Guido Saveri (22349)
 guido@saveri.com
R. Alexander Saveri (173102)
 rick@saveri.com
Geoffrey C. Rushing (126910)
 grushing@saveri.com
Cadio Zirpoli (179108)
 cadio@saveri.com
Matthew D. Heaphy (227224)
 mheaphy@saveri.com
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Lead Counsel for Direct Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-CV-5944-JST |
| | MDL No. 1917 |
| This Document Relates to: | **DECLARATION OF R. ALEXANDER SAVERI IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO THE IRICO DEFENDANTS' AMENDED MOTIONS TO DISMISS CLAIMS OF DIRECT PURCHASER PLAINTIFFS FOR LACK OF SUBJECT MATTER JURISDICTION (FED. R. CIV. P. 12(b)(1)) (ECF Nos. 5410, 5412)** |
| *ALL DIRECT PURCHASER ACTIONS* | |
| | Date: May 30, 2019 |
| | Time: 2:00 p.m. |
| | Judge: Honorable Jon S. Tigar |
| | Courtroom: 9 |

1  I, R. Alexander Saveri, declare:

2       1.     I am the Managing Partner of Saveri & Saveri, Inc., Lead Counsel for Direct

3  Purchaser Plaintiffs ("Plaintiffs") in this action. I am a member of the Bar of the State of California

4  and admitted to practice in the Northern District of California. I make this Declaration in Support

5  of DPPs' Opposition to the Irico Defendants' Amended Motions to Dismiss Claims of Direct

6  Purchaser Plaintiffs for Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)) (ECF Nos.

7  5410, 5412). Except as otherwise stated, I have personal knowledge of the facts stated below.

8       2.     I have been involved in virtually every aspect of this case from its outset in 2007.

9       3.     Attached hereto as Exhibit 1 is a true and correct copy of a document entitled

10  IRICO Group Corporation's Master Plan for Separating Principal and Secondary Businesses,

11  Restructuring and Redistribution, produced in this litigation bearing the Bates stamp IRI-CRT-

12  00002041–105 and a translation thereof. It was marked as Deposition Exhibit No. 8401. The Irico

13  Defendants designated this document "confidential" under the terms of the protective order (ECF

14  No. 306) when they produced it.

15       4.     Attached hereto as Exhibit 2 is a true and correct copy of a document entitled

16  Articles of Caihong Electronics Group Company, produced in this litigation bearing the Bates

17  stamp IRI-CRT-00000779–85 and a translation thereof. It was marked as Deposition Exhibit No.

18  8395. See Zhang Deposition, Day 2 (Exhibit 27 hereto), p. 47. The Irico Defendants designated this

19  document "confidential" under the terms of the protective order (ECF No. 306) when they

20  produced it.

21       5.     Attached hereto as Exhibit 3 is a true and correct copy of a document entitled Irico

22  Display Devices Co., Ltd.'s Announcement of Self-Inspection Report and Rectification Plan

23  Concerning the "Campaign to Strengthen Corporate Governance of the Listed Company," dated

24  August 15, 2007, published by the Shanghai Stock Exchange at

25  http://static.sse.com.cn/disclosure/listedinfo/announcement/c/2007-08-

26  17/600707_20070817_1.pdf, and a translation thereof. It was marked as Deposition Exhibit No.

27  8417. See Wang Deposition, Day 2 (Exhibit 29 hereto), pp. 37-38.

28       6.     Attached hereto as Exhibit 4 is a true and correct copy of a document entitled Irico

1

Defendants' Objections and Responses to Direct Purchaser Plaintiff Studio Spectrum, Inc.'s First Set of Interrogatories, dated May 4, 2018, including the verification of the same, dated May 18, 2018, which I received on May 21, 2018 via email from Stuart Plunkett of Baker Botts L.L.P., counsel for the Irico Defendants. The Irico Defendants designated this document "confidential" under the terms of the protective order (ECF No. 306).

7.      Attached hereto as Exhibit 5 is a true and correct copy of a document entitled IRICO Display Devices Co., Ltd.'s Articles of Association, produced in this litigation bearing the Bates stamp IRI-CRT-00001026–67 and a translation thereof. It was marked as Deposition Exhibit No. 8416. See Wang Deposition, Day 2 (Exhibit 29 hereto), pp. 28-29.

8.      Attached hereto as Exhibit 6 is a true and correct copy of a document entitled Companies Law of the People's Republic of China, dated October 27, 2005, published by the China Securities Regulatory Commission at http://www.csrc.gov.cn/pub/csrc_en/laws/rfdm/statelaws/200904/t20090428_102712.html (English) and http://www.csrc.gov.cn/pub/newsite/flb/flfg/flxzsf/201312/t20131205_239324.html (Chinese). It was marked as Deposition Exhibit No. 8414. See Wang Deposition, Day 2 (Exhibit 29 hereto), p. 17.

9.      Attached hereto as Exhibit 7 is a true and correct copy of a document entitled Code of Corporate Governance for Listed Companies, dated January 7, 2002, published by the China Securities Regulatory Commission at http://www.csrc.gov.cn/pub/csrc_en/laws/rfdm/DepartmentRules/201804/P020180427400732459560.pdf (English) and http://www.csrc.gov.cn/pub/newsite/flb/flfg/bmgf/ssgs/gszl/201012/t20101231_189703.html (Chinese). It was marked as Deposition Exhibit No. 8415. See Wang Deposition, Day 2 (Exhibit 29 hereto), pp. 23-24.

10.     Attached hereto as Exhibit 8 is a true and correct copy of a document entitled Irico Defendants' Objections to Plaintiffs' Notice of Deposition Pursuant to Fed. R. Civ. P. 30(b)(6), dated February 13, 2019 and served on this office via email on February 13, 2019.

11.     Attached hereto as Exhibit 9 is a true and correct copy of an email I received on

February 25, 2019, from Tom Carter of Baker Botts L.L.P., counsel for the Irico Defendants.

12. Attached hereto as Exhibit 10 is a true and correct copy of a document entitled Irico Display Devices Co., Ltd. Independent Directors System, dated August 28, 2007, and a translation thereof, published by the Shanghai Stock Exchange at http://www.sse.com.cn/disclosure/listedinfo/announcement/c/2007-08-30/600707_20070830_3.pdf.

13. Attached hereto as Exhibit 11 is a true and correct copy of a document entitled Irico Display Devices Co., Ltd. Work Rules of Nominating Committee of Board of Directors, dated August 28, 2007, and a translation thereof, published by the Shanghai Stock Exchange at http://www.sse.com.cn/disclosure/listedinfo/announcement/c/2007-08-30/600707_20070830_2.pdf.

14. Exhibit 2 to the Plunkett Declaration (ECF No. 5312-5), a document produced in this litigation bearing the Bates stamp IRI-CRT-00000232–321 and a translation thereof, was marked as Deposition Exhibit No. 8418. See Wang Deposition, Day 2 (Exhibit 29 hereto), pp. 43-44. Plaintiffs refer to this document in their Opposition as Exhibit 2 to the Amended Plunkett Declaration (ECF No. 5413-1).

15. Attached hereto as Exhibit 12 is a true and correct copy of a document entitled China National Electronics Import and Export Caihong Co.'s Certificate of Account Transfer for Exported Goods, produced in this litigation bearing the Bates stamp IRI-CRT-00003578–79 and a translation of IRI-CRT-00003578. It was marked as Deposition Exhibit No. 8408. See Wang Deposition, Day 1 (Exhibit 28 hereto), pp. 97-99. The Irico Defendants designated this document "confidential" under the terms of the protective order (ECF No. 306) when they produced it.

16. Exhibit 49 to the Plunkett Declaration (ECF No. 5313-12), a document produced in this litigation bearing the Bates stamp IRI-CRT-00000956–1010 and a translation thereof, was marked as Deposition Exhibit No. 8394. See Zhang deposition, Day 2 (Exhibit 27 hereto), pp. 31-32. In their Opposition, Plaintiffs refer to this document as Exhibit 49 to the Amended Plunkett Declaration (ECF No. 5413-8).

17. Attached hereto as Exhibit 13 is a true and correct copy of a document entitled

Purchase and Sale Contract for Industrial Mining Products, produced in this litigation bearing the Bates stamp IRI-CRT-00003732 and a translation thereof. The Irico Defendants designated this document "confidential" under the terms of the protective order (ECF No. 306) when they produced it.

18.     Attached hereto as Exhibit 14 is a true and correct copy of a document entitled Purchase and Sales Contract for Industrial and Mineral Products, produced in this litigation bearing the Bates stamp IRI-CRT-00001154 and a translation thereof.

19.     Attached hereto as Exhibit 15 is a true and correct copy of excerpts of a native file produced in this litigation bearing the Bates stamp IRI-CRT-00003546 and a translation thereof. The Irico Defendants designated this document "confidential" under the terms of the protective order (ECF No. 306) when they produced it. It was marked as Deposition Exhibit No. 8413. This exhibit is further discussed in the Hwu declaration, filed herewith.

20.     Attached hereto as Exhibit 16 is a true and correct copy of a document entitled China National Electronics Import and Export Caihong Co.'s Certificate of Account Transfer for Exported Goods, produced in this litigation bearing the Bates stamp IRI-CRT-00003568–69 and a translation of IRI-CRT-00003568. The Irico Defendants designated this document "confidential" under the terms of the protective order (ECF No. 306) when they produced it. It was marked as Deposition Exhibit No. 8404. See Wang deposition, Day 1 (Exhibit 28 hereto), pp. 88-89.

21.     Attached hereto as Exhibit 17 is a true and correct copy of a document entitled China National Electronics Import and Export Caihong Co.'s Certificate of Account Transfer for Exported Goods, produced in this litigation bearing the Bates stamp IRI-CRT-00003576–77 and a translation of IRI-CRT-00003576. The Irico Defendants designated this document "confidential" under the terms of the protective order (ECF No. 306).  It was marked as Deposition Exhibit No. 8407. See Wang deposition, Day 1 (Exhibit 28 hereto), pp. 94-95.

22.     Attached hereto as Exhibit 18 is a true and correct copy of a document entitled Caihong Electronics Group Company Certificate of Account Transfer, produced in this litigation bearing the Bates stamp IRI-CRT-00003574 and a translation thereof. The Irico Defendants designated this document "confidential" under the terms of the protective order (ECF No. 306).

4

23.     Attached hereto as Exhibit 19 is a true and correct copy of a document entitled Articles of Incorporation of Irico (USA) Inc., produced in this litigation bearing the Bates stamp IRI-CRT-00003513. The Irico Defendants designated this document "confidential" under the terms of the protective order (ECF No. 306).  This document bears the stamp, dated July 5, 1995, of the California Secretary of State. It is published by the California Secretary of State at https://businesssearch.sos.ca.gov/Document/RetrievePDF?Id=01898795-4492288.

24.     Attached hereto as Exhibit 20 is a true and correct copy of a document entitled IRICO Group Corporation's Auditing Department Document, produced in this litigation bearing the Bates stamp IRI-CRT-00003490–97 and a translation thereof. The Irico Defendants designated this document "confidential" under the terms of the protective order (ECF No. 306). It was marked as Deposition Exhibit No. 8392. See Zhang Deposition, Day 1 (Exhibit 26 hereto), pp. 50-52.

25.     Attached hereto as Exhibit 21 is a true and correct copy of a document produced in this litigation bearing the Bates stamp IRI-CRT-00003498–99 and a translation thereof. The Irico Defendants designated this document "confidential" under the terms of the protective order (ECF No. 306). It was marked as Deposition Exhibit No. 8393. See Zhang Deposition, Day 1 (Exhibit 26 hereto), pp. 57-58.

26.     Attached hereto as Exhibit 22 is a true and correct copy of a document produced in this litigation bearing the Bates stamp IRI-CRT-00003566–67 and a translation of IRI-CRT-00003566. The Irico Defendants designated this document "confidential" under the terms of the protective order (ECF No. 306). It was marked as Deposition Exhibit No. 8405. See Wang Deposition, Day 1 (Exhibit 28 hereto), pp. 90-91.

27.     Attached hereto as Exhibit 23 is a true and correct copy of the English version of the Decree of the State Council of the People's Republic of China No. 378, the Interim Regulations on Supervision and Management of State-owned Assets of Enterprises, dated May 27, 2003, published by the State-owned Assets Supervision and Administration Commission of the State Council at http://en.sasac.gov.cn/2003/11/24/c_118.htm. I am informed and believe that it is the same document was referenced in footnote 2 of Display's Motion to Dismiss, the link to which did not function at the time I prepared my declaration.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28.     Attached hereto as Exhibit 24 is a true and correct copy of Irico Group Electronics Co., Ltd.'s Announcement Relating to Very Substantial Disposal and Connected Transactions and Very Substantial Acquisition and Connected Transactions Involving: (A) Initial Capital Injection Transactions Comprising: (1) The First Capital Injection Into Irico Glass by A Share Company; (2) The First Capital Injection Into Irico (Zhangjiagang) and Irico (Hefei) by Irico Glass; (B) A Share Issue and Related Transactions Comprising: (1) The Issue of New A Shares by A Share Company; (2) The Second Capital Injection Into Irico Glass by A Share Company; and (3) The Second Capital Injection Into Irico (Zhangjiagang) and Irico (Hefei) by Irico Glass and Resumption of Trading, dated September 18, 2009, published by Hong Kong Exchanges and Clearing Limited at http://www3.hkexnews.hk/listedco/listconews/SEHK/2009/0920/LTN20090920007.pdf.

29.     Attached hereto as Exhibit 25 is a true and correct copy of excerpts of Irico Group Electronics Co., Ltd.'s 2005 Annual Report, dated April 24, 2006, published by Irico Group Electronics (now known as Irico Group New Energy Co. Ltd.) at http://www.irico.com.cn/en/wp-content/uploads/2006/05/LTN20050504421.pdf. It was marked as Deposition Exhibit No. 8402.

30.     Attached hereto as Exhibit 26 is a true and correct copy of excerpts of the transcript of the first day of the deposition of Zhang Wenkai on March 4, 2019. ("Zhang Dep. (Day 1)") The Irico Defendants have designated this transcript "highly confidential" under the terms of the protective order (ECF No. 306).

31.     Attached hereto as Exhibit 27 is a true and correct copy of excerpts of the transcript of the second day of the deposition of Zhang Wenkai on March 5, 2019. ("Zhang Dep. (Day 2)") The Irico Defendants have designated this transcript "highly confidential" under the terms of the protective order (ECF No. 306).

32.     Attached hereto as Exhibit 28 is a true and correct copy of excerpts of the transcript of the first day of the deposition of Wang Zhaojie on March 6, 2019. ("Wang Dep. (Day 1)") The Irico Defendants have designated this transcript "highly confidential" under the terms of the protective order (ECF No. 306).

33.     Attached hereto as Exhibit 29 is a true and correct copy of excerpts of the transcript of the second day of the deposition of Wang Zhaojie on March 7, 2019. ("Wang Dep. (Day 2)")

The Irico Defendants have designated this transcript "highly confidential" under the terms of the protective order (ECF No. 306).

34.     Attached hereto as Exhibit 30 is a true and correct copy of excerpts of the transcript of the third day of the deposition of Wang Zhaojie on March 8, 2019. ("Wang Dep. (Day 3)") The Irico Defendants have designated this transcript "highly confidential" under the terms of the protective order (ECF No. 306).

35.     Attached hereto as Exhibit 31 is a true and correct copy of excerpts of the transcript of the deposition of Donald Clarke on March 26, 2019. ("Clarke Dep.") As of today, the Irico Defendants have not designated this transcript "highly confidential" under the terms of the protective order (ECF No. 306), however, time remains for them to do so.

36.     Attached hereto as Exhibit 32 is a true and correct copy of a letter I received on September 14, 2018, from Stuart Plunkett of Baker Botts L.L.P., counsel for the Irico Defendants.

37.     Attached hereto as Exhibit 33 is a true and correct copy of an email I received on October 15, 2018, from Reilly Stoler of Baker Botts L.L.P., counsel for the Irico Defendants.

38.     Attached hereto as Exhibit 34 is a true and correct copy of a letter I received on February 6, 2019, from Stuart Plunkett of Baker Botts L.L.P., counsel for the Irico Defendants.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of April, 2019 in San Francisco, California.

*/s/ R. Alexander Saveri*
R. Alexander Saveri

# EXHIBIT 1



STATE of NEW YORK        )
                         )                    ss:
COUNTY of NEW YORK       )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"IRI-CRT-00002041 – IRI-CRT-0002105"*, originally written in *Chinese,* is to the best of our knowledge and belief, a true, accurate and complete translation into *English.*

Dated: December 17, 2018

Seth Wargo
Consortra Translations

Sworn to and signed before ME this
____ day of _Dece ubes_,
2018.

Notary Public

JAMES G MAMERA
Notary Public - State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires Dec. 4, 2022

Your
legal
translation
partner

New York, NY  |  Washington, DC  |  Houston, TX  |  San Francisco, CA
Hong Kong

D☐P☐ Exhibit 8401
Deponent ZWang
Date 3/6/15 Rptr BW

**IRICO Group Corporation**

**Master Plan for Separating Principal and Secondary Businesses, Restructuring and Redistribution**

**Content**

**Part 1: Basic status of IRICO Group Corporation**

I.  **Brief introduction of IRICO Group Corporation**

(1) History..................................................................................................................................................................(1)

(2) Assets and operation................................................................................................................................................(1)

(3) Employees.............................................................................................................................................................(1)

(4) Investment structure and backbone enterprises...........................................................................................................(1)

II.  **Development of principal business of IRICO Group Corporation**

(I)  IRICO Group Corporation's exploration and practice in promoting principal business, downsizing main establishment and increasing competitiveness of principal business

1. Measures and main practices adopted...........................................................................................................................(2)

2. Achievements attained..............................................................................................................................................(3)

(II) Basic information of policies on redistributing employees, downsizing for higher efficiency and placing redundant employees

1. Main measures and main practices adopted...................................................................................................................(4)

2. Achievements attained..............................................................................................................................................(4)

(III) Main problems faced by IRICO Group Corporation in principal business development.......................................................(4)

(IV) Problems in redistributing and replacing redundant employees......................................................................................(6)

(V) IRICO Group Corporation's ideas and targets for downsizing main establishment and increasing competitiveness of principal business planning

1. Ideas of reformation and development of principal business.............................................................................................(6)

2. Target of planning...................................................................................................................................................(7)

1

**Part 2: General status of IRICO Group Corporation Plan for Separating Principal and Secondary businesses, Restructuring and Redistribution**

**Section I Separating Principal and Secondary Businesses**

I.   **Basis for separating principal and secondary businesses and their respective scopes**

(I) Basis for separating principal and secondary businesses................................................................................................(8)

(II) Basic scopes of principal and secondary businesses.....................................................................................................(8)

1. Basic scope of principal business......................................................................................................................................(9)

2. Basic scope of secondary business....................................................................................................................................(9)

(III) Specific scopes of principal and secondary businesses

1. Specific scopes of principal business..............................................................................................................................(10)

(1) Products of principal business.......................................................................................................................................(10)

(2) Companies for principal business...................................................................................................................................(10)

2. Specific scopes of secondary business

(1) Social-function companies..............................................................................................................................................(11)

(2) Operational entities which provide logistics services...................................................................................................(11)

(3) Supporting production companies..................................................................................................................................(11)

(4) Functional entities with outsourcing conditions..........................................................................................................(11)

(5) Companies the Group Corporation invests in with little relation to principal business.............................................(11)

II.  **Main ways to implement separation of principal and secondary businesses**

(I) Ways to implement separation of principal and secondary businesses........................................................................(12)

(II) Restructuring and redistribution are the main ways to implement separation of principal and secondary businesses................................................................................................................................................................................(13)


**Section II Restructuring and Redistribution**

I.   **General concept of restructuring and redistribution**

(I) General concept...............................................................................................................................................................(14)

(II) Targets...........................................................................................................................................................................(15)

II.  **Three types of assets available for restructuring and redistribution**

1. Definitions and scope of the three types of assets..........................................................................................................(15)

2

2. General situations of the three types of assets.................................................................................(16)

(1) Main products and services involved in three types of assets.....................................................(16)

(2) Use and efficiency of the three types of assets...........................................................................(16)

(3) Total amount of the three types of assets and their percentages in total assets...........................(16)

**III. Employees involved in the restructuring and redistribution**

1. Overview.......................................................................................................................................(16)

2. Social security.............................................................................................................................(16)

3. Debts to employees.......................................................................................................................(17)

**IV. Principle for restructuring and redistribution..........................................................................(17)**

**V. Main forms of restructuring and redistribution and offer of shareholdings**

(1) Forms of restructuring and redistribution....................................................................................(18)

(2) Shareholdings offered in restructured and redistributed companies and companies with principal and secondary

businesses separated.........................................................................................................................(18)

**VI. Ways to handle assets and liabilities of restructured and redistributed companies**

(I) Basic principles...........................................................................................................................(19)

(II) Ways to handle assets and liabilities..........................................................................................(19)

l. Handling of assets..........................................................................................................................(19)

(1) Scope of assets and basic handling process.................................................................................(19)

(2) Ways of assets disposal and content............................................................................................(20)

(3) Ways to handle bad assets and idle assets...................................................................................(21)

(4) Ways to handle non-operational type assets................................................................................(21)

2. Handling of creditors' rights and liabilities..................................................................................(21)

(1) Principle for handling creditors' rights and liabilities..................................................................(21)

(2) Ways to determine creditors' rights and liabilities.......................................................................(22)

**VII. Handling of restructured companies' right of land use...........................................................(22)**

**VIII. Methods to redistribute and replace employees**

(I) Principle for redistributing and replacing employees....................................................................(23)

(II) Definition of the scope of employees to be redistributed and replaced........................................(23)

(III) Ways to redistribute and replace employees..............................................................................(24)

CONFIDENTIAL                                        IRI-CRT-00002043 - Translation

(IV) Handling of various labor relationships in the processes of redistribution and replacement..............................................(24)

1. Employees redistributed to restructured companies..............................................................................................(25)

2. Internally retired employees..............................................................................................(25)

3. Employees seeking own employment..............................................................................................(25)

4. Employees who lose working capacity due to injuries at work (including occupational diseases)........................................(26)

5. Employees who are sick or injured not at work..............................................................................................(26)

6. Handling of several abnormal labor relationships..............................................................................................(26)

7. Employees whose employment contracts expire during the restructuring process........................................................(27)

(V) Handling of social security relationships..............................................................................................(27)

(VI) Expenses related to replacement of employees..............................................................................................(28)

(VII) Support and incentive measures for the tasks of redistributing and replacing employees................................................(29)

IX. Total amount of financial compensations, their sources and payment..............................................................(29)

X.   How to deal with several issues encountered during the processes of redistribution and replacement

1. Related transactions..............................................................................................(30)

2. Policies in support of restructured and redistributed companies..............................................................................................(30)

Section 3: Basic statuses of restructured and redistributed entities and restructuring plans (or restructuring ideas)

I.   List of entities to be included in the scope of restructuring and redistribution, and their respective basis statuses (See Attachment 3)

II.   Restructuring and redistribution plans for the first batch of pilot entities for implementation of restructuring and redistribution (4 entities)

1. Restructuring and redistribution plans for IRICO Construction Engineering Company..............................................(31)

2. Restructuring and redistribution plans for Shenzhen IRICO Electronics Company..............................................(33)

3. Restructuring and redistribution plans for China Electronic Device Industrial Corporation........................................(36)

4. Restructuring and redistribution plans for Caihong Import & Export Company..............................................(38)

III. Preliminary restructuring plans or ideas for other entities to be restructured and redistributed

1. Preliminary restructuring plan for IRICO Electronics Screen Plant..............................................(41)

2. Restructuring ideas for Shaanxi IRICO Fluorescent Material Co., Ltd...........................................(42)

3. Restructuring ideas for Xianyang Caiqin Electronics Device Co., Ltd..............................................(42)

4

CONFIDENTIAL                           IRI-CRT-00002044 - Translation

4. Preliminary restructuring plan for IRICO Materials Company.................................................................................(42)

5. Preliminary restructuring plan for IRICO Sales Company......................................................................................(43)

6. Restructuring ideas for IRICO Three Productions Corporation...............................................................................(43)

7. Restructuring ideas for IRICO Labor Services Company........................................................................................(43)

8. General restructuring ideas for entities under Three Productions Corporation and Labor Services Company............(44)

9. Restructuring ideas for IRICO Advertising Company.............................................................................................(44)

10. Restructuring ideas for IRICO Decoration Company............................................................................................(44)

11. Disposal ideas for Haikou IRICO Hot Spring Hotel..............................................................................................(44)

12. Disposal ideas for Xi'an IRICO Electrical Appliance Co., Ltd..............................................................................(45)

13. Redistribution ideas for IRICO School.................................................................................................................(45)

14. Restructuring and redistribution ideas for IRICO Hospital....................................................................................(46)

15. Restructuring and redistribution ideas for training centers (including IRICO Vocational University, IRICO Technical
Secondary School and IRICO Technical School).......................................................................................................(46)

### Section 4: Organization and Implementation of Separating Principal and Secondary Businesses, Restructuring and Redistribution

**I.   IRICO Group Corporation's work principles and key measures for implementing separation of principal and secondary businesses, restructuring and redistribution**

(I) Work principles for separating principal and secondary businesses, restructuring and redistribution...................(47)

(II) Key measures for separating principal and secondary businesses, restructuring and redistribution....................(47)

**II.   Organization and implementation of separating principal and secondary businesses, restructuring and redistribution in IRICO Group Corporation**

(I) Bodies for organizing and implementing separation of principal and secondary businesses, restructuring and
redistribution in the Group Corporation...................................................................................................................(48)

(II) Decision-making process for implementing separation of principal and secondary businesses, restructuring
and redistribution in the Group Corporation..............................................................................................................(48)

(III) Implementation process for separation of principal and secondary businesses, restructuring and redistribution in the
Group Corporation..................................................................................................................................................(49)

(IV) Operation standard for separation of principal and secondary businesses, restructuring and redistribution in the
Group Corporation..................................................................................................................................................(50)

**Attachments:**

Attachment 1.      Organizational structure chart of IRICO Group Corporation

Attachment 2.      Strategies for development of IRICO Group Corporation (Summary)

Attachment 3.      Entities participating in restructuring and redistribution and their basic statuses

Attachment 4.      Resolutions on master plans for separating principal and secondary businesses, restructuring and
redistribution submitted by the Offices of General Manager of IRICO Group Corporation

Attachment 5.      Beijing Dentons Law Offices, LLP's legal opinions on IRICO Group Corporation's master plans for
separating principal and secondary businesses, restructuring and redistribution

CONFIDENTIAL

IRI-CRT-00002045 - Translation

IRICO Group Corporation

Master Plan for Separating Principal and Secondary businesses, Restructuring and Redistribution

Section 1: Basic status of IRICO Group Corporation

I.      Brief introduction of IRICO Group Corporation

(I) History

IRICO Group Corporation is a unique super-large state-owned sole proprietorship approved by the State Council and is directly managed by the State-owned Assets Supervision and Administration Commission of the State Council. IRICO Group Corporation was reorganized on the basis of the former IRICO Electronics Group, whose predecessor was the Shaanxi CRT Head Manufacturing Plant, which was a key project incorporated in the 6th Five-Year Plan and the place where China's first CRT was manufactured.

(II) Assets and operation of the Group Corporation

1. Assets

As of 31 December 2002, IRICO Group Corporation's audited assets were RMB7,643,448,360.88 with total liabilities in amount of RMB3,569,855,181.88 and owner's equity in amount of RMB3,183,341,699.29.

2. Operation

CRT is the principal business of IRICO Group Corporation with annual CRT production capacity of nearly 10 million units. The Company has manufactured 78,530,000 CRT units from the date of production since its establishment with accumulated revenue from product sale in amount of RMB64.3 billion, realizing profit and tax in amount of RMB8.128 billion and earning foreign currencies in amount of RMB0.94 billion from exports.

(III) Employees

Currently, IRICO Group Corporation has 21410 employees of whom 10800 have full-time capacity (i.e. permanent employees or known as permanent employees) and more than 10000 are employed on short-term contracts. There are 1110 managers of various fields and 1579 engineering technicians of various disciplines.

(IV) Investment structure and backbone enterprises

Currently, IRICO Group Corporation has more than 20 wholly-owned subsidiaries, holding

6

IRI-CRT-00002046 - Translation

companies and stake-participating companies (See Attachment 1: Organizational structure chart of IRICO Group Corporation for details), of which IRICO CRT Head Plant and IRICO Display Device Company Limited (a listed company) are the main backbone companies of IRICO Group Corporation.

### IRICO CRT Head Plant

IRICO CRT Head Plant is a company wholly-owned by the people established in 1979 with approval from the Shaanxi Administration for Industry & Commerce, and is a wholly-owned subsidiary of IRICO Group Corporation. Ten non-legal person entities, including the CRT Plant No. 1 under the Head Plant, are set up for independent internal auditing. The financial statements of the said entities are incorporated into the Head Plant's financial statements.

As of 31 December 2002, its total assets was RMB3,888,437,572.68 with liabilities in amount of RMB2,111,671,712.81 and owner's equity in amount of RMB1,776,765,859.87.

### IRICO Display Device Company Limited

IRICO Display Device Company Limited was established on 29 July 1992, the Company listed its shares on the Shanghai Stock Exchange on 20 May 1996. Currently, IRICO Group Corporation holds 56.14% stakes in IRICO Display Device Company Limited.

The Company's primary products include 64cmFS and 54cmFS ordinary display device and 64cmPF ~ 74cmPF flat CRT. It mainly engages in the research & development, production and operation of CRT.

As at 31 December 2002, the Company's total assets was RMB2,401,187,451.43, with total liabilities in amount of RMB740,126,713.15, and owners' equity in amount of RMB1,661,060,738.28.

**II.      Development of principal business of IRICO Group Corporation**

**(I) IRICO Group Corporation's exploration and practice in promoting principal business, downsizing main establishment and increasing competitiveness of principal business**

#### 1. Measures and main practices adopted

(I) IRICO set up the Three Productions Department in 1993 and established the IRICO Three Productions Corporation in 1994 by further restructuring it into an independent corporate legal person. Some supporting systems for the principal business were separated from functions of the logistics services entities, this is the main way and form through which IRICO Group Corporation separates the principal and secondary businesses and replace redundant employee in recent years.

(2) In 1998, the television plant in Inner Mongolia was returned to the original place. The 6 entities in Beijing were separated so as to totally disconnect asset and management from IRICO. The businesses of these entities are not closely associated with IRICO Group Corporation's principal business. The separation is advantageous for promotion of the principal business and downsizing main establishment.

CONFIDENTIAL                                                                                           IRI-CRT-00002047 - Translation

(3) In 1999, IRICO Display Device Company Limited acquired and merged CRT Plant No. 2. This has achieved economies of scale and further increase competitiveness of the principal business.

(4) In 2002, the fluorescent powder plant and deflection yoke plant were sold to Xi'an IRICO Fluorescent Material Co., Ltd and Xi'an Information Company. The scale was expanded and capacity to compete in the market was increased as a result.

(5) In 2002, the internal market mock plan and internal price settlement methods were implemented and succeeded in strengthening market awareness of all production entities.

(6) In 1992, the skill-based wage system was implemented with continuous improvement made. Not only did it save costs of human resources, but it also paved the way to intensify three system reformations for the principal business.

(7) Efforts were made to develop new display models as a way to solve the issues regarding the Group Corporation's subsequent development, such as producing the organic EL jointly with related scientific research institutions and pilot production of PDP products, etc.

(8) Greater efforts were made in scientific research institutes and employee development and more investments were made in the Group Corporation's technical centers. On one hand, these have increased the capacity to closely trace development of components of new CRT model; on the other hand, existing techniques were transformed through a series of technical transformation and technical measures making contributions to exploration of potentials of the principal business and increase efficiency.

In response to needs arising from competition, IRICO Group Corporation restructured the production elements, promoted shifting of internal mechanisms and strengthened R&D capacity through the said measures to progressively know the path of the principal business development and strengthen its competitiveness.

**2. Achievements attained**

Implementation of the said measures and practices brought remarkable achievements. All economic indicators of IRICO showed stable growth. In 2002, the CRT output of 9.6 million units set historical record. The glass shell output was 16.51 million units, electronic gun output was 10.38 million units, deflecting coil output was 10.60 million units, fluorescent powder output was 360 tonnes and shadow mask output was 4.89 million units. In 2002, the Company earned sales income of RMB7.1 billion representing 20.21% growth year-on-year. The total industrial output was RMB12.23 billion representing 34% growth year-on-year. Industrial added value of RMB2.58 billion was fulfilled representing 15.8% growth year-on-year. Profit tax of RMB0.87 billion was realized representing 31.8% growth year-on-year. In 2002, total profit of RMB 455,873,145.97 was realized representing 58% growth year-on-year. Foreign currency in amount of USD0.134 billion was realized through exports representing 30% growth year-on-year.

**(II) Basic information of policies on redistributing employees, downsizing for higher efficiency and replacing redundant employees**

8

**1. Main measures and main practices adopted**

(1) To realize downsizing for higher efficiency through skill improvement measures.

(2) To actively attract social capitals and foreign investments leveraging advantaged resources and products. Joint ventures were set up besides participating in setting up independent legal person entities including Xi'an IRICO Information Co., Ltd, Xianyang IRICO Electronic Components Co. Ltd, Shaanxi IRICO Fluorescent Material Co., Ltd and Xianyang Caiqin Electronics Device Co., Ltd. which absorbed a large number of redundant employees.

(3) The Three Productions Corporation was established to which logistics services, social services, properties and training departments were transferred for replacing redistributed employees of the principal business. This has promoted independent auditing of the said departments, turning services to business operations, and marketize progressively with great success achieved. In the last 9 years, more than 1500 redundant employees from the principal business have been placed to the Three Productions Corporation.

(4) To make use of related policies of Shaanxi province and Xi'an city to redistribute and replace employees of Xi'an IRICO Electrical Appliance Co., Ltd. More than 400 employees have been redistributed and replaced to date.

(5) The companies under the Group Corporation increase labor productivity rate and enhance efficiency through reducing number of employees by exploring their own potentials, transformation and downsizing.

(6) To redistribute and replace employees according to national policies on internal retirement. As of 31 December 2003, more than 200 employees of the Group Corporation have internally retired.

(7) The IRICO Group Corporation and its subsidiary entities step up management and have terminated employment contracts pursuant to the law with a few employees who severely breached the employment contracts. More than 400 employees have been dismissed from late 1995 until now.

**2. Achievements attained**

Through said measures, IRICO Group Corporation has placed more than 4000 redundant employees designated for redistribution, representing 20% of the total employees of the Group Corporation. This contributed to downsizing of the Group Corporation's main establishment and serves as an effective cushion for further separation of the principle and secondary businesses. When the IRICO Group Corporation first established the plant, annual CRT output was approximately 960000 units with approximately 6000 employees. Currently, the IRICO Group Corporation has annual CRT output as high as 10 million units with only 13000 employees engage in the manufacture of CRT. This reflects a significant increase in the Group Corporation's labor productivity rate.

**(III) Main problems faced by IRICO Group Corporation in principal business development**

**1. State-owned sole proprietorship of IRICO Group Corporation poses serious restrictions on continuous development of the principal business**

CONFIDENTIAL                                          IRI-CRT-00002049 - Translation

Data from 2002 shows that there were 9 foreign-invested companies or joint ventures engaging in the manufacture of CRT in China with another two domestic joint-stock enterprises; IRICO Group Corporation was the only state-owned enterprise. In the face of intensive competition, the impact of ownership system is growing, making IRICO Group Corporation lag behind its competitors due to its structure alone.

**2. Strategic management function of IRICO Group Corporation is yet to play its role.**

This is manifested in prolonged absence of clear strategic positioning and development plans with significant poor market research and development capacities. No market-oriented operation management system has been developed by now and the management model is mostly the old model adopted for plant management. All production entities of the principal business attach weight to production management paying little attention to business management. Many operators concentrate on business affairs and the parent-subsidiary management system with property rights as the link is yet to be formulated, etc.

**3. Unreasonable human resource composition with serious shortage of senior management and operation talents; generally high wage costs; intensification of labor, personnel and allocation system reform is highly needed.**

Currently, the Group Corporation human resource composition is unreasonable. There is sufficient production management and engineering technicians but serious shortage of senior management and operation talents, especially those in information management, international sales, capital operation and risk control. In the meantime, leadership team of the IRICO Group Corporation is unable to meet the needs of further development and expansion in terms of ideologies, concepts, comprehensive quality and knowledge structure.

Employees remain hired once they are employed with only upward but no downward adjustments to their salaries. The high income of non-marketization greatly increases IRICO Group Corporation's management and labor costs, thus indirectly weakening its competitiveness.

The existence of the said issues is closely associated with ineffective personnel, labor and allocation systems of the Group Corporation, and it is only through continuous intensification of reform to these three systems that these issues can be genuinely solved.

**4. Failure to concentrate on principal business and heavy establishment form heavy burden to the company.**

IRICO Group Corporation's scope of operation is too broad due to reasons including the absence of clear corporate development strategies and failure to concentrate on principal business. Besides, the companies which engage in the principal and secondary businesses have heavy social burden – a problem which has not been eradicated.

In conclusion, the said issues regarding ownership system, management, internal mechanisms, human resource and lack of clear-cut boundary between principal and secondary businesses and heavy social burden are all factors which restrict development of IRICO Group Corporation's principal business. Of them, ownership system, human resource and lack of clear-cut boundary between principal and secondary businesses are issues which pose the greatest restrictions on development of the principal business so priority should be given to solve them.

10

CONFIDENTIAL                                              IRI-CRT-00002050 - Translation

#### (IV) Problems in redistributing and replacing redundant employees

In redistributing and replacing redundant employees who engage in the principal business, IRICO Group Corporation is still facing some special problems which affect the continuation of such task to a considerable extent. This is mainly manifested as follows:

##### 1. Restrictions of the overall socio-economic environment

Xianyang, where IRICO Group Corporation's main enterprise and great majority of the employees are situated, lies in the western part of China where socio-economic development is backward with relatively low societal demand for labor resources, limited market capacity and relatively high rate of unemployment. Therefore, the redistribution and replacement of redundant employees and downsizing for greater efficiency is met with great difficulties.

##### 2. Conservative mind of employees

Being relatively closed and detached for decades, the Company has become a relatively closed and detached industrial city where the employees are relatively traditional-minded and poor in adapting to economic evolution. Such conservation ideology forms a great hurdle to reforms;

##### 3. Restraints imposed by old modes of redistribution and replacement of redundant employees

The old model failed to simultaneously establish correspondingly sound employment contract system when redistributing and replacing redundant employees. Most of the redistributed and replaced employees still stay in the IRICO Group Corporation or Head Plant and are put under management through a model identical with the old model for management of permanent employees. As a result: labor relationship and capacities of employees remain unchanged, and no changes took place in the employees' concept of employment. The separation is only nominal and the Company has not been genuinely released from its unlimited joint liabilities.

In addition, the entities which accept the redundant employees from principal business failed to establish sound legal person governance structure, no change took place in property rights relationship and superior-subordinate relationship at all, thus limiting development of these entities.

Under such circumstances, clear-cut and standard property rights relationship and superior-subordinate relationship can hardly be achieved.

#### (V) IRICO Group Corporation's ideas and targets for downsizing main establishment and increasing competitiveness of principal business

The IRICO Group Corporation's specific idea or plan for downsizing main establishment and increasing competitiveness of principal business are as follows:

##### 1. Ideology of reformation and development of principal business

(1) To continue with intensifying reform of property rights and implement standard corporate transformation to the principal business.

(2) To improve mid- and long-term development strategies of IRICO Group Corporation.

CONFIDENTIAL                    IRI-CRT-00002051 - Translation

(3) To determine positioning and functions of the Group Corporation, and formulate and improve parent-subsidiary management system.

(4) To shift IRICO Group Corporation's basic governance system of principal business from production management to operation management and strategy management.

(5) To pursue low-cost development by applying the strategy of overall cost leadership to traditional industry and products.

(6) To apply related diversification strategies in new-type display devices, strengthen scientific research and development capacities, increase the ability to track new products and new technologies in new-type display device so as to support the Group Corporation's structural adjustments in the industry and products.

(7) To optimize the existing internal organizational structure and functions, and reform the personnel, labor and allocation systems on such basis.

(8) To continue with development of corporate cultural system including corporate leadership culture.

(9) To separate social functions from corporate offices and separate principal and secondary businesses to ease the principal business's burden.

In conclusion, **IRICO Group Corporation's overall idea for development is: To develop core competitiveness based on overall-cost leadership under guidance of accurate development strategies and bring into play the Group Corporation's strategic management function for comprehensive restructuring and transformation of the Group Corporation's property rights system, management system, internal mechanisms and corporate culture, etc. and strengthen competitiveness of principal business; separate principal and secondary businesses and clarify principal business to ease the burden. In the meantime, step up transformation and innovation of existing products through scientific research besides optimizing product mix, and prepare the Group Corporation for timely entrance into the field of new-type display device and fulfil structural adjustments of the industry.**

2. Target of planning

The eventual target is: By 2010, not only shall the Group Corporation enjoy remarkable advantage in the traditional CPT field but it also leads in the traditional CRT industry; it shall also boast product R&D capacities or the capacity for joint production with multinational companies and become the display manufacturer and R&D base with diversified products offered, large-scale operation, modern management and ability to compete internationally as a world-renowned group corporation to lay solid foundation for attaining the vision of 'hundred-year IRICO'.

### Section II: General status of IRICO Group Corporation Plan for Separating Principal and Secondary Businesses, Restructuring and Redistribution

### Section I Separating Principal and Secondary Businesses

**I. Basis for separating principal and secondary businesses and their respective scopes**

12

(I) Basis for separating principal and secondary businesses

**1. The corporate strategic positioning and development plans formulated by the IRICO Group Corporation in 2003 are the most important and most basic foundation for determining the line separating principal and secondary businesses**

(1) IRICO Group Corporation's strategic position and development planning

I. Industry and product positioning

IRICO Group Corporation's industry and product positioning is the existing CPT product field.

2. IRICO Group Corporation's development strategies

(1) Development strategies and mid- and long-term planning

IRICO Group Corporation's overall development strategies are: To carry out the basic competitive strategy of overall cost leadership in the field of traditional CPT products for developing lowest-cost core competitiveness and laying the foundation for fulfilling large-scale operation so as to turn IRICO Group Corporation into the leader in the respective product field with the lowest overall cost and strongest competitiveness.

Besides preparing for development in the traditional CPT products, related diversified operation strategies shall also be implemented for making new-type display device as the new financial growth point and foster it as the second pillar industry. Taking into consideration that IRICO Group Corporation is not positioned to enter the new-type display device industry now, tracking strategies will be adopted actively for progressive entrance into the realm. Such strategies will be implemented in two main ways: First, to closely monitor and study new technology and new product trends in the realm of new-type display device so timely debut can be made in large scale; second, to have strategic cooperation with multinational companies by providing professional supporting services, etc. leveraging the opportunity of industrial structural adjustments and professional division of tasks of overseas display device industry. This allows the Company to progressively participate in the value chain of new-type display device for fulfilling structural adjustments of the industry and product so as to lay foundation for eventual full entry into the realm.

(2) Mid- and long-term strategic targets

By 2010, IRICO Group Corporation will develop into China's strongest and largest display manufacturer, R&D base and world-class mega corporation with international reputation boasting diversified products, large-scale operation and modern management laying solid foundation for attaining the vision of 'hundred-year IRICO.

According to IRICO Group Corporation's said strategic positioning and development plan, the existing CPT products and new-type display device are the direction for the core business and active development. In other words, it is the principal business of the Group Corporation.

(See Attachment 2: Strategic Positioning and Development Plan IRICO Group Corporation for details)

CONFIDENTIAL

IRI-CRT-00002053 - Translation

**2. Some of the CRT supporting companies shall be included in the scope of principal business according to actual situations. The following factors will be considered when actually categorizing:**

(1) Supporting companies which are highly related with CRT and cannot be separated shall be included as principal business;

(2) Supporting companies which involve high transaction or switching costs thus directly affecting competitiveness of CRTs shall be included as principal business;

(3) Supporting companies which represent high percentage in CRT cost structure thus directly affecting competitiveness of CRTs shall be included as principal business;

(4) Supporting companies which represent relatively high percentages in overall profit contribution or income thus greatly affecting the Group Corporation's income shall be included as principal business.

**(II) Basic scopes of principal and secondary businesses**

**1. Basic scope of principal business**

It can be determined as follows based on IRICO Group Corporation's industry and product positioning: Principal business must be associated with display device; industries and products not associated with display device cannot be included in the scope of principal business.

According to IRICO Group Corporation's strategic planning of creating the core competitiveness of overall cost leadership, it can be determined that: not all industries and products associated with display device can be included as principal business, only those display device companies and products which directly influence the Group Corporation's core competitiveness shall belong to the scope of principal business.

Taking into consideration that the Group Corporation's core competitiveness relies on overall cost leadership, which is mainly a result of resilience of the Group Corporation's overall support, the supporting companies which directly affect composition of the total cost of the Group Corporation's display device shall also be included in the basic scope of principal business.

Instead of company size and profitability, the criteria for determining basic scope of principal business is whether it is in line with the main direction of development specified in the Group Corporation's development strategies or whether it is inseparable from composition of the Group Corporation's core competitiveness.

**2. Basic scope of secondary business**

Businesses other than principal business belong to the broadly-defined secondary business.

**Basic scope of secondary business mainly includes:**

(1) Companies which undertake social functions (such as School, Hospital, Public Security Office, IRICO Vocational University, IRICO Technical Secondary School and IRICO Technical School);

(2) Logistic service system (mainly in the company system of Three Productions Corporation and Labor Services Company, etc.);

(3) Relatively highly-marketized supporting systems with lower transaction and switching costs;

14

CONFIDENTIAL                                                                 IRI-CRT-00002054 - Translation

(4) Functional units equipped with conditions for outsourcing (such as some of IRICO Group Corporation's internal, non-independent legal person operational units and the Caihong Import and Export Company);

(5) CRT-unrelated industries in which IRICO Group Corporation invests. According to IRICO Group Corporation's development strategies and structural adjustment arrangements, the industries in which the above entities engage and the products and services they provide are not in line with the Group Corporation's main development direction, they all belong to secondary services.

### (III) Specific scopes of IRICO Group Corporation's principal and secondary businesses

#### 1. Specific scope of principal business

Based on the said criteria for separating the principal and secondary businesses and taking into consideration IRICO Group Corporation's needs regarding development strategy and structural adjustment, the Managers' Office has studied and decided upon separate scopes of the existing principal and secondary businesses as follows:

#### (1) Products of principal business mainly include:

1) The production and final assembly of color display of various types and specifications;

2) The main spare parts and component products of color display including electronic guns, glass, deflector yokes and special parts, etc.;

#### (2) Principal business companies include:

1) CRT Plant No. 1 (CRT final assembly)

2) IRICO Display Devices Company Limited (CRT final assembly)

3) Electronic Gun Factory (Specially matched to IRICO CRT, inseparable)

4) Glass Factory (large proportion of the cost, high switching cost)

5) Power plant (inseparable)

6) Xi'an IRICO Information Company (large proportion of the cost and revenue, high switching cost)

7) Xianyang IRICO Electronic Accessories Company (Specially-supplied products, inseparable)

8) Zhuhai Caizhu Industrial Corporation (represents high percentage in revenue)

9) IRICO Kunshan Industrial Corporation (represents high percentage in revenue)

#### 2. Specific scope of IRICO's secondary business

Businesses other than the principal business are broadly-defined secondary services. They mainly include social function entities run by the company, business entities which provide logistics services including logistics, transport,

15

construction, procurement, sales, import and exports, and property management to the principal business; entities which supply parts and components for color display device and are relatively highly-marketized with lower transaction and switching costs. Industries and products not associated with display device shall belong to secondary businesses. They mainly include:

**(1) There are three types of social function entities:**

1) Entities which perform government functions: Public Security Office of the Group Corporation.

2) Public Welfare entities: IRICO School, IRICO Hospital, IRICO Vocational University, IRICO Technical Secondary School and IRICO Technical School.

3) Welfare entities: IRICO Kindergarten, welfare facilities (including vehicle fleet, bowling center, swimming pool, gymnasium and property management room), property management center, customer vehicle fleet and communication station under the operation room (the said entities are all under management of the Three Productions Corporation), food store, self-help shopping mall and vehicle fleet of the Labor Services Company, etc.

**(2) Operation entities which provide logistics services**

The IRICO guesthouse, reception center (including travel agents), labor insurance product factories and business catering company under the Three Productions Corporation; advertising company, decoration company, Qilipu integrated market, vehicle repair plant, equipment company and landscape company under the IRICO Operation Room; and trademark factory and printer under the Labor Services Company.

**(3) Supporting production companies** (Color display device parts and component companies which are relatively marketized with lower transaction and switching costs)

1) IRICO Screen Plant

2) IRICO Fluorescent Materials Co., Ltd

3) Caiqin Electronics Co., Ltd

4) Shenzhen IRICO Electronics Co., Ltd

5) Trailer plant, electronics packaging material plant and chemical materials plant under the Three Productions Corporation

6) IRICO television parts plant, plastic products plant, foam plant, purification plant, polishing plant, 818 Plant (glass recycling plant) under the Labor Services Company

**(4) Functional entities with conditions for outsourcing**

Internal functional entities which undertake in-house market functions such as IRICO Materials Company, IRICO Sales Company and Caihong Import and Export Company.

**(5) Companies invested by the Group with little relevance to principal business**

1) Wholly-owned subsidiaries of the Group Corporation

16

a. Shaanxi IRICO Construction & Engineering Company and the IRICO Real Estate Development Company, IRICO Construction Supervisory Company and IRICO Construction & Engineering Design Institute under its management

b. Shenzhen Hongyang Industry and Trade Company

c. IRICO Huizhou Head Corporation

d. Haikou Hot Spring Hotel Co., Ltd

e. China Electronic Device Industrial Corporation

2) Subsidiaries controlled by the Group Corporation

a. IRICO Hongyou Transport Company (under management of Three Productions Corporation)

b. Xi'an IRICO Electrical Appliance Co., Ltd

3) Stake-participating companies of the Group Corporation

a. Beijing Quanchuang Communication Equipment Co., Ltd

b. Beijing Infotech Ventures Co., Ltd

c. Beijing Visionox Co., Ltd

d. Shenzhen Ruikeao Electronics Technology Development Company

e. Yong An Insurance Company

f. IRICO Packaging Plant

j. Shenzhen IRICO-ROYAL Electronics Information Co., Ltd.

**II. Main ways to implement separation of principal and secondary businesses**

**(I) Ways to implement separation of principal and secondary businesses**

The said secondary business entities shall be separated in the following ways according to individual circumstances:

1. To separate social-function entities from the Company, social-function entities like IRICO School, IRICO Hospital, IRICO Group Corporation Public Security Office, IRICO Vocational University, IRICO Technical Secondary School and IRICO Technical School shall be collectively handed over to the local governments through negotiations with them on the basis of proper handling of assets, organizations and employees. For the social-function entities which the local governments are unwilling or unable to take over, if qualified under the state policies on industrialized operations, shall be subject to separation of principal and secondary businesses by ways of restructuring and redistribution.

2. Organizations which run their own welfare-type logistics services shall be transformed into operation-type with the free services changed into paid services. They shall be changed from purely serving the company into serving society and progressively be transformed into self-sufficient economic entities with independent auditing and responsible for their own profit and loss. Those which are equipped to survive in the market shall participate in the restructuring and redistribution.

17

3. Operation-type logistics service entities shall undergo separation of secondary businesses from principal business through restructuring and redistribution and develop into legal economic entities with diverse subjects of property right.

4. Small supporting production companies which are relatively highly marketized shall participate in the restructuring and redistribution based on the principle mentioned above.

5. Functional entities with conditions to be outsourced, meaning certain functional entities within IRICO Group Corporation: shall be developed into independent legal economic entities so they continue to provide related services to the Group Corporation as market subject.

6. Companies little-associated with principal business in which IRICO Group Corporation invests. Three main situations are involved:

(1) Secondary business companies wholly-owned by IRICO Group Corporation: Those eligible ones shall participate in the restructuring and redistribution;

(2) Secondary business companies with controlling stakes held by IRICO Group Corporation. They shall be restructured and redistributed after consent is obtained from other shareholders;

(3) Companies with stakes participated by IRICO Group Corporation shall not participate in the restructuring and redistribution but have investments strategically adjusted according to the Group Corporation's strategic planning for progressive divestment; the funds thus obtained shall be used for development of the principal business.

7. Entities which have ceased operation or face other survival problems, such as Haikou Hot Spring Hotel Co., Ltd, Xi'an IRICO Electrical Appliance Industrial Co., Ltd and IRICO Hongyou Transport Company, shall undergo separation of secondary businesses from principal business through transfer, cooperation or liquidation pursuant to the law. The assets obtained shall be properly redistributed for replacement of employees of all entities on the basis of the activated existing assets.

**(II) Restructuring and redistribution are the main ways to implement separation of principal and secondary businesses.**

1. Restructuring and redistribution method is applicable to entities whose assets are one of the three types of assets of the principal business and whose employees are redundant employees of the principal business and which can implement industrialized operations.

2. Entities which are not allowed by the state to have industrialized operation, such as IRICO Group Corporation Public Security Office, junior high and primary schools run by IRICO (compulsory education phase) and companies with stakes participated by IRICO Group Corporation, cannot have their secondary businesses separated from principal business by way of restructuring and redistribution. Secondary business entities other than those can have their secondary businesses separated from principal business by way of restructuring and redistribution.

3. Secondary business entities with assets as one of the three types of assets of the IRICO Group Corporation's principal business and employees as principal business redundant employees who need to be downsized and are well-positioned for market operations shall be separated from IRICO Group Corporation's principal business mainly by way of restructuring and redistribution.

In conclusion, restructuring and redistribution are the main ways for separation of principal and secondary businesses in the light of actual circumstances of IRICO Group Corporation.

**Diagram: Schematic diagram of separation of principal and secondary businesses of IRICO Group Corporation**

18



**Section II Restructuring and Redistribution**

## I. General concept of restructuring and redistribution

### (I) General concept

(1) To restructure and create market-facing, independently audited, self-sufficient legal person economic entities (encourage becoming private-sector operations), redistribute redundant employees and eventually clarify and marketize property right relationships, labor relationships and superior-subordinate relationships making use of IRICO Group Corporation's three assets which are well-positioned for business operations. This is to lay the foundation for developing and expanding secondary businesses on the basis of downsizing the main establishment.

19

IRI-CRT-00002059 - Translation

(2) Restructured companies which are market-viable and operators and employees ready for restructuring shall be directly restructured into legal person economic entities controlled by non-state-owned legal person. Those ineligible can continue to be controlled by state-owned legal person but must become self-sufficient and market-facing with clear property rights and independent auditing besides working out plans and making various preparations for developing into companies controlled by non-state-owned legal person.

(3) When carrying out said separation and restructuring, the relationship between employees, especially regular employees and entities they belong to shall be clarified according to law. Redundant employees of redistributed companies to be restructured as companies controlled by non-state-owned legal person, the former company shall dissolve employment contracts with them pursuant to the law and pay monetary compensation; the employees shall sign an employment contract with a term no less than 3 years with the restructured companies. Redundant employees of redistributed companies to be restructured as companies controlled by state-owned legal person, the former company and restructured company may change the employment contracts pursuant to state rules, the employer subject shall shift from former company into restructured company.

**(II) Targets to Achieve**

1) Companies viable for restructuring shall adjust the property rights composition and improve the corporate governance structure. Upon restructuring, unitary state-owned companies shall be transformed into non state-owned enterprise adapting the company system with diversified property rights structure. Those not viable for the time being shall also pursue diversification of property rights. In principle, state-owned shares shall not exceed 75%.

2) To redistribute redundant employees for optimization of labor composition. Upon completion of capacity transformation of all employees, the company may change the basis of opening position from people to operation needs. Jobs shall be opened for competition and the company's competitiveness shall be strengthened by reducing wage costs and increasing labor productivity rate.

In conclusion, secondary business entities well-positioned to survive in the market shall be restructured into market economy subjects with qualification of independent legal person pursuant to the Company Law and develop and expand amid competition. Employees should have their state-owned employee capacity changed on the basis of proper replacement so as to increase their market awareness and competitiveness.

## II. Three types of assets available for restructuring and redistribution

### 1. Definitions and scope of the three types of assets

The bases for defining the three said assets include: (1) Definitions for content of the 'three types of assets' in Document No. 859 and the related documents; (2) Development strategies of IRICO Group Corporation and the standard and scope for determining IRICO Group Corporation's principal and secondary businesses. Specifically, all assets included in the secondary business scope are within the scope of the three types of assets; they are non-principal

CONFIDENTIAL                                                IRI-CRT-00002060 - Translation

business assets. Currently, IRICO Group Corporation have no effective market viable idle assets being left idle for more than 1 year, neither has the IRICO Group Corporation closed bankrupt companies for policy reasons, so there are no considerably profitable bankrupt company assets which fit with China's industrial policies.

Therefore, **IRICO Group Corporation's three types of assets are its non-principal business assets which include secondary business assets, assets of logistics service entities and other assets which are little-associated with the principal business**. Because some of the Company's social-function assets such as assets of Public Security Office and IRICO Group Corporation's owners' right in stake-participating companies, are not to be restructured and redistributed, they should be deleted from non-principal business assets. The remaining non-principal business assets are non-principal business assets which can participate in the restructuring and redistribution.

### 2. General situations of the three types of assets

#### (1) Main products and services involved in the three types of assets

Logistics services including company-run schools, medical services, architectural design, supervision of construction works and assembly, guesthouse reception, infant education, property management, protection of public order, and some of the production companies which provide CRT support. Also, the products and services of some companies are not associated with IRICO Group Corporation's principal business.

#### (2) Use and efficiency of the three types of assets

Overall efficiency of the three types of assets is relatively poor. Some of them have significantly depreciated due to market changes. Some of them belong to welfare facilities without capacity to operate as businesses. Some of them are assets to be used for IRICO Group Corporation's supporting production but they have low added value and average efficiency due to high labor cost. Also, bad assets represent a relatively high percentage in the three types of assets.

#### (3) Total amount of the three types of assets and their percentages in total assets

Preliminary accounting shows that non-principal business assets are in the amount of RMB1.7 billion representing approximately 23% in IRICO Group Corporation's total assets.

## III. Employees involved in the restructuring and redistribution

### 1. Overview

The restructuring and redistribution involve 3853 redundant employees representing approximately 18% of all IRICO Group Corporation's employees and 36% of permanent employees.

### 2. Social security

The IRICO entities to be restructured and redistributed are participants of social coordination including pension, sickness, unemployment and housing provident fund, etc. pursuant to the rules of the country, Shaanxi Province and Xiangyang city. Socialized management has been implemented for the retired employees, no entity has defaulted in social security premium payment.

CONFIDENTIAL                                                                    IRI-CRT-00002061 - Translation

3. Debts to employees

The restructured and redistributed entities owe no debts to employees such as wage in arrears, pool fund or social security premiums.

Attached: **Breakdown of IRICO Group Corporation's three types of assets and the employees involved**

(As at October 2003)

| No. | Type of assets involved and unit | Amount of assets (Unit: RMB) | Number of employees involved |
|---|---|---|---|
| 1 | IRICO Hospital | 12272601 | 150 |
| 2 | IRICO School | 76102381 | 229 |
| 3 | Training Centre | 1994856 | 40 |
| 4 | Three Productions Company (Incl. subsidiary entities) | 59925425 | 552 |
| 5 | Labor Services Company (Incl. subsidiary entities) | 80510000 | 111 |
| 6 | Construction Engineering Company | 10479099 | 78 |
| 7 | Materials Company | 13234605 | 200 |
| 8 | Sales Company | 2974560 | 67 |
| 9 | China Electronic Device Industrial Corporation | 562319639 | 189 |
| 10 | Shenzhen Hongyang Industry and Trade Company | 244022127 | 4 |
| 11 | Xi'an IRICO Electrical Appliance Industrial Co., Ltd | 77999911 | 1373 |
| 12 | Shenzhen IRICO Electronics Company | 29409679 | 8 |
| 13 | Shaanxi IRICO Fluorescent Materials Company | 171093575 | 240 |
| 14 | IRICO Electronics Screen Plant | 18654057 | 159 |
| 15 | Caiqing Electronics Company | 66500336 | 237 |
| 16 | Caihong Import and Export Company | 233810376 | 65 |
| 17 | IRICO Haikou Hot Spring Hotel | 79995391 | 20 |
| 18 | IRICO Kindergarten | (Incl. in Three Production's figures) | 112 |
| 19 | IRICO Packaging Factory | Stake-participating company | 11 |
| 20 | Shenzhen Royal Information Company | Stake-participating company | 8 |
| | Total | 1741298615 | 3853 |

**IV. Principle for restructuring and redistribution**

(1) Restructuring and redistribution requires adjustments of and integration with business, assets and establishment structures, attention should be paid to integration of resources so as to increase market viability of restructured companies.

Due to factors in such aspects as management systems and profit patterns, intensive horizontal competition and splitting of resources exist within the IRICO Group Corporation. Not only do they unnecessarily result in internal consumption, but they also prevent resource advantage to play its role thus weakening the Company's competitiveness. Therefore, both principal and secondary businesses should pay attention to restructuring of assets, employees and businesses in the process of separation of principal and secondary businesses, restructuring and redistribution.

CONFIDENTIAL

IRI-CRT-00002062 - Translation

(2) Coordinate planning, step-by-step implementation, maturity of one shall be followed by restructuring of another

To restructure assets and businesses of secondary business entities according to targets favorable to maintaining stability and increasing market competitiveness. Generally, employees shall be redistributed according to their own entities and positions. For companies with operation capacity and are viable for restructuring, IRICO Group Corporation should withdraw its state-owned stakes or only keep stake-participating status. For companies with operation capacity but not yet viable for restructuring yet, IRICO Group Corporation may temporarily maintain its share-controlling status but create conditions for withdrawal as soon as possible.

## 5.  Primary Forms of Enterprise Restructuring and Redistribution and Arrangement of Stock Rights

### (1) Types of enterprise restructuring and reposition of redundant personnel

IRICO Group Corporation will, in light of the actual conditions of the secondary business entities and in accordance with the provisions of the Company Law and other relevant laws and regulations, take full advantage of market resources and measures, gradually diversify the subjects of property rights by means of joint investment, cooperation, selling, renting, contracting, and so on, encourage the employees, operators and social investors to make investment in the enterprises subject to restructuring and redistribution, and allow the employees to convert their economic compensation into shares of the enterprises subject to restructuring and redistribution.

The primary method of restructuring and redistribution is to change the non-core enterprise into limited corporation with diversified share ownership, and most of the non-core enterprises will, directly or by two steps, be restructured into limited company with diversified share ownership, which is controlled by non-State-owned legal person.

### (2) Separation of principal and secondary businesses, and arrangement of stock rights of enterprises subject to restructuring and redistribution

1) Any enterprise subject to restructuring and redistribution that possesses the conditions for market survival will be directly restructured into a limited company controlled by non-State-owned legal person. IRICO Group Corporation may make one-off share withdrawal of its State-owned legal-person shares or maintain a share-holding position，but in principle the shareholding ratio shall be lower than 20%.

2) With regard to any enterprise subject to restructuring and redistribution that does not possess conditions for market survival, IRICO Group Corporation shall make overall arrangement and withdraw its shares step by step, and in principle the shareholding ratio of IRICO Group Corporation shall be lower than 75%.

3) With regard to any social organization run by enterprises which the government is not willing to take over and for which industrial operations is allowed according to State policies, IRICO Group Corporation may restructure it into a corporate economic entity, and its arrangement of stock rights can refer to the model of restructured enterprises.

## 6.  Disposal of Assets, Credits and Debts of Enterprises Subject to Restructuring and Redistribution

### (I) Basic principles

23

CONFIDENTIAL                                    IRI-CRT-00002063 - Translation

1. To divest non-operational assets to avoid unreasonable social burdens.

2. To divest bad assets and idle assets to improve the quality of assets.

3. To make effort to bring in incremental assets. To inject incremental funds and revitalize the stock of assets, by bringing in strategic investors, operators and employees as shareholders.

4. To take full advantage of the three categories of assets to develop ancillary secondary businesses and make arrangements for redistributed personnel.

5. To comply with the principle of "assets follow business", namely, assets that are closely related to the production and operation of an entity subject to restructuring will remain in such entity so as to keep the completeness of assets and to ensure that such entity subject to restructuring has an independent and integrated business system.

6. To divide the credits and debts in accordance with the principle of relevance, i.e., relevance to asset, relevance to business and relevance to personnel.

**(II) Disposal of assets, credits and debts**

**1.  Disposal of assets**

**(1) Scope of assets and basic procedures of disposal**

1) For the purpose of this Scheme, assets included in the scope of secondary business shall refer to assets that are not principal business assets, idle assets and effective assets of close-down and bankrupt enterprises, namely the so called "Three Categories of Assets", and the amount of assets included in the scope of non-core business shall be subject to the net State-owned assets determined after assets inspection, audit and assessment. Whether to grant discount to a secondary business enterprise or relevant secondary business assets will be decided on asset quality and profitability.

2) The ownership shall be straightened out for the assets possessed by the enterprises to be restructured.

With regard to an enterprise of which the ownership is not clear or disputed (such as IRICO Labor Service Company), first of all, the ownership shall be defined or the dispute over ownership shall be mediated; with regard to an enterprise of which the proof of contribution is complete but the ownership is not clear, relevant procedures shall be supplemented according to rules.

3) IRICO Group Corporation will take the lead and all enterprises subject to restructuring and redistribution shall cooperate during the all-around registration and inspection of various categories of assets of the enterprises subject to restructuring and redistribution, the full check of various categories of assets and credits and debts on the books, and the preparation of the balance sheet and the schedule of assets. In the inspection of assets, the inspection work shall extend to the enterprise invested in, for any long-term investments actually controlled.

4) With regard to any loss of assets found during inspection, including bad debt losses, inventory losses, loss from fixed assets and projects under construction, guarantee-related losses, equity investment losses, credit investment losses, losses from running the transaction of securities, futures and foreign exchanges, and other asset losses, the loss of assets shall be confirmed or written off in accordance with the relevant provisions of the Notice of the Ministry of Finance on Issuing the Interim Measures for Accounting Treatment of Enterprise Asset Losses (Cai Qi [2003] No. 233) and the Work Rules for the Determination of the Asset Losses of State-owned Enterprises promulgated by the State-owned Assets Supervision and Administration Commission of the State Council.

CONFIDENTIAL                                                    IRI-CRT-00002064 - Translation

5)  The result of assessment of the State-owned assets of the enterprises subject to restructuring redistribution, that is, the net State-owned assets shall, first of all, be used to make economic compensation to the personnel joining the enterprises subject to restructuring and redistribution that are controlled by non-State-owned legal person, and the standard for compensation shall be made in accordance with the document Ref. [2003] No. 21 promulgated by the State-owned Assets Supervision and Administration Commission of the State Council (hereinafter referred to as "SASAC").

6)  The insufficient part after all reserves and payments are made as required from the net State-owned assets of any enterprise subject to restructuring and redistribution will be made up by IRICO Group Corporation; if there is surplus after all payments have been made as required from the net State-owned assets of any enterprise with large scale assets, the surplus may be sold to the personnel (including the operators) of the restructured enterprise or to outside investors, or may be kept in the restructured enterprise by means of renting, share purchase, conversion to credit, etc..

7)  Assets that are scattered in different enterprises but in related businesses will be restructured together by IRICO Group Corporation pursuant to the market conditions in terms of business and assets, and the personnel involved will, in principle, be handled in accordance with the principle of "Personnel follows Business".

8)  With regard to the assets that have no market prospect or of which the quality is poor, disposal shall be made in a timely manner if calculation of profit and loss can be carried out in accordance with the law. With regard to the assets that cannot be charged to profit or loss, the enterprise subject to restructuring and redistribution shall provide sufficient evidence and IRICO Group Corporation will grant preference upon study and confirmation within 10% of the assessment value; any part exceeding 10% of the assessment value shall be reported by IRICO Group Corporation to the SASAC for confirmation.

9)  With regard to the divested assets that are not included in the scope of enterprises subject to restructuring and redistribution but are viable for operation, an enterprise legal person with independent accounting may be established and part of the redundant personnel could be arranged accordingly; with regard to the divested assets that are not eligible for operation, methods of disposal such as public sales and running under lease may be adopted, and the income obtained shall be used with priority given to situating the redundant personnel; with regard to the divested assets that fail to meet the aforesaid conditions, IRICO Group Corporation or any enterprise subject to restructuring and redistribution that is willing to accept such assets may carry out temporary management.

**(2) Method and content of assets disposal**

1)  IRICO Group Corporation will divest non-business fixed assets, idle fixed assets and fixed assets to be abandoned, divest the inventory to be abandoned and the overstocking inventory, and divest the credits (including products sold on credit) that will become due after three or more years without hope for recovery.

2)  After overall restructuring, IRICO Group Corporation will, in light of the actual situation and with as eye on the future development strategy of company, adopt multiple methods to carry out restructuring of its subordinate entities and conduct the operation in accordance with the law. IRICO Group Corporation will choose the appropriate method of restructuring according to the actual situation and characteristics of its subordinate entity, such as shareholding by employees, shareholding y operators, joint stock-holding partnership, contract operation, operation under lease, sales, etc.

25

CONFIDENTIAL

3)  When the net assets of a subordinate entity to be restructured are insufficient, IRICO Group Corporation may: (1) convert its credit in the entity to be restructured into net assets; (2) assume the debts that it intended to leave to the entity to be restructured; (3) transfer from other entities relevant physical assets needed by the entity to be restructured; or (4) reduce its shareholding ratio that it intends to have.

When the net assets of a subordinate entity to be restructured are more than sufficient, IRICO Group Corporation may: (1) convert some assets to leasing assets; (2) convert part of the assets into debts owed to it by the entity to be restructured; or (3) sell the entity to be restructured to social legal persons and natural persons.

**(3) Disposal of bad assets and idle assets**

1)  Bad assets sorted out by IRICO Group Corporation (subject to the amount confirmed by audit), including bad credits past due by three or more years, inventory losses, losses from fixed assets, etc., shall be reported to the Ministry of Finance (hereinafter referred to as "MOF") for approval of write-off; IRICO Group Corporation or the State-owned assets management company will continue to sort out and seek to recover those bad assets that does not meet the conditions and cannot be written off.

2)  With regard to the idle fixed assets that are sorted out by IRICO Group Corporation and are viable for operation, IRICO Group Corporation will establish an enterprise legal person and situate the redundant personnel; the assets not viable for operation will be publicly auctioned to other entities and individuals (a written statement shall be presented to the authority in charge of the examination and approval of State-owned capital in case the selling price is more than 10% lower than the assessed value), or leased to other entities and individuals with a leasing contract to be entered into (the leasing fee shall be concluded with reference to the bank loan interest rate for the same period. The idle fixed assets that cannot be disposed in accordance with the methods mentioned above shall be subject to the management of IRICO Group Corporation.

**(4) Disposal of non-productive assets**

Non-operational assets of IRICO Group Corporation that have been assuming social functions will be divested and handed over to relevant departments of the local government free of charge after full negotiation with the local government and the State-owned capital of IRICO Group Corporation shall be reduced accordingly. As for the divested non-operational assets that government is not willing or able to accept but is eligible for industrialized operation according to the policies, IRICO Group Corporation may establish a corporate economic entity with relevant assets in accordance with the law or adopt the methods of leasing, contract operation, sales, and so on.

**2.  Disposal of credits and debts**

**(1) Principles for disposal of credits and debts**

1)  Principle of "credits and debts follow assets". When assets go into a subordinate entity to be restructured, the corresponding debts shall also be assumed by the same entity. For any debt which can be confirmed as incurred by particular assets or businesses, when such asset or business goes into an entity to be restructured, the debt shall also be assumed by the same entity.

2)  Principle of legality. Guarantee that the assumption of debts by an entity to be restructured has gone through legal and complete formalities, and the origin of such credits and debts shall be clear and legal.

3)  Principle of respecting the right of creditor. Before a debt is assumed by an entity to be restructured, opinions of the creditors shall be solicited in advance and the creditors shall negotiate to implement the debt.

CONFIDENTIAL

IRI-CRT-00002066 - Translation

4) Principle of moderation. With a view to ensuring that the financial structure of an entity to be restructured is stable and reasonable, IRICO Group Corporation shall fully consider the credit and debt such entity has or owes to it and the scale of net assets of such entity.

**(2) Method to implement credits and debts**

1) IRICO Group Corporation will take overall charge of the consolidation and verification of the credits and debts of the enterprises to be restructured, conduct necessary audit, identify the creditors and debtors and enter into debt preservation agreement with the creditors and debtors.

2) Any restructured enterprise that used to be an independent legal person shall continue to assume and implement the existing credit and debt relations; any restructured enterprise that is separated from a main enterprise shall assume debts according to the agreed proportion.

3) As for any secondary business entity subject to overall restructure, the corporate enterprise established will succeed all credits and debts of the original entity; as for any entity restructured by means of separation, relevant credits and debts shall be succeeded by all parties established after separation; as for entities restructured by means of merger, the entity established after merger will succeed the credits and debts assumed by all entities before the merger.

4) The debts inside IRICO Group Corporation (including the surplus of the net State-owned assets of an enterprise subject to restructuring after all payments made as required during restructuring, which is kept in the restructured enterprise by means of being converted into credits of IRICO Group Corporation) cannot be offset as a result of the separation of core business and non-core business or the restructuring and redistribution, and shall be sorted out in a timely manner by relevant entities under the organization of IRICO Group Corporation. Relevant entities shall formulate practical repayment plans and make payment as scheduled.

All salaries, medical fees, pool resources and other fees owed to the employees shall be settled before the restructuring and may be directly deducted from the net State-owned assets.

5) IRICO Group Corporation debts owed to the redundant personnel subject to reposition such as pool resources, salaries (owed), medical fees and outstanding social insurance shall be handled in accordance with Article 17 of the No. 313 Document of the MOF and may be paid from the net assets of enterprise.

**7. Disposal of Land Use Rights of Enterprises subject to Restructuring**

In accordance with relevant laws and policies of the State and the People's Government of Shanxi Province on the management of land resources and with a view to implementing the land policies related to the arrangement of redundant personnel in case of separation of core business and non-core business and restructuring of the State-owned enterprises, it is confirmed:

1. If the land currently used by an enterprise subject to restructuring and redistribution is a land of which the land use right was obtained by IRICO Group Corporation by transfer and which will affect the overall planning of IRICO Group Corporation, the enterprise subject to restructuring and redistribution shall, in principle, use the land by means of leasing.

2. If the land currently used by an enterprise subject to restructuring and reposition of redundant personnel is a land obtained by IRICO Group Corporation through administrative allocation, the enterprise subject to restructuring and redistribution can continue to use the land by means of administrative allocation provided that the land

27

use purpose shall not be changed and the prior approval of the people's government of the local county or above; if it's necessary to change the land use purpose, verification shall be made in accordance with the Catalog of Lands Allocated (Decree No. 9 of the Department of Land and Resources), and the entity above can continue to use the land by means of allocation provided that the purpose of land after change conforms with the Catalog of Lands Allocated; if the purpose of land after change does not conform with the Catalog of Lands Allocated, the entity above shall go through the formality for compensable use of land in accordance with the law, and it is allowed to use the land transfer fees to pay the cost of restructuring.

3. Upon full negotiation with IRICO Group Corporation and approval by the competent authority of land and resources, an enterprise subject to restructuring and redistribution may accept the transfer of the State-allocated land use right it currently uses, go through the formality together with IRICO Group Corporation for the transfer with the competent authority of land and resources in accordance with the law and pay relevant fees.

### 8. Methods for Redistribution of Redundant Personnel

#### (I) Principles for redistribution of redundant personnel

1. Principle of properly dealing with the relationship of reform, development and stability

IRICO Group Corporation shall, with a view to achieving its overall target of restructuring and reposition of redundant personnel and in consideration of the ability to tolerate of enterprise, employee and society, adopt different methods to arrange redundant personnel under different situation.

2. Principle of adjusting labor relations in accordance with the law

Enterprises shall adjust the labor relations between the enterprise and its employees during the restructuring. During the adjustment of labor relations, the enterprise shall give consideration to the interests of all parties, properly deal with the relation between reform and stability, safeguard the legitimate rights and interests of the enterprise and its employees, and achieve harmonious and stable labor relations.

4. Principle of standard operation

IRICO Group Corporation shall, within the framework of the overall enterprise structuring scheme and in accordance with relevant laws, regulations and policies, work out the scheme for reposition of redundant personnel, which shall be deliberated and adopted by the employees' representatives or labor union of the enterprise to be restructured and shall be implemented after being verified and archived IRICO Group Corporation

5. Principle of "personnel following assets" and "personnel following business"

The regular employees of an enterprise (entity) before restructuring shall, in principle, be arranged for by the restructured enterprise.

6. Principle of maintaining the continuity of policy

The standards for compensation collected by any personnel who terminates labor contract and gets employed or searches for jobs in society and the standards for living costs collected by early retiring personnel shall be consistent before and after restructuring among the subordinate enterprises of IRICO Group Corporation and shall be in balance with the standard of similar enterprises in this region.

#### (II) Defining the scope of redundant personnel subject to reposition

For the purpose of this Scheme, redundant personnel subject to reposition shall refer to the regular employees of

28

the secondary businesses, logistics services and other entities with little relation with any principal business that shall be separated in accordance with the national industrial policy as well as the requirement of enterprise development strategy and the principle of division of labor on the basis of specialization, and the regular employees among the redundant personnel caused by industrial restructure and product restructure, including:

1. Regular employees of entities deemed as "Three Category Assets" in accordance with the spirit of the document Ref. Guo Jing Mao Qi Gai [2002] No. 859, including the on-post employees, post-waiting employees, employees under job-protected leave and other non-employed personnel of such entities.

2. Regular employees in the principal businesses who shall be cut and subject to reposition.

**(III) Approaches for redistribution of redundant personnel**

1. Redistributed to the restructured enterprise. An employee signs a new labor contract with the restructured enterprise and continues employment in the restructured enterprise. This is the primary way of redistributing redundant personnel.

2. In consideration of the actual difficulty of re-employment of elder employees, enterprises may go through the formality for removing an employee who is within five years from the statutory age for retirement from his / her posts for rest (i.e., internal retiring ahead of schedule) with reference to Decree No. 111 promulgated by the State Council in 1993 and the document Ref. Guo Fa [2000] No. 42. During such rest period, the enterprise will not arrange any post to the employee and shall distribute living expenses to the employee on a monthly basis, and the employee shall go through the formalities of official retirement after satisfying the conditions for retirement as stipulated by the law.

3. An employee who satisfies the conditions for early retirement can go through the formality for early retirement in accordance with relevant provisions of the State.

4. With regard to an employee whose labor contract expires in the process of enterprise restructuring, the original labor contract terminates automatically and IRICO Group Corporation will not renew the labor contract with him / her in principle. If he / she is employed by the restructured enterprise after competition for post, a new labor contract shall be entered into with the restructured enterprise.

5. Self-search for jobs. In the process of enterprise restructuring, an employee who does not satisfy the conditions for internal retiring ahead of schedule or early retirement may voluntarily apply for early termination of the labor contract with the enterprise and search jobs in society.

**(IV) Handling of various labor relationships in the process of redistribution of redundant personnel**

Firstly, IRICO Group Corporation shall strictly implement the Notice of the Ministry of Labor on Issues of Labor Contract Performance during Enterprises' Implementation of Stock System and Stock Cooperative System Reform (Lao Bu Fa [1998] No. 34). First of all, IRICO Group Corporation shall implement the provisions on preceding consultation regarding the change to labor contract with the employee, and IRICO Group Corporation (or Shaanxi Color Picture Tube Plant in some case) may terminate the labor contract with the employee subject to reposition in case of failure to reach agreement on the change to the labor contract through consultation; IRICO Group Corporation shall, at the same time, inform the employee who is going to be subject to redistribution of the termination of the original labor contract thirty (30) days in advance.

Secondly, the original labor relation shall be dealt with in accordance with the law depending on the methods of and corresponding policy on the reposition of redundant personnel:

29

**1. Employee employed by restructuring enterprise**

(1) After termination of the original labor contract with IRICO Group Corporation, an employee repositioned in a restructured enterprise controlled by non-State-owned legal person can obtain the economic compensation in accordance with the standard prescribed in the document Ref. [2003] No. 21 of the SASAC, (such economic compensation shall not be paid by cash in principle, and the employee may choose to convert such economic compensation into shares or credits of the restructured enterprise and participate in the profit distribution by the restructured enterprise), and the restructured enterprise and the employee will enter into a new labor contract and the employee's working years in the restructured enterprise shall be recalculated. The term of the new labor contract shall be determined by the restructured enterprise and the employee through mutual agreement, and it shall be no shorter than three years if the restructured enterprise and the employee fail to reach mutual agreement through consultation.

(2) After termination of the original labor contract with IRICO Group Corporation, no economic compensation will be made to an employee repositioned in a restructured enterprise absolutely controlled by a State-owned legal person, and the employee's working years before and after restructure shall be consolidated and the compensation standard in the preceding paragraph shall be referred to after the structured enterprise is changed to an enterprise controlled by a non-State-owned legal person; the restructured enterprise and the employee will enter into a new labor contract, and the restructured enterprise and the employee shall continue to perform the rights and obligations in the original labor contract. If the employee's position is changed and he/she is not competent for work after such change, the restructured enterprise may adjust the position of the employee or provide relevant training, or make changes to the labor contract upon mutual agreement through consultation.

If the restructured enterprise and the employee cannot reach mutual agreement through consultation on changing the term of the labor contract, the remaining term of the original labor contract shall be completed; if the remaining term of the original labor contract is shorter than three (3) years, it shall be extended to three (3) years.

**2. Employee internally retired ahead of schedule**

(1) As for an employee who has internally retired ahead of schedule before the restructure, IRICO Group Corporation will continue to perform the agreement on internal retiring ahead of schedule entered into with such employee.

(2) At the time of restructuring and redistribution of redundant personnel among the enterprises, an employee who satisfies the conditions for internal retiring ahead of schedule and applies for internal retiring ahead of schedule may enter into an agreement on internal retiring ahead of schedule with IRICO Group Corporation, and the retirement office of IRICO Group Corporation will take charge of the relevant management (except for China National Electronics Devices Corporation).

(3) As for an employee who has made early retirement in the process of restructuring and reposition of redundant personnel, IRICO Group Corporation will take full responsibility and make unified solution based on the current early retirement benefits of IRICO Group Corporation. Such employee's living expenses and the social insurance contributions made by enterprise before the statutory retirement age shall be used for specified purpose only and will be incorporated into the unified social Insurance premiums after such employee reaches the statutory retirement age and goes through the official retirement formality. China National Electronics Devices Corporation will reserve relevant costs from its net State-owned assets and manage its early retiring employees.

**3. Employee searching for jobs in society**

If an employee voluntarily terminates the labor contract with the enterprise in the process of restructuring and search jobs

30

in the society, the enterprise shall, in accordance with relevant provisions, terminate the labor contract, make economic compensation to the employee, go through the formality for termination of labor contract within the time limit, transfer the files, make unemployment registration, etc.

### 4. Employee losing the capability to work due to work-related injury (including occupational disease)

Any employee who has lost complete or a majority of his/her work ability due to work-related injury (including occupational disease) shall be subject to the Regulations on Work-Related Injury Insurance and have the right to enjoy work-related injury insurance benefits.

As for an employee who suffers from occupational disease or work-related injury and has lost part of his/her working ability, if he/she requires to terminate the labor contract with the enterprise, the enterprise shall terminate the labor relation and give economic compensation to him/her after making calculation and payment of the medical expenses, salaries payable and other costs wholly for once.

### 5. Employee suffering from disease or non-work-related injury

As for an employee who suffers from disease or non-work-related injury and is within the stipulated medical period, the economic compensation may be calculated in advance and reserved, and the enterprise may terminate the labor contract and give economic compensation upon expiry of the medical period; or the enterprise may, upon mutual agreement through consultation with the employee, terminate the labor contract and give economic compensation after making advance payment of the salaries payable and relevant benefits for the medical period.

In accordance with the provisions of the document Ref. Lao Ban Fa [1994] No. 214, as for an employee who suffers from mental disease and is assessed as loss of working ability, IRICO Group Corporation may terminate the labor contract with him/her and pay to him/her the medical subsidy equal to his/her standard salary of three months to six months.

When terminating the labor relation, the enterprise shall make payment of the medical subsidy not lower than six-month salaries in addition to the economic compensation to the employee who suffers disease or non-work-related injury. As for an employee who suffers serious disease or incurable illness, the enterprise shall appropriately increase the medical subsidy, and the part increased for employee suffering serious disease and incurable illness may not be lower than 50% and 100% of the medical subsidy respectively.

### 6. Handling of some abnormal labor relations

(1) With regard to an employee who works in a limited company subordinated to IRICO Group Corporation and has actual labor relation with such limited liability but whose employment relation is still in IRICO Group Corporation without any change, the employer in the labor contract shall be changed into the limited company and whether to make economic compensation shall be decided in accordance with the nature of the limited company that he/she works for.

(2) Long-term post-waiting, long-term study, long-term seconded, long-term "no service and no payment" and other abnormal labor relations shall be dealt with in accordance with the following provisions:

1). With regard to a long-term post-waiting employee, the labor relation with IRICO Group Corporation shall be terminated, and he/she can get the economic compensation after changing his/her status. According to the two-way selection principle, if the restructured enterprise accepts him/her, he/she will work in such enterprise and enter into a new labor contract with such enterprise; if he/she is not willing to accept reposition or the restructured enterprise is not able to accept him/her, IRICO Group Corporation shall terminate the labor relation after making payment of the economic compensation in accordance with the law.

31

2). With regard to an employee under the circumstance of long-term study, IRICO Group Corporation shall inform him/her to return to the company and deal with the labor relation within a specified time limit. If IRICO Group Corporation and the employee agree to maintain the labor relation after consultation, changes shall be made to relevant provisions of the labor contract to define the rights and obligations during the period of study; if the consultation fails, IRICO Group Corporation shall terminate the labor relation and make economic compensation.

3). With regard to an employee lent out long term, IRICO Group Corporation shall make the employer clear with the entity borrowing the employee. If the entity borrowing the employee officially hires the employee, the labor relation with IRICO Group Corporation shall be terminated and a new labor contract shall be entered into by the entity borrowing the employee and the employee (if the entity borrowing the employee is a non-State-owned enterprise, economic compensation shall be paid by IRICO Group Corporation). If entity borrowing the employee is not willing to officially hire the employee, IRICO Group Corporation shall change the labor contract with the employee in accordance with the law; if no agreement is made on the aforesaid changes through consultation, the labor relation with IRICO Group Corporation shall be terminated and IRICO Group Corporation shall pay economic compensation to the employee.

4). With regard to an employee who provides no service and receives no payment, IRICO Group Corporation may terminate the labor contract in accordance with the law without making any economic compensation.

### 7. Employee whose labor contract expires in the process of restructuring

With regard to an employee whose labor contract expires in the process of restructuring, the labor contract shall terminate automatically and IRICO Group Corporation will not renew the labor contract with him/her in principle and will pay the living subsidy to him/her in accordance with the document of the Ministry of Labor and Social Security Ref. Lao She Ting Han [2001] No. 280.

If an employee satisfies the retiring conditions upon expiration of his/her labor contract, he/she may go through the formality for retirement and collect the pension; if an employee does not satisfy the retiring conditions upon expiration of his/her labor contract, the enterprise shall assist him/her to make unemployment registration and collect unemployment benefits. (Lao Bu Fa [1996] No. 354)

### (5). Handling of social insurance account

After enterprise restructuring, the transfer and succession of the employees' social insurance account shall be carried out as required. As for employees arranged to restructured enterprises or other enterprises, their employer and themselves shall continue to participate in social insurance; as for employees who search for jobs in the society, the provisions of the local social security administrative authority shall apply.

IRICO Group Corporation shall actively coordinate with the social security administrative authority and undergo the formalities for transfer of its employees' social insurance accounts. If the coordination is inconsistent and it is difficult to transfer the social insurance accounts, the social insurance accounts of the employees of the restructured enterprise may be temporarily managed by IRICO Group Corporation on behalf of the restructured enterprise upon approval of the local social security administrative authority, and the restructured enterprise and IRICO Group Corporation shall sign a custody agreement for employees' social insurance accounts. IRICO Group Corporation shall withhold and pay the social insurance premiums according to the standard specified by the social security administrative authority, and all costs thereof shall be borne by the restructured enterprise and the employees themselves.

If it is difficult to transfer the social insurance accounts of the employees who search jobs in the society, the social insurance accounts of such employees may also be temporarily managed by IRICO Group Corporation on their behalf upon approval

32

of the local social security administrative authority, and they shall enter into a custody agreement for their social insurance accounts. IRICO Group Corporation shall withhold and pay the social insurance premiums according to the standard specified by the social security administrative authority, and all costs thereof shall be borne by themselves.

**(6). Costs related to reposition of redundant personnel**

1. Economic compensation paid for termination of labor contract

In the event that an employee repositioned in a restructured enterprise controlled by a non-State-owned legal person terminates the labor contract with IRICO Group Corporation, IRICO Group Corporation shall pay economic compensation to the employee with its State-owned assets in accordance with relevant provisions of the State and such economic compensation may be converted into shares or credits in the restructured enterprise on voluntary basis by the employee.

The standard for economic compensation for termination of labor contract shall be subject to the provisions of the document Ref. Lao She Bu Fa [2003] No. 21.

Considering the actual situation of the subordinated enterprise of IRICO Group Corporation, the standard for economic compensation for termination of labor contract with the employees may be executed as follows:

(1) When an enterprise terminates the labor contract with an employee, the enterprise shall pay economic compensation, which shall be based on the working years that the employee works in such enterprise, equal to the employee's monthly average salary for every year (if the time is less than one year, it is also deemed as one year) he/she works in such enterprise. The employee's total economic compensation shall be calculated according to his/her actual employment ages in such enterprise.

The salary calculation standard for economic compensation shall refer to the average salary over the twelve-month period preceding the termination of the labor contract by the employee under the circumstance of normal operation of the enterprise. If the average monthly salary of the employee is lower than the average monthly salary of the enterprise, the payment shall be made in accordance with the average monthly salary of the enterprise.

To facilitate the calculation, the average monthly salary of the enterprise shall be determined based on the average monthly salary of IRICO Group Corporation in the previous year. If the average monthly salary of the enterprise is higher than average monthly salary of IRICO Group Corporation, the economic compensation may be calculated and paid based on the average monthly salary of the enterprise.

If the average monthly salary of an employee exceeds three times the average monthly salary of the enterprise or more, the economic compensation shall be calculated and paid based on the amount not more than three times the average monthly salary of the enterprise.

(2) IRICO Group Corporation shall make one-off payment in cash to an employee searching jobs by himself/herself as the economic compensation to for termination of the labor contract. In principle, the economic compensation shall not exceed the level of economic compensation that shall be paid when the enterprise terminates the labor contract.

(3) No economic compensation may be made to the following personnel for termination of the labor contract: titular or affiliated personnel who has no actual labor relation with the enterprise; personnel dealt with as voluntary resignation; personnel who settles down abroad (outbound) for private affairs; personnel whose labor contract is terminated in accordance with Article 25 of the Labor Law; personnel who resigns and terminates the labor contract.

2. Standard for living expenses of early retiring employees

The standard for living expenses of early retiring employees shall be determined by the enterprise pursuant to its actual

33

conditions. However, the standard for living expenses may not exceed the amount verified by the calculation method that is used to calculate the pension of normal retiring personnel in the province. The early retiring employees' individual contributions to pension insurance may remain the same as they are on duty or be paid based on their standard for living expenses.

Once approved, the standard for living expenses of early retiring employees shall not be subject to any adjustment until official retirement. When an early retiring employee satisfies the statutory retirement conditions, his/her basic pension after retirement shall be approved and calculated as required by the social security administrative authority.

3. In principle, the economic compensation and living expenses of early retiring employees that the enterprises shall pay for termination of labor contract in the process of separation of principal businesses and secondary businesses and the restructuring of secondary businesses shall be paid with the net State-owned assets of the restructured enterprises. The insufficient part of payment with the net State-owned assets of the restructured enterprises shall be made up for by IRICO Group Corporation.

4. Other costs that may incur in the process of restructure will be implemented in the enterprises one by one in accordance with the provisions of the State.

**(7). Support and encouragement measures in the redistribution of redundant personnel**

Firstly, in accordance with the spirit of the national re-employment meeting and the provision of the document Ref. No. 859, IRICO Group Corporation will extend its principal businesses upward during the implementation of relevant diversification strategy, extending the industrial chain, cultivating new profit driver, and vigorously increasing job positions. Secondly, IRICO Group Corporation will fully preach the policy, help the redundant personnel use the tax reduction and exemption and subsidy policies, and support the personnel in entrepreneurship and search for jobs in society. Thirdly, IRICO Group Corporation will look for proper social organizations to carry out training and guide the personnel to change their concept of employment. Fourthly, IRICO Group Corporation will establish incubation mechanisms for individual search for jobs, entrepreneurship, etc.

**9.   Total Amount, Sources and Payment of Economic Compensation**

During the restructure and redistribution, any permanent employee who is employed by a restructured enterprise controlled by a non-State-owned legal person after reposition of redundant personnel shall be entitled to economic compensation when he/she terminates the labor contract with IRICO Group Corporation in accordance with the law.

1.   Calculation standard of economic compensation

Economic compensation shall be subject to the provisions of the documents Ref. No. 859 and Ref. [2003] No. 21 of the Ministry of Labor.

2.   After preliminary calculation, the economic compensation to be paid to the employees for termination of labor contract amounts to RMB **164,021,106**.

3.   The source of the economic compensation are mainly IRICO Group Corporation's net State-owned assets in the enterprises subject to restructuring and reposition of redundant personnel and the income obtained by IRICO Group Corporation through transfer of shares and liquidation of assets; the insufficient part of payment including economic compensation made in accordance with the law shall be made up by IRICO Group Corporation.

4.   Payment of the economic compensation. After the Scheme becomes effective, an employee who agrees to terminate the labor relation after consultation shall enter into an agreement on terminating the labor contract with IRICO Group Corporation within the specified time limit and get the economic compensation in accordance with the law.

CONFIDENTIAL                                                     IRI-CRT-00002074 - Translation

**10. Handling of Several Issues in the Process of Restructuring and Redistribution**

    **1.  Related transactions**

After separation of the restructured enterprises, the trading between IRICO Group Corporation and any restructured enterprise will be conducted fully in accordance with the market discipline and the principles of fairness and reasonableness as well as equality and voluntariness, and the transacting entities shall undertake corresponding civil obligations and enjoy corresponding civil rights in accordance with the civil contract.

    **2.  Support policy for the enterprises subject to restructuring and redistribution**

IRICO Group Corporation will provide certain policy support to the enterprises subject to restructuring and reposition of redundant personnel. Those polices mainly include:

    1)  IRICO Group Corporation will, according to the scheme for separation of principal and secondary businesses and restructuring and redistribution as well as the affiliated transaction agreements signed with the restructured enterprises, appropriately protect the internal market and, other factors being equal, prefer the products or services of the enterprise subject to restructuring and redistribution so as to fully reflect the spirit of "give them a leg up to get them going".

    2)  Production and operation conditions of the enterprise subject to restructuring and redistribution.

    3)  To make use of the advantage of IRICO Group Corporation in management, technology and talents and provide guidance and help to the enterprises subject to restructuring and redistribution so as to facilitate the improvement of management and technology of such enterprises.

    4)  To help recommend operators to and supervise the legitimacy of the process of operator selection of the enterprises subject to restructuring and redistribution.

    5)  Fees shall be charged pursuant to the preferential policy with regard to the fixed assets of IRICO Group Corporation occupied by the enterprises subject to restructuring and redistribution; a certain period of support shall be provided to the enterprises subject to restructuring and redistribution that are not eligible for operation, and the fees shall be reduced year by year.

However, the principles that IRICO Group Corporation adopts in its support policies mentioned above are "internal entities first but no protection of laggard" and "priority subject to same competitive conditions", with a view to facilitating the enterprises subject to restructuring and redistribution to actively reduce costs, upgrade quality, improve service and enhance market competitiveness as soon as possible.

The support policies mentioned above may be reflected in relevant agreements with the enterprises subject to restructuring and reposition of redundant personnel.

## Section 3   Entities Participating in Restructuring and Redistribution and Scheme of Restructure (or Idea of Restructure)

**I.  List of Entities Participating in Restructuring and Redistribution and Their Basic Information** (see the details in Attachment 3: List of Entities Participating in Restructuring and Redistribution and Their Basic Information)

**II. Implementation Scheme of Restructuring and Redistribution for the 1st Batch of Pilot Entities Subject to Restructuring and Redistribution (four enterprises in total)**

CONFIDENTIAL                                   IRI-CRT-00002075 - Translation

IRICO Construction Engineering Co., Ltd.

Scheme of Restructuring and Redistribution

**I.  Basic Information of Company**

IRICO Construction Engineering Co., Ltd. (hereinafter referred to as "Engineering Company") was established in March 1993, a company owned by the whole people. Economic method is project management general contracting.

Xianyang IRICO Real Estate Development Corporation, Shaanxi IRICO Construction PMC Corporation and Shaanxi IRICO Construction and Engineering Design Institute are subsidiaries of IRICO Construction Engineering Co., Ltd. and are not subject to independent accounting.

By 31 December 2002, the company had assets of RMB 10,479,099.58 in total, debts of RMB 4,007,037.90 in total, and shareholders' equity of RMB 6,472,061.68 in total.

**II.  Analysis of Restructuring Conditions**

**1.  Engineering Company has certain capability of survival and potential of market development.**

Engineering Company has many qualifications but has not made use of their true value. At present, Engineering Company and its three subordinate companies have rich qualification resources, including the qualification of Grade C real estate development and construction contracting, Grade A project cost consultancy qualification, Grade B architectural design qualification, and Grade A PMC qualification, among which PMC qualification is the only Grade A PMC qualification in Xianyang City. Besides, the key personnel are all intellectuals with high quality.

**2.  Engineering Company operators and most of its employees are active in restructure.**

**3.  The management team is united and has the spirit of market development.**

Overall, the Engineering Company has certain capability of survival and potential of market development; the operators and employees relatively support restructuring; Engineering Company meets the conditions for one-time restructuring into a legal entity controlled by non-State-owned legal person.

**III.Scheme of Restructure**

**(I)  Form of restructure and shareholding structure**

1.  Form of restructure: being restructured into a limited liability company controlled by a non-State-owned legal person.

Engineering Company, Shaanxi IRICO Construction and Engineering Design Institute and Shaanxi IRICO Construction PMC Corporation are combined as one limited liability company that can implement EPC projects; Xianyang IRICO Real Estate Development Corporation is kept and reformed into a limited liability company of which the shares are held by its employees.

2.  Shareholding structure

(1) IRICO Group Corporation transfers its shares in the aforesaid companies to the current operators and employees of Engineering Company and retain no more than 20% of its shares.

(2) The shareholding ratio of the operators and employees is more than 50%. The employee share ownership shall comply with the principle of leaning towards operators and sales backbones, while in principle the shareholding ratio of the operators may not exceed five times the average shareholding ratio of the common employees.

(3) The shareholding ratio of other private capital brought in shall be less than 30%.

(4) Sources of shareholders' contributions: IRICO Group Corporation uses the net assets after payment of the restructuring costs as its contributions; operators and employees make contributions with the economic compensation obtained and some self-raised cash; private capitals make contributions in the form complying with the Company Law.

36

CONFIDENTIAL                                                     IRI-CRT-00002076 - Translation

3. Carriers of the shares of operators and employees

Since the number of operators and employees making contributions has exceeded the limit of fifty (50) shareholders in a limited liability company according to the Company Law, a trust and investment corporation or the legal representative of the labor union will be selected with priority as the carriers of the shares of operators and employees, holding shares on behalf of operators and employees; the representatives of the staff members of the company may be elected to hold the shares on behalf of operators and employees upon the decision of the employees who make contributions. The content of the shareholding entrustment agreement shall be agreed by the parties through negotiation and such agreement shall define the legal fact that the contributions are made on behalf of other.

4. Corporate governance structure:

(1) The company shall have the shareholders' meeting as the company's highest authority, which is composed by all shareholders of the company and exercises rights in accordance with the Company Law and the company's articles of association, and the rules of procedure and voting procedures of the shareholders' meeting shall be subject to the company's articles of association.

(2) The company shall have a board of directors as the company's top governing body, which is to be composed of 3 to 13 members nominated by the shareholders according to their proportional ratio of the equity interests held and elected by the shareholders' meeting. The board of directors shall be accountable to the shareholders' meeting and exercise the powers in accordance with the Company Law, the company's articles of association and the rules of procedure. The chairman of the board of directors shall be the legal representative of the company.

(3) The company shall have a board of supervisors as the company's supervisory authority, which shall be elected by and accountable to the shareholders' meeting. The board of supervisors is to be composed of 3 or more members and shall include the representatives of the staff members of the company. The board of supervisors shall have one chairman who is to convene the meetings of the board of supervisors.

**(II) Condition of personnel and opinions on reposition of redundant personnel**

1. At present, Engineering Company has 95 personnel, of which 78 are permanent personnel.

2. The aforesaid permanent personnel will terminate the labor contract with IRICO Group Corporation and get economic compensation.

3. Fifteen (15) personnel who satisfy the early retiring conditions may go through the early retiring formalities on the basis of voluntariness and then be incorporated by IRICO Group Corporation into its prevailing early retiring personnel management system for management.

4. With regard to the retired personnel, the enterprise will conduct handover work on relevant integrated fees with IRICO Group Corporation and turn it over to the retirement office of IRICO Group Corporation for management.

5. After getting the economic compensation, sixty (63) personnel will join a new company and enter into a new labor contract of at least three (3) years with the new company.

**(III) Economic compensation and sources thereof**

The estimated total amount of economic compensation needed is RMB **4,312,589**.

The funds are mainly from IRICO Group Corporation's net State-owned assets in Engineering Company and the income obtained by IRICO Group Corporation through transfer of shares and liquidation of assets; the insufficient part of payment including economic compensation made in accordance with the law shall be made up by IRICO Group Corporation.

CONFIDENTIAL                                                                              IRI-CRT-00002077 - Translation

**(IV) Disposal of assets**

1. The building of IRICO Group Corporation that is now occupied by the company is not in the scope of restructuring and it will be taken back by IRICO Group Corporation and then leased to Engineering Company for use.

2. The IRICO Group Corporation takes back its undistributed profits of RMB 3,328,977.

3. After paying the economic compensation with the net assets that have been included in the scope of restructure and evaluated, IRICO Group Corporation prices and transfers 80% of the shares of the surplus net assets to the personnel and new social investors of Engineering Company, and the personnel of Engineering Company shall have the right of first refusal to the shares of IRICO Group Corporation.

4. The insufficient part of payment with the net assets shall be made up in cash by IRICO Group Corporation.

**(V) Credits and debts**

The credits and debts of the former restructured enterprise shall be succeeded and borne by the newly established company.

With regard to the debts inside IRICO Group Corporation, IRICO Group Corporation shall make unified coordination and debts repayment agreements shall be signed.

**(VI) Policy support**

Since Engineering Company has relatively weak market awareness and relatively poor market operation experience for a long time, IRICO Group Corporation shall provide certain support to Engineering Company within three (3) years in terms of the expansion and reconstruction projects of IRICO Group Corporation and financing.

**IV. Youth League and Party Relations, Archives Management and Social Insurance Succession and Other Connection Work**

After the company restructuring, relevant formalities for localized management shall be go though in accordance with the specific regulations of Shaanxi Province and Xianyang City.

## Shenzhen IRICO Electronics Company
## Scheme of Restructuring and Redistribution

**I. Company profile**

Shenzhen IRICO Electronics Company (hereinafter referred to as "Shenzhen IRICO") is an internally-linked enterprise for all jointly invested by IRICO Group Corporation, Shenzhen Special Economic Zone Development Group Co., Ltd. and Shenzhen Sangda Electronics Co., Ltd. Shenzhen IRICO was established in April 1989 with registered capital pf RMB 4,230,000 and is mainly engaged in the production and sales of magnet convergence used by color picture tubes and display tubes.

By 31 October 2003, Shenzhen IRICO had assets of RMB 35,081,883.57 in total, debts of RMB 10,389,140.54 in total, and shareholders' equity of RMB 24,692,743.03 in total, among which the shareholder equity of IRICO Group Corporation was RMB 1,728,490.12.

At present, Shenzhen IRICO has 165 personnel, of which 8 are permanent personnel and all are official employees dispatched by IRICO Group Corporation.

38

## II. Analysis of Restructuring Condition

1.  Shenzhen IRICO has capacity for market survival and potential of market development.

Shenzhen IRICO produces more than 18 million pieces of magnet convergence per year, of which 60% are used by IRICO Group Corporation and around 40% are sold to Samsung, SEG Hitachi, CPTF and other companies, and has certain capacity for market survival. Although it has the disadvantage of rigid mechanism, the system-oriented problems restricting company development will be completely resolved after the successful completion of the restructure, and the potential of development will be significantly stimulated.

2.  Good business condition, high quality of assets, and capable to pay all costs of restructure

Although Shenzhen IRICO is faced with the restriction of product lineup and the pressure of market competition, the current business condition and the quality of assets is good, all costs of restructure can be paid, and it is a good time for restructure.

3.  Company operators and most of its employees are active in restructure and have market concept.

Operators and employees of Shenzhen IRICO have strong market awareness and risk tolerance capability compared with other mainland supporting enterprises of IRICO Group Corporation because Shenzhen IRICO is located in Shenzhen, a region where the market economy is highly developed. At present, operators and employees of Shenzhen IRICO are taking the attitude of supporting and participating in the restructure and they hope the restructure could be done as soon as possible.

4.  The company management level of the operating team is high, and they have strong market awareness and enterprising spirit.

Shenzhen IRICO has strong capability in technology and management since its management and technical personnel are from IRICO Group Corporation, and therefore its company management system is relatively complete compared with other similar domestic companies. Besides, the operating team has never been satisfied with the internal market of IRICO Group Corporation and they have been adhering to market-oriented and customer-oriented operation policy. They have certain market awareness and enterprising spirit.

5.  The other two state-owned shareholders of Shenzhen IRICO are in favor of the restructure and have agreed to give up the right of first refusal towards the shares transferred by IRICO Group Corporation.

Overall, Shenzhen IRICO meets the basic conditions for one-time restructuring into an independent legal entity controlled by non-State-owned legal person.

## III. Scheme of Restructure

### (I)  Form of restructure and shareholding structure

1.  Form of restructure: being restructured into a limited liability company controlled by a non-State-owned legal person

2.  Company name after restructure: Shenzhen IRICO Electronics Co., Ltd.

3.  Scope of business after restructure: basically no change, taking advantage of plastic injection and moulding and developing new products in addition to the production of magnet convergence

4.  Shareholding structure after restructuring: After IRICO Group Corporation transferred 50% out of 70% of the shares it held to the operators and employees based on the assessed net asset value, the shareholding structure is as follows: IRICO Group

39

Corporation holds 20% of the shares, company operators, employees and some sales backbones hold 50% of the shares (of which major shares shall be held by operators), Shenzhen Special Economic Zone Development Group Co., Ltd. holds 20% of the shares, and Shenzhen Sangda Electronics Co., Ltd. holds 10% of the shares.

5. Sources of the contributions of operators and employees: operators and employees make contributions with the economic compensation obtained and some self-raised cash.

6. Corporate governance structure

(1) The company shall have the shareholders' meeting as the company's highest authority, which is composed by all shareholders of the company and exercises rights in accordance with the Company Law and the company's articles of association, and the rules of procedure and voting procedures of the shareholders' meeting shall be subject to the company's articles of association.

(2) The company shall have a board of directors as the company's top governing body, which is to be composed of 3 to 13 members nominated by the shareholders according to their proportional ratio of the equity interests held and elected by the shareholders' meeting. The board of directors shall be accountable to the shareholders' meeting and exercise the powers in accordance with the Company Law, the company's articles of association and the rules of procedure. The chairman of the board of directors shall be the legal representative of the company.

(3) The company shall have a board of supervisors as the company's supervisory authority, which shall be elected by and accountable to the shareholders' meeting. The board of supervisors is to be composed of 3 or more members and shall include the representatives of the staff members of the company. The board of supervisors shall have one chairman who is to convene the meetings of the board of supervisors.

**(II)  Condition of personnel and opinions on reposition of redundant personnel**

1. At present, Shenzhen IRICO has eight permanent personnel and one personnel on leave and all of them are personnel dispatched to Shenzhen IRICO by IRICO Group Corporation.

2. All eight permanent personnel will terminate the labor contract with IRICO Group Corporation and get the economic compensation in accordance with the law, and the compensation will set off part of the shares; the on-leave personnel will be handed over to IRICO Group Corporation and incorporated into the retired personnel of IRICO Group Corporation for management.

3. After the new company completes the registration of change, it will enter into a new labor contract of at least three (3) years with the aforesaid eight personnel respectively.

**(III) Total amount of economic compensation and sources thereof**

Based on the preliminary calculation, the estimated economic compensation amounts to about RMB 1,120,000 for the permanent personnel, calculated according to the formula of average monthly salary over the twelve-month period up to 31 October 2003 multiplying continuous working years (working years shall be accumulated in case of transfer from other State-owned company) of the same permanent personnel. Such economic compensation shall be paid from the IRICO Group Corporation's net assets in Shenzhen IRICO.

**(IV) Disposal of assets**

1. There are legal obstacles in the current house property due to historical issues and it will not become part of the restructured company. The existing shareholders and Shenzhen government will negotiate on the house property.

40

2.  IRICO Group Corporation will use about RMB1,120,000 to pay the economic compensation for terminating the labor contract, and such payment will be made from IRICO Group Corporation's net assets in Shenzhen IRICO.

**(V) Disposal of credits and debts**

Most of the existing credits and debts are floating credits and debts incurred in the normal business of Shenzhen IRICO, and all such credits and debts shall be enjoyed and borne by the restructured enterprise.

**(VI)      Land use right**

The new company will adopt the way of leasing to obtain land use right.

**IV. Youth League and Party Relations, Archives Management and Social Insurance Succession and Other Connection Work**

The handover and succession of the aforesaid relations shall be conducted in accordance with the document Ref. No. 859 and relevant provisions of local governments of Shenzhen, and localized management shall be applied.

**V.  Related Transactions and Support Policy**

Since the main products of Shenzhen IRICO are internally provided to IRICO Group Corporation at present, IRICO Group Corporation will enter into an internal market support agreement with Shenzhen IRICO granting priority under same conditions within a time limit with a view to reflecting the support policy after restructure.

<br>

## China National Electronics Devices Corporation
## Scheme of Restructuring and Redistribution

**I.  Company profile**

China National Electronics Devices Corporation (hereinafter referred to as "CNEDC") mainly engages in the production and sales of electronics devices. By 31 December 2002, it had assets of RMB 562,319,639.98 in total, debts of RMB 359,509,952.23 in total, and shareholders' equity of RMB 200,295,585.89 in total.

**II.  Analysis of Restructuring Condition**

1.  At present, CNEDC has good profits, and operators and employees are active in restructure.

2.  CNEDC prepared for restructure for two years before the release of the document Ref. No. 859, and the basic conditions for restructure have been preliminarily met.

3.  The operating team has the sense of market development and rich experience in operation and management.

**III. Scheme of Restructure**

**(I)  Form of restructure and shareholding structure**

1.  Form of restructure: restructuring CNEDC from the nature of solely state-owned enterprise into a limited liability company controlled by a non-State-owned legal person

2.  Shareholding structure: IRICO Group Corporation withdraws fully and shares will be held by China National Electronics Devices Corporation's current operators, employees and social investors. Operators and employees have the right of first refusal regarding the transfer of the shares of IRICO Group Corporation (major shares shall be held by operators and the shareholding ratio of the operators may not exceed five times the average shareholding ratio of the common employees), and other shares will be purchased by social investors (private enterprises of Zhejiang Province).

41

3. Carriers of the shares of operators and employee

Since the number of operators and employees making contributions has exceeded the limit of fifty (50) shareholders in a limited liability company according to the Company Law, a trust and investment corporation or the legal representative of the labor union will be selected with priority as carrier of the shares of operators and employees, holding shares on behalf of operators and employees; the representatives of the staff members of the company may be elected to hold the shares on behalf of operators and employees upon the decision of the employees who make contributions. The content of the shareholding entrustment agreement shall be agreed by the parties through negotiation and such agreement shall define the legal fact that the contributions are made on behalf of other.

4. Sources of the contributions of operators and employees: operators and employees make contributions with the economic compensation obtained and some self-raised cash.

5. Corporate governance structure

(1) The company shall have the shareholders' meeting as the company's highest authority, which is composed by all shareholders of the company and exercises rights in accordance with the Company Law and the company's articles of association, and the rules of procedure and voting procedures of the shareholders' meeting shall be subject to the company's articles of association.

(2) The company shall have a board of directors as the company's top governing body, which is to be composed of 3 to 13 members nominated by the shareholders according to their proportional ratio of the equity interests held and elected by the shareholders' meeting. The board of directors shall be accountable to the shareholders' meeting and exercise the powers in accordance with the Company Law, the company's articles of association and the rules of procedure. The chairman of the board of directors shall be the legal representative of the company.

(3) The company shall have a board of supervisors as the company's supervisory authority, which shall be elected by and accountable to the shareholders' meeting. The board of supervisors is to be composed of 3 or more members and shall include the representatives of the staff members of the company. The board of supervisors shall have one chairman who is to convene the meetings of the board of supervisors.

6. Business scope of restructured company: the current scope of business remaining unchanged.

**(II)  Condition of personnel and opinions on reposition of redundant personnel**

1. CNEDC has 189 permanent employees, 160 in-service employees, 38 employees meeting the national statutory and Beijing early retirement conditions (working for 30 years), 90 retired employees among which 8 are retired with honors.

2. All fees withdrawn by retired employees in accordance with the provisions of the State and local government of Beijing Municipality shall be incorporated into the restructured company for management.

3. With regard to 36 employees who have handled early retiring procedure (among which 20 employees handled early retiring procedure in accordance with the policy of Beijing Municipality), no economic compensation may be made and such employees shall be incorporated into the restructured company and be subject to the management by the restructured company as required after withdrawal of relevant living expenses and social insurance premiums.

4. With regard to 8 employees who meet the early retiring conditions, if they choose to continue to work based on the

42

principle of voluntariness, they can get economic compensation after terminating the original labor contract and shall enter into a labor contract of at least three years with the new company; if they choose early retirement, no economic compensation will be paid, and early retirement procedures shall be gone through after reserving the living expenses and social insurance premiums of five years.

5. All other employees join the restructured new company and enter into a new labor contract of at least three years with the new company respectively.

### (III) Total amount of economic compensation and sources thereof

Based on the preliminary calculation, the estimated economic compensation amounts to about RMB 16,986,896 for the permanent personnel, calculated according to the formula of average monthly salary over the twelve-month period up to 31 October 2003 multiplying continuous working years of the same permanent personnel.

Such economic compensation is sourced from the IRICO Group Corporation's net assets in CNEDC.

### (IV) Disposal of assets

1. IRICO Group Corporation will take back the undistributed profits.

2. The economic compensation paid by IRICO Group Corporation to terminate the labor contract amounts to about RM 16,986,896, which will be paid with IRICO Group Corporation's net assets in CNEDC.

3. The surplus net assets after all payments made pursuant to the policies shall be transferred to CNEDC's operators and employees, who will purchase the surplus and sell to social investors.

### (V) Disposal of credits and debts

The existing credits and debts shall be enjoyed and borne by the restructured company.

IRICO Group Corporation shall make counter-guarantee for the loan balance guaranteed by CNEDC, and collateral shall be made from the current fixed assets of CNEDC and formalities for collateral registration shall be one through.

### (VI) Land use right

CNEDC will continue to use the current State-owned allotted land in the way of allocation after it consults with the Beijing Municipal Administration of State Land, Resources and Housing.

## IV. Youth League and Party Relations, Archives Management and Social Insurance Succession and Other Connection Work

It shall be conducted in accordance with relevant regulations on social security in Beijing.

## China National Electronics Import and Export Caihong Co. Restructuring & Redistribution Scheme

### I. Company's Basic Situation

China National Electronics Import and Export Caihong Co. has registered assets of 22 million yuan, and belongs to China National Electronics Import and Export Parent Company (in fact, the relationship is doing-business-as). The company is a foreign trading company, and mainly operates IRICO Group Corporation's internal import and export business.

43

CONFIDENTIAL

IRI-CRT-00002083 - Translation

As of 2002 October 31, the company's total assets amounted to 233,810,376.93 yuan, of which fixed assets were 3,457,972.62 yuan, liquid assets 229,034,253.75 yuan. Total debts were 227,672,067.21 yuan, owners' rights totaled 6,138,309.72 yuan.

**II.  Analysis of conditions for reform**

    1. Possesses the conditions for market survival and growth potential.

    2. Operators and employees' are relatively active in the restructuring, and their concepts are in the right place.

    3. The operator team's corporate management level is high, and possesses strong market awareness, with plenty of spirit and initiative.

    In summary, the company has the fundamental conditions for a one-time restructuring into a non-state-owned controlled independent legal person.

**III. Reform Plan**

    **(I)  Reformed form and equity structure**

    1.  Reformed form: Limited liability company controlled by a non-State-owned legal person

    2.  Company name after reform: Shaanxi Province Caihong Import and Export Limited Liability Company (tentative name, will adopt name finally certified by the Industry and Business Bureau)

    3.  Business scope after reform: Mainly handling IRICO Group Corporation's related import and export business.

    4.  Shareholding structure: IRICO Group Corporation will hold 20% of shares, remaining shares will be held by current employees and operators, of which operators should hold large shares, their holding amount not normally exceeding five-times regular employees' share amount.

    5.  Carriers of the shares of operators and employees

    Since the number of operators and employees making contributions has exceeded the limit of fifty shareholders in a limited liability company according to the Company Law, a trust and investment corporation or the legal representative of the labor union will be selected with priority as the carriers of the shares of operators and employees, holding shares on behalf of operators and employees; the representatives of the staff members of the company may be elected to hold the shares on behalf of operators and employees upon the decision of the employees who make contributions. The content of the shareholding entrustment agreement shall be agreed by the parties through negotiation and such agreement shall define the legal fact that the contributions are made on behalf of other.

    6.  Source of funding for operators and employees

    Operators and employees can use the obtained economic compensation to buy stock, and then raise a portion of the cash contribution; the private capital is raised in a way that is compliant with Company Law.

    7.  Corporate governance structure:

    (1) The company has a shareholder meeting, which is the highest authority of the company, and is composed of all shareholders, and exercises its rights in accordance with the "Company Law" and the company's Articles of Association, The method of meetings and voting procedures will be carried out in accordance with the provisions of the company's Articles of Association.

    (2) The company's Board of Directors is the company's top decision-making body. The Board of Directors is composed of three to thirteen directors. The members of the Board of Directors are nominated by shareholders with reference to their proportion of equity and are elected by the shareholders' to the shareholders' meeting and exercises its powers in accordance with the "Company Law," the "Articles of Association," and the "Rules of Procedure for the Board of Directors." The chairman of the company is the legal representative of the company.

44

(3) The company establishes a board of supervisors, which is the company's supervisory body and is elected by and responsible to the shareholders' meeting. The number of the board of supervisors is not less than three and there shall be employee representatives. The board of supervisors has one chairman of the board of supervisors and is the convener of the board of supervisors.

**(II) Personnel Status and Resettlement Opinions**

1. There are 65 permanent employees, of which 7 qualify for internal retirement.

2. All the above mentioned employees will dissolve their labor contracts with IRICO Group Corporation, and IRICO Group Corporation shall pay economic compensation funds.

3. 7 employees met the conditions for internal retirement on voluntary basis. If they choose internal retirement, then they shall withdraw living expenses and social insurance premiums until the legal retirement age, and when they reach the retirement age, formal retirement procedures shall be conducted, related social insurance shall be handled in accordance with social tong and other regulations; if they don't choose internal retirement and request to continue working, then they shall dissolve their labor relations with IRICO Group Corporation and receive economic compensation according to the law.

4. For employees entering the restructured company, they shall sign a labor contract of no less than three years with the new company.

**(III) Total amount and source of economic compensation**

For permanent employees through September 2003, total economic compensation funds are initially calculated to be 3,616,374 yuan, averaging 56,000 yuan per person.

**(IV) Disposition of assets**

Because the company's current assets are of relatively poor quality, after evaluation, net assets shall be granted a certain discount based on quality of assets, in principle not exceeding 10%, and shall be reported to state-owned assets supervisory institutions for review.

**(V) Handling credit rights and debt obligations**

The existing creditor's rights and debts are enjoyed and borne by the restructured company.

**I.    The organization of the relationship between the party and the organization, the file management, the social insurance connection, etc.**

After the reform is completed, the company will coordinate with the related departments of Xianyang City to process the above localization management.

**II.   Related Transactions and Support Policy**

IRICO Group Corporation shall give the new company a period of supportive policy, and an actual agreement will be separately signed.

**Attached: Personnel and economic compensation funds calculations for the four restructured and redistributed companies**

45

CONFIDENTIAL

| Name of Company | People to be redistributed, placed | Economic reimbursement amount (unit: Yuan) | Per person economic reimbursement amount (unit: Yuan) |
|---|---|---|---|
| IRICO Construction Engineering Company | 78 people | 4312589 | 55289 |
| China Electronic Devices Industrial Corporation | 189 people | 16986896 | 89877 |
| China National Electronics Import & Export Caihong Co. | 65 people | 3616374 | 55636 |
| Shenzhen IRICO Electronics Co., Ltd. | 8 people | 1120000 | 140000 |
| Total | 340 people | 26035859 | |

**II Initial Restructuring Plan or Restructuring Ideas of Other Restructuring and Redistribution Units**

Other than the above four pilot-restructured and redistributed companies, other units involved in restructuring and redistribution have already formulated preliminary restructuring plans. The remaining units have also established the idea of restructuring and redistribution on the basis of investigation and research and the restructuring plan is being developed. In order to facilitate the examination and approval of the authorities, the initial restructuring plans or reform ideas of these units are listed. After the specific plans are formed, they will be reported in batches.

**1. Initial Reform Plan of IRICO Screen Plant**

**I.  Company's Basic Situation** (see Attachment III)

**II. Reform Plan**

**(I)  Reformed form and equity structure**

1.  Reformed form: Non-state-owned limited liability company

2.  Shareholding structure: Through the entrustment of funds to a trust investment company, the employees of IRICO Group Corporation will have the trust investment company and IRICO Group Corporation to jointly establish an investment company and then have this investment company directly acquire the shares of IRICO Group Corporation in IRICO Screen Plant. IRICO Group Corporation will retain 20 shares.

**(II) Personnel Status and Resettlement Opinions:**

1.  All 159 fixed employees of IRICO Screen Plant will dissolve their labor contracts with IRICO Group Corporation and IRICO Group Corporation shall pay the economic compensation.

46

2.  For employees entering the reformed company, they shall sign a labor contract of no less than three years with the new company.

### (III)  Total amount and source of economic compensation

As of 2003 October 31, the total economic compensation funds are initially calculated to be 8574184 yuan.

### (IV) Handling credit rights and debt obligations

The existing creditor's rights and debts are enjoyed and assumed by the restructured company

### (V)  Land use rights

After the reform, the company will obtain land use rights by way of lease.

#### 2.  Initial Reform Plan of IRICO Fluorescent Materials Ltd. Co.

#### 3.  Initial Reform Plan of Caiqin Electronics Co.

**Restructuring and diversion of company (2) and (3) will follow the mode of IRICO Screen Plant**

#### 4.  Initial Reform Plan of IRICO Materials Co.

**I.**  **Company's Basic Situation** (see Attachment III)

**II.**  **Overall Idea of the Reform Plan**

To change the Material Company's function of managing the Group Corporation while engaging in business activities, so as to transform the company into a diversified and standardized company-owned enterprise that is owned by the operators and employees. Then operate the company through an agency procurement and other agreements between the Group Corporation and the joint stock company.

**III.  Initial Plan**

1.  Dissolve the labor relations between IRICO Group Corporation and its employees, and pay them economic compensation. Within 30 days of the establishment of the new company, have the employees sign a labor contract of no less than three years with the new company;

2.  Form an independent limited liability company on the basis of the current company. Based on the employees' willingness and ability to invest, IRICO Group Corporation will choose to completely withdraw its shares or keep its shareholding position in the new company (the shareholding ratio shall not be higher than 20%). Allow employees to invest in the new company with the economic compensation;

3.  The new company will conclude agency agreements and other legal documents with IRICO Group Corporation to clarify the rights and obligations of both parties. IRICO Group Corporation will provide some level of support for a certain period of time.

4.  After the restructuring, the company shall pay IRICO Group Corporation for the use of its buildings and will be given discounts for a period. After the expiration of the preferential period, the rental fee will be paid according to the market price.

5.  The existing creditor's rights and debts are assumed by IRICO Group Corporation.

47

CONFIDENTIAL

##### 5. Initial Reform and Redistribution Plan of IRICO Sales Co.

For the overall idea of the restructuring and diversion of the two abovementioned companies under the reform plan, refer to the restructuring model of the Material Company.

##### 6. Reform Idea for IRICO Three Productions Corporation

**I.   Company's Basic Situation** (see Attachment III)

**II.   Reform Plan**

As there are many subsidiary companies under the Three Productions Company and the situation varies for each company, the restructuring and diversion approach for each company should be differentiated. However, from the perspective from the parent company level, the restructuring and diversion work should focus on the following points:

1. The Three Productions Company handles the situation of its various subsidiaries differently according to the situation, and re-optimizes the allocation of resources through various methods such as cancellation, equity diversification, merger, leasing, and sales; and expands the service market and strengthens internal management to achieve healthy development.

2. The Three Productions Company itself will also undergo a company restructuring. Employees of the Three Productions Company will be allowed to hold shares and IRICO Group Corporation will completely withdraw. Even if the conditions for a complete withdrawal are not met, diversification of property rights will still be realized. IRICO Group Corporation will maintain a shareholding position but its shareholding ratio shall not be higher than 20% in principle.

3. Through support in resource allocation and project support, the Group Corporation will help the Three Productions Company transform via the restructuring and diversion, so as to send the Three Productions Company down the track towards a virtuous cycle of healthy development.

4. There state-owned allocated land of IRICO Group Corporation currently used by the company, if the land use will not be changed after the reform, the land can continue to be used by way of allocation after consultation with the Xianyang Land Management Department.

5. There are a total of 530 fixed employees, all of whom have cancelled their labor contract with IRICO Group Corporation and received economic compensation accordingly. The amount of economic compensation was initially estimated to be 22,776,254 yuan. Within 30 days of the establishment of the new company, employees will sign a labor contract of no less than three years with the new company.

##### 7. Reform idea for the Labor Services Company

**I.   Company's Basic Situation** (see Attachment III)

**II.   Reform Plan**

1. First of all, define the property rights of the company's assets in accordance with the relevant provisions of the "Interim Measures for the Definition of Property Rights of State-Owned Assets and the Resolution of Property Rights Disputes" and the "Interim Measures for the Definition of Property Rights of State-Owned Assets of Collective Enterprises".

2. After defining the property rights relationship, the existing fixed employees of the Labor Services Company of the

48

will be paid economic compensation and encouraged to use the compensation as investment funds in the reformed enterprise. Large collective workers will be paid economic compensation in reference to fixed employees. After employees receive the compensation, they may sign a labor contract of no less than three years with the new Labor Services Company. There are currently a total of 111 fixed workers and the amount of economic compensation is initially estimated to be 6,179,600 yuan.

3.   With regards to net assets belonging to the Group Corporation in the Labor Services Company, the Group Corporation will solve the problem by way of selling, leasing or equity participation. The shareholding ratio shall generally not be higher than 20%.

4.   The name of the Labor Services Company will be changed to facilitate participate in market competition.

**8.   Wholistic Reform Idea for the Subsidiaries under Three Productions Company and the Labor Services Company** The overall idea of the reform plan is: to comprehensively sort the subsidiaries managed by the Third Industry Company and the Labor Services Company according to their nature, business, personnel and asset correlation. The business-type units and non-operating units will be divided on this basis and the nature of the units will be clarified to determine the development direction and supporting policies. Some of the non-operating units can directly fall under management of the group company. Restructure and optimize the assets, businesses and personnel of the subsidiary business-type units and integrate resources to improve the market viability of the restructured enterprises and thoroughly solve the long-standing serious horizontal competition and the division of resources within IRICO Group Corporation, while preventing new cases of enterprise performing social functions.

**9.   Reform Idea for IRICO Advertising Co.**

**10.   Reform idea for IRICO Renovation Co.**

1.   Reform conditions of the two above companies: IRICO Advertising Co. and IRICO Renovation Co. are currently operating in a personal contracting manner with market viability, no external liabilities, and small asset scale, and thus meet the conditions for a restructuring.

2.   Reform plan: After replacement of the identity of the existing contractor, the company will receive shares of IRICO Group Corporation according to the assessed net asset value and convert the company into a limited liability company.

**11.   Reform and Redistribution Idea for Haikou IRICO Hot Spring Hotel**

**I.   Company's Basic Situation** (see Attachment III)

**II.   Reform Idea**

(1) Through marketization operations, the hotel will be sold or a strategic partner will be sought to jointly operate the hotel. Operations can also be launched under lease or subcontracting to reduce losses;

49

(2) If the existing assets cannot be revitalized, then bankruptcy liquidation shall be carried out according to law and the employees of the company shall be settled with the bankruptcy property.

## 12.  Reform and Redistribution Idea for Xi'an IRICO Electric Industrial Co.

**I.   Company's Basic Situation**

The company's main business has a low degree of relevance to the Group Corporation, and business has ceased due to legacy problems from the original merger and acquisition of the company. At present, there are 1373 fixed employees and the Group actually pays living expenses of more than 20 million yuan every year. Up to now, a total of nearly 100 million has been paid and this has become a heavy burden to IRICO Group Corporation.

**II.  Solution Plan:**

1.  First of all, the land use rights certificate should be changed through consultation or legal means to determine the ownership of the property rights and to prevent illegal encroachment of the land;

2.  Strive for local government support, consolidate the land assets and use the realized funds to once and for all resettle the employees of the original company;

3.  In addition, bankruptcy liquidation can also be used to solve the above problems.

## 13.  Reform and Redistribution Idea for IRICO School

**I.   Basic Situation** (see Attachment  III)

**II.  Existing problem**

IRICO School is among the best in Xianyang City and even Shaanxi Province. Its high school is especially well-known; however, due to restrictions from the current system and school buildings, it is unable to fully utilize its resource advantages. The local government is not enthusiastic about taking over the elementary and middle schools, which are the stages of compulsory education, and has even requested IRICO Group Corporation to bear the expenses indefinitely.

**III. Reform Plan**

Given the above situation, the separation of IRICO School should fully embody the spirit of the "*Decision of the State Council on Basic Education Reform and Development*" and continue to negotiate with the local government to transfer the management of IRICO middle and elementary school to the local government. IRICO Group Corporation and the local government can assume the educational costs jointly and make the transition year-by-year.

If the local government refuses to receive the schools, the school should strive to get the government to return the education surcharge (IRICO Group Corporation pays an annual education surcharge of approximately 5 million yuan) or strive to obtain the government's support for IRICO Group Corporation to continue to run the school, so as to reduce the burden on the company.

CONFIDENTIAL

IRI-CRT-00002090 - Translation

As the high school part of IRICO School is not in the compulsory education stage, the school can be operated jointly with societal forces, attract foreign capital, implement privatization and industrialization, and reform the current school system. At present, some units are inquiring about investment intentions and the solution plan is being communicated to the education department of the Xianyang City Government.

IRICO Group Corporation will promote the separation of the school from the Group in light of the specific circumstances, so as to ensure that it does not affect the schooling of students, the order of teaching, the quality of teaching or the implementation of school funding.

## 14.  Reform Idea for IRICO Hospital

**I.    Basic Situation** (see Attachment III)

**II.   Current problem**

The layout of the hospital is unreasonable and the competition is fierce and large and inclusive. There is no obvious competitive advantage; the salary incentives for high-level, core medical staff are not sufficient and brain drain is severe.

**III.  Reform Plan**

The separation of IRICO Hospital should be carried out in accordance with the "*Guiding Opinions on Urban Health System Reform*", combined with the reform of the urban employee medical insurance system, and on the basis of continued implementation of the Group Corporation's medical reform policy.

There are three specific ways of separation: 1) separate it from the Group and implement industrialized operation, allowing existing employees of the hospital to invest in the hospital after changing their status; 2) in consultation with the local government, transfer the hospital assets and personnel to the local government, after which it will be under the management of the local government; 3) until the conditions for separation are met, cooperate with social investors to establish an independent legal entity.

After the separation of the hospital, the relevant operation funds will be handled in accordance with the Group Corporation's current medical reform policy. A consecutive three-year transition period will be calculated and the funds would decrease year by year.

## 15.  Training Centers (including IRICO Vocational College, IRICO Secondary School and IRICO Technical School)

**I.    Basic Situation** (see Attachment III)

**II.   Reform Idea**

IRICO College and IRICO Secondary School are a part of the societal work of the company and their survival has become a problem; therefore this function should be stripped off. As a technical training base for the Group, IRIC Technical School can be kept, and the method of operation of the institution can be "business-oriented and government-supported". The technical school can also be operated via joint operation with various parties in the community.

51

With regards to the surplus housing of the IRICO Training Center, these can be used as expansion school buildings of IRICO High school, used for investment, or leased to IRICO School after the reform.

### Section 4          Organization and Implementation of Separation, Restructuring and Diversion of Principal and Secondary Businesses

### I.   Working Principles and Main Measures for the Implementation of the Separation, Restructuring and Diversion of IRICO Group Corporation

In accordance with the spirit of the re-employment policy in the already-issued national document No. 859 and General Secretary Hu Jintao's speech at the national re-employment symposium this year, IRICO Group Corporation will implement the separation, restructuring and diversion of the company according the principles of "taking the job position to enter the market", and do its best to digest diverted personnel internally within the group and not socialize employment conflicts. It will also enhance its competitiveness by increasing the intensity of the property rights reform of its auxiliary enterprises, absorb and place more new employees from society and ease the pressure on employment in society. Therefore the separation, restructuring and diversion of the company shall be implemented in accordance with the following principles:

**(I)   Working Principles for the Implementation of the Separation, Restructuring and Diversion of Principal and Secondary Businesses**

1. Handle the relationship between reform, development, and stability properly, fully consider the affordability of enterprises, employees, and society, make overall plans and implement them step by step to ensure stability;

2. Implementing structural adjustments via the restructuring and diversion of IRICO Group Corporation, restructure and combine the main businesses of IRICO Group Corporation, match the national industrial policy, which is conducive to accelerating the development of enterprises and promote the optimization of the corporate asset structure, organizational structure and personnel structure;

3. The implementation of the restructuring and diversion should be in accordance with the law and the standard operation should adhere to the principles of openness, fairness and justice, safeguard the legitimate rights and interests of the state, enterprises and employees, prevent the loss of state-owned assets and the escape of debts;

4. Adhere to the principles of "positivity, prudence, overall planning, progressive advancement and step-by-step implementation" and wait for the conditions to mature for the reform to ensure the reform successfully transforms the mechanism and promotes the optimization of structural adjustment of the main enterprise;

**(II) Main Measures for the Implementation of the Separation, Restructuring and Diversion of Principal and Secondary Businesses**

1. Strengthen the implementation of work and personnel of organization leadership and departments. In order to strengthen the leadership and organization of system-wide auxiliary business restructuring and diversion, in accordance with the requirements of State Economic and Trade Enterprise Reform Document [2003] No. 27, the Group Corporation established a restructuring and diversion leading group with the general manager as the team leader and with the participation of the enterprise management office, planning department and human resources department. The restructuring units have also clarified the specific responsible departments and personnel and the division of labor required to complete the restructuring and diversion work.

2. In accordance with the spirit of Document No. 859 and its supporting policies and in combination with the specific situation of the Group Corporation, prepare the auxiliary business restructuring and diversion plan for relevant units for this year and request each unit to breakdown and implement the plan according to the actual situation and actively promote the plan.

52

3. Make key breakthroughs and guide the situation through key areas to actively and steadily promote the restructuring and diversion work for auxiliary businesses. The restructuring and diversion leading analyzed the enterprises directly under the company and determined that Shenzhen IRICO Electronics, IRICO Construction Engineering and other companies would be the first batch of companies to undergo the restructuring. At the same time, it will summarize experiences and compile samples of the restructuring plan to provide guidance to other units for their formulation of restructuring and diversion plans for auxiliary components. In this way, the intensity of efforts will increase while training a group of workers and employees who have a good grasp of policy and are skilled.

4. Establish a monitoring mechanism to check the progress of the restructuring and diversion work for auxiliary businesses. Establish a regular reporting system for the progress of the reform of the auxiliary industry and grasp the progress of work and problems encountered in a timely manner. This will not only urge the enterprise to advance the work, but will also promptly provide guidance to solve the problems that are encountered.

5. In order to ensure the orderly operation of the restructuring and diversion work, IRICO Group Corporation hired Beijing Dentons Law Offices as the chief legal counsel for the separation and restructuring of IRICO Group Corporation. It is responsible for planning, coordinating and promoting the separation of all main and auxiliary businesses. The measures for separation and restructuring of the diversion work are mainly based on the degree of conditions for the restructuring of the enterprises that need to be reformed, in accordance with the principle of restructuring when maturity is reached. For those components that do not meet the conditions, it is necessary to clarify the restructuring plan as soon as possible to ensure that the enterprises undergoing restructuring can achieve the purpose of the reform smoothly and properly divert and resettle personnel.

**II.   Organization and Implementation of the Separation, Restructuring and Diversion of IRICO Group Corporation**

**(I)   Institutions involved in the Organization and Implementation of the Separation, Restructuring and Diversion of IRICO Group Corporation**

In order to strengthen the leadership for the separation and restructuring of the company's main and auxiliary components, IRICO Group Corporation has established a restructuring and diversion leading group composed of the following personnel:

Team leader: Ma Jinquan (general manger), Deputy team leader: Tao Kui (Party Secretary of the Group), XING Daoqin (deputy general manager), NIU Xin'an (deputy party secretary and chairman of the labor union of the Group)

The members of the leading group are composed of the persons mainly responsible for relevant functional departments, such as enterprise management, personnel, finance and other relevant functional departments of the group company. The leading group has an office and is responsible for coordinating the organization and implementation of daily work.

Specific personnel are: director: Niu Xin'an (deputy); deputy director: Xu Quancheng, Zhang Zhankui, Wang Ximin, Fu Jiuquan, Ji Xingxi, Xu Zhendong, Wei Xiaojun; members: Gao Zhanmin, Yang Yixing, Wang Jun, Zhang Wenyan, Lan Yaoping, Song Wenbin, Pang Jun

**(II)   Decision Making Process for the Separation, Restructuring and Diversion of IRICO Group Corporation**

IRICO Group Corporation will be responsible for organizing and implementing the separation, restructuring and diversion of the main and auxiliary components. The internal agenda of IRICO Group Corporation for the separation, restructuring and diversion of the main and auxiliary components are:

(1) The general manager's office of the Group Corporation will pass a resolution to determine the scope of the main and auxiliary business and the main and auxiliary business units that are proposed to undergo restructuring and diversion, and will formulate the overall plan that will be reported to the SASAC, Ministry of Finance, Ministry of Labor and Social Security Department for joint approval;

CONFIDENTIAL

(2) In accordance with the above mentioned joint approval, the main and auxiliary business units that are proposed to undergo restructuring and diversion will carry out propaganda and mobilization to make all employees understand the necessity and principles of the reform and the various requirements of national laws, regulations and policies, so as to obtain their understanding, support and participation. Convene an employee representative assembly to consider and approve matters concerning the diversion and resettlement of employees and the disposition of assets for the resettlement of employees;

(3) Through the development and planning department of the Group Corporation, the auxiliary business units that are planned to undergo restructuring and diversion will propose a specific restructuring and diversion plan to the Group Corporation.

(4) The general manager's office of the Group Corporation will review and approve the restructuring and diversion plans of auxiliary components one by one.

**(III) Implementation Procedures for the Separation, Restructuring and Diversion of IRICO Group Corporation**

(1) Clarify the property rights, that is, clearly define the property rights of the assets of the units undergoing restructuring and diversion. Since most of the auxiliary units of IRICO Group Corporation are wholly state-owned enterprises, or joint-stock companies or limited liability companies under the modern company system, the property rights of the great majority of auxiliary business units are clear. With regards to the to-be-restructured units that have unclear ownership or have property rights disputes (such as IRICO Labor Services Company), it is necessary to first define the property rights or resolve the disputes in accordance with relevant state regulations;

(2) Asset and capital verification and auditing. Carry out a comprehensive inventory check on all types of assets of the reformed enterprises, including various assets, claims and debts, and prepare balance sheets and property inventory as of the date of the reform. IRICO Group Corporation will then entrust an intermediary to perform an audit on the results of the asset and capital verification;

(3) Asset evaluation. IRICO Group Corporation will entrust a qualified asset evaluation agency in accordance with the "*Administrative Measures for the Assessment of State-owned Assets*" (Order No. 91 of the State Council on 1991 November 16), the "*Regulations on Several Issues Concerning the Evaluation and Management of State-owned Assets*" (Order No. 14 of the Ministry of Finance on 2001 December 31) and other relevant regulations to evaluate all assets involved in the restructuring of the enterprises;

(4) Handle labor relations. If undergoing restructuring and diversion through the company system, the company shall change or terminate its labor contracts with its employees and change or re-sign labor contracts for three years or more. Employees will also be paid economic compensation in accordance with national regulations and relevant regulations;

(5) Asset disposal and capital contribution. In accordance with the specific restructuring and diversion plans, the assets of the state-owned enterprises will be sold, leased, capital contribution or transferred into creditor's rights. With regards to auxiliary units that undergo the company's system reform, the result of the asset evaluation will be used as the basis for IRICO Group Corporation's capital contribution in the reformed enterprise. At the same time, the other shareholders of the company will also contribute capital to the company;

(6) Establishment and registration of companies;

54

(7) Registration of state-owned property rights;

(8) Restructure management and interfacing work at the region of the company. If the restructured company is not a state-owned enterprise, it will be necessary to carry out handover work such as maintaining a good relationship with the party and organizations of the local government, social insurance relationships with workers, manage employee files and assess job titles, etc.;

(9) Disposal of stripped assets. Assets that have not been included in the scope of restructuring after the completion of the restructuring of the enterprise will be divested and used to form an enterprise legal person, which will be independently accounted for and operated according to law. Divested assets that do not meet the conditions for operation should be sold, leased or transferred to the local government for free. Any divested assets that cannot be disposed of via the above methods can be managed by the continuing enterprise or directly managed by IRICO Group Corporation.

**(IV) Operating Guidelines for the Separation, Restructuring and Diversion of IRICO Group Corporation**

1. In the spirit of the 2002 National Re-employment Conference and the 2003 National Re-employment Seminar, and on the basis of Document No. 859 and other supporting documents, operations will be carried out according to the specific situation of IRICO Group Corporation;

2. National laws and regulations on management of state-owned assets will be strictly implemented to prevent the loss of state-owned assets. State-owned assets shall not be sold at low prices, converted into shares at a low price, or transferred to operators and other employees or individuals at a low price;

3. The norms of the General Principles of the Civil Law, Contract Law and other civil law shall be strictly abided by to effectively safeguard the legitimate rights and interests of creditors and other related parties, do a good job in clearing creditor's rights and debts in the process of the restructuring and diversion, implement debtors and creditors and to not use the restructuring as a chance to evade the debt owed to banks and other creditors;

4. In accordance with the relevant national policies on re-employment and labor and social security policies and laws, properly resettle surplus personnel of the diverted enterprises to reduce the pressure of employment on society and ensure stability;

5. In accordance with the Company Law and other legal norms, transform the restructured and diverted enterprises into modern corporate enterprises with diversified property rights, a well-established corporate governance structure, and market competitiveness;

6. Plans affecting the resettlement and diversion of employees should be reviewed and passed by the employee representative assembly before implementation.

55

Attachment II    Development Strategy of IRICO Group Corporation

**Strategic Positioning and Development Plan of IRICO Group Corporation (Summary)**

## I.    Market Environment and Competition Faced by IRICO Group Corporation

1.  Overall situation of the CRT industry

Although CRT has a relatively good price/performance ratio and still has room to survive for a long period of time, its market space is relatively saturated and the overall situation of the industry is not optimistic. Thus it is called a "sunset industry" in the industry.

2.  The situation of the CRT market in the world

At the end of 2001, there were about 22 companies engaged in CRT manufacturing in the world, with about 70 plants, 250 production lines, an annual production capacity of 300 million, and global market demand of more than 250 million.

Compared to the giants in the industry, IRICO Group Corporation's global market share is still at a relatively low level.

3.  Overall situation of the domestic CRT market

At present, there are 12 companies in the CRT industry in China. As at the end of 2002, there were about 39 CPT production lines and the annual production capacity was about 50 million. There were about 21 CDT production lines and the annual production capacity was about 37.4 million.

Overall, the production capacity of domestic CPT has far exceeded the demand of the domestic color TV consumer market.

4.  IRICO Group Corporation faces severe market competition pressure

(1) The situation of oversupply in the CPT market will intensify

Due to a period of short supply in the domestic CPT market in 2002 and good expectations for the market in 2003, companies are trying to increase production lines or expand production. It can be foreseen that the situation of oversupply in the domestic CRT market will intensify, which will inevitably lead to more intense competition.

(2) Threats of market competitors

There are 12 companies in China's CPT industry, of which 9 are sino-foreign joint ventures or wholly foreign-owned enterprises. Among the other 3 companies, only IRICO Group Corporation is a state-owned company.

Since China joined the WTO, major international companies that produce color display devices have all entered China and compete directly against IRICO Group Corporation, posing a direct threat to IRICO Group Corporation. A collectivization pattern of competition has taken shape.

Although IRICO Group Corporation is temporarily in a leading position in the domestic market, it is not the industry leader. Beijing Matsushita, Shanghai Novotel, LG Shuguang and other enterprises have stepped up to seize market share and the market shares of these companies are all at 11% or higher, which poses a strong challenge to the status of IRICO Group Corporation.

CONFIDENTIAL                                                                    IRI-CRT-00002096 - Translation

(3) High exit barriers in the industry have resulted in increased competition rigidity

Due to the large amount of investment required for the CPT industry, the long cycle, requirement for many special equipment and assets, low disposal value and requirement for many employees, the exit barrier of the industry is very high. This will undoubtedly increase the rigidity and intensity of competition

(4) Threats of Replacements

Since the second half of the 1990s, new technologies such as flat panel display devices (FPDs) have been developed rapidly. In addition, due to the development of large-scale integrated circuits and the application of computers and digital technologies, this has caused the development of color TV technology to go towards the direction of big, flat and ultra-thin screens. The development of new display devices such as LCD and PDP have had a huge impact on the traditional CPT market and will greatly shorten the life cycle of CPT products. At present, the main products of IRICO Group Corporation are concentrated in the traditional CPT field and the pressure on the development of such alternatives is also the biggest and most direct.

## II.  Strategic Positioning of IRICO Group Corporation

1.  Industry and product positioning

(1) Limitations of IRICO Group Corporation's industry and product positioning

IRICO Group Corporation's existing resources are almost exclusively concentrated in the existing CRT products (mainly CPT products). The company has a very weak foundation in new display device technology and product development. In addition, these new display devices require a huge investment, and this it has limited the development of IRICO Group Corporation in this field.

(2) Market prospects of IRICO Group Corporation's industry and product positioning

Although the competition is fierce in the CRT and especially the CPT industry, **CPT products still have a large market development space and CPT technology still has a long time to survive.**

(3) Resources and advantages of IRICO Group Corporation

1)  IRICO Group Corporation has the advantage of having management and technological talents

2)  It has formed a vertically integrated component system and has cost advantages

3)  It has a certain degree of financial strength and has expanded financing channels.

According to the above analysis, IRICO Group Corporation's industry positioning and product positioning should be based on the existing CPT product field. The realistic choice for IRICO Group Corporation is to implement existing products and relevant diversification on this basis and at the same time, closely track new display device technologies and products to enter new product areas at the right time and thus realize structural adjustments of industries and product.

CONFIDENTIAL                                                      IRI-CRT-00002097 - Translation

2. Development strategy of IRICO Group Corporation

(1) Overall development strategy

The overall development strategy of IRICO Group Corporation is: to implement a total cost leadership strategy with existing display devices as the focus to realize the industrialization of components to become stronger and enlarge the principal business. Actively track, research, and analyze technologies and products in the field of new display devices and enter in a timely and steady manner to achieve industrial and product structure adjustments to make IRICO Group Corporation into China's strongest and largest display production and R&D base with diverse products, large scale operation and modern management.

(2) Basic competitive strategy: **Total cost leadership strategy and related diversification strategy**

1) **IRICO Group Corporation will adopt the overall strategy of taking the lead in the main business, that is the traditional CRT product field (mainly CPT) and will adapt it into the basic competitive strategy of the company.**

2) **Adopt related diversification strategies in the field of new display devices.**

In order to solve the future development problems of IRICO Group Corporation, the company will need to adapt an active tracking strategy in the field of new display devices and implement related diversification strategies. There are two main ways to achieve this: firstly, by closely tracking and researching the development trend of new technologies and new products in the field of new display devices and then making a timely entry into the field; secondly, take advantage of the timing of adjustment of the time when the foreign display device industry makes structural adjustments and specializations to implement strategic cooperation with multinational display device companies, so as to gradually participate in the value chain of new display devices by providing professional support and other means, and in this way achieve structural adjustment of the industry and products.

(3) IRICO Group Corporation can implement the total cost leadership strategy in its medium and long-term strategic planning to build core competitiveness with the lowest cost and lay the foundation for realizing the scale of operation. It can also implement related diversified business strategies and seek and develop new economic growth points for IRICO to create a new pillar industry.

(4) The target of the medium and long-term strategy is to develop IRICO Group Corporation into the most powerful and largest display device production and R&D base in China with diversified products, large-scale operation and modern management, and a world-class and internationally renowned large enterprise, so as to lay a solid foundation for the long-term goal of making IRICO stand tall for 100 years.

CONFIDENTIAL                                    IRI-CRT-00002098 - Translation

**Attachment 3      Participants in the Restructuring and Diversion Plan and their Basic Situations**

**I.    Units undertaking corporate social functions**

**1.  IRICO School**

The school has a primary school section, junior secondary section and high school section. 223 staffs are employed, of which 192 are teachers, 27 are teaching assistants, 4 are principals and vice principals. The ratio of teachers to non-teaching staff is 7.1:1. The school operates on a contracting basis for its staff while teachers are employed.

The school's various fixed assets amount to 9.3223 million yuan. The school's operations require 9.1 million yuan per year. 6.35 million yuan is allocated by the Group Corporation and 2.75 million Yuan is raised by the school.

**2.  IRICO Hospital**

IRICO Hospital was established in 1978 and was rated as a Class IIA hospital in 1995. Xianyang City has defined it as a "non-profit hospital".

Personnel situation: 150 fixed employees.

IRICO Group Corporation's support for the hospital: Allocation of 5 million yuan in 2002, allocation of 3 million yuan in 2003, planned allocation of 1.5 million yuan in 2004, after which it will be pushed fully on the market.

**3.  Training Center: includes IRICO Vocational College, IRICO Secondary School and IRICO Technical School**

The training center is under the human resources department of IRICO Group Corporation and is mainly responsible for on-the-job training, qualification education and pre-job training. The training center currently has 40 fixed employees, of which 22 are teachers and 18 are management staff. IRICO Vocational College, IRICO Secondary School and IRICO Technical School are under the training center and fees are subject to revenue and expenditures. In 2002, the Group Corporation disbursed budget of 3.43 million yuan and took in 950,000 yuan for various fees.

**II.  Auxiliary units relatively concentrated at Comprehensive management companies**

The auxiliary business units in Xianyang City are mainly concentrated in two companies, IRICO Three Production Company and Labor Services Company

**1. Basic situation of IRICO Three Production Parent Company**

Shaanxi IRICO Three Production Company (hereinafter referred to as the company) was established by IRICO Group Corporation in April 1994 to fundamentally solve the problem of "enterprise performing social responsibilities". It is a wholly owned subsidiary of IRICO Group Corporation but it actually still assumes some of the management functions of the Group Corporation.

Internal organization and structure: A total of 4 production plants, 8 business-type service units and 2 charity business units.

59

The company is generally not competitive in the market and the business income comes mainly from the Group Corporation.

As of June 2003, the company had a total of 1280 employees (excluding laborers in horticultural companies and around 50 employees working in an electronic packaging materials plant, bracket plant, chemical materials plant, labor insurance product plant and the head office), of which 530 were fixed employees.

As of 2002 December 31, the total assets of Three Production Company amounted to 59,925,425.32 yuan, with debts of 23,727,912.54 and owners' equity of 36,197,512.78 yuan.

**5.  IRICO Labor Services Company**

IRICO Labor Services Company mainly provides IRICO Group Corporation with internal shielding, electronic shielding, tube base, casings, bubble holders and other products, as well as printing under the IRICO trademark, glass bulb recycling, grinding, food stores and other similar services.

There are 728 registered workers, of which 386 are fixed employees (111 are fixed employees in IRICO Group Corporation, 275 are collective laborers), 146 have retired and 275 have internally retired.

As of 2003 June 30, the total assets was 80.51 million yuan, current assets was 61.91 million yuan and fixed assets was 18.6 million yuan.

**III.  Benefits-type logistics service units**

**6.  IRICO Kindergarten** (managed under IRICO Three Production Company)

IRICO Kindergarten is a benefits institution of the Group Corporation and is mainly enrolled with the children of the Group Corporation's staffs. It is under IRICO Three Production Company and is an advanced kindergarten of China. There are currently 190 employees, of which 112 are fixed employees. A total of 2.8 million yuan is paid in wages to employees every year and 2 million yuan is paid for management fees. The total expenses require 7 million yuan per year including the above and water, power, heating and other expenses. The kindergarten has revenue of around 1.4 million yuan, so has a budget gap of 5.6 million yuan which the Group Corporation spreads among beneficiary units. At present, the kindergarten's profit making ability is increasing due to the launch of special kindergarten teaching activities.

**7.  Public welfare facilities** (managed under IRICO Three Production Company)

The units include a property management office, culture and sports management office, shuttle bus team and bowling alley.

There are 13 fixed employees in the property management office and 24 workers on short-term contract workers.

The culture and sports management office has a club, sports center and swimming pool. There are 12 fixed employees.

The shuttle bus team has 6 vehicles with 6 drivers, 3 ticket sellers and 1 short-term contract worker.

The bowling alley has 10 fixed employees and 30 short-term contract workers.

**8.  Property management center** (managed under IRICO Three Production Company)

60

The center mainly collects the water and power fees of residents and has some overlap in function with the construction and horticultural company. At present, the center's total assets are 1,026,659.57 yuan; there are 12 fixed employees and 3 short-term contract workers.

**9. Communication station and shuttle team under the operations office** (operations office belongs to IRICO Three Production Company)

The communication station and shuttle bus team are currently operated in a contracting manner. The communication station mainly uses paging and intra-group telephones for its business and the paging service has basically been suspended. The internal telephone service has also been impacted heavily by social communication companies. The shuttle team has a small market and cannot survive independently. The communication station has 26 fixed employees, 2 short-term contract workers; the shuttle team has 10 fixed employees (1 person on awaiting job post) and 2 short-term contract workers.

**10. Grain store under the Labor Services Company, self-selected shops, vehicle team**

The grain store is operated for a policy nature and mainly provides IRICO employees with grain and oil products. It has always been making a loss and makes a loss of about 100,000 yuan every year. There are 10 workers, of which 9 are fixed employees.

The self-selection shop basically break even. There are about 20 fixed employees.

The vehicle team provides vehicle services to the Labor Services Company. It has 3 dump trucks, 4 sedan cars and 1 shuttle bus.

### III. Operational logistics service units

**11. IRICO Hotel** (managed under IRICO Three Production Company)

IRICO Hotel is under Three Production Company and its main source of business and income is accommodation and conference functions. The absolute in-plant spending accounts for 17%~21% and market consumption related to the factory accounts for about 10%, the remaining is from customers on the market. As of the end of June 2003, the total net assets of the hotel were 10,564,608.43 yuan. The hotel has 204 workers, of which 58 are fixed employees who have signed a labor contract with IRICO Group Corporation.

**12. IRICO Reception Center** (managed under IRICO Three Production Company)

The main business and income of IRICO Reception are: accommodation, dining and beverage, undertaking small conferences, holding training classes. It has an annual income of about 4 million yuan and the revenue from dining and beverage accounts for 55% of this. As of the end of June 2003, the total net assets of the reception were 2,357,766.96 yuan. It has 103 workers, of which 19 are fixed employees who have signed a labor contract with the main plant.

**13. Commercial drink company** (managed under IRICO Three Production Company)

It has living stoves, cold beverage plants, pools and supermarkets under it. Main business: provide services related to living. From 1995 to 2000, a portion of the workers tried to make their own way. The enterprise profit index is 400,000 yuan in one year. As of the end of June 2003, the total net assets were 5,263,077.84 yuan. There are 163 workers, of which 58 are fixed employees (38 are currently on duty and 11 are engaged in self-employment). All of them signed contracts with the main plant.

CONFIDENTIAL                                                    IRI-CRT-00002101 - Translation

**14.  Vehicle repair factory, advertising company, renovation company, comprehensive market at Qilipu under the Operations Office**

At present, the advertising company, renovation company and vehicle repair factor is operated by personal business contracting. There are 4 fixed employees who work in the comprehensive management office (includes Qilipu comprehensive market where one person is on standby); there are 8 fixed employees at the vehicle repair factory, 4 fixed employees at the renovation company, and 5 fixed employees at the advertising company (operated by one person). The fixed employees mentioned above signed labor contracts with the main plant.

**15.  IRICO Electronic Devices** (managed under IRICO Three Production Company)

This company mainly serves the main plant internally and undertakes the sporadic non-bulk and non-scale business to meet production needs. It takes internal factory orders and makes procurement in the market. Its profit is less than 5%. Assets: as of the end of June 2003, the total net assets were 108,699.12 yuan. Personnel situation: there are a total of 43 workers, all of which are fixed employees; 20 of them work in the office and 23 operate independently and pay management fees. The above employees all signed labor contracts with the Group Corporation.

**16.  Construction and horticulture company** (managed under IRICO Three Production Company)

The main business of this company is the greenification and environmental protection of the production areas and living areas of the company. It also undertakes some construction and maintenance projects. Its total net assets are 3,298,280.38 yuan. The company currently has a total of 428 people: 113 fixed employees, 20 short-term contract workers and 295 laborers.

**17.  Labor insurance products plant** (managed under IRICO Three Production Company)

Its main business and income come from the business of gloves and clothes cleaning. 95% of its business comes from the company and 5% is from external customers. In 2002, its operating revenue was 3.3 million yuan and its expected revenue for 2003 is 4 million yuan. The profit margin is about 5%. As of the end of June 2003, the total net assets were 120,765 yuan. It has 11 fixed employees and 59 short-term contract workers. 2 of the fixed employees are affiliated, have signed agreements, do not receive a wage, and personally assume their expenses and liabilities.

**18.  Trademark plant and printing plant** under the Labor Services Company

The trademark plant mainly provides IRICO with trademark printing services and makes revenue of about 300,000 per annum. It has 10-plus fixed employees.

The printing plant mainly provide IRICO Group Corporation with internal printing services and makes just enough to maintain its operations. It has 20 or more fixed employees.

**IV.  Enterprises that provide supporting products or services**

**19.  Shenzhen IRICO Electronics** (one of four restructuring pilot units)

CONFIDENTIAL

### 20.  IRICO Net Plate Plant

Full name is IRICO Electronics Net Plate Plant (Originally IRICO Shadow Mask Branch Plant), this company is under IRICO CRT Main Plant. It mainly produces 37CM and 56CM flat screen shadow masks for CRT Plant No. 1 and all its products are sold to the Group for tube plants.

Net Plate Plant has 59 fixed employees.

As of 2003 October 31, its total assets were 18,654,057.40 yuan

### 21.  IRICO Fluorescent Materials Ltd. Co

IRICO Group Company is the controlling shareholder of IRICO Fluorescent Materials Ltd. Co. The company was established on 1995 December 5 with a registered capital of 90 million yuan. The company mainly does business in three-color phosphors and raw powder used for color tubes and displays, and sells its own products. As of 2002 December 31, its total assets were 171,093,575.55 yuan, total liabilities were 45,459,952.82 and owners' equity was 123,735,183.15. The company currently has 240 fixed employees.

### 22.  Xianyang Caiqing Electronics Company

Xianyang Caiqing Electronics Company was created after Xianyang Caiqin Electronics Devices Plant was restructured in July 2000. The company produces and sells nails, anode caps, stent glass rods and glass powder. As of 2003 October 31, the company's total assets were 66,500,336. 21 yuan, liabilities were 26,145,267.23 yuan and owners' equity was 40,355,068.98 yuan. The company has 294 workers, of which 240 are fixed employees.

### 23.  IRICO Electronic Packaging Material Factory (also known as IRICO Bubble Factory, managed under IRICO Three Production Company)

It mainly does business internally with the Group Corporation and makes 54cm and 64 cm bubble brackets for the share company, as well as refines sulfuric acid and high concentration hydrochloric acid for Fluorescent Company. Its assets are 4,300,000 yuan mainly due to the machinery and equipment. It has 30 fixed employees who have signed labor contracts with IRICO Group Corporation.

### 24.  IRICO Bracket Plant (managed under IRICO Three Production Company)

It mainly does business internally with the company's plants and earns the difference after recovering old brackets and manually repairing them, exclusively supplies the Group. The Plant's current fixed assets are 530,000 yuan, of which property and buildings account for 337,000 yuan, machinery and equipment account for 47,000 yuan, electronic devices account for 70,000 yuan and transport equipment accounts for 75,000 yuan. There are currently 115 workers, of which 48 are fixed employees, 5 have taken long leave and 67 are on short-term contracts.

### 25.  IRICO Chemical Plant (managed under IRICO Three Production Company)

The Chemical Plant mainly produces and supplies chemical products such as insulating liquid and water-soluble adhesives, etc. In 2002, the output value was 2.49 million and profit was 240,000 yuan. As of the end of June 2003, the total net assets were 1,360,779 yuan and non-performing assets were 174,532 yuan. The Chemical Plant has 21 fixed employees and 9 short-term workers.

CONFIDENTIAL                                                                                   IRI-CRT-00002103 - Translation

**26.  IRICO Television Accessories Plant** (part of the Labor Services Company)

The plant mainly produces inner screens for IRICO Color Tubes and has an annual income of 18 million yuan. It is the main source of revenue of the Labor Services Company. There are currently 120 fixed employees.

**27.  Plastic Product Plant** (part of the Labor Services Company)

Supplies tubes and tube molds to IRICO Color Tubes exclusively and makes a profit of 800,000 annually. There are currently about 80 fixed employees.

**28.  Purification Equipment Plant** (part of the Labor Services Company)

Provides air purification for IRICO Glass; the company is starting to lose money in recent years due to a price decline and high labor costs. The company loses about 50,000 yuan every year on average. There are currently about 30 fixed employees.

**29.  Plant 818** (also known as the glass recycling plant; managed under the Labor Services Company)

Its main business is to recycle and reuse glass from IRICO Glass. In recent years, the efficiency of the plant has declined in recent years due to an improved yield of IRICO glass. It made a profit of around 200,000 yuan last year. There are currently about 80 fixed employees.

**30.  Bubble Bracket Plant** (part of the Labor Services Company)

Produces bubble brackets for IRICO and makes an annual profit of 200,000 to 300,000 yuan. There are currently about 50 fixed employees.

**31.  Polishing Plant** (part of the Labor Services Company)

Provides glass polishing services to IRICO Glass branch Plant and makes an annual profit of several thousand to several tens of thousands of yuan. There are currently 10 fixed employees.

**V.  Functional departments that can be outsourced**

**32.  IRICO Materials Company**

This company is actually the materials procurement department of the Group Corporation. Managed by Group's company department, it mainly procures structural materials and auxiliary materials that are required for production from enterprises in Xianyang for the Group Corporation, and is responsible for recycling waste materials on the production line. It has 200 fixed employees and 140 or so short-term contract workers. Its employed assets and finances are both directly managed by the Group Corporation.

**33.  IRICO Sales Company**

This company was originally IRICO CRT Main Plant Sales Company, and was later changed to IRICO Group Corporation Sales Company. It is managed by the Group's Company Department, and is only a joint-stock company sales company in name. Its main function is overall responsibility for the internal sales of the head plant and the joint-stock company. There are 67 fixed employees and all are on duty. Its employed assets and finances are both directly managed by the Group Corporation.

64

CONFIDENTIAL                                                                 IRI-CRT-00002104 - Translation

**34.   China National Electronics Import & Export Caihong Company** (one of four restructuring pilot units)

Currently the company does business as China National Electronics Import and Export Co; actual assets, personnel, and business all belong to IRICO Group Corporation. It actually serves as IRICO Group Corporation's import and export business management department.

## V. Wholly owned and controlled companies established by IRICO Group Corporation that have little relevance to the principal business

**35.   Shaanxi IRICO Construction Engineering Company** (one of four restructuring pilot units)

**36.   Shenzhen Hongyang Industry and Trade Company**

At present, the company mainly operates: phosphor sales and property leasing.

As at 2002 December 31, the total assets were 244,022,127.08 yuan, total liabilities were 15,467,162.26 and owners' equity was 228,554,964.82.

**37.   China Electronic Device Industry** (one of four restructuring pilot units)

**38.   IRICO Hongyou Transportation Company**

As of the end of June 2003, the company's net value of fixed assets was 25,877.84. There are currently 23 workers, all of which are fixed employees of IRICO. 15 of them are paid wages for their post while the others are paid living expenses of 500 yuan every month.

**39.   Xi'an IRICO Electric Industrial (closed)**

As of 2002 December 31, the total assets were 77,999,911.54, total liabilities were 100,117,247.22 and owners' equity was -22,117,335.68.

**40.   IRICO Haikou Hot Spring Hotel (closed)**

IRICO Haikou Hot Spring Hotel is a wholly owned subsidiary of IRICO Group Corporation. Due to its suspension of business in 2002, there is no product sales revenue or product sales cost. The administrative expenses are 2.6497 million yuan and the loss made was 2.3347 million yuan.

As of 2002 December 31, the total assets were 79,995,391.52, total liabilities were 1,135,456.44 and owners' equity was 78,859,935.08 yuan.

65

IRI-CRT-00002105 - Translation

# 彩虹集团公司
## 主辅分离、改制分流总体方案

# 目　　录

## 第一部分：彩虹集团公司的基本情况

### 一、　彩虹集团公司简介

（一）集团公司历史沿革............................................................（1）

（二）集团公司资产、经营情况....................................................（1）

（三）集团公司人员情况............................................................（1）

（四）集团公司的投资结构和骨干企业...........................................（1）

### 二、　彩虹集团公司主业发展情况

（一）彩虹集团公司在突出主业、精干主体、提高主业竞争力方面的探索和

实践

1、采取的措施和主要做法..........................................................（2）

2、取得的成效........................................................................（3）

（二）彩虹集团公司实施下岗分流、减员增效、安置富余人员政策的基本情

况

1、彩虹集团公司采取的主要措施和方式.........................................（4）

2、取得的成效........................................................................（4）

（三）彩虹集团公司主业发展面临的主要问题...................................（4）

（四）分流安置富余人员工作中存在的问题.....................................（6）

（五）彩虹集团公司今后精干主体、提高主业竞争力的改革发展思路与目标

规划

1、主业改革发展的思路.............................................................（6）

2、目标规划...........................................................................（7）

1

IRI-CRT-00002041

## 第二部分　彩虹集团公司主辅分离、改制分流的总体情况
### 第一则　　主　辅　分　离

一、　主辅业划分的依据和范围

（一）主辅业的划分依据……………………………………………………（8）

（二）主辅业的基本范畴……………………………………………………（8）

1、主业基本范畴………………………………………………………（9）

2、辅业的基本范畴……………………………………………………（9）

（三）主辅业的具体范围

1、主业的具体范围……………………………………………………（10）

（1）主业产品…………………………………………………………（10）

（2）主业企业…………………………………………………………（10）

2、辅业的具体范围

（1）企业办社会………………………………………………………（11）

（2）提供后勤服务的经营性单位……………………………………（11）

（3）配套生产企业……………………………………………………（11）

（4）具备外包条件的职能单位………………………………………（11）

（5）彩虹集团公司投资的与主业关联度不大的企业………………（11）

二、实施主辅分离的主要途径

（一）实施主辅分离的途径…………………………………………………（12）

（二）改制分流是实施主辅分离的主要途径………………………………（13）

### 第二则　　　改制分流

一、改制分流的总体思路

（一）总体思路………………………………………………………………（14）

（二）要实现的目标…………………………………………………………（15）

二、可用于改制分流的三类资产情况

1、三类资产的界定依据和范围……………………………………………（15）

2

2、三类资产的总体情况...................................................（16）

（1） 三类资产涉及的主要产品和服务...........................（16）

（2）三类资产的使用和效益情况...............................................（16）

（3）三类资产总额及所占总资产的比重.........................................（16）

## 三、改制分流涉及的人员情况

1、总体情况.................................................................（16）

2、社保情况................................................................. （16）

3、对职工负债情况.......................................................... （17）

## 四、改制分流应遵循的原则.........................................（17）

## 五、改制分流的主要形式和股权设置

（1）改制分流的形式.......................................................... （18）

（2）主辅分离、改制分流企业股权设置....................................... （18）

## 六、改制分流企业的资产和债权债务处理

（一）基本原则...............................................................(19)

（二）资产和债权债务的处理...............................................(19)

1、资产处置..................................................................(19)

（1）资产的范围和基本处理程序...............................................(19)

（2）资产处置的方式及内容..................................................(20)

（3）不良资产、闲置资产的处置办法...................................... (21)

（4）非经营性资产的处置....................................................(21)

2、债权债务的处理............................................................(21)

（1）债权债务的处理原则.....................................................(21)

（2）落实债权债务的方式....................................................(22)

## 七、改制企业土地使用权的处理............................................(22)

## 八、人员分流安置办法

（一）人员分流安置的原则..................................................... (23)

（二）分流安置人员范围的界定................................................. (23)

（三）人员分流安置途径...................................................... (24)

3

IRI-CRT-00002043

（四）改制分流过程中各种劳动关系的处理……………………………………（24）

　　1、分流到改制企业的人员…………………………………………（25）

　　2、内部退养人员…………………………………………………（25）

　　3、自谋职业人员…………………………………………………（25）

　　4、因工负伤（包括职业病）丧失劳动能力的人员………………（26）

　　5、患病或者非因工负伤的人员……………………………………（26）

　　6、几种非正常劳动关系的处理……………………………………（26）

　　7、在改制过程中原劳动合同到期的人员…………………………（27）

（五）社会保险关系的处理………………………………………………．（27）

（六）安置人员的相关费用………………………………………………．（28）

（七）人员分流安置工作中的扶持和鼓励措施…………………………（29）

**九、经济补偿金总额、来源及其发放………………………………………**（29）

**十、改制分流过程中几个问题的处理**

　　1、关联交易………………………………………………………（30）

　　2、对改制分流企业的扶持政策…………………………………（30）

## 第三部分 改制分流单位的基本情况和改制方案（或改制思路）

**一、纳入改制分流范围的单位名单及其基本情况**（见附件3）

**二、第一批实施改制分流试点单位的改制分流实施方案（共四家）**

1、彩虹建设工程公司改制分流方案…………………………………（31）

2、深圳彩虹电子公司改制分流方案…………………………………（33）

3、中国电子器件工业总公司改制分流方案…………………………（36）

4、彩虹进出口公司改制分流方案……………………………………（38）

**三、其他改制分流单位的初步改制方案或改制思路**

1、彩虹电子网版厂初步改制方案……………………………………（41）

2、陕西彩虹荧光材料公司改制思路…………………………………（42）

3、陕西彩秦电子公司改制思路………………………………………（42）

4

4、彩虹物资公司初步改制方案……………………………………………………（42）

5、彩虹销售公司初步改制方案……………………………………………………（43）

6、彩虹三产总公司改制思路………………………………………………………（43）

7、劳动服务公司改制思路…………………………………………………………（43）

8、对于三产总公司和劳动服务公司下属单位的整体改制思路……………（44）

9、彩虹广告公司改制思路…………………………………………………………（44）

10、彩虹装潢公司改制思路………………………………………………………（44）

11、海口彩虹温泉大酒店处置思路………………………………………………（44）

12、西安彩虹电器工业有限责任公司处置思路…………………………………（45）

13、彩虹学校改制分流思路………………………………………………………（45）

14、彩虹医院改制分流思路………………………………………………………（46）

15、培训中心改制分流思路（包括彩虹职大、彩虹中专、彩虹技校）……（46）

## 第四部分　　主辅分离、改制分流的组织和实施

### 一、　彩虹集团公司实施主辅分离、改制分流的工作原则和主要措

（一）主辅分离、改制分流的工作原则……………………………………（47）

（二）实施主辅分离、改制分流的主要措施………………………………（47）

### 二、彩虹集团集团公司主辅分离、改制分流的组织和实施

（一）集团公司实施主辅分离、改制分流的组织、实施机构…………（48）

（二）集团公司实施主辅分离、改制分流的决策程序………………（48）

（三）集团公司主辅分离、改制分流的实施程序…………………………（49）

（四）集团公司实施主辅分离、改制分流的操作规范………………（50）

**附件：**

附件1、彩虹集团公司组织机构图

附件2、彩虹集团公司的发展战略(摘要)

附件3、参加改制分流的单位及其基本情况

附件4、彩虹集团公司总经理办公会报送主辅分离、改制分流总体方案的决议

附件5、北京市大成律师事务所关于彩虹集团公司主辅分离改制分流总体方案的
　　　　法律意见书

CONFIDENTIAL

IRI-CRT-00002045

# 彩虹集团公司
# 主辅分离改制分流总体方案

## 第一部分：彩虹集团公司的基本情况

### 一、 彩虹集团公司简介

#### （一）集团公司历史沿革

彩虹集团公司是经国务院批准设立的国家特大型国有独资企业，直接归属国务院国有资产监督管理委员会管理。彩虹集团公司是在原彩虹电子集团基础上重组设立的，其前身是陕西彩色显像管总厂，被列为国家"六五"计划重点引进项目。我国第一只彩色显像管在这里诞生。

#### （二）集团公司资产、经营情况

1、资产情况

截止 2002 年 12 月 31 日，彩虹集团公司经审计的资产合计 7,643,448,360.88 元，负债合计 3,569,855,181.88 元，所有者权益合计 3,183,341,699.29 元。

2、经营情况

彩虹集团公司以彩色显示器件（CRT）为主业，其中，彩色显像（显示）管的年生产能力近 1000 万只，公司从建成投产至今，共生产彩色显像管（显示管）7，853 万只，产品累计销售收入 643 亿元，实现利税 81.28 亿元，出口创汇 9.4 亿元。

#### （三）集团公司人员情况

彩虹集团公司现有职工人数 21410 人，其中具有全民身份的职工（即固定工或称固定工）10800 人，短期合同工 10000 余人。各类管理人员 1110 人，各类工程技术人员 1579 人。

#### （四）集团公司的投资结构和骨干企业

目前，彩虹集团公司拥有全资子公司、控股公司及参股公司共有 20 多家（详见附件 1：彩虹集团架构图），其中，彩虹彩色显像管总厂和彩虹显示器件股份

6

IRI-CRT-00002046

有限公司（上市公司）是彩虹集团公司的主要骨干企业。

**彩虹彩色显像管总厂**

彩虹彩色显像管总厂是 1979 年经陕西省工商行政管理局批准成立的全民所有制企业，是彩虹集团公司的全资子公司。总厂下设彩管一厂等 10 个实行内部独立核算的非法人单位。上述单位的报表在总厂汇总。

截止 2002 年 12 月 31 日，资产合计 3,888,437,572.68 元，负债合计 2,111,671,712.81 元，所有者权益合计 1,776,765,859.87 元。

**彩虹显示器件股份有限公司**

彩虹显示器件股份有限公司于 1992 年 7 月 29 日成立，公司股票于 1996 年 5 月 20 日在上海证券交易所挂牌交易。目前，彩虹集团公司持有彩虹显示器件股份有限公司 56.14%的股份。

公司主要产品有 64cmFS、54cmFS 普通彩色显像管和 64cmPF、74cmPF 纯平彩色显像管，主要从事彩色显示器的开发、生产和经营。

截止 2002 年 12 月 31 日，公司资产合计 2,401,187,451.43 元，负债合计 740,126,713.15 元，所有者权益合计 1,661,060,738.28 元。

## 二、 彩虹集团公司主业发展情况

### （一）彩虹集团公司在突出主业、精干主体、提高主业竞争力方面的探索和实践

#### 1、采取的措施和主要做法

（1）1993 年彩虹集团公司成立三产事业部，1994 年更进一步将其改制为独立的企业法人，成立彩虹三产总公司，将为主业配套的一些辅助生产系统和后勤服务单位的职能予以分离，这是彩虹集团公司这些年来分离辅业和安置富余人员的最主要的渠道和方式。

（2）1998 年将下属的内蒙电视机厂交还原地方；将北京六所整体进行剥离，实现资产和管理与彩虹完全脱钩。这些单位的业务与彩虹集团公司的主营业务关联度不大，将其予以剥离，有利于突出主业、精干主体。

7

IRI-CRT-00002047

（3）1999 年，彩虹器件股份公司对彩管二厂实施整体并购，实现了规模效应，进一步提高了了主营业务的竞争力。

（4）2002 年，将荧光粉厂、偏转工厂分别出售给荧光材料公司和西安资讯公司，使其规模得到扩大，搏击市场的能力增强。

（5）2002 年，实施内部模拟市场方案和内部价格结算办法，增强了各生产单位的市场意识。

（6） 1992 年推行并不断完善的岗位技能工资制度，不但节约了人力成本，也为主业继续深化三项制度改革作了铺垫。

（7）尝试向新型显示器件进军，如和有关科研机构合作生产有机 EL，试产 PDP 产品等，以解决集团公司后续发展的问题。

（8）加强了科研机构和人员的建设，加大对集团公司技术中心的投资力度，一方面增强了密切跟踪新型显示器件的能力，一方面通过一系列的技术改造和技术措施，对现有工艺进行改造，为主业挖掘生产潜力和增加效益做出了贡献。

彩虹集团公司因应竞争形势的需要，通过上述措施，重组企业生产要素、推动内部机制转换、加强科研力量，使主业在发展中逐步得到明晰、竞争力得到加强。

**2、取得的成效**

上述措施和做法的实施，取得了明显的成效，彩虹集团公司的各项经济指标均实现了稳定增长，2002 年彩管产量达 960 万只，创历史最高记录，玻壳产量达 1651 万只，电子枪产量达 1038 万只，偏转线圈产量达 1060 万只，荧光粉产量达 360 吨，荫罩 489 万只。2002 年度公司实现销售收入 71 亿元，同比增长 20.21%；完成工业总产值 122.3 亿元，同比增长 34%；完成工业增加值 25.8 亿元，同比增长 15.8%；实现利税 8.7 亿元，同比增长 31.8%。2002 年度实现利润总额 455,873,145.97 元，同比增长 58%；出口创汇 1.34 亿美元，同比增长 30%。

**（二）彩虹集团公司实施下岗分流、减员增效、分流安置富余人员政策的基本情况**

8

IRI-CRT-00002048

**1、彩虹集团公司采取的主要措施和方式：**

（1）通过技改举措实现减员增效。

（2）借用优势资源和产品，积极引进社会资本和外资，设立合资合作公司，先后参与设立了西安彩虹资讯有限公司、咸阳彩虹电子配件有限公司、陕西彩虹荧光材料有限公司、咸阳彩泰电子器件有限责任公司等独立法人单位，吸纳了大量企业富余人员。

（3）设立三产总公司，通过将集团公司一些后勤、公益、物业、培训等部门向三产总公司移交，安置主业分流人员，促使上述部门独立核算，变服务为经营，逐步走向市场化，取得了很大成效。近 9 年来，通过三产总公司安置的主业富余人员达 1500 多人。

（4）利用陕西省和西安市有关政策，对西安彩虹电器工业有限责任公司职工进行分流安置，至今已分流安置 400 多人。

（5）集团公司各所属企业通过自身挖潜改造，精简合并，提高劳动生产率，实现减员增效。

（6）按照国家有关内部退养的政策，分流安置部分职工，截止 2003 年 12 月 31 日，集团公司实行内部退养人员达到 200 多人。

（7）彩虹集团公司及其所属各单位通过强化管理，依法与一小部分严重违反劳动合同的职工解除劳动合同。自 1995 年底至今，实现减员 400 多人。

**2、取得的成效**

通过上述措施，彩虹集团公司共安置分流富余人员共计 4000 多人，约占企业总人数的 20%，为实现彩虹集团公司主业精干作出了贡献，对进一步实施主辅分离工作也是很好的铺垫。彩虹集团在建厂初期彩管的年产量只有 96 万只左右，人员为 6000 人左右；目前，彩虹集团的彩管年产量已经达到 1000 万只，而从事彩管生产的员工只有 13，000 人，企业的劳动生产率有了大幅度的提高。

**（三）彩虹集团公司主业发展面临的主要问题**

**1、彩虹集团公司国有独资企业的所有制形式严重制约了主业的继续发展**

9

IRI-CRT-00002049

根据 2002 年的数据显示，目前国内生产ＣＲＴ产品的企业中有 9 家为外资或合资企业，另外 2 家为内资股份制企业，唯有彩虹集团公司一家是国有企业。在激烈的竞争中，体制所产生的影响越来越大，彩虹集团公司单是在体制上就已经落后竞争对手。

**2、彩虹集团公司的集团战略管理功能尚未发挥作用。**

这表现在：整个集团长期没有明确的战略定位和发展规划；对市场的研究和开发能力严重不足；至今还没有建立以市场为导向的经营管理体制，管理模式大多沿袭以前的工厂管理模式，各个主业生产单位注重生产管理、经营管理明显薄弱；很多经营者陷入事务性工作之中；以产权为纽带的母子公司管理体制尚未形成等等。

**3、人才结构不尽合理、高级管理和经营人才匮乏；人工成本总体偏高；劳动、人事、分配制度改革亟待深化。**

集团公司现有的人才结构不尽合理，生产管理和工程技术人才充足，而高级管理和经营人才则严重缺乏，尤其缺少诸如信息管理、国际营销、资本运作、风险控制等方面的高级管理和经营人才。同时，彩虹集团干部队伍的思想观念、综合素质、知识结构等已不能适应彩虹集团公司主业进一步发展壮大的需要。

人员能进不能出，收入能增不能减，非市场化的高收入大大增加了彩虹集团公司的管理成本和人工成本，无形中削弱了企业的竞争力。

上述问题的存在，与集团公司人事、劳动、分配三项制度改革不到位有密切关系；这些问题也只有在三项制度改革不断深化的过程中才能真正得到解决。

**4、主业不突出、主体不精干、企业负担沉重。**

由于长期以来缺乏明确清晰的企业发展战略等原因，彩虹集团公司经营范围过于宽泛、主业不突出，辅业和企业办社会负担沉重的问题并没有得到根本解决。

总之，上述体制问题、管理问题、内部机制问题、人才问题以及主辅不清、社会负担沉重等问题均是制约彩虹集团公司主业发展的因素。而其中所有制形式、人才问题和主辅不清、企业负担沉重问题对主业发展的制约作用最为明显，是迫切需要解决的问题。

10

IRI-CRT-00002050

### （四）分流安置富余人员工作中存在的问题

目前，彩虹集团公司在分流安置主业富余人员方面依旧面临着一些特殊问题，在一定程度上影响到这项工作的继续开展。主要表现在：

**1、社会经济大环境的制约**

彩虹集团主体企业和绝大部分职工所在的咸阳市处于我国西部地区，属于经济和社会欠发达的地区，社会对劳动力资源的公共需求较小，市场容量有限，而下岗失业人员又较多，分流安置富余人员、减员增效的难度非常之大。

**2、职工思想观念保守**

企业几十年来形成了相对封闭、相对独立的工业城区，导致职工传统观念意识较强，适应经济变革的能力较弱，思想相对保守，推行改革的思想阻力很大；

**3、以往分流安置富余人员模式的局限性**

以前的模式没能在人员分流的同时相应建立完善的劳动合同制度，多数被分流安置职工的劳动关系仍旧保留在彩虹集团公司或总厂，企业对这些职工的管理也沿袭原固定工的管理模式。这就导致：人员的劳动关系和身份并没有改变，职工的劳动就业观念也没有发生根本改变，实际是分而不离，企业的无限连带责任并没有真正解除。

此外，对接收主业富余人员的单位也没能建立健全法人治理结构，产权关系、隶属关系上没有发生根本改变，制约了这些单位的发展。

在上述情况下，是难以实现产权关系、劳动关系、隶属关系的清晰和规范。

### （五）彩虹集团公司今后精干主体、提高主业竞争力的改革发展思路与目标规划

彩虹集团公司精干主体、提高主业竞争力的具体思路或规划是：

**1、主业改革发展的思路**

（1）继续深化产权制度改革，对主业实施规范的公司制改造。

（2）完善彩虹集团公司中长期发展战略

11

（3）明确集团公司的定位和职能，建立和完善母子公司管理体制。

（4）实现彩虹集团公司主业企业基本管理制度从生产管理型向经营管理型、战略管理型转变。

（5）在传统行业和产品领域实施总成本领先战略，走低成本发展之路

（6）在新型显示器件领域实施相关多元化战略，加强技术研发力量，提高跟踪新型显示器件领域新产品新技术的能力，为彩虹集团公司实现行业和产品的结构性调整提供支持。

（7）优化现有的内部组织机构和职能，并在此基础上改革人事、劳动、分配制度。

（8）继续加强企业领导力文化等企业文化体系建设。

（9）分离企业办社会职能，分离辅业，使主业轻装上阵。

综上，**彩虹集团公司的发展的整体思路**是：**在正确的发展战略的指引下，围绕打造总成本领先的核心竞争力，发挥集团公司战略管理职能，对整个企业集团的产权制度、管理体制、内部机制、企业文化等进行全方位的重组和改造，增强主业竞争力；实施主辅分离，明晰主业，减轻负担；同时，通过科研力量的加强改造和创新现有产品、优化产品结构，并为集团公司适时进入新型显示器件产品领域，实现产业结构性调整做好准备。**

**2、目标规划**

最终要实现的目标是：到 2010 年，不但在传统的 CPT 领域具备明显优势，能够引领传统 CRT 产业；而且在新型显示器件领域，具备产品研发能力或与跨国公司合作生产的能力，成为产品多元化、经营规模化、管理现代化、具有国际竞争力的显示器件生产和研发基地、国际知名企业集团，为实现"百年彩虹"的远景目标奠定坚实基础。

# 第二部分　彩虹集团公司主辅分离、改制分流的总体情况
## 第一则　主　辅　分　离

## 一、　主辅业划分的依据和范围

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　　IRI-CRT-00002052

**（一）主辅业的划分依据**

**1、彩虹集团公司 2003 年制订的企业战略定位和发展规划是确定主辅业界限的最重要、最基本的依据**

（1）彩虹集团公司的战略定位和发展规划

1、行业和产品定位

彩虹集团公司的行业定位和产品定位于现有的 CPT 产品领域。

2、彩虹集团公司的发展战略

（1）发展战略和中长期规划

彩虹集团公司的总体发展战略是：在传统的 CPT 产品领域，实施总成本领先的基本竞争战略，打造成本最低的核心竞争力，奠定实现经营规模化的基石，使彩虹集团公司成为该产品领域内总成本最低、竞争力最强的显示器件巨头；

在作好传统 CPT 产品的同时，实施相关多元化的经营战略，将新型显示器件作为彩虹集团公司新的经济增长点，培育第二支柱产业。鉴于目前彩虹集团公司尚不具备大规模进入新型显示器件产业领域的条件，因此，将主要采取积极跟踪的策略，逐步进入新型显示器件产业领域。实现该战略的途径主要有两种：一是通过密切跟踪、调研新型显示器件领域的新技术、新产品的发展趋势，适时大规模进入该领域；二是借助国外显示器件产业结构调整和专业化分工的时机，与跨国显示器件企业实施战略合作，通过提供专业配套等方式，逐步参与到新型显示器件的价值链条中，实现产业和产品的结构性调整，并为最终全面进入该领域作好铺垫。

（2）中长期战略的目标

到 2010 年，使彩虹集团公司发展成为产品多元化、经营规模化、管理现代化的中国最强、最大的显示器件生产和研发基地、世界一流和国际知名的大型企业集团，为"立百年彩虹"的远景目标奠定坚实基础。

根据彩虹集团公司上述战略定位和发展规划，现有 CPT 产品以及新型显示器件产品领域，是彩虹集团公司的核心业务和大力发展的方向，即属于彩虹集团公司的主业。

（详见附件 2：《彩虹集团公司的战略定位和发展规划》）

13

**2、根据彩虹集团公司的实际情况，部分彩管配套企业也将列入主业范畴，具体划分时考虑以下因素：**

（1）与彩管的关联度大、不可分割的配套企业，作为主业；

（2）交易成本或转换成本高，直接影响彩管竞争力的配套企业，作为主业；

（3）占彩管成本构成比重大，直接影响彩管竞争力的配套企业，作为主业；

（4）对彩管的整体利润贡献率或所占收入的比重较大，对彩虹集团公司收入影响大的配套企业，作为主业。

**（二）主辅业的基本范畴**

**1、主业基本范畴**

根据彩虹集团公司的行业和产品定位，可以确定：主业必须与显示器件有关，与显示器件无关的行业和产品不能列为主业范畴。

根据彩虹集团公司打造总成本领先这一核心竞争力的战略规划，可以确定：并非所有与显示器件有关的行业和产品都能作为主业，只有那些对彩虹集团核心竞争力的构成产生直接影响的显示器件企业和产品才属于主业范畴。

鉴于彩虹集团的核心竞争力在于总成本领先，而总成本领先主要是由于彩虹集团综合配套能力强，因此，对于那些直接影响彩虹集团显示器件总成本构成的主要配套企业，同样列为主业的基本范畴。

在划分主业的基本范畴时，不以具体企业规模大小、是否赢利为指标，只以是否为彩虹集团发展战略中确定的主要发展方向或者是否与彩虹集团核心竞争力构成不可分割作为依据。

**2、辅业的基本范畴**

主业范畴之外，即属于广义的辅业范畴。

辅业的基本范畴主要包括：

（1）企业承担社会功能的部分（如学校、医院、公安处、彩虹职大、彩虹中专、彩虹技校等）；

（2）后勤服务系统（主要集中在三产总公司、劳动服务公司等企业系统内）；

（3）市场化程度较高、交易或转换成本不大的配套生产系统；

14

                                                                                           IRI-CRT-00002054

（4）具备外包条件的职能部门（如彩虹集团公司内部一些非独立法人的经营性单位和彩虹进出口公司）；

（5）彩虹集团公司投资的与 CRT 产业无关的行业。根据彩虹集团公司的发展战略和结构调整的安排，上述单位所从事的行业和提供的产品和服务均不是彩虹集团公司要发展的主要方向，都属于广义的辅业范畴

### （三）彩虹集团公司主辅业的具体范围

#### 1、主业的具体范围：

根据彩虹集团公司上述主业和辅业的划分依据，综合考虑彩虹集团公司的发展战略和结构调整的需要，经过彩虹集团公司经理办公会研究决定，彩虹集团公司目前主业和辅业的范围分别界定为:

#### （1）主业产品主要包括：

1）各种品种和规格的彩色显示器件的生产和总装；

2）彩色显示器件的主要零配件产品，包括电子枪、玻璃、偏转线圈、专用零件等；

#### （2）主业企业主要包括

1）彩管一厂（彩管总装）

2）彩虹显示器件股份公司（彩管总装）

3）电子枪厂（彩虹彩管专配、不可分割）

4）玻璃厂（所占成本比重大、转换成本高）

5）动力厂（不可分割）

6）西安彩虹资讯有限公司（所占收入和成本比重大、转换成本高）

7）咸阳彩虹电子配件有限公司（专配产品，不可分割）

8）珠海彩珠实业总公司（所占收入比重大）

9）彩虹昆山实业总公司（所占收入比重大）

#### 2、彩虹集团公司辅业具体范围：

主业范围之外，就是广义的辅业。主要包括企业办社会单位；为主业提供后勤、交通运输、工程建设、采购、销售和进出口、物业管理等后勤服务的经营

15

IRI-CRT-00002055

性单位；市场程度化较高，交易和转换成本较低的的为彩色显示器件提供零配件及原材料的单位；与彩色显示器件无关的行业和产品均属于辅业。这些辅业单位主要有：

**（1）企业办社会**　具体分三类：

1）承担政府职能的单位：集团公司公安处。

2）公益型单位：彩虹学校、彩虹医院、彩虹职大、彩虹中专、彩虹技校

3）福利型单位：彩虹幼儿园，公益设施部（含班车队、保龄球馆、、游泳池、体育馆、房产管理室），物业管理中心，经营室下属的客车队和通信站（上述单位均归三产总公司管理）；劳动服务公司粮店、自选商场、车队等。

**（2）提供后勤服务的经营性单位**

三产总公司下属的彩虹宾馆，招待所（含旅行社），劳保用品厂、商饮公司，彩虹经营室下属的广告公司、装潢公司、七里铺综合市场、汽修厂，设备公司，修建园艺公司，劳动服务公司下属商标厂、印刷厂等单位。

**（3）配套生产企业**（市场程度化较高，交易和转换成本较低的彩色显示器件零配件企业）

1）彩虹网版厂

2）彩虹荧光材料有限公司

3）彩秦电子有限公司

4）深圳彩虹电子有限公司

5）三产总公司下属的托架厂、电子包装材料厂、化工材料厂

6）劳动服务公司下属彩虹电视配件厂、塑料制品厂、泡托厂、净化厂、研磨厂、818厂（玻壳再生厂）

**（4）具备外包条件的职能单位**

企业内部承担市场功能的职能单位，如彩虹物资公司，彩虹销售公司，彩虹进出口公司。

**（5）彩虹集团公司投资的与主业关联度不大的企业**

1）集团公司的全资子公司。

16

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　　　　　　IRI-CRT-00002056

　　a、陕西彩虹建设工程公司及其管理的彩虹房地产开发公司、彩虹工程建设监理公司、彩虹建设工程设计院。

　　b、深圳虹阳工贸公司

　　c、彩虹惠州总公司

　　d、海口温泉大酒店有限公司

　　e、中国电子器件工业总公司

　　2）集团公司控股的子公司

　　a、彩虹虹友运输公司（归三产总公司管理）

　　b、西安彩虹电器工业有限责任公司

　　3）集团公司参股的公司

　　a、北京全创通讯设备有限公司

　　b、北京盈富泰克投资有限公司、

　　c、北京维诺信科技有限公司、

　　d、深圳市瑞科澳电子技术开发公司、

　　e、永安保险公司

　　f、彩虹包装箱厂

　　j、深圳彩虹皇旗资讯公司

## 二、实施主辅分离的主要途径

### （一）实施主辅分离的途径

　　对列为辅业的上述单位，将分别情况，采取以下途径予以分离：

　　1、对于彩虹学校、彩虹医院、彩虹集团公安处、彩虹大专、彩虹中专、彩虹技校等企业办社会职能，要通过与地方政府协商，在妥善处理资产、机构、人员的基础上，成建制移交地方政府，分离企业办社会职能。对于政府不愿或无力接收的承担企业办社会职能的单位，如符合国家从事产业化经营的政策，则可按照改制分流方式实施主辅分离。

　　2、对于企业自办福利型后勤服务机构，要从福利型转变为经营型，由无偿服务改为有偿服务，由单纯的为企业服务逐步转为面向社会服务，逐步改造成为独立核算、自负盈亏的经济实体。具备市场生存条件的，参加改制分流。

17

CONFIDENTIAL

IRI-CRT-00002057

3、对于经营性的后勤服务单位，通过改制分流方式进行主辅分离，组建产权主体多元化的法人经济实体。

4、对于市场化程度较高的小型配套生产企业，按照前述原则参加改制分流。

5、对于集团公司具备外包条件的单位，指彩虹集团公司内部一些职能部门：将其创办为独立的法人经济实体，作为市场主体为彩虹集团继续提供相关服务。

6、彩虹集团公司投资的与主业关联度不大的企业。这具体又分为三种情况

（1）彩虹集团公司全资的辅业公司：具备条件的，全部参加改制分流；

（2）彩虹集团公司控股的辅业公司，在征得其他股东同意后，改制分流

（3）彩虹集团公司参股的公司，不参加改制分流，按照集团公司的战略规划对投资进行战略性调整，逐步退出，将所得资金用于主业发展。

7、对于已经停业或者面临其他生存问题的单位，如海口彩虹温泉大酒店、西安彩虹电器工业公司、彩虹虹友运输公司等单位，要通过转让、合作或依法进行清算的方式进行主辅分离，在盘活现有资产的基础上，用所得资产妥善分流安置所在单位的职工。

**（二）改制分流是实施主辅分离的主要途径**

1、改制分流方式适用于资产属于主业的三类资产、人员属于主业富余人员、可以实行产业化经营的单位。

2、对于国家不允许实行产业化经营的单位如彩虹集团公司公安处、彩虹学校的初中小学（义务教育阶段），以及彩虹集团公司参股的企业，均不能以改制分流方式进行主辅分离。除此之外的其他辅业单位则可通过改制分流的方式实现与主业的分离。

3、对于资产属于彩虹集团公司主业的三类资产范畴、人员属于主业需要精简的富余人员、同时具备市场经营条件的辅业单位，将主要采取改制分流的方式与彩虹集团公司主业分离。

总之，根据彩虹集团公司的实际情况，改制分流将是主辅分离的主要途径。

**图：彩虹集团公司主辅分离示意图**

CONFIDENTIAL                                                                    IRI-CRT-00002058



第二则　　改制分流

## 一、改制分流的总体思路

### （一）总体思路

（1）利用彩虹集团公司具备经营条件的三类资产，改制创办面向市场、独立核算、自负盈亏的法人经济实体（鼓励民营化），分流安置企业富余人员，最终实现产权关系、劳动关系、隶属关系的清晰化和市场化。在解决主业精干的基础上，为辅业在市场中发展壮大奠定基础。

19

IRI-CRT-00002059

（2）对具备市场生存能力、经营者和职工有改制意愿的改制企业，直接改制为非国有法人控股的法人经济实体；对于暂时不具备条件的，可继续保持国有法人控股地位，但务必做到产权明晰、独立核算、面向市场、自负赢亏，并作好向非国有法人控股企业发展的规划和各项准备。

（3）在进行上述分离改制工作时，依法理顺各单位人员尤其是正式职工与所在单位的劳动关系。对分流进入改制为非国有法人控股企业的富余人员，原主体企业要依法与其解除劳动合同，并支付经济补偿金，职工与改制企业签订不少于三年的劳动合同；对分流进入改制为国有法人控股企业的富余人员，原主体企业和改制企业可按国家规定与其变更劳动合同，用工主体由原主体企业变更为改制企业。

**（二）要实现的目标**

1）具备改制条件的企业，要调整产权结构，完善公司治理结构。改制后，变单一国有为非国有控股的产权结构多元化的公司制企业；暂时不具备条件的，也要实现产权多元化。国有股原则上不能超过 75%。

2）分流富余人员，实现劳动优化组合。全员身份置换后，企业可以将因人设岗改为按工作需要设岗，并普遍实行竞争上岗，降低人工成本，提高劳动生产率，提高企业竞争力。

总之，要使具备市场生存条件的辅业单位按照公司法的规定改制成具有独立法人资格的市场经济主体，并在竞争中发展壮大；在妥善安置职工的基础上，改变职工的国有职工身份，提高其市场意识和竞争力。

# 二、可用于改制分流的三类资产情况

## 1、三类资产的界定依据和范围

上述三类资产界定的依据为：（1）859 号文及相关文件对"三类资产"内涵的界定；（2）彩虹集团公司的发展战略，以及彩虹集团公司主辅业划分的标准和范围。具体而言，所有划入辅业范围的资产均属于三类资产的范畴，属于非主业资产；目前彩虹集团公司没有闲置一年以上有市场生存能力的有效闲置资

CONFIDENTIAL                                                                  IRI-CRT-00002060

产、彩虹集团公司也没有也没有政策性关闭破产企业，因此也不存在符合国家产业政策、有一定获利能力的破产企业资产。

因此，**彩虹集团公司的三类资产就是彩虹集团公司的非主业资产，包括辅业资产、后勤服务单位的资产以及与主业关联度不大的其他资产**；由于部分企业办社会的资产如公安处的资产、彩虹集团公司在参股企业的所有者权益不参加改制分流，应当从非主业资产中剔除，其余的非主业资产则属于可以参加改制分流的非主业资产。

### 2、三类资产的总体情况

#### （1）三类资产涉及的主要产品和服务

企办学校、医疗服务、建筑设计、施工监理安装、宾馆招待、幼儿教育、物业管理、治安保卫等后勤服务单位以及为彩管配套的部分生产企业、此外还有一些企业的产品和服务与彩虹集团公司主业没有关联度。

#### （2）三类资产的使用和效益情况

三类资产的整体效益较差，有些已经因为市场变化的原因导致价值锐减,；有些资产本属于福利性设施，不具备经营能力；部分属于彩虹配套生产用资产，但是由于人工成本高，附加值偏低，效益一般。另外，三类资产中的不良资产较多。

#### （3）三类资产总额及所占总资产的比重

经过初步统计，非主业资产为 17 亿元，约占彩虹集团公司总资产的 23%。

## 三、改制分流涉及的人员情况

### 1、总体情况

改制分流涉及的富余人员为3853人,占彩虹集团公司全部职工的18%左右，占固定工人数的 36%。

### 2、社会保险情况

彩虹集团公司改制分流单位均按照国家和陕西省、咸阳市的规定参加了养老、疾病、失业、住房公积金等社会统筹，其中离退休人员已实行社会化管理，所有单位均没有任何欠缴社会保险费的情况。

21

    IRI-CRT-00002061

3、对职工负债情况

改制分流单位没有欠发工资、集资款、社会保险费等对职工负债的情况。

附：　　**彩虹集团公司三类资产及其涉及的人员情况表**

(截止到 2003 年 10 月)

| 序号 | 三类资产涉及的单位 | 资产数额（单位：元） | 涉及人员人数 |
|---|---|---|---|
| 1 | 彩虹医院 | 12272601 | 150 |
| 2 | 彩虹学校 | 76102381 | 229 |
| 3 | 培训中心 | 1994856 | 40 |
| 4 | 三产总公司（含下属单位） | 59925425 | 552 |
| 5 | 劳动服务公司（含下属单位） | 80510000 | 111 |
| 6 | 建设工程公司 | 10479099 | 78 |
| 7 | 物资公司 | 13234605 | 200 |
| 8 | 销售公司 | 2974560 | 67 |
| 9 | 中国电子器件工业总公司 | 562319639 | 189 |
| 10 | 深圳虹阳工贸公司 | 244022127 | 4 |
| 11 | 西安彩虹电器工业公司 | 77999911 | 1373 |
| 12 | 深圳彩虹电子公司 | 29409679 | 8 |
| 13 | 陕西彩虹荧光材料公司 | 171093575 | 240 |
| 14 | 彩虹电子网版厂 | 18654057 | 159 |
| 15 | 彩泰电子公司 | 66500336 | 237 |
| 16 | 彩虹进出口公司 | 233810376 | 65 |
| 17 | 彩虹海口温泉大酒店 | 79995391 | 20 |
| 18 | 彩虹幼儿园 | （含在三产数字内） | 112 |
| 19 | 彩虹包装箱厂 | 参股企业 | 11 |
| 20 | 深圳皇旗资讯公司 | 参股企业 | 8 |
| | 总　计 | 1741298615 | 3853 |

**四、改制分流应遵循的原则**

（1）改制分流要与业务、资产、人员结构调整相结合，注重资源整合，以提高改制企业的市场生存能力。

由于管理体制、利益格局等方面的因素，彩虹集团公司内部存在着严重的同业竞争以及资源被分割的局面，这种情况不但造成无谓内耗，并且无法发挥资源优势，削弱了企业的竞争力。因此，在主辅分离、改制分流过程中，无论

22

IRI-CRT-00002062

是主业还是辅业，均应当重视资产、人员、业务等方面的重组工作。

（2）统筹规划，分步实施，成熟一个，改制一个。

按照有利于稳定和提高企业市场竞争力的目的，对辅业单位的资产和业务进行重组，人员总体上仍按照现在所处的单位和岗位进行分流。对于具备经营和改制条件的，彩虹集团公司退出国有股份或仅保持参股地位；对于有经营能力，但是暂时不具备国有股退出或参股条件的，可暂时保持彩虹集团公司的控股地位，但应创造条件，尽早退出。

**五、改制分流的主要形式和股权设置**

**（1）改制分流的形式**

根据具体辅业单位的情况，充分利用市场资源和手段，按照《公司法》和其他有关法律法规的规定，通过合资、合作、出售、租赁、承包等方式，逐步实现产权主体多元化，鼓励职工、经营者和社会投资者对改制分流企业进行投资，允许职工将所得经济补偿金折为改制分流企业的股份。

将辅业单位改制为股权多元化的公司制企业是改制分流的主要方式。大多数辅业单位将直接或分两步改制为非国有法人控股的股权多元化的有限公司。

**（2）主辅分离、改制分流企业股权设置**

1）对于具备市场生存条件的改制分流企业，直接改制为非国有法人控股的有限责任公司，彩虹集团公司国有法人股可一次性退出或保留参股地位，参股比例原则上应低于 20%；

2）对于暂时不具备市场生存能力的改制分流企业，彩虹集团公司也应整体规划、逐步退出，彩虹集团公司的持股比例原则上应低于 75%。

3）对于政府不愿接收、国家政策允许产业化经营的企业办社会单位，也可改制为法人经济实体，其股权设置参照改制企业的股权设置模式进行。

**六、改制分流企业的资产和债权债务处理**

**（一）基本原则**

23

1、剥离非经营性资产，避免不合理的社会负担。

2、剥离不良资产、闲置资产，提高资产的质量。

3、争取引入增量资产。通过引进战略投资者、经营者持股、职工持股注入增量资金，盘活存量。

4、充分利用三类资产，发展配套辅业，安置分流职工。

5、遵循"资产随业务走"的原则，与改制单位生产经营业务有密切关系的资产保留在该公司。保持资产的完整性，保障改制单位有独立完整的业务体系。

6、依据资产相关性、业务相关性及人员相关性原则，合理划分债权债务。

### （二）资产和债权债务的处理

#### 1、资产处置

#### （1）资产的范围和基本处理程序

1）列为辅业范围的资产是指非主业资产、闲置资产、关闭破产企业的有效资产即所谓的"三类资产"，其数额以经过资产清查、审计、评估的后的国有净资产为准。对各辅业企业及相关辅业资产将根据资产质量、盈利状况决定是否给予折扣优惠。

2）对于改制企业占用的资产应首先明晰其产权关系。

对于产权关系不明确或者存在产权争议的（如彩虹劳动服务公司），应先进行产权界定或产权纠纷调处；对于出资证据齐全但尚未明确产权归属关系的，应按照规定补办相应手续。

3）彩虹集团公司主持、改制分流企业予以配合，对改制分流企业的各类资产进行全面的登记清查、全面核对查实帐面上各类资产和债权债务，并编制资产负债表和财产清单。在资产清查中，对于拥有实际控制权的长期投资，清查工作将延伸至被投资企业。

4）清查出的资产损失、包括坏帐损失、存货损失、固定资产及在建工程损失、担保损失、股权投资损失、债权投资损失以及经营证券、期货、外汇交易的损失等资产损失，其资产损失的认定和核销按照财政部关于印发《企业资产损失财务处理暂行办法》的通知（财企[2003]233号）和国务院国有资产监

24

IRI-CRT-00002064

督管理委员会《国有企业资产损失认定工作规则》的有关规定确认处理。

5）改制分流企业的国有资产的评估结果即国有净资产首先应用作对分流进入非国有法人控股的改制分流企业的人员的经济补偿，补偿标准按照国资委（2003）21 号文件执行。

6）改制分流企业的国有净资产按照规定进行各项提留和支付后的不足部分，由彩虹集团公司予以补足；对于企业资产规模较大，国有净资产按规定进行各项支付后仍有剩余的，其剩余部分可向改制企业的员工（包括经营者）或外部投资者出售，也可采取租赁、入股或转为债权等方式留在改制企业。

7）对于分布于不同企业但资产和业务具备相关性的资产，将根据市场情况统一由彩虹集团公司进行业务和资产的重组，相应人员原则上也遵循人员随业务走的原则进行处理。

8）对于已经没有市场前景或者资产质量很差的资产，能依法进行损益处理的，要及时处理；对于不能计入损益的，由改制分流企业提出充足依据，彩虹集团公司在评估值 10%以内的经确认研究后予以优惠；对于超出 10%的，由彩虹集团公司上报申请国资委确认。

9）对没有纳入改制分流企业范围的，但具备经营条件的剥离资产，可以其组建企业法人，独立核算，并相应安置部分富余人员；对于不具备经营条件的剥离资产，可采取整体公开出售、租赁经营等方式处理，所的收入优先用于安置富余人员；对于不具各上述条件的剥离资产，可由彩虹集团公司或愿意接收的改制分流企业暂时管理。

**（2）资产处置的方式及内容**

1）对集团公司非经营性固定资产资产、闲置的固定资产、待报废的固定资产予以剥离；对待报废的存货、超储积压的存货予以剥离；对回收无望的三年以上债权（包括赊销产品）予以剥离。

2）集团公司整体改制后，从实际出发，着眼于未来公司发展战略，对其下属单位采取多种方式进行改制，并依法规范操作。根据下属单位的实际情况和特点，选择合适的改制方式，如：内部职工持股、经营者持股、股份合作制、承包经营、租赁经营、出售等方式。

25

IRI-CRT-00002065

3）对拟改制的下属单位，当其净资产不足时，可采取：（1）将集团公司对改制单位的债权转为净资产；（2）将集团公司拟留给改制单位的债务转由集团承担；（3）从集团公司其他单位划入改制企业所需的相应实物资产；（4）减持集团公司拟持有的股权比例。

当改制单位的净资产过大时，可采取：（1）将相应资产转为租赁资产；（2）将部分资产转归改制单位对集团的债务（3）出售给社会法人和自然人。

**（3）不良资产、闲置资产的处置办法**

1）对集团公司清查出来的不良资产（最终以审计确认的数字为准），包括三年以上不良债权、存货损失、固定资产损失等，报财政部门批准核销，对不符合条件，未经核销的部分，由集团公司或国有资产经营公司继续清理、追讨。

2）集团公司清查出来的闲置固定资产 、具备经营条件的，组建企业法人，安置分流人员；对不具备经营条件的资产，以评估结果为基础，公开向其他单位和个人拍卖（出售价格低于评估结果 10%以上的，要向国有资本审批部门作出书面说明）或向其他单位或个人租赁，并签订租赁合同（租赁费参照同期银行贷款利率约定）。对不能按上述办法处置的，由集团公司管理

**（4）非经营性资产的处置**

集团公司承担社会职能的非经营性资产予以剥离，与当地政府充分协商后，无偿移交政府有关部门，相应核减集团国有资本。对于政府不愿或无力接收的、政策允许进行产业化经营的，可依法用相关资产组建法人经济实体或者采取租赁、承包经营、出售等方式进行。

**2、债权债务的处理**

**（1）债权债务的处理原则**

1）债权、债务随资产走的原则。资产进入拟改制下属单位，相应的债务也要进入。凡能明确某项资产、业务而产生的负债，该项资产业务进入改制单位，则该负债也进入。

2）合法性原则。保证进入改制单位的债务有合法完备的手续，该项债权债务的起源要明确、合法。

3）尊重债权人权利原则。有关债务进入改制单位必须事先征求债权人的意

26

IRI-CRT-00002066

见，并协议落实债务。

4）适度性原则。为保证改制单位财务结构稳健合理，要综合考虑其对集团公司的债权债务和自身净资产的规模，进行确定。

**（2）落实债权债务的方式**

1）由集团公司总体负责改制企业的债权债务清理和核实工作，并进行必要的审计，落实债权、债务人并与债权人或债务人订立债务保全协议。

2）改制企业原为独立法人的，要继续承担和落实原有的债权债务关系；从原主体企业分立重组的改制企业，按商定的比例承担债务。

3）实行整体改建的辅业单位，由成立的公司制企业承继原企业的全部债权债务；实行分立式改建的，由分立的各方承继原企业的相关债权债务；企业实行合并式改建的，由合并后的企业承继合并前各方的债权债务。

4）集团内部债务（包括改制时改制企业国有净资产按规定进行各项支付后的剩余部分采取转为彩虹集团公司债权方式留在改制企业的部分）不能因为主辅分离、改制分流而抵消，由集团公司组织各单位进行及时清理，相关单位要制订切实可行的还款计划，按期偿还。

对于所欠职工的工资、医疗费、集资款等，必须在改制前予以解决，可从国有净资产中直接扣除。

5）对于拖欠分流安置人员的集资款、工资（欠发）、医药费和欠缴社会保险等债务，按财政部313号文件第十七条的规定处理，可从企业净资产中支付。

**七、改制企业土地使用权的处理**

根据国家和陕西省人民政府关于土地资源管理的有关法律、政策规定，及落实国有企业主辅分离改制分流安置富余人员中的土地政策，确定：

1、对于改制分流企业现用地为彩虹集团通过出让方式取得的土地使用权及影响到彩虹集团整体规划的土地，改制分流企业原则上以租赁的形式使用。

2、对于改制分流企业现用地为原彩虹集团的行政划拨土地，只要不改变土地用途的，经所在地县级（含）以上人民政府批准，可继续以划拨方式使用；需要改变土地用途的，应按照《划拨土地目录》（国土资源令第9号）核定，改变

CONFIDENTIAL                                                                 IRI-CRT-00002067

后的用途符合《划拨土地目录》的，可继续以划拨方式使用；不符合《划拨土地目录》的，应依法办理土地有偿使用手续，允许将土地出让收益用于支付改制成本。

3、经与彩虹集团公司充分协商并经过国土资源管理部门同意后，改制分流企业可受让目前使用的国有划拨土地使用权，并共同到国土资源管理部门依法办理转让手续，缴纳相关费用。

## 八、人员分流安置办法

### （一）人员分流安置的原则

1、妥善处理改革、发展、稳定的关系原则

围绕集团公司改制分流工作的总体目标，考虑企业、职工和社会的承受能力，区别不同情况，对富余人员采取不同方式进行分流安置。

2、依法调整劳动关系原则

企业在改制过程中，应同时依法调整企业与职工的劳动关系。调整劳动关系应兼顾各方利益，妥善处理改革与稳定的关系，维护企业和职工的合法权益，实现劳动关系的和谐稳定。

4、规范操作原则

在企业改制总体方案框架内，按照有关法律、法规和相关政策制定职工分流安置方案，职工分流安置方案需经改制单位职工代表或者工会审议通过，并报集团公司审核备案后实施。

5、按照"人随资产走""人随业务走"的原则

改制前企业（或单位）在册的全民职工，原则上由改制企业安置。

6、保持政策连续性的原则。

如对于解除劳动合同到社会上就业和自谋职业人员领取的补偿金、内部退养人员领取生活费的标准等，企业内部要前后保持一致，外部要注意与本地区同类企业的平衡。

### （二）分流安置人员范围的界定

分流安置的人员是指根据国家产业政策，按照企业发展战略要求和专业化

28

分工的原则，需要分离的辅业、后勤服务以及与主业关联度不大的其他单位的全民身份的职工；由于产业、产品结构调整造成的企业富余人员中的全民职工。具体包括：

1、按国经贸企改[2002]859 号文件精神，属于"三类资产"单位全部在册的全民职工，包括单位的在岗员工、待岗或下岗员工、停薪留职人员以及其他非在岗人员等。

2、主业中需要精简分流的全民职工。

**（三）人员分流安置途径**

1、分流到改制后的企业。职工与改制企业重新签订劳动合同，在改制企业继续就业。这是人员分流安置的最主要的方式。

2、考虑年龄较大职工再就业的实际困难，对距法定退休年龄不足五年的职工，企业可参照 1993 年国务院第 111 号令和国发［2000］42 号文件办理离岗休养（即内部退养），退养期间企业不再安排工作岗位，职工按月领取生活费，到达法定退休条件时办法正式退休手续。

3、对符合提前退休条件的职工，按国家有关规定办理提前退休。

4、企业改制过程中劳动合同到期的职工，原劳动合同自行终止，彩虹集团公司原则上不再与其续签劳动合同。在改制企业竞聘上岗的，可与改制企业重新签订劳动合同。

5、自谋职业。在改制过程中，对于不符合办理内部退养和提前退休条件的职工，可自愿申请与企业解除劳动合同，到社会上就业。

**（四）改制分流过程中各种劳动关系的处理**

首先：应严格执行原劳动部《关于企业实施股份制和股份合作制改革中履行动合同问题的通知》（劳部发（1998）34 号）规定，首先应当履行与职工就变更劳动合同先行协商的规定，经协商不能就变更劳动合同达成协议的，再由彩虹集团公司（部分为总厂）解除与分流职工的劳动合同；同时，应当提前 30 日将解除原劳动合同的情况通知被安置分流的职工。

其次，应视人员分流安置的具体方式及相应政策，依法处理原劳动关系：

29

IRI-CRT-00002069

**1、分流到改制企业的人员**

（1）分流到非国有法人控股改制企业的职工，与彩虹集团解除原有劳动合同后，可依照国资委（2003）21号文的标准获得经济补偿金，（该经济补偿金原则上不以现金方式支付，职工可选择对改制企业的折股款或债权，参与改制企业收益分配），改制企业与职工重新签订劳动合同，职工在改制企业的工作年限重新计算。劳动合同的期限由改制企业与职工协商确定，协商不一致的，重新签订劳动合同的期限应不少于3年。

（2）分流到国有法人绝对控股改制企业的职工，彩虹集团公司与其解除劳动合同，不支付经济补偿金，改制前后职工工作年限合并计算，待改制企业变更为非国有法人控股的企业时，参照前条补偿标准执行；改制企业与职工协商签订新的劳动合同，由改制企业继续与职工履行原劳动合同的权利义务。职工工作岗位发生变化以及因岗位变更不能胜任工作的，改制企业可调整职工工作岗位或提供相应培训，或经协商对劳动合同作出变更。

改制企业与职工变更劳动合同期限不能协商一致的，应当履行原劳动合同中尚未履行的期限；原劳动合同未履行期限短于3年的，应延长至3年。

**2、内部退养人员**

（1）对于在改制前已办理内部退养的人员，由彩虹集团公司继续履行与职工的内部退养协议。

（2）在企业改制分流时，符合内部退养条件的职工，本人申请办理内部退养的，职工可与彩虹集团公司签订内部退养协议，由彩虹集团公司离退休办公室进行管理（中国电子器件工业总公司除外）。

（3）对改制分流过程中办理内退的人员，根据目前彩虹集团公司的内退待遇，由彩虹集团公司统一负责解决，内退人员法定退休年龄前的退养生活费及企业应为其缴纳的社会保险费用，实行专款专用，到法定退休年龄时，为职工办理正式退休手续，进入社保统筹；对于中国电子器件工业总公司则直接从公司国有净资产中预留相关费用后，由该公司管理本单位内退人员。

**3、自谋职业人员**

在改制过程中，职工自愿与企业解除劳动合同，到社会再就业的，企业应按

30

IRI-CRT-00002070

有关规定解除劳动合同，给予经济补偿金，在规定时间内办理解除劳动合同手续，转移档案，办理失业登记等。

### 4、因工负伤（包括职业病）丧失劳动能力的人员

对因工负伤（包括职业病）丧失劳动能力或大部分丧失劳动能力人员，按照《工伤保险条例》的规定办理，享受工伤保险待遇。

对患职业病和因工伤残.部分丧失劳动能力的人员，如本人提出与企业解除劳动合同的，按规定一次性计发医疗、应付工资等费用后，解除劳动关系，并给予经济补偿。

### 5、患病或者非因工负伤的人员

对患病或者非因工负伤，在规定医疗期内的职工可提前计算留出经济补偿费用，待医疗期满后再解除劳动合同给予经济补偿，或与本人协商一致，提前支付医疗期内应付的工资及相关待遇后再解除劳动关系并给予经济补偿。

根据劳办发（1994）214 号的规定，对于患精神病并经鉴定丧失劳动能力的，可由彩虹集团公司解除劳动合同，发给相当于本人标准工资 3 个月至 6 个月的医疗补助费。

在解除劳动关系时，企业除应当对患病或非因工负伤人员支付经济补偿金外，还应当支付不低于 6 个月工资的医疗补助费。患重病或绝症的，还应当适当增加医疗补助费，患重病的增加部分不低于医疗补助费的 50%，患绝症的增加部分不低于医疗补助费的 100%。

### 6、几种非正常劳动关系的处理

（1）对于在彩虹集团公司所属公司制企业工作并形成事实劳动关系，但人事关系仍在彩虹集团公司、未做处理的职工，将劳动合同用工主体变更为所属公司，按照所在企业的性质，确定是否给予经济补偿金。

（2）对于长期待岗、长期学习、长期外借、两不找等非正常劳动关系，按照如下办法予以处理：

1）、对于长期待岗的，一律解除与彩虹集团公司的劳动关系，进行身份置换，获得经济补偿，按照双向选择原则，改制企业接受的，进入改制企业工作，与改制企业重新签订劳动合同。对于不愿安置分流或者改制企业不能接收的，依法支付经济补偿金后，解除劳动关系。

31

IRI-CRT-00002071

2）、对于长期学习的，应通知其限期回单位处理劳动关系，经协商保持劳动关系的，对相关劳动合同条款予以变更，明确学习期间的权利义务关系；对于协商不成的，解除劳动关系，给予经济补偿。

3）、对于长期外借人员应与借用单位明确用工主体，由借用单位正式雇佣的，应与解除与彩虹集团公司的劳动关系，由借用单位与其签定劳动合同（其中，借用单位为非国有企业的，由彩虹集团公司支付经济补偿金）。借用单位不愿正式雇佣的，应依法与其原变更劳动合同，经过协商无法就变更达成协议的，解除与彩虹集团公司的劳动关系，并由彩虹集团公司支付经济补偿金。

4）、对于两不找人员，可依法解除劳动关系，不予补偿；

**7、在改制过程中原劳动合同到期的人员**

企业改制过程中劳动合同到期的职工，原劳动合同自行终止，彩虹集团公司原则上不再与其续签劳动合同，按照劳动和社会保障部劳社厅函〔2001〕280号文件的规定支付生活补助费。

对于合同期限届满后符合退休条件的，可以办理退休手续，领取养老保险金；不符合退休条件的，企业应当协助职工办理失业登记，领取失业救济金。（劳部发（1996）354 号）

**（五）、社会保险关系的处理**

企业改制后，应按规定做好职工社会保险关系的转移和接续工作。分流到改制企业或到其他企业就业人员，应由其所在企业和个人继续参保；对于到社会上自谋职业的人员，按地方社保部门规定执行。

彩虹集团公司应积极与社保部门协调，办理职工社会保险关系转移手续。对于协调不一致、办理转移保险关系有困难的，经地方社保主管部门同意，改制企业职工的社会保险关系可由原主体企业暂时代管，改制企业与彩虹集团公司签订职工社保关系代管协议，彩虹集团公司企业负责按社保部门规定的标准代收代缴社会保险费，所需费用由改制企业及职工个人承担。

到社会上自谋职业和就业的人员，转移社会保险关系有困难的，经地方社保部门同意，也可以由彩虹集团公司暂时代管其社会保险关系，本人与彩虹集团公司签订社保关系代管协议，彩虹集团公司负责按社保部门规定的标准代收

CONFIDENTIAL                                                                    IRI-CRT-00002072

代缴社会保险费，所需费用由个人承担。

**（六）、安置人员的相关费用**

1、解除劳动合同所支付的经济补偿金

对于分流到非国有控股改制企业的职工，与原彩虹集团公司解除劳动合同，按国家有关规定，由彩虹集团公司用国有净资产给予经济补偿，并可以在职工自愿的基础上转为改制企业的股权或债权。

解除劳动合同经济补偿金的标准按照劳社部发［2003］21号文的规定执行。

考虑到集团公司所属企业的实际情况，办理与职工解除劳动合同所支付经济补偿金的标准可按以下办法执行：

（1）企业与职工解除劳动合同，由企业给予经济补偿，经济补偿金根据职工在本单位工作年限，每满一年（不满一年的按一年计算）发给相当于本人一个月的平均工资，经济补偿金总额按职工在本企业工作的实际工龄计算。

经济补偿金的工资计算标准是指企业正常生产情况下劳动者解除合同前十二个月的月平均工资。职工本人的月平均工资低于企业月平均工资的，按企业月平均工资支付。

为便于计算，企业月平均工资按照集团公司上年度月平均工资确定，所属企业月平均工资高于集团公司月平均工资的，可按所属企业月平均工资计发。

职工本人月平均工资超过本企业月平均工资3倍及以上的，按不高于本企业月平均工资的3倍计发。

（2）自谋职业的人员，因解除劳动合同领取的经济补偿金，由彩虹集团公司一次性以现金支付。补偿金原则上不得超过企业原办理协议解除劳动合同支付的经济补偿金水平。

（3）对于以下人员解除劳动合同可不支付经济补偿金：与企业未有实际劳动关系的挂名挂靠人员；按自动离职处理的人员；因私出国（出境）定居人员；依据《劳动法》第25条规定，被解除劳动合同的；职工个人提出辞职解除劳动合同的人员。

2、内部退养人员的生活费标准

办理内部退养人员的生活费标准由企业根据实际情况自行确定，但生活费

33

IRI-CRT-00002073

标准最高不得超过按所在省计算正常退休人员养老金的计算办法核定的数额。内退人员养老保险个人缴费标准可保持其在岗时水平不变，也可按退养生活费标准缴纳。

内部退养人员生活费标准一次核定后，至正式退休前不再调整。符合法定退休条件时，按社保部门规定核定计算其退休后的基本养老金。

3、主辅分离辅业改制工作中解除劳动合同企业所支付的经济补偿金、内退人员生活费原则上用改制单位的国有净资产支付。改制企业的国有净资产按规定进行各项支付的不足部分，由彩虹集团公司予以补足。

4、对于改制过程中可能发生的其他费用，将按照国家规定逐个在改制分流单位中落实。

### （七）、人员分流安置工作中的扶持和鼓励措施

一是根据全国再就业会议的精神和 859 号文的规定，集团公司将在实行相关多元化战略的过程中把主业向上延伸，拉长产业链，培育新的利润增长点，大力开发就业岗位；二是充分宣讲政策，帮助其运用好税收减免和补贴政策，扶持职工自主创业、自谋职业；三是寻找合适的社会机构进行培训，引导其转变就业观念；四是建立自谋职业职工创业孵化机制等。


### 九、经济补偿金总额、来源及其发放

在改制分流时，对分流进入改制后的非国有法人控股企业的固定工，在依法与彩虹集团公司解除合同的同时，获得经济补偿金。

1、经济补偿金的计算标准

经济补偿金按照 859 号文和劳动部（2003）21 号文规定的标准执行。

2、用于支付职工解除劳动关系的经济补偿金经初步测算为 164021106 元。

3、经济补偿金的来源主要是彩虹集团公司在改制分流企业中的国有净资产、以及彩虹集团公司出让股份、变现资产等获得的收入；对于依法进行包括经济补偿金在内的各项支付不足的部分，由彩虹集团公司予以补足。

4、经济补偿金的发放。方案生效后，经协商解除劳动关系的职工，应在规

CONFIDENTIAL                                              IRI-CRT-00002074

定期限内与公司签订解除劳动合同协议，并依法获得经济补偿。

### 十、改制分流过程中几个问题的处理

#### 1、关联交易

改制企业分离后，彩虹集团与各改制单位之间的交易往来将完全按照市场规律和公平合理、平等自愿的原则进行，交易主体均按照民事合同承担相应的民事义务，享有相应的民事权利。

#### 2、对改制分流企业的扶持政策

彩虹集团公司将对改制分流企业提供一定的政策扶持。这些政策主要包括：

1）彩虹集团要按照主辅分离改制分流方案及其与改制企业签署的关联交易协议，从对改制分流企业予以扶持角度出发，适度保护内部市场，在同等条件下优先选择改制分流企业提供的产品或服务，从而充分体现"扶上马，送一程"的精神。

2）改制分流企业的生产经营条件。

3）利用集团公司的管理、技术、人才等优势为改制分流企业提供指导和帮助，促使其管理、技术水平的提高。

4）帮助推荐并监督改制分流企业经营者的产生过程合法。

5）改制分流企业占用集团公司的固定资产按照优惠政策收取费用、对暂时不具备经营条件的改制分流单位，给予一定扶持期限，费用逐年递减。

但是，彩虹集团公司上述扶持政策采取的是"内部优先但不保护落后"、"在竞争条件下同等优先"的原则，以此促使改制分流单位主动降低成本、提高质量、改善服务，尽快提高市场竞争能力。

上述扶持政策可在与改制分流单位的相关协议中体现。

## 第三部分　参与改制分流的单位及其改制方案（或改制思路）

### 一、纳入改制分流范围的单位名单及其基本情况（详见附件 3：参加改制分流的单位名单及其基本情况）

### 二、第一批实施改制分流试点单位的改制分流实施方案（共四家）

CONFIDENTIAL

IRI-CRT-00002075

## 彩虹建设工程公司改制分流方案

### 一、企业基本情况

公司于 1993 年 3 月成立，全民所有制企业。经济方式为工程管理总承包。

公司下属咸阳彩虹房地产开发公司、公司下属陕西彩虹工程建设监理公司、公司下属陕西彩虹建设工程设计院，均未独立核算。

截止 2002 年 12 月 31 日，资产合计 10,479,099.58 元，负债合计 4,007,037.90 元，所有者权益合计 6,472,061.68 元。

### 二、改制条件分析

**1、工程公司具备一定生存能力市场发展潜力。**

工程公司具备众多资质，但没有真正发挥其价值。工程公司及其下属三个单位目前具备房地产开发和施工总承包三级资质、工程造价咨询甲级资质、建筑设计乙级资质，以及建设工程监理甲级资质，其中监理资质是咸阳市唯一一个工程监理甲级资质，各项资质资源丰富。同时，主要职工均为知识分子，人员素质高。

**2、工程公司经营者和绝大多数职工对改制有积极性。**

**3、经营班子较团结、并具有市场开拓精神。**

总之，工程公司具备一定的市场开拓和生存能力，经营者和职工对改制比较支持，具备一次性改制为非国有法人控股的法人实体的条件。

### 三、改制方案

#### （一）　改制形式和股权结构

1、改制形式：改制为非国有法人控股的有限责任公司。

将工程公司、设计院、监理公司合并组建为一家开展工程总承包业务的有限责任公司；彩虹房地产公司予以保留，并改造成职工持股的有限责任公司。

2、股权结构：

（1）彩虹集团公司在上述公司的股权部分转让给工程公司现有经营者和职工，所留存股份比例不超过 20%。

（2）经营者和职工股权比例为 50%以上，职工持股遵循向经营者和业务骨干倾斜的原则，经营者持股比例原则上不超过一般职工平均持股额的 **5** 倍。

（3）吸收其他民营资本进入，股权比例为 30%以下。

（4）股东出资来源：集团公司以支付改制成本后的净资产作为出资；经营者和职工以取得的经济补偿金入股，再自筹一部分现金出资；民营资本以符合公司

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　　　　　　IRI-CRT-00002076

法规定的形式出资。

3、经营者和职工持股的载体

由于出资的经营者和职工人数较多，超过了公司法限定的有限责任公司的股东不能超过 50 人的限制，因此，经营者和职工的持股载体将优先选择委托信托投资公司或者工会法人代为持有股份的方式进行；经过出资职工决议，也可采取推举职工代表持有股份的方式进行。关于委托持股的协议内容，由当事人协商确定，协议应明确代为出资的法律事实。

4、法人治理结构：

（1）公司设股东会，是公司最高权力机构，由全体股东组成，依照《公司法》和公司章程行使权利，议事方式和表决程序按公司章程规定执行。

（2）公司设董事会，是公司的最高决策层，董事会由三至十三名董事组成，董事成员由各股东参考股权比例提名，并由股东会选举产生，董事会对股东会负责，并依《公司法》、《公司章程》、《董事会议事规则》行使职权。 董事长为公司法定代表人。

（3）公司设监事会，是公司的监督机构，由股东会选举产生并对其负责。监事会人数不少于三人，并应有职工代表参加。监事会设监事会主席一人，为监事会召集人。

**（二）人员状况和安置分流意见**

1、工程公司现有员工 95 人，其中固定工 78 人。

2、上述固定工与彩虹集团公司解除劳动合同并获得经济补偿。

3、15 名符合内退条件的职工可在其自愿的基础上办理内退手续，由彩虹集团公司纳入现行内退人员管理体系进行管理。

4、对于离退休人员，企业将相关统筹费用与彩虹集团公司办理交接后，交给彩虹集团公司离退休办公室管理。

5、63 名职工依法获得经济补偿后，进入新公司并与新公司签订期限不少于三年的劳动合同。

**（三）经济补偿金及其来源**

经测算所需经济补偿金总额为 **4312589** 元。

资金来源主要是彩虹集团公司在工程公司的中的国有净资产以及彩虹集团

CONFIDENTIAL

公司出让股份、变现资产等获得的收入；对于依法进行包括经济补偿金在内的各项支付不足的部分，由彩虹集团公司予以补足。

### （四）资产处置

1、目前企业占用的彩虹集团公司的房屋不纳入改制范围，由彩虹集团公司收回并租赁给工程公司使用。

2、彩虹集团公司未分配利润 3328977 元予以收回。

3、彩虹集团公司以纳入改制范围并经过评估后的净资产支付经济补偿金后，将剩余净资产中 80%的股份作价转让给工程公司职工及新进入的社会投资者，职工对彩虹集团公司的股份享有优先受让权。

4、对于净资产进行各项支付不足部分，由彩虹集团公司以现金方式补足。

### （五）债权债务

原改制企业债权债务由新成立的公司继承和负担；

对于集团内部债务问题，由集团公司统一协调，并签定债务偿还协议。

### （六）政策扶持

鉴于工程公司长期以来的市场意识不够强，市场运作经验不够丰富，集团公司应当在三年之内，在彩虹集团公司改扩建工程项目上和融资问题上对工程公司给予一定扶持。

## 四、党团组织关系、档案管理、社会保险接续等衔接工作

在公司改制后，按照陕西省和咸阳市的具体规定，办理属地化管理相关手续。

## 深圳彩虹电子公司改制分流方案

### 一、 公司情况简介

深圳市彩虹电子公司是由彩虹集团公司、深圳经济特区发展（集团）公司和深圳桑达电子总公司合资经营的全民内联企业，公司成立于 1989 年 4 月，注册资本 423 万元，主要从事彩管及显示管用会聚磁件生产和销售；

截止 2003 年 10 月 31 日，公司资产总额为 35081883.57 元，负债 10389140.54元，所有者权益合计为 24692743.03 元，其中彩虹集团公司所有者权益为1728490.12 元。

公司现有员工 165 人。其中固定工 8 人，均为彩虹集团公司外派正式职工。

CONFIDENTIAL

IRI-CRT-00002078

## 二、改制条件分析

1、具备市场生存条件和发展潜力

公司现年产会聚磁件 1800 多万只，其中 60%内配彩虹集团公司，40%左右销售给三星、赛格日立、华映光电等公司，具备一定的市场生存能力；虽然目前存在机制不灵活的弊端，但是，随着本次改制的顺利完成，制约公司发展的制度问题将得到彻底解决，这将大大激发公司的发展潜力。

2、经营状况较好，资产质量较高，能够支付改制各项成本。

虽然公司目前面临产品结构的制约和市场竞争的压力，但是目前经营状况和资产质量均较好，能够支付各项改制成本，改制时机较好。

3、经营者和职工对改制的积极性较高，市场观念到位。

由于公司处在深圳这样的市场经济比较发达的地区，市场竞争环境相对彩虹集团公司处于内地的配套企业，经营者和职工的市场意识和抗风险能力较强。目前，公司经营者和职工对改制持积极支持和参与的态度，希望公司尽快改制。

4、经营班子企业管理水平较高，并且具有较强的市场意识、富有进取精神。

由于公司的管理和技术人员都来自彩虹集团公司，具备较强的技术和管理能力，因此与国内同类企业相比，公司的企业管理制度相对比较完善；同时，经营班子一直没有满足于彩虹集团公司的内配市场，多年来坚持面向市场、面向用户的经营方针，富有一定的市场意识和开拓进取精神。

5、公司的另外两家国有股东对于改制持支持态度，并已经承诺放弃彩虹集团公司所转让股份的优先受让权；

综上，公司具备一次改制为非国有控股的独立法人的基本条件。

## 三、改制方案

### （一）改制形式及股权结构

1、改制形式：改制为非国有法人控股的有限责任公司

2、改制后公司名称：深圳彩虹电子有限公司

3、改制后业务范围：基本不变,在作好会聚磁件的同时,利用现有的设备,发挥注塑和制模的优势开发新产品

4、改制后股权结构：彩虹集团公司将其持有的 70%的股份中的 50%按照评估后的净资产价值转让给彩虹的经营者和职工后，股权结构如下：彩虹集团公司

CONFIDENTIAL

IRI-CRT-00002079

持有 20%的股份，公司经营者、职工和部分业务骨干持有 50%的股份（其中经营者应持大股），深圳市特区发展集团公司持有 20 的股份，深圳市桑达有限责任公司持有 10%的股份。

5、经营者和职工出资来源：经营者和职工以取得的经济补偿金折价入股，再自筹一部分现金出资。

6、法人治理结构：

（1）公司设股东会，是公司最高权力机构，由全体股东组成，依照《公司法》和公司章程行使权利，议事方式和表决程序按公司章程规定执行。

（2）公司设董事会，是公司的最高决策层，董事会由三至十三名董事组成，董事成员由各股东参考股权比例提名，并由股东会选举产生，董事会对股东会负责，并依《公司法》、《公司章程》、《董事会议事规则》行使职权。 董事长为公司法定代表人。

（3）公司设监事会，是公司的监督机构，由股东会选举产生并对其负责。监事会人数不少于三人，并应有职工代表参加。监事会设监事会主席一人，为监事会召集人。

**（二）人员状况及安置意见：**

1、目前公司有固定工 8 人，离休 1 人，均为彩虹集团公司委派到公司的职工。

**2**、8 名固定工全部解除与彩虹集团公司解除劳动合同，依法得到经济补偿，补偿金折抵部分股份；1 名离休人员交给彩虹集团公司纳入离退休人员进行管理。

3、在新公司变更登记后，由新公司与上述 8 名职工签订不少于三年的劳工合同。

**（三）补偿金总额及来源**

固定工根据截止到 2003 年 10 月 31 日前 12 个月平均工资*本人在本企业连续工作年限（从其他国有单位调入的，工龄累积计算）公式计算，经过初步测算，需经济补偿金约 1120000 元。该补偿金从彩虹集团公司在公司所占净资产中支付。

**（四）资产处置**

1、目前的房产由于历史遗留问题而存在法律障碍，因为不进入改制后的公司，由现有股东与深圳市政府协商房产问题。

40

IRI-CRT-00002080

2、彩虹集团公司用于解除劳动关系的经济补偿金约 1120000 元,从彩虹集团公司所占净资产中支付。

**（五）债权债务处理**

现有债权债务多为公司正常经营中产生的流动性债权债务,由改制后的企业享有和承担。

**（六）土地使用权**

新公司采取租赁方式取得土地使用权。

**四、党团组织关系、档案管理和社会保险关系接续**

上述关系的移交和接续按照 859 号文件和深圳市地方政府的有关规定执行,实行属地化管理。

**五、关联交易及扶持政策**

由于目前公司的主要产品内配给彩虹集团公司,为体现改制后的扶持政策,将由彩虹集团公司与公司签订在一定期限内给予同等优先的内部市场扶持协议。

# 中国电子器件工业总公司改制分流方案

**一、企业简介**

公司主要从事电子器件的生产和销售,截止 2002 年 12 月 31 日,资产合计 562319639.98 元,负债总额 359509952.23 元,所有者权益合计 200295585.89 元。

**二、改制条件分析**

1、公司目前效益较好,经营者和职工改制积极性高。

2、859 号文出台之前,已酝酿改制 2 年时间,改制基础条件已初步完成。

3、经营班子富有市场开拓意识,经营和管理经验丰富。

**三、改制方案**

**（一）改制形式及股权结构**

**1、**改制的形式：将中国电子器件工业总公司的国有独资企业性质改制为非国有控股的有限责任公司

2、股权结构：彩虹集团公司全部退出, 由公司目前经营者、职工和社会投资者持有公司的股份。其中经营者和职工优先受让彩虹集团公司的股份,（经营者应持大股,其持有股份的额度一般不超过一般职工持股额度的五倍）其余股份

41

IRI-CRT-00002081

由社会投资者（浙江民营企业）购买。

3、关于经营者和职工持股的载体

由于出资的经营者和职工人数较多，超过了公司法限定的有限责任公司的股东不能超过 50 人的限制，因此，经营者和职工的持股载体将优先选择委托信托投资公司或者工会法人代为持有股份的方式进行；经过出资职工决议，也可采取推举职工代表持有股份的方式进行。关于委托持股的协议内容，由当事人协商确定，协议应明确代为出资的法律事实。

4、经营者和职工的出资来源：经营者和职工可以用取得的经济补偿金入股，再自筹一部分现金出资；民营资本以符合公司法规定的形式出资。

5、法人治理结构：

（1）公司设股东会，是公司最高权力机构，由全体股东组成，依照《公司法》和公司章程行使权利，议事方式和表决程序按公司章程规定执行。

（2）公司设董事会，是公司的最高决策层，董事会由三至十三名董事组成，董事成员由各股东参考股权比例提名，并由股东会选举产生，董事会对股东会负责，并依《公司法》、《公司章程》、《董事会议事规则》行使职权。 董事长为公司法定代表人。

（3）公司设监事会，是公司的监督机构，由股东会选举产生并对其负责。监事会人数不少于三人，并应有职工代表参加。监事会设监事会主席一人，为监事会召集人。

6、改制后公司业务范围： 目前业务范围保持不变。

**（二）人员状况及安置意见：**

1、公司固定工 189 人，在职职工 160 人，符合国家法定和北京市内退条件（工作时间满 30 年）的有 38 人，离退休 90 人，其中离休 8 人。

2、离退休人员提留国家和北京市地方政府规定的各项费用，纳入改制后公司管理。

3、已经办理内部退养人员 36 人（其中 20 人为按照北京市政策办理内部退养的人员），不给经济补偿，提留相关生活费和社会保险费后，进入改制后的公司，由改制后的公司按照规定管理。

4、具备内部退养条件的 8 名职工，按照自愿原则，如其选择继续工作，可

CONFIDENTIAL                                                                IRI-CRT-00002082

获得经济补偿，解除原劳动合同，与新公司签订不少于 3 年的劳动合同；如选择提前退养，则不给经济补偿，在预留 5 年的生活费和社会保险费后，办理内部退养手续。

5、其余职工全部进入改制后的新公司，并与新公司签订不少于 3 年的劳动合同。

**（三）经济补偿金总额及来源**

固定工根据截止到 2003 年 10 月 31 日前 12 个月平均工资*本人在本企业连续工作年限公式计算补偿金数额，经过初步测算为 16986896 元。

补偿金来源于彩虹集团公司在公司的净资产。

**（四）资产处置**

1、彩虹集团公司收回未分配利润。

2、彩虹集团公司用于解除劳动关系的经济补偿金约 16986896 元，从彩虹集团公司所占净资产中支付。

3、在依照政策进行各项支付后的剩余净资产，转让给公司经营者和职工，经营者和职工出资购买剩余部分出售给社会投资者。

**（五）债权债务处理**

现有债权债务由改制后的企业享有和承担。

彩虹集团公司为公司担保的贷款余额做反担保手续，以目前公司的固定资产进行抵押，并办理抵押登记手续。

**（六）土地使用权**

目前公司使用的国有划拨土地由公司与北京市国土资源和房屋管理局协商后继续以划拨方式使用。

**四、党团组织关系、档案管理、社会保险接续等衔接工作**

按照北京市社会保障相关规定执行。


# 中国电子进出口彩虹公司改制分流方案

**一、 公司情况简介**

中国电子进出口彩虹公司注册资本 2200 万元，隶属中国电子进出口总公司（实为挂靠关系）。公司为外贸企业，主要经营彩虹集团公司内部的进出口业务。

CONFIDENTIAL                                                                 IRI-CRT-00002083

截止 2002 年 10 月 31 日，公司资产总额为 233810376．93 元，其中固定资产 3457972．62 元,流动资产 229034253．75 元,负债总额 227672067．21 元，所有者权益合计为 6138309．72 元。

**二、 改制条件分析**

1、具备市场生存条件和发展潜力。

2、经营者和职工对改制的积极性较高，观念比较到位。

3、经营班子企业管理水平较高，并且具有较强的市场意识、富有进取精神。

综上，公司具备一次改制为非国有控股的独立法人的基本条件。

**三、改制方案**

**（一）改制形式及股权结构**

1、改制形式：非国有法人控股的有限责任公司

2、改制后公司名称：陕西省彩虹进出口有限责任公司（暂定名，以工商局最终核定名称为准）

3、改制后业务范围：主要从事彩虹集团公司的相关进出口业务。

4、股权结构：彩虹集团持有公司 20%股份，其余股份由目前职工和经营者持有，其中经营者应持大股，持股额度一般不超过一般职工持股额度的五倍。

5、经营者和职工持股的载体

由于出资的经营者和职工人数较多，超过了公司法限定的有限责任公司的股东不能超过 50 人的限制，因此，经营者和职工的持股载体将优先选择委托信托投资公司或者工会法人代为持有股份的方式进行；经过出资职工决议，也可采取推举职工代表持有股份的方式进行。关于委托持股的协议内容，由当事人协商确定，协议应明确代为出资的法律事实。

6、经营者和职工的出资来源

经营者和职工以取得的经济补偿金折价入股，再自筹一部分现金出资。

7、法人治理结构：

（1）公司设股东会，是公司最高权力机构，由全体股东组成，依照《公司法》和公司章程行使权利，议事方式和表决程序按公司章程规定执行。

（2）公司设置董事会，是公司的最高决策层，董事会由三至十三名董事组成，董事成员由各股东参考股权比例提名，并由股东会选举产生，董事会对股东会负

44

IRI-CRT-00002084

责，并依《公司法》、《公司章程》、《董事会议事规则》行使职权。 董事长为公司法定代表人。

（3）公司设监事会，是公司的监督机构，由股东会选举产生并对其负责。监事会人数不少于三人，并应有职工代表参加。监事会设监事会主席一人，为监事会召集人。

**（二）人员状况及安置意见：**

1、固定工 65 人，其中符合内退人员 7 人。

2、上述职工全部与彩虹集团公司解除劳动合同，并由彩虹集团公司支付经济补偿金。

3、7 名符合内退条件的职工，根据自愿原则，如其选择内退，则提留距离法定退休年龄的生活费和社会保险费，待达到退休年龄时办理正式退休手续，相关社会保险按照社会统筹的规定办理；如其不选择内退而要求继续工作，则解除与彩虹集团公司的劳动关系，并依法获得经济补偿。

4、对于进入改制后公司的职工，将与新公司签订不少于三年的劳动合同。

**（三）补偿金总额及来源**

固定工截止到 2003 年 9 月，经济补偿金总数初步测算为 3616374 元，人均 56000 元。

**（四）资产处置**

由于公司目前资产质量较差，经评估后的净资产按照资产质量可给予一定优惠，原则上不超过 10%，并报国有资产监督管理机构备案审核。

**（五）债权债务处理**

现有债权债务由改制后的企业享有和承担。

**四、党团组织关系、档案管理、社会保险接续**

改制完成后，与咸阳市有关部门进行协调，办理上述关系的属地化管理。

**五、关联交易及扶持政策**

彩虹集团公司将对新公司给予一定期限的扶持政策，具体协议另行签订。

**附：四家改制分流企业的人员及经济补偿金测算表**

CONFIDENTIAL

IRI-CRT-00002085

| 企 业 名 称 | 分流安置人数 | 经济补偿金数额（单位：元） | 人均经济补偿金数额（单位：元） |
|---|---|---|---|
| 彩虹建设工程公司 | 78 人 | 4312589 | 55289 |
| 中国电子器件工业总 公 司 | 189 人 | 16986896 | 89877 |
| 中国电子进出口彩虹公司 | 65 人 | 3616374 | 55636 |
| 深圳市彩虹电子公司 | 8 人 | 1120000 | 140000 |
| 总　　计 | 340 人 | 26035859 | |

## 二、其他改制分流单位的初步改制方案或改制思路

　　除以上四家试点改制分流企业外，其他参与改制分流的单位部分已经拟订初步改制方案，其余单位也已在调查研究的基础上确定了改制分流的思路，改制方案正在制订之中，为便于审批机关掌握情况，特列示这些单位的初步改制方案或改制思路，待具体方案形成后，将分批上报。

### 1、彩虹电子网版厂初步改制方案

**一、企业简介**（见附件 3）

**二、改制方案**

**（一）改制形式及股权结构**

　　1、改制形式：非国有法人控股的有限责任公司

　　2、股权结构：彩虹集团职工通过将资金信托给信托投资公司，再由信托投资公司与彩虹集团公司共同设立一家投资公司后，由该投资公司直接收购彩虹集团公司在网版厂的股份，彩虹集团公司保留 20 的股份。

**（二）人员状况及安置意见：**

　　1、网版厂固定工 159 人全部与彩虹集团公司解除劳动合同，并由彩虹集团公司支付经济补偿金。

46

IRI-CRT-00002086

2、对于进入改制后公司的职工，将与新公司签订不少于三年的劳动合同。

### （三）补偿金总额及来源

截止到 2003 年 10 月 31 日，经济补偿金总数初步测算为 8574184 元。

### （四）债权债务处理

现有债权债务由改制后的企业享有和承担。

### （五）土地使用权

改制后公司采取租赁方式取得土地使用权。

**2、陕西彩虹荧光材料公司改制初步方案**

**3、陕西彩泰电子公司改制初步方案**

**2、3 两公司比照网版厂的模式进行改制分流。**

**4、彩虹物资公司初步改制方案**

**一、基本情况：**见附件 3

**二、改制总体思路**

　　改变物资公司既承担集团公司管理职能、又从事经营活动的角色，将其改建为由经营者和职工持股的、股权多元化的、规范的公司制企业，再通过与集团公司和股份公司订立代理采购协议等方式开展经营。

**三、初步方案**

　　1、解除彩虹集团公司与职工的劳动关系，并给予经济补。在新公司成立后 30 日内，职工与新公司签订期限不少于三年的劳动合同；

　　2、在目前公司的基础上组建独立的有限责任公司，彩虹集团公司根据职工的出资意愿和能力，选择全部退出或在新公司保持参股地位（参股比例不高于 20%），允许职工用经济补偿金作为向新公司的投资；

　　3、新公司将与彩虹集团公司订立代理协议等法律文件，明确双方权利义务关系，在一定期间内彩虹集团公司给予一定扶持。

　　4、改制后公司占用的彩虹集团公司的房屋有偿使用，给予一定优惠期限，优惠期限届满后按照市场价格支付租赁费用。

　　5、改制前形成的债权债务问题由彩虹集团公司负责处理。

47

IRI-CRT-00002087

### 5、彩虹销售公司初步改制分流方案

上述两单位改制总体思路和改制方案：参照物资公司的改制模式

### 6、彩虹三产总公司改制思路

**一、基本情况见附件 3**

**二、改制思路**

由于三产总公司下属单位众多，情况又各不相同，因此其改制分流的方式方法也应有所区别，但从总公司层面上而言，改制分流工作应当着重于下列几点：

1、三产总公司对其下属单位区别不同情况进行处理，通过注销、股权多元化、合并、租赁、出售等多种方式重新优化配置资源，拓展服务市场、强化内部管理，实现健康发展。

2、三产总公司本身也进行公司制改造，允许三产总公司职工持股，彩虹集团公司完全退出，如不具备完全退出的条件，也要实现产权主体多元化，彩虹集团公司保持参股地位，所占股份原则上不高于 20%。

3、集团公司从资源配置、项目扶持等方面，帮助三产总公司通过改制分流实现脱胎换骨，把三产总公司送上健康发展的良性循环轨道。

4、企业目前使用的彩虹集团公司的土地彩虹集团公司划拨土地，改制后如不改变土地用途，可在与咸阳市土地管理部门协商后，继续以划拨方式使用。

5、固定工共计 530 人，全部与彩虹集团公司解除劳动合同，相应得到经济补偿金，经济补偿金金额经初步测算为 22,776,254 元。在新公司成立后 30 日内，与新公司签订期限不少于三年的劳动合同。

### 7、劳动服务公司改制思路

**一、基本情况：**见附件 3 。

**二、改制思路**

1、首先应当按照《国有资产产权界定和产权纠纷处理暂行办法》和《集体企业国有资产产权界定暂行办法》的相关规定，对劳服公司的资产进行产权界定。

2、在界定清楚产权关系后，将对劳动服务公司现有的固定工给予经济补偿，

CONFIDENTIAL

IRI-CRT-00002088

鼓励其将补偿作为向改制企业的投资款。大集体工比照固定工进行经济补偿，职工获得补偿后与改制后的劳动服务公司签订不短于三年的劳动合同。目前固定工共计 111 人，经济补偿金金额初步测算为 6，179，600 元。

3、对于属于集团公司在劳动服务公司中的净资产，集团公司将采取出售、租赁、参股等方式予以解决，参股比例一般不高于 20%。

4、变更劳司的企业名称以便于参与市场竞争。

## 8、对于三产总公司和劳动服务公司下属单位的整体改制思路

**总的改制思路是：**将三产总公司和劳动服务公司管理的下属单位按照单位性质以及业务、人员、资产相关性的原则进行全面梳理；在此基础上，将经营性单位与非经营性单位予以划分，明确单位性质，确定发展方向和扶持政策；其中部分非经营性单位可直接收归集团公司管理；对于下属经营性单位的资产、业务、人员进行重组优化，整合资源，以提高改制企业的市场生存能力，并彻底解决彩虹集团公司内部长期存在的严重的同业竞争以及资源被分割的局面，同时防止新的企业办社会产生。

## 9、彩虹广告公司改制思路
## 10、彩虹装潢公司改制思路

1、上述两单位改制条件：彩虹广告公司和彩虹装潢公司目前均实行个人承包方式进行经营，有市场生存能力，没有对外负债，资产规模很小，具备改制的条件。

2、改制思路：对现有承包者的身份进行置换后由其按照评估后的净资产价值受让彩虹集团公司的股份，并将其改制为有限责任公司。

## 11、海口彩虹温泉大酒店改制分流思路

**一、企业基本情况**（见附件 3）

**二、改制思路**

（1）通过市场化运作，将酒店出售或者寻找战略合作伙伴共同经营酒店，也可采取租赁、承包方式开展经营，减少损失；

CONFIDENTIAL

IRI-CRT-00002089

（2）如无法盘活现有资产，则依法进行破产清算，并用破产财产安置企业职工。

## 12、西安彩虹电器工业有限责任公司改制分流思路

**一、基本情况：**

该公司主营业务与集团公司关联度小，且因原被并购企业遗留问题，现已停业。目前，公司固定工共有 1373 人，集团每年实际承担职工生活费 2000 多万元，至今已支付近 1 亿元，成为彩虹集团公司一项沉重的负担。

**二、解决思路：**

1、首先应当通过协商或者法律手段将土地使用权证书予以变更，确定产权归属，并切实防止土地被非法侵占的行为发生；

2、争取地方政府支持，将土地资产予以盘整，并用变现的资金一次性安置原企业职工；

3、此外，还可以采取破产清算的方式解决上述问题。

## 13、彩虹学校改制分流思路

**一、基本情况：** 见附件 3

**二、存在的问题**

彩虹学校教学质量在咸阳市乃至陕西省都名列前茅，其高中部尤其知名，但囿于目前体制和校舍限制，无法完全发挥资源优势；而属于义务教育阶段的初中、小学，地方政府接受的积极性不高，甚至要求彩虹集团无限期承担费用。

**三、改制思路**

基于上述情况，彩虹学校的分离工作，应贯彻《国务院关于基础教育改革与发展的决定》的精神，继续与地方政府协商，将彩虹学校初中、小学成建制移交地方政府管理。办学经费可采取彩虹集团与地方财政共同负担、逐年过渡的办法解决。

如地方政府不同意接收，则应争取政府返还教育费附加（彩虹集团每年上缴的教育费附加约 500 万元）或政府予以补助的方式支持彩虹集团公司继续办好学校，减轻企业负担。

CONFIDENTIAL                                                                IRI-CRT-00002090

对于彩虹学校高中部，因其不属于义务教育阶段，可采取社会力量联合办学的方式，吸引外来资本，实行民营化、产业化经营，改革目前办学体制。目前已有投资意向单位，方案思路也正在咸阳市政府教育主管部门进行沟通中。

彩虹集团将结合具体情况，在保证不影响学生上学、不影响教学秩序、不影响教学质量、保证办学经费落实的情况下，推动彩虹学校的分离工作。

### 14、彩虹医院改制思路

**一、基本情况：**见附件 3

**二、目前的问题**

医院布局不合理，竞争激烈，大而全，没有明显竞争优势；对高级、核心医务人员的薪酬激励不够，人才流失严重。

**三、分离改制的思路**

彩虹医院的分离要遵循《关于城镇医疗卫生体制改革的指导意见》的原则，并与城镇职工医疗保险制度改革结合，在继续贯彻集团公司医改政策的基础上进行。

具体分离方式有三：一是从集团分离出来，实行产业化经营，允许医院现有人员在转换身份后出资购买医院；二是与当地政府协商，将医院资产、人员成建制移交地方政府，由地方政府统一管理；三是在暂时不具备分离条件时，可采取与社会投资者联合办医的方式，组建独立的法人单位。

医院分离后，有关经费按照目前集团公司医改政策执行，三年过渡期连续计算，费用逐年递减。

### 15、培训中心（包括彩虹职大、彩虹中专、彩虹技校）

**一、基本情况：**见附件 3

**二、改制思路**

彩虹大学和彩虹中专做为企业办社会的一部分，其生存已成问题，因此应该将该部分职能予以剥离；彩虹技校作为集团进行技术培训的基地，可以予以保留，办学方式可采取"企业为主、政府支持"的办学形式，也可采取社会各方联合办学的形式继续办好技校。

51

CONFIDENTIAL

对于彩虹培训中心富余的房屋，可作为彩虹学校高中部扩所需校舍，作为投资或者租赁给改制后的彩虹学校使用。

## 第四部分　　主辅分离、改制分流的组织和实施

### 一、彩虹集团公司实施主辅分离、改制分流的工作原则和主要措施

根据国家已经出台的 859 号文等有关再就业政策、胡锦涛总书记在今年全国再就业座谈会会议上讲话的精神，彩虹集团公司采取"带着岗位进市场"的原则实施主辅分离、改制分流，尽可能在集团内部消化分流人员，不将就业矛盾社会化，并通过加大辅业企业产权改革的力度增强竞争力，吸收安置更多的社会新增就业人口，缓解社会就业压力。由此彩虹集团公司进行主辅分离、改制分流工作将遵循以下原则，并采取相应措施予以落实：

#### （一）主辅分离、改制分流的工作原则

1、正确处理改革、发展、稳定的关系，充分考虑企业、职工和社会的承受能力，整体规划，分步实施，确保稳定；

2、实施改制分流与彩虹集团公司的结构调整、改制重组和做强彩虹集团公司主业相结合，符合国家产业政策，有利于加快企业发展，促进企业资产结构、组织结构、人员结构的优化；

3、实施改制分流要依法进行，规范操作，坚持"公开、公平、公正"的原则，维护国家、企业及职工的合法权益，防止国有资产流失和逃废债务；

4、坚持"积极稳妥，总体规划，循序渐进，分步实施"的原则，条件成熟一个改制一个，确保改制企业成功转换机制，促进主体企业优化结构调整；

#### （二）实施主辅分离、改制分流的主要措施

1、加强组织领导和部门工作、人员的落实。为加强对全系统辅业改制分流工作的领导和组织工作，按照国经贸企该改[2003]27 号文件的要求，集团公司成立了以总经理为组长，企管办、规划部、人力资源部参加的改制分流领导小组。各改制单位也明确了具体负责的部门和人员，分工负责抓好改制分流工作。

2、根据 859 号文及配套政策精神，结合集团公司企业的具体情况，编制相关单位今年的辅业改制分流计划，并要求各单位根据实际情况将计划分解落实，

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　　　　IRI-CRT-00002092

积极推进。

3、重点突破，以点带面，积极稳妥地推进辅业改制分流工作。集团公司改制分流工作组对直属企业进行逐个分析研究，确定将深圳彩虹电子有限公司、建设工程公司等几个公司作为第一批改制单位，同时总结经验并归纳改制方案样本，用于指导其他单位研究制定辅业改制分流方案。这样既 加大了工作力度，又培训了一批掌握政策、熟悉操作技巧的工作人员。

4、建立辅业改制分流工作进展监控机制。建立辅业改制分流进展情况定期报告制度，及时掌握改制工作进展情况和遇到的问题，既督促企业推进工作，又将发现的问题及时给以指导。

5、为使整个改制分流工作规范有序运作，彩虹集团公司聘请了北京市大成律师事务所作为彩虹集团公司主辅分离、改制分流工作的总法律顾问，负责策划、协调、推动整个主辅分离、改制分流工作

上述措施主要是结合需要改制的企业本身改制的条件具备程度，按照成熟一个，改制一个的原则进行，对于尚不具备条件的，要明确改制的思路并尽快创造改制条件，确保改制企业能够顺利实现改制目的，并妥善分流安置人员。

## 二、彩虹集团集团公司主辅分离、改制分流的组织和实施

### （一）集团公司实施主辅分离、改制分流的组织、实施机构；

为强化企业主辅分离改制分流工作的领导,彩虹集团公司组建了由下列人员组成的主辅分离改制分流工作领导小组：

组长：马金泉（总经理）、副组长：陶 魁（集团党委书记）   刑道钦（副总经理）   牛新安（集团党委副书记兼集团工会主席）

领导小组成员由集团公司的企业管理、人事、财务等有关职能部门主要负责人组成。领导小组下设办公室，负责协调组织实施日常工作。

具体人员为：主任：牛新安（兼）、副主任：徐全成   张占葵   王西民   符九全   仇兴喜   许振东   魏小军、成员：高占民   杨怡星   王 军   张文彦   闫跃平   宋文斌   庞 军

### （二）集团公司实施主辅分离、改制分流的决策程序

主辅分离、改制分流，由彩虹集团公司负责组织实施。彩虹集团公司进行主辅分离、改制分流的内部议事程序为：

（1）集团公司经理办公会通过决议，确定主业和辅业范围以及拟进行改制分

53

IRI-CRT-00002093

流的辅业单位，制定总体方案，报送国资委、财政部、劳动和社会保障部联合批复；

（2）根据上述联合批复，拟进行改制分流的辅业单位进行宣传动员，让全体员工了解改制的必要性、原则、国家法律法规和政策的各项要求，取得员工对改制工作的理解、支持和参与。召开职工代表大会审议通过涉及职工分流安置和用于安置职工的资产处置等有关事项；

（3）拟进行改制分流的辅业单位通过集团公司发展规划部向集团公司提出具体改制分流方案。

（4）集团公司经理办公会对辅业单位改制分流方案逐个进行审核认定。

**（三）集团公司主辅分离、改制分流的实施程序**

（1）明晰产权，即清楚界定改制分流单位的资产产权。由于彩虹集团公司大部分辅业单位要么是纯国有企业，要么是现代公司制度下的股份有限公司或有限责任公司，因此绝大部分辅业单位的资产产权是清晰的。对于权属关系不明确或者存在产权纠纷的改制企业（如彩虹劳动服务公司），应当按照国家有关规定先进行产权界定或者产权纠纷调处；

（2）清产核资与审计。对改制企业的各类资产进行全面清查登记，包括对各类资产、债权、债务进行核对查实，并编制改建日的资产负债表及财产清册。然后由彩虹集团公司将资产清查的结果委托中介机构进行审计；

（3）资产评估。彩虹集团公司委托具有相应资格的资产评估机构，按照《国有资产评估管理办法》(1991 年 11 月 16 日国务院令第 91 号)、《国有资产评估管理若干问题的规定》(2001 年 12 月 31 日财政部令第 14 号)等有关规定对改制企业所涉及的全部资产进行评估；

（4）劳动关系的处理。通过公司制改建进行改制分流的，企业要与员工变更或解除劳动合同，并变更或重新签定三年以上期限的劳动合同。依照国家法律法规和相关规定对员工进行经济补偿；

（5）资产处置与出资。根据改制分流的具体方案对国有资产采取出售、租赁、折股出资或转为债权等方式进行处理。辅业单位进行公司制改建的，资产评估的结果作为彩虹集团公司对改制企业折股出资的依据。同时，公司其他股东向公司出资；

（6）公司设立与登记；

CONFIDENTIAL

IRI-CRT-00002094

（7）进行国有产权登记；

（8）改制企业属地管理交接工作。企业改制为非国有法人控股企业的，要与地方人民政府做好改制企业中党、团等组织关系、职工的各项社会保险关系以及职工档案管理、职称评定等移交接收工作；

（9）剥离资产处理。企业改制分流完成后没有纳入改制范围的资产，具备经营条件的，可以剥离后用其组建企业法人，独立核算，依法经营；对不具备经营条件的剥离资产，通过整体出售、租赁经营、无偿移交地方政府或所在地社区等方法加以处置。凡是不能通过上述方式处置的剥离资产，可以由存续企业管理，也可以由彩虹集团公司直接管理。

**（四）集团公司实施主辅分离、改制分流的操作规范。**

1．以 2002 年全国再就业会议和 2003 年再就业座谈会会议精神及 859 号文等相关配套文件为基本依据，根据彩虹集团公司的具体情况进行操作；

2．严格执行国家有关国有资产管理的法律法规，防止国有资产流失，不得将国有资本低价折股或者低价转让给经营者和其他职工个人；

3．严格遵守民法通则、合同法等民事法律规范，切实维护债权人等相关方的合法权益，在改制分流过程中作好改制企业的债权债务清理工作，落实债权债务人，不得利用改制之机逃废银行或其他债权人的债务；

4．遵照国家有关再就业的相关政策及劳动和社会保障的各项政策和法律，妥善安置分流企业富余人员，减轻社会就业压力，确保稳定；

5．依照公司法等法律规范，将改制分流企业改建为产权主体多元化、具备完善的法人治理结构和市场竞争力的现代公司制企业；

6．对于涉及职工安置分流的方案应取得职工代表大会审议通过方可实施。

CONFIDENTIAL

IRI-CRT-00002095

附件 2   彩虹集团公司的发展战略
## 彩虹集团公司的战略定位和发展规划（摘要）

### 一、彩虹集团公司面临的市场环境和竞争形势

1、   CRT 行业总体形势

虽然由于 CRT 具有相对良好的性价比，在很长一段时期内还有生存空间，但是其市场空间已经相对饱和，行业总体形势不容乐观，从而被业内称为"夕阳产业"。

2、世界范围内 CRT 市场情况

2001 年底，世界上从事 CRT 生产制造的公司大约有 22 家，拥有约 70 座工厂，生产线 250 条左右，年产能 3 亿只，大于 2.5 亿只的全球市场需求。

跟行业巨头相比，彩虹集团公司的全球市场占有率仍处于较低水平。

3、国内 CRT 市场总体情况

目前，中国彩管行业共有 12 家企业，截止到 2002 年底，共有 CPT 生产线 39 条，年产能 5000 万只左右。CDT 生产线共有 21 条，年产能 3740 万只。

总体而言，国内彩管的产能已经远大于国内彩电消费市场的需求。

4、彩虹集团公司面临严峻的市场竞争压力

（1）CPT 市场供大于求的局面将加剧

由于 2002 年国内 CPT 市场一度的供不应求，以及对 2003 年市场的良好预期，各企业都在想方设法增加生产线或者进行扩产改造。可以预见，国内 CRT 市场供大于求的局面将加剧，这必然导致竞争更加白热化。

（2）市场竞争者的威胁

中国彩管行业（CPT）共有 12 家企业，其中 9 家是中外合资或外商独资企业，在其余的 3 家公司中，只有彩虹集团公司一家是国有独资企业。

自中国加入 WTO 之后，国际上生产彩色显示器件的主要企业已全部进入中国，与彩虹集团公司展开直接的竞争，对彩虹集团公司构成直接的威胁。竞争的一体化格局已经初步形成。

彩虹集团公司国内市场占有率虽然暂时处于领先地位，但并非行业主导者，北京松下、上海永新、LG 曙光等企业加紧抢夺市场分额，几家企业的市场份额

56

都在 11%以上，已对彩虹集团公司的地位构成强有力的挑战。

（3）行业退出壁垒高造成竞争刚性增大

由于彩管行业的投资大，周期长，专用设备和资产多，清算价值低，从业人员多，因此行业的退出壁垒很高，这无疑会大大增加竞争的刚性和激烈程度。

（4）替代品的威胁

自 20 世纪 90 年代后半期开始，平板显示器件(FPD)等新技术得到迅猛地发展，此外·由于大规模集成电路的发展，以及计算机和数字技术的应用，也引导彩色电视机技术的款式必须向大屏幕、平面化、超薄型化发展。LCD、PDP 等新型显示器件的发展对传统的 CPT 市场形成巨大的市场冲击，并且会大大缩短 CPT 产品的生命周期。目前彩虹集团公司的主要产品均集中在传统的 CPT 领域，面对的这种替代品发展的压力最大、也最为直接。

**二、彩虹集团公司的战略定位**

1、行业和产品定位

（1）彩虹集团公司行业和产品定位的局限性

彩虹集团公司现有的资源几乎全部集中在现有的 CRT 产品领域（主要是 CPT 产品），在新型显示器件技术和产品研发方面基础非常薄弱，加上这些新型显示器件的投资巨大，从而限制了彩虹集团在该领域的发展。

（2）彩虹集团公司的行业和产品的市场前景

虽然传统 CRT 尤其是 CPT 产业领域行业竞争激烈，但是 **CPT 产品仍旧存在较大的市场发展空间，CPT 技术仍有较长的生存时间。**

（3）彩虹集团公司的资源和优势

1）彩虹集团公司具备经营管理和技术人才优势

2）形成了纵向一体化的零部件配套体系和成本优势

3）具有了一定的经济实力，并拓展了融资渠道。

根据前述分析，彩虹集团公司的行业定位和产品定位应该立足于现有的 CPT 产品领域。将现有产品做好并在此基础上实施相关多元化、同时密切跟踪新型显示器件技术和产品，适时进入新产品新领域，实现产业和产品的结构调整应是彩

57

CONFIDENTIAL

IRI-CRT-00002097

虹集团公司的现实选择。

2、彩虹集团公司的发展战略

（1）总体发展战略

彩虹集团公司的总体发展战略是：以现有的显示器件为龙头，零部件实现产业化，实施总成本领先战略，做强、做大主业；积极跟踪、调研、分析新型显示器件领域的技术和产品，适时稳步进入，实现产业和产品结构调整，使彩虹发展成为产品多元化、经营规模化、管理现代化的中国最强、最大的显示器件生产和研发基地。

（2）基本竞争战略：**总成本领先战略和相关多元化战略**

**1）彩虹集团在主营业务即传统的 CRT 产品领域（以 CPT 为主），采取总成本领先战略，并将其作为企业的基本竞争战略。**

**2）在新型显示器件领域，采取相关多元化战略。**

为解决彩虹集团公司的后续发展问题，彩虹集团在新型显示器件领域采取积极跟踪的策略，实施相关多元化战略。实现的途径主要有两种：一是通过密切跟踪、调研新型显示器件领域的新技术、新产品的发展趋势，适时进入该领域；二是借助国外显示器件产业结构调整和专业化分工的时机，与跨国显示器件企业实施战略合作，通过提供专业配套等方式，逐步参与到新型显示器件的价值链条中，实现产业和产品的结构性调整。

（3）彩虹集团公司中长期战略规划实施总成本领先战略，打造成本最低的核心竞争力，奠定实现经营规模化的基石；实施相关多元化经营战略，寻求和发展彩虹新的经济增长点，培育第二支柱产业

（4）中长期战略的目标到2010年，使彩虹集团公司发展成为产品多元化、经营规模化、管理现代化的中国最强、最大的显示器件生产和研发基地、世界一流和国际知名的大型企业集团，为"立百年彩虹"的远景目标奠定坚实基础。

58

CONFIDENTIAL
IRI-CRT-00002098

**附件 3：参加改制分流的单位及其基本情况**

**一、承担企业办社会职能的单位**

  **1、彩虹学校**

    学校设小学部、初中部和高中部，在编教职工 223 人，其中教师 192 人，教学辅助人员 27 人，校长、副校长 4 人，教师和非教学人员之比为 7.1:1。学校全员实行合同制，教师实行聘任制。

    学校的各种固定产值为 932.23 万元。学校每年共需经费 910 万元，其中635 万元由集团公司下拨，275 万元由学校创收。

  **2、彩虹医院**

    彩虹医院成立于 1978 年，1995 年被评为二级甲等医院。咸阳市将其定位为"非赢利性医院"。

    人员情况：固定工共 150 人。

    彩虹集团对医院的扶植：2002 年拨款 500 万元，2003 年拨款 300 万元，2004年拟拨款 150 万元，之后就全面推向市场。

  **3、培训中心：包括彩虹职大、彩虹中专、彩虹技校**

    培训中心隶属于彩虹人力资源部，主要负责集团公司员工在职培训、学历教育和岗前培训。培训中心现有固定工 40 人，其中教师 22 人，管理人员 18 人。培训中心下设彩虹职大、彩虹中专和彩虹技校三所学校，费用实行收支两条线。2002 年集团公司下拨经费为 343 万元，上缴各种费用 95 万元。

**二、辅业单位较为集中的综合性管理公司**

    咸阳地区辅业单位主要集中在彩虹三产总公司和劳动服务公司两家企业。

  **1、彩虹三产总公司基本情况：**

    陕西彩虹三产总公司（以下简称公司）是彩虹集团公司为从根本上解决"企业办社会"的问题于 1994 年 4 月成立，为彩虹集团的全资子公司，但实际上还承担着集团公司的部分管理职能。

    内部组织结构：共有 4 个生产配套厂，8 个经营性服务单位，2 个公益事业型单位。

CONFIDENTIAL

IRI-CRT-00002099

总公司业务普遍市场竞争性不强，业务收入的对像主要为集团公司。

截止 2003 年 6 月底，总公司共有职工 1280 人（不包括园艺公司劳务工和在电子包装材料厂、托架厂、化工材料厂、劳保用品厂、总公司机关工作的职工 50 人。），其中固定工 530 人。

截止 2002 年 12 月 31 日，三产总公司资产合计 59,925,425.32 元，负债合计 23,727,912.54 元，所有者权益合计 36,197,512.78 元。

### 5、彩虹劳动服务公司

彩虹劳动服务公司主要为彩虹集团提供内屏蔽、电子屏蔽、管基、管帽、泡托等产品和彩虹商标印刷、玻壳再生、研磨、粮店等服务。

在册职工 728 人，其中固定工 386 人（彩虹集团公司固定工 111 人，集体工 275 人）、退休 146 人，内退 275 人。

截止到 2003 年 6 月 30 日，资产总额为 8051 万元，其中流动资产 6191 万元，固定资产 1860 万元。

## 三、福利型后勤服务单位

### 6、彩虹幼儿园（归属彩虹三产总公司管理）

彩虹幼儿园为集团公司福利机构，主要收教集团公司内部幼儿，隶属于彩虹三产总公司，为国家先进幼教单位。现有员工 190 人，其中固定工 112 人，员工每年工资支出 280 万元，管理费用 200 万元左右，加上水、电、暖等其他各项费用，每年需 700 万元，其中幼儿园创收 140 万元，资金缺口为 560 万元，由集团受益单位分摊。目前，幼儿园通过开展特色幼教活动，赢利能力逐渐增强。

### 7、公益设施部（归属彩虹三产总公司管理）

下属单位有房产管理室、文体管理室、班车队和保龄球馆。

房产管理室固定工 13 人，短期合同工 24 人。

文体管理室设有俱乐部、体育馆和游泳池。固定工 12 人。

班车队有 6 辆车，配有 6 个司机，3 个售票员，1 个短期合同工。

保龄球馆固定工 10 人，短期合同工 30 人。

### 8、物业管理中心（归属彩虹三产总公司管理）

60

中心主要是代收住户的水电费，职能与修建园艺公司有重叠。中心目前净资产总额 1026659.57 元，现有固定工 12 人，短期合同工 3 人。

**9、经营室下属通信站、客车队**（经营室归属彩虹三产总公司）

通信站、客车队目前采用责任承包的方式开展经营；通信站主要以寻呼和集团内部电话为主营业务，现寻呼电话已基本停办，内部电话业务也受到社会各通信公司的较大冲击；客车队经营市场狭小，不能独立生存。通信站有固定工 26 人，短期合同工 2 人；客车队固定工 10 人（一人待岗），短期合同工 2 人。

**10、劳动服务公司粮店、自选商店、车队**

粮店为政策性粮油单位，主要为彩虹员工提供粮油产品、一直亏损，每年亏损约 10 万元；职工 10 人，其中固定工 9 人。

自选商场基本盈亏持平，固定工 20 人左右。

车队为劳动服务公司提供用车服务，有倒料车 3 辆、小轿车 4 辆、班车 1 辆。

## 三、经营性后勤服务单位

**11、彩虹宾馆**（归属彩虹三产总公司管理）

彩虹宾馆是隶属于三产总公司，业务及收入主要是住宿与承办会议。其中绝对的厂内消费占到 17%~21%，与厂有关的市场消费占到 10%左右，其他均为市场客源。截止 2003 年 6 月底宾馆净资产总额为 10564608.43 元。宾馆现有职工 204 人，其中固定工 58 人，与彩虹集团公司签定劳动合同。

**12、彩虹招待所**（归属彩虹三产总公司管理）

彩虹招待所主要业务及收入：住宿、餐饮、承办小型会议、举办培训班。年收入大约 400 万元，餐饮收入占营业收入的 55%；截止 2003 年 6 月底，招待所净资产总额为 2357766.95 元；现有员工 103 人，其中固定工 19 人，均与总厂签定劳动合同。

**13、商饮公司**（归属彩虹三产总公司管理）

现下辖生活灶、冷饮厂、浴池、购物超市等经营单位。主要业务：提供生活服务。1995 年至 2000 年，一部分职工自谋出路。企业利润指标为一年 40 万元。截止 2003 年 6 月底，净资产总额 5263077.84 元。现有职工 163 人，其中固定工

CONFIDENTIAL

IRI-CRT-00002101

５８人（目前在岗 38 人，从事个体经营的１１人），全部与总厂签定的合同。

**14、经营室下属汽修厂、广告公司、装潢公司、七里铺综合市场**

目前广告公司、装潢公司与汽修厂采用个人经营承包的方式。经营室综合管理室固定工 4 人（含七里铺综合市场，一人待岗）；汽修厂固定工 8 人；装潢公司固定工 4 人；广告公司中固定工 5 人（一人挂靠自主经营）。上述固定工均与总厂签定劳动合同。

**15、彩虹电子设备公司**（归属彩虹三产总公司管理）

主要面向总厂的对内业务，承揽总厂内非批量的、规格缺的零星业务，满足生产需要。拿厂内订单，市场采购。利润不到 5%。资产情况：截止 2003 年 6 月底设备公司净资产总额为 108699.12 元。人员状况：共有员工 43 人，均为固定工，其中 20 人在职上班，23 人独立经营，交纳管理费。上述人员均与集团公司签定劳动合同。

**16、修建园艺公司**（归属彩虹三产总公司管理）

主要业务是负责总厂生产区内及生活区的绿化和环保，此外也承接部分工程和维修项目。现净资产总额为 3298280.38 元。目前公司有固定工 113 人，短期合同工 20 人，劳务工 295 人，共计 428 人。

**17、劳保用品厂**（归属彩虹三产总公司管理）

主要业务及收入经营手套、洁净服，95%面向总厂，5%外销。2002 年经营收入 330 万元，预计 2003 年收入到达 400 万元。利润率在 5%左右；截止 2003 年 6 月底，劳保厂净资产总额为 120765 元；现有固定工 11 人，短期合同工 59 人。固定工中有 2 人挂靠，签定协议，不发工资，三金个人自负。

**18、劳动服务公司所属商标厂、印刷厂**

商标厂主要为彩虹总厂提供商标印刷服务，年赢利 30 万左右，有固定工 10 余人。

印刷厂主要为彩虹集团内部印刷办公文件，微利维持经营，有固定工 20 多人。


**四、提供配套产品或服务的企业**

**19、深圳彩虹电子公司**（四家改制试点单位之一）

CONFIDENTIAL                                        IRI-CRT-00002102

### 20、彩虹网版厂

全称为彩虹电子网版厂（原彩虹荫罩分厂），隶属于彩虹显象管总厂，主要为彩管一厂配套生产 37CM 、56CM 平板荫罩，所有产品都销售给集团配套彩管厂。

网版厂固定工共 159 人。

截止 2003 年 10 月 31 日，资产总额为 18654057.40 元。

### 21、彩虹荧光材料公司

陕西彩虹荧光材料有限公司是彩虹集团公司控股的企业。公司成立于 1995 年 12 月 5 日，注册资本人民币 9000 万元。公司主营彩色显示管、显示器用三基色荧光粉、生粉，销售自产产品；截止 2002 年 12 月 31 日，资产合计 171,093,575.55 元，负债合计 45,459,952.82 元，所有者权益合计 123,735,183.15 元；公司现有固定工 240 人。

### 22、咸阳彩泰电子器件有限责任公司

咸阳彩泰电子器件有限责任公司是 2000 年 7 月由咸阳彩泰电子器件厂改制，公司经营销钉、阳极帽、支架玻杆和支玻粉生产、销售；截止 2003 年 10 月 31 日，公司总资产为 66500336.21 元，负债 26145267.23 元，所有者权益 40355068.98 元；公司现有员工 294 人，其中固定工 240 人。

### 23、电子包装材料厂（又名泡托厂，归属彩虹三产总公司管理）

主要是面向集团的对内业务，其中给股份公司生产 54cm 和 64cm 泡托架，为荧光粉有限公司生产精制硫酸、高浓度盐酸；现有资产 4，300，000 元，主要为机器设备；固定工 30 人，均与彩虹集团公司签定劳动合同。

### 24、彩虹托架厂（归属三产总公司管理）

主要是对厂内的业务，通过回收旧托架并进行手工修理，赚取差价，对集团独家供应；工厂现有固定资产 53 万元，其中，房屋建筑 33.7,万元，机械设备 4.7,电子设备 7 万元,运输设备 7.5 万元；现有职工１１５人，其中固定工 48 人，5 人请长假；短期合同工６７人。

### 25、彩虹化工厂（归属三产总公司管理）

化工厂主要生产和供应化工产品，如绝缘液、水融性粘接剂等。2002 年产值 249 万元，利润 24 万元；截止 2003 年 6 月底，净资产总额为 1，360，779 元，

CONFIDENTIAL

IRI-CRT-00002103

不良资产 174532 元；化工厂现有固定工 21 人，短期合同工 9 人。

### 26、彩虹电视配件厂（属劳动服务公司）

工厂主要为彩虹彩管生产内屏蔽，年收入达 1800 万元，为劳动服务公司主要收入来源。目前固定工 120 人。

### 27、塑料制品厂（属劳动服务公司）

为彩管独家供应管机、管模，每年赢利 80 万元。目前有固定工 80 人左右。

### 28、净化设备厂（属劳动服务公司）

为彩虹玻壳进行空气净化，由于价格下滑和人工成本高，近年开始亏损，平均每年亏损 5 万多；目前固定工 30 人左右。

### 29、818 厂（又名玻壳再生厂，归属属劳动服务公司管理）

主要业务为彩虹玻壳回收利用，近年来，由于彩虹玻壳良品率提高，导致工厂效益下滑，去年赢利为 20 多万；目前固定工 80 多人。

### 30、泡托厂（属劳动服务公司）

为彩虹提供泡沫托架，年利润在 20—30 万之间；目前有固定工 50 多人。

### 31、研磨厂（属劳动服务公司）

为彩虹玻璃分厂提供玻璃研磨服务，每年赢利几千到几万不等；目前有固定工 10 人。


### 五、可实行外包的职能部门

### 32、彩虹物资公司

公司实为集团公司物资采购部门，按照集团公司处室管理，主要为集团公司在咸阳企业采购生产用结构材料和辅助材料，并负责回收生产线上的废旧物资。固定工 200 人，短期合同工 140 余人。占用的资产和财务均由集团公司直接管理。

### 33、彩虹销售公司

该公司原为彩虹显像管总厂销售公司，后改为彩虹集团公司销售公司，按照集团公司处室管理，挂股份公司销售公司的牌子。主要职能是统一负责总厂和股份公司的产品内销。固定工 67 人，全部在岗。占用的资产和财务均由集团公司直接管理。

CONFIDENTIAL                                                            IRI-CRT-00002104

**34、中国电子进出口彩虹公司**（四家改制试点单位之一）

目前公司挂靠中国电子进出口公司，实际资产、人员、业务均归属彩虹集团公司。实为彩虹集团公司进出口业务管理部门。

**五、　彩虹集团投资设立的与主业关联度不大的全资和控公司**

**35、陕西彩虹建设工程公司**（四家改制试点单位之一）

**36、深圳虹阳工贸公司**

目前公司主要经营：荧光粉销售、房屋租赁。

截止 2002 年 12 月 31 日，资产合计 244,022,127.08 元，负债合计 15,467,162.26 元，所有者权益合计 228,554,964.82 元。

**37、中国电子器件工业总公司**（四家改制试点单位之一）

**38、彩虹虹友运输公司**

截止 2003 年 6 月底，公司固定资产净值 25877.84 元；现有职工 23 人，全部为彩虹固定工。其中在岗发工资的 15 人，其余人员每月领生活费 500 元。

**39、西安彩虹电器工业有限责任公司（已停业）**

截止 2002 年 12 月 31 日，资产合计 77,999,911.54 元，负债总计 100,117,247.22 元，所有者权益合计-22,117,335.68 元。

**40、海口彩虹温泉大酒店（已停业）**

海口彩虹温泉大酒店为彩虹集团公司的全资子公司 2002 年度由于停业，没有产品销售收入和产品销售成本，管理费用 264.97 万元，亏损 233.47 万元。

截止 2002 年 12 月 31 日，资产合计 79,995,391.52 元，负债合计 1,135,456.44 元，所有者权益合计 78,859,935.08 元。

65

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　IRI-CRT-00002105

# EXHIBIT 2



**certified**translate
A LANGUAGE FISH LLC COMPANY

info@certifiedtranslate.com   2425 Olympic Blvd., Suite 4000W   usa  1-888-856-2228
www.certifiedtranslate.com    Santa Monica, CA 90404          int  +1-310-684-3153
                                                              fax  +1-310-564-1944

## CERTIFIED TRANSLATION

*ata*

A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: | **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|---|
| Firm: | **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
|---|
| |
| **IRI-CRT-00000779E - IRI-CRT-00000785E** |
| |
| |

| Source Language: | **SIMPLIFIED CHINESE** | Target Language: | **ENGLISH** |
|---|---|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

By:   Sean Kirschenstein, Director          Date:   September 20, 2018

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On _Sept 20, 2018_ before me, ___Kristin Gail Chamberlain___, Notary Public, appeared ___Sean Kirschenstein___, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Kristi Cllli_

KRISTIN GAIL CHAMBERLAIN
Commission # 2111580
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2020

D☐P☐ Exhibit _8395_
Deponent _Zhang_
Date _3/5/19_ Rptr _RW_

25

Attachment 2

Articles of Caihong Electronics Group Company

Section One. General Principles

Article I. This company, named Caihong Electronics Group Company (hereinafter referred to as the Caihong Company), has its legal address at Caihong Road, Qindu District, Xianyang City, Shaanxi Province.

Article II. Subject to the planning of national economic and social development, the Caihong Company is an enterprise group founded on a voluntary basis and in accordance with the law. To adapt to the objective requirements of the planned commodity economy and socialized mass production, it is oriented to high technology and exports, targeting domestic and international markets as well as foreign enterprise groups in competition. It works to separate the government from enterprise functions and ownership from operational rights, and strives to convert itself from a productive business to one with productive operations.

Article III. Based on public ownership, spearheaded by "Caihong" brand quality products and centered on the Shaanxi color picture tube factory, the Caihong Company has partnered with multiple businesses, scientific research design units and universities to form a close economic association featuring scientific research and development, production and sales, technical service and financing. Being trans-regional, trans-ownership and cross-industry, the multifaceted, multi-tiered and multi-mode production and management are integrated with technology, industry and trade as well as imports and exports.

Article IV. The Caihong Company is an economic entity of independent management, with self-supporting accounting on its own account at its own risk. This industrial company delivers taxes as required as a legal entity. Based on national regulations, it has been approved by government regulators and ratified by the administrative department for industry and commerce.

- 1 -

CONFIDENTIAL                                                          IRI-CRT-00000779.01E_Translation

*19*

Article V. The purpose of the Caihong Company is that, under the guidance of national planning, subject to the objective requirements of a socialist commodity economy, and facing the domestic and international markets, it will give full play to the technology, equipment, products, talent, capital and management, and other advantages. It will advance the production and technical progress, develop brand name and quality products, develop high technology products, develop the outward economy, and meet social demands to the utmost extent. It will increase the capacity to achieve foreign exchange through exports, to gain optimal economic benefits, to contribute to national construction, and to accelerate the development of our electronics industry.

Article VI. The guideline for management is to be centered on operations, with finances as the bond, with technology as the driver, and with benefits as the goal.

Article VII. The Caihong Company strictly follows national policies, laws, decrees and relevant regulations, voluntarily accepts inspection and supervision of the departments of finance, banking, tax administration, audit, product pricing, the administration for industry and commerce, statistics, etc., and pays taxes in accordance with the law, in order to ensure the sound development of the company.

Article VIII. Member units of the Caihong Company come in close level, semi-close level and loose level types, based on their degree of closeness in terms of their internal economic and technological relations.

1. The close level members are businesses set up by related companies, affiliated factories and the main factory of the Caihong Company with independent investment in coastal open cities.

2. Semi-close level members are joint ventures and scientific research and development centers with 50% or more of shares held by the group company and the main factory.

3. Loose level members are enterprises, scientific research design units and universities engaged in stable designated coordination or supply and demand relations through technical and economic contracts or agreements. Organized by the company, they are involved in professional collaborative production, joint development of products, or business activities.

- 2 -

CONFIDENTIAL

Article IX. The Caihong Company has a registered capital of 690 million yuan.

Section Two. Scope and Mode of Business

Article X. Scope of business of the Caihong Company:

1. Engineering design and technical contracts for production of color picture tubes and other vacuum electron tubes;

2. Business related to chemical and metal materials and materials required for the production of electronic products;

3. Manufacturing and sales of color picture tubes and other special equipment and instruments and apparatuses relevant to vacuum electron tubes;

4. Business related to machining, repair, manufacturing and transportation;

5. Distribution of diversified industrial water, gas and fuel;

6. Technical consultation, development, service and technical training related to color picture tubes and other vacuum electron tubes;

7. Exchange of information regarding the economy, technology, talent and management as well as advertisements, exhibitions and other publicity;

8. After the company was founded, the original operating items of the main factory and members units at the close level and semi-close level were incorporated into the scope of business of the Caihong Company.

Being practical and realistic, the company will actively expand its scope of business and offer multiple kinds of exchanges and services to the market and society.

Article XI. Method of operations of the Company

Oriented by the market demand, the company has mapped out the development strategy of "international exposure and

[illegible handwriting]                                    - 3 -

CONFIDENTIAL                                    IRI-CRT-00000780.01E_Translation

competitiveness and has established four centers (color picture tube production center, new product development center, talent training center and color picture tube technology output center)". By virtue of these advantages, the group enables a reasonable allocation of diverse production factors. Led by scientific research and development, and spearheaded by branded quality products and quality services, the group gives priority to one business while developing diversified operations. It has established a business method of coordinated practice integrating scientific research, development, manufacturing, application, sales and service, following the operating method called "one coordinated process". It has moved toward professional production and economy of scale, promoting all around product and technology applications. It continues to track the cutting edge scientific technology around the world, takes the initiative to develop the outward economy, strengthens the competitiveness of its products and technology in both markets, and rivals the top electronics groups of developed countries.

Section Three. Management System

Article XII. The Caihong Company implements a multi-tiered management mode combining concentration with decentralization:

1. With regard to close level members, it applies integration of asset management. It features direct operation, uniform planning, management, accounting and collective responsibility for gains and losses as to human and financial resources and belongings as well as production and sales.

2. With regard to semi-close level members, it applies the method of independent operation and joint management. These members follow the uniform provisions of the company and undertake tasks according to agreements, building close relations with The Caihong Company in production, operations, finance and material supply. They have independent accounting; they assume sole responsibility for their own profits or losses, distribute earnings and share losses according to the agreement.

3. With regard to loose level members, it maps out plans, and offers guidance and a unified coordination plan as well as relevant technical quality standards. They have independent operation; these members assume responsibility based on contracts, and take sole responsibility for their own profits or losses.

Article XIII. The Caihong Company has determined the decision making level, management level and execution level for management.

- 4 -

1. Decision making level: comprises the general manager, vice general managers and the management committee of the company. It mainly decides the guidelines and strategies regarding management, reviews the long term planning and overall blueprints, approves fund raising, distribution and use, determines the direction of major technical transformation and product development, and appoints and dismisses leading cadres of diverse divisions and members at the close level and semi-close level.

2. Management level: the functional division, business companies and professional centers of the Caihong Company. Its basic functions are supervision, coordination and providing advice. Its main tasks are formulating and reviewing plans of the company, undertaking budgeting, guidance and coordination related to production, technical and operational management of members, and organizing scientific research and development, sales service and outward business activities.

3. Execution level: member units at the close level, the semi-close level and the loose level, responsible for organization of production and operating activities. It is committed to increasing production and boost profits.

Article XIV. The Caihong Company features a general manager responsibility system. The position of general manager is held by the director of the main factory; it has a four year term of office, and can be reappointed. Several vice general managers are arranged to assist with the work of the general manager.

The general manager exercises the following functions and powers:

1. Perform the articles of the Caihong Company, and report the work to the management committee and employee representative congress on a regular basis.

2. Lead in the daily production and operation work of the Caihong Company in an all around way, and deal with major issues proposed by member units.

3. Determine the development planning, annual production and operation plans and financial budget, as well as accounting plans and method of distribution of interest.

- 5 -

CONFIDENTIAL                                                                      IRI-CRT-00000781.01E_Translation

4. Nominate candidates for vice general managers, general engineers, general accountants, and general economists, and report the list to the relevant divisions. Appoint and remove division heads, managers of companies directly subordinate to the Caihong Company, as well as major persons in charge of factories.

5. Determine the institutional setting plan of the Caihong Company.

6. Develop and set the rules and regulations and management system of the Caihong Company.

7. Make final decisions regarding the handling of disciplinary violations and violations of regulations.

8. Deal with major external business on the behalf of the Caihong Company.

Article XV. The Caihong Company has established a management committee to assist the general manager in making major decisions. The management committee is comprised of representatives of the member units.

The management committee exercises the following functions and powers:

1. Engage in deliberations regarding the articles and regulations of the Caihong Company.

2. Engage in deliberations regarding development strategy, policies and objectives, solutions, production and operation planning and annual production and operation plans as well as financial budget and accounting plans.

3. Engage in deliberations regarding the withdrawal ratio of diverse funds and the annual profit distribution plan.

4. Discuss and examine collaborations and mergers with other economic organizations, as well as the absorption or dissolution of member units of the company.

5. Engage in deliberations regarding the work reports and proposals of the general manager.

6. Engage in deliberations regarding the institutional setting plan of the company.

Article XVI. Establish a worker representative congress of the Caihong Company. The congress of worker representatives is democratically elected from among the employees of the Caihong Company with political rights according to the provisions of law.

- 6 -

CONFIDENTIAL

It enables employees to exercise the authority of democratic management, specifically giving them the rights to engage in deliberation regarding major decisions, supervise administrative leadership and safeguard the lawful rights and interests of company employees.

Article XVII. With regard to institutional setting, the Caihong Company implements a system dependent group institution mode, based upon the main factory. It implements "one system, two name brands". The functional divisions of the main factory also belong to the Caihong Company.

1. The Caihong Company has established the following functional departments based on management functions and the business system:

Business development division, technology division, production technology division, production division, quality division, finance division, personnel and labor division, public relations division, inspection and audit division, electronic research laboratory, general manager's office and public security office.

2. The Caihong Company has established the following business companies and professional centers based on management functions and external business:

Finance company, sales company, electronics import and export company, material supply and sales company, electronics technology service company, logistics company, environmental protection company, life service company, labor service company, workers' hotel, archive center, center of measurement, education center and information center.

3. The business development division of the Caihong Company has established a collaborative operation office as a professional management body for semi-close level and loose level members of the Caihong Company.

Article XVIII. The affiliated factory of the Caihong Company implements a decentralized type of management system. The factory has independent accounting and assumes sole responsibility for its profits or losses. As a relatively independent operator, it has certain decision making power with functional divisions. It assumes simulated sole responsibility for its profits or losses. All kinds of affiliated factories apply the factory director responsibility system and leveled contracted managerial responsibility system based on all around quality management, with technical progress

- 7 -

CONFIDENTIAL

*22*

as the core and economic benefits as the goal, which is how it promotes development.

Section Four. Rights and Obligations of Company Members

Article XIV. Rights

1. Share the reputation of the "Caihong Electronics Group Company" and have the right to use the trademark of "Caihong".

2. The Caihong Company enjoys priority in the rights of supplies and the use of shared technical results, products, economic technology and information.

3. All of the member units have deliberative power for development and major strategic decision making related to the Caihong Company.

4. Member units of the close level have the right of voluntary talent exchange.

5. On the condition that the directive plan made by the Caihong Company has been completed without damaging the benefits of the Caihong Company, the close level member units enjoy certain decision making power within the scope of production and operation rights of uniform provisions determined by the Caihong Company. The member units at the semi-close level and loose level have flexible production and operation rights in cases of strictly implementing an agreement or contract.

6. The member units of the Caihong Company have the right to raise criticisms and suggestions regarding the work of the Caihong Company.

Article XX. Obligations

1. The members of the Caihong Company should follow the national laws, regulations and policies of the Communist Party.

2. Abide by company articles and safeguard the interests of the Caihong Company, implement the decisions and resolutions of the Caihong Company, accept the leadership and coordination of the company, and fulfill contracts or agreements signed by multiple parties.

3. Member units that accept all kinds of plans and missions delivered by the Caihong Company should ensure the output, value the quality and

- 8 -

CONFIDENTIAL

maintain the reputation of the "Caihong" trademark.

4. Ensure uniform management or coordination in employee, financial and physical resources, production, supply and sales, planned technology and quality; be subject to the judgement of the company in case of disputes regarding member units.

5. All of the member units should first use the raw materials, components and parts and auxiliary equipment of the company on the premise of ensuring the completion of nationally directed plans and tasks as well as technical performance, product quality, price preference and on time delivery of goods. Outsourced projects and proliferated products should be selected inside the company first.

6. Major economic and technical activities of member units at the close level and semi-close level should be reported to the company for approval.

7. Major decisions, patents, production and operation, technology and information related to the Caihong Company should be kept confidential.

8. Members have the obligations to offer each other convenience regarding technical exchanges, talent training and product development.

9. Actively raise funds for the Caihong Company.

10. Report to the company and legal representatives regarding their work.

11. Members have the obligations of mutual support and helping to solve problems.

12. Other obligations to be determined.

Section Five. Fund Management and Profit Distribution

Article XXI. The Caihong Company and all of its members shall have the general accountant and finance function take charge of financial control, apply the economic

- 9 -

budgeting responsibility system, supervise and check all of the links of operations and production, and follow through on all of the national financial regulations, provisions and financial systems.

Article XXII. The finance company of the Caihong Company undertakes deposit and loan settlement and cash accounting inside the company and provides internal capital accommodation. It makes horizontal adjustment and accommodation by virtue of time differences and geographical differences among members that use capital, and offers loans of special purpose to company members for technical transformation and new product development. It establishes business relations with banks or other financial institutions, or entrusts financial business to banks and issues bonds and stocks to its employees and people outside the company.

Article XXIII. With regard to funds used by close and semi-close level members for infrastructure and major programs, member units should raise funds on their own, borrow from banks, or obtain investment or a loan from the company as well as investments from other divisions. The raising of funds is also possible through other channels based on provisions on authority for examination and approval.

Article XXIV. Current fund loans obtained by the Caihong Company and its members can be made by the company and distributed to members afterwards, or separately made by members and distributed horizontally; in other words, whoever makes the loan shall be held responsible for repayment.

Article XXV. The Caihong Company, based on the principle of unification of rights and responsibilities, should coordinate well the economic benefit relations among the country, the company, members and local divisions of members and general employees of the company. It should give priority to national benefits, overall results, and the interests of all, and shall strictly follow the principles of equity and mutual benefit.

Article XXVI. With regard to close type members of unified accounting, members of the company should not levy product taxes on each other, but only on products sold externally.

- 10 -

Non-close level members without uniform accounting should separately pay taxes to local departments. Scientific research centers, universities and design units among these members still enjoy original tax treatment, subject to no income tax with regard to the transfer of technology results.

Article XXVII. Close level members of the company shall implement unified distribution and collectively assume responsibility for their profits or losses. Non-close level members shall implement distribution based on the ratio of investment or agreement provisions. In case of any loss, the parties involved should share the responsibility based on the agreement or make up for it with the profits of the following year.

Article XVIII. Distribution based on the procedures of guarantee first, withdrawal, interest payment and participation in profit:

1. Ensure national income taxes and profits;

2. Make up for any loss of the previous year;

3. Withdraw the development fund, welfare fund, reserve fund and employee bonus fund based on national regulations;

4. Pay individual shared benefits of employees and distributed bonuses. In case there is no surplus in the same year or the surplus is used to make up for a previous loss, no profits will be allocated.

Article XXIX. Withdraw a small amount of special bonuses as incentives to major contributors of the company or its members.

Article XXX. The close level and semi-close level member units must deliver monthly accounting statements and annual financial budgets directly to the company.

Section Six. Conditions and Procedures for Joining and Exiting the Company

Article XXXI. Conditions for participating in the Caihong Company:

1. Enterprise and public institutions that are qualified to become a legal entity.

- 11 -

*24*

2. Have inherent economic and technical connections with the company.

3. Agree to the articles of the Caihong Company and fulfill rights and obligations.

4. Provide a written application and produce the relevant certificates and documents. Upon discussion and approval by the management committee of the company, applicants should go through the formalities of joining the company in order to become a member of the Caihong Company.

Article XXXII. Procedures to exit the Caihong Company:

Based on the principles of equity, mutual benefit, and voluntariness, members that intend to exit the Caihong Company should provide a written application a half year in advance. Upon approval by the management committee of the company, the relevant formalities will be processed, and then all of the rights related to the Caihong Company will expire.

Section Seven. Termination of Liquidation

Article XXXIII. In case of one of following situations, the company will be dissolved after the approval of the competent national department:

1. Severe violation of national laws or regulations such that the public benefit of the society are harmed.

2. The state decides to dissolve the company.

3. The company declares bankruptcy.

4. Other inevitable incidents which prevent the company from continuing.

5. For other reasons, the company decides to go out of business.

Article XXXIV. Once the Caihong Company announces its dissolution, the management committee should confirm the establishment of and authorize a liquidation committee for liquidation.

Article XXXV. The liquidating committee should take full responsibility for liquidation issues of the Caihong Company based on national laws and regulations. Other units and individuals have no right to arbitrarily deal with the property of the

- 12 -

CONFIDENTIAL

IRI-CRT-00000784.02E_Translation

*25*

company.

Article XXXVI. After the liquidation work has been completed, the liquidation committee should produce a liquidation report and issue income statements and accounting books during the liquidation period, which should be verified by a government approved auditing body. After reporting to the approval department and obtaining approval, the cancellation procedures required by the business administration department should be followed, which means that the Caihong Company has been terminated.

Section Eight. Supplementary Provisions

Article XXXVII. The management committee of the Caihong Company has the final right to modify, supplement and explain these articles.

Article XXXVIII. These articles shall take effect upon approval.

October 1988

- 13 -

CONFIDENTIAL                                        IRI-CRT-00000785E_Translation

**25**

附件二

彩虹电子集团公司章程

## 第一章 总 则

第一条 本公司名称为彩虹电子集团公司（以下简称彩虹公司）。公司的法定地址在陕西省咸阳市秦都区彩虹路。

第二条 彩虹公司在国民经济发展和社会发展规划的指导下，为适应有计划商品经济和社会化大生产的客观需要，本着政企职责分开、所有权与经营权分离、生产型向生产经营型转变的要求，以高技术、外向型为主导，以国内市场、国际市场和国外企业集团为竞争目标，依法自愿组建的企业集团。

第三条 彩虹公司以公有制为基础，以"彩虹"牌名优产品为龙头，以陕西彩色显象管厂为主体，联合多个企业、科研设计单位、院校，形成跨地区、跨行业、跨所有制形式及多方位、多层次、多形式的实行工技贸相结合，进出口相结合的多种生产经营，具有科研开发、生产销售、技术服务、资金融通等综合功能的紧密型经济联合体。

第四条 彩虹公司是自主经营、独立核算、自负盈亏、照章纳税、具有法人资格的实业性的经济实体。彩虹公司按照国家的有关规定，经政府管理部门批准成立，经工商行政管理部门注册核准。

— 1 —

第五条 彩虹公司的宗旨是：在国家计划指导下，按照社会主义商品经济的客观要求，面向国际国内两个市场，充分发挥集团内拥有的技术、设备、产品、人才、资金和管理等各方面的优势，通过组织社会化大生产，促进生产和技术进步，创造名优产品，开发高技术产品，发展外向型经济，最大限度地满足社会需要，增强出口创汇能力，获取最佳经济效益，为国家建设增加积累，加速我国电子工业发展。

第六条 彩虹公司的经营方针是，以经营为中心，以金融为纽带，以科技为动力，以效益为目标。

第七条 彩虹公司严格遵守国家政策、法律、法令和有关规定，自觉接受财政、银行、税务、审计、物价、工商行政、统计等政府部门的考查和监督，依法纳税，以保证公司的健康发展。

第八条 彩虹公司成员单位按其内在经济技术关系紧密程度，分为紧密层、半紧密层和松散层。

1、紧密层成员是彩虹公司的业务公司、直属工厂以及主体厂在沿海开放城市独立投资兴办的企业。

2、半紧密层成员是集团公司和主体厂投资控股50%以上的合资企业、科研开发中心。

3、松散层成员是以经济技术合同或协议形式，参加公司组织的专业化协作配套生产、联合开发产品或参与经营活动，形成稳定的定点协作或供销关系的企业、科研设计单位和院校。

— 2 —

CONFIDENTIAL

NO.E 1277340000000000064000-19-169903-20170919

IRI-CRT-00000779



第九条　彩虹公司注册资本为 6·9 亿元。

## 第二章　经营范围和经营方式

第十条　彩虹公司经营范围：

1、进行彩色显象管及其它电真空器件生产项目的工程设计、技术承包；

2、经营化工、金属等材料和电子产品生产所需的各种物资业务；

3、制造销售彩色显象管及其它电真空器件专用设备、仪器仪表；

4、承担机械加工、修理、制造和运输业务；

5、经销各种工业用水、气体及燃料等；

6、开展彩色显象管及其它电真空器件的技术咨询、技术开发、技术服务以及专业技术培训业务；

7、开展经济、技术、人才、管理等信息交流，以及广告、展览等宣传业务；

8、公司成立后，主体厂和紧密层及半紧密层成员单位原有的经营项目纳入彩虹公司的经营范围。

根据公司的发展，积极创造条件逐步扩大经营范围，向市场和社会提供多种交流和服务。

第十一条　公司的经营方式。

以市场需要为导向，制定发展战略规划。即"面向世界。立足党

—3—

争，形成四个中心（彩管生产中心、新品开发中心、人才培训中心、彩管技术输出中心）"。利用集团优势，合理配置各种生产要素，以科研开发为先导，以名牌优质产品为龙头，以优质服务为保障，一业为主，多种经营，实行科研、开发、制造、应用、销售、服务"一条龙"的经营方式；同专业化生产和规模经济发展，形成产品、技术多点辐射的格局，并不断追踪世界先进科学技术，积极发展外向型经济，增强产品和技术在两个市场的竞争能力，与世界发达国家超级电子集团相竞争抗衡。

## 第三章　管理体制

第十二条　彩虹公司采取集权和分权相结合的多层次管理模式。

1、对主体层成员，是资产经营一体化，对人、财、物、供、产、销实行统一计划、统一管理，直接经营，统一核算、统负盈亏。

2、对紧密层成员实行自主经营，共同经营管理，执行公司统一规定，签订协议规定承担任务，与彩虹公司建立比较密切稳定的生产、经营、财政、物资依托关系。独立核算，自负盈亏，按协议分配收益、分担亏损。

3、对松散层成员实行规划引导，统一协作计划和有关技术质量标准，按合同承担责任，独立经营、自负盈亏。

第十三条　彩虹公司管理层次分为决策层、管理层和执行层。

—4—

NO.E 12773400000000000000640003-20-168903-20170919

IRI-CRT-00000780



1、决策层，彩虹公司总经理、副总经理、公司管理委员会组成公司的决策层，主要任务是决定公司的经营方针和经营战略，审定公司的长远规划和综合计划，审批公司资金的筹措、分配和使用，决定公司重大技术改造和产品发展方向，任免公司部门和紧密层、半紧密层成员的领导干部。

2、管理层，是彩虹公司的职能部门、业务公司和专业中心。基本职能是监督、协调、参谋；主要任务是编制、审查公司的计划、预算、指导、协调公司成员的生产、技术和经营管理，组织科研开发、销售服务及对外开展经营活动。

3、执行层，是紧密层、半紧密层、松散层成员单位，负责按公司计划组织生产经营活动，努力扩大生产，增加利润。

第十四条　彩虹公司实行总经理负责制，总经理由主体厂厂长兼任，任期四年，可以连任。公司设副总经理若干人，协助总经理工作。

总经理行使以下职权。

1、执行彩虹公司章程，定期向管理委员会和职工代表大会报告工作。

2、全面领导彩虹的各项日常生产经营工作，负责处理成员单位提出的有关重大问题。

3、决定彩虹的发展规划、年度生产经营计划和财务预算、决算方案和利益分配办法。

—5—

4、提出彩虹公司副总经理、总工程师、总会计师、总经济师人选，上报有关部门按干部管理权限任免，任免部门负责人，直属公司经理和工厂主要负责人。

5、决定彩虹公司的机构设置方案。

6、组织制订彩虹公司各种规章制度和管理办法。

7、对违纪违章职工作出奖惩处理决定。

8、代表彩虹公司处理对外重要业务。

第十五条　彩虹公司设置管理委员会，协助总经理决定公司的重大问题。管理委员会由各成员单位代表组成。

管理委员会行使下列职权。

1、审议彩虹公司章程和公司规章制度。

2、审议彩虹公司的发展战略、方针目标及对策、生产经营规划、年度生产经营计划和财务预算、决算方案。

3、审议各项基金的提取比例和年度利润分配方案。

4、讨论审议与其它经济组织的合作、合并、联合和吸收或取消公司成员单位。

5、审议总经理的工作报告和提案。

6、审议公司的机构设置方案。

第十六条　建立公司职工代表大会。公司职工代表大会依照法律规定在享有政治权利的彩虹公司职工中，通过一定的程序民主选举产生，

—6—

CONFIDENTIAL

NO.E 1277340000000000084003-21-1168003-20170919



IRI-CRT-00000781

是公司职工行使民主管理权力机构，有审议公司重大决策，监督行政领导和维护公司职工合法权益等方面的权力。

第十七条 彩虹公司机构设置，采用依附型集团机构模型，以主体厂为依托。实行"一套机构，两块牌子"，主体厂职能部门同时也是公司职能部门。

1、彩虹公司按管理职能及业务系统设置下列职能部门。

经营发展部、技术部、生产技术部、生产部、质量部、财务部、人事劳动部、公共关系部、监察审计部、电子研究所、总经理室、公安处。

2、彩虹公司按照承担的管理职能和对外开展经营业务设置下列业务公司和专业中心；

财务公司、销售公司、电子进出口公司、物资供销公司、电子技术服务公司、运输公司、环保公司、生活服务公司、劳动服务公司、彩虹宾馆、职工医院、档案中心、计量中心、教育中心、信息中心。

3、彩虹公司经营发展部设置合作经营室作为彩虹公司半紧密层、松散层成员单位的专业管理机构。

第十八条 彩虹公司直属工厂采取模拟分权式管理体制。工厂是独立核算、自计盈亏，相对独立的生产经营者，给予一定的自主权，拥有职能机构、负有模拟性盈亏责任。各直属厂实行厂长负责制，推行以全面质量管理为基础，全面技术进步为核心、全面经济效益为目

— 7 —

标的分层承包经营责任制，促进工厂发展。

## 第四章 公司成员的权利和义务

### 第十九条 权利

1、共享"彩虹电子集团公司"的荣誉和按照有关规定有权使用"彩虹"商标。

2、彩虹公司内有互享技术成果、产品、经济技术、信息的优惠优先供应和使用权。

3、各成员单位对彩虹公司有关发展、重大战略决策有审议权。

4、紧密层各成员单位之间有自愿进行人才交流的权力。

5、在保证完成彩虹公司下达的指令性计划、不损害彩虹公司利益的前提下，紧密层成员单位在公司统一规定的生产经营权范围内，享有一定的自主权。半紧密层和松散层成员单位在严格执行协议或合同的情况下，有采取灵活多样的生产经营权。

6、彩虹公司成员对公司的工作有批评和建议权。

### 第二十条 义务

1、彩虹公司成员必须遵守国家的法律、法规和党的方针政策。

2、遵守彩虹公司章程，维护彩虹公司利益，执行彩虹公司决议、决定，接受公司的领导和协调，履行公司各方签订的合同或协议。

3、接受彩虹公司下达的各项计划任务的成员单位，必须保证产

— 8 —

CONFIDENTIAL

IRI-CRT-00000782



NO.E 127734/000000000000064003-22-168903-20170919

23

量、重视质量，维护"彩虹"商标声誉。

4、服从公司在财物、产供销、计划技术、质量等方面的统一管理或统一协调：在成员单位之间发生矛盾纠纷时，服从公司的裁决。

5、在确保完成国家指令性计划任务的前提下，在保证技术性能，产品质量，价格优惠和按期交货的前提下，各成员单位应优先使用公司内所有的原材料、元器件和配套件，外协项目和扩散产品优先在公司内选择。

6、紧密层、半紧密层成员单位的重大经济技术活动须报经公司批准。

7、涉及彩虹公司内部的重大决策、专利、生产经营、技术、信息等方面负有保密的责任。

8、各成员之间有科技交流、人才培训、开发产品等其它活动提供方便的义务。

9、积极为彩虹公司筹集资金。

10、向公司及法定代表人报告工作情况。

11、各成员有互相支持、互相帮助、排忧解难的义务。

12、应承担的其它义务。

第五章　资金管理与利润分配

第二十一条　彩虹公司和各成员设总会计师和财务组织，负责财务

—9—

管理，推行经济核算责任制，监督检查经营生产的各个环节，贯彻执行国家各项财政规定，条例和财务制度。

第二十二条　彩虹公司的财务公司办理公司内部的存款贷款结算和现金收付业务，为公司内部资金融通服务，利用公司成员之间资金运用上的时间差，空间差进行横向调剂融通，向公司成员发放专项贷款，进行技术改造、新品开发、同银行暨其它金融机构建立业务往来关系，也可以委托专业银行代理金融业务，经过批准，向内部职工以及社会发行债券、股票。

第二十三条　紧密、半紧密层成员进行基本建设和重大技措项目所需的资金，按规定的审批权限，分别由成员单位自筹，银行贷款，公司投资或贷款，其它部门投资以及各种方式集资。

第二十四条　彩虹公司及成员从银行取得的流动资金贷款可以由公司上交下拨，统贷统还，也可以由公司成员分别贷款，横向拆放，谁贷谁还。

第二十五条　彩虹公司按照责权利相统一的原则，正确确定国家、公司、各成员、各成员所在地方和公司全体职工五方面的经济利益关系，坚持以国家利益为重，整体利益为重，大局利益为重的优先原则。公司严格实行平等、互利的分配准则。

第二十六条　凡实行统一核算的紧密层成员，内部各单位相互提供的产品不征产品税，只就对外销售产品征收产品税，不实行统一核

—10—

NO.E 1277340000000000000064003-23-168903-20170919

CONFIDENTIAL

IRI-CRT-00000783



算的非紧密层成员，分别向当地有关部门交纳税款、成员中科研、院校、设计单位仍继续享受原税收待遇，转让技术成果免征所得税。

第二十七条 公司聚密层成员按实行统一分配、统负盈亏，非紧密层成员按比例或协议规定进行分配，倘若发生亏损，由各方按协议有关规定分配，亦可在下一年度盈利中弥补。

第二十八条 按先保、后提、付息、分红的程序实施分配：

1、确保国家税利收入。

2、弥补前年度的亏损；

3、按国家规定提取发展基金、福利基金、储备基金和职工奖励基金；

4、支付职工个人股息和分配红利，若当年无盈余时，或盈有盈余但亏损未弥补前，不分配红利。

第二十九条 在红利中，提取少量的特别奖金，用于对公司或成员做出了重大贡献者的奖励。

第三十条 紧密、半紧密层成员单位必须按期直接向公司报送月度会计报表和年度财务决算。

第六章 参加与退出公司的条件及程序

第三十一条 参加彩虹公司的条件：

1、具有法人资格的企事业单位。

— 1 1 —

2、与本公司有内在的经济技术的联系。

3、承认彩虹公司章程，履行权力和义务。

4、提出书面申请和由其有关证明及文件，经公司管理委员会讨论通过，办理加入公司手续，即成为彩虹公司成员。

第三十二条 退出彩虹公司的程序。

本着平等、互利、自主、自愿的原则，凡要求退出彩虹公司者，应在半年前提出书面申请，经公司管理委员会讨论同意后，办理有关手续，同时终止享受彩虹公司一切权利。

第七章 公司的终止清算

第三十三条 彩虹公司有下列情形之一时，经国家主管部门批准，即予解散。

1、严重违反国家法律、法规，危害社会公共利益。

2、国家决定撤销本公司。

3、破产。

4、其它不可抗拒的意外事件迫使公司无法续存。

5、因其它原因，公司决定歇业。

第三十四条 彩虹公司一旦宣告解散，由公司管理委员会确定成立清算委员会并授权其进行清算工作。

第三十五条 清算委员会按照国家有关法律和法规的规定，全权处理彩虹公司的清算事宜，其它任何单位和个人无权擅自处理公司财

— 1 2 —

NO.E 12773400000000000364003-24-168803-20170919

CONFIDENTIAL

IRI-CRT-00000784



产。

第三十六条　清算工作结束后，清算委员会提出清算报告并造具清算期内收支报表和各种财务簿册，经政府批准的审计部门验证，报审批部门批准后，向工商管理部门办理注销手续，即宣告彩虹公司终止。

## 第八章　附　　则

第三十七条　本章程修改，补充权和解释权属于彩虹公司管理委员会。

第三十八条　本章程自批准之日起生效。

一九八八年十月

— 1 8 —



CONFIDENTIAL

NO.E 12773400000000000084003-25-168903-2017 0919

IRI-CRT-00000785

# EXHIBIT 3



**certified**translate
A LANGUAGE FISH LLC COMPANY

info@certifiedtranslate.com    2425 Olympic Blvd., Suite 4000W    usa   1-888-856-2228
www.certifiedtranslate.com    Santa Monica, CA 90404    int   +1-310-684-3153
   fax   +1-310-564-1944

## CERTIFIED TRANSLATION



A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: | **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|---|
| Firm: | **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
|---|
| |
| **IDD 8-15-2007 Report and Disclosure re Independent Business OperationsE** |
| |
| |

| Source Language: | **SIMPLIFIED CHINESE** | Target Language: | **ENGLISH** |
|---|---|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**    Sean Kirschenstein, Director      **Date:**    September 26, 2018

A copy of the translated version(s) is attached to this statement of certification.

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On _Sept. 26, 2018_ before me, _Kristin Gail Chamberlain_ , Notary Public, appeared _Sean Kirschenstein_ , who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _K Nstn Clln_



KRISTIN GAIL CHAMBERLAIN
Commission # 2141680
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2020

D☐P☐ Exhibit _841 7_
Deponent _Wong_
Date _3/7/19_ Rptr _KW_

Stock Code: 600707          Stock abbreviation in Chinese: 彩虹股份          Document Number: L2007-022

## IRICO Display Devices Co., Ltd.

## Announcement of Self-Inspection Report and Rectification Plan Concerning the "Campaign to Strengthen Corporate Governance of the Listed Company"

IRICO Display Devices Co., Ltd (the "Company") and all members of the board of directors of the Company warrant that there are no false representations or misleading statements contained in, or material omissions from this announcement, and severally and jointly accept responsibilities for the truthfulness, accuracy and completeness of this announcement.

### I. Special notes: issues in corporate governance that need improvement

According to China Securities Regulatory Commission's *Notice on Issues Concerning Campaign to Strengthen Corporate Governance of Listed Companies*, IRICO Display Devices Co., Ltd has set up a special working group, with the Company's chairman as the primary responsible person, and has developed specific action plans. For the sake of integrity and compliance with applicable laws and regulations (including the Company Law and Securities Law of the People's Republic of China) and internal rules and policies (including the Company's *Articles of Association*), the special working group has conducted self-inspection of corporate governance as per each requirement set forth in the Notice. After thorough self-examination, the Company was found to have the following main issues in corporate governance that need improvement:

1. Further improvement of the Company's corporate governance structure, establishment of an independent director system, setup of a nomination committee of the board of directors, and better performance of each specialized committee and independent director of the board of directors;

2. Further improvement of the Company's corporate governance system, perfect and amend the Company's "Management System of Raised Funds" and "Administrative Measures on Information Disclosure" based on applicable regulations;

3. Improvement of the Company's shareholder voting system regarding important issues, in order to properly uphold the rights of shareholders to vote at the general meeting of shareholders and enable them to exercise their rights as shareholders;

4. Further standardize related-party transactions, implement procedures for examining and approving related-party transactions in strict accordance with the *Rules Governing the Listing of Stocks on Shanghai Stock Exchange* and the Company's *Articles of Association*; and effective supervision by independent directors, in order to ensure the compliance, fairness, and proper disclosure of related-party transactions;

5. Further improvement of the Company's internal control mechanism; enhancing awareness of department heads and management at all levels towards risk management and internal control, in order to improve management efficiency; regular examination and evaluation of the internal control mechanism, in order to determine its integrity, rationality and effectiveness.

## II. Overview of corporate governance

Since the Company was listed, its operations have been managed in strtict accordance with applicable laws, regulations and rules including the Company Law and Securities Law of the People's Republic of China, the Code of Corporate Governance for Listed Companies in China, and the Company's *Articles of Association*. The Company has established a relatively robust corporate governance structure, and has basically achieved compliance with relevant corporate governance requirements for listed companies, mainly in the following aspects:

1. Functioning of general meetings of shareholders

The Company's general meetings of shareholders, including the procedures for convening and holding the general meetings, meeting notices, appointment of proxies, and voting procedure, have been executed in strict accordance with the *Company's Articles of Association* and *Rules of Procedure for General Meetings of Shareholders*. Voting procedure standardization and minutes of the general meetings of shareholders are complete. All previous general meeting of shareholders were witnessed by lawyers on site, with legal opinions issued and published in a timely manner.

2. Functioning of the board of directors

The Company has established *Rules of Procedure for Meetings of the Board of Directors*, but has not yet developed an Independent Director System. The procedures for convening and holding meetings of the board of directors have been executed in accordance with applicable rules and regulations including the *Rules Governing the Listing of Stocks on Shanghai Stock Exchange*, and the Company's *Articles of Association* and *Rules of Procedure for Meetings of the Board of Directors*.

3. Functioning of the board of supervisors

The Company has established *Rules of Procedure for Meetings of the Board of Supervisors*. The number and composition of members of the board of supervisors are in compliance with applicable laws and regulations. The Company's supervisors have conscientiously performed their duties to supervise and audit the Company's operations, related-party transactions, financial status, and performance of senior executives as per the Company's *Articles of Association* and *Rules of Procedure for Meetings of the Board of Supervisors*.

4. Performance of managers

The Company has established "Working Rules for the General Manager" in accordance with the *Company Law of the People's Republic of China* and the Company's *Articles of Association*, in order to supervise the organization and conduct of managers, maintain normal operations of the Company, and protect the rights and interests of shareholders. The management team of the Company is in charge of operations management of the Company; each member of the management team is able to control daily production and operation activities of the Company effectively within the scope of their respective duties.

5. Internal control of the Company

According to applicable laws and regulations, the Company has established a relatively complete, effective and reasonable internal control mechanism that adapts to the Company's asset structure, business models, development status and management practice, in order to improve internal management, ensure normal operations, maintain the security and integrity of corporate assets, prevent frauds, and achieve the Company's business objectives. The Company's internal control mechanism mainly includes: *Articles of Association* and the system of "three meetings", an information disclosure management system, job duty standards, a financial control system, a human resources

management system, a quality management system, an equipment and parts management system, a production management system, a safety management system, a sales management system, and a digital information management system. The Company's relatively complete, effective, logical internal control mechanism has ensured normal production operations of the Company and achieved the goal of controlling business risks effectively. In the future, the Company will further optimize its internal control mechanism, so that it is more efficient and practical to meet the Company's development strategies and business objectives.

6. The Company's situation re: "Three Separates, Two Independents" with the controlling shareholder

(1) In business operations

The Company's business is independent from the controlling shareholder. The Company's production systems are completely independent from the controlling shareholder. The Company has signed agreements on related-party transactions with controlling shareholder for power supply based on market prices. The Company has an independent procurement and sales and marketing system; there is no horizontal competition between the Company and its controlling shareholder.

(2) In personnel management

The Company has signed labor contracts with all personnel. The Company's labor, HR and salary management is independent from the controlling shareholder. The Company's general manager holds office on a full-time basis. The general manager and other senior executives of the Company do not receive wages from controlling shareholder's units.

(3) In asset management

The independence of the Company's assets is complete. The Company's land use rights, real estate ownership, industrial property rights, and trademark rights are clearly defined and documented. The Company has signed agreements with controlling shareholder and its related subsidiaries regarding use of trademarks, real estate, land lease, and/or other services, and has completed all necessary examination and approval procedures.

(4) In production and administration

The company's production, operations and administration management are completely independent of the controlling shareholder; there exists no situation where controlling shareholder has directly or indirectly interfered in the Company's establishing internal institutions.

(5) In financial management

The Company has established an independent financial accounting department, developed independent financial accounting and financial management systems, opened independent bank accounts, and pays taxes independently according to applicable laws and regulations.

7. Information disclosure

The Company has established *Administrative Measures on Information Disclosure*, *Management Rules for Internal Reporting of Important Information*, and *Rules for Investor Relation Management* in accordance with applicable laws and regulations. The Company has strictly followed the rules and regulations of China Securities Regulatory Commission and Shanghai Stock Exchange on information disclosure, and has fulfilled its information disclosure obligations in a proper manner.

8. Incentive and constraint mechanism

The Company has established an effective performance evaluation system, but has not implemented an equity incentive mechanism.

9. Investor relations

The company has earnestly developed investor relations management. To ensure compliance and effectiveness of investor relations management, the Company has established *Rules for Investor Relation Management*, which set forth the objectives, principles, activities and work of investor relations management, as well as organization and implementation of activities and work related to investor relations management. The Company has a team of specialists responsible for investor relations management and another team of specialists responsible receiving visiting investors. The Company communicates with investors through various channels, such as reception of visiting investors, phone inquiries, mails, emails, on-site visits, one-on-one communication, media interviews and reports.

10. The Company has amended its *Articles of Association*, *Rules of Procedure for General Meetings of Shareholders*, *Rules of Procedure for Meetings of the Board of Directors*, and *Rules of Procedure for Meetings of the Board of Supervisors*. The Company will continue to improve its corporate governance-related systems in accordance with changes in applicable laws and policies and requirements of regulatory authorities.

**III. Problems in corporate governance and reasons**

**(I) Establishment of an independent director system**

The Company will establish an *Independent Director System* in accordance with *the Company Law of the People's Republic of China*, *Guidelines for the Introduction of Independent Directors into Listed Companies*, *Provisions on Strengthening Protection of the Rights and Interests of General Public Shareholders*, and the Company's *Articles of Association*, in order to enable independent directors to perform their duties effectively, protect the Company's interest as a whole, and facilitate corporate operations in a compliant manner.

**(II) Establishment of a nomination committee of the board of directors**

Currently the Company's board of directors has established subordinate committees including a remuneration committee, an audit committee, and an investment strategy committee, but has not established a nomination committee. To optimize the composition of the board of directors and improve corporate governance, the Company will set up a nomination committee of the board of directors as soon as possible and elect committee members to develop "*Rules for the Nomination Committee of the Board of Directors*".

**(III) Amendment of the Fund Raising Management System**

The Company has already established a Fund Raising Management System. The Company will amend its Fund Raising Management System in accordance with the "*Notice on Strengthening Management of Funds Raised by Listed Companies*" recently issued by China Securities Regulatory Commission.

**(IV) Amendment of the Administrative Measures on Information Disclosure**

The Company has already established an Administrative Measures on Information Disclosure. The Company will amend anew its "*Administrative Measures on Information Disclosure*" in accordance with the "*Administrative Measures on Information Disclosure by Listed Companies*" issued by China Securities Regulatory Commission, in order to supervise information disclosure by the Company and/or any relevant information disclosure obligor, improve management of information disclosure-related affairs, and protect the rights and interests of investors.

(V) Management of related-party transactions to ensure fairness and compliance with regulatory requirements

The Company will improve management of related-party transactions, implement strict procedures for examining and approving related-party transactions in strict accordance with the *Rules Governing the Listing of Stocks on Shanghai Stock Exchange* and the Company's *Articles of Association*, and enable independent directors to perform their duties in supervision effectively, in order to ensure the fairness, proper disclosure, and compliance of the related-party transactions with regulatory requirements.

**(VI) Further improvement of the Company's internal control mechanism**

The Company will improve its internal control mechanism, enhance the awareness of department heads and staff members at all levels towards risk management and internal control, and examine and evaluate the internal control mechanism regularly, in order to determine its integrity, rationality and effectiveness.

**(VII) Further improvement in the Company's shareholder voting system regarding important issues**

According to China Securities Regulatory Commission's *Provisions on Strengthening Protection of the Rights and Interests of General Public Shareholders* and *Rules on Shareholders' General Meetings of Listed Companies*, the Company will provide a safe, economical and convenient online voting system for shareholders to exercise their rights at general meetings of shareholders regarding 5 categories of important issues that involve issuance of new shares, issuance of convertible bonds, placement of shares to original shareholders, major assets restructuring, or debt/equity swaps, in order to protect the rights and interests of general public shareholders and enable them to have a greater say.

**IV. Rectification measures, rectification timeframe and responsible persons**

According to the above results of self-inspection, the Company has developed the following rectification plan as per applicable laws and regulations:

1. In the future, the Company will continue to create conditions for training directors, supervisors, and senior executives and actively participate in corporate governance-related trainings organized by the regulatory authorities, in order to enable the directors, supervisors and senior executives to understand and follow relevant requirements for corporate governance, perform their duties more effectively, and improve their performance in decision-making and business management and compliance with regulatory requirements. The Company will arrange relevant staff to attend trainings required by the regulatory authorities, and the responsible person is the Company's secretary of the board of directors.

2. According to applicable laws and regulations, the Company will establish and improve its corporate governance structure and systems, which should be completed by the end of August 2007, and the responsible person is the secretary of the board of directors.

3. According to China Securities Regulatory Commission's *Provisions on Strengthening Protection of the Rights and Interests of General Public Shareholders* and *Rules on Shareholders' General Meetings of Listed Companies*, the Company will improve its voting system regarding important issues and provide online voting for shareholders at

general meetings with regard to important issues that involve issuance of new shares, etc., in order to protect the rights and interests of the shareholders; the responsible person is the secretary of the board of directors.

The Company will implement the above rectification measures according to the timeframe requirements in the *"Notice on Issues Concerning Campaign to Strengthen Corporate Governance of Listed Companies"* issued by Shanxi Securities Regulatory Bureau.

### V. Good corporate governance practices with features

In order to improve corporate governance, the Company took the lead in introducing independent directors to the board of directors in 2002. The Company has also established specialized committees of the board of directors; in particular, the remuneration and appraisal committee meets at the end of each year to review the performance of each senior executive in the year. We will continue to optimize our corporate governance systems in the future.

### VI. Other matters

The Company's "Self-Inspection Report and Rectification Plan Concerning the Campaign to Strengthen Corporate Governance of the Listed Company" has been reviewed and approved by the board of directors. According to the requirements of China Securities Regulatory Commission and Shanxi Securities Regulatory Bureau, the Company strives to ensure the success of the campaign by collecting advice or comments of investors and the public on the Company's corporate governance results and rectification plans and providing an interactive platform for the "campaign to strengthen corporate governance of the listed company". Detailed contacts of the platform are as follows:

| | |
|---|---|
| Tel: | 029-88314617; 029-33333109 |
| Fax: | 029-88314617; 029-33333109 |
| Email: | gfoffice@ch.com.cn |
| Email for public comments: | |
| Department of Listed Company Supervision, CSRC: | gszl@csrc.gov.cn |
| Shanghai Stock Exchange: | List22@secure.sse.com.cn |
| Shanxi Securities Regulatory Bureau: | xa_gszl@csrc.gov.cn |

**IRICO Display Devices Co., Ltd.**

**August 15, 2007**

# IRICO Display Devices Co., Ltd.
# Self-Inspection Report Concerning the "Campaign to Strengthen Corporate Governance of the Listed Company"

According to China Securities Regulatory Commission's *Notice on Issues Concerning Campaign to Strengthen Corporate Governance of Listed Companies*, IRICO Display Devices Co., Ltd has set up a special working group, with the Company's chairman as the primary responsible person, and has developed specific action plans. For the sake of integrity and compliance with applicable laws and regulations (including the Company Law and Securities Law of the People's Republic of China) and internal rules and policies (including the Company's Articles of Association), the special working group has conducted self-inspection of corporate governance as per each requirement set forth in the Notice. The results of the self-inspection are as follows:

### I. Basic information of the Company and its shareholders

### 1. Development history and basic information of the Company

(1) Development history of the Company

IRICO Display Devices Co., Ltd (the "Company") is a joint stock company approved by the Commission for Restructuring the Economic System of Shaanxi Province [approval number: SGF (1992) No.34) ] and established via subscription by three parties: IRICO Group, the former Shaanxi Trust & Investment Co., Ltd of ICBC, and the former Shaanxi Trust & Investment Co., Ltd of CCB. The Company obtained its business license (No. 6100001005467) issued by Shaanxi Provincial Administration for Industry and Commerce on July 29, 1992. The Company's scope of business mainly includes: development, production, and sales of color display devices, electronic products and parts, and raw materials; import and export of technologies and products as a manufacturer or agent, processing with materials, samples or semi-finished products supplied, and compensation trade (except import and export of products or technologies restricted or banned by China); and physical leasing.

The Company was listed on Shanghai Stock Exchange on May 20, 1996. In July 1997, the former Shaanxi Trust & Investment Co., Ltd of ICBC, the former Shaanxi Trust & Investment Co., Ltd of CCB, and the former Shaanxi Trust & Investment Co., Ltd of Bank of China respectively transferred their shares of the Company, 122.88 million shares in total, to IRICO Group, which was approved by China Securities Regulatory Commission. In October 2004, as approved by the State-owned Assets Supervision and Administration Commission of the State Council (the "SASAC"), IRICO Group transferred all of its shares of the Company to IRICO Group Electronics Co., Ltd ("IRICO Electronics"), a wholly-owned company of IRICO Group; IRICO Electronics became the controlling shareholder of the Company and IRICO Group has been the actual controller of the Company.

7E_Translation

(2) Basic information of the Company

Chinese name: 彩虹显示器件股份有限公司

English name: IRICO DISPLAY DEVICES CO., LTD

Legal representative: Ximin WANG

Registered address: West Zone, Hi-Tech Development Zone, Xi'an City, Shaanxi Province, China

Business address: No. 16 Fenghui Nan Road, Hi-Tech Development Zone, Xi'an City, Shaanxi Province, China

Postal code: 710075

Email: gfoffice@ch.com.cn

Website: http://www.iricoltd.com.cn

Company listed on: Shanghai Stock Exchange

Stock abbreviation in Chinese: 彩虹股份

Stock code: 600707

(3) Stock issuance and listing

In August 1992, the Company issued 300,000,000 common shares at a price of RMB 1.5 per share, each with a nominal value of RMB 1, which was approved by Shaanxi Branch of the People's Bank of China [approval number: SYF 1992 (54)].

As approved by China Securities Regulatory Commission [approval number: CSRC (1996) No.25] and Shanghai Stock Exchange [approval number: SSE No.024], 92.08 million public shares of the Company were listed on Shanghai Stock Exchange on May 20, 1996.

In June 1996, the Company's fourth general meeting of shareholders reviewed and approved a plan for distribution of profits earned in 1995: issuance of 2 bonus shares for every 10 shares held; date of record: 2 July 1996; ex-dividend date and listing date of bonus shares: 3 July 1996. The total shares of the Company became 360 million shares.

In February 2000, the Company implemented allotment of shares for the year 1999. On the basis of the 360,000,000 total issued shares recorded at the end of 1998, the Company offered 3 rights shares for every 10 existing shares at a price of RMB 9 per rights share. The Company's controlling shareholder subscribed for 28 million shares non-monetary contributions; 12.3191 million rights shares were offered for subscription to legal person shareholders of the Company, and they waived all of their allotment right; general public shareholders subscribed for 33.1488 million rights shares. In total, 61.1488 million rights shares were issued. After the allotment of shares, the Company had a total of 421.1488 million shares.

**2. The Company's control relations and chain, use chart to explain and list final actual controller;**

State-owned Assets Supervision and Administration Commission of the State Council

| 100%

IRICO Group

| 75%

IRICO Group Electronics Co., Ltd

| 42.90%

IRICO Display Devices Co., Ltd

**3. Ownership structure; controlling shareholder or actual controller and its influence on the Company**

(1) Changes in share capital

| Type of shares | Number of shares | Ratio (%) |
|---|---|---|
| I. Shares subject to conditional sales | | |
| Shares held by state-owned legal persons | 180,675,565 | 42.90 |
| Shares held by domestic legal persons | 36,497,619 | 8.67 |
| II. Shares not subject to conditional sales | | |
| RMB-denominated common shares | 203,975,616 | 48.43 |
| III. Total | 421,148,800.00 | 100.00 |

(2) Overview of controlling shareholder and actual controller

Controlling shareholder: IRICO Group Electronics Co., Ltd; legal representative: Daoqin XING; registered capital: RMB 1,941,174,000; date of establishment: September 2004; main scope of business or management activities: development, manufacturing and sales of color display devices and supporting products and materials, electronic devices, vacuum electronic appliances, and various electronic products.

Actual controller: IRICO Group; legal representative: Daoqin XING; date of establishment: September 1995; registered capital: RMB 1 billion; main scope of business or management activities: development and manufacturing of color picture tubes, display tubes, color TV, display units and supporting products, electronic devices, vacuum electronic appliances, and various electronic products.

**4. Whether the controlling shareholder or actual controller "owns a controlling stake in multiple listed companies"; if so, please explain the impact or risk on corporate governance and stable operation of the Company; and whether there are horizontal competitions and/or related-party transactions between the multiple listed companies.**

The Company's controlling shareholder is IRICO Group Electronics Co., Ltd (an H-share company listed on the main board of the Hong Kong Stock Exchange; stock abbreviation: IRICO Electronics; stock code: 0438). IRICO Group is the actual controller of both the Company and IRICO Electronics.

There are no horizontal competitions between the Company, the controlling shareholder, and the actual controller.

There are related-party transactions necessary for daily production and operations between the Company, the controlling shareholder, and the actual controller. The related-party transactions include procurement of parts and components, sales of goods, and power supply.

**5. Institutional investors and their impact on the Company:**

None.

**6. Whether the Company's Articles of Association is revised and improved in accordance with the** *Guidelines for the Articles of Association of Listed Companies* **(as Amended in 2006)**

The Company's *Articles of Association* has been revised and improved in strict accordance with the China Securities Regulatory Commission's *Guidelines for the Articles of Association of Listed Companies* (as Amended in 2006), and has been reviewed and approved at the Company's general meeting of shareholders.

**II. Compliance in operations**

**1. General meetings of shareholders**

**(1) Whether the procedures for convening and holding generals meeting of shareholders are in compliance with applicable rules and regulations**

The procedures for convening and holding the Company's generals meeting of shareholders have been in compliance with applicable rules and regulations including the *Rules Governing the Listing of Stocks on Shanghai Stock Exchange* and the Company's *Articles of Association* and *Rules of Procedure for General Meetings of Shareholders.*

**(2) Whether notices and authorization related to general meetings of shareholders are in compliance with applicable rules and regulations**

Notices and authorization related to the Company's generals meeting of shareholders have been in compliance with applicable rules and regulations including *the Company Law of the People's Republic of China,* the *Rules Governing the Listing of Stocks on Shanghai Stock Exchange,* and the Company's *Articles of Association* and *Rules of Procedure for General Meetings of Shareholders.*

**(3) Whether review of proposals at the general meetings of shareholders are in line with the procedures and whether the right of speech of minority shareholders is protected**

Review of proposals at the Company's general meetings of shareholders has been conducted in accordance with applicable laws and regulations and the Company's *Articles of Association.* At the general meetings of shareholders, all shareholders have been treated equally and facilitated to exercise their rights as shareholders, and the right of speech of minority shareholders has been ensured

**(4) Whether there is any extraordinary general meeting of shareholders proposed by any shareholder**

holding 10% or more of the Company's shares singly or in aggregate, or whether there is any general meeting of shareholders proposed by the board of supervisors. If so, please explain why.

Up to now, the convener of the Company's general meetings of shareholders has been the board of directors. There have been no extraordinary general meetings of shareholders proposed by any shareholder holding 10% or more of the Company's shares singly or in aggregate; there have been no general meetings of shareholders proposed by the board of supervisors.

(5) Whether there is any provisional motion proposed by any shareholder holding 3% or more of the Company's shares singly or in aggregate. If so, please explain why.

The Company's board of directors received a "Shareholder's Motion on Profit Distribution of IRICO Display Devices Co., Ltd for the Year 2004" submitted by the Company's controlling shareholder IRICO Group Electronics Co., Ltd. As approved the board of directors, the motion, proposing a cash dividend of RMB 3.00 (tax-inclusive) for every 10 shares, was submitted to, reviewed, and approved at the general meeting of shareholders in 2004.

(6) Whether minutes of the general meetings of shareholders are complete and kept safe; whether resolutions of the general meetings have been disclosed in a full and timely manner

The minutes of the Company's general meetings of shareholders are complete and kept safe; resolutions of the general meetings have been disclosed in a full and timely manner.

(7) Whether there was any action or measure regarding important issues carried out before review at a general meeting of shareholders. If so, please explain why.

The Company strictly implements decision-making procedures regarding important issues according to applicable laws and regulations and the Company's Articles of Association and rules of procedures for "three meetings", and has adhered to the decision-making principle of first review, then implement, and there has been no circumstance where the general meeting of shareholders was circumvented.

(8) Whether the Company's general meetings of shareholders had any other situation violating the *Rules on Shareholders' General Meetings of Listed Companies*.

The Company's previous general meetings of shareholders had no situation **violating the *Rules on Shareholders' General Meetings of Listed Companies***.

2. Board of directors

(1) Whether the Company has established *Rules of Procedure for Meetings of the Board of Directors*, *Independent Director System,* and other internal rules.

The Company has established *Rules of Procedure for Meetings of the Board of Directors*, but has not set up an *Independent Director System*.

(2) Composition of the board of directors and source of members

On 20 September 2005, the Company held the second extraordinary general meeting of shareholders of 2005.

At the meeting, the "Motion Submitted by IRICO Group Electronics Co., Ltd Regarding Director Candidates for the Fifth Board of Directors and Supervisor Candidates for the Fifth Board of Supervisors" was reviewed and approved. By cumulative voting, Mr. Ximin WANG, Mr. Wenhui DING, Mr. Jianchao MA, Mr. Xiaohong TIAN, Mr. Shouguo ZHAO, Mr. Tianxi ZHANG, and Mr. Rulin LIU were elected as directors of the fifth board of directors. In particular, Mr. Shouguo ZHAO, Mr. Tianxi ZHANG, and Mr. Rulin LIU are independent directors.

**(3) Resume and main duties of the chairman. Whether the chairman holds office on a part-time basis and whether there is any situation lack of supervision**

About the Chairman Mr. Ximin WANG: from April 2001 to December 2004, Mr. Wang served as the head of the production department of IRICO Group; from December 2004 to July 2005, he served as assistant president and general manager of the operations management department of IRICO Group Electronics Co., Ltd; since August 2005, he has been the vice president of IRICO Group Electronics Co., Ltd. Currently, he is the chairman of the fifth board of directors of this Company.

The chairman holds office at shareholders of the Company on a part-time basis. The Company has a relatively sound mechanism that ensures efficient decision-making and effective business management. The chairman is free from any behavior lackingsupervision.

**(4) Qualification and appointment/dismissal of directors; whether appointment/dismissal of directors of state-controlled listed companies complies with legal procedures**

All directors and independent directors of the Company are qualified according to applicable rules and regulations, and free from any practice that violates laws, regulations, or the Company's Articles of Association. The Company's appointment/dismissal of directors complies with legal procedures.

**(5) Whether each director acts diligently and responsibly; how is their performance in attending meetings of the board of directors and performing other duties**

The directors of the Company have been diligent and responsible in performing their duties, keeping abreast of the Company's management and business operations, reviewing the Company's periodic reports, and ensuring the truthfulness, accuracy and completeness of information disclosed by the Company. In addition, the directors of the Company have attended meetings of the board of directors in person or by an authorized agent according to the *Rules of Procedure for Meetings of the Board of Directors*, provided opinions and/or suggestions at the meetings, and voted independently on proposals discussed at the meetings.

**(6) Professional performance each director: whether job requirements are clearly defined and whether each director acts professionally in important decisions and investments of the Company**

Each director of the Company is professional and experienced in their respective fields of expertise, and they have provided professional advice and suggestions regarding important decisions and investments of the Company.

**(7) The number and proportion of part-time directors, and their impacts on the Company's operations; whether there is a conflict of interest between directors and the Company, and whether the conflict of interest is handled in an appropriate manner**

The Company has 3 part-time directors, accounting for 42.86% of the total number of directors. These part-time directors have a comprehensive understanding of the industry's development, enabling the Company to obtain more useful industry information; these directors also provide professional advice to help the Company make better decisions. The part-time directors exercise their rights within the scope of authority granted by the board of directors,

12E_Translation

which has no adverse effect on the Company's operations, and there is no conflict of interest.

**(8) Whether the procedures for convening and holding meetings of the board of directors are in compliance with applicable rules and regulations**

The procedures for convening and holding meetings of the board of directors have been in compliance with applicable rules and regulations including the *Rules Governing the Listing of Stocks on Shanghai Stock Exchange* and the Company's *Articles of Association* and *Rules of Procedure for Meetings of the Board of Directors*.

**(9) Whether notices and authorization related to meetings of the board of directors are in compliance with applicable rules and regulations**

The notices and authorization related to meetings of the board of directors have been in compliance with applicable rules and regulations including the *Rules Governing the Listing of Stocks on Shanghai Stock Exchange*, and the Company's *Articles of Association* and *Rules of Procedure for Meetings of the Board of Directors*.

**(10) Whether the board of directors has established subordinate committees, such as nomination committee, remuneration committee, audit committee, and investment strategy committee; the division of responsibilities and operations of each committee**

The Company's board of directors has established subordinate committees, including a remuneration committee, an audit committee, and an investment strategy committee, except a nomination committee.

Division of responsibilities and operations of each committee:

Main duties of the Strategy Committee: to conduct researches and provide advice on the Company's long-term development strategy and major investment decisions.

Main duties of the Audit Committee: to give proposals on hiring or replacing an external audit agency, supervise the Company's internal audit system and its implementation, facilitate communication between internal and external audits, audit the Company's financial information and disclosure, and review the Company's internal control mechanism.

Main duties of the Remuneration and Appraisal Committee: to study the criteria for appraisal of directors and managers, conduct appraisal and give advice, and study and review remuneration policies and plans for directors and senior executives.

Up to now, the division of responsibilities of the three specialized committees has been clear, and their overall performance has been satisfactory.

**(11) Whether minutes of the meetings of board of directors are complete and kept safe; whether resolutions of the meetings have been disclosed in a full and timely manner**

The minutes of the meetings of the board of directors are complete and kept safe; resolutions of the meetings have been disclosed in a full and timely manner.

**(12) Whether any resolution of the board of directors is signed by authorized agents**

Each resolution of the board of directors has been signed by each director present at the meeting or by a director authorized by the director.

13E_Translation

**(13) Whether any resolution of the board of directors contains unauthorized modifications that are inconsistent with voting results**

No resolution of the board of directors contains unauthorized modifications that are inconsistent with voting results.

**(14) Whether independent directors have been diligent and responsible in supervising the Company's important production and operation decisions, foreign investments, nomination, remuneration and assessment of senior executives, and internal audit**

The Company has consulted or communicated with the independent directors before making important decisions regarding production, operations, nomination, remuneration and assessment of senior executives, internal audit, etc. The main duties of the independent director in supervision are to give independent opinions at meetings of the board of directors and provide independent comments on special issues. The Company's independent directors have played a supervisory and advisory role in above-mentioned important decisions.

**(15) Whether the performance of duties of the independent directors is affected by major shareholders and/or the actual controllers of the Company**

The Company's independent directors have performed their duties independently in accordance with the Articles of Association, and their performance of duties is not affected by major shareholders and/or the actual controllers of the Company.

**(16) Whether the performance of duties of the independent directors is fully supported by relevant departments and personnel of the Company**

The independent directors of the Company have been able to work independently according to the law, and their work has been actively supported by the office of the board of directors. The secretary of the board of directors is responsible for communication and liaison with the independent directors.

**(17) Whether any independent director was dismissed without justifiable reasons before the expiration of his or her term of office, whether such situation was handled appropriately;**

No independent director of the Company was dismissed before the expiration of his or her term of office.

**(18) Whether the work schedule of the independent directors is appropriate, and whether they have been absent from 3 consecutive meetings of the board of directors**

The work schedule of the independent directors is appropriate, and none of them has been absent from 3 consecutive meetings of the board of directors.

**(19) Whether the secretary of the board of directors is a senior executive of the Company and how was the secretary's performance**

The secretary of the board of directors is a senior executive of the Company. The secretary of the board of directors has performed duties according to applicable laws and regulations and the Company's *Articles of Association* and other internal management rules, specifically in terms of ensuring the compliance of "three meetings" and information disclosure with regulatory requirements, and conducting investor relations management effectively, and maintaining communications with the regulatory authorities.

14E_Translation

**(20) Whether any limited investment authority has been granted to the board of directors at a general meeting of shareholders, and whether the authority is reasonable and legal and effectively monitored**

The general meeting of shareholders authorized the board of directors to make investments limited as follows:

1. The board of directors has the authority to decide on foreign investments if: the value of a single investment project does not exceed 15% of the latest audited net asset value of the Company; the annual cumulative investments does not exceed 50% of the latest audited net asset value of the Company.

The board of directors has the authority to decide on acquisition or sale of assets if: the value of a single asset does not exceed 15% of the latest audited net asset value of the Company; acquisition of assets from or sales of assets to the same party within 12 consecutive months for no more than three times.

The board of directors has the right to decide on asset-backed projects if their annual accumulated amount does not exceed 50% of the latest audited net asset value.

2. The board of directors has the right to decide on related-party transactions if the contract amount of a single transaction or the accumulated amount of transactions of the same type within 12 consecutive months that does not exceed 5% of the Company's latest audited net asset value.

3. Limits on the board of directors'authority to decide on external guarantees are:

(1) The amount of a single guarantee does not exceed RMB 30 million;

(2) The accumulated amount of guarantee for the same object does not exceed RMB 30 million;

(3) The accumulated amount of guarantee does not exceed 5% of the Company's latest audited net asset value.

The above authority is in line with applicable laws and regulations and has been monitored effectively in practice. Up to now, the Company has no external guarantees.

**3. Board of supervisors**

**(1) Whether the Company has established *Rules of Procedure for Meetings of the Board of Supervisors* or similar rules;**

The Company's board of supervisors has established *Rules of Procedure for Meetings of the Board of Supervisors*.

**(2) Whether the composition of the board of supervisors and source of members meet regulatory requirements**

The Company's board of supervisors consists of three supervisors. 2 supervisors are elected at a general meeting of shareholders; 1 supervisor is a staff representative. The composition of the board of supervisors and source of members are in compliance with applicable laws and regulations and the Company's Articles of Association.

**3) Qualification and appointment/dismissal of supervisors**

On 20 September 2005, the Company held the second extraordinary general meeting of shareholders of 2005.

At the meeting, the "Motion Submitted by IRICO Group Electronics Co., Ltd Regarding Director Candidates for the Fifth Board of Directors and Supervisor Candidates for the Fifth Board of Supervisors" was reviewed and approved. By cumulative voting, Mr. Di GE and Mr. Yueping WEN as (shareholder supervisors) and Mr. Jiashun LI (as a staff supervisor) were elected as supervisors of the fifth board of supervisors.

All supervisors of the Company are qualified according to applicable rules and regulations, and free from any practice that violates laws, regulations, or the Company's Articles of Association. The Company's appointment/dismissal of supervisors complies with legal procedures.

### (4) Whether the procedures for convening and holding meetings of the board of supervisors are in compliance with applicable rules and regulations

The procedures for convening and holding meetings of the board of supervisors have been in compliance with applicable rules and regulations including the *Rules Governing the Listing of Stocks on Shanghai Stock Exchange* and the Company's *Articles of Association* and *Rules of Procedure for Meetings of the Board of Supervisors.*

### (5) Whether notices and authorization related to meetings of the board of supervisors are in compliance with applicable rules and regulations

The notices and authorization related to meetings of the board of supervisors have been in compliance with applicable rules and regulations including the *Rules Governing the Listing of Stocks on Shanghai Stock Exchange* and the Company's *Articles of Association* and *Rules of Procedure for Meetings of the Board of Supervisors.*

### (6) Whether the board of supervisors has vetoed any resolution of the board of directors in the past 3 years, discovered and corrected inaccuracies in the Company's financial reports, or has found and corrected any illegal or inappropriate behavior of any director or the general manager in performing their duties;

The board of supervisors has neither vetoed any resolution of the board of directors in the past 3 years, discovered errors in the Company's financial reporting, nor found any illegal or inappropriate behavior of any director or the general manager in performing their duties.

### (7) Whether minutes of the meetings of board of supervisors are complete and kept safe; whether resolutions of the meetings have been disclosed in a full and timely manner

The minutes of the meetings of the board of supervisors are complete and kept safe; resolutions of the meetings have been disclosed in a full and timely manner.

### (8) Whether the supervisors have been diligent and responsible in performing their supervisory duties

Members of the board of supervisors have been diligent and responsible in performing their supervisory duties. The board of supervisors serves to supervise the Company's directors, managers, financial officers, secretary of the board of directors, and other senior executives by attending meetings of the board of directors and general meetings of shareholders, holding meetings of the board of supervisors, and auditing quarterly, semi-annual and annual financial reports of the Company, and reviewing and providing independent opinions on related-party transactions and important issues of the Company.

### 4. Managers

### (1) Whether the Company has established rules of procedure for management meetings or similar rules;

The Company has established *Working Rules for the General Manager* in accordance with *the Company Law of the People's Republic of China* and the Company's *Articles of Association*, in order to supervise the behavior of the

16E_Translation

general managers, maintain normal operations of the Company, and protect the rights and interests of shareholders.

**(2) Whether the Company's managers especially the general manager are selected by competition, and whether the Company has established an rational personnel selection mechanism**

The Company has one general manager, nominated by the chairman and appointed/dismissed by the board of directors. The Company has one secretary of the board of directors, nominated by the chairman and appointed/dismissed by the board of directors. The Company has 2 deputy general managers and 1 chief accountant, nominated by the general manager and appointed/dismissed by the board of directors.

**(3) Resume of the general manager; whether the general manager is from a controlling shareholder of the Company**

Resume of the general manager: from May 2001 to August 2005, Mr. Wenhui DING had been a deputy general manager of the Company; since August 2005, he has been the general manager of the Company.

The general manager is not from any controlling shareholder of the Company.

**(4) Whether the managers can effectively control daily production and operations of the Company**

The management team of the Company is in charge of operations management of the Company; each member of the management team is able to control daily production and operation activities of the Company effectively within the scope of their respective duties.

**(5) Whether the managers are stable during their term of office**

The Company's managers have been basically stable during their terms of office.

**(6) Whether there is a responsibility system for managers during their term of office; how is their recent performance; whether there are incentive and punishment measures**

The Company has established a target-oriented performance appraisal system. Senior executives are evaluated on a monthly and annual basis according to their completion of business targets and performance of duties. The monthly evaluation is performed by using key performance indicators (KPI); in annual evaluation, the senior executives should report on their work to the board of directors. Assessment results are used as the basis for salary and promotion. The Company will further improve its performance standards and related rules for evaluation of directors, supervisors, and senior executives.

**(7) Whether any of the managers acts beyond his or her authority; whether the board of directors and the board of supervisors are able to supervise and restrict the managers effectively; and whether there is a tendency of "insider control"**

No manager of the Company has acted beyond his or her authority; the board of directors and the board of supervisors are able to supervise and restrict the managers effectively; there is no tendency of "insider control".

**(8) Whether the Company has established an internal accountability mechanism for managers and whether their duties and authority are clear**

The Company has established a detailed "Management Guide", including rules on management of safety, production, quality, procurement, and sales, as well as rules on rewards and punishments. The Company shall hold management personnel at all levels responsible for any negligence, intentional act or illegal behavior which is detrimental to the Company's interests. The responsibilities of the Company's management personnel are clearly divided and a balance between authority and responsibility is maintained.

**(9) Whether senior executives including managers perform their duties faithfully and act in the best interests of the Company and all shareholders; and whether any senior executive who fails to perform his or her duty or goes against integrity is punished according to applicable rules and regulations**

The Company's senior executives including managers have performed their duties faithfully and acted in the best interests of the Company and all shareholders. No senior executive fails to perform his or her duty or goes against integrity.

**(10) Whether any of the directors, supervisors and senior executives has been involved in any illegal trading of the Company's shares in the past three years; and if so, whether the Company has taken corresponding measures**

The directors, supervisors, and senior executives have not been involved in any illegal trading of the Company's shares in the past three years.

**5. Internal control of the Company**

**(1) Whether the Company's internal management mechanism is well-established and effectively implemented**

According to applicable laws and regulations, the Company has established a relatively complete, effective and reasonable internal control mechanism that adapts to the Company's asset structure, business models, development status and management practice, in order to improve internal management, ensure normal operations, maintain the security and integrity of corporate assets, prevent frauds, and achieve the Company's business objectives. The Company's internal control mechanism mainly includes: *Articles of Association* and the "three meetings" system, information disclosure management system, job duty standards, a financial control system, a human resources management system, a quality management system, an equipment and parts management system, a production management system, a safety management system, a sales management system, and a digital information management system. The internal control mechanism is able to ensure normal operations of the Company and control business risks effectively. In the future, the Company will further optimize its internal control mechanism, so that it is more efficient and practical to meet the Company's development strategies and business objectives.

**(2) Whether the Company's accounting system is well-established according to regulatory requirements**

The Company has established and improved its accounting system according to applicable laws and regulations.

**(3) Whether the Company's financial management meets regulatory requirements, and whether internal control processes such as authorization and signing/stamping are effectively implemented**

The Company's financial management meets regulatory requirements; internal control processes such as authorization and signing/stamping are effectively implemented and managed by specialists.

**(4) Whether the Company's official seals/stamps are used and managed in a proper manner**

The Company has developed a "seal management system" and implemented the system strictly. Official seals of the Company are managed by specialists.

**(5) Whether the Company's internal management mechanism is similar to that of the controlling shareholder, and whether the Company maintains independence in system construction**

The Company has developed various management systems based on actual situations of the Company and has basically maintained independence in system construction.

**(6) Whether the Company's registered address, address of primary assets, and business address are not in the same area, and whether this has certain impacts on the Company's operations**

The Company's registered address is located in the Hi-Tech Development Zone of Xi'an City, which is good for the Company to make the best of preferential policies and other conditions of the development zone. The Company's primary assets and offices are located in Xianyang City of Shaanxi Province, which has no impacts on the Company's operations.

**(7) Whether the Company achieves effective management of branch offices/subsidiaries, especially off-site ones, and whether any of them has a risk of running out of control**

The Company has appointed directors and supervisors to supervise holding subsidiaries and participate in their decision management. There has been no out-of-control situation.

**(8) Whether the company has established an effective risk prevention mechanism to protect the Company from accidental risks**

The Company has established a risk prevention system and a graded early-warning mechanism, which set forth responsibilities of personnel at all levels for asset risk control. The Company also evaluates asset risk status and improves information communication channels to protect the Company from accidental risks effectively.

**(9) Whether the Company has set up an audit department, and whether the Company's internal auditing and internal control systems are complete and effective**

The Company has set up an audit department; the Company's internal auditing and internal control systems are complete and effective.

**(10) Whether the Company has established a full-time legal affairs department; whether all contracts have been reviewed by in-house lawyers; and how is the performance of the department in ensuring legal operations of the Company**

The Company has not set up a full-time legal affairs department. The Company has engaged a law firm to serve as a long-term legal advisor, providing relevant legal consulting services. The Company's contract management is based on applicable bidding/tender procedures. The contract management department of the controlling shareholder (IRICO Group Electronics Co., Ltd) assists the Company in internal contract review and plays an important role in ensuring legal operations of the Company.

**(11) Whether the Company's auditor has issued a "Management Recommendation Letter"; how did the auditor evaluate internal management systems of the Company and what rectification measures were taken**

The auditor has not issued a management recommendation letter for the Company.

**(12) Whether the Company has established a fund-raising management system**

The Company has established a fund-raising management system. The Company will amend the management system according to the *Notice on Strengthening Management of Funds Raised by Listed Companies*.

**(13) Whether funds raised by the Company recently have been used to achieve expected results**

The use of funds raised by the Company recently has achieved expected results.

**(14) Whether the original purpose of the funds raised by the Company recently is changed, and whether the change is reasonable and meets regulatory requirements**

According to a resolution of the general meeting of shareholders, the original purpose of the funds raised by the Company recently is changed, and the change is reasonable and meets regulatory requirements.

**(15) Whether the Company has established a long-term mechanism to prevent major shareholders and their affiliates from occupying the Company's funds or acting against the Company's interests**

The Company has a well-established system for fund management and external guarantees. No major shareholders or their affiliates occupy the Company's funds.

**III. Independence of the Company**

**1. Whether the chairman, manager, deputy managers, secretary of the board of directors, financial controller and other personnel of the Company work on a part-time basis for the Company's shareholders and/or their affiliates**

The Company's chairman, general manager, and financial controller work on a part-time basis for the following shareholders and/or their affiliates:

| Name | Name of organization | Position |
|------|---------------------|----------|
| Ximin WANG | IRICO Group Electronics Co., Ltd | Vice president |
| Wenhui DING | Xianyang IRICO Digital Display Co., Ltd | Director and deputy general manager |
| Zhenzhu LIU | Xianyang IRICO Digital Display Co., Ltd | Financial controller |

Xianyang IRICO Digital Display Co., Ltd is a joint venture company funded by the Company and the controlling shareholder. The Company holds 49% of the registered capital of Xianyang IRICO Digital Display Co., Ltd.

The Company's deputy general managers and secretary of the board of directors do not work on a part-time basis for the Company's shareholders and/or their affiliates.

20E_Translation

**2. Whether the Company can recruit management personnel and employees independently**

The Company has an independent workforce and can recruit its management staff and employees independently. All the employees have signed labor contracts with the Company. The Company is independent of the controlling shareholder in terms of labor, personnel and wage management.

**3. Whether the Company's departments** (including production department, business management department, procurement and marketing department, and HR department) **are independent, and whether any employee holds the same office at the Company and the controlling shareholder**

The Company's departments (including production department, business management department, procurement and marketing department, and HR department) are independent; no employee holds the same office at the Company and the controlling shareholder.

**4. Whether the ownership of any assets contributed by promoters of the Company is clear, and whether the ownership of such assets has not been transferred to the Company**

The ownership of all assets contributed by promoters of the Company is clear and has been transferred to the Company.

**5. Whether the land use rights relating to the Company's main production and operation sites are clear and independent of major shareholders**

The land use rights relating to the Company's main production and operation sites are clear and independent of major shareholders. Some of the factory buildings and lands used by the Company's subsidiaries (including a glassworks and IRICO Zixun Co., Ltd) are leased from the Company's actual controller – IRICO Group.

**6. Whether the Company's auxiliary production systems and supporting facilities are complete and independent**

The Company's main business is production and sales of color picture tubes. The Company has 4 production lines of color picture tubes; major products include: 54cmFS, 64cmFS, 64cmPF, and 74cmPF color picture tubes. The Company has independent production systems, auxiliary production systems and supporting facilities. Water, electricity and gas sources used for production of the Company are purchased from the Company's actual controller – IRICO Group.

**7. Situation of trademark registration and use; whether the Company's intangible assets (including industrial property rights and non-patented technology) are independent of major shareholders**

The Company has signed a trademark licensing agreement with the actual controller IRICO Group. According to the agreement, IRICO Group allows the Company to use the "IRICO" trademark for a royalty of one thousandth upon all products sold. The Company's industrial assets, intangible assets (including industrial property rights and non-patented technology) are independent of major shareholders.

**8. Whether the Company's accounting department is independent in financial accounting**

The Company has an independent financial accounting department, the Company and its subsidiaries have established independent financial accounting and financial management systems. The Company has independent bank accounts and does not share any bank account with the controlling shareholder.

The Company pays taxes independently according to applicable laws and regulations, and there has been no tax evasion.

### 9. Whether the Company's procurement and sales departments are independent

The Company has independent procurement and sales systems, and has established a sound management system. The Company has signed related-party transaction agreements with related parties regarding procurement of parts and components and sales of products.

### 10. Whether the Company has signed any agreement for entrusted management of assets with the controlling shareholder or its related parties, and whether such agreement has impacts on the Company's independence in production and operations

The Company has not signed any agreement for entrusted management of assets with the controlling shareholder or its related parties.

### 11. Whether the Company is dependent on the controlling shareholder or other related parties, and whether such dependence has impacts on the Company's production and operations

The Company's top five suppliers of raw materials are all related parties. In 2006, they accounted for about 66% of the Company's total purchases, which means the Company is somewhat dependent on these suppliers, mainly because: IRICO Group, IRICO Electronics and its subordinate manufacturers have a supporting supplier relationship with the Company and its subsidiary IRICO Zixun Co., Ltd; moreover, most of the manufacturers operate in Xianyang. Since most of the parts/components required for the Company's production cannot be purchased from external suppliers and the parts/products supplied by IRICO Group are high-quality, low-price, stably available, and easy to deliver, such related-party transactions enable the Company to make the best of the internal resources of IRICO Group, reduce procurement, marketing and production costs, and increase the Company's efficiency and profitability.

### 12. Whether there is horizontal competition between the Company and the controlling shareholder or other related parties in which the controlling shareholder owns a controlling stake

There is no horizontal competition between the Company and the controlling shareholder or other related parties in which the controlling shareholder owns a controlling stake.

### 13. Whether there are related-party transactions between the Company and the controlling shareholder or other related parties in which the controlling shareholder owns a controlling stake, and whether such related-party transactions are executed according to necessary decision-making procedures

The Company and its subsidiaries have daily related-party transactions with the actual controller, the controlling shareholder and their subordinate parties. The related-party transactions mainly include: procurement of materials, parts/components and power sources from related companies, lease of some factory buildings, and trademark use rights. The Company has implemented necessary decision-making procedures for these related-party transactions; the independent directors have provided independent advice on these transactions at the board of directors; related directors have withdrawn from voting at the board of directors regarding such transactions, and related shareholders have relinquished their rights to vote at the general meeting of shareholders regarding such transactions.

### 14. What is the ratio of profits from related party transactions to total profits, and how do the transactions affect independence of the Company in production and operations?

In 2006, the Company's related party transactions did not bring profits to the Company, and these transactions had no impact on independence of the Company in production and operations.

**15. Is the Company's business dependent on major trading partners (major business partners), and how does the Company prevent risks**

The Company's major trading partners are large-scale TV manufacturers in China, and the Company's business is not dependent on these manufacturers.

**16. Whether each decision of the Company is independent of the controlling shareholder**

Each decision of the Company is independent of the controlling shareholder. The board of directors is the permanent decision-making body of the Company and is accountable to the general meeting of shareholders. The board of directors reviews major decisions regarding business activities of the Company and submits the decisions to the general meeting of shareholders for consideration and approval.

**IV. Transparency of the Company**

**1. Whether the Company has established an information disclosure management system in accordance with the *Administrative Measures on Information Disclosure by Listed Companies*, and whether the system is implemented strictly**

The Company has amended its *Administrative Measures on Information Disclosure* and *Management Rules for Internal Reporting of Important Information* in accordance with the *Administrative Measures on Information Disclosure by Listed Companies*; information disclosure of the Company has been in compliance with regulatory requirements.

**2. Whether the Company has established procedures for preparation, review and disclosure of periodic reports; whether the procedures are implemented strictly; whether the Company's periodic reports in recent years have been disclosed in a timely manner; whether non-standard unqualified opinions have been issued for the Company's annual financial reports, and whether the impacts of issues involved have been eliminated**

The Company has established *Administrative Measures on Information Disclosure*, which set forth procedures for preparation, review and disclosure of the Company's periodic reports. The periodic reports have been prepared, reviewed and disclosed according to applicable rules and regulations and the Company's *Administrative Measures on Information Disclosure*. In recent years, the Company's periodic reports have been disclosed in a timely manner, and no non-standard unqualified opinions have been issued for the Company's annual financial reports.

**3. Whether the Company has developed procedures for reporting, communication, review and disclosure of significant events, and whether the procedures are implemented strictly**

The Company has developed "*Management Rules for Internal Reporting of Important Information*" according to applicable laws and regulations. Each of the Company's significant events has been reported, communicated, reviewed, and disclosed according to said *Management Rules* and the "*Administrative Measures on Information Disclosure*".

**4. What is the authority of the secretary of the board of directors, and whether his/her right to know and make suggestions regarding information disclosure is protected?**

The secretary of the board of directors, as a senior executive of the Company and the designated liaison between the Company and the Stock Exchange, is responsible for:

(1) Timely communication and liaison between the Company, related parties, the Stock Exchange and other securities regulatory agencies;

(2) Handling affairs related to the Company's information disclosure, supervising and urging the Company to establish and implement the information disclosure management system and the internal reporting system for important information, prompting the Company and relevant parties to fulfill information disclosure obligations, and conducting disclosure of periodic and interim reports at the Stock Exchange as required;

(3) Assisting the Company in investor relations management, reception of visiting investors, giving responses to investors' enquiries, and providing investors with information disclosed by the Company;

(4) Preparation for meetings of the board of directors and general meetings of shareholders, and preparation and submission of files to be reviewed at these meetings;

(5) Attending meetings of the board of directors, and making and signing meeting minutes;

(6) Protecting the confidentiality of information to be disclosed by the Company, taking confidentiality measures, prompting all members of the Company's board of directors and relevant insiders to keep the relevant information confidential before it is formally disclosed, and promptly taking remedial measures and reporting to the Stock Exchange in case insider information is disclosed;

(7) Maintaining the Company's register of shareholders, register of directors, and information of major shareholders, directors, supervisors, and senior executives who hold shares of the Company, as well as documents and minutes for the board of directors and general meetings of shareholders;

(8) Assisting directors, supervisors and senior management personnel in understanding applicable laws, regulations and rules on information disclosure, including the "*Rules Governing the Listing of Stocks on Shanghai Stock Exchange*", other rules of the Stock Exchange, and the Company's Articles of Association, as well as their responsibilities in information disclosure set forth in the listing agreement;

(9) Urging the board of directors to exercise its powers according to law; reminding directors of any resolution of the board that goes against applicable laws, regulations and rules including the "*Rules Governing the Listing of Stocks on Shanghai Stock Exchange*", other rules of the Stock Exchange, and the Company's Articles of Association, and inviting supervisors present at the meeting to give comments; and, recording comments by relevant supervisors and individuals if the board of directors insists on making the above resolution, and reporting to the Stock Exchange promptly.

**5. Whether the Company's confidentiality mechanism for information disclosure works well; and whether there has been any unauthorized information disclosure or any insider trading behavior**

The Company's confidentiality mechanism for information disclosure works well. The Company's information disclosure obligor and insiders shall keep information confidential before it is disclosed publicly. The Company's information disclosure obligor should take necessary measures to control the number of insiders to the minimum possible scope before the information is publicly disclosed. If any person of the Company's consultants, intermediaries and affiliates discloses the Company's information without prior authorization and causes losses to the Company, the Company reserves the right to hold the person accountable for the losses.

Up to the present, there has been no unauthorized information disclosure or insider trading behavior.

**6. Whether there has been any modification or supplement made after information disclosure; why, and how to prevent similar situation**

The Company modified "(II) Prospects for the Company's Future Development" in "Chapter VII Report of the Board of Directors" of the Company's Annual Report 2005, in accordance with the "*Standards for Contents and Formats of Information Disclosure by Companies Publicly Offering Securities No. 2 - Contents and Formats of Annual Reports*" (revised in 2005) and relevant rules and regulations of Shanghai Stock Exchange. In the future, the Company will prepare and disclose interim and periodic reports of the Company in strict accordance with the "*Standards for Contents and Formats of Information Disclosure by Companies Publicly Offering Securities*".

**7. Whether the Company has received any on-site inspection by regulatory authorities in recent years; or whether the Company has been warned, punished, or ordered to make correction because its information disclosure did not meet regulatory requirements; and whether the Company has taken corresponding rectification measures**

(1) Shaanxi Branch of China Securities Regulatory Commission inspected the Company from October 25th to 29th, 2004, and issued a "Notice on Problems Found in 2004 Annual Inspection of IRICO Display Devices Co., Ltd and Requirements for Rectification" [SZJH (2005) No.41] on February 18, 2005. The Notice points out the Company's problems in operational compliance, financial internal control, securities investment accounting, etc. In response to the Notice, the Company has developed a rectification and taken rectification measures in a timely and satisfactory manner as per the requirements of the regulatory authorities.

(2) Shaanxi Branch of China Securities Regulatory Commission conducted a special inspection on the Company from August 24th to September 25th, 2005, and issued a "Notice of Rectification" [SZJF (2005) No. 69] on October 21st, 2005. The Notice points out Company's problems in short-term investment, financial management, related-party transactions, etc. In response to the Notice, the Company has determined responsibilities of personnel at different levels and taken practical rectification measures in a timely and satisfactory manner as per the requirements of the regulatory authorities.

**8. Whether the Company was criticized or warned by the Stock Exchange because of improper information disclosure**

The Company has never been criticized or warned by the Stock Exchange because of improper information disclosure.

**9. How is the awareness of the Company about proactive information disclosure?**

In addition to fulfilling information disclosure obligations according to regulatory requirements, the Company has been proactive in information disclosure. The Company also organizes directors, supervisors and senior executives to study applicable laws and regulations on information disclosure by listed companies, in order to gain better awareness about information disclosure. The awareness of the Company and information disclosure obligors about proactive information disclosure is growing.

**V. Innovations in corporate governance and overall evaluation**

**1. Whether online voting is implemented at the Company's general meetings of shareholders and how is**

the degree of participation (excluding meetings of shareholders regarding reform of non-tradable shares)

The Company has not implemented online voting at general meetings of shareholders (including annual and extraordinary general meetings of shareholders), except meetings of shareholders regarding reform of non-tradable shares.

### 2. Whether proxy solicitation is performed at the Company's general meetings of shareholders (excluding meetings of shareholders regarding reform of non-tradable shares)

The Company has never performed proxy solicitation at general meetings of shareholders.

### 3. Whether the Company's directors and supervisors are elected by cumulative voting

The directors for the fifth board of directors and supervisors for the fifth board of supervisors are elected by cumulative voting.

### 4. Whether the Company is active in investor relations management, and whether the Company has established working rules and measures for investor relations management

The Company has been active in investor relations management according to the guidelines of regulatory authorities. To ensure compliance and effectiveness of investor relations management, the Company has established *Rules for Investor Relation Management*, which set forth the objectives, principles, activities and work of investor relations management, as well as organization and implementation of activities and work related to investor relations management. The Company has a team of specialists responsible for investor relations management and another team of specialists responsible for investor reception. The Company communicates with investors through various channels, such as reception of visiting investors, phone calls, mails, emails, on-site visits, one-on-one communication, media interviews, and reports.

### 5. Whether the Company attaches importance to corporate culture and what measures are taken

The Company always attaches importance to the construction of its corporate culture. The Company has established an efficient mechanism for personnel selection, training, performance evaluation, and development, which enables the Company to attract and retain talents and build a professional team that drives the Company to a higher level.

### 6. Whether the Company has established an effective performance evaluation system; whether the Company's equity incentive mechanism works well and meet regulatory requirements

The Company has established an effective performance evaluation system, but has not implemented an equity incentive mechanism.

### 7. Whether the Company has taken other innovative measures in corporate governance; whether these measures are effective and what does the result suggest

In order to improve corporate governance, the Company introduced independent directors to the board of directors in 2002. The Company has also established specialized committees of the board of directors; in particular, the remuneration and appraisal committee meets at the end of each year to review the performance of each senior executive in the year. We will continue to optimize our corporate governance systems in the future.

**8. Whether the Company has opinions and suggestions on improving corporate governance and establishment of laws and regulations**

Improving the governance structure of listed companies is of great importance to increase their business efficiency, ensure compliance with regulatory requirements, establish a modern enterprise system, and promote the development of the capital market. Each listed company should establish specialized committees for its board of directors, and make the best of these committees to optimize management systems of the company and improve the company's capacity in decision-making and risk control. In addition, each listed company should strengthen the supervisory role and authority of its board of supervisors, not only in supervision of financial affairs but also in supervision of overall operations of the company.

IRICO Display Devices Co., Ltd

August 15, 2007

证券代码：600707　　　股票简称：彩虹股份　　　编号：临 2007-022

## 彩虹显示器件股份有限公司

## 关于"加强上市公司治理专项活动"自查报告和整改计划的公告

**本公司及董事会全体成员保证公告内容的真实、准确和完整，对公告的虚假记载、误导性陈述或者重大遗漏负连带责任。**

一、特别提示：公司治理方面存在的有待改进的问题

根据中国证券监督管理委员会《关于开展加强上市公司治理专项活动有关事项的通知》要求，本公司成立了以董事长为第一责任人的专项工作小组，对该项工作进行了认真细致的部署。公司专项工作小组本着实事求是的原则，严格对照《公司法》、《证券法》等有关法律、行政法规，以及《公司章程》等内部规章制度，并逐条对照通知附件的要求，对公司治理情况进行了自查。经过认真自查，公司治理方面存在以下主要问题有待改进：

1、进一步完善公司治理结构，建立独立董事制度，设立董事会提名委员会，充分发挥公司董事会各专业委员会和独立董事的作用。

2、进一步完善公司治理制度，根据有关规定完善和修订《募集资金的管理制度》、《信息披露管理办法》

3、建立和完善股东对重大事项的表决制度，为公司股东参与股东大会表决、行使股东权利提供保障。

4、进一步规范关联交易，严格按照《公司章程》以及上海证券交易所《股票上市规则》的要求，履行关联交易的审批程序，同时发挥独立董事的监督作用，保证关联交易的规范、公允和充分披露。

5、进一步完善公司内部控制制度的建设，同时加强公司各部门负责人和各级管理人员风险意识和自觉执行内部控制的意识，提高管理水平；定期检查和评估内部控制制度的完整性、合理性以及执行效力。

二、公司治理概况

公司上市以来能够严格按照《公司法》、《证券法》、《上市公司治理准则》等法律、法规以及《公司章程》的有关规定规范运作，建立了较为完善的法人治理结构，公司治理的实际情况基本符合有关上市公司治理的规范文件要求，主要体现在以下几个方面：

1、股东大会运作情况

公司股东大会的召集、召开程序、会议通知、授权委托等严格按照《公司章程》及《股东大会议事规则》的规定进行，表决程序规范，股东大会会议记录完整。公司历次股东大会均经聘请律师现场出席见证，出具法律意见书并及时公告。

2、董事会运作情况

公司已制定《董事会议事规则》，但尚未制定《独立董事制度》。公司董事会的召集、召开程序均符合《上海证券交易所股票上市规则》、《公司章程》和《董事会会议事规则》的相关规定。

3、监事会运作情况

公司建立了监事会议事规则，监事会的人数及人员构成符合相关法规的规定。公司监事能根据《公司章程》及《监事会会议事规则》规定，认真履行自己的职责，对公司的依法运作、关联交易、财务状况、高级管理人员履行职责等情况进行有效的监督和审核。

4、经理层运作情况

为切实规范经理层的组织及行为，维护公司的正常运作，保证股东的合法权益，根据《公司法》和《公司章程》的相关规定，公司制定了《总经理工作细则》。公司经营层拥有充分的经营管理权，公司经营层的每位成员根据分工的不同履行各自的职责，能够对公司的日常生产经营实施有效的控制。

**5、公司内部控制情况**

为了规范公司的内部控制，加强内部管理，保证各项业务的正常、规范进行，确保公司资产的安全和完整，防止欺诈和舞弊行为，实现公司的经营管理目标，公司依照国家有关法律法规的规定，根据公司的资产结构和经营方式，结合自身业务发展情况和运营管理经验，建立了较为完整、有效、合理的内部控制制度体系。公司的主要内控制度包括：公司章程和"三会"制度、信息披露管理制

度、岗位职责标准、财务控制制度体系、人力资源管理制度、质量管理制度、设备及备品备件管理制度、生产管理、安全管理、销售管理、信息化管理等业务制度。公司较为完整、有效、合理的内部控制制度体系，保障了公司正常生产经营活动的进行，并达到了有效控制经营风险的目的。未来公司还将根据生产经营及公司发展的实际需要，对公司的内部控制制度作进一步的修改和完善，使内控制度与公司的发展相适应。

6、公司与控股股东"三分开、两独立"方面的情况

（1）业务方面

公司业务独立于控股股东。公司的生产系统完全独立于控股股东，动力供应依据市场价格与控股股东签订了关联交易协议，公司拥有独立的采购和销售系统，与控股股东之间不存在同业竞争。

（2）人员方面

公司全员实行劳动合同制，在劳动、人事、工资管理等方面独立于控股股东。公司总经理专职，总经理及其他高级管理人员没有在控股股东单位领薪。

（3）资产方面

本公司的资产独立完整，土地使用权、房产、工业产权、商标等归属明确，产权明晰。本公司和控股股东及关联子公司签订了商标使用权许可使用协议、房产、土地租赁和综合服务协议，履行了必要的审批程序。

（4）机构方面

公司的生产经营和行政管理完全独立于控股股东，不存在控股股东直接或间接干预本公司设立内部机构的情况。

（5）财务方面

公司设立有独立的财务会计部门，并建立了独立的会计核算体系和财务管理制度，开立了独立的银行帐户，依法独立纳税。

7、信息披露

公司根据有关规定制订了《信息披露管理办法》、《重大信息内部报告制度》、《投资者关系管理制度》等制度。公司能够严格遵守中国证监会和上海证券交易所有关信息披露的法律法规的规定，认真地履行了信息披露义务。

8、激励约束机制

公司已建立了合理的绩效评价体系，但尚未实施股权激励机制。

9、投资者关系

公司一直积极开展投资者关系管理工作，制定了《投资者关系管理制度》，从投资者关系管理的目的、原则和内容、投资者关系活动、投资者关系工作的组织和实施等方面对开展投资者关系工作进行了规范，确保投资者关系管理工作的合规性和有效性。公司指定专人负责投资者关系管理，并安排专人做好投资者来访接待工作。公司通过召开接待投资者来访、电话咨询、邮寄资料或发送电子邮件、现场参观、一对一沟通、媒体采访和报道等多种形式与投资者交流与沟通。

10、公司已修订了《公司章程》、《股东大会议事规则》、《董事会议事规则》和《监事会议事规则》，公司还将根据国家法规政策的变化和监管部门的要求，不断修订和完善公司治理的有关制度。

### 三、公司治理存在的问题及原因

#### （一）、完善独立董事制度

为了充分发挥独立董事作用，维护公司整体利益，公司将根据《公司法》、《关于在上市公司建立独立董事制度的指导意见》、《关于加强社会公众股股东权益保护的若干规定》和《公司章程》的有关规定，制定《独立董事制度》，强化独立董事职责，促进公司规范运作。

#### （二）、设立董事会提名委员会

目前公司董事会已设立了下属委员会，包括薪酬委员会、审计委员会、投资战略委员会，但尚未设立提名委员会。为优化董事会组成，完善公司治理结构，公司将尽快设立董事会提名委员会并选举委员会委员，制定《董事会提名委员会实施细则》。

#### （三）、修订《募集资金的管理制度》

公司已经制定了《募集资金的管理制度》。公司将根据中国证监会近期发布的《关于加强上市公司募集资金使用管理的通知》要求，对公司原募集资金管理制度进行重新修订。

#### （四）、修订《信息披露管理办法》

公司已经制定了《信息披露管理办法》，为了规范公司及其他信息披露义务人的信息披露行为，加强信息披露事务管理，保护投资者合法权益，公司将按照中国证监会发布的《上市公司信息披露管理办法》的文件要求，对原《信息披露管理办法》进行重新修订。

**（五）、规范关联交易，保证交易公允性**

进一步规范关联交易，严格按照《公司章程》以及上海证券交易所《股票上市规则》的要求，履行关联交易的审批程序，同时发挥独立董事的监督作用，保证关联交易的规范、公允和充分披露。

**（六）、加强公司内部控制制度的建设和执行**

进一步完善公司内部控制制度的建设，同时加强公司各部门负责人和各级管理人员风险意识和自觉执行内部控制的意识，提高管理水平；定期检查和评估内部控制制度的完整性、合理性以及执行效力。

**（七）、建立和完善股东对重大事项的表决制度**

根据中国证监会 《关于加强社会公众股股东权益保护的若干规定》和 《上市公司股东大会规则》的要求，为了保障社会公众股股东的合法权益，增加他们的话语权，今后公司召开股东大会时，对于公司股东大会审议的事项涉及增发新股、发行可转换公司债券、向原有股东配售股份、重大资产重组、以股抵债、对公司有重大影响的附属企业到境外上市等五大类的情形，公司将向股东提供安全、经济、便捷的股东大会网络投票系统，方便股东行使表决权。

四、整改措施、整改时间及责任人

根据上述自查情况，对照相关法律法规的要求，公司拟订了如下整改计划：

1、公司将在今后的工作中持续为董事、监事、高管人员学习培训创造条件，积极参加监管部门组织的有关公司治理的培训，确保公司董事、监事 、高管人员及时了解和掌握有关公司治理方面的规定与要求，促进董事、监事 、高管人员更加勤勉地履行职责，提高公司决策和管理的水平和规范性。公司将根据监管部门的培训安排积极组织相关人员参加培训，责任人为公司董事会秘书。

2、公司将按照相关法律法规的规定，建立和完善公司治理结构和制度。相关制度的制定完成时间为2007年8月底，责任人为公司董事会秘书。

3、公司将根据中国证监会《关于加强社会公众股股东权益保护的若干规定》

和 《上市公司股东大会规则》的要求，完善对重大事项的表决制度，在对股东大会所审议的事项涉及增发新股等规定的重大事项进行决策时，提供网络投票，为股东参与股东大会表决，行使股东权利提供保障。责任人为公司董事会秘书。

对于上述整改措施，公司还将严格按照陕西省证监局《关于开展加强上市公司智力专项活动有关事项的通知》的时间要求，认真、积极地落实。

**五、有特色的公司治理做法**

为提高公司治理水平，公司曾率先于 2002 年在公司董事会成员中增加了独立董事的人选；公司还设立了董事会各专业委员会，其中薪酬与考核委员会在每年度末召开会议，听取每一位高管人员对上一年度的工作述职，并根据工作绩效给予考评。我们还将在以后的工作中不断探讨更好的公司治理制度。

**六、其他需要说明的事项**

公司《上市公司治理专项活动自查报告及整改计划》已经公司董事会审议通过，根据中国证监会和陕西省证监局关于开展上市公司治理专项活动的要求，为推动专项活动的顺利开展，听取投资者和社会公众对本公司治理情况和整改计划的意见和建议，公司"上市公司治理专项活动"互动平台，具体联系方式如下：

电　　话： 029-88314617、029-33333109
传　　真： 029-88314617、029-33333109
电子邮箱： gfoffice@ch.com.cn
公众评议邮箱：
中国证监会上市公司监管部： gszl@csrc.gov.cn
上海证券交易所： List22@secure.sse.com.cn
陕西省证监局公开邮箱： xa_gszl@csrc.gov.cn

**彩虹显示器件股份有限公司**

**二〇〇七年八月十五日**

## 彩虹显示器件股份有限公司
## 关于加强上市公司治理专项活动的自查报告

　　根据中国证券监督管理委员会《关于开展加强上市公司治理专项活动有关事项的通知》要求，本公司成立了以董事长为第一责任人的专项工作小组，对该项工作进行了认真细致的部署。公司专项工作小组本着实事求是的原则，严格对照《公司法》、《证券法》等有关法律、行政法规，以及《公司章程》等内部规章制度，并逐条对照通知附件的要求，对公司治理情况进行了自查，现将自查情况报告如下：

### 一、公司基本情况、股东状况

### 1、公司的发展沿革、目前基本情况：

　　（1）、公司发展沿革

　　彩虹显示器件股份有限公司(以下简称"本公司")是经陕西省经济体制改革委员会陕改发[1992]34号文批准，由彩虹集团公司(以下简称"彩虹集团")、原中国工商银行陕西省信托投资公司、原中国建设银行陕西省信托投资公司三方共同发起，以募集方式设立的股份有限公司。本公司于1992年7月29日向陕西省工商行政管理局申请工商注册登记，营业执照注册号为6100001005467。公司主要从事彩色显示器件、电子产品及零部件、原材料的生产、开发、经营，自营和代理各类商品及技术的进出口业务、承办"三来一补"业务（国家限制或禁止进出口的商品和技术除外）及实物租赁等。

　　本公司股票于1996年5月20日在上海证券交易所挂牌交易。1997年7月经中国证监会批准同意，原中国工商银行陕西省信托投资公司、原中国建设银行陕西省信托投资公司、原中国银行陕西省信托投资公司分别将其持有的本公司股份共计12,288万股转让给彩虹集团。2004年10月经国务院国有资产监督管理委员会(以下简称"国资委")批复，彩虹集团将其持有本公司的股份全部转让给彩虹集团独家发起设立的彩虹集团电子股份有限公司（"彩虹电子"），彩虹电子成为本公司的控股股东，彩虹集团公司为本公司的实际控制人。

（2）、公司基本情况

中文名称：彩虹显示器件股份有限公司

英文名称：IRICO DISPLAY DEVICES CO.,LTD

法定代表人：王西民

注册地址：西安高新产业开发区西区

办公地址：西安高新技术开发区西区沣惠南路 16 号

邮政编码：710075

电子信箱：gfoffice@ch.com.cn

公司国际互联网网址：http://www.iricoltd.com.cn

股票上市交易所：上海证券交易所

股票简称：彩虹股份

股票代码：600707

（3）、股票发行与上市情况

1992 年 8 月，经中国人民银行陕西省分行陕银复 1992(54)号文件批复，公司按照每股 1.5 元的价格发行普通股股份 30000 万股，每股面值 1 元。

1996 年 5 月，经中国证券监督管理委员会证监发审字(1996)25 号文批准、上海证券交易所上证上字第(024)号文审核同意，公司社会公众股 9208 万股于 1996 年 5 月 20 日在上海证券交易所挂牌上市。

1996 年 6 月，公司第四次股东大会议通过 1995 年度利润分配方案：每 10 股送 2 股，股权登记日 1996 年 7 月 2 日，除权及红股上市日 7 月 3 日，公司股本总额变更为 36000 万股。

2000 年 2 月，本公司实施了 1999 年度配股。以 1998 年末股份总数 36000 万股为基数，按每 10 股配 3 股的比例向全体股东配售，配股价格每股人民币 9 元。本公司控股股东以非货币方式认购 2800 万股；社会法人股股东应配 1231.91 万股，放弃全部配股权；社会公众股股东配售 3314.88 万股，配售股份总数为 6114.88 万股。配股完成后，公司股份总数变更为 42114.88 万股。

**2、公司控制关系和控制链条，请用方框图说明，列示到最终实际控制人；**



**3、公司的股权结构情况，控股股东或实际控制人的情况及对公司的影响；**

（1）、股份变动情况表

| 股份类别 | 持股数量 | 比例(%) |
|---|---|---|
| 一、有限售条件股份 | | |
| 国有法人持股 | 180675565 | 42.90 |
| 境内法人持股 | 36497619 | 8.67 |
| 二、无限售条件股份 | | |
| 人民币普通股 | 203975616 | 48.43 |
| 三、股份总数 | 421148800.00 | 100.00 |

（2）、控股股东及实际控制人具体情况介绍

控股股东：彩虹集团电子股份有限公司；法人代表：邢道钦，注册资本：194,117.40 万元，成立日期：2004 年 9 月，主要经营业务或管理活动：彩色显示器件及其配套产品和材料、电子器件、电真空器件、电子产品的研究、开发、制造、销售。

实际控制人：彩虹集团公司；法人代表：邢道钦，成立日期：1995 年 9 月，注册资本：100,000 万元，主要经营业务或管理活动：彩色显像管、显示管、彩色电视机、显示器及其配套产品、电子器件、电真空器件、电子产品的研究、开发、制造。

**4、公司控股股东或实际控制人是否存在"一控多"现象，如存在，请说明**

对公司治理和稳定经营的影响或风险，多家上市公司之间是否存在同业竞争、关联交易等情况；

本公司控股股东为彩虹集团电子股份有限公司（在香港联交所主板挂牌上市的 H 股公司，股票简称：彩虹电子，股票代码：0438），本公司与彩虹电子的实际控制人均为彩虹集团公司。

本公司与控股股东、实际控制人之间不存在同业竞争问题。

本公司与控股股东、实际控制人之间存在着为日常生产经营所必要的关联交易，包括零部件采购、销售商品以及动能供应等关联交易。

**5、机构投资者情况及对公司的影响**

无。

**6、《公司章程》是否严格按照我会发布的《上市公司章程指引（2006 年修订）》予以修改完善。**

《公司章程》已经严格按照中国证监会发布的《上市公司章程指引（2006年修订）》的要求进行了修改和完善，并经股东大会审议通过。

**二、公司规范运作情况**

**1、股东大会**

**（1）股东大会的召集、召开程序是否符合相关规定**

公司股东大会的召集、召开程序均符合《上海证券交易所股票上市规则》、《公司章程》和《股东大会议事规则》的相关规定。

**（2）股东大会的通知时间、授权委托等是否符合相关规定；**

公司股东大会的通知时间、授权委托等符合《公司法》、《上海证券交易所股票上市规则》、《公司章程》和《股东大会议事规则》的相关规定。

**（3）股东大会提案审议是否符合程序，是否能够确保中小股东的话语权；**

公司股东大会提案审议符合法律、法规和《公司章程》规定的相关程序；公司召开股东大会，能够做到平等对待所有股东，为股东行使权利提供便利，并能够确保中小股东的话语权。

**（4）有无应单独或合并持有公司有表决权股份总数 10%以上的股东请求召**

开的临时股东大会，有无应监事会提议召开股东大会？如有，请说明其原因；

截止目前，公司股东大会召开的召集人均为公司董事会，尚未有单独或合并持有公司有表决权股份总数10%以上的股东请求召开临时股东大会的情形，也没有监事会请求召开股东大会的情形。

**（5）是否有单独或合计持有 3%以上股份的股东提出临时提案的情况？如有，请说明其原因；**

本公司曾接到本公司控股股东彩虹集团电子股份有限公司向本公司董事会提交的《关于彩虹显示器件股份有限公司2004年度利润分配的股东提案》，经董事会批准，同意将此提案提交2004年度股东大会审议。提案提出了全体股东按每10股派发现金红利3.00元（含税）的利润分配预案。该提案获得了2004年度股东大会的批准。

**（6）股东大会会议记录是否完整、保存是否安全；会议决议是否充分及时披露；**

公司股东大会会议记录完整并安全保存，会议决议充分及时地进行了披露。

**（7）公司是否有重大事项绕过股东大会的情况，是否有先实施后审议的情况？如有，请说明原因；**

公司按照法律、法规、公司章程和"三会"议事规则的相关规定，严格执行重大事项的决策程序，贯彻先审议后实施的决策原则，不存在绕过股东大会的情形。

**（8）公司召开股东大会是否存在违反《上市公司股东大会规则》的其他情形。**

公司召开的历次股东大会没有违反《上市公司股东大会规则》的情形。

**2、董事会**

**（1）公司是否制定有《董事会议事规则》、《独立董事制度》等相关内部规则；**

公司已制定《董事会议事规则》，尚未制定《独立董事制度》。

**（2）公司董事会的构成与来源情况；**

2005年9月20日，公司召开了2005年度第二次临时股东大会。会议审议

11

通过了《彩虹集团电子股份有限公司提交的关于本公司第五届董事会董事候选人、监事会股东监事候选人的提案》。大会采用累积投票的方式选举王西民先生、丁文惠先生、马建朝先生、田小红先生、赵守国先生、张天西先生、刘汝林先生为公司第五届董事会董事，其中赵守国先生、张天西先生、刘汝林先生为独立董事。

**（3）董事长的简历及其主要职责，是否存在兼职情况，是否存在缺乏制约监督的情形；**

董事长王西民先生：2001 年 4 月至 2004 年 12 月，任彩虹集团公司生产部部长；2004 年 12 月至 2005 年 7 月，任彩虹集团电子股份有限公司总裁助理、运营管理部总经理；2005 年 8 月起，任彩虹集团电子股份有限公司副总裁。现任本公司第五届董事会董事长。

公司董事长在股东单位兼职。公司相对健全的治理机制保证了公司决策的科学化和经营管理的正常化，董事长不存在缺乏制约监督的情形。

**（4）各董事的任职资格、任免情况，特别是国有控股的上市公司任免董事是否符合法定程序；**

公司全体董事、独立董事的任职资格符合相关规定，不存在与法律、法规和《公司章程》相抵触的情形，任免程序符合法定程序。

**（5）各董事的勤勉尽责情况，包括参加董事会会议以及其他履行职责情况；**

公司董事能够认真、勤勉地行使公司赋予的职权，及时了解公司业务经营管理状况，对公司定期报告签署书面确认意见，保证公司信息披露的真实、准确、完整；公司董事能够按照《董事会议事规则》亲自或委托其他董事参加董事会会议，并在会议上发表自己的意见和建议，并对会议的各项议案独立地进行表决。

**（6）各董事专业水平如何，是否有明确分工，在公司重大决策以及投资方面发挥的专业作用如何；**

公司董事在各自的专业领域具有丰富的专业知识和从业经验，在对公司重大决策以及投资方面都能较好的发挥其专业作用，提出专业意见和建议。

**（7）兼职董事的数量及比例，董事的兼职及对公司运作的影响，董事与公司是否存在利益冲突，存在利益冲突时其处理方式是否恰当；**

公司兼职董事共 3 人，占董事人数的 42.86%。兼职董事更加全面地了解行

业发展情况，使公司能够获得更多的行业资讯，同时也能够提供一些专业化的意见，为公司决策提供帮助。兼职董事严格按照董事会授予的权限行使权利，未对公司运做产生不良影响，也不存在利益冲突。

**（8）董事会的召集、召开程序是否符合相关规定；**

公司董事会的召集、召开程序均符合《上海证券交易所股票上市规则》、《公司章程》和《董事会会议事规则》的相关规定。

**（9）董事会的通知时间、授权委托等是否符合相关规定；**

公司董事会的通知时间、授权委托均符合《上海证券交易所股票上市规则》、《公司章程》和《董事会会议事规则》的相关规定。

**（10）董事会是否设立了下属委员会，如提名委员会、薪酬委员会、审计委员会、投资战略委员会等专门委员会，各委员会职责分工及运作情况；**

公司董事会设立了下属委员会，包括薪酬委员会、审计委员会、投资战略委员会，尚未设立提名委员会。

各委员会职责分工及运作情况：

战略委员会的主要职责是对公司长期发展战略和重大投资决策进行研究并提出建议。

审计委员会的主要职责是：提议聘请或更换外部审计机构、监督公司的内部审计制度及其实施、负责内部审计与外部审计之间的沟通、审核公司的财务信息及其披露、审查公司的内控制度。

薪酬与考核委员会的主要职责是：研究董事与经理人员考核的标准，进行考核并提出建议、研究和审查董事、高级管理人员的薪酬政策与方案。

截止目前，三个专业委员会的职责分工明确，整体运做情况良好。

**（11）董事会会议记录是否完整、保存是否安全，会议决议是否充分及时披露；**

公司董事会会议记录完整并安全保存，会议决议充分及时地进行了披露。

**（12）董事会决议是否存在他人代为签字的情况；**

公司董事会的决议由每位出席会议的董事本人签字，并依据未亲自出席董

事的授权委托，由受托董事代为签字。

**（13）董事会决议是否存在篡改表决结果的情况；**

公司董事会决议不存在篡改表决结果的情况。

**（14）独立董事对公司重大生产经营决策、对外投资、高管人员的提名及其薪酬与考核、内部审计等方面是否起到了监督咨询作用；**

公司重大生产经营决策、对外投资、高管人员的提名及其薪酬与考核、内部审计等方面的重大决策，事前与独立董事咨询和沟通，独立董事行使监督职权的形式主要是在董事会会议上发表独立意见、签署专项意见和独立意见书，独立董事对上述重大决策发挥了监督咨询作用。

**（15）独立董事履行职责是否受到上市公司主要股东、实际控制人等的影响；**

公司独立董事按照《公司章程》的规定和要求独立履行职责，不存在受到公司主要股东、实际控制人影响的情形。

**（16）独立董事履行职责是否能得到充分保障，是否得到公司相关机构、人员的配合；**

公司独立董事依法独立地开展工作，其履行职责能够得到充分保障。公司董事会办公室积极配合独立董事履行职责和相关工作的开展，董事会秘书直接负责与独立董事的沟通与联络工作。

**（17）是否存在独立董事任期届满前，无正当理由被免职的情形，是否得到恰当处理；**

公司不存在独立董事任期届满前被免职的情形。

**（18）独立董事的工作时间安排是否适当，是否存在连续 3 次未亲自参会的情况；**

公司独立董事的工作时间安排适当，不存在连续 3 次未亲自参会的情况。

**（19）董事会秘书是否为公司高管人员，其工作情况如何；**

公司董事会秘书是公司高管人员。董事会秘书能够按照相关法律、法规和公司章程以及公司内部的各项管理制度开展工作，保证公司三会按照要求及时召开，能够认真履行信息披露，积极地作好投资者关系管理工作，同时保持与监管

部门的沟通和联络。

**（20）股东大会是否对董事会有授权投资权限，该授权是否合理合法，是否得到有效监督。**

股东大会对董事会有授权投资权限为：

1、董事会决定对外投资事项的权限为：单个项目不超过最近一期经审计净资产值的 15%；年度累计投资项目不超过公司最近一期经审计净资产值的 50%。

董事会决定收购或出售资产事项的权限为：单个项目不超过最近一期经审计净资产值的 15%；连续 12 个月内向同一当事人收购或出售资产不超过三次；

董事会有权决定年度累计金额不超过最近一期经审计净资产值 50%的资产抵押项目。

2、董事会有权决定单一合同交易金额或连续 12 月内同类标的交易金额不超过公司最近一期经审计净资产绝对值 5%以下的关联交易事项。

3、董事会决定对外担保事项的权限为：

（1）单次担保金额不超过人民币 3000 万元；

（2）为同一被单保对象累计担保金额不超过人民币 3000 万元；

（3）累计担保金额不超过公司最近一期经审计净资产值的 5%。

根据相关法律、法规的规定，该项授权合理合法，在实践中得到了有效地监督。截止目前本公司无任何对外担保的情形。

**3、监事会**

**（1）公司是否制定有《监事会议事规则》或类似制度；**

公司监事会制定有《监事会议事规则》。

**（2）监事会的构成与来源，职工监事是否符合有关规定；**

公司监事会由 3 名监事组成，其中股东大会选举产生 2 名，职工代表监事 1 名，其构成与来源符合法律、法规和《公司章程》的规定。

**（3）监事的任职资格、任免情况；**

2005 年 9 月 20 日，公司召开了 2005 年度第二次临时股东大会。会议审议

通过了《彩虹集团电子股份有限公司提交的关于本公司第五届董事会董事候选人、监事会股东监事候选人的提案》。大会采用累积投票的方式选举葛迪先生、闫跃平先生为公司第五届监事会股东监事，与职工监事李向顺先生共同组成公司第五届监事会。

公司监事的任职资格符合相关规定，不存在与法律、法规和《公司章程》相抵触的情形，任免程序符合法定程序。

**（4）监事会的召集、召开程序是否符合相关规定；**

公司监事会的召集、召开程序均符合《上海证券交易所股票上市规则》、《公司章程》和《监事会会议事规则》的相关规定。

**（5）监事会的通知时间、授权委托等是否符合相关规定；**

公司监事会的通知时间、授权委托均符合《上海证券交易所股票上市规则》、《公司章程》和《监事会会议事规则》的相关规定。

**（6）监事会近 3 年是否有对董事会决议否决的情况，是否发现并纠正了公司财务报告的不实之处，是否发现并纠正了董事、总经理履行职务时的违法违规行为；**

监事会近 3 年没有对董事会决议否决的情况，没有发现并纠正公司财务报告不实的情况，没有发现公司董事、总经理履行职务时存在违法违规的行为。

**（7）监事会会议记录是否完整、保存是否安全，会议决议是否充分及时披露；**

公司监事会会议记录完整并安全保存，会议决议充分及时地进行了披露。

**（8）在日常工作中，监事会是否勤勉尽责，如何行使其监督职责。**

在日常工作中，监事会成员能够勤勉尽责地行使其监督职责。监事会通过列席董事会、股东大会、召开监事会会议，审议、审核公司各季度、半年度、年度财务报告，对公司董事、经理、财务负责人和董事会秘书等高级管理人员进行监督，对公司关联交易、重大事项进行审议并发表独立意见。

**4、经理层**

**（1）公司是否制定有《经理议事规则》或类似制度；**

为了切实规范总经理的组织及行为，维护公司的正常运作，保证股东的合

法权益，根据《公司法》和《公司章程》的相关规定，公司制定了《总经理工作细则》。

**（2）经理层特别是总经理人选的产生、招聘，是否通过竞争方式选出，是否形成合理的选聘机制；**

公司设总经理一名，由董事长提名，由董事会决定聘任或解聘；公司设董事会秘书一名，由董事长提名，由董事会决定聘任或解聘。公司设副总经理 2 名，总会计师 1 名，由总经理提名任免，由董事会决定聘任或解聘。

**（3）总经理的简历，是否来自控股股东单位；**

公司总经理的简历：丁文惠先生，2001 年 5 月至 2005 年 8 月，任本公司副总经理；2005 年 8 月至今任本公司董事、总经理。

公司总经理不是来自控股股东单位。

**（4）经理层是否能够对公司日常生产经营实施有效控制；**

公司经营层拥有充分的经营管理权，公司经营层的每位成员根据分工的不同履行各自的职责，能够对公司的日常生产经营实施有效的控制。

**（5）经理层在任期内是否能保持稳定性；**

公司经营层在任期内基本保持稳定。

**（6）经理层是否有任期经营目标责任制，在最近任期内其目标完成情况如何，是否有一定的奖惩措施；**

公司建立了以目标责任制为基础的考评体系。根据经营业绩和履行职责情况对高级管理人员实行月度考评和年度考核，月度考评以 KPI 指标为考核依据，年度考核时高管人员向董事会进行工作述职，考核结果作为其薪酬、晋升的依据。公司将进一步建立和完善董事、监事和高管人员的绩效评价标准和有关制度。

**（7）经理层是否有越权行使职权的行为，董事会与监事会是否能对公司经理层实施有效的监督和制约，是否存在"内部人控制"倾向；**

公司经理层没有越权行使职权的行为，董事会和监事会对公司经理层实施有效的监督和制约，不存在"内部人控制"倾向。

**（8）经理层是否建立内部问责机制，管理人员的责权是否明确；**

公司已建立有一套详细的《管理手册》，包括安全、生产、质量、采购、销售各专业管理规定及奖惩条例，对各级管理人员因故意或过失发生的违规违纪等有损公司利益的行为追究相应地责任，公司管理人员职责划分明确，责权对等。

**（9）经理层等高级管理人员是否忠实履行职责，维护公司和全体股东的最大利益，未能忠实履行职务，违背诚信义务的，其行为是否得到惩处；**

公司经理层等高级管理人员能够忠实履行职务，维护公司和全体股东的最大利益。未发生不能忠实履行职务，违背诚信义务的行为。

**（10）过去 3 年是否存在董事、监事、高管人员违规买卖本公司股票的情况，如果存在，公司是否采取了相应措施。**

近 3 年公司董事、监事、高管人员不存在违规买卖本公司股票的情况。

**5、公司内部控制情况**

**（1）公司内部管理制度主要包括哪些方面，是否完善和健全，是否得到有效地贯彻执行；**

为了规范公司的内部控制，加强内部管理，保证各项业务的正常、规范进行，确保公司资产的安全和完整，防止欺诈和舞弊行为，实现公司的经营管理目标，公司依照国家有关法律法规的规定，根据公司的资产结构和经营方式，结合自身业务发展情况和运营管理经验，建立了较为完整、有效、合理的内部控制制度体系。公司的主要内控制度包括：公司章程和"三会"制度、信息披露管理制度、岗位职责标准、财务控制制度体系、人力资源管理制度、质量管理制度、设备及备品备件管理制度、生产管理、安全管理、销售管理、信息化管理等业务制度。公司较为完整、有效、合理的内部控制制度体系，保障了公司正常生产经营活动的进行，并达到了有效控制经营风险的目的。未来公司还将根据生产经营及公司发展的实际需要，对公司的内部控制制度作进一步的修改和完善，使内控制度与公司的发展相适应。

**（2）公司会计核算体系是否按照有关规定建立健全；**

公司已经按照有关规定建立健全了公司会计核算体系。

**（3）公司财务管理是否符合有关规定，授权、签章等内部控制环节是否有效执行；**

公司财务管理制度符合有关规定，授权、签章等内部控制环节有效执行，

均有专人管理。

**（4）公司公章、印鉴管理制度是否完善，以及执行情况；**

公司制定了较为完善的《印鉴管理制度》，并严格按照制度的规定进行管理，公章、印鉴由公司办公室专人管理。

**（5）公司内部管理制度是否与控股股东趋同，公司是否能在制度建设上保持独立性；**

公司根据公司的实际情况制定各项管理制度，在制度建设上基本保持独立。

**（6）公司是否存在注册地、主要资产地和办公地不在同一地区情况，对公司经营有何影响；**

公司注册地位于西安高新技术开发区，有利于充分利用其信息、政策等优惠条件。主要资产和主要办公地位于咸阳，对公司经营不存在影响。

**（7）公司如何实现对分支机构，特别是异地分子公司有效管理和控制，是否存在失控风险；**

公司对控股子公司委派董事、监事，参与该公司的决策管理和监督，没有出现失控的情形。

**（8）公司是否建立有效的风险防范机制，是否能抵御突发性风险；**

公司已制定风险防范制度，设立了分级预警机制，层层分解预警责任指标，逐级落实资产风险责任，并对资产风险状况进行评价考核，完善信息传递流程，从而有效抵御突发性风险。

**（9）公司是否设立审计部门，内部稽核、内控体制是否完备、有效；**

公司设立了审计部门，公司内部稽核、内控体制完备、有效。

**（10）公司是否设立专职法律事务部门，所有合同是否经过内部法律审查，对保障公司合法经营发挥效用如何；**

公司没有设立专职法律事务部门，公司聘请了律师事务所担任常年法律顾问，提供相关的法律咨询服务。公司经营过程中的合同管理严格按照招、投标程序进行，控股股东彩虹集团电子股份有限公司的合同管理部门协助进行内部合同审核，对保障公司合法经营发挥着重大作用。

**（11）审计师是否出具过《管理建议书》，对公司内部管理控制制度如何评价，公司整改情况如何。**

审计师没有出具过《管理建议书》。

**（12）公司是否制定募集资金的管理制度；**

公司已经制定了募集资金的管理制度。公司将根据《关于加强上市公司募集资金使用管理的通知》要求对该管理制度进行重新修订。

**（13）公司的前次募集资金使用效果如何，是否达到计划效益；**

公司前次募集资金使用情况良好，并已达到了计划效益。

**（14）公司的前次募集资金是否有投向变更的情况，程序是否符合相关规定，理由是否合理、恰当；**

根据股东大会决议，公司对前次募集资金投向进行了变更，变更程序符合相关规定，变更的理由合理、恰当。

**（15）公司是否建立防止大股东及其附属企业占用上市公司资金、侵害上市公司利益的长效机制。**

公司已建立规范的资金管理、对外担保制度，不存在大股东及其附属企业占用公司资金的情况。

**三、公司独立性情况**

**1.公司董事长、经理、副经理、董事会秘书、财务负责人等人员在股东及其关联企业中有无兼职；**

公司董事长、总经理、财务负责人在股东及其关联企业中的兼职情况：

| 姓　名 | 兼职单位名称 | 担任的职务 |
|---|---|---|
| 王西民 | 彩虹集团电子股份有限公司 | 副总裁 |
| 丁文惠 | 咸阳彩虹数码显示有限公司 | 董事、副总经理 |
| 刘珍珠 | 咸阳彩虹数码显示有限公司 | 财务总监 |

咸阳彩虹数码显示有限公司为本公司与控股股东共同投资设立，本公司占注册资本的49%

公司副总经理、董事会秘书没有在股东及其关联企业中的兼职情况。

**2. 公司是否能够自主招聘经营管理人员和职工；**

公司拥有独立的员工队伍，能够自主招聘经营管理人员和员工。公司员工与公司均签订了劳动合同。公司在劳动、人事及工资管理等方面独立于控股股东。

**3. 公司的生产经营管理部门、采购销售部门、人事等机构是否具有独立性，是否存在与控股股东人员任职重叠的情形；**

公司的生产经营管理部门、采购销售部门以及人事等机构具有独立性，各职能部门不存在与控股股东任职重叠的情形。

**4. 公司发起人投入股份公司的资产的权属是否明确，是否存在资产未过户的情况；**

公司发起人投入股份公司的资产权属明确，不存在资产未过户的情况。

**5. 公司主要生产经营场所及土地使用权情况如何，是否独立于大股东；**

公司主要生产经营场所及土地使用权权权清晰，独立于大股东。公司下属玻璃工厂和控股子公司彩虹资讯的部分生产经营所用厂房、土地向实际控制人彩虹集团公司进行租赁。

**6. 公司的辅助生产系统和配套设施是否相对完整、独立；**

本公司的主业为彩色显像管的生产与销售，共有彩管生产线 4 条，主要产品有 54cmFS、64cmFS、64cmPF、74cmPF 彩色显像管。公司拥有独立的生产系统、辅助生产系统和配套设施，生产所用水、电、气等动能从公司实际控制人彩虹集团公司采购。

**7. 公司商标注册与使用情况如何，工业产权、非专利技术等无形资产是否独立于大股东；**

公司与实际控制人彩虹集团公司签订商标使用许可协议，合同规定彩虹集团许可公司产品有偿使用"彩虹"商标，商标使用费的作价依据为：按照产品销售收入的千分之一支付使用费。公司工业产权、非专利技术等无形资产独立于大股东。

**8. 公司财务会计部门、公司财务核算的独立性如何；**

公司具有独立的财务会计部门，公司及其子公司已建有独立的会计核算体系和财务管理制度。本公司拥有独立的银行账户，不存在与控股股东共用银行账

户的情况。公司依法独立纳税,不存在欠漏税行为。

**9. 公司采购和销售的独立性如何;**

公司拥有独立的采购和销售系统,并建立了完善的管理制度。公司零部件采购、销售商品所产生的关联交易均与相关关联方签订了关联交易协议。

**10. 公司与控股股东或其关联单位是否有资产委托经营,对公司生产经营的独立性产生何种影响;**

公司与控股股东或其关联单位没有资产委托经营的情形。

**11. 公司对控股股东或其他关联单位是否存在某种依赖性,对公司生产经营的独立性影响如何;**

公司原材料采购的前五名供应商均为关联单位,2006 年度占采购总额的66%,存在一定的依赖性,主要原因是:公司和公司控股子公司彩虹资讯与彩虹集团公司、彩虹电子及其下属生产企业在生产经营中存在着配套供应的关系,且大多数厂家经营场所在咸阳。由于公司生产所需的大多数零部件无法从外部采购,同时彩虹集团公司内部配套厂家的产品质量较好、价格较低、供货稳定、便于运输、有利于生产组织,该等关联交易可充分利用彩虹集团公司内部的配套优势,节约采购(销售)费用,降低生产成本,提高公司的生产效率和效益。

**12. 公司与控股股东或其控股的其他关联单位是否存在同业竞争;**

公司与控股股东或其控股的其他关联单位不存在同业竞争。

**13. 公司与控股股东或其控股的其他关联单位是否有关联交易,主要是哪些方式;关联交易是否履行必要的决策程序;**

本公司及公司控股子公司与公司实际控制人、控股股东及其下属的其他关联单位之间存在日常关联交易。关联交易的主要内容是:向关联企业采购原材料、零部件、能源动力及部分厂房租赁和商标使用权等。公司与关联方的关联交易均履行了必要的决策程序,独立董事在董事会上均发表了独立意见,相关关联董事在董事会表决时进行了回避,关联股东在股东大会表决时放弃了表决权。

**14. 关联交易所带来利润占利润总额的比例是多少,对公司生产经营的独立性有何种影响;**

2006 年度公司关联交易没有为公司带来利润,对公司生产经营的独立性没

有影响。

**15. 公司业务是否存在对主要交易对象即重大经营伙伴的依赖，公司如何防范其风险；**

公司业务的的主要交易对象主要是国内各大型电视机厂商，不存在依赖性。

**16. 公司内部各项决策是否独立于控股股东。**

公司内部各项决策能够做到独立于控股股东。董事会是公司的常设决策机构，向股东大会负责。董事会对公司经营活动中的重大决策进行审议，并提交股东大会审议批准。

**四、公司透明度情况**

**1. 公司是否按照《上市公司信息披露管理办法》建立信息披露事务管理制度，是否得到执行。**

公司已按照《上市公司信息披露管理办法》的规定修订了《信息披露管理办法》和《重大信息内部报告制度》，在信息披露过程中公司能够严格按照制度规定进行信息披露。

**2. 公司是否制定了定期报告的编制、审议、披露程序，执行情况，公司近年来定期报告是否及时披露，有无推迟的情况，年度财务报告是否有被出具非标准无保留意见，其涉及事项影响是否消除；**

公司制定了《信息披露管理办法》，办法中规定了公司定期报告的编制、审议、披露程序。公司定期报告的编制、审议、披露严格按照交易所的相关要求和公司《信息披露管理办法》执行。公司近年来定期报告均保证了及时披露，没有推迟的情况，公司年度财务报告没有被出具非标准无保留意见。

**3. 上市公司是否制定了重大事件的报告、传递、审核、披露程序，落实情况如何；**

公司根据有关规定制定了《重大信息内部报告制度》，公司各项重大事件的报告、传递、审核、披露按照该制度和《信息披露管理办法》的相关规定执行。

**4. 董事会秘书权限如何，其知情权和信息披露建议权是否得到保障；**

董事会秘书是公司高级管理人员，是公司与证券交易所之间的指定联络人。

（一）负责公司和相关当事人与证券交易所及其他证券监管机构之间的及时

沟通和联络。

（二）负责处理公司信息披露事务，督促公司制定并执行信息披露管理制度和重大信息的内部报告制度，促使公司和相关当事人依法履行信息披露义务，并按规定向证券交易所办理定期报告和临时报告的披露工作。

（三）协调公司与投资者关系，接待投资者来访，回答投资者咨询，向投资者提供公司已披露的资料。

（四）按照法定程序筹备董事会会议和股东大会，准备和提交拟审议的董事会和股东大会的文件。

（五）参加董事会会议，制作会议记录并签字。

（六）负责与公司信息披露有关的保密工作，制订保密措施，促使公司董事会全体成员及相关知情人在有关信息正式披露前保守秘密，并在内幕信息泄露时，及时采取补救措施并向证券交易所报告。

（七）负责保管公司股东名册、董事名册、大股东及董事、监事、高级管理人员持有公司股票的资料，以及董事会、股东大会的会议文件和会议记录等。

（八）协助董事、监事和高级管理人员了解信息披露相关法律、法规、规章、证券交易所股票上市规则及证券交易所的他规定和公司章程，以及上市协议对其设定的责任。

（九）促使董事会依法行使职权；在董事会拟作出的决议违反法律、法规、规章、证券交易所股票上市规则及证券交易所其他规定和公司章程时，应当提醒与会董事，并提请列席会议的监事就此发表意见；如果董事会坚持作出上述决议，董事会秘书应将有关监事和其他人的意见记载于会议记录上，并立即向证券交易所报告。

**5. 信息披露工作保密机制是否完善，是否发生泄漏事件或发现内幕交易行为。**

公司信息披露工作保密机制完善，公司信息披露的义务人和信息知晓人，对其知晓的未公开披露的信息负有保密的责任。公司信息披露的义务人应采取必要的措施，在信息公开披露之前，将信息知情者控制在最小范围。公司聘请的顾问、中介机构、关联人若擅自披露公司信息，给公司造成损失的，公司保留追究其责任的权利。

截止目前，没有发生泄漏事件或发现内幕交易行为。

**6. 是否发生过信息披露"打补丁"情况，原因是什么，如何防止类似情况；**

根据中国证监会《公开发行证券的公司信息披露内容与格式准则第 2 号–年度报告的内容与格式》(2005 年修订)和上海证券交易所的相关要求，公司对 2005 年报"第七章　董事会报告"之"(二)对公司未来发展的展望"部分进行了修改和补充公告。今后公司将严格按照《公开发行证券的公司信息披露内容与格式准则》的要求，编制和披露公司各类临时报告和定期报告。

**7. 公司近年来是否接受过监管部门的现场检查，或其他因信息披露不规范而被处理的情形，如存在信息披露不规范、不充分等情况，公司是否按整改意见进行了相应的整改；**

(1)中国证监会陕西监管局于 2004 年 10 月 25 日至 29 日对公司进行了巡检，并于 2005 年 2 月 18 日下发了陕证监函字[2005]41 号《关于对彩虹显示器件股份有限公司 2004 年度巡检发现问题及整改要求的通报》，指出了公司规范化运作、财务内控制度、证券投资核算等方面的问题。公司已根据通报的要求，制订了整改方案和整改措施，按照监管部门的要求及时认真地完成了整改工作。

(2)中国证监会陕西监管局于 2005 年 8 月 24 日至 9 月 25 日对公司进行了专项核查，并于 2005 年 10 月 21 日向公司下发了《限期整改通知书》(陕证监发[2005]69 号)，指出了本公司在短期投资、财务管理、关联交易等方面存在的问题。针对《限期整改通知》中提出的问题，公司逐项进行了责任分解，提出了切实可行的整改措施。公司已按照监管部门的要求及时认真地完成了整改工作。

**8. 公司是否存在因信息披露问题被交易所实施批评、谴责等惩戒措施；**

公司没有因信息披露问题被交易所实施批评、谴责的情况。

**9. 公司主动信息披露的意识如何。**

除按照相关要求履行信息披露义务外，公司始终保持日常主动信息披露的自觉性。公司还通过多种方式组织董事、监事及高管人员学习上市公司规范运做的相关法律法规，提高信息披露意识。公司及有关信息披露义务人主动信息披露的意识在不断地加强。

**五、公司治理创新情况及综合评价。**

**1. 公司召开股东大会时，是否采取过网络投票形式，其参与程度如何；(不**

**包括股权分置改革过程中召开的相关股东会议。）**

公司除股权分置改革过程中召开的相关股东会议采取了网络投票的方式外，股东大会（年度和临时股东大会）未采取网络投票形式召开。

**2. 公司召开股东大会时，是否发生过征集投票权的情形；（不包括股权分置改革过程中召开的相关股东会议。）**

公司召开股东大会时，没有发生过征集投票权的情形。

**3. 公司在选举董事、监事时是否采用了累积投票制；**

公司在选举第五届董事会董事、监事会监事时采用了累积投票制。

**4. 公司是否积极开展投资者关系管理工作，是否制定投资者关系管理工作制度，具体措施有哪些；**

公司一直积极开展投资者关系管理工作，并在监管部门的指引下逐步规范此项工作。公司制定了《投资者关系管理制度》，从投资者关系管理的目的、原则和内容、投资者关系活动、投资者关系工作的组织和实施等方面对开展投资者关系工作进行了规范，确保投资者关系管理工作的合规性和有效性。公司指定专人负责投资者关系管理，并安排专人做好投资者来访接待工作。公司通过召开接待投资者来访、电话咨询、邮寄资料或发送电子邮件、现场参观、一对一沟通、媒体采访和报道等多种形式与投资者交流与沟通。

**5. 公司是否注重企业文化建设，主要有哪些措施；**

公司一贯注重企业文化建设，建立并完善了人员培训、人才引进和激励机制，以良好的工作氛围和发展机遇吸引并留住人才，建立能够适应企业现代化管理和公司未来发展需要的高素质员工队伍。

**6. 公司是否建立合理的绩效评价体系，是否实施股权激励机制，公司实施股权激励机制是否符合法律、法规要求，股权激励的效果如何；**

公司已经建立了合理的绩效评价体系，但尚未实施股权激励机制。

**7. 公司是否采取其他公司治理创新措施，实施效果如何，对完善公司治理制度有何启示；**

为提高公司治理水平，公司于 2002 年率先在公司董事会成员中增加了独立董事的人选；公司还设立了董事会各专业委员会，其中薪酬与考核委员会在每年

26

度末召开会议，听取每一位高管人员对上一年度的工作述职，并根据工作绩效给予考评。我们还将在以后的工作中不断探讨更好的公司治理制度。

### 8. 公司对完善公司治理结构和相关法规建设有何意见建议。

完善上市公司治理结构是规范上市公司运作、提升上市公司质量的基础，做好这项工作对于实现建立现代企业制度的目标，进一步规范和发展资本市场都是十分必要和有意义的。上市公司应进一步加强董事会专业委员会建设，强化专业部门的职能，建立健全各项管理制度，进一步提高公司科学决策能力和风险防范能力；同时加强监事会的监督职能和权限，提升监事会的地位，不仅仅就财务方面进行监督，更需要全面地监督公司的运作。

**彩虹显示器件股份有限公司**

**二〇〇七年八月十五日**

# EXHIBIT 4

1  John Taladay (*pro hac vice*)
   john.taladay@bakerbotts.com
2  Erik Koons (*pro hac vice*)
   erik.koons@bakerbotts.com
3  BAKER BOTTS LLP
   1299 Pennsylvania Ave., NW
4  Washington, D.C. 20004
   Telephone: (202)-639-7700
5  Facsimile: (202)-639-7890

6  Stuart C. Plunkett (State Bar No. 187971)
   stuart.plunkett@bakerbotts.com
7  BAKER BOTTS LLP
   101 California Street, Suite 3600
8  San Francisco, California 94111
   Telephone: (415) 291-6200
9  Facsimile: (415) 291-6300

10 *Attorneys for Defendants*
   *IRICO GROUP CORP. and*
11 *IRICO DISPLAY DEVICES CO., LTD.*

12             **UNITED STATES DISTRICT COURT**

13            **NORTHERN DISTRICT OF CALIFORNIA**

14                **SAN FRANCISCO DIVISION**

15

16 IN RE: CATHODE RAY TUBE (CRT)          Case No. 3:07-cv-05944-JST
   ANTITRUST LITIGATION
17                                         MDL No. 1917

18 ────────────────────────────           **IRICO DEFENDANTS' OBJECTIONS
                                           AND RESPONSES TO DIRECT**
19 This Document Relates to:              **PURCHASER PLAINTIFF STUDIO
                                           SPECTRUM, INC.'S FIRST SET OF**
20     ALL DIRECT PURCHASER ACTIONS       **INTERROGATORIES**

21

22

23 PROPOUNDING PARTY:                     Direct Purchaser Plaintiff Studio Spectrum, Inc.

24 RESPONDING PARTIES:                    Irico Group Corporation
                                          Irico Display Devices Co., Ltd.
25

26 SET NO.:                               One

27

28

─────────────────────────────────────────────────────────────────
IRICO'S OBJECTIONS AND RESPONSES TO                Master File No. 3:07-cv-05944-SC
DPP'S FIRST SET INTERROGATORIES                    MDL No. 1917

Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby respond to the Direct Purchaser Plaintiff Studio Spectrum, Inc.'s ("Plaintiff") First Set of Interrogatories ("Interrogatories"). Irico reserves the right to amend or supplement these Objections and Responses (the "Responses") to the extent allowed by the Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California ("Local Rules"). Subject to and without waiving any of Irico's General and Specific Objections as set forth below, Irico is willing to meet and confer with Plaintiff regarding such General and Specific Objections.

The following Responses are made only for purposes of this case. The Responses are subject to all objections as to relevance, materiality and admissibility, and to any and all objections on any ground that would require exclusion of any response if it were introduced in court. All evidentiary objections and grounds are expressly reserved.

These Responses are subject to the provisions of the Stipulated Protective Order that the Court issued on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated "Confidential" in accordance with the provisions of the Protective Order.

## GENERAL OBJECTIONS

Irico makes the following General Objections to Plaintiff's Interrogatories:

1.      Irico's Responses are based upon information available to and located by Irico as of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states that it has conducted, or will conduct, a diligent search, reasonable in scope, of those files and records in its possession, custody, or control believed to likely contain information responsive to Plaintiff's Interrogatories.

2.      No express, incidental, or implied admissions are intended by these Responses and should not be read or construed as such.

3.      Irico does not intend, and its Responses should not be construed as, an agreement or acquiescence with any characterization of fact, assumption, or conclusion of law contained in or implied by the Interrogatories.

IRICO'S OBJECTIONS AND RESPONSES TO                1                Master File No. 3:07-cv-05944-SC
DPP'S FIRST SET INTERROGATORIES                                                                MDL No. 1917

4. To the extent that Irico responds to Plaintiff's Interrogatories by stating that Irico will produce or make available for examination responsive information or documents, Irico does not represent that any such information or documents exist. Irico will make a good faith and reasonable attempt to ascertain whether information responsive to Plaintiff's Interrogatories exists and is properly producible, and will produce or make available for examination non-privileged responsive materials to the extent any are located during the course of a reasonable search.

5. Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiff.

6. Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

7. Irico objects to Plaintiff's Interrogatories to the extent they seek information that is not relevant to jurisdictional issues or disproportionate to the needs of the case in resolving such jurisdictional issues.

8. Irico objects to Plaintiff's Interrogatories to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or amend its Responses.

9. Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case.

10. Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege

1    or immunity. Irico will provide only information that it believes to be non-privileged and

2    otherwise properly discoverable. None of Irico's responses is intended nor should be construed as

3    a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any

4    information or responsive documents subject to any such doctrine, privilege, protection or

5    immunity from production shall not constitute a general, inadvertent, implicit, subject-matter,

6    separate, independent or other waiver of such doctrine, privilege, protection or immunity from

7    production.

8          11.     Irico objects to Plaintiff's Interrogatories to the extent that they call for

9    information that is not in the possession, custody, or control of Irico. Irico also objects to the

10   extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties,

11   including but not limited to any of Irico's subsidiary or affiliated companies.

12         12.     Irico objects to Plaintiff's Interrogatories to the extent that responding would

13   require Irico to violate the privacy and/or confidentiality of a third party or confidentiality

14   agreement with a third party.

15         13.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information

16   that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily

17   available from other sources.

18         14.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information

19   or documents concerning transactions outside the United States. Such Interrogatories are unduly

20   burdensome and irrelevant because they do not relate to actions by Irico in or causing a direct

21   effect in the United States.  Such Interrogatories are also unduly burdensome and irrelevant to this

22   pending action as Plaintiffs' class definition is confined to "all persons . . . who directly

23   purchased a Cathode Ray Tube Product . . . in the United States" (see Direct Purchaser Plaintiffs'

24   Consolidated Amended Complaint).

25         15.     Irico objects to Plaintiff's Interrogatories to the extent that compliance would

26   require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body

27   of foreign jurisdictions.

28

---

IRICO'S OBJECTIONS AND RESPONSES TO          3          Master File No. 3:07-cv-05944-SC
DPP'S FIRST SET INTERROGATORIES                        MDL No. 1917

16.     Irico's responses, whether now or in the future, pursuant to Plaintiff's Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

17.     Irico objects to Plaintiff's Interrogatories to the extent that compliance would require Irico to seek information stored on backup or archived databases or other systems that are not readily accessible or otherwise no longer active.

18.     Irico objects to Plaintiff's Interrogatories to the extent that they are compound and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

19.     Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for legal conclusions.

20.     Irico objects to the Interrogatories to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

21.     Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

## GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Irico objects to the definitions of "You" and "Your" (Definition No. 6) to the extent that Plaintiff defines those terms to include the Irico's "predecessors, successors, subsidiaries, departments, divisions, and/or affiliates." This definition is legally incorrect, overbroad, unduly burdensome, vague, and ambiguous. Irico also objects to the inclusion of "all present and former directors, officers, Employees, agents, representatives or any Persons acting or purporting to act on behalf of" Irico within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

2.      Irico objects to the definition of "Document" (Definition No. 8) to the extent it seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, or any other applicable laws.

3.      Irico objects to the definition of "Employee" (Definition No. 9) on the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to the extent that it seeks information protected by the attorney client or other applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or foreign law.

4.      Irico objects to the definitions of "CRT" and "CRT Products" (Definitions No. 10 and 11) on the grounds that they are vague, ambiguous and overly broad. Irico further objects to the use of the term "CRT Products" to the extent that it is inconsistent with the definition of "CRT Products" as set forth in Plaintiff's pleadings.

5.      Irico objects to the definition of the "Relevant Time Period" (Definition No. 12) as overbroad, unduly burdensome, beyond the applicable statute of limitations, and beyond the relevant time period for determining jurisdictional issues.

6.      Irico objects to the definition of "Communication" (Definition No. 14) on the grounds that it is vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure.

7.      Irico objects to the definition of "Meeting" (Definition No. 16) on the grounds that the definition is overly broad, unduly burdensome, and seeks information that is neither relevant nor proportionate to the needs of the case.

8.      Irico objects to Instruction No. 1 (related to identification of persons) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the

extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any orders of the Court, and on the grounds that it is vague, ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the extent it seeks information that would disclose personal confidential information and/or violate any and all rights of privacy under the United States Constitution or Article I of the Constitution of the State of California, or any other applicable law or state constitution, or that is otherwise prohibited from disclosure because to do so would cause Irico to violate legal and/or contractual obligations to any other persons or entities.

9.    Irico objects to Instruction No. 2 (related to identification of an entity other than a natural person) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

10.   Irico objects to Instruction No. 3 (related to the production of business records in response to an interrogatory pursuant to Federal Rule of Civil Procedure 33(d)) on the grounds that it is unduly burdensome and purports to impose burdens and obligations upon Irico beyond those required by the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

## SPECIFIC RESPONSES TO INTERROGATORIES

## INTERROGATORY NO. 1

Please describe in detail the circumstances surrounding Group's creation, including:

a.    The identity of all Persons with knowledge of Group's creation; and

b.    The identity of all Documents that refer or relate to Group's creation.

## RESPONSE TO INTERROGATORY NO. 1

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks information beyond the scope of what is relevant to resolving jurisdictional issues and beyond that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel. Irico also objects that this interrogatory is overbroad, unduly burdensome, and disproportionate to

the needs of the case in resolving jurisdictional issues.  Irico also objects to this interrogatory on the grounds that identification of "all Persons" and "all Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the case.  Irico also objects that this interrogatory seeks information that is publicly available.

Subject to and without waiving the objections stated above, Irico responds as follows:

Irico Group's origins trace back to a decision by the State Council of the People's Republic of China in the 1970s to fully fund and support the production of CRTs due to the strategic importance of CRTs in the development of China's national economy. Given the significance of CRTs in the fields of communications, science, education, culture, medicine, industry, agriculture, and others, the Fourth Ministry of Machinery Industry reported to the State Council on February 17, 1977that it intended to introduce CRT technology and equipment from abroad. This resulted in the construction of the wholly state-owned and state-funded Shaanxi Color CRT "4400" Plant in 1978 in Xianyang, which was classified as an industrial enterprise owned by the whole people of China. Irico Group was established on March 16, 1989 in Xianyang, Shaanxi Province with the approval of the Chinese Ministry of Machinery and Electronics Industry, and was formed out of the wholly state-owned assets of the Shaanxi Color CRT "4400" Plant. Group was established by the Chinese government to aid in China's national economic development by responding to the need of the Chinese people for color televisions. Group's approved scope of business was defined as the production of color picture tubes, display tubes, and ancillary components; the approved scope did not include any finished products such as televisions or computer monitors. Group received funding solely from the Chinese government.

Irico further states that Zhang Shaowen and Guo Mengquan have knowledge of this subject.

Irico further refers Plaintiff to documents Bates labeled IRI-CRT-00000001 to IRI-CRT-00000904.

**INTERROGATORY NO. 2**

Please describe in detail the circumstances surrounding Display's creation, including:

a.      The identity of all Persons with knowledge of Display's creation; and

b.      The identity of all Documents that refer or relate to Display's creation.

**RESPONSE TO INTERROGATORY NO. 2**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks information beyond the scope of what is relevant to resolving jurisdictional issues and beyond that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel. Irico also objects that this interrogatory is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues.  Irico also objects to this interrogatory on the grounds that identification of "all Persons" and "all Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the case.  Irico also objects that this interrogatory seeks information that is publicly available.

Subject to and without waiving the objections stated above, Irico responds as follows:

Irico Display was established in 1992 by Irico Group and wholly state-owned entities, Shaanxi ICBC Trust and Investment Corporation and Shaanxi PCBC Trust and Investment Corporation. Display had it its domicile in Xianyang, Shaanxi Province. As a collaboration founded and held by three wholly state-owned entities and created with the approval of the Shaanxi Provincial Economic System Reform Committee, Display was set up as a wholly state-owned enterprise of the Chinese government. Display was tasked with the development, production, and sales of color picture displays, parts, and raw materials. Display's stated purpose was to make greater contributions to China's national economic development by satisfying the domestic need for CRT products.

Irico further states that Long Tao and Hou Ruijin have knowledge of this subject.

Irico further refers Plaintiff to documents Bates labeled IRI-CRT-00000001 to IRI-CRT-00000904.

| IRICO'S OBJECTIONS AND RESPONSES TO | 8 | Master File No. 3:07-cv-05944-SC |
| DPP'S FIRST SET INTERROGATORIES | | MDL No. 1917 |

1   **INTERROGATORY NO. 3**

2       Please describe the direct ownership of Group from 2006 to 2008, including:

3       a.     The identity of all Persons with knowledge of Group's ownership from 2006 to

4               2008; and

5       b.     The identity of all Documents which refer or relate to Group's ownership from

6               2006 to 2008.

7   **RESPONSE TO INTERROGATORY NO. 3**

8       Irico reasserts and incorporates each of the General Objections and Objections to the

9   Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks

10   information beyond the scope of what is relevant to resolving jurisdictional issues and beyond

11   that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel.

12   Irico also objects that this interrogatory is overbroad, unduly burdensome, and disproportionate to

13   the needs of the case in resolving jurisdictional issues.  Irico also objects to this interrogatory on

14   the grounds that identification of "all Persons" and "all Documents" is overbroad, unduly

15   burdensome, and disproportionate to the needs of the case.  Irico also objects that this

16   interrogatory seeks information that is publicly available.

17       Subject to and without waiving the objections stated above, Irico responds as follows:

18       On November 26, 2007, Group was wholly owned by the State Council of the People's

19   Republic of China.

20       Irico further states that Guo Mengquan has knowledge of this subject.

21       Irico further refers Plaintiff to documents Bates labeled IRI-CRT-00000001 to IRI-CRT-

22   00000904.

23   **INTERROGATORY NO. 4**

24       Please describe the direct ownership of Display from 2006 to 2008, including:

25       a.     The identity of all Persons with knowledge of Display's ownership from 2006 to

26               2008; and

27       b.     The identity of all Documents which refer or relate to Display's ownership from

28               2006 to 2008.

**RESPONSE TO INTERROGATORY NO. 4**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this interrogatory seeks information beyond the scope of what is relevant to resolving jurisdictional issues and beyond that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel. Irico also objects that this interrogatory is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues. Irico also objects to this interrogatory on the grounds that identification of "all Persons" and "all Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the case. Irico also objects that this interrogatory seeks information that is publicly available.

Subject to and without waiving the objections stated above, Irico responds as follows:

On November 26, 2007, Display was owned 41.36% by Irico Group Electronics Co., Ltd. ("Electronics"), which was in turn 75% owned by Group. The ten largest shareholders of Display in 2007 were as follows:

| Display Shareholder as of November 26, 2007 | Shares held |
|---|---|
| Irico Group Electronics Co., Ltd | 41.36% |
| Zhejiang Lanshen Information Technology Investment Co., Ltd. | 1.71% |
| Xi'an Yaxuan Trading Co., Ltd. | 0.97% |
| Urumqi City Commercial Bank Co., Ltd. | 0.45% |
| Xi'an Aircraft Industry (Group) Co., Ltd. | 0.45% |
| Sinochem International Petroleum Co. | 0.45% |
| Tao Xinxian | 0.41% |
| Shaanxi Tak Industrial Co., Ltd. | 0.36% |
| Shanghai Tiandi Technology Investment Development Co., Ltd. | 0.33% |
| Wang Junying | 0.33% |

Display was classified by the Chinese State-owned Assets Supervision and Administration Commission ("SASAC") as a "state-owned holding company" in 2007 under Chinese law due to the government holding a controlling interest through Group and Electronics.

1     Irico further states that Long Tao and Yan Yunlong have knowledge of this subject.

2     Irico further refers Plaintiff to documents Bates labeled IRI-CRT-00000001 to IRI-CRT-

3  00000904.

4     **INTERROGATORY NO. 5**

5     Please describe any status, obligations, and/or privileges that Group or Display had under

6  Chinese Law from 2006 to 2008 because of the alleged status of Group or Display as an agency,

7  instrumentality, and/or organ of China, including:

8     a.    The identity of all Persons with knowledge of Group's or Display's special status,

9          obligations, and/or privileges under Chinese Law from 2006 to 2008; and

10    b.    The identity of all Documents which refer or relate to Group's or Display's special

11         status, obligations, and/or privileges under Chinese Law from 2006 to 2008.

12  **RESPONSE TO INTERROGATORY NO. 5**

13     Irico reasserts and incorporates each of the General Objections and Objections to the

14  Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks

15  information beyond the scope of what is relevant to resolving jurisdictional issues and beyond

16  that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel.

17  Irico also objects that this interrogatory is overbroad, unduly burdensome, and disproportionate to

18  the needs of the case in resolving jurisdictional issues.  Irico also objects to this interrogatory on

19  the grounds that identification of "all Persons" and "all Documents" is overbroad, unduly

20  burdensome, and disproportionate to the needs of the case.  Irico also objects that this

21  interrogatory seeks information that is publicly available.  Irico also objects that the terms

22  "status," "obligations," and "privileges" are vague and ambiguous, rendering this interrogatory

23  overbroad and unduly burdensome.

24     Subject to and without waiving the objections stated above, Irico responds as follows:

25     On November 26, 2007, Irico Group was a state-owned enterprise wholly owned and

26  funded by the State Council of the People's Republic of China. As such, Group was subject to the

27  direct management, supervision, and control by SASAC and other departments of the State

28  Council.  Group undertook many public service obligations and benefited from substantial

1   government support—well beyond any obligations and benefits conferred on privately-owned

2   corporations. All major operating activities, financial policies, and appointment or dismissals of

3   senior executives were directly managed by the Chinese government.

4          SASAC's control over Group was authorized by the Interim Regulations on Supervision

5   and Management of State-owned Assets of Enterprises, adopted by the State Council in 2003 and

6   in effect on November 26, 2007. Among other things, those regulations specified that SASAC

7   shall: (1) perform responsibilities on behalf of the State as the sole investor in Group and

8   safeguard the rights and interests of the state in the assets utilized by Group; (2) guide and push

9   forward any reform or restructuring efforts by Group; (3) dispatch supervisory panels to Group;

10  (4) appoint and remove the board of directors, General Manager, Deputy General Manager, Chief

11  Accountant, and other "responsible persons" of Group; (5) evaluate the performance and set the

12  compensation of board members and management of Group, including rewarding good

13  performance and punishing poor performance; (6) supervise and perform regular audits to ensure

14  the preservation and appreciation of the value of state-owned assets held by Group; (7) review

15  and approve any restructuring plans and articles of association; (8) handle any merger or

16  bankruptcy events affecting Group and make arrangements for laid-off workers; (9) authorize

17  operation of any state-owned assets by Group and its subsidiaries; and (10) receive regular reports

18  from Group on its finances, production, and operations as well as the preservation or appreciation

19  of state-owned assets. Any directors, managers, and other "responsible persons" of Group are

20  subject to disciplinary sanctions—including removal, disqualification from any future leadership

21  positions at state-owned enterprises, and potential criminal liability—for actions causing a loss of

22  State-owned assets.

23         In addition to these regulations, Group was required to refer any investment activities and

24  major asset or property rights transfers to the State Council for approval. Group was obligated to

25  achieve performance targets for maintenance and appreciation of State-owned assets in

26  accordance with government requirements. Group received all of its capital funding from the

27  Chinese government; its budget was set annually by SASAC and the Chinese Ministry of

28  Finance, consisting of government funds appropriated to Group for various purposes, including

1    specific projects to improve Display's operations. Group's finances were monitored directly by

2    the Ministry of Finance, and Group was obligated to pay a set portion of its after-tax profits back

3    to the government. The government also delegated the provision of numerous public services to

4    Group, including a school system, police department, hospital, and senior living center, set up in

5    Xianyang, Shaanxi Province.

6        Irico Display was registered as and held the status of a "state-owned holding company" in

7    2007. That term is defined under Chinese law to include entities partially owned by the Chinese

8    government, over which the government exercises control. As a state-owned holding company,

9    Irico Display also enjoyed many benefits and was subject to responsibilities that did not apply to

10   non-state-owned corporations. Display was subject to direct supervision by SASAC as authorized

11   by the Interim Regulations described above. Under those regulations, SASAC was authorized to:

12   (1) appoint representatives to Display shareholder meetings to exercise authority as the

13   controlling shareholder under SASAC's instructions; (2) nominate the Chairman and other

14   directors to Display's board of directors to act according to SASAC's instructions; (3) nominate

15   the Chairman and other members of Display's supervisory panel; (4) nominate top management

16   of Display, including the General Manager, Deputy General Manager, and Chief Accountant; (5)

17   direct Display (and other companies under Irico Group) in reform, restructuring, and other efforts

18   to adjust corporate governance in accordance with State Council policy; (6) supervise the

19   financial situation of Display in order to safeguard the state's interest in its state-owned assets; (7)

20   establish guidelines for executive and employee compensation; and (8) evaluate the performance

21   of top Display directors and management it has appointed. As with Group, any directors,

22   managers, and other "responsible persons" for Display are subject to disciplinary sanctions,

23   including potential criminal liability, for actions causing a loss of state-owned assets.  Under

24   these regulations, Display was commanded to "accept the supervision and administration

25   conducted by" SASAC. Display also benefited from special guidance and coordination from

26   SASAC in overcoming business difficulties and solving problems in the process of their reform

27   and development.

28

IRICO'S OBJECTIONS AND RESPONSES TO          13          Master File No. 3:07-cv-05944-SC
DPP'S FIRST SET INTERROGATORIES                              MDL No. 1917

1    In addition to the obligations and privileges set forth in these regulations, Display was

2    subject to other requirements and received other forms of government support. Major production

3    changes by Display, such as new assembly lines and equipment, required direct approval by the

4    Economics and Trade Committee of Shaanxi Province. Display needed approval from SASAC

5    and the Shaanxi Province state-owned asset supervision authorities for its initial public offering.

6    Display also received significant financial support from SASAC and the Ministry of Finance,

7    including all of its initial funding at the time of formation, and periodic investments allocated by

8    SASAC through Group for use by Display, in particular for capital projects, including for its thin-

9    film-transistor liquid-crystal display project in 2007.  Display was at all times subject to the

10    absolute control of Group, and thus control by the Chinese government, in all its business

11    activities, financial policies, and appointment of management.  Group was listed as the "actual

12    controller" of Display pursuant to Article 217(3) of the 2006 Chinese Company Law, which

13    defines the term as "a person who is able practically to govern the behavior of a company through

14    investment relations, agreements or other arrangements, although the person is not a shareholder

15    of the company."  Display was required to submit regular financial, operational, and investment

16    reports to Group for approval.  Display also benefitted from the public services delegated to

17    Group by the Chinese government, including a school system, police department, hospital, and

18    senior living center, set up around Display's operations in Xianyang, Shaanxi Province.

19    Irico further states that Long Tao and Guo Mengquan have knowledge of this subject.

20    Irico further refers Plaintiff to documents Bates labeled IRI-CRT-00000001 to IRI-CRT-

21    00000904.

22    **<u>INTERROGATORY NO. 6</u>**

23    Please describe any Chinese government supervision of Group from 2006 to 2008,

24    including:

25    a.    The identity (including government job title) of any Chinese officials involved in

26    such supervision;

27    b.    The identity of all Documents referring or relating to such supervision; and

28    c.    The identity of other Persons with knowledge of such supervision.

1  **RESPONSE TO INTERROGATORY NO. 6**

2      Irico reasserts and incorporates each of the General Objections and Objections to the

3  Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks

4  information beyond the scope of what is relevant to resolving jurisdictional issues and beyond

5  that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel.

6  Irico also objects that this interrogatory is overbroad, unduly burdensome, and disproportionate to

7  the needs of the case in resolving jurisdictional issues.  Irico also objects to this interrogatory on

8  the grounds that identification of "any Chinese officials," "all Persons," and "all Documents" is

9  overbroad, unduly burdensome, and disproportionate to the needs of the case.  Irico also objects

10  that this interrogatory seeks information that is publicly available.  Irico also objects that the term

11  "supervision" is vague and ambiguous, rendering this interrogatory overbroad and unduly

12  burdensome.

13      Subject to and without waiving the objections stated above, Irico responds as follows:

14      See Irico's response above to Interrogatory No. 5. As a wholly state-owned enterprise as

15  of November 26, 2007, Group was subject to supervision by SASAC and other departments of the

16  State Council of the People's Republic of China in various aspects of its business, including

17  finance, operations, and personnel management including its board of directors and senior

18  management.

19      Irico further states that Long Tao and Guo Mengquan have knowledge of this subject.

20      Irico further refers Plaintiff to documents Bates labeled IRI-CRT-00000001 to IRI-CRT-

21  00000904.

22      **INTERROGATORY NO. 7**

23      Please describe any Chinese government supervision of Display from 2006 to 2008,

24  including:

25      a.      The identity (including government job title) of any Chinese officials involved in

26              such supervision;

27      b.      The identity of all Documents referring or relating to such supervision; and

28      c.      The identity of other Persons with knowledge of such supervision.

**RESPONSE TO INTERROGATORY NO. 7**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this interrogatory seeks information beyond the scope of what is relevant to resolving jurisdictional issues and beyond that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel. Irico also objects that this interrogatory is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues. Irico also objects to this interrogatory on the grounds that identification of "any Chinese officials," "all Persons," and "all Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the case. Irico also objects that this interrogatory seeks information that is publicly available. Irico also objects that the term "supervision" is vague and ambiguous, rendering this interrogatory overbroad and unduly burdensome.

Subject to and without waiving the objections stated above, Irico responds as follows:

See Irico's response to Interrogatory Nos. 5 and 6. As a state-owned holding company as defined under Chinese law as of November 26, 2007, Display was subject both to supervision by SASAC and management and supervision by the government through Group, which held absolute control over Display's operations, finances, and personnel.

Irico further states that Long Tao and Guo Mengquan have knowledge of this subject.

Irico further refers Plaintiff to documents Bates labeled IRI-CRT-00000001 to IRI-CRT-00000904.

**INTERROGATORY NO. 8**

Describe the role, if any, that Irico Group Electronics Co., Ltd. played in the management and/or supervision of Display from 2006 to 2008, including:

a.    The identity of all Persons with knowledge of such management and/or supervision; and

b.    The identity of all Documents which refer or relate to such management and/or supervision.

**RESPONSE TO INTERROGATORY NO. 8**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks information beyond the scope of what is relevant to resolving jurisdictional issues and beyond that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel. Irico also objects that this interrogatory is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues.  Irico also objects to this interrogatory on the grounds that identification of "all Persons" and "all Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the case.  Irico also objects that this interrogatory seeks information that is publicly available.  Irico also objects that the terms "management" and "supervision" are vague and ambiguous, rendering this interrogatory overbroad and unduly burdensome.

Subject to and without waiving the objections stated above, Irico responds as follows:

Irico Group Electronics Co., Ltd. was established on September 10, 2004, under the approval of SASAC. As of November 26, 2007, Group held 75% of the shares of Electronics and maintained absolute control over Electronics. The directors, supervisors, and senior executives of Electronics were all determined by the Chinese government through Group. Group, under Chinese government control and as the "actual controller" of Display as defined under the 2006 Chinese Company Law, also determined the directors, supervisors, and senior executives of Display, directing Electronics to perform appointment and dismissal procedures on its behalf.

Irico further states that Zhu Xiaohang and Guo Mengquan have knowledge of this subject.

Irico further refers Plaintiff to documents Bates labeled IRI-CRT-00000001 to IRI-CRT-00000904.

**INTERROGATORY NO. 9**

Please describe with particularity all investigation or collection of information that Wenkai Zhang performed in connection with the preparation of his declaration, including:

a.       The identity of all Employees, officers or agents of Irico with whom he

communicated (whether oral or written) in connection with his declaration; and

1        b.      The identity of all Documents he reviewed in connection with his declaration.

2    **RESPONSE TO INTERROGATORY NO. 9**

3        Irico reasserts and incorporates each of the General Objections and Objections to the

4    Definitions and Instructions set forth above.  Irico further objects that this request seeks

5    information and documents beyond the scope of what is relevant to resolving jurisdictional issues

6    and beyond that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to

7    Compel.  Mr. Zhang's declaration is no longer at issue, because his declaration was submitted in

8    support of Irico's Motion to Set Aside Default, which the Court has already decided.  Irico also

9    objects that this request is overbroad, unduly burdensome, and disproportionate to the needs of

10   the case in resolving jurisdictional issues.  Irico also objects that this request calls for information

11   and documents that are privileged under the attorney-client privilege and work product doctrine.

12   Irico also objects to this interrogatory on the grounds that identification of "all Persons" and "all

13   Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the case.

14   **INTERROGATORY NO. 10**

15       Explain with particularity the basis for Your contention that Group was managed directly

16   by the Chinese government (or a political subdivision thereof) through the filing of the original

17   complaint herein, including:

18       a.      The identity of all Persons with knowledge of such management; and

19       b.      The identity of all Documents which refer or relate to such management.

20   **RESPONSE TO INTERROGATORY NO. 10**

21       Irico reasserts and incorporates each of the General Objections and Objections to the

22   Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks

23   information beyond the scope of what is relevant to resolving jurisdictional issues and beyond

24   that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel.

25   Irico also objects to this interrogatory on the grounds that identification of "all Persons" and "all

26   Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the case.

27   Irico also objects that this interrogatory seeks information that is publicly available.  Irico also

28   objects that the term "managed" is vague and ambiguous, rendering this interrogatory overbroad

1   and unduly burdensome.

2          Subject to and without waiving the objections stated above, Irico responds as follows:

3          See Irico's responses to Interrogatory Nos. 5 and 6.

4   **INTERROGATORY NO. 11**

5          Please describe with particularity the basis for the contention, as stated in paragraph 7 of

6   the Zhang Declaration, that "Irico Group's management, including its Legal Representative and

7   General Manager, was appointed directly . . . by the SASAC after 2003," including:

8          a.      The identity of all Persons with knowledge of the appointment of Group's

9                  management; and

10         b.      The identity of all Documents which refer or relate to the appointment of Group's

11                 management.

12  **RESPONSE TO INTERROGATORY NO. 11**

13         Irico reasserts and incorporates each of the General Objections and Objections to the

14  Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks

15  information beyond the scope of what is relevant to resolving jurisdictional issues and beyond

16  that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel.

17  Irico also objects to this interrogatory on the grounds that identification of "all Persons" and "all

18  Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the case.

19         Subject to and without waiving the objections stated above, Irico responds as follows:

20         See Irico's responses to Interrogatory Nos. 5 and 6.

21  **INTERROGATORY NO. 12**

22         Please describe with particularity the basis for the contention, as stated in paragraph 8 of

23  the Zhang Declaration, that "[a]t the time the DPP's original complaint was filed on

24  November 26, 2007, Irico Display was a State-owned holding company," including:

25         a.      The identity of all Persons with knowledge of the basis for the contention; and

26         b.      The identity of all Documents sufficient to support that contention.

27  **RESPONSE TO INTERROGATORY NO. 12**

28         Irico reasserts and incorporates each of the General Objections and Objections to the

IRICO'S OBJECTIONS AND RESPONSES TO          19          Master File No. 3:07-cv-05944-SC
DPP'S FIRST SET INTERROGATORIES                          MDL No. 1917

1  Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks

2  information beyond the scope of what is relevant to resolving jurisdictional issues and beyond

3  that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel.

4  Irico also objects to this interrogatory on the grounds that identification of "all Persons" and "all

5  Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the case.

6          Subject to and without waiving the objections stated above, Irico responds as follows:

7          See Irico's responses to Interrogatory Nos. 4 through 7.

8  **INTERROGATORY NO. 13**

9          Please describe with particularity the basis for the contention, as stated in paragraph 8 of

10  the Zhang Declaration, that "Irico Display's management was appointed by the State

11  Council-appointed management of Irico Group and reviewed by Irico Display's shareholders,"

12  including:

13          a.      The identity of all Persons with knowledge of the appointment of Display's

14                  management; and

15          b.      The identity of all Documents which refer or relate to the appointment of Display's

16                  management.

17  **RESPONSE TO INTERROGATORY NO. 13**

18          Irico reasserts and incorporates each of the General Objections and Objections to the

19  Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks

20  information beyond the scope of what is relevant to resolving jurisdictional issues and beyond

21  that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel.

22  Irico also objects to this interrogatory on the grounds that identification of "all Persons" and "all

23  Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the case.

24          Subject to and without waiving the objections stated above, Irico responds as follows:

25          See Irico's responses to Interrogatory Nos. 4 through 8.

26  **INTERROGATORY NO. 14**

27          Please describe with particularity the basis for the contention, as stated in paragraph 8 of

28  the Zhang Declaration, that "Irico Display's management was subject to the same regulations that

IRICO'S OBJECTIONS AND RESPONSES TO          20          Master File No. 3:07-cv-05944-SC
DPP'S FIRST SET INTERROGATORIES                                  MDL No. 1917

1    apply to state officials," including:

2          a.      The identity of all Persons with knowledge of the basis for the contention; and

3          b.      The identity of all Documents supporting the contention.

4    **RESPONSE TO INTERROGATORY NO. 14**

5          Irico reasserts and incorporates each of the General Objections and Objections to the

6    Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks

7    information beyond the scope of what is relevant to resolving jurisdictional issues and beyond

8    that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel.

9    Irico also objects to this interrogatory on the grounds that identification of "all Persons" and "all

10   Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the case.

11         Subject to and without waiving the objections stated above, Irico responds as follows:

12         See Irico's response to Interrogatory No. 5. The management of Irico Display and its

13   subsidiaries, as senior management of state-controlled companies, are regarded as performing

14   official state duties under Chinese law. As such, Display's management is subject to the Chinese

15   government's mandates for the integrity of state officials, relevant government anti-corruption

16   provisions, and supervision by the state Commission for Discipline Inspection. As described in

17   Irico's response to Interrogatory No. 5, SASAC regulations specify that Display's directors,

18   management, and other "responsible persons" are subject to disciplinary sanction and are liable to

19   compensate the State for any loss of State-owned assets caused by abuse of power or neglect of

20   duty.  In addition, Article 93 of the Chinese Criminal Law stipulates that "people engaged in

21   official duties in state-owned companies, enterprises, institutions, and people's organizations, and

22   those who shall be assigned to non-state-owned companies, enterprises, institutions, and social

23   organizations from state-owned companies, enterprises, institutions, and other persons who are

24   engaged in official duties in accordance with the law, shall be treated as state functionaries."  A

25   Notice issued by the Supreme People's Court and Supreme People's Procuratorate of China (the

26   highest Chinese court and prosecuting authority, respectively) clarified that the top management

27   in state-owned holding companies such as Display are considered state functionaries under this

28   law.  For example, between 2013 and 2015, three managers of a subsidiary of Display were tried

1    as public officials and convicted for accepting bribes during the course of their duties.

2          Irico further states that Yan Yunlong has knowledge of this subject.

3          Irico further refers Plaintiff to documents Bates labeled IRI-CRT-00000001 to IRI-CRT-

4    00000904.

5    **INTERROGATORY NO. 15**

6          Please describe with particularity the basis for the contention, as stated in paragraph 9 of

7    the Zhang Declaration, that "Irico Display was managed directly by the State Council-appointed

8    management of Irico Group and indirectly by the Ministry of Industry and Information

9    Technology of the State Council," including:

10          a.      The identity of all Persons with knowledge of the basis for the contention; and

11          b.      The identity of all Documents supporting the contention.

12   **RESPONSE TO INTERROGATORY NO. 15**

13          Irico reasserts and incorporates each of the General Objections and Objections to the

14   Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks

15   information beyond the scope of what is relevant to resolving jurisdictional issues and beyond

16   that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel.

17   Irico also objects to this interrogatory on the grounds that identification of "all Persons" and "all

18   Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the case.

19          Subject to and without waiving the objections stated above, Irico responds as follows:

20          See Irico's responses to Interrogatory Nos. 5 through 8.

21   **INTERROGATORY NO. 16**

22          Please describe with particularity the basis for the contention, as stated in paragraph 9 of

23   the Zhang Declaration, that "Irico Group directly appointed the management of Irico Display,"

24   including:

25          a.      The identity of all Persons with knowledge of the basis for the contention; and

26          b.      The identity of all Documents supporting the contention.

27

28

IRICO'S OBJECTIONS AND RESPONSES TO          22          Master File No. 3:07-cv-05944-SC
DPP'S FIRST SET INTERROGATORIES                                      MDL No. 1917

1   **RESPONSE TO INTERROGATORY NO. 16**

2         Irico reasserts and incorporates each of the General Objections and Objections to the

3   Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks

4   information beyond the scope of what is relevant to resolving jurisdictional issues and beyond

5   that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel.

6   Irico also objects to this interrogatory on the grounds that identification of "all Persons" and "all

7   Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the case.

8         Subject to and without waiving the objections stated above, Irico responds as follows:

9         See Irico's responses to Interrogatory Nos. 5 through 8.

10  **INTERROGATORY NO. 17**

11        Please describe with particularity the basis for the contention, as stated in paragraph 10 of

12  the Zhang Declaration, that "[a]ny major business decisions or transactions entered into or

13  contemplated by Irico Display required review and approval by Irico Group and/or the Ministry

14  of Industry and Information Technology of the State Council, or another appropriate department

15  of the State Council," including:

16        a.      The identity of all Persons with knowledge of the basis for the contention; and

17        b.      The identity of all Documents which support the contention.

18  **RESPONSE TO INTERROGATORY NO. 17**

19        Irico reasserts and incorporates each of the General Objections and Objections to the

20  Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks

21  information beyond the scope of what is relevant to resolving jurisdictional issues and beyond

22  that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel.

23  Irico also objects to this interrogatory on the grounds that identification of "all Persons" and "all

24  Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the case.

25        Subject to and without waiving the objections stated above, Irico responds as follows:

26        See Irico's responses to Interrogatory Nos. 5, 6, and 7.

27

28

1    **INTERROGATORY NO. 18**

2        Please describe with particularity the basis for the contention, as stated in paragraph 10 of

3    the Zhang Declaration, that "Irico Display was required to submit financial statements and reports

4    about operating activities and investments to Irico Group for review," including:

5            a.        The identity of all Persons with knowledge of the basis for the contention; and

6            b.        The identity of all Documents which support the contention.

7    **RESPONSE TO INTERROGATORY NO. 18**

8        Irico reasserts and incorporates each of the General Objections and Objections to the

9    Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks

10   information beyond the scope of what is relevant to resolving jurisdictional issues and beyond

11   that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel.

12   Irico also objects to this interrogatory on the grounds that identification of "all Persons" and "all

13   Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the case.

14       Subject to and without waiving the objections stated above, Irico responds as follows:

15       See Irico's responses to Interrogatory Nos. 5, 6 and 7.

16   **INTERROGATORY NO. 19**

17       Please describe with particularity the basis for the contention, as stated in paragraph 10 of

18   the Zhang Declaration, that "[f]or some matters beyond Irico Group's authority—including

19   (l) material investments by Irico Display, (2) mergers and acquisitions by Irico Display, (3) sale

20   of shares resulting in a change in control over the company, (4) declaration of bankruptcy or

21   cessation of operations by Irico Display, (5) financing, including issuance of stocks and bonds,

22   and (6) proposed budgets—Irico Group had to obtain approval from the relevant agency of the

23   State Council in order for Irico Display to take such action" and "[t]hus, Irico Display's business

24   and operations were controlled and supervised by Irico Group, as well as the relevant departments

25   of the State Council," including:

26           a.        The identity of all Persons with knowledge of the basis for the contention;

27           b.        The identity of all Documents which support the contention; and

28

---

IRICO'S OBJECTIONS AND RESPONSES TO         24         Master File No. 3:07-cv-05944-SC
DPP'S FIRST SET INTERROGATORIES                              MDL No. 1917

1   c.  All instances in which approval was sought from, granted or denied in whole or in

2      part by the "relevant agency of the State Council."

3 **RESPONSE TO INTERROGATORY NO. 19**

4   Irico reasserts and incorporates each of the General Objections and Objections to the

5 Definitions and Instructions set forth above.  Irico further objects that this interrogatory seeks

6 information beyond the scope of what is relevant to resolving jurisdictional issues and beyond

7 that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel.

8 Irico also objects to this interrogatory on the grounds that identification of "all Persons," "all

9 Documents," and "all instances" is overbroad, unduly burdensome, and disproportionate to the

10 needs of the case.

11   Subject to and without waiving the objections stated above, Irico responds as follows:

12   See Irico's responses to Interrogatory Nos. 5, 6 and 7.

13 **INTERROGATORY NO. 20**

14   Please describe with particularity Irico's sales and marketing of CRT Products in the

15 United States during the Class Period, and/or attempts to sell or market any CRT Products in the

16 United States during the Class Period, including:

17   a.  The identity of all Persons with knowledge of such sales and marketing and/or

18      attempts to sell or market CRT Products in the United States; and

19   b.  The identity of all Documents referring or relating to such sales and marketing

20      and/or attempts to sell or market CRT Products in the United States.

21 **RESPONSE TO INTERROGATORY NO. 20**

22   Irico reasserts and incorporates each of the General Objections and Objections to the

23 Definitions and Instructions set forth above.  Irico further objects that this request seeks

24 information and documents beyond the scope of what is relevant to resolving jurisdictional issues

25 and beyond that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to

26 Compel.  Irico also objects that this request is overbroad, unduly burdensome, and

27 disproportionate to the needs of the case in resolving jurisdictional issues.  Irico also objects to

28 this interrogatory on the grounds that identification of "all Persons" and "all Documents" is

1  overbroad, unduly burdensome, and disproportionate to the needs of the case.

2      Subject to and without waiving these objections and pursuant to Federal Rule of Civil

3  Procedure 33(d), Irico will produce or make available for inspection business records from which

4  the answer to this Interrogatory may be determined.

5      Irico further states that Guo Menquan and Long Tao have knowledge of this subject.

6  **INTERROGATORY NO. 21**

7      Please describe with particularity the basis for the contention, as stated in the Reply Brief

8  of Irico in Support of Motion to Set Aside Default (ECF No. 5229), that "the pricing activity that

9  DPPs allege to result from illegal conduct was mandated by the Chinese government," including:

10      a.      The identity of all Persons with knowledge of the basis for the contention; and

11      b.      The identity of all Documents which support the contention.

12  **RESPONSE TO INTERROGATORY NO. 21**

13      Irico reasserts and incorporates each of the General Objections and Objections to the

14  Definitions and Instructions set forth above.  Irico further objects that this request seeks

15  information and documents beyond the scope of what is relevant to resolving jurisdictional issues

16  and beyond that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to

17  Compel.  Irico also objects to this interrogatory on the grounds that identification of "all Persons"

18  and "all Documents" is overbroad, unduly burdensome, and disproportionate to the needs of the

19  case.

20  Dated: May 4, 2018

21

22                              */s/ Stuart C. Plunkett*
                                Stuart C. Plunkett (State Bar No. 187971)
23                              stuart.plunkett@bakerbotts.com
                                BAKER BOTTS LLP
24                              101 California Street, Suite 3600
                                San Francisco, California 94111
25                              Telephone: (415) 291-6200
                                Facsimile: (415) 291-6300
26
                                John Taladay (*pro hac vice*)
27                              john.taladay@bakerbotts.com
                                Erik Koons (*pro hac vice*)
28                              erik.koons@bakerbotts.com

---

IRICO'S OBJECTIONS AND RESPONSES TO        26        Master File No. 3:07-cv-05944-SC
DPP'S FIRST SET INTERROGATORIES                              MDL No. 1917

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER BOTTS LLP
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone: (202)-639-7700
Facsimile: (202)-639-7890

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

1     <u>**CERTIFICATE OF SERVICE**</u>

2     **In re: Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917**

3
         I declare that I am employed in the County of San Francisco, California.  I am over the
4 age of eighteen years and not a party to the within case; my business address is: Baker Botts LLP, 101 California Street, Suite 3600, San Francisco, CA 94111.

5         On May 4, 2018, I served the following document(s) described as:

6     **IRICO DEFENDANTS' OBJECTIONS AND RESPONSES TO DIRECT PURCHASER
PLAINTIFF STUDIO SPECTRUM, INC.'S FIRST SET OF INTERROGATORIES**

7
on the following interested parties in this action:
8

9
Guido Saveri (guido@saveri.com)           Mario N. Alioto (malioto@tatp.com)
R. Alexander Saveri (rick@saveri.com)      Lauren C. Capurro (laurenrussell@tatp.com)
Geoffrey C. Rushing (grushing@saveri.com)   Joseph M. Patane (jpatane@tatp.com)
10 Cadio Zirpoli (cadio@saveri.com)          TRUMP, ALIOTO, TRUMP & PRESCOTT,
Matthew D. Heaphy (mheaphy@saveri.com)   LLP
11 SAVERI & SAVERI, INC.                 2280 Union Street
706 Sansome St # 200,                   San Francisco, CA 94123
12 San Francisco, CA 94111

13 *Lead Counsel for the Direct Purchaser*      *Lead Counsel for the Indirect Purchaser*
*Plaintiffs*                                      *Plaintiffs*
14

15 [ ]     (BY OVERNIGHT DELIVERY) I enclosed the documents in an envelope or package
provided by an overnight delivery carrier and addressed to the persons at the addresses
16        listed above. I placed the envelope or package for collection and overnight delivery at an
office or regularly utilized drop box of the overnight delivery carrier.
17

18 [ ]     (BY MAIL) by placing a true copy thereof in a sealed envelope with postage fully prepaid
and addressed to the persons at the addresses as shown above.  I am readily familiar with
the business practice of Baker Botts LLP for collection and processing of correspondence
19        for mailing with the United States Postal Service, and the correspondence would be
deposited with United States Postal Service that same day in the ordinary course of
20        business.

21 [X]     (BY ELECTRONIC MAIL) I caused such documents to be sent to the persons at the
email addressed listed above.  I did not receive, within a reasonable time after the
22        transmission, any electronic message or other indication that the transmission was
unsuccessful.
23

         I declare under penalty of perjury under the laws of the State of California that the
24 foregoing is true and correct.  Executed on May 4, 2018, 2012 at San Francisco, California.

25

                                        */s/ Stephanie DM Pearson*
26                                         Stephanie DM Pearson

27

28

## VERIFICATION

I, Yunlong Yan, am General Counsel of Irico Group Corporation.  I verify under penalty of perjury and based on reasonable inquiry, that the answers set forth in **IRICO DEFENDANTS' OBJECTIONS AND RESPONSES TO DIRECT PURCHASER PLAINTIFF STUDIO SPECTRUM, INC.'S FIRST SET OF INTERROGATORIES** are true and correct to the best of my knowledge, information and belief.

Executed on May 18, 2018

Yunlong Yan
General Counsel
Irico Group Corporation



# EXHIBIT 5



STATE of NEW YORK        )
                         )          ss:
COUNTY of NEW YORK       )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"IRI-CRT-00001026 – IRI-CRT-00001067"*, originally written in *Chinese,* is to the best of our knowledge and belief, a true, accurate and complete translation into *English.*

Dated: September 21, 2018

Seth Wargo
Consortra Translations

Sworn to and signed before ME this
21st day of September,
2018.

Notary Public

JAMES G. MAMERA
Notary Public - State of New York
No. 01MA6157195
Qualified in New York County
My Comm. Expires Dec. 4, 2018

Your
legal
translation
partner

D☐P☐ Exhibit 8416
Deponent Wang
Date 3|7|19 Rptr BW

# IRICO Display Devices Co., Ltd.
## Articles of Association

Adopted by the Inaugural General Assembly on 28 December 1992

Amended by the 6th General Meeting of Shareholders on June 26, 1998

Amended by the 2nd Extraordinary General Meeting of Shareholders of 1999, September 20, 1999

Amended by the 1st Extraordinary General Meeting of Shareholders of 2001, June 29, 2001

Amended by the 2nd Extraordinary General Meeting of Shareholders of 2001, 07 September 2001

Amended by the 10th General Meeting of Shareholders on June 27, 2002

Amended by the 1st Extraordinary General Meeting of Shareholders of 2018, October 18, 2002

Amended by the 1st Extraordinary General Meeting of Shareholders of 2004, September 29, 2004

Amended by the 1st Extraordinary General Meeting of Shareholders of 2005, February 25, 2005

Amended by the 13th General Meeting of Shareholders on May 27, 2005

Amended by the 14th General Meeting of Shareholders on June 27, 2006

# Table of Contents

**Chapter I General Provisions**

**Chapter II Business Goals and Scope**

**Chapter III Shares**

Section I Issuance of Shares

Section II Increase, Decrease and Repurchase of shares

Section III Transfer of Shares

**Chapter IV Shareholders**

Section I General Provisions

Section II Rights and Obligations of Shareholders

Section III Controlling Shareholders and Actual Controllers

Section IV Related Party Transactions

**Chapter V General Meeting of Shareholders**

Section I General Provisions

Section II Annual General Meeting of Shareholders

Section III Extraordinary General Meeting of Shareholders

Section IV. Convening of General Meeting of Shareholders

Section V Proposal of General Meeting of Shareholders

Section VI Convening of General Meeting of Shareholders

Section VII. Voting Procedure of General Meeting of Shareholders

Section VIII Resolution of General Meeting of Shareholders

Section IX Election Procedures of Directors and Supervisors

Section X Minutes of General Meeting of Shareholders

Section XI Authorisation of the Board of Directors by the General Meeting of Shareholders

**Chapter VI. Directors and Boards of Directors**

Section 1 Directors

Section II Independent Directors

Section III. Board of Directors

Section IV. Authorization of Chairman by the Board of Directors

Section V Secretary of the Board of Directors

Section VI Special Committee of the Board of Directors

**Chapter VII Supervisors and Board of Supervisors**

Section 1 Supervisor

Section II Board of Supervisors

**Chapter VIII Managers**

**Chapter IX Performance Evaluation and Incentive and Restraint Mechanism**

Section I Performance Evaluation of Directors, Supervisors and Managers

Section II Incentive and Restraint Mechanism of Managers

**Chapter X Financial Accounting system, Profit Distribution and Audit**

Section I Financial Accounting System

Section II Internal Audit

Section III Appointment of Accounting Firms

**Chapter XI Continuous Information Disclosure**

**Chapter XII Stakeholders**

**Chapter XIII Merger, Spinning Off, Dissolution and Liquidation**

Section 1. Merger or Spinning Off

Section II Dissolution and Liquidation

**Chapter XIV Amendment to the Articles of Association**

**Chapter XV Supplementary Provisions**

IRI-CRT-00001027 - Translation

## Chapter I General Provisions

**Article 1** In order to safeguard the legitimate rights and interests of IRICO Display Devices Co., Ltd (hereinafter referred to as "the Company"), its shareholders and creditors, standardize the organization and conduct of the Company, these Articles of Association are formulated in accordance with the Company Law of the People's Republic of China (hereinafter referred to as the Company Law), the Securities Law of the People's Republic of China and other relevant provisions.

**Article 2** the Company (hereinafter referred to as the "Company") is a company limited by shares established in accordance with the normative opinions of the Company Limited and other relevant provisions.

the Company was approved by Shaanxi Provincial Economic System Reform Commission (1992) Document No.34, and set up by means of directed placement; it has registered in Shaanxi Provincial Administration for Industry and Commerce, and obtained business license.

Upon the approval of the Shaanxi Provincial Economic System Reform Commission Shaan Gai Fa (1996) No.109 document, the Company has been standardized in accordance with the "Company Law", and has completed the re-registration formalities according to the law.

**Article 3** On August 11, 1992, the Company issued 300 million common shares denominated in RMB by way of directed placement, upon approval by Shaanxi Branch of People's Bank of China, Shaan Yin Fu (1992) No.54 Document. All the shares were domestic shares subscribed in RMB by domestic investors and were listed on the Shanghai Stock Exchange on May 20, 1996.

**Article 4** The registered name of a company:     Chinese: 彩虹显示器件股份有限公司.

English: **IRICO DISPLAY DEVICES CO., LTD**

**Article 5** Domicile of the Company: Xi'an Hi-tech Industrial Development Zone, Shaanxi Province

Zip Code: 710075

**Article 6** Registered capital of the Company: RMB 421.1488 Million

**Article 7** the Company shall be a limited liability company with permanent existence.

**Article 8** The chairman of the Board of Directors shall be the legal representative of the Company.

**Article 9** The total assets of the Company shall be divided into equal shares, and the shareholders shall be held liable to the Company to the extent of the shares held by them, and the Company shall be liable to its debts with all its assets.

**Article 10** The Articles of Association of the Company shall become legally binding documents regulating the organization and conduct of the Company, the rights and obligations between the Company and the shareholders, and between shareholders and shareholders from the effective date as from the date of the entry into force of the Articles of Association and shall be legally binding on the Company, shareholders, directors, supervisors and senior management personnel. According to the Articles of Association, shareholders may sue shareholders; shareholders may sue directors, supervisors, managers and other senior managers of the Company; shareholders may sue the Company; the Company may sue shareholders, directors, supervisors, managers and other senior managers.

**Article 11** The term "other senior managers" as mentioned in these Articles of Association refers to the secretary of the Board of Directors and the person in charge of the finance of the Company.

## Chapter II Business Goals and Scope

**Article 12** The goals of the Company: to focus on customer demand, provide high-quality products and services with excellent technology and management.

**Article 13** Upon examination and approval by the Company registration authority, the business scope of the Company is as follows: production, development and operation of colour display devices, electronic products and components and raw materials; self-support and acting for the import and export business of all kinds of commodities and technologies; lease in kind, undertaking of "processing and compensation trade" and so on.

## Chapter III Shares

### Section 1 Issuance of Shares

**Article 14** The shares of the Company shall be in the form of stocks.

1

IRI-CRT-00001028 - Translation

**Article 15** The principles of openness, fairness and impartiality shall be applied in the issuance of shares of the Company, and each share of the same class shall have the same rights.

Shares of the same class issued at the same time shall be issued under the same conditions and at the same price per share; shares subscribed for by any organization or individual shall pay the same amount of price for each share.

**Article 16** The nominal value of shares issued by the Company shall be denominated in RMB.

**Article 17** The shares issued by the Company shall be collectively deposited in the Shanghai Branch of the China Securities Registration and Clearing Co., Ltd.

**Article 18** The approved total number of common shares issued by the Company is 300 million. At the time of its establishment, it has issued 66 million shares to the sponsor IRICO Group,54 million shares to the Shaanxi Trust and Investment Corporation of the Industrial and Commercial Bank of China, and 30 million shares to China Construction Bank Shaanxi Trust and Investment Company, totalling 150 million shares and accounting for 50% of the total number of common shares issued by the Company.

The above funds were fully paid in on 31 August 1992.

**Article 19** The share capital structure of the Company shall be as follows: 421.1488 million shares of common share, of which 240.16 million shares are held by sponsors and 180.9888 million shares are held by other domestic equity shareholders.

**Article 20** The Company or any of its subsidiary (including any of its affiliates) shall not provide any financial assistance to any person who purchases or intends to purchase shares of the Company in the form of gifts, advances, guarantees, compensation or loans.

### Section II Increase, Decrease and Repurchase of Shares

**Article 21** In accordance with the needs of operation and development and in accordance with the provisions of laws and regulations, the Company may increase its capital by the following means, upon respective resolution of the General Meeting of Shareholders.

(1) shares issued publicly;

(2) shares issued not publicly;

(3) distributing dividend shares to existing shareholders;

(4) converting provident fund into share capital;

(5) other means approved by the provisions of laws and administrative regulations and the securities authority under the State Council.

**Article 22** the Company may reduce its registered capital. The reduction of the registered capital of the Company shall be handled in accordance with the procedures set forth in the Company Law and other relevant provisions and procedures stipulated in the Articles of Association.

**Article 23** Under the following circumstances, the Company may repurchase its shares after adopting the procedures stipulated in the Articles of Association and submitting them to the state competent authorities for approval:

(1) reducing the registered capital of the Company;

(2) merging with other companies that hold shares of the Company;

(3) rewarding the shares to the employees of the Company;

(4) where a shareholder requests the Company to acquire its shares because of his objection to the resolution on merger or division made by the General Meeting of Shareholders

Except in the above circumstances, the Company shall not engage in the trading of its shares.

**Article 24** A company may repurchase shares in any of the following ways:

(1) centralized bidding on the stock exchange;

(2) offer;

(3) other means approved by the CSRC.

**Article 25** Where the Company acquires shares in the Company for the reasons mentioned in Section 1 to 3 of Article 23, a resolution shall be made by the General Meeting of Shareholders. In case the Company acquires its shares in accordance with Article 23, it shall cancel within 10 days from the date of the acquisition; in the case of Section 2 and 4, it shall transfer or cancel within six months.

2

The shares acquired by the Company in accordance with Section 3 of Article 23 shall not exceed 5% of the total shares issued by the Company; the funds used for the acquisition shall be paid out of the Company's after-tax profits; the shares acquired shall be transferred to the employees within 1 year.

### Section III Transfer of Shares

**Article 26** The shares of the Company may be transferred according to law.

**Article 27** The Company shall not accept targets which have shares of the Company as pledge.

**Article 28** The directors, supervisors, managers and other senior managers shall, during their term of office, regularly report to the Company their holdings of company shares (including the newly added shares due to the distribution of dividends, the conversion of provident fund, the exercise of convertible corporate bonds, newly added shares by means of purchase and inheritance) and the changes thereof; The shares transferred each year during their term of office shall not exceed 25% of the total number of shares held by them; The Company shares held by them shall not be transferred within one year from the date of the listing of the shares of the Company. The said personnel shall not transfer their shares in the Company within six months after resignation.

**Article 29** Where the directors, supervisors, senior management personnel of the Company and shareholders who hold more than 5% of the Company sell the shares held by them within 6 months from the date of purchase or purchase them again within 6 months from the date of the sale, the proceeds thus obtained shall belong to the Company. The Board of Directors of the Company will recoup his/her earnings. However, securities companies which hold more than 5% of the shares by underwriting and purchasing the remaining shares after sale, the sale of the shares shall not be subject to the time limit of six months.

If the Board of Directors of the Company fails to execute in accordance with the provisions of the preceding paragraphs, the shareholders shall have the right to require the Board of Directors to execute within 30 days. If the Board of Directors of the Company fails to execute within the abovementioned time limit, the shareholders shall have the right to file a lawsuit directly in the people's court in their own name for the benefit of the Company. If the Board of Directors of the Company fails to execute in accordance with the provisions of Paragraph 1, the responsible director shall bear joint and several liability according to law.

### Chapter IV Shareholders
### Section I General Provisions

**Article 30** The shareholders of the Company shall be those who hold shares in the Company according to law.

**Article 31** The register of shareholders shall be sufficient evidence to prove that the shareholders hold shares in the Company.

**Article 32** The Company shall sign a share custody agreement with the securities registration institution and establish a register of shareholders on the basis of the certificate provided by the securities registration authority. the Company shall regularly inquire about the information of the major shareholders and the changes of the major shareholders' shareholdings (including the pledge of the shares) to grasp the ownership structure of the Company in a timely manner.

**Article 33** When a company convenes a General Meeting of Shareholders, distributes dividends, liquidates or engages in other conducts requiring the identity confirmation of shareholders, the Board of Directors or the convenor of the General Meeting of Shareholders shall determine the date of registration of equity, and the shareholders registered after the date of equity registration shall be the shareholders who enjoy the relevant rights and interests.

### Section II Rights and Obligations of Shareholders

**Article 34** As the owner of the Company, the shareholders shall enjoy all the legal rights stipulated in the laws, administrative regulations and the Articles of Association.

**Article 35** Shareholders shall have rights and undertake obligations according to the type of shares they hold; shareholders who hold shares of the same type shall have the same rights and undertake the same obligations.

**Article 36** The shareholders of the Company shall have the following rights:

(1) to obtain dividends and other forms of benefit distribution in accordance with the shares held by them;

(2) to request, convene, chair, participate in or appoint a shareholder's proxy to attend the shareholders' meeting in accordance with the law;

(3) to exercise voting rights in accordance with the shares held by them;

(4) to supervise the Company's business practices and offer suggestions or inquiries;

(5) to transfer, grant or pledge the shares held by them in accordance with the provisions of the laws, administrative regulations and Articles of Association of the Company;

IRI-CRT-00001030 - Translation

Articles of Association - IRICO Display Devices Co. Ltd.

(6) to inspect the Articles of Association of the Company, the register of shareholders, the counterfoil of the Company bond, the minutes of General Meeting of Shareholders, the resolutions of meeting of Board of Supervisors, and financial and accounting reports;

(7) to participate in the distribution of the remaining assets of the Company according the shares held by them when the Company terminates or liquidates;

(8) to require the Company to acquire the shares of shareholders who object to the resolution on merger or division made by the General Meeting of Shareholders;

(9) other rights conferred by laws, administrative regulations and Articles of Association of the Company.

**Article 37** Where a shareholder proposes to peruse the relevant information mentioned in the preceding article or to request information, he/she shall provide the Company with a written document certifying the type and number of shares held by him/her, and the Company shall provide the information in accordance with the requirements of the shareholder after verifying his/her identity.

**Article 38** Where the resolution of General Meeting of Shareholders or the Board of Directors of the Company violates laws and administrative regulations, the shareholders shall have the right to request the people's court to determine its invalidity.

Where the procedure for convening a General Meeting of Shareholders or the Board of Directors, and the method of voting may in violation of the laws, administrative regulations or the Articles of Association, or the contents of the resolution may violate the Articles of Association, the shareholders shall have the right to apply to the people's court for revocation within 60 days from the date of the resolution.

**Article 39** Where a director or senior manager may violate the provisions of the law, administrative regulations or the Articles of Association in the performance of his/her duties of the Company and causes losses to the Company, shareholders holding more than 1% of the shares of the Company individually or jointly for 180 consecutive days shall have the right to request in writing the Board of Supervisors to initiate a legal proceeding in the people's court; where the Board of Supervisors violates the provisions of the law, administrative regulations or the Articles of Association when performing its duties and causes losses to the Company, the shareholders may request the Board of Directors to file a lawsuit to the people's court in writing.

In case the Board of Supervisors or the Board of Directors refuse to bring a lawsuit upon receipt of the written request of the shareholders specified in the preceding paragraph, or fails, within 30 days from the date of receipt of the request, to bring a lawsuit, or where an urgent case or failure to bring a lawsuit would immediately cause irreparable harm to the interests of the Company, the shareholders specified in the preceding paragraph shall have the right to bring a lawsuit directly to the people's court in their own name for the benefit of the Company.

Where another person infringes upon the lawful rights and interests of the Company and causes losses to the Company, the shareholders specified in the preceding paragraph of this article may bring a lawsuit to a people's court in accordance with the provisions of the preceding two paragraphs.

**Article 40** Where a director or senior manager violates the provisions of laws, administrative regulations or the Articles of Association and damages the interests of shareholders, the shareholders may bring a lawsuit to a people's court.

**Article 41** The shareholders of the Company shall undertake the following obligations:

(1) to abide by laws, administrative regulations and the Articles of Association;

(2) to pay a share fee in accordance with the shares they have subscribed for and the manner in which they become shareholders;

(3) to not withdraw shares except in the circumstances prescribed by laws and regulations;

(4) the rights of shareholders shall not be abused to harm the interests of the Company or other shareholders; the independent status of the Company as a legal person and the limited liability of shareholders shall not be abused to harm the interests of the creditors of the Company.

Where the shareholders of the Company abuse their rights to cause losses to the Company or other shareholders, they shall bear the liability for compensation according to law.

Where the shareholders of the Company abuse their independent status as a legal person of the Company and their limited liability, evade the debts and seriously damage the interests of the creditors of the Company, they shall bear joint and several liability for the Company's debts.

(5) other obligations assumed by laws, administrative regulations and Articles of Association of the Company.

**Article 42** In case the shareholders hold 5% of the shares issued by the Company, a written report shall be made to the Company from the date on which that percentage is reached.

**Article 43** Shareholders holding more than 5% voting shares of the Company shall make a written report to the Company from the date of the occurrence of such facts when any of the following circumstances occur.

(1) when the increase or decrease of his/her holding shares is more than 5%;

(2) when the shares held by him/her are pledged;

(3) when the shares held by him/her are subject to the judiciary freezing.

4

### Section III Controlling Shareholders and Actual Controllers

**Article 44** The controlling shareholders and the actual controllers shall bear the obligation of good faith to the Company and other shareholders of the Company.

When exercising the right to vote, the controlling shareholders shall not make a decision that would be detrimental to the legitimate rights and interests of the Company and other shareholders of the Company.

**Article 45** The controlling shareholders and the actual controllers shall not use their related relations to harm the interests of the Company. Those who violate the regulations and cause losses to the Company shall be liable for compensation.

The controlling shareholders shall strictly exercise the rights of the investor in accordance with the law, and the controlling shareholders and the actual controllers shall not interfere directly or indirectly with the Company's decision-making and the production and business activities carried out in accordance with the law beyond the statutory procedures. They shall not use their special status to obtain additional benefits, nor shall they harm the legitimate rights and interests of the Company and other shareholders of the Company by means of related party transactions, profit distribution, asset restructuring, external investment, capital occupation, loan guarantee, etc., nor shall they use their controlling position to damage the interests of the Company and other shareholders of the Company.

**Article 46** The controlling shareholders and the Company shall ensure the independence of their personnel, assets and financial affairs, with independent institutions and businesses, independent accounting, responsibilities and risks.

**Article 47** The personnel of the Company shall be independent of the controlling shareholders. The manager, the financial officer, the marketing chief and the secretary of the Board of Directors of the Company shall not hold any positions other than a director in the controlling shareholders. Where the senior management of the controlling shareholder also serves as a director of the Company, he/she shall ensure that he has sufficient time and energy to undertake the work of the listed company.

**Article 48** The assets invested by the controlling shareholders in the Company shall be independent and complete with clear ownership. Where the controlling shareholder contributes capital with non-monetary assets, he/she shall go through the formalities of property right change and clearly define the scope of the asset. the Company shall independently register, establish, account and manage the assets. The controlling shareholders shall not occupy or dispose of the assets or interfere with the operation and management of the assets by the Company.

**Article 49** the Company shall establish sound financial and accounting management systems and conduct independent accounting in accordance with the requirements of relevant laws and regulations. The controlling shareholders shall respect the financial independence of the Company and shall not interfere in the financial and accounting activities of the Company.

**Article 50** The Board of Directors, the Board of Supervisors and other internal institutions of the Company shall operate independently. There is no hierarchical relationship between controlling shareholders and their functional departments and companies and their functional departments. The controlling shareholders and their subordinate bodies shall not issue to the Company and its subsidiaries any plans and instructions concerning the operation of the Company, nor shall they in any other way affect the independence of its operation and management.

**Article 51** The nomination of candidates for directors and supervisors by controlling shareholders shall strictly follow the conditions and procedures prescribed by laws, regulations and the Articles of Association. Candidates for directorship and supervisor role nominated by controlling shareholders shall have relevant professional knowledge and the ability to make decisions and supervise. The controlling shareholder shall not perform any approval procedures for the resolution on personnel election of the General Meeting of Shareholders and the resolution on the appointment of personnel of the Board of Directors; and shall not appoint or remove senior managers of the Company beyond the General Meeting of Shareholders or the Board of Directors.

**Article 52** The controlling shareholders shall not engage in any business operations which constitute direct or indirect competition with the Company.

### Section IV Related Party Transactions

**Article 53** A written agreement shall be signed between the Company and the affiliated party for related party transactions. The signing of the agreement should follow the principles of equality, voluntariness, equivalence and compensation, and the content of the agreement should be clear and specific. the Company shall disclose the conclusion, alteration, termination and performance of the agreement in accordance with the relevant provisions.

**Article 54** the Company shall take effective measures to prevent the related parties from interfering in the operation of the Company by monopolizing the channels of procurement and sales, thereby harming the interests of the Company. The related party transaction should follow the commercial principle and the price of the related party transaction should not deviate from the price or charging standard of the independent third party in the market in principle. The Company shall fully disclose the pricing basis of related party transactions.

**Article 55** When the General Meeting of Shareholders deliberates on related party transactions, the associated shareholders shall relinquish their voting rights over the motion (proposal) and the shares held (represented) by them shall not be counted into the total number of valid casts in the voting.

**Article 56** the Company shall strictly abide by the procedures stipulated in the laws, regulations and normative documents and the Articles of Association when considering related party transactions.

**Article 57** In considering related party transactions, the Board of Directors shall, unless the associated director has disclosed it to the Board of Directors in accordance with the Articles of Association, and the Board of Directors does not count it as a quorum and does not participate in the voting, the Company shall have the right to cancel the contract, transaction or arrangement unless the other party is a bona fide third party.

5

**Article 58** Where a director has a connection with an enterprise involved in the resolution of a board meeting, he/she shall not exercise the right to vote on the resolution, nor shall he/she exercise voting rights on behalf of any other director. The meeting of the Board of Directors may be held in the presence of a majority of the non-affiliated directors, and the resolution of the meeting of the directors shall be approved by a majority of the directors. In case the number of unaffiliated directors present at the Board of Directors is less than three, the matter shall be referred to the General Meeting of Shareholders for deliberation.

**Article 59** When deliberating related party transactions, the Board of Directors shall pay attention to the necessity and fairness of the transaction, and the possibility of harming the interests of non-affiliated shareholders, and, if necessary, shall employ a professional institution to issue a special report.

**Article 60** the Company shall take effective measures to prevent shareholders and their affiliated parties from occupying or transferring the Company's funds, assets and other resources in various forms.

**Article 61** The Board of Directors shall, in addition to the timely and full disclosure of related party transactions in accordance with relevant laws, regulations and normative documents, report on the implementation at the Annual General Meeting.

### Chapter V General Meeting of Shareholders
### Section I General Provisions

**Article 62** The General Meeting of Shareholders of a company shall be composed of all shareholders.

**Article 63** The General Meeting of Shareholders shall be the authority of the Company and shall exercise the following functions and powers according to law:

(1) to decide on the Company's business policy and investment plan;

(2) to elect and replace directors and decide on matters relating to the remuneration of directors;

(3) to elect and replace independent directors and decide on the allowances of independent directors;

(4) to elect and replace the supervisors appointed by the representatives of the shareholders and to decide on matters relating to the remuneration of the supervisors;

(5) to review and approve the report of the Board of Directors;

(6) to review and approve the report of the Board of Supervisors;

(7) to review and approve the Company's annual financial budget and final accounts;

(8) to review and approve the Company's profit distribution plan and loss compensation plan ;

(9) to consider and approve major related party transactions;

(10) to make a resolution on the increase or reduction of the registered capital of the Company;

(11) to make a resolution on the issuance of corporate bonds;

(12) to make a resolution on the investment projects funded by the Company;

(13) to make resolutions on matters such as merger, division, dissolution and liquidation of the Company;

(14) to amend the Articles of Association of the Company;

(15) to make a resolution on the employment or dismissal of an accounting firm by the company;

(16) to review the proposal of shareholders holding more than 3% of the total number of voting shares issued on behalf of the Company;

(17) to consider proposals submitted by independent directors;

(18) to review the proposals submitted by the Board of Supervisors of the Company;

(19) to review and approve the matters of external guarantee as provided for in the Articles of Association;

(20) to review matters in which the purchase and sale of material assets by the Company within one year exceeds 30% of its total audited assets in the latest period;

(21) to review equity incentive plans;

(22) to review other matters that shall be decided upon by the General Meeting of Shareholders in accordance with the laws, regulations and the Articles of Association.

The functions and powers of the above-mentioned General Meeting of Shareholders shall not be exercised by the Board of Directors or other institutions and individuals in the form of authorization.

**Article 64** The following acts of external guarantee of the Company shall be resolved and approved by the General Meeting of Shareholders.

(1) any guarantees after the total amount of external guarantees of the Company and its controlling subsidiaries reach or exceed 50% of its latest audited net assets

(2) any guarantee after the total amount of the Company's external guarantee reaches or exceeds 30% of the total audited assets in the latest period;

6

(3) guarantees provided for guaranteed subjects whose asset-liability ratio exceeds 70%;

(4) single guarantee which accounts for more than 10% of the latest audited net assets;

(5) guarantees provided to shareholders, actual controllers and their related parties.

**Article 65** The General Meeting of Shareholders shall exercise its functions and powers within the scope prescribed by laws and regulations and shall not interfere with the disposition of shareholders' rights.

**Article 66** General meetings shall be divided into annual general meeting and extraordinary general meeting.

Unless otherwise stated, the term "general meeting" in the Articles of Association includes the annual general meeting and the extraordinary general meeting.

**Article 67** Shareholders may attend the general meeting in person or entrust a proxy to attend and vote on their behalf. Shareholders' proxy does not have to be a shareholder of the Company.

Unless otherwise stated, the term "shareholder" in the following articles of this section includes a shareholder's proxy.

**Article 68** Shareholders present at the general meeting shall enjoy the right to be informed, speak, inquire and vote according to law.

Shareholders who meet the conditions stipulated in the Articles of Association shall have the right to submit shareholder proposals in accordance with the procedures prescribed in the Articles of Association.

**Article 69** The location in which the general meeting of the Company would be held shall be the city where the Company is located.

**Article 70** The General Meeting of Shareholders may, in addition to setting up a venue and holding it in the form of an on-site meeting, upon the decision of the convenor, also provide a form of online voting to facilitate the participation of shareholders in the meeting. Shareholders who vote through the internet shall be deemed to be present at the general meeting.

**Article 71** When the General Meeting of Shareholders adopts the form of online voting, the means of confirming the identity of the shareholders shall be set out in the notice of the meeting.

**Article 72** The convenor and moderator of the general meeting shall conscientiously and responsibly arrange the matters for deliberation at the meeting and shall give each motion or proposal a reasonable time for discussion.

**Article 73** The Board of Directors of a company shall appoint a lawyer to attend the general meeting and issue opinions and public announcements on the following issues:

(1) whether the convening and convening procedures of the General Meeting of Shareholders are in conformity with the provisions of the laws, administrative regulations, and the Articles of Association;

(2) whether the qualifications of the persons attending the meeting and the conveners are legal and valid;

(3) whether the voting procedure of the general meeting of shareholder and the result of the voting are legal and valid;

(4) legal opinions issued at the request of the Company on other issues.

**Article 74** the Company holding a general meeting shall adhere to the principle of simplicity and shall not grant additional economic benefits to shareholders present at the meeting.

**Article 75** The shareholders attending the General Meeting of Shareholders shall abide by the provisions of relevant laws, regulations, normative documents and Articles of Association of the Company, conscientiously maintain the order of the meeting, and shall not infringe upon the legitimate rights and interests of other shareholders.

### Section II Annual General Meeting of Shareholders

**Article 76** The annual general meeting shall be convened once a year and shall be convened within six months after the end of the previous fiscal year.

If the Company is unable to convene an annual general meeting within the period mentioned above, it shall report to the stock exchange, explain the reasons and make a public announcement.

**Article 77** The agenda of the Annual General Meeting shall include the following:

(1) to review and approve the report of the Board of Directors;

(2) to review and approve the report of the Board of Supervisors;

(3) to review and approve the Company's annual financial budget and final accounts;

(4) to review and approve the Company's profit distribution plan and loss compensation plan ;

(5) to make resolutions on the employment or dismissal of an accounting firm employed by the Company.

IRI-CRT-00001034 - Translation

### Section III Extraordinary General Meeting of Shareholders

**Article 78** An Extraordinary General Meeting shall be convened within two months from the date of the occurrence if one of the following circumstances occurs:

(1) when the number of directors is less than five;

(2) when the uncompensated loss of the Company amounts to one third of the total share capital;

(3) when the shareholders holding more than 10% of the total voting shares of the Company individually or jointly request in writing;

(4) when the Board of Directors deems it necessary;

(5) when the Board of Supervisors proposes to convene;

(6) other circumstances stipulated in the Articles of Association.

The number of shares held in paragraph 3 above shall be calculated on the date of written request by the shareholders.

### Section IV. Convening of General Meeting of Shareholders

**Article 79** The General Meeting of Shareholders shall be convened by the Board of Directors according to law.

Where the Board of Directors is unable to perform its duties or fails to convene an annual general meeting without reasonable reasons, other qualified convenors shall have the right to convene the Annual General Meeting.

**Article 80** Independent director shall have the right to propose to the Board of Directors the convening of an Extraordinary General Meeting. The Board of Directors shall, in accordance with the provisions of the laws, administrative regulations and the Articles of Association, provide written feedback for approval or disapproval of the convening of the Extraordinary General Meeting within 10 days after the receipt of the proposal.

In case the Board of Directors agrees to convene an Extraordinary General Meeting, it shall, within five days after making the resolution of the Board of Directors, issue a notice of the convening of the General Meeting of Shareholders; in case the Board of Directors does not agree to the convening of the Extraordinary General Meeting, it shall state the reasons and make an announcement.

**Article 81** The Board of Supervisors shall have the right to propose to the Board of Directors the convening of an Extraordinary General Meeting, and shall submit it in writing to the Board of Directors. The Board of Directors shall, in accordance with the provisions of the laws, administrative regulations and the Articles of Association, within 10 days after receiving the proposal, provide written feedback for approval or disapproval of the convening of the Extraordinary General Meeting.

In case the Board of Directors agrees to convene an Extraordinary General Meeting, it shall, within five days after the resolution of the Board of Directors, issue a notice of convening the General Meeting of Shareholders. The notice shall seek the consent of the Board of Supervisors for the change originally proposed.

In case the Board of Directors does not agree to the convening of an Extraordinary General Meeting or fails to provide feedback within 10 days after receiving the proposal, it shall be deemed that the Board of Directors is unable or fails to perform its duty of convening a general meeting of shareholders, and the Board of Supervisors may convene and preside over the meeting on its own.

**Article 82** Shareholders who individually or collectively hold more than 10% of the shares of the Company shall have the right to request the Board of Directors to convene an Extraordinary General Meeting and shall submit it in writing to the Board of Directors. The Board of Directors shall, in accordance with the provisions of the laws, administrative regulations and the Articles of Association, within 10 days after receipt of the request, provide written feedback for approval or disapproval of the convening of the Extraordinary General Meeting.

In case the Board of Directors agrees to convene an Extraordinary General Meeting, it shall, within five days after the resolution of the Board of Directors, issue a notice of convening the General Meeting of Shareholders. The notice shall seek the consent of the relevant shareholders for the change of the original request.

In case the Board of Directors does not agree to convene an Extraordinary General Meeting, or fails to provide feedback within 10 days after receiving the request, the shareholders who individually or collectively hold more than 10% of the shares of the Company shall have the right to propose to the Board of Supervisors the convening of the Extraordinary General Meeting, and shall submit a request in writing to the Board of Supervisors.

Where the Board of Supervisors agrees to convene an Extraordinary General Meeting, it shall, within five days of receiving the request, issue a notice of convening the General Meeting of Shareholders. The relevant shareholders' consent shall be sought for the change of the original proposal in the notice.

In case the Board of Supervisors fails to issue a notice of the convening of General Meeting of Shareholders within the prescribed time limit, it shall be deemed that the Board of Supervisors shall not convene or preside over the general meeting, and shareholders who hold more than 10% of the shares of the Company individually or collectively for more than 90 consecutive days may convene and preside over the meeting themselves.

**Article 83** Where the Board of Supervisors or the shareholders decide to convene a general meeting of shareholder on their own, they shall notify the Board of Directors in writing, and at the same time report to local office of CSRC offices and stock exchange for the record.

The proportion of the shared held by convening shareholders shall not be less than 10% before the announcement of the resolution of the General Meeting of Shareholders.

8

When issuing the notice and resolution announcement of the General Meeting of Shareholders, the convening shareholders shall submit relevant certificate materials to the local office of CSRC and the stock exchange where the Company is located.

**Article 84** The Board of Directors and the secretary of the Board of Directors shall cooperate with the General Meeting of Shareholders convened by the Board of Supervisors or the shareholders themselves. The Board of Directors shall provide register of shareholders on the date of equity registration.

**Article 85** the expenses necessary for the meeting of shareholders convened by the Board of Supervisors or the shareholders themselves shall be borne by the Company.

### Section V Notice of General Meeting of Shareholders

**Article 86** When a company holds an Annual General Meeting, the convenor shall notify the shareholders of the Company by public announcement 20 days before the meeting; when the Company shall convene an Extraordinary General Meeting, the convenor shall notify the shareholders by public announcement 15 days before the meeting. The date of the meeting shall not be included in the calculation of the time limit for the commencement of the notice of the said meeting.

Once the notice of the meeting is announced, all relevant persons shall be deemed to have received the notice.

**Article 87** The notice of convening the General Meeting of Shareholders shall include the following contents:

(1) the convenor, time, location, manner and duration of the meeting;

(2) matters to be review by the meeting;

(3) the voting procedure (applicable to online voting);

(4) to state in obvious terms that all shareholders shall have the right to attend the General Meeting of Shareholders, and may entrust a proxy to attend the meeting and vote, and the proxy of the shareholder need not be a shareholder of the Company;

(5) the date of equity registration for shareholders entitled to attend the general meeting ;

(6) the time and place of service of the proxy letter;

(7) the name and contact information of the permanent contact person for the meeting;

(8) the date, location and manner of registration of the meeting.

The interval between the date of equity registration and the date of the General Meeting of Shareholders set by the Company shall not be more than 7 working days. Once confirmed, the date of equity registration shall not change.

**Article 88** Upon issuing notice of convening the General Meeting of Shareholders, the convenor shall, within the prescribed time, provide full and complete disclosure of all the proposals to be reviewed at the meeting on the designated website, and for the matters to be discussed that shall require the opinions of the independent directors, the opinions and reasons of the independent director shall be disclosed at the same time when issuing the notice or supplementary notice of the General Meeting of Shareholders.

**Article 89** Upon the notice of convening the General Meeting of Shareholders, except for the reasons of force majeure or other unexpected events, the general meeting shall not be postponed or cancelled, and the proposal specified in the notice shall not be cancelled. In the event of an extension or cancellation, the convenor shall announce and explain the reasons at least two working days before the scheduled date.

### Section VI Proposal of General Meeting of Shareholders

**Article 90** When the Company convenes General Meeting of Shareholders, the Board of Directors, the Board of Supervisors and the shareholders who individually or collectively hold more than 3% of the shares of the Company shall have the right to submit proposals to the Company.

**Article 91** A proposal for the General Meeting of Shareholders shall meet the following conditions:

(I) there shall be clear topics;

(2) the content of the proposal shall be specific and complete;

(3) the contents of the proposal shall not conflict with the provisions of the laws, regulations and the Articles of Association and falls within the scope of business of the Company and the scope of responsibilities of the general meeting;

(4) submitted to or served on the Board of Directors in writing.

**Article 92** Shareholders who, individually or collectively, hold more than 3% of the shares of the Company may, within 10 days before the convening of the General Meeting of Shareholders, submit an interim proposal and submit it in writing to the convenor. The convenor shall, within two days after receiving the proposal, issue a supplementary notice to the general meeting and announce the contents of the interim proposal. Except in the circumstances specified in the preceding paragraph, the convenor may not, after issuing a notice to the General Meeting of Shareholders, amend the proposal already listed in the notice of the general meeting or add new proposals. In case a proposal is not specified in the notice of the general meeting or does not meet the requirements of the proposal of the general meeting under Article 91 of the Articles of Association, the General Meeting of Shareholders shall not vote and make a resolution.

### Section VII Convening of General Meeting of Shareholders

**Article 93** The Board of Directors and other convenors shall take necessary measures to ensure the normal order of the General Meeting of Shareholders. For acts such as interference with the general meeting, trouble causing and infringement upon

9

Articles of Association - IRICO Display Devices Co. Ltd.

the legitimate rights and interests of shareholders, measures shall be taken to stop them and report to the relevant departments for investigation in a timely manner.

**Article 94** All shareholders or their proxies registered on the date of equity registration shall have the right to attend the General Meeting of Shareholders and exercise voting rights in accordance with relevant laws and regulations and the Articles of Association.

**Article 95** The attendance of shareholders at the general meeting shall be registered at the time specified in the notice of the meeting. Registration of the meeting may be registered by shareholders in the registry or by fax or letter.

**Article 96** The shareholders shall separately provide the following documents for registration of the meeting:

(1) corporate shareholders: photocopies of business licenses of legal persons, certificates of legal representatives or letter of authorisation and certificates of identity of attendees;

(2) individual shareholders: personal identification certificate and stock account card; if an entrusted proxy is present, a copy of the identity certificate of the individual shareholder shall be provided; the stock account card; the letter of authorisation; and the identity certificate of the proxy.

The above identity certificates refer to legally valid identity documents within the territory of China, including, but not limited to, resident identity cards and passports of the People's Republic of China.

**Article 97** When a shareholder entrusts a proxy to attend the meeting on his/her behalf, the number of proxies shall not exceed two. Where the principal is a corporate shareholder, its legal representative or the person authorised by the resolution of the Board of Directors or other decision-making bodies shall attend the meeting as a representative.

**Article 98** A shareholder shall entrust a proxy in writing, either signed by the principal or by the proxy in writing; where the principal is a corporate shareholder, either stamped with the seal of the corporate shareholder or signed by its duly entrusted proxy.

Where the letter of authorisation is signed by another person authorised by the principal, the letter of authorisation or other authorisation document shall be notarized.

**Article 99** The letter of authorisation issued by a shareholder to entrust another person to attend a General Meeting of Shareholders shall contain the following contents:

(a) the name of the proxy;

(II) whether he/she has the right to vote;

(3) instructions to vote for, against or abstain from voting separately on each matter on the agenda of the general meeting;

(4) Specific instructions on whether or not to vote on the provisional proposal that may be included in the agenda of the general meeting, and what type of voting rights shall be exercised if voting rights are available;

(5) the date of issuance and the period of validity of the letter of authorisation;

(6) the signature (or seal) of the principal, and in the case of the principal being a corporate shareholder, the seal of the legal entity shall be affixed.

The letter of authorisation shall indicate whether the proxy may vote according to his/her own will if the principal does not give specific instructions.

When there are two proxies entrusted by the shareholder, the voting right shall be expressly granted to one of them.

**Article 100** The proxy for voting shall be prepared at least 24 hours before the convening of the General Meeting of Shareholders at the Company's domicile or in such other places as may be designated in the notice of convening the meeting.

**Article 101** The persons attending the General Meeting of Shareholders shall go through the formalities of sign-in.

The sign-in register shall be made by the Company. The name of the person attending the meeting (or the name of the unit), his/her identification number, the name of the principal and the amount of shares holding or representing voting rights shall be stated in the register.

**Article 102** Where an individual shareholder attends the general meeting in person, he/she shall present his/her identity certificate and stock ownership certificate. Where a proxy entrusted by an individual shareholder attends the shareholders' general meeting, he/she shall present a letter of authorisation, a certificate of ownership of the shareholder and a personal identity certificate.

**Article 103** The corporate shareholder shall be represented at the shareholders' general meeting by the its legal representative or a proxy entrusted by the legal representative. In case the legal representative attends the shareholders' general meeting, he shall present the certificate of legal entity, the certificate capable of proving his/her qualification of the legal representative, the certificate of stock ownership and the identity certificate of his or her own.

Where a proxy entrusted by a corporate shareholder attends the shareholders' general meeting, he/she shall present his/her own identity certificate, the certificate of proof of the legal entity of corporate shareholder, the letter of authorisation issued by the legal representative of the legal entity of the corporate shareholder and the certificate of stock ownership.

**Article 104** The convenor and the lawyer employed by the Company shall jointly verify the legitimacy of the qualification of shareholders according to the register of shareholders provided by the securities registration and settlement institution, and shall register the names (or title) of shareholders and the number of shares holding voting rights. The registration of the meeting shall be terminated prior to the announcement by the moderator of the meeting of the number of shareholders and proxies present at the meeting and the total number of shares holding voting rights.

10

**Article 105** The Board of Directors of the Company, independent directors and shareholders who meet the relevant conditions may solicit the voting rights from the shareholders of the Company at the shareholders' general meeting.

The solicitation of voting rights shall be conducted on a pro bono basis and the information shall be fully disclosed to the solicited persons.

**Article 106** When the General Meeting of Shareholders is convened, all the directors, supervisors and secretaries of the Board of Directors of the Company shall be present, and the manager and other senior managerial personnel shall attend as non-voting delegates.

**Article 107** The General Meeting of Shareholders convened by the Board of Directors shall be presided over by the chairman of the Board of Directors. In case the chairman is unable to perform his/her duties for some reasons, the vice-chairman shall preside; in case the vice-chairman is unable to perform his/her duties or fails to perform his/her duties, a director elected jointly by more than half of the directors shall preside.

The General Meeting of Shareholders convened by the Board of Supervisors shall be presided over by the chairman of the Board of Supervisors. In case the chairman of the Board of Supervisors is unable to perform his/her duties or fails to perform his/her duties, a supervisor elected jointly by more than half of the supervisors shall preside.

The General Meeting of Shareholders convened by the shareholders themselves shall be presided over by a representative nominated by the convenor.

When convening the General Meeting of Shareholders, in case the moderator of the meeting violates the rules of procedure and prevents the meeting from continuing, the general meeting may, with the consent of more than half of the shareholders present at the meeting, elect a person to act as the moderator and continue.

**Article 108** At the Annual General Meeting, the Board of Directors and the Board of Supervisors shall report to the general meeting on their work in the past year. Each independent director shall also make a debriefing report.

**Article 109** The chairman, directors, supervisors or general managers and other senior management personnel of the Company shall, at the General Meeting of Shareholders, provide explanations and demonstrations to the questions and suggestions of the shareholders, except for the following circumstances:

(1) the question is not related to the subject of the meeting;

(B) the matters involved in the question has yet to be ascertained;

(3) the question relates to the Company's trade secrets;

(4) answering the question will lead to a violation of the obligation of fair information disclosure;

(5) other reasonable reasons.

### Section 8. Voting Procedure of General Meeting of Shareholders

**Article 110** The shareholders shall exercise their voting rights by the number of voting shares they represent, and each share shall have one vote.

All shareholders or their proxies registered at the date of shareholder registration shall have the right to attend the General Meeting of Shareholders and exercise voting rights in accordance with relevant laws and regulations and the Articles of Association.

**Article 111** The General Meeting of Shareholders shall vote item by item on the reports, motions and proposals included in the agenda of the meeting by secret ballot, and shall not suspend or not vote on them for any reason.

Where the General Meeting of Shareholders has different proposals regarding the same matter, the voting shall be held in the order of time in which the proposals are put forward.

**Article 112** The convenor shall ensure that the general meeting of shareholders is held continuously until a final resolution is reached. Where the general meeting may be suspended or unable to make a resolution due to force majeure and other special reasons, necessary measures shall be taken to resume the convening of the general meeting or directly terminate it as soon as possible, with timely announcement to be made. At the same time, the convenor shall report to the local office of the CSRC and the stock exchange where the Company is located.

**Article 113** The moderator of the meeting shall, before voting, announce the number of shareholders and proxies present at the meeting and the total number of voting shares. The number of shareholders and proxies present at the meeting and the total number of voting shares shall be subject to the registration of the meeting.

**Article 114** the Company may, in addition to on-site voting , provide a voting platform to shareholders through a network system or other means in accordance with the provisions of the CSRC, so as to facilitate the shareholders to exercise their voting rights.

**Article 115** All shareholders registered on the registration date of the General Meeting of Shareholders shall have the right to exercise their voting rights through the voting system of the general meeting network, However, the same voting right can only be selected by one of the on-site voting, online voting or other voting methods that meet the requirements. The result of the first ballot shall prevail in the event of repeated voting on the same voting right.

**Article 116** Before voting on a proposal, the General Meeting of Shareholders shall elect two shareholder representatives and a supervisor as the scrutineers to scrutinize the voting process and the counting of votes.

Shareholders who have an interest in deliberating matters shall not act as scrutineers and participate in the scrutinizing and counting of votes.

11

The witness lawyers employed by the Company and the scrutineers shall be jointly responsible for the scrutinizing and counting of the votes.

Shareholders who vote online or otherwise have the right to check their voting results through the corresponding voting system.

**Article 117** The closing time of the site of the General Meeting of Shareholders shall not be earlier than that of the network or any other means. The moderator of the meeting shall announce the voting situation and result of each proposal and, based on the result of the voting, announce whether the proposal is adopted or not. Before the official announcement of the voting results, the listed companies, tellers, scrutineers, major shareholders, network service parties and other relevant parties involved on the site, network and other voting methods of the general meeting shall have the obligation to keep the voting information confidential.

**Article 118** The shareholders present at the General Meeting of Shareholders shall express one of the following views on the proposal submitted to the vote: consent, opposition or abstention.

An unfilled, misfilled, illegible voting vote, or a non-voting vote, shall be deemed as a waiver of the voting right of the voter, and the voting result of the number of shares held by him/she shall be counted as "abstention".

**Article 119** The voting results shall be announced on the site after the voting votes have been counted by the scrutineers, and the voting results of the resolutions shall be recorded in the minutes of the meeting.

The scrutineers shall sign the voting statistics, and the voting votes and the voting statistics shall be filed together.

**Article 120** Where the moderator of the meeting has any doubt about the voting results, he/she may count the number of votes cast; where the moderator of the meeting does not count the votes, and the shareholders present at the meeting shall object to the voting results announced by the moderator, they shall have the right to demand the counting of the votes immediately after the announcement of the voting results, and the moderator shall count the votes immediately.

### Section IX Resolution of General Meeting of Shareholders

**Article 121** Resolutions of General Meeting of Shareholders are divided into ordinary resolutions and special resolutions.

**Article 122** The ordinary resolution of the General Meeting of Shareholders shall be approved by more than half of the voting rights held by the shareholders participating in the meeting.

The special resolution shall be approved by more than two-thirds of the voting rights held by the shareholders participating in the meeting.

**Article 123** The following matters shall be approved by ordinary resolution of the General Meeting of Shareholders:

(1) work report of the Board of Directors and the Board of Supervisors;

(2) profit distribution plan and loss compensation plan drawn up by the Board of Directors;

(3) the appointment and dismissal of members of the Board of Directors and the Board of Supervisors, their remuneration and methods of payment;

(4) the Company's annual budget plan and final accounts plan;

(5) the annual report of the Company;

(6) other matters that should be approved by special resolutions in accordance with the provisions of laws, administrative regulations or the Articles of Association.

**Article 124** the following matters shall be approved by special resolutions of the General Meeting of Shareholders:

(1) the Company increases or decreases its registered capital;

(2) the division, merger, dissolution and liquidation of the Company;

(3) the amendment of the Articles of Association of the Company;

(4) in case the Company purchases or sells major assets or guarantee more than 30% of its total assets audited in the latest period;

(5) equity incentive plan;

(6) any other matters that need to be approved by special resolutions in accordance with the provisions of the laws, administrative regulations, normative documents and the Articles of Association, as well as those identified by ordinary resolution of the general meeting of shareholder as having a significant impact on the Company that needs to be approved by special resolutions.

**Article 125** Where the General Meeting of Shareholders of the Company approves proposals on cash distribution, transfer of shares or conversion of capital provident fund into shares, the Board of Directors of the Company shall, within two months after the conclusion of the General Meeting of Shareholders, implement a specific plan.

**Article 126** Unless the Company is in a crisis or under other special circumstances, without being approved by a special resolution of the General Meeting of Shareholders, the Company shall not enter into a contract with any person other than directors, managers or other senior management personnel to hand over the management of all or important business of the Company to that person.

**Article 127** The moderator of the meeting shall announce whether or not the resolution of the General Meeting of Shareholders shall be approved according to the voting results.

The resolution shall take effect after the signature of the directors and the secretary of the Board of Directors present at the meeting.

In case all the directors of the Board of Directors of the Company fail to attend the General Meeting of Shareholders, the signature of all the shareholders present at the meeting shall prevail.

**Article 128** The resolution of the General Meeting of Shareholders shall be announced in a timely manner, and the announcement shall set out the number of shareholders and proxies present at the meeting, the total number of voting shares and the proportion of voting shares in the total number of voting shares of the Company, the manner of voting, the voting results of each proposal and the details of the resolutions approved.

**Article 129** The proposal shall not be amended by the General Meeting of Shareholders when it is examined. Otherwise, the relevant amendment shall be regarded as a new proposal and shall not be voted upon at the current meeting.

**Article 130** In case a proposal has not been approved or the resolution of the previous meeting has been amended at the current General Meeting of Shareholders, special prompts shall be made in the announcement of the resolution of the current meeting.

### Section X Election Procedures of Directors and Supervisors

**Article 131** The directors and supervisors elected by the General Meeting of Shareholders shall, individually or jointly, nominate candidates who hold more than 3% of the shares of the Company and submit them to the General Meeting of Shareholders for voting in the form of proposals.

**Article 132** The independent directors shall be nominated by the Board of Directors of the Company, the Board of Supervisors, and the shareholders who hold more than 1% of the shares of the Company individually or collectively, and shall be elected by the General Meeting of Shareholders.

**Article 133** When shareholders nominate candidates for directors, independent directors or supervisors, they shall submit to the Board of Directors the proposal for nomination, the details of the candidates nominated, the statement of the candidates or the letter of commitment 10 days before the General Meeting of Shareholders.

**Article 134** The Board of Directors shall, in the notice of the General Meeting of Shareholders, fully disclose the details of the candidates for directors, independent directors and supervisors, including at least the following:

(1) personal information such as educational background, work experience, part-time work, etc.;

(2) whether there is an association with the Company or the controlling shareholder and the actual controller of the Company;

(3) disclosure of the amount of shares held by them in the Company;

(4) whether or not they have been punished by the CSRC and other relevant departments and punished by the stock exchange.

**Article 135** Candidates for directors, independent directors and supervisors shall, prior to the General Meeting of Shareholders, issue a written undertaking to accept nominations, promise that the personal data publicly disclosed shall be true and complete and ensure that they would perform their duties effectively after being elected.

**Article 136** A cumulative voting system shall be adopted in the election of directors by the General Meeting of Shareholders.

**Article 137** the system of cumulative voting shall be implemented as follows:

(I) Method of calculating cumulative votes

(a) the number of voting shares held by each shareholder multiplied by the number of directors to be elected at this General Meeting of Shareholders shall be the cumulative number of votes cast by that shareholder in this voting.

(B) in the event of a multi-round election at a General Meeting of Shareholders, the cumulative voting votes of the shareholders shall be recalculated according to the number of directors to be elected in each round.

(C) the secretary of the Board of Directors of the Company shall announce the cumulative votes of each shareholder before each cumulative vote, and any shareholder, independent director, supervisor, scrutineer, witness lawyer or notary of the notary office who has any objection to the announcement of the result shall check immediately.

(II) Method of voting

Each shareholder may, in accordance with his/her own will (the proxy shall comply with the instructions of the principal's letter of authorisation), cast the cumulative votes separately or exclusively on any director candidate, and in case if the shareholder votes on two or more director candidates, the votes shall not have to be equally distributed, but the sum of the respective votes shall be equal to or less than the number of votes accumulated by them, otherwise the voting shall be invalid.

(III) Election of directors

1. Equal elections

(A) a director candidate shall be elected when the number of votes obtained exceeds 1/2 of the number of shares validly cast at a meeting; if

(B) the number of elected directors is less than the number of directors to be elected, but the number of elected directors exceeds 2/3 or more of the board members as stipulated in the Articles of Association, the vacancy shall be filled at the next general meeting of the shareholders; if

Articles of Association - IRICO Display Devices Co. Ltd.

(C)the number of elected directors is less than the number of directors to be elected and, as a result, the members of the Board of Directors are less than 2/3 or more as stipulated in the Articles of Association, a second round of election shall be held for the unelected candidates for directors; if

(D) the requirements of the preceding paragraph have not been met in the second round of election, a further General Meeting of Shareholders shall be convened within two months after the conclusion of the current general meeting to elect the vacant directors.

2. Differential elections

(A) if the candidates for directors have obtained more than 1/2 votes in excess of the number of shares valid for voting at the meeting and the number of such candidates is equal to or less than the number of directors to be elected, such candidates shall be elected; if

(B) more than 1/2 votes have been cast in excess of the number of valid shares cast at the meeting, the number of directors to be elected shall be more than the number of directors to be elected, and those who have obtained more votes shall be elected in the order of the number of votes obtained; if

(C) a second round of elections shall be held for two or more candidates who are unable to decide which of them to be elected because they have the same number of votes; if

(D) if the second round of the election still fails to decide on the final candidate, another election shall be held at the next General Meeting of Shareholders; if

(E) the members of the Board of Directors are less than 2/3 specified in the Articles of Association, the next General Meeting of Shareholders shall be held within two months after the conclusion of the current meeting.

**Article 138** When the General Meeting of Shareholders elects the supervisors of shareholders, the voting method shall be the same as that of the directors.

**Article 139** Once elected, directors and supervisors of the shareholders shall assume their duties immediately.

### Section XI Minutes of General Meeting of Shareholders

**Article 140** Minutes of the General Meeting of Shareholders shall be made by the secretary of the Board of Directors. The minutes shall contain the following:

(1) the number of voting shares at the meeting and the proportion in the total number of shares of the Company;

(2) the date, location, agenda and name of the convener of the meeting;

(3) the names of the moderator and the directors, supervisors, managers and other senior managerial personnel present at the meeting;

(4) the review of each proposal, the main points of speech and the result of the voting;

(5) the voting results of each voting matter (including the results of the on-site voting, online voting and other voting methods; the voting results of the non-circulating shareholders and the circulating shareholders, respectively);

(6) the inquiry opinions and suggestions of the shareholders and the replies or explanations from the Board of Directors and the Board of Supervisors;

(7) the names of lawyers, tellers and scrutineers;

(8) other contents that should be included in the minutes in the consideration of the General Meeting of Shareholders or stipulated in the provisions of the Articles of Association.

Article 141 The convenor shall ensure that the contents of the minutes of the meeting are true, accurate and complete. The directors, supervisors, secretaries of the Board of Directors, convenors or their representatives, and the moderator of the meeting shall sign the minutes of the meeting. The minutes of the meeting shall be kept together with the signature book of the shareholders present on the site, the letter of authorisation and the valid information of online and other means of voting, for a period of not less than 10 years.

Article 142 Matters such as the number of participants in the General Meeting of Shareholders, the number of shares held by the shareholders present at the meeting, the letter of authorisation, the voting results of each voting matter, the minutes of the meeting, the legitimacy of the meeting procedure, etc., may be notarized.

### Section XII. Authorization of the Board of Directors by the General Meeting of Shareholders

**Article 143** The authority of the Board of Directors to decide on matters of foreign investment shall be as follows: a single project shall not exceed 15% of the net audited asset value in the latest period; and the annual cumulative investment project shall not exceed 50% of the net asset value of the Company audited in the latest period.

**Article 144** The authority of Board of Directors to decide on the acquisition or sale of assets shall be as follows: the cumulative amount of a single project or annual project shall not exceed 30% of the total assets audited in the latest period; the assets shall be purchased or sold to the same party not more than three times in 12 consecutive months;

the Board of Directors shall have the right to decide on asset mortgage projects whose annual accumulated amount does not exceed 50% of the last audited net asset value.

**Article 145** The Board of Directors shall have the right to determine the amount of transactions under a single contract or related party transactions in which the amount of the same subject matter within 12 consecutive months shall not exceed 5% of the absolute value of the last audited net assets of the Company.

14

## Chapter VI. Directors and Boards of Directors
### Section 1 Directors

**Article 146** A director of the Company shall be a natural person and not be required to hold shares in the Company.

**Article 147** A director of the Company may not be appointed under any of the following circumstances.

(1) having no civil capacity or limited civil capacity;

(2) being sentenced to punishment for corruption, bribery, embezzlement of asset, misappropriation of asset or disruption of the order of the socialist market economy, and it has been less than 5 years since the execution completes; or being deprived of political rights because of a crime, and it has been less than 5 years since the execution completes;

(3) serving as the director or manager of the Company or enterprise in bankruptcy liquidation and bearing personal responsibility for the bankruptcy of the Company or enterprise, and it has been less than 3 years from the date of the completion of the bankruptcy liquidation of the Company or enterprise;

(4) serving as the legal representative of a company or an enterprise whose business license has been revoked or ordered to be closed down for violation of the law, and being personally liable, and it has been less than 3 years from the date of the revocation of the business license of the Company or enterprise;

(5) the outstanding debts due to the individual in a relatively large amount;

(6) imposed by the China Securities Regulatory Commission (CSRC) on the prohibition of entry into the securities market, and the time limit has not expired;

(7) other contents prescribed by laws, administrative regulations or departmental regulations.

The election of a director in contravention of this section shall be null and void.

In case of any of the above situation occurs to the serving directors, the Board of Directors shall immediately stop the directors concerned from performing their duties and request the General Meeting of Shareholders to replace them as soon as it becomes aware of the occurrence of such circumstances.

**Article 148** The directors shall be elected or replaced by the General Meeting of Shareholders for a term of three years. Upon the expiration of the directors' term of office, they may be re-elected. Before the expiration of their term of office, the General Meeting of Shareholders shall not dismiss them without reason.

The term of office of a director shall be counted from the date of approval of the resolution of the General Meeting of Shareholders until the expiration of the term of office of the current Board of Directors. If a director's term of office expires without timely re-election, the original director shall still perform his/her duties as a director in accordance with the laws, administrative regulations, departmental regulations and the provisions of the Articles of Association before the re-elected director takes up his/her position.

**Article 149** The directors shall abide by the provisions of the laws, administrative regulations and the Articles of Association and shall bear the following obligations of loyalty to the Company:

(1) they shall not abuse their power to accept bribes or other illegal income, and may not encroach on company assets;

(2) they shall not misappropriate company funds;

(3) the assets or funds of the Company shall not be kept in an account in their own name or in the name of any other individual;

(4) they shall not, in violation of the provisions of the Articles of Association, lend the Company funds to others or provide guarantees for others with the Company assets without the consent of the General Meeting of Shareholders or the Board of Directors;

(5) no contract or transaction with the Company shall be entered into without the consent of the General Meeting of Shareholders or in violation of the provisions of the Articles of Association;

(6) they shall not, without the consent of the General Meeting of Shareholders, abuse their duties to seek for themselves or others business opportunities that should belong to the Company, to run their own business on their own or for others in the same business as the Company;

(7) they shall not accept the commission on transactions with the Company as their own;

(8) they shall not disclose company secrets without authorisation;

(9) they shall not abuse their associated relationship to harm the interests of the Company;

(10) other obligations of loyalty stipulated in laws, administrative regulations, departmental regulations and the Articles of Association.

The income earned by the directors in violation of the provisions of this article shall be attributable to the Company; if losses are caused to the Company, the directors shall be liable for compensation.

**Article 150** the Company shall sign an appointment contract with its directors and clarify the rights and obligations between the Company and the directors, the term of office of the directors, the liability of the directors for violating laws and regulations and the Articles of Association, and the compensation from the Company's earlier cancellation of the contract for reasons.

**Article 151** The directors shall abide by the laws, administrative regulations and the Articles of Association and shall bear the following obligations of diligence to the Company:

15

(1) they shall exercise with care, seriousness and diligence the rights conferred on them by the Company to ensure that its business practices are in conformity with national laws, administrative regulations and various national economic policies, and that its business activities shall not exceed the scope of business stipulated in the business license;

(2) all shareholders shall be treated fairly;

(3) they shall keep abreast of the situation of the Company's business operation and management in a timely manner;

(4) A written confirmation opinion shall be signed on the Company's periodic report. To ensure that the information disclosed by the Company is true, accurate and complete;

(5) they shall truthfully provide relevant information and materials to the Board of Supervisors, and shall not hinder the Board of Supervisors or supervisors from exercising their functions and powers;

(6) other obligations of diligence as stipulated in laws, administrative regulations, departmental regulations and the Articles of Association.

**Article 152** No director may act on behalf of the Company or the Board of Directors in his/her personal capacity without the provisions of the Articles of Association or the lawful authorisation of the Board of Directors. When a director acts in his/her own capacity, if the third party reasonably believes that the director is acting on behalf of the Company or the Board of Directors, the director shall declare his/her position and identity in advance.

**Article 153** Where the individual director or any other enterprise in which he/she holds position is directly or indirectly associated with existing or planned contract, transaction or arrangement of the Company, (other than an employment contract), the nature and extent of the relationship shall be disclosed to the Board of Directors as soon as possible, regardless of whether the relevant matter generally requires the approval or consent of the Board of Directors.

**Article 154** Where a director of the Company notifies the Board of Directors in writing before the Company first considers entering into the relevant contract, transaction or arrangement, and declares that company's future contracts, transactions and arrangement are of interest to the Company due to the contents listed in the notice, the relevant director shall be deemed to have made disclosure stipulated in the preceding article of the Articles of Association.

**Article 155** Where a director fails to attend the Board of Directors' meeting in person for two consecutive times and does not entrust other directors to attend the meeting, he/she shall be deemed unable to perform his/her duties, and the Board of Directors shall recommend that he/she be replaced by the General Meeting of Shareholders.

**Article 156** A director may resign before the expiration of his/her term of office. He/she shall submit a written resignation report to the Board of Directors.

**Article 157** Where the resignation of a director results in fewer than 5 members of the Board of Directors of the Company, the resignation of the director shall not take effect until the next director has filled the vacancy arising from his/her resignation.

The remaining directors shall, as soon as possible, convene an Extraordinary General Meeting to elect the directors to fill the vacancy arising from the resignation of the director. Before the General Meeting of Shareholders has made a resolution on the election of director, the functions and powers of the resigning director and the remaining directors shall be subject to reasonable restrictions.

Except in the circumstances listed in the preceding paragraph, the resignation report submitted by a director shall take effect when it is delivered to the Board of Directors.

**Article 158** Where a director proposes to resign or his/her term of office expires, his/her obligations to the Company and the shareholders shall remain valid within one year after the his/her resignation report takes effect or the his/her term of office expires.

**Article 159** A director who has not completed his/her term of office shall be liable for any losses caused to the Company as a result of his/her unauthorized departure.

**Article 160** the Company shall not pay taxes for its directors in any form.

**Article 161** Where a resolution of the Board of Directors violates laws, administrative regulations or the Articles of Association and causes the Company to suffer losses, the directors participating in the resolution shall be liable for compensation to the Company. A director may, however, be exempt from liability if it proves that an objection was made at the time of the voting and recorded in the minutes of the meeting.

**Article 162** A director who, in the course of performing his/her duties, violates the provisions of laws, administrative regulations, departmental regulations or the Articles of Association and causes losses to the Company shall be liable for compensation.

**Article 163** Upon the approval of the General Meeting of Shareholders, the Company may purchase liability insurance for the directors. Except for the liability of directors resulting from the violation of laws, administrative regulations and the provisions of the Articles of Association.

### Section II Independent Directors

**Article 164** the Company shall have three independent directors, of whom there shall be no less than one accounting practitioner with a senior professional title or a certified public accountant qualification.

**Article 165** The independent directors shall be nominated by the Company's Board of Directors, Board of Supervisors and shareholders holding more than 1% of shares of the Company individually or collectively, and shall be elected or replaced by the General Meeting of Shareholders.

16

Articles of Association - IRICO Display Devices Co. Ltd.

**Article 166** Before the election of independent directors at the General Meeting of Shareholders, the Company shall submit the relevant materials (including, but not limited to, statements of nominators, statements of candidates and biographical records of independent directors) of the candidates for independent directors to the local office of CSRC and the stock exchanges where the Company is located.

If the Board of Directors objects to the relevant information of the nominees, it shall submit the its written opinions at the same time.

**Article 167** Where a stock exchange objects to the qualifications or independence of the candidate for an independent director, the candidate may not be elected as an independent director, but may, with the consent of the nominator, stand for election as a director candidate.

When an independent director shall be elected at the General Meeting of Shareholders, the Board of Directors shall provide an explanation as to whether the candidate for independent director has been challenged by the stock exchange.

**Article 168** The nominator of an independent director shall obtain the consent of the nominee before his/or nomination. The nominator shall have a full understanding of the nominees' occupation, educational background, title, detailed work experience and all part-time jobs, and shall make a statement on his/her qualifications and independence as an independent director.

**Article 169** Upon acceptance of a nomination, an independent director shall issue a public statement concerning the absence of any relationship between himself/herself and the Company that may affect his/her independent and objective judgment.

**Article 170** The term of office of an independent director shall be the same as that of the other members of the current Board of Directors.

Independent directors may be re-elected for a term not exceeding six years.

**Article 171** the Company shall pay an appropriate allowance to the independent directors.

The allowance of an independent director shall be prepared by the Board of Directors, submitted to the General Meeting of Shareholders for review and approval, and disclosed in the annual report of the Company.

In addition to the above allowances, the independent directors shall not derive additional undisclosed benefits from the Company and its major shareholders or interested institutions and personnel.

**Article 172** The independent director shall be responsible to all the shareholders of the Company, but when the interests of the shareholders are not consistent, they shall pay more attention to the interests of the minority shareholders.

**Article 173** An independent director shall meet the following basic conditions for his/her appointment, which shall be appropriate for him/her to exercise functions and powers:

(1) to be qualified as a director of a listed company in accordance with laws, administrative regulations and other relevant provisions;

(2) having the independence required by the normative documents of the securities regulatory authority;

(3) having basic knowledge of the operation of a listed company and being familiar with relevant laws, administrative regulations, rules and regulations;

(4) having at least five years of legal, economic or other work experience necessary for the performance of the duties of independent director;

(5) other conditions stipulated in the Articles of Association of the Company.

**Article 174** The following persons shall not serve as independent directors:

(1) persons employed in the Company or its subsidiaries or branches, and their immediate relatives and main social relations;

(2) the natural person shareholders who directly or indirectly hold more than 1% shares issued outside the Company or are among the top 10 shareholders of the Company, and their immediate relatives and main social relations;

(3) persons employed ,in the units holding more than 5% shares issued outside the Company directly or indirectly or among the top 5 shareholders of the Company, and their immediate family members and main social relations;

(4) any person who has had the circumstances listed in the preceding three paragraphs in the last year;

(5) persons who have an interest relationship with the Company, its affiliates or the Company's management personnel;

(6) persons employed in institutions that have direct or indirect business relations or interests with the Company;

(7) persons who provide financial, legal or advisory services to the Company or its subsidiaries or branch companies, or other persons employed in such institutions;

(8) persons employed in securities regulatory authorities, securities institutions and securities investment funds;

(9) any person who may not be allowed to serve as a director of a company as stipulated in the Company Law or other relevant laws or administrative regulations;

(10) persons who have been identified by the CSRC as being prohibited from entering the market and whose prohibition have not yet been lifted.

IRI-CRT-00001044 - Translation

(11) other persons between the companies who may affect their independent and objective judgements.

(12) other persons identified by the CSRC.

The above immediate family members refer to the spouses, parents, children and so on; the main social relations refer to brothers and sisters, mother/father-in-law, daughter/son-in-law, the spouses of brothers and sisters, brothers and sisters of the spouses, etc.

**Article 175** The independent director shall perform the duty of due diligence in good faith as stipulated in the laws, regulations, normative documents and the Articles of Association.

**Article 176** In addition to the general functions and powers of directors, an independent director shall have the following special functions and powers:

(1) A major related party transaction (which refers to a related party transaction in which the total amount of the Company's proposed agreement with the associated party exceeds 3 million yuan or more than 5% of the Company's latest audited net asset value) shall be submitted to the Board of Directors for discussion only after the receipt of prior consent from the independent directors; before making judgment, the independent director may appoint an intermediary institution to issue an independent financial advisory report as the basis for his/her judgment;

(2) to propose to the Board of Directors the employment or dismissal of an accounting firm;

(3) to request the Board of Directors to convene an Extraordinary General Meeting;

(4) to propose the convening of a meeting of Board of Directors;

(5) before making a resolution, the Board of Directors shall adopt the proposal to suspend voting if the independent director considers that the information or argumentation of the matter under review is insufficient;

(6) to solicit the voting rights publicly from the shareholders before the convening of General Meeting of Shareholders;

(7) to hire an external audit institution or an advisory body independently.

In case that the above proposal is not accept or the above functions and powers could not be exercised normally, the Company shall disclose the relevant information.

**Article 177** An independent director shall express independent opinion on the following matters:

(1) to nominate, appoint or dismiss directors;

(2) to appoint or dismiss senior management personnel;

(3) the remuneration of directors and senior management personnel of the Company;

(4) the financial report of the Company;

(5) when cash dividends are not included in the profits distribution plans made by the Board of Directors;

(6) the Company's plan for issuing new shares;

(7) loans or other financial transactions involving shareholders, actual controllers and their associated enterprises of the Company whose total amount of existing or newly occurring amounts is more than 3 million yuan or more than 5% of the Company's latest audited net asset value, and whether the Company has taken effective measures to recover the arrears;

(8) plans for asset replacement, acquisition or sale that account for more than 30% of the Company's latest audited total assets;

(9) plans for venture investment, guarantee and asset loss that accounts for more than 10% of the Company's latest audited net assets;

(10) to issue a special statement of the Company's accumulated and current external guarantee situation, and issue independent opinions in the annual report of the Company;

(11) matters on which independent directors are required to express their opinions by the securities regulatory authorities and stock exchanges;

(12) matters in which laws, regulations and normative documents require independent directors to express their opinions;

(13) matters which, in the opinion of the independent directors, may impair the rights and interests of the minority shareholders;

(14) such other matters as the independent directors deem necessary.

**Article 178** The independent director shall express independent opinion in one of the following ways:

(I) consent;

(II) reservations and the reasons;

(III) objections and the reasons;

(IV) inability to express opinions and obstacles thereto.

**Article 179** Where the relevant matters need to be disclosed involves disclosure, the Company shall announce the opinions of the independent directors. In the event that the independent directors are unable to reach an agreement on their differences of opinions, the Board of Directors shall disclose their opinions separately.

**Article 180** In order to ensure the effective exercise of the functions and powers of the independent directors, the Company shall provide the necessary conditions for the independent directors:

(1) the Company shall ensure that independent directors enjoy the same right to know as other directors. Where decisions shall be made by the Board of Directors, the Company must notify the independent directors in advance within the prescribed time limit and provide sufficient information at the same time. If the information is deemed insufficient by the independent directors, they may request additional information.

(2) the Company shall provide such working conditions as necessary for the independent directors to perform their duties (including, but not limited to, providing documents, materials, office space, means of transportation and communications, and access to and from production and business premises).

(3) the secretary of company's Board of Directors shall actively provide assistance to the independent directors in the performance of their duties, such as briefings, materials, etc. Where an independent opinion, proposal or written statement issued by an independent director should be made public, the secretary of the Board of Directors shall go to the stock exchange to proceed with the announcement in time.

(4) when independent directors exercise their functions and powers, the relevant personnel of the Company shall cooperate actively, shall not refuse, obstruct or conceal, and shall not interfere with their independent exercise of functions and powers.

**Article 181** The independent directors shall submit the annual report of all independent directors to the Company's Annual General Meeting, explaining the performance of their duties.

**Article 182** the Company may establish a necessary system of liability insurance for independent directors in order to reduce the risks that may arise from the normal performance of their duties.

**Article 183** The information provided by the Company to the independent directors shall be kept by the Company and the independent directors themselves for at least five years.

**Article 184** If an independent director fails to attend the Board of Directors' meeting in person for three consecutive times, the Board of Directors shall submit his/her removal and replacement to the General Meeting of Shareholders.

Unless otherwise provided in laws, regulations, normative documents and the Articles of Association, an independent director shall not be removed from position without reason before the expiration of his/her term of office. In case that the removal is necessary, the Company shall disclose it as a special disclosure, and the removed independent director may issue a public statement if he/she considers that the reasons for the removal provided by the Company are improper.

**Article 185** The independent director may resign before the expiration of his/her term of office.

The resignation of the independent director shall be submitted to the Board of Directors in writing with a description of any circumstances relating to his/her resignation or which he/she deems necessary to bring to the attention of the shareholders and stakeholders of the Company. If the resignation of an independent director results in the number of members of the independent director or Board of Directors being lower than the statutory or minimum number specified in the Articles of Association, the Board of Directors shall convene a General Meeting of Shareholders to elect additional independent directors within 60 days from the date of receipt of the resignation report. Before the by-elected independent director assumes office, the resigned independent director shall still perform his/her duties in accordance with the provisions of the laws, administrative regulations and the Articles of Association. If an independent director has not been elected within the time limit, the resigned independent director may cease to perform his duties any longer.

**Article 186** In the event that an independent director fails to perform his/her duties or commits serious dereliction of duty, the Board of Directors or the Board of Supervisors shall request the General Meeting of Shareholders to remove or replace him/her.

When the Board of Directors or the Board of Supervisors makes such a resolution, the director or supervisor who holds the dissenting opinion shall have the right to require a public announcement of his/her opinion.

### Section III. Board of Directors

**Article 187** the Company shall have a Board of Directors and be responsible to the General Meeting of Shareholders.

**Article 188** The Board of Directors shall consist of seven directors (including three independent directors).

**Article 189** The Board of Directors shall exercise the following functions and powers:

(1) to be responsible for the convening of the General Meeting of Shareholders and to report to the meeting;

(2) to implement the resolutions of the General Meeting of Shareholders;

IRI-CRT-00001046 - Translation

(3) to decide on the Company's business plan and investment plan;

(4) to formulate the annual financial budget and final accounts plan of the Company;

(5) to formulate the profit distribution plan and the plan for making up the losses of the Company;

(6) to formulate plans for the Company to increase or reduce its registered capital, issue bonds or other securities, and list its shares;

(7) to draw up plans for the material acquisition or repurchase of the Company's shares or for the merger, division, dissolution and alteration of the Company;

(8) to decide, within the scope of authorisation of the General Meeting of Shareholders, on the Company's foreign investment, acquisition and sale of assets, asset mortgage, entrustment of financial management, related party transactions, and so on;

(9) matters relating to security other than decisions to be reviewed and approved by the General Meeting of Shareholders;

(10) to decide on the establishment of the Company's internal administrative bodies;

(11) to appoint or dismiss the Company's general manager or secretary of the Board of Directors; to appoint or dismiss senior managerial personnel, such as the deputy general manager and the person in charge of the Company's finance, upon the nomination of the general manager; and to decide on the matters of remuneration, rewards and punishments of these personnel;

(12) to formulate the basic management system of the Company;

(13) to formulate the amendment plan for the Company's Articles of Association ;

(14) to manage the disclosure of company information;

(15) to apply to the General Meeting of Shareholders for the appointment or replacement of the accounting firm audited by the Company;

(16) to listen to the general manager's work report and review his/her work;

(17) other functions and powers stipulated in the provisions of laws, regulations or Articles of Association of the Company, as well as conferred by the General Meeting of Shareholders.

**Article 190** the Company shall have a chairman who shall be elected and removed by a majority of all the directors.

**Article 191** The chairman of the Board of Directors shall exercise the following functions and powers:

(1) to preside over the General Meeting of Shareholders and to convene and preside over the meeting of the Board of Directors;

(2) to supervise and inspect the implementation of the resolutions of the Board of Directors;

(3) to sign shares, bonds and other marketable securities of the Company;

(4) to sign important documents of the Board of Directors and other documents which should be signed by the legal representative of the Company;

(5) to exercise the functions and powers as the legal representative;

(6) in the event of force majeure such as exceptional natural disasters, to exercise the power of special disposal of the affairs of the Company in conformity with the provisions of the law and the interests of the Company, and to report to the Company's Board of Directors and the General Meeting of Shareholders afterwards;

(7) other functions and powers conferred by the Board of Directors.

**Article 192** In case that the chairman of the Board of Directors is unable to perform his/her duties, he/she shall appoint a director to perform the duties on his/her behalf. If the chairman is unable to perform his/her duties, nor has he/she appointed a director to perform duties on his/her behalf, one director shall be nominated by more than 1/2 directors to perform his/her duties.

**Article 193** the Company's Board of Directors of a company shall explain to the General Meeting of Shareholders the non-standard audit report issued by the certified public accountant on the Company's financial report.

**Article 194** All directors of the Company shall treat the external guaranty with caution and strictly control the debt risk arising from the external guarantee.

**Article 195** The Board of Directors shall formulate an System of Investor Relation Management, actively carry out investor relations management work, and actively strengthen communication and exchanges with investors, especially social and public investors, through various forms, set up special investor consultation hotline, set up investor relationship column on the Company website, hold regular meetings with public investors, and respond to public investors' concerns in time. The secretary of the Board of Directors shall be responsible for the Company's management of the investor relations of the Company.

### Section IV. Authorization of the Board of Directors to the Chairman

Article 196 During the intersessional period of the Board of Directors, the chairman shall have the right to decide on and sign a single bank loan contract not exceeding RMB 50 million yuan.

The decision made by the chairman shall be in the best interests of the Company and shall be reported to the next meeting of Board of Directors.

### Section V Secretary of the Board of Directors

**Article 197** The Board of Directors shall have a secretary.

The secretary of the Board of Directors shall be senior managerial personnel of the Company, nominated by the chairman of the Board of Directors, and appointed by the Board of Directors to be responsible to the Company and the Board of Directors.

The secretary of the Board of Directors shall be the designated liaison between the Company and the stock exchange.

**Article 198** The secretary of the Board of Directors shall have the necessary professional knowledge and experience.

Qualifications of the secretary of the Board of Directors:

(1) with a college degree or above and having been engaged in secretarial or economic management or equity affairs for not less than three years;

(2) with good knowledge of law, finance, securities and enterprise management, and having good personal qualities and professional skills and strictly abiding by laws, regulations, rules, and can faithfully perform his/her duties with good ability to handle public affairs.

(3) obtaining the certificate of qualification for the training of the secretary of the Board of Directors issued by the stock exchange.

**Article 199** A person may not serve as secretary of the Board of Directors under any of the following circumstances:

(1) subject to one of the circumstances provided for in Article 147 of the Company Law;

(2) having been less than 3 years since the last administrative punishment of the CSRC;

(3) having been publicly condemned by the stock exchange or criticized by three or more circulars in the past 3 years;

(4) being the Company's current supervisor;

(5) other circumstances in which the stock exchange determines that he/she is not suitable to serve as secretary to the Board of Directors

**Article 200** The secretary of the Board of Directors shall perform the following duties:

(1) to be responsible for timely communication and liaison between the Company and the relevant parties and the stock exchange and other securities regulatory bodies so as to ensure that the stock exchange can obtain working contacts with him/her at any time;

(2) to be responsible for handling the Company's information disclosure affairs, to urge the Company to formulate and implement the information disclosure management system and the internal reporting system for major information, and to urge the Company and the relevant parties to fulfil their information disclosure obligations in accordance with the law, And shall handle the disclosure of periodic and interim reports to the stock exchanges in accordance with the relevant provisions;

(3) to coordinate the relations between the Company and its investors, receive visits from the investors, answer the investors' inquiries, and provide the investors with the information disclosed by the Company;

(4) to prepare the meeting of the Board of Directors and the General Meeting of Shareholders, and prepare and submit the document to be reviewed by these meetings, in accordance with the legal procedures;

(5) to attend the meeting of the Board of Directors, make minutes of the meeting and sign the minutes;

(6) to be responsible for the confidentiality work related to the disclosure of information of the Company, formulate confidential measures, urge all members of the Company's Board of Directors and relevant insiders to keep secrets before the official disclosure of the relevant information, and take timely remedial measures and report to the stock exchange when the inside information is disclosed;

(7) to be responsible for the custody of the register of the Company's shareholders, the register of directors, the information of major shareholders and directors, supervisors and senior managers holding shares of the Company, as well as the documents and minutes of meetings of the Board of Directors and the General Meeting of Shareholders;

(8) to assist directors, supervisors and senior managers to understand the relevant laws, regulations, rules and regulations on information disclosure, the stock exchange's listing rules , and its other regulations and the Articles of Association, as well as the responsibilities to which the listing agreement shall be established;

(9) to urge the Board of Directors to exercise its functions and powers in accordance with the law; to remind the director present at the meeting and request the supervisor who attends the meeting as nonvoting delegate to express their opinions when a resolution to be made by the Board of Directors violates the laws, regulations, rules governing the listing of stocks of the stock exchange, other provisions of the stock exchange and the Company's Articles of Association if the Board of Directors insists on making such a resolution, the secretary shall record in the meeting minutes of the opinion of the supervisor concerned and his / her personal opinion, and report immediately to the stock exchange;

IRI-CRT-00001048 - Translation

(10) other duties required by the stock exchange.

**Article 201** The company's directors or other senior managerial personnel may concurrently serve as the secretary of the Board of Directors of the Company. The certified public accountants of the counting firm and the lawyers of the law firms employed by the Company may not concurrently serve as its secretary of the Board of Directors.

**Article 202** The secretary of the Board of Directors shall be nominated by the chairman and appointed or dismissed by the Board of Directors. Where a director concurrently serves as secretary of the Board of Directors, he/she shall not do so in a dual capacity if an act is required to be done separately by the director and the secretary of the Board of Directors.

**Article 203** the Company shall provide convenient conditions for the secretary of the Board of Directors to perform his/her duties, and the directors, supervisors, senior managerial personnel and relevant personnel of the Company shall support and cooperate with the work of the secretary.

In order to perform his/her duties, the secretary of the Board of Directors shall have the right to know the financial and business situation of the Company, attend relevant meetings concerning information disclosure, review all documents relating to the disclosure of information, and require relevant departments and personnel of the Company to provide relevant materials and information in a timely manner.

The secretary of the Board of Directors may report directly to the stock exchange when he/she is unduly obstructed or seriously obstructed in the course of performing his/her duties.

**Article 204** the Company shall dismiss the secretary of the Board of Directors for good reasons and shall not dismiss him without cause.

When the secretary of the Board of Directors is dismissed or resigns, the Company shall promptly report to the stock exchange where its stock is listed, explain the reasons and issue a public announcement.

The secretary of the Board of Directors shall have the right to submit a personal statement report to the stock exchange where the Company shares are listed in the case of improper dismissal by the Company or in connection with its resignation.

**Article 205** In case that the secretary of the Board of Directors has any of the following circumstances, the Company shall, within one month from the date of the occurrence of the facts, dismiss him/her:

(1) ceasing to be qualified as secretary of the Board of Directors;

(2) unable to perform his/her duties for more than three consecutive months;

(3) making major mistakes or omissions in the course of performing his/her duties, which causes heavy losses to the investors;

(4) violating state laws, regulations, rules, these rules, other provisions of the exchange and the Articles of Association of the Company, which causes heavy losses to investors.

**Article 206** the Company shall, when appointing a secretary of the Board of Directors, sign a confidentiality agreement with him/her requiring him/her to undertake to perform the confidentiality obligations continuously during his/her term of office and after leaving the position until the relevant information is disclosed, except for information relating to the violation of laws and regulations by the Company.

Before leaving the position, the secretary of the Board of Directors shall be subject to the departure review of the Board of Directors and the Board of Supervisors, and hand over relevant archives and documents, and matters being handled or pending under the supervision of the Company's Board of Supervisors.

**Article 207** During the vacancy of the secretary, the Board of Directors shall appoint director or senior managerial personnel to act as the secretary and report to the stock exchange for the record, and at the same time, determine the candidate for the secretary as soon as possible The chairman shall act as the secretary before the Company appoints one.

The chairman shall act as the secretary after a vacancy period of more than three months, until the Company formally appoints one.

**Article 208** the Company shall, while appointing a secretary of the Board of Directors, also appoint a representative of securities affairs to assist the secretary in performing his/her duties; if the secretary is unable to perform his/her duties, the securities representative shall exercise the rights and perform the duties on his/her behalf. In the meantime, the secretary shall not necessarily be exempt from the responsibility of the Company's information disclosure.

The securities representative shall obtain the certificate of secretary of the Board of Directors issued by the stock exchange.

IRI-CRT-00001049 - Translation

### Section VI Special Committee of the Board of Directors

**Article 209** the Company's Board of Directors may, in accordance with the relevant resolutions of the General Meeting of Shareholders, establish special committees on strategies, audits, nominations, remuneration and appraise. The members of the special committees are all directors, among whom the independent directors in the audit committee, the nomination committee, the remuneration and appraisal committee shall be the majority and act as convenor, and at least one independent director in the audit committee shall have accounting professional background.

**Article 210** The main responsibility of the Strategy Committee shall be to study and make suggestion the Company's long-term development strategy and major investment decisions

**Article 211** The main responsibilities of the Audit Committee are as follows:

(I) to propose the hiring or replacement of an external audit institution;

(2) to supervise the Company's internal audit system and its implementation;

(III) to be responsible for the communication between internal audit and external audit;

(4) to examine and verify the Company's financial information and its disclosure;

(5) to review the Company's internal control system of the Company.

**Article 212** The main responsibilities of the Nomination Committee are as follows:

(1) to study the criteria and procedures for the selection of directors and managers and make recommendations;

(2) to extensively search for qualified candidates for directors and managers;

(3) to review and make suggestions on the selection of candidates and managers for directors.

**Article 213** the main responsibilities of the Remuneration and Appraisal Committee are as follows:

(1) to study the criteria for the assessment of directors and managers, conduct the assessment and make suggestions;

(2) to study and review the remuneration policies and plans of directors and senior managerial personnel.

**Article 214** Each special committee may employ an intermediary to provide professional advice, and the relevant expenses shall be borne by the Company.

**Article 215** Each special committee shall be responsible to the Board of Directors, and the proposals of each special committee shall be submitted to the Board of Directors for review and approval.

### Chapter VII Supervisors and Boards of Supervisors

### Section 1 Supervisors

**Article 216** The supervisors shall be the representatives of the Company's shareholders and employees. The number of supervisors served by the Company's employee representatives shall not be less than 1/3 of the total number of supervisors.

**Article 217** Directors, managers and other senior managerial personnel may not concurrently act as supervisors. Article 147 of the Articles of Association shall apply to the supervisor under the circumstances that he/she shall not serve as a director.

In the event of the occurrence of the circumstances stipulated in Article 147, the Board of Supervisors shall immediately stop the relevant supervisor from performing his/her duties as soon as it is aware of the occurrence of such circumstances, and shall report to the General Meeting of Shareholders or the general meeting of employees (representatives) to dismiss and replace him/her.

**Article 218** Supervisors shall abide by laws, administrative regulations and the Articles of Association, bear the duty of loyalty and diligence to the Company, not abuse their powers to accept bribes or other illegal income, and not encroach on the property of the Company.

**Article 219** Supervisors shall serve for a term of three years. The supervisors served by shareholders shall be elected or replaced by the General Meeting of Shareholders, and the supervisors served by employees shall be democratically elected or replaced by company's employees. The supervisor shall be eligible for re-election. Before the supervisor's term of office expires, the General Meeting of Shareholders shall not dismiss him/her from his/her duties without reason. The term of office of the supervisors shall be calculated from the date of the approval of the resolution of the General Meeting of Shareholders and expire at the end of the term of the current Board of Supervisors.

**Article 220** If a supervisor fails to be re-elected at the end of his/her term of office, or if the member of the Board of Supervisors is less than a quorum as a result of the resignation of the supervisor during his/her term of office, before the re-elected supervisor takes up position, the former supervisor shall still perform his/her duties in accordance with the provisions of the laws, administrative regulations and the Articles of Association.

**Article 221** The supervisor shall ensure that the information disclosed by the Company shall be true, accurate and complete.

**Article 222** The supervisor may attend the meeting of the Board of Directors as nonvoting delegate and put forward questions or suggestions on matters decided by the Board of Directors.

**Article 223** The supervisor shall not use his/her associated relationship to harm the interests of the Company, and if losses have been caused to the Company, he/she shall bear the liability for compensation.

**Article 224** The supervisor who, in the course of performing his/her duties, violates the provisions of laws, administrative regulations, departmental regulations or the Articles of Association and causes losses to the Company shall be liable for compensation.

**Article 225** Supervisors shall have legal or accounting expertise and working experience.

**Article 226** Supervisors shall have the right to know the Company's operating conditions and bear the corresponding obligation of confidentiality. The Board of Supervisors may independently employ an intermediary to provide professional advice.

**Article 227** the Company shall take measures to ensure the supervisors' right to know and provide necessary assistance for the supervisors to perform their duties normally without any interference or obstruction.

the Company shall bear the reasonable expenses required by the supervisors for the performance of their duties.

**Article 228** If a supervisor fails to attend the meeting of the Board of Supervisors in person for two consecutive times, he/she shall be deemed unable to perform his/her duties and shall be replaced by the General Meeting of Shareholders or the general meeting of employees.

**Article 229** The remuneration of supervisors shall be determined by the General Meeting of Shareholders.

**Article 230** the Company shall not pay taxes for its supervisors in any form.

**Article 231** A supervisor may resign before the expiration of his/her term of office. The provisions of Chapter VI of the Articles of Association concerning the resignation of a director shall apply to the supervisor.

**Article 232** Supervisors shall abide by the provisions of laws, administrative regulations and the Articles of Association of the Company, and fulfil the obligations of good faith and diligence.

### Section II Board of Supervisors

**Article 233** A Board of Supervisors shall be set up. The Board of Supervisors is a permanent supervisory body of the Company and shall be responsible to the Shareholder Meeting. The Board of Supervisors shall be composed of 3 supervisors, 2 of whom represent shareholders and 1 represents employees of the Company.

The Board of Supervisors shall have a chairman who shall be appointed by the supervisor and be elected or removed by a majority of all supervisors.

If the chairman of the Board of Supervisors is unable to perform his/her functions and powers, he/she shall appoint a supervisor to perform the functions and powers on his/her behalf.

**Article 234** The Board of Supervisors shall exercise the following functions and powers:

(1) to review the Company's periodic reports prepared by the Board of Directors and provide opinion in writing;

(2) to inspect the financial affairs of the Company;

(3) to supervise the acts of directors and senior managerial personnel in the performance of company duties, and make proposals on the removal of directors and senior managerial personnel who violate laws, administrative regulations, the Articles of Association or resolutions of the General Meeting of Shareholders;

(4) to require the directors and senior managerial personnel to correct their acts found to be harmful to the interests of the Company;

(5) to propose the convening of an Extraordinary General Meeting and convene and preside over the meeting when the Board of Directors fails to perform its duties of convening and presiding over the meeting as stipulated in the Company Law;

(6) to submit proposal to the General Meeting of Shareholders;

(7) to initiate legal proceedings against directors and senior managerial personnel in accordance with the provisions of Article 152 of the Company Law;

(8) to conduct investigation if it finds abnormalities in the Company's business; if necessary, it may employ accounting firms, law firms and other professional institutions to assist it in its work, and the expenses shall be borne by the Company.

(9) other functions and powers conferred by the provisions of the Articles of Association or the General Meeting of Shareholders.

**Article 235** When exercising its functions and powers, the Board of Supervisors may, if necessary, employ law firms, accounting firms and other professional institutions to offer assistance, and the expenses incurred therefrom shall be borne by the Company.

24

## Chapter VIII Manager

**Article 236** the Company shall have managers, of whom a general manager and a number of deputy general managers appointed or dismissed by the Board of Directors. A director may be appointed concurrently as general manager, deputy general manager or other senior management personnel, provided that the director who concurrently holds the post of general manager, deputy general manager or other senior management shall not exceed 1/2 of the total number of directors of the Company.

**Article 237** The circumstances stipulated in Article 147 of the Articles of Association under which a director may not be appointed shall apply to senior managerial personnel.

In the event of the occurrence of the circumstances specified in Article 147 to the incumbent manager, the Board of Directors shall, as soon as it becomes aware of the occurrence of the situation, immediately stop him/her to perform his/her duties and convene a meeting to perform the dismissal procedure.

The provisions of the Articles of Association relating to the director's duty of loyalty and Article 151 (4)-(6) relating to the duty of diligence shall apply to senior managerial personnel as well.

**Article 238** Persons holding positions other than director in entities of the Company's controlling shareholders or actual controllers shall not serve as senior managerial personnel of the Company.

**Article 239** The term of office of a manager shall be three years, who may be re-appointed for a second term.

**Article 240** The appointment of the Company's managers shall be carried out in strict accordance with the relevant laws and regulations and the provisions of the Articles of Association. No organization or individual may interfere with the normal procedures for selecting and appointing managers of the Company.

**Article 241** the Company shall sign an employment contract with the manager and clarify the rights and obligations of both parties.

**Article 242** The general manager shall be responsible to the Board of Directors and exercise the following functions and powers:

(1) to take charge of the production, operation and management of the Company and report to the Board of Directors;

(2) to organize and implement resolutions of the Board of Directors, annual plans and investment plans of the Company;

(3) to draw up plans for the establishment of internal management bodies of the Company;

(4) to formulate the basic management system of the Company;

(v) to formulate specific rules and regulations of the Company;

(6) to request the Board of Directors to appoint or dismiss the Company's deputy general manager and the person in charge of financial affairs;

(7) to appoint or dismiss managerial personnel other than those who should be appointed or dismissed by the Board of Directors;

(8) to draw up the wages, benefits, rewards and punishments of the Company's employees of the Company, and decide on the employment and dismissal of these employees;

(9) to propose the convening of an interim meeting of the Board of Directors;

(10) other powers and powers conferred by the Articles of Association or the Board of Directors.

**Article 243** The general manager shall attend the meeting of Board of Directors as nonvoting delegate.

The non-managing director does not have the right to vote on the Board of Directors.

**Article 244** The manager shall, at the request of the Board of Directors or the Board of Supervisors, report to the Board of Directors or the Board of Supervisors on the signing and implementation of major contracts, utilization of funds and profit and loss of major contracts of the Company. The manager must guarantee the authenticity of the report.

**Article 245** When drawing up policies relating to wages, welfare, safety in production, labour protection, labour insurance, labour contracts or other issues concerning the vital interests of the employees, the manager shall listen to the opinions of the trade unions or the employee representatives in advance.

**Article 246** The general manager shall formulate detailed rules for the work of manager, which shall be implemented after the approval of the Board of Directors.

**Article 247** the detailed rules of the work of manager shall include the following:

(1) the conditions, procedures and participants of the manager's meeting;

(2) the specific duties and responsibilities of the general manager, the deputy general manager and other senior managerial personnel and their division of labour;

(3) the use of the Company's funds and assets, the authority to sign major contracts, and the reporting system to the Board of Directors and the Board of Supervisors;

(4) other matters the Board of Directors deems necessary.

**Article 248** The manager shall abide by the provisions of the laws, administrative regulations and Articles of Association, and perform the obligations of good faith and diligence.

**Article 249** The manager may resign before the expiration of his/her term of office. The specific procedures and measures for the manager's resignation shall be stipulated in the employment contract signed between the manager and the Company.

25

**Article 250** The appointment and dismissal of a manager shall follow statutory procedures and be publicly announced.

## Chapter IX Performance Evaluation and Incentive and Restraint Mechanism
### Section 1 Performance Evaluation of Directors, Supervisors and Managers

**Article 251** the Company shall establish fair and transparent performance evaluation standards and procedures for directors, supervisors and managers.

**Article 252** The performance evaluation of directors and managers shall be organized by the Board of Directors or the remuneration and appraisal committee established thereunder. The evaluation of independent directors and supervisors should be carried out by combining self-evaluation with mutual evaluation.

**Article 253** The amount and payment method of directors' remuneration shall be submitted by the Board of Directors to the General Meeting of Shareholders for approval. When a director is evaluated or his/her remuneration is discussed by the Board of Directors or the remuneration and appraisal committee, the director shall withdraw.

**Article 254** The Board of Directors and the Board of Supervisors shall report to the General Meeting of Shareholders on the performance of the duties of the directors and supervisors, the results of the performance evaluation and the remuneration thereof, and shall disclose them.

### Section II Incentive and Restraint Mechanism of Managers

**Article 255** the Company shall establish an incentive mechanism in which the remuneration of its managers is linked to their individual performance in order to attract talents and maintain the stability of the managers.

**Article 256** the Company's performance evaluation of managers shall be the basis for determining the compensation of managers and other incentives.

**Article 257** The manager's salary distribution plan shall be approved by the Board of Directors, explained to the General Meeting of Shareholders and disclosed.

**Article 258** Where the managers violate the laws, administrative regulations and the Articles of Association and causes losses to the Company, the Company's Board of Directors shall actively take measures to investigate their legal liability.

## Chapter X Financial Accounting System, Profit Distribution and Audit
### Section 1 Financial Accounting System

**Article 259** the Company shall formulate its financial accounting system in accordance with the laws, administrative regulations and provisions of relevant state departments.

**Article 260** the Company shall submit its annual financial and accounting reports to the CSRC and the stock exchange within 4 months from the end of each fiscal year, , submit semi-annual financial and accounting reports to the local office of the CSRC and the Stock Exchange within 2 months from the end of the first six months of each fiscal year, and submit the quarterly financial and accounting reports to the local office of the CSRC and the Stock Exchange within 1 month from the end of the first 3 months and the first 9 months of each fiscal year.

The above-mentioned financial and accounting reports shall be compiled in accordance with the provisions of relevant laws, administrative regulations and departmental regulations.

**Article 261** the Company's annual financial report and the interim financial report for the distribution of interim profits shall include the following:

(1) balance sheet;

(2) income statement;

(3) statement of profit distribution;

(4) statement of cash flows;

(5) notes to the accounting statements.

When the Company does not distribute interim profits, the interim financial report includes the above financial statements and notes other than item (3) .

IRI-CRT-00001053 - Translation

**Article 262** the Company's financial and accounting reports in its annual report must be audited by an accounting firm qualified to carry out securities and futures-related business.

the Company's financial and accounting reports in its semi-annual report may not be audited, but shall be audited under any of the following circumstances:

(1) to intend to distribute profits, convert provident funds into shares or make up for losses in the second half of the year;

(2) to intends to apply for refinancing such as issuing new shares or convertible corporate bonds in the second half of the year, if deemed necessary to be audited in accordance with relevant provisions;

(3) to apply for resumption of the listing of shares after suspension, if deemed necessary to be audited as required;

(4) other circumstances under which the CSRC or the Stock Exchange deems that an audit should be conducted.

The financial information contained in the quarterly report of the Company shall not be subject to audit except as otherwise stipulated by the CSRC or the Stock Exchange.

**Article 263** the Company shall not keep separate accounting books other than the statutory one. the Company assets shall not be deposited in an account opened in the name of any individual.

**Article 264** When the Company distributes after-tax profits in the current year, it shall draw 10% of the profits to be included in its statutory provident fund. If the accumulative amount of the Company's statutory accumulation fund is more than 50% of its registered capital, it may no longer be withdrawn.

If the Company's statutory provident fund is not sufficient to make up for the losses of the previous year, it shall, before drawing up the statutory accumulation fund in accordance with the provisions of the preceding paragraph, make up the loss with the current year's profits.

After drawing up the legal accumulation fund from the after-tax profit, upon the resolution of the general meeting of shareholders, the Company could also draw up any accumulation fund from its after-tax profit.

The residual after-tax profits of the Company after making up the losses and withdrawing the accumulation fund shall be distributed in proportion to the shares held by the shareholders, except for those which shall not be allocated according to the proportion of the shares held in these Articles of Association.

Where the General Meeting of Shareholders, in violation of the provisions of the preceding paragraph, distributes profits to the shareholders before the Company makes up the losses and draws the statutory provident fund, the shareholders must return the profits distributed in violation of the Company regulations.

The shares held by the Company shall not be included in the distribution of profits.

**Article 265** the Company's provident fund shall be used to make up for the Company's losses, expand the Company's production and operation, or increase the Company's capital. However, the capital accumulation fund will not be used to cover the Company's losses.

When the statutory provident fund is converted to capital, the retained reserve fund shall not be less than 25% of the Company's registered capital before the conversion.

**Article 266** Upon the resolution made by the Company's General Meeting of Shareholders on the profit distribution plan, its Board of Directors shall complete the distribution of dividends (or shares) within two months after the convening of the General Meeting of Shareholders.

**Article 267** the Company's profit distribution policy in the current year shall be formulated and announced by the Board of Directors before the convening of the Annual General Meeting.

**Article 268** the Company shall distribute dividends by way of cash or shares.

**Article 269** Where a shareholder illegally occupies the company's funds, the Company shall deduct the cash dividend allocated by the shareholder in order to repay the funds occupied.

### Section II Internal Audit

**Article 270** the Company shall implement an internal audit system with full-time auditors to supervise its financial revenues and expenditures and economic activities.

**Article 271** The Company's internal audit system and duties of the auditors shall be implemented upon the approval of the Board of Directors. The chief auditor shall be responsible to the Board of Directors and report on his work.

### Section III Employment of Accounting Firms

**Article 272** The accounting firm hired by the Company which has obtained "qualification for securities and futures related business" shall be engaged in accounting statement audit, net asset verification and other related consulting services for a term of one year and may be re-appointed.

**Article 273** The employment of an accounting firm by the Company must be decided by the General Meeting of Shareholders, and the Board of Directors may not appoint an accounting firm before the decision has been made by the meeting.

**Article 274** the Company shall undertake to provide true and complete accounting vouchers, accounting books, financial and accounting reports and other accounting materials to the accounting firm that it employs, and shall not refuse, conceal or falsely report .

**Article 275** The audit fee of an accounting firm shall be determined by the General Meeting of Shareholders.

**Article 276** The accounting firm employed by the Company shall have the following rights:

(1) to review the financial statements, records and vouchers of the Company and have the right to require the Company's directors, managers or other senior managerial personnel to provide relevant information and explanations;

(2) to require the Company to provide information and descriptions of its subsidiaries necessary for the accounting firm to perform its functions;

(3) to attend the General Meeting of Shareholders as nonvoting delegate, obtain notice of the general meeting or other related information, and speak at the general meeting on matters concerning it as the accounting firm employed by the Company.

**Article 277** The decision of the General Meeting of Shareholders on the dismissal of an accounting firm by the Company shall be disclosed in the China Securities News and the Shanghai Securities News, and the reasons for the replacement shall be stated if necessary and also be reported to the CSRC and the China Institute of Certified Public Accountants for the record.

**Article 278** When the Company dismisses or does not renew its employment of an accounting firm, it shall notify the firm 30 days in advance, and the firm shall have the right to state its views to the General Meeting of Shareholders. If an accounting firm considers that the Company has improper reasons for its dismissal or non-renewal of its employment, it may lodge a complaint with the CSRC and the China Institute of Certified Public Accountants. If an accounting firm offers to resign, it shall explain to the General Meeting of Shareholders whether the Company has any improper circumstances.

## Chapter XI Continuous Information Disclosure

**Article 279** the Company shall formulate a management system of information disclosure, strictly in accordance with the provisions of laws, regulations, normative documents and the Articles of Association, disclose in a timely and fair manner all information that may have a greater impact on the trading price of the Company's shares and their derivatives, and submit the announcements and relevant reference documents to the Stock Exchange at the soonest.

**Article 280** the Company and its directors shall ensure that the information disclosed is true, accurate and complete, and that there are no false records, misleading statements or material omissions.

**Article 281** The information disclosed by the Company shall be easy to understand. Companies should ensure that users of information have access to the information in an economical and convenient way such as the Internet.

**Article 282** The secretary of the Board of Directors of the Company shall be responsible for the disclosure of information, including establishing the information disclosure system, receiving visits, answering inquiries, contacting shareholders, and providing investors with the information disclosed publicly by the Company. The Board of Directors and managers shall actively support the work of the secretary. No institution or individual shall interfere with the work of the secretary.

**Article 283** the Company designates the China Securities News and the Shanghai Securities News as newspapers that publish company announcements and other information to be disclosed.

## Chapter XII Stakeholders

**Article 284** the Company shall respect the legitimate rights of banks and other stakeholders such as creditors, employees, consumers, suppliers and communities.

**Article 285** the Company shall actively cooperate with stakeholders to jointly promote its sustained and healthy development.

**Article 286** the Company shall provide the necessary conditions for safeguarding the rights and interests of the stakeholders. When their legitimate rights and interests are infringed upon, the stakeholders shall have the opportunity and the means to obtain compensation.

**Article 287** the Company shall provide the banks and other creditors with the necessary information to enable them to make judgments and decisions on the Company's operating and financial situation.

**Article 288** the Company shall encourage its employees to share their opinions on the Company's operation, financial situation and major decisions concerning their interests through direct communication and exchange with the Board of Directors, the Board of Supervisors and the managers.

**Article 289** While maintaining the sustainable development of the Company and maximizing the interests of its shareholders, the Company should pay attention to the welfare, environmental protection, public welfare and other issues in the community, and attach importance to the its social responsibility.

### Chapter XIII Merger, Spinning Off, Dissolution and Liquidation
#### Section 1. Merger or Spinning Off

**Article 290** the Company may be merged or spun off according to law.

The merger of companies may take two forms: merger by consolidation and merger by the establishment of a new company.

**Article 291** The merger or spinning off of a company shall be handled in accordance with the following procedures:

(1) the Board of Directors shall formulate a plan for merger or spinning off;

(2) the General Meeting of Shareholders shall make a resolution in accordance with the provisions of the Articles of Association;

(3) the parties sign a merger or spinning off contract;

(4) to go through the relevant review and approval formalities according to law;

(5) to deal with the credits, debts and other matters related to the merger or spinning off;

(6) to go through the registration of dissolution or alteration.

**Article 292** The merger of a company shall be concluded by the parties to the merger and a balance sheet and a list of assets shall be drawn up. the Company shall notify the creditors within 10 days from the date of the decision of General Meeting of Shareholders on the merger, and shall issue a public announcement in the China Securities News and the Shanghai Securities News within 30 days.

**Article 293** The creditor shall have the right to require the Company to pay off its debts or provide corresponding guarantee within 30 days from the date of receipt of the notice or within 45 days from the date of the announcement if the notice has not been received.

**Article 294** When the Company is merged, the creditor's rights and debts of the parties to the merger shall be inherited by the surviving company or the newly established company after the merger.

**Article 295** When the Company is spun off, its property shall be separated accordingly.

When the Company is spun off, a balance sheet and a list of assets shall be drawn up. the Company shall notify the creditors within 10 days from the date of the resolution of division, and issue an announcement in the China Securities News and the Shanghai Securities News within 30 days.

**Article 296** The debts of the Company before spinning off shall be jointly and severally liable by the Company after the division, unless otherwise agreed upon by the Company and the creditors in writing in respect of the settlement of the debt prior to the spinning off.

**Article 297** When company needs to reduce its registered capital, it must draw up a balance sheet and a list of assets.

The Company shall notify the creditors within 10 days from the date of making the resolution to reduce the registered capital, and issue an announcement in the China Securities News and the Shanghai Securities News within 30 days. The creditor shall have the right to require the Company to pay off its debts or provide corresponding guarantee within 30 days from the date of receipt of the notice or 45 days from the date of the announcement if the notice has not been received.

The Company's registered capital after capital reduction shall not to be below the legal minimum.

**Article 298** Where the registered items are altered due to the merger or spinning off of the Company, the alteration shall be registered with the Company registration authority in accordance with law; if the Company is dissolved, it shall be cancelled from registration according to law; if a new company shall be established, its establishment shall be registered in accordance with the law. If the Company increases or decreases its registered capital, it shall, in accordance with the law, go through the registration of alteration with the Company registration authority.

#### Section II Dissolution and Liquidation

**Article 299** Under any of the following circumstances, the Company shall dissolve and liquidate in accordance with the law:

(1) dissolution as a result of merger or division;

(2) dissolution upon resolution of the General Meeting of Shareholders;

(3) having its business license revoked, ordered to close down or be revoked according to law;

(4) if serious difficulties arise in the operation and management of the Company and the interests of the shareholders will suffer heavy losses as a result of its continued existence, shareholders holding more than 10% of the voting rights of all shareholders of the Company may request the people's court to dissolve the Company if it cannot be solved by other means.

IRI-CRT-00001056 - Translation

**Article 306** If the Company is dissolved in accordance with items (2), (3) and (4) of **Article 306** of the Articles of Association, a liquidation team shall be set up within 15 days from the date of the occurrence of the cause of dissolution and liquidation shall begin. The liquidation team shall be composed of such persons as may be determined by the directors or the General Meeting of Shareholders. If a liquidation team is not established within the time limit, the creditors may apply to the people's court to appoint relevant persons to form a liquidation team for liquidation.

**Article 301** The liquidation team shall exercise the following functions and powers during liquidation:

(1) to issue notice or announcement to the creditors;

(2) to settle the Company's assets and to compile a balance sheet and a list of assets;

(3) to handle the outstanding business of the Company;

(4) to settle the taxes payable and the taxes incurred in the course of liquidation;

(5) to settle claims and debts;

(6) to dispose of the residual assets after the Company has discharged its debts;

(7) to participate in civil litigation on behalf of the Company.

**Article 302** The liquidation team shall notify the creditors within 10 days from the date of its establishment and issue public announcements in the China Securities News and the Shanghai Securities News within 60 days.

**Article 303** The creditors shall, within 30 days from the date of receipt of the notice, or within 45 days from the date of the announcement if the notice has not been received, file their claims to the liquidation team. When filing their claims, they shall explain the relevant items of the claims and provide supporting materials. The liquidation team shall register the claims.

During the period of filing claims, the liquidation team shall not pay off the creditors.

**Article 304** After settling the Company's assets, and drawing up a balance sheet and a list of assets, the liquidation team shall formulate a liquidation plan and report it to the General Meeting of Shareholders or the people's court for confirmation.

the Company's assets shall be allocated in proportion to the shares held by the shareholders in the payment of liquidation expenses, the wages of employees, the social insurance expenses and the statutory compensation, the payment of the taxes owed, and the settlement of the remaining property after the Company's debts have been paid.

During liquidation, the Company survives, but cannot engage in business activities unrelated to liquidation. The assets of the Company will not be distributed to the shareholders until they have been liquidated in accordance with the provisions of the preceding paragraph.

**Article 305** After settling the Company's assets and drawing up a balance sheet and a list of assets, the liquidation team shall apply to the people's court for bankruptcy if it considers that the Company's assets are insufficient to pay off its debts.

After the Company has been declared bankrupt by a people's court, the liquidation team shall hand over the liquidation affairs to the people's court.

**Article 306** After liquidation, the liquidation team shall prepare a liquidation report, report it to the General Meeting of Shareholders or the people's court for confirmation, submit it to the Company registration authority, apply for cancellation of the Company's registration, and announce the termination of the Company.

**Article 307** The members of the liquidation team shall be faithful to their duties, perform their liquidation obligations according to law, not abuse their functions and powers to accept bribes or other illegal income, and not encroach on the assets of the Company.

Any member of the liquidation team who has caused losses to the Company or the creditors as a result of intentional or gross negligence shall be liable for compensation.

**Article 308** Where the Company is declared bankrupt according to law, bankruptcy liquidation shall be carried out in accordance with the law on enterprise bankruptcy.

### Chapter XIV Amendment to the Articles of Association

**Article 309** The Company shall amend its Articles of Association under any of the following circumstances:

(1) after the amendment of the Company Law or relevant laws or administrative regulations, the matters stipulated in the Articles of Association are in conflict with the provisions of the amended laws and administrative regulations;

(2) the circumstances of the Company have changed and are inconsistent with the items recorded in the Articles of Association;

(3) the General Meeting of Shareholders decides to amend the Articles of Association.

**Article 310** Where the amendment to the Articles of Association approved by the resolution of the General Meeting of Shareholders shall be subject to review and approval by the competent authority, it shall be submitted to the competent authority for review and approval; where company registration is involved, the alteration shall be registered according to law.

**Article 311** The Board of Directors shall amend the Articles of Association in accordance with the resolution of the General Meeting of Shareholders and approval opinions of the relevant competent authorities.

**Article 312** The amendment to the Articles of Association which belong to the information required by laws and regulations to be disclosed shall be publicized in accordance with the relevant provisions.

## Chapter XV Supplementary Provisions

### Article 313 Interpretation

(1) A controlling shareholder refers to a shareholder whose shares account for more than 50% of the total share capital of the Company;

Although less than 50 per cent, the voting rights based on the shares held by them are sufficient to have a significant impact on the decisions of the shareholders' general meeting

Shareholder

(2) Actual controller refers to someone who, though not a shareholder of the Company, can actually control the Company's behaviour through investment relations, agreements or other arrangements.

(3) Associated relationship refers to the relationship between the controlling shareholders, actual controllers, directors, supervisors and senior managerial personnel of the Company and the enterprises directly or indirectly controlled by the Company, as well as other relationships that may lead to the transfer of the Company's interest. However, the state-controlled enterprises are not only to be related to each other because they are controlled by the state.

(4) The definitions of associated parties, related party transactions and major related party transactions are the same as those in the Stock Listing Rules revised from time to time by the Shanghai Stock Exchange

**Article 314** The Board of Directors may, in accordance with the provisions of the Articles of Association, formulate detailed Articles of Association which shall not be in conflict with provision of the Articles of Association

**Article 315** The Articles of Association are written in Chinese, and in case there is any discrepancy between the Articles of Association in any other language or version, the Chinese version approved and registered at the Shaanxi Provincial Administration for Industry and Commerce shall prevail.

**Article 316** The terms "above", "within", "below" and "not exceeding" as mentioned in the Articles of Association include the base number; "other than", "below", "more than", "over" does not include the base number.

**Article 317** The Articles of Association shall be interpreted by the Board of Directors of the Company.

**Article 318** The annexes to the Articles of Association include the rules of procedure of the Board of Directors and the rules of procedure of the Board of Supervisors.

IRI-CRT-00001058 - Translation

Annex

# IRICO Display Devices Co., Ltd.
# Rules of Procedure of the Board of Directors

### Article 1 Purpose

In order to further standardize the deliberations and decision-making procedures of the Board of Directors of IRICO Display Devices Co., Ltd. (hereinafter referred to as "the Company"), urge the directors and the Board of Directors to perform their duties effectively, and improve the standard operation and scientific decision-making level of the Board of Directors, these rules are formulated in accordance with the Company Law, Securities Law, Governance Standards for Listed Companies, Rules Governing the Listing of Stocks on Shanghai Stock Exchange and other relevant provisions.

### Article 2 Office of Board of Directors

The Board of Directors shall have an office to handle its daily affairs.

### Article 3 Regular Meetings

Board meetings are divided into regular meetings and interim meetings.

The Board of Directors shall convene regularly meetings at least once a year in the first and second half of the year.

### Article 4 Proposals for Regular Meetings

Before issuing the notice of convening regular meeting of the Board of Directors, the office of the Board of Directors shall fully solicit the opinions of the directors and submit the proposal to the chairman of the Board of Directors for drafting after preliminary formation of the meeting proposal.

The chairman shall consult the manager and other senior managerial personnel as necessary before drawing up a proposal.

### Article 5 Interim Meeting

The Board of Directors shall convene an interim meeting under any of the following circumstances:

(1) proposed by shareholders representing more than 1/10 of the voting rights;

(2) jointly proposed by more than 1/3 of the directors;(3) proposed by the Board of Supervisors;

(4) the chairman of the board deems it necessary;

(5) proposed by more than 1/2 of the independent directors;

(6) proposed by the manager;

(7) required by the securities regulatory authority;

(8) other circumstances stipulated in the Company's Articles of Association.

### Article 6 Proposal Procedures for Interim Meeting

Where an interim meeting of the Board of Directors is proposed in accordance with the provisions of the preceding article, a written proposal signed (sealed) by the proposer shall be submitted either through the office of the Board of Directors or directly to the chairman. The written proposal shall contain the following:

(1) the name of the proposer;

(2) the reasons for the proposal or the objective cause on which the proposal is based;

(3) the proposed time or time limit, venue and manner of the meeting;

(4) clear and specific proposals;

(5) the contact information of the proposer and the date of the proposal, etc.

The contents of the proposal shall be within the scope of competence of the Board of Directors as stipulated in the Articles of Association of the Company, and the materials relating to the proposal shall be submitted together.

IRI-CRT-00001059 - Translation

The office of the Board of Directors shall, upon receipt of the above written proposals and relevant materials, transfer them to the chairman of the Board of Directors on the same day. If the chairman considers that the contents of the proposal are not clear or specific or that the relevant materials are not sufficient, he/she may request the proposer to amend or supplement the proposal.

The chairman shall, within 10 days after receiving the proposal or the request of the securities regulatory authority, convene a meeting of the Board of Directors and preside over it.

### Article 7 Convening and Presiding Over Meetings

The meeting of the Board of Directors shall be convened and presided over by the chairman of the Board of Directors; if the chairman is unable or fails to perform his duties, the vice-chairman shall convene and preside over the meeting. If there is no vice-chairman or the vice-chairman is unable or fails to perform his duties, a director nominated by more than half of the directors shall convene and preside over it.

### Article 8 Notice of Meeting

In convening regular and interim meetings of the Board of Directors, the office of the Board of Directors shall issue a notice of the meeting in writing with the seal of the office of the Board of Directors and submit it to all directors and supervisors as well as the manager and secretary of the Board of Directors 10 and 5 days in advance by direct service, fax, e-mail or other means. If the notice is not delivered directly, it shall also be confirmed by telephone and recorded accordingly.

In case of an urgency to convene an interim meeting of the Board of Directors as soon as possible, a notice of the meeting may be sent at any time by telephone or other oral means, provided that the convenor shall provide an explanation at the meeting.

### Article 9 Contents of the Notice of Meeting

The written notice of the meeting shall include at least the following contents:

(I) the time and place of the meeting;

(2) the manner of convening the meeting;

(3) matters to be reviewed (meeting proposals);

(4) convenor and moderator of the meeting, proposer of the interim meeting and their written proposals;

(5) the meeting materials necessary for the voting of the directors;

(6) the requirement that the directors shall attend the meeting in person or entrust other directors to attend the meeting on their behalf;

(7) contacts and contact information.

The oral notice of the meeting shall include, at a minimum, the contents in above item (1) and (2), as well as a statement of the urgency for the convening of an interim meeting of the Board of Directors as soon as possible.

### Article 10 Delivery Time of the Notice of Meeting:

(1) when delivered directly, the time of service shall be taken as the time when it is signed by the addressee or the recipient entrusted by the addressee;

(2) in the case of service by fax, the time when the fax is sent shall be the time of service, provided that the fax number shall be confirmed by the addressee;

(3) when served by email, the time of delivery shall be the time of service, provided that the e-mail address shall be confirmed by the addressee.

If the meeting notice was not sent to someone entitled to be notified or such person did not receive the notice due to accidental omission, the meeting and the resolution made at the meeting should not therefore be null and void.

### Article 11 Change of Notice of Meeting

After the written notice of the regular meeting of the Board of Directors is issued, in case of a need to change the time and place of the meeting or add, change or cancel the proposals for the meeting, a written notice of change shall be issued three days before the original meeting to provide an explanation and relevant contents and materials of the new proposal. In case of less than three days to issue a notice of change, meeting shall be delayed accordingly or convened on schedule upon the approval of all attending directors.

After the notice of the meeting of the extraordinary meeting of the board of directors is issued, if you want to change the daytime, place, etc. of the meeting, or add, change, or eliminate the meeting, you should obtain the 4th meeting of the meeting and make a corresponding record.

IRI-CRT-00001060 - Translation

### Article 12 Convening of Meeting

The meeting of the Board of Directors shall be convened only if a majority of the directors are present. If the director concerned refuses to attend or fails to attend the meeting and thus fails to meet the minimum number requirements for the meeting, the chairman and the secretary of the Board of Directors shall promptly report to the regulatory authority.

The supervisors may attend the meeting of the Board of Directors as nonvoting delegates; if the manager and the secretary of the Board of Directors do not concurrently serve as directors, they shall attend the meeting as nonvoting delegates. If the moderator of the meeting deems it necessary, he/she may notify other relevant persons concerned to attend the meeting.

### Article 13 Personal and Entrusted Attendance

The director shall in principle attend the meeting of Board of Directors in person. If, for any reason, he/she is unable to attend the meeting, he/she shall review the meeting materials in advance to form a clear opinion, and entrust other directors in writing to attend the meeting on his/her behalf.

The of authorisation shall state:

(1) the name of the principal and the trustee;

(2) the principal's brief comments on each proposal;

(3) the scope of the principal's authorization and instructions on the intention to vote on the proposal;

(4) the signature, date, etc of the principal.

Where another director is entrusted with signing a written confirmation opinion on behalf of the regular report, a special authorization shall be given in the letter of authorisation.

The entrusted director shall submit a written letter of authorisation to the meeting moderator stating the entrusted attendance on the signing book of the meeting.

### Article 14 Restrictions on Proxies

The following principles shall be followed for the entrusted attendance:

(1) when reviewing related party transactions, a non-affiliated director may not entrust an affiliated director to attend on his/her behalf; nor may the affiliated director accept the entrustment of the non-affiliated director;

(2) the independent director shall not entrust a non-independent director to attend on his/her behalf, nor shall the non-independent director accept the entrustment of the independent director;

(3) the directors shall not, without stating their personal opinions and voting intentions on the proposal, entrust any other directors to attend on their behalf, nor shall the directors concerned accept full entrustment and the entrustment without clear authorization.

(4) A director shall not accept the entrustment of more than two directors, nor shall the director entrust a director who has been entrusted by two other directors to attend on his/her behalf.

### Article 15 Manners of Convening Meeting

The meeting of the Board of Directors shall be convened on-site. If necessary, with the consent of the convenor (moderator) and the proposer, the meeting may, on the premise of ensuring that the directors fully express their opinions, also be convened by video, telephone, fax or e-mail. The meeting may also be convened on-site and in any other ways simultaneously.

In the case that the meeting is not held on-site, the number of directors attending the meeting shall be and shows by video the directors present, the directors who express their opinions in the teleconference, and the effective voting votes, such as faxes or e-mails, are actually received within the prescribed time limit, The number of directors attending the meeting is calculated, such as a written confirmation letter submitted by the director after the meeting.

### Article 16 Review Procedures of the Meeting

The moderator of the meeting shall invite the directors present at the meeting of Board of Directors to express their clear views on various proposals.

For a proposal requiring prior approval by the independent director in accordance with the provisions, the moderator of the meeting shall, before discussing the proposal concerned, appoint an independent director to read out the written approval opinion reached by the independent directors.

Where a director obstructs the normal conduct of the meeting or affects other directors to speak, the moderator of the meeting shall promptly stop it.

Except with the unanimous consent of all the directors present at the meeting, the meeting of the Board of Directors shall not vote on a proposal not included in the notice of the meeting. Where a director accepts the entrustment of other directors to attend the meeting , he/she may not vote on behalf of other directors on a proposal not included in the notice of the meeting.

IRI-CRT-00001061 - Translation

### Article 17 Expressing Opinions

The directors shall carefully read the relevant meeting materials and express their views independently and prudently on the basis of a full understanding of the situation.

The directors may, prior to the meeting, consult the office of the Board of Directors, the convenor of the meeting, the manager and other senior managerial personnel, specialized committees, accounting firms, law firms, and other relevant personnel and institutions about the information needed for decision-making, and may also suggest to the moderator during the meeting that representatives of the above-mentioned persons and institutions be invited to explain the situation.

### Article 18 Voting at the Meeting

After each proposal has been fully discussed, the moderator shall, in due course, submit it to the directors present at the meeting for a vote.

The voting shall be conducted by the means of one person being represented by one vote, and in the form of registration and in writing.

The voting may also be taken by show of hands upon the decision of the moderator.

The voting intentions of the directors are divided into consent, objection and abstention. The directors present at the meeting shall choose one of the above-mentioned intentions. If no choice has been made or two or more intentions are chosen at the same time, the moderator shall request the director concerned to choose again, and if he/she refuses to do so, it shall be deemed to as abstention; if he leaves the meeting without a vote, its shall be deemed abstention.

### Article 19 Statistics of the Voting Results

After the voting of the present directors has been completed, the representatives of securities affairs and the relevant staff members in the office of the Board of Directors shall promptly collect the voting votes of the directors and hand them over to the secretary of the Board of Directors for statistics under the supervision of a supervisor or an independent director.

When the voting is taken by show of hands, the secretary of the Board of Directors shall count the results of the voting and announce it on-site.

If the meeting is held on-site, the moderator of the meeting shall announce the statistical results on-site; in other cases, the moderator shall require the secretary of the Board of Directors to notify the director of the voting results one working day before the expiration of the prescribed time limit for voting.

If a director votes after the moderator has announced the voting results or after the expiration of the prescribed time limit for voting, the voting shall not be counted.

### Article 20 Formation of Resolutions

Except as provided in **Article 21** of these rules, for the Board of Directors to consider and approve a proposal of the meeting and forms a relevant resolution, more than half of the Company's directors must vote in favour of the proposal. Where laws, administrative regulations and the Articles of Association of Company stipulate that a resolution of the Board of Directors shall obtain the consent of more directors, such provisions shall prevail.

In accordance with the provisions of the Company's Articles of Association, for the Board of Directors, within its limits of authority, to make a resolution on the matters of guarantee, it shall be subject to the consent of more than 2/3 of the directors present at the meeting, in addition to the consent of more than half of all the directors of the Company. In case of any conflict between different resolutions in terms of content and meaning, the resolution after the time of formation shall prevail.

### Article 21 Withdrawal of Voting

Under the following circumstances, the directors shall withdraw from voting on the relevant proposal:

(1) the circumstances stipulated in Listing Rules of Shanghai Stock Exchange that require the directors to withdraw;

(2) the circumstances in which the directors themselves think they should withdraw;

(3) any other circumstances specified in the Articles of Association of the Company that need to be avoided because of the association between the directors and the enterprises involved in the meeting proposal.

In the case of a director's withdrawal from voting, the meeting of the Board of Directors concerned shall be attended by more than half of the unrelated directors, and the resolution shall be approved by a majority of these directors. If the number of unrelated directors present at the meeting is less than three, the relevant proposal may not be voted on, but the matter shall be referred to the General Meeting of Shareholders for consideration.

### Article 22 No Overstepping of Authority

The Board of Directors shall act strictly in accordance with the authorisation of the General Meeting of Shareholders and the Company's Articles of Association, and shall not exceed its authority to form a resolution.

### Article 23. Special Provisions on the Distribution of Profits

If the meeting of Board of Directors needs to make a resolution on the Company's profits distribution, it may first notify the certified public accountant of the preliminary distribution plan to be submitted to the Board of Directors for consideration and request a draft audit report accordingly (all financial data other than those related to distribution had been established). After the Board of Directors has made a resolution on allocation, it shall require the certified public accountant to issue a formal audit report, and then, on the basis of the formal audit report, make a resolution on other relevant matters concerning the periodic report.

IRI-CRT-00001062 - Translation

### Article 24 Disposition of Unapproved Proposals

If a proposal has not been approved, the meeting of Board of Directors shall not, within one month, review any proposal of the same content in the absence of any significant change in the relevant conditions and factors.

### Article 25 Suspension of Voting

If more than 1/2 of the attending directors or more than two independent directors consider that the proposal is not clear or specific, or that they are unable to make a judgment on the relevant matter due to insufficient meeting materials and other reasons, the moderator of the meeting shall request a suspension of voting on the subject at the meeting.

The director who proposes to suspend the voting shall make a clear request as to the conditions to be met for the proposal to be resubmitted for consideration.

### Article 26 Recording of Meetings

The meetings of Board of Directors convened on-site or by video telephone or other means may be recorded throughout the course as necessary.

### Article 27 Record of Meetings

The secretary of the Board of Directors shall arrange the staff of the office of the Board of Directors to keep record of the meeting of the Board of Directors. Minutes of meetings should include the following:

(1) the session and the time, place and manner of the meeting;

(2) the issuance of notice of the meeting;

(3) convenor and moderator of the meeting;

(4) the personal attendance and the entrusted attendance of the directors;

(5) the proposals reviewed by the meeting, the main points and main comments of each director on relevant matters, and the voting intention on the proposals;

(6) the manner in which each proposal is to be voted on and the voting results (indicating the specific number of consent, objection, abstention);

(7) such other matters as the directors at the meeting believe should be recorded.

### Article 28 Minutes of Meetings and Records of Resolutions

In addition to the minutes of the meeting, the secretary of the Board of Directors may, as necessary, arrange the staff of the office of the Board of Directors to make a concise summary of the meeting, and make separate records of the resolutions resulting from the meeting based on the results of the statistical voting.

### Article 29 Signature of Directors

The directors present at the meeting shall sign and confirm the minutes of the meeting and the records of the resolutions on their own behalf and on behalf of the directors entrusted by them to attend the meeting. Where a director has different opinions on the minutes of the meeting or the record of the resolution, he/she may, at the time of signature, provide a written explanation. If necessary, he/she shall report to the regulatory authorities in a timely manner and may also issue a public statement.

A director who neither signs for confirmation as provided in the preceding paragraph nor provides a written explanation of his/her dissenting opinion or reports to the regulatory authorities or issue a public statement shall be deemed to fully agree with the contents of the minutes of the meeting and the records of the resolutions.

### Article 30 Announcement of Resolutions

The secretary of the Board of Directors shall act in accordance with the relevant provisions of Rules for Stock Listing on the Shanghai Stock Exchange.

### Article 31 Confidentiality System

Persons attending and sitting in the meeting of the Board of Directors and relevant staff shall have the obligation to keep confidential the contents of the meetings. No one shall make use of the insider information of the meeting for the benefits of their own or others.

Without the approval of the chairman of the Board of Directors, the attending directors and the persons sitting in at the meeting shall not take away the informal documents and materials provided by the meeting.

IRI-CRT-00001063 - Translation

Except for directors, supervisors, accountants and lawyers employed by the Company, no one may review the minutes of the meeting of the Board of Directors without the authorization of the Board of Directors or the approval of the chairman .

The directors and nonvoting attendees shall be responsible for the careful custody of the documents and materials provided to them, and shall report to the chairman of the and the secretary of the Board of Directors in case of loss.

The documents of the Board of Directors shall be kept by the secretary of the Board of Directors.

When the secretary of the Board of Directors leaves office, he/she shall, under the supervision of the Board of Supervisors of the Company, hand over to the designated person the Company's files, documents and materials in his/her custody.

Without the approval of the Board of Directors, no recording or videotaping of the meeting shall be made by the attending directors or those nonvoting attendees.

The meeting of the Board of Directors and its resolutions shall be disclosed by the secretary of the Board of Directors in accordance with relevant provisions. The directors and nonvoting attendees present at the meeting shall not disclose the information of the meeting in any form unless authorized by the chairman or the information of the meeting has been made public.

The secretary of the Board of Directors shall be responsible for the confidentiality of the information of the Board of Directors. The secretary shall promptly take remedial measures when the information is leaked.

### Article 32 Implementation of Resolutions

The chairman of the Board of Directors shall urge relevant personnel to implement the resolutions of the Board of Directors, check the implementation of the resolutions, and report the implementation of the resolutions that have been formed at future meeting of the Board of Directors.

### Article 33 Preservation of Meeting Archives

The secretary of the Board of Directors shall be responsible for the preservation of archives of the meeting of Board of Directors, including the meeting's notice and materials, signature book, letter of authorisation for the entrusted director to attend the meeting, recordings of the meeting, voting vote, minutes of the meeting, records of the resolution, announcement of the resolution, etc., signed and confirmed by the attending directors, etc. The preservation term of these archives shall be not less than ten years.

### Article 34 Supplementary Provisions

In these rules, "above" includes the base number.

These rules shall come into effect after being been formulated by the Board of Directors and submitted to the General Meeting of Shareholders for approval, and shall be amended in the same way.

These rules shall be interpreted by the Board of Directors.

IRI-CRT-00001064 - Translation

# IRICO Display Devices Co., Ltd.
## Rules of Procedures of the Board of Supervisors

### Article 1. Purpose

In order to further standardize the proceedings and voting procedures of the Board of Supervisors of IRICO Display Devices Co., Ltd (hereinafter referred to as "the Company"), urge the supervisors and the Board of Supervisors to perform their supervisory duties effectively, and improve the corporate governance structure of the Company, these rules are formulated in accordance with the Company Law, the Securities Law, Governance Standards of Listed Company, Rules Governing the Listing of Stocks on Shanghai Stock Exchange, a series of normative documents issued by the CSRC and the Articles of Association of the Company.

### Article 2. Office of the Board of Supervisors

The Board of Supervisors may set up an office to handle its daily affairs.

The chairman of the Board of Supervisors shall also be responsible for the office of the Board of Supervisors and shall keep its seal.

The chairman may request the representative of the securities affairs of the Company or other personnel to assist him in handling the day-to-day affairs of the Board of Supervisors.

### Article 3. Regular and Interim Meetings of the Board of Supervisors

The meetings of the Board of Supervisors are divided into regular meetings and interim meetings.

The regular meeting shall be convened every six months. Under any of the following circumstances, the Board of Supervisors shall convene an interim meeting within 10 days:

(1) proposed by any supervisor;

(2) the General Meeting of Shareholders or the meeting of the Board of Directors approves a resolution that violates the laws, regulations, rules and regulations, various regulations and requirements of the regulatory authorities, the Articles of Association of the Company, the resolution of the general meeting of shareholders of the Company and other relevant provisions;

(3) the misconduct of directors and senior managerial personnel may cause significant harm to the Company or adversely affect the Company in the market;

(4) the Company, or any of its directors, supervisors and senior managerial personnel is sued by a shareholder;

(5) the Company, or any of its directors, supervisors and senior managerial personnel is punished by the securities regulatory authorities or publicly condemned by the Shanghai Stock Exchange;

(6) the securities regulatory authorities request the convening of the meeting;

(7) other circumstances stipulated in the Articles of Association of the Company.

### Article 4. Proposals for Regular Meetings

Before issuing the notice of convening a regular meeting of the Board of Supervisors, the office of the Board of Supervisors shall solicit proposals for the meeting from all the supervisors and shall spend at least two days to solicit the opinions of the employees of the Company. When soliciting proposals and opinions, the office of the Board of Supervisors shall explain that the Board of Supervisors shall focus on the supervision of the Company's normative operation and the duties of directors and senior managerial personnel, rather than on the decision-making of the Company's operation and management.

### Article 5. Proposal Procedures for Interim Meetings

Where a supervisor proposes to convene an interim meeting of the Board of Supervisors, he/she shall submit to the chairman of the Board of Supervisors, through the office of the Board of Supervisors or directly to the chairman, a written proposal signed by the proposed supervisor. The written proposal shall contain the following:

(1) the name of the proposed supervisor;

(2) the reasons for the proposal or the objective cause on which the proposal is based;

(3) the proposed time or time limit, venue and modalities for the convening of the meeting;

(4) clear and specific proposals;

(5) the contact details of the proposed supervisor and the date of the proposal.

Within three days after the receipt of a written proposal by the supervisor or the chairman of the Board of Supervisors, the office of the Board of Supervisors shall issue a notice of convening an interim meeting of the Board of Supervisors.

IRI-CRT-00001065 - Translation

If the office of the Board of Supervisors is delayed in issuing the notice of the meeting, the proposed supervisor should report to the regulatory authority in a timely manner.

### Article 6 Convening and Presiding Over Meetings

The meeting of the Board of Supervisors shall be convened and presided over by the chairman of the Board of Supervisors; if the chairman is unable to or fails to perform his duties, a supervisor jointly nominated by more than half of the supervisors shall convene and preside over the meeting.

### Article 7 Notice of Meeting

In convening regular and interim meetings of the Board of Supervisors, the office of the Board of Supervisors shall notify the meeting in writing with the seal of the Board of Supervisors 10 and 5 days in advance, respectively, and submit the notice to all supervisors by direct service, fax, e-mail or other means. If the service is not direct, it shall also be confirmed by telephone and recorded accordingly.

In the case of an urgency to convene an interim meeting of the Board of Supervisors as soon as possible, the notice of the meeting may be given orally or by other means such as telephone at any time , but the convenor shall provide an explanation at the meeting.

### Article 8 Contents of the Notice of Meeting

The written notice of the meeting shall include at least the following:

(1) the time and place of the meeting;

(2) matters to be reviewed (meeting proposals);

(3) convenor and moderator of the meeting, proposer of the interim meeting and his/her written proposals;

(4) the meeting materials necessary for the voting of the supervisors;

(5) requirement that the supervisor shall attend the meeting in person;

(6) contacts and contact information.

The oral notice of the meeting shall include at least the contents of items (1) and (2) above, as well as an explanation of the urgency to convene the interim meeting as soon as possible.

### Article 9 Delivery Time of Notice of Meeting:

(1) when served directly, the time of service shall be taken as the time when it is signed by the addressee or the recipient entrusted by the addressee;

(2) in the case of service by fax, the time when the fax is sent shall be the time of service, provided that the fax number shall be confirmed by the addressee;

(3) when served by e-mail, the time of delivery shall be the time of service, provided that the e-mail address shall be confirmed by the addressee.

If the meeting notice was not sent to someone entitled to be notified or such person did not receive the notice due to accidental omission, the meeting and the resolution made at the meeting shall not therefor be null and void.

### Article 10 The Manner of Convening Meetings

The meeting of the Board of Supervisors shall be held on-site.

In case of emergency, the meeting of supervisors may vote by means of communication, but the convenor of the Board of Supervisors (the moderator of the meeting) shall explain the specific emergency situation to the supervisors attending the meeting. During the voting of the communication, the supervisors shall fax their written opinions and voting intention on the matter under consideration to the office of the Board of Supervisors after the signature has been confirmed. The supervisors shall not merely state the opinions of the voting without expressing their written opinion or the reasons for the voting.

### Article 11 Convening of Meetings

The meeting of the Board of Supervisors shall be convened only if more than half of the supervisors are present. If the relevant supervisor refuses to attend the meeting or his/her delay in attending the meeting results in the number of attendees is below the the minimum requirements for the meeting, other supervisors shall report to the regulatory authority in a timely manner.

The secretary of the Board of Directors and the representative of securities affairs shall attend the meeting as nonvoting delegates.

### Article 12 Review Procedure of Meetings

The moderator of the meeting shall call upon the attending supervisors to express their clear opinions on various proposals.

The moderator shall, on the basis of the proposal of the supervisor, require the directors, senior managerial personnel, other employees of the Company or the business personnel of relevant intermediary institutions to attend the meeting for questioning.

### Article 13 Resolution of the Board of Supervisors

The voting of the meeting of the Board of Supervisors shall be conducted by means of one person being represented by one vote, and in the form of registration and in writing.

The voting may also be taken by show of hands upon the decision of the moderator.

The voting intentions of the supervisor is divided into consent, objection and abstention. The supervisors participating in the meeting shall choose one of the above-mentioned intentions. If no choice is made or two or more intentions are chosen at the same time, the moderator of the meeting shall ask the supervisor to choose again, and if he/she refuses to choose, it shall be deemed as an abstention; if he/she leaves the meeting halfway, it shall be deemed as an abstention.

A resolution of the Board of Supervisors shall be approved by a majority of all supervisors.

### Article 14 Audio Recordings of Meetings

The meeting of the Board of Supervisors can be recorded as needed.

### Article 15 Minutes of Meetings

The staff of the office of the Board of Supervisors shall keep records of the on-site meeting. The minutes of the meeting shall include the following:

(1) the session and the time, place and manner of the meeting;

(2) the issuance of notice of the meeting;

(3) convenor and moderator of the meeting;

(4) attendance at the meeting;

(5) the proposals reviewed by the meeting, the main points and main comments of each supervisor on relevant matters, and the voting intention on the proposals;

(6) the manner in which each proposal is to be voted on and the voting results (indicating the specific number of consent, objection, abstention);

(7) such other matters as the attending supervisors deem appropriate to record.

For the meeting of the Board of Supervisors convened by means of communication, the office of the Board of Supervisors shall, with reference to the above provisions, collate the minutes of the meetings.

### Article 16 Signature of the Supervisor

The supervisors attending the meeting shall sign and confirm the minutes of the meeting. Where the supervisor has different opinions on the minutes of the meeting, he/she may make a written statement at the time of signature. If necessary, he/she shall report to the regulatory authorities in a timely manner and may also issue a public statement.

If the supervisor does not sign for confirmation in accordance with the provisions of the preceding paragraph, nor does he/she provide a written explanation of his/her dissenting opinion or report to the regulatory authorities or issue a public statement, he/she shall be deemed to agree fully with the contents of the minutes of the meeting.

### Article 17 Announcement of Resolutions

The secretary of the Board of Directors shall be responsible for the announcement of the resolution of the Board of Supervisors in accordance with the relevant provisions of Rules Governing the Listing of Stocks on Shanghai Stock Exchange.

### Article 18 Implementation of Resolutions

The supervisors shall urge relevant personnel to implement the resolutions of the Board of Supervisors. The chairman of the Board of Supervisors shall report on the implementation of the resolutions that have been formed at future meetings.

### Article 19 Preservation of the Meeting Archives

The archives of the meeting of the Board of Supervisors, including the meeting notice and meeting materials, the meeting check-in book, the sound recording materials, the voting votes, the meeting minutes confirmed by the meeting supervisors' signature, the announcement of the resolution, etc., shall be kept by a special person appointed by the chairman of the Board of Supervisors.

The preservation term of the materials of the meeting of the Board of Supervisors shall be not less than ten years.

### Article 20 Supplementary Provisions

Matters not covered in these rules shall be subject to the relevant provisions of the Rules of Procedures of the Board of Directors of the Company.

In these rules, "above" includes the base number.

These rules shall come into effect after being formulated by the Board of Supervisors and submitted to the General Meeting of Shareholders for approval, and shall be amended in the same way.

These rules shall be interpreted by the Board of Supervisors.

IRI-CRT-00001067 - Translation

# 彩虹显示器件股份有限公司
# 章程

经 1992 年 12 月 28 日创立大会通过

经 1998 年 06 月 26 日第六次股东大会修改

经 1999 年 09 月 20 日 1999 年度第二次临时股东大会修改

经 2001 年 06 月 29 日 2001 年度第一次临时股东大会修改

经 2001 年 09 月 07 日 2001 年度第二次临时股东大会修改

经 2002 年 06 月 27 日第十股东大会修改

经 2002 年 10 月 18 日 2002 年度第一次临时股东大会修改

经 2004 年 09 月 29 日 2004 年度第一次临时股东大会修改

经 2005 年 02 月 25 日 2005 年度第一次临时股东大会修改

经 2005 年 05 月 27 日第十三次股东大会修改

经 2006 年 06 月 27 日第十四次股东大会修改

# 目　录

**第一章　总则**

**第二章　经营宗旨和范围**

**第三章　股份**

第一节　股份发行

第二节　股份增减和回购

第三节　股份转让

**第四章　股东**

第一节　一般规定

第二节　股东的权利和义务

第三节　控股股东和实际控制人

第四节　关联交易

**第五章　股东大会**

第一节　一般规定

第二节　年度股东大会

第三节　临时股东大会

第四节　股东大会的召集

第五节　股东大会提案

第六节　股东大会的召开

第七节　股东大会表决程序

第八节　股东大会决议

第九节　董事、监事选举程序

第十节　股东大会会议记录

第十一节股东大会对董事会的授权

**第六章　董事和董事会**

第一节　董事

第二节　独立董事

第三节　董事会

第四节　董事会对董事长的授权

第五节　董事会秘书

第六节　董事会专门委员会

**第七章　监事和监事会**

第一节　监事

第二节　监事会

**第八章　经理**

**第九章　绩效评价与激励约束机制**

第一节　董事、监事、经理人员的绩效评价

第二节　经理人员的激励与约束机制

**第十章　财务会计制度、利润分配和审计**

第一节　财务会计制度

第二节　内部审计

第三节　会计师事务所的聘任

**第十一章　持续信息披露**

**第十二章　利益相关者**

**第十三章　合并、分立、解散和清算**

第一节　合并或分立

第二节　解散和清算

**第十四章　修改章程**

**第十五章　附则**

0

IRI-CRT-00001027

彩虹显示器件股份有限公司章程

## 第一章   总则

**第一条**   为维护彩虹显示器件股份有限公司（以下简称"公司"）、股东和债权人的合法权益，规范公司的组织与行为，根据《中华人民共和国公司法》（以下简称《公司法》）、《中华人民共和国证券法》和其他有关规定，制订本章程。

**第二条**   公司系依照《股份有限公司规范意见》和其他有关规定成立的股份有限公司(以下简称"公司"）。

公司经陕西省经济体制改革委员会陕改发(1992)34号文件批准，以定向募集方式设立；在陕西省工商行政管理局注册登记，取得营业执照。

经陕西省经济体制改革委员会陕改发(1996)109号文件批复，公司已依照《公司法》进行了规范，并依法履行了重新登记手续。

**第三条**   公司于1992年8月11日经中国人民银行陕西分行陕银复(1992)54号文件批准，首次以定向募集方式发行人民币普通股30000万股。全部为境内投资人以人民币认购的内资股。于1996年5月20日在上海证券交易所上市。

**第四条**   公司注册名称：中文：彩虹显示器件股份有限公司

英文：**IRICO   DISPLAY   DEVICES   CO.,   LTD**

**第五条**   公司住所：陕西省西安市高新技术产业开发区

邮政编码：710075

**第六条**   公司注册资本为人民币：42114.88万元

**第七条**   公司为永久存续的股份有限公司。

**第八条**   董事长为公司的法定代表人。

**第九条**   公司全部资产分为等额股份，股东以其所持股份为限对公司承担责任，公司以其全部资产对公司的债务承担责任。

**第十条**   本公司章程自生效之日起，即成为规范公司的组织与行为、公司与股东、股东与股东之间权利义务关系的具有法律约束力的文件，对公司、股东、董事、监事、高级管理人员具有法律约束力。依据公司章程，股东可以起诉股东；股东可以起诉公司董事、监事、经理和其他高级管理人员；股东可以起诉公司；公司可以起诉股东、董事、监事、经理和其他高级管理人员。

**第十一条**   本章程所称其他高级管理人员是指公司的董事会秘书、财务负责人。

## 第二章   经营宗旨和范围

**第十二条**   公司的经营宗旨：以客户需求为中心，用卓越的技术和管理，不断提供高品质的产品与服务。

**第十三条**   经公司登记机关核准，公司经营范围是：彩色显示器件、电子产品及零部件、原材料的生产、开发、经营；自营和代理各类商品及技术的进出口业务；实物租赁、承办"三来一补"业务等。

## 第三章   股份

### 第一节   股份发行

**第十四条**   公司的股份采取股票的形式。

1

IRI-CRT-00001028

彩虹显示器件股份有限公司章程

**第十五条**　公司股份的发行，实行公开、公平、公正的原则，同种类的每一股份应当具有同等权利。

同次发行的同种类股票，每股的发行条件和价格应当相同；任何单位或者个人所认购的股份、每股应当支付相同价额。

**第十六条**　公司发行的股票，以人民币标明面值。

**第十七条**　公司的发行的股票，在中国证券登记结算有限责任公司上海分公司集中存管。

**第十八条**　公司经批准发行的普通股总数为30000万股，成立时向发起人彩虹集团公司发行6600万股，中国工商银行陕西省信托投资公司5400万股，中国建设银行陕西省信托投资公司3000万股，共计发行15000万股，占公司发行普通股总数的50%。

上述资金已于1992年8月31日全部到位。

**第十九条**　公司的股本结构为：普通股42114.88万股，其中发起人持有24016万股，其他内资股股东持有18098.88万股。

**第二十条**　公司或公司的子公司(包括公司的附属企业)不以赠与、垫资、担保、补偿或贷款等形式，对购买或者拟购买公司股份的人提供任何资助。


### 第二节　股份增减和回购

**第二十一条**　公司根据经营和发展的需要，依照法律、法规的规定，经股东大会分别作出决议，可以采用下列方式增加资本。

(一)公开发行的股份；

(二)非公开发行的股份；

(三)向现有股东派送红股；

(四)以公积金转增股本；

(五)法律、行政法规规定以及国务院证券主管部门批准的其他方式。

**第二十二条**　公司可以减少注册资本。公司减少注册资本，按照《公司法》以及其他有关规定和本章程规定的程序办理。

**第二十三条**　公司在下列情况下，经本章程规定的程序通过，并报国家有关主管机构批准后，可以购回本公司的股票：

(一)减少公司注册资本；

(二)与持有本公司股票的其他公司合并；

(三)将股份奖励给本公司职工；

(四)股东因对股东大会作出的合并、分立决议持异议，要求公司收购其股份的。

除上述情形外，公司不进行买卖本公司股票的活动。

**第二十四条**　公司购回股份，可以下列方式之一进行：

(一)证券交易所集中竞价交易方式；

(二)要约方式；

(三)中国证监会认可的其他方式。

**第二十五条**　公司因本章程第二十三条第(一)项至第(三)项的原因收购本公司股份的，应当经股东大会决议。公司依照第二十三条规定收购本公司股份后，属于第(一)项情形的，应当自收购之日起10日内注销；属于第(二)项、第(四)项情形的，应当在6个月内转让或者注销。

2

IRI-CRT-00001029

彩虹显示器件股份有限公司章程

公司依照第二十三条第（三）项规定收购的本公司股份，将不超过本公司已发行股份总额的 5%；用于收购的资金应当从公司的税后利润中支出；所收购的股份应当 1 年内转让给职工。

### 第三节　股份转让

**第二十六条**　公司的股份可以依法转让。

**第二十七条**　公司不接受本公司的股票作为质押权的标的。

**第二十八条**　董事、监事、经理以及其他高级管理人员在其任职期间内，应当定期向公司申报其所持有的本公司股份（包括因公司派发股份股利、公积金转增股本、行使可转换公司债券的转股权、购买、继承等新增加的股份）及其变动情况；在其任职期间每年转让的股份不得超过其所持有本公司股份总数的 25%；所持本公司股份自公司股票上市交易之日起 1 年内不得转让。上述人员离职后六个月内不得转让其所持有的本公司的股份。

**第二十九条**　公司董事、监事、高级管理人员、持有公司 5%以上的股东，将其所持有的公司股票在买入之日起 6 个月以内卖出，或者在卖出之日起 6 个月以内又买入的，由此所得收益归公司所有。但公司董事会将收回其所得收益。但同时，证券公司因包销购入售后剩余股票而持有 5%以上股份的，卖出该股票不受 6 个月时间限制。

公司董事会不按照前款规定执行的，股东有权要求董事会在 30 日内执行。公司董事会未在上述期限内执行的，股东有权为了公司的利益以自己的名义直接向人民法院提起诉讼。公司董事会不按照第 1 款的规定执行的，负有责任的董事依法承担连带责任。

### 第四章　股东

### 第一节　一般规定

**第三十条**　公司股东为依法持有公司股份的人。

**第三十一条**　股东名册是证明股东持有公司股份的充分证据。

**第三十二条**　公司应当与证券登记机构签订股份保管协议，依据证券登记机构提供的凭证建立股东名册。公司应定期查询主要股东资料及主要股东的持股变更（包括股权的出质）情况，及时掌握公司的股权结构。

**第三十三条**　公司召开股东大会、分配股利、清算及从事其他需要确认股东身份的行为时，由董事会或股东大会召集人确定股权登记日，股权登记日收市后登记在册的股东为享有相关权益的股东。

### 第二节　股东的权利和义务

**第三十四条**　股东作为公司的所有者，享有法律、行政法规和本章程规定的各项合法权利。

**第三十五条**　股东按其所持有股份的种类享有权利，承担义务；持有同一种类股份的股东享有同等权利，承担同种义务。

**第三十六条**　公司股东享有下列权利：

（一）依照其所持有的股份份额获得股利和其他形式的利益分配；

（二）依法请求、召集、主持、参加或者委派股东代理人参加股东会议；

（三）依照其所持有的股份份额行使表决权；

（四）对公司的经营行为进行监督，提出建议或者质询；

（五）依照法律、行政法规及公司章程的规定转让、赠与或质押其所持有股份；

3

IRI-CRT-00001030

彩虹显示器件股份有限公司章程

（六）查阅公司章程、股东名册、公司债券存根、股东大会会议记录、董事会会议决议、监事会会议决议、财务会计报告；

（七）公司终止或者清算时，按其所持有的股份份额参加公司剩余财产的分配；

（八）对股东大会作出的合并、分立决议持异议的股东，要求公司收购其股份；

（九）法律、行政法规及公司章程所赋予的其他权利。

**第三十七条**  股东提出查阅前条所述有关信息或者索取资料的，应当向公司提供证明其持有公司股份的种类以及持股数量的书面文件，公司经核实股东身份后按照股东的要求予以提供。

**第三十八条**  公司股东大会、董事会决议内容违反法律、行政法规的，股东有权请求人民法院认定无效。

股东大会、董事会的会议召集程序、表决方式违反法律、行政法规或者本章程，或者决议内容违反本章程的，股东有权自决议作出之日起 60 日内，请求人民法院撤销。

**第三十九条**  董事、高级管理人员执行公司职务时违反法律、行政法规或者本章程的规定，给公司造成损失的，连续 180 日以上单独或合并持有公司 1%以上股份的股东有权书面请求监事会向人民法院提起诉讼；监事会执行公司职务时违反法律、行政法规或者本章程的规定，给公司造成损失的，股东可以书面请求董事会向人民法院提起诉讼。

监事会、董事会收到前款规定的股东书面请求后拒绝提起诉讼，或者自收到请求之日起 30 日内未提起诉讼，或者情况紧急、不立即提起诉讼将会使公司利益受到难以弥补的损害的，前款规定的股东有权为了公司的利益以自己的名义直接向人民法院提起诉讼。

他人侵犯公司合法权益，给公司造成损失的，本条第一款规定的股东可以依照前两款的规定向人民法院提起诉讼。

**第四十条**  董事、高级管理人员违反法律、行政法规或者本章程的规定，损害股东利益的，股东可以向人民法院提起诉讼。

**第四十一条**  公司股东承担下列义务：

（一）遵守法律、行政法规和公司章程；

（二）依其所认购的股份和入股方式缴纳股金；

（三）除法律、法规规定的情形外，不得退股；

（四）不得滥用股东权利损害公司或者其他股东的利益；不得滥用公司法人独立地位和股东有限责任损害公司债权人的利益。

公司股东滥用股东权利给公司或者其他股东造成损失的，应当依法承担赔偿责任。

公司股东滥用公司法人独立地位和股东有限责任，逃避债务，严重损害公司债权人利益的，应当对公司债务承担连带责任。

（五）法律、行政法规及公司章程规定应当承担的其他义务。

**第四十二条**  股东持有公司已发行的股份达到百分之五时，应当自达到该比例之日向公司作出书面报告。

**第四十三条**  持有公司百分之五以上有表决权股份的股东，发生下列情形之一时，应当自该事实发生之日向公司作出书面报告。

（一）其持有股份增减变化达百分之五以上时；

（二）其持有股份进行质押时；

（三）其持有股份被司法冻结时；

4

IRI-CRT-00001031

彩虹显示器件股份有限公司章程

### 第三节  控股股东及实际控制人

**第四十四条**  控股股东及实际控制人对公司和公司其他股东负有诚信义务。

控股股东在行使表决权时，不得作出有损于公司和公司其他股东合法权益的决定。

**第四十五条**  控股股东、实际控制人不得利用其关联关系损害公司利益。违反规定的，给公司造成损失的，应当承担赔偿责任。

控股股东应严格依法行使出资人的权利，控股股东及实际控制人不得超越法定程序直接或者间接干预公司的决策及依法开展的生产经营活动，不得利用其特殊地位谋取额外的利益，不得利用关联交易、利润分配、资产重组、对外投资、资金占用、借款担保等方式损害公司和公司其他股东的合法权益，不得利用其控制地位损害公司和公司其他股东的利益。

**第四十六条**  控股股东与公司应实行人员、资产、财务分开，机构、业务独立，各自独立核算、独立承担责任和风险。

**第四十七条**  公司人员应独立于控股股东。公司的经理人员、财务负责人、营销负责人和董事会秘书在控股股东单位不得担任董事以外的其他职务。控股股东高级管理人员兼任公司董事的，应保证有足够的时间和精力承担上市公司的工作。

**第四十八条**  控股股东投入公司的资产应独立完整、权属清晰。控股股东以非货币性资产出资的，应办理产权变更手续，明确界定该资产的范围。公司应当对该资产独立登记、建帐、核算、管理。控股股东不得占用、支配该资产或干预公司对该资产的经营管理。

**第四十九条**  公司应按照有关法律、法规的要求建立健全的财务、会计管理制度，独立核算。控股股东应尊重公司财务的独立性，不得干预公司的财务、会计活动。

**第五十条**  公司的董事会、监事会及其他内部机构应独立运作。控股股东及其职能部门与公司及其职能部门之间没有上下级关系。控股股东及其下属机构不得向公司及其下属机构下达任何有关公司经营的计划和指令，也不得以其他任何形式影响其经营管理的独立性。

**第五十一条**  控股股东对公司董事、监事候选人的提名，应严格遵循法律、法规和本章程规定的条件和程序。控股股东提名的董事、监事候选人应当具备相关专业知识和决策、监督能力。控股股东不得对股东大会人事选举决议和董事会人事聘任决议履行任何批准手续；不得越过股东大会、董事会任免公司的高级管理人员。

**第五十二条**  控股股东不应当从事与公司构成直接或者间接竞争的经营业务。

### 第四节  关联交易

**第五十三条**  公司与关联人之间的关联交易应签订书面协议。协议的签订应当遵循平等、自愿、等价、有偿的原则，协议内容应明确、具体。公司应将该协议的订立、变更、终止及履行情况等事项按照有关规定予以披露。

**第五十四条**  公司应采取有效措施防止关联人以垄断采购和销售业务渠道等方式干预公司的经营，损害公司利益。关联交易活动应遵循商业原则，关联交易的价格原则上应不偏离市场独立第三方的价格或收费的标准。公司应对关联交易的定价依据予以充分披露。

**第五十五条**  股东大会审议关联交易事项时，关联股东应当放弃对该项议案（提案）的表决权，且其持有（代表）的股份不计入该项表决的有效表决票总数。

**第五十六条**  公司审议关联交易事项时，应当严格遵守法律、法规和规范性文件及本章程规定的程序。

**第五十七条**  董事会审议关联交易事项时，除非有关联关系的董事按照本章程的要求向董事会作了披露，并且董事会在不将其计入法定人数，该董事亦未参加表决的会议上批准了该事项，公司有权撤销该合同、交易或者安排，但在对方是善意第三人的情况下除外。

**第五十八条**  董事与董事会会议决议事项所涉及的企业有关联关系的，不得对该项决议

5

IRI-CRT-00001032

彩虹显示器件股份有限公司章程

行使表决权，也不得代理其他董事行使表决权。该董事会会议由过半数的无关联关系董事出席即可举行，董事会会议所作决议须经无关联关系董事过半数通过。出席董事会的无关联董事人数不足 3 人的，应将该事项提交股东大会审议。

**第五十九条** 董事会审议关联交易事项时，应当关注交易的必要性和公允性，应当关注是否可能损害非关联股东的利益，必要时应当聘请专业机构出具专项报告。

**第六十条** 公司应采取有效措施防止股东及其关联方以各种形式占用或者转移公司的资金、资产及其他资源。

**第六十一条** 董事会对于关联交易事项，除应当依照有关法律、法规和规范性文件及时充分披露外，还应当在年度股东大会上就执行情况作出报告。

## 第五章 股东大会

### 第一节 一般规定

**第六十二条** 公司股东大会由全体股东组成。

**第六十三条** 股东大会是公司的权力机构，依法行使下列职权：

（一）决定公司经营方针和投资计划；

（二）选举和更换董事，决定有关董事的报酬事项；

（三）选举和更换独立董事，决定独立董事的津贴；

（四）选举和更换由股东代表出任的监事，决定有关监事的报酬事项；

（五）审议批准董事会的报告；

（六）审议批准监事会的报告；

（七）审议批准公司的年度财务预算方案、决算方案；

（八）审议批准公司的利润分配方案和弥补亏损方案；

（九）审议批准重大关联交易事项；

（十）对公司增加或者减少注册资本作出决议；

（十一）对发行公司债券作出决议；

（十二）对公司募集资金投资项目作出决议；

（十三）对公司合并、分立、解散和清算等事项作出决议；

（十四）修改公司章程；

（十五）对公司聘用、解聘会计师事务所作出决议；

（十六）审议代表公司发行在外有表决权股份总数的 3%以上的股东的提案；

（十七）审议独立董事提出的提案；

（十八）审议公司监事会提出的提案；

（十九）审议批准本章程规定的对外担保事项；

（二十）审议公司一年内购买、出售重大资产超过公司最近一期经审计总资产 30%的事项；

（二十一）审议股权激励计划；

（二十二）审议法律、法规和本章程规定应当由股东大会决定的其他事项。

上述股东大会的职权不得通过授权的形式由董事会或其他机构和个人代为行使。

**第六十四条** 公司下列对外担保行为，须经股东大会审议通过。

（一）本公司及本公司控股子公司的对外担保总额，达到或超过最近一期经审计净资产的 50%以后提供的任何担保；

（二）公司的对外担保总额，达到或超过最近一期经审计总资产的 30%以后提供的任何

IRI-CRT-00001033

彩虹显示器件股份有限公司章程

担保；

（三）为资产负债率超过 70%的担保对象提供的担保；

（四）单笔担保额超过最近一期经审计净资产 10%的担保；

（五）对股东、实际控制人及其关联方提供的担保。

**第六十五条** 股东大会应当在法律、法规规定的范围内行使职权，不得干涉股东对自身权利的处分。

**第六十六条** 股东大会分为年度股东大会和临时股东大会。

除非另有说明，本章程所称股东大会包括年度股东大会和临时股东大会。

**第六十七条** 股东可以亲自出席股东大会，也可以委托代理人代为出席和表决。

股东代理人不必是公司的股东。

除非另有说明，本章以下各条所称股东均包括股东代理人。

**第六十八条** 股东出席股东大会，依法享有知情权、发言权、质询权和表决权。

符合本章程规定条件的股东，有权依照本章程规定的程序提交股东提案。

**第六十九条** 公司召开股东大会的地点为公司所在地城市。

**第七十条** 股东大会除设置会场、以现场会议形式召开外，经召集人决定，还可以提供网络投票形式，为股东参加股东大会提供便利条件。
股东通过网络方式投票表决的，视为出席股东大会。

**第七十一条** 股东大会采用网络投票形式时，确认股东身份的方式在会议通知公告中列明。

**第七十二条** 股东大会的召集者和主持人应认真、负责地安排股东大会审议事项，应给予每项议案或者提案合理的讨论时间。

**第七十三条** 公司董事会应当聘请律师出席股东大会，对以下问题出具意见并公告：

（一）股东大会的召集、召开程序是否符合法律、行政法规的规定，是否符合本章程；

（二）出席会议人员的资格、召集人资格是否合法有效；

（三）股东大会的表决程序、表决结果是否合法有效；

（四）应公司要求对其他问题出具的法律意见。

**第七十四条** 公司召开股东大会应坚持从简原则，不得给予出席会议股东额外的经济利益。

**第七十五条** 股东出席股东大会应当遵守有关法律、法规、规范性文件及公司章程之规定，自觉维护会议秩序，不得侵犯其他股东的合法权益。

### 第二节　年度股东大会

**第七十六条** 年度股东大会每年召开一次，应于上一会计年度完结之后的 6 个月之内举行。

公司在上述期限内因故不能召开年度股东大会，应该报告证券交易所，说明原因并公告。

**第七十七条** 年度股东大会会议议程应当包括下列内容：

（一）　审议批准董事会的报告；

（二）　审议批准监事会的报告；

（三）　审议批准公司年度财务预算方案、决算方案；

（四）　审议批准公司的利润分配方案和弥补亏损方案；

（五）　对公司聘用、解聘会计师事务所作出决议。

IRI-CRT-00001034

彩虹显示器件股份有限公司章程

### 第三节　临时股东大会

**第七十八条**　临时股东大会不定期召开，出现下列情形之一的，公司在事实发生之日起两个月以内召开临时股东大会：

（一）董事人数不足五人时；

（二）公司未弥补的亏损额达股本总额的 1/3 时；

（三）单独或者合并持有公司有表决权股份总数 10%以上的股东书面请求时；

（四）董事会认为必要时；

（五）监事会提议召开时；

（六）本章程规定的其他情形。

前述第（三）项持股数按股东提出书面要求日计算。

### 第四节　股东大会的召集

**第七十九条**　股东大会会议由董事会依法召集。

董事会不能履行职责或无合理理由而不召开年度股东大会时，其他具有资格的召集人有权召集年度股东大会。

**第八十条**　独立董事有权向董事会提议召开临时股东大会。对独立董事要求召开临时股东大会的提议，董事会应当根据法律、行政法规和本章程的规定，在收到提议后 10 日内提出同意或不同意召开临时股东大会的书面反馈意见。

董事会同意召开临时股东大会的，将在作出董事会决议后的 5 日内发出召开股东大会的通知；董事会不同意召开临时股东大会的，将说明理由并公告。

**第八十一条**　监事会有权向董事会提议召开临时股东大会，并应当以书面形式向董事会提出。董事会应当根据法律、行政法规和本章程的规定，在收到提案后 10 日内提出同意或不同意召开临时股东大会的书面反馈意见。

董事会同意召开临时股东大会的，将在作出董事会决议后的 5 日内发出召开股东大会的通知，通知中对原提议的变更，应征得监事会的同意。

董事会不同意召开临时股东大会，或者在收到提案后 10 日内未作出反馈的，视为董事会不能履行或者不履行召集股东大会会议职责，监事会可以自行召集和主持。

**第八十二条**　单独或者合计持有公司 10%以上股份的股东有权向董事会请求召开临时股东大会，并应当以书面形式向董事会提出。董事会应当根据法律、行政法规和本章程的规定，在收到请求后 10 日内提出同意或不同意召开临时股东大会的书面反馈意见。

董事会同意召开临时股东大会的，应当在作出董事会决议后的 5 日内发出召开股东大会的通知，通知中对原请求的变更，应当征得相关股东的同意。

董事会不同意召开临时股东大会，或者在收到请求后 10 日内未作出反馈的，单独或者合计持有公司 10%以上股份的股东有权向监事会提议召开临时股东大会，并应当以书面形式向监事会提出请求。

监事会同意召开临时股东大会的，应在收到请求 5 日内发出召开股东大会的通知，通知中对原提案的变更，应当征得相关股东的同意。

监事会未在规定期限内发出股东大会通知的，视为监事会不召集和主持股东大会，连续 90 日以上单独或者合计持有公司 10%以上股份的股东可以自行召集和主持。

**第八十三条**　监事会或股东决定自行召集股东大会的，须书面通知董事会，同时向公司所在地中国证监会派出机构和证券交易所备案。

在股东大会决议公告前，召集股东持股比例不得低于 10%。

召集股东应在发出股东大会通知及股东大会决议公告时，向公司所在地中国证监会派出机构和证券交易所提交有关证明材料。

8

IRI-CRT-00001035

彩虹显示器件股份有限公司章程

**第八十四条** 对于监事会或股东自行召集的股东大会，董事会和董事会秘书将予配合。董事会应当提供股权登记日的股东名册。

**第八十五条** 监事会或股东自行召集的股东大会，会议所必需的费用由本公司承担。

### 第五节　股东大会的通知

**第八十六条** 公司召开年度股东大会，召集人应当在会议召开 20 日之前以公告方式通知公司股东；公司召开临时股东大会，召集人应当在会议召开 15 日之前以公告方式通知各股东。计算上述会议通知起始期限时，不应当包括会议召开当日。

会议通知一经公告，视为所有相关人员收到通知。

**第八十七条** 召开股东大会的通知包括以下内容：

（一）会议的召集人、会议时间、地点、方式和会议期限；

（二）会议审议的事项；

（三）投票程序（适用于网络方式投票）；

（四）以明显的文字说明：全体股东均有权出席股东大会，并可以委托代理人出席会议和参加表决，该股东代理人不必是公司的股东；

（五）有权出席股东大会股东的股权登记日；

（六）投票代理委托书的送达时间和地点；

（七）会务常设联系人姓名、联系方式；

（八）会议登记日期、地点、方式。

公司召开股东大会确定的股权登记日与股东大会会议日期之间的间隔应当不多于 7 个工作日。股权登记日一旦确认，不得变更。

**第八十八条** 召集人在发出召开股东大会的通知后，应当在规定的时间内将该次会议拟审议的所有提案在指定网站上充分、完整的披露，拟讨论的事项需要独立董事发表意见的，发布股东大会通知或补充通知时应当同时披露独立董事的意见及理由。

**第八十九条** 召开股东大会的会议通知发出后，除有不可抗力或者其它意外事件等原因，股东大会不应延期或取消，股东大会通知中列明的提案不应取消。一旦出现延期或取消的情形，召集人应当在原定召开日前至少 2 个工作日公告并说明原因。

### 第六节　股东大会提案

**第九十条** 公司召开股东大会，董事会、监事会以及单独或者合并持有公司 3%以上股份的股东，有权向公司提出提案。

**第九十一条** 股东大会提案应当符合下列条件：

（一）有明确议题；

（二）提案内容具体、完整；

（三）提案内容与法律、法规和本章程的规定不相抵触，并且属于公司经营范围和股东大会职责范围；

（四）以书面形式提交或送达董事会。

**第九十二条** 单独或者合计持有公司 3%以上股份的股东，可以在股东大会召开 10 日前提出临时提案并书面提交召集人。召集人应当在收到提案后 2 日内发出股东人会补充通知，公告临时提案的内容。

除前款规定的情形外，召集人在发出股东大会通知公告后，不得修改股东大会通知中已列明的提案或增加新的提案。

股东大会通知中未列明或不符合本章程第九十一条股东大会提案条件的提案，股东大会不得进行表决并作出决议。

### 第七节　股东大会的召开

**第九十三条** 董事会和其他召集人应采取必要措施，保证股东大会的正常秩序。对于干扰股东大会、寻衅滋事和侵犯股东合法权益的行为，将采取措施加以制止并及时报告有关部

9

IRI-CRT-00001036

彩虹显示器件股份有限公司章程

门查处。

**第九十四条** 股权登记日登记在册的所有股东或其代理人，均有权出席股东大会，并依照有关法律、法规及本章程行使表决权。

**第九十五条** 股东出席股东大会应按会议通知规定的时间进行登记。

会议登记可以由股东到登记处登记，也可以采用传真、信函方式登记。

**第九十六条** 股东进行会议登记应当分别提供下列文件：

（一）法人股东：法人营业执照复印件、法定代表人证明书或授权委托书及出席人身份证明；

（二）个人股东：本人身份证明、股票账户卡；如委托代理人出席，则应提供个人股东身份证明复印件；股票账户卡；授权委托书；代理人身份证。

上述身份证明指在中国境内具有法律效力的身份证明文件，包括但不限于中华人民共和国居民身份证和护照。

**第九十七条** 股东委托代理人代为出席会议时，委托代理人以不超过二人为限。

委托人为法人的，由其法定代表人或者董事会、其他决策机构决议授权的人作为代表出席会议。

**第九十八条** 股东应当以书面形式委托代理人，由委托人签署或者由其以书面形式委托的代理人签署：委托人为法人的，应当加盖法人印章或者由其正式委托的代理人签署。

委托书由委托人授权他人签署的，授权签署的授权书或者其他授权文件应当经过公证。

**第九十九条** 股东出具的委托他人出席股东大会的授权委托书应当载明下列内容：

（一）代理人的姓名；

（二）是否具有表决权；

（三）分别对列入股东大会议程的每一审议事项投赞成、反对或弃权票的指示；

（四）对可能纳入股东大会议程的临时提案是否有表决权，如果有表决权应行使何种表决权的具体指示；

（五）委托书签发日期和有效期限；

（六）委托人签名（或盖章），委托人为法人的，应加盖法人单位印章。

委托书应当注明如果委托人不作具体指示，代理人是否可以按自己的意思表决。

股东委托的代理人为二人时，应当明确地将投票表决权授予其中一人。

**第一百条** 投票代理委托书至少应当在股东大会召开前二十四小时备置于公司住所，或者召集会议的通知中指定的其他地方。

**第一百零一条** 出席股东大会的人员应当履行签到手续。

签到名册由公司负责制作。签到名册载明参加会议人员姓名（或单位名称）、身份证明号码、委托人姓名（或名称）、持有或者代表有表决权的股份数额等事项。

**第一百零二条** 个人股东亲自出席股东大会的，应当出示本人身份证明和持股证。

个人股东委托的代理人出席股东大会的，应当出示授权委托书，股东持股凭证和本人身份证明。

**第一百零三条** 法人股东应由法定代表人或者法定代表人委托的代理人出席股东大会。

法定代表人出席股东大会的，应当出示法人单位证明文件、能够证明其具有法定代表人资格的证明、持股凭证和本人身份证明。

法人股东委托的代理人出席股东大会的，应当出示本人身份证明、法人股东单位证明文件，法人股东单位的法定代表人出具的授权委托书及持股凭证。

**第一百零四条** 召集人和公司聘请的律师将依据证券登记结算机构提供的股东名册共同对股东资格的合法性进行验证，并登记股东姓名（或名称）及其所持有表决权的股份数。在会议主持人宣布现场出席会议的股东和代理人人数及所持有表决权的股份总数之前，会议登记应当终止。

10

IRI-CRT-00001037

彩虹显示器件股份有限公司章程

**第一百零五条** 公司董事会、独立董事和符合有关条件的股东可以向公司股东征集其在股东大会上的投票权。

投票权征集应采取无偿的方式进行，并应向被征集人充分披露信息。

**第一百零六条** 股东大会召开时，本公司全体董事、监事和董事会秘书应当出席会议，经理和其他高级管理人员应当列席会议。

**第一百零七条** 由董事会召集的股东大会由董事长主持。董事长因故不能履行职务时，由副董事长主持；副董事长不能履行职务或者不履行职务时，由半数以上董事共同推举的一名董事主持。

由监事会自行召集的股东大会，会议由监事会主席主持。监事会主席不能履行职务或不履行职务时，由半数以上监事共同推举的一名监事主持。

由股东自行召集的股东大会，会议由召集人推举代表主持。

召开股东大会时，会议主持人违反议事规则使股东大会无法继续进行的，经现场出席股东大会有表决权过半数的股东同意，股东大会可推举一人担任会议主持人，继续开会。

**第一百零八条** 在年度股东大会上，董事会、监事会应当就其过去一年的工作向股东大会作出报告。每名独立董事也应作出述职报告。

**第一百零九条** 公司的董事长、董事、监事或总经理及其他高级管理人员在股东大会上应当就股东的质询和建议作出解释和说明，但存在下列情形的除外：

（一）质询问题与会议议题无关；

（二）质询问题涉及事项尚待查实；

（三）质询问题涉及公司商业秘密；

（四）回答质询问题将导致违反公平信息披露义务；

（五）其他合理的事由。

### 第八节　股东大会表决程序

**第一百一十条** 股东以其所代表的有表决权的股份数额行使表决权，每一股份享有一票表决权。

股东登记日登记在册的所有股东或其代理人，均有权出席股东大会。并依照有关法律、法规及本章程行使表决权。

**第一百一十一条** 股东大会对列入会议议程的各项报告、议案、提案应当采用记名投票方式逐项进行表决，不得以任何理由搁置或不予表决。

股东大会对同一事项有不同提案的，应以提案提出的时间顺序进行表决。

**第一百一十二条** 召集人应当保证股东大会连续举行，直至形成最终决议。因不可抗力等特殊原因导致股东大会中止或不能作出决议的，应采取必要措施尽快恢复复召开股东大会或直接终止本次股东大会，并及时公告。同时，召集人应向公司所在地中国证监会派出机构及证券交易所报告。

**第一百一十三条** 会议主持人应当在表决前宣布现场出席会议的股东和代理人人数及所持有表决权的股份总数，现场出席会议的股东和代理人人数及所持有表决权的股份总数以会议登记为准。

**第一百一十四条** 公司召开股东大会除现场表决外，可以利用符合中国证监会规定的网络系统或者其他方式向股东提供投票平台，以方便股东行使表决权。

**第一百一十五条** 股东大会股权登记日登记在册的所有股东，均有权通过股东大会网络投票系统行使表决权，但同一表决权只能选择现场投票、网络投票或符合规定的其他投票方式中的一种表决方式。同一表决权出现重复表决的以第一次投票结果为准。

**第一百一十六条** 股东大会对提案进行表决前，应当推举两名股东代表和一名监事为监票人，负责监督投票过程和计票工作。

与审议事项与股东有利害关系的股东，不得出任监票人，参加监票、计票工作。

IRI-CRT-00001038

彩虹显示器件股份有限公司章程

公司聘请的见证律师与监票人共同负责监票、计票工作。

通过网络或其他方式投票的股东，有权通过相应的投票系统查验自己的投票结果。

**第一百一十七条** 股东大会现场结束时间不得早于网络或其他方式，会议主持人应当宣布每一提案的表决情况和结果，并根据表决结果宣布提案是否通过。

在正式公布表决结果前，股东大会现场、网络及其他表决方式中所涉及的上市公司、计票人、监票人、主要股东、网络服务方等相关各方对表决情况均负有保密义务。

**第一百一十八条** 出席股东大会的股东，应当对提交表决的提案发表以下意见之一：同意、反对或弃权。

未填、错填、字迹无法辨认的表决票、未投的表决票均视为投票人放弃表决权利，其所持股份数的表决结果应计为"弃权"。

**第一百一十九条** 表决票经监票人统计后当场公布表决结果，决议的表决结果载入会议记录。

监票人应当在表决统计表上签名，表决票和表决统计表应当一并存档。

**第一百二十条** 会议主持人如果对表决结果有任何怀疑，可以对所投票数进行点算；如果会议主持人未进行点算，出席会议的股东对会议主持人宣布的表决结果有异议时，有权在宣布表决结果后要求立即点算，会议主持人应当即时点票。

### 第九节 股东大会决议

**第一百二十一条** 股东大会决议分为普通决议和特别决议。

**第一百二十二条** 股东大会作出普通决议，应当由参加股东大会投票表决的股东所持表决权的 1/2 以上通过。

股东大会作出特别决议，应当由参加股东大会投票表决的股东所持表决权的 2/3 以上通过。

**第一百二十三条** 下列事项由股东大会以普通决议通过：

（一）董事会和监事会的工作报告；

（二）董事会拟定的利润分配方案和弥补亏损方案；

（三）董事会和监事会成员的任免及其报酬和支付方法；

（四）公司年度预算方案、决算方案；

（五）公司年度报告；

（六）除法律、行政法规规定或者本章程规定应当以特别决议通过以外的其他事项。

**第一百二十四条** 下列事项由股东大会以特别决议通过：

（一）公司增加或者减少注册资本；

（二）公司的分立、合并、解散和清算；

（三）公司章程的修改；

（四）公司在一年内购买、出售重大资产或者担保金额超过公司最近一期经审计总资产 30%的；

（五）股权激励计划；

（六）法律、行政法规、规范性文件及本章程规定的，以及股东大会以普通决议认定会对公司产生重大影响的、需要以特别决议通过的其他事项。

**第一百二十五条** 公司股东大会通过有关派现、送股或资本公积金转增股东提案的，公司董事会须在股东大会结束后两个月内实施具体方案

**第一百二十六条** 除公司处于危机等特殊情况外，非经股东大会以特别决议批准，公司将不与董事、经理和其它高级管理人员以外的人订立将公司全部或者重要业务的管理交予该人负责的合同。

**第一百二十七条** 会议主持人根据表决结果宣布股东大会的决议是否通过。

12

IRI-CRT-00001039

彩虹显示器件股份有限公司章程

股东大会决议由出席会议的公司董事和董事会秘书签字后生效。

公司董事会全体董事均未出席股东人会时，由出席会议现场的全部股东签字后生效。

**第一百二十八条** 股东大会决议应当及时公告，公告中应列明出席会议的股东和代理人人数、所持有表决权的股份总数及占公司有表决权股份总数的比例、表决方式、每项提案的表决结果和通过的各项决议的详细内容。

**第一百二十九条** 股东大会审议提案时，不得对提案进行修改，否则，有关变更应当被视为一个新的提案，不得在本次股东大会上进行表决。

**第一百三十条** 提案未获通过，或者本次股东大会变更前次股东大会决议的，应当在股东大会决议公告中作特别提示。

### 第十节　董事、监事选举程序

**第一百三十一条** 董事和出股东人会选举产生的监事，单独或者合并持有公司股份 3%以上的股东提名候选人，以提案形式提交股东大会表决。

**第一百三十二条** 独立董事由公司董事会、监事会、单独或者合并持有公司股份 1%以上的股东提名，由股东大会选举决定。

**第一百三十三条** 股东提名董事、独立董事或者监事候选人时，应当在股东大会召开十日之前，将提名提案、提名候选人的详细资料、候选人的声明或承诺函提交董事会。

**第一百三十四条** 董事会应在股东大会通知中充分披露董事、独立董事、监事候选人的详细资料，至少包括以下内容：

（一）教育背景、工作经历、兼职等个人情况；

（二）与本公司或本公司的控股股东及实际控制人是否存在关联关系；

（三）披露持有本公司股份数量；

（四）是否受过中国证监会及其他有关部门的处罚和证券交易所惩戒。

**第一百三十五条** 董事、独立董事、监事候选人应在股东大会召开之前作出书面承诺，同意接受提名，承诺公开披露的个人资料真实、完整并保证当选后切实履行职责。

**第一百三十六条** 股东大会选举董事进行表决时，采用累积投票制。

**第一百三十七条** 累积投票制实施办法如下：

（一）累积表决票数计算办法

（甲）每位股东持有的有表决权的股份乘以本次股东大会应选举董事人数之积，即为该股东本次表决累积表决票数。

（乙）股东大会进行多轮选举时，应当根据每轮选举应当选董事人数重新计算股东累积表决票数。

（丙）公司董事会秘书应当在每轮累积投票表决前宣布每位股东的累积表决票数，任何股东、公司独立董事、公司监事、本次股东大会监票人、见证律师或公证处公证员对宣布结果有异议时，应当立即进行核对。

（二）投票办法

每位股东均可以按照自己的意愿（代理人应遵守委托人授权书指示），将累积表决票数分别或全部集中投向任一董事候选人，如果股东投票于两名以上董事候选人时，不必平均分配票数，但其分别投票之和只能等于或者小于其累积表决票数，否则，其该项表决无效。

（三）董事当选

1. 等额选举

（甲）董事候选人获取选票数超过参加会议有效表决股份数二分之一以上时即为当选；若

（乙）当选董事人数少于应选董事，但已当选董事人数超过本章程规定的董事会成员三分之二以上时，则缺额应在下次股东大会上填补；若

13

IRI-CRT-00001040

彩虹显示器件股份有限公司章程

（丙）当选董事人数少于应选董事，且由此导致董事会成员不足本章程规定的三分之二以上时，则应当对未当选的董事候选人进行第二轮选举；若

（丁）第二轮选举仍未能满足上款要求时，则应当在本次股东大会结束之后的二个月内再次召开股东大会对缺额董事进行选举。

2. 差额选举

（甲）董事候选人获取选票超过参加会议有效表决股份数二分之一以上，且该等人数等于或者小于应当选董事人数时，该等候选人即为当选；若

（乙）获取超过参加会议有效表决股份数二分之一以上的选票的董事候选人多于应当选董事人数时，则按得票多少排序，取得票较多者当选；若

（丙）因两名及其以上的候选人得票相同而不能决定其中当选者时，则对该等候选人进行第二轮选举；若

（丁）第二轮选举仍未能决定当选者时，则应在下次股东大会另行选举；若

（戊）由此导致董事会成员不足本章程规定的三分之二以上时，则下次股东大会应当在本次股东大会结束后的一个月以内召开。

**第一百三十八条** 股东大会选举股东监事时，表决方法与选举董事相同。

**第一百三十九条** 董事、股东监事一经当选，立即就任。

## 第十一节　股东大会会议记录

**第一百四十条** 召开股东大会应当由董事会秘书作出会议记录。会议记录记载以下内容：

（一）出席股东大会有表决权的股份数和占公司股份总数的比例；

（二）召开会议的日期、地点、议程和召集人姓名或名称；

（三）会议主持人以及出席或列席会议的董事、监事、经理和其他高级管理人员姓名；

（四）对每一提案的审议经过、发言要点和表决结果；

（五）每一表决事项的表决结果（包括现场表决、网络表决和其他方式表决的结果；非流通股东和流通股东分别统计的表决结果）；

（六）股东的质询意见、建议及董事会、监事会的答复或说明等内容；

（七）律师及计票人、监票人姓名；

（八）股东大会认为和本章程规定应当载入会议记录的其他内容。

第一百四十一条　召集人应当保证会议记录内容真实、准确和完整。出席会议的董事、监事、董事会秘书、召集人或其代表、会议主持人应当在会议记录上签名。会议记录应当与现场出席股东的签名册及代理出席的委托书、网络及其他方式表决情况的有效资料一并保存，保存期限不少于 10 年。

第一百四十二条　对股东大会到会人数、参会股东持有的股份数额、授权委托书、每一表决事项的表决结果、会议记录、会议程序的合法性等事项，可以进行公证。

### 第十二节　股东大会对董事会的授权

**第一百四十三条** 董事会决定对外投资事项的权限为：单个项目不超过最近一期经审计净资产值的 15%；年度累计投资项目不超过公司最近一期经审计净资产值的 50%。

**第一百四十四** 董事会决定收购或出售资产事项的权限为：单个项目或年度累计不超过最近一期经审计总资产的 30%。连续 12 个月内向同一当事人收购或出售资产不超过三次；

董事会有权决定年度累计金额不超过最近一期经审计净资产值 50%的资产抵押项目。

**第一百四十五条** 董事会有权决定单一合同交易金额或连续 12 月内同类标的交易金额不超过公司最近一期经审计净资产绝对值 5%以下的关联交易事项。

14

彩虹显示器件股份有限公司章程

## 第六章 董事和董事会

### 第一节 董事

**第一百四十六条** 公司董事为自然人，董事无需持有公司股份。

**第一百四十七条** 有下列情形之一的，不能担任公司的董事：

（一）无民事行为能力或者限制民事行为能力；

（二）因贪污、贿赂、侵占财产、挪用财产或者破坏社会主义市场经济秩序，被判处刑罚，执行期满未逾5年，或者因犯罪被剥夺政治权利，执行期满未逾5年；

（三）担任破产清算的公司、企业的董事或者厂长、经理，对该公司、企业的破产负有个人责任的，自该公司、企业破产清算完结之日起未逾3年；

（四）担任因违法被吊销营业执照、责令关闭的公司、企业的法定代表人，并负有个人责任的，自该公司、企业被吊销营业执照之日起未逾3年；

（五）个人所负数额较大的债务到期未清偿；

（六）被中国证监会处以证券市场禁入处罚，期限未满的；

（七）法律、行政法规或部门规章规定的其他内容。

违反本条规定选举董事的，该项选举无效。

在任董事出现上述情形时，董事会应当自知道该情况发生之日起，立即停止有关董事履行职责，并提请股东大会予以撤换。

**第一百四十八条** 董事由股东大会选举或更换，任期三年。董事任期届满，连选可以连任。董事在任期届满以前，股东大会不得无故解除其职务。

董事任期从股东大会决议通过之日起计算，至本届董事会任期届满时为止。董事任期届满未及时改选，在改选出的董事就任前，原董事仍应当依照法律、行政法规、部门规章和本章程的规定，履行董事职务。

**第一百四十九条** 董事应当遵守法律、行政法规和本章程的规定，对公司负有下列忠实义务：

（一）不得利用职权收受贿赂或者其他非法收入，不得侵占公司的财产；

（二）不得挪用公司资金；

（三）不得将公司资产或者资金以其个人名义或者其他个人名义开立账户存储；

（四）不得违反本章程的规定，未经股东大会或董事会同意，将公司资金借贷给他人或者以公司财产为他人提供担保；

（五）不得违反本章程的规定或未经股东大会同意，与本公司订立合同或者进行交易；

（六）未经股东大会同意，不得利用职务便利，为自己或他人谋取本应属于公司的商业机会，自营或者为他人经营与本公司同类的业务；

（七）不得接受与公司交易的佣金归为己有；

（八）不得擅自披露公司秘密；

（九）不得利用其关联关系损害公司利益；

（十）法律、行政法规、部门规章及本章程规定的其他忠实义务。

董事违反本条规定所得的收入，应当归公司所有；给公司造成损失的，应当承担赔偿责任。

**第一百五十条** 公司应与董事签订聘任合同，明确公司和董事之间的权利义务、董事的任期、董事违反法律法规和本章程的责任以及公司因故提前解除合同的补偿等内容。

**第一百五十一条** 董事应当遵守法律、行政法规和本章程，对公司负有下列勤勉义务：

（一）应谨慎、认真、勤勉地行使公司赋予的权利，以保证公司的商业行为符合国家法律、行政法规以及国家各项经济政策的要求，商业活动不超过营业执照规定的业务范围；

（二）应公平对待所有股东；

（三）及时了解公司业务经营管理状况；

15

IRI-CRT-00001042

彩虹显示器件股份有限公司章程

（四）应当对公司定期报告签署书面确认意见。保证公司所披露的信息真实、准确、完整；

（五）应当如实向监事会提供有关情况和资料，不得妨碍监事会或者监事行使职权；

（六）法律、行政法规、部门规章及本章程规定的其他勤勉义务。

**第一百五十二条** 未经本章程规定或者董事会的合法授权，任何董事不得以个人名义代表公司或者董事会行事。董事以其个人名义行事时，在第三方合理地认为该董事在代表公司或者董事会行事的情况下，该董事应当事先声明其立场和身份。

**第一百五十三条** 董事个人或者其所任职的其他企业直接或者间接与公司已有的或者计划中的合同、交易、安排有关联关系时（聘任合同除外，不论有关事项在一般情况下是否需要董事会批准同意，均应当尽快向董事会披露其关联关系的性质和程度。

**第一百五十四条** 如果公司董事在公司首次考虑订立有关合同、交易、安排前以书面形式通知董事会，声明自于通知所列的内容，公司日后达成的合同、交易、安排与其有利益关系，则在通知阐明的范围内，视为有关董事做了本章程前条所规定的披露。

**第一百五十五条** 董事连续两次未能亲自出席，也不委托其他董事出席董事会会议，视为不能履行职责，董事会应当建议股东人会予以撤换。

**第一百五十六条** 董事可以在任期届满以前提出辞职。董事辞职应当向董事会提交书面辞职报告。

**第一百五十七条** 如因董事的辞职导致公司董事会少于5人时，该董事的辞职报告应当在下任董事填补因其辞职产生的缺额后方能生效。

余任董事应当尽快召集临时股东大会选举董事，填补因董事辞职产生的空缺，在股东大会未就董事选举作出决议以前，该提出辞职的董事以及余任董事的职权应当受到合理的限制。

除前款所列情形外，董事辞职报告送达董事会时生效。

**第一百五十八条** 董事提出辞职或者任期届满，其对公司和股东负有的义务在其辞职报告生效后或者任期届满后的一年内仍然有效。

**第一百五十九条** 任职尚未结束的董事，对因其擅自离职使公司造成的损失，应当承担赔偿责任。

**第一百六十条** 公司不以任何形式为董事纳税。

**第一百六十一条** 董事会决议违反法律、行政法规或者本章程，致使公司遭受损失的，参与决议的董事对公司负赔偿责任。但经证明在表决时曾表明异议并记载于会议记录的，董事可以免除责任。

**第一百六十二条** 董事执行公司职务时违反法律、行政法规、部门规章或本章程的规定，给公司造成损失的，应当承担赔偿责任。

**第一百六十三条** 经股东大会批准，公司可以为董事购买责任保险。但董事因违反法律、行政法规和本章程规定而导致的责任除外。

## 第二节 独立董事

**第一百六十四条** 公司设独立董事三名，其中具有高级职称或注册会计师资格的会计从业人员不少于一名。

**第一百六十五条** 独立董事由公司董事会、监事会、单独或合并持有公司股份百分之一以上的股东提名，由股东大会选举或更换。

**第一百六十六条** 在选举独立董事的股东大会召开前，公司应当将独立董事候选人的有

16

IRI-CRT-00001043

彩虹显示器件股份有限公司章程

关材料（包括但不限于提名人声明、候选人声明、独立董事履历表）报送公司所在地中国证监会派出机构和证券交易所。

董事会对被提名人的有关情况有异议的，应同时报送董事会的书面意见。

**第一百六十七条** 证券交易所对独立董事候选人的任职资格或者独立性提出异议时，该候选人不得作为独立董事当选，但经提名人同意，可作为董事候选人参加选举。

股东大会选举独立董事时，董事会应对独立董事候选人是否被证券交易所提出异议的情况作出说明。

**第一百六十八条** 独立董事的提名人在提名前应当征得被提名人的同意。提名人应当充分了解被提名人职业、学历、职称、详细的工作经历、全部兼职等情况，并对其担任独立董事的资格和独立性发表声明。

**第一百六十九条** 独立董事接受提名后，应当就其本人与公司之间不存在任何影响其独立客观判断的关系发表公开声明。

**第一百七十条** 独立董事的任期与本届董事会其他董事任期一致。

独立董事连选可以连任，但是连任时间不得超过六年。

**第一百七十一条** 公司应当给予独立董事适当的津贴。

独立董事的津贴由董事会拟定预案，提请股东大会审议批准，并在公司年报中披露。

除上述津贴外，独立董事不应从公司及其主要股东或有利害关系的机构和人员处取得额外的、未予披露的其他利益。

**第一百七十二条** 独立董事对公司全体股东负责，但当股东利益不一致时，应当重点关注中小股东的利益不受损害。

**第一百七十三条** 独立董事应当具备与其行使职权相适应的任职条件，担任独立董事应当符合下列基本条件：

（一）根据法律、行政法规及其他有关规定，具备担任上市公司董事的资格；

（二）具有证券监管部门规范性文件要求的独立性；

（三）具备上市公司运作的基本知识，熟悉相关法律、行政法规、规章及规则；

（四）具有五年以上法律、经济或者其他履行独立董事职责所必需的工作经验；

（五）公司章程规定的其他条件。

**第一百七十四条** 下列人员不得担任独立董事：

（一）在公司或公司的子公司、分公司任职的人员及其直系亲属、主要社会关系；

（二）直接或间接持有公司发行在外股份百分之一以上或者位居公司前十名股东中的自然人股东及其直系亲属、主要社会关系；

（三）在直接或间接持有公司发行在外股份百分之五以上或者位居公司前五名股东中的单位任职的人员及其直系亲属、主要社会关系；

（四）最近一年内曾经具有前三项所列举情形的人员；

（五）与公司、公司关联人或公司管理层人士有利益关系的人员；

（六）在直接或间接地与公司存在业务联系或利益关系的机构任职的人员；

（七）为公司或者公司的子公司、分公司提供财务、法律、咨询等服务的人员或者在该等机构中任职的其他人员；

（八）在证券监管部门、证券经营机构、证券投资基金任职的人员；

（九）《公司法》或其他相关法律、行政法规规定不得担任公司董事的人员；

（十）被中国证监会认定为市场禁入者且禁入尚未解除的人员。

IRI-CRT-00001044

彩虹显示器件股份有限公司章程

（十一）　公司之间存在其他任何可能影响其作出独立客观判断的关系的人员。

（十二）　中国证监会认定的其他人员。

上述直系亲属是指配偶、父母、子女等；主要社会关系是指兄弟姐妹、岳父母、儿媳、女婿、兄弟姐妹的配偶、配偶的兄弟姐妹等。

**第一百七十五条**　独立董事应当履行法律、法规、规范性文件及本章程规定的诚信尽责义务。

**第一百七十六条**　独立董事除具有董事的一般职权外，还具有下列特别职权：

（一）重大关联交易（指公司拟与关联人达成的总额高于 300 万元或高于公司最近经审计净资产值的 5%的关联交易）应由独立董事事前同意后，方可提交董事会讨论；独立董事作出判断前，可以聘请中介机构出具独立财务顾问报告，作为其判断的依据；

（二）向董事会提议聘用或解聘会计师事务所；

（三）向董事会提请召开临时股东大会；

（四）提议召开董事会；

（五）董事会作出决议前，独立董事认为审议事项资料或论证不充分，提议暂缓表决时，董事会应予以采纳；

（六）可以在股东大会召开前公开向股东征集投票权；

（七）独立聘请外部审计机构或者咨询机构。

如上述提议未被采纳或上述职权不能正常行使，公司应将有关情况予以披露。

**第一百七十七条**　独立董事应当对下列事项发表独立意见：

（一）提名、任免董事；

（二）聘任或解聘高级管理人员；

（三）公司董事、高级管理人员的薪酬；

（四）公司财务报告；

（五）董事会作出的利润分配预案中不含现金派息时；

（六）公司发行新股的方案；

（七）公司的股东、实际控制人及其关联企业对公司现有或新发生的总额高于 300 万元或高于公司最近经审计净资产值 5%以上的借款或其他资金往来，以及公司是否采取有效措施回收欠款；

（八）占公司最近经审计后总资产百分之三十以上的资产置换、收购或出售方案；

（九）占公司最近经审计后净资产百分之十以上的风险投资、担保及财产损失方案；

（十）在公司年度报告中，对公司累计和当期对外担保情况进行专项说明，并发表独立意见；

（十一）证券监管部门、证券交易所要求独立董事发表意见的事项；

（十二）法律、法规及规范性文件要求独立董事发表意见的事项；

（十三）独立董事认为可能损害中小股东权益的事项；

（十四）独立董事认为必要的其他事项。

**第一百七十八条**　独立董事发表独立意见应采用下列方式之一：

（一）同意；

（二）保留意见及其理由；

（三）反对意见及其理由；

（四）无法发表意见及其障碍。

18

IRI-CRT-00001045

彩虹显示器件股份有限公司章程

**第一百七十九条**　如有关事项涉及需要披露时，公司应当将独立董事的意见予以公告，独立董事出现意见分歧无法达成一致时，董事会应将各独立董事的意见分别披露。

**第一百八十条**　为保证独立董事有效行使职权，公司应当为独立董事提供必要的条件：

（一）公司应当保证独立董事享有与其他董事同等的知情权。凡须经董事会决策的事项，公司必须在规定的时限内提前通知独立董事并同时提供足够的资料，独立董事认为资料不充分的，可以要求补充。

（二）公司应提供独立董事履行职责所必需的工作条件（包括但不限于提供文件、资料、办公场所、交通和通信工具及出入生产经营场所的便利条件）。

（三）公司董事会秘书应积极为独立董事履行职责提供协助，如介绍情况、提供材料等。独立董事发表的独立意见、提案及书面说明应当公告的，董事会秘书应及时到证券交易所办理公告事宜。

（四）独立董事行使职权时，公司有关人员应当积极配合，不得拒绝、阻碍或隐瞒，不得干预其独立行使职权。

**第一百八十一条**　独立董事应当向公司年度股东大会提交全体独立董事年度报告书，对其履行职责的情况进行说明。

**第一百八十二条**　公司可以建立必要的独立董事责任保险制度，以降低独立董事正常履行职责可能引致的风险。

**第一百八十三条**　公司向独立董事提供的资料，公司及独立董事本人应当至少保存五年。

**第一百八十四条**　独立董事连续三次未亲自出席董事会会议的，由董事会提请股东大会予以撤换。

除非法律、法规、规范性文件及本章程另有规定外，独立董事任期届满前不得无故被免职。如果必须免职时，公司应将其作为特别披露事项予以披露，被免职的独立董事认为公司免职理由不当的，可以作出公开声明。

**第一百八十五条**　独立董事在任期届满前可以提出辞职。

独立董事辞职应向董事会递交书面辞职报告，并对任何与其辞职有关或其认为有必要引起公司股东和利益相关者注意的情况进行说明。

独立董事辞职导致独立董事成员或董事会成员低于法定或本章程规定的最低人数时，董事会应当在自接到辞职报告之日起的 60 日内召集股东大会补选独立董事。在补选的独立董事就任前，该等辞职独立董事仍应当按照法律、行政法规及本章程的规定履行职务。逾期未补选独立董事时，该等辞职独立董事可以不再履行职务。

**第一百八十六条**　独立董事不能履行职责或发生严重失职行为时，由董事会或监事会提请股东人会予以撤换。

董事会或监事会作出上述决议时，持反对意见的董事或监事有权要求对其意见进行公告。


### 第三节　董事会

**第一百八十七条**　公司设董事会，对股东大会负责。

**第一百八十八条**　董事会由七名董事（包括三名独立董事）组成。

**第一百八十九条**　董事会行使下列职权：

（一）负责召集股东大会，并向大会报告工作；

（二）执行股东大会的决议；

19

IRI-CRT-00001046

彩虹显示器件股份有限公司章程

（三）决定公司的经营计划和投资方案；

（四）制订公司的年度财务预算方案、决算方案；

（五）制订公司的利润分配方案和弥补亏损方案；

（六）制订公司增加或者减少注册资本、发行债券或其他证券及上市方案；

（七）拟订公司重大收购、回购本公司股票或者合并、分立和解散及变更公司形式的方案；

（八）在股东大会授权范围内，决定公司的对外投资、收购出售资产、资产抵押及委托理财、关联交易等事项；

（九）决定须经股东大会审议通过之外的对担保事项；

（十）决定公司内部管理机构的设置；

（十一）聘任或者解聘公司总经理、董事会秘书；根据总经理的提名，聘任或者解聘公司副总经理、财务负责人等高级管理人员，并决定其报酬事项和奖惩事项；

（十二）制订公司的基本管理制度；

（十三）制订公司章程的修改方案；

（十四）管理公司信息披露事项；

（十五）向股东大会提请聘请或更换为公司审计的会计师事务所；

（十六）听取公司总经理的工作汇报并检查总经理的工作；

（十七）法律、法规或公司章程规定，以及股东大会授予的其他职权。

**第一百九十条** 公司设董事长一人。以全体董事的过半数选举产生和罢免。

**第一百九十一条** 董事长行使下列职权：

（一）主持股东大会和召集、主持董事会会议；

（二）督促、检查董事会决议的执行；

（三）签署公司股票、公司债券及其他有价证券；

（四）签署董事会重要文件和其他应由公司法定代表人签署的其他文件；

（五）行使法定代表人的职权；

（六）在发生特大自然灾害等不可抗力的紧急情况下，对公司事务行使符合法律规定和公司利益的特别处置权，并在事后向公司董事会和股东大会报告；

（七）董事会授予的其他职权。

**第一百九十二条** 董事长不能履行职责时，应当指定一名董事代其履行职责，董事长不能履行职责，亦未指定董事代其行使职责时，由二分之一以上的董事共同推举一名董事履行职责。

**第一百九十三条** 公司董事会应当就注册会计师对公司财务报告出具的非标准的审计报告向股东大会作出说明。

**第一百九十四条** 公司全体董事应当审慎对待对外担保，严格控制对外担保产生的债务风险。

**第一百九十五条** 董事会应当制定《投资者关系管理工作制度》，积极开展投资者关系管理工作，通过多种形式主动加强与投资者特别是社会公众投资者的沟通和交流，设立专门的投资者咨询电话，在公司网站开设投资者关系专栏，定期举行与公众投资者见面活动，及时答复公众投资者关心的问题。公司董事会秘书具体负责公司投资者关系管理工作。

### 第四节　董事会对董事长的授权

**第一百九十六条** 董事会闭会期间，董事长有权决定并签署单笔金额不超过人民币5000万元的银行借款合同。

20

IRI-CRT-00001047

彩虹显示器件股份有限公司章程

董事长做出的上述决定应符合公司的最大利益，并在下次董事会上进行报告。

### 第五节 董事会秘书

**第一百九十七条** 董事会设董事会秘书一人。

董事会秘书是公司高级管理人员，由董事长提名，经董事会聘任对公司和董事会负责。

董事会秘书是公司与证券交易所之间的指定联络人。

**第一百九十八条** 董事会秘书应当具有必备的专业知识和经验。

董事会秘书的任职资格：

（一）具有大学专科以上学历，从事秘书或经济管理、股权事务等工作不少于三年；

（二）掌握法律、财务、证券、企业管理等方面的知识，具有良好的个人品质和职业道德，严格遵守法律、法规、规章，能够忠诚地履行职责，并具有良好的处理公共事务的能力。

（三）取得证券交易所颁发的董事会秘书培训合格证书。

**第一百九十九条** 具有下列情形之一的人士不得担任董事会秘书：

（一）有《公司法》第 147 条规定情形之一的；

（二）自受到中国证监会最近一次行政处罚未满三年的；

（三）最近三年受到证券交易所公开谴责或三次以上通报批评的；

（四）本公司现任监事；

（五）证券交易所认定不适合担任董事会秘书的其他情形

**第二百条** 董事会秘书的应当履行如下职责：

（一）负责公司和相关当事人与证券交易所及其他证券监管机构之间的及时沟通和联络，保证证券交易所可以随时与其取得工作联系；

（二）负责处理公司信息披露事务，督促公司制定并执行信息披露管理制度和重大信息的内部报告制度，促使公司和相关当事人依法履行信息披露义务，并按规定向证券交易所办理定期报告和临时报告的披露工作；

（三）协调公司与投资者关系，接待投资者来访，回答投资者咨询，向投资者提供公司已披露的资料；

（四）按照法定程序筹备董事会会议和股东大会，准备和提交拟审议的董事会和股东大会的文件；

（五）参加董事会会议，制作会议记录并签字；

（六）负责与公司信息披露有关的保密工作，制订保密措施，促使公司董事会全体成员及相关知情人在有关信息正式披露前保守秘密，并在内幕信息泄露时，及时采取补救措施并向证券交易所报告；

（七）负责保管公司股东名册、董事名册、大股东及董事、监事、高级管理人员持有公司股票的资料，以及董事会、股东大会的会议文件和会议记录等；

（八）协助董事、监事和高级管理人员了解信息披露相关法律、法规、规章、证券交易所股票上市规则及证券交易所的他规定和公司章程，以及上市协议对其设定的责任；

（九）促使董事会依法行使职权；在董事会拟作出的决议违反法律、法规、规章、证券交易所股票上市规则及证券交易所其他规定和公司章程时，应当提醒与会董事，并提请列席会议的监事就此发表意见；如果董事会坚持作出上述决议，董事会秘书应将有关监事和其个

21

彩虹显示器件股份有限公司章程

人的意见记载于会议记录上，并立即向证券交易所报告；

（十）证券交易所要求履行的其他职责。

**第二百零一条** 公司董事或者其他高级管理人员可以兼任公司董事会秘书。公司聘请的会计师事务所的注册会计师和律师事务所的律师不得兼任公司董事会秘书。

**第二百零二条** 董事会秘书由董事长提名，经董事会聘任或者解聘。董事兼任董事会秘书的，如某一行为需由董事、董事会秘书分别作出时，则该兼任董事及公司董事会秘书的人不得以双重身份作出。

**第二百零三条** 公司应当为董事会秘书履行职责提供便利条件，董事、监事、高级管理人员及公司有关人员应当支持、配合董事会秘书的工作。

董事会秘书为履行职责有权了解公司的财务和经营情况，参加涉及信息披露的有关会议，查阅涉及信息披露的所有文件，并要求公司有关部门和人员及时提供相关资料和信息。

董事会秘书在履行职责过程中受到不当妨碍和严重阻挠时，可以直接向证券交易所报告。

**第二百零四条** 公司解聘董事会秘书应当具有充分理由，不得无故将其解聘。

董事会秘书被解聘或者辞职时，公司应当及时向股票上市地证券交易所报告，说明原因并公告。

董事会秘书有权就被公司不当解聘或者与辞职有关的情况，向公司股票上市地证券交易所提交个人陈述报告。

**第二百零五条** 董事会秘书有以下情形之一的，公司应当自事实发生之日起在一个月内解聘其董事会秘书职务：

（一）不再具备担任董事会秘书资格；

（二）连续三个月以上不能履行职责；

（三）在执行职务时出现重大错误或疏漏，给投资者造成重大损失；

（四）违反国家法律、法规、规章、本规则、本所其他规定和公司章程，给投资者造成重大损失。

**第二百零六条** 公司应当在聘任董事会秘书时与其签订保密协议，要求其承诺在任职期间以及在离任后持续履行保密义务直至有关信息披露为止，但涉及公司违法违规的信息除外。

董事会秘书离任前，应当接受董事会、监事会的离任审查，在公司监事会的监督下移交有关档案文件、正在办理或待办理事项。

**第二百零七条** 公司董事会秘书空缺期间，董事会应当指定一名董事或高级管理人员代行董事会秘书的职责，并报证券交易所备案，同时尽快确定董事会秘书人选。公司指定代行董事会秘书职责的人员之前，由董事长代行董事会秘书职责。

董事会秘书空缺期间超过三个月之后，董事长应当代行董事会秘书职责，直至公司正式聘任董事会秘书。

**第二百零八条** 公司在聘任董事会秘书的同时，还应当聘任证券事务代表，协助董事会秘书履行职责；在董事会秘书不能履行职责时，由证券事务代表行使其权利并履行其职责。在此期间，并不当然免除董事会秘书对公司信息披露事务所负有的责任。

证券事务代表应当取得证券交易所颁发的董事会秘书证书。

IRI-CRT-00001049

彩虹显示器件股份有限公司章程

### 第六节 董事会专门委员会

**第二百零九条** 公司董事会可以按照股东大会的有关决议，设立战略、审计、提名、薪酬与考核等专门委员会。专门委员会成员全部由董事组成，其中审计委员会、提名委员会、薪酬与考核委员会中独立董事应占多数并担任召集人，审计委员会中至少应有一名独立董事具有会计专业背景。

**第二百一十条** 战略委员会的主要职责是对公司长期发展战略和重大投资决策进行研究并提出建议。

**第二百一十一条** 审计委员会的主要职责是：

（一）提议聘请或更换外部审计机构；

（二）监督公司的内部审计制度及其实施；

（三）负责内部审计与外部审计之间的沟通；

（四）审核公司的财务信息及其披露；

（五）审查公司的内控制度。

**第二百一十二条** 提名委员会的主要职责是：

（一）研究董事、经理人员的选择标准和程序并提出建议；

（二）广泛搜寻合格的董事和经理人员的人选；

（三）对董事候选人和经理人选进行审查并提出建议。

**第二百一十三条** 薪酬与考核委员会的主要职责是：

（一）研究董事与经理人员考核的标准，进行考核并提出建议；

（二）研究和审查董事、高级管理人员的薪酬政策与方案。

**第二百一十四条** 各专门委员会可以聘请中介机构提供专业意见，有关费用由公司承担。

**第二百一十五条** 各专门委员会对董事会负责，各专门委员会的提案应提交董事会审查决定。

### 第七章 监事和监事会

#### 第一节 监事

**第二百一十六条** 监事由股东代表和公司职工代表担任。公司职工代表担任的监事不得少于监事人数的1/3。

**第二百一十七条** 董事、经理和其他高级管理人员不得兼任监事。

本章程第147条规定不得担任董事的情形适用于监事。

在任监事出现第147条规定的情形时，监事会应当自知道该情形发生之日起，立即停止有关监事履行职责，并提请股东大会或职工（代表）大会予以撤换。

**第二百一十八条** 监事应当遵守法律、行政法规和本章程，对公司负有忠实义务和勤勉义务，不得利用职权收受贿赂或者其他非法收入，不得侵占公司的财产。

**第二百一十九条** 监事每届任期三年，股东担任的监事由股东大会选举或更换，职工担任的监事由公司职工民主选举产生或更换。监事连选可以连任。

监事在任期届满以前，股东大会不得无故解除其职务。

监事任期自股东大会决议通过之日起计算，至本届监事会任期届满时为止。

**第二百二十条** 监事任期届满未及时改选，或者监事在任期内辞职导致监事会成员低于法定人数的，在改选出的监事就任前，原监事仍应当依照法律、行政法规和本章程的规定，履行监事职务。

**第二百二十一条** 监事应当保证公司披露的信息真实、准确、完整。

23

IRI-CRT-00001050

彩虹显示器件股份有限公司章程

第二百二十二条　监事可以列席董事会会议，并对董事会决议事项提出质询或者建议。

第二百二十三条　监事不得利用其关联关系损害公司利益，若给公司造成损失的，应当承担赔偿责任。

第二百二十四条　监事执行公司职务时违反法律、行政法规、部门规章或本章程的规定，给公司造成损失的，应当承担赔偿责任。

第二百二十五条　监事应具有法律或者会计方面的专业知识及工作经验。

第二百二十六条　监事有了解公司经营情况的权利，并承担相应的保密义务。监事会可以独立聘请中介机构提供专业意见。

第二百二十七条　公司应采取措施保障监事的知情权，为监事正常履行职责提供必要的协助，任何人不得干预、阻挠。

监事履行职责所需的合理费用应由公司承担。

第二百二十八条　监事连续两次不能亲自出席监事会会议的，视为不能履行职责，股东大会或职工代表大会应予以撤换。

第二百二十九条　监事的薪酬由股东大会决定。

第二百三十条　公司不以任何形式为监事纳税。

第二百三十一条　监事可以在任期届满以前提出辞职，本章程第六章有关董事辞职的规定，适用于监事。

第二百三十二条　监事应当遵守法律、行政法规和公司章程的规定，履行诚信和勤勉的义务。


## 第二节　监事会

第二百三十三条　公司设监事会。监事会是公司常设的监督机构，对股东大会负责。监事会由三名监事组成。其中股东代表二人，公司职工代表一人。

监事会设主席一名，由监事担任，以全体监事的过半数选举产生或者罢免。

监事会主席不能履行职权时，由主席指定一名监事代行其职权。

第二百三十四条　监事会行使下列职权：

（一）应当对董事会编制的公司定期报告进行审核并提出书面审核意见；

（二）检查公司财务；

（三）对董事、高级管理人员执行公司职务的行为进行监督，对违反法律、行政法规、本章程或者股东大会决议的董事、高级管理人员提出罢免的建议；

（四）当董事、高级管理人员的行为损害公司的利益时，要求董事、高级管理人员予以纠正；

（五）提议召开临时股东大会，在董事会不履行《公司法》规定的召集和主持股东大会职责时召集和主持股东大会；

（六）向股东大会提出提案；

（七）依照《公司法》第 152 条的规定，对董事、高级管理人员提起诉讼；

（八）发现公司经营情况异常，可以进行调查；必要时，可以聘请会计师事务所、律师事务所等专业机构协助其工作，费用由公司承担。

（九）本章程规定或股东大会授予的其他职权。

第二百三十五条　监事会行使职权，必要时可以聘请律师事务所、会计师事务所等专业性机构给予帮助，由此发生的费用由公司承担。

24

IRI-CRT-00001051

彩虹显示器件股份有限公司章程

### 第八章　经理

**第二百三十六条**　公司设经理，其中总经理一名，副总经理若干名，由董事会聘任或解聘。董事可受聘兼任总经理、副总经理或者其他高级管理人员，但兼任总经理、副总经理或者其他高级管理人员职务的董事不得超过公司董事总数的二分之一。

**第二百三十七条**　本章程第147条规定的不得担任董事的情形适用于高级管理人员。

在任职出现第147条规定的情形时，董事会应当自知道该情况发生之日起，立即停止其履行职责，并召开董事会履行解聘程序。

本章程关于董事的第149条忠实义务和第151条（四）-（六）关于勤勉义务的规定，同时适用于高级管理人员。

**第二百三十八条**　在公司控股股东、实际控制人单位担任除董事以外其他职务的人员，不得担任公司的高级管理人员。

**第二百三十九条**　经理每届任期三年，经理连聘可以连任。

**第二百四十条**　公司经理人员的聘任，应严格按照有关法律、法规和本章程的规定进行。任何组织和个人不得干预公司经理人员的正常选聘程序。

**第二百四十一条**　公司应和经理人员签订聘任合同，明确双方的权利义务关系。

**第二百四十二条**　总经理对董事会负责，行使下列职权：

（一）主持公司的生产经营管理工作，并向董事会报告工作；

（二）组织实施董事会决议、公司年度计划和投资方案；

（三）拟订公司内部管理机构设置方案；

（四）拟订公司的基本管理制度；

（五）制订公司的具体规章；

（六）提请董事会聘任或者解聘公司副总经理、财务负责人；

（七）聘任或者解聘除应由董事会聘任或者解聘以外的管理人员；

（八）拟定公司职工的工资、福利、奖惩，决定公司职工的聘用和解聘；

（九）提议召开董事会临时会议；

（十）本章程或董事会授予的其他职权。

**第二百四十三条**　总经理列席董事会会议。

非董事总经理在董事会上没有表决权。

**第二百四十四条**　经理应当根据董事会或者监事会的要求，向董事会或者监事会报告公司重大合同的签订、执行情况、资金运用情况和盈亏情况。经理必须保证该报告的真实性。

**第二百四十五条**　经理拟定有关职工工资、福利、安全生产以及劳动保护、劳动保险、劳动合同等涉及职工切身利益的问题时，应当事先听取工会或职代会的意见。

**第二百四十六条**　总经理应制订经理工作细则，报董事会批准后实施。

**第二百四十七条**　经理工作细则包括下列内容：

（一）经理会议召开的条件、程序和参加的人员；

（二）总经理、副总经理及其他高级管理人员各自具体的职责及其分工；

（三）公司资金、资产运用，签订重大合同的权限，以及向董事会、监事会的报告制度；

（四）董事会认为必要的其他事项。

**第二百四十八条**　公司经理应当遵守法律、行政法规和公司章程的规定，履行诚信和勤勉的义务。

**第二百四十九条**　经理可以在任期届满以前提出辞职。有关经理辞职的具体程序和办法

25

IRI-CRT-00001052

彩虹显示器件股份有限公司章程

由经理与公司签订的聘任合同规定。

**第二百五十条**  经理的任免应履行法定的程序，并予以公告。

## 第九章  绩效评价与激励约束机制
### 第一节  董事、监事、经理人员的绩效评价

**第二百五十一条**  公司应建立公正透明的董事、监事和经理人员的绩效评价标准和程序。

**第二百五十二条**  董事和经理人员的绩效评价由董事会或其下设的薪酬与考核委员会负责组织。独立董事、监事的评价应采取自我评价与相互评价相结合的方式进行。

**第二百五十三条**  董事薪酬的数额和方式由董事会提出方案报请股东大会决定。在董事会或薪酬与考核委员会对董事个人进行评价或讨论其报酬时，该董事应当回避。

**第二百五十四条**  董事会、监事会应当向股东大会报告董事、监事履行职责的情况、绩效评价结果及其薪酬情况，并予以披露。

### 第二节  经理人员的激励与约束机制

**第二百五十五条**  公司应建立经理人员的薪酬与公司绩效和个人业绩相联系的激励机制，以吸引人才，保持经理人员的稳定。

**第二百五十六条**  公司对经理人员的绩效评价应当成为确定经理人员薪酬以及其它激励方式的依据。

**第二百五十七条**  经理人员的薪酬分配方案应获得董事会的批准，向股东大会说明，并予以披露。

**第二百五十八条**  经理人员违反法律、行政法规和本章程规定，致使公司遭受损失的，公司董事会应积极采取措施追究其法律责任。

## 第十章  财务会计制度、利润分配和审计
### 第一节  财务会计制度

**第二百五十九条**  公司依照法律、行政法规和国家有关部门的规定，制定公司的财务会计制度。

**第二百六十条**  公司在每一会计年度结束之日起 4 个月内向中国证监会和证券交易所报送年度财务会计报告，在每一会计年度前 6 个月结束之日起 2 个月内向中国证监会派出机构和证券交易所报送半年度财务会计报告，在每一会计年度前 3 个月和前 9 个月结束之日起的 1 个月内向中国证监会派出机构和证券交易所报送季度财务会计报告。

上述财务会计报告按照有关法律、行政法规及部门规章的规定进行编制。

**第二百六十一条**  公司年度财务报告以及进行中期利润分配的中期财务报告，包括下列内容：

（一）资产负债表；

（二）利润表；

（三）利润分配表；

（四）现金流量表；

（五）会计报表附注。

公司不进行中期利润分配时，中期财务报告包括上列除第（三）项以外的会计报表及

26

彩虹显示器件股份有限公司章程

附注。

第二百六十二条  公司年度报告中的财务会计报告必须经具有执行证券、期货相关业务资格的会计师事务所进行审计。

公司半年度报告中的财务会计报告可以不经审计，但有下列情形之一的，应当进行审计：

（一）拟在下半年进行利润分配、公积金转增股本或弥补亏损的；

（二）拟在下半年申请发行新股或可转换公司债券等再融资事宜，根据有关规定需要进行审计的；

（三）股票被暂停上市后申请恢复上市按要求需要进行审计的；

（四）中国证监会或证券交易所认为应当进行审计的其他情形。

公司季度报告中的财务资料无须审计，但中国证监会或证券交易所另有规定的除外。

第二百六十三条  公司除法定的会计账册外，不另立会计账簿。公司的资产，不以任何个人名义开立账户存储。

第二百六十四条  公司分配当年税后利润时，应当提取利润的 10%列入公司法定公积金。公司法定公积金累计额为公司注册资本的 50%以上的，可以不再提取。

公司的法定公积金不足以弥补以前年度亏损的，在依照前款规定提取法定公积金之前，应当先用当年利润弥补亏损。

公司从税后利润中提取法定公积金后，经股东大会决议，还可以从税后利润中提取任意公积金。

公司弥补亏损和提取公积金后所余税后利润，按照股东持有的股份比例分配，但本章程规定不按持股比例分配的除外。

股东大会违反前款规定，在公司弥补亏损和提取法定公积金之前向股东分配利润的，股东必须将违反规定分配的利润退还公司。

公司持有的本公司股份不参与分配利润。

第二百六十五条  公司的公积金用于弥补公司的亏损、扩大公司生产经营或者转为增加公司资本。但是，资本公积金将不用于弥补公司的亏损。

法定公积金转为资本时，所留存的该项公积金将不少于转增前公司注册资本的 25%。

第二百六十六条  公司股东大会对利润分配方案作出决议后，公司董事会须在股东大会召开后两个月内完成股利（或股份）的派送事项。

第二百六十七条  公司当年利润分配政策由董事会在年度股东大会召开前制定并予以公告。

第二百六十八条  公司分配股利采取现金或者股票方式。

第二百六十九条  股东违规占有公司资金的，公司应当扣减该股东所分配的现金红利，以偿还其占用的资金。

### 第二节  内部审计

第二百七十条  公司实行内部审计制度，配备专职审计人员，对公司财务收支和经济活动进行内部审计监督。

第二百七十一条  公司内部审计制度和审计人员的职责，应当经董事会批准后实施。审计负责人向董事会负责并报告工作。

### 第三节  会计师事务所的聘任

第二百七十二条  公司聘用取得"从事证券、期货相关业务资格"的会计师事务所进行会计报表审计、净资产验证及其他相关的咨询服务等业务，聘期 1 年，可以续聘。

第二百七十三条  公司聘用会计师事务所必须由股东大会决定，董事会不得在股东大会

27

IRI-CRT-00001054

彩虹显示器件股份有限公司章程

决定前委任会计师事务所。

**第二百七十四条** 公司保证向聘用的会计师事务所提供真实、完整的会计凭证、会计账簿、财务会计报告及其他会计资料，不得拒绝、隐匿、谎报。

**第二百七十五条** 会计师事务所的审计费用由股东大会决定。

**第二百七十六条** 经公司聘用的会计师事务所享有下列权利：

（一）查阅公司财务报表、记录和凭证，并有权要求公司的董事、经理或者其他高级管理人员提供有关的资料和说明；

（二）要求公司提供为会计师事务所履行职务所必需的其子公司的资料和说明；

（三）列席股东大会，获得股东大会的通知或者与股东大会有关的其他信息，在股东大会上就涉及其作为公司聘用的会计师事务所的事宜发言。

**第二百七十七条** 公司解聘会计师事务所由股东大会作出决定，并在《中国证券报》和《上海证券报》上予以披露，必要时说明更换原因，并报中国证监会和中国注册会计师协会备案。

**第二百七十八条** 公司解聘或者不再续聘会计师事务所时，提前三十天通知会计师事务所，会计师事务所有权向股东大会陈述意见。会计师事务所认为公司对其解聘或者不再续聘理由不当的，可以向中国证监会和中国注册会计师协会提出申诉。会计师事务所提出辞聘的，应当向股东大会说明公司有无不当情事。

## 第十一章　持续信息披露

**第二百七十九条** 公司应当制定信息披露管理制度，严格按照法律、法规、规范性文件和本章程的规定，及时、公平地披露所有对公司股票及其衍生品种交易价格可能产生较大影响的信息，并将公告和相关备查文件在第一时间报送证券交易所。

**第二百八十条** 公司及董事应当保证信息披露内容的真实、准确、完整，无虚假记载、误导性陈述或重大遗漏。

**第二百八十一条** 公司披露的信息应当便于理解。公司应保证信息使用者能够通过经济、便捷的方式（如互联网）获得信息。

**第二百八十二条** 公司董事会秘书负责信息披露事项，包括建立信息披露制度、接待来访、回答咨询、联系股东，向投资者提供公司公开披露的资料等。董事会及经理人员应对董事会秘书的工作予以积极支持。任何机构及个人不得干预董事会秘书的工作。

**第二百八十三条** 公司指定《中国证券报》、《上海证券报》为刊登公司公告和其他需要披露信息的报刊。

## 第十二章　利益相关者

**第二百八十四条** 公司应尊重银行及其它债权人、职工、消费者、供应商、社区等利益相关者的合法权利。

**第二百八十五条** 公司应与利益相关者积极合作，共同推动公司持续、健康地发展。

**第二百八十六条** 公司应为维护利益相关者的权益提供必要的条件，当其合法权益受到侵害时，利益相关者应有机会和途径获得赔偿。

**第二百八十七条** 公司应向银行及其它债权人提供必要的信息，以便其对公司的经营状况和财务状况作出判断和进行决策。

**第二百八十八条** 公司应鼓励职工通过与董事会、监事会和经理人员的直接沟通和交

28

IRI-CRT-00001055

彩虹显示器件股份有限公司章程

流，反映职工对公司经营、财务状况以及涉及职工利益的重大决策的意见。

**第二百八十九条** 公司在保持公司持续发展、实现股东利益最大化的同时，应关注所在社区的福利、环境保护、公益事业等问题，重视公司的社会责任。

### 第十三章　合并、分立、解散和清算
#### 第一节　合并或分立

**第二百九十条** 公司可以依法进行合并或者分立。

公司合并可以采取吸收合并和新设合并两种形式。

**第二百九十一条** 公司合并或者分立，按照下列程序办理：

（一）董事会拟订合并或者分立方案；

（二）股东大会依照章程的规定作出决议；

（三）各方当事人签订合并或者分立合同；

（四）依法办理有关审批手续；

（五）处理债权、债务等各项合并或者分立事宜；

（六）办理解散登记或者变更登记。

**第二百九十二条** 公司合并应由合并各方签订合并协议，并编制资产负债表和财产清单。公司应当自股东大会作出合并决议之日起10日内通知债权人，并于30日内在《中国证券报》和《上海证券报》上公告。

**第二百九十三条** 债权人自接到通知书之日起30日内，未接到通知书的自公告之日起四十五日内，有权要求公司清偿债务或者提供相应的担保。

**第二百九十四条** 公司合并时，合并各方的债权、债务，由合并后存续的公司或者新设的公司承继。

**第二百九十五条** 公司分立，其财产作相应的分割。

公司分立，应当编制资产负债表及财产清单。公司应当自作出分立决议之日起10日内通知债权人，并于30日内在《中国证券报》和《上海证券报》上公告。

**第二百九十六条** 公司分立前的债务由分立后的公司承担连带责任。但是，公司在分立前与债权人就债务清偿达成的书面协议另有约定的除外。

**第二百九十七条** 公司需要减少注册资本时，必须编制资产负债表及财产清单。

公司应当自作出减少注册资本决议之日起10日内通知债权人，并于30日内在《中国证券报》和《上海证券报》上公告。债权人自接到通知书之日起30日内，未接到通知书的自公告之日起45日内，有权要求公司清偿债务或者提供相应的担保。

公司减资后的注册资本不得不低于法定的最低限额。

**第二百九十八条** 公司合并或者分立，登记事项发生变更的，依法向公司登记机关办理变更登记；公司解散的，依法办理公司注销登记；设立新公司的，依法办理公司设立登记。

公司增加或者减少注册资本，应当依法向公司登记机关办理变更登记。

#### 第二节　解散和清算

**第二百九十九条** 有下列情形之一时，公司应当解散并依法进行清算：

（一）因合并或者分立而解散；

（二）股东大会决议解散；

（三）依法被吊销营业执照、责令关闭或者被撤销；

（四）公司经营管理发生严重困难，继续存续会使股东利益受到重大损失，通过其他途径不能解决的，持有公司全部股东表决权10%以上的股东，可以请求人民法院解散公司。

IRI-CRT-00001056

彩虹显示器件股份有限公司章程

**第三百条** 公司本章程第三百零六条第（二）项、第（三）项和第（四）项规定而解散的，应当在解散事由出现之日起 15 日内成立清算组，开始清算。清算组由董事或者股东大会确定的人员组成。逾期不成立清算组进行清算的，债权人可以申请人民法院指定有关人员组成清算组进行清算。

**第三百零一条** 清算组在清算期间行使下列职权：

（一）通知或者公告债权人；

（二）清理公司财产、编制资产负债表和财产清单；

（三）处理公司未了结的业务；

（四）清缴所欠税款以及清算过程中产生的税款；

（五）清理债权、债务；

（六）处理公司清偿债务后的剩余财产；

（七）代表公司参与民事诉讼活动。

**第三百零二条** 清算组应当自成立之日起 10 日内通知债权人，并于 60 日内在《中国证券报》和《上海证券报》上公告。

**第三百零三条** 债权人应当自接到通知书之日起 30 日内，未接到通知书的自公告之日起 45 日内，向清算组申报其债权。债权人申报债权时，应当说明债权的有关事项，并提供证明材料。清算组应当对债权进行登记。

在申报债权期间，清算组不得对债权人进行清偿。

**第三百零四条** 清算组在清理公司财产、编制资产负债表和财产清单后，应当制定清算方案，并报股东大会或者人民法院确认。

公司财产在分别支付清算费用、职工的工资、社会保险费用和法定补偿金，缴纳所欠税款，清偿公司债务后的剩余财产，公司按照股东持有的股份比例分配。

清算期间，公司存续，但不能开展与清算无关的经营活动。公司财产在未按前款规定清偿前，将不会分配给股东。

**第三百零五条** 清算组在清理公司财产、编制资产负债表和财产清单后，认为公司财产不足清偿债务的，应当向人民法院申请宣告破产。

公司经人民法院宣告破产后，清算组应当将清算事务移交给人民法院。

**第三百零六条** 清算结束后，清算组应当制作清算报告，报股东大会或者人民法院确认，并报送公司登记机关，申请注销公司登记，公告公司终止。

**第三百零七条** 清算组人员应当忠于职守，依法履行清算义务，不得利用职权收受贿赂或者其他非法收入，不得侵占公司财产。

清算组人员因故意或者重大过失给公司或者债权人造成损失的，应当承担赔偿责任。

**第三百零八条** 公司被依法宣告破产的，依照有关企业破产的法律实施破产清算。

## 第十四章　修改章程

**第三百零九条** 有下列情形之一的，公司应当修改章程：

（一）《公司法》或有关法律、行政法规修改后，章程规定的事项与修改后的法律、行政法规的规定相抵触；

（二）公司的情况发生变化，与章程记载的事项不一致；

（三）股东大会决定修改章程。

**第三百一十条** 股东大会决议通过的章程修改事项应经主管机关审批的，须报原审批的主管机关批准；涉及公司登记事项的，依法办理变更登记。

**第三百一十一条** 董事会依照股东大会修改章程的决议和有关主管机关的审批意见修改公司章程。

**第三百一十二条** 章程修改事项属于法律、法规要求披露的信息，按规定予以公告。

IRI-CRT-00001057

彩虹显示器件股份有限公司章程

## 第十五章  附则

**第三百一十三条**　释义

（一）控股股东，是指其持有的股份占公司股本总额 50%以上的股东；持有股份的比例虽然不足 50%，但依其持有的股份所享有的表决权已足以对股东大会的决议产生重大影响的股东。

（二）实际控制人，是指虽不是公司的股东，但通过投资关系、协议或者其他安排，能够实际支配公司行为的人。

（三）关联关系，是指公司控股股东、实际控制人、董事、监事、高级管理人员与其直接或者间接控制的企业之间的关系，以及可能导致公司利益转移的其他关系。但是，国家控股的企业之间不仅因为同受国家控股而具有关联关系。

（四）关联人、关联交易、重大关联交易，其定义与上海证券交易所不时修订的《股票上市规则》中的定义相同。

**第三百一十四条**　董事会可依照本章程的规定，制订章程细则，章程细则不得与章程的规定相抵触。

**第三百一十五条**　本章程以中文书写，其他任何语种或不同版本的章程与本章程有歧义时，以在陕西省工商行政管理局最近一次核准登记后的中文版章程为准。

**第三百一十六条**　本章程所称"以上"、"以内"、"以下"、"不超过"都含本数；"不满"、"以外"、"低于"、"多于"、"超过"不含本数。

**第三百一十七条**　本章程由公司董事会负责解释。

**第三百一十八条**　本章程附件包括董事会议事规则和监事会议事规则。

IRI-CRT-00001058

彩虹显示器件股份有限公司章程

附件

# 彩虹显示器件股份有限公司
# 董事会议事规则

### 第一条　宗旨

为了进一步规范彩虹显示器件股份有限公司（以下简称"公司"）董事会的议事方式和决策程序，促使董事和董事会有效地履行其职责，提高董事会规范运作和科学决策水平，根据《公司法》、《证券法》、《上市公司治理准则》、《上海证券交易所股票上市规则》等有关规定，制订本规则。

### 第二条　董事会办公室

董事会下设董事会办公室，处理董事会日常事务。

### 第三条　定期会议

董事会会议分为定期会议和临时会议。

董事会每年应当至少在上下两个半年度各召开一次定期会议。

### 第四条　定期会议的提案

在发出召开董事会定期会议的通知前，董事会办公室应当充分征求各董事的意见，初步形成会议提案后交董事长拟定。

董事长在拟定提案前，应当视需要征求经理和其他高级管理人员的意见。

### 第五条　临时会议

有下列情形之一的，董事会应当召开临时会议：

（一）代表十分之一以上表决权的股东提议时；

（二）三分之一以上董事联名提议时；

（三）监事会提议时；

（四）董事长认为必要时；

（五）二分之一以上独立董事提议时；

（六）经理提议时；

（七）证券监管部门要求召开时；

（八）本公司《公司章程》规定的其他情形。

### 第六条　临时会议的提议程序

按照前条规定提议召开董事会临时会议的，应当通过董事会办公室或者直接向董事长提交经提议人签字（盖章）的书面提议。书面提议中应当载明下列事项：

（一）提议人的姓名或者名称；

（二）提议理由或者提议所基于的客观事由；

（三）提议会议召开的时间或者时限、地点和方式；

（四）明确和具体的提案；

（五）提议人的联系方式和提议日期等。

提案内容应当属于本公司《公司章程》规定的董事会职权范围内的事项，与提案有关的

IRI-CRT-00001059

彩虹显示器件股份有限公司章程

材料应当一并提交。

董事会办公室在收到上述书面提议和有关材料后，应当于当日转交董事长。董事长认为提案内容不明确、具体或者有关材料不充分的，可以要求提案人修改或者补充。

董事长应当自接到提议或者证券监管部门的要求后十日内，召集董事会会议并主持会议。

**第七条　会议的召集和主持**

董事会会议由董事长召集和主持；董事长不能履行职务或者不履行职务的，由副董事长召集和主持；未设副董事长、副董事长不能履行职务或者不履行职务的，由半数以上董事共同推举一名董事召集和主持。

**第八条　会议通知**

召开董事会定期会议和临时会议，董事会办公室应当分别提前十日和五日将盖有董事会办公室印章的书面会议通知，通过直接送达、传真、电子邮件或者其他方式，提交全体董事和监事以及经理、董事会秘书。非直接送达的，还应当通过电话进行确认并做相应记录。

情况紧急，需要尽快召开董事会临时会议的，可以随时通过电话或者其他口头方式发出会议通知，但召集人应当在会议上作出说明。

**第九条　会议通知的内容**

书面会议通知应当至少包括以下内容：

（一）会议的时间、地点；

（二）会议的召开方式；

（三）拟审议的事项（会议提案）；

（四）会议召集人和主持人、临时会议的提议人及其书面提议；

（五）董事表决所必需的会议材料；

（六）董事应当亲自出席或者委托其他董事代为出席会议的要求；

（七）联系人和联系方式。

口头会议通知至少应包括上述第（一）、（二）项内容，以及情况紧急需要尽快召开董事会临时会议的说明。

**第十条　会议通知的送达时间：**

（一）直接送达时，以面交收件人或收件人委托的代收人签收的时间为送达时间；

（二）以传真方式送达时，以发出传真的时间为送达时间，但传真号码应经收件人确认；

（三）以电子邮件方式送达时，以发出的时间为送达时间，但电子邮箱应经收件人确认。

因意外遗漏未向某有权得到通知的人送出会议通知或者该等人没有收到会议通知，会议及会议作出的决议并不因此无效。

**第十一条　会议通知的变更**

董事会定期会议的书面会议通知发出后，如果需要变更会议的时间、地点等事项或者增加、变更、取消会议提案的，应当在原定会议召开日之前三日发出书面变更通知，说明情况和新提案的有关内容及相关材料。不足三日的，会议日期应当相应顺延或者取得全体与会董事的认可后按期召开。

董事会临时会议的会议通知发出后，如果需要变更会议的时间、地点等事项或者增加、变更、取消会议提案的，应当事先取得全体与会董事的认可并做好相应记录。

33

IRI-CRT-00001060

彩虹显示器件股份有限公司章程

### 第十二条　会议的召开

董事会会议应当有过半数的董事出席方可举行。有关董事不出席或者怠于出席会议导致无法满足会议召开的最低人数要求时，董事长和董事会秘书应当及时向监管部门报告。

监事可以列席董事会会议；经理和董事会秘书未兼任董事的，应当列席董事会会议。会议主持人认为有必要的，可以通知其他有关人员列席董事会会议。

### 第十三条　亲自出席和委托出席

董事原则上应当亲自出席董事会会议。因故不能出席会议的，应当事先审阅会议材料，形成明确的意见，书面委托其他董事代为出席。

委托书应当载明：

（一）委托人和受托人的姓名；

（二）委托人对每项提案的简要意见；

（三）委托人的授权范围和对提案表决意向的指示；

（四）委托人的签字、日期等。

委托其他董事对定期报告代为签署书面确认意见的，应当在委托书中进行专门授权。

受托董事应当向会议主持人提交书面委托书，在会议签到簿上说明受托出席的情况。

### 第十四条　关于委托出席的限制

委托和受托出席董事会会议应当遵循以下原则：

（一）在审议关联交易事项时，非关联董事不得委托关联董事代为出席；关联董事也不得接受非关联董事的委托；

（二）独立董事不得委托非独立董事代为出席，非独立董事也不得接受独立董事的委托；

（三）董事不得在未说明其本人对提案的个人意见和表决意向的情况下全权委托其他董事代为出席，有关董事也不得接受全权委托和授权不明确的委托。

（四）一名董事不得接受超过两名董事的委托，董事也不得委托已经接受两名其他董事委托的董事代为出席。

### 第十五条　会议召开方式

董事会会议以现场召开为原则。必要时，在保障董事充分表达意见的前提下，经召集人（主持人）、提议人同意，也可以通过视频、电话、传真或者电子邮件表决等方式召开。董事会会议也可以采取现场与其他方式同时进行的方式召开。

非以现场方式召开的，以视频显示在场的董事、在电话会议中发表意见的董事、规定期限内实际收到传真或者电子邮件等有效表决票，或者董事事后提交的曾参加会议的书面确认函等计算出席会议的董事人数。

### 第十六条　会议审议程序

会议主持人应当提请出席董事会会议的董事对各项提案发表明确的意见。

对于根据规定需要独立董事事前认可的提案，会议主持人应当在讨论有关提案前，指定一名独立董事宣读独立董事达成的书面认可意见。

董事阻碍会议正常进行或者影响其他董事发言的，会议主持人应当及时制止。

除征得全体与会董事的一致同意外，董事会会议不得就不包括在会议通知中的提案进行表决。董事接受其他董事委托代为出席董事会会议的，不得代表其他董事对未包括在会议通知中的提案进行表决。

IRI-CRT-00001061

彩虹显示器件股份有限公司章程

**第十七条 发表意见**

董事应当认真阅读有关会议材料，在充分了解情况的基础上独立、审慎地发表意见。

董事可以在会前向董事会办公室、会议召集人、经理和其他高级管理人员、各专门委员会、会计师事务所和律师事务所等有关人员和机构了解决策所需要的信息，也可以在会议进行中间主持人建议请上述人员和机构代表与会解释有关情况。

**第十八条 会议表决**

每项提案经过充分讨论后，主持人应当适时提请与会董事进行表决。

会议表决实行一人一票，以记名和书面等方式进行。

经会议主持人决定，也可采用举手表决方式进行表决。

董事的表决意向分为同意、反对和弃权。与会董事应当从上述意向中选择其一，未做选择或者同时选择两个以上意向的，会议主持人应当要求有关董事重新选择，拒不选择的，视为弃权；中途离开会场未进行表决的，视为弃权。

**第十九条 表决结果的统计**

与会董事表决完成后，证券事务代表和董事会办公室有关工作人员应当及时收集董事的表决票，交董事会秘书在一名监事或者独立董事的监督下进行统计。

采用举手方式进行表决时，由董事会秘书当场统计表决结果并予以宣布。

现场召开会议的，会议主持人应当当场宣布统计结果；其他情况下，会议主持人应当要求董事会秘书在规定的表决时限结束后下一工作日之前，通知董事表决结果。

董事在会议主持人宣布表决结果后或者规定的表决时限结束后进行表决的，其表决情况不予统计。

**第二十条 决议的形成**

除本规则第二十一条规定的情形外，董事会会议通过会议提案并形成相关决议，必须有超过公司全体董事人数之半数的董事对该提案投赞成票。法律、行政法规和本公司《公司章程》规定董事会形成决议应当取得更多董事同意的，从其规定。

董事会根据本公司《公司章程》的规定，在其权限范围内对担保事项作出决议，除公司全体董事过半数同意外，还必须经出席会议的三分之二以上董事的同意。

不同决议在内容和含义上出现矛盾的，以形成时间在后的决议为准。

**第二十一条 回避表决**

出现下述情形的，董事应当对有关提案回避表决：

（一）《上海证券交易所股票上市规则》规定董事应当回避的情形；

（二）董事本人认为应当回避的情形；

（三）本公司《公司章程》规定的因董事与会议提案所涉及的企业有关联关系而须回避的其他情形。

在董事回避表决的情况下，有关董事会会议由过半数的无关联关系董事出席即可举行，形成决议须经无关联关系董事过半数通过。出席会议的无关联关系董事人数不足三人的，不得对有关提案进行表决，而应当将该事项提交股东大会审议。

**第二十二条 不得越权**

董事会应当严格按照股东大会和本公司《公司章程》的授权行事，不得越权形成决议。

**第二十三条 关于利润分配的特别规定**

董事会会议需要就公司利润分配事宜作出决议的，可以先将拟提交董事会审议的分配预

35

IRI-CRT-00001062

彩虹显示器件股份有限公司章程

案通知注册会计师，并要求其据此出具审计报告草案（除涉及分配之外的其他财务数据均已确定）。董事会作出分配的决议后，应当要求注册会计师出具正式的审计报告，董事会再根据注册会计师出具的正式审计报告对定期报告的其他相关事项作出决议。

**第二十四条　提案未获通过的处理**

提案未获通过的，在有关条件和因素未发生重大变化的情况下，董事会会议在一个月内不应当再审议内容相同的提案。

**第二十五条　暂缓表决**

二分之一以上的与会董事或两名以上独立董事认为提案不明确、不具体，或者因会议材料不充分等其他事由导致其无法对有关事项作出判断时，会议主持人应当要求会议对该议题进行暂缓表决。

提议暂缓表决的董事应当对提案再次提交审议应满足的条件提出明确要求。

**第二十六条　会议录音**

现场召开和以视频、电话等方式召开的董事会会议，可以视需要进行全程录音。

**第二十七条　会议记录**

董事会秘书应当安排董事会办公室工作人员对董事会会议做好记录。会议记录应当包括以下内容：

（一）会议届次和召开的时间、地点、方式；

（二）会议通知的发出情况；

（三）会议召集人和主持人；

（四）董事亲自出席和受托出席的情况；

（五）会议审议的提案、每位董事对有关事项的发言要点和主要意见、对提案的表决意向；

（六）每项提案的表决方式和表决结果（说明具体的同意、反对、弃权票数）；

（七）与会董事认为应当记载的其他事项。

**第二十八条　会议纪要和决议记录**

除会议记录外，董事会秘书还可以视需要安排董事会办公室工作人员对会议召开情况作成简明扼要的会议纪要，根据统计的表决结果就会议所形成的决议制作单独的决议记录。

**第二十九条　董事签字**

与会董事应当代表其本人和委托其代为出席会议的董事对会议记录和决议记录进行签字确认。董事对会议记录或者决议记录有不同意见的，可以在签字时作出书面说明。必要时，应当及时向监管部门报告，也可以发表公开声明。

董事既不按前款规定进行签字确认，又不对其不同意见作出书面说明或者向监管部门报告、发表公开声明的，视为完全同意会议记录、和决议记录的内容。

**第三十条　决议公告**

董事会决议公告事宜，由董事会秘书根据《上海证券交易所股票上市规则》的有关规定办理。

**第三十一条　保密制度**

出席和列席董事会会议的人员及相关工作人员对于会议内容负有保密义务。任何人不得利用会议内幕信息为自己或他人谋取利益。

非经董事长批准，出席会议的董事及列席人员不得将会议提供的非正式文件、资料带离

36

IRI-CRT-00001063

会场。

除公司董事、监事、公司聘请的会计师和律师之外，其他人士非经董事会授权或董事长批准，不得查阅董事会会议记录。

董事及列席人员有责任认真保管其所持有的会议文件、资料，如有遗失，应及时报告董事长及董事会秘书。

董事会文件由董事会秘书妥善保存。

董事会秘书离任时，在公司监事会的监督下向指定人员移交其保管的公司档案、文件、资料。

非经董事会批准，出席会议的董事及列席人员不得对会议情况录音、录像。

董事会会议召开情况及决议，由董事会秘书根据相关规定予以披露。除非董事长授权或该次会议信息已经公开，出席会议的董事及列席人员不得以任何形式公开会议信息。

董事会秘书负责董事会信息保密工作。当董事会会议信息泄露时，董事会秘书应当及时采取补救措施。

### 第三十二条  决议的执行

董事长应当督促有关人员落实董事会决议，检查决议的实施情况，并在以后的董事会会议上通报已经形成的决议的执行情况。

### 第三十三条  会议档案的保存

董事会会议档案，包括会议通知和会议材料、会议签到簿、董事代为出席的授权委托书、会议录音资料、表决票、经与会董事签字确认的会议记录、会议纪要、决议记录、决议公告等，由董事会秘书负责保存。

董事会会议档案的保存期限为十年以上。

### 第三十四条  附则

在本规则中，"以上"包括本数。

本规则由董事会制订报股东大会批准后生效，修改时亦同。

本规则由董事会解释。

IRI-CRT-00001064

# 彩虹显示器件股份有限公司
# 监事会议事规则

### 第一条 宗旨

为了进一步规范彩虹显示器件股份有限公司（以下简称"公司"）监事会的议事方式和表决程序，促使监事和监事会有效地履行监督职责，完善公司法人治理结构，根据《公司法》、《证券法》、《上市公司治理准则》、《上海证券交易所股票上市规则》、中国证监会发布的一系列规范性文件及《公司章程》，制订本规则。

### 第二条 监事会办公室

监事会可以设监事会办公室，处理监事会日常事务。

监事会主席兼任监事会办公室负责人，保管监事会印章。监事会主席可以要求公司证券事务代表或者其他人员协助其处理监事会日常事务。

### 第三条 监事会定期会议和临时会议

监事会会议分为定期会议和临时会议。

监事会定期会议应当每六个月召开一次。出现下列情况之一的，监事会应当在十日内召开临时会议：

（一）任何监事提议召开时；

（二）股东大会、董事会会议通过了违反法律、法规、规章、监管部门的各种规定和要求、公司章程、公司股东大会决议和其他有关规定的决议时；

（三）董事和高级管理人员的不当行为可能给公司造成重大损害或者在市场中造成恶劣影响时；

（四）公司、董事、监事、高级管理人员被股东提起诉讼时；

（五）公司、董事、监事、高级管理人员受到证券监管部门处罚或者被上海证券交易所公开谴责时；

（六）证券监管部门要求召开时；

（七）本《公司章程》规定的其他情形。

### 第四条 定期会议的提案

在发出召开监事会定期会议的通知之前，监事会办公室应当向全体监事征集会议提案，并至少用两天的时间向公司员工征求意见。在征集提案和征求意见时，监事会办公室应当说明监事会重在对公司规范运作和董事、高级管理人员职务行为的监督而非公司经营管理的决策。

### 第五条 临时会议的提议程序

监事提议召开监事会临时会议的，应当通过监事会办公室或者直接向监事会主席提交经提议监事签字的书面提议。书面提议中应当载明下列事项：

（一）提议监事的姓名；

（二）提议理由或者提议所基于的客观事由；

（三）提议会议召开的时间或者时限、地点和方式；

（四）明确和具体的提案；

（五）提议监事的联系方式和提议日期等。

在监事会办公室或者监事会主席收到监事的书面提议后三日内，监事会办公室应当发出召开监事会临时会议的通知。

IRI-CRT-00001065

彩虹显示器件股份有限公司章程

监事会办公室怠于发出会议通知的，提议监事应当及时向监管部门报告。

### 第六条　会议的召集和主持

监事会会议由监事会主席召集和主持；监事会主席不能履行职务或者不履行职务的，由半数以上监事共同推举一名监事召集和主持。

### 第七条　会议通知

召开监事会定期会议和临时会议，监事会办公室应当分别提前十日和五日将盖有监事会印章的书面会议通知，通过直接送达、传真、电子邮件或者其他方式，提交全体监事。非直接送达的，还应当通过电话进行确认并做相应记录。

情况紧急，需要尽快召开监事会临时会议的，可以随时通过口头或者电话等方式发出会议通知，但召集人应当在会议上作出说明。

### 第八条　会议通知的内容

书面会议通知应当至少包括以下内容：

（一）会议的时间、地点；

（二）拟审议的事项（会议提案）；

（三）会议召集人和主持人、临时会议的提议人及其书面提议；

（四）监事表决所必需的会议材料；

（五）监事应当亲自出席会议的要求；

（六）联系人和联系方式。

口头会议通知至少应包括上述第（一）、（二）项内容，以及情况紧急需要尽快召开监事会临时会议的说明。

### 第九条　会议通知的送达时间：

（一）直接送达时，以面交收件人或收件人委托的代收人签收的时间为送达时间；

（二）以传真方式送达时，以发出传真的时间为送达时间，但传真号码应经收件人确认；

（三）以电子邮件方式送达时，以发出的时间为送达时间，但电子邮箱应经收件人确认。

因意外遗漏未向某有权得到通知的人送出会议通知或者该等人没有收到会议通知，会议及会议作出的决议并不因此无效。

### 第十条　会议召开方式

监事会会议应当以现场方式召开。

紧急情况下，监事会会议可以通讯方式进行表决，但监事会召集人（会议主持人）应当向与会监事说明具体的紧急情况。在通讯表决时，监事应当将其对审议事项的书面意见和投票意向在签字确认后传真至监事会办公室。监事不应当只写明投票意见而不表达其书面意见或者投票理由。

### 第十一条　会议的召开

监事会会议应当有过半数的监事出席方可举行。相关监事拒不出席或者怠于出席会议导致无法满足会议召开的最低人数要求的，其他监事应当及时向监管部门报告。

董事会秘书和证券事务代表应当列席监事会会议。

### 第十二条　会议审议程序

会议主持人应当提请与会监事对各项提案发表明确的意见。

会议主持人应当根据监事的提议，要求董事、高级管理人员、公司其他员工或者相关中介机构业务人员对会接受质询。

### 第十三条　监事会决议

监事会会议的表决实行一人一票，以记名和书面等方式进行。

经会议主持人决定，也可采用举手表决方式进行表决。

39

IRI-CRT-00001066

监事的表决意向分为同意、反对和弃权。与会监事应当从上述意向中选择其一，未做选择或者同时选择两个以上意向的，会议主持人应当要求该监事重新选择，拒不选择的，视为弃权；中途离开会场未进行表决的，视为弃权。

监事会形成决议应当全体监事过半数同意。

### 第十四条　会议录音

召开监事会会议，可以视需要进行全程录音。

### 第十五条　会议记录

监事会办公室工作人员应当对现场会议做好记录。会议记录应当包括以下内容：

（一）会议届次和召开的时间、地点、方式；

（二）会议通知的发出情况；

（三）会议召集人和主持人；

（四）会议出席情况；

（五）会议审议的提案、每位监事对有关事项的发言要点和主要意见、对提案的表决意向；

（六）每项提案的表决方式和表决结果（说明具体的同意、反对、弃权票数）；

（七）与会监事认为应当记载的其他事项。

对于通讯方式召开的监事会会议，监事会办公室应当参照上述规定，整理会议记录。

### 第十六条　监事签字

与会监事应当对会议记录进行签字确认。监事对会议记录有不同意见的，可以在签字时作出书面说明。必要时，应当及时向监管部门报告，也可以发表公开声明。

监事既不按前款规定进行签字确认，又不对其不同意见作出书面说明或者向监管部门报告、发表公开声明的，视为完全同意会议记录的内容。

### 第十七条　决议公告

监事会决议公告事宜，由董事会秘书根据《上海证券交易所股票上市规则》的有关规定办理。

### 第十八条　决议的执行

监事应当督促有关人员落实监事会决议。监事会主席应当在以后的监事会会议上通报已经形成的决议的执行情况。

### 第十九条　会议档案的保存

监事会会议档案，包括会议通知和会议材料、会议签到簿、会议录音资料、表决票、经与会监事签字确认的会议记录、决议公告等，由监事会主席指定专人负责保管。

监事会会议资料的保存期限为十年以上。

### 第二十条　附则

本规则未尽事宜，参照本公司《董事会议事规则》有关规定执行。

在本规则中，"以上"包括本数。

本规则由监事会制订报股东大会批准后生效，修改时亦同。

本规则由监事会解释。

IRI-CRT-00001067