# EXHIBIT 6



中国证券监督管理委员会
CHINA SECURITIES REGULATORY COMMISSION

Maintain a transparent, fair and equitable market
Strengthen the protection of investors, small investors in particular
Facilitate the sound development of the capital market

Home    About    News    Policies    Statistics    International Affairs    Market Entry    Enforcement    Mutual Fund    Service

⌂    Home > Laws & Regulations > Laws&Regulations on Securities and Futures > State Laws              Input the Keywords...        Advanced Search

## Companies Law of the People's Republic of China

27-10-2005

Order of the President of the People's Republic of China

No. 42

The Companies Law of the People's Republic of China has been revised and adopted at the 18th Meeting of the Standing Committee of the Tenth National People's Congress of the People's Republic of China on October 27, 2005, and its revised version is hereby promulgated and shall go into effect as of January 1, 2006.

Hu Jintao

President of the People's Republic of China

October 27, 2005

### Companies Law of the People's Republic of China

*(Adopted at the 5th Meeting of the Standing Committee of the Eighth National People's Congress on December 29, 1993; amended for the first time in accordance with the Decision on Revision of the Company Law of the People's Republic of China made at the 13th Meeting of the Standing Committee of the Ninth National People's Congress on December 25, 1999; amended for the second time in accordance with the Decision on Revision of the Company Law of the People's Republic of China made at the 11th Meeting of the Standing Committee of the Tenth National People's Congress on August 28, 2004; and revised at the 18th Meeting of the Standing Committee of the Tenth National People's Congress on October 27, 2005)*

**Contents**

Chapter I General Provisions

D☐P☐ Exhibit 84 14
Deponent Wang
Date 3/7/19    Rptr JW

Chapter II Incorporation and Organizational Structure of a Company with Limited Liability

Section 1 Incorporation

Section 2 Organizational Structure

Section 3 Special Provisions on One-person Companies with Limited Liability

Section 4 Special Provisions on Wholly Stated-owned Companies

Chapter III Equity Transfer of Companies with Limited Liability

Chapter IV Incorporation and Organizational Structure of a Company Limited by Shares

Section 1 Incorporation

Section 2 Shareholders General Assembly

Section 3 Board of Directors, and the Manager

Section 4 Board of Supervisors

Section 5 Special Provisions on Organizational Structure of Listed Companies

Chapter V Issue and Transfer of Shares of Companies Limited by Shares

Section 1 Issue of Shares

Section 2 Transfer of Shares

Chapter VI Qualifications and Obligations of Directors, Supervisors and Senior Managers of Companies

Chapter VII Corporate Bonds

Chapter VIII Financial Affairs and Accounting of Companies

Chapter IX Merger and Division of Companies, Increase and Reduction of Capital

Chapter X Dissolution and Liquidation of Companies

Chapter XI Branches of Foreign Companies

Chapter XII Legal Responsibility

Chapter XIII Supplementary Provisions

**Chapter I General Provisions**

Article 1 This Law is enacted in order to standardize the organization and behavior of companies, to protect the legitimate

rights and interests of companies, shareholders and creditors, to maintain the socio-economic order and to promote the development of the socialist market economy.

Article 2 For the purposes of this Law, the term company refers to a company with limited liability or a company limited by shares incorporated within the territory of the People's Republic of China in accordance with this Law.

Article 3 A company is an enterprise legal person, which has independent property of a legal person and enjoys the property rights of a legal person. The company shall be liable for its debts to the extent of its entire property.

Shareholders of a company with limited liability shall assume liability towards the company to the extent of the capital contributions subscribed respectively by them; and the shareholders of a company limited by shares shall assume liability towards the company to the extent of the shares subscribed respectively by them.

Article 4 The shareholders of a company shall, in accordance with law, enjoy such rights as benefiting from the assets of the company, participation in making major decisions and selection of managerial personnel.

Article 5 In its operational activities, a company shall abide by laws and administrative regulations, observe social morals and commercial ethics, persist in honesty and good faith, accept supervision by the government and the public, and assume social responsibility.

The legitimate rights and interests of companies shall be protected by law, and shall be inviolable.

Article 6 Where an entity intends to incorporate a company, it shall, in accordance with law, apply to a company registration authority for registration of such incorporation. Where the conditions for incorporation provided for by this Law are met, the company registration authority shall have the company registered as a company with limited liability or a company limited by shares; and where the said conditions are not met, the company shall not be registered as one with limited liability or as one limited by shares.

Where laws or administrative regulations provide that approval is required for incorporation of a company, the procedures of approval shall be completed according to law prior to registration of the company.

The public may apply to the company registration authority for inquiry about the items registered by a company, and the authority shall provide services for such inquiry.

Article 7 The company registration authority shall issue a business license to a company incorporated according to law. The date on which the business license is issued shall be the date on which a company is incorporated.

In the business license of a company shall clearly be stated such items as the name, domicile, registered capital, actually received capital, scope of business and name of the legal representative of the company.

Where the items stated in the business license of a company are altered, the company shall have the alterations registered according to law, and the company registration authority shall renew its business license.

Article 8 A company with limited liability incorporated according to this Law shall have the words "company with limited liability" or "limited company" indicated in its name.

A company limited by shares incorporated according to this Law shall have the words "company limited by shares" or "company by shares" indicated in its name.

Article 9 Where a company with limited liability is to be changed into a company limited by shares, it shall meet the conditions of a company limited by shares provided for by this Law. Where a company limited by shares is to be changed into a company

with limited liability, it shall meet the conditions of a company with limited liability provided for by this Law.

Where a company with limited liability is changed into a company limited by shares, or a company limited by shares is changed into a company with limited liability, the rights of credit and the debts of the company prior to the change shall be inherited by the company after the change.

Article 10 The domicile of a company shall be the place where its main administrative organization is located.

Article 11 Articles of association shall be formulated according to law when a company is incorporated. The articles of association of a company shall have binding force on the company, its shareholders, directors, supervisors and senior managers.

Article 12 The business scope of a company shall be defined in the company's articles of association, and shall be registered according to law. A company may revise its articles of association and alter its scope of business, but shall have such revision and alteration registered.

The items within the scope of business of a company that are subject to approval as provided for by laws and administrative regulations shall be submitted for approval according to law.

Article 13 The chairman of the board of directors, the executive director or the manager shall, in accordance with the provisions of a company's articles of association, serve as the legal representative of the company, which shall be registered according to law. Where the legal representative of a company is replaced, the company shall have such replacement registered.

Article 14 A company may establish branches. Where a company intends to establish a branch, it shall apply for registration to the company registration authority, in order to obtain a business license for the branch. However, such a branch shall not possess the status of a legal person, and its civil liabilities shall be borne by the company.

A company may establish subsidiaries, which shall possess the status of legal persons, and shall independently bear civil liabilities according to law.

Article 15 A company may invest in other enterprises; however, it shall not become the investor that assumes joint and several liability for the debts of the enterprises in which it invests, except where otherwise provided for by law.

Article 16 Where a company intends to invest in another enterprise or provide guarantee for another entity, the matter shall, in accordance with the provisions of the company's articles of association, be subject to a resolution adopted by the board of directors or the shareholders assembly or the shareholders general assembly; and where norms for the gross amount of investments or guarantees and for the amount of a single investment or guarantee are specified in the company's articles of association, such norms shall not be exceeded.

Where a company intends to provide a guarantee for its shareholder or its actual controller, the matter shall be subject to a resolution adopted by its shareholders assembly or shareholders general assembly.

The shareholder specified in the preceding paragraph or the shareholder dominated by the actual controller specified in the preceding paragraph shall not participate in the vote on the matter specified in the preceding paragraph. The resolution on such matter shall be adopted if it is voted for by other shareholders present at the meeting who hold more than half of the voting rights.

Article 17 Companies shall protect the lawful rights and interests of their staff and workers, sign labor contracts with them

according to law, participate in social insurance, and improve occupational protection so as to achieve safety in production. Companies shall, in various forms, improve vocational education and on-the-job training among their staff and workers so as to enhance their quality.

Article 18 The staff and workers of a company shall, in accordance with the Trade Union Law of the People's Republic of China, organize a trade union to carry out trade union activities and protect the lawful rights and interests of the staff and workers. The company shall provide the trade union of the company with the conditions necessary for carrying out its activities. The trade union of a company shall represent the staff and workers to sign with the company collective contracts on such items as the payment for work done, working hours, welfare and insurance benefits as well as occupational safety and health of the staff and workers according to law.

Companies shall, through the conference of the representatives of the staff and workers or other forms, carry out democratic management in accordance with the provisions of the Constitution and relevant laws.

When a company discusses to make decisions on structural reform or on major issues in business operation, or formulate important rules and regulations, it shall listen to the opinions of the trade union, and shall listen to the opinions and proposals of the staff and workers through the conference of the representatives of staff and workers or other forms.

Article 19 In companies, Communist Party organizations shall, in accordance with the provisions of the Constitution of the Communist Party of China, be set up to carry out activities of the Party. Companies shall provide the necessary conditions for the Party organizations to carry out their activities.

Article 20 The shareholder of a company shall observe laws, administrative regulations and the company's articles of association, exercise the rights of a shareholder according to law, and shall not abuse his rights to damage the interests of the company or other shareholders; and he shall not abuse the independent status of the company as a legal person or the limited liability of shareholders to damage the interests of the creditors of the company.

Where the shareholder of a company abuses the rights of shareholders and thus causes losses to the company or other shareholders, he shall be liable for compensation according to law.

Where the shareholder of a company abuses the independent status of the company as a legal person or the limited liability of shareholders, evades debts and thus seriously damages the interests of the creditors of the company, he shall assume joint and several liability for the debts of the company.

Article 21 Proprietary shareholders, the actual controllers, directors, supervisors and senior managers of a company shall not take advantage of their affiliated relations to damage the interests of the company.

A person who, in violation of the provisions of the preceding paragraph, causes losses to a company shall be liable for compensation.

Article 22 The resolution adopted by the shareholders assembly or the shareholders general assembly or the board of directors of a company, which in content violates laws or administrative regulations, shall be invalid.

Where the procedures for convening the meeting of the shareholders assembly or the shareholders general assembly, or the board of directors, or the voting formulas are against laws, administrative regulations or the articles of association of a company, or the content of the resolution adopted is against the company's articles of association, the shareholders may, within 60 days from the date the resolution is adopted, request the people's court to rescind the resolution.

Where shareholders take legal proceedings in accordance with the provisions of the preceding paragraph, the people's court may, upon request of the company, demand the shareholders to provide appropriate guarantee.

Where a company has registered for alteration in accordance with the resolution adopted by the shareholders assembly, the

shareholders general assembly or the board of directors, and the people's court declares the resolution invalid or rescinds it, the company shall apply for cancellation of the registration for such alteration.

### Chapter II Incorporation and Organizational Structure of a Company with Limited Liability

Section 1 Incorporation

Article 23 The following conditions shall be met for the incorporation of a company with limited liability:

(1) The number of shareholders conforms to the statutory number;

(2) The capital contributions of the shareholders reach the statutory minimum amount of capital;

(3) The shareholders have jointly formulated the articles of association;

(4) The company has its name and has established an organizational structure in conformity with the requirements for a company with limited liability; and

(5) The company has its own domicile.

Article 24 A company with limited liability shall be jointly invested in and incorporated by not more than 50 shareholders.

Article 25 The articles of association of a company with limited liability shall specify the following items:

(1) the name and domicile of the company;

(2) the scope of business of the company;

(3) the registered capital of the company;

(4) the names or titles of the shareholders;

(5) the forms of capital contributions, the amounts and dates of capital contributions made by shareholders;

(6) the bodies of the company, and the measures for their establishment, their functions and powers, as well as the rules of procedure;

(7) the legal representative of the company; and

(8) other items which the shareholders assembly deems necessary to be specified.

The shareholders shall sign their names on and affix their seals to the company's articles of association.

Article 26 The registered capital of a company with limited liability shall be the amount of capital contributions subscribed for by all of its shareholders, as is registered with the company registration authority. The amount of the initial capital contributions made by all of the shareholders of the company shall be not less than 20 percent of the company's registered capital, or not less than the statutory minimum amount of the registered capital either, and the remainder shall be paid for in full by the shareholders within two years from the date the company is established; and in the case of an investment company, it may pay for the remainder in full within five years.

The minimum amount of the registered capital of a company with limited liability shall be RMB 30,000 yuan. Where a greater amount is provided for by laws or administrative regulations, such provision shall prevail.

Article 27 A shareholder may make his capital contributions in currency or do so by contributing such non-currency property as material objects, intellectual property rights and land-use rights that can be evaluated in currency and can be transferred according to law, except for the property that is not allowed to be used as capital contributions, as is provided for by laws or administrative regulations.

Non-currency property used for capital contributions shall be evaluated and verified, and shall not be overvalued or undervalued. Where laws or administrative regulations provide otherwise, those provisions shall prevail.

The amount of capital contributions made by all of the shareholders in currency shall not be less than 30 percent of the registered capital of a company with limited liability.

Article 28 A shareholder shall pay, on schedule and in full, the amount of the capital contributions subscribed for in accordance with the provisions of the articles of association of a company. Where a shareholder makes capital contributions in currency, he shall deposit the full amount of such capital contributions in currency in the bank account opened by the company with limited liability; and where a shareholder makes capital contributions with non-currency property, he shall, according to law, go through the formalities for the transfer of his property rights.

Where a shareholder fails to make capital contributions in accordance with the provisions of the preceding paragraph, in addition to paying to the company of his portion of the capital contributions in full, he shall be liable for breach of contract towards the shareholders who have, on schedule and in full, made their capital contributions.

Article 29 After the shareholders have made their capital contributions, such capital contributions shall be subject to capital verification by a capital verification authority set up according to law, which shall issue capital verification certificates.

Article 30 After the initial capital contributions made by shareholders have been verified by a capital verification authority set up according to law, a representative designated by all the shareholders or a proxy jointly entrusted by them shall submit to the company registration authority such documents as a written application for registration of the company, the company's articles of association and the capital verification certificates, in order to apply for registration of the incorporation of the company.

Article 31 Where after the incorporation of a company with limited liability, it is discovered that the actual amount of the value of the non-currency property used as capital contributions for the incorporation of the company is obviously less than the amount of the value prescribed in the company's articles of association, the shareholders that made such contributions shall make up the difference; and the others who are shareholders at the time of the incorporation of the company shall bear joint and several liability therefor.

Article 32 After a company with limited liability is incorporated, it shall issue investment certificates to its shareholders.

In an investment certificate the following items shall be specified:

(1) the name of the company;

(2) the date on which the company is incorporated;

(3) the registered capital of the company;

(4) the name or title of the shareholder, the amount and date of capital contributions; and

(5) the serial number of the investment certificate and the date of its verification and issue.

An investment certificate shall bear the seal of the company.

Article 33 A company with limited liability shall prepare a roster of its shareholders in which the following items shall be recorded:

(1) the names or titles and domiciles of the shareholders;

(2) the amounts of the capital contributions made by the shareholders; and

(3) the serial numbers of their investment certificates.

The shareholders recorded in the roster of the shareholders may claim to exercise their rights in such capacity on the basis of the said roster.

The company shall register with a company registration authority the names or titles of its shareholders and the amount of

their capital contributions; and where items of registration are altered, it shall have the registration altered accordingly. Without registration or without registration for alteration, the company shall not act against the third party.

Article 34 A shareholder shall have the right to consult and duplicate the company's articles of association, the minutes of the meeting of the shareholders assembly, the resolutions of the board of directors, the resolutions of the board of supervisors, and the financial and accounting reports of the company.

A shareholder may request to consult the accounting books of the company. To do that, the shareholder shall submit a written request to the company and explain his purposes. Where the company deems, on reasonable grounds, that it is for illegitimate purposes that the shareholder requests to consult its accounting books, which may damage the lawful interests of the company, the company may refuse to provide its accounting books for the shareholder to consult, and shall, within 15 days from the date the shareholder submits the written request, give a written reply to the shareholder and state its reasons. Where the company refuses to provide its accounting books, the shareholder may request the people's court to demand the company to provide such books.

Article 35 Shareholders shall draw dividends in proportion to the capital contributions they made; and when a company increases its capital, its shareholders shall have the right of first refusal to make their subscriptions in proportion to the capital contributions they made, except where all the shareholders have agreed to draw the dividends not in proportion to their capital contributions or to do without the right of first refusal in proportion to their capital contributions when making subscriptions.

Article 36 Once a company is incorporated, its shareholders shall not secretly withdraw their capital contributions.

Section 2 Organizational Structure

Article 37 The shareholders assembly of a company with limited liability shall be composed of all of its shareholders. The shareholders assembly is the organ of power of the company and shall exercise its functions and powers in accordance with this Law.

Article 38 The shareholders assembly shall exercise the following functions and powers:

(1) to decide on the operational policy and investment plan of the company;

(2) to elect or replace directors and supervisors who are not representatives of the staff and workers, and to decide on matters concerning the remuneration of the directors and supervisors;

(3) to examine and approve reports of the board of directors;

(4) to examine and approve reports of the board of supervisors or the supervisors;

(5) to examine and approve the annual financial budget plan and final accounts plan of the company;

(6) to examine and approve the company's plans for profit distribution and for making up losses;

(7) to adopt resolutions on the increase or reduction of the registered capital of the company;

(8) to adopt resolutions on the issue of corporate bonds;

(9) to adopt resolutions on the merger, division, dissolution, liquidation or transformation of the company;

(10) to amend the articles of association of the company; and

(11) other functions and powers provided for in the company's articles of association.

Where the shareholders express, in writing, their unanimous agreement on the matters specified in the preceding paragraph, they may directly make a decision without convening a meeting of the shareholders assembly, and all the shareholders shall sign their names on and affix their seals to the documents of the decision.

Article 39 The first meeting of the shareholders assembly of a company shall be convened and presided over by the shareholder who has made the greatest capital contributions to the company, and he shall exercise the functions and powers in accordance with the provisions of this Law.

Article 40 The meetings of the shareholders assembly shall be divided into regular meetings and interim meetings.

Regular meetings shall be convened on schedule as specified by the provisions of the company's articles of association. An interim meeting shall be convened when it is proposed by shareholders representing one-tenth or more of the voting rights, by one-third or more of the directors, by the board of supervisors, or by the supervisors of a company without a board of supervisors.

Article 41 Where a board of directors is set up in a company with limited liability, the meeting of the shareholders assembly shall be convened by the board of directors and presided over by the chairman of the board of directors; where the chairman of the board cannot perform such function or fails to do so, the meeting shall be presided over by the vice-chairman of the board; and where the vice-chairman cannot perform the function or fails to do so, the meeting shall be presided over by a director jointly elected by half and more of the directors.

Where no board of directors is set up in a company with limited liability, the meeting of the shareholders assembly shall be convened and presided over by the executive director.

Where a board of directors or the executive director cannot perform or fails to perform the duty of convening a meeting the shareholders assembly, such a meeting shall be convened and presided over by a board of supervisors or the supervisor of a company where no board of supervisors is set up; and where the board of supervisors or the supervisor fails to convene and preside over the meeting, the shareholder representing one-tenth or more of the voting rights may convene and preside over such a meeting on his own.

Article 42 All the shareholders shall be notified 15 days prior to the convening of a meeting of the shareholders assembly, except where otherwise provided for by the company's articles of association or agreed upon by all of the shareholders.

The shareholders assembly shall keep minutes of the decisions that are made on the matters discussed at the meeting, and the shareholders present at the meeting shall sign the minutes.

Article 43 Shareholders shall exercise their voting rights at a meeting of the shareholders assembly in proportion to their respective capital contributions, except where otherwise provided for by the company's articles of association.

Article 44 The modes of meeting and voting procedures of the shareholders assembly shall, in addition to what is provided for in this Law, be stipulated by the company's articles of association.

Resolutions made at a meeting of the shareholders assembly on amendment to the company's articles of association, the increase or reduction of the registered capital, or on the merger, division, dissolution or transformation of the company shall be subject to adoption by the shareholders representing two-thirds or more of the voting rights.

Article 45 A company with limited liability shall set up a board of directors, which shall be composed of 3 to 13 members, except where otherwise provided for by Article 51 of this Law.

The members of the board of directors of a company with limited liability that is incorporated with the investment of two or more State-owned enterprises or two or more State-owned investment entities shall include representatives of the staff and workers of the company; and the members of the board of directors of other companies with limited liability may include representatives of the staff and workers of the companies. The representatives of the staff and workers on the board of

directors shall be democratically elected by the staff and workers of the company through the conference of the representatives of the staff and workers, the general meeting of the staff and workers, or through other forms.

A board of directors shall have a chairman and may have a vice-chairman. The measures for the election of the chairman and vice-chairman of the board shall be stipulated by the company's articles of association.

Article 46 The term of office of a director shall be stipulated by the company's articles of association, but each term of office shall not exceed three years. A director may, if reelected upon expiration of his term of office, serve consecutive terms.

Where no election is conducted in time before the expiration of the term of office of a director, or the number of the directors is less than the statutory number due to the resignation of a director within his term of office, the existing director shall, before the director-elect takes office, continue to perform his duty as a director in accordance with the provisions of laws, administrative regulations or the company's articles of association.

Article 47 The board of directors shall be accountable to the shareholders assembly and exercise the following functions and powers:

(1) to convene the meeting of the shareholders assembly, and to report on its work to the board;

(2) to implement the resolutions adopted by the shareholders assembly;

(3) to decide on the operational plans and investment plans of the company;

(4) to draw up the annual financial budget plan and final accounts plan of the company;

(5) to draw up plans for profit distribution and plans for making up losses of the company;

(6) to draw up plans for the increase or reduction of the registered capital and the issue of corporate bonds of the company;

(7) to draw up plans for the merger, division, dissolution and transformation of the company;

(8) to decide on the establishment of the internal administrative bodies of the company;

(9) to decide on the appointment or dismissal of the manager of the company and the matters concerning his remuneration, and upon recommendation of the manager, decide on the appointment or dismissal of the deputy manager(s) and persons in charge of the financial affairs of the company, and on the matters concerning their remuneration;

(10) to formulate the basic management system of the company; and

(11) to exercise other functions and powers stipulated by the company's articles of association.

Article 48 The meeting of a board of directors shall be convened and presided over by the chairman of the board; where the chairman of the board cannot perform such functions or fails to do so, the meeting shall be convened and presided over by the vice-chairman of the board; and where the vice-chairman cannot perform such functions or fails to do so, the meeting shall be convened and presided over by a director jointly elected by half and more of the directors.

Article 49 The modes of meeting and voting procedures of a board of directors shall, in addition to the provisions of this Law, be stipulated by a company's articles of association.

The board of directors shall keep minutes of the decisions that are made on the matters discussed at the meeting, and the directors present at the meeting shall sign the minutes.

The one-person one-vote system shall be practiced for voting on resolutions of the board of directors.

Article 50 A company with limited liability may have a manager, who shall be engaged or dismissed by decision of the board of directors. The manager shall be accountable to the board of directors and shall exercise the following functions and powers:

(1) to take charge of production, operation and management of the company and organize implementation of the resolutions of the board of directors;

(2) to organize implementation of the annual operational plan and the investment plan of the company;

(3) to draw up plans for establishment of the internal administrative bodies of the company;

(4) to draw up the basic management system of the company;

(5) to formulate the specific rules of the company;

(6) to recommend the engagement or dismissal of the deputy manager(s) and of the persons in charge of financial affairs of the company;

(7) to decide on the engagement or dismissal of the persons in charge of management other than the ones the engagement or dismissal of whom is to be decided by the board of directors; and

(8) to exercise other functions and powers granted by the board of directors.

Where the articles of association of a company provide otherwise for the functions and powers of the manager, the provisions there shall prevail.

The manager shall attend meetings of the board of directors as a non-voting attendant.

Article 51 Where a company with limited liability has a relatively small number of shareholders and is relatively small in scale, it may have an executive director instead of a board of directors. The executive director may concurrently serve as the manager of the company.

The functions and powers of an executive director shall be stipulated by the company's articles of association.

Article 52 A company with limited liability shall have a board of supervisors, which shall be composed of not less than three members. Where a company with limited liability has a relatively small number of shareholders and is relatively small in scale, it may have one or two supervisors instead of a board of supervisors.

A board of supervisors shall be composed of representatives of the shareholders and an appropriate proportion of representatives of the staff and workers of the company, namely, not less than one-third of the number of the board of supervisors. The specific proportion shall be stipulated by the company's articles of association. The representatives of the staff and workers on the board of supervisors shall be democratically elected by the staff and workers of the company through the conference of the representatives of the staff and workers, or the general meeting of the staff and workers, or through other forms.

The board of supervisors shall have one chairman, who shall be elected by more than half of all the supervisors. The chairman of the board of supervisors shall convene and preside over the meeting of the board of supervisors; and where the chairman of the board of supervisors cannot perform such functions or fails to do so, a supervisor jointly elected by more than half of the supervisors shall convene and preside over the meeting of the board of supervisors.

Directors and senior managers shall not concurrently serve as supervisors.

Article 53 The term of office of a supervisor shall be three years. A supervisor may, if reelected upon expiration of the term of office, serve consecutive terms.

Where no election is conducted in time before the expiration of the term of office of a supervisor, or the number of the supervisors is less than the statutory number due to the resignation of a supervisor within his term of office, the existing supervisor shall, before the supervisor-elect takes office, continue to perform his duty as a supervisor in accordance with the provisions of laws, administrative regulations or the company's articles of association.

Article 54 The board of supervisors and the supervisor of a company without a board of supervisors shall exercise the following functions and powers:

(1) to examine the financial affairs of the company;

(2) to supervise the acts of the directors and senior managers in respect of the performance of their duties assigned by the company, and put forward proposals for removal of the directors or senior managers who violate laws, administrative regulations or the company's articles of association, or the resolutions adopted by the shareholders assembly;

(3) to demand directors or senior managers to rectify when their acts damage the interests of the company;

(4) to propose convening an interim meeting of the shareholders assembly and to convene and preside over the meeting when the board of directors fails to perform the duty of convening and presiding over such meeting as provided for by this Law;

(5) to put forth motions at the meeting of the shareholders assembly;

(6) to take legal proceedings against directors or senior managers in accordance with the provisions of Article 152 of this Law; and

(7) to exercise other functions and powers stipulated by the company's articles of association.

Article 55 A supervisor may attend meetings of the board of directors as a non-voting participant, and may inquire about or put forth proposals on matters on which resolutions have been or are to be adopted by the board of directors.

When the board of supervisors or the supervisor of a company without a board of supervisors discovers something unusual in the operation of the company, it/he may conduct investigation into the operating situation; and when necessary, it/he may engage an accounting firm or other such services to assist in the work, and the expenses entailed shall be paid by the company.

Article 56 A board of supervisors shall convene at least one meeting in each year. Supervisors may propose convening an interim meeting of the board of supervisors.

The mode of the meeting shall, in addition to the provisions of this Law, be stipulated by the company's articles of association.

Resolutions of the board of supervisors shall be subject to adoption by half and more of the supervisors.

The board of supervisors shall keep minutes of the decisions made on matters discussed at a meeting, and the supervisors present at the meeting shall sign the minutes.

Article 57 The expenses needed to exercise the functions and powers by the board of supervisors or the supervisor of a company without such a board shall be paid by the company.

Section 3 Special Provisions on One-person Companies with Limited Liability

Article 58 The provisions of this Section are applicable to the incorporation and the organizational structure of a one-person company with limited liability; and where no provisions are stipulated in this Section on such company, the provisions of Sections 1 and 2 of this Chapter shall be applicable.

For the purposes of this Law, the one-person company with limited liability means a company with limited liability where there is only one shareholder who is a natural person or a legal person.

Article 59 The minimum amount of the registered capital for a one-person company with limited liability is 100,000 yuan. The shareholder shall make the capital contributions in one lump sum as stipulated by the articles of association of the company.

A natural person may only make investment for the incorporation of one one-person company with limited liability. Such a company may not make investment for the incorporation of a new one-person company with limited liability.

Article 60 A one-person company with limited liability shall clearly indicate whether it is of the sole investment of a natural person or of a legal person in its registration, and shall have it stated clearly as such in its business license.

Article 61 The articles of association of a one-person company with limited liability shall be formulated by the shareholder.

Article 62 No shareholders assembly shall be set up in a one-person company with limited liability. When the shareholder makes a decision on the matters specified in the first paragraph of Article 38 of this Law, he shall do so in written form and sign it before keeping it for the record in the company.

Article 63 A one-person company with limited liability shall, at the end of each fiscal year, draw up its financial and accounting report and have it audited by an accounting firm.

Article 64 Where the shareholder of a one-person company with limited liability cannot prove that the property of the company is independent of his own property, he shall assume the joint and several liability for the debts of the company.

Section 4 Special Provisions on Wholly Stated-owned Companies

Article 65 The provisions of this Section shall be applicable to the incorporation and the organizational structure of wholly Stated-owned companies; and where no provisions are stipulated on such company in this Section, the provisions of Sections 1 and 2 of this Chapter shall be applicable.

For the purposes of this law, a wholly Stated-owned companies is one with limited liability which is solely invested in by the State and for which the State Council or the local people's government authorizes the State-owned assets regulatory institution under the people's government at the corresponding level to perform the duties of an investor.

Article 66 The articles of association of a wholly Stated-owned company shall be formulated by the State-owned assets regulatory institution, or shall be formulated by its board of directors and submitted to the said institution for approval.

Article 67 No shareholders assembly shall be set up in a wholly Stated-owned company, and the functions and powers of such board shall be exercised by the State-owned assets regulatory institution. The said institution may authorize the company's board of directors to exercise part of the functions and powers of the shareholders assembly and to make decisions on important matters of the company; however, matters on the merger, division and dissolution of the company, on the increase and reduction of the registered capital and the issue of corporate bonds shall be subject to decision by the State-owned assets regulatory institution; and among such matters, the merger, division, dissolution and application for bankruptcy of important wholly Stated-owned companies shall, after examination and verification by the said institution, be submitted to the people's government at the corresponding level for approval.

The important wholly Stated-owned companies mentioned in the preceding paragraph shall be defined in accordance with the regulations of the State Council.

Article 68 A wholly Stated-owned company shall have a board of directors, which shall exercise its functions and powers in accordance with the provisions of Articles 47 and 67 of this Law. The term of office of a director shall not exceed three years. On the board of directors, there shall be representatives of the staff and workers of the company.

The members of the board of directors shall be appointed by the State-owned assets regulatory institution; but the representatives of the staff and workers among such members shall be elected by the conference of the representatives of the staff and workers of the company.

The board of directors shall have one chairman and may have a vice-chairman. The chairman and vice-chairman shall be designated by the State-owned assets regulatory institution from among the members of the board of directors.

Article 69 A wholly Stated-owned company shall have a manager, who shall be engaged or dismissed by the board of

directors. The manager shall exercise his functions and powers in accordance with the provisions of Article 50 of this Law. Upon consent of the State-owned assets regulatory institution, a member of the board of directors may concurrently serve as manager.

Article 70 Without the consent of the State-owned assets regulatory institution, the chairman or vice-chairman of the board of directors or the director or senior manager of a wholly Stated-owned company shall not hold a post concurrently in another company with limited liability, company limited by shares or economic organization.

Article 71 There shall be not less than five persons on the board of supervisors of a wholly State-owned company, and among them, the proportion of the representatives of the staff and workers shall not be less than one-third. The specific proportion shall be stipulated by the company's articles of association.

The members of a board of supervisors shall be appointed by the State-owned assets regulatory institution; but the representatives of the staff and workers among the members on the board of supervisors shall be elected by the conference of the representatives of the staff and workers of the company. The chairman of the board of supervisors shall be designated by the State-owned assets regulatory institution from among the members on the board of supervisors.

The board of supervisors shall exercise the functions and powers stipulated by Subparagraphs (1), (2) and (3) in Article 54 of this Law and the other functions and powers prescribed by the State Council.

### Chapter III Equity Transfer of Companies with Limited Liability

Article 72 Shareholders of a company with limited liability may mutually transfer all or a part of their equity to each other.

Where a shareholder intends to transfer his equity to a person other than a shareholder, the matter shall be subject to consent by more than half of the other shareholders. The shareholder shall inform, in writing, the other shareholders of his intention to transfer his equity in order to seek their consent. Where the other shareholders give no reply at the expiration of 30 days from the date they receive the written information, it shall be regarded as their consent to the transfer. Where half or more of the other shareholders do not give their consent to the transfer, they shall buy such equity; and the ones who do not do so shall be deemed as giving their consent to the transfer.

With regard to the equity the transfer of which is consented to by the shareholders, all the other shareholders shall have the right of first refusal under equal conditions. Where two or more shareholders claim to exercise the right of first refusal, they shall determine, through consultation, the proportions of the equity to be purchased by them respectively; and where consultation fails, they shall exercise the right of first refusal on the basis of the proportions of their respective capital contributions at the time when the equity is transferred.

Where the articles of association of a company stipulate otherwise on equity transfer, such stipulations shall prevail.

Article 73 When a people's court transfers the equity of a shareholder in accordance with the procedures of compulsory execution as provided for by law, it shall notify the company and all the shareholders of the matter, and notify that the other shareholders shall have the right of first refusal under equal conditions. When at the expiration of 20 days from the date the other shareholders receive the notification from the people's court, they have not exercised their right of first refusal, they shall be regarded as waiving such right.

Article 74 After the transfer of the equity in accordance with the provisions of Articles 72 and 73 of this Law, the company shall cancel the investment certificate of the original shareholder and issue an investment certificate to the new shareholder, and shall accordingly revise the records regarding the shareholders and their capital contributions in the company's articles of association and in the roster of the shareholders. Such revisions made in the company's articles of association need not be voted by the shareholders assembly.

Article 75 Under one of the following circumstances, where a shareholder votes against the resolution adopted by the shareholders assembly, he may request the company to purchase his equity at a reasonable price:

(1) The company fails to distribute its profits to the shareholders for five consecutive years, when it has been making profits for five years running and meets the conditions for distributing profits as is provided for by this Law;

(2) The company is to be merged or divided, or the principal part of its property is to be transferred; or

(3) When the period of business stipulated by the company's articles of association expires or other situations originating the dissolution stipulated by the said articles of association arise, a resolution is adopted by the shareholders assembly to revise the articles of association for continued existence of the company.

Where a shareholder fails to reach an agreement on the equity purchase with the company within 60 days from the date the resolution is adopted by the shareholders assembly, he may bring a suit before a people's court within 90 days from the date the resolution is adopted by the shareholders assembly.

Article 76 After the death of a shareholder, who is a natural person, his legal heir may inherit his qualification, except where otherwise provided for by the company's articles of association.

**Chapter IV Incorporation and Organizational Structure of a Company Limited by Shares**

Section 1 Incorporation

Article 77 The following conditions shall be met if a company limited by shares is to be incorporated:

(1) The number of promoters conforms to the statutory number;

(2) The share capital subscribed for and raised by promoters reaches the statutory minimum amount of capital;

(3) The issue of shares and the preparations made for incorporation conform to the provisions of law;

(4) The company's articles of association are formulated by the promoters, and such articles of association of a company incorporated by means of share offer are adopted at the inaugural meeting;

(5) The company has its name, and its organizational structure conforms to the requirements for a company limited by shares; and

(6) The company has its domicile.

Article 78 A company limited by shares may be incorporated by means of promotion or by means of share offer.

A company incorporated by means of promotion is one incorporated by the promoters subscribing for all the shares to be issued by the company.

A company incorporated by means of share offer is one incorporated by the promoters subscribing for a portion of the shares to be issued by the company, with the rest offered to the general public or to specific quarters.

Article 79 To incorporate a company limited by shares, there shall be not less than 2 but not more than 200 promoters, more than half of whom shall have their domiciles within the territory of the People's Republic of China.

Article 80 The promoters of a company limited by shares shall undertake the matters concerning the preparation for incorporation of the company.

The promoters shall sign a promoters' agreement, in which to define their respective rights and obligations in the process of the incorporation of the company.

Article 81 Where a company limited by shares is incorporated by means of promotion, its registered capital shall be the total amount of the share capital subscribed for by all the promoters, as is registered with the company registration authority. The initial capital subscriptions by all the promoters of the company shall be not less than 20 percent of the registered capital and the remainder shall be paid in full by the promoters within two years from the date the company is incorporated; in the case of an investment company, it may do so within five years. Before the money is furnished in full, the company shall not offer shares to others.

Where a company limited by shares is incorporated by means of share offer, its registered capital shall be the total amount of the actually received share capital as is registered with the company registration authority.

The minimum amount of the registered capital of a company limited by shares shall be 5,000,000 yuan. Where the minimum amount of the registered capital of a company limited by shares is greater than the said amount, as is stipulated by laws or administrative regulations, the provisions there shall prevail.

Article 82 The articles of association of a company limited by shares shall specify the following items:

(1) the name and domicile of the company;

(2) the scope of business of the company;

(3) the means of incorporation of the company;

(4) the total number of shares, the par value for each share and the registered capital of the company;

(5) the names or titles of the promoters, the number of shares subscribed for by them, or the forms and dates of their contributions;

(6) the composition, functions and powers of the board of directors and its rules of procedure;

(7) the legal representative of the company;

(8) the composition, functions and powers of the board of supervisors and its rules of procedure;

(9) methods for distribution of the company's profits;

(10) the reasons for dissolution of the company and its liquidation methods;

(11) methods for notices and announcements of the company; and

(12) other items that the shareholders general assembly deems necessary to be specified.

Article 83 The provisions of Article 27 of this Law shall be applicable to the forms of contributions made by the promoters.

Article 84 Where a company limited by shares is incorporated by means of promotion, each of the promoters shall, in writing, subscribe for the full portion of the shares to be subscribed for by him as stipulated by the company's articles of association; if a promoter offers to pay the subscriptions in a lump sum, he shall do so immediately; and if a promoter offers to pay the subscriptions by installments, he shall immediately pay for the first installment. Where a promoter invests with non-currency property, he shall go through the formalities for the transfer of his property rights according to law.

Where a promoter fails to pay the subscriptions in accordance with the provisions of the preceding paragraph, he shall be liable for the default in accordance with the promoters' agreement.

After the initial payment of the subscriptions by the promoters, the board of directors and the board of supervisors shall be elected. The board of directors shall submit to the company registration authority the company's articles of association, the capital verification certificate issued by the capital verification authority, which is set up according to law, and the other documents specified by laws or administrative regulations, in order to apply for registration of the incorporation of the company.

Article 85 Where a company limited by shares is incorporated by means of share offer, the shares subscribed for by the

promoters shall be not less than 35 percent of the total number of the shares issued by the company; where laws or administrative regulations provide otherwise, the provisions there shall prevail.

Article 86 Where shares are to be offered to the general public, the promoters shall publish the prospectus of the company, and prepare subscription forms. In a subscription form shall clearly be stated the items specified by Article 87 of this Law, and the subscriber shall fill in the number of the shares subscribed for, the amount of money involved and his domicile, and shall sign and seal the form. The subscriber shall pay money for the number of the shares he subscribes for.

Article 87 The company's articles of association formulated by the promoters shall be attached to a prospectus, in which the following items shall clearly be stated: (1) the number of shares subscribed for by the promoters;
(2) the par value and the issue price of each share;
(3) the total number of bearer shares issued;
(4) the purpose of the funds to be raised;
(5) the rights and obligations of the subscribers; and
(6) the dates of start and end for the share offer and a statement to the effect that subscribers may withdraw their share subscriptions when the shares are not fully subscribed for at the expiration of the time limit.

Article 88 Where promoters offer shares to the general public, the shares shall be underwritten by the securities company established according to law, and an underwriting agreement shall be concluded.

Article 89 Where promoters offer shares to the general public, they shall enter into an agreement with a bank on the collection of subscription moneys on their behalf.
The bank entrusted with collecting the subscription moneys shall, in accordance with the agreement, collect and keep the said moneys, issue receipts to the subscribers for their payments, and bear the obligation to issue certificates of receipt of moneys to relevant departments.

Article 90 After payment in full of the subscription moneys for the shares issued, such moneys shall be subject to verification by the capital verification authority established according to law, which shall produce a capital verification certificate. The promoters shall, within 30 days from the date the subscription moneys are paid in full, convene and preside over an inauguration assembly. An inauguration assembly shall be composed of all the promoters and subscribers.
Where the shares issued are not fully subscribed for at the date of expiration as specified in the prospectus, or the promoters fail to convene an inaugural meeting within 30 days from the date the subscription moneys for the shares issued are paid in full, the subscribers may claim refund from the promoters of their subscription moneys paid for the shares, plus their bank deposit interest calculated for the same period.

Article 91 The promoters shall notify each subscriber of the date of the inauguration assembly or make an announcement of such meeting 15 days prior to its convention. The inauguration assembly shall be convened only if the promoters and subscribers representing more than half of the total shares issued are present.
An inauguration assembly shall exercise the following functions and powers:
(1) to examine the promoters' report on the preparations for the incorporation of the company;
(2) to adopt the articles of association of the company;
(3) to elect members of the board of directors;
(4) to elect the members of the board of supervisors;
(5) to examine and verify the expenses incurred for the incorporation of the company;
(6) to examine and verify the evaluation of the property used by the promoters to pay subscription moneys; and

(7) to adopt a resolution against the incorporation of the company in the event that a force majeure occurs or a major change takes place in the operational conditions, which directly affects the incorporation of the company.

A resolution adopted at the inaugural meeting on the items specified in the preceding paragraph shall be subject to adoption by the subscribers attending the meeting who have more than half of the voting rights.

Article 92 After payment of their subscription moneys or making their capital contributions as substitutes for their share subscriptions, the promoters and subscribers shall not withdraw their share capital except where the shares issued are not fully subscribed for within the time limit, or the promoters fail to convene an inaugural meeting on schedule, or a resolution against the incorporation of the company is adopted at the inaugural meeting.

Article 93 The board of directors shall, within 30 days from the date the inaugural meeting is closed, submit the following documents to the company registration authority to apply for registration of the incorporation of the company:

(1) the written application for registration of the company;

(2) the minutes of the inaugural meeting;

(3) the articles of association of the company;

(4) the capital verification certificate;

(5) the appointment documents and identification certificates of the legal representative, directors and supervisors;

(6) the qualification certificate of the promoter as a legal person or his identification certificate as a natural person; and

(7) the certificate of the domicile of the company.

In the case of a company limited by shares incorporated by means of share offer which publicly issues its shares, it shall, in addition, submit to the company registration authority the approval document issued by the securities regulatory authority under the State Council.

Article 94 Where after the incorporation of a company limited by shares, a promoter fails to pay in full the subscription moneys in accordance with the provisions of the company's articles of association, he shall pay them in full; and the other promoters shall bear joint and several liability.

Where after the incorporation of a company limited by shares, it is discovered that the actual evaluation of the non-currency property used as capital contributions for the incorporation of the company is obviously less than the evaluation prescribed by the company' articles of association, the promoters making such contributions shall make up the difference; and the other promoters shall bear joint and several liability.

Article 95 The promoters of a company limited by shares shall bear the following liabilities:

(1) Where the company cannot be incorporated, they shall bear the joint and several liability for all the debts and expenses incurred in the act of incorporation;

(2) Where the company cannot be incorporated, they shall bear the joint and several liability for refunding the subscription moneys paid by the subscribers, plus their bank deposit interest calculated for the same period of time; and

(3) Where the interests of the company are impaired due to the fault committed by the promoters in the process of the incorporation of the company, they shall bear the liability to pay compensation to the company.

Article 96 Where a company with limited liability is converted into a company limited by shares, the total amount of the actually received share capital to be converted shall not be greater than the amount of its net assets. Where a company with limited liability that is converted into a company limited by shares publicly issues shares for the purpose of increasing its capital, it shall do so according to law.

Article 97 A company limited by shares shall have its articles of association, the roster of the shareholders, the stubs of

CHINA SECURITIES REGULATORY COMMISSION - Companies Law of the People's Republic of China

corporate bonds, the minutes of the meetings of the shareholders general assembly, the minutes of the meetings of the board of directors and of the board of supervisors, and the financial and accounting reports kept at the company.

Article 98 Shareholders shall have the right to consult the company's articles of association, the roster of the shareholders, the stubs of corporate bonds, the minutes of the meetings of the shareholders general assembly, the resolutions adopted at the meetings of the board of directors and of the board of supervisors, and the financial and accounting reports, and shall have the right to put forward proposals on or to make inquiries about the business operation of the company.

Section 2 Shareholders General Assembly

Article 99 The shareholders general assembly of a company limited by shares shall be composed of all the shareholders. The shareholders general assembly is the organ of power of the company and shall exercise its functions and powers according to this Law.

Article 100 The provisions of the first paragraph of Article 38 of this Law on the functions and powers of the shareholders assembly of a company with limited liability shall be applicable to the shareholders assembly of a company limited by shares.

Article 101 The annual meeting of the shareholders general assembly shall be convened once a year. An interim meeting shareholders general assembly shall be convened within two months where one of the following situations occurs:
(1) When the number of directors is less than the number prescribed by this Law, or less than two-thirds of the number required by the company's articles of association;
(2) When the amount of the losses that the company has left unrecouped reaches one-third of the total share capital actually received;
(3) When a shareholder individually holding, or the shareholders together holding, more than 10 percent of the company's shares request(s) to convene such a meeting;
(4) When the board of directors deems it necessary;
(5) When the board of supervisors proposes to convene such a meeting; or
(6) When other situations stipulated by the company's articles of association occur.

Article 102 A meeting of the shareholders general assembly shall be convened by the board of directors and presided over by the chairman of the board; where the chairman cannot perform the function or fails to do so, the vice-chairman shall preside over such a meeting; and where the vice-chairman cannot perform the function or fails to do so, a director jointly elected by more than half of the directors shall preside over it.
Where the board of directors cannot perform or fails to perform the duty of convening a meeting of the shareholders general assembly, the board of supervisors shall, in time, convene and preside over such a meeting; and where the board of supervisors fails to convene and preside over the meeting, the shareholder individually holding, or the shareholders together holding, more than 10 percent of the company's shares for 90 or more consecutive days may convene and preside over the meeting of his or their own accord.

Article 103 Where a meeting of the shareholders general assembly is to be convened, the shareholders shall, 20 days prior to the convening of such a meeting, be notified of the time and place of the meeting to be convened and of the matters to be deliberated at the meeting; where an interim meeting of the shareholders general assembly is to be convened, the shareholders shall be notified of it 15 days prior to the convening of the meeting; and where bearer shares are to be issued, an announcement of the time and place of the meeting to be convened and the matters to be deliberated at the meeting shall

be made 30 days prior to its convention.

A shareholder individually holding, or the shareholders together holding, more than three percent of the shares of the company may make provisional proposals and submit them in writing to the board of directors 10 days prior to the convening of the meeting of the shareholders general assembly; and the board of directors shall notify the other shareholders of such proposals within two days from the date it receives the proposals and shall submit them to the shareholders general assembly for deliberation. The content of the provisional proposals shall be kept within the scope of the functions and powers of the shareholders general assembly, and the proposals shall contain explicit subjects for discussion and specific matters for resolution.

No resolutions on matters not clearly stated in the notifications mentioned in the preceding two paragraphs shall be adopted at a meeting of the shareholders general assembly.

Where holders of bearer shares intend to attend a meeting of the shareholders general assembly, they shall deposit their share certificates with the company for a period beginning from five days prior to the convening of the meeting to the end of the meeting.

Article 104 Shareholders attending a meeting of the shareholders general assembly shall have the right to one vote for each share held, but the company itself shall have no right to vote for the shares held.

A resolution to be made by the shareholders general assembly shall be subject to adoption by more than half of the voting rights held by the shareholders present at the meeting. But resolutions to be made by the shareholders general assembly on revision of the company's articles of association, on increase or reduction of the registered capital, on merger, division, dissolution or transformation of the company shall be subject to adoption by more than two-thirds of the voting rights held by the shareholders present at the meeting.

Article 105 With regard to such matters as transfer and assignment of major assets of a company and provision of guarantee for another entity which are subject to resolution by the shareholders general assembly, as prescribed by this Law and the company's articles of association, the board of directors shall, in a timely manner, convene a meeting of the shareholders general assembly, at which to hold a vote on the matters mentioned above.

Article 106 For election of directors or supervisors by the shareholders general assembly, the system of cumulative voting may be practiced in accordance with the provisions of the company's articles of association or the resolution adopted by the shareholders general assembly.

For the purposes of this Law, the system of cumulative voting means that for election of directors or supervisors by the shareholders general assembly, the number of voting rights allocated to each share is equal to the number of directors or supervisors to be elected and such voting rights held by the shareholders may be pooled.

Article 107 A shareholder may entrust a proxy to attend a meeting of the shareholders general assembly. The proxy shall present the shareholder's power of attorney to the company, and shall exercise the voting rights within the scope of authorization.

Article 108 Decisions on matters discussed at a meeting of the shareholders general assembly shall be minuted down, and the chairperson and the directors present at the meeting shall sign the minutes. The minutes of the meeting shall be kept together with the roster of the signatures of the shareholders attending the meeting and the powers of attorney of the proxies attending the meeting.

Section 3 Board of Directors, and the Manager

Article 109 A company limited by shares shall have a board of directors composed of 5 to 19 members.

The board of directors may, among the members, have representatives from among the staff and workers of the company. Such representatives on a board of directors shall be democratically elected by the staff and workers of the company through the conference of the representatives of the staff and workers, the general meeting of the staff and workers, or through other forms.

The provisions in Article 46 of this Law on the term of office of a director of a company with limited liability shall be applicable to the director of a company limited by shares.

The provisions in Article 47 of this Law on the functions and powers of the board of directors of a company with limited liability shall be applicable to the board of directors of a company limited by shares.

Article 110 A board of directors shall have one chairman and may have a vice-chairman. The chairman and vice-chairman of the board of directors shall be elected by more than half of all the directors.

The chairman of the board of directors shall convene and preside over the meetings of the board, and shall inspect the implementation of the resolutions adopted by the board of directors. The vice-chairman of the board of directors shall assist the chairman in his work. Where the chairman cannot perform the functions or fails to do so, the vice-chairman shall perform the functions; and where the vice-chairman cannot perform the functions or fails to do so, a director jointly elected by more than half of the directors shall perform the functions.

Article 111 The meeting of the board of directors shall be convened at least twice a year. All the directors and supervisors shall be notified of such a meeting 10 days prior to its convention.

Shareholders representing more than one-tenth of the voting rights, more than one-third of the directors, or the board of supervisors may propose to convene an interim meeting of the board of directors. The chairman of the board shall convene and preside over such a meeting within 10 days from the date he receives the proposal.

The form of notification and the time limit for notification in respect of the convening of an interim meeting of the board of directors may be separately prescribed.

Article 112 A meeting of the board of directors shall be held only if more than half of all the directors are present. Any of the resolutions made by the board shall be subject to adoption by more than half of all the directors.

The one-person one-vote system shall be practiced when resolutions of the board of directors are put to the vote.

Article 113 Meetings of the board of directors shall be attended by the directors in person. If a director cannot attend a meeting of the board for one reason or another, he may, in writing, entrust another director with attending the meeting on his behalf, and in the power of attorney shall clearly indicate the scope of authorization.

Decisions on matters discussed at a meeting of the board of directors shall be minuted down, and the minutes of the meeting shall be signed by the directors present.

Directors shall be liable for the resolutions adopted by the board of directors. Where a resolution of the board violates laws, administrative regulations, or the company's articles of association, or the resolutions of the shareholders general assembly, and thus causes serious losses to the company, the directors participating in the adoption of such a resolution shall be liable for compensation to the company. However, where a director is proved to have expressed his objection to such a resolution when it was put to the vote and his objection was recorded in the minutes of the meeting, he may be exempted from such liability.

Article 114 A company limited by shares shall have a manager, who shall be engaged or dismissed by decision of the board of directors.

The provisions in Article 50 of this Law on the functions and powers of the manager of a company with limited liability shall be applicable to the manager of a company limited by shares.

Article 115 The board of directors may decide that one of its members shall concurrently serve as the manager of the company.

Article 116 A company shall not provide loans, directly or through its subsidiary, to its directors, supervisors or senior managers.

Article 117 A company shall regularly disclose to its shareholders information about the remunerations obtained by the directors, supervisors and senior managers from the company.

Section 4 Board of supervisors

Article 118 A company limited by shares shall have a board of supervisors, which shall be composed of not less than three members.

A board of supervisors shall include representatives of shareholders, and representatives of the staff and workers of the company in an appropriate proportion, which shall be not less than one-third of the total number of members on the board of supervisors. The specific proportion shall be prescribed by the company's articles of association. The representatives of the staff and workers on the board of supervisors shall be democratically elected by the staff and workers of the company through the conference of the representatives of the staff and workers, or the general meeting of the staff and workers, or through other forms.

The board of supervisors shall have one chairman and may have one vice-chairman. Both shall be elected by more than half of all the supervisors. The chairman of the board of supervisors shall convene and preside over the meeting of the board; where the chairman of the board of supervisors cannot perform the functions or fails to do so, the vice-chairman shall convene and preside over the meeting of the board; and where the vice-chairman cannot perform the functions or fails to do so, a supervisor jointly elected by half or more of the supervisors shall convene and preside over the meeting of the board.

A director or senior manager shall not concurrently serve as supervisor.

The provisions in Article 53 of this Law on the term of office of a supervisor of a company with limited liability shall be applicable to the supervisor of a company limited by shares.

Article 119 The provisions in Articles 54 and 55 of this Law on the functions and powers of the board of supervisors of a company with limited liability shall be applicable to the board of supervisors of a company limited by shares.

The expenses necessary for the exercise of the functions and powers of the board of supervisors shall be borne by the company.

Article 120 The board of supervisors shall convene a meeting at least once every six months. Supervisors may propose to convene an interim meeting of the board of supervisors.

The mode of the meeting and the voting procedure of the board of supervisors shall, in addition to the provisions of this Law, be stipulated by the company's articles of association.

A resolution made by the board of supervisors shall be subject to adoption by more than half of the supervisors.

Decisions on matters discussed at a meeting of the board of supervisors shall be minuted down, and the minutes of the meeting shall be signed by all the supervisors present.

Section 5 Special Provisions on Organizational Structure of Listed Companies

Article 121 For the purposes of this Law, a listed company means a company limited by shares which has its shares listed and traded at stock exchanges.

Article 122 Where a listed company purchases or sells major assets within one year, or the amount of guarantee exceeds 30 percent of its total assets, the matter shall be subject to resolution by the shareholders general assembly, which shall be subject to adoption by the shareholders present who hold two-thirds or more of the voting rights.

Article 123 A listed company shall have independent directors. The specific measures in this regard shall be formulated by the State Council.

Article 124 A listed company shall have a secretary of the board of directors, who shall be in charge of such matters as preparation for the meetings of the shareholders general assembly and of the board of directors of the company, safekeeping of documents, management of data on the company's shareholders and disclosure of information.

Article 125 Where the director of a listed company is affiliated with an enterprise that is involved in the matters on which a resolution is to be made at a meeting of the board of directors, he shall not exercise his voting right on such resolution, nor shall he exercise the voting right on behalf of another director. Such a meeting of the board of directors may be held with the attendance of more than half of the directors who are not affiliated with the enterprise, and the resolution made at the meeting of the board shall be subject to adoption by more than half of the unaffiliated directors. Where the number of unaffiliated directors present at the meeting of the board is less than three persons, the matters shall be submitted to the shareholders general assembly of the listed company for deliberation.

**Chapter V Issue and Transfer of Shares of Companies Limited by Shares**

Section 1 Issue of Shares

Article 126 The capital of a company limited by shares shall be divided into shares of equal value.
The shares of the company shall take the form of share certificates, which are vouchers issued by the company to certify the shares held by its shareholders.

Article 127 The shares shall be issued in compliance with the principles of fairness and impartiality. The shares of the same class must carry the same rights.
Shares of the same class issued at the same time shall be issued on the same conditions and at the same price. All units and individuals shall pay the same price for each of the share they subscribe for.

Article 128 Shares may be issued at or above their par value, but shall not be issued below their par value.

Article 129 Share certificates may be in paper form or in other forms as prescribed by the securities regulatory authority under the State Council.
The following main items shall clearly be indicated on a share certificate:

(1) the name of the company;

(2) the date of the company's incorporation;

(3) the class of the shares, the par value and the number of shares represented by the certificate; and

(4) the serial number of the share certificate.

A share certificate shall be signed by the legal representative and sealed by the company.

The words promoter's share certificate shall clearly be indicated on the share certificates issued to promoters.

Article 130 Shares issued by a company may be either registered shares or bearer shares.

Shares issued by a company to promoters and legal persons shall be registered shares, on which shall be indicated the titles or names of the promoters or legal persons. Such shares shall not be registered in other names or names of their representatives.

Article 131 Where registered shares are issued, the company shall prepare a roster of the shareholders, in which the following items shall be recorded:

(1) the titles or names, and domiciles of the shareholders;

(2) the number of shares held by each shareholder;

(3) the serial numbers of the share certificates held by each shareholder; and

(4) the date on which each shareholder obtains his shares.

Where bearer shares are issued, the company shall keep a record of the number, the serial numbers and the issue date of the share certificates.

Article 132 The State Council may formulate separate regulations on the shares of other classes issued by companies, which are not provided for in this Law.

Article 133 A company limited by shares shall formally deliver its share certificates to the shareholders immediately after its incorporation. The company shall not deliver its share certificates to the shareholders prior to its incorporation.

Article 134 Where a company issues new shares, a resolution on the following matters shall be adopted by the shareholders general assembly:

(1) the class and number of the new shares;

(2) the issue price of the new shares;

(3) the opening and closing dates for the issue of the new shares; and

(4) the class and number of the new shares issued to the existing shareholders.

Article 135 When a company publicly issues new shares upon verification and approval by the securities regulatory authority under the State Council, it shall announce its prospectus on the new share offer and its financial reports, and shall prepare subscription application forms.

The provisions of Articles 88 and 89 of this Law shall be applicable to the issue of new shares by a company to the public.

Article 136 Where a company issues new shares, it may, on the basis of its operational and financial conditions, decide on a proposal on the price of the new shares.

Article 137 Where the new shares issued by a company are fully subscribed for, the company shall apply to the company registration authority for the registration of modification in its capital and shall make an announcement thereafter.

Section 2 Transfer of Shares

Article 138 Shares held by shareholders may be transferred in accordance with law.

Article 139 Shareholders shall transfer their shares through stock exchanges established in accordance with law or through other forms prescribed by the State Council.

Article 140 Registered shares shall be transferred by means of endorsement by shareholders or by such other means as provided for by laws or administrative regulations; and after such transfer, the company shall register the names or titles and domiciles of the transferees in its roster of shareholders.

No registration of modification to the roster of shareholders as stipulated by the preceding paragraph shall be made within the period of 20 days prior to the convening of a meeting of the shareholders general assembly or within the period of 5 days prior to the date of record on which the company decides to distribute dividends. However, where laws provide otherwise in respect of registration of modification made to the roster of the shareholders of listed companies, the provisions there shall prevail.

Article 141 Transfer of bearer shares shall become effective immediately after a shareholder delivers such share certificates to a transferee.

Article 142 Shares held by the promoters of a company shall not be transferred within one year from the date the company is incorporated. Shares issued prior to the public issue by a company shall not be transferred within one year from the date the shares of the company are listed and traded at stock exchanges.

Directors, supervisors and senior managers of a company shall declare to the company the numbers of the company's shares held by them and the changes of the shares they hold, and the number of the company's shares annually transferred by each of them during their term of office shall not exceed 25 percent of the total number of the company's shares held by them respectively; and the company's shares held by them shall not be transferred within one year from the date the shares of the company are listed and traded. The company's shares held by the persons mentioned above shall not be transferred within six months after they leave office. The company's articles of association may stipulate other restrictive provisions on the transfer of the company's shares held by the directors, supervisors and senior managers of the company.

Article 143 A company shall not purchase its own shares, except where:

(1) It reduces its registered capital;

(2) It merges with another company that holds its shares;

(3) It rewards the staff and workers of the company with its shares; or

(4) A shareholder requests the company to purchase his shares because he holds objections to the resolution on the merger or division of the company adopted by the shareholders general assembly.

Purchase of its own shares by a company due to the reasons specified in Subparagraph (1), (2) or (3) of the preceding paragraph shall be subject to resolution adopted by the shareholders general assembly. Where a company purchases its own shares on grounds of Subparagraph (1) as specified in the preceding paragraph, such shares shall be cancelled within 10 days from the date it purchases them; and where the shares are purchased on grounds of Subparagraph (2) or (4), such shares shall be transferred or cancelled within six months.

The number of its own shares purchased by a company in accordance with the provisions of Subparagraph (3) of the first paragraph shall not exceed five percent of the total number of the shares issued by the company; the funds used for such purchase shall be allotted from the after-tax profits of the company; and the shares purchased shall be transferred to its staff

and workers within one year.

A company shall not accept its own shares as the subject matter of a mortgage.

Article 144 Where registered share certificates are stolen, lost or destroyed, the shareholder may, in accordance with the procedure for public notice for assertion of claims provided for in the Civil Procedure Law of the People's Republic of China, request a people's court to declare such share certificates void. After the people's court has declared the said share certificates void, the shareholder may apply to the company for replacement of such share certificates.

Article 145 A listed company shall have its shares listed and traded in accordance with relevant laws, administrative regulations and the rules of stock exchanges governing transactions.

Article 146 A listed company shall, in accordance with the provisions of laws and administrative regulations, disclose its financial and business situations and its major litigations, and shall publicize its financial reports every six months of each fiscal year.

### Chapter VI Qualifications and Obligations of Directors, Supervisors and Senior Managers of Companies

Article 147 None of the following persons shall serve as a director, supervisor, or senior manager of a company:

(1) a person who has no or limited capacity for civil conduct;

(2) a person who was sentenced to criminal punishment for embezzlement, bribery, seizure of property or misappropriation of property or for sabotage of the socialist market economic order, where less than five years have elapsed after the expiration of the period of execution; or a person who was deprived of his political rights for the commission of a crime, where less than five years have elapsed after the expiration of the period of execution;

(3) a person who, being a director or the head or manager of a company or enterprise that went into bankruptcy and liquidation, was personally liable for the bankruptcy of the said company or enterprise, where less than three years have elapsed from the date liquidation of the company or enterprise is completed;

(4) a person who, being the legal representative of a company or an enterprise, the business license of which was revoked for violation of law and which was ordered to close down, was personally liable for the above, where less than three years have elapsed from the date the business license of the company or enterprise is revoked; or

(5) a person who fails to liquidate a relatively large amount of personal debts when they are due.

Where a company elects or appoints its directors or supervisors, or engages its senior managers in violation of the provisions of the preceding paragraph, such election, appointment or engagement shall be invalid.

Where, during his term of office, a director, supervisor or senior manager is found to be a person as specified in the first paragraph of this Article, the company shall remove him from office.

Article 148 Directors, supervisors and senior managers of a company shall observe laws, administrative regulations and the company's articles of association and shall assume the duties of loyalty and diligence to the company.

Directors, supervisors and senior managers of a company shall not take advantage of their functions and powers to accept bribes or collect other illicit earnings, and shall not take illegal possession of the property of the company.

Article 149 A director or senior manager shall not commit the following acts:

(1) misappropriating the funds of the company;

(2) opening an account in his own name or in the name of another person to deposit the funds of the company;

(3) in violation of the stipulations of the company's articles of association or without the consent of the shareholders assembly,

the shareholders general assembly or the board of directors, loaning the funds of the company to another person or using the property of the company to provide guarantee for another person;

(4) in violation of the stipulations of the company's articles of association or without the consent of the shareholders assembly or the shareholders general assembly, entering into a contract or conducting transactions with the company;

(5) without the consent of the shareholders assembly or the shareholders general assembly, taking advantage of his position to seek commercial opportunities, which belong to the company, for himself or for another person, or operating for himself or for another person the same kind of business as that of the company where he is holding a post;

(6) taking into his own possession the commissions from transactions conducted by another person with the company;

(7) disclosing secrets of the company without authorization; or

(8) other acts committed in violation of the duty of loyalty to the company.

All earnings derived by the directors or senior managers in violation of the provisions in the preceding paragraph shall be returned to the company.


Article 150 Where a director, supervisor or senior manager violates laws, administrative regulations or the company's articles of association in performance of his duties for the company, and thus causes losses to the company, he shall be liable for compensation.


Article 151 Where the shareholders assembly or the shareholders general assembly requests directors, supervisors or senior managers to be present at its meeting, the latter shall attend the meeting as non-voting participants and subject themselves to inquires by the shareholders.

Directors or senior managers shall truthfully provide relevant information and data to the board of supervisors or the supervisors of a company with limited liability where there is no such board of supervisors, and shall not hinder the exercise of the functions and powers by the board of supervisors or the supervisors.


Article 152 Where a director or senior manager causes losses to the company, as specified in Article 150 of this Law, the shareholders of a company with limited liability, or the shareholders of a company limited by shares individually or jointly holding one percent or more of its shares for 180 or more consecutive days may request, in writing, the board of supervisors or the supervisors of the company with limited liability where there is no such board to bring a lawsuit to a people's court; and where a supervisor causes losses to the company, as specified in Article 150 of this Law, the shareholders mentioned above may request, in writing, the board of directors or the executive director of a company with limited liability where there is no such board to bring a lawsuit to a people's court.

Where the board of supervisors or the supervisor of a company with limited liability where there is no such board, or the board of directors, or the executive director refuses to take legal proceedings after receiving the written request from the shareholders as specified in the preceding paragraph, or fails to take legal proceedings within 30 days from the date it/he receives such request, or under emergency situations, failure to take legal proceedings immediately results in irreparable damage to the interests of the company, the shareholders specified in the preceding paragraph shall have the right, in their own names, directly to bring a lawsuit to a people's court in the interests of the company.

Where another person infringes upon the lawful rights and interests of a company and thus causes losses to the company, the shareholders specified in the first paragraph of this Article may bring a lawsuit to a people's court in accordance with the provisions of the preceding two paragraphs.


Article 153 Where a director or senior manager violates the provisions of laws, administrative regulations or the company's articles of association and thus damages the interests of the shareholders, the shareholders may bring a lawsuit to a people's court.

### Chapter VII Corporate Bonds

Article 154 For the purposes of this Law, corporate bonds mean negotiable instruments issued by a company in accordance with the statutory procedures and with an agreement reached on the repayment of the principal and the payment of the interests within a given period of time.

To issue corporate bonds, a company shall meet the requirements for such issue as provided for by the Securities Law of the People's Republic of China.

Article 155 After an application for the issue of corporate bonds is verified and approved by the department authorized by the State Council, the company shall announce the method of offer of the corporate bonds.

The following main items shall be specified in the method for offer of the corporate bonds:

(1) the name of the company;

(2) the purpose of use of the funds raised in bond form;

(3) the total amount of the bonds and their par value;

(4) the method of determining the interest rate of the bonds;

(5) the time limit for and the method of repaying the principal and paying the interest;

(6) security for the bonds;

(7) the issue price of the bonds and the beginning and ending dates for bond issue;

(8) the net assets value of the company;

(9) the total amount of the undue bonds issued by the company; and

(10) the underwriting agency of the corporate bonds.

Article 156 Where a company issues its bonds in the form of certificate, such certificate shall clearly carry thereon items such as the name of the company, the par value, the interest rate, and the time limit for repayment, and shall be signed by the legal representative and sealed by the company.

Article 157 Corporate bonds may be registered bonds and may also be bearer bonds.

Article 158 To issue corporate bonds, the company shall prepare the counterfoils of such bonds.

Where registered corporate bonds are issued, the following items shall be specified in the counterfoils of the corporate bonds:

(1) the name or title and domicile of the bondholder;

(2) the date on which the bondholder acquired the bonds and their serial numbers;

(3) the total amount of the bonds, the par value of the bonds, the interest rate and the time limit for and the method of repayment of the principal and payment of interest; and

(4) the issue date of the bonds.

Where bearer corporate bonds are issued, the total amount of the bonds, the interest rate, the time limit for and the method of repayment, the issue date and the serial numbers of the bonds shall be specified in the stubs of the corporate bonds.

Article 159 The registration and clearing institution of registered corporate bonds shall establish systems relating to registration and custody of bonds, interest payment, encashment, etc.

Article 160 Corporate bonds may be transferred, and the price for the transfer shall be agreed upon by the transferor and transferee.

Where corporate bonds are listed and traded at stock exchanges, their transfer shall be conducted in accordance with the rules of the stock exchanges governing transactions.

Article 161 Registered corporate bonds shall be transferred by means of endorsement by the bondholders or by other means as provided for by laws or administrative regulations; and after such transfer, the company shall record the name or title and the domicile of the transferee in the stub of the corporate bonds.

Where bearer corporate bonds are transferred, the transfer shall become effective immediately after a bondholder delivers such bonds to a transferee.

Article 162 Upon resolution adopted by its shareholders general assembly, a listed company may issue corporate bonds that can be converted into shares. The specific measures for conversion shall be stipulated in the method of offer of the corporate bonds. The issue of such convertible corporate bonds by a listed company shall be subject to verification and approval by the securities regulatory authority under the State Council.

Where corporate bonds convertible into shares are issued, the words convertible corporate bond shall be clearly indicated on such bonds, and the amount of the convertible corporate bonds shall be recorded in the stubs of such bonds.

Article 163 A company that issues corporate bonds convertible into shares shall convert the bonds of the bondholders into shares in accordance with the conversion measures. However, the bondholders shall have the option whether or not to convert their bonds into shares.

**Chapter VIII Financial Affairs and Accounting of Companies**

Article 164 A company shall establish its financial and accounting system in accordance with the provisions of laws, administrative regulations and the rules of the finance department under the State Council.

Article 165 At the end of each fiscal year, a company shall prepare its financial reports, which shall be audited by an accounting firm according to law.

Financial reports shall be prepared in accordance with the provisions of laws, administrative regulations and the rules of the finance department under the State Council.

Article 166 A company with limited liability shall send its financial report to each of its shareholders within the time limit stipulated in its articles of association.

A company limited by shares shall, 20 days prior to the convening of the annual meeting of the shareholders general assembly, make the financial report available at the company for examination by its shareholders; and a company limited by shares that publicly issues its shares shall publicize its financial report.

Article 167 Where a company distributes the annual after-tax profits, it shall allocate 10 percent of its profits for the statutory surplus fund. Where the accumulated amount of the statutory surplus fund of the company exceeds 50 percent of its registered capital, further allocation may be dispensed with.

Where the statutory surplus fund of a company is insufficient to make up the company's losses of the previous year, the company shall, first of all, apply its annual profits to making up its losses prior to allocation for the statutory surplus fund in accordance with the provisions of the preceding paragraph.

After allocating after-tax profits for the surplus fund, a company may, upon resolution adopted by the shareholders assembly or the shareholders general assembly, allocate after-tax profits for its discretionary surplus fund.

After making up its losses and making allocations for its surplus fund, a company with limited liability shall distribute the remaining after-tax profits in accordance with the provisions of Article 35 of this Law; and a company limited by shares shall distribute them to its shareholders in proportion to the shares held by each shareholder, except where the articles of association of the company limited by shares stipulate that such profits shall not be distributed in proportion to the shares held.

Where the shareholders assembly, the shareholders general assembly or the board of directors, in violation of the provisions of the preceding paragraph, distributes profits to the shareholders before the company makes up its losses and makes allocation for the statutory surplus fund, the shareholders shall return to the company the profits distributed to them in violation of the provisions.

No profits shall be distributed to a company for its own shares.

Article 168 The premium income derived from the shares issued above par value by a company limited by shares, and other income which, according to the rules set by the finance department under the State Council, should be enlisted into the capital surplus fund shall be put into the capital surplus fund of the company.

Article 169 The surplus fund of a company shall be used to make up for the company's losses or to expand production and operation of the company, or shall be converted into an increase in the company's capital. However, the capital surplus fund shall not be used for making up the losses of the company.

Where the statutory surplus fund is converted capital, the remaining amount of such surplus fund shall not be less than 25 percent of the registered capital prior to such conversion.

Article 170 Appointment or dismissal of an accounting firm in charge of the auditing business of a company shall be subject to decision by the shareholders assembly, the shareholders general assembly or the board of directors in accordance with the provisions of the company's articles of association.

Where the shareholders assembly, the shareholders general assembly or the board of directors of a company votes on the dismissal of an accounting firm, it shall allow the accounting firm to state its opinions.

Article 171 A company shall provide authentic and complete accounting vouchers, accounting books, financial and accounting reports and other accounting data to the accounting firm it appoints, and shall not refuse to do so, or conceal the facts or make false reports about them.

Article 172 A company shall not have any other accounting books in addition to the statutory accounting books.

No accounts shall be opened in the name of any individual for deposit of the assets of a company.

**Chapter IX Merger and Division of Companies, Increase and Reduction of Capital**

Article 173 Merger of companies may take the form of merger by amalgamation or merger by new establishment.

When a company has another company amalgamated with it, it is merger by amalgamation, and the amalgamated company shall be dissolved. When two or more companies merge to establish a new company, it is merger for new establishment, and all parties being merged shall be dissolved.

Article 174 When companies merge, the parties to the merger shall sign a merger agreement, and draw up a balance sheet and a detailed inventory of assets. The companies shall, within 10 days from the date the resolution on such merger is adopted, notify their creditors of the intended merger, and make an announcement about it in the newspaper within 30 days

CHINA SECURITIES REGULATORY COMMISSION - Companies Law of the People's Republic of China

therefrom. The creditors may, within 30 days from the date they receive the written notice, or within 45 days from the date the announcement is made in case of those who have not received the written notice, claim full repayment of their debts or provision of a corresponding guarantee from the companies.

Article 175 When companies merge, the claims and debts of all the parties to the merger shall be succeeded to by the company that continues to exist after the merger or by the newly established company.

Article 176 Where a company proceeds into a division, its assets shall be divided appropriately.

When a company intends to divide itself, it shall draw up a balance sheet and a detailed inventory of assets. The company shall, within 10 days from the date the resolution on such division is adopted, notify its creditors of the intended division, and make an announcement about it in the newspaper within 30 days therefrom.

Article 177 The companies after the division shall assume joint and several liability for the debts prior to the division, except where the company before the division and its creditors have otherwise reached a written agreement on repayment of the debts.

Article 178 Where a company needs to reduce its registered capital, it shall draw up a balance sheet and a detailed inventory of assets.

The company shall, within 10 days from the date a resolution on reduction of its registered capital is adopted, notify its creditors of such resolution, and shall make an announcement in the newspaper within 30 days therefrom. The creditors shall, within 30 days from the date they receive the written notice, or within 45 days from the date the announcement is made in the case of those who have not received such written notice, have the right to claim full repayment of their debts or provision of a corresponding guarantee from the company.

After reduction of the capital, the amount of the company's registered capital shall not be less than the statutory minimum.

Article 179 Where a company with limited liability increases its registered capital, the capital contributions to newly increased shares subscribed for by the shareholders shall be governed by the relevant provisions of this Law on payment of capital contributions in connection with the incorporation of a company with limited liability.

Where a company limited by shares issues new shares to increase its registered capital, subscription for new shares by the shareholders shall be governed by the relevant provisions of this Law on payment of share subscriptions in connection with the incorporation of a company limited by shares.

Article 180 Where the merger or division of a company involves changes in the registered items, such changes shall, in accordance with law, be registered with the company registration authority; where a company is dissolved, it shall apply for cancellation of its registration according to law; and where a new company is incorporated, it shall have its incorporation registered according to law.

Where a company increases or reduces its registered capital, it shall apply to the company registration authority for registration of such change according to law.

**Chapter X Dissolution and Liquidation of Companies**

Article 181 A company shall be dissolved for one of the following reasons:

(1) Where the term of business operation as stipulated in the company's articles of association expires or other causes for dissolution as stipulated in the articles of association occur;

(2) Where a resolution on dissolution is adopted by the shareholders assembly or the shareholders general assembly;

(3) Where merger or division of the company necessitates its dissolution;

(4) Where the business license of the company is revoked, or the company is ordered to close down, or its registration is cancelled, according to law; or

(5) Where the people's court has the company dissolved in accordance with the provisions of

Article 183 of this Law.

Article 182 Where a company finds itself in the conditions as prescribed in Subparagraph (1) of

Article 181 of this Law, it may continue to exist through revision of its articles of association.

In the case of a company with limited liability, revision of the articles of association in accordance with the provisions of the preceding paragraph shall be subject to adoption by the shareholders who hold more than two-thirds of the voting rights; and in the case of a company limited by shares, such a revision shall be subject to adoption by the shareholders present at the meeting of the shareholders general assembly, who hold more than two-thirds of the voting rights.

Article 183 Where a company is confronted with serious difficulties in operation and management, its continued existence may cause grievous losses to the interests of its shareholders and the difficulties cannot be surmounted through other channels, the shareholders holding more than 10 percent of the total number of the voting rights held by all the shareholders of the company may request a people's court to dissolve the company.

Article 184 Where a company is dissolved because of the reasons specified in Subparagraph (1), (2), (4) or (5) of Article 181 of this Law, it shall, within 15 days from the date the reasons for dissolution prevail, set up a liquidation team to begin liquidation. The liquidation team of a company with limited liability shall be composed of its shareholders; and the liquidation team of a company limited by shares shall be composed of its directors or the persons decided on by the shareholders general assembly. Where a company fails to set up a liquidation team to conduct liquidation at the expiration of the prescribed time limit, its creditors may apply to a people's court for designating relevant persons to form a liquidation team for liquidation. The people's court shall accept the application and shall, in a timely manner, organize a liquidation team to conduct liquidation.

Article 185 During the period of liquidation, a liquidation team shall exercise the following functions and powers:

(1) to check up on the property of the company and draw up a balance sheet and an inventory of its assets separately;

(2) to notify the creditors by notice or announcement;

(3) to dispose of and liquidate the company's unfinished business;

(4) to pay off the tax arrears and the taxes generated in the process of liquidation;

(5) to clear up claims and debts;

(6) to dispose of the property remaining after the company pays off its debts; and

(7) to participate in civil lawsuits on behalf of the company.

Article 186 A liquidation team shall, within 10 days from the date it is established, notify the creditors of its establishment and make an announcement in the newspaper within 60 days therefrom. The creditors shall declare their claims to the liquidation team within 30 days from the date they receive the written notice, or within 45 days from the date the announcement is made, in the case of those who have not received such notice.

When declaring his claims, a creditor shall specify the matters in respect of each claim, and provide supporting materials. The

liquidation team shall register the claims.

During the period when creditors declare their claims, the liquidation team shall not pay off the debts to them.

Article 187 After the liquidation team has checked up on the property of a company and drawn up the balance sheet and the inventory of assets, it shall work out a liquidation plan and submit the plan to the shareholders assembly, the shareholders general assembly or a people's court for confirmation.

After a company pays off respectively the liquidation expenses, the wages of its staff and workers, the social insurance premiums and the statutory compensations, pays its tax arrears and clears up its debts, the remaining property of a company with limited liability shall be distributed in proportion to the capital contributions made by its shareholders; and the remaining property of a company limited by shares shall be distributed in proportion to the shares held by its shareholders.

During the period of liquidation, the company shall continue to exist, but it shall not engage in any operational activities not related to liquidation. The property of the company shall not be distributed to its shareholders before it has made the payments as specified in the provisions of the preceding paragraph.

Article 188 If, after checking up on the property of a company and drawing up the balance sheet and the inventory of its property, a liquidation team discovers that property of the company is insufficient to pay off its debts, it shall, in accordance with law, apply to a people's court for declaration of bankruptcy of the company.

After the people's court has ruled to declare the company bankrupt, the liquidation team shall turn the liquidation matters over to the people's court.

Article 189 After the liquidation of a company is completed, the liquidation team shall prepare a liquidation report and submit the report to the shareholders assembly, the shareholders general assembly or the people's court for confirmation, and shall submit it to the company registration authority in order to apply for cancellation of the registration of the company and shall announce termination of the company.

Article 190 Members of a liquidation team shall be devoted to their duties and perform their liquidation obligations according to law.

Members of a liquidation team shall not take advantage of their functions and powers to accept bribes or other illegal income, or to take illegal possession of the property of the company.

Where a member of the liquidation team causes losses to the company or its creditors intentionally or through gross negligence, he shall be liable for compensation.

Article 191 Where a company is declared bankrupt according to law, bankruptcy liquidation shall be conducted in accordance with the law on enterprise bankruptcy.

**Chapter XI Branches of Foreign Companies**

Article 192 For the purposes of this Law, a foreign company is one that is incorporated outside the territory of the People's Republic of China in accordance with the law of a foreign country.

Article 193 Where a foreign company intends to establish a branch within the territory of the People's Republic of China, it shall submit an application to the competent authority in China together with such relevant documents as its articles of association and the company's registration certificate issued by its country. Upon approval, it shall, according to law, apply to the company registration authority for registration before obtaining a business license for its branch.

CHINA SECURITIES REGULATORY COMMISSION - Companies Law of the People's Republic of China

Measures for examining and approving the establishment of branches of foreign companies shall be separately formulated by the State Council.

Article 194 Where a foreign company intends to establish a branch within the territory of the People's Republic of China, it shall designate its representative or agent within the territory of the People's Republic of China to take charge of the branch and shall allocate to the branch funds commensurate with the operational activities the branch is engaged in.

Where a minimum amount of operational funds for a branch of a foreign company is required to be prescribed, the State Council shall separately prescribe such amount.

Article 195 The branch of a foreign company shall clearly indicate in its name the nationality and the form of liability of the foreign company.

The branch of a foreign company shall keep at its office a copy of the articles of association of the foreign company.

Article 196 The branch established by a foreign company within the territory of the People's Republic of China shall not have the status of a Chinese legal person.

A foreign company shall bear civil liability for the operational activities engaged in by its branch within the territory of the People's Republic of China.

Article 197 In its business activities conducted within the territory of the People's Republic of China, the branch of a foreign company established upon approval shall observe Chinese laws and shall not impair the public interests of China. The lawful rights and interests of such branch shall be protected by Chinese laws.

Article 198 Where a foreign company intends to dissolve its branch established within the territory of the People's Republic of China, it shall pay off all the debts of the branch according to law and carry out liquidation in accordance with the provisions of this Law on the procedures of company liquidation. It shall not have the property of the branch transferred out of the territory of the People's Republic of China prior to the payment of all its debts.

**Chapter XII Legal Responsibility**

Article 199 Where a company, in violation of the provisions of this Law, obtains its registration by making a false report on its registered capital, submitting falsified materials or concealing important facts by other fraudulent means, the company registration authority shall order it to rectify; in the case of a company that makes a false report on its registered capital, it shall be fined not less than 5 percent but not more than 15 percent of the registered capital falsely reported; in the case of a company that submits falsified materials or conceals important facts by other fraudulent means, it shall be fined not less than 50,000 yuan but not more than 500,000 yuan; and if the circumstances are serious, the registration of the company shall be cancelled or its business license shall be revoked.

Article 200 Where a promoter or a shareholder of a company makes a false capital contribution by failing to deliver, or failing to deliver on schedule, his capital contribution in currency or non-currency property, the company registration authority shall order him to rectify, and shall impose on him a fine of not less than 5 percent but not more than 15 percent of the amount of such false capital contribution.

Article 201 Where a promoter or a shareholder of a company secretly withdraws his capital contribution after the incorporation

CHINA SECURITIES REGULATORY COMMISSION - Companies Law of the People's Republic of China

of the company, the company registration authority shall order him to rectify, and shall impose on him a fine of not less than 5 percent but not more than 15 percent of the amount of the capital contribution secretly withdrawn.

Article 202 Where a company, in violation of the provisions of this Law, keep other accounting books in addition to the statutory accounting books, the finance department under the people's government at or above the county level shall order it to rectify, and shall impose on it a fine of not less than 50,000 yuan but not more than 500,000 yuan.

Article 203 Where a company makes false records or conceals important facts in such materials as its financial reports submitted to the relevant competent department according to law, the said department shall impose a fine of not less than 30,000 yuan but not more than 300,000 yuan on each of the persons directly in charge of the company and of the other persons directly responsible.

Article 204 Where a company fails to allocate the statutory surplus fund in accordance with the provisions of this Law, the finance department under the people's government at or above the county level shall order it make up the amount in full, and may impose on the company a fine of not more than 200,000 yuan.

Article 205 Where a company fails to notify its creditors of its decision to merge, divide, reduce its registered capital or go into liquidation or announce such decision to them, as is required by the provisions of this Law, the company registration authority shall order it to rectify, and shall impose on it a fine of not less than 10,000 yuan but not more than 100,000 yuan.

Where a company, in the process of liquidation, conceals its property, records false information in the balance sheet or the inventory of its property, or distributes its property prior to the payment of all its debts, the company registration authority shall order it to rectify, and shall impose on it a fine of not less than 5 percent but not more than 10 percent of the value of the concealed property or of the amount of the property distributed prior to the payment of all its debts; and the other persons directly in charge and other persons directly responsible shall each be fined not less than 10,000 yuan but not more than 100,000 yuan.

Article 206 Where, during the period of liquidation, a company conducts operational activities not related to liquidation, the company registration authority shall give it a warning and confiscate its unlawful gains.

Article 207 Where a liquidation team fails to submit its liquidation report to the company registration authority in accordance with the provisions of this Law, or conceals or omits important facts in the liquidation report submitted, the company registration authority shall order it to rectify.

Where a member of the liquidation team takes advantage of his functions and powers to engage in malpractices for personal gain or to seek unlawful income, or takes illegal possession of the property of the company, the company registration authority shall order him to return the property to the company and confiscate his unlawful gains, and may impose on him a fine of not less than the amount of the unlawful gains but not more than five times that amount.

Article 208 Where an institution in charge of assets assessment, capital verification or certificate verification provides false information, the company registration authority shall confiscate its unlawful gains and impose on it a fine of not less than the amount of the unlawful gains but not more than five times that amount, and the department in charge may, in accordance with law, order the institution to suspend business, revoke the qualification certificate of the person directly responsible, or revoke the institution's business license.

Where an institution in charge of assets assessment, capital verification or certificate verification provides, due to negligence, a report with major omissions, the company registration authority shall order it to rectify; and if the circumstances are relatively

serious, a fine of not less than the amount of its gains derived therefrom but not more than five times that amount shall be imposed on it, and the department in charge may, in accordance with law, order the institution to suspend business, revoke the qualification certificate of the person directly responsible, or revoke the institution's business license.

Where losses are caused to the creditors of a company due to the misrepresentation of the assessment result, capital verification or certificate verification prepared by an institution in charge of assets assessment, capital verification or certificate verification, the institution shall be liable for compensation within the amount of the misrepresented assessment or verification, except where it can prove itself faultless.

Article 209 Where the company registration authority approves an application for registration which does not meet the conditions for registration as stipulated by this Law, or does not approve an application for registration which meets the conditions for registration as stipulated by this Law, the persons directly in charge and the other persons directly responsible shall be given administrative sanctions according to law.

Article 210 Where a department at a higher level peremptorily orders a company registration authority to have registered with it a company whose application for registration does not meet the requirements for registration as stipulated by this Law, or not to have registered with it a company whose application for registration meets the requirements for registration as stipulated by this Law, or covers up an illegal registration, the persons directly in charge and the other persons directly responsible shall be given administrative sanctions according to law.

Article 211 Where an entity that has not registered according to law as a company with limited liability or a company limited by shares assumes the name of such company, or where an entity that has not registered according to law as the branch of a company with limited liability or of a company limited by shares assumes the name of such branch, the company registration authority shall order it to rectify or have it banned and may, in addition, impose on it a fine of not more than 100,000 yuan.

Article 212 Where a company, without justifiable reasons, fails to commence business for more than six months after its incorporation, or after commencement of business it suspends business operation of its own accord for six or more consecutive months, the company registration authority may revoke its business license.

Where a company fails to apply for registration of alterations in accordance with the provisions of this Law when items of company registration are altered, the company registration authority shall order it to have the alterations registered within a specified time limit; and if it fails to comply at the expiration of the time limit, it shall be fined not less than 10,000 yuan but not more than 100,000 yuan.

Article 213 Where a foreign company, in violation of the provisions of this Law, establishes a branch within the territory of the People's Republic of China, the company registration authority shall order it to rectify or to close the branch, and may, in addition, impose on the foreign company a fine of not less than 50,000 yuan but not more than 200,000 yuan.

Article 214 Where a company takes advantage of the name of the company to engage in serious illegal activities which endanger State security or harm public interests, the business license of the company shall be revoked.

Article 215 Where a company, for violation of the provisions of this Law, should assume civil liability for compensation and pay fines or penalties but its property is insufficient to make such payment, it shall assume the civil liability for compensation first.

Article 216 Where a crime is constituted due to violation of the provisions of this Law, criminal responsibility shall be investigated according to law.

**Chapter XIII Supplementary Provisions**

Article 217 The following terms used in this Law mean:

(1) Senior managers include the manager, deputy manager and the person in charge of financial affairs of a company, and the secretary of a board of directors of a listed company and the other persons specified in a company's articles of association.

(2) A proprietary shareholder means a shareholder whose capital contribution accounts for more than 50 percent of the total capital of a company with limited liability or the amount of the shares who holds accounts for more than 50 percent of the total amount of the shares of a company limited by shares; and a shareholder, although the amount of his capital contribution or the proportion of the shares he holds is less than 50 percent, whose voting rights enjoyed on the basis of the amount of capital contribution made or the number of shares held are enough to have a vital bearing on the resolutions of a shareholders assembly or a shareholders general assembly.

(3) An actual controller means a person who is able practically to govern the behavior of a company through investment relations, agreements or other arrangements, although the person is not a shareholder of the company.

(4) Affiliated relations mean the relations between the proprietary shareholder, actual controller, director, supervisor and senior manager of a company with the enterprises which are directly or indirectly under their control, and other relations which may lead to transfer of the company's interests. However, affiliated relations do not exist among the holding companies of the State although their shares are held by the State in common.

Article 218 This Law shall be applicable to foreign-invested companies with limited liability and such companies limited by shares; and where laws on foreign investments provide otherwise, the provisions there shall be applicable.

Article 219 This Law shall go into effect as of January 1, 2006.

Contact Us | Related Links | Legal Notice | Sitemap
Add: Focus Place 19, Jin Rong Street, West District Beijing 100033

© 2008 China Securities Regulatory Commission All Rights Reserved
Best viewed at 1024*768 screen resolution with Internet Explorer 6.0

2/27/2019 中华人民共和国公司法

粟赭版 | English | 站内搜索： 本站点检索 | 高级

中国证券监督管理委员会
CHINA SECURITIES REGULATORY COMMISSION

维护市场公开、公平、公正
维护投资者特别是中小投资者合法权益
促进资本市场健康发展

首页 HOME

政务
信息公开  政策法规  新闻发布
信息披露  统计数据  人事招聘

服务
办事指南  在线申报  监管对象
业务资格  人员资格  投资者保护

互动
公众留言  信访专栏  举报专栏
在线访谈  征求意见  廉政评议

您的位置：首页 > 法律部 > 法律法规 > 国家法律

## 中华人民共和国公司法

中国证监会 www.csrc.gov.cn    时间：2005-10-27    来源：

　　（1993年12月29日第八届全国人民代表大会常务委员会第五次会议通过　根据1999年12月25日第九届全国人民代表大会常务委员会第十三次会议
《关于修改〈中华人民共和国公司法〉的决定》第一次修正根据2004年8月28日第十届全国人民代表大会常务委员会第十一次会议《关于修改〈中
华人民共和国公司法〉的决定》第二次修正2005年10月27日第十届全国人民代表大会常务委员会第十八次会议修订）

第一章　总　则

第二章　有限责任公司的设立和组织机构

第一节　设　立

第二节　组织机构

第三节　一人有限责任公司的

第四节　国有独资公司的

第三章　有限责任公司的股权转让

第四章　股份有限公司的设立和组织机构

第一节　设　立

第二节　股东大会

第三节　董事会、经理

第四节　监　事　会

第五节　上市公司组织机构的

第五章　股份有限公司的股份发行和转让

第一节　股份发行

第二节　股份转让

第六章　公司董事、监事、高级管理人员的资格和义务

第七章　公司债券

第八章　公司财务、会计

第九章　公司合并、分立、增资、减资

第十章　公司解散和清算

第十一章　外国公司的分支机构

2/27/2019                                          中华人民共和国公司法

第十二章  法律责任

第十三章  附  则

## 第一章  总  则

第一条  为了规范公司的组织和行为，保护公司、股东和债权人的合法权益，维护社会经济秩序，促进社会主义市场经济的发展，制定本法。

第二条  本法所称公司是指依照本法在中国境内设立的有限责任公司和股份有限公司。

第三条  公司是企业法人，有独立的法人财产，享有法人财产权。公司以其全部财产对公司的债务承担责任。

有限责任公司的股东以其认缴的出资额为限对公司承担责任；股份有限公司的股东以其认购的股份为限对公司承担责任。

第四条  公司股东依法享有资产收益、参与重大决策和选择管理者等权利。

第五条  公司从事经营活动，必须遵守法律、行政法规，遵守社会公德、商业道德，诚实守信，接受政府和社会公众的监督，承担社会责任。

公司的合法权益受法律保护，不受侵犯。

第六条  设立公司，应当依法向公司登记机关申请设立登记。符合本法规定的设立条件的，由公司登记机关分别登记为有限责任公司或者股份有限公司；不符合本法规定的设立条件的，不得登记为有限责任公司或者股份有限公司。

法律、行政法规规定设立公司必须报经批准的，应当在公司登记前依法办理批准手续。

公众可以向公司登记机关申请查询公司登记事项，公司登记机关应当提供查询服务。

第七条  依法设立的公司，由公司登记机关发给公司营业执照。公司营业执照签发日期为公司成立日期。

公司营业执照应当载明公司的名称、住所、注册资本、实收资本、经营范围、法定代表人姓名等事项。

公司营业执照记载的事项发生变更的，公司应当依法办理变更登记，由公司登记机关换发营业执照。

第八条  依照本法设立的有限责任公司，必须在公司名称中标明有限责任公司或者有限公司字样。

依照本法设立的股份有限公司，必须在公司名称中标明股份有限公司或者股份公司字样。

第九条  有限责任公司变更为股份有限公司，应当符合本法规定的股份有限公司的条件。股份有限公司变更为有限责任公司，应当符合本法规定的有限责任公司的条件。

有限责任公司变更为股份有限公司的，或者股份有限公司变更为有限责任公司的，公司变更前的债权、债务由变更后的公司承继。

第十条  公司以其主要办事机构所在地为住所。

第十一条  设立公司必须依法制定公司章程。公司章程对公司、股东、董事、监事、高级管理人员具有约束力。

第十二条  公司的经营范围由公司章程规定，并依法登记。公司可以修改公司章程，改变经营范围，但是应当办理变更登记。

公司的经营范围中属于法律、行政法规规定须经批准的项目，应当依法经过批准。

第十三条  公司法定代表人依照公司章程的规定，由董事长、执行董事或者经理担任，并依法登记。公司法定代表人变更，应当办理变更登记。

第十四条  公司可以设立分公司。设立分公司，应当向公司登记机关申请登记，领取营业执照。分公司不具有法人资格，其民事责任由公司承担。

公司可以设立子公司，子公司具有法人资格，依法独立承担民事责任。

第十五条  公司可以向其他企业投资；但是，除法律另有规定外，不得成为对所投资企业的债务承担连带责任的出资人。

第十六条  公司向其他企业投资或者为他人提供担保，依照公司章程的规定，由董事会或者股东会、股东大会决议；公司章程对投资或者担保的总额及单项投资或者担保的数额有限额规定的，不得超过规定的限额。

公司为公司股东或者实际控制人提供担保的，必须经股东会或者股东大会决议。

前款规定的股东或者受前款规定的实际控制人支配的股东，不得参加前款规定事项的表决。该项表决由出席会议的其他股东所持表决权的过半数通过。

中华人民共和国公司法

第十七条　公司必须保护职工的合法权益，依法与职工签订劳动合同，参加社会保险，加强劳动保护，实现安全生产。

公司应当采用多种形式，加强公司职工的职业教育和岗位培训，提高职工素质。

第十八条　公司职工依照《中华人民共和国工会法》组织工会，开展工会活动，维护职工合法权益。公司应当为本公司工会提供必要的活动条件。公司工会代表职工就职工的劳动报酬、工作时间、福利、保险和劳动安全卫生等事项依法与公司签订集体合同。

公司依照宪法和有关法律的规定，通过职工代表大会或者其他形式，实行民主管理。

公司研究决定改制以及经营方面的重大问题、制定重要的规章制度时，应当听取公司工会的意见，并通过职工代表大会或者其他形式听取职工的意见和建议。

第十九条　在公司中，根据中国共产党章程的规定，设立中国共产党的组织，开展党的活动。公司应当为党组织的活动提供必要条件。

第二十条　公司股东应当遵守法律、行政法规和公司章程，依法行使股东权利，不得滥用股东权利损害公司或者其他股东的利益；不得滥用公司法人独立地位和股东有限责任损害公司债权人的利益。

公司股东滥用股东权利给公司或者其他股东造成损失的，应当依法承担赔偿责任。

公司股东滥用公司法人独立地位和股东有限责任，逃避债务，严重损害公司债权人利益的，应当对公司债务承担连带责任。

第二十一条　公司的控股股东、实际控制人、董事、监事、高级管理人员不得利用其关联关系损害公司利益。

违反前款规定，给公司造成损失的，应当承担赔偿责任。

第二十二条　公司股东会或者股东大会、董事会的决议内容违反法律、行政法规的无效。

股东会或者股东大会、董事会的会议召集程序、表决方式违反法律、行政法规或者公司章程，或者决议内容违反公司章程的，股东可以自决议作出之日起六十日内，请求人民法院撤销。

股东依照前款规定提起诉讼的，人民法院可以应公司的请求，要求股东提供相应担保。

公司根据股东会或者股东大会、董事会决议已办理变更登记的，人民法院宣告该决议无效或者撤销该决议后，公司应当向公司登记机关申请撤销变更登记。

## 第二章　有限责任公司的设立和组织机构

### 第一节　设　立

第二十三条　设立有限责任公司，应当具备下列条件：

（一）股东符合法定人数；

（二）股东出资达到法定资本最低限额；

（三）股东共同制定公司章程；

（四）有公司名称，建立符合有限责任公司要求的组织机构；

（五）有公司住所。

第二十四条　有限责任公司由五十个以下股东出资设立。

第二十五条　有限责任公司章程应当载明下列事项：

（一）公司名称和住所；

（二）公司经营范围；

（三）公司注册资本；

（四）股东的姓名或者名称；

（五）股东的出资方式、出资额和出资时间；

（六）公司的机构及其产生办法、职权、议事规则；

　　　　　　　　　　　　　　　　中华人民共和国公司法

（七）公司法定代表人；

（八）股东会会议认为需要规定的其他事项。

股东应当在公司章程上签名、盖章。

第二十六条　有限责任公司的注册资本为在公司登记机关登记的全体股东认缴的出资额。公司全体股东的首次出资额不得低于注册资本的百分之二十，也不得低于法定的注册资本最低限额，其余部分由股东自公司成立之日起两年内缴足；其中，投资公司可以在五年内缴足。

有限责任公司注册资本的最低限额为人民币三万元。法律、行政法规对有限责任公司注册资本的最低限额有较高规定的，从其规定。

第二十七条　股东可以用货币出资，也可以用实物、知识产权、土地使用权等可以用货币估价并可以依法转让的非货币财产作价出资；但是，法律、行政法规规定不得作为出资的财产除外。

对作为出资的非货币财产应当评估作价，核实财产，不得高估或者低估作价。法律、行政法规对评估作价有规定的，从其规定。

全体股东的货币出资金额不得低于有限责任公司注册资本的百分之三十。

第二十八条　股东应当按期足额缴纳公司章程中规定的各自所认缴的出资额。股东以货币出资的，应当将货币出资足额存入有限责任公司在银行开设的账户；以非货币财产出资的，应当依法办理其财产权的转移手续。

股东不按照前款规定缴纳出资的，除应当向公司足额缴纳外，还应当向按期足额缴纳出资的股东承担违约责任。

第二十九条　股东缴纳出资后，必须经依法设立的验资机构验资并出具证明。

第三十条　股东的首次出资经依法设立的验资机构验资后，由全体股东指定的代表或者共同委托的代理人向公司登记机关报送公司登记申请书、公司章程、验资证明等文件，申请设立登记。

第三十一条　有限责任公司成立后，发现作为设立公司出资的非货币财产的实际价额显著低于公司章程所定价额的，应当由交付该出资的股东补足其差额；公司设立时的其他股东承担连带责任。

第三十二条　有限责任公司成立后，应当向股东签发出资证明书。

出资证明书应当载明下列事项：

（一）公司名称；

（二）公司成立日期；

（三）公司注册资本；

（四）股东的姓名或者名称、缴纳的出资额和出资日期；

（五）出资证明书的编号和核发日期。

出资证明书由公司盖章。

第三十三条　有限责任公司应当置备股东名册，记载下列事项：

（一）股东的姓名或者名称及住所；

（二）股东的出资额；

（三）出资证明书编号。

记载于股东名册的股东，可以依股东名册主张行使股东权利。

公司应当将股东的姓名或者名称及其出资额向公司登记机关登记；登记事项发生变更的，应当办理变更登记。未经登记或者变更登记的，不得对抗第三人。

第三十四条　股东有权查阅、复制公司章程、股东会会议记录、董事会会议决议、监事会会议决议和财务会计报告。

股东可以要求查阅公司会计账簿。股东要求查阅公司会计账簿的，应当向公司提出书面请求，说明目的。公司有合理根据认为股东查阅会计账簿有不正当目的，可能损害公司合法利益的，可以拒绝提供查阅，并应当自股东提出书面请求之日起十五日内书面答复股东并说明理由。公司拒绝提供查阅的，股东可以请求人民法院要求公司提供查阅。

中华人民共和国公司法

第三十五条　股东按照实缴的出资比例分取红利；公司新增资本时，股东有权优先按照实缴的出资比例认缴出资。但是，全体股东约定不按照出资比例分取红利或者不按照出资比例优先认缴出资的除外。

第三十六条　公司成立后，股东不得抽逃出资。

## 第二节　组织机构

第三十七条　有限责任公司股东会由全体股东组成。股东会是公司的权力机构，依照本法行使职权。

第三十八条　股东会行使下列职权：

（一）决定公司的经营方针和投资计划；

（二）选举和更换非由职工代表担任的董事、监事，决定有关董事、监事的报酬事项；

（三）审议批准董事会的报告；

（四）审议批准监事会或者监事的报告；

（五）审议批准公司的年度财务预算方案、决算方案；

（六）审议批准公司的利润分配方案和弥补亏损方案；

（七）对公司增加或者减少注册资本作出决议；

（八）对发行公司债券作出决议；

（九）对公司合并、分立、解散、清算或者变更公司形式作出决议；

（十）修改公司章程；

（十一）公司章程规定的其他职权。

对前款所列事项股东以书面形式一致表示同意的，可以不召开股东会会议，直接作出决定，并由全体股东在决定文件上签名、盖章。

第三十九条　首次股东会会议由出资最多的股东召集和主持，依照本法规定行使职权。

第四十条　股东会会议分为定期会议和临时会议。

定期会议应当依照公司章程的规定按时召开。代表十分之一以上表决权的股东，三分之一以上的董事，监事会或者不设监事会的公司的监事提议召开临时会议的，应当召开临时会议。

第四十一条　有限责任公司设立董事会的，股东会会议由董事会召集，董事长主持；董事长不能履行职务或者不履行职务的，由副董事长主持；副董事长不能履行职务或者不履行职务的，由半数以上董事共同推举一名董事主持。

有限责任公司不设董事会的，股东会会议由执行董事召集和主持。

董事会或者执行董事不能履行或者不履行召集股东会会议职责的，由监事会或者不设监事会的公司的监事召集和主持；监事会或者监事不召集和主持的，代表十分之一以上表决权的股东可以自行召集和主持。

第四十二条　召开股东会会议，应当于会议召开十五日前通知全体股东；但是，公司章程另有规定或者全体股东另有约定的除外。

股东会应当对所议事项的决定作成会议记录，出席会议的股东应当在会议记录上签名。

第四十三条　股东会会议由股东按照出资比例行使表决权；但是，公司章程另有规定的除外。

第四十四条　股东会的议事方式和表决程序，除本法有规定的外，由公司章程规定。

股东会会议作出修改公司章程、增加或者减少注册资本的决议，以及公司合并、分立、解散或者变更公司形式的决议，必须经代表三分之二以上表决权的股东通过。

第四十五条　有限责任公司设置董事会，其成员为三人至十三人；但是本法第五十一条另有规定的除外。

两个以上的国有企业或者两个以上的其他国有投资主体投资设立的有限责任公司，其董事会成员中应当有公司职工代表；其他有限责任公司董事会成员中可以有公司职工代表。董事会中的职工代表由公司职工通过职工代表大会、职工大会或者其他形式民主选举产生。

董事会设董事长一人，可以设副董事长。董事长、副董事长的产生办法由公司章程规定。

第四十六条　董事任期由公司章程规定，但每届任期不得超过三年。董事任期届满，连选可以连任。

董事任期届满未及时改选，或者董事在任期内辞职导致董事会成员低于法定人数的，在改选出的董事就任前，原董事仍应当依照法律、行政法规和公司章程的规定，履行董事职务。

第四十七条　董事会对股东会负责，行使下列职权：

（一）召集股东会会议，并向股东会报告工作；

（二）执行股东会的决议；

（三）决定公司的经营计划和投资方案；

（四）制订公司的年度财务预算方案、决算方案；

（五）制订公司的利润分配方案和弥补亏损方案；

（六）制订公司增加或者减少注册资本以及发行公司债券的方案；

（七）制订公司合并、分立、解散或者变更公司形式的方案；

（八）决定公司内部管理机构的设置；

（九）决定聘任或者解聘公司经理及其报酬事项，并根据经理的提名决定聘任或者解聘公司副经理、财务负责人及其报酬事项；

（十）制定公司的基本管理制度；

（十一）公司章程规定的其他职权。

第四十八条　董事会会议由董事长召集和主持；董事长不能履行职务或者不履行职务的，由副董事长召集和主持；副董事长不能履行职务或者不履行职务的，由半数以上董事共同推举一名董事召集和主持。

第四十九条　董事会的议事方式和表决程序，除本法有规定的外，由公司章程规定。

董事会应当对所议事项的决定作成会议记录，出席会议的董事应当在会议记录上签名。

董事会会议的表决，实行一人一票。

第五十条　有限责任公司可以设经理，由董事会决定聘任或者解聘。经理对董事会负责，行使下列职权：

（一）主持公司的生产经营管理工作，组织实施董事会决议；

（二）组织实施公司年度经营计划和投资方案；

（三）拟订公司内部管理机构设置方案；

（四）拟订公司的基本管理制度；

（五）制定公司的具体规章；

（六）提请聘任或者解聘公司副经理、财务负责人；

（七）决定聘任或者解聘除应由董事会决定聘任或者解聘以外的负责管理人员；

（八）董事会授予的其他职权。

公司章程对经理职权另有规定的，从其规定。

经理列席董事会会议。

第五十一条　股东人数较少或者规模较小的有限责任公司，可以设一名执行董事，不设董事会。执行董事可以兼任公司经理。

执行董事的职权由公司章程规定。

第五十二条　有限责任公司设监事会，其成员不得少于三人。股东人数较少或者规模较小的有限责任公司，可以设一至二名监事，不设监事会。

监事会应当包括股东代表和适当比例的公司职工代表，其中职工代表的比例不得低于三分之一，具体比例由公司章程规定。监事会中的职工代表由公司职工通过职工代表大会、职工大会或者其他形式民主选举产生。

监事会设主席一人，由全体监事过半数选举产生。监事会主席召集和主持监事会会议；监事会主席不能履行职务或者不履行职务的，由半数以上监事共同推举一名监事召集和主持监事会会议。

董事、高级管理人员不得兼任监事。

第五十三条 监事的任期每届为三年。监事任期届满，连选可以连任。

监事任期届满未及时改选，或者监事在任期内辞职导致监事会成员低于法定人数的，在改选出的监事就任前，原监事仍应当依照法律、行政法规和公司章程的规定，履行监事职务。

第五十四条 监事会、不设监事会的公司的监事行使下列职权：

（一）检查公司财务；

（二）对董事、高级管理人员执行公司职务的行为进行监督，对违反法律、行政法规、公司章程或者股东会决议的董事、高级管理人员提出罢免的建议；

（三）当董事、高级管理人员的行为损害公司的利益时，要求董事、高级管理人员予以纠正；

（四）提议召开临时股东会会议，在董事会不履行本法规定的召集和主持股东会会议职责时召集和主持股东会会议；

（五）向股东会会议提出提案；

（六）依照本法第一百五十二条的规定，对董事、高级管理人员提起诉讼；

（七）公司章程规定的其他职权。

第五十五条 监事可以列席董事会会议，并对董事会决议事项提出质询或者建议。

监事会、不设监事会的公司的监事发现公司经营情况异常，可以进行调查；必要时，可以聘请会计师事务所等协助其工作，费用由公司承担。

第五十六条 监事会每年度至少召开一次会议，监事可以提议召开临时监事会会议。

监事会的议事方式和表决程序，除本法有规定的外，由公司章程规定。

监事会决议应当经半数以上监事通过。

监事会应当对所议事项的决定作成会议记录，出席会议的监事应当在会议记录上签名。

第五十七条 监事会、不设监事会的公司的监事行使职权所必需的费用，由公司承担。

## 第三节 一人有限责任公司的特别规定

第五十八条 一人有限责任公司的设立和组织机构，适用本节规定；本节没有规定的，适用本章第一节、第二节的规定。

本法所称一人有限责任公司，是指只有一个自然人股东或者一个法人股东的有限责任公司。

第五十九条 一人有限责任公司的注册资本最低限额为人民币十万元。股东应当一次足额缴纳公司章程规定的出资额。

一个自然人只能投资设立一个一人有限责任公司，该一人有限责任公司不能投资设立新的一人有限责任公司。

第六十条 一人有限责任公司应当在公司登记中注明自然人独资或者法人独资，并在公司营业执照中载明。

第六十一条 一人有限责任公司章程由股东制定。

第六十二条 一人有限责任公司不设股东会。股东作出本法第三十八条第一款所列决定时，应当采用书面形式，并由股东签名后置备于公司。

第六十三条 一人有限责任公司应当在每一会计年度终了时编制财务会计报告，并经会计师事务所审计。

第六十四条 一人有限责任公司的股东不能证明公司财产独立于股东自己的财产的，应当对公司债务承担连带责任。

## 第四节 国有独资公司的特别规定

第六十五条 国有独资公司的设立和组织机构，适用本节规定；本节没有规定的，适用本章第一节、第二节的规定。

2/27/2019                                       中华人民共和国公司法

本法所称国有独资公司，是指国家单独出资、由国务院或者地方人民政府授权本级人民政府国有资产监督管理机构履行出资人职责的有限责任公司。

第六十六条　国有独资公司章程由国有资产监督管理机构制定，或者由董事会制订报国有资产监督管理机构批准。

第六十七条　国有独资公司不设股东会，由国有资产监督管理机构行使股东会职权。国有资产监督管理机构可以授权公司董事会行使股东会的部分职权，决定公司的重大事项，但公司的合并、分立、解散、增加或者减少注册资本和发行公司债券，必须由国有资产监督管理机构决定；其中，重要的国有独资公司合并、分立、解散、申请破产的，应当由国有资产监督管理机构审核后，报本级人民政府批准。

前款所称重要的国有独资公司，按照国务院的规定确定。

第六十八条　国有独资公司设董事会，依照本法第四十七条、第六十七条的规定行使职权。董事每届任期不得超过三年。董事会成员中应当有公司职工代表。

董事会成员由国有资产监督管理机构委派；但是，董事会成员中的职工代表由公司职工代表大会选举产生。

董事会设董事长一人，可以设副董事长。董事长、副董事长由国有资产监督管理机构从董事会成员中指定。

第六十九条　国有独资公司设经理，由董事会聘任或者解聘。经理依照本法第五十条规定行使职权。

经国有资产监督管理机构同意，董事会成员可以兼任经理。

第七十条　国有独资公司的董事长、副董事长、董事、高级管理人员，未经国有资产监督管理机构同意，不得在其他有限责任公司、股份有限公司或者其他经济组织兼职。

第七十一条　国有独资公司监事会成员不得少于五人，其中职工代表的比例不得低于三分之一，具体比例由公司章程规定。

监事会成员由国有资产监督管理机构委派；但是，监事会成员中的职工代表由公司职工代表大会选举产生。监事会主席由国有资产监督管理机构从监事会成员中指定。

监事会行使本法第五十四条第（一）项至第（三）项规定的职权和国务院规定的其他职权。

                              第三章  有限责任公司的股权转让

第七十二条　有限责任公司的股东之间可以相互转让其全部或者部分股权。

股东向股东以外的人转让股权，应当经其他股东过半数同意。股东应就其股权转让事项书面通知其他股东征求同意，其他股东自接到书面通知之日起满三十日未答复的，视为同意转让。其他股东半数以上不同意转让的，不同意的股东应当购买转让的股权；不购买的，视为同意转让。

经股东同意转让的股权，在同等条件下，其他股东有优先购买权。两个以上股东主张行使优先购买权的，协商确定各自的购买比例；协商不成的，按照转让时各自的出资比例行使优先购买权。

公司章程对股权转让另有规定的，从其规定。

第七十三条　人民法院依照法律规定的强制执行程序转让股东的股权时，应当通知公司及全体股东，其他股东在同等条件下有优先购买权。其他股东自人民法院通知之日起满二十日不行使优先购买权的，视为放弃优先购买权。

第七十四条　依照本法第七十二条、第七十三条转让股权后，公司应当注销原股东的出资证明书，向新股东签发出资证明书，并相应修改公司章程和股东名册中有关股东及其出资额的记载。对公司章程的该项修改不需再由股东会表决。

第七十五条　有下列情形之一的，对股东会该项决议投反对票的股东可以请求公司按照合理的价格收购其股权：

（一）公司连续五年不向股东分配利润，而公司该五年连续盈利，并且符合本法规定的分配利润条件的；

（二）公司合并、分立、转让主要财产的；

（三）公司章程规定的营业期限届满或者章程规定的其他解散事由出现，股东会会议通过决议修改章程使公司存续的。

自股东会会议决议通过之日起六十日内，股东与公司不能达成股权收购协议的，股东可以自股东会会议决议通过之日起九十日内向人民法院提起诉讼。

第七十六条　自然人股东死亡后，其合法继承人可以继承股东资格；但是，公司章程另有规定的除外。

                              第四章  股份有限公司的设立和组织机构

中华人民共和国公司法

第一节　设　立

第七十七条　设立股份有限公司，应当具备下列条件：

（一）发起人符合法定人数；

（二）发起人认购和募集的股本达到法定资本最低限额；

（三）股份发行、筹办事项符合法律规定；

（四）发起人制订公司章程，采用募集方式设立的经创立大会通过；

（五）有公司名称，建立符合股份有限公司要求的组织机构；

（六）有公司住所。

第七十八条　股份有限公司的设立，可以采取发起设立或者募集设立的方式。

发起设立，是指由发起人认购公司应发行的全部股份而设立公司。

募集设立，是指由发起人认购公司应发行股份的一部分，其余股份向社会公开募集或者向特定对象募集而设立公司。

第七十九条　设立股份有限公司，应当有二人以上二百人以下为发起人，其中须有半数以上的发起人在中国境内有住所。

第八十条　股份有限公司发起人承担公司筹办事务。

发起人应当签订发起人协议，明确各自在公司设立过程中的权利和义务。

第八十一条　股份有限公司采取发起设立方式设立的，注册资本为在公司登记机关登记的全体发起人认购的股本总额。公司全体发起人的首次出资额不得低于注册资本的百分之二十，其余部分由发起人自公司成立之日起两年内缴足；其中，投资公司可以在五年内缴足。在缴足前，不得向他人募集股份。

股份有限公司采取募集方式设立的，注册资本为在公司登记机关登记的实收股本总额。

股份有限公司注册资本的最低限额为人民币五百万元，法律、行政法规对股份有限公司注册资本的最低限额有较高规定的，从其规定。

第八十二条　股份有限公司章程应当载明下列事项：

（一）公司名称和住所；

（二）公司经营范围；

（三）公司设立方式；

（四）公司股份总数、每股金额和注册资本；

（五）发起人的姓名或者名称、认购的股份数、出资方式和出资时间；

（六）董事会的组成、职权和议事规则；

（七）公司法定代表人；

（八）监事会的组成、职权和议事规则；

（九）公司利润分配办法；

（十）公司的解散事由与清算办法；

（十一）公司的通知和公告办法；

（十二）股东大会会议认为需要规定的其他事项。

第八十三条　发起人的出资方式，适用本法第二十七条的规定。

第八十四条　以发起设立方式设立股份有限公司的，发起人应当书面认足公司章程规定其认购的股份；一次缴纳的，应即缴纳全部出资；分期缴纳的，应即缴纳首期出资。以非货币财产出资的，应当依法办理其财产权的转移手续。

发起人不依照前款规定缴纳出资的，应当按照发起人协议承担违约责任。

发起人首次缴纳出资后，应当选举董事会和监事会，由董事会向公司登记机关报送公司章程、由依法设立的验资机构出具的验资证明以及法律、行政法规规定的其他文件，申请设立登记。

第八十五条　以募集设立方式设立股份有限公司的，发起人认购的股份不得少于公司股份总数的百分之三十五；但是，法律、行政法规另有规定的，从其规定。

第八十六条　发起人向社会公开募集股份，必须公告招股说明书，并制作认股书。认股书应当载明本法第八十七条所列事项，由认股人填写认购股数、金额、住所，并签名、盖章。认股人按照所认购股数缴纳股款。

第八十七条　招股说明书应当附有发起人制订的公司章程，并载明下列事项：

（一）发起人认购的股份数；

（二）每股的票面金额和发行价格；

（三）无记名股票的发行总数；

（四）募集资金的用途；

（五）认股人的权利、义务；

（六）本次募股的起止期限及逾期未募足时认股人可以撤回所认股份的说明。

第八十八条　发起人向社会公开募集股份，应当由依法设立的证券公司承销，签订承销协议。

第八十九条　发起人向社会公开募集股份，应当同银行签订代收股款协议。

代收股款的银行应当按照协议代收和保存股款，向缴纳股款的认股人出具收款单据，并负有向有关部门出具收款证明的义务。

第九十条　发行股份的股款缴足后，必须经依法设立的验资机构验资并出具证明。发起人应当自股款缴足之日起三十日内主持召开公司创立大会。创立大会由发起人、认股人组成。

发行的股份超过招股说明书规定的截止期限尚未募足的，或者发行股份的股款缴足后，发起人在三十日内未召开创立大会的，认股人可以按照所缴股款并加算银行同期存款利息，要求发起人返还。

第九十一条　发起人应当在创立大会召开十五日前将会议日期通知各认股人或者予以公告。创立大会应有代表股份总数过半数的发起人、认股人出席，方可举行。

创立大会行使下列职权：

（一）审议发起人关于公司筹办情况的报告；

（二）通过公司章程；

（三）选举董事会成员；

（四）选举监事会成员；

（五）对公司的设立费用进行审核；

（六）对发起人用于抵作股款的财产的作价进行审核；

（七）发生不可抗力或者经营条件发生重大变化直接影响公司设立的，可以作出不设立公司的决议。

创立大会对前款所列事项作出决议，必须经出席会议的认股人所持表决权过半数通过。

第九十二条　发起人、认股人缴纳股款或者交付抵作股款的出资后，除未按期募足股份、发起人未按期召开创立大会或者创立大会决议不设立公司的情形外，不得抽回其股本。

第九十三条　董事会应于创立大会结束后三十日内，向公司登记机关报送下列文件，申请设立登记：

（一）公司登记申请书；

（二）创立大会的会议记录；

（三）公司章程；

（四）验资证明；

（五）法定代表人、董事、监事的任职文件及其身份证明；

（六）发起人的法人资格证明或者自然人身份证明；

（七）公司住所证明。

以募集方式设立股份有限公司公开发行股票的，还应当向公司登记机关报送国务院证券监督管理机构的核准文件。

第九十四条　股份有限公司成立后，发起人未按照公司章程的规定缴足出资的，应当补缴；其他发起人承担连带责任。

股份有限公司成立后，发现作为设立公司出资的非货币财产的实际价额显著低于公司章程所定价额的，应当由交付该出资的发起人补足其差额；其他发起人承担连带责任。

第九十五条　股份有限公司的发起人应当承担下列责任：

（一）公司不能成立时，对设立行为所产生的债务和费用负连带责任；

（二）公司不能成立时，对认股人已缴纳的股款，负返还股款并加算银行同期存款利息的连带责任；

（三）在公司设立过程中，由于发起人的过失致使公司利益受到损害的，应当对公司承担赔偿责任。

第九十六条　有限责任公司变更为股份有限公司时，折合的实收股本总额不得高于公司净资产额。有限责任公司变更为股份有限公司，为增加资本公开发行股份时，应当依法办理。

第九十七条　股份有限公司应当将公司章程、股东名册、公司债券存根、股东大会会议记录、董事会会议记录、监事会会议记录、财务会计报告置备于本公司。

第九十八条　股东有权查阅公司章程、股东名册、公司债券存根、股东大会会议记录、董事会会议决议、监事会会议决议、财务会计报告，对公司的经营提出建议或者质询。

### 第二节　股东大会

第九十九条　股份有限公司股东大会由全体股东组成。股东大会是公司的权力机构，依照本法行使职权。

第一百条　本法第三十八条第一款关于有限责任公司股东会职权的规定，适用于股份有限公司股东大会。

第一百零一条　股东大会应当每年召开一次年会。有下列情形之一的，应当在两个月内召开临时股东大会：

（一）董事人数不足本法规定人数或者公司章程所定人数的三分之二时；

（二）公司未弥补的亏损达实收股本总额三分之一时；

（三）单独或者合计持有公司百分之十以上股份的股东请求时；

（四）董事会认为必要时；

（五）监事会提议召开时；

（六）公司章程规定的其他情形。

第一百零二条　股东大会会议由董事会召集，董事长主持；董事长不能履行职务或者不履行职务的，由副董事长主持；副董事长不能履行职务或者不履行职务的，由半数以上董事共同推举一名董事主持。

董事会不能履行或者不履行召集股东大会会议职责的，监事会应当及时召集和主持；监事会不召集和主持的，连续九十日以上单独或者合计持有公司百分之十以上股份的股东可以自行召集和主持。

第一百零三条　召开股东大会会议，应当将会议召开的时间、地点和审议的事项于会议召开二十日前通知各股东；临时股东大会应当于会议召开十五日前通知各股东；发行无记名股票的，应当于会议召开三十日前公告会议召开的时间、地点和审议事项。

2/27/2019　　　　　　　　　　　　　　　中华人民共和国公司法

单独或者合计持有公司百分之三以上股份的股东，可以在股东大会召开十日前提出临时提案并书面提交董事会；董事会应当在收到提案后二日内通知其他股东，并将该临时提案提交股东大会审议。临时提案的内容应当属于股东大会职权范围，并有明确议题和具体决议事项。

股东大会不得对前两款通知中未列明的事项作出决议。

无记名股票持有人出席股东大会会议的，应当于会议召开五日前至股东大会闭会时将股票交存于公司。

第一百零四条　股东出席股东大会会议，所持每一股份有一表决权。但是，公司持有的本公司股份没有表决权。

股东大会作出决议，必须经出席会议的股东所持表决权过半数通过。但是，股东大会作出修改公司章程、增加或者减少注册资本的决议，以及公司合并、分立、解散或者变更公司形式的决议，必须经出席会议的股东所持表决权的三分之二以上通过。

第一百零五条　本法和公司章程规定的转让、受让重大资产或者对外提供担保等事项必须经股东大会作出决议的，董事会应当及时召集股东大会会议，由股东大会就上述事项进行表决。

第一百零六条　股东大会选举董事、监事，可以依照公司章程的规定或者股东大会的决议，实行累积投票制。

本法所称累积投票制，是指股东大会选举董事或者监事时，每一股份拥有与应选董事或者监事人数相同的表决权，股东拥有的表决权可以集中使用。

第一百零七条　股东可以委托代理人出席股东大会会议，代理人应当向公司提交股东授权委托书，并在授权范围内行使表决权。

第一百零八条　股东大会应当对所议事项的决定作成会议记录，主持人、出席会议的董事应当在会议记录上签名。会议记录应当与出席股东的签名册及代理出席的委托书一并保存。

### 第三节　董事会、经理

第一百零九条　股份有限公司设董事会，其成员为五人至十九人。

董事会成员中可以有公司职工代表。董事会中的职工代表由公司职工通过职工代表大会、职工大会或者其他形式民主选举产生。

本法第四十六条关于有限责任公司董事任期的规定，适用于股份有限公司董事。

本法第四十七条关于有限责任公司董事会职权的规定，适用于股份有限公司董事会。

第一百一十条　董事会设董事长一人，可以设副董事长。董事长和副董事长由董事会以全体董事的过半数选举产生。

董事长召集和主持董事会会议，检查董事会决议的实施情况。副董事长协助董事长工作，董事长不能履行职务或者不履行职务的，由副董事长履行职务；副董事长不能履行职务或者不履行职务的，由半数以上董事共同推举一名董事履行职务。

第一百一十一条　董事会每年度至少召开两次会议，每次会议应当于会议召开十日前通知全体董事和监事。

代表十分之一以上表决权的股东、三分之一以上董事或者监事会，可以提议召开董事会临时会议。董事长应当自接到提议后十日内，召集和主持董事会会议。

董事会召开临时会议，可以另定召集董事会的通知方式和通知时限。

第一百一十二条　董事会会议应有过半数的董事出席方可举行。董事会作出决议，必须经全体董事的过半数通过。

董事会决议的表决，实行一人一票。

第一百一十三条　董事会会议，应由董事本人出席；董事因故不能出席，可以书面委托其他董事代为出席，委托书中应载明授权范围。

董事会应当对会议所议事项的决定作成会议记录，出席会议的董事应当在会议记录上签名。

董事应当对董事会的决议承担责任。董事会的决议违反法律、行政法规或者公司章程、股东大会决议，致使公司遭受严重损失的，参与决议的董事对公司负赔偿责任。但经证明在表决时曾表明异议并记载于会议记录的，该董事可以免除责任。

第一百一十四条　股份有限公司设经理，由董事会决定聘任或者解聘。

本法第五十条关于有限责任公司经理职权的规定，适用于股份有限公司经理。

第一百一十五条　公司董事会可以决定由董事会成员兼任经理。

第一百一十六条　公司不得直接或者通过子公司向董事、监事、高级管理人员提供借款。

2/27/2019                                                     中华人民共和国公司法

第一百一十七条　公司应当定期向股东披露董事、监事、高级管理人员从公司获得报酬的情况。

## 第四节　监事会

第一百一十八条　股份有限公司设监事会，其成员不得少于三人。

监事会应当包括股东代表和适当比例的公司职工代表，其中职工代表的比例不得低于三分之一，具体比例由公司章程规定。监事会中的职工代表由公司职工通过职工代表大会、职工大会或者其他形式民主选举产生。

监事会设主席一人，可以设副主席。监事会主席和副主席由全体监事过半数选举产生。监事会主席召集和主持监事会会议；监事会主席不能履行职务或者不履行职务的，由监事会副主席召集和主持监事会会议；监事会副主席不能履行职务或者不履行职务的，由半数以上监事共同推举一名监事召集和主持监事会会议。

董事、高级管理人员不得兼任监事。

本法第五十三条关于有限责任公司监事任期的规定，适用于股份有限公司监事。

第一百一十九条　本法第五十四条、第五十五条关于有限责任公司监事会职权的规定，适用于股份有限公司监事会。

监事会行使职权所必需的费用，由公司承担。

第一百二十条　监事会每六个月至少召开一次会议。监事可以提议召开临时监事会会议。

监事会的议事方式和表决程序，除本法有规定的外，由公司章程规定。

监事会决议应当经半数以上监事通过。

监事会应当对所议事项的决定作成会议记录，出席会议的监事应当在会议记录上签名。

## 第五节　上市公司组织机构的

特别规定　第一百二十一条　本法所称上市公司，是指其股票在证券交易所上市交易的股份有限公司。

第一百二十二条　上市公司在一年内购买、出售重大资产或者担保金额超过公司资产总额百分之三十的，应当由股东大会作出决议，并经出席会议的股东所持表决权的三分之二以上通过。

第一百二十三条　上市公司设独立董事，具体办法由国务院规定。

第一百二十四条　上市公司设置董事会秘书，负责公司股东大会和董事会会议的筹备、文件保管以及公司股东资料的管理，办理信息披露事务等事宜。

第一百二十五条　上市公司董事与董事会会议决议事项所涉及的企业有关联关系的，不得对该项决议行使表决权，也不得代理其他董事行使表决权。该董事会会议由过半数的无关联关系董事出席即可举行，董事会会议所作决议须经无关联关系董事过半数通过。出席董事会的无关联关系董事人数不足三人的，应将该事项提交上市公司股东大会审议。

## 第五章　股份有限公司的股份发行和转让

### 第一节　股份发行

第一百二十六条　股份有限公司的资本划分为股份，每一股的金额相等。

公司的股份采取股票的形式。股票是公司签发的证明股东所持股份的凭证。

第一百二十七条　股份的发行，实行公平、公正的原则，同种类的每一股份应当具有同等权利。

同次发行的同种类股份，每股的发行条件和价格应当相同；任何单位或者个人所认购的股份，每股应当支付相同价额。

第一百二十八条　股票发行价格可以按票面金额，也可以超过票面金额，但不得低于票面金额。

第一百二十九条　股票采用纸面形式或者国务院证券监督管理机构规定的其他形式。

股票应当载明下列主要事项：

（一）公司名称；

（二）公司成立日期；

（三）股票种类、票面金额及代表的股份数；

（四）股票的编号。

股票由法定代表人签名，公司盖章。

发起人的股票，应当标明发起人股票字样。

第一百三十条 公司发行的股票，可以为记名股票，也可以为无记名股票。

公司向发起人、法人发行的股票，应当为记名股票，并应当记载该发起人、法人的名称或者姓名，不得另立户名或者以代表人姓名记名。

第一百三十一条 公司发行记名股票的，应当置备股东名册，记载下列事项：

（一）股东的姓名或者名称及住所；

（二）各股东所持股份数；

（三）各股东所持股票的编号；

（四）各股东取得股份的日期。

发行无记名股票的，公司应当记载其股票数量、编号及发行日期。

第一百三十二条 国务院可以对公司发行本法规定以外的其他种类的股份，另行作出规定。

第一百三十三条 股份有限公司成立后，即向股东正式交付股票。公司成立前不得向股东交付股票。

第一百三十四条 公司发行新股，股东大会应当对下列事项作出决议：

（一）新股种类及数额；

（二）新股发行价格；

（三）新股发行的起止日期；

（四）向原有股东发行新股的种类及数额。

第一百三十五条 公司经国务院证券监督管理机构核准公开发行新股时，必须公告新股招股说明书和财务会计报告，并制作认股书。

本法第八十八条、第八十九条的规定适用于公司公开发行新股。

第一百三十六条 公司发行新股，可以根据公司经营情况和财务状况，确定其作价方案。

第一百三十七条 公司发行新股募足股款后，必须向公司登记机关办理变更登记，并公告。

### 第二节 股份转让

第一百三十八条 股东持有的股份可以依法转让。

第一百三十九条 股东转让其股份，应当在依法设立的证券交易所进行或者按照国务院规定的其他方式进行。

第一百四十条 记名股票，由股东以背书方式或者法律、行政法规规定的其他方式转让；转让后由公司将受让人的姓名或者名称及住所记载于股东名册。

股东大会召开前二十日内或者公司决定分配股利的基准日前五日内，不得进行前款规定的股东名册的变更登记。但是，法律对上市公司股东名册变更登记另有规定的，从其规定。

第一百四十一条 无记名股票的转让，由股东将该股票交付给受让人后即发生转让的效力。

第一百四十二条 发起人持有的本公司股份，自公司成立之日起一年内不得转让。公司公开发行股份前已发行的股份，自公司股票在证券交易所上市交易之日起一年内不得转让。

公司董事、监事、高级管理人员应当向公司申报所持有的本公司的股份及其变动情况，在任职期间每年转让的股份不得超过其所持有本公司股份总数的百分之二十五；所持本公司股份自公司股票上市交易之日起一年内不得转让。上述人员离职后半年内，不得转让其所持有的本公司股份。

公司章程可以对公司董事、监事、高级管理人员转让其所持有的本公司股份作出其他限制性规定。

第一百四十二条　公司不得收购本公司股份。但是，有下列情形之一的除外：

（一）减少公司注册资本；

（二）与持有本公司股份的其他公司合并；

（三）将股份奖励给本公司职工；

（四）股东因对股东大会作出的公司合并、分立决议持异议，要求公司收购其股份的。

公司因前款第（一）项至第（三）项的原因收购本公司股份的，应当经股东大会决议。公司依照前款规定收购本公司股份后，属于第（一）项情形的，应当自收购之日起十日内注销；属于第（二）项、第（四）项情形的，应当在六个月内转让或者注销。

公司依照第一款第（三）项规定收购的本公司股份，不得超过本公司已发行股份总额的百分之五；用于收购的资金应当从公司的税后利润中支出；所收购的股份应当在一年内转让给职工。

公司不得接受本公司的股票作为质押权的标的。

第一百四十四条　记名股票被盗、遗失或者灭失，股东可以依照《中华人民共和国民事诉讼法》规定的公示催告程序，请求人民法院宣告该股票失效。人民法院宣告该股票失效后，股东可以向公司申请补发股票。

第一百四十五条　上市公司的股票，依照有关法律、行政法规及证券交易所交易规则上市交易。

第一百四十六条　上市公司必须依照法律、行政法规的规定，公开其财务状况、经营情况及重大诉讼，在每会计年度内半年公布一次财务会计报告。

### 第六章　公司董事、监事、高级管理人员的资格和义务

第一百四十七条　有下列情形之一的，不得担任公司的董事、监事、高级管理人员：

（一）无民事行为能力或者限制民事行为能力；

（二）因贪污、贿赂、侵占财产、挪用财产或者破坏社会主义市场经济秩序，被判处刑罚，执行期满未逾五年，或者因犯罪被剥夺政治权利，执行期满未逾五年；

（三）担任破产清算的公司、企业的董事或者厂长、经理，对该公司、企业的破产负有个人责任的，自该公司、企业破产清算完结之日起未逾三年；

（四）担任因违法被吊销营业执照、责令关闭的公司、企业的法定代表人，并负有个人责任的，自该公司、企业被吊销营业执照之日起未逾三年；

（五）个人所负数额较大的债务到期未清偿。

公司违反前款规定选举、委派董事、监事或者聘任高级管理人员的，该选举、委派或者聘任无效。

董事、监事、高级管理人员在任职期间出现本条第一款所列情形的，公司应当解除其职务。

第一百四十八条　董事、监事、高级管理人员应当遵守法律、行政法规和公司章程，对公司负有忠实义务和勤勉义务。

董事、监事、高级管理人员不得利用职权收受贿赂或者其他非法收入，不得侵占公司的财产。

第一百四十九条　董事、高级管理人员不得有下列行为：

（一）挪用公司资金；

（二）将公司资金以其个人名义或者以其他个人名义开立账户存储；

（三）违反公司章程的规定，未经股东会、股东大会或者董事会同意，将公司资金借贷给他人或者以公司财产为他人提供担保；

（四）违反公司章程的规定或者未经股东会、股东大会同意，与本公司订立合同或者进行交易；

（五）未经股东会或者股东大会同意，利用职务便利为自己或者他人谋取属于公司的商业机会，自营或者为他人经营与所任职公司同类的业务；

（六）接受他人与公司交易的佣金归为己有；

中华人民共和国公司法

（七）擅自披露公司秘密；

（八）违反对公司忠实义务的其他行为。

董事、高级管理人员违反前款规定所得的收入应当归公司所有。

第一百五十条　董事、监事、高级管理人员执行公司职务时违反法律、行政法规或者公司章程的规定，给公司造成损失的，应当承担赔偿责任。

第一百五十一条　股东会或者股东大会要求董事、监事、高级管理人员列席会议的，董事、监事、高级管理人员应当列席并接受股东的质询。

董事、高级管理人员应当如实向监事会或者不设监事会的有限责任公司的监事提供有关情况和资料，不得妨碍监事会或者监事行使职权。

第一百五十二条　董事、高级管理人员有本法第一百五十条规定的情形的，有限责任公司的股东、股份有限公司连续一百八十日以上单独或者合计持有公司百分之一以上股份的股东，可以书面请求监事会或者不设监事会的有限责任公司的监事向人民法院提起诉讼；监事有本法第一百五十条规定的情形的，前述股东可以书面请求董事会或者不设董事会的有限责任公司的执行董事向人民法院提起诉讼。

监事会、不设监事会的有限责任公司的监事，或者董事会、执行董事收到前款规定的股东书面请求后拒绝提起诉讼，或者自收到请求之日起三十日内未提起诉讼，或者情况紧急、不立即提起诉讼将会使公司利益受到难以弥补的损害的，前款规定的股东有权为了公司的利益以自己的名义直接向人民法院提起诉讼。

他人侵犯公司合法权益，给公司造成损失的，本条第一款规定的股东可以依照前两款的规定向人民法院提起诉讼。

第一百五十三条　董事、高级管理人员违反法律、行政法规或者公司章程的规定，损害股东利益的，股东可以向人民法院提起诉讼。

## 第七章　公司债券

第一百五十四条　本法所称公司债券，是指公司依照法定程序发行、约定在一定期限还本付息的有价证券。

公司发行公司债券应当符合《中华人民共和国证券法》规定的发行条件。

第一百五十五条　发行公司债券的申请经国务院授权的部门核准后，应当公告公司债券募集办法。

公司债券募集办法中应当载明下列主要事项：

（一）公司名称；

（二）债券募集资金的用途；

（三）债券总额和债券的票面金额；

（四）债券利率的确定方式；

（五）还本付息的期限和方式；

（六）债券担保情况；

（七）债券的发行价格、发行的起止日期；

（八）公司净资产额；

（九）已发行的尚未到期的公司债券总额；

（十）公司债券的承销机构。

第一百五十六条　公司以实物券方式发行公司债券的，必须在债券上载明公司名称、债券票面金额、利率、偿还期限等事项，并由法定代表人签名，公司盖章。

第一百五十七条　公司债券，可以为记名债券，也可以为无记名债券。

第一百五十八条　公司发行公司债券应当置备公司债券存根簿。

发行记名公司债券的，应当在公司债券存根簿上载明下列事项：

（一）债券持有人的姓名或者名称及住所；

（二）债券持有人取得债券的日期及债券的编号；

2/27/2019                                                   中华人民共和国公司法

（三）债券总额、债券的票面金额、利率、还本付息的期限和方式；

（四）债券的发行日期。

发行无记名公司债券的，应当在公司债券存根簿上载明债券总额、利率、偿还期限和方式、发行日期及债券的编号。

第一百五十九条  记名公司债券的登记结算机构应当建立债券登记、存管、付息、兑付等相关制度。

第一百六十条  公司债券可以转让，转让价格由转让人与受让人约定。

公司债券在证券交易所上市交易的，按照证券交易所的交易规则转让。

第一百六十一条  记名公司债券，由债券持有人以背书方式或者法律、行政法规规定的其他方式转让；转让后由公司将受让人的姓名或者名称及住所记载于公司债券存根簿。

无记名公司债券的转让，由债券持有人将该债券交付给受让人后即发生转让的效力。

第一百六十二条  上市公司经股东大会决议可以发行可转换为股票的公司债券，并在公司债券募集办法中规定具体的转换办法。上市公司发行可转换为股票的公司债券，应当报国务院证券监督管理机构核准。

发行可转换为股票的公司债券，应当在债券上标明可转换公司债券字样，并在公司债券存根簿上载明可转换公司债券的数额。

第一百六十三条  发行可转换为股票的公司债券的，公司应当按照其转换办法向债券持有人换发股票，但债券持有人对转换股票或者不转换股票有选择权。

第八章  公司财务、会计

第一百六十四条  公司应当依照法律、行政法规和国务院财政部门的规定建立本公司的财务、会计制度。

第一百六十五条  公司应当在每一会计年度终了时编制财务会计报告，并依法经会计师事务所审计。

财务会计报告应当依照法律、行政法规和国务院财政部门的规定制作。

第一百六十六条  有限责任公司应当依照公司章程规定的期限将财务会计报告送交各股东。

股份有限公司的财务会计报告应当在召开股东大会年会的二十日前置备于本公司，供股东查阅；公开发行股票的股份有限公司必须公告其财务会计报告。

第一百六十七条  公司分配当年税后利润时，应当提取利润的百分之十列入公司法定公积金。公司法定公积金累计额为公司注册资本的百分之五十以上的，可以不再提取。

公司的法定公积金不足以弥补以前年度亏损的，在依照前款规定提取法定公积金之前，应当先用当年利润弥补亏损。

公司从税后利润中提取法定公积金后，经股东会或者股东大会决议，还可以从税后利润中提取任意公积金。

公司弥补亏损和提取公积金后所余税后利润，有限责任公司依照本法第三十五条的规定分配；股份有限公司按照股东持有的股份比例分配，但股份有限公司章程规定不按持股比例分配的除外。

股东会、股东大会或者董事会违反前款规定，在公司弥补亏损和提取法定公积金之前向股东分配利润的，股东必须将违反规定分配的利润退还公司。

公司持有的本公司股份不得分配利润。

第一百六十八条  股份有限公司以超过股票票面金额的发行价格发行股份所得的溢价款以及国务院财政部门规定列入资本公积金的其他收入，应当列为公司资本公积金。

第一百六十九条  公司的公积金用于弥补公司的亏损、扩大公司生产经营或者转为增加公司资本。但是，资本公积金不得用于弥补公司的亏损。

法定公积金转为资本时，所留存的该项公积金不得少于转增前公司注册资本的百分之二十五。

第一百七十条  公司聘用、解聘承办公司审计业务的会计师事务所，依照公司章程的规定，由股东会、股东大会或者董事会决定。

公司股东会、股东大会或者董事会就解聘会计师事务所进行表决时，应当允许会计师事务所陈述意见。

2/27/2019                                 中华人民共和国公司法

第一百七十一条  公司应当向聘用的会计师事务所提供真实、完整的会计凭证、会计账簿、财务会计报告及其他会计资料，不得拒绝、隐匿、谎报。

第一百七十二条  公司除法定的会计账簿外，不得另立会计账簿。

对公司资产，不得以任何个人名义开立账户存储。

第九章   公司合并、分立、增资、减资

第一百七十三条  公司合并可以采取吸收合并或者新设合并。

一个公司吸收其他公司为吸收合并，被吸收的公司解散。两个以上公司合并设立一个新的公司为新设合并，合并各方解散。

第一百七十四条  公司合并，应当由各合并方签订合并协议，并编制资产负债表及财产清单。公司应当自作出合并决议之日起十日内通知债权人，并于三十日内在报纸上公告。债权人自接到通知书之日起三十日内，未接到通知书的自公告之日起四十五日内，可以要求公司清偿债务或者提供相应的担保。

第一百七十五条  公司合并时，合并各方的债权、债务，应当由合并后存续的公司或者新设的公司承继。

第一百七十六条  公司分立，其财产作相应的分割。

公司分立，应当编制资产负债表及财产清单。公司应当自作出分立决议之日起十日内通知债权人，并于三十日内在报纸上公告。

第一百七十七条  公司分立前的债务由分立后的公司承担连带责任。但是，公司在分立前与债权人就债务清偿达成的书面协议另有约定的除外。

第一百七十八条  公司需要减少注册资本时，必须编制资产负债表及财产清单。

公司应当自作出减少注册资本决议之日起十日内通知债权人，并于三十日内在报纸上公告。债权人自接到通知书之日起三十日内，未接到通知书的自公告之日起四十五日内，有权要求公司清偿债务或者提供相应的担保。

公司减资后的注册资本不得低于法定的最低限额。

第一百七十九条  有限责任公司增加注册资本时，股东认缴新增资本的出资，依照本法设立有限责任公司缴纳出资的有关规定执行。

股份有限公司为增加注册资本发行新股时，股东认购新股，依照本法设立股份有限公司缴纳股款的有关规定执行。

第一百八十条  公司合并或者分立，登记事项发生变更的，应当依法向公司登记机关办理变更登记；公司解散的，应当依法办理公司注销登记；设立新公司的，应当依法办理公司设立登记。

公司增加或者减少注册资本，应当依法向公司登记机关办理变更登记。

第十章   公司解散和清算

第一百八十一条  公司因下列原因解散：

（一）公司章程规定的营业期限届满或者公司章程规定的其他解散事由出现；

（二）股东会或者股东大会决议解散；

（三）因公司合并或者分立需要解散；

（四）依法被吊销营业执照、责令关闭或者被撤销；

（五）人民法院依照本法第一百八十三条的规定予以解散。

第一百八十二条  公司有本法第一百八十一条第（一）项情形的，可以通过修改公司章程而存续。

依照前款规定修改公司章程，有限责任公司须经持有三分之二以上表决权的股东通过，股份有限公司须经出席股东大会会议的股东所持表决权的三分之二以上通过。

第一百八十三条  公司经营管理发生严重困难，继续存续会使股东利益受到重大损失，通过其他途径不能解决的，持有公司全部股东表决权百分之十以上的股东，可以请求人民法院解散公司。

第一百八十四条  公司因本法第一百八十一条第（一）项、第（二）项、第（四）项、第（五）项规定而解散的，应当在解散事由出现之日起十五日内成立清算组，开始清算。有限责任公司的清算组由股东组成，股份有限公司的清算组由董事或者股东大会确定的人员组成。逾期不成立清

算组进行清算的，债权人可以申请人民法院指定有关人员组成清算组进行清算。人民法院应当受理该申请，并及时组织清算组进行清算。

第一百八十五条　清算组在清算期间行使下列职权：

（一）清理公司财产，分别编制资产负债表和财产清单；

（二）通知、公告债权人；

（三）处理与清算有关的公司未了结的业务；

（四）清缴所欠税款以及清算过程中产生的税款；

（五）清理债权、债务；

（六）处理公司清偿债务后的剩余财产；

（七）代表公司参与民事诉讼活动。

第一百八十六条　清算组应当自成立之日起十日内通知债权人，并于六十日内在报纸上公告。债权人应当自接到通知书之日起三十日内，未接到通知书的自公告之日起四十五日内，向清算组申报其债权。

债权人申报债权，应当说明债权的有关事项，并提供证明材料。清算组应当对债权进行登记。

在申报债权期间，清算组不得对债权人进行清偿。

第一百八十七条　清算组在清理公司财产、编制资产负债表和财产清单后，应当制定清算方案，并报股东会、股东大会或者人民法院确认。

公司财产在分别支付清算费用、职工的工资、社会保险费用和法定补偿金，缴纳所欠税款，清偿公司债务后的剩余财产，有限责任公司按照股东的出资比例分配，股份有限公司按照股东持有的股份比例分配。

清算期间，公司存续，但不得开展与清算无关的经营活动。公司财产在未依照前款规定清偿前，不得分配给股东。

第一百八十八条　清算组在清理公司财产、编制资产负债表和财产清单后，发现公司财产不足清偿债务的，应当依法向人民法院申请宣告破产。

公司经人民法院裁定宣告破产后，清算组应当将清算事务移交给人民法院。

第一百八十九条　公司清算结束后，清算组应当制作清算报告，报股东会、股东大会或者人民法院确认，并报送公司登记机关，申请注销公司登记，公告公司终止。

第一百九十条　清算组成员应当忠于职守，依法履行清算义务。

清算组成员不得利用职权收受贿赂或者其他非法收入，不得侵占公司财产。

清算组成员因故意或者重大过失给公司或者债权人造成损失的，应当承担赔偿责任。

第一百九十一条　公司被依法宣告破产的，依照有关企业破产的法律实施破产清算。

<p style="text-align:center">第十一章　外国公司的分支机构</p>

第一百九十二条　本法所称外国公司是指依照外国法律在中国境外设立的公司。

第一百九十三条　外国公司在中国境内设立分支机构，必须向中国主管机关提出申请，并提交其公司章程、所属国的公司登记证书等有关文件，经批准后，向公司登记机关依法办理登记，领取营业执照。

外国公司分支机构的审批办法由国务院另行规定。

第一百九十四条　外国公司在中国境内设立分支机构，必须在中国境内指定负责该分支机构的代表人或者代理人，并向该分支机构拨付与其所从事的经营活动相适应的资金。

对外国公司分支机构的经营资金需要规定最低限额的，由国务院另行规定。

第一百九十五条　外国公司的分支机构应当在其名称中标明该外国公司的国籍及责任形式。

外国公司的分支机构应当在本机构中置备该外国公司章程。

第一百九十六条　外国公司在中国境内设立的分支机构不具有中国法人资格。

2/27/2019 中华人民共和国公司法

外国公司对其分支机构在中国境内进行经营活动承担民事责任。

第一百九十七条  经批准设立的外国公司分支机构，在中国境内从事业务活动，必须遵守中国的法律，不得损害中国的社会公共利益，其合法权益受中国法律保护。

第一百九十八条  外国公司撤销其在中国境内的分支机构时，必须依法清偿债务，依照本法有关公司清算程序的规定进行清算。未清偿债务之前，不得将其分支机构的财产移至中国境外。

## 第十二章　法律责任

第一百九十九条  违反本法规定，虚报注册资本、提交虚假材料或者采取其他欺诈手段隐瞒重要事实取得公司登记的，由公司登记机关责令改正，对虚报注册资本的公司，处以虚报注册资本金额百分之五以上百分之十五以下的罚款；对提交虚假材料或者采取其他欺诈手段隐瞒重要事实的公司，处以五万元以上五十万元以下的罚款；情节严重的，撤销公司登记或者吊销营业执照。

第二百条  公司的发起人、股东虚假出资，未交付或者未按期交付作为出资的货币或者非货币财产的，由公司登记机关责令改正，处以虚假出资金额百分之五以上百分之十五以下的罚款。

第二百零一条  公司的发起人、股东在公司成立后，抽逃其出资的，由公司登记机关责令改正，处以所抽逃出资金额百分之五以上百分之十五以下的罚款。

第二百零二条  公司违反本法规定，在法定的会计账簿以外另立会计账簿的，由县级以上人民政府财政部门责令改正，处以五万元以上五十万元以下的罚款。

第二百零三条  公司在依法向有关主管部门提供的财务会计报告等材料上作虚假记载或者隐瞒重要事实的，由有关主管部门对直接负责的主管人员和其他直接责任人员处以三万元以上三十万元以下的罚款。

第二百零四条  公司不依照本法规定提取法定公积金的，由县级以上人民政府财政部门责令如数补足应当提取的金额，可以对公司处以二十万元以下的罚款。

第二百零五条  公司在合并、分立、减少注册资本或者进行清算时，不依照本法规定通知或者公告债权人的，由公司登记机关责令改正，对公司处以一万元以上十万元以下的罚款。

公司在进行清算时，隐匿财产，对资产负债表或者财产清单作虚假记载或者在未清偿债务前分配公司财产的，由公司登记机关责令改正，对公司处以隐匿财产或者未清偿债务前分配公司财产金额百分之五以上百分之十以下的罚款；对直接负责的主管人员和其他直接责任人员处以一万元以上十万元以下的罚款。

第二百零六条  公司在清算期间开展与清算无关的经营活动的，由公司登记机关予以警告，没收违法所得。

第二百零七条  清算组不依照本法规定向公司登记机关报送清算报告，或者报送清算报告隐瞒重要事实或者有重大遗漏的，由公司登记机关责令改正。

清算组成员利用职权徇私舞弊、谋取非法收入或者侵占公司财产的，由公司登记机关责令退还公司财产，没收违法所得，并可以处以违法所得一倍以上五倍以下的罚款。

第二百零八条  承担资产评估、验资或者验证的机构提供虚假材料的，由公司登记机关没收违法所得，处以违法所得一倍以上五倍以下的罚款，并可以由有关主管部门依法责令该机构停业、吊销直接责任人员的资格证书，吊销营业执照。

承担资产评估、验资或者验证的机构因过失提供有重大遗漏的报告的，由公司登记机关责令改正，情节较重的，处以所得收入一倍以上五倍以下的罚款，并可以由有关主管部门依法责令该机构停业、吊销直接责任人员的资格证书，吊销营业执照。

承担资产评估、验资或者验证的机构因其出具的评估结果、验资或者验证证明不实，给公司债权人造成损失的，除能够证明自己没有过错的外，在其评估或者证明不实的金额范围内承担赔偿责任。

第二百零九条  公司登记机关对不符合本法规定条件的登记申请予以登记，或者对符合本法规定条件的登记申请不予登记的，对直接负责的主管人员和其他直接责任人员，依法给予行政处分。

第二百一十条  公司登记机关的上级部门强令公司登记机关对不符合本法规定条件的登记申请予以登记，或者对符合本法规定条件的登记申请不予登记的，或者对违法登记进行包庇的，对直接负责的主管人员和其他直接责任人员依法给予行政处分。

2/27/2019                                      中华人民共和国公司法

第二百一十一条　未依法登记为有限责任公司或者股份有限公司，而冒用有限责任公司或者股份有限公司名义的，或者未依法登记为有限责任公司或者股份有限公司的分公司，而冒用有限责任公司或者股份有限公司的分公司名义的，由公司登记机关责令改正或者予以取缔，可以并处十万元以下的罚款。

第二百一十二条　公司成立后无正当理由超过六个月未开业的，或者开业后自行停业连续六个月以上的，可以由公司登记机关吊销营业执照。

公司登记事项发生变更时，未依照本法规定办理有关变更登记的，由公司登记机关责令限期登记；逾期不登记的，处以一万元以上十万元以下的罚款。

第二百一十三条　外国公司违反本法规定，擅自在中国境内设立分支机构的，由公司登记机关责令改正或者关闭，可以并处五万元以上二十万元以下的罚款。

第二百一十四条　利用公司名义从事危害国家安全、社会公共利益的严重违法行为的，吊销营业执照。

第二百一十五条　公司违反本法规定，应当承担民事赔偿责任和缴纳罚款、罚金的，其财产不足以支付时，先承担民事赔偿责任。

第二百一十六条　违反本法规定，构成犯罪的，依法追究刑事责任。

## 第十三章　附　则

第二百一十七条　本法下列用语的含义：

（一）高级管理人员，是指公司的经理、副经理、财务负责人，上市公司董事会秘书和公司章程规定的其他人员。

（二）控股股东，是指其出资额占有限责任公司资本总额百分之五十以上或者其持有的股份占股份有限公司股本总额百分之五十以上的股东；出资额或者持有股份的比例虽然不足百分之五十，但依其出资额或者持有的股份所享有的表决权已足以对股东会、股东大会的决议产生重大影响的股东。

（三）实际控制人，是指虽不是公司的股东，但通过投资关系、协议或者其他安排，能够实际支配公司行为的人。

（四）关联关系，是指公司控股股东、实际控制人、董事、监事、高级管理人员与其直接或者间接控制的企业之间的关系，以及可能导致公司利益转移的其他关系。但是，国家控股的企业之间不仅因为同受国家控股而具有关联关系。

第二百一十八条　外商投资的有限责任公司和股份有限公司适用本法；有关外商投资的法律另有规定的，适用其规定。

第二百一十九条　本法自2006年1月1日起施行。

关于我们 | 联系我们　法律声明

版权所有：中国证券监督管理委员会　京ICP备 05035542号

# EXHIBIT 7

Please note: <u>Chinese version</u> is binding

**This translation is furnished for information purposes only, and the original Chinese text is binding in all respects.**

Code of Corporate Governance for Listed Companies

Preface

In accordance with the basic principles of the Company Law, the Securities Law and other relevant laws and regulations, as well as the commonly accepted standards in international corporate governance, the Code of Corporate Governance for Listed Companies (hereinafter referred to as "the Code") is formulated to promote the establishment and improvement of modern enterprise system by listed companies, to standardize the operation of listed companies and to bring forward the healthy development of the securities market of our country.

The Code sets forth, among other things, the basic principles for corporate governance of listed companies in our country, the means for the protection of investors' interests and rights, the basic behavior rules and moral standards for directors, supervisors, managers and other senior management members of listed companies.

The Code is applicable to all listed companies within the boundary of the People's Republic of China. Listed companies shall act in the spirit of the Code in their efforts to improve corporate governance. Requirements of the Code shall be embodied when listed companies formulate or amend their articles of association or rules of governance. The Code is the major measuring standard for evaluating whether a listed company has a good corporate governance structure, and if major problems exist with the corporate governance structure of a listed company, the securities supervision and regulation authorities may instruct the company to make corrections in accordance with the Code.

Chapter 1. Shareholders and Shareholders' Meetings

(1) Rights of Shareholders

1. As the owner of a company, the shareholders shall enjoy the legal rights stipulated by laws, administrative regulations and the company's articles of association. A listed company shall establish a corporate governance structure sufficient for ensuring the full exercise of shareholders' rights.

1

D☐P☐ Exhibit 8415
Deponent Wang
Date 3/7/19  Rptr BW

2. The corporate governance structure of a company shall ensure fair treatment toward all shareholders, especially minority shareholders. All shareholders are to enjoy equal rights and to bear the corresponding duties based on the shares they hold.

3. Shareholders shall have the right to know about and the right to participate in major matters of the company set forth in the laws, administrative regulations and articles of association. A listed company shall establish efficient channels of communication with its shareholders.

4. Shareholders shall have the right to protect their interests and rights through civil litigation or other legal means in accordance with laws and administrative regulations. In the event the resolutions of shareholders' meetings or the resolutions of the board of directors are in breach of laws and administrative regulations or infringe on shareholders' legal interests and rights, the shareholders shall have the right to initiate litigation to stop such breach or infringement. The directors, supervisors and managers of the company shall bear the liability of compensation in cases where they violate laws, administrative regulations or articles of association and cause damages to the company during the performance of their duties. Shareholders shall have the right to request the company to sue for such compensation in accordance with law.

(2) Rules for Shareholders' Meetings

5. A listed company shall set out convening and voting procedures for shareholders' meetings in its articles of association, including rules governing such matters as notification, registration, review of proposals, voting, counting of votes, announcement of voting results, formulation of resolutions, recording of minutes and signatories, public announcement, etc.

6. The board of directors shall earnestly study and arrange the agenda for a shareholders' meeting. During a shareholders' meeting, each item on the agenda shall be given a reasonable amount of time for discussion.

7. A listed company shall state in its articles of association the principles for the shareholders' meeting to grant authorization to the board of directors. The content of such authorization shall be explicit and concrete.

8. Besides ensuring that shareholders' meetings proceed legally and effectively, a listed company shall make every effort, including fully utilizing modern information technology means, to increase the number of shareholders attending the shareholders' meetings. The time and location of the shareholders' meetings shall be set so as to allow the maximum number of

shareholders to participate.

9. The shareholders can either be present at the shareholders' meetings in person or they may appoint a proxy to vote on their behalf, and both means of voting possess the same legal effect.

10. The board of directors, independent directors and qualified shareholders of a listed company may solicit for the shareholders' right to vote in a shareholders' meeting. No payments shall be made to the shareholders for such solicitation, and sufficient information shall be provided to persons whose voting rights are being solicited.

11. Institutional investors shall play a role in the appointment of company directors, the compensation and supervision of management and major decision-making processes.

(3) Related Party Transactions

12. Written agreements shall be entered into for related party transactions among a listed company and its related parties. Such agreements shall observe principles of equality, voluntarity, and making compensation for equal value. The contents of such agreements shall be specific and concrete. Matters such as the signing, amendment, termination and execution of such agreements shall be disclosed by the listed company in accordance with relevant regulations.

13. Efficient measures shall be adopted by a listed company to prevent its related parties from interfering with the operation of the company and damaging the company's interests by monopolizing purchase or sales channels. Related party transactions shall observe commercial principles. In principle, the prices for related party transactions shall not deviate from an independent third party's market price or charging standard. The company shall fully disclose the basis for pricing for related party transactions.

14. The assets of a listed company belong to the company. The company shall adopt efficient measures to prevent its shareholders and their affiliates from misappropriating or transferring the capital, assets or other resources of the company through various means. A listed company shall not provide financial guarantees for its shareholders or their related parties.

## Chapter 2. Listed Company and Its Controlling Shareholders

(1) Behavior Rules for Controlling Shareholders

15. During the restructuring and reorganization of a company that plans to list, the controlling shareholders shall observe the principle of "first restructuring, then listing", and shall emphasize the establishment of a reasonable shareholding structure that has checks and balances.

16. During the restructuring and reorganization of a company that plans to list, the controlling shareholders shall sever the company's social functions and strip out non-operational assets. Non-operational institutions, welfare institutions and their facilities shall not be included in the listed company.

17. Controlling shareholders' remaining enterprises or institutions that provide services for the major business of the listed company may be restructured into specialized companies in accordance with the principles of specialization and market practice, and may enter into relevant agreements with the listed company in accordance with commercial principles. Remaining enterprises engaged in other businesses shall increase their capability of independent development. Remaining enterprises not capable to continue operation shall exit the market, through such channels as bankruptcy, in accordance with relevant laws and regulations. Enterprises meeting certain requirements during restructuring may sever all their social functions and disperse surplus employees at one time and keep no remaining enterprises.

18. The controlling shareholders shall support the listed company to further reform labor, personnel and distribution systems, to transform operational and managerial mechanisms, and to establish such systems as: management selection through bidding and competition, with the chance for both promotion and demotion; employment of employees on the basis of competitive selection, with the chance for both employment and termination of employment; income distribution scheme that provides sufficient incentive, with the chance to both increase and decrease the remuneration; etc.

19. The controlling shareholders owe a duty of good faith toward the listed company and other shareholders. The controlling shareholders of a listed company shall strictly comply with laws and regulations while exercising their rights as investors, and shall be prevented from damaging the listed company's or other shareholders' legal rights and interests, through means such as assets restructuring, or from taking advantage of their privileged position to gain additional benefit.

20. The controlling shareholders shall nominate the candidates for directors and supervisors in strict compliance with the terms and procedures provided for by laws, regulations and the company's articles of association. The nominated candidates shall possess certain relevant professional knowledge and the capability to make decisions or supervise. The resolutions

made by the shareholders' meetings electing personnel or the board of directors' resolutions appointing personnel shall not be subject to approval procedures by the controlling shareholders. The controlling shareholders are forbidden to appoint senior management personnel by circumventing the shareholders' meetings or the board of directors.

21. The important decisions of a listed company shall be made through a shareholders' meeting or board of directors' meeting in accordance with law. The controlling shareholders shall not directly or indirectly interfere with the company's decisions or business activities conducted in accordance with laws; nor shall they impair the listed company's or other shareholders' rights and interests.

(2) Independence of Listed Company

22. A listed company shall be separated from its controlling shareholders in such aspects as personnel, assets and financial affairs, shall be independent in institution and business, shall practice independent business accounting, and shall independently bear risks and obligations.

23. The personnel of a listed company shall be independent from the controlling shareholders. The management, financial officers, sales officers and secretary of the board of directors of the listed company shall not take posts other than as a director in a controlling shareholder's entities. In the case where a member of a controlling shareholder's senior management concurrently holds the position of director of the listed company, such member shall ensure adequate time and energy to perform the work for the listed company.

24. The assets invested by a controlling shareholder in a listed company shall be independent, complete and with clear indication of ownership. Where controlling shareholders invest non-cash assets into a listed company, ownership transfer procedures shall be completed and explicit boundaries for such assets shall be clarified. The listed company shall independently register such assets, set up independent account for such assets, and carry out independent business accounting and management for such assets. The controlling shareholders shall not misappropriate or control such assets or interfere with the listed company's management of such assets.

25. A listed company shall establish sound financial and accounting management systems in accordance with laws and regulations and shall conduct independent business accounting. Controlling shareholders shall respect the financial independence of the company and shall not interfere with the financial and accounting activities of the company.

26. The board of directors, the supervisory committee and other internal offices of a listed company shall operate in an independent manner. There shall be no subordination relationship between, on the one hand, a listed company or its internal offices and, on the other hand, the company's controlling shareholders or their internal offices, and the latter shall not give plans or instructions concerning the listed company's business operation to the former, nor shall the latter interfere with the independent operation of the former in any other manner.

27. A listed company's business shall be completely independent from that of its controlling shareholders. Controlling shareholders and their subsidiaries shall not engage in the same or similar business as that of the listed company. Controlling shareholders shall adopt efficient measures to avoid horizontal competition with the listed company.

Chapter 3. Directors and Board of Directors

(1) Election Procedures for Directors

28. A company shall establish a standardized and transparent procedure for director election in its articles of association, so as to ensure the openness, fairness, impartialness and independence of the election.

29. Detailed information regarding the candidates for directorship shall be disclosed prior to the convening of the shareholders' meeting to ensure adequate understanding of the candidates by the shareholders at the time of voting.

30. Candidates for directorship shall give written undertakings to accept their nomination, to warrant the truthfulness and completeness of the candidate's information that has been publicly disclosed and to promise to earnestly perform their duties once elected.

31. The election of directors shall fully reflect the opinions of minority shareholders. A cumulative voting system shall be earnestly advanced in shareholders' meetings for the election of directors. Listed companies that are more than 30% owned by controlling shareholders shall adopt a cumulative voting system, and the companies that do adopt such a system shall stipulate the implementing rules for such cumulative voting system in their articles of association.

32. Appointment agreements shall be entered into by a listed company and its directors to clarify such matters as the rights and obligations between the company and the director, the term of the directorship, the director's

liabilities in case of breach of laws, regulations or articles of association, and the compensation from the company in case of early termination of the appointment agreement for cause by the company.

(2) The Duties and Responsibilities of Directors

33. Directors shall faithfully, honestly and diligently perform their duties for the best interests of the company and all the shareholders.

34. Directors shall ensure adequate time and energy for the performance of their duties.

35. Directors shall attend the board of directors meetings in a diligent and responsible manner, and shall express their clear opinions on the topics discussed. When unable to attend a board of directors meeting, a director may authorize another director in writing to vote on his behalf and the director who makes such authorization shall be responsible for the vote.

36. The board of directors shall abide by relevant laws, regulations, rules and the company's articles of association, and shall strictly fulfill the undertakings they made publicly.

37. Directors shall earnestly attend relevant trainings to learn about the rights, obligations and duties of a director, to familiarize themselves with relevant laws and regulations and to master relevant knowledge necessary for acting as directors.

38. In cases where the resolutions of board of directors violate laws or regulations or a listed company's articles of association and cause losses to the listed company, directors responsible for making such resolutions shall be liable for compensation, except those proved to have objected and the objections of whom have been recorded in the minutes.

39. After approval by the shareholders' meeting, a listed company may purchase liability insurance for directors. Such insurance shall not cover the liabilities arising in connection with directors' violation of laws, regulations or the company's articles of association.

(3) Duties and Composition of the Board of Directors

40. The number of directors and the structure of the board of directors shall be in compliance with laws and regulations and shall ensure the effective discussion and efficient, timely and prudent decision-making process of the board of directors.

41. The board of directors shall possess proper professional background. The directors shall possess adequate knowledge, skills and qualities to perform their duties.

42. The board of directors shall be made accountable to shareholders. A listed company's corporate governance framework shall ensure that the board of directors can exercise its power in accordance with laws, administrative regulations and the company's articles of association.

43. The board of directors shall earnestly perform its duties as stipulated by laws, regulations and the company's articles of association, shall ensure that the company complies with laws, regulations and its articles of association, shall treat all the shareholders equally and shall be concerned with the interests of stakeholders.

(4) Rules and Procedure of the Board of Directors

44. A listed company shall formulate standardized rules of procedure for its board of directors in its articles of association to ensure the board of directors' efficient function and rational decisions.

45. The board of directors shall meet periodically and shall convene interim meetings in a timely manner when necessary. Each board of directors' meeting shall have a pre-decided agenda.

46. The meetings of the board of directors of a listed company shall be conducted in strict compliance with prescribed procedures. The board of directors shall send notice to all directors in advance, at the stipulated time, and shall provide sufficient materials, including relevant background materials for the items on the agenda and other information and data that may assist the directors in their understanding of the company's business development. When two or more independent directors deem the materials inadequate or unclear, they may jointly submit a written request to postpone the meeting or to postpone the discussion of the related matter, which shall be granted by the board of directors.

47. The minutes of the board of directors' meetings shall be complete and accurate. The secretary of the board of directors shall carefully organize the minutes and the records of discussed matters. Directors that have attended the meetings and the person who drafted the minutes shall sign the minutes. The minutes of the board of directors' meetings shall be properly maintained and stored as important records of the company, and may be used as an important basis for clarifying responsibilities of individual directors in the future.

48. In the case of authorization to the chairman of the board of directors to exercise part of the board of directors' power of office when the board of directors is not in session, clear rules and principles for such authorization shall be stated in the articles of association of the listed company. The content of such authorization shall be clear and specific. All matters related to material interests of the company shall be submitted to the board of directors for collective decision.

(5) Independent Directors

49. A listed company shall introduce independent directors to its board of directors in accordance with relevant regulations. Independent directors shall be independent from the listed company that employs them and the company's major shareholders. An independent director may not hold any other position apart from independent director in the listed company.

50. The independent directors shall bear the duties of good faith and due diligence toward the listed company and all the shareholders. They shall earnestly perform their duties in accordance with laws, regulations and the company's articles of association, shall protect the overall interests of the company, and shall be especially concerned with protecting the interests of minority shareholders from being infringed. Independent directors shall carry out their duties independently and shall not subject themselves to the influence of the company's major shareholders, actual controllers, or other entities or persons who are interested parties of the listed company.

51. Relevant laws and regulations shall be complied with for matters such as the qualifications, procedure of election and replacement, and duties of independent directors.

(6) Specialized Committees of the Board of Directors

52. The board of directors of a listed company may establish a corporate strategy committee, an audit committee, a nomination committee, a remuneration and appraisal committee and other special committees in accordance with the resolutions of the shareholders' meetings. All committees shall be composed solely of directors. The audit committee, the nomination committee and the remuneration and appraisal committee shall be chaired by an independent director, and independent directors shall constitute the majority of the committees. At least one independent director from the audit committee shall be an accounting professional.

53. The main duties of the corporate strategy committee shall be to conduct research and make recommendations on the long-term strategic

development plans and major investment decisions of the company.

54. The main duties of the audit committee are (1) to recommend the engagement or replacement of the company's external auditing institutions; (2) to review the internal audit system and its execution; (3) to oversee the interaction between the company's internal and external auditing institutions; (4) to inspect the company's financial information and its disclosure; and (5) to monitor the company's internal control system.

55. The main duties of the nomination committee are (1) to formulate standards and procedures for the election of directors and managers and make recommendations; (2) to extensively seek qualified candidates for directorship and management; and (3) to review the candidates for directorship and management and make recommendations.

56. The main duties of the remuneration and appraisal committee are (1) to study the appraisal standard for directors and management personnel, to conduct appraisal and to make recommendations; and (2) to study and review the remuneration policies and schemes for directors and senior management personnel.

57. Each specialized committee may engage intermediary institutions to provide professional opinions, the relevant expenses to be borne by the company.

58. Each specialized committee shall be accountable to the board of directors. All proposals by specialized committees shall be submitted to the board of directors for review and approval.

Chapter 4. The Supervisors and the Supervisory Board

(1) Duties and Responsibilities of the Supervisory Board

59. The supervisory board of a listed company shall be accountable to all shareholders. The supervisory board shall supervise the corporate finance, the compliance and legitimacy of directors, managers and other senior management personnel's performance of duties, and shall protect the company's and the shareholders' legitimate rights and interests.

60. Supervisors shall have the right to learn about the operating status of the listed company and shall have the corresponding obligation of confidentiality. The supervisory board may independently hire intermediary institutions to provide professional opinions.

61. A listed company shall adopt measures to ensure supervisors' right to learn about company's matters and shall provide necessary assistance to supervisors for their normal performance of duties. No one shall interfere with or obstruct supervisors' work. A supervisor's reasonable expenses necessary to perform their duties shall be borne by the listed company.

62. The record of the supervisory committee's supervision as well as the results of financial or other specific investigations shall be used as an important basis for performance assessment of directors, managers and other senior management personnel.

63. The supervisory board may report directly to securities regulatory authorities and other related authorities as well as reporting to the board of directors and the shareholders' meetings when the supervisory board learns of any violation of laws, regulations or the company's articles of association by directors, managers or other senior management personnel.

(2) The Composition and Steering of the Supervisory Board

64. Supervisors shall have professional knowledge or work experience in such areas as law and accounting. The members and the structure of the supervisory board shall ensure its capability to independently and efficiently conduct its supervision and inspection of directors, managers and other senior management personnel and to supervise and examine the company's financial matters.

65. A listed company shall formulate in its articles of association standardized rules and procedures governing the steering of the supervisory board. The supervisory board's meetings shall be convened in strict compliance with the rules and procedures.

66. The supervisory board shall meet periodically and shall convene interim meetings in a timely manner when necessary. If for any reason a supervisory board meeting cannot be convened as scheduled, an explanation shall be publicly announced.

67. The supervisory board may ask directors, managers and other senior management personnel, internal auditing personnel and external auditing personnel to attend the meetings of supervisory board and to answer the questions that the supervisory board is concerned with.

68. Minutes shall be drafted for the meetings of the supervisory board, which shall be signed by the supervisors that attended the meetings and the person who drafted the minutes. The supervisors shall have the right to

request to record in the minutes explanatory notes to their statements in the meetings. Minutes of the meetings of the supervisory board shall be properly maintained and stored as important records of the company.

## Chapter 5. Performance Assessments and Incentive and Disciplinary Systems

(1) Performance Assessment for Directors, Supervisors and Management Personnel

69. A listed company shall establish fair and transparent standards and procedures for the assessment of the performance of directors, supervisors and management personnel.

70. The performance assessment of the directors and management personnel shall be conducted by the board of directors or by the remuneration and appraisal committee of the board of directors. The evaluation of the performance of independent directors and supervisors shall be conducted through a combination of self-review and peer review.

71. The board of directors shall propose a scheme for the amount and method of compensation for directors to the shareholders' meeting for approval. When the board of directors or the remuneration and appraisal committee reviews the performance of or discusses the compensation for a certain director, such director shall withdraw.

72. The board of directors and the supervisory board shall report to the shareholder meetings the performance of the directors and the supervisors, the results of the assessment of their work and their compensation, and shall disclose such information.

(2) Selection of Management Personnel

73. The recruiting of management personnel of a listed company shall be conducted in strict observation with relevant laws and regulations and the company's articles of association. No institution or individual shall interfere with a listed company's normal recruiting procedure for management personnel.

74. The recruiting of management personnel of a listed company shall, to the extent possible, be carried out in a fair and transparent manner, through domestic and international markets for professional management, making full use of intermediary agencies.

75. Employment agreements shall be entered into by a listed company and its management personnel to clarify each party's rights and obligations.

76. The appointment and removal of managers shall be in compliance with legal procedure and shall be publicly announced.

(3) Incentive and Disciplinary Systems for Management

77. To attract qualified personnel and to maintain the stability of management, a listed company shall establish rewarding systems that link the compensation for management personnel to the company's performance and to the individual's work performance.

78. The performance assessment for management personnel shall become a basis for determining the compensation and other rewarding arrangements for the person reviewed.

79. The results of the performance assessment shall be approved by the board of directors, explained at the shareholders' meetings and disclosed.

80. A listed company shall specify management personnel's duties and responsibilities in its articles of association. If management personnel violate laws, regulations or the company's articles of association and cause damages to the company, the board of directors of the company shall actively investigate and pursue such personnel's legal liabilities.

Chapter 6. Stakeholders

81. A listed company shall respect the legitimate rights of banks and other creditors, employees, consumers, suppliers, the community and other stakeholders.

82. A listed company shall actively cooperate with its stakeholders and jointly advance the company's sustained and healthy development.

83. A company shall provide the necessary conditions to ensure the legitimate rights of stakeholders. Stakeholders shall have opportunities and channels for redress for infringement of rights.

84. A company shall provide necessary information to banks and other creditors to enable them to make judgments and decisions about the company's operating and financial situation.

85. A company shall encourage employees' feedback regarding the

company's operating and financial situations and important decisions affecting employee's benefits through direct communications with the board of directors, the supervisory board and the management personnel.

86. While maintaining the listed company's development and maximizing the benefits of shareholders, the company shall be concerned with the welfare, environmental protection and public interests of the community in which it resides, and shall pay attention to the company's social responsibilities.

### Chapter 7. Information Disclosure and Transparency

(1) Listed Companies' Ongoing Information Disclosure

87. Information disclosure is an ongoing responsibility of listed companies. A listed company shall truthfully, accurately, completely and timely disclose information as required by laws, regulations and the company's articles of association.

88. In addition to disclosing mandatory information, a company shall also voluntarily and timely disclose all other information that may have a material effect on the decisions of shareholders and stakeholders, and shall ensure equal access to information for all shareholders.

89. Disclosed information by a listed company shall be easily comprehensible. Companies shall ensure economical, convenient and speedy access to information through various means (such as the Internet).

90. The secretary of the board of directors shall be in charge of information disclosure, including formulating rules for information disclosure, receiving visits, providing consultation, contacting shareholders and providing publicly disclosed information about the company to investors. The board of directors and the management shall actively support the secretary's work. No institutions or individuals shall interfere with the secretary's work.

(2) Disclosure of Information Regarding Corporate Governance

91. A listed company shall disclose information regarding its corporate governance in accordance with laws, regulations and other relevant rules, including but not limited to: (1) the members and structure of the board of directors and the supervisory board; (2) the performance and evaluation of the board of directors and the supervisory board; (3) the performance and evaluation of the independent directors, including their attendance at board of directors' meetings, their issuance of independent opinions and their opinions regarding related party transactions and appointment and removal of directors

14

and senior management personnel; (4) the composition and work of the specialized committees of the board of directors; (5) the actual state of corporate governance of the company, the gap between the company's corporate governance and the Code, and the reasons for the gap; and (6) specific plans and measures to improve corporate governance.

(3) Disclosure of Shareholder's Rights and Interests

92. A company shall timely disclose detailed information about each shareholder who owns a comparatively large percentage of shares of the company, the shareholders who actually control the company when acting in concert and the company's actual controllers in accordance with relevant regulations.

93. A listed company shall learn about and disclose in a timely manner, changes in the shareholding of the company and other important matters that may cause changes in the shareholding of the company.

94. When controlling shareholders increase or decrease their shareholding or pledge the company's shares, or when the actual control of the company transfers, the company and its controlling shareholders shall timely and accurately disclose relevant information to all shareholders.

Chapter 8. Supplementary Article

95. This Code shall come into effect on the date of issuance.

繁體版 | English

站内搜索: 本站点检索        高级

中国证券监督管理委员会
CHINA SECURITIES REGULATORY COMMISSION

维护市场公开、公平、公正
维护投资者特别是中小投资者合法权益
促进资本市场健康发展

| 首页 HOME | 政务 | 信息公开　政策法规　新闻发布　信息披露　统计数据　人事招聘 | 服务 | 办事指南　在线申报　监管对象　业务资格　人员资格　投资者保护 | 互动 | 公众留言　信访专栏　举报专栏　在线访谈　征求意见　廉政评议 |

⌂ 您的位置: 首页 ＞ 法律部 ＞ 法律法规 ＞ 规范性文件 ＞ 上市公司类 ＞ 公司治理与内部控制

# 上市公司治理准则

中国证监会 www.csrc.gov.cn        时间: 2002-01-07        来源:

证监发[2002]1号

各上市公司:

为推动上市公司建立和完善现代企业制度,规范上市公司运作,促进我国证券市场健康发展,现发布《上市公司治理准则》,请遵照执行。

中国证券监督管理委员会

国家经济贸易委员会

二〇〇二年一月七日

## 导 言

为推动上市公司建立和完善现代企业制度,规范上市公司运作,促进我国证券市场健康发展,根据《公司法》、《证券法》及其它相关法律、法规确定的基本原则,并参照国外公司治理实践中普遍认同的标准,制订本准则。

本准则阐明了我国上市公司治理的基本原则、投资者权利保护的实现方式,以及上市公司董事、监事、经理等高级管理人员所应当遵循的基本的行为准则和职业道德等内容。

本准则适用于中国境内的上市公司。上市公司改善公司治理,应当贯彻本准则所阐述的精神。上市公司制定或者修改公司章程及治理细则,应当体现本准则所列明的内容。本准则是评判上市公司是否具有良好的公司治理结构的主要衡量标准,对公司治理存在重大问题的上市公司,证券监管机构将责令其按照本准则的要求进行整改。

## 第一章　股东与股东大会

### 第一节　股东权利

第一条　股东作为公司的所有者,享有法律、行政法规和公司章程规定的合法权利。上市公司应建立能够确保股东充分行使权利的公司治理结构。

第二条　上市公司的治理结构应确保所有股东,特别是中小股东享有平等地位。股东按其持有的股份享有平等的权利,并承担相应的义务。

第三条 股东对法律、行政法规和公司章程规定的公司重大事项，享有知情权和参与权。上市公司应建立和股东沟通的有效渠道。

第四条 股东有权按照法律、行政法规的规定，通过民事诉讼或其他法律手段保护其合法权利。股东大会、董事会的决议违反法律、行政法规的规定，侵犯股东合法权益，股东有权依法提起要求停止上述违法行为或侵害行为的诉讼。董事、监事、经理执行职务时违反法律、行政法规或者公司章程的规定，给公司造成损害的，应承担赔偿责任。股东有权要求公司依法提起要求赔偿的诉讼。

### 第二节　股东大会的规范

第五条 上市公司应在公司章程中规定股东大会的召开和表决程序，包括通知、登记、提案的审议、投票、计票、表决结果的宣布、会议决议的形成、会议记录及其签署、公告等。

第六条 董事会应认真审议并安排股东大会审议事项，股东大会应给予每个提案合理的讨论时间。

第七条 上市公司应在公司章程中规定股东大会对董事会的授权原则，授权内容应明确具体。

第八条 上市公司应在保证股东大会合法、有效的前提下，通过各种方式和途径，包括充分运用现代信息技术手段，扩大股东参与股东大会的比例。股东大会时间、地点的选择应有利于让尽可能多的股东参加会议。

第九条 股东既可以亲自到股东大会现场投票，也可以委托代理人代为投票，两者具有同样的法律效力。

第十条 上市公司董事会、独立董事和符合有关条件的股东可向上市公司股东征集其在股东大会上的投票权。投票权征集应采取无偿的方式进行，并应向被征集人充分披露信息。

第十一条 机构投资者应在公司董事选任、经营者激励与监督、重大事项决策等方面发挥作用。

### 第三节　关联交易

第十二条 上市公司与关联人之间的关联交易应签订书面协议。协议的签订应当遵循平等、自愿、等价、有偿的原则，协议内容应明确、具体。公司应将协议的订立、变更、终止及履行情况等事项按照有关规定予以披露。

第十三条 上市公司应采取有效措施防止关联人以垄断采购和销售业务渠道等方式干预公司的经营，损害公司利益。关联交易活动应遵循商业原则，关联交易的价格原则上应不偏离市场或第三方的价格或收费的标准。公司应对关联交易的定价依据予以充分披露。

第十四条 上市公司的资产属于公司所有。上市公司应采取有效措施防止股东及其关联方以各种形式占用或转移公司的资金、资产及其他资源。上市公司不得为股东及其关联方提供担保。

## 第二章　控股股东与上市公司

### 第一节　控股股东行为的规范

第十五条 控股股东对拟上市公司改制重组时应遵循先改制、后上市的原则，并注重建立合理制衡的股权结构。

第十六条 控股股东对拟上市公司改制重组时应分离其社会职能，剥离非经营性资产。非经营性机构、福利性机构及其设施不得进入上市公司。

第十七条 控股股东为上市公司主业服务的存续企业或机构可以按照专业化、市场化的原则改组为专业化公司，并根据商业原则与上市公司签订有关协议。从事其他业务的存续企业应增强其独立发展的能力。无继续经营能力的存续企业，按照有关法律、法规的规定，通过实施破产等途径退出市场。企业重组时具备一定条件的，可以一次性分流其社会职能及分流富余人员，不保留存续企业。

第十八条 控股股东应支持上市公司深化劳动、人事、分配制度改革，转换经营管理机制，建立管理人员竞聘上岗、能上能下，职工择优录用、能进能出，收入分配能增能减、有效激励的各项制度。

第十九条  控股股东对上市公司及其他股东负有诚信义务。控股股东对其所控股的上市公司应严格依法行使出资人的权利，控股股东不得利用资产重组等方式损害上市公司和其他股东的合法权益，不得利用其特殊地位取得额外的利益。

第二十条  控股股东对上市公司董事、监事候选人的提名，应严格遵循法律、法规和公司章程规定的条件和程序。控股股东提名的董事、监事候选人应当具备相关专业知识和决策、监督能力。控股股东不得对股东大会人事选举决议和董事会人事聘任决议履行任何批准手续，不得越过股东大会、董事会任免上市公司的高级管理人员。

第二十一条  上市公司的重大决策应由股东大会和董事会依法作出。控股股东不得直接或间接干预公司的决策及依法开展的生产经营活动，损害公司及其他股东的权益。

<p style="text-align:center">第二节  上市公司的独立性</p>

第二十二条  控股股东与上市公司应实行人员、资产、财务分开，机构、业务独立，各自独立核算、独立承担责任和风险。

第二十三条  上市公司人员应独立于控股股东。上市公司的经理人员、财务负责人、营销负责人和董事会秘书在控股股东单位不得担任除董事以外的其他职务。控股股东高级管理人员兼任上市公司董事的，应保证有足够的时间和精力承担上市公司的工作。

第二十四条  控股股东投入上市公司的资产应独立完整、权属清晰。控股股东以非货币性资产出资的，应办理产权变更手续，明确界定该资产的范围。上市公司应当对该资产独立登记、建账、核算、管理。控股股东不得占用、支配该资产或干预上市公司对该资产的经营管理。

第二十五条  上市公司应按照有关法律、法规的要求建立健全的财务、会计管理制度，独立核算。控股股东应尊重公司财务的独立性，不得干预公司的财务、会计活动。

第二十六条  上市公司的董事会、监事会及其他内部机构应独立运作。控股股东及其职能部门与上市公司及其职能部门之间没有上下级关系。控股股东及其下属机构不得向上市公司及其下属机构下达任何有关上市公司经营的计划和指令，也不得以其他任何形式影响其经营管理的独立性。

第二十七条  上市公司业务应完全独立于控股股东。控股股东及其下属的其他单位不应从事与上市公司相同或相近的业务。控股股东应采取有效措施避免同业竞争。

<p style="text-align:center">第三章   董事与董事会</p>

<p style="text-align:center">第一节   董事的选聘程序</p>

第二十八条  上市公司应在公司章程中规定规范、透明的董事选聘程序，保证董事选聘公开、公平、公正、独立。

第二十九条  上市公司应在股东大会召开前披露董事候选人的详细资料，保证股东在投票时对候选人有足够的了解。

第三十条  董事候选人应在股东大会召开之前作出书面承诺，同意接受提名，承诺公开披露的董事候选人的资料真实、完整并保证当选后切实履行董事职责。

第三十一条  在董事的选举过程中，应充分反映中小股东的意见。股东大会在董事选举中应积极推行累积投票制度。控股股东控股比例在30%以上的上市公司，应当采用累积投票制度。采用累积投票制度的上市公司应在公司章程里规定该制度的实施细则。

第三十二条  上市公司应和董事签订聘任合同，明确公司和董事之间的权利义务、董事的任期、董事违反法律法规和公司章程的责任以及公司因故提前解除合同的补偿等内容。

<p style="text-align:center">第二节   董事的义务</p>

第三十三条  董事应根据公司和全体股东的最大利益、忠实、诚信、勤勉地履行职责。

第三十四条  董事应保证有足够的时间和精力履行其应尽的职责。

第三十五条  董事应以认真负责的态度出席董事会，对所议事项表达明确的意见。董事确实无法亲自出席董事会的，可以书面形式委托其他董事按委托人的意愿代为投票，委托人应承担法律责任。

第三十六条  董事应遵守有关法律、法规和公司章程的规定，严格遵守其公开作出的承诺。

第三十七条  董事应积极参加有关培训，以了解作为董事的权利、义务和责任，熟悉有关法律法规，掌握作为董事应具备的相关知识。

第三十八条  董事会决议违反法律、法规和公司章程的规定，致使公司遭受损失的，参与决议的董事对公司承担赔偿责任。但经证明在表决时曾表明异议并记载于会议记录的董事除外。

第三十九条  经股东大会批准，上市公司可以为董事购买责任保险。但董事因违反法律法规和公司章程规定而导致的责任除外。

### 第三节  董事会的构成和职责

第四十条  董事会的人数及人员构成应符合有关法律、法规的要求，确保董事会能够进行富有成效的讨论，作出科学、迅速和谨慎的决策。

第四十一条  董事会应具备合理的专业结构，其成员应具备履行职务所必需的的知识、技能和素质。

第四十二条  董事会向股东大会负责。上市公司治理结构应确保董事会能按照法律、法规和公司章程的规定行使职权。

第四十三条  董事会应认真履行有关法律、法规和公司章程规定的职责，确保公司遵守法律、法规和公司章程的规定，公平对待所有股东，并关注其他利益相关者的利益。

### 第四节  董事会议事规则

第四十四条  上市公司应在公司章程中规定规范的董事会议事规则，确保董事会高效运作和科学决策。

第四十五条  董事会应定期召开会议，并根据需要及时召开临时会议。董事会会议应有事先拟定的议题。

第四十六条  上市公司董事会会议应严格按照规定的程序进行。董事会应按规定的时间事先通知所有董事，并提供足够的资料，包括会议议题的相关背景材料和有助于董事理解会议议事进展的信息和数据。当2名或以上独立董事认为资料不充分或论证不明确时，可联名以书面形式向董事会提出延期召开董事会会议或延期审议该事项，董事会应予以采纳。

第四十七条  董事会会议记录应完整、真实。董事会秘书对会议所议事项要认真组织记录和整理。出席会议的董事、董事会秘书和记录人应在会议记录上签名。董事会会议记录作为公司重要档案妥善保存，以作为日后明确董事责任的重要依据。

第四十八条  董事会授权董事长在董事会闭会期间行使董事会部分职权的，上市公司应在公司章程中明确规定授权原则和授权内容，授权内容应当明确、具体。凡涉及公司重大利益的事项应由董事会集体决策。

### 第五节  独立董事制度

第四十九条  上市公司应按照有关规定建立独立董事制度。独立董事应独立于所受聘的公司及其主要股东。独立董事不得在上市公司担任除独立董事外的其他任何职务。

第五十条  独立董事对公司及全体股东负有诚信与勤勉义务。独立董事应按照相关法律、法规、公司章程的要求，认真履行职责，维护公司整体利益，尤其要关注中小股东的合法权益不受损害。独立董事应独立履行职责，不受公司主要股东、实际控制人、以及其他与上市公司存在利害关系的单位或个人的影响。

第五十一条  独立董事的任职条件、选举更换程序、职责等，应符合有关规定。

第六节 董事会专门委员会

第五十二条 上市公司董事会可以按照股东大会的有关决议，设立战略、审计、提名、薪酬与考核等专门委员会。专门委员会成员全部由董事组成，其中审计委员会、提名委员会、薪酬与考核委员会中独立董事应占多数并担任召集人，审计委员会中至少应有一名独立董事是会计专业人士。

第五十三条 战略委员会的主要职责是对公司长期发展战略和重大投资决策进行研究并提出建议。

第五十四条 审计委员会的主要职责是：（1）提议聘请或更换外部审计机构；（2）监督公司的内部审计制度及其实施；（3）负责内部审计与外部审计之间的沟通；（4）审核公司的财务信息及其披露；（5）审查公司的内控制度。

第五十五条 提名委员会的主要职责是：（1）研究董事、经理人员的选择标准和程序并提出建议；（2）广泛搜寻合格的董事和经理人员的人选；（3）对董事候选人和经理人选进行审查并提出建议。

第五十六条 薪酬与考核委员会的主要职责是：（1）研究董事与经理人员考核的标准，进行考核并提出建议；（2）研究和审查董事、高级管理人员的薪酬政策与方案。

第五十七条 各专门委员会可以聘请中介机构提供专业意见，有关费用由公司承担。

第五十八条 各专门委员会对董事会负责，各专门委员会的提案应提交董事会审查决定。

第四章 监事与监事会

第一节 监事会的职责

第五十九条 上市公司监事会应向全体股东负责，对公司财务以及公司董事、经理和其他高级管理人员履行职责的合法合规性进行监督，维护公司及股东的合法权益。

第六十条 监事有了解公司经营情况的权利，并承担相应的保密义务。监事会可以独立聘请中介机构提供专业意见。

第六十一条 上市公司应采取措施保障监事的知情权，为监事正常履行职责提供必要的协助，任何人不得干预、阻挠。监事履行职责所需的合理费用应由公司承担。

第六十二条 监事会的监督记录以及进行财务或专项检查的结果应成为对董事、经理和其他高级管理人员绩效评价的重要依据。

第六十三条 监事会发现董事、经理和其他高级管理人员存在违反法律、法规或公司章程的行为，可以向董事会、股东大会反映，也可以直接向证券监管机构及其他有关部门报告。

第二节 监事会的构成和议事规则

第六十四条 监事应具有法律、会计等方面的专业知识或工作经验。监事会的人员和结构应确保监事会能够独立有效地行使对董事、经理和其他高级管理人员及公司财务的监督和检查。

第六十五条 上市公司应在公司章程中规定规范的监事会议事规则。监事会会议应严格按规定程序进行。

第六十六条 监事会应定期召开会议，并根据需要及时召开临时会议。监事会会议因故不能如期召开，应公告说明原因。

第六十七条 监事会可要求公司董事、经理及其他高级管理人员、内部及外部审计人员出席监事会会议，回答所关注的问题。

第六十八条 监事会会议应有记录，出席会议的监事和记录人应当在会议记录上签字。监事有权要求在记录上对其在会议上的发言作出某种说明性记载。监事会会议记录应作为公司重要档案妥善保存。

上市公司治理准则

## 第五章　绩效评价与激励约束机制

### 第一节　董事、监事、经理人员的绩效评价

第六十九条　上市公司应建立公正透明的董事、监事和经理人员的绩效评价标准和程序。

第七十条　董事和经理人员的绩效评价由董事会或其下设的薪酬与考核委员会负责组织。独立董事、监事的评价应采取自我评价与相互评价相结合的方式进行。

第七十一条　董事报酬的数额和方式由董事会提出方案报请股东大会决定。在董事会或薪酬与考核委员会对董事个人进行评价或讨论其报酬时，该董事应当回避。

第七十二条　董事会、监事会应当向股东大会报告董事、监事履行职责的情况、绩效评价结果及其薪酬情况，并予以披露。

### 第二节　经理人员的聘任

第七十三条　上市公司经理人员的聘任，应严格按照有关法律、法规和公司章程的规定进行。任何组织和个人不得干预公司经理人员的正常选聘程序。

第七十四条　上市公司应尽可能采取公开、透明的方式，从境内外人才市场选聘经理人员，并充分发挥中介机构的作用。

第七十五条　上市公司应和经理人员签订聘任合同，明确双方的权利义务关系。

第七十六条　经理的任免应履行法定的程序，并向社会公告。

### 第三节　经理人员的激励与约束机制

第七十七条　上市公司应建立经理人员的薪酬与公司绩效和个人业绩相联系的激励机制，以吸引人才，保持经理人员的稳定。

第七十八条　上市公司对经理人员的绩效评价应当成为确定经理人员薪酬以及其它激励方式的依据。

第七十九条　经理人员的薪酬分配方案应获得董事会的批准，向股东大会说明，并予以披露。

第八十条　上市公司应在公司章程中明确经理人员的职责。经理人员违反法律、法规和公司章程规定，致使公司遭受损失的，公司董事会应积极采取措施追究其法律责任。

## 第六章　利益相关者

第八十一条　上市公司应尊重银行及其它债权人、职工、消费者、供应商、社区等利益相关者的合法权利。

第八十二条　上市公司应与利益相关者积极合作，共同推动公司持续、健康地发展。

第八十三条　上市公司应为维护利益相关者的权益提供必要的条件，当其合法权益受到侵害时，利益相关者应有机会和途径获得赔偿。

第八十四条　上市公司应向银行及其它债权人提供必要的信息，以便其对公司的经营状况和财务状况作出判断和进行决策。

第八十五条　上市公司应鼓励职工通过与董事会、监事会和经理人员的直接沟通和交流，反映职工对公司经营、财务状况以及涉及职工利益的重大决策的意见。

第八十六条　上市公司在保持公司持续发展、实现股东利益最大化的同时，应关注所在社区的福利、环境保护、公益事业等问题，重视公司的社会责任。

上市公司治理准则

## 第七章　信息披露与透明度

### 第一节　上市公司的持续信息披露

第八十七条　持续信息披露是上市公司的责任。上市公司应严格按照法律、法规和公司章程的规定，真实、准确、完整、及时地披露信息。

第八十八条　上市公司除按照强制性规定披露信息外，应主动、及时地披露所有可能对股东和其它利益相关者决策产生实质性影响的信息，并保证所有股东有平等的机会获得信息。

第八十九条　上市公司披露的信息应当便于理解。上市公司应保证使用者能够通过经济、便捷的方式（如互联网）获得信息。

第九十条　上市公司董事会秘书负责信息披露事项，包括建立信息披露制度、接待来访、回答咨询、联系股东，向投资者提供公司公开披露的资料等。董事会及经理人员应对董事会秘书的工作予以积极支持。任何机构及个人不得干预董事会秘书的工作。

### 第二节　公司治理信息的披露

第九十一条　上市公司应按照法律、法规及其他有关规定，披露公司治理的有关信息，包括但不限于：（1）董事会、监事会的人员及构成；（2）董事会、监事会的工作及评价；（3）独立董事工作情况及评价，包括独立董事出席董事会的情况、发表独立意见的情况及对关联交易、董事及高级管理人员的任免等事项的意见；（4）各专门委员会的组成及工作情况；（5）公司治理的实际状况，及与本准则存在的差异及其原因；（6）改进公司治理的具体计划和措施。

### 第三节　股东权益的披露

第九十二条　上市公司应按照有关规定，及时披露持有公司股份比例较大的股东以及一致行动时可以实际控制公司的股东或实际控制人的详细资料。

第九十三条　上市公司应及时了解并披露公司股份变动的情况以及其它可能引起股份变动的重要事项。

第九十四条　当上市公司控股股东增持、减持或质押公司股份，或上市公司控制权发生转移时，上市公司及其控股股东应及时、准确地向全体股东披露有关信息。

## 第八章　附则

第九十五条　本准则自发布之日起施行。

关于我们 ｜ 联系我们 ｜ 法律声明

版权所有：中国证券监督管理委员会　京ICP备 05035542号

# EXHIBIT 8

John Taladay (*pro hac vice*)
john.taladay@bakerbotts.com
Erik Koons (*pro hac vice*)
erik.koons@bakerbotts.com
BAKER BOTTS LLP
1299 Pennsylvania Ave. NW
Washington, D.C. 20004
Telephone:  202.639.7700
Facsimile:   202.639.7890

Stuart C. Plunkett (State Bar No. 187971)
stuart.plunkett@bakerbotts.com
BAKER BOTTS LLP
101 California Street, Suite 3600
San Francisco, California 94111
Telephone: (415) 291-6200
Facsimile: (415) 291-6300

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION, | Case No. 3:07-cv-05944-JST |
| | MDL No.: 1917 |
| THIS DOCUMENT RELATES TO: | **IRICO DEFENDANTS' OBJECTIONS TO PLAINTIFFS' NOTICE OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(b)(6)** |
| *ALL DIRECT AND INDIRECT PURCHASER ACTIONS* | |

Irico Group Corporation and Irico Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby serve the following objections to the Notice of Depositions of Defendants Irico Group Corporation and Irico Display Devices Co., Ltd. Pursuant to Fed. R. Civ. P. 30(b)(6), served on February 5, 2019 (the "Notice").

## GENERAL OBJECTIONS

Irico makes the following General Objections to the Notice:

1.     These objections are based upon information available to and located by Irico as of the date of service of these objections.

2.     No express, incidental, or implied admissions are intended by these objections and should not be read or construed as such.

3.     Irico does not intend, and its objections should not be construed as, an agreement or acquiescence with any characterization of fact, assumption, or conclusion of law contained in or implied by the Notice.

4.     To the extent that Irico's response to the Notice suggests Irico will produce or make available for examination responsive information or documents, Irico does not represent that any such information or documents exist.

5.     Irico objects to the Notice to the extent the examination topics are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiffs.

6.     Irico objects to the Notice to the extent that it seeks to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

7.     Irico objects to the Notice to the extent it seeks information or documents that are not relevant to jurisdictional issues or disproportionate to the needs of the case in resolving such jurisdictional issues.

8.     Irico objects to the Notice to the extent the examination topics are not described with reasonable particularity, vague, ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such vague or ambiguous topics so as to provide responsive

information that is proportionate to the needs of the case. If Plaintiffs subsequently asserts an interpretation of any topic that differs from Irico's understanding, Irico reserves the right to supplement or amend its objections.

9. Irico objects to the Notice to the extent the examination topics contain terms that are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous topics so as to provide responsive information that is proportionate to the needs of the case.

10. Irico objects to the Notice to the extent the examination topics seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico will provide only information that it believes to be non-privileged and otherwise properly discoverable. None of Irico's responses is intended nor should be construed as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any information subject to any such doctrine, privilege, protection or immunity from production shall not constitute a general, inadvertent, implicit, subject-matter, separate, independent or other waiver of such doctrine, privilege, protection or immunity from production.

11. Irico objects to the Notice to the extent that the examination topics call for information that is not in the possession, custody, or control of Irico. Irico also objects to the extent that any of the topics seek information from non-parties or third parties, including but not limited to any of Irico's subsidiary or affiliated companies.

12. Irico objects to the Notice to the extent that responding would require Irico to violate the privacy and/or confidentiality of a third party or confidentiality agreement with a third party.

13. Irico objects to the Notice to the extent the examination topics seek information that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily available from other sources.

14. Irico objects to the Notice to the extent the examination topics seek information

concerning transactions outside the United States. Such topics are unduly burdensome and irrelevant because they do not relate to actions by Irico in or causing a direct effect in the United States.  Such topics are also unduly burdensome and irrelevant to this pending action as Plaintiffs' class definitions are confined to "all persons . . . who directly purchased a Cathode Ray Tube Product . . . in the United States" (see Direct Purchaser Plaintiffs' Consolidated Amended Complaint) and "individuals and entities that indirectly purchased Cathode Ray Tube Products . . . in the United States" (see Indirect Purchaser Plaintiffs' Fourth Consolidated Amended Complaint).

15.     Irico objects to the Notice to the extent that compliance would require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body of foreign jurisdictions.

16.     Irico's responses, whether now or in the future, pursuant to the Notice should not be construed as either (i) a waiver of any of Irico's general or specific objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

17.     Irico objects to the Notice to the extent that compliance would require Irico to seek information stored on backup or archived databases or other systems that are not readily accessible or otherwise no longer active.

18.     Irico objects to the Notice to the extent that any examination topic states and/or calls for legal conclusions.

19.     Irico objects to the Notice to the extent that any examination topic contains express or implied assumptions of fact or law with respect to the matters at issue in this case.

20.     Irico objects to the Notice to the extent the examination topics seek documents that cannot be removed or transmitted outside China without violating the laws and regulations of that country, including but not limited to restrictions on the transmission of state secrets or trade secrets as those terms are defined under Chinese law.

21.     Irico reserves the right to assert additional General and Specific Objections as appropriate.

**GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1.      Irico objects to the definitions of "You" and "Your" (Definition No. 6) to the extent that Plaintiffs define those terms to include the Irico's "predecessors, successors, subsidiaries, departments, divisions, and/or affiliates." This definition is legally incorrect, overbroad, unduly burdensome, vague, and ambiguous. Irico also objects to the inclusion of "all present and former directors, officers, Employees, agents, representatives or any Persons acting or purporting to act on behalf of" Irico within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

2.      Irico objects to the definition of "Document" (Definition No. 8) to the extent it seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, or any other applicable laws.

3.      Irico objects to the definition of "Employee" (Definition No. 9) on the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to the extent that it seeks information protected by the attorney client or other applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or foreign law.

4.      Irico objects to the definitions of "CRT" and "CRT Products" (Definitions No. 10 and 11) on the grounds that they are vague, ambiguous and overly broad. Irico further objects to the use of the term "CRT Products" to the extent that it is inconsistent with the definition of "CRT Products" as set forth in Plaintiffs' pleadings.

5.      Irico objects to the definition of the "Relevant Time Period" (Definition No. 13) as overbroad, unduly burdensome, beyond the applicable statute of limitations, and beyond the relevant time period for determining jurisdictional issues.

6.      Irico objects to the definition of "Communication" (Definition No. 14) on the

grounds that it is vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure.

7.      Irico objects to the definition of "Meeting" (Definition No. 16) on the grounds that it is vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure.

## OBJECTIONS TO TOPICS FOR EXAMINATION

**TOPIC 1:**  The corporate formation, ownership, and purpose of Group and Display, including any basis for any contention by Irico that Group and Display engage in a public activity, and including any changes in status.

**OBJECTION TO TOPIC 1**:

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico further objects that this topic is not described with reasonable particularity.  Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues. Irico also objects that this topic seeks to unreasonably require preparation of a witness on an extremely broad range of information, including "any basis for any contention" relating to numerous facts, events and corporate changes over nearly two decades.  Irico also objects that this topic seeks information that is publicly available, more easily available from third parties, or already known to Plaintiff, including from Irico's responses to DPPs' Interrogatory Nos. 1 through 5 and Irico's various document productions.  Irico also objects that the terms "purpose," "public activity," and "status" are vague, ambiguous, unintelligible, and subject to multiple interpretations.  Irico will attempt to construe this vague and ambiguous language so as to provide responsive information that is proportionate to the needs of the case in resolving jurisdictional issues.  Irico also objects that this topic calls for legal argument or a legal conclusion.

Subject to and without waiving the objections stated above, Irico will designate Mengquan Guo to discuss in general terms the formation, ownership, and purpose of Group and Display.

**TOPIC 2:**  Supervision of either Group or Display by officials of the People's Republic of China, including any specific instances of supervision or control that Irico contends are relevant to alleged organ status of Display.

**OBJECTION TO TOPIC 2:**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico further objects that this topic is not described with reasonable particularity.  Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues. Irico also objects that this topic seeks to unreasonably require preparation of a witness on an extremely broad range of information, including decades-old "specific instances of supervision or control" over a period of thirteen years.  Irico also objects that this topic seeks information that is publicly available, more easily available from third parties, or already known to Plaintiff, including from Irico's responses to DPPs' Interrogatory Nos. 5 through 7 and Irico's various document productions.  Irico also objects that the terms "supervision," "control," and "organ status" are vague, ambiguous, unintelligible, and subject to multiple interpretations.  Irico will attempt to construe this vague and ambiguous language so as to provide responsive information that is proportionate to the needs of the case in resolving jurisdictional issues.  Irico also objects that this topic calls for legal argument or a legal conclusion.

Subject to and without waiving the objections stated above, Irico will designate Mengquan Guo to discuss in general terms the supervision or control of Group and Display by the government of China.

**TOPIC 3:**  The inter-defendant Communications identified in Exhibit 11 to the Saveri Declaration or in the Leitzinger Report involving Irico, including any related internal Communications on or about the same Dates.

**OBJECTION TO TOPIC 3**:

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico further objects that this topic is not described with reasonable particularity.  Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues.  Irico also objects that this topic seeks to unreasonably require preparation of a witness on decades-old alleged events of which Irico has no record and for which the circumstances cannot be determined.  Irico also objects that this topic seeks information that is publicly available, more easily available from third parties, or already known to Plaintiffs, including from Irico's responses to DPPs' Request for Production No. 10.

Subject to and without waiving the objections stated above, Irico will designate Zhaojie Wang to discuss the information, if any, found by Irico regarding the meetings described in this topic.

**TOPIC 4:**  Any sales, attempted sales, or contemplated sales by Irico, directly or indirectly, to the United States during the Class Period, including, but not limited to, sales through China National Electronics Imp. & Exp. Caihong Co., Irico Group Electronics Co. Ltd., Xian Irico Display Technology Co., Ltd., Irico (USA) Inc., and/or the Irico HuangQi Company.

**OBJECTION TO TOPIC 4**:

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico further objects that this topic is not described with reasonable particularity.  Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues.  Irico also objects that this topic seeks to unreasonably require preparation of a witness on an extremely broad range of information, including "any sales, attempted sales, or contemplated sales" over a 13-year period reaching back over two decades.  Irico also objects that this topic seeks information that is publicly available, more easily available from third parties, or already known to Plaintiff, including from Irico's responses to DPPs' Interrogatory No. 20 and Irico's various document productions.  Irico also objects that the terms "attempted sales,"

"contemplated sales," "indirectly," and "through" are vague, ambiguous, unintelligible, and subject to multiple interpretations. Irico will attempt to construe this vague and ambiguous language so as to provide responsive information that is proportionate to the needs of the case in resolving jurisdictional issues. Irico also objects that this topic calls for legal argument or a legal conclusion.

Subject to and without waiving the objections stated above, Irico will designate Zhaojie Wang to discuss in general terms the information known to Irico regarding the sales, or lack thereof, of its CRTs into the United States.

**TOPIC 5:** All Documents and Communications that Wenkei Zhang reviewed or relied on in preparing his Declaration.

**OBJECTION TO TOPIC 5**:

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this topic is not described with reasonable particularity. Irico also objects that this topic seeks information beyond the scope of what is relevant to resolving jurisdictional issues. Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues. Irico also objects that this topic seeks information that is publicly available, more easily available from third parties, or already known to Plaintiff, including from Irico's responses to DPPs' Interrogatory No. 9 and Irico's various document productions. Irico also objects that this topic calls for information that is privileged under the attorney-client, work product, or any other applicable privilege or immunity.

Subject to and without waiving the objections stated above, Irico will designate Wenkai Zhang to discuss the documents and information he received for the preparation of his Declaration.

**TOPIC 6:** The preservation, or not, of evidence by Group and/or Display relevant to their FSIA defenses or the merits of this case, from 2008 to present.

**OBJECTION TO TOPIC 6**:

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this topic is not described with reasonable particularity. Irico also objects that this topic seeks information beyond the scope of what is relevant to resolving jurisdictional issues as the "merits of this case" are not within the scope of current discovery. Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues. Irico also objects that this topic seeks information that is publicly available, more easily available from third parties, or already known to Plaintiff. Irico also objects that this topic calls for legal argument or a legal conclusion. Irico also objects that this topic calls for information that is privileged under the attorney-client, work product, or any other applicable privilege or immunity.

Subject to and without waiving the objections stated above, Irico will designate Wenkai Zhang to discuss in general terms Irico's preservation of documents and other information.

**TOPIC 7:**  The activities of Irico (USA) Inc. related to CRTs or CRT Products.

**OBJECTION TO TOPIC 7**:

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this topic is not described with reasonable particularity. Irico also objects that this topic seeks information beyond the scope of what is relevant to resolving jurisdictional issues, as it relates to an entity that is not a defendant in this case and has not been alleged to be a participant in any CRT-related conspiracy. Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues. Irico also objects that this topic seeks information that is publicly available, more easily available from third parties, or already known to Plaintiff, including from Irico's responses to IPPs' Interrogatory No. 4 (Second Set) and Irico's various document productions. Irico also objects that Irico (USA) Inc. had no affiliation with Irico for a portion of the Relevant Time Period and so Irico cannot provide any information regarding activities of Irico (USA) Inc. during those years.

Irico also objects that the term "related to" is vague, ambiguous, unintelligible, and subject to multiple interpretations. Irico will attempt to construe this vague and ambiguous language so as to provide responsive information that is proportionate to the needs of the case in resolving jurisdictional issues.

Subject to and without waiving the objections stated above, Irico will designate Mengquan Guo to discuss in general terms the information known to Irico regarding the CRT-related activities of Irico (USA) Inc.

**TOPIC 8:**  Any status, obligations, or privileges that Group or Display had under the law of the People's Republic of China during the period from 2006 to 2008.

**OBJECTION TO TOPIC 8**:

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this topic is not described with reasonable particularity. Irico also objects that this topic seeks information beyond the scope of what is relevant to resolving jurisdictional issues. Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues. Irico also objects that this topic seeks information that is publicly available, more easily available from third parties, or already known to Plaintiff, including from Irico's responses to DPPs' Interrogatory No. 5 and Irico's various document productions. Irico also objects that the terms "status," "obligations," and "privileges" are vague, ambiguous, unintelligible, and subject to multiple interpretations. Irico will attempt to construe this vague and ambiguous language so as to provide responsive information that is proportionate to the needs of the case in resolving jurisdictional issues. Irico also objects that this topic calls for legal argument or a legal conclusion.

Subject to and without waiving the objections stated above, Irico will designate Mengquan Guo to discuss in general terms the status of Group and Display under Chinese law as of November 26, 2007.

**TOPIC 9:**  The basis for the statement in the Zhang Declaration that "Irico declined to answer [the DPP's complaint] because it believed that Irico Group and Irico Display were immune from suit in the United States."

**OBJECTION TO TOPIC 9:**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico further objects that this topic is not described with reasonable particularity.  Irico also objects that this topic seeks information irrelevant to resolving jurisdictional issues.  Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues. Irico also objects that this topic calls for legal argument or a legal conclusion.  Irico also objects that this topic calls for information that is privileged under the attorney-client, work product, or any other applicable privilege or immunity.

Subject to and without waiving the objections stated above, Irico will designate Wenkai Zhang to discuss statements made in his Declaration.

**TOPIC 10:**  A complete description of Your transactional sales files for CRTs and/or CRT Products, including the transactional data for CRT and/or CRT Product sales produced by You in this action and the information contained in such data.

**OBJECTION TO TOPIC 10:**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico further objects that this topic is not described with reasonable particularity.  Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues. Irico also objects that this topic seeks to unreasonably require preparation of a witness on decades-old defunct databases for which information is largely unavailable.  Irico also objects that this topic seeks information that is publicly available, more easily available from third parties, or already known to Plaintiff, including from Irico's various document productions.

1  Subject to and without waiving the objections stated above, Irico will designate Wenkai

2  Zhang to discuss in general terms the information contained in the sales data files that Irico has

3  produced.

4  **TOPIC 11:**  Group's and/or Display's monitoring of consumer market for CRT Products

5  during the Class Period, including the use of market data, reports, studies or analyses generated

6  internally or obtained from third parties.

7  **OBJECTION TO TOPIC 11**:

8  Irico reasserts and incorporates each of the General Objections and Objections to the

9  Definitions and Instructions set forth above.  Irico further objects that this topic is not described

10  with reasonable particularity.  Irico also objects that this topic seeks information irrelevant to

11  resolving jurisdictional issues, including information that is immaterial to any alleged direct

12  effect in the United States.  Irico also objects that this topic seeks to unreasonably require

13  preparation of a witness on an extremely broad range of information, including "market data,

14  reports, studies, or analysis" used over a 13-year period reaching back over two decades.  Irico

15  also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs

16  of the case in resolving jurisdictional issues.  Irico also objects that the terms "monitoring of

17  consumer market," "reports," "studies," and "analyses" are vague, ambiguous, unintelligible,

18  and subject to multiple interpretations.

19  **TOPIC 12:**  Group's and/or Display's sales of CRTs to the following entities, including sales

20  to related entities that manufactured and sold CRT Products during the Class Period:

21  Changhong, Konka, TCL, Skyworth, Hisense, Haier, XOCECO (厦门华侨电子), Soyea (数源

22  科技), Yisheng (深圳溢胜), LG Electronics (Shenyang), Hangzhou Jinlipu (杭州金利普),

23  Shenzhen Techtop, Suntrue, Starlight (or Starlite), Hangzhou Huashan, Suzhou Youshida (苏州

24  优视达), and China National Electronics Import & Export Caihong Co. (中国电子进出口彩虹

25  公司).

26  **OBJECTION TO TOPIC 12**:

27  Irico reasserts and incorporates each of the General Objections and Objections to the

28  Definitions and Instructions set forth above.  Irico further objects that this topic is not described

with reasonable particularity.  Irico also objects that this topic seeks information irrelevant to resolving jurisdictional issues, as the listed companies are all based in China.  Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues.  Irico also objects that this topic seeks information that is more easily available from third parties or already known to Plaintiff, and such information is fully set out in Irico's responses to IPPs' Interrogatory No. 3 (Second Set).  Irico also objects that this topic seeks to unreasonably require a witness to memorize the sales information already produced in response to IPPs' Interrogatory No. 3 (Second Set).

**TOPIC 13:**  Any Communications that Group and/or Display or any affiliate of Group and/or Display had with customers concerning any sales, contemplated sales, pricing, or shipment to the United States during the Class Period.

**OBJECTION TO TOPIC 13**:

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico further objects that this topic is not described with reasonable particularity.  Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues. Irico also objects that, as described in Irico's responses to DPPs' Interrogatory No. 20 and Request for Production No. 9 and IPPs' Interrogatory No. 17 (First Set), no responsive information on this topic has been found after an extensive search of all physical and electronic sources within Irico's possession, custody, or control.

**TOPIC 14:**  Knowledge of Group and/or Display or any affiliate of Group and/or Display regarding customers' sale of CRT Products to the United States during the Class Period.

**OBJECTION TO TOPIC 14**:

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico further objects that this topic is not described with reasonable particularity.  Irico also objects that this topic seeks information beyond the scope of what is relevant to resolving jurisdictional issues, including sales by entities with no affiliation to Irico.  Irico also objects that this topic is overbroad, unduly burdensome, and

disproportionate to the needs of the case in resolving jurisdictional issues. Irico also objects that this topic seeks information that is more easily available from third parties or already known to Plaintiff, including from Irico's responses to DPPs' Interrogatory No. 20 and IPPs' Interrogatory No. 17 (First Set).

Subject to and without waiving the objections stated above, Irico will designate Zhaojie Wang to discuss in general terms Irico's knowledge, if any, of Irico's customers sales of CRT Products containing Irico CRTs to the United States.

**TOPIC 15:** The worldwide market share of Group and/or Display for CRTs or CRT Products during the Class Period.

**OBJECTION TO TOPIC 15:**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this topic is not described with reasonable particularity. Irico also objects that this topic seeks information beyond the scope of what is relevant to resolving jurisdictional issues. Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues. Irico also objects that this topic seeks information that is publicly available, more easily available from third parties, or already known to Plaintiff.

Subject to and without waiving the objections stated above, Irico will designate Mengquan Guo to discuss in general terms Irico's knowledge of its worldwide CRT market share, to the extent Irico has any such information.

**TOPIC 16:** The relationship, including any direct or indirect ownership and/or control, between China National Electronics Imp. & Exp. Caihong, Co., Xian Irico Display Technology Co., Ltd., Irico (USA) Inc., and/or the Irico HuangQi Company on the one hand, and Group and/or Display on the other.

**OBJECTION TO TOPIC 16:**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this topic is not described with reasonable particularity. Irico also objects that this topic seeks information beyond the

scope of what is relevant to resolving jurisdictional issues, as it relates to entities that are not defendants in this case and have not been alleged to be a participant in any CRT-related conspiracy.  Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues.  Irico also objects that this topic seeks information that is publicly available, more easily available from third parties, or already known to Plaintiff, including from Irico's responses to DPPs' Interrogatory No. 20, IPPs' Interrogatory No. 4 (Second Set) and Irico's various document productions.

Subject to and without waiving the objections stated above, Irico will designate Mengquan Guo to discuss in general terms the relationship between Irico Group and Display and the entities named in this topic.

**TOPIC 17:**  The ownership of Irico (USA) Inc., including any direct or indirect ownership and/or control, by China National Electronics Imp. & Exp. Caihong, Co., Group and/or Display.

**OBJECTION TO TOPIC 17**:

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico further objects that this topic is not described with reasonable particularity.  Irico also objects that this topic seeks information beyond the scope of what is relevant to resolving jurisdictional issues, as it relates to entities that are not defendants in this case and have not been alleged to be a participant in any CRT-related conspiracy.  Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues.  Irico also objects that this topic seeks information that is publicly available, more easily available from third parties, or already known to Plaintiff, including from Irico's responses to DPPs' Interrogatory No. 20, IPPs' Interrogatory No. 4 (Second Set) and Irico's various document productions.

Subject to and without waiving the objections stated above, Irico will designate Mengquan Guo to discuss in general terms the relationship between Irico Group and Display and the entities named in this topic.

**TOPIC 18:**  The nature and extent of the search for Documents and/or information by Group and Display in response to Plaintiffs' discovery requests.

**OBJECTION TO TOPIC 18**:

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico further objects that this topic is not described with reasonable particularity.  Irico also objects that this topic seeks information beyond the scope of what is relevant to resolving jurisdictional issues as the "merits of this case" are not within the scope of current discovery.  Irico also objects that this topic is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues. Irico also objects that this topic seeks information that is already known to Plaintiff, including from Irico's responses to DPPs' Request for Production No. 9 and IPPs' Request for Production No. 18 (First Set).  Irico also objects that this topic calls for information that is privileged under the attorney-client, work product, or any other applicable privilege or immunity.

Subject to and without waiving the objections stated above, Irico will designate Wenkai Zhang to discuss in general terms the extent of Irico's discovery efforts.

Dated:  February 13, 2019

*/s/ Stuart C. Plunkett*

John Taladay (*pro hac vice*)
john.taladay@bakerbotts.com
Erik Koons (*pro hac vice*)
erik.koons@bakerbotts.com
1299 Pennsylvania Ave.,NW
Washington, D.C. 20004
Telephone:  202.639.7700
Facsimile:   202.639.7890

Stuart C. Plunkett (State Bar No. 187971)
stuart.plunkett@bakerbotts.com
BAKER BOTTS LLP
101 California Street, Suite 3600
San Francisco, California 94111
Telephone: (415) 291-6200
Facsimile: (415) 291-6300

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

## CERTIFICATE OF SERVICE

**In re: Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917**

I declare that I am employed in Washington, District of Columbia. I am over the age of eighteen years and not a party to the within case; my business address is: Baker Botts L.L.P., 1299 Pennsylvania Avenue, Washington, DC 20004.

On February 13, 2019, I served the following document(s) described as:

**IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD.'S OBJECTIONS TO PLAINTIFFS' NOTICE OF DEPOSITION OF IRICO DEFENDANTS PURSUANT TO FED. R. CIV. P. 30(b)(6)**

on the following interested parties in this action:

Guido Saveri (guido@saveri.com)
R. Alexander Saveri (rick@saveri.com)
Geoffrey C. Rushing (grushing@saveri.com)
Cadio Zirpoli (cadio@saveri.com)
Matthew D. Heaphy (mheaphy@saveri.com)
SAVERI & SAVERI, INC.
706 Sansome St # 200,
San Francisco, CA 94111

Mario N. Alioto (malioto@tatp.com)
Lauren C. Capurro (laurenrussell@tatp.com)
Joseph M. Patane (jpatane@tatp.com)
TRUMP ALIOTO TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123

*Lead Counsel for the Direct Purchaser Plaintiffs*

*Lead Counsel for the Indirect Purchaser Plaintiffs*

Christopher Micheletti
(cmicheletti@zelle.com)
Qianwei Fu (qfu@zelle.com)
ZELLE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104-4807
D (415) 633-1912

*Lead Counsel for the Indirect Purchaser Plaintiffs*

[X]    (BY ELECTRONIC MAIL) I caused such documents to be sent to the persons at the email addressed listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on February 13, 2019, 2012 at Washington, District of Columbia.

_/s/ Thomas Carter_
Thomas Carter

# EXHIBIT 9

**Matthew Heaphy**

| | |
|---|---|
| **From:** | Tom.Carter@BakerBotts.com |
| **Sent:** | Monday, February 25, 2019 1:31 PM |
| **To:** | stuart.plunkett@bakerbotts.com; LaurenRussell@TATP.com |
| **Cc:** | Matthew Heaphy; john.taladay@bakerbotts.com; erik.koons@bakerbotts.com; kaylee.yang@bakerbotts.com; malioto@tatp.com; jpatane@tatp.com; CMicheletti@zelle.com; QFu@zelle.com; Rick Saveri; Geoff Rushing; Cadio Zirpoli; drew.lucarelli@bakerbotts.com; brian.jacobsmeyer@BakerBotts.com |
| **Subject:** | RE: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST |

Counsel:

Irico will designate witnesses for the 30(b)(6) topics originally assigned to Mr. Guo as follows:

- Topic 1: Zhaojie Wang
- Topic 2: Zhaojie Wang
- Topic 7: Wenkai Zhang
- Topic 8: Zhaojie Wang
- Topic 15: Zhaojie Wang
- Topic 16: Wenkai Zhang
- Topic 17: Wenkai Zhang

Thank you,
Tom Carter

---

**From:** Plunkett, Stuart
**Sent:** Monday, February 25, 2019 2:01 PM
**To:** Lauren Capurro <LaurenRussell@TATP.com>
**Cc:** mheaphy@saveri.com; Taladay, John <john.taladay@bakerbotts.com>; Koons, Erik <erik.koons@bakerbotts.com>; Carter, Tom <Tom.Carter@BakerBotts.com>; Yang, Kaylee <kaylee.yang@bakerbotts.com>; malioto@tatp.com; jpatane@tatp.com; CMicheletti@zelle.com; QFu@zelle.com; Rick@saveri.com; Geoff@saveri.com; Lucarelli, Drew <drew.lucarelli@bakerbotts.com>; Jacobsmeyer, Brian <brian.jacobsmeyer@BakerBotts.com>
**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

All:

In advance of our call this morning, I wanted to let you know that we just received word that Mr. Guo will be unable to travel to Hong Kong due to health issues.  The Rule 30(b)(6) topics that Mr. Guo was preparing for will be reassigned to Mr. Zhang and Mr. Wang.  We will send you those details.  Mr. Zhang will sit for deposition Monday and Tuesday and Mr. Wang will go Wednesday, Thursday, and Friday.

Regards,

Stuart

**Stuart C. Plunkett**
Partner, San Francisco Office
stuart.plunkett@bakerbotts.com

T +1.415.291.6203
C +1.415.608.8165

---

**From:** Lauren Capurro <LaurenRussell@TATP.com>
**Sent:** Sunday, February 24, 2019 9:52 PM
**To:** Plunkett, Stuart <stuart.plunkett@bakerbotts.com>
**Cc:** mheaphy@saveri.com; Taladay, John <john.taladay@bakerbotts.com>; Koons, Erik <erik.koons@bakerbotts.com>; Carter, Tom <Tom.Carter@BakerBotts.com>; Yang, Kaylee <kaylee.yang@bakerbotts.com>; malioto@tatp.com; jpatane@tatp.com; CMicheletti@zelle.com; QFu@zelle.com; Rick@saveri.com; Geoff@saveri.com; cadio@saveri.com; Lucarelli, Drew <drew.lucarelli@bakerbotts.com>; Jacobsmeyer, Brian <brian.jacobsmeyer@BakerBotts.com>
**Subject:** Re: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

Stuart:

We would like to talk tomorrow regarding the deposition topics. Does 11.30 am Pacific still work for everyone?

If we are unable to resolve this ourselves, we propose contacting Judge Walker tomorrow to request an expedited/modified briefing schedule on our motion to compel. We would propose simultaneous letter briefs to be submitted on Tuesday so that Walker can rule before the depositions.

Regards,

Lauren

Sent from my iPhone

On Feb 22, 2019, at 9:53 AM, <stuart.plunkett@bakerbotts.com> <stuart.plunkett@bakerbotts.com> wrote:

> Lauren,
>
> Please see attached correspondence.  We can be available Monday anytime between 11:30 a.m. and 4 p.m. if you want to discuss any of these topics.
>
> Regards,
>
> Stuart
>
> **Stuart C. Plunkett**
> Partner, San Francisco Office
> stuart.plunkett@bakerbotts.com
> T +1.415.291.6203
> C +1.415.608.8165

---

**From:** Lauren Capurro (Russell) <LaurenRussell@TATP.com>
**Sent:** Tuesday, February 19, 2019 11:07 AM
**To:** Plunkett, Stuart <stuart.plunkett@bakerbotts.com>; mheaphy@saveri.com; Taladay, John <john.taladay@bakerbotts.com>; Koons, Erik <erik.koons@bakerbotts.com>; Carter, Tom <Tom.Carter@BakerBotts.com>; Yang, Kaylee <kaylee.yang@bakerbotts.com>; malioto@tatp.com; jpatane@tatp.com; CMicheletti@zelle.com; QFu@zelle.com
**Cc:** Rick@saveri.com; Geoff@saveri.com; cadio@saveri.com; Lucarelli, Drew <drew.lucarelli@bakerbotts.com>; Jacobsmeyer, Brian <brian.jacobsmeyer@BakerBotts.com>

**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

Stuart,

Please see the attached letter regarding Irico's objections to Plaintiffs' Rule 30(b)(6) topics.

Best,

Lauren

Lauren C. Capurro (Russell)
Attorney at Law
Trump, Alioto, Trump & Prescott, LLP
2280 Union Street
San Francisco, CA 94123
Tel: (415) 563-7200
Direct line: (415) 447-1496
Cell: (415) 860-5051
Fax: (415) 346-0679
E-mail: laurenrussell@tatp.com

This message is sent by a law firm and may contain information that is privileged or confidential.  If you received this transmission in error, please notify the sender by email and delete the message and any attachments.

---

**From:** stuart.plunkett@bakerbotts.com [mailto:stuart.plunkett@bakerbotts.com]
**Sent:** Tuesday, February 19, 2019 10:40 AM
**To:** mheaphy@saveri.com; john.taladay@bakerbotts.com; erik.koons@bakerbotts.com; Tom.Carter@BakerBotts.com; kaylee.yang@bakerbotts.com; malioto@tatp.com; jpatane@tatp.com; LaurenRussell@TATP.com; CMicheletti@zelle.com; QFu@zelle.com
**Cc:** Rick@saveri.com; Geoff@saveri.com; cadio@saveri.com; drew.lucarelli@bakerbotts.com; brian.jacobsmeyer@BakerBotts.com
**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

Matt,

Thanks for this information.  Yes, we will provide an interpreter for the depositions.

Stuart

**Stuart C. Plunkett**
Partner, San Francisco Office
stuart.plunkett@bakerbotts.com
T +1.415.291.6203
C +1.415.608.8165

---

**From:** Matthew Heaphy <mheaphy@saveri.com>
**Sent:** Tuesday, February 19, 2019 10:15 AM
**To:** Plunkett, Stuart <stuart.plunkett@bakerbotts.com>; Taladay, John <john.taladay@bakerbotts.com>;

Koons, Erik <erik.koons@bakerbotts.com>; Carter, Tom <Tom.Carter@BakerBotts.com>; Yang, Kaylee <kaylee.yang@bakerbotts.com>; malioto@tatp.com; jpatane@tatp.com; LaurenRussell@TATP.com; CMicheletti@zelle.com; QFu@zelle.com
**Cc:** Rick Saveri <Rick@saveri.com>; Geoff Rushing <Geoff@saveri.com>; Cadio Zirpoli <cadio@saveri.com>; Lucarelli, Drew <drew.lucarelli@bakerbotts.com>; Jacobsmeyer, Brian <brian.jacobsmeyer@BakerBotts.com>
**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

Stuart:

Thank you for letting us know about the witnesses' schedules. We will confer internally and determine whether it will be possible for us to extend the depositions after business hours.

Our understanding of the deposition protocol is that Irico is responsible for providing the interpreter and that Plaintiffs may have check interpreters. Please confirm that you will make the arrangements for the interpreter.

The location for the depositions will be:

Kobre & Kim LLP
ICBC Tower, 6th Floor
3 Garden Road
Central, Hong Kong

Best,
Matt

Matthew Heaphy
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111
mheaphy@saveri.com
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

---

**From:** stuart.plunkett@bakerbotts.com [mailto:stuart.plunkett@bakerbotts.com]
**Sent:** Friday, February 15, 2019 5:00 PM
**To:** Matthew Heaphy; john.taladay@bakerbotts.com; erik.koons@bakerbotts.com; Tom.Carter@BakerBotts.com; kaylee.yang@bakerbotts.com; malioto@tatp.com; jpatane@tatp.com; LaurenRussell@TATP.com; CMicheletti@zelle.com; QFu@zelle.com
**Cc:** Rick Saveri; Geoff Rushing; Cadio Zirpoli; drew.lucarelli@bakerbotts.com; brian.jacobsmeyer@BakerBotts.com
**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

Matt,

I write to follow up on a few items we have discussed regarding the upcoming depositions.  I have confirmed that our witnesses will not be able to arrange for flexible travel schedules that

would allow the deposition days to slip and ultimately go into Saturday.  We will need to all work efficiently and potentially go longer on certain days if necessary.  Regarding translators, we discussed that Irico would provide a translator for the deposition and that plaintiffs would have the option of also bringing a check translator.  Is that consistent with your understanding?  Finally, have you secured a location for the depositions?  We are anxious to know the location as it could impact our travel arrangements.

Thanks much,

Stuart

**Stuart C. Plunkett**
Partner, San Francisco Office
stuart.plunkett@bakerbotts.com
T +1.415.291.6203
C +1.415.608.8165

---

**From:** Matthew Heaphy <mheaphy@saveri.com>
**Sent:** Tuesday, February 5, 2019 1:19 PM
**To:** Taladay, John <john.taladay@bakerbotts.com>; Koons, Erik <erik.koons@bakerbotts.com>; Plunkett, Stuart <stuart.plunkett@bakerbotts.com>; Carter, Tom <Tom.Carter@BakerBotts.com>; Eickhof, Ashley <Ashley.Eickhof@BakerBotts.com>; Yang, Kaylee <kaylee.yang@bakerbotts.com>; malioto@tatp.com; jpatane@tatp.com; LaurenRussell@TATP.com; CMicheletti@zelle.com; QFu@zelle.com
**Cc:** Rick Saveri <Rick@saveri.com>; Geoff Rushing <Geoff@saveri.com>; Cadio Zirpoli <cadio@saveri.com>
**Subject:** In re Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917, Master File No. 07-CV-5944-JST

Counsel:

Please find attached the deposition notices for the upcoming depositions in Hong Kong:

- AMENDED NOTICE OF DEPOSITION OF DEFENDANTS IRICO GROUP CORPORATION AND IRICO DISPLAY DEVICES CO., LTD. PURSUANT TO FED. R. CIV. P. 30(b)(6);
- AMENDED NOTICE OF DEPOSITION OF MENGQUAN GUO;
- AMENDED NOTICE OF DEPOSITION OF ZHAOJIE WANG;
- AMENDED NOTICE OF DEPOSITION OF WENKAI ZHANG; and
- CERTIFICATE OF SERVICE.

We are working on securing a location and will inform you of it as soon as we have done so.

Best,

Matthew Heaphy
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111
mheaphy@saveri.com
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

**Confidentiality Notice:**

The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.

<3128_001.pdf>

# EXHIBIT 10



info@certifiedtranslate.com | 2425 Olympic Blvd., Suite 4000W | usa  1-888-856-2228
www.certifiedtranslate.com | Santa Monica, CA 90404 | int  +1-310-684-3153
| | fax  +1-310-564-1944

## CERTIFIED TRANSLATION



**A member of the American
Translators Association
ATA Member Number: 248719**

*Documents Translated For:*

| Name: | **David Y. Hwu** | Street Address: **706 Sansome Street** |
|-------|------------------|----------------------------------------|
| Firm: | **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
|---|
| |
| |
| **IDD 2007-8-30E** |
| |
| |

| Source Language: | **SIMPLIFIED CHINESE** | Target Language: | **ENGLISH** |
|---|---|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director          **Date:**   September 25, 2018

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On _Sep. 25, 2018_ before me, ____Kristin Gail Chamberlain____, Notary Public, appeared____Sean Kirschenstein____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Kristi Clli_



KRISTIN GAIL CHAMBERLAIN
Commission # 2141880
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2020

<span style="color:red">**Irico Display Devices Co., Ltd.**</span>
<span style="color:red">**Independent Directors System**</span>

(Considered and passed at the fourteenth meeting of the fifth board of directors on August 28, 2007)

## Chapter 1 General Provisions

**Section 1.**   This System is formulated to improve the corporate governance structure of Irico Display Devices Co., Ltd. (the "Company"), promote standardized operations and ensure the conscientious performance of duties by independent directors, and is formulated in accordance with the *Company Law*, the *Guiding Opinions for Establishing Independent Director Systems in Listed Companies* (the "*Guiding Opinions*") and the *Code of Corporate Governance for Listed Companies* issued by the China Securities Regulatory Commission (the "CSRC"), the *Shares Listing Rules* of the Shanghai Stock Exchange, and the *Articles of Associations of Irico Display Devices Co., Ltd.* (the "*Articles of Association*").

**Section 2.**   Independent directors refers to directors who do not hold any positions except for directors in the Company and who do not have any relationship with the Company and its major shareholders that may hinder their independent and objective judgment.

**Section 3.**   The Company shall have three independent directors, including at least one accounting professional.

The term "accounting professional" as mentioned in this section refers to a person with a senior accounting title or who is a certified public accountant.

**Section 4.**   Independent directors and prospective independent directors shall, in accordance with the requirements of the CSRC, participate in trainings organized by the CSRC and its authorized institutions.

**Section 5.**   The provisions concerning directors in the *Articles of Association* shall apply to independent directors, except as otherwise provided in this System.

## Chapter 2 Qualifications of Independent Directors

**Section 6.**   Independent directors shall meet the following basic requirements:

(1) being qualified as a director of a listed company in accordance with laws, administrative regulations and other relevant provisions;

(2) being independent as required by the *Guiding Opinions*, not holding any post other than a director and having no relationship with the Company and its major shareholders that may hinder his or her independent and objective judgment;

(3) having basic knowledge of how listed companies operate and familiarity with relevant laws,

1

administrative regulations, rules and regulations;

(4)  having at least five years of legal, economic or other work experience necessary to perform the duties of an independent director;

(5)   other qualifications stipulated in the *Articles of Association*.

**Section 7.**     The following persons shall not be independent directors:

(1)  Persons working for the Company or the Company's subsidiaries or branch companies, and their immediate relatives and main social relations.

(2)  Natural person shareholders who are directly or indirectly holding one percent or more of the outstanding shares issued by the Company or who are among the top ten shareholders of the Company, and their immediate relatives and main social relations;

(3)  Persons serving in entities that are directly or indirectly holding 5% or more of the outstanding shares issued by the Company or that are among the top five shareholders of the Company, and their immediate relatives and main social relations;

(4)  Persons who fit one of the above three descriptions in the past year;

(5)  Persons having a relationship with the Company, a Company affiliate or Company management in which they are an interested party;

(6)  Persons serving in an institution that has a relationship with the Company in which it is directly or indirectly an interested party;

(7)  Persons providing financial, legal or advisory services to the Company or its subsidiaries or branches, or other personnel who serve in institutions that provide such services;

(8)  Persons serving in securities regulatory departments;

(9)  Persons who are not allowed to serve as directors of a company as stipulated in the *Company Law* or other relevant laws and administrative regulations;

(10)     Persons who have been identified by the CSRC as being prohibited from entering the market and for whom such prohibition has not been removed;

(11)     Any other persons having relations with the Company that may hinder their independent and objective judgment;

(12)     Other persons identified by the CSRC.

The above-mentioned immediate relatives refers to, among others, spouse, parents, and children; main social relations refers to, among others, brothers and sisters, parents-in-law, daughters-in-law, sons-in-law, spouses of brothers and sisters, and spouses' brothers and sisters.

### Chapter 3 Nomination, Election and Replacement of Independent Directors

**Section 8.**    The Company's board of directors, board of supervisors, and shareholders having a single or combined holding of 1% or more of the Company's issued shares may nominate candidates for independent directors to be elected and decided upon at a general shareholders meeting.

**Section 9.**   The nominator of an independent director shall obtain the consent of the nominee before making the nomination. The nominator shall be fully aware of the nominee's occupation, educational background, professional title, detailed work experience, all part-time jobs, etc. and issue his or her opinions on the qualifications and independence of such independent director. The nominee shall make a public statement that there is no relationship between him or her and the Company that may affect his or her independent and objective judgement.

Before a general shareholders meeting to elect independent directors, the Company's board of directors shall publish the above information in accordance with the provisions.

**Section 10.**  Before a general shareholders meeting for the election of independent directors is convened, the Company shall submit relevant materials for all the nominees to the CSRC, the local agency of the CSRC, and the Shanghai Stock Exchange. If the board of directors has any objection to relevant circumstances concerning a nominee, it shall submit its opinion in writing at the same time.

A nominee that the stock exchange objects to may be a candidate for a director of the Company, but not an independent director. When a general shareholders meeting is held to elect independent directors, the board of directors of the Company shall explain whether the candidates for independent directors have met with objection from the stock exchange.

**Section 11.**  In accordance with the provisions of the *Articles of Association*, the cumulative voting system shall be used to elect independent directors at a general shareholders meeting.

**Section 12.**  The term of office of an independent director is the same as that of other directors of the Company. When his or term of office expires, an independent director may be re-elected, but the new term shall not exceed six years.

**Section 13.**  Where an independent director fails to attend a board meeting in person on three consecutive occasions, the board of directors shall request his or her replacement at a general shareholders meeting.

**Section 14.**  Except as otherwise stipulated in laws, regulations, normative documents or the *Articles of Association*, an independent director may not be removed without reason before his or her term of office expires. If removal is necessary, the Company shall disclose it as a special disclosure matter. If the independent director who was removed considers that the Company's reason for the removal is improper, he or she may make a public statement.

**Section 15.**  Independent directors may resign before their term of office expires.

A resigning independent director shall submit a written letter of resignation to the board of directors and shall state any circumstances relating to his resignation or circumstances which he or she considers are necessary to bring to the attention of the shareholders and stakeholders of the Company.

If the resignation of an independent director results in the number of independent directors or board members to be lower than the legal minimum number or the minimum number stipulated in the *Articles of Association*, the board of directors shall, within 60 days of receiving the resignation letter, convene a general meeting of shareholders to elect a replacement independent director. Before the replacement independent director assumes his/her post, the resigning independent director shall still perform his or her

3

duties in accordance with laws, administrative regulations and the *Articles of Association*. If the election of such replacement independent director is overdue, the resigning independent director may stop performing his or her duties.

The Company shall fill all independent director slots in accordance with the provisions of the *Guiding Opinions*.

**Section 16.** Where an independent director is unable to perform his or her duties or commits a serious dereliction of duty, the board of directors or the board of supervisors shall request his or her replacement at a general shareholders meeting.

When the board of directors or the board of supervisors adopts the above-mentioned resolution, directors or supervisors who oppose the resolution have the right to request the opportunity to announce their opinions.

**Section 17.** A shareholder having a single or combined holding of 1% or more of the Company's shares may propose to the board of directors of the Company that an independent director be challenged or removed if he or she is unqualified or incapable of being an independent director, is failing to perform his or her duties independently or is failing to safeguard the legal rights and interests of the Company and small and medium-sized investors. The independent director being questioned shall explain and disclose the questioned matters in a timely manner. The board of directors of the Company shall hold a special meeting for discussion in a timely manner after receiving the challenge or removal proposal and disclose the results of the discussion.

## Chapter 4 Functions and Powers of Independent Directors

**Section 18.** In order to fully carry out their role as independent directors, the Company grants independent directors the following special powers in addition to the powers granted them by the *Company Law* and other relevant laws and regulations:

(1) Significant affiliated transactions (namely, affiliated transactions with a total value of more than 3 million yuan or higher than 5% of the Company's most recently audited net asset value that the Company wants to enter into with an affiliate) shall be submitted to the board of directors for discussion only with the prior consent of the independent directors; before the independent directors issue a judgment, they may employ an intermediary to produce an independent professional report to serve as the basis for their judgement.

(2) To propose to the board of directors the engagement or dismissal of accounting firms;

(3) To request the board to convene a provisional general shareholders meeting;

(4) To propose to convene a board meeting;

(5) Before the board of directors formulates a resolution, if an independent director considers that the information or arguments on the matter under consideration is insufficient, he or she may propose to postpone the voting, and the board of directors shall adopt such proposal;

(6) To independently engage an external auditing or consulting agency to conduct audits or provide consultations on specific Company matters, and the relevant expenses shall be borne by the Company;

(7) To publicly solicit votes from shareholders before a general meeting of shareholders is convened.

If the above proposals are not adopted or if the above powers cannot be exercised properly, the Company shall disclose the relevant facts and circumstances.

**Section 19.** In addition to performing the above duties, independent directors shall also express their independent opinions on the following matters to the board of directors or at general meetings of shareholders:

(1) Nomination, appointment and removal of directors;

(2) Appointment or dismissal of senior management;

(3) Remuneration of directors and senior managers of the Company;

(4) Company's annual financial report;

(5) Absence of cash distributions in profit distribution plans from the board of directors,

(6) Schemes for issuing new shares;

(7) Shareholders, the actual controller and their affiliated enterprises having existing or new loans from the Company or other financial dealings with the Company totaling more than 3 million yuan or higher than 5% of the Company's most recently audited net asset value, and whether the Company has taken effective measures to recover the owed payments;

(8) Plans for the swap, purchase or sale of assets that account for 30% or more of the Company's most recently audited total assets;

(9) Venture capital, security and property loss schemes that account for 10% or more of the Company's most recently audited net assets;

(10) Providing special explanations and independent opinions on the Company's cumulative and current-period external guarantees in the Company's annual reports:

(11) Matters on which the securities regulatory authority and stock exchange require independent directors to express their opinions;

(12) Matters on which laws, regulations and normative documents require independent directors to express their opinions;

(13) Matters that the independent directors believe may damage the rights and interests of minority shareholders;

(14) Other matters deemed necessary by the independent directors.

**Section 20.** Independent directors should use one of the following ways to express their independent opinions:

(1) consent;

(2) withhold comment and the reason for it;

(3)   object and the reason for it;

(4)   unable to express opinion and the obstacle barring such expression.

**Section 21.**   If a matter involves needed disclosures, the Company shall announce the independent directors' opinion on it, and if the independent directors have differing opinions and are unable to reach consensus, the board of directors shall disclose the opinions of the independent directors separately.


## Chapter 5 Obligations of Independent Directors

**Section 22.**   It is the duty of independent directors to demonstrate integrity, diligence and a sense of responsibility toward the Company and all shareholders. Independent directors shall, in accordance with relevant laws and regulations, the *Guiding Opinions* and the *Articles of Association*, diligently perform their duties, safeguard the interests of the Company and pay special attention to protecting the legal rights and interests of public shareholders.

**Section 23.**   Independent directors shall perform their duties independently and shall not be affected by the major shareholders, the actual controller, or entities or individuals that have an interest in the Company and its major shareholders or actual controller.

**Section 24.**   Independent directors shall, in principle, serve concurrently as independent directors in no more than five listed companies, and shall ensure that they have sufficient time and energy to perform their duties effectively.

**Section 25.**   Independent directors shall attend meetings of the board of directors on time, understand the Company's production work, business, and operations, conduct investigations on their own initiative and obtain the information and materials needed for making decisions.

The information provided by the Company to an independent director shall be kept for at least five years by the Company and the independent director himself or herself.

**Section 26.**   If something causes an independent director to be unable to attend a meeting, he or she may entrust another independent director in writing to attend on his or her behalf.

The power of attorney shall specify the name of the entrusted agent, the matters entrusted to him or her, the powers granted and the validity period of the power of attorney, and shall be signed or sealed by the principal.

An independent director who is entrusted to attend a meeting of the board of directors shall exercise the rights of an independent director within his or her scope of authorization. If an independent director fails to attend a board meeting and also fails to entrust another independent director to attend on his or her behalf, he or she shall be deemed to have waived his or her right to vote at the meeting.

**Section 27.**   An independent director shall submit an annual report on his or her work to the annual general meeting of Company shareholders explaining the performance of his or her duties.


## Chapter 6 Working Conditions of Independent Directors

**Section 28.**   The Company shall ensure that independent directors have access to the same information as other directors. The Company must give independent directors statutory advance notice of any matters requiring decision-making by the board of directors and at the same time provide sufficient information on such matters. If an independent director considers that the information is insufficient, he or she may ask for supplementary information. When two or more independent directors consider that the information is insufficient or the argument is unclear, they may jointly submit a written proposal to the board of directors to postpone the meeting of the board of directors or to postpone the consideration of the matter, and the board of directors shall accept the proposal.

**Section 29.**   The Company shall provide the working conditions necessary for an independent director to perform his duties (including but not limited to providing documents, information, office space, means of transportation and telecommunication, and convenient access to production and business premises).

**Section 30.**   The secretary of the board of directors of the Company shall actively assist the independent directors in performing their duties, such as by giving them an introduction to matters of relevance, providing materials, regularly informing them of Company operations, and organizing field visits by the independent directors if necessary. Where the independent opinions, proposals and written statements issued by the independent directors should be announced, the secretary of the board of directors shall handle the announcement in a timely manner.

**Section 31.**   When an independent director is exercising his functions and powers, relevant Company personnel shall actively cooperate with him or her, and shall not refuse to cooperate, hinder him or her, conceal matters from him or her, or interfere with his or her independent exercising of his functions and powers.

**Section 32.**   The expenses incurred by an independent director in hiring an intermediary institution and other expenses required for exercising his or her functions and powers shall be borne by the Company.

**Section 33.**   The Company shall give independent directors an appropriate allowance. The allowance standard shall be formulated by the board of directors, examined and approved at a general meeting of shareholders and disclosed in the Company's annual report.

Besides the above-mentioned allowance, independent directors shall not receive any additional undisclosed benefits from the Company, its major shareholders or institutions or personnel that have interests in the Company.

**Section 34.**   The Company may establish a necessary liability insurance system for independent directors in order to reduce the risks that may arise from the normal performance of duties by independent directors.

## Chapter 7 Supplementary Provisions

**Section 35.**   The terms "or more" and "or less" in this System are inclusive of the specified number, while the terms "more than," "higher than," "less than" and "lower than" are not inclusive of the specified number.

**Section 36.**   Matters not covered in this System shall be implemented in accordance with relevant national laws, regulations, rules and regulations and the relevant provisions of the Company's *Articles of Association*.

**Section 37.**   This System shall be interpreted by the board of directors.

**Section 38.**   This System shall come into force as of the date on which it is passed by the board of directors.

# 彩虹显示器件股份公司
# 独立董事制度

(2007 年 8 月 28 日第五届董事会第十四次会议审议通过)

## 第一章 总 则

**第一条** 为了进一步完善彩虹显示器件股份有限公司（以下简称"公司"）的治理结构，促进公司规范运作，确保独立董事认真履行职责，根据《公司法》、中国证监会发布的《关于在上市公司建立独立董事制度的指导意见》（以下简称"《指导意见》"）和《上市公司治理准则》、上海证券交易所《股票上市规则》及《彩虹显示器件股份有限公司章程》（以下简称"《公司章程》"）的有关规定，特制定本制度。

**第二条** 独立董事是指不在公司担任除董事外的其他职务，并与公司及公司主要股东不存在可能妨碍其进行独立客观判断关系的董事。

**第三条** 公司设独立董事三名，其中至少包括一名会计专业人士。

本条所称会计专业人士是指具有高级职称或注册会计师资格的人士。

**第四条** 独立董事及拟担任独立董事的人士应当按照中国证监会的要求，参加中国证监会及其授权机构组织的培训。

**第五条** 《公司章程》中关于董事的规定适用于独立董事，本制度另有规定的除外。

## 第二章 独立董事的任职条件

**第六条** 担任公司独立董事应当符合下列基本条件：

（一）根据法律、行政法规及其他有关规定，具备担任上市公司董事的资格；

（二）具有《指导意见》所要求的独立性，必须不在公司担任除董事外的其他职务，并与公司及其主要股东不存在可能妨碍其进行独立客观判断的关系；

（三）具备上市公司运作基本知识，熟悉相关法律、行政法规、规章及规则；

（四）具有五年以上法律、经济或其他履行独立董事职责所必需的工作经验；

（五）《公司章程》规定的其他条件。

**第七条**　下列人员不得担任独立董事：

（一）在公司或公司的子公司、分公司任职的人员及其直系亲属、主要社会关系；

（二）直接或间接持有公司发行在外股份百分之一以上或者居公司前十名股东中的自然人股东及其直系亲属、主要社会关系；

（三）在直接或间接持有公司发行在外股份百分之五以上或者居公司前五名股东中的单位任职的人员及其直系亲属、主要社会关系；

（四）最近一年内曾经具有前三项所列举情形的人员；

（五）与公司、公司关联人或公司管理层人士有利益关系的人员；

（六）在直接或间接地与公司存在业务联系或利益关系的机构任职的人员；

（七）为公司或者公司的子公司、分公司提供财务、法律、咨询等服务的人员或者在该等机构中任职的其他人员；

（八）在证券监管部门任职的人员；

（九）《公司法》或其他相关法律、行政法规规定不得担任公司董事的人员；

（十）被中国证监会认定为市场禁入者且禁入尚未解除的人员；

（十一）与公司之间存在其他任何可能影响其作出独立客观判断的关系的人员；

（十二）中国证监会认定的其他人员。

上述直系亲属是指配偶、父母、子女等；主要社会关系是指兄弟姐妹、岳父母、儿媳、女婿、兄弟姐妹的配偶、配偶的兄弟姐妹等。


### 第三章　独立董事的提名、选举和更换

**第八条**　公司董事会、监事会、单独或者合并持有公司已发行股份1%以上

的股东可以提名独立董事候选人，并经股东大会选举决定。

**第九条**  独立董事的提名人在提名前应当征得被提名人的同意。提名人应当充分了解被提名人职业、学历、职称、详细的工作经历、全部兼职等情况，并对其担任独立董事的资格和独立性发表意见，被提名人应当就其本人与公司之间不存在任何影响其独立客观判断的关系发表公开声明。

在选举独立董事的股东大会召开前，公司董事会应当按照规定公布上述内容。

**第十条**  在选举独立董事的股东大会召开前，公司应将所有被提名人的有关材料报送中国证监会、公司所在地中国证监会派出机构和上海证券交易所。公司董事会对被提名人的有关情况有异议的，应同时报送董事会的书面意见。

对证券交易所持有异议的被提名人，可作为公司董事候选人，但不作为独立董事候选人。在召开股东大会选举独立董事时，公司董事会应对独立董事候选人是否被证券交易所提出异议的情况进行说明。

**第十一条**  股东大会就选举独立董事进行表决时，根据《公司章程》的规定，采用累积投票制。

**第十二条**  独立董事每届任期与公司其他董事任期相同，任期届满，连选可以连任，但是连任时间不得超过六年。

**第十三条**  独立董事连续 3 次未亲自出席董事会会议的，由董事会提请股东大会予以撤换。

**第十四条**  除非法律、法规、规范性文件及《公司章程》另有规定外，独立董事任期届满前不得无故被免职。如果必须免职时，公司应将其作为特别披露事项予以披露，被免职的独立董事认为公司的免职理由不当的，可以作出公开的声明。

**第十五条**  独立董事在任期届满前可以提出辞职。

独立董事辞职应向董事会递交书面辞职报告，并对任何与其辞职有关或其认为有必要引起公司股东和利益相关者注意的情况进行说明。

独立董事辞职导致独立董事成员或董事会成员低于法定或《公司章程》规定的最低人数时，董事会应当在自接到辞职报告之日起的六十日内召集股东大会补选独立董事。在补选的独立董事就任前，该等辞职独立董事仍应当按照法律、行

政法规及《公司章程》的规定履行职务。逾期未补选独立董事时，该等辞职独立董事可以不再履行职务。

公司应当按照《指导意见》的规定补足独立董事人数。

**第十六条**   独立董事不能履行职责或发生严重失职行为时，由董事会或监事会提请股东大会予以撤换。

董事会或监事会作出上述决议时，持反对意见的董事或监事有权要求对其意见进行公告。

**第十七条**   对于不具备独立董事资格或能力、未能独立履行职责、或未能维护公司和中小投资者合法权益的独立董事，单独或者合计持有公司 1%以上股份的股东可以向公司董事会提出对独立董事的质疑或罢免提议。被质疑的独立董事应及时解释质疑事项并予以披露。公司董事会应在收到相关质疑或罢免提议后及时召开专项会议进行讨论，并将讨论结果予以披露。

## 第四章  独立董事的职权

**第十八条**   为了充分发挥独立董事的作用，独立董事除应当具有《公司法》和其他相关法律、法规赋予董事的职权外，公司还赋予独立董事以下特别职权：

（一）重大关联交易（指公司拟与关联人达成的总额高于 300 万元或高于公司最近经审计净资产值的 5%的关联交易）应由独立董事事前同意后，方可提交董事会讨论；独立董事作出判断前，可以聘请中介机构出具独立专业报告，作为其判断的依据；

（二）向董事会提议聘用或解聘会计师事务所；

（三）向董事会提请召开临时股东大会；

（四）提议召开董事会；

（五）董事会作出决议前，独立董事认为审议事项资料或论证不充分，提议暂缓表决时，董事会应予以采纳；

（六）独立聘请外部审计机构和咨询机构，对公司的具体事项进行审计和咨询，相关费用由公司承担；

（七）可以在股东大会召开前公开向股东征集投票权。

如上述提议未被采纳或上述职权不能正常行使，公司应将有关情况予以披露。

**第十九条**　独立董事除履行上述职责外，还应当对以下事项向董事会或股东大会发表独立意见：

（一）提名、任免董事；

（二）聘任或解聘高级管理人员；

（三）公司董事、高级管理人员的薪酬；

（四）公司年度财务报告；

（五）董事会作出的利润分配预案中不含现金派息时；

（六）公司发行新股的方案；

（七）公司的股东、实际控制人及其关联企业对公司现有或新发生的总额高于 300 万元或高于公司最近经审计净资产值 5%以上的借款或其他资金往来，以及公司是否采取有效措施收回欠款；

（八）占公司最近经审计后总资产百分之三十以上的资产置换、收购或出售方案；

（九）占公司最近经审计后净资产百分之十以上的风险投资、担保及财产损失方案；

（十）在公司年度报告中，对公司累计和当期对外担保情况进行专项说明，并发表独立意见；

（十一）证券监管部门、证券交易所要求独立董事发表意见的事项；

（十二）法律、法规及规范性文件要求独立董事发表意见的事项；

（十三）独立董事认为可能损害中小股东权益的事项；

（十四）独立董事认为必要的其他事项。

**第二十条**　独立董事发表独立意见应采用下列方式之一：

（一）同意；

（二）保留意见及其理由；

（三）反对意见及其理由；

（四）无法发表意见及其障碍。

第二十一条　如有关事项涉及需要披露时，公司应当将独立董事的意见予以公告，独立董事出现意见分歧无法达成一致时，董事会应将各独立董事的意见分别披露。


## 第五章　独立董事的义务

第二十二条　独立董事对公司及全体股东负有诚信、勤勉、尽责义务。独立董事应当按照相关法律法规、《指导意见》和《公司章程》的要求，认真履行职责，维护公司利益，尤其要关注社会公众股股东的合法权益不受损害。

第二十三条　独立董事应当独立履行职责，不受公司主要股东、实际控制人、或者与公司及其主要股东、实际控制人存在利害关系的单位或个人的影响。

第二十四条　独立董事原则上最多在 5 家上市公司兼任独立董事，并确保有足够的时间和精力有效地履行独立董事的职责。

第二十五条　独立董事应当按时出席董事会会议，了解公司的生产经营和运作情况，主动进行调查，获取做出决策所需要的情况和资料。

公司向独立董事提供的资料，公司及独立董事本人应当至少保存五年。

第二十六条　独立董事因故不能出席的，可以书面委托其他独立董事代为出席。

委托书应当载明代理人的姓名、代理事项和权限、有效期限，并由委托人签名或盖章。

代为出席董事会会议的独立董事应当在授权范围内行使独立董事的权利。独立董事未出席董事会会议，亦未委托其他独立董事代表出席的，视为放弃在该次会议上的投票权。

第二十七条　独立董事应当向公司年度股东大会提交年度述职报告，对其履行职责的情况进行说明。


## 第六章　独立董事的工作条件

第二十八条 公司应当保证独立董事享有与其他董事同等的知情权。凡须经董事会决策的事项，公司必须按法定的时间提前通知独立董事并同时提供足够的资料，独立董事认为资料不充分的，可以要求补充。当2名或2名以上独立董事认为资料不充分或论证不明确时，可联名书面向董事会提出延期召开董事会会议或延期审议该事项，董事会应予以采纳。

第二十九条 公司应提供独立董事履行职责所必需的工作条件（包括但不限于提供文件、资料、办公场所、交通和通信工具及出入生产经营场所的便利条件）。

第三十条 公司董事会秘书应积极为独立董事履行职责提供协助，如介绍情况、提供材料、定期通报公司运营情况，必要时可组织独立董事实地考察等。独立董事发表的独立意见、提案及书面说明应当公告的，董事会秘书应及时办理公告事宜。

第三十一条 独立董事行使职权时，公司有关人员应当积极配合，不得拒绝、阻碍或隐瞒，不得干预其独立行使职权。

第三十二条 独立董事聘请中介机构的费用及其他行使职权时所需的费用由公司承担。

第三十三条 公司应当给予独立董事适当的津贴。津贴的标准应当由董事会制订预案，股东大会审议通过，并在公司年报中进行披露。

除上述津贴外，独立董事不应从公司及其主要股东或有利害关系的机构和人员获得额外的、未予披露的其他利益。

第三十四条 公司可以建立必要的独立董事责任保险制度，以降低独立董事正常履行职责可能引致的风险。


## 第七章 附则

第三十五条 本制度所称"以上"、"以下"均含本数；"高于"、"低于"均不含本数。

第三十六条 本制度未尽事宜，依照国家有关法律、法规、规章和《公司章程》的有关规定执行。

第三十七条 本制度由公司董事会负责解释。

第三十八条 本制度自董事会通过之日起实施。

# EXHIBIT 11



**certified**translate
A LANGUAGE FISH LLC COMPANY

info@certifiedtranslate.com   2425 Olympic Blvd., Suite 4000W   usa  1-888-856-2228
www.certifiedtranslate.com   Santa Monica, CA 90404   int  +1-310-684-3153
fax  +1-310-564-1944

## CERTIFIED TRANSLATION

A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: | **David Y. Hwu** | Street Address: **706 Sansome Street** |
|-------|------------------|----------------------------------------|
| Firm: | **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

|  |
|---|
|  |
| **IDD 2007-8-30E** |
|  |
|  |

| Source Language: | **SIMPLIFIED CHINESE** | Target Language: | **ENGLISH** |
|------------------|------------------------|------------------|-------------|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director        **Date:**   September 25, 2018

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On ___Spt. 25, 2018___ before me, ___Kristin Gail Chamberlain___, Notary Public, appeared ___Sean Kirschenstein___, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ___Kristi Chli___



KRISTIN GAIL CHAMBERLAIN
Commission # 2141880
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2020

# Irico Display Devices Co., Ltd.

# Work Rules of Nominating Committee of Board of Directors

(Considered and passed at the fourteenth meeting of the fifth board of directors on August 28, 2007)

## Chapter 1 General Provisions

**Section 1.**  These Work Rules are formulated to meet the development needs of Irico Display Devices Co., Ltd. (the "Company"), improve corporate governance, attract talented people from far and wide and achieve sustainable development, and are formulated in accordance with the *Company Law*, *Code of Corporate Governance for Listed Companies*, the *Articles of Association* and other applicable provisions.

**Section 2.**  The Nominating Committee is a special work unit under the board of directors mainly responsible for selecting appropriate directors and senior managers to meet the Company's development needs.

**Section 3.**  Directors as referred to in these Work Rules include internal directors and external directors.

Senior managers as referred to in these Work Rules refer to the Company's senior managers engaged by the board of directors, including the general manager, deputy general manager, chief accountant, board secretary and other senior managers as recognized by the Company.

## Chapter 2 Makeup of the Personnel

**Section 4.**  The Nominating Committee is comprised of five directors, no less than half of whom shall be independent directors.

**Section 5.**  The members of the Nominating Committee shall be appointed by the board of directors.

**Section 6.**  The Nominating Committee shall have one chairman, who shall be an independent director and shall be responsible for presiding over the Committee's work.

**Section 7.**  The term of office of Nominating Committee members shall be the same as that of the concurrent board of directors. If a member is no longer a director of the Company during the term of office, such member shall automatically lose his or her qualification to be a Committee member.

When the board of directors begins a new session, continuing board members may continue to be Nominating Committee members.

**Section 8.**  The Company's board office shall assist with the work of the Nominating Committee.

## Chapter 3 Duties and Responsibilities

**Section 9.**  The key duties and responsibilities of the Nominating Committee are:

(1)  Study and formulate the selection standards and procedures for directors and senior managers;

(2)    Widely search for qualified candidates for directors and senior managers;

(3)    Review the qualifications of proposed directors and senior managers and put forward suggestions.

## Chapter 4 Procedural Rules

**Section 10.** The Nominating Committee shall send out a meeting notice at least five days in advance of a meeting.

**Section 11.** The chairman of the Nominating Committee shall preside over the Committee's meetings.

**Section 12.** All Committee members must be present for a Nominating Committee meeting to proceed.

**Section 13.** The Nominating Committee may invite the Company's chairman, supervisors, and board secretary as well as professional consultants and legal advisors to attend the meeting as nonvoting delegates.

**Section 14.** Voting in the Nominating Committee shall be done by a show of hands. Each member has one vote.

There shall be two types of votes in the Nominating Committee: for or against.

**Section 15.** Resolutions by the Nominating Committee shall be passed upon approval by two-thirds or more of the members.

**Section 16.** All matters subject to resolution by the Nominating Committee, no matter if such resolution is passed by the Committee, shall be submitted to the board of directors for consideration. Members who object to a resolution have the right to make a statement at the board meeting.

**Section 17.** Minutes shall be taken at Nominating Committee meetings and signed by the members who attended the meetings.

**Section 18.** Nomination Committee meeting minutes are confidential Company documents and shall be kept by the board secretary for at least ten years.

**Section 19.** All persons attending Nominating Committee meetings shall be obliged to maintain confidentiality and shall not disclose information about the meetings without the authorization of the Company's chairman or the board of directors.

## Chapter 5 Supplementary Provisions

**Section 20.** These Work Rules are formulated and revised by the board of directors.

**Section 21.** These Work Rules shall be interpreted by the board of directors.

**Section 22.** These Work Rules shall come into force as of the date on which they are passed by the board of directors.

# 彩虹显示器件股份有限公司
# 董事会提名委员会工作细则

(2007 年 8 月 28 日第五届董事会第十四次会议审议通过)

## 第一章 总则

**第一条** 为了适应彩虹显示器件股份有限公司（以下简称"公司"）发展需要，完善公司治理，广泛吸纳人才，实现可持续发展，根据《公司法》、《上市公司治理准则》、《公司章程》及其他有关规定，制定本工作细则。

**第二条** 提名委员会是董事会下设的专门工作机构，主要负责选择适合公司发展需要的董事、高层管理人员。

**第三条** 本细则所称董事包括内部董事和外部董事。

本细则所称高层管理人员指由董事会聘任的公司高级管理人员，包括总经理、副总经理、总会计师和董事会秘书及其公司认定的高级管理人员。

## 第二章 人员组成

**第四条** 提名委员会成员由五名董事组成，其中独立董事人数不少于二分之一。

**第五条** 提名委员会委员由董事会委任。

**第六条** 提名委员会设主任委员一名，由独立董事担任，负责主持委员会工作。

**第七条** 提名委员会委员任期与同届董事会任期一致。委员在任期内不再担任公司董事职务，即自动失去委员资格。

董事会换届后，连任董事可以连任提名委员会委员。

**第八条** 公司董事会办公室协助提名委员会工作。

## 第三章 工作职责

**第九条** 提名委员会的主要职责：

（1）研究制订董事和高管人员的选择标准和程序；

1

（2）广泛搜寻合格的董事、高管人员的人选；

（3）对拟任董事和高管人员的资格进行审查并提出建议。

## 第四章　议事规则

**第十条**　提名委员会召开会议，至少应当提前五日发出会议通知。

**第十一条**　提名委员会会议由主任委员主持。

**第十二条**　提名委员会会议应当由全体委员出席方可召开。

**第十三条**　提名委员会召开会议时，可以邀请公司董事长、监事、董事会秘书及专业咨询顾问、法律顾问列席会议。

**第十四条**　提名委员会采用举手方式进行表决，每一名委员有一票表决权。

提名委员会表决意见分为同意、反对两种。

**第十五条**　提名委员会作出决议须经三分之二以上委员通过。

**第十六条**　需经提名委员会作出决议的事项，无论是否获得会议通过，均应呈报董事会审议，持有反对意见的委员有权在董事会会议上进行陈述。

**第十七条**　提名委员会会议应当制作会议记录，出席会议的委员应当在会议记录上签名。

**第十八条**　提名委员会会议记录属于公司机密文件。会议记录由公司董事会秘书保存，保存期不少于十年。

**第十九条**　参加提名委员会会议的人员均负有保密义务，非经公司董事长或董事会授权，不得擅自披露会议有关信息。

## 第五章　附则

**第二十条**　本工作细则由董事会制订并修改。

**第二十一条**　本工作细则由董事会解释。

**第二十二条**　本工作细则自董事会通过之日起实施。

# EXHIBIT 12



**certified**translate

A LANGUAGE FISH LLC COMPANY

info@certifiedtranslate.com  
www.certifiedtranslate.com

2425 Olympic Blvd., Suite 4000W  
Santa Monica, CA 90404

usa 1-888-856-2228  
int +1-310-684-3153  
fax +1-310-564-1944

## CERTIFIED TRANSLATION

A member of the American  
Translators Association  
ATA Member Number: 248719

*Documents Translated For:*

| Name: **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|
| Firm: **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
|---|
| |
| **IRI-CRT-00003578E** |
| |
| |

| Source Language: **SIMPLIFIED CHINESE** | Target Language: **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

By: Sean Kirschenstein, Director

Date: February 21, 2019

*A copy of the translated version(s) is attached to this statement of certification.*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California  
County of Los Angeles

On __Feb. 21, 2019__ before me, ___Kristin Gail Chamberlain___, Notary Public, appeared ___Sean Kirschenstein___, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ___Kristin Chm___



KRISTIN GAIL CHAMBERLAIN  
Notary Public - California  
Los Angeles County  
Commission # 2141880  
My Comm. Expires Feb 7, 2020

D☐P☐ Exhibit 8408  
Deponent Wang  
Date 3/6/19 Rptr KW

Scanned and created by Camscanner [QR Code]

**China National Electronics Import and Export Caihong Co.**

## Certificate of Account Transfer for Exported Goods

Card No. _____                          *April 30, 1999*                          Transfer No. **9**

| Overseas Customer | | *Hisense (Irico USA)* | | Product Name and Model | | Quantity | Unit Price | | Total Price | |
|---|---|---|---|---|---|---|---|---|---|---|
| Clerk | | *Wu Lihong* | | *54SX503Y22-DC01 21" CRT* | | *2400* | *USD 52* | | *USD 124,800* | |
| Purchase Receipt No. | | *9TS063* | *VAT receipt 00027912* | | | | | | | |

| Debits | | | Credits | | | Summary | Ten Millions | Millions | Hundred Thousands | Ten Thousands | Thousands | Hundreds | Tens | Ones | Cents |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| General | Subsidiary | √ | General | Subsidiary | √ | | | | | | | | | | |
| 123 Foreign Exchange Accounts Receivable | *004* | √ | 504 Self-Managed Export Sales Revenue | *021* | √ | *2400 21" CPTs to Irico USA (9TS063)* | | $ | *1* | *2* | *4* | *8* | *0* | *0* | *00* |
| | | | | | | | In ¥ | *1* | *0* | *3* | *3* | *3* | *4* | *4* | *00* |
| Total | | | *One million thirty-three thousand three hundred and forty-four yuan and zero cents* | | | | | | | | | | | | |

1 Attachment

Supervisor _____     Recorded by _____     Verified by [illegible]     Form completed by Guo Xiangyun

CONFIDENTIAL

IRI-CRT-00003578E_Translation

中 国 电 子 进 出 口 彩 虹 公 司

## 出 口 货 物 转 帐 凭 证

卡片编号 _____   99 年 30 日   转 9 号

| 国外客户 | 海信(美国采购2) | 货物名称及规格型号 | | 数 量 | 单 价 | 总 价 | |
|---|---|---|---|---|---|---|---|
| 业 务 员 | 武莉红 | 545X503722-DCO1 21"CRT | | 2400只 | USD 52.— | USD 124800.— | |
| 收购发票号 | 9TS063 | 增值税票 | 00027912 | | | | |

| 借 | 方 | | 贷 | 方 | | 摘 要 | | 金 额 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 一级科目 | 明细科目 | √ | 一级科目 | 明细科目 | √ | | | 千 | 百 | 十 | 万 | 千 | 百 | 十 | 元 | 角 | 分 |
| 123应收外汇贷款 | 004 | √ | 504自营出口销售收入 | 021 | √ | 发美国彩虹 21"彩管 2400只 (9TS063) | | ＄ | | 1 | 2 | 4 | 8 | 0 | 0 | 0 | 0 |
| | | | | | | | | ￥ | 1 | 0 | 3 | 3 | 3 | 4 | 4 | 0 | 0 |

| 合 计 | 壹佰零叁万叁仟叁佰肆拾肆元之正 | | | | |
|---|---|---|---|---|---|

主管 _____   记帐 _____   审核 _____   制表 _____

CONFIDENTIAL

IRI-CRT-00003578

# 中国电子进出口彩虹公司

## CEIEC CHINA NATIONAL ELECTRONICS IMP&EXP CAIHONG COMPANY

NO.1 CAIHONG ROAD
XIANYANG SHAANXI
P.R.CHINA
Cable:1752 XIANYANG
Fax:(0910)3313101
Tel:(0910)3313366
Postcode:712021

## INVOICE

**MESSRS.**   IRICO (USA)INC
39658 MISSION BLVD
FREMONT, CA94539
TEL:(501)494-5828 FAX:(501)494-5829

| Invoice No. | Name Of Vessel | Loading Port | Discharging Port | On or About |
|---|---|---|---|---|
| 9TS063 | | XIANYANG, CHINA | QINGDAO,CHINA | APR.16,1999 |
| **Date** | **B/L No.** | **L/C No.** | **Contract No.** | **Licence No.** |
| APR.16,1999 | | T/T | 99EMUSCHCT01029 | |

| Marks & Nos | Description & Quantity | Unit Price | Amount |
|---|---|---|---|

FOB QINGDAO,CHINA

N/M   IRICO PICTURE TUBE
21" CPT
MODEL NO.54SX503Y22-DC01
QTY:2400PCS
CPT ZIBO CHINA
COUNTRY OF ORIGIN AND MANUFACTURE:IRICO,CHINA
                                         USD52.00          USD124,800.00

(SAY,UNITED STATES DOLLARS ONE HUNDRED AND TWENTY FOUR THOUSAND
EIGHT HUNDRED ONLY.)

CHINA NATIONAL ELECTRONICS IMP&EXP
CAIHONG COMPANY

E. & O.E. ───                        MANAGER

 由 扫描全能王 扫描创建

CONFIDENTIAL                                    IRI-CRT-00003579

# EXHIBIT 13



**certified**translate
A LANGUAGE FISH LLC COMPANY

info@certifiedtranslate.com | 2425 Olympic Blvd., Suite 4000W | usa 1-888-856-2228
www.certifiedtranslate.com | Santa Monica, CA 90404 | int +1-310-684-3153
| | fax +1-310-564-1944

**ata**
A member of the American
Translators Association
ATA Member Number: 248719

## CERTIFIED TRANSLATION

*Documents Translated For:*

| Name: **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|
| Firm: **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
|---|
| |
| **IRI-CRT-00003732E** |
| |
| |

| Source Language: **SIMPLIFIED CHINESE** | Target Language: **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director       **Date:**   February 21, 2019

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On ___Feb. 21, 2019___ before me, ___Kristin Gail Chamberlain___, Notary Public, appeared ___Sean Kirschenstein___, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ___Kristin Chm___



KRISTIN GAIL CHAMBERLAIN
Notary Public - California
Los Angeles County
Commission # 2141880
My Comm. Expires Feb 7, 2020

# Purchase and Sale Contract for Industrial and Mining Products

Seller: Caihong CPT General Factory

Buyer: China National Electronics Import and Export Caihong Co.

Contract No.: CHZC0206158

Signing Location: Xianyang, Shaanxi

Signing Date: April 26, 2002

1.  Product name, trademark, model, and quantity

| Product Name | Trademark | Specification and Model | Unit | Quantity (ea.) | Unit Price (yuan ea.) | Total (yuan) | Goods Handoff Date and Quantity |
|---|---|---|---|---|---|---|---|
| CPT | Caihong | 14" | Ea. | 162,891 | 251.55 | 40,975,231.05 | |
| CPT | Caihong | 14" C Tube | Ea. | 2304 | 170.82 | 393,569.28 | |
| Total (spell out): Forty-one million three hundred and sixty-eight thousand eight hundred yuan and thirty-three cents | | | | | | | |

2.  Quality requirements, technical standards, and terms and time limit of seller's responsibility for quality: Execution will be according to the standards in seller's written technical specifications.

3.  Location and means of goods handoff (collection): Seller's warehouse.

4.  Shipping method; arrival port and expense liability: Buyer is responsible for shipping. Buyer will pay the shipping expenses.

5.  Packaging standards; provision and takeback of packaging materials: Original packaging from seller. Packaging materials will not be taken back.

6.  Settlement method and deadline: Cash settlement. Goods will be shipped upon payment.

7.  Liability for breach of contract: Will be resolved via negotiation between the two parties.

8.  Method for resolving contract disputes: In the event that a dispute arises in the execution of this contract, it shall be resolved by negotiation between the two parties. Should the negotiation fail, the case may be brought before the People's Court where the contract was signed).

9.  Other agreements:

    Buyer will provide seller in advance with specific goods-supplying specifications and CPT magnetic field parameters in writing.

10. Four copies of this contract have been executed (two copies for the seller; two copies for the buyer). This contract takes effect when the representatives of the two parties have signed it affixed their contract seals.

| Seller | Buyer |
|---|---|
| Entity Name (Seal): Caihong CPT General Factory<br>Address: Caihong Road, Xianyang, Shaanxi<br>Legal Representative: *Wang Guo Ping*<br>Authorized Agent:<br>Tel:<br>Bank: Industrial and Commercial Bank of China, Caihong Branch Office, Xianyang<br>Account No.: 2604020909022111105<br>Postal Code: 712021<br><br>[seal:] Caihong CPT General Factory<br>    Contract Seal<br>    (1) | Entity Name (Seal):<br>Address:<br>Legal Representative:<br>Authorized Agent: *Fang Liang Jun*<br>Tel:<br>Bank:<br>Account No.:<br>Postal Code:<br><br>[seal:] China National Electronics Import and Export Caihong Co.<br>    Contact Seal<br>    (1) |

Valid April 26, 2002 through May 28, 2002

## 工矿产品购销合同

供方：彩虹彩色显像管总厂

需方：中国电子进出口彩虹公司

合同编号：CHZC0206158

签订地点：陕西咸阳

签订时间：2002 年 4 月 26 日

一、产品名称、商标、型号、数量：

| 产品名称 | 商标 | 规格型号 | 单位 | 数量（只） | 单价(元/只) | 总金额（元） | 交货时间及数量 |
|---|---|---|---|---|---|---|---|
| 彩色显像管 | 彩虹 | 14″ | 只 | 162891 | 251.55 | 40975231.05 | |
| 彩色显像管 | 彩虹 | 14″ C 管 | 只 | 2304 | 170.82 | 393569.28 | |

合计金额（大写）：肆仟壹佰叁拾陆万捌仟捌佰元叁角叁分

二、质量要求、技术标准、供方对质量负责的条件和期限：__按供方技术规格书标准执行。__

三、交（提）货地点、方式：__供方库房。__

四、运输方式及到达站港和费用负担：__需方负责运输，运费由需方支付。__

五、包装标准、包装物的供应与回收：__供方原包装，包装物不回收。__

六、结算方式及期限：__现汇结算，款到发货。__

七、违约责任：__双方协商解决。__

八、解决合同纠纷的方式：本合同在履行过程中发生争议，由当事人双方协商解决。协商不成，可向签订地人民法院起诉。

九、其它约定事项：

__具体供货规格及彩管磁场参数由需方提前书面通知供方。__

十、本合同一式四份（供方两份、需方两份），双方代表签字并加盖合同章后本合同生效。



| 供　　　　方 | 需　　　　方 |
|---|---|
| 单位名称（章）彩虹彩色显像管总厂 | 单位名称（章） |
| 单位地址：陕西咸阳彩虹路 | 单位地址： |
| 法定代表人： | 法定代表人： |
| 委托代理人： | 委托代理人： |
| 电话： | 电话： |
| 开户行：咸阳市工行彩虹分理处 | 开户行： |
| 帐号：2604020909022111105 | 帐号： |
| 邮政编码：712021 | 邮政编码： |

有效期限：2002 年 4 月 26 日至 2002 年 5 月 28 日

# EXHIBIT 14



info@certifiedtranslate.com  2425 Olympic Blvd., Suite 4000W   usa  1-888-856-2228
www.certifiedtranslate.com   Santa Monica, CA 90404   int  +1-310-684-3153
fax  +1-310-564-1944

## CERTIFIED TRANSLATION



A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: | **David Y. Hwu** | Street Address: **706 Sansome Street** |
|-------|-------------------|-----------------------------------------|
| Firm: | **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

|  |
|--|
|  |
| **IRI-CRT-00001154E** |
|  |
|  |

| Source Language: | **SIMPLIFIED CHINESE** | Target Language: | **ENGLISH** |
|------------------|------------------------|------------------|-------------|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director                    **Date:**   September 25, 2018

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On _Sep. 25, 2018_ before me, ___Kristin Gail Chamberlain___, Notary Public, appeared _Sean Kirschenstein_, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Kristin Chamberlain_



KRISTIN GAIL CHAMBERLAIN
Commission # 2141880
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2020

# Purchase and Sales Contract for Industrial and Mineral Products

Supplier: IRICO Display Device Co., Ltd.

Purchaser: China National Electronics Import and Export Caihong Company

Contract Number: CHGF0207173

Place of signing: Xianyan, Shaanxi

Date of signing: June 26, 2002

I. Product name, trademark, model and quantity:

| Product Name | Trademark | Specification | Unit of Measure | Quantity | Price (yuan / unit) | Sum (yuan) | Delivery Date and Quantity |
|---|---|---|---|---|---|---|---|
| | | | | | | | July |
| Color tubes | Caihong | 21" | Unit | 4848 | 450.45 | 2183781.6 | |
| Color tubes | Caihong | 21" | Unit | 18112 | 377.91 | 6844705.92 | |
| Color tubes | Caihong | 25" | Unit | 1 | 530 | 530 | |
| Total amount (in words): nine million, twenty-nine thousand, seventeen yuan and fifty-two hundredths. | | | | | | | |

II. Quality requirements, technical standards, quality responsibility conditions and deadline for the supplier: implemented based on the technical specifications of the supplier.

III. Delivery / pickup location and method: warehouse of the supplier.

IV. Method of transportation, arrival station port and cost sharing: the buyer shall take care of transportation and freight.

V. Packing standards and supply and recovery of wrapping materials: use the original package of the supplier (plastic film packing), without recovering packing materials.

VI. Method and deadline of settlement: delivery upon payment.

VII. Liability for violation of contract: settlement negotiated by the two parties

VIII. Method to resolve contract disputes: in case of disputes during the execution of the contract, the two parties involved shall seek a negotiated settlement. If no agreement is reached through negotiation, they can file a suit at the people's court in the place of signing.

IX. Other agreed terms:

The purchaser shall notify the supplier in written form in advance of the specifications of the supplies and the parameters of the magnetic field of the color tubes.

X. This contract has four copies of the same format (the supplier retains two copies, and the purchaser retains two copies). The contract shall enter into effect upon being signed and stamped with the contract seal by both parties.

| Supplier | Purchaser |
|---|---|
| Company name (seal): IRICO Display Device Co., Ltd. | Company name (seal): |
|    IRICO Display Device Co., Ltd. |    IRICO Group Co., Ltd. |
|    Special seal for contract use (2) [seal] |    IRICO Import and Export Company [seal] |
| Company address: West Zone of High Tech Development Zone, Xi'an City, Shaanxi Province | Company address: |
| Legal representative: Wang Guojun [signature] | Legal representative: |
| Entrusted agent: | Entrusted agent: Gao Rongguo [signature] |
| Telephone: | Telephone: |
| Bank of deposit: Caihong Branch of Industrial and Commercial Bank of China in Xianyang City | Bank of deposit: |
| Account number: 2604020909022108284 | Account number: |
| Postal code: 712021 | Postal code:      Xu Haiyan [signature] |

Effective period: June 26, 2002 to July 28, 2002

# 工矿产品购销合同

供方：彩虹显示器件股份有限公司　　　　　　　合同编号：CHGF0207173
需方：中国电子进出口彩虹公司　　　　　　　　签订地点：陕西咸阳
　　　　　　　　　　　　　　　　　　　　　　签订时间：2002 年 6 月 26 日

一、产品名称、商标、型号、数量：

| 产品名称 | 商标 | 规格 | 计量单位 | 数量 | 价格（元/只） | 金额（元） | 交货日期及数量 |
|---|---|---|---|---|---|---|---|
| 彩管 | 彩虹 | 21″ | 只 | 4848 | 450.45 | 2183781.6 | 7月 |
| 彩管 | 彩虹 | 21″ | 只 | 18112 | 377.91 | 6844705.92 | |
| 彩管 | 彩虹 | 25″ | 只 | 1 | 530 | 530 | |
| 合计金额（大写）：玖佰零贰万玖仟零壹拾柒元伍角贰分. | | | | | | | |

二、质量要求、技术标准、供方对质量负责的条件和期限：__按供方技术规格书标准执行.__

三、交（提）货地点、方式：__供方仓库.__

四、运输方式及到达站港和费用负担：__需方负责运输, 运费由需方支付.__

五、包装标准、包装物供应及回收：__供方原包装（塑膜包装）, 包装物不回收.__

六、结算方式及期限：__款到发货.__

七、违约责任：__由双方协商解决.__

八、解决合同纠纷的方式：本合同在履行过程中发生争议, 由当事人双方协商解决. 协商不成, 可向签订地人民法院起诉.

九、其它约定事项：
　　　　__具体供货规格及彩管磁场参数由需方提前书面通知供方.__

十、本合同一式四份（供方两份、需方两份）, 双方代表签字并加盖合同章后本合同生效.

| 供　　方 | 需　　方 |
|---|---|
| 单位名称（章）：彩虹显示器件股份有限公司 | 单位名称（章）： |
| 单位地址：陕西省西安市高新开发区西区 | 单位地址： |
| 法定代表人： | 法定代表人： |
| 委托代理人： | 委托代理人： |
| 电话： | 电话： |
| 开户行：咸阳市工行彩虹分理处 | 开户行： |
| 帐号：2604020909022108284 | 帐号： |
| 邮政编码：712021 | 邮政编码： |
| | 有效期限：　2002 年 6 月 26 日至 2002 年 7 月 28 日 |

**EXHIBIT 15**



**certified**translate

A LANGUAGE FISH LLC COMPANY

info@certifiedtranslate.com   2425 Olympic Blvd., Suite 4000W   usa  1-888-856-2228
www.certifiedtranslate.com   Santa Monica, CA 90404   int  +1-310-684-3153
fax  +1-310-564-1944

## CERTIFIED TRANSLATION

A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|
| Firm:   **Saveri & Saveri, Inc.** | City/State/Zip:  **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
|---|
| **IRI-CRT-00003546E (Selected Records)** |

| Source Language:   **SIMPLIFIED CHINESE** | Target Language:   **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director          **Date:**   February 22, 2019

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On ___Feb. 22 2015___ before me, ___Kristin Gail Chamberlain___, Notary Public, appeared ___Sean Kirschenstein___, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ___Kristi Chm___

KRISTIN GAIL CHAMBERLAIN
Notary Public - California
Los Angeles County
Commission # 2141880
My Comm. Expires Feb 7, 2020

D☐P☐ Exhibit *8413*
Deponent *Wang*
Date *3|6|19* Rptr *BW*.

| Year and Month | Party | Product Name | Quantity | Amount in USD | RECORD# (Column added to note row # in original DBF) |
|---|---|---|---|---|---|
| 01/99 | IRICO USA | 14" CPT | 10080 | 272160 | 3 |
| 04/99 | IRICO USA | 14" CPT | 2016 | 56448 | 39 |
| 11/99 | G.P.X. Inc. | 14" TV | 1050 | 22050 | 229 |
| 11/99 | G.P.X. Inc. | 14" TV | 1050 | 22050 | 231 |
| 11/99 | G.P.X. Inc. | 14" TV | 450 | 9675 | 232 |
| 11/99 | G.P.X. Inc. | 14" TV | 450 | 9450 | 233 |
| 11/99 | G.P.X. Inc. | 14" TV | 1130 | 22600 | 234 |
| 11/99 | G.P.X. Inc. | 14" TV | 1130 | 22600 | 235 |
| 11/99 | G.P.X. Inc. | 14" TV | 1000 | 21000 | 236 |
| 11/99 | G.P.X. Inc. | 14" TV | 1190 | 31535 | 237 |
| 12/99 | G.P.X. Inc. | 14" TV | 1050 | 22050 | 238 |
| 12/99 | G.P.X. Inc. | 14" TV | 1050 | 22050 | 239 |
| 12/99 | G.P.X. Inc. | 14" TV | 950 | 21425 | 240 |
| 12/99 | G.P.X. Inc. | 14" TV | 1190 | 24990 | 241 |
| 12/99 | G.P.X. Inc. | 14" TV | 1000 | 21000 | 242 |
| 12/99 | G.P.X. Inc. | 14" TV | 1050 | 22050 | 243 |
| 12/99 | G.P.X. Inc. | 14" TV | 1050 | 22050 | 244 |
| 01/98 | IRICO USA | 14" CPT | 0 | -18900 | 280 |
| 01/98 | IRICO USA | 14" CPT | 5040 | 178920 | 282 |
| 02/98 | IRICO USA | 14" CPT | 20160 | 691488 | 298 |
| 06/98 | IRICO USA | 14" CPT | 10080 | 302400 | 350 |
| 06/98 | IRICO USA | 14" CPT | 2016 | 64512 | 353 |
| 02/98 | IRICO USA | 21" CPT | 5280 | 322080 | 458 |
| 05/98 | GLBAL | Convergence Cup | 3000 | 4750 | 487 |
| 07/98 | IRICO USA | TV kits | 20200 | 791840 | 489 |
| 11/98 | IRICO USA | TV kits | 10100 | 373700 | 491 |
| 11/98 | GLBAL | Electron gun | 500 | 3750 | 493 |
| 04/97 | IRICO USA | 14" CPT | 2016 | 80640 | 549 |
| 04/97 | IRICO USA | 14" CPT | 2016 | 80640 | 551 |
| 07/97 | IRICO USA | 14" CPT | 2016 | 80640 | 600 |
| 09/97 | IRICO USA | 14" CPT | 3024 | 117936 | 642 |
| 07/97 | IRICO USA | 21" CPT | 3200 | 219200 | 692 |
| 07/96 | IRICO USA | 14" CPT | 5040 | 224280 | 879 |
| 07/96 | IRICO USA | 14" CPT | 10080 | 448560 | 880 |
| 07/96 | IRICO USA | 14" CPT | 7560 | 336420 | 881 |
| 07/96 | IRICO USA | 14" CPT | 5040 | 224280 | 882 |
| 07/96 | IRICO USA | 14" CPT | 12096 | 565488 | 883 |
| 07/96 | IRICO USA | 14" CPT | 10080 | 448560 | 884 |
| 07/96 | IRICO USA | 14" CPT | 10080 | 471240 | 890 |
| 07/96 | IRICO USA | 14" CPT | 15120 | 672840 | 891 |
| 07/96 | IRICO USA | 14" CPT | 13608 | 605556 | 892 |
| 12/96 | IRICO USA | 14" CPT | 2016 | 90720 | 995 |

# Document Produced in Native Format

CONFIDENTIAL



| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | 年月 | 单位 | 产品名称 | 数量 | 美元金额 | RECORD# (Column added to note row # in original DBF) |
| 2 | 01/99 | 美彩 | 14"CPT | 10080 | 272160 | 3 |
| 3 | 04/99 | 美彩 | 14"CPT | 2016 | 56448 | 39 |
| 4 | 11/99 | G.P.X.INC | 14"TV | 1050 | 22050 | 229 |
| 5 | 11/99 | G.P.X.INC | 14"TV | 1050 | 22050 | 231 |
| 6 | 11/99 | G.P.X.INC | 14"TV | 450 | 9675 | 232 |
| 7 | 11/99 | G.P.X.INC | 14"TV | 450 | 9450 | 233 |
| 8 | 11/99 | G.P.X.INC | 14"TV | 1130 | 22600 | 234 |
| 9 | 11/99 | G.P.X.INC | 14"TV | 1130 | 22600 | 235 |
| 10 | 11/99 | G.P.X.INC | 14"TV | 1000 | 21000 | 236 |
| 11 | 11/99 | G.P.X.INC | 14"TV | 1190 | 31535 | 237 |
| 12 | 12/99 | G.P.X.INC | 14"TV | 1050 | 22050 | 238 |
| 13 | 12/99 | G.P.X.INC | 14"TV | 1050 | 22050 | 239 |
| 14 | 12/99 | G.P.X.INC | 14"TV | 950 | 21425 | 240 |
| 15 | 12/99 | G.P.X.INC | 14"TV | 1190 | 24990 | 241 |
| 16 | 12/99 | G.P.X.INC | 14"TV | 1000 | 21000 | 242 |
| 17 | 12/99 | G.P.X.INC | 14"TV | 1050 | 22050 | 243 |
| 18 | 12/99 | G.P.X.INC | 14"TV | 1050 | 22050 | 244 |
| 19 | 01/98 | 美彩 | 14"CPT | 0 | -18900 | 280 |
| 20 | 01/98 | 美彩 | 14"CPT | 5040 | 178920 | 282 |
| 21 | 02/98 | 美彩 | 14"CPT | 20160 | 691488 | 298 |
| 22 | 06/98 | 美彩 | 14"CPT | 10080 | 302400 | 350 |
| 23 | 06/98 | 美彩 | 14"CPT | 2016 | 64512 | 353 |
| 24 | 02/98 | 美彩 | 21"CPT | 5280 | 322080 | 458 |
| 25 | 05/98 | GLBAL | 汇聚杯 | 3000 | 4750 | 487 |
| 26 | 07/98 | 美彩 | TV散件 | 20200 | 791840 | 489 |
| 27 | 11/98 | 美彩 | TV散件 | 10100 | 373700 | 491 |
| 28 | 11/98 | GLBAL | 电子枪 | 500 | 3750 | 493 |
| 29 | 04/97 | 美彩 | 14"CPT | 2016 | 80640 | 549 |
| 30 | 04/97 | 美彩 | 14"CPT | 2016 | 80640 | 551 |
| 31 | 07/97 | 美彩 | 14"CPT | 2016 | 80640 | 600 |
| 32 | 09/97 | 美彩 | 14"CPT | 3024 | 117936 | 642 |
| 33 | 07/97 | 美彩 | 21"CPT | 3200 | 219200 | 692 |
| 34 | 07/96 | 美彩 | 14"CPT | 5040 | 224280 | 879 |
| 35 | 07/96 | 美彩 | 14"CPT | 10080 | 448560 | 880 |
| 36 | 07/96 | 美彩 | 14"CPT | 7560 | 336420 | 881 |
| 37 | 07/96 | 美彩 | 14"CPT | 5040 | 224280 | 882 |
| 38 | 07/96 | 美彩 | 14"CPT | 12096 | 565488 | 883 |
| 39 | 07/96 | 美彩 | 14"CPT | 10080 | 448560 | 884 |
| 40 | 07/96 | 美彩 | 14"CPT | 10080 | 471240 | 890 |
| 41 | 07/96 | 美彩 | 14"CPT | 15120 | 672840 | 891 |
| 42 | 07/96 | 美彩 | 14"CPT | 13608 | 605556 | 892 |
| 43 | 12/96 | 美彩 | 14"CPT | 2016 | 90720 | 995 |

Sheet1

CONFIDENTIAL

IRI-CRT-00003546.001

# EXHIBIT 16



**certified**translate
A LANGUAGE FISH LLC COMPANY

info@certifiedtranslate.com   2425 Olympic Blvd., Suite 4000W   usa   1-888-856-2228
www.certifiedtranslate.com   Santa Monica, CA 90404   int   +1-310-684-3153
fax   +1-310-564-1944

## CERTIFIED TRANSLATION



A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|
| Firm:   **Saveri & Saveri, Inc.** | City/State/Zip:  **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
|---|
| IRI-CRT-00003568E |
| |
| |

| Source Language:   **SIMPLIFIED CHINESE** | Target Language:   **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

By:   Sean Kirschenstein, Director                    Date:   February 21, 2019

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On   Feb. 21, 2019   before me,   Kristin Gail Chamberlain   , Notary Public, appeared   Sean Kirschenstein   , who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature   Kristin Chln



KRISTIN GAIL CHAMBERLAIN
Notary Public - California
Los Angeles County
Commission # 2141880
My Comm. Expires Feb 7, 2020

D☐P☐ Exhibit 5402
Deponent Wang
Date 3/6/19   Rptr BW

Scanned and created by Camscanner [QR Code]

**China National Electronics Import and Export Caihong Co.**

## Certificate of Account Transfer for Exported Goods

Card No. **8TS086**                                 **June 24, 1998**                          Transfer No. **62**

| Overseas Customer | | | Irico (USA) | | | Product Name and Model | Quantity | Unit Price | | Total Price | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Clerk | | | Xi Jiansheng | | | 14" CPT 37SX110Y22-DC05 | 2016 | USD 32 | | USD 64,512 | |
| Purchase Receipt No. | | | 00014959 | | | | | | | | |

| Debits | | | Credits | | | | Amount | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| General | Subsidiary | √ | General | Subsidiary | √ | Summary | Ten Millions | Millions | Hundred Thousands | Ten Thousands | Thousands | Hundreds | Tens | Ones | Cents | | 1 Attachment |
| 123 Foreign Exchange Accounts Receivable | 004 | √ | 504 Self-Managed Export Sales Revenue | 999 | √ | 2016 14" CPTs to Irico (USA) (8TS086) | | $ | 6 | 4 | 5 | 1 | 2 | 00 | | |
| | | | | | | | In ¥ | 5 | 3 | 4 | 1 | 5 | 9 | 36 | | |
| Total | | | Five hundred and thirty-four thousand one hundred and fifty-nine yuan and thirty-six cents | | | | | | | | | | | | | |

Supervisor _____     Recorded by _____     Verified by _____     Form completed by **Dong Congfeng**

CONFIDENTIAL

IRI-CRT-00003568E_Translation

# 中 国 电 子 进 出 口 彩 虹 公 司
## 出 口 货 物 转 帐 凭 证



片编号 8TS086                98 年 B4 日                        转 62 号

| 国外客户 | 新电子集团、公司 | 货物名称及规格型号 | 数 量 | 单 价 | 总 价 |
|---|---|---|---|---|---|
| 业 务 员 | 美电子 | 14"彩看 375×mc/22-2005 | 2016 | USD32- | USD64.512- |
| 收款发票号 | 00014959 | | | | |

| 借 方 | | ✓ | 贷 方 | | ✓ | 摘 要 | 金 额 |
|---|---|---|---|---|---|---|---|
| 一级科目 | 明细科目 | | 一级科目 | 明细科目 | | | 千百十万千百十元角分 |
| 123应收外汇帐款 | 00× | ✓ | 504自营出口销售收入 | 999 | ✓ | 发美国取地214"彩晋2016只 | 共 6 4 5 1 2 00 |
| | | | | | | (8TS086) | 折算 5 3 4 1 5 9 36 |

合 计    伍拾叁万肆仟壹佰伍拾玖元叁角陆分

主管          记帐          审核          制表 董聚峰

CONFIDENTIAL                                        IRI-CRT-00003568

中国电子进出口彩虹公司

CEIEC CHINA NATIONAL ELECTRONICS IMP&EXP CAIHONG COMPANY

SHANGHAI XIC...
Telex:70570 XYCEG CN
Cable:1752 XIANYANG
Fax:(0910)3313101
Tel:(0910)3313858
Postcode:712021

# INVOICE

**MESSRS.**  IRICO (USA) INC.
39658 MISSION BLVD FREMONT, CA 94539

| Invoice No. | Name Of Vessel | Loading Port | Discharging Port | On or About |
|---|---|---|---|---|
| 8TS086 | | SHANGHAI CHINA | DURBAN R.S.A. | JUN.20,1998 |
| Date | B/L No. | L/C No. | Contract No. | Licence No. |
| JUN.8,1998 | | T/T | 98EMUSCHCT01055 | |

| Marks & Nos | Description & Quantity | Unit Price | Amount |
|---|---|---|---|
| | CFR DURBAN R.S.A. | | |
| N/M | 2016 PCS 14 INCHES (37CM) COLOR PICTURE TUBE IRICO BRAND SPEC 37SX110Y22-DC05 CFR DURBAN R.S.A. | USD32.00 | USD64,512.00 |

(SAY,UNITED STATES DOLLARS SIXTY FOUR THOUSAND FIVE HUNDRED AND TWELVE ONLY.)

CHINA NATIONAL ELECTRONICS IMP&EXP
CAIHONG COMPANY

E. & O.E. _____

MANAGER

 由 扫描全能王 扫描创建

CONFIDENTIAL

IRI-CRT-00003569

# EXHIBIT 17



info@certifiedtranslate.com   2425 Olympic Blvd., Suite 4000W   usa  1-888-856-2228
www.certifiedtranslate.com   Santa Monica, CA 90404   int  +1-310-684-3153
fax  +1-310-564-1944

## CERTIFIED TRANSLATION



A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name:  David Y. Hwu | Street Address: 706 Sansome Street |
|---|---|
| Firm:    Saveri & Saveri, Inc. | City/State/Zip:  San Francisco / CA / 94111 |

*Description of Document(s):*

| |
|---|
| |
| IRI-CRT-00003576E |
| |
| |

| Source Language:   SIMPLIFIED CHINESE | Target Language:   ENGLISH |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**     Sean Kirschenstein, Director                **Date:**   February 21, 2019

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On ___Feb. 21. 2019___ before me, ___Kristin Gail Chamberlain___, Notary Public, appeared ___Sean Kirschenstein___, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ___Kristi CMi___



KRISTIN GAIL CHAMBERLAIN
Notary Public - California
Los Angeles County
Commission # 2141880
My Comm. Expires Feb 7, 2020

D☐P☐ Exhibit  8407
Deponent  Wang
Date  3/6/19  Rptr  BW

Scanned and created by Camscanner [QR Code]

**China National Electronics Import and Export Caihong Co.**

## Certificate of Account Transfer for Exported Goods

Card No. **2TW446**                              **July 22, 2002**                              Transfer No. **61**

| Overseas Customer | | | *Diamond* | | | Product Name and Model | Quantity | Unit Price | Total Price | |
|---|---|---|---|---|---|---|---|---|---|---|
| Clerk | | | *Wen Haiyang* | | | *37 cm CPT* | *2016* | *USD 24.00* | *USD 48,384* | |
| Purchase Receipt No. | | | *00126257* | | | | | | | |

| Debits | | | Credits | | | Summary | Amount | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| General | Subsidiary | √ | General | Subsidiary | √ | | Ten Millions | Millions | Hundred Thousands | Ten Thousands | Thousands | Hundreds | Tens | Ones | Cents | |
| 123 Foreign Exchange Accounts Receivable | *006* | | 504 Self-Managed Export Sales Revenue | *014* | | *Revenue from 2016 14" CPTs to Diamond 2TW446* | | $ | 4 | 8 | 3 | 8 | 4 | 00 | | 1 Attachment |
| | | | | | | | In ¥ | 4 | 0 | 0 | 6 | 1 | 9 | 52 | | |
| Total | | | *Four hundred thousand six hundred and nineteen yuan and fifty-two cents* | | | | | | | | | | | | | |

Supervisor _____        Recorded by _____        Verified by <u>Dong Congfeng</u>    Form completed by **Yang Taigang**

CONFIDENTIAL                                                                 IRI-CRT-00003576E_Translation

中 国 电 子 进 出 口 彩 虹 公 司

## 出 口 货 物 转 帐 凭 证

2002 年 7 月 2 日

转 61 号

| 货物名称及规格型号 | 数 量 | 单 价 | 总 价 |
|---|---|---|---|
| Diamond | | | |
| 37cm彩管 | 2016个 | US229.00 | US463724 |

| 借 方 | | 贷 方 | | 摘 要 | 金 额 |
|---|---|---|---|---|---|
| 明细科目 | | 一级科目 | 明细科目 | | 千百十万千百十元角分 |
| 006 | | 504自营出口销售收入 | 014 | 转货Diamond 14"CPT 2016只收入 | ¥4838400 |
| | | | | 2ITW446 | ¥400061952 |
| 计 | | | | 玉佰捌拾万零陆佰壹拾玖元伍角贰分 | |

记帐 　　　审核 　　　制表

中 国 电 子 进 出 口 彩 虹 公 司

## 出 口 货 物 转 帐 凭 证

2002 年 7 月 2 日

转 61 号

| 货物名称及规格型号 | 数 量 | 单 价 | 总 价 |
|---|---|---|---|
| Diamond | | | |
| 37cm彩管 | 2016只 | US224.00 | US450584 |

| 借 方 | 贷 方 | | 摘 要 | 金 额 |
|---|---|---|---|---|
| 明细科目 | 一级科目 | 明细科目 | | |
| 006 | 504自营出口销售收入 | 014 | 转售Diamond 14"CPT 2016只 收入 | ￥4838400 |
| | | | 2TW446 | ￥4006195 2 |

玖拾万零陆佰壹拾玖元伍角贰分

记帐 _____ 审核 [重联单] 制表 杨春丽

CONFIDENTIAL

IRI-CRT-00003576

中国电子

# CEIEC CHINA NATIONAL ELECTRONICS IMP&EXP
CAIHONG COMPANY

XIANYANG SHANXI P.R.CHINA
Case:1752 XIANYANG
Fax:(0910)3313101
Tel:(0910)3313456
Postcode:712021

## INVOICE

**MESSRS.** DIAMOND ELECTRONICS
2297 NIELS BOHR SUITE #118
OTAY MESA,SAN DIEGO,CA 9154
619-661-9363  619-661-9389 FAX

| Invoice No. | Name Of Vessel | Loading Port | Discharging Port | On or About |
|---|---|---|---|---|
| 2TW446 | BY SEA | TIANJIN CHINA | LONG BEACH CA USA | JLY.20,2002 |
| Date | B/L  No. | L/C No. | Contract No. | Licence No. |
| JLY.5,2002 | | | 02EMUSCHCT01069 | |

| Marks & Nos | Description & Quantity | Unit Price | Amount |
|---|---|---|---|
| | | FOB TIANJIN CHINA | |
| | 2016 PCS.-14"CRT MODEL 37SX110Y22-DC11 UNIT PRICE:$24.00USD | USD24.00 | USD48,384.00 |

(SAY,UNITED STATES DOLLARS FORTY EIGHT THOUSAND THREE HUNDRED AND EIGHTY FOUR ONLY.)

CHINA NATIONAL ELECTRONICS IMP&EXP
CAIHONG COMPANY

E. & O.E. _____

MANAGER


由 扫描全能王 扫描创建

CONFIDENTIAL

IRI-CRT-00003577

# EXHIBIT 18



**certified**translate
A LANGUAGE FISH LLC COMPANY

info@certifiedtranslate.com | 2425 Olympic Blvd., Suite 4000W | usa 1-888-856-2228
www.certifiedtranslate.com | Santa Monica, CA 90404 | int +1-310-684-3153
| | fax +1-310-564-1944

## CERTIFIED TRANSLATION



A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|
| Firm:   **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
|---|
| |
| **IRI-CRT-00003574E** |
| |
| |

| Source Language:   **SIMPLIFIED CHINESE** | Target Language:   **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director          **Date:**   February 27, 2019

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On _Feb. 27, 2019_ before me,____Kristin Gail Chamberlain____, Notary Public, appeared____Sean Kirschenstein____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Kristi Cui_



KRISTIN GAIL CHAMBERLAIN
Notary Public - California
Los Angeles County
Commission # 2141880
My Comm. Expires Feb 7, 2020

Scanned and created by Camscanner [QR Code]

*090*

# Caihong Electronics Group Company

## Certificate of Account Transfer

**March 30, 1998**

Transfer No. Z *69*

| Debit | | | Credit | | | Summary | Amount | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| General | Subsidiary | √ | General | Subsidiary | √ | | Hundred Millions | Ten Millions | Millions | Hundred Thousands | Ten Thousands | Thousands | Hundreds | Tens | Ones | Cents | |
| Foreign Exchange Accounts Receivable | *007* | √ | 505 Agency Export Sales Revenue | *999* | √ | *Transfer of revenue from acting as agent for Royal in exporting display devices* | | | | | *1* | *3* | *9* | *9* | *3* | *20* | |
| | | | | | | *8TY017  $1690* | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Total | | | | | | *Thirteen thousand nine hundred and ninety-three yuan and twenty cents* | | | | ¥ | *1* | *3* | *9* | *9* | *3* | *20* | |

Supervisor _____     Recorded by _____     Verified by **_Geng Jun_**     Form completed by **_Dong Congfeng_**

CONFIDENTIAL

IRI-CRT-00003574E_Translation

CONFIDENTIAL



IRI-CRT-00003574

由 扫描全能王 扫描创建

CONFIDENTIAL

CEIEC 中国电子进出口彩虹公司

CHINA NATIONAL ELECTRONICS IMP&EXP
CAIHONG COMPANY

**INVOICE**

P.O.BOX NO. C XXXX
SHAANXI P.R.CHINA
Tolex:7073 XYCEC CN
Cable:1713 XIANYANG
TEL:(029)3311391
FAX:(029)3311396
Postcode:712021

MESSRS.   WESTEX

| Marks & Nos | Description & Quantity | Unit Price | Amount |
|---|---|---|---|
| N/M | 14"MONITOR | USD106.00 | USD3816.00 |
| | 15 " MONITOR | USD138.00 | USD408.00 |
| | 17"MONITOR | USD241.00 | USD964.00 |

Invoice No.  ST201
Date  JAN.1.1998

Name of Vessel
BY AIR
B/L No.   XIAN

Loading Port
U.S.A.
L/C No.   Contract No. 98ENISDMC94011

Discharging Port

On or About

Licence No.

(SAY,UNITED STATES DOLLARS ONE THOUSAND SIX HUNDRED AND NINETY ONL
Y.)

E. & O.E.

CHINA NATIONAL ELECTRONICS IMP&EXP
CAIHONG COMPANY

MANAGER

IRI-CRT-00003575

由 扫描全能王 扫描创建

# EXHIBIT 19

1898795

FILED
In the office of the Secretary of State
of the State of California

JUL -5 1995

BILL JONES, Secretary of State

**ARTICLES OF INCORPORATION**

**OF**

**IRICO (USA)  INC.**

ONE:     The name of this corporation is IRICO (USA) INC.

TWO:     The purpose of this corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

THREE:     The name and address in this state of the corporation's initial agent for service of process is HELEN Y.H. HUI, c/o IRICO (USA) INC., 3494 Camino Tassajara, Suite 102, Danville, California 94506.

FOUR:     The total number of shares which the corporation is authorized to issue is ten million (10,000,000).

Dated:     June 29, 1995

_____
HELEN Y. H. HUI

I declare that I am the person who executed the above Articles of Incorporation, and such instrument is my act and deed.

_____
HELEN Y. H. HUI

corp2:articles\iricoart.corp

CONFIDENTIAL                                                  IRI-CRT-00003513

# EXHIBIT 20



STATE of NEW YORK ⟩
⟩ ss:
COUNTY of NEW YORK ⟩

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"IRI-CRT-00003490 – IRI-CRT-0003497"*, originally written in *Chinese*, is to the best of our knowledge and belief, a true, accurate and complete translation into *English*.

Dated: December 17, 2018

Seth Wargo
Consortra Translations

Sworn to and signed before ME this
17th day of December,
2018.

Notary Public

JAMES G MAMERA
Notary Public - State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires Dec. 4, 2022

D☐P☐ Exhibit 8392
Deponent ZUANG
Date 3/4/15 Rptr AT

Your
legal
translation
partner

006

# IRICO Group Corporation
# Auditing Department Document

<hr>

IRICO Auditing (2001) No.1

<hr>

A Brief on Auditing Results for IRICO (USA) Inc.

To IRICO Group Corporation,

Under the instructions from IRICO Group Corporation leadership, our department assembled a three-person audit team led by department head ZHANG Xingxi and we served an audit notice to IRICO (USA) Inc. via fax on 27 April 2001. The audit team arrived in Fremont, California, USA on 27 May shortly before commencing field audit work. First of all, the audit team requested LIU Feng, General Manager of IRICO (USA) Inc., to supply documents and filings that are required to perform the audit, such as accounting documents, accounting books, and financial statements dating back to the year when the company was incorporated. However, the company's General Manager LIU Feng claimed that, before 1998, the company's finance function had been controlled by HUANG Xueli, the shareholder acting on behalf of the company's US investors and they didn't hand over accounting records when they pulled out of the company in 1998, and hence he could not supply such records. With regard to accounting records dated after 1998, General Manager LIU Feng alleged because the company was transferred to INB on 10 April 2001, which meant that all property of the original company including such records are in the possession of the acquirer and the acquirer's consent is required in order to access such records. After repeated negotiations initiated by the audit team, LIU Feng only provided records as follows:

1

CONFIDENTIAL                                                IRI-CRT-00003490 - Translation

007

1. Stubs of checks written by the company to external parties from 1 January 1998 to 30 April 2001;

2. Bank statements from 1 January 2000 to 30 April 2001;

3. IRICO (USA) Inc.'s Sale and Purchase Agreement;

4. A photocopy of the Resolutions of the 2nd-term Board of Directors, IRICO (USA) Inc.

Given that IRICO (USA) Inc. was already sold to US-based INB by LIU Feng without authorization on 10 April 2001, LIU Feng refused to provide accounting records required for the performance of the proposed audit, such as annual financial reports and accounting documents that are related to the company's business operations. As a result, the basic requirements for the performance of an audit could not be met. And given limitations on auditor's statutory duties and powers as well as means of inspection, the financial statements of IRICO (USA) Inc. under the audit, which would truly reflect its accounting information and lead to complete and accurate audit results, could not be revealed, making it impossible for the audit team to duly carry out its audit work. As a result, the audit team could only conduct some partial investigations over IRICO (USA) Inc. based on limited materials provided by LIU Feng, such as check stubs, some bank statements, and IRICO (USA) Inc.'s Sale and Purchase Agreement.

In carrying out the investigations, the audit team has mainly performed the following tasks in relation to the materials provided by LIU Feng:

1. Recorded each stub of checks written by the company since 1998;

2. Categorized the expenses by economic activity in line with the available stubs of checks;

3. Checked bank statements from 1 January 2000 to 30 April 2001 one by one;

4. Checked corporate credit card expenses with transaction value above 1,000 US dollars since 1998;

5. Reviewed IRICO (USA) Inc.'s Sale and Purchase Agreement signed by LIU and sought advice from a local law firm in relation to the content of the agreement;

6. Conducted inquiries and consultations with relevant US authorities in relation to company profile, shareholder identities, and corporate credit profile of the acquirer INB Co..

2

CONFIDENTIAL                                        IRI-CRT-00003491 - Translation

008

I. Company Profile

Based in Fremont, California, USA, IRICO (USA) Inc. was initially established as a joint venture between IRICO Group Corporation and its US partners. Incorporated in July 1995, the company had registered capital of 1.75 million US dollars. In particular, China National Electronics Imp & Exp Caihong Co. had a 34.3% stake in the company by contributing 600,000 US dollars in cash; Caihong (Hong Kong) Co. had a 45.7% stake in the company by contributing 800,000 US dollars in cash; HUANG Xueli had a 10% stake (including awarded performance shares worth 50,000 US dollars) by contributing 125,000 US dollars in cash, totalling 175,000 US dollars in cash; HUANG Maike had a 10% stake by contributing 175,000 US dollars in cash. In October 1995, IRICO Group Corporation dispatched LIU Feng and ZHU Jian to the US. ZHU Jian hasn't been to the US since March 1997 due to visa issues.

According to LIU Feng, an agreement was reached on 26 February 1998 for the US investors MS HUANG Xueli and MR HUANG Maike to unload their shareholdings in the company as collaboration with the siblings had been allegedly extremely difficult. And the brother and the sister refunded capital in the amount of 1 million US dollars to the company in 1998. Since then, the company has been entirely run by us, with LIU Feng solely in charge. During the audit, it was found that LIU Feng obtained permanent resident visa (green card) in the US on 20 July 2000. On 10 April 2001, the company was sold by its general manager LIU Feng to US-based INB Co. without authorization.

II. Company revenue and expenditures

1. Situation Prior to 1998

As LIU Feng failed to supply accounting documents for the company dated before 1998, the audit team could not verify the company's operational results prior to 1998.

2. Situation since 1998

① Based on check stubs provided by LIU Feng, the company posted expenditures of 914,670.45 US dollars cumulatively from 1 January 1998 to 30 April 2001;

3

009

②  Based on check stubs from the company's opening bank as supplied by LIU Feng, the company procured fixed assets worth 40,417.48 US dollars cumulatively from 1 January 1998 to 30 April 2001;

③  As the company did not provide bank statements for 1998 and 1999, the audit team could not verify its operating revenue, fund investment gains or interest income during both years. Based on bank statements from the company's opening bank as supplied by LIU Feng, the company posted operating revenue of 122,943.00 US dollars and operating costs of 112,896.00 US dollars from 1 January 2000 to 30 April 2001, respectively.

④  Based on bank statements from the company's opening bank as supplied by LIU Feng, the company posted interest income of 12,105.59 US dollars from 1 January 2000 to 30 April 2001, including:

10,444.06 US dollars in 2000

1,661.53 US dollars in 2001.

⑤  Based on bank statements and fixed asset lists, the company had net assets of 119,581.42 US dollars as of 30 April 2001, including:

Net value of fixed assets of 30,364.17 US dollars

Bank deposits of 89,217.25 US dollars.

III. Investigations over Sale and Purchase Agreement

IRICO (USA) Inc. was sold to US-based INB Co. by LIU Feng on 10 April 2001. As far as the Sale and Purchase Agreement provided by LIU Feng is concerned, the audit team entrusted Mr. SHI Xiaodong, General Manager of San Francisco-based container service unit of China Ocean Shipping (Group) Company, to seek legal consultation with law firm Morrison and Foerster LLP.

4

010

According to Cedric C. Chao, a lawyer at Morrison and Foerster LLP, the signing process and basis of the agreement itself complied with US laws.

Taking into account the lawyer's opinions, the audit team believes that the Sale and Purchase Agreement signed by LIU Feng violated the parent company's intent and damaged the parent company's interests in the following ways:

1. It is against the spirit and intent of the resolutions reached by the IRICO (USA) Inc.'s Board of Directors on 9 March 2000. IRICO (USA) Inc.'s Board of Directors fully entrusted LIU Feng to sell the company on 9 March 2000 under the conditions that the transaction price shall be 1 million US dollars and total consideration for the deal shall be delivered by 31 December 2000 at the latest. The Board of Directors did not authorize the provision in the agreement signed by LIU Feng that IRICO Group Corporation shall support the company to realize annual net profit of 700,000 US dollars as a condition. That was tantamount to selling the company for free and resulted in asset losses on the part of IRICO (USA) Inc.

2. As the company name IRICO (USA) Inc. was also transferred to the acquirer as part of the deal, the acquirer would continue to use the corporate name IRICO (USA) Inc. to conduct business. In case the acquirer is engaged in any improper or illegal operating activity, it would damage the reputation of IRICO Group Corporation to some extent. And in case that IRICO Group Corporation plans to start a subsidiary again in the US, it would not be able to use the name IRICO (USA) Inc. any longer.

As far as the agreement signed by LIU Feng is concerned, Cedric C. Chao advised that we could sue LIU Feng and the acquirer INB Co. on the ground that "LIU Feng signed the Sale and Purchase Agreement against the spirit and intent of the resolutions reached by the IRICO (USA) Inc.'s Board of Directors on 9 March 2000", demanding to terminate the performance of the agreement.

Nonetheless, if the dispute concerning the selling of IRICO (USA) Inc. is to be resolved via a lawsuit in the US, IRICO Group Corporation would have to pay legal fees of a significant amount. According to Cedric C. Chao, a lawsuit that costs 100,000 US dollars in legal fees is commonplace in the US.

5

011

In order to appropriately handle this issue, the audit team sought consultations with Mr. SHI Xiaodong, General Manager of San Francisco-based container service unit of China Ocean Shipping (Group) Company and the latter's Financial Director, MS ZHOU Yuzhen. They think it is fairly easy to register a company in the US and pursuing a lawsuit in the US that involves hefty legal fees would be meaningless and unworthy since currently IRICO (USA) Inc. was only a shell company without property investments or any debt dispute in the country.

In order to get more information about the acquirer, the audit team visited a number of agencies of the California government to make inquiries about INB Co.. Incorporated on 24 October 1997, INB's registered address is 3695 STEVENSON BLVD BLD STE 236 FREMONT, CA 94538. According to a corporate filing with the California state government dated 12 January 1998, INB had only one shareholder, LIU Feng, with equity capital of 50,000 US dollars. In a corporate filing dated 18 March 1998, INB's CEO, secretary, and financial director positions were all assumed by LIU Feng. In a corporate filing dated 7 May 2001, the person assuming general manager, secretary, and financial director positions at INB changed into SUN Xiaolin.

According to LIU Feng, he initially established INB Co. and held a stake in the company on behalf of Hong Kong resident SUN Xiaolin, before having the company transferred to SUN Xiaolin on 30 March 2001. Later on, LIU Feng, on behalf of IRICO Group Corporation, signed the IRICO (USA) Inc.'s Sale and Purchase Agreement with SUN Xiaolin on 10 April.

IV. Outstanding issues

1. LIU Feng sold IRICO (USA) Inc. without authorization and refused to provide materials requested by the auditing department for the performance of the proposed audit, such as annual financial reports and accounting documents related to the company's business operations, making it impossible for the audit team to duly carry out its audit work. Such actions constituted serious violation of the company's rules and policies.

2. By reviewing the stubs of checks written by the company since 1998, the audit team found that the company paid 400,000 US dollars in three batches in April 1999, for the purposes of short-term fund investments and expenses related to the company's electronics, tooling, and other businesses in 1998 and 1999.

6

012

However, the audit team could not verify related revenue as LIU Feng refused to provide relevant financial statements.

3. As the general manager of IRICO (USA) Inc., LIU Feng sold the company to US-based INB Co. without approval from IRICO Group Corporation, resulting in losses of state-owned assets. Such an action constituted the violation of regulations related to supervision and management of state-owned enterprises' assets.

4. IRICO (USA) Inc.'s Sale and Purchase Agreement hurt the interests of IRICO Group Corporation. First of all, pursuant to the resolutions of the 2nd-term Board of Directors, IRICO (USA) Inc., LIU Feng was entrusted to sell the company for 1 million US dollars, but the terms of the agreement dictate that IRICO Group Corporation shall support the company to realize annual net profit of 700,000 US dollars as a condition, which not only runs contrary to the original intention of the resolutions but also results in asset losses on the part of IRICO Group Corporation. Second, in case the acquirer is engaged in any improper or illegal operating activity, it would damage the reputation of IRICO Group Corporation to some extent as the company name IRICO (USA) Inc. was also transferred to the acquirer as part of the deal and the acquirer continues to use the corporate name IRICO (USA) Inc. to conduct business.

5. In a corporate filing with California state government dated 18 March 1998, the acquirer INB's CEO, secretary, and financial director positions were all assumed by LIU Feng and the person assuming general manager, secretary, and financial director positions at INB was changed into SUN Xiaolin in a corporate filing dated 7 May 2001.

V. Suggestions

LIU Feng was apparently involved in suspected violations of laws and discipline, though there is insufficient evidence for now. To investigate LIU Feng's wrongdoings, there exist two major challenges: first, LIU Feng lives in the US, he holds a Green Card, it is impossible he would return to China; second, evidence collection would involve US laws, which suggests too many big obstacles and hefty costs, making it hard to do. To pursue a civil case, IRICO Group Corporation would have to pay a significant amount of US dollars for legal fees, which makes little sense as the potential gains could not make up for the losses.

7

013

If IRICO Group Corporation takes administrative actions against LIU Feng in accordance with relevant management processes, such as removing LIU Feng's employee status, it could be the best outcome for him as such a scenario is what he desires. Therefore, if there exist other potential solutions, any immediate administrative actions should be refrained.

Given the above reasoning, we have following recommendations in relation to IRICO (USA) Inc. and LIU Feng's situation:

1. As LIU Feng sold IRICO (USA) Inc. without an approval from IRICO Group Corporation, which was against the parent company's intent and damaged the parent company's interests, it is advisable to not acknowledge IRICO (USA) Inc.'s Sale and Purchase Agreement signed between LIU Feng and INB while awaiting an opportunity to pursue and reserve the rights to pursue legal action against LIU Feng;

2. Continue to negotiate with LIU Feng, urging him to immediately terminate the Sale and Purchase Agreement he signed with INB Co. and execute the resolutions reached by the IRICO (USA) Inc.'s Board of Directors on 9 March 2000 by selling the company at the price of 1 million US dollars.

3. IRICO Group Corporation should take administrative actions against LIU Feng in accordance with relevant management processes at an appropriate time.

4. As efforts aimed at dealing with IRICO (USA) Inc. and LIU Feng's situation would involve cross-border issues and any international legal actions would be confronted with deep policy implications and too many thorny obstacles, coupled with limitations on statutory duties and powers as well as means of inspection, it would be very hard for IRICO Group Corporation to pursue this case. It is recommendable to seek advices from relevant higher-level authorities on how to deal with it.

27 July 2001
Auditing Department
(Chop) IRICO Group Corporation

| CC: Supervisory Office | | Archive (2) |
| --- | --- | --- |
| Auditing Office | | Printed and Distributed on 27 July 2001 |
| Printed by: QING Bei | Reviewed by: ZHANG Xingxi | No. of Copies: 4 |

8

CONFIDENTIAL                                        IRI-CRT-00003497 - Translation

# 彩 虹 集 团 公 司
# 审 计 部 文 件

彩审 [2001] 1 号

### 关于彩虹（美国）公司审计情况汇报

彩虹集团公司:

根据集团公司领导的指示,我部组成了以部长仉兴喜为组长的三人审计小组,2001年4月27日我部以传真的方式向彩虹（美国）公司下达了审计通知。审计小组于5月27日到达美国加利福尼亚州福利蒙特市,随即展开审计工作。首先审计小组要求公司总经理刘丰提供自公司成立以来历年的会计凭证、帐簿和财务报告等实施审计所必需的资料。但刘丰总经理称,1998年以前,公司的财务是由美方股东黄雪莉控制,98年美方撤股时,未将会计资料移交我方,因而无法提供;98年以后的会计资料因公司已在2001年4月10日转让给INB公司,原公司的一切物品归受让方所有,若要求提供须经受让方同意。经过审计小组多次交涉,刘丰仅提供了以下资料:

1

由 扫描全能王 扫描创建

IRI-CRT-00003490

007

1. 1998年1月1日至2001年4月30日公司对外开具的支票存根;

2. 2000年1月1日至2001年4月30日的银行对帐单;

3. 彩虹（美国）公司转让合同;

4. 彩虹（美国）公司第二届董事会决议（复印件）;

由于刘丰将彩虹（美国）公司已在2001年4月10日擅自转让给美国INB公司,刘丰对审计所需的与经营活动有关的财务决算报表、会计凭证等会计资料不予提供,无法满足审计最基本的条件,受法定职责、权限和检查手段的局限,无法揭示被审计的彩虹（美国）公司会计报表反映会计信息的真实情况,作出完整、正确的审计结果,使正常的审计工作无法进行。审计小组只能根据刘丰所提供的支票存根和部分银行对帐单、彩虹（美国）公司转让合同等资料对彩虹（美国）公司的一些情况进行调查了解。

在调查了解实施过程中审计小组主要对其提供的资料进行了以下工作:

1. 对其所提供1998年以来支出的支票存根进行了逐一登记;

2. 对登记的支出按支票存根所列的经济内容进行了分类;

3. 对2000年1月1日至2001年4月30日银行对帐单进行了逐一核查;

4. 对98年以来1000美元以上的公司信用卡支出进行了核查。

5. 对其所签定的公司转让合同进行了审查,并就合同内容咨询了当地的律师行。

6. 对受让方INB公司的基本情况以及股东、公司资信等情况

2

 由 扫描全能王 扫描创建

CONFIDENTIAL

IRI-CRT-00003491

008

向美国政府有关部门进行了调查咨询。

一、 公司基本情况

彩虹（美国）公司是集团公司与美方合资成立的合资公司，地址位于美国加利福尼亚州福利蒙特市。公司成立于1995年7月，注册资本175万美元，其中：彩虹进出口公司投资60万美元现金，占34.3%股权；彩虹（香港）公司投资80万美元现金，占45.7%股权；黄雪莉投资12.5万美元现金，送其干股5万美元，合计17.5万美元，占10%股权；黄麦克投资17.5万美元现金，占10%股权。1995年10月彩虹集团公司派刘丰、竺简赴美。1997年3月以后竺简因签证问题在没有去美国。

据刘丰反映由于与合资外方黄氏兄妹的合作极为困难，1998年2月26日与外方达成协议，美方从公司撤股，并在1998年一年内归还我方100万美元资本金。自此，该公司转由我方独自经营，由刘丰一人负责，审计调查时得知刘丰于2000年7月20日取得美国永久居住身份（绿卡）。2001年4月10日公司被总经理刘丰擅自转让给美国INB公司。

二、公司财务收支情况

1. 1998年以前的情况

由于刘丰未能提供 1998 年以前的公司会计资料，因此，无法对 1998 年以前的经营情况进行核实。

2. 1998 年以来的情况

① 据刘丰提供的支票存根资料，公司自 1998 年 1 月 1 日

3

 由 扫描全能王 扫描创建

至 2001 年 4 月 30 日累计发生费用 914,670.45 美元。

　　② 根据刘丰提供的公司开户银行支票存根，公司自 1998 年 1 月 1 日至 2001 年 4 月 30 日累计购置固定资产 40,417.48 美元。

　　③ 由于公司未提供 98、99 年度的银行对账单，其 98、99 年度的经营收入、基金投资收益和利息收入等无法核实。依据刘丰提供的公司开户银行 2000 年和 2001 年银行对账单，公司 2000 年 1 月 1 日至 2001 年 4 月 30 日累计主营业务收入 122,943.00 美元，累计主营业务成本　112,896.00 美元。

　　④ 依据刘丰提供的公司开户银行 2000 年和 2001 年银行对账单，公司 2000 年 1 月 1 日至 2001 年 4 月 30 日利息收入 12,105.59 美元。其中：

　　　2000 年　10,444.06 美元

　　　2001 年　　1,661.53 美元

　　⑤ 依据刘丰提供的公司开户银行对账单和固定资产清单，截止 2001 年 4 月 30 日，公司净资产 119,581.42 美元。其中：

　　　固定资产净值　　　30,364.17 美元

　　　银行存款　　　　　89,217.25 美元

　三、　合同调查情况

　　2001 年 4 月 10 日彩虹（美国）公司被刘丰转让给美国 INB 公司。根据刘丰所提供的转让合同书，审计小组委托中国远洋运输（集团）总公司在旧金山所设的集装箱服务有限公司总经理石小东先生，找到美国美富律师事务所对该合同进行了法律方面的

4

由 扫描全能王 扫描创建

IRI-CRT-00003493

咨询。该律师事务所赵启民律师认为就合同本身来讲，合同签定的程序、依据均符合美国的法律。

综合律师的意见，审计小组认为刘丰所签订的转让合同有以下方面是违背了集团公司意愿并损害了集团公司利益的：

1、不符合彩虹（美国）公司 2000 年 3 月 9 日董事会决议精神和意愿。彩虹（美国）公司 2000 年 3 月 9 日董事会全权委托刘丰出让彩虹（美国）公司，是以 100 万美金的价格出让，且转让资金收回最迟应在 2000 年 12 月 31 日前，并没有象刘丰所签订的合同中所写的同时要彩虹集团公司每年支持其 70 万美金利润作为前提。这实际上是变相将公司无偿转让了，并造成彩虹（美国）公司资产的损失。

2、由于彩虹（美国）公司转让的同时"彩虹（美国）公司"的名称也被转让了，受让方继续使用彩虹（美国）公司来做生意，如有不正当或非法经营行为将会给彩虹集团的声誉造成一定的损害。例如彩虹集团再来美国投资注册公司将不能使用"彩虹（美国）公司"这个名称。

对于刘丰转让彩虹（美国）公司所签定的合同，美国律师事务所赵启民律师认为可按"刘丰没有按照彩虹（美国）公司 2000 年 3 月 9 日董事会决议精神和意愿签定了本转让合同"为理由起诉刘丰和买方 INB 公司，终止其合同的执行。

但如在美国通过法律诉讼打官司解决彩虹（美国）公司转让一事，彩虹集团将要支付一笔相当数额的美金，按美国律师赵启

5

 由 扫描全能王 扫描创建

011

民所说，在美国打一场官司花10万美金是一件很平常的事。

就此问题审计小组又专门与中国远洋运输（集团）总公司在旧金山所设的集装箱服务有限公司总经理石小东先生、财务总监周玉珍女士进行了交谈咨询。他们认为在美国注册公司是一件很容易的事情，如目前彩虹（美国）公司在美国没有不动产投资，没有债权债务纠纷，仅仅是一个空壳公司，在美国起诉打官司花上一大笔律师费，意义不大，得不偿失。

为了解受让方公司的情况，审计小组先后到加州政府多个部门查询 INB 公司的情况。IBN 公司成立于1997年10月24日，注册地点是 3695 STEVENSON BLVD BLD STE 236   FREMONT, CA 94538 。1998年1月12日上报州政府的公司资料显示只有一名股东为刘丰，股本 50,000 美元。1999年3月18日上报资料中公司 CEO、秘书、财务总监均为刘丰，2001年5月7日公司上报的资料将总经理、秘书、财务总监变更为孙晓林。

据刘丰讲：INB 公司是香港人孙晓林委托他注册成立并持股，直到2001年3月30日才被其转到孙晓林名下的。4月10日他又代表彩虹与孙晓林签定了转让彩虹（美国）公司的。

四、存在的问题

1、刘丰将彩虹（美国）公司擅自转让并拒绝向审计部门提供所需的与经营活动有关的财务决算报表、会计凭证等审计资料，使正常的审计工作无法进行，是严重的违规违纪行为。

2、从刘丰所提供的1998年以来支出的支票存根中审计小组发

6

 由 扫描全能王 扫描创建

CONFIDENTIAL

IRI-CRT-00003495

现，公司99年4月分三次支付40万美元，用于短期基金投资和98、99年度经营电子产品、模具等业务的费用支出，因刘丰不提供有关财务帐目，所以无法对此收益情况进行核实。

3、公司总经理刘丰未经集团公司同意，于 2001 年 4 月 10 日擅自将彩虹（美国）公司转让给美国 INB 公司，造成国有资产流失，违反了国有企业财产监督管理的有关规定。

4、转让公司的合同中，损害了彩虹集团公司的利益。首先，第二届董事会决议委托其以 100 万美元转让，而合同中却以彩虹集团须每年支持其获得 70 万美元的利润为条件，不仅违背了董事会决议的原意，而且使公司资产造成损失；其次，在转让的同时"彩虹（美国）公司"的名称也被转让了，受让方继续以彩虹（美国）公司的名称经营，如有不正当或非法经营行为将会给彩虹集团的声誉造成一定的损害。

5、在 1999 年 3 月 18 日上报加州政府资料中受让方 INB 公司的 CEO、秘书、财务总监均为刘丰，2001 年 5 月 7 日公司上报的资料才将总经理、秘书、财务总监变更为孙晓林。

**五、建议**

刘丰涉嫌违法违纪问题明显，但目前证据不足。刘丰问题如要查证有两大难点：一是刘丰在美国，持有绿卡，不可能再回国；二是取证涉及到美国的法律问题，障碍太大太多，费用也不会少，很难做到。作为民事案子，可打民事官司，但彩虹集团将要支付一笔相当数额的美金，意义不大，得不偿失。

7

 由 扫描全能王 扫描创建

集团公司依据有关管理制度对刘丰其作出行政处理，如开除厂籍，这可能是刘丰最好的结局，也是刘丰所希望的。所以，在还有其他解决问题的可能情况下，不宜立即作出行政处理。

签于上述情况，对彩虹（美国）公司及刘丰问题的处理建议如下：

1、刘丰未经集团公司同意擅自转让彩虹（美国）公司，违背了集团公司意愿并严重损害了集团公司的利益，对其与美国 INB 公司所签定的彩虹（美国）公司的转让合同不予承认，等待机会，追究和保留追究对刘丰的法律责任。

2、继续和刘丰交涉，要求其立即终止与美国 INB 公司所签定的转让合同，执行彩虹（美国）公司 2000 年 3 月 9 日董事会决议，按 100 万美金的价格转让。

3、集团公司应依据有关管理制度在适当时候对其作出行政处理。

4、由于彩虹（美国）公司及刘丰问题的处理涉外跨国，而涉外案件政策性强，障碍太大太多，集团公司受法定职责、权限和检查手段的局限，很难查处此案，建议请示上级机关由有关部门处理。

二 00 一年七月二十五日

抄送: 监察处

审计办公室

打印: 庆蓓          校对: 仇兴喜          档（2）

2001 年 7 月 27 日印发

份数: 4

8

由 扫描全能王 扫描创建

CONFIDENTIAL                                    IRI-CRT-00003497

# EXHIBIT 21



STATE of NEW YORK            )
                             )        ss:
COUNTY of NEW YORK           )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"IRI-CRT-00003498 – IRI-CRT-0003499"*, originally written in *Chinese*, is to the best of our knowledge and belief, a true, accurate and complete translation into *English*.

Dated: December 17, 2018

Seth Wargo
Consortra Translations

Sworn to and signed before ME this
___ 17ᵗʰ___ day of _December_ ,
2018

Notary Public

JAMES G MAMERA
Notary Public - State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires Dec. 4, 2022

D☐ P☐ Exhibit 8393
Deponent ZHANG
Date 3/4/19 Rptr AS

Your
legal
translation
partner

# SHAANXI PROVINCE PEOPLE'S GOVERNMENT

SZH [1995]. No.131

Reply on Approving the Application for Establishing IRICO (USA) Inc. in the United States

To Provincial Foreign Trade and Economic Cooperation Department:

This is to acknowledge that TSWJMFZ (1995) No.200 Document from you has been received.

In order to expand our provinces exports of electronic and mechanic products to North America and deepen trade, investments and cooperation between China and the US, the Provincial People's Government, upon review, hereby approves that China National Electronics Imp & Exp Caihong Co. to establish IRICO (USA) Inc. in the US, with total investment of 600,000 US dollars and scope of business as follows: exports of color display tubes, color TV sets and other home appliance products and related technologies; undertake production activities in partnership with foreign investors; travel services and other trade activities; consulting, networking and aftersales services. It is hoped that your department coordinate with China National Electronics Imp & Exp Caihong Co. to select and send talented personnel with both skills and good ethics to the US to carry out related work.

In Response.

CONFIDENTIAL

[No body text on this page]

SHAANXI PEOPLE'S GOVERNMENT
24 August 1995

Reply to application for establishing a foreign trade enterprise in a foreign country

XXXX Industrial Bureau, IRICO Group Corporation

XXXX Office                          Printed and Distributed on 25 August 1995

No. of Printouts: 15

# 陕 西 省 人 民 政 府

陕政函〔1995〕131号

## 关于同意在美国设立美国彩虹公司的批复

省外经贸厅:

你厅陕外经贸发字〔1995〕200号文件收悉。

为了扩大我省机电产品对北美洲的出口发展中美间的贸易、投资与合作,经省人民政府研究,同意中国电子进出口彩虹公司在美国设立"美国彩虹公司",总投资60万美元,经营范围是:彩色显像管、彩色电视机和其它家电产品及相关技术的出口;承办与外方合资经营、合作生产业务;开展旅游服务和其它贸易活动;咨询联络及售后服务。望你厅协同中电彩虹公司,选拔德才兼备的人员赴美工作。

此复。

 由 扫描全能王 扫描创建

CONFIDENTIAL

IRI-CRT-00003498

[此页无正文]

一九九五年八月二十四日

外贸  驻外企业  批复

工业局、彩虹集团。

办公厅        1995年8月25日印发

共印15份

 由 扫描全能王 扫描创建

CONFIDENTIAL

IRI-CRT-00003499

**EXHIBIT 22**



**certified**translate
A LANGUAGE FISH LLC COMPANY

info@certifiedtranslate.com  2425 Olympic Blvd., Suite 4000W   usa  1-888-856-2228
www.certifiedtranslate.com   Santa Monica, CA 90404            int  +1-310-684-3153
                                                                fax  +1-310-564-1944

## CERTIFIED TRANSLATION



A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|
| Firm:   **Saveri & Saveri, Inc.** | City/State/Zip:  **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
|---|
| |
| **IRI-CRT-00003566E** |
| |
| |

| Source Language:   **SIMPLIFIED CHINESE** | Target Language:   **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

By:   Sean Kirschenstein, Director          Date:   February 21, 2019

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On ___Feb. 21, 2019___ before me, ___Kristin Gail Chamberlain___, Notary Public, appeared ___Sean Kirschenstein___, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____



KRISTIN GAIL CHAMBERLAIN
Notary Public - California
Los Angeles County
Commission # 2141880
My Comm. Expires Feb 7, 2020

D☐P☐ Exhibit 8405
Deponent  Wang
Date 3/6/19  Rptr BW

Scanned and created by Camscanner [QR Code]

China National Electronics Import and Export Caihong Co.

## Certificate of Account Transfer for Exported Goods

Card No. _____     *June 8, 1998*     Transfer No. *31*

| Overseas Customer | | *Irico (USA)* | | Product Name and Model | Quantity | Unit Price | | Total Price | |
|---|---|---|---|---|---|---|---|---|---|
| Clerk | | *Xi Jiansheng* | | *37SX110Y22-DC05* | *10,080* | *USD 30* | | *USD 302,400* | |
| Purchase Receipt No. | | *00014916* | | | | | | | |

| Debits | | | Credits | | | Summary | Amount | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| General | Subsidiary | √ | General | Subsidiary | √ | | Ten Millions | Millions | Hundred Thousands | Ten Thousands | Thousands | Hundreds | Tens | Ones | Cents |
| *[illegible]* | *004* | *√* | *[illegible]* | *999* | *√* | *10,080 14" CPTs to Irico (USA) (8TS080)* | $ | | | 3 | 0 | 2 | 4 | 0 | 0 | 00 |
| | | | | | | | In ¥ | 2 | 5 | 0 | 3 | 8 | 7 | 2 | 00 |
| Total | | | *Two million five hundred and three thousand eight hundred and seventy-two yuan and zero cents* | | | | | | | | | | | | |

*1 Attachment*

Supervisor _____     Recorded by _____     Verified by *Geng Jun* ___     Form completed by *Dong Congfeng*

CONFIDENTIAL

IRI-CRT-00003566E_Translation



中 国 电 子 进 出 口 彩 虹 公 司

## 出 口 货 物 转 帐 凭 证

98 年 6 月 8 日

转 31 号

| 货物名称及规格型号 | 数 量 | 单 价 | 总 价 |
|---|---|---|---|
| 37SV100/11- DC05 | 10080 | US$30- | US$302,400- |

发票号 00014916

| 借 方 | | 贷 方 | | 摘 要 | 金 额 |
|---|---|---|---|---|---|
| 一级科目 | 明细科目 | 一级科目 | 明细科目 | | |
| | 001 | | 999 | 发美国彩虹公司14"彩管 10080只 (8TS080) | 共 30240000 |
| 合 计 | | | | | 摘 2503872 00 |

主管　　　记帐　　　审核 再火军　　　制表 董联峰

CONFIDENTIAL

IRI-CRT-00003566

中国电子进出口彩虹公司

CHINA NATIONAL ELECTRONICS IMP&EXP
CAIHONG COMPANY

CEIEC

**INVOICE**

Cable:1752 XIANYANG
Fax:(0910)3343181
Tel:(0910)3313856
Postcode:712021

MESSRS. IRICO (USA) INC.
39658 MISSION BLVD,FREMONT,CA94539

| Invoice No. | Name Of Vessel | Loading Port | Discharging Port | On or About |
|---|---|---|---|---|
| 8TS080 | | SHANGHAI PORT,CHINA | ALEXANDRIA PORT | Licence No. |
| Date | B/L  No. | L/C No. | Contract No. | |
| MAY.25,1998 | | | 98EMUSCHCT01054 | |

| Marks & Nos | Description & Quantity | Unit Price | Amount |
|---|---|---|---|

FOB ANY CHINESE PORT

N/M
240PALLETS

14" COLOR PICTURE TUBE,
QTY 10080 AS PER PROFORMA INVOICE NO. USZ-98429T
DATED 30/04/98 COVERING F.O.B. ANY CHINESE PORT.
USD30.00          USD302,400.00

(SAY,UNITED STATES DOLLARS THREE HUNDRED  AND TWO THOUSAND
FOUR HUNDRED ONLY.)

CHINA NATIONAL ELECTRONICS IMP&EXP
CAIHONG COMPANY

E. & O.E.



MANAGER

由 扫描全能王 扫描创建

IRI-CRT-00003567

# EXHIBIT 23



**State-owned Assets Supervision and Administration Commission of the State Council**

中文    Contact Us    | Search...

HOME        ABOUT US        LATEST        SPECIALS        DIRECTORY        RESOURCES        VIDEOS

Home > Laws and Regulations

# Interim Regulations on Supervision and Management

Updated: 2003-11-24        (en.sasac.gov.cn)



Decree of the State Council of the People's Republic of China

No. 378

Interim Regulations on Supervision and Management of State-owned Assets of Enterprises, adopted at the Eighth Executive Meeting of the State Council on May 13, 2003, are hereby promulgated and shall be effective as of the date of promulgation.

Premier: Wen Jiabao

May 27, 2003

## Specials





Interim Regulations on Supervision and Management of State-owned Assets of Enterprises

Chapter I General Provisions

Article 1 These Regulations are formulated to establish a State-owned assets supervision and management system that suits the needs of socialist market economy, better run State-owned enterprises, push forward the strategic adjustment to the layout and structure of the State economy, develop and expand the State economy, and realize the preservation of and increase in the value of State-owned assets.

Article 2 These Regulations are applicable to the supervision and management of State-owned assets of State-owned enterprises, State-owned holding enterprises and enterprises with State-owned equity.

These Regulations are not applicable to the supervision and management of State-owned assets of financial institutions.

Article 3 For purposes of these Regulations, the term "State-owned assets of enterprises" refers to all forms of State investments in enterprises and the equities generated therefrom, as well as otherequitieswhich are legally determined to be owned by the State.

Article 4 State-owned assets of enterprises are owned by the State. The State exercises a State-owned assets management system under which the State Council and local people's governments perform the responsibilities of investor on behalf of the State respectively, enjoying owner's equity, combining rights with obligations and duties, and administering assets, personnel and other affairs.

Article 5 The State Council represents the State in performing the responsibilities of investor in large State-owned enterprises, State-owned holding enterprises and enterprises with State-owned equity, which have a vital bearing on the lifeline of the national economy and State security, and in large State-owned enterprises, State-owned holding enterprises and enterprises with State-owned equity within such sectors as important infrastructure and natural resources. Enterprises in which the State Council performs the responsibilities of investor are to be determined and announced by the State Council.

The people's government of a province, autonomous region or municipality directly under the Central Government, the people's government at the level of city divided into districts or of autonomous prefecture shall respectively represent the State in performing the responsibilities of investor in State-owned enterprises, State-owned holding enterprises and enterprises with State-owned equity other than those in which the State Council performs the responsibilities of investor. Enterprises in which the people's government of the province, autonomous region or municipality directly under the Central Government performs the responsibilities of investor are to be determined and announced by the people's government of such province, autonomous region or municipality directly under the Central Government, and be reported for the record to the State-owned assets supervision and administration authority of the State Council. Other enterprises in which the people's government at the level of city divided into districts or of autonomous prefecture performs the responsibilities of investor are to be determined and announced by the people's government at the level of city divided into districts or of autonomous prefecture, and be reported for the record to the State-owned assets supervision and administration authority of the people's government of the province, autonomous region or municipalities directly under the Central Government.

Enterprises in which the State Council, the people's government of a province, autonomous region or municipality directly under the Central Government, or the people's government at the level of city divided into districts or of autonomous prefecture performs the responsibilities of investor are hereinafter collectively referred to as the invested enterprises.

Article 6 The State Council, the people's government of a province, autonomous region or municipality directly under the Central Government, the people's government at the level of city divided into districts or of autonomous prefecture shall establish a State-owned assets supervision and administration authority respectively. The State-owned assets supervision and administration authority shall, under the authorization, perform the responsibilities of investor according to law, supervise and administer State-owned assets of enterprises according to law.

Subject to the approval of the people's government of a province, autonomous region or municipality directly under the Central Government, a city divided into districts or autonomous prefecture where State-owned assets form a smaller part of the total assets of enterprises need not establish a separate State-owned assets supervision and administration authority.

Article 7 People's governments at all levels shall strictly abide by the laws and regulations on State-owned assets management, persist in the separation of government functions of social and public administration from the functions of investor of State-owned assets, persist in the separation of government functions from enterprise management and separation of ownership from management.

The State-owned assets supervision and administration authority shall not perform the functions of social and public administration assumed by the government. Other institutions and departments under the government shall not perform the responsibilities of investor of State-owned assets of enterprises.

Article 8 The State-owned assets supervision and administration authority shall, in accordance with these Regulations and other related laws and administrative regulations, establish and improve its internal supervision systems and strictly abide by the laws and administrative regulations.

Article 9 In the event of wars, serious natural calamities or other major and emergent situations, the State may, in accordance with the law, uniformly reallocate and dispose State-owned assets of enterprises.

Article 10 The invested enterprises and the enterprises set up with the investment of such invested enterprises enjoy autonomy in their operation as provided by the relevant laws and administrative regulations.

The State-owned assets supervision and administration authority shall support the independent operation of enterprises according to law, and shall not interfere in their production and operation activities, apart from performing the responsibilities of investor.

Article 11 The invested enterprises shall make efforts to increase economic efficiency and bear the responsibility of preserving and increasing the value of State-owned assets operated and managed by them.

The invested enterprises shall accept the supervision and administration conducted by the State-owned assets supervision and administration authority according to law, and shall not harm the legitimate rights and interests enjoyed by the owner of State-owned assets of enterprises and other investors.

Chapter II State-owned Assets Supervision and Administration Authorities

Article 12 The State-owned assets supervision and administration authority of the State Council is a specially established authority directly subordinated to the State Council which, on behalf of the State Council, performs the responsibilities of investor, supervises and manages State-owned assets of enterprises.

The State-owned assets supervision and administration authority of the people's government of a province, autonomous region or municipality directly under the Central Government, or the State-owned assets supervision and administration authority of the people's government at the level of city divided into districts or of autonomous prefecture, is a specially established authority directly subordinated to the respective people's government which, on behalf of the government at the same level, performs the responsibilities of investor, supervises and manages State-owned assets of enterprises.

The State-owned assets supervision and administration authority of the government at a higher level guides and supervises according to law the management work of State-owned assets supervision and administration of the government at a lower level.

Article 13 The main responsibilities of a State-owned assets supervision and administration authority are as follows:

(1) perform the responsibilities of investor for the invested enterprises in accordance with the Company Law of the People's Republic of China and other related laws and regulations, and safeguard the rights and interests of the owner;

(2) guide and push forward the reform and restructuring of State-owned enterprises and State-owned holding enterprises;

(3) dispatch supervisory panels to the invested enterprises pursuant to the relevant regulations;

(4) appoint or remove the responsible persons of the invested enterprises and evaluate their performance in accordance with the statutory procedures, and grant rewards or impose punishments based on the evaluation results;

(5) supervise and administer the preservation of and increase in the value of State-owned assets of enterprises by means of statistics or auditing;

(6) perform other responsibilities of investor and undertake other tasks assigned thereto by the government at the corresponding level.

Besides the responsibilities set forth in the preceding paragraph, the State-owned assets supervision and administration authority of the State Council may formulate rules and systems on State-owned assets supervision and administration of enterprises.

Article 14 The main obligations of a State-owned assets supervision and administration authority are as follows:

(1) promote the reasonable flow and optimized allocation of State-owned assets, and propel the adjustment of the layout and structure of the State economy;

(2) maintain and improve the controlling power and competitive power of the State economy in areas which have a vital bearing on the lifeline of the national economy and State security, and improve the overall quality of the State economy;

(3) explore effective systems and ways for the management of State-owned assets of enterprises, enhance the work of supervision and management of State-owned assets of enterprises, promote the preservation of and increase in the value of State-owned assets of enterprises, and prevent the loss of State-owned assets of enterprises;

(4) guide and promote the establishment of modern enterprise system in State-owned enterprises and State-owned holding enterprises, improve corporate governance, and advance the modernization of management;

(5) respect and safeguard the operational autonomy of State-owned enterprises and State-owned holding enterprises, safeguard the legitimate rights and interests of enterprises according to law, impel enterprises to operate and manage according to law, and strengthen their competitive power;

(6) offer guidance and coordination to State-owned enterprises and State-owned holding enterprises in overcoming difficulties and solving problems in the process of their reform and development.

Article 15 The State-owned assets supervision and administration authority shall report to the government at the corresponding level about the supervision and management work of State-owned assets of enterprises, the preservation of and increase in the value of State-owned assets and other major matters.

Chapter III Administration of Responsible Persons of Enterprises

Article 16 The State-owned assets supervision and administration authority shall establish and improve the mechanism for selecting and appointing the responsible persons of enterprises and the mechanism of incentives and restraints that meet the requirements of modern enterprise system.

Article 17 The State-owned assets supervision and administration authority appoints or removes, or makes a proposal to appoint or remove, the responsible persons of its invested enterprises in accordance with the relevant provisions:

(1) appoint or remove the general manager, deputy general manager, chief accountant or other responsible persons of a wholly State-owned enterprise;

(2) appoint or remove the chairman, vice chairman, or director of the board of a wholly State-owned company, and make a proposal to the company for the appointment or removal of the general manager, deputy general manager, or chief accountant, etc.;

(3) nominate the candidate for the director of the board or supervisor to be dispatched to a State-owned holding company according to the company's articles of association, recommend the candidate for the chairman or vice-chairman of the board, or the chairman of the supervisory panel of a State-owned holding company, and make a proposal to the company on the candidate for the general manager, deputy general manager, or chief accountant;

(4) nominate the candidate for the director of the board or supervisor to be dispatched to a company with State-owned equity according to the company's articles of association.

Where the State Council, the people's government of a province, autonomous region, or municipality directly under the Central Government, or the people's government at the level of city or autonomous prefecture provides otherwise

on the appointment or removal of the responsible persons of the invested enterprises, such provisions shall prevail.

Article 18 The State-owned assets supervision and administration authority shall establish a system for evaluating the performance of the responsible persons of enterprises, sign performance contracts with the responsible persons of enterprises appointed by it, and conduct annual and office-term evaluation of the responsible persons according to the performance contracts.

Article 19 The State-owned assets supervision and administration authority shall, in accordance with the relevant provisions, determine the remuneration of the responsible persons of wholly State-owned enterprises and wholly State-owned companies among the invested enterprises, and grant rewards to or impose punishments upon the responsible persons of the invested enterprises based on the evaluation results.

Chapter IV Administration of Major Matters of Enterprises

Article 20 The State-owned assets supervision and administration authority is responsible for directing State-owned enterprises and State-owned holding enterprises to establish a modern enterprise system, reviewing and approving the restructuring plans or joint-stock transforming plans of the wholly State-owned enterprises or wholly State-owned companies among the invested enterprises, and reviewing and approving the articles of association of the wholly State-owned companies among the invested enterprises.

Article 21 The State-owned assets supervision and administration authority decides, in accordance with the statutory procedures, on such major matters as the division，merger, bankruptcy, dissolution, capital increase or decrease, or issue of company bonds of wholly State-owned enterprises or wholly State-owned companies among the invested enterprises. The division, merger, bankruptcy or dissolution of key wholly State-owned enterprises or wholly State-owned companies shall, upon the review by the State-owned assets supervision and administration authority, be reported for approval to the people's government at the corresponding level.

When reviewing and deciding on major matters of wholly State-owned enterprises or wholly State-owned companies among the invested enterprises in the field of science, technology and industry for national defense in accordance with the statutory procedures, the State-owned assets supervision and administration authority shall comply with the relevant laws and provisions of the State.

Article 22 The State-owned assets supervision and administration authority shall, in accordance with the provisions of the Company Law, appoint representatives of shareholders to the shareholders' meeting, or directors to the board of directors, of State-owned holding companies or companies with State-owned equity.

When the shareholder's meeting or the board of directors of a State-owned holding company or company with State-owned equity decides on such major matters as division，merger, bankruptcy, dissolution, capital increase or decrease, issue of company bonds, or appointment or removal of the responsible persons, the representatives of shareholders or the directors appointed thereto by the State-owned assets supervision and administration authority shall voice their opinions and exercise the right to vote according to the instructions of the State-owned assets supervision and administration authority.

The representatives of shareholders or the directors appointed by the State-owned assets supervision and administration authority shall report to the said authority in due time about their performance of responsibilities.

Article 23 The State-owned assets supervision and administration authority decides on the transfer of State-owned equity of its invested enterprises. The transfer of whole or part of the State-owned equity which may result in the loss of holding position of the State in the invested enterprises shall be reported for approval to the people's government at the corresponding level.

Article 24 Where any major matters of the important subsidiary enterprises established with the investment of the invested enterprises need to be reported by the invested enterprises to the State-owned assets supervision and

administration authority for approval, the management measures therefor shall be separately formulated by the State-owned assets supervision and administration authority of the State Council and submitted to the State Council for approval.

Article 25 The State-owned assets supervision and administration authority shall, in accordance with the relevant provisions of the State, organize and coordinate the work concerning the merger and bankruptcy of wholly State-owned enterprises and wholly State-owned companies among the invested enterprises, and cooperate with the relevant departments to make arrangements for settling laid-off workers.

Article 26 The State-owned assets supervision and administration authority shall, in accordance with the relevant provisions of the State, work out the guideline for the remuneration system reform of its invested enterprises, and regulate and control the overall level of the allocation of remuneration of its invested enterprises.

Article 27 Subject to the approval of the State Council, wholly State-owned enterprises and wholly State-owned companies among the invested enterprises may enjoy the rights prescribed in Article 12 of the Company Law as investment companies or holding companies as specified by the State Council, and may enjoy the rights prescribed in Article 20 of the Company Law as State-authorized investment institutions.

Article 28 The State-owned assets supervision and administration authority may authorize qualified wholly State-owned enterprises and wholly State-owned companies among the invested enterprises to engage in authorized operation of State-owned assets.

The authorized wholly State-owned enterprises and wholly State-owned companies shall operate, manage and supervise according to law the State-owned assets generated from State investment in their wholly owned enterprises, holding enterprises or enterprises with equity.

Article 29 The authorized wholly State-owned enterprises and wholly State-owned companies shall establish and improve a modern enterprise system, and be liable to preserve and increase the value of State-owned assets of enterprises.

Chapter V Management of State-owned Assets of Enterprises

Article 30The State-owned assets supervision and administration authority shall, in accordance with the relevant provisions of the State, be responsible for the basic management work, such as the definition and registration of property rights, the supervision and management of assets appraisal, the making of inventory of assets and liabilities, assets statistics, and overall assessment of State-owned assets.

The State-owned assets supervision and administration authority shall coordinate the settlement of disputes over property rights of State-owned assets among its invested enterprises.

Article 31 The State-owned assets supervision and administration authority shall establish a system for the supervision and management of property rights trading of State-owned assets of enterprises, reinforce the supervision and management of property rights trading of State-owned assets of enterprises, promote the reasonable flow of State-owned assets of enterprises, and prevent the loss of State-owned assets of enterprises.

Article 32 The State-owned assets supervision and administration authority shall perform the responsibilities of investor for the returns on the State-owned assets of the invested enterprises in accordance with law, and for any major investment and financing plan, development strategy and planning in accordance with the development plan and industrial policies of the State.

Article 33 Where the disposal of any major assets of wholly State-owned enterprises and wholly State-owned companies among the invested enterprises is subject to the approval of the State-owned assets supervision and administration authority, the matter shall be dealt with in accordance with the relevant provisions.

Chapter VI Supervision of State-owned Assets of Enterprises

Article 34 The State-owned assets supervision and administration authority of the State Council shall, on behalf of the State Council, dispatch supervisory panels to wholly State-owned enterprises and wholly State-owned companies among the invested enterprises. The composition, powers and ethics of conducts of a supervisory panel shall be in compliance with the Interim Regulations on Supervisory Panels of State-owned Enterprises.

The dispatch of supervisory panels to wholly State-owned enterprises and wholly State-owned companies among the invested enterprises by the State-owned assets supervision and administration authority of the local people's government on behalf of the people's government at the corresponding level shall be conducted with reference to the provisions of the Interim Regulations on Supervisory Panels of State-owned Enterprises.

Article 35 The State-owned assets supervision and administration authority shall supervise the financial situations of its invested enterprises in accordance with law, establish and improve the index system for the preservation of and increase in the value of State-owned assets, and safeguard the rights and interests of the investor of State-owned assets.

Article 36 Wholly State-owned enterprises and State-holding enterprises shall strengthen their internal supervision and risk control, establish and improve the systems of finance, audit, corporate legal counsel, and democratic supervision by staff members and workers in accordance with the relevant provisions of the State.

Article 37 Wholly State-owned enterprises and wholly State-owned companies among the invested enterprises shall, in accordance with the relevant provisions, regularly report to the State-owned assets supervision and administration authority about the situations of their finance, production and operation, as well as the preservation of and increase in State-owned assets.

Chapter VII Legal Liability

Article 38 Where, in violation of the relevant provisions, the State-owned assets supervision and administration authority appoints or removes the responsible persons of its invested enterprises, or makes a proposal to appoint or remove the responsible persons of its invested enterprises, or illegally interferes in the production and operation of the invested enterprises and infringes upon their legitimate rights and interests, thereby causing loss of State-owned assets of the enterprises or other serious results, the person directly in charge and other persons directly responsible therefor shall be given an administrative sanction in accordance with law. If a crime is constituted, criminal liability shall be investigated in accordance with law.

Article 39 Where, in violation of the relevant provisions, a wholly State-owned enterprise or wholly State-owned company among the invested enterprises fails to report to the State-owned assets supervision and administration authority about the situations of its finance, production and operation, or the preservation of and increase in the value of State-owned assets, it shall be given a warning; if the circumstances are serious, the person directly in charge and other persons directly responsible therefor shall be given a disciplinary sanction in accordance with law.

Article 40 Where the responsible person of a State-owned enterprise or State-holding enterprise abuses his power or neglects his duty, thus causing loss of State-owned assets of the enterprise, such person shall take the liability of compensation and be given a disciplinary sanction in accordance with law; if a crime is constituted, criminal liability shall be investigated in accordance with law.

Article 41 The responsible person of a State-owned enterprise or State-holding enterprise who is liable for the loss of State-owned assets of the enterprise, and therefore given a disciplinary sanction of removal from office or heavier, shall not take the office of responsible person of any State-owned enterprise or State-holding enterprise within five years; and the responsible person who causes heavy loss of State-owned assets of the enterprise or is imposed upon criminal penalty shall not take the office of responsible person of any State-owned enterprise or State-holding enterprise for life.

Chapter VIII Supplementary Provisions

Article 42 The organizational form, organizational structure, rights and obligations of State-owned enterprises, State-holding enterprises and enterprises with State-owned equity shall be governed by the Company Law of the People's Republic of China and other laws, administrative regulations as well as these Regulations.

Article 43 The build-up of primary organizations of the Communist Party of China, the development of socialist ideological and cultural progress, the improvement of the Party's work style and the build-up of clean government in State-owned enterprises, State-holding enterprises and enterprises with State-owned equity shall be conducted pursuant to the Constitution of Communist Party of China and other relevant provisions.

Trade unions in State-owned enterprises, State-holding enterprises and enterprises with State-owned equity shall be organized pursuant to the relevant provisions of the Trade Union Law of the People's Republic of China and the Constitution of Trade Unions of China.

Article 44 The State-owned assets supervision and administration authority of the State Council, the people's government of a province, autonomous region or municipality directly under the Central Government may formulate implementing measures in accordance with these Regulations.

Article 45 Where there is any discrepancy between these Regulations and the administrative regulations on the supervision and administration of State-owned assets formulated before the effectiveness of these Regulations, these Regulations shall prevail.

Article 46 Units that have not had their government functions separated from enterprise management shall, in accordance with the provisions of the State Council, accelerate the reform to separate government functions from enterprise management. After the accomplishment of the separation of government functions from enterprise management, the State-owned assets supervision and administration authority shall perform the responsibilities of investor and conduct the supervision and management of State-owned assets of the enterprise according to law.

Article 47 These Regulations shall be effective as of the date of promulgation.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Translated by:Xu Aibo        Ye Meng        Zhang Nengzi

Proofread and corrected by: Wang Shanchuan          Xu Aibo

Examined and verified by: Yan Xiaofeng        Wang Shanchuan

Examined and approved by: Legislative Affairs Office of the State Council, PRC

ABOUT US              LATEST              SPECIALS              DIRECTORY              RESOURCES              VIDEOS

| What we do | SASAC News | Statistics |
| Leadership | SOEs News | Laws and Regulations |
| Bureaux | | FAQs |

Copyright © 2019 State-owned Assets Supervision and Administration Commission of the State Council All rights reserved.
Presented by China Daily

# EXHIBIT 24

*Hong Kong Exchanges and Clearing Limited and The Stock Exchange of Hong Kong Limited take no responsibility for the contents of this announcement, make no representation as to its accuracy or completeness and expressly disclaim any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this announcement.*



# 彩 虹 集 團 電 子 股 份 有 限 公 司
# IRICO GROUP ELECTRONICS COMPANY LIMITED*

*(A joint stock company incorporated in the People's Republic of China with limited liability)*

(Stock Code: 0438)

## ANNOUNCEMENT
## RELATING TO
## VERY SUBSTANTIAL DISPOSAL AND CONNECTED TRANSACTIONS
## AND
## VERY SUBSTANTIAL ACQUISITION AND CONNECTED
## TRANSACTIONS INVOLVING:
## (A) INITIAL CAPITAL INJECTION TRANSACTIONS COMPRISING:
## (1) THE FIRST CAPITAL INJECTION INTO IRICO GLASS
## BY A SHARE COMPANY;
## (2) THE FIRST CAPITAL INJECTION INTO IRICO (ZHANGJIAGANG)
## AND IRICO (HEFEI) BY IRICO GLASS;
## (B) A SHARE ISSUE AND RELATED TRANSACTIONS COMPRISING:
## (1) THE ISSUE OF NEW A SHARES BY A SHARE COMPANY;
## (2) THE SECOND CAPITAL INJECTION INTO IRICO GLASS
## BY A SHARE COMPANY; AND
## (3) THE SECOND CAPITAL INJECTION INTO IRICO (ZHANGJIAGANG)
## AND IRICO (HEFEI) BY IRICO GLASS
## AND
## RESUMPTION OF TRADING

# SUMMARY

# INITIAL CAPITAL INJECTION TRANSACTIONS

## First IRICO Glass Capital Injection

On 17 September 2009, the Company, A Share Company and the other existing shareholders of IRICO Glass entered into the First IRICO Glass Registered Capital Increase Agreement, pursuant to which A Share Company has agreed to inject RMB475 million in cash into IRICO Glass, a subsidiary of the Company. The Company and the other existing shareholders of IRICO Glass will not inject any capital into IRICO Glass pursuant to the First IRICO Glass Registered Capital Increase Agreement.

## First IRICO (Zhangjiagang) Capital Injection and First IRICO (Hefei) Capital Injection

On 17 September 2009, IRICO Group, Zhangjiagang Industry Corporation and IRICO Glass entered into the First IRICO (Zhangjiagang) Registered Capital Increase Agreement, pursuant to which IRICO Glass has agreed to inject RMB500 million in cash into IRICO (Zhangjiagang), an associate of IRICO Group (the controlling shareholder of the Company). IRICO Group and Zhangjiagang Industry Corporation will not inject any capital into IRICO (Zhangjiagang) pursuant to the First IRICO (Zhangjiagang) Registered Capital Increase Agreement.

On 17 September 2009, IRICO Group and IRICO Glass entered into the First IRICO (Hefei) Registered Capital Increase Agreement, pursuant to which IRICO Glass has agreed to inject RMB15 million in cash into IRICO (Hefei), an associate of IRICO Group (the controlling shareholder of the Company). IRICO Group will not inject any capital into IRICO (Hefei) pursuant to the First IRICO (Hefei) Registered Capital Increase Agreement.

The Initial Capital Injection Transactions are independent of and not conditional upon the completion of the A Share Issue.

**A SHARE ISSUE AND RELATED TRANSACTIONS**

**A Share Issue**

A Share Company proposes to issue new A Shares, by way of non-public offering, to not more than 10 specific investors, including IRICO Group and Zhangjiagang Industry Corporation. The number of new A Shares proposed to be issued pursuant to the A Share Issue will not exceed 540 million A Shares. The net proceeds (after deducting the related expenses) of the A Share Issue to be received by A Share Company is expected to be not more than RMB3.5 billion.

**Second IRICO Glass Capital Injection**

On 17 September 2009, the Company, A Share Company and the other existing shareholders of IRICO Glass entered into the Second IRICO Glass Registered Capital Increase Agreement, pursuant to which the A Share Company has agreed to further inject RMB3.5 billion (such amount may be adjusted depending on the amount of the A Share Issue Proceeds) in cash raised from the A Share Issue into IRICO Glass. The Company and the other existing shareholders of IRICO Glass will not inject any capital into IRICO Glass pursuant to the Second IRICO Glass Registered Capital Increase Agreement.

**Second IRICO (Zhangjiagang) Capital Injection and Second IRICO (Hefei) Capital Injection**

On 17 September 2009, IRICO Group, Zhangjiagang Industry Corporation and IRICO Glass entered into the Second IRICO (Zhangjiagang) Registered Capital Increase Agreement, pursuant to which IRICO Glass has agreed to further inject RMB500 million (it is the parties' understanding that such amount may be adjusted depending on the amount of the A Share Issue Proceeds) in cash into IRICO (Zhangjiagang). IRICO Group and Zhangjiagang Industry Corporation will not inject any capital into IRICO (Zhangjiagang) pursuant to the Second IRICO (Zhangjiagang) Registered Capital Increase Agreement.

On 17 September 2009, IRICO Group and IRICO Glass entered into the Second IRICO (Hefei) Registered Capital Increase Agreement, pursuant to which IRICO Glass has agreed to inject RMB1.8 billion (it is the parties' understanding that such amount may be adjusted depending on the amount of the A Share Issue Proceeds) in cash into IRICO (Hefei). IRICO Group will not inject any capital into IRICO (Hefei) pursuant to the Second IRICO (Hefei) Registered Capital Increase Agreement.

The First IRICO Glass Capital Injection, the A Share Issue and the Second IRICO Glass Capital Injection constitute a very substantial disposal under Chapter 14 of the Listing Rules and a connected transaction under Chapter 14A of the Listing Rules for the Company, and therefore are subject to relevant reporting, announcement and independent shareholders' approval requirements under Chapters 14 and 14A of the Listing Rules.

The First IRICO (Zhangjiagang) Capital Injection, the First IRICO (Hefei) Capital Injection, the Second IRICO (Zhangjiagang) Capital Injection and the Second IRICO (Hefei) Capital Injection constitute a very substantial acquisition under Chapter 14 of the Listing Rules and a connected transaction under Chapter 14A of the Listing Rules for the Company, and therefore are subject to relevant reporting, announcement and independent shareholders' approval requirements under Chapters 14 and 14A of the Listing Rules.

At the request of the Company, trading in the H Shares of the Company on the Stock Exchange has been suspended with effect from 14 September 2009 pending the release of this announcement. Application has been made by the Company to the Stock Exchange for the resumption of trading in the H Shares with effect from 9:30 a.m. on 21 September 2009.

## A.   INITIAL CAPITAL INJECTION TRANSACTIONS

## 1.   FIRST IRICO GLASS CAPITAL INJECTION

On 17 September 2009, the Company, A Share Company and the other existing shareholders of IRICO Glass entered into the First IRICO Glass Registered Capital Increase Agreement, pursuant to which A Share Company has agreed to inject RMB475 million in cash into IRICO Glass, a subsidiary of the Company. The Company and the other existing shareholders of IRICO Glass will not inject any capital into IRICO Glass pursuant to the First IRICO Glass Registered Capital Increase Agreement.

### (a)   First IRICO Glass Registered Capital Increase Agreement

*Parties*

(1)   The Company;

(2)   A Share Company; and

(3)   The other existing shareholders of IRICO Glass, who are Independent Third Parties

*First IRICO Glass Capital Injection*

Pursuant to the First IRICO Glass Registered Capital Increase Agreement, A Share Company has agreed to inject RMB475 million in cash into IRICO Glass, a subsidiary of the Company. The registered capital to be injected by A Share Company in respect of the First IRICO Glass Capital Injection will be determined with reference to the appraised asset value of IRICO Glass as of 31 August 2009, which is not yet available as at the date of this announcement. After the appraised asset value of IRICO Glass as of 31 August 2009 is determined, the Company, A Share Company and the other existing shareholders of IRICO Glass will enter into a separate supplemental agreement to agree the amount of registered capital to be acquired by A Share Company in respect of the First IRICO Glass Capital Injection based on the appraised results. The Company will make further announcement on such supplemental agreement if and when appropriate. Assuming the First IRICO Glass Capital Injection is made at par, immediately following the completion of the First IRICO Glass Capital Injection, the total registered capital of IRICO Glass will increase from RMB390 million (as of the date hereof) to RMB865 million. The Company considers it appropriate to assume that registered capital in the amount of RMB475 million in IRICO Glass will be acquired by A Share Company pursuant to the First IRICO Glass Capital Injection for the purpose of illustration in this announcement.

*Payment terms*

A Share Company is required to pay the amount for the First IRICO Glass Capital Injection to the designated account of IRICO Glass within 60 business days after the effective date of the First IRICO Glass Registered Capital Increase Agreement.

*Conditions precedent*

The First IRICO Glass Registered Capital Increase Agreement will take effect upon the satisfaction of all of the following conditions:

1.   the First IRICO Glass Capital Injection and its use of proceeds having been approved by the shareholders of the Company; and

2.   the First IRICO Glass Registered Capital Increase Agreement having been approved in the shareholders' meeting of A Share Company.

**Shareholding structure of IRICO Glass**

As at the date of this announcement, the shareholding structure of IRICO Glass is as follows:



Assuming the First IRICO Glass Capital Injection is made at par, immediately following the completion of the First IRICO Glass Capital Injection, the shareholding structure of IRICO Glass will be as follows:



The Company considers that immediately following the completion of the First IRICO Glass Capital Injection, IRICO Glass will continue to be a subsidiary of the Company.

**Use of proceeds**

The proceeds in the aggregate amount of approximately RMB475 million to be received by IRICO Glass from the First IRICO Glass Capital Injection is currently intended to be used in the following manners:

1.  RMB460 million for the First IRICO (Zhangjiagang) Capital Injection; and

2.  RMB15 million for the First IRICO (Hefei) Capital Injection.

**Source of funding**

In order to finance the First IRICO Glass Capital Injection, on 17 September 2009, A Share Company entered into the Loan Agreement with IRICO Group, pursuant to which IRICO Group has agreed to make a loan in the amount of RMB400 million to A Share Company, of which RMB200 million for a term of 1 year at an interest rate of 5.31% per annum and the remaining RMB200 million for a term of 1.5 year at an interest rate of 5.4% per annum. The remaining RMB75 million to be injected by A Share Company to IRICO Glass pursuant to the First IRICO Glass Capital Injection will be funded by A Share Company's internal resources. The First IRICO Glass Capital Injection is independent of and not conditional upon the completion of the A Share Issue.

**Implications under the Listing Rules**

*First IRICO Glass Capital Injection*

As at the date of this announcement, the Company is the holder of RMB271.17 million of the registered capital in IRICO Glass, representing approximately 69.53% of the existing registered capital of IRICO Glass. Immediately following the completion of the First IRICO Glass Capital Injection, assuming that the First IRICO Glass Capital Injection will be made at par, the direct shareholding percentage of the Company in IRICO Glass will be diluted down to 31.35% and the shareholding percentage of A Share Company in IRICO Glass will be 54.91%. Assuming that the shareholding percentage of the Company in A Share Company does not change before the completion of the First IRICO Glass Capital Injection, the total effective shareholding of the Company (directly and indirectly through A Share Company) in IRICO Glass will be 53.58%, representing a reduction of 15.95% from its shareholding percentage in IRICO Glass immediately prior to the First IRICO Glass Capital Injection. Such reduction of effective shareholding percentage will constitute a deemed disposal under Chapter 14 of the Listing Rules.

Having considered the implications of Rules 14.22 and 14.23 of the Listing Rules, the Company aggregates the impact of the Initial Capital Injection Transactions with the A Share Issue and Related Transactions for the purpose of classifying the First IRICO Glass Capital Injection under Chapters 14 and 14A of the Listing Rules. As the highest percentage ratio among all the relevant percentage ratios (as defined in Rule 14.07 of the Listing Rules), calculated on an aggregate basis, for the deemed disposal is more than 75%, the First IRICO Glass Capital Injection is considered as a very substantial disposal under Chapter 14 of the Listing Rules.

As at the date of this announcement, to the best of the Directors' knowledge, information and belief having made all reasonable enquiry, no connected person of the Company (other than at the level of its subsidiaries) as defined under Rules 14A.11(1) to (4) is or are (individually or together) entitled to exercise, or control the exercise of 10% or more of the voting power at any general meeting of A Share Company, a non-wholly owned subsidiary of the Company, other than through the Company. Therefore A Share Company is not a connected person of the Company as of the date of this announcement. However, as the proceeds received by IRICO Glass from the First IRICO Glass Capital Injection would be used for the First IRICO (Zhangjiagang) Capital Injection and the First IRICO (Hefei) Capital Injection, which would constitute connected transactions, the Company considers it appropriate to also classify the First IRICO Glass Capital Injection as a connected transaction. As the highest of its applicable percentage ratios is more than 2.5%, the deemed disposal resulting from the First IRICO Glass Capital Injection is considered to be a very substantial disposal and connected transaction, and therefore should be subject to the relevant reporting, announcement and independent shareholders' approval requirements under Chapters 14 and 14A of the Listing Rules.

### *Loan Agreement*

IRICO Group, being the controlling shareholder of the Company, is a connected person of the Company. However, as the Company considers that the loan under the Loan Agreement is made by IRICO Group for the benefit of A Share Company on normal commercial terms (or better to A Share Company) and no security over the assets of A Share Company is required to be granted by A Share Company in favour of IRICO Group in respect of such loan, pursuant to Rule 14A.65(4) of the Listing Rules, the Loan Agreement and the transactions contemplated thereunder should be exempt from the reporting, announcement and independent shareholders' approval requirements under Chapter 14A of the Listing Rules.

**Expected gain or loss of the Company**

Since there will be no transfer of assets or equity interests owned by the Company in IRICO Glass pursuant to the First IRICO Glass Capital Injection and there will be no proceeds receivable by the Company from the deemed disposal resulting from the First IRICO Glass Capital Injection, there will be no significant gain or loss arising from such deemed disposal by the Company of interests in IRICO Glass to be reported in the next financial statements of the Company.

## 2. FIRST IRICO (ZHANGJIAGANG) CAPITAL INJECTION AND FIRST IRICO (HEFEI) CAPITAL INJECTION

**First IRICO (Zhangjiagang) Capital Injection**

On 17 September 2009, IRICO Group, Zhangjiagang Industry Corporation and IRICO Glass entered into the First IRICO (Zhangjiagang) Registered Capital Increase Agreement, pursuant to which IRICO Glass has agreed to inject RMB500 million in cash into IRICO (Zhangjiagang), which is owned as to 60% by IRICO Group and 40% by Zhangjiagang Industry Corporation and therefore an associate of IRICO Group. IRICO Group and Zhangjiagang Industry Corporation will not inject any capital into IRICO (Zhangjiagang) pursuant to the First IRICO (Zhangjiagang) Registered Capital Increase Agreement.

**(a)   First IRICO (Zhangjiagang) Registered Capital Increase Agreement**

*Parties*

(1)   IRICO Group;

(2)   Zhangjiagang Industry Corporation, who is an Independent Third Party; and

(3)   IRICO Glass

*First IRICO (Zhangjiagang) Capital Injection*

Pursuant to the First IRICO (Zhangjiagang) Registered Capital Increase Agreement, IRICO Glass has agreed to inject RMB500 million in cash into IRICO (Zhangjiagang). The registered capital to be acquired by IRICO Glass in respect of the First IRICO (Zhangjiagang) Capital Injection is determined with reference to the appraised value of the equity holders' interest of IRICO (Zhangjiagang) as of 31 August 2009. Such valuation is made based on the cost method and the registered capital is to be acquired by IRICO Glass at par in respect of the amount of the First IRICO (Zhangjiagang) Capital Injection. Immediately following the completion of the First IRICO (Zhangjiagang) Capital Injection, the total registered capital of IRICO (Zhangjiagang) will increase from RMB23 million to RMB523 million, and IRICO Glass will be interested in approximately 95.60% of the registered capital of IRICO (Zhangjiagang).

*Payment terms*

IRICO Glass is required to pay the amounts for the First IRICO (Zhangjiagang) Capital Injection to the designated account of IRICO (Zhangjiagang) within 30 business days after the effective date of the First IRICO (Zhangjiagang) Registered Capital Increase Agreement.

*Conditions precedent*

The First IRICO (Zhangjiagang) Registered Capital Increase Agreement will take effect upon the satisfaction of all of the following conditions precedent:

1.  the First IRICO (Zhangjiagang) Capital Injection having been approved in the shareholders' meeting of A Share Company;

2.  the First IRICO (Zhangjiagang) Capital Injection having been approved in the shareholders' meeting of the Company;

3.  the First IRICO Glass Capital Injection having been approved in the shareholders' meeting of the Company; and

4.     the First IRICO Glass Capital Injection having been approved in the shareholders' meeting of A Share Company.

**Shareholding structure of IRICO (Zhangjiagang)**

As at the date of this announcement, the shareholding structure of IRICO (Zhangjiagang) is as follows:



Immediately following the completion of the First IRICO Glass Capital Injection and the First IRICO (Zhangjiagang) Capital Injection, the shareholding structure of IRICO (Zhangjiagang) will be as follows:



The Company considers that immediately following the completion of the First IRICO (Zhangjiagang) Capital Injection, IRICO (Zhangjiagang) will become a subsidiary of the Company.

**Use of proceeds**

The proceeds in the amount of approximately RMB500 million to be received by IRICO (Zhangjiagang) from the First IRICO (Zhangjiagang) Capital Injection is currently intended to be used for the construction of the advanced TFT-LCD glass substrate production line project.

**Source of funding**

The capital injection in the amount of RMB500 million required to be injected by IRICO Glass to IRICO (Zhangjiagang) pursuant to the First IRICO (Zhangjiagang) Capital Injection will be funded, as to RMB460 million, by part of the proceeds from the First IRICO Glass Capital Injection and the remaining RMB40 million by IRICO Glass' internal resources. The First IRICO (Zhangjiagang) Capital Injection is independent of and not conditional upon the completion of the A Share Issue.

## FIRST IRICO (HEFEI) CAPITAL INJECTION

On 17 September 2009, IRICO Group and IRICO Glass entered into the First IRICO (Hefei) Registered Capital Increase Agreement, pursuant to which IRICO Glass has agreed to inject RMB15 million in cash into IRICO (Hefei), which is wholly-owned by IRICO Group and therefore an associate of IRICO Group (the controlling shareholder of the Company). IRICO Group will not inject any capital into IRICO (Hefei) pursuant to the First IRICO (Hefei) Registered Capital Increase Agreement.

**(b)   First IRICO (Hefei) Registered Capital Increase Agreement**

*Parties*

(1)   IRICO Group; and

(2)   IRICO Glass

*First IRICO (Hefei) Capital Injection*

Pursuant to the First IRICO (Hefei) Registered Capital Increase Agreement, IRICO Glass has agreed to inject RMB15 million in cash into IRICO (Hefei). The registered capital to be injected by IRICO Glass in respect of the First IRICO (Hefei) Capital Injection is determined with reference to the appraised value of the equity holders' interest of IRICO (Hefei) as of 31 August 2009. Such valuation is made based on the asset base method and the registered capital is to be acquired by IRICO (Glass) at par in respect of the amount of the First IRICO (Hefei) Capital Injection. Immediately following the completion of the First IRICO (Hefei) Capital Injection, the total registered capital of IRICO (Hefei) will increase from RMB5 million to RMB20 million, and IRICO Glass will be interested in 75% of the registered capital of IRICO (Hefei).

*Payment terms*

IRICO Glass is required to pay the amount for the First IRICO (Hefei) Capital Injection to the designated account of IRICO (Hefei) within 30 business days after the effective date of the First IRICO (Hefei) Registered Capital Increase Agreement.

*Conditions precedent*

The First IRICO (Hefei) Registered Capital Increase Agreement will take effect upon the satisfaction of all of the following conditions precedent:

1.   the First IRICO (Hefei) Capital Injection having been approved in the shareholders' meeting of A Share Company;

2.   the First IRICO (Hefei) Capital Injection having been approved in shareholders' meeting of the Company;

3.   the First IRICO Glass Capital Injection having been approved in the shareholders' meeting of the Company; and

4.   the First IRICO Glass Capital Injection having been approved in the shareholders' meeting of the A Share Company.

**Shareholding structure of IRICO (Hefei)**

As at the date of this announcement, the shareholding structure of IRICO (Hefei) is as follows:



Immediately following the completion of the First IRICO Glass Capital Injection and the First IRICO (Hefei) Capital Injection, the shareholding structure of IRICO (Hefei) will be as follows:



The Company considers that immediately following the completion of the First IRICO (Hefei) Capital Injection, IRICO (Hefei) will become a subsidiary of the Company.

**Use of proceeds**

The proceeds in the aggregate amount of approximately RMB15 million to be received by IRICO (Hefei) from the First IRICO Glass Capital Injection is currently intended to be used primarily for the day-to-day operation, project research and other preparation work for IRICO (Hefei).

**Source of funding**

It is the current intention of IRICO Glass that the RMB15 million required to be injected by IRICO Glass to IRICO (Hefei) pursuant to the First IRICO (Hefei) Capital Injection will be funded by part of the proceeds from the First IRICO Glass Capital Injection. The First IRICO (Hefei) Capital Injection is independent of and not conditional upon the completion of the A Share Issue.

**Implications relating to the First IRICO (Zhangjiagang) Capital Injection and the First IRICO (Hefei) Capital Injection under the Listing Rules**

Given that the First IRICO (Zhangjiagang) Capital Injection and the First IRICO (Hefei) Capital Injection are relating to the same line of business of the Group, the Company considers it appropriate to aggregate the two transactions for the purpose of calculating the relevant percentage ratios (as defined in Rule 14.07 of the Listing Rules) in accordance with Chapters 14 and 14A of the Listing Rules.

The First IRICO (Zhangjiagang) Capital Injection and the First IRICO (Hefei) Capital Injection will constitute acquisitions under Chapter 14 of the Listing Rules. Having considered the implications of Rules 14.22 and 14.23 of the Listing Rules, the Company aggregates the impact of the Initial Capital Injection Transactions with the A Share Issue and Related Transactions for the purpose of classifying the First IRICO (Zhangjiagang) Capital Injection and the First IRICO (Hefei) Capital Injection under Chapters 14 and 14A of the Listing Rules. As the highest percentage ratio among all the relevant percentage ratios (as defined in Rule 14.07 of the Listing Rules) for the acquisitions in respect of the First IRICO (Zhangjiagang) Capital Injection and First IRICO (Hefei) Capital Injection, calculated on an aggregate basis, is more than 100%, such transactions constitute a very substantial acquisition under Chapter 14 of the Listing Rules. Further, as each of IRICO (Zhangjiagang) and IRICO (Hefei) is an associate of IRICO Group as at the date of this announcement, the First IRICO (Zhangjiagang) Capital Injection and the First IRICO (Hefei) Capital Injection together also constitute a connected transaction of the Company under Chapter 14A of the Listing Rules. Therefore, the First IRICO (Zhangjiagang) Capital Injection and the First IRICO (Hefei) Capital Injection together are considered to be a very substantial acquisition and connected transaction, and therefore are subject to the relevant reporting, announcement and independent shareholders' approval requirements under Chapters 14 and 14A of the Listing Rules.

## 3.   REASONS FOR AND BENEFIT RELATING TO INITIAL CAPITAL INJECTION TRANSACTIONS

With the fast growing market demand in the flat panel display industry, particularly in respect of the liquid crystal television sets and other display devices in the PRC, the Group proposes to utilise its patent, technology and superiority in related resources to accelerate the expansion of production scale in producing TFT-LCD glass substrate, so as to increase its market share at a relatively early stage, to establish and maintain a pioneer position in the industry within the PRC. Coupled with the current capital status of the Company, the capital injection from A Share Company, a subsidiary of the Company, to IRICO Glass, and then from IRICO Glass to IRICO (Zhangjjiagang) and IRICO (Hefei), would help prepare the Group for the standardization of glass substrate development, so as to expedite the development in the construction of glass substrate projects and strategic transformation of the Group.

The Directors believe that the terms of the Initial Capital Injection Transactions are fair and reasonable and the transactions contemplated thereunder are in the interests of the Company and its shareholders as a whole.

The Initial Capital Injection Transactions are independent of and not conditional upon the completion of the A Share Issue.

## B.  A SHARE ISSUE AND RELATED TRANSACTIONS

### 1.  A SHARE ISSUE

A Share Company proposes to issue new A Shares, by way of non-public offering, to not more than 10 specific investors, including IRICO Group and Zhangjiagang Industry Corporation. The number of new A Shares proposed to be issued pursuant to the A Share Issue will not exceed 540 million A Shares, and the final number of A Shares to be issued will be agreed between the board of directors of A Share Company and the relevant underwriter(s). The net proceeds (after deducting related expenses) of the A Share Issue to be received by A Share Company is expected to be not more than RMB3.5 billion. IRICO Group has agreed to subscribe for the new A Shares to be issued pursuant to the A Share Issue with an amount of not less than RMB1 billion. Zhangjiagang Industry Corporation has also agreed to subscribe for the new A Shares to be issued pursuant to the A Share Issue with an amount of not less than RMB500 million. Each specific investor, other than IRICO Group and Zhangjiagang Industry Corporation, together with its related parties should not subscribe for more than 150 million A Shares pursuant to the A Share Issue. The new A Shares to be issued pursuant to the A Share Issue, when fully paid, will rank pari passu in all material respects with the A Shares in issue as at the date of this announcement.

**Subscription price**

Each of the specific investors, including IRICO Group and Zhangjiagang Industry Corporation, will subscribe for new A Shares pursuant to the A Share Issue at the same subscription price.

The subscription price will not be lower than RMB6.6 per A Share, being 90% of the average trading price of the A Shares during the 20 trading days prior to the date on which the A Share Issue was approved in the board meeting of A Share Company. Such minimum subscription price may be adjusted in the event that any dividend, bonus shares or capitalization issue are declared or made by A Share Company prior to the completion of the A Share Issue.

As required by the applicable rules and regulations in the PRC and provided in the IRICO Group Subscription Agreement and the Zhangjiagang Industry Corporation Subscription Agreement, the final subscription price will be determined by the board of directors of A Share Company and the relevant underwriter(s) based on a price sounding-out process among the specific investors other than IRICO Group and Zhangjiagang Industry Corporation.

The Company considers it appropriate to assume that the final subscription price will be equal to the minimum subscription price of RMB6.6 per A Share, the maximum number of new A Shares, i.e., 540 million A Shares, will be issued pursuant to the A Share Issue and the A Share Issue Proceeds will be in the amount of RMB3.5 billion for the purpose of illustration in this announcement.

**Lock-up arrangement**

Unless otherwise provided by laws, regulations or standardized documents, the new A Shares to be subscribed for by IRICO Group and Zhangjiagang Industry Corporation shall not be disposed of within 36 months from the date of the issue of such new A Shares, and the new A Shares to be subscribed for by the other specific investors shall not be disposed of within 12 months from the date of the issue of the respective new A Shares, and thereafter subject to the relevant regulations of CSRC and the Shanghai Stock Exchange.

**(a)   IRICO Group Subscription Agreement**

On 17 September 2009, A Share Company and IRICO Group entered into the IRICO Group Subscription Agreement pursuant to which IRICO Group has agreed, as one of the specific investors, to subscribe for the new A Shares pursuant to the A Share Issue in the amount of not less than RMB1 billion.

*Parties*

(1)   A Share Company as the issuer; and

(2)   IRICO Group as the subscriber.

*Subscription price payable by IRICO Group*

IRICO Group, as one of the specific investors under the A Share Issue, will subscribe for the new A Shares pursuant to the A Share Issue at the same subscription price as described in the sub-section headed "Subscription price" above for details.

— 18 —

*Payment terms*

IRICO Group is required to pay the subscription amount for the A Share Issue in accordance with a payment notice to be issued by A Share Company and the relevant underwriter(s).

### Conditions Precedent and Termination

The IRICO Group Subscription Agreement will take effect upon the satisfaction of all of the following conditions precedent:

1. the A Share Issue and its related matters having been approved by the board of directors and in the shareholders' meeting of A Share Company;

2. the A Share Issue and its related matters having been approved by the board of directors and in the shareholders' meeting of the Company;

3. the A Share Issue having been approved by CSRC; and

4. the subscription of the new A Shares to be issued pursuant to the A Share Issue by IRICO Group having been approved by SASAC.

The IRICO Group Subscription Agreement will terminate automatically if the above conditions precedent cannot be fulfilled.

Upon the occurrence of a force majeure event unforeseen or unavoidable by A Share Company or IRICO Group, resulting in the IRICO Group Subscription Agreement becoming unable, impossible or unnecessary to be performed, such agreement may be terminated by agreement between the parties.

**(b)   Zhangjiagang Industry Corporation Subscription Agreement**

On 17 September 2009, A Share Company and Zhangjiagang Industry Corporation entered into the Zhangjiagang Industry Corporation Subscription Agreement pursuant to which Zhangjiagang Industry Corporation Subscription Agreement has agreed, as one of the specific investors, to subscribe for the new A Shares pursuant to the A Share Issue in the amount of not less than RMB500 million.

*Parties*

(1)   A Share Company as the issuer; and

(2)   Zhangjiagang Industry Corporation as the subscriber.

*Subscription price payable by Zhangjiagang Industry Corporation*

Zhangjiagang Industry Corporation, as one of the specific investors under the A Share Issue, will subscribe for the new A Shares pursuant to the A Share Issue at the final subscription price as described in the sub-section headed "Subscription price" above for details.

*Payment terms*

Zhangjiagang Industry Corporation is required to pay the subscription amount for the A Share Issue in accordance with a payment notice to be issued by A Share Company and the relevant underwriter(s).

*Conditions Precedent and Termination*

The Zhangjiagang Industry Corporation Subscription Agreement will take effect upon the satisfaction of all of the following conditions precedent:

1.   the A Share Issue and its related matters having been approved by the board of directors and in the shareholders' meeting of A Share Company;

2.   the A Share Issue and its related matters having been approved by the board of directors and in the shareholders' meeting of the Company; and

3.   the A Share Issue having been approved by CSRC.

The Zhangjiagang Industry Corporation Subscription Agreement will terminate automatically if the above conditions precedent cannot be fulfilled.

Upon the occurrence of force majeure events unforeseen or unavoidable by A Share Company or Zhangjiagang Industry Corporation, resulting in the Zhangjiagang Industry Corporation Subscription Agreement becoming unable, impossible or unnecessary to be performed, such agreement may be terminated by agreement between the parties.

**(c)   Other specific investors under the A Share Issue**

As of the date of this announcement, the specific investors under the A Share Issue, other than IRICO Group and Zhangjiagang Industry Corporation, are not yet determined. Once the identities of such other specific investors have been determined, the Company will make disclosure under the Listing Rules where necessary. It is the current intention of A Share Company that such other specific investors would be Independent Third Parties. However, if it turns out that any of such other specific investors is a connected person of the Company, the Company would make further announcement in such regard and, if the identity of such connected person is not disclosed to the shareholders of the Company according to the Listing Rules before the EGM, no A Shares would be issued to such connected person under the A Share Issue until such connected transaction has been approved by the Independent Shareholders according to the Listing Rules, where necessary.

**Shareholding structure of A Share Company**

As at the date of this announcement, the shareholding structure of A Share Company is as follows:



Assuming that the final subscription price will be equal to the minimum subscription price of RMB6.6 per A Share and the maximum number of A Shares will be issued pursuant to the A Share Issue, immediately following the completion of the A Share Issue, the shareholding structure of A Share Company will be as follows:



| # | including Zhangjiagang Industry Corporation |
|---|---|
| ## | excluding the specific investors |

The Company considers that immediately following the completion of the A Share Issue, A Share Company will continue to be a subsidiary of the Company.

**Use of proceeds**

It is expected that the net proceeds raised from the A Share Issue, after deducting the related expenses, will not exceed RMB3.5 billion. The entire amount of the A Share Issue Proceeds is proposed to be used for the Second IRICO Glass Capital Injection, and IRICO Glass will apply such capital received in the following projects:

| Project | Required capital for the project (RMB'000,000) | The amount of A Share Issue Proceeds proposed to be applied to the project (RMB'000,000) |
|---|---|---|
| 1 the research and development of the advanced TFT-LCD glass substrate production line(s) and the construction of phase II expansion project of TFT-LCD glass substrate production line(s) by IRICO Glass in Xianyang, the PRC *(Note 1)* | 1,700 | 900 |
| 2 the Second IRICO (Hefei) Capital Injection for the construction of the advanced TFT-LCD glass substrate production line by IRICO (Hefei) *(Note 2)* | 2,435 | 1,800 |
| 3 the Second IRICO (Zhangjiagang) Capital Injection for the construction of the advanced TFT-LCD glass substrate production line by IRICO (Zhangjiagang) *(Note 3)* | 1,780 | 500 |
| 4 The additional working capital for IRICO Glass *(Note 4)* | 300 | 300 |
| Total | 6,215 | 3,500 |

*Note (1):*    IRICO Glass proposed to invest RMB1.7 billion on phase II of the expansion project of TFT-LCD glass substrate production line(s), of which RMB900 million would be funded by the capital raised pursuant to the A Share Issue.

*Note (2):*    It is proposed that IRICO (Hefei) would invest RMB2.435 billion to establish two fifth generation and two sixth generation glass substrate production lines, of which RMB1.8 billion would be funded by the capital raised pursuant to the A Share Issue. Such capital would be injected into IRICO Glass by A Share Company, following which the same will be injected into IRICO (Hefei) by IRICO Glass.

— 23 —

*Note (3):*   It is proposed that IRICO (Zhangjiagang) would invest RMB1.78 billion for the construction of three fifth generation glass substrate production lines, of which RMB500 million would be funded by the capital raised pursuant to the A Share Issue. Such capital would be injected into IRICO Glass by A Share Company, following which the same would be injected into IRICO (Zhangjiagang) by IRICO Glass.

*Note (4):*   The portion of the capital received from the A Share Issue in the amount of RMB300 million would be used by A Share Company to make capital injection into IRICO Glass to provide additional working capital for IRICO Glass.

In the event that the actual amount of A Share Issue Proceeds received by A Share Company is lower than RMB3.5 billion, the board of directors of A Share Company may, having taken into account the actual circumstance and without altering the projects, adjust the amounts of the A Share Issue Proceeds to be applied to different projects and the priority thereof. Pending the completion of the A Share Issue, the relevant member of the Group may, having taken into account the actual progress of the relevant projects, apply any other funds available to them to the projects, while such funds may subsequently be substituted by the relevant amounts of A Share Issue Proceeds after completion of the A Share Issue.

**Implications under the Listing Rules relating to the A Share Issue**

Assuming that the final subscription price will be equal to the minimum subscription price of RMB6.6 per A Share and the maximum number of A Shares will be issued pursuant to the A Share Issue, the shareholding percentage of the Company in A Share Company will be diluted and reduced from approximately 40.49% to approximately 18.16%, which reduction of shareholding percentage will constitute a deemed disposal under Chapter 14 of the Listing Rules.

Having considered the implications of Rules 14.22 and 14.23 of the Listing Rules, the Company aggregates the impact of the Initial Capital Injection Transactions with the A Share Issue and Related Transactions for the purpose of classifying the A Share Issue under Chapters 14 and 14A of the Listing Rules. As the highest percentage ratio among all the relevant percentage ratios (as defined in Rule 14.07 of the Listing Rules), calculated on an aggregate basis, for such deemed disposal is more than 75%, such deemed disposal constitutes a very substantial disposal under Chapter 14 of the Listing Rules. In addition, as a substantial portion of the A Shares issuable under the A Share Issue would be subscribed by IRICO Group, the Company considers it appropriate to also classify the A Share Issue as a connected transaction under Chapter 14A of the Listing Rules. Therefore, the A Share Issue, including the respective transactions contemplated under the IRICO Group Subscription Agreement and the Zhangjiagang Industry Corporation Subscription Agreement, should be considered as a very substantial disposal and connected transactions and therefore subject to the relevant reporting, announcement and independent shareholders' approval requirements under Chapter 14 and Chapter 14A of the Listing Rules.

**Expected gain or loss of the Company**

Since there will be no transfer of assets or equity interests held by the Company in A Share Company pursuant to the A Share Issue and there will be no proceeds receivable by the Company from the deemed disposal resulting from the A Share Issue, there will be no significant gain or loss arising from such deemed disposal by the Company of interests in A Share Company to be reported in the next financial statements of the Company.

**2.   SECOND IRICO GLASS CAPITAL INJECTION**

On 17 September 2009, the Company, A Share Company and the other existing shareholders of IRICO Glass entered into the Second IRICO Glass Registered Capital Increase Agreement, pursuant to which the A Share Company has agreed to further inject RMB3.5 billion (such amount may be adjusted depending on the amount of the A Share Issue Proceeds) in cash raised from the A Share Issue into IRICO Glass. The Company and the other existing shareholders of IRICO Glass will not inject any capital into IRICO Glass pursuant to the Second IRICO Glass Registered Capital Increase Agreement.

**(a)   Second IRICO Glass Registered Capital Increase Agreement**

*Parties*

(1)   The Company;

(2)   A Share Company; and

(3)   The other existing shareholders of IRICO Glass, who are Independent Third Parties

*Second IRICO Glass Capital Injection*

Pursuant to the Second IRICO Glass Registered Capital Increase Agreement, A Share Company has agreed to further inject RMB3.5 billion (such amount may be adjusted depending on the amount of the A Share Issue Proceeds) in cash raised from the A Share Issue into IRICO Glass, a subsidiary of the Company. The registered capital to be injected by A Share Company in respect of the Second IRICO Glass Capital Injection will be determined with reference to the appraised asset value of IRICO Glass as of 31 August 2009, which is not yet available as at the date of this announcement. After the appraised asset value of IRICO Glass as of 31 August 2009 is determined, the Company, A Share Company and the other existing shareholders of IRICO Glass will enter into a separate supplemental agreement to agree the amount of registered capital to be acquired by A Share Company in respect of the Second IRICO Glass Capital Injection based on the appraised results. The Company will make further announcement on such supplemental agreement if and when appropriate. Assuming the First IRICO Glass Capital Injection and the Second IRICO Glass Capital Injection are made at par, immediately following the completion of the First IRICO Glass Capital Injection and the Second IRICO Glass Capital Injection, the total registered capital of IRICO Glass will increase, on an aggregate

basis, from RMB390 million (as of today) to RMB4.365 billion (immediately following the completion of the First IRICO Glass Capital Injection and the Second IRICO Glass Capital Injection). The Company considers it appropriate to assume that registered capital in the amount of RMB475 million and RMB3.5 billion will be acquired by A Share Company pursuant to the First IRICO Glass Capital Injection and the Second IRICO Glass Capital Injection, respectively, for the purpose of illustration in this announcement.

### Payment terms

A Share Company is required to pay the amounts for the Second IRICO Glass Capital Injection to the designated account of IRICO Glass within 12 months after the effective date of the Second IRICO Glass Registered Capital Agreement.

### Conditions precedent

The Second IRICO Glass Registered Capital Increase Agreement will take effect on such date as shall be further agreed between the parties within 1 year after the satisfaction of all of the following conditions:

1.  the A Share Issue having been approved by law and the capital raised thereunder has been completed;

2.  the A Share Issue having been approved in the shareholders' meeting of A Share Company; and

3.  the A Share Issue having been approved in the shareholders' meeting of the Company.

**Shareholding structure of IRICO Glass**

As at the date of this announcement, the shareholding structure of IRICO Glass is as follows:



Assuming the First IRICO Glass Capital Injection and the Second IRICO Glass Capital Injection are made at par, immediately following the completion of the First IRICO Glass Capital Injection, the A Share Issue and the Second IRICO Glass Capital Injection, the shareholding structure of IRICO Glass will be as follows:



The Company considers that immediately following the completion of the Second IRICO Glass Capital Injection, IRICO Glass will continue to be a subsidiary of the Company.

**Use of proceeds**

The proceeds in the aggregate amount of approximately RMB3.5 billion to be received by IRICO Glass from the Second IRICO Glass Capital Injection is currently intended to be used in the manner as provided in the sub-section headed "Use of Proceeds" under the section headed "A Share Issue" above.

**Implications under the Listing Rules**

As at the date of this announcement, the Company is the holder of RMB271,170,000 of the registered capital in IRICO Glass, representing approximately 69.53% of the existing registered capital of IRICO Glass. Immediately following the completion of the First IRICO Glass Capital Injection and the Second IRICO Glass Injection, assuming that the First IRICO Glass Capital Injection and the Second IRICO Glass Capital Injection will be made at par, the total effective shareholding of the Company (directly and indirectly through A Share Company) in IRICO Glass will be 22.51%, representing a reduction of 47.02% from its shareholding percentage in IRICO Glass as of the date of this announcement. Such reduction of effective shareholding percentage resulting from the First IRICO Capital Injection and the Second IRICO Capital Injection, on an aggregate basis, will constitute a deemed disposal under Chapter 14 of the Listing Rules.

Having considered the implications of Rules 14.22 and 14.23 of the Listing Rules, the Company aggregates the impact of the Initial Capital Injection Transactions with the A Share Issue and Related Transactions for the purpose of classifying the Second IRICO Glass Capital Injection under Chapters 14 and 14A of the Listing Rules. As the highest percentage ratio among all the relevant percentage ratios (as defined in Rule 14.07 of the Listing Rules), calculated on an aggregate basis, for the deemed disposal is more than 75%, the Second IRICO Glass Capital Injection constitutes a very substantial disposal under Chapter 14 of the Listing Rules.

As at the date of this announcement, to the best of the Directors' knowledge, information and belief having made all reasonable enquiry, no connected person of the Company (other than at the level of its subsidiaries) as defined under Rules 14A.11(1) to (4) is or are (individually or together) entitled to exercise, or control the exercise of 10% or more of the voting power at any general meeting of A Share Company, a non-wholly owned subsidiary of the Company, other than through the Company. Therefore A Share Company is not a connected person of the Company as of the date of this announcement. However, as the proceeds received by IRICO Glass from the Second IRICO Glass Capital Injection would be used for the Second IRICO (Zhangjiagang) Capital Injection and the Second IRICO (Hefei) Capital Injection, which would constitute connected transactions, the Company considers it appropriate to also classify the Second IRICO Glass Capital Injection as a connected transaction. As the highest of its applicable percentage ratios is more than 2.5%, the deemed disposal resulting from the Second IRICO Glass Capital Injection should be considered as a very substantial disposal and connected transaction and therefore subject to the relevant reporting, announcement and independent shareholders' approval requirements under Chapters 14 and 14A of the Listing Rules.

**Expected gain or loss of the Company**

Since there will be no transfer of assets or equity interests owned by the Company in IRICO Glass pursuant to the Second IRICO Glass Capital Injection and there will be no proceeds receivable by the Company from the deemed disposal resulting from the Second IRICO Glass Capital Injection, there will be no significant gain or loss arising from such deemed disposal by the Company of interests in IRICO Glass to be reported in the next financial statements of the Company.

### 3.   SECOND IRICO (ZHANGJIAGANG) CAPITAL INJECTION AND SECOND IRICO (HEFEI) CAPITAL INJECTION

**SECOND IRICO (ZHANGJIAGANG) CAPITAL INJECTION**

On 17 September 2009, IRICO Group, Zhangjiagang Industry Corporation and IRICO Glass entered into the Second IRICO (Zhangjiagang) Registered Capital Increase Agreement, pursuant to which IRICO Glass has agreed to further inject RMB500 million (it is the parties' understanding that such amount may be adjusted depending on the amount of the A Share Issue Proceeds) in cash into IRICO (Zhangjiagang). IRICO Group and Zhangjiagang Industry Corporation will not inject any capital into IRICO (Zhangjiagang) pursuant to the Second IRICO (Zhangjiagang) Registered Capital Increase Agreement.

**(a)   Second IRICO (Zhangjiagang) Registered Capital Increase Agreement**

*Parties*

(1)   IRICO Group;

(2)   Zhangjiagang Industry Corporation, who is an Independent Third Party; and

(3)   IRICO Glass

*Second IRICO (Zhangjiagang) Capital Injection*

Pursuant to the Second IRICO (Zhangjiagang) Registered Capital Increase Agreement, IRICO Glass has agreed to further inject RMB500 million (it is the parties' understanding that such amount may be adjusted depending on the amount of the A Share Issue Proceeds) in cash into IRICO (Zhangjiagang). The registered capital to be injected by IRICO Glass in respect of the Second IRICO (Zhangjiagang) Capital Injection is determined with reference to the appraised value of the equity holders' interest of IRICO (Zhangjiagang) as of 31 August 2009. Such valuation is made based on the cost method and the registered capital is to be acquired by IRICO Glass at par in respect of the amount of the Second IRICO (Zhangjiagang) Capital Injection. Immediately following the completion of the First IRICO (Zhangjiagang) Capital Injection and the Second IRICO (Zhangjiagang) Capital Injection, it is expected that the total registered capital of IRICO (Zhangjiagang) will increase to RMB1.023 billion, and IRICO Glass will be interested in approximately 97.75% of the registered capital of IRICO (Zhangjiagang).

*Payment terms*

IRICO Glass is required to pay the amounts for the Second IRICO (Zhangjiagang) Capital Injection to the designated account of IRICO (Zhangjiagang) within 12 months after the effective date of the Second IRICO (Zhangjiagang) Registered Capital Increase Agreement.

*Conditions precedent*

The Second IRICO (Zhangjiagang) Registered Capital Increase Agreement will take effect upon the satisfaction of all of the following conditions precedent:

1.  the A Share Issue having been approved in the shareholders' meeting of A Share Company;

2.  the A Share Issue having been approved in shareholders' meeting of the Company;

3.  the A Share Issue having been approved by law and the capital raised thereunder has been completed; and

4.  the Second IRICO (Zhangjiagang) Capital Injection having been approved in the shareholders' meeting of the Company.

**Shareholding structure of IRICO (Zhangjiagang)**

As at the date of this announcement, the shareholding structure of IRICO (Zhangjiagang) is as follows:



Immediately following the completion of the First IRICO (Zhangjiagang) Capital Injection, the A Share Issue and the Second IRICO (Zhangjiagang) Capital Injection, the shareholding structure of IRICO (Zhangjiagang) will be as follows:



The Company considers that immediately following the completion of the Second IRICO (Zhangjiagang) Capital Injection, IRICO (Zhangjiagang) will continue to be a subsidiary of the Company.

**Use of proceeds**

The proceeds in the amount of approximately RMB500 million to be received by IRICO (Zhangjiagang) from the Second IRICO (Zhangjiagang) Capital Injection is currently intended to be used by IRICO (Zhangjiagang) for the construction of the advanced TFT-LCD glass substrate production line project.

## SECOND IRICO (HEFEI) CAPITAL INJECTION

On 17 September 2009, IRICO Group and IRICO Glass entered into the Second IRICO (Hefei) Registered Capital Increase Agreement, pursuant to which IRICO Glass has agreed to inject RMB1.8 billion (it is the parties' understanding that such amount may be adjusted depending on the amount of the A Share Issue Proceeds) in cash into IRICO (Hefei). IRICO Group will not inject any capital into IRICO (Hefei) pursuant to the Second IRICO (Hefei) Registered Capital Increase Agreement.

**(b)   Second IRICO (Hefei) Registered Capital Increase Agreement**

*Parties*

(1)   IRICO Group; and

(2)   IRICO Glass

*IRICO (Hefei) Capital Injection*

Pursuant to the Second IRICO (Hefei) Registered Capital Increase Agreement, IRICO Glass has agreed to inject RMB1.8 billion (it is the parties' understanding that such amount may be adjusted depending on the amount of the A Share Issue Proceeds) in cash into IRICO (Hefei). The registered capital to be injected by IRICO Glass in respect of the Second IRICO (Hefei) Capital Injection is determined with reference to the appraised value of the equity holders' interest of IRICO (Hefei) as of 31 August 2009. Such valuation is made based on the asset base method and the registered capital is to be acquired by IRICO Glass at par in respect of the amount of the Second IRICO (Hefei) Capital Injection. Immediately following the completion of the First IRICO (Hefei) Capital Injection and the Second IRICO (Hefei) Capital Injection, the total registered capital of IRICO (Hefei) will increase to RMB1.82 billion, and IRICO Glass will be interested in approximately 99.73% of the registered capital of IRICO (Hefei).

— 34 —

*Payment terms*

IRICO Glass is required to pay the amounts for the Second IRICO (Hefei) Capital Injection to the designated account of IRICO (Hefei) within 12 months after the effective date of the Second IRICO (Hefei) Registered Capital Increase Agreement.

*Conditions precedent*

The Second IRICO (Hefei) Registered Capital Increase Agreement will take effect upon the satisfaction of all of the following conditions precedent:

1. the A Share Issue and related matters having been approved in the shareholders' meeting of A Share Company;

2. the A Share Issue and related matters having been approved in shareholders' meeting of the Company;

3. the A Share Issue having been approved by law and the capital raised thereunder has been completed; and

4. the Second IRICO (Hefei) Registered Capital Increase Agreement having been approved in the shareholders' meeting of the Company.

**Shareholding structure of IRICO (Hefei)**

As at the date of this announcement, the shareholding structure of IRICO (Hefei) is as follows:



Immediately following the completion of the First IRICO (Hefei) Capital Injection, the A Share Issue and the Second IRICO (Hefei) Capital Injection, the shareholding structure of IRICO (Hefei) will be as follows:



The Company considers that immediately following the completion of the Second IRICO (Hefei) Capital Injection, IRICO (Hefei) will continue to be a subsidiary of the Company.

**Use of proceeds**

The proceeds in the aggregate amount of approximately RMB1.8 billion to be received by IRICO (Hefei) from the Second IRICO (Hefei) Capital Injection is currently intended to be used by IRICO (Hefei) for the construction of the advance TFT-LCD glass substrate production line.

**Implications relating to the Second IRICO (Zhangjiagang) Capital Injection and the Second IRICO (Hefei) Capital Injection under the Listing Rules**

Given that the Second IRICO (Zhangjiagang) Capital Injection and the Second IRICO (Hefei) Capital Injection are relating to the same line of business of the Group, the Company considers it appropriate to aggregate the two transactions for the purpose of calculating the relevant percentage ratios (as defined in Rule 14.07 of the Listing Rules) in accordance with Chapters 14 and 14A of the Listing Rules.

The Second IRICO (Zhangjiagang) Capital Injection and the Second IRICO (Hefei) Capital Injection will constitute acquisitions under Chapter 14 of the Listing Rules. Having considered the implications of Rules 14.22 and 14.23 of the Listing Rules, the Company aggregates the impact of the Initial Capital Injection Transactions with the A Share Issue and Related Transactions for the purpose of classifying the Second IRICO (Zhangjiagang) Capital Injection and the Second IRICO (Hefei) Capital Injection under Chapters 14 and 14A of the Listing Rules. As the highest percentage ratio among all the relevant percentage ratios (as defined in Rule 14.07 of the Listing Rules), calculated on an aggregate basis, for such transactions is more than 100%, such transactions constitute a very substantial acquisition under Chapter 14 of the Listing Rules. Further, as each of IRICO (Zhangjiagang) and IRICO (Hefei) is a connected person of the Company as at the date of this announcement, the Second IRICO (Zhangjiagang) Capital Injection and the Second IRICO (Hefei) Capital Injection together also constitute a connected transaction of the Company under Chapter 14A of the Listing Rules. Therefore the Second IRICO (Zhangjiagang) Capital Injection and the Second IRICO (Hefei) Capital Injection together should be considered as a very substantial acquisition and connected transaction, and therefore are subject to the relevant reporting, announcement and independent shareholders' approval requirements under Chapters 14 and 14A of the Listing Rules.

**4. REASONS FOR AND BENEFIT RELATING TO A SHARE ISSUE AND RELATED TRANSACTIONS**

The first domestic fifth generation liquid crystal glass substrate production line whose intellectual property rights are owned by the Company had commenced production in October 2008. With the fast growing market demand in the flat panel display industry, particularly in respect of the liquid crystal television sets and other display devices in the PRC, the Company considers that it must grasp the opportunity for the development in the industry, promptly increase the intensity of its investment and realise the fast expansion of the production capacity of liquid crystal glass substrate. Under the present conditions, the Company proposes to fully utilise the financing platform of its subsidiary, A Share Company, to raise the necessary capital for the development of the liquid crystal glass substrate production business through the A Share Issue. After the capital raised pursuant to the A Share Issue has been completed, A Share Company proposes to make capital injection into IRICO Glass in the amount of RMB3.5 billion. IRICO Glass in turn proposes to inject such amount into IRICO (Zhangjiagang) and IRICO (Hefei) in the amount of RMB1.8 billion and 500 million, respectively, for the construction of the advanced TFT-LCD glass substrate production line project. The remaining RMB300 million and RMB900 million of the A Share Issue Proceeds will be used as additional working capital and for the research and development of the advanced TFT-LCD glass substrate production line(s) and the construction of phase II expansion project of TFT-LCD glass substrate production line(s) by IRICO Glass, respectively. The Group believes that there is a prospect for the development in the advanced TFT-LCD glass substrate production line project, the completion of which will expedite the development in the construction of the glass substrate project and strategic transformation of the Group. It is expected that the overall operation results of the Group will be improved.

The Directors believe that the terms of the A Share Issue and Related Transactions are fair and reasonable and the transactions contemplated thereunder are in the interests of the Company and its shareholders as a whole.

## C.   EGM

The board of Directors will convene an EGM for the Independent Shareholders to consider, if appropriate, approve the Initial Capital Injection Transactions and the A Share Issue and Related Transactions, respectively, as separate transactions.

An independent board committee comprising the independent non-executive Directors will be formed to advise the Independent Shareholders on the Initial Capital Injection Transactions and the A Share Issue and Related Transactions. An independent financial adviser will, in accordance with the Listing Rules, be appointed to advise the independent board committee and the Independent Shareholders on the same.

Since a substantial portion of the A Shares issuable under the A Share Issue will be subscribed by IRICO Group and each of IRICO (Zhangjiagang) and IRICO (Hefei) is an associate of IRICO Group, IRICO Group will abstain from voting in connection with the Initial Capital Injection Transactions and the A Share Issue and Related Transactions in the EGM.

A circular of the Company containing, among other matters, further details of the Initial Capital Injection Transactions and the A Share Issue and Related Transactions, the recommendation of the independent board committee and the advice of an independent financial adviser on the relevant transactions, a notice of the EGM and any other information as required by the Listing Rules will be despatched to the shareholders of the Company as soon as practicable.

## D.   NON-EXEMPT CONTINUING CONNECTED TRANSACTIONS

As the shareholding percentage of IRICO Group in A Share Company may exceed 10% immediately following the completion of the A Share Issue, A Share Company (being a subsidiary of the Company) may become a connected person of the Company. The Company considers that certain non-exempt continuing connected transactions may arise thereafter and such transactions may be subject to the relevant reporting, announcement and independent shareholders' approval requirements under Chapter 14A of the Listing Rules. An announcement of the Company, containing details of such transactions will be made if and when appropriate.

## E.  INFORMATION ON THE RELEVANT PARTIES

### The Company

The Company is principally engaged in the production and sales of display devices (colour picture tubes and flat panel display devices) and its components, electronic glass, phosphor materials and metallic products.

### IRICO Group

IRICO Group is a wholly state-owned enterprise and the controlling shareholder of the Company holding approximately 75% of its issued share capital. IRICO Group, in addition to operating businesses through the Company, is principally engaged in the research and development, production and trading of businesses relating to colour picture tubes, display panels and their components, colour television sets and electronic products.

### A Share Company

A Share Company is principally engaged in the production, development and operation of colour display devices, electronic products and components and raw materials.

|  | For the year ended 31 December 2007 | For the year ended 31 December 2008 |
|---|---|---|
| Profit/(loss) before taxation and extraordinary items of A Share Company | RMB(57,026,235.56) | RMB30,325,400.64 |
| Profit/(loss) after taxation and extraordinary items of A Share Company | RMB(27,486,120.42) | RMB30,396,079.08 |

The audited net asset value of A Share Company, based on PRC GAAP, as at 31 December 2008 was RMB1,959,257,940.32.

**IRICO Glass**

IRICO Glass is principally engaged in the production and operation of electronic glass products and outbound trading (except those restricted by the PRC government)

|  | For the year ended 31 December 2007 | For the year ended 31 December 2008 |
|---|---|---|
| Profit/(loss) before taxation and extraordinary items of IRICO Glass | RMB0 | RMB(6,792,872.73) |
| Profit/(loss) after taxation and extraordinary items of IRICO Glass | RMB0 | RMB(6,792,872.73) |

The audited net asset value of IRICO Glass, based on PRC GAAP, as at 31 December 2008 was RMB383,207,127.27. As at the date of this announcement, the existing shareholders of IRICO Glass are the Company, Sichuan Changhong, Heibei Dongxu and 41 natural person shareholders.

Sichuan Changhong's principal businesses include household appliances; electronic products and parts; communication devices; computers and other electronic equipment; electronic and electrical machinery special equipment; electrical machinery and equipment; battery products; medical electronic products; power equipment; digital surveillance products; metal products; equipment instruments; office machinery; education and sports supplies; manufacturing, retailing and repairing furniture, kitchen cabinet and gas appliances; leasing houses and equipment; packaging and technical services; road transport, storage and portage; e-commerce; software development, retail and services; enterprise management consultation and services; investing in high-tech projects and other businesses allowed by the state; developing and managing real estate; and recycling abandoned electrical and electronic devices.

Hebei Dongxu is principally engaged in the production and design of non-standardized facilities and components; sale of the processing of the components of electronic products for grinding materials (except in relation to cars); import and export business of various self-made and licensed products and technology.

The Company confirms that the existing shareholders of IRICO Glass other than the Company are Independent Third Parties.

**IRICO (Zhangjiagang)**

IRICO (Zhangjiagang) is a company incorporated in the PRC on 28 October 2008 and is principally engaged in the research and development, manufacturing and sales of TFT-LCD panels, module and their accessories; the import and export business of various self-made and licensed products and technology (except those prohibited for operation or restricted for trading by the PRC government). The Company understands from IRICO (Zhangjiagang) that no profit or loss was recorded by IRICO (Zhangjiagang) for the period from 28 October 2008 (date of incorporation) to 31 August 2009.

The audited values of total assets, total liabilities and net assets of IRICO (Zhangjiagang), based on PRC GAAP, as at 31 August 2009 are set out as follows:

|  | **As at 31 August 2009** |
|---|---|
|  | *(RMB)* |
| Total assets | 24,064,894.77 |
| Total liabilities | 1,064,894.77 |
| Net assets | 23,000,000 |

**Zhangjiagang Industry Corporation**

Zhangjiagang Industry Corporation's principal businesses include investment and management of land development projects and the trading of metal materials, chemical fiber, wool, timber, hardware, AC power, electrical products, construction materials, textile products, rubber products, industrial chemicals (except for hazardous goods), agricultural by-products. The Company confirms that Zhangjiagang Industry Corporation is an Independent Third Party.

**IRICO (Hefei)**

IRICO (Hefei) is a company incorporated in the PRC on 26 August 2009 and is principally engaged in the investment, construction, development, manufacturing and sales of glass substrates for liquid crystal, other glass and related products and trading (except those prohibited for operation or restricted for trading by the PRC government). The Company understands from IRICO (Hefei) that no profit or loss was recorded by IRICO (Hefei) for the period from 26 August 2009 (date of incorporation) to 31 August 2009.

The audited values of total assets, total liabilities and net assets of IRICO (Hefei), based on PRC GAAP, as at 31 August 2009 are set out as follows:

|  | **As at 31 August 2009** |
|---|---|
|  | *(RMB)* |
| Total assets | 5,000,000 |
| Total liabilities | 0 |
| Net assets | 5,000,000 |

## F.   SUSPENDING AND RESUMPTION OF TRADING

At the request of the Company, the trading in the H shares of the Company on the Stock Exchange has been suspended with effect from 14 September 2009 pending the release of this announcement. The Company has already applied to the Stock Exchange for the resumption of trading of its H shares with effect from 9:30 a.m. on 21 September 2009.

## G.   DEFINITIONS

In this announcement, unless the context otherwise requires, the following terms shall have the following meanings:

| | |
|---|---|
| "A Share Company" | IRICO Display Device Co., Ltd. (彩虹顯示器件有限公司), a subsidiary of the Company and a company listed on the Shanghai Stock Exchange |
| "A Share Issue and Related Transactions" | the A Share Issue, the Second IRICO Glass Capital Injection, the Second IRICO (Zhangjiagang) Capital Injection and the Second IRICO (Hefei) Capital Injection |
| "A Share Issue" | the proposed issue of new A Shares, by way of non-public offering, by A Share Company to not more than 10 specific investors, including IRICO Group and Zhangjiagang Industry Corporation, subject to certain terms and conditions, including the respective transactions contemplated under the IRICO Group Subscription Agreement and the Zhangjiagang Industry Corporation Subscription Agreement |
| "A Share Issue Proceeds" | the net proceeds to be received by A Share Company pursuant to the A Share Issue |
| "A Shares" | ordinary shares issued by the Company of RMB1.00 each, which are subscribed for and paid up in RMB and are listed on the Shanghai Stock Exchange |
| "associate" | has the meaning as defined in Rule 1.01 of the Listing Rules |
| "Company" | IRICO Group Electronics Company Limited (彩虹集團電子股份有限公司), a joint stock limited company established in the PRC with limited liability, whose H shares are listed on the Stock Exchange |
| "connected person" | has the meaning as defined in Rule 1.01 of the Listing Rules |
| "controlling shareholder" | has the meaning as defined in Rule 1.01 of the Listing Rules |

— 44 —

| | |
|---|---|
| "CSRC" | China Securities Regulatory Commission（中國證券監督管理委員會）, a regulatory body responsible for the supervision and regulation of the securities market of the PRC |
| "Director(s)" | director(s) of the Company |
| "EGM" | an extraordinary general meeting to be held by the Company relating to the approval of, among other matters, the Initial Capital Injection Transactions and/or the A Share Issue and Related Transactions |
| "First IRICO (Hefei) Capital Injection" | the proposed injection of capital into IRICO (Hefei) by IRICO Glass pursuant to the First IRICO (Hefei) Registered Capital Increase Agreement |
| "First IRICO (Hefei) Registered Capital Increase Agreement" | the registered capital increase agreement entered into between IRICO Group and IRICO Glass on 17 September 2009 in respect of the First IRICO (Hefei) Capital Injection |
| "First IRICO (Zhangjiagang) Capital Injection" | the proposed injection of capital into IRICO (Zhangjiagang) by IRICO Glass pursuant to the First IRICO (Zhangjiagang) Registered Capital Increase Agreement |
| "First IRICO (Zhangjiagang) Registered Capital Increase Agreement" | the registered capital increase agreement entered into between IRICO Group, Zhangjiagang Industry Corporation and IRICO Glass on 17 September 2009 in respect of the First IRICO (Zhangjiagang) Capital Injection |
| "First IRICO Glass Capital Injection" | the proposed injection of capital into IRICO Glass by A Share Company pursuant to the First IRICO Glass Registered Capital Increase Agreement |
| "First IRICO Glass Registered Capital Increase Agreement" | the registered capital increase agreement entered into between the Company, A Share Company and the other existing shareholders of IRICO Glass on 17 September 2009 in respect of the First IRICO Glass Capital Injection |

| | |
|---|---|
| "Group" | the Company and its subsidiaries |
| "Hebei Dongxu" | Hebei Dongxu Machinery Co., Ltd.（河北東旭機械設備有限公司）, a limited liability company incorporated in the PRC |
| "Independent Shareholders" | the shareholders of the Company, other than IRICO Group and its associates |
| "Independent Third Parties" | a party or parties who, to the best of the Directors' knowledge, information and belief and having made all reasonable enquiries, is/are third party(ies) independent of the Company and connected persons of the Company as at the date of this announcement |
| "Initial Capital Injection Transactions" | the First IRICO Glass Capital Injection, the First IRICO (Zhangjiagang) Capital Injection and the First IRICO (Hefei) Capital Injection |
| "IRICO (Hefei)" | IRICO (Hefei) LCD Glass Company Limited（彩虹（合肥）液晶玻璃有限公司）, a limited liability company established in the PRC |
| "IRICO (Zhangjiagang)" | IRICO (Zhangjiagang) Flat Panel Display Co., Ltd.（彩虹（張家港）平板顯示有限公司）, a limited liability company established in the PRC |
| "IRICO Glass" | Shaanxi IRICO Electronics Glass Company Limited（陝西彩虹電子玻璃有限公司）, a limited liability company established in the PRC |
| "IRICO Group Subscription Agreement" | the subscription agreement entered into between IRICO Group and A Share Company on 17 September 2009 in respect of the subscription of new A Shares by IRICO Group pursuant to the A Share Issue |

| | |
|---|---|
| "IRICO Group" | IRICO Group Corporation (彩虹集團公司), a wholly state-owned enterprise and the controlling shareholder of the Company holding 75% of its issued share capital |
| "Listing Rules" | The Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited |
| "Loan Agreement" | the loan agreement entered into between A Share Company and IRICO Group on 17 September 2009 in respect of a loan in the amount of RMB400 million |
| "PRC GAAP" | the Accounting Standards for Business Enterprises published by the Ministry of Finance of the PRC from time to time and other relevant rules |
| "PRC" | the People's Republic of China |
| "RMB" | Renminbi, the lawful currency of the PRC |
| "SASAC" | the state-owned Assets Supervision and Administration Commission of the State Council of the PRC (中國國務院國有資產監督管理委員會) |
| "Second IRICO (Hefei) Capital Injection" | the proposed further injection of capital into IRICO (Hefei) by IRICO Glass pursuant to the Second IRICO (Hefei) Registered Capital Increase Agreement |
| "Second IRICO (Hefei) Registered Capital Increase Agreement" | the registered capital increase agreement entered into between IRICO Group and IRICO Glass on 17 September 2009 in respect of the Second IRICO (Hefei) Capital Injection |

| | |
|---|---|
| "Second IRICO (Zhangjiagang) Capital Injection" | the proposed further injection of capital into IRICO (Zhangjiagang) by IRICO Glass pursuant to the Second IRICO (Zhangjiagang) Registered Capital Increase Agreement |
| "Second IRICO (Zhangjiagang) Registered Capital Increase Agreement" | the registered capital increase agreement entered into between IRICO Group, Zhangjiagang Industry Corporation and IRICO Glass on 17 September 2009 in respect of the Second IRICO (Zhangjiagang) Capital Injection |
| "Second IRICO Glass Capital Injection" | the proposed further injection of capital into IRICO Glass by A Share Company pursuant to the Second IRICO Glass Registered Capital Increase Agreement |
| "Second IRICO Glass Registered Capital Increase Agreement" | the registered capital increase agreement entered into between the Company, A Share Company and the other existing shareholders of IRICO Glass on 17 September 2009 in respect of the Second IRICO Glass Capital Injection |
| "Sichuan Changhong" | Sichuan Changhong Electronics Co., Ltd. (四川長虹電器股份有限公司), a limited liability company incorporated in the PRC |
| "Stock Exchange" | The Stock Exchange of Hong Kong Limited |
| "subsidiary(ies)" | has the meaning ascribed to it under Rule 1.01 of the Listing Rules |
| "TFT-LCD" | thin film transistor liquid crystal display |
| "Zhangjiagang Industry Corporation" | Jiangsu Province Zhangjiagang Economic Development Zone Industry Corporation (江蘇省張家港經濟開發區實業總公司), a limited company incorporated in the PRC |

"Zhangjiagang Industry Corporation Subscription Agreement"

the subscription agreement entered into between Zhangjiagang Industry Corporation and A Share Company on 17 September 2009 in respect of the subscription of new A Shares by Zhangjiagang Industry Corporation pursuant to the A Share Issue

By order of the board of Directors
**IRICO Group Electronics Company Limited**
**Xing Daoqin**
*Chairman*

Shaanxi Province, the PRC
18 September 2009

*As at the date of this announcement, the Board consists of Mr. Xing Daoqin, Mr. Tao Kui and Mr. Zhang Junhua as executive Directors, Mr. Guo Mengquan, Mr. Niu Xinan, Mr. Fu Jiuquan and Mr. Zhang Weichuan as non-executive Directors, and Mr. Xu Xinzhong, Mr. Feng Bing, Mr. Wang Jialu, Mr. Lv Hua, and Mr. Zhong Pengrong as independent non-executive Directors.*

\*   *For identification purposes only*

# EXHIBIT 25



# CONTENT

| | | |
|---|---|---|
| 1. | Corporate Profile | 2 |
| 2. | Financial Highlights | 5 |
| 3. | Chairman's Statement | 7 |
| 4. | Management Discussion and Analysis | 11 |
| 5. | Profiles of Directors, Supervisors and Senior Management | 25 |
| 6. | Report of the Directors | 33 |
| 7. | Report of the Supervisory Committee | 47 |
| 8. | Corporate Governance Report | 48 |
| 9. | Report of the Auditors | 66 |
| 10. | Consolidated Balance Sheet | 67 |
| 11. | Balance Sheet | 69 |
| 12. | Consolidated Income Statement | 71 |
| 13. | Consolidated Statement of Changes in Equity | 72 |
| 14. | Consolidated Cash Flow Statement | 73 |
| 15. | Notes to the Financial Statements | 74 |
| 16. | Five Year Financial Summary | 134 |

D☐ P☐ Exhibit 8402
Deponent Lang
Date 5/6/19 Rptr BW



# Corporate Profile

## 1. Introduction

IRICO Group Electronics Company Limited (the "Company") was incorporated in Xianyang, Shaanxi Province, the People's Republic of China (the "PRC" or "China") on 10 September 2004. It was established with the contribution made by IRICO Group Corporation, the controlling shareholder and sole promoter of the Company, in respect of its assets of production and sales of color picture tubes ("CPTs") in its related core businesses and, the equity interests in its eight subsidiaries engaged in related operations. The Company's H Shares were successfully listed on the main board of The Stock Exchange of Hong Kong Limited (the "Stock Exchange") on 20 December 2004.

The Company and its subsidiaries (the "Group") are the largest CPTs manufacturer in China and one of the world's major CPTs and CPT components manufacturers. We also have the longest operating history amongst all CPTs manufacturers in China, with over 20 years of experience in CPTs production.

Major customers of the Group include TCL, Changhong, Hisense, Konka and Skyworth, which are major television producers in China.



**Corporate Profile** *(Continued)*

## 2.  Corporate information

### Executive Directors

| | |
|---|---|
| Xing Daoqin | Chairman |
| Tao Kui | Vice Chairman |
| Guo Mengquan | President |
| Zhang Shaowen | |
| Yun Dajun | Chief Financial Controller |

### Non-executive Director
Zhang Xingxi

### Independent non-executive Directors
Feng Fei
Xu Xinzhong
Feng Bing
Wang Jialu
Zha Jianqiu

### Audit committee
Zha Jianqiu
Feng Bing
Feng Fei
Xu Xinzhong
Zhang Xingxi

### Joint Company secretaries
Zhang Chunning
Ng Yuk Keung

### Qualified accountant
Ng Yuk Keung

### Authorised representative
Yun Dajun
Zhang Chunning

## Corporate Profile *(Continued)*

## 2. Corporate information *(continued)*

### Legal address in the PRC
No. 1 Caihong Road
Xianyang, Shaanxi Province
The People's Republic of China
Postal code: 712021

### Place of business in Hong Kong
Room 3103, 31st Floor
Convention Tower, 1 Wanchai Road
Hong Kong

### Company website
www.irico.com.cn

### Legal adviser
Baker & McKenzie
14th Floor, Hutchison House
10 Harcourt Road
Hong Kong

### Auditors
PricewaterhouseCoopers
22nd Floor
Prince's Building
Central
Hong Kong

### Principal bankers
Industrial and Commercial Bank of China (Xianyang Branch)
Construction Bank of China (Xianyang Branch)
Industrial and Commercial Bank of China (Xi'an Advanced Technology Development Zone Branch)
Industrial and Commercial Bank of China (Xi'an Branch)

### Registrar of H Shares
Computershare Hong Kong Investor Services Limited
Room 1712 - 1716, 17th Floor, Hopewell Center
183 Queen's Road East
Hong Kong

### Investor and media relations
Wonderful Sky Public Relations and Financial Consultant Company Limited
Unit 3103, 31st Floor, Office Tower
Convention Plaza,1 Harbour Road
Hong Kong

## Report of the Auditors

# PRICEWATERHOUSE COOPERS 

羅兵咸永道會計師事務所

PricewaterhouseCoopers
22nd Floor Prince's Building
Central, Hong Kong

**TO THE EQUITY HOLDERS OF**
**IRICO GROUP ELECTRONICS COMPANY LIMITED**
(A joint stock company incorporated in the People's Republic of China with limited liability)

We have audited the financial statements on pages 67 to 133 which have been prepared in accordance with accounting principles generally accepted in Hong Kong.

## Respective responsibilities of directors and auditors

The Company's directors are responsible to prepare financial statements which give a true and fair view. In preparing financial statements which give a true and fair view it is fundamental that appropriate accounting policies are selected and applied consistently.

It is our responsibility to form an independent opinion, based on our audit, on those financial statements and to report our opinion solely to you, as a body, and for no other purpose. We do not assume responsibility towards or accept liability to any other person for the contents of this report.

## Basis of opinion

We conducted our audit in accordance with Hong Kong Standards on Auditing issued by the Hong Kong Institute of Certified Public Accountants. An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the financial statements. It also includes an assessment of the significant estimates and judgements made by the directors in the preparation of the financial statements, and of whether the accounting policies are appropriate to the circumstances of the Company and the Group, consistently applied and adequately disclosed.

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance as to whether the financial statements are free from material misstatement. In forming our opinion we also evaluated the overall adequacy of the presentation of information in the financial statements. We believe that our audit provides a reasonable basis for our opinion.

## Opinion

In our opinion the financial statements give a true and fair view of the state of affairs of the Company and of the Group as at 31st December 2005 and of the Group's loss and cash flows for the year then ended and have been properly prepared in accordance with the disclosure requirements of Hong Kong Companies Ordinance.

**PricewaterhouseCoopers**
Certified Public Accountants

Hong Kong, 24th April 2006

Notes to the Financial Statements
For the year ended 31st December 2005
(All amounts in RMB thousand unless otherwise stated)

## 35. Related-party transactions

The Group is controlled by IRICO Group Corporation (incorporated in the PRC), which owns 75% of the Company's shares. The remaining 25% of the shares are widely held.

Related parties include IRICO Group Corporation and its subsidiaries (other than the Group), associates and jointly controlled entities (hereinafter collectively refered to the "IRICO Group"), corporations in which the Company is able to control, jointly control or exercise significant influence, key management personnel of the Company and IRICO Group Corporation and their close family members. IRICO Group Corporation does not produce financial statements available for public use.

IRICO Group Corporation is controlled by PRC government. In accordance with HKAS 24 "Related Party Disclosures", other state-owned enterprises and their subsidiaries, directly or indirectly controlled by the PRC government are also regarded as related parities of the Group and defined as "Other state controlled enterprise". For purpose of related transaction disclosure, the Group has in place procedures to assist the identification of the immediate ownership structure of its customers and suppliers as to whether they are state-owned companies. Many state-owned enterprises have multi-layered corporate structure and the ownership structures change over time as a result of transfers and privatization programs. Nevertheless, in the opinions of directors, the majority of the Group's activities have been conducted with other state controlled enterprises in the Group's ordinary course of business. In the meantime, the meaningful information relating to related party transactions has been adequately disclosed.

The following transactions were carried out with related parties:

### (a)  Sales of goods and provision of services

|  | 2005 | 2004 |
|---|---|---|
| Sales of goods (Note (i)): |  |  |
| The IRICO Group |  |  |
| —Shenzhen Hongyang Industry & Trade Company | 29,022 | 32,920 |
| —the utilities plant of the ultimate holding company | 14,791 | 32,248 |
| —Rui Bo Electronics (HK) Limited | 9,050 | — |
| —Caihong Labour Services Company | 1,283 | 154 |
| —Shaanxi IRICO General Service Corporation | 429 | 592 |
| —Shaanxi IRICO Construction Engineering Co., Ltd. | 11 | — |
| —Xian IRICO Electric Co., Ltd. | 3 | 109 |
| —China National Electronics Imp. & Exp. Caihong Company (note (ii)) | — | 347,015 |
| —Shenzhen IRICO-ROYAL Info-Electronics Ltd. | — | 585 |
| —Shenzhen IRICO Electronics Co. Ltd. (note (iii)) | — | 58 |
|  | 54,589 | 413,681 |
| Other state controlled enterprises | 1,882,563 | 3,099,464 |
| Provision of services |  |  |
| —Management fee from the ultimate holding company (Note (iv)) | — | 8,172 |

Notes to the Financial Statements
For the year ended 31st December 2005
All amounts in RMB thousands unless otherwise stated

## 35. Related-party transactions (*continued*)

### (a) Sales of goods and provision of services (*continued*)

Notes:

(i) Sales to related parties were conducted at prices not less than cost and with terms mutually agreed by both contract parties.

(ii) Sales to and purchase from China National Electronics Imp. & Exp. Caihong Company were discontinued before the listing of the Company.

(iii) As at 19th May 2005, Shenzhen IRICO Electronics Co. Ltd. reformed to be a private owned company, thus it is not related party of the Group after the reform. There is no remaining balance due to / from this company, and the purchase amount in note b) only represents the first half year of 2005.

(iv) In 2004, the management fee received/receivable from the utilities plant of the ultimate holding company, was levied based on 3% of the sales amount of the utilties plant of the ultimate holding company for financing and management service provided by the Group as agreed by the parties involved. This transaction was discontinued upon the incorporation of the Company.

### (b) Purchases of goods and provision of services

|  | 2005 | 2004 |
|---|---:|---:|
| Purchases of goods (Note (i)): | | |
| The IRICO Group | | |
| —Caihong Labour Services Company | 81,862 | 103,447 |
| —Shaanxi IRICO General Service Corporation | 47,341 | 50,082 |
| —Xianyang Cailian Packaging Materials Co., Ltd. | 37,311 | 26,416 |
| —Xian Caihong Plastic Co., Ltd. | 12,159 | 11,731 |
| —Shenzhen IRICO Electronics Co., Ltd. | 4,958 | 12,874 |
| —Xianyang Caihong Adhesive Belt Co., Ltd. | 4,530 | 5,242 |
| —Shenzhen Hongyang Industry & Trade Company | 2,407 | 1,621 |
| —China National Electronics Imp. & Exp. Caihong Company (Note (ii)) | — | 246,526 |
| | 190,568 | 457,939 |
| Other state controlled enterprises | 923,179 | 1,532,381 |
| | | |
| Purchases of property, plant and equipments: | | |
| The IRICO Group | | |
| —Xian Guangxin Electronics Co., Ltd. (Note (iii)) | 639 | — |
| Other state controlled enterprises | 68,816 | 491,201 |

Notes to the Financial Statements
For the year ended 31st December 2005
(All amounts in RMB thousand unless otherwise stated)

## 35. Related-party transactions (*continued*)

(e) Year-end balances arising from sales/purchases of goods/provision of services

| | Group | | Company | |
|---|---|---|---|---|
| | **2005** | 2004 | **2005** | 2004 |
| Trade receivables from related parties (Note): | | | | |
| The IRICO Group | | | | |
| — Shenzhen Hongyang Industry & Trade Company | **4,206** | 7,949 | **—** | — |
| — Shenzhen IRICO-ROYAL Info-Electronics Ltd. | **3,421** | 3,421 | **3,421** | 3,421 |
| — The Utilities Plant of the ultimate holding company | **49** | — | **49** | — |
| — Shenzhen IRICO Electronics Co., Ltd. | **—** | 30 | **—** | — |
| | **7,676** | 11,400 | **3,470** | 3,421 |
| Other state controlled enterprises | **872,282** | 939,046 | **226,234** | 267,256 |
| | **879,958** | 950,446 | **229,704** | 270,677 |
| Reprensenting: | | | | |
| Trade receivables (Note 12) | **243,694** | 489,710 | **48,798** | 169,408 |
| Trade bills receivable (Note 12) | **636,264** | 460,736 | **180,906** | 101,269 |
| | **879,958** | 950,446 | **229,704** | 270,677 |



# 目　錄

1.　公司簡介 2

2.　財務概要 5

3.　董事長報告 7

4.　管理層討論與分析 11

5.　董事、監事及高級管理人員簡歷 25

6.　董事會報告 33

7.　監事會報告 47

8.　企業管治報告 48

9.　核數師報告 66

10.　綜合資產負債表 67

11.　資產負債表 69

12.　綜合利潤表 71

13.　綜合股東權益變動表 72

14.　綜合現金流量報表 73

15.　財務報表附註 74

16.　五年財務資料概要 134



公司簡介

# 1. 概況

彩虹集團電子股份有限公司（「本公司」）於2004年9月10日在中華人民共和國（「中華人民共和國」或「中國」）陝西省咸陽市註冊成立，是由控股股東及本公司唯一一發起人彩虹集團公司以與生產、銷售彩色顯像管（「彩管」）之核心業務相關之資產，以及從事相關業務之8家子公司之股權作價出資設立。本公司之H股股票於2004年12月20日在香港聯合交易所有限公司（「聯交所」）主板掛牌交易。

本公司及其附屬公司（「本集團」）是中國最大之彩色顯像管生產商及全球主要之彩色顯像管及配件製造商之一，亦是所有中國彩色顯像管生產商中經營歷史最悠久之一家，在彩色顯像管生產方面有逾20年經驗。

本集團之主要客戶中包括TCL、長虹、海信、康佳和創維，是中國主要之電視機生產商。



## 公司簡介 (續)

## 2. 公司資料

**執行董事**

| | |
|---|---|
| 邢道欽 | 董事長 |
| 陶　魁 | 副董事長 |
| 郭盟權 | 總裁 |
| 張少文 | |
| 雲大俊 | 財務總監 |

**非執行董事**

仇興喜

**獨立非執行董事**

馮　飛
徐信忠
馮　兵
王家路
查劍秋

**審計委員會**

查劍秋
馮　兵
馮　飛
徐信忠
仇興喜

**公司聯席秘書**

張春寧
吳育強

**合資格會計師**

吳育強

**授權代表**

雲大俊
張春寧

## 2. 公司資料 *(續)*

### 中國法定地址
中華人民共和國陝西省咸陽市彩虹路1號
郵編：712021

### 香港營業地點
香港灣仔道1號會展辦公大樓31樓3103室

### 公司網址
www.irico.com.cn

### 法律顧問
貝克·麥堅時律師事務所
香港夏愨道10號和記大廈14樓

### 核數師
羅兵咸永道會計師事務所
香港中環
太子大廈22樓

### 主要往來銀行
中國工商銀行(咸陽分行)
中國建設銀行(咸陽分行)
中國工商銀行(西安市高新開發區支行)
中國工商銀行(西安市支行)

### 香港H股過戶登記處
香港中央證券登記有限公司
香港皇后大道東183號
合和中心17樓1712 - 1716室

### 投資者及傳媒關係
皓天公關財經顧問有限公司
香港灣仔港灣道1號
會展辦公大樓
31樓3103室

核數師報告

# PRICEWATERHOUSECOOPERS ⓡ

羅兵咸永道會計師事務所

羅兵咸永道會計師事務所
香港中環
太子大廈 22 樓

**致彩虹集團電子股份有限公司全體股東**
*(於中華人民共和國註冊成立之股份有限公司)*

本核數師已完成審核第67頁至第133頁之財務報表，該等財務報表乃按照香港普遍採納之會計原則編製。

## 董事及核數師各自之責任

編製真實兼公平之財務報表乃貴公司董事之責任。在編製該等真實兼公平之財務報表時，董事必須採用適當之會計政策，並且貫徹應用該等會計政策。

本核數師之責任是根據審核之結果，對該等財務報表作出獨立意見，並僅向整體股東報告，除此之外本報告別無其他目的。本核數師不會就報告的內容向任何其他人士負上或承擔任何責任。

## 意見之基礎

本核數師已按照香港會計師公會所頒佈之香港審計準則進行審核工作。審核範圍包括以抽查方式查核與財務報表所載數額及披露事項有關之憑證，亦包括評審董事於編製財務報表時所作之重大估計和判斷，所採用之會計政策是否適合貴公司與貴集團之具體情況，及有否貫徹應用並足夠披露該等會計政策。

本核數師在策劃及進行審核工作時，均以取得所有本核數師認為必需之數據及解釋為目標，以便獲得充分憑證，就該等財務報表是否存有重大錯誤陳述，作出合理之確定。在作出意見時，本核數師亦已評估該等財務報表所載之數據在整體上是否足夠。本核數師相信我們之審核工作已為下列意見提供合理之基礎。

## 意見

本核數師認為，上述財務報表足以真實兼公平地顯示貴公司與貴集團於2005年12月31日結算時之財政狀況，及貴集團截至該日止年度之虧損及現金流量，並按照《香港公司條例》之披露規定妥為編製。

**羅兵咸永道會計師事務所**
香港執業會計師

香港，2006年4月24日

財務報表附註

## 35. 關聯方交易

本集團控股公司為彩虹集團公司(於中國註冊成立),擁有本公司75%的股份。其餘25%的股份為分散持有。

關聯方包括彩虹集團公司及其子公司(不含本集團)、聯營公司及合資公司(此後統稱彩虹集團)、本公司有能力控制或共同控制或對其具重大影響的公司,以及本公司及彩虹集團公司主要管理人員及其家庭成員。彩虹集團公司並無編製公開的財務報表。

彩虹集團公司由中國政府控制。根據香港會計準則第24號「關聯方披露」,其餘亦由中國政府直接或間接控制的國有企業及其子公司(被定義為「其他國有控股企業」)均被視為本集團之關聯方。就關連交易的披露而言,本集團已設立相關程序,幫助辨識客戶及供應商的直接所有權結構是否屬國有企業。許多國有企業有多層產權結構,其所有權結構隨所有權轉讓及私有化活動而不時發生變動。儘管如此,本公司董事認為,本集團乃依照本集團的正常業務過程與其他國家控股企業開展大部分業務。同時,對關聯方交易有關的資料均已作充分披露。

本公司與關聯方進行了如下交易:

### (a) 銷售貨物及提供服務

|  | 2005年 | 2004年 |
|---|---|---|
| 銷售貨物(附註(i)) |  |  |
| 彩虹集團 |  |  |
| 一深圳虹陽工貿公司 | 29,022 | 32,920 |
| 一最終控股公司所有之彩虹動力廠 | 14,791 | 32,248 |
| 一瑞博電子(香港)有限公司 | 9,050 | - |
| 一彩虹勞動服務公司 | 1,283 | 154 |
| 一陝西彩虹三產總公司 | 429 | 592 |
| 一陝西彩虹建築工程公司 | 11 | - |
| 一西安彩虹電器公司 | 3 | 109 |
| 一中國電子進出口彩虹公司(附註(ii)) | - | 347,015 |
| 一深圳彩虹皇旗電子信息有限公司 | - | 585 |
| 一深圳彩虹電子有限公司(附註(iii)) | - | 58 |
|  | 54,589 | 413,681 |
| 其他國有控股企業 | 1,882,563 | 3,099,464 |
| 提供服務 |  |  |
| 一自最終控股公司獲取之管理費(附註(iv)) | — | 8,172 |

# 財務報表附註

截至2005年12月31日止年度

（除另行標明外其金額以人民幣千元列示）

## 35. 關聯方交易 (續)

### (a) 銷售貨物及提供服務 (續)

(i) 對關聯方之銷售以不低於成本價及按訂約雙方所協議之條款進行。

(ii) 對中國國家電子進出口彩虹公司的銷售及採購於本公司上市前已中止。

(iii) 於2005年5月19日，深圳彩虹電子有限公司改制為私有制企業，因此其改制後不再是本集團關聯方。本集團已不存在該公司的應收／應付餘額，上述採購額僅代表2005年上半年的發生額 (附註(b))。

(iv) 2004年，經有關各方達成協議，本集團就提供財務及管理服務向最終控股公司所有之彩虹動力廠收取／應收的管理費，以彩虹動力廠銷售額3%計算。該交易於本公司成立時終止。

### (b) 購買貨物及接受服務

| | 2005年 | 2004年 |
|---|---|---|
| 購買貨物(附註(i))： | | |
| 彩虹集團 | | |
| 　—彩虹勞動服務公司 | 81,862 | 103,447 |
| 　—陝西彩虹三產總公司 | 47,341 | 50,082 |
| 　—咸陽彩虹電子包裝材料有限公司 | 37,311 | 26,416 |
| 　—西安彩虹塑業有限公司 | 12,159 | 11,731 |
| 　—深圳彩虹電子有限公司 | 4,958 | 12,874 |
| 　—咸陽彩虹膠帶有限責任公司 | 4,530 | 5,242 |
| 　—深圳虹陽工貿公司 | 2,407 | 1,621 |
| 　—中國電子進出口彩虹公司(附註(ii)) | — | 246,526 |
| | 190,568 | 457,939 |
| 其他國有控股企業 | 923,179 | 1,532,381 |
| | | |
| 購買物業、廠房及設備： | | |
| 彩虹集團 | | |
| 　—西安廣信電子有限公司(附註(iii)) | 639 | — |
| 其他國有控股企業 | 68,816 | 491,201 |

# 財務報表附註

附註2005年12月31日止年度

## 35. 關聯方交易 (續)

### (e)  銷售 / 採購貨物 / 提供服務產生之年末結餘

| | 本集團 | | 本公司 | |
| --- | --- | --- | --- | --- |
| | **2005年** | 2004年 | **2005年** | 2004年 |
| 關聯方應收貿易賬款(附註)： | | | | |
| 彩虹集團 | | | | |
| 一深圳虹陽工貿公司 | **4,206** | 7,949 | **—** | — |
| 一深圳彩虹皇旗電子信息有限公司 | **3,421** | 3,421 | **3,421** | 3,421 |
| 一最終控股公司所有之彩虹動力廠 | **49** | — | **49** | — |
| 一深圳彩虹電子有限公司 | **—** | 30 | **—** | — |
| | **7,676** | 11,400 | **3,470** | 3,421 |
| 其他國有控股企業 | **872,282** | 939,046 | **226,234** | 267,256 |
| | **879,958** | 950,446 | **229,704** | 270,677 |
| 應收貿易賬款(附註12) | **243,694** | 489,710 | **48,798** | 169,408 |
| 應收貿易票據(附註12) | **636,264** | 460,736 | **180,906** | 101,269 |
| | **879,958** | 950,446 | **229,704** | 270,677 |

# EXHIBIT 26

1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
2
     - - - - - - - - - - - - - - - - - - -
3    IN RE:                          )
                                     )
4    CATHODE RAY TUBE (CRT)          )
     ANTITRUST LITIGATION            )Master File No.:
5                                    )07-CV-5944-JST
                                     )
6                                    )MDL No. 1917
                                     )
7                                    )
                                     )
8    - - - - - - - - - - - - - - - - - - -

9          VIDEOTAPED DEPOSITION OF ZHANG WENKAI

10                  HIGHLY CONFIDENTIAL

11                      VOLUME I

12                MONDAY, MARCH 4, 2019

13                 AT:  09.00 a.m.

14                   Taken at:

15                 Kobre & Kim
                  6/F ICBC Tower
16                3 Garden Road
                     Central
17                 Hong Kong

18

19   Court Reporter:

20   Amanda Tolton
     Accredited Real-time Reporter
21

22

23

24

25

Case 4:07-cv-05944-JST Document 5641-2 Filed 11/05/19 Page 276 of 508
Zhang Wenkai - highly confidential
March 04, 2019                                          41

 1  documents I have reviewed.  Irico USA is managed or

 2  controlled by a person whose name is Liu Feng, L-I-U

 3  F-E-N-G.  I was told Mr. Liu Feng is a government

 4  officer from Ministry of Finance.  He is the actual

 5  person who managed Irico USA.  So, as a result, the

 6  Irico Group have no access to manage Irico USA.  As a

 7  result, in the end, Irico USA was illegally

 8  transferred by Mr. Liu Feng.  And then, in the

 9  meantime, Irico Group can do nothing.  That's roughly

10  about the background.

11      Q.  What is the relationship between Irico USA

12  Inc. and Irico Display?

13      A.  They have no relationship at all.

14      Q.  Mr. Zhang, Irico Group was an initial

15  investor in Irico USA, correct?

16      A.  What time frame are you referring to?

17      Q.  1995 and 1996.

18      A.  Are you asking that in between 1995 and 1996

19  whether Irico Group have a -- has a share of Irico

20  USA?

21      Q.  Yes.

22      A.  From the auditing report we have reviewed,

23  the answer is, "yes."

24      Q.  Mr. Zhang, you're familiar with CNEIECC, the

25  China National Electronics Import & Export Caihong

```
 1    Company, correct?

 2         A.   What do you mean, "familiar"?  In which

 3    regard, when you are saying "familiar"?

 4         Q.   I'm talking about the relationship between

 5    the companies, which is Topic 16 of the 30(b)(6)

 6    notice.

 7              What is CNEIECC's relationship with

 8    Irico Group?

 9         A.   In what time frame were you referring to?

10         Q.   During the class period.

11         A.   During that period, these are the two

12    totally independent legal person or legal institute.

13    CNEIECC's shareholder is hold by the

14    China National Electronics Import & Export Company.

15    And the whole shareholder or the only investors is

16    the people -- the department, State Department of the

17    People's Republic of China.

18              CHECK INTERPRETER:  It should be "state

19    counsel."

20              INTERPRETER:  State counsel.

21              MR. HWU:  Can I ask the interpreter --

22              COURT REPORTER:  You need to use the

23    microphone.

24              VIDEOGRAPHER:  You need to speak up, please.

25              MR. HWU:  Can I ask the interpreter to try
```

 1    that again?  Thank you.

 2         A.  Okay.  And then the only shareholder from --

 3    the only shareholder --

 4              INTERPRETER:  Oh, okay.

 5         A.  The only investor for Irico Group is the

 6    state counsel of People's Republic of China.

 7    BY MR. BENZ:

 8         Q.  Okay.  And what is CNEIECC's relationship

 9    with Display?

10         A.  Just the buyer and the seller.  No, it's

11    not -- no shares involved between these two company.

12         Q.  Mr. Zhang, is it fair to say that Irico USA

13    Inc. was a joint venture by Group and CNEICCC?

14              MR. HWU:  Can I try -- can I ask the

15    interpreter to try again.

16              INTERPRETER:  Sure.

17              VIDEOGRAPHER:  You need to speak up.

18              MR. HWU:  Can I ask the interpreter to

19    render that one more time?

20              INTERPRETER:  Sure.

21              MR. HWU:  Thank you.

22              (Interpreter re-translates.)

23              MR. HWU:  CNEICCC should be (Chinese

24    spoken.)

25              INTERPRETER:  Oh, yes, yes.

```
 1              (Interpreter re-translates.)

 2      A.   I'm not aware that Irico USA's joint

 3  venture, because all the knowledge regarding Irico

 4  USA was from the auditing document I have reviewed

 5  and none of those document mentioned this issue.

 6  Because all the knowledge I have obtained were from

 7  those auditing report.

 8              MR. BENZ:  Drew, why don't we take a break,

 9  and then we'll do another stretch before lunch?

10              MR. LUCARELLI:  Okay, sounds good.  Thanks.

11              VIDEOGRAPHER:  One second, please.  This

12  marks the end of Media No. 3 in the deposition of

13  Zhang Wenkai.  Going off the record.  The time is

14  11.19.

15  (11.19 a.m.)

16                    (Break taken.)

17  (11.32 a.m.)

18              VIDEOGRAPHER:  We are back on the record.

19  Here begins Media No. 4 in the deposition of

20  Zhang Wenkai.  The time is 11:32.

21  BY MR. BENZ:

22      Q.   Mr. Zhang, we're still on Topic 16.

23           Do you have an understanding as to why

24  CNEIECC was created?

25      A.   CNEIECC?  I'm not quite sure.  I don't know.
```

1     Q.  Do you have an understanding as to the

2   business -- what CNEIECC did for business, what was

3   its business?

4     A.  So my understanding is that based on that

5   particular time frame the -- there is an exclusive

6   ownership for Import & Export business.  The products

7   produced by Irico Group, we cannot export by ourself

8   at that time.  We can only sell our products to

9   CNEIECC.  With regard to how CNEIECC exported the

10  products, that's their own operation, we have no

11  knowledge.  And I also do aware that also through

12  CNEIECC we have import certain raw materials.  That's

13  basically the relationship.

14    Q.  Do you have an understanding as to how many

15  employees CNEIECC had during the relevant time

16  period?

17    A.  I don't know.

18    Q.  Do you have an understanding of the

19  relationship between CNEIECC and Electronics?

20    A.  The Electronics is the subsidiary of the

21  Group.  So as a result they also need to sell the

22  products to CNEIECC as a closed end sales, then

23  CNEIECC then can then export the products.

24    Q.  Do you have an understanding as of the

25  relationship between CNEIECC and Irico Display?

 1      A.  Their relationship is identical to the

 2   relationship between CNEIECC and Electronics.  They

 3   are just simply a trading partner, a seller and a

 4   buyer, if CNEIECC want to export certain products,

 5   they will purchase from Electronics or Display.

 6      Q.  Do you have an understanding whether any

 7   Irico company owned a portion of CNEIECC?

 8      A.  You can check from the registration,

 9   business registration of CNEIECC, and the Irico have

10   no share, only CNEIECC during that time frame, and

11   during the class period.

12      Q.  What about now?

13      A.  After 2014, so based on the government's

14   request, the share from the CNEIECC was transferred

15   to the Irico Group without any cost.  This is after

16   2014.

17      Q.  What about before the class period 1995?

18      A.  Based on the camera's registration file, if

19   you are referring the time frame before 1995, I

20   believe the CNEIECC was founded either in 1995 --

21   1985 or 1983, I'm not quite sure, maybe it's 1985.

22   It was founded by Irico but it was not called

23   CNEIECC.  That name is called Caihong --

24   C-A-I-H-O-N-G -- Import & Export, something like

25   that.  But then after 1987, because of the national

Case 4:07-cv-05944-JST Document 5641-2 Filed 11/05/19 Page 282 of 508
Zhang, Wenkai - highly confidential
March 04, 2019                                          47

1   foreign trade policy, the shares were transferred to

2   China National Electronics Import & Export Company.

3   I'm very positive that in the time frame between 1987

4   to 1995, the sole registered shareholder is

5   China National Electronics Import & Export Company.

6        Q.  During the relevant time period, did CNEIECC

7   share management with Irico Group?

8        A.  No.  Based on my understanding, those

9   leadership from CNEIECC were commissioned by their

10  governance company; that is,

11  China National Electronics Import & Export Company.

12       Q.  Did -- during the relevant time period, did

13  CNEIECC share a physical address with Group?

14       A.  It's different buildings, separate building,

15  not in the same office.

16       Q.  How far apart were the buildings?

17       A.  It's just across the road from our current

18  office, about roughly 200 meters apart.

19       Q.  Did CNEIECC share the same mailing address

20  with Group?

21       A.  I don't know, because I never reviewed that

22  mailing address.

23       Q.  They were both at No. 1 Caihong Road,

24  correct?

25       A.  I do aware that the address for the Group is

 1    No. 1 Caihong Road, but I'm not sure whether CNEIECC

 2    is -- CNEIECC's mailing address is also No. 1

 3    Caihong Road.

 4         Q.  During the relevant time period, do you know

 5    if any Irico employees went to work at CNEIECC?

 6         A.  When you say "went to work," do you mean the

 7    allocation by their supervisors or managers or it's

 8    their personal job switch?

 9         Q.  Let's break it up.

10              Allocation by supervisors or managers.

11         A.  Just like human resources change without --

12    you know, discontinued their employee -- employment,

13    right?

14              MR. HWU:  Yes.

15    BY MR. BENZ:

16         Q.  Yes, they would have been detailed to

17    CNEIECC.

18         A.  Based on my understanding, there were no

19    such situation.

20         Q.  Okay.  How about job switches, did that ever

21    happen, to your knowledge, during the relevant time

22    period?

23         A.  Yeah, there were certain people, they quit

24    the job at the CNEIECC and signed a contract with

25    Irico, and worked for Irico.

1        Q.  And vice versa?

2        A.  I have no knowledge about that.  I never

3    heard of that.

4        Q.  Do you know, Mr. Zhang, what the ownership

5    structure of Irico (USA) Inc. was during the class

6    period?

7        A.  Do you mean the shareholder -- who are the

8    shareholder -- major shareholders or who actually

9    operate or managing the company?

10       Q.  One at a time.  Shareholder structure first:

11   Do you know the shareholder structure of

12   Irico (USA) Inc.?

13       A.  From the auditing report I have reviewed,

14   the earliest time when the company was founded, the

15   Irico (USA) was founded, it was founded by Irico's

16   Hong Kong office.  But after 1995, when the

17   shareholder -- the shares were transferred and then

18   is -- the major shareholder is the Group.

19           MR. HWU:  Correction.  "1999."

20       A.  The company was founded in '95.  And then

21   the share transfer was conducted in '99.

22           MR. HWU:  Thank you.

23   BY MR. BENZ:

24       Q.  Do you have an understanding, Mr. Zhang, as

25   to the management structure of Irico (USA) during the

 1  relevant time period?

 2      A.  The only person we do aware is Mr. Liu Feng.

 3      Q.  Okay.  Did Display have any ownership

 4  interest in Irico (USA)?

 5      A.  From the auditing report, the Display has no

 6  share of the Irico (USA).

 7      Q.  Okay.

 8          Now is a good time to break for lunch.

 9          MR. LUCARELLI:  Okay.

10          VIDEOGRAPHER:  Going off the record.  This

11  marks the end of Media No. 4 in the deposition of

12  Zhang Wenkai.  The time is 11.52.

13  (11.52 a.m.)

14                    (Lunch.)

15  (1.05 p.m.)

16          VIDEOGRAPHER:  We are back on the record.

17  Here begins Media No. 5 in the deposition of

18  Zhang Wenkai.  The time is 1:05.

19      (Exhibit 8392 marked for identification)

20  BY MR. BENZ:

21      Q.  Mr. Zhang, I've handed you what we've marked

22  as Exhibit 8392.  It appears to be an Irico Group

23  Corporation Auditing Document.

24      A.  Yes.

25      Q.  The Bates numbers on the document are

```
 1    IRI-CRT-3490 through 3497.

 2         A.  Yes.

 3         Q.  And this is a combined document with the

 4    certified translation on top of the Chinese original.

 5              So, Mr. Zhang, please take as long as you

 6    need to review the document and let me know when

 7    you're finished.

 8         A.  (Perusing document.)

 9              Yes, I have read it.

10         Q.  Okay.  Can you tell me what this document

11    is?

12         A.  This is a auditing report produced from the

13    Auditing Department of Irico Group.

14         Q.  And this document was created by

15    Irico Group Corporation, correct?

16              INTERPRETER:  "Co-operation"?

17    BY MR. BENZ:

18         Q.  This document was created by

19    Irico Group Corporation?

20         A.  Yes, this is a report from the Auditing

21    Department of Irico Group Corporation.

22         Q.  And this document was kept by

23    Irico Group Corporation in its files and produced to

24    us in this litigation, correct?

25         A.  Yes.
```

```
1        Q.  And this document is a true and correct copy

2   of the Irico Group Corporation Auditing Department

3   document dated 27 July, 2001, correct?

4        A.  Yes.

5        Q.  If you could turn to Page 3 of this exhibit.

6   At the top of this page with Bates number 3492,

7   there's a heading that says "Company Profile."

8            Do you see that?

9        A.  You mean this one?  (Indicating.)

10       Q.  There's 3492 here, but it's Page 3 of the

11  document.

12       A.  Yes.

13       Q.  Okay.  The word, "Company Profile," it

14  reads:

15            "Based in Freemont, California, USA, Irico

16  (USA) Inc. was initially established as a joint

17  venture between Irico Group Corporation and its US

18  partners."

19            Do you see that?

20       A.  Yes, I saw it.

21       Q.  Is that correct?

22       A.  Well, according to the Chinese translation,

23  you did mention "initially;" but the document I

24  reviewed didn't mention so-called "initially."

25       Q.  What does this document say to you?
```

Case 4:07-cv-05944-JST Document 5641-2 Filed 11/05/19 Page 288 of 508
Zhang deposition - confidential
March 04, 2019                                          53

 1       A.  This document was produced in 2001.

 2           It said -- it said a joint venture between

 3   the Group and its US partner means the incident after

 4   1999, which means after the shares were transferred.

 5   Okay.  There's another document which we also

 6   produced and submitted to you.  It indicate in the

 7   beginning on top of the Irico Group, Irico Group and

 8   its US partner, there is another partner called

 9   CNEIECC, also serve as a shareholder.  So to me,

10   personally, I would consider the statement indicate

11   the time frame after 1999.

12       Q.  In the paragraph under "Company Profile," it

13   reads that CNEIECC "had a 34.3 % stake in the company

14   by contributing 600,000 US dollars in cash."

15           Is that correct?

16       A.  The information -- as it is said on this

17   document, I -- the only thing I can do is trust the

18   authentic truth of this document.  But all the

19   information regarding Irico (USA) on the document, I

20   have reviewed.

21       Q.  Okay.  It also goes on to say that:

22           "Caihong (Hong Kong) Co. had a 45.7% stake

23   in the company by contributing 800,000 US dollars in

24   cash."

25           Do you see that?

 1      A.  Yes.

 2      Q.  Is that correct?

 3      A.  Again, besides this report, with regard to

 4  the Irico Hong Kong's investment on Irico (USA), this

 5  is a document -- the only document I have, so I have

 6  to trust this is a true fact.

 7      Q.  What is your understanding of Irico Group's

 8  financial stake in Irico (USA) Inc.?

 9      A.  I'm not quite sure about the financial stake

10  or financial perspective.

11      Q.  Some names are mentioned in the paragraph

12  below.  Do you know Ms.Huang Xueli?

13      A.  I don't know this person.

14      Q.  Do you know Mr. Huang Maike?

15      A.  I don't know.

16      Q.  Do you know Liu Feng?

17      A.  The other day I heard that, Yang Hua told me

18  this name, Yang Hua, whose name I have mentioned

19  earlier.  I was told by Yang Hua that Liu Feng used

20  to be a Director in the Ministry of Finance in the

21  People's Republic of China.  Later on, he worked for

22  Irico.  That's how much I know about this person, but

23  I never tried to contact this person.

24      Q.  Okay.

25          MR. HWU:  Can I ask the interpreter to

```
 1   interpret his answer again.

 2           INTERPRETER:  Okay.

 3       A.  With regard to Liu Feng?

 4           MR. HWU:  I think his answer was:

 5           "They attempted to contact Liu Feng, but

 6   they couldn't get in touch with him."

 7       A.  Yes, I did try to contact Liu Feng, but I

 8   never get in touch with Mr. Liu Feng.

 9           MR. HWU:  Thank you.

10       A.  I couldn't find this person.

11   BY MR. BENZ:

12       Q.  Do you know Zhu Jian?

13       A.  I don't know.

14       Q.  If you turn to the first page of this

15   exhibit, the one with Bates number 3490, it says, "A

16   Brief on Auditing Results for Irico (USA) Inc.," do

17   you see that, above the text?

18           You see that?

19       A.  Yes.

20       Q.  And then it further goes on to say, to

21   Irico Group Corporation:

22           "Under the instructions from

23   Irico Group Corporation leadership our department

24   assembled a three-person audit team led by department

25   head Zhang Xingxi and we served an audit note to
```

 1    Irico (USA) Inc. (USA) Inc. via fax on 27 April of

 2    2001."

 3           Do you see that?

 4       A.  Yes.

 5       Q.  And then it goes on to say at:

 6           "The audit team arrived in Freemont,

 7    California, USA on 27 May shortly before commencing

 8    field audit work."

 9           Do you see that?

10       A.  Yes.

11       Q.  Okay.

12           So is it fair to say that

13    Irico Group Corporation sent an audit team to the

14    United States in 2001 to look at the books of

15    Irico (USA) Inc.?

16       A.  Yes.

17       Q.  Do you have an understanding as to what

18    happened as a result of the audit team's work and

19    visit?

20       A.  The result I know is indicated on this

21    report.

22       Q.  And what is that result?

23       A.  In general, this report indicated that the

24    General Manager, Liu Feng, of Irico (USA) transferred

25    the share without the approval of the Irico Group,

Case 4:07-cv-05944-JST Document 5641-3 Filed 11/05/19 Page 292 of 508
Zhang Wenkai - highly confidential
March 04, 2019                                    57

1    where Irico Group have no control regarding that

2    behavior, which has caused a very negative impact to

3    the Irico Group.  That's basically a statement.

4        Q.  So it's your understanding that Liu Feng

5    sold Irico (USA) without Irico Group's permission?

6        A.  Yes.

7         (Exhibit 8393 marked for identification)

8    BY MR. BENZ:

9        Q.  Mr. Zhang, I've handed you what we've marked

10   as Exhibit 8393.  It appears to be a document from

11   the Shaanxi Province People's Government.  The Bates

12   numbers on it are IRI-CRT-3498 through 3499.  And the

13   date on it, is it, 24 August, 1995.

14          Please take as long as you need to review

15   the document, and let me know when you're ready.

16       A.  (Perusing document.)

17          Yes, I am done.

18       Q.  Okay.  Mr. Zhang, do you have an

19   understanding as to what this document is?

20       A.  Yes, this is a government approval document

21   when we established Irico (USA) back then.

22       Q.  Did you review this document in preparation

23   for your deposition?

24       A.  Are you referring to the deposition or to

25   the declaration?

 1       Q.  First, the deposition.

 2       A.  As I stated earlier this morning, for the

 3  preparation of this deposition, I didn't particularly

 4  review any document, because I have reviewed

 5  accordingly and produced certain documents in the

 6  past.

 7       Q.  But you relied upon this document when you

 8  prepared your declaration, correct?

 9       A.  Yes.

10       Q.  And this document was kept in Irico Group's

11  files, correct?

12       A.  Yes.

13       Q.  And your -- you produced this document in

14  this litigation, correct?

15       A.  Yes.

16       Q.  Does this appear to be a true and correct

17  copy of that -- this document?

18       A.  I'm not quite sure when you say "correct"

19  and "true."

20       Q.  Does this document appear to you to be a

21  true and correct copy of what the actual document

22  was?

23       A.  Yes, it's identical to the document I

24  collected and reviewed.

25       Q.  And this -- is it fair to say that this is

 1    Shaanxi Province approving Caihong Company's

 2    establishment of Irico (USA)?

 3         A.   No.   This is a document, approval document,

 4    from Shaanxi Provincial Government to approve the

 5    CNEIECC to establish Irico (USA).

 6         Q.   But if you look, Mr. Zhang, to the page with

 7    Bates number 3499, the following page, it lists

 8    Irico Group Corporation as a recipient.

 9         Do you see that?

10         A.   It didn't say the recipient here.   Normally,

11    this position is for the copy or cc.   We are not the

12    primary recipient.   So the official recipient of this

13    document should be the Department of Foreign Trade

14    from the Shaanxi Provincial Government.

15         Q.   With a copy to Irico Group Corporation?

16         A.   I wouldn't say it's a -- I wouldn't call it

17    a copy.   Let me think about how to rephrase it.

18         This document only indicated that the

19    Shaanxi Provincial Government agree or approve

20    CNEIECC to establish Irico (USA), other relevant

21    agencies or units.   For example, you can see this is

22    a Department of Electronic Industry, Bureau of

23    Electronic Industry, just to inform relevant

24    agencies, just to inform, a notice.

25         Q.   So it's your understanding that Group --

 1   Irico Group Corporation was informed that CNEIECC was

 2   establishing Irico (USA) Inc.?

 3       A.  Yes, it's just a notice.

 4       Q.  Going back to the first page, Mr. Zhang.

 5   The large paragraph reads:

 6           "In order to expand our provinces exports of

 7   electronic and mechanic products to North America and

 8   deepen trade, investments and cooperation between

 9   China and the US, the Provincial People's Government,

10   upon review, hereby approves that China national

11   Electronics Import & Export Caihong company to

12   establish Irico (USA) Inc. in the US, with total

13   investment of 600,000 US dollars."

14           Do you see that?

15       A.  Yes, I saw it.

16       Q.  The document goes on to describe

17   Irico (USA) Inc.'s, "Scope of business as follows:

18   Exports of color display tubes, color TV sets and

19   other home appliance products and related

20   technologies."

21           Do you see that?

22       A.  Yes.

23       Q.  Is it fair to say that that is a fair

24   description of the scope of Irico (USA) Inc.'s

25   business?

```
 1              CERTIFICATE OF COURT REPORTER

 2

 3   I, Amanda Tolton, an Accredited Real-time Reporter,

 4   hereby certify that the testimony of the witness

 5   Zhang Wenkai in the foregoing transcript, numbered

 6   pages 1 through 116, taken on this 4th day of March,

 7   2019 was recorded by me in machine shorthand and was

 8   thereafter transcribed by me; and that the foregoing

 9   transcript is a true and accurate verbatim record of

10   the said testimony.

11

12   I further certify that I am not a relative, employee,

13   counsel or financially involved with any of the

14   parties to the within cause, nor am I an employee or

15   relative of any counsel for the parties, nor am I in

16   any way interested in the outcome of the within

17   cause.

18

19

20   Signed:   Amanda Tolton

21   Name:   Amanda Tolton

22   Date:   ......................

23

24

25
```

# EXHIBIT 27

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
 2                   San Francisco Division

 3   - - - - - - - - - - - - - - - - - -
     IN RE:                           )
 4                                     )
     CATHODE RAY TUBE (CRT)            )Master File No.
 5   ANTITRUST LITIGATION             )07-CV-5944-JST
                                       )
 6                                     )MDL No. 1917
                                       )
 7                                     )
                                       )
 8   - - - - - - - - - - - - - - - - - -

 9              DEPOSITION OF ZHANG WENKAI

10                 HIGHLY CONFIDENTIAL

11                     VOLUME II

12              Tuesday, March 5th, 2019

13                 AT:  9.05 am

14                 Taken at:

15              Kobre & Kim
                 6/F ICBC Tower
16               3 Garden Road
                   Central
17               Hong Kong

18

19

20

21

22

23   Court Reporter:

24   Bron Williams
     Accredited Real-time Reporter
25
```

```
 1   for a second?

 2             MR. BENZ:  Yes, please.

 3             VIDEOGRAPHER:  This marks the end of media

 4   number 1 in the deposition of Zhang Wenkai volume II.  Going

 5   off the record.  The time is 9.20 am.

 6                      (Break taken)

 7             VIDEOGRAPHER:  We are back on the record.  Here

 8   begins media number 2 in the deposition of Wenkai Zhang,

 9   volume 2, the time is 9.22.

10    BY MS. FU:

11             Q.  Please take a look at topics 16 and 17.

12             A.  Yes, I saw it.

13             Q.  Are you prepared and qualified to testify

14   about these two topics?

15             A.  Yes, I can.

16             Q.  So you just testified that Irico Group was the

17   parent company of CNEICC at the time when it was founded in

18   1985.  What was this company called at the time when it was

19   founded by Irico?

20             MR. LUCARELLI:  Object to form.

21             A.  Whose name was called?

22    BY MS. FU:

23             Q.  The company that was founded by Irico in 1985.

24             MR. LUCARELLI:  Object to form.

25             A.  I did review the company's commerce
```

1    registration form, I'm not quite sure what it called, but

2    I do aware the name is not CNEICC back then.  Because in

3    1987 the name had -- or the title was changed to CNEICC.  So

4    I suppose in 1985 they should be called with another name.

5            Although I cannot recollect the actual name back

6    then, but I'm quite sure that you can find the name on the

7    registration title.

8     BY MS. FU:

9            Q.  Did Irico Group produce this commerce

10   registration form?

11           A.  As far as I can remember, we did produce that

12   information.

13           Q.  When this company was formed in 1985, it was

14   part of Irico, correct?

15           A.  I'm not quite sure.  However, we did produce

16   that information to you.  If the commerce registration say

17   yes, then it is yes.  If it didn't say yes, then it is not.

18           Q.  Did Irico Group's articles of association

19   provide for the establishment of an import and export

20   company?

21           MR. LUCARELLI:  Object to form.

22           A.  I'm not quite sure I understand your

23   meaning --

24           MS. FU:  Just one second.

25           INTERPRETER:  (Chinese spoken).

```
 1              A.  (Chinese spoken).

 2              MS. FU:  I would like to make a correction to your

 3    translation.  (Chinese spoken).

 4              INTERPRETER:  (Chinese spoken).

 5              A.  With regard to the articles of association for

 6    Irico Group, I didn't see a statement that we established an

 7    import export company called CNEICC.

 8     BY MS. FU:

 9              Q.  That's not my question.  I'm not asking you if

10    Group's articles of association provide for the

11    establishment of this specific company called CNEICC.  My

12    question was:  Did Irico Group's articles of association

13    provide for the establishment of an import and export

14    company?

15              MR. LUCARELLI:  Object to form.

16              A.  Are you asking me that can I find the

17    statement to establish an import and export company inside

18    the group's articles of association without mentioning the

19    name of that company?

20     BY MS. FU:

21              Q.  That's correct.

22              A.  First of all, I did review the articles of

23    association.  However, in the Irico Group's articles of

24    association, it didn't mention anything regarding establish

25    a company to perform import and export business.
```

 1              Secondly, the articles of association in China, it
 2    was only mentioned about corporate governance, it will not
 3    mention about anything to establish an import or export
 4    company.
 5              Q.  Going back to the company we talked about
 6    earlier, which you testified that it was founded by Irico in
 7    1985, and then later changed its name to CNEICC, what was
 8    the intended purpose for Group to set up this import and
 9    export company?
10              A.  I don't know.  However, I would suggest to
11    review the company's commerce registration, it should state
12    their objectives.  However, I really don't remember that.
13              Q.  You also testified that in 1987 Group's shares
14    were transferred to China Electronics Import and Export
15    Company yesterday.  Do you recall?
16              A.  With regard to the official term in China,
17    I wouldn't call it transfer.  It is rather a transfer
18    without cost.
19              Q.  And why were the shares transferred from group
20    to CNEICC without cost?
21              A.  Because a company like ours is governed by the
22    Government.  So when the Government issued an order to ask
23    us, transfer the shares, then we have to follow that order.
24              And secondly, another background is that back
25    then, in China, the import and export has a very stringent

1    regulation.  Each industry they have their own professional

2    import and export company.  For example like CNEICC -- for

3    example CNEICC, it is in charge of all the import and export

4    for the electronic products, the official name is China

5    National Electronics Import and Export Company.  So when we

6    call CNEICC, it is belong to the China National Electronic

7    Import and Export Company, in charge of the import and

8    export business.  Back then manufacturer and trading company

9    are totally independent.  Which means Irico cannot conduct

10   any trading business.

11           Q.  So CNEICC was set up to specialize in handling

12   the export and import business for Irico, is that correct?

13           MR. LUCARELLI:  Object to form.

14           A.  I wouldn't say it is a concept of supporting

15   the business.

16    BY MS. FU:

17           Q.  Let me repeat my question --

18           A.  Because --

19           Q.  I think there was a confusion between my

20   question and your translation.  Let me just repeat my

21   question.

22           So CNEICC was set up to specialize in handling the

23   export and import business for Irico, correct?

24           MR. LUCARELLI:  Object to form.

25           A.  With regard to this question, the fact doesn't

1    look like that.  I did find some former CNEICC employees who

2    switched job and worked for Irico.  Because what they told

3    me is that CNEICC not only purchased products from Irico and

4    export to overseas, but also import some raw materials for

5    Irico.  On top of that they also conduct other trading

6    business as well.

7     BY MS. FU:

8              Q.  What other trading business?  Can you

9    describe?

10             A.  He was not quite sure, but he did mention the

11   CNEICC's import certain audio equipment.

12             Q.  Who was this employee you talked to?

13             A.  Mr. Hao Xiao Jin.

14             INTERPRETER:  H-A-O X-I-A-O J-I-N.

15             A.  It is a female.  Ms. Hao Xiao Jin.

16    BY MS. FU:

17             Q.  Did you talk to any other former CNEICC

18   employees?

19             A.  This is the only person I found and connected.

20             Q.  Why does the company CNEICC's name have

21   Irico's trademark Caihong in it?

22             A.  I'm not quite sure about that, but the fact is

23   that the Caihong, this name in China is very popular.  You

24   can find this in the market place, in shopping mall, in the

25   food court.  This is a very popular name.  So I really don't

Case 4:07-cv-05944-JST Document 5641-3 Filed 11/05/19 Page 305 of 508
Zhang, Wenkai - highly confidential
March 05, 2019                                                    18

1    know.  Why --

2            Q.  Are you saying it is a coincidence that the

3    name CNEICC has Irico's trademark Caihong in it?

4            MR. LUCARELLI:  Object to form.

5            A.  I didn't say it is a coincidence.  Could be,

6    or could be not, but the Chinese characters are identical.

7    Just that.  There are several bridges called Caihong, or an

8    Irico bridge.  So we don't have any ownership of those

9    bridges.

10           Q.  During what time period did CNEICC handle

11   Irico's import and export business?

12           A.  The establishment of CNEICC is not solely for

13   the Irico's import and export business.  They would do the

14   business based on their business plan.  And also the fact is

15   that during the class period, we have no control of CNEICC

16   at all.  So I really cannot answer in what period they

17   handled the Irico import and export.

18           Q.  Are you aware that your attorneys have told us

19   that CNEICC handled all Irico's export and import until

20   September 2004?

21           MR. LUCARELLI:  Object to form.

22           INTERPRETER:  Can I clarify?  Did you say 2014, or

23   2004?

24    BY MS. FU:

25           Q.  2004.

Case 4:07-cv-05944-JST Document 5641-3 Filed 11/05/18 Page 306 of 508
Zhang, Wenkai - highly confidential
March 05, 2019                                                    19

 1                 INTERPRETER:  (Chinese spoken).

 2                 A.  In what form did our attorney inform you

 3    regarding that?

 4     BY MS. FU:

 5                 Q.  Through discovery responses.

 6                 A.  First of all, I really don't know where -- in

 7    what form our attorney informed you that, and the fact is

 8    that I was not there when our attorney informed you this

 9    information.

10                 Then if our attorney did produce that information,

11    plus the fact that the information came from my position,

12    then it is a fact.

13                 Correction, is --

14                 (Chinese spoken) --

15                 MR. HWU:  One moment.  I want to make the record

16    that the witness has just corrected the interpreter's

17    translation, and directed him to redo it.

18                 You may continue.

19                 INTERPRETER:  Correction --

20                 A.  It is not the fact -- well, if our attorney

21    did produce that information, then it is information, as he

22    said.

23     BY MS. FU:

24                 Q.  You are the company's designee for those

25    topics you are designated to testify about, right?

 1          A.  Yes.

 2          Q.  And you just testified that you are not aware

 3  that your attorneys provided information regarding the time

 4  period during which CNEICC handled the export and import

 5  business on behalf of Irico?

 6          A.  Well, what I mean is I'm not aware of the

 7  time, the form of counsel produced those information to you.

 8  Which means I don't know whether you have face-to-face

 9  conversation, or through the phone, or through the e-mail.

10  However we do recognize the content of such information.

11          And then with regard to whether that content is

12  consistent with the fact, I'm not quite sure.

13          Q.  Are you saying your attorneys provided

14  information to the plaintiffs that might not be consistent

15  with the facts?

16          MR. LUCARELLI:  Object to form.

17          A.  (Chinese spoken) --

18   BY MS. FU:

19          Q.  Can you explain?

20          A.  No, that's not what I mean.  What I mean is

21  the information I gave to the counsel who produced it to you

22  are the true information.  And also those are the

23  information we try our best to identify the most

24  comprehensive information.  This is what I mean.

25          With regard to the contents on those

 1   information -- with regard to whether those contents match

 2   the fact during the class period, because I didn't -- I was

 3   not there, so I cannot verify whether it is true or not.

 4          As a contemporary person, the contents does not

 5   necessarily reflect the truth or the fact of what happened

 6   in the history.

 7          Q.  So the information produced by Irico, or

 8   attorneys representing Irico, came from group's archives,

 9   correct?

10          MR. LUCARELLI:  Object to form.

11          A.  No.  As I stated yesterday, during the

12   information search, we did a lot of efforts.  Certainly, the

13   archive room from the Group is a very important information

14   resource.  On top of that, we also tried our best to search

15   all the available electronic data.

16          Like the King Dee Systems, those information are

17   not retained in our archive room.

18          We also review some of the data from the Custom.

19   Those data are not kept in our archive room.

20          We also try our best to interview certain people

21   who might aware of the situation.  Those persons are not

22   antique, we cannot keep them or lock them in the archive

23   room.

24          MR. LUCARELLI:  Are we at a good spot to take

25   a break?

```
 1              MS. FU:  Not yet.  In five minutes, maybe.  Is

 2    that okay?

 3              Q.  Has Irico produced the best information it

 4    could find?

 5              A.  First of all, within our capacity, we have

 6    tried our best to search all the evidence.

 7              Secondly, with all the available evidence, we have

 8    tried our best to scan or in other ways to produce those

 9    evidence.

10              Third, especially, in particular for the original

11    finance record, they are kept in our archive room, we found

12    them, but it is beyond our capacity to produce it.

13              Yesterday, I already replied in response about our

14    difficulty.

15              Q.  Are you aware of any instance where documents

16    in Irico's custody has been altered or forged?

17              MR. LUCARELLI:  Object to form.

18              A.  Based on our understanding, and the

19    information we have identified, we didn't find any altered

20    or forged.

21     BY MS. FU:

22              Q.  Are you aware of any instance where documents

23    in Irico's custody has been deliberately destroyed?

24              MR. LUCARELLI:  Object to form.

25              A.  Based on my understanding, there are no
```

 1   intentional or deliberate destroy of any electronic or hard

 2   copy information.

 3    BY MS. FU:

 4           Q.  Are you aware that in this case the court

 5   issued an order in 2008 requiring parties to preserve all

 6   evidence?

 7           A.  Which year were you mentioning?

 8           INTERPRETER:  (Chinese spoken).

 9           A.  With regard to this question, I did consult

10   with the director Yan Yunlong, because he was handling this

11   issue back then.  He cannot remember whether there was

12   a court order back then.  I also asked other people, for

13   example like Wang Zhaojie, he also could not recollect

14   whether he has saw such a court order or not.

15           As a result, even with the fact that I have tried

16   my best, I cannot confirm the situation you just mentioned

17   there.

18    BY MS. FU:

19           Q.  Did Irico export through any other company

20   aside from CNEICC?

21           A.  What do you mean "through"?

22           Q.  Did any other company aside from CNEICC handle

23   Irico's import and export business during the relevant time

24   period?

25           A.  (Chinese spoken).

```
 1              MS. FU:  I would like the interpreter to try one
 2      more time.
 3              INTERPRETER:  (Chinese spoken).
 4              A.  When you say "handle," do you mean that Irico
 5      issued a comment say "please handle this import and export
 6      business for us"?
 7       BY MS. FU:
 8              Q.  That's not what I mean.
 9              What I mean is whether there are -- there were any
10      other companies aside from CNEICC conducted the import and
11      export business on behalf of Irico?
12              MR. LUCARELLI:  Object to form.
13              A.  First of all, as I mentioned earlier, Irico is
14      a manufacturer.  For quite some time, manufacturer cannot
15      conduct import and export business.  As a result, there is
16      no export demand for Irico.  It is fair to say there are
17      some trading companies, they have import or export demand,
18      so they will purchase a product and export those products.
19              So for example, when they purchase products from
20      Irico there is no reason they will tell us where they want
21      to sell those products.
22              For example, if I purchase a computer at the
23      store, then I won't tell the store manager where I want to
24      use that computer, whether I use it at home or in the
25      office, or who I will give that computer to.  That's my own
```

 1  business.

 2   BY MS. FU:

 3          Q.  Is it your testimony today that Irico never

 4  tried to export its products?

 5          MR. LUCARELLI:  Objection, misstates testimony.

 6          A.  Well, what I mean is that there is no actual

 7  export action or complete export action happen.  With regard

 8  to the plan or idea or concept, either in written or in

 9  somebody's mind or somebody's brain, I have no idea.  In

10  People's Republic of China the law only asks us to

11  responsible, or response to our actions.  You don't -- you

12  are not responsible or liable to your idea or concepts.  The

13  law doesn't reach your heart.  So if we go back to

14  2,000 years ago, then we are responsible for our mind or our

15  ideas.

16   BY MS. FU:

17          Q.  I would like to strike the answer as

18  non-responsive.

19          MR. HWU:  Interpreter, please ...

20          INTERPRETER:  (Chinese spoken).

21   BY MS. FU:

22          Q.  So CNEICC was independently negotiating

23  contracts for the sales of CRTs -- strike that.

24          CNEICC never kept records for how much it

25  exported?

Case 4:07-cv-05944-JST Document 5641-2 Filed 11/05/19 Page 313 of 508
Zhang, Wenkai (2 highly confidential) at trial
March 05, 2019                    26

1              MR. LUCARELLI:  Object to form.

2              MS. FU:  Strike that question.

3              Q.  Irico never kept records of how much it

4    exported?

5              A.  (Chinese spoken).

6              MR. LUCARELLI:  Object to form.

7              A.  Are you saying Irico kept record of export?

8     BY MS. FU:

9              Q.  Irico exported CRTs through CNEICC, correct?

10             MR. LUCARELLI:  Object to form.

11             A.  As I mentioned earlier, Irico is

12    a manufacturer, but back in the days where trading or export

13    is restricted, we cannot export our products.  With regard

14    to our client, for example, CNEICC is one of our key

15    clients, based on their own individual demand, for example

16    they want to conduct export, they will come to us and

17    purchase our product for export.  So the statement does not

18    stand for, like, when you say we export our product through

19    CNEICC.

20     BY MS. FU:

21             Q.  So it is your testimony on behalf of Irico

22    that Irico did not keep track of exports?

23             MR. LUCARELLI:  Objection, misstates testimony.

24             A.  I don't think I made that statement.  My

25    statement is that as a manufacturer, Irico never export our

Case 4:07-cv-05944-JST Document 5641-3 Filed 11/05/18 Page 314 of 508
Zhang Wenkai - highly confidential
March 05, 2019                                    27

1    products, or we never conduct export business.

2     BY MS. FU:

3          Q.  Is it your testimony today that, on behalf of

4    Irico, that Irico never conducted export business?

5          A.  Well, before the government released the

6    restriction on the international trading, no, we didn't

7    conduct any export business.

8          Q.  When did the government release the

9    restriction on the international trading?

10         A.  Yes, I did look for that answer.  It is

11   a progress.  It is not one order and everything changed

12   overnight.  It is a progress and gradual change for over 10

13   to 20 years.  It is a gradually, a slow transition based on

14   different industry, as well as different regions.  So

15   I really don't know when we can conduct the trading business

16   by ourselves.

17         Q.  When did Irico start to conduct export

18   business?

19         A.  Perhaps it is after 2004, or after 2005, we

20   did have some export business.

21         Q.  Which Irico company conducted export business

22   on behalf of Irico around after 2004/2005?

23         MR. LUCARELLI:  Object to form.

24         A.  There were many.  For example Xian Cairui,

25   and -- Xian Cairui.

 1              INTERPRETER:  X-I-A-N C-A-I-R-U-I.

 2         A.   There is another company like Xian Export and

 3    Process Company, I don't recall the exact name.

 4     BY MS. FU:

 5         Q.   Did all these companies export CRTs or CRT

 6    products on behalf of Irico after 2004 or 2005?

 7              MR. LUCARELLI:  Object to form.

 8         A.   No, based on our understanding, they basically

 9    are selling the fluorescent powders or the raw materials

10    only.  The reason I have that information is because

11    I searched some of the data from the Customs.

12              I remember those export orders files follow the

13    number 09, and then I asked the Customs officers, 09

14    represents kilograms.

15              So as a result of that, obviously it is not

16    something like CRT.  Because CRT's unit is by pieces, not by

17    kilogram.

18              And also the fact that the products Irico produced

19    cannot satisfy the demand in domestic market.

20              So our primary market is domestic market.  If

21    there are any export, the amount should be very, very small,

22    or even none.  The best source is the accounting or finance

23    record.

24              MR. LUCARELLI:  Counsel, we have been going almost

25    an hour and a half.  Can we take a break now?

```
 1              MS. FU:  Yes, we can take a break.

 2              VIDEOGRAPHER:  This marks the end of media number

 3    2 in the deposition of Zhang Wenkai volume II.  Going off

 4    the record, the time is 10.25.

 5                          (Break taken.)

 6              VIDEOGRAPHER:  We are back on the record.  Here

 7    begins media number 3 in the deposition of Zhang Wenkai

 8    volume II.  The time is 10.51.

 9     BY MS. FU:

10         Q.  Mr. Zhang, do you understand that you are

11    still under oath under penalty of perjury?

12         A.  Yes.

13         Q.  You testified yesterday that in May 2014,

14    Group took over the full ownership of CNEICC.  Do you recall

15    that?

16              MR. LUCARELLI:  Object to form.

17         A.  I did mention 2014, but I didn't specify which

18    month.

19     BY MS. FU:

20         Q.  Between 1987 through 2014, had CNEICC ever

21    shared common business address with Irico?

22              MR. LUCARELLI:  Object to form.

23         A.  During that period, I only aware of the

24    business address for Irico.  Whereas CNEICC exact mailing

25    address I have no idea.  Which I have also mentioned
```

```
 1   yesterday.

 2           Q.  Are there any other written record of Irico

 3   that show CNEICC's business address?

 4           MR. LUCARELLI:  Object to form.

 5           A.  Could you repeat your question one more time?

 6    BY MS. FU:

 7           Q.  Does Irico have any written records showing

 8   the business address of CNEICC for the time period between

 9   1987 through 2014?

10           MR. LUCARELLI:  Object to form.

11           A.  I never found such a document.

12    BY MS. FU:

13           Q.  Between 1987 through 2014, had CNEICC and

14   Irico ever shared common assets?

15           A.  Common asset?

16           I don't quite understand what do you mean by

17   "common assets".

18           MS. FU:  Let me make a correction to your

19   translation.  (Chinese spoken).

20           INTERPRETER:  (Chinese spoken).

21           A.  No.

22    BY MS. FU:

23           Q.  Between 1987 through 2014, had CNEICC and

24   Irico ever shared common employees?

25           A.  Based on my understanding, no.
```

```
 1              Q.  You testified yesterday that CNEICC -- some

 2    CNEICC's employees went to work for Irico at some point

 3    during the class period.  Do you recall?

 4              A.  Yes, I did say that.  What I mean is some of

 5    the staff quit from CNEICC and joined Irico.  But these are

 6    their own business.

 7              Q.  How many CNEICC employees went to work for

 8    Group?  Can you give us your best estimate?

 9              MR. LUCARELLI:  Object to form.

10              A.  I don't know exactly how many of them.

11    BY MS. FU:

12              Q.  Can you give an estimate?  30?  50?  100?

13    More than 100?

14              MR. LUCARELLI:  Object to form.

15              A.  To be responsible, I would say, I don't know.

16    BY MS. FU:

17              (Exhibit 8394 marked for identification)

18    BY MS. FU:

19              Q.  The court reporter just handed you what has

20    been marked as Exhibit 8394, bearing the Bates number

21    IRI-CRT00000956 through 1010.  And its certified translation

22    provided by Irico's counsel.

23              So this is a combined document, with the English

24    translation on top of the Chinese version.  Please take

25    a moment to review.  I only have a few questions about two
```

Case 4:07-cv-05944-JST Document 5641-3 Filed 11/05/19 Page 319 of 508
Zhang deposition, highly confidential
March 05, 2019                                        32

 1   are on three pages that I will point you to.

 2             A.  I just briefly glanced at it.

 3             Q.  Do you recognize this document?

 4             A.  Yes.

 5             Q.  Can you describe this document?

 6             A.  This is an application for the group back in

 7   2004 to apply restructure and change the company structures.

 8             Q.  For the benefit of the interpreter, if you can

 9   speak up a little bit, that would be helpful.  Is that okay?

10             A.  (Chinese spoken).

11             Q.  Let's take look at this document titled

12   "Request for instructions about 'Overall plan for the

13   Separation, Restructuring and Diversion of Primary and

14   Secondary Service of Irico Group Corporation'" to the

15   Ministry of Finance.

16             So at the end of this document, it shows

17   there are five attachments.  Do you see that?

18             A.  Yes.

19             Q.  And at page 957 it bears the group seal and

20   was dated April 12th 2004.  Do you see it?

21             A.  Did you say 957?

22             Q.  The Bates number at the bottom of the

23   document.

24             A.  Yes, I saw it.

25             Q.  Do you recognize the seal?

 1              A.  Yes.

 2              Q.  Does it appear to be the true seal from Irico

 3  Group?

 4              MR. LUCARELLI:  Object to form.

 5              A.  There is no way for me to verify whether this

 6  is a true Group seal.

 7   BY MS. FU:

 8              Q.  This document was kept in Irico Group's files,

 9  correct?

10              A.  Yes.

11              Q.  And it was produced by Irico in this

12  litigation, correct?

13              A.  Yes.

14              Q.  Do you have any reason to believe this

15  document is not a true and correct copy by Group to the

16  Ministry of Finance on April 12, 2004, regarding the group's

17  request for instructions on its restructuring plan?

18              A.  This is a true document.

19              Q.  When Group submits a report to the government,

20  it wouldn't knowingly include any false or inaccurate

21  information, correct?

22              A.  Definitely it should not include any

23  intentional or knowingly false information.

24              However, I'm not quite sure whether there are some

25  typos or some -- human errors.

Case 4:07-cv-05944-JST Document 5641-3 Filed 11/05/19 Page 321 of 508
Zhang, Wenkai - highly confidential
March 05, 2019                                    34

1              Q.  I would like you to take a look at

2      attachment 2, Bates number ending 999.  Do you see it?

3              A.  Yes.

4              Q.  At 998 it says Irico Group company

5      organization chart.  Do you see it?

6              A.  Yes.

7              Q.  Does this chart accurately reflect Irico

8      Group's corporate structure in or around April 2004?

9              A.  I'm not quite sure.  Because this is not the

10     official registration document, so I'm not quite sure

11     whether it accurately reflects the situation back then.

12             Q.  Irico submitted this document as an attachment

13     to this request for a restructuring plan to the Ministry of

14     Finance in 2004, correct?

15             A.  Yes.

16             Q.  Are you aware that Irico also submitted this

17     exhibit to the court in this case?

18             A.  Yes, I do aware.

19             Q.  Take a look at the organization chart at 999.

20     The bottom tier of the org chart shows three different types

21     of subsidiaries of Irico Group.  Do you see that?

22             A.  Yes.

23             Q.  So it shows wholly-owned company, holding

24     company, and shareholding company, do you see it?

25             A.  Yes.

1              Q.  And under wholly-owned company, do you see

2    a company named China Electronics Import and Export IRICO

3    Company?

4              A.  So this is what you mean CNEICC, right?

5              Q.  You tell me.  Is this the same company as

6    CNEICC?

7              A.  Yes, I saw such a company.

8              Q.  Do you have any reason to believe this is not

9    the same company we discussed earlier when we referred to as

10   CNEICC?

11             A.  I suppose they are the same.

12             Q.  So according to this chart, around 2004 CNEICC

13   was a wholly-owned company of Irico Group, correct?

14             A.  No.

15             Q.  Can you explain?

16             A.  Because when we -- when would like to justify

17   the relationship between one corporation to another

18   corporation, it should be based on the commerce registration

19   file.

20             Q.  Are you saying this organization chart does

21   not accurately reflect the relationship between Irico Group

22   and CNEICC around 2004?

23             A.  Yes, as I mentioned earlier, this document --

24   when you review this document, you cannot assume the fact

25   there are no human errors or typos.

 1          Q.  Are you implying that Irico made a human error

 2   or typo when it submitted this report to the Ministry of

 3   Finance in 2004?

 4          MR. LUCARELLI:  Object to form.

 5          A.  I cannot verify how those errors were made.

 6          However, with regard to the shareholders'

 7   information, between two different companies, we should

 8   refer to the commerce registration information.

 9    BY MS. FU:

10          Q.  This exhibit shows, at this time, around 2004,

11   Group informed the Government, meaning the Ministry of

12   Finance, it owned CNEICC, correct?

13          MR. LUCARELLI:  Object to form.

14          A.  No.  As I stated earlier, it is a common

15   standard that when you verify the relationship between two

16   companies, the fact should be based on the commerce

17   registration file.

18    BY MS. FU:

19          Q.  So when Irico Group created this document,

20   including the organization chart in attachment 2, are you

21   saying it did not base its information on the commerce of

22   registration?

23          MR. LUCARELLI:  Object to form.

24          A.  I don't know, because I didn't create this

25   document.  Neither do I know who created this document back

Case 4:07-cv-05944-JST Document 5641-2 Filed 11/05/18 Page 324 of 508
Zhang Wenkai - highly confidential
March 05, 2019                                                    37

```
 1    then.

 2     BY MS. FU:

 3          Q.  So you just said you did not create this

 4    document, you were not the author of this document.  So you

 5    are not qualified to say if this is a typo or human error,

 6    correct?

 7              MR. LUCARELLI:  Object to form.

 8              A.  That is not correct.

 9              If the statement is inconsistent, or it does not

10    reflect the commerce registration file, then it is

11    incorrect.

12     BY MS. FU:

13          Q.  What does the commerce registration say about

14    the relationship between Irico Group and CNEICC around 2004?

15              A.  They are two individual or separate companies.

16              INTERPRETER:  Let me correct.  "It is two

17    independent companies."

18     BY MS. FU:

19          Q.  So are you saying in 2004 Group submitted

20    false information to the Ministry of Finance?

21              MR. LUCARELLI:  Objection, misstates testimony.

22              A.  I didn't understand your question.  Could you

23    repeat your question?

24     BY MS. FU:

25          Q.  Are you saying in 2004 Group submitted false
```

 1    information to the Ministry of Finance?

 2              MR. LUCARELLI:  Same objection.

 3     BY MS. FU:

 4              Q.  This is a yes or no question.  I would like an

 5    answer to my question.

 6              A.  I consider in this document at this area there

 7    is an error.

 8              Q.  Is this your personal belief, or are you

 9    speaking on behalf of Irico?

10              A.  On behalf of Irico.

11              Q.  So you are saying Irico submitted false

12    information to the Ministry of Finance in 2004?

13              MR. LUCARELLI:  Object to form.

14              A.  I think it should be a typo.  It is a typing

15    error.

16     BY MS. FU:

17              Q.  When you say "should be," is that a guess?  Or

18    do you have any basis for your statement?

19              MR. LUCARELLI:  Object to form.

20              A.  First of all, back in 2004, when we submit

21    this document, there is no intention or knowingly to make

22    this error.  Secondly, because of ignorance we didn't review

23    the commerce registration file.  This is why there are such

24    typing error.

25

 1   BY MS. FU:

 2          Q.  You were not involved in creating this

 3   document, correct?

 4          A.  That's right, back then I didn't join Irico.

 5          Q.  So you have no basis to say this is a mistake

 6   included in Irico Group's document submitted to the Ministry

 7   of Finance?

 8          MR. LUCARELLI:  Object to form.

 9          A.  No, that's not the fact.  There is an obvious

10   conflict from the commerce registration file we have

11   reviewed.  So we should base on the commerce registration

12   file.

13   BY MS. FU:

14          Q.  Do you have any knowledge how this document

15   was created back in 2004?

16          A.  I don't know.

17          Q.  Did Irico ever inform the Ministry of Finance

18   about this alleged typing error?

19          A.  I don't know.

20          Q.  If Irico ever informed Ministry of Finance

21   about this typing error, such a notification would be kept

22   in Irico's archives, correct?

23          A.  I don't know whether there is such a notice

24   exists.

25          Q.  That's not the question I asked.  Let me

1    repeat.  If Irico ever informed the Ministry of Finance

2    about this typing error, such a notification would have been

3    kept in Irico's archives, correct?

4              A.  Yesterday I did respond regarding this

5    question.  So those documents that eligible to enter the

6    archive room would be submitted through the secondary

7    subsidiary or from each department who will compile the

8    document and submit the document.

9              So as a result, if there is such a document or

10   notice, whether it would enter the archive room or not,

11   I really don't know.

12             Q.  You testified yesterday that important Irico

13   documents would enter Irico's archive room.  Do you recall

14   that?

15             MR. LUCARELLI:  Object to form.

16             A.  Yes, I do remember.

17    BY MS. FU:

18             Q.  So if there were ever such a notification from

19   Irico Group to the Ministry of Finance regarding this typing

20   error, would that document, that documentation -- that

21   notification be considered an important document?

22             A.  I really don't know about that.

23             Q.  Do you consider Exhibit 8394 an important

24   document?

25             A.  Important to what?

```
 1              Q.  Important enough so that Irico have kept it in

 2      its archives?

 3              A.  Yes, separation and restructure is something

 4      very important.

 5              Q.  Well you just testified that this exhibit is

 6      very important document at Irico.  So before submitting this

 7      document, Irico would be careful enough to check for

 8      mistakes, correct?

 9              MR. LUCARELLI:  Object to form.

10              A.  We don't call it check.  We have a document

11      protocol, we call it proofreading.

12       BY MS. FU:

13              Q.  I'll strike the witness's answer as

14      non-responsive.

15              I would like to -- I would like an answer to my

16      question.  I'll repeat.

17              You just testified that this exhibit is a very

18      important document at Irico, so before Irico submitted this

19      document, Irico would be very careful to check for mistakes,

20      correct?

21              MR. LUCARELLI:  Object to form.

22              A.  Allow me to repeat my statement.  The action

23      is not called "check," but proofreading.

24       BY MS. FU:

25              Q.  I'll strike that answer again as
```

1    non-responsive.

2          Let me rephrase the question.  You testified that

3    this document is a very important document at Irico.  So

4    before Irico submitted this document to the Ministry of

5    Finance, Irico would be careful enough to proofread for

6    mistakes, correct?

7          A.  Yes.  With regard to the contents, or the

8    sentence, or if the smooth of the sentence, we will conduct

9    proofreading.

10         Q.  Who authored this document?

11         INTERPRETER:  (Chinese spoken).

12         MS. FU:  I would like to correct the interpreter.

13   My question is who authored this document, not who proofread

14   the document.

15         A.  I don't know.

16    BY MS. FU:

17         Q.  Moving on, you can put that exhibit aside.  Do

18   you read People's Daily?  (Chinese spoken).

19         MR. LUCARELLI:  Object to form.

20    BY MS. FU:

21         Q.  Let me ask again.  Do you read People's Daily?

22         MR. LUCARELLI:  Same objection.

23         A.  No.  I don't read People's Daily.

24    BY MS. FU:

25         Q.  To your knowledge, do any of the employees at

```
 1  Irico read People's Daily?
 2            MR. LUCARELLI:  Object to form.
 3            A.  I have no knowledge about other employees'
 4  reading habits.
 5   BY MS. FU:
 6            Q.  But you know about People's Daily, right?
 7            A.  Yes, I do.
 8            Q.  People's Daily is an official newspaper of the
 9  Communist Party of China, correct?
10            A.  I don't know about that.  I have no knowledge
11  regarding their official relationship or any ownership.
12            Q.  Do you consider People's Daily a reliable news
13  source?
14            A.  I don't know, because I don't read People's
15  Daily.
16            Q.  Do you have reason to believe it is not
17   a reliable news source?
18            MR. LUCARELLI:  Object to form.
19            A.  Could you repeat the question one more time?
20   BY MS. FU:
21            Q.  Do you have any reason to believe that
22  People's Daily is not a reliable news source?
23            MR. LUCARELLI:  Object to form.
24            A.  There is no reason for me to believe it is not
25   a reliable news source, however, I have no reason to believe
```

1    it is a reliable news resource.

2     BY MS. FU:

3          Q.  Is it your testimony that you don't know

4    whether People's Daily is a government newspaper?

5          MR. LUCARELLI:  Object to form.

6          A.  I really don't know whether it is a government

7    newspaper.

8     BY MS. FU:

9          Q.  What is People's Daily?  In your own words can

10   you describe it?

11         A.  I think it is just a newspaper.  It is just

12   like a Xian Daily or Sanshi News.

13         Q.  Are you aware that -- strike that.

14         Are you aware that People's Daily is owned by the

15   government?

16         A.  Like I said earlier, I really don't know the

17   People's Daily's ownership.

18         MS. FU:  Let's take --

19         MR. HWU:  Counsel, would you like to break for

20   lunch right now?

21         MR. LUCARELLI:  Sure.

22         VIDEOGRAPHER:  This marks the end of media number

23   3 in the deposition of Zhang Wenkai volume II.  Going off

24   the record.  The time is 11.51.

25                        (Lunch recess.)

```
 1                VIDEOGRAPHER:  We are back on the record.  Here

 2     begins media number 4 in the deposition of Zhang Wenkai,

 3     volume II.  The time is 1.04.

 4      BY MS. FU:

 5                Q.  Welcome back, Ms. Zhang.

 6                Do you understand that you are still under oath?

 7                A.  Yes.

 8                Q.  Are you a member of the communist party?

 9                A.  No.

10                Q.  Earlier today you testified that you reviewed

11     the Irico Group's articles of association, do you recall

12     that?

13                MR. LUCARELLI:  Object to form.

14                A.  Yes, I did review it.

15      BY MS. FU:

16                Q.  You also testified that in the Group's

17     articles of association it didn't mention anything regarding

18     a company to start import and export business.  Do you

19     recall that?

20                A.  I mean, there is no information regarding

21     establish import and export company.

22                Q.  So it is your understanding that in the Irico

23     Group's articles of association there isn't a provision

24     which provides for the establishment of an import and export

25     company, correct?
```

```
 1              A.  To my knowledge, there are no such

 2    a provision.

 3              Q.  When did you review Irico Group's articles of

 4    association?  Do you recall?

 5              MR. LUCARELLI:  Object to form.

 6              A.  I don't remember exact time.

 7     BY MS. FU:

 8              Q.  Do you remember in which year?

 9              A.  I did review it in 2018 and 2017.

10              Q.  So you reviewed Irico Group's articles of

11    association in 2017 and 2018, in connection with this

12    litigation, correct?

13              A.  No.

14              Q.  Under what circumstances did you review Irico

15    Group's articles of association?

16              A.  I did review it for the sake of this

17    litigation, and also for other reasons.

18              Q.  Are you familiar with the content of Irico

19    Group's articles of association?

20              A.  Not very familiar.

21              Q.  But you do remember in the articles of

22    association for Irico Group it didn't mention anything

23    regarding a company to start import and export business,

24    correct?

25              A.  When I reviewed the articles of association of
```

 1    the Irico Group, I never saw such a statement.

 2              (Exhibit 8395  marked for identification)

 3     BY MS. FU:

 4              Q.   The court reporter just handed you what has

 5    been marked as Exhibit 8395, bearing the Bates range

 6    IRI-CRT-0000079 through 785.  Would you please read the

 7    document and tell us whether or not you recognize it.

 8              A.   Yes, I can recognize this document.

 9              Q.   What is it?

10              A.   The articles of association for Irico Group

11    when the group was founded.

12              Q.   Was Irico Group known as Caihong Electronics

13    Group Company in 1988?

14              A.   Yes.

15              Q.   Is this the same articles of association you

16    reviewed in connection with this litigation?

17              A.   Yes.

18              Q.   Does Exhibit 8395 appear to be a true and

19    correct copy of Irico Group's articles of association?

20              A.   Yes.

21              Q.   I would like to direct your attention to

22    article XVII.  The Bates number at the bottom is 782.

23              A.   Yes.

24              Q.   Under article XVII.2, it says:

25              "[Irico Group establishes] the following business

 1    companies and professional centers ..."

 2            And then the list includes an economic(sic)

 3    import and export company.  Do you see it?

 4            MR. LUCARELLI:  Object to form.

 5            MS. FU:  I would like to correct your

 6    interpretation.  "Electronics" import and export company.

 7            A.  Yes, I saw it.

 8     BY MS. FU:

 9            Q.  Does this document refresh your recollection

10    that the articles of association of Irico Group did mention

11    a company -- did mention about starting a company to handle

12    import and export business?

13            A.  Could you repeat your question one more time?

14            Q.  Does this document refresh your recollection

15    that Irico Group's articles of association did mention about

16    starting a company to handle import and export business?

17            A.  Yes.

18            Q.  So would you like -- strike that.

19            So in fact, Irico Group did start a company to

20    handle import and export business that you recall, correct?

21            MR. LUCARELLI:  Object to form.

22            A.  This is not correct statement.

23     BY MS. FU:

24            Q.  Can you explain?

25            A.  We didn't identify any company since Irico

1    Group was founded to conduct import and export business.

2            Q.  What investigations did you conduct to

3    identify whether Irico Group after the establishment set up

4    an export/import business?

5            MR. LUCARELLI:  Object to form.

6            A.  I asked department head, Mr. Yan Yunlong, as

7    well as Mr. Wang Zhaojie.  Both of them told me they never

8    heard such of a new company to handle the electronic import

9    and export.

10  BY MS. FU:

11           Q.  But the Group's articles of association

12   indicates that it did set up a company to handle electronics

13   import and export, correct?

14           MR. LUCARELLI:  Object to form.

15           A.  I'm sorry, I didn't follow the question.  Can

16   you repeat one more time?

17  BY MS. FU:

18           Q.  But the group's articles of association

19   indicate that it did set up a company to handle electronics

20   import and export, correct?

21           MR. LUCARELLI:  Same objection.

22           A.  Not correct.

23  BY MS. FU:

24           Q.  Can you explain?

25           A.  My understanding about this article of

1    association indicates that it planned to establish.  Doesn't

2    mean it already established a new company.

3            Q.  So you don't know one way or the other whether

4    in fact Irico Group set up a company to handle electronics

5    import and export, correct?

6            MR. LUCARELLI:  Object to form.

7            A.  I consider that is not a correct statement.

8    Because I did consult with department head Yan Yunlong, as

9    well as Mr. Wang Zhaojie.  Both of them told me in their

10   recollection they never heard of such a new company to

11   handle electronic export.

12    BY MS. FU:

13           Q.  So your conclusion is based on your

14   communications with Director Yan Yunlong and Wang Zhaojie,

15   correct?

16           A.  Yes.

17           Q.  And you did not have any discussions with

18   Director Yan Yunlong and Mr. Wang Zhaojie regarding this

19   provision in the Irico Group's articles of association,

20   correct?

21           MR. LUCARELLI:  Object to form.

22           A.  Well, since I was not aware of this provision,

23   so our conversation or discussion does not involve this

24   provision.

25

| | |
|---|---|
| 1 | CERTIFICATE OF COURT REPORTER |
| 2 | |
| 3 | I, Bron Williams, an Accredited Real-time Reporter, hereby |
| 4 | certify that the testimony of the witness ZHANG WENKAI in |
| 5 | the foregoing transcript, numbered pages 1 through 64, taken |
| 6 | on this 5th day of March, 2019 was recorded by me in machine |
| 7 | shorthand and was thereafter transcribed by me; and that the |
| 8 | foregoing transcript is a true and accurate verbatim record |
| 9 | of the said testimony. |
| 10 | |
| 11 | |
| 12 | I further certify that I am not a relative, employee, |
| 13 | counsel or financially involved with any of the parties to |
| 14 | the within cause, nor am I an employee or relative of any |
| 15 | counsel for the parties, nor am I in any way interested in |
| 16 | the outcome of the within cause. |
| 17 | |
| 18 | |
| 19 | Signed:  *Bron Williams* |
| 20 | Name:    Bron Williams |
| 21 | Date:    ........................ |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

# EXHIBIT 28

1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
2                    San Francisco Division

3    - - - - - - - - - - - - - - - - - - -
     IN RE:                           )
4                                     )
     CATHODE RAY TUBE (CRT)           )Master File No.
5    ANTITRUST LITIGATION             )07-CV-5944-JST
                                      )
6                                     )MDL No. 1917
                                      )
7                                     )
                                      )
8    - - - - - - - - - - - - - - - - - - -

9                DEPOSITION OF WANG ZHAOJIE

10                  HIGHLY CONFIDENTIAL

11                       VOLUME I

12              Wednesday, March 6th, 2019

13                   AT:  9.08 am

14                    Taken at:

15                 Kobre & Kim
                  6/F ICBC Tower
16                3 Garden Road
                    Central
17                 Hong Kong

18

19

20

21

22

23   Court Reporter:

24   Bron Williams
     Accredited Real-time Reporter

25

Case 4:07-cv-05944-JST Document 5641-3 Filed 11/05/19 Page 341 of 508
Wang confidential - third-party contest
March 06, 2019                                    41

```
 1              A.  (Chinese spoken).

 2              INTERPRETER:  The witness is asking to repeat the

 3   question.

 4              (Chinese spoken).

 5              A.  I suppose not.

 6    BY MR. BENZ:

 7              Q.  So your answer is no?

 8              A.  As far as I can remember, I didn't.

 9              Q.  Then in your next position from January 2011

10   to July 2013, you were general manager of sales at IGE,

11   correct?

12              A.  Yes.

13              Q.  What were your responsibilities?

14              A.  Again, responsible for sales.

15              Q.  Did you have a concurrent job title at Group

16   from January 2011 to July 2013?

17              A.  No, during that period I worked at Hefei City.

18              Q.  And that's Hefei Rainbow Blu-ray Technology?

19              A.  I'm sorry, I made a mistake.

20              In that period -- could you repeat the question

21   one more time?

22              Q.  Sure.  From January 2011 to July 2013, when

23   you were general manager of sales at IGE, did you have

24   a concurrent job or title at Irico Group?

25              A.  No.
```

1              Q.  Since July 2013, you have been general manager

2    of Irico Smart Lighting Company, correct?

3              A.  Yes.

4              Q.  Okay.  Do you know the company Hefei Rainbow

5    Blu-ray Technology Company?

6              MS. FU:  (Chinese spoken).

7              A.  Yes.

8     BY MR. BENZ:

9              Q.  What is it?

10             A.  A company produce LD.

11             Q.  What is LD?  Liquid display?

12             A.  No.

13             Q.  What is LD?

14             A.  LED.

15             Q.  LED what?

16             A.  The chip for LED.

17             Q.  Okay.  Does Hefei Rainbow Blu-ray Technology

18    Company have any relationship with Irico Display?

19             A.  No.

20             MR. PLUNKETT:  Objection, vague.

21     BY MR. BENZ:

22             Q.  Mr. Wang, have you had any other job titles

23    since July 2013?

24             A.  After July 2013, I work at Hefei for a while,

25    before I joined this -- the smart lighting company.

```
 1              Q.   What was your position at Hefei?

 2              A.   Deputy general manager of the company.

 3              Q.   What year was that?  Or what time period?

 4              A.   I joined Hefei at July 2013, and then I was

 5   transferred to Smart Lighting Company.

 6              Q.   Have you ever worked at Irico Display?

 7              A.   No.

 8              Q.   Okay.

 9              MR. BENZ:  This is a good time for a quick break.

10   We have been going for an hour.

11              MR. PLUNKETT:  Sure.

12              VIDEOGRAPHER:  This marks the end of the media

13   number 3 in the deposition of Wang Zhaojie.  The time is

14   11.17.

15                      (Break taken.)

16              VIDEOGRAPHER:  We are back on the record.  Here

17   begins media number 4 in the deposition of Wang Zhaojie.

18   The time is 11.38.

19    BY MR. BENZ:

20              Q.   Mr. Wang, until 2004, CNEICC was responsible

21   for all of Irico's exports, correct?

22              MR. PLUNKETT:  Objection, vague.

23              INTERPRETER:  Excuse me I didn't --

24              A.   (Chinese spoken).

25              MS. FU:  I would like the translator to
```

 1           MR. PLUNKETT:  Objection, vague.

 2    BY MR. BENZ:

 3           Q.  Strike that.  I'll ask a different question.

 4           Before this deposition, were you aware that you

 5    had been designated to testify about any sales, attempted

 6    sales, or contemplated sales by Irico directly or indirectly

 7    to the United States during the class period through CNEICC?

 8           A.  The question is very vague.

 9           MS. FU:  I would like the interpreter to render

10    that again.

11           INTERPRETER:  (Chinese spoken).

12           A.  I still consider the question is very vague.

13    I would like you to be more specific regarding the question.

14    BY MR. BENZ:

15           Q.  I will make it very simple.  Before this

16    deposition were you aware that you had been designated to

17    testify about CNEICC?

18           MR. PLUNKETT:  Objection, vague.

19           A.  I consider this question is not very

20    straightforward.  It is very vague.  So I have difficulty to

21    answer that.

22    BY MR. BENZ:

23           Q.  Why do you think the question is vague,

24    Mr. Wang?

25           A.  Because I don't understand what you mean.  You

1    make the question very complicated.

2             Q.  You know what I'm referring to when I say

3    "CNEICC," correct?

4             A.  Yes.

5             Q.  Before this deposition, were you aware that

6    you were designated to talk about CNEICC?

7             MR. PLUNKETT:  Objection, vague.

8             A.  Yes, I'm the representative for Irico Display

9    as well as Irico Group.  But I'm not very clear about this

10   particular company.  It has no relationship with Irico

11   Group.

12     BY MR. BENZ:

13            Q.  Before this deposition, what was your

14   understanding of topic 4?

15            A.  I don't understand.

16            Q.  While you were a director of sales at Irico

17   Group, did you communicate with anyone at CNEICC?

18            A.  There was some contact for the work.

19            Q.  Can you describe those contacts from work with

20   CNEICC?

21            A.  I cannot remember, it was too long ago.

22            Q.  Do you remember any specific names of

23   individuals at CNEICC that you worked with?

24            A.  It was too long ago, I cannot remember their

25   names.

1          Q.  Until 2004, CNEICC was responsible for all of

2    Irico's exports, correct?

3               MR. PLUNKETT:  Objection, vague.

4          A.  This question is very vague.

5     BY MR. BENZ:

6          Q.  What do you not understand about it?

7          A.  This company is an independent company.  We do

8    not understand their company operations.

9               MR. BENZ:  I note for the record that every time

10   we get an objection vague, from Mr. Wang's counsel, the

11   witness adopts vagueness as a reason for not responding to

12   the question.

13              MR. PLUNKETT:  I don't know the purpose of that

14   notation, but if you look through the record, that's not

15   correct.

16              Let me just instruct the witness, for the record,

17   that when I object to a question as vague, if the witness

18   understands the question he should answer, despite my

19   objection.

20          A.  I understand.

21    BY MR. BENZ:

22          Q.  I'll ask the question one more time.  Until

23   2004, CNEICC was responsible for all of Irico's exports,

24   correct?

25              MR. PLUNKETT:  Objection, vague.

Case 4:07-cv-05944-JST Document 5641-3 Filed 11/05/19 Page 347 of 508
Wang Confidential - highly confidential
March 06, 2019                                              51

 1              A.  I don't know.

 2      BY MR. BENZ:

 3              Q.  Around September 2004, IGE or Electronics took

 4      over responsibility for Irico's exports, correct?

 5              A.  (Chinese spoken).

 6              INTERPRETER:  I repeat the question.

 7              (Chinese spoken).

 8              A.  No.

 9      BY MR. BENZ:

10              Q.  Why is that not correct?

11              A.  We only make domestic sales.

12              (Exhibit 8400 marked for identification)

13              Q.  Mr. Wang, did IGE ever export CRT or CRT

14      products to other countries?

15              A.  I don't know.

16              Q.  You don't know?  Or Electronics did not

17      export?

18              A.  I don't know.

19              Q.  Mr. Wang, I've handed you what we have marked

20      as Exhibit 400.  I'll represent to that you this exhibit

21      came from Irico's lawyers in 2009.  If you could look to the

22      fourth page of Exhibit 8400, at the top the header reads:

23              "Response of Irico Group corporation and Irico

24      Display Devices Company Limited to Plaintiffs' Information

25      Requests."

1              "In order to expand our provinces export of

2    electronic and mechanic products to North America and deepen

3    trade, investments and cooperation between China and the US,

4    the Provisional People's Government, upon review, hereby

5    approves that China National Electronic [Import and Export]

6    Caihong Company to establish IRICO (USA) Inc in the US, with

7    total investment of 600,000 US dollars and scope of business

8    as follows:  Exports of color display tubes, color TV sets

9    and other home appliance products and related technologies;

10   undertake production activities in partnership with foreign

11   investors; travel services and other trade activities;

12   consulting, networking and aftersales services."

13             Q.  Okay.

14             A.  Did you finish this question?  Because I need

15   to take a break.

16             MR. BENZ:  We can take a break.  We are done with

17   this exhibit.

18             VIDEOGRAPHER:  This marks the end of media number

19   6 in the deposition of Wang Zhaojie.  Going off the record,

20   the time is 3.40.

21                       (Break taken.)

22             VIDEOGRAPHER:  We are back on the record.  Here

23   marks the beginning of media number 7 in the deposition of

24   Wang Zhaojie.  The time is 4.05 p.m.

25             MR. BENZ:  I'm going to now show the witness nine

```
 1    documents.  These are export invoices, they all relate to

 2    topic 4.

 3            I will be marking each exhibit individually and

 4    I will have a few questions as to each exhibit.

 5            (Exhibit 8404 marked for identification)

 6            I have handed you what has been marked as

 7    Exhibit 8404.  It is a two-page --

 8            A.  Okay.

 9            Q.  -- it is a two page-exhibit with Bates number

10    IRI-CRT0003568, and 3569.

11            A.  Go ahead.

12            Q.  Have you seen this document before?

13            A.  Yes, I saw it before.

14            Q.  When did you see it?

15            A.  A couple of days ago.

16            Q.  This is an export invoice from CNEICC to Irico

17    USA dated June 24, 1998, correct?

18            A.  This is a certificate of account transfer from

19    exported good from CNEICC, but I don't know the detail.

20            Q.  It is dated June 24, 1998, correct?

21            A.  Yes.

22            Q.  And it shows an order for 2016 14-inch CPTs,

23    correct?

24            MR. PLUNKETT:  Object to form.

25            A.  The document speaks for itself.
```

 1    BY MR. BENZ:

 2            Q.  I will ask the question again.  The document

 3    shows an order for 2016 14-inch CPTs, correct?

 4            MR. PLUNKETT:  Object to the form.

 5            A.  This is an order from -- an export order from

 6    CNEICC.  I don't know the content.

 7    BY MR. BENZ:

 8            Q.  This was produced to us by your attorneys.  Do

 9    you understand that?

10            A.  Yes.

11            Q.  Okay.  Do you see the amount for $64,512 in

12    the right upper corner of the invoice?

13            A.  Yes.  It says.

14            Q.  Do you have any reason to believe this is not

15    a true and correct copy of this export invoice?

16            MR. PLUNKETT:  Object to the form.

17            A.  (Chinese spoken).

18            INTERPRETER:  The witness is asking me to repeat

19    the question.

20            (Chinese spoken).

21            A.  Okay.  Repeat the question one more time.

22            INTERPRETER:  (Chinese spoken).

23            A.  I don't think so.

24    BY MR. BENZ:

25            Q.  If you could turn to the second page with the

 1    Bates number 3569, this one?

 2             A.  Yes, I saw it.

 3             Q.  At the top do you see where it shows the

 4    invoice being sent to Irico USA, 39658 Mission Boulevard

 5    Fremont California 90399.

 6             A.  The document speaks for itself.

 7             Q.  If you look down on the -- there is a model

 8    number here in the middle of the description, and quantity.

 9             A.  Yes, I saw it.

10             Q.  It reads:

11             "Irico brand spec 37SX110Y22-DC05".  Do you see

12    that?

13             A.  Are you referring to this line?  (Indicated).

14             Q.  Yes.

15             A.  Because I don't read English.  If you mean

16    this sentence, or this line, yes.

17             Q.  Looking at the number 37SX110Y22-DC05, as you

18    sit here today, Mr. Wang, do you know if that refers to an

19    Irico brand tube?

20             A.  I suppose so.

21             (Exhibit 8405 marked for identification)

22             Q.  Mr. Wang, I've handed you what has been marked

23    8405.  It is a two-page-exhibit with Bates number

24    IRI-CRT-0003566 and 7.

25             Have you seen this document before?

1          A.  Yes.

2          Q.  What is it?

3          A.  This is a certificate of account transfer for

4    exported goods from China National Electronics Import and

5    Export Caihong Company.

6          Q.  And the product listed here, these are Irico

7    14-inch CPTs, correct?

8              MR. PLUNKETT:  Object to the form.

9          A.  (Chinese spoken).

10             INTERPRETER:  The witness is asking to repeat the

11   question.

12             (Chinese spoken).

13         A.  I'm not quite sure about that.

14         Q.  Do you see underneath the summary, it lists --

15   it references 10,080 14-inch CPTs to Irico USA.  Do you see

16   that?

17         A.  Yes.

18         Q.  And to the upper right it lists a total price

19   of US$$302,400, do you see that?

20         A.  Yes.

21         Q.  And looking at the product name and model,

22   37SX110Y22-DC05, that's the same product model that we were

23   looking for on 14-inch CPTs in the Exhibit 8404, correct?

24         A.  That's correct.

25             (Exhibit 8406 marked for identification)

 1          Q.  Mr. Wang, I've handed you what we have marked

 2   as Exhibit 8406.  It is a two-page document with Bates

 3   number IRI-CRT-0003570 and 71.  Have you seen this exhibit

 4   before?

 5          A.  Yes.

 6          Q.  When did you see it?

 7          A.  A couple of days ago.

 8          Q.  This is also an export invoice from CNEICC to

 9   Irico USA, correct?

10          A.  I'm not quite sure, because this is a document

11   from CNEICC, so I don't know that their content.

12          Q.  Mr. Wang, this document was produced by Irico

13   Group in this litigation.  Do you understand that?

14          A.  Yes.

15          Q.  And you are here as a corporate designee to

16   talk about topic 4.  Do you understand that?

17          A.  Yes.

18          Q.  Do you have an understanding as to the

19   business purpose of this document?

20          A.  I don't know.  Because this document belongs

21   to CNEICC, it is not related or relevant to us.

22          Q.  Do you see the date, 30th December 1996, in

23   the top of the first page?

24          A.  I saw December 1996, but I cannot tell the

25   date -- well, it is correct, yes.

 Q. Okay, and in the upper right-hand corner there is listed a US dollars amount of $90,720. Do you see that?
A. I cannot read this document very clearly.
MS. FU: I would correct the interpreter translation. "I cannot read this document very clearly" -- strike that. "I cannot read very clearly this document that you provided."
BY MR. BENZ:
Q. Mr. Wang, this is how the document was produced to us. Is it fair -- can you read the number that is listed here? Or if you can't, just let me know.
A. Because this photocopy is not very clear to me.
Q. Yeah --
A. If the copy -- if the copy on your hand is very clear, then I suppose it is correct, but my copy -- for my copy -- are you referring to this?
Q. Yes, my copy is just as bad as yours.
Let's turn to the second page. There is a dollar amount listed. Do you see the US dollar amount of $90,720 there on the last page of the document?
A. Yes, I saw it.
Q. Going back to the earlier page, under summary, there is a product description for 2016 14-inch CPTs. Do you see that?

```
 1              A.  Yes, I saw it.

 2              (Exhibit 8407  marked for identification)

 3              Q.  Mr. Wang, I've handed you what we have marked

 4      as Exhibit 8407.  It is a two page document with Bates

 5      numbers IRI-CRT-00003576 and 77.

 6              A.  Okay.

 7              Q.  This is an export invoice from CNEICC to

 8      Diamond Electronics dated July 22, 2002, correct?

 9              INTERPRETER:  Excuse me, I was looking for the

10      Chinese term for "Diamond Electronics" on this document.

11      Otherwise I will just --

12       BY MR. BENZ:

13              Q.  Let me strike the question.  I'll start over.

14              This is an export invoice from CNEICC, correct,

15      Mr. Wang?

16              A.  Yes.

17              Q.  Do you see the name "Diamond" listed as the

18      overseas customer?

19              A.  Yes, I saw it.

20              Q.  Do you see that?

21              A.  Yes, I saw it.

22              Q.  Okay.  Do you know what "Diamond" refers to?

23              A.  (Chinese spoken) --

24              MS. FU:  I would like to object to the interpreter

25      translation.  You can just use the English word "Diamond".
```

```
 1              A.  I don't know.

 2     BY MR. BENZ:

 3              Q.  Do you have any understanding whether Diamond

 4     refers to Diamond Electronics, a distributor in San Diego

 5     California?

 6              A.  I really don't know.

 7              Q.  Have you seen this document before?

 8              A.  Yes.  I saw it before.

 9              Q.  A few days ago?

10              A.  That's correct.

11              Q.  Okay.  Do you see the dollar amount of

12     US$48,384 in the upper right-hand corner?

13              A.  Again, the photocopy is very vague.  I cannot

14     read this --

15              Q.  That's okay.

16              A.  If the original copy says so then I suppose it

17     is correct.

18              Q.  I agree.  My copy is equally bad.  If you

19     could turn to the last page.  Do you see the dollar amount

20     48,000 --

21              A.  This page?  Which part?

22              Q.  The middle.

23              A.  Yes.  Right there.

24              Q.  Do you see the US dollars amount of $48,384?

25              A.  Yes, I saw that.
```

1          Q.  And up in the address on that page it lists

2    Diamond Electronics in Otay Mesa, San Diego California.  Do

3    you see that?

4          A.  I don't read English.  However if the document

5    says so, then it is true.

6          Q.  That's fine.  I understand you don't read

7    English.

8          Going back to the first page of the document, do

9    you see the reference to the product 2016 14-inch CPTs under

10   the summary?

11         A.  Which part are we referring to?  (Indicated).

12   Yeah, summary?  Okay.  Repeat the question.

13         INTERPRETER:  (Chinese spoken).

14         A.  I'm not quite sure I understand.  Revenue for

15   2016 14-inch CPT.  What does it mean by "revenue"?

16         I really cannot tell that, this Chinese character,

17   this is handwritten.

18         Because it is just too scratch -- I cannot tell

19   what exactly is this character.

20    BY MR. BENZ:

21         Q.  But -- in the Chinese original it does say

22   14-inch CPT 2016, correct?

23         A.  I only saw something like "transfer diamond

24   14-inch CPT, 2016 pieces."  Then the last character is like

25   the receive.  Something like the receive.  And the first

```
 1    character I cannot tell.

 2               (Exhibit 8408 marked for identification)

 3               Q.  Mr. Wang, I've handed you what we have marked

 4    as Exhibit 408.

 5               A.  Okay.

 6               Q.  It is a two-page document with Bates number

 7    IRI-CRT-00003578 and 79.  Have you seen this document

 8    before?

 9               A.  Yes.

10               Q.  A few days ago?

11               A.  Yes, that's correct.

12               Q.  What is this document?

13               A.  This is a certificate of account transfer for

14    exported goods from China National Electronics Import and

15    Export Caihong Company.

16               Q.  It is going to Irico USA, correct?

17               A.  This is a document from CNEICC, so I don't

18    know the content of this document.

19               Q.  You understand, Mr. Wang, that this document

20    was produced by Irico Group in this litigation, correct?

21               A.  Yes, I know that.

22               Q.  And you understand you are the corporate

23    designee for Irico Group and Irico Display for topic 4,

24    correct?

25               A.  Yes.
```

1          Q.  Who is the overseas customer that is listed on

2    this export invoice?

3          MR. PLUNKETT:  Object to the form.

4          A.  Because this document is internal certificate

5    from CNEICC, so I have no knowledge about the content.  It

6    is not convenient -- comfortable for me to answer.

7    BY MR. BENZ:

8          Q.  Looking at the Chinese characters, can you

9    tell me who the overseas customer is there?

10         A.  Because this document is an internal document

11   from the CNEICC, I really have no knowledge about the

12   content.  So as the document said, it is -- there is an

13   overseas customer.  But I don't really know the meaning of

14   this term.

15         Q.  Do you know who Hisense is?

16         A.  It is a company produce or do home appliance

17   as well as TV set.

18         Q.  Where is Hisense located?

19         A.  I believe the headquarters of Hisense is in

20   Qiangdao City.

21         Q.  Do you see the US dollar price of $124,800 in

22   the upper right-hand corner of the page?

23         A.  The total price, yes, I saw it.

24         Q.  Looking on the last page of the document, do

25   you see the address to Irico USA Inc, in Fremont California?

1              A.  I don't read English but the document speaks

2    for itself.

3              Q.  Looking at the lower right-hand corner of the

4    last page can you tell the signature of the manager there

5    for China National Electronic Import and Export Caihong

6    Company?

7              A.  It is not very clear to me.

8              Q.  Is this Sha Tao's signature?

9              A.  If you say Sha Tao, it looks like Sha Tao's

10   signature.

11             Q.  Do you know who Sha Tao is?

12             A.  Yes.  I do know Sha Tao.

13             Q.  Who is Sha Tao?

14             A.  I don't quite know that.  Here it is supposed

15   to be -- I don't really understand this person.

16             Q.  You said you knew who Sha Tao is, correct?

17             A.  I know this person.

18             Q.  Where does this person work?

19             A.  He used to work for CNEICC.

20             Q.  Did Sha Tao work for CNEICC in 1999?

21             A.  I don't know.

22             Q.  Do you know if Sha Tao worked at Irico Group

23   in 1999?

24             A.  I don't know.

25             Q.  Do you know if Hisense had a location or an

```
 1    office in the United States?

 2              A.  I don't know.

 3              (Exhibit 8409 marked for identification)

 4              A.  Okay.

 5              Q.  Mr. Wang, I've handed you what has been marked

 6    as Exhibit 8409.  It is a two-page-exhibit with Bates

 7    numbers IRI-CRT-00003584 and 85.

 8              With apologies, this is how the document was

 9    produced to us.  Have you seen this exhibit before?

10              A.  Yes.

11              Q.  A few days ago?

12              A.  That's correct.

13              Q.  Do you -- what is this document?

14              A.  This is a certificate of account transfer for

15    exported goods.

16              Q.  And the export invoice is from Caihong Company

17    to Irico USA dated January 22, 1999, correct?

18              A.  I don't know.  Because this is an internal

19    certificate for the exported goods from CNEICC, so I don't

20    know.

21              Q.  Please turn to the back page.

22              A.  Okay.

23              Q.  Do you see that this export invoice was billed

24    to Irico USA Inc?

25              A.  Irico USA.  Which part are you referring to.
```

1           Q.  Top left, addressee?

2           A.  This part?  (Indicated).

3           Yes.

4           Q.  Do you see the amount of US$272,160 in the

5    middle right of the page?

6           A.  Yes.  I saw it.

7           Q.  And can you read the signature, Chinese

8    characters?  Who signed this export invoice?

9           A.  I would guess it is Sha Tao.  Yes I expect, or

10   I guess this is Sha Tao.

11          Q.  There is a reference on the left side to 240

12   pallets.  Do you have an understanding -- do you have an

13   understanding as to how many tubes are in 240 pallets?

14          A.  I don't know.

15          Q.  Do you see the reference in the Chinese copied

16   to this right here (Indicated)?  Does that refer to 10,080

17   pieces?

18          A.  I cannot read it.  It is not very clear.

19          Q.  Turning to the last page, do you see the

20   reference to 14-inch color TV picture tube in English?

21          A.  I don't read English.  The document speaks for

22   itself.

23          Q.  When you were involved in sales at Irico Group

24   for over two decades, did you ever deal with foreign sales?

25          A.  No.

Case 4:07-cv-05944-JST Document 5641-3 Filed 11/05/19 Page 363 of 508
Wang Zhaojie - highly confidential
March 06, 2019                                              102

```
1              MR. PLUNKETT:  Object to the form.

2              A.  I need to take a break.

3              MR. BENZ:  We can take a break.

4              VIDEOGRAPHER:  This marks the end of media number

5    7 in the deposition of Wang Zhaojie.  Going off the record,

6    the time is 4.51.

7                        (Break taken.)

8              VIDEOGRAPHER:  We are back on the record.  Here

9    begins media number 8 in the deposition of Wang Zhaojie.

10   The time is 5.09.

11             (Exhibit 8410  marked for identification)

12             Q.  Mr. Wang, I've handed you what has been marked

13   as Exhibit 8410.

14             A.  Okay.

15             Q.  It is a two-page document with Bates number

16   IRI-CRT-00003586 and 87.

17             Do you have an understanding as to what this

18   document is?

19             A.  This is it a certificate of payment for

20   materials purchased.

21             Q.  And the date on this is  February 8, 1998,

22   correct?

23             A.  Yes, that's correct.

24             Q.  Have you seen this document before?

25             A.  Yes.
```

1           Q.  A few days ago?

2           A.  Yes.

3           Q.  The quantity listed is 5,040, correct?  Do you

4   see that?

5           A.  Yes.

6           Q.  The product referenced is 14-inch CPTs.  Do

7   you see that?

8           A.  Yes, as the document stated.

9           Q.  The amount for goods listed is US$178,920.  Do

10  you see that?

11          A.  The photocopy is not very clear.  But if the

12  document says so, then it is so.

13          Q.  Could you look on the last page?

14          A.  No problem.

15          Q.  Do you see the reference to $178,920 in the

16  middle right of the page?

17          A.  The photocopy is not very clear.  I believe

18  what is said is what is said.

19              (Exhibit 8411 marked for identification)

20          Q.  Mr. Wang, I've handed you what we marked as

21  Exhibit 8411.

22          A.  Okay.

23          Q.  It is a two-page-exhibit with Bates numbers

24  IRI-CRT-00003588 and 89.

25          A.  Yes, I saw it.

1          Q.   Have you seen this document before?

2          A.   Yes.

3          Q.   A few days ago?

4          A.   That's correct.

5          Q.   What is your understanding of this document?

6          A.   As it said here, it is a certificate of

7    payment for materials purchased.

8          Q.   You see the date of April 25th, 1997?

9          A.   Yes, I saw it.

10          Q.   In the summary, the description of the product

11   is 2016 14-inch CPTs to Irico USA Inc.  Do you see that?

12          Lower left side of the page.

13          A.   (Chinese spoken) --

14          MS. FU:  I would like to --

15          INTERPRETER:  (Chinese spoken).

16          A.   Yes, I saw it.

17   BY MR. BENZ:

18          Q.   And the quantity referenced up above is 2016,

19   do you see that?

20          A.   Is it under summary, or where is it?

21          Q.   It is under -- no, it is above under -- it is

22   under quantity.

23          A.   It looks like a 2010 to me.

24          Q.   Okay.  If you could turn to the last page.

25   The dollar amount in the middle right-hand side shows

 1    $80,640.  Do you see that?

 2              A.  Yes, I saw it.

 3              Q.  Looking at the serial number there, just

 4    above, it is 37SX110Y22-DC05.  This is the code for Irico

 5    CPTs, correct?

 6              A.  Where is it?

 7              Q.  (Indicated).

 8              A.  The code is, yes.

 9              (Exhibit 8412  marked for identification)

10              Q.  Mr. Wang, I've handed you what we have marked

11    as Exhibit 8412.

12              A.  Okay.

13              Q.  It is a two-page-exhibit, Bates numbers

14    IRI-CRT-00003594 and 95.

15              A.  Yes.

16              Q.  Have you seen this document before?

17              A.  Yes.

18              Q.  A few days ago?

19              A.  That's correct.

20              Q.  If you, look on the bottom left hand corner,

21    the Chinese characters there show ship to Irico USA,

22    correct?

23              A.  I don't know, that summary is stated -- sent

24    to US Irico company, color tube.

25              Q.  And the date -- sorry, what is your

```
 1    understanding of this document?

 2          A.   This is a certificate of payment for materials

 3    purchased.

 4          Q.   And the date is July 17, 1997, do you see

 5    that?

 6          A.   Yes, I saw it.

 7          Q.   Under quantity it lists, again, 2016.  Do you

 8    see that?

 9          A.   Yes, I saw it.

10          Q.   And the amount for goods lists that US dollar

11    amount of $80,640, do you see that?

12          A.   The photocopy is not very clear.  I believe

13    the document speaks for itself.

14          Q.   If you look at the number here in the lower

15    right, it lists $80,640.  Do you see that?

16          A.   Yes, I saw it.

17          Q.   The next series of questions and the exhibit

18    I will be using relate to topic 4 of the 30(b)(6) notice.

19          A.   Okay.

20          Q.   Mr. Wang, can you tell me what you did as

21    Irico's corporate designee to investigate CNEICC's US sales?

22          A.   What is the company, again?

23          Q.   It is CNEICC.  Which we have also referred to

24    as the China National Electronics Import Export Caihong

25    Company.
```

```
 1                   CERTIFICATE OF COURT REPORTER

 2

 3    I, Bron Williams, an Accredited Real-time Reporter, hereby

 4    certify that the testimony of the witness Wang Zhaojie in

 5    the foregoing transcript, numbered pages 1 through 115,

 6    taken on this 6th day of March, 2019 was recorded by me in

 7    machine shorthand and was thereafter transcribed by me; and

 8    that the foregoing transcript is a true and accurate

 9    verbatim record of the said testimony.

10

11

12    I further certify that I am not a relative, employee,

13    counsel or financially involved with any of the parties to

14    the within cause, nor am I an employee or relative of any

15    counsel for the parties, nor am I in any way interested in

16    the outcome of the within cause.

17

18

19    Signed:   *Bron Williams*

20    Name:    Bron Williams

21    Date:    ........................

22

23

24

25
```

# EXHIBIT 29

```
 1            IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2                 San Francisco Division

 3   - - - - - - - - - - - - - - - - - -
     IN RE:                            )
 4                                     )
     CATHODE RAY TUBE (CRT)            )Master File No.
 5   ANTITRUST LITIGATION              )07-CV-5944-JST
                                       )
 6                                     )MDL No. 1917
                                       )
 7                                     )
                                       )
 8   - - - - - - - - - - - - - - - - - -

 9            DEPOSITION OF WANG ZHAOJIE

10               HIGHLY CONFIDENTIAL

11                   VOLUME II

12            Thursday, March 7th, 2019

13               AT:  9.02 am

14               Taken at:

15              Kobre & Kim
              6/F ICBC Tower
16            3 Garden Road
                 Central
17             Hong Kong

18

19

20

21

22

23   Court Reporter:

24   Bron Williams
     Accredited Real-time Reporter
25
```

```
 1    BY MR. BENZ:

 2            Q.  So as you sit here today, Mr. Wang, you don't

 3    remember one way or the other whether you spoke to Mr. Guo

 4    in the last 30 days, correct?

 5            A.  What I mean is 30 days from today, within this

 6    period, I'm not quite sure whether I have conversation with

 7    Mr. Guo or not.

 8            Q.  I want to ask you some questions in your

 9    capacity as a representative of Irico Group and Irico

10    Display.  I want to start with topic 8.

11            I will read you topic 8 if you could translate.

12            "Any status, obligations, or privileges that Group

13    or Display had under the law of the People's Republic of

14    China during the period from 2006 to 2008."

15            Did you prepare to testify on behalf of Irico

16    Group and Irico Display on this topic?

17            A.  Yes, I'm ready.

18            Q.  What did you do to prepare for your testimony

19    on topic 8?

20            A.  I work for Irico for many years.

21            I also read relevant information and documents.

22    I also try my best to read through the declaration in

23    Mr. Guo.

24            Q.  To prepare to testify about this topic did you

25    review any Chinese laws?
```

```
 1              A.  I'm not quite sure you are pointing to.

 2              Q.  I'm just asking if you reviewed any legal

 3  documents.

 4              MR. PLUNKETT:  Object to the form.

 5              MR. BENZ:  Okay --

 6              A.  Please be more specific.

 7   BY MR. BENZ:

 8              Q.  Yes.  Did you review any laws promulgated by

 9  the People's Congress?

10              A.  I'm not clear about your question.

11              Q.  Did you review any laws that were issued by

12  the Standing Committee of the People's Congress?

13              INTERPRETER:  I would like to clarify the term

14  "People's Congress."

15              (Chinese spoken).

16              A.  Your question is not very clear.

17   BY MR. BENZ:

18              Q.  Did you review any documents issued by the

19  Chinese government?

20              MR. PLUNKETT:  Object to the form.

21              A.  Your question is too vague.

22   BY MR. BENZ:

23              Q.  Did you review any rules issued by a Chinese

24  government regulator?

25              A.  Your question is still very vague.
```

1          Q.  Did you view any laws issued by the Chinese

2     government?

3          A.  The question is too vague.

4          Q.  Did you review any statutes from the People's

5     Republic of China?

6          A.  (Chinese spoken).

7          MS. FU:  Correction.  (Chinese spoken).

8          A.  There are many, many rules issued by the

9     government.  So this question is too vague.

10     BY MR. BENZ:

11         Q.  Well, Mr. Wang, you testified that you

12     reviewed documents to prepare.  Which documents did you

13     review?

14         A.  The information in our document.

15         Q.  What do you mean by that?

16         A.  The document prepared by our counsel.

17         Q.  Can you be more specific?

18         A.  Would you repeat your question one more time?

19         Q.  I will ask a new question.  What categories of

20     documents did you review?

21         INTERPRETER:

22         A.  (Chinese spoken).

23         INTERPRETER:  I want to clarify one term.

24     (Chinese spoken).

25         A.  (Chinese spoken).

```
 1              INTERPRETER:  (Chinese spoken).

 2              A.  I have reviewed 50 documents.  And the

 3   relevant informations.

 4              (Exhibit 8414 marked for identification)

 5              Q.  Mr. Wang, I've handed you what has been marked

 6   as Exhibit 8414.

 7              A.  Okay.

 8              Q.  I will represent to you that it is from

 9   a Chinese government website.  The exhibit has the official

10   English version on top, and the official Chinese version

11   underneath.

12              Please take a moment to familiarize yourself with

13   this document.

14              A.  Okay.  It will take a while.

15    BY MR. BENZ:

16              Q.  Mr. Guo(sic), it has been 13 minutes.  You can

17   have as much time as you want to review the document, but

18   I only have a few questions about the document.

19              Sorry:  Mr. Wang.

20              A.  Just take a while, I'm about to finish it.

21              Q.  That's fine.  Thank you.

22              A.  Okay, I'm done.

23              Q.  Mr. Wang, do you know what this document is?

24              A.  This is a company law of the People's Republic

25   of China.
```

```
 1              Q.  Have you seen this before?

 2              A.  I know a little bit regarding company law, but

 3   I don't have a good impression regarding this document.

 4              Q.  Did you review this document for your

 5   deposition?

 6              A.  I do know a little bit regarding the company

 7   law.

 8              Q.  I understand, but my question was did you

 9   review it for your deposition here today?

10              A.  I did review company law, but not in this kind

11   of form or format.

12              Q.  Okay.  You see at the top in the header,

13   Mr. Wang, it says "Companies Law of the People's Republic of

14   China"?

15              A.  Yes.

16              Q.  Then underneath it says -- do you see where it

17   says "shall go into effect as of January 1, 2006"?

18              A.  Yes.

19              Q.  I want to ask you a question about the period

20   from 2006 to 2008.  Do you have any understanding one way or

21   the other that this companies law of the People's Republic

22   of China applied to Irico Group and Irico Display?

23              MR. PLUNKETT:  Object to the form.

24              A.  The litigation period end '07 or '08?

25
```

```
 1   BY MR. BENZ:

 2          Q.  Yes from January 12006 to the end of 2008.

 3          A.  Could you please repeat that?

 4          Q.  Is it your understanding that the companies

 5   law of the People's Republic of China apply to Irico Group

 6   and Irico Display after January 1, 2006?

 7          MR. PLUNKETT:  Object, calls for a legal

 8   conclusion.

 9   BY MR. BENZ:

10          Q.  Let me strike that.  Topic 8 is about the

11   period from 2006 to 2008, so my question is relating to that

12   time period.

13          MR. PLUNKETT:  Objection, calls for a legal

14   conclusion.

15          COURT REPORTER:  Mr Plunkett, could you make your

16   objections a little louder.

17          MR. PLUNKETT:  Yes.

18          COURT REPORTER:  You whispered that first one.

19   BY MR. BENZ:

20          Q.  Is it your understanding that the companies

21   law to the People's Republic of China applied to Irico Group

22   and Irico Display from 2006 to 2008?

23          MR. PLUNKETT:  Objection, calls for a legal

24   conclusion.

25          A.  Your question is not very clear.
```

 1   BY MR. BENZ:

 2           Q.  I'm not asking for a legal conclusion,

 3   Mr. Wang.  I'm asking for your business understanding as to

 4   whether this law applied to Irico Group and Irico Display

 5   from 2006 to 2008.

 6           MR. PLUNKETT:  Same objection.

 7           A.  Your question is not very clear.

 8   BY MR. BENZ:

 9           Q.  Did Irico Group follow the companies law?

10           MR. PLUNKETT:  Object to the form.

11           A.  Your question is not very clear and not very

12   specific.

13   BY MR. BENZ:

14           Q.  Let me ask my questions, and I'll continue.

15           Did Irico Display follow the companies law?

16           MR. PLUNKETT:  Object to the form.

17           A.  Your question is not accurate and not clear.

18   BY MR. BENZ:

19           Q.  Did Irico Group refer to the companies law for

20   guidance in conducting its business affairs?

21           MR. PLUNKETT:  Object to the form.

22           A.  Irico Group is a corporation owned by the

23   general public.  It is a state-owned company.

24   BY MR. BENZ:

25           Q.  You did not answer my question, Mr. Wang.  My

1    question was:  Did Irico Group refer to the company law for

2    guidance in conducting its business affairs?

3              MR. PLUNKETT:  Object to the form.

4              A.  Your question is not very clear.

5              MR. PLUNKETT:  Let me just remind the witness of

6    a couple of instructions.  One is that even if I object, you

7    still have to answer the question if you understand the

8    question.

9              That's all.

10    BY MR. BENZ:

11              Q.  I will ask the question one more time,

12   Mr. Wang.  Did Irico Group refer to this companies law for

13   guidance in conducting its business affairs?

14              MR. PLUNKETT:  Object to the form.

15              A.  As a state-owned corporation, the Irico Group

16   will follow all the laws promulgated by the People's

17   Republic of China.

18    BY MR. BENZ:

19              Q.  This question with respect to Irico Display.

20   Did Irico Display refer to the companies law for guidance in

21   conducting its business affairs?

22              MR. PLUNKETT:  Object to the form.

23              A.  As a Chinese company, Irico Display will

24   follow all the laws and rules published by People's Republic

25   of China.

1   BY MR. BENZ:

2           Q.  If you could, Mr. Wang, refer to article 11.

3           It is in the -- the English version is the fourth

4   page in.  It is on page 2 in the Chinese version.

5           A.  Yes, I got it.

6           Q.  Okay.  This -- I'll read the second sentence

7   in English of article 11, and I'll ask the translator to

8   translate into Chinese.

9           The second sentence read:

10          "The articles of association of a company shall

11  have a binding force on the company, its shareholders,

12  directors, supervisors and senior managers."

13          Do you see that?

14          A.  Yes.

15          Q.  Do you have -- is it your understanding that

16  the articles of association of Irico Display were binding on

17  Irico Display?

18          MR. PLUNKETT:  Object to the form.

19          MS. FU:  I would like to correct that translation.

20  (Chinese spoken).

21          A.  Are we discussing the articles of the law?

22  BY MR. BENZ:

23          Q.  Yes, the articles of association of Irico

24  Display.

25          MR. PLUNKETT:  Object to form.

Case 4:07-cv-05944-JST Document 5641-3 Filed 11/05/18 Page 380 of 508
Wang Zhaojie - highly confidential
March 07, 2019                                              23

```
 1              A.  I don't have the article of association of

 2   Irico Display, I need to review it to answer that.

 3    BY MR. BENZ:

 4              Q.  As you sit here today, are you aware of any

 5   times when Irico Group violated the companies law of the

 6   People's Republic of China?

 7              A.  Based on my understanding, no.

 8              Q.  As you sit here today, are you aware of any

 9   times when Irico Display violated the companies law of the

10   People's Republic of China?

11              A.  Based on my understanding, no.

12              MR. BENZ:  We have been going for an hour.  Break?

13              MR. PLUNKETT:  I'm ready to break any time you

14   are.

15              MR. BENZ:  Let's take a short break.

16              VIDEOGRAPHER:  This marks the end of media

17   number 1 in the deposition of Wang Zhaojie volume II.  Going

18   off the record, the time is 9.57.

19                        (Break taken.)

20              VIDEOGRAPHER:  We are back on the record.  Here

21   begins media number 2 in the deposition of Wang Zhaojie

22   volume II.  The time is 10.27.

23         (Exhibit 8415  marked for identification)

24              MR. BENZ:  Mr Wang, we are handing you what has

25   been marked at Exhibit 8415.
```

 1              A.  Yes.

 2              Q.  I will represent to you that it is from

 3   a Chinese government website.  The exhibit has the official

 4   English version on top and the official Chinese version

 5   underneath.

 6              Please take your time to familiarize yourself with

 7   the document.

 8              A.  Yes, I'm done.

 9              Q.  What is this document?

10              A.  This is a document for code of corporate

11   governance for listed companies.

12              Q.  Have you seen this document before?

13              A.  I understand.

14              Q.  My question was, have you seen this document

15   before today?

16              A.  I have reviewed a code of corporate governance

17   for list companies before.

18              Q.  Did you look at this document to prepare for

19   your deposition?

20              A.  I have reviewed code of corporate governance

21   for listed companies before.

22              Q.  Do you see on the Chinese version there is

23   a date of January 7, 2002?

24              A.  Yes, I saw it.

25              Q.  Is it your understanding that this code of

Case 4:07-cv-05944-JST Document 5641-3 Filed 11/05/18 Page 382 of 508
Wang Confidential - highly confidential
March 07, 2019                                                        25

1    corporate governance for listed companies applied to listed

2    companies in China after January 7, 2002?

3             A.  I suppose so.

4             Q.  It your understanding that Irico Display was

5    a company with shares listed on a Stock Exchange?

6             A.  Yes.

7             Q.  And Display is listed on the Shanghai

8    exchange?

9             A.  Yes.

10            Q.  And Irico Electronics, or IGE is a listed

11   company also, correct?

12            A.  That's correct.

13            Q.  And Electronics is listed in Hong Kong?

14            A.  Yes.

15            Q.  Is it your understanding that this code of

16   corporate governance for listed companies applied to Display

17   after January 7, 2002?

18            A.  Irico Display is a public listed company so it

19   should follow the code of the rules published by the

20   government.

21            Q.  Do you know if Irico Display ever violated the

22   code of corporate governance for listed companies?

23            A.  Based on my understanding, no.

24            Q.  Mr. Wang, I want to ask you some more

25   questions in your capacity as representative of Irico Group

 1   and Irico Display.

 2           I want to look at topics 1 and 2.  If you could

 3   look back at the deposition notice.  This is Exhibit 8390.

 4           A.  I need to translate the --

 5           Q.  I'm going to read it to you.

 6           Topic 1 reads:

 7           "The corporate formation, ownership, and purpose

 8   of Group and Display, including any basis for any contention

 9   by Irico that Group and Display engage in a public activity,

10   and including any changes in status."

11           A.  Okay.

12           Q.  Did you prepare to testify on behalf of Irico

13   Group and Irico Display on this topic?

14           A.  Yes, I'm ready.

15           Q.  Okay.  Now I will read you topic 2.

16           A.  Okay.

17           Q.  "Supervision of either Group or Display by

18   officials of the People's Republic of China, including any

19   specific instances of supervision or control that Irico

20   contends are relevant to alleged organ status of Display."

21           Did you prepare to testify on behalf of Irico

22   Group and Irico Display on this topic?

23           A.  Yes, I'm ready.

24           Q.  I want to ask you a question that applies only

25   to the time when you personally worked at Irico Group.

 1   During that time were you a member of the Chinese Communist

 2   Party?

 3           A.  Yes.

 4           Q.  When you were at Group, your supervisor was

 5   Mr. Guo, correct?

 6           Was Mr. Guo a member of the Chinese Communist

 7   Party?

 8           MR. JACOBSMEYER:  Object to the form.

 9           A.  Your question is not very precise, because the

10   fact is that I worked for Irico for many, many years, so

11   there is Mr. Guo who worked for many, many years.  There are

12   quite a lot of change in between.  So I'm not quite when you

13   refer to supervisor, I'm not quite sure regarding that

14   point.

15    BY MR. BENZ:

16           Q.  I'm talking about Mr. Guo who authored the

17   declaration that you reviewed.

18           Was Mr. Guo a member of the Chinese Communist

19   Party when he was your supervisor?

20           A.  I don't know.

21           However, there is a requirement, for people who

22   serve as a senior manager in Irico Group, this person

23   supposed to be a member of Chinese Communist Party member.

24           Okay.  The reason I say your question is very

25   vague, is the fact that Mr. Guo joined Irico many, many

 1    years ago, and even earlier than me.  He started from

 2    a technician at the factory, and become a deputy manager at

 3    the glass factory, and then later on he was promoted to the

 4    senior management.  As a state-owned corporation, all the

 5    senior managers supposed to be the member of the communist

 6    party.  This is an amendment by the SASAC, the State-owned

 7    Assets Supervision Administration Commission of the State

 8    Council.

 9              MS. FU:  I would like to make a correction to the

10    last sentence.  "This is a requirement by the SASAC."  Not

11    an amendment.  It is a requirement.

12              INTERPRETER:  Thank you.

13    BY MR. BENZ:

14         Q.  Okay.

15         (Exhibit 8416  marked for identification)

16         Q.  Mr. Wang, I've handed you the exhibit that's

17    been marked 8416.  It was produced by Irico in this

18    litigation with Bates numbers IRI-CRT-00001026 through 27.

19         We have the original Chinese document as well as

20    a certified English translation on top.

21         Please take as long as you would like to review

22    this document.

23         A.  I have reviewed it.

24         Q.  What is this document?

25         A.  This is an articles of association for Irico

1    Display Device Corporation Limited.

2              Q.  At the bottom of the first page -- do you see

3    where it says that it was amended by the 14th general

4    meeting of shareholders on June 27, 2006?

5              A.  Yes, I saw it.

6              Q.  So these Irico Display Devices Company Limited

7    articles of association would have been in effect after

8    June 27th, 2006?

9              A.  Yes.

10             Q.  And Irico Display was obligated to follow its

11   articles of association, correct?

12             MR. JACOBSMEYER:  Object to the form.

13             A.  I'm not quite sure I understand your meaning.

14   BY MR. BENZ:

15             Q.  I'll ask a different question.  The articles

16   of association of Irico Display were legally binding on

17   Irico Display, correct?

18             MR. JACOBSMEYER:  Object to the form.

19             A.  I cannot answer the way you asked me, because

20   I don't have legal background.

21   BY MR. BENZ:

22             Q.  Understood.  Please look at article 10.

23             Do you see article 10?

24             A.  (Chinese spoken).

25             [In English] Okay.

 1   BY MR. BENZ:

 2             Q.  I'll read it, and translator please translate.

 3             "The Articles of Association of the Company shall

 4   become legally binding documents regulating the organization

 5   and conduct of the Company, the rights and obligations

 6   between the Company and the shareholders, and between

 7   shareholders and shareholders from the effective date as

 8   from the date of the entry into force of the Articles of

 9   Association and shall be legally binding on the company,

10   shareholders, directors, supervisors, and senior management

11   personnel."

12             Does that refresh your recollection about the

13   articles of association of Irico Display being legally

14   binding on Irico Display?

15             MR. JACOBSMEYER:  Object as to form.

16             A.  I don't have a legal background.  With regard

17   to the articles of association for Irico Display Device, the

18   document speaks for itself.  I would like to emphasize that

19   I don't have any legal background, so it is rather difficult

20   for me to answer legal questions.

21   BY MR. BENZ:

22             Q.  Did Irico Display follow its own articles of

23   association?

24             MR. JACOBSMEYER:  Object to the form.

25             A.  As I stated earlier, article 10 speaks for

```
 1    itself.  I really don't know how to answer that.  Because

 2    I consider your question is too broad, it is not very

 3    precise.  So I don't know how to answer it.

 4      BY MR. BENZ:

 5             Q.  Are you aware that Irico Display ever violated

 6    its own articles of association?

 7             MR. JACOBSMEYER:  Object to the form.

 8             A.  Based on my understanding, no.

 9      BY MR. BENZ:

10             Q.  Are you aware whether any of Irico Display's

11    shareholders ever violating their articles of association?

12             A.  I don't know.

13             Q.  If you look at article 12, Mr. Wang, article

14    12 reads:

15             "The goals of the Company:  To focus on customer

16    demand, provide high-quality products and services with

17    excellent technology and management."

18             Do you see that?

19             A.  Yes.

20             Q.  Does article 12 accurately describe the goals

21    of Irico Display?

22             MR. JACOBSMEYER:  Object to the form.

23             A.  The document speaks for itself.

24      BY MR. BENZ:

25             Q.  If you look at article 46, please.  Article 46
```

1    reads:

2            "The controlling shareholders [of] the Company

3    shall ensure the independence of their personnel, assets,

4    and financial affairs, with independent institutions and

5    businesses, independent accounting, responsibilities and

6    risks."

7            MR. JACOBSMEYER:  Objection, mischaracterizes the

8    document.

9            MR. BENZ:  Stop for a second.  Did I read it

10   incorrectly?

11           MR. JACOBSMEYER:  "The controlling shareholders of

12   the company", it reads "the controlling shareholders and the

13   company."

14           MR. BENZ:  Thank you.  I'll re-read it.

15           "The controlling shareholders and the Company

16   shall ensure the independence of their personnel, assets and

17   financial affairs, with independent institutions and

18   businesses, independent accounting, responsibilities and

19   risks."

20           Do you see that?

21           A.  Yes.

22           Q.  As you sit here today are you aware of any

23   instance in which Irico Display and its shareholders did not

24   comply with article 46?

25           A.  Based on my understanding, no.

1              Q.  If you could look at article 164.

2              A.  Okay.

3              Q.  Article 164 reads:

4              "The Company shall have three independent

5    directors, of whom there shall be no less than one

6    accounting practitioner with a senior professional title or

7    certified public accountant qualification."

8              Do you see that?

9              A.  Yes.

10             Q.  Do you know what an independent director is?

11             A.  I don't know.

12             Q.  Is it your understanding that Irico Display

13   had three -- sorry, strike that.  Is it your understanding

14   that Irico Display had independent directors on its board

15   after June 27, 2006?

16             A.  I don't know about that.

17             Q.  If you could look at article 240.

18             A.  Okay.

19             Q.  Article 240 reads:

20             "The appointment of the Company's managers shall

21   be carried out in strict in accordance with the relevant

22   laws and regulations and the provisions of the Articles of

23   Association."

24             It goes on to read:

25             "No organization or individual may interfere

 1    with the normal procedures for selecting and appointing

 2    managers of the Company."

 3              Do you see that?

 4              A.  Yes.

 5              Q.  As you sit here today, are you aware of any

 6    organization or individual ever interfering with the normal

 7    procedures for selecting and appointing managers of Irico

 8    Display?

 9              A.  Your question is not very clear.

10              Q.  As you sit here today, are you aware of any

11    instances in which any organization or individual violated

12    article 240?

13              MR. JACOBSMEYER:  Object as to form.

14              A.  I don't understand your question.

15     BY MR. BENZ:

16              Q.  When Display's managers were appointed, were

17    they appointed in accordance with article 240?

18              MR. JACOBSMEYER:  Object as to form.

19              A.  I don't understand your question.

20     BY MR. BENZ:

21              Q.  Please explain what part you do not

22    understand.

23              A.  I really don't know what you mean.

24              MR. BENZ:  Break?

25              MR. JACOBSMEYER:  Sure.

```
 1            VIDEOGRAPHER:  This marks the end of volume --

 2   media number 2 in the deposition of Wang Zhaojie volume II.

 3   Going off the record, the time is 11.10.

 4                      (Break taken.)

 5            VIDEOGRAPHER:  We are back on the record.  Here

 6   begins media number 3 in the deposition of Wang Zhaojie,

 7   volume II.  The time is 11.24.

 8    BY MR. BENZ:

 9            Q.  Mr. Wang, did Irico Display conduct regular

10   board meetings during the relevant time frame?

11            A.  I'm not clear regarding the detailed

12   information.

13            MS. FU:  I would like to make a correction.

14   "I don't know the detailed information."

15    BY MR. BENZ:

16            Q.  But it is your understanding that board

17   meetings were conducted by Irico Display?

18            A.  Yes.

19            Q.  Did Chinese government officials attend Irico

20   Display's board meetings?

21            A.  Because I didn't attend the board meetings, so

22   I don't know that.

23            MS. FU:  I would like to make a correction.

24   "I have never attended board meetings so I don't know that."

25
```

 1   BY MR. BENZ:

 2             Q.   If you could turn back to Exhibit 8416.

 3             Mr. Wang, could you turn to article 240?

 4             A.   Okay.

 5             Q.   Mr. Wang, if you could please read article 240

 6   in Chinese, and I would like the translator to translate it

 7   into English for me.

 8             A.   "(Chinese spoken)."

 9             INTERPRETER:   Can I correct one character?

10   (Chinese spoken).

11             A.   (Chinese spoken).

12             INTERPRETER:   Just one character.

13             "'Article 240:

14             The appointment of the Company's managers should

15   be carried out in strict accordance with the relevant laws

16   and regulations and the provisions of the Articles of

17   Association.   No organization or individual may interfere

18   with the normal procedures for selecting and appointing

19   managers of the Company.'"

20   BY MR. BENZ:

21             Q.   Mr. Wang, are you aware of any instance in

22   which an organization or individual interfered with the

23   normal procedures for selecting and appointing managers of

24   Irico Display?

25             A.   Based on my understanding, no.

Case 4:07-cv-05944-JST Document 5641-3 Filed 11/05/18 Page 394 of 508
Wang Bingcheng - highly confidential
March 07, 2019                                      37

```
 1              (Exhibit 8417 marked for identification)

 2              Q.  Mr. Wang, I've handed you what we have marked

 3    as Exhibit 8417?

 4              A.  Okay.

 5              Q.  For the record -- strike that.

 6              Please take as long as you need, Mr. Wang, to

 7    review the exhibit, and let me know when you are ready.

 8              A.  This is too much.  Perhaps we should start,

 9    even I haven't finished it.

10              Q.  Sure.

11              A.  It is a long document here.

12              Q.  If you need more time just let me know.

13              A.  I don't want to delay your time.

14              Q.  That's fine.  I will ask my questions, if you

15    need more time, that's fine.  I just have a few questions.

16              A.  Yes, why not just ask me questions, if I need

17    more time to review it, I will let you know.

18              Q.  Yes.  Okay.

19              Have you seen this document before?

20              A.  No.

21              Q.  Do you have an understanding as to what this

22    document is?

23              A.  As it said on this document, it said this is

24    an announcement of self inspection report and rectification

25    plan concerning the campaign to strengthen corporate
```

```
 1   governance of the listed company.

 2           Q.  And the date on the last page is  August 15th,

 3   2007?

 4           A.  Yes.

 5           Q.  And it appears this report was created by

 6   Irico Display devices Co Ltd?

 7           A.  I think the source should be no problem.

 8   I suppose so.

 9           Q.  If you could, Mr. Wang, go to -- I'm looking

10   at the Chinese version here at the top of page 2.  Can you

11   read this paragraph into the record, and I would like the

12   translator to translate into English.  It is section -- the

13   heading is "II.  Overview of corporate governance", in

14   English, and then there are two sentences that follow.

15           A.  So I should read the Chinese now?

16           Q.  Yes, please.

17           A.  Which paragraph?

18           Q.  (Indicated).

19           A.  "(Chinese spoken)."

20           INTERPRETER:  Should I read following?

21           MR. BENZ:  I would like you to translate it into

22   English please.

23           INTERPRETER:  "Since the company was listed, its

24   operations have been managed in strict in accordance with

25   applicable laws, regulations and the rules including the
```

1    company law and securities law of the People's Republic of

2    China, the code of corporate governance for listed company

3    in China, and in the company's articles of associations.

4    The company has established a relatively robust corporate

5    governance structure, and has basically achieved compliance

6    with relevant corporate governance requirements for listed

7    companies, mainly in the following aspects."

8                MR. JACOBSMEYER:  Counsel, can the record show it

9    is unclear if the translator is translating the witness's

10   statements rather than just reading the English language

11   translation?

12               MR. BENZ:  I asked the translator to read from

13   Mr. Wang's testimony.  So I don't know if anything is clear,

14   but that's what I requested.

15               INTERPRETER:  (Chinese spoken).

16    BY MR. BENZ:

17         Q.  So Mr. Wang, my question is:  The

18   representation in the Irico report that "since the company

19   was listed its applications have been managed in strict

20   accordance with applicable laws, regulations in the rules,

21   including the company law and the security law of the

22   People's Republic of China", is correct?

23               A.  This is an announcement issued by Irico

24   Display Device Corporate Limited.  With regard to

25   announcement of the self inspection report and rectification

1    plan concerning the campaigns to strengthen corporate

2    governance of the listed company.  The document speaks for

3    itself.

4              MS. FU:  Correction to the witness's last

5    sentence.  The literal translation should be "whatever is

6    written here, that's how it is."

7              INTERPRETER:  Okay.

8    BY MR. BENZ:

9         Q.  I'm working off the English translation.  If

10   we could turn to the third page, heading 6.  Where it reads:

11            "The company situation re:  'Three separates, two

12   independents' with the controlling shareholder."

13            Under the header "In business operations,"

14   the report reads:

15            "The Company's business is independent from

16   the controlling shareholder."

17            Do you see that?

18       A.  Yes.

19       Q.  Is it correct that Electronics was the

20   controlling shareholder?

21            MR. JACOBSMEYER:  Object to form.

22       A.  What this announcement is written, it is

23   written.

24   BY MR. BENZ:

25       Q.  Do you know who the controlling shareholder is

1      in Display?

2                  A.   Are you referring Irico Display?

3                  Q.   Yes.

4                  A.   Irico Group.  It is actual controlling group.

5                  Q.   Turn to -- it is page 10 of the English

6      translation.  At the bottom there is a heading, 3, whether

7      review of proposals at the general meetings of shareholders

8      are in line with the procedures and whether the right of

9      minority shareholders is protected.

10                 Do you see that?

11                 A.   Yes.

12                 Q.   Okay.  The second sentence of that paragraph

13     reads:

14                 "At the general meetings of shareholders, all

15     shareholders have been treated equally and facilitated to

16     exercise their rights as shareholders, and the right of

17     speech of minority shareholders has been ensured."

18                 Do you see that?

19                 A.   Yes, I saw it.

20                 Q.   Is it correct that at Display's general

21     meetings of shareholders, all shareholders have been treated

22     equally and facilitated to exercise their rights as

23     shareholders?

24                 A.   What the announcement reflects it is what it

25     reflects.

 1              MS. FU:  Objection to the translation.  The

 2      literal translation should be "what the announcement

 3      reflects, that's how it is."

 4              INTERPRETER:  Yes, "that's how it is," yes.

 5      BY MR. BENZ:

 6              Q.  Who is the controlling shareholder of Irico

 7      Display?

 8              MR. JACOBSMEYER:  Object to the form.

 9              A.  I'm not quite sure the time frame you are

10      referring, because this question is not precise, and plus

11      the fact in -- during the period there is a so-called

12      shareholders change.

13      BY MR. BENZ:

14              Q.  Mm-hmm.

15              In 2007, Mr. Wang, isn't it correct that

16      Electronics owned shares of Display, but Group did not?

17              A.  I don't recall the detailed information.

18              MS. FU:  I would like to correct the translation.

19      "I don't know the detailed information."

20              INTERPRETER:  (Chinese spoken).

21              A.  I'm not very clear regarding that particular

22      -- regarding this issue on that particular period.

23              MR. BENZ:  It is noon, I think this would probably

24      be a good place to break for lunch.  I have one more exhibit

25      after lunch, but it will take a while.  So why don't we

 1    break for lunch and reconvene.

 2              MR. JACOBSMEYER:  Works for us.

 3              VIDEOGRAPHER:  This marks the end of media

 4    number 3 in the deposition of Wang Zhaojie.  Volume II.

 5    Going off the record, the time is 12 o'clock.

 6                     (Lunch recess.)

 7              VIDEOGRAPHER:  We are back on the record.  Here

 8    begins media number 4 in the deposition of Wang Zhaojie,

 9    volume II, the time is 1.23.

10              MR. BENZ:  Could you hand Mr. Wang what we have

11    marked as Exhibit 8418.

12              (Exhibit 8418 marked for identification)

13              A.  Okay.

14              Q.  Mr. Wang, we have handed you what has been

15    marked as Exhibit 8418.  This is the Irico Display Devices

16    Company 2007 annual report.  The Bates numbers on the

17    document are IRI-CRT-0000232 through 321.  We have the

18    certified English translation on top of the Chinese

19    original.

20              Please take as long as you need to review.  I have

21    questions about just a few pages on the document.

22              A.  Because this is a rather thick document,

23    I don't want to delay the time.  Could you just tell me

24    which pages you would like me to review?

25              Q.  Yes.  Page 12.  Page 13, page 14, page 19.

```
 1    That's all.

 2              A.  Give me a few minutes.

 3              MR. JACOBSMEYER:  Counsel, we would like to inform

 4    the interpreter that the page numbering may not match up for

 5    the English and the Chinese version.

 6              A.  I will just read the Chinese version.

 7              MR. BENZ:  It did on the first few pages, but you

 8    may be right.  So fair enough.

 9              A.  I will just read the Chinese version.

10     BY MR. BENZ:

11              Q.  Okay.

12              A.  Yes I have read all those four pages.

13              Q.  Okay.  Mr. Wang, have you seen Exhibit 8418

14    before?

15              A.  Yes, I have read it before.

16              Q.  Did you review it in preparation for your

17    deposition here today?

18              A.  Yes.

19              Q.  When Irico Display's board of directors met,

20    do you know if the board ever referred to the articles of

21    association?

22              MR. JACOBSMEYER:  Object as to form.

23              A.  Because I'm not a member of the board of

24    directors, so I don't know the case.

25
```

```
 1    BY MR. BENZ:

 2           Q.  If you could turn to page 12, at the top, at

 3    the top of page 12 there is a heading that says "Corporate

 4    Governance Structure."  Do you see that?

 5           A.  Yes.

 6           Q.  And then underneath there is a heading that

 7    says "Corporate Governance."  Do you see that?

 8           A.  Yes.

 9           Q.  Then the sentence that follows reads:

10           "The company is subject to standardized operation

11    in strict accordance with the relevant provisions of the

12    "Company Law," "Securities Law", "Code of Governance for

13    Listed Companies", and "Corporate By-laws" ..."

14           Do you see that?

15           A.  Yes.

16           Q.  Is that statement correct?

17           MR. JACOBSMEYER:  Object to the form.

18           A.  What it said reflects what it said.

19    BY MR. BENZ:

20           Q.  If you could look at the Chinese characters

21    for what is interpreted here in the English translation as

22    "corporate bylaws," is the corporate bylaws the same thing

23    as articles of incorporation?

24           Sorry, articles of association.

25           A.  I don't understand the meaning.
```

```
 1              Q.  The English translation here says corporate

 2     bylaws, but I've been told the Chinese characters mean

 3     articles of association.  Is that correct?

 4              A.  I didn't follow your questions.

 5              Q.  Is the corporate bylaws the same thing as

 6     articles of association?

 7              A.  I don't know.

 8              Q.  Further down on page 12, there is a section 1,

 9     "Shareholders and shareholder meetings."  Do you see that?

10              A.  Yes.

11              Q.  In the second sentence it reads:

12              "The convocation and voting procedures of the

13     company's shareholder meetings are standardized, and all

14     shareholder meetings are witnessed by lawyers."

15              Do you see that?

16              A.  You mean this sentence?

17              Q.  Yes.

18              A.  Yes.

19              Q.  Is it correct that all Display shareholder

20     meetings are witnessed by lawyers?

21              MR. JACOBSMEYER:  Object to form.

22              A.  I'm not a board member of the Display, so I'm

23     not clear with regard to the board meeting.

24       BY MR. BENZ:

25              Q.  This is about shareholder meetings, Mr. Wang.
```

1          A.  I never participate at the shareholders

2    meeting, so I don't know.

3          Q.  Under the next heading, number 2, it reads

4    "Controlling shareholders in listed companies."  Do you see

5    that?

6          A.  Yes.

7          Q.  The report then states:

8          "Separation and independence from the company's

9    controlling shareholders is implemented in the five areas of

10   business, personnel, assets, institutions and finance."

11         Do you see that?

12         A.  Yes.

13         Q.  Is that statement correct?

14         MR. JACOBSMEYER:  Object to the form.

15         MR. BENZ:  What is the basis for your objection,

16   besides coaching the witness?

17         A.  (Chinese spoken).

18         MS. FU:  I would like the interpreter to translate

19   counsel's objection.

20         MR. JACOBSMEYER:  That the question is vague as to

21   time.

22         MR. BENZ:  Let me re-ask the question, Mr. Wang.

23         Q.  In 2007, is it correct that all Display

24   shareholder meetings are witnessed by lawyers?

25              A.  I'm not a shareholder, so I don't know the

1    situation.

2                Q.  Reading to the next sentence, as of 2007, is

3    it correct that the statement that -- sorry.  I'll start

4    over on this sentence.  The report goes on to state:

5                "Separation and independence from the company's

6    controlling shareholders is implemented in the five areas of

7    business, personnel, assets, institutions and finance."

8                Do you see that?

9                A.  Yes.

10               Q.  In 2007, was that statement correct?

11               A.  This is the Irico Display company issues, I --

12   personally I have no comment.

13               Q.  Mr. Wang, you are representing Irico Display

14   here today, correct?

15               A.  Yes.

16               Q.  So I'm asking you, on behalf of Irico Display,

17   is this statement correct as of 2007?

18               MR. JACOBSMEYER:  Objection, beyond the scope.

19               MR. BENZ:  These are topics 1 and 2.  Do you still

20   maintain your objection?  Got to make the record.

21               MR. JACOBSMEYER:  Same objection.

22               MR. BENZ:  Topics 1 and 2.  Alright.

23     BY MR. BENZ:

24               Q.  Can you answer my question, Mr. Wang?

25               A.  I don't know myself.

Case 4:07-cv-05944-JST Document 5640-2 Filed 11/05/19 Page 406 of 508
Wang Confidential - highly confidential
March 07, 2019                                    49

```
 1      BY MR. BENZ:

 2              Q.  Do you know on behalf of Irico Display whether

 3      this is a correct statement as of 2007?

 4              A.  Personally, I don't know.

 5              Q.  Mr. Wang, is it not true that for topic 1 you

 6      prepared to talk about the corporate formation, ownership

 7      and purpose of Group and Display?

 8              MR. JACOBSMEYER:  Objection, beyond the scope.

 9              A.  I don't know.

10              MR. BENZ:  That's fine.  We will go ahead and make

11      our transcript.

12              The next sentence reads:

13              "The company's board of directors and board of

14      supervisors maintain independent operation, ensuring

15      independence in the company's major decisions."

16              Do you see that?

17              A.  Where is it?

18              Is it on page 12?

19              Q.  Yes.

20              A.  Which subtitle?

21              Q.  2.

22              A.  Yes, I saw it.

23              Q.  Mr. Wang, as Irico Display's corporate

24      designee for topic 1, is that a correct statement as of

25      2007?
```

1          A.  The document speaks for itself.  What is said

2     there is what is said.

3          MS. FU:  I would like to correct the translation.

4     The literal translation is "whatever is written here that's

5     how it is."

6          INTERPRETER:  Okay.

7     BY MR. BENZ:

8          Q.  If you could turn to page 13, Mr. Wang.  At

9     the bottom of page 13 the second sentence from the bottom

10    reads:

11          "The company has independent purchasing and sales

12    systems."

13          Do you see that?

14          A.  Yes, I saw it.

15          Q.  Okay.  As the corporate designee for Irico

16    Display on topics 1 and 2, is that a correct statement as of

17    2007?

18          MR. JACOBSMEYER:  Object to the form.

19          MR. BENZ:  What is the basis for your objection?

20          MR. JACOBSMEYER:  This is beyond the scope of

21    topics 1 or 2.

22          MR. BENZ:  I absolutely disagree with you, so we

23    will make our record.

24          Q.  Mr. Wang, can you answer my question please?

25          A.  What has been written on this report is what

 1    is written.

 2              MS. FU:  Like to make an objection to the literal

 3    translation.  It should be "whatever it is written here,

 4    that's how it is."

 5    BY MR. BENZ:

 6              Q.  Mr. Wang, can you turn to page 14.  At the top

 7    of page 14 there is a number 2 and the heading "Personnel

 8    aspect."  Do you see that?

 9              A.  Yes.

10              Q.  And then the second sentence of that paragraph

11    reads:

12              "The company's general manager is employed

13    full-time, and the general manager and other senior

14    executives receive no pay from controlling shareholders'

15    units."

16              Do you see that?

17              A.  Yes.

18              Q.  As Irico's corporate designee for topics 1 and

19    2, is that statement correct for Irico Display as of 2007?

20              A.  I don't remember.

21              Q.  Mr. Wang, in 2007, did executives of Display

22    receive pay from any other Irico company?

23              A.  I don't know.

24              Q.  Moving down to number 5, the heading is

25    "Finance aspect."  Do you see that?

1          A.  Yes.

2          Q.  The next sentence reads -- strike that.

3          The report then states:

4          "The company has established independent financial

5  accounting departments, has set up an independent accounting

6  system and financial management system, has independent bank

7  accounts, and independently pays taxes according to law."

8          Do you see that?

9          A.  Yes.

10          Q.  As Irico Display's corporate designee for

11  topics 1 and 2, is that a correct statement as of 2007?

12          A.  What has been written on the document, that's

13  how it is.

14          Q.  Did Irico Display pay taxes in 2007?

15          A.  I don't know.

16          Q.  Did display employ its own accountants?

17          A.  I don't know.

18          Q.  If you could turn to page 19.

19          One-third of the way down the page there is

20  a number 3 with the heading "Business plan for the New

21  Year."  Do you see that?

22          A.  Yes.

23          Q.  The report then states:

24          "The company's main business goals for 2008:

25  Color tube sales of 15,380,000 and sales revenue of

 1    3.25 billion yuan."

 2              Do you see that?

 3              A.  Yes.

 4              Q.  As Irico Display's corporate designee for

 5    topic 1, is that a correct description of Irico display's

 6    main business goal for 2008 as it was written in 2007?

 7              A.  The question is not very clear.

 8              MS. FU:  I would like the interpreter to try that

 9    one more time.

10              MR. JACOBSMEYER:  I also object to the form of the

11    question.

12              MR. BENZ:  What is the basis for your objection?

13              MR. JACOBSMEYER:  Mischaracterizes when the

14    document was written.

15              A.  Would you mind repeating your question.

16     BY MR. BENZ:

17              Q.  Before I do, Mr. Wang, can you turn back to

18    page 89.

19              Do you see on that page the date, April 23rd,

20    2008?

21              A.  Yes, I saw it.

22              Q.  And the signature shows this report was issued

23    by Irico Display Component Co Ltd board of directors?  Do

24    you see that?

25              A.  Yes.

1           Q.  This report appears to have been signed by

2    chairman of the board of directors Xing Daoqin, do you see

3    that?

4                A.  Yes.

5                Q.  Please turn back to page 19.

6                A.  Yes.  Go ahead.

7                Q.  You see this sentence under business plan for

8    the new year:

9                "The company's main business goals for 2008:

10   Color tube sales of 15,380,000 and sales revenue of

11   3.25 billion yuan."

12               A.  Yes, I saw it.

13               Q.  As Irico Display's corporate designee for

14   topic 1, is that a correct description of Irico Display's

15   main business goals for 2008 as reported by the board of

16   directors on April 23, 2008?

17               A.  (Chinese spoken) --

18               MS. FU:  I would like the interpreter to try that

19   one more time.  (Chinese spoken) --

20               INTERPRETER:  (Chinese spoken).

21               A.  (Chinese spoken) (Indicates).

22               MS. FU:  Go ahead.

23               A.  What has been written is how it is.  Because

24   it is written as the business plan for the New Year 2008.

25               MR. BENZ:  Thank you Mr. Wang, I'm going to turn

```
 1    the questioning over to my co-counsel Ms. Capurro.

 2            Would you like to take a break now?  Or should we

 3    continue.

 4            MS. CAPURRO:  We will take five minutes.

 5            VIDEOGRAPHER:  This marks the end of media

 6    number 4 in the deposition of Wang Zhaojie volume 2.  Going

 7    off the record, the time is 2.04.

 8                        (Break taken.)

 9            VIDEOGRAPHER:  We are back on the record.  Here

10    begins media number 5 in the deposition of Wang Zhaojie,

11    volume II.  The time is 2.14.

12     MR DAVID HWU (affirmed) -- acting as a check interpreter

13            MS. CAPURRO:  Good afternoon, Mr. Wang.  My name

14    is Lauren Capurro.  I'm counsel for the indirect purchaser

15    plaintiffs in this case.

16            I would like to just begin by reminding you that

17    you are under oath.  Do you understand that?

18            A.  I understand.

19            Q.  You understand that by testifying under oath

20    here today it is the same as testifying in a court before

21    a judge and a jury?

22            A.  I understand.

23            Q.  Do you understand what "under penalty of

24    perjury" means?

25            A.  I don't understand.
```

```
1                     CERTIFICATE OF COURT REPORTER

2

3    I, Bron Williams, an Accredited Real-time Reporter, hereby

4    certify that the testimony of the witness WANG ZHAOJIE in

5    the foregoing transcript, numbered pages 1 through 111,

6    taken on this 7th day of March, 2019 was recorded by me in

7    machine shorthand and was thereafter transcribed by me; and

8    that the foregoing transcript is a true and accurate

9    verbatim record of the said testimony.

10

11

12   I further certify that I am not a relative, employee,

13   counsel or financially involved with any of the parties to

14   the within cause, nor am I an employee or relative of any

15   counsel for the parties, nor am I in any way interested in

16   the outcome of the within cause.

17

18

19   Signed:    Bron Williams

20   Name:    Bron Williams

21   Date:    ........................

22

23

24

25
```

# EXHIBIT 30

1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
2                    San Francisco Division

3    - - - - - - - - - - - - - - - - - -
     IN RE:                          )
4                                     )
     CATHODE RAY TUBE (CRT)           )Master File No.
5    ANTITRUST LITIGATION             )07-CV-5944-JST
                                      )
6                                     )MDL No. 1917
                                      )
7                                     )
                                      )
8    - - - - - - - - - - - - - - - - - -

9              DEPOSITION OF WANG ZHAOJIE

10                 HIGHLY CONFIDENTIAL

11                    VOLUME III

12              Friday, March 8th, 2019

13                   AT:  9.05 am

14                   Taken at:

15                 Kobre & Kim
                   6/F ICBC Tower
16                 3 Garden Road
                     Central
17                 Hong Kong

18

19

20

21

22

23   Court Reporter:

24   Bron Williams
     Accredited Real-time Reporter
25

 1              INTERPRETER:  (Chinese spoken).

 2              A.  If your question refers to reimbursement, yes,

 3     of course, I cannot pay that by myself.  Because I'm an

 4     employee of the company.  So I certainly need reimbursement.

 5      BY MS. CAPURRO:

 6              Q.  So who would you submit those expense reports

 7     to?

 8              A.  I submit to my assistant.

 9              Q.  And who would your assistant submit the

10     expense reports to?

11              A.  That's a process for financial reimbursement.

12              We do have a financial reimbursement procedure.

13     So I just attach all my receipts and then because it was too

14     long ago, and many persons changed the roles, so I cannot

15     remember exactly.

16              Q.  Did Irico Group search for business expense

17     reports like the ones you are referring to for production in

18     this litigation?

19              MR. PLUNKETT:  Objection, beyond the scope.

20              A.  I'm not clear about that situation.

21      BY MS. CAPURRO:

22              Q.  Do you know if Irico Group kept those business

23     expense reports?

24              MR. PLUNKETT:  Same objection.

25              A.  I'm not clear about that.

1    BY MS. CAPURRO:

2              Q.  Who would know?

3              A.  I'm not clear, because I'm not in charge of

4    finance.

5              Q.  Do you know what I mean when I say

6    "competitor"?

7              A.  With what regard?  When you say "competitor."

8              Q.  Who were Irico Group's competitors, CRT

9    competitors, during the period 1995 to 2007?

10             A.  Competitors from the same industry?

11             Q.  Yes.

12             A.  In CRT industry?

13             Q.  Correct.

14             A.  At that time there was Samsung, and Shanghai

15   Yunshin.

16             INTERPRETER:  Y-U-N-S-H-I-N.

17             A.  And Changsha LG.

18             INTERPRETER:  C-H-A-N-G-S-H-A LG.

19             MS. FU:  I would like to make a correction.

20   Shanghai Yongxin.  Y-O-N-G-X-I-N.

21             INTERPRETER:  Agree.

22             A.  Beijing (Chinese spoken), like Beijing

23   Panasonic.  Et cetera.

24   BY MS. CAPURRO:

25             Q.  Are those the only competitors you remember?

1              A.  Because the time expand to a very long period,

2      and some companies join the industry, some companies just

3      left the industry, so I cannot remember all those

4      competitors.  Well, regardless that, for all the companies

5      in the CRT business are our competitors.

6              Q.  Have you ever met with anyone who worked at

7      Chunghwa?

8              MS. FU:  (Chinese spoken).

9              INTERPRETER:  (Chinese spoken).

10             A.  Yes.

11     BY MS. CAPURRO:

12             Q.  Have you ever met with anyone who worked for

13     LG Electronics?

14             A.  We basically contact Changsha LG.  Because I'm

15     not quite sure which LG Electronics you are referring to,

16     but we met people from Changsha.

17             Q.  Was LG a CPT manufacturer, or a CDT

18     manufacturer?

19             A.  Changsha LG, I'm quite sure they produce CPT.

20     With regard to CDT, I don't remember, because it was too

21     long ago.

22             Q.  During the relevant period, did you meet with

23     anyone who worked at Philips?

24             A.  Which Philip are you referring to?

25             Q.  Which Philips CRT manufacturer did you meet

```
 1    with?

 2              A.  Have I said -- did I say anything regarding

 3    I have met people from Philips?

 4              Q.  Are you familiar with an entity called Philips

 5    Hefei?

 6              MS. FU:  Hefei Philip, doesn't really matter.

 7              A.  I have no knowledge of it.

 8     BY MS. CAPURRO:

 9              Q.  Did you ever meet with anyone during the

10    relevant period from LG Philips Displays?

11              A.  I'm not quite sure, but perhaps there is

12    a restructure between LG and Philips in the past.

13              MS. FU:  "Perhaps there is a reorganization or

14    merger between LG and Philips in the past."

15     BY MS. CAPURRO:

16              Q.  Yes, in 2001, LG and Philips combined their

17    CRT business to become LG Philips Displays.  Are you aware

18    of that?

19              A.  Yes, I heard of it.  But I don't know the

20    detailed information.

21              Q.  I'm not asking you for detailed information,

22    I'm asking you if you ever met with anyone who worked for LG

23    Philips Displays, or LPD?

24              MR. PLUNKETT:  Object to the form.

25              A.  Well it was too long ago, so I don't remember
```

1   exactly, but we normally just call Changsha LG or Beijing

2   Panasonic, or Shanghai Yonxin.  That's it.

3    BY MS. CAPURRO:

4           Q.  Did you have e-mail communications with

5   employees of any of the CRT manufacturers that we have just

6   discussed?

7           MR. PLUNKETT:  Object to the form.

8           A.  It was too long ago, I don't remember.

9    BY MS. CAPURRO:

10          Q.  Did you use e-mail during the period to

11  communicate with -- strike that.

12          Did you use e-mail during the class period?

13          A.  E-mail, certainly, yes, but I don't remember

14  which time frame.

15          Q.  Did you communicate with employees of any of

16  the CRT manufacturers that we have discussed by fax?

17          A.  I don't remember whether I have used fax to

18  communicate with those employees, but back then, the primary

19  communication channels are either telephone or fax.

20          MS. FU:  I would like to make a correction.

21  I think he said "I don't remember whether I have

22  communicated with those competitors, but back then the

23  primary communication channels are either telephone or fax."

24          MR. PLUNKETT:  Do we need the interpreter to agree

25  or disagree with the check translator on the record?

Case 4:07-cv-05944-JST Document 5641-3 Filed 11/05/19 Page 421 of 508
Tang Qianemoist C41-3 hhF edd on 1/05/est Pat?e
March 08, 2019                                    90

1            "IRICO ... and BMCC."

2            Do you see that?

3            A.  Yes.

4            Q.  It says:

5            "CPT was elected as representative to convey the

6     [quarter] 3 price-up news to IRICO, and ask it to

7     follow ..."

8            Do you see that?

9            A.  Yes.

10           Q.  As Irico's 30(b)(6) designee, were you ever

11    aware of representatives of Chunghwa contacting Irico Group

12    or Irico Display to ask them to follow price agreements

13    reached at meetings of CRT competitors?

14           MR. PLUNKETT:  Object to the form, lacks

15    foundation.

16           A.  I don't understand the situation.  This is

17    a report from CPT.

18           MS. CAPURRO:  Aside from this document, are you

19    aware -- strike that.

20           Aside from this document, did Chunghwa ever

21    contact Irico and ask them to follow price agreements

22    reached at meetings with other CRT competitors?

23           A.  I have no knowledge about that.  What right

24    does CPT have to ask us to follow that price agreement?

25    I don't understand.

1              Q.  You can set that document aside.

2              (Exhibit 8423  marked for identification)

3              Q.  Mr. Wang, the court reporter has handed you

4     the next document that has been marked as an exhibit as

5     Exhibit number 8423.  Please take a minute to review the

6     document and let me know when you are ready.

7              A.  Yes, I have read it.

8              Q.  See at the top of the page the date says

9     May 24th, 1999?

10             A.  Yes.

11             Q.  I will refer you back to the previous exhibit.

12    CHU000029191, and the date there was May 20th, 1999.

13    Correct?

14             A.  Yes.

15             Q.  These are notes of Chunghwa's Lu Jing-Song.

16    Do you know Lu Jing-Song?

17             MR. PLUNKETT:  Object to the form.

18             A.  I wouldn't say I know this person, but

19    I thought I met him before.

20     BY MS. CAPURRO:

21             Q.  Directing your attention to the first

22    paragraph, it's:

23             "Just contacted Irico's Vice-President Wei by

24    phone. (Manager Lee is unable to be contacted because he is

25    on a flight from Beijing back to Xian now.)  I explained

1    that we hoped that IRICO could cooperate with us to increase

2    the 14-inch CPT sales price starting July 1.  IRICO

3    basically agreed."

4              Do you see that?

5         A.  Yes.

6         Q.  Did Vice President Wei or Manager Lee ever

7    inform you regarding this call from Jing-Song Lu to them?

8              MR. PLUNKETT:  Object to the form, lacks

9    foundation.

10        A.  I can tell right now, no I don't have any

11   impression.

12    BY MS. CAPURRO:

13        Q.  Do you recall where you met Mr. Lu?

14        A.  I don't have a very good strong impression

15   about this person.  When I saw this name and also I realized

16   he is from CPT, so I suppose I have met this person before.

17   With regard to when I met this person, I cannot remember.

18        Q.  Do you recall whether Mr. Lu attended meetings

19   -- strike that.  Do you recall whether you attended meetings

20   of your competitors at which Mr. Lu was also there?

21        A.  With regard to this type of meeting, I have

22   attended many, many such meetings, plus it was very long

23   ago, so if he was there, then I have met him.  If he was not

24   then I have not.  I really don't remember.

25        Q.  Okay.  You can set that document aside.

1          MS. CAPURRO:  Take a break.  Let's go off the

2     record.

3          VIDEOGRAPHER:  This marks the end of media number

4     8 in the deposition of Wang Zhaojie, volume III.  Going off

5     the record, the time is 4.39.

6                    (Break taken.)

7          VIDEOGRAPHER:  We are back on the record.  Here

8     marks the beginning of media number 9 in the deposition of

9     Wang Zhaojie, volume II.  The time is 5.08.

10          MS. CAPURRO:  We are going to mark the next

11     exhibit in order.

12          (Exhibit 8424 marked for identification)

13          MS. CAPURRO:  The court reporter has handed you

14     what has been marked as Exhibit 8424.  This is a document

15     that was produced by defendant Chunghwa in this litigation.

16     Please take a minute to review the document and let me know

17     when you are ready.

18          A.  Okay, I have read it.

19          Q.  Have you seen this document before, Mr. Wang?

20

21          A.  Yes.

22          Q.  Directing your attention to the first page of

23     the document CHU00030679.  The date of the meeting is

24     indicated as October 9th, 1998.  Do you see that?

25          MR. PLUNKETT:  Object to the form.

```
 1                    CERTIFICATE OF COURT REPORTER

 2

 3      I, Bron Williams, an Accredited Real-time Reporter, hereby

 4      certify that the testimony of the witness Wang Zhaojie in

 5      the foregoing transcript, numbered pages 1 through 115,

 6      taken on this 8th day of March, 2018 was recorded by me in

 7      machine shorthand and was thereafter transcribed by me; and

 8      that the foregoing transcript is a true and accurate

 9      verbatim record of the said testimony.

10

11

12      I further certify that I am not a relative, employee,

13      counsel or financially involved with any of the parties to

14      the within cause, nor am I an employee or relative of any

15      counsel for the parties, nor am I in any way interested in

16      the outcome of the within cause.

17

18

19      Signed:   Bron Williams

20      Name:   Bron Williams

21      Date:   ........................

22

23

24

25
```

# EXHIBIT 31

1             UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4    - - - - - - - - - - - - - - - - -x

5    IN RE:  CATHODE RAY TUBE (CRT)   :   MASTER FILE NO.:
     ANTITRUST LITIGATION                 07-CV-5944-JST
6                                     :   MDL NO.: 1917

7    - - - - - - - - - - - - - - - - -x

8

9

10             VIDEOTAPED DEPOSITION OF:

11             DONALD C. CLARK, PH.D.

12               Washington, D.C.

13               March 26, 2019

14

15

16

17

18   Reported by:
     Misty Klapper, CRR, RMR
19   Job No.: 265384

20

21

22

23

24

25

1              procuratorate is issuing guidance to lower

2              level procurators about how they should

3              interpret this particular term, and the

4              Supreme People's Court is issuing, you know,

5              instructions to lower level courts about how

6              they should interpret this term.

7                        So, really, this is just a kind

8              of -- it should be interpreted as a kind of --

9              understood as a kind of legislation.

10                  Q.    If you could turn to page two of

11             your declaration, paragraph eight.  This

12             paragraph describes -- strike that.

13                        Does this paragraph describe all

14             of the documents you reviewed in the course of

15             doing your work in this case?

16                  A.    It may not describe all of them,

17             because I can't, you know, remember every

18             single thing I looked at.  So when I'm

19             preparing this report, I may have, you know,

20             gone online to -- to look up some information.

21             I may have, you know, looked at some stuff

22             that was in my own library or on my computer.

23                        It's certainly the main

24             documents.

25                  Q.    And -- and would this -- the

1              documents described here, would they include

2              all of the documents that you are relying on

3              for your opinions in this matter?

4                     A.     Yes, I -- I think they do.  You

5              know, the documents that I've relied on I have

6              specifically, you know, footnoted in the

7              declaration.  So I'm -- I'm not going to come

8              up and tell you there's some other document

9              out there that -- that I relied on that you

10             haven't heard of before.

11                    Q.     And that -- is that true for --

12             subheading A you refer to, you know, 1,000

13             plus pages of documents.

14                           To the extent you're relying

15             on -- on a document within that Bates range,

16             is it -- is it referenced specifically in your

17             declaration?

18                    A.     I believe so, yes.

19                    Q.     Okay.  And subheading D, the

20             business licenses of Irico (Hefei)

21             Photovolt -- Photovoltaic Company, Limited, et

22             cetera, those three companies, for what

23             purpose did you review the business licenses?

24                    A.     Yeah, those were the three

25             companies that were involved in the criminal

1          cases that I discuss.  And so I was -- you

2          know, I wanted to see how the business

3          licenses described the companies and what they

4          said about their -- I think it was to see what

5          they said about their -- their ownership.

6                Q.    And that would be customary,

7          that a business license would show the

8          ownership of a company?

9                A.    I guess the business license

10         would not show the ownership.  No, that would

11         be their registration.  The business license

12         would show the -- the corporate form of the

13         company.

14               Q.    Okay.  And is the business

15         license what you -- what you get when you

16         establish the business?

17               A.    It's -- it's one of the things

18         you have to have in order to engage in

19         business.

20               Q.    And --

21               A.    You know, you show it to people

22         to show that you're a duly established and --

23         and, you know, lawfully running business.

24               Q.    And is that true for all

25         businesses in China?

1           A.     I believe so, perhaps depending

2      on how you define business; but certainly if

3      you want to call yourself a business and be

4      treated as a business, you know, for tax

5      purposes and things like that, then, as far as

6      I know, you need to have a business license.

7           Q.     And do you need to submit an

8      application to government, some -- some

9      government entity, in order to obtain a

10     business license?

11          A.     Yeah, the business license is

12     issued by an entity called the Administration

13     of Industry and Commerce.

14          Q.     And then you mentioned the

15     registration.

16                 Did you review the

17     registration -- is that a different document?

18          A.     Yeah.  So I believe in the --

19     the Administration of Industry and Commerce,

20     you know, keeps records on the -- on

21     businesses.  And in those records they -- they

22     do have statements about ownership.

23          Q.     And --

24          A.     So that -- that is -- that is

25     different from the business license.

```
 1              Q.     Okay.  And did you review the

 2       registration for these companies?

 3              A.     I -- I don't recall.

 4              Q.     Okay.  And the licenses, are

 5       they required to be updated periodically?

 6              A.     Yes.

 7              Q.     And how about the registration?

 8              A.     To the best of my knowledge, the

 9       registration, you know, needs to be updated

10       when there's changes in the details, but, you

11       know, I don't know all the details about that.

12              Q.     So did you review the -- so you

13       don't recall -- strike that.

14                     Did you review the registration

15       for Irico Group?

16              A.     I don't recall.  I remember

17       reviewing registrations for something; but was

18       it in this case or was it another case, I

19       can't recall.

20              Q.     And did you -- same question for

21       Display.

22              A.     Again, I cannot recall whether I

23       reviewed the registration.  It -- it's not --

24       let's see, let me just think a moment.

25                     No, I did not.
```

 1              Q.    So the answer -- so you did not

 2       review -- just to be clear, so your testimony

 3       is you did not review the registration for

 4       Group?

 5              A.    I -- I don't believe I did.  I

 6       don't --

 7              Q.    Same question --

 8              A.    Unless it was in these documents

 9       in 8a.

10              Q.    Okay.  Okay.  And then same

11       question for Electronics?

12              A.    I -- I don't believe so.

13              Q.    Okay.  And are these -- are the

14       registrations available online?

15              A.    Well, that is an interesting

16       question.  The -- they may or may -- or they

17       may not be.

18                    The Administration of Industry

19       and Commerce, you know, following some, you

20       know, embarrassing reports in Western media

21       about shareholdings of Chinese government

22       leaders, they have been much more, you know,

23       careful about what records they make public.

24                    So I'm not exactly sure where

25       things stand now with those -- with the public

1              availability of corporate registrations and

2              documents.

3                      Q.      And if you were looking for

4              that, would you go to the website of the

5              Ministry of Industry and Commerce, to the

6              extent they have one?

7                      A.      That's where I would go first.

8                      Q.      Okay.   If you would, please,

9              turn to page eight of your declaration.

10                       In paragraph 24 you -- you say:

11                       In my opinion, based on the

12             evidence that I have reviewed and my knowledge

13             of Chinese law, Irico Display was, before and

14             during 2007, officially considered at the very

15             least a state-controlled entity and in some

16             contexts a state-owned entity.

17                       So my first question about

18             paragraph 24 is officially considered by whom?

19                     A.      By the Chinese state, by, you

20             know -- in -- in effect, that paragraph is a

21             summary of everything that -- that follows

22             below, so...

23                     Q.      Okay.   And so the basis for this

24             opinion is entirely set forth in your

25             declaration; is that correct?

 1              A.    Yes.

 2              Q.    And so you say that in some

 3      contexts Display was officially considered a

 4      state-owned entity.

 5                    In -- so in what context --

 6      contexts was that true?

 7              A.    Well, this is what I talk about

 8      in, then, the subsequent paragraph, paragraph

 9      25, that we have, you know, a document.

10                    So Display in 1995, prior to its

11      issuance of shares in the -- to the public,

12      was owned by, I believe, four, perhaps, wholly

13      state-owned enterprises.

14              Q.    And -- and is there a definition

15      of -- well, is there a definition, a statutory

16      definition, of state-owned contained in the

17      body of Chinese law somewhere?

18              A.    In the 2003 interim regulations

19      of the state, you know, Assets Supervision and

20      Administration Commission, which are discussed

21      in the various documents in this case that

22      people have submitted, I think they have a --

23      a definition there, the definition basically

24      serving the purpose of distinguishing

25      state-owned from state-controlled.

1                    And in that definition, I -- my

2         recollection is that they mean, you know,

3         basically 100 percent, you know, beneficially

4         owned by the state without any kind of

5         non-state interest.

6              Q.    You don't -- but you're not

7         relying on that regulation here?

8              A.    No.  My recollection is that

9         there was a document, which specifically

10        identified Irico Display as state-owned in

11        1995.

12             Q.    And is there a statutory -- and

13        by statutory, I mean some -- some

14        codification --

15             A.    Yes.

16             Q.    -- in one place of the

17        definition of state-controlled entity?

18             A.    In the 2003 interim regulations

19        there is a definition.  It is possible that

20        there are other definitions other places for

21        other purposes.  The -- the concepts, both

22        of -- in particular, state-owned is sometimes

23        used very strictly and sometimes used loosely.

24                   State-controlled, I think, is

25        fairly unambiguously defined in the 2003

```
1          interim regulations.

2                    Q.    But, again, you're not relying

3          on that definition here?

4                    A.    Well, I was relying on the

5          definition -- well, not only on the

6          definition, but, again, also on specific

7          documents that say Irico Display is

8          state-controlled.  And -- and I reference

9          those documents.

10                   Q.    Right.  And I'm going to get to

11         those, but -- but in terms of -- you haven't

12         cited and so you're not relying on the

13         definition you believe is contained in the

14         2003 interim regulations of state-controlled;

15         is that correct?

16                   A.    Well, I -- I don't recall

17         whether I cited those specific regulations.  I

18         see in paragraph 22 I refer to a 1994 document

19         that defines control as including any

20         ownership stake of over 30, but less than 50.

21                   Q.    Okay.  That's footnote 22 you're

22         referring to?

23                   A.    That's -- I'm sorry, yes,

24         footnote 22.

25                   Q.    Okay.  Okay.
```

1              MR. RUSHING:  Well, let me --

2       let's mark the next document here.  This is --

3       if you could just -- Madam Reporter, if you

4       could -- oh, sorry -- mark the next exhibit,

5       please.

6                    (Thereupon, Deposition Exhibit

7                 Number 8427 was marked for

8                 identification.)

9          BY MR. RUSHING:

10             Q.    Professor Clarke, I'm handing

11      you what was submitted to the court in this

12      action, in this particular proceeding, as

13      Exhibit 32 to the Plunkett -- to the various

14      Plunkett declarations.  It's my understanding

15      that they're all the same in terms of their

16      exhibits.

17                  It has been marked Exhibit 8427.

18      And I'm going to ask you to -- some questions

19      about what it is.  It's -- the first page

20      is -- is entitled 2007 Enterprise Financial

21      Account Statement.  And the document is Bates

22      numbered IRI-CRT-00000670 through 671.

23                  If you could take a minute and

24      look that over.

25                  Professor Clarke, have you had a

1              chance to review Exhibit 8427?

2                      A.     Yes, this document looks

3              familiar.

4                      Q.     And this is one of the documents

5              upon which you're basing your opinion that

6              Display was a, quote, state-controlled entity

7              in 2007?

8                      A.     I believe so.

9                      Q.     So what is this document?

10                     A.     Well -- and -- and you'll have

11             to excuse me, because my eyesight is not good

12             and the print is extremely small.

13                            But this is headed, you know,

14             enterprise -- you know, 2007 enterprise

15             financial, you know, budget report.  That's

16             how I'm reading the Chinese.  What does the

17             English say?  Financial account statement.

18                            The English that you see under

19             it where it says business merger table is not

20             a correct translation.  It's, you know, group

21             consolidated table.  Just the -- the term that

22             they've translated as merger means

23             consolidated in the accounting sense.

24                     Q.     And so on the -- the second

25             Bates stamped page, on the right, the box on

```
1              the right-hand side, if you go down about
2              halfway, there's a -- or if you go down six
3              boxes -- one, two, three, four, five, six --
4              there's a -- apparently a category that says
5              Economic Type, colon.
6                        And there -- and then in -- in
7              the far right box there's the number 1, which
8              seems to refer to the first category listed
9              there, state-owned or state-controlled.
10                       Do you see that?
11             A.     Yes.
12             Q.     And this is the box you're
13             relying -- this is the evidence you're
14             relying -- relying on, in part, to conclude
15             that Display was a state -- considered a
16             state-owned entity in 2007; is that correct?
17             A.     Not quite.  This is -- I'm
18             relying on that box to conclude it was
19             probably considered a state-controlled entity.
20             Q.     What did I say, state-owned?
21             A.     Yes.
22             Q.     Oh, I'm sorry, that's what I
23             meant to say.
24                       Okay.  In your declaration on
25             page 9 footnote 30 --
```

1            A.    Yes.

2            Q.    -- and does this footnote refer

3      to the part of the document you just -- we

4      just discussed?

5            A.    Yes, it does.

6            Q.    And you say that the, quote,

7      guoyou konggu, end quote, translated here as,

8      quote, state-controlled, means, quote,

9      controlled by state or state-owned entities,

10     end quote.

11                 And when you say means, do you

12     mean that in a general sense or do you mean

13     that specific to this document?

14                 MR. HUSTON:  Objection, vague

15     and ambiguous.

16                 THE WITNESS:  Well, I certainly

17     meant as applied to this specific document.

18     As I sit here now, do I believe that that

19     applies in general?  I believe that would

20     apply in general also.

21        BY MR. RUSHING:

22           Q.    And when you say means, are you

23     saying that properly -- strike that.

24                 Does the term guoyou konggu

25     refer explicitly to -- strike that.

```
 1                    Does the term guoyou konggu mean
 2          expressly controlled by a state-owned entity?
 3               A.    Sorry, I'm not sure I understand
 4          the question.
 5                    I think what I was trying to do
 6          here is maybe to -- I -- I may have had in
 7          mind the confusion over the proper translation
 8          of that term that I had seen in previous
 9          documents, that is, whether it meant holding
10          company or -- or not.
11                    And I had seen that -- so I -- I
12          may have been just trying to clarify that it
13          doesn't mean holding company, that it means
14          controlled, you know, by the state.  And then
15          the question is what does state mean.
16                    Clearly it doesn't mean just
17          directly the state, because they have defined
18          Irico Display as state-controlled.  And -- and
19          we know that it was not directly owned by
20          SASAC but was, rather, in 2007 owned, in large
21          percentage, by Irico Electronics, which, in
22          turn, was owned by Irico Group.
23                    So I think that is what I had in
24          mind with that explanation.
25               Q.    So to be precise, Display is
```

1              best described as -- by the -- the term

2              controlled by a state-owned entity; is that

3              correct?

4                      A.     Well, controlled by the state or

5              a state-owned entity.

6                             And I think the point here is

7              that it -- you know, it doesn't matter for the

8              purposes of the classification.  They're

9              not -- when the system decides to classify

10             something as state-controlled, you know, using

11             this particular term -- which, for the sake of

12             the Court Reporter I won't make her keep on

13             writing down in Chinese -- I think when they

14             use that term, they are not making a

15             distinction.

16                      Q.     But would a literal translation

17             of guoyou konggu be controlled by a

18             state-owned entity?

19                      A.     Well, let me see.  I'm trying to

20             think, what would a literal translation be.

21                             I guess if we were to -- if I

22             were to come up with a literal translation, it

23             might be -- and -- and, you know, if I were to

24             come up with a literal translation, it might

25             be controlled by state ownership.

```
1                         And that sounds vague, but, you

2            know, that's -- that's just in the nature of

3            the term.  So what does it mean to be

4            controlled by state ownership?  Does it mean

5            you're directly owned by SASAC or does that

6            include ownership by a state-owned enterprise.

7                         So, you know, clearly as we can

8            see from here, because they're defining Irico

9            Display as properly categorized by that term,

10           it includes being formally owned by entities,

11           you know, below SASAC.

12                         I'm sorry, I hope that's

13           responsive, but I'm not sure if it is.

14               Q.    Okay.  And -- and so do you have

15           a cite for that in -- in Chinese law?

16               A.    For that definition?  For -- I'm

17           sorry, a cite for what?

18               Q.    The concept that, I believe, you

19           just described, that entities owned by

20           state-owned -- strike that.

21                         The concept that entities

22           controlled by state-owned entities is included

23           within the definition of guoyou konggu.

24                         MR. HUSTON:  Objection, vague

25           and ambiguous.
```

```
 1                    THE WITNESS:  Well, my -- my
 2           cite would be, for example, this document,
 3           because it is -- I mean, we know what Irico
 4           Display's ownership structure looks like, what
 5           its formal ownership structure looks like.
 6                         And -- and we know that it is
 7           being called state-owned or state-controlled.
 8           In my opinion, they didn't mean state-owned.
 9           They meant the second alternative.
10              BY MR. RUSHING:
11                 Q.    Okay.  So the answer is other
12           than -- apart from this document, you don't
13           have a cite for that?
14                 A.    A cite for the notion that this
15           term, which we are translating as
16           state-controlled, can include controlled by a
17           wholly state-owned enterprise?
18                 Q.    Yes.
19                    MR. HUSTON:  Objection, vague
20           and ambiguous.
21                    THE WITNESS:  It -- there may be
22           something -- I'm sorry -- there may be
23           something in the 2003 interim regulations that
24           we've been discussing from SASAC, but I'm
25           not -- you know, as I sit before you now, I
```

 1          can't tell you a precise cite.

 2                  BY MR. RUSHING:

 3                  Q.    So going back to this -- to the

 4          document, Exhibit 8427, is this all you've

 5          ever seen of this particular document?

 6                          MR. HUSTON:  Objection, vague

 7          and ambiguous.

 8                  BY MR. RUSHING:

 9                  Q.    Well, what I mean is there's two

10          Bates stamped pages, 670 and 671.  670 appears

11          to be, perhaps, a cover sheet.  I can't tell.

12                  A.    Yes.

13                  Q.    And the second page is a copy of

14          one or more pages.

15                          And so my question is, is this

16          all you've ever seen of -- of this document?

17                  A.    I think so.

18                  Q.    Okay.

19                  A.    I'm not entirely sure, but I

20          think so.

21                  Q.    Does the document appear to you

22          to be incomplete?

23                          MR. HUSTON:  Objection, lacks

24          foundation.

25                          THE WITNESS:  I am not sure,

 1          because I -- I don't know what this type of

 2          document generally contains.  So I'm -- I'm

 3          not sure.

 4               BY MR. RUSHING:

 5               Q.    In paragraph 29 you say in

 6          the -- referring to this exhibit -- you say in

 7          the second sentence, In the cover pages of its

 8          2007 audited financial report.

 9                    Do you see that?

10               A.    Yes.

11               Q.    So that suggests to me that

12          there's more to this document than -- than

13          you -- than has been included in the -- in the

14          Plunkett declaration.

15                    Does that refresh your

16          recollection?

17               A.    Well, it doesn't refresh my

18          recollection as to whether I saw more.  I

19          don't think I saw more.  It does make me

20          inclined to agree that it's probably

21          incomplete, now that I consider the matter

22          further.

23               Q.    And how do you know that -- I

24          mean, you -- you described them as cover

25          pages, presumably meaning it's the first few

```
 1            Bureau when the Ministry of Public Security
 2            asked.  So it has some consequences there.
 3                      Now, are -- are there other
 4            realms of state regulation where it's
 5            important to decide whether that label applies
 6            because certain practical consequences may
 7            follow?  There -- there might be.  You know, I
 8            can't say, sitting here right now, you know,
 9            what they are, other than the specific ones
10            I've discussed.  It -- it might be.
11                 Q.    Okay.  Okay.
12                 A.    I'm thinking in terms of,
13            perhaps, state control of personnel or party
14            control of personnel.  There may be rules that
15            we don't know about that -- for example, the
16            local party committee is supposed to be
17            consulted on managerial appointments at the
18            high level in, for example, state-owned for
19            sure; state-controlled, maybe; not
20            state-controlled, not.
21                      So there would have to be
22            somebody drawing a line there if there were
23            such a rule like that and if we know the party
24            is involved in managerial appointments in --
25            in some enterprises.
```

```
 1              Q.    Okay.

 2              A.    So they need to -- they need

 3       to -- so it wouldn't surprise me if we could

 4       find some rule, probably secret, about that

 5       distinction.

 6              Q.    Okay.  Thank you.

 7              If you could turn to page six of

 8       your report.

 9              A.    Okay.

10              Q.    Paragraph 22 you say, A number

11       of documents show SASAC exercising close

12       control and supervision over Irico Group.

13              And so my question to you is

14       what do you mean by close control and

15       supervision over Irico Group?

16              A.    I mean precisely the particular

17       things that I talked about.  So that sentence

18       should be understood as a kind of a summary

19       statement that summarizes the -- the -- the

20       facts here.

21              So, you know, I think it's a

22       fair description of auditing accounts,

23       approving a reorganization plan, exercising

24       supervision over salaries of senior officers.

25       You know, to me, you know, it's a fair
```

1              description to call that close control.  But

2              it's really the facts just are what they are

3              and, you know, people can put their own

4              adjective on it.

5                   Q.    Okay.  And so the basis -- so if

6              I understand you correctly, the -- the

7              basis -- the entire basis for that statement,

8              for the statement that SASAC exercises close

9              control and -- strike that.

10                        The entire basis for the first

11             sentence of paragraph 22 are the documents

12             identified in the following subsections of

13             that paragraph; is that correct?

14                  A.    Well, you know, 90 percent.  I

15             guess also, just from what I know about if you

16             are an enterprise under -- directly under

17             SASAC, then -- I mean, there weren't a lot of

18             them.  At this point in -- in, you know, 2004,

19             2007 I think there was, you know, over 200,

20             but fewer than -- sorry, over 100, but fewer

21             than 200.

22                        And -- and so, you know, I think

23             it's fair to say that over all of those SASAC

24             was exercising some degree of control.  Was it

25             close control over every single enterprise?

```
 1              You know, I could not say.

 2                      But I think I'm relying largely

 3      on these documents.  I don't have documents

 4      outside of these documents relating to the

 5      specific relationship with SASAC and Irico

 6      Group.

 7              Q.    Okay.  You're not suggesting

 8      that SASAC had any kind of day-to-day control

 9      over Irico Group Corporation -- strike that.

10                      You're not saying that Irico

11      Group -- I mean, that SASAC -- strike that.

12                      You're not saying that SASAC

13      exercised day-to-day control over Irico Group?

14                      MR. HUSTON:  Objection, vague

15      and ambiguous.

16                      THE WITNESS:  I -- I guess I

17      could put it this way:

18                      In other words, is the question

19      was -- you know, were SASAC personnel, that is

20      people, you know, formerly on the payroll of

21      SASAC, you know, living in Beijing, were they

22      in contact daily with management at Irico

23      Group, my suspicion would be probably not, if

24      that's what you mean by day-to-day control.  I

25      don't think it would have gone to that level
```

1        where they were daily in contact with them.

2                BY MR. RUSHING:

3                Q.    Well, and my question was

4        whether you -- your -- I should -- the

5        question was whether your assertion in

6        paragraph 22 should be read to suggest that

7        they were -- that SASAC was exercising

8        day-to-day control in 2007.

9                A.    Well, again, if -- if by

10       day-to-day control we mean were people, you

11       know, employed by SASAC, living in Beijing,

12       you know, on a daily basis contacting people,

13       you know, out in Irico Group's headquarters,

14       sort of telling them what to do, my suspicion

15       would be no.  So it should not be read to --

16       to mean that I am saying that that was

17       happening.

18               Q.    Well, okay.  For example -- and

19       we can go through the documents if we need to,

20       but in sub -- in paragraph -- subparagraph A,

21       there's -- it says, Various SASAC documents

22       show SASAC auditing the accounts of Irico

23       Group over the years.  And footnote 13 then

24       lists four documents for -- for the years 2003

25       through 2006, and which appears to indicate

 1          that SASAC is reviewing an annual audit or a

 2          periodic audit in a sort of high-level

 3          oversight manner, rather than day-to-day

 4          control.

 5                    Is -- do you agree with that?

 6          A.     So let me make sure I understand

 7          the question.

 8                    Does this -- are -- are these

 9          evidence of SASAC kind of not keeping daily

10          track of, kind of, revenues and -- and costs

11          but, rather, looking at them periodically?

12                    I guess maybe I could -- maybe a

13          metaphor would be helpful.  I think what I see

14          SASAC doing here, and I think generally, is

15          maybe operating like a particularly active

16          board of directors would at an American

17          corporation.

18                    So if you think of the typical

19          board of directors in a U.S. corporation, you

20          know, their job is to select the management.

21          And it's the CEO, you know, who -- selected by

22          the board of directors and his or her

23          management team that decides on everybody

24          else's salaries, you know, decides on, you

25          know, even quite major projects.

1                          So SASAC does more than that, I

2            think.  So they are definitely more closely

3            involved in the management of a -- you know,

4            one of their constituent corporations, in my

5            view, than would, say, you know, just the

6            board of directors at a typical American

7            corporation.

8                          So maybe that's helpful in -- in

9            understanding what I mean by close control.

10                  Q.     Have you seen documents that

11           would indicate SASAC was actively involved in

12           the day-to-day business of Irico Group in

13           2007?

14                  A.     The documents that I've seen

15           about SASAC's involvement, you know, are the

16           ones that are in the -- you know -- the set of

17           documents that -- that I think we've all seen

18           and -- and the ones that I cite here to the

19           extent that I thought they were relevant.

20                          So --

21                  Q.     Okay.  Okay.  Turning to page

22           four of your declaration, in paragraph 15 you

23           quote a person named Barry Naughton.

24                  A.     Yes.

25                  Q.     In which he says, SASAC's core

 1          mission is to carry out the government's

 2          functions as investor and owner of state

 3          assets and, thus, separate these tasks from

 4          the government's role as public manager of

 5          society as a whole.

 6                    Do you agree with that

 7          statement?

 8               A.    I guess as -- as a statement of

 9          their core mission, this is in a sense what

10          they are being asked to do because the -- you

11          know, what -- what enterprise reform in China,

12          you know, in the '90s and beyond has been

13          about is -- it's kind of had two goals, and

14          one is to try to make state-owned enterprises

15          run more efficiently.

16                    And to do that, as -- as

17          Naughton says, one of the things they try to

18          do is to say let's, you know, separate the

19          economic functions of enterprises from their,

20          you know, social functions.

21                    But at the same time, you know,

22          they haven't been able to do it completely

23          because, as I mentioned here, you know, at the

24          same time there is absolutely no ambition to

25          give up state ownership per se.

1             And so we know that the state

2        wants to get involved for reasons other than

3        pure economics.  And SASAC also has to keep

4        those things in mind.

5             And that's very clear, for

6        example, when you look at the -- Irico

7        Display's, you know, near bankruptcy that's

8        discussed in the amended Wang declaration,

9        where, you know, SASAC steps in, you know, and

10       saves the enterprise, apparently, because one

11       of their concerns was, you know, unemployment

12       and, you know, social instability that might

13       result if a bunch of people lost their jobs.

14            So on the one hand, they will

15       say, you know, our goal is to -- you know, is

16       to seek profits and run these things

17       profitably; but at the same time, you know,

18       it's very clear that it's kind of the state in

19       general, and SASAC in particular is also using

20       its -- its ownership, you know, to pursue

21       noneconomic goals and what we might think of

22       as social goals.

23            Q.    Okay.  So apart from this -- the

24       bankruptcy you just mentioned, have you -- can

25       you identify any ways in which these -- SASAC

 1              effectuated these goals you're talking about,

 2              apart from investor and owner of, you know,

 3              state assets?  Can you -- strike that.  Let me

 4              start over.

 5                        In what ways has SASAC

 6              effectuated its goals, other than -- and its

 7              role -- other than as investor and owner of

 8              state assets with -- you know -- with regard

 9              to Display?

10              A.    Let me see if I understand the

11              question.

12                        Do you mean other than as a

13              profit maximizing owner?

14              Q.    Yes.

15              A.    Because it's -- it's using, you

16              know, its position as owner, you know, to do

17              many things.

18                        So do I understand your question

19              how is it using its position as owner to do

20              something other than, you know, profit

21              maximize?  Is that the question?

22              Q.    Yes, in reference -- in specific

23              reference to Display.

24              A.    So -- well, for example, Irico

25              Group, right, which is -- whose management is

1          appointed by SASAC, as we know, is exercising

2          control over the management of Irico Display.

3          And then SASAC, obviously, as we know,

4          exercises control and -- and selects the

5          management of Irico Group.

6                    So -- so then the question is

7          well, you know, what is the basis on which

8          they make those decisions as to who should be

9          the manager, for example.

10                   Are they looking around and

11         finding the person who is, you know, best at,

12         you know, running the company for a profit or

13         are they looking for someone who is, you know,

14         politically reliable or, you know, some --

15         some other criteria.

16                   I mean, I suspect it's a mixture

17         of all of those things.  But, for example, we

18         are told that -- in -- in the amended Wang

19         declaration -- that all the -- at least the

20         senior management at Irico Display and Irico

21         Group all had to be Communist party members.

22                   So if that is correct, then, you

23         know, that means that there's at least some,

24         you know, element of political reliability

25         going into the selection process of managers,

1              as well as simply, you know, is this the right

2              person to run the business at a -- at a

3              profit.

4                     Q.    Well, okay, the -- and so --

5              well, all right.

6                           So are there any -- is there any

7              evidence that you've reviewed that supports

8              the idea -- the proposition that SASAC did

9              something specifically in regard to Display

10             that effectuated goals, other than profit

11             maximization?

12                    A.    Well, again, we're told in one

13             of the affidavits that they made a -- a

14             specific injection through Irico Group that

15             designated -- the Ministry of Finance and

16             SASAC made a specific injection of capital

17             through Irico Group designated for Irico

18             Display's use for the development of some kind

19             of production line.  I can't remember the

20             details.

21                          Now, what was the motivation

22             behind that?  You know, was it because someone

23             at SASAC or Irico Display or Irico Group

24             thought this would be a, you know, useful

25             profit making idea and -- and then, you know,

```
 1          convinced somebody of that and they couldn't

 2          raise capital in the public capital markets

 3          or, you know, was it, you know, because the

 4          state for its own reasons decided they want to

 5          develop this production line.  You know, I

 6          have no way of knowing.

 7                  Q.    Right.  So there's no document

 8          you can point to that says that that

 9          production line you're talking about was

10          developed for a reason other than profit

11          maximization?

12                  A.    Correct; but, on the other hand,

13          one would not expect to find a document that

14          would say that.

15                  Q.    But absent such a document,

16          however, it's simply speculation, then, as to

17          the reasons -- SASAC's reasons for -- for

18          approving --

19                  A.    Yes, I'm not even speculating it

20          was for a noneconomic reason.  You know, I

21          don't know.

22                  My -- my larger point, though,

23          is that, you know, we see, just going back to

24          your original question about, you know, the

25          Barry Naughton quote, you know, what is SASAC
```

1        supposed to be doing, you know, in a sense

2        SASAC has, you know, been given a

3        contradictory task.  You know, what the state

4        would like is a unicorn and the unicorn is a

5        state-owned enterprise that is run, you know,

6        efficiently and profitably and also delivers

7        on all the social goals, you know, has

8        politically reliable workers and provides full

9        employment and lots of, you know, taxes and

10       profits for the state.  But, you know, you

11       can't have a unicorn.

12               So, you know, what is the

13       reality over time of what has happened.  And,

14       you know, the reality of time -- over time is

15       that state enterprises, a number of them,

16       have, you know, with competition from outside

17       enterprises, become more profitable.  But it

18       is absolutely clear to me that they are not

19       run completely, you know, with the goal of

20       profit in mind.  And we see this -- you know,

21       evidence of this all the time.

22               You know, in particular, again,

23       just going back to the bankruptcy, you know,

24       they -- you will see in the -- I think it's

25       the -- the Wang declaration that the supposed

1          goal of the intervention was to prevent harm

2          to the economy, but, you know, in fact, if you

3          think about it, the real harm to the economy

4          comes from continuing to run an inefficient

5          plant.

6                    Every other cathode ray tube

7          plant, apparently, in the country they say

8          went bankrupt.  Why did this one survive?  And

9          most likely this one survived because for

10         various reasons they managed to convince the

11         powers that be that, you know, they shouldn't

12         let all these workers get unemployed, or that

13         they, you know, had a better -- you know, they

14         were going to contribute more to, you know,

15         China's technological advance or something

16         like that.

17                   But it -- it just doesn't seem

18         to me likely to have been a decision driven by

19         economics.

20             Q.    Okay.  But -- so apart from the

21         bankruptcy and the new production line you

22         mentioned --

23             A.    Well, again, just to be clear --

24             Q.    Let me -- let me -- let me

25         finish my question.

1           A.      Sure.

2           Q.      Apart from the bankruptcy and

3      the new production line you referred to, what

4      specific evidence have you seen of SASAC

5      pursuing or managing Display in the pursuit of

6      goals, other than profit maximization?

7           A.      Okay.  So -- so let me clarify.

8               I -- I do cite the bankruptcy

9      case as one such example, but it was not my

10     intention to cite the SASAC investment in the

11     production line as an example of SASAC

12     involvement in pursuit of noneconomic motives.

13              I do not know -- you know, as I

14     mentioned, somebody may have made a decision,

15     correct or not, that this would actually be a

16     very profitable line of production.  I just

17     don't know.

18              So please don't misunderstand on

19     that point.  I am -- I am not asserting that

20     that is an example of SASAC intervening for

21     noneconomic purposes.

22              I do think the bankruptcy is

23     such an example.  And just, in general, the

24     fact that SASAC and the party, you know,

25     personnel system, you know, keep very close

```
1            tabs on who is going to be senior management

2            in these enterprises, in other words, if

3            they -- that is a sign, I think, of state

4            involvement for noneconomic purposes because

5            you wouldn't need party involvement if you

6            were just trying to get the best person for

7            the job from an economic standpoint.

8                 Q.    But do you have any evidence

9            that any particular appointment to Display by

10           Group was made as a result of SASAC's pursuit

11           of policies, other than profit maximization?

12                A.    No, not beyond just what I've

13           mentioned as the general purpose of SASAC's

14           involvement.

15                Q.    Okay.

16                A.    But if you're saying is there a

17           document, a smoking gun?  No.

18                Q.    Okay.  Turning to page ten of

19           your declaration, in paragraph 31 you say, The

20           evidence shows that Irico Group exercised

21           direct control over personnel appointments at

22           Irico Display in the late 1990s and in 2007.

23                      And my question is, can you

24           please just identify the evidence that you're

25           referring to in that statement?
```

```
 1              A.    Yes.  The evidence is, you know,

 2       what I've listed in the rest of that paragraph

 3       and the, you know, paragraphs 32 through 34 --

 4       sorry, 34 wouldn't count.  Yeah, just with

 5       respect to personnel appointments, I'm sorry,

 6       it is what I list here in A, B, C and D in

 7       paragraph 31.

 8              Q.    All right.  So let's --

 9              MR. RUSHING:  Mark this next in

10       line.

11                   (Thereupon, Deposition Exhibit

12              Number 8432 was marked for

13              identification.)

14         BY MR. RUSHING:

15              Q.    I'm handing you an exhibit

16       that's been marked 8432.  This is what I

17       believe to be a collection of documents that

18       were attached as Exhibit 33 to the declaration

19       of Stuart Plunkett.

20                   Do you see that, Professor

21       Clarke?

22              A.    Which one?

23              Q.    So what -- what is Exhibit 33?

24              A.    You're asking me?

25              Q.    Yes.
```

1            A.    Well, Exhibit 3 -- 33, I'm

2       sorry, is a collection of documents issued by

3       Irico Group.  The first one is addressed to --

4       that is at Bates number 672, that's addressed

5       to Irico Electronics; 673, Irico Electronics;

6       674, addressed to Irico Electronics.

7                 Do you want me to keep going?

8            Q.    No.

9            A.    Okay.  So it's several --

10      several documents issued by -- well, sorry,

11      later on 675 is issued not by Group, but by

12      Irico Electronics Group.  But that's 1993.  So

13      I can't recall.  I'd have to go back to figure

14      out who that was in 1993.  I think it's not

15      the same as Irico Electronics today.

16           Q.    Okay.  So let's turn to -- turn

17      to page 676, which is --

18           A.    Okay.

19           Q.    -- a letter for recommending

20      Zhang Shaowen to be the Supervisor Candidate

21      of the Board of Supervisors of the stock

22      certificate of Irico Display Devices Company.

23           A.    Let me just -- that's strange,

24      Board of Supervisors of the stock certificate

25      is a strange way of putting it.  Let's see

```
 1          what's wrong here.
 2                    Yeah, nothing to do with stock
 3          certificates.
 4               Q.    How is it -- what's the proper
 5          translation?
 6               A.    Basically, you know, stock
 7          company, you know, company limited by shares.
 8          It means kind of the Delaware type corporation
 9          where you have lots of -- you know, can be
10          listed on the public exchange.  It's -- it's
11          the type of company that Irico Display was.
12               Q.    Okay.  So --
13               A.    So instead of certificate, it
14          should read like company.  It's just a
15          mistranslation.
16               Q.    Okay.  And I believe you --
17          you -- you cite to this document in subheading
18          A of paragraph 31; is that correct?
19               A.    Correct.
20               Q.    So this appears -- well, it
21          reads, our company intends to recommend Zhang
22          Shaowen as a candidate for the supervisor of
23          your board of supervisor of -- supervisors of
24          your company.
25                    The last sentence says, we
```

1           hereby submit this to the general meeting of

2           stockholders for audit.

3                     Do you see that?

4           A.    Yes.

5           Q.    So is it your understanding that

6           Group was making a nomination that needed to

7           be confirmed according to the ordinary

8           procedures of Display, that is to say a vote

9           of the shareholders?

10          A.    Yeah, just -- this thing is

11          translated as audit.  It really means to,

12          like, you know, review and discuss or

13          something like that.  I don't think that

14          changes anything significant for your

15          purposes.

16                     Yeah, so this is, right,

17          Irico -- this is 1998.  So this is Irico

18          Group.  I cannot recall whether in 1998 Irico

19          Group was a direct shareholder or, you know, a

20          holder through an intermediary.  That is, was

21          Irico Electronics already in there in 1998?  I

22          can't recall.

23                     I'm sorry, but then can you

24          repeat your question?

25          Q.    My question is, this appears

```
 1            that it's a nomination as a candidate -- it's

 2            a nomination of a candidate who -- who, if he

 3            is going to become the supervisor of the board

 4            of supervisors needs to be approved according

 5            to the ordinary procedures of Display.

 6                 A.    Right.  In other words, there

 7            has to be the -- you know, you have to go

 8            through the formal process of the shareholder

 9            vote --

10                 Q.    Yes.

11                 A.    -- to appoint a supervisor.

12                 Q.    Yes.

13                       And did you make any inquiry as

14            to whether that, in fact, occurred in this

15            instance?

16                 A.    Whether he was eventually put

17            on?

18                 Q.    Yes.

19                 A.    Yeah, I don't believe so.  In

20            some of the other cases I recall, you know, we

21            saw a letter saying this person should be

22            appointed and then we saw a later document

23            showing that they had, in fact, been

24            appointed.  That's in my footnote 35 here.

25            That was in 2007.  There's just not enough
```

```
 1          documents from the late '90s to show, at least

 2          not enough documents that I saw.

 3                  Q.    Okay.  But my question is, did

 4          you in -- in -- if you look at subparagraph

 5          D --

 6                  A.    Yes.

 7                  Q.    -- the two thousand -- the

 8          November 2007 recommendation, which is

 9          Irico -- it's the last page of the exhibit --

10                  A.    Yes.

11                  Q.    -- the document refers to -- I

12          mean, the language in the translation it uses

13          anyway is that the individuals are recommended

14          to be candidates for the various offices.

15                      Do you see that?

16                  A.    Yes.

17                  Q.    But then later in that paragraph

18          you characterize the recommendations as, in

19          fact, instructions.

20                      Do you see that?

21                  A.    Yes.

22                  Q.    And the inference -- you -- you

23          infer that they were, in fact, instructions

24          based on the fact that -- that they were

25          all -- they all assumed the positions to which
```

 1          they had been nominated, correct?

 2                   A.     Yeah, that that, you know, kind

 3          of makes it evident that they were

 4          instructions.

 5                   Q.     Right.  And that's -- and -- and

 6          that opinion is based solely on the fact that

 7          they eventually were listed as having those

 8          jobs in the annual report you referred to?

 9                   A.     I wouldn't say based solely,

10          because, I mean, you're -- you're correct that

11          for the '90s I don't have a piece of evidence

12          that shows these instructions or these

13          nominations were ever, you know, actually

14          effectuated.

15                        But I would be extremely

16          surprised if they had not been because, you

17          know, just from, you know, what we know about

18          Irico Group's relationship with -- sorry,

19          Irico Display's relationship with -- with

20          Irico Group and just, you know, frankly, you

21          know, what -- what I know about corporate

22          governance in general.

23                        So for -- let me give you an

24          example.  Probably maybe about ten years ago

25          there were -- the -- the state decided to do

1              some reorganizing of China's mobile telephone

2              industry.  And I think there were about three

3              companies in that industry, all of which were

4              publicly listed companies.

5                        And they did a -- a kind of a

6              musical chairs where the head of company A

7              went to B and B went to C and I think C went

8              over to A.  And, you know, that was all done

9              very clearly pursuant to a state policy.

10                       You know, relevant instructions

11             were given.  I'm sorry to use the passive

12             rather than the active, because I don't know

13             who actually gave them, but, you know,

14             instructions were given that this is going to

15             happen.  Board of directors votes were made to

16             make these appointments happen.

17                       You know, and everybody kind of

18             understands that in a state, you know,

19             controlled corporation like that, even if it's

20             publicly listed, you know, when you get

21             instructions from -- you know, that have been

22             clearly -- you know, by senior management that

23             come from the party personnel department, that

24             this is what you do.

25                  Q.     Okay.

1           A.    So that's just kind of the

2     background from which I'm working when I look

3     at these documents and see these things.  And

4     that's kind of the background, you know,

5     knowledge that I'm bringing to it.

6           Q.    But you have no -- there's no

7     evidence to suggest that these people were not

8     qualified for the jobs they were nominated to,

9     correct?

10          A.    Correct.

11          Q.    And did you inquire -- did you

12    make -- and -- and -- strike that.

13                And did you inquire as to

14    whether the proper corporate procedures were

15    followed as specified, for example, in the

16    Articles of Association as to this appointment

17    in November of 2007?

18          A.    November 2007.  No, I assume

19    that the proper procedures were followed and

20    the shareholders voted as they were supposed

21    to vote or the directors voted as they were

22    supposed to vote.

23                You know, people not following

24    instructions is very rare.  I mean, everybody

25    kind of understands what you're supposed to

```
 1            do.

 2                   Q.     Okay.  All right.  I understand

 3            that, but -- but in terms of these specific

 4            appointments to Display --

 5                   A.     Right.

 6                   Q.     -- the people nominated were --

 7            strike that.

 8                          Do you have any evidence that as

 9            to these specific people appointed or --

10            strike that.

11                          As to these individuals

12            nominated in November 2007, do you have any

13            specific evidence that they were not legally

14            appointed to their positions pursuant to the

15            company law and the Articles of Association of

16            Display?

17                   A.     No, I -- I don't think so.

18            That's not my kind of claim at all, that there

19            was something illegal about it.

20                          So, for example, if we look at

21            paragraph D, we see Irico Group, which is at

22            that time, I think, the grandfather in a

23            sense, not the direct parent, but the parent's

24            parent, of Irico Display saying here's the

25            person we think should be general manager,
```

1           here's the person we think should be deputy

2           general manager.  Those are board

3           appointments.

4                   So, you know, who -- who is

5           reading this document?  The person that's

6           reading this document are the members of the

7           board of Irico Display, you know, who are

8           basically appointed, again, by Irico Group.

9           And they see these instructions and these are

10          what their superiors are telling them to do

11          and -- and then they do it.

12                  And the way they obey the

13          instruction is to cast the necessary vote.

14          You know, they have a board meeting and they

15          say okay, so we've been told to appoint this

16          guy as general manager, this guy as deputy

17          general manager, this person as chief

18          financial officer, you know, everybody in

19          favor, raise their hand.  And they'll all

20          raise their hand.  That is how I picture the

21          process going.

22                  Irico Group cannot, you know,

23          simply by issuing a document, you know, put

24          this manager on the payroll, you know.  That

25          has to be -- you know, there has to be the

```
 1              formal board resolution, especially because

 2              it's a listed company.

 3                    Q.    Right.  And so it's your

 4              expectation that the proper procedures were

 5              followed in this case?

 6                         MR. HUSTON:  Objection, asked

 7              and answered.

 8                         THE WITNESS:  Yes, I -- I think

 9              it's very likely the proper procedures, you

10              know, the formal procedures were followed.

11                    BY MR. RUSHING:

12                    Q.    Okay.  Did you review the

13              Articles of -- strike that.

14                         Have you reviewed -- strike

15              that.

16                         Did you review the Display

17              Articles of Association as part of your work

18              in preparing this declaration?

19                    A.    Yeah, my recollection is that

20              I -- I looked at some of it, some of the

21              Articles.  I believe I had that document

22              available to me in Chinese in any case.

23              That's my recollection.  I -- I don't think I

24              cite it in my declaration, so that's why I

25              can't recall for sure.
```

```
 1              Q.    It's my understanding that you

 2       do not cite it.

 3              A.    Um-hmm (affirmative).

 4              Q.    And so my question is that

 5       you're not -- your -- your opinion is not

 6       informed by the contents of the Articles of

 7       Association; is that correct?

 8              A.    I think that's correct.

 9              Q.    All right.  Let's -- what time

10       is it?

11                    MR. HUSTON:  We've been going

12       about an hour, a little -- little bit more.

13                    MR. RUSHING:  Let's take a

14       ten-minute break.

15                    MR. HUSTON:  Sure.

16                    VIDEO OPERATOR:  We're going off

17       the record at 2:06 p.m.

18                    (Thereupon, a brief recess was

19       taken.)

20                    VIDEO OPERATOR:  We're going

21       back on the record at 2:27 p.m.  This is the

22       beginning of media unit number four in the

23       deposition of Donald Clarke.

24            BY MR. RUSHING:

25              Q.    Okay.  Turning to page 12 of
```

1              your declaration, Professor Clarke, we've

2              covered some of this already, so I just want

3              to, hopefully, work through this quickly.

4                        So in paragraph 36 you say, In

5              my opinion, Irico Display's senior management,

6              directors and senior executives, would have

7              been considered state personnel in 2007 for

8              the purposes of China's criminal law.

9                        So my question -- my first

10             question is, what is the basis for that?  Can

11             you identify all the -- the documentary -- the

12             evidentiary basis for that opinion for me?

13                  A.     Sure.  So I guess it would be

14             the -- the specific article of the criminal

15             law, which I talk about in paragraph 38, this

16             joint opinion, the 2010 opinion that I talk

17             about in paragraph 39, and then the three

18             cases that I discuss, you know, all of which

19             are, you know, particularly related to Irico

20             Display or all -- all the Defendants being

21             senior managers at companies associated with

22             Irico Group, so they seemed relevant.

23                  Q.     So the -- the three cases, how

24             did you find those?

25                  A.     They were provided to me.

```
1              Q.     By counsel?

2              A.     Yes.

3              Q.     And so did you do any legal

4       research or have legal research performed in

5       order to find other cases on the same subject?

6              A.     I don't believe I did.  I don't

7       specifically recall doing that.

8              Q.     So did -- do you recall looking

9       for cases involving different companies?  Do

10      you recall looking for cases involving

11      different -- different companies -- different

12      companies?

13             A.     No.  No, I don't.

14             Q.     Do you recall looking for cases

15      in, you know, the 2 -- near the 2007 time

16      frame?

17             A.     No.

18             Q.     Okay.  So referring to paragraph

19      39 of your declaration, which is on page 13,

20      you rely on the 2010 document issued jointly

21      by the Supreme People's Court and the Supreme

22      People's Procuratorate --

23             A.     Procuratorate.

24             Q.     -- is that correct?

25             A.     I rely more on the cases than --
```

 1          than on this document because, again, you

 2          know, we have the same issue that we've

 3          discussed already about, you know, how we

 4          should define state-controlled.

 5                    So I'm -- I'm relying much more

 6          on the cases.

 7               Q.    Okay.

 8                    MR. RUSHING:  So can we mark

 9          that one next.

10                         (Thereupon, Deposition Exhibit

11                    Number 8433 was marked for

12                    identification.)

13          BY MR. RUSHING:

14               Q.    Okay.  I'm handing you Exhibit

15          8433, which is a multi-page document and was

16          attached as Exhibit 1 to the Plunkett

17          declaration.

18                    Professor Clarke, is this the

19          document to which you refer in paragraph 39?

20               A.    Let's see.  It looks like it,

21          yes.

22               Q.    And so I don't have too many

23          questions on this document.

24                    On the first page, the -- the

25          last full paragraph --

```
 1          A.     All right.

 2          Q.     -- says, With constant pushes

 3     for enterprise restructuring, People's Courts

 4     and People's Procuratorates have encountered

 5     some new situations and new issues when

 6     handling job-related criminal cases, such as

 7     embezzlement and bribery acceptance, in

 8     state-contributed enterprises.

 9               So do you read that as

10     indicating that this question of, you know,

11     defining state personnel was a new or --

12     strike that -- a developing issue in the law

13     in China in 2010?

14          A.     I'm sorry, can you repeat the

15     question?

16          Q.     Yes.  Do you see here on the --

17     in the last full paragraph of the

18     translated --

19          A.     Yes.

20          Q.     -- version on the first page it

21     refers to the fact that the People's Courts

22     and the People's Procuratorates have

23     encountered some new situations and new

24     issues?  Do you see that?

25          A.     Yes.
```

1          Q.    So do you agree that that would

2     seem to indicate that the -- this was an issue

3     that was developing on -- at that time?

4                     MR. HUSTON:  Objection, vague

5     and ambiguous.

6                     THE WITNESS:  Yeah, can you

7     specify the this, when you say this was an

8     issue?

9          BY MR. RUSHING:

10         Q.    Yes.  Yes, I can.

11                    The criminal laws definition of

12    state personnel.

13         A.    So that was one of the things,

14    right, that was, apparently, causing problems

15    because of state-owned enterprise reform.

16                    So, you know, ever since the

17    early '90s really or the mid '90s it was no

18    longer an easy matter to say this is a

19    state-owned enterprise, this isn't a

20    state-owned enterprise.  And so clearly they

21    were starting to get cases.

22                    And then this is what happens,

23    these cases filter up.  The Supreme People's

24    Court say, oh, we see the courts below are

25    having these problems, let's try to figure out

1           how to help them resolve these problems in a

2           unified way.

3                Q.    So this opinion was a -- a

4           response to uncertainty amongst the

5           individuals charged with, you know, enforcing

6           the laws as they related to, you know, the

7           criminal laws definition of state personnel;

8           is that correct?

9                A.    Among other things.  So this is

10          covering a number of subjects, but, yes, one

11          would guess that courts below and

12          procuratorates below were saying, you know,

13          how do we handle these cases of enterprises

14          that are not pure state-owned enterprises.

15          That's my suspicion that that's what's driving

16          it.

17               Q.    And, in fact, in -- at -- at --

18          strike that.

19                    MR. RUSHING:  Can you mark this

20          one as the next, please.

21                        (Thereupon, Deposition Exhibit

22                    Number 8434 was marked for

23                    identification.)

24                    MR. RUSHING:  I think I've

25          written on one of these.

1              MR. HUSTON:  Not this one.

2              MR. RUSHING:   This one.

3         BY MR. RUSHING:

4         Q.    Okay.  Professor Clarke, I'm

5    handing you what's been marked Exhibit 8434.

6    And it's a -- what purports to be a letter

7    from the Ministry of Finance regarding

8    opinions on the determination of state-owned

9    enterprises.

10        A.    Okay.  Thank you.

11        Q.    So -- so take a minute and look

12   at that and let me know if you've ever seen it

13   before.

14        A.    I don't recall seeing it, at

15   least not in connection with this case.  I'm

16   pretty sure that in the course of my research,

17   you know, and work, I would have run across it

18   before, but I don't specifically recall seeing

19   it in connection with this case.

20        Q.    Okay.  Thank you.

21              And in the very first

22   paragraph -- well, this is another letter from

23   a ministry or I guess the -- the first one was

24   from the Bureau of Statistics.  This one is

25   from -- from the Ministry of Finance, again,

```
 1              to the Ministry of Public Security, addressing

 2              the question that appears to be similar to

 3              that we discussed -- or, you know, that --

 4              discussed in the Plunkett Exhibit 11 earlier.

 5              And Plunkett Exhibit 11 is Exhibit 8429.

 6                        Okay.  So looking at -- if you

 7              compare -- do you have Exhibit 8429 there?

 8              A.     Yes, I do.

 9              Q.     And so if you -- you compare the

10              first paragraphs of each letter, in Exhibit

11              8434 the first paragraph refers to a letter

12              requesting opinions on the determination of

13              state-owned companies and enterprises, paren,

14              N. O. period Gong dash Jing 2003 368.

15                        Do you see that?

16              A.     Yes, I do.

17              Q.     And can you -- if you compare

18              that to the first paragraph of Exhibit 8429,

19              does it appear that they're responding to the

20              same letter?

21              A.     Yes, it does.

22              Q.     And is that filing -- what does

23              Gong Jing 2003 368 mean, if you know?

24              A.     I can hazard a guess as to what

25              it's about in a sense.
```

```
 1                        So those -- those are both
 2            Romanizations of characters.  And we don't
 3            know what the characters are.  But my guess
 4            is -- and this is just a guess, but it's a
 5            semi-informed guess -- is that Gong -- that's
 6            just an unofficial document title.
 7                 Q.     Okay.
 8                 A.     Gong stands for the first
 9            character of the word that means Public
10            Security Ministry.  And so they would have
11            justed abbreviate it that.
12                        Jing probably is the first
13            character of the word for economics.  So it
14            may be that this is a kind of the economic
15            crime section of the Public Security Ministry.
16            That's just kind of a guess based on not
17            knowing what the characters are or how they do
18            these things.
19                        And then -- but it would make
20            sense that that would be -- that the Ministry
21            of Public Security would have a department in
22            it that was in charge of handling economic
23            crimes, which, you know, bribery and
24            embezzlement are.
25                        2003, obviously the year in
```

 1          which it's issued.  And number 368 just means

 2          that it's the 368th document that this, you

 3          know, department has issued that year.  That's

 4          my guess as to what it means.

 5                    So I believe, yes, it looks like

 6          they sent the same letter to at least two

 7          different departments, saying help us out on

 8          this issue.

 9          Q.    Okay.  If you look at the

10          first -- first sentence of the second, Roman

11          Numeral II, paragraph --

12          A.    Yes.

13          Q.    -- with the continuous deepening

14          of the reform of state-owned enterprises, the

15          meaning of the long used term state-owned

16          companies and enterprises has changed

17          considerably.

18                    Is that -- do you agree with

19          that?

20          A.    Yes.  And I think we discussed

21          this earlier.  I said that it would -- you

22          know, it used to be obvious what was and what

23          wasn't.  And then it became much vaguer as we

24          started to get enterprises with mixed

25          ownership or, you know, derivative ownership.

1            Q.     And I think as we discussed with

2       reference to the previous -- to the -- the

3       letter from the State Bureau of Statistics,

4       does this indicate to you -- this exchange of

5       correspondence, does it indicate to you that

6       the -- at least at the Ministry of Public

7       Security there was a good deal of uncertainty

8       as to how to apply the law, you know, in terms

9       of the definition of state personnel?

10           A.     Well, certainly in terms of

11      anything that required a definition of

12      state-owned, you know, state-owned company,

13      yeah.

14           Q.     Okay.

15           A.     And to the extent that includes

16      state personnel, then -- then, yes.  I

17      don't -- you know, not having seen the letter,

18      I don't know whether they specifically asked

19      about state personnel.  And I don't see

20      anything in either of these things that

21      specifically addresses the issue of who counts

22      as, you know, state personnel.

23                  But they do, of course, address

24      this issue of, you know, who counts as

25      state-owned and state-controlled, which is

1            relevant to the issue of state personnel.

2                     Q.    And the -- as I read this

3            letter, the Ministry of Finance is saying that

4            the way in which you classify companies

5            depends on the kind of policy matters that are

6            important in various areas of society and,

7            therefore, for example, they don't think you

8            should just adopt the -- the reasoning of the

9            Ministry of Finance.

10                     Is that a fair characterization?

11                 A.    Yes.

12                     MR. HUSTON:  Objection,

13            argumentative.

14                     THE WITNESS:  But I do think

15            that's a fair characterization.  In fact, I

16            think I made the same point talking about this

17            letter from the State Statistical Bureau, that

18            they do things for their reasons and, you

19            know, different policies might apply for the

20            criminal law when you're trying to decide who

21            is state-owned and state-controlled.

22                     But the Ministry of Finance does

23            say exactly this and I -- I think that's

24            correct.

25                 BY MR. RUSHING:

```
 1                Q.    And looking -- the second

 2          sentence of paragraph two on the -- on the

 3          second page --

 4                A.    Second -- yes.  Sorry, do you

 5          mean -- oh, the -- so not counting the cover

 6          page?

 7                Q.    Yeah.  I mean, second --

 8                A.    Sorry.

 9                Q.    -- the second page of the

10          letter --

11                A.    Of the document.  Okay.

12                Q.    -- yes, the third page of the

13          exhibit.  Sorry.

14                A.    Right.  I see.  So number two,

15          that's the second full paragraph here.

16                Q.    Yeah.

17                A.    From the perspective of control?

18                Q.    Yes.

19                A.    I see it.

20                Q.    The second sentence there, As

21          for enterprises in which the state holds a

22          relatively controlling share, because the

23          shareholding and control structures are fairly

24          complicated, serious studies should be

25          conducted and specific standards for judgment
```

```
 1            established if these enterprises are to be

 2            included in the category of state-owned

 3            companies and enterprises.

 4                         Do you accept that as a fair

 5            statement of the state of the law as it -- as

 6            it applied to, you know, the definition of

 7            state personnel with regard to companies like

 8            Display?

 9                         MR. HUSTON:  Objection, vague

10            and ambiguous.

11                         THE WITNESS:  Yeah, let me just

12            take a look at the paragraph here in Chinese.

13                         So just one caution, that in

14            the -- in the first sentence, again, we have

15            this troublesome phrase state-owned holding

16            company that has caused all this difficulty,

17            that is exactly the term that we are now

18            correctly translating as state-controlled

19            companies.

20                         So they're saying state-owned

21            enterprise -- companies and enterprises should

22            include state-controlled companies.  And then

23            in the second sentence, among these, then they

24            talk about the difference between absolutely

25            controlled, which more than 50 percent, and
```

```
 1              then relatively controlled.

 2                        So they're saying -- I read this

 3              as -- and I think everybody would read it --

 4              as the Ministry of Finance saying that we have

 5              no problem in saying that when the state holds

 6              more than 50 percent of the shares, that

 7              company should be considered a state-owned

 8              company and enterprise.

 9                        And they're saying we don't have

10              a firm view as to what the criminal law ought

11              to say in the cases of other companies where

12              the state holds 50 percent or less.

13                        That -- that's how I understand

14              this statement.

15                   Q.    Well, and it goes on, though, to

16              recommend serious studies should be conducted,

17              et cetera.

18                        Do you see that?

19                   A.    Yes.  And they're saying, you

20              know, we're not the people to do it.  We're

21              the Ministry of Finance.  And that's

22              essentially what they say in the fourth

23              paragraph.  They say the Supreme People's

24              Court, you know, should provide a judicial

25              interpretation.  This is, you know, not in our
```

```
 1        wheelhouse.

 2               Q.     And -- and do you know if the

 3        supreme judicial court provided an -- an

 4        interpretation?

 5               A.     Yes, that's what the 2010

 6        document is.  They did it together with the

 7        supreme -- I mean, they weren't following --

 8        they weren't, you know, obeying the Ministry

 9        of Finance's orders, because they can't give

10        them orders, but that is -- certainly would

11        satisfy what the Ministry of Finance is asking

12        for.  That's the sort of thing they had in

13        mind, let's put it that way.

14               Q.     Right.  And so -- and as far as

15        you know, there was no clear -- you know,

16        clear statement of the law provided before

17        2010?

18               A.     Correct.  I -- I don't -- right,

19        I don't know that the Supreme People's Court,

20        you know, had any judicial interpretation on

21        this issue, you know, prior to 2010.

22               Q.     So these cases -- there's a --

23        in each case there was a first instance and a

24        second -- what -- what you've described as a

25        first instance and a second instance in these
```

1          cases.

2                          I presume the second instance in

3          each case was by a higher court?

4                  A.     Yes.  And the reason I call it

5          first and second instance, instead of trial

6          and appeal, is that -- just a very simple

7          reason -- is that in the Chinese system you

8          can appeal everything, not just the law, but

9          also the facts.  So it's a de novo hearing in

10         the second instance.  That's why I call it by

11         a different term.

12                 Q.     And does precedent matter in

13         Chinese criminal cases?

14                 A.     Okay.  Yeah, so this is a

15         complex subject.  The -- I guess you would say

16         the dogma of the Chinese legal system is that

17         precedent doesn't matter because the

18         self-image of the Chinese legal system is one

19         of a continental legal system.

20                         And the -- you know -- the

21         stereotyped image of a continental legal

22         system is one in which precedent doesn't

23         matter.  But in actual fact that's not true of

24         continental legal systems.

25                         And it's not totally true of

```
 1            China.  In other words, it is accurate in the

 2            sense that you cannot go to a Chinese court

 3            and say here's this previous decision, the

 4            principles of our legal system require that

 5            you follow it.

 6                      On the other hand, lawyers,

 7            practicing lawyers in China, pay a lot of

 8            money for access to commercial case law

 9            databases.  And that's because they find them

10            useful in their practice.

11                      And so knowing what other courts

12            have done is something that is useful

13            information to a lawyer when they're, you

14            know, making their case before a Chinese

15            court.

16                      In addition, there's been

17            research done by Professor Ben Liebman at

18            Columbia Law School, where he has shown that

19            judges also quite actively -- are also quite

20            active in using these case law databases in

21            handling cases and in trying to figure out

22            well, what -- you know, what have other people

23            done when faced with the same situation.

24                      So it's -- it's accurate to say

25            that they're not, kind of, formally binding in
```

1            the same way that they are here if everybody

2            agrees that the facts are -- are on all fours.

3            But they're not irrelevant and they're

4            certainly a guide to -- you know, they're an

5            indication of what courts are actually doing.

6                 Q.    So in the first case of Liu

7            Junjie, J-U-G-J-I-E --

8                         MR. HUSTON:  Can we get a

9            reference, Geoff?

10                        MR. RUSHING:  Oh, yeah.

11            Paragraph 40 of your declaration.

12                        THE WITNESS:  I see it.

13              BY MR. RUSHING:

14                 Q.    He was convicted on February

15            28th 2014; is that -- am I reading that

16            correctly?

17                 A.    Just look -- just looking at my

18            footnotes, that's how I have dated the first

19            instance case, yes.  So I am going to assume

20            that I dated it correctly.  I don't have the

21            case in front of me, but I'll assume that's

22            the date of the first case.

23                 Q.    And then the next case, Liu

24            Maihai, he was -- he won the first trial on

25            April 16, 2014, about six weeks later; is that

```
 1          correct?

 2                    A.    Yes.

 3                    Q.    And so his case wasn't -- and

 4          then -- and then his case was reversed seven

 5          months later, approximately, on November 11th

 6          2014.

 7                    A.    November 11th, correct.

 8                    Q.    And so until -- until his case

 9          was reversed -- strike that.

10                          So -- so at least until

11          Mr. Junjie -- Mr. Liu's case was affirmed on

12          May 6th, you had a trial court decision on

13          each side of the issue; is that right?

14                    A.    Well, let's see.  We have

15          February 28th for the Liu Junjie case,

16          paragraph 40.  We have April 16th for the Liu

17          Maihai case, paragraph 42.  And we have a

18          third case, Ge Di, paragraph 44.  Let me just

19          see when that -- that was June 30th.  Okay.

20                          And, sorry, and what's the

21          question again?

22                    Q.    You had a case -- you had two

23          cases, one going one way and the other going

24          the other way in, you know, the first few

25          months of 2014, correct?
```

```
 1              A.     Yes.  That's just restating the

 2         result of the first instance trials, yes.

 3              Q.     Well, I'm saying at least as of

 4         that point in time the issue was -- was

 5         unresolved; is that true?

 6              A.     Well, I don't think that

 7         conclusion follows.  I think as to whether the

 8         issue was -- the reason it doesn't necessarily

 9         follow is because, of course, in any legal

10         system we have a phenomenon of mistake.

11                    And what we have here is three

12         cases in which after they had fully gone

13         through the system, the system all came out

14         the same way.

15                    So to me that's, you know,

16         pretty convincing evidence that they thought

17         about it, because in all these cases the

18         defendants, you know, made the argument that

19         they weren't state personnel.

20                    And so the system in -- in each

21         case in -- two trials sort of considered it,

22         considered those arguments, and -- and

23         ultimately rejected them.

24              Q.     But you base your -- but you say

25         in paragraph 36 that based on these decisions
```

1           in 2014 and later, you believe that Irico

2           Display's senior management would have been

3           considered state personnel in 2007.

4                       And my question is, given the

5           uncertainties in the law that we've talked

6           about, how can you be confident making such

7           a -- an assertion?

8           A.      So -- well, I like this question

9           as a professor.  And I hope you won't mind me

10          being pedantic, but it -- I mean, this is an

11          interesting question of jurisprudence, because

12          in 2010, you know, after 2007, three years

13          after, we have a document that pretty much

14          settles the question, I think.  And these

15          three cases, I think, show the question being

16          settled.

17                      So the -- the question is what

18          was this -- you know, was the law -- was there

19          no law on the subject in 2007?  Was it

20          settled, except nobody knew it was settled and

21          we only knew after the fact in 2010 that the

22          Supreme People's Court, you know, has now told

23          you this is what the law was in 2007, it's

24          just that nobody knew it?

25                      So I guess when I see the

1              CERTIFICATE OF NOTARY

2                    I, MISTY KLAPPER, the officer

3         before whom the foregoing deposition was

4         taken, do hereby certify that the witness

5         whose testimony appears in the foregoing

6         deposition was duly sworn by me; that the

7         testimony of said witness was taken by me in

8         shorthand and thereafter reduced to

9         typewriting by me; that said deposition is a

10        true record of the testimony given by said

11        witness; that I am neither counsel for,

12        related to, nor employed by any of the parties

13        to the action in which this deposition was

14        taken; and, further, that I am not a relative

15        or employee of any attorney or counsel

16        employed by the parties hereto, nor

17        financially or otherwise interested in the

18        outcome of this action.

19            _____

20        Misty Klapper
          Notary Public in and for
          District of Columbia

21

22

23

24

25

# EXHIBIT 32

# BAKER BOTTS LLP

| | | |
|---|---|---|
| 101 CALIFORNIA ST. | AUSTIN | LONDON |
| SUITE 3600 | BEIJING | MOSCOW |
| SAN FRANCISCO, CALIFORNIA | BRUSSELS | NEW YORK |
| 94111 | DALLAS | PALO ALTO |
| | DUBAI | RIYADH |
| TEL  +1.415.291.6200 | HONG KONG | **SAN FRANCISCO** |
| FAX  +1.415.291.6300 | HOUSTON | WASHINGTON |
| BakerBotts.com | | |

Stuart C. Plunkett
TEL: 415.291.6203
FAX: 415.291.6303
stuart.plunkett@bakerbotts.com

September 14, 2018

*VIA E-MAIL*

R. Alexander Saveri (E-mail: rick@saveri.com)
Geoffrey C. Rushing (E-mail: grushing@saveri.com)
Cadio Zirpoli (E-mail: cadio@saveri.com)
Matthew D. Heaphy (E-mail: mheaphy@saveri.com)
SAVERI & SAVERI, INC.
706 Sansome St # 200
San Francisco, CA 94111

Re:    In re: Cathode Ray Tube (CRT) Antitrust Litigation -
Master File No. 3:07-cv05944-SC; MDL No. 1917

Counsel:

Irico Defendants are electronically producing documents Bates labeled IRI-CRT-00001199 through -3489, which can be downloaded at the following link:

Link: https://bbmft.bakerbotts.com/pkg?token=3ca2579a-0f78-40bc-a306-da7a42e71c45

Passwords to access the download link and extract the files will be sent under separate cover.  Irico Defendants designate this submission as "Confidential" pursuant to the Stipulated Protective Order.

This production contains additional nonprivileged electronic documents located by Irico that are responsive to Plaintiffs' discovery requests, including:

1.  Reports, requests for approval, and other communications with Chinese government entities and related internal communications;

2.  Directives from Chinese government entities and related internal communications;

3.  Agendas and summaries of internal meetings, shareholder meetings, and meetings with Chinese government officials;

4.  Organizational charts;

Active 38595917.1

5.   Internal planning and strategy documents;

6.   Documents related to restructuring of Irico entities; and

7.   Records of remarks given by Irico management and Chinese government officials.

Irico did not locate any responsive, nonprivileged documents in its electronic files relating to alleged conspiratorial meetings or sales of Irico CRT products to the United States (by Irico entities or third parties).

If you have any questions or have difficulty accessing these documents, please do not hesitate to contact me.

Sincerely,

Stuart C. Plunkett

cc:   Mario N. Alioto (malioto@tatp.com)
      Lauren C. Capurro (laurenrussell@tatp.com)
      Joseph M. Patane (jpatane@tatp.com)
      Christopher Micheletti (cmicheletti@zelle.com)

# EXHIBIT 33

## Matthew Heaphy

| | |
|---|---|
| **From:** | reilly.stoler@bakerbotts.com |
| **Sent:** | Monday, October 15, 2018 6:08 PM |
| **To:** | Guido Saveri; Rick Saveri; Geoff Rushing; Cadio Zirpoli; Matthew Heaphy; qfu@zelle.com; cmicheletti@zelle.com; jpatane@tatp.com; malioto@tatp.com; laurenrussell@tatp.com |
| **Cc:** | Tom.Carter@BakerBotts.com; erik.koons@bakerbotts.com; stuart.plunkett@bakerbotts.com; john.taladay@bakerbotts.com; kaylee.yang@bakerbotts.com; brian.jacobsmeyer@BakerBotts.com |
| **Subject:** | In re CRT, Case No. 3:07-cv-05944, MDL No. 1917 - 2018.10.15 Production of Documents |
| **Attachments:** | IRI-CRT007 .zip |

Counsel,
Irico hereby produces the attached documents, bates ranges IRI-CRT-00003490-3517.
These documents are responsive to Request No. 9 of DPPs First Set of Requests for Production, and Request No. 1 of IPPs Second Set of Interrogatories.

**Reilly Stoler**
Baker Botts L.L.P.
reilly.stoler@bakerbotts.com
T +1.415.291.6223
101 California Street , Suite 3600
San Francisco, CA 94111



**Confidentiality Notice:**

The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.

# EXHIBIT 34

# BAKER BOTTS LLP

|  |  |  |
|---|---|---|
| 101 CALIFORNIA ST. | AUSTIN | LONDON |
| SUITE 3600 | BEIJING | MOSCOW |
| SAN FRANCISCO, CALIFORNIA | BRUSSELS | NEW YORK |
| 94111 | DALLAS | PALO ALTO |
|  | DUBAI | RIYADH |
| TEL +1.415.291.6200 | HONG KONG | **SAN FRANCISCO** |
| FAX +1.415.291.6300 | HOUSTON | WASHINGTON |
| BakerBotts.com |  |  |

Stuart C. Plunkett
TEL: 415.291.6203
FAX: 415.291.6303
stuart.plunkett@bakerbotts.com

February 6, 2019

*Via E-Mail*

R. Alexander Saveri (E-mail: rick@saveri.com)
Geoffrey C. Rushing (E-mail: grushing@saveri.com)
Cadio Zirpoli (E-mail: cadio@saveri.com)
Matthew D. Heaphy (E-mail: mheaphy@saveri.com)
SAVERI & SAVERI, INC.
706 Sansome St # 200
San Francisco, CA 94111

Mario N. Alioto (malioto@tatp.com)
Lauren C. Capurro (laurenrussell@tatp.com)
Joseph M. Patane (jpatane@tatp.com)
Trump, Alioto, Trump & Prescott, LLP
2280 Union Street
San Francisco, CA 94123

Christopher Micheletti (cmicheletti@zelle.com)
44 Montgomery Street
Suite 3400
San Francisco CA 94104

Re:     In re: Cathode Ray Tube (CRT) Antitrust Litigation -
        Master File No. 3:07-cv-05944-SC; MDL No. 1917

Counsel:

Irico Defendants are electronically producing documents Bates labeled IRI-CRT-00003646 through -4168, which can be downloaded at in the link included in the cover email. Passwords to access the download link and extract the files will be sent under separate cover. Irico Defendants designate this submission as "Confidential" pursuant to the Stipulated Protective Order.

This production contains all responsive materials found in the boxes of hard copy documents collected from China National Electronics Import & Export Caihong Co., as discussed on our January 23, 2019 meet and confer call.

Active 39542961.1

If you have any questions, please do not hesitate to contact me.

Sincerely,

Stuart C. Plunkett