# EXHIBIT 1

Tracy R. Kirkham (69912)
John D. Bogdanov (215830)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA 94103
Telephone: (415) 788-3030
Facsimile: (415) 882-7040
Email: trk@coopkirk.com
          jdb@coopkirk.com

***Interim Lead Counsel for NRS Indirect
Purchaser Plaintiff Subclass***

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Master File No. 4:07-cv-5944-JST |
| | MDL No. 1917 |
| This Document Relates to:<br><br>All Indirect-Purchaser Actions | **CLASS ACTION COMPLAINT OF NON-REPEALER STATE INDIRECT PURCHASER PLAINTIFF ELEANOR LEWIS** |

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ......................................................................................4

II.    JURISDICTION AND VENUE .............................................................5

III.   DEFINITIONS ........................................................................................7

IV.    PLAINTIFFS ..........................................................................................7

V.     DEFENDANTS ......................................................................................7

VI.    AGENTS AND CO-CONSPIRATORS ...............................................22

VII.   INTERSTATE TRADE AND COMMERCE ........................................26

VIII.  FACTUAL ALLEGATIONS ................................................................26

       A.     CRT Technology......................................................................26

       B.     Structural Characteristics Of The CRT Market .......................27

              a.     Market Concentration ....................................................27

              b.     Information Sharing .......................................................28

              c.     Consolidation .................................................................28

              d.     Multiple Interrelated Business Relationships ...............28

              e.     High Costs Of Entry Into The Industry ........................30

              f.     The Maturity Of The CRT Product Market ..................30

              g.     Homogeneity Of CRT Products.....................................31

       C.     Pre-Conspiracy Market ............................................................31

       D.     Defendants' And Co-Conspirators' Illegal Agreements........................32

              a.     "Glass Meetings" ..........................................................32

              b.     Bilateral Discussions......................................................36

              c.     Defendants' And Co-Conspirators' Participation In Group And Bilateral Discussions ..............................................................38

       E.     The CRT Market During the Conspiracy...................................45

       F.     International Government Antitrust Investigations ...................47

2

IX.     THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS ...............................52

X.      FRAUDULENT CONCEALMENT .................................................................................56

XI.     CLASS ACTION ALLEGATIONS .................................................................................58

XII.    VIOLATIONS ALLEGED ...............................................................................................60

        A.      First Claim for Relief:  Violation of Section 1 of the Sherman Act .....................60

XIII.   PRAYER FOR RELIEF ...................................................................................................62

CLASS ACTION COMPLAINT OF NON-REPEALER STATE
INDIRECT PURCHASER PLAINTIFF ELEANOR LEWIS - Case No. 4:07-cv-5944, MDL No. 1917

1    Plaintiff Eleanor Lewis, individually and on behalf of a Class of all those similarly

2    situated in the United States, ("Plaintiff"), brings this action for injunctive relief under federal

3    antitrust laws against the Defendants named herein, and complaining and alleging as follows:

4                                   **I.   INTRODUCTION**

5        1.    Plaintiff brings this antitrust class action on behalf of individuals and entities that

6    indirectly purchased Cathode Ray Tube Products ("CRT Products") (as further defined below),

7    in the United States from Defendants, their predecessors, their successors, any subsidiaries or

8    affiliates thereof, or any of their named and unnamed co-conspirators, during the period

9    beginning at least as early as March 1, 1995 until at least November 25, 2007 (the "Class

10   Period").  Plaintiff alleges that during the Class Period the Defendants conspired to fix, raise,

11   maintain and/or stabilize prices of CRT Products sold in the United States.  Because of

12   Defendants' unlawful conduct, Plaintiff and other Class Members paid artificially inflated prices

13   for CRT Products and have suffered antitrust injury to their business or property.

14       2.    As further detailed below, beginning in at least 1995, Defendants Samsung,

15   Philips, Daewoo, LG and Chunghwa met or talked with at least one other Defendant in order to

16   discuss and agree upon CRT Product prices and the amount of CRT Products each would

17   produce.  Over time, these Defendants reached out to the other Defendant and co-conspirator

18   CRT Product manufacturers, including Toshiba, Panasonic, Hitachi, BMCC, IRICO, Thomson,

19   Mitsubishi, Thai CRT and Samtel, who then also met or talked with their competitors for the

20   purpose of fixing the prices of CRT Products.  By 1997, a formal system of multilateral and 28

21   bilateral meetings was in place, involving the highest levels of the Defendant corporations, all

22   with the sole purpose of fixing the prices of CRT Products at supracompetitive levels.

23       3.    Throughout the Class Period, Defendants' conspiracy was effective in moderating

24   the normal downward pressure on prices for CRT Products caused by periods of oversupply and

25   competition from new technologies, such as TFT-LCD and Plasma. Defendants' conspiracy

26   resulted in unusually stable pricing and even rising prices in a very mature, declining market.  As

27   a result of Defendants' unlawful conduct, Plaintiff and Class members paid higher prices for

28   CRT Products than they would have paid in a competitive market.

---

4.      This global conspiracy is being investigated by the Antitrust Division of the United States Department of Justice ("DOJ"), and by several other international competition authorities. On February 10, 2009, a federal grand jury in San Francisco issued a two-count indictment against C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., for his participation in a global conspiracy to fix the prices of CRTs used in computer monitors and televisions.  This is the first indictment to be issued in the DOJ's ongoing investigation into the CRT industry.

## II.  JURISDICTION AND VENUE

5.      This action is instituted under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to recover costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and all others similarly situated sustained as a result of the Defendants' violations of those laws.

6.      The Court has subject matter jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1337.

7.      Venue is proper in this Judicial District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 (b), (c) and (d), because during the Class Period one or more of the Defendants resided, transacted business, was found, or had agents in, this district, and because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, and a substantial portion of the affected portion of the interstate trade and commerce described below has been carried out in this district.

8.      Defendants conduct business throughout the United States, including this jurisdiction, and they have purposefully availed themselves of the laws of the United States. Defendants' products are sold in the flow of interstate commerce, and Defendants' activities had a direct, substantial and reasonably foreseeable effect on such commerce.

9.      Defendants' conspiracy to fix the prices of CRT Products substantially affected commerce throughout the United States and in each of the states identified herein, because Defendants directly or through their agents, engaged in activities affecting each such state. Defendants have purposefully availed themselves of the laws of the United States and in each of

the states identified herein in connection with their activities relating to the production, marketing, and sale and/or distribution of CRT Products.  Defendants produced, promoted, sold, marketed, and/or distributed CRT Products, thereby purposefully profiting from access to indirect purchaser consumers throughout the United States.  As a result of the activities described herein, Defendants:

    a.  Caused damage to the residents of the United States identified herein;

    b.  Caused damage throughout the United States and in each of the states identified herein by acts or omissions committed outside each such state and by regularly doing or soliciting business in each such state;

    c.  Engaged in a persistent course of conduct throughout the United States and within each state and/or derived substantial revenue from the marketing and sale of CRT Products in each such state; and

    d.  Committed acts or omissions that they knew or should have known would cause damage (and, in fact, did cause damage) throughout the United States and in each such state while regularly doing or soliciting business in each such state, engaging in other persistent courses of conduct in each such state, and/or deriving substantial revenue from the marketing and sale of CRT Products in each such state.

10.    The conspiracy described herein adversely affected every person nationwide who indirectly purchased Defendants' and their co-conspirators' CRT Products.  Defendants' conspiracy has resulted in an adverse monetary effect on indirect purchasers throughout the United States.

11.    Prices of CRT Products throughout the United States and in each state identified in this Complaint were raised to supracompetitive levels by the Defendants and their co-conspirators.  Defendants knew that commerce in CRT Products throughout the United States and in each of the states identified herein would be adversely affecting by implementing their conspiracy.

### III. **DEFINITIONS**

12.    As used herein, the term "CRT" or "CRTs" stands for "cathode ray tube(s)."  A CRT is a display technology used in televisions, computer monitors and other specialized applications.  The CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors.  An electron gun at the back of the vacuum tube emits electron beams.  When the electron beams strike the phosphors, the phosphors produce either red, green, or blue light.  A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors.  This process is rapidly repeated several times per second to produce the desired images.

13.    There are two types of CRTs: color display tubes ("CDTs") which are used in computer monitors and other specialized applications; and color picture tubes ("CPTs") which are used in televisions.  CDTs and CPTs are collectively referred to herein as "cathode ray tubes" or "CRTs."

14.    As used herein "CRT Products" includes (a) CRTs; and (b) products containing CRTs, such as television sets and computer monitors.

15.    The "Class Period" or "relevant period" means the period beginning at least March 1, 1995 through at least November 25, 2007.

16.    "Person" means any individual, partnership, corporation, association, or other business or legal entity.

17.    "OEM" means any Original Equipment Manufacturer of CRT Products.

### IV. **PLAINTIFFS**

18.    Plaintiff Eleanor Lewis is an Ohio resident.  During the relevant period, Ms. Lewis indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

### V. **DEFENDANTS**

**Philips Entities**

19.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V. ("Royal Philips") is a Dutch company with its principal place of business located at

7

1    Amstelplein 2, Breitner Center, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded

2    in 1891, is one of the world's largest electronics companies, with 160,900 employees located in

3    over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001. In 2001,

4    Royal Philips transferred its CRT business to a 50/50 CRT joint venture with defendant LG

5    Electronics, Inc. forming Defendant LG.Philips Displays (n/k/a LP Displays International, Ltd.).

6    In December 2005, as a result of increased pressure on demand and prices for CRT Products,

7    Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said

8    it would not inject further capital into the joint venture.  During the Class Period, Royal Philips

9    manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

10   through its subsidiaries or affiliates, to customers throughout the United States.

11          20.     Defendant Philips Electronics North America Corporation ("PENAC") is a

12   Delaware corporation with its principal place of business located at 1251 Avenue of the

13   Americas, New York, NY 10020-1104.  Philips Electronics NA is a wholly owned and

14   controlled subsidiary of Defendant Royal Philips.  During the Class Period, Philips Electronics

15   NA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

16   through its subsidiaries or affiliates, to customers throughout the United States.  Defendant Royal

17   Philips dominated and controlled the finances, policies, and affairs of PENAC relating to the

18   antitrust violations alleged in this Complaint.

19          21.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Electronics

20   Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu

21   Street, Nangang District, Taipei, Taiwan.  Philips Electronics Taiwan is a subsidiary of

22   Defendant Royal Philips.  During the Class Period, Philips Electronics Taiwan manufactured,

23   marketed, sold and/or distributed CRT Products, either directly or indirectly through its

24   subsidiaries or affiliates, to customers throughout the United States.  Defendant Royal Philips

25   dominated and controlled the finances, policies, and affairs of Philips Electronics Taiwan

26   relating to the antitrust violations alleged in this Complaint.

27          22.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

28   Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1

8

CLASS ACTION COMPLAINT OF NON-REPEALER STATE
INDIRECT PURCHASER PLAINTIFF ELEANOR LEWIS - Case No. 4:07-cv-5944, MDL No. 1917

andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Class Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips Brazil relating to the antitrust violations alleged in this Complaint.

23.    Defendants Royal Philips, PENAC, Philips Electronics Taiwan, and Philips Brazil are collectively referred to herein as "Philips."

**LP Displays**

24.    Defendant LP Displays International, Ltd. f/k/a LG Philips Displays ("LP Displays") was created in 2001 as a 50/50 joint venture between Defendants LG Electronics, Inc. and Royal Philips Electronics of The Netherlands.  In March 2007, LP Displays became an independent company organized under the laws of Hong Kong with its principal place of business located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion, and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LG Electronics would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Class Period, LP Displays manufactured, marketed, sold and distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

**Samsung Entities**

25.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Co., Ltd. ("Samsung SDI"), is a South Korean company with its principal place of business located at 15th – 18th Floor, Samsung Life Insurance Building, 150, 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-716, South Korea.  Samsung SDI is a public company.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy businesses, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in

1   the market for CRTs; more than another other producer.  Samsung SDI has offices in Chicago

2   and San Diego.  During the Class Period, Samsung SDI manufactured, marketed, sold and/or

3   distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

4   customers throughout the United States.

5          26.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

6   corporation with its principal place of business located at 3333 Michelson Drive, Suite 700,

7   Irvine, California.  Samsung SDI America is a wholly-owned and controlled subsidiary of

8   Samsung SDI.  During the Class Period, Samsung SDI America manufactured, marketed, sold

9   and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates,

10  to customers throughout the United States.  Defendant Samsung SDI dominated and controlled

11  the finances, policies, and affairs of Samsung SDI America relating to the antitrust violations

12  alleged in this Complaint.

13         27.     Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a

14  Mexican company with its principal place of business located at Blvd. Los Olivos, No.21014,

15  Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned

16  and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI

17  Mexico manufactured, marketed, sold and/or distributed CRT Products to customers, either

18  directly or indirectly through its subsidiaries or affiliates, throughout the United States.

19  Defendant and Samsung SDI dominated and controlled the finances, policies, and affairs of

20  Samsung SDI Mexico relating to the antitrust violations alleged in this Complaint.

21         28.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian

22  company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito

23  Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and

24  controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI Brazil

25  manufactured, marketed, sold and/or distributed CRT Products to customers, either directly or

26  indirectly through its subsidiaries or affiliates, throughout the United States.  Defendant Samsung

27  SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Brazil relating

28  to the antitrust violations alleged in this Complaint.

29.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Class Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.  Defendant and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this Complaint.

30.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.  Defendant Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this Complaint.

31.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian company with its principal place of business located at Lot 635 & 660, Kawasan Perindustrian, Tuanku, Jaafar, 71450 Sungai Gadut, Negeri Semblian Darul Khusus, Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI Co., Ltd.  During the Class Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.  Defendant Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this Complaint.

32.     Defendants Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Samsung SDI Malaysia are referred to collectively herein as "Samsung."

11

1    **Toshiba Entities**

2          33.    Defendant Toshiba Corporation is a Japanese corporation with its principal place

3    of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, Toshiba

4    Corporation held a 5-10 % worldwide market share for CRTs used in televisions and computer

5    monitors.  In December 1995, Toshiba Corporation partnered with Orion Electric Company

6    (n/k/a Daewoo Electronics Corporation) and two other non-defendant entities to form P.T.

7    Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an

8    annual production capacity of 2.3 million CRTs by 1999.  In 2002, Toshiba Corporation entered

9    into a joint venture with Defendant Panasonic Corporation called MT Picture Display Co., Ltd.

10   in which the entities consolidated their CRT businesses.  During the Class Period, Toshiba

11   Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or

12   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

13         34.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation

14   with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New

15   York, NY 10020.  Toshiba America is a wholly owned and controlled subsidiary of defendant

16   Toshiba Corporation.  During the Class Period, Toshiba America sold and/or distributed CRT

17   Products, either directly or indirectly through its subsidiaries or affiliates, to customers

18   throughout the United States.  Defendant Toshiba Corporation dominated and controlled the

19   finances, policies, and affairs of Toshiba America relating to the antitrust violations alleged in

20   this Complaint.

21         35.    Defendant Toshiba America Consumer Products, LLC ("TACP") is headquartered

22   in 82 Totawa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly owned and controlled

23   subsidiary of Defendant Toshiba Corporation through Toshiba America. During the Class

24   Period, TACP sold and/or distributed CRT Products, either directly or indirectly through its

25   subsidiaries or affiliates, to customers throughout the United States.  Defendant Toshiba

26   Corporation dominated and controlled the finances, policies, and affairs of TACP relating to the

27   antitrust violations alleged in this Complaint.

28         36.    Defendant Toshiba America Information Systems, Inc. ("TAIP") is a California

corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92718.  TAIP is a wholly owned and controlled subsidiary of Toshiba Corporation through Toshiba America, Inc.  During the Class Period, TAIP manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.  Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TAIP relating to the antitrust violations alleged in this Complaint.

37.    Defendant Toshiba America Electronics Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 9775 Toledo Way, Irvine, California 92618, and 19000 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC is a wholly owned and controlled subsidiary of Toshiba America, Inc., which is a holding company for defendant Toshiba Corporation.  TAEC acted as the North American sales and marketing representative for MTPD. Before MTPD's formation in 2003, TAEC was the North American engineering, manufacturing, marketing and sales arm of defendant Toshiba Corporation.  During the Class Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TAEC relating to the antitrust violations alleged in this Complaint.

38.    Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of defendant Toshiba Corporation. Toshiba Corporation transferred Toshiba Thailand to its CRT joint venture with Panasonic Corporation, MT Picture Display Co., Ltd., in 2003.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned subsidiary of MT Picture Display until its closure in 2007.  During the Class Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.  Defendant

1   Toshiba Corporation dominated and controlled the finances, policies, and affairs of TDDT

2   relating to the antitrust violations alleged in this Complaint.

3        39.   P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture

4   formed by Toshiba Corporation, Orion Electric Company and two other non-defendant entities in

5   December 1995. TEDI's principal place of business was located in Indonesia.  TEDI was

6   projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI

7   was transferred to MT Picture Display Co., Ltd. and its name was changed to PT.MT Picture

8   Display Indonesia.  During the Class Period, TEDI manufactured, marketed, sold and/or

9   distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

10  customers throughout the United States. Defendant Toshiba Corporation dominated and

11  controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in

12  this Complaint.

13       40.   Defendants Toshiba Corporation, Toshiba America, Inc., TACP, TAIP, TAEC,

14  TDDT and TEDI are referred to collectively herein as "Toshiba."

15  **Panasonic Entities**

16       41.   Defendant Panasonic Corporation, which was at all times during the Class Period

17  known as Matsushita Electric Industrial Co., Ltd. and only became Panasonic Corporation on

18  October 1, 2008, is a Japanese entity with its principal place of business located at 1006 Oaza

19  Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  In 2002, Panasonic Corporation entered into a

20  CRT joint venture with defendant Toshiba forming MT Picture Display Co., Ltd. ("MTPD").

21  Panasonic Corporation was the majority owner with 64.5 percent.  On April 3, 2007, Panasonic

22  Corporation purchased the remaining 35.5 percent stake in the joint venture, making MTPD a

23  wholly-owned subsidiary of Panasonic Corporation.  In 2005, the Panasonic brand had the

24  highest CRT Product revenue in Japan.  During the Class Period, Panasonic Corporation

25  manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

26  through its subsidiaries or affiliates, to customers throughout the United States.

27       42.   Matsushita Electronic Corporation (Malaysia) Sdn Bhd. ("Matsushita Malaysia")

28  was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku

14

1    Ampuan Section 21, Shah Alam Industrial Site, Shah Alam, Malaysia 40000.  Matsushita

2    Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.

3    Panasonic Corporation transferred Matsushita Malaysia to its CRT joint venture with Toshiba

4    Corporation, MT Picture Display Co., Ltd., in 2003.  It was re-named as MT Picture Display

5    (Malaysia) Sdn. Bhd. and operated as a wholly-owned subsidiary of MT Picture Display until its

6    closure in 2006.  During the Class Period, Matsushita Malaysia manufactured, marketed, sold

7    and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates,

8    to customers throughout the United States.  Defendant Panasonic Corporation dominated and

9    controlled the finances, policies, and affairs of Matsushita Malaysia relating to the antitrust

10   violations alleged in this Complaint.

11        43.    Defendants Panasonic Corporation and Matsushita Malaysia are collectively

12   referred to herein as "Panasonic."

13        44.    Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese

14   company with its principal place of business located at No. 9, Jiuxianqiao N. Rd., Dashanzi

15   Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which was held

16   by MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China

17   National Electronics Import & Export Beijing Company (a China state-owned enterprise), and

18   Beijing Yayunchun Branch of the Industrial and Commercial Bank of China, Ltd. (a China state-

19   owned enterprise).  Formed in 1987, BMCC was Matsushita's (n/k/a Panasonic) first CRT

20   manufacturing facility in China.  BMCC is the second largest producer of CRTs in China.

21   During the Class Period, BMCC manufactured, marketed, sold and/or distributed CRT Products,

22   either directly or indirectly through its subsidiaries or affiliates, to customers throughout the

23   United States.

24   **Hitachi Entities**

25        45.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business

26   located at 6-1 Marunouchi Center Building 13F, Chiyoda-ku, Tokyo 100-8280, Japan.  Hitachi

27   Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s

28   worldwide market share for color CRTs was 20 percent.  During the Class Period, Hitachi Ltd.

1   manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

2   through its subsidiaries or affiliates, to customers throughout the United States.

3          46.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with

4   its principal place of business located at AKS Building, 3 Kandaneribeicho 3, Chiyoda-ku,

5   Tokyo, 101-0022, Japan.  Hitachi Displays, Ltd. was originally established as Mobara Works of

6   Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning,

7   development, design, manufacturing and sales concerned with the display business of Hitachi,

8   Ltd. were spun off to create a separate company called Hitachi Displays, Ltd.  During the Class

9   Period, Hitachi Displays, Ltd. manufactured, marketed, sold and/or distributed CRT Products,

10  either directly or indirectly through its subsidiaries or affiliates, to customers throughout the

11  United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and

12  affairs of Hitachi Displays relating to the antitrust violations alleged in this Complaint.

13         47.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware

14  corporation with its principal place of business located as 1000 Hurricane Shoals Road, Ste. D-

15  100, Lawrenceville, GA 30043.  HEDUS is a subsidiary of defendants Hitachi Displays, Ltd. and

16  Hitachi, Ltd. During the Class Period, HEDUS manufactured, marketed, sold and/or distributed

17  CRT Products to customers, either directly or indirectly through its subsidiaries or affiliates, to

18  customers throughout the United States.  Defendant Hitachi, Ltd. and Hitachi Displays, Ltd.

19  dominated and controlled the finances, policies, and affairs of HEDUS relating to the antitrust

20  violations alleged in this Complaint.

21         48.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company

22  with its principal place of business located at 2000 Sierra Point Parkway, Brisbane, California

23  94005.  Hitachi America is a wholly-owned and controlled subsidiary of defendant Hitachi, Ltd.

24  During the Class Period, Hitachi America sold and/or distributed CRT Products, either directly

25  or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

26  Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi

27  America relating to the antitrust violations alleged in this Complaint.

28         49.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singapore company with its

1  principal place of business located at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore,

2  049318.  Hitachi Asia is a wholly owned and controlled subsidiary of defendant Hitachi, Ltd.

3  During the Class Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT

4  Products, either directly or indirectly through its subsidiaries or affiliates, to customers

5  throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances,

6  policies, and affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

7       50.    Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a

8  Chinese company with its principal place of business located at 5001 Huanggang Road, Futian

9  District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interest in

10 Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the

11 government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member

12 of the Hitachi corporate group for all but the last two weeks of the Class Period. During the Class

13 Period, Hitachi Shenzhen manufactured, sold and distributed CRT Products, either directly or

14 indirectly through its subsidiaries or affiliates, to customers throughout the United States.

15 Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies,

16 and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

17      51.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, HEDUS, Hitachi

18 Asia, and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

19 **Tatung**

20      52.    Defendant Tatung Company of America, Inc. ("Tatung America") is a California

21 corporation with its principal place of business located at 2850 El Presidio Street, Long Beach,

22 California.  Tatung America is a subsidiary of Tatung Company. Currently, Tatung Company

23 owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin,

24 the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's

25 recent death, her share recently passed to her two children.  During the Class Period, Tatung

26 America manufactured, marketed, sold and/or distributed CRT Products, either directly or

27 indirectly through its subsidiaries or affiliates, to customers throughout the United States.

28 **IRICO Entities**

17

CLASS ACTION COMPLAINT OF NON-REPEALER STATE
INDIRECT PURCHASER PLAINTIFF ELEANOR LEWIS - Case No. 4:07-cv-5944, MDL No. 1917

53.     Defendant IRICO Group Corporation ("IGC") is a Chinese corporation with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, sale and/or distribution of CRT Products.  During the Class Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

54.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of defendant IGC.  In 2006, IDDC was China's top CRT maker. During the Class Period, IDDC manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this Complaint.

55.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit and taxation.  During the Class Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

56.     Defendants IGC, IDDC, and IGE are collectively referred to herein as "IRICO."

**Thai CRT**

57.     Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company with its principal place of business located at 1/F Siam Cement Road, Bangsue Dusit, Bangkok,

18

1  Thailand.  Thai CRT is a subsidiary of Siam Cement Group.  It was established in 1986 as

2  Thailand's first manufacturer of CRTs for color televisions.  During the Class Period, Thai CRT

3  manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

4  through its subsidiaries or affiliates, to customers throughout the United States.

5  **Samtel**

6      58.     Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal

7  place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.

8  Samtel's market share for CRTs sold in India is approximately 40%.  Samtel is India's largest

9  exporter of CRTs.  Samtel has gained safety approvals from the United States, Canada, Germany

10  and Great Britain for its CRT Products.  During the Class Period, Samtel manufactured,

11  marketed, sold and/or distributed CRT Products, either directly or indirectly through its

12  subsidiaries or affiliates, to customers throughout the United States.

13  **Daewoo/Orion Entities**

14      59.     During the Class Period, Orion Electric Company ("Orion") was a major

15  manufacturer of CRTs. Orion was a Korean corporation which filed for bankruptcy in 2004.  In

16  1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was

17  involved in CRT Product sales and manufacturing joint ventures and had subsidiaries all over the

18  world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is

19  informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo

20  Group included Daewoo Electronics Company, Ltd., Daewoo Telecom Company, Daewoo

21  Corporation, and Orion Electric Components Company.  The Daewoo Group was dismantled in

22  or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity

23  called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA

24  produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.

25  In December 1995, Orion partnered with defendant Toshiba Corporation and two other non-

26  defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.

27  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  During

28  the Class Period, Orion, Daewoo Electronics, TEDI and DOSA manufactured, marketed, sold

19

CLASS ACTION COMPLAINT OF NON-REPEALER STATE
INDIRECT PURCHASER PLAINTIFF ELEANOR LEWIS - Case No. 4:07-cv-5944, MDL No. 1917

1   and/or distributed CRT Products, either directly or indirectly through their subsidiaries or

2   affiliates, to customers throughout the United States.

3        60.    Daewoo Electronics, Orion, and DOSA are collectively referred to herein as

4   "Daewoo."

5   **Thomson Entities**

6        61.    Defendant Thomson SA (n/k/a Technicolor SA) ("Thomson SA" or "Technicolor

7   SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc

8   92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary

9   Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United

10   States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA

11   sold its CRTs internally to its television-manufacturing division, which had plants in the United

12   States and Mexico, and to other television manufacturers in the United States and elsewhere.

13   Thomson SA's television division also purchased CRTs from other CRT manufacturers.

14   Thomson SA's CRT televisions were sold in the United States to consumers under the RCA

15   brand.

16        62.    In November 2003, Thomson SA sold its television division to a joint venture it

17   formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson

18   Electronics Corporation ("TCL-Thomson").  TCL took a 67 percent stake in the joint venture,

19   with Thomson SA holding the rest of the shares.  As part of the joint venture agreement, the

20   parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand

21   in Asia and the Thomson and RCA brands in Europe and North America, respectively.

22        63.    In July 2005, Thomson SA sold its CRT business to Videocon.  At the same time,

23   it invested €240 million in Videocon, including a €225 million investment in Videocon and a €15

24   million investment in Videocon International.  Thomson SA also acquired a 13.1% interest in

25   Videocon.  Under its agreement with Videocon, Thomson management would help Videocon run

26   the CRT business during the transition period and beyond.  Videocon and Thomson also agreed

27   on Preferred Supplier Agreements for Thomson's display components business.  Thomson SA

28   obtained at least one seat on Videocon's board of directors.  Thomson SA maintained at least a

20

CLASS ACTION COMPLAINT OF NON-REPEALER STATE
INDIRECT PURCHASER PLAINTIFF ELEANOR LEWIS - Case No. 4:07-cv-5944, MDL No. 1917

1   10% ownership interest in Videocon for the rest of the Class Period.

2        64.    During the Class Period, Thomson SA manufactured, marketed, sold and/or

3   distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

4   customers throughout the United States.

5        65.    Defendant Thomson Consumer Electronics, Inc. (n/k/a Technicolor USA, Inc.)

6   ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business

7   located at 10330 N Meridian St., Indianapolis, IN 46290-1024.  Thomson Consumer Electronics

8   is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major

9   manufacturer of CRTs for the United States market, with plants located in Scranton, PA, Marion,

10   IN and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson

11   Consumer Electronics sold its CRTs internally to its own television-manufacturing division,

12   which had plants in the United States and Mexico, and to other television manufacturers in the

13   United States and elsewhere.  Thomson's CRT televisions were sold in the United States to

14   United States consumers under the RCA brand.  Thomson Consumer Electronic's television

15   business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon

16   Industries, Ltd. in 2005.  During the Class Period, Thomson Consumer Electronics

17   manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

18   through its subsidiaries or affiliates, to customers throughout the United States.

19        66.    Thomson SA and Thomson Consumer Electronics are collectively referred to

20   herein as "Thomson."

21   **Technologies Displays**

22        67.    Defendant Technologies Displays Americas LLC ("TDA") (formerly Thomson

23   Displays Americas LLC) is a Delaware limited liability company with its principal place of

24   business located at 1778 Carr Road Suite 4B, Calexico, California 92231.  Thomas Displays

25   Americas LLC was a wholly-owned subsidiary of Thomson Consumer Electronics.  It was one

26   of the Thomson subsidiaries purchased by Videocon as alleged herein.  It is a wholly-owned

27   subsidiary of Videocon and is now owned by Eagle Corp., Ltd., which became a wholly-owned

28   subsidiary of Videocon on December 31, 2005, after Videocon acquired the balance 81% equity

1   stake in Eagle Corp., Ltd. Eagle Corp. acquired TDA in September 2005.  TDA was originally

2   formed with governing members represented equally from Thomson and Videocon.  TDA is the

3   parent corporation of Technologies Displays Mexicana, a Mexican corporation which

4   manufactured CRTs and sold CRTs to TDA for sale and distribution in the United States.

5   Thomson, and then defendant Videocon, dominated and/or controlled the finances, policies,

6   and/or affairs of TDA relating to the antitrust violations alleged herein.  Two high-level

7   managers, Jack K. Brunk, Managing Director of NAFTA Sales, and James P. Hanrahan,

8   Thomson's General Manager, transitioned to work for TDA after Videocon acquired Thomson's

9   CRT business.  TDA referred to itself as a "Thomson" business even after Videocon's

10  acquisition.  During the Class Period, TDA marketed, sold and/or distributed CRTs, either

11  directly or indirectly through its subsidiaries or affiliates, to customers throughout the United

12  States.

13  **Videocon**

14          68.     Defendant Videocon Industries, Ltd. ("Videocon") is an Indian corporation with its

15  principal place of business located at Aurangabad-Paithan Road, 14 KM Stone, Chitegaon, Tq.

16  Paithan, Dist. Aurangabad - 431 105, India.  In or about June 2005, Videocon acquired the CRT

17  businesses of Thomson SA and its wholly-owned subsidiary Thomson Consumer Electronics,

18  which included manufacturing facilities in Poland, Italy, Mexico, and China.  Videocon

19  manufactured its CRTs for the United States market in Thomson's former CRT plants in

20  Mexicali, Mexico and China.  Videocon sold these CRTs primarily to the joint venture, TCL-

21  Thomson, which manufactured CRT televisions for the U.S. market in Juarez, Mexico, and in

22  China, and which it sold under the RCA brand.  During the Class Period, Videocon

23  manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

24  through its subsidiaries or affiliates, to customers throughout the United States.

25          69.     All of the above-listed defendants are collectively referred to herein as

26  "Defendants."

27                          **VI.  AGENTS AND CO-CONSPIRATORS**

28          70.     Various other persons, firms and corporations, some of whom are unknown to the

1    Plaintiff at this time and therefore are not named as Defendants herein, but including the known

2    entities described below, have participated as co-conspirators with Defendants and have

3    performed acts and made statements in furtherance of the conspiracy and/or in furtherance of the

4    anticompetitive, unfair or deceptive conduct.  Plaintiff reserves the right to name some or all of

5    these Persons as Defendants at a later date.

6    **Mitsubishi Entities**

7          71.     Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a

8    Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

9    Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

10   Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

11   internally to Mitsubishi's television and monitor manufacturing division and to other television

12   and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

13   division also purchased CRTs from other CRT manufacturers.  During the Class Period,

14   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

15   United States.

16         72.     Co-conspirator Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric

17   USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

18   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan.  Mitsubishi

19   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

20   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

21   and monitor manufacturing division and to other television and monitor manufacturers in the

22   U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

23   other CRT manufacturers.  During the Class Period, Mitsubishi Electric USA manufactured,

24   marketed, sold and distributed CRT Products in the United States.

25         73.     Co-conspirator Mitsubishi Digital Electronics Americas, Inc. ("Mitsubishi

26   Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

27   Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.  During the Class

28   Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT

23

1   televisions and monitors in the United States.

2       74.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are

3   collectively referred to herein as "Mitsubishi."

4   **LG Electronics Entities**

5       75.    Co-conspirator LG Electronics, Inc. is a corporation organized under the laws of

6   Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong,

7   Yeoungdeungpo-gu, Seoul 150-721, South Korea.  LG Electronics, Inc. is a $48.5 billion global

8   force in consumer electronics, home appliances and mobile communications, which established

9   its first overseas branch office in New York in 1968.  The company's name was changed from

10  GoldStar Communications to LG Electronics, Inc. in 1995, the year in which it also acquired

11  Zenith in the United States.  In 2001, LG Electronics, Inc. transferred its CRT business to a

12  50/50 CRT joint venture with Defendant Koninklijke Philips Electronics N.V. a/k/a Royal

13  Philips Electronics N.V. forming Defendant LG.Philips Displays (n/k/a LP Displays

14  International, Ltd.).  During the Class Period, LG Electronics, Inc. manufactured, marketed, sold

15  and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates,

16  to customers throughout the United States.

17      76.    Co-conspirator LG Electronics U.S.A., Inc. ("LGEUSA") is a Delaware

18  corporation with its principal place of business located at 1000 Sylvan Avenue, Englewood

19  Cliffs, NJ 07632.  LG Electronics USA, Inc. is a wholly-owned and controlled subsidiary of

20  Defendant LG Electronics, Inc.  During the class period, LG Electronics U.S.A., Inc.

21  manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

22  through its subsidiaries or affiliates, to customers throughout the United States.  Defendant LG

23  Electronics, Inc. dominated and controlled the finances, policies, and affairs of LGEUSA relating

24  to the antitrust violations alleged in this Complaint.

25      77.    Co-conspirator LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese

26  entity with its principal place of business located at 7F, No.47, Lane3, Jihu Road, NeiHu District,

27  Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG

28  Electronics, Inc.  During the class period, LGETT manufactured, marketed, sold and/or

1   distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

2   customers throughout the United States.  Defendant LG Electronics, Inc. dominated and

3   controlled the finances, policies, and affairs of LGETT relating to the antitrust violations alleged

4   in this Complaint.

5       78.   Co-conspirators LG Electronics, Inc., LGEUSA, and LGETT are collectively

6   referred to herein as "LG."

7   **Chunghwa Entities**

8       79.   Co-conspirator Chunghwa Picture Tubes Ltd. ("CPT") is a Taiwanese company

9   with its principal place of business located at 1127 Heping Road, Bade City, Taoyuan, Taiwan.

10  CPT was founded in 1971 by Tatung Company.  Throughout the majority of the Class Period,

11  Tatung Company owned a substantial share in CPT.  Although Tatung Company's holdings in

12  CPT have fallen over time, it retains substantial control over CPT's operations.  Tatung

13  Company lists Chunghwa on its website as one of its "global subsidiaries."  And the Chairman of

14  CPT, Weishan Lin, is also the Chairman and General Manager of Tatung Company.  CPT is a

15  leading manufacturer of CRTs.  During the Class Period, CPT manufactured, marketed, sold

16  and/or distributed CRT Products, both directly and through its wholly-owned and controlled

17  subsidiaries in Malaysia, China, and Scotland, to customers throughout the United States.

18      80.   Co-conspirator Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

19  Malaysia") is a Malaysian company with its principal place of business located at Lot 1, Subang

20  Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.

21  Chunghwa Malaysia a wholly-owned and controlled subsidiary of defendant Chunghwa Picture

22  Tubes.  Chunghwa Malaysia is a leading worldwide supplier of CRTs.  During the Class Period,

23  Chunghwa Malaysia manufactured, marketed, sold and/or distributed CRT Products, either

24  directly or indirectly through its subsidiaries or affiliates, to customers throughout the United

25  States.  Defendant CPT dominated and controlled the finances, policies, and affairs of Chunghwa

26  Malaysia relating to the antitrust violations alleged in this Complaint.

27      81.   Co-conspirators CPT and Chunghwa Malaysia are collectively referred to herein as

28  "Chunghwa."

25

CLASS ACTION COMPLAINT OF NON-REPEALER STATE
INDIRECT PURCHASER PLAINTIFF ELEANOR LEWIS - Case No. 4:07-cv-5944, MDL No. 1917

82.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

83.     Defendants are also liable to acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

84.     Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.  Each Defendant which is a subsidiary of a foreign parent acts as the sole United States agent for CRT Products made by its parent company.

## VII.   INTERSTATE TRADE AND COMMERCE

85.     Throughout the Class Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate and international commerce, including through and into this judicial district.

86.     During the Class Period, Defendants collectively controlled the vast majority of the market for CRT Products, both globally and in the United States.

87.     Defendants' unlawful activities, as described herein, took place within the flow of interstate commerce to purchasers of CRT Products located in states other than the states in which Defendants are located, as well as throughout the world, and had a direct, substantial and reasonably foreseeable effect upon interstate and international commerce, including the United States markets for CRT Products.

## VIII.  FACTUAL ALLEGATIONS

### A.      CRT Technology

88.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  It was not until the RCA Corporation introduced the product at the 1939 World's Fair, however, that it became widely available to

26

1  consumers.  Since then, CRTs have become the heart of most display products, including

2  televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs. Even large

3  public displays, including many scoreboards at sports arenas, are comprised of thousands of

4  single color CRTs.

5      89.    As noted above, the CRT is a vacuum tube that is coated on its inside face with

6  light sensitive phosphors.  An electron gun at the back of the vacuum tube emits electron beams.

7  When the electron beams strike the phosphors, the phosphors produce either red, green, or blue

8  light.  A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams

9  to produce the desired colors.  This process is rapidly repeated several times per second to

10  produce the desired images.

11      90.    The quality of a CRT display is dictated by the quality of the CRT itself.  No

12  external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

13  the whole product such that the product is often simply referred to as "the CRT."

14      91.    Until the last few years, CRTs were the dominant technology used in displays,

15  including television and computer monitors.  During the Class Period, this translated into the sale

16  of millions of CRT Products, generating billions of dollars in annual profits.

17      **B.    Structural Characteristics Of The CRT Market**

18      92.    The structural characteristics of the CRT Product market are conducive to the type

19  of collusive activity alleged in this Complaint.  These characteristics include market

20  concentration, ease of information sharing, the consolidation of manufacturers, multiple

21  interrelated business relationships, significant barriers to entry, maturity of the CRT Product

22  market, and homogeneity of products.

23      **a.    Market Concentration**

24      93.    During the Class Period, the CRT industry was dominated by relatively few

25  companies.  In 2004, defendants Samsung SDI, LG.Philips Displays (n/k/a LP Displays),

26  Chunghwa, and MT Picture Display together held a collective 78% share of the global CRT

27  market.  The high concentration of market share facilitates coordination since there are fewer

28  cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor

the pricing and production of other cartel members.

**b.    Information Sharing**

94.    Because of common membership in trade associations for the CRT Product market and related markets (for e.g., TFT-LCD), interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these opportunities to discuss and agree upon their pricing for CRT Products.

95.    Defendants Chunghwa, Hitachi and Samsung are all members of the Society for Information Display.  Defendants Samsung and LG Electronics, Inc. are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo, LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants used these trade associations as vehicles for discussing and agreeing upon their pricing for CRT Products.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

**c.    Consolidation**

96.    The CRT Product industry also had significant consolidation during the Class Period, including but not limited to: (a) the creation of LG.Philips Displays (n/k/a LP Displays) in 2001 as a joint venture between Royal Philips and LG Electronics, Inc.; and (b) the 2002 merger of Toshiba and Matsushita/Panasonic's CRT business into MTPD.

97.    Defendants also consolidated their manufacturing facilities in lower cost venues such as China and reduced manufacturing capacity to prop up prices.

**d.    Multiple Interrelated Business Relationships**

98.    The CRT Product industry has a close-knit nature whereby multiple business relationships between supposed competitors blur the lines of competition and provided ample opportunity to collude.  These business relationships also created a unity of interest among

28

1   competitors so that the conspiracy was easier to implement and enforce than if such

2   interrelationships did not exist.

3       99.     Examples of the high degree of cooperation among Defendants in both the CRT

4   Product market and other closely related markets include the following:

5           a.      The formation of the CRT joint venture LG.Philips Displays in 2001 by

6   Defendants LG Electronics, Inc. and Royal Philips.

7           b.      Defendants LG Electronics, Inc. and Royal Philips also formed LG.Philips

8   LCD Co., Ltd., n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of

9   manufacturing TFT-LCD panels.

10          c.      The formation of the CRT joint venture MTPD in 2003 by Defendants

11  Toshiba and Panasonic.

12          d.      Defendants Toshiba and Panasonic also formed Toshiba-Matsushita

13  Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD

14  panels.

15          e.      In December 1995, Defendants Daewoo and Toshiba partnered with two

16  other non-Defendant entities to form TEDI which manufactured CRTs in Indonesia.

17          f.      Defendants Daewoo and Toshiba also signed a cooperative agreement

18  relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN LCDs, and

19  Toshiba, which had substituted its STN LCD production with TFT LCD production, marketed

20  Daewoo's STN LCDs globally through its network.

21          g.      Also in 1995, Defendant Chunghwa entered into a technology transfer

22  agreement with Defendant Toshiba for large CPTs.

23          h.      Defendant Chunghwa has a joint venture with Defendant Samsung

24  Electronics Co., Ltd. for the production of liquid crystal display panels.  Chunghwa now licenses

25  the technology from Defendant Royal Philips, a recent development that helped resolve a patent

26  infringement suit filed in 2002.

27          i.      Defendants LG Electronics, Inc. and Hitachi Ltd. entered into a joint

28  venture in 2000 for the manufacture, sale and distribution of optical storage products such as

29

CLASS ACTION COMPLAINT OF NON-REPEALER STATE
INDIRECT PURCHASER PLAINTIFF ELEANOR LEWIS - Case No. 4:07-cv-5944, MDL No. 1917

DVD drives.

j.     Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung Electronics Co., Ltd. and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k.     Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Inc., Samsung, Royal Philips, and Panasonic.

**e.     High Costs Of Entry Into The Industry**

100.   There are substantial barriers to entry in the CRT Products industry. It would require substantial time, resources and industry knowledge to even potentially overcome the barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

**f.     The Maturity Of The CRT Product Market**

101.   Newer industries are typically characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

102.   Demand for CRT Products was declining throughout the Class Period.  Static or declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

103.   In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and Plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and are predicted to decline by an additional 84.5 percent between 2006 and 2010.

104.   Although demand was declining as a result of the popularity of flat-panel LCD/plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Class Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and

30

plasma displays during the Class Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

105.   In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

106.   As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.  CRT televisions continue to dominate the global television market, accounting for 75 percent of worldwide TV units in 2006.

### g.   Homogeneity Of CRT Products

107.   CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Products for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sell and Plaintiff (and Class members) purchase CRT Products primarily on the basis of price.

108.   It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.   Pre-Conspiracy Market

109.   The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and the Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity, and customers.

110.   In the early 1990s, representatives from Samsung, Daewoo, Chunghwa and Orion visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.  The pricing discussions were usually limited, however, to exchanges of the range of prices that each competitor had quoted to specific

1    customers.

2         **D.    Defendants' And Co-Conspirators' Illegal Agreements**

3         111.   Plaintiff is informed and believes, and thereon alleges, that in order to control and

4    maintain profitability during declining demand for CRT Products, Defendants and their co-

5    conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has

6    been to raise, fix, maintain and/or stabilize the prices at which they sold CRT Products to

7    artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

8         112.   The CRT conspiracy was effectuated through a combination of group and bilateral

9    meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the

10   primary method of communication and took place on an informal, ad hoc basis.  During this

11   period, representatives from Defendants LG, Samsung and Daewoo visited the other Defendant

12   and co-conspirator manufacturers including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba,

13   Mitsubishi and Panasonic to discuss increasing prices for CRT Products in general and to

14   specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan,

15   Malaysia, Indonesia, and Singapore.

16        113.   Defendants Samsung, Chunghwa, LG, Mitsubishi and Daewoo also attended

17   several ad hoc group meetings during this period.  The participants at these group meetings also

18   discussed increasing prices for CRT Products.

19        114.   As more manufacturers formally entered the conspiracy, group meetings became

20   more prevalent.  Beginning in 1997, the Defendants began to meet in a more organized,

21   systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.

22   Defendants' representatives attended hundreds of these meetings during the Class Period.

23        115.   The overall CRT conspiracy raised and stabilized worldwide prices (including

24   United States prices) that Defendants charged for CRT Products.

25             **a.    "Glass Meetings"**

26        116.   The group meetings among the participants in the CRT price-fixing conspiracy

27   were referred to by the participants as "Glass Meetings" or "GSM."  Glass Meetings were

28   attended by employees at three general levels of the Defendants' corporations.

32

CLASS ACTION COMPLAINT OF NON-REPEALER STATE
INDIRECT PURCHASER PLAINTIFF ELEANOR LEWIS - Case No. 4:07-cv-5944, MDL No. 1917

117.   The first level of these meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "Top Meetings."  Top Meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.  Because attendees at Top Meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at Top Meetings were also able to resolve disputes because they were decision makers who could make agreements.

118.   The second level of meetings were attended by the Defendants' high level sales managers and were known as "Management Meetings."  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at Top Meetings.

119.   Finally, the third level of meetings were known as "Working Level Meetings" and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The Working Level Meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

120.   The Chinese Glass Meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent Glass Meeting to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

121.   Glass Meetings also occurred occasionally in various European countries.

1   Attendees at these meetings included those Defendants which had subsidiaries and/or

2   manufacturing facilities located in Europe, including Philips, LG, LP Displays, Chunghwa,

3   Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), IRICO,

4   Thomson and, from 2005, Videocon.

5      122.   Representatives of the Defendants also attended what were known amongst

6   members of the conspiracy as "Green Meetings."  These were meetings held on golf courses.

7   The Green Meetings were generally attended by top and management level employees of the

8   Defendants and co-conspirators, including Samsung and Thomson.

9      123.   During the Class Period, Glass Meetings took place in Taiwan, South Korea,

10  Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia and the United States.

11     124.   Participants would often exchange competitively sensitive information prior to a

12  Glass Meeting.  This included information on inventories, production, sales and exports.  For

13  some such meetings, where information could not be gathered in advance of the meeting, it was

14  brought to the meeting and shared.

15     125.   The Glass Meetings at all levels followed a fairly typical agenda.  First, the

16  participants exchanged competitive information such as proposed future CRT pricing, sales

17  volume, inventory levels, production capacity, exports, customer orders, price trends, and

18  forecasts of sales volumes for coming months.  The participants also updated the information

19  they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

20  who would write the information on a white board.  The meeting participants then used this

21  information to discuss and agree upon what price each would charge for CRTs to be sold in the

22  following month or quarter.  They discussed and agreed upon target prices, price increases, so-

23  called "bottom" prices, and price ranges for CRTs.  They also discussed and agreed upon prices

24  of CRTs that were sold to specific customers, and agreed upon target prices to be used in

25  negotiations with large customers.  Having analyzed the supply and demand, the participants

26  would also discuss and agree upon production cutbacks.

27     126.   During periods of oversupply, the focus of the meeting participants turned to

28  making controlled and coordinated price reductions.  This was referred to as setting a "bottom

price."

127.   Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

128.   Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  The Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

129.   The agreements reached at the Glass Meetings included:

a.   agreements on CRT Product prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines;

b.   placing agreed-upon price differentials on various attributes of CRT Products, such as quality or certain technical specifications;

c.   agreements on pricing for intra-company CRT Product sales to vertically integrated customers;

d.   agreements as to what to tell customers about the reason for a price increase;

e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

1            g.      agreements to exchange pertinent information regarding shipments,

2    capacity, production, prices and customer demands;

3            h.      agreements to coordinate uniform public statements regarding available

4    capacity and supply;

5            i.      agreements to allocate both overall market shares and share of a particular

6    customer's purchases;

7            j.      agreements to allocate customers;

8            k.      agreements regarding capacity, including agreements to restrict output and

9    to audit compliance with such agreements; and

10           l.      agreements to keep their meetings secret.

11       130.   Efforts were made to monitor each Defendant's adherence to these agreements in a

12   number of ways, including seeking confirmation of pricing both from customers and from

13   employees of the Defendants themselves.  When cheating did occur, it was addressed in at least

14   four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not

15   live up to an agreement; 3) threats to undermine a competitor at one of its principal customers;

16   and 4) a recognition in a mutual interest in living up to the target price and living up to the

17   agreements that had been made.

18       131.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT

19   Products by TFT-LCDs increased, the group Glass Meetings became less frequent and bilateral

20   meetings again became more prevalent.  In addition, in December 2006 the DOJ issued

21   subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have

22   concerns about antitrust issues.

23                   **b.      Bilateral Discussions**

24       132.   Throughout the Class Period, the Glass Meetings were supplemented by bilateral

25   discussions between various Defendants.  The bilateral discussions were more informal than the

26   group meetings and occurred on a frequent, ad hoc basis, often between the group meetings.

27   These discussions, usually between sales and marketing employees, took the form of in-person

28   meetings, telephone contacts and emails.

133.   During the Class Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico and the United States.

134.   The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe and the United States.

135.   In order to ensure the efficacy of their global conspiracy, the Defendants also used bilateral meetings to coordinate pricing with CRT Product manufacturers in Brazil, Mexico and the United States, such as Philips, Samsung SDI, Thomson, Mitsubishi and later, LPD (from 2001) and Videocon (from 2005).  These CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Class Period.  Because these manufacturers were all wholly-owned and controlled subsidiaries of Defendants or co-conspirators Philips, Samsung SDI, Thomson, Mitsubishi and LPD, they adhered to the unlawful price-fixing agreements.  In this way, the Defendants ensured that prices of all CRT Products sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

136.   Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

137.   Bilateral discussions were also used to coordinate prices with CRT Product manufacturers that did not ordinarily attend the group meetings, such as Defendants and co-conspirators Hitachi, Toshiba, Panasonic, Thai CRT, Samtel, Thomson, Mitsubishi and later Videocon.  It was often the case that in the few days following a Top or Management Meeting, the attendees at these group meetings would meet bilaterally with the other Defendant and co-conspirator manufacturers for the purpose of communicating whatever CRT Product pricing

37

CLASS ACTION COMPLAINT OF NON-REPEALER STATE
INDIRECT PURCHASER PLAINTIFF ELEANOR LEWIS - Case No. 4:07-cv-5944, MDL No. 1917

and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT Product pricing agreements to Hitachi.  LG had a relationship with Toshiba and was responsible for communicating CRT Product pricing agreements to Toshiba.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT Product pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG, and Thai CRT. Sometimes Hitachi and Toshiba also attended the Glass Meetings. Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  In this way, Hitachi, Toshiba, Samtel, Thomson and Mitsubishi participated in the conspiracy to fix prices of CRT Products.

> **c.** **Defendants' And Co-Conspirators' Participation In Group And Bilateral Discussions**

138.   Between at least 1995 and 2007, Defendant Samsung, through Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in at least 200 Glass Meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRT Products.

139.   Defendants Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. Thus, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

140.   Between at least 1995 and 2001, Defendant LG, through LG Electronics, Inc. and LGETT, participated at least 100 Glass Meetings at all levels.  After 2001, LG participated in the CRT Product conspiracy through its joint venture with Philips, LG.Philips Displays (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG.  LG also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRT

1    Products. LG never effectively withdrew from this conspiracy.

2        141.   Defendant LGEUSA was represented at those meetings and was a party to the

3    agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, they

4    played a significant role in the conspiracy because Defendants wished to ensure that the prices

5    for CRT Products paid by direct purchasers would not undercut the pricing agreements reached

6    at the Glass Meetings.  Thus, LGEUSA was an active, knowing participant in the alleged

7    conspiracy.

8        142.   Between at least 1996 and 2001, Defendant Philips, through Royal Philips and

9    Philips Taiwan, participated at least 100 Glass Meetings at all levels.  After 2001, Philips

10   participated in the CRT Product conspiracy through its joint venture with LG, LG.Philips

11   Displays (n/k/a LP Displays).  A substantial number of these meetings were attended by high

12   level executives from Philips.  Philips also engaged in numerous bilateral discussions with other

13   Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRT

14   Products.  Philips never effectively withdrew from this conspiracy.

15       143.   Defendants PENAC and Philips Brazil were represented at those meetings and

16   were a party to the agreements entered at them.  To the extent PENAC and Philips Brazil sold

17   and/or distributed CRT Products to direct purchasers, they played a significant role in the

18   conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct

19   purchasers would not undercut the pricing agreements reached at the Glass Meetings.  Thus,

20   PENAC and Philips Brazil were active, knowing participants in the alleged conspiracy.

21       144.   Between at least 2001 and 2006, Defendant LP Displays (f/k/a LG.Philips

22   Displays) participated in at least 100 Glass Meetings at all levels.  A substantial number of these

23   meetings were attended by the highest ranking executives from LP Displays.  Certain of these

24   high level executives from LP Displays had previously attended meetings on behalf of

25   defendants LG and Philips. LP Displays also engaged in bilateral discussions with other

26   Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRT

27   Products.

28       145.   Between at least 1995 and 2006, Defendant Chunghwa, through CPT, Chunghwa

39

1    Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated

2    in at least 100 Glass Meetings at all levels.  A substantial number of these meetings were

3    attended by the highest ranking executives from Chunghwa, including the former Chairman and

4    CEO of CPT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other

5    Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and

6    supply levels for CRT Products.

7         146.    Defendant Tatung America was represented at those meetings and was a party to

8    the agreements entered at them.  To the extent Tatung America sold and/or distributed CRT

9    Products to direct purchasers, it played a significant role in the conspiracy because Defendants

10   wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut

11   the pricing agreements reached at the Glass Meetings.  Thus, Tatung America was an active,

12   knowing participant in the alleged conspiracy.

13        147.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and

14   DOSA, participated in at least 100 Glass Meetings at all levels.  A substantial number of these

15   meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged

16   in bilateral discussions with other Defendants on a regular basis.  Through these discussions,

17   Daewoo agreed on prices and supply levels for CRT Products.  Bilateral discussions with

18   Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.

19   Daewoo never effectively withdrew from this conspiracy.

20        148.    Between at least 1995 and 2003, Defendant Toshiba, through Toshiba

21   Corporation, TDDT and TEDI, participated in several Glass Meetings.  After 2003, Toshiba

22   participated in the CRT conspiracy through its joint venture with Panasonic, MTPD.  These

23   meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also

24   engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through

25   these discussions, Toshiba agreed on prices and supply levels for CRT Products.  Toshiba never

26   effectively withdrew from this conspiracy.

27        149.    Defendants Toshiba America, Inc., TACP, TAIP and TAEC were represented at

28   those meetings and were a party to the agreements entered at them.  To the extent Toshiba

America, Inc., TACP, TAIP and TAEC sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings.  Thus, Toshiba America, TACP, TAIP, and TAEC were active, knowing participants in the alleged conspiracy.

150.   Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several Glass Meetings.  These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRT Products. Hitachi never effectively withdrew from this conspiracy.

151.   Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

152.   Between at least 1996 and 2003, Defendant Panasonic (known throughout the class period as Matsushita Electric Industrial Co., Ltd.), through Panasonic Corporation and Matsushita Malaysia, participated in several Glass Meetings.  After 2003, Panasonic participated in the CRT conspiracy through its joint venture with Toshiba, MTPD.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRT Products.  Panasonic never effectively withdrew from this conspiracy.

153.   Between at least 2003 and 2006, MTPD participated in multiple Glass Meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral

41

1  discussions with other Defendants.  For example, an MTPD representative testified that MTPD

2  and Thomson Consumer Electronics met regularly in the United States during the conspiracy

3  period and exchanged confidential information on production and capacity of North American

4  CRT factors and future CRT prices.  Through these discussions, MTPD agreed on prices and

5  supply levels for CRT Products.

6      154.   Between at least 1998 and 2007, Defendant BMCC participated in multiple Glass

7  Meetings.  These meetings were attended by high level sales managers from BMCC. BMCC also

8  engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese

9  CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for

10 CRT Products.  None of BMCC's conspiratorial conduct in connection with CRT Products was

11 mandated by the Chinese government. BMCC was acting to further its own independent private

12 interests in participating in the alleged conspiracy.

13     155.   Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and IDDC,

14 participated in multiple Glass Meetings.  These meetings were attended by the highest ranking

15 executives from IRICO. IRICO also engaged in multiple bilateral discussions with other

16 Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO

17 agreed on prices and supply levels for CRT Products.  None of IRICO's conspiratorial conduct in

18 connection with CRT Products was mandated by the Chinese government.  IRICO was acting to

19 further its own independent private interests in participating in the alleged conspiracy.

20     156.   Between at least 1997 and 2006, Defendant Thai CRT participated in multiple

21 Glass Meetings.  These meetings were attended by the highest ranking executives from Thai

22 CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

23 particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

24 levels for CRT Products.  Thai CRT never effectively withdrew from this conspiracy.

25     157.   Between at least 1998 and 2006, Defendant Samtel participated in multiple

26 bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were

27 attended by high level executives from Samtel.  Through these discussions, Samtel agreed on

28 prices and supply levels for CRT Products.  Samtel never effectively withdrew from this

42

CLASS ACTION COMPLAINT OF NON-REPEALER STATE
INDIRECT PURCHASER PLAINTIFF ELEANOR LEWIS - Case No. 4:07-cv-5944, MDL No. 1917

1    conspiracy.

2          158.    Between at least 1996 and 2005, Defendant Thomson participated in at least 61

3    meetings with its competitors, including several Glass Meetings and multiple bilateral meetings

4    and "Green Meetings" in the United States, in which unlawful agreements as to price, output

5    restrictions, and/or consumer and market allocation of CRTs occurred.  These meetings were

6    attended by high level sales managers from Thomson.  At these meetings, Thomson discussed

7    such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,

8    plant shutdowns, customer allocation, and new product development and agreed on prices and

9    supply levels for CRT Products.  The purpose of these meetings was to raise and stabilize the

10   prices of and set supply levels of CRT Products sold by Thomson and its competitors in North

11   America, including the United States.  These meetings among competitors did not take place in

12   the context of customer-supplier relationships.  Thomson also communicated with its

13   competitors over the telephone and by e-mail.  Through all these discussions, Thomson agreed

14   on prices and supply levels for CRTs.

15         159.    Thomson has admitted that it participated in the conspiracy to fix the prices of

16   CRTs. In its 2011 Annual Report to shareholders, Technicolor SA stated that it "played a minor

17   role in the alleged anticompetitive conduct" concerning CRTs.  In fact, Technicolor SA's role

18   was far from minor.  In December 2012, the European Commission levied a fine of €38.6 million

19   against Technicolor SA for its participation in the CRT conspiracy between 1999 and 2005.  In

20   its 2012 Annual Report, Technicolor SA acknowledged that "[f]ollowing the European

21   Commission decision, purchasers may bring individual claims against the Company seeking

22   compensation for alleged loss suffered as a result of anti-competitive conduct."  Thomson never

23   effectively withdrew from this conspiracy.

24         160.    In 2005, defendant Videocon acquired Thomson's global CRT business, including

25   Thomson's U.S. subsidiary, Defendant Thomson Displays Americas ("TDA") (n/k/a

26   Technologies Displays Americas) and a Mexican subsidiary, Thomson Displays Mexicana

27   ("TDM") (n/k/a Technologies Displays Mexicana).  Defendants Videocon and Thomson

28   continued to participate in, and did not effectively withdraw from the conspiracy.  Between 2005

1    and 2007, Defendant Videocon participated in several Glass Meetings and multiple bilateral

2    meetings with its competitors, including a number of meetings taking place in China and in

3    Europe in or about July 2005, in the fall of 2005, and in 2006.  These meetings were attended by

4    Videocon executives and employees, continuing the practice established by Thomson.  At these

5    meetings, Videocon discussed such things as CRT prices, production, revenues, volumes,

6    demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

7    development, and agreed on prices and supply levels for CRT Products.  In these meetings,

8    Videocon shared information with competitors about the U.S. market for CRTs.  Videocon never

9    effectively withdrew from this conspiracy.  Because Defendants joined a continuing conspiracy,

10   they are responsible not only for their own acts but also all acts of their co-conspirators in

11   furtherance of the conspiracy during the class period, as detailed herein.

12        161.   Upon information and belief, Videocon dominated or controlled the finances,

13   policies and affairs of TDA and TDM once it acquired these companies, and directed the pricing

14   of CRT Products sold to the North American market.  Between 1995 and 2007, Defendant TDA

15   and its wholly-owned subsidiary TDM participated in the conspiracy meetings described herein

16   and/or were a party to the agreements entered at these meetings.  TDA and TDM were active,

17   knowing participants in the alleged conspiracy, and the prices established by TDA and/or TDM

18   were the product of conspiratorial communications between Videocon and its co-conspirators.

19   To the extent TDA and TDM manufactured, sold and/or distributed CRTs, they played a

20   significant role in the conspiracy because Videocon and its co-conspirators wished to ensure that

21   the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached

22   at the conspiratorial meetings.

23        162.   Between at least 1995 and 2005, co-conspirator Mitsubishi participated in multiple

24   bilateral and some multilateral meetings with its competitors.  These meetings were attended by

25   high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things

26   as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant

27   shutdowns, customer allocation, and new product development, and agreed on prices and supply

28   levels for CRT Products.  Mitsubishi never effectively withdrew from this conspiracy.

163.   When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

### E.   The CRT Market During the Conspiracy

164.   Until the last few years, CRTs were the dominant technology used in displays, including television and computer monitors.  During the Class Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

165.   The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|-----------------------|------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

166.   During the Class Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  See, The Future of Liquid Crystal and Related Display Materials, Fuji Chimera Research, 1997, p.12.

167.   Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Class Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in

1  1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of

2  scale, in conjunction with technological improvements and advances in manufacturing

3  techniques, will produce a drop in the price of the average electronic display to about $50 in

4  1997." Information Display 9/92 p.19.  Despite such predictions, and the existence of economic

5  conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

6       168.   In 1996, another industry source noted that "the price of the 14" tube is at a

7  sustainable USD50 and has been for some years…."

8       169.   In early 1999, despite declining production costs and the rapid entry of flat panel

9  display products, the price of large sized color CRTs actually rose.  The price increase was

10 allegedly based on increasing global demand.  In fact, this price increase was a result of the

11 collusive conduct as herein alleged.

12      170.   After experiencing oversupply of 17" CRTs in the second half of 1999, the average

13 selling price of CRTs rose again in early 2000.  A March 13, 2000 article in Infotech Weekly

14 quoted an industry analyst as saying that this price increase was "unlike most other PC-related

15 products."

16      171.   A BNET Business Network news article from August 1998 reported that "key

17 components (cathode ray tubes) in computer monitors have risen in price.  'Although several

18 manufacturers raised their CRT prices in the beginning of August, additional CRT price

19 increases are expected for the beginning of October….While computer monitor price increases

20 may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not

21 foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

22      172.   A 2004 article from Techtree.com reports that various computer monitor

23 manufacturers, including LG Electronics, Philips, and Samsung, were raising the price of their

24 monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

25 used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of

26 September this year [2004] there will be 20% hike in the price of our CRT monitors."

27      173.   Defendants also conspired to limit production of CRTs by shutting down

28 production lines for days at a time, and closing or consolidating their manufacturing facilities.

174.   For example, the Defendants' CRT factory utilization percentage fell from 90 percent in the third quarter of 2000 to 62 percent in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Class Period but to a lesser degree.  Plaintiff is informed and believes that these sudden, coordinated drops in factory utilization by the Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRT Products.

175.   During the Class Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

176.   During the Class Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

177.   These price increases and price stability in the market for CRT Products during the Class Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

F.    **International Government Antitrust Investigations**

178.   Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRT Products sold in the United States during the Class Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ") and others in November 2007.

179.   On November 8, 2007, antitrust authorities in Europe, Japan and South Korea raided the offices of manufacturers of CRTs as part of an international investigation of alleged price fixing.

180.   DOJ has subpoenaed Thomson in connection with its investigation of CRT price-fixing.

181.   On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Defendant Chunghwa Picture Tubes, Ltd., Cheng Yuan Lin, aka C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in the Northern District of California.

182.   On May 12, 2011, the DOJ and Defendant Samsung SDI signed an Amended Plea Agreement in which Samsung SDI agreed to, and subsequently did in fact, plead guilty to participating in a conspiracy among major cathode display tube ("CDT") producers.  CDTs are a type of CRT.  Samsung acknowledged that the primary purpose of the conspiracy was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. In furtherance of the conspiracy, Samsung SDI acknowledged that, through its officers and employees, it engaged in discussions and attended meetings with representatives of other major CDT producers and, during these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI acknowledged that acts in furtherance of this conspiracy were carried out within the Northern District of California.  Samsung SDI paid a criminal fine of $32 million. Due to the pending related civil cases Samsung SDI paid no restitution.  It informed the sentencing court that issues bearing on restitution were more properly addressed in this pending civil action. Civil restitution was part of the recommended sentence.

183.   MT Picture Display Co., Ltd., then the CRT unit of Defendant Panasonic, has confirmed that it was raided by Japan's Fair Trade Commission.

184.   Kyodo News reported on November 8, 2007, upon information and belief, that MT Picture Display fixed prices for CRTs with manufacturers in three Asian countries, including South Korea's Samsung SDI Co.

185.   Kyodo News further reported that:

> Officials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target prices when delivering their products to TV manufacturers in Japan and South Korea, the sources said.

186.   Defendant Samsung SDI Co., Ltd. was raided by South Korea's Fair Trade Commission, which has started an investigation into Samsung's CRT business.

187.   The *Asian Shimbun* further reported on November 10, 2007 that "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said.  The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies' [referring to the four Asian-based manufacturers—MT Picture Display, Samsung SDI Co., Chunghwa Picture Tubes, LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

188.   On November 21, 2007, Defendant Royal Philips publicly disclosed that it too is subject to one or more investigations into anticompetitive conduct in the CRT industry.  Royal Philips spokesman Joon Knapen declined to comment on which jurisdictions have started investigations.  Royal Philips stated that it intended to assist the regulators.

189.   In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

190.   On December 5, 2012, the European Commission adopted a decision relating to infringements of Article 101 of the Treaty on the Functioning of the European Union and Article 53 of the EEA Agreement in the sector of CRTs, in which it found collusion on prices, market shares, customers and output as well as the exchange of confidential information and monitoring

49

CLASS ACTION COMPLAINT OF NON-REPEALER STATE
INDIRECT PURCHASER PLAINTIFF ELEANOR LEWIS - Case No. 4:07-cv-5944, MDL No. 1917

implementation of the collusive agreements.  The infringements involved two types of CRTs: CDTs used in computer monitors, during the period at least from October 1996 until March 2006, and color picture tubes ("CPTs") used in color televisions during the period at least from December 1997 until November 2006.  The European Commission imposed fines in the following total amounts against Defendants and co-conspirators responsible for the infringements: Chunghwa Entities (€0 due to leniency for being the first to reveal the existence of the conspiracy); Samsung SDI (€150,842,000); Philips Entities (€313, 356,000); LG Electronics (€295,597,000); Philips and LG Electronics, jointly and severally liable (€391,940,000); Technicolor (Thomson) (€38,631,000); Panasonic (€157,478,000); Toshiba (€28,048,000); Panasonic, Toshiba, and MT Picture Dispute Co., jointly and severally liable (€86,738,000); and Panasonic and MT Picture Display Co., jointly and severally liable (€7,885,000).

191.   On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Picture Tubes (UK), Ltd., Chunghwa Picture Tubes, Ltd., Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany Gmbh, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available, the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured picture tubes and coloured screen tubes) on the European market between 1995 and 2007.  The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production.  The undertakings evolved a structural system and functional mechanism of cooperation.
>
> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the

European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

192.  As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

193.  Several Defendants also have a history of "cooperation" and anticompetitive conduct. For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory (DRAM).

194.  Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory and NAND Flash Memory.

195.  In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

196.  On December 12, 2006, news reports indicated that Defendants Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics, Inc, LG Display Co., Ltd., were all under investigation for price fixing of TFT-LCDs.

197.  On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation, and Defendant Chunghwa Picture Tubes, Ltd.—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

198.  On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, Ltd., a subsidiary of Defendant Hitachi, Ltd., to plead guilty to

1  violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role
2  in a conspiracy to fix the prices of TFT-LCD panels.

3       199.   The indictments of LG Display Co., Ltd., Sharp Corporation, Chunghwa Picture
4  Tubes, Ltd. and Hitachi Displays, Ltd., all state that the combination and conspiracy to fix the
5  prices of TFT-LCDs was carried out, in part, in the Northern District of California.

6  ## IX. THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS

7       200.   Defendants' conspiracy to fix, raise, maintain and stabilize the price of CRT
8  Products at artificial levels resulted in harm to Plaintiff and the Class alleged herein because it
9  resulted in their paying higher prices for CRT Products than they would have paid in the absence
10  of Defendants' conspiracy.  The entire overcharge at issue was taken from Class members by
11  Defendants.  As the DOJ acknowledged in announcing the indictment of defendant Chunghwa's
12  former Chairman and CEO, "This conspiracy harmed countless Americans who purchased
13  computers and televisions using cathode ray tubes sold at fixed prices."

14       201.   The Defendants identified above that attended the Glass Meetings, monitored the
15  prices of televisions and computer monitors sold in the U.S. and elsewhere on a regular basis.
16  The purpose and effect of investigating such retail market data was at least three fold.  First, it
17  permitted Defendants, such as Chunghwa, which did not manufacture CRT televisions or
18  computer monitors the way that Samsung, LG, Daewoo, Panasonic, Toshiba, Philips, Hitachi,
19  Thomson and Mitsubishi did, to police the price fixing agreement to make sure that intra-
20  defendant CRT sales were kept at supra-competitive levels.  Secondly, it permitted all
21  Defendants to police their price fixing agreement to independent OEMs who would reduce prices
22  for finished goods if there was a corresponding reduction in CRT prices from a Defendant.
23  Finally, as discussed above, Defendants used the prices of finished products to analyze whether
24  they could increase prices or should agree to a "bottom" price instead.  The Defendants
25  concluded that in order to make their CRT price increases stick, they needed to make the
26  increase high enough that their direct customers (CRT TV and monitor makers) would be able to
27  justify a corresponding price increase to their customers (for e.g., retailers and computer OEMs).
28  In this way, Defendants assured that 100% of the supracompetitive overcharges for CRT

1   Products were taken from Class members by Defendants.

2          202.   The indirect purchaser consumer buys CRT Products from either a computer or TV

3   OEM such as Dell or Sharp, or a reseller such as Best Buy.

4          203.   Because of the breadth of the price-fixing conspiracy here, the direct purchaser

5   CRT TV and monitor manufacturers were not constrained by their competitors from spreading

6   the overcharge through all levels of commerce.  Because each of the direct purchaser's

7   competitors were also buying CRTs at supracompetitive prices from conspiracy members, no

8   direct purchaser faced end-product price competition from a competitor that was not paying

9   supracompetitive prices for CRTs.

10         204.   The price of CRT Products is directly correlated to the price of CRTs.  The

11  margins for CRT TV and monitor makers are sufficiently thin that price increases of CRTs force

12  them to increase the prices of their CRT Products.  This means that increases in the price of

13  CRTs lead to quick corresponding price increases at the OEM level for CRT Products.

14         205.   Computer and TV OEMs and retailers of CRT Products are all subject to vigorous

15  price competition, whether selling CRT TVs or computer monitors.  The demand for CRTs is

16  ultimately determined by purchasers of products containing such products.  The market for CRTs

17  and the market for CRT Products are therefore inextricably linked and cannot be considered

18  separately.  Defendants are well aware of this intimate relationship, and use forecasts of CRT

19  TVs and computer monitors to predict sales of and determine production levels and pricing for

20  CRTs.

21         206.   Computers and televisions are commodities with little or no brand loyalty such that

22  aggressive pricing causes consumers to switch preferences to different brands.  Prices are closely

23  based on production costs, which are in turn directly determined by component costs, as

24  assembly costs are minimal.  OEMs accordingly use component costs, like the cost of CRTs, as

25  the starting point for all price calculations.  On information and belief, computer and TV OEMs

26  price their end-products on a "cost-plus" basis.  Thus, computer and television prices closely

27  track increases and decreases in component costs.

28         207.   The CRT is the most expensive component in the products into which they are

1   incorporated.  On information and belief, the cost of the CRT in a computer monitor is

2   approximately 60% of the total cost to manufacture the computer monitor.  On information and

3   belief, the cost of the CRT in a television is a slightly smaller percentage of the total

4   manufacturing cost because a television has more components than a computer monitor, such as

5   the tuner and speakers.

6   208.   Economic and legal literature recognizes that the more pricing decisions are based

7   on cost, the easier it is to determine whether customers paid an illegal overcharge.  The

8   directness of affected costs refers to whether an overcharge affects a direct (i.e., variable) cost or

9   an indirect (i.e., overhead) cost.  Overcharges are more likely to be spread through all levels of

10  commerce if the overcharges affect direct costs.  Here, CRTs are a direct and substantial cost of

11  CRT Products.  Therefore, Plaintiff will be able to show that overcharges on the CRTs were

12  taken from Class members by Defendants.

13  209.   Once a CRT leaves its place of manufacture, it remains essentially unchanged as it

14  moves through the distribution system.  CRTs are identifiable, discreet, physical objects that do

15  not change form or become an indistinguishable part of the TV or computer monitor in which

16  they are contained.  Thus, CRTs follow a traceable physical chain from the Defendants to the

17  OEMs to the purchasers of finished products incorporating CRTs.

18  210.   Moreover, just as CRTs can be physically traced through the supply chain, so can

19  their price by traced to show that changes in the prices paid by direct purchasers of CRTs affect

20  prices paid by indirect purchasers of CRT Products.  On information and belief, computer and

21  TV OEMs price their end-products on a "cost-plus" basis.

22  211.   In retailing, it is common to use a "mark-up rule."  The retail price is set as the

23  wholesale cost plus a percentage markup designed to recover non-product costs and to provide a

24  profit.  This system guarantees that increases in costs to the retailer will ultimately be paid by

25  end buyers.  For example, CDW, a large seller of CRT monitors, uses such a system.  A

26  declaration in the DRAM case from CDW's director of pricing details exactly how they

27  calculated selling prices:

28

> In general, CDW employs a "building block" approach to setting its advertised prices. The first building block is the Cost of Goods Sold (COGS), which represents the price CDW paid to acquire the product…CDW…adds a series of positive markups to the cost to CDW to acquire a given product. These markups are in addition to the pass through effect of changes in the costs charged to CDW for that product by a given vendor.

212.   Economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. As Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624:

> A monopoly charge at the top of the distribution chain generally results in higher prices at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and will pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain will be poorer as a result of the monopoly price at the top.

> Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

213.   Similarly, two other antitrust scholars—Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Hass School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern School of Law and author of the Handbook of the Law of Antitrust)—have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception; it is the rule."

214.   As Professor Jeffrey McKie-Mason (Arthur W. Burks Professor for Information and Computer Science, Professor of Economics and Public Policy, and Associate Dean for Academic Affairs in the School of Information at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in a judicial decision in that case granting class certification):

55

CLASS ACTION COMPLAINT OF NON-REPEALER STATE
INDIRECT PURCHASER PLAINTIFF ELEANOR LEWIS - Case No. 4:07-cv-5944, MDL No. 1917

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers…. Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

215.    The purpose of Defendants' conspiratorial conduct was to fix, raise, maintain and stabilize the price of CRTs and, as a direct and foreseeable result, CRT Products. The market for CRTs and the market for CRT Products are inextricably linked. One exists to serve the other. Defendants not only knew, but expressly contemplated that prices of CRT Products would increase as a direct result of their increasing the prices of CRTs.

216.    Finally, many of the Defendants and/or co-conspirators themselves have been and are currently manufacturers of CRT TVs and computer monitors. Such manufacturers include, for example, Samsung, LG, Hitachi, Toshiba, Philips, and Panasonic. Having agreed to fix prices for CRTs, the major component of the end products they were manufacturing, these Defendants intended to pass on the full cost of this component in their finished products, and in fact did so.

217.    As a direct and proximate result of Defendants' illegal conduct, Plaintiff and other indirect purchasers have been forced to pay supra-competitive prices for CRT Products.

## X.  FRAUDULENT CONCEALMENT

218.    Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiff and the Class.

219.    Plaintiff and members of the Class did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating the law as alleged herein until shortly before this litigation was commenced. Nor could Plaintiff and the Class members have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods

1    designed to avoid detection.  In addition, the conspiracy was by its nature self-concealing.

2        220.   Defendants engaged in a successful, illegal price-fixing conspiracy with respect to

3    CRT Products, which they affirmatively concealed, in at least the following respects:

4            a.      By agreeing among themselves not to discuss publicly, or otherwise

5    reveal, the nature and substance of the acts and communications in furtherance of their illegal

6    scheme, and by agreeing to expel those who failed to do so;

7            b.      By agreeing among themselves to limit the number of representatives from

8    each Defendant attending the meetings so as to avoid detection;

9            c.      By agreeing among themselves to refrain from listing the individual

10   representatives of the Defendants in attendance at meetings in any meeting report;

11           d.      By agreeing among themselves to refrain from taking meeting minutes or

12   taking any kind of written notes during the meetings;

13           e.      By giving false and pretextual reasons for their CRT Product price

14   increases during the relevant period and by describing such pricing falsely as being the result of

15   external costs rather than collusion;

16           f.      By agreeing among themselves on what to tell their customers about price

17   changes, and agreeing upon which attendee would communicate the price change to which

18   customer;

19           g.      By agreeing among themselves to quote higher prices to certain customers

20   than the fixed price in effect to give the appearance that the price was not fixed;

21           h.      By agreeing among themselves upon the content of public statements

22   regarding capacity and supply;

23           i.      By agreeing among themselves to eliminate references in expense reports

24   which might reveal the existence of their unlawful meetings; and

25           j.      By agreeing on other means to avoid detection of their illegal conspiracy

26   to fix the prices of CRT Products; and

27           k.      By consistently denying the existence of their illegal conspiracy to fix

28   prices of CRT Products.

221.   In particular, a March 1999 document summarizes a bilateral meeting between Thomson and Samsung SDI notes: "This concerns conversation between working-level people in the same industry which is strictly forbidden … thus please take special concern in keeping this following confidential."  Another document dated October 1999 reports on a bilateral meeting between Thomson and a co-conspirator and states: "Everybody is requested to keep it as a secret as it would be serious … if it is open to customers or European Commission."

222.   As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiff and the Class asserts the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff and the members of the Class.

## XI. CLASS ACTION ALLEGATIONS

223.   Plaintiff brings this action individually and as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following class (the "Nationwide Class"):

> All persons and or entities who or which indirectly purchased in the United States for their own use and not for resale, CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or co-conspirator thereof, at any time during the period from at least March 1, 1995 through at least November 25, 2007.  Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and, any affiliate, legal representative, heir or assign of any Defendant. Also excluded are named co-conspirators, any federal, state or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

This class is comprised of multiple subclasses, including an equitable relief subclass consisting of persons and/or entities which purchased CRT Products in the states of Alabama, Alaska, Colorado, Connecticut, Delaware, Georgia, Idaho, Indiana, Kentucky, Louisiana, Maryland, New Jersey, Ohio, Oklahoma, Pennsylvania, Texas, Virginia, and Wyoming.

224.   This action has been brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

> a.      The Class is ascertainable and there is a well-defined community of

58

1    interest among members of the Class;

2          b.      Based upon the nature of trade and commerce involved and the number of

3    indirect purchasers of CRT Products, Plaintiff believes that the number of Class members is very

4    large, and therefore joinder of all Class members is not practicable;

5          c.      Plaintiff's claims are typical of Class members' claims because Plaintiff

6    indirectly purchased CRT Products manufactured by Defendants or their co-conspirators, and

7    therefore Plaintiff's claims arise from the same common course of conduct giving rise to the

8    claims of the members of the Class and the relief sought is common to the Class;

9          d.      The following common questions of law or fact, among others, exist as to

10   the members of the Class:

11               i.      Whether Defendants formed and operated a combination or

12   conspiracy to fix, raise, maintain, or stabilize the prices of CRT Products;

13               ii.     Whether the combination or conspiracy caused CRT Product prices

14   to be higher than they would have been in the absence of Defendants' conduct;

15               iii.    The operative time period of Defendants' combination or

16   conspiracy;

17               iv.     Whether Defendants' conduct caused injury to the business or

18   property of Plaintiff and the members of the Class;

19               v.      Whether Defendants' conduct violates Section 1 of the Sherman

20   Act (15 U.S.C. § 1) as alleged in the First Claim for Relief;

21               vi.     The appropriate nature of class-wide equitable relief.

22         e.      These and other questions of law and fact common to the members of the

23   Class predominate over any questions affecting only individual members, including legal and

24   factual issues relating to liability and damages;

25         f.      After determination of the predominant common issues identified above, if

26   necessary or appropriate, the Class can be divided into logical and manageable subclasses;

27         g.      Plaintiff will fairly and adequately protect the interests of the Class in that

28   Plaintiff has no interests that are antagonistic to other members of the Class and has retained

59

1  counsel competent and experienced in the prosecution of class actions and antitrust litigation to

2  represent Plaintiff and the Class;

3          h.      A class action is superior to other available methods for the fair and

4  efficient adjudication of this litigation since individual joinder of all damaged Class members is

5  impractical.  The damages suffered by the individual Class members are relatively small, given

6  the expense and burden of individual prosecution of the claims asserted in this litigation.  Thus,

7  absent the availability of class action procedures it would not be feasible for Class members to

8  redress the wrongs done to them.  Even if the Class members could afford individual litigation,

9  the court system could not. Further, individual litigation presents the potential for inconsistent or

10  contradictory judgments and would greatly magnify the delay and expense to all parties and the

11  court system.  Therefore, the class action device presents far fewer case management difficulties

12  and will provide the benefits of unitary adjudication, economy of scale and comprehensive

13  supervision in a single court;

14          i.      Defendants have acted, and/or refused to act, on grounds generally

15  applicable to the Class, thereby making appropriate final injunctive relief with respect to the

16  Class as a whole; and

17          j.      In the absence of a class action, Defendants would be unjustly enriched

18  because they would be able to retain the benefits and fruits of their wrongful conduct.

19                      **XII.    VIOLATIONS ALLEGED**

20      **A.    First Claim for Relief:  Violation of Section 1 of the Sherman Act**

21      225.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every

22  allegation set forth in the preceding paragraphs of this Complaint.

23      226.   Beginning at a time unknown to Plaintiff, but at least as early as March 1, 1995,

24  through at least November 25, 2007, the exact dates being unknown to Plaintiff and exclusively

25  within the knowledge of Defendants, Defendants and their co-conspirators, entered into a

26  continuing agreement, understanding, and conspiracy to unreasonably restrain trade and

27  commerce in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

28      227.   In particular, Defendants have combined and conspired to fix, raise, maintain or

60

1  stabilize the prices of CRT Products sold in the United States.

2      228.   Defendants, by their unlawful conspiracy, artificially raised, inflated and

3  maintained the market prices of CRT Products as herein alleged.

4      229.   The contract, combination or conspiracy consisted of a continuing agreement,

5  understanding and concert of action among Defendants and their co-conspirators, the substantial

6  terms of which were to fix, raise, maintain and stabilize the prices of CRT Products they sold in

7  the United States and elsewhere.

8      230.   In formulating and carrying out the alleged agreement, understanding, and

9  conspiracy, the Defendants and their co-conspirators did those things that they combined and

10  conspired to do, including, but not limited to the acts, practices, and course of conduct set forth

11  above, and the following, among others:

12          a.   Participated in meetings and conversations to discuss the prices and supply

13  of CRT Products in the United States and elsewhere;

14          b.   Agreed to manipulate prices and limit supply of CRT Products sold in the

15  United States and elsewhere in a manner that deprived direct and indirect purchasers of CRT

16  Products of free and open competition;

17          c.   Issued price announcements and price quotations in accordance with the

18  agreements reached;

19          d.   Sold CRT Products to customers in the United States at non-competitive

20  prices; and

21          e.   Invoiced customers in the United States at the agreed-upon, fixed prices for

22  CRT Products and transmitting such invoices via U.S. mail and other interstate means of

23  delivery.

24      231.   The combination and conspiracy alleged herein has had the following effects,

25  among others:

26          a.   Price competition in the sale of CRT Products has been restrained,

27  suppressed and/or eliminated in the United States;

28          b.   Prices for CRT Products sold by Defendants and their co-conspirators have

61

CLASS ACTION COMPLAINT OF NON-REPEALER STATE
INDIRECT PURCHASER PLAINTIFF ELEANOR LEWIS - Case No. 4:07-cv-5944, MDL No. 1917

1  been fixed, raised, maintained and stabilized at artificially high, non-competitive levels

2  throughout the United States; and

3       c.    Those who purchased CRT Products directly or indirectly from Defendants

4  have been deprived the benefits of free and open competition.

5       232.   As a direct result of the unlawful conduct of Defendants and their co-conspirators

6  in furtherance of their continuing contract, combination or conspiracy, Plaintiff and the members

7  of the Nationwide Class have been injured and will continue to be injured in their business and

8  property by paying more for CRT Products purchased indirectly from the Defendants and their

9  co-conspirators than they would have paid and will pay in the absence of the combination and

10  conspiracy.

11       233.   These violations are continuing and will continue unless enjoined by this Court.

12       234.   Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the

13  Nationwide Class seek the issuance of an injunction against Defendants, preventing and

14  restraining the violations alleged herein.

15                    **XIII.   PRAYER FOR RELIEF**

16       WHEREFORE, Plaintiff prays as follows:

17       A.    That the Court determine that the claims alleged herein under the Sherman Act

18  may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of

19  Civil Procedure;

20       B.    That the Court adjudge and decree that the unlawful conduct, contract,

21  combination and conspiracy alleged herein constitutes a violation of the Sherman Act, 15 U.S.C.

22  § 1, as alleged in the First Claim for Relief;

23       C.    That Defendants, their co-conspirators, successors, transferees, assigns, parents,

24  subsidiaries, affiliates, and the officers, directors, partners, agents and employees thereof, and all

25  other persons acting or claiming to act on behalf of Defendants, or in concert with them, be

26  permanently enjoined and restrained from, in any manner, directly or indirectly, continuing,

27  maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of

28  action, or adopting or following any practice, plan, program or design having a similar purpose

1    or effect in restraining competition;

2         D.    That Plaintiff and the Class be awarded restitution, including disgorgement of

3    profits obtained by Defendants as a result of its acts of unfair competition and acts of unjust

4    enrichment;

5         E.    That the Court award Plaintiff and the Class she represents pre-judgment and post-

6    judgment interest as permitted by law;

7         F.    That Plaintiff and the members of the Class recover their costs of suit, including

8    reasonable attorneys' fees as provided by law; and

9         G.    That the Court award Plaintiff and the Class she represents such other and further

10   relief as may be necessary and appropriate.

11   Dated: _____                    By:  /s/ Tracy R. Kirkham

12                                             Tracy R. Kirkham (69912)
                                              John D. Bogdanov (215830)
13                                            COOPER & KIRKHAM, P.C.
                                              357 Tehama Street, Second Floor
14                                            San Francisco, CA 94103
                                              Telephone: (415) 788-3030
15                                            Facsimile: (415) 882-7040
                                              Email: trk@coopkirk.com
16                                                    jdb@coopkirk.com

17                                            *Interim Lead Counsel for NRS Indirect
                                              Purchaser Plaintiff Subclass*
18

19

20

21

22

23

24

25

26

27

28