Tracy R. Kirkham (69912)
John D. Bogdanov (215830)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA 94103
Telephone: (415) 788-3030
Facsimile: (415) 882-7040
Email: trk@coopkirk.com
      jdb@coopkirk.com

*Interim Lead Counsel for the Non-Repealer
State Subclass*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Master File No. 4:07-cv-5944-JST |
| | MDL No. 1917 |
| This Document Relates to: | **DECLARATION OF JOHN D. BOGDANOV IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF REPLY IN SUPPORT OF RENEWED MOTION OF NON-REPEALER STATE SUBCLASS MEMBER ELEANOR LEWIS TO INTERVENE** |
| All Indirect Purchaser Actions | |
| | Hearing Date: February 12, 2020 |
| | Time:       2:00 p.m. |
| | Judge:     Honorable Jon S. Tigar |
| | Courtroom:  6, 2nd Floor |

I, John D. Bogdanov, declare as follows:

1.      I am member in good standing of the State Bar of California.  I am a partner in Cooper & Kirkham, P.C.  I have personal knowledge of the facts stated in this Declaration and, if called as a witness, I could and would testify competently to them.  I make this Declaration in support of the "Request for Judicial Notice in Support of Reply in Support of Renewed Motion of Non-Repealer State Subclass Member Eleanor Lewis to Intervene."

2.      Attached hereto as Exhibit 1 is a true and correct copy of the "Memorandum and Order," *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,* No. 1:05-md-01720-MKB-JO (E.D.N.Y.) (ECF No. 7076), dated September 27, 2017.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 9th day of January, 2020, in San Francisco, California.

_____/s/ *John D. Bogdanov*_____
John D. Bogdanov

DECLARATION OF JOHN D. BOGDANOV IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE
Case No. 4:07-cv-5944, MDL No. 1917

**EXHIBIT 1**

Case 1:05-cv-05944-JST Document 5669-1 Filed 01/09/20 Page 4 of 27

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X

IN RE PAYMENT CARD                                    MEMORANDUM
INTERCHANGE FEE AND MERCHANT                          AND ORDER
DISCOUNT ANTITRUST LITIGATION
                                                      05-MD-1720 (MKB) (JO)

This document refers to: ALL ACTIONS.
---------------------------------------------------------X

James Orenstein, Magistrate Judge:

The plaintiffs in this multi-district litigation – some acting on behalf of putative classes of

millions of merchants, and others acting independently – have accused the corporate entities that

operate the Visa and MasterCard payment card networks as well as several banks of violating federal

and state antitrust laws. As a result of recent developments, both in this case and in the case law of

this circuit, they now seek to amend their respective complaints in a number of ways. For the

following reasons, I partially grant and partially deny the motions.

I.      Background

I assume the reader's familiarity with the factual and procedural history of this litigation, and

in particular refer the reader to the detailed descriptions of the payment card industry set forth in the

opinion of this court approving a class-wide settlement in 2013, and the opinion of the appellate

court reversing that approval three years later. *See In re Payment Card Interchange Fee & Merch. Disc.

Antitrust Litig.*, 986 F. Supp. 2d 207, 214-15 (E.D.N.Y. 2013) ("*Interchange I*"), *rev'd*, 827 F.3d 223 (2d

Cir. 2016) ("*Interchange II*"), *cert. denied*, 137 S. Ct. 1374 (2017).[1]  I discuss here only those aspects of

that history relevant to the instant motions. In doing so, it is convenient to use certain shorthand

labels to refer to various groups of parties, as set forth in the Appendix.

---

[1]  Most of the history of this litigation is reflected on the docket under which this order is captioned.
However, district court proceedings from early 2014 through late October 2016, during which
jurisdiction over much of the litigation had vested in the circuit court, are recorded in the docket of
*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 14-MD-1720 (MKB) (JO).

A.      The Payment Card Industry

When a consumer uses a payment card to purchase goods or services from a merchant, the transaction is received by the merchant's acquiring bank, which in turn notifies that credit card's network provider (in this case Visa or MasterCard) of the intended purchase. The network reaches out to the cardholder's issuing bank, and assuming the needed funds are available, the issuing bank approves the transaction. The network then informs the acquiring bank that the transaction has been approved, and the issuing bank transfers the purchase price minus an interchange fee (set by the issuing bank) and a merchant discount fee (an amount retained by the acquiring bank).

Merchants that accept Visa or MasterCard cards are bound to the defendants' network rules. These rules include a default interchange fee that applies to every transaction on the network (unless the merchant and issuing bank enter into their own agreement); the Honor-All-Cards rule which requires merchants that choose to accept any of the Network Defendants' credit cards to accept all of them; and anti-steering rules that prevent merchants from charging different prices at the point of sale based on the shopper's form of payment (collectively, the "Network Rules").

B.      The Initial Class Action Complaints

On October 20, 2005, the Judicial Panel on Multidistrict Litigation consolidated fourteen actions asserting the antitrust claims described above and transferred them to this court for pretrial proceedings. Docket Entry ("DE") 1; DE 2. Since then, dozens more have been added, and there are currently over 90 cases associated with this action, some pleaded as class actions and some filed by plaintiffs suing only on behalf of themselves.

Following this court's appointment of interim co-lead class counsel, the Class Plaintiffs filed their First Consolidated Amended Class Complaint on April 24, 2006. DE 317 ("First Class Comp."). That pleading defined two putative classes: one seeking monetary damages and the other seeking equitable relief. *Id.* ¶ 97. The Class Plaintiffs asserted claims under Sections 1 and 2 of the

Sherman Act, 15 U.S.C. §§ 1, 2, as well as state law claims, all predicated on a contention that the defendants' unlawful contracts, combinations, and conspiracies, harmed competition and caused merchants to pay supracompetitive prices in the market for network services. *Id.* ¶¶ 3-4, 213-347.

In defining the scope of the relevant market, the Class Plaintiffs relied on controlling case law arising from earlier litigation concerning the same networks' practices. *See id.* ¶¶ 198-212 (citing *In re Visa Check/MasterMoney Antitrust Litig.* ("*Visa Check*"), 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003); *United States v. Visa* ("*Visa*"), 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003). As the circuit court had explained in *Visa*, and as the Class Plaintiffs alleged here, there exist two related but distinct markets relevant to the instant dispute. In the market for network services – the market in which the Class Plaintiffs alleged that the defendants had engaged in unlawful anticompetitive conduct – payment card networks are sellers that compete with one another to secure the business of the banks and merchants that purchase such services. In the separate market for general purpose payment cards, the sellers are the banks that issue the cards and the buyers are the consumers who obtain the cards and use them for purchases. *See Visa*, 344 F.3d at 238-39; First Class Comp. ¶¶ 198-212. More recently, however, the same appellate court has held that the relevant market for similar complaints by a nationwide class of merchants against another payment card network – American Express – is a single, two-sided market that encompasses the networks, the processing banks, the merchants who accept cards for payments, and the consumers who use those cards. *See United States v. American Express, Co.* ("*AmEx*"), 838 F.3d 179, 196-200 (2d Cir. 2016), *petition for cert. filed*, No. 16-1454 (U.S. June 6, 2017). That decision has been a significant factor in prompting the instant motions to amend.

On January 29, 2009, after filing further supplemental pleadings and litigating dismissal motions, the Class Plaintiffs filed their Second Consolidated Class Action Complaint, which, together with two supplemental complaints filed the same day, collectively comprise the Class

Plaintiffs' currently operative pleading. *See* DE 1153 (the "Operative Class Complaint" or "Class Comp."); DE 1154 (the Second Supplemental Class Action Complaint); DE 1152 (the First Amended Supplemental Class Action Complaint).[2] The Operative Class Complaint omitted certain class claims that had been included in its predecessor and added an antitrust claim against Visa for fixing interchange fees for PIN debit card transaction but otherwise replicated the class plaintiffs' earlier claims. *See* DE 988 (letter describing proposed amendments). Of particular relevance here, like its predecessor, the Operative Class Complaint asserts that the Network Rules unlawfully allow issuing banks to set interchange fees in the market for network services at supracompetitive rates. Class Comp. ¶¶ 246-248; DE 6880-1 ("Damages Class Memo.") at 6.

     C.    The Class Settlement

     On October 19, 2012, after extensive negotiations, the parties to the then-pending class claims executed a proposed settlement agreement. DE 1656. On November 27, 2012, the court preliminarily approved the proposed settlement, provisionally certified two classes (a class for damages claims, from which members could opt out, and a class for injunctive relief in which membership was mandatory), and enjoined all members of the provisionally certified settlement classes from litigating any claims covered by the settlement. DE 1745 (Order). On December 13, 2013, the court certified the two settlement classes and approved the proposed settlement over the

---

[2] Each of the cited documents is a redacted version, available on the public docket, of a corresponding sealed pleading. The sealed versions are docketed at DE 1146, DE 1145, and DE 1144, respectively. The supplemental pleadings assert claims arising from the fact that after this litigation began, each of the networks conducted an initial public offering of stock ("IPO") that transformed it from a consortium of banks into a new public company independent of the banks. In their supplemental pleadings, the class plaintiffs asserted that the IPOs were anticompetitive and violated the Clayton Act. Second Supplemental Class Action Complaint ¶¶ 1-8, 235-267; First Amended Supplemental Class Action Complaint ¶¶ 1-10; 270-302. Those claims are not implicated in the instant motions to amend, and I therefore refer exclusively to Operative Class Complaint as the baseline for comparison to the proposed amendment.

objections of several named plaintiffs as well as several non-party class members. *Interchange I*, 986 F. Supp. 2d at 213, 217. Under the approved terms, the defendants were released from any claims arising from the Network Rules existing as of November 27, 2012, and the members of the certified classes received over seven billion dollars in damages and injunctive relief.

      D.    <u>The Direct Action Plaintiffs' Post-Settlement Complaints</u>

      Following the court's preliminary approval of the proposed settlement, three groups of merchants that had not previously appeared as named parties – the Target, 7-Eleven, and Home Depot groups or, collectively, the "Direct Action Plaintiffs" – opted out of the settlement's damages class and filed their own complaints in other districts, all of which were ultimately transferred to this court and consolidated in the instant multidistrict litigation. *See Target Corp., et al. v. Visa Inc., et al.*, 13-CV-5745 (MKB) (JO) ("*Target*"), DE 1 (complaint); *id.*, DE 95 (transfer order); *id.*, DE 107 (amended complaint) (the "Target Operative Complaint" or "Target Comp."); *7-Eleven, Inc., et al. v. Visa Inc., et al.*, 13-CV-5746 (MKB) (JO) ("*7-Eleven*"), DE 1 (complaint); *id.*, DE 9 (transfer order); *id.*, DE 80 (fourth amended complaint) (the "7-Eleven Operative Complaint" or "7-Eleven Comp."); *The Home Depot, Inc., et al. v. Visa Inc., et al.*, 16-CV-5507 (MKB) (JO) ("*Home Depot*"), DE 1 (complaint) (the "Home Depot Operative Complaint" or "Home Depot Comp."); *id.*, DE 34 (transfer order). All of the Direct Action Plaintiffs sought relief only for themselves; they did not seek to represent a putative class.

      As relevant here, the operative pleadings of the three groups of Direct Action Plaintiffs assert claims under Sections 1 and 2 of the Sherman Act and state antitrust laws. Specifically:

- Target alleges that the defendants have violated Section 1 because the Network Rules "individually and in combination, preclude merchants from gaining the benefits of competition as to the terms, including a fee (if any), for the acceptance of cards of particular issuing banks and preclude card issuers from competing for merchant acceptance of their cards." Target Comp. ¶ 6.

5

- 7-Eleven alleges that the defendants have violated Sections 1 and 2 (and also state antitrust laws) because the Network Rules have "prevented merchants from realizing the price-reducing benefits of Issuers competing on price, which would have occurred in a competitive market. Instead, merchants … pay the same Interchange Fee on a given transaction regardless of which Issuer is involved. There is no competition." 7-Eleven Comp. ¶ 89.

- Home Depot alleges that the defendants have violated Sections 1 and 2 (and also state antitrust laws) because the Network Defendants' conduct has "caused substantial and ongoing anticompetitive harm to merchants as direct purchasers of General Purpose Payment Card Network Services in the form of inflated Interchange Fees paid directly by those merchants, foreclosure of network competitors, and reduced output." Home Depot Comp. ¶ 187.

E.     Vacatur of the Settlement and Subsequent Developments

After the Direct Action Plaintiffs had filed their initial complaints, on June 30, 2016, the circuit court vacated this court's decision to certify the settlement classes and approve the proposed settlement. *Interchange II*, 827 F. 3d 223 (2d Cir. 2016). The appellate court concluded that the Class Plaintiffs lacked adequate representation, in violation of the rule governing class actions and of their right to due process, and therefore remanded the litigation to this court for further proceedings.

On November 30, 2016, I appointed two groups of interim co-lead class counsel. One group was appointed to represent merchants seeking to certify a class pursuant to Federal Rule of Civil Procedure 23(b)(2) (the "Equitable Relief Class"). The second group represents those seeking to certify a class pursuant to Federal Rule of Civil Procedure 23(b)(3) (the "Damages Class"). DE 6754 (memorandum and order).[3]  The appointment of new interim co-lead counsel to represent the interests of different putative classes, necessitated by the circuit court's decision that unified class

---

[3]  The class names are imprecise, and used as a convenient shorthand. *See id.* at 2 n.2. The Direct Action Plaintiffs, along with Walmart, having opposed the appointment of any lead counsel for a group seeking class certification under Federal Rule of Civil Procedure (b)(2), have sought relief with respect to the role that co-lead counsel may play in representing the Equitable Relief Class. Their objections to my order denying those requests remain pending before the court. DE 6947 (appeal); DE 6957 (Equitable Relief Class Response); DE 6958 (Defendants' Response); DE 6964-1 (Direct Action Plaintiffs' Reply).

counsel had labored under an inherent conflict of interest, naturally required each newly defined group of putative class plaintiffs to file a new pleading. The Equitable Relief Class did so on March 31, 2017. DE 6892.

As discussed below, the ability of the Damages Class to file an updated pleading, as well as the Direct Action Plaintiffs' perceived need to further amend their complaints, has been affected by two recent circuit court decisions in other actions involving antitrust claims arising from interchange fees and network rules for merchants: *AmEx* and *Salveson v. JP Morgan Chase & Co.*, 663 F. App'x 71, 75 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1826 (2017).

The *AmEx* decision, issued about three months after the opinion reversing the settlement in this case, affected the parties' understanding of the litigation risks attendant to their proposed definitions of the relevant market. As noted above, the initial complaints in this litigation relied on precedent such as *Visa* and *Visa Check* to assert claims that the defendants had harmed competition in a one-sided market for payment card network services – that is, a market in which merchants act solely as buyers of the products the networks sell. In *AmEx*, however, the circuit court rejected a district court's application of such a market definition because it failed to account for harm to the consumers who use payment cards for their purchases. *See AmEx*, 838 F.3d at 197; *see also* DE 7068 (transcript of oral argument dated Apr. 20, 2017) ("Tr.") at 44 (defendant JP Morgan Chase's counsel, opposing the motions to amend, describing the *AmEx* opinion as "the first time in a credit card case a court has expressly said it is a two-sided market").

Like the plaintiffs in this litigation, the *AmEx* plaintiffs challenged certain nondiscriminatory provisions ("NDPs") contained in American Express's regulations that prohibited merchants from discounting and steering at the point of sale. The appellate court in *AmEx* reasoned that the rules about which the merchant plaintiffs in *Visa* complained constituted horizontal restraints in a one-sided market for network services, but that the NDPs constituted vertical restraints that affected

Case 4:07-cv-05944-JST Document 5660-1 Filed 01/09/20 Page 11 of 27

competition in both the market for network services and the two-sided market for general purpose cards. *AmEx*, 838 F.3d at 197-98. The court, noting that the evidence in the record demonstrated "that the quality and output of credit cards across the entire industry continues to increase[,]" thus held that the plaintiffs in *AmEx* had failed to prove a "net harm to … both cardholders and merchants[.]" *Id.* at 206.

The *Salveson* case also turned on the role of payment card holders in the markets relevant to this litigation. In the *Salveson* complaint, originally filed in the Northern District of California on December 16, 2013, four individual plaintiffs acting on behalf of a putative class alleged that as consumers using payment cards for their purchases, they had directly paid to the defendant banks supracompetitive, price-fixed interchange fees. *See Melvin Salveson, et al. v. JP Morgan Chase & Co., et al.*, 14-CV-3529 (MKB) (JO), DE 1. On June 4, 2014, the Judicial Panel on Multidistrict Litigation transferred the case to this court. *Id.*, DE 61. On November 26, 2014, this court granted the *Salveson* defendants' motion to dismiss that action on the ground that the cardholder plaintiffs were, with respect to their payment of interchange fees, indirect purchasers of payment card network services who therefore lacked standing to complain of the antitrust violations that resulted in such fees. *See id.*, DE 83 at 6 ("The markets for general purpose payment cards and for payment card network services are separate and distinct, and payment-card consumers are considered to participate only in the former.") (citing *Visa*, 344 F.3d at 239); *see Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). On review of that decision, the same circuit court that had just weeks before issued the *AmEx* opinion affirmed the order of dismissal, explaining that cardholders like Salveson suffer no direct injury by paying interchange fees. *See Salveson*, 663 F. App'x at 75.

F.      The Instant Motions

The various groups of plaintiffs now seek leave to amend their respective complaints in several ways for a number of reasons. *See* DE 6884 (fully-briefed 7-Eleven motion); DE 6881 (fully-

briefed Target motion); DE 6890 (sealed version of Target's memorandum of law in support); DE

6887 (fully-briefed Home Depot motion); DE 6888 (sealed version of Home Depot's memorandum

of law in support); DE 6880 (fully-briefed Damages Class motion).[4]  The defendants consent to

some of those amendments, but object to any amendment that would assert antitrust claims

predicated on the definition of a two-sided market of the type described in *AmEx*. DE 6881-2

(defendants' memorandum of law) ("Opp.") at 1, 25 (opposing amendments "to the extent that they

assert new legal and factual allegations regarding market definitions, market power, and competition

for or effects on cardholders.").[5]  Moreover, to the extent such amendments are allowed, the

defendants contend that they should not relate back to the time of the pleadings they would

---

[4]  In addition to the motions described above, the plaintiffs listed below have adopted some of their counterparts' arguments in litigating their own motions to amend:

- The plaintiffs in *Sunoco Inc. (R&M) v. Visa Inc., et al.*, 14-CV-5800 (MKB) (JO), rely on Target's arguments. *See* DE 6875.

- The remaining plaintiffs in *Delta Airlines Inc., et al v. Visa Inc., et al.*, 14-CV-5800 (MKB) (JO), rely on the arguments of both Target and 7-Eleven. *See* DE 6889; DE 6889-8 (reply).

- Plaintiff Roundy's Supermarket, Inc. filed a separate motion to amend that raises the same issues as the motions summarized in the text above. *See* DE 6907; Opp. at 1 n.1.

- Plaintiff Rue21, Inc. ("Rue21") similarly asked to file an amended complaint in a letter dated December 6, 2016, DE 6766, but never filed a fully-briefed motion as directed or responded to the defendants' opposition; it later filed a notice of bankruptcy. DE 6973. To the extent Rue21's motion remains pending, it implicates the same issues (*see* Opp. at 1 n.1), and is resolved in the same way, as the motions described above.

- The sole plaintiff in *American Eagle Outfitters, Inc. v. Visa Inc., et al.*, 14-CV-0321 (MKB) (JO), joins in the motions of Target, 7-Eleven, and Rue21. DE 6885.

- The plaintiffs in *Wal-Mart Stores, Inc., et al v. Visa U.S.A. Inc., et al.*, 14-CV-2318 (MKB) (JO) ("*Wal-Mart*"), moved to amend on the same grounds as those asserted by the Direct Acton Plaintiffs. *See* DE 6989; DE 6994. Because the *Wal-Mart* action has been stayed to accommodate the parties' settlement efforts, *see* DE 7072, this order does not formally resolve the motion on the merits; instead, I terminate it without prejudice.

[5]  The defendants submitted one memorandum of law (with supporting exhibits) in opposition to each of the plaintiffs' motions for leave to amend. *See* Opp. at 1. For ease of reference, I cite to the version submitted in opposition to Target's motion.

supersede, and that the Direct Action Plaintiffs' claims should not be given the benefit of a tolling theory that would deem them to have been asserted as early as 2005. Opp. at 21-25; *see also* Tr. 46-47, 51; DE 6937 ("Defs. Supp. Ltr.") at 4-5.

At oral argument on April 20, 2016, *see* DE 6929 (minute entry), I discussed with the parties the effect of *AmEx* and the extent to which the parties' earlier pleadings had – or had not -- asserted that the defendants had acted to harm competition in a two-sided market that included cardholders. I also asked the parties to address the effect on the analysis of the instant motions, if any, of the fact that the *Salveson* case, which was consolidated as part of the instant multidistrict litigation, had been resolved on the basis of the proposition that cardholders are not part of the relevant market for purposes of the claims being litigated here. *See* Tr. at 31-32, 56. Following oral argument, the parties submitted supplemental letters in support of their respective positions. *See* DE 6936 ("Damages Class Supp. Ltr."); DE 6937 ("Defs. Supp. Ltr."); DE 6939 ("Direct Action Plaintiffs' Supp. Ltr.").

II.     Discussion

    A.     Applicable Law

        1.     Leave to Amend

A court should "freely" grant leave to amend a pleading in the absence of reasons to deny it such as "undue delay, bad faith or … futility[.]" *Foman v. Davis*, 371 U.S. 178, 182 (1962) (quoting Fed. R. Civ. P. 15(a)). "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981). The party seeking leave to amend bears the burden of satisfactorily explaining any delay. *Franconero v. UMG Recordings, Inc.*, 542 F. App'x 14, 18 (2d Cir. 2013). Once it does so, the opposing party has to show more in terms of prejudice. *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 46-47 (2d Cir. 1983). In determining prejudice, courts consider whether the proposed amendment would impose significant new discovery and trial preparation burdens on

the opponent, whether it would significantly delay the dispute's resolution, and the movant's ability

to bring a timely action in another forum. *See Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.

1993). The decision to grant or deny a motion to amend rests within the sound discretion of the

district court. *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995).

2.    <u>Relation Back</u>

"An amendment to a pleading relates back to the date of the original pleading when … the

amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set

out – or attempted to be set out – in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). For a newly-

added claim to relate back under Rule 15(c), the "basic claim must have arisen out of the conduct set

forth in the original pleading[,]" and the central inquiry is "whether adequate notice of the matters

raised in the amended pleading has been given to the opposing party." *ASARCO LLC v. Goodwin*,

756 F.3d 191, 202 (2d Cir. 2014).

3.    <u>Class Action Tolling</u>

Once a party files a class action complaint, the applicable limitations period for the asserted

claim is tolled as to all members of the putative class. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538,

554 (1974) ("*American Pipe*") ("[T]he commencement of a class action suspends the applicable statute

of limitations as to all asserted members of the class who would have been parties had the suit been

permitted to continue as a class action."). The rationale for this *American Pipe* tolling is that "absent

putative class members are expected and encouraged to remain passive … and to 'rely on the named

plaintiffs to press their claims.'" *Cullen v. Margiotta*, 811 F.2d 698, 719 (2d Cir. 1987) (quoting *Crown,

Cork & Seal Co. v. Parker*, 462 U.S. 345, 350-51 (1983)), *overruled on other grounds by Agency Holding Corp.

v. Malley-Duff & Assocs.*, 483 U.S. 143 (1987). *American Pipe* tolling applies not only to wholly passive

members of the putative class, but also to those "who later file their own independent actions." *Police

& Fire Ret. Sys. v. IndyMac MBS*, 721 F.3d 95, 105 (2d Cir. 2013). The rule shadows "the functional

operation of a statute of limitations.… The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." *American Pipe*, 14 U.S. at 554 (quoting *Order of R.R Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348-49 (1944)). However, as the Supreme Court recently explained, "[t]he source of the tolling rule applied in *American Pipe* is the judicial power to promote equity, rather than to interpret and enforce statutory provisions. Nothing in the *American Pipe* opinion suggests that the tolling rule it created was mandated by the text of a statute or federal rule." *Ca. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2051-52 (2017) ("*CalPERS*").

    B.    <u>The Damages Class</u>

The Damages Class Plaintiffs contend that they should be granted leave to amend over the defendants' objections, and that the amendment should relate back to their original complaint, because "the core of [their] allegations has been and continues to be that Defendants' collusive agreements and network rules inflate prices to supracompetitive levels." DE 6880-5 (Damages Class Reply) at 6. While I agree with that characterization of their factual allegations, I disagree that it resolves the dispute. Specifically, I conclude that the Damages Class Plaintiffs rely on a legal theory that is not only new, but fundamentally distinct from the legal violation that they previously asserted – indeed, it relies on the new authority of *AmEx* to posit a theory of liability that accounts for benefits to cardholders that they had affirmatively rejected earlier in the litigation. DE 1494-2 (redacted version of Class Plaintiffs' memorandum of law in support of summary judgment) at 61-67; 1494-4 (redacted reply) at 40-42; DE 1503 (sealed version of Class Plaintiffs' motion for summary judgment); *see also* Opp. at 3-4 (citing Class Plaintiffs' opposition to dismissal motion, DE 1226, at 17). Thus, while fairness requires that the Damages Class Plaintiffs be permitted to adapt to

*AmEx* by asserting claims that they previously had reason to believe would be futile, fairness likewise precludes having those claims relate back to the start of the instant litigation.

### 1.  Leave to Amend

The defendants fault the plaintiffs for delay, arguing that they have had the opportunity to assert claims based on a two-sided market at least since the defendants themselves raised it as a defense to the Class Plaintiffs' assertion that the defendants had harmed competition in a market defined to exclude cardholders as relevant actors. *See* Opp. at 15-17. Without more, however, such delay is not a reason to deny leave to amend. *See Agerbrink v. Model Svc. LLC*, 155 F. Supp. 3d 448, 452 (S.D.N.Y. 2016) (citing cases).

What matters more than the delay itself is the reason for it. All of the parties appear to agree that the recent decision in *AmEx* has prompted the plaintiffs to seek to add to their pleadings the claims that the defendants oppose. *See* DE 6880-1 ("Damages Class Memo.") at 6; DE 6880-5 ("Damages Class Reply") at 8; Opp. at 1 (arguing that the plaintiffs seek to amend so as to avoid dismissal under *AmEx*); Defs. Supp. Ltr. at 2 (contending that without additional discovery, the plaintiffs' case would be dismissed under *AmEx*); Tr. 44 (agreeing that absent amendment and without further discovery, the defendants will likely seek dismissal on the basis of *AmEx*). That is no surprise, as the parties also appear to agree that *AmEx* significantly changed the legal landscape: the opinion is the first in which any court has expressly analyzed a payment card antitrust action in the context of a two-sided market. Tr. 33, 44-45; *see also US Airways, Inc. v. Sabre Holdings Corp.*, 2017 WL 1064709, at *10 (S.D.N.Y. Mar. 21, 2017) (recognizing that *AmEx* "is one of the few cases that explicitly addresses two-sided markets").[6]

---

[6]  The parties' description of the unprecedented nature of the *AmEx* opinion is not in tension with the reference in *US Airways, Inc.* to some "few" cases addressing two-sided markets. The latter case

To be sure, the court in *AmEx* took pains to distinguish the case before it from the circumstances of the *Visa* case (upon which the plaintiffs here previously relied in describing the market relevant to the instant litigation), and it would be premature to opine as to whether *AmEx* does or does not provide a basis for dismissing the claims previously asserted in these consolidated actions. At a minimum, the fact that the same court that decided *AmEx* went on just a few weeks later to affirm this court's dismissal of the claims in *Salveson* – a decision predicated on the assumption of a one-sided market that excludes cardholders as relevant actors – would at least support a colorable argument that the initial claims in this litigation asserting a one-sided market remain viable. But what cannot reasonably be disputed is that *AmEx* altered the parties' litigation risks in an important way. Simply put, the plaintiffs had no reason to add two-sided market claims before *AmEx* because they disagreed with the defendants that such a market definition was appropriate and the unequivocal case law of this circuit supported that view; once *AmEx* necessarily altered their analysis in that regard, they promptly moved to amend. The delay about which the defendants complain was therefore excusable.[7]

The defendants also argue that allowing the disputed amendments now would be unduly prejudicial because it would require them to redo years of discovery, throughout all of which the parties on both sides had assumed that the plaintiffs would seek to prove that the defendants had harmed competition in a one-sided market. *See* Opp. at 17-20. There is no question that the parties

---

involved claims arising "in a different industry and with very different facts" and the opinion did not cite any other decisions discussing a two-sided market in the context of payment cards. *Id.*

[7]  The defendants also argue in a footnote – the placement of which is itself a reason to disregard the argument, *see, e.g., Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 2014 WL 684831, at *2 n.2 (S.D.N.Y. Feb. 21, 2014) (citing cases) – that the plaintiffs' alternative pleading tactics violate Federal Rules of Civil Procedure 8. Opp. at 8-9 n.7. To the contrary, Rule 8 permits pleading alternative statements and inconsistent claims. Fed. R. Civ. P. 8(d).

Case 4:07-cv-05944-JST Document 5669-1 Filed 01/09/20 Page 18 of 27

have already borne substantial discovery burdens: by the time the court approved the settlement in *Interchange I*, the parties had completed fact and expert discovery, which included hundreds of depositions and voluminous document productions. Nor do I seriously question the proposition that the parties have a great deal of work ahead of them in preparing to litigate the newly asserted claims.[8] But those burdens – both the arguably wasted efforts of the past and the work that lies ahead – are common to all of the parties; they are not uniquely, or unduly, prejudicial to the defendants alone.

The ground has shifted under all of the parties. That does not mean that one side alone should suffer by being limited to the assertion of claims that may suddenly, and quite unexpectedly, have become untenable. Over the past dozen years, all of the parties to this litigation have invested heavily in their assumption that controlling law presumes the relevant market to be one-sided. Now that the circuit court has upset that assumption, both sides will have to invest still more to prepare for litigation of the newly asserted claims. But that in itself is not a reason to foreclose the claims entirely. *See Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 285 (2d Cir. 2000) (citing *Block*, 988 F.2d at 351) ("the fact that one party has spent time and money preparing for trial will usually not be deemed prejudice sufficient to warrant a deviation from the rule broadly allowing amendment to pleadings"); *N.Y. State Elec. & Gas Corp. v. Sec'y of Labor*, 88 F.3d 98, 104-05 (2d Cir. 1996) (prejudice does not arise from an amending party's change of legal theory, but rather from a

---

[8] Although I do not base my decision on any assumption that allowing the proposed amendments will be less burdensome than the defendants claim to fear, I am confident that the parties will rise to the challenge of supplementing their past discovery efforts efficiently. As the Damages Class Plaintiffs note, the parties have already taken extensive discovery relating to potential effects of the challenged practices on cardholders. *See* Damages Class Memo. at 6-7; Damages Class Reply at 2-4; *see also* Opp. at 20 n.15 (recognizing the overlap in discovery); Tr. at 11-12 (reporting that the parties are working jointly to avoid any inefficiencies and incompatible demands on the defendants). Moreover, the advent of the Direct Action Plaintiffs' claims and the circuit court's reversal of the earlier class settlement has in any event required extensive new discovery that has yet to be done.

resulting disadvantage to the opposing party in presenting its case). In the absence of any undue

delay, bad faith, or futility of the newly asserted claims predicated on the existence of a two-sided

market, I grant the Damages Class Plaintiffs' motion for leave to amend.

        2.   <u>Relation Back</u>

The Damages Class Plaintiffs argue that the new claims based on a two-sided market relate

back to their original complaint because they rely on the same factual allegations about the

defendants' conduct as before and that the defendants were on notice of the two-sided market

theory because they themselves cited it in their own defense. *See* Damages Class Memo. at 6;

Damages Class Reply at 9. As explained below, I respectfully disagree.

The proposition that the defendants could have put themselves on notice of the two-sided

market theory by citing it as a refutation of the plaintiffs' initial one-sided market theory is

untenable. The Damages Class Plaintiffs cite no authority supporting such a counter-intuitive theory,

and it is at odds with prevailing case law. Rule 15 does not allow a wholly new legal theory to relate

back to an earlier claim simply because both rest on the same factual assertions. Rather, those factual

assertions, and the pleadings that surround them, must give fair notice of the possibility of the later

claim. *See Slatyon v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006) ("Under Rule 15, the 'central

inquiry is whether adequate notice of the matters raised in the amended pleading has been given to

the opposing party within the statute of limitations by the general fact situation alleged in the

original pleading.'") (quoting without internal quotations and citations *Stevelman v. Alias Research, Inc.*,

174 F.3d 79, 86 (2d Cir. 1999)). The litigation of this case did not satisfy that requirement. Instead,

the Class Plaintiffs pleaded claims predicated on certain conduct that they contended harmed

competition in a one-sided market; the defendants sought to refute those claims in part by arguing

that the conduct alleged had in fact promoted competition when viewed in the context of a two-

sided market; and the Class Plaintiffs replied that such a redefinition of the market was inapposite

and therefore unavailing. That is the precise opposite of providing the defendants with fair notice that they might have to defend against a claim that the relevant market has two sides – it is an attempt to forestall the defendants' efforts to characterize the Class Plaintiffs' claims in a way the latter explicitly disavowed.

Such a reading of the record is particularly apt in the context of an antitrust case, where market definition is a critical aspect of the litigation. A plaintiff pleading a claim under Section 1 or 2 of the Sherman Act "must allege a plausible relevant market in which competition will be impaired." *City of New York v. Group Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011). The Class Plaintiffs originally contended that the defendants were liable because they engaged in conduct that harmed the merchants who purchased their services in a one-sided market, and that any benefits to cardholders arising from that conduct could not avert that liability. Those same plaintiffs now seek to plead a wholly new alternative claim: that the defendants' conduct harmed competition in a different, two-sided market. *See* Tr. at 54 (Damages Class counsel: "I am not going to run away from the fact that the two-sided market theory is different than the one-sided market theory").[9]  I therefore conclude that the Damages Class Plaintiffs' new claims relating to a two-sided market do not relate back to the original complaint.[10]

---

[9]  Citing *US Airways*, the Damages Class Plaintiffs contend that relation back is appropriate because the newly added claims and the original one-sided market claims are pleaded in the alternative based on the same core facts. Damages Class Supp. Ltr. at 1-3. In *US Airways, Inc.*, the plaintiffs proceeded to trial and secured a jury verdict on the basis of a one-sided market theory, but the jury also answered in the affirmative when asked to decide whether the plaintiff had proved that the defendants had harmed competition in a hypothetical two-sided marked. In upholding that verdict, the court noted that the evidence had sufficed for the latter theory as well as the former. *US Airways, Inc.*, 2017 WL 1064709, at *12 n.6. The case may stand for the proposition that the Damages Class Plaintiffs might not need to respond to *AmEx* by asserting a new alternative claim, but it says nothing about whether, if such a claims is asserted, it relates back to the original complaint.

[10]  In a footnote, the defendants add that the plaintiffs' new claims pertaining to EMV "Chip" technology should not relate back. *See* Opp. at 21 n.17. The argument is not properly before the court, and I disregard it. *See, e.g., Dorchester Fin.*, 2014 WL 684831, at *2 n.2.

C.   <u>The Direct Action Plaintiffs</u>

1.   <u>Leave to Amend</u>

The Direct Action Plaintiffs raise many of the same arguments in support of leave to amend

as the Damages Class Plaintiffs, and I rely on the reasoning set forth above to grant their motions as

well. I note, however, that the Direct Action Plaintiffs are in a different position with respect to

some of their arguments. First, granting leave to amend does not have as great an impact on the

discovery burdens facing the parties to the Direct Action Plaintiffs' claims: because those claims

were filed only after the earlier class-wide settlement, discovery on those claims has not proceeded

nearly as far as discovery on the Class Plaintiffs' claims; moreover, recent discovery productions

have already begun to focus on the role of cardholders. *See* DE 6881-3 (Target Reply) at 2-4; DE

6884-6 (7-Eleven Reply) at 3-8; DE 6887-9 (Home Depot Reply) at 6-8 (noting that at the time of

filing, depositions for Home Depot had not yet been scheduled).

Second, as the defendants acknowledge, the Direct Action Plaintiffs are entitled in any event

to assert for the first time claims for injunctive relief that had previously been barred under the

terms of the class-wide settlement. Because such claims can properly include allegations of harm to

cardholders in a two-sided market, the discovery that the parties will inevitably conduct on the

injunctive relief claims that the Direct Action Plaintiffs are plainly entitled to assert will in any event

overlap significantly with the discovery burdens that the defendants fear would arise as a result of

granting the contested motions to amend. *See* Tr. 45-46. I therefore grant the Direct Action

Plaintiffs leave to amend.

2.   <u>Relation Back and *American Pipe* Tolling</u>

Like the Damages Class Plaintiffs, the claims that the Direct Action Plaintiffs originally filed

were predicated on allegations that the defendants' conduct harmed competition in a one-sided

market. *See*, *e.g.*, Tr. at 20 (acknowledgment by Target's counsel). Accordingly, as with the Damages

Case 1:05-md-01720-MKB-JO   Document 7659-1   Filed 09/24/19   Page 19 of 24 PageID #:
103020
Case 4:07-cv-05944-JST   Document 5669-1   Filed 01/09/20   Page 22 of 27

Class Plaintiffs, I conclude that the Direct Action Plaintiffs' new claims relating to a two-sided
market do not relate back to their original complaints.

The Direct Action Plaintiffs fare no better in seeking to take advantage of *American Pipe*
tolling by characterizing their two-sided market claims as an "alternative" theory that supplements
the Class Plaintiffs' original claims. Even before the Supreme Court made clear in *CalPERS* that the
nature of *American Pipe* tolling is wholly equitable, courts in this circuit considering the availability of
such tolling employed a notice-based analysis similar to that used to determine the availability of
relation back under Rule 15(c). Thus, whether viewed through the prism of relation back or that of
equitable tolling under *American Pipe*, the pertinent question is whether the original class complaint
sufficed to put the defendants on fair notice of the plaintiffs' later claims. *Cullen*, 811 F.2d at 720
("American Pipe tolling is properly extended to claims of absent class members that involve the
same evidence, memories, and witnesses as were involved in the initial putative class action."),
*overruled on other grounds by Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987); *Escott
v. Barchis Constr. Corp.*, 340 F.2d 731, 734 (2d Cir. 1965) (tolling the plaintiffs' claims because "[t]he
defendants were thus made aware of the nature of the evidence that would be needed at the trial");
*see also CalPERS*, 137 S. Ct. at 2051 ("By filing a class complaint within the statutory period, the
named plaintiff [in *American Pipe*] 'notifie[d] the defendants not only of the substantive claims being
brought against them, but also of the number and generic identities of the potential plaintiffs who
may participate in the judgment.'") (quoting *American Pipe*, 414 U.S. at 555); *Crown, Cork & Steal Co.*
462 U.S. at 353 (notice required to make defendants aware of "the need to preserve evidence and
witnesses respecting the claims of all the members of the class.").[11]

---

[11]  Other jurisdictions appear to take a more restrictive approach, applying *American Pipe* tolling only
the same cause of action previously asserted by the putative class. *See In re Comm. Bank of N. Va.*, 622

Thus, for the same reasons that I conclude above that the newly pleaded claims asserting harm in a two-sided market do not relate back to earlier pleadings asserting harm in a different market, I also conclude that equity does not require applying equitable tolling under *American Pipe* to the Direct Action Plaintiffs' claims based on a two-sided market. In addition to relying on the same reasoning set forth above, however, I also take into account arguments that the Direct Action Plaintiffs offer specifically on the tolling issue.

First, the Direct Action Plaintiffs' reliance on the "same anticompetitive rules and conduct" alleged in the class complaint and their proposed amendments incorrectly narrows the scope of the notice required. *See* Target Reply at 9; 7-Eleven Reply at 10; Home Depot Reply at 9. To successfully plead and prove a violation of Section 1 or 2 of the Sherman Act, a plaintiff must identify not only the defendant's allegedly anticompetitive conduct, but also the relevant market and the resulting anticompetitive harm. *Group Health, Inc.*, 649 F.3d at 155 (citing cases). But the Class Plaintiffs' original complaints identified only a one-sided market in which the effect of the defendants' conduct on cardholders was immaterial. *See* Tr. 23 (counsel for Damages Class Plaintiffs explaining that "if this case had gone to trial three years ago, we would have put in evidence that there is a one-sided market."). As a result, the defendants were never on sufficient notice that they needed to preserve and develop evidence relating to the effect of their conduct on cardholders who were actors in a two-sided market. *See Crown, Cork & Steal Co.*, 462 U.S. at 353.

Second, Home Depot contends that declining to toll the "alternative" market allegations in this case will force absent plaintiffs to file separate actions if they disagree "even slightly" with any of class counsel's litigation decisions. Home Depot Reply at 9-10. I respectfully disagree: if Home

---

F.3d 275, 299 (3d Cir. 2010) (collecting cases); *Scott v. Ill. Bell Tel. Co.,* 169 F. Supp. 3d 845, 854 (N.D. Ill. 2016) (same).

Depot or any of the other Direct Action Plaintiffs had refrained from asserting a two-sided market

theory only out of respect for *American Pipe*'s preference to avoid a proliferation of lawsuits (and not

because, like all of the other parties to this litigation, they assumed that the relevant market was the

one-sided kind at issue in *Visa* that excludes cardholders), they would have asserted such claims as

soon as they entered the fray rather than now. It thus does no violence to the rationale of *American*

*Pipe* to observe that under the precise circumstances of this litigation, equity does not compel the

tolling the Direct Action Plaintiffs seek. The goal of *American Pipe* tolling is "to prevent a 'needless

multiplicity of actions' which might result if putative class members were required to file separate

actions to hedge against the possibility of the class action failing." *Lawrence v. Phillip Morris Cos.*, 1999

WL 51845, at *3 (E.D.N.Y. Jan. 9, 1997) (citing *Crown, Cork & Steal Co.*, 462 U.S. at 351)). But that

goal is not served by tolling in this case because no putative class member ever had a reason to

hedge against the failure of the Class Plaintiffs' original claims by asserting a separate claim

predicated on allegations of competitive harm to a two-sided market – as the history of this litigation

makes clear, the incentive for any party to do so arose only once the circuit court decided *AmEx*.

Finally, the Direct Action Plaintiffs cite the defendants' acknowledgement that the new two-

sided market claims will be consolidated with earlier causes of action as a basis to conclude that the

two types of claims share sufficient common factual issues to support *American Pipe* tolling. Direct

Action Plaintiffs' Supp. Ltr. at 3. Again, I respectfully disagree: the standard for consolidation in

multidistrict litigation is wholly distinct from the analysis pertinent to a request for *American Pipe*

tolling. *See* 28 U.S.C. § 1407(a) (requiring "one or more common questions of fact."). I therefore

conclude that the Direct Action Plaintiffs' proposed two-sided market allegations are not entitled to

*American Pipe* tolling.

III.    Conclusion

For the reasons set forth above, I grant in part and deny in part the plaintiffs' contested motions for leave to file an amended complaint. Specifically, I grant the plaintiffs leave to amend their complaints to include allegations pertaining to a two-sided relevant market over the defendants' objections, but only to the extent that these claims are not time-barred: the two-sided market claims do not relate back to earlier pleadings and are not subject to equitable tolling. As to all other proposed amendments, I grant leave on consent. The plaintiffs are respectfully directed to amend their complaints in accordance with this order and to file the amended complaints as separate entries on the docket by October 27, 2017.

SO ORDERED.

Dated:  Brooklyn, New York
        September 27, 2017

                                        _____/s/_____
                                        James Orenstein
                                        U.S. Magistrate Judge

APPENDIX

Consistent with the general usage in this litigation:

- "Class Plaintiffs" refers collectively to all of the named plaintiffs asserting class action claims, and in particular refers to the group of parties for whom interim co-lead counsel was appointed in 2006. *See* DE 278.

- "Equitable Relief Class" refers collectively to the plaintiffs seeking to certify a class under Federal Rule of Civil Procedure (b)(2), for whom interim co-lead counsel was appointed in 2016. *See* DE 6754.

- "Damages Class" refers collectively to the plaintiffs he plaintiffs seeking to certify a class under Federal Rule of Civil Procedure (b)(3), for whom interim co-lead counsel was appointed in 2016. *See* DE 6754.

- "Target" refers collectively to Target Corporation, Macy's Inc.; The TJX Companies, Inc.; Kohl's Corporation; Staples, Inc.; J.C. Penney Corporation, Inc.; Office Depot, Inc.; L Brands, Inc.; OfficeMax Incorporated (now a subsidiary of Office Depot Inc.); Big Lots Stores, Inc.; Abercrombie & Fitch Co.; Ascena Retail Group, Inc.; Saks Incorporated; Lord & Taylor LLC; The Bon-Ton Stores, Inc.; Chico's FAS, Inc.; Luxottica U.S. Holdings Corp.; American Signature, Inc.; and their respective subsidiaries.

- "7-Eleven" refers collectively to 7-Eleven; Academy Sports; Aldo; Alimentation Couche-Tard; Alon USA; Amazon.com; AMC Theatres; Ashley Furniture; Barnes & Noble; Barnes & Noble College; Beall's, Boscov's; Brookshire's; The Buckle; Carter's; Children's Place; Coborn's; Costco; Cracker Barrel; Crate & Barrel; Cumberland Farms; D'Agostino's; Dick's Sporting Goods; Dillard's; Drury Hotels; Family Dollar; Family Express; Foot Locker; The Gap; Genesco; GNC; Gulf; HMSHost; IKEA; Jetro; Lowe's; Michaels Stores; Mills Companies; National Association of Convenience Stores; National Community Pharmacists Association; National Grocers Association; New York & Company; NIKE; P.C. Richard & Son; PacSun; Panda Restaurant Group; Panera; Ralph Lauren; REI; Republic Services; Restoration Hardware; Sears; Starbucks; Stein Mart; Swarovski; Talbots; Thermo Fisher Scientific; Thorntons; Whole Foods; and Yum! Brands.

- "Home Depot" refers collectively to The Home Depot, Inc. and Home Depot U.S.A., Inc.

- "Direct Action Plaintiffs" refers collectively to the Target, 7-Eleven, and Home Depot plaintiffs (and is distinct from a separate grouping of plaintiffs known as the "Individual Plaintiffs" who likewise asserted claims independent of the class actions but who entered into separate settlement agreements with the defendants that remain in effect, and whose claims have therefore been resolved).

- "Visa" refers collectively to Visa, Inc., Visa U.S.A., Inc., and Visa International Service Association.

- "MasterCard" refers collectively to MasterCard International Incorporated and MasterCard Incorporated.

- "Network Defendants" refers collectively to the Visa and MasterCard defendants.

- "Bank Defendants" refers to collectively to all of the remaining defendants, each of which is a bank.