MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
JENNY S. YELIN – 273601
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:        mbien@rbgg.com
              jbornstein@rbgg.com
              jyelin@rbgg.com

Attorneys for Non-Party
FINANCIAL RECOVERY SERVICES, INC.,
d/b/a FINANCIAL RECOVERY STRATEGIES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION,<br><br>This Document Relates to:<br><br>INDIRECT PURCHASER ACTIONS FOR THE 22 STATES | Master File No. CV-07-5944-JST<br>MDL No. 1917<br><br>**CLASS ACTION**<br><br>**DECLARATION OF JEFFREY N. LEIBELL IN SUPPORT OF FRS'S MOTION TO REQUIRE MODIFICATION OF SETTLEMENT WEBSITE, TO REQUIRE ALL LATE CLAIMS TO BE PROCESSED, AND TO DEEM TIMELY ALL LATE CLAIMS FILED TO DATE**<br><br>Hearing Date: May 20, 2020<br>Time: 2:00 p.m.<br>Courtroom: 9, 19th Floor<br>Judge: Honorable Jon S. Tigar |

Case No. 07-cv-5944-JST

DECL. OF J. LEIBELL ISO FRS'S MOTION TO REQUIRE MODIF. OF SETTLEMENT WEBSITE, TO REQUIRE ALL LATE CLAIMS TO BE PROCESSED, AND TO DEEM TIMELY ALL LATE CLAIMS FILED TO DATE

[3525813.3]

JEFFREY N. LEIBELL declares as follows:

1.      I am the Chief Legal & Financial Officer of Financial Recovery Services, LLC and of Financial Recovery Services, Inc., each d/b/a Financial Recovery Strategies (together, "FRS"). I submit this declaration in support of FRS's Motion to Require Modification of Settlement Website, to Require All Late Claims to Be Processed, and to Deem Timely All Late Claims Filed to Date to describe certain communications that FRS had with class counsel ("IPP Counsel") for the Indirect Purchaser Plaintiffs ("IPPs") and with the Settlement Administrator concerning proofs of claim that were submitted to the Settlement Administrator after the December 7, 2015 claim filing deadline and those that have not yet been submitted (together, "Late Claims"). I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2.      In or about January 2017, the Settlement Administrator, The Notice Company, advised FRS that IPP Counsel directed the Settlement Administrator not to process Late Claims so as not to incur the costs of processing them unless the Court decided to accept them.

3.      As a result, FRS sent to IPP Counsel a letter dated February 8, 2017 in which FRS advised:

> your direction necessarily will result in the ultimate rejection of [Late Claims], which, under the circumstances of this action, would unfairly prejudice the many members of the Settlement Class that submitted them … while providing no benefit to those members of the Settlement Class that submitted claims on or before the claims submission bar dates … .

FRS then made the following request:

> Accordingly, we request that, pursuant to Federal Rule of Civil Procedure 6(b), "which permits the Court to enlarge the time to respond to court ordered deadlines," you submit now a simple (likely unopposed) motion either to extend the claims filing bar date to a date to be determined once the appeals have been resolved, or, at the very least, to accept those [Late] Claims. Notice to the Settlement Class may be provided via the official website and banner ads. In FRS's view, such a motion would provide you with the authority to incur the costs necessary to process [Late] Claims, and permit you, as Class Counsel, to fulfill your "fiduciary duty to the class as a whole."

[3525813.3]

A true and accurate photocopy of my February 8, 2017 letter is attached as **Exhibit 1** hereto.

4.      On the afternoon of February 15, 2017, in response to FRS's request that we receive a reply by that date or be constrained to seek judicial intervention, I received a telephone call from Mario Alioto. Mr. Alioto advised that his colleague, Joseph Patane also was on the call. Mr. Alioto assured me that he would instruct Joseph Fisher, President of The Notice Company, who, at that time was on vacation, to process all Late Claims and that I would receive confirmation once Mr. Fisher returned from vacation.

5.      On February 27, 2017, when FRS still had not received the confirmation promised by Mr. Alioto, I sent to him a follow up email. A true and accurate photocopy of my February 27, 2017 email is attached as **Exhibit 2** hereto.

6.      On March 6, 2017, having still not received any communication either from Mr. Alioto or Mr. Fisher, I sent another follow email in which I demanded a response by the next day. A true and accurate photocopy of my March 6, 2017 email is attached as **Exhibit 3** hereto.

7.      On March 7, 2017, Mr. Fisher exchanged emails with Robin Niemiec, FRS's EVP of Operations. Mr. Fisher advised that he would communicate with IPP Counsel and revert back. On March 8, 2017, Mr. Fisher sent to Ms. Niemiec an email in which he confirmed that, although no decision had been made concerning whether Late Claims would be included in any distribution, The Notice Company would begin auditing the Late Claims submitted by FRS. A true and accurate photocopy of the March 7, 2017 and March 8, 2017 emails between Mr. Fisher and Ms. Niemiec is attached as **Exhibit 4** hereto.

8.      On March 9, 2017, I received an email response from Mr. Alioto, in which he stated, among other things, "I wanted to confirm that Joe Fisher (our Claim Administrator) is in touch with Robin Niemiec of your firm and is addressing your concerns. Hopefully, he will be able to give you the assurances you need about the auditing of your claims." A true and accurate photocopy of Mr. Alioto's March 9, 2017

[3525813.3]

email is attached as **Exhibit 5** hereto.

9.      By July of 2017, even though Mr. Fisher had stated in his March 8, 2017 email that, "over the coming weeks," he would be "discussing the matter with Lead Counsel," FRS had not received any further communication. Accordingly, on July 17, 2017, I sent to Mr. Alioto a follow up email and attached to it relevant research that FRS had performed. A true and accurate photocopy of my July 17, 2017 email and its attachment is attached as **Exhibit 6** hereto.

10.     On July 25, 2017, in response to my July 17, 2017 email, I received an email from Mr. Fisher. Mr. Fisher attached to his email a copy of this Court's January 26, 2016 Order concerning the California Attorney General's request for an extension for California natural persons (ECF No. 4339). A true and accurate photocopy of Mr. Fisher's July 25, 2017 email without its attachment is attached as **Exhibit 7** hereto.

11.     Thereafter, FRS and Mr. Fisher exchanged email correspondence and conducted telephone conversations on the issue. During one such call on September 7, 2018, FRS was led to believe that IPP Counsel had agreed to recommend the acceptance of otherwise eligible Late Claims but that IPP Counsel had not yet determined the date through which its recommendation would apply.

12.     In or about late November 2017, without any notification from IPP Counsel or Mr. Fisher, FRS became aware that IPP Counsel had published at the top of the homepage of the Court-supervised website for the settlement of the indirect purchaser actions, https://crtclaims.com/ (the "Settlement Website") the following advisory:

> The deadline to submit claims has passed.  We will no longer be processing late claims in connection with the CRT Indirect Purchaser Antitrust Litigation.

FRS learned that that advisory was published on or about November 15, 2017 (the "Nov. 15 Advisory"). A true and accurate photocopy of a screenshot of the homepage of the Settlement Website (provided by the Wayback Machine (https://web.archive.org/web/20180513092916/https://www.crtclaims.com/) on March 22, 2018) is attached as **Exhibit 8** hereto.

[3525813.3]

13.     FRS then undertook several communications with Mr. Fisher and Mr. Battin, and, while those communications were ongoing, received IPP Counsel's motion for preliminary approval (ECF No. 5425) of IPPs' settlement with Mitsubishi Electric Co. (the "Mitsubishi Settlement"). On February 27, 2018, FRS objected to the proposed Plan of Distribution for the Mitsubishi Settlement because it did not treat equitably Late Claims. ECF No. 5252.

14.     On March 7, 2018, 2018, IPP Counsel replied to FRS's Objection (ECF No. 5255), and on March 9, 2018, Spectrum Recovery, LLC ("Spectrum") opposed it, ECF No. 5256).

15.     On March 15, 2018, FRS submitted its response to new matters raised by IPP Counsel and to Spectrum's opposition.

16.     After the Ninth Circuit's hearing the appeals to this Court's judgment concerning the settlements (the "2016 Settlements") that are the subject of the Court's March 11, 2020 Order Granting Motion for Preliminary Approval (ECF No. 5695), the issues on appeal and the Late Claim issue were referred to arbitration. ECF No. 5296. No agreement was reached, however.

17.     After the remand from the Ninth Circuit, IPPs submitted their Motion Pursuant to Ninth Circuit Mandate to Reconsider and Amend Final Approval Order, Final Judgment and Fee Order. ECF No. 5587. The only mention of Late Claims was on footnote 101 page 23: "Depending on how the Court decides to deal with late claims, as things currently stand, claimants will receive between $6.10 to $5.12 per CRT unit."

18.     FRS, Spectrum and Crowell & Moring LLC ("Crowell") responded. ECF Nos. 5609, 5595 & 5608.

19.     After the Court granted preliminary approval (ECF No. 5695), FRS sought clarification of that order to address Late Claims. ECF No. 5696.

20.     IPP Counsel, Spectrum and Crowell each opposed. ECF Nos. 5702, 6797 & 5699.

Case No. 07-cv-5944-JST

[3525813.3]

21.     FRS replied to those oppositions on April 7, 2020. ECF No. 5706. In that reply, FRS observed that IPP Counsel had removed the Nov. 15 Advisory at or about the time that it published the recent settlement notice. A true and accurate photocopy of a screenshot of the current homepage of the Settlement Website is attached as **Exhibit 9** hereto.

22.     To learn about Late Claims, therefore, a website visitor must now click on the "FAQ" tab at the top of the homepage, then scroll down the FAQ page almost to the bottom. A true and accurate photocopy of a screenshot of the current FAQ page of the Settlement Website is attached as **Exhibit 10** hereto.

23.     FRS's request for clarification was denied. ECF No. 5707.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. This declaration was executed in Ludlow, Vermont, this 10th day of April 2020.


_____
Jeffrey N. Leibell

[3525813.3]

# EXHIBIT 1



Jeffrey N. Leibell
**General Counsel**
(201) 853-1246
jleibell@frsco.com

February 8, 2017

**VIA EMAIL**
Mario N. Alioto, Esq.
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
malioto@tatp.com

*In re: Cathode Ray Tube (CRT) Antitrust Litigation*,
<u>MDL No. 1917, Case No. C-07-5944-JST (N.D. Cal.) ("*CRT*")</u>

Dear Mr. Alioto:

Financial Recovery Services, Inc. d/b/a Financial Recovery Strategies ("FRS") is a class action settlement claims recovery consultant that,[1] as of February 6, 2017, submitted for 2,197 members of the *CRT* Settlement Class claims that include 3,639,386 CRT Products; 809 of those claims, which include 1,287,646 CRT Products, were submitted after the claim submission bar dates established by the Court (the "Post Bar Date Claims"). FRS writes to you, as Class Counsel appointed by the Court to "fairly and adequately protect the interests of the Settlement Class,"[2] because FRS recently was advised by the Settlement Administrator that you directed it not to process Post

---

[1] FRS provides its clients with industry-leading asset recovery and cost savings services – without any risk or expenses – while adhering to the highest level of professional ethics and standards. FRS specializes in, among other services, class action settlement and other claims consulting, with approximately 17,000 active class action clients that range in size and sophistication from small business owners and farmers, on the one hand, to "Fortune 500" household name multinational conglomerates, on the other. In 2016 alone, FRS submitted over 2,750 claims to recover from settlements with a total fund value of almost $3.5 billion. FRS's class action settlement claim consulting services include the following:

- Notifying clients when FRS learns of settlements that may be valuable to them;
- Taking action to enhance the likelihood that all of FRS's clients' eligible business units are included in the claim process;
- Providing advice on what, if any, documents need to be collected and maintained, and, when requested, assisting in that effort;
- When required documents are not available or are too burdensome to collect, developing innovative alternatives, and then negotiating to obtain claims administrator and counsel approval of those alternatives;
- Preparing, assembling and submitting FRS's clients' claims, and managing them throughout the claims processing lifecycle, including working with our clients to address any concerns or questions that a claims administrator may have;
- Providing regular updates on the recovery process and all related developments; and
- Auditing clients' recoveries to assure that their checks have not been under calculated.

[2] Amended Order Granting Preliminary Approval of Class Action Settlements with the Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Thomson and TDA Defendants, at ¶9 (Doc. No. 3906, 4:5-7).

---



Mario N. Alioto, Esq.
February 8, 2017
Page 2

Bar Date Claims so as not to incur the costs of processing those claims unless the Court decided to accept them. FRS believes that your direction necessarily will result in the ultimate rejection of Post Bar Date Claims, which, under the circumstances of this action, would unfairly prejudice the many members of the Settlement Class that submitted them (the "Post Bar Date Claimants") while providing no benefit to those members of the Settlement Class that submitted claims on or before the claims submission bar dates (the "Pre-Bar Date Claimants"). Accordingly, we request that, pursuant to Federal Rule of Civil Procedure 6(b), "which permits the Court to enlarge the time to respond to court ordered deadlines,"[3] you submit now a simple (likely unopposed) motion either to extend the claims filing bar date to a date to be determined once the appeals have been resolved, or, at the very least, to accept those Post Bar Date Claims. Notice to the Settlement Class may be provided via the official website and banner ads.[4] In FRS's view, such a motion would provide you with the authority to incur the costs necessary to process Post Bar Date Claims, and permit you, as Class Counsel, to fulfill your "fiduciary duty to the class as a whole."[5]

The likely unavoidable consequences of your direction will be the rejection of all Post Bar Date Claims: When in your distribution motion you make your recommendation to the Court concerning Post Bar Date Claims, those claims will not have been processed and, to process them at that time, when, unlike now, a distribution would be imminent, would certainly cause a delay in the distribution to Pre-Bar Date Claimants. The almost certain

---

[3] *E.g., In re Cendant Corp. PRIDES Litig.*, 189 F.R.D. 321, (D.N.J. 1999).

[4] *See* Order Granting Final Approval of Indirect Purchaser Settlements, *In re: Cathode Ray Tube (CRT) Antitrust Litigation*, MDL No. 1917, Case No. C-07-5944 JST, 2016 WL 3648478, at *20 (N.D. Cal. July 7, 2016) (hereinafter, "*CRTI* Final Approval Order") (citing *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1128 (9th Cir. 1977) ("[T]he district court ha[s] discretion to grant late claims."); *see id.* at *21 (approving use of banner ads, etc. in connection with notice of reopening reseller claim period). When the Court overruled arguments that the claim filing period should have been enlarged because, as reflected by the arguably small number of claims and CRT Products, notice was inadequate, the Court "found no persuasive evidence for concluding that the claims rate would have been higher with a different notice," *CRTI* Final Approval Order, 2016 WL 3648478, at *21, and, instead, credited your argument that "'claimants [often have] difficulty remembering how many qualifying products they [have] purchased and, accordingly, [are] hesitant to file claims without being sure,'" *id.* (quoting ECF No. 4459 at 6). FRS believes that the number of Post Bar Date Claims and corresponding CRT Products that FRS has submitted on behalf of its clients provides "persuasive evidence" that, in view of the pendency of the appeals, many members of the Settlement Class will go uncompensated if the original claims filing bar date is not extended.

[5] *Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 1157, 1167 (9th Cir. 2013) (citing *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948,968 (9th Cir. 2009) ("class counsel's fiduciary duty is to the class as a whole"; "The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel.") (quoting *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir.1995)); *see Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003) ("class counsel ultimately owe their fiduciary responsibility to the class as a whole") (citing *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir.1995) ("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed.")); *Neilson v. Union Bank of Cal.*, N.A., No. CV 02-06942 MMM (CWx), 2003 WL 27374138, at *6 n.17 (C.D. Cal. Aug. 12, 2003) ("These cases stand for the unexceptional proposition that class counsel must act in the best interests of the class as a whole, and may not favor certain class members over others."); *cf.* FED R. CIV. P. 23(2)(A) advisory committee's note ("[A]n attorney who acts on behalf of the class before certification must act in the best interests of the class as a whole.").



**FRS** FINANCIAL
RECOVERY
STRATEGIES

Mario N. Alioto, Esq.
February 8, 2017
Page 3

outcome of your direction, therefore, would be for the Court to reject Post Bar Date Claims.[6] Because of, among other things, the pending appeals, however, no distribution will occur within the next several months, if not longer.[7] Accordingly, the timing of the eventual distribution bears no relationship to the Court-imposed bar dates, which renders those bar dates arbitrary. Given that all Post Bar Date Claimants are members of the Settlement Class who, to the same extent as Pre-Bar Date Claimants, were victims of the same alleged prohibited conduct that was at the core of the *CRT* action that you successfully resolved, Post Bar Date Claimants are, but for the now-arbitrary claim submission bar dates, indistinguishable from Pre-Bar Date Claimants. As a result of the pending appeals, therefore, depriving Post Bar Date Claimants of any recovery would be prejudicial to them without providing any benefit to Pre-Bar Date Claimants. Processing and accepting otherwise valid Post Bar Date Claims is the only way for you to satisfy the fiduciary duties that you owe to all members of the Settlement Class.

Class actions are prosecuted to compensate as many victims as possible of systemic wrongdoing that affected all members of the class.[8] That is why, in our decades of experience in the prosecution and settlement of complex class actions, in the administration of class action settlements, and in the submission of claims for our clients to recover from them, we have never before encountered a direction not to process post bar date claims. It also likely is why, to the best of our knowledge, every court overseeing the administration of a non-reversion common fund class action settlement has approved post-bar date claims that did not unduly delay the distribution, even though accepting those "late" claims necessarily results in lower recoveries for claimants who filed their claims before the bar dates. That, after all, is the very nature of class actions that are resolved through non-reversionary common fund settlements: Every claim results in a diminution of the recoveries provided by every other claim. Thus, although "a cut-off date is essential and at some point the matter must be terminated," that "cut-off date," so as not to be arbitrary, must bear a reasonable relationship to the timing of the distribution – here, the resolution of the pending appeals – because post bar date claims "need to be treated fairly by some method for consideration subsequent to notice."[9]

---

[6] Unless you direct the Settlement Administrator to process all Post Bar Date Claims, due process requires that you provide now to Post Bar Date Claimants notice of the rejection of their claims as untimely so that they may avail themselves of their rights to challenge that rejection. If you wait until your distribution motion to recommend to the Court that it reject Post Bar Date Claims, and then, only after receiving the Court's imprimatur, send rejection letters to Post Bar Date Claimants, you would deprive them of their due process rights to challenge your recommendation.

[7] Opening merits briefs in certain of the consolidated appeals were just docketed on January 27, 2017; further briefing has been stayed pending court order; and motions to dismiss certain appeals remain pending. *See, e.g.,* Order in Lead Case No. 16-16368 (9th Cir. Jan. 26, 2017 Dkt. No. 41).

[8] *See, e.g., Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 863 (9th Cir. 2016) ("Class actions are used to 'vindicate[e] ... the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997)); *see generally, General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 155 (1982); *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979); *Sweet v. Pfizer*, 232 F.R.D. 360, 366 (C.D. Cal. 2005).

[9] Reports of the Conference for District Court Judges, 63 F.R.D. 231, 262 (1973) (noting that, "[f]requently, such claimants include those who have not had actual notice.") (cited in *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1127 (9th Cir. 1977); *see* Manual for Complex Litigation (Fourth) (2004) § 21.662 & n.1002 ("The court should allow adequate time for



FINANCIAL
RECOVERY
STRATEGIES

Mario N. Alioto, Esq.
February 8, 2017
Page 4

The administrations of the settlements obtained in two recent complex class actions – *In re: TFT-LCD (Flat Panel) Antitrust Litigation*, MDL No. 1827 (N.D. Cal) ("*LCDI*"), which concerned consumers of LCD flat screen televisions, computer monitors and laptops, and was settled for $1.08 billion, and *In re: Dynamic Random Memory (DRAM) Antitrust Litigation*, MDL No. 1486 (N.D. Cal.) ("*DRAM*"), which concerned an electronic component that allows for storage and retrieval of electronic data, and was settled for $310 million – are instructive:

**LCDI.** The court-ordered claims filing bar date was December 6, 2012; as a result of, *inter alia*, the pendency of several appeals to the approval of the settlement, however, that bar date was extended 18 months to June 6, 2014.[10] The claims administrator "continued to receive and process claims submitted after" the original bar date.[11] Considering only otherwise valid claims, 215,395 claims, which included 10,255,315 LCD "panel equivalents," were received by the original claims bar date; another 18,078 claims, which included 5,956,723 LCD panel equivalents, were received between the original bar date and the extended bar date.[12] Thus, valid LCD panel equivalents received after the original bar date accounted for approximately 37% of the total 16,212,038 valid LCD panel equivalents. Class Counsel recommended, and the Court approved, the acceptance of those post bar date claims.[13]

**DRAM.** The court-ordered claims filing bar date was August 1, 2014; as a result, *inter alia*, of the pendency of several appeals to the approval of the settlement, however, that bar date was extended 11 months to July 1, 2015.[14] The claims administrator "continued to receive claims after the initial August 1, 2014 deadline, and processed those claims contemporaneously with the earlier filed claims."[15] As of the original claims bar date, the claims administrator had received 449,979 claims; another 19,508 claims were received between the original bar date and the extended bar date.[16] In connection with those post bar date claims, Class Counsel made the following recommendation to the Court:

---

late claims …") (citing *In re Crazy Eddie Sec. Litig.*, 906 F. Supp. 840, 845 (E.D.N.Y. 1995) (noting "there is an implicit recognition that late claims should ordinarily be considered in the administration of a settlement") (citation omitted).

[10] *See, e.g.*, Declaration of Robin M. Niemiec of Rust Consulting, Inc., Notice and Claims Administrator, in Support of Indirect Purchaser Plaintiffs' Motion to Authorize Distribution of Settlement Fund, executed Sept. 12, 2014 (Doc. No. 9217-1), at ¶6.

[11] *See id.*

[12] *See id.* at ¶ 26 & Ex. A (Claims Summary).

[13] *See, e.g.*, Second Amended Order Granting Final Approval of Combined Class, Parens Patriae, and Governmental Entity Settlements with AUO, LG Display, and Toshiba Defendants; Ordering Final Judgment of Dismissal with Prejudice; Award of Attorneys' Fees, Expenses, and Incentive Awards (Doc. No. 7697), at 6, n.4. ("IPP counsel recommend that late-filed claims be included in distribution payments, and this Court agrees.").

[14] *See, e.g.*, Declaration of Amy L. Lake of Rust Consulting, Inc., Notice and Claims Administrator, executed May 4, 2016 (Doc. No. 2273-2), at ¶6.

[15] *See id.* at ¶ 7.

[16] *See id.* at ¶¶ 6 & 9.



FINANCIAL
RECOVERY
STRATEGIES

Mario N. Alioto, Esq.
February 8, 2017
Page 5

This distribution has not been delayed by the additional claims filed between August 1, 2014 and July 1, 2015, and Settling Plaintiffs believe that considerations of overall fairness to the Settlement Class outweigh any prejudice to those class members who filed by August 1, 2014. Anticipating that the Court would agree, Settling Plaintiffs instructed Rust to process and audit all claims filed by July 1, 2015.[17]

Not surprisingly, the Court then approved the acceptance of post bar date claims.[18]

As those administrations demonstrate, the essential feature of a non-reversion common fund class action settlement is that similarly situated victims of the wrongdoing that bound them together as class members must be treated similarly in the recovery. Any reduction of the recovery per unit, therefore, is irrelevant to deciding whether or not to include post bar date claims; all that is relevant, is treating all similarly situated class members similarly. Because Post Bar Date Claimants and Pre-Bar Date Claimants are similarly situated, Post Bar Date Claimants must be afforded the same treatment as Pre-Bar Date Claimants.

FRS will represent its clients' interests to the fullest extent. Accordingly, please contact me by February 15, 2017 so that we may resolve this issue as expeditiously as possible and without bringing to the Court a dispute for resolution. If I do not hear from you by then, FRS will be constrained immediately to bring this matter to the attention of the Court.

Very truly yours,

Jeffrey N. Leibell

Copy to: Joseph M. Fisher, President
        The Notice Company
        legal@notice.com

---

[17] Declaration of Josef D. Cooper in Support of Motion to Distribute Settlement Funds, executed May 4, 2016 (Doc. No. 2273-1), at ¶13.

[18] Order Granting Motion to Distribute Settlement Funds, Doc. No. 2283, at ¶ 11 ("The Court hereby approves for payment all claims received from members of the Indirect Purchaser Settlement Class that were filed on or before July 1, 2015.").

# EXHIBIT 2

# Jeffrey N. Leibell

**From:** Jeffrey Leibell <jleibell@frsco.com>
**Sent:** Monday, February 27, 2017 9:08 PM
**To:** malioto@tatp.com
**Subject:** CRT Indirect

Mario:

When we spoke on February 15, you advised that you would provide to me a writing confirming that you had instructed the Notice Company to process all claims received after the claims filing bar date as if they were received on or before that date. You also advised the Joe Fisher of the Notice Company would not be returning to the U.S. until February 25. Now that February 25 has passed, I would appreciate receiving that writing as soon as possible.

Thanks,
Jeff

**Jeffrey N. Leibell**
General Counsel
201.853.1246 | jleibell@frsco.com | **LinkedIn**

---



**Financial Recovery Strategies**
80 Wesley Street, South Hackensack, NJ 07606
201.853.0300 Main | 201.853.0301 Fax
| www.FRSCO.com

*This email message is for the sole use of the intended recipient(s), and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email, and destroy all copies and attachments of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.*

*The above communication is not intended to provide any tax advice. If you wish to obtain tax advice concerning any matter described or referred to in this email message, you should contact your tax advisor.*

*Financial Recovery Strategies (FRS) is a third-party class action settlement claims recovery consulting firm; we are not class counsel or a claims administrator. Class members may always file claims on their own without retaining FRS, and may contact class counsel and the claims administrator for information about a settlement and for claims filing assistance. FRS, if retained, works on an agreed-upon contingent commission basis.*

# EXHIBIT 3

## Jeffrey N. Leibell

| | |
|---|---|
| **From:** | Jeffrey Leibell |
| **Sent:** | Monday, March 6, 2017 9:07 AM |
| **To:** | malioto@tatp.com |
| **Cc:** | Robin NIEMIEC (rniemiec@frsco.com); legal@notice.com |
| **Subject:** | RE: CRT Indirect |

Mario:

I have not heard from you in the almost 3 weeks since our February 15 call. You have not even had the courtesy to respond to the email (below) that I sent to you a week ago. That is not the behavior that I expected after our pleasant call during which you assured me that, with respect to the subject matter in issue, "we are not at loggerheads." Accordingly, I must insist on receiving from you by no later than tomorrow a writing in which you advise The Notice Company to process all claims received after the claims filing bar date as if they were received on or before that date. If I do not receive the writing that on February 15 you agreed to provide, I shall be forced to advise the court, as I had originally advised you I would do, and let you then explain to the court why this matter could not be resolved without the court's intervention.

Jeff
**Jeffrey N. Leibell**
General Counsel
201.853.1246 | jleibell@frsco.com | **LinkedIn**



**Financial Recovery Strategies**
80 Wesley Street, South Hackensack, NJ 07606
201.853.0300 Main | 201.853.0301 Fax | www.FRSCO.com

*This email message is for the sole use of the intended recipient(s), and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email, and destroy all copies and attachments of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.*
*The above communication is not intended to provide any tax advice. If you wish to obtain tax advice concerning any matter described or referred to in this email message, you should contact your tax advisor.*
*Financial Recovery Strategies (FRS) is a third-party class action settlement claims recovery consulting firm; we are not class counsel or a claims administrator. Class members may always file claims on their own without retaining FRS, and may contact class counsel and the claims administrator for information about a settlement and for claims filing assistance. FRS, if retained, works on an agreed-upon contingent commission basis.*

**From:** Jeffrey Leibell [mailto:jleibell@frsco.com]
**Sent:** Monday, February 27, 2017 9:08 PM
**To:** malioto@tatp.com
**Subject:** CRT Indirect

Mario:

When we spoke on February 15, you advised that you would provide to me a writing confirming that you had instructed the Notice Company to process all claims received after the claims filing bar date as if they were received on or before that date. You also advised the Joe Fisher of the Notice Company would not be returning to the U.S. until February 25. Now that February 25 has passed, I would appreciate receiving that writing as soon as possible.

Thanks,
Jeff

**Jeffrey N. Leibell**
General Counsel
201.853.1246 | jleibell@frsco.com | **LinkedIn**

---

**Financial Recovery Strategies**
80 Wesley Street, South Hackensack, NJ 07606
201.853.0300 Main | 201.853.0301 Fax
| www.FRSCO.com

*This email message is for the sole use of the intended recipient(s), and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email, and destroy all copies and attachments of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.*

*The above communication is not intended to provide any tax advice. If you wish to obtain tax advice concerning any matter described or referred to in this email message, you should contact your tax advisor.*

*Financial Recovery Strategies (FRS) is a third-party class action settlement claims recovery consulting firm; we are not class counsel or a claims administrator. Class members may always file claims on their own without retaining FRS, and may contact class counsel and the claims administrator for information about a settlement and for claims filing assistance. FRS, if retained, works on an agreed-upon contingent commission basis.*

# EXHIBIT 4

**Jeffrey N. Leibell**

| | |
|---|---|
| **From:** | Robin Niemiec |
| **Sent:** | Tuesday, March 7, 2017 9:35 AM |
| **To:** | Jeffrey Leibell |
| **Subject:** | FW: CRT Indirect |

See email chain.

**Robin Niemiec**
Executive Vice President Operations
561.231.5332 | rniemiec@frsco.com | **LinkedIn**

 **Financial Recovery Strategies**
80 Wesley Street, South Hackensack, NJ 07606
201.853.0300 Main | 201.853.0301 Fax | www.FRSCO.com

*This email message is for the sole use of the intended recipient(s), and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email, and destroy all copies and attachments of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.*
*The above communication is not intended to provide any tax advice. If you wish to obtain tax advice concerning any matter described or referred to in this email message, you should contact your tax advisor.*
*Financial Recovery Strategies (FRS) is a third-party class action settlement claims recovery consulting firm; we are not class counsel or a claims administrator. Class members may always file claims on their own without retaining FRS, and may contact class counsel and the claims administrator for information about a settlement and for claims filing assistance. FRS, if retained, works on an agreed-upon contingent commission basis.*

**From:** Robin Niemiec
**Sent:** Tuesday, March 07, 2017 9:34 AM
**To:** 'Joseph M. Fisher' <legal@notice.com>
**Subject:** RE: CRT Indirect

Glad to hear it, re: Israel.

Ok – yeah, let me know.  My general counsel is anxious to send the letter to the Court tomorrow (since he said it in his email).  He still may send it, but I will let him know you plan on talking to Mario this week.

Saw that the Court dismissed the two appeals from counsel...that is good news.

Robin

**Robin Niemiec**
Executive Vice President Operations
561.231.5332 | rniemiec@frsco.com | **LinkedIn**

 **Financial Recovery Strategies**
80 Wesley Street, South Hackensack, NJ 07606
201.853.0300 Main | 201.853.0301 Fax | www.FRSCO.com

*This email message is for the sole use of the intended recipient(s), and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email, and destroy all copies and attachments of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.*
*The above communication is not intended to provide any tax advice. If you wish to obtain tax advice concerning any matter described or referred to in this email message, you should contact your tax advisor.*
*Financial Recovery Strategies (FRS) is a third-party class action settlement claims recovery consulting firm; we are not class counsel or a claims administrator.*

*Class members may always file claims on their own without retaining FRS, and may contact class counsel and the claims administrator for information about a settlement and for claims filing assistance. FRS, if retained, works on an agreed-upon contingent commission basis.*

**From:** Joseph M. Fisher [mailto:legal@notice.com]
**Sent:** Tuesday, March 07, 2017 9:30 AM
**To:** Robin Niemiec <rniemiec@frsco.com>
**Subject:** Re: CRT Indirect

Robin,

Nice to hear from you.  I was traveling to Israel; it was a fantastic trip.

After I speak with class counsel on CRT, I'll get back to you before the end of the week.

Best regards,


Joe

Joseph M Fisher
President
The Notice Company, Inc.
94 Station St
Hingham, MA 02043
781-740-1900  tel
781-836-4297  fax
legal@notice.com

On 3/7/17 8:46 AM, Robin Niemiec wrote:

> Joe:
>
> Have you heard anything from Mario, by any chance?  We haven't heard anything and just wanted to make sure we hadn't missed anything.  Our preference is not to go to the Court (of course) with this issue but Mario hasn't gotten back to us.
>
> Let me know.  Also, heard you were away for a bit…hope you had a good trip.
>
> Thanks.
>
> **Robin Niemiec**
> Executive Vice President Operations
> 561.231.5332 | rniemiec@frsco.com | **LinkedIn**
>
> ___
>
> **Financial Recovery Strategies**
> 80 Wesley Street, South Hackensack, NJ 07606
> 201.853.0300 Main | 201.853.0301 Fax | www.FRSCO.com

*This email message is for the sole use of the intended recipient(s), and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email, and destroy all copies and attachments of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.*
*The above communication is not intended to provide any tax advice. If you wish to obtain tax advice concerning any matter described or referred to in this email message, you should contact your tax advisor.*
*Financial Recovery Strategies (FRS) is a third-party class action settlement claims recovery consulting firm; we are not class counsel or a claims administrator. Class members may always file claims on their own without retaining FRS, and may contact class counsel and the claims administrator for information about a settlement and for claims filing assistance. FRS, if retained, works on an agreed-upon contingent commission basis.*

**From:** Jeffrey Leibell
**Sent:** Monday, March 06, 2017 9:07 AM
**To:** malioto@tatp.com
**Cc:** Robin Niemiec <rniemiec@frsco.com>; legal@notice.com
**Subject:** RE: CRT Indirect

Mario:

I have not heard from you in the almost 3 weeks since our February 15 call. You have not even had the courtesy to respond to the email (below) that I sent to you a week ago. That is not the behavior that I expected after our pleasant call during which you assured me that, with respect to the subject matter in issue, "we are not at loggerheads." Accordingly, I must insist on receiving from you by no later than tomorrow a writing in which you advise The Notice Company to process all claims received after the claims filing bar date as if they were received on or before that date. If I do not receive the writing that on February 15 you agreed to provide, I shall be forced to advise the court, as I had originally advised you I would do, and let you then explain to the court why this matter could not be resolved without the court's intervention.

Jeff
**Jeffrey N. Leibell**
General Counsel
201.853.1246 | jleibell@frsco.com | **LinkedIn**



**Financial Recovery Strategies**
80 Wesley Street, South Hackensack, NJ 07606
201.853.0300 Main | 201.853.0301 Fax | www.FRSCO.com

*This email message is for the sole use of the intended recipient(s), and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email, and destroy all copies and attachments of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.*
*The above communication is not intended to provide any tax advice. If you wish to obtain tax advice concerning any matter described or referred to in this email message, you should contact your tax advisor.*
*Financial Recovery Strategies (FRS) is a third-party class action settlement claims recovery consulting firm; we are not class counsel or a claims administrator. Class members may always file claims on their own without retaining FRS, and may contact class counsel and the claims administrator for information about a settlement and for claims filing assistance. FRS, if retained, works on an agreed-upon contingent commission basis.*

**From:** Jeffrey Leibell [mailto:jleibell@frsco.com]
**Sent:** Monday, February 27, 2017 9:08 PM
**To:** malioto@tatp.com
**Subject:** CRT Indirect

Mario:

When we spoke on February 15, you advised that you would provide to me a writing confirming that you had instructed the Notice Company to process all claims received after the claims filing bar date as if they were received on or before that date. You also advised the Joe Fisher of the Notice Company would not be returning to the U.S. until February 25. Now that February 25 has passed, I would appreciate receiving that writing as soon as possible.

Thanks,
Jeff

**Jeffrey N. Leibell**
General Counsel
201.853.1246 | jleibell@frsco.com | **LinkedIn**

---

**Financial Recovery Strategies**
80 Wesley Street, South Hackensack, NJ 07606
201.853.0300 Main | 201.853.0301 Fax
| www.FRSCO.com

*This email message is for the sole use of the intended recipient(s), and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email, and destroy all copies and attachments of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.*

*The above communication is not intended to provide any tax advice. If you wish to obtain tax advice concerning any matter described or referred to in this email message, you should contact your tax advisor.*

*Financial Recovery Strategies (FRS) is a third-party class action settlement claims recovery consulting firm; we are not class counsel or a claims administrator. Class members may always file claims on their own without retaining FRS, and may contact class counsel and the claims administrator for information about a settlement and for claims filing assistance. FRS, if retained, works on an agreed-upon contingent commission basis.*

# EXHIBIT 5

**Jeffrey N. Leibell**

| | |
|---|---|
| **From:** | Mario Alioto <MAlioto@TATP.com> |
| **Sent:** | Thursday, March 9, 2017 8:47 PM |
| **To:** | Jeffrey Leibell |
| **Cc:** | Robin Niemiec; legal@notice.com; MAlioto@tatp.com |
| **Subject:** | RE: CRT Indirect |

My apologies for not responding to this email sooner.  I'm afraid I don't agree with your characterization of our recent dealings.  Rather than engage in an unproductive exchange of further emails, I wanted to confirm that Joe Fisher (our Claim Administrator) is in touch with Robin Niemiec of your firm and is addressing your concerns.  Hopefully, he will be able to give you the assurances you need about the auditing of your claims.  With best personal regards, Mario

---

**From:** Jeffrey Leibell [mailto:jleibell@frsco.com]
**Sent:** Monday, March 6, 2017 6:07 AM
**To:** malioto@tatp.com
**Cc:** Robin Niemiec <rniemiec@frsco.com>; legal@notice.com
**Subject:** RE: CRT Indirect

Mario:

I have not heard from you in the almost 3 weeks since our February 15 call. You have not even had the courtesy to respond to the email (below) that I sent to you a week ago. That is not the behavior that I expected after our pleasant call during which you assured me that, with respect to the subject matter in issue, "we are not at loggerheads." Accordingly, I must insist on receiving from you by no later than tomorrow a writing in which you advise The Notice Company to process all claims received after the claims filing bar date as if they were received on or before that date. If I do not receive the writing that on February 15 you agreed to provide, I shall be forced to advise the court, as I had originally advised you I would do, and let you then explain to the court why this matter could not be resolved without the court's intervention.

Jeff
**Jeffrey N. Leibell**
General Counsel
201.853.1246 | jleibell@frsco.com | **LinkedIn**

---

**Financial Recovery Strategies**
80 Wesley Street, South Hackensack, NJ 07606
201.853.0300 Main | 201.853.0301 Fax | www.FRSCO.com

*This email message is for the sole use of the intended recipient(s), and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email, and destroy all copies and attachments of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.*

*The above communication is not intended to provide any tax advice. If you wish to obtain tax advice concerning any matter described or referred to in this email message, you should contact your tax advisor.*

*Financial Recovery Strategies (FRS) is a third-party class action settlement claims recovery consulting firm; we are not class counsel or a claims administrator. Class members may always file claims on their own without retaining FRS, and may contact class counsel and the claims administrator for information about a settlement and for claims filing assistance. FRS, if retained, works on an agreed-upon contingent commission basis.*

---

**From:** Jeffrey Leibell [mailto:jleibell@frsco.com]
**Sent:** Monday, February 27, 2017 9:08 PM

**To:** malioto@tatp.com
**Subject:** CRT Indirect

Mario:

When we spoke on February 15, you advised that you would provide to me a writing confirming that you had instructed the Notice Company to process all claims received after the claims filing bar date as if they were received on or before that date. You also advised the Joe Fisher of the Notice Company would not be returning to the U.S. until February 25. Now that February 25 has passed, I would appreciate receiving that writing as soon as possible.

Thanks,
Jeff

**Jeffrey N. Leibell**
General Counsel
201.853.1246 | jleibell@frsco.com | **LinkedIn**

---



**Financial Recovery Strategies**
80 Wesley Street, South Hackensack, NJ 07606
201.853.0300 Main | 201.853.0301 Fax
| www.FRSCO.com

*This email message is for the sole use of the intended recipient(s), and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email, and destroy all copies and attachments of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.*
*The above communication is not intended to provide any tax advice. If you wish to obtain tax advice concerning any matter described or referred to in this email message, you should contact your tax advisor.*
*Financial Recovery Strategies (FRS) is a third-party class action settlement claims recovery consulting firm; we are not class counsel or a claims administrator. Class members may always file claims on their own without retaining FRS, and may contact class counsel and the claims administrator for information about a settlement and for claims filing assistance. FRS, if retained, works on an agreed-upon contingent commission basis.*

# EXHIBIT 6

## Jeffrey N. Leibell

| | |
|---|---|
| **From:** | Jeffrey Leibell |
| **Sent:** | Monday, July 17, 2017 9:50 AM |
| **To:** | malioto@tatp.com |
| **Cc:** | Robin NIEMIEC (rniemiec@frsco.com) |
| **Subject:** | In re: Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Case No. C-07-5944-JST (N.D. Cal.) ("CRTI") |
| **Attachments:** | FRS Research iso Accepting Late Claims (2017-07-17)(2).pdf |

Mario:

Our last communications concerning late claims was your March 9, 2017 email which referred to the March 8, 2017 email we received from Joseph Fisher of The Notice Company. Those emails confirmed the agreement reached during our February 15, 2017 telephone call that the Post-Deadline Claims submitted by FRS would be processed. However, although you agreed to process Post-Deadline Claims, you reserved decision concerning whether you would recommend to the Court that those claims be accepted. Mr. Fisher's email put it this way: "No decision has been made about whether, or to what extent, late claims will be paid." He went on to conclude that he would "be discussing the matter with Lead Counsel over the coming weeks." As The Notice Company appears to be attempting to wrap up the claims processing phase of the administration – FRS was required to complete by July 10, 2017 all audit and other requests for information concerning both timely and late claims – it seems appropriate now to revisit the acceptance of Post-Deadline Claims.

FRS has already provided you with its position: All eligible claimants – timely and late claimants alike – deserve the benefits of your successful resolution of *CRTI*. They are, in both fact and appearance, equal, particularly because the claim filing deadline necessarily will not bear any relationship to the date of the eventual distribution. We hope that, having had time to further consider the matter, you agree, and that you will recommend to the Court that those claims be accepted. However, should you still have any lingering doubt, FRS wanted to provide you with the results of research we completed to support of the acceptance of late claims in another class action. That research, which is attached, confirms the experience we've gained over decades of prosecuting and settling complex class actions, of administering class action settlements, and of submitting claims for clients to recover from them: FRS did not identify *any* court that rejected late claims based on the reduction in recoveries to timely claims or just because they were late. Accordingly, judicial precedent, and, we believe, justice and fairness, require that Post-Deadline Claimants be afforded the same treatment as timely claimants. Therefore, we hope that you will recommend to the Court that Post-Deadline Claims be accepted.

We request the courtesy of a response to this email so that, should you decline to make the requested recommendation, FRS may timely undertake appropriate action.

Best regards,
Jeff

**Jeffrey N. Leibell**
Chief Operating Officer & General Counsel
201.853.1246 | jleibell@frsco.com | **LinkedIn**

 **Financial Recovery Strategies**
80 Wesley Street, South Hackensack, NJ 07606
201.853.0300 Main | 201.853.0301 Fax | www.FRSCO.com

*This email message is for the sole use of the intended recipient(s), and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email, and destroy all copies and attachments of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.*
*The above communication is not intended to provide any tax advice. If you wish to obtain tax advice concerning any matter described or referred to in this email message, you should contact your tax advisor.*
*Financial Recovery Strategies (FRS) is a third-party class action settlement claims recovery consulting firm; we are not class counsel or a claims administrator.*

*Class members may always file claims on their own without retaining FRS, and may contact class counsel and the claims administrator for information about a settlement and for claims filing assistance. FRS, if retained, works on an agreed-upon contingent commission basis.*



Jeffrey N. Leibell
**Chief Operating Officer &
General Counsel**
(201) 853-1246
jleibell@frsco.com

**A *PER SE* RULE TO REJECT LATE CLAIMS WOULD VIOLATE DECADES OF LEGAL PRECEDENT AND PRACTICE**

Over twenty-four years ago in *Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership*, the Supreme Court, by expressly rejecting the "narrow" approach taken by several courts of appeals, and by holding instead that *per se* rules are to be avoided in favor of a "flexible understanding" of excusable neglect when evaluating, among other filings, late claims, resolved the circuit split over the meaning and scope of "excusable neglect" in connection with missing a filing deadline:

> With regard to determining whether a party's neglect of a deadline is excusable, *... **we conclude that the determination is at bottom an equitable one, taking account of all the relevant circumstances surrounding the party's omission***.[1]

Although *Pioneer* was decided in the context of Bankruptcy Rule 9006(b)(1), every court of appeals has since invoked *Pioneer* to provide the standard for evaluating situations in which "the failure to comply with a filing deadline is attributable to negligence,"[2] and also has held that "the correct approach is to avoid any *per se* rule,"

---

[1] 507 U.S. 380, 384, 113 S. Ct. 1489, 1498, 123 L. Ed.2d 74 (1993). *Pioneer* set forth the following four-factor test:

> the danger of prejudice to the [non-moving party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

507 U.S. at 395, 113 S. Ct. 1489. FRS's Post-Deadline Claim clients (the "Post-Deadline Claimants") easily meet each of these factors:

(1) The non-moving parties – here, the defendants – have no financial interest in whether or not late claims are accepted, and, as will be explained below, there is no prejudice to timely claimants;

(2) As will be explained in detail below, there is no significant impact on the judicial process because FRS promptly filed claims for all of its Post-Deadline Claimant clients while the claims administrator has been processing claims;

(3) The delay was not within the control of FRS's Post-Deadline Claimant clients because, as described below, all of FRS's Post-Deadline Claimant clients were first made aware of the *CRTI* settlements by FRS, after which, upon being retained, FRS promptly submitted their claims; and

(4) There is no basis on which to assert that either FRS or its Post-Deadline Claimant clients acted other than in good faith.

[2] *See, e.g., Pratt v. Philbrook*, 109 F.3d 18, 19 (1st Cir.1997) ("*Pioneer* must be understood to provide guidance outside the bankruptcy context."); *U.S. v. Hooper*, 9 F.3d 257, 259 (2d Cir. 1993) ("nothing in *Pioneer* limits its interpretation of 'excusable neglect' to the Bankruptcy Rules"); *In re Orthopedic Bone Screw Prods Liab. Litig.*, 246 F.3d 315, 322 (3d Cir. 2001) (*Pioneer* addressed excusable neglect concerning "the enlargement of time periods in the civil rules"); *Thompson v. E.I. DuPont de Nemours & Co., Inc.*, 76 F.3d 530, 533 (4th Cir. 1996) ("it is evident that the [*Pioneer*] Court intended its definition of 'excusable neglect' to be equally applicable" beyond the bankruptcy context); *Cowart v. Ingalls Shipbuilding*, No. 99-60034, 192 F.3d 126, 1999 WL 683819, at *1 (5th Cir. Aug. 4, 1999) (*per curiam*) ("We have responded by importing *Pioneer's* analysis of 'excusable neglect' into non-bankruptcy contexts"); *Deym v. von Fragstein*, 127 F.3d 1102



and, therefore, that "erecting a rigid barrier against late filings attributable in any degree to the movant's negligence," must be rejected in favor of a "flexible meaning to 'excusable neglect.'"[3] A late claim may not be rejected based on a *per se* rule, therefore; rather, before a late claim may be rejected, it must first be evaluated under – and then fail – the *Pioneer* excusable neglect standard.[4]

---

(Table), 1997 WL 650933, at *1 (6th Cir. Oct. 16, 1997 ("this Court has subsequently held that the *Pioneer* definition of 'excusable neglect' also applies to the standard as used" outside the bankruptcy context); *Prizevoits v. Indiana Bell Tel. Co.*, 76 F.3d 132, 134 (7th Cir. 1996) ("the term[excusable neglect] bears the same or similar meaning throughout the federal procedural domain"); *Fink v. Union Central Life Ins. Co.*, 65 F.3d 722, 724 (8th Cir. 1995) ("We believe the *Pioneer* interpretation of excusable neglect under the Bankruptcy Rules also applies when interpreting excusable neglect" in other contexts."); *Pincay v. Andrews*, 389 F.3d 853, 855 (9th Cir. 2004) (*en banc*) ("The [*Pioneer*] Court also reviewed various contexts in which the phrase [excusable neglect] appeared in the federal rules of procedure and made it clear the same test applies in all those contexts."); *City of Chanute, Kan. v. Williams Natural Gas Co.*, 31 F.3d 1041, 1046 (10th Cir. 1994) ("Because the [*Pioneer*] Court's analysis of what constitutes 'excusable neglect' in the bankruptcy context rested on the plain meaning of the terms, there is no reason that the meaning would be different in" other contexts.); *Cheney v. Anchor Glass Container Corp.*, 71 F.3d 848, 849-50 (11th Cir. 1996) ("In reaching its decision, the [*Pioneer*] Court reviewed the meaning of excusable neglect in the context of analogous rules that allow for late filings."); *In re Vitamins Antitrust Class Actions*, 327 F.3d 1207, 1209 (D.C. Cir. 2003) (applying *Pioneer* to affirm modification of final order to allow class member to opt out of settlement); *Information Systems & Networks Corp. v. U.S.*, 994 F.2d 792, 796 (Fed Cir. 1993) (failure to answer counterclaim was excusable neglect under *Pioneer*).

[3] *Pincay*, 389 F.3d at 860 (quoting *Pioneer*, 507 U.S. at 395 n.14, 113 S. Ct. 1489); *accord Graphic Comms. Intern. Union, Local 12-N v. Quebecor Printing Providence, Inc.*, 270 F.3d 1, 5 (1st Cir. 2001 ("the Supreme Court had 'adopted a forgiving attitude toward instances of "excusable neglect," a term *Pioneer* suggests will be given a broad reading.'" (quoting *Pratt*, 109 F.3d at 22); *Hooper*, 9 F.3d at 259 (The *Pioneer* Court "held that a determination of whether the neglect was excusable "is at bottom an equitable one ...."); *Orthopedic Bone Screw*, 246 F.3d at 329 (adherence to a cutoff date "must not be so rigid as to preclude recovery by a deserving claimant") (citing *Zients v. LaMorte*, 459 F.2d 628, 631 (2d Cir. 1972)); *Thompson*, 76 F.3d at 533 ("The [*Pioneer*] Court defined 'excusable' as 'at bottom an equitable [inquiry], taking account of all relevant circumstances surrounding the party's omission ...'") (first alteration added; quotation omitted); *In re Eagle Bus Mfg., Inc.*, 62 F.3d 730, 739 (5th Cir. 1995) ("The standard for determining whether a party's neglect of a deadline is excusable is a flexible one because it is rooted in equity."); *Deym*, 1997 WL 650933, at *1 ("In [*Pioneer*], the Supreme Court announced a 'flexible understanding of "excusable neglect.""') (quotation omitted); *Robb v. Norfolk & Western Ry. Co.*, 122 F.3d 354, 361 (7th Cir. 1997) ("By following *Pioneer* in a clear and straightforward fashion, we join the other circuits that acknowledge 'excusable neglect' has a new and broader meaning in the aftermath of the Supreme Court's 1993 decision.") (citing cases); *Fink*, 65 F.3d at 723-24 ("the Supreme Court recently established a more flexible analysis of the excusable neglect standard in *Pioneer*"); *City of Chanute*, 31 F.3d at 1046 ("it is clear that 'excusable neglect' ... is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant.") (quotation omitted); *Cheney*, 71 F.3d at 849-50 ("'excusable neglect' is understood to encompass situations in which the failure to comply with a filing deadline is attributable to negligence.") (quotation omitted); *Vitamins*, 327 F.3d at 1209 ("The *Pioneer* standard precludes the adoption of any such *per se* rule. The Court in *Pioneer* purposely fashioned a flexible rule which, by its nature, counsels against the imposition of a *per se* rule on attorney neglect."); *Information Systems*, 994 F.2d at 796 (In *Pioneer*, "the Supreme Court adopted a balancing approach, 'taking account of all relevant circumstances surrounding the party's omission.'") (quotation omitted).

[4] *See, e.g., In re Cendant Corp. PRIDES Litig.*, 235 F.3d 176, 181-85 (3d Cir. 2000) (reversing district court for failing to conduct proper excusable neglect analysis); *Chemetron Corp. v. Jones*, 72 F.3d 341, 349 (3d Cir. 1995) (even in bankruptcy context, court committed reversible error because its excusable neglect "analysis failed to adequately consider the totality of the circumstances presented."); *In re O'Brien Envntl. Energy, Inc.*, 188 F.3d 116, 127 (3d Cir. 1999) (also in bankruptcy context, reversing because district court "erred in determining that Manus was not entitled to relief from the March 8 order based upon excusable neglect."); *In re Crazy Eddie Sec. Litig.*, 906 F. Supp. 840, 843 (E.D.N.Y. 1995) (even



Instructive on the acceptance of late claims in class actions substantially similar to *CRTI* are the recent administrations of the $1.08 billion settlement in *In re: TFT-LCD (Flat Panel) Antitrust Litigation*, MDL No. 1827 (N.D. Cal.) ("*LCDI*"), which concerned consumers in 24 states and the District of Columbia all of whom purchased LCD flat screen televisions, computer monitors and laptops, and of the $210 million settlement in *In re: Dynamic Random Memory (DRAM) Antitrust Litigation*, MDL No. 1486 (N.D. Cal.) ("*DRAM*"), which concerned an electronic component that allows for storage and retrieval of electronic data:

> **LCDI.** The court-ordered claims filing deadline was December 6, 2012; as a result of, *inter alia*, the pendency of several appeals to the approval of the settlement, however, that deadline was extended eighteen months to June 6, 2014.[5] The claims administrator "continued to receive and process claims submitted after" the original deadline.[6] 215,395 valid claims, which included 10,255,315 LCD "panel equivalents," were received by the original claims deadline; another 18,078 otherwise valid claims, which included 5,956,723 LCD panel equivalents, were received between the original deadline and the extended deadline.[7] Thus, valid LCD panel equivalents received after the original deadline accounted for approximately 37% of the total 16,212,038 valid LCD panel equivalents. class counsel recommended, and the court approved, the acceptance of those post-deadline claims.[8]

> **DRAM.** The court-ordered claims filing deadline was August 1, 2014; as a result of, *inter alia*, the pendency of several appeals to the approval of the settlement, however, that deadline was extended eleven months to July 1, 2015.[9] The claims administrator "continued to receive claims after the initial August 1,

---

in reversionary class action settlement, "court must make its determination after 'taking account of all relevant circumstances surrounding the party's omissions.'") (quoting *Pioneer*, 507 U.S. at 394-95, 113 S. Ct. at 1498); *id.* at 844 ("any strict requirement that a late claimant must demonstrate good cause for delay in filing a proof of claim in a class action settlement, is clearly inappropriate when the court is exercising its equitable power in this context. … [T]he *Pioneer* analysis is clearly applicable" in connection with evaluating late claims in class action settlements, where "the proper inquiry is necessarily an equitable one. …. The court is "entrusted with broad equitable powers to balance the interests of affected parties.") (internal quotation omitted); *In re Brand Name Prescription Drugs Antitrust Litig.*, 171 F.R.D. 213, 216 (N.D. Ill. 1997) (allowing late opt out, holding that the "'neglect' portion of the [excusable neglect] standard is meant to include within the rule situations where the failure to meet a deadline is attributable to negligence. … [T]he determination that the neglect be 'excusable' is an equitable one, 'taking account of all relevant circumstances surrounding' the failure to meet the deadline.") (quoting *Pioneer*, 507 U.S. at 394-95, 113 S. Ct. at 1497-98).

[5] *See, e.g.*, *LCDI*, Declaration of Robin M. Niemiec of Rust Consulting, Inc., Notice and Claims Administrator, in Support of Indirect Purchaser Plaintiffs' Motion to Authorize Distribution of Settlement Fund, executed Sept. 12, 2014 (Doc. No. 9217-1), at ¶6.

[6] *See id.*

[7] *See id.* at ¶ 26 & Ex. A (Claims Summary).

[8] *See, e.g.*, *LCDI*, Second Amended Order Granting Final Approval of Combined Class, *Parens Patriae*, and Governmental Entity Settlements with AUO, LG Display, and Toshiba Defendants; Ordering Final Judgment of Dismissal with Prejudice; Award of Attorneys' Fees, Expenses, and Incentive Awards, *DRAM* (Doc. No. 7697), at 6, n.4. ("IPP counsel recommend that late-filed claims be included in distribution payments, and this Court agrees.").

[9] *See, e.g.*, *DRAM*, Declaration of Amy L. Lake of Rust Consulting, Inc., Notice and Claims Administrator, executed May 4, 2016 (Doc. No. 2273-2), at ¶6.



FINANCIAL
RECOVERY
STRATEGIES

2014 deadline, and processed those claims contemporaneously with the earlier filed claims."[10] As of the original claims deadline, the claims administrator had received 449,979 claims; another 19,508 claims were received between the original deadline and the extended deadline. [11] In connection with those post-deadline claims, class counsel made to the court the following recommendation:

> This distribution has not been delayed by the additional claims filed between August 1, 2014 and July 1, 2015, and Settling Plaintiffs believe that considerations of overall fairness to the Settlement Class outweigh any prejudice to those class members who filed by August 1, 2014. Anticipating that the Court would agree, Settling Plaintiffs instructed Rust to process and audit all claims filed by July 1, 2015.[12]

The court then approved the acceptance of post-deadline claims.[13]

As the examples provided by the administrations of these two analogous class action settlements demonstrate, the essential feature of a non-reversionary common fund settlement is that similarly situated victims of the wrongdoing that bound them together must be treated similarly in the recovery. To do otherwise – to favor those with a certain characteristic, such as those who filed timely claims, over those who do not possess that characteristic – would be a textbook example of inadequate representation that would subject the settlements to collateral attack by Post-Deadline Claimants whose otherwise valid claims would be rejected, but who nevertheless would be subject to the releases because they did not exclude themselves from the action.[14]

And because of, among other things, the pending appeals, no distribution will occur within the next several months, if not longer.[15] Accordingly, the timing of the eventual *CRTI* distribution cannot bear any relationship to the current court-imposed deadlines, which renders those deadlines arbitrary. Given that all Post-Deadline Claimants are members of the Settlement Class who, to the same extent as timely claimants, were victims of the same alleged prohibited conduct that was at the core of *CRTI*, Post-Deadline Claimants are, but for the now-arbitrary claim submission deadlines, indistinguishable from timely claimants. Accepting otherwise valid Post-Deadline Claims is the best way to provide compensation to as many victims of the alleged wrongful conduct and on whose behalves

---

[10] *See id.* at ¶ 7.

[11] *See id.* at ¶¶ 6 & 9.

[12] *DRAM*, Declaration of Josef D. Cooper in Support of Motion to Distribute Settlement Funds, executed May 4, 2016 (Doc. No. 2273-1), at ¶13.

[13] *DRAM*, Order Granting Motion to Distribute Settlement Funds, Doc. No. 2283, at ¶ 11 ("The Court hereby approves for payment all claims received from members of the Indirect Purchaser Settlement Class that were filed on or before July 1, 2015.").

[14] *See, e.g., Sam Fox Pub. Co. v. U.S.,* 366 U.S. 683, 691-92, 81, S. Ct. 1309, 1314, 6 L.Ed.2d 604 (1961) ("the judgment in a class action will bind only those members of the class whose interests have been adequately represented by existing parties to the litigation") (citing, *inter alia, Hansberry v. Lee,* 311 U.S. 32, 61 S. Ct. 115. 85 L. Ed. 22 (1940)). In this regard, because The Notice Company has their contact information, timely direct notice of rejection for lateness is required so that Post-Deadline Claimants may avail themselves of their due process rights to bring to the Court a challenge to that rejection. *Cf. Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 94 S. Ct. 2140, 2152 40 L. Ed.2d 732 (1974) ("individual notice to identifiable class members is not a discretionary consideration to be waived in a particular case"). As of this writing, however, Post-Deadline Claimants have not received any such notice.

[15] Answering briefs were submitted for review on July 3, 2017. *See, e.g.,* Doc. Nos. 81-83, Case No. 16-16368 (9th Cir.).



the multimillion dollar settlements were obtained, and, respectfully, the only way for class counsel to satisfy the fiduciary duties that its owes to all members of the Settlement Class.

**The Reduction in Amounts Distributed to Timely Claimants**
**as a Result of Accepting Post-Deadline Claims Is Not Legally Cognizable Prejudice**

Every court that has published an opinion concerning whether the reduction in distributions to timely claimants caused by accepting late claims constituted prejudice to timely claims sufficient to exclude late claims has rejected that proposition. Indeed, the *sine quo non* of non-reversionary common fund settlements is that every accepted claim diminishes the recoveries provided by every other accepted claim. As set forth below, courts have held time and time again that, because timely and late claims stand on equal footing concerning the alleged wrongful conduct, and because timely claimants have no right to receive any particular amount, timely claimants are not prejudiced by the acceptance of late claims.

- In *In re Bear Stearns Companies, Inc. Securities, Derivative & ERISA Litigation*, the court, having already accepted over 350 late claims, and over the opposition of the lead plaintiff, allowed the inclusion of another – and relatively substantial – late claim, reasoning that the resulting lower recoveries for timely claimants did not constitute prejudice:

  > [C]lass members **are not prejudiced** since they are obligated to share a fixed recovery with other equally entitled claimants and **timely-filed claimants have no justifiable expectation of any particular payout**.[16]

- Similarly, the court in *In re Electric Carbon Products Antitrust Litigation*, in allowing late claims with total qualified purchases of over $28 million, aptly observed:

  > [C]ourts have generally said that the mere reduction of money available to timely registrants is **not considered prejudice for purposes of this inquiry**. All legitimate members of the class are normally presumed **equally entitled to share in recovery.**[17]

Then, directly on point to the lack of prejudice to timely filed claimants, the *Electric Carbon Products* court held that no such prejudice existed:

  > **[D]espite the significant value of the late claims, there is no fatal prejudice** as that term is defined in *Orthopedic Bone Screw* with regard to the mere diminution of the expected recovery of the earlier claimants. …

  > … **The Court cannot find prejudice** merely because, contrary to the facts of this case and the law of this Circuit, the parties assumed qualified late claimants—who

---

[16] 297 F.R.D. 90, 96 (S.D.N.Y. 2013) (emphasis added); *see id.* at 95 (In connection with an earlier distribution, the court allowed late claims that were "disproportionately large"; "Counsel argued [in connection with those late claims] that 'it would be unfair to deny payment of an otherwise eligible claim received while claims were still being processed because it was submitted after the Court-approved claims filing deadline.'"); *cf. Dahingo v. Royal Caribbean Cruises, Ltd.*, 312 F. Supp.2d 440, 446 (S.D.N.Y. 2004) ("where a change in the allocation of a settlement fund affects only the distribution among class members and not the obligations of the defendant, courts will exercise their equitable powers.").

[17] 622 F. Supp.2d 144, 154 (D.N.J. 2007) (internal citation omitted; emphasis added).



had begun to come forward and of which some of them were aware—would not have access to the settlement.

> ... **the Court has an obligation not to elevate the claims of any class member over the claims of other class members, no matter how large a class member's stake in the case might be. All legitimate class members should, if equitable, be permitted to share in the settlement**. ...
>
> ...
>
> ... [T]he failure to anticipate what late claims would materialize **does not constitute prejudice**.[18]

- Equally instructive is the holding in *In re Authentidate Holding Corporation Securities Litigation*, in which the court denied the lead plaintiff's motion seeking an order to deny late claims, finding that including late claims provided a more equitable distribution, and that **the resulting 40% reduction in recoveries for timely claimants** did not constitute prejudice:

  > Lead Plaintiff argues that the inclusion of the late claims would prejudice those who filed timely claims by reducing the pro-rata distribution of the Net Settlement Fund from 40% to 24% of each Authorized Claimant's Recognized Claim. **That prejudice does not flow from Late Claimants' untimely filing of their claims; it flows from the conceded fact that the Late Claimants suffered substantial compensable losses. Such prejudice resulting from payout reductions attributable to a more equitable distribution among a larger group of injured parties is not a form of prejudice that warrants denial of recovery to the Late Claimants under the circumstances of this case.**[19]

- And even when "the distribution of the settlement fund [was] at hand" in *In re Agent Orange Product Liability Litigation*, Judge Weinstein accepted approximately 3,500 late claims, holding that timely claimants would not be prejudiced both because late claimants and timely claimants stood on equal footing, and because timely claimants had no right to any particular recovery amount:

  > There can, therefore, be **little prejudice to the claimants whose claims were timely filed by admission of these claimants to the class for consideration on an equal footing**. Moreover, **since no payments have yet been made to any claimants, earlier estimates of possible payment amounts did not confer on the early claimants any right to those particular amounts**. Figures previously cited by the court as statistical approximations of the possible payment schedules do not vest in any individual claimant, or in the class as a whole, anything more than a generalized and unquantified expectation of payment to qualifying class members.[20]

---

[18] *Id.* at 156-57 (emphasis added).

[19] Master File No. 05 Civ. 5323(LTS), 2013 WL 324153, at *1 (S.D.N.Y. Jan. 25, 2103) (emphasis added).

[20] 689 F. Supp. 1250, 1262-63 (E.D.N.Y. 1988) (citations and internal quotes omitted; emphasis added); *see Zients v. LaMorte*, 459 F.2d 628, 630-31 (2d Cir. 1972) (reversing district court's rejection of late claims because they "would result in only a miniscule reduction in recovery by timely claimants," and because "**all the equities are on the side of the**



- Not to belabor the point, but the Third Circuit in *In re Orthopedic Bone Screw Products Liability Litigation* went even farther: In addition to holding that the inclusion of late claims would not prejudice timely claimants, who were no more deserving of a recovery than late claimants, the Court of Appeals also held that the District Court's failure to include late claims was an abuse of discretion that would provide timely claimants with a "windfall":

> More generally, we find it appropriate to consider the effect of Sambolin's inclusion on those whom it might prejudice—namely those members of the settlement class who filed their registrations by the May 15, 1997 deadline. *It cannot be maintained that timely registrants are more deserving of remedy*, for purposes of equity, than tardy registrants with similar claims, presuming the failure to register on time was indeed blameless. By excluding ... late registrants from the class, *the timely registrants would receive what is essentially a "windfall,"* comprised of some portion of the recovery that would be owed to the otherwise deserving late registrants .... *[T]he loss of a windfall is not prejudicial.*[21]

In finding that the district court had abused its discretion in excluding the late claimant, Sambolin, the Third Circuit held that he

> ha[d] adequately pursued his claim against AcroMed in good faith and with reasonably timely efforts since learning of the settlement. *Under these facts, we find that each factor of the Pioneer analysis counsels in favor of including Sambolin within the settlement class and that the Court abused its discretion in excluding him from sharing in the remedy.*[22]

And even courts that have declined to accept some late claims did not do so because their inclusion was prejudicial to timely claimants, but, instead, excluded them only after finding that those late claimants did not meet the *Pioneer* excusable neglect standard.

- In *Wal-Mart Stores, Inc. v. Visa USA, Inc.*, the Second Circuit affirmed the district court's rejection of a late claim because the late claimant "did not show that its late filing was excusable neglect."[23]

---

[claims], the fund has not been distributed and the administration of the fund would be insignificantly hampered by allowing these few late claims") (emphasis added).

[21] 246 F.3d 315, 324 (3d Cir. 2001) (emphasis added); *see CME Grp. Inc. v. Chicago Bd. Options Exch., Inc.*, CIV.A. 2369–VCN, 2009 WL 1856693, at *3 (Del. Ch. June 25, 2009) ("Even though other Group A Member distributions will be diminished somewhat ..., *the additional proceeds from the settlement pool they would receive if late filers were excluded is simply a windfall.*") (emphasis added).

[22] 246 F.3d 323 (emphasis added); *see id.* at 329 ("Because *we find that the District Court did not perform a balancing of the equitable factors of excusable neglect* in determining Sambolin's exclusion from the settlement class, and because none of the equitable factors support the District Court's result, we conclude that its holding was necessarily in error.") (emphasis added); *see In re Cendant Corp. PRIDES Litig.*, 233 F.3d 188, 193-96 (3d Cir. 2000) (quoting and following *Zients* and *Pioneer* to affirm district court's acceptance of late claims).

[23] 395 Fed. Appx. 743, 744, 2010 WL 3894917, at *1-*2 (2d Cir. Oct. 6, 2010); *see In re Oxford Health Plans, Inc.*, 383 Fed. Appx. 43, 45-46, 2010 WL 2649812, at *1-*2 (rejecting late claim under the *Pioneer* standard).



- In *Blank v. Jacobs*, the court accepted some claims, but declined to accept others, because the latter claims did not satisfy the *Pioneer* standard, finding, for example, that "misplacement of the forms without any further explanation other than believing it would not be problematic to submit a late claim does not constitute excusable neglect, particularly given a delay of over six months."[24]

- And in *Sutton v. Hopkins County, Ky.*, the court allowed some late claimants, but denied one because that claimant did not offer "any explanation regarding his lack of diligence in keeping himself apprised of the class action, when he discovered that a settlement had been reached, and his timeliness in contacting the Court or Class Counsel upon learning of the settlement."[25]

This uniformly held reasoning is particularly on point concerning late claims submitted to recover from settlements of indirect purchaser antitrust actions, like *CRTI*, in which eligible claimants, because they do not receive mailed notice,[26] are unlikely to sit on their rights and, therefore, are overwhelmingly likely to meet the excusable neglect standard.

- The court in *Blank*, for example, "focus[ing] on the length and reasons for delay," allowed late claims when excusable neglect was demonstrated, such as, for example, when a broker "would not release records regarding [claimant]'s trades" and claimant's accountant did so "but only after a manual search," and when "the respective class members did not know or receive notice of the settlement through no fault of their own."[27]

- And in *Sutton*, the court had previously accepted late claims because those claimants "demonstrated diligence in pursuing their claim including contact with class counsel."[28]

FRS's *CRTI* Post-Deadline Claim clients meet the excusable neglect standard because, to the best of FRS's knowledge, none of them had seen notices concerning the *CRTI* settlements, and only learned of them when they were notified

---

[24] *See* No. 03-CV-2111(JS)(WDW), 2013 WL 1310503, at *3-*4 (E.D.N.Y. Mar. 27, 2013); *accord In re Auction Houses Antitrust Litig.*, No. 00 Civ. 0648 LAK RLE, 2004 WL 3670993, at *9 (accepting late claims for some claimants, but declining to do so for others because, for example, secretary's misplacement of the claim forms, along with other reasons, was insufficient to demonstrate excusable neglect).

[25] *See* C. A. No. 4:03CV-003-M, 2009 WL 383406, at *1-*2 (W.D. Ky. Nov. 16, 2009).

[26] *See, e.g.*, *CRTI*, Amended Order Granting Motion for Preliminary Approval (Doc. No. 3906), at ¶13; Indirect Purchaser Plaintiffs' Notice of Motion & Motion for Preliminary Approval of Class Action Settlements, f(Doc. No. 3861), at 24:3-25:12. Thus, even though the publication notice satisfies the due process requirements of federal law, it does not establish, nor could it, that FRS's Post-Deadline Claimant clients' delay was within their control or the result of anything other than good faith. *See, e.g.*, *Orthopedic Bone Screw*, 246 F.3d at 326-28 ("Sambolin's seven month delay in filing his Registration Form resulted from his lack of awareness, in light of the minimal constructive notice provided by the parties, that his right to a remedy was being litigated in a binding class action. … **The constructive notice given to him was too minimal to impart blame upon him for his lack of awareness.**") (emphasis added).

[27] 2013 WL 1310503, at *3-*4.

[28] 2009 WL 383406, at *1; *see Sutton v. Hopkins County, Ky.*, C. A. No. 4:03CV-003-M, 2009 WL 329843, at *3 (W.D. Ky. Oct. 13, 2009) (accepting prior late claim).



by FRS, at which point they retained FRS which promptly submitted their claims.[29] As the *Bear Stearns* court held in accepting a late claim from a claimant, Cancan, that, as is the case in indirect purchaser antitrust actions like *CRTI*, did not receive direct notice:

> ***While it is arguable that Cancan should have learned of the settlement sooner via the public notices, Cancan's failure to find news on the Settlement constitutes neglect at worst.*** Excusable neglect "is not limited strictly to omissions caused by circumstances beyond the control of the movant." *Pioneer Inv. Servs. Co.*, 507 U.S. at 392, 113 S. Ct. 1489. ***"[F]or purposes of Rule 60(b), 'excusable neglect' is understood to encompass situations in which the failure to comply with a filing deadline is attributable to negligence."*** *Id.* at 394, 113 S. Ct. 1489. "[E]xclud[ing] every instance of an inadvertent or negligent omission would ignore the most natural meaning of the word 'neglect.'" *Id.* at 394-95, 113 S. Ct. 1489*. **"The word [neglect] therefore encompasses both simple, faultless omissions to act and, more commonly, omissions caused by carelessness."*** *Id.* at 388, 113 S. Ct. 1489.
>
> > While "[t]here is no question that in the distribution of a large class action settlement fund, 'a cutoff date is essential and at some point the matter must be terminated,'" application of this principle must not be so rigid as to preclude recovery by a deserving claimant.
>
> *In re Orthopedic Bone*, 246 F.3d at 329 (citations omitted). ***The Court does not believe that a rigid cutoff date is essential.*** As such, Cancan's motion to modify is granted.[30]

As the foregoing demonstrates, the reduction in distribution amounts to timely claimants that results from accepting Post-Deadline Claimants is not prejudicial to timely claimants both because they stand on equal footing with Post-Deadline Claimants, and, therefore, timely claimants have no better right than Post-Deadline Claimants to recover, and because timely claimants have no right at all to recover any particular amount. Accordingly, that reduction cannot form the basis on which to reject Post-Deadline Claims.

---

[29] FRS, relying on decades of uniform custom and law confirming the acceptance of late claims in non-reversionary common fund settlements, continued after the deadline to reach out to potentially eligible consumers that may have been victimized by the conduct alleged in *CRTI* so that as many of them as possible may recover from the *CRTI* settlements.

[30] *Bear Stearns*, 297 F.R.D. at 98; *see also Agent Orange*, 689 F. Supp. at 1262 (Allowing late claims because "[t]he equities with regard to late claims compellingly favor inclusion. … As was the case with claimants who missed the original filing deadline, these individuals cite as common reasons for their failure to file timely claims that they were unaware: "(1) of the lawsuit or (2) of the need to file a claim, or (3) of the deadline itself."); *Authentidate*, 2013 WL 324153, at *2 (Allowing late claim because the requisite information required analysis that "Late Claimants lacked the resources to conduct."); *Electric Carbon Prods.*, 622 F. Supp.2d at 160-61 (misaddressed notice and counsel of record's affirmance "that it did not see the public notice in the *Wall Street Journal,* which the Court had ordered when approving the settlement" "makes clear that the reason for delay was not within its control"); *id.* at 162-64 (finding excusable neglect because "[t]he circumstances of [late claimant's] initial delay are understandable …. Further, [claimant] has shown diligence in documenting its claims since learning of the settlement."); *id.* at 164 (excusable neglect was found when late claimant, upon first learning of the settlement after the deadline, "promptly contacted … a company that facilitates settlement claims," which in turn acted promptly to file claim); *Orthopedic Bone Screw*, 246 F.3d at 326-27 (allowing late claim because of lack of actual notice: "The constructive notice given to him was too minimal to impart blame upon him for his lack of awareness.").



### Any Delay Caused by Processing Post-Deadline Claims Does Not Support Their Rejection

As with the "prejudice" to timely claimants, every court that has published an opinion concerning whether lateness by itself is sufficient grounds on which exclude late claims has rejected that proposition. To begin, and as I'm sure that you, as a very experienced class action litigator is well aware, processing Post-Deadline Claims is unlikely to cause any delay in the distribution, and, in any event, any delay is not likely to be excessive, because claims administration is a "batch" process of fits and starts that necessarily includes several waiting periods as groups of claims are processed. For example, while the claims administrator is waiting for batches of claimants with deficient claims to respond to deficiency notices, which batch process repeats as more claims proceed through the administration, or waits for batches of claimants whose claims are selected for audits to respond to those audit requests, which batch process also repeats, and, in both cases, waits for the exchange of additional rounds of related correspondence, the claims administrator has more than ample time and capacity to process additional claims from deserving victims. As the Second Circuit reasoned in *In re Oxford Health Plans, Inc.,* for example, "in the ordinary case there will be little prejudice or disruption caused by allowing a late-submitted claim."[31] Here, in particular, while the Court-approved deadline for all claimants other than natural persons who reside in California (for whom the deadline was extended to June 30, 2016), was December 7, 2015, the eventual distribution, as a result of, among other matters, the pending appeals, has not yet occurred some 19 months later and still counting. Accordingly, any delay that may have been occasioned by processing Post-Deadline Claims is immaterial to the timing of that distribution, and, therefore, would not support rejecting Post-Deadline Claims.

Rigid adherence to what has become an arbitrary deadline also would defy *Pioneer*, as well as judicial precedent in non-reversionary common fund settlements:

- In *Orthopedic Bone Screw*, the Third Circuit rejected a "delay" argument, holding that, "[a]s long as distribution of the limited fund settlement remains pending, we reject th[e] contention" that the 7-month delay warrants exclusion of the late claim.[32]

- Similarly, the *Bear Stearns* court accepted a late claim (after already having accepted 354 late claims) even though the late claim was filed one year after the deadline, even though the court had already

---

[31] 383 Fed. Appx. 43, 45-46, 2010 WL 2649812, at *1-*2 (2d Cir. June 30, 2010) (affirming rejection of late claim based on application of *Pioneer* excusable neglect factors and finding that timeliness was "entirely within [claimant's] reasonable control).

[32] 246 F.3d at 325 (accepting late claims while "the process of winnowing the valid claims from the invalid, and the compensable claims from the uncompensable" is ongoing will not "deter the expedient and just resolution of claims."); *see id.* at 321 ("[a] primary use of [the court's] equitable powers is balancing the goals of expedient settlement distribution and the consideration due to late-arriving class members. … Integral to this balancing, however, is the court's responsibility and 'inherent power and duty to protect unnamed, but interested persons.'" "***The Second Circuit in* Zients *likened those claimants excluded from recovery in a class action to 'wards of the court,' and we have similarly stated that 'the court plays the important role of protector of the absentees' interests, in a sort of fiduciary capacity*.'") (citations and internal quotations omitted; emphasis added); *McPhail v. First Command Fin. Planning, Inc.*, No. 05cv179-IEG-JMA, 2009 WL 839841, at *9 (S.D. Cal. Mar. 30, 2009) ("The Court will exercise this discretion [to grant untimely claims] if there is a showing of good and sufficient cause to excuse the tardiness of the claims.") (citing *Zients*).



entered an order approving distribution, and even though 90% of the settlement fund already had been distributed.[33]

- In *Authentidate* as well, the court denied the lead plaintiff's motion seeking an order to deny late claims, holding, even after the distribution motion was granted, that the lead plaintiff had not demonstrated that "permitting the claims would cause undue delay or otherwise adversely impact judicial proceedings."[34]

- The court in *Electrical Carbon Products* also permitted late claims, even as late as the time it considered the distribution motion, finding that, similar to *CRTI*, because no distribution could occur until claim processing was completed, "there is only some incremental delay on the judicial proceedings."[35]

- Likewise, the *Agent Orange* court allowed 3,500 late claims even "[a]fter three and a half years of appeals," when "the distribution of the settlement fund [was] at hand."[36] And over twenty-four years ago in *Zients v. LaMorte*, the Second Circuit reversed the district court's rejection of late claims holding, on facts directly on point to the issue here, as follows:

> *Until the fund created by the settlement is actually distributed, the court retains its traditional equity powers. It is not novel law to announce that a court supervising the distribution of a trust fund has the inherent power and duty to protect unnamed, but interested persons.* In the words of Professor Chafee, the dean of equity law, *these individuals are akin to "wards of the court."* Z. Chafee, Some Problems of Equity 292 (1950). Moreover, in this case*, the Stipulation, approved by the court, vested the court with the authority to administer the settlement plan. In the order approving the plan, the court explicitly reserved "jurisdiction over* the effectuation of the settlement and compromise provided for herein for all purposes including the resolution of *any disputes that may arise with respect to the payment of the settlement proceeds."*
>
> Thus, we have before us several claimants who did not receive notice of the settlement or deadline for filing claims for the reasons we have stated, and yet who had *bona fide* claims but were denied participation in the fund. *Moreover, allowing these five claims would result in only a miniscule reduction in recovery by timely claimants. We conclude therefore that where, as here, all the equities are on the side of the claimants, the fund has not been distributed and the administration of the fund would be insignificantly hampered by allowing these few late claims, appellants should be permitted to participate in the fund.*[37]

---

[33] *See* 297 F.R.D. at 93-98.

[34] *See* 2013 WL 324153, at *1-*2.

[35] 622 F.Supp.2d at 158; *see id.* at 148 ("Rather than setting a cut-off deadline for the claims at issue, the Court looks at each claimant's conduct and determines whether its delay in filing a claim is the result of 'excusable neglect …'"); *id.* at 153 ("the proper inquiry focuses on whether the claims were late and why, not on setting a cut-off deadline").

[36] *See* 689 F. Supp. at 1252.

[37] 459 F.2d 628, 630-31 (2d Cir. 1972) (emphasis added); *see In re Crazy Eddie Sec. Litig.*, 906 F. Supp. 840, 843-47 (E.D.N.Y. 1995) (relying on *Zients*, even in a reversionary fund settlement, to permit late claims that satisfied *Pioneer* standard).



- The Third Circuit's holding in *Orthopedic Bone Screw* also is particularly instructive:

> [W]e conclude that the District Court's ruling was inconsistent with the exercise of sound discretion in denying Sambolin participation in the settlement **solely for his failure to comply with the registration deadline imposed**. We recognize that deadlines are an integral component of effective consolidation and management of the modern mass tort class action. *See, e.g., In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1127 (9th Cir.1977). Yet **rigid and unquestioned adherence to such limitations belies principles of equity and the court's role as a fiduciary in class actions when allowing a claimant participation in a settlement works no harm on the conduct of the proceedings and does not significantly prejudice the interests of the parties**.[38]

In fact, FRS did not uncover any court that, with respect to participation in a non-reversionary common fund, rejected late claims solely based on tardiness.

*   *   *   *   *

While "a cut-off date is essential and at some point the matter must be terminated," that "cut-off date," so as to be equitable and not arbitrary, must bear a reasonable relationship to the timing of the distribution, because Post-Deadline Claimants "need to be treated fairly by some method for consideration subsequent to notice."[39]

---

[38] 246 F.3d at 316-17 (emphasis added).

[39] Reports of the Conference for District Court Judges, 63 F.R.D. 231, 262 (1973) (noting that, "[f]requently, such claimants include those who have not had actual notice.") (cited in *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1127 (9th Cir. 1977); *see* Manual for Complex Litigation (Fourth) (2004) § 21.662 & n.1002 ("The court should allow adequate time for late claims …") (citing *In re Crazy Eddie Sec. Litig.*, 906 F. Supp. 840, 845 (E.D.N.Y. 1995) (noting "there is an implicit recognition that late claims should ordinarily be considered in the administration of a settlement") (citation omitted); *In re Authentidate*, 2013 WL 324153, at *2.

# EXHIBIT 7

# Jeffrey N. Leibell

| | |
|---|---|
| **From:** | Joseph M. Fisher <legal@notice.com> |
| **Sent:** | Tuesday, July 25, 2017 8:59 PM |
| **To:** | Jeffrey Leibell |
| **Cc:** | Robin Niemiec; 'Mario Alioto' |
| **Subject:** | Re: In re: Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Case No. C-07-5944-JST (N.D. Cal.) ("CRTI") |
| **Attachments:** | In re Cathode Ray Tube _CRT_ Antitrust Litig._ 2016-01-26.PDF |

Jeff,

As you know, The Notice Company is the claims administrator in the CRT indirect purchaser settlement. Class counsel forwarded to us your email of July 17 (below) and asked that we assist them in considering your request that late claims be accepted.

In this regard, we have the following observations and requests to you for a response.

1.  The District Court, in its Order dated January 26, 2016, granted an extension of the claims deadline to natural persons who reside in California. The Court simultaneously refused to grant the same extension to persons residing in other states.  A copy of the Order is attached.  Please explain how FRS' request for an extension of the claims deadline is consistent with the Court's ruling.  Please note that, subsequently, the District Court issued its approval order that confirmed the adequacy of class-wide notice in this case.

2.  Please let us know the specific deadline(s) that FRS deems applicable to its CRT indirect purchaser claims. The Court-approved deadline for end users to submit claims was December 7, 2015; the deadline was June 30, 2016, for end user claims by natural persons who reside in California.

3.  Several court decisions concerning late claims involved an evaluation of the reasonableness and good faith of a claimant's delay in filing its claim.  Such an evaluation would require, for each of FRS' late claims, a representation by each claimant that (a) specifies the date (or approximate time period) when it first learned, from any source, of the CRT indirect settlement, and (b) identifies any other justification the claimant relies on for its late filing. Please provide us with this information.

4.  For similar reasons, we request that FRS specify, for each of its late claims, (a) the date when FRS first informed the claimant of the CRT indirect settlement, regardless of whether the claimant was a FRS client at the time, and (b) the date when the claim was filed.

I will keep Class Counsel informed of your responses to these requests.

Thank you.

Joe

```
Joseph M Fisher
President
The Notice Company, Inc.
94 Station St
Hingham, MA 02043
781-740-1900  tel
781-836-4297  fax
```

legal@notice.com

---

**From:** Jeffrey Leibell [mailto:jleibell@frsco.com]
**Sent:** Monday, July 17, 2017 6:50 AM
**To:** malioto@tatp.com
**Cc:** Robin Niemiec
**Subject:** In re: Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Case No. C-07-5944-JST (N.D. Cal.) ("CRTI")


Mario:

Our last communications concerning late claims was your March 9, 2017 email which referred to the March 8, 2017 email we received from Joseph Fisher of The Notice Company. Those emails confirmed the agreement reached during our February 15, 2017 telephone call that the Post-Deadline Claims submitted by FRS would be processed. However, although you agreed to process Post-Deadline Claims, you reserved decision concerning whether you would recommend to the Court that those claims be accepted. Mr. Fisher's email put it this way: "No decision has been made about whether, or to what extent, late claims will be paid." He went on to conclude that he would "be discussing the matter with Lead Counsel over the coming weeks." As The Notice Company appears to be attempting to wrap up the claims processing phase of the administration – FRS was required to complete by July 10, 2017 all audit and other requests for information concerning both timely and late claims – it seems appropriate now to revisit the acceptance of Post-Deadline Claims.

FRS has already provided you with its position: All eligible claimants – timely and late claimants alike – deserve the benefits of your successful resolution of *CRTI*. They are, in both fact and appearance, equal, particularly because the claim filing deadline necessarily will not bear any relationship to the date of the eventual distribution. We hope that, having had time to further consider the matter, you agree, and that you will recommend to the Court that those claims be accepted. However, should you still have any lingering doubt, FRS wanted to provide you with the results of research we completed to support of the acceptance of late claims in another class action. That research, which is attached, confirms the experience we've gained over decades of prosecuting and settling complex class actions, of administering class action settlements, and of submitting claims for clients to recover from them: FRS did not identify ***any*** court that rejected late claims based on the reduction in recoveries to timely claims or just because they were late. Accordingly, judicial precedent, and, we believe, justice and fairness, require that Post-Deadline Claimants be afforded the same treatment as timely claimants. Therefore, we hope that you will recommend to the Court that Post-Deadline Claims be accepted.

We request the courtesy of a response to this email so that, should you decline to make the requested recommendation, FRS may timely undertake appropriate action.

Best regards,

Jeff

**Jeffrey N. Leibell**

Chief Operating Officer & General Counsel

201.853.1246 | jleibell@frsco.com | **LinkedIn**

---

**Financial Recovery Strategies**

80 Wesley Street, South Hackensack, NJ 07606

201.853.0300 Main | 201.853.0301 Fax | www.FRSCO.com

*This email message is for the sole use of the intended recipient(s), and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email, and destroy all copies and attachments of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.*

*The above communication is not intended to provide any tax advice. If you wish to obtain tax advice concerning any matter described or referred to in this email message, you should contact your tax advisor.*

*Financial Recovery Strategies (FRS) is a third-party class action settlement claims recovery consulting firm; we are not class counsel or a claims administrator. Class members may always file claims on their own without retaining FRS, and may contact class counsel and the claims administrator for information about a settlement and for claims filing assistance. FRS, if retained, works on an agreed-upon contingent commission basis.*

# EXHIBIT 8

# CRT INDIRECT PURCHASER CLASS ACTION SETTLEMENTS

## IN RE: CRT ANTITRUST LITIGATION (MDL 1917)

| HOME | SETTLEMENT DETAILS | FILE A CLAIM | OBJECTIONS | FAQ | CONTACT | EN ESPAÑOL |
|------|-------------------|--------------|------------|-----|---------|------------|

- The deadline to submit claims has passed. We will no longer be processing late claims in connection with the CRT Indirect Purchaser Antitrust Litigation.
- The judgment of the U.S. District Court granting final approval to the CRT Indirect purchaser class action settlements has been appealed to the Ninth Circuit Court of Appeals. No settlement funds have been distributed to claimants at this time. No date has been set for distribution.

### CLICK HERE IF YOU ARE AN END USER

End users indirectly purchased CRT Products for their own use and not for resale.

### CLICK HERE IF YOU ARE A RESELLER

Resellers Indirectly purchased CRT Products for the purpose of reselling them to someone else.

### ABOUT THE LAWSUIT

Class action Settlements totaling $576.75 million have been reached involving Cathode Ray Tubes ("CRTs"), a display device that was sold by itself or as the main component in TVs and computer monitors. The Settlements include CRTs and CRT Products purchased "indirectly" in AZ, CA, FL, HI, IA, KS, ME, MI, MN, MS, NE, NV, NM, NY, NC, ND, SD, TN, VT, WV, WI, or the District of Columbia.

Indirect purchases means that you purchased the CRT products from someone other than the defendant manufacturers or alleged co-conspirators.

The lawsuit claims that the Defendants fixed the prices of CRTs causing consumers to pay more for CRTs and products containing CRTs, such as TVs and computer monitors (collectively "CRT Products"). The Defendants deny Plaintiffs' allegations.

Purchases of Sony® branded televisions and monitors are NOT eligible to be included in the CRT indirect purchaser case. All other brands of CRT televisions and monitors are eligible.

Los avisos disponibles para su descarga en español.

### IMPORTANT DATES

#### October 8, 2015

Deadline for end users to opt-out or object to the Settlements.

#### December 7, 2015

Deadline for end users to file a claim online or by mail.

#### June 30, 2016

The end users claims deadline for natural persons who reside in California extended until June 30, 2016. A copy of the Court's Order is available here.

#### July 7, 2016

The District Court issued its Order Granting Final Approval of Indirect Purchaser Settlements. A copy of the Court's Order is available here. This Order has been appealed to the United States Court of Appeals for the Ninth Circuit.

#### September 30, 2016

Deadline for end users and resellers to object to the allocation of the net settlement fund between resellers and consumers. For more information on how to object or comment, click HERE.

#### November 16, 2016

The District Court issued its Order Granting Final Approval of the Plan Distribution of the Chunghwa Settlement Fund. A copy of the Court's Order is available here. This Order has been appealed to the United States Court of Appeals for the Ninth Circuit.

#### November 29, 2016

Deadline for resellers to file a claim online or by mail.

# EXHIBIT 9

# CRT INDIRECT PURCHASER CLASS ACTION SETTLEMENTS

In Re: CRT Antitrust Litigation (MDL 1917), N.D. Cal.

| Home | Settlement Documents | Objections | Final Approval Hearing | FAQ | Electronic Payment | Contact ⌄ | COVID-19 Notice |

En Español

## Legal Notice

**Amendments to Settlements Have Been Reached With Seven Defendants in the Cathode Ray Tubes (CRT) Indirect Purchaser Class Actions**

A Federal Court authorized this notice. This is not a solicitation from a lawyer.

Please read this notice carefully. Your legal rights may be affected whether or not you act.

This is the fourth legal notice in the indirect purchaser litigation known as ***In re: Cathode Ray Tube (CRT) Antitrust Litigation***, MDL No. 1917, in the U. S. District Court for the Northern District of California. There are nine (9) settlements in this litigation involving alleged overcharges on the price of Cathode Ray Tube ("CRT") Products purchased indirectly from the Defendants.

- **"CRT Products"** include CRTs and products containing CRTs, such as televisions and computer monitors.
- **"Indirectly"** means that you purchased the CRT Product from someone other than a Defendant or alleged co-conspirator. For example, you bought a television containing a

### Important Dates

**MAY 29, 2020:** Deadline to Object

**JUNE 12, 2020:** Deadline for Responses to Objections

**JULY 8, 2020:** Final Hearing

### Important Documents

Detailed Notice of Amendments to Settlements

# EXHIBIT 10

- I. Do I have a lawyer representing me?

- J. How do I object or comment on the Amendments to the 2016 Settlements or attorneys' fees?

- K. May I exclude myself from the Amended 2016 Settlements?

- L. When and where will the Court consider the Amendments to the 2016 Settlements and request for attorneys' fees?

- M. Do I have to come to the hearing?

- N. May I speak at the hearing?

- O. When will I get paid?

- P. May I submit a claim now? Will late claims be paid?

  The claims-submission deadline approved by the Court for all class members, except resellers and California natural persons, was **December 7, 2015.** The claims deadline for California natural persons was **June 30, 2016.** The deadline for resellers to submit a claim was **November 29, 2016.**

  The Court has not yet decided whether claims submitted after the Court-approved deadlines will be paid.

- Q. When will reseller claims be paid?

- R. Can I sign up for electronic payment of my claim?

- S. Where can I get more information?