Christopher M. Curran (*pro hac vice*)
ccurran@whitecase.com
Lucius B. Lau (*pro hac vice*)
alau@whitecase.com
Dana E. Foster (*pro hac vice*)
defoster@whitecase.com
Matthew N. Frutig (*pro hac vice*)
mfrutig@whitecase.com
White & Case LLP
701 Thirteenth Street, N.W.
Washington, DC  20005
Telephone:  (202) 626-3600
Facsimile:  (202) 639-9355

*Counsel to Toshiba America Electronic Components, Inc.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(OAKLAND DIVISION)

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 4:07-cv-05944-JST MDL No. 1917 |
| This Document Relates to Case No. 4:20-cv-05606-JST (N.D. cal.) | |
| Government of Puerto Rico, | **DECLARATION OF COLLEEN SMITH IN SUPPORT OF TAEC'S MOTION TO DISMISS PUERTO RICO'S COMPLAINT PURSUANT TO RULES 4, 12(b)(2), 12(b)(4), AND 12(b)(5) OF THE FEDERAL RULES OF CIVIL PROCEDURE** |
| *Plaintiffs*, | |
| v. | |
| Panasonic Corp. of North America, *et al.*, | |
| *Defendants*. | |

White & Case LLP
701 Thirteenth Street, NW
Washington, DC  20005

White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005

1  I, Colleen Smith, hereby declare as follows:

2  1.      I am Senior Manager of Legal Administration at Toshiba America Electronic
3  Components, Inc. ("TAEC").

4  2.      I submit this declaration in support of TAEC's Motion to Dismiss Puerto
5  Rico's Complaint Pursuant to Rules 4, 12(b)(2), 12(b)(4), and 12(b)(5) of the Federal Rules
6  of Civil Procedure, filed contemporaneously herewith.  Except for those matters stated on
7  information and belief, which I believe to be true, I have personal knowledge of the facts
8  stated herein and would competently testify thereto if called as a witness.

9  3.      I have been employed at TAEC for thirty-five (35) years and have held the
10 position of Senior Manager of Legal Administration since July 2013.

11 4.      On February 14, 2019, a summons and complaint was hand delivered to
12 TAEC's offices at 5231 California Ave., Irvine, CA 92617.

13 5.      A true and correct copy of the complaint and summons delivered to TAEC's
14 offices on that day is attached hereto as **Exhibit 1**.

15 6.      As is common when service of process is delivered to our front desk, I
16 received a call from our receptionist and I went to the front desk to pick up the delivery.

17 7.      I do not recall meeting or speaking with the service processor, but it is my
18 custom to provide my business card to the delivery person.

19 8.      The summons hand delivered to TAEC on February 14, 2019 was addressed to
20 Toshiba America Information Systems, Inc. ("TAIS") at 9740 Irvine Blvd., Irvine, CA 92718,
21 not TAEC at 5231 California, Ave, Irvine, CA 92617.

22 9.      The only summons delivered to TAEC's offices (5231 California Ave., Irvine,
23 CA 92617) in this matter is the one attached hereto as Exhibit 1.

24              *       *       *

25

26

27

28

1        10.      Based on information and belief, I am not, and have never been, a resident

2  agent, officer, managing agent, general agent, or any other type of agent authorized by

3  appointment or designated by law to receive service of process on behalf of TAEC or TAIS.

4

5        I declare under penalty of perjury that the foregoing is true and correct.

6        Executed this <u>5th</u> day of May, 2021, in Dana Point, CA.

7

8                                        _____

9                                                  Colleen Smith

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005

DECLARATION OF COLLEEN SMITH IN SUPPORT OF TAEC'S
MOTION TO DISMISS PUERTO RICO'S COMPLAINT PURSUANT
TO RULES 4, 12(b)(2), 12(b)(4), AND 12(b)(5) OF THE FEDERAL RULES OF CIVIL PROCEDURE
Case No. 4:07-cv-05944-JST, MDL No. 1917

2

# Exhibit 1

**Commonwealth of Puerto Rico**
**Court of First Instance**
SUPERIOR Division of SAN JUAN

| | |
|---|---|
| GOVERNMENT OF PUERTO RICO | CASE NO:   SJ2018CV10831 |
| Name(s) of Plaintiff(s) | Courtroom No.: |
| | Civil Action:   UNJUST ENRICHMENT |
| V | (Subject or Matter) |
| LG ELECTRONICS ET AL | |
| Name of Defendant(s) | |

SUMMONS

UNITED STATES OF AMERICA                                    )
THE PRESIDENT OF THE UNITED STATES OF AMERICA    ) SS
COMMONWEALTH OF PUERTO RICO                          )

To:    TOSHIBA AMERICA INFORMATION SYSTEMS, INC..
      Name of defendant being served
      9740 IRVINE BLVD, IRVINE, CALIFORNIA 92718
      Address of defendant being served.

      YOU ARE HEREBY summoned and required to file with the court your responsive answer to the complaint, within _30_ days of service thereof, excluding the day of service. You must file your responsive pleading through the Unified System for Case Management and Administration (SUMAC), which you may access at the following address: https://unired.ramajudicial.pr/sumac/, unless you are appearing pro se, in which case you shall file a responsive pleading with the clerk of the court. If you fail to file a responsive pleading within the term stated above, the court may enter default judgment against you and grant the legal remedy requested in the complaint, or any other, if the court, in the exercise of its sound discretion, may deem so warranted.

      DENISE MALDONADO-ROSA
      Name of plaintiff's counsel or name of plaintiff, if plaintiff does not have counsel

      15652
      Supreme Court Number, if an attorney

      PO BOX 367775
      SAN JUAN, PUERTO RICO 00936
      Address

      TEL. 787 630-2717
      Telephone number/Fax number

      DMALDONADO@JUSTICIA.PR.GOV                    ,
      Email:
I set my hand and the seal of the Court hereto, this ___ day of _[Stamped Feb. 8, 2019]_.

      [STAMPED: GRISELDA RODRIGUEZ COLLADO]
      Name of the Regional Clerk
      [STAMPED: VIRGEN Y. DEL VALLE DIAZ
      By: DEPUTY CLERK] -INITIALS
      Name and Signature of the Deputy Clerk of the Court
[Stamped with the Seal of the Commonwealth of Puerto Rico, General Court of Law, Court of First Instance, San Juan Superior Division KO 95, Initialed]

OAT 1721 Summons (SUMAC)
(Rev. May 2018)
2009 Rules of Civil Procedure, as amended

CASE NO._____

---

**CERTIFICATE OF SERVICE OF SUMMONS BY BAILIFF**

---

I,_____, Bailiff of the Court of First Instance, _____, Division, CERTIFY that I served the complaint

and summons for the referenced case on the _____ day of _____ 20_____, ☐ AM ☐ PM in the following manner:

☐ Through personal delivery to the defendant at the following street address:

_____

☐ Accessible in the immediate presence of the defendant at the following street address:

_____

☐ Leaving a copy of the documents with an agent authorized by the defendant or designated by law to receive summons at the following

street address:

_____

☐ I could not serve process personally due to:

_____

    In _____ Puerto Rico, this _____ day of _____.

_____        _____
Name of Regional Bailiff                    Name and Badge Number of Bailiff of Court of First Instance

---

**SERVICE BY PRIVATE PARTY**

---

I,_____, state that I have the legal capacity pursuant to Rule 4.3 of the rules of Civil Procedure of Puerto
Rico, and I certify that the service of process in the case of reference was made by me in the following manner:

☐ Through personal delivery to the defendant at the following street address:

_____

☐ Accessible in the immediate presence of the defendant at the following street address:

_____

☐ Leaving a copy of the documents with an agent authorized by the defendant or designated by law to receive summons at the following

street address:

☐ I could not serve process personally due to:

| COST OF SERVICE |
| --- |
| $ |

**STATEMENT OF PROCESS SERVER**

I declare under penalty of perjury, in accordance with the laws of the Commonwealth of Puerto Rico that the information provided in the certification of service of process is true and correct. IN WITNESS WHEREOF, I sign this statement in _____ ,Puerto Rico this _.day of _____ ,

_____
(Signature of the process server)                                             (Address of the process server)

AFFIDAVIT NUMBER. _____ *[if sworn before a Notary-Attorney]*

        Sworn and signed before me by _____, whose personal circumstances are those as stated above, and who I witness is known to me _____.
                        *(personally or in the manners established by the Notary Act)*

        In _____ Puerto Rico, this _____ day of _____ .

                        _____
                        *Name of Notary (Attorney) or Regional Clerk*

                        _____
                        *Name and Signature of Deputy Clerk*

OAT 1721 Summons (SUMAC)
(Rev. May 2018)
2009 Rules of Civil Procedure, as amended

# Anne Catesby Jones
## Translator/Traductora
**Caleta de las Monjas #19, San Juan, P.R. 00901**
Tel. 787-725-1379        Mobile: 787- 930-3834  e-mail: annecatesby@gmail.com

February 9, 2019

TO WHOM IT MAY CONCERN:

I have translated the above Summons in Case No SJ2018CV10831 from Spanish to English, to the best of my ability and I certify that the translation is true and correct.



Verify at www.atanet.org/verify

Anne Catesby Jones

ATA #2537

COMMONWEALTH OF PUERTO RICO
COURT OF FIRST INSTANCE
SUPERIOR COURT OF SAN JUAN

| | |
|---|---|
| **GOVERNMENT OF PUERTO RICO, THROUGH ITS ATTORNEY GENERAL OF JUSTICE OF PUERTO RICO WANDA VAZQUEZ,** Plaintiff | Civil No. 2018CV10381 |
| vs. | Re: Unjust Enrichment |
| **LG ELECTRONICS, INC., LG ELECTRONICS USA, INC. , LG ELECTRONICS TAIWAN TAIPEI CO., LTD., KONINKLIJKE PHILIPS ELECTRONICS NV, LG PHILIPS DISPLAYS, LTD. , PHILIP ELECTRONICS NORTH AAMERA CORPORATION, NORTH AMERICA CORPORATION, V PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD., PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA, LP DISPLAYS, INTERNATIONAL, LTD, SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG SDI AMERICA, INC., SAMSUNG SDI MEXICO SA DE CV, SHENZHEN SAMSUNG SDI CO., LTD., TIANJIN SAMSUNG SDI CO., LTD., SAMSUNG SDI (MALAYSIA) SDN. BHD., TOSHIBA CORPORATION, TOSHIBA AMERICA CONSUMER PRODUCTS, LLC, TOSHIBA AMERICA INFORMATION SYSTEMS, INC., TOSHIBA AMERICA ELECTRONICS COMPONENTS, INC., TOSHIBA DISPLAY DEVICES (THAILAND) COMPANY, LTD., PT TOSUMMIT ELECTRONIC DEVICES INDONESIA, PANASONIC CORPORATION, PANASONIC CORPORATION OF NORTH AMERICA,** | |

1

| MATSUSHITA ELECTRONIC CORPORATION, (MALAYSIA) SDN BHD., MT PICTURE DISPLAY CO., LTD., BEIJING-MATSUSHITA COLOR CRT, COMPANY, LTD. LTD. , HITACHI, LTD., HITACHI AMERICA, LTD., HITACHI ASIA, LTD. , SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD. , TATUNG COMPANY OF AMERICA, INC., CHUNGHWA PICTURE TUBES LTD. , CHUNGHWA PICTURE TUBES. (MALAYSIA) SDN. BHD., IRICO GROUP; JOHN DOE, married to JANE DOE, and their community property partnership; CORPORATION XYZ <br> Defendants | |

## COMPLAINT

**TO THE HONORABLE COURT:**

**COMES NOW** the Government of Puerto Rico through its Attorney General of Puerto Rico, Wanda Vázquez-Garced, who very respectfully STATES, ALLEGES, and PRAYS:

## I.      INTRODUCTION

1.   The Attorney General brings this unjust enrichment case through her *parens patriae* authority for purchases of Cathode Ray Tube Products ("CRT Products") (as further defined below), from March 1, 1995 until at least November 25, 2007 (the "Class Period").

2.   The Attorney General alleges that during the Period the Defendants conspired to fix, raise, maintain, and/or stabilize prices of CRT Products sold in Puerto Rico.

3.   Because of Defendants' unlawful conduct, Puerto Rican consumers and governmental agencies paid artificially inflated prices for CRT Products and have been unjustly harmed.

4.   As further detailed below, beginning in at least 1995, Defendants Samsung, Philips, Daewoo, LG and Chunghwa met or talked with at least one other Defendant in order to discuss and agree upon CRT Product prices and the amount of CRT Products each would produce.

5.   Over time, these Defendants reached out to the other Defendant CRT Product manufacturers, including Toshiba, Panasonic, Hitachi, BMCC, IRICO, Thai CRT, and Samtel, who then also met or talked with their competitors for the purpose of fixing the prices of CRT Products.

6.    By 1997, a formal system of multilateral and bilateral meetings was in place, involving the highest levels of the Defendant corporations, all with the sole purpose of fixing the prices of CRT Products at supra competitive levels.

7.    Throughout the Period, Defendants' conspiracy was effective in moderating the normal downward pressure on prices for CRT Products caused by periods of oversupply and competition from new technologies, such as TFT-LCD and Plasma.

8.    Defendants' conspiracy resulted in unusually stable pricing and even rising prices in a very mature, declining market.

9.    As a result of Defendants' unlawful conduct, Puerto Rican consumers and governmental agencies paid higher prices for CRT Products than they would have paid in a competitive market.

10.   The Defendants knew that by placing their CRT Products in the international market, selling to distributors that distributed to retailers in Puerto Rico, the products with inflated prices would reach consumers in Puerto Rico.

11.   The economy of Puerto Rico is fueled by consumerism.

12.   Although Puerto Rico is not a nation as such, the World Bank puts it in the 29th position of all countries in the world, just after Spain and with more consumerism than Greece per capita, through the formula of " final household expenditure per capita " or "final household consumption expenditure per capita".

13.   The Defendants put CRT Products into the mainstream of commerce knowing that consumers in Puerto Rico were going to spend millions of dollars more than they should have done because of the pricing scheme created by the Defendants.

14.   According to Banco Santander, consumers in Puerto Rico spend twice as much as consumers in the United States.

15.   The Sam's Club #1 of Puerto Rico is the number one of all Sam's Club stores in terms of money spent per square foot.

16.   The conspiracy was investigated by the Antitrust Division of the United States Department of Justice ("DOJ"), and by several other international competition authorities.

17.   On February 10, 2009, a federal grand jury in San Francisco issued a two-count indictment against C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., for his

participation in a global conspiracy to fix the prices of CRTs used in computer monitors and televisions.

18.   This was the first indictment to be issued in the DOJ's investigation into the CRT industry.

## II. JURISDICTION AND VENUE

19.   The Attorney General Vazquez initiates this case to recover the unjust enrichment and recover the expenses of the case, including reasonable attorneys' fees for the damage suffered by Puerto Rican consumers and government entities as a result of the conspiracies by the Defendants to inflate the prices of their products.

20.   The Puerto Rico Anti-Trust law does not provide a remedy to indirect purchasers of products. Therefore, this Honorable Court has jurisdiction due to defendants' unjust enrichment.

21.   Venue is proper in this Judicial District pursuant to Rule 3.5 of the Puerto Rico Rules of Civil Procedure due to Defendants' intentional acts to take advantage of the Puerto Rico market, by placing their products in the stream of commerce so that the products inevitably arrived here.

22.   This Court has jurisdiction because the Defendants sold their products here; a substantial part of the events that make up the Attorney General's claims occurred in Puerto Rico;. and a substantial portion of the affected commerce described herein was carried out here.

23.   Defendants operated in Puerto Rico by selling their merchandise here, and through doing so, they have intentionally acted to exploit the market of Puerto Rico and as a consequence the laws of Puerto Rico.

24.   The products sold by Defendants were sold in the flow of commerce to Puerto Rico and the activities of Defendants had a direct, substantial effect, and reasonably foreseeable effect on such commerce.

25.   The Defendants' conspiracy to fix the prices of the CRT Product(s) substantially affects commerce throughout Puerto Rico due to the Defendants intentionally carrying out activities affecting Puerto Rico.

26.   Defendants purposefully availed themselves of the laws of Puerto Rico in connection with their activities in relation to the production, marketing, sale, and/or distribution of CRT Products in Puerto Rico.

4

27.     Defendants produced, promoted, sold, marketed, and/or distributed CRT products, and, therefore, intentionally profited from consumers in Puerto Rico.

28.     As a result of the activities described herein, Defendants:

      a.   Caused damage to the residents of Puerto Rico repeatedly;

      b.   Caused damage to Puerto Rico by acts or omissions committed outside Puerto Rico and by regularly doing or soliciting business in Puerto Rico;

      c.   Engaged in a persistent course of conduct within Puerto Rico and/or derived substantial revenue from the marketing and sale of CRT Products in Puerto Rico; and

      d.   Committed acts or omissions that they knew or should have known would cause damage (and, in fact, did cause damage) in Puerto Rico while regularly doing or soliciting business in Puerto Rico, engaging in other persistent courses of conduct in Puerto Rico such as the sale of CRT Products in Puerto Rico.

29.     The conduct described herein adversely affected Puerto Rico and its consumers, since the latter purchased Defendants' CRT Products.

30.     Defendants' conspiracy has resulted in an adverse monetary effect on consumers in Puerto Rico.

31.     Prices of CRT Products in Puerto Rico identified in the complaint were raised to supracompetitive levels by the Defendants and their co-conspirators.

32.     Defendants knew that CRT Products business in Puerto Rico would be adversely affected by implementing their conspiracy.

### III. DEFINITIONS

33.     As used herein, the term "CRT" or "CRTs" stands for "cathode ray tube(s)."

34.   A CRT is a display technology used in televisions, computer monitors, and other specialized applications.

35.   The CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors.

36.   An electron gun at the back of the vacuum tube emits electron beams.

37.   When the electron beams strike the phosphors, the phosphors produce either red, green, or blue light.

38.   A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors.

39.   This process is rapidly repeated several times per second to produce the desired images.

40.   There are two types of CRTs: color display tubes ("CDTs") which are used in computer monitors and other specialized applications; and color picture tubes ('CPTs") which are used in televisions.

41.   CDTs and CPTs are collectively referred to herein as "cathode ray tubes" or CRTs."

42.   As used herein "CRT Products" includes (a) CRTs; and (b) products containing CRTs, such as television sets and computer monitors.

43.   The "Class Period" or "relevant period" means the period beginning at least March 1, 1995 through at least November 25, 2007.

44.   "Person" means any individual, partnership, corporation, association, or other business or legal entity.

45.   "OEM" means any Original Equipment Manufacturer of Products.

## IV. PLAINTIFF

46.   Attorney General Wanda Vazquez Garced is plaintiff in *parens patriae* for the consumers and government agencies of Puerto Rico who were impoverished as a result of Defendants' actions.

6

## V. DEFENDANTS

### LG Electronics Entities

47.  Defendant LG Electronics, Inc. is a corporation organized under the laws of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeoungdeungpo-gu, Seoul 150-721, South Korea.

48.  LG Electronics, Inc. is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first branch office outside of Korea in New York in 1968.

49.  The company's name was changed from GoldStar Communications to LG Electronics, Inc. in 1995, the year in which it also acquired in the United States.

50.  In 2001, LG Electronics, Inc. transferred its CRT business to a 50/50 CRT joint venture with Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V. forming Defendant LG.Philips Displays (n/k/a LP Displays International, Ltd.).

51.  During the Period, LG Electronics, Inc. manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

52.  Defendant LG Electronics U.S.A., Inc. ("LGEUSA) is a Delaware corporation with its principal place of business located at 1000 Sylvan Avenue, Englewood Cliffs, NJ 07632.

53.  LG Electronics USA, Inc. is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.

54.  During the Period, LG Electronics U.S.A., Inc. manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

55.  Defendant LG Electronics, Inc. dominated and controlled the finances, policies, and affairs of LGEUSA relating to the antitrust violations alleged in this Complaint.

56.  Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.

7

57.   LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.

58.   During the period, LGETT manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

59.   Defendant LG Electronics, Inc. dominated and controlled the finances, policies, and affairs of LGETT relating to the antitrust violations alleged in this Complaint.

60.   Defendants LG Electronics, Inc., LGEUSA, and LGETT are collectively referred to herein as "LG."

**<u>Philips Entities</u>**

61.   Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V. ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1096 BC Amsterdam, The Netherlands.

62.   Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.

63.   Royal Philips had sole ownership of its CRT business until 2001.

64.   In 2001, Royal Philips transferred its CRT business to a 50/50 CRT joint venture with defendant LG Electronics, Inc. forming Defendant LG.Philips Displays (n/k/a LP Displays International, Ltd.).

65.   In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not invest further capital in the joint venture.

66.   During the Period, Royal Philips manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

67.   Defendant Philips Electronics North America Corporation ("PENAC") is a Delaware corporation with its principal place of business located at 3000 Minuteman Road, M/S 109, Andover, MA 01810-1032.

68.   PENAC is a wholly owned and controlled subsidiary of Defendant Royal Philips.

69.   During the Period, PENAC manufactured, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

70.   Defendant Royal Philips dominated and controlled the finances, policies, and affairs of PENAC relating to the antitrust violations alleged in this Complaint.

71.   Defendant Philips Electronics Industries Taiwan, Ltd. ("Philips Electronics Taiwan") is a Taiwanese company with its principal place of business located at 15th Floor No. 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.

72.   Philips Electronics Taiwan is a subsidiary of Defendant Royal Philips.

73.   During the Period, Philips Electronics Taiwan manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

74.   Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips Electronics Taiwan relating to the antitrust violations alleged in this Complaint.

75.   Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.

76.    Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.

77.   During the Period, Philips Brazil manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

78.   Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips Brazil relating to the antitrust violations alleged in this Complaint.

79.   Defendants Royal Philips, PENAC, Philips Electronics Taiwan, and Philips Brazil are collectively referred to herein as "Philips."

**LP Displays**

80.    Defendant LP Displays International, Ltd. f/k/a LG.Philips Displays ("LP Displays") was created in 2001 under Hong Kong law as a 50/50 joint venture between Defendants LG Electronics, Inc. and Royal Philips Electronics of The Netherlands with its principal place of business at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.

81.    LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion, and a market share of 27%.

82.    LP Displays announced in March 2007 that Royal Philips and LG Electronics would cede control over the company and the shares would be owned by financial institutions and private equity firms.

83.    During the Period, LP Displays manufactured, marketed, sold, and distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

**Samsung Entities**

84.    Defendant Samsung Electronics Co., Ltd. ("SEC") is South Korean company with its principal place of business located at 129, Samsung-ro, Maetan-3dong, Yeongtong-gu, Suwon-si, Gyeonggi-do, South Korea.

85.    During the Period, SEC manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

86.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 85 Challenger Road, Ridgefield Park, New Jersey 07660.

87.    SEAI is a wholly-owned and controlled subsidiary of defendant SEC.

88.    During the Period, SEAI manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

89.   Defendant SEC dominated and controlled the finances, policies, and affairs of SEAI relating to the antitrust violations alleged in this Complaint.

90.   Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Co., Ltd. ("Samsung SDI"), is a South Korean company with its principal place of business located at 150-20, Gongse-ro Giheung-gu Yongin, 446-577, South Korea.

91.   Samsung SDI is a public company.

92.   SEC is a major shareholder holding almost 20 percent of the stock.

93.   Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy businesses, with 28,000 employees and facilities in 18 countries.

94.   In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than another other producer.

95.   Samsung SDI has offices in Chicago and San Diego.

96.   During the Period, Samsung SDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

97.   Defendant SEC dominated and controlled the finances, policies, and affairs of Samsung SDI relating to the antitrust violations alleged in this Complaint.

98.   Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California.

99.   Samsung SDI America is a wholly-owned and controlled subsidiary of Samsung SDI.

100.  During the Period, Samsung SDI America manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

101.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI America relating to the antitrust violations alleged in this Complaint.

102.    Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.21014-A, Parque Industrial El Florido, Tijuana, BJ 22224 Mexico.

103.    Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

104.    During the Period, Samsung SDI Mexico manufactured, marketed, sold, and/or distributed CRT Products to customers, either directly or indirectly through its subsidiaries or affiliates, throughout Puerto Rico.

105.    Defendants SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this Complaint.

106.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.

107.    Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

108.    During the Period, Samsung SDI Brazil manufactured, marketed, sold, and/or distributed CRT Products to customers, either directly or indirectly through its subsidiaries or affiliates, throughout Puerto Rico.

109.    Defendants SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this Complaint.

110.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at No. 5003 Huanggang, North Road, Futian District, Shenzhen, China.

111.    Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

112.    During the Period, Samsung SDI Shenzhen manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

113.    Defendant SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this Complaint.

13

Case 4:07-cv-05944-JST   Document 5937-2   Filed 05/05/21   Page 22 of 71

SJ2018CV10831  12/17/2018  8:24:46 a.m. Page **14** of **63**

114.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.

115.    Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

116.    During the Period, Samsung SDI Tianjin manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

117.    Defendant SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this Complaint.

118.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian company with its principal place of business located at Lot 635 & 660, Kawasan Perindustrian, Tuanku Jaafar, Sungai Gadut, Serembam, Malaysia.

119.    Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI Co., Ltd.

120.    During the Period, Samsung SDI Malaysia manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

121.    Defendant SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this Complaint.

122.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Samsung SDI Malaysia are referred to collectively herein as "Samsung."

**Toshiba Entities**

123.    Defendant Toshiba Corporation is a Japanese corporation with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.

124.   In 2001, Toshiba Corporation held a 5-10 % worldwide market share for CRTs used in televisions and computer monitors.

125.   In December 1995, Toshiba Corporation partnered with Orion Electric Company (n/k/a Daewoo Electronics Corporation) and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.

126.   TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.

127.   In 2002, Toshiba Corporation entered into a joint venture with Defendant Panasonic Corporation called MT Picture Display Co., Ltd. in which the entities consolidated their CRT businesses.

128.   During the Period, Toshiba Corporation manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

129.   Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, NY 10020.

130.   Toshiba America is a wholly owned and controlled subsidiary of defendant Toshiba Corporation.

131.   During the Period, Toshiba America manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

132.   Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of Toshiba America relating to the antitrust violations alleged in this Complaint.

133.   Defendant Toshiba America Consumer Products, LLC ("TACP") is headquartered in 82 Totawa Rd., Wayne, New Jersey 07470-3114.

134.   TACP is a wholly owned and controlled subsidiary of Defendant Toshiba Corporation through Toshiba America.

135.   During the Period, TACP sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

136.   Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TACP relating to the antitrust violations alleged in this Complaint.

15

137.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92718.

138.    TAIS is a wholly owned and controlled subsidiary of Toshiba Corporation through Toshiba America, Inc.

139.    During the Period, TAIS manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

140.    Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TAIS relating to the antitrust violations alleged in this Complaint.

141.    Defendant Toshiba America Electronics Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618.

142.    TAEC is a wholly owned and controlled subsidiary of Toshiba America, Inc., which is a holding company for defendant Toshiba Corporation.

143.    TAEC was the North American sales and marketing representative for defendant MTPD.

144.    Before MTPD's formation in 2003, TAEC was the North American engineering, manufacturing, marketing and sales arm of defendant Toshiba Corporation.

145.    During the Period, TAEC manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

146.    Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TAEC relating to the antitrust violations alleged in this Complaint.

147.    Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.

148.   TDDT was a wholly-owned and controlled subsidiary of defendant Toshiba Corporation.

149.   Toshiba Corporation transferred Toshiba Thailand to its CRT joint venture with Panasonic Corporation, MT Picture Display Co., Ltd., in 2003.

150.   It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned subsidiary of MT Picture Display until its closure in 2007.

151.   During the Period, TDDT manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

152.   Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TDDT relating to the antitrust violations alleged in this Complaint.

153.   P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by Toshiba Corporation, Orion Electric Company and two other non-defendant entities in December 1995.

154.   TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to MT Picture Display Co., Ltd. and its name was changed to PT.MT Picture Display Indonesia.

155.   During the Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

156.   Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this Complaint.

157.   Defendants Toshiba Corporation, Toshiba America, Inc., TACP, TAIP, TAEC, TDDT and TEDI are referred to collectively herein as "Toshiba."


**Panasonic Entities**

158.   Defendant Panasonic Corporation, which was at all times during the Period known as

17

Matsushita Electric Industrial Co., Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity with its principal place of business located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.

159. In 2002, Panasonic Corporation entered into a CRT joint venture with defendant Toshiba forming defendant MT Picture Display Co., Ltd. ("MTPD").

160. Panasonic Corporation was the majority owner with 64.5 percent.

161. On April 3, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making MTPD a wholly-owned subsidiary of Panasonic Corporation.

162. In 2005, the Panasonic brand had the highest CRT Product revenue in Japan.

163. During the Period, Panasonic Corporation manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

164. Defendant Panasonic Corporation of North America ("Panasonic NA") is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, NJ 07102.

165. Panasonic NA is a wholly owned and controlled subsidiary of Defendant Panasonic Corporation.

166. During the Period, Panasonic NA manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

167. Defendant Panasonic Corporation dominated and controlled the finances, policies, and affairs of Panasonic NA relating to the antitrust violations alleged in this Complaint.

168. Matsushita Electronic Corporation (Malaysia) Sdn Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 12, Jalan PKNK, Utama, Kawasan Perindustrian, Sngai Petani, Malaysia 40000.

169. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.

170. Panasonic Corporation transferred Matsushita Malaysia to its CRT joint venture with Toshiba

Corporation, MT Picture Display Co., Ltd., in 2003.

171.    It was re-named as MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly-owned subsidiary of MT Picture Display until its closure in 2006.

172.    During the Period, Matsushita Malaysia manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

173.    Defendant Panasonic Corporation dominated and controlled the finances, policies, and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this Complaint.

174.    Defendants Panasonic Corporation, Panasonic NA and Matsushita Malaysia are collectively referred to herein as "Panasonic."

175.    Defendant MT Picture Display Co., Ltd. ("MTPD") was established as a CRT joint venture between defendants Panasonic Corporation and Toshiba.

176.    MTPD is a Japanese entity with its principal place of business located at 1-1, Saiwai-cho, Takatsuki-shi, Osaka 569-1193, Japan.

177.    On April 3, 2007, defendant Panasonic Corporation purchased the remaining stake in MTPD, making it a wholly-owned subsidiary, and renaming it MT Picture Display Co., Ltd.

178.    During the Period, MTPD manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

179.    Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9, Jiuxianqiaobei N. Rd., Dashanzi Chaoyang District, Beijing, China.

180.    BMCC is a joint venture company, 50% of which is held by defendant MTPD.

181.    The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Branch of the Industrial and Commercial Bank of China, Ltd. (a China state-owned enterprise).

182.    Founded in 1987, BMCC was Matsushita's (n/k/a Panasonic) first CRT manufacturing facility in China.

183.    BMCC is the second largest producer of CRTs in China.

184.    During the Period, BMCC manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

**Hitachi Entities**

185.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business located at 6-6 Marunouchi Center Building, Chiyoda-ku, Tokyo 100-8280, Japan.

186.    Hitachi Ltd. is the parent company for the Hitachi brand of CRT Products.

187.    In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.

188.    During the Period, Hitachi Ltd. manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

189.    Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3F AKS Building, 3 Neribei-cho Kanda, Chiyoda-ku, 101-0022, Japan.

190.    Hitachi Displays, Ltd. established  Mobara Works of Hitachi Ltd. in the City of Mobara, Japan in 1943.

191.    In 2002, all planning, development, design, manufacturing, and sales departments involved in the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays, Ltd.

192.    During the Period, Hitachi Displays, Ltd. manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

193.    Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Displays relating to the antitrust violations alleged in this Complaint.

194.    Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located as 1000 Hurricane Shoals Road, Ste. D-100, Lawrenceville, GA 30043.

195.   HEDUS is a subsidiary of defendants Hitachi Displays, Ltd. and Hitachi, Ltd.

196.   During the Period, HEDUS manufactured, marketed, sold, and/or distributed CRT Products to customers, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

197.   Defendant Hitachi, Ltd. and Hitachi Displays, Ltd. dominated and controlled the finances, policies, and affairs of HEDUS relating to the antitrust violations alleged in this Complaint.

198.   Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, NY 10591-4625.

199.   Hitachi America is a wholly-owned and controlled subsidiary of defendant Hitachi, Ltd.

200.   During the Period, Hitachi America marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

201.   Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi America relating to the antitrust violations alleged in this Complaint.

202.   Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singapore company with its principal place of business located at 7 Tampines, Grand #08-01 Hitachi Square, Singapore.

203.   Hitachi Asia is a wholly owned and controlled subsidiary of defendant Hitachi, Ltd.

204.   During the Period, Hitachi Asia manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

205.   Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

206. Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.

207. Hitachi Displays, Ltd. owned at least a 25% interest in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).

208. Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but two weeks of the Period.

209. During the Period, Hitachi Shenzhen manufactured, marketed, sold, and distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

210. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

211. Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, HEDUS, Hitachi Asia, and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

**Tatung**

212. Defendant Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.

213. Tatung America is a subsidiary of Tatung Company.

214. Currently, Tatung Company owns approximately half of Tatung America.

215. The other half was previously owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.

216. Following Lun Kuan Lin's death, her share passed to her two children.

217. During the Period, Tatung America manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

**Chunghwa Entities**

218.  Defendant Chunghwa Picture Tubes Ltd. ("CPT") is a Taiwanese company with its principal place of business located at No. 1, Huaying Rd., Longtan District, Taoyuan 325City, Taiwan.

219.  CPT was founded in 1971 by Tatung Company.

220.  During most of the Period, Tatung Company owned a substantial share in CPT.

221.  Although Tatung Company's holdings in CPT have fallen over time, it retains substantial control over CPT's operations.

222.  Tatung Company listed Chunghwa on its website as one of its "global subsidiaries."

223.  And the Chairman of CPT, Weishan Lin, was also the Chairman and General Manager of Tatung Company.

224.  CPT was a leading manufacturer of CRTs.

225.  During the Period, CPT manufactured, marketed, sold, and/or distributed CRT Products, both directly and through its wholly-owned and controlled subsidiaries in Malaysia, China, and Scotland, to customers throughout Puerto Rico.

226.  Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business located at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Malaysia.

227.  Chunghwa Malaysia a wholly-owned and controlled subsidiary of defendant Chunghwa Picture Tubes.

228.  Chunghwa Malaysia is a leading worldwide supplier of CRTs.

229.  During the Period, Chunghwa Malaysia manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

230.  Defendants CPT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**IRICO Entities**

231.    Defendant IRICO Group Corporation ("IGC") is a Chinese corporation with its principal place of business located at 1 Caihong Rd., Qindu District, Xianyang, China 712021.

232.    IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, sale, and/or distribution of CRT Products.

233.    During the Period, IGC manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

234.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at Xiayang Yuquan West Road, Xianyang, China.

235.    IDDC is a partially-owned subsidiary of defendant IGC.

236.    In 2006, IDDC had the highest volume of CRTs manufactured in China.

237.    During the Period, IDDC manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

238.    Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this Complaint.

239.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, China.

240.    IGE is owned by Defendant IGC.

241.    According to its website, IGE was the first CRT manufacturer in China and one of the two largest manufacturers of CRTs in the world.

242.    Their website also claimed that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit and taxation.

243.    During the Period, IGE manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

244.    Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

245.    Defendants IGC, IDDC, and IGE are collectively referred to herein as "IRICO."

**Thai CRT**

246.   Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company with its principal place of business located at 1 Siam Cement Road, Bangsue Dusit, Bangkok, 10800 Thailand.

247.   Thai CRT is a subsidiary of Siam Cement Group.

248.   It was established in 1996 as Thailand's first manufacturer of CRTs for color televisions.

249.   During the Period, Thai CRT manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

**Samtel**

250.   Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal place of business located at 5th Floor, 501, 9 Copia Corporate suites, Dist. Centre, Jasala, New Delhi, India.

251.   Samtel's market share for CRTs sold in India is approximately 40%.

252.   Samtel is India's largest exporter of CRTs.

253.   Samtel has gained safety approvals from the United States, Canada, Germany and Great Britain for its CRT Products.

254.   During the Period, Samtel manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

**Daewoo/Orion Entities**

255.   During the Period, Orion Electric Company ("Orion") was a major manufacturer of CRTs.

256.   Orion was a Korean corporation that filed for bankruptcy in 2004.

257.    In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.

258.    Orion was involved in CRT Product sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.

259.    By information and belief, Plaintiffs consider that Orion was wholly owned by the "Daewoo Group."

260.    The Daewoo Group included Daewoo Electronics Company, Ltd., Daewoo Telecom Company, Daewoo Corporation, and Orion Electric Components Company.

261.    The Daewoo Group was dismantled in or around 1999.

262.    Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

263.    As of approximately 1996, DOSA produced 1.2 million CRTs annually.

264.    Daewoo CRT business in or around 2004.

265.    In December 1995, Orion partnered with defendant Toshiba Corporation and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.

266.    TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.

267.    During the Period, Orion, Daewoo Electronics, TEDI and DOSA manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through their subsidiaries or affiliates, to customers throughout Puerto Rico.

268.    Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."


**Unknown Entities**

269.    John Doe, married to Jane Doe, with whom he has a conjugal partnership, is a currently unknown individual, who may be liable for the allegations set forth in this Complaint.

270.    Corporation XYC is a corporation, the identity of which is currently unknown, which may be liable for the allegations set forth in the Complaint.

26

271.   All of the above-listed defendants are collectively referred to herein as "Defendants."

## VI. AGENTS AND CO-CONSPIRATORS

272.   Various other persons, firms and corporations, not named as Defendants herein, and presently unknown to Plaintiffs, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy and/or in furtherance of the anticompetitive, unfair or deceptive conduct.

273.   Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

274.   Defendants are also liable to acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

275.   Each of the Defendants named herein acted as the agent or joint venture of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

276.   Each Defendant which is a subsidiary of a foreign parent company acts as the sole United States agent for CRT Products made by its parent company.

277.   Plaintiffs reserve the right to amend the Complaint to include all such parties.

## VII. FACTUAL ALLEGATIONS

### CRT Technology

278.   CRT technology was first developed more than a century ago.

279.   The first commercially practical CRT television was made in 1931.

280.   It was not until the RCA Corporation introduced the product at the 1939 World's Fair, however, that it became widely available to consumers.

281.   Since then, CRTs have become the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs.

282. Even large public displays, including many scoreboards at sports arenas, are comprised of thousands of single color CRTs.

283. As noted above, the CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors.

284. An electron gun at the back of the vacuum tube emits electron beams.

285. When the electron beams strike the phosphors, the phosphors produce either red, green, or blue light.

286. A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors.

287. This process is rapidly repeated several times per second to produce the desired images.

288. The quality of a CRT display is dictated by the quality of the CRT itself. No external control or feature can make up for a poor quality tube.

289. Until 2006, CRTs were the dominant technology used in displays, including television and computer monitors.

290. During the Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

**A. Structural Characteristics Of The CRT Market**

291. The structural characteristics of the CRT Product market are conducive to the type of collusive activity alleged in this Complaint.

292. These characteristics include market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, maturity of the CRT Product market, and homogeneity of products.

a. **Market Concentration**

293. During the Period, the CRT industry was dominated by relatively few companies.

294. In 2004, defendants Samsung SDI, LG.Philips Displays (n/k/a LP Displays), MT Picture Display and Chunghwa together held a collective 78% share of the global CRT market.

295.  The high concentration of market share facilitates coordination, since there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### b. Information Sharing

296.  Because of common membership in trade associations for the CRT Product market and related markets (for e.g., TFT-LCD), interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.

297.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.

298.  Defendants took advantage of these opportunities to discuss and agree upon their pricing for CRT Products.

299.  Defendants Chunghwa, Hitachi, and Samsung are all members of the Society for Information Display.

300.  Defendants Samsung and LG Electronics, Inc. are two of the co-founders of the Korea Display Industry Association.

301.  Similarly, Daewoo, LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.

302.  Upon information and belief, Defendants used these trade associations as vehicles for discussing and agreeing upon their pricing for CRT Products.

303.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### c. Consolidation

304.  The CRT Product industry also had significant consolidation during the Period, including but not limited to: (a) the creation of LG.Philips Displays (n/k/a LP Displays) in 2001 as a joint

venture between Royal Philips and LG Electronics, Inc.; and (b) the 2002 merger of Toshiba and Matsushita/Panasonic's CRT business into MTPD.

305.    Defendants also consolidated their manufacturing facilities in lower cost venues such as China and reduced manufacturing capacity to keep prices high.

**d. Multiple Interrelated Business Relationships**

306.    The nature of the CRT Product industry  and the multiple business relationships between supposed competitors blur the lines of competition and provided ample opportunity to collude.

307.    These business relationships also created a unity of interest among competitors so that the conspiracy was easier to implement and enforce than if such interrelationships had not existed.

308.    The high degree of cooperation among Defendants in both the CRT Product market and other closely related markets is reflected in the following facts:

      a.    The formation of the CRT joint venture LG Philips Displays in 2001 by Defendants LG Electronics, Inc. and Royal Philips.

      b.    Defendants LG Electronics, Inc. and Royal Philips also formed  LG.Philips LCD Co., Ltd., n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

      c.    The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

      d.    Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

      e.    In December 1995, Defendants Daewoo and Toshiba partnered with two other non-Defendant entities to form TEDI which manufactured CRTs in Indonesia.

      f.    Defendants Daewoo and Toshiba also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN LCDs, and Toshiba, which had substituted its STN LCD production with TFT

LCD production, marketed Daewoo's STN LCDs globally through its network.

g. Also in 1995, Defendant Chunghwa entered into a technology transfer agreement with Defendant Toshiba for large CPTs.

h. Defendant Chunghwa has a joint venture with Defendant Samsung Electronics Co., Ltd. for the production of liquid crystal display panels. Chunghwa now purchases the technology from Defendant Royal Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics, Inc. and Hitachi Ltd. entered into a joint venture in 2000 for the manufacture, sale, and distribution of optical storage products such as DVD drives.

j. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung Electronics Co., Ltd. and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k. Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Inc., Samsung, Royal Philips, and Panasonic.

### e. High Costs Of Entry Into The Industry

309.    There are substantial barriers to entry in the CRT Products industry.

310.    It would require substantial time, resources and industry knowledge to even potentially overcome the barriers to entry.

311.    It is also extremely unlikely that a new producer would have entered the market in light of the declining demand for CRT Products.

### f. The Maturity Of The CRT Product Market

312.    New industries are typically characterized by rapid growth, innovation, and high profits.

313.    The CRT Product market was mature, and like many mature industries, was characterized by slim profit margins, creating a motivation to collude.

314.    Demand for CRT Products was declining throughout the Period.

315.    Static or declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

316.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and Plasma displays.

317.    This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.

318.    Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent, and the reduction has accelerated since then.

319.    Although demand was declining as a result of the popularity of flat-panel LCD/plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.

320.    Due to the high costs of LCD panels and plasma displays during the Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

321.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.

322.    By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

323.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

324.    Currently, there are hardly any sales of CRT products.


g. **Homogeneity Of CRT Products**

325.    CRT Products are commodity-like products which are manufactured in standardized sizes.

326.    One Defendant's CRT Products for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.

327.    Defendants sold and Puerto Rico consumers purchased CRT Products primarily on the basis of price.

328.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.


**B. Pre-Conspiracy Market**

329.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international, and the Defendants began serving customers that were also being served by other international companies.

330.    During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.

331.    A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity, and customers.

332.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in S.E. Asia.

333.    During this period, these producers began to include discussions about price in their meetings.

334.    The pricing discussions were usually limited, however, to exchanges of the range of prices that each competitor had quoted to specific customers.

## C. Defendants' And Co-Conspirators' Illegal Agreements

335.    Plaintiffs are informed and believe, and thereon allege, that in order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have entered into a contract, agreement, trust or conspiracy, the effect of which has been to raise, fix, maintain, and/or stabilize the prices at which they sold CRT Products to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

336.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.

337.    In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.

338.    During this period, representatives from Defendants LG, Samsung, and Daewoo visited the other Defendant manufacturers including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba, and Panasonic to discuss increasing prices for CRT Products in general and to specific customers.

339.    These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

340.    Defendants Samsung, Chunghwa, LG, and Daewoo also attended several ad hoc group meetings during this period.

341.    The participants at these group meetings also discussed increasing prices for CRT Products.

342.    As more manufacturers formally entered the conspiracy, group meetings became more prevalent.

343.    Beginning in 1997, the Defendants began to meet in a more organized, systematic, and formal fashion, and a system of multilateral and bilateral meetings was put in place.

344.    Defendants' representatives attended hundreds of these meetings during the Period.

345.    The overall CRT conspiracy raised and established worldwide prices (including prices in Puerto Rico) that Defendants charged for CRT Products.

a.  **"Glass Meetings"**

346.  The group meetings among the participants in the CRT price-fixing conspiracy were referred to by the participants as "Glass Meetings" or "GSM."

347.  Glass Meetings were attended by employees at three general levels of the Defendants' corporations.

348.  The first level of these meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "Top Meetings."

349.  Top Meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.

350.  Because attendees at Top Meetings had authority as well as more reliable information, these meetings resulted in agreements.

351.  Attendees at Top Meetings were also able to resolve disputes because they were decision makers who could make agreements.

352.  The second level of meetings were attended by the Defendants' high level sales managers and were known as "Management Meetings."

353.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at Top Meetings.

354.  Finally, the third level of meetings were known as "Working Level Meetings" and were attended by lower level sales and marketing employees.

355.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.

356.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.

357.  The Working Level Meetings also tended to be more regional and often took place near Defendants' factories.

358.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

manufacturers' employees met in Korea, the Chinese in China, and so on.

    a. The Chinese Glass Meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.

    b. The China meetings had the principal purpose of reporting what had been decided at the most recent Glass Meeting to the Chinese manufacturers.

    c. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

    d. Glass Meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and IRICO.

359. Representatives of the Defendants also attended what were known amongst members of the conspiracy as "Green Meetings."

360. These were meetings held on golf courses.

361. The Green Meetings were generally attended by top and management level employees of the Defendants.

362. During the Period, Glass Meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia.

363. Participants would often exchange competitively sensitive information prior to a Glass Meeting.

364. This included information on inventories, production, sales, and exports.

365. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

366.    The Glass Meetings at all levels followed a fairly typical agenda.

367.    First, the participants exchanged competitive information such as proposed future CRT price-fixing, sales volume, inventory levels, production capacity, exports, customer orders, price trends, and forecasts of sales volumes for coming months.

368.    The participants also updated the information they had provided in the previous meeting.

369.    Each meeting had a rotating, designated "Chairman" who would write the information on a white board.

370.    The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.

371.    They discussed and agreed upon target prices, price increases, so-called "bottom" prices, and price ranges for CRTs.

372.    They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.

373.    Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

374.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions. This was referred to as setting a "bottom price."

375.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.

376.    Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.

377.    In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

378.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.

379.   Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.

380.   The Defendants therefore concluded that in order to make their CRT price increases acceptable to customers, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their other customers in the sales chain.

381.   Defendants thereby ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

382.   The agreements reached at the Glass Meetings included:

a.   agreements on CRT Product prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines;

b.   placing agreed-upon price differentials on various attributes of CRT Products, such as quality or certain technical specifications;

c.   agreements on pricing for intra-company CRT Product sales to vertically integrated customers;

d.   agreements as to what to tell customers about the reason for a price increase;

e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon price setting;

f.   agreements to coordinate price setting with CRT manufacturers in other geographic markets such as Brazil, Europe, and India;

g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices, and customers' demands;

h.   agreements to coordinate uniform public statements regarding available capacity and supply;

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

     k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

     l.   agreements to keep their meetings secret.

383.   Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of the Defendants themselves.

384.   When a Defendant violated the agreement,  this was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition in a mutual interest in living up to the target price and living up to the agreements that had been made.

385.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group Glass Meetings became increasingly less frequent and bilateral meetings again became more prevalent.

386.   In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

      **b**. **Bilateral Discussions**

387.   Throughout the Period, the Glass Meetings were supplemented by bilateral discussions between several Defendants.

388.   The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings.

389.   The bilateral discussions, usually between sales and marketing employees, took place in in-person meetings, telephone contacts, and emails.

390.   During the Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, the United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and Mexico.

391.   The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, and Europe.

392.    In order to ensure the efficacy of their global conspiracy, the Defendants also used bilateral meetings to coordinate pricing with CRT Product manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil, and Samsung SDI Mexico.

393.    These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products.

394.    As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Period.

395.    Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.

396.    In this way, the Defendants ensured that prices of all CRT Products imported into Puerto Rico were fixed, raised, maintained, and/or stabilized at supracompetitive levels.

397.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.

398.    The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

399.    Bilateral discussions were also used to coordinate prices with CRT Product manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic, Thai CRT, and Samtel.

400.    It was often the case that in the few days following a Top or Management Meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT Product price-fixing and/or output agreements had been reached during the meeting.

401.    For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT Product price fixing agreements to Hitachi.

402.    LG had a relationship with Toshiba and was responsible for communicating CRT Product pricing agreements to Toshiba.

40

403.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT Product pricing agreements to Samtel.

404.  Hitachi, Toshiba, and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG, and Thai CRT.

405.  Sometimes Hitachi and Toshiba also attended the Glass Meetings.

406.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRT Products.

      c.   **Defendants' And Co-Conspirators' Participation In Group And Bilateral Discussions**

407.  Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in at least 200 Glass Meetings at all levels.

408.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.

409.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.

410.  Through these discussions, Samsung agreed on prices and supply levels for CRT Products.

411.  Defendants SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.

412.  To the extent SEC and SEAI sold, and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the Glass Meetings.

413.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

414.  Between at least 1995 and 2001, Defendant LG, through LG Electronics, Inc. and LGETT, participated at least 100 Glass Meetings at all levels.

415.  After 2001, LG participated in the CRT Product conspiracy through its joint venture with

Philips,  LG.Philips Displays (n/k/a LP Displays).

416.  A substantial number of these meetings were attended by the highest ranking executives from LG.

417.  LG also engaged in bilateral discussions with each of the other Defendants on a regular basis.

418.  Through these discussions, LG agreed on prices and supply levels for CRT Products.

419.  LG never effectively withdrew from this conspiracy.

420.  Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.

421.  To the extent LGEUSA sold, and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings.

422.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

423.  Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated at least 100 Glass Meetings at all levels.

424.  After 2001, Philips participated in the CRT Product conspiracy through its joint venture with LG, LG.Philips Displays (n/k/a LP Displays).

425.   A substantial number of these meetings were attended by high level executives from Philips.

426.  Philips also engaged in numerous bilateral discussions with other Defendants.

427.  Through these discussions, Philips agreed on prices and supply levels for CRT Products.

428.  Philips never effectively withdrew from this conspiracy.

429.  Defendants PENAC and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.

430.  To the extent PENAC and Philips Brazil sold, and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings.

431.  Thus, PENAC and Philips Brazil were active, knowing participants in the alleged conspiracy.

432.  Between at least 2001 and 2006, Defendant LP Displays (f/k/a LG.Philips Displays) participated at least 100 Glass Meetings at all levels.

433.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.

434.  Certain of said high level executives had previously attended meetings on behalf of defendants LG and Philips.

435.  LP Displays also engaged in bilateral discussions with other Defendants.

436.  Through these discussions, LP Displays agreed on prices and supply levels for CRT Products.

437.  Between at least 1995 and 2006, Defendant Chunghwa, through CPT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 Glass Meetings at all levels.

438.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of CPT, C.Y. Lin.

439.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.

440.  Through these discussions, Chunghwa agreed on prices and supply levels for CRT Products.

441.  Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them.

442.  To the extent Tatung America sold, and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the price fixing agreements reached at the Glass Meetings.

443.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

444.  Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 Glass Meetings at all levels.

445.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.

446.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.

447.  Through these discussions, Daewoo agreed on prices and supply levels for CRT Products.

448.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.

449.  Daewoo never effectively withdrew from this conspiracy

450.  Between at least 1995 and 2003, Defendant Toshiba, through Toshiba Corporation, TDDT and TEDI, participated in several Glass Meetings.

451.  After 2003, Toshiba participated in the CRT conspiracy through its joint venture with Panasonic, MTPD.

452.  These meetings were attended by high level sales managers from Toshiba and MTPD.

453.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.

454.  Through these discussions, Toshiba agreed on prices and supply levels for CRT Products.

455.  Toshiba never effectively withdrew from this conspiracy.

456.  Defendants Toshiba America, Inc., TACP, TAIP, and TAEC were represented at those meetings and were a party to the agreements entered at them.

457.  To the extent Toshiba America, Inc., TACP, TAIS, and TAEC sold, and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the agreements reached at the Glass Meetings.

458.  Thus, Toshiba America, TACP, TAIS, and TAEC were active, knowing participants in the alleged conspiracy

459.  Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several Glass Meetings.

460.  These meetings were attended by high level managers from Hitachi.

461.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.

462.  Through these discussions, Hitachi agreed on prices and supply levels for CRT Products.

463.  Hitachi never effectively withdrew from this conspiracy.

464.  Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.

465.  To the extent Hitachi America and HEDUS sold, and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the price fixing agreements reached at the Glass Meetings.

466.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

467.  Between at least 1996 and 2003, Defendant Panasonic (known throughout the Period as Matsushita Electric Industrial Co., Ltd.), through Panasonic Corporation and Matsushita Malaysia, participated in several Glass Meetings.

468.  After 2003, Panasonic participated in the CRT conspiracy through its joint venture with Toshiba, MTPD.

469.  These meetings were attended by high level sales managers from Panasonic and MTPD.

470.  Panasonic also engaged in multiple bilateral discussions with other Defendants.

471.  Through these discussions, Panasonic agreed on prices and supply levels for CRT Products.

472.  Panasonic never effectively withdrew from this conspiracy.

473.   Panasonic NA was represented at those meetings and was a party to the agreements entered at them.

474.   To the extent Panasonic NA sold, and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings.

475.   Thus, Panasonic NA was an active, knowing participant in the alleged conspiracy.

476.   Between at least 2003 and 2006, Defendant MTPD participated in multiple Glass Meetings and in fact led many of these meetings during the latter years of the conspiracy.

477.   These meetings were attended by high level sales managers from MTPD.

478.   MTPD also engaged in bilateral discussions with other Defendants.

479.   Through these discussions, MTPD agreed on prices and supply levels for CRT Products.

480.   Between at least 1998 and 2007, Defendant BMCC participated in multiple Glass Meetings.

481.   These meetings were attended by high level sales managers from BMCC.

482.   BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.

483.   Through these discussions, BMCC agreed on prices and supply levels for CRT Products.

484.   None of BMCC's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government.

485.    BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

486.   Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple Glass Meetings.

487.   These meetings were attended by the highest ranking executives from IRICO.

488.   IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.

489.   Through these discussions, IRICO agreed on prices and supply levels for CRT Products.

490.   None of IRICO's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government.

491.   IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

492.   Between at least 1997 and 2006, Defendant Thai CRT participated in multiple Glass Meetings.

493.   These meetings were attended by the highest ranking executives from Thai CRT.

494.   Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.

495.   Through these discussions, Thai CRT agreed on prices and supply levels for CRT Products.

496.   Thai CRT never effectively withdrew from this conspiracy.

497.   Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.

498.   These meetings were attended by high level executives from Samtel.

499.   Through these discussions, Samtel agreed on prices and supply levels for CRT Products.

500.   Samtel never effectively withdrew from this conspiracy.

501.   When Plaintiff, the Attorney General, refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, the Attorney General is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.

502.   In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.

503.   The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.

504.   As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

47

## D. The CRT Market During The Conspiracy

505. Until about ten years ago, CRTs were the dominant technology used in displays, including television and computer monitors.

506. During the Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

507. The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|:---:|:---:|:---:|:---:|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

508. During the Period, North America was the largest market for CRT TVs and computer monitors.

509. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.

510. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. See, The Future of Liquid Crystal and Related Display Materials, Fuji Chimera Research, 1997, p. 12.

511. Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Period.

512. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.

513. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p. 19.

514. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

515.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years...."

516.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.

517.    The price increase was allegedly based on increasing global demand.

518.    In fact, this price increase was a result of the collusive conduct as herein alleged.

519.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.

520.    A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

521.    A BNET Business Network news article from August 1998 reported that ""key components (cathode ray tubes) in computer monitors have risen in price. Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October. . . .While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases. '"

522.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips, and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.

523.    Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be 20% hike in the price of our CRT monitors."

524.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

525.    For example, the Defendants' CRT factory use percentage fell from 90 percent in the third quarter of 2000 to 62 percent in the first quarter of 2001.

526.    This is the most dramatic example of a drop in factory use.

527.    There were sudden drops throughout the Period but to a lesser degree.

528.  Plaintiff is informed and believes that these sudden, coordinated drops in factory utilization by the Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRT Products.

529.  During the Period, while demand in Puerto Rico for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.

530.  As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

531.  During the Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRT Products.

532.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

533.  These price increases and price stability in the market for CRT Products during the Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**E. International Government Antitrust Investigations**

534.  Defendants' conspiracy to fix, raise, maintain, and stabilize the prices of, and restrict output for, CRT Products sold in Puerto Rico during the Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ") and others in November 2007.

535.  On November 8, 2007, antitrust authorities in Europe, Japan, and South Korea raided the offices of manufacturers of CRTs as part of an international investigation of alleged price fixing.

536.  On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Defendant Chunghwa Picture Tubes, Ltd., Cheng Yuan Lin, a/k/a C.Y.

Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.

537.   The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."

538.   The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.

539.   Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in the United States.

540.   Defendant MT Picture Display Co., Ltd., the CRT unit of Defendant Panasonic, has confirmed that it was raided by Japan's Fair Trade Commission.

541.   *Kyodo News* reported on November 8, 2007, upon information and belief, that MT Picture Display fixed prices for CRTs with manufacturers in three Asian countries, including South Korea's Samsung SDI Co.

542.   Kyodo News further reported that:

> "Officials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target prices when delivering their products to TV manufacturers in Japan and South Korea, the sources said."

543.   Defendant Samsung SDI Co., Ltd. was raided by South Korea's Fair Trade Commission, which has started an investigation into Samsung's CRT business.

544.   The *Asian Shimbun* further reported on November 10, 2007 that

> "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said. The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies [referring to the four Asian-based manufacturers -MT Picture Display, Samsung SDI Co., Chunghwa Picture Tubes, LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

545   On November 21, 2007, Defendant Royal Philips publicly disclosed that it too is subject to one or more investigations into anticompetitive conduct in the CRT industry.

546   Royal Philips spokesman Joon Knapen declined to comment on which jurisdictions have started investigations.

547.   Royal Philips stated that it intended to assist the regulators.

548.     In its 2008 Annual Report, Defendant Toshiba reports that

"[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

549.  On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Picture Tubes (UK), Ltd., Chunghwa Picture Tubes, Ltd., Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany Gmbh, Matsushita Global HQ, Matsushita European HQ.

Based on the data available, the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured picture tubes and coloured screen tubes) on the European market between 1995 and 2007.

The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production.

The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007.

The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

550.  As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

551.  Several Defendants also have a history of "cooperation" and anticompetitive conduct.

552.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory (DRAM).

553.   Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory and NAND Flash Memory.

554.   In December 2006, government authorities in Japan, South Korea, the European Union, and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

555.   On December 12, 2006, news reports indicated that Defendants Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips, LG Electronics, Inc, and LG Display Co., Ltd., were all under investigation for price fixing of TFT-LCDs.

556.   On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation, and Defendant Chunghwa Picture Tubes, Ltd.—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

557.   On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, Ltd., a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

558.   The indictments of LG Display Co., Ltd., Sharp Corporation, Chunghwa Picture Tubes, Ltd., and Hitachi Displays, Ltd., all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in the United States.

## VIII. THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS

559.    Defendants' conspiracy to fix, raise, maintain, and stabilize the price of CRT Products at artificial levels resulted in harm to Plaintiff and the indirect purchaser consumers and governmental agencies alleged herein because it resulted in their paying higher prices for CRT Products than they would have paid in the absence of Defendants' conspiracy.

560.    The entire overcharge related to sales in Puerto Rico during the Period was passed on to consumers in Puerto Rico.

561.    As the DOJ acknowledged in announcing the indictment of defendant Chunghwa's former Chairman and CEO, "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices."

562.    The Defendants identified above that attended the Glass Meetings, monitored the prices of televisions and computer monitors sold in the U.S. and elsewhere on a regular basis.

563.    The purpose and effect of investigating such retail market data was at least threefold.

564.    First, it permitted Defendants, such as Chunghwa, which did not manufacture CRT televisions or computer monitors the way that Samsung, LG, Daewoo, Panasonic, Toshiba, Philips, and Hitachi did, to police the price fixing agreement to make sure that intra-defendant CRT sales were kept at supra-competitive levels. 565.    Secondly, it permitted all Defendants to police their price-fixing agreement to independent OEMs who would reduce prices for finished goods if there was a corresponding reduction in CRT prices from a Defendant.

566.    Finally, as discussed above, Defendants used the prices of finished products to analyze whether they could increase prices or should agree to a "bottom" price instead.

567.    The Defendants concluded that in order to make their CRT price increases work, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers (e.g., retailers and computer OEMs).

568.   In this way, Defendants ensured that 100% of the supracompetitive overcharges for CRT Products were passed on to indirect purchaser consumers.

569.   The consumers in Puerto Rico bought CRT Products from either a computer or TV OEM such as Dell or Sharp, or a reseller such as Best Buy.

570.   Because of the breadth of the price-fixing conspiracy here, the direct purchaser CRT TV and monitor manufacturers were not constrained by their competitors from passing on the overcharge.

571.   Because each of the direct purchaser's competitors were also buying CRTs at supracompetitive prices from conspiracy members, no direct purchaser faced end-product price competition from a competitor that was not paying supracompetitive prices for CRTs.

572.   The price of CRT Products is directly correlated to the price of CRTs.

573.   The margins for CRT TV and monitor makers are sufficiently slim that price increases of CRTs force them to increase the prices of their CRT Products.

574.   This means that increases in the price of CRTs lead to quick corresponding price increases at the OEM level for CRT Products.

575.   Computer and TV OEMs and retailers of CRT Products are all subject to vigorous price competition, whether selling CRT TVs or computer monitors.

576.   The demand for CRTs is ultimately determined by purchasers of products containing such products.

577.   The market for CRTs and the market for CRT Products are therefore inextricably linked and cannot be considered separately.

578.   Defendants are well aware of this intimate relationship, and use forecasts of CRT TVs and computer monitors to predict sales of and determine production levels and pricing for CRTs.

579.   Computers and televisions are commodities with little or no brand loyalty such that aggressive pricing causes consumers to switch preferences to different brands.

580. Prices are closely based on production costs, which are in turn directly determined by component costs, as assembly costs are minimal.

581. OEMs accordingly use component costs, like the cost of CRTs, as the starting point for all price calculations.

582. On information and belief, computer and TV OEMs price their end-products on a "cost-plus" basis.

583. Thus, computer and television prices closely track increases and decreases in component costs.

584. The CRT is the most expensive component in the products into which they are incorporated.

585. On information and belief, the cost of the CRT in a computer monitor is approximately 60% of the total cost to manufacture the computer monitor.

586. On information and belief, the cost of the CRT in a television is a slightly smaller percentage of the total manufacturing cost because a television has more components than a computer monitor, such as the tuner and speakers.

587. Economic and legal literature recognizes that the more pricing decisions are based on cost, the easier it is to determine the pass-through rate.

588. The directness of affected costs refers to whether an overcharge affects a direct (i.e., variable) cost or an indirect (i.e., overhead) cost.

589. Overcharges will be passed through sooner and at a higher rate if the overcharges affect direct costs.

590. Here, CRTs are a direct and substantial cost of CRT Products.

591. Therefore, Plaintiffs will be able to show that the overcharge on the CRTs was passed through to indirect purchasers.

592. Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.

593. CRTs are identifiable, discreet, physical objects that do not change form or become an indistinguishable part of the TV or computer monitor in which they are contained.

594.    Thus, CRTs follow a traceable physical chain from the Defendants to the OEMs to the purchasers of finished products incorporating CRTs.

595.    Moreover, just as CRTs can be physically traced through the supply chain, so can their price by traced to show that changes in the prices paid by direct purchasers of CRTs affect prices paid by consumers of CRT Products.

596.    On information and belief, just as the CRTs can be physically traced through the supply chain, their price can be traced to show the changes in the prices paid by the direct purchasers of the CRTs affect the prices paid by consumers of CRT Products: the computer and TV OEMs price their end-products on a "cost-plus" basis.

597.    In retailing, it is common to use a "mark-up rule."

598.    The retail price is set as the wholesale cost plus a percentage markup designed to recover non-product costs and to provide a profit.

599.    This system guarantees that increases in costs to the retailer will be passed on to end buyers.

600.    For example, CDW, a large seller of CRT monitors, uses such a system. A statement in the DRAM case by CDW's director of pricing details exactly how they calculated selling prices:

> "In general, CDW employs a "building block" approach to setting its advertised prices. The first building block is the Cost of Goods Sold (COGS), which represents the price CDW paid to acquire the product…CDW…adds a series of positive markups to the cost to CDW to acquire a given product. These markups are in addition to the pass through effect of changes in the costs charged to CDW for that product by a given vendor."

601.    Economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component.

602.    As Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624:

> "A monopoly charge at the top of the distribution chain generally results in higher prices

at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and will pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain will be poorer as a result of the monopoly price at the top. Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level."

603.   Similarly, two other antitrust scholars—Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Hass School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern School of Law and author of the Handbook of the Law of Antitrust)—have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception; it is the rule."

604.   As Professor Jeffrey McKie-Mason (Arthur W. Burks Professor for Information and Computer Science, Professor of Economics and Public Policy, and Associate Dean for Academic Affairs in the School of Information at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in a judicial decision in that case granting class certification):

"As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers.... Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well."

605.   The purpose of Defendants' conspiratorial conduct was to fix, raise, maintain, and stabilize the price of CRTs and, as a direct and foreseeable result, CRT Products.

606.   The market for CRTs and the market for CRT Products are inextricably linked.

607.   One exists to serve the other.

608.   Defendants not only knew, but expressly contemplated that prices of CRT Products would increase as a direct result of their increasing the prices of CRTs.

609.  Finally, many of the Defendants and/or co-conspirators themselves have been and are currently manufacturers of CRT TVs and computer monitors.

610.  Such manufacturers include, for example, Samsung, LG, Hitachi, Toshiba, Philips, and Panasonic.

611.  Having agreed to fix prices for CRTs, the major component of the end products they were manufacturing, these Defendants intended to pass on the full cost of this component in their finished products, and in fact did so.

612.  As a direct and proximate result of Defendants' illegal conduct, Plaintiffs and other indirect purchasers have been forced to pay supra-competitive prices for CRT Products.

613.  These inflated prices have been passed on to them by direct purchaser manufacturers, distributors, and retailers.

## IX. FRAUDULENT CONCEALMENT

614.  Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiff.

615.  Plaintiff did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating the law as alleged herein until shortly before this litigation was commenced.

616.  Nor could Plaintiff have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

617.  In addition, the conspiracy was by its nature self-concealing.

618.  Defendants engaged in a successful, illegal price-fixing conspiracy with respect to CRT Products, which they affirmatively concealed, in at least the following respects:

 a.  By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme, and by agreeing to expel those who failed to do so;

b.  By agreeing among themselves to limit the number of representatives from each Defendant attending the meetings so as to avoid detection;

c.  By agreeing among themselves to refrain from listing the individual representatives of the Defendants in attendance at meetings in any meeting report;

d.  By agreeing among themselves to refrain from taking meeting minutes or taking any kind of written notes during the meetings;

e.  By giving false and pretextual reasons for their CRT Product price increases during the relevant period and by describing such pricing falsely as being the result of external costs rather than collusion;

f.  By agreeing among themselves on what to tell their customers about price changes, and agreeing upon which attendee would communicate the price change to which customer;

g.  By agreeing among themselves to quote higher prices to certain customers than the fixed price in effect to give the appearance that the price was not fixed;

h.  By agreeing among themselves upon the content of public statements regarding capacity and supply;

i.  By agreeing among themselves to eliminate references in expense reports which might reveal the existence of their unlawful meetings; and

j.  By agreeing on other means to avoid detection of their illegal conspiracy to fix the prices of CRT Products.

619.  As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiff asserts the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff in representation of the consumers and governmental agencies of Puerto Rico.

## X. CAUSE OF ACTION

### A.  **Unjust Enrichment**

620.  Plaintiff incorporates, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

621.    Plaintiff files this Complaint on her own behalf, for the relevant government agencies, and
        as *parens patriae* for natural persons and corporations, to assure that public rights are
        complied with, and to protect Puerto Rico's residents from Defendants' unjust enrichment.

622.    Defendants' conspiracy enriched them.

623.    The enrichment resulting in a corresponding loss (or impoverishment) of Plaintiff.

624.    There is a connection or a nexus between the loss (or impoverishment) of the Plaintiff and
        the enrichment of Defendants.

625.    There is no justification for Defendants' enrichment.

626.    There is no legal provision or rule that precludes the application of unjust enrichment.

627.    There is no adequate legal remedy to cure the harm to Plaintiff.

628.    There is no statute that provides a remedy for the harm caused.

629.    There is no contract related to the controversy before the Court.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the Government of Puerto Rico, very respectfully prays as follows:

a       That the Court rule that the conduct, conspiracy combination, and acts and practices
        related in this Complaint have enriched Defendants to Plaintiff's detriment;

b       That the Court order Defendants to compensate Plaintiff to the extent that Defendants
        have been enriched and Plaintiff impoverished for an amount of no less than
        $30,000,000;

c       That the Court order that the Plaintiff be compensated with any other amount as the
        law provides;

d       That the Court order that Plaintiff be awarded legal interest at the highest rate;

e       That the Court award Plaintiff the costs and expenses of this litigation, including
        reasonable attorneys' fees;

f       That the Court order any other remedy that it understands to be fair and appropriate
        under the circumstances.

In San Juan, Puerto Rico, this 17th day of December 2018.

Respectfully Submitted,


WANDA VAZQUEZ-GARCED
ATTORNEY GENERAL

/s/Denise Maldonado-Rosa
Assistant Attorney General
Sole Registry of Attorneys 15652

PO Box 9020192
(787) 201-8900

dmaldonado@justicia.pr.gov

/s/Jane A. Becker Whitaker
Jane A. Becker Whitaker
Sole Registry of Attorneys 9352
/s/ Jean Paul Vissepó-Garriga
Jean Paul Vissepó-Garriga
Sole Registry of Attorneys 14482

Becker & Vissepó, PSC
San Juan, Puerto Rico 00918
P. O. Box 9023914
San Juan, PR 00902-3914
Tel: (787) 945-2406

E-mail: jbw@beckervissepo.com
janebeckerwhitaker@gmail.com
E-mail: jpv@beckervissepo.com
jp@vissepolaw.com