Christopher M. Curran (*pro hac vice*)
ccurran@whitecase.com
Lucius B. Lau (*pro hac vice*)
alau@whitecase.com
Dana E. Foster (*pro hac vice*)
defoster@whitecase.com
Matthew N. Frutig (*pro hac vice*)
mfrutig@whitecase.com
White & Case LLP
701 Thirteenth Street, N.W.
Washington, DC  20005
Telephone:  (202) 626-3600
Facsimile:  (202) 639-9355

*Counsel to Toshiba America Electronic Components, Inc.*

White & Case LLP
701 Thirteenth Street, NW
Washington, DC  20005

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(OAKLAND DIVISION)

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 4:07-cv-05944-JST<br>MDL No. 1917 |
| This Document Relates to Case No. 4:20-cv-05606-JST (N.D. cal.)<br><br>Government of Puerto Rico,<br><br>　　　　　*Plaintiff*,<br><br>v.<br><br>Panasonic Corp. of North America, *et al.*,<br><br>　　　　　*Defendants*. | **DECLARATION OF MATTHEW N. FRUTIG IN SUPPORT OF TAEC'S MOTION TO DISMISS PUERTO RICO'S COMPLAINT PURSUANT TO RULES 4, 12(b)(2), 12(b)(4), AND 12(b)(5) OF THE FEDERAL RULES OF CIVIL PROCEDURE** |

White & Case LLP
701 Thirteenth Street, NW
Washington, DC  20005

I, Matthew N. Frutig, hereby declare as follows:

1.      I am an attorney with the law firm of White & Case LLP, counsel for Defendant Toshiba America Electronic Components, Inc. ("TAEC").

2.      I submit this declaration in support of TAEC's Motion to Dismiss Puerto Rico's Complaint Pursuant to Rules 4, 12(b)(2), 12(b)(4), and 12(b)(5) of the Federal Rules of Civil Procedure, filed contemporaneously herewith.  Except for those matters stated on information and belief, which I believe to be true, I have personal knowledge of the facts stated herein, and I could and would competently testify thereto if called as a witness.

3.      On February 27, 2019, in light of Plaintiff's attempted service of process on Toshiba America Information Systems, Inc. ("TAIS") on February 14, 2019, in my role as TAIS's counsel, I sent a letter to Plaintiff's counsel listed on the summons, Denise Maldonado-Rosa, Esq.

4.      In the letter, I alerted her that Plaintiff's attempted service on TAIS was deficient because neither TAIS nor anyone authorized to accept service of process on behalf of TAIS is located at the address listed on the summons (9740 Irvine Blvd., Irvine, California 92718).

5.      Attached hereto as **Exhibit 1** is a true and correct copy of the letter I sent on February 27, 2019.

6.      On February 28, 2019, I received a phone call from Ms. Jane Becker Whitaker, who identified herself as Puerto Rico's counsel in the instant matter.  On the call, I reiterated that Plaintiff had attempted to serve TAIS at the wrong address and that the correct address was publicly available.   TAEC was not discussed during the call.

7.      Although Plaintiff has never sought confirmation, neither TAEC nor anyone authorized to accept service on behalf of TAEC is located at the address listed on the summons (9740 Irvine Blvd., Irvine, California 92718).

8.      On March 4, 2021, defense counsel requested that Plaintiff voluntarily dismiss TAEC because it had not been served.

9.      On March 9, 2021, Plaintiff stated TAEC had been served.

DECLARATION OF MATTHEW N. FRUTIG
IN SUPPORT OF TAEC'S MOTION TO DISMISS PUERTO RICO'S COMPLAINT PURSUANT
TO RULES 4, 12(b)(2), 12(b)(4), AND 12(b)(5) OF THE FEDERAL RULES OF CIVIL PROCEDURE
Case No. 4:07-cv-05944-JST, MDL No. 1917

White & Case LLP
701 Thirteenth Street, NW
Washington, DC  20005

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

10.    Attached hereto as **Exhibit 2** is a true and correct copy of a Proof of Service of Summons executed by Mr. Frank Harrigan, filed in *Aptus USA, LLC. v. Schneider*, No. 8:16-cv-00413-DOC (C.D. Cal. Mar. 23, 2016), ECF No. 10.

11.    Attached hereto as **Exhibit 3** is a true and correct copy of a Proof of Service executed by Mr. Frank Harrigan, filed in *Oxygen Funding, Inc. v. Hall*, No. 6:17-ap-01058-SY (Bankr. C.D. Cal. Apr. 27, 2018), ECF No. 32.

12.    Attached hereto as **Exhibit 4** is a true and correct copy of a Proof of Service of Summons and Complaint executed by Mr. Frank Harrigan, filed in *Macy's Inc. v. Strategic Marks, LLC*, No. 3:11-cv-06198-EMC (N.D. Cal. Dec. 22, 2011), ECF No. 13.

13.    Attached hereto as **Exhibit 5** is a true and correct copy of a certified English translation of the decision in *Harry Pagán Rivera v. Felicita Ruiz Ortiz et al.*, No. KLCE201900315, 2019 PR App. LEXIS 1067 (P.R. Ct. App. Apr. 12, 2019), which was issued in Spanish and is cited in TAEC's Motion to Dismiss.  In the absence of a local rule governing the citation to Puerto Rico authority issued in Spanish, a certified English translation is attached for the convenience of the Court.  Certified English translations of other decisions issued in Spanish and cited in TAEC's Motion to Dismiss are identified below.

14.    Attached hereto as **Exhibit 6** is a true and correct copy of a certified English translation of the decision in *Doral Bank v. Jose A. Ramirez Perez et al.*, No. KLAN201201734, 2013 PR App. LEXIS 944 (P.R. Ct. App. Mar. 13, 2013).

15.    Attached hereto as **Exhibit 7** is a true and correct copy of a certified English translation of the decision in *Scotiabank De Puerto Rico (Antes R & G Premier Bank) v. Millenium Properties, Inc*., No. KLAN201001483, 2010 PR App. LEXIS 4293 (P.R. Ct. App. Dec. 16, 2010).

16.    Attached hereto as **Exhibit 8** is a true and correct copy of a certified English translation of the decision in *Ivette Vélez Muñiz v. Sara Lee Corp.*, No. KLCE0101357, 2001 PR App. Lexis 2327 (P.R. Ct. App. Dec. 31, 2001).

White & Case LLP
701 Thirteenth Street, NW
Washington, DC  20005

17.     Attached hereto as **Exhibit 9** is a true and correct copy of a certified English translation of the decision in *Alfonso Mora et al. v. Tyco Electronics Puerto Rico, Inc.*, No. KLAN200400609, 2004 PR App. LEXIS 2827 (P.R. Ct. App Aug. 4, 2004).

18.     Attached hereto as **Exhibit 10** is a true and correct copy of a certified English translation of the decision in *Antonio Marrero v. Preferred Health Management ("PHM")*, No. KLCE200900945, 2009 PR App. LEXIS 4296 (P.R. Ct. App. Oct. 15, 2009).

19.     Attached hereto as **Exhibit 11** is a true and correct copy of a certified English translation of the decision in *Jennifer Crespo López, Sr. et al. v. Biomet, Inc., et al.*, No. KLAN201201763, 2013 PR App. LEXIS 289 (P.R. Ct. App. Feb. 26, 2013).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of May, 2021, in Washington, DC.

_____
Matthew N. Frutig

DECLARATION OF MATTHEW N. FRUTIG
IN SUPPORT OF TAEC'S MOTION TO DISMISS PUERTO RICO'S COMPLAINT PURSUANT
TO RULES 4, 12(b)(2), 12(b)(4), AND 12(b)(5) OF THE FEDERAL RULES OF CIVIL PROCEDURE
Case No. 4:07-cv-05944-JST, MDL No. 1917

# Exhibit 1

**WHITE & CASE**

February 27, 2019

White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
**T** +1 202 626 3600

whitecase.com

VIA E-MAIL to dmaldonado@justicia.pr.gov

Denise Maldonado-Rosa, Esq.
Office of Monopolistic Affairs
P.O. Box 367775
San Juan, Puerto Rico 00936

**Re: *Government of Puerto Rico v. LG Electronics, et al.*, No. SJ2018CV10831**

Dear Ms. Maldonado-Rosa:

I write regarding the attempted service of the summons and complaint in the above-captioned matter on Toshiba America Information Systems, Inc. ("TAIS"), made on or about February 14, 2019. A copy of the summons and complaint is attached.

The attempted service is deficient because neither TAIS, nor anyone authorized to accept service of process on behalf of TAIS, is located at the address listed on the summons (9740 Irvine Blvd., Irvine, California 92718). *See, e.g., Doral Bank v. Jose A. Ramirez Perez et al.*, 2013 Pr App. Lexis 944, *22, *34-35 (P.R. Ct. App. 2013) (a plaintiff has a duty to ensure that it has identified the correct address and that proper service is a "constitutional imperative"); *Scotiabank De Puerto Rico (Antes R & G Premier Bank) v. Millenium Properties, Inc.*, 2010 Pr App. Lexis 4293, *8, *23 (P.R. Ct. App. 2010) (service was plagued by various deficiencies including failing to serve process at the correct address).

In order to properly complete service on TAIS, please resend the summons and complaint to the proper address. If you have any questions or intend to take the position that service on TAIS was proper in this matter, please contact me directly.

Denise Maldonado-Rosa, Esq.
February 27, 2019

**WHITE & CASE**

TAIS (on behalf of itself and its parents, subsidiaries, affiliates, directors, officers, employees, and agents) expressly reserves all of its rights, defenses, privileges, and immunities, including without limitation defenses based on lack of personal jurisdiction, insufficiency of service, and insufficiency of service of process.

Sincerely,

**Matthew N. Frutig**

**T** + 1 (202) 729-2321
**E** mfrutig@whitecase.com

2

**Commonwealth of Puerto Rico**
**Court of First Instance**
SUPERIOR Division of SAN JUAN

GOVERNMENT OF PUERTO RICO
Name(s) of Plaintiff(s)

V

LG ELECTRONICS ET AL
Name of Defendant(s)

CASE NO:   SJ2018CV10831
Courtroom No.:
Civil Action:   UNJUST ENRICHMENT
(Subject or Matter)

**SUMMONS**

UNITED STATES OF AMERICA                        )
THE PRESIDENT OF THE UNITED STATES OF AMERICA   ) SS
COMMONWEALTH OF PUERTO RICO                     )

To:   TOSHIBA AMERICA INFORMATION SYSTEMS, INC..
Name of defendant being served
9740 IRVINE BLVD, IRVINE, CALIFORNIA 92718
Address of defendant being served.

YOU ARE HEREBY summoned and required to file with the court your responsive answer to the complaint, within 30 days of service thereof, excluding the day of service. You must file your responsive pleading through the Unified System for Case Management and Administration (SUMAC), which you may access at the following address: https://unired.ramajudicial.pr/sumac/, unless you are appearing pro se, in which case you shall file a responsive pleading with the clerk of the court. If you fail to file a responsive pleading within the term stated above, the court may enter default judgment against you and grant the legal remedy requested in the complaint, or any other, if the court, in the exercise of its sound discretion, may deem so warranted.

DENISE MALDONADO-ROSA
Name of plaintiff's counsel or name of plaintiff, if plaintiff does not have counsel

15652
Supreme Court Number, if an attorney

PO BOX 367775
SAN JUAN, PUERTO RICO 00936
Address

TEL. 787 630-2717
Telephone number/Fax number

DMALDONADO@JUSTICIA.PR.GOV                        ,
Email:
I set my hand and the seal of the Court hereto, this ___ day of   [Stamped Feb. 8, 2019].

[STAMPED: GRISELDA RODRIGUEZ COLLADO]
Name of the Regional Clerk
[STAMPED: VIRGEN Y. DEL VALLE DIAZ
By: DEPUTY CLERK] -INITIALS
Name and Signature of the Deputy Clerk of the Court
[Stamped with the Seal of the Commonwealth of Puerto Rico, General Court of Law, Court of First Instance, San Juan
Superior Division KO 95, Initialed]

OAT 1721 Summons (SUMAC)
(Rev. May 2018)
2009 Rules of Civil Procedure, as amended

CASE NO._____

**CERTIFICATE OF SERVICE OF SUMMONS BY BAILIFF**

I,_____, Bailiff of the Court of First Instance, _____, Division, CERTIFY that I served the complaint

and summons for the referenced case on the _____ day of _____ 20_____, ☐ AM ☐ PM in the following manner:

☐Through personal delivery to the defendant at the following street address:

_____

☐Accessible in the immediate presence of the defendant at the following street address:

_____

☐Leaving a copy of the documents with an agent authorized by the defendant or designated by law to receive summons at the following

street address:

_____

☐ I could not serve process personally due to:

_____

    In _____ Puerto Rico, this _____ day of _____.

_____          _____
Name of Regional Bailiff                          Name and Badge Number of Bailiff of Court of First Instance

**SERVICE BY PRIVATE PARTY**

I,_____, state that I have the legal capacity pursuant to Rule 4.3 of the rules of Civil Procedure of Puerto
Rico, and I certify that the service of process in the case of reference was made by me in the following manner:

☐ Through personal delivery to the defendant at the following street address:

_____

☐ Accessible in the immediate presence of the defendant at the following street address:

_____

☐ Leaving a copy of the documents with an agent authorized by the defendant or designated by law to receive summons at the following

street address:

_____

☐ I could not serve process personally due to:

_____

| COST OF SERVICE |
| --- |
| $ _____ |

**STATEMENT OF PROCESS SERVER**

I declare under penalty of perjury, in accordance with the laws of the Commonwealth of Puerto Rico that the information provided in the certification of service of process is true and correct. IN WITNESS WHEREOF, I sign this statement in _____, Puerto Rico this _.day of _____,

_____                    _____
(Signature of the process server)                                    (Address of the process server)

AFFIDAVIT NUMBER. _____ *[if sworn before a Notary-Attorney]*

      Sworn and signed before me by _____, whose personal circumstances are those as stated above, and who I witness is known to me _____.
                 *(personally or in the manners established by the Notary Act)*

      In _____ Puerto Rico, this _____ day of _____.

                    _____
                    *Name of Notary (Attorney) or Regional Clerk*

                    _____
                    *Name and Signature of Deputy Clerk*

OAT 1721 Summons (SUMAC)
(Rev. May 2018)
2009 Rules of Civil Procedure, as amended

# Anne Catesby Jones
## Translator/Traductora
**Caleta de las Monjas #19, San Juan, P.R. 00901**
Tel. 787-725-1379       Mobile: 787- 930-3834  e-mail: annecatesby@gmail.com

February 9, 2019

TO WHOM IT MAY CONCERN:

I have translated the above Summons in Case No SJ2018CV10831 from Spanish to English, to the best of my ability and I certify that the translation is true and correct.



American Translators Association
ata
Anne Catesby Jones
English into Spanish
Certification #5084

Certified Translator

Verify at www.atanet.org/verify

Anne Catesby Jones

ATA #2537

## COMMONWEALTH OF PUERTO RICO
## COURT OF FIRST INSTANCE
## SUPERIOR COURT OF SAN JUAN

|  |  |
|---|---|
| **GOVERNMENT OF PUERTO RICO, THROUGH ITS ATTORNEY GENERAL OF JUSTICE OF PUERTO RICO WANDA VAZQUEZ,** Plaintiff<br><br>vs.<br><br>**LG ELECTRONICS, INC., LG ELECTRONICS USA, INC. , LG ELECTRONICS TAIWAN TAIPEI CO., LTD., KONINKLIJKE PHILIPS ELECTRONICS NV, LG PHILIPS DISPLAYS, LTD. , PHILIP ELECTRONICS NORTH AAMERA CORPORATION, NORTH AMERICA CORPORATION, V PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD., PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA, LP DISPLAYS, INTERNATIONAL, LTD, SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG SDI AMERICA, INC., SAMSUNG SDI MEXICO SA DE CV, SHENZHEN SAMSUNG SDI CO., LTD., TIANJIN SAMSUNG SDI CO., LTD., SAMSUNG SDI (MALAYSIA) SDN. BHD., TOSHIBA CORPORATION, TOSHIBA AMERICA CONSUMER PRODUCTS, LLC, TOSHIBA AMERICA INFORMATION SYSTEMS, INC., TOSHIBA AMERICA ELECTRONICS COMPONENTS, INC., TOSHIBA DISPLAY DEVICES (THAILAND) COMPANY, LTD., PT TOSUMMIT ELECTRONIC DEVICES INDONESIA, PANASONIC CORPORATION, PANASONIC CORPORATION OF NORTH AMERICA,** | Civil No. 2018CV10381<br><br><br>Re: Unjust Enrichment |

1

| | |
|---|---|
| **MATSUSHITA ELECTRONIC CORPORATION, (MALAYSIA) SDN BHD., MT PICTURE DISPLAY CO., LTD., BEIJING-MATSUSHITA COLOR CRT, COMPANY, LTD. LTD. , HITACHI, LTD., HITACHI AMERICA, LTD., HITACHI ASIA, LTD. , SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD. , TATUNG COMPANY OF AMERICA, INC., CHUNGHWA PICTURE TUBES LTD. , CHUNGHWA PICTURE TUBES. (MALAYSIA) SDN. BHD., IRICO GROUP; JOHN DOE, married to JANE DOE, and their community property partnership; CORPORATION XYZ**<br>Defendants | |

## COMPLAINT

**TO THE HONORABLE COURT:**

    **COMES NOW** the Government of Puerto Rico through its Attorney General of Puerto Rico, Wanda Vázquez-Garced, who very respectfully STATES, ALLEGES, and PRAYS:

## I.    INTRODUCTION

1.    The Attorney General brings this unjust enrichment case through her *parens patriae* authority for purchases of Cathode Ray Tube Products ("CRT Products") (as further defined below), from March 1, 1995 until at least November 25, 2007 (the "Class Period").

2.    The Attorney General alleges that during the Period the Defendants conspired to fix, raise, maintain, and/or stabilize prices of CRT Products sold in Puerto Rico.

3.    Because of Defendants' unlawful conduct, Puerto Rican consumers and governmental agencies paid artificially inflated prices for CRT Products and have been unjustly harmed.

4.    As further detailed below, beginning in at least 1995, Defendants Samsung, Philips, Daewoo, LG and Chunghwa met or talked with at least one other Defendant in order to discuss and agree upon CRT Product prices and the amount of CRT Products each would produce.

5.    Over time, these Defendants reached out to the other Defendant CRT Product manufacturers, including Toshiba, Panasonic, Hitachi, BMCC, IRICO, Thai CRT, and Samtel, who then also met or talked with their competitors for the purpose of fixing the prices of CRT Products.

2

6.   By 1997, a formal system of multilateral and bilateral meetings was in place, involving the highest levels of the Defendant corporations, all with the sole purpose of fixing the prices of CRT Products at supra competitive levels.

7.   Throughout the Period, Defendants' conspiracy was effective in moderating the normal downward pressure on prices for CRT Products caused by periods of oversupply and competition from new technologies, such as TFT-LCD and Plasma.

8.   Defendants' conspiracy resulted in unusually stable pricing and even rising prices in a very mature, declining market.

9.   As a result of Defendants' unlawful conduct, Puerto Rican consumers and governmental agencies paid higher prices for CRT Products than they would have paid in a competitive market.

10.  The Defendants knew that by placing their CRT Products in the international market, selling to distributors that distributed to retailers in Puerto Rico, the products with inflated prices would reach consumers in Puerto Rico.

11.  The economy of Puerto Rico is fueled by consumerism.

12.  Although Puerto Rico is not a nation as such, the World Bank puts it in the 29th position of all countries in the world, just after Spain and with more consumerism than Greece per capita, through the formula of " final household expenditure per capita " or "final household consumption expenditure per capita".

13.  The Defendants put CRT Products into the mainstream of commerce knowing that consumers in Puerto Rico were going to spend millions of dollars more than they should have done because of the pricing scheme created by the Defendants.

14.  According to Banco Santander, consumers in Puerto Rico spend twice as much as consumers in the United States.

15.  The Sam's Club #1 of Puerto Rico is the number one of all Sam's Club stores in terms of money spent per square foot.

16.  The conspiracy was investigated by the Antitrust Division of the United States Department of Justice ("DOJ"), and by several other international competition authorities.

17.  On February 10, 2009, a federal grand jury in San Francisco issued a two-count indictment against C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., for his

participation in a global conspiracy to fix the prices of CRTs used in computer monitors and televisions.

18.    This was the first indictment to be issued in the DOJ's investigation into the CRT industry.

## II. JURISDICTION AND VENUE

19.    The Attorney General Vazquez initiates this case to recover the unjust enrichment and recover the expenses of the case, including reasonable attorneys' fees for the damage suffered by Puerto Rican consumers and government entities as a result of the conspiracies by the Defendants to inflate the prices of their products.

20.    The Puerto Rico Anti-Trust law does not provide a remedy to indirect purchasers of products. Therefore, this Honorable Court has jurisdiction due to defendants' unjust enrichment.

21.    Venue is proper in this Judicial District pursuant to Rule 3.5 of the Puerto Rico Rules of Civil Procedure due to Defendants' intentional acts to take advantage of the Puerto Rico market, by placing their products in the stream of commerce so that the products inevitably arrived here.

22.    This Court has jurisdiction because the Defendants sold their products here; a substantial part of the events that make up the Attorney General's claims occurred in Puerto Rico;. and a substantial portion of the affected commerce described herein was carried out here.

23.    Defendants operated in Puerto Rico by selling their merchandise here, and through doing so, they have intentionally acted to exploit the market of Puerto Rico and as a consequence the laws of Puerto Rico.

24.    The products sold by Defendants were sold in the flow of commerce to Puerto Rico and the activities of Defendants had a direct, substantial effect, and reasonably foreseeable effect on such commerce.

25.    The Defendants' conspiracy to fix the prices of the CRT Product(s) substantially affects commerce throughout Puerto Rico due to the Defendants intentionally carrying out activities affecting Puerto Rico.

26.    Defendants purposefully availed themselves of the laws of Puerto Rico in connection with their activities in relation to the production, marketing, sale, and/or distribution of CRT Products in Puerto Rico.

Case 4:07-cv-05944-JST   Document 5937-3   Filed 05/05/21   Page 16 of 156

SJ2018CV10831  12/17/2018  8:24:46 a.m. Page **5** of **63**

27.    Defendants produced, promoted, sold, marketed, and/or distributed CRT products, and, therefore, intentionally profited from consumers in Puerto Rico.

28.    As a result of the activities described herein, Defendants:

     a.  Caused damage to the residents of Puerto Rico repeatedly;

     b.  Caused damage to Puerto Rico by acts or omissions committed outside Puerto Rico and by regularly doing or soliciting business in Puerto Rico;

     c.  Engaged in a persistent course of conduct within Puerto Rico and/or derived substantial revenue from the marketing and sale of CRT Products in Puerto Rico; and

     d.  Committed acts or omissions that they knew or should have known would cause damage (and, in fact, did cause damage) in Puerto Rico while regularly doing or soliciting business in Puerto Rico, engaging in other persistent courses of conduct in Puerto Rico such as the sale of CRT Products in Puerto Rico.

29.    The conduct described herein adversely affected Puerto Rico and its consumers, since the latter purchased Defendants' CRT Products.

30.    Defendants' conspiracy has resulted in an adverse monetary effect on consumers in Puerto Rico.

31.    Prices of CRT Products in Puerto Rico identified in the complaint were raised to supracompetitive levels by the Defendants and their co-conspirators.

32.    Defendants knew that CRT Products business in Puerto Rico would be adversely affected by implementing their conspiracy.

### III. DEFINITIONS

33.    As used herein, the term "CRT" or "CRTs" stands for "cathode ray tube(s)."

34.     A CRT is a display technology used in televisions, computer monitors, and other specialized applications.

35.     The CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors.

36.     An electron gun at the back of the vacuum tube emits electron beams.

37.     When the electron beams strike the phosphors, the phosphors produce either red, green, or blue light.

38.     A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors.

39.     This process is rapidly repeated several times per second to produce the desired images.

40.     There are two types of CRTs: color display tubes ("CDTs") which are used in computer monitors and other specialized applications; and color picture tubes ('CPTs") which are used in televisions.

41.     CDTs and CPTs are collectively referred to herein as "cathode ray tubes" or CRTs."

42.     As used herein "CRT Products" includes (a) CRTs; and (b) products containing CRTs, such as television sets and computer monitors.

43.     The "Class Period" or "relevant period" means the period beginning at least March 1, 1995 through at least November 25, 2007.

44.     "Person" means any individual, partnership, corporation, association, or other business or legal entity.

45.     "OEM" means any Original Equipment Manufacturer of Products.

## IV. PLAINTIFF

46.     Attorney General Wanda Vazquez Garced is plaintiff in *parens patriae* for the consumers and government agencies of Puerto Rico who were impoverished as a result of Defendants' actions.

## V. <u>DEFENDANTS</u>

### <u>LG Electronics Entities</u>

47.   Defendant LG Electronics, Inc. is a corporation organized under the laws of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeoungdeungpo-gu, Seoul 150-721, South Korea.

48.   LG Electronics, Inc. is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first branch office outside of Korea in New York in 1968.

49.   The company's name was changed from GoldStar Communications to LG Electronics, Inc. in 1995, the year in which it also acquired in the United States.

50.   In 2001, LG Electronics, Inc. transferred its CRT business to a 50/50 CRT joint venture with Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V. forming Defendant LG.Philips Displays (n/k/a LP Displays International, Ltd.).

51.   During the Period, LG Electronics, Inc. manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

52.   Defendant LG Electronics U.S.A., Inc. ("LGEUSA) is a Delaware corporation with its principal place of business located at 1000 Sylvan Avenue, Englewood Cliffs, NJ 07632.

53.   LG Electronics USA, Inc. is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.

54.   During the Period, LG Electronics U.S.A., Inc. manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

55.   Defendant LG Electronics, Inc. dominated and controlled the finances, policies, and affairs of LGEUSA relating to the antitrust violations alleged in this Complaint.

56.   Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.

57.   LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.

58.   During the period, LGETT manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

59.   Defendant LG Electronics, Inc. dominated and controlled the finances, policies, and affairs of LGETT relating to the antitrust violations alleged in this Complaint.

60.   Defendants LG Electronics, Inc., LGEUSA, and LGETT are collectively referred to herein as "LG."

**Philips Entities**

61.   Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V. ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1096 BC Amsterdam, The Netherlands.

62.   Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.

63.   Royal Philips had sole ownership of its CRT business until 2001.

64.   In 2001, Royal Philips transferred its CRT business to a 50/50 CRT joint venture with defendant LG Electronics, Inc. forming Defendant LG.Philips Displays (n/k/a LP Displays International, Ltd.).

65.   In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not invest further capital in the joint venture.

66.   During the Period, Royal Philips manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

67.   Defendant Philips Electronics North America Corporation ("PENAC") is a Delaware corporation with its principal place of business located at 3000 Minuteman Road, M/S 109, Andover, MA 01810-1032.

9

68.     PENAC is a wholly owned and controlled subsidiary of Defendant Royal Philips.

69.     During the Period, PENAC manufactured, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

70.     Defendant Royal Philips dominated and controlled the finances, policies, and affairs of PENAC relating to the antitrust violations alleged in this Complaint.

71.     Defendant Philips Electronics Industries Taiwan, Ltd. ("Philips Electronics Taiwan") is a Taiwanese company with its principal place of business located at 15th Floor No. 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.

72.     Philips Electronics Taiwan is a subsidiary of Defendant Royal Philips.

73.     During the Period, Philips Electronics Taiwan manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

74.     Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips Electronics Taiwan relating to the antitrust violations alleged in this Complaint.

75.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.

76.      Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.

77.     During the Period, Philips Brazil manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

78.     Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips Brazil relating to the antitrust violations alleged in this Complaint.

79.     Defendants Royal Philips, PENAC, Philips Electronics Taiwan, and Philips Brazil are collectively referred to herein as "Philips."

## LP Displays

80.    Defendant LP Displays International, Ltd. f/k/a LG.Philips Displays ("LP Displays") was created in 2001 under Hong Kong law as a 50/50 joint venture between Defendants LG Electronics, Inc. and Royal Philips Electronics of The Netherlands with its principal place of business at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.

81.    LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion, and a market share of 27%.

82.    LP Displays announced in March 2007 that Royal Philips and LG Electronics would cede control over the company and the shares would be owned by financial institutions and private equity firms.

83.    During the Period, LP Displays manufactured, marketed, sold, and distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

## Samsung Entities

84.    Defendant Samsung Electronics Co., Ltd. ("SEC") is South Korean company with its principal place of business located at 129, Samsung-ro, Maetan-3dong, Yeongtong-gu, Suwon-si, Gyeonggi-do, South Korea.

85.    During the Period, SEC manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

86.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 85 Challenger Road, Ridgefield Park, New Jersey 07660.

87.    SEAI is a wholly-owned and controlled subsidiary of defendant SEC.

88.    During the Period, SEAI manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

89.    Defendant SEC dominated and controlled the finances, policies, and affairs of SEAI relating to the antitrust violations alleged in this Complaint.

90.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Co., Ltd. ("Samsung SDI"), is a South Korean company with its principal place of business located at 150-20, Gongse-ro Giheung-gu Yongin, 446-577, South Korea.

91.    Samsung SDI is a public company.

92.    SEC is a major shareholder holding almost 20 percent of the stock.

93.    Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy businesses, with 28,000 employees and facilities in 18 countries.

94.    In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than another other producer.

95.    Samsung SDI has offices in Chicago and San Diego.

96.    During the Period, Samsung SDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

97.    Defendant SEC dominated and controlled the finances, policies, and affairs of Samsung SDI relating to the antitrust violations alleged in this Complaint.

98.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California.

99.    Samsung SDI America is a wholly-owned and controlled subsidiary of Samsung SDI.

100.    During the Period, Samsung SDI America manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

101.    Defendants SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI America relating to the antitrust violations alleged in this Complaint.

102.   Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.21014-A, Parque Industrial El Florido, Tijuana, BJ 22224 Mexico.

103.   Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

104.   During the Period, Samsung SDI Mexico manufactured, marketed, sold, and/or distributed CRT Products to customers, either directly or indirectly through its subsidiaries or affiliates, throughout Puerto Rico.

105.   Defendants SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this Complaint.

106.   Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.

107.   Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

108.   During the Period, Samsung SDI Brazil manufactured, marketed, sold, and/or distributed CRT Products to customers, either directly or indirectly through its subsidiaries or affiliates, throughout Puerto Rico.

109.   Defendants SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this Complaint.

110.   Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at No. 5003 Huanggang, North Road, Futian District, Shenzhen, China.

111.   Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

112.   During the Period, Samsung SDI Shenzhen manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

113.   Defendant SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this Complaint.

114.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its
principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin,
China.

115.    Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

116.    During the Period, Samsung SDI Tianjin manufactured, marketed, sold, and/or distributed CRT
Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout
Puerto Rico.

117.    Defendant SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of
Samsung SDI Tianjin relating to the antitrust violations alleged in this Complaint.

118.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian company
with its principal place of business located at Lot 635 & 660, Kawasan Perindustrian, Tuanku
Jaafar,  Sungai Gadut, Serembam, Malaysia.

119.    Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI
Co., Ltd.

120.    During the Period, Samsung SDI Malaysia manufactured, marketed, sold, and/or distributed CRT
Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout
Puerto Rico.

121.    Defendant SEC and Samsung SDI dominated and controlled the finances, policies, and affairs of
Samsung SDI Malaysia relating to the antitrust violations alleged in this Complaint.

122.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung
SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Samsung SDI Malaysia are referred
to collectively herein as "Samsung."

**Toshiba Entities**

123.    Defendant Toshiba Corporation is a Japanese corporation with its principal place of business at 1-1,
Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.

124.    In 2001, Toshiba Corporation held a 5-10 % worldwide market share for CRTs used in televisions and computer monitors.

125.    In December 1995, Toshiba Corporation partnered with Orion Electric Company (n/k/a Daewoo Electronics Corporation) and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.

126.    TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.

127.    In 2002, Toshiba Corporation entered into a joint venture with Defendant Panasonic Corporation called MT Picture Display Co., Ltd. in which the entities consolidated their CRT businesses.

128.    During the Period, Toshiba Corporation manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

129.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, NY 10020.

130.    Toshiba America is a wholly owned and controlled subsidiary of defendant Toshiba Corporation.

131.    During the Period, Toshiba America manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

132.    Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of Toshiba America relating to the antitrust violations alleged in this Complaint.

133.    Defendant Toshiba America Consumer Products, LLC ("TACP") is headquartered in 82 Totawa Rd., Wayne, New Jersey 07470-3114.

134.    TACP is a wholly owned and controlled subsidiary of Defendant Toshiba Corporation through Toshiba America.

135.    During the Period, TACP sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

136.    Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TACP relating to the antitrust violations alleged in this Complaint.

137.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92718.

138.    TAIS is a wholly owned and controlled subsidiary of Toshiba Corporation through Toshiba America, Inc.

139.    During the Period, TAIS manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

140.    Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TAIS relating to the antitrust violations alleged in this Complaint.

141.    Defendant Toshiba America Electronics Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618.

142.    TAEC is a wholly owned and controlled subsidiary of Toshiba America, Inc., which is a holding company for defendant Toshiba Corporation.

143.    TAEC was the North American sales and marketing representative for defendant MTPD.

144.    Before MTPD's formation in 2003, TAEC was the North American engineering, manufacturing, marketing and sales arm of defendant Toshiba Corporation.

145.    During the Period, TAEC manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

146.    Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TAEC relating to the antitrust violations alleged in this Complaint.

147.    Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.

148.  TDDT was a wholly-owned and controlled subsidiary of defendant Toshiba Corporation.

149.  Toshiba Corporation transferred Toshiba Thailand to its CRT joint venture with Panasonic Corporation, MT Picture Display Co., Ltd., in 2003.

150.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned subsidiary of MT Picture Display until its closure in 2007.

151.  During the Period, TDDT manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

152.  Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TDDT relating to the antitrust violations alleged in this Complaint.

153.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by Toshiba Corporation, Orion Electric Company and two other non-defendant entities in December 1995.

154.  TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to MT Picture Display Co., Ltd. and its name was changed to PT.MT Picture Display Indonesia.

155.  During the Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

156.  Defendant Toshiba Corporation dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this Complaint.

157.  Defendants Toshiba Corporation, Toshiba America, Inc., TACP, TAIP, TAEC, TDDT and TEDI are referred to collectively herein as "Toshiba."


**Panasonic Entities**

158.  Defendant Panasonic Corporation, which was at all times during the Period known as

17

Matsushita Electric Industrial Co., Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity with its principal place of business located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.

159. In 2002, Panasonic Corporation entered into a CRT joint venture with defendant Toshiba forming defendant MT Picture Display Co., Ltd. ("MTPD").

160. Panasonic Corporation was the majority owner with 64.5 percent.

161. On April 3, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making MTPD a wholly-owned subsidiary of Panasonic Corporation.

162. In 2005, the Panasonic brand had the highest CRT Product revenue in Japan.

163. During the Period, Panasonic Corporation manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

164. Defendant Panasonic Corporation of North America ("Panasonic NA") is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, NJ 07102.

165. Panasonic NA is a wholly owned and controlled subsidiary of Defendant Panasonic Corporation.

166. During the Period, Panasonic NA manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

167. Defendant Panasonic Corporation dominated and controlled the finances, policies, and affairs of Panasonic NA relating to the antitrust violations alleged in this Complaint.

168. Matsushita Electronic Corporation (Malaysia) Sdn Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 12, Jalan PKNK, Utama, Kawasan Perindustrian, Sngai Petani, Malaysia 40000.

169. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.

170. Panasonic Corporation transferred Matsushita Malaysia to its CRT joint venture with Toshiba

Corporation, MT Picture Display Co., Ltd., in 2003.

171.    It was re-named as MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly-owned subsidiary of MT Picture Display until its closure in 2006.

172.    During the Period, Matsushita Malaysia manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

173.    Defendant Panasonic Corporation dominated and controlled the finances, policies, and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this Complaint.

174.    Defendants Panasonic Corporation, Panasonic NA and Matsushita Malaysia are collectively referred to herein as "Panasonic."

175.    Defendant MT Picture Display Co., Ltd. ("MTPD") was established as a CRT joint venture between defendants Panasonic Corporation and Toshiba.

176.    MTPD is a Japanese entity with its principal place of business located at 1-1, Saiwai-cho, Takatsuki-shi, Osaka 569-1193, Japan.

177.    On April 3, 2007, defendant Panasonic Corporation purchased the remaining stake in MTPD, making it a wholly-owned subsidiary, and renaming it MT Picture Display Co., Ltd.

178.    During the Period, MTPD manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

179.    Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9, Jiuxianqiaobei N. Rd., Dashanzi Chaoyang District, Beijing, China.

180.    BMCC is a joint venture company, 50% of which is held by defendant MTPD.

181.    The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Branch of the Industrial and Commercial Bank of China, Ltd. (a China state-owned enterprise).

182.    Founded in 1987, BMCC was Matsushita's (n/k/a Panasonic) first CRT manufacturing facility in China.

183.    BMCC is the second largest producer of CRTs in China.

184.   During the Period, BMCC manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

**Hitachi Entities**

185.   Defendant Hitachi, Ltd. is a Japanese company with its principal place of business located at 6-6 Marunouchi Center Building, Chiyoda-ku, Tokyo 100-8280, Japan.

186.   Hitachi Ltd. is the parent company for the Hitachi brand of CRT Products.

187.    In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.

188.   During the Period, Hitachi Ltd. manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

189.   Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3F AKS Building, 3 Neribei-cho Kanda, Chiyoda-ku, 101-0022, Japan.

190.   Hitachi Displays, Ltd. established  Mobara Works of Hitachi Ltd. in the City of Mobara, Japan in 1943.

191.   In 2002, all planning, development, design, manufacturing, and sales departments involved in the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays, Ltd.

192.   During the Period, Hitachi Displays, Ltd. manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

193.   Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Displays relating to the antitrust violations alleged in this Complaint.

194.   Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located as 1000 Hurricane Shoals Road, Ste. D-100, Lawrenceville, GA 30043.

195.  HEDUS is a subsidiary of defendants Hitachi Displays, Ltd. and Hitachi, Ltd.

196.  During the Period, HEDUS manufactured, marketed, sold, and/or distributed CRT Products to customers, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

197.  Defendant Hitachi, Ltd. and Hitachi Displays, Ltd. dominated and controlled the finances, policies, and affairs of HEDUS relating to the antitrust violations alleged in this Complaint.

198.  Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, NY 10591-4625.

199.  Hitachi America is a wholly-owned and controlled subsidiary of defendant Hitachi, Ltd.

200.  During the Period, Hitachi America marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

201.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi America relating to the antitrust violations alleged in this Complaint.

202.  Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singapore company with its principal place of business located at 7 Tampines, Grand #08-01 Hitachi Square, Singapore.

203.  Hitachi Asia is a wholly owned and controlled subsidiary of defendant Hitachi, Ltd.

204.  During the Period, Hitachi Asia manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

205.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

206.   Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.

207.   Hitachi Displays, Ltd. owned at least a 25% interest in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).

208.   Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but two weeks of the Period.

209.   During the Period, Hitachi Shenzhen manufactured, marketed, sold, and distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

210.   Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

211.   Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, HEDUS, Hitachi Asia, and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

**Tatung**

212.   Defendant Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.

213.   Tatung America is a subsidiary of Tatung Company.

214.   Currently, Tatung Company owns approximately half of Tatung America.

215.   The other half was previously owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.

216.   Following Lun Kuan Lin's death, her share passed to her two children.

217.   During the Period, Tatung America manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

22

**Chunghwa Entities**

218. Defendant Chunghwa Picture Tubes Ltd. ("CPT") is a Taiwanese company with its principal place of business located at No. 1, Huaying Rd., Longtan District, Taoyuan 325City, Taiwan.

219. CPT was founded in 1971 by Tatung Company.

220. During most of the Period, Tatung Company owned a substantial share in CPT.

221. Although Tatung Company's holdings in CPT have fallen over time, it retains substantial control over CPT's operations.

222. Tatung Company listed Chunghwa on its website as one of its "global subsidiaries."

223. And the Chairman of CPT, Weishan Lin, was also the Chairman and General Manager of Tatung Company.

224. CPT was a leading manufacturer of CRTs.

225. During the Period, CPT manufactured, marketed, sold, and/or distributed CRT Products, both directly and through its wholly-owned and controlled subsidiaries in Malaysia, China, and Scotland, to customers throughout Puerto Rico.

226. Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business located at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Malaysia.

227. Chunghwa Malaysia a wholly-owned and controlled subsidiary of defendant Chunghwa Picture Tubes.

228. Chunghwa Malaysia is a leading worldwide supplier of CRTs.

229. During the Period, Chunghwa Malaysia manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

230. Defendants CPT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**IRICO Entities**

23

231.  Defendant IRICO Group Corporation ("IGC") is a Chinese corporation with its principal place of business located at 1 Caihong Rd., Qindu District, Xianyang, China 712021.

232.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, sale, and/or distribution of CRT Products.

233.  During the Period, IGC manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

234.  Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at Xiayang Yuquan West Road, Xianyang, China.

235.  IDDC is a partially-owned subsidiary of defendant IGC.

236.  In 2006, IDDC had the highest volume of CRTs manufactured in China.

237.  During the Period, IDDC manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

238.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this Complaint.

239.  Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, China.

240.  IGE is owned by Defendant IGC.

241.  According to its website, IGE was the first CRT manufacturer in China and one of the two largest manufacturers of CRTs in the world.

242.  Their website also claimed that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit and taxation.

243.  During the Period, IGE manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

244.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

245.  Defendants IGC, IDDC, and IGE are collectively referred to herein as "IRICO."

**Thai CRT**

246.   Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company with its principal place of business located at 1 Siam Cement Road, Bangsue Dusit, Bangkok, 10800 Thailand.

247.   Thai CRT is a subsidiary of Siam Cement Group.

248.   It was established in 1996 as Thailand's first manufacturer of CRTs for color televisions.

249.   During the Period, Thai CRT manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

### Samtel

250.   Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal place of business located at 5th Floor, 501, 9 Copia Corporate suites, Dist. Centre, Jasala, New Delhi, India.

251.   Samtel's market share for CRTs sold in India is approximately 40%.

252.   Samtel is India's largest exporter of CRTs.

253.   Samtel has gained safety approvals from the United States, Canada, Germany and Great Britain for its CRT Products.

254.   During the Period, Samtel manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout Puerto Rico.

### Daewoo/Orion Entities

255.   During the Period, Orion Electric Company ("Orion") was a major manufacturer of CRTs.

256.   Orion was a Korean corporation that filed for bankruptcy in 2004.

257.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.

258.  Orion was involved in CRT Product sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.

259.  By information and belief, Plaintiffs consider that Orion was wholly owned by the "Daewoo Group."

260.  The Daewoo Group included Daewoo Electronics Company, Ltd., Daewoo Telecom Company, Daewoo Corporation, and Orion Electric Components Company.

261.  The Daewoo Group was dismantled in or around 1999.

262.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

263.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.

264.  Daewoo CRT business in or around 2004.

265.  In December 1995, Orion partnered with defendant Toshiba Corporation and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.

266.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.

267.  During the Period, Orion, Daewoo Electronics, TEDI and DOSA manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through their subsidiaries or affiliates, to customers throughout Puerto Rico.

268.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

### **Unknown Entities**

269.  John Doe, married to Jane Doe, with whom he has a conjugal partnership, is a currently unknown individual, who may be liable for the allegations set forth in this Complaint.

270.  Corporation XYC is a corporation, the identity of which is currently unknown, which may be liable for the allegations set forth in the Complaint.

271.   All of the above-listed defendants are collectively referred to herein as "Defendants."

## VI. AGENTS AND CO-CONSPIRATORS

272.   Various other persons, firms and corporations, not named as Defendants herein, and presently unknown to Plaintiffs, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy and/or in furtherance of the anticompetitive, unfair or deceptive conduct.

273.   Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

274.   Defendants are also liable to acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

275.   Each of the Defendants named herein acted as the agent or joint venture of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

276.   Each Defendant which is a subsidiary of a foreign parent company acts as the sole United States agent for CRT Products made by its parent company.

277.   Plaintiffs reserve the right to amend the Complaint to include all such parties.

## VII. FACTUAL ALLEGATIONS

**CRT Technology**

278.   CRT technology was first developed more than a century ago.

279.   The first commercially practical CRT television was made in 1931.

280.   It was not until the RCA Corporation introduced the product at the 1939 World's Fair, however, that it became widely available to consumers.

281.   Since then, CRTs have become the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs.

282.  Even large public displays, including many scoreboards at sports arenas, are comprised of thousands of single color CRTs.

283.  As noted above, the CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors.

284.  An electron gun at the back of the vacuum tube emits electron beams.

285.  When the electron beams strike the phosphors, the phosphors produce either red, green, or blue light.

286.  A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors.

287.  This process is rapidly repeated several times per second to produce the desired images.

288.  The quality of a CRT display is dictated by the quality of the CRT itself. No external control or feature can make up for a poor quality tube.

289.  Until 2006, CRTs were the dominant technology used in displays, including television and computer monitors.

290.  During the Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

### A. Structural Characteristics Of The CRT Market

291.  The structural characteristics of the CRT Product market are conducive to the type of collusive activity alleged in this Complaint.

292.  These characteristics include market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, maturity of the CRT Product market, and homogeneity of products.

#### a.  Market Concentration

293.  During the Period, the CRT industry was dominated by relatively few companies.

294.  In 2004, defendants Samsung SDI, LG.Philips Displays (n/k/a LP Displays), MT Picture Display and Chunghwa together held a collective 78% share of the global CRT market.

295.   The high concentration of market share facilitates coordination, since there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### b. Information Sharing

296.   Because of common membership in trade associations for the CRT Product market and related markets (for e.g., TFT-LCD), interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.

297.   The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.

298.   Defendants took advantage of these opportunities to discuss and agree upon their pricing for CRT Products.

299.   Defendants Chunghwa, Hitachi, and Samsung are all members of the Society for Information Display.

300.   Defendants Samsung and LG Electronics, Inc. are two of the co-founders of the Korea Display Industry Association.

301.   Similarly, Daewoo, LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.

302.   Upon information and belief, Defendants used these trade associations as vehicles for discussing and agreeing upon their pricing for CRT Products.

303.   At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### c. Consolidation

304.   The CRT Product industry also had significant consolidation during the Period, including but not limited to: (a) the creation of LG.Philips Displays (n/k/a LP Displays) in 2001 as a joint

29

venture between Royal Philips and LG Electronics, Inc.; and (b) the 2002 merger of Toshiba and Matsushita/Panasonic's CRT business into MTPD.

305.  Defendants also consolidated their manufacturing facilities in lower cost venues such as China and reduced manufacturing capacity to keep prices high.

**d. Multiple Interrelated Business Relationships**

306.  The nature of the CRT Product industry and the multiple business relationships between supposed competitors blur the lines of competition and provided ample opportunity to collude.

307.  These business relationships also created a unity of interest among competitors so that the conspiracy was easier to implement and enforce than if such interrelationships had not existed.

308.  The high degree of cooperation among Defendants in both the CRT Product market and other closely related markets is reflected in the following facts:

   a.  The formation of the CRT joint venture LG Philips Displays in 2001 by Defendants LG Electronics, Inc. and Royal Philips.

   b.  Defendants LG Electronics, Inc. and Royal Philips also formed LG.Philips LCD Co., Ltd., n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

   c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

   d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

   e.  In December 1995, Defendants Daewoo and Toshiba partnered with two other non-Defendant entities to form TEDI which manufactured CRTs in Indonesia.

   f.  Defendants Daewoo and Toshiba also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN LCDs, and Toshiba, which had substituted its STN LCD production with TFT

LCD production, marketed Daewoo's STN LCDs globally through its network.

g. Also in 1995, Defendant Chunghwa entered into a technology transfer agreement with Defendant Toshiba for large CPTs.

h. Defendant Chunghwa has a joint venture with Defendant Samsung Electronics Co., Ltd. for the production of liquid crystal display panels. Chunghwa now purchases the technology from Defendant Royal Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics, Inc. and Hitachi Ltd. entered into a joint venture in 2000 for the manufacture, sale, and distribution of optical storage products such as DVD drives.

j. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung Electronics Co., Ltd. and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k. Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Inc., Samsung, Royal Philips, and Panasonic.

### e. High Costs Of Entry Into The Industry

309.    There are substantial barriers to entry in the CRT Products industry.

310.    It would require substantial time, resources and industry knowledge to even potentially overcome the barriers to entry.

311.    It is also extremely unlikely that a new producer would have entered the market in light of the declining demand for CRT Products.

### f. The Maturity Of The CRT Product Market

312.    New industries are typically characterized by rapid growth, innovation, and high profits.

313.    The CRT Product market was mature, and like many mature industries, was characterized by slim profit margins, creating a motivation to collude.

314.   Demand for CRT Products was declining throughout the Period.

315.   Static or declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

316.   In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and Plasma displays.

317.   This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.

318.   Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent, and the reduction has accelerated since then.

319.   Although demand was declining as a result of the popularity of flat-panel LCD/plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.

320.   Due to the high costs of LCD panels and plasma displays during the Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

321.   In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.

322.   By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

323.   As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

324.    Currently, there are hardly any sales of CRT products.


**g. Homogeneity Of CRT Products**

325.    CRT Products are commodity-like products which are manufactured in standardized sizes.

326.    One Defendant's CRT Products for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.

327.    Defendants sold and Puerto Rico consumers purchased CRT Products primarily on the basis of price.

328.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.


**B. Pre-Conspiracy Market**

329.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international, and the Defendants began serving customers that were also being served by other international companies.

330.    During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.

331.    A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity, and customers.

332.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in S.E. Asia.

333.    During this period, these producers began to include discussions about price in their meetings.

334.    The pricing discussions were usually limited, however, to exchanges of the range of prices that each competitor had quoted to specific customers.

## C. Defendants' And Co-Conspirators' Illegal Agreements

335.    Plaintiffs are informed and believe, and thereon allege, that in order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have entered into a contract, agreement, trust or conspiracy, the effect of which has been to raise, fix, maintain, and/or stabilize the prices at which they sold CRT Products to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

336.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.

337.    In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.

338.    During this period, representatives from Defendants LG, Samsung, and Daewoo visited the other Defendant manufacturers including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba, and Panasonic to discuss increasing prices for CRT Products in general and to specific customers.

339.    These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

340.    Defendants Samsung, Chunghwa, LG, and Daewoo also attended several ad hoc group meetings during this period.

341.    The participants at these group meetings also discussed increasing prices for CRT Products.

342.    As more manufacturers formally entered the conspiracy, group meetings became more prevalent.

343.    Beginning in 1997, the Defendants began to meet in a more organized, systematic, and formal fashion, and a system of multilateral and bilateral meetings was put in place.

344.    Defendants' representatives attended hundreds of these meetings during the Period.

345.    The overall CRT conspiracy raised and established worldwide prices (including prices in Puerto Rico) that Defendants charged for CRT Products.

a. **"Glass Meetings"**

346.   The group meetings among the participants in the CRT price-fixing conspiracy were referred to by the participants as "Glass Meetings" or "GSM."

347.   Glass Meetings were attended by employees at three general levels of the Defendants' corporations.

348.   The first level of these meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "Top Meetings."

349.   Top Meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.

350.   Because attendees at Top Meetings had authority as well as more reliable information, these meetings resulted in agreements.

351.   Attendees at Top Meetings were also able to resolve disputes because they were decision makers who could make agreements.

352.   The second level of meetings were attended by the Defendants' high level sales managers and were known as "Management Meetings."

353.   These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at Top Meetings.

354.   Finally, the third level of meetings were known as "Working Level Meetings" and were attended by lower level sales and marketing employees.

355.   These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.

356.   These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.

357.   The Working Level Meetings also tended to be more regional and often took place near Defendants' factories.

358.   In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

manufacturers' employees met in Korea, the Chinese in China, and so on.

    a.  The Chinese Glass Meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.

    b.  The China meetings had the principal purpose of reporting what had been decided at the most recent Glass Meeting to the Chinese manufacturers.

    c.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

    d.  Glass Meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and IRICO.

359.  Representatives of the Defendants also attended what were known amongst members of the conspiracy as "Green Meetings."

360.  These were meetings held on golf courses.

361.  The Green Meetings were generally attended by top and management level employees of the Defendants.

362.  During the Period, Glass Meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia.

363.  Participants would often exchange competitively sensitive information prior to a Glass Meeting.

364.  This included information on inventories, production, sales, and exports.

365.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

366.    The Glass Meetings at all levels followed a fairly typical agenda.

367.    First, the participants exchanged competitive information such as proposed future CRT price-fixing, sales volume, inventory levels, production capacity, exports, customer orders, price trends, and forecasts of sales volumes for coming months.

368.    The participants also updated the information they had provided in the previous meeting.

369.    Each meeting had a rotating, designated "Chairman" who would write the information on a white board.

370.    The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.

371.    They discussed and agreed upon target prices, price increases, so-called "bottom" prices, and price ranges for CRTs.

372.    They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.

373.    Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

374.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions. This was referred to as setting a "bottom price."

375.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.

376.    Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.

377.    In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

378.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.

379.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.

380.  The Defendants therefore concluded that in order to make their CRT price increases acceptable to customers, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their other customers in the sales chain.

381.  Defendants thereby ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

382.  The agreements reached at the Glass Meetings included:

    a.  agreements on CRT Product prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines;

    b.  placing agreed-upon price differentials on various attributes of CRT Products, such as quality or certain technical specifications;

    c.  agreements on pricing for intra-company CRT Product sales to vertically integrated customers;

    d.  agreements as to what to tell customers about the reason for a price increase;

    e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon price setting;

    f.  agreements to coordinate price setting with CRT manufacturers in other geographic markets such as Brazil, Europe, and India;

    g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices, and customers' demands;

    h.  agreements to coordinate uniform public statements regarding available capacity and supply;

    i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

    j.  agreements to allocate customers;

      k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

      l.   agreements to keep their meetings secret.

383.   Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of the Defendants themselves.

384.   When a Defendant violated the agreement,  this was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition in a mutual interest in living up to the target price and living up to the agreements that had been made.

385.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group Glass Meetings became increasingly less frequent and bilateral meetings again became more prevalent.

386.   In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

      **b. Bilateral Discussions**

387.   Throughout the Period, the Glass Meetings were supplemented by bilateral discussions between several Defendants.

388.   The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings.

389.   The bilateral discussions, usually between sales and marketing employees, took place in in-person meetings, telephone contacts, and emails.

390.   During the Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, the United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and Mexico.

391.   The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, and Europe.

392. In order to ensure the efficacy of their global conspiracy, the Defendants also used bilateral meetings to coordinate pricing with CRT Product manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil, and Samsung SDI Mexico.

393. These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products.

394. As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Period.

395. Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.

396. In this way, the Defendants ensured that prices of all CRT Products imported into Puerto Rico were fixed, raised, maintained, and/or stabilized at supracompetitive levels.

397. Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.

398. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

399. Bilateral discussions were also used to coordinate prices with CRT Product manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic, Thai CRT, and Samtel.

400. It was often the case that in the few days following a Top or Management Meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT Product price-fixing and/or output agreements had been reached during the meeting.

401. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT Product price fixing agreements to Hitachi.

402. LG had a relationship with Toshiba and was responsible for communicating CRT Product pricing agreements to Toshiba.

403.    And Thai CRT had a relationship with Samtel and was responsible for communicating CRT Product pricing agreements to Samtel.

404.    Hitachi, Toshiba, and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG, and Thai CRT.

405.    Sometimes Hitachi and Toshiba also attended the Glass Meetings.

406.    In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRT Products.

     c.   **Defendants' And Co-Conspirators' Participation In Group And Bilateral Discussions**

407.    Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in at least 200 Glass Meetings at all levels.

408.    A substantial number of these meetings were attended by the highest ranking executives from Samsung.

409.    Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.

410.    Through these discussions, Samsung agreed on prices and supply levels for CRT Products.

411.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.

412.    To the extent SEC and SEAI sold, and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the Glass Meetings.

413.    Thus, SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

414.    Between at least 1995 and 2001, Defendant LG, through LG Electronics, Inc. and LGETT, participated at least 100 Glass Meetings at all levels.

415.    After 2001, LG participated in the CRT Product conspiracy through its joint venture with

Philips,  LG.Philips Displays (n/k/a LP Displays).

416.   A substantial number of these meetings were attended by the highest ranking executives from LG.

417.   LG also engaged in bilateral discussions with each of the other Defendants on a regular basis.

418.   Through these discussions, LG agreed on prices and supply levels for CRT Products.

419.   LG never effectively withdrew from this conspiracy.

420.   Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.

421.   To the extent LGEUSA sold, and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings.

422.   Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

423.   Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated at least 100 Glass Meetings at all levels.

424.   After 2001, Philips participated in the CRT Product conspiracy through its joint venture with LG, LG.Philips Displays (n/k/a LP Displays).

425.   A substantial number of these meetings were attended by high level executives from Philips.

426.   Philips also engaged in numerous bilateral discussions with other Defendants.

427.   Through these discussions, Philips agreed on prices and supply levels for CRT Products.

428.   Philips never effectively withdrew from this conspiracy.

429.   Defendants PENAC and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.

430.   To the extent PENAC and Philips Brazil sold, and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings.

42

431.   Thus, PENAC and Philips Brazil were active, knowing participants in the alleged conspiracy.

432.   Between at least 2001 and 2006, Defendant LP Displays (f/k/a LG.Philips Displays) participated at least 100 Glass Meetings at all levels.

433.   A substantial number of these meetings were attended by the highest ranking executives from LP Displays.

434.   Certain of said high level executives had previously attended meetings on behalf of defendants LG and Philips.

435.   LP Displays also engaged in bilateral discussions with other Defendants.

436.   Through these discussions, LP Displays agreed on prices and supply levels for CRT Products.

437.   Between at least 1995 and 2006, Defendant Chunghwa, through CPT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 Glass Meetings at all levels.

438.   A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of CPT, C.Y. Lin.

439.   Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.

440.   Through these discussions, Chunghwa agreed on prices and supply levels for CRT Products.

441.   Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them.

442.   To the extent Tatung America sold, and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the price fixing agreements reached at the Glass Meetings.

443.   Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

444.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 Glass Meetings at all levels.

445.    A substantial number of these meetings were attended by the highest ranking executives from Daewoo.

446.    Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.

447.    Through these discussions, Daewoo agreed on prices and supply levels for CRT Products.

448.    Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.

449.    Daewoo never effectively withdrew from this conspiracy

450.    Between at least 1995 and 2003, Defendant Toshiba, through Toshiba Corporation, TDDT and TEDI, participated in several Glass Meetings.

451.    After 2003, Toshiba participated in the CRT conspiracy through its joint venture with Panasonic, MTPD.

452.    These meetings were attended by high level sales managers from Toshiba and MTPD.

453.    Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.

454.    Through these discussions, Toshiba agreed on prices and supply levels for CRT Products.

455.    Toshiba never effectively withdrew from this conspiracy.

456.    Defendants Toshiba America, Inc., TACP, TAIP, and TAEC were represented at those meetings and were a party to the agreements entered at them.

457.    To the extent Toshiba America, Inc., TACP, TAIS, and TAEC sold, and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the agreements reached at the Glass Meetings.

458.    Thus, Toshiba America, TACP, TAIS, and TAEC were active, knowing participants in the alleged conspiracy

459.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several Glass Meetings.

460.  These meetings were attended by high level managers from Hitachi.

461.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.

462.  Through these discussions, Hitachi agreed on prices and supply levels for CRT Products.

463.  Hitachi never effectively withdrew from this conspiracy.

464.  Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.

465.  To the extent Hitachi America and HEDUS sold, and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the price fixing agreements reached at the Glass Meetings.

466.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

467.  Between at least 1996 and 2003, Defendant Panasonic (known throughout the Period as Matsushita Electric Industrial Co., Ltd.), through Panasonic Corporation and Matsushita Malaysia, participated in several Glass Meetings.

468.  After 2003, Panasonic participated in the CRT conspiracy through its joint venture with Toshiba, MTPD.

469.  These meetings were attended by high level sales managers from Panasonic and MTPD.

470.  Panasonic also engaged in multiple bilateral discussions with other Defendants.

471.  Through these discussions, Panasonic agreed on prices and supply levels for CRT Products.

472.  Panasonic never effectively withdrew from this conspiracy.

45

473.   Panasonic NA was represented at those meetings and was a party to the agreements entered at them.

474.   To the extent Panasonic NA sold, and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings.

475.   Thus, Panasonic NA was an active, knowing participant in the alleged conspiracy.

476.   Between at least 2003 and 2006, Defendant MTPD participated in multiple Glass Meetings and in fact led many of these meetings during the latter years of the conspiracy.

477.   These meetings were attended by high level sales managers from MTPD.

478.   MTPD also engaged in bilateral discussions with other Defendants.

479.   Through these discussions, MTPD agreed on prices and supply levels for CRT Products.

480.   Between at least 1998 and 2007, Defendant BMCC participated in multiple Glass Meetings.

481.   These meetings were attended by high level sales managers from BMCC.

482.   BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.

483.   Through these discussions, BMCC agreed on prices and supply levels for CRT Products.

484.   None of BMCC's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government.

485.    BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

486.   Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple Glass Meetings.

487.   These meetings were attended by the highest ranking executives from IRICO.

488.   IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.

46

489.    Through these discussions, IRICO agreed on prices and supply levels for CRT Products.

490.    None of IRICO's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government.

491.    IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

492.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple Glass Meetings.

493.    These meetings were attended by the highest ranking executives from Thai CRT.

494.    Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.

495.    Through these discussions, Thai CRT agreed on prices and supply levels for CRT Products.

496.    Thai CRT never effectively withdrew from this conspiracy.

497.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.

498.    These meetings were attended by high level executives from Samtel.

499.    Through these discussions, Samtel agreed on prices and supply levels for CRT Products.

500.    Samtel never effectively withdrew from this conspiracy.

501.    When Plaintiff, the Attorney General, refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, the Attorney General is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.

502.    In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.

503.    The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.

504.    As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

### D. The CRT Market During The Conspiracy

505.   Until about ten years ago, CRTs were the dominant technology used in displays, including television and computer monitors.

506.   During the Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

507.   The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|---|---|---|---|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

508.   During the Period, North America was the largest market for CRT TVs and computer monitors.

509.   According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.

510.   By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. See, The Future of Liquid Crystal and Related Display Materials, Fuji Chimera Research, 1997, p. 12.

511.   Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Period.

512.   In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.

513.   For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p. 19.

514.   Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

515.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years...."

516.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.

517.    The price increase was allegedly based on increasing global demand.

518.    In fact, this price increase was a result of the collusive conduct as herein alleged.

519.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.

520.    A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

521.    A BNET Business Network news article from August 1998 reported that ""key components (cathode ray tubes) in computer monitors have risen in price. Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October. . . .While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases. '"

522.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips, and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.

523.    Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be 20% hike in the price of our CRT monitors."

524.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

525.    For example, the Defendants' CRT factory use percentage fell from 90 percent in the third quarter of 2000 to 62 percent in the first quarter of 2001.

526.    This is the most dramatic example of a drop in factory use.

527.    There were sudden drops throughout the Period but to a lesser degree.

528. Plaintiff is informed and believes that these sudden, coordinated drops in factory utilization by the Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRT Products.

529. During the Period, while demand in Puerto Rico for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.

530. As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

531. During the Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRT Products.

532. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

533. These price increases and price stability in the market for CRT Products during the Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

### E. International Government Antitrust Investigations

534. Defendants' conspiracy to fix, raise, maintain, and stabilize the prices of, and restrict output for, CRT Products sold in Puerto Rico during the Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ") and others in November 2007.

535. On November 8, 2007, antitrust authorities in Europe, Japan, and South Korea raided the offices of manufacturers of CRTs as part of an international investigation of alleged price fixing.

536. On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Defendant Chunghwa Picture Tubes, Ltd., Cheng Yuan Lin, a/k/a C.Y.

Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.

537.   The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."

538.   The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.

539.   Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in the United States.

540.   Defendant MT Picture Display Co., Ltd., the CRT unit of Defendant Panasonic, has confirmed that it was raided by Japan's Fair Trade Commission.

541.   *Kyodo News* reported on November 8, 2007, upon information and belief, that MT Picture Display fixed prices for CRTs with manufacturers in three Asian countries, including South Korea's Samsung SDI Co.

542.   Kyodo News further reported that:

> "Officials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target prices when delivering their products to TV manufacturers in Japan and South Korea, the sources said."

543.   Defendant Samsung SDI Co., Ltd. was raided by South Korea's Fair Trade Commission, which has started an investigation into Samsung's CRT business.

544.   The *Asian Shimbun* further reported on November 10, 2007 that

> "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said. The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies [referring to the four Asian-based manufacturers -MT Picture Display, Samsung SDI Co., Chunghwa Picture Tubes, LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

545    On November 21, 2007, Defendant Royal Philips publicly disclosed that it too is subject to one or more investigations into anticompetitive conduct in the CRT industry.

546    Royal Philips spokesman Joon Knapen declined to comment on which jurisdictions have started investigations.

547.   Royal Philips stated that it intended to assist the regulators.

52

548.    In its 2008 Annual Report, Defendant Toshiba reports that

"[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

549.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Picture Tubes (UK), Ltd., Chunghwa Picture Tubes, Ltd., Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany Gmbh, Matsushita Global HQ, Matsushita European HQ.

Based on the data available, the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured picture tubes and coloured screen tubes) on the European market between 1995 and 2007.

The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production.

The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007.

The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

550.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

551.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.

552.    For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory (DRAM).

553.   Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory and NAND Flash Memory.

554.   In December 2006, government authorities in Japan, South Korea, the European Union, and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

555.   On December 12, 2006, news reports indicated that Defendants Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips, LG Electronics, Inc, and LG Display Co., Ltd., were all under investigation for price fixing of TFT-LCDs.

556.   On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation, and Defendant Chunghwa Picture Tubes, Ltd.—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

557.   On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, Ltd., a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

558.   The indictments of LG Display Co., Ltd., Sharp Corporation, Chunghwa Picture Tubes, Ltd., and Hitachi Displays, Ltd., all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in the United States.

## VIII. THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS

559. Defendants' conspiracy to fix, raise, maintain, and stabilize the price of CRT Products at artificial levels resulted in harm to Plaintiff and the indirect purchaser consumers and governmental agencies alleged herein because it resulted in their paying higher prices for CRT Products than they would have paid in the absence of Defendants' conspiracy.

560. The entire overcharge related to sales in Puerto Rico during the Period was passed on to consumers in Puerto Rico.

561. As the DOJ acknowledged in announcing the indictment of defendant Chunghwa's former Chairman and CEO, "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices."

562. The Defendants identified above that attended the Glass Meetings, monitored the prices of televisions and computer monitors sold in the U.S. and elsewhere on a regular basis.

563. The purpose and effect of investigating such retail market data was at least threefold.

564. First, it permitted Defendants, such as Chunghwa, which did not manufacture CRT televisions or computer monitors the way that Samsung, LG, Daewoo, Panasonic, Toshiba, Philips, and Hitachi did, to police the price fixing agreement to make sure that intra-defendant CRT sales were kept at supra-competitive levels. 565. Secondly, it permitted all Defendants to police their price-fixing agreement to independent OEMs who would reduce prices for finished goods if there was a corresponding reduction in CRT prices from a Defendant.

566. Finally, as discussed above, Defendants used the prices of finished products to analyze whether they could increase prices or should agree to a "bottom" price instead.

567. The Defendants concluded that in order to make their CRT price increases work, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers (e.g., retailers and computer OEMs).

568. In this way, Defendants ensured that 100% of the supracompetitive overcharges for CRT Products were passed on to indirect purchaser consumers.

569. The consumers in Puerto Rico bought CRT Products from either a computer or TV OEM such as Dell or Sharp, or a reseller such as Best Buy.

570. Because of the breadth of the price-fixing conspiracy here, the direct purchaser CRT TV and monitor manufacturers were not constrained by their competitors from passing on the overcharge.

571. Because each of the direct purchaser's competitors were also buying CRTs at supracompetitive prices from conspiracy members, no direct purchaser faced end-product price competition from a competitor that was not paying supracompetitive prices for CRTs.

572. The price of CRT Products is directly correlated to the price of CRTs.

573. The margins for CRT TV and monitor makers are sufficiently slim that price increases of CRTs force them to increase the prices of their CRT Products.

574. This means that increases in the price of CRTs lead to quick corresponding price increases at the OEM level for CRT Products.

575. Computer and TV OEMs and retailers of CRT Products are all subject to vigorous price competition, whether selling CRT TVs or computer monitors.

576. The demand for CRTs is ultimately determined by purchasers of products containing such products.

577. The market for CRTs and the market for CRT Products are therefore inextricably linked and cannot be considered separately.

578. Defendants are well aware of this intimate relationship, and use forecasts of CRT TVs and computer monitors to predict sales of and determine production levels and pricing for CRTs.

579. Computers and televisions are commodities with little or no brand loyalty such that aggressive pricing causes consumers to switch preferences to different brands.

580.   Prices are closely based on production costs, which are in turn directly determined by component costs, as assembly costs are minimal.

581.   OEMs accordingly use component costs, like the cost of CRTs, as the starting point for all price calculations.

582.   On information and belief, computer and TV OEMs price their end-products on a "cost-plus" basis.

583.   Thus, computer and television prices closely track increases and decreases in component costs.

584.   The CRT is the most expensive component in the products into which they are incorporated.

585.   On information and belief, the cost of the CRT in a computer monitor is approximately 60% of the total cost to manufacture the computer monitor.

586.   On information and belief, the cost of the CRT in a television is a slightly smaller percentage of the total manufacturing cost because a television has more components than a computer monitor, such as the tuner and speakers.

587.   Economic and legal literature recognizes that the more pricing decisions are based on cost, the easier it is to determine the pass-through rate.

588.   The directness of affected costs refers to whether an overcharge affects a direct (i.e., variable) cost or an indirect (i.e., overhead) cost.

589.   Overcharges will be passed through sooner and at a higher rate if the overcharges affect direct costs.

590.   Here, CRTs are a direct and substantial cost of CRT Products.

591.   Therefore, Plaintiffs will be able to show that the overcharge on the CRTs was passed through to indirect purchasers.

592.   Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.

593.   CRTs are identifiable, discreet, physical objects that do not change form or become an indistinguishable part of the TV or computer monitor in which they are contained.

594.  Thus, CRTs follow a traceable physical chain from the Defendants to the OEMs to the purchasers of finished products incorporating CRTs.

595.  Moreover, just as CRTs can be physically traced through the supply chain, so can their price by traced to show that changes in the prices paid by direct purchasers of CRTs affect prices paid by consumers of CRT Products.

596.  On information and belief, just as the CRTs can be physically traced through the supply chain, their price can be traced to show the changes in the prices paid by the direct purchasers of the CRTs affect the prices paid by consumers of CRT Products: the computer and TV OEMs price their end-products on a "cost-plus" basis.

597.  In retailing, it is common to use a "mark-up rule."

598.  The retail price is set as the wholesale cost plus a percentage markup designed to recover non-product costs and to provide a profit.

599.  This system guarantees that increases in costs to the retailer will be passed on to end buyers.

600.  For example, CDW, a large seller of CRT monitors, uses such a system. A statement in the DRAM case by CDW's director of pricing details exactly how they calculated selling prices:

> "In general, CDW employs a "building block" approach to setting its advertised prices. The first building block is the Cost of Goods Sold (COGS), which represents the price CDW paid to acquire the product…CDW…adds a series of positive markups to the cost to CDW to acquire a given product. These markups are in addition to the pass through effect of changes in the costs charged to CDW for that product by a given vendor."

601.  Economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component.

602.  As Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624:

> "A monopoly charge at the top of the distribution chain generally results in higher prices

at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and will pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain will be poorer as a result of the monopoly price at the top. Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level."

603.    Similarly, two other antitrust scholars—Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Hass School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern School of Law and author of the Handbook of the Law of Antitrust)—have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception; it is the rule."

604.    As Professor Jeffrey McKie-Mason (Arthur W. Burks Professor for Information and Computer Science, Professor of Economics and Public Policy, and Associate Dean for Academic Affairs in the School of Information at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in a judicial decision in that case granting class certification):

> "As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers.... Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well."

605.    The purpose of Defendants' conspiratorial conduct was to fix, raise, maintain, and stabilize the price of CRTs and, as a direct and foreseeable result, CRT Products.

606.    The market for CRTs and the market for CRT Products are inextricably linked.

607.    One exists to serve the other.

608.    Defendants not only knew, but expressly contemplated that prices of CRT Products would increase as a direct result of their increasing the prices of CRTs.

609. Finally, many of the Defendants and/or co-conspirators themselves have been and are currently manufacturers of CRT TVs and computer monitors.

610. Such manufacturers include, for example, Samsung, LG, Hitachi, Toshiba, Philips, and Panasonic.

611. Having agreed to fix prices for CRTs, the major component of the end products they were manufacturing, these Defendants intended to pass on the full cost of this component in their finished products, and in fact did so.

612. As a direct and proximate result of Defendants' illegal conduct, Plaintiffs and other indirect purchasers have been forced to pay supra-competitive prices for CRT Products.

613. These inflated prices have been passed on to them by direct purchaser manufacturers, distributors, and retailers.

## IX. FRAUDULENT CONCEALMENT

614. Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiff.

615. Plaintiff did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating the law as alleged herein until shortly before this litigation was commenced.

616. Nor could Plaintiff have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

617. In addition, the conspiracy was by its nature self-concealing.

618. Defendants engaged in a successful, illegal price-fixing conspiracy with respect to CRT Products, which they affirmatively concealed, in at least the following respects:

   a. By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme, and by agreeing to expel those who failed to do so;

b.  By agreeing among themselves to limit the number of representatives from each Defendant attending the meetings so as to avoid detection;

c.  By agreeing among themselves to refrain from listing the individual representatives of the Defendants in attendance at meetings in any meeting report;

d.  By agreeing among themselves to refrain from taking meeting minutes or taking any kind of written notes during the meetings;

e.  By giving false and pretextual reasons for their CRT Product price increases during the relevant period and by describing such pricing falsely as being the result of external costs rather than collusion;

f.  By agreeing among themselves on what to tell their customers about price changes, and agreeing upon which attendee would communicate the price change to which customer;

g.  By agreeing among themselves to quote higher prices to certain customers than the fixed price in effect to give the appearance that the price was not fixed;

h.  By agreeing among themselves upon the content of public statements regarding capacity and supply;

i.  By agreeing among themselves to eliminate references in expense reports which might reveal the existence of their unlawful meetings; and

j.  By agreeing on other means to avoid detection of their illegal conspiracy to fix the prices of CRT Products.

619.  As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiff asserts the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff in representation of the consumers and governmental agencies of Puerto Rico.

## X. CAUSE OF ACTION

### A.  **Unjust Enrichment**

620.  Plaintiff incorporates, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

61

621. Plaintiff files this Complaint on her own behalf, for the relevant government agencies, and as *parens patriae* for natural persons and corporations, to assure that public rights are complied with, and to protect Puerto Rico's residents from Defendants' unjust enrichment.

622. Defendants' conspiracy enriched them.

623. The enrichment resulting in a corresponding loss (or impoverishment) of Plaintiff.

624. There is a connection or a nexus between the loss (or impoverishment) of the Plaintiff and the enrichment of Defendants.

625. There is no justification for Defendants' enrichment.

626. There is no legal provision or rule that precludes the application of unjust enrichment.

627. There is no adequate legal remedy to cure the harm to Plaintiff.

628. There is no statute that provides a remedy for the harm caused.

629. There is no contract related to the controversy before the Court.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the Government of Puerto Rico, very respectfully prays as follows:

a   That the Court rule that the conduct, conspiracy combination, and acts and practices related in this Complaint have enriched Defendants to Plaintiff's detriment;

b   That the Court order Defendants to compensate Plaintiff to the extent that Defendants have been enriched and Plaintiff impoverished for an amount of no less than $30,000,000;

c   That the Court order that the Plaintiff be compensated with any other amount as the law provides;

d   That the Court order that Plaintiff be awarded legal interest at the highest rate;

e   That the Court award Plaintiff the costs and expenses of this litigation, including reasonable attorneys' fees;

f   That the Court order any other remedy that it understands to be fair and appropriate under the circumstances.

In San Juan, Puerto Rico, this 17th day of December 2018.

Respectfully Submitted,

_____

WANDA VAZQUEZ-GARCED
ATTORNEY GENERAL

/s/Denise Maldonado-Rosa
Assistant Attorney General
Sole Registry of Attorneys 15652

PO Box 9020192
(787) 201-8900

dmaldonado@justicia.pr.gov

/s/Jane A. Becker Whitaker
Jane A. Becker Whitaker
Sole Registry of Attorneys 9352
/s/ Jean Paul Vissepó-Garriga
Jean Paul Vissepó-Garriga
Sole Registry of Attorneys 14482

Becker & Vissepó, PSC
San Juan, Puerto Rico 00918
P. O. Box 9023914
San Juan, PR 00902-3914
Tel: (787) 945-2406

E-mail: jbw@beckervissepo.com
janebeckerwhitaker@gmail.com
E-mail: jpv@beckervissepo.com
jp@vissepolaw.com

# Exhibit 2

POS-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*<br>_ MICHAEL D. ADAMS \| SBN: 185835<br>RUTAN & TUCKER, LLP<br>611 ANTON BLVD., SUITE 1400<br>COSTA MESA, CA 92626<br>TELEPHONE NO.: (714) 641-5100 \| FAX NO. \| E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*: Plaintiffs: | FOR COURT USE ONLY |

| |
|---|
| UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA |
| STREET ADDRESS: 411 WEST FOURTH ST. |
| MAILING ADDRESS: |
| CITY AND ZIP CODE: SANTA ANA, CA 92701 |
| BRANCH NAME: |

| | |
|---|---|
| PLAINTIFF/PETITIONER: APTUS USA, LLC, ET AL. | CASE NUMBER:<br>8:16-cv-00413 DOC (KESx) |
| DEFENDANT/RESPONDENT: ROBERT SCHNEIDER, ET AL. | |

| | |
|---|---|
| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>032923-0001 2314 |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:

   a. ☒ Summons
   b. ☒ Complaint
   c. ☐ Alternative Dispute Resolution (ADR) package
   d. ☐ Civil Case Cover Sheet
   e. ☐ Cross-complaint
   f. ☒ other *(specify documents)*: CIVIL COVER SHEET; NOTICE OF ELECTRONIC FILING; NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES; NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM; INITIAL STANDING ORDER FOLLOWING ASSIGNMENT OF CIVIL CASE TO JUDGE CARTER; CERTIFICATION OF INTERESTED ENTITIES OR PERSONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 7.1

3. a. Party served *(specify name of party as shown on documents served)*:
   ROBERT SCHNEIDER

   b. ☐ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:

4. Address where the party was served: 2208 W OCEANFRONT, UNIT B
   NEWPORT BEACH, CA 92663

5. I served the party *(check proper box)*
   a. ☐ by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*:   (2) at *(time)*:

   b. ☒ by substituted service. On *(date)*: 03/11/2016 at *(time)*: 04:40 pm I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3b)*:
   ROBERT MARC - ROOMMATE

     (1) ☐ (business) a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

     (2) ☒ (home) a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

     (3) ☐ (physical address unknown) a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him of her of the general nature of the papers.

     (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on
     *(date)*: from *(city)*:        or ☒ a declaration of mailing is attached.

     (5) ☒ I attach a declaration of diligence stating actions taken first to attempt personal service.

| | | |
|---|---|---|
| Form Approved for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | PROOF OF SERVICE OF SUMMONS | Code of Civil Procedure, § 417.10<br>POS010-1/2639815CH |

| PETITIONER: APTUS USA, LLC, ET AL. | CASE NUMBER: |
|---|---|
| RESPONDENT: ROBERT SCHNEIDER, ET AL. | 8:16-cv-00413 DOC (KESx) |

c. ☐ by mail and acknowledgment of receipt of service. I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

  (1) on *(date):*                                    (2) from *(city):*

  (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

  (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ by other means *(specify means of service and authorizing code section):*

  ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☒ as an individual defendant.
b. ☐ as the person sued under the fictitious name of *(specify):*
c. ☐ as occupant.
d. ☐ On behalf of *(specify):*
  under the following Code of Civil Procedure section:

  ☐ 416.10 (corporation)              ☐ 415.95 (business organization, form unknown)
  ☐ 416.20 (defunct corporation)      ☐ 416.60 (minor)
  ☐ 416.30 (joint stock company/association)  ☐ 416.70 (ward or conservatee)
  ☐ 416.40 (association or partnership)  ☐ 416.90 (authorized person)
  ☐ 416.50 (public entity)            ☐ 415.46 (occupant)
                                       ☐ other:

7. Person who served papers
a. Name: **FRANK HARRIGAN C/O Nationwide Legal, LLC**
b. Address: **200 W. Santa Ana Blvd., Suite 300  Santa Ana, CA 92701**
c. Telephone number: **(714) 558-2400**
d. The fee for service was: $ **713.58**
e. I am:

  (1) ☐ not a registered California process server.
  (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
  (3) ☒ registered California process server:
    (i) ☐ owner      ☐ employee      ☒ independent contractor.
    (ii) Registration No.: **1530**
    (iii) County: **ORANGE**

8. ☒ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

  or

9. ☐ I am a California sheriff or marshal and I certify that the foregoing is true and correct.

  Date: 03/17/2016

  Nationwide Legal, LLC
  200 W. Santa Ana Blvd., Suite 300
  Santa Ana, CA 92701
  (714) 558-2400
  www.nationwideasap.com

  FRANK HARRIGAN                                                ▶
  *(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)*                              *(SIGNATURE)*

| Attorney or Party without Attorney:<br>MICHAEL D. ADAMS, SBN: 185835<br>RUTAN & TUCKER, LLP<br>611 ANTON BLVD., SUITE 1400<br>COSTA MESA, CA 92626<br>TELEPHONE No.: (714) 641-5100     FAX No. (Optional): | E-MAIL ADDRESS (Optional): | | FOR COURT USE ONLY |
|---|---|---|---|
| Attorney for: Plaintiffs | Ref No. or File No.:<br>032923-0001 2314 | | |

Insert name of Court, and Judicial District and Branch Court:
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA -

Plaintiff: APTUS USA, LLC, ET AL.

Defendant: ROBERT SCHNEIDER, ET AL.

| AFFIDAVIT OF<br>DUE DILIGENCE | HEARING DATE: | TIME: | DEPT.: | CASE NUMBER:<br>8:16-cv-00413 DOC (KESx) |
|---|---|---|---|---|

After due search, careful inquiry and diligent attempts at the following address(es), I have not been able to effect service of said process on: ROBERT SCHNEIDER

Documents: SUMMONS;COMPLAINT;CIVIL COVER SHEET; NOTICE OF ELECTRONIC FILING; NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES; NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM; INITIAL STANDING ORDER FOLLOWING ASSIGNMENT OF CIVIL CASE TO JUDGE CARTER; CERTIFICATION OF INTERESTED ENTITIES OR PERSONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 7.1

| Date | Time | Location | Results |
|---|---|---|---|
| 03/07/2016 | 07:30 pm | Home | GIVEN ADDRESS IS A RESIDENCE. PER CAUCASIAN MALE (25-30 YEARS OLD, 6'2", 190LBS) AND ASIAN FEMALE, THEY HAVE LIVED AT THIS LOCATION FOR ABOUT 3-4 MONTHS. THE NEIGHBOR CONFIRMED THAT THEY JUST MOVED IN. at: 498 ROBINSON DRIVE,  TUSTIN, CA 92782 |
| 03/08/2016 | 05:30 pm | Business | GIVEN ADDRESS IS A BUSINESS. LOCATION IS A UPS STORE. PER STAFF, THEY CANT GIVE OUT INFORMATION REGARDING BOX HOLDERS, ONLY THE MANAGER CAN AND HE ISN'T HERE. at: 247310 MOULTON PKWY., O-189,  LAGUNA HILLS, CA 92637 |
| 03/09/2016 | 09:00 am | Business | PER STAFF, THEY CANT GIVE OUT INFORMATION, ONLY THE MANAGER CAN BUT HE ISN'T IN YET. at: 247310 MOULTON PKWY., O-189,  LAGUNA HILLS, CA 92637 |
| 03/09/2016 | 08:10 pm | Home | GIVEN ADDRESS IS A RESIDENCE. LOCATION IS A OCEAN FRONT, 2 STORY HOUSE RIGHT ON THE BOARDWALK WITH A 2 CAR GARAGE IN THE ALLEYWAY. THE LIGHTS WERE ON IN BOTH TOP AND BOTTOM, A & B APARTMENTS. THERE WAS NO ANSWER AT NEITHER OF THE DOORS. I SAW NO ACTIVITY IN NEITHER A OR B. THERE WAS A JEEP PARKED IN THE A SPOT OF THE GARAGE. at: 2208 W. OCEAN FRONT, UNIT B,  NEWPORT BEACH, CA 92663 |
| 03/10/2016 | 07:25 am | Home | THERE WAS NO ANSWER AT EITHER OF THE DOORS. NO LIGHTS WERE ON, THE JEEP WAS STILL IN THE GARAGE, AND NO ACTIVITY WAS SEEN OR HEARD WITHIN THE PREMISES. at: 2208 W. OCEAN FRONT, UNIT B,  NEWPORT BEACH, CA 92663 |
| 03/10/2016 | 05:30 pm | Home | THERE WAS NO ANSWER AT EITHER OF THE DOORS. NO LIGHTS WERE ON, THE JEEP WAS STILL IN THE GARAGE, AND NO ACTIVITY WAS SEEN OR HEARD WITHIN THE PREMISES. at: 2208 W. OCEAN FRONT, UNIT B,  NEWPORT BEACH, CA 92663 |

**Continued on Next Page**

AFFIDAVIT OF DUE DILIGENCE

Order#: 2639815CH/DIIFormat.mdl

Attorney or Party without Attorney:
MICHAEL D. ADAMS, SBN: 185835
RUTAN & TUCKER, LLP
611 ANTON BLVD., SUITE 1400
COSTA MESA, CA 92626
TELEPHONE No.: (714) 641-5100          FAX No. (Optional):          E-MAIL ADDRESS (Optional):

Attorney for: Plaintiffs

Ref No. or File No.:
032923-0001 2314

FOR COURT USE ONLY

Insert name of Court, and Judicial District and Branch Court:
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA -

Plaintiff: APTUS USA, LLC, ET AL.

Defendant: ROBERT SCHNEIDER, ET AL.

| AFFIDAVIT OF DUE DILIGENCE | HEARING DATE: | TIME: | DEPT.: | CASE NUMBER: |
| --- | --- | --- | --- | --- |
| | | | | 8:16-cv-00413 DOC (KESx) |

After due search, careful inquiry and diligent attempts at the following address(es), I have not been able to effect service of said process on: ROBERT SCHNEIDER

Documents: SUMMONS;COMPLAINT;CIVIL COVER SHEET; NOTICE OF ELECTRONIC FILING; NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES; NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM; INITIAL STANDING ORDER FOLLOWING ASSIGNMENT OF CIVIL CASE TO JUDGE CARTER; CERTIFICATION OF INTERESTED ENTITIES OR PERSONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 7.1

| Date | Time | Location | Results |
| --- | --- | --- | --- |
| | | | **Continued from Previous Page** |
| 03/11/2016 | 03:35 pm | Business | I SPOKE WITH CHARLIE, EMPLOYEE OF THE UPS STORE, HE STATED THAT THE SUBJECT HASN'T HAD A BOX AT THIS LOCATION IN YEARS. HE ALSO STATED THAT MANY PEOPLE HAVE COME LOOKING FOR HIM INCLUDING THE FBI AND THE CIA. at: 247310 MOULTON PKWY., O-189, LAGUNA HILLS, CA 92637 |
| 03/11/2016 | 04:40 pm | Home | UPON ARRIVAL TO THE LOCATION I NOTICED A LETTER/PIECE OF MAIL FOR THE SUBJECT. I WENT AROUND BACK TO THE GARAGE AND SAW A WHITE TOYOTA AVALON PARKED IN SPOT B, THERE WAS A  MAN INSIDE, HE CONFIRMED THE ADDRESS AND ROBERT STATED THAT HE WAS THE SUBJECT'S ROOMMATE. I SUB-SERVED THE DOCUMENTS ON ROBERT MARC, ROOMMATE. at: 2208 W. OCEAN FRONT, UNIT B,  NEWPORT BEACH, CA 92663 |

Fee for Service: 713.58
County: ORANGE
Registration No.: 1530
**Nationwide Legal, LLC**
200 W. Santa Ana Blvd., Suite 300
Santa Ana, CA 92701
(714) 558-2400
www.nationwideasap.com

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on March 17, 2016.

Signature: _____
FRANK HARRIGAN

AFFIDAVIT OF DUE DILIGENCE

Order#: 2639815CH/DIIFormat.mdl

| | | | | FOR COURT USE ONLY |
|---|---|---|---|---|

Attorney or Party without Attorney:
MICHAEL D. ADAMS, SBN: 185835
RUTAN & TUCKER, LLP
611 ANTON BLVD., SUITE 1400
COSTA MESA, CA 92626
TELEPHONE No.: (714) 641-5100          FAX No. (Optional):

E-MAIL ADDRESS (Optional):

Attorney for: Plaintiffs

Ref No. or File No.:
032923-0001 2314

Insert name of Court, and Judicial District and Branch Court:
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA -

Plaintiff: APTUS USA, LLC, ET AL.

Defendant: ROBERT SCHNEIDER, ET AL.

| PROOF OF SERVICE BY MAIL | HEARING DATE: | TIME: | DEPT.: | CASE NUMBER: 8:16-cv-00413 DOC (KESx) |
|---|---|---|---|---|

1. I am over the age of 18 and not a party to this action. I am employed in the county where the mailing occured.

2. I served copies of the SUMMONS;COMPLAINT;CIVIL COVER SHEET; NOTICE OF ELECTRONIC FILING; NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES; NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM; INITIAL STANDING ORDER FOLLOWING ASSIGNMENT OF CIVIL CASE TO JUDGE CARTER; CERTIFICATION OF INTERESTED ENTITIES OR PERSONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 7.1

3. By placing a true copy thereof enclosed in a sealed envelope, with First Class postage thereon fully prepaid, in the United States Mail at SANTA ANA, California, addressed as follows:

    a. Date of Mailing:        March 11, 2016
    b. Place of Mailing:       SANTA ANA, California
    c. Addressed as follows:   ROBERT SCHNEIDER
                               2208 W OCEANFRONT, UNIT B
                               NEWPORT BEACH, CA 92663

I am readily familiar with the firm's practice for collection and processing of documents for mailing. Under that practice, it would be deposited within the United States Postal Service, on that same day, with postage thereon fully prepaid at SANTA ANA, California in the ordinary course of business.

Fee for Service: $ 713.58
Nationwide Legal, LLC
200 W. Santa Ana Blvd., Suite 300
Santa Ana, CA 92701
(714) 558-2400
www.nationwideasap.com

I declare under penalty of perjury under the laws of the The State of California that the foregoing information contained in the return of service and statement of service fees is true and correct and that this declaration was executed on March 17, 2016.

Signature: _Sheri Navarro_

SHERI NAVARRO

PROOF OF SERVICE BY MAIL

Order#: 2639815CH/mailproof

# Exhibit 3

U.S. Department of Justice
United States Marshals Service

**PROCESS RECEIPT AND RETURN**
*See Instructions for "Service of Process by the U.S. Marshal"*
*on the reverse of this form.*

| PLAINTIFF | COURT CASE NUMBER |
|---|---|
| Oxygen Funding, Inc. | 6:17-ap-01058-SY |
| DEFENDANT | TYPE OF PROCESS |
| John Paul Hall | Wage Garnishment |

**SERVE** → NAME OF INDIVIDUAL, COMPANY, CORPORATION, ETC., TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN
Wm. Vandergeest Landscape Care

**AT** ADDRESS (Street or RFD, Apartment No., City, State and ZIP Code)
3342 West Castor Street, Santa Ana, CA 92704

SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW:

D. Edward Hays, Esq./ Chad V. Haes, Esq.
MARSHACK HAYS LLP
870 Roosevelt
Irvine, CA 92620

| | |
|---|---|
| Number of process to be served with this Form - 285 | 1 |
| Number of parties to be served in this case | 1 |
| Check for service on U.S.A. | |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE (Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available For Service):
Fold

Nationwide Legal to effect service.

**FILED**
**APR 27 2018**
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

| Signature of Attorney or other Originator requesting service on behalf of: | ☑ PLAINTIFF ☐ DEFENDANT | TELEPHONE NUMBER | DATE |
|---|---|---|---|
| D. Edward Hays | | 949.333.7777 | 02.02.18 |

**SPACE BELOW FOR USE OF U.S. MARSHAL ONLY — DO NOT WRITE BELOW THIS LINE**

| I acknowledge receipt for the total number of process indicated. (Sign only first USM 285 if more than one USM 285 is submitted) | Total Process | District of Origin No. 12 | District to Serve No. 12 | Signature of Authorized USMS Deputy or Clerk  Danielle Chavez | Date 2/6/18 |
|---|---|---|---|---|---|

☐ I hereby certify and return that I ☐ have personally served, ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual, company, corporation, etc., at the address shown above or on the individual, company, corporation, etc., shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc., named above (See remarks below)

| Name and title of individual served (if not shown above) | | ☐ A person of suitable age and discretion then residing in the defendant's usual place of abode. |
|---|---|---|
| Address (complete only if different than shown above) | Date of Service | Time ____ am / pm |
| | Signature of U.S. Marshal or Deputy | |

RECEIVED U.S. MARSHAL 2018 FEB 6

| Service Fee 65 | Total Mileage Charges (including endeavors) | Forwarding Fee | Total Charges 65 | Advance Deposits | Amount owed to U.S. Marshal or | Amount of Refund |
|---|---|---|---|---|---|---|

REMARKS:

Served on: 2/7/18

Geri McDannold

| PRIOR EDITIONS MAY BE USED | 1.  CLERK OF THE COURT | FORM USM-285 (Rev. 12/15/80) (Instructions Rev. 12/08) |
|---|---|---|

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address) | FOR COURT USE ONLY |
|---|---|
| D. Edward Hays, #162507/ Chad V. Haes, #267221<br>**Marshack Hays LLP**<br>870 Roosevelt, Irvine, California 92620-5749<br>Telephone No.: (949) 333-7777<br>Fax No.: (949) 333-7778<br>Attorney(s) for: Oxygen Funding, Inc.<br>Ref: 2778673 | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF U.S BANKRUPTCY
COURT- CENTRAL, RIVERSIDE DIVISION

Plaintiff: OXYGEN FUNDING, INC., a California corp.
Defendant: JOHN PAUL HALL

| PROOF OF SERVICE | HEARING DATE: | TIME: | LEVYING OFFICER FILE NO.: | CASE NUMBER:<br>Adv. No. 6:17-ap-01058-SY |
|---|---|---|---|---|

*At the time of service I was at least 18 years of age and not a party to this action, and I served copies of the:*

- APPLICATION FOR EARNINGS WITHHOLDING ORDER (WAGE GARNISHMENT)
- EARNINGS WITHHOLDING ORDER (WAGE GARNISHMENT)
- EMPLOYER'S RETURN (WAGE GARNISHMENT)
- CONFIDENTIAL STATEMENT OF JUDGMENT DEBTOR'S SOCIAL SECURITY NUMBER (SUPPLEMENT TO WAGE GARNISHMENT FORMS WG-001, WG-002, WG-004, WG-005, WG-009, WG-012, AND WG-030)
- EMPLOYEE INSTRUCTIONS
- CLAIM OF EXEMPTION (WAGE GARNISHMENT)
- (BLANK) FINANCIAL STATEMENT (WAGE GARNISHMENT-ENFORCEMENT OF JUDGMENT)
- EXEMPTIONS FROM THE ENFORCEMENT OF JUDGMENTS
- CURRENT DOLLAR AMOUNT OF EXEMPTIONS FROM ENFORCEMENT OF JUDGMENTS
- WRIT OF EXECUTION
- NOTICE OF THE JUDGMENT DEBTOR

2.  a.  *Name of Party served:*  Wm. Vandergeest Landscape Care

   b.  *Person with whom left with:*  Geri MC Dannold/ Secretary

   c.  *Address:*  3342 W. Castor St.
   Santa Ana, California 92704

3.  *I served the party named in item 2a. by personally delivering the copies to the person served as follows:*

   (1) *on:* 02/07/2018       (2) *at:*  10:55 AM

4.  *I received this document(s) for service on (date):* 02/07/18

*Person serving:*
Frank Harrigan
*NATIONWIDE LEGAL, LLC. (LA  12-234648)*
*1609 James M. Wood Blvd.*
*Los Angeles, California 90015*
*(213) 249-9999*

a. Fee for service $
b. ☐ Is not a *Registered California Process Server*
c. ☒ Is a *Registered California Process Server*
d. ☒ *Employee or Independent Contractor*
   (1) Registration No.: 1530
   (2) County: Orange

*I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

**Date:** February 9, 2018       _____

Rule 982(a)(23) Judicial Council of California

**PROOF OF SERVICE**

# Exhibit 4

| HANSON BRIDGETT LLP<br>GARNER K. WENG (SBN 191462)<br>CHRISTOPHER S. WALTERS (SBN 267262)<br>425 MARKET STREET, 26TH FLOOR<br>SAN FRANCISCO, CA 94105<br>TELEPHONE: (415) 777-3200<br>FACSIMILE: (415) 541-9366<br>ATTORNEY(S) FOR: PLAINTIFFS, MACY'S INC.<br>AND MACYS.COM, INC.<br>REFERENCE: 3146269 | |
|---|---|

<div align="center">

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

</div>

| MACY'S INC. AND MACYS.COM, INC.<br><br>**Plaintiff (s)**<br><br>v.<br><br>**Defendant (s)**<br><br>STRATEGIC MARKS, LLC | **CASE NUMBER:**<br>**CV11 6198**<br><br>**PROOF OF SERVICE**<br>**SUMMONS AND COMPLAINT**<br>(Use separate proof of service for each person/party served) |
|---|---|

1.   At the time of service I was at least 18 years of age and not a party to this action and I served copies of the *(specify documents)*:
    a. ☒ summons          ☒ complaint          ☐ alias summons          ☐ first amended complaint
                                                                                    ☐ second amended complaint
                                                                                    ☐ third amended complaint

    ☒ other *(specify)*: ECF REGISTRATION INFORMATION HANDOUT; WELCOME TO THE U.S. DISTRICT COURT IN ADDITION TO THE LOCAL RULES, THE FOLLOWING GUIDELINES HAVE BEEN PROVIDED TO ENSURE THAT THE FILING PROCESS IS ACCOMPLISHED WITH EASE AND ACCURACY; NOTICE OF ASSIGMENT OF CASE TO A UNITED STATES MAGISTRATE JUDGE FOR TRIAL; (BLANK) CONSENT TO PROCEED BEFORE A UNITED STATES MAGISTRATE JUDGE; (BLANK) DECLINATION TO PROCEED BEFORE A MAGISTRATE JUDGE AND REQUEST FOR REASSIGNMENT TO A UNITED STATES DISTRICT JUDGE; ORDER SETTING INITIAL CASE MANAGEMENT CONFERENCE AND ADR DEALINES; CIVIL STANDING ORDER FOR MAGISTRATE JUDGE JACQUELINE SCOTT CORLEY; STANDING ORDER FOR ALL JUDGES OF THE NORTHERN DISTRICT OF CALIFORNIA CONTENTS OF JOINT CASE MANAGEMENT STATEMENT

2.   Person served:
    a. ☒ Defendant *(name)*: STRATEGIC MARKS, LLC
    b. ☒ Other *(specify name and title or relationship to the party/business named)*: ELLIA KASSOFF, AUTHORIZED AGENT FOR SERVICE OF PROCESS FOR STRATEGIC MARKS, LLC
    c. ☒ Address Where papers were served: 25 RIDGEVIEW, IRVINE, CA 92603

3.   **Manner of service** in compliance with *(the appropriate box **must** be checked)*:
    a.   ☒  Federal Rules of Civil Procedure
    b.   ☐  California Code of Civil Procedure

4.   **I served** the person named in item 2:

    a. ☒ By **Personal service**. By personally delivering copies. If the person is a minor, by leaving copies with a parent, guardian, conservator or similar fiduciary and to the minor if at least (12) years of age.

        1. ☒ **Papers were served on** *(date)*: **DECEMBER 20, 2011**      at *(time)*: **6:00PM**

    b. ☐ By **Substituted service**. By leaving copies:

        1. ☐ **(home)** at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household, at least 18 years of age, who was informed of the general nature of the papers.

        2. ☐ **(business)** or a person apparently in charge of the office of place of business, at least 18 years of age, who was informed of the general nature of the papers.

        3. ☐ **Papers were served on** *(date)*: _____      at *(time)*: _____

<div align="right">1</div>

<div align="center">

**PROOF OF SERVICE-SUMMONS AND COMPLAINT**

</div>

CV-1 (04/01)

4. ☐ **by mailing** (by first-class mail, postage prepaid) copies to the person served in item 2(b) at the place were the copies were left in Item 2(c).

5. ☐ **papers were mailed** on (date): _____

6. ☐ **due diligence.** I made at least three (3) attempts to personally serve the defendant.

c. ☐ **Mail and acknowledgment of service.** By mailing *(by first-class mail or airmail, postage pre-paid)* copies to the person served, with two (2) copies of the form of Waiver of Service of Summons and Complaint and a return envelope, postage prepaid to the sender. **(Attach completed Waiver of Service of Summons and Complaint).**

d. ☐ **Service on domestic corporation, unincorporated association (including partnership), or public entity. (F.R.Civ.P.4(h)) (C.C.P. 416.10)** By delivering, during usual business hours, a copy of the summons and complaint to an officer, a managing or general agent, or to any other agent authorized by appointment of by law to receive service of process and, if the agent is one authorized by statute and the statute so requires, a mailing, by first-class mail, postage prepaid, a copy to the defendant.

e. ☐ **Substituted service on domestic corporation, unincorporated association (including partnership), or public entity. (C.C.P. 415.20 only)** By leaving during usual office hours, a copy of the summons and complaint in the office of the person served with the person who apparently was in charge and thereafter by mailing *(by first-class mail, postage prepaid)* copies to the persons at the place where the copies were left in full compliance with C.C.P. 415.20. Substitute service upon the California Secretary of state requires a court order. **(Attach a copy of the order to this proof of service).**

f. ☐ **Service on a foreign corporation.** In any manner prescribed for individuals by FRCP 4(f).

g. ☐ **Certified or registered mail service.** By mailing to an address outside California *(by first-class mail, postage prepaid, requiring a return receipt)* copies to the person served. **(Attach signed return receipt o other evidence of actual receipt by the person served).**

h. ☐ **Other** (specify code section and type of service):

5. Service upon the **United States, and Its Agencies, Corporations or Officers.**

a. ☐ by delivering a copy of the summons and complaint to the clerical employee designated by the U.S. Attorney authorized to accept service, pursuant to the procedures for the Office of the U.S. Attorney for acceptance of service, or by sending a copy of the summons and complaint by registered or certified mail addressed to the civil process clerk at the U.S. Attorneys Office.
Name of person served:
Title of person served:
Date and time of service: *(date):* _____ at *(time):* _____

b. ☐ By sending a copy of the summons and complaint by registered or certified mail to the Attorney General of the United States at Washington, D.C. **(Attached signed return receipt of other evidence of actual receipt by the person served).**

c. ☐ By sending a copy of the summons and complaint by registered or certified mail to the officer, agency or corporation **(Attach signed return receipt or other evidence of actual receipt by the person served).**

6. At the time of service I was at least 18 years of age and not a party to this action.

7. *Person who served papers (name, address and telephone number):*

**FRANK HARRIGAN**
**Service Provided for:**
NATIONWIDE LEGAL LLC
859 HARRISON STREET, SUITE A
SAN FRANCISCO, CALIFORNIA 94107 (LA 6771)
(415) 351-0400

a. Fee for service $
d. Registered California process server
   (1) Employee or independent contractor
   (2) Registration No.: **1530**
   (3) County: **ORANGE**

8. ☐ I am a California sheriff, marshal, or constable and I certify that the foregoing is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Date: DECEMBER 21, 2011

_____
*(Signature)*

2

**PROOF OF SERVICE-SUMMONS AND COMPLAINT**

CV-1 (04/01)

# Exhibit 5

## *HARRY PAGÁN RIVERA, Plaintiff-Appellee v. FELICITA RUIZ ORTIZ, ARCADIO VILLAFAÑE VIRELLA, TERESA DÍAZ VELÁZQUEZ AND THE SLG COMPRISED OF BOTH, CORPORACIÓN DE RENOVACIÓN URBANA Y VIVIENDA DE PUERTO RICO, Respondents-Petitioner*

Puerto Rico Court of Appeals, San Juan Judicial Region

April 12, 2019

KLCE201900315

**Reporter**
2019 PR App. LEXIS 1067 *

HARRY PAGÁN RIVERA, Plaintiff-Appellee v. FELICITA RUIZ ORTIZ, ARCADIO VILLAFAÑE VIRELLA, TERESA DÍAZ VELÁZQUEZ AND THE SLG COMPRISED OF BOTH, CORPORACIÓN DE RENOVACIÓN URBANA Y VIVIENDA DE PUERTO RICO, Respondents-Petitioner

**Previous History:  [*1]** Certiorari from the Court of First Instance, Higher Chamber of Ponce. Case No. J AC2018-0003. About: Contradictory Ownership.

## Case Summary

### Main Terms

Housing, party, summons, Department, Law, be, corporation, as, Court, claim, on, case, without, capacity, forum, indispensable, State, lawsuit, petitioner, respondent, law, person, property, Justice, Rule, which, dismissal, Renewal, defendant, summons

**Judges:** Panel XI. Panel composed of its president, Judge Cintrón Cintrón, Judge Surén Fuentes and Judge Cortés González.

**Opinion By**: Cortés González

## Opinion

Cortés González, Reporting Judge

### JUDGMENT

In San Juan, Puerto Rico, on April 12, 2019.

The Housing Department appears, through the Office of the Attorney General (Housing or petitioner) through the title appeal and requests that we revoke an *Order* issued by the Court of First Instance, Higher Court of Ponce (TPI). Through the same, the primary court denied the dismissal of the claim filed by Mr. Harry Pagán Rivera (Mr. Pagán Rivera or respondent) and authorized serving the summons to the Department of Housing through the Commonwealth of Puerto Rico (ELA) by serving a summons to the Secretary of Justice.

I.

The action that originates the appeal began with an Ex Parte Petition on Ownership Proceedings. After several procedural incidents, the case was referred to be assigned to another chamber for having become a matter of litigation.[1] After being assigned **[*2]** to a civil

---

[1] The referral to another Chamber was made after the procedure was completed in the ex parte case and a judgment

HARRY PAGÁN RIVERA, Plaintiff-Appellee v. FELICITA RUIZ ORTIZ, ARCADIO VILLAFAÑE VIRELLA, TERESA DÍAZ VELÁZQUEZ AND THE SLG COMPRISED OF BOTH, CORPORACIÓN DE R....

chamber, the magistrate in charge required the submission of a registration certificate or recent title study and a claim accumulating the current registration holders and any real rights holder registered on the property subject to the case, who would be an indispensable party in the case.[2] Thus, Mr. Pagán Rivera filed the *Claim Accumulating Parties* against Ms. Felícita Ruiz Ortiz; Mr. Arcadio Villafañe Virella, Ms. Teresa Díaz Vázquez and the community property of husband and wife comprised of both; and, the Puerto Rico Urban Renovation and Housing Corporation (CRUV). He alleged to hold the material, peaceful, public, continuous, uninterrupted possession of a property that he claimed is registered in favor of the co-defendants Villafañe Virella and Díaz Vázquez. He included the CRUV as a party, as the result of a mortgage registered in its favor in the Property Registry in guarantee of a promissory note that expired on May 1, 2006.[3] On April 12, 2018, the summons addressed to the CRUV was issued. It was served on April 18, 2018, through Mr. González.[4]

On May 25, 2018, the respondent **[*3]** requested that contempt be filed and a judgment be issued because the CRUV had not answered the claim.[5] On June 12, 2018, the Department of Housing requested an extension to appear. The primary court declared the petition of Mr. Pagán Rivera "Without Merit" and granted the extension requested by the petitioner. In the meantime, on July 31, 2018, the appellee filed a *Motion Requesting a Declaration of Contempt* for the term granted to the petitioner to submit his rejoinder and for not appearing at the CRUV having elapsed.

---

was issued in the case, which was subsequently left without effect in the face of alleged disputes between the respondent and the defendant Ruiz Ortiz.

[2] Resolution issued on March 6, 2018 by the Hon. Mariano Vidal Sáenz.

[3] According to the Property Certification issued on March 19, 2018, these were the defendants who should be included. *Writ of certiorari*, Annex 6, p. 60.

[4] *Motion of Objection to the Issuance of the Order*, Annex 1, page 1.

[5] *Writ of Certiorari*, Annex 8, p. 62.

On August 10, 2018, Housing filed a *Motion Requesting Dismissal*. It stated that there is no summons in accordance with Rule 4.4 of Civil Procedure since Mr. Pagán Rivera served a summons on an extinct corporation, with an incomplete address and without the information of the person who received it. He attached a *Certification* to his application that affirmed that in civil case no. J AC2018-0003, it does not appear registered as a duly served summons to the ELA. He argued that the CRUV is not operating and that its assets became part of Housing, so this is the government agency with its own legal capacity. He argued that it was **[*4]** appropriate to summon the Head of the Agency and the Secretary of Justice, because it was the ELA and not the agency that would eventually respond for the complaint if the appeal prevails. However, he acknowledged that a summons served against the CRUV was arising from the proceedings.

For its part, the respondent objected and argued that the CRUV enjoyed fiscal autonomy, so it was not necessary to summon the State. He also asserted that even though the dissolution of the CRUV had been ordered, it had been resolved that the merger into Housing did not have the effect of suppressing its legal capacity to sue and be sued. As for the petitioner's argument that it was not recorded who had been served the summons, he maintained, that from the judicial proceedings it became apparent that the CRUV had been summoned through Mr. González. Subsequently, on October 26, 2018, Mr. Pagán Rivera filed a new motion requesting that a judgment be issued.

On January 15, 2019, the TPI issued several *Orders*. Among them, it denied the *Motion Requesting a Declaration of Contempt*, the *Motion Requesting Dismissal* and the *Motion Requesting* Judgment. Regarding the dismissal, it provided that according to the case **[*5]** *BPPR v. SLG Negrón, 164 DPR 855 (2005)*, the serving of a new summons had merit. With regard to the *Motion Requesting a Declaration of "Without Merit", Motion Requesting Dismissal*, it ordered that, according to the case *Fred Reyes v. ELA, 150 DPR 599 (2000)*, the case law requires that Housing be served through the ELA by delivery to the Secretary of Justice. It also requested the respondent to submit a serving of summons project and granted thirty (30) days to serve the summons once it was issued.

In view of the TPI's denial on the request for dismissal, the petitioner submitted an *Urgent Request for Reconsideration* on January 25, 2019. It argued that the

HARRY PAGÁN RIVERA, Plaintiff-Appellee v. FELICITA RUIZ ORTIZ, ARCADIO VILLAFAÑE VIRELLA, TERESA DÍAZ VELÁZQUEZ AND THE SLG COMPRISED OF BOTH, CORPORACIÓN DE R....

case was an unequivocal and insistent intention of Mr. Pagán Rivera not to consolidate the ELA. It maintained that the Court could not remedy the failure to serve the summons by order when the term established by law had already elapsed. It stated that the Rules empowered the TPI to dismiss the action and that the rules do not provide for instructing the parties in the lawsuit. It reiterated the lack of jurisdiction over Housing. It pointed out that in the instances in which it has appeared, it has not submitted to the jurisdiction nor has it waived its rights or defenses. By means of Resolution **[*6]** of February 4, 2019, the primary court declared the request for reconsideration as "Without Merit".

In disagreement, the petitioner appears before this appellate court through the appellee's brief, through which he requests the revocation of two of the Orders issued, that is, the one that denied the dismissal of the lawsuit and the one that authorized the serving of a new summons. In his appeal, he formulates the following indication of error:

> The honorable Court of First Instance erred and abused of its discretion by not dismissing the case records without prejudice and as ordered by Rule 4.3 (C) of the 2009 Civil Procedure, 32 LPRA App. V, R. 4.3 (C).

Mr. Pagán appeared, objecting to the appeal and reiterated the proposals he made before the primary court.

**II**.

**A. *Certiorari***

*Certiorari* is the discretionary procedural vehicle that authorizes a higher-ranking court to review the determinations of a lower court. *IG Builders et al. v. BBVAPR, 185 DPR 307, 337-338 (2012)*. In accordance with the provisions of Article 4.006(b) of Law No. 201-2003, *4 LPRA sect. 24 and*, better known as the Law of the Judiciary of the Commonwealth of Puerto Rico of 2003; Rule 52.1 of Civil Procedure, 32 LPRA App. V, R. 52.1; and Rules 32(D) to 34 of the Regulations of the Court of Appeals, 4 LPRA App. XXII-B, R. 40, jurisdiction has been conferred on our court to attend to a writ of *Certiorari* **[*7]**. In accordance with the aforementioned bylaws, this appeal will only be issued after evaluating and considering the following criteria:

(A) If the remedy and provision of the appealed decision, unlike its grounds, are contrary to law.

(B) If the situation of facts raised is the most appropriate for analysis of the problem.

(C) If there has been prejudice, partiality or gross and manifest error in the assessment of the evidence by the Court of First Instance.

(D) If the matter raised requires more careful consideration in light of the original proceedings, which must be put on record or have more elaborate arguments.

(E) Whether the stage of the procedure in which the case is presented is the most favorable for its consideration.

(F) If the issuance of the records or the order to show merit does not cause an improper fractionation of the lawsuit and an undesirable delay in the final settlement of the litigation.

(G) If the issuance of the records or the order to show merit prevents a failure of justice. Rule 40 of the Regulations of the Court of Appeals, 4 LPRA App. XXII-B, R 40.

**B. Summons**

The summons is the procedural mechanism that allows the court to acquire jurisdiction over the defendant, so that **[*8]** it is bound by the opinion that the sentencing court issues. *Torres Zayas v. Montano Gómez et als., 199 DPR 458, 467 (2017)*; *Cirino González v. Adm. Corrección, 190 DPR 14, 30 (2014)*. It is intended to notify the defendant of the existence of a claim filed against it. *Bernier González v. Rodríguez Becerra, 200 DPR 637, 644 (2018)*. Rule 4 of Civil Procedure, 32 LPRA App. V, R 4 *et seq*, regulates its requirements, which are strictly compliant. The summons "represents the inaugural step of due process of law that makes the exercising of judicial jurisdiction viable". *Bernier González v. Rodríguez Becerra, supra*; *Cirino González v. Adm. Corrección, supra*.

Once the summons is issued, the party has a non-extendable term of one hundred and twenty (120) days to serve it. *Bernier González v. Rodríguez Becerra, supra to pg. 649*; *Torres Zayas v. Montano Gómez et als., supra to pg.468*. After the aforementioned term has elapsed without the summons having been served, the court must issue a judgment decreeing the dismissal and filing without prejudice. Rule 4.3(C) of Civil Procedure, 32 LPRA App. V, R. 4.3(c). As long as the summons has not been served, the party named in the

HARRY PAGÁN RIVERA, Plaintiff-Appellee v. FELICITA RUIZ ORTIZ, ARCADIO VILLAFAÑE VIRELLA, TERESA DÍAZ VELÁZQUEZ AND THE SLG COMPRISED OF BOTH, CORPORACIÓN DE R....

heading will be considered only as a nominal party of the case. *Torres Zayas v. Montano Gómez et als., supra*; *Sánchez Rivera v. Malavé Rivera, 192 DPR 854 (2015)*.

Rule 4.4 of Civil Procedure, 32 LPRA App. V, R. 4.4, regulates the personal serving of notice of the summons and the claim. *Fred and others v. ELA, 150 DPR 599, 604 (2000)*. This regulatory provision acknowledges various ways to serve a summons, namely: (1) the staff, (2) at the request of waiver of the defendant party and (3) by edict. In particular, paragraphs (e), (f), and (g) indicate to whom **[*9]** the summons will be served when the ELA, a State agency or a public corporation is part of the process. Said regulatory provision provides the following:

> (e) To a corporation, company, partnership, association or any other legal entity, serving a copy of the summons and of the claim to an official, administrative manager, general agent or to any other agent authorized by appointment or designated by law to receive said summons. A copy of the summons and the claim will be delivered to both spouses of the Community Property of Husband and Wife.
> (f) To the Commonwealth of Puerto Rico, serving a copy of the summons and the claim to the Secretary of Justice or to the person he or she designates.

> (g) To an official, or an office of the Commonwealth of Puerto Rico, other than a public corporation, serving a copy of the summons and of the claim to said official, or to the chief executive of said office. In addition, it will be an essential requirement that in all lawsuits filed against an official or a government agency of the **[*10]** Commonwealth of Puerto Rico, other than a public corporation, the plaintiff serves a copy of the summons and of the claim to the Secretary of Justice or to the person he or she designates. If the office is a public corporation, copies will be served as provided for in Rule 4.4(e).

To determine which of the subsections must be complied with, it must be determined whether the defendant is the State, one of its offices or a public corporation. *Cirino González v. Adm. De Corrección, supra to pg. 31*. It must also be established whether the entity has the legal capacity to sue and be sued. If the instrumentality does not have its own legal personality, Rule 4.4(f) must be used since the true defendant is the State. *Cirino González v. Adm. De Corrección, supra to pg. 32*. In that case, the Secretary of Justice or the designated person will be summoned. Id. Otherwise, the public corporation will have legal capacity to comply with subparagraph (e) of the undersigned Rule.[6]

Our Highest Court has pronounced: "[i]n the past, we have indicated that when a summons is served incorrectly, the appropriate remedy is not to dismiss the claim, but rather to order the repetition of the process." *BPPR v. SLG Negrón, 164 DPR 855, 874 (2000)*; *Negrón v. Depto. Servicios Sociales, 105 DPR 873, 876 (1977)*. It has also stated that, in this **[*11]** manner, the public policy is complied with whereby cases are sorted out on their merits and the party is not deprived of their day in court. *BPPR v. SLG Negrón*, supra; *Ghiliotti v. ASA, 149 DPR 902, 915 (1999)*. In *BPPR v. SLG Negrón, supra*, it was authorized to serve a new summons in light of facts that revealed that the delay of the primary court in disposing of the dispute, unnecessarily delayed the correct serving of the summons to the defendant. There it was expressed that, "even though the initial responsibility of correctly carrying out the procedures to serve the summons within the regulatory term falls exclusively on the plaintiff, in this case the delay of the court itself contributed, with all probability, contributed towards this."

## C. Indispensable Party

Again, our highest Court of Justice has defined the following as an indispensable party:

---

[6] Cases resolved under the Rules of Civil Procedure of 1979.

HARRY PAGÁN RIVERA, Plaintiff-Appellee v. FELICITA RUIZ ORTIZ, ARCADIO VILLAFAÑE VIRELLA, TERESA DÍAZ VELÁZQUEZ AND THE SLG COMPRISED OF BOTH, CORPORACIÓN DE R....

"[t]he one who has such an interest in the matter involved in the dispute that a final decree cannot be issued between the parties in the action without radically injuring and affecting their interest, or without allowing the dispute to be in such a state that its final determination must be inconsistent with equity and a clean conscience." *Colón Negrón et al. v. Mun. Bayamón, 192 DPR 499, 510 (2015)*; *Cirino González v. Adm. de Corrección et al., 190 DPR 14, 46 (2014)*.

Rule 16.1 of the Civil Procedure is the procedural scheme that addresses the mechanism **[\*12]** to include an indispensable party in a litigation that has already begun. *Colón Negrón et al. v. Mun Bayamón, supra.* Where applicable, it provides that:

"[t]he persons who have a common interest without whose presence the dispute cannot be adjudicated, will become parties and will accumulate as plaintiffs or defendants, as appropriate." 32 LPRA App. V, R. 16.1.

The transcribed Rule is based on two fundamental principles, namely: "(1) the constitutional protection that prevents a person from being deprived of freedom and property without due process of law, and (2) the need to include an indispensable party so that the judicial decree issued can be complete." *López Garcia v. López García, 2018 TSPR 57, 200 DPR ___ (2018)*; *Colón Negrón et al v. Mun Bayamón, supra.* Therefore, "an indispensable party is one that cannot be dispensed with, since, without its presence, the litigious issues cannot be correctly adjudicated, since their rights would be affected." *López Garcia v. López García, supra, Deliz et als. v. Igartúa et als., 158 DPR 403, 432 (2003)*. The "common interest" referred to in Rule 16.1 is that "it must be real and immediate and it cannot be mere speculations or of a future interest." *López Garcia v. López García, supra*; *Pérez v. Morales Rosado, 172 DPR 216, 223 (2007)*.

The final determination of whether a party is indispensable will depend on the specific facts in each case, including: time, place, allegations, evidence and classes of rights **[\*13]** and conflicting interests. *Colón Negrón et al. v. Mun. Bayamón, supra at pg. 511-512*; J.A. Cuevas Segarra, Tratado de derecho procesal civil, 2nd Ed., San Juan, Pubs. J.T.S., 2011, T. II, p. 695. This implies "that the courts must make a judicial review of the rights of the parties that are not present and the consequences of being joined to the proceedings."

*López Garcia v. López García, supra*; *Colón Negrón et al v. Mun. Bayamón, supra to p. 512*. "The fundamental thing is to determine whether the court can do justice and grant a final and complete remedy to the parties present without affecting the interests of the absent party." *López Garcia v. López García, supra*; *Pérez v. Morales Rosado, supra.*

The reason for being of this Rule "is in the interest of protecting those individuals -- natural or legal persons -- who are not present in the lawsuit from the effects that the judgment issued entails and thus avoid the multiplicity of lawsuits by means of an effective and complete remedy. *López Garcia v. López García, supra*; *García Colón v. Sucn. González, 178 DPR 527 (2010)*.

The lack of an indispensable party constitutes an inalienable defense that can be filed at any time during the judicial process. "Furthermore, the appeals courts, if they so understand, can and should raise, motu proprio, the lack of an indispensable party in a lawsuit, because it affects the jurisdiction **[\*14]** of the court." Id.

## D. Legal Capacity; CRUV and Department of Housing

The Department of Housing was created by Law No. 97 of July 10, 1972, known as the Organic Law of the Department of Housing, *3 LPRA sec. 441 et seq.* It is an executive government department aimed at the development and execution of public housing policy and community development of the Commonwealth. *Fred and others v. ELA, 150 DPR 599, 604 (2000)*. The CRUV was the public corporation with legal capacity in charge of the administration and development of low-cost housing in Puerto Rico. Statement of Reasons, Law No. 106-1991 (1991 (Part I) Laws of Puerto Rico 415). This corporation was created by Law No. 88 of June 22, 1957, "with the purpose of reorganizing government programs for public housing and urban renovation that had been successively established since 1938." *Pagán v. ELA, 131 DPR 795, 801 (1992)*. By means of Law No. 55-1991, the legislature authorized the dissolution of the CRUV and amended Article 5 of Law No. 97, *supra*. Subsection (a) of the aforementioned Article establishes the following, "all the powers, duties, functions, authorities, contracts, obligations, exemptions and privileges of the Urban and Housing Renovation Administration **[\*15]** created by Law No. 88 approved on June 22, 1957 (*17 LPRA secs. 21* to 25) are transferred to the Department and it is removed." Article 5(a) of Law No. 97, *supra, 3 LPRA sec. 441d*. In that same year, Law No. 58-1991, known

HARRY PAGÁN RIVERA, Plaintiff-Appellee v. FELICITA RUIZ ORTIZ, ARCADIO VILLAFAÑE VIRELLA, TERESA DÍAZ VELÁZQUEZ AND THE SLG COMPRISED OF BOTH, CORPORACIÓN DE R....

as the Law to Reorganize the Department of Housing, was approved, which regulated the transfer of programs and services in its Article 9. Article 9 provided the following:

all the powers and authorities of the Public Housing Program of the Urban Renovation and Housing Corporation are transferred to the Public Housing Administration. Unless in the future the Secretary provides otherwise, by virtue of the authority conferred upon it by Article 10 of this law, the Subsidized Housing Projects of the Federal Department of Housing and Urban Development and the Administration of Households for Farmers are exempted from this transfer, as well as the Housing Projects Subsidized by the Commonwealth of Puerto Rico and by the Puerto Rico Urban Renovation and Housing Corporation and the Federal Housing Program adopted in accordance with Section 8, which will continue under the Administration of the Urban Renovation and Housing Corporation or the Department, **[*16]** as provided by the Secretary.

Law No. 55-1991 was amended when Law No. 106-1998, *17 LPRA 27aa et seq.* In accordance with the provisions of the legislator, the following was established in Articles 1, 4 and 5 of Law No. 106-1998:

Article 1- The Office for the Liquidation of the Accounts of the Urban Renewal and Housing Corporation is dissolved, and the transfer of all of its assets to the Department of Housing, effective as of June 30, 1998, is ordered. With respect to the disposal of the movable and immovable assets thus transferred, the Secretary (a) of the Department of Housing is granted all the rights and powers that were granted to the Special Auditor under Law No. 55 of August 9, 1991, as amended, providing that no Board or Ratifying Committee will be constituted for these transactions. *17 LPRA sect. 27aa*

Article 4.-The Office is dissolved effective June 30, 1998, without the need for any other management or the granting of any additional deed or document. The documents, assets and liabilities held by the Office on the effective date of this Law shall be transferred as provided for in this Law, and it is hereby clearly established that the **[*17]** Department of Housing shall not be liable for any claim beyond what is inherited from the Office. All the defenses of the Office under Law No. 55 of August 9, 1991, as amended, may be lifted by said Department in the event of any claim related to the

operations or properties of the extinct CRUV. *17 LPRA sect. 27dd*

Article 5.-For the purposes of the transfer provided herein, the constitution of a Transition Committee is ordered, of which the Special Auditor will be part and those persons to whom he or she appoints, if deemed necessary, as well as the personnel of the Department of Housing appointed by the Secretary of Housing.

The Transition Committee will have the task of organizing, in an agile and effective manner, the total transfer of the Office's assets, as well as its equipment, files, folders and any other properties or documents. It must also deliver to the Secretary of Housing a complete inventory of the assets, liabilities and lawsuits pending before the courts of the country. Said transition period shall not exceed June 30, 1998. *17 LPRA sect. 27ee*

Following the aforementioned amendments, our Highest Court interpreted in **[*18]** *Fred et al. v. ELA, supra*, with regard to the legal capacity and manner of serving the summons to the Department of[7] Housing in accordance with the provisions of Law No. 97, *supra*, *3 LPRA sec. 441 et seq*. There it mentioned:

It should be noted that, the Organic Law of the Department of Housing does not provide that the Department is a division or public corporation with a legal personality independent from the Commonwealth. Nor does it confer legal capacity to sue and be sued. *In addition, in Pagán et al. v. ELA et al., supra, pp. 807-808*, we clarify that the purpose of assigning the CRUV to the Department was not to merge both entities or absorb the personality of the other, but rather to uniform and centralize the formulation of public policy related to housing in Puerto Rico.

In this case, we had to resolve whether the Commonwealth, through the Department, is civilly liable for negligent acts or omissions attributable to the Urban Renovation and Housing Corporation (hereinafter, the CRUV). We answered in the negative. We resolved that the CRUV is a public corporation with its own legal personality, separate

---

[7] The Supreme Court ruled that the Department of Housing is an executive department that lacks separate legal capacity and it is different from the Commonwealth, so it is appropriate to be summoned only through the Secretary of Justice, under Rule 4.4 (f) of Civil Procedure. (case resolved under Rules of Civil Procedure of 1979)

HARRY PAGÁN RIVERA, Plaintiff-Appellee v. FELICITA RUIZ ORTIZ, ARCADIO VILLAFAÑE VIRELLA, TERESA DÍAZ VELÁZQUEZ AND THE SLG COMPRISED OF BOTH, CORPORACIÓN DE R....

and independent from the Commonwealth, which also has the capacity to sue and be sued. For this reason, it is solely responsible for its acts.

There, also, we equated the Department with the Commonwealth. Upon clarifying **[\*19]** whether the Commonwealth acquired liability when the CRUV was dissolved, we add that it "has a different legal personality that is separate from the Department of Housing, and therefore, from the Commonwealth." *Pagán et al. v. ELA et al., supra, p.* 809. That is, the Department acquired the powers of the CRUV, but not its capacity to sue and be sued. *Fred v. ELA, supra to pgs. 607-609.*

**III.**

Housing appears before us and states that the TPI had an impact by not dismissing the claim filed without prejudice. This is due to alleged insufficient service of notice for having summoned the CRUV and not the Department of Housing through the Secretary of Justice.

As we indicated earlier, the CRUV is the extinct public corporation that was created in 1957, with independent legal capacity. Even when current legislation has maintained its merger and affiliation to Housing, the case law regulations have not been left without effect. Thus, our Highest Court has preserved its interpretation and expressly recognized that the CRUV is a public corporation with the capacity to sue and be sued. In view of this, it is mandatory to conclude that the CRUV maintains its legal capacity, and therefore, in a lawsuit in which it has been added as a party, it is appropriate that it be summoned as established in **[\*20]** Rule 4.4(e) of Civil Procedure, *supra*.

From the case proceedings, it is apparent that the plaintiff under appeal summoned the CRUV on April 18, 2018; a fact that is not in dispute. She indicated that she did so through an attorney with the last name González. It is not apparent from the proceedings that the authorization of Mr. González to receive summonses in its name has been challenged.[8] So the TPI acquired jurisdiction over the CRUV, since the summons as

served is sufficient.[9] It should be noted that there is a copy in the appeal of the Deed of Judicial Sale Number 121 of February 24, 1983 granted before the Notary Public Thomas Doran Gelabert, by virtue of which the assignment and transfer of the property was given to the CRUV through a mortgage execution claim process filed by the CRUV against the registered owners who assumed the mortgage in their favor.[10]

Contrary to what the petitioner states, the case procedures in question do not denote that the respondent has failed to comply with Rule 4.3(c) of Civil Procedure. On the contrary, she was diligent when summoning the party that was added in the action on contradictory domain proceedings that it filed, that is, **[\*21]** the CRUV.

The TPI understood that *Fred v. ELA, supra*, also required that Housing be summoned. Based on its interpretation, after five (5) months have passed since this dispute was raised, the TPI, in its exercising of its discretion, authorized the issuance of a summons on behalf of Housing, required the respondent to provide the summons project and in compliance with it, the respondent acted. She proceeded to serve the summons issued on February 6, 2019 on behalf of the Commonwealth of Puerto Rico through the Secretary of Justice, delivering it to Ms. Wandymar Burgos Vargas, assistant secretary.

---

[8] We noted that the serving of the summons appears as sworn and it indicates that it was done through personal delivery to Ave. Barbosa, 10th Floor and adds Mr. González. *Writ of Certiorari*, Appendix pp. 53 and 54.

---

[9] *Writ of Certiorari*, Annex 10, p. 68. The petitioner alleged in his motion to dismiss that the assets of the CRUV were transferred to the Department of Housing, but did not mention the legal basis that supports this. We note that the most recent amendments to Law No. 106-1998 were based on the fact that, "currently, the Office for Asset Management of the extinct CRUV has countless assets in its inventory, so it is estimated that the asset liquidation process will be extended longer than expected" Explanation of motives. (2001 (Part I) Laws of Puerto Rico 470-471).

[10] *Writ of Certiorari*, Appendix page 39-50.

HARRY PAGÁN RIVERA, Plaintiff-Appellee v. FELICITA RUIZ ORTIZ, ARCADIO VILLAFAÑE VIRELLA, TERESA DÍAZ VELÁZQUEZ AND THE SLG COMPRISED OF BOTH, CORPORACIÓN DE R....

We are of the opinion that this is inofficious for the purpose of acquiring jurisdiction over the CRUV. We emphasize that, according to the registry data arising from a title study of April 4, 2017, which was added to the appeal, a mortgage lien is registered in favor of the CRUV, and furthermore, a Declaration to the Demand on the Execution of an Ordinary Mortgage in civil case number 81-5411, in which the CRUV appears as a plaintiff and the registered title holders are Villafañe Virella and Díaz Vázquez, who had acquired the property in dispute from CRUV in **[*22]** 1977.

However, we also observe from the documents attached to the appeal, a copy of Deed Number 26 on the Judicial Sale granted on September 17, 2008 before the Notary Public Sotero León Colón. In its ninth clause, it states that "[t]he Office for the Liquidation of Accounts of the Puerto Rico Urban Renovation and Housing Corporation, a petitioner of the civil action of Foreclosure through the Ordinary Channels, referring to the property that is the object of this act, was replaced by its successor THE DEPARTMENT OF HOUSING OF PUERTO RICO, in accordance with Law number one hundred and six (106) of the thirtieth (30th) of June of two [sic] thousand nine hundred and ninety-eight (1998)."

It does not appear in the appeal file that the two (2) aforementioned Deeds on Judicial Sale have been registered in the Property Registry. Although in one of the Motions[11] submitted by the petitioner, it refers to a Registration Certification issued on March 19, 2018, a copy thereof was not attached and it does not mention that by virtue of such deeds the CRUV or Housing have become owners of the real estate property.

However, it does not seem unreasonable to us **[*23]** that the primary court should order a summons to be served to Housing, when in spite of the foregoing, the Commonwealth was not included in the lawsuit. And so, even when the Claim Accruing Parties mentions Housing in its allegations 12 and 13.

Our Supreme Court has ruled that in any lawsuit in which the validity of a legal business related to a real estate property is questioned, indispensable parties shall be considered those who have acquired any real right or interest in the property in question arising from the Property Registry. _López Garcia v. López García, supra._ However, in the case at hand, the validity of the

legal business is not involved, and it becomes essential to notify any person with an interest that could be affected by any remedy that may be granted with respect to the property in question of the proceeding. The documents reveal that Housing, which apparently replaced the CRUV in a real right, has a particular and special relationship with the extinct CRUV, and could be affected if the petitioner were favored in the lawsuit filed. Because Housing does not have the capacity to sue and be sued, it proceeded to summon the Commonwealth. Therefore, the first step in the process **[*24]** was **to amend the Claim to include the Commonwealth** as it is an indispensable party. The **summons** project that the petitioner presented in compliance with the TPI order was not **addressed to the defendant** as required by Rule 4.2 of Civil Procedure, since the Commonwealth is not recorded as a defendant. To provide the necessary legal certainty, the latter has yet to be done. It is necessary to amend the claim in its heading and incorporate the allegations against the Commonwealth regarding Housing as its executive department, after which the corresponding summons must be issued, the correct project of which must be accompanied by the petitioner.

In short, we conclude that the decision to deny the request for dismissal was not contrary to law. Therefore, it is appropriate to confirm the order under appeal and to act diligently in accordance with the provisions herein.

### IV.

In view of the grounds previously provided, we issued the writ of _certiorari_ and confirmed the ruling under appeal. The proceedings are returned to the Chamber of origin to carry out subsequent procedures consistent with the provisions herein.

The Court so agreed and ordered and the Secretary of the Court so certifies.

Judge Cintrón Cintrón **[*25]** dissents without a written opinion.

---

[11] Appendix of the Write of Certiorari, annex 6, p. 58-60.

HARRY PAGÁN RIVERA, Plaintiff-Appellee v. FELICITA RUIZ ORTIZ, ARCADIO VILLAFAÑE VIRELLA,
TERESA DÍAZ VELÁZQUEZ AND THE SLG COMPRISED OF BOTH, CORPORACIÓN DE R....

Ms. Lilia M. Oquendo Solís

Secretary of the Court of Appeals

---

**End of Document**



| | |
|---|---|
| **DATE OF TRANSLATION:** | 3-May-21 |
| **ELECTRONIC FILE NAME:** | Harry Pagán Rivera v. Felicita Ruiz Ortiz et al., No. KLCE201900315, 2019 PR App. LEXIS 1067 (P.R. Ct. App. Apr. 12, 2019) |
| **SOURCE LANGUAGE:** | Spanish |
| **TARGET LANGUAGE:** | English (United States) |
| **TRANSPERFECT JOB ID:** | US0974817 |

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

TCert v. 2.0

# Exhibit 6

# *DORAL BANK, Appellee v. JOSE A. RAMIREZ PEREZ T/C/C JOSE ANTONIO RAMIREZ PEREZ, HIS WIFE MARIA R. GONZALEZ IGLESIAS T/C/C MARIA DEL ROCIO GONZALEZ IGLESIAS AND THE COMMUNITY PROPERTY OF HUSBAND AND LIFE CONSTITUTED BETWEEN THEM; UNITED STATES OF AMERICA, Appellants*

Puerto Rico Court of Appeals, San Juan Judicial Region

March 13, 2013

KLAN201201734

**Reporter**

2013 PR App. LEXIS 944 *

DORAL BANK, Appellee v. JOSE A. RAMIREZ PEREZ T/C/C JOSE ANTONIO RAMIREZ PEREZ, HIS WIFE MARIA R. GONZALEZ IGLESIAS T/C/C MARIA DEL ROCIO GONZALEZ IGLESIAS AND THE COMMUNITY PROPERTY OF HUSBAND AND LIFE CONSTITUTED BETWEEN THEM; UNITED STATES OF AMERICA, Appellants

**Previous History:** [*1] Appeal from the Court of First Instance. Higher Chamber of San Juan. K CD2010-3652 (603).

## Case Summary

### Main Terms

summons, judgment, rebellion, party, court, on, edict, lawsuit, address, as, defendant, without, notification, motion, against, hearing, case, appellant, effect, copy, be, our, requirements, Rule, this, by, person, when, these, jurisdiction

**Judges:** PANEL III. Panel composed of its president, Judge Ramírez Nazario and Judges Piñero González and Rodríguez Casillas.

**Opinion by:** Ramirez Nazario

## Opinion

Ramírez Nazario, Reporting Judge

### SENTENCE

In San Juan, Puerto Rico, on March 13, 2013.

Mrs. Rocío González Iglesias[1] (the appellant or Mrs. González) appears before this Court and requests the revocation of a judgment issued in contempt on October 3, 2011 by the Court of First Instance of the Court of San Juan (TPI). By virtue of the aforementioned judgment, the TPI declared with place a lawsuit on collection of money and foreclosure of mortgage, filed by Doral Bank (Doral) against the appellant, her husband Mr. José A. Ramírez Pérez (Mr. Ramírez) and the Property Tax Law Society (SLG) comprised by the same.

Having examined the briefs submitted for our consideration, in light of applicable law, we revoke the contested judgment.

---

[1] Ms. González appears on behalf of herself and the community property of husband and wife comprised of her and Mr. José A. Ramírez Pérez.

DORAL BANK, Appellee v. JOSE A. RAMIREZ PEREZ T/C/C JOSE ANTONIO RAMIREZ PEREZ, HIS WIFE MARIA R. GONZALEZ IGLESIAS T/C/C MARIA DEL ROCIO GONZALEZ IGLESIAS AND THE...

-I-

On November 30, 2010, Doral Bank filed a **[*2]** lawsuit on the collection of money and foreclosure of mortgage by the ordinary means against Ms. González, Mr. Ramírez and the SLG comprised by them. It was alleged in the lawsuit that the spouses Ramírez-González granted a mortgage in guarantee of a promissory note that guaranteed the amount of $131,250.00 of principal, plus annual interest at 9.50%, costs, expenses and attorney fees. It was stated that that amount should be paid in monthly installments of $1,103.62 beginning on October 1, 1999. It was added that the spouses Ramírez-González failed to comply with their obligation by failing to pay the monthly payments due since April 1, 2010.

It arises from the record that Ms. González was summoned personally with a copy of the claim on December 3, 2010. The SLG was also summoned through the appellant on December 7, 2010.

In view of the fact that Doral could not summon Mr. Ramírez personally, it thereby requested his summons by means of an edict. The aforementioned edict was published in the newspaper El Vocero, on February 24, 2011. A copy of the claim, order and summons by edict was sent to Mr. Ramírez on February 28, 2011, to the following addresses: (1) Development **[*3]** Sagrado Corazón 1623, Calle Úrsula, San Juan, P.R., **00945**, (2) Calle Santa Úrsula # 1623, Dev. Sagrado Corazón, San Juan, P.R., **00945**.

After the term to reply and in view of the fact that neither the appellant, nor Mr. Ramírez, nor the SLG presented the corresponding responsive allegation, on March 30, 2011, Doral submitted a "Motion Requesting a Declaration of Contempt and for a judgment to be issued in accordance with Rule 45.2 (b) of Civil Procedure." In that motion, Doral certified having sent a copy of the motion "to the defendants in the heading to their address of record by regular mail."[2] In response to this motion, the appellant appeared before the TPI on April 12, 2011 by way of a "Motion Requesting Extension". Although she acknowledged in this motion that she had been summoned on December 3, 2010, she stated that her husband, Mr. Ramírez, needed to be summoned "who is an indispensable part of this proceeding". She also stated that upon receiving the

summons, she began communications with Doral in order to explore payment alternatives, so she understood that the proceedings were suspended. She added that upon receiving the motion requesting the declaration of contempt, she proceeded to contract **[*4]** legal representation. Thus, she requested a term of 30 days to respond to the claim.

In response to this extension motion, the TPI issued an order on April 20, 2011, requiring Doral to react in ten days. In addition, it ordered him to submit evidence of the "notification by certified mail with acknowledgment of receipt of the edict." Thus, Doral appeared on May 2, 2011, and opposed the granting of the extension requested by the appellant and submitted a copy of the evidence of sending the edict by certified mail, which had been requested. Despite having the positions of both parties and after several months, **the TPI did not issue any order or resolution having available the motion for extension presented by Ms. González**. In view of this, on June 29, 2011, Doral submitted a motion in which it is reiterated in its request of March 30 that the contempt be noted to the spouses Ramírez-González and the SLG and that the corresponding judgment be handed down in contempt. Together with the aforementioned motion, Doral presented a draft Judgment.

Thus, on October 3, 2011, the TPI issued the order that is transcribed below:

> As of this date **[*5]** the term requested by the defendant has elapsed. With no response, all parties summoned are considered to be in contempt.

Said order was notified to the spouses Ramírez-González and the SLG, on October 11, 2011, to the following address: Sagrado Corazón Development, 1623, Calle Úrsula, San Juan, P.R. **00945**.

It should be noted that on that same day, October 3, 2011, the TPI issued a judgment in contempt against the spouses Ramírez-González and the SLG.

On the summons of the defendants, the TPI provided the following:

> The defendant duly summoned and having not appeared to answer or make any kind of allegation to the Claim, its contempt was duly noted in accordance with the provisions of Rule 45.1 of the Civil Procedure of Puerto Rico, 32 L.P.R.A. Ap. V,

---

[2] See Appendix Appeal, Pg. 20.

DORAL BANK, Appellee v. JOSE A. RAMIREZ PEREZ T/C/C JOSE ANTONIO RAMIREZ PEREZ, HIS WIFE
MARIA R. GONZALEZ IGLESIAS T/C/C MARIA DEL ROCIO GONZALEZ IGLESIAS AND THE...

R. 45.1. Having noted the defendant's contempt and not having among the allegations of the Claim any assertion that has to be verified, for the facts have been correctly alleged and, in addition, with these facts corroborated by a Sworn Declaration that was submitted, as well as the documents that were made part of said Sworn Declaration, the Court **[*6]** considers all the allegations of the claim accepted and therefore concludes that it is not necessary to hold a hearing in contempt. See Rule 45.2 (b) of Civil Procedure, 32 L.P.R.A. Ap. V. R. 45.2 (b).

In disagreement with the declaration in contempt made by the TPI, on October 19, 2011, Ms. González submitted a motion for reconsideration. She requested that the contempt be lifted and that she be allowed to submit her statement of defense to the claim. In support of her request, she maintained that she had submitted a request for extension on April 12, 2011, and that the TPI granted Doral ten days to express itself in this regard. However, at that date **Doral had not filed its opposition nor had it been notified him with a copy of this**. She added that she had **also not received any resolution from the court resolving her request for extension**. In turn, the appellant submitted a motion to the TPI requesting that Doral be ordered to notify it with a copy of all the pleadings submitted to said court since the appellant appeared by request for extension. In light of these motions, the motion for reconsideration and the "Motion **[*7]** Requesting that we be notified" are understood, and the TPI asked Doral to react in ten days.

In compliance with said order, Doral submitted pleadings dated November 7, 2011, in which it stated that by mistake or inadvertently it had sent the appellant's notifications to an incorrect address and proceeded to notify them correctly.

Thus, the appellant submitted a "Motion Establishing Additional Grounds Request for Reconsideration of Declaration of Contempt once we Had Been Notified of the Motions Filed by Doral Bank." In this motion, Ms. González tells the TPI that the address that appeared on record and to which both the TPI and Doral were sending the correspondence was incorrect. Thus, she maintained that the address provided by Doral for the spouses Ramírez-González, in the claim was: Dev. Sagrado Corazón, 1623 Calle Úrsula, San Juan, P.R., **00945**. However, their correct address is: Dev. Sagrado Corazón, 1623 Calle Santa Úrsula, San Juan, P.R., **00926**. (Note that the zip code is different.) She alleged

that after being summoned, she met with personnel from Doral's "Loss Mitigation" Department, to try to reach **[*8]** a loan restructuring agreement, by not receiving any other notification on the lawsuit she understood that it had been suspended and therefore did not submit her Statement of Defense to the claim.

Ms. González also stated that Doral published an edict to summon Mr. Ramírez and that from the motion filed for these purposes, it appears that Doral notified him with a copy of the edict, summons and claim, to an incorrect address. In this regard, she reiterated that the postal code that appears in the envelope of the notification is **00945**, when it should have been **00926**.

She also maintained that she has never received any order or pleadings referring to this case, with the exception of an order of April 8, 2011, on the declaration of contempt against her. Regarding this notification, she indicated that the envelope shows the zip code 00945 scratched out manually and 00926 is written on top of it and she concludes that **said correction** made it possible for this notification **to reach her**[3]. She maintained that it is based on this notification that she proceeded to contract legal representation and submitted the request for extension to respond. She added that, as the request for extension was submitted outside of the term, the instance court had the discretion to grant it **[*9]** or deny it and that, therefore, "she was prevented from submitting a Statement of Defense to the claim since the court had not granted her request for extension." In short, she reiterated that she did not submit the corresponding reply because she was unable to submit it without the court having authorized it. She also argued that because she had not received the corresponding notifications in a timely manner, she did not know that Mr. Ramírez had been summoned by edict. This explains why her request for extension stated that there were indispensable parts were missing in the lawsuit.

Based on the above, she maintained that it was appropriate for the TPI to render without effect the judgment handed down in contempt, among other reasons, because (1) the lack of notification of the pleadings and orders of the court deprived her of due process of law and (2) in view of the fact that Mr. Ramírez was notified of the summons by edict to an incorrect address, such a summons was defective which deprived the TPI of jurisdiction over an indispensable

---

[3] See copy of envelope, Ap Pg. 114.

DORAL BANK, Appellee v. JOSE A. RAMIREZ PEREZ T/C/C JOSE ANTONIO RAMIREZ PEREZ, HIS WIFE
MARIA R. GONZALEZ IGLESIAS T/C/C MARIA DEL ROCIO GONZALEZ IGLESIAS AND THE...

part and that, therefore, the judgment issued was null and void.

Subsequently, Mr. Ramírez appeared, for the first time, in the lawsuit. He submitted a document entitled **[*10]** "Special Appearance Challenging the Summons by Edict and Requesting a Suspension of Judgment." It states that, through Ms. González, he had come to know of the judgment in contempt issued against him. He indicated that he was never notified of the lawsuit that Doral filed against him and that he was unaware that he had been summoned by edict. He maintained that the address to which a copy of the claim and of the summons by edict were sent, via certified mail, **had an incorrect zip code that does not correspond to his last known address**. He added that the notifications sent by Doral, before filing the claim, were sent to the correct address containing zip code 00926. Finally, he alleged that Doral had failed to comply with Rule 4.6 of Civil Procedure on the summons by edict, by notifying him of a copy of the lawsuit and the summons by edict at an address that does not correspond to his last known address, so the TPI never acquired jurisdiction over his person. Based on this, he requested that the judgment handed down in contempt be rendered null and void, since it was null and void.

For her part, on December 5, 2011, Ms. **[*11]** González submitted another brief to the TPI in which she argued additional grounds for the judgment issued to be rendered null and void. For these purposes, she stated that the TPI should have held a hearing in contempt before issuing a judgment. As a basis for this, she stated that in accordance with the clauses of the mortgage contract granted by the parties, Doral was prevented from accelerating the maturity of the same without first proceeding to carry out certain procedures detailed in the aforementioned contract. She indicated that if the TPI had held a hearing it would have verified that Doral had failed to comply with the aforementioned obligation, so it was prevented from demanding the total amount of the obligation.

On November 28, 2011, the TPI requested Doral to present its position. In compliance with this order, Doral submitted a document before the TPI through which it opposed the motion for reconsideration filed by the appellant because it was in breach, in its opinion, with the rules of civil procedure. In addition, it opposed the motion for Suspension of Judgment filed by Mr. Ramírez. Regarding this, it stated that regardless of the error in the zip code, the notifications were returned because **[*12]** Mr. Ramírez did not claim them at the

post office and that is why said correspondence was classified as "unclaimed" by the mail service, regardless of the error in the zip code. It added that its notifications comply with the criterion on the reasonably calculated address, within the circumstances of the case, to give notice to the opposing party. Finally, it maintained that the address used to notify the spouses Ramírez-González is the one that appears in the promissory note signed by the parties. For these arguments, among others, it alleged that the judgment handed down in contempt was not admissible.

Thus, on June 22, 2012, with the parties notified on October 3, 2012, the TPI issued a resolution whereby it declared that the Motion for Reconsideration submitted by Ms. González was not admissible. **The TPI provided nothing about the motion for Suspension of Judgment filed by Mr. Ramírez.**

-II-

Due to their disagreement with the proceedings of the court of instance, the appellant appeared before this Court by means of an appeal and raised the commission of the following indications of error:

> 1. The Honorable Court erred in annotating and issuing a judgment in **[*13]** contempt against the plaintiff-appellant party [sic] María del Rocío González when the request for extension made by the defendant-appellant party to file an answerable allegation in the case was pending award by the TPI.
> 2. The Honorable Court erred in issuing a judgment in contempt against the co-defendant José A. Ramírez Pérez despite the non-compliance of Doral Bank with the requirements of Rule 4.7 of Civil Procedure by sending a copy of the summons and the claim to this co-defendant to an incorrect address that does not belong to him.
> 3. The co-defendant José A. Ramírez Pérez is an indispensable party in this proceeding and since the judgment in contempt issued by the TPI on October 3, 2011 has not been duly summoned, it is null and void for having been issued without having acquired jurisdiction over this defendant.

DORAL BANK, Appellee v. JOSE A. RAMIREZ PEREZ T/C/C JOSE ANTONIO RAMIREZ PEREZ, HIS WIFE MARIA R. GONZALEZ IGLESIAS T/C/C MARIA DEL ROCIO GONZALEZ IGLESIAS AND THE...

4. The TPI erred in having issued a judgment in contempt, without holding a rebellious hearing, in favor of Doral Bank accelerating or declaring the entire loan as overdue when the evidence submitted by Doral Bank in support of its request for a judgment in contempt does not show evidence that Doral Mortgage complied with the requirement of prior notification **[\*14]** to be able to declare the entire loan imposed by clause 18 of the deed of incorporation of the first mortgage as overdue.

-III-

-A-

The summons constitutes "the inaugural step of due process of law that makes the exercise of judicial jurisdiction viable" within our adversary system of justice. *Acosta v. ABC, Inc., 142 DPR 927 (1997)*; *Reyes v. Oriental Fed. Savs. Bank, 133 DPR 15 (1993)*; *Pagán v. Rivera Burgos, 113 DPR 750 (1983)*. On the one hand, the summons seeks to notify the defendant in a civil lawsuit that a legal claim has been filed against it and to guarantee its right to be heard and defended. *Banco Popular v. S.L.G. Negrón, 164 DPR 855 (2005)*; *Datiz v. Hospital Episcopal, 163 DPR 10 (2004)*; *Bco. Central Corp. v. Capitol Plaza, Inc., 135 DPR 760 (1994)*. On the other hand, it constitutes **the means by which the courts acquire jurisdiction over the person** of the defendant, in such a way that said person is bound by the opinion that is finally issued. *Banco Popular v. S.L.G. Negrón, supra; Márquez v. Barreto, 143 DPR 137 (1997).* (Emphasis added.)

**The proper completion of the summons constitutes a constitutional imperative of the due [\*15] process of law**, so **strict** compliance is required when obeying its requirements. *Banco Popular v. S.L.G. Negrón, supra; Datiz v. Hospital Episcopal, supra; Chase Manhattan Bank v. Polanco Martínez, 131 DPR 530 (1992); Rodríguez v. Nasrallah, 118 D.P.R. 93 (1986).* (Emphasis added.) With regard to the term in which the summons must be processed, Rule 4.3 (c) of the 2009 Civil Procedure, 32 L.P.R.A. Ap. V, R. 4.3(c), provides that it will be processed within one hundred and twenty (120) days from the filing of the defendant or date of issuance of the summons by edict. The aforementioned rule adds the following:

The Secretary shall issue the summons on the same day the claim is filed. If the Secretary does not issue it on the same day, the time that it takes will be the same additional time that the courts will grant to process the summons once the plaintiff has submitted a request for extension in a timely manner. After this period has elapsed without the summons having been served, the Court must issue a judgment decreeing the dismissal and filing without prejudice. **[\*16]** A subsequent dismissal and filing for breach of the term provided herein shall have the effect of an award on merit. 32 L.P.R.A. Ap. V, R. 4.3(c).

However, although the personal processing of the summons is the most suitable method to acquire jurisdiction over the person, by way of exception, the Rules of Civil Procedure authorize the summons by edict. *Banco Popular v. S.L.G. Negrón , supra.* Thus, when the person to be summoned, being in Puerto Rico, cannot be located after the relevant proceedings have been carried out, it is appropriate that their summons be made through the publication of an edict. *Id.*

In accordance with the foregoing, Rule 4.6 of the Civil Procedure of 2009, 32 L.P.R.A. Ap. V, R.4.6, provides on the "Summons by edicts and their publication":

**a.** When the person to be summoned is outside Puerto Rico, or that, although being in Puerto Rico, he or she could not be located after the relevant proceedings were carried out, or hide themselves so that they cannot be summoned, or if it is a foreign corporation without a resident agent, and this is verified to the satisfaction of the court by means of an affidavit that expresses said proceedings, and also appears **[\*17]** of said declaration, or the claim filed, that there is a complaint that justifies the granting of a remedy against the person to be summoned, or that said person is an appropriate party in the lawsuit, **the court may issue an order to provide for the summons to be made by an edict**. No unsuccessful service of notice will be required as a condition for issuing the order that provides that the summons be made by edict. (Emphasis added.)

DORAL BANK, Appellee v. JOSE A. RAMIREZ PEREZ T/C/C JOSE ANTONIO RAMIREZ PEREZ, HIS WIFE MARIA R. GONZALEZ IGLESIAS T/C/C MARIA DEL ROCIO GONZALEZ IGLESIAS AND THE...

It follows from the above statute that the requirements for authorizing a summons by edict are limited to the Court being accredited by means of a sworn declaration of the proceedings to summon the defendant, who has not been able to be summoned for any of the causes contemplated in the civil procedural order and that also appears in the declaration or claim filed that there is a claim justifying the granting of a remedy. The Supreme Court has expressed that in the event that the plaintiff submits a sworn statement to the court -- in order to justify the summons by edict -- it has to detail all the efforts made to summon the defendant and its content has to be sufficient **[*18]** in order to inspire the necessary judicial conviction. *Global v. Salaam, 164 DPR 474 (2005).*

With regard to the evidence of the service of notice of the summons, Rule 4.7 of the Civil Procedure provides that:

**Rule 4.7. Proof of service of notice**

The person serving the summons shall submit to the Court the record of having done so within the period granted to the person summoned to appear. If the service of notice was carried out by a bailiff, its evidence will consist of a certification for this purpose; if it was carried out by a private person, it will consist of their sworn statement. **In the event that the notification of the summons is made by edicts, its publication will be proven by means of the sworn statement of the administrator or authorized agent of the newspaper, accompanied by a copy of the published edict and a document from the lawyer certifying that a copy of the summons and the claim was deposited in the mail.** In the cases of summons included in Rule 4.3 (b)(2) and (5), the service of notice will be confirmed by means of an affidavit that establishes compliance with all the requirements set forth by the order of **[*19]** a judge. In the case covered by Rule 4.6, the acknowledgment of receipt of the defendant will be submitted. The failure to present proof of service of notice shall not have effect as to its validity. The admission of the defendant that he or she has been summoned, their waiver of the service of notice of the summons or their appearance will make such evidence unnecessary. 32 L.P.R.A. Ap. V, R. 4.7. (Emphasis added.)

From the aforementioned rules, it arises that the most important requirements of the summons by edicts are: (1) the initial affidavit in which the proceedings carried out to locate the person to be summoned are expressed; (2) **that it has been sent to the defendant by certified mail, to the last known address, within 10 days after the order was issued to be summoned by edict, a copy of the claim and the summons**; and (3) the publication or service of notice of the edict within 120 days after being issued. The edict must contain certain specific information, for example, specify the nature of the lawsuit for the summons to be valid. J. A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Publicaciones J.T.S., 2011, T. I, pg. 354. **[*20]** (Emphasis added.)

It is necessary to emphasize that the statutory provisions to acquire jurisdiction over the person of a defendant, by means of the publication of edicts in replacement of personal notification, **must be strictly observed**. The summons method used by the plaintiff must have **a reasonable probability of notifying or informing the defendant of the action taken against it, in such a way that it can appear to defend itself, if it so wishes**. *Marquez Rest v. Barreto Lima, 143 D.P.R. 137 (1997).* (Emphasis added.)

It should be noted that with regard to the requirement to notify the defendant of a copy of the summons and the claim, in the new Rules of Civil Procedure of 2009, Rule 4.6, above, underwent a change. For these purposes, the phrase "last known residence" was replaced by "by last known physical or postal address". This change was due to the fact that the purpose of the rule is not to create restrictions on the place where the notification to the defendant is addressed with a copy of the claim and the summons. J. A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Publicaciones J.T.S., 2011, T. I, pg. 353. In *Rodríguez v. Nasrallah, 118 DPR 93* (1986), **[*21]** the Supreme Court interpreted that notification requirement. To this end, it stated that the address had to comply with the requirement of **being reasonably calculated**, within the concurrent circumstances, **to give notice to the opposing party**. *Id.*, to pg. 102. In the aforementioned case, the Supreme Court adopted the criterion expressed in *Evans v. Galloway, 701 P.2d 659, 661 (Ohio 1985)* on "the reasonably calculated address". This rule was then repeated in *Rivera v. Jaume, 157 D.P.R. 562 (2002)*, where it was resolved that the party notifying by edict complies with the requirement of notification to the place

DORAL BANK, Appellee v. JOSE A. RAMIREZ PEREZ T/C/C JOSE ANTONIO RAMIREZ PEREZ, HIS WIFE MARIA R. GONZALEZ IGLESIAS T/C/C MARIA DEL ROCIO GONZALEZ IGLESIAS AND THE...

of the last known address of the defendant **if the notification is sent to a physical or residential address that within the particular circumstances of the case, has a reasonable possibility of informing the defendant of the claim filed against it**. *Id.* (Emphasis added.)

In *Rivera v. Jaume, supra*, the plaintiff sent the notification to a PO Box, the only address he knew from the information provided by the defendant's brother. The notification was returned by the postal service with the annotation of "*unclaimed*". In this case, the defendant challenged **[*22]** the judgment in contempt handed down against him because jurisdiction over him was never acquired. The Supreme Court extensively evaluated the precedents and practice on this issue in Puerto Rico and in state courts. **It distinguished the situation in which the recipient does not claim the correspondence compared to when it expressly rejects it**. There is no doubt that it will be notified in this last situation. *Id.* (Emphasis added.)

From the analysis carried out by the Supreme Court, it arises that only **in extraordinary circumstances** have state courts declared the summons by edicts or by regular mail valid when the notification of the claim and the summons have been returned by the postal service. *Id.*, on p. 582, which cites with approval *Danz v. Lockhart, 967 P.2d 1075 (1998).* Therefore, in order to safeguard the due process of law to the defendant, Rivera *v. Jaume* states that **the a quo court must, at least, inquire about whether the plaintiff knew or was sure, to the best of its knowledge, that the address that it provided to it belonged, or once belonged, to the defendant**." (Emphasis added.) *Id.*, at pp. 582-583.

In summary, authorized **[*23]** by the Court the summons by edicts, the plaintiff will seek the publication of the edict in a newspaper of general circulation, and within ten days following the publication, it will send to the defendant, by certified mail, at the last known address, a copy of the summons and the claim filed. The plaintiff must make reasonable efforts to notify the defendant. **In the presence of doubt as to whether the defendant was notified, the court of instance must inquire about these efforts**. (Emphasis added.)

Finally, we must emphasize that **when the summons is served incorrectly, the appropriate remedy is not the dismissal of the action, but to order the summons to be repeated.** However, since **the requirements of the summons are requirements of due process of law, without its compliance, the court lacks jurisdiction over the person of the defendant**, so any judgment that is issued **will be null and void**. *Banco Popular v. S.L.G. Negrón, supra.* (Emphasis added.)

**B-**

On the other hand, Rule 45.1 of Civil Procedure, 32 L.P.R.A. Ap. V, R. 45.1, provides that the declaration of contempt shall be justified "when a party against which **[*24]** a judgment granting an affirmative remedy is requested that has ceased to present allegations or otherwise defend itself as provided in these rules." *Id.* See also, *Ocasio v. Kelly Servs.*, 163 D.P.R. (2005); *Álamo v. Supermercado Grande, Inc., 153 D.P.R. 93 (2002)*. This remedy operates both in situations in which the defendant does not comply with the requirement to appear to answer the claim or to defend himself in another manner prescribed by law, without presenting any allegation against the remedy requested; as in those in which he has failed to comply with any court mandate, which motivates the latter to impose the contempt as a penalty.

In summary, contempt is the procedural position in which the party that has stopped fulfilling a procedural duty or stopped exercising its right to defend itself is placed. Thus, Rule 45.1 of the Civil Procedure, *supra*, allows for the declaration of two types of contempt: for failure to appear or as a penalty.

The reason why the figure of contempt was created was to stimulate the parties in litigation to process the proceedings diligently. For this reason, the Court, at the time of resolving a motion requesting the declaration of contempt, **must interpret Rule 45 of Civil Procedure, [*25]** *supra*, **liberally, which means that it must always resolve any doubt in favor of the party opposing the granting of the contempt**. This interpretation is consistent with the judicial doctrine that prefers cases to be seen on their merits. *Neptune Packing Corp. v. Wackenhut Corp., 120 D.P.R. 283 (1988)*; *Imp. Vilca, Inc. v. Hogares Crea, Inc., 118 D.P.R. 679* (1987). (Emphasis added.)

DORAL BANK, Appellee v. JOSE A. RAMIREZ PEREZ T/C/C JOSE ANTONIO RAMIREZ PEREZ, HIS WIFE MARIA R. GONZALEZ IGLESIAS T/C/C MARIA DEL ROCIO GONZALEZ IGLESIAS AND THE...

It should be noted that the **purpose of Rule 45** of Civil Procedure, *supra*, is **not to confer an advantage on the plaintiffs** that allows them to obtain a judgment without a hearing on merits; but it is a procedural lack for the benefit of the good administration of the awarding function. *J.R.T. v. Missy Mfg. Corp., 99 DPR 805 (1971).* (Emphasis added.) It really constitutes a deterrent for the parties that resort to the delay of judicial proceedings as an element of their litigation strategy. Thus, it functions as a coercive remedy against an opponent, who, having been granted the opportunity to refute the claim, due to its passivity or recklessness, opts not to defend itself. *Álamo v. Supermercado Grande, Inc., supra; Ocasio v. Kelly Servs., Inc., supra.*

It is warned **[*26]** that the court, if it so deems necessary, must hold the **evidence hearings** it deems **necessary** so that the plaintiff supports its allegations by applying the provisions of Rule 45.2 (b) of the 2009 Civil Procedure, which reads, in what is pertinent, as follows:

Rule 45.2. Judgment
  (a) [...].

  (b) [...] If in order for the court to be able to issue a judgment or to execute it, it is necessary to set the status of an account, or determine the amount of the damages, or prove the veracity of any assertion by means of evidence or to carry out an investigation of any other matter, **the court must hold the hearings it deems necessary** and appropriate or entrust the matter to a commissioner. When the party against which a judgment in contempt is requested has appeared in the lawsuit, said party shall be notified of the indication of any hearing in contempt held. (Emphasis added.) 32 LPRA Ap. V, R. 45.2

In accordance with the above standard, in the *Continental Ins. Co vs. Isleta Marina, 106 D.P.R. 809 (1978),* on page 817, the Supreme Court expressed as regards the awarding of a lawsuit in contempt, that:

...the courts are not merely obligated automatas **[*27]** to grant indemnifications for diluting a case in contempt. For the release of such a delicate matter, the law recognizes that the process for forming judicial awareness requires the verification "of any assertion" by means of evidence. To this end, the court "shall hold the hearings it deems necessary and appropriate." And with reference to a defendant in contempt - who has previously appeared - it

desires the right to hear the accusation, attend the hearing, cross-examine the witnesses of the plaintiff, challenge the amount and appeal the judgment. It does not waive the defense of lack of jurisdiction or that the claim does not adduce facts constituting a cause of action in favor of the claimant. **In other words, a process in contempt does not guarantee *per se*, a favorable judgment to the plaintiff**; the defendant does not admit incorrectly alleged facts or conclusions of law. (Citations omitted). (Emphasis added.)

On the other part, in accordance with Rule 45.3 of Civil Procedure, 32 L.P.R.A. Ap. V, **just cause is required for a court, in the exercise of its discretion, to render without effect a declaration of contempt or a judgment in contempt.** To **[*28]** render without effect a judgment in contempt, in addition to just cause, Rule 45.3, *supra*, refers to Rule 49.2 of Civil Procedure, 32 L.P.R.A. Ap. V. *In Neptune Packing Corp. v. Wackenhut Corp., 120 D.P.R. 283, 294 (1988),* the Supreme Court ruled that "the criteria inherent to Rule 49.2 of Civil Procedure, *supra*, such as if the petitioner had a good defense in its merits, the time between the judgment and the request for relief, and the degree of prejudice that may be caused to the other party when the granting of the suspension of sentence are equally applicable when requesting a judgment in contempt to be deemd null and void." *Id.*

If the defendant has a good defense and the reopening of the case does not cause any harm to the party that promoted the declaration and the ruling in contempt, denying the request for suspension would constitute a clear abuse of discretion. *Neptune Packing Corp. v. Wackenhut Corp., supra; Murphy Lugo v. Atl. So. Insurance, 91 DPR 335 (1964).* **In these cases, the scale must always be inclined in favor of the hearing on the merits of the matter, unless the circumstances of the case are of such a nature that they reveal [*29] a stubborn or reckless spirit on the part of the defendant.** *Fine Art Wallpaper v. Wolff, 102 DPR 451* (1974); *J.R.T. v. Missy Mfg. Corp., supra.* This solution is in accordance with the legal doctrine that obliges the courts to liberally interpret Rules 45.3, *supra*, and 49.2, *supra*, and **compels them to resolve any doubt in favor of the defendant requesting that the judgment handed down in contempt** be rendered null and void so that the lawsuit can be resolved on its merits. *Diaz v. Higher Court, 93 DPR 79, 87 (1966).* (Emphasis added.)

DORAL BANK, Appellee v. JOSE A. RAMIREZ PEREZ T/C/C JOSE ANTONIO RAMIREZ PEREZ, HIS WIFE MARIA R. GONZALEZ IGLESIAS T/C/C MARIA DEL ROCIO GONZALEZ IGLESIAS AND THE...

In any case, the determination to suspend the declaration of contempt is sustained in the sound discretion of the judge of First Instance to whom it is appropriate to gauge the justification given by one party to depart from the diligent and timely procedure in the processing of their case. If there is no abuse of that discretion, we should not replace our criterion with the court that conducts the civil process. *Garriga Gordils v. Maldonado*, 109 DPR 817 (1980); *Banco Central Corp. v. Gelabert* Álvarez, _131 DPR 1005 (1992)._

-IV-

In summary, Ms. González contends that the TPI had an impact when issuing a judgment in contempt and should have left it without effect. For **[*30]** it is based on three fundamentals. In the first place, she alleges that it did not submit a rejoinder because the TPI never resolved the request for extension that it submitted. She understands that the TPI could not issue a judgment when it was still pending to resolve its request for extension to answer.

Secondly, she argues that Mr. Ramírez is an indispensable party in the lawsuit and that he was not summoned in accordance with the law by not being notified with a copy of the summons, lawsuit and edict as required by the Rules of Civil Procedure. She maintains that, as she was not properly summoned, the *a quo* court never acquired jurisdiction over him and the judgment issued is null and void.

Thirdly, she indicates that before issuing a judgment, the TPI was obliged to hold a hearing. She bases her contention on certain clauses of the mortgage contract that impose certain obligations on Doral before being able to demand payment of the debt. She understands that the TPI should have first verified, through a hearing for these purposes, that Doral had complied with such requirements before proceeding to issue a judgment. The appellant has the reason.

After examining the procedural tract of the case in the proceedings, it arises that both **[*31]** the court of first instance and Doral have made errors that adversely affect the rights of the appellant.

On the first grounds of the appellant, it is clear from the file that the TPI never resolved the motion for extension submitted by Ms. González. This, after having accepted it for its consideration and requiring Doral's position in this regard. The TPI should have resolved it as part of the due legal procedure. However, it never made use of it.

As the appellant indicates, after the period to answer provided in Rule 10.1 of Civil Procedure, 32 L.P.R.A. Ap. V. R. 10.1, and in view of the consideration of the TPI, a request for termination for such, the party could not assert the power to submit the answer without the determination and authorization of the court of instance. Ms. González could also not assume that the silence of the court appealed implied that the extension had been granted, nor could she assume its refusal. This being the case, the TPI insisted on proceeding to issue a judgment in contempt against the appellant. For this sole reason, the judgment in contempt appealed should have been rendered ineffective by the TPI.

On the other grounds **[*32]** outlined by the appellant, the lack of jurisdiction over the person of Mr. Ramírez due to failure in the service of summons and, therefore, lack of an indispensable party, and on the impossibility of Doral to claim the debt without having complied with certain requirements established in the loan contract, we conclude that they constitute just cause for which TPI should have rendered the declaration of contempt null and void, and consequently, the judgment issued as well.

The appellant argues that before issuing a judgment in contempt, the TPI should have held an evidentiary hearing. As we mentioned, it contends that Doral was prevented from demanding the total payment of the debt and the foreclosure of the mortgage without first complying with clause 18 of the deed of incorporation of the first mortgage. In accordance with this, Doral was contractually obliged to send a notification by mail specifying the breach, the action required to remedy said breach, the deadline for this, which will not be less than 30 days from the notification, and the warning that failing to remedy said breach on or before the indicated date may result in the acceleration of the maturity of **[*33]** payment of the sums guaranteed by the mortgage.

DORAL BANK, Appellee v. JOSE A. RAMIREZ PEREZ T/C/C JOSE ANTONIO RAMIREZ PEREZ, HIS WIFE MARIA R. GONZALEZ IGLESIAS T/C/C MARIA DEL ROCIO GONZALEZ IGLESIAS AND THE...

It maintains that, in view of this, the TPI should have held a hearing to verify compliance with these requirements. Let us remember, in this sense, that Rule 45.2 *supra* itself, warns that if in order for the court to issue a judgment or to enforce it, it is necessary to verify the veracity of any assertion by means of evidence or to carry out an investigation of any other matter, the court must hold the hearings it deems necessary and appropriate.

We understand in this case, that in view of the allegations on breach of the signed contract, which would give rise to the inadmissibility of the claimed debt, the TPI had to hold a hearing to receive evidence in this regard and adjudicate the matter.

As for Ms. González's remaining approach, we saw that our legal system requires that the requirements of the summons be **strictly** complied with by edict. This is so, since the courts only acquire jurisdiction over the person of the defendant through a well-served summons. *Medina Garay v. Medina Garay, supra*. In this regard, our Supreme Court stated that, "**it is the combination of both requirements, the publication [\*34] of the edict with all the required information and the sending of the copy of the summons and the claim to the last known address of the defendant, which means that this mechanism of summons by means of an edict has a reasonable probability of notifying the defendant of the actions being filed against it, allowing it to make an informed decision about whether or not to appear to defend itself**." *Id.* Let us remember that the summons method used must have a reasonable probability of notifying or informing the defendant of the action being filed against it, so that it can appear to defend itself. *Márquez the rest v. Barreto Lima, supra.*

In the file there is a copy of the envelopes in which the notification was sent to Mr. Ramírez. These appear with a postage service annotation that says "unclaimed", which means that said correspondence was returned. Faced with this fact, the TPI had to ensure that the address provided by Doral was a correct address. That is, in the interests of safeguarding the due procedure of law for Mr. Ramírez, the court had to, at least, inquire about whether Doral effectively knew and was sure, [\*35] to the best of its knowledge, that the address that was provided to the court belonged to the defendant. The court should not have settled and given full credit to

the information provided by Doral[4], when it had before it evidence that, as a matter of reality, raised doubts about whether the address used to send the notification of the claim and the summons, was the correct address of Mr. Ramírez. That is, the TPI had to ensure that the mechanism used to summon him had a reasonable probability of notifying him of the action file against him. We can conclude that, in the case at hand, the reasonable probability of notifying Mr. Ramírez of the lawsuit filed against him was disrupted or diminished when the notification of the summons was sent to an incorrect address. The doubt created by this fact should have been **sufficient cause** to move the discretion of the TPI in favor of the party that opposes the judgment issued in contempt. Thus, it should have left it null and void and ordered a new summons of Mr. Ramírez. Note that the TPI also did not hold an evidentiary hearing to try to resolve this matter with the best elements of trial. To [\*36] so acting, it abused its discretion.

As we have seen, the proper service of notice of the summons constitutes a constitutional imperative of due procedure of law, for which strict compliance is required when obeying its requirements. Remember that this constitutes the means by which the courts acquire jurisdiction over the person of the defendant, in such a way that it becomes bound by the final opinion issued. This, coupled with the liberal form with which the court must interpret Rule 45 of Civil Procedure, *supra*, forces us to conclude that the court appealed influenced the refusal to render the judgment handed down in contempt null and void. After all the purpose of the aforementioned rule is not to confer an advantage on the plaintiffs that allows them to obtain a judgment without a hearing on merits.

It should also be noted that in this case, the community property of husband and wife, the spouses Ramírez González, also appears as a defendant. In accordance with the new rules of civil [\*37] procedure in effect, the community property of husband and wife is summoned to deliver a copy of the claim and the summons to **both** spouses. Rule 4.4 (e) of Civil Procedure, 32 L.P.R.A. Ap. V, R. 4.4 (e). That is, in accordance with the aforementioned rule to correctly summon the community property, a copy of the lawsuit and the summons had to be delivered to the appellant and to Mr. Ramírez. That is, in order to acquire jurisdiction over the community

---

[4] Including reference information on the different stamps or annotations used by the postal service and when applicable, their use. See Appendix, Pg. 157.

DORAL BANK, Appellee v. JOSE A. RAMIREZ PEREZ T/C/C JOSE ANTONIO RAMIREZ PEREZ, HIS WIFE
MARIA R. GONZALEZ IGLESIAS T/C/C MARIA DEL ROCIO GONZALEZ IGLESIAS AND THE...

property, Doral also had to comply with the requirements of the summons by notice of publication and notification regarding Mr. Ramírez as representative of the community property. By not properly notifying Mr. Ramírez, as representative of the community property, with a copy of the edict, the lawsuit and the summons, the TPI also did not acquire jurisdiction over it. This deprived the TPI of jurisdiction over the person of the defendant and the community property, so the judgment thus issued has no validity or legal effect. It is null.

-V-

From the grounds set forth, the Judgment in contempt issued by the TPI on October 3, 2012 is revoked, for **[*38]** lack of validity. The case is returned to the court of instance so that the proceedings can continue consistently with this judgment. In particular, it is ordered that the appellant be given a reasonable term to answer the claim and that Doral proceed to repeat the summons to Mr. Ramírez.

The Court so agreed and ordered and the Secretary of the Court so certifies.

Atty. Dimarie Alicea Lozada

Secretary of the Court of Appeals



| | |
|---|---|
| **DATE OF TRANSLATION:** | 3-May-21 |
| **ELECTRONIC FILE NAME:** | Doral Bank v. Jose A. Ramirez Perez et al., No. KLAN201201734, 2013 PR App. LEXIS 944 (P.R. Ct. App. Mar. 13, 2013) |
| **SOURCE LANGUAGE:** | Spanish |
| **TARGET LANGUAGE:** | English (United States) |
| **TRANSPERFECT JOB ID:** | US0974817 |

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

TCert v. 2.0

# Exhibit 7

### *SCOTIABANK DE PUERTO RICO (FORMERLY R & G PREMIER BANK) PLAINTIFF APPELLEE and MILLENIUM PROPERTIES, INC., ET. ALS. DEFENDANT CENTRAL INDUSTRIAL SERVICES, INC., APPELLANT CO-DEFENDANT*

Court of Appeals of Puerto Rico, Judicial Region of Arecibo, Guayama and Utuado

December 16, 2010

KLAN201001483

**Reporter**
2010 PR App. LEXIS 4293 *

SCOTIABANK DE PUERTO RICO (FORMERLY R & G PREMIER BANK) PLAINTIFF APPELLEE and MILLENIUM PROPERTIES, INC., ET. ALS. DEFENDANT CENTRAL INDUSTRIAL SERVICES, INC., APPELLANT CO-DEFENDANT

**Previous History: [*1]** Appeal from the Court of First Instance, Higher Chamber of Arecibo. CIVIL No. C CD2008-1330 (302). ABOUT: Collection of Money and Foreclosure.

## Case Summary

### Main Terms

judgment, Court, summons, party, Rule, motion, plaintiff, said, appeal, edict, instance, without, order, partial, case, procedure, was, filed, person, as, forum, be, relief, law, corporation, Industrial, claim, effect, summoned, issued

**Judges:** PANEL XI. Panel composed of its president, Judge Cabán García, Judge Medina Monteserín, Judge Cintrón Cintrón and Judge Saavedra Serrano. Judge Saavedra Serrano does not intervene.

**Opinion by:** Medina Monteserín

## Opinion

Medina Monteserín, Reporting Judge

### JUDGMENT

In San Juan, Puerto Rico, on December 16, 2010.

Central Industrial Services Inc. appears by means of an action called "appeal" filed on October 14, 2010. This party requests that we review the Resolution issued by the Court of First Instance Higher Chamber of Arecibo, on September 14, 2010, notified on September 21, 2010. By means of the aforementioned Resolution, the court of instance declared a motion for Suspension of Sentence filed by Central Industrial Services, Inc. to be WITHOUT MERIT. Since this is a review of a resolution, on October 25, 2010, we provided that the appeal would be handled as a certiorari.

The petitioning party points out that the court of instance erred in declaring the motion for Suspension of Sentence to be WITHOUT MERIT, **[*2]** because that party was never served notice in accordance with the law.

On November 15, 2010, Scotiabank de Puerto Rico, previously RG Premier Bank, filed its objection to the appeal. With this finalized, we proceed to its consideration.

SCOTIABANK DE PUERTO RICO (FORMERLY R & G PREMIER BANK) PLAINTIFF APPELLEE and MILLENIUM PROPERTIES, INC., ET. ALS. DEFENDANT CENTRAL INDUSTRIAL SERVICES, INC., CODE....

I

On December 5, 2008, RG Premier Bank of Puerto Rico filed a lawsuit for the collection of money and execution of pledges and mortgages by ordinary means against different natural and legal persons, including the co-defendant, herein petitioner, Central Industrial Services, Inc. (hereinafter Central). On December 9, 2008, the court of instance issued a personal summons addressed to that party.

On January 15, 2009, the co-defendant, Central, was allegedly summoned through Coriliz Díaz Reyes as Administrative Assistant of said corporation. On May 29, the plaintiff requested the court to issue new summonses since in conversation with an attorney of the defendant, a controversy had arisen over the authorization, if any of the persons who received the summons addressed to Central. On September 23, 2009, the plaintiff filed a motion requesting a summons by edict before the court of instance [*3] alleging the following:

"FIRST: In this case, a lawsuit was filed on December 9, 2008.
SECOND: That the plaintiff has attempted to personally summon the co-defendant, Central Industrial Services, with the procedures being unsuccessful.
THIRD: That the plaintiff proceeded to summon the co-defendant Central Industrial Services, according to the provisions of Article 12.01 of the Corporations Act of 1995 (14 LPRA § 3126), leaving a copy of the summons and the claim in the corporation's offices in the presence of an employee of said corporation who was of legal age.
FOURTH: That to prevent the co-defendant Central Industrial Services from alleging faults with such a summons in the future, we request that this Honorable Court, in accordance with Rule 4.5 of Civil Procedure, authorize the summons of the co-defendant Central Industrial Services by means of an edict.
FOURTH: It is necessary to summon the co-defendant, Central Industrial Services, for being an indispensable party in the lawsuit.

FIFTH: The last known address of the co-defendant indicated above is as follows: Hacienda La Monserrate, A-15 Calle Ruiseñor, Manatí, [*4] PR 00674; PMB 275 PO Box 2020, Barceloneta, PR 00617; Carr. # 2 km 56.9, Barceloneta, PR 00617. (Appendix, Attachment 6).

The plaintiff did not attach to its motion the affidavit of the summoning party proving the unsuccessful procedures to serve the personal summons. Even so, the court authorized the summons by edict which in turn was published in the newspaper "Primera Hora" on October 17, 2009. Evidence of the serving of the claim and summons to the defendant by certified mail is not apparent from the appendix of the appeal, nor from the documents attached to the objection of the respondent.

On December 15, 2009, [1] the plaintiff filed a "Motion for the Declaration of Contempt and the Register of Judgment" before the primary court. On December 21, the court declared Central to be in contempt. This order was notified to Central on December 21, at PMB 131 Box 2020 Barceloneta, P.R. 00617.

On March 8,[*5] 2010, the court handed down a final partial judgment, notified on March 10, ordering Central to pay a certain amount of money and ordering the execution of the pledge and mortgage, in the event that Central did not pay what was allegedly owed to the plaintiff. The partial judgment was notified to Central's correct address and it was also notified by edicts, published on March 29 and April 5, 2010.

On March 17, 2010, Central filed a motion before the court entitled "Objection to Partial Judgment and Request to leave said Judgment without effect," alleging an attempt had been made to serve the summons at Central through Ms. Coriliz Díaz Reyes, who was never its employee, nor was she a person authorized to receive summons addressed to Central. It also alleged that the address included in the summons was wrong, since the correct address of the corporation, as it is shown in the Department of State, was Carr # 2, km 56.9, Barceloneta, P.R. 00617. It indicated that the only person authorized to receive summons was the resident agent of the corporation, Mr. Enrique Pérez Vázquez. He also indicated that the request [*6] for a summons by edict did not comply with the requirements established in the Rules of Civil Procedure of Puerto Rico because it was not accompanied by an affidavit by the party serving the summons confirming the steps taken to serve the personal summons of Central without success. On March 26, 2010, the plaintiff submitted a reply to the objection filed by Central, alleging that said party had knowledge of the lawsuit from its beginning; that in the face of the possible dispute over the personal

---

[1] According to the case management system of the Judicial Branch portal.

SCOTIABANK DE PUERTO RICO (FORMERLY R & G PREMIER BANK) PLAINTIFF APPELLEE and
MILLENIUM PROPERTIES, INC., ET. ALS. DEFENDANT CENTRAL INDUSTRIAL SERVICES, INC., CODE....

serving of the summons, it requested the court to summons by edicts and the latter authorized it, leaving Central duly summoned and that the partial judgment was also duly published by edicts. On April 6, 2010, notified on April 7, the court of instance issued an order declaring the "Motion for Objection of Judgment" filed by Central to be WITHOUT MERIT, considering said motion as a reconsideration.

On June 15, 2010, Central filed a motion to suspend the judgment alleging that it was not the holder of the promissory note offered in pledge and of the property that was intended to be executed through the partial judgment issued against said co-defendant; **[*7]** that said assets belonged to the co-defendant Millennium Properties, Inc. and that since the judgment was not rendered against Millennium, the opinion was not enforceable and also violated the due process of law for which Millennium Properties, Inc. was the creditor. On June 22, the plaintiff replied, stating that what was admissible was not the suspension of the judgment, but rather to amend it so that it was only in collection of money and not in execution of pledge and mortgage by ordinary means. On June 23, notified on June 29, the court of instance issued an "amended partial ruling" agreeing to what was requested by the plaintiff. Central was duly notified of said partial judgment.

On August 25, 2010, Central filed a motion entitled "Request for the leaving the Partial Judgment of Central Industrial Services for Lack of Notification" to be rendered null and void, which procedurally was a motion to suspend the amended partial judgment issued on June 23, 2010. Central reiterated in that motion that it had not been duly summoned, neither personally nor by edicts. In particular and as an additional basis not previously raised, Central noted that the **[*8]** notice by certified mail of the summons by edict was sent to an incorrect address that does not belong to said co-defendant party and that its correct mailing address was PMB 131 Box 2020, Barceloneta, P.R.

A copy of a reply filed by the plaintiff to the motion for suspension filed by Central on August 25 is not apparent from the appendix of the appeal, nor from the documents attached to the objection to the appeal.

On September 14, 2010, notified on September 21, the Court of First Instance declared the motion for suspension filed by Central to be WITHOUT MERIT.

II

### The Writ of Certiorari

Interlocutory decisions, other than judgments, are reviewable before the Court of Appeals, by means of the writ of certiorari. The writ of certiorari is the extraordinary procedural vehicle used so that a higher-ranking court can correct an error of law committed by a lower-ranking court. *People v. Díaz de León, Opinion of September 16, 2009, 2009 T.S.P.R. 142*. Different from the appeal, the appeals court has the power to issue the writ of certiorari at its discretion, **[*9]** because it is an ordinary matter of interlocutory affairs. However, such discretion does not operate in a vacuum and must be exercised in a reasonable manner, always seeking to achieve a fair solution. *Negrón v. Secretary of Justice, 154 DPR 79, 91 (2001)*. The exercise of discretion by the intermediate appeals court "must respond to a form of reasonableness, which, applied to judicial judgment, is a justice conclusion and not a power to act in one way or another, creating an abstraction of the rest of the law." *Torres Martínez v. Torres Ghigliotty, Opinion of November 21, 2008, 2008 T.S.P.R. 181*.

In order to be able to exercise our discretionary power in a wise and prudent manner to understand or not on the merits of the matters that are suggested to us through the writ of certiorari, Rule 40 of the *Regulations of the Court of Appeals* indicates the criteria that must be taken into consideration when addressing a request for issuance of a writ of certiorari. The aforementioned rule provides the following:

"The Court shall take into consideration the following criteria when determining the issuance of a writ of certiorari or an order to show **[*10]** cause:

(A) If the remedy and provision of the appealed decision, unlike its grounds, are contrary to law.

SCOTIABANK DE PUERTO RICO (FORMERLY R & G PREMIER BANK) PLAINTIFF APPELLEE and MILLENIUM PROPERTIES, INC., ET. ALS. DEFENDANT CENTRAL INDUSTRIAL SERVICES, INC., CODE....

(B) If the situation of facts raised is the most appropriate for the analysis of the problem.

(C) If there has been prejudice, partiality or gross and manifest error in the assessment of the evidence by the Court of First Instance.

(D) If the matter raised requires more careful consideration in light of the original proceedings, which must be raised, or more elaborate allegations.

(E) If the stage of the procedures in which the case is presented is the most favorable for its consideration.

(F) If the issuance of the records or the order to show merit does not cause an improper fragmentation of the lawsuit and an undesirable delay in the final settlement of litigation.

(G) If the issuance of the record or the order to show cause prevents a failure of justice.

In accordance with the criteria listed, the Court of Appeals, "will evaluate both the correction of the appealed decision as well as the stage of the procedure in which it is presented for the purpose of determining whether it is most appropriate to intervene and not cause an undue fragmentation **[*11]** and/or an unjustified delay of the litigation." *Torres Martínez v. Torres Ghiglioty, supra.*

Rule 52.1 of the new Rules of Civil Procedure of Puerto Rico in turn limits the disputes that the Court of Appeals may review through the writ of certiorari, providing:

"Any appeal, certiorari, certification and any other procedure to review judgments and resolutions will be processed in accordance with the applicable law, these rules and the rules adopted by the Supreme Court of Puerto Rico.

The writ of certiorari to review resolutions and interlocutory orders issued by the Court of First Instance shall only be issued by the Court of Appeals when a resolution and order is appealed under Rules 56 and 57 or the under a denial of a motion of a default nature. However, and by exception to the foregoing, the Court of Appeals may review orders or interlocutory resolutions issued by the Court of First Instance when appealing decisions based on the admissibility of essential witnesses or experts, matters relating to evidentiary privileges, declarations **[*12]** of contempt or in cases of family relationships. When denying the issuance of a writ of certiorari in these cases, the Court of Appeals does not have to

substantiate its decision.

Any other decision and interlocutory order issued by the Court of First Instance may be reviewed in the appeal filed against the judgment subject to the provisions of Rule 50 on non-harmful errors."

### Rule 49.2 of Civil Procedure of Puerto Rico

By means of the timely submission of a motion for relief under Rule 49.2 of the *Civil Procedure of Puerto* Rico, a party affected by a judgment, resolution or order may request the court to render it null and void. Said Rule must be interpreted liberally, without this meaning that it is used as a master key to reopen cases, in substitution of reconsideration or review remedies. By interpreting Rule 49.2, the Supreme Court of Puerto Rico has stated that "a person has no right to have his or her complaints acquire a permanence in the courts, keeping the other party in a state of uncertainty without further excuse for **[*13]** lack of diligence than a brief reference to special circumstances, carelessness or inadvertencies." *Olmeda Nazario v. Sueiro Jiménez, 123 D.P.R. 294, 299 (1989).*

The motion for relief permitted by Rule 49.2, "cannot be used to challenge substantive issues that should have been raised before the judgment such as affirmative defenses, or after the judgment in an appeal for review" *Rivera v. Algarin, 159 D.P.R. 482, 490 (2003).*

Rule 49.2 of the Rules of Civil Procedure of Puerto Rico approved in 2009 is essentially similar in its wording to the previous Rule 49.2 of those approved in 1979. The new Rule provides:

"Through a motion and under those conditions that are fair, the court may relieve a party or its legal representative of a judgment, order or procedure for the following reasons:

(a) error, inadvertence, surprise or excusable negligence;

(b) discovery of essential evidence that, despite due diligence, could not have been discovered in time to request a new trial in accordance with Rule 48;

SCOTIABANK DE PUERTO RICO (FORMERLY R & G PREMIER BANK) PLAINTIFF APPELLEE and MILLENIUM PROPERTIES, INC., ET. ALS. DEFENDANT CENTRAL INDUSTRIAL SERVICES, INC., CODE....

(c) fraud (including what has so far been called "intrinsic" [*14] as well as that called "extrinsic"), false representation or other misconduct of an adverse party;

(d) nullity of the judgment;

(e) the judgment has been satisfied, waived or complied with, or the previous judgment on which it was based has been revoked or otherwise rendered void, or it would not be fair that the judgment continues in force, or

(f) any other reason that justifies the granting of a remedy against the effects of a judgment.

The provisions of this rule shall not apply to judgments handed down in divorce lawsuits, unless the motion is based on grounds (c) or (d). The motion will be submitted within a reasonable term, but in no case after six (6) months of having registered the judgment or order or having carried out the procedure. A motion under this Rule 49.2 will not affect the purpose of a judgment, nor will it suspend its effects. *This rule does not limit the power of the court to*:

(1) hear an independent lawsuit for the purpose of relieving a party from a judgment, order or proceeding;

(2) *grant a remedy to a party that has not actually been summoned, and*

(3) [*15] leave null and void a judgment for the purpose of fraud to the court..." (Emphasis ours).

Except in cases of nullity or when the judgment has been satisfied, the decision to relieve a party of the effects of a judgment or order in a discretionary nature. *Náter Cardona v. Ramos Muñiz, 162 D.P.R. 616 (2004)*.

Under the parameters of Rule 49.2, supra, it is understood that a judgment is null and void "when it has been issued without jurisdiction or when the due procedure of law has been breached... [these being] the only grounds for nullity of judgments in our procedural law". R. Hernández --Colón, *Derecho Procesal Civil*, pgs. 407-408 (5th ed. 2010).

### The Summons and the Due Process of Law

The *Constitution of the Commonwealth of Puerto Rico in its Article II, Section 7* establishes that no person shall be deprived of their freedom or property without due process of law. The Supreme Court of Puerto Rico has repeatedly pointed out that due process of law is not a

rigorous mold given in the abstract since its nature is pragmatic and circumstantial. *San Jerónimo Caribe Project, Inc.* [*16] *v. A.R.P.E.,* Opinion of July 31, 2008, 2008 TSPR 130; *Torres Prods. v. Mun. Board Aguadilla*, 169 D.P.R. 886 (2007); *Lucero v. San Juan Star, 159 DPR 494 (2003)*.

In *Álvarez v. Arias, 156 D.P.R. 352, 365 (2002)* the Supreme Court, reiterating the foregoing in *Rivera Rodríguez & Co v. Lee Stowell, 133 D.P.R. 881 (1993)* stated:

"... due process of law requires that certain requirements be complied with in all adverse proceedings, namely: (1) adequate notification of the complaint filed; (2) proceedings before an impartial judge; (3) opportunity to be heard; (4) right to cross-examine witnesses and examine evidence presented against them; (5) have the assistance of an attorney, and (6) that the decision be based on the proceedings. See *Rivera Rodríguez & Co. V. Lee Stowell, etc., supra.* **It is precisely through the summons that the requirement of adequate notification is met**. See *León v. Rest. El Tropical, 154 D.P.R. 249 (2001)*; *Rodríguez v. Nasrallah, 118 D.P.R. 93 (1986)*.

Adequate notification constitutes a [*17] fundamental requirement of due process of law, which is required throughout the entire judicial process. Therefore, the constitutional guarantee requires the court to notify any order, resolution or judgment it issues." (Citations omitted) (Emphasis ours).

Rule 4 of the *Civil Procedure of Puerto Rico*, which establishes and defines the figure of the summons in our jurisdiction, makes the constitutional mandate viable to a due process of law to which all parties in a litigation are creditors. As expressed by the Supreme Court in *Lucero v. San Juan* Star, supra, p. 507, "the subpoena or summons represents the inaugural step of due process of law that makes the exercise of judicial jurisdiction viable and its adulteration constitutes a flagrant violation of fair treatment."

Rule 4.4 (e) of the Civil Procedure of Puerto Rico in force at the time of issuing the judgment in this case, establishes that the serving of the summons to a corporation will be done by delivering a copy of it "and of the lawsuit to an official, administrative manager or general agent, or to any other agent authorized by appointment or designated [*18] by law to receive

SCOTIABANK DE PUERTO RICO (FORMERLY R & G PREMIER BANK) PLAINTIFF APPELLEE and
MILLENIUM PROPERTIES, INC., ET. ALS. DEFENDANT CENTRAL INDUSTRIAL SERVICES, INC., CODE....

summons."

In *Quiñones Román v. Cia ABC., 152 D.P.R. 367, 376 (2000)* the Supreme Court, interpreting the scope of Rule 4.4 (e), in particular as to the persons authorized to receive the summons by a corporation, stated:

"... what is really important for a person to qualify as an administrative agent through whom a foreign corporation authorized to do business in Puerto Rico can be summoned is that it is in a position of sufficient responsibility so that it is reasonable to presume that it will transmit or forward the summons and claim to his superiors."

See also *Nazario Morales v. A.E.E., 172 D.P.R. 615 (2007)*; *Hach Co. v. Pure, Water Systems, Inc., 114 D.P.R. 58 (1983). Pou v. American Motors Corp., 127 D.P.R. 810 (1991).*

Rule 4.5 of Civil Procedure, in force at the time of issuing a judgment in this case, in turn authorizes the summons by edicts under certain circumstances and provides as appropriate:

"(a) When the person to be summoned is outside of Puerto Rico, **[*19]** or being in Puerto Rico, could not be located after the relevant proceedings have been carried out or is hidden so as not to be summoned, or if it is a foreign corporation without a resident agent, *and this will be verified to the satisfaction of the court by means of an affidavit, with an expression of these said diligence,* and will also appear in said declaration, or the sworn claim filed, that there is a person who has to be summoned, or that said person is an appropriate party in the lawsuit, the court may issue an order providing that the summons be made by an edict.
No unsuccessful service of notice will be required as a condition for issuing the order providing that the summons be made by edict.

The order will provide that the publication be made only once in a general circulation newspaper on the Island of Puerto Rico. The order will provide, in addition, that within ten (10) days following the publication of the edict, a copy of the summons and of the claim filed be sent to the defendant, by certified mail with acknowledgment of receipt or any other form of correspondence delivery service with acknowledgment of receipt provided that said entity does not have any connection **[*20]** to the plaintiff and has no interest in the lawsuit, to the place of their last known residence, unless it is justified by a

sworn statement that, despite the efforts made, with their expression, it has not been possible to locate any known residence of the defendant, in which case the court will excuse compliance with this provision..." (Emphasis ours).

The failure to comply with the requirements for the issuance and publication of the summons by edict deprives jurisdiction to the Court of First Instance on the party that has not been duly summoned. *Banco Popular v. S.L.G. Negrón, 164 D.P.R. 855 (2005)*. As we know, any judgment handed down against a person without the court having acquired jurisdiction over it is null and void.

In *Marquez v. Barreto, 143 D.P.R. 137, 143 (1997)* the Supreme Court of Puerto Rico reiterated that the method used to summon the plaintiff "must have a reasonable probability of notifying or informing the defendant about the claim filed against them", so that the latter, if it so wishes, can appear to defend itself. Therefore, it pointed out to the Court that in cases in which **[*21]** the defendant is summoned by edict, the nature of all complaints contained in the claim must be recorded in the edict. *Id. pg. 147*.

III

In light of the aforementioned regulations applied to the procedural facts of this case, we understand that the court of instance erred in denying the motion to suspend judgment.

In its appeal, Central reiterates the approaches presented before the primary court as to the effect that it was never summoned under the law. The plaintiff herein appealed, in turn, contends in its objection to the appeal, that the argument on the inaccuracy of the summons was awarded by the court of first instance on April 6, 2010, and that said opinion was not appealed and that therefore the writ of certiorari should not be issued because the appeal was filed late. The respondent also points out that the mechanism provided for by Rule 49.2 of the Civil Procedure of Puerto Rico is not applicable to this case because the partial judgment is final and firm.

SCOTIABANK DE PUERTO RICO (FORMERLY R & G PREMIER BANK) PLAINTIFF APPELLEE and
MILLENIUM PROPERTIES, INC., ET. ALS. DEFENDANT CENTRAL INDUSTRIAL SERVICES, INC., CODE....

The plaintiff appealed herein, does not have the reason. Firstly, because the motion to suspend the judgment was filed within six (6) months **[\*22]** of the issuance of the amended partial sentence of June 23, 2010. Said judgment was *not* amended "nunc pro tunc" retroactively to the date of the partial judgment originally issued on March 8, 2010. *Security Ins. Co. vs. Higher Court, 101 D.P.R. 191 (1973).* This being the case, the file in the proceedings of the amended partial judgment activated new terms for the reconsideration and appeal review thereof, as well as activated the term of six (6) months to request the relief of the opinion under Rule 49.2 of the Civil Procedure of Puerto Rico. In addition, "the six-month term is not applicable to motions for relief based on the non-existence of the summons and court fraud." *Hernández Colón*, supra, page 410. It is necessary to emphasize that Rule 49.2 according to its own terms, "does not limit the power of the court to, (among others] grant a remedy to a party that has not actually been summoned." This responds to the fact that a judgment is null and void if it has been issued without jurisdiction and the lack of jurisdiction "may mean lack of jurisdiction in absolute terms, *or lack of jurisdiction over* **[\*23]** *the person, or defects in the summons*". *Hernández Colón*, supra, p. 408. (Emphasis ours).

In the present case, the procedure to summon the defendant was certainly plagued by errors. The plaintiff tried to personally summon the Central Industrial Services corporation, through a person who, according to the defendant, was not an employee, agent or official of the corporation, nor was she authorized by it to receive summonses.

In face of the possible controversy about the suitability of the service of notice of the personal summons, the plaintiff itself requested the court of instance to allow it to summon Central Industrial Services Corporation by edicts. *The plaintiff did not attach to its request the affidavit of the summoning party proving the efforts made without success to summon Central.* **This requirement is essential before the Court to authorize the summons by edicts and as is provided by Rule 4.5 of the Civil Procedure of Puerto Rico**. This Rule also requires the sending of the claim and the summons to the defendant by certified mail with acknowledgment of receipt **[\*24]** to the place of its last known residence. The appendix of the appeal does not show faithful compliance with the foregoing and the plaintiff -- appealed does not deny having omitted the affidavit of the Plaintiff in the motion requesting a summons by edict.

Thus, the plaintiff undoubtedly did not fully comply with the provisions of Rule 4 of the Civil Procedure of Puerto Rico, so the court was prevented from authorizing the summons by edict, with the final result of which it issued the original partial judgment, as well as the amended partial judgment lacking jurisdiction over the co-defendant Central Industrial Services, Inc.

Note that since it is not about the non-existence of the issuance of a summons within six (6) months of the filing of the claim, but rather of failure to serve the summons because it was done incorrectly, it is appropriate for the plaintiff party to request from the court of instance the issuance of a new summons and to comply with its processing within the term provided by law, strictly complying with the requirements established in the Rules of Civil Procedure of Puerto Rico.

Based on the grounds **[\*25]** above, we issued the writ of certiorari we revoked the Resolution issued by the Court of First Instance on September 14, 2010, we rendered the Amended Partial Judgment void on June 23, 2010 and we returned the case to the court of instance for the continuation of the proceedings.

Judge Cintrón Cintrón casts a concurrent vote without a written opinion.

The Court so agreed and ordered and the Secretary of the Court so certifies.

Dimarie Alicea Lozada

Secretary of the Court of Appeals

---

**End of Document**



**DATE OF TRANSLATION:**           3-May-21

**ELECTRONIC FILE NAME:**          Scotiabank De Puerto Rico (Antes R & G Premier Bank) v. Millenium Properties, Inc., No. KLAN201001483, 2010 PR App. LEXIS 4293 (P.R. Ct. App. Dec. 16, 2010)

**SOURCE LANGUAGE:**               Spanish
**TARGET LANGUAGE:**               English (United States)
**TRANSPERFECT JOB ID:**           US0974817

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

TCert v. 2.0

# Exhibit 8

# *IVETTE VÉLEZ MUÑIZ COMPLAINANT APPEALED V. SARA LEE CORPORATION, COACH LEATHER, INC., NOEL RODRÍGUEZ, HIS WIFE AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, BRUNILDA SOSA, HER HUSBAND AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE DEFENDANT-PETITIONER*

Circuit Court of Appeals of Puerto Rico, Regional Circuit Iii of Arecibo-Utuado

December 31, 2001

KLCE0101357

**Reporter**
2001 PR App. LEXIS 2327 *

IVETTE VÉLEZ MUÑIZ COMPLAINANT APPEALED V. SARA LEE CORPORATION, COACH LEATHER, INC., NOEL RODRÍGUEZ, HIS WIFE AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, BRUNILDA SOSA, HER HUSBAND AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE DEFENDANT-PETITIONER

**Previous History: [*1]** Certiorari from the Court of First Instance, Higher Chamber of Utuado ABOUT: WRONGFUL DISMISSAL CIVIL No. LPE2001-0009.

## Case Summary

### Main Terms

Court, Law, summons, contempt, corporation, case, complaint, jurisdiction, be, State, party, on, judgment, without, procedure, subsidiary, appealed, Instance, effect, same, according to, person, Application, was, Annotation, employer, fact, this, appeal, against

**Judges:** Panel composed of its president, Judge Soler Aquino, and Judges Colón Birriel and Escribano Medina.

**Opinion By:** Colon Birriel

## Opinion

JUDGMENT

In San Juan, Puerto Rico, on December 31, 2001.

-I-

Sara Lee Corporation ("Sara Lee") requests the review of a "Resolution" issued by the Court of First Instance, Higher Chamber of Utuado (the "Court"), on October 22, 2001, filed a copy of the notification of November 1, 2001 in the records, and notified the parties on November 5 of that same year; in the case of Ivette Vélez Muñiz v. Sara Lee Corporation, et al., Civil No. LPE 2001-0009, On Wrongful Dismissal. Writ of Certiorari, *Notification and* Resolution, Exhibit 1 of the appendix, on pp. 1-7. The ruling declared a request filed by Sara Lee, on May 31, 2001, for the purpose of rendering null and void the declaration of contempt against it for the nullity of the summons and indicating a hearing to award the amount of damages to be WITHOUT MERIT. With the appeal of records filed before us, Ivette Vélez Muñiz (the "appellee" or the "complainant") **[*2]** requested the dismissal of the appeal due to lack of jurisdiction. We resolve.

-II-

On February 20, 2001, the appellee filed a Complaint against the following defendants: (1) Sara Lee Corp. and its subsidiary Coach Leather, Inc.; (2) Noel Rodríguez in his personal capacity, his wife and the

IVETTE VÉLEZ MUÑIZ, COMPLAINANT-APPEALED V. SARA LEE CORPORATION, COACH LEATHER, INC., NOEL RODRIGUEZ, HIS WIFE AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, BRUNILDA SO...

Community Property of Husband and Wife, composed of both; (3) Brunilda Sosa, her husband and the Legal Property of Husband and Wife, composed of both. Writ of Certiorari, *Complaint*, Exhibit 2 of the appendix, on pp. 8-10. She requested the payment of overtime and periods to eat meals allegedly worked and not compensated in accordance with Law No. 379 of May 15, 1948, as amended; unjustified dismissal under Law No. 80 of May 30, 1976, as amended; dismissal for alleged reprisal in violation of Law No. 115 of December 20, 1991, as amended; violation of Law No. 45 of April 18, 1935, as amended by denying her the right to resort to the State Insurance Fund; and violation of Law No. 44 of July 2, 1985, as amended, and the federal statute "American With Disabilities Act" by being discriminated against for alleged impediment. The complaint **[*3]** was filed under the summary procedure for labor claims provided for in Law No. 2 of October 17, 1961, as amended, *32 L.P.R.A. § 3118 et seq.*

On February 21, 2001, the co-defendant Coach Leatherware was summoned through James Wagner, one of its vice presidents. Writ of Certiorari, *Summons*, Exhibit 3 of the appendix, on pp. 17-18. On that same date, the appellee handed over to Wagner, the summons addressed to Sara Lee. Writ of Certiorari, *Summons*, Exhibit 3 of the appendix, on pp. 11-12. The remaining defendants were also summonsed. Writ of Certiorari, *Summons*, Exhibit 3 of the appendix, on pp. 13-16. Thus, on March 5, 2001, Coach Leatherware, Rodríguez and the Community Property of Husband and Wife (SLG) composed of him and his wife; and Sosa filed a rejoinder to the complaint filed against them. Writ of Certiorari, *Response to the Complaint*, Exhibit 4 of the appendix, on pp. 19-24.

On or around March 16, 2001, the appellee submitted a brief entitled "Motion to Request a Declaration of Contempt and For Judgment to be Issued". Writ **[*4]** of Certiorari, *Motion…*, Exhibit 6 of the appendix, on pp. 26-30. Brief, of which according to Sara Lee, it was not notified. On April 2, 2001, the Court issued separate orders in which it transferred the hearing on the status of the proceedings to June 7, 2001, and stated that during the hearing in question, the request for the declaration of contempt made by the appellee would be discussed. Writ of Certiorari, *Notification*, Exhibit 7 of the appendix, on pp. 31-32. Subsequently, in a document dated May 10, 2001, the complainant party again requested that Sara Lee be declared as in contempt. Writ of Certiorari, *Second Motion on the Declaration of*

*Contempt*, Exhibit 8 of the appendix, on pp. 33-36. Finally, on May 21, 2001, the Court declared contempt against Sara Lee, scheduling a hearing for damages for September 28, 2001. Writ of Certiorari, *Notification*, Exhibit 9 of the appendix, on p. 37.

Thus, Sara Lee filed a brief without submitting itself to the jurisdiction of the Court, which was entitled "Request for the Declaration of Contempt to be Deemed Null and Void Due to Annulment of the Summons and Request for Sanctions due to Recklessness". Writ **[*5]** of Certiorari, *Request…*, Exhibit 10 of the appendix, on pp. 38-47. In summary, Sara Lee challenged the jurisdiction of the Court of Instance to declare contempt, since the summons that they attempted to serve was null and void. In support of its position, it argued that: (a) they had attempted to serve the summons through Wagner, who is an employee of Coach Leatherware; (b) that Wagner is not and has never been an employee of Sara Lee Corporation, he has absolutely no relationship with it and therefore is not authorized to receive summonses on its behalf; and (c) that Sara Lee was never the employer of the appellee. All of which was signed in the Affidavit provided by Wagner, under Affidavit No. 43,312. Writ of Certiorari, *Request…*, Exhibit 10 of the appendix, on p. 47.

On June 7, 2001, a hearing was held on the status of the proceedings. In the hearing, in addition to discussing the arguments on the challenge of jurisdiction, Sara Lee requested an additional term to add an additional defense, namely, that it had not been present in our jurisdiction since at least 1995. On June 14, 2001, the Court issued an order filed in the records and notified **[*6]** to the parties on the 20th of the same month and year, in which it permitted the amendment requested and granted the respondent 15 days from the date the amendment was made to oppose it. Writ of Certiorari, *Notification and Order*, Exhibit 11 of the appendix, on pp. 48-49. The amendment was submitted on June 18, 2001, in a document entitled "Supplement to the Request for the Declaration of Contempt to Be Null and Void Due to Annulment of the Summons". Writ of Certiorari, *Supplement…*, Exhibit 12 of the appendix, on pp. 50-57. Approximately one month after the expiration of the period granted by the Court for the appealed party to object to Sara Lee's request, without anything having been done in this regard, Sara Lee submitted a "Motion Reiterating the Request to Make the Declaration of Contempt Null and Void Due to Annulment of the Summons". Writ of Certiorari, *Motion…*, Exhibit 13 of the

IVETTE VÉLEZ MUÑIZ, COMPLAINANT-APPEALED V. SARA LEE CORPORATION, COACH LEATHER, INC., NOEL RODRIGUEZ, HIS WIFE AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, BRUNILDA SO...

appendix, on pp. 58-59.

Late and outside those terms granted by the Court of Instance, the appellee filed a brief entitled "Motion in Opposition to the Request to Void the Declaration of Contempt", in which it indicates that Wagner received **[\*7]** the summons addressed to Sara Lee, indicating that he would make sure it would be received by one of its officers, and that Sara Lee and Coach Leatherware, are the same thing. Writ of Certiorari, *Motion…*, Exhibit 14 of the appendix, on pp. 60-79. For its part, on August 31, Sara Lee submitted a "Replica to the Motion in Opposition to the Request to Void the Declaration of Contempt", in which it reiterated that (a) serving the summons of a foreign corporation made through an employee of a subsidiary of the subsidiary, is not permitted practice in Puerto Rico and therefore has the effect of nullifying the summons; (b) the fact that Sara Lee has managed the pension and share plan of a subsidiary does not make it the same thing; and (c) the allegation that Sara Lee and Leatherware are the same thing, then defeats the declaration of contempt, since if that assertion is presumed to be true, it would be mandatory to conclude that Sara Lee had already answered the complaint through Coach Leatherware's reply. Writ of Certiorari, *Replica…*, Exhibit 15 of the appendix, on pp. 80-94. Finally, on October 22, 2001, the Court issued the "Resolution" the review of which **[\*8]** today concerns us. Furthermore, the Court concluded that Sara Lee is the employer of the appellee, and that it was summonsed in accordance with Law No. 2; whereby it should be determined that the declaration of contempt was with merit. Writ of Certiorari, *Resolution*, Exhibit 1 of the appendix, on pp. 1-7. Sara Lee does not agree with the following indications of error:

First Error: The Court of Instance erred in concluding that Sara Lee Corporation was the employer of the complainant-appellant. This determination is contrary to the evidence in the record and to the doctrine of "a single employer" outlined by our Supreme Court in <u>Odriozola</u> v. <u>Superior Cosmetics Distributors Corporation</u>, 116 DPR 485 (1985). The Court of Instance erred in concluding that Sara Lee Corporation and Coach Leatherware International, Inc. are one and the same thing.

Second Error: If the determination by the Court of Instance that Sara Lee and Coach Leatherware are indeed the same entity is deemed correct, the Court of Instance erred in declaring Sara Lee Corporation is in contempt. Considering that both are the same entity, it would be mandatory to conclude that Sara Lee already answered the complaint through **[\*9]** the timely submission of the reply to the complaint by Coach Leatherware.

Third Error: The Court of Instance erred in determining that Sara Lee's summons through an employee of one of her subsidiaries is a valid one under Law No. 2 of October 17, 1961, as amended. As a result of this error, the Court of Instance erred in concluding that it had jurisdiction to declare contempt against Sara Lee and when declaring contempt against Sara Lee.

Fourth Error: The Court of Instance mistakenly declared in the Resolution the review of which is requested that the defendant is in contempt. There is no controversy as to whether Coach Leatherware, Mr. Rodríguez and Ms. Sosa promptly answered the complaint in accordance with Law No. 2 of October 17, 1961, as amended.

-III-

The summons is a procedural mechanism of deep constitutional roots by which the court acquires jurisdiction over the person of the defendant. The purpose of the summons is to notify a person about the filing of a legal action against them, so that they can, if they wish, appear to be heard and defend themselves **[\*10]** from the claim filed against them. <u>Peguero</u> v. <u>Hernández Pellot</u>, 139 D.P.R. 487, 494 (1995). As a general rule, a court does not have jurisdiction over a non-resident. However, there are exceptions to this rule; among these are cases of when there has been express or tacit submission or consent of the person to the jurisdiction of the court. If a submission or consent is absent, due process of law also allows the exercise of jurisdiction over a non-resident if the minimum contact requirements between the defendant and the local court are met. *Riego Zúñiga v. Líneas Aéreas LACSA, 139 D.P.R. 509, 515 (1995)*. Doctrine found in Rule 4.7 of Civil Procedure, which provides:

(a) When the person to be summoned does not have its domicile in Puerto Rico, the General Court of Justice of Puerto Rico will have personal jurisdiction over said person, as if it were a domicile of the Commonwealth of Puerto Rico, if the lawsuit or claim arises as a result of said person:

IVETTE VÉLEZ MUÑIZ, COMPLAINANT-APPEALED V. SARA LEE CORPORATION, COACH LEATHER, INC., NOEL RODRIGUEZ, HIS WIFE AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, BRUNILDA SO...

Having carried out business transactions within Puerto Rico on its own or through its agent; **[*11]** or Having participated in unlawful acts within Puerto Rico on its own or through its agent; or Having been involved in an accident while, by themselves or through their agent, driving a motor vehicle in Puerto Rico; or Having been involved in an accident in Puerto Rico when operating, by themselves or through their agent, a passenger or cargo transportation business in Puerto Rico or between Puerto Rico and the United States or between Puerto Rico and a foreign country or if the accident occurs outside Puerto Rico in the operation of said business when the contract has been granted in Puerto Rico; or When the owner or using or possessing, on their own, or through their agent, any real estate located in Puerto Rico.

In such cases, the summons shall be served in accordance with the provisions of Rule 4.5.

In summary, so that a court can assume jurisdiction over a natural or legal person that is not a resident, due procedure of law requires that two (2) basic requirements be met: (1) that the person has had minimal contact with the court and that the cause of action arises from or is related to these contacts and (2) that the method used to summons the person has a reasonable probability of notifying and informing the defendant about **[*12]** the action filed against him or her... (Quotations Omitted) *Pou v. American Motors Corp., 127 D.P.R. 810, 819 (1991)*. American case law has established some additional criteria or requirements to be considered at the time of a court to decide whether or not to assume jurisdiction over a foreign corporation. Among others, it has been pointed out that the courts of the states, which is understood to include Puerto Rico for the purposes of the matter discussed herein, should weigh the following: (1) the burden that the litigation in the state which assumes jurisdiction imposes on the defendant; (2) the interest of the state court in awarding the dispute and the interest of the plaintiff in obtaining compensation; (3) the interest of the interstate justice system in resolving disputes in the most efficient manner, and (4) the shared interest of the various states in advancing substantive and fundamental social policies. (Quotations Omitted) *Pou v. American Motors, supra*, footnote No. 5, on p. 819.

To ensure the existence of *in personam* jurisdiction, due process of law requires that all defendants in a civil lawsuit be **[*13]** properly notified of the lawsuit filed against them, through the summons procedure established by law. This procedure varies depending, among other things, on whether or not the defendant resides in Puerto Rico or whether it is a natural or legal person. (Quotations Omitted) *Riego Zúñiga v. Líneas Aéreas LACSA, 139 D.P.R. 509, 515 (1995)*. To determine whether there is *in personam* jurisdiction over a corporation, it is important to distinguish between the domicile, residence or citizenship of its shareholders and the domicile of the corporation itself. The important factor is the domicile of the corporate entity, which in general terms and for jurisdictional purposes may be the place where the office is located or the main place of business and the state where it was incorporated. *Peguero v.* Hernández Pellot, supra to p. 502.

When the defendant is a foreign corporation, [1] the summons will be executed as follows:

The resident agent of a foreign corporation authorized to do business in the Commonwealth will be the agent of the corporation for purposes of any service of summons to the foreign corporation or delivery **[*14]** to such corporation of any order, notification or complaint required or permitted by law.

A foreign corporation may be summonsed by registered mail or certificate with acknowledgment of receipt, addressed to the secretary of the foreign corporation at its designated office as recorded in its application for a certificate of authorization or in its most recent annual report if the foreign corporation:

Has no resident agent or cannot summons the resident agent with reasonable diligence;

has ceased to do business in the Commonwealth in accordance with section 3173 of this title, or its authorization certificate has been revoked in accordance with section 3176 of this title.

The summons has been processed in accordance with subsection (b) of this section on the earliest date among the following:

---

[1] Corporation organized in accordance with the laws of any jurisdiction other than the Commonwealth. Art. 13.01 General Corporations Act, **14 L.P.R.A. § 3161**.

IVETTE VÉLEZ MUÑIZ, COMPLAINANT-APPEALED V. SARA LEE CORPORATION, COACH LEATHER, INC., NOEL RODRIGUEZ, HIS WIFE AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, BRUNILDA SO...

The date on which the foreign corporation receives the mail correspondence;

The date on the acknowledgment of receipt, if it is signed in the name of the foreign corporation, or Five (5) days after **[*15]** it is deposited in the United States mail, as evidenced by the postmark, if sent postage-paid and with the correct address.

1 This section does not stipulate the only method, or the method required to summons a foreign corporation. Art. 13.12, General Corporations Act, 14 L.P.R.A. § 3172.

On the other hand, Art. 12.01 § 3126 of the Corporations Act, *supra*, stipulates, as regards the general method of summoning corporations, the following:

1 Any corporation organized in the Commonwealth will be summonsed by personally delivering a copy of the summons to any officer or director of the corporation in the Commonwealth, or the registered agent of the corporation in the Commonwealth, or leaving it at the domicile or habitual residence of any officer, director or agent registered (if the registered agent is an individual) in the Commonwealth, or in the designated office or other business headquarters of the corporation in the Commonwealth. If the registered agent is a corporation, the summons may be served through said corporation in its capacity as agent, by means of delivery in the Commonwealth of a copy **[*16]** of the summons to the president, vice president, secretary, deputy secretary or any director of the corporate resident agent. The summons served by means of the delivery of a copy to the domicile or habitual residence of any registered officer, director or agent, or to the designated office or other business headquarters of the corporation in the Commonwealth, must be left in the presence of an adult at least six (6) days prior to the date of the indication of the judicial procedure and the sender will clearly report the method of serving said summons in the notification thereof. If the appearance is to be immediate, the summons must be delivered in person to the officer, director or resident agent.

1 When, by due diligence, a corporation cannot be summonsed by serving the summons to any person authorized to receive it as provided in subparagraph (a) of this section, such summonses shall be served as provided in the Rules of Civil Procedure of the Commonwealth, App. III of Title 32.

Under the Federal Law against Discrimination in Employment, *29 U.S.C. sec. 621 et seq* **[*17]** .; the Federal Law of Civil Rights, Title VII, *42 U.S.C. sec. 2000e*; and Law No. 100 of June 30, 1959, as amended, *29 L.P.R.A. § 146 et seq*; to determine whether a parent company and its subsidiary are one and the same thing, so that the former responds for unlawful acts committed by employees or agents of the subsidiary, the following factors are taken into account: (1) if its operations are interrelated; (2) the management staff is common to both corporations; (3) there is joint control of labor relations, and (4) an owner relationship or joint financial control. In addition, it has been otherwise resolved that the parent company responds if it controls its subsidiary to such a degree that it converts the latter into agent or instrument of the former, and if by not ruling out the duality of legal entities between both corporations (1) the subsidiary corporation would be helped to perpetrate fraud or damage, such as, for example, a violation of the law, and (2) if the parent company is released from liability, the claimant would suffer damage or unfair loss. See *Odriozola* v. S. Cosmetic Distributors Corp., 116 D.P.R. 485, 496 *(1985)*. **[*18]** In addition, the serving of the summons made at a subsidiary does not confer jurisdiction over the parent company, if separate corporate identities are maintained; unless the subsidiary corporation is an *alter ego* or agent of the parent company. (Our Translation) *Akzona v. E.I. Du Pont Demous and Co., 607 F. Supp. 227, 237* (United District Court of Delaware).

In the case at hand, Sara Lee argues in the first place that the Court erred in declaring contempt to a party over which she has not acquired jurisdiction, since the person who received the summons is not authorized to do so, because she is not and has never been an employee, officer, administrative manager, or general manager of Sara Lee. It also adds that Coach Leatherware International, Inc., is a subsidiary of Coach, Inc., which in turn is a subsidiary of Sara Lee; and that the mere fact of having drawn up a stock plan for its subsidiaries, does not make them a single legal entity for the purpose of imposing liability under the complaint filed. For its part, the respondent argues that Sara Lee and Coach are one and the same thing, but she does not present arguments that support her **[*19]** position. ²

_____

² The respondent only submitted the forms for the stock plan, which is not in dispute, and which was provided by Sara Lee; and news taken from an Internet page indicating that Sara Lee Corp. announced the sale of some of its divisions, which

IVETTE VÉLEZ MUÑIZ, COMPLAINANT-APPEALED V. SARA LEE CORPORATION, COACH LEATHER, INC., NOEL RODRIGUEZ, HIS WIFE AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, BRUNILDA SO...

She did not offer evidence demonstrating that (a) the operations between both corporations were interrelated; (b) management personnel is common to both; (c) there is joint control of labor relations; and/or (d) there is an owner relationship or joint financial control. It also did not demonstrate that Sara Lee had converted its subsidiary Coach Leather Inc. into its agent or instrument; or that if the duality of the legal entities between them was not ruled out, Coach Leather, Inc. would be helped to commit fraud or damage, and/or that the respondent would suffer damage or unfair loss by exempting Sara Lee from liability. [3]

**[*20]** We cannot lose sight that in the case in question, Coach Leather, Inc., as well as the other co-defendants, answered the complaint in a timely manner, so we see no reason to think that any harm is caused to the respondent, if it is determined that Sara Lee and her subsidiary Coach, are different personalities. Therefore, we conclude that the parent company Sara Lee and Coach Leather, Inc. have different and separate legal capacities for the purposes of the complaint filed; therefore, the Court erred in concluding that Sara Lee was the employer of the appellee Ivette Vélez Muñiz, and consequently having declared the contempt of said party, by validating the serving of the summons to a subsidiary corporation made through a manager. Consequently, the first and third errors were committed. Taking into account that the second mistake was the alternative of not having committed the first one, its discussion became academic.

With regard to the fourth point of error, in effect the Court at all times refers in its opinion to "the defendant party". However, in the operative part thereof, the Court indicates and cites: **[*21]** "On the grounds discussed above, this Court declares the Motion to be Without Merit so that the declaration of contempt is rendered null and void and a hearing is indicated to award the amount of the damages." If we look at the opinion issued together with all the documents generated during the procedural process of the case, we will notice that it is

completely clear that contempt was only declared against Sara Lee Corp. So the last error was not committed. We only have to discuss the approach of lack of jurisdiction made by the respondent in her "Motion for Compliance with Order and to Request Dismissal of the Writ of Certiorari Due to Lack of Jurisdiction," submitted to our secretary on December 19, 2001. In essence, it is alleged that it is appropriate to dismiss the appeal filed by Sara Lee, as established in section 4 of Law 2, *supra*, and what was resolved by our Supreme Court in the case of Ríos Moya v. Industrial Optics, Op. of August 21, 2001, 2001 J.T.S. 121. The respondent indicates that, having declared contempt against Sara Lee on May 21, 2001, and having notified the parties on the 23rd of the same month and year; the only available remedy for the affected party **[*22]**, herein petitioner, was to resort to a review before this Court within the term of ten (10) days provided for by section 4 of Law 2, *supra*. Which she did not do, since she chose to go to the same Court, to request that the declaration of contempt be rendered null and void. The reason is not present. Let us consider.

Law No. 2 provides a summary procedural mechanism by which it is sought to achieve the rapid consideration and award of complaints filed by employees or workers against their employers. The nature of this type of complaint requires speed in its processing to achieve the legislative purposes of protecting employment, discourage dismissal without just cause and provide the dismissed worker with economic resources between one job and another. In view of its reparative nature, this law must be interpreted liberally in favor of the employee. (Quotations Omitted) Ruiz Rivas v. Colegio San Agustín, Op. of October 5, 2000, 2000 J.T.S. 159, p. 213.

In order to achieve its legislative purposes, Law No. 2 provides for a procedural process that, allowing the employer to win back its rights, is more onerous for the same. For example, said law provides short terms to **[*23]** answer the complaint, strict criteria to grant an extension to answer the complaint, limitations on the use of mechanisms on discovery of evidence, etc. (Quotations Omitted) Ruiz Rivas v. Colegio San Agustín, *supra*. Thus, for example, from Law No. 2 itself, it is clear that the breach of the terms to answer a complaint requires that the court grant the remedy requested by the complainant, unless within the term provided, the defendant submits a swear-in extension

---

include Coach Leatherware. It is also not in dispute that Coach is a subsidiary of Sara Lee, therefore nothing provides the evidence presented by the respondent to support her allegation.

[3] Although these criteria have been used in cases under the Law of Discrimination in Employment, *supra*; Civil Rights Law, *supra*; and Law 100, *supra*; we find no reasons that would prevent us from applying them to the case at hand.

IVETTE VÉLEZ MUÑIZ, COMPLAINANT-APPEALED V. SARA LEE CORPORATION, COACH LEATHER, INC., NOEL RODRIGUEZ, HIS WIFE AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, BRUNILDA SO...

request in which it sets out the facts that justify it. Law No. 2, *supra, 32 L.P.R.A. § 3120.*

By interpreting this rule, our Supreme Court has established that, as a rule, courts of instance have the duty to strictly comply with the summary procedure of this Law and that they lack jurisdiction to grant extensions in cases where the order is not complied with. This is a legislative mandate that is generally not subject to the discretion of the court. *Mercado Cintrón v. Zeta Communications, Inc., 135 D.P.R. 737 (1994)*. The fact that on occasion the special circumstances of a particular case **[*24]** require some flexibility in the application of Law No. 2, does not give us free rein to ignore in any case the unequivocal and mandatory precept of speed in the judicial process established in that law. Ordinarily, we have no alternative other than the rigorous application of the restrictive terms of Law No. 2. Only in exceptional cases, when there are special circumstances, can we be more flexible. Ríos Moya v. Industrial Optics, *supra.* Thus, for example, it is justified to make the application of Law No. 2 more flexible when the causes that justify the delay in filing the reply to a complaint arise from the same proceedings. In this case, the court may, *motu* proprio, and in the exercise of its discretion, grant an extension to the term to answer the complaint if it understands that by doing so it will avoid a failure of justice. In such cases, our review function will be limited to determining whether the court of instance has abused its discretion. Ruiz Rivas v. Colegio San Agustín, *supra*, on page 214. The courts have the same discretion to determine whether the complaint filed by the worker **[*25]** must be processed through the ordinary route, instead of the summary. To make this determination, the courts must make "a fair balance between the interests of the employer and those of the complainant worker, in light of the specific circumstances of the claims in the complaint." *Rivera Rivera v. Insular Wire Products, Corp., 140 D.P.R. 912 (1996)*; Berríos Heredia v. González, Op. of June 15, 2000, 2000 J.T.S. 102, on p. 1297. When the complaint is based on data that the employer is obliged by law to collect and keep, it is obvious that there is no reason to delay the proceedings by granting unnecessary extensions for it to respond. However, in those cases in which a court determines that they are complicated claims or that there are special circumstances that merit the defendant employer conducting a more thorough and detailed investigation to answer and present adequate defenses, the granting of an extension is justified. *Rivera v. Insular Wire Products, Corp., supra,*

*at p. 926* (1996). Therefore, each case must be studied individually in order to determine **[*26]** whether or not adjusting the application of Law 2 is merited or not.

With regard to the judgments handed down in contempt, under the summary procedure of Law No. 2, our Supreme Court expressed in Ruiz Rivas v. Colegio San Agustín, *supra*, the following:

"conclusive allegations and determinations of law, as well as facts incorrectly alleged, are not sufficient to sustain a determination of the employer's liability. We must bear in mind that in order for a ruling to be issued in contempt, the complainant party must have made allegations of specific facts in its complaint; facts that when the contempt is declared are considered admitted. In addition, the general damages claimed, by not constituting a liquid sum, have to be proven; it is not sufficient to simply allege that the damages amount or add up to the amount claimed. Under any circumstances, the amount of the damages must be the object of proof."

Therefore, the determining factor in issuing a judgment in contempt will be, if the allegations contained in the complaint, contain sufficient facts for the granting of the remedy, and not mere assertions on the employer's liability.

Finally, we must **[*27]** indicate that the summary nature of Law 2 extends to the review procedures. To this end, section 4 provides that if the defendant does not file their reply to the complaint in the manner and within the term provided for in *section 3120* of this title, the judge will issue a judgment against the defendant, at the request of the defendant, granting the requested remedy. In this case, said judgment will be final and it cannot be appealed; however, it is provided that the defendant may go from the District Court to the corresponding High Court, or from the High Court in which the claim has originated to the Supreme Court, within ten (10) days following the notification of the judgment to review the proceedings.

IVETTE VÉLEZ MUÑIZ, COMPLAINANT-APPEALED V. SARA LEE CORPORATION, COACH LEATHER, INC., NOEL RODRIGUEZ, HIS WIFE AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, BRUNILDA SO...

In *Santiago v. Palmas del Mar Poperties, Inc., 143 D.P.R. 886, 901-902 (1997),* (a rule that was recently repeated in Ríos Moya v. Industrial Optics, *supra*); our Supreme Court expressed itself in the following way when interpreting the aforementioned legal provision:

When the defendant does not submit his reply to the complaint in the manner and form required by Law No. 2, *supra*, the **[*28]** Court, at the request of the defendant, will issue a judgment in contempt against him and will grant him the requested remedy. The same will happen if the defendant does not appear at the trial. In both situations, the law does not allow the judgment to be appealed; this will be final. However, it is allowed that the procedures can be reviewed through the certiorari procedural mechanism. We are, therefore, before a *sui géneris* proceeding, a limited review of a final judgment. Although it participates in the nature of the review of interlocutory issues on procedural procedures, it is a final limited review judgment. We are before a final judgment of the Court of First Instance for which a procedure has not been established in the Law of the Judiciary of Puerto Rico of 1994, as amended. Nor has a procedure been established in a special law approved later. Article 4.002(i) of the Puerto Rico Judiciary Law of 1994, *supra*, applies to the review of this type of judgment. The appropriate appeal is that of *certiorari*, and the term to file it is jurisdictional, of ten (10) days, since this was the term **[*29]** and these were "the conditions provided by law for the filing of the equivalent appeal that was previously filed before the Supreme Court." From the judgment issued by the Circuit Court, one may appeal to the Supreme Court by means of the writ of *certiorari* established in Art. 3.002 (d)(4) of the Puerto Rico Judiciary Law of 1994, *supra*. There will be a strict compliance term of thirty (30) days.

It is then clear that in judgments issued in contempt under sections 4 and 6 of Law No. 2 *supra*, the affected party will have a term of ten (10) days counted from the notification to go in the writ of *certiorari* before us. However, the case at hand is distinguishable from the above as well as from the case of Ríos Moya v. Industrial Optics, *supra*, since, in the case at hand, the contempt of Sara Lee was declared, but no judgment of contempt was handed down. It is well known that a resolution puts an end to an incident within the judicial process, while a judgment puts an end to the dispute between the parties through a final award. *Banco Santander P.R. v. Fajardo Farms Corp., 141 D.P.R. 237, 245 (1996).* **[*30]** In this case, there is no ruling

whatsoever that can be executed, since no remedy has been granted to the respondent. Therefore, neither Section 4 of Law No. 2, *supra*, nor what was resolved in Ríos Moya v. Industrial Optics, *supra* is applicable to the case of record. However, since this is an interlocutory resolution, what which is resolved in the case of Dávila and Rivera v. Antilles Shipping *Inc.* is applicable, Op. of February 12, 1999, 99 J.T.S. 10. In this case, our Supreme Court, in an Opinion issued by Judge Rebollo López, concluded that the appeals courts, as a matter of self-limitation, will not review interlocutory resolutions in summary proceedings under Law 2 of October 17, 1961, unless it is an ultra vires interlocutory resolution, issued without jurisdiction, or extreme cases in which the purposes of justice require the intervention of this court. In all other cases, the party seeking to challenge interlocutory resolutions must wait until a final judgment is issued to include the indication of error in the corresponding appeal.

Since in this case it is an interlocutory resolution **[*31]** issued without jurisdiction, in addition to being an exceptional case, we should consider the appeal filed, as we have done.

In view of the foregoing, we issue the requested order and revoke the Resolution issued by the Court of First Instance, Higher Chamber of Utuado.

The Court so agreed and ordered and the Secretary of the Court so certifies. (b)

Aida I. Oquendo Graulau'

General Secretary

_____

**End of Document**



| | |
|---|---|
| **DATE OF TRANSLATION:** | 3-May-21 |
| **ELECTRONIC FILE NAME:** | Ivette Vélez Muñiz v. Sara Lee Corp., No. KLCE0101357, 2001 PR App. Lexis 2327 (P.R. Ct. App. Dec. 31, 2001) |
| **SOURCE LANGUAGE:** | Spanish |
| **TARGET LANGUAGE:** | English (United States) |
| **TRANSPERFECT JOB ID:** | US0974817 |

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

TCert v. 2.0

# Exhibit 9

## *NORMA L. ALFONSO MORA AND OTHER CO-PLAINTIFFS WHOSE NAMES ARE IDENTIFIED IN THE ANNEXES TO THE CLAIM, Appellants v. TYCO ELECTRONICS PUERTO RICO, INC., Appellee*

Court of Appeals of Puerto Rico, Judicial Region of Arecibo

August 4, 2004

KLAN200400609

**Reporter**

2004 PR App. LEXIS 2827 *

NORMA L. ALFONSO MORA AND OTHER CO-PLAINTIFFS WHOSE NAMES ARE IDENTIFIED IN THE ANNEXES TO THE CLAIM, Appellants v. TYCO ELECTRONICS PUERTO RICO, INC., Appellee

**Previous History: [*1]** Appeal from the High Court of Arecibo. Civil No. CPE2003-0131 (402). Special Summary Procedure. Law 2 of October 17, 1967.

## Case Summary

### Main Terms

summons, edict, court, appellants, address, claim, plaintiffs, defendant, company, case, proceedings, through, Affidavit, over, without, information, due, order, Declaration, publication, reasonable, mail, was, Judgment, appellants, known, summons, issued, Motion, any

**Judges:** Panel composed of its president, Judge López Vilanova, Judge Cordova Arone and Judge González Rivera.

**Opinion By**: Córdova Arone

## Opinion

JUDGMENT

In San Juan, Puerto Rico, on August 4, 2004.

The appellants, Norma L. Alfonso Mora and Others, request that we revoke the Judgment issued by the Court of First Instance, Higher Chamber of Arecibo, on February 25, 2004. This judgment dismisses the claim filed by the plaintiffs, herein appellants, for lack of jurisdiction over the defendant, Tyco Electronics Puerto Rico, Inc., due to the unsuccessful service of notice. The appellants filed their argument in objection on July 1, 2004. The matters set forth by the parties are of strict law, and therefore it is not necessary to examine controversial facts. We are in a position to resolve.

I

Let's review the relevant facts of the case.

The appellant and another twenty-five (25) former employees of the appellant, at the pharmaceutical plant that it operated in Arecibo, Puerto Rico, until the closing thereof, **[*2]** on April 23, 2001, filed a lawsuit on April 29, 2003, claiming, among other things, allegedly owed salaries.

The original summonses were issued on the same date that the claim was filed by the Secretary of the Court of First Instance and when attempting to serve them it was discovered that the plant that the appellee operated, was closed. Tyco was investigated in the Police Headquarters of that zone and in the post offices and it

NORMA L. ALFONSO MORA AND OTHER CO-PLAINTIFFS WHOSE NAMES ARE IDENTIFIED IN THE
ANNEXES TO THE CLAIM, Appellants v. TYCO ELECTRONICS PUERTO RICO, INC., Appellee

was not possible to obtain any information there. The unsuccessful service of notice of the summons was confirmed under oath and in light of this situation the plaintiffs herein decided to summon the appellees by edict.

Information was obtained about the last known addresses of Tyco. In addition to the mailing address in Puerto Rico, it was found that Tyco was a corporation organized according to the laws of the Commonwealth of Puerto Rico on September 29, 1997 under another name, changing its name to Electronics Puerto Rico, Inc. on July 10, 2000. It was confirmed that the resident agent of Tyco was the Tyco corporation itself, so upon cessation of doing business in Puerto **[*3]** Rico, it terminated its presence in this jurisdiction without appointing a new resident agent.

On August 14, 2003, the appellees requested that the court be allowed to summon Tyco by publication of an edict. In order to increase the possibilities for the appellants to be made aware of the lawsuit, a draft order was submitted to authorize the sending of a copy of the summons and the claim to Tyco at its address in Puerto Rico and to the last known address of its parent company, Tyco Electronics Corp. at 140 Fourth Ave. Waltham, M.A. 02154-7577 U.S.A. This address was obtained from an e-mail from an officer of said parent company, dated January 15, 2001. The information that Tyco was a subsidiary of Tyco Electronics Corp. was obtained from the records of the Department of State of Puerto Rico and from a certification of May 8, 2000 that indicated that Tyco Electronics Corporation was the owner of all the shares of the appellee.

The summons by edict was issued by the Secretary of the Court on September 3, 2003 and published on September 26, 2003. The summons by edict order was authorized by the court on August 26 **[*4]** of 2003. The aforementioned summons by edict was sent by certified mail with acknowledgment of receipt with the claim to Tyco at its mailing address in Arecibo, Puerto Rico and to its parent company at its last known address, at 140 Fourth Ave. Waltham M.A. 02154-7577 U.S.A. and as alleged by the appellants within the term of 10 days provided for in the order and subpoena issued. According to Exhibit 5 and 7 on page 84 and 85 of the appellants' appendix, these notifications were sent on October 1, 2003 and were returned on October 6 and 20, 2003. However, the Affidavit signed by the secretary of Mr. Luís R. Mellado González, signed on January 8, 2003, affirms that these notifications were sent on October 29, 2003. On February 23, 2004, however, an

Affidavit was submitted to the court clarifying that the date on which the notifications were sent by mail was October 1, 2003 and not October 29, 2003. The edict was published on September 26, 2003 according to Exhibit 3, page 63 of the appellants' appendix. That is, these exhibits show that an attempt was made to notify Tyco Electronics Puerto Rico, Inc. at the addresses **[*5]** indicated in the edict, within the 10 days established by Rule 4.5 of Civil Procedure. It is also shows that the notification letters were returned and not received by the aforementioned recipient.

The appellants understand that this summons complies with the publication order of the writ issued and the court acquired jurisdiction over Tyco in accordance with the aforementioned Rule 4.5 of Civil Procedure.

Upon the discovery of another address of Tyco's parent company in the United States, the appellants sent or notified it again. On this occasion, Tyco reacts and responds to the claim by means of a special appearance and also presents a Motion for Dismissal due to Unsuccessful Service of Notice of the Summons on December 17, 2003.

The appellee received the second summons on November 17, 2003 just over 50 days after the publication of the summons by edicts.

On January 13, 2004, the appellee submitted its Motion to be Submitted Without Objection, Motion of Dismissal, because the appellants had not objected to its Motion of Dismissal, despite more than 27 days having passed since its submission. That same day, **[*6]** on January 13, 2004, the appellants filed before the court a "Motion Requesting a Judgment in Contempt, in Objection to Allowing the Filing of the Reply to the Claim and to the Dismissal." This motion was signed on December 26, 2003. We have no record of when the second summonses were sent. The original summonses never appeared. The appellants inform us in their Statement of Appeal that in all proceedings the staff of the Secretary of the Court makes a note of the date of issue of the summonses, although no copy of said summonses already issued is kept. However, the Affidavit that forms part of the appellant appendix, Annex 1 page 52, does not refer to this note of the date of issue. The Affidavit signed by Yadira Capó Soto, paralegal and resident of Trujillo Alto, which says that Abigail Maisonet, representative of the civil division of the Secretary of the Court of First Instance, Higher Chamber of Arecibo, reviewed the request for reproduction of documents and upon reviewing the file it was noticed that there had to

NORMA L. ALFONSO MORA AND OTHER CO-PLAINTIFFS WHOSE NAMES ARE IDENTIFIED IN THE
ANNEXES TO THE CLAIM, Appellants v. TYCO ELECTRONICS PUERTO RICO, INC., Appellee

be an error, since there are no original summonses **[\*7]** that must accompany the claim.

II

The appellants point out two errors that they allege were committed by the appealed court that justify the revocation of the appealed Judgment:

It erred in dismissing the claim for alleged breach of the order of summons by edict.

It erred in not issuing a judgment in contempt against the appellee.

Because the aforementioned errors are closely related, we will discuss them together.

III

In this case, the suitability of the summons by edict and its publication made to Tyco Electronics, Puerto Rico, Inc. is questioned. The dispute revolves around whether the appellant plaintiffs complied with the requirements of Rule 4.5 of the Civil Procedure, 32 L.P.R.A. App. III, R. 4.5. The respondent maintains that reasonable proceedings were not met to locate the party and that the procedures expressed in the sworn statement that were made to notify the defendant do not constitute the reasonable proceedings required by due process of law to ensure that Tyco was summoned in accordance with the law. Obviously, if we determine that the proceedings expressed by the plaintiffs were not reasonable, the summons **[\*8]** by edicts would be inadequate, so the contempt requested by the plaintiffs would be without merit. In that case, we would not have to address the second error indicated.

*Section 7 of Article II of the Constitution of Puerto* Rico, as well as *Amendments V and XIV of the Constitution of the United States*, guarantee that no person will be deprived of their freedom or property without due process of law. *Const. of the Commonwealth of Puerto Rico, Art. II, Sect. 7.1 L.P.R.A. Due process of law requires that the defendant be properly notified of the claim against him and that he also be given the opportunity to be heard before his rights are awarded. Álvarez Elvira v. Arias Ferrer, Â Â Â D.P.R. Â Â Â , 2003 J.T.S. 81, on pg. 1024.*

The summons is the formal notification to which all defendants, by virtue of the minimum guarantees of due process of law, have the right when there is a judicial complaint so that, if they so wish, they may appear to defend themselves. <u>Lucero Cuevas</u> v. <u>The San Juan Star</u>, Â Â Â D.P.R. Â Â Â , 2002 J.T.S. 37, Res. of March 18, 2002.

The summons is the procedural mechanism by which a court enforces its **[\*9]** jurisdiction over the person of the defendant. *First Bank of P.R. v. Inmob. Nac., Inc., 144 D.P.R. 901, 913 (1998)*.

In accordance with the above, our highest court has repeated on several occasions that, as a general rule, strict compliance with the requirements of the summons is necessary. *Chase Manhattan Bank, N.A. v. Polanco Martínez, 131 D.P.R. 530, 535 (1992)*. The foregoing is even more important when faced with a summons by edicts, replacing the personal notification, which requires rigorous, faithful and strict compliance. *Medina Garay and Other v. Medina Garay, 161 D.P.R. Â Â Â , 2004 T.S.P.R. 75*. Strict compliance means that notification by means of summons by edict shall be interpreted in such a way that there is a reasonable probability that the defendant is notified of the action filed against him and may make an informed decision on whether or not to appear to defend himself.

Let's look at the other formalities required by Rule 4.5 of the Civil Procedure; the order will provide for the publication to be made only once in a newspaper **[\*10]** of general daily circulation of the island of Puerto Rico. The order will provide, in addition, that within ten days following the publication of the edict, a copy of the summons and of the claim filed be sent to the defendant, by certified mail with acknowledgment of receipt or any other form of correspondence delivery service with acknowledgment of receipt provided that said entity does not have any connection to the plaintiff and has no interest in the lawsuit, to the place of their last known residence, unless it is justified by a sworn statement that, despite the efforts made, with their support, it has not been possible to locate any known residence of the defendant, in which case the court will excuse compliance with this provision. Rule 4.5 of Civil Procedure, *Supra.*

NORMA L. ALFONSO MORA AND OTHER CO-PLAINTIFFS WHOSE NAMES ARE IDENTIFIED IN THE ANNEXES TO THE CLAIM, Appellants v. TYCO ELECTRONICS PUERTO RICO, INC., Appellee

The summons by edicts must be processed within six months of having been issued. Rule 4.3(b) of the Rules of Civil Procedure, 32 L.P.R.A App. III, R 4.3, Medina Garary and Other, *Supra*. In summary, among the most important requirements of the summons by edicts are, (i) the initial affidavit **[*11]** which provides the proceedings carried out to locate the person to be summoned; (ii) for a copy of the claim filed and of the summons to be sent to the defendant by certified mail, to his last known address, within ten days following the publication of the edict, and (iii) the service of notice of the summons within six months after being issued. *Monell v. Mun. of Carolina, 146 D.P.R. 20, 25 (1998)*.

To resolve the disputes presented, we have to decide whether the proceedings carried out by the appellant plaintiffs indicated in the Affidavits of the summoning party, Julio Estrada and that of Mr. Luís R. Mellado González constitute reasonable services of notice and comply with the requirements of Rule 4.5 cited above, and with due process of law. The question that we must ask ourselves as stated above is, if the summons method that was used in our case could have had a reasonable probability of notifying or informing the defendant about the action filed against it, in such a way that it could appear to defend itself, if it so desired.

In Mr. Estrada's sworn statement, he reports that the site **[*12]** where Tyco's business was located had closed some time ago and that it is operating in the United States. He went to the nearest Police precinct where Tyco operated and there they informed him that they had no information about the company. He then went in person to the mailing address of Arecibo and Mr. Díaz informed him that he had no information about the company. He contacted the 411 telephone system of the Puerto Rico Telephone Company of Puerto Rico and Ms. González, the operator of that company, informed him that she did not find any information about the company.

The Atty. Mellado González declares that the manufacturing plant that operated Tyco Electronics Puerto Rico, Inc. at its address at Calle A Edificio 417 Zona Industrial Zeno Gandía, Arecibo, Puerto Rico, has closed operations. That despite the investigations carried out, no officer or any person through which Tyco Electronics Puerto Rico, Inc. could be summoned could be found, in this jurisdiction, and also, the resident agent appointed in the certificate of incorporation filed with the Department of State of Puerto Rico, is the corporation itself, for which it is justified to order the summons by **[*13]** Edicts in accordance with Rule 4.5 of the Civil Procedure in which a claim is presented that justifies the granting of a remedy against Tyco Electronics Puerto Rico, Inc., employer of the plaintiffs.

In the appeal application, the appellants indicate that they had learned of another address through an e-mail and the parent company could be notified at its last known address at 140 Fourth Ave. Waltham M.A. 02154-7577 U.S.A. Both companies were notified by means of the ordered edict and within the term provided by the aforementioned Rule 4.5 but in both cases the notification envelope was returned unopened because the addresses indicated at the time they were sent did not exist in the postal system.

Subsequently, without requesting a new edict or permission to publish the ordered edict again, in the understanding that the published one was valid, they notify the new address of Tyco's parent company and this time, on November 17, 2003, the notifications were received. On December 17, 2003, Tyco appeared without submitting itself to the jurisdiction of the court to file its Motion for Dismissal due to Unsuccessful Service of Notice of the Summons.

According to the appellees, **[*14]** the services indicated do not constitute reasonable services of notices and do not conform to the established rule. The summons method used by the plaintiff must have a reasonable probability of notifying or informing the defendant of the action taken against it, in such a way that it can appear to defend itself, if it so wishes.

They argue that the first address provided by the plaintiffs to the court was Tyco's when it operated in Puerto Rico. It was impossible to serve the summons at this address and this was confirmed by the summonsing party. The company had closed its factory or operations about three years ago. The second address used corresponded to a place in Waltham Massachusetts, in

NORMA L. ALFONSO MORA AND OTHER CO-PLAINTIFFS WHOSE NAMES ARE IDENTIFIED IN THE
ANNEXES TO THE CLAIM, Appellants v. TYCO ELECTRONICS PUERTO RICO, INC., Appellee

the United States, obtained from an email from 2001, two years before the filing of the claim. The address did exist but the structure had been sold and demolished more than two years ago. This address does not correspond to Tyco since two years before the filing of the claim. It also asserts that they had six months to summons it to make the necessary arrangements to discover the correct directions and nothing was done.

They argue that because Tyco is part of an international conglomerate, **[*15]** the information was easy to discover by calling the telephone information systems of the United States or by conducting a simple search on the Internet. They cite to us the case, _Lanzó Llanos v. Banco de la Vivienda, 133 DPR 507_ in support of its contention. In this case, some services of notice similar to those carried out by the summonsing party in our case were conducted and the court determined that they were not sufficient. It determined that in order to carry out a summons by means of edicts, it is necessary for the interested party to prove to the court the fact that it has been diligent in trying to locate the defendant. That an attempt was made to conduct the personal summons and, despite the procedures carried out, it has not been able to serve it. Only when it is reliably demonstrated that those potentially effective services of notice have been carried out in order to find the defendant, can the court grant permission to summons it through the aforementioned publication.

While it is true that in the case in question, the court granted permission for the publication of the edict, it did so based on information received from the plaintiff. Once **[*16]** it has the opportunity to examine the position of the claim, it reconsiders and acknowledges that the edict, in the manner notified, does not comply with the requirements of the cited Rule 4.5 and its interpretative case law. We conclude, just like the T.P.I., that the edict does not comply with the due process of law nor does it comply with the rules established by our Supreme Court in cases where it is required to summons by edicts. The facts of this case, as well as the sworn statements submitted, do not demonstrate that the plaintiff has effectively made efforts to try to locate the defendant and summons him in such a way that it becomes appropriate to enforce the summons order issued by edict. The appellants knew or should have known that the published edict was not going to take effect because Tyco had closed its offices and the other address indicated were taken from a document that more than two years old.

The decision we reached makes it unnecessary to discuss the second indication of error.

On the basis of the foregoing grounds, the Judgment object of this appeal is confirmed.

The Court so agreed and ordered and the Secretary of the Court so certifies.

**[*17]** Aida Ileana Oquendo Graulau

General Secretary

_____

**End of Document**



| | |
|---|---|
| **DATE OF TRANSLATION:** | 3-May-21 |
| **ELECTRONIC FILE NAME:** | Alfonso Mora et al. v. Tyco Electronics Puerto Rico, Inc., No. KLAN200400609, 2004 PR App. LEXIS 2827 (P.R. Ct. App Aug. 4, 2004) |
| **SOURCE LANGUAGE:** | Spanish |
| **TARGET LANGUAGE:** | English (United States) |
| **TRANSPERFECT JOB ID:** | US0974817 |

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

TCert v. 2.0

# Exhibit 10

# *ANTONIO MARRERO, PETITIONER v PREFERRED HEALTH MANAGEMENT ("PHM"), APPELLEE*

Court of Appeals of Puerto Rico, Judicial Region of San Juan

October 15, 2009

KLCE200900945

**Reporter**
2009 PR App. LEXIS 4296 *

ANTONIO MARRERO, PETITIONER v PREFERRED HEALTH MANAGEMENT ("PHM"), APPELLEE

**Previous History: [*1]** Certiorari from the Court of First Instance, Court of San Juan. CASE NO. KPE2008-4458 (506). ABOUT: CLAIM OF SALARIES.

# Case Summary

## Main Terms

summons, person, Law, Court, corporation, service of notice, case, name, be, appealed, receive, contempt, petitioner, same, on, was, jurisdiction, sufficient, any, complaint, effect, received, said, part, processed, claim, defendant, annotation, office, Rules

**Judges:** PANEL II. Panel composed of its president, Judge Pesante Martínez, and Judges Morales Rodríguez and Rivera García.

**Opinion by**: Rivera García

# Opinion

Rivera García, Judge Rapporteur

**SENTENCE**

In San Juan, Puerto Rico, on October 15, 2009.

Mr. Antonio Marrero (the petitioner) appears before us by means of the writ of *certiorari* in the heading. He requests that we review a Resolution issued by the Court of First Instance, Court of San Juan (TPI), on May 14, 2009 and notified on June 5, 2009. Through this determination, the TPI voided the declaration of contempt on Preferred Health Management (PHM or the respondent) due to the defect in the service of notice of the summons.

Having evaluated the file in light of the right that we will set out below, we proceed to issue the requested writ of *certiorari* and confirm the appealed resolution.

I

Mr. Antonio Marrero served as Executive Vice President of PHM since November 2003. In 2006, that affiliate company was sold, so the petitioner **[*2]** was dismissed from his job. [1] In view of this, on December 30, 2008, the petitioner filed against the respondent a claim for salaries under Law No. 2 of October 17, 1961, as amended, known as the Labor Claims Summary

---

[1] These data arise from the allegations of the complaint filed by the petitioner. However, in the *certiorari* appeal, the petitioner clarifies that according to the information offered by the respondent, PHM was merged with MMM on December 26, 2007. See, Writ of *certiorari*, p. 12.

ANTONIO MARRERO, PETITIONER v PREFERRED HEALTH MANAGEMENT ("PHM"), APPELLEE

Procedure Act (Law No. 2), *32 L.P.R.A. sec. 3118 et seq.* In summary, he alleged that under clause 6.5(A) of the employment contract, PHM owed him the amount of $ 545,000 for the premature termination of the employment agreement. He argued that he made several collection efforts, but the respondent did not respond to his payment requirements.

Once the complaint was filed, the summons was processed on January 7, 2009. According to **[*3]** it is clear from the certification on the back of the document, that it was delivered personally to the PHM offices, but the individual who received it was not recorded. In that sense, the petitioner limited himself to affirming that "[h]e personally notified Preferred Health Management, Inc. [...] on January 7, 2009, at 12:20 pm [...] in San Juan; Puerto Rico...". [2] (Citations omitted).

The respondent, on its part, did not submit its reply to the complaint. In view of this, the petitioner requested on two occasions that the contempt of said party be noted for failing to comply with the terms established in Law No. 2. Finally, on March 18, 2009, the TPI noted the contempt to the respondent. It also urged the petitioner to submit a motion for a judgment in contempt. [3]

 **[*4]** Meanwhile, on April 30, 2009, MMM Holding, Inc. (MMM) filed a special appearance in the request for dismissal due to lack of jurisdiction. It indicated that PHM had been acquired by MMM by merger made prior to the filing of the complaint by the petitioner. For this reason, it alleged that the entity that should have been summoned was MMM and not PHM, since the latter lost its own legal personality. Alternatively, it argued that the summons to PHM was defective, since it could not be physically served to a legal entity, but rather to a natural person with the capacity to receive said document. Thus, it requested that the complaint against it be dismissed and that the declaration of contempt be denied. [4]

The petitioner objected to the aforementioned request. It understood that according to *León García v. Restaurante El Tropical, 154 DPR 249 (2001).* **[*5]** the service of summons served to the person in charge of the business or person authorized to do so is sufficient in law. He also added that the service of notice of an entity that does not exist legally is equally valid when it is served as per its business name. [5]

Thus, on May 14, 2009, the TPI issued the appealed resolution in which the declaration of contempt against PHM was deemed null and void. It stated that such a decision was admissible by virtue of the defect in the service of notice of the summons.

In disagreement with said determination, the petitioner appears before us and points out that:

> The Honorable TPI erred in rendering the declaration of contempt against PHM ineffective, without holding a hearing or having the appearance of this party, despite the fact that it was final and firm.

> The Honorable TPI erred in leaving the declaration of contempt null and void in the understanding that there is **[*6]** a deficiency in the service of notice because it has not summoned MMM, despite the fact that PHM is doing business in the same place, under the same name, and meets all the requirements for said summons to be valid in accordance with the resolution in *León García v. Restaurante el Tropical, 154 D.P.R. 249 (2001).*

II

The service of notice of the summons is the procedural mechanism by which the defendant is notified of the claim against them. Given its importance within the constitutional imperative of due process of law, the doctrine requires that the requirements of the summons be strictly complied with. *Global v. Salaam, 164 DPR 474 (2005)*; *Quiñones Román v. Cía ABC, 152 DPR 367 (2000)*; *First Bank of P.R. v. Inmob. Nac., Inc., 144 DPR 901 (1998).* This rigor seeks for the defendant to have the opportunity to be heard and to defend himself *Rodríguez v. Nasrallah, 118 DPR 93 (1986).* Thus, in the event of non-observance of the formalities of the service of notice of the summons, the court is deprived of exercising its jurisdiction over the defendant. *Datiz v.*

---

[2] Summons, Appendix of the appeal, Annex 6, pp. 36-37.

[3] Order of March 18, 2009, Appendix of the appeal, Annex 3, p. 14.

[4] Request for Dismissal for Lack of Jurisdiction, Appendix to the appeal, Annex 2, pp. 3-8.

[5] Opposition to late and inadmissible motion to dismiss the defendant, Appendix of the appeal, Annex 11, pp. 60-71.

ANTONIO MARRERO, PETITIONER v PREFERRED HEALTH MANAGEMENT ("PHM"), APPELLEE

*Hospital Episcopal, 160 DPR 10 (2004)*; **[*7]** *Márquez v. Barreto, 143 DPR 137 (1997)*.

Notwithstanding the foregoing, the Supreme Court has ruled that the lack of jurisdiction over a party due to deficiencies in the service of notice of the summons is not sufficient grounds to dismiss a complaint. In this sense, the failure to complete the service of notice can be remedied by issuing a new order or summons that is processed in accordance with the provisions of the Rules of Civil Procedure or special laws, as applicable. *Negrón v. Depto. Servicios Sociales, 105 DPR 873, 876 (1977)*.

In the specific case of the service of notice of a summons to an employer in labor claims under Law No. 2, *supra*, said statute establishes the way in which the claimant must complete it. For these purposes, section 3 provides the following:

> The bailiff or a private person shall serve the notification of the court clerk to the defendant. If the defendant is not found, the order will be served to the person who in any way represents said defendant in the factory, workshop, establishment, farm or place where the work that gave rise to the claim was carried out or in his/her office **[*8]** or residence. If the defendant cannot be summoned in the manner provided above, his summons shall be made in accordance with the provisions of the Rules of Civil Procedure for such cases. *32 L.P.R.A. sec. 3120*.

Three forms of summons emerge from the aforementioned section. The determination as to which of these applies in each case will depend on the concurrent circumstances at the time of carrying out the service of notice. Particularly in lawsuits where the defendant employer is a corporation, the case law has resolved that the summons will be made in accordance with the second option of section 3, *supra*, regarding the plaintiffs who are not found. Accordingly, when a defendant cannot be summoned personally because he or she is not found, then the summons will be served on any person representing the same. The reason why this particular provision applies to the notification of corporations is that the personal summons is inadequate because it is not a natural person, but rather a legal entity. *Lucero v. San Juan Star, 159 DPR 494 (2003)*.

Likewise, from the section transcribed **[*9]** it is possible to deduce the place and the person to whom the notification of the complaint will be delivered when the defendant is not in or it is a corporation. As for the place, Law No. 2 provides that the summons must be served in the factory, workshop, establishment, farm, site where the work that gave rise to the complaint, office or residence was carried out. In the meantime, with respect to the individual who may receive the summons in such a way that it constitutes sufficient notification for the employer, said bylaw provides that the petitioner shall deliver the documents to the person who in any way represents the defendant.

Based on the foregoing, the element of representation arises for the purposes of a person's ability to receive summons on behalf of the defendant corporation. In this sense, the notification may not be processed through any person but rather that person who is legally or conventionally authorized to act on its behalf. *Lucero v. San Juan Star, supra.* However, Law No. 2 does not delimit persons who may be considered representatives of the employer for the purpose of receiving a summons. **[*10]** In view of this, case law addressed that legal gap by means of the adoption by reference of the method to summon the corporations provided for in the Rules of Civil Procedure and in the General Corporations Act, Law No. 144 of August 10, 1995, as amended (Corporations Act), *14 L.P.R.A. sec. 2601 et seq. Id.*

Where applicable, Rule 4.4(e) of Civil Procedure, 32 L.P.R.A. Ap. III, R. 4.4, establishes that:

> In the applicable cases, if the defendant does not waive the summons through the mechanism set forth in Rule 4.3.1, the summons and the claim will be served together. The plaintiff will provide the person who makes the necessary copies. Said person, **upon delivery of the copy of the summons, shall record on the back of the same** with their signature, the date and place of said summons and **the name of the person to whom it was served.** The service of notice will be done as follows:
>
> (a) [...]
> [...]
>
> (e) **To a corporation**, company, partnership, association or any other legal entity, **delivering a copy of the summons and the claim to an official, administrative manager [*11] or general agent, or to any other agent authorized by appointment or designated by law to receive summons**. [...] (Emphasis added).

ANTONIO MARRERO, PETITIONER v PREFERRED HEALTH MANAGEMENT ("PHM"), APPELLEE

In accordance with the aforementioned rule, Article 12.01 of the Corporations Act postulates that:

(a) Any corporation organized in the Commonwealth will be summoned by **personally delivering a copy of the summons to any officer or director of the corporation in the Commonwealth,** or to the registered agent of the corporation in the Commonwealth, [...] or in the designated office or other business headquarters of the corporation in the Commonwealth. [...] (Emphasis added) *14 L.P.R.A. sec. 3126.*

In accordance with the aforementioned legal provisions, for the service of summons to a corporation to be valid and sufficient, it must be done through an officer, director, administrative manager, general agent or any agent designated by appointment or by law to receive summons. The determining factor in these cases will be that the person who is served the summons "in a position of sufficient responsibility so that it is reasonable to presume that he will transfer **[*12]** or send the summons or demand to his superiors." *Lucero v. San Juan Star, supra*; *Quiñones Román v. Cía ABC, supra.* For the purposes of defining whether a person is suitable to receive a summons addressed to a corporation, what must be taken into account is not the position that he or she occupies, but the duties, functions and authority of said individual. *Lucero v. San Juan Star,* supra; *Hach Co. v. Pure Water Systems, Inc.,* 114 DPR 58 (1983).

When any question arises regarding the jurisdiction of the court over a corporation due to the suitability of the person who received the summons, the court of first instance cannot automatically issue a new summons and order the restart of its processing. On the contrary, it is appropriate to hold an evidentiary hearing to clarify the dispute. *Lucero v. San Juan Star, supra.*

-B-

On the other hand, our procedural order recognizes the discretionary power of the Court of Appeals to issue an appeal for *certiorari*. In order for us to be able to exercise this discretionary power in a wise and prudent manner **[*13],** Rule 40 of the Regulations of this court, 4 L.P.R.A. Ap. XXII-B, R.40, indicates the criteria that we must take into consideration when attending to a request for issuance of a writ of *certiorari*. 4 L.P.R.A. Ap. XXII-A, R. 40. For these purposes, the aforementioned rule provides that:

The Tribunal shall take into consideration the following criteria when determining the issuance of a writ of *certiorari* or an order to show cause:

A. If the remedy and provision of the appealed decision, unlike its grounds, are contrary to law.

B. If the situation of facts raised is the most appropriate for the analysis of the problem.

C. If there has been prejudice, partiality or gross and manifest error in the assessment of the evidence by the Court of First Instance.

D. If the matter raised requires more careful consideration in light of the original proceedings, which must be raised, or more elaborate allegations.

E. Whether the stage of the procedure in which the case is presented is the most favorable for its consideration.

F. If the issuance of the order or the order to show cause does not cause an improper fractionation of the lawsuit and an **[*14]** undesirable delay in the final settlement of the litigation.

G. If the issuance of the order or the order to show cause prevents a failure of justice.

III

The core dispute in this appeal is whether the summons filed at the PHM offices was sufficient in law to grant the court jurisdiction over MMM. According to the file, the summons was served at the PHM offices by delivering it to a receptionist whose name and position are not specified on the back of the summons. At the time of filing the complaint, PHM had no legal capacity as it was merged with MMM. However, the petitioner argues that in accordance with the resolution in the case of *León García v. Restaurante El Tropical, supra*, the summons to PHM tied in MMM, since it was managed under the business name of the respondent and processed in the person in charge of the company.

The current regulation regarding the summons of a corporation subject to a claim under Law No. 2, *supra*, provides two requirements for the service of notice to be considered adequate and sufficient. These **[*15]** are: (1) that it be carried out in the factory, workshop, establishment, farm, place where the work that gave rise to the claim, office or residence was carried out; and (2) that it be served to an official, director, administrative manager, general agent or any agent designated by appointment or by law to be served

ANTONIO MARRERO, PETITIONER v PREFERRED HEALTH MANAGEMENT ("PHM"), APPELLEE

summons. *Lucero v. San Juan Star, supra.*

Thus, in order to determine whether the lifting of the declaration of contempt for PHM was correct, we must determine whether the disputed service of notice meets all the requirements set forth above. To this end, we resort to the certification of the service of notice that appears on the back of the summons. Where relevant, it indicates that the summons was served "personally to Preferred Health Management, Inc." on January 7, 2009 in San Juan, Puerto Rico. [6]

After evaluating the record of the service of notice, we noted that it does not **[*16]** contain the individual to whom the party serving the notice delivered the summons and a copy of the complaint. Rule 4.4 of the Civil Procedure, *supra*, imposes on the person serving the copy of the summons to be disclosed under his/her signature "[t]he name of the person to whom it was made out". While it is true that current case law is inclined to acknowledge that not all defects in the certification of the service of notice have the effect of annulling the summons, in the specific case of summonses to legal entities the name of the person receiving the document is of great importance. This is because the validity of the notification will depend on the authority that the individual had to receive summonses.

In accordance with the foregoing, in *A.F.F. v. Higher Court, 99 DPR 310, 316 (1970),* the Supreme Court clarified that the purpose of including the name of the person receiving the summons is to "give notice to the defendant? of the person to whom the summons was delivered so that he can determine that it was delivered to a person qualified to receive it because otherwise the summons is null and void **[*17]** and does not confer jurisdiction." We must remember that both Rule 4.4 of the Civil Procedure, supra, and Article 12.01 of the Corporations Act, *supra*, clearly establish that a corporation must be served through a person with the authority to receive said summons. Thus, given the particular relevance that this information has when the defendant is a corporation, we understand that the absence of the name of the individual who received the summons makes the serving of the same a defective one and deprives the court of exercising its jurisdiction over said party.

Having discussed the above, it is pertinent to clarify that the doctrine outlined in the case of *León García v. Restaurante El Tropical, supra,* does not apply to this case. In that lawsuit, the Supreme Court validated a summons filed at the place of business of the employer through the administrator of the establishment. Certainly, as the petitioner argues, the entity in the name of which the summons of the defendant was served had no legal capacity. However, unlike the case in question, the person who received the summons in the aforementioned case turned out to be **[*18]** an executive officer of the corporation that owned and operated the premises in question. In view of these particular facts, the Supreme Court understood that the corporation that was intended to be served received sufficient and adequate notification given that the person who received the summons was an executive of said legal entity.

As subsequently resolved by the Supreme Court in *Lucero v. San Juan Star, supra,* the validation of the summons in the case of *León García v. Restaurante El Tropical, supra,* was based on the fact that the two elements of place and person eligible to receive the summons provided for in Law No. 2, *supra,* had been satisfied. With respect to this last requirement, it clarified that the representative capacity of a person for the purpose of receiving summons, had to be determined according to the provisions of the Rules of Civil Procedure and the Corporations Act for the summons of a corporation. However, in accordance with the foregoing analysis, in the case of the heading, the identity of the person who received the summons on behalf of PHM is unknown because it is not recorded in the certification of the service of notice.

In view of **[*19]** this, the court of first instance had no choice but to order the lifting of the declaration of contempt for not having acquired jurisdiction over the respondent. We are aware of the expedited and summary nature of the procedure established under Law No. 2, *supra.* However, case law has reiterated that this characteristic cannot have the effect of depriving the employer of its right to due process of law. Consequently, it is necessary for the defendant to be given the opportunity to be properly notified of the lawsuit against it so that there is a reasonable probability that it is informed of the existence of the same so that it can defend itself from the complaint. *Quiñones Román v. Cía ABC, supra.*

---

[6] Service of notice by an individual, Appendix of the appeal, pg. 10.

ANTONIO MARRERO, PETITIONER v PREFERRED HEALTH MANAGEMENT ("PHM"), APPELLEE

When evaluating the case of record in light of the doctrine outlined above, we conclude that the summons of PHM did not meet the minimum requirements of due process of law. It is not apparent from the record that there is a reasonable probability that MMM was notified of the existence of the claim. Even though the file contains an affidavit that the person who was served [*20] the summons was a receptionist who was authorized for these purposes, we understand that this does not remedy the deficiency in the certification of the service of notice.

In view of the foregoing analysis, it is unnecessary to discuss whether the service of notice made in the PHM offices was sufficient to notify MMM of the complaint. The failure to identify the person who received the summons as representative of the corporation had the effect of invalidating the service of notice and depriving the court of being able to exercise its jurisdiction over the respondent. This, in turn, annulled the declaration of contempt against PHM. In that sense, what proceeds is that a new summons should be issued in the name of MMM, after having corroborated that, indeed, that corporation assumed all the obligations of the respondent.

IV

On the basis of the foregoing grounds, we issued the requested writ of *certiorari* and confirmed the appealed resolution. We also return the case to the TPI for the purpose of issuing a new summons in the name of MMM Holding, Inc., which must be served in accordance with the resolution herein.

Let it be notified.

The Court has agreed and ordered and the Secretary [*21] of the Court has certified.

Dimarie Alicea Lozada

Court of Appeals Secretary

---

End of Document



**DATE OF TRANSLATION:**    3-May-21

**ELECTRONIC FILE NAME:**    Antonio Marrero v. Preferred Health Management ("PHM"), No. KLCE200900945, 2009 PR App. LEXIS 4296 (P.R. Ct. App. Oct. 15, 2009)

**SOURCE LANGUAGE:**    Spanish

**TARGET LANGUAGE:**    English (United States)

**TRANSPERFECT JOB ID:**    US0974817

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

TCert v. 2.0

# Exhibit 11

## *ENG. JENNIFER CRESPO LÓPEZ, MR. DAVID FERNÁNDEZ DÍAZ AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, Plaintiffs-Appellants v. BIOMET, INC., EBI PATIENT CARE, INC., BIOMET ORTHOPEDICS PUERTO RICO, INC., MS. GLORIMAR SANCHEZ LOPEZ AND MR. HÉCTOR DE LEÓN, BOTH IN THEIR PERSONAL CAPACITY, UNKNOWN DEFENDANT ABC, COMPAÑÍA ASEGURADORA XYZ, Defendants-Appellees*

Court of Appeals of Puerto Rico, Judicial Region of Bayamon

February 26, 2013

KLAN201201763

**Reporter**

2013 PR App. LEXIS 289 *

ENG. JENNIFER CRESPO LÓPEZ, MR. DAVID FERNÁNDEZ DÍAZ AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, Plaintiffs-Appellants v. BIOMET, INC., EBI PATIENT CARE, INC., BIOMET ORTHOPEDICS PUERTO RICO, INC., MS. GLORIMAR SANCHEZ LOPEZ AND MR. HÉCTOR DE LEÓN, BOTH IN THEIR PERSONAL CAPACITY, UNKNOWN DEFENDANT ABC, COMPAÑÍA ASEGURADORA XYZ, Defendants-Appellees

**Previous History:** [*1] Appeal from the Court of First Instance, Higher Chamber of Bayamón. Case No.: DDP2012-0380. About: Damages and Losses, Violation of Dignity, Privacy and Reputation, Gender Discrimination, Law 100 of 1959, Age and Sex Discrimination, *29 L.P.R.A. 146-151.*

## Case Summary

### Main Terms

party, court, Biomet, as, appellant, claim, facts, case, corporations, judgment, controversy, employer, corporation, law, summary, dismissal, company, about, forum, motion, summons, when, as far as, Rule, this, without, against, indispensable, any, be

**Judges**: Panel made up of its president, Judge García García, Judge Varona Méndez and Judge Gómez Córdova.

**Opinion By:** García García

## Opinion

García García, Reporting Judge

JUDGMENT

In San Juan, Puerto Rico, on February 26, 2013.

Jennifer Crespo López, David Fernández Díaz and the Community Property of Husband and Wife (hereinafter the appellant) request the revocation of a *Partial Judgment* issued by the Court of First Instance, Higher Chamber of Bayamón, on September 20, 2012. By means of the aforementioned opinion, the lawsuit on damages and discrimination filed by the appellant party regarding the codefendants Biomet, Inc. (hereinafter Biomet) and Biomet Orthopedics Puerto Rico, Inc. (hereinafter Orthopedics) was dismissed with prejudice.

ENG. JENNIFER CRESPO LÓPEZ, MR. DAVID FERNÁNDEZ DÍAZ AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, Plaintiffs-Appellants v. BIOMET, INC., EBI PATIENT ....

Subsequently, the court denied the reconsideration of said opinion on October 4, 2012 and notified such on the 9th of the same month and year.

In a timely manner, Biomet and Orthopedics appeared **[*2]** in a special manner and without accepting the jurisdiction of this Court, supporting the correction of the appealed opinion.

Thus, with the benefit of the appearance of the parties and protected as per the applicable law, we proceed to resolve.

I

Below is a brief factual and procedural summary, as it arises from the record before us.

This case originated on March 20, 2012, when the appellant filed a lawsuit against, among others, EBI Patient Care, Inc. (hereinafter EBI); Biomet; Orthopedics; Glorimar Sánchez López; and Héctor de León.[1] This complaint was based on the provisions of the Constitution of the Commonwealth; Article 1802 of the Civil Code, *31 L.P.R.A. sec. 5141*; and Law No. 100 of June 30, 1959, as amended (Law 100), *29 L.P.R.A. secs. 146 et seq.* As applicable, the appellant alleged that on November 8, 2008, the plant's production supervisor and director, Héctor de León, had verbally abused Eng. Jennifer Crespo López (Eng. Crespo) and had publicly humiliated her in the center of the production plant.[2] She indicated that Héctor de León did not give explanations or apologize for his behavior, even though **[*3]** Eng. Crespo gave him the opportunity to do so. As for the co-defendant Glorimar Sánchez López, human resources manager of EBI, the appellant alleged that she had not addressed the matter as was her responsibility or she had protected the actions of the production supervisor and director. The appellant argued that she had suffered physical and emotional

damage as a result of the acts and omissions of Glorimar Sánchez and Héctor de León. From the record before us it is apparent that the appellant included Biomet and Orthopedics in their claim because they understand that they, as the parent and sister company of EBI, had to respond for the damages caused.

In due course, EBI, Héctor de León and Glorimar Sánchez jointly submitted their Statement of Defense.[3]

For its part, Biomet and Orthopedics appeared on June 4, 2012 without submitting to the jurisdiction of the trial court, and requested the dismissal of claims against them, under Rule 10.2 of the Civil Procedure, 32 L.P.R.A. Ap V, R. 10.2.[4] They alleged that the fact that neither of the two aforementioned companies was the employer of Eng. Crespo departed from the claim, so the lawsuit against him lacked a complaint justifying the granting of a remedy. They also alleged that their summonses were served incorrectly, as they were delivered personally to the co-defendant Glorimar Sánchez, EBI Human Resources Manager.

After several procedural stages, the appellant filed her opposition to the dismissal.[5] As applicable, she alleged that Biomet and Orthopedics were the parent and sister company of EBI, so they were an indispensable part of the lawsuit to respond for the damages caused.

Thus, by order issued on July 23, 2012 and notified on August 3, 2012, the primary court ordered the appellant to clarify who was her employer. In addition, it inquired what obligation, if any, or contractual relationship existed between Biomet and Orthopedics with the appellant.[6] The appellant was granted a period of 20 days to comply with the order, under penalty of

---

[1] App., pp. 1-8.

[2] As per the records, the appellant alleged that on that occasion, Eng. Crespo went to speak with EBI's plant supervisor and production director, Héctor de León, who was with the operators in the bone plant area ("the Bone Healing system pack area"). Eng. Crespo asked the supervisor about some changes in the plant that she had encountered that day. In response, the supervisor began to yell at her in front of all the plant's operators, saying that no one could question him about anything **[*4]** with respect to what he did or to the decisions he made.

---

[3] *Opposing Argument to the Written Notice of Appeal (Opposing Argument), pg.* 2.

[4] The application included a Biomet organization chart; an affidavit from Glorimar Sánchez; an affidavit from Henry Rodríguez Santiago, Orthopedics Director; and Certificates of Incorporation from the Puerto Rico Department of State for Orthopedics and EBI. **[*5]** App., pgs. 9-23.

[5] The respective EBI and Orthopedics annual reports for 2010 ("2010 Corporation Annual Report") and a letter addressed to the legal representation of the appellant signed by the Vice President and Legal Counsel of the Division ("Vice President & Division Counsel") of Biomet Spine & Bone Healing Technologies were attached. App., pp. 25-45.

[6] App. of *Opposing Argument,* **[*6]** pg. 4-6.

ENG. JENNIFER CRESPO LÓPEZ, MR. DAVID FERNÁNDEZ DÍAZ AND THE COMMUNITY PROPERTY OF
HUSBAND AND WIFE, Plaintiffs-Appellants v. BIOMET, INC., EBI PATIENT ....

sanctions. There is no record in the file for our consideration that the appellant complied with the aforementioned order.

It is apparent from a Minutes notified on September 18, 2012 that, having called the case for the Initial Conference and after the parties argued their respective positions regarding the motion for dismissal filed by Biomet and Orthopedics, the court declared it admissible.[7] Subsequently, on September 20, 2012, and notified on the 25th of the same month and year, the court issued the contested partial judgment.[8]

Before being notified of the partial opinion, the appellant unsuccessfully requested the reconsideration of the dismissal.[9]

Then, in a timely manner, the appellant again requested the reconsideration, by means of its *Motion to the Judicial Records Emphasizing Request [\*7] for Reconsideration*. In essence, she reiterated that Biomet and Orthopedics were an indispensable part of the lawsuit to respond for the damages caused and that there were real and substantial disputes regarding essential facts of the case. The sentencing court declared the aforementioned motion to be inadmissible on October 4, 2012 and notified the parties on the 9th of the same month and year.

Not in accordance with the determination of the instance court, the appellant appeals to us with the following indication of error:

> The Honorable Court of First Instance erred in deciding by means of Summary Judgment the dispute regarding two of the co-defendants despite there being controversial material facts, this in contrast to what is required by the rules of civil procedure and our Honorable Supreme Court.

For its part, Biomet and Orthopedics presented their opposition to the appeal in a timely manner, in a special appearance and without accepting the jurisdiction of this Court. They argue, in summary, that neither of the two companies is an indispensable part of the lawsuit, so it is appropriate to confirm the appealed opinion. They also raise the inadequacy of the summons.

II

A

The summons **[\*8]** is the procedural mechanism by which a court enforces its jurisdiction over the person of the defendant. *Rodríguez v. Administración, 177 D.P.R. 714, 720 (2009)*; *Lucero v. San Juan Star, 159 D.P.R. 494 (2003)*; *First Bank of P.R. v. Inmob. Nac., Inc., 144 D.P.R. 901 (1998)*. The defendant is hereby notified that there is a judicial proceeding against it and it is bound by the opinion that is finally issued. Medina v. Medina, 161 D.P.R. 806 (2004); *Banco Popular v. S.L.G. Negrón-Toledo, 164 D.P.R. 855 (2005)*.

The Rules of Civil Procedure establish that the plaintiff must submit a copy of the summons together with the claim, which must be issued by the Secretary of the court. Rule 4.1 of Civil Procedure, 32 L.P.R.A. App. V, R. 4.1. Once the summonses have been issued, the plaintiff has a period of one hundred and twenty (120) days to serve them. Rule 4.3 (c) of Civil Procedure of 2009, 32 L.P.R.A. App. V, R. 4.3(c). After this term has elapsed without the plaintiff having served the summons, the claim shall be dismissed and filed away without prejudice. *Id.*

With regard to the case before our consideration, **[\*9]** Rule 4.4 of the same body of rules, provides that the serving of the summons to a corporation, company, partnership, association or any other legal entity, will be made by delivering a copy of the summons and the claim to an official, manager, administrative manager, general agent or any other authorized agent by appointment or designated by law to receive summons. 32 L.P.R.A. App. V, R. 4.4 (e).

---

[7] App., pgs. 46-47.

[8] The partial judgment expressly concludes that there is no reason to postpone the opinion until the total resolution of the lawsuit and orders that it be registered, in accordance with Rule 42.3 of the Civil Procedure, 32 L.P.R.A. App. V, R. 42.3.

[9] On September 21, 2012, the appellant submitted a Motion for Reconsideration in which, in essence, it reiterated the arguments that it had put forth in the Opposition to Dismissal. App., pp. 25-40 and 49-64.

ENG. JENNIFER CRESPO LÓPEZ, MR. DAVID FERNÁNDEZ DÍAZ AND THE COMMUNITY PROPERTY OF
HUSBAND AND WIFE, Plaintiffs-Appellants v. BIOMET, INC., EBI PATIENT ....

For its part, Article 12.01 of the General Corporations Act, *14 L.P.R.A. section 3781*, provides that a corporation will be summoned by personally serving a copy of the summons to any officer or director of the corporation in the Commonwealth, or the registered agent of the corporation in the Commonwealth, or leaving it at the usual address or residence of any officer, director or agent registered (if the registered agent is an individual) in the Commonwealth, or at the designated office or other business headquarters of the corporation in the Commonwealth.

B

The concept of indispensable part is found in Rule 16.1 of the 2009 Civil Procedure, 32 L.P.R.A. App. V, R. 16.1. This provides that an indispensable party **[*10]** is one that has a common interest without whose presence the dispute cannot be adjudicated. As established by the Supreme Court, this common interest "is [not] any interest in a lawsuit, but rather it is an interest of such an order that prevents the creation of an adequate right without affecting or radically destroying its rights. [...] That interest has to be real and immediate. They are not mere speculations or a future interest." *Pérez Rosa v. Morales Rosado, 172 D.P.R. 216 (2007)*.

It should be noted that the lack of an indispensable party constitutes such a relevant and vital approach that it can be presented at any time, that is, it can be submitted for the first time on appeal and may even be raised by an appeals court, since in the absence of an indispensable party, the court lacks jurisdiction. In addition, the failure to bring an indispensable party to the lawsuit constitutes a violation of due process of law of said absent party. *García Colón v. Sucn. González, 178 D.P.R. 527, 548-551 (2010)*; *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 625 (1983); *Rodríguez Rodríguez v. Moreno Rodríguez, 135 D.P.R. 623 (1994)*.

C

Civil Procedure Rule 10.2 **[*11]** of 2009, 32 L.P.R.A. App. V, R. 10.2, establishes that any defense of facts or law against a complaint will be set forth in the rejoinder. However, this same rule allows the party against whom the claim has been filed to submit a motion for dismissal, in which any of the following defenses are alleged: (1) lack of jurisdiction over the matter, (2) lack of jurisdiction over the person, (3) failure to summons, (4) failure to serve the summons, (5) failure to file a complaint justifying the granting of a remedy, and (6) failure to add an indispensable party. *Trans-Oceanic Life Ins. v. Oracle Corp., 184 D.P.R. 689 (2012)*. In the case at hand, this rule also provides the following:

> [....] If in a motion in which defense number (5) is formulated, matters not contained in the challenged allegation are set forth, and these are not excluded by the court, the motion must be considered as a request for summary judgment and will be subject to all subsequent procedures provided for in Rule 36 of this appendix until its final resolution, and all parties must have **[*12]** a reasonable opportunity to submit all relevant matters under that motion under that rule.

It is a repeated rule that in the face of a motion to dismiss, the court must take as true all the facts well alleged in the claim and interpret the assertions in the most favorable manner for the plaintiff and make all the inferences that may assist it in its claim. Ortiz Matías et al v. Mora Development Corp. et al, res. *of January 24, 2013, 187 D.P.R.* (2013), 2013 T.S.P.R. 7; *Asociación Fotoperiodistas v. Rivera Schatz, 180 D.P.R. 920, 935 (2011)*; *Parrilla v. Rodríguez, 163 D.P.R. 263 (2004)*; *Candal Vicente v. CT Radiology, Inc.,* 112 D.P.R. 227 (1981). In these cases, the claim will only be dismissed if it is shown that the plaintiff has no right to remedy under any facts that can be proven in the trial. Ortiz Matías et al v. Mora Development Corp. et al, *supra*; *S.L.G. Sierra v. Rodríguez Luciano, 163 D.P.R. 738 (2005)*; *López Rivas v. Sria. de Justicia, 162 D.P.R. 345 (2004)*; *Pressure Vessels P.R. v. Empire Gas P.R.,* 137 D.P.R. 497, 505 (1994).

On the other hand, Rule 39.2 of Civil Procedure regulates the dismissal of cases. **[*13]** Where applicable, this Rule provides:

> (a) If the plaintiff fails to comply with these rules or with any court order, the court, at its own initiative, or at the request of the defendant, may order the dismissal of the lawsuit or any complaint against it or the elimination of the allegations, as appropriate.

ENG. JENNIFER CRESPO LÓPEZ, MR. DAVID FERNÁNDEZ DÍAZ AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, Plaintiffs-Appellants v. BIOMET, INC., EBI PATIENT ....

In the case of a first breach, the severe sanction of dismissal of the claim or the elimination of the allegations shall only proceed after the court, in the first place, has warned the attorney or lawyer of the party about the situation and they has been granted the opportunity to respond. If the lawyer of the party does not respond to such warning, the court will proceed to impose sanctions on the lawyer of the party and the party will be notified directly about the situation. After the party has been duly informed or warned of the situation and of the consequences that it may have if the same is not corrected, the court may order the dismissal of the lawsuit or the elimination of the allegations. The court shall grant the party a reasonable period of time to correct the situation that **[\*14]** in no case shall be less than thirty (30) days, unless the circumstances of the case justify the reduction of the term.

[...] 32 L.P.R.A. App. V, R. 39.2.

D

Rule 36 of the Civil Procedure of 2009, 32 L.P.R.A. App. V, R. 36, stipulates that which refers to a summary judgment. This is a procedural mechanism available to resolve disputes where a trial is not required. The party promoting the summary judgment must clearly establish its right and demonstrate that there is no substantial controversy over any material fact. _Ramos Pérez v. Univisión, 178 D.P.R. 200 (2010)_.

The purpose of this rule is to alleviate the processing of a case because a hearing is not necessary, since the undisputed documents that accompany the motion for summary judgment demonstrate that there is no real and substantial dispute of facts, and it is only necessary to apply the law. In this way, useless trials are avoided, as well as the wasting of time and money that this entails for the parties and the court. _Id._

It is essential that, from the documents that accompany the application or that are in the court records, no legitimate dispute arises over material **[\*15]** facts of the case and that, therefore, only the law needs to be applied. _Nissen v. Genthaller, 172 D.P.R. 503 (2007)_.

Our Supreme Court has previously provided that a material fact is one that can affect the result of the complaint in accordance with applicable substantive law. _Ramos Pérez v. Univisión, supra_, quoting J.A. Cuevas Segarra, Tratado de Derecho Procesal Civil, San Juan, Publicaciones JTS, 2000, T. I, pg. 609. On the other hand, Rule 36.1 of Civil Procedure of 2009 refers to "material" facts as "essential and relevant".[10] 32 L.P.R.A. App. V.; _Const. José Carro v. Mun. Dorado, Op. of July 9, 2012, 2012 T.S.P.R. 114, 2012 J.T.S. 127, 186 D.P.R._ _(2012)_; _Mejías et al v. Carrasquillo et al, Op. of April 3, 2012, 2012 T.S.P.R. 62, 2012 J.T.S. 75, 185 D.P.R._ _(2012)_; _Ramos Pérez v. Univisión, supra._ In addition, citing S. Baicker-McKee and others, Federal Civil Rules Handbook, Thomson West, 2009, p. 1085, it is mentioned in _Ramos Pérez v. Univisión, supra_, that _"[w]hether a fact is 'material' hinges on the substantive law at issue. A fact is 'material' if it can affect the outcome of the case. Disputes over irrelevant or **[\*16]** unnecessary facts are insufficient to defeat a motion for summary judgment"_.

Likewise, in _Ramos Pérez v. Univisión, supra_, the Highest Court added that the dispute over the material fact has to be real, that is:

[T]he dispute is not always real or substantial, or genuine. The dispute must be of sufficient quality for a judge to settle it through a plenary trial. The formula, therefore, must be that the motion for a summary judgment properly submitted can only be denied if the party opposing it presents an opposition based on facts that can move a judge to rule in its favor. If the judge convinces himself that there is no reasonable possibility that listening to what he reads cannot lead him to a decision in favor of that party, he must issue a summary judgment. P.E. Ortiz Álvarez, Hacia el uso óptimo de la sentencia sumaria, Year 3, No. 2, Rev. Forum, p. 8 (1987).

If the opposing party wishes to defend itself, it will have to demonstrate that there is a dispute regarding the facts submitted by the petitioning party. **[\*17]** _Cruz v. Sánchez, 172 D.P.R. 526 (2007)_. The opposing party must submit documents that dispute the facts presented by the sponsor. _Carpets & Rugs v. Tropical Reps, 175 D.P.R. 615 (2009)._

_____

[10] Rule 36.2 of the Civil Procedure of 2009 refers to "material" facts in the same way. 32 L.P.R.A. App. V.

ENG. JENNIFER CRESPO LÓPEZ, MR. DAVID FERNÁNDEZ DÍAZ AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, Plaintiffs-Appellants v. BIOMET, INC., EBI PATIENT ....

However, the fact that no evidence is presented that disputes the evidence presented by the petitioner does not necessarily mean that the summary judgment is admissible or that the petitioner has the right for a decision in its favor. *Velez v. García Passalacqua, 163 D.P.R. 223 (2004)*; *Jusino Figueroa v. Walgreens, 155 D.P.R. 560 (2001)*. The plaintiff cannot rest on the general assertions of its claim. To defeat the motion for summary judgment, it is not enough to submit mere affirmations. *Ramos Pérez v. Univisión, supra.*

It is important to note that the court will not issue a summary judgment when: (1) there are material and essential controversial facts; (2) there are alternative allegations in the claim that have not been refuted; (3) it arises from the documents themselves that accompany the motion, a real dispute about some material and essential fact; (4) if as a matter of law it is not admissible. *Echandi v. Stewart Title Guaranty Co., 174 D.P.R. 355 (2008)*; *Vera Morales v. Bravo Colón*, 161 D.P.R. 308 (2004). **[*18]** A court must not issue summary judgment when there are subjective elements of intent, negligence, mental purposes or when the factor of credibility is essential. *Carpets & Rugs v. Tropical Reps, supra.*

Taking into consideration that the summary judgment is an extraordinary procedural mechanism and that its concession is at the discretion of the court, "[t]he guiding principle that must guide the judge in the determination on whether or not the summary judgment is admissible is wise discernment, since misused, it can be used to deprive a litigant of his "day in court," an elemental principle of due process of law." *Cross v. Sánchez, supra, p*gs. 549-550.

In this sense, the appeals courts must resort to the same criteria used by the court of first instance when reviewing the correction of their decision to issue a judgment or not in summary. Our review function is limited to considering the documents that were submitted to the primary court and when studying them, the appeals court can only determine whether or not there is any genuine dispute of material facts and whether the law was applied correctly. *Vera Morales v. Bravo Colón, 161 D.P.R. 308,335 (2004).*

In **[*19]** definitive, because it is a discretionary remedy, the use of the summary judgment mechanism has to be measured and will proceed only when the court is clearly convinced that it has undisputed documents before it, that there are no disputes over the essential or relevant facts and that, therefore, what remains is to apply the law. *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714 (1986).

AND

Our legal system acknowledges, as a general rule, that the corporation has a separate and distinct legal personality from its members or holders.[11] Art. 27 of the Civil Code, *31 L.P.R.A. sec. 101*; General Corporations Act of 2009, Law No. 164 of December 16, 2009, *14 L.P.R.A. sec. 3501 et seq*; *Santiago et al v. Rodríguez et al, 181 D.P.R. 204, 214 (2011)*; D.A.Co. v. Alturas Fl. Dev. Corp. and other, *132 DPR 905, 924 (1993)*; *Srio. D.A.Co. v. Comunidad San José, Inc., 130 D.P.R. 782 (1992)*; *Sucn. Santaella v. Srio de Hacienda*, 96 D.P.R. 442 (1968); *Fleming v. Toa Alta Develop. Corp.*, 96 D.P.R. 240 (1968). However, by exception, the corporate veil may be unsecured to impose personal responsibility on shareholders, even when **[*20]** these are legal entities, in cases where the recognition of the "separate legal personality" to the corporation in dispute equates to: (1) sanctioning fraud, (2) promoting an injustice, (3) evading a statutory obligation, (4) defeating public policy, (5) justifying inequity, or (6) defending crime. D.A.Co. v. Alturas Fl. Dev. Corp. and other, *supra, p. 925*; *Srio.* D.A.C.O. v. Comunidad San José, Inc., *supra, p*g. 798; *Fleming v. Toa Alta Develop. Corp.*, *supra*; Carlos E. Díaz Olivo, Derecho Corporativo-Corporaciones, San Juan, Publicaciones Puertorriqueñas, 2005, pgs. 53-54.

The case law developed around the previous corporations act maintains that these principles also extend to the assumptions of a parent-subsidiary relationship or affiliated corporations. In this regard, **[*21]** it has been mentioned that in a parent-subsidiary relationship, corporations will be respected as entities with different and separate legal personalities, even when the parent company owns all the shares of the

---

[11] The General Corporations Act of 2009, Law No. 164 of December 16, 2009, **14 L.P.R.A. Secs. 3501-4066**, repealed the General Corporations Act of 1995. However, as for the legal personality of corporations, Article 105 of the new corporations act, **14 L.P.R.A. Sec. 3505**, contains provisions similar to those of the previous act.

ENG. JENNIFER CRESPO LÓPEZ, MR. DAVID FERNÁNDEZ DÍAZ AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, Plaintiffs-Appellants v. BIOMET, INC., EBI PATIENT ....

subsidiary and its officers and shareholders are the same. However, the separation, for purposes of imposition of civil liability, shall not be recognized to the extent that: (1) transactions, property, employees, or bank accounts of the corporations are mixed and confused; (2) the corporate formalities of each corporation are not observed, such as meetings of the Board of Directors and shareholders; (3) the corporation is inadequately capitalized as an independent unit in the sense of not having the capacity to face its foreseeable ordinary obligations; (4) the corporation's policies are not aimed mainly at its own interests, but to those of the other corporation. Díaz Olivo, *op. Cit.*, pgs. 59-60; D.A.Co. v. Alturas Fl. Dev. Corp. and other, *supra*, p. 928.

With respect to the foregoing, it has been acknowledged that in order to pierce the corporate veil and conclude that in a parent-subsidiary relationship, corporations are "one single entity", **[*22]** it is necessary to prove the confusion or identity between said corporations. In addition, it is necessary to prove that acknowledging the difference between the two would result in sanctioning the evasion of obligations, fraud, injustice or defeating public policy. González v. San Just Corp., 101 D.P.R. 168 (1973); Díaz Olivo, op. Cit., p. 60. It is important to note that the evidence that justifies piercing the corporate veil must be strong and robust. González v. San Just Corp., pg. 172.

In addition to the doctrine of piercing the corporate veil (alter ego), in Puerto Rico we have also accepted the doctrine of the successor employer (successorship) and the doctrine of "one sole employer", which were developed in case law in the federal courts and the National Labor Relations Board to protect the rights of workers. Rodríguez v. Bco. Gub. de Fom. P.R., 151 D.P.R. 383 (2000); Bruno López v. Motorplan, Inc. and others, 134 D.P.R. 111, 120 (1993). The doctrine of a single employer is generally used when dealing with companies that coexist. Rodríguez v. Bco. Gub. de Fom. P.R., supra. The doctrine of the ego alter and successorship are used when one company replaces the other. *Id.*; **[*23]** J.R.T. v. Asoc. C. Playa Azul I, 117 D.P.R. 20, 29 (1986).

With regard to the doctrine of a single employer, it has been acknowledged that it applies when two or more employers meet the following criteria: (1) interrelated operations; (2) centralized control of labor relations; (3) common administration, and (4) common property. J.R.T. v. Asoc. C. Playa Azul I, supra, pages 30-31; Odriozola v. S. Cosmetic Dist. Corp., 116 D.P.R. 485,

496 (1985). It is not necessary for all factors to be present and none of them is decisive. The fact that several entities may or may not be considered a single employer depends on the analysis of all the circumstances of the case. The fundamental thing is to determine whether there is general control over critical matters at the levels of the companies' labor policy. J.R.T. v. Asoc. C. Playa Azul I, supra, pages 30-31.

III

We proceed to resolve it in accordance with the aforementioned regulations.

The appellant contests the decision of the instance court to dismiss the claim as regards Biomet and Orthopedics, on the grounds that they are an indispensable part of the lawsuit. She also alleges that in this case there is a true material and substantial dispute of essential and relevant facts **[*24]**, namely, whether all parties were duly and effectively served notice in the case. In support of her position, she argues that Biomet, Orthopedics and EBI are the same corporate entity in accordance with the Puerto Rico Corporations Act. As a sample of this, she mentions that in the Corporate Annual Report for 2010, both EBI and Orthopedics appointed as "incorporator" the same individual, whose email address ends in "@biomet.com". In addition, it indicates that the companies themselves admit that there is a "very close" relationship between them, by including the following in footnote 1 of the motion to dismiss:

> i. Biomet is a company incorporated in the state of Indiana, which in turn is the parent company of the subsidiaries EBI and Biomet Orthopedics. See Annex No. 1, Organizational Chart. Biomet, EBI and Biomet Orthopedics are duly incorporated and separate corporations, each with their own employer identification number (EIN) and their own legal personality. Only EBI, however, is Crespo's employer. See Annexes No. 2-3, Sworn Statements of Glorimar Sánchez and Héctor Rodríguez.[12]

---

[12] Appeal, p. 14.

ENG. JENNIFER CRESPO LÓPEZ, MR. DAVID FERNÁNDEZ DÍAZ AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, Plaintiffs-Appellants v. BIOMET, INC., EBI PATIENT ....

On the other hand, **[*25]** she indicates that there is also a very close relationship between the co-defendant companies and Glorimar Sánchez, sufficient for everyone to be responsible for the damages and losses that the appellant party claims. To support this argument, she mentions a letter from Biomet addressed to the appellant, with a copy to Glorimar Sánchez, where the company identifies itself as Biomet Spine & Bone Healing Technologies and EBI, LLC d/b/a Biomet Spine & Bone Healing Technologies.[13] According to the appellant, this letter shows that Glorimar Sánchez had a position of sufficient responsibility in the company to presume that she would ensure her superiors received the summons and the lawsuit.

On the other hand, she states that there was evidence from the defendant that the appellant had not been able to examine, so the primary court could have postponed the provision of the motion for summary judgment until the discovery of evidence was concluded. In addition, she mentions that in deciding on the motion to dismiss, the court should have accepted as true all the facts alleged in the claim, interpreting the allegations in its favor.

After a detailed examination of the records **[*26]** before us, we are convinced that the indicated error was not committed. Let us consider.

Certainly, in this case the dismissal of the lawsuit was requested with regard to Biomet and Orthopedics under Rule 10.2 of Civil Procedure, *supra.* Among the defenses that were raised, it was alleged that the claim ceased to expose a complaint that justified the granting of a remedy. As a consequence and according to our procedural order, it was considered as a request for summary judgment.

As previously discussed, as a general rule, corporations have their own legal personality, separate and distinct from their components or members. <u>D.A.Co. v. Alturas Fl. Dev. Corp. and other</u>, *supra*. These principles also extend to the assumptions of a parent-subsidiary relationship or affiliated corporations. To be able to pierce the corporate veil and conclude that in a parent-subsidiary relationship, corporations are "one", it is necessary to prove the confusion or identity between said corporations. In addition, it is necessary to prove that acknowledging the difference between the two would result in sanctioning the evasion of obligations,

fraud, injustice or defeating public policy. <u>González v. San Just Corp.</u>, 101 D.P.R. 168 (1973).

In **[*27]** the case of subsidiaries and affiliates, separation will not be recognized when: (1) transactions, property, employees, or bank accounts of the corporations are mixed or confused; (2) the corporate formalities of each corporation are not observed, such as meetings of the Board of Directors and shareholders; (3) the corporation is inadequately capitalized as an independent unit in the sense of not having the capacity to face its foreseeable ordinary obligations; (4) the corporation's policies are not aimed mainly at its own interests, but to those of the other corporation. Díaz Olivo, *op. cit.*, pgs. 59-60. It is important to note that the evidence that justifies piercing the corporate veil must be strong and robust. <u>González v. San Just Corp.</u>, pg. 172.

For its part, the doctrine of a single employer applies when two or more employers meet the following criteria: (1) interrelated operations; (2) centralized control of labor relations; (3) common administration, and (4) common property. <u>J.R.T. v. Asoc. C. Playa Azul I</u>, *supra,* pages 30-31; <u>Odriozola v.</u> S. Cosmetic Dist. <u>Corp.</u>, 116 D.P.R. 485, 496 (1985). It is not necessary for **[*28]** all factors to satisfy and none of them is decisive. The fact that several entities may or may not be considered a single employer depends on the analysis of all the circumstances of the case. The fundamental thing is to determine whether there is general control over critical matters at the levels of the companies' labor policy. <u>J.R.T. v. Asoc. C. Playa Azul I</u>, *supra,* pages 30-31.

In the case before us, it is apparent from the records that EBI, Biomet and Orthopedics are separate and independent corporations from each other. There is no dispute that Biomet is a corporation registered and incorporated under the laws of the state of Indiana, while both EBI and Orthopedics are incorporated under the laws of Puerto Rico. It also arises from the documents for our consideration that the latter presented separate annual reports, where the same person appears as an incorporator and with an email address that includes the name of Biomet. However, contrary to what the appellant alleges, this does not constitute strong and robust evidence demonstrating the identity between corporations to justify the piercing of the corporate veil.

---

[13]App., pg. 45.

ENG. JENNIFER CRESPO LÓPEZ, MR. DAVID FERNÁNDEZ DÍAZ AND THE COMMUNITY PROPERTY OF HUSBAND AND WIFE, Plaintiffs-Appellants v. BIOMET, INC., EBI PATIENT ....

On the other hand, the appellant did not offer, as regards **[*29]** to the co-defendant corporations, evidence demonstrating: (1) interrelated operations; (2) centralized control of labor relations; (3) common administration, and (4) common property. As such it is not appropriate for them to be considered as a single employer.

For the purposes of our discussion, although persuasively, we refer to the case of *DeLia v. Verizon Communications, Inc., 656 F3d 1 (1st Cir. 2011)*, resolved by the Federal Court of Appeals for the First Circuit. In the aforementioned case, the court confirmed the summary judgment issued by the primary court in favor of Verizon Communications, Inc. (Verizon), which determined that Ms. Caroline DeLia (DeLia) was not an employee of Verizon, parent company of Verizon Directories Services-East Inc., n/k/a Idearc Media Services-East, Inc. (Idearc), employer of the employee. The appeals court determined that the main element to be considered was the control that the alleged employer could have over the form and way in which the employee exercised her functions. The court did not find enough to establish that the co-defendant corporation was the "employer" of the following: 1) the plaintiff's subjective belief that she had been **[*30]** an employee of Verizon for 14 years, as arising from an *affidavit* that she submitted to the primary court; 2) who worked in the Verizon offices in Middleton, Massachusetts (although it was not disputed that they were Idearc's offices) and that the building access key (*key card*) had the Verizon logo was not indicative of the type of control necessary over the employee; 3) Verizon's rules of conduct explicitly indicated that Verizon did not supervise or control the terms and conditions of work of its subsidiaries' employees; 4) although Verizon was the one who administered her benefits, Idearc was the one who paid for them; and 5) a letter of congratulations that she received from the president and "CEO" of Verizon in appreciation for 15 years of service. *Id.*

The federal court of appeals determined that, even if this evidence was evaluated together, DeLia had not been able to demonstrate that Verizon had some control over the manner and means in which she performed her work.

In the case at hand, the appellant made no specific allegation against Biomet or Orthopedics in the lawsuit, apart from stating that they should be liable for the damages **[*31]** for being the parent company and sister of EBI. It is evident that the acts or omissions that allegedly caused the damages claimed in the lawsuit are attributed to EBI employees only. Therefore, even assuming that they were actually committed, the complaint would only proceed against EBI, since the appellant did not refute the fact that Biomet and Orthopedics are not and have never been the employer of Eng. Crespo. Let us remember that the appellant did not comply with the order of the primary court regarding indicating who the employer of Eng. Crespo was and if there was any contractual relationship between Biomet and Orthopedics with the appellant. Consequently, the appellant did not dispute the detailed and sufficient evidence presented by the appellant, to create a substantial dispute of relevant and essential facts as required by our procedural order. The weight of the evidence to demonstrate that the three corporations are a single corporation, is not discharged with mere allegations. In this case, we have no justification to conclude that there is confusion or identity between Biomet, Orthopedics and EBI, in the absence of evidence for such purposes. The appellant also did not show that acknowledging **[*32]** the difference between the corporations results in sanctioning the evasion of obligations, fraud, injustice or defeat of public policy of the State.

With regard to the claim that Biomet and Orthopedics are an indispensable part of the lawsuit, we remind you that this concept applies to the party that has a common interest without whose presence the dispute cannot be adjudicated. It is not apparent from the records before us that the rights of Biomet and Orthopedics could be inevitably affected or destroyed if they are absent from the dispute, nor if there is any reason why the dispute cannot be adjudicated without its presence. Especially, when it has been established that the common interest that is required is not any interest in a lawsuit, but is a real and immediate interest; it is not mere speculation or a future interest.

As we discussed earlier, it is apparent from the revised documents that each of the defendant corporations has its own legal personality and enjoys limited liability. Even taking as true all the facts well alleged in the claim and interpreting the assertions in the most favorable manner for the appellant, **[*33]** we do not see justification for a cause of action against Biomet and Orthopedics.

ENG. JENNIFER CRESPO LÓPEZ, MR. DAVID FERNÁNDEZ DÍAZ AND THE COMMUNITY PROPERTY OF
HUSBAND AND WIFE, Plaintiffs-Appellants v. BIOMET, INC., EBI PATIENT ....

In light of the foregoing and of the allegations of the claim herein in dispute, we understand that, as regards Biomet and Orthopedics, the claim fails to expose a complaint that justifies the granting of a remedy. Therefore, the primary court did not err in dismissing the cause of action against the aforementioned co-defendant corporations.

In view of the determination we reached, it is unnecessary to discuss the approach as to whether the summonses to the aforementioned corporations were correctly served.

We further clarify that, although it is true that the sentencing court mentioned in the contested opinion that it resolved under the provisions of Rule 39.2 (a), which regulates the dismissal as a penalty for non-compliance with the rules or any court order and that does not apply to the facts of the case, it also expressed that it evaluated the request for dismissal and opposition to it on the merits. After carefully analyzing the records before us, we agreed with the decision of the appealed court as to the dismissal of the cause of action against Biomet and **[*34]** Orthopedics being appropriate.

IV

On the grounds set out above, we confirm the contested *Partial Judgment*.

The Court so agreed and ordered and the Secretary of the Court so certifies.

Dimarie Alicea Lozada

Secretary of the Court of Appeals

**End of Document**



| | |
|---|---|
| **DATE OF TRANSLATION:** | 3-May-21 |
| **ELECTRONIC FILE NAME:** | Jennifer Crespo López, Sr. et al. v. Biomet, Inc., et al., Case No KLAN201201763, 2013 PR App. LEXIS 289 (P.R. Ct. App. Feb. 26, 2013) |
| **SOURCE LANGUAGE:** | Spanish |
| **TARGET LANGUAGE:** | English (United States) |
| **TRANSPERFECT JOB ID:** | US0974817 |

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

TCert v. 2.0