**LAW OFFICES OF JOHN A. GIRARDI**
JOHN A. GIRARDI, SBN 54917
John@JohnGirardiLaw.com
29900 Hawthorne Blvd.,
Rolling Hills Estates, CA 90274
Telephone: (310) 265-5787

**SHINDLER, ANDERSON, GOPLERUD & WEESE, P.C.**
J. Barton Goplerud
5015 GRAND RIDGE DRIVE, SUITE 100
WEST DES MOINES
IA 50265
Tel: (515) 223-4567
goplerud@sagwlaw.com

**BECKER VISSEPO, PSC**
Jane Becker Whitaker, PR-Bar Num. 9352
1225 Ponce de Leon, Suite 1102
San Juan, PR 00907
Tel. 787 945.2406
jbw@beckervissepo.com
janebeckerwhitaker@gmail.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No.: 4:07-cv-05944 JST<br>Master File No. 4:07-cv-05944-JST |
| This document relates to:<br><br>Government of Puerto Rico, et al.,<br>　　　　Plaintiff,<br>v.<br><br>Panasonic Corp. of North America, et al.,<br>　　　　Defendants. | MDL No. 1917<br><br>**THE GOVERNMENT'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS CLAIMS FOR FAILURE TO STATE A CLAIM (ECF No. 5935)**<br><br>Courtroom:　　　6, 2nd Floor |

1

**THE GOVERNMENT'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS CLAIMS FOR FAILURE TO STATE A CLAIM (ECF No. 5935)**

**TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Plaintiff, the Government of Puerto Rico, respectfully requests the Court to deny Defendants' Motion, and submits the following opposition in support. First, Puerto Rico has not adopted an *Illinois Brick* repealer statute, and therefore can pursue its unjust-enrichment claim. Second, the Government's *parens patriae* claim on behalf of its citizens and governmental agencies should prevail because the Puerto Rican legislature expressly authorizes the claim and the Government, as a sovereign, has a legitimate interest in pursuing claims against Defendants for their admittedly illegal conduct.

DATED: July 7, 2021                              LAW OFFICES OF JOHN A. GIRARDI


By:    s/*John A.* Girardi
       JOHN A. GIRARDI

       *Attorney for Plaintiff*, THE GOVERNMENT OF
       PUERTO RICO

**THE GOVERNMENT'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS CLAIMS FOR
FAILURE TO STATE A CLAIM (ECF No. 5935)**

## I.    Introduction

Defendants admitted to their roles in one of the largest illegal cartels in history, where they conspired to fix prices. For their crimes, Defendants paid hundreds of millions of dollars in criminal fines and private settlements. Puerto Rico and its population, however, have not received a penny in recompense for the harm they bore. Accordingly, Plaintiff, the Government of Puerto Rico, represented by its Attorney General, the Hon. Dennise Longo Quiñones,[1] on behalf of the Government of Puerto Rico and in *parens patriae* on behalf of the population of Puerto Rico and its governmental agencies, brought the instant action seeking monetary relief under 31 L.P.R.A. § 7 for unjust enrichment.

Unable to deny the injuries they caused the Government and Puerto Rico's citizens; Defendants are left to argue positions that contradict the "majority of courts" that have been presented with the issue. Namely, Defendants argue that the Government's claim for unjust enrichment on behalf of indirect purchasers is foreclosed due to the availability of relief under the Puerto Rico Antitrust Act ("PRAA"), 10 L.P.R.A. §§ 257, *et seq*. But, the PRAA is modeled after federal antitrust laws, and the Commonwealth has not repealed *Illinois Brick*. Accordingly, the Government's claim for unjust enrichment is proper and indeed its only viable claim against Defendants for their criminal acts. Defendants next argue that even if the PRAA does not apply, the Government's claim for unjust enrichment must be dismissed because it is an end-run around Puerto Rico's prohibition on indirect purchaser standing. The issue with this argument is that Judge Battani recently rejected it. Moreover, the Supreme Court of Puerto Rico in *Estado Libre Asociado v. Benjamin Cole*,[2] has condoned equitable claims brought by the Government that are otherwise unavailable under alternative theories of relief.

Defendants also challenge the Government's standing to bring this action as *parens patriae*. In so doing, they ignore the express authority the Legislature granted the Government to pursue such

---

[1] The current Attorney General, Domingo Emmanuelli, continues the action.

[2] We attach a translation. (**EXHIBIT 1**)

**THE GOVERNMENT'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS CLAIMS FOR FAILURE TO STATE A CLAIM (ECF No. 5935)**

actions (32 L.P.R.A. § 3341), as well as the obvious interest it possesses as a sovereign to protect its citizenry from Defendants' admittedly criminal conduct.

Thus, the Government requests the Court to deny Defendants' joint motion to dismiss.

## II.    Statement of Facts

Cathode-Rod Tubes (CRT) are the tubes used in the display technology for televisions, computer monitors, and other specialized applications.[3] Complaint (Certified Translation), ECF 30-1, Case No. 3:19-cv-01246-ADC, attached as **Exhibit 2** for the Court's convenience, ¶¶ 34–35. In the late 1990s and early aughts, as CRTs faced competition from the flat screen TVs, their manufacturers (the Defendants here) conspired to and did fix prices on such monitors, which they sold worldwide, including to Puerto Rican consumers and government entities. *Id.* ¶¶ 3–6. Government authorities began to investigate that price fixing.

At the end of 2007, the antitrust authorities in Europe, Japan, and South Korea raided the CRT manufacturing offices as part of an international investigation of alleged price fixing. Compl. ¶ 534. In February 2009, a federal grand jury in San Francisco indicted the previous Chairman and Chief Executive Officer of the Defendant Chunghwa Picture Tubes, Ltd of two crimes for participating in global price-fixing conspiracies for two types of CRTs used in computer monitors and television sets. *Id.* ¶¶ 17, 536. A press release from United States Department of Justice announced that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry." *Id.* ¶ 537. As the DOJ recognized in announcing the indictment against the Director General and Chairman of the Defendant Chunghwa: "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices." *Id.* 561.

As a result of the Defendants' illegal conduct, consumers and government entities in Puerto Rico paid higher prices for CRT products than they would have paid in a competitive market. *Id.* ¶¶ 3, 9. That led to the Government of Puerto, by and through its Attorney General, filing this lawsuit in her parens patriae authority for purchases of CRT products from March 1995 until, at least, November

---

[3] There are two types of CRTs: color-display tubes (CDT) that are used inn computer monitors and other specialized applications; and colored picture tubes (CPT) that are used for television sets. Compl. ¶ 40. Both are CRTs for the purpose of this case as CRTs include CRTs and products with CRTs such as television sets or computer monitors. *Id.* at 41–42.

THE GOVERNMENT'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS CLAIMS FOR
FAILURE TO STATE A CLAIM (ECF No. 5935)

2007. *Id.* ¶ 1. Since Puerto Rico's Anti-Trust laws do not provide a remedy for indirect purchasers, the Government pursues its claims for unjust enrichment for the damages suffered by the consumers and government entities of Puerto Rico. *Id.* ¶ 19.

## III. LEGAL ARGUMENT: THE COURT SHOULD PERMIT THE GOVERNMENT TO PURSUE ITS CASE BEYOND THE RULE 12(B)(6) STAGE.

### a. The standard for dismissal favors the Government and is beyond the Defendants' reach.

Per Civil Rule 8, "[a] complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Niantic, Inc. v. Global++*, No. 19-cv-03425-JST, 2020 U.S. Dist. LEXIS 250756, * (N.D. Ca. Sept. 02, 2020) (Tigar, J.) (citing Fed.R.Civ.P. 8(a)(2), *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"To satisfy Rule 8 and survive a Rule 12(b)(6) motion to dismiss, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, at 678). "In determining whether a plaintiff has met this plausibility standard, the court 'accepts all factual allegations as true and construes the pleadings in the light most favorable to the nonmoving party.'" *Id.* (quoting *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005)).

### b. The Government has sufficiently alleged a claim for unjust enrichment under the laws of Puerto Rico.

The Government has sufficiently pled an unjust enrichment claim; the Defendants do not contest this. The Supreme Court of Puerto Rico has stated that unjust enrichment is established through five elements: "1) existence of enrichment; 2) a correlative loss; 3) nexus between loss and enrichment; 4) lack of cause for enrichment; and 5) absence of a legal precept excluding application of enrichment without cause[.]" *Roberto Hatton v. Mun. of Ponce*, 134 P.R. Dec. 1001 (1994) (citations omitted). The Defendants engaged in a long-running conspiracy to unlawfully fix, artificially raise,

5

maintain and/or stabilize prices of CRT products sold in Puerto Rico. Compl. ¶ 2. It is further alleged that Defendants' illegal conduct resulted in artificially inflated prices that the Government of Puerto Rico and the population of Puerto Rico paid in connection with their purchases or leases. *Id.* ¶ 3, 9. As a result, The Government along with the population of Puerto Rico sustained damages, which inured an undue benefit upon Defendants. *Id.* Since no Puerto Rico anti-trust law provides a remedy, the Government's unjust-enrichment claim is its path to recover the damages suffered by its citizens and government entities. *Id.* 19–20, 620–629.

Defendants do not challenge the veracity of their "alleged" illegal conduct. At no point in their motion do they even attempt to argue that their illegal conduct did not cause Puerto Rico and its population to sustain injuries or that they were unjustly enriched by their conduct. Indeed, they cannot, as they have already pled guilty to criminal charges for their conduct and paid hundreds of millions of dollars in settlements, and their culpability is now a matter of fact. Instead, Defendants raise two non-substantive arguments in an effort to skirt justice. First, Defendants argue that the Government's claim is barred due to the rights afforded under the PRAA to indirect purchasers. Second, Defendants state that they are insulated from liability under a claim for unjust enrichment—even if the PRAA does not permit indirect purchaser claims. They are wrong on each count.

### c.  The PRAA follows *Illinois Brick*'s prohibition of indirect-purchaser standing.

The Government has a right to relief against Defendants for unjust enrichment because the PRAA does not allow indirect-purchaser plaintiffs. Like many states in the United States, Puerto Rico has enacted antitrust laws that govern the Commonwealth. The Puerto Rican legislature passed PRAA on June 25, 1964, and modeled it after federal counterparts. *See Pressure Vessels of P.R. v. Empire Gas De P.R.*, 137 P.R. Dec. 497 (1994).[4] The PRAA addresses "the prohibition on unreasonable

---

[4] *See In re Broiler Chicken Antitrust Litig.*, 2020 U.S. Dist. LEXIS 124591, at *49–50 (N.D. Ill. July 15, 2020) (citing *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 853 n.1 (1st Cir. 2016) ("Puerto Rico's antitrust statute is coterminous with the Sherman Act."); *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 754 (1st Cir. 1994) ("[C]ourts interpret Puerto Rico's [antitrust] laws as essentially embodying the jurisprudence relevant to the parallel federal [antitrust] law."); *Shell Co. (P.R.) Ltd. v. Los Frailes Serv. Station, Inc.*, 551 F. Supp. 2d 127, 135 (D.P.R. 2007) ("Puerto Rico courts generally follow federal antitrust law when interpreting local antitrust laws[.]")); *Rivera-Muniz v. Horizon Lines Inc.*,

**THE GOVERNMENT'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS CLAIMS FOR FAILURE TO STATE A CLAIM (ECF No. 5935)**

restraints on trade or commerce in Puerto Rico, with monopolistic practices, and with certain types of unwanted price-fixing practices." *Id.* at 508.

Since 1977 with the Supreme Court's decision in *Illinois Brick*, indirect purchasers are precluded from seeking relief for antitrust violations under federal law. *Ill. Brick Co. v. Ill.*, 431 U.S. 720 (1977). "In response to the prohibition against antitrust actions by indirect purchasers set forth by the Supreme Court in *Illinois Brick*…. many states enacted repealer provisions, allowing state actions for indirect purchasers." *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1001 (E.D. Mich. 2014). Puerto Rico, however, has never adopted an *Illinois Brick* repealer statute, and continues to apply the principles of federal antitrust law to the PRAA, including its prohibition on indirect purchaser standing. *See, e.g.,* S*taley v. Gilead Scis., Inc.,* No. 19-cv-02573-EMC, 2020 U.S. Dist. LEXIS 36747, at *121 (N.D. Cal. Mar. 3, 2020) ("Puerto Rico does not have an *Illinois Brick* repealer statute"); *In re Opana Er Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016) ("Puerto Rico has not passed an *Illinois Brick* repealer, and its territorial courts have not addressed the issue directly. Other federal district courts have concluded that *Illinois Brick* applies and bars indirect-purchaser actions in Puerto Rico.") (citing *United Food & Commer. Workers Local 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharm. USA, Inc.,* 74 F. Supp. 3d 1052, 1085-86 (N.D. Cal. Nov. 7, 2014); *In re Nexium Antitrust Litig.*, 968 F. Supp. 2d 367, 409-10 (D. Mass. 2013); *In re Digit. Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011); *In re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d 1179, 1185-87 (N.D. Cal. 2009)).[5] In light of Puerto Rico's adherence to the principles of federal

---

737 F. Supp. 2d 57, 61 (D.P.R. 2010) ("PRAA is modeled after federal antitrust statutes." (citing and comparing P.R. Laws Ann. tit. 10, §§ 258, 260, with 15 U.S.C. §§ 1-2)).

[5] *See also In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2015 U.S. Dist. LEXIS 125999, at *62 (D. Mass. Aug. 14, 2015) ("Because Puerto Rico's antitrust laws have been interpreted in accordance with federal law, the bar against claims by indirect purchasers set forth in *Illinois Brick* applies and mandates dismissal of the Puerto Rico claims."); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 252 (D. Conn. 2015) ("Puerto Rico has not passed an *Illinois Brick* repealer"); *In re Static Random Access Memory Antitrust Litig.*, U.S. Dist. LEXIS 131002, at *39 (N.D. Cal. Dec. 8, 2010) ("Plaintiffs point to no authority that suggests that *Illinois Brick*'s interpretation of federal antitrust law would not be applied to Puerto Rico law.").

**THE GOVERNMENT'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS CLAIMS FOR FAILURE TO STATE A CLAIM (ECF No. 5935)**

1     antitrust laws and the knowing absence of an *Illinois Brick* repealer statute, courts consistently find

2     that indirect purchasers do not have standing under the PRAA. *See id.*

3          Defendants ignore the majority of courts throughout the country that dismissed claims brought

4     pursuant to the PRAA on behalf of indirect purchasers; even recently, courts have rejected the

5     application of the PRAA to indirect purchasers. *See Staley v. Gilead Scis., Inc.,* No. 19-cv-02573-

6     EMC, 2020 U.S. Dist. LEXIS 36747, at *121 (N.D. Cal. Mar. 3, 2020) (collecting cases; "the Court

7     finds Judge Orrick's *United Food* decision more persuasive. The Court therefore grants Gilead's

8     motion to dismiss on the Puerto Rico Act, in particular, to the extent Plaintiffs seek damages as indirect

9     purchasers."); *In re Broiler Chicken Antitrust Litig.*, 2020 U.S. Dist. LEXIS 124591, at *53–54 (N.D.

10     Ill. July 15, 2020) ("This Court joins the majority of courts and finds … that the PRAA does not permit

11     claims by indirect purchasers.").

12          Accordingly, "[t]his Court [should] join [] the majority of courts in concluding that the EPPs

13     do not have standing to bring antitrust claims under Puerto Rico law." *In re Loestrin 24 Fe Antitrust*

14     *Litig.*, 410 F. Supp. 3d 352, 373 (D.R.I. 2019).

15          **d.  Because the PRAA does not create a right to relief for indirect purchasers, the**

16              **Government may bring its claim for unjust enrichment.**

17          Under Puerto Rico law, "claims for unjust enrichment are subsidiary in nature and will only

18     be available in situations where there is no available action to seek relief." *Ocaso, S.A., Compania de*

19     *Seguros Y Reaseguros v. P.R. Mar. Shipping Auth.*, 915 F. Supp. 1244, 1263 (D.P.R. 1996) (quotation

20     marks and citation omitted). As explained in detail in the Complaint and above, the Government of

21     Puerto Rico has no cause of action under the PRAA or any other statutory right to relief. Thus, its only

22     path to relief for the harm caused by Defendants' admittedly criminal conduct is a claim based in

23     equity, such as unjust enrichment. *See* 31 L.P.R.A. § 7 ("When there is no statute applicable to the

24     case at issue, the court shall decide in accordance with equity, which means that natural justice, as

25     embodied in the general principles of jurisprudence and in accepted and established usages and

26     customs, shall be taken into consideration.").

27          Defendants' argument that even if the PRAA does not allow for indirect-purchaser standing,

28     the Government's unjust-enrichment claim fails because it is an improper end-run around the

**THE GOVERNMENT'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS CLAIMS FOR FAILURE TO STATE A CLAIM (ECF No. 5935)**

PRAA's exclusion of indirect purchasers has already been rejected. In 2017, several defendants argued to Judge Battani that the end-payor plaintiffs' claim for unjust enrichment under the laws of Illinois or South Carolina must be dismissed due to "each state's statutory ban against antitrust or consumer protection class action claims[.]" *In re Auto. Parts Antitrust Litig.*, No. 16-cv-03403, 2017 U.S. Dist. LEXIS 224676, at *94 (E.D. Mich. Sept. 28, 2017). As Defendants assert here, those defendants "argue[d] the existence of the ban prohibits an end-run around it through the unjust enrichment claim." *Id*. Judge Battani rejected this argument and denied defendants' motion to dismiss the end-payor plaintiffs' claim for unjust enrichment. *Id.* at *97 ("[T]he Court declines to expand the statutory prohibition to preclude common law claims in the absence of an explicit directive to do so…. Plaintiffs are free to pursue their unjust enrichment claims based on their assertion that they overpaid for Vehicles.").[6]

Other courts have also found that "unjust enrichment claims are viable regardless of the applicable state antitrust laws." *See King Drug Co. of Florence v. Cephalon, Inc.*, 702 F. Supp. 2d 514, 539-40 (E.D. Pa. 2010) (citing *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d at 669–71; *In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672, 679 n.40 (S.D. Fla. 2004)). That is because "[n]o reason or logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also dispossesses the same person of his right to pursue a common law equitable remedy." *In re G-fees Antitrust Litig.*, 584 F. Supp. 2d 26, 46 (D.D.C. 2008).

Further, a chief concern of the Supreme Court in deciding *Illinois Brick* was that allowing compensation to indirect purchases for antitrust violations could result in duplicative recovery. *See Ill. Brick*, 431 U.S. at 731; *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 850 (E.D. Pa. 2019). But there is no risk of duplicative recovery here. The Government of Puerto Rico and its

---

[6] Notably, Defendants' argument is even weaker in the case of Puerto Rico. Unlike Illinois or South Carolina, Puerto Rico has no express prohibition on indirect purchaser recoveries. *See, e.g.,* 740 Ill. Comp. Stat. 10/7 ("[N]o person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act[.]"). Instead, Puerto Rico's prohibition is based on the absence of an *Illinois Brick* repealer statute or an authoritative ruling permitting indirect purchasers under the PRAA.

population were not included in any of the prior settlements in this MDL, and their interests are not protected by any other actions. Additionally, "the concerns that motivate *Illinois Brick* … are not implicated in the context of unjust enrichment claims because the very nature of such claims requires a focus on the gains of the defendants, not the losses of the plaintiffs." *Id.* (quotation marks omitted).

Defendants reliance on *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1088 (S.D. Cal. 2017) is misplaced because the basis for that decision is that "it would be inequitable to permit relief where the state has *clearly* made a policy determination that no such relief should lie." *Id.* at 1088–89 (emphasis added). Similarly, *United Food* does not hold that there can never be an unjust enrichment claim for indirect purchasers in Puerto Rico—quite the opposite. 74 F. Supp.3d 1052. *United Foods* holds that indirect purchasers cannot sue under unjust enrichment "absent authority from the courts of [that state] that would allow unjust enrichment claims to proceed." *Id.* at 1089.

Such authority exists. In *E.L.A.*[7] *v. Cole,* 164 D.P.R. 608 (2005), the Supreme Court of Puerto Rico held that unjust enrichment is available unless it violates an important principle of public order incarnated in the Constitution or the laws of the Commonwealth. *Id*. at 634. The *Cole* court cited *Hatton v. Municipio de Ponce,* 134 D.P.R. 1001, 1010 (1994), where the court denied an unjust-enrichment claim because a government supplier failed to get the necessary written approvals before delivering goods because the use of public funds is strictly regulated. *Id*. In *Cole,* the Puerto Rico Supreme Court rejected defendant's argument that the Government's suit constituted an end run around Puerto Rico's tort statute's statute of limitations of one year because the government did not have a tort claim. *Id*. So too here, the Government's claim for unjust enrichment cannot be an "end run around" the PRAA's statute of limitations because the Government never had a viable claim under Puerto Rican statutory law.

Accordingly, despite Defendants' arguments, this Court should not give weight to the cases cited by Defendants, including *Broiler Chicken*, that held that the indirect purchaser claims for unjust enrichment claims fail in *Illinois Brick* jurisdictions. That is not the law of Puerto Rico. The law of

---

[7] E.L.A. stands for Estado Libre Asociado, the name of the Government of Puerto Rico in Spanish.

**THE GOVERNMENT'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS CLAIMS FOR FAILURE TO STATE A CLAIM (ECF No. 5935)**

1  Puerto Rico only limits a claim of unjust enrichment when it would violate an important public policy

2  or the Constitution. *Cole*, 164 D.P.R. at 633–34. Here, *bringing* the unjust enrichment claim doesn't

3  violate a public policy; in fact, it *accomplishes* an important public policy: compensating victims of

4  price fixers. Accordingly, the Government has adequately alleged a claim for unjust enrichment.

5      **e. The Government of Puerto Rico has *parens patriae* standing to bring this case.**

6      Here, Puerto Rico has expressly authorized the Attorney General to bring a claim for

7  unjust enrichment on behalf of consumers of new and used automobiles. 32 L.P.R.A. § 3341; *see*

8  *Cardizem*, 218 F.R.D. at 520-21 (states, through their Attorneys General, possess "the authority

9  to [bring,] settle and release indirect purchaser claims in a *parens patriae* or other representative

10  capacity.") Additionally, the Government satisfies *Snapp* because it has a legitimate interest as a

11  sovereign to protect its population from Defendants' illegal conduct.

12      Recognizing the special interests that states have to safeguard "the well-being of its

13  populace," the United States Supreme Court conferred standing upon states, through their

14  attorneys general, to bring claims on behalf of their citizenry as *parens patriae*—the "parent of

15  the country." *Alfred L. Snapp & Son v. P.R.*, *45*8 U.S. 592 (1982). A state's right to bring a claim as

16  *parens patriae* can be established with an explicit grant of statutory authority or by satisfying the

17  *Snapp* factors. Indeed, in *Snapp* the Supreme Court gave its imprimatur to the Government of

18  Puerto Rico's intervention on behalf of Puerto Rican apple pickers because of the indirect

19  economic benefit the island would receive from such intervention. *Id.* at 33, 37.

20      **f. 32 L.P.R.A. § 3341 explicitly confers *parens patriae* rights upon the Government**

21      **of Puerto Rico to pursue this action on behalf of its population.**

22      The Puerto Rican Legislature has explicitly "recognized the right to consumers of goods

23  and services and/or to the Commonwealth of Puerto Rico, through their agencies, dependencies

24  and instrumentalities in their capacity of '*parens patriae*' to file a class suit on behalf of said

25  consumers by reason of damages as well as injunction suits[.]" 32 L.P.R.A. § 3341. Notably, the

26  Legislature did not limit the Government's *parens patriae* rights to any particular cause of action,

27  just that the action be brought on behalf of consumers. Such is the case here: the Government

28  brings this action as *parens patriae* on behalf  of its population and governmental agencies

11

**THE GOVERNMENT'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS CLAIMS FOR**
**FAILURE TO STATE A CLAIM (ECF No. 5935)**

that that purchased CRT products from March 1995 to November 2007. Compl. ¶ 1. The Government's *parens patriae* standing in this action should be uncontroversial. This District has already recognized in a prior antitrust action that "the Commonwealth of Puerto Rico… ha[s] expressly conferred *parens patriae* authority upon [its] Attorney [] General." *Cardizem*, 218 F.R.D. at 521 (citing P.R. Laws Ann. tit. 32, §§ 3341–3344).

Defendants are, therefore, wrong to assert that there is no express authority. Their reliance on *Carpenter* for this proposition is misplaced as the case was wrongly decided. In *Carpenter*, the Judge Gelpi held that "no Commonwealth statute nor Puerto Rico Supreme Court precedent explicitly provides for *parens patriae* standing to present unjust enrichment claims." 442 F. Supp. 3d at 479. But this ignores the plane language of 32 L.P.R.A. § 3341. *Carpenter*'s reading of 32 L.P.R.A. § 3341 would destroy all force of the *parens patriae* authorization in all circumstances. While the statute does not contain the words "unjust enrichment," it also does not delineate *any* particular cause of action. *See Ramos v. Hyundai Motor Co.*, 431 F. Supp. 209, 212 (D.P.R. 2006), *aff'd*, 501 F.3d 12, 2007 U.S. App. LEXIS 20748 (1st Cir. 2007) (holding that 32 L.P.R.A. § 3341"do[es] not contain any substantive law, but rather [is] part of the Code of Civil Procedure and [is] limited to authorizing the filing of class actions by consumers for damages or against monopolies. A successful suit would still require that the plaintiff establish a viable cause of action under the appropriate statutes[.]").

Accordingly, because the Puerto Rican Legislature has expressly conferred *parens patriae* rights upon the Government of Puerto Rico to pursue this action on behalf of its population, the Court should deny Defendants' motion, particularly at this early juncture in the case.

### g.  The Government also has *parens patriae* standing under *Snapp*.

The Government also has an independent basis to bring this action as *parens patriae* pursuant to *Snapp*. The United States Supreme Court in *Snapp* held that a governmental entity may bring a claim as *parens patriae* where it has a "quasi-sovereign interest" in the claims at issue—*i.e.*, the state is not "only a nominal party without a real interest of its own." *Snapp*, 458 U.S. at 600. In particular, Defendants are wrong that the Government lacks *parens patriae* standing because it has no sovereign

interest in the interests of private parties. *See Georgia v. Pa. R. Co.*, 324 U.S. 439, 450 (1945) (finding Georgia has a legitimate interest in pursuing antitrust claims as parens patriae).

The Government of Puerto Rico has a legitimate and vital state interest in seeking a recovery for the economic harm that Defendants caused through their admittedly illegal conspiracy. *See Snapp*, 458 U.S. at 607. Puerto Rico's interests are not determined by Defendants, rather "[a]s a sovereign entity, [Puerto Rico] is entitled to assess its needs, and decide which concerns of its citizens warrant its protection and intervention." *Id.* at 612 (Brennan, J., Marshall, J., Blackmun, J., and Stevens, J., concurring in the judgment). Puerto Rico has done exactly that. The enabling act of the Puerto Rican Department of Justice authorizes the Department to seek judicial relief where it is needed to "maintain [] free competition." 3 L.P.R.A. § 294i(f). Further, Puerto Rico's present financial hardship is another factor demonstrating its interest and desire to seek relief on behalf of its population. Defendants' price fixing added another brick on the neck of citizens bowed by a recession since 2006 that has never abated. Indeed, the Commonwealth's struggles intensified in 2016, when Puerto Rico declared bankruptcy under PROMESA, 48 U.S. 2101 *et seq.* [8]In its current state of affairs, Puerto Rico has a deep-seated interest as a sovereign in protecting its citizenry from the illegal conduct of foreign corporations and obtaining whatever funds it can for the benefit of all of its citizens.

Nothing bars Puerto Rico from brining an action as *parens patriae* to supplement any private right of action its population may have. Indeed, that is routinely the case in complex antitrust cases. *See, e.g.*, *Cardizem*, 218 F.R.D. at 515 ($80 million settlement entered into by private plaintiffs and state attorneys general who brought claims as *parens patriae*); *In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347, 349 (E.D.N.Y. 2000) (approving $57 million settlement of private plaintiff class action and an action brought by state attorneys as parens patriae).[9]

---

[8] More recently, there has been Hurricane Maria, earthquakes, and the ravages of COVID 19 on an already rickety health care system.

[9] Indeed, the Legislature recognized the right of the Government to bring an action as *parens patriae* as a supplement to a private right of action brought by its citizenry. *See* 32 L.P.R.A. § 3341 (There is recognized the right to consumers of goods and services ***and***/or to the Commonwealth of Puerto Rico, through their agencies, dependencies and instrumentalities in their capacity of '*parens patriae*' to file a class suit…") (emphasis added).

**THE GOVERNMENT'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS CLAIMS FOR FAILURE TO STATE A CLAIM (ECF No. 5935)**

1    In this context, Defendants' reliance on *Connecticut v. Physicians Health Servs. of Conn., Inc.*,

2   103 F. Supp. 2d 495, 504 (D. Conn. 2000) is mistaken because under the Puerto Rico statute, *parens*

3   *patriae* standing is supplemental to that of class actions not exclusive of them. Defendants' reliance

4   on *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261 (1972), is also misplaced. "A central premise of

5   [the] holding in *Hawaii* was concern over duplicative recoveries." *Reiter*, 442 U.S. at 342. The Court

6   "noted that a 'large and ultimately indeterminable part of the injury to the 'general economy'' for

7   which the State sued was 'no more than a reflection of injuries to the 'business or property' of

8   consumers' for which, on a proper showing, they could recover in their own right." *Id.* (quoting

9   *Hawaii*, 405 U.S. at 263-264). Here, there is no risk of duplicative recoveries, and the parties can

10  precisely track the harm borne by its population, as was the case in each of the settlements Defendants

11  entered into in this MDL.

12    Accordingly, the Government of Puerto Rico, as a sovereign, has a legitimate interest in

13  prosecuting claims against Defendants for their illegal conduct in the Commonwealth, and

14  requests the Court to allow it to pursue its case.

15  **IV.    Conclusion**

16    Based upon the foregoing, the Government should prevail against the Defendants' early motion

17  to dismiss. On top of the Defendants' high burden, which they cannot overcome, the law is on the

18  Government's side. Without another claim for relief through the PRAA, the Government's unjust

19  enrichment claim is its path forward. And it has standing under its parens patriae rights explicitly

20  through Puerto Rico's 32 L.P.R.A. § 3341 as well as under *Snapp*.

21   DATED: July 7, 2021                    LAW OFFICES OF JOHN A. GIRARDI

22

23

24                              By:    *s/John A.* Girardi
                                       JOHN A. GIRARDI

25

26                                     *Attorney for Plaintiff*, THE GOVERNMENT OF
                                       PUERTO RICO

27

28

**THE GOVERNMENT'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS CLAIMS FOR
FAILURE TO STATE A CLAIM (ECF No. 5935)**

# EXHIBIT 1

CERTIFIED TRANSLATION

**COMMONWEALTH OF PUERTO RICO**
**COURT OF FIRST INSTANCE**
**SUPERIOR CHAMBER OF SAN JUAN**

Exhibit 4

| | |
|---|---|
| **THE GOVERNMENT OF PUERTO RICO THROUGH THE ATTORNEY GENERAL OF PUERTO RICO, WANDA VAZQUEZ GARCED** | Civil Num. SJ2018- |
| Plaintiff | |
| Vs. | In re: Unjust Enrichment |
| **LG ELECTRONICS, INC., LG ELECTRONICS USA, INC. , LG ELECTRONICS TAIWAN TAIPEI CO., LTD., KONINKLIJKE PHILIPS ELECTRONICS N.V., LG PHILIPS DISPLAYS, LTD. , PHILIP ELECTRONICS NORTH AAMERA [sic] CORPORATION NORTH AMERICA CORPORATION, V PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD., PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA, LP DISPLAYS INTERNATIONAL, LTD, SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG SDI AMERICA, INC., SAMSUNG SDI MEXICO S.A. DE C.V., SHENZHEN SAMSUNG SDI CO., LTD., TIANJIN SAMSUNG SDI CO., LTD., SAMSUNG SDI (MALAYSIA) SDN. BHD., TOSHIBA CORPORATION, TOSHIBA AMERICA CONSUMER PRODUCTS, LLC, TOSHIBA AMERICA INFORMATION SYSTEMS, INC., TOSHIBA AMERICA ELECTRONICS COMPONENTS, INC., TOSHIBA DISPLAY DEVICES (THAILAND) COMPANY, LTD., P.T. TOSUMMIT ELECTRONIC DEVICES INDONESIA, PANASONIC CORPORATION, PANASONIC CORPORATION OF NORTH AMERICA, MATSUSHITA ELECTRONIC CORPORATION (MALAYSIA) SDN BHD., MT PICTURE DISPLAY CO., LTD., BEIJING-MATSUSHITA COLOR CRT COMPANY, LTD., HITACHI, LTD., HITACHI AMERICA, LTD., HITACHI ASIA, LTD., SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.,** | |
| **TATUNG COMPANY OF AMERICA, INC., CHUNGHWA PICTURE TUBES LTD.,** | |



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

| | |
|---|---|
| **CHUNGHWA PICTURE TUBES (MALAYSIA) SDN. BHD., IRICO GROUP. "JOHN DOE"** married to **"JANE DOE"** together forming a community property, **COMPANY XYZ,** | |
| Defendants. | |

# COMPLAINT

**TO THE HONORABLE COURT:**

**NOW COMES,** the plaintiff, The Government of Puerto Rico, by and through the Puerto Rico Attorney General, Wanda Vazquez Garced, who very respectfully STATES, ALLEGES and PRAYS:

## I. INTRODUCTION

1.        The Attorney General files this lawsuit in her *parens patriae* authority for purchases of Cathode-Ray Tube Products (CRT Products as defined hereinafter) from March 1, 1995 until at least November 25, 2007 (the Period).

2.        The Attorney General alleges that during this period the Defendants conspired to fix, increase, maintain, and/or stabilize the prices of CRT Products sold in Puerto Rico.

3.        Due to the illegal conduct of the Defendants, Puerto Rican consumers and government entities of Puerto Rico paid inflated prices for CRT Products and consequently suffered damages.

4.        As detailed below, starting in at least 1995, the Defendants Samsung, Philips, Daewoo, LG, and Chunghwa met or spoke with at least another Defendant to discuss and agree on the prices of CRT Products and the quantity of CRT Products that each one would produce.

5.        Over time, these Defendants approached other manufacturers of CRT Products, including Toshiba, Panasonic, Hitachi, BMCC, IRICO, Thai CRT, and Samtel, who then also met or spoke with their competitors with the aim of fixing the prices of the Products.

6.        Already by 1997, a formal system of multilateral and bilateral meetings had been created,

2

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

involving the highest-level executives from the Defendants' corporations, all for the sole purpose of fixing supracompetitive pricing for CRT Products.

**7.**        The Defendants' conspiracy was carried out by moderating the downward pressure on CRT Product prices caused by periods of excess supply (oversupply) and competition by new technologies, such as TFT-LCD and Plasma.

**8.**        The Defendants' conspiracy resulted in especially stable prices and even rising prices in a very mature and shrinking market.

**9.**        As a result of the Defendants' illegal conduct, consumers in Puerto Rico paid higher prices for CRT products than they would have paid in a competitive market.

**10.**        The Defendants knew that when they introduced their CRT Products into the international market by way of sale to retailers and distributors in Puerto Rico, these products with their inflated prices would reach consumers in Puerto Rico.

**11.**        The economy of Puerto Rico is fueled by consumerism.

**12.**        Although Puerto Rico is not a nation as such, the World Bank ranks it as 29th out of all of the countries of the world, just after Spain and with a higher consumerism per capita than Greece, using the "household final consumption expenditure per capita" formula.

**13.**        The Defendants placed CRT Products in the flow of commerce knowing that Puerto Rican consumers would spend millions of dollars more than they should have paid because of the price-fixing scheme created by the Defendants.

**14.**        According to Banco Santander, consumers in Puerto Rico spend twice as much as consumers in the United States.

**15.**        The #1 Sam's Club in Puerto Rico is the number one of all Sam's Club stores in terms of money sold per square foot.

**16.**        The conspiracy was investigated by the Antitrust Division of the U.S. Department of Justice ("DOJ"), and by several other international competition authorities.

**17.**        On February 10, 2009, a federal grand jury in San Francisco, California issued an indictment on two counts against C.Y. Lin, the former Director and Chief Executive Officer of the

3

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Defendant Chunghwa Picture Tubes, Ltd., for his participation in the Global conspiracy to fix the price of CRTs used in computer monitors and televisions

18.        This was the first indictment to be issued following the DOJ investigation into the CRT Product industry.

## II. JURISDICTION AND AUTHORITY

19.        The Attorney General is initiating the present case to recover on a claim of unjust enrichment, to recover litigation costs, including reasonable attorney's fees for damages suffered by consumers and Puerto Rican government entities as a result of the conspiracies by the Defendants to inflate the prices of their products.

20.        Puerto Rico's Anti-Trust Law does not provide a remedy for indirect purchasers of products. Therefore, this Honorable Court has jurisdiction due to defendants' unjust enrichment.

21.        This Honorable Court has jurisdiction over Plaintiffs' claims as a result of their intentional actions to use the Puerto Rican market, by placing their products into the flow of commerce that inevitably comes here.

22.        This Court has jurisdiction due to the fact that: the Defendants sold their products here; a substantial part of the events that make up the Plaintiff's claims occurred in Puerto Rico; and a substantial portion of the affected trade described hereinafter was carried out in Puerto Rico.

23.        The Defendants operated in Puerto Rico, and by doing so, they acted intentionally to take advantage of the Puerto Rican market and consequently the laws of Puerto Rico.

24.        The Defendants' products were sold in the flow of commerce in Puerto Rico, and the Defendants' activities had a direct, substantial, and reasonably foreseeable effect on said trade.

25.        The Defendants' conspiracy to fix the prices of CRT Products substantially affected the trade through Puerto Rico, due to the fact that the Defendants directly, or through their agents, carried out activities that affected Puerto Rico.

26.        The Defendants purposefully availed themselves of the laws of Puerto Rico in connection with their activities related to the production, marketing, sale, and/or distribution of CRT Products.

4

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5991 Filed 07/22/19 Page 20 of 99
CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 5 of 61

27.      The Defendants produced, promoted, sold, marketed, and/or distributed CRT Products and therefore deliberately profited financially from accessing Puerto Rican consumers.

28.      As a result of the activities described herein, the Defendants:

   **a.**   Repeatedly caused harm to Puerto Rico's consumers.

   **b.**   Caused harm to Puerto Rico by their acts or omissions made outside of Puerto Rico and by regularly doing or soliciting business in Puerto Rico on several occasions.

   **c.**   Persistently took part in activities within Puerto Rico and/or derived substantial revenue from the marketing and sale of CRT Products in Puerto Rico.

   **d.**   Perpetuated acts or omissions that they knew or should have known would cause harm (and, in fact, did cause harm) in Puerto Rico while carrying out or regularly soliciting business in Puerto Rico, persistently participating in other activities in Puerto Rico such as the Sale of CRT Products in Puerto Rico.

29.      The behavior described in this Complaint adversely affected both Puerto Rico and its consumers, given that the latter bought the CRT Products from the Defendants.

30.      The Defendants' conspiracy has had a negative financial impact on consumers in Puerto Rico.

31.      The prices of CRT Products in Puerto Rico identified in this Complaint rose to supracompetitive levels as a result of the Defendants and their co-conspirators.

32.      The Defendants knew that the CRT trade in Puerto Rico would be adversely affected by the implementation of their conspiracy.


### III. DEFINITIONS

33.      As used in the present Complaint, the term "CRT" or "CRTs" means "cathode ray tube(s)."

5

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 3:19-cv-01246-JSC Document 59-1 Filed 04/02/19 Page 21 of 99
CERTIFIED TRANSLATION
Case3:19-cv-01246    Document 1-6    Filed 03/18/19    Page 6 of 61

**34.**    CRT is a display technology used in televisions, computer monitors, and other specialized applications.

**35.**    The CRT is an electron tube with a light-sensitive phosphor-coated inner side.

**36.**    The tube contains an electron gun that emits electron beams.

**37.**    When the electron beams hit the phosphors, they produce red, green, or blue light emissions.

**38.**    A magnetic field system within the CRT, also at varying voltages, directs the rays to produce the desired colors.

**39.**    Said process is repeated many times each second to produce the desired images.

**40.**    There are two types of CRTs: color display tubes ("CDTs"), which are used in computer monitors and other specialized applications; and colored picture tubes ("CPTs"), which are used for TV sets.

**41.**    CDTs and CPTs shall be referred to collectively in the aforementioned case as cathode ray tubes or "CRTs."

**42.**    As used in the present case, "CRT products" include: (a) CRTs; and (b) products with CRTs, such as TV sets or computer monitors.

**43.**    The "Period" or "relevant period" means the period beginning, at least, on March 1, 1995 until, at least, November 25, 2007.

**44.**    "Persons" means any individual, partnership, corporation, association, or other business or legal entity.

**45.**    "OEM" Original Equipment Manufacturer means any Original Equipment Manufacturer of Products.

## IV. PLAINTIFF

**46.**    The Plaintiff is the Attorney General of Puerto Rico, Wanda Vazquez Garced, on behalf of the consumers and government entities of Puerto Rico who were impoverished by the actions of the Defendants in the present case.

6

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

## V. DEFENDANTS

### LG Electronics Entities

47.     The Defendant LG Electronics, Inc. is a corporation organized under the laws of Korea and headquartered at LG Twin Towers, 20 Yeouido-dong, Yeoungdeungpo-gu, Seoul 150-721, South Korea.

48.     LG Electronics, Inc. is a global force valued at $48.5 billion that manufactures electronic products for consumers, household appliances, and mobile communications, which established its first branch outside of Korea in New York in 1968.

49.     The company changed its name from GoldStar Communications to LG Electronics, Inc. in 1995, the year in which it also acquired in the United States.

50.     In 2001, LG Electronics, Inc. transferred its CRT business to a 50/50 CRT joint venture with the Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V., thereby forming the Defendant LG. Philips Displays (a/k/a/ LP Displays International, Ltd.).

51.     During the Period, LG Electronics, Inc. manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

52.     The Defendant LG Electronics U.S.A., Inc. ("LGEUSA) is a corporation based in Delaware, with its principal place of business located at 1000 Sylvan Avenue, Englewood Cliffs, NJ 07632.

53.     LG Electronics USA, Inc. is a controlled and wholly owned subsidiary by the Defendant LG Electronics, Inc.

54.     During the Period, LG Electronics U.S.A., Inc. manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

55.     The Defendant LG Electronics, Inc. dominated and controlled LGEUSA's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

56.     The Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located in 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.

7

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

57.     LGETT is a wholly owned and controlled subsidiary of the Defendant LG Electronics, Inc.

58.     During the Period, LGETT manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers within Puerto Rico.

59.     The Defendant LG Electronics, Inc. dominated and controlled LGETT's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

60.     We shall refer to the Defendants LG Electronics, Inc., LGEUSA and LGETT collectively as "LG."

**Philips Entities**

61.     The Defendant Koninklijke Philips Electronics N.V. a/k/a/ Royal Philips Electronics N.V. ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1096 BC Amsterdam, The Netherlands.

62.     Royal Philips, founded in 1891, is one of the largest electronics companies in the world with 160,900 employees located in more than 60 countries.

63.     Royal Philips was the sole owner of its CRT business until 2001.

64.      In 2001, Royal Philips transferred its CRT business to a 50/50 CRT Joint Venture with the Defendant LG Electronics, Inc., thereby forming the Defendant LG. Philips Displays (a/k/a LP Displays International, Ltd.).

65.     In December 2005, as a result of increased pressure on the demand and prices of CRT Products, Royal Philips discounted the remaining value of its 126 million euro investment and indicated that it would not invest additional capital in the joint venture.

66.     During the Period, Royal Philips manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

67.     The Defendant Philips Electronics North America Corporation ("PENAC") is a Delaware corporation with its principal place of business located at 3000 Minuteman Road, M/S 109, Andover, MA 01810-1032.

8

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

68.      PENAC is a wholly owned and controlled subsidiary and is controlled by the Defendant Royal Philips.

69.      During the Period, PENAC manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

70.      The Defendant dominated and controlled PENAC's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

71.      The Defendant Philips Electronics Industries Taiwan, Ltd. ("Philips Electronics Taiwan") is a Taiwanese company with its principal place of business located on 15th Floor, No. 3-1 Yuan Qu Street, Nan-Gang District, Taipei, Taiwan.

72.      Philips Electronics Taiwan is a subsidiary of the Defendant Royal Philips.

73.      During the Period, Philips Electronics Taiwan manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

74.      The Defendant Royal Philips dominated, and controlled Philips Electronics Taiwan's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

75.      The Defendant Philips Da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company headquartered in Av Torquato Tapajos 2236, Landar (Part 1), Flores, Manaus, AM 39048-660, Brazil.

76.      Philips Brazil is a wholly owned subsidiary controlled by the Defendant Royal Philips.

77.      During the Period, Philips Brazil manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

78.      The Defendant Royal Philips dominated, and controlled Philips Brazil's finances, policies and issues related to the antitrust infringements alleged in this Complaint.

79.      We shall refer to the Defendants Royal Philips, PENAC, Philips Electronics Taiwan, and

9

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Philips Brazil collectively in this Complaint as "Philips."

**LP Displays**

80.       The Defendant LP Displays International, Ltd. a/k/a/ LG. Philips Displays ("LP Displays") was created in 2001, pursuant to the laws of Hong Kong, as a 50/50 joint venture between the Defendants, LG Electronics, Inc. and Royal Philips Electronics of The Netherlands, with its principal place of business located in Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.

81.       LP Displays is a main supplier of CRTs, for use in television sets and computer monitors, with annual sales in 2006 of over $2 billion and it has a market share of 27%.

82.        LP displays announced in March 2007 that Royal Philips and LG Electronics would assign the control over the company and that the shares would belong to financial institutions and private equity firms.

83.       During the Period, LP Displays manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

**Samsung Entities**

84.       The Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at 129, Samsung-ro, Maetan-3dong, Yeongtong-gu, Suwon-si, Gyeonggi-do, South Korea.

85.       During the Period, SEC manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

86.       The Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 85 Challenger Road, Ridgefield Park, New Jersey 07660.

87.       SEAI is wholly owned and is a subsidiary controlled by the Defendant SEC.

88.       During the Period, SEAI manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

10

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

89.      The Defendant SEC dominated and controlled SEAI's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

90.      The Defendant Samsung SDI Co., Ltd. a/k/a Samsung Display Device Co., Ltd. ("Samsung SDI"), is a South Korean company with its principal place of business located at 150-20, Gongse-ro Giheung-gu Yongin, 446-577, South Korea.

91.      Samsung SDI is a public company.

92.      SEC is a main shareholder with nearly 20 percent of the shares.

93.      Founded in 1970, Samsung SDI claimed to be the leading company in the display and energy industry with 28,000 employees and facilities in 18 countries.

94.      In 2002, Samsung SDI had worldwide market share of 34.3% for CRTs; more than any other manufacturer.

95.      Samsung SDI has offices in Chicago and San Diego.

96.      During the Period, Samsung SDI manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

97.      The Defendant SEC dominated and controlled Samsung SDI's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

98.      The Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation headquartered at 3333 Michelson Drive, Suite 700, Irvine, California.

99.      Samsung SDI America is wholly owned and a subsidiary controlled by Samsung SDI.

100.     During the Period, Samsung SDI America manufactured, marketed, sold, and/or distributed CRT Products to consumers, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

101.     The Defendants SEC and Samsung SDI dominated and controlled Samsung SDI America's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

11

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

102.    The Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business at Blvd. Los Olivos, No .21014-A, Parque Industrial El Florido, Tijuana, BJ 22224, Mexico.

103.    Samsung SDI Mexico is wholly owned and a controlled subsidiary of the Defendant Samsung SDI.

104.    During the Period, Samsung SDI Mexico manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

105.    The Defendants SEC and Samsung SDI dominated and controlled Samsung SDI Mexico's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

106. The Defendants Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business at Av. Eixo Norte Sul, S/N, Industrial District, 69088-480 Manaus, Amazonas, Brazil.

107.    SDI Brazil is wholly owned by the Defendant Samsung SDI.

108.    During the Period, Samsung SDI Brazil manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates, to consumers throughout Puerto Rico.

109.    The Defendants SEC and Samsung SDI dominated and controlled Samsung SDI Brazil's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

110.    The Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business at No. 5003 Huanggang, North Road, Futian District, Shenzhen, China.

111.    Samsung SDI Shenzhen is wholly owned and a controlled subsidiary of the Defendant Samsung SDI.

112.    During the Period, Samsung SDI Shenzhen manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates, to consumers throughout Puerto Rico.

113.    The Defendants SEC and Samsung SDI dominated and controlled Samsung SDI Shenzhen's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

12

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**114.** The Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xizn Park, Tianjin, China.

**115.** Samsung SDI Tianjin is wholly owned and a controlled subsidiary of the Defendant Samsung SDI.

**116.** During the Period, Samsung SDI Tianjin manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates, to consumers throughout Puerto Rico.

**117.** The Defendants SEC and Samsung SDI dominated and controlled Samsung SDI Tianjin's finances, policies and issues related to the antitrust infringements alleged in this Complaint.

**118.** The Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian company with its principal place of business located at Lot 635 & 660, Kawasan Perindustrian, Tuanku Jaafar, Sungai Gadut, Seremban Malaysia.

**119.** Samsung SDI Malaysia is wholly owned and a controlled subsidiary of the Defendant Samsung SDI Co., Ltd.

**120.** During the Period, Samsung SDI Malaysia manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates, to consumers throughout Puerto Rico.

**121.** The Defendants SEC and Samsung SDI dominated and controlled Samsung SDI Malaysia's finances, policies and issues related to the antitrust infringements alleged in this Complaint.

**122.** The Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Samsung SDI Malaysia shall be collectively referred to in the present complaint as "Samsung."


**Toshiba Entities**

**123.** The Defendant Toshiba Corporation is a Japanese corporation with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.

13

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

124.    In 2001, Toshiba Corporation maintained a global market share of 5-10% for CRT Products used in television sets and computer monitors.

125.    In December 1995, Toshiba Corporation partnered with Orion Electric Company (a/k/a Daewoo Electronics Corporation) and two other non-defendant entities to create P.T. Tosummit Electronic devices Indonesia ("TEDI") in Indonesia.

126.    TEDI planned to have a production capacity of 2.3 million of CRT Products by 1999.

127.    In 2002, Toshiba Corporation entered into a joint venture, with the Defendant Panasonic Corporation, called MT Picture Display Co., Ltd. in which the entities consolidated their CRT business.

128.    During the Period, Toshiba Corporation manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates, to consumers throughout Puerto Rico.

129.    The Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, NY 10020.

130.    Toshiba America is wholly owned and a controlled subsidiary of the Defendant Toshiba Corporation.

131.    During the Period, Toshiba America manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates, to consumers throughout Puerto Rico.

132.    The Defendant Toshiba Corporation dominated and controlled Toshiba America's finances, policies and issues related to the antitrust infringements alleged in this Complaint.

133.    The Defendant Toshiba America Consumer Products, LLC ("TACP") is headquartered at 82 Totawa Rd., Wayne, New Jersey 07470-3114.

134.    TACP is wholly owned and a controlled subsidiary of the Defendant Toshiba Corporation through Toshiba America.

135.    During the Period, TACP manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

136.    The Defendant Toshiba Corporation dominated and controlled TACP's finances, policies and issues related to the antitrust infringements alleged in this Complaint.

14

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**137.** The Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92718.

**138.** TAIS is wholly owned and a controlled subsidiary of the Defendant Toshiba Corporation through Toshiba America, Inc.

**139.** During the Period, TAIS manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**140.** The Defendant Toshiba Corporation dominated and controlled TAIS' finances, policies and, issues related to the antitrust infringements alleged in this Complaint.

**141.** The Defendant Toshiba America Electronics Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Ste D700, Irvine, California 92618.

**142.** TAEC is wholly owned and a controlled subsidiary of Toshiba America, Inc., which is a holding company for the Defendant Toshiba Corporation.

**143.** TAEC was the North American Sales and marketing representative of the Defendant MTPD.

**144.** Prior to the creation of MTPD in 2003, TAEC was the engineering, manufacturing, and sales arm for North America for the Defendant Toshiba Corporation.

**145.** During the Period, TAEC manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**146.** The Defendant, Toshiba Corporation dominated and controlled TAEC's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

**147.** Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") is a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.

15

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

148.     TDDT is wholly owned and a controlled subsidiary of the Defendant Toshiba Corporation.

149.     Toshiba Corporation transferred Toshiba Thailand to its CRT joint venture with Panasonic Corporation, MT Picture Display Co., Ltd., in 2003.

150.     It was renamed MT Picture Display (Thailand) Co., Ltd. and operated as a wholly owned subsidiary of MT Picture Display until its closure in 2007.

151.     During the Period, TDDT manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

152.     The Defendant Toshiba Corporation dominated and controlled TDDT's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

153.     P.T. Tosummit Electronic devices Indonesia ("TEDI") is a CRT joint venture formed in December 1995, by Toshiba Corporation, Orion Electric Company, and two other non-defendant entities.

154.     TEDI's principal place of business is in Indonesia. TEDI planned to have an annual CRT production capacity of 2.3 million by 1999. In 2003, TEDI was transferred to MT Picture Display Co., Ltd.. and changed its name to PT.MT Picture Display Indonesia.

155.     During the Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

156.     The Defendant Toshiba Corporation dominated and controlled TEDI's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

157.     The Defendants: Toshiba Corporation, Toshiba America, Inc., TACP, TAIS, TAEC, TDDT and TEDI shall be collectively referred to in the present complaint as "Toshiba."


**Panasonic Entities**

158.     The Defendant Panasonic Corporation, which at all times during the Period was called

16

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Matsushita Electric Industrial Co., Ltd. And later became Panasonic Corporation on October 1, 2008, is a Japanese entity with its principal place of business at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.

159.     In 2002, Panasonic Corporation formed a CRT joint venture with the Defendant Toshiba, creating MT Picture Display Co., Ltd. ("MTPD").

160.     Panasonic Corporation owned the majority of the shares with 64.5 per cent.

161.     On April 3, 2007, Panasonic Corporation purchased the remaining 35.5 percent interest in the joint venture, making MTPD a wholly owned subsidiary of Panasonic Corporation.

162.     In 2005, the Panasonic brand had the highest CRT Product revenues in Japan.

163.     During the Period, Panasonic manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

164.     The Defendant Panasonic Corporation of North America ("Panasonic NA") is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, NJ 07102.

165.     Panasonic NA is wholly owned and a controlled subsidiary of the Defendant Panasonic Corporation.

166.     During the Period, Panasonic NA manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

167.     The Defendant Panasonic dominated and controlled Panasonic NA's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

168.     Matsushita Electronic Corporation (Malaysia) Sdn BHD. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 12, Jalan PKNK, Utama, Kawasan Perindustrian, Sngai Petani, Malaysia 40000.

169.     Matsushita Malaysia was wholly owned and a controlled subsidiary of the Defendant Panasonic Corporation.

170.     Panasonic Corporation transferred Matsushita Malaysia to its CRT joint venture

17

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

with Toshiba Corporation, MT Picture Display Co., Ltd., in 2003.

**171.**     It was renamed MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MT Picture Display until its closure in 2006.

**172.**     During the Period, Matsushita Malaysia manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**173.**     The Defendant Panasonic Corporation dominated and controlled Matsushita Malaysia's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

**174.**     The Defendants Panasonic Corporation, Panasonic NA and Matsushita Malaysia shall be collectively referred to in the Lawsuit as "Panasonic."

**175.**     The Defendant MT Picture Display Co., Ltd. ("MTPD") established itself as a CRT joint venture between the defendants Panasonic Corporation and Toshiba.

**176.**     The Defendant MTPD is a Japanese entity with its principal place of business located at 1-1, Saiwai-cho, Takatsuki-shi, Osaka 569-1193, Japan.

**177.**     On April 3, 2007, the Defendant Panasonic Corporation purchased the remaining interest in MTPD, making it a wholly owned subsidiary of Panasonic Corporation and renaming it MT Picture Display Co., Ltd.

**178.**     During the Period, MTPD manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**179.**     The Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9, Jiuxianqiaobei N. Rd., Dashanzi Chaoyang District, Beijing, China.

**180.**     BMCC is a joint venture, of which 50% belongs to the Defendant MTPD.

**181.**     The other 50% belongs to Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a company belonging to the Government of China) and the Beijing Yayuncun branch of Industrial and Commercial Bank of China, Ltd. (a company belonging to the government of China).

**182.**     Founded in 1987, BMCC was Matsushita's first facility (a/k/a Panasonic) to manufacture CRT Products in China.

18

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**183.**        BMCC is the second largest producer of CRTs in China.

**184.**        During the Period, BMCC manufactured, marketed, sold, and/or distributed CRTs, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.


**The Hitachi Entities**

**185.**        The Defendant Hitachi, LTD. is a Japanese company with its headquarters located at 6-6 Marunouchi Center Building, Chiyoda-ku, Tokyo 100-8280, Japan.

**186.**        Hitachi LTD. is the parent company of Hitachi brand of CRT Products.

**187.**        In 1996, Hitachi's worldwide market share for CRTs was 20 percent.

**188.**        During the Period, Hitachi Ltd. manufactured, marketed, sold, and/or distributed CRTs directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**189.**        Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3F AKS Building, 3 Neribei-cho Kanda, Chiyoda-ku, 1010022, Japan.

**190.**        Hitachi Displays, Ltd. established the Mobara Works of Hitachi, Ltd. in the city of Mobara, Japan, in 1943.

**191.**        In 2002, all the planning, development, design, manufacturing, and sales departments related to the screen business of Hitachi Ltd. were segregated to create a separate company called Hitachi Displays, Ltd.

**192.**        During the Period, Hitachi Displays manufactured, marketed, sold, and/or distributed CRTs directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**193.**        The Defendant Hitachi, Ltd. dominated and controlled Hitachi Displays' finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

**194.**        Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 1000 Hurricane Shoals Road, Ste. D-100, Lawrenceville, GA 30043.

19

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**195.**    HEDUS is a subsidiary of the Defendants Hitachi Displays, Ltd. and Hitachi, Ltd.

**196.**    During the Period, HEDUS manufactured, marketed, sold, and/or distributed CRTs directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**197.**    The Defendant Hitachi, Ltd. and Hitachi Displays, Ltd. dominated and controlled HEDUS' finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

**198.**    The Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business at 50 Prospect Avenue, Tarrytown, NY 10591-4625.

**199.**    Hitachi America is wholly owned and a controlled subsidiary of the Defendant Hitachi, Ltd.

**200.**    During the Period, Hitachi America manufactured, marketed, sold, and/or distributed CRTs directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**201.**    The Defendant Hitachi, Ltd. dominated and controlled Hitachi America's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

**202.**    The Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singapore company with its principal place of business located at 7 Tampines, Grand #08-01 Hitachi Square, Singapore.

**203.**    Hitachi Asia is wholly owned and a controlled subsidiary of the Defendant Hitachi, Ltd.

**204.**    During the Period, Hitachi Asia manufactured, marketed, sold, and/or distributed CRTs directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**205.**    The Defendant, Hitachi, Ltd. dominated and controlled Hitachi Asia's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

20

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

206.    Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with headquarters at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.

207.    Hitachi Displays, Ltd. Had a minimum share of 25% in Hitachi Shenzhen until November 8, 2007 (which was, incidentally, close to the time when the government investigations into the CRT industry began).

208.    So, Hitachi Shenzhen was a member of the Hitachi corporate group throughout the Period with the exception of two weeks.

209.    During the Period, Hitachi Shenzhen manufactured, marketed, sold, and/or distributed CRTs directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

210.    The Defendants Hitachi, Ltd. And Hitachi Displays, Ltd. Dominated and controlled Hitachi Shenzhen's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

211.    The Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, HEDUS, Hitachi Asia and Hitachi Shenzhen are collectively referred to as "Hitachi." In the present Complaint.

**Tatung**

212.    The Defendant Tatung Company of America, Inc. ("Tatung America") is a Californian corporation with its principal place of business located at 2850 in Presidio Street, Long Beach, California.

213.    Tatung America is a subsidiary of Tatung Company.

214.    Today, Tatung Company is about half of Tatung America.

215.    The other half belonged to Lun Kuan Lin, the daughter of the former president of Tatung Company, T.S. Lin.

216.    After the death of Lun Kuan Lin, her stake passed on to her two sons.

217.    During the Period, Tatung America manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

21

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

## Chunghwa Entities

218.    The Defendant Chunghwa Picture Tubes Ltd. ("CPT") is a Taiwanese company with its principal place of business located at No. 1, Huaying Rd., Longtan District, Taoyuan City, Taiwan.

219.    CPT was founded in 1971 by Tatung Company.

220.    Through most of the Period, Tatung Company was the owner of a substantial share of CPT.

221.    Although Tatung Company's stake in CPT has dropped over time, it still retains substantial control over CPT's operations.

222.    Tatung Company described Chunghwa on its *Website* as one of its global subsidiaries.

223.    And the *Chairman* of CPT, Weishan Lin, was also the *Chairman* and General Manager of Tatung Company.

224.    CPT was a prominent manufacturer of CRTs.

225.    During the Period, CPT America manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries in Malaysia, China, and Scotland to consumers throughout Puerto Rico.

226.    The Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company headquartered at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Malaysia.

227.    Chunghwa Malaysia is a wholly owned subsidiary of the Defendant Chunghwa Picture Tubes.

228.    Chunghwa Malaysia is a prominent supplier of CRT Products.

229.    During the Period, Chungwa Malaysia America manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

230.    The Defendant CPT dominated and controlled Chunghwa Malaysia's finances, policies, and issues related to the antitrust violations alleged in this Complaint.


## IRICO Entities

22

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**231.** The Defendant IRICO Group Corporation ("IGC") is a Chinese corporation with its principal place of business located at 1 Caihong Rd., Qindu District, Xianyang, China. 712021.

**232.** IGC is the parent company for multiple subsidiaries that manufacture, market, sell, and/or distribute CRT Products.

**233.** During the Period, IGC manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

**234.** The Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at Xiayang Yuquan West Road, Xianyang, China.

**235.** IDDC is a subsidiary partially belonging to the Defendant IGC.

**236.** In 2006, IDDC was the largest CRT manufacturer in China.

**237.** During the Period, IDDC manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

**238.** The Defendant IGC dominated and controlled IDDC's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

**239.** The Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, China.

**240.** IGE belongs to the Defendant IGC.

**241.** On its **website**, IGE claimed to be the leading CRT manufacturer in China and one of the largest CRT manufacturers in the world.

**242.** Its **website** also claimed that in 2003, they were the largest CRT manufacturers in China in terms of production and turnover, sales revenue, aggregate earnings, and paid taxes.

**243.** During the Period, IGE manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

**244.** The Defendant IGC dominated and controlled IGE's finances, policies, and issues related

23

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

to the antitrust infringements alleged in this Complaint.

245.    The Defendants IGC, IDDC and IGE shall collectively be referred to in the lawsuit proceedings as "IRICO."


**Thai CRT Entities**

246.    The Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company with its principal place of business located at 1 Siam Cement Road, Bangsue Dusit, Bangkok, Thailand.

247.    Thai CRT is a subsidiary of Siam Cement Group.

248.    It was founded in 1996 as the first manufacturer of CRT Products for color televisions in Thailand.

249.    During the Period, Thai CRT manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.


**Samtel**

250.    The Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal place of business located at 5th Floor, 501, 9 Copy Corporate Suites, Dist. Centre, Jasala, New Delhi, India.

251.    Samtel's share of the CRT sales market in India is approximately 40%.

252.    Samtel is the largest exporter of CRT Products in India.

253.    Samtel has obtained security clearance in the United States, Canada, Germany, and Great Britain for its CRT Products.

254.     During the Period, Samtel manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.


**Daewoo/Orion entities**

255.    During the Period, Orion Electric Company ("Orion") was a major manufacturer of CRTs.

256.    Orion was a Korean corporation that filed for bankruptcy in 2004.

24

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

257.    In 1995, approximately 85% of Orion's billion dollars sales were attributable to CRTs.

258.    Orion was involved in CRT Product sales and joint ventures, and had subsidiaries throughout the world, including South Africa, France, Indonesia, Mexico, and the United States.

259.    On information and belief, the Plaintiff understands that Orion was wholly owned by the "Daewoo Group."

260.    The Daewoo Group includes Daewoo Electronics Company, Ltd., Daewoo Telecom Company, Daewoo Corporation and Orion Electric Components Company.

261.    The Daewoo Group shut down in or around 1999.

262.    Daewoo Electronics and Orion formed a joint venture with a 50/50 stake in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

263.    In approximately 1996, DOSA produced 1.2 million CRT Products annually.

264.    Daewoo the CRT business in or around 2004.

265.    In December 1995, Orion partnered with the Defendant Toshiba Corporation and two other non-defendant entities to form P.T. Tosummit Electronic devices Indonesia ("TEDI") in Indonesia.

266.    TEDI planned to have an annual CRT production capacity of 2.3 million by 1999.

267.    During the Period, Orion, Daewoo Electronics, TEDI, and DOSA manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through their subsidiaries or affiliates to consumers throughout Puerto Rico.

268.    Daewoo Electronics, Orion, and DOSA shall collectively be referred to in the aforementioned lawsuit as "Daewoo."

**Unknown Entities**

269.    John Doe, married to Jane Doe with whom he forms community property, is an unknown individual, who may be liable for the allegations in this Complaint.

270.    XYZ Corporation is a corporation, whose identity is currently unknown, which may be liable for the allegations in this Complaint.

25

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 3:19-cv-05946-ASC   Document 5039   Filed 04/02/19   Page 26 of 99
CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 26 of 61

271.    All the previously named Defendants shall be collectively referred to in the present complaint as "Defendants."

## VI. AGENTS AND CO-CONSPIRATORS

272.    Multiple other persons, firms and corporations, which are not named as Defendants, and which are not known to the Plaintiff in this case, have participated as co-conspirators with the Defendants, and have carried out acts and made statements to foster the conspiracy and/or to encourage anti-competitive, unfair, or deceptive behavior.

273.    When referring to any act, fact, or transaction of any corporations in the aforementioned complaint, such allegation means the corporation performs the act, fact, or transaction through or by its officers, directors, agents, employees, or representatives while they were performing duties regarding the management, direction, control, or transaction of the corporation's businesses or affairs.

274.    The Defendants are also responsible for acts carried out to promote the alleged conspiracy through acquired or merged companies.

275.    Each of the Defendants named in the present complaint acted as an agent or joint venture of or by the other defendant parties regarding the acts, infringements, or common course of conduct alleged herein.

276.    Each Defendant that is a subsidiary of a parent company, acts as the sole agent in the United States for CRT Products made by its parent company.

277.    The plaintiff reserves the right to amend the claim to include all of these parties.

## VII. STATEMENTS OF FACTS

**CRT Technology**

278.    CRT technology was developed over a century ago.

279.    The first commercially practical CRT television set was made in 1931.

280.    However, it was not made widely available to consumers until the RCA Corporation presented the product at the World Fair.

281.    Since then, CRT Products have become the core of many monitors, including television

26

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

sets, computer screens, oscilloscopes, air traffic control monitors, and ATMs.

282.    It manufactured even large public monitors, including many sports arena scoreboards, composed of thousands of single-color CRT Products.

283.    As explained, a CRT is a vacuum tube with a light-sensitive phosphor-coated inner side.

284.    The tube contains an electron gun that emits electron beams.

285.    When the electron beams hit the phosphors, they produce red, green, or blue light emissions.

286.    A magnetic field system within the CRT, also at voltages, directs the beams to produce the desired colors.

287.    This process is repeated quickly multiple times per second to produce the desired images.

288.    The quality of the CRT monitor depends on the material itself, not on its external features.

289.    Until 2006, CRTs were the dominant technology in computer monitors and television sets.

290.    During the Period, this resulted in the sale of millions of CRT Products, generating billions of dollars in annual revenue.

### A. **Structural Characteristics of the CRT Market**

291.    The structural characteristics of the CRT market led to the type of occlusive activities alleged in the Complaint.

292.    These characteristics include: concentration; the ease of sharing information; the consolidation of manufacturers; interrelated multi-business relationships; significant impediments for entering the business; the maturity of the CRT market; and product homogeneity.

### a.    **Market Concentration**

293.    During the Period, the CRT industry was dominated by relatively few companies.

294.    In 2004, the defendants Samsung SDI, LG. Philips displays (a/k/a LP Displays), MT Picture Display and Chunghwa together owned a collective share of 78% of the global CRT market.

27

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

295.    The high market share concentration facilitates coordination because there are fewer members of the cartel, including coordination for pricing or market allocation, and it is easier to monitor the prices and production of other members of the cartel.

**b.      Exchange of Information**

296.    Due to the common membership in trade associations for the CRT Market and related markets (e.g., TFT-LCD), business arrangements such as joint ventures, alliances between companies in certain countries and relationships between executives in certain companies, there are many opportunities for the Defendants to discuss and exchange competitive information.

297.    Communication was facilitated through meetings, telephone calls, emails, and instant messages.

298.    The Defendants took advantage of these opportunities to discuss and agree on price fixing for CRT Products.

299.    The Defendants Chunghwa, Hitachi, and Samsung are all members of the Society for Information Display.

300.    The Defendants Samsung and LG Electronics, Inc. are two of the co-founders of the Korea Display Industry Association.

301.    Likewise, Daewoo, LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.

302.    On information and belief, the Defendants repeatedly used said trade associations as vehicles to discuss and reach agreements on price fixing for their CRT Products.

303.    At these trade association meetings, the Defendants exchanged proprietary and sensitive information in competitive terms, which they used to implement and monitor their conspiracy.

**c.      Consolidation**

304.    The CRT Product Industry underwent significant consolidation during the Period, including, but not limited to: (a) the creation of LG. Philips displays (a/k/a LP Displays) in 2001 as a

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

joint venture between Royal Philips and LG Electronics, Inc.; and (b) the merger in 2002 of Toshiba's CRT business and Matsushita/Panasonic to MTPD.

305.     The Defendants also consolidated their manufacturing facilities in lower-cost sites such as China and reduced the manufacturing capacity to maintain high prices.


### d.     Multiple Interrelated Business Relationships

306.     Given the nature of the CRT industry, and the multiple business relationships between alleged competitors, competition is reduced and ample opportunities to collude arise.

307.     These business relationships also created a unit of interest among competitors, so the conspiracy became easier to implement and enforce than if said relationships had not existed.

308.     The high degree of cooperation between the Defendants in the CRT Product market and closely related markets is reflected as follows:

a.     The formation of the joint venture of CRT LG. Philips Displays in 2001 by the Defendants LG Electronics, Inc. and Royal Philips.

b.     The Defendants LG Electronics, Inc. and Royal Philips also formed LG. Philips LCD Co., Ltd., a/c/c LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.     The formation of the joint venture CRT MTPD in 2003 by the Defendants Toshiba and Panasonic.

d.     The Defendants Toshiba and Panasonic also formed Toshiba- Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.     In December 1995, the Defendants Daewoo and Toshiba partnered with two other Non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.     The Defendants Daewoo and Toshiba also signed an agreement related to LCDs in 1995. Through the agreement, Daewoo produced STN LCDs, and Toshiba, which had replaced

29

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

the production of STN LCD with the production of TFT LCD, marketed Daewoo's STN LCDs globally through its network.

g.   Also, in 1995, the Defendant Chunghwa reached a technology transfer agreement with the Defendant Toshiba for large CPTs [*sic*].

h.   The Defendant Chunghwa has a joint venture with the Defendant Samsung Electronics Co., Ltd. for the production of liquid crystal panels. Chunghwa currently buys the technology from the Defendant Royal Philips, a development that helped resolve a patent infringement lawsuit filed in 2002.

i.   The Defendants LG Electronics, Inc. and Hitachi Ltd. entered into a joint venture in 2000 for manufacturing, selling, and distributing optical storage products such as DVD drives.

j.   The Defendant Samtel participated in a joint venture, Samcor Glass Limited, with the Defendant Samsung Electronics Co., Ltd. and the non-defendant company Corning Inc. USA for the production and supply of glass tubes for displays.

k.   The Defendant Samtel claims to have supplied CRTs to the Defendants LG Electronics, Inc., Samsung, Royal Philips and Panasonic.

**e.   High Entry Costs to the Industry**

**309.**   There were substantial obstacles for entering into the CRT Product industry.

**310.**   It would have required substantial time, resources, and industry knowledge for a potential producer to overcome barriers to entering the CRT Product Industry.

**311.**   It was also unlikely that new producers would have entered the market due to declining demand for CRT Products.

**f.   The Maturity of the CRT Product Market**

**312.**   New industries are typically characterized by rapid growth, innovation, and high gains.

**313.**   The CRT Market was mature, and, like many of these industries, is characterized by narrow

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

profit margins, creating a motivation to collude.

**314.**    The demand for Products was declining throughout the Period.

**315.**    Stagnant or declining demand is another factor that leads to the likelihood of conspiracy arrangements, as it provides a greater incentive for firms to avoid having to compete for prices.

**316.**    Moreover, conventional CRT television sets and monitors were being quickly replaced by TFT-LCD monitors and Plasma Displays.

**317.**    This was one of the factors that led Defendants to participate in this pricing scheme to stop the price decline of CRTs Products.

**318.**    Between 2000 and 2006, revenues from the sale of CRT television sets in the United States declined by 50.7 percent, and the market decline has accelerated since then.

**319.**    Although demand decreased as a result of the popularity of flat panel LCD/Plasma TVs and LCD monitors, television sets and monitors were still the dominant monitor technology throughout the Period, leading to the collusion among the Defendants and the valuable international price-fixing conspiracy.

**320.**    Due to the high costs of LCD panels and plasma monitors during the Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

**321.**    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.

**322.**    By 2002, this figure had dropped to 73 percent; still a substantial market share.

**323.**    As for CRT TVs, they accounted for 73 percent of the television market in North America in 2004, and by the end of 2006 they still held a market share of 46 percent.

31

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

**324.**     Now, sales of CRT products are practically non-existent.

**g.**     **Homogeneity of CRT Products**

**325.**     CRT Products are similar to basic products, which are manufactured in standardized sizes.

**326.**     CRT Products manufactured by a Defendant for a particular application, such as a particular size of television sets or a computer monitor, could be substituted for one another.

**327.**     The Defendants sold and the consumers of Puerto Rico bought the CRT Products mainly based on price.

**328.**     It is easier to form and support a cartel when the product is similar to a basic product, as it is easier to reach agreements in terms of prices to be charged and to monitor prices once they have already been agreed upon.

**B.**     **The Market before the Conspiracy**

**329.**     The genesis of the CRT conspiracy was at the end of the '80s when the CRT business became more international and the Defendants began to serve customers who were also served by other international companies.

**330.**     During this period, the Defendants' employees met with employees of their competitors while visiting their customers.

**331.**     A culture of cooperation developed over the years and these Defendants' employees exchanged market information regarding production, capacity, and customers.

**332.**     At the beginning of the '90s, representatives of Samsung, Daewoo, Chunghwa, and Orion visited one another's factories in South Asia.

**333.**     During this period, producers began to include discussions on pricing in their meetings.

**334.**     Discussions on pricing tended to be limited, however, to exchanges of price ranges quoted by each competitor to specific customers.

32

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**C.**     **The Illegal Agreements of the Defendants and their Co-Conspirators**

**335.**     The Plaintiff has been informed and therefore believes, and thus alleges, that in order to be able to control and maintain their earnings while the demand for CRT Products decreased, the Defendants and their co-conspirators formed a contract, an agreement, trust, or conspiracy, the effect of which would have been to issue, fix, maintain, and/or stabilize CRT sale prices at artificially inflated levels from at least March 1, 1995 until, at least, November 25, 2007.

**336.**     The CRT conspiracy was carried out through a combination of group and bilateral meetings.

**337.**     In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and they took place in an informal and ad hoc manner.

**338.**     During this period, representatives of the Defendants LG, Samsung, and Daewoo visited the other Defendant manufacturers including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba, and Panasonic to discuss the increase in prices of CRT Products in general and for customers.

**339.**     These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

**340.**     The Defendants Samsung, Chunghwa, LG, and Daewoo also attended multiple ad hoc group meetings during this period.

**341.**     The participants in these group meetings also discussed increasing prices for CRT Products.

**342.**     While more manufacturers formally entered the conspiracy, group meetings started to become more prevalent.

**343.**     Beginning in 1997, the Defendants began to meet in a more organized, systematic, and formal manner, and a system of multilateral and bilateral meetings was established.

**344.**     The Defendants' representatives attended hundreds of said meetings during the Period.

**345.**     The global CRT conspiracy rose and set global prices (including prices in Puerto Rico) that the Defendants charged for CRT Products.

33

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

a.      **"Glass Meetings"**

346.      Group meetings among participants in the conspiracy to fix CRT prices were referred to by the participants as "Glass Meetings" or GSMs.

347.      Employees at three general levels within the Defendants' corporations attended the Glass Meetings.

348.      The first tier of meetings was attended by the companies' high-level executives, including CEOs, Chairmen and Vice Chairmen, and were known as the "Top Meetings."

349.      *Top Meetings* took place less frequently, typically every three months, and focused on long-term agreements and enforcing price-fixing agreements.

350.      Since those attending *Top Meetings* had authority as well as more reliable information, said meetings resulted in agreements.

351.      Those attending *Top Meetings* also had to settle disputes, given that they had the authority to enter into agreements.

352.      Senior sales managers attended second-tier meetings, which were known as Management Meetings.

353.      These meetings took place more frequently, typically monthly, and involved implementing the agreements established in the *Top Meetings.*

354.      Finally, marketing and lower-level sales employees attended the third-tier of meetings, which were known as "Work-Level Meetings".

355.      These meetings were usually held weekly or monthly and were mostly limited to the exchange of information and discussions on the price fixing, given that employees at the lower levels did not have the authority to reach agreements.

356.      Such lower-level employees would then transmit competitive information to individuals in the corporate hierarchy chain with authority to fix prices.

357.      The Work-Level Meetings tended to be more regional and often took place near the Defendants' factories.

358.      In other words, Taiwan's manufacturing employees met in Taiwan; Korean manufacturing

34

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

employees met in Korea, and so on:

    a.    The Chinese Glass Meetings started in 1998 and usually took place monthly after a *Top Meeting* or a Management Level Meeting.

    b.    The main aim of the meetings held in China, also known as *China Meetings,* was to inform Chinese manufacturers about what had been decided in the most recent Glass Meetings.

    c.    Those taking part in the Chinese meetings included manufacturers located in China, such as IRICO and BMCC, as well as China branches and those of other Defendants, including, but not limited to, Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

    d.    Glass Meetings were occasionally held in several European countries as well.

    e.    Those attending these meetings included Defendants, who had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended such meetings on behalf of Daewoo), and IRICO.

**359.**    Representatives of the Defendants also attended what was known among the members of the conspiracy as "Green Meetings".

**360.**    These meetings were held on golf courses.

**361.**    Generally, employees at the highest levels - officials and managers of the Defendants - attended Green Meetings.

**362.**    During the Period, Glass Meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia.

**363.**    Participants often exchanged sensitive competitive information before a Glass Meeting.

**364.**    This included information on inventories, production, sales, and exports.

**365.**    For some of said meetings, when information could be obtained prior to the meeting, it was brought to the meeting, where it was shared.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

366.     Glass Meetings at all levels followed a more or less typical agenda.

367.     First, participants would exchange confidential information, such as: pricing proposals for CRTs in the future, sales volume, inventory levels, production capacity, exports, customer orders, trends in pricing, and sales volume forecasts for the coming months.

368.     The participants also updated the information they had provided at the previous meeting.

369.     Each meeting had a designated "Chairman." The Chairman changed from one meeting to another. The Chairman pointed out the information discussed on a white board.

370.     Those taking part in the meetings then used this information to discuss and agree on what price each would charge for the CRTs to be sold in the next month or quarter.

371.     They discussed and agreed on target prices, price increases, so-called "bottom" prices, and price ranges for CRTs.

372.     They also discussed and agreed on prices of CRTs that were sold to specific customers and agreed on target prices for use in negotiations with large customers.

373.     Having analyzed the supply and demand, the participants discussed and agreed on production cuts.

374.     During periods of excess supply, the focus of those taking part in the meeting was on controlling and coordinating price reductions. This was known as the *"bottom price"*.

375.     The Defendants' conspiracy included agreements on the prices at which certain Defendants would sell the CRTs to their own corporate and affiliated subsidiaries, which manufactured the final products such as television sets and computer monitors.

376.     The Defendants understood the importance of keeping their affiliates' domestic prices at a high enough level to support CRT pricing on the market with the other OEMs.

377.     This way, the Defendants made sure that the OEMs that bought directly from the Defendants would pay prices above the competitive level for the CRTs.

378.     All those taking part in the meetings knew of, and in fact discussed, the significant

36

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

impact that the price of the CRTs had on the cost of the finished products, at which the price was fixed.

379.    As for the CRTs themselves, the CRT Market was mature and the profit margins were narrow.

380.    The Defendants therefore concluded that in order to make CRT price increases successful among customers, they had to make the increase high enough to force their direct customers (manufacturers of CRT television sets and monitors) to justify the corresponding price increases for their other customers along the sales chain.

381.    This way, the Defendants ensured that price increases for CRTs were passed on to the indirect purchasers of CRT Products.

382.    The agreements established in the Glass Meetings included:

a.    Agreements on the pricing of CRT Products, including setting target prices, final prices, price ranges, and pricing guidelines.

b.    Price difference agreements on various CRT Product traits, such as quality or certain technical specifications.

c.    Pricing agreements for sales among CRT Product companies to customers who are vertically integrated.

d.    Agreements on what to say to customers about the reason for the price increase.

e.    Agreements to coordinate with competitors who could not attend group meetings and agreements with them to comply with the agreed pricing.

f.    Agreements to coordinate price fixing with CRT manufacturers in other geographic markets such as Brazil, Europe, and India.

g.    Agreements to exchange pertinent information on shipments, capacity, production, pricing, and customer demand.

h.    Agreements to coordinate uniform public statements, capacity, and available supply.

i.    Agreements to allocate both the global market share and the share in customers' private purchases.

j.    Agreements to assign customers.

37

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

     k.     Agreements regarding capacity, including agreements to restrict production and to audit compliance with such agreements.

     l.     Agreements to keep their meetings secret.

**383.** Efforts were made to monitor compliance by each Defendant with said agreements in multiple ways, including seeking confirmation of customer prices and from the Defendants' employees themselves.

**384.** If a Defendant violated the agreements, this was dealt with in at least four ways: **(1)** Monitoring **(2)** Those taking part in meetings challenged other participants if they did not comply with an agreement; **(3)** Threatening to undermine a competitor with one of their main customers; and **(4)** A recognition of the mutual interest in enforcing the target price and complying with the established agreements.

**385.** While market conditions worsened between 2005 and 2007, and the replacement rate of CRT Products by TFT-LCDs increased, Glass Meetings between groups became less and less frequent, and bilateral meetings again became more prevalent.

**386.** Furthermore, in December 2006 the DOJ delivered subpoenas to the manufacturers of the TFT-LCDs and, as a result, CRT co-conspirators began to worry about antitrust issues.

     **b.**     **Bilateral Discussions**

**387.** During the entire Period, Glass Meetings were complemented by bilateral discussions between several Defendants.

**388.** Bilateral discussions were more informal than group meetings and often took place ad hoc, often among group meetings.

**389.** These discussions, usually between sales and marketing employees, took on the form of meetings in person, contact by phone, and emails.

**390.** During the Period, bilateral meetings in person took place in Malaysia, Indonesia, Taiwan, China, the United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, and Mexico.

**391.** The purpose of the bilateral discussions was to exchange information on past and future pricing, confirm production levels, share information on sales orders, confirm pricing rumors, and coordinate price fixing with manufacturers in other geographic locations, including

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Brazil, Mexico, and Europe.

392.    To ensure the effectiveness of their global conspiracy, the Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil, and Samsung SDI Mexico.

393.    Said manufacturers from Brazil and Mexico were extremely important, given that they served the North American market for CRT Products.

394.    As alleged in the present complaint, North America was the largest market for TVs and CRT monitors during the Period.

395.    Given that said manufacturers in Brazil and Mexico are wholly owned and controlled subsidiaries of the Defendants Philips and Samsung SDI, they adhered to the illegal pricing agreements.

396.    This way, the Defendants ensured that the prices of all CRT Products imported into Puerto Rico were fixed, increased, maintained, and/or stabilized at levels above competitive levels.

397.    The Defendants also used bilateral discussions with each other during price negotiations with customers to prevent customers from persuading them to lower prices.

398.    The information obtained in these communications was then shared with the supervisors and taken into account to determine the price to be offered.

399.    Bilateral discussions were also used to coordinate prices with manufacturers of CRT Products that did not attend group meetings such as Hitachi, Toshiba, Panasonic, Thai CRT, and Samtel.

400.    Normally, a few days after a "Top or Management Meeting," the participants of these group meetings met bilaterally with the other manufacturing Defendants in order to communicate any agreements reached on the pricing of CRT or production Products during the meeting.

401.    For example, Samsung had a relationship with Hitachi and was responsible for communicating the pricing agreements of CRT Products to Hitachi.

402.    LG had a relationship with Toshiba and was responsible for informing Toshiba of the price-fixing agreements for CRT Products.

39

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**403.**     Thai CRT had a relationship with Samtel and was responsible for informing Samtel of the price-fixing agreements for CRT Products.

**404.**     Hitachi, Toshiba, and Samtel implemented the agreed prices as they were informed by Samsung, LG, and Thai CRT.

**405.**     Sometimes Hitachi and Toshiba also attended Glass Meetings.

**406.**     This way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix the prices of Products.

    **c.**     **The Involvement of Defendants and Co-Conspirators in Group and Bilateral Discussions**

**407.**     Between at least 1995 and 2007, the Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in at least two hundred Glass Meetings at all levels.

**408.**     Executives from Samsung's highest ranks attended a substantial number of said meetings.

**409.**     Samsung also regularly participated in bilateral discussions with the other Defendants.

**410.**     Through these discussions, Samsung established the prices and supply levels for CRT Products.

**411.**     The Defendants SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were represented in these meetings and were part of the agreements reached therein.

**412.**     As SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because the Defendants wished to ensure that the prices of CRT Products, paid by direct buyers, did not undermine the price-fixing agreements for CRTs achieved at the Glass Meetings.

**413.**     Thus, SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active participants with knowledge of the alleged conspiracy.

**414.**     Between at least 1995 and 2001, the Defendant LG, through LG Electronics, Inc., and LGETT, participated in at least one hundred Glass Meetings at all levels.

**415.**     After 2001, LG participated in the CRT conspiracy through its joint venture with

40

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 3:07-cv-05944-JST   Document 5039   Filed 04/02/19   Page 56 of 99
CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 41 of 61

Philips and LG. Philips Displays (a/k/a LP Displays).

**416.**     LG executives at the highest levels attended a substantial number of said meetings.

**417.**     LG also regularly participated in bilateral discussions with the other Defendants.

**418.**     Through these discussions, LG established the prices and supply levels for CRT Products.

**419.**     LG never effectively left the conspiracy.

**420.**     The Defendant LGEUSA was represented at the meetings and was a part of the agreements reached.

**421.**     As LGEUSA sold and/or distributed CRT Products, they played a significant role in the conspiracy because the Defendants wanted to ensure that CRT prices, paid by direct buyers, did not undermine price-fixing agreements for CRT achieved at the Glass Meetings.

**422.**     Therefore, LGEUSA was an active participant and fully aware of the alleged conspiracy.

**423.**     Between at least 1996 and 2001, the Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least one hundred Glass Meetings at all levels.

**424.**     After 2001, Philips participated in the CRT conspiracy through its joint venture with LG and LG. Philips Displays (a/k/a LP Displays).

**425.**     Philips executives at the highest levels attended a substantial number of such meetings.

**426.**     Philips also participated in multiple bilateral discussions with the other Defendants.

**427.**     Through these discussions, Philips established the prices and supply levels for CRT Products.

**428.**     Philips never effectively left this conspiracy.

**429.**     The Defendants PENAC and Philips Brazil were represented in these meetings and were participants in the agreements reached.

**430.**     As PENAC and Philips Brazil sold and/or distributed CRT Products, they played a significant role in the conspiracy because the Defendants wanted to ensure that CRT prices

41

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 3:07-cv-05944-JST Document 5089 Filed 04/02/19 Page 57 of 99
CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 42 of 61

paid by direct buyers, did not undermine price-fixing agreements for CRT achieved at the Glass Meetings.

**431.**     Therefore, PENAC and Philips Brazil were active participants with knowledge of the alleged conspiracy.

**432.**     Between at least 2001 and 2006, the Defendant LP Displays (a/k/a LG. Philips Displays) participated in at least one hundred Glass Meetings at all levels.

**433.**     Executives at the highest levels of LP Displays attended a substantial number of said meetings.

**434.**     Some of these high-level executives had previously attended meetings on behalf of the Defendants LG and Philips.

**435.**     LP Displays also participated in multiple bilateral discussions with the other Defendants.

**436.**     Through these discussions, LP Displays established the prices and supply levels for CRT Products.

**437.**     Between at least 1995 and 2006, the Defendant Chunghwa, through CPT, Chunghwa Malaysia, and representatives of its factories in Fuzhuo (China) and Scotland, participated in at least one hundred Glass Meetings at all levels.

**438.**     The highest ranking executives of Chungwa, including the previous *Chairman* and CPT CEO, C.Y. Lin, attended a substantial number of these meetings.

**439.**     Chunghwa also regularly participated in bilateral discussions with the other Defendants.

**440.**     Through these discussions, Chunghwa established the prices and supply levels for CRT Products.

**441.**     The Defendant Tatung America was represented at these meetings and was part of the agreements reached during the meeting.

**442.**     As Tatung America sold and/or distributed CRT Products, it played a significant role in the conspiracy because the Defendants wanted to ensure that CRT prices paid by direct buyers, did not undermine price-fixing agreements for CRT achieved at the Glass Meetings.

**443.**     Therefore, Tatung America was an active participant and fully aware of the alleged

42

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

conspiracy.

444.     Between at least 1995 and 2004, Daewoo through Daewoo Electronics, Orion, and DOSA, participated in at least one hundred Glass Meetings at all levels.

445.     The highest ranking executives at Daewoo attended a substantial number of these meetings.

446.     Daewoo also regularly participated in multiple bilateral discussions with the other Defendants.

447.     Through these discussions, Daewoo established the prices and supply levels for CRT Products.

448.     Orion, which belonged entirely to Daewoo's CRT subsidiary, continued bilateral discussions with Daewoo until it filed for bankruptcy in 2004.

449.     Daewoo never effectively left the conspiracy.

450.     Between at least 1995 and 2003, the Defendant Toshiba, through Toshiba Corporation, TDDT, and TEDI, participated in multiple Glass Meetings.

451.     After 2003, Toshiba participated in the CRT conspiracy through its joint venture with Panasonic, MTPD.

452.     High-level sales managers attended these meetings for Toshiba and MTPD.

453.     Toshiba also participated in multiple bilateral discussions with other Defendants, notably with LG.

454.     Through these discussions, Toshiba established the prices and supply levels for CRT Products.

455.     Toshiba never effectively left the conspiracy.

456.     The Defendants Toshiba America, Inc., TACP, TAIP, and TAEC were represented at these meetings and were parties to the agreements reached.

457.     As Tatung America Inc., TACP, TAIS, and TAEC sold and/or distributed CRT Products, they played a significant role in the conspiracy because the Defendants wanted to ensure that CRT prices paid by direct buyers, did not undermine price-fixing agreements for CRT achieved at the Glass Meetings.

458.     Therefore, Toshiba America, TACP, TAIS, and TAEC were active participants with

43

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

knowledge of the alleged conspiracy.

**459.** Between at least 1996 and 2001, the Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in multiple Glass Meetings.

**460.** High-level managers of Hitachi attended these meetings.

**461.** Hitachi also participated in multiple bilateral discussions with other Defendants, notably with Samsung.

**462.** Through these discussions, Hitachi established the prices and supply levels for CRT Products.

**463.** Hitachi never effectively left the conspiracy.

**464.** The Defendants Hitachi America and HEDUS were represented in these meetings and were part of the agreements reached in the same.

**465.** As Hitachi America and HEDUS sold and/or distributed CRT Products, they played a significant role in the conspiracy because the Defendants wanted to ensure that CRT prices paid by direct buyers, did not undermine price-fixing agreements for CRT achieved at the Glass Meetings.

**466.** Therefore, Hitachi America and HEDUS were active participants and fully aware of the alleged conspiracy.

**467.** Between at least 1996 and 2003, the Defendant Panasonic (known throughout the Period as Matsushita Electric Industrial Co., Ltd.), through Panasonic Corporation and Matsushita Malaysia, participated in multiple Glass Meetings.

**468.** After 2003, Panasonic participated in the CRT conspiracy through its joint venture with Toshiba, MTPD.

**469.** High-level sales managers from Panasonic and MTPD attended these meetings.

**470.** Panasonic also participated in multiple bilateral discussions with the other Defendants.

**471.** Through these discussions, Panasonic established the prices and supply levels for CRT Products.

44

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 3:07-cv-05944-JST Document 5039 Filed 04/02/19 Page 46 of 99
CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 45 of 61

**472.** Panasonic never effectively left the conspiracy.

**473.** Panasonic NA was represented in these meetings and was part of the agreements reached.

**474.** As Panasonic NA sold and/or distributed CRT Products, it played a significant role in the conspiracy because the Defendants wanted to ensure that CRT prices paid by direct buyers, did not undermine price-fixing agreements for CRT achieved at the Glass Meetings.

**475.** Therefore, Panasonic NA was an active participant and fully aware of the alleged conspiracy.

**476.** Between at least 2003 and 2006, the Defendant MTPD participated in multiple Glass Meetings and, in fact, headed many of these meetings during the last years of the conspiracy.

**477.** High-level sales managers from MTPD attended these meetings.

**478.** MTPD also participated in multiple bilateral discussions with the other Defendants.

**479.** During these discussions, MTPD established the prices and supply levels for CRT Products.

**480.** Between at least 1998 and 2007, the Defendant BMCC participated in multiple Glass Meetings.

**481.** High-level sales managers from BMCC attended these meetings.

**482.** BMCC also participated in multiple bilateral discussions with the other Defendants, particularly with the other Chinese manufacturers of CRT Products.

**483.** Through these discussions, BMCC established the prices and supply levels for CRT Products.

**484.** No part of BMCC's conspiratorial conduct in connection with CRT Products was ordered by the Chinese government.

**485.** BMCC acted to promote its private independent interests through his involvement in the alleged conspiracy.

**486.** Between at least 1998 and 2007, the Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple Glass Meetings.

**487.** The highest-ranking executives of IRICO attended these meetings.

**488.** IRICO also participated in multiple bilateral discussions with the other Defendants, particularly with the other Chinese manufacturers of CRT Products.

45

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 3:19-cv-05942-ASC Document 593-1 Filed 04/02/19 Page 46 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246     Document 1-6     Filed 03/18/19     Page 46 of 61

**489.** Through these discussions, IRICO established the prices and supply levels for CRT Products.

**490.** No part of the conspiratorial conduct in connection with CRT Products was ordered by the Chinese government.

**491.** IRICO acted to promote its private independent interests through its involvement in the alleged conspiracy.

**492.** Between at least 1997 and 2006, the Defendant Thai CRT participated in multiple Glass Meetings.

**493.** The highest-ranking executives of Thai CRT attended these meetings.

**494.** Thai CRT also participated in multiple bilateral discussions with other Defendants, notably with Samtel.

**495.** Through these discussions, Thai CRT established the prices and supply levels for CRT Products.

**496.** Thai CRT never effectively left the conspiracy.

**497.** Between at least 1998 and 2006, the Defendant Samtel participated in multiple bilateral discussions with the other Defendants, in particular with Thai CRT.

**498.** High-level executives from Samtel attended these meetings.

**499.** Through these discussions, Samtel established the prices and supply levels for CRT Products.

**500.** Samtel never effectively left the conspiracy.

**501.** When the Plaintiff, the Attorney General, refers to a corporate family or companies by a single denomination in the allegations of conspiracy, the Attorney General is alleging that one or more of the employees or agents of the entity within the Corporate family participated in conspirative meetings on behalf of each company of that family.

**502.** In fact, individual participants in conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor could they distinguish between the entities of a corporate family.

**503.** The individual participants entered into the agreements on behalf of, and reported the meetings and discussions to, their respective corporate families.

**504.** As a result, the entire corporate family was represented in meetings and discussions by

46

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

their agents, and they were part of the agreements held at the meetings.

**D.      The CRT Market During the Conspiracy**

505.      Until about ten years ago, CRTs were the dominant technology used for screens, including television sets and computer monitors.

506.      During the Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual earnings.

507.      The following data was reported to Stanford Rezurces [sic], Inc., a market research firm focused on the global display industry:

| Year | Units sold (millions) | Revenue (billions of US dollars) | Average Price per Unit |
|------|----------------------|----------------------------------|------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

508.      North America was the largest market for television sets and CRT monitors during the Period.

509.      According to a report published in Fuji Chimera Research, the 1995 world market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were purchased in North America.

510.      In 2002, North America was still purchasing about 35 percent of the world's CRT monitors. See, The Future of Liquid Crystal and Related Display Materials, Fuji Chimera Research, 1997, page 12.

511.      The Defendants' collusion is evidenced by the price movements in the CRT Market during the Period.

512.      In the '90s, industry analysts repeatedly predicted the decline in consumer prices for CRT Products, which did not fully materialize.

513.      For example, in 1992, an analyst at Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 on page 19.

47

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

514.     Despite such predictions, and the existence of conditions that warranted a decline in prices, CRT prices remained stable.

515.     In 1996, another industry source noted that: "the price of the 14" tube is at a sustainable USD50 and has been for some years..."

516.     At the beginning of 1999, despite the decrease in production costs and the rapid entry of flat-screen products, the price of large color CRTs, in fact, rose.

517.     The price increase was supposedly based on a growing global demand.

518.     In fact, this price increase was the result of the collusive conduct as alleged in this complaint.

519.     After the over-supply of 17-inch CRTs during the second half of 1999, the average selling price of CRTs rose again at the beginning of 2000.

520.     An article dated March 13, 2000 in Infotech Weekly quoted an industry analyst saying that the price increase was: "unlike most other PC-related products."

521.     A BNET Business Network article in August 1998 reported that:

> "key components (cathode ray tubes) in computer monitors have risen in price. 'Although Several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October.. While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

522.     An article in 2004 by Techtree.com reports that several computer monitor manufacturers, including LG Electronics, Philips, and Samsung, were increasing the price of their monitors in response to increases in CRT prices caused by the alleged lack of glass shells used to make the tubes.

523.     Philips is quoted as saying:

> *"It is expected that by the end of September this year [2004] there will be 20% hike in the price of our CRT monitors."*

524.     The Defendants also conspired to limit the production of CRTs through the closure of production lines for entire days, and the closure or consolidation of their manufacturing facilities.

525.     For example, factory use by the Defendants fell from 90 per cent in the third

48

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

quarter of 2000 to 62 per cent in the first quarter of 2001.

**526.**     This is the most dramatic example of declines in factory use.

**527.**     There were sudden drops throughout the Period, but to a lesser degree.

**528.**     The Plaintiff has been informed and believes that such sudden and coordinated drops in factory use by the Defendants was the result of the agreements among the Defendants to decrease production in order to stabilize the prices of CRT Products.

**529.**     During the Period, while the demand in Puerto Rico for CRT Products continued to decline, the Defendants' conspiracy was effective in moderating the normal pressures on CRT Product prices caused by the entry and popularity of the new generation of LCD panels and plasma screens.

**530.**     Finsen Yu, President of Skyworth Macao Commerical [sic] Offshore Co., Ltd., a television manufacturer was quoted in January 2007 as saying: "[t]he CRT technology is very mature; prices and technology have become stable."

**531.**     During the Period, there were not only rare and sustained periods of price stability, but there were even increases in the prices of CRT Products.

**532.**     Said price increases occurred even though demand dropped because CRT Products were nearing their obsolescence, due to the emergence of new, potentially superior, and clearly more popular technology; replaceable technology.

**533.**     Said price increases and price stability in the CRT market during the Period are inconsistent with a competitive market for a product facing a demand that was rapidly declining due to a new replaceable technology.

**E.     International Anti-Trust Investigations by Government Agencies**

**534.**     The Defendants' Conspiracy to fix, increase, maintain, and stabilize the prices and restrict the production of CRT Products sold in Puerto Rico during the Period was demonstrated by a multinational investigation initiated by the Antitrust Division of the United States Department of Justice ("DOJ") and others in November 2007.

**535.**     On November 8, 2007, the antitrust authorities in Europe, Japan, and South Korea raided the CRT manufacturing offices as part of an international investigation of alleged price fixing.

49

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

536.    On February 10, 2009, the DOJ issued a press release announcing that a grand jury in San Francisco had sent, on that very day, an indictment of two crimes against the previous *Chairman and Chief Executive Officer* of the Defendant Chunghwa Picture Tubes, Ltd., Cheng Yuan Lin, a/k/a C.Y. Lin, for its participation in global price fixing conspiracies for two types of CRTs used in computer monitors and television sets.

537.    The press release indicated that:

> "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."

538.    The press release also indicates that Lin had previously been accused for his participation in a conspiracy to fix TFT-LCDs prices.

539.    The indictment of Mr. Lin indicates that the combination and conspiracy to fix CRT prices was partly carried out in the United States.

540.    The Defendant MT Picture Display Co., Ltd., the CRT unit of the Defendant Panasonic, confirmed that it was raided by the Fair Trade Commission of Japan.

541.    Kyodo News reported on November 8, 2007, on information and belief, that MT Picture Display fixed CRT prices with manufacturers in three Asian countries, including Samsung SDI Co. of South Korea.

542.    Kyodo News also reported that:

> "Officials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target prices when delivering their products to television manufacturers in Japan and South Korea, the sources said."

543.    The Defendant Samsung SDI Co., Ltd. was raided by the Fair Trade Commission of South Korea, which had begun an investigation into Samsung's CRT business.

544.    The *Asian Shimbun* also reported on November 10, 2007 that:

> "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said. The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies' [referring to the four Asian-based manufacturers— MT Picture Display, Samsung SDI Co., Chunghwa Picture Tubes, LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

545.    On November 21, 2007, the Defendant Royal Philips publicly reported that it was the target of one or more investigations of anti-competitive practices in the CRT industry.

546.    The spokesman for Royal Philips, Joon Knapen, declined to comment on which jurisdictions had begun investigations.

547.    Royal Philips stated that it intended to help regulators.

548.    In its Annual Report of 2008, the Defendant Toshiba reported that:

> "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

549.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. E l HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal-GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.O.O., LG Philips displays Czech Republic s.r.o., LP displays, Chunghwa Picture Tubes (UK), Ltd., Chunghwa Picture Tubes, Ltd., Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany Gmbh, Matsushita Global HQ, Matsushita European HQ.
> Based on the data available, the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including colored picture tubes and colored screen tubes) on the European market between 1995 and 2007. The anti-competitive behavior may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production.
> The undertakings evolved a structural system and functional mechanism of cooperation. According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

550.    As described in this complaint, the Defendants have a history of contact with joint venture competitors, numerous cross-licensing agreements, and other partnerships in the electronics industry.

551.    Many Defendants also have a history of "cooperation" and anti-competitive behavior.

51

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

552.      For example, the Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix Dynamic Random Access Memory (DRAM) prices.

553.      The Defendants Samsung and Toshiba have admitted being contacted by the DOJ as part of an investigation into Static Random Access Memory and NAND Flash Memory price fixing.

554.      In December 2006, the government authorities of Japan, South Korea, the European Union, and the United States, revealed a comprehensive investigation into anti-competitive practices in the closely related TFT-LCD market.

555.      On December 12, 2006, news reports indicated that the Defendants Samsung and Chunghwa, such as the LCD joint ventures between the Defendants Philips and LG Electronics, Inc., LG Display Co., Ltd., were all under investigation for TFT-LCD price fixing.

556.      On November 12, 2008, the DOJ announced that it had reached agreements with three LCD manufacturers — LG Display Co., Ltd. (and its subsidiary in the United States, LG Display America, Inc.), Sharp Corporation, and the Defendant Chunghwa Picture Tubes, Ltd. — to plead guilty to violating Section 1 of the Sherman Act, 15 U.S.C. § 1, and to pay a total of $585 million in criminal fines for their roles in the conspiracy to fix prices of TFT-LCD panels sold worldwide.

557.      On March 10, 2009, the DOJ announced that it had reached an agreement with the Defendant Hitachi Displays, Ltd., a subsidiary of the Defendant Hitachi, Ltd., to plead guilty to violating Section 1 of the Sherman Act, 15 U.S.C. § 1, and to pay a fine of $31 million for its role in the conspiracy to fix the prices of TFT-LCD panels.

558.      The indictments of LG Display Co., Ltd., Sharp Corporation, Chunghwa Picture Tubes, Ltd., and Hitachi displays, Ltd. all stated that the combination and conspiracy to fix the prices of TFT-LCDs took place, partly in the United States.

52

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

### VIII.   THE REPERCUSSION OF THE EXCESSIVE CHARGES ON THE PLAINTIFF

559.     The Defendants' conspiracy to fix, increase, maintain, and stabilize the price of CRT Products at artificial levels resulted in damages to the Plaintiff because Puerto Rico consumers had to pay higher prices for CRT Products, than they would have paid in the absence of the conspiracy by the Defendants.

560.     The entire overcharge related to sales in Puerto Rico during the Period was passed on to consumers in Puerto Rico.

561.     As the DOJ acknowledged in announcing the indictment against the Director General and *Chairman* of the Defendant Chunghwa: "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices."

562.     The Defendants identified earlier, that they regularly attended Glass Meetings, they monitored the prices of televisions and computer monitors sold in the U.S. and elsewhere.

563.     The purpose and effect of investigating such data from the retail market had three motivations.

564.     First, it allowed Defendants, such as Chunghwa, which did not manufacture televisions or CRT monitors in the way Samsung, LG, Daewoo, Panasonic, Toshiba, Philips and Hitachi did, to monitor the price fixing agreement to ensure that sales among the Defendants were kept at supracompetitive levels.

565.     Second, it allowed all the Defendants to monitor the price fixing agreement for independent OEMs, which would reduce the prices of the finished goods if there was a corresponding reduction in a Defendant's CRT prices.

566.     Finally, as outlined above, the Defendants used the prices of the finished goods to analyze whether they could increase the prices or on the contrary they had to agree on a "bottom" price.

567.     The Defendants concluded that in order to make CRT price increases work, they had to make the increase high enough for their customers (TV and CRT monitor manufacturers) to justify an increase in prices for their clients (e.g., retailers and computer OEMs).

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

568.    In this way, the Defendants ensured that 100% of the supracompetitive overcharges for CRT Products was passed on to the indirect consumers of their products.

569.    Consumers in Puerto Rico purchased CRTs either from an OEM of computers and television sets such as Dell or Sharp, or from a retailer like Best Buy.

570.    Due to the scope of the price-fixing conspiracy described in the present complaint, television and computer monitor manufacturers were not compelled to pass on the overcharge to the merchandise consumers.

571.    Due to the fact that each of the direct buyers' competitors were also buying CRT for supracompetitive prices from members of the conspiracy, no direct buyer faced competition of goods from a competitor who was not paying the supracompetitive prices for the CRTs.

572.    The Price of CRT Products correlates directly to the price of CRTs.

573.    Margins for CRT television and monitor manufacturers were narrow enough for CRT price increases to force them to increase the prices of their CRT Products.

574.    The foregoing means that increases in CRT prices lead to the corresponding rapid increases in the prices of CRT Products at the OEM level.

575.    Computer and television OEMs and CRT retailers are all subject to vigorous price competition if they are selling CRT television sets or monitors.

576.    The demand for CRTs is ultimately determined by buyers of products containing CRT's.

577.    The market for CRTs and the market for CRT Products are inextricably intertwined and thus cannot be considered separately.

578.    The Defendants were fully aware of this close relationship and used CRT television and monitor forecasts to predict sales and determine production levels and pricing of CRTs.

579.    Computers and television sets are goods with little or no brand loyalty, therefore aggressive pricing will result in consumers changing their preferences to different brands.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

**580.**       Prices are based on production costs, which in turn are determined by the costs of the components, since the cost of assembly is minimal.

**581.**       Therefore, OEMs use the costs of components, such as the cost of CRTs, as a starting point for calculating all prices.

**582.**       On information and belief, the OEMs of computers and television sets establish the prices of finished goods by a cost basis plus margin.

**583.**       So, the prices of computers and television sets follow the costs of the components.

**584.**       The CRT is the most expensive component of the products in which they are incorporated.

**585.**       On information and belief, the cost of a CRT in a computer monitor is approximately 60% of the total cost of manufacturing the computer monitor.

**586.**       On information and belief, the cost of a CRT in a television set is a little less than the total manufacturing cost, because a television set has more components than a computer monitor, such as the tuner and the speakers.

**587.**       The economic and legal literature recognizes that, as price-fixing decisions are based on cost, it is easy to determine the rate of transferring the cost.

**588.**       The accuracy of the costs involved refers to whether an overcharge affects a direct cost *i.e.* variable) or indirect *i.e.* general expenses).

**589.**       Surcharges can be transferred much faster at a higher rate if overcharges affect direct costs.

**590.**       Here, the CRTs are a direct and substantial cost of CRT Products.

**591.**       Therefore, the Plaintiff will be able to prove that the CRT overcharges were passed on to consumers in Puerto Rico.**592.**  Once a CRT leaves its manufacturing site, it remains essentially unchanged as it moves through the distribution system.

**593.**       CRTs are identifiable, discrete, and physical objects, which do not change shape and they are not an indistinguishable part of the television set or the computer monitor into which they are incorporated.

55

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

594.     Therefore, the CRTs follow a traceable chain from the Defendants to the OEMs to the consumers of the finished products that incorporate the CRTs.

595.     Furthermore, as CRTs can be physically tracked through the supply chain, the price thereof can also be traced to show that changes in prices paid by direct buyers of CRTs affect the prices paid by Users of CRT Products.

596.     Furthermore, upon information and belief, given that CRTs can be physically tracked through the supply chain, the price thereof can also be traced to show that changes in prices paid by direct buyers of CRTs affect the prices paid by consumers of CRT Products; computer and television OEMs establish the prices of the finished products according to cost base plus margin.

597.     Retailers regularly use a margin rule.

598.     The retail price is set as the wholesale cost plus a percentage margin designed to cover non-product-related costs and a profit.

599.     This System ensures that cost increases for the retailer will be passed on to the final consumer.

600.     For example, CDW, a large vendor of CRT monitors, uses such a system. A statement in the case of *DRAM* the CDW pricing director details precisely how sales prices are calculated:

> In general, CDW employs a "building block" approach to setting its advertised prices. The first building block is the Cost of Goods Sold (COGS), which represents the price CDW paid to acquire the product. ..CDW...adds a series of positive markups to the cost to CDW to acquire a given product. These markups are in addition to the pass-through effect of changes in the costs charged to CDW for that product by a given vendor.

601.     The economic and legal literature has recognized that the illegal overcharges of a component usually result in higher prices for products containing this component at the fixed price.

602.     As Professor Herbert Hovenkamp, a notable scholar in the antitrust field, said in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) on p. 624:

> A monopoly charge at the top of the distribution chain generally results in

56

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

higher prices at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and will pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain will be poorer as a result of the monopoly price at the top. Theoretically, one can calculate the percentage of any overcharge that firm at one distributional level will pass on to those at the next level.

603.    Likewise, two other scholars in the antitrust field — Professor Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Hass School of Business at the University of California, Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern School of Law and author of the Handbook of the Law of Antitrust)—noted that: "In a multiple-level chain of distribution, passing on monopoly overcharges is not the exception; it is the rule."

604.    As Professor Jeffrey McKie-Mason (Arthur W. Burks Professor for Information and Computer Science, Professor of Economics and Public Policy, and associate Dean of Academic Affairs at the School of Information at the University of Michigan), an expert who has presented evidence in several cases of indirect purchasers in relation to Microsoft Corporation, said (giving evidence quoted in a decision in the case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers.... Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

605.    The purpose of the conspiratorial conduct of the Defendants was to fix, increase, maintain, and stabilize the prices of CRTs and, as a direct and predictable result, CRT Products.

606.    The CRT market for CRTs and the market for CRT Products are inextricably intertwined.

607.    One exists to serve the other.

608.    The Defendants not only knew, but expressly contemplated that the prices of CRT Products would increase as a result of their CRT price increases.

57

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 3:07-cv-05944-JST Document 5939 Filed 04/02/19 Page 73 of 99
CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 58 of 61

609.     Finally, many Defendants and/or their co-conspirators themselves were manufacturers of CRT television sets and computer monitors.

610.     Such manufacturers include, for example, Samsung, LG, Hitachi, Toshiba, Philips, and Panasonic.

611.     Having agreed to fix the prices of the CRTs, the major component of the finished products they were making, those Defendants were intent on passing the full cost of this component on to their finished merchandise and, indeed, they did.

612.     As a direct and foreseeable result of the Defendants' illegal conduct, Puerto Rico consumers were forced to pay supracompetitive prices for the Products.

613.     These inflated prices have been passed on to consumers by manufacturers, distributors, and retailers.

## IX. FRAUDULENT CONCEALMENT

614.     Throughout the relevant period, the Defendants affirmatively and fraudulently hid their illegal conduct from the Plaintiff.

615.     The Plaintiff did not discover and could not have discovered through exercising reasonable care, that the Defendants were infringing the law and enriching themselves at the expense of consumers in Puerto Rico until the public disclosures.

616.     Nor could the Plaintiff have discovered the violations before, because the Defendants were conducting their conspiracy in secret, concealing the nature of their illegal conduct and acts in order to foster such activities, and fraudulently concealed these activities through several methods designed to avoid detection.

617.     Moreover, the conspiracy by its very nature was self-concealed.

618.     The Defendants participated in a successful and illegal price-fixing conspiracy with respect to CRT Products, which they affirmatively concealed in the following aspects:

    a.     By way of agreements with each other not to publicly discuss, or in any other way disclose, the nature and substance of acts and communications to promote their illegal scheme, and through expulsion arrangements for those who

58

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 3:07-cv-05944-JST   Document 5039   Filed 04/02/19   Page 74 of 99
CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 59 of 61

ceased to comply with the scheme.

b.      Through agreements with each other to limit the number of representatives of each Defendant attending meetings to avoid detection.

c.      Through agreements to prevent individual representatives attending the meetings from being mentioned in any meeting reports.

d.      Through agreements with each other to stop taking minutes at meetings or to take any form of written notes during meetings.

e.      By giving false and para-textual reasons for their CRT price increases during the relevant period, and falsely describing that such pricing was for external costs rather than through their conspiracy.

f.      Through agreements with each other to tell customers about price changes, and remembering which person attending would communicate the price change to which customer.

g.      Through agreements with each other to cite higher prices than the price fixed for certain customers in order to seem like the price was not fixed.

h.      Through agreements with each other regarding the content of statements on capacity and supply.

i.      Through agreements with each other to remove references in expense reports, which could have revealed illegal meetings.

j.      Through agreements via other means to prevent their illegal conspiracy to fix the prices of CRT Products being detected.

**619.**      As a result of the fraudulent concealment of the conspiracy, the Defendant claims that the statutory limitation did not begin until information about the illegal conspiracy was published.

## X. <u>CAUSE OF ACTION</u>

### <u>UNJUST ENRICHMENT</u>

**620.**      The Plaintiff incorporates each of the foregoing allegations by reference as if they were set forth in full.

**621.**      The Plaintiff presents this claim in person, on behalf of the government entities, and as *parens patriae* of natural persons and corporations, to enforce public rights and to protect residents

59

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

from the unjust enrichment of the Defendants.

**622.**     The Defendants' conspiracy enriched them.

**623.**     The enrichment of the Defendants resulted in a correlative loss (or impoverishment) of the Plaintiff.

**624.**     There was a connection or nexus between the Plaintiff's loss (or impoverishment) and the enrichment of the Defendants.

**625.**     There are no reasons whatsoever that justify the enrichment of the Defendants.

**626.**     There is a lack of a provision or legal precept that prevents the application of enrichment without reason.

**627.**     There is no adequate legal remedy to repair the harm caused to the Plaintiff.

**628.**     No statute provides a remedy for the harm caused.

**629.**     No contract relates to the controversy before this Honorable Court.


## XI. **PETITION**

**IN VIEW OF THE FOREGOING,** the Plaintiff, The Government of Puerto Rico, very respectfully requests this Honorable Court;

**(a)**     To declare that the conduct, conspiracy and combination and acts and practices related and alleged in this Lawsuit have enriched the Defendants at the expense of the Plaintiff;

**(b)**     To order that the Defendants compensate the Plaintiff to the extent that the Defendants have been enriched and the Plaintiff impoverished for a sum of no less than $30 million;

**(c)**     That the Plaintiff be granted any other amounts as permitted by Law;

**(d)**     That the Plaintiff be granted the legal interest at the highest rate;

**(e)**     That the Plaintiff be granted the costs and expenses of the litigation, including reasonable attorneys' fees; and

**(f)**     For any other remedy to be ordered when deemed to be fair and appropriate under the circumstances.


In San Juan, Puerto Rico today, December 17, 2018.

**Respectfully submitted.**

WANDA VÁZQUEZ GARCED
Attorney General

/s/Denise Maldonado Rosa

60

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Denise Maldonado Rosa
*Deputy Attorney General*
RUA 15,652

PO Box 9020192
Tel. (787) 201-8900
E-mail dmaldonado@justicia.pr.gov

/s/Jane A. Becker Whitaker
    Jane A. Becker Whitaker
    RUA 9.352

/s/Jean Paul Vissepó Garriga
    Jean Paul Vissepo Garriga
    RUA 14.482

Becker & Vissepó, PSC
P.O. Box 9023914
San Juan, PR 00902-3914
Tel: (787) 945-2406

E-mail jbw@beckervissepo.com
janebeckerwhitaker@gmail.com

E-mail jpv@beckervissepo.com
jp@vissepolaw.comD

61

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

EXHIBIT 2

**164 D.P.R. 608        E.L.A. v. Cole**

**Government of Puerto Rico, Plaintiff-appellee v. Benjamín Cole Vázquez; Local Committee of the Popular Democratic Party et als., Defendants-appellants**

Page: 608

Number: CC-2000-211        Decided: April 13, 2005

CERTIORARI to review the JUDGMENT of Jocelyn López Vilanova, Roberto Córdova Arone and Jorge L. Escribano Medina, of the Court of Appeals, which reversed a summary judgment entered by the Court of First Instance, which required the Municipality of Mayagüez and the Popular Democratic Party  (appellant herein) to pay jointly and severally to the Government of Puerto Rico a sum of money, in addition to the costs and expenses of the litigation. Judgment is entered requiring the Popular Democratic Party to pay a sum of money to plaintiff. The State is ordered, once it receives the funds, to proceed to pay the referenced amount to the Municipality of Mayagüez.

Page: 614

Pedro E. Ortiz Álvarez, Attorney for Appellant; Karen Pagán Pagán, from Office of Solicitor General, Attorney for Appellee.

## ASSOCIATE JUSTICE REBOLLO LÓPEZ
## AUTHORED THE COURT'S OPINION

As the result of an investigation performed by the Comptroller's Office,[1] the Government of Puerto Rico filed a Complaint for collection of public funds against the Local Municipal Committee of the Popular Democratic Party in Mayagüez and against the then mayor of that municipality, Mr.  Benjamín Cole Vázquez, in his personal capacity and as president of said Committee.[2]

Based on the Comptroller's report, the Government of Puerto Rico alleged that municipal employee Miguel Galo Perocier was performing duties for the Local Committee for the PDP in Mayagüez while collecting a salary from the referenced municipality as the Assistant Director of Conservation and Maintenance of Building and as a Painter II.[3] The government also alleged that while Mr. Galo Perocier was performing duties for that political committee, he received wages, bonus, and fringe benefits – such as vacation leave and sick pay – provided for with funds from the municipality. In this way, the government of Puerto Rico sought reimbursement jointly and severally to the public fisc of the money paid to the employee. Finally, the government asked the Court of First Instance to declare that defendants' actions constituted illegal practices and improper use of public funds for private purposes, all that in contravention of the dispositions of Article



Page: 615

VI, Section 9, of the Constitution of Puerto Rico.

As a result of that claim, those defendants filed a <u>Third Party Complaint</u> against the Popular Democratic Party at the central level, (hereinafter PDP) alleging all responsibility derived from the actions alleged in the original Complaint should be ascribed to the latter. This was done with the purpose of having the P.P.D. respond directly to the government of Puerto Rico for any claim that the government alleged and eventually proved.

Specifically, they alleged that they did not legally exist separately from said political party and therefore, all responsibility for the actions alleged would be that of the party or central committee of the P.P.D. They asserted that the allegations set forth by the plaintiffs, if proven, were the foreseeable consequence of the actions authorized by the party's central committee, since the party's municipal committee in Mayagüez existed of necessity and for the benefit of said central committee. This complaint was <u>dismissed</u> through a partial judgment since the third party plaintiffs never served the summons during the term set by law.[4]

With this background, on August 12, 1994, the government of Puerto Rico filed an <u>Amended Complaint</u> to include the Popular Democratic Party as a party defendant. After the corresponding authorization of the court, on December 28 of 1995, the government of Puerto Rico filed a <u>Second Amended</u> Complaint to voluntarily dismiss its claim against Mr. Cole Vázquez (the Cole Vázquez estate) in his personal capacity.[5] The allegations against him were re-alleged this time in his official capacity and the Municipality of Mayagüez was included as a defendant.

Page: 616

The latest Complaint alleged, in synthesis, that Mr. Galo was paid with municipal funds for days of work when he provided services to the Municipal campaign Committee, <u>all per the orders and instructions of the then mayor, Mr. Cole Vázquez.</u>  It was alleged, in addition, that those duties were not performed for the benefit of the municipality, but rather for the benefit of the Mayor, the local committee, and the PDP at the central level.

Plaintiff alleged that the latter two had benefitted from the intentional and negligent acts of the municipality, thus constituting unjust enrichment on the part of the mentioned political party to the detriment of the government of Puerto Rico. In the same way, it accused the municipality of having acted in an illegal and fraudulent manner by paying wages and fringe benefits to an employee who did no work, and, in the alternative alleged the municipality acted negligently by not taking the necessary measures so that this type of action did not occur. As a consequence, it alleged that the PPD as well as the municipality were jointly and severally liable to the public fisc in the amount of forty-four thousand two hundred and eighty dollars ($44,280.00), an amount equivalent to the wages paid illegally to Mr. Galo Perocier.

After various procedural forays, on May 30, 1996, the municipality filed an answer to the complaint and raised as affirmative defenses that the Complaint did not state a claim, that the statute of limitations had run, and that the municipality received no benefit from the facts set



forth in the Complaint. <u>The municipality argued that, in any event, it should have been a plaintiff and not a defendant.</u>

The PDP, on its behalf, filed its answer on September 26, 1996. In its answer, it denied all responsibility and raised as affirmative defense, *inter alia,* that the claim was time barred, that the party, at the central level, had no knowledge of the acts alleged in the Complaint, so it could have consented

Page: 617

to their taking place and that the Complaint failed to state a claim.

At the time that the PDP answered the referenced Amended Complaint, the government of Puerto Rico had already filed a first Motion for Summary Judgment.[6] The government attached the Puerto Rico Comptroller's Report; sworn statements of Mr. Galo Perocier; and five sworn statements of municipal employees and former municipal employees.[7] Based on this, the government of Puerto Rico asked the Court to enter judgment against the co-defendants --P.D.P. and the municipality—for the illegal and improper use of public funds and ordering the immediate restitution of said funds to the Government of Puerto Rico.

In its request, the government of Puerto Rico alleged that there was no factual controversy as to the use of the employee's services and of public funds for the benefit of either Mr. Cole Vázquez or the Popular Democratic Party without legal authorization and in clear violation of the constitutional proviso that regulates the strict use of public assets and funds. The Court did not rule on that motion for summary judgment.

On July 19, 1996, the government of Puerto Rico filed a <u>second </u>motion for summary judgment. In the same it included the documents filed previously and added a sworn statement from the Director of the Municipal Division of the Comptroller's Office,  copies of the payroll checks and the attendance cards punched by Mr. Galo Perocier, together with various checks endorsed by Mr. Galo.

The PDP filed an opposition to that motion

Page: 618

for summary judgment on December 16 of the same year. <u>It did not attach</u> any documents to the same. It argued that the documentary evidence presented by the government of Puerto Rico did not support entry of summary judgment, because the statements that the party had benefitted lacked supporting documents. The party argued that that fact precluded that the case be resolved summarily and that, as a consequence, that evidence should be questioned and presented at trial. Moreover, it reiterated its allegation that it did not know about the alleged facts, and raised, again, the defense that the claims were time barred.

Regarding the last argument, the PPD maintained that the instant case was not a claim for unjust enrichment, but rather about intentional or negligent acts and omissions [tort] as provided for in



Article 1802 of the Puerto Rico Civil Code, 31 L.P.R.A sec. 5141, which has a statute of limitations of one (1) year, counting from the time the injured party learned of the harm caused. 31 L.P.R.A sec. 5298. Thus, PDP alleged that since the Comptroller's investigation had culminated with the preparation of a report – dated October 11, 1988 – by that date, plaintiff knew or should have known, about the facts of the case. Based on this, the PDP argued that the Complaint filed on December 27, 1995,[8] was filed after the statute of limitations of one (1) year.

The Court of First Instance granted the Motion for Summary Judgment filed by the government of Puerto Rico and proceeded to enter judgment against the co-defendants on June 30, 1999, filing the same on August 31 of the

Page: 619

same year. The referenced forum determined that the documents that the government of Puerto Rico filed in support of its request for summary judgment were clear and convincing and that they plainly sustained the allegations regarding the disbursements made by the municipality to Mr. Galo and as to the work that he performed in the PDP municipal committee. In addition, the court concluded that during the period between June 1980 and June 1986, the municipality paid Mr. Galo Perocier the sum of $44,280.00 without that employee having performed any work, duties, or services for the referenced municipality, not during working hours or outside them; that, on the contrary, said person performed work and duties exclusively for the party's local committee, even though the municipality paid the money.

The referenced court determined that on the date in question Mr. Cole acted as president of the Local Committee of the PDP, and that, according to the PDP's Official Regulation, it was the President's duty to establish, operate, and assure that the local committee of the PDP fulfilled its functions in the municipality. The court indicated that the PDP, as a political party organized under Puerto Rico's electoral law, was an entity with the legal capacity to sue and be sued since the municipal and local committees of a political party did not have legal standing apart from the legally established party.[9] Finally, the Court ruled that such committees exist because of the needs of and for the benefit of the political parties, and such entities were subordinated to the principal political and the representatives of the same in the municipality.

As a result, the trial court concluded that the PDP had benefitted from the actions of Mr. Cole Vázquez, as president of the municipal committee of the PDP in Mayagüez,

Page: 620

in violation of the doctrine of unjust enrichment. In this way, the referenced forum rejected the cause of action of tort for illegal and negligent acts. It resolved that restitution that arises from the cause of action for unjust enrichment, directed at re-establishing the equilibrium between two patrimonies affected by the displacement of an amount of money equivalent to the sum for which one of the parties was unjustly enriched is different from a cause of action in tort for illegal acts.

The trial court held that the statute of limitations in the instant case to claim public funds based on illegal and fraudulent payments, is fifteen (15) years, since it is a claim analogous to



collection of money, rejecting in that way all defenses as to the statute of limitations.[10]

Finally, the trial court ordered the Municipality of Mayagüez and the PDP jointly and severally to pay the government of Puerto Rico the sum of forty-four thousand two hundred and eighty dollars ($44,280.00), the amount of salary that Mr. Galo Perocier received from municipal public funds, plus costs, expenses, and attorneys' fees;[11] pursuant to Articles

Page: 621

201 and 216 of the Penal Code of Puerto Rico, 33 L.P.R.A sec. 4352, 4391, respectively.[12]

Unsatisfied with those determinations, the municipality of Mayagüez went to the then Court of Appeals by appeal.[13] In the same fashion, the PDP went to the referenced forum for review of the summary judgment issued against it by the trial court. In synthesis, it argued that the summary judgment was not appropriate because there were credibility questions that should have been heard at trial and there should not have been joint and several liabilities against the party for actions taken by the president of the municipal committee. The party also argued that the unjust enrichment doctrine should not have been applied in this case because the cause of action was for the tort of conversion under Article 1802 of Civil Code, supra. Finally, the party argued that since this was a conversion action, the statute of limitations had run.

Page: 622

Through a decision entered on January 18, 2000, the intermediate appeals forum reversed the imposition of liability against the municipality of Mayagüez. The referenced forum understood that the unjust enrichment doctrine did not apply against said party, since that entity was the entity, precisely the one which was impoverished as a result of the mayor's actions and at no time was enriched by the payments made to Mr. Galo Perocier. Regarding the application of Articles 201 and 216 of the Penal Code to this case, the court of the first instance found that they do not apply to institutions, such as the municipality or the Government, but rather only to natural persons.

On the other hand, the intermediate appellate forum affirmed the summary judgment entered by the court of first instance as to the liability of the PDP at the central level. The referenced forum based its determination as to the appropriateness of summary judgment on the documents and sworn statement submitted in support of the summary judgment, which totally supported and established incontrovertibly the allegations contained in the amended complaint.[14] As a consequence, it decided that there was no controversy of fact that needed to be decided in a trial, and, in light

Page: 623

of the documents submitted, all that was needed was to apply the law.

Citing the Electoral Law of Puerto Rico, *supra*, the referenced court concluded



that the political party organized as the PDP had standing to sue and be sued, unlike the local or municipal committees that are not legal entities separate and apart from the party duly registered..[15] In this way, it affirmed the determination of the court of first instance as to the conclusion that municipal committees that exist for the benefit of the central party and function as subsidiaries of the same, and that, in that capacity, the PDP at the central level had been enriched from the services of the person whose salary was paid by the municipality which employed him.

In addition, the appeals court indicated that at no time was the fact denied that the municipality was liable for those payments; that the evidence presented by the government of Puerto Rico demonstrated clearly that the period of time during which Mr. Galo provided those services to the committee, the place where he provided them, and who paid him. Based on this, it concluded that the court of first instance correctly applied the doctrine of unjust enrichment in this case, indeed that the party had seen itself benefitted through its local committee. Finally, the court held that since the bar date applicable to this case was that of fifteen (15) years, analogous to personal suits in collection of money that do not have a specific term set by law, the statute of limitations had not run.

Unsatisfied, the PDP filed through vía *certiorari*—before this Court. It argues that the judgment issued be the court of appeals should be revoked and that of the court of first instance affirmed because the appeals court erred by:

> ... affirming that summary judgment should be entered for

Page: 624

> the plaintiffs, even though there is a question of credibility as to the sworn statements that could only be resolved at trial;

> ... affirming the imposition of joint and several liability to the PDP for supposed actions imputable to the president of municipal committee of the party;

> ... determining that the doctrine of unjust enrichment applied in this case;

> ... affirming the judgment of a cause of action where the statute of limitations had run.

Through a Resolution to that effect, on April 14, 2000, we denied the *certiorari* petition. Unsatisfied with that holding, the PDP filed a timely motion for reconsideration, which we denied through a Resolution issued on May 19, 2000. That being the case, the petitioner filed a second motion of reconsideration. Having examined that motion, through a Resolution of June 9, 2000, we decided to reconsider our denial and proceeded to issue the certiorari. Having received briefs from both sides and being in a position to resolve the matter filed, we proceed to do so.

## I

In its first assignment of error, the petitioner argues that the appeals court erred in concluding that it was proper to issue summary judgment in this case, as a matter of law. We consider this



argument.

[1] On repeated occasions we have expressed that summary judgment is an extraordinary and discretionary procedural mechanism the purpose of which is to facilitate the swift and just resolution of litigation and civil cases that do not present genuine controversies as to the material facts, and thus, do not merit holding a trial on the merits. Management Administration Services, Corp. v. E.L.A., res. el 29 de noviembre de 2000, 152 DPR 599 (2000), 2000 TSPR 174; Hernández Villanueva v. Hernández, res. el 27 de enero de 2000, 150 DPR171 (2000), 2000 TSPR 14. The use of this mechanism permits judgment to be entered without

Page: 625

the need for an evidentiary hearing, when from the non-controverted documents that accompany the request of the same, and the totality of the evidence in the case, it arises that there is no controversy as to the material facts, and the only thing needed is for the law to be applied. Partido Acción Civil v. Estado Libre Asociado de Puerto Rico , res. el 25 de febrero de 2000, 150 DPR 359 (2000), 2000 TSPR 29; Medina v. M,S, & D Química P.R. Inc., 135 D.P.R. 716 (1994).

[2] Rule 36 of Civil Procedure, 32 L.P.R.A. Ap. III, R. 36, governs everything about said procedural mechanism. Specifically, Rule 36.3, supra, provides that summary judgment shall be entered "immediately if the allegations, depositions, answers to interrogatories, and admissions offered, together with sworn statements, if any, demonstrate that there is no real substantial controversy as to any material fact and that as a matter of law summary judgment should be entered in favor of the moving party." Management Administration v. E.L.A., 152 DPR 599 (2000), 2000 TSPR 174; Rivera v. Superior Packaging, 132 D.P.R. 115 (1992). Summary judgment may only be entered when it arises clearly from the moving party's motion that under no reading of the facts could the non-moving party prevail and when the court has the truth of all the necessary facts to resolve the controversy. Management Administration Services, 152 DPR 599 (2000), 2000 TSPR 174; Rivera Rodríguez v. Dept. Hacienda, res. September 17, 1999, 149 DPR 141 (1999), 99 TSPR 139; Corp. Presiding Bishop v. Purcell, 117 D.P.R. 714 (1986).

[3] On the other hand, summary judgment cannot be entered when there is a bona fide dispute as to the facts. Cuadrado Lugo v. Santiago, 126 D.P.R. 272 (1990). Summary judgment should only be entered in clear cases and any doubt as to the existence of a controversy as to the material facts should be resolved against the moving party and in favor of the non-moving party. Córdova Ramos v. Larín Herrera, res. June 2, 2000, 151 DPR 192

Page: 626

(2000), 2000 TSPR 79; Audiovisual Lang. v. Sistema Est. Natal Hermanos, 144 D.P.R. 563 (1997).

[4] As a general rule, that moving party has the obligation to demonstrate, in the first instance, the lack of any real, substantial controversy as to every material fact in light of the substantive law which will determine that judgment should be entered as a matter of law. Córdova Ramos v.



Larín Herrera, 151 DPR 192 (2000), 2000 TSPR 79. In this way, the court may consider proof that, if not adequately refuted, permits that the suit be disposed of in favor of one of the parties. **[5]** If the opposing party wants to defend, it must demonstrate that there is controversy as to the facts presented by the moving party. *Ibíd.* To defeat a request for summary judgment the opposing party should present, as a general rule, sworn counter declarations and documents that that create a controversy as to the facts presented by the moving party. Rivera v. Superior, 132 D.P.R. 115 (1992); Córdova Ramos v. Larín Herrera, 151 DPR 192 (2000), 2000 TSPR 79. If the non-moving party does nothing, it runs the risk of having judgment entered against itself without a trial on the merits. Cuadrado Lugo v. Santiago, 126 D.P.R. 272 (1990); Mercado Vega v. U.P.R., 128 D.P.R. 273 (1991). It is not enough, that is, to present mere allegations to controvert the material facts that the moving party asserts are not in controversy. Audiovisual Lang. v. Est. Natal, 144 D.P.R. 563 (1997).

**[6]** In considering a motion for summary judgment, all the non-controverted facts set forth in the documents and sworn statements will be taken as true. Piñero González v. A.A.A., res. el 23 de octubre de 1998, 146 DPR 890 (1998), 98 TSPR 141. All reasonable inferences that can be made should be made from the perspective most favorable to the non-moving party. Management Admnistration Services, 152 DPR 599 (2000),  2000 TSPR 174.

Page: 627

When, then, from the non-controverted documents that are attached there arises no legitimate dispute of fact, all that is necessary is to apply the law, and without the interests of the parties being put in danger, judgment can be entered without having a trial on the merits. Audiovisual Lang. v. Est. Natal, 144 D.P.R. 563 (1997).

**[7]** Thus it is that taking into consideration that summary judgment is an extraordinary remedy and that its grant is in the court's discretion, "the wise discernment is the guiding principle for its use because, used badly, it can lend itself to depriving a litigant of "her day in court" an elemental principal of due process of law." Roig Com. Bank v. Rosario Cirino, 126 D.P.R. 613, 617 (1990); Córdova Ramos v. Larín Herrera, 151 DPR 192 (2000), 2000 TSPR 79; Management Administration Services, 152 DPR 599 (2000), 2000 TSPR 174.

**[8]** Hence, by entering summary judgment, the court: (a) shall examine the documents attached to the motion requesting the same, the documents included in the opposition, those that are in the court file; (b) shall determine if the opposition controverted any material fact or if there are allegations in the complaint that have not been controverted or refuted in some way by the documents. Management Administration Services, 152 DPR 599 (2000), 2000 TSPR 174; PFZ Properties v. General Accident, 136 D.P.R. 881 (1994); Corp. Presiding Bishop, 117 D.P.R. 714 (1986).

## II

With these principles in mind, we analyze whether the court of first instance erred in resolving that there was no real or substantial controversy as to the material facts of the case that would impede the entry of summary judgment in favor of the plaintiff.



In the motion for summary judgment filed by

Page: 628

the government of Puerto Rico, it was argued that, in accord with the constitutional mandate of the Comptroller's Office of Puerto Rico, that Office performed an investigation of the municipality of Mayagüez;[16] that according to the document, that investigation covered the period from August 12, 1981 to February 10, 1986, culminating in a document titled Report of Intervention M-89-1 dated October and among the findings contained in said Report is one that states that municipal employee Miguel Galo Parocier was working for the political committee during work hours from June 1980 to June 1986 and that while was occurring that employee was receiving a salary from the municipality of Mayagüez as Assistant Director of Maintenance and Building Conservation and as a Painter.

II.

Attached to the motion for summary judgment was the reference Report containing the mentioned finding, <u>together with the following documents</u>:

> Sworn statement taken by the auditor, Mr. Eddie Cruz, of Mr. Miguel A. Galo on September 29 and 30 of 1986, in which he said he worked for the municipality of Mayagüez as a Painter, <u>Dispatched to the Comité Popular</u>, and as a Guard; he said he had performed

Page: 629

> that work from 1980 to 1986, every day, and he indicated that the money for the payment of his salary came from the Municipality;
>
> Sworn statement given by Mr. Galo Perocier before the District Attorney Elvira Cora Ramsey, where he reiterated that he had performed work on a continuous basis for the Political Committee of the PDP in Mayagüez during working hours. He stated, in addition that his attendance cards were filled in by hand in the municipal Department of Public Works saying that he had worked as a painter. Again, he specified that he was paid his salary as an employee by the Municipality;
>
> In the latter statement one hundred fifty-five (155) checks were described that were made out to Mr. Galo and cashed by him. These checks were duly identified by Mr. Galo before DA Ramsey;
>
> Sworn statement given by Eng. Héctor Rafael Bass Pineda, general assistant to the municipal Department of Public Works before District Attorney Elvira Cora Ramsey, where said employee stated that was general knowledge that Mr. Galo worked for the political committee of the PDP during working hours; he swore that during this time, Mr. Galo's attendance was registered through attendance cards prepared by hand by secretaries of the referenced Department of Public Works;



Sworn statement of Mr. Bernabé Pérez Rodríguez, who worked as the Director of the municipality's Public Works from May of 1982 until September of 1985. He stated that Mr. Galo was one of the workers of the Department and that he was assigned to the facilities of the Political Committee of the PDP. He said that he personally observed

Page: 630

that during working hours and identified fifty (50) attendance cards of Mr. Galo;

Sworn statement of Ms. Norma Rodríguez Pérez, Stenographer II of the municipality. She stated that she knew Mr. Galo since he worked in Municipal Public Works and that she knew that he worked during working hours at the referenced committee;

Sworn statement of Ms. Naida Rivera González, Office Worker I of the municipality and secretary of Eng. Héctor Bass. She stated that she knew about Mr. Galo working as a painter at the municipality;

Sworn statement of Mr. Eduard Rivera Correa, Director of the Division of Municipalities at the Puerto Rico Comptroller's Office. He stated that as part of the duties conferred to the Comptroller's Office, an investigation was performed as to the Municipality of Mayagüez. That the findings obtained in that investigation, it arose that Mr. Galo appeared as an employee of the Municipal Department of Public Works, when in reality he worked at the referenced political committee, and that according to the auditing work performed, they learned that he was paid the sum of $44,280.00 in salary and fringe benefits.

Based on that documentation, the plaintiff argued that there was no controversy of facts as to whether Mr. Galo Perocier was an employee of the Municipality when, in reality he spent his time attending to and working for the Local Committee of the PDP in Mayagüez; that from June 1980 to June 1986, Mr. Galo Perocier received $44,280.00, from public money of the Municipality without the Municipality benefitting from Galo's work; that the PDP benefitted from Mr. Galo's work since he was assigned to the referenced committee and in its capacity as a political party

Page: 631

organized pursuant to the Electoral Law of Puerto Rico, it was responsible for the illegal use of public funds with which Mr. Galo Perocier was paid.

On its behalf, and as noted above, the PDP did <u>not</u> file any statement or document in its opposition. In that pleading, the PDP limited itself to arguing that the documentary evidence presented by the government of Puerto Rico did not support its motion for summary judgment, since the plaintiff's argument that the party had benefitted lacked proof to sustain it. The party also argued that the imputed facts and the cause of action against it was time barred. As an argument in support of the statute of limitations defense, the party maintained that the instant case was not properly a claim for unjust enrichment, but rather for the tort of conversion under



Article 1802 of the Civil Code, which has a statute of limitations of one (1) year from the moment that the injured person learned of the harm caused; and that, as a consequence, the case was filed outside of the statute of limitations.

As we stated above, Rule 36.5 of Civil Procedure, supra, provides that when faced with a motion for summary judgment, the opposing party cannot rest exclusively on the statements or denials contained in the pleading, but rather is obliged to answer in a detailed and specific manner, setting forth the pertinent facts that demonstrate that there is a real controversy that should be heard in a trial. In other words, in order to defeat a motion for summary judgment, it is not enough to present mere allegations. Córdova Ramos v. Larín Herrera, 144 D.P.R. 563 (1997). As a result, it must be concluded, in the instant case, the PDP did not comply with its procedural obligation to controvert the statements, documents, facts and

Page: 632

declarations presented by the government of Puerto Rico because it did not file a single document to refute the facts and statements set forth by the government of Puerto Rico in its request for a summary judgment.

### III

Next, the petitioner argues that the Court of Appeals erred by confirming the imposition of joint and several liability on PDP for acts imputable to the president of municipal committee of the party, since the PDP at the central level, allegedly had been unjustly enriched by the services performed by Mr. Galo Perocier without having contributed anything to the salary received by that employee.

### A

**[9-10]** The doctrine of unjust enrichment is almost as old as the law itself. It is a corollary to the concept of equity, which is equivalent to saying that it is a corollary to the concept of justice. Silva v. Comisión Industrial, 91 D.P.R. 891 (1965). In that sense, it is a general principle of law based in the equity that informs all rule of law. Ortiz Andujar v. E.L.A., 122 D.P.R. 817 (1988). Just as with other causes of action based on principles of equity, the claim for unjust enrichment only proceeds when there is no law that provides another cause of action. Ibíd.[17]"Unjust enrichment is only invoked when the law has not foreseen the situation the produced the transfer of patrimony that has no reasonable explanation in

Page: 633

existing circumstances." Ibíd., at p. 822.[18] In that case, we emphasized the fact that as with every general principle, this doctrine has developed and become more concrete through jurisprudence, to the point that today nobody can deny its manifest growth.

**[11]** So that the doctrine can apply there must be a concurrence of certain basic requisites, that is,: i) enrichment; ii) a corresponding impoverishment; iii) a nexus between the impoverishment and the enrichment; iv) the lack of consideration to justify the enrichment; v) the lack of any legal precept that excludes the application of the enrichment without consideration. Ortiz



Andujar, 122 D.P.R. 817 (1988); Morales v. Municipio de Toa Baja, 119 D.P.R. 682 (1987).

**[12]** Even when in our jurisdiction this doctrine is not regulated by the dispositions of the Civil Code, we find it subsumed in the concept of the quasi contract. Ortiz Andújar, 122 D.P.R. 817 (1988). Certainly, this Court has incorporated it fully with all of its profiles and reach. Specifically, in Plan de Bienestar Salud v. Alcalde Cabo Rojo, 114 D.P.R. 697, 703 (1983), we decided as to the parameters that should always be evaluated when there are controversies as to the application of the doctrine. In that case we discussed various principles that govern unjust enrichment without consideration and we enumerated the following norms: i) the doctrine of unjust enrichment is applicable, in certain situations, to administrative bodies; ii) the application of the doctrine will depend on the specific circumstances of each case since the Civil Code does not exhaust all the situations to which the doctrine extends; iii) the doctrine of unjust enrichment cannot be invoked

Page: 634

when its effect would undermine an important principle of public policy enshrined in the Constitution or laws of the Country.

**[13]** Later, in Hatton v. Municipio de Ponce, 134 D.P.R. 1001, 1010 (1994), we reiterated this norm and held, while defining the reach of this doctrine, that the same "shall not apply when it would lead to a result contrary to the clear public policy, set forth in a statute or in the Constitution." In Municipio de Ponce v. Gobernador, 138 D.P.R. 431 (1995), we reasserted this aspect of the doctrine and held that in entering into agreements that breach the open format of healthy public administration set forth in our laws, the doctrine of unjust enrichment should not be invoked, since its effect would be to violate principals of great importance enshrined in the Constitution and laws of the Country.

B

With that doctrinal and jurisprudential background in mind, we examine the application of unjust enrichment in this case.

As to the first requisite, the petitioner questions the fact that the two appellate fora could have reached the conclusion that the central level of the PDP could have been enriched by the services performed by Mr. Galo as a worker for the municipal committee.  In support of that argument, the party alleges that the party, at the central level, could not have been enriched by actions of which it had no knowledge much less agreed to.

**[14]** As to this, we understand that it is indispensable to point out that "the enrichment may occur in two (2) different modalities: the positive or increase in patrimony (*lucrum emergens*), or the negative or diminishment of patrimony (*damnum cessans*). The negative (*damnun cessans*) is based on the premise that *not spending* is the equivalent of earning. In other words, to the degree that someone suffers a loss that ordinarily

Page: 635

microjuris.com

a third party would suffer, the former has saved an expense to the latter. This situation can <u>not</u> be permitted in a system where justice reigns and must be remedied." <u>Ortiz Andújar</u>, supra, pp. 826-27. Emphasis supplied. <u>The case before us presents clearly a factual situation of the modality of unjust enrichment in its negative aspect.</u>

There is no controversy that Mr. Galo was assigned to the municipal committee of the PDP in Mayagüez and that his salary was paid by the Municipality. <u>That being true, it is evident that the Municipality paid expenses for the PDP for Mr. Galo's benefit as salaries, bonuses, vacation and sick leave</u>. The Municipality took care of satisfying all type of benefits of an employee who performed services exclusively for the political entity.

We are not persuaded by the argument of the PDP to the effect that its organization did not know that Mr. Galo worked at the municipal committee of Mayagüez, since it was proven that the employee provided work at that place and that his salary was paid by the Municipality of Mayagüez, so it is evident that such payment constituted a "saving" to the party. This is true, because if it were not, the PDP would have had to employ a person at its own cost to take care of the committee.

[15] We should keep in mind that under our Electoral Law, supra, a local or municipal committee of a political party does <u>not</u> have an independent judicial personality separate from the of the registered party. The condition of having a judicial personality belongs to all political parties organized under the cited statute; they have the right to sue and be sued. <u>P.S.P.</u> v. <u>E.L.A.</u>, 107 D.P.R. 590 (1978). Political parties, at the same time are a basic element of every democracy. <u>P.P.D.</u> v. <u>Gobernador</u>, 139 D.P.R. 643 (1995). Our electoral system

Page: 636

contemplates the continued existence of political parties and their participation in the discussion of matters of public interest. *Ibíd*. This is compatible with the role that they fill in our society, since they are characterized by being vias through which the political and economic tendencies of society are channeled. *Ibíd.*; <u>P.S.P.</u> v. <u>E.L.A.</u>, 107 D.P.R. 590 (1978). As political parties, they perform quasi-governmental functions, such as create administrative programs and proposing candidates for political positions. *Ibíd.*

In addition, and with respect to the <u>second</u> requisite, it is important to point out that there is not the slightest doubt – or controversy – as to the fact that the Municipality of Mayagüez paid all means of renumeration to Mr. Galo. As a consequence, it <u>suffered a reduction in its coffers</u> that reached forty-four thousand two hundred eighty dollars ($44,280.00). <u>That amount of money was never in controversy</u>. This is the amount of public funds that the Puerto Rico Office of the Comptroller detailed in its Intervention Report as paid by the Municipality to Mr. Galo Perocier without his having performed any work for its benefit, but rather for the Municipal Committee of PDP.

[16] As for the <u>third</u> requisite that must be present so that the doctrine of unjust enrichment can be properly applied –the <u>correlation</u> between the impoverishment of one party and the enrichment of the other – we should point out that the relationship between the impoverishment



and the enrichment <u>does not require that effect be produced as a direct link between impoverished party to the enriched party</u>. Citing the scholar Puig Brutau,[19] in <u>Ortiz Andujar</u>, supra, at p. 828, <u>we pointed out that the determining factor is the existence of a sufficient connecting link between the patrimony of the party that suffered the loss and that of</u>

Page: 637

<u>the party the received the benefit</u>. It must be from the same circumstance that generated on the one side the loss and on the other the gain. There does <u>not</u> have be a direct displacement that directly occurs between the harmed party and the benefitted party, but rather in the same facts that caused the loss and the gain. *Ibíd.*

The petitioner argues that in this case the doctrine does not apply because the PDP did not benefit as an institution from Mr. Galo's work for the referenced municipal committee, and for that reason the party maintains that there is no relationship between the impoverishment of the Municipality and the alleged enrichment of the party. The party is <u>incorrect.</u>

According to the PDP's Official Rules, it arises clearly that among the very functions of the municipal committee are: (i) to be responsible for the political leadership of the Party in the area of its jurisdiction; (ii) to represent the Party in all electoral events, activities, and campaign matters; (iii) to maintain an appropriate locale to perform basic functions; (iv) maintain an active financing plan; (v) to organize the mobilization of its members to different activities and to electoral events; (vi) to organize activities to promote the Party's objectives y (vii) to carry its message in an effective manner, through a program of political education, among other functions.[20] It should be pointed out, in addition, that in accord with Article 22 of the abovementioned Rules, each municipal committee shall be the directive organ of the party in its area.[21]

The above regulatory functions of the municipal committees of PPD <u>demonstrate clearly that such entities are subordinate to the PDP P.P.D., as a central entity</u>

Page: 638

<u>and they exist because the party needs them in the municipality where they are located</u>. In other words, they are part of <u>the very structure</u> of the political party, be it what it may be, created with the purpose and objective of promoting the party's political ideals.

Certainly, the PDP can <u>not</u> now argue that it did not benefit from the work performed by Mr. Galo Perocier as the person in charge of the municipal local committee of the party in Mayagüez, since it was the principal beneficiary, <u>even though indirectly</u>, of everything that the municipal committee managed to achieve in compliance with its duties and functions per the party's rules.

As for the <u>fourth</u> requisite, that is, the lack of consideration that justifies the enrichment, just as we indicated in <u>Ortiz Andujar</u>, supra, p. 829, "the term 'consideration' does not here have the meaning that it has in contractual matters, instead it takes the meaning of a legal act that justifies



the acquisition of an asset." Citations omitted. Thus, "the enrichment should not derive from a legal source that legitimizes the acquisition." Citations omitted.

In the instant case there is no reason or any justification that would allow the municipal committee to use the services of a municipal employee, much less that the referenced municipality should not pay for such services.

Finally, and as to the requisite that there not be a legal precept that excludes the application of unjust enrichment without consideration, the petitioner argues that the doctrine as to torts – which is based on the dispositions of Article 1802 of the Civil Code – prevents unjust enrichment being applied to the PDP. The petitioner cannot mix concepts relative to unjust enrichment with torts. <u>Ortiz Andújar</u>, supra. "A cause of action for unjust enrichment is different from indemnification for a tort." *Ibíd*, at p. 825.

Page: 639

**[17]** In the above cited case we held, with respect to the difference between the two causes of action that:

> [A] tort case is always oriented toward the responsible party, and the concepts of blame and causality are indispensable to determining the duty to indemnify. An unjust enrichment case is focused always on the enriched without consideration, leaving out all notions of blame and causality; leaving as a secondary the responsible party of the patrimony. In tort there must be a relationship between the primary actor and the harm. In unjust enrichment there is a direct relationship between the patrimony of the impoverished and the enriched. In the former, the remedy extends to all the harm, without limitation, except certain legal exceptions. In the latter, restitution has as its objective and its measure –except with concrete exceptions—in the amount of the enrichment. The harm may constitute, thus, *damnum emergens* (positive harm) and *lucrum cessans* (lost income). The enrichment can be produced by an increase in patrimony (*lucrum emergens*) or by not losing patrimony (*damnum cessans*). Torts arise from an illicit act. The harm may be produced by action or omission. Enrichment –as secondary to the responsible party--, only positively by the displacement of assets from the patrimony of another." Citations omitted. *Ibíd.*, pp. 825-26.

**[18]** There is no denying that this case presents a clear case of unjust enrichment. The petitioner cannot successfully argue that any claim related to the acts of the president of the Local Committee should be made as a tort claim under Article 1802 of the Civil Code. The enrichment was found in the lack of diminishment of the PDP's party's patrimony because of not having to pay the salary of an employee who performed services. "Indemnification for tort is measured by the harm experienced by the victim, independent of whether or not the responsible party benefitted, , <u>whereas the restitution that results in a case of unjust enrichment cannot be greater</u>

Page: 640

<u>than the benefit to the other party</u>". <u>Ortiz Andújar</u>, supra, at. 826. Citation omitted and emphasis



supplied. It is precisely the amount of money equivalent to the salary earned by Mr. Galo Perocier, with which the PDP was enriched by not having to disburse. <u>In conclusion, the instant case all the requisites of the proper application of unjust enrichment are present.</u>

IV

As to the last argument of error, we will briefly discuss the supposed time bar of the cause of action of this case and the claim to collect public funds.

The PDP states that this case is not a claim for unjust enrichment, but rather about tort pursuant to Article 1802 of the Puerto Rico Civil Code, supra, the statute of limitation of which is one (1) year counted from the moment when the injured person has knowledge of the harm that caused the injury. Artículo 1868 del Código Civil de Puerto Rico, supra.

The party argues, in addition, that since the Comptroller Office's investigation culminated in a report,[22] that at that moment the plaintiff knew –or should have known—of the facts of the case, and, as a result the amended complaint of December 26, 1995, was filed outside that the statute of limitations of one (1) year.

**[19]** We have held that "an action strictly to collect public funds obtained illicitly does <u>not arise under Article 1802 pf the  Código Civil,</u> 31 L.P.R.A sec. 5141...  What is involved

Page: 641

is an action of a personal natural ... such as one to be reimbursed for enrichment without consideration" <u>E.L.A.</u> v. <u>Soto Santiago</u>, 131 D.P.R. 304, 322 (1992). Emphasis supplied. In that case we stated that "when considering an action filed by the State to collect for the illegal disbursement of public funds ... we hold that for statute of limitations the mentioned action is personal for collection of money... being a personal action without a time bar ... the statute of limitations of fifteen (15) years pursuant to Art. 1864 of the Civil Code, *supra*, for personal actions that do not have a fixed statute of limitations." *Ibíd.*, pp. 322-323; see also, <u>E.L.A.</u> v. <u>Asoc. Empleados Obras Pub. Mun.</u>, 126 D.P.R. 320 (1990).

Having concluded that cause of action in this case is a claim for collection of public funds used illegally and that the allegations were proven by plaintiff, we conclude that the mentioned error did <u>not</u> occur, since the statute of limitations had not run when the Complaint was filed.

V

We cannot conclude without referring to Article VI, Section 9, of the Constitution of Puerto Rico, which provides:

Public properties and funds may only be disbursed  for public purposes and for the sustenance and function of the State.

**[20]** In <u>Marrero</u> v. <u>Mun. de Morovis</u>, 115 D.P.R. 643, 645 (1984), we held that public funds or resources can <u>not</u> be used by a political party for its private purposes. Adopting the reasoning of



the Trial of First Instance, we point out that to the degree that public funds are used for partisan political propaganda

Page: 642

the rights of the rest of voters are affected.

**[21]** On this same subject in <u>P.P.D.</u> v. <u>Gobernador</u>, 139 D.P.R. 643 (1995), at 688, we said that the constitutional restriction on the use of public funds does <u>not</u> permit partisan political of said fund nor any other use that allows a political party or candidate to obtain an advantage at the expense of the public fisc. "The true essence of a free government consists of considering public positions as a trust, focused on the good of the country and not for the good of a determined individual or party. *Ibíd.*, at 690; *Ex rel*. Pérez v. <u>Manescau,</u> 33 D.P.R. 739, 742 (1924).

**[22]** In <u>De Jesús</u> v. <u>Autoridad de Carreteras</u>, res. el April 30, 1999, 148 DPR 255, 269 (1999), 99 TSPR 66, citing <u>A.E.E.</u> v. <u>P.N.P.</u>, 128 D.P.R. 294 (1991) [23], we pointed out that:

The concept of 'public order' such as the accumulation and reflection of general principles of Law, certainly recognizes the high judicial value that several Justices expressly cogently in <u>Autoridad de Energía Eléctrica y otros</u> v. <u>P.N.P.</u>, 128 D.P.R. 294 (1991), (concurring vote of Associate Justice Negrón García which was joined by Associate Justices Rebollo López and Andréu García), when we determined that <u>public funds could not be used to pay salaries hired by government agencies if such personas or worked for a different agency</u>:

[T] he improper or illegal disbursement of public funds – in its multiple forms, sometimes clumsy and others sophisticated are acts that are incompatible with a democratic system of government enshrined in our Constitution which respects human dignity and the money of the people, who are the only sovereign It does not matter the modality adopted, nor the hierarchy of the functionary involved, such practices are intolerable. In the last instance, the entity prejudiced, not only economically but also morally is the general citizenry...

It is then, the Courts' obligation

Page: 643

To vindicate those fundamental values.' Emphasis supplied.

**[23]** We have reiterated, in addition that the prudent management of public funds is saturated with public interest, no matter the quantity involved.  It deserves remember that "it is important, and it would be as small as the matter was any sum, when the people's money from taxpayers, or from municipal money. The interests of those communities are those of the people, of the taxpayers, and their employment or investment require a great amount of care to translate these legal demands. <u>Hatton</u> v. <u>Municipio de Ponce</u>, 134 D.P.R. 1001 (1994), p. 1012; <u>Vázquez</u> v. <u>Municipio</u>, 40 D.P.R. 509, 512 (1930). There is <u>no</u> doubt, as a consequence, that the government of Puerto Rico had the clear right to file a complaint in this case to claim or collect the public funds illegally disbursed by the Municipality of Mayagüez.



We can not give our imprimatur to the expense of public funds to pay the salary, bonuses, sick and vacation leave when the employee performed no work related to his employment by the municipality, but only for the private benefit of the political committee. This constitutes a clear example of improper use of public funds which our Constitution prohibits. As the highest interpreters of the same, it is our duty and responsibility to watch over this to assure that such funds are used directly for the needs of the public and not the purposes of a party or of any political party No public policy of the laws or Constitution would be promoted in this way.

In essence, we are obliged to conclude that the disbursement of public funds in this case to pay the salary, benefits, etc. of the municipal employee Galo Perocier was done in contravention of the constitutional rule that regulates all disbursement of public funds for public purposes, not private. It goes without saying

Page: 644

that said disbursement of public funds benefitted the PDP, since it was paid for by the Municipality that should have paid for its party. Clear public policy, which should be encouraged by every functionary of the government, at that state as well as the municipal is that of encouraging the promotion watch out for the wise and honest administration of the people's money.

Thus, we reiterate the government's capacity, based on the investigations of the Comptroller's Office as required by the constitution to file a Complaints like the one in this case.[24] Therefore, in compliance with its constitutional obligation to watch out for the wise and proper administration of public funds, state as well as municipal, for the government to file this case. The government by acting this way, is safeguarding all citizens in Puerto Rico, specifically those of the Municipality of Mayagüez, because those funds are destined to the general benefit of the public.

Notwithstanding the State's recognized capacity to claim public state and municipal funds, we should not that even though the State has filed this case, such funds should eventually be returned to the coffers of the Municipality of Mayagüez. We reach that conclusion for the simple reason that given the conflict of interest in this case, where the mayor himself acted against the interest of the citizens of Municipio, using the referenced funds for purposes not authorized by law, it was obvious that said functionary was not going to go to court to claim the money for Mayaguez. Said in a different way, even when the municipality had not gone to court to collect these funds, precisely due to the mayor

Page: 645

who incurred in the acts that created the present situation, we reiterate that the State had the obligation to watch out for the interests that that official did not safeguard, given the public nature of the funds in question, the Municipality of Mayagüez has a right to the same.[25]

VI



Since we conclude that the disbursement of public funds in the instant case occurred in contravention of Article VI, Section 9 of our Constitution, we affirm the decision of the then Court of Appeals, as to finding liability on the part of the Popular Democratic Party[26] and order that political party the proper restitution of the referenced funds to the public treasury. Taking into consideration that the Municipality of Mayagüez was entity affected and impoverished by the illegal distribution of said funds, we deem it proper that the State, as soon as it receives the funds through its fiscal and financial agent shall assign the corresponding amount to the Municipality

Page: 646

Since that is the entity that has the true right to receive them.

A Judgment affirming will be entered.

_____

Footnotes:

[1] That investigation took place from August 12, 1980 to February 10, 1986. The complete Report of the investigation was filed on October 11, 1988. Investigation Report M-89-1. Appendix pp.82-99.

[2] Original Complaint of March 18, 1991.

[3] Specifically, it is alleged that he was performing those tasks from the month of June 1980 to June 1986, including Saturdays and Sundays without break. See also: Investigative Report M-89-1 of October 11, 1988 regarding the Municipality of Mayagüez drafted by the Office of the Comptroller of Puerto Rico. Appendix, pp 82-99.

[4] Partial Judgment Court of First Instance, dated November 12, 1993, filed and notified on November 17, 1993. Appendix at 193.

[5] Mr. Cole Vázquez died on January 30, 1993, and thus, the defendant was duly substituted.

[6] Summary Judgment Motion of September 27, 1995; filed with the Court on October 4, 1995.

[7] Sworn Statements given by Mr. Miguel Galo Perocier; his supervisor, Mr. René Ramos Muñoz; by the Assistant Engineer of the Department of Public Works of the municipality, Mr. Héctor Rafael Bass Pineda; by the Director of Public Works of the municipality from May of 1982 until September of 1986, Mr. Bernabé Pérez Rodríguez; by the Office Clerk, Ms. Norma Rodríguez; by the secretary of Eng. Bass, Ms. Naida Rivera González; and by the Director of the Puerto Rico Comptroller's Office, Eduard Rivera Correa. Appendix, pp. 115-144.

[8] We understand it relevant to note that that amended complaint to include the P.P.D. as a defendant was filed on August 12, 1994 and not on September 26, 1995, as that party alleges. Regarding the argument that the statute of limitation has run, the one (1) year term to file a claim under Article 1802, ante, had run as to consideration under either date to compute such term.

[9] 16 L.P.R.A. sec. 3101 et seq.



[10] Article 1864 of the Puerto Rico Civil Code, 31 L.P.R.A sec. 5294, provides that personal actions that do not have a special statute of limitation run at fifteen years.

This forum has held that "an action limited to collecting public monies obtained illicitly does not arise under Article 1802 of the Civil Code, 31 L.P.R.A sec. 5141 .Instead such action is a personal action such as those for unjust enrichment." E.L.A. v. Soto Santiago, 131 D.P.R. 304, 322 (1992).

[11] As for the municipality, the court of first instance indicated that statute of limitations on the complaint for negligence for not taking the necessary measures to avoid this situation had run. As to the allegation that the municipality acted illegally and fraudulently by paying salaries and fringe benefits to the employee who did not perform any work, that forum resolved that Mr. Galo was a municipal employee, but at the instruction of the Mayor provided services to the local P.P.D. committee, receiving a salary paid by the municipality without the municipality benefiting in any way. Nonetheless, the Court imposed joint and several liability on the P.P.D., based on Articles 201 and 216 of the Puerto Rico Penal Code, 33 L.P.R.A sec. 4352, 4391, respectively. It held that such a cause had no statute of limitations and that crimes as to illegal payments of public funds were governed by the doctrine of unjust enrichment.

[12] Article  201 of the Puerto Rico Penal Code, *supra*, as to the appropriation by a functionary of labor or public services provides as follows :

> Any public official or employee who uses for her own benefit or that of a third party the labor or services paid for by the Government of Puerto Rico, ...shall be sanctioned with a penalty of imprisonment for a set term of three (3) years. (Emphasis added.)

On another matter, Article 216, infra, regarding crimes re public funds, provides, in pertinent part:

> Shall be punished with imprisonment ... any official, public employee or any person charges with receiving, holding, transferring, disbursing or in any other way affecting public money who commits the following acts:
>
> (a)  Without legal authority to appropriate in whole or in part for personal benefit or for another person. Emphasis added.
>     . . .

[13] In its pleading the Municipality implied that the court of first instance erred by:

> ...finding that Articles 201 and 216 of the Puerto Rico Penal Code imposes liability on municipalities, and, in this case, the Municipality of Mayagüez;
> ...applying the doctrine of Unjust Enrichment against the Municipality of Mayagüez;
> ...resolving the Motion for Summary Judgment against the Municipality of



Mayagüez.

14 The statement was made as a consequence of an examination the intermediate appellate court made of the sworn statements given by Mr. Miguel Galo Perocier; his supervisor, Mr. René Ramos Muñoz; by the Assistant Engineer for the Department of Public Works of the municipality, Mr. Héctor Rafael Bass Pineda; by the Director of Public Works of municipality from May 1982 to September 1986, Mr. Bernabé Pérez Rodríguez; by the Office Clerk, Mrs. Norma Rodríguez; by the secretary of Engineer Bass, Mrs. Naida Rivera González; and by the Director of Puerto Rico' Office of the Comptroller, Eduard Rivera Correa.

The appellate forum found that those declarations were never rebutted by the appellant, P.P.D., and that they established clearly the direct participation of the mayor of Mayagüez, who permitted Mr. Galo Perocier, to perform work from the local committee of the P.P.D. at the expense of the municipality.

The Court found, in addition, that the appellant P.P.D. had never before raised the alleged controversy related to the credibility of the statements of Mr. Galo Perocier, in his opposition to the request for summary judgment and that it was in the appellate court that appellant raised that as error for the first time.

15 See: 16 L.P.R.A sec. 1301 *et. seq.*, P.S.P. v. E.L.A., 107 D.P.R. 590 (1978).

16 Law Num. 17 of May 8, 1973, as amended by Law Num. 51 of June 7, 1977, grants the Comptroller's Office, as part of the Department of Justice,  the authority to file civil actions before the courts that arise as a result of intervention of the Comptroller related to income, accounts, and disbursement of the municipalities. The Comptroller's investigations are permeated with the highest public interest and are directed to promoting the healthiest administration of public funds.

According to the law that created the Comptroller's Office, Law Num. 9 of July 24, 1952, that Office has the authority to, through its auditors and employee intervene, supervise, and, if necessary if irregularities regarding the use of public funds are uncovered, refer information to the Secretary of Justice to take the legal action necessary.

The Comptroller shall have oversight over all income, accounts and disbursements of the State, its agencies and instrumentalities and of municipalities to determine if such have  occurred in compliance with law. Article III, Section 22 de la Constitución.

17 When a court encounters controversies for which the legislator has not foreseen expressly or provided a solution, it is necessary to go to the mandate contained in Article 7 of the Civil Code, which provides, "when there is no law applicable to the case, the court shall decide with equity, which means that it will keep natural law in mind in accord with general legal principles and established custom.." Ortiz Andujar v. E.L.A., 122 D.P.R. 817 (1988), at 822.

18 See: J. Puig Brutau, Fundamentos del Derecho Civil, Barcelona, Ed. Bosch, 1983, T.II, Vol. 3, at 43-74.

19 See: J. Puig Brutau, Fundamentos del Derecho Civil, Barcelona, Ed. Bosch, 1983, T.II, Vol. 3, at 57.



[20] See: Article 25 of the Official Regulation of the Partido Popular Democrático for the date of the events.

[21] See: Article 22 of the Official Regulation of the Partido Popular Democrático for the date of the events.

[22] Dated October 11, 1988.

[23] See: 128 D.P.R. 294, 299 (1991), Concurrence of Associate Justice Negrón García joined by Associate Justices Rebollo López y Andréu García.

[24]     Law Num. 17 of May 8, 1973, as amended by Law Num. 51 of June 7, 1977, affords the Office of the Comptroller, as part of the Department of Justice, the authority to file civil actions that arise from interventions of the Comptroller regarding income, accounts, and disbursements of the municipalities before the courts. The Comptroller's investigations are permeated with the highest public interest and are directed toward promoting the healthiest administration of public funds.

        According to the law that created the Comptroller's Office, Law Num. 9 of July 24, 1952, that Office has the authority to, through its auditors and employee intervene, supervise, and, if necessary if irregularities regarding the use of public funds are uncovered, refer information to the Secretary of Justice to take the legal action necessary.

        The Comptroller shall have oversight over all income, accounts and disbursements of the State, its agencies and instrumentalities and of municipalities to determine if such have  occurred in compliance with law. Article III, Section 22 de la Constitución.

[25] Holding otherwise would mean that in any case in which a mayor participates in an improper scheme, in which there is an illegal diversion of public municipal funds, where the mayor fails to bring the corresponding legal action, those funds could not be collected. It is for that reason the E.L.A., of necessity, has the capacity (standing) to commence the instant case to collect public funds illegally disbursed against the party that illegally benefitted from that disbursement, in representation of the citizens of that municipality; in compliance with the constitutional mandate of Section 9 of Article VI de la Constitution of Puerto R Rico.

[26]     With the confirmation of that determination of liability, we are not, however, opening the doors so that the political parties, as such, have to answer, as a general rule, for every fraudulent action taken by their official. It is precisely in light of the specific facts and circumstances of this case, in which the P.P.D. was benefitted and enriched by the actions of its official, that we order the reimbursement of the public funds used in violation of Article VI, Section 9, of our Constitution.

