R. Alexander Saveri (173102)
   *rick@saveri.com*
Geoffrey C. Rushing (126910)
   *grushing@saveri.com*
Matthew D. Heaphy (227224)
   *mheaphy@saveri.com*
Sarah Van Culin (293181)
   *sarah@saveri.com*
SAVERI & SAVERI
706 Sansome Street
San Francisco, California 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Interim Lead Counsel for the*
*Direct Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-CV-5944-JST |
| | MDL No. 1917 |
| This Document Relates to: | **DIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION WITH RESPECT TO THE IRICO DEFENDANTS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| *ALL DIRECT PURCHASER ACTIONS* | |
| | Date:  March 24, 2022 |
| | Time:  2:00 p.m. |
| | Judge: Hon. Jon S. Tigar |
| | Ctrm:  6, 2nd Floor |

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 2

I.      INTRODUCTION. ................................................................................................... 2

II.     PROPOSED CLASS TO BE CERTIFIED. ............................................................ 3

III.    THE FIRST LITIGATED CLASS CERTIFICATION ORDER ............................. 3

IV.     FACTUAL BACKGROUND. .................................................................................. 4

   A.   The Investigations by the DOJ and Other Governmental Authorities. ............... 4

   B.   Defendants and Their Co-conspirators Conducted One of the Most Effective and Well-Documented Price-Fixing Conspiracies Ever. ....................................... 5

      1.   The CRT Conspiracy Was Elaborately Organized, Efficient, and Effective. .................. 5

      2.   The Conspirators Set Prices, Production Levels, and Market Shares. ........................... 10

      3.   Monitoring and Success of the Conspiratorial Agreements. ......................................... 12

      4.   The Conspirators Concealed the Conspiracy. ................................................................ 14

V.      ARGUMENT. .......................................................................................................... 15

   A.   Plaintiffs Satisfy the Requirements of FRCP 23(a). ......................................... 16

   B.   This Action Meets the Requirements of FRCP 23(b)(3). ................................... 19

      1.   Common Questions of Law and Fact Predominate. ...................................................... 19

      2.   A Class Action Is Superior Here. .................................................................................. 25

VI.     CONCLUSION ........................................................................................................ 25

i

DPPs' NOMAM FOR CLASS CERTIFICATION WITH RESPECT TO IRICO DEFS.; MEMORANDUM OF
POINTS & AUTHORITIES IN SUPPORT THEREOF; Master File No. 07-CV-5944-JST

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*Aberin v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2021 WL 1320773 (N.D.
    Cal. Mar. 23, 2021)........................................................................................................ 24

4

5

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................................ 19

6

*Amgen Inc. v. Conn. Ret. Plans*, 568 U.S. 455 (2013) ..................................................... 15, 19

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) ........................................... 16

7

*Castillo v. Bank of America, NA*, 980 F.3d 723 (9th Cir. 2020) ............................................. 17

8

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ..................................................................... 23

9

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ...................................... 15, 16

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .................................................... 17

10

*Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972) ................................................................. 15

11

*In re Catfish Antitrust Litig.*, 826 F. Supp. 1019 (N.D. Miss.1993).................................... 17

12

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 07-cv-05944-JST, 2020 WL 1873554 (N.D.
    Cal. Mar. 11, 2020)....................................................................................................... 19

13

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857, 872 (N.D. Cal. 2012).... 17, 23

14

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013 WL 5391159
    (N.D. Cal. Sept. 24, 2013) ........................................................................................ 3, 23

15

16

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82 (D.
    Conn. 2009) .................................................................................................................. 21

17

*In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 570–73 (N.D. Cal. 2013).................. 21, 22

*In re Intuitive Surgical Sec. Litig.*, Case No. 5:13-cv-01920-EJD,  2016 WL 7425926 (N.D.
    Cal. Dec. 22, 2016)....................................................................................................... 18

18

19

*In re Korean Ramen Antitrust Litig.*, No. 13-CV-04115-WHO, 2017 WL 235052 (N.D. Cal.
    Jan. 19, 2017) ............................................................................................................... 17

20

*In re Magnetic Audiotape Antitrust Litig.*, No. 99 CIV 1580, 2001 WL 619305 (S.D.N.Y.
    June 1, 2001) ................................................................................................................. 21

21

22

*In re Mego Financial Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) ................................. 18

23

*In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2010 WL 5396064 (N.D.
    Cal. Dec. 23, 2010)................................................................................................. 18, 21

24

*In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005) .............................. 15

25

*In re Static Random Access (SRAM) Antitrust Litig.*, No. C 07-01819 CW, 2008 WL
    4447592 (N.D. Cal. Sept. 29, 2008) ...................................................... 18, 20, 24, 25

26

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010) ..................... 20, 21

27

*In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619 (N.D. Cal. 2018) (Tigar, J.) ..................... 18, 23

28

ii

DPPs' NOMAM FOR CLASS CERTIFICATION WITH RESPECT TO IRICO DEFS.; MEMORANDUM OF
POINTS & AUTHORITIES IN SUPPORT THEREOF; Master File No. 07-CV-5944-JST

*In re Urethane Antitrust Litig.*, No. 13-3215, 2014 WL 4801253 (10th Cir. Sept. 29, 2014) ......... 21

*Lambert v. Nutraceutical Corp.*, 870 F.3d 1170 (9th Cir. 2017) ...................................................... 24

*Leyva v. Medline Industries Inc.*, 716 F.3d 510 (9th Cir. 2013) ...................................................... 24

*Messner v. Northshore Univ. Health System*, 669 F.3d 802 (7th Cir. 2012).................................... 19

*Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811 (9th Cir. 2019) ......................................................... 24

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979).............................................................................. 15

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009)....................................................... 18

*Sarmiento v. Sealy, Inc.*, 18-cv-01990-JST, 2020 WL 4458915 (N.D. Cal. May 27, 2020)...... 16, 20

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931) .............................. 23

*Terry v. Hoovestol, Inc.*, Case No. 16-cv-05183-JST, 2018 WL 6439167 (N.D. Cal. Dec. 7, 2018)................................................................................................................................................. 16

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159 (C.D. Cal. 2002) ............................................................................................................................ 19

*Vaquero v. Ashley Furniture Industries, Inc.,* 824 F.3d 1150 (9th Cir. 2016) ............................... 24

*Wortman v. Air New Zealand*, 326 F.R.D. 549 (N.D. Cal. 2018) ................................................... 16

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ........................................... 20

## RULES

Federal Rule of Civil Procedure 23 ......................................................................................... *passim*

1

2

**NOTICE OF MOTION AND MOTION**

**TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:**

3          **PLEASE TAKE NOTICE** that on March 24, 2022 at 2:00 p.m., before the Honorable Jon

4   S. Tigar, District Judge of the United States District Court, Northern District of California, at the

5   Oakland Courthouse, Courtroom 6, 2nd Floor, 1301 Clay Street, Oakland, California, Direct

6   Purchaser Plaintiffs ("DPPs") will and hereby do move for class certification pursuant to Rule 23 of

7   the Federal Rules of Civil Procedure ("FRCP 23").

8          DPPs seek certification of the following class for damages pursuant to FRCP 23(b)(3):

9          All persons and entities who, between March 1, 1995 and November 25, 2007, directly
           purchased a CRT Product in the United States from any Defendant or any subsidiary

10         or affiliate thereof, or any co-conspirator or any subsidiary or affiliate thereof.
           Excluded from the class are defendants, their parent companies, subsidiaries or

11         affiliates, any co-conspirators, all governmental entities, and any judges or justices
           assigned to hear any aspect of this action.

12

13  DPPs also move for appointment of Saveri & Saveri, Inc. as Class Counsel pursuant to FRCP 23(g).

14          This motion is based on this Notice of Motion and Motion, the supporting Memorandum of

15  Points and Authorities, the Expert Report of Phillip M. Johnson, Ph.D. (November 19, 2021) filed

16  herewith, the Declaration of R. Alexander Saveri (previously filed in support of the DPPs' Motion

17  for Class Certification with Respect to the Thomson and Mitsubishi Defendants (ECF Nos. 2968-5

18  (unredacted version), 2969-2 (redacted version))), the Declaration of R. Alexander Saveri in Support

19  of DPPs' Motion for Class Certification Re: the Irico Defendants filed herewith, the Declaration of

20  R. Alexander Saveri in Support of DPPs' Application for Entry of Default Against the Irico

21  Defendants (previously filed as ECF No. 5191-1), the Declaration of R. Alexander Saveri in Support

22  of DPPs' Opposition to the Irico Defendants' Motion to Set Aside Default (previously filed as ECF

23  Nos. 5228-1 & 5228-2), the [Proposed] Order Granting Direct Purchaser Plaintiffs' Motion for Class

24  Certification filed herewith, all exhibits and appendices to such documents, any reply papers, any

25  argument made at the hearing, and all other papers and records on file in this matter.[1]

26

27  [1] Because the factual support for this motion is already in the Court's file, DPPs rely on previously
    filed declarations. DPPs believe that this is more efficient for the Court and the parties. If the Court

28  desires DPPs to refile these documents, DPPs will do so.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION.

The Cathode Ray Tube ("CRT") litigation involves one of the most well-documented global price-fixing conspiracies in history.[2] It has been the subject of numerous enforcement proceedings by domestic and foreign competition authorities. Over the course of hundreds of "Glass Meetings" and other meetings from March of 1995 to November of 2007, the conspirators, including Defendants Irico Group Corporation ("Group") and Irico Display Devices Co., Ltd. ("Display") (together "Irico Defendants" or "Irico") agreed to fix and stabilize CRT prices, limit production of CRTs, and allocate customers. The conspirators have admitted to attending hundreds of conspiratorial meetings, produced meeting notes, and described the conspiracy in detail. An overwhelming body of evidence shows regular meetings of high-level officers and virtually constant, detailed discussions about the CRT market, including continual agreements on prices and production levels; extensive monitoring of CRT sales and production; and enforcement of conspiratorial agreements.

The Irico Defendants are the sole remaining defendants in this litigation. They improperly and unilaterally ceased participation in the case after their motion to dismiss was denied in 2010, reappearing over seven years later only after DPPs filed a motion for default judgment. In so doing, in addition to stymying the general progress of the litigation against them, the Irico Defendants also avoided the Court's first order certifying a DPP class, necessitating this motion. Order in re Class Certification with Respect to the Thomson and Mitsubishi Defendants (July 8, 2015) (ECF No. 3902) ("Cert. Order"). Certification of another DPP class remains appropriate—the facts and the law are materially unchanged.

Indeed, the Court has already held three times that the critical issues on class certification— whether or not classwide issues predominate; whether or not impact can be proven on a classwide basis at the direct purchaser level—should be resolved in favor of class certification. In addition to the Cert. Order, on September 24, 2013, Judge Conti adopted the Interim Special Master's ("ISM")

---

[2] Cathode Ray Tubes or CRTs are color picture tubes ("CPTs") used in televisions; color display tubes ("CDTs") are used in computer monitors. CRT televisions and CRT monitors sold by Defendants will be referred to as "Finished Products."

June 20, 2013 recommendation (ECF No. 1742) that an Indirect Purchaser Plaintiffs' ("IPP") class be certified. *In re Cathode Ray Tube (CRT) Antitrust Litig*., No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) ("*CRT I*"). These two orders also required findings that impact and damages could be proved on a classwide basis at the direct purchaser level of distribution—the same issues presented here. *Id.* at *5-6.[3]

## II.   PROPOSED CLASS TO BE CERTIFIED.

The DPPs[4] are direct purchasers of CRTs and Finished Products from Defendants, their co-conspirators,[5] and/or their subsidiaries or affiliates. They have brought this action on behalf of themselves and a proposed class ("Class") defined as:

> All persons and entities who, between March 1, 1995 and November 25, 2007, directly purchased a CRT Product in the United States from any Defendant or any subsidiary or affiliate thereof, or any co-conspirator or any subsidiary or affiliate thereof. Excluded from the class are defendants, their parent companies, subsidiaries or affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.[6]

## III.   THE FIRST LITIGATED CLASS CERTIFICATION ORDER

The Cert. Order reflected, as required, a "rigorous" examination of the evidence and the law relating to DPPs' motion. Cert. Order at 8. In a 50-page order, Judge Conti found—after thorough analysis—all of the requirements of FRCP 23 satisfied. He examined the report of DPPs' expert economist Dr. Jeffrey Leitzinger in detail and rejected attacks on his findings.

Judge Conti found all of the requirements of FRCP 23(a) satisfied and rejected arguments that the class was not ascertainable. Cert. Order at 11-16. He also found predominance under FRCP 23(b)—i.e., that DPPs could prove their case—conspiracy, impact and damages—via class wide

---

[3] In addition, the Court has certified numerous DPP and IPP settlement classes. Declaration of R. Alexander Saveri in Support of Direct Purchaser Plaintiffs' Motion for Class Certification Re: The Irico Defendants ("Saveri 2021 Decl.") ¶ 3. Hereafter "Ex. __" with alphabetic exhibits refers to the Saveri 2021 Declaration.

[4] Arch Electronics, Inc.; Crago, d/b/a Dash Computers, Inc.; Meijer, Inc. and Meijer Distribution, Inc.; Nathan Muchnick, Inc.; Princeton Display Technologies, Inc.; Radio & TV Equipment, Inc.; Studio Spectrum, Inc.; and Wettstein and Sons, Inc., d/b/a Wettstein's. These representatives were approved by the Court in the Cert. Order (at 11) and for various settlement classes.

[5] The complete co-conspirator list is set forth in the Saveri 2021 Declaration. Saveri 2021 Decl. ¶ 2.

[6] The class definition is identical to the one certified by Judge Conti. Cert. Order at 6, 50. Judge Conti also required that "affiliates" be identified. *Id.*

3

evidence. *See id.* at 43. As to the conspiracy, he stated:

> Upon its own inquiry the Court is satisfied that the quantity and quality of the evidence supports by a preponderance of the evidence that there was a price-fixing scheme and its existence and operations would be a question common to all class members.

Cert. Order at 37-8. As to impact, Judge Conti found that each category of proof offered by DPPs was common to the class. Thus, he found "contemporaneous evidence" of the conspiracy showed classwide impact:

> DPPs put forward evidence (as reviewed by Dr. Leitzinger) suggesting that all but a small fraction of the CRT market was impacted, that the conspiracy's price goals were achieved a significant portion of the time, and that conspirators were effective at monitoring and enforcing conspiratorial agreements.

*Id.* at 39-40. He found that Dr. Leitzinger's statistical analysis was sound and also proved classwide impact. *See id.* at 42. And he found that Dr. Leitzinger's analysis and conclusion that "structural factors" relating to the CRT market and the alleged conspiracy—e.g., the conspirators' control of the CRT market and capacity, the global nature of the conspiracy and its high level of organization, high barriers to entry into the CRT market, that the conspiracy set prices for over 90% of CRTs during the class period, etc. (*id.* at 30-31)—also proved classwide impact. *Id.* at 43 ("The Court's review of structural factors presented by Dr. Leitzinger shows, by a preponderance of the evidence that structural issues could be shown at trial to have generated class impact.").

Judge Conti also approved DPPs' damage study:

> Dr. Leitzinger's report is supported by both documentary facts and industry data, his approach to determining whether Mitsubishi was part of the conspiracy or sold CRT products in connection therewith is based on factual review of evidence, and his use of regression and correlation analysis is well established as a means of providing classwide proof of antitrust injury and damages.

*Id.* at 48; *see also id.* at 44-45.

Finally, Judge Conti found that DPPs had satisfied FRCP 23(b)(3) superiority. *Id.* at 49-50.

## IV.     FACTUAL BACKGROUND.

### A.     The Investigations by the DOJ and Other Governmental Authorities.

Co-conspirator Chunghwa disclosed the conspiracy to the United States Department of Justice ("DOJ") when it applied for and received amnesty from criminal prosecution in 2007. In

4

May of 2011, co-conspirator SDI pleaded guilty to participating in the CRT conspiracy.[7] The DOJ also indicted six former executives of co-conspirators SDI, Chunghwa, LGE, and LPD, alleging, *inter alia*, agreements on prices, output, and market allocation; exchange of sales, production, market share, and pricing data; auditing to verify compliance with conspiratorial agreements; and active concealment of the conspiracy. Exs. 5–8. When announcing the indictment of Chunghwa's President, C.Y. Lin, the DOJ was clear: "[t]his conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices." Ex. 9.[8]

**B.   Defendants and Their Co-conspirators Conducted One of the Most Effective and Well-Documented Price-Fixing Conspiracies Ever.**

**1.   The CRT Conspiracy Was Elaborately Organized, Efficient, and Effective.**

The existence and operation of the CRT conspiracy is the overwhelmingly predominant issue for purposes of this motion and can be established through common, classwide proof from the conspirators' own documents and testimony. During hundreds of meetings over the course of twelve years, Defendants and their co-conspirators, *inter alia*, agreed: (a) to set target prices, price guidelines, and base or bottom prices for CRTs; (b) to reduce CRT output; (c) to allocate market and customer shares; (d) to monitor compliance with price and output agreements; (e) to exchange a wide range of confidential information regarding sales, production, demand, inventory, prices, and customer negotiations and other topics; and (f) to conceal the existence of the conspiracy.[9]

The conspirators began their meetings to exchange confidential price and production

---

[7] Declaration of R. Alexander Saveri in Support of Direct Purchaser Plaintiffs' Motion for Class Certification with Respect to the Thomson and Mitsubishi Defendants ("Saveri Decl.") (previously filed at ECF Nos. 2968-5 (unredacted version sealed per Order (ECF No. 3498)), 2969-2 (redacted version), Ex. 3. Hereafter "Ex. _" with numeric exhibits refers to exhibits to this previously filed Saveri Declaration.

[8] Foreign competition authorities have also fined CRT conspirators. The European Commission fined Chunghwa, Samsung, Philips, LGE, Panasonic, Toshiba, and Thomson, among others, 1.47 billion Euros ($1.9 billion). Ex. 10. The Japan Fair Trade Commission fined Panasonic, Samsung, and LGPD a total of $37.4 million. Ex. 11. The Korean Fair Trade Commission ("KFTC") fined Samsung, Chunghwa, and LGPD $23.5 million. Ex. 12. The KFTC also produced a detailed report on the workings of the conspiracy. A translated version of the report is Ex. 13. The Czech Competition Authority fined Chunghwa, Panasonic, Thomson, Toshiba, and others a total of 51.787 million CZK. Ex. 14. Thomson admitted liability in annual reports. Ex. 140.

[9] The conspirators' responses to interrogatories requiring identification of every conspiratorial meeting or communication list hundreds of contacts. *See* Exs. 17–28.

information and agree on pricing as early as February 1995.[10] The conspiracy proceeded through group and bilateral meetings. The group meetings were generally attended by the non-Japanese participants—*e.g.*, Thomson, SDI, LGE, Philips, Chunghwa, and Orion.[11] Japanese manufacturers—such as Mitsubishi, Hitachi, Panasonic, and Toshiba—were well aware of the antitrust laws and avoided group meetings to escape detection. Group meeting participants were assigned to meet with the Japanese companies separately to educate them about the agreements made at glass meetings, to obtain their input/assent, and to collect sales, production, and customer information.[12]

The conspirators implemented practices that would ensure the success of the conspiracy. By 1997, they had established a formal system of "glass" meetings to increase the quantity and quality of information available to the conspirators. Ex. 31 at 52:14–53:15.

The meetings were organized on three levels: (1) quarterly top level meetings attended by CEOs and CRT business unit heads; (2) monthly management level meetings attended by "Sales VP[s] or above" from each company; and (3) working level meetings attended by lower level employees for preparation of materials and data to be used at higher level meetings (monthly or every two months). *Id.* at 53:22–54:2; 73:14–74:5. In addition, there were "green meetings," which usually occurred in conjunction with top level and management meetings, where key executives

---

[10] Ex. 29 at SDCRT-0086208E (February 14, 1995 CPT meeting); *see also* Ex. 30 at CHU00028565E–66E (March 17–18, 1995 meeting); Ex. 31 at 56–57 (Defendants agreed on CRT prices beginning in 1995); Ex. 32 at CHU00028877E–78E (March 22, 1995 bilateral meeting Chunghwa/Samsung).

[11] *See, e.g.*, Ex. 39 at SDCRT-0086435E (October 20, 1998 CDT meeting) (market updates from Philips, Chunghwa, Orion, SDD [SDI], and LG).

[12] *See* Ex. 33 at CHU00028397E. *See also* Ex. 31 at 327:21–330:15 (bilateral meetings with Hitachi, Toshiba, Matsushita, and Irico); Ex. 39 at SDCRT-0086434E (October 20, 1998 CDT meeting) ("The 5 companies will reach an agreement to increase the price level. Samsung will deliver the 5 companies' opinions (to Matsushita)."); Ex. 34 at CHU00029188E (June 21, 1999 CPT meeting) (S.K. Park of SDI "[s]aid he would . . . arrange something like a Top Management meeting next week to explain to MMEC [Panasonic] the determination and achievement of this current price-up plan and ask MMEC [to follow] the new prices."); Ex. 35 at CHU00028791E–93E (November 23, 1996 CDT meeting) (discussing Hitachi); Ex. 36 at CHU00028464E (August 25, 1998 CDT meeting) (bilateral meeting with Panasonic); Ex. 93 at CHU00029229.01E (May 10, 1999 CPT meeting) (two attendees—"LG and OEC"—will contact Toshiba); Ex. 71 at SDCRT-0086417E (July 18, 1998 CDT meeting) (Through Matsushita, the Japanese members "Expressed their intention to participate actively" and "Caution against ANTITRUST LAW"); Ex. 50 at CHU00028386E (August 21, 1998 bilateral meeting Hitachi/Chunghwa) (Hitachi representative "indicated that he welcomes the price increase"); Ex. 2 at 60:8–63:4 (Samsung SDI's JI Lee met with Mitsubishi, others).

played golf to "increase[e] mutual trust." *Id.* at 75:16–24.[13] At least as early as 1998, the

conspirators organized and held regional meetings, including meetings in China with Chinese CRT

manufacturers. Saveri 2021 Decl., Ex. A at 238:3–240:1 (Chunghwa conspirator J.S. Lu testimony:

China meetings began prior to November 1998; Irico "major" participant).

Meetings were lengthy—they might take place over a day or two—and generally followed

the same format: (1) a market update, where member companies presented, *inter alia*, confidential

sales, production, and inventory information; (2) a market share analysis; (3) discussion of customer

negotiations; (4) an analysis of global supply and demand; (5) discussion and agreement regarding

target prices, output restrictions, and market allocation; (6) discussion of members' compliance with

previous agreements; and (7) "AOB" (any other business).[14] The conspirators designated a presiding

company to chair the meetings, coordinate information exchange and arrange meeting places. Ex. 31

at 64:16–65:11. Slide presentations were often exchanged in advance of the meetings.[15]

The cartel held separate meetings for CDTs and CPTs after 2000. However, the meetings

followed the same format, were often held on the same occasion, and were attended by many of the

same people.[16] As Chunghwa's S.J. Yang explained, there was a "[c]ommon acknowledgement to

---

[13] *See also* Ex. 41 at CHU00021268E–71E (March 4, 1999) (itinerary for March 5, 1999 Glass Meeting and March 6, 1999 Green Meeting); Ex. 13 at 16–17, ¶ 35 & Table 7 (KFTC Report (Statement of SDI General Manager I.H. Song)).

[14] *See generally* Ex. 42 at 62:15–63:11; Ex. 13 at 18–19, ¶ 38 & Table 11 (KFTC Report (Statement of SDI General Manager I.H. Song)). *See generally* meeting notes cited in nn.15, 19 below.

[15] *See, e.g.*, Ex. 43 at CHU00030857E–68E (September 20, 1999 CDT Meeting) (PowerPoint slides showing production, capacity, line configuration, demand, production outlook, etc.); Ex. 44 at CHU00028686E (November 11, 1997 bilateral meeting Chunghwa/Samsung) (information re production volumes, supply, demand). Ex. 45 at CHU00660386–89 (June 26, 2001 CPT meeting) (PowerPoint with "Market Update" slides); Ex. 46 at CHU00647932–43 (February 24, 2005 CDT meeting) (PowerPoint showing sales, market share review, capacity control guidelines, secrecy reminders, etc.); Ex. 47 at SDCRT-0087936E (December 6, 2002 meeting) (PowerPoint showing production, sales, price guidelines); Ex. 48 at CHU00031112.01E (March 19, 2001 CDT meeting) (2001 worldwide demand forecast); Ex. 49 at CHU00660426–35 (April 2002 CDT meeting) (PowerPoint showing inventory, sales, capacity, inventory, production, etc.); Ex. 51 at SDCRT-0086706–21 (October 26, 1999 CDT meeting) (PowerPoint showing supply, demand, output, capacity, etc.); Ex. 52 at SDCRT-0087359–70 (July 13, 2000 CDT meeting) (PowerPoint slides); Ex. 53 at CHU00660408–18 (August 2001 CDT meeting) (PowerPoint slides); Ex. 54 at CHU00660373–82 (April 22, 2002 CPT meeting) (PowerPoint slides); Ex. 55 at SDCRT-0087963–69 (December 1, 2002 CDT meeting) (PowerPoint slides); Ex. 56 at CHU00660671–80 (March 2003 CDT meeting) (PowerPoint slides); Ex. 57 at SDCRT-0090258–66 (March 2, 2004 CDT meeting) (PowerPoint slides); Ex. 13 at 17–18, Table 9 (KFTC Report (Statement of SDI General Manager I.H. Song)).

[16] This was done to enhance the secrecy of the meetings, by, *inter alia*, reducing the number of

7

discuss the same issues" at both meetings. *See* Ex. 63 at 8. Often, the conspirators would manage CDT and CPT supply by switching production from one product to the other.[17]

The Irico Defendants' participation in the conspiracy is well-documented. The Court has already noted that "there is evidence of the Irico Defendants' participation in 'a single, overarching conspiracy.'"). Order Setting Aside Default at 16 (Feb. 1, 2018) (ECF No. 5240). Discovery to date discloses over 100 meetings and other contacts by Irico with co-conspirators Chunghwa, Samsung SDI, Philips, LG, Toshiba, Hitachi and others. *See* Order re DPPs' Mot. to Compel Interrog. Further Answers at 2 (Aug. 4, 2021) (ECF No. 5944) ("103 documents that the DPPs assert establish incriminating conduct and communications by Irico").[18] These meetings were attended by high level sales managers and other senior executives from Irico and included discussion of CRT prices, production, future production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, as well as agreements on prices, customer allocations, and supply levels for CRTs. For example, on November 6, 1998, Irico hosted a meeting with Chunghwa, Philips, Samsung SDI (SSDD), Orion, and BMCC where specific prices were set for Irico CPTs. ECF No. 5228-2, Ex. 12 at CHU00030686.01E. Chunghwa's notes emphasized the conspirators' agreement to fix prices:

> Therefore, the meeting attendees achieved a unified approach and a common understanding, hastening each sales department to deliver the message as follows: "It

---

attendees at each meeting. *See* Ex. 58 at CHU00031007.02E (May 26, 2000 CDT meeting) ("CDT and CPT's [Glass Meetings] should be held separately after June 20[, 2000] to avoid more attendees gossiping"). *See also* Ex. 31 at 75:8–14 (meetings followed each other); Ex. 59 at SDCRT-0087344E (June 20, 2000 CDT meeting) (meeting schedule: 3 hour CDT meeting, followed by dinner with "CDT + CPT member[s]," followed by 3 hour CPT meeting). *Compare* Ex. 60 at CHU00030960.01E (January 24, 2000 CDT meeting) and Ex. 61 at CHU00029152E (January 24, 2000 CPT meeting) (SDI's Inn Kim and H.M. Ha attend both meetings); Ex. 62 at CHU00036391E (December 21, 2001 CPT meeting) (next CDT Glass Meeting in morning and next CPT Glass Meeting in afternoon of January 18, 2002).

[17] *See, e.g.*, Ex. 31 at 34:1–35:2 (would adjust lines to CDT or CPT "depending on the market"); Ex. 64 at CHU00031275.02E (September 20–21, 2004 CDT Meeting) ("SDI has CPT/CDT shared line"); Ex. 65 at CHU00029235.02E (April 15, 1999 CPT meeting) (line "changed to 50% CPT & 50% 17" CDT"); Ex. 66 at CHU00124030.02E (July 22, 2004 meeting) (CPT switched to CDT); Ex. 67 at 112:24–115:16; Ex. 68 at EIN0017706–07, 29, 47 (LG's line flexibility "enables product mix to reflect market demand" ).

[18] In the proceedings relating to the default entered against Irico, DPPs submitted documents evidencing 26 such meetings. An index of these meetings was publicly filed as ECF No. 5228-1, Ex. 11, which includes docket citations to each meeting note as well as related deposition excerpts.

is impossible for the prices to drop. If there are signs of oversupply, then it will be handled with reducing production."

*Id.* at CHU00030686.02E. Notes of a June 22, 1999 meeting between Irico, Orion and Chunghwa disclose that:

> They [Irico] very much appreciated the market information provided by CPT and ORION and are willing to cooperate with the move to increase the price of 14" CPT, except that July orders have already been received. They are willing to increase the overall price beginning in August.

ECF No. 5228-2, Ex. 17 at CHU00029051E ¶ 3. Notes of an August 5, 1999 meeting between Irico, Samsung SDI, Chunghwa, Philips, Orion and BMCC show discussion of "bottom price for key accounts" both for export and domestic sales for 14", 15" and 17" CDTs, "based on MPR II." A major topic was "Special lecture by MR. C.C.LIU ([Chunghwa] headquarters administrator)": "1) The industry meetings should remain confidential considering the international regulation of antitrust laws[;] 2) F[OLLOW]/UP on China regarding the top meeting decision[; and] 3) Discussions focused on 14"/15" prices[.]" ECF No. 5228-2, Ex. 20 at SDCRT-0086672E; *see also* ECF No. 5191-2, Ex. I.

Similarly, on August 9, 2001, Irico and Hitachi, BMCC, Chunghwa, Philips, LG and SDI considered production reduction proposals for CPTs and "Suggested Price" whereby "[e]ach company must follow the above pricing and must not sell at a lower price through any unfair competition means." ECF No. 5191-2, Ex. L at SDCRT-0087701E.

On December 31, 2003, Irico met with Chunghwa in Shenzen, China to discuss future production and plans. *See* ECF No. 5191-2, Ex. M. The report notes that Irico and Chunghwa "wish to once more exchange views regarding CPT factory production capacities." *Id.* at CHU00030067.03E ¶ 7.

An October 2005 meeting report documents Chunghwa's and Irico's "[h]ope [that] with both sides' sufficient communication and no malicious competition, can hold the market price and create a win-win opportunity." ECF No. 5228-2, Ex. 26 at CHU00040992E ¶ 4.

Other conspirators have testified to Irico's participation in the conspiracy. For example, Chunghwa conspirator J.S. Lu testified regarding a July, 2001 meeting that Irico "said it is willing to cooperate as I wrote it in this report" to "increase the overall price beginning in August." ECF No.

9

1    5228-2, Ex. 18 at 187:22–188:25. The Irico Defendants have confirmed attendance at competitor

2    meetings: senior manager, Zhaojie Wang, admitted attending "many, many such meetings." Saveri

3    2021 Decl., Ex. B at 92:19–24.

4          **2.       The Conspirators Set Prices, Production Levels, and Market Shares.**

5          Meeting notes referring to agreements on price—"price guidelines" or "bottom prices"—

6    and/or output restrictions—in the form of line or factory shutdowns—are legion.[19] The

7    conspiratorial agreements covered the entire market.[20] As Chunghwa's C.C. Liu explained:

8          Q.: Let's assume for a moment that you were to raise the price of 15-inch color picture
     tubes, without changing the price of the 17-inch color picture tubes. Do you have an
9    understanding, based upon your years of experience in the CRT business, what effect,
     if any, that would have on the relative mix of sales of 15-inch and 17 inch CPT tubes?

10         A.: This question is not difficult. We are professionals in this industry. We are selling

11   tubes like professionals if not experts. How could we only change the price of a 15

12

13   [19] *See, e.g.*, Ex. 69 at CHU0028760.01E–.02E (February 25, 1997 CDT meeting) ("bottom line
     prices" agreed upon, agreements to "reduce production days in order to control output quantity," and
14   to maintain "original [market share] as a principle," and to use "mutual assistance and trust" with
     each other); Ex. 70 at CHU00028726E (May 20, 1997 CDT meeting) (agreements at the May 7,
15   1997 CDT management level Glass Meeting were reiterated: (1) "guard [the] bottom price" and (2)
     "do not lower prices to take other makers' orders"); Ex. 71 at SDCRT-0086416E (July 18, 1998
16   CDT meeting) (agreements on price and supply detailed and "[i]t was confirmed that the CDT
     industry will definitely maintain the existing agreed-upon price"); Ex. 72 at CHU00028614E
17   (August 25, 1998 CPT meeting) (S.K. Park of SDI "indicated that its headquarters intends to invite
     CPT, LG, and Orion to discuss together how to stabilize CPT sales price"); Ex. 60 at
18   CHU00030960.02E (January 24, 2000 CDT meeting) ("Mr. Inn Kim called upon everyone again to
     keep the Agreed Price in order to show the sincerity of the Major 5. By doing this, the Japanese
19   manufacturers will naturally cooperate on the maintenance of the pricing."); Ex. 73 at
     CHU00030423.01E (April 22, 2002 CPT meeting) (the "Price Guide Line agreed by everyone");
20   Ex. 74 at CHU00660214E (June 19, 2003 CDT meeting) (SDI reported that it "approved of the line
     reduction proposal" and, based on the "resolution at the beginning of the year, . . . it had already
21   stopped a line in Suwon and converted one line in Pusan to produce CPT" and that "[a]nother line in
     Suwon will be stopped in 3Q") (market share ratios divided: "market rule is based on the negotiated
22   global market share ratio" and pursuant to the "agreement reached . . . the three makers modified
     yearly production targets for each customer and readjusted the three makers' market share ratios" );
23   Ex. 75 at SDCRT-0091657E (June 28, 2005 CDT meeting) (attendees "agreed to maintain the sales
     price until July"); Ex. 76 at CHU00030871.01E (September 28, 1999 CDT meeting) (agreement "to
24   continue reducing production with a stop production of 7 days/Line in October"); Ex. 53 at
     CHU00660414 (August 2001 CDT meeting) (PowerPoint: "shutdown plan schedule" for each
25   company by line and "monitoring rule: anytime open prior 3 days notice"); Ex. 77 at
     CHU00660198E (January 2, 2003 CDT meeting) (SDI confirmed "it has stopped half a production
26   line" at 2 plants and that "one more line stoppage can be accomplished in February"); Ex. 81 at
     SDCRT-0086511 ("price guideline agreed between Samsung and Thomson").

27   [20] *See also* Ex. 83 at CHU00031240.01E (March 25–27, 2004 CDT meeting) (agreement to "raise
     price across the board on all sizes to all customers by USD 2~3"); Ex. 77 at CHU00660199E
28   (January 2, 2003 CDT meeting) (discussion of "pricing of the entire market").

inches tubes without changing the prices for [17] inches of tubes? Of course, we would consider the overall market structure and the market acceptance and the reasonable cost gaps. We would certainly raise the prices at the same time.

*      *      *

We would not only raise the prices for 15 inches without changing price of all other items unless there is a particular situation that the purchase of 17 inches was not that strong and the purchase for 15 inches was particularly strong. Otherwise we would have an overall comprehensive consideration of the products categorically.

Ex. 31 at 296:3–298:21.

The conspirators agreed upon specific prices for CRT sizes which accounted for the overwhelming majority of sales. They commonly agreed on prices for 14", 15", 17" and 19" CDTs.[21] These sizes accounted for 98% of the sales of CDTs in the class period. *See* Expert Report of Phillip M. Johnson, Ph.D. (November 19, 2021) ("Johnson Rep.") ¶¶ 51-52, fig. 9. Similarly, the conspirators agreed upon prices for 14", 15", 20", 21", 25", 28", 29", and 32" CPTs accounting for 90% of sales in the class period. *Id.*[22] The conspirators also regularly discussed and agreed on price differentials for different sizes, types and configurations of CRTs. For example, the co-conspirators established price differentials for tubes sold with or without a "deflection yoke."[23]

---

[21] *See, e.g., Id.*; Ex. 56 at CHU000660676 (March 2003 CDT meeting) (15", 17", 19"); Ex. 79 at CHU00031011.02E (June 27, 2001 CDT meeting) (14", 15", 17"); Ex. 80 at CHU00031145.01E (June 20, 2000 CDT meeting) (14", 15", 17", 17" Flat, 19" 85KHz, 19" 95Khz).

[22] *See, e.g.,* Ex. 61 at CHU00029154.01E (January 24, 2000 CPT meeting) ("14"/20"/21" will increase price together . . . the target will be $1/pcs."); Ex. 85 at CHU0029245.02E–47E (March 7, 1999 CPT meeting) (14" and 20" "bottom price"); Ex. 95 at SDCRT-0091355E (March 2005 CPT meeting) (15", 21", 25", 29"); Ex. 98 at MTPD-0423675E (April 25, 2003 CPT meeting) (15", 21", 25", 28", 29", 32"); Ex. 121 at MTPD-0580726 (Sheet 2) P-0001E (November 28, 2003 CPT meeting) (15", 21", 25", 28", 29", 32", 34").

[23] Ex. 86 at CHU00029149E–50.01E. *See also, e.g.,* Ex. 48 at CHU00031112.01E; Ex. 56 at CHU00660675 (March 2003 CDT meeting) (PowerPoint with agenda item "Price gap as per Size and Type including new option price"), at CHU00660676 (grid showing target price for different types of variously configured 15", 17" and 19" tubes); Ex. 87 at CHU00030810.01E; Ex. 88 at CHU00030682.01E (October 9, 1998 CDT meeting) (regarding 15" CDT "a price differential of at least US$15 should be maintained from 14""); Ex. 89 at CHU00028401E (September 23, 1996 bilateral meeting Chunghwa/Hitachi) (discussion of price differential[s] between sizes); Ex. 90 at CHU00028747E (March 26, 1997 CDT meeting) (setting forth "price differentials among the tube types"); Ex. 91 at CHU00030704.01E (January 18, 1999 meeting) (discussing price differentials among types of 19" CDTs); Ex. 92 at CHU00030807.01E.–02E (July 28, 1999 meeting) (discussing price differences for 15" and 17" CDTs); Ex. 66 at CHU00124031.01E (July 22, 2004 meeting) ("cost differentiations of various 21" *PF* provided by MTPD"); Ex. 65 at CHU0029236.01E (April 15, 1999 CPT meeting) (bare and ITC prices agreed for 14" and 20"); Ex. 93 at CHU00029228.01E (May 10, 1999 CPT meeting) (prices for Bare and ITC 14" and 20"); Ex. 40 at SDCRT0088732.01E (September 8, 2003 CPT meeting) ("important to have a price strategy for 21" Flat in order to maintain the price of 20"/21" Normal . . . ."); Ex. 94 at CHU00029145.01E.–02E (March 24, 2000

11

### 3. Monitoring and Success of the Conspiratorial Agreements.

The CRT conspiracy was characterized by extraordinary monitoring and enforcement mechanisms. The conspirators dispatched "auditors" to visit other conspirators' plants and verify compliance with "work stoppage" and "line shutdown" agreements.[24] The conspirators monitored their sales and market share to confirm that pricing agreements were followed.[25] Cartel members actively sought information from their customers about the prices they were paying for CRTs.[26] Conspirators that were suspected violators of pricing agreements were confronted and disciplined.[27]

The conspiracy resulted in higher CRT prices. The conspirators believed in and explicitly

---

CPT meeting) (showing conversion for Bare to ITC of $3.5 for 14", $4.5 for 20"); Ex. 92 at CHU00030808.01E (July 28, 1999 CDT meeting) ("Dot Pitch price difference remained at USD5"); Ex. 90 at CHU00028747E (March 26, 1997 CDT meeting) (describing "[t]he price differential among the tube types:"); Ex. 96 at CHU00030559.02E (December 17, 2002 CPT meeting) (adjustment of Bare/ITC differentials); Ex. 97 at CHU00660630 (October 28, 2003 meeting) (pricing adjustments for different configurations of 15", 17", and 19" CDTs).

[24] Ex. 13 at 19, Table 11 (KFTC Report (Statement of I.H. Song)). *See also* Ex. 31 at 348:5–349:22 (audits to prevent cheating); Ex. 99 at CHU00030839E–40E (August 22, 1999 CPT and CDT bilateral meeting Chunghwa/LG) (Chunghwa visit to LGE plant); Ex. 100 at CHU00030985E–90E (March, 31, 2000) (report on upcoming audit of Samsung SDI Shenzhen plant, auditing plan); Ex. 101 at CHU00030998E (April 9–10, 2000 bilateral meeting Chunghwa/Samsung) (report on audit of Samsung SDI Shenzhen plant); Ex. 102 at SDCRT-0090355E–59E (November 30, 2004) (audit plan); Ex. 103 at CHU00071481E–82E (December 29, 2004 CDT meeting) ("Line shutdown plan" and auditors); Ex. 104 at SDCRT-0086569 (March 31, 1999 memo from Samsung, LG, and Orion to Chunghwa) (subject: "Monitoring plan for working day reduction in April"); Ex. 106 at CHU00030750.01E (April 28, 1999 CDT meeting) (plant shutdown schedule and auditing); Ex. 107 at SDCRT-0086596E (April 14, 1999 CDT meeting) (plans for "monitoring of other companies").

[25] *See, e.g.*, Ex. 69 at CHU00028760.02E (February 25, 1997 CDT meeting) ("to take 'maintaining of original M/S [market share] as a principle, respective makers must not use the opportunity to acquire original delivery volume of other makers due to price increase"); Ex. 56 at CHU00660672–73 (March 2003 meeting) (sales and market share of conspirators).

[26] *See, e.g.*, Ex. 56 at CHU00660675 (March 2003 meeting) ("Taipei Working Level Meeting—Verification · Feedback from Customer"); Ex. 103 at CHU00071481E (December 29, 2004 CDT meeting) (Chunghwa questioned LPD's price to customers after conferring with customer AOC); Ex. 130 at CHU000660724 (August 17, 2004 CDT meeting) (price monitoring and penalty system).

[27] *See, e.g.*, Ex. 31 at 368:1–15 (evidence collected and suspected cheaters confronted); Ex. 103 at CHU00071481E (December 29, 2004 CDT meeting) (discussing prices offered by conspirators); Ex. 13 at 42–43, ¶ 85 (KFTC Report) (August 18, 1997 CDT meeting to check whether agreements were carried out); Ex. 108 at SDCRT-0087953E (November 1, 2002 CDT meeting) ("penalty if company cheat price"; the "person in charge & manager will be dispelled." If anyone deviates from the agreement, the "other 2 company will attack trouble maker's [*sic*] major customer."); Ex. 109 at CHU00578883.02E (November 15, 2004 CDT meeting) (SDI reprimands LPD for selling to Proview, one of its main customers, without telling SDI, noting that "this action already violated tacit agreement on sales allocation" and that "SDI was resentful and strongly demanded LPD to explain and describe follow-up measures and how it plans to proceed with Proview").

---

noted the effectiveness of the conspiracy. One meeting note memorably stated that "because of the success of Glass Meeting, everybody has been Enjoying Business this year."[28] The evidence also shows that inflated CRT prices resulted in inflated prices for Finished Products sold by the co-conspirators and their affiliates. The meeting notes document frequent observations that increases in Finished Product prices resulted from conspiratorial CRT price increases.[29] In addition, the co-conspirators regularly analyzed "street prices" of Finished Products to inform the prices set for CRTs.[30] The conspirators also established prices for CRTs "sold" internally within vertically

[28] Ex. 1 at CHU00030916.02E. *See also, e.g.*, Ex. 31 at 364:19–365:10; Ex. 36 at CHU00028464E ("[P]rice increase has effectively been implemented."); Ex. 43 at CHU00030855.02E (Prices of 14" and 15" were "successfully increased."); Ex. 71 at SDCRT-0086416E ("[M]ost monitor manufacturers acknowledge the inevitability of the price increase."); Ex. 90 at CHU00028747E ("In terms of price increases for 14" CDT, the meeting attendees all said that the customers all more or less accepted, no problem."); Ex. 91 at CHU00030701.01E–.02E ("The conclusion of the 17" CDT price increase: proceeding smoothly; each maker has increased prices since January 16."); Ex. 110 at SDCRT-0086677E (Prices for 14" and 15" increased.); Ex. 111 at CHU00030889.01E ("Mr. Lin emphasized that this year the 17" price has been able to be *keep* at a price no less than $90 because of the Glass Meeting."); Ex. 112 at CHU00030902E ("Price-up trend in European & American market thanks to capacity reduction in Asia."); Ex. 113 at SDCRT-0086557E ("All companies successfully completed price increase."); Ex. 114 at TSB-CRT-00041862E ("It was confirmed that the price increases for February and beyond were successful."); Ex. 115 at CHU00028867E ("[P]rices to customers increased again on September 1."); Ex. 116 at CHU00031179.02E (While customers disagree with "price increase, they are beginning to understand that it is inevitable.").

[29] *See, e.g.*, Ex. 115 at CHU00028867E (September 18, 1995 CPT bilateral meeting Chunghwa/Samsung) ("prices to customers increased again on September 1. SEC was no exception. SEC will increase [Finished Product] sales prices to its customers (Apple, etc.) starting October 1."); Ex. 117 at CHU00030731.02E (March 15, 1999 CDT meeting) ("Mr. Ha also claimed that its headquarters had conveyed the price increase information to SEC. SEC has also informed its customers that the sales price would be increased again."); Ex. 118 at CHU00031184.02E (February 22, 2002 CDT meeting) ("[T]he $2 price increase this time was to facilitate monitor makers' transfer of the CDT increase to customers."); Ex. 119 at CHU00030831.01E (August 10, 1999 CDT meeting) ("Besides, addressing the customers' queries raised by CPT as to whether the Korean market would simultaneous increase the price for 15" [Underlined by hand], SDD stated that in addition to SEC accepting, export customers such as Hyundai/Daewoo have also accepted, but it would require some time for the Monitor makers to reflect the price increase to the PC system makers."); Ex. 120 at CHU00031254.01E (July 2, 2004 CDT meeting) ("it is necessary to ask customers to pass the extra cost of CDTs on to system makers."); Ex. 83 at CHU00031242E (March 25–27, 2004 CDT meeting) ("we should also inform the customers of a possible second stage of price hike, so that they can take time to pass on to OEM customers.").

[30] *See, e.g.*, Ex. 53 at CHU00660417 (August 2001 CDT meeting) (PowerPoint includes "street price review" and analysis of LCD street prices ratio to CRT street prices); Ex. 91 at CHU00030702.01E (January 18, 1999 CDT meeting) ("Conclusion: Mr. David indicated that recently the newspapers and media have repeatedly published information about the expected rise of CDT and Monitor prices. It is quite helpful for our CDT and Monitor makers to raise the prices even further in the future."); Ex. 123 at CHU00030791.01E (June 23, 1999 CDT meeting) ("President Lin indicated that raising the price on 15" not only benefits 15" CDT makers, but also gives Monitor makers the opportunity to adjust the price . . . ."); Ex. 124 at CHU00028589.01E (October 23, 2001 meeting) (noting "recent successful rise in TFT retail prices"); Ex. 125 at CHU00031174.01E

13

integrated makers of Finished Products.[31] Thus, even when CRT manufacturing subsidiaries "sold" CRTs internally, or to Finished Products business units of other conspirators, the cost of the CRTs directly affected the price of the finished television or computer monitor. And, of course, the CRT is the most costly input of a Finished Product. Johnson Rep. ¶ 95.

### 4. The Conspirators Concealed the Conspiracy.

The conspirators knew that their actions were illicit and actively concealed the conspiracy. Among other things, the conspirators agreed on pretextual justifications for price increases and orchestrated communications with customers to create the false impression of competition, including agreeing how, when and by whom customers would be notified of price increases.[32]

The conspirators also disguised the nature of glass meetings. C.C. Liu of Chunghwa testified that attendees kept the meetings a "secret" by keeping the group of attendees the same, and, at hotel meetings, attendees "walk[ed] into the meeting venue separately" and there was "no public information board on site in the hotel." Ex. 31 at 93:10–94:13.[33] Members were reminded of the need for secrecy. For example, an agenda item at one meeting was "Method to Avoid Antitrust

---

(December 28, 2001 CDT meeting) ("Currently, LCD has successfully raised its price 3 times since October and it will increase another $10 next month."); Ex. 126 at CHU00031180.02E (January 23, 2002 CDT meeting) (suggested price increase in April 2002, "in order to more efficiently facilitate monitor factories' smoothly transferring the CDT [tube] price increase to customers"); Ex. 119 at CHU00030831.01E (August 10, 1999 CDT meeting) ("it would require some time for the Monitor makers to reflect the price increase to the PC system makers."); Ex. 122 at CHU00031052.02E (September 21, 2000 CDT meeting) (wholesale and retail prices of LCD and CRT monitors).

[31] *See, e.g.*, Ex. 31 at 326:14–327:15 (internal discounts not to exceed 5% so as not to affect price increase); Ex. 125 at CHU00031175.01E (December 28, 2001 CDT meeting) (makers agree on prices to be offered to "intra-group" monitor makers as 2.5% less than other customers).

[32] *See, e.g.*, Ex. 127 at CHU00036378.02E–79.01E (May 10, 1999 CPT meeting) ("Each maker shall send a price-up notice to respective customer as follows:" followed by detailed notification plan. "Participants had a comprehensive and thorough discussion about when to send the official price-up letter to particular customers and how to verify or monitor."); Ex. 34 at CHU00029185.01E (June 21, 1999 meeting) ("Review of price-up notices to each customer by various makers"); Ex. 56 at CHU00660675 (Glass Meeting PowerPoint for March 2003) (method, timing of customer price communications, press release), at CHU00660678 (pretext—cost increases—for increase); Ex. 69 at CHU00028760.01E (February 25, 1997 CDT meeting) ("how to let the customers believe that the current CDT price has hit bottom"); Ex. 128 at CHU00030722.02E (March 1, 1999 CDT meeting) (SDI urged members to justify price on pretext that "Glass price has been raised"); Ex. 129 at CHU00028763E (February 24, 1997 CDT meeting) ("published the news about reducing production"); Ex. 38 at ME00131622E (price increase notices).

[33] *See, e.g.*, Ex. 58 at CHU00031007.02E (May 26, 2000 CDT) (Philips urges that "all the attendees try to not make meeting minutes and only to keep the relevant Marketing Survey. . . . Jerry Lin also suggested limiting each maker to 2 attendees for both Top Meetings and Working level meetings.").

14

1    Laws."[34] Members were also instructed not to take notes and to destroy evidence.[35]

2    **V.    ARGUMENT.**

3         The Supreme Court has long recognized that antitrust class actions are a vital component of

4    antitrust enforcement. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard*

5    *Oil Co.*, 405 U.S. 251, 266 (1972). Consequently, as Judge Conti noted, courts "resolve doubts in

6    these actions in favor of certifying the class." Cert. Order at 6 (quoting *In re Rubber Chems.*

7    *Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) ("*Rubber Chems*).

8         To determine whether the DPPs have satisfied their burden under Rules 23(a) and (b), the

9    court must conduct a "rigorous analysis," which may require it to probe behind the pleadings. *Ellis*

10   *v. Costco Wholesale Corp.*, 657 F.3d 970, 980–81 (9th Cir. 2011). However, "Rule 23 grants courts

11   no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may

12   be considered to the extent—but only to the extent—that they are relevant to determining whether

13   the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans*, 568

14   U.S. 455, 465–66 (2013); Cert. Order at 8.

15        "The district court is required to examine the merits of the underlying claim in this context,

16   only inasmuch as it must determine whether common questions exist; not to determine whether class

17   members could actually prevail on the merits of their claims." *Ellis*, 657 F.3d at 983 n.8. Thus, it

18   would be improper to determine on a certification motion which of the parties' respective experts'

19

20   [34] Ex. 130 at CHU00660727 (August 17, 2004 CDT meeting); *see also* Ex. 131 at SDCRT-
21   0086672E (August 5, 1999 meeting) ("Special lecture" that "[t]he industry meetings should remain
     confidential considering the international regulation of antitrust laws") (publicly filed as ECF No.
     5228-2, Ex. 20).

22   [35] *See, e.g.*, Ex. 132 at CHU00028706E (August 1, 1997 CDT bilateral meeting Chunghwa/Samsung)
23   (to keep meetings secret, parties agree to "exchange information orally and not provide any written
     information."); Ex. 133 at MTPD-0038856E (November 28, 2003 CPT meeting) (meeting notes
24   marked "Highly Confidential/Destroy after Reading"); Ex. 134 at MTPD-0497049E (May 18, 2004
     CPT meeting) (meeting notes "Extremely Sensitive / Destroy After Reading"); Ex. 135 at MTPD-
25   0492286E (September 27, 2004) (email re MTPD meeting with Chunghwa states "[t]his type of
     communication may raise a cartel red flag. No forwarding please! Please delete after reading.");
26   Ex. 136 at HDP-CRT00025646E (January 1996 bilateral meeting) (internal Hitachi email re meeting
     with SDI marked "handle with care/destroy after reading."); Ex. 113 at SDCRT-0086557E (January
27   18, 1999 CDT meeting) (meeting notes marked "[p]lease dispose of this material after reading it");
     Ex. 109 at CHU00578883.01E (draft notes for November 15, 2004 CDT meeting) (names and
28   information from the meeting are crossed out, noting "[g]iven that holding meetings with peers in the
     industry violates free market mechanism, it is not suitable to leave any evidence on paper").

findings and observations are more credible on the merits: "[t]o hold otherwise would turn class

certification into a mini-trial." *Id.* Plaintiffs need only show that they satisfy the prerequisites set

forth in FRCP 23(a) and one subsection of FRCP 23(b). *See Rubber Chems.*, 232 F.R.D. at 349–50.

There is also no requirement that the class be ascertainable under FRCP 23. "In 2017, however, the

Ninth Circuit ruled definitively that ascertainability is not a requirement under Rule 23." *Sarmiento*

*v. Sealy, Inc.*, 18-cv-01990-JST, 2020 WL 4458915, at n.3 (N.D. Cal. May 27, 2020) (Tigar, J.)

(citing *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125 (9th Cir. 2017)).

> **A.** **Plaintiffs Satisfy the Requirements of FRCP 23(a).**

> **Numerosity**. There "is no fixed numerical threshold class members must exceed to satisfy

the numerosity requirement." *Terry v. Hoovestol, Inc.*, Case No. 16-cv-05183-JST, 2018 WL

6439167, at *3 (N.D. Cal. Dec. 7, 2018) (Tigar, J.) (holding 39-member settlement class met

numerosity requirement). Here the transactional data produced by the conspirators show there are

thousands of geographically dispersed members of the proposed class. Saveri Decl. ¶ 2.

Accordingly, as the Court has already held, the FRCP 23(a)(1) standard is satisfied. Cert. Order at 9.

> **Commonality**. FRCP 23(a)(2) requires that class members share common issues of law or

fact. Only one significant issue is necessary to satisfy the commonality prong. *Wal-Mart v. Dukes*,

564 U.S. 338, 359 (2011). Courts in this Circuit have repeatedly held that this prong is satisfied

where—as here—a price-fixing conspiracy is alleged. "[T]he very nature of a conspiracy antitrust

action compels a finding that common questions of law and fact exist." *Wortman v. Air New*

*Zealand*, 326 F.R.D. 549, 556 (N.D. Cal. 2018) (Breyer, J.)(quoting *In re Dynamic Random Access*

*Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *3 (N.D. Cal. June 5,

2006) ("*DRAM*"). Other common questions include whether the conspiracy caused the prices of

CRTs to be set at supra-competitive levels, the measure of classwide damages and whether the

conspirators engaged in affirmative acts to conceal the conspiracy. As the Court has already found,

the FRCP 23(a)(2) standard is satisfied. *See* Cert. Order at 22.

> **Typicality**. "The typicality prerequisite of Rule 23(a) is fulfilled if 'the claims or defenses of

the representative parties are typical of the claims or defenses of the class.'. . . 'Under the rule's

permissive standards, representative claims are 'typical' if they are reasonably co-extensive with

16

those of absent class members; they need not be substantially identical.'" *Castillo v. Bank of America, NA*, 980 F.3d 723, 729 (9th Cir. 2020) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). As Judge Conti explained, "[t]ypicality requirements are often satisfied 'wherein it is alleged that the defendants engaged in a common [price-fixing] scheme relative to all members of the class.'. . . In such cases, 'there is a strong assumption that the claims of the representative parties will be typical of the absent class members.'" Cert. Order at 10 (quoting *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1035 (N.D. Miss. 1993)).

Purported factual differences from Class members with respect to purchasing practices or dealings with defendants do not preclude typicality. "[T]here is substantial legal authority holding in favor of a finding of typicality in price fixing conspiracy cases, even where differences exist between plaintiffs and absent class members with respect to pricing, products, and/or methods of purchasing products." *In re Korean Ramen Antitrust Litig.*, No. 13-CV-04115-WHO, 2017 WL 235052, at *18 (N.D. Cal. Jan. 19, 2017) (quoting *DRAM*, 2006 WL 1530166, at *5).

As Judge Conti noted, the named DPPs' claims are typical of the claims of other putative Class members because "the pervasive nature and common impact of Defendants' alleged price-fixing scheme supports that the claims made by the DPPs 'stem from the same event, practice, or course of conduct that forms the basis of the claims of the class and are based on the same legal or remedial theory.'" Cert. Order at 3 (quoting *In re Citric Acid*, No. 95–1092, C–95–2963 FMS,1996 WL 655791 (N.D. Cal. Oct. 2, 1996). The alleged conspiracy set the supra-competitive prices all Plaintiffs and Class members paid and forms the linchpin of the claims of every Plaintiff and Class member. That some purchased CRTs in Finished Products does not undermine typicality. The Court has already held that Finished Products purchasers may seek the same overcharge as purchasers of CRTs. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857, 872 (N.D. Cal. 2012) ("*CRT II*").

**Adequacy**. Plaintiffs also satisfy FRCP 23(a)(4). "The proper resolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Financial Corp. Sec. Litig.*, 213

17

F.3d 454, 462 (9th Cir. 2000). Adequacy requires that Plaintiffs (1) have no interests that are antagonistic to or in conflict with the interests of the class; and (2) retain counsel able to vigorously prosecute the interests of the class. *See SRAM*, 2008 WL 4447592, at \*4. Only one class representative need meet this requirement. *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009) "'[T]he threshold of knowledge required to qualify a class representative is low; a party must be familiar with the basic elements of her claim . . . and will be deemed inadequate only if she is 'startlingly unfamiliar' with the case.'" *In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 628 (N.D. Cal. 2018) (Tigar, J.) (quoting *In re Intuitive Surgical Sec. Litig.*, Case No. 5:13-cv-01920-EJD, 2016 WL 7425926, at \*7 (N.D. Cal. Dec. 22, 2016).

Courts have regularly found this requirement satisfied in price-fixing cases. Class representatives "will be found to be adequate when the attorneys representing the class are qualified and competent, and the class representatives are not disqualified by interests antagonistic to the remainder of the class." *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2010 WL 5396064, at \*4 (N.D. Cal. Dec. 23, 2010)("*Online DVD Rental*"). "The mere potential for a conflict of interest is not sufficient to defeat class certification; the conflict must be actual, not hypothetical." *In re Static Random Access (SRAM) Antitrust Litig.*, No. C 07-01819 CW, 2008 WL 4447592, at \*4 (N.D. Cal. Sept. 29, 2008). There is no conflict here. The named DPPs allege Class members were injured by the same conspiracy in the same way, seek the same relief in the form of overcharge damages, and share an identical interest in proving Defendants' liability.

The named DPPs have also retained skilled counsel with extensive experience in prosecuting antitrust class actions. The Court has appointed Saveri & Saveri, Inc. as Interim Lead Class Counsel. Order Appointing Interim Lead Counsel (May 9, 2008) (ECF No. 282). The Saveri firm has undertaken the responsibilities assigned to it and—with other able Plaintiffs' counsel—have vigorously pursued the litigation on behalf Plaintiffs and the proposed Class. Among other things, Plaintiffs have obtained nine settlements totaling over $212 million. The Saveri firm has devoted substantial time, resources, and leadership necessary to vigorously prosecute this action, and will continue to do so. As the Court has already held, Plaintiffs meet the adequacy requirement[36] *See*

---

[36] Saveri & Saveri, Inc. also seek appointment as Lead Counsel for the class pursuant to Rule 23(g).

1    Cert. Order at 22.

2      **B.**  **This Action Meets the Requirements of FRCP 23(b)(3).**

3       To qualify for certification under FRCP 23(b)(3) a class must meet two additional

4    requirements: "[c]ommon questions must predominate over any questions affecting only individual

5    members; and class resolution must be superior to other available methods for the fair and efficient

6    adjudication of the controversy." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)

7    (internal quotations omitted). As noted by the Supreme Court: "[p]redominance is a test readily met

8    in certain cases alleging . . . violations of the antitrust laws." *Id.* at 625.

9        **1.**  **Common Questions of Law and Fact Predominate.**

10      Courts commonly find "predominance" under FRCP 23(b)(3) satisfied in direct purchaser

11   horizontal price fixing cases. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 07-cv-05944-JST, 2020

12   WL 1873554, at *5 (N.D. Cal. Mar. 11, 2020) ("[I]n price-fixing cases, such as this, 'courts

13   repeatedly have held that the existence of the conspiracy is the predominant issue and warrants

14   certification even when significant individual issues are present.'" (quoting *Thomas & Thomas*

15   *Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 167 (C.D. Cal. 2002)).

16   The Rule "does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of

17   [her] claim [is] susceptible to classwide proof.' . . . What the rule does require is that common

18   questions '*predominate* over any questions affecting only individual [class] members.'" *Amgen*, 568

19   U.S. at 469 (brackets and emphasis in original). The inquiry is whether the class is "sufficiently

20   cohesive to warrant adjudication by representation." *Id.* (quoting *Amchem*, 521 U.S. at 623).

21       Rule 23(b)(3)'s predominance requirement is satisfied when "common questions
          represent a significant aspect of [a] case and . . . can be resolved for all members of [a]

22       class in a single adjudication." . . . Or, to put it another way, common questions can
          predominate if a "common nucleus of operative facts and issues" underlies the claims

23       brought by the proposed class. . . . Individual questions need not be absent. The text of
          Rule 23(b)(3) itself contemplates that such individual questions will be present. The

24       rule requires only that those questions not predominate over the common questions
          affecting the class as a whole.

25

26   *Messner v. Northshore Univ. Health System*, 669 F.3d 802, 815 (7th Cir. 2012) (internal citations

27   omitted). As Judge Conti noted in *CRT I*, "the Court's rigorous analysis overlaps with the merits of

28
<hr>
19

1    the IPPs' claims and requires that the IPPs make an evidentiary case for predominance, . . . but

2    Defendants are trying to push the ISM and the Court toward a full-blown merits analysis, which is

3    forbidden and unnecessary at this point." 2013 WL 5391159, at *5 (citations omitted). "In

4    determining whether common questions predominate, the Court identifies the substantive issues

5    related to the plaintiffs' claims (both the causes of action and affirmative defenses), and then

6    considers the proof necessary to establish each element of the claim or defense, and how these issues

7    would be tried." *Sarmiento*, 2020 WL 4458915, at *5.

8        Here, common issues predominate with respect to DPPs' proof of the three elements of their

9    claim: (1) that Defendants participated in a conspiracy to fix prices in violation of the antitrust laws;

10   (2) that DPPs suffered antitrust injury (*i.e.*, "impact") caused by the conspiracy; and (3) the damages

11   they sustained. *See* Cert. Order at 38, 43, & 48. Common questions predominate because the DPPs

12   will establish these elements through "generalized proof" applicable to the Class as a whole.

13       **Existence and Nature of the Conspiracy.** If each Class member were required to prove its

14   claim individually at trial, each would show that Defendants and their co-conspirators organized,

15   participated in, and operated the same global price-fixing cartel. Each would submit the same type

16   of proof detailed above in Section IV above, namely: hundreds of Glass Meetings attended by the

17   conspirators, the meeting notes and other documents proving them, testimony of the conspirators'

18   employees about the industry and their price-fixing efforts, and similar evidence. This proof, along

19   with economic evidence of the conspiracy, is common to the Class and supports a finding of

20   predominance. *See SRAM*, 2008 WL 4447592, at *5 (common liability issues predominated because

21   common evidence regarding alleged conspiracy, including written records of in-person, telephone,

22   and email communications, would be necessary to prove claims of all class members).

23       **Classwide Proof of Impact**. Proof of antitrust injury requires a showing of some injury to

24   "business or property" due to an antitrust violation. *See Reiter*, 442 U.S. at 337–41; *Zenith Radio*

25   *Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 126 (1969) *superseded by statute on other grounds*.

26       "[O]n a motion for class certification, the Court only evaluates whether the method by which

27   plaintiffs propose to prove class-wide impact could prove such impact, not whether plaintiffs in fact

28   can prove class-wide impact." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 313

20

1    (N.D. Cal. 2010) ("*LCD*") (quoting *In re Magnetic Audiotape Antitrust Litig.*, No. 99 CIV 1580,

2    2001 WL 619305, at *4 (S.D.N.Y. June 1, 2001)). Stated another way, all that is required is that

3    plaintiffs present a "'plausible methodology to demonstrate that antitrust injury can be proven on a

4    class-wide basis.'" *Id.* at 311. "'[T]he issue at class certification is not which expert is the most

5    credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way

6    to prove a class-wide measure of [impact] through generalized proof." *Online DVD Rental*, 2010

7    WL 5396064, at *10 (quoting *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust*

8    *Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009) ("*EPDM*")

9         The DPPs present three types of "generalized proof." First, as Plaintiffs' expert economist,

10   Dr. Johnson explains, the contemporaneous evidence of the conspiracy shows classwide impact.

11   Second, Dr. Johnson presents statistical evidence of classwide harm. Third, Dr. Johnson concludes,

12   based upon evidence of the structure of the CRT market and the operation of the CRT conspiracy,

13   that the conspiracy caused classwide impact. Each of these categories of evidence is substantially

14   identical to that presented to Judge Conti and each constitutes a "plausible methodology" to prove

15   generalized harm. Together, they easily satisfy the requirements of FRCP 23(b)(3).

16        First, evidence of conspiratorial conduct can prove impact. *See, e.g. In re High-Tech Emp.*

17   *Antitrust Litig.*, 289 F.R.D. 555, 570–73, 576 (N.D. Cal. 2013). Here, as explained above, there is

18   abundant evidence common to the Class that Defendants' conspiracy had classwide impact. Thus,

19   the conspirators systematically set bottom prices thereby raising the beginning price for negotiation.

20   *See* Section IV.B.2 above.

21        Proof of a conspiracy to establish a "base" price would establish at least the *fact* of
          damage, even if the extent of the actual damages suffered by the plaintiffs would vary.

22        . . . [T]he proof with respect to the "base" price from which these negotiations began,
          or the structure of the conspiracy to affect individual negotiations, would be common

23        to the class. Accordingly . . . the fact of damage is predominantly, if not entirely, a
          common question.

24

25   *EPDM*, 256 F.R.D. at 89 (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493,

26   523 (S.D.N.Y. 1996) ("*NASDAQ*")); *see also In re Urethane Antitrust Litig.*, No. 13-3215, 2014 WL

27   4801253, at *6 (10th Cir. Sept. 29, 2014) ("Under the prevailing view, price-fixing affects all market

28   participants, creating an inference of class-wide impact even when prices are individually

21

negotiated. . . . The inference of class-wide impact is especially strong where, as here, there is evidence that the conspiracy artificially inflated the baseline for price negotiations." (citations omitted)). Like Dr. Leitzinger, Dr. Johnson shows that the alleged conspirators set "target prices" for all but a small fraction of the CRT market. Johnson Report at ¶ 51 (90% of CPT and 98% of CDT shipments targeted); *id.* ¶¶ 50, 52, figure 9. As Dr. Johnson notes: "That result, by itself, goes a long way towards establishing the existence of broad impact on the part of the alleged conspiracy." *Id.* ¶ 51. Dr. Johnson also notes that other aspects of the conspiracy—e.g., it operated in a structured pricing environment in which price increases were intended to apply to all configurations of all CRTs, its extensive organization and communication—facilitated broad impact. *Id.* at ¶¶ 30-43, 58-61.

Contemporaneous evidence also shows that the agreed bottom prices were effective in raising prices; the conspirators repeatedly proclaimed the success of their price fixing. *See* Section IV.B.4 above. This also proves classwide impact. The conspirators monitored and enforced their pricing and output agreements, which also proves classwide impact. *See High-Tech*, 289 F.R.D. at 572 (monitoring and enforcement of conspiratorial agreements shows "broad effects" on class). Judge Conti found this evidence "has the ability to show impact through common evidence and methods." Cert. Order at 40.

Second, Dr. Johnson's statistical analysis confirms that the conspiracy succeeded in raising prices for all CRTs. Johnson Rep. ¶¶ 7, 53-56, figs. 10, 11, 57, 62 & figs.12, 13. Dr. Johnson performed a series of hedonic regressions that explain CRT prices using a set of observable characteristics—size, screen format, whether ITC or bare, transaction quantity, and manufacturer. They showed that the vast majority of price variability amongst CRT buyers is attributable to these characteristics, rather than disparate conspiracy impact. *Id.* ¶¶ 26-29, fig. 7. Dr. Johnson also analyzed the effect of the conspirators' price agreements—"price targets"—on actual prices. His correlation analysis shows that target and actual prices were highly correlated. His regression analysis indicates—with a high degree of statistical significance—that "target prices" increased actual prices. *Id.* ¶¶ 53-56 & figs.10–11. Additionally, Dr. Johnson's correlation analyses show that the prices of the few CRT sizes for which express "target prices" were not found were also highly

22

correlated with the prices of targeted CRTs. *Id.* ¶¶ 57, 62–64 & figs.12 & 13. And although Dr.

Johnson was not required to do so under *Royal Printing* (*CRT II*, 911 F. Supp. 2d at 871), he further

showed through a regression analysis that conspiratorial overcharges would necessarily be reflected

in Finished Product prices. Johnson Rep. ¶¶ 89-97 & fig. 20. In these regards, Dr. Johnson's

statistical analysis and his conclusions are substantially identical to Dr. Leitzinger's.

Dr. Johnson has also performed additional statistical analyses further confirming his

conclusion of widespread impact. He adapted his damage model to allow its application to

individual customers. These regressions confirmed widespread impact among customers as to which

sufficient data exists. *Id.* ¶¶ 81-86, fig. 19.[37]

Third, economic analyses of the structure of an industry are another type of common proof

which courts have relied on to find that antitrust injury is susceptible to classwide proof within the

meaning of FRCP 23(b)(3). Cert. Order at 43 ("The Court's review of structural factors presented by

Dr. Leitzinger shows, by a preponderance of the evidence, that structural issues could be shown at

trial to have generated class impact."). Like Dr. Leitzinger, Dr. Johnson also concludes that during

the class period, the CRT industry was characterized by a number of structural factors—market

power, barriers to entry, output restrictions, a price structure, and ability to monitor prices—that

would have resulted in classwide impact. Johnson Rep. ¶¶ 7, 22, 23, fig. 4, fig. 6, 44-49, fig. 8, 46,

51–54, 60–63. Judge Conti relied on a similar analysis by the IPPs' expert in affirming a

recommendation to certify a class of indirect purchasers of CRTs. *CRT I*, 2013 WL 5391159, at *3.

**Classwide Proof of Damages**. Dr. Johnson's damage model determines the difference

between the prices actually charged for CRTs during the class period and prices in a "but for" world.

It is therefore tied closely to the DPPs' theory of liability.[38] Johnson Report ¶¶ 72-80. It is based on

---

[37] Dr. Johnson also demonstrated that prices in China and North America closely tracked global prices. Johnson Report, ¶¶ 65-67, figures 14, 15. He also demonstrated that prices of CDTs and CPTs were closely correlated. *Id.* ¶¶ 62, 63, fig. 12.

[38] The proposed method "need not be exact" but "must be consistent with [the plaintiffs'] liability case." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("*Comcast*") (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)). "Plaintiffs' burden at this stage is only to demonstrate that 'the questions of law or fact common to the class members *predominate* over any questions affecting only individual members.' . . . Courts in this circuit have not interpreted *Comcast* to 'require certification proponents to rely on a class-wide damages model to demonstrate predominance.' . . . Rather, '[t]he Ninth Circuit reads *Comcast* to demand only that plaintiffs 'be

the well-established "before and after" method, which was previously approved by Judge Conti. Cert. Order at 43-48 ("[Dr. Leitzinger's] use of regression and correlation analysis is well established as a means of providing classwide proof of antitrust injury and damages."). Dr. Johnson uses econometric techniques—a reduced form regression analysis "widely employed by economists" (Johnson Rep. ¶ 72-73)—to compare prices during the conspiracy period with prices from "before" and "after" the conspiracy, while controlling for material changes in the market between the time periods. *Id*. ¶¶ 74-76.

Dr. Johnson's model is designed to measure the importance of past prices in determining future prices, as well as the direct effect on prices of an active conspiracy. *Id*. ¶¶ 77, 78, 79, figs. 16, 17, 18. Dr. Johnson's model determines overcharge percentages for each quarter of each year of the conspiracy ranging from 0.1 percent to 10.5 percent for CDTs and from 0.2 percent to 8.3 percent for CPTs. *Id.* ¶ 80.[39] Dr. Johnson's damage model is substantially identical to Dr. Leitzinger's previously approved model. *See* ECF No. 5191-2, Ex. D.

This type of study is a standard of antitrust practice. Cert. Order at 44-45. The merits of this methodology "will be adjudicated at trial based upon economic theory, data sources, and statistical techniques that are entirely common to the class." *SRAM*, 2008 WL 4447592, at *6 (quoting *NASDAQ*, 169 F.R.D. at 521). It is well-established that a need for individualized damage calculations will not defeat class certification. *Vaquero v. Ashley Furniture Industries, Inc.,* 824 F.3d 1150, 1155 (9th Cir. 2016) ("Under *Tyson Foods* and our precedent, therefore, the rule is clear: the need for individual damages calculations does not, alone, defeat class certification."). "[U]ncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages." *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th Cir. 2019) (quoting *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017)." "At the class certification stage, Plaintiffs must show that damages can 'feasibly and efficiently be calculated once the common liability questions are adjudicated.'" *Aberin v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2021 WL 1320773, at *11 (N.D. Cal. Mar. 23, 2021) (quoting *Leyva v.*

able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *In re Twitter Inc. Sec. Litig.*, 326 F.R.D. at 630 (citations omitted).
[39] As Judge Conti confirmed, the use of average quarterly prices is proper. Cert. Order at 44-45.

24

1    *Medline Industries Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013).

2          Here, Dr. Johnson has presented a workable and widely accepted methodology for measuring

3    classwide damages. In doing so, moreover, Dr. Johnson has gone well beyond FRCP 23's

4    requirements and he has constructed a complete working model (though preliminary) that can

5    determine damages on a classwide basis. Johnson Rep. ¶¶ 87-88.

6                        **2.      A Class Action Is Superior Here.**

7          FRCP 23(b)(3) requires that a class action be "superior to other available methods for fairly

8    and efficiently adjudicating the controversy." Here, it would be incredibly inefficient to litigate the

9    predominating common issues in individual proceedings. In addition, "[i]n antitrust cases such as

10   this, the damages of individual direct purchasers are likely to be too small to justify litigation, but a

11   class action would offer those with small claims the opportunity for meaningful redress." *SRAM*,

12   2008 WL 4447592, at *7. The prosecution of separate actions would also create the risk of

13   inconsistent rulings and could result in prejudice to the named DPPs and Class members. As Judge

14   Conti noted in the Cert. Order: "[C]ontinuing in the form of a class action will promote judicial

15   efficiency, is likely the only means of recovery for many plaintiffs whose recovery would otherwise

16   be too low to justify the cost of individual litigation, and there seems to be little disagreement among

17   the proposed class regarding whether class treatment would be beneficial." Cert. Order at 49. Thus,

18   class certification remains plainly superior here to individual proceedings.

19   **VI.    CONCLUSION**

20         For the foregoing reasons, the DPPs respectfully request that the court grant class

21   certification and appoint Saveri & Saveri Class Counsel pursuant to FRCP 23(g).

22

23   Dated: November 19, 2021                    Respectfully submitted,

24                                                /s/ *R. Alexander Saveri*
25                                               R. Alexander Saveri (173102)
                                                 Geoffrey C. Rushing (126910)
26                                               Matthew D. Heaphy (227224)
                                                 Sarah Van Culin (293181)
27                                               SAVERI & SAVERI, INC.
                                                 706 Sansome Street
28                                               San Francisco, CA 94111

1

Telephone: (415) 217-6810
Facsimile: (415) 217-6813

2

*Interim Lead Counsel for*
*Direct Purchaser Plaintiffs*

3

4

Joseph W. Cotchett
Adam J. Zapala
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000

5

6

7

8

Steven F. Benz
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999

9

10

11

12

Douglas A. Millen
William H. London
FREED KANNER LONDON & MILLEN
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224) 632-4519

13

14

15

16

*Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28

DPPs' NOMAM FOR CLASS CERTIFICATION WITH RESPECT TO IRICO DEFS.; MEMORANDUM OF POINTS
& AUTHORITIES IN SUPPORT THEREOF; Master File No. 07-CV-5944-JST