BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
        evan.werbel@bakerbotts.com
        tom.carter@bakerbotts.com
        drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 4:07-cv-05944-JST (N.D. Cal.) |
| | MDL No. 1917 |
| This Document Relates to: | **IRICO DEFENDANTS' OPPOSITION TO DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION WITH RESPECT TO THE IRICO DEFENDANTS** |
| ALL DIRECT PURCHASER ACTIONS | |
| | Date: March 31, 2022 Time: 2:00 pm Judge: Hon. Jon S. Tigar Courtroom: 6, 2nd Floor |

TABLE OF CONTENTS
Contents

**INTRODUCTION** ................................................................................................................ **1**

**FACTUAL BACKGROUND** ............................................................................................. **3**

   A.   CRTs are Differentiated Products that Cannot Serve as Substitutes for One Another ....... 3

   B.   There are Fundamental Differences Between the United States, China, and Other Overseas Markets for the Various Types of CRTs ..................................................................................... 4

   C.   CRT Manufacturers Sold to a Variety of Differently Situated Customers Across the World
       5

   D.   Irico Was a Disruptive Player in the CRT Industry ............................................................. 6

**ARGUMENT** ....................................................................................................................... **7**

   A.   Dr. Johnson's Decision to Appropriate a Majority of his Analysis from a Different Expert Casts Serious Doubt on the Reliability of "His" Expert Opinions ............................................... 8

   B.   DPPs Cannot Satisfy Rule 23(a)'s Requirements for Typicality and Adequacy of Representation ................................................................................................................................. 10

      1.   DPPs' Class Representatives Are Not Typical, Nor Can They Adequately Represent the Class Because They Are Not Properly Members of a Direct Purchaser Class ..................... 10

      2.   Even if They Have Standing, DPP Class Representatives' Claims are Atypical of Those of the Bulk of Class-wide Direct Purchases ........................................................................... 13

   C.   DPPs Fail to Show that Common Questions would Predominate as Required by Rule 23(b)(3) ........................................................................................................................................ 14

      1.   DPPs' Own "Class-wide" Impact Analysis Actually Shows that a Large Majority of CRT Shipments Were Not Subject to Any Alleged Price Fixing ......................................... 14

      2.   Dr. Johnson's Price Target Regressions Do Not Show Class-wide Impact .................. 17

      3.   Dr. Johnson's Models Obfuscate Key Disparities in Impact from Product Differentiation, Geographic Distinctions, and Purchasing Practices ..................................... 19

      4.   Dr. Johnson's Damages Model Fails the *Comcast* Standard by Incorporating "Damages that are Not the Result of the Wrong" ................................................................................... 22

   D.   Given the Wide Disparities Within the DPP Class and the Lack of Reliable Class-Wide Models for Impact and Damages, Class Resolution is not Superior ........................................... 25

**CONCLUSION** ................................................................................................................. **25**

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**CASES**

4

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ................................................................................. 14

*Bowerman v. Field Asset Servs., Inc.*,
   No. 13–cv–00057–WHO, 2014 WL 4676611 (N.D. Cal. Sept. 17, 2014) ............................ 14

*Brazil v. Dole Packaged Foods, LLC*,
   No. 12-CV-01831-LHK, 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014), *aff'd*, 660 Fed. Appx.
   531 (9th Cir. 2016) ..................................................................................... 19

*Bruton v. Gerber Prod. Co.*,
   No. 12-CV-02412-LHK, 2018 WL 1009257 (N.D. Cal. Feb. 13, 2018) ............................... 24

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ............................................................................... 7, 22

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) ..................................................................... 10, 13

*Easter v. Am. West Fin.*,
   381 F.3d 948 (9th Cir. 2004) ...................................................................... 10

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) ................................................................................ 10

*Illinois Brick v. Illinois*,
   431 U.S. 720 (1977) ................................................................................ 11

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   738 F. Supp. 2d 1011 (N.D. Cal. 2010) ................................................................ 10

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   911 F. Supp. 2d 857 (N.D. Cal. 2012) ...................................................... 1, 10, 12

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. 4:07-cv-5944-JST, 2016 WL 7805628 (N.D. Cal. Aug. 4, 2016) ........................... 10, 11

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. 4:07-cv-5944-JST, slip. op. (N.D. Cal. Jan. 30, 2017), ECF No. 5105 ......................... 10

*In re Milk Prods. Antitrust Litig.*,
   195 F.3d 430 (8th Cir. 1999) ...................................................................... 13

*In re Optical Disc Drive Antitrust Litig.*,
   303 F.R.D. 311 (N.D. Cal. 2014) ................................................................. 13, 14

*In re Rail Freight Surcharge Antitrust Litig.*,
   292 F. Supp. 3d 14 (D.D.C. 2017) ...................................................................... 25

*Larsen v. Vizio, Inc.*,
   No. SACV 14-01865-CJC(JCGx), 2017 WL 11633132 (C.D. Cal. Apr. 27, 2017).............. 24

*Levine v. United States*,
   383 U.S. 265 (1966) ............................................................................................ 25

*McCarthy v. Kleindienst*,
   741 F.2d 1406 (D.C. Cir. 1984) ......................................................................... 25

*Moore v. BASF Corp.*,
   No. CIV.A. 11-1001, 2012 WL 6002831 (E.D. La. Nov. 30, 2012), *aff'd sub nom* ................ 9

*Raymo v. Sec'y of Health & Hum. Servs.*,
   No. 11-0654V, 2014 WL 1092274 (Fed. Cl. Feb. 24, 2014) ................................. 9

*Reitman v. Champion Petfoods USA, Inc.*,
   830 Fed. App'x 880 (9th Cir. 2020) ................................................................... 23

*Royal Printing Co. v. Kimberly–Clark Corp.*,
   621 F.2d 323 (9th Cir.1980) ................................................................................ 1

*Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*,
   No. 6:15-CV-641-ORL-28TBS, 2017 WL 11457208 (M.D. Fla. Apr. 13, 2017) .................... 9

*Sun Microsystems, Inc. v. Hynix Semiconductor Inc.*,
   608 F. Supp. 2d 1166 (N.D. Cal 2009) ............................................................. 12

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) ............................................................................................ 22

*United States v. Lothian*,
   976 F.2d 1257 (9th Cir. 1992) ............................................................................ 25

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .............................................................................................. 7

**STATUTES**

Fed. R. Civ. P. 23 ................................................................................... passim

1      Defendants Irico Group Corp. and Irico Display Devices Co., Ltd. ("Irico" or "Irico

2   Defendants") respectfully oppose the Direct Purchaser Plaintiffs' ("DPPs") Motion for Class

3   Certification with Respect to the Irico Defendants (ECF No. 5962).

4                                    **INTRODUCTION**

5      The Direct Purchaser Plaintiffs ("DPPs") fail to carry their burden to demonstrate the

6   requirements for a class action under FRCP 23, attempting to shoehorn their claims against Irico,

7   the only remaining defendant in this case, into a mold that does not fit.  In essence, DPPs have

8   simply re-submitted their prior briefing, hoping this Court will rubber-stamp their motion on the

9   basis that Judge Conti had granted class certification in a companion case against the differently-

10  situated Mitsubishi defendants and as to Indirect Purchaser Plaintiffs.  Neither of those cases is

11  instructive on whether the DPP's motion should be approved in this case against Irico.  Moreover,

12  worse than dusting off their prior submissions, the DPPs engaged a new expert economist, Dr.

13  Johnson, to submit a report that he purports to be his own, but the vast majority of which –

14  including all of the critical analyses – he admits in his deposition is copied exactly from DPPs

15  prior expert, Dr. Leitzinger, without any citation, credit or sourcing. Carter Decl.[1], Ex. 1

16  ("Johnson Dep.") at 136:6-139:9.  For that reason alone, it should be deemed unreliable.  But if it

17  is examined further, this report – even if it were somehow credited as the work of Dr. Johnson –

18  is rife with faulty models that fail to implement even the most basic economic tests for stability.

19  No reliable determination of commonality or predominance could be based on his report.

20     First, DPPs class representatives are predominantly buyers of finished products against

21  Irico who lack standing to be class members when examined in light of the Court's prior rulings

22  in this case.  Indirect purchaser members of the DPP class have standing to pursue claims where

23  their purchases were made "from an entity allegedly owned or controlled" by a conspiring

24  Defendant.  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857, 872 (N.D. Cal.

25  2012); *see also Royal Printing Co. v. Kimberly–Clark Corp.*, 621 F.2d 323, 327 (9th Cir.1980)

26

27  _____
    [1] All references to the Carter Decl. refer to the Declaration of Thomas E. Carter in Support of
28  Irico Defendants' Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification With
    Respect to the Irico Defendants, filed concurrently herewith.

---

1  ("*Royal Printing*").  That is not the case.  DPPs do not, and cannot, assert that any class member

2  purchased any finished product "from any entity owned or controlled" by Irico.  Irico was a CRT

3  manufacturer that sold its products to independent manufacturers of finished products that have

4  no impediment to pursuing damage actions.  Thus, the *Royal Printing* exception that underpinned

5  Judge Conti's Mitsubishi class certification ruling, and this Court's summary judgment decisions

6  in the Thompson and TDA cases, has no application here.  The DPPs' finished product class

7  representatives are not proper members, and not typical or adequate representatives under Rule

8  23(a), of the class.

9      Second, DPPs have failed to satisfy the predominance and commonality prerequisites for

10  class certification under FRCP 23.  DPPs' assertions hinge on the report offered by Dr. Johnson.

11  But Dr. Johnson copied almost the entirety, *more than 86 percent*, of Dr. Leitzinger's report,

12  which had been offered in DPPs' case again Mitsubishi, into "his" report.    Dr. Johnson admitted

13  copying the large majority of Dr. Leitzinger's report, agreeing that it was "not a coincidence."

14  Johnson Dep. 127:22-25.  As a result, the key analytics shown in Dr. Johnson's report – including

15  all four of the regression analyses presented – are *exact copies* of Dr. Leitzinger's models and

16  results, *down to the fourth decimal place*.  Yet Dr. Johnson did not cite to Dr. Leitzinger's report

17  a single time, did not identify Dr. Leitzinger's report among his source materials and, in his

18  deposition, steadfastly denied that Dr. Leitzinger was even a source of anything in his report.

19  Johnson Dep. 138:4-17.  Dr. Johnson's report is not his own work and is not a reliable analysis by

20  an expert charged with reporting on his independent findings.  Accordingly, in keeping with

21  precedent, Dr. Johnson's report should not be considered as reliable by the court.  Without it,

22  DPPs have no foundation for their allegations of commonality and predominance and their

23  motion for class certification should be denied.

24      Third, even if Dr. Johnson's report is considered, it suffers from multiple critical errors.

25  Among those critical errors: (1) he misrepresents his foundational target price analysis, which he

26  concluded "by itself, goes a long way towards establishing the existence of broad impact"; (2)

27  advances a regression analysis in support of his conclusions on price effect that is purely

28  correlation with no supporting indication of causation; and (3) fails to apply basic econometric

tests, such as cointegration and non-stationarity tests, to check the exposure of his work to fatal errors.   In addition, Dr. Johnson draws conclusions on key points, like product interaction, without conducting even the most basic economic tests.  These elementary economic failings inherently cast doubt on his conclusion that the alleged cartel resulted in common impact across class members.  Finally, he presents a damages study that fails to match the harm alleged.  For example, his study bakes-in and relies upon two years of price effects before there is *any* evidence to suggest coordination of prices for the products involved.  It also relies on "but for" prices that fail to consider Chinese Government mandated price floors for CRTs.  And it ignores the fact that there is no evidence to suggest that Irico participated in the alleged conspiracy until August of 1998 – three years after the start of the class period.  In short, it falls far short of the *Comcast* requirements.

Each of these failings is sufficient to condemn DPPs motion to failure.  Combined, they expose DPP's motion for exactly what it is: a complete rehash of an approach from a different case with differently situated defendants in the hopes that the essential differences and unique posture of this case will be ignored.

## FACTUAL BACKGROUND

### A.    CRTs are Differentiated Products that Cannot Serve as Substitutes for One Another

CRTs were a highly differentiated product, with a wide range of types, sizes, features, and end uses.  The two primary types of CRTs, color display tubes ("CDTs") and color picture tubes ("CPTs"), are distinct products with distinct end uses.  CDTs were used in computer monitors, while CPTs were used in TVs.[2]  Because of these different uses, CDTs and CPTs were not good substitutes and had non-interchangeable components.[3]  As an example, CDTs were generally smaller than CPTs, had a higher resolution than CPTs, and used many different internal components than CPTs.[4]  CPTs, meanwhile, were designed to focus on brightness and larger

[2] *See* ECF No. 5962-2, Expert Report of Phillip M. Johnson ("Johnson Rep.") at ¶ 13.

[3] *See, e.g.*, Carter Decl. Ex. 2, Heiser (Hitachi) Dep. 46:24-47:23 ███████████
███████████).

[4] *Id.*

1    displays to facilitate distanced television viewing.

2         The distinct utility of CDTs and CPTs meant that sellers had to use different

3    manufacturing techniques to create CDTs and CPTs.[5]  Because the products were sold to different

4    customers, sellers ██████████████████████████████████████████████████████

5    ██████████████████████████████

6         The onset of flat panel technology, i.e. LCDs and plasma, introduced competitive options

7    for consumers, the impact of which occurred at different points in time for CDTs and CPTs.

8    CDTs felt the impact first, reflected in the precipitous drop in global CDT monitor penetration

9    from 91% in 2001 to 10% in 2007.[7]  CPTs, meanwhile, faced weaker competition from LCDs at

10   first and saw the global market share for CRT TVs drop from 100% to 48% during this same time

11   period.[8]  These factors influenced CDT and CPT prices separately during the class period.

12   **B.    There are Fundamental Differences Between the United States, China, and Other**
         **Overseas Markets for the Various Types of CRTs**

13
         The non-interchangeability of CRT technology across geographies created additional

14
     fundamental divisions across CRT sales based on location. For example, due to different

15
     broadcasting standards, manufacturers had to make different CPTs depending on where a TV was

16
     used.[9]  A television manufactured and sold for U.S. use would not work if brought overseas to

17
     Europe.[10]  Demand for different technology also fueled the variable market dynamics. In general,

18   _____

19   [5] Carter Decl. Ex. 4, Michael Son (SDI) Dep. 318:20-319:9 (██████████████████████████

20   █████████████)

21   [6] *See, e.g.,* Carter Decl. Ex. 5, Jae In Lee (SDI) Dep. 212:1-213:2 (██████████████████████
     ██████████████████); Ex. 6, Chih Chun Liu (Chunghwa) Dep. 502:2-19 (████████).

22
     [7] Carter Decl. Ex. 7, Expert Report of Robert D. Willig ("Willig Rep.") at ¶ 16.  Dr. Willig's

23   report was submitted by other defendants to critique the analysis of Dr. Leitzinger, whose
     analyses Dr. Johnson largely appropriated without material change.  *See infra* at 10.

24   [8] *Id.*

25   [9] *See, e.g.,* Carter Decl. Ex. 8, Nishiyama (Panasonic) Dep. 129:4-23 (████████████████████

26   ████████████████████████████); Ex. 3, De Moor
     (Philips) Dep. 241:7-18 (d██████████████████████████████████████████

27   ████████████).

28   [10] Carter Decl. Ex. 3, De Moor (Philips) Dep. 241:7-18 (████████████████████████████████████
     ██████████████████████████).

1    Americans wanted larger and higher performing TVs and computer monitors.[11] This, combined

2    with the higher tariff and shipping costs in North America, meant that nearly all CPT TVs

3    destined for the U.S. had to be manufactured in North America.[12]

4           The Chinese market for CRTs was vastly different than that of the U.S.  As a developing

5    country when CRTs were the prevailing technology for a much longer time, far fewer Chinese

6    consumers actually possessed a television or computer monitor compared to their American

7    counterparts, prompting the Chinese government to directly involve itself in CRT and television

8    production.[13]  When market conditions in China caused CRT and finished product prices to drop

9    precipitously in 1998, the government intensified its involvement by passing direct regulation of

10   CRT and television price levels that set floor prices below which it was unlawful to sell for all

11   manufacturers based in China.  *See infra* at 23.

12   **C.     CRT Manufacturers Sold to a Variety of Differently Situated Customers Across
            the World**

13
14          Some CRT manufacturers were vertically integrated, owning both the facilities that

15   manufactured CRTs and the facilities that incorporated the CRTs into finished products.  Others,

16   like Irico, sold CRTs to independent entities that manufactured finished products.  For those

17   vertically integrated entities that initial "sale" of the CRT was often only an internal transfer.

18   After CRTs were incorporated into a finished product, the finished product was in some cases

19   sold directly to end users, but most were sold through different sales channels including

20   distributors, retailers, or other companies that in turn marketed the finished product to end users.[14]

21   ---

[11] *See, e.g.*, Carter Decl. Ex. 2, Heiser (Hitachi) Dep. 40:24-41:15 ("███████████████
22   ████████████████████████: Ex. 8, Nishiyama (Panasonic) Dep. 75:20-76:7 (████████
     ████████████████████████).

23   [12] *See, e.g.*, Carter Decl. Ex. 3, De Moor (Philips) Dep. 34:13-36:21 (████████████
24   █████████████████████████: Ex. 10, Uchiyama (Toshiba) Dep. 19:1-
     9, 45:13-15, 46:8-47:3 (████████████████████████████).

25   [13] *See* Carter Decl. Ex. 30 at IRI-CRT-00000651 (Chinese government agencies and officials
     opining on the importance of "Color TV … for industry, national defense, and civilian use" and
26   directing it to be included in China's "five-year plan.")

27   [14] *See, e.g.*, Carter Decl. Ex. 11, Panosian (SEC/SEA) Dep. 116:19-117:25; 141:4-20 (████████
28   (███████████████████████): Ex. 12, Huber (Toshiba) Dep. 44:16-47:4
     (████████████████████████████).

The larger customers were able to obtain more favorable and stable prices.[15] Smaller customers had little choice but to purchase finished products at list price.[16]  CRTs not produced by vertically integrated entities were sold primarily to independent CRT Product manufacturers for incorporation into TVs and monitors.  DPPs' class, as proposed, includes both U.S.-based direct purchasers of CRTs and U.S.-based indirect purchasers of finished products, if purchased from an entity owned or controlled by a defendant or alleged co-conspirator.

### D.     Irico Was a Disruptive Player in the CRT Industry

The documentary evidence on which DPPs rely to support its allegations of a conspiracy confirms that Irico's alleged involvement was as an outsider and saboteur.  D███████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

██████████████████  Irico's hyper-competitive behavior is explained by two distinguishing factors: the low quality and generally outdated technology of Irico's CRTs, and its unique status as a wholly state-owned enterprise throughout the entire class period.  Irico's status as a state-

---

[15] *See* Carter Decl. Ex. 13, Yun Seok Lee (LG Electronics) Dep. 44:4-8 (███████████████████████████████████); Ex. 14, London (SEC/SEA) Dep. 195:3-196:18; 198:3-199:3; 201:3-202:21 (████████████.

[16] Carter Decl. Ex. 15, Buckowski (Studio Spectrum) Dep. 115:22-116:3 (███████████████); Ex. 16, Lau (Royal Data) Dep. 128:20-129:23 (██████); Ex. 17, Nusbaum (Arch Electronics) Dep. 72:6-14 (██████).

1    owned enterprise insulated it from some of the consequences of those low prices.  The documents

2    relied upon by DPPs confirm that as a state-owned enterprise Irico was often not overly

3    concerned with profits or even breaking even.  ████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████  This evidence casts

8    serious doubt on whether Irico actually reached a "meeting of the minds" with any of its alleged

9    co-conspirators.  But more importantly for the instant motion, it calls into serious question

10   whether the impact of any conspiracy of which Irico is alleged to have been a part was common.

11                                                **ARGUMENT**

12           DPPs bear the burden of proof to demonstrate, by a preponderance of the evidence, that all

13   requirements for maintaining a class action under Federal Rule of Civil Procedure 23 are met.

14   "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.

15   338, 350 (2011).  Rather, the Court must be "satisfied, after a rigorous analysis, that the

16   prerequisites of Rule 23(a) have been satisfied," which "[f]requently … will entail some overlap

17   with the merits of the plaintiff's underlying claim."  *Id.* at 350-51.  These requirements include

18   showing that "(1) the class is so numerous that joinder of all members is impracticable; (2) there

19   are questions of law or fact common to the class; (3) the claims or defenses of the representative

20   parties are typical of the claims or defenses of the class; and (4) the representatives parties will

21   fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  Likewise, the

22   "same analytical principles govern Rule 23(b)," which, "[i]f anything … is even more demanding

23   than Rule 23(a)" and includes additional "procedural safeguards" to ensure (in the case of

24   damages classes) that courts "take a close look at whether common questions predominate over

25   individual ones," *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013), and that "a class action is

26   superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed.

27   R. Civ. P. 23(b)(3).  Plaintiffs fail to meet these rigorous requirements.

28

**A.** **Dr. Johnson's Decision to Appropriate a Majority of his Analysis from a Different Expert Casts Serious Doubt on the Reliability of "His" Expert Opinions**

Dr. Johnson testified, under oath, that the analyses in his proffered report reflected his judgments, his methodologies and his opinions. Johnson Dep. 112:6-114:12. He further testified that he included a "complete and accurate" list of his sources. *Id.* at 114:4-22. And that he was providing his own opinion, not the opinion of anyone else. *Id.* at 122:7-15.

Yet, when confronted with the stark comparison, he could not deny the identicality of his report to Dr. Leitzinger's:

> Q.    It's not a coincidence that the words are identical in your report to Dr. Leitzinger's report, is it?
> A.    No, not at all.

*Id.* at 127:22-25 (objection omitted).

> Q.    Dr. Johnson, it wouldn't surprise you if a majority of the language in your report was identical to the language in Dr. Leitzinger's report; is that correct?
> A.    I haven't gone through to do an analysis on that, but it wouldn't surprise me, no.

*Id.* at 132:14-21.

But it is not merely the descriptive language on the industry background or the nature of the conspiracy that reflects a cut-and-paste job from Dr. Leitzinger's report, it is the essential analyses that form the backbone of his conclusions:

- His target price regression analysis asserting that "The Cartel's Price Targets Elevated Actual Prices" for North America (Figure 10): ***identical***.

- His target price regression for Non-North America (Figure 11): ***identical***.

- His correlation study of targeted CRTs and other CRTs (Figure 13): ***identical***.

- His CRT overcharge regression analysis (Figure 16): ***identical***.

- His Quarterly Weighted Actual and But-For Price study for CDTs and CPTs (Figures 17 and 18): ***identical***.

Every variable chosen, every quantitative method applied, every data source used and every test run in each of these analyses, and others, reflect the choices of Dr. Leitzinger, carbon copied by Dr. Johnson, with results that are identical down to the fourth decimal. Attached at Exhibit 27 is a copy of Dr. Leitzinger's 2014 report highlighted to show the portions that were

1   copied verbatim into Dr. Johnson's report.  In short, more than **86 percent** of Dr. Leitzinger's

2   report[17] was copied verbatim into Dr. Johnson's report.

3         While DPPs undoubtedly will argue that Dr. Johnson came to these opinions on his own

4   accord and that he and his staff re-ran the analyses, no amount of explanation can justify his

5   denials of reliance on Dr. Leitzinger:

> Q.   So it's your testimony that you did not rely at all on Dr. Leitzinger's report in
>       forming your opinion; is that correct?
> A.   The report is an expression of Dr. Leitzinger's opinion, his report is an expression
>       of his opinions and analysis that he -- that's done in his report. My report is a
>       reflection of the analysis done in my report, the materials reviewed in my report,
>       and contains the opinions. It's --- Dr. Leitzinger's report is not a source document or
>       a piece of evidence in this case that I would rely on.
> Q.   I think you said before that it's no coincidence that some of your language was
>       identical to Dr. Leitzinger's language; is that correct?
> A.   I don't recall whether I said those words or not, but it's -- I wouldn't call it a
>       coincidence.

13   Johnson Dep. 138:4-25.  That Dr. Johnson and his team may have "checked the math" of Dr.

14   Leitzinger or added a few additions does not justify the total adoption of Dr. Leitzinger's

15   approach, ideas and methodologies without credit and while denying it as a source.  To use a

16   regrettable but unavoidable term: Dr. Johnson's report is plagiarism.

17         In such circumstances, courts have readily decided in their discretion that the opinions of

18   expert witnesses are not reliable and have refused to rely on those opinions. *See Spiral Direct,*

19   *Inc. v. Basic Sports Apparel, Inc.*, No. 6:15-CV-641-ORL-28TBS, 2017 WL 11457208, at *2

20   (M.D. Fla. Apr. 13, 2017) ("Due to Kasper's attempt to appropriate the opinions of [a previous

21   expert] and play them off as her own, Kasper's report is unreliable and must be excluded.");

22   *Moore v. BASF Corp.*, No. CIV.A. 11-1001, 2012 WL 6002831, at *7 (E.D. La. Nov. 30, 2012),

23   *aff'd sub nom.* Moore v. Int'l Paint, L.L.C., 547 F. App'x 513 (5th Cir. 2013) (holding expert

24   report and testimony inadmissible at trial because the expert plagiarized report, and then testified

25   that the report he proffered was his original drafting); *Raymo v. Sec'y of Health & Hum. Servs.*,

26   No. 11-0654V, 2014 WL 1092274, at *14 (Fed. Cl. Feb. 24, 2014) (precluding any reliance upon

---

[17] Based on a comparison of the word count of the text of Dr. Leitzinger's report that is repeated verbatim in Dr. Johnson's report, excluding footnotes and exhibits.

the expert's opinion and testimony because the expert plagiarized his report, denied consulting with the expert he plagiarized, and did not disclose his plagiarism to opposing counsel until after he was confronted). Irico respectfully contends that Dr. Johnson's report should not be deemed reliable and should be excluded.

**B.      DPPs Cannot Satisfy Rule 23(a)'s Requirements for Typicality and Adequacy of Representation**

Plaintiffs must demonstrate that their claims or defenses are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality requires that "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982). The typicality analysis "must involve a comparison of the plaintiffs' claims or defenses with those of the absent class members." *Deiter v. Microsoft Corp.,* 436 F.3d 461, 467 (4th Cir. 2006).

**1.      DPPs' Class Representatives Are Not Typical, Nor Can They Adequately Represent the Class Because They Are Not Properly Members of a Direct Purchaser Class**

Irico is keenly aware of the court's prior rulings on DPP standing in this case, both with respect to the motions to dismiss and motions for summary judgment for lack of standing, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857 (N.D. Cal. 2012), and on motions for summary judgment of individual defendants, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 4:07-cv-5944-JST, 2016 WL 7805628, (N.D. Cal. Aug. 4, 2016); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 4:07-cv-5944-JST, slip. op. (N.D. Cal. Jan. 30, 2017), ECF No. 5105. Irico's argument here is distinct from those prior arguments. As explained below, DPPs' proposed class contains a preponderance of class members who are not entitled to any recovery from Irico because they lack standing to be members of this DPP class. Thus, the claims of DPPs' named Plaintiffs are neither typical of the proposed class nor will they fairly and adequately protect the interests of the class, because those representatives are not properly members of the class under Rule 23(a). *See Easter v. Am. West Fin.*, 381 F.3d 948, 962 (9th Cir. 2004) (denying certification under Rule 23 for lack of standing because "a plaintiff having one cause of action against one defendant could not represent a class with actions against defendants who had behaved similarly

1   but had not injured the plaintiff.").

2         As this court previously decided, although indirect purchasers normally cannot sue under

3   the Clayton Act for the portion of damages passed on to them, "[t]here are situations, however,

4   where forces in the indirect purchaser market are superseded such that the entire anticompetitive

5   harm is passed from the direct purchaser to the indirect purchaser." *In re Cathode Ray Tube*

6   *(CRT) Antitrust Litig.*, No. 4:07-cv-5944-JST, 2016 WL 7805628, at *5, citing *Illinois Brick v.*

7   *Illinois*, 431 U.S. 720, 736 (1977). This is because the "control relationship between a direct

8   purchaser and a price fixer forecloses any realistic possibility of suit by the direct purchaser." *Id.*

9   (citations omitted).  That circumstance does not apply to the instant motion.

10        First, DPPs represent both direct and indirect purchasers, and claim damages for both

11  groups.[18]  These two widely-disparate groups have been granted standing to pursue claims for two

12  different reasons: the direct purchasers because they are not barred by *Illinois Brick*, and the

13  indirect purchasers because, although otherwise barred by *Illinois Brick*, they purchased from an

14  entity owned or controlled by a conspiring defendant.  The DPPs, obviously, do not represent the

15  claims of all indirect purchasers, only those that purchased from an entity owned or controlled by

16  a defendant; otherwise the DPP class would subsume the entirety of the IPP class as well.  Where

17  an indirect purchaser bought both from an entity controlled by a defendant, and from other

18  unaffiliated downstream sellers (such as wholesalers), they may have separate claims for those

19  distinct purchases that fall in both the DPP class and the IPP class. *See, e.g.,* ECF No. 1978 ¶¶

20  236-249 (amended complaint filed by opt-out class member Best Buy asserting violations of

21  Section 1 of the Sherman Act and the Minnesota Antitrust Act of 1971).  Thus, it is crucial to

22  distinguish among direct purchasers of CRTs, indirect purchasers who bought from integrated

23  manufacturer of finished products, and indirect purchasers who bought from a non-integrated

24  manufacturer of finished products.

25        Second, because DPPs also represent some direct purchasers of CRTs, it is clear that

26    [18] While DPPs point to "thousands" of potential class members as identified in CRT manufacturer

27  transactional data, Mot. at 16, that statistic obfuscates a key distinction among the members of the
    purported class: less than one hundred of those "thousands" are direct purchasers of CRTs.  Of
    the small group of direct purchasers, the purchases are heavily concentrated among large buyers

28  such as ███████████.  Carter Decl. ¶¶ 26, 40, Ex. 25.

1  market forces do not prevent claims by direct purchasers of CRTs in all circumstances of this

2  case, only in some.  Thus, Judge Conti concluded that indirect purchasers here could pursue

3  damages only where those market forces are absent: "The Named DPPs are indirect purchasers,

4  but, under *Royal Printing*, they have standing to sue *insofar as* they purchased FPs incorporating

5  the allegedly price-fixed CRTs *from an entity owned or controlled by any allegedly conspiring*

6  *defendant*." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d at 872 (emphasis

7  added).  To hold otherwise – i.e., to allow damage claims by indirect purchasers where the market

8  forces did not restrict claims by direct purchasers – would wholly circumvent *Illinois Brick* and

9  fail to apply the logic of *Royal Printing* and this court.

10        Under this ruling, only the direct purchases of CRTs are relevant to the present motion.

11  The evidence is undisputed that Irico had no "owned or controlled entity" that ever sold any

12  finished product to any member of DPP's putative class.  Irico sold the vast majority of its CRTs

13  directly to Chinese manufacturers of televisions and monitors.[19]  *See* Carter Decl, Ex. 33 at 17

14  (99.2% domestic sales during first nine years of class period).  Irico's limited foreign sales were

15  sales of CRTs to manufacturers of televisions and monitors.  Because Irico's customers were

16  direct purchaser of CRTs – not finished products – there is no "control relationship between the

17  direct purchaser and [Irico] that would foreclose the possibility of suit by the direct purchaser" in

18  this matter.  Further, Plaintiffs have admitted through discovery that, in their extensive claims

19  distribution process related to all recoveries in this case, not a single U.S. customer claimed to

20  have made a purchase of a finished product (or CRT) from any entity owned or controlled by

21  Irico.  Carter Decl. Ex. 32 at 6.

22        This is not a scenario where control "between the direct purchaser and either the

23  defendant or the indirect purchaser" creates "such functional economic or other unity . . . that

24  there effectively has been only one sale." *Sun Microsystems, Inc. v. Hynix Semiconductor Inc.*,

25  608 F. Supp. 2d 1166, 1180-82 (N.D. Cal 2009).  Irico sold CRTs, not finished products, solely to

---

[19] We note again that in the present motion DPPs bear the burden of establishing all elements of class certification by a preponderance of the evidence, not based on allegations as viewed most favorably for the plaintiff or by whether there is a genuine issue of material fact (i.e., the standards applicable to the previous decisions on standing in this case).  Nonetheless, there is no evidence or genuine contention that Irico ever sold finished products to any U.S. customer.

1    independent direct purchasers that are not members of DPPs class.  The narrow exception

2    provided by *Royal Printing* does not apply because the prerequisite conditions are not met as to

3    Irico, the only defendant remaining in this action.[20]  Thus, DPPs' representatives, consisting

4    mainly of indirect purchasers, and the proposed composition of its class, fail the requirements of

5    FRCP 23(a).

6       **2.    Even if They Have Standing, DPP Class Representatives' Claims are Atypical
             of Those of the Bulk of Class-wide Direct Purchases**

7        The claims of the named Plaintiffs are also not typical of the claims or defenses of absent

8    class members because the named class representatives purchased only small quantities at

9    standardized prices, whereas absent class members purchase large quantities under individually

10   negotiated prices. *See, e.g.*, *Deiter*, 436 F.3d at 467-68 (finding that named plaintiffs "would

11   hardly prove a case on behalf of Microsoft's Enterprise customers" who purchased in larger

12   quantities and through individual negotiations); *In re Optical Disc Drive Antitrust Litig.*, 303

13   F.R.D. 311, 317 (N.D. Cal. 2014) ("*ODD*") (finding certification unwarranted where absent class

14   members "volumes and means of [] purchases do not compare" to named plaintiffs); *In re Milk

15   Prods. Antitrust Litig.,* 195 F.3d 430, 437 (8th Cir. 1999) (plaintiffs who "made only small

16   wholesale purchases at list price" not typical and adequate to represent buyers at formula-based

17   prices). In *In re Graphics Processing Unit Antitrust Litigation*, class certification was denied

18   because named class representatives who purchased only individual graphic cards sought to

19   represent a class of all direct purchasers of graphics cards or chips, including Dell, Apple, and

20   other absent class members who purchased in large volumes. 253 F.R.D. 478, 480-81 (N.D. Cal.

21   2008)."Overwhelming disparity" existed between the named plaintiffs and large volume

22   purchasers where named plaintiffs "simply do not have the appropriate incentive to establish

23   antitrust violations with respect to all of the absent class members." *Id.* at 489-90.

24       Here, Dr. Johnson confirms that purchases █████████████████████

25   _____

26   [20] Importantly, denying class status as to DPP's indirect purchaser in their claims against Irico
     would not "displace the rule of joint and several liability," as was the focus of this court's

27   decision in TDA. ECF 5105 at 9.  Irico potentially would still be jointly and severally liable for
     all direct sales to CRT purchasers, the only level of the market to which they sold and potentially

28   reaped benefits, while the other defendants have been pursued jointly and severally for sales of
     finished products by their, and their alleged co-conspirators', owned and controlled entities.

1  ████████████████████████████ *See* Carter Decl. ¶ 26, Ex. 25 at 1. Purchases by just

2  ████████████████████████████████████████████. *See* Carter Decl.

3  ¶ 26, Ex. 25 at 2.[21] As in *GPU*, the named Plaintiffs here are not typical of these large purchasers

4  who makeup the bulk of the sales in the entire class. *See GPU,* 253 F.R.D. at 483.

5  These fundamental disparities defeat not only typicality, but also adequacy of

6  representation, as FRCP Rule 23(a)(4) "requires that the representative parties fairly and

7  adequately protect the interests of the class." *ODD*, 303 F.R.D. at 317.

8  **C.** **DPPs Fail to Show that Common Questions would Predominate as Required by Rule 23(b)(3)**

9

10  Rule 23(b)(3) requires "that the questions of law or fact common to class members

11  predominate over any questions affecting only individual members."  This is a "far more

12  demanding" requirement than merely demonstrating the existence of common questions under

13  Rule 23(a).  *Bowerman v. Field Asset Servs., Inc.*, No. 13–cv–00057–WHO, 2014 WL 4676611,

14  at *9 (N.D. Cal. Sept. 17, 2014) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624

15  (1997)).  DPPs must have devised a reliable methodology: (1) to prove class-wide impact from

16  the alleged conspiracy and (2) to calculate class-wide damages as to all class members.  (Mot. at

17  20-24.)  As discussed below, DPPs' proffered methodology is fatally flawed as to both

18  requirements. The common questions of law and fact proffered by DPPs would be drowned out

19  by separate questions of how, to what extent, and even whether some putative DPP class

20  members were harmed.

21  **1.** **DPPs' Own "Class-wide" Impact Analysis Actually Shows that a Large Majority of CRT Shipments Were Not Subject to Any Alleged Price Fixing**

22  DPPs' primary argument in support of class-wide impact is what they refer to as "bottom

23  prices" or "target prices" allegedly set during meetings of CRT competitors.  (Mot. at 21-23.)

24  DPPs lead with a bold claim on this topic: that "Dr. Johnson shows that the alleged conspirators

25  set 'target prices' for *all but a small fraction of the CRT market*," including "90% of CPT and

26  _____

27  [21] Importantly, these data do not include CRTs manufactured and integrated into CRT Products by Defendants.  Purchases from these entities would only serve to enlarge significantly the percentage of the purchases from the large OEMs as opposed to those similarly situated to the proposed named Plaintiffs.

28

1   98% of CDT shipments targeted." (Mot. at 22 (emphasis added).)  With this statement, DPPs

2   take a deeply misleading analysis employed by Dr. Johnson and alchemize it into an outright

3   falsehood.  To arrive at these 90% and 98% figures, Dr. Johnson merely looked at whether a

4   certain CRT type (i.e., CPT or CDT) and size (e.g., 14 inch, 17 inch, etc.) was the subject of an

5   alleged "price target" *at any point* during the 13-year class period.  If a type/size combination was

6   subject to a price target at *any* point in time, he considers *all* CRTs of that type/size combination

7   to have been subject to a price target for *all* time periods.  To take a specific example, as

8   illustrated below, Dr. Johnson does not find any price target for 29" CPTs until January 1999, but

9   because he finds that single price target, he counts all sales of 29" CPTs prior to January 1999 –

10  i.e., four full years of sales from 1995 through 1998 – as being affected by price targets.[22]  He

11  does not find another price target for any month for 29" CPTs until January 2003, yet he counts

12  every month in between – i.e., four full years of sales – as being affected by price targets.  And

13  29" CPTs are by no means an anomaly: Dr. Johnson identified no price targets at all for any CPT

14  until April 1997, and no price targets for any CRT at all before August 1995, Johnson Dep.

15  198:10-21; 213:24-214:4, meaning his calculation of "targeted" shipments included six months of

16  sales for all CRTs before any conceivable claim of price targeting, and over two years of sales of

17  all CPTs before any CPT target price appears in the record.   Only by including all sales in all of

18  the months in which there were ***no*** price targets for these products does he arrive at his 90% and

19  98% figures.

20        This statistical sleight-of-hand is not a mere hypothetical problem.  Dr. Johnson ascribes

21  huge weight to these jacked-up percentages in reaching his conclusions, stating in his report that

22  "That result, by itself, goes a long way towards establishing the existence of broad impact on the

23  part of the alleged conspiracy."  Johnson Rep. ¶ 51.

24        The illustration below shows all months relevant to his analysis in which Dr. Johnson

25  identifies an alleged price target.  Consecutive months of price targets are connected, so that

26  100% coverage would form a solid bar and every bit of white space reflects one or more months

27

28  [22] For obvious reasons, the price targets identified by Dr. Johnson could not have had any
    retroactive effect, as Dr. Johnson conceded.  Johnson Dep. 211:17-20.

without a price target.[23]  The gaps in Dr. Johnson's analysis swallow any viable claim that they

demonstrate "class-wide" impact:[24]

**Alleged CPT Target Prices by Month, 1995-2007**



**Alleged CDT Target Prices by Month, 1995-2007**



*Source: Target Price Backup Data supplied by Dr. Johnson*

---

[23] Dr. Johnson acknowledged in his deposition that as a matter of economics cartelists would need to meet frequently to set price targets in light of changing market conditions and for many products prices were set monthly.  Johnson Dep. 171:11-172:24.

[24] Indeed, when analyzing virtually identical price target calculations conducted previously by Dr. Leitzinger, Dr. Robert Willig determined that the alleged target prices applied to ███████████ ████████████████████████████████████████████████████████  Willig Rep., ¶ 22.

1    Dr. Johnson's misleading conclusions based on target prices are even more problematic

2    when applied to the Irico Defendants, given that DPPs do not assert that Irico participated in any

3    conspiracy before August 1998.  Yet over six million 14-inch CPT units shipped by the Irico

4    Defendants from 1995-1997 were branded as "targeted shipments" by Dr. Johnson and DPPs.[25]

5    Carter Decl. Ex. 31 at 7-8.  The large gaps in the target price analysis clearly unmasks Dr.

6    Johnson's statement that "the share of shipments represented by the targeted CRTs was over 98

7    percent for CPTs and over 90 percent for CDTs" as a falsehood.  Far from "go[ing] a long way

8    towards establishing the existence of broad impact on the part of the alleged conspiracy" (Mot. at

9    22), the analysis shows the impropriety of DPPs' proposed all-CRT class and undermines their

10   attempts to craft a reliable model to measure impact and damages of the alleged conspiracy.

11           **2.      Dr. Johnson's Price Target Regressions Do Not Show Class-wide Impact**

12   Dr. Johnson compounds the error of his price target analysis by building a regression

13   model to test whether target prices "were associated with" actual CRT prices for particular sizes

14   and types of CRTs, finding "evidence of a positive relationship" between the two.  Johnson Rep.

15   ¶¶ 55-56.  DPPs once again take Dr. Johnson's artfully worded conclusion and twist it into

16   something wholly inaccurate, claiming that these regressions "confirm[] that the conspiracy

17   succeeded in raising prices for all CRTs."  Mot. at 22.  Not so.  The "positive relationship" found

18   by Dr. Johnson simply means that target prices and actual prices tended to move in the same

19   general direction around the same time – both consistently downward.  With demand for CPTs

20   and CDTs shrinking and eventually disappearing as consumers increasingly chose flat-panel

21   displays for their monitors and televisions, it is hardly a surprise that actual prices would be

22   consistently falling over time while target prices did the same.  Contradicting DPPs' claim, Dr.

23   Johnson admitted that "even a high degree of correlation" – which is all he purports to find here –

24   "does not imply a causal relationship." Johnson Dep. 103:8-16.  What DPPs are seeking to show

25   here – that target prices *caused* an increase in actual prices above the competitive level – is

26   simply not something that Dr. Johnson's regressions are capable of showing, as he admits.

27

28   [25] No target price was identified for any 14" CPTs until April 1997, Johnson Dep. 213:24-214:4, and no target price for 14" CPTs allegedly involving Irico until August 1999.

But Dr. Johnson does not perform any of the basic and customary tests available to economists to test for, and weed out, *spurious* correlations from regression models – that is, correlations that reveal nothing about an actual relationship between the two variables being tested because they "are related only through their correlation with an omitted variable."[26]  The very authorities on use of regression analysis cited by Dr. Johnson in his report confirm that "[i]t is *standard practice* to test individual time-series for stationarity prior to inclusion in a regression model," because "regressions containing nonstationary time series may produce spurious results."[27]  One common source of such spurious results is "the time-series properties of the data under study," including where "all variables may be similarly trending so that any relationship between them may simply be because each is growing over time."[28]  In the case of Dr. Johnson's target price regressions, both variables are *shrinking* over time, heightening these same concerns where the purported use by DPPs is to show that target prices *elevated* actual price levels.  Failing to test for stationarity, an error Dr. Johnson repeats in all his regression analyses, can result in "nonstationary data" causing a "spurious regression … which generally overstates how good is a model's 'fit,' as well as makes independent variables appear to be more significant than they actually are in explaining variation in the dependent variable."[29]  "[C]ommon econometric technique[s]," such as error correction models and use of first differences, are available to address and minimize these concerns with regression analysis of time-series data,[30] but Dr. Johnson conspicuously made no use of any such techniques.

Dr. Johnson's failure to use standard economic tools (specified by his own cited authorities) to ensure the reliability of his models and conclusions speaks volumes as to likelihood of spurious results for his target price-actual price regressions.  Dr. Johnson admitted

[26] James F. Nieberding, Estimating Overcharges in Antitrust Cases Using a Reduced-Form Approach: Methods and Issues, 9 J. App. Econ. 361, 375 (2006), *available at* https://www.tandfonline.com/doi/abs/10.1080/15140326.2006.12040652.

[27] *Id.*

[28] *Id.*

[29] *Id.* at 375-76.

[30] *Id.* at 376.

1  his familiarity with issues of nonstationarity and other tests, such as cointegration, that are

2  available to help separate spurious regression results from substantive ones, *see* Johnson Dep.

3  104:10-106:15, and thus could, and should, have applied these error-control frameworks in the

4  first instance before asking the Court to rely on his analysis.  Given these failings, it is impossible

5  to conclude that Dr. Johnson's regressions demonstrate any meaningful correlative relationship

6  between target prices and actual prices. Thus, DPPs' assertion that the analysis shows that the

7  alleged conspiracy "succeeded in raising prices for all CRTs" is baseless.  *See Brazil v. Dole*

8  *Packaged Foods, LLC*, No. 12-CV-01831-LHK, 2014 WL 5794873, at *13 (N.D. Cal. Nov. 6,

9  2014) ("In the end, it is not enough for [plaintiffs and their expert] to just say that the Regression

10  Model controls for other factors; [they] must *show* the Court that the model has.") (emphasis

11  added), *aff'd*, 660 Fed. Appx. 531 (9th Cir. 2016).

12        Dr. Johnson's attempt to show a relationship between *non-targeted* CRT prices and those

13  of CRTs with identified price targets has equally serious flaws.  In Fig. 13, he estimates median

14  correlation coefficients between price indexes of non-targeted CPT and CDT sizes and targeted

15  CPTs and CDTs, ranging from a low of negative 0.37 to a high of positive 0.97.  Johnson Rep.

16  Fig. 13.  This would seem to indicate that some CRT types were very poorly correlated, if at all,

17  with prices of other CRT types. Yet, to mask this serious discrepancy, Dr. Johnson simply takes a

18  *weighted average* coefficient of 0.93 and deems it acceptable to show "classwide" impact across

19  *all sizes and types* regardless of the substantial variation in his correlation calculations.[31]

20  ### 3.  Dr. Johnson's Models Obfuscate Key Disparities in Impact from Product Differentiation, Geographic Distinctions, and Purchasing Practices

21

22        As described above, *see infra* at 3, CRTs were highly differentiated products, and those

23  made for one particular end use could not serve as functional substitutes for those intended for a

24  different end use. The implications of this lack of demand substitutability are a matter of basic

25  economics: if customers cannot switch from a particular CRT to other types or sizes of CRTs as

26  practical alternatives, those other types and sizes are not meaningful competitive restraints on the

---

[31] Moreover, given that these regressions again attempt to compare time series data trending in the same direction – prices falling as CRTs in general became less and less popular – without any attempt to control for spurious correlations, they suffer from the same infirmities that plagued his regressions of target prices and are inherently unreliable.

1   pricing of the first CRT.[32]

2          Dr. Johnson simply ignores these demand factors *entirely* and lumps all products together

3   in evaluating the critical question of whether there was common impact on customers.  Johnson

4   Dep. 57:5-58:4 ("Did you conduct an analysis of how customer demand for particular sizes and

5   types of CRT would be affected by price changes?  [A:] No… I haven't done a study of consumer

6   demand and how that specifically would respond to price … .").  He instead relies only on

7   selective and stunningly weak supply-side considerations (i.e. CRT manufacturers' ability to

8   switch between manufacturing different sizes and types) for his "price structure" theory, quickly

9   surmising that pricing of all CRT sizes and types were inextricably interrelated, and thereby

10  opining on classwide impact.  *See* Johnson Rep. ¶¶ 26-29, 58-61.  The single piece of testimony

11  Dr. Johnson cites refer only to niche production capabilities and contradict the bulk of the record

12  ▮ the prohibitive cost of converting CRT production lines to different sizes or types.  He cites

13  deposition testimony of Jay Heinecke of Toshiba as evidence that "[i]t was possible to produce

14  two different sizes on the same line at the same time in tandem" and to make certain production

15  changes "in short order, in some cases within the same day."  Johnson Rep. ¶ 59.  But this cherry-

16  picked testimony refers only to Toshiba's specialized ability to switch between 19-inch and 20-

17  inch CPTs, Carter Decl. Ex. 28, Heinecke (Toshiba) Dep. 82:2-83:14, and omits Mr. Heinecke's

18  adjacent testimony that Toshiba's CDTs (in this case, 17-inch CDTs) required a separate

19  production line because they were a "different beast."  *Id.* at 81:17-20.  Dr. Johnson could recall

20  no evidence beyond Mr. Heinecke's limited testimony indicating an ability for manufacturers to

21  economically switch production between CRT sizes or types, did not conduct any analysis of

22  what the cost might be for other manufacturers to obtain similar functionality to that described by

23  Mr. Heinecke, and did no analysis whatsoever of the cost or time of modifying existing

24  production facilities to switch between different sizes or types of CRTs.  Johnson Dep. 71:4-78:5.

25          Had Dr. Johnson reviewed the record more thoroughly on the subject, he would have

26  _____

27  [32] *See, e.g.*, U.S. Department of Justice & Federal Trade Commission, Horizontal Merger
    Guidelines (Aug. 19, 2010), at 7-13 (describing process for defining relevant product markets
    based on the "range of possible substitutes" for customers), *available at*
28  https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf.

1    found substantial evidence that switching between CRT sizes and types was a laborious and

2    generally cost-prohibitive proposition.  *See* Carter Decl. Ex. 29, S.K. Park (SDI) Dep. 344:25-

3    345:17 (switching would cost 80 to 90 percent of the cost of constructing a new production line);

4    Carter Decl. Ex. 9, Tobinaga (Panasonic) Dep. 152:13-153:18 (converting a production line

5    between significantly different sizes, such as 15 inch to 21 inch, was impossible, and converting

6    between "small" sizes would cost $5-6 million); Carter Decl. Ex. 4, Son (SDI) Dep. 318:25-319:9

7    (switching would require "considerable amount of money").  The record simply does not support

8    Dr. Johnson's supposition that production line "flexibility" would create price relationships

9    across all CRT sizes and types, and he conducts no economic analysis of the issue.

10          Indeed, the very models that Dr. Johnson uses to show purported interrelationships

11   between CRT sizes and types actually show substantial variation, particularly between CPTs and

12   CDTs.  Dr. Johnson's Figure 7, showing hedonic regression results across quarters for all CPTs

13   and all CDTs, clearly indicate that the variables Dr. Johnson chose are much worse at explaining

14   variations in CDT prices, with R-squared values barely exceeding 60 percent for certain quarters

15   and averaging only 83 percent across the entire class period.  The portion of CRT price variation

16   explained by the characteristics chosen by Dr. Johnson also varied wildly across the time period,

17   particularly for CDTs, dropping from over 90% in the fourth quarter of 2000 to under 80% in the

18   following quarters.  For the remainder of the class period, the R-squared values for CPTs

19   gradually climb back over 90% while the CDT values continue to fluctuate dramatically across

20   quarters.  To obscure this wide variation and create a self-fulfilling prophecy, Dr. Johnson simply

21   takes an *average* of the R-squared values *across 13 years* and declares that the "vast majority of

22   the variability" is explained by something other than disparate impact from the alleged

23   conspiracy. But that is true, at most, only for *certain* CRT types during *certain* periods of time

24   over 13 years, even assuming that Dr. Johnson, or more accurately Dr. Leitzinger, chose the

25   appropriate variables to construct his regression.  Combining all CPT sizes and all CDT sizes

26   together in a single quarterly regression likely also served to obscure additional variation in the fit

27   of the chosen variables.  In short, Dr. Johnson's own model shows that impact was not common

28   as to different product types and sizes over time.

Dr. Johnson's failure to consider consumer demand factors, his mistaken reliance on supply-side substitutability, and his imposition of averaged results that ignore substantial internal variation across CRTs, all obscure significant differences in impact, which is not common across different segments of the purported DPP class that purchased different product types and sizes. Constructively, he "assum[ed] away the very differences that make the case inappropriate for classwide resolution." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454 (2016).

### 4. Dr. Johnson's Damages Model Fails the *Comcast* Standard by Incorporating "Damages that are Not the Result of the Wrong"

Under the Supreme Court's *Comcast Corp. v. Behrend* decision, DPPs' proffered damages model must match the specific harm that is alleged, and must not "identif[y] damages that are not the result of th[at] wrong."  569 U.S. 27, 37 (2013).  If the model cannot distinguish between "supra-competitive prices in general and supra-competitive prices attributable to" the alleged harm, then "Rule 23(b)(3) cannot authorize treating [purchasers] as members of a single class," and certification must be denied.  *Id.* at 38.  Dr. Johnson's damages model fails this test as it is mismatched to the alleged harm in at least three ways: (1) it covers products that were never subject to the alleged conspiracy; (2) assumes but-for pricing that does not factor in mandatory price floors implemented by the Chinese government during the class period; and (3) covers years for which Irico could not be liable given their limited participation in any alleged conspiracy.

### (a) DPPs' Overcharge Model Sweeps in Products that Could not Plausibly Have Been Impacted

The core of DPPs' allegations is the claim that manufacturers met to fix the prices of CRTs, reflected in the price targets identified by Dr. Johnson.  As detailed above, *see supra* pp. 14-17, there are dramatic gaps in the CRT sizes and types that were allegedly subjected to price-fixing agreements throughout the Class Period.  Even under Dr. Johnson's flawed overcounting of "targeted" products, there still remain a significant portion of CRT sizes and types for which no target prices were found and thus there is no plausible impact on purchasers of those particular CRTs, including 6, 10, 16, 17, 19, 24, 26, 33, 36, and 38-inch CPTs as well as 20 and 21-inch CDTs, collectively making up approximately 85 million units sold across the class period.[33]

---

[33] Based on sales data provided by Dr. Johnson as backup to his report. *See* Carter Decl. ¶ 41.

1   DPPs are not entitled to claim damages for products that were never part of the alleged

2   conspiracy to begin with; conclusory allegations that all CRTs were affected despite the lack of

3   target prices will not suffice under the "rigorous" review required by *Comcast*. *See Reitman v.*

4   *Champion Petfoods USA, Inc.*, 830 Fed. App'x 880, 881-82 (9th Cir. 2020) (affirming denial of

5   class certification for failure to satisfy predominance, where "price premium" damages model

6   failed to distinguish price difference attributable to specific misleading statements at issue).

7              **(b)    DPPs' Overcharge Model Fails to Consider Mandatory Price Floors that**
                       **Impacted Key CPT Sizes for all Manufacturers with Production in China**
8
9          On November 16, 1998, the Chinese central government, though its State Planning

10  Commission and State Economic and Trade Commission, promulgated new Regulations on

11  Preventing Unfair Price Actions through Dumping of Industrial Products and Strengthening Price

12  Self-Discipline of Industries ("Unfair Price Regulations") pursuant to the Price Law of the

13  People's Republic of China.  Carter Decl. Ex. 34.  The Chinese government described these

14  regulations as "important measures taken by the state to regulate prices on the market of industrial

15  products," *id.* ¶ 1, and they were binding on "[a]ny business operator engaging in production and

16  sales of industrial products within the People's Republic of China" and applied to any "industrial

17  products with prices subject to the market."  *Id.* at Art. 2-3.  The Unfair Price Regulations prohibit

18  both selling products below a producer's actual costs, *id.* at Art. 5, and below "industrial average

19  production costs," *id.* at Art. 9.   In February of 1999, the Ministry of Information Industry of the

20  People's Republic of China promulgated a notice that, pursuant to the Unfair Price Regulations, it

21  would be investigating and publishing "average industry production costs" for CRTs and color

22  televisions.  Carter Decl. Ex. 35 at 3.  This notice also provided a list of enterprises subject to the

23  Unfair Price Regulations and mandatory cost reporting, which included Irico Group as well as the

24  Chinese arms of BMCC, Thomson (Novel), Philips (Huafei), Hitachi, and Samsung.  *Id.* at 4.

25         In April 1999, the Ministry of Information Industry published charts of "average

26  production costs" for 21" and 25" CPTs and color televisions.  Carter Decl. Ex. 37 at IRI-CRT-

27  00031459.  These "costs" actually acted as minimum price floors, because in any "case where a

28  manufacturing enterprise s[old] the products at prices *lower* than the published industrial average

    costs," any CRT competitor could submit a complaint to the State Planning Commission,

1    triggering a government investigation into violations of the Unfair Price Regulations and leading

2    to an "order … to correct [its price] and impose penalties" on the low-price competitor.  *Id.*

3    (emphasis added).  Similarly, in August and September 2000, the Ministry published revised

4    price floors for 21" and 25" televisions and CPTs, respectively, along with a new price floor for

5    29" televisions and CPTs.  Carter Decl. Ex. 36, 38.[34]

6          Dr. Johnson admitted that he was unaware of these (or any other) restrictions on CRT

7    pricing in China, and therefore did no analysis of their impact on his overcharge assessment or the

8    ability of any China-based manufacturer to actually charge his calculated but-for price without

9    running afoul of the Unfair Price Regulations.  Johnson Dep. 245:23-249:8.  Because Dr.

10   Johnson's damages model relies on the differences between his calculated actual prices and but-

11   for prices, if certain defendants or their subsidiaries were not *legally able* to charge the but-for

12   price, that would seriously undermine the reliability of the damages model.  Furthermore, if one

13   accepts Dr. Johnson's dubious "price structure" theory that all prices of all sizes and types of

14   CRTs are interrelated, *see* Johnson Rep. ¶¶ 62-64 – which is integral to his conclusions about

15   common impact – and his hypothesis that China and North America prices are closely linked, *see*

16   *id*. ¶¶ 65-67, then the Unfair Price Regulations would have had a cascading impact on prices of

17   *all* CPTs and CDTs sold by *all* manufacturers globally, *completely independent* of any alleged

18   conspiracy impacts.  So either Dr. Johnson is wrong about his price structure theory or he is

19   wrong about his "but for" pricing analysis, or he is wrong about both, but he cannot be right about

20   both.  In any event, Dr. Johnson's failure to undertake any analysis to measure and control for the

21   degree of this impact is fatal to his entire damages model.  *See Bruton v. Gerber Prod. Co.*, No.

22   12-CV-02412-LHK, 2018 WL 1009257, at *9 (N.D. Cal. Feb. 13, 2018) (rejecting plaintiff

23   expert's damages model because it "presume[d] that the entire price difference" was attributable

24   to the challenged conduct when other factors "might explain all or part of the difference"); *see*

25   *also Larsen v. Vizio, Inc*., No. SACV 14-01865-CJC(JCGx), 2017 WL 11633132, at *10 (C.D.

26

27   [34] Since these price floors were set by size and based on the "model with a lower cost" as reported
     by each Chinese manufacturer, Carter Decl. Ex. 35 at 8, they represent a price floor for the most
     basic CRT model of each size.  As such, CRTs of the same size with additional features would

28   have been priced higher than the floor price as a matter of basic logic.

1   Cal. Apr. 27, 2017) (rejecting plaintiff expert's damages model because it used the wrong

2   baseline measurement to calculate a price premium).

3         **(c)    DPPs' Overcharge Model Provides No Reliable Way to Isolate Damages
           for the Portions of the Class Period for which Irico Defendants Could Be
4           Liable**

5         There is no evidence to suggest that Irico Defendants participated in any aspect of the

6   alleged conspiracy before August 1998, well over three years after the start of the class period.

7   "[A] defendant cannot be held liable for substantive offenses committed before joining or after

8   withdrawing from a conspiracy." *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992)

9   (citing *Levine v. United States*, 383 U.S. 265, 266 (1966)).  Given that Irico is the sole defendant

10  in the action, any damages model must take account of this fact and provide a reliable method of

11  calculating damages that resulted from Irico's evidenced participation.  Dr. Johnson's model

12  offers no such capability, casting a wide net to assume full overcharges from all sales by all

13  defendants across the class period, and rendering it unreliable as a model for use against Irico.[35]

14        **D.    Given the Wide Disparities Within the DPP Class and the Lack of Reliable Class-
           Wide Models for Impact and Damages, Class Resolution is not Superior**

15        DPPs' bear the burden of establishing "that a class action is a superior to other available

16  methods for fairly and efficiently adjudicating the controversy."  Fed R. Civ. P. 23(b)(3). Because

17  individual issues predominate over common ones in this case, *see supra* pp. 14-25, class

18  resolution would "sacrifice procedural fairness" by imposing "uniformity of decision" on persons

19  who are *not* similarly situated.  "[W]hen individual issues predominate, a class action will be

20  deemed inferior." *In re Rail Freight Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 144 (D.D.C.

21  2017) (citing *McCarthy v. Kleindienst*, 741 F.2d 1406, 1415 (D.C. Cir. 1984).

22                        <u>**CONCLUSION**</u>

23        For the foregoing reasons, DPPs' motion should be denied.

24

25

26  _____

27  [35] The Irico Defendants also withdrew from the production of CDTs around 2001 and ceased all
    CDT sales by 2003, Carter Decl. Ex. 31 at 7-8.  If impact is considered separately for CDT and
    CPT buyers, as it should be, this would further reflect the inadequacy of DPPs' assertions as it
28  would improperly include damages that occurred *after* the date of Irico's withdrawal from alleged
    cartel.  *See Lothian*, 976 F.2d at 1262.

1    Dated:  January 21, 2022                    Respectfully submitted,

2

3                                               */s/ John M. Taladay*

4                                               BAKER BOTTS L.L.P.
                                                John M. Taladay (*pro hac vice*)
5                                               Evan J. Werbel (*pro hac vice*)
                                                Thomas E. Carter (*pro hac vice*)
6                                               Andrew L. Lucarelli (*pro hac vice*)
                                                700 K Street, N.W.
7                                               Washington, D.C. 20001
                                                (202)-639-7700
8                                               (202)-639-7890 (fax)
                                                Email: john.taladay@bakerbotts.com
9                                                         evan.werbel@bakerbotts.com
                                                          tom.carter@bakerbotts.com
10                                                        drew.lucarelli@bakerbotts.com

11                                              Jonathan Shapiro (State Bar No. 257199)
                                                101 California Street, Suite 3600
12                                              San Francisco, California 94111
                                                (415) 291-6200
13                                              (415) 291-6300 (fax)
                                                Email: jonathan.shapiro@bakerbotts.com

14

15                                              *Attorneys for Defendants*
                                                *IRICO GROUP CORP. and*
16                                              *IRICO DISPLAY DEVICES CO., LTD.*

17

18

19

20

21

22

23

24

25

26

27

28