# __EXHIBIT 1__

1

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                    OAKLAND DIVISION

 4

 5   IN RE:  CATHODE RAY TUBE       )
     (CRT) ANTITRUST LITIGATION,    ) Case No.
 6                                  ) 4:07-cv-05944-JST
     RELATED TO:                    )
 7                                  ) MDL No.
     ALL DIRECT PURCHASER ACTIONS   ) 1917
 8   _____)

 9

10

11

12

13

14

15              REMOTE VIDEOTAPED DEPOSITION OF

16                  PHILLIP M. JOHNSON, Ph.D.

17                 TUESDAY, JANUARY 11, 2022

18

19

20

21

22

23

24
     Reported in Stenotype by:
25   Cody R. Knacke, RPR, CSR No. 13691
     Job No.:  825149
```

Case 4:07-cv-05944-JST   Document 5984-2   Filed 01/21/22   Page 3 of 362
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                Phillip M. Johnson, Ph.D.
January 11, 2022

56

1  quantitative study of that question.

2  BY MR. CARTER:

3      Q.   And you haven't done a specific

4  quantitative study of the television or monitor

5  manufacturers' willingness to switch between sizes

6  of CRT; correct?

7          MR. RUSHING:  Objection to form.

8          THE WITNESS:  I have not done a study like

9  that, no.

10  BY MR. CARTER:

11     Q.   Did you conduct any analysis of CRT

12  customers' willingness to substitute from ITC to

13  bare tubes or vice versa?

14     A.   For CRT customers?

15     Q.   Yes.

16         MR. RUSHING:  Objection.  Form.

17         THE WITNESS:  No, I have not done a

18  specific study about the substitutability between

19  those two -- two types.

20  BY MR. CARTER:

21     Q.   Do you know what a shadow mask is?

22     A.   I recall the term and discuss it and

23  describe it in my report.  It's the element of the

24  technology that's within a CRT that assists with the

25  display of the image.

IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                Phillip M. Johnson, Ph.D.
January 11, 2022

57

1      Q.   And did you conduct any analysis of CRT

2    customers' willingness to substitute between

3    different types of shadow masks?

4      A.   No, I have not done a study of that type.

5      Q.   Did you conduct an analysis of how customer

6    demand for particular sizes and types of CRT would

7    be affected by price changes?

8           MR. RUSHING:  Objection to form.

9           THE WITNESS:  No, I -- generally the

10   analyses I have done of CRT prices embody within

11   them the relationship between quantities and prices.

12   But I have not done a particular study of how

13   consumers' demands for the products responded or

14   would have responded to various changes in price.

15          Of course as an economist I have some

16   understanding of what one expects to how demand

17   responds to price, but I haven't done a specific

18   quantitative estimation of that relationship.

19   BY MR. CARTER:

20     Q.   So you're saying as an economist, you

21   expect that the customers might be willing to switch

22   between, for example, different sizes based on the

23   change in price, but you don't know how much change

24   in price because you haven't studied that; correct?

25          MR. RUSHING:  Objection to form.

58

1               THE WITNESS:  I think I gave the answer I

2     intended to, which is I haven't done a study of

3     consumer demand and how that specifically would

4     respond to price as part of the analysis I did here.

5     BY MR. CARTER:

6         Q.   Is it your opinion that CPT and CDT prices

7     are interrelated?

8               MR. RUSHING:  Objection to form.

9               THE WITNESS:  Yes, there's a relationship

10    between the two types of products.

11    BY MR. CARTER:

12        Q.   Would an analysis of CRT customers'

13    willingness to substitute between CDTs and CPTs

14    based on price changes inform the analysis of that

15    relationship?

16              MR. RUSHING:  Objection to form.

17              THE WITNESS:  It might.  I would expect

18    that there would be other aspects of the products

19    and markets that would be as important or more

20    important in contributing to a relationship between

21    the prices of CRT and CD -- or sorry -- CPT and CDT

22    products.

23    BY MR. CARTER:

24        Q.   Such as?

25              MR. RUSHING:  Same objection.

IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                    Phillip M. Johnson, Ph.D.
                                                                         January 11, 2022

59

1          THE WITNESS:  Well, such as issues about

2    the ability of manufacturers to switch manufacturing

3    between one to the other, ability or common --

4    common cost factors.  Maybe common elements of

5    pricing, such as the pricing activities of the

6    coconspirators in the alleged conspiracy.

7          I think that those other sorts of factors

8    among the -- on the producer's side of things are

9    important in resulting in a relationship between

10   prices of CPT and CDT products.

11         MR. CARTER:  I have marked Exhibit 8547,

12   which is U.S. Department of Justice and Federal

13   Trade Commission Horizontal Merger Guidelines.

14              (Exhibit 8547 was marked for identification

15              by the Certified Shorthand Reporter, and a

16              copy is attached hereto.)

17   BY MR. CARTER:

18   Q.   I'll put it up on the screen.

19        Do you see that document?

20   A.   Yes.  The cover page just came up.

21   Q.   Are you familiar with the Horizontal Merger

22   Guidelines?

23   A.   I have reviewed them on various occasions.

24   Q.   You'd agree that they're considered an

25   authority on market definition in antitrust cases?

Case 4:07-cv-05944-JST   Document 5984-2   Filed 01/21/22   Page 7 of 362
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION          Phillip M. Johnson, Ph.D.
January 11, 2022

70

1   repeat the beginning of your answer, sir.  You cut

2   out.

3          THE WITNESS:  I'm not sure I can recollect

4   the exact words I used at the beginning of my

5   answer, so -- but I can try to answer the question

6   again if that's okay.

7          This is the section of the report where I

8   just describe how the activities of the defendants,

9   the coconspirators, were intended to impact and did

10  impact more than just the products -- the specific

11  products for which we had target prices.

12  BY MR. CARTER:

13     Q.   And the subsection 1 underneath this titled

14  "Qualitative Evidence," it's fair to say this is

15  summarizing what you would believe to be the record

16  evidence supporting your conclusion that target

17  prices affected the price of nontargeted CRTs?

18         MR. RUSHING:  Objection to form.

19         THE WITNESS:  I'm not sure I -- certainly

20  there's a discussion of documents in depositions

21  that are relevant to the question.  I don't know

22  that I'm putting together an overall summary of all

23  of that record evidence, but I think it's documents

24  that help explain how that process worked and

25  that -- how the defendants -- or the defendant

Case 4:07-cv-05944-JST  Document 5984-2  Filed 01/21/22  Page 8 of 362
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION
Phillip M. Johnson, Ph.D.
January 11, 2022

71

1   employees, you know, saw that -- saw those

2   relationships and saw how that process worked.

3   BY MR. CARTER:

4       Q.   So in paragraph 59 you state, "It was

5   possible to produce two different sizes on the same

6   line in tandem (one unit of one size and then, the

7   other unit of the next size).  If a customer wanted

8   to change certain aspects of the configuration, the

9   production lines were flexible enough to make those

10  changes in short order, in some cases within the

11  same day."

12          You cite a Toshiba deponent for both of

13  those statements; correct?

14          MR. RUSHING:  Objection to form.

15          THE WITNESS:  There is a deponent, Jay Alan

16  Heinecke, referenced in both of the footnotes

17  attached to those two sections.  There's also some

18  other documents cited in the first -- or another

19  document cited in the first paragraph.

20  BY MR. CARTER:

21      Q.   Are you opining in this paragraph that any

22  CRT manufacturer could produce multiple sizes on

23  their production lines?

24          MR. RUSHING:  Objection to form.

25          THE WITNESS:  I don't know that I'm able to

Case 4:07-cv-05944-JST   Document 5984-2   Filed 01/21/22   Page 9 of 362
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                    Phillip M. Johnson, Ph.D.
January 11, 2022

72

1    say that every manufacturer at all times was able to

2    make all possible changes, but it is my

3    understanding that there was -- were adjustments

4    that were possible and adjustments that were made.

5    I don't -- I don't know the full extent of those

6    possibilities.

7    BY MR. CARTER:

8        Q.   Did you find any evidence that

9    manufacturers other than Toshiba had the capability

10   of running two sizes in tandem on a single

11   production line?

12       A.   I don't recall as I sit here everything

13   I've seen, but nothing's -- I don't recall at the

14   moment whether or not I've seen it for others

15   than -- other than what's cited here.  But I do

16   expect that it was probably broader than Toshiba and

17   that there were -- that flexibility was something

18   that manufacturers would value in their production

19   processes and want to be able to do in response to

20   changes in what was being ordered.

21       Q.   Did you study what the incremental cost was

22   to Toshiba to construct this production line with

23   the ability to run multiple sizes in tandem?

24            MR. RUSHING:  Objection to the form.

25            THE WITNESS:  No, I don't recall specific

73

 1   figures with regard to that.  It seems like if they

 2   could make those changes in short order, then it

 3   probably wasn't hugely expensive to make those

 4   changes.

 5   BY MR. CARTER:

 6      Q.   You're talking about making the changes

 7   after they've already constructed the production

 8   line; right?

 9         MR. RUSHING:  Objection to form.

10         THE WITNESS:  That's what I'm referencing

11   in that statement, yes.

12   BY MR. CARTER:

13      Q.   Did you study the cost to Toshiba or any

14   other manufacturer of actually building a production

15   line with the capability of running multiple sizes

16   at the same time?

17         MR. RUSHING:  Objection to form.

18         THE WITNESS:  I don't think I made a

19   specific study in that regard.  There's some

20   discussion of the costs of entering the CRT

21   production industry and plant costs at the time.

22         I don't recall anything with the detail

23   about what sort of costs were involved in making the

24   plant more or less flexible.

25   ///

1  BY MR. CARTER:

2     Q.   So it's fair to say you didn't conduct any

3  analysis of whether it would be economical for other

4  CRT producers to build or modify a production line

5  to run multiple sizes at once?

6         MR. RUSHING:  Objection to form.

7         THE WITNESS:  I don't know for a fact that

8  they couldn't run multiple sizes.  I haven't done a

9  study of that.  I didn't have the -- I don't recall

10 seeing -- I don't recall the details of what

11 products were run on what lines.  I do recall there

12 was form production-related materials in documents

13 that we saw that might have some bearing on that,

14 whether or not they could, but I don't recall as I

15 sit here what I've seen about those capabilities or

16 those costs.

17 BY MR. CARTER:

18    Q.   Going back to paragraph 59 in your report,

19 you write, "Given this flexibility, price

20 differences between CRTs of different

21 characteristics that were not cost-related would be

22 expected, as an economic matter, to induce changes

23 in output in favor of the more profitable

24 configurations, creating market pressure to re-align

25 prices."

75

1          When you reference this flexibility, you're

2     referring to changing aspects of configuration

3     similar to what Toshiba did and the example you cite

4     in the footnote?

5          MR. RUSHING:  Objection to form.

6          THE WITNESS:  There -- this is one example

7     of a way that manufacturers adjust their output, by

8     potentially switching what a line produces from one

9     product type to another or one set of product

10    characteristics to a different set of product

11    characteristics.

12         There's also flexibility in the choice of

13    how fast you run which lines potentially or which

14    lines you shut down for how long.  If you alter your

15    product mix, how you shift resources or staff from

16    one -- one aspect of the product line to another.

17    Those all contribute to the flexibility and

18    relationship between prices over time.

19    BY MR. CARTER:

20       Q.   So did you assume that because Toshiba had

21    that factory, that other manufacturers would be able

22    to do the same?

23         MR. RUSHING:  Objection to form.

24         THE WITNESS:  No, I wouldn't say that I

25    assumed that.  I think it's -- wouldn't surprise me

Case 4:07-cv-05944-JST   Document 5984-2   Filed 01/21/22   Page 13 of 362
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                    Phillip M. Johnson, Ph.D.
                                                                      January 11, 2022

76

1    if they did.  I think what I'm describing here is

2    something that I am aware of from this -- this

3    aspect of the documents, which is all I've seen, and

4    this is something that would contribute to that

5    relationship.

6          And even if it doesn't extend to all

7    manufacturers, to the extent any or some

8    manufacturers have the ability to make those

9    adjustments, it contributes to the linkages in the

10   industry, in the marketplace, because they're making

11   shifts in output that affect total output of those

12   product types.

13   BY MR. CARTER:

14   Q.   So did you conduct any analysis of the cost

15   of switching production lines between CDTs and CPTs?

16          MR. RUSHING:  Objection to form.

17          THE WITNESS:  No, I have not done an

18   analysis of that type.

19   BY MR. CARTER:

20   Q.   Did you conduct any analysis of the cost of

21   switching production lines between different sizes

22   of CRTs?

23          MR. RUSHING:  Objection to form.

24          THE WITNESS:  No.  I don't recall having --

25   having information of the type that allowed me to do

77

1   that.  I'm not sure that it would be necessary, but

2   I have not done a study of that type.

3   BY MR. CARTER:

4      Q.   And did you conduct any analysis of the

5   amount of time that would be needed to switch over a

6   production line between sizes or types of CRTs?

7           MR. RUSHING:  Objection to form.

8           THE WITNESS:  Well, as I reference here in

9   this paragraph, at least for changes between sizes

10  in some of the things, that can be done very

11  quickly, even within the same day.

12          So to the extent your question just asked

13  about that, there's some information in that regard.

14          I don't -- we haven't done a study that

15  touched on the time it would take to switch between

16  CDT and CPT or vice versa.

17  BY MR. CARTER:

18     Q.   So when you wrote in paragraph 59 that the

19  flexibility could create market pressure to realign

20  prices, you haven't looked at the degree of

21  flexibility that would be necessary to result in the

22  pressure that you're referring to in this sentence?

23          MR. RUSHING:  Objection to form.

24          THE WITNESS:  It's not something that I

25  could quantify, if that's what you mean by "the

Case 4:07-cv-05944-JST   Document 5984-2   Filed 01/21/22   Page 15 of 362
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                    Phillip M. Johnson, Ph.D.
January 11, 2022

78

1   degree of."  But certainly to the extent that

2   there's flexibility, and there's some evidence that

3   there was some flexibility of manufacturers, that

4   contributes to those relationships that I address

5   with my analysis of the CRT prices in the industry.

6          MR. CARTER:  I think we can take our next

7   break now.

8          Geoff, over there in California, I don't

9   have a preference of whether we take a short break

10  or if you want to take your lunch break now.  Would

11  you rather wait till the next segment for the long

12  break?

13         MR. RUSHING:  It's up to Dr. Johnson.

14         THE WITNESS:  I am good with whatever works

15  for you.  Whatever moves things along most

16  efficiently, I think, is what I prefer.

17         MR. RUSHING:  Okay.  Well, let's do a short

18  break then.

19         MR. CARTER:  Very good.  We'll see you a

20  little after 11: -- say 11:55.

21         MR. RUSHING:  Okay.

22         MR. CARTER:  All right.

23         THE VIDEOGRAPHER:  The time is now

24  11:42 a.m., and we are off the record.

25         (Recess.)

IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                    Phillip M. Johnson, Ph.D.
January 11, 2022

79

1          THE VIDEOGRAPHER:  The time is 11:59 a.m.,

2   and we are on the record.

3          MR. CARTER:  Thank you.

4          Before we jump back and through the

5   questions, I just want to put the corrected exhibit

6   numbers on the record just so everybody's clear

7   about it.

8          So Exhibit 8544 will be the deposition

9   notice for Phillip Johnson.

10          (Exhibit 8544 was marked for identification

11          by the Certified Shorthand Reporter, and a

12          copy is attached hereto.)

13          MR. CARTER:  Exhibit 8545 will be

14   Dr. Johnson's expert report.

15          (Exhibit 8545 was marked for identification

16          by the Certified Shorthand Reporter, and a

17          copy is attached hereto.)

18          MR. CARTER:  And Exhibit 8546 is the court

19   opinion in the Scott v. Chipotle Mexican Grill case.

20          (Exhibit 8546 was marked for identification

21          by the Certified Shorthand Reporter, and a

22          copy is attached hereto.)

23          MR. CARTER:  And I believe 8547 is already

24   correctly numbered.

25   ///

IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                    Phillip M. Johnson, Ph.D.
January 11, 2022

103

1              MR. RUSHING:  Object to the form.

2              THE WITNESS:  It's a chart of prices.  It

3     doesn't -- yeah, it illustrates the relationship --

4     the relationship of prices across these regions.  It

5     doesn't break that relationship down into

6     components.

7     BY MR. CARTER:

8       Q.   Isn't it true that even a high degree of

9     correlation does not imply a causal relationship?

10             MR. RUSHING:  Objection to form.

11             THE WITNESS:  I would agree with that.  I

12    would just add that observances of high degrees of

13    correlation can be supportive of there being a

14    causal relation.  Also, it can depend upon the

15    nature of the correlations you examine.  But in and

16    of itself, correlation isn't causation.

17    BY MR. CARTER:

18      Q.   It's fair to say that looking at figures 14

19    and 15, the three price lines for North America,

20    China and rest of world price indices are all

21    trending downwards as CRT prices fell over time;

22    correct?

23             MR. RUSHING:  Objection to the form.

24             THE WITNESS:  I think as far as how I want

25    to address this trend would be done in different

104

1    ways.  I certainly agree that for all three, the

2    prices start higher than they end up.  So there's

3    time periods of upward movement and downward

4    movement and upward movement again and downward

5    movement again.  But overall, from beginning of the

6    period to the end, prices of CRTs appear to have

7    been lower at the end than they were at the

8    beginning.

9    BY MR. CARTER:

10       Q.   Are you familiar with the concept of

11   nonstationarity?

12       A.   Yes, I've had some exposure to that.

13       Q.   What do you understand the term

14   "nonstationarity" to mean?

15            MR. RUSHING:  Objection to form.

16            THE WITNESS:  As I recall, stationarity or

17   nonstationarity referred to whether a generating

18   process is -- I would characterize it being unmoving

19   over time.  It would be variations around a common

20   or a consistent -- consistent place or...

21   BY MR. CARTER:

22       Q.   Would you say the regional prices modeled

23   in figures 14 and 15 are nonstationary?

24            MR. RUSHING:  Object to form.

25            THE WITNESS:  I think I'd want to do some

1   further analysis before taking an opinion on that.

2   BY MR. CARTER:

3      Q.   So I take it, then, that you haven't done

4   any analysis to adjust for nonstationarity of any of

5   the price trends shown in figures 14 and 15?

6           MR. RUSHING:  Object to form.

7           THE WITNESS:  Figures in 14 are

8   illustrating the matched model -- the Fisher

9   Matched-Model prices over that period of time.

10  There's no adjustment appropriate to that.

11  BY MR. CARTER:

12     Q.   Are you familiar with the concept of a

13  cointegration test?

14     A.   Yes, I have seen that.

15     Q.   What's your understanding of the purpose of

16  the cointegration test?

17          MR. RUSHING:  Object to form.

18          THE WITNESS:  The cointegration tests refer

19  to temporal relationships between different series.

20  BY MR. CARTER:

21     Q.   And what does it measure about those

22  temporal relationships?

23          MR. RUSHING:  Object to form.

24          THE WITNESS:  It looks at whether they're a

25  long run -- or whether there are long-run

106

1  relationships between the different series.

2  BY MR. CARTER:

3     Q.   Your figures 14 and 15 are meant to

4  illustrate temporal relationships between CDT and

5  CPT prices across regions; correct?

6          MR. RUSHING:  Object to form.

7          THE WITNESS:  Yes.

8  BY MR. CARTER:

9     Q.   And you did not perform a cointegration

10  test as part of your analysis of pricing across

11  regions; correct?

12          MR. RUSHING:  Object to form.

13          THE WITNESS:  Not on these series.  I

14  looked at relationships between the prices in other

15  analyses.

16          MR. CARTER:  Okay.  I think we can take

17  another break now if you all wanted to take your

18  lunch break at this point.  We could reconvene at

19  1:45 Pacific Time.  Would that work?

20          MR. RUSHING:  Sure.  What time -- I mean,

21  how long would you intend to go?  I'd rather take a

22  shorter break to avoid going, you know, too late,

23  but do you have an idea how much longer you want to

24  go in the afternoon?

25          MR. CARTER:  So I think at this point I'll

IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                    Phillip M. Johnson, Ph.D.
January 11, 2022

107

1   be handing it over to John.

2           MR. TALADAY:  Yeah.  So I don't know

3   exactly, Geoff, but it's later for us here than it

4   is there.  So we understand, but we, you know, we

5   need a lunch break here, too.  And, again, it's

6   later here than it was there.  So why don't we

7   reconvene at -- in an hour, basically, as Tom

8   suggested.

9           MR. RUSHING:  Okay.  Fine.  So what are we

10  saying?

11          MR. TALADAY:  We said 1:45 Pacific, 3:45

12  East Coast.  Basically an hour.

13          MR. RUSHING:  Okay.

14          THE VIDEOGRAPHER:  The time is 12:44 p.m.,

15  and we are going off the record.

16          (Luncheon recess taken at 12:44 p.m.)

17

18

19

20

21

22

23

24

25

111

1        THE WITNESS:  So as far as the numbers, the

2    file starts with 8544.  In the directory it says

3    deposition notice.  I don't know if you meant --

4    mean to refer to the other file, at least in this

5    folder it starts with 8436.  I know there's a

6    renumbering issue, I just don't want to be confused

7    on the numbers part of it.

8        MR. RUSHING:  Well, my understanding is

9    that the expert report -- and I may not be right,

10   but I think it is important that we're all on the

11   same page -- is 8545.

12       MR. TALADAY:  Geoff, thank you.  I think

13   that's correct.  So let me rephrase the question.

14   BY MR. TALADAY:

15   Q.  Dr. Johnson, is Exhibit 8545 a copy of your

16   report?

17   A.  Yeah, the file name I see in the folder, it

18   starts with 8545, and the appended file name has

19   what appears to be the file name of my -- my report.

20   And I can open it quickly and confirm it does -- in

21   the open pages, it does look like that's my report.

22       MR. RUSHING:  I'd just point out for the

23   record, your -- the copy that we're looking at was

24   supplied by you, John.  So I presume it's the

25   report, but I don't think Mr. -- Dr. Johnson has

Case 4:07-cv-05944-JST   Document 5984-2   Filed 01/21/22   Page 23 of 362
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                    Phillip M. Johnson, Ph.D.
January 11, 2022

112

1   gone through every page, but I presume it's the

2   report.

3           MR. TALADAY:  We'll represent to you that

4   it's the report we received.

5   BY MR. TALADAY:

6       Q.  Dr. Johnson, does the report that you

7   submitted in this case reflect your opinions with

8   respect to class certification?

9       A.   It reflects my opinions on the assignment I

10  was given, which was described there, which relates

11  to some economic questions related to class

12  certification.

13      Q.   And do those opinions reflect your judgment

14  about how to analyze those issues?

15          MR. RUSHING:  Object to the form.

16          THE WITNESS:  I analyzed them in this

17  matter, so I certainly judged that this is an

18  appropriate way to analyze those questions.

19  BY MR. TALADAY:

20      Q.   So it reflects your judgment then?

21      A.   My judgment, yes.

22      Q.   And does it reflect your judgment about the

23  variables to consider when you conduct the tests

24  that you used to analyze these issues?

25          MR. RUSHING:  Object to the form.

113

1        THE WITNESS:  I'm not sure what test you're

2   referring to.

3   BY MR. TALADAY:

4   Q.   Well, you conduct numerous tests, right,

5   throughout the report; is that correct?

6        MR. RUSHING:  Object to the form.

7        THE WITNESS:  I'm not sure that I do.  What

8   tests are you referring to?

9   BY MR. TALADAY:

10   Q.   Well, for example, the correlation studies,

11   there's a hedonic regression, there's a regression

12   analysis you used to estimate overcharges.  Those

13   are all tests within your report; is that correct?

14        MR. RUSHING:  Object to the form.

15        THE WITNESS:  I don't think I characterize

16   them as tests.  And I don't really think I agree

17   with that characterization either.  The --

18   BY MR. TALADAY:

19   Q.   How would you characterize them?

20   A.   Well, as you recall, the overcharges

21   analysis, that provides an estimate of the

22   overcharges.  So I would characterize that as an

23   estimation of overcharges in this matter.

24   Q.   Do the estimations and analyses that you

25   conducted in the course of your report reflect your

114

1   judgment about the variables to include in those

2   estimations and analyses?

3          MR. RUSHING:  Object to the form.

4          THE WITNESS:  Certainly I used my judgment

5   in these analyses and determined that they were

6   appropriate for the questions I'm addressing.

7   BY MR. TALADAY:

8      Q.   Ultimately this is your opinion and you

9   stand by the methodologies and conclusions that you

10  reached as you wrote this report; is that correct?

11         MR. RUSHING:  Object to the form.

12         THE WITNESS:  Yes, I do.

13  BY MR. TALADAY:

14     Q.   And you also provided a list of source

15  material that you relied on in preparing your

16  report; is that correct?

17     A.   Yes, I did.

18     Q.   And was that list of source material

19  complete and accurate?

20         MR. RUSHING:  Object to the form.

21         THE WITNESS:  To my knowledge, it should be

22  complete and accurate.

23         MR. TALADAY:  All right, Tom, could you

24  please bring up Exhibit 8545 and turn to paragraph 8

25  on page 3.

Case 4:07-cv-05944-JST   Document 5984-2   Filed 01/21/22   Page 26 of 362
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION          Phillip M. Johnson, Ph.D.
                                                            January 11, 2022

115

1    BY MR. TALADAY:

2        Q.   And, Dr. Johnson, I understand that you

3    also have a hardcopy of this exhibit.  And if you

4    prefer to refer to your hardcopy, I'm comfortable

5    with that.

6        A.   I'm comfortable either way.

7        Q.   All right.  Could you please read the

8    introductory clause of paragraph 8 prior to the

9    subbullets.

10       A.   (As Read:)  "In the course of my work on

11   this assignment, my staff and I have reviewed

12   extensive data, documents and testimony developed

13   through the course of discovery in this case.  A

14   list of the materials we have reviewed is included

15   in Exhibit 2.  Based upon my review and analysis of

16   these materials, I have concluded that there is

17   evidence common to members of the proposed Class

18   that is sufficient to prove widespread impact.  This

19   evidence involves:" and it goes through the bullet

20   points where you asked me to stop.

21       Q.   So this reflects your conclusion that there

22   is evidence common to the members of the proposed

23   class; is that correct?

24            MR. RUSHING:  Object to the form.

25            THE WITNESS:  Yes.

121

1   my assignment and analyze those questions, which I

2   had done.

3       Q.   Were you retained to provide an independent

4   report?

5           MR. RUSHING:  Object to the form.

6           THE WITNESS:  I'm not sure what you mean by

7   "independent report."

8   BY MR. TALADAY:

9       Q.   Were you hired to -- anyone other than

10  yourself?

11      A.   I'm sorry.  Can you say that again?

12      Q.   Yes.

13          Were you hired to provide the opinion of

14  anyone other than yourself?

15          MR. RUSHING:  Object to the form.

16          THE WITNESS:  No, I was asked to present my

17  opinion.

18  BY MR. TALADAY:

19      Q.   You weren't hired to provide a communal

20  opinion of you and everyone else at Econ One;

21  correct?

22          MR. RUSHING:  Object to the form.

23          THE WITNESS:  That's correct.  These are my

24  opinions.

25  ///

122

1   BY MR. TALADAY:

2       Q.   You weren't hired simply to reiterate the

3   opinion of Dr. Leitzinger; is that correct?

4            MR. RUSHING:  Object to the form.

5            THE WITNESS:  I was not.

6   BY MR. TALADAY:

7       Q.   And do you contend that this report

8   reflects your independent opinion?

9            MR. RUSHING:  Object to the form.

10           THE WITNESS:  This report reflects my

11  opinion.  I'm not sure what the issue (audio

12  difficulties) the word independent means, but I was

13  not told by counsel or Dr. Leitzinger or anyone else

14  what opinions to take in this matter.  These are my

15  opinions.

16  BY MR. TALADAY:

17      Q.   So it's your opinion and not anyone else's

18  opinion; correct?

19           MR. RUSHING:  Object to the form.

20           THE WITNESS:  I wouldn't say it's not

21  anyone else's opinion.  I expect that Dr. Leitzinger

22  would agree with me based upon his earlier analysis

23  and maybe others might agree with me as well, but

24  certainly this report reflects my opinions.

25           MR. TALADAY:  Can we move -- please move to

123

1    paragraph 8 of Dr. Leitzinger's report.

2    BY MR. TALADAY:

3        Q.   Dr. Johnson, can I ask you to please read

4    paragraph 8 in Dr. Leitzinger's report.

5        A.   "CRTs were the dominant technology used in

6    televisions and computer monitors, automated teller

7    machines, gaming devices, measuring instruments and

8    electronic medical devices (collectively 'display

9    products') from the 1950s into the 2000s.  Since

10   then, liquid crystal displays ('LCDs' or 'TFT-LCDs')

11   have supplanted CRTs in most display applications."

12       Q.   Thank you.  Dr. Johnson, can you please

13   read paragraph 10 of your report.

14       A.   "CRTs were the dominant technology used in

15   televisions and computer monitors, automated teller

16   machines, gaming devices, measuring instruments and

17   electronic medical devices (collectively 'display

18   products') from the 1950s into the 2000s.  Since

19   then, liquid crystal displays ('LCDs' or 'TFT-LCDs')

20   have supplanted CRTs in most display applications."

21           MR. RUSHING:  Pardon me, but Dr. Johnson's

22   microphone seemed to have fizzled a bit at the end

23   of that.  Is that -- did everybody catch that?

24   BY MR. TALADAY:

25       Q.   Dr. Johnson, I'm afraid I'm going to have

132

```
 1          MR. RUSHING:  I don't understand what just

 2   happened.

 3          MR. TALADAY:  Yeah.  So my apologies,

 4   Geoff.  I got a note that my computer battery was

 5   about to die --

 6          MR. RUSHING:  Oh, I see.  Okay.  No

 7   worries.

 8          MR. TALADAY:  -- from my network and I had

 9   to get a, you know, charge plug into it before it

10   died, so...

11          MR. RUSHING:  Okay, no worries.

12          MR. TALADAY:  Moment of panic.

13   BY MR. TALADAY:

14      Q.   Dr. Johnson, it wouldn't surprise you if a

15   majority of the language in your report was

16   identical to the language in Dr. Leitzinger's

17   report; is that correct?

18          MR. RUSHING:  Object to the form.

19          THE WITNESS:  I haven't gone through to do

20   an analysis on that, but it wouldn't surprise me,

21   no.

22   BY MR. TALADAY:

23      Q.   Is it fair to say, Dr. Johnson, that your

24   report is effectively a redline of Dr. Leitzinger's

25   report?
```

1   data?  You didn't use the same master dataset; is

2   that correct?

3          MR. RUSHING:  Object to the form.

4          THE WITNESS:  That's my recollection.  If

5   there were -- if there were changes that occurred

6   with the underlying data after he had created his

7   master dataset, we certainly -- certainly would have

8   had that recreated and -- to use the most current

9   data and, in the process of doing this analysis, ran

10  these analyses from the start.

11  BY MR. TALADAY:

12     Q.   Let me make sure I'm clear on this.  Are

13  you saying, Dr. Johnson, that you would not have

14  simply adjusted the master dataset that

15  Dr. Leitzinger used to reflect the changes to that

16  dataset, but that you would have abandoned that

17  dataset entirely, gone back to the source data for

18  every defendant to recompile that to create a new

19  master dataset?

20         MR. RUSHING:  Object to the form.

21         THE WITNESS:  Well, I'm not sure the

22  implications of your characterization of abandoning

23  it, but the analysis that is done in this report was

24  done for this report.

25  ///

136

1    BY MR. TALADAY:

2        Q.   Did the analysis that was done for this

3    report build on the dataset that was used by

4    Dr. Leitzinger in his report?

5            MR. RUSHING:  Object to the form.

6            THE WITNESS:  My recollection would be that

7    my staff would have recreated that dataset and not

8    used the actual data file that Dr. Leitzinger used.

9    So I think that that shouldn't -- that would have

10   been the case, although if the -- I didn't confirm

11   that, but that's my recollection of how we proceeded

12   in this case for this report.

13   BY MR. TALADAY:

14       Q.   So it wouldn't surprise you, then,

15   Dr. Johnson, to learn that paragraph 10 of your

16   report was the same as paragraph 8 of Dr. John --

17   excuse me -- of Dr. Leitzinger's report; 11 of your

18   report was the same as paragraph 9 of

19   Dr. Leitzinger's report; paragraph 12 of your report

20   was identical to paragraph 10 of Dr. Leitzinger's

21   report; your paragraph 13 was identical to his

22   paragraph 11; your paragraph 14 was identical to his

23   paragraph 12; and that many other paragraphs, which

24   I would be happy to identify for you, are identical.

25   That wouldn't surprise you if that was the case,

 1   would it?

 2          MR. RUSHING:  Object to the form.  I mean,

 3   asked and answered among many other things.  I don't

 4   know how many times we're going to go through this.

 5          THE WITNESS:  No, it wouldn't surprise me

 6   if many of the paragraphs contained many of the same

 7   words as Dr. Leitzinger's report.

 8   BY MR. TALADAY:

 9      Q.   Did you rely on Dr. Leitzinger's report in

10   forming your opinions?

11          MR. RUSHING:  Object to the form.

12          THE WITNESS:  No, I wouldn't say I relied

13   on it.  His report and my report share an origin in

14   looking at a lot of the same materials, the same

15   documents and data.  And the analysis that is done

16   is done in very common ways.

17          But I don't -- I don't need to cite his

18   report because the analysis and the opinions and the

19   material that support those opinions and analysis

20   are contained within my report.

21   BY MR. TALADAY:

22      Q.   So is your testimony you didn't rely at all

23   on Dr. Leitzinger's report to form your opinion?

24          MR. RUSHING:  Object to form.

25          THE WITNESS:  I'm sorry.  You broke up

138

1   there, at least for me.  Could you say that again?

2   BY MR. TALADAY:

3       Q.   Yes.

4            So it's your testimony that you did not

5   rely at all on Dr. Leitzinger's report in forming

6   your opinion; is that correct?

7            MR. RUSHING:  Object to the form.

8            THE WITNESS:  The report is an expression

9   of Dr. Leitzinger's opinion, his report is an

10  expression of his opinions and analysis that he --

11  that's done in his report.

12           My report is a reflection of the analysis

13  done in my report, the materials reviewed in my

14  report, and contains the opinions.  It's --

15  Dr. Leitzinger's report is not a source document or

16  a piece of evidence in this case that I would rely

17  on.

18  BY MR. TALADAY:

19      Q.   I think you said before that it's no

20  coincidence that some of your language was identical

21  to Dr. Leitzinger's language; is that correct?

22           MR. RUSHING:  Object to the form.

23           THE WITNESS:  I don't recall whether I said

24  those words or not, but it's -- I wouldn't call it a

25  coincidence.

Case 4:07-cv-05944-JST   Document 5984-2   Filed 01/21/22   Page 35 of 362
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION          Phillip M. Johnson, Ph.D.
January 11, 2022

139

1    BY MR. TALADAY:

2        Q.   So it was purposeful that you used the same

3    words?

4            MR. RUSHING:   Object to the form.

5            THE WITNESS:   These words do a good job of

6    expressing the opinions that I have and the material

7    that I think is relevant to those opinions, and so I

8    saw no reason to artificially change to different

9    words to express the same opinions that I have.

10   BY MR. TALADAY:

11       Q.   (Audio difficulties).   I think we get the

12   gist.   Thank you.

13           MR. RUSHING:   Did somebody just say

14   something?

15           THE WITNESS:   It seemed like there was a

16   breakup there.   If there was a question, I didn't

17   hear it.

18   BY MR. TALADAY:

19       Q.   I just said thank you.

20           Could you please turn to paragraph 27 of

21   your report.

22       A.   Yes, I'm there.

23       Q.   (Audio difficulties) you state, "To

24   reflect product characteristics, I

25   included information from the transaction data

140

1    regarding the CRT size, whether it was widescreen,

2    whether ITC or bare, transition quantity, and an

3    indicator for the brand."

4            Can you please state why it is that brand

5    matters?

6            MR. RUSHING:  Objection.  You -- the first

7    part of your question was garbled, John.

8            MR. TALADAY:  I'll try it again, Geoff.

9    BY MR. TALADAY:

10   Q.   Dr. Johnson, did you hear my question?

11   A.   I didn't hear the very first part of it.

12   It was garbled for me as well.

13   Q.   I simply read the sentence beginning with

14   the words, "To reflect product characteristics."

15           Can you please review (audio difficulties).

16           MR. RUSHING:  This is -- this is on page 27

17   of Dr. Johnson's report?

18           MR. TALADAY:  Paragraph 27, page 16.

19           MR. RUSHING:  Oh, sorry.

20           MR. TALADAY:  Tom, you can take down the

21   Leitzinger report.

22           THE WITNESS:  So, I'm sorry.  Again, you

23   were garbled again in what you just said.  I think

24   you asked me to read part of the paragraph starting

25   with "reflect"; is that correct?

Case 4:07-cv-05944-JST   Document 5984-2   Filed 01/21/22   Page 37 of 362
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION          Phillip M. Johnson, Ph.D.
January 11, 2022

170

1    types of products were actively and consistently

2    targeted by the cartel members.

3          This paragraph here is talking about the

4    significance of those products within the shipments

5    by defendants.

6          So my opinion is that those products were

7    impacted by the price targeting.  That opinion is in

8    part based upon the target price analysis, and also

9    in part based upon other documents that I have seen

10   and depositions referencing the breadth and the

11   extent of the cartel's price fixing efforts.

12   BY MR. TALADAY:

13       Q.   The last sentence says that, "That result,

14   by itself, goes a long way towards establishing the

15   existence of a broad impact on the part of the

16   alleged conspiracy."

17          What result is it that you're referring to

18   there?

19          MR. RUSHING:  Objection to form.

20          THE WITNESS:  It's the result about the

21   share of shipments accounted for by the products

22   which the cartel is known to have targeted, known to

23   have targeted with regard to price communication.

24   BY MR. TALADAY:

25       Q.   When a price target is set, how long does

1   it last?

2          MR. RUSHING:  Objection to form.

3          THE WITNESS:  What do you mean by "how long

4   does it last"?

5   BY MR. TALADAY:

6      Q.   For how long is that price target in

7   effect?

8      A.   Are you asking me how long the impact of

9   that -- that price -- that collusion persists?

10     Q.   No.

11         What I'm asking is, based on your review

12  and analysis of all of the documents reflecting

13  price targets, when the competitors set a price

14  target, for how long typically was that price target

15  intended to be in effect with respect to their sales

16  of products?

17     A.   There were frequent meetings.  And the

18  meetings (audio difficulties) new price targets.  So

19  the -- I think that it depends upon the instance

20  that you're talking about.

21     Q.   And there were frequent meetings because --

22  well, why?  Why were there frequent meetings?

23         MR. RUSHING:  Objection to form.

24         THE WITNESS:  I'm not sure of all of the

25  reasons, but the way it's known as a matter of

172

1  economics, is a monopolist or a cartel will want to

2  adjust its conspiracy price for market conditions,

3  for the discipline in instances there are thought to

4  have been participants who are not fully

5  implementing the cartel price.  There could be a

6  whole range of things that cause the cartel to want

7  to make adjustments to its cartel or target price.

8  BY MR. TALADAY:

9     Q.   And there are instances with respect to

10  some sizes of some products where new price targets

11  were set almost monthly for periods of time; is that

12  correct?

13          MR. RUSHING:  Objection to form.

14          THE WITNESS:  I think, yeah.

15  BY MR. TALADAY:

16     Q.   And there are instances where you identify

17  multiple price targets for the same product in the

18  same month; isn't that correct?

19          MR. RUSHING:  Objection to form.

20          THE WITNESS:  There were -- there are

21  instances where there were ranges covering multiple

22  products of a type.  And there were, you know,

23  multiple meetings and multiple discussions.  So,

24  yes, that might be the case.

25  ///

173

1    BY MR. TALADAY:

2        Q.   Do you think in part that was the result of

3    changing market conditions; is that correct?

4            MR. RUSHING:  Objection to form.

5            THE WITNESS:  I don't think that's an

6    accurate characterization of my answer.

7    BY MR. TALADAY:

8        Q.   I'm sorry, could you repeat that,

9    Dr. Johnson?

10       A.   I don't think that's an accurate

11   characterization of my view or the answer to that

12   question.

13       Q.   Did you state that market conditions could

14   be one of the reasons -- changing market conditions

15   could be one of the reasons that they would meet

16   frequently to reset price targets?

17           MR. RUSHING:  Objection to the form.

18           THE WITNESS:  I said that changing market

19   conditions could be one of the reasons for them to

20   adjust prices or price targets, yes.

21   BY MR. TALADAY:

22       Q.   Thank you.

23           And there were separate price targets set

24   for different sizes of products; isn't that correct?

25           MR. RUSHING:  Object to the form.

IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION          Phillip M. Johnson, Ph.D.
January 11, 2022

198

1          MR. TALADAY:  Yeah, I believe at this point

2    in time it's been organized by date.  I don't want

3    to say reorganized, because I'm not sure the exact

4    version.  This is just how -- it appeared

5    differently when we converted it from the -- you

6    know, the original format to Excel, but it's the

7    same data, just organized by date.  That's what

8    you're seeing right now.  Okay.

9    BY MR. TALADAY:

10        Q.   So, Dr. Johnson, what is the earliest

11   target price that you identified?

12        A.   I don't recall the earliest date from

13   memory off the top of my head.  But if you want to

14   ask me about what I'm seeing here, you're welcome to

15   do so.

16        Q.   Yeah, yeah.  Are you able to tell from this

17   file, assuming it's correctly organized by date,

18   what the earliest target price you found is?

19        A.   The first entry in this file is a line that

20   begins with Bates number CHU00028869.  And the

21   second column has in it a date of August 16, 1995.

22        Q.   And do you see any other target prices for

23   any other -- excuse me.  Let me strike that.

24          Can you tell us what type of product and

25   what size of product that target price was set for?

211

1    BY MR. TALADAY:

2        Q.   Yes.  But in explaining that, you didn't

3    limit yourself simply to the target price analysis.

4    You've included the allegations on the plaintiffs'

5    complaint; right?

6            MR. RUSHING:  Objection to form.

7            THE WITNESS:  No, that's not correct.

8    BY MR. TALADAY:

9        Q.   What's the first date upon which you see a

10   target price for 17-inch CDTs?  And if you like,

11   Dr. Johnson, we can, you know, manipulate this to

12   organize it by 17-inch CDTs if you'd like.

13       A.   Looking at the screen that you have shared

14   with me, assuming that this is ordered by date, the

15   first line upon which I see 17-inch CDT appears to

16   be in the fourth quarter of 1996.

17       Q.   Is it your testimony that the price targets

18   set in the fourth quarter of 1996 was effective

19   retroactively?

20       A.   No, I don't have that opinion.

21           MR. RUSHING:  Objection to form.

22   BY MR. TALADAY:

23       Q.   It couldn't have applied to shipments that

24   were made prior to the price target being set;

25   right?

212

1          MR. RUSHING:  Objection to form.

2          THE WITNESS:  I don't believe that that

3    would be the case.

4    BY MR. TALADAY:

5      Q.   But all of the shipments prior to that date

6    that were included in the data are included in your

7    calculation of CDT share; right?

8          MR. RUSHING:  Objection to form.

9          THE WITNESS:  As we've discussed a number

10   of times now, the numbers -- the share for 17-inch

11   CDT and that calculation reflects the share of sales

12   of that product over the -- within the data.

13   BY MR. TALADAY:

14     Q.   So that's a yes?

15         MR. RUSHING:  Objection to form.

16         MR. TALADAY:  Tom, let me ask you to

17   reorganize the data now by product -- well, I'd ask

18   you to look at CPTs, 25-inch CPTs only.  And do it

19   slowly, please, so that there's time for the video

20   to watch it.

21         I'm sorry, Tom, let me restate this.  Can

22   you organize it just by CDTs and then in date order?

23         MR. RUSHING:  And, again, I'm sorry.  I

24   didn't hear that.

25         MR. TALADAY:  Yes, yes.  I'm looking for an

1    organization of only CPTs by date, chronological

2    date.  So in other words, a subset of the previous

3    view that only looks at CPTs.

4    BY MR. TALADAY:

5        Q.   Dr. Johnson, the first price target that

6    you identified for CPTs has a date of April 16,

7    1997, assuming this data is correct; right?

8             MR. RUSHING:  Objection to form.

9             THE WITNESS:  So just to make sure I'm

10   clear, so you're saying this is sorted by type,

11   showing CPTs first, and then by date in ascending

12   date order; is that correct?

13   BY MR. TALADAY:

14       Q.   That's almost correct.  I believe that it

15   doesn't show CPTs first.  It shows only CPTs.  I

16   believe the CDTs have been hidden.

17       A.   Okay.  Then I believe your question was

18   what's the first date -- I'm sorry.  Maybe just

19   repeat your question for me.  Getting a little late.

20       Q.   Yes.

21            Again -- and for all questions with respect

22   to the data, make the assumption that the data is

23   correct so I don't have to keep repeating that.

24            The first date for which you find a price

25   target for CPTs, according to the data, is

214

1    April 1997; right?

2            MR. RUSHING:  Objection.

3            THE WITNESS:  That's what this document

4    appears to indicate.

5    BY MR. TALADAY:

6        Q.   And the only entries effective for 1997

7    were for 20-inch and 14-inch CPTs; correct?

8        A.   For that date of -- for that document for

9    that date of -- that's dated April 16, 1997, yes, I

10   see entries for 14-inch and 20-inch.

11       Q.   And there are additional entries for

12   December 1997, effective 1998, that only apply to

13   the 14-inch CPTs; correct?

14           MR. RUSHING:  Objection to form.

15           THE WITNESS:  All the entries I see for

16   that document dated -- or the records dated

17   December 3, 1997, appear to be CPT 14-inch.

18   BY MR. TALADAY:

19       Q.   In your calculation of the 98.16 percent,

20   you included all shipments of '95 and '96 for all

21   CPTs, correct, for all sizes?

22           MR. RUSHING:  Objection to form.

23           THE WITNESS:  That's correct.

24   BY MR. TALADAY:

25       Q.   Let me restate that.  I actually think I

215

1   got that wrong.  So I'll ask it again.  I was

2   looking at the CDT number rather than the CPT

3   number.  So here's the question.

4           In your calculation of the 90.19 percent

5   with respect to CPTs, you include all shipments for

6   all sizes of CPTs in 1995 and 1996; correct?

7           MR. RUSHING:  Objection to form.

8           THE WITNESS:  Right.  In the 90.19 percent,

9   that includes all shipments of targeted products

10  that occurred during the class period, including

11  that period of time you're referencing.

12  BY MR. TALADAY:

13     Q.   And there are no price targets that you

14  identified for either 1995 or 1996 for any CPT;

15  correct?

16          MR. RUSHING:  Objection to form.

17          THE WITNESS:  That's correct.

18          MR. TALADAY:  Tom, let me ask you to

19  organize now within CPTs by size.  And let me ask

20  you to go to 15-inch CPTs.

21  BY MR. TALADAY:

22     Q.   Dr. Johnson, the first price target -- can

23  you identify the first price target you found for

24  15-inch CPTs?

25          MR. RUSHING:  Objection to form.

244

```
1          MR. TALADAY:  Let me introduce a document

2    that we'll mark as Exhibit 8550, if I have that

3    correct.

4          (Exhibit 8550 was marked for identification

5          by the Certified Shorthand Reporter, and a

6          copy is attached hereto.)

7          MR. TALADAY:  And, Tom, can you please

8    publish the document marked as IRI-CRT-00031457 to

9    00031468.  And can you please publish that one?

10   Thank you.

11   BY MR. TALADAY:

12     Q.   Dr. Johnson, I will represent to you that

13   this is a translation of internal Irico documents,

14   and you're welcome to look at the document, but I

15   will refer you in particular to page 0031459.

16         MR. RUSHING:  So, counsel, when was this

17   document produced in discovery?

18         MR. TALADAY:  I don't know when, Geoff.  I

19   don't remember exactly when.  It's obviously been

20   marked.  I could ask Tom if you have an answer to

21   that question, or Drew.  In any event, it's an

22   exhibit now, so...

23         MR. RUSHING:  Well, okay.  I'd like to be

24   able to review this document.

25         MR. TALADAY:  Well, Geoff, you can review
```

Case 4:07-cv-05944-JST   Document 5984-2   Filed 01/21/22   Page 48 of 362
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                Phillip M. Johnson, Ph.D.
January 11, 2022

245

1    it in your own time, but this is Dr. Johnson's time.

2           MR. RUSHING:  Well, no.  No.  I want to

3    look at this document.  So let me hold on and see if

4    I can get back into the -- to the document viewer

5    thing here.

6    BY MR. TALADAY:

7       Q.   Dr. Johnson, if you would like to see other

8    pages, just let us know.  Happy to --

9       A.   Okay.  I haven't -- I don't recall this

10   document, so...

11      Q.   Well, let me get my question on record,

12   Dr. Johnson, and then you can --

13          MR. RUSHING:  Is this -- pardon me -- in

14   the chat?  The thing that -- is there a link that I

15   can -- is that link in the chat one that I can click

16   on?

17          MR. TALADAY:  It's been uploaded to the

18   document page.

19          MR. CARTER:  The link in the chat is a link

20   to the shared marked exhibits page.

21          MR. RUSHING:  Okay.  Thank you.

22   BY MR. TALADAY:

23      Q.   Dr. Johnson, here's my question.  And

24   again, you can feel free to review the document as

25   you like.

246

1          Were you aware of Chinese price regulations

2     that set a floor price for certain sizes of CRT

3     tubes?

4          MR. RUSHING:  Objection to form.

5          THE WITNESS:  No, I'm not -- I'm not

6     familiar with those sorts of regulations.

7          MR. TALADAY:  All right.  I'm done with

8     this document.

9          Tom, I would ask you to publish the other

10    document that we discussed which will be marked as

11    Exhibit 8551.  And publish it when you can, Tom.

12          (Exhibit 8551 was marked for identification

13          by the Certified Shorthand Reporter, and a

14          copy is attached hereto.)

15          MR. TALADAY:  And, Geoff, for your

16    purposes, this document was an exhibit to one of our

17    motions filed, you can see 12/21/2017.

18          And, Tom, can you please go to the next

19    page.  And the next, please.

20          MR. RUSHING:  And are we -- are we marking

21    this?  Has this got an exhibit number?

22          MR. TALADAY:  Yeah, I believe I identified

23    this as Exhibit 8551.

24    BY MR. TALADAY:

25       Q.   Have you had a chance to review this page,

IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                Phillip M. Johnson, Ph.D.
January 11, 2022

247

1   Dr. Johnson?

2       A.   Sorry.  Give me a moment to finish

3   reviewing this.

4           Okay.  I've read the paragraph.

5       Q.   I'm going to spare you, Dr. Johnson.  I

6   will read this paragraph instead of asking you to do

7   it, or at least portions of it.

8           So this is addressed -- there's a date at

9   the top of the year 2000.  There is a note that

10  says -- a line that says, "To color CRT

11  manufacturing enterprises."  And it says, it reads,

12  "To prevent actions of unfair price competition in

13  the color CRT industry and maintain a normal market

14  order, the industrial average production costs of

15  three types of color CRTs, i.e. 21 inches, 25 inches

16  and 29 inches, are hereby published (see the

17  attached table for details) pursuant to the Trial

18  Measures to Prevent Unfair Price Competition

19  Regarding Color CRTs and Color TVs by the State

20  Planning Commission and the Ministry of Information

21  Industry.  All color CRT manufacturing enterprises

22  are asked to seriously implement the costs.  In the

23  case where a manufacturing enterprise sells the

24  products at prices lower than the published

25  industrial average production costs to cause market

1   disorders and harm the interests of other

2   manufacturing enterprises, a harmed enterprise may

3   file a report with the State Planning Commission or

4   a competent department in charge of prices of a

5   province, autonomous region or municipality directly

6   under the Central Government.  In the cases where it

7   is confirmed through investigation that there is

8   indeed an action of unfair price competition, a

9   competent government department in charge of prices

10  shall order the responsible party to correct and

11  impose penalties according to specific situations."

12          Did I read that roughly accurately,

13  Dr. Johnson?

14          MR. RUSHING:  Objection to form.  I mean,

15  go ahead.

16          THE WITNESS:  I didn't listen to the whole

17  paragraph with an eye towards correcting, you know,

18  misstatements or misphrasings that you may have had,

19  so I don't want to be the -- that's what you have

20  the court reporter for.  But I see the document here

21  and I can read the document if I need to.

22  BY MR. TALADAY:

23     Q.   Were you aware of pricing regulations

24  established by the State Planning Commission and

25  administrative information industry on color CRT

249

1   manufacturing enterprises in the year 2000?

2          MR. RUSHING:  Objection to form.

3          THE WITNESS:  I don't recall as I sit here

4   having a great deal of information about that.  I

5   may have heard something about an issue there at

6   some point, and I may have -- I may have seen this

7   document before.  I don't really recall as I sit

8   here.

9   BY MR. TALADAY:

10     Q.   Okay.  It is possible, isn't it,

11  Dr. Johnson, that these price regulations, to the

12  extent that they imposed a price floor for CRT

13  manufacturers, could have impacted the ability of a

14  defendant subject to these regulations to charge the

15  but-for prices in your analysis; isn't that right?

16         MR. RUSHING:  Objection to form.

17         THE WITNESS:  I'm not really sure without

18  knowing anything about the constraints that they

19  purport to impose here about particular costs, how

20  this compared to prices and whether -- how they were

21  enforced or not enforced.  I mean, I suppose it's

22  also possible that if the market prices had been

23  different, maybe this ministry would have undertaken

24  a different action.  You know, it's -- this is --

25  this was issued in the context of the actual prices.

250

1   In a but-for world, I don't know whether this -- if

2   it had some -- posed some serious constraint,

3   whether that constraint would have been the same or

4   have had to have been revised.  I really don't have

5   the context to do a but-for analysis on this

6   document.

7   BY MR. TALADAY:

8       Q.   Would it have mattered to you in your

9   assessment of overcharges whether there were price

10  regulations establishing price floors above your

11  but-for prices?

12          MR. RUSHING:  Objection to form.

13          THE WITNESS:  My analysis utilized actual

14  prices.  So if there were things that affected

15  actual prices, it would be -- would be reflected or

16  would have impact on that analysis.  To the extent

17  that there are significant events in the global

18  market, I'm not sure that the actions of the

19  Ministry of Information in China by itself would

20  have been substantial to have a measurable

21  substantial effect on the analysis of global CRT

22  prices and the global CRT overcharge.

23          So I don't -- I would be surprised if

24  information of this type would have had an impact

25  on -- substantial impact on my analysis.

# **EXHIBIT 1**

## **(FILED UNDER SEAL)**

# <u>EXHIBIT 2</u>

# (FILED UNDER SEAL)

# **<u>EXHIBIT 3</u>**

# **(FILED UNDER SEAL)**

# <u>EXHIBIT 4</u>

## (FILED UNDER SEAL)

# EXHIBIT 5

# (FILED UNDER SEAL)

# **EXHIBIT 6**

## (FILED UNDER SEAL)

# **EXHIBIT 7**

Highly Confidential

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>DIRECT PURCHASER CLASS ACTION | Master File No. CV-07-5944-SC<br>MDL No. 1917 |

**EXPERT REPORT OF ROBERT D. WILLIG**

09/10/13

**PUBLIC REDACTED VERSION**

# TABLE OF CONTENTS

I. **Introduction** ..................................................................................................1
   A. Qualifications ...........................................................................................1
   B. Assignment ..............................................................................................2

II. **Summary of Conclusions** ...............................................................................4
   A. There Is No Evidence of Sustained and Effective Collusion Across All CRTs Purchased by the Proposed Class. .............................................................5

      *Dr. Leitzinger's Analyses of Actual and Target Price Data Do Not Establish Class-wide Impact.* .........................................................................................7

   B. There Is No Evidence of a Price Structure. ................................................9
      *Actual Pricing Data Are Wholly Inconsistent with the Existence of a Structure in Prices of CRTs and CRT Finished Products.* ...............................................9
      *Dr. Leitzinger's Price Correlation Analysis Does Not Support the Existence of a Price Structure or Common Impact.* ...........................................................11

   C. Pass-through of CRT Costs to Finished Product Prices Was Complex and Differentiated. ........................................................................................12

   D. Dr. Leitzinger's CRT Overcharge Analysis Shows No Impact of the Alleged Cartel on the Prices of Several Major CRT Categories. .......................................13

III. **No Evidence of Uniform, Effective and Sustained Collusion** .....................14

   B. Dr. Leitzinger's Analyses of Actual and Target Price Data Do Not Establish Class-wide Impact. .........................................................................................26

Highly Confidential

Dr. Leitzinger's Analysis of Actual and Target Prices at Most Demonstrates a Positive Relationship between Actual and Target Prices; It Does Not Demonstrate that the Alleged Target Prices Had an Impact on Actual CRT Prices.............................28

Dr. Leitzinger Overstates the Average Relationship between Actual Prices and Target Prices. ...............................................................................................................32

Dr. Leitzinger's Hedonic Regressions Undermine Claims of Class-wide Cartel Impact.................................................................................................................35

IV.    There Is No Evidence of a "Price Structure." ...............................................................41

   A.    No Evidence of a "Structure" to Prices of CRTs and CRT Finished Products .............41

Widely Differentiated CRTs and CRT Finished Products Resulted in Widely Different Dynamics for Their Prices. ...............................................................42

Substantially Different Market Forces, Such as Competition from LCD and Plasma Technologies, Influenced CRT and CRT Finished Product Prices Differently during the Alleged Class Period. .........................................................................49

Conduct Directed at CRT Prices Outside the United States Need Not Have Elevated CRT Market Prices in the United States. .......................................52

   B.    Dr. Leitzinger's Price Correlation Analyses Do Not Establish Common Impact, and They Mask the True Heterogeneity in Price Changes.................................................54

V.    Pass-through of CRT Costs to Finished Products Prices Was Complex and Differentiated. .................................................................................................................62

VI.    Estimating CRT Overcharges ........................................................................................69

Dr. Leitzinger's CRT Overcharge Model is Fundamentally Unsound. .........................72

VII.    Conclusions ...................................................................................................................74

Highly Confidential

# I.      Introduction

## A.  Qualifications

1.   I am a Professor of Economics and Public Affairs at the Woodrow Wilson School and the Economics Department of Princeton University, USA. I am also a Senior Consultant at Compass Lexecon, an economics consulting firm based in the U.S. Previously, I was a Supervisor in the Economics Research Department of Bell Laboratories. My teaching and research have specialized in the fields of industrial organization, government-business relations, and welfare theory.

2.    I have extensive experience analyzing economic issues arising under the law. From 1989 to 1991, I served as Chief Economist in the Antitrust Division of the U.S. Department of Justice, where I led the development of the 1992 *Horizontal Merger Guidelines*. I met with outsiders, weighed evidence, and participated in decisions on when to use enforcement power. Core to my work were issues pertaining to alleged conspiracies and market competition. I am the author of *Welfare Analysis of Policies Affecting Prices and Products* and *Contestable Markets and the Theory of Industry Structure* (with William Baumol and John Panzar) as well as numerous articles. I have served on the editorial boards of *The American Economic Review*, *The Journal of Industrial Economics*, and the *MIT Press Series on Regulation*. Also, I have served as a consultant and advisor to the Federal Trade Commission, the Department of Justice, the OECD, the Inter-American Development Bank, the World Bank, and the governments of many nations.

3.   I was invited by the Pennsylvania Bar Institute, Antitrust Law Committee CLE and the PLI Annual Antitrust Law Institute in 2007 to give talks on class certification matters, and I have prepared expert reports on class certification matters.

Highly Confidential

4.  I have been retained by the defendants in CRT litigation related to Indirect Purchaser Plaintiffs' claims of CRT price fixing, and I have filed two reports in that litigation.[1]

5.  My curriculum vitae, which includes a list of my publications, is at Attachment 1. A list of matters in which I have given sworn testimony as an expert during the past four years, at trial or in deposition, is at Attachment 2.

## B.  Assignment

6.  The allegations in this case involve a conspiracy to elevate the prices of cathode ray tubes ("CRTs"). Plaintiffs allege that Defendants[2] and their co-conspirators successfully colluded to elevate the prices of CRTs sold in the U.S. between March 1995 and November 2007 (the class period).  Plaintiffs have asked the Court to certify a class of direct purchasers ("the DPP class") consisting of "all persons and entities who directly purchased a Cathode Ray Tube Product, ..., in the United States from any Defendant or any subsidiary or affiliate thereof [during the class period]."[3]

7.  I understand that it is incumbent on Plaintiffs to show that injury and damages to the DPP class as a result of the actions of the alleged cartel of CRT manufacturers during the class period can be established using common evidence and common methods, i.e., that the conduct at issue had a "common impact" on members of the proposed class of direct purchasers.

---

[1] Expert Report of Robert D. Willig, December 17, 2012; and Rebuttal Declaration of Robert D. Willig, March 25, 2013.

[2] The following firms are listed as Defendants in the relevant complaint: Chunghwa Entities; Daewoo Entities; Hitachi Entities; Irico Entities; LG Electronics Entities; Panasonic Entities; Philips Entities; LG Philips Display (listed under Philips Entities); Samsung Electronics entities; Samsung SDI entities; Thai-CRT; Toshiba Entities; Samtel; Tatung Company of America, Inc. (Direct Purchaser Plaintiffs' Consolidated Amended Complaint, March 16, 2009, pp. 5-18.) However, I understand that Plaintiffs have settled or dismissed their claims against all but Hitachi and Samsung SDI.

[3] Direct Purchaser Plaintiffs' Consolidated Amended Complaint, March 16, 2009, p.1.

Highly Confidential

8. I have been retained by Defendants Hitachi and Samsung SDI ("SDI")[4] to:

    a)    Address whether Plaintiffs are likely to be able to demonstrate, at a single trial, through common proof on a class-wide basis, that all or virtually all of the members of the proposed class suffered economic injury from the alleged conspiracy;

    b)    Review the expert report filed by Dr. Jeffrey Leitzinger, the economic expert for the DPP class, and opine on the analyses and views presented therein.

9. As a starting point for my analysis, I assume that the DPP class is correct in its allegation that the group of defendant CRT manufacturers and their alleged co-conspirators attempted to elevate prices of some CRTs to direct purchasers during the relevant period. However, I do not assume that the alleged cartel was effective in its attempts to elevate prices to any or all direct purchasers of CRTs during the nearly thirteen-year class period. Instead, I investigate whether, as an empirical matter, the fact and extent of impact on all direct purchasers can be assessed using common evidence and methods.

10. A list of the information and data I relied upon in forming the opinions expressed herein is attached at Attachment 3. My opinions expressed herein are based on those materials and data, my previous work related to the indirect purchaser class CRT litigation, my knowledge and experience in industrial organization economics and antitrust economics, my experience in antitrust enforcement at the Department of Justice, and my experience in advising and consulting with clients on competition matters over the past 30 years, both here and abroad.

11. The opinions expressed in this report reflect the information and facts I believe to be true at the time this report is filed. I reserve the right to revise my opinions if additional information and facts supplied in discovery or through subsequent expert reports and depositions make such revisions appropriate.

---

[4] I was also retained by SEA and SEC until May 22, 2013, the date the DPP class voluntarily dismissed those companies from their case.

Highly Confidential

12. Compass Lexecon is being compensated for my work at my usual hourly rate of $1,350 which is the same rate for research and testimony. This compensation is in no way connected to the outcome of this litigation.

## II.     Summary of Conclusions

13. The proposed DPP class is extremely broad. It encompasses CRTs as well as CRT finished products (i.e., TVs and monitors containing CRTs), CRTs used in TVs and in monitors, and it includes CRTs sold in all geographic regions since Plaintiffs allege that there was a global conspiracy.[5]

14. Given the complexities of the CRT marketplace during the class period, my overall conclusion is that common methods and evidence cannot be used validly to assess the impact of the alleged cartel on all or almost all members of the proposed DPP class. Instead, an individualized examination would be required to determine whether any particular direct purchaser actually paid a cartel overcharge when purchasing a given CRT or CRT finished product. This opinion is based on the following findings:

   a)     CRT price dynamics were complex and heterogeneous during the cartel period because of differentiated market forces in the CRT marketplace. For example, CDTs and CPTs were distinct products subject to different market forces. CDTs were affected earlier and more extensively by competition from LCD and plasma technologies than CPTs, and this differentiated impact is evident in the earlier and more rapid decline of CDT prices than CPT prices.

 Despite the evidence of heterogeneity in the CRT marketplace, Dr. Leitzinger's conclusions are based on analyses that pool together all or most CRTs.

---

[5] I understand that although plaintiffs allege a global conspiracy, their claims are confined to the U.S. (Direct Purchaser Plaintiffs' Consolidated Amended Complaint, March 16, 2009, ¶¶ 214-215.)

Highly Confidential



c)    Dr. Leitzinger's conclusions rest on analyses that make no distinction between CPT sales in North America and sales elsewhere.

d)    The alleged cartel was unlikely to have been successful in elevating CRT prices class-wide, as evidenced by the fact that the target prices that Dr. Leitzinger contends were set by the alleged cartel were poor predictors of actual CRT prices.

15. I briefly summarize my more detailed conclusions below, and provide my analyses in the body of this report.

## A. There Is No Evidence of Sustained and Effective Collusion Across All CRTs Purchased by the Proposed Class.

16. Dr. Leitzinger's opinion (contrary to mine) that class-wide impact can be established using common methods and evidence rests on three claims: (a) the alleged cartel set "target prices" for CRTs that accounted for a majority of CRT sales, and the Defendants and their alleged co-conspirators were successful in elevating CRT sales prices based on those target prices; (b) a so-called "price structure" existed for CRTs; (c) pass-through rates were uniformly positive across all CRT finished products, *i.e.*, there was universal or near-universal pass-through of allegedly elevated CRT prices by manufacturers of TVs and monitors. If either (a) or (b) is incorrect, then his entire methodology for establishing common impact on direct purchasers of CRTs collapses. For purchasers of CRT finished products, all three of these claims must be correct. In fact, all three claims are fundamentally incorrect, and the evidence cited by Dr. Leitzinger does not support his conclusions, thereby rendering his conclusions unreliable, as I explain below.

Highly Confidential

██████████████████████████████████████████████████████████

██████████████████████████████

██Several features of the CRT marketplace (such as opaque pricing) imply that the alleged cartel may not have been consistently effective in increasing CRT prices class-wide (if at all). ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

18. The documentary evidence of breakdowns in the alleged cartel is supported by data on actual CRT prices. ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████ Because Dr. Leitzinger has not presented any but-for prices for particular CRTs, he has provided no basis that would allow a fact-finder to ascertain which, if any, of the substantial majority of CRTs priced below the alleged applicable target prices were priced above the but-for price.

██In order to further examine whether the evidence is consistent with the cartel having a class-wide impact, I have also employed an econometric model to test whether changes in actual prices tended to track changes in target prices. If the alleged target prices had a class-wide impact on actual prices, then quarter-to-quarter changes in the alleged target prices identified by Dr. Leitzinger should reliably predict changes in the actual prices for the corresponding CRT models. ████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

Highly Confidential

20. Part of the lack of consistent adherence to target prices identified by Dr. Leitzinger was likely due to the fact that during the class period some alleged cartel members were vertically integrated.  The vertically integrated manufacturers typically sold CRTs to affiliated and non-affiliated downstream finished-product manufacturers.  Because the transfer price paid by an affiliated downstream finished-product manufacturer to an upstream CRT manufacturer was likely to be opaque to other CRT manufacturers, integrated firms may have found it easier to deviate from the cartel agreement without being detected. ██████████████████

████████████████████████████

████████████████████

*Dr. Leitzinger's Analyses of Actual and Target Price Data Do Not Establish Class-wide Impact.*

██ Dr. Leitzinger reviews the same data but reaches a different conclusion. ██████████

██████████████████████████████

██████████████████████████████

████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████

██████████████████████████████

---

[6] Corrected Expert Report of Jeffrey J. Leitzinger, Ph.D., August 1, 2013 ("Leitzinger Report"), ¶ 6. Dr. Leitzinger also filed an expert report in this litigation on May 14, 2013 (Expert Report of Jeffrey J. Leitzinger, Ph.D., May 14, 2013).  All references herein to his report refer to the August 1, 2013 Corrected Expert Report.

██████████████████████

████████████████

Highly Confidential



23. Dr. Leitzinger's actual-price target-price regression analysis at most demonstrates the existence of a positive relationship between actual prices and the alleged target prices, which does not establish that the alleged target prices had an impact on actual CRT prices. For example, to the extent that the control variables that Dr. Leitzinger included in his regression do not capture all of the market forces that affected both actual and target prices, one would expect to observe a positive relationship between actual and target prices regardless of the extent to which target prices influence actual prices.

Dr. Leitzinger's actual-price target-price regression analysis also does not demonstrate that there was a class-wide relationship between actual and target prices.

In order to further confirm these results, I examined whether the alleged target prices, expressed in the same functional form as in Dr. Leitzinger's analysis, are reliable predictors of actual price *levels*.

Highly Confidential

**B.  There Is No Evidence of a Price Structure.**

*Actual Pricing Data Are Wholly Inconsistent with the Existence of a Structure in Prices of CRTs and CRT Finished Products.*

Highly Confidential

█However, CRTs were widely differentiated along many dimensions. For example, I understand that CPTs were used exclusively in televisions, whereas CDTs were used predominantly in desktop computer monitors and were not used in televisions. From the standpoint of manufacturers of monitors and TVs, CPTs and CDTs were not substitutes. Other factors such as customization of CRTs limited the extent of demand and supply substitution of CRTs. ████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████

████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
███████████████████

█The heterogeneous price dynamics of CRTs and CRT finished products likely were the result of differentiated features of these products and, more importantly, the result of substantially different market forces that influenced the prices of different CRT product segments at various points during the class period. █████████████████

████████████████████████████████████████
███████████████████████████████
████████████████████████████████████████
█████████████████

32. In addition to the differentiated price dynamics across product categories, there is substantial evidence of diverse price dynamics across geographic regions. This is another source of differentiation in CRT price dynamics, particularly for CPTs. This is particularly relevant here because although the U.S.-based Plaintiffs allege a global CRT cartel, a substantial volume of CPTs used in TVs sold in the U.S. were manufactured or sold in North America. Market conditions for CPTs in North America were different from those in the rest of the world. Given these facts, it would not be surprising if CPT

Highly Confidential

prices in the U.S. and North America were different from CPT prices in the rest of the world. Indeed, prices of CPTs sold in North America had substantially different patterns of changes than prices of CPTs sold in the rest of the world.

*Dr. Leitzinger's Price Correlation Analysis Does Not Support the Existence of a Price Structure or Common Impact.*



34. However, correlations of the type estimated by Dr. Leitzinger are most likely spurious, produced by basic flaws long recognized by economists. In fact, even if the so-called targeted and non-targeted CRTs were entirely unrelated by any demand or supply substitution, Dr. Leitzinger's analysis would likely produce a very high estimate of price correlation simply because prices of most CRTs, for example, were declining due to common market forces such as buyers switching to LCDs and declining manufacturing costs, even if the extent to which these market forces affected CRTs' prices differed across various categories of CRTs.

35. Moreover, Dr. Leitzinger's price correlation analysis masks considerable heterogeneity in CRT price dynamics because the analysis is focused only on *average* CRT prices, aggregated across many different CRTs within broad categories. An analysis using disaggregated CRT price data reveals that the alleged target prices identified by Dr. Leitzinger are very poor predictors of actual sales prices of non-targeted CRTs. This result is wholly inconsistent with Dr. Leitzinger's contention that the alleged target prices broadly impacted sales prices of non-targeted CRTs.

Highly Confidential

## C. Pass-through of CRT Costs to Finished Product Prices Was Complex and Differentiated.

36. The proposed DPP class includes purchasers of CRTs as well as purchasers of CRT finished products. Even assuming *arguendo* that the alleged CRT cartel impacted prices paid by direct purchasers of most or all CRTs during the class period, it likely would have broadly impacted prices paid by class members for all or nearly all *finished products* only if the increase in CRT prices flowed through to finished products purchased by class members in a uniformly positive manner.

█████ As explained above, certain categories of CRT finished products faced stiffer and earlier competition from LCDs and plasma technologies. As such, manufacturers may not have had the ability to pass-through increases in CRT prices in some categories of finished products. More generally, economic theory shows that not all finished product prices would necessarily have been elevated and some prices may even have fallen if the alleged cartel was able to elevate prices of all CRTs. ████████████████

- 12 -

Highly Confidential

**D. Dr. Leitzinger's CRT Overcharge Analysis Shows No Impact of the Alleged Cartel on the Prices of Several Major CRT Categories.**

42. In sum, Dr. Leitzinger is mistaken in his claim that his damages model proves the feasibility of a formulaic approach to reliably estimating damages. If anything, his data

and his analysis demonstrate the need for a disaggregated analysis of damages and impact given the non-uniform impact (if any) of the alleged cartel. This is not surprising given the extremely broad class claimed by plaintiffs, a class that includes many and heterogeneous products and regions.

## III.   No Evidence of Uniform, Effective and Sustained Collusion



44. However, economic theory has established that cartels in industries with certain features and conduct are less likely to be effective than cartels in industries without those features. Such characteristics include opaque pricing (i.e., prices are not entirely transparent to suppliers)[13] and differing degrees of vertical integration across alleged cartel members.[14] These features are found in the CRT industry during the relevant period.

45. Transparency of pricing matters for cartel stability because a cartel cannot succeed if cartel members can readily gain sales by cheating on the agreement and undercutting cartel prices without inviting retaliation. Cheating is more likely to be detected and

---

[13] See, e.g., Church, J., & Ware, R. (2000). *Industrial Organization: A Strategic Approach.* McGraw-Hill. p. 340.

[14] See, e.g., Carlton, D.W., & Perloff, J. M. (1999). *Modern Industrial Organization, 3rd edition.* Addison-Wesley. p.138.

Highly Confidential

deterred if each member of the alleged cartel were able to observe prices other cartel members charged their customers. If so, members would be able to detect whether cartel participants are, in fact, complying with the agreed-upon target prices. Conversely, if prices are opaque, then cartel members are unlikely to be able to detect cheating in a timely manner. Opaque pricing is especially likely to destabilize a cartel if the market experiences frequent changes in demand, cost and technology because it would be difficult for cartel members to separate price changes and shifts in market shares due to such changes in market conditions from price changes and shifts in market shares due to cheating.[15]

██ As discussed in Section IV, CRTs are extremely heterogeneous products, and CRT prices depend materially on a variety of CRT features. ████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████
██████████████████████████████

47. Opaque and complex pricing are all the more likely to have eroded the effectiveness of the alleged cartel because there were major changes in the industry during the class

---

[15] Carlton, D.W., & Perloff, J. M. (1999). *Modern Industrial Organization, 3rd edition.* Addison-Wesley. p. 137; Motta, M. (2004). *Competition Policy: Theory and Practice.* Cambridge University Press, p. 150; Scherer, F.M. (1980). *Industrial Market Structure and Economic Performance, 2nd edition.* Houghton Mifflin. pp. 205-206; Church, J., & Ware, R. (2000). *Industrial Organization: A Strategic Approach.* McGraw-Hill. p. 341.

[16] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

period such as the growing competitive presence of LCD and plasma technologies.[18] Shifts in CRT market shares and price changes due to technology disruptions would be difficult to separate from share shifts due to cheating when prices are hard to know.

■ In addition to complex and opaque prices, the differing degrees of vertical integration by CRT suppliers also make it unlikely that the alleged cartel was consistently effective in elevating prices. During the class period, several large CRT manufacturers were vertically integrated into manufacturing finished CRT products (i.e., TVs and monitors) while others were not. ████████████████████████████

████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████

██████████████████████████████████

████████████████████████████████

49. Economists have identified such asymmetries in vertical integration as a contributor to cartel instability.[21] The price paid by a finished product manufacturer to an affiliated

---

[18] The shift from analog TV to digital TV in the U.S. was another notable change in the CRT marketplace during the class period. In particular, widescreen and high definition digital CPTs differed from analog CPTs and from CPTs used to display standard definition digital broadcasts. (United States International Trade Commission. (2000). *Color Picture Tubes from Canada, Japan, Korea, and Singapore, Investigations Nos. 731-TA-367-370 (Review), Determinations and Views of the Commission.* USITC Publication No 3291. pp. 21-22.)



[21] Carlton, D.W., & Perloff, J. M. (1999). *Modern Industrial Organization, 3rd edition.* Addison-Wesley. p. 138. To be clear, I do not mean to imply that successful cartelization is impossible in the presence of asymmetries in vertical integration, merely that economists have identified such asymmetries as a contributor to cartel instability.

Highly Confidential

CRT manufacturer (the "transfer" price) is likely to be hard to detect by other firms, and the output incentives of a vertically integrated supplier of finished products are apt to differ significantly from those of non-integrated upstream and downstream producers.[22]

50. ██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████ Thus, whether or not the CRT cartel alleged by the DPP class was consistently effective in elevating prices of all (or most) products and customers during the nearly thirteen-year class period is ultimately an empirical question that needs to be resolved by examining the evidence on record.



---

[22] In particular, whereas unaffiliated finished-product manufacturers could be expected to use favorable pricing offered by one CRT manufacturer to try to convince other CRT manufacturers to offer even lower prices, an integrated finished-product manufacturer would not reveal that its upstream affiliate had cheated on the cartel agreement by lowering its transfer price.

[23] ████████████████████████████████████

Highly Confidential





[26] Economists have recognized that shifting shares among alleged cartel members is a symptom of an unstable cartel. (See, e.g., Grout, P., & Sonderegger, S. (2005). Predicting Cartels. *Office of Fair Trading*; Harrington, J. E. (2007). Detecting Cartels. In P. Buccirossi (Eds.), *Advances in the Economics of Competition Law*. MIT Press.)

Highly Confidential



Highly Confidential



55.

In order to further examine this issue, I have analyzed whether changes in actual prices tended to track changes in target prices.

Highly Confidential

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████ To test this prediction of cartel effectiveness more broadly for the entire set of target prices identified by Dr. Leitzinger, I have employed an econometric model to estimate how well quarter-to-quarter changes in actual prices of individual CRT models are predicted by changes in the corresponding target prices identified by Dr. Leitzinger.[30, 31] If the alleged cartel members closely adhered to the putative target prices, then changes in target prices should reliably predict changes in actual prices.[32] ██████████████████

_____

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[32] I compare actual and target price *changes* rather than *levels* because target price levels are likely to be somewhat predictive of actual price levels even if the alleged cartel members completely ignored the alleged target prices. For example, all else equal, both target and actual prices for a 30-inch CPT would presumably be higher than for a 14-inch CPT regardless of whether the alleged cartel members ever adhered to the target prices. Thus, actual and target price levels would be highly correlated regardless of the extent to which alleged cartel members adhered to the alleged target prices. Additionally, declining production costs could be expected to reduce both actual and target prices regardless of whether the alleged cartel members ever adhered to the target prices. Comparing changes in actual and target prices mitigates these biases in two ways. First, price *changes* were less correlated with product characteristics than were price *levels*. ████████████████████████████████████████

(footnote continued ...)

Highly Confidential



The R-squared statistic is a standard metric ranging from 0 to 1 that measures the share of variation in the dependent variable in the model (in this case, changes in actual prices) that is explained by the independent variable(s) (changes in the alleged target prices).[33]

(… footnote continued)

[33] Gujarati, D. N. (1995). *Basic Econometrics, 3rd edition.* McGraw Hill. pp. 74-78.

Highly Confidential





(footnote continued …)

Highly Confidential

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████ If actual prices followed target prices closely, I would expect most observations to be located close to the 45-degree line (which is traced in the chart) indicating that an actual price change was equal to the alleged applicable target price change. ████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

██████

62. ███████████████████████████████████

███████████████████████████████████████████

████████████████ As explained above, varying degrees of vertical integration among

(... footnote continued)



[38] More precisely, the vertical axis measures the change in the actual average sales price of a particular model of CRT sold to a particular customer by a particular manufacturer in a particular quarter. The horizontal axis measures the change in the alleged target price for the corresponding manufacturer, application, size, and finish in the same quarter.

Highly Confidential

alleged cartel members can potentially erode the effectiveness of price cartels. The transfer price paid by an affiliated downstream finished-product manufacturer to an upstream CRT manufacturer is likely to be opaque to other CRT manufacturers, thus enabling integrated firms to deviate from cartel agreements with a relatively lower risk of detection and penalties for such cheating.

63. ████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████ Specifically, I implemented the same econometric model as the one described above (i.e., where I assess how well quarter-to-quarter changes in actual prices are predicted by target price changes), but now I do so separately for merchant and transfer CRT prices. Put differently, I inquire whether there is any difference between (a) the extent to which changes in *transfer* CRT prices are correlated with target price changes and (b) the extent to which changes in *merchant* CRT prices are correlated with target price changes.

████ If vertically integrated firms deviated more from the target prices identified by Dr. Leitzinger when they sold CRTs to downstream affiliates than when they sold to unaffiliated customers, then we would observe a smaller correlation between transfer prices and target prices than between merchant prices and target prices. ████████
████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
██████████████

████████████████████████████████████████████████
████████████████████████████████████████████████

---

[39] I test for significance using a two-tailed t-test at the 95% level.

Highly Confidential

66. ████████████████████████████████████████

████████████████████████████████ Consequently, individualized inquiries would be required to establish whether the alleged cartel was effective at elevating prices for specific CRT models to specific customers at specific times.

**B.   Dr. Leitzinger's Analyses of Actual and Target Price Data Do Not Establish Class-wide Impact.**

████ Dr. Leitzinger reviews the same data that I discussed in the previous section but reaches a different conclusion. ██████████████████████████████

- 26 -

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

██ However, Dr. Leitzinger's conclusion does not follow from the figures he reports because the figures do not show that target prices existed for 90-plus percent of CRT sales. ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

████████████████████████████████████████████████████████

████████████████████████████

Highly Confidential



*Dr. Leitzinger's Analysis of Actual and Target Prices at Most Demonstrates a Positive Relationship between Actual and Target Prices; It Does Not Demonstrate that the Alleged Target Prices Had an Impact on Actual CRT Prices.*

Highly Confidential



If target prices were set even partly based on actual prices, then one would expect to find a positive relationship, at least on average, between actual prices and target prices without target prices having any impact on actual prices.  Finally, even if actual prices and target prices exhibit a positive relationship, it does not preclude the possibility that actual prices were frequently below the alleged applicable target prices.

Highly Confidential



74.



Based on this evidence, I concluded that the alleged cartel was either ineffective or at least was not frequently effective.

75. Nevertheless, in order to further confirm my results, I have assessed whether the alleged target prices

---

49

Highly Confidential

 are reliable predictors of actual price *levels*.

 If the alleged cartel members had adhered consistently to the alleged target prices, the target prices would be



Highly Confidential

able to predict actual prices with greater precision.[55]  Thus, the evidence indicates that the alleged cartel members did not consistently adhere to the alleged target prices, if at all.

*Dr. Leitzinger Overstates the Average Relationship between Actual Prices and Target Prices.*



---

[55]

[56] As also noted above, even a positive average relationship between actual prices and target prices does not imply that target prices had an impact on actual prices, even on average.

[57]

Highly Confidential



**79.**

Highly Confidential



(... footnote continued)



Highly Confidential



81. In sum, for all the reasons described above, Dr. Leitzinger's actual-target regression fails to demonstrate that the alleged cartel effectuated class-wide impact through its alleged setting of target prices.

*Dr. Leitzinger's Hedonic Regressions Undermine Claims of Class-wide Cartel Impact*



---

[62] I also addressed two additional flaws in Dr. Leitzinger's methodology. 

Highly Confidential



Even if Dr. Leitzinger's hedonic regressions predict CRT prices as well as he claims they do, the R-squared statistics of these regressions are irrelevant for the purpose of testing whether alleged cartel activities resulted in class-wide impact – even if the putative cartel had highly differentiated impacts on CRT prices, the hedonic regressions could still have high R-squared statistics.

84. ███████████████████████████████████

This example illustrates why the ability of CRT product characteristics to explain CRT prices accurately provides no information

---

Highly Confidential

regarding whether any impact was uniformly positive across CRTs with different product characteristics.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████

86. ████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

88. Specifically, I estimated separate regressions for each quarter (████████████████

██████, and I recorded for each quarter for which data were available the relative prices estimated by the model for the most popular CPT sizes.[69]  I then compared the estimated

---

███████████████████████████████████████

[69] I have examined 14, 20, 21, 29 and 34-inch CPTs, and 14, 15, 17 and 19-inch CDTs ██████████
██████████████████████████████████████████████████████

average price of the largest CPT with the estimated prices of smaller CPTs in each quarter holding other CPT characteristics constant. The results are presented in Exhibit 5.

I performed a similar analysis for CDTs and found similar results.[71]

90.

Highly Confidential



[74] Leitzinger Report, ¶ 34 ("I find that almost all of the observed pricing variability is related to these non-conspiracy factors [included in his hedonic regressions].")

██ To illustrate the fallacy of relying on a high R-squared statistic ███████████
████████, consider a regression that tries to predict the prices of cars and bicycles based on the number of wheels. Such a regression would likely have a very high R-squared statistic, *i.e.,* the number of wheels would predict a high proportion of the variations in the prices simply because cars are priced much higher than bicycles on average. However, this regression would not reliably predict the price of an individual bicycle or car, and one would not conclude from the high R-squared statistic that similar market forces determine prices of cars and bicycles. Similarly, Dr. Leitzinger obtains a high R-squared statistic because CRT prices are highly correlated with CRT size (for instance), but that does not imply that his analysis is able to reliably estimate the prices of individual CRTs of a given size. ████████████████████████

███████████████████

_____

75 ███████████

███ I thus conclude that a material amount of CRT price variation arises from factors not included in the hedonic regressions. ██████████████████████████

██████████████████████████████████████████

███████████████████████████████

## IV. There Is No Evidence of a "Price Structure."

### A. No Evidence of a "Structure" to Prices of CRTs and CRT Finished Products

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

███ I demonstrate in this section that Dr. Leitzinger's claim that a CRT price structure existed is unsupported by his price correlation analyses and more generally by the evidence on record. ██████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████

98. Before explaining the flaws in Dr. Leitzinger's correlation analyses, I first describe in this section the salient features of the CRT marketplace, the enormous heterogeneity in

---

77 ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

78 ████████████████████

Highly Confidential

CRTs and CRT finished products, and the differentiation in the market forces to which various CRTs and CRT finished products were subjected. In view of this diversity, it is not surprising that CRT pricing dynamics do not exhibit anything like the structure that Dr. Leitzinger claims.

*Widely Differentiated CRTs and CRT Finished Products Resulted in Widely Different Dynamics for Their Prices.*

99. CRTs were widely differentiated along many dimensions. For example, I understand that CPTs were used exclusively in televisions, whereas CDTs were used predominantly in desktop computer monitors and were not used in televisions. The two were not substitutes from the standpoint of manufacturers of monitors and TVs (i.e., customers of CRT manufacturers) because of differences in resolution, electrical current tolerances and brightness.[79, 80] CPTs and CDTs were each further differentiated along a variety of dimensions. For example, CPT pricing depended on CPT size, shape (curved or flat), and



Highly Confidential

the type of "mask"[81] included in the CPT. Similarly, CDT pricing depended on CDT size, shape, frequency,[82] and glare.[83]

███ A particular CRT model was not easily interchangeable with other CRT models, even those that may have shared similar basic features. Each CRT model was designed to fit the specific technical requirements of a particular finished product requested by a customer. ████████████████████████



---

[81] The "shadow mask" is a finely perforated screen that ensures that an electron beam strikes the correct phosphor dot. "In a colour picture tube, it is absolutely necessary to ensure that each of the three electron beams strikes only one phosphor in each triad. For this purpose, a mask, called a shadow mask or an aperture mask, is inserted between the neck of the picture tube and the phosphor dot screen." (Bali, S. P. (1994). *Colour Television: Theory and Practice.* Delhi: Tata McGraw-Hill Publishing Company Limited. p. 83)

[82] The "frequency," also called the refresh rate, is the number of times per second the image on a display device is refreshed or restroked on the screen. (Graf, R. F. (1999). *Modern Dictionary of Electronics, 7th Edition.* Woburn, MA: Butterworth-Heinemann.)

[83] 



Highly Confidential





Highly Confidential





Highly Confidential



105.

_____

[94] ███████████████████████████████████████████████████

[95] I implemented this test as follows: I first identified quarters that experienced the largest quarter-to-quarter changes in global CDT average prices (as measured by the CDT Fisher Price Index) during the class period. Specifically, I identified the 25% of quarters that saw the largest changes in the CDT Fisher Price Index. (████████████████████████████████████████ For each of these quarters, I assessed the fraction of CPT prices that changed in the opposite direction and the fraction of prices that did not change during the same time period. (A CPT "price" was defined as the quarterly weighted average price paid by a particular customer for a particular CPT model.) I then averaged the results across the quarters in the sample using quarterly CPT sales volumes as weights. This methodology is described in the notes to Exhibit 10A.

[96] The metric of co-movement in CRT prices I employ in Exhibit 10A and in Exhibit 10B almost surely overstates the extent to which a hypothetical overcharge in one CRT category would cause prices in the other CRT category also to be higher. In my analysis, which tracks changes in prices over time, inter-temporal shocks that directly affect all CRT prices are likely to cause prices to move in the same direction for reasons that have nothing to do with demand-side or supply-side substitution. For example, the price of natural gas likely affects the cost of manufacturing glass of all types, and hence the prices of flat glass panes used in windows of buildings may be correlated with the prices of CRTs, which also use glass. However, such a correlation does not imply that if a cartel increased the price of either CRTs or flat glass panes that it would necessarily result in an increase in the price of the other. Any co-movement caused by inter-temporal market-wide shocks that directly affect all CRT prices has no bearing on whether a hypothetical overcharge in one product category would cause prices for the other product category also to be higher, because a hypothetical overcharge does not involve an

(footnote continued …)

Highly Confidential



(... footnote continued)

increase in price over time, but rather an increase in price relative to a counterfactual but-for world *at the same point in time*.

[97] "Small" CPTs are defined as CPTs that are smaller than 20 inches in diagonal length. "Medium" CPTs are defined as CPTs between 20 and 29 inches in diagonal length. Large CPTs are defined as CPTs that are at least 30 inches.

[98] Often CRT prices were negotiated in currencies other than the USD. Nonetheless, the USD is the proper currency for analyzing price variation because the target prices that Dr. Leitzinger alleges that the putative cartel used to fix prices were denominated in U.S. dollars. (Leitzinger Report, ¶¶ 5-6.) If the same market forces applied to all CRTs, one would expect USD price changes to be similar across all CRTs even if some prices were negotiated in foreign currencies. This is true even in the presence of exchange rate movements. Nonetheless, in order to further confirm my findings, I have also examined the extent of heterogeneity in changes in negotiated prices (*i.e.*, prices expressed in the currency in which they were negotiated). The results of these analyses clearly illustrate that even when prices are expressed in the currencies in which they were negotiated, price changes exhibited a substantial amount of heterogeneity across CRTs, with many prices increasing and many other prices decreasing in the same quarter. For example, in the 25% quarters that experienced the largest changes in the average CDT price during the class period, 29% of CPT prices either changed in the opposite direction or did not change at all when prices are expressed in the negotiated currency. Also, in the 25% of quarters that experienced the greatest changes in the average price for *small* CPTs, 32% of *large* CPT prices either changed in the opposite direction or did not change at all when prices are expressed in the negotiated currency.

[99] In order to further investigate divergent CRT price movements illustrated in Exhibit 10A, I have compared the differences in quarterly price changes among the CRTs whose prices increased the most with price changes among the CRTs whose prices decreased the most.

(footnote continued ...)

Highly Confidential



(… footnote continued)

Highly Confidential

*Substantially Different Market Forces, Such as Competition from LCD and Plasma*
*Technologies, Influenced CRT and CRT Finished Product Prices Differently during the*
*Alleged Class Period.*

███████ CRT finished products' shares of desktop monitors and TVs sold globally began
to decline around 2000. ████████████████████████████████████



────────────────────

[100] I exclude rear-projection CRT TVs from my analyses since I understand that they are not part
of ███████████████

Highly Confidential



Given the differential impact of LCD and plasma competition on various segments of CRTs, it would not be surprising to find very different dynamic price patterns for various segments of CRTs.

---

[103] 

[104] For the purpose of my analyses, "large" CRT TVs are defined to be TVs that are at least 30 inches in viewable size.

[105] CRT TVs fared poorly among large TVs sold in North America, declining from 66% in early 2001 to just 5% by late 2007, while CRT TVs' share of small and mid-sized TVs fell from almost 100% in early 2001 to 38% by late 2007. See Exhibit 12B.

[106] See, e.g., "To compete with the flat panels, the CPT makers and TV OEMs are boosting production of flat-face CRTs." (iSuppli, "Flat-Panel Sets Gain Strong Footing in TV Market", Television Systems, Market Tracker – Q1 2006, CHU00154658 – CHU00154694 at CHU00154673.)

Highly Confidential



---

[107] 

[108] Fisher Indices (or more precisely, chained Fisher Indices of the type I employ) are an accurate way to track changes in average prices of CRTs over time because they remove the effect of changes in product mixes from price trends. (Diewert, W. E. (1993). The Early History of Price Index Research & Fisher Ideal Output, Input and Productivity Indexes Revisited. In W.E. Diewert and A.O. Nakamura (Eds.), *Essays in Index Number Theory, Volume I*, Elsevier Science Publishers. pp. 58, 320-330; International Labour Organization. (2004). *Consumer Price Index Manual: Theory and Practice.* International Labour Organization. pp. 6-32.)

Highly Confidential



117.    In sum, competition from newly emergent LCD and plasma technologies affected different categories of CRTs differentially, and this differentiated impact is evident in the differentiated patterns of CRT pricing.

*Conduct Directed at CRT Prices Outside the United States Need Not Have Elevated CRT Market Prices in the United States.*

(footnote continued ...)



120.

Greater competition from LCDs in the U.S. likely would have reduced the impact of the putative cartel in the U.S. relative to the rest of the world.

(... footnote continued)

Highly Confidential



**B. Dr. Leitzinger's Price Correlation Analyses Do Not Establish Common Impact, and They Mask the True Heterogeneity in Price Changes.**

123. █████████████████████████████████████████

████████████████████████████████

██████████████████████████████████

████████████████████████████ Rather, many individualized inquiries would be necessary to assess whether the observed prices are higher than they would have been absent the alleged collusion for the many different CRTs and CRT finished products with diverse patterns of price movements over time.

124. █████████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████████████

_____

115 ████████████████████

Highly Confidential



However, Dr. Leitzinger provides neither a coherent economic explanation for the existence of a price structure among CRTs, nor a plausible data analysis to support his opinion.



Highly Confidential

 However, basic economic theory holds that if the alleged cartel successfully elevated prices of targeted CRTs, it also must have sold fewer of those CRTs. Thus, the alleged cartel could not have shifted production from non-targeted CRTs to targeted CRTs without undermining the increase in targeted CRT prices.

---

[121] To the extent that the alleged cartel also agreed to restrict output of CRTs more generally (i.e., not just the outputs of the CRT models with targeted prices) and successfully implemented such an agreement, this could have resulted in increases of even non-targeted CRT prices.

Highly Confidential



However, correlations of the type estimated by Dr. Leitzinger are most likely spurious, produced by basic flaws long recognized by economists. In fact, even if the so-called targeted and non-targeted categories of CRTs were entirely unrelated by any supply or demand substitution, Dr. Leitzinger's analysis would produce a very high estimate of price correlation just because they were affected by common market forces that had nothing to do with the putative cartel.

[127] See, e.g., Aldrich, J. "Correlations Genuine and Spurious in Pearson and Yule," *Statistical Science*, Vol. 10, No.4, 1995, pp. 364-376.

(footnote continued ...)

Highly Confidential

█████████████████████████████████████████████████

████████████████████████████████████

129.   ███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ The resulting spurious correlation
embedded in Dr. Leitzinger's correlation analysis can be illuminated by examining the
relationship between CRT prices and ozone depleting atmospheric substances such as
atmospheric chlorine levels. Chlorine gas levels have declined consistently in recent
years due to policies designed to protect the ozone layer. Because most CRT prices have
also declined, when Dr. Leitzinger's approach is applied to data on CRT prices and
atmospheric chlorine levels, it would inevitably find a high, positive correlation between
the two.

████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

███████████████████

---

(... footnote continued)

█████████████████████████

██████████████████████████████████████ Data on atmospheric chlorine levels are from the
National Oceanic and Atmospheric Administration.

- 58 -

Highly Confidential



---

[131] For the purpose of this analysis, a 28-inch CPT model is considered to be "comparable" to a 34-inch CPT model if both were produced by the same firm and had the same "finish" (i.e., bare or ITC).

Highly Confidential



████ I have conducted a similar analysis using target prices of other so-called targeted CPT categories (other than 28-inch CPTs) to predict prices of 34-inch CPTs ████

_____

[132] I have also conducted this analysis using contemporaneous and lagged values of target prices, and I find qualitatively similar results.

- 60 -

████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

136.    These prediction errors – based on disaggregated CPT price data – are wholly
inconsistent with Dr. Leitzinger's contention that sales prices of non-targeted CRTs were
consistently affected by target prices of targeted CRTs.

██████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

---

[136] The analysis in Exhibit 18 is a conservative test of cartel effectiveness because the model
attributes any co-movement between actual and alleged target prices to adherence by the alleged
cartel when the co-movement may instead have been caused by changes in market forces that
had ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████
████████████████████

Highly Confidential



## V.     Pass-through of CRT Costs to Finished Products Prices Was Complex and Differentiated.

140.    The proposed DPP class includes purchasers of CRTs as well as purchasers of CRT finished products. Even assuming *arguendo* that the alleged CRT cartel had a uniformly positive impact on the prices paid by direct purchasers of most or all CRTs during the class period, it likely would have had a uniformly positive impact on the prices paid by class members for *finished products* only if the increase in CRT prices flowed through to finished products purchased by class members in a uniformly positive manner.

---

140

Highly Confidential

However, if manufacturers of finished products did not pass through cost changes for some products, for example, because of competition from other technologies, then some products included in the class analysis may not have been impacted and some DPP members may not have been harmed by the alleged cartel.

141.     Economic theory shows that not all finished product prices would necessarily have been elevated and prices of some may even have fallen if the alleged cartel had been able to elevate prices of all CRTs. For example, suppose ▇▇▇▇▇▇▇▇▇▇▇ that vertically integrated firms as well as un-integrated firms closely adhered to target CRT prices set by the alleged cartel, and as a consequence prices of all CRTs (*i.e.*, merchant as well as transfer prices) were significantly and permanently elevated. In this scenario, finished product manufacturers that sourced most of their CRTs from third-party CRT suppliers would have faced an increase in cost, and they may have increased the prices they charged for most of their TVs and monitors. However, vertically integrated CRT finished product manufacturers that self-supplied most of their CRTs may have been less likely to elevate their CRT TV and monitor prices, and may even have reduced those prices despite the elevation in CRT prices.

142.     Economic theory also shows that the response of vertically integrated firms in this setting depends on technical economic conditions related to the nature of competition among CRT finished product manufacturers.[141] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Whether firms' prices can be characterized as strategic complements or substitutes depends on a variety of market characteristics, and

---

[141] See, *e.g.,* Bulow, J. I., J. D. Geanakoplos, and P. D. Klemperer. "Multimarket Oligopoly: Strategic Substitutes and Complements." Journal of Political Economy, Vol. 93, No. 3. (1985), pp. 488-511. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Highly Confidential

Dr. Leitzinger has performed no analysis as to whether these conditions had been met in the CRT finished products marketplace.





Highly Confidential



Highly Confidential



████████████ Even as an estimate of average pass-through rates, Dr. Leitzinger's analysis is

fundamentally flawed. ████████████████████████████████████

Highly Confidential



[149] A standard econometric technique used when unobserved differences between products need to be controlled for in a "panel data" setting (i.e., in a dataset that has multiple products for multiple periods) is to include fixed effects (or "dummy variables") for individual products in the regression, as I do in my pass-through regressions (described in more detail in the Appendix). See, Davis, P., & Garcés, E. (2010). *Quantitative Techniques for Competition and Antitrust Analysis*. Princeton University Press. Section 2.2.3.1.

Highly Confidential



████ Dr. Leitzinger's regression model of pass-through rates is likely flawed because it does not control for material changes in market conditions during the relevant period. ████

---

[150] For example, many monitor manufacturers shifted production to China during the class period. "Production shift to China is progressing rapidly in Taiwan. Most of the monitor manufacturers in Taiwan are establishing production centers in China because it is becoming increasingly difficult to remain price competitive in Taiwan due to the rapid decline in prices." (*Flat Panel Display Applications: Trends and Forecasts*. (2001). Fuji Chimera Research Institute, translated by InterLingua, p. 212.) From 1999 to 2005, China's share of CDT monitor production increased from 32.5% to 81.9%. *Forecasts and Trends for Flat Panel Displays and Their Applications*. (2000). Fuji Chimera Research Institute, translated by InterLingua, p. 164; *Flat Panel Display Applications: Trends and Forecasts*. (2007). Fuji Chimera Research Institute, translated by InterLingua, p. 280.

[151] ████████████████████████████████████

## VI. Estimating CRT Overcharges



Highly Confidential



Highly Confidential





[159] "Small" CPTs are defined to be those with a diagonal length less than 20 inches, and "large" CPTs have a length of at least 30 inches. The remaining CPTs are defined as "medium-sized."

- 71 -

*Dr. Leitzinger's CRT Overcharge Model is Fundamentally Unsound.*

158.    Dr. Leitzinger's proposed approach to estimating even aggregate overcharges is fundamentally unsound.  For his approach to be sound and reliable, it must appropriately control for the enormous changes that occurred in the CRT marketplace during the nearly 20 years between the early 1990s and the late 2000s that Dr. Leitzinger examines. ██████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████[160]  Most of these changes likely would have occurred even in the absence of the alleged cartel.

159.    The soundness of the methodology Dr. Leitzinger proposes can be tested by comparing average CRT prices before and after the cartel. If Dr. Leitzinger's overcharge model is able reliably to isolate and estimate the impact of the alleged cartel's conduct on CRT prices and properly control for changes in market conditions, then his model would predict that the average CRT price in the pre-cartel period (i.e., prior to Q2 1995) and the post-cartel period (i.e., after Q1 2007) are comparable after controlling for differences in market conditions between the two periods. Alternatively, his model should predict that the average CRT price during the pre-cartel period should be lower than the average price in post-cartel period if post-cartel prices were elevated somewhat by the lingering effects of the cartel.

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

---

[160]  See Exhibit 12, *supra* note 106 and *supra* note 150.

Highly Confidential



163.    In sum, Dr. Leitzinger is mistaken in his claim that his overcharge model proves the feasibility of a formulaic approach to reliably estimating damages.[162] If anything, his data and his analysis demonstrate the need for a disaggregated analysis of impact and damages.

---



[162] Leitzinger Report, ¶¶ 67-68.

Highly Confidential

## VII.  Conclusions

█████ Overall, it is my conclusion that the fact of impact on all (or almost all) of the members of the proposed DPP class from the alleged collusion among the defendant CRT producers cannot be established by means of common evidence. ████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████

█████ Dr. Leitzinger's attempts to overcome this reality do not withstand scrutiny. ████

████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████

166. ██████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████

Highly Confidential

 In other words, there is no evidence with any validity that supports any theory of classwide impact and common damages methodology.

Highly Confidential

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. This declaration was executed on the 10th day of September 2013 in Princeton, New Jersey.


_Robert Willig_

Robert D. Willig

**Attachment 1: Curriculum Vitae**

**Name**:              **Robert D. Willig**

**Address**:                    220 Ridgeview Road, Princeton, New Jersey  08540

**Birth**:                    1/16/47; Brooklyn, New York

**Marital Status**:              Married, four children

**Education**:      Ph.D.  Economics, Stanford University, 1973
                    Dissertation:  Welfare Analysis of Policies
                                   Affecting Prices and Products.
                    Advisor:  James Rosse

                  M.S.   Operations Research, Stanford University, 1968.

                  A.B.   Mathematics, Harvard University, 1967.

**Professional Positions**:

Professor of  Economics and Public Affairs, Princeton University, 1978-.

Principal External Advisor, Infrastructure Program, Inter-American Development Bank, 6/97-8/98.

Deputy Assistant Attorney General, U.S. Department of Justice, l989-1991.

Supervisor, Economics Research Department, Bell Laboratories, 1977-1978.

Visiting Lecturer (with rank of Associate Professor), Department of Economics and Woodrow Wilson School, Princeton University, 1977-78 (part time).

Economics Research Department, Bell Laboratories, 1973-77.

Lecturer, Economics Department, Stanford University, 1971-73.

**Other Professional Activities**:

ABA Section of Antitrust Law Economics Task Force, 2010-2012

Advisory Committee, Compass Lexecon 2010 -,

OECD Advisory Council for Mexican Economic Reform, 2008 -2009,

Senior Consultant, Compass Lexecon, 2008 -,

Director, Competition Policy Associates, Inc., 2003-2005

Advisory Board, Electronic Journal of Industrial Organization and Regulation Abstracts, 1996-.

Advisory Board, Journal of Network Industries, 2004-.

Visiting Faculty Member (occasional), International Program on Privatization and Regulatory Reform, Harvard Institute for International Development, 1996-2000.

Member, National Research Council Highway Cost Allocation Study Review Committee, 1995-98.

Member, Defense Science Board Task Force on the Antitrust Aspects of Defense Industry Consolidation, 1993-94.

Editorial Board, Utilities Policy, 1990-2001

Leif Johanson Lecturer, University of Oslo, November 1988.

Member, New Jersey Governor's Task Force on Market-Based Pricing of Electricity, 1987-89.

Co-editor, Handbook of Industrial Organization, 1984-89.

Associate Editor, Journal of Industrial Economics, 1984-89.

Director, Consultants in Industry Economics, Inc., 1983-89, 1991-94.

Fellow, Econometric Society, 1981-.

Organizing Committee, Carnegie-Mellon-N.S.F. Conference on Regulation, 1985.

Board of Editors, American Economic Review, 1980-83.

Nominating Committee, American Economic Association, 1980-1981.

Research Advisory Committee, American Enterprise Institute, 1980-1986.

Editorial Board, M.I.T. Press Series on Government Regulation of Economic Activity, 1979-93.

- A2 -

Program Committee, 1980 World Congress of the Econometric Society.

Program Committee, Econometric Society, 1979, 1981, 1985.

Organizer, American Economic Association Meetings: 1980, 1982.

American Bar Association Section 7 Clayton Act Committee, 198l.

Principal Investigator, NSF grant SOC79-0327, 1979-80; NSF grant 285-6041, 1980-82; NSF grant SES-8038866, 1983-84, 1985-86.

Aspen Task Force on the Future of the Postal Service, 1978-80.

Organizing Committee of Sixth Annual Telecommunications Policy Research Conference, 1977-78.

Visiting Fellow, University of Warwick, July 1977.

Institute for Mathematical Studies in the Social Sciences, Stanford University, 1975.


**Published Articles and Book Chapters**:

"The Liftoff of Consumer Benefits from the Broadband Revolution" (with Mark Dutz and Jon Orszag), Review of Network Economics (2012) vol. 11, issue 4, article 2.

"Competition and innovation-driven inclusive growth" (with Mark Dutz, Ioannis Kessides and Stephen O'Connell), in Promoting Inclusive Growth: Challenges and Policies,  Luiz de Mello and Mark Dutz (eds.),  OECD, 2011.

"Unilateral Competitive Effects of Mergers: Upward Pricing Pressure, Product Quality, and Other Extensions," Review of Industrial Organization  (2011) 39:19–38.

"Antitrust and Patent Settlements: The Pharmaceutical Cases," (with John Bigelow) in The Antitrust Revolution (Fifth Edition), John Kwoka and Lawrence White (eds.), 2009.

 "The 1982 Department of Justice Merger Guidelines: An Economic Assessment," (with J. Ordover) reprinted in Economics of Antitrust Law, Benjamin Klein (ed.), Edward Elgar, 2008.

"On the Antitrust Treatment of Production Joint Ventures," (with Carl Shapiro)  reprinted in Economics of Antitrust Law, Benjamin Klein (ed.), Edward Elgar, 2008.

 "Consumer's Surplus Without Apology," reprinted in Applied Welfare Economics, Richard Just, Darrel Hueth and Andrew Schmitz (eds.), Edward Elgar, 2008; reprinted in  Readings in

Social Welfare: Theory and Policy, Robert E. Kuenne (ed.), Blackwell, 2000, pp. 86-97; reprinted in  Readings in Microeconomic Theory, M. M. La Manna (ed.), Dryden Press, 1997, pp. 201-212.

"The Risk of Contagion from Multi-Market Contact," (with Charles Thomas), The International Journal of Industrial Organization, Vol. 24, Issue 6 (Nov. 2006), pp 1157 – 1184.

"Pareto-Superior Nonlinear Outlay Schedules," reprinted in The Economics of Public Utilities, Ray Rees (ed.), Edward Elgar, 2006; reprinted in The Economics of Price Discrimination, G. Norman, (ed.), Edward Elgar, 1999.

"Economic Effects of Antidumping Policy," reprinted in The WTO and Anti-Dumping, Douglas Nelson (ed.), Edward Elgar, 2005.

"Merger Analysis, Industrial Organization Theory and the Merger Guidelines," reprinted in Antitrust and Competition Policy, Andrew Kleit (ed.) Edward Elgar, 2005

"Antitrust Policy Towards Agreements That Settle Patent Litigation,"  (with John Bigelow), Antitrust Bulletin, Fall 2004, pp. 655-698.

"Economies of Scope," (with John Panzar), reprinted in The Economics of Business Strategy, John Kay (ed.), Edward Elgar, 2003.

"Panel on Substantive Standards for Mergers and the Role of Efficiencies," in International Antitrust Law & Policy, Barry E. Hawk (ed.), Juris Publishing, 2003.

 "Practical Rules for Pricing Access in Telecommunications," (with J. Ordover) in Second Generation Reforms in Infrastructure Services , F. Basanes and R. Willig (eds.), Johns Hopkins Press, 2002.

"Comments on Antitrust Policy in the Clinton Administration," in American Economic Policy in the 1990s, J. Frankel and P. Orszag (eds.), MIT Press, 2002.

"Entrepreneurship, Access Policy and Economic Development: Lessons from Industrial Organization," (with M. Dutz and J. Ordover), European Economic Review, (44)4-6 (2000), pp. 739-747.

"Public Versus Regulated Private Enterprise," reprinted in Privatization in Developing Countries, P. Cook and C. Kirkpatrick (eds.), Edward Elgar, 2000.

"Deregulation v. the Legal Culture: Panel Discussion," in Is the Telecommunications Act of 1996 Broken?, G. Sidak (ed.), AEI Press, 1999.

"Economic Principles to Guide Post-Privatization Governance," in Can Privatization Deliver? Infrastructure for Latin America, R. Willig co-editor, Johns Hopkins Press, 1999.

"Access and Bundling in High-Technology Markets," (with J. A. Ordover), in Competition, Innovation and the Microsoft Monopoly: Antitrust in the Digital Marketplace, J. A. Eisenach and T. Lenard (eds.), Kluwer, 1999.

"Competitive Rail Regulation Rules: Should Price Ceilings Constrain Final Products or Inputs?," (With W. J. Baumol), Journal of Transport Economics and Policy, Vol. 33, Part 1, pp. 1-11.

"Economic Effects of Antidumping Policy," Brookings Trade Forum: 1998, 19-41.

"Interview With Economist Robert D. Willig," Antitrust , Vol. 11, No. 2, Spring 1997, pp.11-15.

"Parity Pricing and its Critics: A Necessary Condition for Efficiency in Provision of Bottleneck Services to Competitors," (with W. J. Baumol and J. A. Ordover), Yale Journal on Regulation, Vol. 14, No. 1, Winter 1997, pp. 145-164.

"Restructuring Regulation of the Rail Industry," (with Ioannis Kessides), in Private Sector, Quarterly No. 4, September 1995, pp. 5 - 8. Reprinted in Viewpoint, October, 1995, The World Bank. Reprinted in Private Sector, special edition: Infrastructure, June 1996.

"Competition and Regulation in the Railroad Industry," (with Ioannis Kessides), in Regulatory Policies and Reform: A Comparative Perspective, C. Frischtak (ed.), World Bank, 1996.

"Economic Rationales for the Scope of Privatization," (with Carl Shapiro), reprinted in The Political Economy of Privatization and Deregulation, E. E. Bailey and J. R. Pack (eds.), The International Library of Critical Writings in Economics, Edward Elgar Publishing Co., 1995, pp. 95-130.

"Weak Invisible Hand Theorems on the Sustainability of Multi-product Natural Monopoly," (with W. Baumol and E. Bailey), reprinted in The Political Economy of Privatization and Deregulation, E. E. Bailey and J. R. Pack (eds.), The International Library of Critical Writings in Economics, Edward Elgar Publishing Co., 1995, pp. 245-260.

"Economists' View: The Department of Justice Draft Guidelines for the Licensing and Acquisition of Intellectual Property," (with J. Ordover), Antitrust, V. 9, No. 2 (spring 1995), 29-36.

"Public Versus Regulated Private Enterprise," in Proceedings of the World Bank Annual Conference on Development Economics 1993, L. Summers (ed.), The World Bank, 1994.

"Economics and the 1992 Merger Guidelines: A Brief Survey," (with J. Ordover), Review of Industrial Organization, V. 8, No. 2, (1993), pp. 139-150.

"The Role of Sunk Costs in the 1992 Guidelines' Entry Analysis," <u>Antitrust</u>, V. 6, No. 3 (summer 1992).

"Antitrust Lessons from the Airlines Industry: The DOJ Experience," <u>Antitrust Law Journal</u>, V. 60, No. 2 (1992).

"William J. Baumol," (with E. E. Bailey), in <u>New Horizons in Economic Thought: Appraisals of Leading Economists</u>, W. J. Samuels (ed.), Edward Elgar, 1992.

"Anti-Monopoly Policies and Institutions," in <u>The Emergence of Market Economies in Eastern Europe</u>, Christopher Clague and Gordon Rausser (eds.), Basil Blackwell, 1992.

"Economics and the 1992 Merger Guidelines," (with Janusz Ordover), in <u>Collaborations Among Competitors: Antitrust Policy and Economics</u>, Eleanor Fox and James Halverson (eds.), American Bar Association, 1992.

"On the Antitrust Treatment of Production Joint Ventures," (with Carl Shapiro), reprinted in <u>Collaborations Among Competitors: Antitrust Policy and Economics</u>, Eleanor Fox and James Halverson (eds), American Bar Association, 1992.

"Merger Analysis, Industrial Organization Theory, and Merger Guidelines," <u>Brookings Papers on Economic Activity -- Microeconomics 1991</u>, pp. 281-332.

"On the Antitrust Treatment of Production Joint Ventures," (with C. Shapiro), <u>Journal of Economic Perspectives</u>, Vol. 4, No. 3, Summer 1990, pp. 113-130.

"Economic Rationales for the Scope of Privatization," (with Carl Shapiro), in <u>The Political Economy of Public Sector Reform and Privatization</u>, E.N. Suleiman and J. Waterbury (eds.), Westview Press, Inc., 1990, pp. 55-87.

"Contestable Market Theory and Regulatory Reform," in <u>Telecommunications Deregulation: Market Power and Cost Allocation</u>, J.R. Allison and D.L. Thomas (eds.), Ballinger, 1990.

"Address To The Section," <u>Antitrust Law Section Symposium</u>, New York State Bar Association, 1990.

"Price Caps: A Rational Means to Protect Telecommunications Consumers and Competition," (with W. Baumol), <u>Review of Business</u>, Vol. 10, No. 4, Spring 1989, pp. 3-8.

"U.S.-Japanese VER: A Case Study from a Competition Policy Perspective," (with M. Dutz) in <u>The Costs of Restricting Imports, The Automobile Industry</u>. OECD, 1988.

"Contestable Markets," in <u>The New Palgrave: A Dictionary of Economics</u>, J. Eatwell, M. Milgate, and P. Newman (eds.), 1987.

"Do Entry Conditions Vary Across Markets: Comments," <u>Brookings Papers on Economic Activity</u>, 3 - 1987, pp. 872-877.

"Railroad Deregulation: Using Competition as a Guide," (with W. Baumol), <u>Regulation</u>, January/February 1987, Vol. 11, No. 1, pp. 28-36.

"How Arbitrary is 'Arbitrary'? - or, Toward the Deserved Demise of Full Cost Allocation," (with W. Baumol and M. Koehn), <u>Public Utilities Fortnightly</u>, September 1987, Vol. 120, No. 5, pp. 16-22.

"Contestability: Developments Since the Book," (with W. Baumol), <u>Oxford Economic Papers</u>, December 1986, pp. 9-36.

"The Changing Economic Environment in Telecommunications: Technological Change and Deregulation," in <u>Proceedings from the Telecommunications Deregulation Forum</u>; Karl Eller Center; 1986.

"Perspectives on Mergers and World Competition," (with J. Ordover), in <u>Antitrust and Regulation</u>, R.E. Grieson (ed.), Lexington, 1986.

"On the Theory of Perfectly Contestable Markets," (with J. Panzar and W. Baumol), in <u>New Developments in The Analysis of Market Structure</u>, J. Stiglitz and F. Mathewson (eds.), MIT Press, 1986.

"InterLATA Capacity Growth and Market Competition," (with C. Shapiro), in <u>Telecommunications and Equity: Policy Research Issues</u>, J. Miller (ed.), North Holland, 1986.

"Corporate Governance and Market Structure," in <u>Economic Policy in Theory and Practice</u>, A. Razin and E. Sadka (eds.), Macmillan Press, 1986.

"Antitrust for High-Technology Industries: Assessing Research Joint Ventures and Mergers," (with J. Ordover), <u>Journal of Law and Economics</u>, Vol 28(2), May 1985, pp. 311-334.

"Non-Price Anticompetitive Behavior by Dominant Firms Toward the Producers of Complementary Products," (with J. Ordover and A. Sykes), in <u>Antitrust and Regulation</u>, F.M. Fisher (ed.), MIT Press, 1985.

"Telephones and Computers: The Costs of Artificial Separation," (with W. Baumol), <u>Regulation</u>, March/April 1985.

"Transfer Principles in Income Redistribution," (with P. Fishburn), <u>Journal of Public Economics</u>, 25 (1984), pp. 1-6.

"Market Structure and Government Intervention in Access Markets," in <u>Telecommunications Access and Public Policy</u>, A. Baughcam and G. Faulhaber (eds.), 1984.

"Pricing Issues in the Deregulation of Railroad Rates," (with W. Baumol), in Economic Analysis of Regulated Markets: European and U. S. Perspectives, J. Finsinger (ed.), 1983.

"Local Telephone Pricing in a Competitive Environment," (with J. Ordover), in Telecommunications Regulation Today and Tomorrow, E. Noam (ed.), Harcourt Brace Jovanovich, 1983.

"Economics and Postal Pricing Policy," (with B. Owen), in The Future of the Postal Service, J. Fleishman (ed.), Praeger, 1983.

"Selected Aspects of the Welfare Economics of Postal Pricing," in Telecommunications Policy Annual, Praeger, 1987.

"The Case for Freeing AT&T" (with M. Katz), Regulation, July-Aug. 1983, pp. 43-52.

"Predatory Systems Rivalry: A Reply" (with J. Ordover and A. Sykes), Columbia Law Review, Vol. 83, June 1983, pp. 1150-1166. Reprinted in Corporate Counsel's Handbook - 1984.

"Sector Differentiated Capital Taxation with Imperfect Competition and Interindustry Flows," Journal of Public Economics, Vol. 21, 1983.

"Contestable Markets: An Uprising in the Theory of Industry Structure: Reply," (with W.J. Baumol and J.C. Panzar), American Economic Review, Vol. 73, No. 3, June 1983, pp. 491-496.

"The 1982 Department of Justice Merger Guidelines: An Economic Assessment," (with J. Ordover), California Law Review, Vol. 71, No. 2, March 1983, pp. 535-574. Reprinted in Antitrust Policy in Transition: The Convergence of Law and Economics, E.M. Fox and J.T. Halverson (eds.), 1984.

"Intertemporal Failures of the Invisible Hand: Theory and Implications for International Market Dominance," (with W.J. Baumol), Indian Economic Review, Vol. XVI, Nos. 1 and 2, January-June 1981, pp. 1-12.

"Unfair International Trade Practices," (with J. Ordover and A. Sykes), Journal of International Law and Politics, Vol. 15, No. 2, winter 1983, pp. 323-337.

"Journals as Shared Goods: Reply," (with J. Ordover), American Economic Review, V. 72, No. 3, June 1982, pp. 603-607.

"Herfindahl Concentration, Rivalry, and Mergers," (with J. Ordover and A. Sykes), Harvard Law Review, V. 95, No. 8, June 1982, pp. 1857-l875.

"An Economic Definition of Predation: Pricing and Product Innovation," (with J. Ordover), Yale Law Journal, Vol. 90: 473, December 1981, pp. 1-44.

"Fixed Costs, Sunk Costs, Entry Barriers, and the Sustainability of Monopoly," (with W. Baumol), Quarterly Journal of Economics, Vol. 96, No. 3, August 1981, pp. 405-432.

"Social Welfare Dominance," American Economic Review, Vol. 71, No. 2, May 1981, pp. 200-204.

"Economies of Scope," (with J. Panzar), American Economic Review, Vol. 72, No. 2, May 1981, pp. 268-272.

"Income-Distribution Concerns in Regulatory Policymaking," (with E.E. Bailey) in Studies in Public Regulation (G. Fromm, ed.), MIT Press, Cambridge, 1981, pp. 79-118.

"An Economic Definition of Predatory Product Innovation," (with J. Ordover), in Strategic Predation and Antitrust Analysis, S. Salop (ed.), 1981.

"What Can Markets Control?" in Perspectives on Postal Service Issues, R. Sherman (ed.), American Enterprise Institute, 1980.

"Pricing Decisions and the Regulatory Process," in Proceedings of the 1979 Rate Symposium on Problems of Regulated Industries, University of Missouri-Columbia Extension Publications, 1980, pp. 379-388.

"The Theory of Network Access Pricing," in Issues in Public Utility Regulation, H.M. Trebing (ed.), MSU Public Utilities Papers, 1979.

"Customer Equity and Local Measured Service," in Perspectives on Local Measured Service, J. Baude, etal. (ed.), 1979, pp. 71-80.

"The Role of Information in Designing Social Policy Towards Externalities," (with J. Ordover), Journal of Public Economics, V. 12, 1979, pp. 271-299.

"Economies of Scale and the Profitability of Marginal-Cost Pricing: Reply," (with J. Panzar), Quarterly Journal of Economics, Vol. 93, No. 4, Novmber 1979, pp. 743-4.

"Theoretical Determinants of the Industrial Demand for Electricity by Time of Day," (with J. Panzar) Journal of Econometrics, V. 9, 1979, pp. 193-207.

"Industry Performance Gradient Indexes," (with R. Dansby), American Economic Review, V. 69, No. 3, June 1979, pp. 249-260.

"The Economic Gradient Method," (with E. Bailey), American Economic Review, Vol. 69, No. 2, May 1979, pp. 96-101.

"Multiproduct Technology and Market Structure," American Economic Review, Vol. 69, No. 2,

May 1979, pp. 346-351.

"Consumer's Surplus Without Apology: Reply," American Economic Review, Vol.      69, No. 3, June 1979, pp. 469-474.

"Decisions with Estimation Uncertainty," (with R. Klein, D. Sibley, and L. Rafsky), Econometrica, V. 46, No. 6, November 1978, pp. 1363-1388.

"Incremental Consumer's Surplus and Hedonic Price Adjustment," Journal of Economic Theory, V. 17, No. 2, April 1978, pp. 227-253.

"Recent Theoretical Developments in Financial Theory: Discussion, "The Journal of Finance, V. 33, No. 3, June 1978, pp. 792-794.

"The Optimal Provision of Journals Qua Sometimes Shared Goods," (with J. Ordover), American Economic Review, V. 68, No. 3, June 1978, pp. 324-338.

"On the Comparative Statics of a Competitive Industry With Infra-marginal Firms," (with J. Panzar), American Economic Review, V. 68, No. 3, June 1978, pp. 474-478.

"Pareto Superior Nonlinear Outlay Schedules," Bell Journal of Economics, Vol. 9, No. 1, Spring 1978, pp. 56-69.

"Predatoriness and Discriminatory Pricing," in The Economics of Anti-Trust: Course of Study Materials, American Law Institute-American Bar Association, 1978.

"Economies of Scale in Multi-Output Production," (with J. Panzar), Quarterly Journal of Economics, V. 91, No. 3, August 1977, pp. 481-494.

"Weak Invisible Hand Theorems on the Sustainability of Multi-product Natural Monopoly," (with W. Baumol and E. Bailey), American Economic Review, V. 67, No. 3, June 1977, pp. 350-365.

"Free Entry and the Sustainability of Natural Monopoly," (with J. Panzar), Bell Journal of Economics, Spring 1977, pp. 1-22.

"Risk Invariance and Ordinally Additive Utility Functions," Econometrica, V. 45, No. 3, April 1977, pp. 621-640.

"Ramsey-Optimal Pricing of Long Distance Telephone Services," (with E. Bailey), in Pricing in Regulated Industries, Theory and Application, J. Wenders (ed.), Mountain State Telephone and Telegraph Co., 1977, pp. 68-97.

"Network Externalities and Optimal Telecommunications Pricing: A Preliminary Sketch," (with R. Klein), in Proceedings of Fifth Annual Telecommunications Policy Research Conference,

Volume II, NTIS, 1977, pp. 475-505.

"Otsenka ekonomicheskoi effektivnosti proizvodstvennoi informatsii" ["The Evaluation of the Economic Benefits of Productive Information"] in Doklady Sovetskikh i Amerikanskikh Spetsialistov Predstavlennye na Pervyi Sovetsko-Amerikanskii Simpozium po Ekonomicheskoi Effektivnosti Informat sionnogo Obsluzhivaniia [Papers of Soviet and American Specialists Presented at the First Soviet- American Symposium on Costs and Benefits of Information Services], All Soviet Scientific Technical Information Center, Moscow, 1976.

"Vindication of a 'Common Mistake' in Welfare Economics," (with J. Panzar), Journal of Political Economy, V. 84, No. 6, December 1976, pp. 1361-1364.

"Consumer's Surplus Without Apology," American Economic Review, V. 66, No. 4, September 1976, pp. 589-597.


**Books**

Second Generation Reforms in Infrastructure Services,  F. Basanes and R. Willig (eds.), Johns Hopkins Press, 2002.

Can Privatization Deliver? Infrastructure for Latin America, R. Willig co-editor, Johns Hopkins Press, 1999.

Handbook of Industrial Organization, (edited with R. Schmalensee), North Holland Press, Volumes 1 and 2, 1989.

Contestable Markets and the Theory of Industry Structure, (with W.J. Baumol and J.C. Panzar), Harcourt Brace Jovanovich, 1982. Second Edition, 1989.

Welfare Analysis of Policies Affecting Prices and Products, Garland Press, 1980.


**Unpublished Papers and Reports**:

"'Reverse Payments' in Settlements of Patent Litigation: Split Opinions on Schering-Plough's K-Dur (2005 and 2012)" (with John P. Bigelow), in **The Antitrust Revolution, Sixth Edition**,  (J. Kwoka and Laurence White, eds.), Oxford University Press, forthcoming.

"Delta-Northwest: Merger Approval Driven by Consumer Benefits from Airline Network Effects" (with Mark Israel, Bryan Keating and Daniel Rubinfeld), in **The Antitrust Revolution, Sixth Edition**,  (J. Kwoka and Laurence White, eds.), Oxford University Press, forthcoming.

"Unilateral Competitive Effects" (with Bryan Keating), in **The Oxford Handbook on International Antitrust Economics**, (Roger D. Blair and D. Daniel Sokol, eds.), Oxford

University Press, forthcoming.

"Airline Network Effects and Consumer Welfare" (with Bryan Keating, Mark Israel and Daniel Rubinfeld), 2012, under revision for **Review of Network Economics**

"Commentary on Economics at the FTC: Hospital Mergers, Authorized Generic Drugs, and Consumer Credit Markets" (with Nauman Ilias, Bryan Keating, and Paolo Ramezzana), 2012, under revision for **Review of Industrial Organization.**

"Recommendations for Excessive-Share Limits in the Surfclam and Ocean Quahog Fisheries" (with Glenn Mitchell and Steven Peterson), Report to National Marine Fisheries Service and the Mid-Atlantic Fishery Management Council, 5/23/2011.

"Public Comments on the 2010 Draft Horizontal Merger Guidelines," paper posted to Federal Trade Commission website, 6/4/2010

"An Econometric Analysis of the Matching Between Football Student-Athletes and Colleges," (with Yair Eilat, Bryan Keating and Jon Orszag), submitted for publication.

Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington, (co-authored), AEI-Brookings Joint Center Brief No. 07-02, 12/2/07

"(Allegedly) Monopolizing Tying Via Product Innovation," statement before the Department of Justice/Federal Trade Commission Section 2 Hearings, November 1, 2006.

"Assessment of U.S. Merger Enforcement Policy," statement before the Antitrust Modernization Commission, 11/17/05.

"Investment is Appropriately Stimulated by TELRIC," in Pricing Based on Economic Cost, 12/2003.

"Brief of Amici Curiae Economics Professors, re Verizon v. Trinko, In the Supreme Court of the U.S.," (with W.J. Baumol, J.O. Ordover and F.R. Warren-Boulton), 7/25/2003.

"Stimulating Investment and the Telecommunications Act of 1996," (with J. Bigelow, W. Lehr and S. Levinson), 2002.

"An Economic Analysis of Spectrum Allocation and Advanced Wireless Services," (with Martin N. Baily, Peter R. Orszag, and Jonathan M. Orszag), 2002

"Effective Deregulation of Residential Electric Service," 2001

"Anticompetitive Forced Rail Access," (with W. J. Baumol), 2000

"The Scope of Competition in Telecommunications" (with B. Douglas Bernheim), 1998

"Why Do Christie and Schultz Infer Collusion From Their Data? (with Alan Kleidon), 1995.

"Demonopolization," (with Sally Van Siclen), OECD Vienna Seminar Paper, 1993.

"Economic Analysis of Section 337: The Balance Between Intellectual Property Protection and Protectionism," (with J. Ordover) 1990.

"The Effects of Capped NTS Charges on Long Distance Competition," (with  M. Katz).

"Discussion of Regulatory Mechanism Design in the Presence of Research Innovation, and Spillover Effects," 1987.

"Industry Economic Analysis in the Legal Arena," 1987.

"Deregulation of Long Distance Telephone Services: A Public Interest Assessment," (with M. Katz).

"Competition-Related Trade Issues," report prepared for OECD.

"Herfindahl Concentration Index," (with J. Ordover), Memorandum for ABA Section 7 Clayton Act Committee, Project on Revising the Merger Guidelines, March 1981.

"Market Power and Market Definition," (with J. Ordover), Memorandum for ABA  Section 7 Clayton Act Committee, Project on Revising the Merger Guidelines, May 1981.

"The Continuing Need for and National Benefits Derived from the REA Telephone Loan Programs - An Economic Assessment," 1981.

"The Economics of Equipment Leasing:  Costing and Pricing," 1980.

"Rail Deregulation and the Financial Problems of the U.S. Railroad Industry," (with W.J. Baumol), report prepared under contract to Conrail, 1979.

"Price Indexes and Intertemporal Welfare," Bell Laboratories Economics Discussion Paper, 1974.

"Consumer's Surplus:  A Rigorous Cookbook," Technical Report #98, Economics Series, I.M.S.S.S., Stanford University, l973.

"An Economic-Demographic Model of the Housing Sector," (with B. Hickman and M. Hinz), Center for Research in Economic Growth, Stanford University, 1973.

- A13 -

**Invited Conference Presentations**:

Brookings Institution Conference on The Economics of the Airline Industry
                "Airline Network Effects and Consumer Welfare"            2012

AGEP Public Policy Conference on Pharmaceutical Industry Economics, Regulation and Legal
Issues; Law and Economics Center, George Mason University School of Law
                "Pharmaceutical Brand-Generic Disputes"            2012

U.S.-EU Alliance Study Peer Review Conferences
                "Review of Cooperative Agreements in Transatlantic Airline Markets"    2012
                "The Research Agenda Ahead"    2012

Antitrust in the High Tech Sector Conference
                "Developments in Merger Enforcement"            2012

Georgetown Center for Business and Public Policy, Conference on the Evolution of Regulation
                "Reflections on Regulation"    2011

Antitrust Forum, New York State Bar Association
                "Upward Price Pressure, Market Definition and Supply Mobility"    2011

American  Bar Association, Antitrust Section, Annual Convention
                "The New Merger Guidelines' Analytic Highlights"    2011

OECD and World Bank Conference on Challenges and Policies for Promoting Inclusive Growth
                "Inclusive Growth From Competition and Innovation"    2011

Villanova School of Business Executive MBA Conference
                "Airline Network Effects, Competition and Consumer Welfare"    2011

NYU School of Law Conference on Critical Directions in Antitrust
                "Unilateral Competitive Effects"    2010

Conf. on the State of European Competition Law and Enforcement in a Transatlantic Context
                "Recent Developments in Merger Control"    2010

Center on Regulation and Competition, Universidad  de Chile Law School
                "Economic Regulation and the Limits of Antitrust Law"    2010

Center on Regulation and Competition, Universidad  de Chile Law School
                "Merger Policy and Guidelines Revision"    2010

Faculty of Economics, Universidad de Chile

"Network Effects in Airlines Markets"                                             2010

Georgetown Law Global Antitrust Enforcement Symposium
　　　　"New US Merger Guidelines"                                                2010

FTI London Financial Services Conference
　　　　　　"Competition and Regulatory Reform"                                  2010

NY State Bar Association Annual Antitrust Conference
　　　　"New Media Competition Policy"                                           2009

Antitrust Law Spring Meeting of the ABA
　　　　"Antitrust and the Failing Economy Defense"                             2009

Georgetown Law Global Antitrust Enforcement Symposium
　　　　"Mergers: New Enforcement Attitudes in a Time of Economic Challenge"     2009

Phoenix Center US Telecoms Symposium
　　　　"Assessment of Competition in the Wireless Industry"                     2009

FTC and DOJ Horizontal Merger Guidelines Workshop
　　　　"Direct Evidence is No Magic Bullet"                                     2009

Northwestern Law Research Symposium: Antitrust Economics and Competition Policy
　　　　"Discussion of Antitrust Evaluation of Horizontal Mergers"               2008

Inside Counsel Super-Conference
　　　　"Navigating Mixed Signals under Section 2 of the Sherman Act"            2008

Federal Trade Commission Workshop on Unilateral Effects in Mergers
　　　　"Best Evidence and Market Definition"                                    2008

European Policy Forum, Rules for Growth: Telecommunications Regulatory Reform
　　　　"What Kind of Regulation For Business Services?"                         2007

Japanese Competition Policy Research Center, Symposium on M&A and Competition Policy
　　　　"Merger Policy Going Forward With Economics and the Economy"             2007

Federal Trade Commission and Department of Justice Section 2 Hearings
　　　　"Section 2 Policy and Economic Analytic Methodologies"                   2007

Pennsylvania Bar Institute, Antitrust Law Committee CLE
　　　　"The Economics of Resale Price Maintenance and Class Certification"      2007

Pennsylvania Bar Institute, Antitrust Law Committee CLE

"Antitrust Class Certification – An Economist's Perspective"          2007

Fordham Competition Law Institute, International  Competition Economics Training Seminar
"Monopolization and Abuse of Dominance"          2007

Canadian Bar Association Annual Fall Conference on Competition Law
"Economic Tools for the Competition Lawyer"          2007

Conference on Managing Litigation and Business Risk in Multi-jurisdiction Antitrust Matters
"Economic Analysis in Multi-jurisdictional Merger Control"          2007

World Bank Conference on Structuring Regulatory Frameworks for Dynamic and Competitive
South Eastern European Markets
"The Roles of Government Regulation in a Dynamic Economy"          2006

Department of Justice/Federal Trade Commission Section 2 Hearings
"(Allegedly) Monopolizing Tying Via Product Innovation"          2006

Fordham Competition Law Institute,  Competition Law Seminar
"Monopolization and Abuse of Dominance"          2006

Practicing Law Institute on Intellectual Property Antitrust
"Relevant Markets for Intellectual Property Antitrust"          2006

PLI Annual Antitrust Law Institute
"Cutting Edge Issues in Economics"          2006

World Bank's Knowledge Economy Forum V
"Innovation, Growth and Competition"          2006

Charles University Seminar Series
"The Dangers of Over-Ambitious Antitrust Regulation"          2006

NY State Bar Association Antitrust Law Section Annual Meeting
"Efficient Integration or Illegal Monopolization?"          2006

World Bank Seminar
"The Dangers of Over-Ambitious Regulation"          2005

ABA Section of Antitrust Law 2005 Fall Forum
"Is There a Gap Between the Guidelines and Agency Practice?"          2005

Hearing of Antitrust Modernization Commission
"Assessment of U.S. Merger Enforcement Policy"          2005

LEAR Conference on Advances in the Economics of Competition Law
    "Exclusionary Pricing Practices"         2005

Annual Antitrust Law Institute
    "Cutting Edge Issues in Economics"         2005

PRIOR Symposium on States and Stem Cells
    "Assessing the Economics of State Stem Cell Programs"   2005

ABA Section of Antitrust Law – AALS Scholars Showcase
    "Distinguishing Anticompetitive Conduct"       2005

Allied Social Science Associations National Convention
    "Antitrust in the New Economy"          2005

ABA Section of Antitrust Law 2004 Fall Forum
    "Advances in Economic Analysis of Antitrust"     2004

Phoenix Center State Regulator Retreat
    "Regulatory Policy for the Telecommunications Revolution"   2004

OECD Competition Committee
    "Use of Economic Evidence in Merger Control"     2004

Justice Department/Federal Trade Commission Joint Workshop
    "Merger Enforcement"            2004

Phoenix Center Annual U.S. Telecoms Symposium
    "Incumbent Market Power"          2003

Center for Economic Policy Studies Symposium on Troubled Industries
    "What Role for Government in Telecommunications?"    2003

Princeton Workshop on Price Risk and the Future of the Electric Markets
    "The Structure of the Electricity Markets"      2003

2003 Antitrust Conference
    "International Competition Policy and Trade Policy"    2003

International Industrial Organization Conference
    "Intellectual Property System Reform"       2003

ABA Section of Antitrust Law 2002 Fall Forum
    "Competition, Regulation and Pharmaceuticals"     2002

Fordham Conference on International Antitrust Law and Policy
        "Substantive Standards for Mergers and the Role of Efficiencies"     2002

Department of Justice Telecom Workshop
        "Stimulating Investment and the Telecommunications Act of 1996"     2002

Department of Commerce Conference on the State of the Telecom Sector
        "Stimulating Investment and the Telecommunications Act of 1996"     2002

Law and Public Affairs Conference on the Future of Internet Regulation
        "Open Access and Competition Policy Principles"     2002
Center for Economic Policy Studies Symposium on Energy Policy
        "The Future of Power Supply"     2002

The Conference Board: Antitrust Issues in Today's Economy
        "The 1982 Merger Guidelines at 20"     2002

Federal Energy Regulatory Commission Workshop
        "Effective Deregulation of Residential Electric Service"     2001

IPEA International Seminar on Regulation and Competition
        "Electricity Markets: Deregulation of Residential Service"     2001
        "Lessons for Brazil from Abroad"     2001

ABA Antitrust Law Section Task Force Conference
        "Time, Change, and Materiality for Monopolization Analyses"     2001

Harvard University Conference on American Economic Policy in the 1990s
        "Comments on Antitrust Policy in the Clinton Administration"     2001

Tel-Aviv Workshop on Industrial Organization and Anti-Trust
        "The Risk of Contagion from Multimarket Contact"     2001

2001 Antitrust Conference
        "Collusion Cases: Cutting Edge or Over the Edge?"     2001
        "Dys-regulation of California Electricity"     2001

FTC Public Workshop on Competition Policy for E-Commerce
        "Necessary Conditions for Cooperation to be Problematic"     2001

HIID International Workshop on Infrastructure Policy
        "Infrastructure Privatization and Regulation"     2000

Villa Mondragone International Economic Seminar
        "Competition Policy for Network and Internet Markets"     2000

New Developments in Railroad Economics: Infrastructure Investment and Access Policies
   "Railroad Access, Regulation, and Market Structure"     2000

The Multilateral Trading System at the Millennium
   "Efficiency Gains From Further Liberalization"     2000

Singapore – World Bank Symposium on Competition Law and Policy
   "Policy Towards Cartels and Collusion"     2000

CEPS: Is It a New World?: Economic Surprises of the Last Decade
   "The Internet and E-Commerce"     2000

Cutting Edge Antitrust: Issues and Enforcement Policies
   "The Direction of Antitrust Entering the New Millennium"   2000

The Conference Board: Antitrust Issues in Today's Economy
   "Antitrust Analysis of Industries With Network Effects"   1999

CEPS: New Directions in Antitrust
   "Antitrust in a High-Tech World"     1999

World Bank Meeting on Competition and Regulatory Policies for Development
   "Economic Principles to Guide Post-Privatization Governance"   1999

1999 Antitrust Conference
   "Antitrust and the Pace of Technological Development"   1999
   "Restructuring the Electric Utility Industry"    1999

HIID International Workshop on Privatization, Regulatory Reform and Corporate Governance
   "Privatization and Post-Privatization Regulation of Natural Monopolies" 1999

The Federalist Society: Telecommunications Deregulation: Promises Made,
Potential Lost?
   "Grading the Regulators"     1999

Inter-American Development Bank: Second Generation Issues In the Reform
Of Public Services
   "Post-Privatization Governance"     1999
   "Issues Surrounding Access Arrangements"    1999

Economic Development Institute of the World Bank -- Program on Competition Policy
   "Policy Towards Horizontal Mergers"    1998

Twenty-fifth Anniversary Seminar for the Economic Analysis Group of the Department of

Justice
  "Market Definition in Antitrust Analysis"                                    1998

HIID International Workshop on Privatization, Regulatory Reform and Corporate Governance
  "Infrastructure Architecture and Regulation: Railroads"                      1998

EU Committee Competition Conference – Market Power
  "US/EC Perspective on Market Definition"                                     1998

Federal Trade Commission Roundtable
  "Antitrust Policy for Joint Ventures"                                        1998

1998 Antitrust Conference
  "Communications Mergers"                                                     1998

The Progress and Freedom Foundation Conference on Competition, Convergence, and the
Microsoft Monopoly
  Access and Bundling in High-Technology Markets                              1998

FTC Program on The Effective Integration of Economic Analysis into Antitrust Litigation
  The Role of Economic Evidence and Testimony                                 1997

FTC Hearings on Classical Market Power in Joint Ventures
  Microeconomic Analysis and Guideline                                        1997

World Bank Economists --Week IV Keynote
  Making Markets More Effective With Competition Policy                       1997

Brookings Trade Policy Forum
  Competition Policy and Antidumping: The Economic Effects                    1997

University of Malaya and Harvard University Conference on The Impact of Globalisation and
Privatisation on Malaysia and Asia in the Year 2020
  Microeconomics, Privatization, and Vertical Integration                     1997

ABA Section of Antitrust Law Conference on The Telecommunications Industry
  Current Economic Issues in Telecommunications                               1997

Antitrust 1998: The Annual Briefing
  The Re-Emergence of Distribution Issues                                     1997

Inter-American Development Bank Conference on Private Investment, Infrastructure Reform and
Governance in Latin America & the Caribbean
  Economic Principles to Guide Post-Privatization Governance                  1997

- A20 -

Harvard Forum on Regulatory Reform and Privatization of Telecommunications in the Middle
East
    Privatization: Methods and Pricing Issues                1997

American Enterprise Institute for Public Policy Research Conference
    Discussion of Local Competition and Legal Culture         1997

Harvard Program on Global Reform and Privatization of Public Enterprises
    "Infrastructure Privatization and Regulation: Freight"        1997

World Bank Competition Policy Workshop
    "Competition Policy for Entrepreneurship and Growth"        1997

Eastern Economics Association Paul Samuelson Lecture
    "Bottleneck Access in Regulation and Competition Policy"      1997

ABA Annual Meeting, Section of Antitrust Law
    "Antitrust in the 21st Century: The Efficiencies Guidelines"    1997

Peruvian Ministry of Energy and Mines Conference on Regulation of Public Utilities
    "Regulation: Theoretical Context and Advantages vs. Disadvantages"   1997

The FCC: New Priorities and Future Directions
    "Competition in the Telecommunications Industry"          1997

American Enterprise Institute Studies in Telecommunications Deregulation
    "The Scope of Competition in Telecommunications"         1996

George Mason Law Review Symposium on Antitrust in the Information Revolution
    "Introduction to the Economic Theory of Antitrust and Information"   1996

Korean Telecommunications Public Lecture
    "Market Opening and Fair Competition"              1996

Korea Telecommunications Forum
    "Desirable Interconnection Policy in a Competitive Market"     1996

European Association for Research in Industrial Economics Annual Conference
    "Bottleneck Access: Regulation and Competition Policy"       1996

Harvard Program on Global Reform and Privatization of Public Enterprises
    "Railroad and Other Infrastructure Privatization"          1996

- A21 -

FCC Forum on Antitrust and Economic Issues Involved with InterLATA Entry
    "The Scope of Telecommunications Competition"         1996

Citizens for a Sound Economy Policy Watch on Telecommunications Interconnection
    "The Economics of Interconnection"         1996

World Bank Seminar on Experiences with Corporatization
    "Strategic Directions of Privatization"         1996

FCC Economic Forum on the Economics of Interconnection
    Lessons from Other Industries         1996

ABA Annual Meeting, Section of Antitrust Law
    The Integration, Disintegration, and Reintegration
    of the Entertainment Industry         1996

Conference Board: 1996 Antitrust Conference
    How Economics Influences Antitrust and Vice Versa         1996

Antitrust 1996: A Special Briefing
    Joint Ventures and Strategic Alliances         1996

New York State Bar Association Section of Antitrust Law Winter Meeting
    Commentary on Horizontal Effects Issues         1996

FTC Hearings on the Changing Nature of Competition in a Global and Innovation-Driven Age
    Vertical Issues for Networks and Standards         1995

Wharton Seminar on Applied Microeconomics
    Access Policies with Imperfect Regulation         1995

Antitrust 1996, Washington D.C.
    Assessing Joint Ventures for Diminution of Competition         1995

ABA Annual Meeting, Section of Antitrust Law
    Refusals to Deal -- Economic Tests for Competitive Harm         1995

FTC Seminar on Antitrust Enforcement Analysis
    Diagnosing Collusion Possibilities         1995

Philadelphia Bar Education Center: Antitrust Fundamentals
    Antitrust--The Underlying Economics         1995

Vanderbilt University Conference on Financial Markets

Why Do Christie and Schultz Infer Collusion From Their Data?                    1995

ABA Section of Antitrust Law Chair=s Showcase Program
    Discussion of Telecommunications Competition Policy                         1995

Conference Board: 1995 Antitrust Conference
    Analysis of Mergers and Joint Ventures                                      1995

ABA Conference on The New Antitrust: Policy of the '90s
    Antitrust on the Super Highways/Super Airways                               1994

ITC Hearings on The Economic Effects of Outstanding Title VII Orders
    "The Economic Impacts of Antidumping Policies"                              1994

OECD Working Conference on Trade and Competition Policy
    "Empirical Evidence on The Nature of Anti-dumping Actions"                   1994

Antitrust 1995, Washington D.C.
    "Rigorous Antitrust Standards for Distribution Arrangements"                1994

ABA -- Georgetown Law Center: Post Chicago-Economics: New Theories
- New Cases?
    "Economic Foundations for Vertical Merger Guidelines"                       1994

Conference Board: Antitrust Issues in Today's Economy
    "New Democrats, Old Agencies: Competition Law and Policy"                   1994

Federal Reserve Board Distinguished Economist Series
    "Regulated Private Enterprise Versus Public Enterprise"                     1994

Institut d'Etudes Politiques de Paris
    "Lectures on Competition Policy and Privatization"                          1993

Canadian Bureau of Competition Policy Academic Seminar Series, Toronto.
    "Public Versus Regulated Private Enterprise"                                1993

CEPS Symposium on The Clinton Administration: A Preliminary Report Card
    "Policy Towards Business"                                                   1993

Columbia Institute for Tele-Information Conference on Competition in Network Industries, New
York, NY
    "Discussion of Deregulation of Networks: What Has Worked and What Hasn't"
                                                                                1993

World Bank Annual Conference on Development Economics
    "Public Versus Regulated Private Enterprise"                               1993

- A23 -

Center for Public Utilities Conference on Current Issues Challenging the Regulatory Process
    "The Economics of Current Issues in Telecommunications Regulation"    1992
    "The Role of Markets in Presently Regulated Industries"    1992

The Conference Board's Conference on Antitrust Issues in Today's Economy, New York, NY
    "Antitrust in the Global Economy"    1992
    "Monopoly Issues for the '90s"    1993

Columbia University Seminar on Applied Economic Theory, New York, NY
    "Economic Rationales for the Scope of Privatization"    1992

Howrey & Simon Conference on Antitrust Developments, Washington, DC
    "Competitive Effects of Concern in the Merger Guidelines"    1992

Arnold & Porter Colloquium on Merger Enforcement, Washington, DC
    "The Economic Foundations of the Merger Guidelines"    1992

American Bar Association, Section on Antitrust Law Leadership Council Conference, Monterey, CA
    "Applying the 1992 Merger Guidelines"    1992

OECD Competition Policy Meeting, Paris, France
    "The Economic Impacts of Antidumping Policy"    1992

Center for Public Choice Lecture Series, George Mason University Arlington, VA
    "The Economic Impacts of Antidumping Policy"    1992

Brookings Institution Microeconomics Panel, Washington, DC,
    "Discussion of the Evolution of Industry Structure"    1992

AT&T Conference on Antitrust Essentials
    "Antitrust Standards for Mergers and Joint Ventures"    1991

ABA Institute on The Cutting Edge of Antitrust: Market Power
    "Assessing and Proving Market Power: Barriers to Entry"    1991

Second Annual Workshop of the Competition Law and Policy Institute of New Zealand
    "Merger Analysis, Industrial Organization Theory, and Merger Guidelines"    1991
    "Exclusive Dealing and the Fisher & Paykel Case"    1991

Special Seminar of the New Zealand Treasury
    "Strategic Behavior, Antitrust, and The Regulation of Natural Monopoly"    1991

Public Seminar of the Australian Trade Practices Commission
    "Antitrust Issues of the 1990's"                                          1991

National Association of Attorneys General Antitrust Seminar
    "Antitrust Economics"                                                1991

District of Columbia Bar's 1991 Annual Convention
    "Administrative and Judicial Trends in Federal Antitrust Enforcement"    1991

ABA Spring Meeting
    "Antitrust Lessons From the Airline Industry"    1991

Conference on The Transition to a Market Economy - Institutional Aspects
    "Anti-Monopoly Policies and Institutions"    1991

Conference Board's Thirtieth Antitrust Conference
    "Antitrust Issues in Today's Economy"    1991

American Association for the Advancement of Science Annual Meeting
    "Methodologies for Economic Analysis of Mergers"    1991

General Seminar, Johns Hopkins University
    "Economic Rationales for the Scope of Privatization"    1991

Capitol Economics Speakers Series
    "Economics of Merger Guidelines"    1991

CRA Conference on Antitrust Issues in Regulated Industries
    "Enforcement Priorities and Economic Principles"    1990

Pepper Hamilton & Scheetz Anniversary Colloquium
    "New Developments in Antitrust Economics"    1990

PLI Program on Federal Antitrust Enforcement in the 90's
    "The Antitrust Agenda of the 90's"    1990

FTC Distinguished Speakers Seminar
    "The Evolving Merger Guidelines"    1990

The World Bank Speakers Series
    "The Role of Antitrust Policy in an Open Economy"    1990

Seminar of the Secretary of Commerce and Industrial Development of Mexico
    "Transitions to a Market Economy"    1990

Southern Economics Association
    "Entry in Antitrust Analysis of Mergers"    1990
    "Discussion of Strategic Investment and Timing of Entry"    1990

American Enterprise Institute Conference on Policy Approaches to the
Deregulation of Network Industries
    "Discussion of Network Problems and Solutions"    1990

American Enterprise Institute Conference on Innovation, Intellectual Property, and World
Competition
    "Law and Economics Framework for Analysis"    1990

Banco Nacional de Desenvolvimento Economico Social Lecture
    "Competition Policy: Harnessing Private Interests for the Public Interest"    1990

Western Economics Association Annual Meetings
    "New Directions in Antitrust from a New Administration"    1990
    "New Directions in Merger Enforcement: The View from Washington"    1990

Woodrow Wilson School Alumni Colloquium
    "Microeconomic Policy Analysis and Antitrust--Washington 1990"    1990

Arnold & Porter Lecture Series
    "Advocating Competition"    1991
    "Antitrust Enforcement"    1990

ABA Antitrust Section Convention
    "Recent Developments in Market Definition and Merger Analysis"    1990

Federal Bar Association
    "Joint Production Legislation: Competitive Necessity or Cartel Shield?"    1990

Pew Charitable Trusts Conference
    "Economics and National Security"    1990

ABA Antitrust Section Midwinter Council Meeting
    "Fine-tuning the Merger Guidelines"    1990
    "The State of the Antitrust Division"    1991

International Telecommunications Society Conference
    "Discussion of the Impact of Telecommunications in the UK"    1989

The Economists of New Jersey Conference
    "Recent Perspectives on Regulation"    1989

Conference on Current Issues Challenging the Regulatory Process
    "Innovative Pricing and Regulatory Reform"                       1989
    "Competitive Wheeling"                              1989

Conference Board: Antitrust Issues in Today's Economy
    "Foreign Trade Issues and Antitrust"                    1989

McKinsey & Co. Mini-MBA Conference
    "Economic Analysis of Pricing, Costing, and Strategic Business Behavior"    1989
                                                      1994

Olin Conference on Regulatory Mechanism Design
    "Revolutions in Regulatory Theory and Practice: Exploring The Gap"    1989

University of Dundee Conference on Industrial Organization and Strategic Behavior
    "Mergers in Differentiated Product Industries"            1988

Leif Johanson Lectures at the University of Oslo
    "Normative Issues in Industrial Organization"             1988

Mergers and Competitiveness: Spain Facing the EEC
    "Merger Policy"                                    1988
    "R&D Joint Ventures"                               1988

New Dimensions in Pricing Electricity
    "Competitive Pricing and Regulatory Reform"            1988

Program for Integrating Economics and National Security: Second Annual Colloquium
    "Arming Decisions Under Asymmetric Information"         1988

European Association for Research in Industrial Economics
    "U.S. Railroad Deregulation and the Public Interest"       1987
    "Economic Rationales for the Scope of Privatization"      1989
    "Discussion of Licensing of Innovations"              1990

Annenberg Conference on Rate of Return Regulation in the Presence of Rapid Technical Change
    "Discussion of Regulatory Mechanism Design in the Presence
     of Research, Innovation, and Spillover Effects"          1987

Special Brookings Papers Meeting
    "Discussion of Empirical Approaches to Strategic Behavior"    1987
    "New Merger Guidelines"                           1990

Deregulation or Regulation for Telecommunications in the 1990's
    "How Effective are State and Federal Regulations?"       1987

Conference Board Roundtable on Antitrust
    "Research and Production Joint Ventures"     1990
    "Intellectual Property and Antitrust"     1987

Current Issues in Telephone Regulation
    "Economic Approaches to Market Dominance:  Applicability of
    Contestable Markets"     1987

Harvard Business School Forum on Telecommunications
    "Regulation of Information Services"     1987

The Fowler Challenge:  Deregulation and Competition in The Local Telecommunications Market
    "Why Reinvent the Wheel?"     1986

World Bank Seminar on Frontiers of Economics
    "What Every Economist Should Know About Contestable Markets"     1986
Bell Communications Research Conference on Regulation and Information
    "Fuzzy Regulatory Rules"     1986

Karl Eller Center Forum on Telecommunications
    "The Changing Economic Environment in Telecommunications:
    Technological Change and Deregulation"     1986

Railroad Accounting Principles Board Colloquium
    "Contestable Market Theory and ICC Regulation     1986

Canadian Embassy Conference on Current Issues in Canadian -- U.S. Trade and Investment
    "Regulatory Revolution in the Infrastructure Industries"     1985

Eagleton Institute Conference on Telecommunications in Transition
    "Industry in Transition:  Economic and Public Policy Overview"     1985

Brown University Citicorp Lecture
    "Logic of Regulation and Deregulation"     1985

Columbia University Communications Research Forum
    "Long Distance Competition Policy"     1985

American Enterprise Institute Public Policy Week
    "The Political Economy of Regulatory Reform"     1984

MIT Communications Forum
    "Deregulation of AT&T Communications"     1984

Bureau of Census Longitudinal Establishment Data File and Diversification Study Conference
    "Potential Uses of The File"    1984

Federal Bar Association Symposium on Joint Ventures
    "The Economics of Joint Venture Assessment"    1984

Hoover Institute Conference on Antitrust
    "Antitrust for High-Technology Industries"    1984

NSF Workshop on Predation and Industrial Targeting
    "Current Economic Analysis of Predatory Practices"    1983

The Institute for Study of Regulation Symposium:  Pricing Electric, Gas, and Telecommunications Services Today and for the Future
    "Contestability As A Guide for Regulation and Deregulation"    1984

University of Pennsylvania Economics Day Symposium
    "Contestability and Competition: Guides for Regulation and Deregulation"    1984

Pinhas Sapir Conference on Economic Policy in Theory and Practice
    "Corporate Governance and Market Structure"    1984

Centre of Planning and Economic Research of Greece
    "Issues About Industrial Deregulation"    1984
    "Contestability:  New Research Agenda"    1984

Hebrew and Tel Aviv Universities Conference on Public Economics
    "Social Welfare Dominance Extended and Applied to Excise Taxation"    1983

NBER Conference on Industrial Organization and International Trade
    "Perspectives on Horizontal Mergers in World Markets"    1983

Workshop on Local Access:  Strategies for Public Policy
    "Market Structure and Government Intervention in Access Markets"    1982

NBER Conference on Strategic Behavior and International Trade
    "Industrial Strategy with Committed Firms:  Discussion"    1982

Columbia University Graduate School of Business, Conference on Regulation and New Telecommunication Networks
    "Local Pricing in a Competitive Environment"    1982

International Economic Association Roundtable Conference on New Developments in the Theory of Market Structure

"Theory of Contestability"                                                     1982
"Product Dev., Investment, and the Evolution of Market Structures"             1982

N.Y.U. Conference on Competition and World Markets: Law and Economics
        "Competition and Trade Policy--International Predation"                 1982

CNRS-ISPE-NBER Conference on the Taxation of Capital
        "Welfare Effects of Investment Under Imperfect Competition"             1982

Internationales Institut fur Management und Verwaltung Regulation Conference
        "Welfare, Regulatory Boundaries, and the Sustainability of Oligopolies" 1981
NBER-Kellogg Graduate School of Management Conference on the
Econometrics of Market Models with Imperfect Competition
        "Discussion of Measurement of Monopoly Behavior:  An
         Application to the Cigarette Industry"                                 1981

The Peterkin Lecture at Rice University
        "Deregulation:  Ideology or Logic?"                                     1981

FTC Seminar on Antitrust Analysis
        "Viewpoints on Horizontal Mergers"                                      1982
        "Predation as a Tactical Inducement for Exit"                           1980

NBER Conference on Industrial Organization and Public Policy
        "An Economic Definition of Predation"                                   1980

The Center for Advanced Studies in Managerial Economics Conference on The Economics of
Telecommunication
        "Pricing Local Service as an Input"                                     1980

Aspen Institute Conference on the Future of the Postal Service
        "Welfare Economics of Postal Pricing"                                   1979

Department of Justice Antitrust Seminar
        "The Industry Performance Gradient Index"                               1979

Eastern Economic Association Convention
        "The Social Performance of Deregulated Markets for Telecom Services"
        1979

Industry Workshop Association Convention
        "Customer Equity and Local Measured Service"                            1979

Symposium on Ratemaking Problems of Regulated Industries
        "Pricing Decisions and the Regulatory Process"                          1979

- A30 -

Woodrow Wilson School Alumni Conference
    "The Push for Deregulation"                                         1979

NBER Conference on Industrial Organization
    "Intertemporal Sustainability"                                   1979

World Congress of the Econometric Society
    "Theoretical Industrial Organization"                           1980
Institute of Public Utilities Conference on Current Issues in Public Utilities Regulation
    "Network Access Pricing"                                    1978

ALI-ABA Conference on the Economics of Antitrust
    "Predatoriness and Discriminatory Pricing"                       1978

AEI Conference on Postal Service Issues
    "What Can Markets Control?"                                1978

University of Virginia Conference on the Economics of Regulation
    "Public Interest Pricing"                                    1978

DRI Utility Conference
    "Marginal Cost Pricing in the Utility Industry: Impact and Analysis"    1978

International Meeting of the Institute of Management Sciences
    "The Envelope Theorem"                                   1977

University of Warwick Workshop on Oligopoly
    "Industry Performance Gradient Indexes"                      1977

North American Econometric Society Convention
    "Intertemporal Sustainability"                                   1979
    "Social Welfare Dominance"                                   1978
    "Economies of Scope, DAIC, and Markets with Joint Production"      1977

Telecommunications Policy Research Conference
    "Transition to Competitive Markets"                            1986
    "InterLATA Capacity Growth, Capped NTS Charges and Long
     Distance Competition"                                   1985
    "Market Power in The Telecommunications Industry"           1984
    "FCC Policy on Local Access Pricing"                        1983
    "Do We Need a Regulatory Safety Net in Telecommunications?"     1982
    "Anticompetitive Vertical Conduct"                            1981
    "Electronic Mail and Postal Pricing"                        1980
    "Monopoly, Competition and Efficiency":  Chairman        1979

"A Common Carrier Research Agenda" | 1978
"Empirical Views of Ramsey Optimal Telephone Pricing" | 1977
"Recent Research on Regulated Market Structure" | 1976
"Some General Equilibrium Views of Optimal Pricing" | 1975

National Bureau of Economic Research Conference on Theoretical Industrial Organization
"Compensating Variation as a Measure of Welfare Change" | 1976
Conference on Pricing in Regulated Industries: Theory & Application
"Ramsey Optimal Pricing of Long Distance Telephone Services" | 1977

NBER Conference on Public Regulation
"Income Distributional Concerns in Regulatory Policy-Making" | 1977

Allied Social Science Associations National Convention
"Merger Guidelines and Economic Theory" | 1990
Discussion of "Competitive Rules for Joint Ventures" | 1989
"New Schools in Industrial Organization" | 1988
"Industry Economic Analysis in the Legal Arena" | 1987
"Transportation Deregulation" | 1984
Discussion of "Pricing and Costing of Telecommunications Services" | 1983
Discussion of "An Exact Welfare Measure" | 1982
"Optimal Deregulation of Telephone Services" | 1982
"Sector Differentiated Capital Taxes" | 1981
"Economies of Scope" | 1980
"Social Welfare Dominance" | 1980
"The Economic Definition of Predation" | 1979
Discussion of "Lifeline Rates, Succor or Snare?" | 1979
"Multiproduct Technology and Market Structure" | 1978
"The Economic Gradient Method" | 1978
"Methods for Public Interest Pricing" | 1977
Discussion of "The Welfare Implications of New Financial Instruments" | 1976
"Welfare Theory of Concentration Indices" | 1976
Discussion of "Developments in Monopolistic Competition Theory" | 1976
"Hedonic Price Adjustments" | 1975
"Public Good Attributes of Information and its Optimal Pricing" | 1975
"Risk Invariance and Ordinally Additive Utility Functions" | 1974
"Consumer's Surplus:  A Rigorous Cookbook" | 1974

University of Chicago Symposium on the Economics of Regulated Public Utilities
"Optimal Prices for Public Purposes" | 1976

American Society for Information Science
"The Social Value of Information:  An Economist's View" | 1975

Institute for Mathematical Studies in the Social Sciences Summer Seminar

"The Sustainability of Natural Monopoly"                                          1975

U.S.-U.S.S.R. Symposium on Estimating Costs and Benefits of Information Services
    "The Evaluation of the Economic Benefits of Productive Information"      1975

NYU-Columbia Symposium on Regulated Industries
    "Ramsey Optimal Public Utility Pricing"                                   1975


**Research Seminars**:

| | |
|---|---|
| Bell Communications Research (2) | University of California, San Diego |
| Bell Laboratories (numerous) | University of Chicago |
| Department of Justice (3) | University of Delaware |
| Electric Power Research Institute | University of Florida |
| Federal Reserve Board | University of Illinois |
| Federal Trade Commission (4) | University of Iowa (2) |
| Mathematica | Universite Laval |
| Rand | University of Maryland |
| World Bank (3) | University of Michigan |
| Carleton University | University of Minnesota |
| Carnegie-Mellon University | University of Oslo |
| Columbia University (4) | University of Pennsylvania (3) |
| Cornell University (2) | University of Toronto |
| Georgetown University | University of Virginia |
| Harvard University (2) | University of Wisconsin |
| Hebrew University | University of Wyoming |
| Johns Hopkins University (2) | Vanderbilt University |
| M. I. T. (4) | Yale University (2) |
| New York University (4) | Princeton University (many) |
| Northwestern University (2) | Rice University |
| Norwegian School of Economics and | Stanford University (5) |
|   Business Administration | S.U.N.Y. Albany |

- A33 -

**Attachment 2: Expert Testimony Provided by Robert D. Willig in the Last Four Years**
**September 2013**

1. In the matter of Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions with Respect to Mobile Wireless Including Commercial Mobile Services; Before the Federal Communications Commission; WT Docket No. 09-66; declaration, 9/30/09.

2. Cindy Cullen, Wendy Fleishman, on Behalf of Themselves and All Others Similarly Situated v. Albany Medical Center, Ellis Hospital, Northeast Health, Seton Health System, and St. Peter's Health Care Service,      In the United States District Court for the Northern District of New York, Civil Action No. 06-CV-0765/ TJM/ DRH; expert report 2/29/2008; deposition 3/27-28/2008; expert report 9/4/2009; deposition 11/19-20/2009, declaration 12/28/2009.

3. In the Australian Competition Tribunal: Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 23 May 2006 under Section 44H(9) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Mount Newman Railway Line, By: Fortescue Metals Group Limited; Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 27 October 2008 under Section 44H(1) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Robe Railway By: Robe River Mining Co PTY LTD & ORS; Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 27 October 2008 under Section 44H(1) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Hamersley Rail Network, By: Hamersley Iron Co PTY LTD & ORS; Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 27 October 2008 under Section 44H(1) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Goldsworthy Railway, By: BHP Billiton Iron Ore PTY LTD and BHP Billiton Minerals PTY LTD; expert report 6/30/2009 and 9/18/2009, trial testimony 11/2/2009-11/6/2009.

4. Stagecoach Group PLC and Coach USA, Inc., et al, Acquisition of Control, Twin America, LLC, Before the Surface Transportation Board, Verified Statement of Professor Robert D. Willig, Submitted November 17, 2009.

5. In re: Rail Freight Fuel Surcharge Antitrust Litigation,  In the United States District Court for the District of Columbia, MDL Docket No. 1869, Misc. No. 07-489 (PLF), expert report 8/1/2010, deposition 8/4/2010.

6. Before the Federal Reserve Bank: Docket Number R-1404: Proposed Rule on Debit Card Interchange Fees and Routing, written statement 2/22/2011.

7.  Before the Surface Transportation Board:  Docket Number EP 704: Review of Commodity, Boxcar, and TOFC/COFC Exemptions; written statement 1/31/2011; testimony at hearing 2/23, 24/2011.

8.  New Zealand Commerce Commission vs. Malaysian Airline Systems Berhad, Ltd. and et. al.; High Court of New Zealand: CV 2008-404-8350, Brief of Evidence 4/28/2011, trial testimony 5/20/11 and 5/23-27/2011.

9.  Before the Federal Communications Commission: Docket Number 11-65: For Consent to Assign or Transfer Control Licenses and Authorization, written reply statement 6/9/2011.

10. In Re: Checking Account Overdraft Litigation, MDL No. 2036 In the United States District Court for the Southern District of Florida, Miami Division, Case No. 09-MD-02036-JLK, Luquetta v. JPMorgan Chase Bank, Declaration In Support of JP Morgan Chase Bank, N.A.'s Opposition to Class Certification, June 16, 2011.

11. Before the Surface Transportation Board: Docket Number EP 705: Competition in the Rail Industry, written statement 4/12/2011, written reply statement 5/27/2011, testimony at hearing 6/22, 23/2011.

12. In the Matter of Rambus Inc. v. Micron Technology, Inc., et al. In the Superior Court of the State of California County of San Francisco, Civil Action No. 04-431105; expert report 11/08/2008; supplemental expert report 12/19/2008, deposition testimony 5/7/2009-5/8/2009, trial testimony 9/1,6,7/2011.

13. In Re McKesson Governmental Entities Average Wholesale Price Litigation, Master File No.: 1:08-CV-10843-PBS; The Board of County Commissioners of Douglas County, Kansas et al. v. McKesson Corp., expert report, April 14, 2010, Response Report, June 28, 2010; Related to Connecticut v. McKesson Corp., expert report, April 14, 2010; Related to Montana v. McKesson Corporation, expert report, November 8, 2010; Related to Oklahoma v. McKesson Corporation, expert report, November 8, 2010; San Francisco Health Plan, et al. v. McKesson Corporation, rebuttal expert report, 9/19/2011.

14. Before the Public Service Commission of Maryland, Case No.: 9271, In the Matter of the Merger of Exelon Corp. and Constellation Energy Group, Inc., written market power rebuttal testimony, 10/17/2011, written surrebuttal testimony 10/26/2011, hearing testimony, 11/2011.

15. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division,  DELL Inc., *et. al.*, v. SHARP Corporation, *et al.*, Case No. 3:10-cv-01064 SI MDL No. 3:07-md-1827-SI, expert report 2/23/2012, deposition 4/18/2012.

16. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division,  Motorola Mobility Inc. v. SHARP Corporation, *et al.*,Case No. 3:09-cv-05840SI MDL No. 3:07-md-1827-SI, expert report  2/23/2012, deposition 4/18/2012.

17. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division,  AT&T Mobility Inc. v. SHARP Corporation, *et al.*,Case No. 09-cv-4997 SI MDL No. 07-m-1827-SI, expert report  2/27/2012, deposition 4/18/2012.

18. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division,  BEST BUY CO., Inc., *et. al.*, v. AU OPTRONICS CORP., *et al.*, Case No. 10-cv-4572 SI MDL No. 07-md-1827-SI, expert report 3/5/2012, deposition 4/18/2012.

19. Clark R. Huffman and Brandi K. Winters, individually and on behalf of all others similarly situated vs. PRUDENTIAL INSURANCE COMPANY of AMERICA, In the United States District Court for the Eastern District of Pennsylvania, Civ. No. 2:10-cv-05135-EL, declaration 4/10/2012.

20. In re Prudential Insurance Company of America SGLI/VGLI Contract Litigation, CLASS ACTION, Master Case No. 3:11-md-02208-MAP, In the United States District Court for the District of Massachusetts, declaration 5/10/2012.

21. Australian Competition and Consumer Commission v. Singapore Airlines Cargo PTE LTD et. al., Before the Federal Court of Australia, District Registry: New South Wales, Division: General, No. NSD 1980 of 2008, NSD 363 of 2009, NSD 876 of 2009 and NSD 1213 of 2009, affidavit and expert report 7/12/2012.

22. Bandspeed, Inc. v. Sony Electronics, Inc. et al. and Cambridge Silicon Radio Limited, Cause No. A-11-CV-771-LY, In the United States District Court for the Western District of Texas, Austin Division, expert report, 9/21/2012.

23. M&G Polymers USA, LLC v. CSX Transportation, Inc., Before the Surface Transportation Board, Docket Number NOR 42123, verified statement, 11/27/2012.

24. National Collegiate Athletic Association et al., Plaintiffs, v. Christopher J. Christie et al., Defendants, In the United States District Court for the District of New Jersey, Civil Action No. 3:12-cv-04947 (MAS) (LHG), expert report  11/21/2012, deposition 11/30/2012.

25. In Re Cathode Ray Tube (CRT) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division, Master

File No. CV-07-5944-SC MDL No. 1917, expert report 12/17/12, deposition 01/24/12.

26. In Re Titanium Dioxide Antitrust Litigation, In the United States District Court of Maryland Northern Division, Case No. 1:10-cv-00318-RDB, expert report 12/21/2012, deposition testimony 02/07/2013, 02/08/2013.

27. PPL EnergyPlus, LLC, et al., v. Douglas R.M. Nazarian, in his official capacity as Chairman of the Maryland Public Service Commission, et al., In the United States District Court of Maryland Northern Division, Case No. 1:12-cv-01286-MJG, expert report 12/21/2012, supplemental expert report 02/01/2013, deposition testimony 02/14/2013, trial testimony 03/08/2013.

28. PPL EnergyPlus, LLC, et al., v. Robert Hanna (originally, Lee A. Solomon), in his official capacity as President of the New Jersey Board of Public Utilities, et al., In the United States District Court for the District of New Jersey, Case No. 3:11-cv-00745-PGS-DEA, expert report 02/06/2013, deposition 02/14/2013 and 02/21/2013, and trial testimony 4/9-10/2013.

29. Total Petrochemicals & Refining USA, Inc. v. CSX Transportation, Inc., Before the Surface Transportation Board, Docket Number NOR 42121, verified statement, 06/20/2013.

30. Bandspeed Inc v. Garmin International, Inc. et al., In the United States District Court for the Western District of Texas, Austin Division, Cause No. A-11-CV-771-LY, expert report, 08/01/2013.

| Attachment 3: List of Materials Relied Upon |
| :---: |
| Expert Report of Robert D. Willig Relating to Direct Purchaser Class Action |
| *In re Cathode Ray Tube Antitrust Litigation* |

| Bates Stamp/Title | Date |
| :--- | :---: |



**Expert Mat**

**Expert Deposi**

**Legal**

Direct Purchaser Plaintiffs' Consolidated Amended Complaint                                    16-Mar-09

**Academic Texts and Articles**

Aldrich, John, "Correlations Genuine and Spurious in Pearson and Yule," *Statistical Science,* Vol. 10, No. 4, 1995, pp. 364-376

Bali, S. P., *Colour Television: Theory and Practice,* Tata McGraw-Hill, 1994

Bulow, J. I., J. D. Geanakoplos, and P. D. Klemperer, "Multimarket Oligopoly: Strategic Substitutes and Complements," *Journal of Political Economy,* Vol. 93, No. 3., 1985, pp. 488-511

Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization,* 3rd edition, Addison-Wesley, 1999

Church, Jeffrey and Roger Ware, *Industrial Organization: A Strategic Approach,* McGraw-Hill, 2000

Davis, P., & Garcés, E., *Quantitative Techniques for Competition and Antitrust Analysis,* Princeton University Press, 2010

Diewert, W. E., "The Early History of Price Index Research & Fisher Ideal Output, Input and Productivity Indexes Revisited," in W.E. Diewert and A.O. Nakamura (Eds.), *Essays in Index Number Theory,* Volume I, Elsevier Science Publishers, 1993

Graf, R. F., *Modern Dictionary of Electronics,* 7th Edition, Butterworth-Heinemann, 1999

Grout, Paul A. and Silvia Sonderegger, "Predicting Cartels: Economic Discussion Paper," A Report Prepared for the Office of Fair Trading, OFT773, March 2005

Gujarati, Damodar N., *Basic Econometrics,* 3rd edition, McGraw-Hill, 1995

Harrington, Joseph E., "Detecting Cartels," in P. Buccirossi (Eds.), *Advances in the Economics of Competition Law,* MIT Press, 2007

Motta, Massimo, *Competition Policy: Theory and Practice,* Cambridge University Press, 2004

Scherer, F.M., *Industrial Market Structure and Economic Performance,* 2nd edition, Houghton Mifflin, 1980

**Industry Studies**

Fuji Chimera Research Institute, *Forecasts and Trends for Flat Panel Displays and Their Applications,* 2000

Fuji Chimera Research Institute, *Flat Panel Display Applications: Trends and Forecasts,* 2001

Fuji Chimera Research Institute, *Flat Panel Display Applications: Trends and Forecasts,* 2007

**Public Documents**

| Attachment 3: List of Materials Relied Upon |
| :--- |
| **Expert Report of Robert D. Willig Relating to Direct Purchaser Class Action** |
| *In re Cathode Ray Tube Antitrust Litigation* |

| Bates Stamp/Title | Date |
| :--- | ---: |

International Labour Organization, *Consumer Price Index Manual: Theory and Practice,* 2004

United States International Trade Commission, *Color Picture Tubes from Canada, Japan, Korea, and Singapore* , Investigations Nos. 731-TA-367-370 (Review), Determinations and Views of the Commission, USITC Publication No 3291, 2000

**_Bates Docume_**



**_Data_**



| Attachment 3: List of Materials Relied Upon |
|---|
| Expert Report of Robert D. Willig Relating to Direct Purchaser Class Action |
| *In re Cathode Ray Tube Antitrust Litigation* |

| Bates Stamp/Title | Date |
|---|---|



*Hitachi*

*LGE*

| Attachment 3: List of Materials Relied Upon |
|---|
| **Expert Report of Robert D. Willig Relating to Direct Purchaser Class Action** |
| *In re Cathode Ray Tube Antitrust Litigation* |

| Bates Stamp/Title | Date |
|---|---|



*LPD*

# Exhibits 1-21D
# [submitted under seal]

# EXHIBIT 8

# (FILED UNDER SEAL)

# EXHIBIT 9

# (FILED UNDER SEAL)

# EXHIBIT 10

# (FILED UNDER SEAL)

# <u>EXHIBIT 11</u>

# (FILED UNDER SEAL)

# EXHIBIT 12

# (FILED UNDER SEAL)

# **EXHIBIT 13**

# **(FILED UNDER SEAL)**

# EXHIBIT 14

Page 1

1

2   ** HIGHLY CONFIDENTIAL **

3   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA

4   SAN FRANCISCO DIVISION
    No. 3:07-cv-05944 SC

5   MDL No. 1817
    ----------------------------------x

6

    IN RE: CATHODE RAY TUBE (CRT)

7   ANTITRUST LITIGATION

8   ----------------------------------x

9   This Document Relates to:

10  ALL ACTIONS

11
    ----------------------------------x

12              July 16, 2012
                9:36 a.m.

13

14

15       Deposition of KIM LONDON, taken by

16  Plaintiffs, pursuant to 30(b)(6) Notice,

17  held at the offices of O'Melveny & Myers

18  LLP, Seven Times Square, New York, New

19  York, before Todd DeSimone, a Registered

20  Professional Reporter and Notary Public of

21  the State of New York.

22

23

24

25

Page 194

1      LONDON - HIGHLY CONFIDENTIAL

2              MR. BRADSHAW:  With respect to  02:13:54PM

3   CRTs?                                      02:13:55PM

4              MR. PAPALE:  Yes, CRT monitors. 02:13:56PM

5      A.      I don't know if Bank of America 02:13:59PM

6   was buying CRT monitors, because you said  02:14:02PM

7   2007.                                      02:14:05PM

8      Q.     I did.  They were customers,     02:14:05PM

9   but not necessarily with CRT monitors?     02:14:09PM

10     A.      Correct.  Microsoft probably     02:14:11PM

11  for CRTs, but I don't know about Bank of   02:14:13PM

12  America.  Bank of America, no, they were   02:14:17PM

13  LCDs only.                                 02:14:20PM

14     Q.     How about AT&T?                   02:14:21PM

15     A.      They began with CRTs and         02:14:23PM

16  transitioned over to LCD.                  02:14:26PM

17     Q.     When did AT&T first become a      02:14:29PM

18  customer?                                  02:14:32PM

19     A.      As I said, we still had CRTs.    02:14:32PM

20  I would have to look back at the contract  02:14:35PM

21  for an exact date.  Probably in the late   02:14:36PM

22  '90s.                                      02:14:43PM

23     Q.     Were there specific allowances   02:14:45PM

24  for sales volumes to some of the larger    02:14:56PM

25  customers?                                 02:14:58PM

```
                                     Page 195

 1        LONDON - HIGHLY CONFIDENTIAL
 2     A.      Yes.                           02:15:00PM
 3     Q.      Was there any kind of standard 02:15:00PM
 4  volume discount that you provided?        02:15:06PM
 5     A.      It varied based upon the       02:15:11PM
 6  customer, the quantity, the model, whether 02:15:15PM
 7  or not it was a new product, aged product, 02:15:18PM
 8  going end of life.  It varied             02:15:23PM
 9  significantly.  And the end users would be 02:15:26PM
10  based upon competition, current           02:15:37PM
11  competition.                             02:15:39PM
12     Q.      Even the discounts would vary  02:15:40PM
13  based upon the competition?               02:15:44PM
14     A.      Yes.                           02:15:45PM
15     Q.      Can you just generally explain 02:15:46PM
16  the process whereby you would enter into a 02:15:55PM
17  contract with, for example, an end user?  02:15:57PM
18  What would you do?                        02:16:00PM
19     A.      What would I do?               02:16:02PM
20     Q.      For example, you said you      02:16:03PM
21  brought AT&T in.  What was the process?    02:16:05PM
22     A.      You basically call on the      02:16:07PM
23  customer, get them to standardize on the  02:16:09PM
24  product.  I won't go into details.  There 02:16:12PM
25  is evaluation units.  You get them        02:16:18PM
```

```
                                        Page 196
```

1          LONDON - HIGHLY CONFIDENTIAL
2    standardized to approve the product.  They  02:16:20PM
3    would approve the product.                  02:16:22PM
4              Then there would be that          02:16:24PM
5    pricing discussion, who they were using at  02:16:25PM
6    the time, how Samsung compared to them      02:16:28PM
7    based upon specification and pricing.  We   02:16:31PM
8    would then work, again, through AT&T, they  02:16:34PM
9    would say I need this display at this       02:16:38PM
10   price and I would back out, you know, if    02:16:41PM
11   we could do that.  We would then say,       02:16:44PM
12   okay, the distributor needs to make X       02:16:49PM
13   percentage margin, the reseller needs X     02:16:52PM
14   percentage margin, AT&T needs to buy at     02:16:55PM
15   this price, I therefore then have to be at  02:16:59PM
16   this price to sell into distribution.  And  02:17:02PM
17   we would come up with a contract based      02:17:05PM
18   upon that.                                  02:17:06PM
19       Q.     Was it different when you were  02:17:07PM
20   soliciting the retailers, different         02:17:17PM
21   process?                                    02:17:21PM
22       A.     I never solicited the           02:17:21PM
23   retailers.                                  02:17:23PM
24       Q.     You didn't get involved with    02:17:23PM
25   them?                                       02:17:24PM

```
                                Page 197
 1        LONDON - HIGHLY CONFIDENTIAL
 2        A.      No, I did not.  But yes, it is  02:17:25PM
 3   different with the retailers.  There is a   02:17:27PM
 4   lot involved.  There is marketing funds     02:17:30PM
 5   that they require.  There is co-op that      02:17:37PM
 6   they require.  There is shelf space.         02:17:40PM
 7   There is ads.  There is a lot that goes      02:17:44PM
 8   into selling to the retail side of the       02:17:47PM
 9   house.                                       02:17:49PM
10        Q.      On a retail sale, was there a   02:17:50PM
11   commitment to maintain a certain price for  02:17:52PM
12   a certain period of time or was it based    02:17:55PM
13   upon just a straight price for a number of  02:17:56PM
14   units?                                       02:18:00PM
15        A.      That I don't know.  I never got 02:18:01PM
16   involved with the pricing discussions for   02:18:05PM
17   retailers.                                   02:18:06PM
18        Q.      And resellers, how does that    02:18:08PM
19   work?                                        02:18:11PM
20        A.      Direct resellers?               02:18:12PM
21        Q.      Yes.                            02:18:13PM
22        A.      Direct resellers, very similar  02:18:14PM
23   situation to distributors, that we would    02:18:16PM
24   have a contract with them for a set period  02:18:21PM
25   of time but pricing would be dictated        02:18:23PM
```

```
                                        Page 198
 1        LONDON - HIGHLY CONFIDENTIAL
 2   based upon our pricing bulletins.          02:18:25PM
 3        Q.        And would a price be maintained 02:18:28PM
 4   over a period of time, so, in other words,  02:18:30PM
 5   you would advise them that a price is       02:18:32PM
 6   going to be honored for a certain period    02:18:35PM
 7   of time, or was it based upon the number    02:18:37PM
 8   of units that they were ordering?           02:18:39PM
 9        A.        No, it was a price.  So the   02:18:40PM
10   standard pricing was based upon standard    02:18:43PM
11   pricing.  This is your day to day price.    02:18:46PM
12   That would go any length of time and        02:18:49PM
13   depending on we may then lower that         02:18:55PM
14   pricing.                                    02:18:57PM
15             But from time to time they may    02:18:58PM
16   come to us for a bulk buy where we would    02:19:00PM
17   give them a quantity discount.  They may    02:19:04PM
18   come to us with a large corporate end user  02:19:06PM
19   opportunity that says hey, I can sell a     02:19:10PM
20   thousand units to AT&T if I'm at this       02:19:13PM
21   price.  So we had our day to day pricing,   02:19:17PM
22   and then from there if the distributor had  02:19:20PM
23   excess inventory we had to move through,    02:19:26PM
24   we might look at pricing.  If they had end  02:19:28PM
25   of life product, there are so many          02:19:34PM
```

```
                                        Page 199
 1        LONDON - HIGHLY CONFIDENTIAL
 2   different situations that we might lower    02:19:36PM
 3   that price to them.                         02:19:37PM
 4        Q.      With resellers, was there a    02:19:38PM
 5   master contract involved with that?        02:19:44PM
 6                MR. BRADSHAW:  I object to     02:19:46PM
 7   form.                                       02:19:47PM
 8        A.      Direct reseller, yes.          02:19:47PM
 9        Q.      You say that is very similar to 02:19:48PM
10   the way you handle distributors?            02:19:50PM
11        A.      Yes.                           02:19:51PM
12        Q.      So there was a contract, a     02:19:52PM
13   master contract with a distributor for a    02:19:54PM
14   period of time I take it?                   02:19:57PM
15                MR. BRADSHAW:  I object to the 02:19:58PM
16   form.  Vague and ambiguous.                 02:19:59PM
17        A.      Yes.                           02:20:01PM
18        Q.      And the price would be         02:20:01PM
19   determined by your bulletins?               02:20:03PM
20        A.      Yes.                           02:20:04PM
21        Q.      But then you would go through  02:20:04PM
22   these other exercises depending upon the    02:20:06PM
23   requirements by the distributor?            02:20:08PM
24        A.      To help them move product      02:20:12PM
25   through, yes.                               02:20:13PM
```

```
                                         Page 200
```

1          LONDON - HIGHLY CONFIDENTIAL
2      Q.      What about were there any          02:20:15PM
3   distributors or resellers or retailers       02:20:17PM
4   that you gave any most favored nations       02:20:19PM
5   treatment to?                                02:20:24PM
6              MR. BRADSHAW:  I object to the     02:20:25PM
7   form.  Vague and ambiguous.                  02:20:26PM
8      Q.      Have you heard the term "most      02:20:27PM
9   favored nations"?                            02:20:30PM
10     A.      Yes.                               02:20:31PM
11     Q.      What does that mean to you?        02:20:31PM
12     A.      Best pricing.                      02:20:33PM
13     Q.      Was there any obligation or did    02:20:35PM
14  you have -- in your contracts did you have   02:20:39PM
15  any best pricing kinds of obligations to     02:20:40PM
16  any of your distributors, resellers,         02:20:44PM
17  retailers?                                   02:20:46PM
18     A.      Not to my knowledge, no.          02:20:46PM
19     Q.      Were any of your contracts         02:20:48PM
20  based on a cost plus basis?                  02:21:22PM
21             MR. BRADSHAW:  I object to the     02:21:24PM
22  form.  Vague and ambiguous.                  02:21:25PM
23     A.      Not to my knowledge.              02:21:26PM
24     Q.      So your pricing wasn't done        02:21:26PM
25  that way?                                    02:21:28PM

                                        Page 201

1            LONDON - HIGHLY CONFIDENTIAL
2       A.      No.                              02:21:28PM
3       Q.      What about discounts and         02:21:28PM
4    rebates in connection with the sale of CRT  02:21:31PM
5    monitors, how would you apply your          02:21:33PM
6    discounts and rebates?  Let's talk about    02:21:39PM
7    the distributors.  What would be a          02:21:42PM
8    circumstance under which a distributor      02:21:44PM
9    would qualify for a discount or a rebate?   02:21:47PM
10      A.      I reviewed some of the           02:21:52PM
11   situations just with you two minutes ago.   02:21:55PM
12              So it would be based upon a       02:21:58PM
13   quantity buy, an end user corporate         02:22:00PM
14   opportunity, competitive situation, excess  02:22:04PM
15   inventory.  If the distributor had excess   02:22:11PM
16   inventory, if Samsung had excess            02:22:24PM
17   inventory, if the product was going end of  02:22:28PM
18   life, you know, it could be varied          02:22:30PM
19   situations.                                 02:22:32PM
20      Q.      Did you distinguish at all       02:22:32PM
21   between a discount or a rebate?             02:22:35PM
22      A.      Yes.                             02:22:37PM
23      Q.      What was that distinction?       02:22:39PM
24      A.      So a discount would be a         02:22:42PM
25   pricing off of the distribution pricing.    02:22:43PM

```
                                        Page 202

 1          LONDON - HIGHLY CONFIDENTIAL
 2    A POS rebate would be a point of sale      02:22:46PM
 3    rebate.  So a discount would be at the     02:22:50PM
 4    time of purchase and/or they would claim   02:22:55PM
 5    it back.  A POS rebate, they would claim   02:22:58PM
 6    it back.  So I guess things were handled a 02:23:02PM
 7    little differently depending on what type  02:23:06PM
 8    of rebate they were getting.               02:23:08PM
 9        Q.     Would a rebate be negotiated in 02:23:09PM
10    advance or would that be something that    02:23:11PM
11    would be done as a promotion if the sales  02:23:13PM
12    weren't going as they had anticipated?     02:23:14PM
13        A.       It all depends.  It could be a 02:23:17PM
14    brand new product that was negotiated in   02:23:18PM
15    advance and we said okay, we are           02:23:21PM
16    introducing this product and we are going  02:23:23PM
17    to give you this POS rebate.  We would     02:23:25PM
18    know about it.  The distributor might buy  02:23:27PM
19    product in and if it wasn't moving, then   02:23:30PM
20    we would say we will give you a rebate on  02:23:32PM
21    that.  So, again, the situations varied.   02:23:35PM
22        Q.       When you said POS, you are     02:23:38PM
23    referring to point of sale?                02:23:40PM
24        A.       Yes, point of sale.  So when   02:23:41PM
25    the reseller purchased it, that is at the  02:23:42PM
```

```
                                              Page 203

 1         LONDON - HIGHLY CONFIDENTIAL
 2    time of sale to the reseller.            02:23:45PM
 3         Q.     How did you record the       02:23:46PM
 4    discounts and rebates in your pricing    02:23:50PM
 5    structure?  In other words, the pricing  02:23:54PM
 6    would be set up -- we talked about the   02:23:55PM
 7    software you were using for purposes of  02:23:58PM
 8    your pricing.                            02:24:01PM
 9              MR. BRADSHAW:  I object to the 02:24:03PM
10    form.  Vague and ambiguous,              02:24:05PM
11    mischaracterizes testimony.              02:24:06PM
12         Q.     Do you remember that this    02:24:07PM
13    morning?                                 02:24:07PM
14         A.     Yes, I do recall.            02:24:08PM
15         Q.     And I can't remember what you 02:24:10PM
16    called the software.  What version was  02:24:12PM
17    that?  You said it was SAP in the        02:24:14PM
18    beginning and then towards the end it was 02:24:16PM
19    something else?                          02:24:19PM
20         A.     Well, GSCM from a supply chain 02:24:19PM
21    management perspective, not from a pricing 02:24:24PM
22    perspective.                             02:24:25PM
23         Q.     So GSCM was not pricing, but 02:24:25PM
24    for pricing it was SAP?                  02:24:30PM
25         A.     I believe that's the system, 02:24:33PM
```

# EXHIBIT 15

CERTIFIED COPY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

In re:  CATHODE RAY TUBE (CRT)      )
ANTITRUST LITIGATION,               )
_____)
                                    )
This Document Relates to:           )
                                    )
ALL ACTIONS.                        )
_____)


30(b)(6) DEPOSITION OF STUDIO SPECTRUM, INC. –

KENNETH BUCKOWSKI

July 16, 2013


Tami L. Le, CSR No. 8716
360860



(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine         (858) 455-5444 San Diego
(916) 922-5777 Sacramento     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs   (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills (212) 808-8500 New York City    (347) 821-4611 Brooklyn       (518) 490-1910 Albany
(516) 277-9494 Garden City    (914) 510-9110 White Plains     (312) 379-5566 Chicago        (702) 366-0500 Las Vegas
              +33 1 70 72 65 26 Paris     +971 4 8137744 Dubai     +852 3693 1522 Hong Kong

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5   In re:  CATHODE RAY TUBE (CRT)     )
    ANTITRUST LITIGATION,              )
6   _____)
                                       )
7   This Document Relates to:          )
                                       )
8   ALL ACTIONS.                       )
    _____)
9

10

11

12

13

14          Videotaped Deposition of 30(b)(6)

15          STUDIO SPECTRUM, INC. - KENNETH

16          BUCKOWSKI, taken on behalf of the

17          Samsung SDI Defendants, at 333 South

18          Hope Street, 43rd Floor, Los Angeles,

19          California, commencing at 9:10 a.m., on

20          Tuesday, July 16, 2013, before Tami L.

21          Le, CSR No. 8716, RPR.

22

23

24

25

                         2

BARKLEY
Court Reporters

12:08  1    larger ones would bring it in through their reps.

2        Q    So if you were considering buying a CRT

3    product, what would be your first step?

4        A    To check the pricing on our list and to compare

12:09  5    it with the other manufacturers and select the most

6    appropriate one for the client based on what I said

7    before, the pricing and quality requirements.

8        Q    So you would compare the price lists and look

9    for comparable quality products between them and try to

12:09 10    find the lowest price; is that correct?

11        A    Yeah, that too, and also the availability.

12    There was a lot of problems with availability, it was

13    back-ordered, not available, so that was another factor,

14    who had product available even.

12:09 15        Q    So tell me if I have this process right.  You

16    would look at the various price lists, compare prices of

17    comparable products --

18        A    Uh-huh.

19        Q    -- look at the lower-priced product and then

12:09 20    contact that manufacturer to see if they had it in

21    stock?

22        A    Yes, uh-huh.  You know, after time, you know

23    where this is, I mean if you're dealing with this all

24    the time, so it was almost like second nature.  This is

12:10 25    a Pana- -- this -- this needs to be filled with a

114

BARKLEY
Court Reporters

12:10   1   Panasonic product, and this one needs to be filled with

        2   a Sony, and this needs to be filled with something of

        3   lesser quality, but just the lowest possible price.

        4   These were always dictated by the market.

12:10   5        Q    When -- when you -- strike that.

        6             Would it be you that would make that call to

        7   the supplier to find out if it's in stock?

        8        A    Sometimes; more often than not, it was Kathy.

        9        Q    Who did you talk to at Panasonic when -- when

12:10  10   you made that call?

       11        A    More often than not, our primary rep was Greg

       12   Gorman and we called him.  And there were also people in

       13   the ordering department, we have the current inventory

       14   account of what was available, and Kathy might do that

12:11  15   or Greg would call over and check for us.

       16        Q    How do you spell Greg's last name?

       17        A    G-O-R-M-A-N.

       18        Q    And was he your primary contact at Panasonic

       19   throughout the period?

12:11  20        A    Beginning that period, and then Vicki Chafie,

       21   C-H-A-F-I-E, became our rep following him.

       22        Q    Did you ever negotiate prices with Panasonic

       23   for CRT products?

       24        A    No.  It was given to us as fixed pricing.

12:11  25        Q    Did you ever negotiate prices for CRT products

                                    115

BARKLEY
Court Reporters

12:11  1    with any of your other suppliers?

       2        A    No, I don't recall that ever being possible.  I

       3    mean, it was fixed pricing.

       4        Q    It was understood that under the dealer

12:11  5    program, you could only purchase at the list price or at

       6    the price provided on the price list?

       7        A    That's correct.

       8        Q    Did you have any CRT product suppliers that

       9    didn't use a price list?

12:12 10        A    No, I don't think so.  They all had fixed

      11    pricing, "fixed cost," as we would call it, our cost.

      12        Q    And did you look for these price lists to

      13    produce in this litigation?

      14        A    Yes.

12:12 15        Q    Did you produce all the ones you found?

      16        A    Produced all we could find, yes.

      17        Q    So in deciding which product to purchase, were

      18    the main factors the factors that we discussed before,

      19    which were namely price, suitability to the customer's

12:13 20    needs and customer's perception of the brand quality?

      21             MR. WILLIAMS:  Asked and answered.

      22             THE DEPONENT:  Yes, that's true.

      23        Q    BY MR. CUNNINGHAM:  And then once Studio

      24    Spectrum decided to make a purchase, what happened then?

12:13 25        A    We would write out a memorandum of what that

                                       116

BARKLEY
Court Reporters

12:13   1   would be, a purchase order, and then fax it to the

2   manufacturer, and they would ship from their warehouses

3   to us.

4      Q    Did this process vary at all depending on what

12:13   5   the CRT product was that you were purchasing?

6         MR. WILLIAMS:  Which process?

7      Q    BY MR. CUNNINGHAM:  The entire

8   seeking-quotes-and-placing-an-order process that we've

9   discussed so far.

12:14   10        MR. WILLIAMS:  Objection to form, vague and

11   ambiguous.

12        THE DEPONENT:  Well, we didn't seek quotes.  It

13   was given to us, so it was just a matter of filling in

14   the purchase order with the quantity, the model number

12:14   15   and the price from our list, and extending that cost.

16      Q    BY MR. CUNNINGHAM:  Other than asking about

17   availability, did you have any other occasions on which

18   you would make phone contact with anybody at Panasonic?

19      A    Yes.

12:14   20      Q    What occasions?

21      A    Technical support; suitability of different

22   products; advice on this was the problem that we've got,

23   what best fits that; or sometimes competitive

24   differences, the client is looking for some certain

12:15   25   product, and what would you have that would fill those

117

BARKLEY
Court Reporters

# EXHIBIT 16

# (FILED UNDER SEAL)

# **EXHIBIT 17**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

–   –   –

IN RE:  CATHODE RAY TUBE

(CRT) ANTITRUST LITIGATION

Master File No.

CV-07-5944-SC

MDL No. 1917

–   –   –

June 20, 2013

–   –   –

Oral deposition of STEVEN R. NUSBAUM
taken pursuant to notice, held at the Law
Offices of Morgan, Lewis & Bochius, 1701
Market Street, Philadelphia, PA 19102,
commencing at 9:13 a.m., on the above date,
before Jennifer P. Miller, Registered
Professional Reporter and Notary Public for
the Commonwealth of Pennsylvania.

1

1    were judged was pricing, correct?

2         A.   Yes.

3         Q.   During the relevant period, did you

4    read any CRT product industry trade

5    publications?

6         A.   Yes.

7         Q.   Do you recall which ones?

8         A.   I subscribed to Twice Magazine,

9    which was an industry publication.

10        Q.   Did any of these industry trade

11   publications assist you in how Arch

12   Electronics did business?

13                  MR. GRABAR:  Objection.

14                  THE WITNESS:  No.

15   BY MR. MARKMAN:

16        Q.   Did any of these publications assist

17   you in negotiating the price of CRT products?

18        A.   No.

19        Q.   Were you or Arch Electronics a

20   member during the relevant period of a

21   cooperative entity or trade association or

22   organization related to CRT products?

23        A.   No.

24        Q.   During the relevant period, did Arch

25   Electronics ever use a process for seeking

71

1    bids for quotes for CRT products?

2                    MR. GRABAR:  Objection.

3                    THE WITNESS:  I really don't

4        understand that question.

5    BY MR. MARKMAN:

6        Q.   During the relevant period, how

7    would you negotiate a price with Matsushita

8    regarding the CRT products?

9                    MR. GRABAR:  Objection.

10                   You can respond.

11                   THE WITNESS:  There was no

12       negotiation.  There was a set price that

13       we were given; that was the price we

14       purchased it from --

15   BY MR. MARKMAN:

16       Q.   Did you seek any information other

17   than price when determining whether to

18   purchase CRT products from Matsushita during

19   the relevant period?

20       A.   No.

21       Q.   Other than price, what factors did

22   you consider important in purchasing a CRT

23   product?

24                   Other than price, what factors,

25   if any, did Arch Electronics consider in

                                                    72

1    purchasing CRT products?

2         A.   Only that the television had to meet

3    the specification of the contract.

4         Q.   During the relevant period, Arch

5    Electronics was not able to negotiate a price

6    regarding CRT products with Matsushita; is

7    that correct?

8         A.   Yes.

9         Q.   Did you use price lists during the

10   relevant period when purchasing CRT products

11   from Matsushita?

12        A.   Yes.

13        Q.   How frequently did you receive price

14   lists from Matsushita during the relevant time

15   period?

16                  MR. GRABAR:  Objection.

17                  THE WITNESS:  I would say every

18        six months as a minimum.

19   BY MR. MARKMAN:

20        Q.   Did Arch Electronics ever receive a

21   purchase price that was different from the

22   listed price?

23        A.   No.

24        Q.   Do you know if other purchasers of

25   Matsushita CRT products used the same price

73

# EXHIBIT 18

# (FILED UNDER SEAL)

# EXHIBIT 19

# (FILED UNDER SEAL)

# EXHIBIT 20

# (FILED UNDER SEAL)

# EXHIBIT 21

# (FILED UNDER SEAL)

# EXHIBIT 22

**[TRANSLATION]**

Contact Report

[Handwritten:]    Submitted to Vice President Chung [Handwritten:] faxed 3/1

Date:                              December 31, 2003 in Shenzhen, China

Companies Visited:         *Irico* Export Sales Chief *Ms.* Yuan Liang

Content:

1. Irico production line and its production capacity:

Total production capacity has reached 14*M* in 2004, and more than 15*M* in 2005, breakdown as follows:

| Line | #A | #B | #C | #D | #E | #F | #G | *#H |
|------|------|------|------|-----------|------|-------------|------|------|
| Size | 21FS | 21FS | 25FS | 25PF/29PF | 14" | 15PF/14" | 21PF | 21FS |
| Capa/Year | 2.0M | 1.8~2M | 1.7M | 2.0M | 14":3.7M/15"PF:0.4M | | 1.8M | 1.8M |

*Remark:* *#H* line is one of the two old Hitachi lines newly purchased. One line is expected to start mass production in August 2004 (production capacity 1.8*M*/year). Approximately 700*k* of 21*FS* (thick tube neck) will be produced in 2004 (Note: Presently, Irico's 21*FS* is thin tube neck). The other line scheduled to be utilized at the end of 2004 is now *Delay* for the schedule is unclear.

2. Description of Irico production & sales:

| Actual sales in 2003 almost reached 10.7M, sorted by size as below: | | | | | | | |
|------|-------|--------|-------|--------|-------|-------|--------|
| 14" | 15"PF | 21"FS | 21"PF | 25"FS | 25"PF | 29"PF | Total |
| 3,600k | 100k+ | 3,800k | 900k+ | 1,500k | 600k | 200k | 10,700k |

*Remark:* 1) In 2004, the production of small & medium sizes is basically planned in accordance with production capacity. 21"*FS* production may increase, depending on *#H* line's output. There will not be a plan to significantly increase volume and sales in 2004 due to the losses sustained by the 25"/29"*PF*.

2) The export plan for 2004 is approximately 14"x 230*k/m* (approximately 2.7*M*, constituting 72% of total production capacity), and approximately 690,000 for 21" (*Q*1x30*k/m*, *Q*2x50*k/m*, *Q*3x70*k/m*, and *Q*4x80*k/m*, related to the *#H's* plan of starting mass production in August).

---

English words found in the original text are *italicized.*
Translator's remarks are indicated in brackets [ ].

3. Irico said that its profit would exceed RMB 400 million this year. However, 14"/21" would mainly contribute to its profit, instead of 25"/29", meaning *usd*1.0 profit (equipment depreciation already amortized fully) would be made when 14" is sold at *usd*16.0. Apparently, 14" contributed most to the profit. On the other hand, the cost of 21"*FS* would reach around *usd*31.0~32.0 (without depreciation), which Irico believes will give itself a strong competitive edge.

4. As to the 14" quotation, Irico said, it had noticed that *Thai-CRT* quoted *usd*19.0 to Changhong in July and had, therefore, supplied 14" to Changhong at low prices under its executive's instructions. Later on, Irico signed a contract with *Vestel* in August to supply 14" at *usd*20.0. We believe that Changhong was most likely not telling the truth when it mentioned $19 because *Thai-CRT* was selling 14" very well and the supply in Southeast Asia was tight in the second half of the year. In Southeast Asia, the selling price had already exceeded $20. Therefore, they would not have *Offer* $19 to Changhong. Furthermore, customers in China/Turkey, etc. all said that CPT price quotes are too high and, presently, the price in the Southeast is approximately *usd*21.0. We do hope that while the 14" is making a strong showing of higher profits, Irico, can cultivate an active role in maintaining the market price (Irico is the most aggressive and belligerent and, therefore, the most qualified to stop the price war).
With regards to 21"*FS*, Irico indicated that it focuses on domestic sales. Due to smaller export volumes, export sales prices were pretty good. However, the price level of *LG*/Fuzhou and Shenzhen SEG-Hitachi Color Display Devices Co (which mainly focuses on export), Shanghai Evernew, etc. should be lower. For example, Shenzhen SEG-Hitachi's December price was *usd*38.5. We indicated that customers in China mainly use domestic sales-related conditions, such as a 6 month postdated bank draft, factory delivery, etc., to request a much lower price in order to offset related expenses. Thus, it is very difficult for Chunghwa Picture Tube to make a decision on the final price quote. The current *usd*38.5 to a little than 39.0 should be considered reasonable and will not destroy the market. (Note:   Our actual price we quote to our major customers in China is between *usd*38.0~39.0, except for the pricing we give to Changhong in Szechuan, which is *usd*37.50).

5. Irico believes that the export-oriented SEG Hitachi, Shanghai Evernew, and Irico should be affected the most by the Chinese export tariff refund. Irico estimated that its costs increased by 2% (when materials costs/labor costs and other expenses are deducted) and the increased color tube price is not sufficient to *Cover* the increased costs. It is difficult to predict whether the increased costs can be absorbed by the upstream materials. Seeing the way upstream material costs are currently on the rise, it is very possible that the color tube factories will be forced to absorb the increased costs themselves.

6. In 2004, Irico *Glass* will expand by adding 2 *Tanks*, primarily for producing 21" *Panel* and a small quantity of 25"/29"*Panel*. Its main goal is to increase its internal supply, improve its competitive edge, and replace Anyang for the supply of 21"*FS panel*.

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [  ].

CONFIDENTIAL – GRAND JURY MATERIAL                    CHU00030067.02E

7. In the near future, both parties wish to once more exchange views regarding *CPT* factory production capacities, glass supply/demand, and the *2Q* market situation in China and Southeast Asia.

- End of Report -

Submitted for approval!

[Handwritten note:] 14" *CPTM*'s cost is estimated at 16.4 (excluding depreciation, and including patent royalty). More efforts will be needed.

[Signed by:] Jia-Fang (Jeff) Yue 3/1

[Submitted by:] Employee Shih-Ming (Maxim) Chen
January 2, 2003

[Submitted to:]     President Jia-Fang (Jeff) Yue
    HQ Assistant Vice President Yang / Assistant Vice President Cheng
    Vice President

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL                    CHU00030067.03E

呈 faxed 3/1
陳動應

接洽報告

日期：2003 年 12 月 31 日於中國深圳
對象：Irico(彩虹)出口營銷部長 Ms.梁援
內容：
1.彩虹生產線及其產能：

04年總產能約達 14M，05 年則達 15M 以上，如下：　　　　　　7 → 8

| 生產線 | #A | #B | #C | #D | #E | #F | #G | *#H |
|--------|------|------|------|----------|------|-----------|------|------|
| 尺寸 | 21FS | 21FS | 25FS | 25PF/29PF | 14" | 15PF/14" | 21PF | 21FS |
| 產能/年 | 2.0M | 1.8~2M | 1.7M | 2.0M | 3.7M/15"PF:0.4M | 1.8M | 1.8M | |

Remark:*#H線係新購 2 條日立舊線之一，其中一線預計 04 年 8 月起量產(產能 1.8M/年)，
　　　　04 年約可產出 21FS (粗管頸)約 700k 左右(註：彩虹現有之 21FS 為細管頸)，另一
　　　　線原預定 2004 年底嫁動，現有 Delay，時程未明確。

2. 彩虹產銷概況：

| 03 年銷售實績約達 10.7M 各尺寸如下 | | | | | | | |
|------|-------|-------|-------|-------|-------|-------|--------|
| 14" | 15"PF | 21"FS | 21"PF | 25"FS | 25"PF | 29"PF | Total |
| 3,600k | 100k+ | 3,800k | 900k+ | 1,500k | 600k | 200k | 10,700k |

Remark:1)2004 年在中小尺寸方面基本上依產能規劃，21"FS 可增量視#H 線出而定。而
　　　　25"/29"PF 因量虧損尺寸故 04 年暫無大幅增量銷售之規劃。
　　　　2)2004 年外銷計劃約為 14"x230k/m(約 2.7M，佔總產能之 72%)；21"則約為 69 萬
　　　　(Q1x30k/m、Q2x50k/m、Q3x70k/m、Q4x80k/m，與#H 計劃 8 月起量產相關)。

3.彩虹稱今年利潤約超過人民幣 4 億元，但利潤並非來自 25/"29"，主要來自 14"/21"，表示
依其廠內估算 14"在售價 usd16.0 時仍有 usd1.0 的利潤(設備折舊已攤完)，對利潤貢獻最
大，而 21"FS 成本則可做到約 usd31.0~32.0 左右(未含折舊)，亦自認有相當的競爭實力。

4.在 14"報價方面，彩虹稱在 7 月時看到 Thai-CRT 對長虹報價為 usd19.0，故依其上級指示
以低價供應長虹，其後並於 8 月以 usd20.0 與 Vestel 簽下交易合同。我方表示長虹所稱之
$19 應造假成份居多，因 Thai-CRT 之 14"產銷狀況不錯，後半年在東南亞供應緊，在東南
亞都賣$20 以上，應不會對長虹 Offer $19。而中國/土耳其等客戶都說華映報價太高，目
前業東南亞價格約在 usd21.0 上下的水準，希彩虹在 14"仍有較高利潤的實力支持下，發揮
維護市場價格的角色(彩虹戰力最強故最有資格止戰)。

而在 21"FS 方面，彩虹表示其以內銷為主，外銷價因量少故也可有不錯的售價，但 LG/福
地及以外銷為主之賽格日立、上海永新新等的報價水準應較低，例如賽格日立 12 月價格為
usd38.5。我方表示中國客戶都以內銷的相關條件，如 6 個月承兌匯票及到廠交貨等，要求
給與更低價格以轉嫁相關費用，故華映在報價上非常難以拿捏，但以現在約 usd38.5~39.點
多應屬合理，不會造成市場的破壞。(註：我方對中國客戶實際報價除地處四川的長虹為
usd37.50，主要客戶約在 usd38.0~39.0 之間)。

5.就中國外銷退稅問題，彩虹認為受影響較大的應屬以外銷為主的賽格日立、上海永新及彩
虹本身，彩虹估算其本身成本約增加 2%(扣除外購材/人工成本及費用比重)，但認為難以
彩管漲價來 Cover，至於是否可往上游材料推則難以論斷，以現在上游材料喊漲的態勢來
看，很可能彩管廠不得不自行吸收。

6.彩虹 Glass 將在 04 年擴增 2 個 Tanks，主要生產 21"Panel 及少量 25"/29"Panel，主要目的
在增加內部供應提高競爭力及取代安陽 21"FS panel 的供應。

7.雙方希近期再就中國及東南亞地區 CPT 廠產能、玻殼供應及 2Q 市況交換意見。

以上報告

14" CPTM 兩估導算成本為 16.4 (不含折舊,含費列全)，故南延要再努力、

縣長 3/1

呈核！

敬悉
孫總經理
HQ 稽協理/副協理
副總經理

職陳時銘

2003年1月2日

CONFIDENTIAL - GRAND JURY MATERIAL　　　　　　　　　　　　　　　　　　　　　　　　　CHU00030067

# EXHIBIT 23

# (FILED UNDER SEAL)

# EXHIBIT 24

# (FILED UNDER SEAL)

# EXHIBIT 25

# (FILED UNDER SEAL)

# EXHIBIT 26

**[TRANSLATION]**

Marketing Contact Report

Date:                           August 20, 2003

Attending Companies:   *Mr.* Rong-Guo Gao, President of *Irico* Export & Import Co.
                               *Ms.* Yuan Liang, Export Sales Dept. Manager

CPT:                           Assistant Vice President Sheng-Jen (S.J.) Yang, Shih-Ming
                                 (Maxim) Chen

Content:

1. Presently, Irico has 7 production lines, including 14"*2, 21"*FS**2, 15"*PF*/21"*PF**1,
   25"*FS*/25"*PF**1 and 29"*PF**1. 2003 planned production capacity is 10.7*M*,
   including 14"*3.62*M*, 21"*FS**3.8*M*, 21"*PF**0.6*M*, 25"*FS**1.55*M*, 25"*PF**0.5*M* and
   29"*PF**0.6*M*. Additionally, planned production volume for this year's new product
   15"*PF* is 500,000~600,000, however, market demand does not seem to be growing
   and therefore, the accumulated production volume till now is approximately 100*K*.

2. President Gao stressed that on the one hand, Irico is a government-owned enterprise
   and must take protection of its employees' livelihood as its top priority, but on the
   other hand, Irico is not developing new products, such as *LCD* and *PDP*. As a result,
   Irico must stick to *CPT* even if it may be a road of no return, regardless of profit or
   loss.

3. Irico will strive to upgrade its production efficiency for its 14" production line in
   the second half of year so as to increase its production capacity (volume) from
   3.6*M* this year to 5.0*M* next year, thereby increasing overall production capacity
   from 10.7*M* this year up to 12*M* next year. In addition, Irico signed a purchase
   contract with Hitachi to procure two 21" production lines (only approximately over
   USD 1 million), which is scheduled to start production at the end of 2004,
   increasing the overall production capacity for *CPT* to 15*M* in 2005.

4. With equipment depreciation fully amortized and all materials produced in-house
   (Irico has its own factories to produce glass/ electron guns/ fluorescent
   powder/*Mask/DY* and other materials), its cost structure is highly competitive. In
   spite of the fierce price competition in the market, Irico still has a considerably high
   profit level for the first half of this year. For example, with no equipment
   depreciation and if the cost of a self-made glass bulb is less than *US*$6, the total
   cost for 14" is merely around*USD*16.

_____
English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL                    CHU00030068.01E
                                                                              Translation

5. In Q2, due to influences such as those of *SARS*, various China *TV* makers' abilities to meet their projections were generally not ideal. So, with the coming of the peak season, all *TV* makers seek to make up for the losses of the first half of the year while increasing their market share, thus, although export orders decreased in November, the domestic market should be able to maintain relatively strong demand through the Chinese New Year festival next year. Overall, *CPT* and *TV* inventories are at reasonable levels, so *CPT* demand and supply should be able to be maintained in relative equilibrium. In China, when *TV* makers buy tubes to produce models for export, they generally have tariff refund issues. Under such circumstances, even though they have the benefit of 6-month payment when they purchase domestically, we should still be able to maintain a stable opportunity when we *Share* their export orders.

6. Price competition is fierce on the 14" front. Irico claimed that it could still sell 14" at *usd*21~21.5, yet admitted that it has dropped its price to *usd*20.5 for some customers, such as *Skyworth*. Additionally, while *Phs* (Brazil) was competing with India's *CRT* makers, *Vestel* asked for *usd*18.9 (*ITC*), causing Irico's orders to drop dramatically from August.

- End of Report -

Respectfully submitted:
  President Jia-Fang (Jeff)Yue
  *HQ*  Assistant Vice President Sheng-Jen (S.J.)Yang / Assistant Vice President Cheng
  Vice President

Submitted by: Employee, Shih-Ming (Maxim) Chen
2003/08/25

_____
English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [  ].

CONFIDENTIAL – GRAND JURY MATERIAL                    CHU00030068.02E
                                                                   Translation

**2002 CRT Quality Performance Report For Thomson-Thailand**

Unit : PPM

| Model | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14" | Usage (pc) | 32434 | 32927 | 61367 | 69264 | 46584 | | | | | | | | 242576 |
| | Reject (p) | 24 | 27 | 37 | 41 | 39 | | | | | | | | 168 |
| | pp | 739.96 | 820.00 | 602.93 | 591.94 | 837.20 | | | | | | | | 692.57 |
| 20" | Usage (pc) | 5089 | 4308 | 3869 | 5367 | 11647 | | | | | | | | 30280 |
| | Reject (p) | 9 | 18 | 9 | 20 | 19 | | | | | | | | 75 |
| | pp | 1768.52 | 4178.27 | 2326.18 | 3726.48 | 1631.32 | | | | | | | | 2476.88 |
| 21" | Usage (pc) | 1814 | 718 | 1208 | 1000 | 648 | | | | | | | | 5388 |
| | Reject (p) | 8 | 4 | 4 | 5 | 1 | | | | | | | | 22 |
| | pp | 4410.14 | 5571.03 | 3311.26 | 5000.00 | 1543.21 | | | | | | | | 4083.15 |

| All mode | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Usage (pc) | 39337 | 37953 | 66444 | 75631 | 58879 | | | | | | | | 278244 |
| Reject (p) | 41 | 49 | 50 | 66 | 59 | | | | | | | | 265 |
| ppm | 1042.28 | 1291.07 | 752.51 | 872.66 | 1002.06 | | | | | | | | 952.40 |

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00030069E

Translation

市場接洽報告

日期：2003 年 8 月 20 日
對象：彩虹〔Irico〕進出口公司總經理 Mr.高榮國、出口營銷部長 Ms.梁援
華映：楊協理、陳時銘
內容：

1. 彩虹現共有生產線 7 條，包括 14"*2、21"FS*2、15"PF/21"PF*1、25"FS/25"PF*1 及 29"PF*1。2003 年度計劃量為 10.7M，其中包括 14"*3.62M、21"FS*3.8M、21"PF*0.6M、25"FS*1.55M、25"PF*0.5M 及 29"PF*0.6M。另今年度新產品 15"PF 雖計劃生產 50~60 萬，但市場不見成長，至今累計產量約 100K。

2. 高總經理強調彩虹一方面因其為國營企業而須以保障員工生計為優先考量，另一方面體認其並無如 LCD、PDP 等新產品發展，故在 CPT 領域即使為不歸路，也只有不論盈虧力拼到底。

3. 彩虹下半年將致力於 14"生產線之效能提升，使其明年產能(量)由今年之 3.6M 增加至 5.0M，使明年產能由 10.7M up 到 12M；另已與日立簽下兩條 21"線之買賣契約(僅約 100 多萬美元)，計劃 2004 年底投產，使 2005 年總 CPT 產能增加至 15M。

4. 由於設備折舊幾已攤提完畢，加上相關材料幾乎均自製(本身有玻璃/電子鎗/螢光粉/Mask/DY 及其他材料廠)，使其有具競爭力之成本結構，儘管市場價格競爭激烈，今年上半年仍有相當之利潤。例如其 14"在無設備折舊及如自製玻殼成本在 US$6 以下，總成本只約 USD16 左右。

5. 由於第 2 季在 SARS 等因素影響下，上半年中國各 TV 廠之預算達成度普遍不理想，隨著旺季之到來，在各 TV 廠想彌補上半年數量及搶估市場之下，儘管外銷單在 11 月後衰退，但內銷市場到明年春節前應可維持較強之需求。整體而言，CPT 及 TV 庫存均處於合理水平，CPT 供需應可維持較平衡之狀況。而在中國 TV 廠以　購管生產外銷機種時，普遍有退稅問題的情況下，儘管其在國內採購有 6 個月付款之利益，我方 Share 其外銷訂單應可維持穩定之機會。

6. 價格競爭在 14"方面尤為激烈，彩虹雖稱仍可以 usd21~21.5 銷售，但亦承認對某些客戶如 Skyworth 等已降至 usd20.5，另在 Phs(巴西)及印度 CRT 廠之競爭下，遭逢 Vestel 以 usd18.9(ITC)要價而自 8 月起訂單銳減。

以上
敬呈　　樂總經理

　　HQ 楊協理/鄭協理

　　　　副總經理



職 陳時銘敬呈
2003/08/25

## 2002 CRT Quality Performance Report For Thomson-Thailand

Unit : PPM

| Model | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14" | Usage (pc | 32434 | 32927 | 61367 | 69264 | 46584 | | | | | | | | 242576 |
| | Reject (p | 24 | 27 | 37 | 41 | 39 | | | | | | | | 168 |
| | pp | 739.96 | 820.00 | 602.93 | 591.94 | 837.20 | | | | | | | | 692.57 |
| 20" | Usage (pc | 5089 | 4308 | 3869 | 5367 | 11647 | | | | | | | | 30280 |
| | Reject (p | 9 | 18 | 9 | 20 | 19 | | | | | | | | 75 |
| | pp | 1768.52 | 4178.27 | 2326.18 | 3726.48 | 1631.32 | | | | | | | | 2476.88 |
| 21" | Usage (pc | 1814 | 718 | 1208 | 1000 | 648 | | | | | | | | 5388 |
| | Reject (p | 8 | 4 | 4 | 5 | 1 | | | | | | | | 22 |
| | pp | 4410.14 | 5571.03 | 3311.26 | 5000.00 | 1543.21 | | | | | | | | 4083.15 |

| All mode | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Usage (pc | 39337 | 37953 | 66444 | 75631 | 58879 | | | | | | | | 278244 |
| Reject (p | 41 | 49 | 50 | 66 | 59 | | | | | | | | 265 |
| ppm | 1042.28 | 1291.07 | 752.51 | 872.66 | 1002.06 | | | | | | | | 952.40 |

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00030069

# EXHIBIT 27

# (FILED UNDER SEAL)

# EXHIBIT 28

# (FILED UNDER SEAL)

# EXHIBIT 29

# (FILED UNDER SEAL)

# EXHIBIT 30



June 25, 2018

**Certification**

**Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of the document with bates numbers range: IRI-CRT-00000650 - IRI-CRT-00000652.

Hanna Kang

Project Manager

Project Number: BBLLP_1806_007

15 W. 37th Street 8th Floor
New York, NY 10018
212.581.8870
ParkIP.com



SIGNIFICANT EVENTS OF IRICO

IRICO

1977—2002

CONFIDENTIAL                                                   IRI-CRT-00000650

SIGNIFICANT EVENTS OF IRICO 1977



1977

On February 17, the party group of the Fourth Ministry of Machinery Industry reported the Party No.4 Document (1977) to the State Council and Deputy Prime Minister Li Xiannian and proposed to introduce packaged technology and equipment of color picture tube from abroad. The State Development Planning Commission also reported to the State Council in February and April regarding this matter. Li Xiannian commented that "We would like to approve this report. Color TV is very important for industry, national defense, and civilian use. It must not be omitted from the projects and it must be included in the plan when we formulate the five-year plan." The other Politburo leaders circled their names and agreed. At this point, the Party Central Committee and the State Council formally approved the restoration of the packaged technology and equipment of color picture tube project on April 13th, which was listed as a national key introduction project. The project was named "Xianyang Color Picture Tube Project", also known as "Xianyang Color TV Project" at that time.

In May, the Fourth Ministry of Machinery Industry appointed Wu Zukai as chief engineer of the factory.

In June, the Fourth Ministry of Machinery Industry formed the leading group for the introduction project and an external technical negotiation team.

On July 24, the factory site selected jointly by Shaanxi Province and the Fourth Ministry of Machinery Industry was north of the Ancun Brigade of the Battle Commune in Xianyang, Shaanxi. The number of the factory was determined as the state-owned 4400 CRT Plant.

In July, the first batch of construction workers arrived in Xi'an.

In August, Japan's Hitachi, Panasonic, Asahi Glass, Electrical Glass, DaiNippon Screen, DaiNipponToryo, and DaiNippon Printing came to China to participate in technical seminars, inquiry and quotation.

In August, Zhang Xiaochen was appointed as factory director.

In September, Xia Minyou was appointed as factory deputy director.

On November 14, under the direct leadership of the Party Central Committee, the "Color TV Engineering Campaign Leadership Team" was established. Hui Shigong, Deputy Director of the Revolutionary Committee of Shaanxi Province served as the team leader, Wang Zongjin, Deputy Minister of Fourth ministry of machinery industry served as deputy leader, and Bai Yi, Deputy Director of the Provincial Construction Commission, Yang Hua, Deputy Secretary of the Xianyang Prefectural Party Committee, Liang Feng, Deputy Director of the Fourth ministry of machinery industry Infrastructure Bureau, and Sun Kehua, the core group leader of the Provincial Electronic Bureau, were the leading group members.

CONFIDENTIAL

IRI-CRT-00000651



1978年

From January 16 to February 10, A 33-member technology delegation headed by Wang Zongjin, Deputy Minister of Fourth ministry of machinery industry went to Japan and investigated the assembly and ITC factories of Toshiba, Hitachi and Panasonic. The delegation investigated two glass factories of Asahi Glass and Electric Glass, the shadow mask manufacturing factory of Dai Nippon Printing and Screen, and corresponding magnetic material factories, deflection coil factories, power equipment factories, television factories, and research institutes, etc.

On March 9, the construction of the single building 1 in the living area was started.

From March 11 to March 19, eight companies including Toshiba, Panasonic, Hitachi, DaiNipponToryo, DaiNippon Printing, DaiNippon Screen, Japan Electric Glass, and Asahi Glass successively went to Beijing and Tianjin to negotiate contracts with us.

On March 14, the Fourth ministry of machinery industry reported the "Inspection Report on the project of Color Picture Tube Packaging in Japan" to Deputy Prime Minister Wang Zhen, Li Xiannian, Yu Qiuli, and Gu Mu, Li Xiannian and other central leaders made instructions on the CPT project.

On April 14, The CPT project construction headquarters convened the first meeting, which was chaired by Zhou Jiyi, member of the Standing Committee of Shaanxi Provincial Party Committee. This was a meeting for pre-campaign preparation and implementation of engineering tasks.

On June 17, The Communist Party of China Fourth ministry of machinery industry party group proposed and the Shaanxi Provincial Party Committee approved the establishment of the Provisional Committee of the Communist Party of China for 4400 CRT Plant. The provisional party committee consisted of Liu Xiping, Zhang Xiaochen and Xia Minyou. Liu Xiping was appointed secretary of the provisional party committee.

1978 | 2

CONFIDENTIAL

IRI-CRT-00000652



# 彩 虹 大 事 记

## SIGNIFICANT EVENTS OF IRICO

IRICO

*1977—2002*



由 扫描全能王 扫描创建

CONFIDENTIAL



彩虹 大事记 1977
SIGNIFICANT EVENTS OF IRICO

**1977年**

**2月17日**　第四机械工业部党组以(1977)党4号文报国务院及李先念副总理,提出从国外引进彩色显像管成套技术和设备。国家计委于2月和4月也为此向国务院打报告。李先念副总理批示:"拟同意这个报告。彩色电视机对工业、国防和民用都很重要,在制定五年计划时,不要在项目上漏掉,必须列入计划"。中央政治局其他领导圈阅并同意。至此,中央、国务院于4月13日正式批准恢复彩色显像管成套设备和技术项目,并列为国家重点引进项目。定名为"咸阳彩色显像管工程",当时也被称为"咸阳彩电工程"。

**5月**　第四机械工业部任命吴祖增为工厂总工程师。

**6月**　第四机械工业部组成引进项目领导小组和对外技术谈判班子。

**7月24日**　经陕西省和第四机械工业部共同选定厂址为陕西省咸阳市战斗公社安村大队以北。确定工厂编号为国营四四00厂。

**7月**　首批工程建设人员抵达西安。

**8月**　日本日立、松下、旭硝子、电气硝子、网版、涂料及印刷等公司来华参加技术座谈和询价、报价工作。

**8月**　任命张笑晨为工厂厂长。

**9月**　任命夏民友为工厂副厂长。

**11月14日**　在中央的直接领导下,成立了"彩电工程会战领导小组"。陕西省革命委员会副主任惠世恭任组长、四机部副部长王宗金任副组长,省建委副主任白毅、咸阳地委副书记杨化、四机部基建局副局长梁峰、省电子局党的核心小组组长孙克华为领导小组成员。

11

 由 扫描全能王 扫描创建

CONFIDENTIAL

IRI-CRT-00000651



1978年

SIGNIFICANT EVENTS OF IRICO

**1月16日至2月10日**　由四机部副部长王宗金同志为团长的技术考察团33人赴日本考察了东芝、日立、松下等三个公司的总装及ITC部分的工厂。考察了旭硝子、电气硝子的两个玻璃厂和大日本印刷、网版的荫罩生产厂以及相应配套的磁性材料工厂、偏转线圈工厂、动力设备工厂、电视机工厂、研究所等。

**3月9日**　生活区单身1号楼工程开工。

**3月11日至3月19日**　日本东芝、松下、日立、大日本涂料、大日本印刷、大日本网版、日本电气硝子、旭硝子等八家公司先后到京、津与我进行合同谈判。

**3月14日**　四机部向王震副总理及李先念、余秋里、谷牧副总理上报"关于彩色显像管成套项目赴日考察报告"，李先念等中央领导同志就彩管工程作出批示。

**4月14日**　彩管工程建设指挥部召开第一次会议，由陕西省委常委周吉一主持。这是一次会战前的准备和落实工程任务的会议。

**6月17日**　经中共第四机械工业部党组建议，陕西省委批准，成立中国共产党四四00厂临时委员会。临时党委由刘希平、张笑晨、夏民友三人组成。刘希平任临时党委书记。

1978 **2**


由 扫描全能王 扫描创建

CONFIDENTIAL

IRI-CRT-00000652

# EXHIBIT 31

John Taladay (*pro hac vice*)
john.taladay@bakerbotts.com
Erik Koons (*pro hac vice*)
erik.koons@bakerbotts.com
BAKER BOTTS LLP
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone: (202)-639-7700
Facsimile: (202)-639-7890

Stuart C. Plunkett (State Bar No. 187971)
stuart.plunkett@bakerbotts.com
BAKER BOTTS LLP
101 California Street, Suite 3600
San Francisco, California 94111
Telephone: (415) 291-6200
Facsimile: (415) 291-6300

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 3:07-cv-05944-SC (N.D. Cal.) |
| | MDL No. 1917 |
| This Document Relates to: | **IRICO DEFENDANTS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO INDIRECT PURCHASER PLAINTIFFS' FIRST SET OF INTERROGATORIES** |
| ALL INDIRECT PURCHASER ACTIONS | |

PROPOUNDING PARTY:      Indirect Purchaser Plaintiffs

RESPONDING PARTIES:      Irico Group Corporation
                                          Irico Display Devices Co., Ltd.

SET NUMBER:      One

1          Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico

2    Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby respond to the

3    Indirect Purchaser Plaintiffs' ("Plaintiff") First Set of Interrogatories ("Interrogatories"). Irico

4    reserves the right to amend or supplement these Objections and Responses (the "Responses") to

5    the extent allowed by the Federal Rules of Civil Procedure and the Local Rules of Practice in

6    Civil Proceedings before the United States District Court for the Northern District of California

7    ("Local Rules"). Subject to and without waiving any of Irico's General and Specific Objections as

8    set forth below, Irico is willing to meet and confer with Plaintiff regarding such General and

9    Specific Objections.

10          The following Responses are made only for purposes of this case. The Responses are

11    subject to all objections as to relevance, materiality and admissibility, and to any and all

12    objections on any ground that would require exclusion of any response if it were introduced in

13    court. All evidentiary objections and grounds are expressly reserved.

14          These Responses are subject to the provisions of the Stipulated Protective Order that the

15    Court issued on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated

16    "Confidential" in accordance with the provisions of the Protective Order.

17                                    **GENERAL OBJECTIONS**

18          Irico makes the following General Objections to Plaintiff's Interrogatories:

19          1.        Irico's Responses are based upon information available to and located by Irico as

20    of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states

21    that it has conducted, or will conduct, a diligent search, reasonable in scope, of those files and

22    records in its possession, custody, or control believed to likely contain information responsive to

23    Plaintiff's Interrogatories.

24          2.        No express, incidental, or implied admissions are intended by these Responses and

25    should not be read or construed as such.

26          3.        Irico does not intend, and its Responses should not be construed as, an agreement

27    or acquiescence with any characterization of fact, assumption, or conclusion of law contained in

28    or implied by the Interrogatories.

4.      To the extent that Irico responds to Plaintiff's Interrogatories by stating that Irico will produce or make available for examination responsive information or documents, Irico does not represent that any such information or documents exist. Irico will make a good faith and reasonable attempt to ascertain whether information responsive to Plaintiff's Interrogatories exists and is properly producible, and will produce or make available for examination non-privileged responsive materials to the extent any are located during the course of a reasonable search.

5.      Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiff.

6.      Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

7.      Irico objects to Plaintiff's Interrogatories to the extent they seek information that is not relevant to jurisdictional issues or disproportionate to the needs of the case in resolving such jurisdictional issues.

8.      Irico objects to Plaintiff's Interrogatories to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or amend its Responses.

9.      Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case.

10.      Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege

1    or immunity. Irico will provide only information that it believes to be non-privileged and

2    otherwise properly discoverable. None of Irico's responses is intended nor should be construed as

3    a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any

4    information or responsive documents subject to any such doctrine, privilege, protection or

5    immunity from production shall not constitute a general, inadvertent, implicit, subject-matter,

6    separate, independent or other waiver of such doctrine, privilege, protection or immunity from

7    production.

8         11.    Irico objects to Plaintiff's Interrogatories to the extent that they call for

9    information that is not in the possession, custody, or control of Irico. Irico also objects to the

10   extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties,

11   including but not limited to any of Irico's subsidiary or affiliated companies.

12        12.    Irico objects to Plaintiff's Interrogatories to the extent that responding would

13   require Irico to violate the privacy and/or confidentiality of a third party or confidentiality

14   agreement with a third party.

15        13.    Irico objects to Plaintiff's Interrogatories to the extent that they seek information

16   that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily

17   available from other sources.

18        14.    Irico objects to Plaintiff's Interrogatories to the extent that they seek information

19   or documents concerning transactions outside the United States. Such Interrogatories are unduly

20   burdensome and irrelevant because they do not relate to actions by Irico in or causing a direct

21   effect in the United States.  Such Interrogatories are also unduly burdensome and irrelevant to this

22   pending action as Plaintiffs' class definition is confined to "individuals and entities that indirectly

23   purchased Cathode Ray Tube Products . . . in the United States" (see Indirect Purchaser Plaintiffs'

24   Fourth Consolidated Amended Complaint).

25        15.    Irico objects to Plaintiff's Interrogatories to the extent that compliance would

26   require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body

27   of foreign jurisdictions.

28

16.     Irico's responses, whether now or in the future, pursuant to Plaintiff's Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

17.     Irico objects to Plaintiff's Interrogatories to the extent that compliance would require Irico to seek information stored on backup or archived databases or other systems that are not readily accessible or otherwise no longer active.

18.     Irico objects to Plaintiff's Interrogatories to the extent that they are compound and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

19.     Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for legal conclusions.

20.     Irico objects to the Interrogatories to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

21.     Irico objects that Plaintiff's Interrogatories are irrelevant and premature because the Court has not set a schedule for jurisdictional discovery or briefing that applies to Plaintiff.

22.     Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

### GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Irico objects to the definitions of "You" and "Your" (Definition No. 1) to the extent that Plaintiff defines those terms to include the Irico's "present and former members, officer, agents, employees, and all other persons acting or purporting to act on their behalf." This definition is legally incorrect, overbroad, unduly burdensome, vague, and ambiguous. Irico also objects to the inclusion of "all present and former directors, officers, Employees, agents, representatives or any Persons acting or purporting to act on behalf of" Irico within this definition to the extent it purports to encompass information that is protected by attorney-client privilege,

work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

2.      Irico objects to the definition of "Document" (Definition No. 8) to the extent it seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, or any other applicable laws.

3.      Irico objects to the definition of "Employee" (Definition No. 9) on the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to the extent that it seeks information protected by the attorney client or other applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or foreign law.

4.      Irico objects to the definitions of "CRT" and "CRT Products" (Definitions No. 6 and 7) on the grounds that they are vague, ambiguous and overly broad. Irico further objects to the use of the term "CRT Products" to the extent that it is inconsistent with the definition of "CRT Products" as set forth in Plaintiff's pleadings.

5.      Irico objects to Instruction No. 1 (related to identification of persons) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any orders of the Court, and on the grounds that it is vague, ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the extent it seeks information that would disclose personal confidential information and/or violate any and all rights of privacy under the United States Constitution or Article I of the Constitution of the State of California, or any other applicable law or state constitution, or that is otherwise prohibited from disclosure because to do so would cause Irico to violate legal and/or contractual obligations to any other persons or entities.

6. Irico objects to Instruction No. 2 (related to identification of an entity other than a natural person) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

7. Irico objects to Instruction No. 3 (related to the production of business records in response to an interrogatory pursuant to Federal Rule of Civil Procedure 33(d)) on the grounds that it is unduly burdensome and purports to impose burdens and obligations upon Irico beyond those required by the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

## SPECIFIC RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 16

Identify the CRTs and/or CRT Products that you manufactured or produced for each month during the Class Period, including the brand name, product number, and intended use.

### RESPONSE TO INTERROGATORY NO. 16

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this interrogatory is irrelevant and premature because the Court has not set a schedule for jurisdictional discovery or briefing that applies to Plaintiff. Irico further objects that this interrogatory seeks information beyond the scope of what is relevant to resolving jurisdictional issues and beyond that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel. Irico also objects that this interrogatory is overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving jurisdictional issues. Irico also objects to this interrogatory as overbroad as to the time period called for; the only relevant inquiry is Irico's status as of November 26, 2007.

Subject to and without waiving the objections stated above, Irico refers Plaintiff to Irico's responses to DPP's jurisdictional discovery, which were served on Plaintiff on May 4, 2018.

### SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16

Subject to and without waiving the objections stated above, Irico responds as follows:

In 1995, Irico Group sold 2,460,000 fourteen-inch CPTs and 1,390,000 twenty-one-inch

1    CPTs.  In 1996, Irico Group sold 2,280,000 fourteen-inch CPTs and 1,790,000 twenty-one-inch

2    CPTs.  In 1997, Irico Group sold 1,690,000 fourteen-inch CPTs and 2,480,000 twenty-one-inch

3    CPTs.  In 1998, Irico Group sold 2,360,000 fourteen-inch CPTs, 3,550,000 twenty-one-inch

4    CPTs, and 190,000 fifteen-inch CDTs.  In 1999, Irico Group sold 2,990,000 fourteen-inch CPTs,

5    3,040,000 twenty-one-inch CPTs, and 780,000 fifteen-inch CDTs.  In 2000, Irico Group sold

6    3,200,000 fourteen-inch CPTs and 820,000 fifteen-inch CDTs.  In 2001, Irico Group sold

7    2,380,000 fourteen-inch CPTs and 280,000 fifteen-inch CDTs.  In 2002, Irico Group sold

8    3,270,000 fourteen-inch CPTs and 4,300 fifteen-inch CDTs. In 2003, Irico Group sold 3,710,000

9    fourteen-inch CPTs, 1,010,000 twenty-one-inch CPTs, and 5,600 fifteen-inch CDTs.  In 2004,

10   Irico Group sold 3,830,000 fourteen-inch CPTs and 1,910,000 twenty-one-inch CPTs.  In 2005,

11   Irico Group sold 4,570,000 fourteen-inch CPTs and 1,550,000 twenty-one-inch CPTs.  In 2006,

12   Irico Group sold 4,030,000 fourteen-inch CPTs and 2,770,000 twenty-one-inch CPTs.  In 2007,

13   Irico Group sold 4,000,000 fourteen-inch CPTs and 3,740,000 twenty-one-inch CPTs.

14        In 1995, Irico Display sold 410,000 twenty-five-inch CPTs.  In 1996, Irico Display sold

15   850,000 twenty-five-inch CPTs.  In 1997, Irico Display sold 1,080,000 twenty-five-inch CPTs.

16   In 1998, Irico Display sold 1,340,000 twenty-five-inch CPTs.  In 1999, Irico Display sold

17   1,350,000 twenty-five-inch CPTs.  In 2000, Irico Display sold 1,510,419 twenty-five-inch CPTs

18   and 2,640,000 twenty-one-inch CPTs.  In 2001, Irico Display sold 1,440,000 twenty-five-inch

19   CPTs, 3,020,000 twenty-one-inch CPTs, and 310,000 CPTs above twenty-seven-inches.  In 2002,

20   Irico Display sold 2,090,000 twenty-five-inch CPTs, 3,590,000 twenty-one-inch CPTs, and

21   310,000 CPTs above twenty-seven-inches.  In 2003, Irico Display sold 2,480,000 twenty-five-

22   inch CPTs, 3,940,000 twenty-one-inch CPTs, and 290,000 CPTs above twenty-seven-inches.  In

23   2004, Irico Display sold 2,890,000 twenty-five-inch CPTs, 4,440,000 twenty-one-inch CPTs, and

24   73,000 CPTs above twenty-seven-inches.  In 2005, Irico Display sold 2,470,000 twenty-five-inch

25   CPTs, 4,090,000 twenty-one-inch CPTs, and 21,000 CPTs above twenty-seven-inches.  In 2005,

26   Irico Display sold 2,430,000 twenty-five-inch CPTs, 4,960,000 twenty-one-inch CPTs, and

27   16,000 CPTs above twenty-seven-inches.  In 2007, Irico Display sold 1,790,000 twenty-five-inch

28   CPTs, 4,840,000 twenty-one-inch CPTs, and 390,000 CPTs above twenty-seven-inches.

IRICO DEFENDANTS' SUPP. OBJECTIONS AND RESPONSES TO
INDIRECT PURCHASER PLAINTIFFS' FIRST SET OF INTERROGATORIES

1

**INTERROGATORY NO. 17**

2

Identify the CRTs and/or CRT Products that you sold, marketed, or distributed for each

3

month during the Class Period, including the brand name, product number, and intended use.

4

**RESPONSE TO INTERROGATORY NO. 17**

5

Irico reasserts and incorporates each of the General Objections and Objections to the

6

Definitions and Instructions set forth above.  Irico further objects that this interrogatory is

7

irrelevant and premature because the Court has not set a schedule for jurisdictional discovery or

8

briefing that applies to Plaintiff.  Irico further objects that this interrogatory seeks information

9

beyond the scope of what is relevant to resolving jurisdictional issues and beyond that authorized

10

under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel.  Irico also objects

11

that this interrogatory is overbroad, unduly burdensome, and disproportionate to the needs of the

12

case in resolving jurisdictional issues.  Irico also objects to this interrogatory as overbroad as to

13

the time period called for; the only relevant inquiry is Irico's status as of November 26, 2007.

14

Subject to and without waiving the objections stated above, Irico refers Plaintiff to Irico's

15

responses to DPP's jurisdictional discovery, which were served on Plaintiff on May 4, 2018.

16

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17**

17

Subject to and without waiving the objections stated above, Irico responds as follows:

18

See Irico's Supplemental Response to Interrogatory No. 16.

19

**INTERROGATORY NO. 18**

20

Identify every channel used by you to sell, market, or distribute CRTs and/or CRT

21

Products during the Class Period, including:

22

(a)      the identity of the entity or division that issued the invoice for the CRT and/or

23

CRT Product sale;

24

(b)      the identity of the entity to which you invoiced the CRT and/or CRT Product sale;

25

(c)      the destined country or region of CRTs and/or CRT Products;

26

(d)      the type of CRT and/or CRT Product sold or distributed through each channel;

27

If You used different channels at different points within the Class Period, identify when

28

you used each channel to sell, market, or distribute CRTs and/or CRT Products.

1  **RESPONSE TO INTERROGATORY NO. 18**

2      Irico reasserts and incorporates each of the General Objections and Objections to the

3  Definitions and Instructions set forth above.  Irico further objects that this interrogatory is

4  irrelevant and premature because the Court has not set a schedule for jurisdictional discovery or

5  briefing that applies to Plaintiff.  Irico further objects that this interrogatory seeks information

6  beyond the scope of what is relevant to resolving jurisdictional issues and beyond that authorized

7  under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to Compel.  Irico also objects

8  that this interrogatory is overbroad, unduly burdensome, and disproportionate to the needs of the

9  case in resolving jurisdictional issues.  Irico also objects to this interrogatory as overbroad as to

10 the time period called for; the only relevant inquiry is Irico's status as of November 26, 2007.

11     Subject to and without waiving the objections stated above, Irico refers Plaintiff to Irico's

12 responses to DPP's jurisdictional discovery, which were served on Plaintiff on May 4, 2018.

13 **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 18**

14     Subject to and without waiving the objections stated above and pursuant to the Special

15 Master's August 2, 2018 order (Dkt. No. 5320) regarding Direct Purchaser Plaintiffs' motion to

16 compel, Irico will (1) search for and produce pertinent documents detailing the legal relationship

17 of Irico and any exporter of Irico's CRT products into the United States throughout the class

18 period; (2) identify the locations of all repositories of electronic documents or files relating to

19 United States sales of Irico's CRT Products and the legal relationships of Irico and any entities

20 that sold Irico's CRT Products in the United States throughout the class period; (3) provide

21 summary explanations of sales records relevant to United States sales of Irico's CRT Products

22 and of "Irico's efforts to sell products in the U.S. during the class period;" and (4) identify all

23 managerial persons with knowledge of United States sales of Irico's CRT Products throughout the

24 class period and their work histories.

25

26

27

28

1  Dated:  August 7, 2018                    BAKER BOTTS LLP

2

3                                            */s/ Stuart C. Plunkett*
                                            _____
                                            Stuart C. Plunkett
4                                            Email:  stuart.plunkett@bakerbotts.com
                                            BAKER BOTTS L.L.P.
5                                            101 California Street, Suite 3600
                                            San Francisco, CA 94111
6                                            Telephone: (415) 291 6203
                                            Facsimile: (415) 291 6303
7
                                            John Taladay (*pro hac vice*)
8                                            john.taladay@bakerbotts.com
                                            Erik Koons (*pro hac vice*)
9                                            erik.koons@bakerbotts.com
                                            BAKER BOTTS LLP
10                                           1299 Pennsylvania Ave., NW
                                            Washington, D.C. 20004
11                                           Telephone: (202)-639-7700
                                            Facsimile: (202)-639-7890
12
                                            *Attorneys for Defendants*
13                                           *IRICO GROUP CORP. and*
                                            *IRICO DISPLAY DEVICES CO., LTD.*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IRICO DEFENDANTS' SUPP. OBJECTIONS AND RESPONSES TO
INDIRECT PURCHASER PLAINTIFFS' FIRST SET OF INTERROGATORIES

1

## CERTIFICATE OF SERVICE

2

**In re: Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917**

3

I declare that I am employed in the County of San Francisco, California. I am over the age of eighteen years and not a party to the within case; my business address is: Baker Botts LLP, 101 California Street, Suite 3600, San Francisco, CA 94111.

4

5

On August 7, 2018, I served the following document(s) described as:

6

**IRICO DEFENDANTS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO INDIRECT PURCHASER PLAINTIFFS' FIRST SET OF INTERROGATORIES**

7

8

on the following interested parties in this action:

9

Guido Saveri (guido@saveri.com)  
R. Alexander Saveri (rick@saveri.com)  
Geoffrey C. Rushing (grushing@saveri.com)  
Cadio Zirpoli (cadio@saveri.com)  
Matthew D. Heaphy (mheaphy@saveri.com)  
SAVERI & SAVERI, INC.  
706 Sansome St # 200,  
San Francisco, CA 94111

Mario N. Alioto (malioto@tatp.com)  
Lauren C. Capurro (laurenrussell@tatp.com)  
Joseph M. Patane (jpatane@tatp.com)  
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP  
2280 Union Street  
San Francisco, CA 94123

10

11

12

13

14

*Lead Counsel for the Direct Purchaser Plaintiffs*

*Lead Counsel for the Indirect Purchaser Plaintiffs*

15

16

17

18

[ ]    (BY OVERNIGHT DELIVERY) I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses listed above. I placed the envelope or package for collection and overnight delivery at an office or regularly utilized drop box of the overnight delivery carrier.

19

20

21

22

[ ]    (BY MAIL) by placing a true copy thereof in a sealed envelope with postage fully prepaid and addressed to the persons at the addresses as shown above. I am readily familiar with the business practice of Baker Botts LLP for collection and processing of correspondence for mailing with the United States Postal Service, and the correspondence would be deposited with United States Postal Service that same day in the ordinary course of business.

23

24

[X]    (BY ELECTRONIC MAIL) I caused such documents to be sent to the persons at the email addressed listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

25

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on August 7, 2018, 2012 at San Francisco, California.

26

27

_/s/ Stuart C. Plunkett_  
Stuart C. Plunkett

28

12

IRICO DEFENDANTS' SUPP. OBJECTIONS AND RESPONSES TO  
INDIRECT PURCHASER PLAINTIFFS' FIRST SET OF INTERROGATORIES

# EXHIBIT 32

Guido Saveri (22349)
        *guido@saveri.com*
R. Alexander Saveri (173102)
        *rick@saveri.com*
Geoffrey C. Rushing (126910)
        *grushing@saveri.com*
Cadio Zirpoli (179108)
        *cadio@saveri.com*
Matthew D. Heaphy (227224)
        *mheaphy@saveri.com*
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, California 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Lead Counsel for Direct Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-CV-5944-JST<br><br>MDL No. 1917 |
| This Document Relates To:<br><br>*ALL DIRECT PURCHASER ACTIONS* | **DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANTS IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD.'S FIRST SET OF INTERROGATORIES TO DIRECT PURCHASER PLAINTIFFS** |

PROPOUNDING PARTIES:           IRICO GROUP CORP.; IRICO DISPLAY DEVICES CO., LTD.

RESPONDING PARTIES:            ARCH ELECTRONICS, INC.; CRAGO, D/B/A DASH COMPUTERS, INC.; MEIJER, INC.; MEIJER DISTRIBUTION, INC.; NATHAN MUCHNICK, INC.; PRINCETON DISPLAY TECHNOLOGIES, INC.; RADIO & TV EQUIPMENT, INC.; STUDIO SPECTRUM, INC.; WETTSTEIN AND SONS, INC. D/B/A WETTSTEIN'S

SET NO.:                       ONE

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Direct Purchaser Plaintiffs Arch Electronics, Inc.; Crago, d/b/a Dash Computers, Inc.; Meijer, Inc.; Meijer Distribution, Inc.; Nathan Muchnick, Inc.; Princeton Display Technologies, Inc.; Radio & TV Equipment, Inc.; Studio Spectrum, Inc.; and Wettstein and Sons, Inc. d/b/a Wettstein's (together, "Plaintiffs"), by their attorneys, hereby provide the following objections to Defendants Irico Group Corp. and Irico Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs (the "Interrogatories") as follows:

## **GENERAL OBJECTIONS**

Each of the following objections is incorporated by reference into each of the responses herein:

1.     Plaintiffs and their counsel have not completed their (1) investigation of the facts relating to this case, (2) discovery in this action, or (3) preparation for trial. The following responses are therefore based upon information known at this time and are provided without prejudice to Plaintiffs' right to supplement these responses prior to trial or to produce evidence based on subsequently discovered information. Likewise, Plaintiffs' responses are based upon, and therefore limited by, Plaintiffs' present knowledge and recollection, and consequently, Plaintiffs reserve the right to make any changes to these responses if it appears at any time that inadvertent errors or omissions have been made.

2.     Plaintiffs generally object to the Interrogatories, including the Instructions and Definitions, on the ground that they purport to enlarge, expand or alter in any way the plain

1  meaning and scope of any interrogatory or to impose any obligations on Plaintiffs' responses in

2  excess of those required by the Federal Rules of Civil Procedure. Plaintiffs will respond to these

3  Interrogatories in accordance with their understanding of the obligations imposed by the Federal

4  Rules of Civil Procedure.

5         3.    Plaintiffs object to the Interrogatories, including the Instructions and Definitions, on

6  the ground that the information sought is protected by the attorney-client privilege, the attorney

7  work product doctrine, the settlement privilege, the mediation privilege or is otherwise privileged

8  and/or immune from discovery. By responding to these Interrogatories, Plaintiffs do not waive,

9  intentionally or otherwise, any attorney-client privilege, any settlement privilege, any mediation

10  privilege, attorney work-product or any other privilege, immunity or other protection that may be

11  asserted to protect any information from disclosure. Accordingly, any response or production of

12  documents or disclosure of information inconsistent with the foregoing is wholly inadvertent and

13  shall not constitute a waiver of any such privilege, immunity or other applicable protection.

14         4.    Plaintiffs object to these Interrogatories on the ground that they are compound,

15  conjunctive or disjunctive.

16         5.    Plaintiffs object to the Interrogatories on the ground that they duplicate other

17  requests, in whole or in part, made in MDL No. 1917 in violation of the Court's Order Re

18  Discovery and Case Management Protocol (April 2, 2012) (Dkt. 1128). Plaintiffs will not

19  reproduce any material that has been previously produced by another party to MDL No. 1917. *See*

20  Case Management Order, 2 (Feb. 16, 2021) (Dkt. 5907).

21         6.    Plaintiffs object to the Interrogatories on the ground that they are overly broad and

22  unduly burdensome.

23         7.    Plaintiffs object to the Interrogatories on the ground that they are vague, ambiguous,

24  redundant, harassing or oppressive.

25         8.    Plaintiffs object to the Interrogatories on the ground that they require Plaintiffs to

26  draw legal conclusions.

27         9.    Plaintiffs object to the Interrogatories on the ground that the information requested

28  is neither relevant nor proportional to the needs of the case.

10.     Plaintiffs object to the Interrogatories on the ground that they, or any portion of them, seek production of any information within the possession, custody, or control of any Defendant, or of publicly available information such that the information is obtainable from some other source that is more convenient, less burdensome or less expensive, or the production of the information will impose undue burden, inconvenience, or expense upon Plaintiffs.

11.     Plaintiffs reserve the right to modify their allegations based on additional discovery, additional analysis of existing discovery, discovery not yet completed and/or expert discovery, and Plaintiffs reserve the right to supplement and/or delete the responses given in light of further evidence and further analysis of present and subsequently acquired evidence.

12.     In addition, in accordance with the Federal Rules of Civil Procedure, Plaintiffs reserve the right to introduce evidence not yet identified herein supporting Plaintiffs' allegations, including evidence that Plaintiffs expect to further develop through the course of discovery and expert analysis.

13.     In providing responses to the Interrogatories, Plaintiffs reserve all objections as to competency, relevance, materiality, privilege, or admissibility as evidence in any subsequent proceeding in, or trial of, this or any other action for any purpose whatsoever.

14.     No incidental or implied admissions are intended in these responses. Plaintiffs' response to all or any part of any interrogatory should not be taken as an admission that: (a) Plaintiffs accept or admit the existence of any fact(s) set forth or assumed by the interrogatory; or (b) Plaintiffs have in their possession, custody or control documents or information responsive to that interrogatory; or (c) documents or information responsive to that interrogatory exist. Plaintiffs' response to all or any part of an interrogatory also is not intended to be, and shall not be, a waiver by Plaintiffs of all or any part of its objection(s) to that interrogatory.

15.     Plaintiffs object to the Interrogatories on the ground that the cumulative requests by Defendants and Co-Conspirators in this litigation exceed the permissible number set forth in the Federal Rules.

**OBJECTIONS TO CERTAIN DEFINITIONS AND INSTRUCTIONS**

1.     Plaintiffs object to the definition of "Claim Form(s)" on the grounds that the term

"or similar forms approved by the Court and sent to or otherwise made available to potential Class Members" is vague and ambiguous and requires Plaintiffs to refer to multiple documents.

2.      Plaintiffs object to the definition of "Complaint" as vague and ambiguous. Plaintiffs understand this definition to refer to DPPs' Consolidated Amended Complaint at ECF No. 436 and as modified by the Stipulation and Order at ECF No. 996.

3.      Plaintiffs object to the definition of "Control" to the extent it requires Plaintiffs to draw legal conclusions.

4.      Plaintiffs object to the definition of "Co-Conspirators" on the grounds that it is vague, ambiguous, and unintelligible. Paragraphs 105-111 of DPP's Consolidated Amended Complaint (ECF No. 436) describe CRT technology and products and do not enumerate entities.

5.      Plaintiffs object to the definition of "Document(s)" on the ground that it is overbroad boilerplate that includes irrelevant examples, such as "package inserts or other information accompanying medications." Plaintiffs further object to the extent that the definition exceeds the scope of the Federal Rules of Civil Procedure.

6.      Plaintiffs object to the definition of "Irico CRTs" as vague, ambiguous, and unintelligible. Paragraphs 37-39 of the Complaint identify the Irico entities named as Defendants to this litigation and allege that those entities manufactured, sold, and distributed CRT Products either directly or through their subsidiaries or affiliates throughout the United States. The phrase "including without limitation any Claim Form(s) that reflects purchases from Irico in Sections A, B, or C of the form" is inconsistent with the preceding language in the definition and renders the definition unintelligible.

7.      Plaintiffs object to the definition of "Verified" as vague, ambiguous, and incomplete. The citation provided does not define the term "Verified."

8.      Plaintiffs object to the definition of "You" and "Your" as vague and ambiguous as it relies on the undefined, capitalized term "Plaintiffs." If "Plaintiffs" is intended to mean the parties identified as "Responding Parties" in the Interrogatories, Plaintiffs object to the definition as overbroad in seeking discovery of class members who are not current Named Plaintiffs and have not served as Class Representatives and further object on the grounds that this definition seeks the

production of documents outside Plaintiffs' possession, custody, and control. Plaintiffs further object on the ground that attorneys and agents are included in this definition, and any response or production of documents that may subsequently occur pursuant to these Interrogatories shall not include any documents protected by the attorney-client privilege, work product doctrine, the settlement privilege, or any other applicable privileges or doctrines. Plaintiffs further object to this definition to the extent that it refers to any entity other than Plaintiffs.

9.     Plaintiffs object to the Instructions to the extent they seek to expand the requirements of the Federal Rules of Civil Procedure. Plaintiffs will respond in accordance with the Federal Rules.

## RESPONSES

## INTERROGATORY NO. 1

Identify any Document(s) that summarize, analyze, evaluate or otherwise compile any information contained in Claim Forms.

## RESPONSE TO INTERROGATORY NO. 1

In addition to Plaintiffs' General Objections and Objections to Certain Definitions and Instructions, each of which is incorporated by this reference as though fully set forth herein, Plaintiffs object to this Interrogatory on the grounds that it calls for materials that are protected by the attorney-client privilege, the work product rule, and/or other evidentiary privilege. Plaintiffs further object to this Interrogatory on the grounds that it is vague and ambiguous including in its use of the terms "summarize," "analyze," "evaluate," and "otherwise compile." Plaintiffs further object to this Interrogatory on the grounds that it is overbroad and duplicative, and harassing in that it will interfere with the ongoing claims process as to which Defendants have no interest. Plaintiffs further object to this Interrogatory on the ground that the burden on Plaintiffs to describe such an overbroad group of documents outweighs any likely benefit and is not proportional to the needs of the case. Plaintiffs further object to this Interrogatory on the grounds that it seeks discovery of absent class members and serves as an inappropriate end-run around the prohibition on discovery of absent class members. Plaintiffs further object to this Interrogatory on the grounds that it seeks irrelevant information that is not necessary or proportional. Plaintiffs further object to this

1   Interrogatory on the grounds that it seeks confidential information of absent class members in

2   violation of their privacy rights. Plaintiffs also object to this Interrogatory on the ground that it is

3   compound.

4   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1**

5          Plaintiffs hereby incorporate their previous objections and response to this interrogatory,

6   *supra*. Subject to, and without waiving the foregoing objections, Plaintiffs provide the following

7   supplemental response pursuant to an agreement with the Irico Defendants whereby the Irico

8   Defendants "will narrow the scope of the outstanding discovery requests to the information

9   provided in Paragraphs 1(a), (b) and (c) in our proposed stipulation" provided that Plaintiffs

10  provide this information and, subject to the Irico Defendants' reservation of rights, represent to

11  Plaintiffs "that at this time Irico does not intend to serve further discovery regarding the claims

12  process, the claims administrator or the absent class members." *See* Rushing July 7, 2021 Ltr.;

13  Werbel July 9, 2021 Ltr. Subject to the foregoing agreement and without waiving the foregoing

14  objections, Plaintiffs provide the following supplemental response:

15         a.     To date, Direct Purchaser Plaintiffs have identified 1,816 valid claim forms

16                submitted by settlement class members for the direct purchase of CRTs, Televisions

17                or Monitors in the United States. Of the 1,816 valid claim forms, 334 identified

18                purchases of CRTs, 1,549 identified purchases of Televisions, and 992 identified

19                purchases of Monitors.

20         b.     To date, Direct Purchaser Plaintiffs have identified no valid claims for purchases of

21                a CRT, Television or Monitor by a settlement class member from any of the Irico

22                Defendants.

23         c.     Direct Purchaser Plaintiffs have no records from any third party documenting direct

24                purchases of Irico CRTs or televisions or monitors containing Irico CRTs in the

25                United States.

26  Plaintiffs will supplement this response in accordance with Rule 26(e) of the Federal Rules of Civil

27  Procedure.

28

1

**INTERROGATORY NO. 2**

2
 Separately, for each Defendant or Co-Conspirator listed on the Claim Form, Identify:

3
 a.    The total number of submitted and Verified Claim Forms that include purchases

4
     from that Defendant or Co-Conspirator in Section A of the Claim Forms;

5
 b.    The total dollar amount of purchases from that Defendant or Co-Conspirator

6
     detailed in Section A of the submitted and Verified Claim Forms;

7
 c.    The total number of submitted and Verified Claim Forms from that Defendant or

8
     Co-Conspirator that include purchases in Section B of the Claim Forms;

9
 d.    The total dollar amount of purchases from that Defendant or Co-Conspirator

10
     detailed in Section B of the submitted and Verified Claim Forms;

11
 e.    The total number of submitted and Verified Claim Forms that include purchases

12
     from that Defendant or Co-Conspirator in Section C of the Claim Forms; and,

13
 f.    The total dollar amount of purchases from that Defendant or Co-Conspirator

14
     detailed in Section C of the submitted and Verified Claim Forms.

15

**RESPONSE TO INTERROGATORY NO. 2**

16
 In addition to Plaintiffs' General Objections and Objections to Certain Definitions and

17
 Instructions, each of which is incorporated by this reference as though fully set forth herein,

18
 Plaintiffs further object to this Interrogatory on the ground that it is vague and ambiguous as to the

19
 meaning of "Identify," "Co-Conspirator," "Verified," and "submitted." Plaintiffs further object to

20
 this Interrogatory on the ground that the burden on Plaintiffs to provide this analysis of the claims

21
 process outweighs its likely benefit and is not proportional to the needs of the case. Plaintiffs object

22
 to this Interrogatory on the ground that it is compound. Plaintiffs further object to this Interrogatory

23
 on the grounds that it calls for (or could be construed to call for) materials that are protected by the

24
 attorney-client privilege, the work product rule or other evidentiary privilege. Plaintiffs further

25
 object to this Interrogatory on the grounds that Defendants' sales information is more easily

26
 available to Defendants from their own records and from discovery already produced in this

27
 litigation. Plaintiffs further object to this Interrogatory on the grounds that it seeks discovery of

28
 absent class members and serves as an inappropriate end-run around the prohibition on discovery

of absent class members. Plaintiffs further object to this Interrogatory on the grounds that it seeks irrelevant information that is not necessary or proportional. Plaintiffs further object to this Interrogatory on the grounds that it seeks confidential information of absent class members in violation of their privacy rights. Plaintiffs further object to this Interrogatory on the grounds that it is overbroad and duplicative, and harassing in that it will interfere with the ongoing claims process as to which Defendants have no interest.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2**

Plaintiffs hereby incorporate their previous objections and response to this interrogatory, *supra*. Subject to, and without waiving the foregoing objections, Plaintiffs supplement their response as follows:

*See* supplemental response to Interrogatory No. 1, *supra*.


**INTERROGATORY NO. 3**

Identify any claims submitted involving Irico CRTs not Identified in Your response to Interrogatory No. 2.

**RESPONSE TO INTERROGATORY NO. 3**

In addition to Plaintiffs' General Objections and Objections to Certain Definitions and Instructions, each of which is incorporated by this reference as though fully set forth herein, Plaintiffs further object to this Interrogatory on the ground that it is vague and ambiguous in its use of terms "claims submitted," "Irico CRTs," and "involving." Plaintiffs further object to this Interrogatory on the grounds that it calls for (or could be construed to call for) materials that are protected by the attorney-client privilege, the work product rule or other evidentiary privilege. Plaintiffs further object to this Interrogatory on the grounds that it seeks individualized discovery of absent class members and serves as an inappropriate end-run around the prohibition on discovery of absent class members. Plaintiffs further object to this Interrogatory on the grounds that it seeks information about individualized claims that are not necessary or proportional at this stage of the litigation. Plaintiffs further object to this Interrogatory on the grounds that it seeks confidential information of absent class members in violation of their privacy rights. Plaintiffs

1    further object to this Interrogatory on the grounds that it is overbroad and duplicative, and

2    harassing in that it will interfere with the ongoing claims process as to which Defendants have no

3    interest.

4    **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3**

5            Plaintiffs hereby incorporate their previous objections and response to this interrogatory,

6    *supra*. Subject to, and without waiving the foregoing objections, Plaintiffs supplement their

7    response as follows:

8            *See* supplemental response to Interrogatory No. 1, *supra*.

9

10   DATED: July 14, 2021              By: */s/ R. Alexander Saveri*

11                                        Guido Saveri
                                          R. Alexander Saveri
12                                        Geoffrey C. Rushing
                                          Cadio Zirpoli
13                                        Matthew D. Heaphy
                                          SAVERI & SAVERI, INC.
14                                        706 Sansome Street
                                          San Francisco, California 94111
15                                        Telephone: (415) 217-6810
                                          Facsimile: (415) 217-6813
16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 33

1  BAKER BOTTS L.L.P.
   John M. Taladay (*pro hac vice*)
2  Evan J. Werbel (*pro hac vice*)
   Thomas E. Carter (*pro hac vice*)
3  Andrew L. Lucarelli (*pro hac vice*)
   700 K Street, N.W.
4  Washington, D.C. 20001
   (202)-639-7700
5  (202)-639-7890 (fax)
   Email: john.taladay@bakerbotts.com
6          evan.werbel@bakerbotts.com
           tom.carter@bakerbotts.com
7          drew.lucarelli@bakerbotts.com

8  Jonathan Shapiro (State Bar No. 257199)
   101 California Street, Suite 3600
9  San Francisco, California 94111
   (415) 291-6200
10 (415) 291-6300 (fax)
   Email: jonathan.shapiro@bakerbotts.com
11

12 *Attorneys for Defendants*
   *IRICO GROUP CORP. and*
13 *IRICO DISPLAY DEVICES CO., LTD.*

14

15                    **UNITED STATES DISTRICT COURT**

16                    **NORTHERN DISTRICT OF CALIFORNIA**

17                         **OAKLAND DIVISION**

18

19 IN RE: CATHODE RAY TUBE (CRT)          Master File No. 4:07-cv-05944-JST
   ANTITRUST LITIGATION                   (N.D. Cal.)
20
                                          MDL No. 1917
21
   This Document Relates to:             **IRICO DEFENDANTS' SIXTH**
22                                        **SUPPLEMENTAL OBJECTIONS AND**
   ALL DIRECT PURCHASER ACTIONS          **RESPONSES TO DIRECT**
23                                        **PURCHASER PLAINTIFFS' FIRST**
                                          **SET OF INTERROGATORIES**
24

25 PROPOUNDING PARTY:        Direct Purchaser Plaintiffs

26 RESPONDING PARTIES:       Irico Group Corporation
                             Irico Display Devices Co., Ltd.
27
   SET NUMBER:               One
28

   IRICO'S 6TH SUPPLEMENTAL OBJECTIONS          Master File No. 4:07-cv-05944-JST
   AND RESPONSES TO DPP'S FIRST SET             MDL No. 1917
   INTERROGATORIES

1    Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico

2    Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby provides its sixth

3    supplemental responses to the Direct Purchaser Plaintiffs' ("Plaintiff") First Set of

4    Interrogatories, dated March 12, 2010 ("Interrogatories"). Irico reserves the right to amend or

5    supplement these Objections and Responses (the "Responses") to the extent allowed by the

6    Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the

7    United States District Court for the Northern District of California ("Local Rules"). Subject to

8    and without waiving any of Irico's General and Specific Objections as set forth below, Irico is

9    willing to meet and confer with Plaintiff regarding such General and Specific Objections.

10    The following Responses are made only for purposes of this case. The Responses are

11    subject to all objections as to relevance, materiality and admissibility, and to any and all

12    objections on any ground that would require exclusion of any response if it were introduced in

13    court. All evidentiary objections and grounds are expressly reserved.

14    These Responses are subject to the provisions of the Stipulated Protective Order issued by

15    the Court on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated

16    "Confidential" in accordance with the provisions of the Protective Order.

17    **GENERAL OBJECTIONS**

18    Irico makes the following General Objections to Plaintiff's Interrogatories:

19    1.    Irico's Responses are based upon information available to and located by Irico as

20    of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states

21    that it has conducted, or will conduct, a diligent search, reasonable in scope, of those files and

22    records in its possession, custody, or control believed to likely contain information responsive to

23    Plaintiff's Interrogatories.

24    2.    No express, incidental, or implied admissions are intended by these Responses and

25    should not be read or construed as such.

26    3.    Irico does not intend, and its Responses should not be construed as, an agreement

27    or acquiescence with any characterization of fact, assumption, or conclusion of law contained in

28    or implied by the Interrogatories.

4.      To the extent that Irico responds to Plaintiff's Interrogatories by stating that Irico will produce or make available for examination responsive information or documents, Irico does not represent that any such information or documents exist. Irico will make a good faith and reasonable attempt to ascertain whether information responsive to Plaintiff's Interrogatories exists and is properly producible, and will produce or make available for examination non-privileged responsive materials to the extent any are located during the course of a reasonable search.

5.      Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiff.

6.      Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

7.      Irico objects to Plaintiff's Interrogatories to the extent they seek information that is not relevant or disproportionate to the needs of the case.

8.      Irico objects to Plaintiff's Interrogatories to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or amend its Responses.

9.      Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case.

10.      Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico will provide only information that it believes to be non-privileged and

1  otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed

2  as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any

3  information or responsive documents subject to any such doctrine, privilege, protection or

4  immunity from production shall not constitute a general, inadvertent, implicit, subject-matter,

5  separate, independent or other waiver of such doctrine, privilege, protection or immunity from

6  production.

7      11.    Irico objects to Plaintiff's Interrogatories to the extent that they call for

8  information that is not in the possession, custody, or control of Irico. Irico also objects to the

9  extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties,

10  including but not limited to any of Irico's subsidiary or affiliated companies.

11      12.    Irico objects to Plaintiff's Interrogatories to the extent that responding would

12  require Irico to violate the privacy and/or confidentiality of a third party or confidentiality

13  agreement with a third party.

14      13.    Irico objects to Plaintiff's Interrogatories to the extent that they seek information

15  that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily

16  available from other sources.

17      14.    Irico objects to Plaintiff's Interrogatories to the extent that they seek information

18  or documents concerning transactions outside the United States. Such Interrogatories are unduly

19  burdensome and irrelevant to this pending action as Plaintiffs' purported class definition is

20  confined to "all persons . . . who directly purchased a Cathode Ray Tube Product . . . in the

21  United States" (see Direct Purchaser Plaintiffs' Consolidated Amended Complaint dated March

22  16, 2009).

23      15.    Irico objects to Plaintiff's Interrogatories to the extent that compliance would

24  require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body

25  of foreign jurisdictions.

26      16.    Irico's responses, whether now or in the future, pursuant to Plaintiff's

27  Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific

28

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS     3     Master File No. 4:07-cv-05944-JST
AND RESPONSES TO DPP'S FIRST SET                MDL No. 1917
INTERROGATORIES

objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

17.     Irico objects to Plaintiff's Interrogatories to the extent that they are compound and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

18.     Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for legal conclusions.

19.     Irico objects to the Interrogatories to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

20.     Irico objects to the Interrogatories to the extent they seek information or documents that cannot be removed or transmitted outside China without violating the laws and regulations of that country, including but not limited to restrictions on the transmission of state secrets or trade secrets as those terms are defined under Chinese law.

21.     Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

## GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Irico objects to the definitions of "Defendant," "You," "Your," and "Yourself" (Definition Nos. 1 and 3) to the extent that Plaintiff defines those terms to include the Irico's "present or former employees, officers, directors, agents, predecessors, successors, parents, subsidiaries, affiliates, joint ventures or any other person acting on their behalf." This definition is overbroad, unduly burdensome, vague, and ambiguous. Irico also objects to the inclusion of all "present or former employees, officers, directors, agents . . . or any other person acting on [the] behalf [of]" Irico within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

2.     Irico objects to the definition of "Document" (Definition No. 4) to the extent it

1   seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil

2   Procedure, the Local Rules, or any other applicable laws.

3       3.      Irico objects to the definition of "Employee" (Definition No. 5) on the grounds

4   that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico

5   further objects to this definition to the extent that it attempts to impose burdens on Irico beyond

6   those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to

7   the extent that it seeks information protected by the attorney client or other applicable privilege,

8   attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or

9   foreign law.

10      4.      Irico objects to the definitions of "CRT" and "CRT Product" (Definition No. 6) on

11  the grounds that they are vague, ambiguous and overly broad. Irico further objects to the use of

12  the term "CRT Products" to the extent that it is inconsistent with the definition of "CRT

13  Products" as set forth in Plaintiff's pleadings.

14      5.      Irico objects to the definition of the "Relevant Time Period" (Definition No. 7) as

15  overbroad, unduly burdensome, and beyond the applicable statute of limitations.

16      6.      Irico objects to the definition of "Communication" (Definition No. 8) on the

17  grounds that it is vague, ambiguous, and overly broad. Irico further objects to this definition to the

18  extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of

19  Civil Procedure.

20      7.      Irico objects to the definition of "Meeting" (Definition No. 10) on the grounds that

21  the definition is overly broad, unduly burdensome, and seeks information that is neither relevant

22  nor proportionate to the needs of the case.

23      8.      Irico objects to Instruction No. 1 (related to identification of persons) to the extent

24  that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized

25  under the Federal Rules of Civil Procedure, including, without limiting the generality of the

26  foregoing, Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the

27  extent that it purports to impose burdens or obligations broader than, inconsistent with, or not

28  authorized under, the Local Rules and any orders of the Court, and on the grounds that it is vague,

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS          5          Master File No. 4:07-cv-05944-JST
AND RESPONSES TO DPP'S FIRST SET                                    MDL No. 1917
INTERROGATORIES

1   ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the

2   extent it seeks information that would disclose personal confidential information and/or violate

3   any and all rights of privacy under the United States Constitution or Article I of the Constitution

4   of the State of California, or any other applicable law or state constitution, or that is otherwise

5   prohibited from disclosure because to do so would cause Irico to violate legal and/or contractual

6   obligations to any other persons or entities.

7       9.      Irico objects to Instruction No. 2 (related to identification of an entity other than a

8   natural person) to the extent that it purports to impose burdens or obligations broader than,

9   inconsistent with, or not authorized under the Federal Rules of Civil Procedure or other applicable

10  rule or Order of this Court.

11      10.     Irico objects to Instruction No. 3 (related to the production of business records in

12  response to an interrogatory pursuant to Federal Rule of Civil Procedure 33(d)) on the grounds

13  that it is unduly burdensome and purports to impose burdens and obligations upon Irico beyond

14  those required by the Federal Rules of Civil Procedure or other applicable rule or Order of this

15  Court.

16                  **SPECIFIC RESPONSES TO INTERROGATORIES**

17  **INTERROGATORY NO. 1**

18      State the name, address, and relationship to You of each person who prepared or assisted

19  in the preparation of the responses to these interrogatories. (Do not identify anyone who simply

20  typed or reproduced the responses.)

21  **RESPONSE TO INTERROGATORY NO. 1**

22      Irico reasserts and incorporates each of the General Objections and Objections to the

23  Definitions and Instructions set forth above. Irico also objects to the extent that this request calls

24  for information and documents that are privileged under the attorney-client privilege and work

25  product doctrine.

26      Subject to and without waiving the objections stated above, Irico responds that the

27  following employees assisted in the preparation of these responses:

28      • Wenkai Zhang

---

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS          6          Master File No. 4:07-cv-05944-JST
AND RESPONSES TO DPP'S FIRST SET                        MDL No. 1917
INTERROGATORIES

1  Irico will supplement its response to this interrogatory with any additional individuals who assist

2  with preparation of supplemental responses.

3  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1**

4    Irico reasserts and incorporates each of the General Objections, Objections to the

5  Definitions and Instructions, and specific objections to Interrogatory No. 1 set forth above.

6    Subject to and without waiving the foregoing objections, Irico states as follows: Irico

7  responds that the following additional employees assisted in the preparation of these responses:

8    • Yan Yunlong

9  **INTERROGATORY NO. 3**

10    Identify each employee with pricing authority who attended any trade association during

11  the Relevant Time Period relating to CRT and/or CRT Products and state with respect to each

12  employee:

13    (a)    the trade association attended;

14    (b)    the dates of attendance;

15    (c)    any offices, chairs or committee positions held in each of the trade associations;

16  and

17    (d)    the dates which those offices, chairs or committee positions were held.

18  **RESPONSE TO INTERROGATORY NO. 3**

19    Irico reasserts and incorporates each of the General Objections and Objections to the

20  Definitions and Instructions set forth above.

21    Subject to and without waiving the objections stated above, Irico responds that it will

22  conduct a reasonable search for information responsive to this Interrogatory, if any, and

23  supplement its response as necessary.

24  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3**

25    Irico reasserts and incorporates each of the General Objections, Objections to the

26  Definitions and Instructions, and specific objections to Interrogatory No. 3 set forth above.

27    Subject to and without waiving the foregoing objections, Irico states as follows:  Irico has

28  been able to confirm the attendance of the specific individuals listed below at trade association

1    meetings during the Relevant Period.

2          Wang Zhaojie attended meetings of the China CPT Industry Association on the following

3    dates: November 6, 1998; April 2, 1999; December 9, 1999; April 6, 2000; and September 14,

4    2000.  Mr. Wang recalls attending other meetings of the China CPT Industry Association during

5    the Relevant Period but cannot recall any specific dates.  Wang Zhaojie did not hold any offices,

6    chairs or committee positions in the China CPT Industry Association.

7          Wang Ximin attended meetings of the China CPT Industry Association during the

8    Relevant Period but cannot recall any specific dates.  Wang Ximin did not hold any offices, chairs

9    or committee positions in the China CPT Industry Association.

10   **INTERROGATORY NO. 5**

11         Identify any meeting or communication between You and other producers of CRT and/or

12   CRT Products during the Relevant Time Period, including the named Defendants in this

13   coordinated proceeding, regarding CRT and/or CRT Product pricing, price increase

14   announcements, terms or conditions of sales, profit margins or market share, production levels,

15   inventory, customers, auctions, reverse auctions, dynamic bidding events, or sales, and for each

16   such meeting or communication:

17         (a)      provide the date and location of the meeting or communication;

18         (b)      identify the person(s) who initiated, called, organized, attended or participated in

19   the meeting or communication;

20         (c)      describe the subject matter discussed and any information you provided or

21   received;

22         (d)      describe every action taken by you as a result of the meeting or communication;

23   and

24         (e)      identify all persons with knowledge relating to the meeting or communication.

25   **RESPONSE TO INTERROGATORY NO. 5**

26         Irico reasserts and incorporates each of the General Objections and Objections to the

27   Definitions and Instructions set forth above.  Irico also objects that this interrogatory is

28   duplicative and cumulative of other requests served on Irico, including during jurisdictional

1    discovery.

2          Subject to and without waiving the objections stated above, Irico responds that it has

3    already provided information responsive to this interrogatory to Plaintiff in its responses to

4    jurisdictional discovery, including Irico's response to Request No. 10 of Direct Purchaser

5    Plaintiff Studio Spectrum, Inc's First Set of Requests for Production.  Irico will conduct a

6    reasonable search for additional information responsive to this interrogatory, if any, and

7    supplement its response as necessary.

8    **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5**

9          Irico reasserts and incorporates each of the General Objections, Objections to the

10   Definitions and Instructions, and specific objections to Interrogatory No. 5 set forth above. Irico

11   also objects to this interrogatory to the extent it purports to require Irico to respond beyond the

12   scope of the modification to Interrogatory No. 5 removing CRT Products from the scope of this

13   interrogatory, as stated in the February 5, 2021 letter from R. Alexander Saveri to John Taladay.

14         Subject to and without waiving the foregoing objections, Irico states as follows: Wang

15   Zhaojie identifies the following meetings or communications with other producers of CRTs:

16         •   November 6, 1998 meeting in Xi'an, People's Republic of China to discuss China
17             CDT market information attended by Wang Zhaojie.

18         •   April 2, 1999 meeting in Nanjing, People's Republic of China to discuss China
19             CDT market information attended by Wang Zhaojie.

20         •   April 6, 2000 meeting in Xiamen, People's Republic of China to discuss China
21             CDT market information attended by Wang Zhaojie.

22         •   A meeting taking place on an unknown date at a SEG Hitachi factory in Shenzhen,
23             People's Republic of China, attended by Wang Zhaojie.

24         Wang Zhaojie believes that he may have attended additional meetings with other

25   producers of CRTs between 1998-2000, but he cannot recall the specifics of those meetings.

26   Such meetings may have occurred in Beijing and Changsha, People's Republic of China.  Wang

27   Zhaojie did not attend any meetings outside of China.  Wang Zhaojie believes he met with one or

28   more representatives of the following Chinese CRT producers: Shenzhen or Tianjin Samsung

---

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS          9          Master File No. 4:07-cv-05944-JST
AND RESPONSES TO DPP'S FIRST SET                                    MDL No. 1917
INTERROGATORIES

SDI, Shanghai Yongxin, Changsha LG, Fuzhou Chunghwa, Beijing Matsushita, Shenzhen SEG Hitachi, and/or Dongguan Fudi.  He could not recall the specific entities that participated in each individual meeting.  Wang Zhaojie could not recall the names of the individual(s) from the various entities who attended each meeting, but believes the various attendees included Wong Lian (Changsha LG), Yang Guojun (Shenzhen SEG Hitachi), Li Mingzhi (either Shenzhen or Tianjin Samsung SDI), and/or J.S. Lu (Fuzhou Chunghwa).  The subject matter of these communications and meetings involved information on Chinese CRT issues and market conditions.  Irico believes these meetings were largely connected to the China CPT Industry Association.

In addition, Su Xiaohua, then the Deputy General Manager for Planning in the Irico Sales Company, recalls attending an event, with an unknown Irico employee, hosted by Skyworth, a Chinese television manufacturer and customer of Irico, at which he interacted with other CRT manufacturers.  This event was organized by Skyworth and involved companies from throughout Skyworth's supply chain, not just CRT manufacturers.  Irico is not aware of any discussions with other CRT manufacturers at this meeting regarding pricing, price increase announcements, terms or conditions of sales, profit margins or market share, production levels, inventory, other customers, auctions, reverse auctions, dynamic bidding events, or sales.

Irico continues to conduct a reasonable search for information responsive to Interrogatory No. 5 as reflected in the March 31, 2021 Special Master's Order re DPPs' Motion to Compel Responses to Interrogatory Nos. 4 & 5, ECF No. 5919. Irico will provide an additional supplemental response by May 10, 2021.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 5 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Wang Ximin believes that he attended no more than a few meetings with other producers of CRTs during the relevant period but cannot recall the specifics of those meetings.  Such meetings may have occurred in Xianyang or Dongguan, People's Republic of China.  Wang Ximin did not

1   attend any meetings outside of China.  Wang Ximin believes he met with one or more

2   representatives of the following Chinese CRT producers during these few meetings but cannot

3   recall specifically: Shenzhen Samsung SDI, Shanghai Yongxin, Changsha LG, Fuzhou

4   Chunghwa, Beijing Matsushita, Shenzhen SEG Hitachi, Nanjing LG Philips and/or Dongguan

5   Fudi. Wang Ximin could not recall the names of the individual(s) from the various entities who

6   attended each meeting or who attended each of the few meetings, but he believes the various

7   attendees would have included Yang Guojun (SEG Hitachi), Zhu Danlin (Shanghai Yongxin),

8   Fang Wenqiang (Beijing Matsushita), Qian Xiaolan (Dongguan Fudi), and/or Yang Xiangjie

9   (Fuzhou Chunghwa).  Wang Ximin also believes he may have spoken with some of these

10   representatives of other Chinese CRT producers by phone on a few occasions during the relevant

11   period but cannot recall the specifics of any such phone calls.  The subject matter of these

12   communications and meetings involved information on Chinese CRT issues and market

13   conditions.  Irico believes these meetings were largely connected to the China CPT Industry

14   Association.

15   **THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5**

16          Irico reasserts and incorporates each of the General Objections, Objections to the

17   Definitions and Instructions, and specific objections to Interrogatory No. 5 set forth above.

18          Subject to and without waiving the foregoing objections, Irico states as follows: Irico

19   identifies the following additional meetings or communications with other producers of CRTs:

20   • December 9, 1999 meeting in Suzhou, People's Republic of China attended by

21          Wang Zhaojie.  Mr. Wang does not recall the content of the meeting but recalls

22          that Song Shizhen accompanied him on this trip.

23   • January 13, 2000 meeting in Xi'an, People's Republic of China.  Irico's records

24          indicate that Yao Jun incurred a fee related to a CDT industry meeting at the Hotel

25          Royal Xi'an on January 13, 2000.  Following a reasonable search for other

26          responsive information, Irico could not ascertain any details of this meeting.

27   • September 14, 2000 meeting in Changsha, People's Republic of China attended by

28          Wang Zhaojie.  Mr. Wang does not recall the content of the meeting but recalls

1    that it was organized by LG and also attended by Yang Zhen, a representative of

2    another CRT producer.

3    Irico also provides the following information based on its review of its travel

4    reimbursement records from the Relevant Period:

5    •   Irico understands that Plaintiff alleges that a meeting between CRT producers took

6        place in Fuzhou, People's Republic of China on October 9, 1998.  Irico's records

7        indicate that Wei Jianshe traveled to Fuzhou on or around this date.  Following a

8        reasonable search for other responsive information, Irico could not confirm that

9        Mr. Wei met with competitors during this trip, nor could it confirm the details of

10       the meeting as alleged by plaintiffs.

11   •   Irico understands that Plaintiff alleges that meetings between CRT producers took

12       place in Beijing, People's Republic of China on December 8 through 10, 1998.

13       Irico's records indicate that Li Weisheng and Ma Jinquan traveled to Beijing on or

14       around these dates.   Following a reasonable search for other responsive

15       information, Irico could not confirm that Li Weisheng or Ma Jinquan met with

16       competitors during this trip, nor could it confirm the details of the meeting as

17       alleged by plaintiffs.

18   •   Irico understands that Plaintiff alleges that a meeting between CRT producers took

19       place on June 22, 1999.  Irico's records indicate that Li Weisheng traveled to

20       Shanghai, People's Republic of China on or around this date.  Following a

21       reasonable search for other responsive information, Irico could not confirm that

22       Mr. Li met with competitors during this trip, nor could it confirm the details of the

23       meeting as alleged by plaintiffs.

24   •   Irico understands that Plaintiff alleges that a meeting between CRT producers took

25       place in Nanjing, People's Republic of China on August 5, 1999.  Irico's records

26       indicate that Wang Zhaojie traveled to Nanjing on or around this date.  Mr. Wang

27       did not recall attending this alleged meeting.  Following a reasonable search for

28       other responsive information, Irico could not confirm that Mr. Wang met with

1    competitors during this trip, nor could it confirm the details of the meeting as

2    alleged by plaintiffs.

3    • Irico understands that Plaintiff alleges that a meeting between CRT producers took

4       place in Tianjin, People's Republic of China on October 12, 1999.  Irico's records

5       indicate that Wang Zhaojie traveled to Tianjin on or around this date.  Mr. Wang

6       did not recall attending this alleged meeting.  Following a reasonable search for

7       other responsive information, Irico could not confirm that Mr. Wang met with

8       competitors during this trip, nor could it confirm the details of the meeting as

9       alleged by plaintiffs.

10   • Irico understands that Plaintiff alleges that a meeting between CRT producers took

11      place in Nanjing, People's Republic of China on November 9, 2000.  Irico's

12      records indicate that Zhang Hushan traveled to Nanjing on or around this date.

13      Following a reasonable search for other responsive information, Irico could not

14      confirm that Zhang Hushan met with competitors during this trip, nor could it

15      confirm the details of the meeting as alleged by plaintiffs.

16   • Irico understands that Plaintiff alleges that a meeting between CRT producers took

17      place in Shanghai, People's Republic of China on November 21, 2006.  Irico's

18      records indicate that Shen Xiaolin traveled to Shanghai on or around this date.

19      Following a reasonable search for other responsive information, Irico could not

20      confirm that Shen Xiaolin met with competitors during this trip, nor could it

21      confirm the details of the meeting as alleged by plaintiffs.

22   **INTERROGATORY NO. 6**

23       Identify each instance during the Relevant Time Period in which You or any other

24   producer of CRT and/or CRT Products, including the named defendants in this coordinated

25   proceeding, instituted a price increase or decrease for CRT and/or CRT Products, and for each

26   such instance:

27       (a)    when such price increase or decrease was announced publicly;

28       (b)    when such price increase or decrease was implemented;

(c)     the amount of the price increase or decrease;

(d)     whether such price increase or decrease was withdrawn;

(e)     each person with responsibility for implementing such price increase or decrease or its withdrawal; and

(f)     any explanation given for such price increase or decrease or withdrawal.

**RESPONSE TO INTERROGATORY NO. 6**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico also objects to the extent that this interrogatory calls for information regarding "any other producer" and thus seeks information outside of Irico's possession, custody or control.

Subject to and without waiving the objections stated above, Irico responds that it will conduct a reasonable search for information responsive to this Interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 6 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico has not identified any systematic tracking of its CRT prices or information on the announcement, implementation, withdrawal, or explanations for CRT price changes during the Relevant Period. Irico refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT and CRT Product sales records.  Irico further directs Plaintiff to documents IRI-CRT-00004295-303; IRI-CRT-00005349-400; IRI-CRT-00005401-515; IRI-CRT-00008843-880 IRI-CRT-00010133-204; IRI-CRT-00028958-964; IRI-CRT-00030226-241; and IRI-CRT-00030462-503 for the answer to this Interrogatory under Federal Rule of Civil Procedure 33(d).  Irico has conducted a reasonable search for other information responsive to this Interrogatory and has located no additional information beyond that described above.

**INTERROGATORY NO. 7**

Identify and describe all joint ventures, partnerships or other cooperative business

1  relationships, during the Relevant Time Period, relating to CRT and/or CRT Products between

2  You and any other CRT or CRT Products producer.

3  **RESPONSE TO INTERROGATORY NO. 7**

4      Irico reasserts and incorporates each of the General Objections and Objections to the

5  Definitions and Instructions set forth above.  Irico also objects that this interrogatory is

6  duplicative and cumulative of other requests served on Irico, including during jurisdictional

7  discovery.

8      Subject to and without waiving the objections stated above, Irico responds that it has

9  already provided information responsive to this interrogatory to Plaintiff in its responses to

10  jurisdictional discovery, including documents produced in response to Request No. 2 of Direct

11  Purchaser Plaintiff Studio Spectrum, Inc.'s First Set of Requests for Production.  Irico will

12  conduct a reasonable search for additional information responsive to this interrogatory, if any, and

13  supplement its response as necessary.

14  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7**

15      Irico reasserts and incorporates each of the General Objections, Objections to the

16  Definitions and Instructions, and specific objections to Interrogatory No. 7 set forth above.

17      Subject to and without waiving the foregoing objections, Irico states as follows:

18      **Shenzhen Irico-Huangqi Information Electronics Co. Ltd.**

19      Shenzhen Irico-Huangqi Information Electronics Co. Ltd. ("Irico Huangqi") was formed

20  on July 2, 1996 as a joint venture between Irico Group and Hong Kong Riyili Co., Ltd.  From

21  July 2, 1996 to August 15, 2002, Irico Group held 60% of the equity of Irico Huangqi and Hong

22  Kong Riyili Co., Ltd. held 40%.  From August 15, 2002 until Irico Huangqi's dissolution in 2006,

23  Irico Group held 33.13% of the company's equity, Gansu Languang Technology Corp. held

24  41.37%, and Hexin Technology Co., Ltd. held 25%.  Irico Huangqi was formally dissolved in

25  2006 and its remaining assets sold at auction.

26      Irico Huangqi's approved scope of business included the research, development,

27  manufacture, and sale of monitors, peripheral equipment, and other electronic devices.  Irico

28  Huangqi's primary business was the manufacture and sale of computer monitors, at least some of

1   which were manufactured using CDTs sold by Irico to Irico Huangqi.  Irico Huangqi did not sell

2   CRTs (except as integrated into monitors) and to Irico's knowledge did not export any products

3   outside of China.

4   <center>**Irico (USA) Inc.**</center>

5       Irico (USA) Inc. ("Irico USA") was incorporated in California on July 5, 1995 as a joint

6   venture between Irico (Hong Kong) Co. ("Irico Hong Kong"), China National Electronics Import

7   & Export Caihong Co. ("CNEIECC"), an independent state-owned entity, and two U.S.

8   individuals named Xueli Huang and Mike Huang.  Irico Hong Kong held a 45.7% stake in Irico

9   USA, while CNEIECC held at 34.3% stake and Xueli and Mike Huang each held 10%.  On

10   February 26, 1998, Xueli and Mike Huang divested from Irico USA, leaving Irico Hong Kong

11   and CNEIECC as the sole owners.  In 1999, CNEIECC sold its ownership stake to Irico Group.

12   On March 9, 2000, Irico Group authorized Liu Feng, General Manager of Irico USA, to sell Irico

13   USA and return the resulting funds to Irico Group.  However, on April 10, 2001, Irico

14   understands that Liu Feng sold the entire company to California-based INB Co. and absconded

15   with the proceeds.  At the time of the transaction, Liu Feng was listed as the operator of INB Co.

16   Then, on May 7, 2001, shortly after the transfer, Sun Xiaolin replaced Liu Feng as the registered

17   operator of INB Co.  Irico USA was dissolved on February 28, 2003.

18       According to the Shaanxi Province People's Government decree establishing Irico USA,

19   the purpose of establishing Irico USA was to expand provincial exports of electromechanical

20   products to North America and to develop trade, investment, and cooperation between China and

21   the United States.  (*See* IRI-CRT-00003498.)  Irico understands from CNEIECC invoice records

22   produced during jurisdictional discovery that CNEIECC sold small volumes of Irico CRTs to

23   Irico USA on several occasions between 1996 and 1999.  However, the invoices indicate that all

24   such sales were shipped to countries other than the United States, including South Africa, Egypt,

25   and China (*see* IRI-CRT-00003561 through -597) with no products delivered to the United States

26   or any United States customer.  Irico is not aware of Irico USA ever manufacturing, marketing,

27   selling, or distributing any CRTs or CRT Products in the United States.

28       Irico further directs Plaintiff to document IRI-CRT-00003490 for the answer to this

1    Interrogatory under Federal Rule of Civil Procedure 33(d).

2    **INTERROGATORY NO. 8**

3        Identify every channel used by You to sell, market, or distribute CRT and/or CRT

4    Products during the Relevant Time Period. If You used different channels at different points

5    within the Relevant Time Period, identify when You used each channel to sell, market, or

6    distribute CRT and/or CRT Products.

7    **RESPONSE TO INTERROGATORY NO. 8**

8        Irico reasserts and incorporates each of the General Objections and Objections to the

9    Definitions and Instructions set forth above.  Irico further objects to the undefined term "channel"

10   as vague, ambiguous, and subject to multiple interpretations.  Irico also objects that this

11   interrogatory is duplicative and cumulative of other requests served on Irico, including during

12   jurisdictional discovery.

13       Subject to and without waiving the objections stated above, Irico responds that it has

14   already provided information responsive to this interrogatory to Plaintiff in its responses to

15   jurisdictional discovery, including Irico's response to Interrogatory No. 18 of Indirect Purchaser

16   Plaintiff's First Set of Interrogatories.  Irico will conduct a reasonable search for additional

17   information responsive to this interrogatory, if any, and supplement its response as necessary.

18   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8**

19       Irico reasserts and incorporates each of the General Objections, Objections to the

20   Definitions and Instructions, and specific objections to Interrogatory No. 8 set forth above.

21       Subject to and without waiving the foregoing objections, Irico states as follows:  From

22   1995 to 2004, Irico Group and Irico Display sold CRTs through the Irico Sales Company, an

23   entity within Irico Group that was responsible at that time for sales of all companies under Irico

24   Group.  Sales during this period were made almost exclusively in China (99.2%) and negotiated

25   by the Irico Sales Company and recorded under the name of the specific company that produced

26   the CRT, *i.e.*, Irico Group or Irico Display.  Neither Irico Group nor Irico Display exported any

27   products to North America.

28       Following a corporate restructuring in 2004 that included the formation of Irico Group

1   Electronics Co. Ltd. ("Irico Electronics"), the Irico Sales Company transitioned to a sales

2   department responsible for the sales of Irico Display and Irico Electronics, and Irico Group

3   ceased the sale of CRTs under its own name.  Starting at that time and continuing through the

4   remainder of the Relevant Period, sales by Irico Display and Irico Electronics were made directly

5   by each company.  During this period, Irico Display and Irico Electronics also sold some CRTs

6   internally to Xi'an Caihui Display Technology Co. Ltd. ("Xi'an Caihui") and Xi'an Cairui

7   Display Technology Co. Ltd. ("Xi'an Cairui"), subsidiaries of Irico Display and Irico Group,

8   respectively, located within the Xi'an Export Processing Zone for the purpose of enjoying

9   preferential tax policies on their exports.  Neither Xi'an Caihui nor Xi'an Cairui exported any

10  products to the United States during the Relevant Period.

11  **INTERROGATORY NO. 9**

12      Identify every channel used by you to purchase CRT and/or CRT Products during the

13  Relevant Time Period. If You used different channels at different points within the Relevant Time

14  Period, identify when You used each channel to purchase CRT or CRT Products.

15  **RESPONSE TO INTERROGATORY NO. 9**

16      Irico reasserts and incorporates each of the General Objections and Objections to the

17  Definitions and Instructions set forth above. Irico further objects to the undefined term "channel"

18  as vague, ambiguous, and subject to multiple interpretations.

19      Subject to and without waiving the objections stated above, Irico responds that it will

20  conduct a reasonable search for information responsive to this Interrogatory, if any, and

21  supplement its response as necessary.

22  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9**

23      Irico reasserts and incorporates each of the General Objections, Objections to the

24  Definitions and Instructions, and specific objections to Interrogatory No. 9 set forth above.

25      Subject to and without waiving the foregoing objections, Irico states as follows: Irico has

26  conducted a reasonable search for information responsive to this Interrogatory and has located no

27  information regarding purchases by Irico of CRTs or CRT Products.

28

1    **INTERROGATORY NO. 10**

2        Identify the CRT and/or CRT Products that You manufactured or produced for each

3    month within the Relevant Time Period, including the brand name, product number, and intended

4    use.

5    **RESPONSE TO INTERROGATORY NO. 10**

6        Irico reasserts and incorporates each of the General Objections and Objections to the

7    Definitions and Instructions set forth above.  Irico also objects that this interrogatory is

8    duplicative and cumulative of other requests served on Irico, including during jurisdictional

9    discovery.

10       Subject to and without waiving the objections stated above, Irico responds that it has

11   already provided information responsive to this interrogatory to Plaintiff in its responses to

12   jurisdictional discovery, including Irico's response to Interrogatory No. 16 of Indirect Purchaser

13   Plaintiffs' First Set of Interrogatories.  Irico will conduct a reasonable search for additional

14   information responsive to this interrogatory, if any, and supplement its response as necessary.

15   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10**

16       Irico reasserts and incorporates each of the General Objections, Objections to the

17   Definitions and Instructions, and specific objections to Interrogatory No. 10 set forth above.

18       Subject to and without waiving the foregoing objections, Irico states as follows:  Irico

19   refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT sales records,

20   which contain information on specific sizes and types of CRTs sold by Irico at specific times

21   during the Relevant Period.  Irico further directs Plaintiff to documents IRI-CRT-00031179

22   through -31215 for the answer to this Interrogatory under Federal Rule of Civil Procedure 33(d).

23   **INTERROGATORY NO. 11**

24       Identify the CRT and/or CRT Products You sold, marketed, or distributed for each month

25   within the Relevant Time Period, including the brand name, product number, and intended use.

26   **RESPONSE TO INTERROGATORY NO. 11**

27       Irico reasserts and incorporates each of the General Objections and Objections to the

28   Definitions and Instructions set forth above.  Irico also objects that this interrogatory is

1  duplicative and cumulative of other requests served on Irico, including during jurisdictional

2  discovery.

3        Subject to and without waiving the objections stated above, Irico responds that it has

4  already provided information responsive to this interrogatory to Plaintiff in its responses to

5  jurisdictional discovery, including Irico's response to Interrogatory No. 17 of Indirect Purchaser

6  Plaintiffs' First Set of Interrogatories.  Irico will conduct a reasonable search for additional

7  information responsive to this interrogatory, if any, and supplement its response as necessary.

8  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11**

9        Irico reasserts and incorporates each of the General Objections, Objections to the

10  Definitions and Instructions, and specific objections to Interrogatory No. 11 set forth above.

11        Subject to and without waiving the foregoing objections, Irico states as follows:  Irico

12  refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT sales records,

13  which contain information on specific sizes and types of CRTs sold by Irico at specific times

14  during the Relevant Period.  Irico has conducted a reasonable search for other information

15  responsive to this Interrogatory and has located no additional information beyond that

16  summarized in the spreadsheet.

17  **INTERROGATORY NO. 12**

18        Provide Your sales of CRT and/or CRT Products to the United States and globally for

19  each month from January 1, 1991 to the present. For each month during this period, state the

20  volume of sales, the U.S. dollar value of sales, the unit sale price, the per unit cost to produce

21  CRT and/or CRT Products, the per unit cost to distribute CRT and/or CRT Products (including

22  overseas freight, tariff, customs, duties, inland freight, storage, insurance, dealer commissions),

23  and the per unit profit earned.

24  **RESPONSE TO INTERROGATORY NO. 12**

25        Irico reasserts and incorporates each of the General Objections and Objections to the

26  Definitions and Instructions set forth above. Irico further objects to this interrogatory as

27  overbroad and unduly burdensome as it requests information outside of Plaintiff's purported

28  "Relevant Time Period."  Irico also objects that this interrogatory is duplicative and cumulative of

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS     20     Master File No. 4:07-cv-05944-JST
AND RESPONSES TO DPP'S FIRST SET     MDL No. 1917
INTERROGATORIES

1  other requests served on Irico, including during jurisdictional discovery.

2      Subject to and without waiving the objections stated above, Irico responds that it has

3  already provided information responsive to this interrogatory to Plaintiff in its responses to

4  jurisdictional discovery, including Irico's responses to Request No. 9 of Direct Purchaser Plaintiff

5  Studio Spectrum, Inc.'s Requests for Production and Interrogatories No. 1 and 3 of Indirect

6  Purchaser Plaintiffs' Second Set of Interrogatories.  Irico will conduct a reasonable search for

7  additional information responsive to this interrogatory, if any, and supplement its response as

8  necessary.

9  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12**

10     Irico reasserts and incorporates each of the General Objections, Objections to the

11  Definitions and Instructions, and specific objections to Interrogatory No. 12 set forth above.

12     Subject to and without waiving the foregoing objections, Irico states as follows: Irico

13  refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT and CRT Product

14  sales records.  Irico has conducted a reasonable search for other information responsive to this

15  Interrogatory and has located no additional information beyond that summarized in the

16  spreadsheet(s).

17  **INTERROGATORY NO. 13**

18     If You offered different prices to different markets, or on a spot market versus contract

19  basis, during the Relevant Time Period, so indicate in the statistical data supplied in response to

20  Interrogatory No. 6.

21  **RESPONSE TO INTERROGATORY NO. 13**

22     Irico reasserts and incorporates each of the General Objections and Objections to the

23  Definitions and Instructions set forth above.  Irico further objects to the terms "markets," "spot

24  markets" and "contract basis" as vague, ambiguous, and subject to multiple interpretations.

25     Subject to and without waiving the objections stated above, Irico responds that it will

26  conduct a reasonable search for information responsive to this Interrogatory, if any, and

27  supplement its response as necessary.

28  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13**

1    Irico reasserts and incorporates each of the General Objections, Objections to the

2    Definitions and Instructions, and specific objections to Interrogatory No. 13 set forth above.

3    Subject to and without waiving the foregoing objections, Irico states as follows: Irico

4    refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT and CRT Product

5    sales records.  Irico has conducted a reasonable search for other information responsive to this

6    Interrogatory and has located no additional information beyond that summarized in the

7    spreadsheet(s).

8    **INTERROGATORY NO. 14**

9    Provide Your aggregate purchases (in both number of units and revenue in U.S. dollars) of

10   CRT and/or CRT Products for each month from January 1, 1991 to the present.

11   **RESPONSE TO INTERROGATORY NO. 14**

12   Irico reasserts and incorporates each of the General Objections and Objections to the

13   Definitions and Instructions set forth above. Irico further objects to this interrogatory as

14   overbroad and unduly burdensome as it requests information outside of Plaintiff's purported

15   "Relevant Time Period."

16   Subject to and without waiving the objections stated above, Irico responds that it will

17   conduct a reasonable search for information responsive to this Interrogatory, if any, and

18   supplement its response as necessary.

19   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14**

20   Irico reasserts and incorporates each of the General Objections, Objections to the

21   Definitions and Instructions, and specific objections to Interrogatory No. 14 set forth above.

22   Subject to and without waiving the foregoing objections, Irico states as follows: Irico has

23   conducted a reasonable search for information responsive to this Interrogatory and has located no

24   information regarding purchases by Irico of CRTs or CRT Products.

25   **INTERROGATORY NO. 15**

26   Provide Your aggregate purchases (in units and U.S. dollars) of CRT or CRT Products

27   from each of the other named defendants in this coordinated proceeding, for the purpose of resale,

28   for each month during from January 1, 1991 to the present.

1    **RESPONSE TO INTERROGATORY NO. 15**

2         Irico reasserts and incorporates each of the General Objections and Objections to the

3    Definitions and Instructions set forth above. Irico further objects to this interrogatory as

4    overbroad and unduly burdensome as it requests information outside of Plaintiff's purported

5    "Relevant Time Period."

6         Subject to and without waiving the objections stated above, Irico responds that it will

7    conduct a reasonable search for information responsive to this Interrogatory, if any, and

8    supplement its response as necessary.

9    **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15**

10        Irico reasserts and incorporates each of the General Objections, Objections to the

11   Definitions and Instructions, and specific objections to Interrogatory No. 15 set forth above.

12        Subject to and without waiving the foregoing objections, Irico states as follows: Irico has

13   conducted a reasonable search for information responsive to this Interrogatory and has located no

14   information regarding purchases by Irico of CRTs or CRT Products.

15

16

17   Dated:  January 7, 2022                    BAKER BOTTS L.L.P.

18

19                                             */s/ John M. Taladay*

20                                             John M. Taladay (*pro hac vice*)
                                               Evan J. Werbel (*pro hac vice*)
21                                             Thomas E. Carter (*pro hac vice*)
                                               Andrew L. Lucarelli (*pro hac vice*)
22                                             700 K Street, N.W.
                                               Washington, D.C. 20001
23                                             (202)-639-7700
                                               (202)-639-7890 (fax)
24                                             Email: john.taladay@bakerbotts.com
                                                      evan.werbel@bakerbotts.com
25                                                    tom.carter@bakerbotts.com
                                                      drew.lucarelli@bakerbotts.com
26
                                               Jonathan Shapiro (State Bar No. 257199)
27                                             101 California Street, Suite 3600
                                               San Francisco, California 94111
28                                             (415) 291-6200

---

1

(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

2

3

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **CERTIFICATE OF SERVICE**

2   **In re: Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917**

3          I declare that I am employed in Washington, District of Columbia.  I am over the age of

4   eighteen years and not a party to the within case; my business address is:  Baker Botts L.L.P., 700

5   K Street, N.W., Washington, D.C. 20001.

6          On January 7, 2022, I served the following document(s) described as:

7   **IRICO DEFENDANTS' SIXTH SUPPLEMENTAL OBJECTIONS AND RESPONSES
    TO DIRECT PURCHASER PLAINTIFFS'**

8   **FIRST SET OF INTERROGATORIES**

9   on the following interested parties in this action:

10

11  R. Alexander Saveri (rick@saveri.com)          Mario N. Alioto (malioto@tatp.com)
    Geoffrey C. Rushing (grushing@saveri.com)      Lauren C. Capurro (laurenrussell@tatp.com)
    Matthew D. Heaphy (mheaphy@saveri.com)         TRUMP ALIOTO TRUMP & PRESCOTT LLP

12  SAVERI & SAVERI, INC.                          2280 Union Street
    706 Sansome St # 200                           San Francisco, CA 94123

13  San Francisco, CA 94111

14  *Lead Counsel for the Direct Purchaser
    Plaintiffs*                                    *Lead Counsel for the Indirect Purchaser*

15                                                 *Plaintiffs*

16

17  Joseph Goldberg (jg@fbdlaw.com)                Dan Birkhaeuser
    FREEDMAN BOYD HOLLANDER                        (dbirkhaeuser@bramsonplutzik.com)

18  GOLDBERG URIAS & WARD P.A.                     BRAMSON, PLUTZIK, MAHLER &
    20 First Plaza, Suite 700                      BIRKHAEUSER, LLP

19  Albuquerque, NM 87102                          2125 Oak Grove Rd, Suite 125
    D (505) 305-1263                               Walnut Creek, CA 94598

    *Counsel for the Indirect Purchaser
    Plaintiffs*                                    *Counsel for the Indirect Purchaser*

20                                                 *Plaintiffs*

21

22  [X]     (BY ELECTRONIC MAIL) I caused such documents to be sent to the persons at the
            email addressed listed above.  I did not receive, within a reasonable time after the

23          transmission, any electronic message or other indication that the transmission was
            unsuccessful.

24
            I declare under penalty of perjury under the laws of the District of Columbia that the

25  foregoing is true and correct.  Executed on January 7, 2022, in Washington, D.C.

26
                                                    */s/ Thomas E. Carter*

27                                                  Thomas E. Carter

28

---

# EXHIBIT 34

# EXHIBIT A



December 20, 2017

**Certification**

**Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of: 国家计委、国家经贸委关于发布《关于制止低价倾销工业品的不正当价格行为的规定》和加强行业价格自律的通知

Hanna Kang

Project Manager

Project Number: BBLLP_1712_051

15 W. 37th Street 8th Floor
New York, NY 10018
212.581.8870
ParkIP.com

Notification of the State Planning Commission and the State Economic and Trade Commission regarding Issuing Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products and Strengthening Price Self-Discipline of Industries

Date: November 16, 1998 Source:

Bureau of Commodity Prices (Councils) of all provinces, autonomous regions, municipalities directly under the Central Government, and municipalities with independent planning status, the State Economic and Trade Commission, the Ministry of Information Industry, the Bureau of Domestic Trade, the State Administration of Metallurgical Industry, the State Administration of Building Materials, the State Administration of Nonferrous Metal Industry, the State Administration of Petrochemical Industry, the State Administration of Machinery Industry, the State Administration of Coal Industry, the State Administration of Textile Industry, and the State Administration of Light Industry,

To prevent unfair price actions through dumping, to protect fair, open and legitimate market competition, to maintain a normal price order, and to safeguard legitimate rights and interests of business operators and consumers, the State Planning Commission and the State Economic and Trade Commission formulated the Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products (hereinafter the "Regulations") pursuant to the Price Law of the People's Republic of China and related laws and regulations of the state. The Regulations are hereby promulgated, and related issues are notified as follows:

1. The Regulations are important measures taken by the state to regulate prices on the market of industrial products and important rules to prevent dumping of industrial products, which have legal effect. The promulgation and implementation of the Regulations will have an important impact on maintaining normal production and operation orders of industrial enterprises, promoting a healthy development of the entire industry, and forming a good environment of competition. All places must seriously implement the Regulations, prevent dumping according to the law, standardize the market order, and standardize price behaviors of enterprises.

2. Relevant state agencies in charge of industries may study and propose industrial average production costs pursuant to Article 8 of the Regulations and related product dumping situations, which will be published regularly to the society upon approval by the State Planning Commission to act as an alert level for price self-discipline by enterprises, to restrict pricing actions of enterprises, and to prevent dumping by enterprises. For industrial products with prices decided by the government or prices under the guidance by the government, prices stipulated by the government must still be strictly implemented.

3. Competent departments in charge of prices at all levels must strengthen monitoring and inspection on implementation of the Regulations, seriously accept and process reported cases, and investigate and punish, strictly according to laws and regulations, dumping actions. Any actions involving those under Article 5 of the Regulations shall be investigated and punished as dumping actions according to the law.

4. Industrial organizations must accept work guidance from competent government departments in charge of prices, urge and guide enterprises to seriously implement the Regulations, help competent departments in charge of the industries measure and determine industrial average costs, promptly gather and summarize industrial cost and price information, and proactively play the role of industrial organizations in preventing dumping, organizing enterprises to perform price self-discipline, and coordinating relations between enterprises.

5. All regions and all related departments must organize manufacturing enterprises and marketing enterprises to seriously study the Regulations and consciously implement the Regulations. Prices of products sold by a manufacturing enterprise shall not be lower than industrial average production costs in principle, and the sales prices of a marketing enterprise shall not be lower than its purchasing costs. All manufacturing and marketing enterprises must promptly report on actions that violate the Regulations and constitute dumping actions, proactively cooperate with competent government departments in charge of prices in price monitoring and inspection, and practically prevent dumping actions.

Any situation or issue occurred during implementation of the Regulations will be coordinated by the State Planning Commission and the State Economic and Trade Commission according their respective scope of responsibilities.

Attachment: Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products Attachment:

Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products

Article 1 To prevent unfair price actions through dumping, to protect fair, open and legitimate market competition, to maintain a normal price order, to protect the national interest, and to safeguard legitimate rights and interests of business operators and consumers, the Regulations are hereby formulated pursuant to the Price Law of the People's Republic of China (hereinafter the "Price Law") and other related laws of the state.

Article 2 The Regulations are applicable to industrial products with prices subject to the market.

Article 3 Any business operator engaging in production and sales of industrial products within the People's Republic of China shall implement the Regulations.

Article 4 The unfair price actions through dumping of industrial products herein refer to actions of a business operator to expel competitors or monopolize the market, such as a production enterprise sells industrial products at prices lower than the enterprise's production costs or a marketing enterprise sells industrial products at prices lower than the enterprise's purchasing costs, which disrupt normal production and operation orders and harm the national interest or legitimate rights and interests of other business operators. A production enterprise's production cost refers to the entire cost in a current month that the enterprise produces an industrial product, including manufacturing cost and to-be-allocated management expenses, financial expenses and sales expenses; a marketing enterprise's purchasing cost includes the purchasing cost in a current month and related shipment and miscellaneous expenses when the marketing enterprise carries an industrial product.

Article 5 The following actions are unfair price actions:

(I) Ex-factory prices of industrial products sold by a manufacturing enterprise are lower than its production costs, and sales prices of a marketing enterprise are lower than its purchasing costs;

(II) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by means of disguised price decreases, such as using high grade and high level products as low grade and low level products;

(III) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by means of discounts, subsidies, and the like. Means of discounts, subsidies, and the like include: (1) direct discounts to sales prices, (2) cash discount and price discount for prices at an interest higher than bank loan interests in the same period according to time length and amount of customer prepayments, (3) different price discounts offered to customers in different sales seasons for non-seasonal products, and (4) freight subsidies in certain amount for all or a part of shipping and miscellaneous expenses of customers;

(IV) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by means of unequal exchanges of goods and materials;

(V) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by means of using goods and materials to pay back debts other than bankruptcy according to the law;

(VI) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by means of issuing invoices in amounts less than those of shipping goods or not issuing invoices;

(VII) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by means of disguised price decreases, such as providing extra quantities, bulk discounts, and the like;

(VIII) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by other means.

Article 6 The following two situations are not treated dumping actions:

(I) A manufacturing enterprise or a marketing enterprise lowers prices of seasonal industrial products and overstocked industrial products to below costs pursuant to Article 14, Paragraph 2 of the Price Law;

(II) Due to relatively high costs, a manufacturing enterprise or a marketing enterprise sells industrial products at prices lower than the enterprise's costs but not lower than the industrial average costs, and without harming the national interest or legitimate rights and interests of other business operators.

Article 7 When a manufacturing enterprise or a marketing enterprise lowers prices of seasonal industrial products and overstocked industrial products for sales pursuant to Article 14, Paragraph 2 of the Price Law, the prices must be clearly labelled according to the stipulated items.

Article 8 According to dumping situations in an industry, a state competent department in charge of the industry may send a proposal to the competent department of the State Council in charge of prices that industrial average costs need to be published, and as entrusted by the competent department of the State Council in charge of prices, measures, determines, and regularly publishes industrial average costs thereof.

Article 9 Manufacturing enterprises or marketing enterprises shall use costs plus reasonable profits as a goal when deciding prices of industrial products and participate in market competition with open, fair and legitimate prices. Ex-factory prices of a manufacturing enterprise shall not be lower than the industrial average production costs in principle; and sales prices of industrial products sold by a marketing enterprise shall not be lower than normal purchasing costs. Manufacturing enterprises or marketing enterprises shall decide specific prices by following the principle of pricing according quality and according to standards, specifications and levels of industrial products promulgated by the state, and prohibit sales by mixing grades or selling as gradeless goods.

Article 10 In the case where a manufacturing enterprise sells industrial products at prices lower than industrial average production costs or a marketing enterprise sells industrial products at prices lower than purchasing costs to disrupt the production and operation orders and harm rights and interests of other business operators, any organization or individual may report the case to a competent government department in charge of prices above the provincial level, and the competent government department in charge of prices may conduct investigation into the case to determine whether those are indeed dumping actions.

Article 11 A reporting party shall truthfully report a case by providing factual information regarding unfair price actions of a reported party and details of damages. A reported manufacturing enterprise or marketing enterprise shall cooperate with the competent government department in charge of prices in investigations by truthfully providing requested books, bills, vouchers and other materials.

Article 12 In the case where a reported manufacturing enterprise or marketing enterprise is found through the investigation to truly have one of the unfair price actions listed in Article 5 of the Regulations, the competent government department in charge of prices may order the manufacturing enterprise or the marketing enterprise to correct the action and impose the following punishments according to the Price Law and specific situations: (1) issue a warning; (2) impose a fine; (3) order the manufacturing enterprise or the marketing enterprise to suspend business for rectification; and (4) file a request with an administration for industry and commerce for revocation of its business license.

Article 13 A manufacturing enterprise or a marketing enterprise of industrial products shall establish and improve internal price management, and cost and expense accounting systems to truthfully and accurately record and approve production and purchasing costs of the industrial products, and no fraud will be tolerated.

Article 14 Competent departments at all levels in charge of industries and trade associations of industries shall urge operators of industrial products in respective industries to implement the Regulations. Manufacturing enterprises with sales prices lower than industrial average production costs and marketing enterprises with sales prices lower than purchasing costs may be advised for correction; in the case where an enterprise refuses to accept advice and is suspected of dumping, the enterprise may be directly reported to a competent government department in charge of prices.

Article 15 For actions of sales by decreasing prices that severely disrupt the market order and are difficult to verify individual costs thereof within a short period, the competent department of the State Council in charge of prices may determine whether those actions are dumping actions by temporarily and directly using industrial average production costs and a reasonable range of price decrease.

Article 16 The competent department of the State Council in charge of prices will work with related departments to formulate, according to the Regulations, measures to determine cost of industrial products that are dumped.

Article 17 Imported industrial products shall be subject to the Anti-Dumping and Anti-Subsidy Regulations of the People's Republic of China.

Article 18 The Regulations shall be subjected to interpretation by the State Planning Commission.

Article 19 The Regulations shall go into effect as of November 25, 1998.

国家计委、国家经贸委关于发布《关于制止低价倾销工业品的不正当价格行为的规定》和加强行业价格自律的通知

日期: 1998-11-16 来源:

各省、自治区、直辖市及计划单列市物价局（委员会）、经贸委、信息产业部、国内贸易局、国家冶金局、国家建材局、国家有色局、国家石化局、国家机械局、国家煤炭局、国家纺织局、国家轻工局：

为制止低价倾销的不正当价格竞争行为，维护公平、公开、合法的市场竞争和正常的价格秩序，保护经营者、消费者的合法权益，根据《中华人民共和国价格法》及国家有关法律、法规，国家计委、国家经贸委制定了《关于制止低价倾销工业品的不正当价格行为的规定》（以下简称《规定》），现予发布，并将有关事项通知如下：

一、《规定》是国家对工业品市场价格进行调控所采取的重要措施，是制止低价倾销工业品的重要规章，具有法律效力。《规定》的发布实施，对维持正常的工业企业生产经营秩序，促进整个工业行业的健康发展，形成良好的竞争环境将产生重要影响。各地要认真贯彻执行《规定》，依法制止低价倾销，规范市场秩序，规范企业的价格行为。

二、国家有关行业主管部门可根据《规定》第八条的有关规定和有关产品低价倾销情况，研究提出有关具体品种的行业平均成本，经国家计委同意后，定期向社会发布，作为企业价格自律的警戒线，以约束企业定价行为，防止企业低价倾销。实行政府定价、政府指导价的工业品，仍要严格按照政府规定的价格执行。

三、各级价格主管部门要加强对《规定》执行情况的监督检查，认真受理举报案件，从严查处低价倾销行为。凡涉及《规定》第五条所列行为的，均应作为低价倾销行为依法进行查处。

四、行业组织要接受政府价格主管部门的工作指导，督促、指导企业认真执行《规定》，协助行业主管部门测定行业平均成本，及时掌握、汇总行业成本、价格信息，积极发挥行业组织在制止低价倾销、组织企业进行 价格自律和协调企业之间关系等方面的作用。

五、各地区和各有关部门要组织生产企业和经销企业认真学习《规定》，自觉执行《规定》。生产企业销售的产品价格原则上不应低于行业平均生产成本，经销企业的销售价格不应低于其进货成本。各生产、经销企业对违反《规定》，构成低价倾销行为的要及时举报，并积极配合政府价格主管部门进行价格监督检查，切实制止低价倾销行为。

《规定》执行中出现的情况和问题由国家计委、国家经贸委根据各自的工作职责范围进行协调。

附：《关于制止低价倾销工业品的不正当价格行为的规定》

附：

关于制止低价倾销工业品的

不正当价格行为的规定

第一条  为制止低价倾销工业品的不正当价格行为，维护公平、公开、合法的市场竞

争和正常的价格秩序，维护国家利益，保护经营者和消费者的合法权益，根据《中华人民

共和国价格法》（以下简称《价格法》）及国家其他有关法律，制定本规定。

第二条  本规定适用于实行市场调节价格的工业品。

第三条  凡在中华人民共和国境内从事生产、销售工业品的经营者，均应执行本规定。

第四条  本规定所称低价倾销工业品的不正当价格行为是指经营者为了排挤竞争对手

或独占市场，生产企业以低于本企业生产成本销售工业品，经销企业以低于本企业进货成

本销售工业品，扰乱正常的生产经营秩序，损害国家利益或者其他经营者合法权益的行为。

生产企业生产成本是指企业生产该工业品的当月完全成本，包括制造成本和应分摊的管理

费用、财务费用、销售费用；经销企业进货成本包括经销企业经营该工业品时的当月进货

价格和相关运杂费。

第五条  以下行为属于低价倾销不正当价格行为：

（一）生产企业销售工业品的出厂价格低于本企业生产成本的，经销企业的销售价格

低于本企业进货成本的；

（二）采用高规格、高等级充抵低规格、低等级等手段，变相降低价格，使生产企业

实际出厂价格低于本企业生产成本，经销企业实际销售价格低于本企业进货成本的；

（三）通过采取折扣、补贴等手段，使生产企业实际出厂价格低于本企业生产成本，

经销企业实际销售价格低于本企业进货成本的。折扣、补贴等手段包括：（1）对销售价格

直接折扣，（2）根据用户提前付款的时间长短和金额多少的不同，以高于银行同期贷款利

率，在价格上给予现金折扣和价格折让，（3）对非季节性产品在不同销售季节对用户给予

不同价格折让，（4）对用户全部或部分承担运杂费或给予一定数量的运费补贴；

（四）进行非对等物资串换，使生产企业实际出厂价格低于本企业生产成本，经销企

业实际销售价格低于本企业进货成本的；

（五）除依法实行破产外，通过以物抵债，使生产企业实际出厂价格低于本企业生产

成本，经销企业实际销售价格低于本企业进货成本的；

（六）采取多发货少开票或不开票方式经销，使生产企业实际出厂价格低于本企业生

产成本，经销企业实际销售价格低于本企业进货成本的；

（七）通过多给数量、批量优惠等方式，变相降低价格，使生产企业实际出厂价格低于本企业生产成本，经销企业实际销售价格低于本企业进货成本的；

（八）采用其他方式使生产企业实际出厂价格低于本企业生产成本，经销企业实际销售价格低于本企业进货成本的。

第六条　以下两种情况不视为低价倾销行为：

（一）生产企业或经销企业依据《价格法》第十四条第二款规定，以低于成本的价格降价处理季节性、积压性工业品的；

（二）生产企业或经销企业由于成本较高，以低于本企业成本但不低于行业平均成本的价格销售，未对国家利益或者其他经营者利益造成损害的。

第七条　生产企业或经销企业依据《价格法》第十四条第二款规定，对季节性工业品、积压工业品降价出售时，必须按规范的项目明码标价。

第八条　国家工业行业主管部门可根据本行业产品低价倾销情况，向国务院价格主管部门提出需发布行业平均成本的工业品品种建议，并接受国务院价格主管部门的委托，测定和定期发布其行业平均生产成本。

第九条　生产企业或经销企业制定工业品价格应以成本加合理利润为目标，以公开、公正、合法的价格参与市场竞争。生产企业的工业品出厂价格原则上不应低于行业平均生产成本；经销企业的工业品销售价格不应低于正常进货成本。生产企业或经销企业应当遵循按质论价原则，按照国家颁布的工业品标准和规格、等级制定具体价格，禁止混等和按统货出售。

第十条　生产企业以低于行业平均生产成本或经销企业以低于进货成本销售工业品，造成生产经营秩序混乱，并损害了其他经营者权益，任何单位和个人都可以向省级以上政府价格主管部门举报，政府价格主管部门可以根据情况立案调查，以确定是否属低价倾销行为。

第十一条　举报人应据实反映情况，提供被举报人不正当价格行为的事实材料及被损害情况。被举报的生产企业或经销企业应当配合政府价格主管部门调查，如实提供所需的帐薄、单据、凭证以及其它资料。

第十二条　经调查认定，被举报的生产企业或经销企业确有本规定第五条所列不正当价格行为之一的，政府价格主管部门可以责令其改正，并视具体情况依据《价格法》进行下列处罚：（1）予以警告；（2）处以罚款；（3）责令其停业整顿；（4）提请工商行政

管理

机构吊销其营业执照。

第十三条 工业品生产企业或经销企业应当建立、健全内部价格管理及成本、费用核算制度，据实、准确记录与核定工业品的生产成本及进货成本，不得弄虚作假。

第十四条 各级工业行业主管部门、工业行业协会要督促本行业工业品经营者执行本规定。对生产企业低于行业平均生产成本销售的、经销企业低于正常进货成本销售的，可以规劝其改正；对于不接受规劝，有低价倾销嫌疑的，可以向政府价格主管部门直接举报。

第十五条 国务院价格主管部门对严重扰乱市场秩序，短期内难以核实其个别成本的降价销售行为，可临时采取直接依据行业平均成本和合理的下浮幅度的办法认定其是否为低价倾销行为。

第十六条 国务院价格主管部门将会同有关部门依据本规定制定低价倾销工业品的成本认定办法。

第十七条 进口工业品适用《中华人民共和国反倾销和反补贴条例》。

第十八条 本规定由国家计委负责解释。

第十九条 本规定自 1998 年 11 月 25 日起执行。

# EXHIBIT 35

# EXHIBIT D



December 20, 2017

**Certification**

**Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of:
关于报送彩电、彩管行业成本资料的通知

Hanna Kang

Project Manager

Project Number: BBLLP_1712_051

| File No. | Catalogue No. | Record No. | Sequence No. |
|---|---|---|---|
|  | [illegible] | 2 | 2 |

P 1

Document of the Ministry of Information Industry
Xin Bu Yun [1999] No. 121

Notification of Reporting Cost Information for Color TV and Color CRT Industry

To all relevant enterprises:

To prevent actions of unfair price competition through dumping in the color TV and color CRT industry, to protect fair, open and legitimate market competition, to maintain a normal price order, and to safeguard legitimate rights and interests of business operators and consumers, this Ministry plans to estimate and publish average industry production costs of some types of color TVs and color CRTs through consultation with and upon approval by the State Planning Commission pursuant to instructions by leaders of the State Council and the Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products Ji Jia Ge (1998) No. 2332 by the State Planning Commission and the State Economic and Trade Commission. To successfully complete this task, this Ministry hereby sends you a notification of related requirements as follows:

1. Enterprises on the list (see Attached Table 1) shall fill in the attached Tables 2 and 3 with their respective production and cost information of 21" and 25" color TVs or color CRTs in the 4th quarter of 1998, and report the information by February 10, 1999. Information for each subsequent quarter shall be reported within 10 days after said each quarter. Each enterprise shall designate a specific person to be in charge of this task and periodically report relevant information. This Ministry will rigorously keep confidentiality of the information reported by enterprises to prevent leakage of business secrets of the enterprises.

- 1 –

| Electronic Industry Archives | |
|---|---|
| Copy | No. 2017049 |

2

     2. On the basis of production and cost information reported by the enterprises, this Ministry will estimate and publish average industry production costs of some of color TVs and color CRTs. For enterprises with sales prices lower than the average industry production costs, this Ministry will work with the State Planning Commission and other departments to perform investigations pursuant to the Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products. Enterprises found through the investigation to truly have actions of unfair price competition through dumping will be punished.

     3. The Department of Economic System Reform and Economic Operations of this Ministry is in charge of this task of estimation and publication of average industry production costs for the color TV and color CRT industry.

     Telephone: 010-68208341, 68208342.
Fax: 010-68277286
Contacts: Fusuo Bao, Tingru Liu
Address: No. 27 Wanshou Road, Beijing
Zip code: 100846
This Notification shall go into effect as of the date of issuance.

     Attachments: 1. List of enterprises to report production and cost information of color TVs or color CRTs
               2. Table of quarterly production and cost information of color TVs
               3. Table of quarterly production and cost information of color CRTs

| Keywords: |
| --- |
| Cc |
| Information |

- 2 -

3

(No text on this page)

February 3, 1999
(Seal of the Ministry of Information Industry of the
People's Republic of China)

Keywords: color TV, color CRT, cost, notification

Cc: The State Planning Commission and the State Economic and Trade Commission.

The General Office of the Ministry of Information Industry    Printed and distributed on
February 3, 1999

4

Attachment 1

 List of enterprises to report production and cost information of color TVs or color CRTs

1. Sichuan Changhong Electronic Group Co., Ltd.
2. Konka Group Co., Ltd.
3. TCL Group Co., Ltd.
4. Shenzhen Chuangwei-RGB Electronics Co., Ltd.
5. Qingdao Hisense Group Co., Ltd.
6. Xiamen Overseas Chinese Electronic Co., Ltd.
7. Panda Electronics Group Co., Ltd.
8. Shanghai Guangdian (Group) Co., Ltd.
9. Beijing Peony Electronic Group Co., Ltd.
10. Guangdong Gaoluhua TV Co., Ltd.
11. Caihong Group Corporation
12. Beijing Matsushita Color CRT Co., Ltd.
13. Shanghai Novel Color Picture Tube Co., Ltd.
14. Huafei Color Display Systems Co., Ltd.
15. Shenzhen SEG Hitachi Display Component Co., Ltd.
16. Guangdong Color Picture Tube Co., Ltd.
17. Lejin Shuguang Electronic Co., Ltd.
18. Shenzhen Samsung Electronic Tube Co., Ltd.


Attachment 2 Table of quarterly production and cost information of color TVs

- 4 -

5

Attachment 2

## Table of quarterly production and cost information of color TVs

Filled by (company seal affixed)                                    Unit: Yuan

| | Size | Production quantity (unit) | Sales quantity (unit) | Unit cost | | | | | Ex-factory price | | | Inventory at end of quarter (unit) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Manufacturing cost | Financial expenses | Sales expenses | Management expenses | Total cost | Sales tax and surtaxes | Average ex-factory price | Lowest ex-factory price | |
| Verified number for the previous quarter | 21" | | | | | | | | | | | |
| | 25" | | | | | | | | | | | |
| Predicted number for the current quarter | 21" | | | | | | | | | | | |
| | 25" | | | | | | | | | | | |

Filled by:                       Telephone:                       Filled on:

Instructions: if there are different models for the same size, the model with a lower cost shall be filled in the table.

6

Attachment 3

Table of quarterly production and cost information of color CRTs

Filled by (company seal affixed)                                    Unit: Yuan

| | Size | Production quantity (piece) | Sales quantity (piece) | Unit cost | | | | | Ex-factory price | | | Inventory at end of quarter (piece) |
| | | | | Manufacturing cost | Financial expenses | Sales expenses | Management expenses | Total cost | Sales tax and surtaxes | Average ex-factory price | Lowest ex-factory price | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Verified number for the previous quarter | 21" | | | | | | | | | | | |
| | 25" | | | | | | | | | | | |
| Predicted number for the current quarter | 21" | | | | | | | | | | | |
| | 25" | | | | | | | | | | | |

Filled by:                    Telephone:                    Filled on:

Instructions: if there are different models for the same size, the model with a lower cost shall be filled in the table.

信息产业部文件

信部运〔1999〕121号

## 关于报送彩电、彩管行业成本资料的通知

各有关企业：

为制止彩电、彩管行业低价倾销的不正当价格行为,维护公平、公开、合法的市场竞争和正常的价格秩序,保护经营者、消费者的合法权益,根据国务院领导的批示和国家计委、国家经贸委计价格(1998)2332号《关于制止低价倾销工业品的不正当价格行为的规定》,经商国家计委同意,我部拟对彩电、彩管部分品种测定和发布其行业平均生产成本。为做好这项工作,现将有关要求通知如下:

1、列入名单的企业(见附表一)要在99年2月10日前,将本企业21英寸、25英寸彩电或彩管98年四季度的产量、成本资料按附表二、三的内容填报后上报。以后每季度后10日内及时

— 1 —

电子工业档案馆
复印 2017069 号

上报。各企业要设专人负责此项工作，并定期上报有关资料。我部将对企业上报资料严格保密，以避免企业商业机密的泄漏。

2、在企业上报产量、成本资料的基础上，我部将测算出部分彩电、彩管的行业平均生产成本，并予以公布。对低于行业平均生产成本销售的企业，我部将配合国家计委等部门，按照《关于制止低价倾销工业品的不正当价格行为的规定》进行调查。对经调查认定确有低价倾销不正当价格行为的企业，将进行处罚。

3、我部经济体制改革与经济运行司负责彩电、彩管行业平均生产成本的测算与发布工作。

联系电话：010—68208341、68208342。

传真：010—68277286

联系人：暴福锁　刘廷儒

地址：北京万寿路27号

邮编：100846

本通知自下发之日起执行。

附件：一、上报彩电、彩管成本、价格资料的企业名单
　　　二、彩电季度成本、价格资料表
　　　三、彩管季度成本、价格资料表

— 2 —

（此页无正文）

资
密

部
业

照
调

将

业



一九九九年二月三日

主题词：彩屯　彩管　成本　通知

抄　送：国家计委，国家经贸委。

信息产业部办公厅　　　　　一九九九年二月三日印发

附件一
## 上报彩电、彩管成本、价格资料企业名单

1、四川长虹电子集团公司
2、康佳集团股份有限公司
3、TCL集团有限公司
4、深圳创维—RGB电子有限公司
5、青岛海信集团公司
6、厦门华侨电子企业有限公司
7、熊猫电子集团股份有限公司
8、上海广电(集团)有限公司
9、北京牡丹电子集团公司
10、广东高路华电视机有限公司
11、彩虹集团公司
12、北京松下彩管有限公司
13、上海永新彩色显象管有限公司
14、华飞彩色显示系统有限公司
15、深圳赛格日立显示器件有限公司
16、广东彩色显象管有限公司
17、乐金曙光电子有限公司
18、深圳三星电管有限公司

彩色电视机季度成本、价格资料表

附件二

## 彩色电视机季度成本、价格资料表

填报单位（加盖公章）：

单位：元

| 规格 | | 生产数量（台） | 销售数量（台） | 单位成本 | | | | | 销售税金及附加 | 出厂价格 | | 季末库存（台） |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 制造成本 | 财务费用 | 销售费用 | 管理费用 | 完全成本 | | 平均出厂价 | 最低出厂价 | |
| 上季核定 | 21英寸 | | | | | | | | | | | |
| | 25英寸 | | | | | | | | | | | |
| 本季预测 | 21英寸 | | | | | | | | | | | |
| | 25英寸 | | | | | | | | | | | |

填报人：　　　　　　　联系电话：　　　　　　　填报时间：

填表说明：同一规格中如有不同型号，按成本低的型号填写。

附件三

# 彩色显象管季度成本、价格资料表

单位：元

填报单位（加盖公章）：

| 规格 | 生产数量（只） | 销售数量（只） | 单位成本 | | | | | 出厂价格 | | | 季末库存（只） |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 制造成本 | 财务费用 | 销售费用 | 管理费用 | 完全成本 | 销售税金及附加 | 平均出厂价 | 最低出厂价 | |
| 上季核定 21英寸 | | | | | | | | | | | |
| 25英寸 | | | | | | | | | | | |
| 本季预测 21英寸 | | | | | | | | | | | |
| 25英寸 | | | | | | | | | | | |

填报人：　　　　　　　　联系电话：　　　　　　　　填报时间：

填表说明：同一规格中如有不同型号，按成本低的型号填写。

# EXHIBIT 36

# EXHIBIT E



December 20, 2017

**Certification**

                              **Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of:
关于发布彩色电视机部分品种行业平均生产成本的通知

Hanna Kang

Project Manager

Project Number: BBLLP_1712_051

15 W. 37th Street 8th Floor
New York, NY 10018
212.581.8870
ParkIP.com

| File No. | Catalogue No. | Record No. | Sequence No. |
|---|---|---|---|
|  | [illegible] | 14 | 3 |

Document of the Ministry of Information Industry
Xin Bu Yun [2000] No. 789

Notification of Publishing Industrial Average Production Costs for Some Types of Color TVs

To color TV manufacturing enterprises:

      To prevent actions of unfair price competition in the color TV industry and maintain a normal market order, the industrial average production costs of three types of color TVs, i.e. 21 inches, 25 inches, and 29 inches, are hereby published (see the attached table for details) pursuant to the Trial Measures to Stop Unfair Price Competition Regarding Color CRTs and Color TVs by the State Planning Commission and the Ministry of Information Industry. All color TV manufacturing enterprises are asked to seriously implement the costs. In the case where a manufacturing enterprise sells the products at prices lower than the published industrial average production costs to cause market disorders and harm the interests of other manufacturing enterprises, a harmed enterprise may file a report with the State Planning Commission or a competent department in charge of prices of a province, autonomous region or municipality directly under the Central Government. In the case where it is confirmed through investigation that there is indeed an action of unfair price competition, a competent government department in charge of prices shall order the responsible party to correct and impose penalties according to specific situations.

- 1 -

| Electronic Industry Archives | |
|---|---|
| Copy | No. 2017053 |

This Notification shall go into effect as of the date of issuance.


Attached Table: Industrial average production costs for Some Sizes of Color TVs


August 25, 2000
(Seal of the Ministry of Information Industry of the People's Republic of China)


Keywords: color TV, production cost, notification

Cc: The State Planning Commission, the State Economic and Trade Commission, and the State Administration for Industry and Commerce.

The General Office of the Ministry of Information Industry          Printed and distributed on
August 25, 2000

- 2 -

Attached Table: Industrial average production costs for Some Sizes of Color TVs

| 21" | 970 Yuan/set |
|---|---|
| 25" | 1420 Yuan/set |
| 29" | 2170 Yuan/set |

题0000之    14    3

# 信息产业部文件

信部运〔2000〕789号

## 关于发布彩色电视机
## 部分品种行业平均生产成本的通知

各彩电生产企业：

为了制止彩色电视机行业的不正当价格竞争行为，维护正常的市场秩序，按照国家计委、信息产业部《关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法》，现将21英寸、25英寸、29英寸三种规格彩电的行业平均成本予以发布(详见附表)。请各彩电生产企业认真贯彻执行。生产企业以低于发布的行业平均成本销售造成市场秩序混乱、损害其它生产企业利益的，受损害的企业可以

— 1 —

电子工业档案馆
复印    2011053    号

向国家计委或者省、自治区、直辖市价格主管部门举报。对经调查认定,确有不正当价格竞争行为的由政府价格主管部门责令改正,并视具体情况进行处罚。

本通知自发布之日起执行。

附表:部分规格彩电行业平均生产成本



二〇〇〇年八月二十五日

主题词:彩电　生产成本　通知

抄　　送:国家计委、国家经贸委、国家工商行政管理局。

信息产业部办公厅　　　　二〇〇〇年八月二十五日印发

— 2 —

附表：

## 部分规格彩电行业平均生产成本

| | |
|---|---|
| 21英寸 | 970元／台 |
| 25英寸 | 1420元／台 |
| 29英寸 | 2170元／台 |

# EXHIBIT 37



January 10, 2022

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, Johnson Wong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: IRI-CRT-00031457

Johnson Wong

Project Number: BBLLP_2201_P0001



15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

| IRICO Group Corporation | | |
|---|---|---|
| C06 Enterprise Management | | |
| Notice on Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs and Notice on Publishing Industrial Average Production Costs of Some Types of Color CRTs and Color TVs | | |
| From March 1999 to April 1999 | Retention period | Long term |
| There are ten pages in this volume | Filing No. | |

| Whole volume No. | Catalog No. | Docket No. |
|---|---|---|
| | | |

CONFIDENTIAL

IRI-CRT-00031457

## In-Volume Catalog

| S.N. | Document author | Original document No. | Document receipt No. | Confidentiality level | Document date | Title | No. of Page |
|---|---|---|---|---|---|---|---|
| 1 | Ministry of Information Industry | Ji Jia Ge (99) 264 | 46 | | March 15, 1999 | Notice of the State Planning Commission and the Ministry of Information Industry on Distributing Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs | 1-7 |
| 2 | Id. | Xin Yun Bu (99) 287 | 51 | | April 2, 1999 | Notice on Publishing Industrial Average Production Costs of Some Types of Color CRTs and Color TVs | 8-10 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

CONFIDENTIAL                                                                                    IRI-CRT-00031458

Mr. Wu: please review this document.  April 15, 1999
001

| Official document | Receipt No. 46 April 14, 1999 |
|---|---|

From the first page of China Electronics Daily, April 13, 1999

Notice on Publishing Industrial Average Production Costs of Some Types of Color CRTs and Color TVs
Xin Bu Yun [1999] No. 287
To curb unfair price competition in the color CRT and color TV industry and maintain normal market order, we have estimated the industrial average production costs of two types of color CRTs and color TVs, i.e. 21-inch and 25-inch, pursuant to the Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs by the State Planning Commission and the Ministry of Information Industry, the cost materials submitted by major manufacturers of color CRTs and color TVs, and the results of survey on typical enterprises. The estimation is hereby published (see the attached table). All color CRT and color TV manufacturers are asked to conscientiously implement the estimation. In case where a manufacturer sells its products at the prices lower than the published industrial average production costs, causing market disorders and harming the interests of other manufacturers, a harmed enterprise may file a report with the State Planning Commission or a competent department in charge of prices of a province, autonomous region and municipality directly under the Central Government. If it is found through investigation that, such manufacturer indeed engages in unfair price competition, a competent government department in charge of prices shall order such manufacturer to correct and impose penalties on it in light of the specific circumstance.
This Notice will be implemented from the date of publication.

Attached Table: Industrial Average Production Costs of Some Sizes and Types of Color CRTs and Color TVs

| 21" Color CRT | RMB440/piece | 21" Color TV | RMB1,130/set |
| 25" Color CRT | RMB720 /piece | 25" Color TV | RMB1,700/set |

Ministry of Information Industry, April 2, 1999

IRICO Group Corporation Document Review List

| Group's proposed opinion: Mr. Wu: please review this document. April 15, 1999 | Department's proposed opinion: |
|---|---|

Leader's instructions:

| Circulation time | Signature | Circulation time | Signature | Circulation time | Signature | Circulation time | Signature |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Required completion time | Processing result Fax sent April 15, 1999 |
|---|---|
| | Signature from the leader of the handling organization |

CONFIDENTIAL                                                          IRI-CRT-00031459

Mr. Wu: please review this document.   April 15, 1999
001

| Official document | Receipt No. 46 April 14, 1999 |
|---|---|

From the first page of China Electronics Daily, April 13, 1999

Notice on Publishing Industrial Average Production Costs of Some Types of Color CRTs and Color TVs

Xin Bu Yun [1999] No. 287

To curb unfair price competition in the color CRT and color TV industry and maintain normal market order, we have estimated the industrial average production costs of two types of color CRTs and color TVs, i.e. 21-inch and 25-inch, pursuant to the Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs by the State Planning Commission and the Ministry of Information Industry, the cost materials submitted by major manufacturers of color CRTs and color TVs, and the results of survey on typical enterprises. The estimation is hereby published (see the attached table). All color CRT and color TV manufacturers are asked to conscientiously implement the estimation. In case where a manufacturer sells its products at the prices lower than the published industrial average production costs, causing market disorders and harming the interests of other manufacturers, a harmed enterprise may file a report with the State Planning Commission or a competent department in charge of prices of a province, autonomous region and municipality directly under the Central Government. If it is found through investigation that, such manufacturer indeed engages in unfair price competition, a competent government department in charge of prices shall order such manufacturer to correct and impose penalties on it in light of the specific circumstance.

This Notice will be implemented from the date of publication.

Attached Table: Industrial Average Production Costs of Some Sizes and Types of Color CRTs and Color TVs

| 21" Color CRT | RMB440/piece | 21" Color TV | RMB1,130/set |
|---|---|---|---|
| 25" Color CRT | RMB720 /piece | 25" Color TV | RMB1,700/set |

Ministry of Information Industry, April 2, 1999

Notice on Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs

Bureaus (Commissions) of Commodity Prices and Competent Departments in Charge of the Electronic Industry of provinces, autonomous regions, municipalities directly under the Central Government, and municipalities specifically designated in the state plan:

To curb unfair price competition and maintain normal market competition order, the State Planning Commission and the Ministry of Information Industry have formulated the Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs (hereinafter referred to as the "Measures"), which are hereby distributed for your earnest implementation. Related issues are hereby notified as follows:

-1-

CONFIDENTIAL                                                    IRI-CRT-00031460

Mr. Wu: please review this document.   April 15, 1999
001

| Official document | Receipt No. 46 April 14, 1999 |
|---|---|

National Development Planning Commission   Document
Ministry of Information Industry

Ji Jia Ge [1999] No. 264

## Notice of the State Planning Commission and the Ministry of Information Industry on Distributing Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs

Bureaus (Commissions) of Commodity Prices and Competent Departments in Charge of the Electronic Industry of provinces, autonomous regions, municipalities directly under the Central Government, and municipalities specifically designated in the state plan:

To curb unfair price competition and maintain normal market competition order, the State Planning Commission and the Ministry of Information Industry have formulated the Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs (hereinafter referred to as the "Measures"), which are hereby distributed for your earnest implementation. Related issues are hereby notified as follows:

-1-

CONFIDENTIAL                                                                    IRI-CRT-00031461

002

    1. Prices of color TVs have plunged in recent years due to the oversupply of products and increasingly fierce market competition. In the price cut competition, some color TV and color CRT manufacturers sell their products at the prices lower than production costs, which disrupts normal price order and harm legitimate rights and interests of other business operators and consumers. The competent departments in charge of price and electronics in all places must work closely with related departments in planning, economic and trade to strengthen leadership and ensure the sound implementation of the Measures.

    2. According to the principles of instructions from the leading comrades of the State Council, the State Planning Commission and the Ministry of Information Industry have decided <u>to focus on color TVs and color CRTs during the campaign of preventing dumping and regulating the market order according to the law in 1999</u>. All places must step up supervision and inspection, with the focus on: whether ex-factory prices of color CRT and color TV manufacturers are lower than their production costs, and whether the sales prices of distributors are lower than their purchasing costs; whether sales are made at low prices by means of discount, subsidy and extra quantity; whether sales are made at low prices by means of using raw materials and parts and components imported through smuggling, lowering performance indicators, using shoddy products as good products, falsely reporting costs, etc.

    3. All color CRT and color TV manufacturers must strictly comply with all provisions in the Measures, consciously regulate pricing, truthfully and accurately record and verify production and purchasing costs, and strictly prohibit less amortization and false reporting of costs. At the same time, the enterprises must correct the unfair price competition found in self-inspection and actively report the unfair price competition to competent departments in charge of prices.

-2-

003

    4. All places should promptly report any problem arising in the implementation of the Measures, supervision and inspection to the State Planning Commission and the Ministry of Information Industry.

    Attachment: Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs

*(Seal of the National Development Planning Commission of the People's Republic of China)*

National Development Planning Commission

March 15, 1999

*(Seal of the Ministry of Information Industry of the People's Republic of China)*

Ministry of Information Industry

Keywords: color TV, price measures, Notice

Cc: The General Office of the State Council, the State Economic and Trade Commission, the Ministry of Finance, the General Administration of Customs, and the Planning Commissions (Planning and Economic Commissions) of all provinces, autonomous regions, municipalities directly under the Central Government and cities specifically designated in the state plan

-3-

CONFIDENTIAL

IRI-CRT-00031462

004

Attachment:

# Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs

Article 1 To curb unfair price competition in the color TV and color CRT industry, protect fair, open and legitimate market competition, the national interest and the legitimate rights and interests of business operators and consumers, and maintain normal price order, the Measures are hereby formulated according to the Price Law of the People's Republic of China (hereinafter referred to as the "Price Law") and other applicable laws of the state.

Article 2 Any business operator engaging in production and sales of color CRTs and color TVs within the People's Republic of China shall implement the Measures.

Article 3 The unfair price competition herein refers to misconduct of a business operator to sell products at the prices lower than their cost or sell products at low prices by reducing costs using unfair means, so as to expel competitors or monopolize the market, which disrupts normal production and operation orders and harms the national interest or legitimate rights and interests of other business operators.

Article 4 The following misconducts of color CRT and color TV operators constitute unfair price competition:

-4-

005

(I) Ex-factory prices of a manufacturer are lower than its production costs over the same period, and sales prices of a distributor are lower than its purchasing costs over the same period;

(II) Actual ex-factory prices of a manufacturer are made lower than its production costs, and actual sales prices of a distributor are made lower than its purchasing costs by means of discount, subsidy and extra quantity;

(III) Sales are made at low prices by means of using raw materials and parts and components imported through smuggling, lowering performance indicators, using shoddy products as good products, falsely reporting costs, etc.;

(IV) A color CRT buyer takes advantage its big market share to force a color CRT manufacturer to sell products at the prices lower than its production costs;

(V) Actual ex-factory prices of a manufacturer are lower than its production costs over the same period, or actual sales prices of a distributor are lower than its purchasing costs over the same period by other means.

Article 5 The Ministry of Information Industry regularly publishes industrial average production costs of main types and sizes of color CRTs and color TVs. The State Planning Commission and the Ministry of Information Industry determine and publish a reasonable range of price decrease.

Article 6 Ex-factory prices of a manufacturer shall not be lower than the industrial average production costs in principle; and the sales prices of a distributor shall not be lower than normal purchasing costs.

-5-

CONFIDENTIAL

IRI-CRT-00031463

006

Article 7 In case where a manufacturer sells its products at the prices lower than published industrial average production costs, or a distributor sells its products at the prices lower than its purchasing costs over the same period, leading to market price disorder and harms to the interests of other manufacturers or distributors, the harmed manufacturers or distributors may report the same to the State Planning Commission or a competent department in charge of prices of a province, autonomous region or municipality directly under the Central Government; and the competent government department in charge of prices will launch investigation into the case in light of the circumstance.

Article 8 The reporting party shall truthfully report the case by providing factual information regarding unfair price competition of the reported party and details of damages. A reported business operator shall cooperate with a competent government department in charge of prices in the investigation by truthfully providing related books, bills, vouchers and other materials.

Article 9 If it is found through the investigation that, the reported operator of color CRTs and color TVs is indeed committing unfair price competition set forth in Article 4 of the Measures, the competent government department in charge of prices shall order the operator to make correction and impose the following penalties according to the Price Law and specific circumstances:

(I)  Issue a warning;

(II)  Impose a fine;

(III)  Order the operator to suspend business for rectification; and

(IV)  File a request with an administration for industry and commerce for revocation of its business license.

-6-

007

Article 10 When performing inspection, a competent department in charge of prices should first take individual costs of manufacturers or operators as a main basis. When it is difficult to confirm an individual cost, industrial average production costs and a reasonable range of price decrease will be used as the main bases.

Article 11 An operator of color CRTs and color TVs shall establish and improve internal price management, cost and expense accounting systems to truthfully and accurately record and verify production and purchasing costs, with no false statement.

Article 12 Competent departments at all levels in the electronic industry and the color CRT and color TV trade association shall urge operators of color CRTs and color TVs to implement the Measures. For manufacturers and distributors that violate the Measures, they shall be advised to correct; in case where the advice doesn't work, a report may be submitted to a competent department in charge of prices for official investigation.

Article 13 The Measures shall be interpreted by the State Planning Commission.

Article 14 The Measures shall go into effect as of April 1, 1999.

-7-

CONFIDENTIAL

IRI-CRT-00031464

| Official document | Receipt No. 51<br>April 21, 1999 |
|---|---|

# Document of the Ministry of Information Industry

Xin Bu Yun [1999] No. 287

## Notice on Publishing Industrial Average Production Costs of Some Types of Color CRTs and Color TVs

IRICO Group Corporation Document Review List

| Group's proposed opinion: | Department's proposed opinion: |
|---|---|

Leader's instructions:

| Circulation time | Signature | Circulation time | Signature | Circulation time | Signature | Circulation time | Signature |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Required completion time | Processing result |
|---|---|
| | Signature from the leader of the handling organization |

CONFIDENTIAL                                                              IRI-CRT-00031465

008

| Official document | Receipt No. 51 April 21, 1999 |
|---|---|

# Document of the Ministry of Information Industry

Xin Bu Yun [1999] No. 287

## Notice on Publishing Industrial Average Production Costs of Some Types of Color CRTs and Color TVs

Color CRT and Color TV manufacturers:

To curb unfair price competition in the color CRT and color TV industry and maintain normal market order, we have estimated the industrial average production costs of two types of color CRTs and color TVs, i.e. 21 inches and 25 inches, pursuant to the Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs by the State Planning Commission and the Ministry of Information Industry, the cost materials submitted by major manufacturers of color CRTs and color TVs, and the results of investigation into typical enterprises. The estimation is hereby published (see the attached table). All color CRT and color TV manufacturers are asked to conscientiously implement the estimation. In case where a manufacturer sells its products at the prices lower than the published industrial average production costs, causing market disorders and harming the interests of other manufacturers, a harmed enterprise may file a report with the State Planning Commission or a competent department in charge of prices of a province,

-1-

CONFIDENTIAL                                    IRI-CRT-00031466

009

autonomous region or municipality directly under the Central Government. If it is found through investigation that, such manufacturer indeed engages in unfair price competition, a competent government department in charge of prices shall order such manufacturer to correct and impose penalties on it in light of specific circumstances.

This Notice shall go into effect as of the date of distribution.

Attachment: Table

April 2, 1999

(Seal of the Ministry of Information Industry of the People's Republic of China)

Keywords: color CRT, color TV, cost, Notice

Cc: The State Planning Commission, the State Economic and Trade Commission, and the State Administration for Industry and Commerce.

The General Office of the Ministry of Information Industry          Distributed on April 12, 1999

-2-

010

Table:
Industrial Average Production costs for Some Sizes and Types of Color CRTs and Color TVs

| | |
|---|---|
| 21" Color CRT | RMB440/piece |
| 25" Color CRT | RMB720/piece |
| 21" Color TV | RMB1,130/set |
| 25" Color TV | RMB 1,700/set |

-3-

CONFIDENTIAL                                                    IRI-CRT-00031467

Note

| Whole volume No.: | |
| --- | --- |
| Catalog No.: | |
| Docket No.: | |
| There are a total of 10 pages within this volume (or book) | |
| Defects or other situations of this volume (or book) | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| Volume prepared by: Wang Yueqin | Checked by: |
| August 15, 2000 | Date: |

03513 x 824



CONFIDENTIAL                                          IRI-CRT-00031468

# 彩虹集团公司

## C06 企业管理

关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法及发布彩管、彩电部分品种行业平均生产成本的通知

| 自九九年 三 月至九九年 四 月 | 保管期限 | 长 期 |
|---|---|---|
| **本卷内共 十 张** | 归档号 | |

| 全宗号 | 目录号 | 案卷号 |
|---|---|---|
| | | |

CONFIDENTIAL

IRI-CRT-00031457

# 卷 内 目 录

| 顺序号 | 文件作者 | 文件原编字号 | 文件收文编号 | 秘别 | 文件日期 | 标题 | 文件所在张号 |
|---|---|---|---|---|---|---|---|
| 1 | 信息产业部 | 计价格(99)264 | 46 | | 99.3.15 | 国家计委、信息产业部印发关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法的通知 | 1~7 |
| 2 | 〃 | 信运部(99)287 | 51 | | 99.4.2 | 关于发布彩色显像管、彩色电视机部分品种行业平均生产成本的通知 | 8~10 |

CONFIDENTIAL
IRI-CRT-00031458

001



公文 收 46 号
99年4月14日

摘自中国电子报1999年4月13日第一版

# 于发布彩色显像管、彩色电视机
# 分品种行业平均生产成本的通知

信部运〔 1999 〕287 号

止彩色显像管、彩色电视机行业的不正当价格竞
护正常的市场秩序，根据国家计委、信息产业部
彩色显像管、彩色电视机不正当价格竞争的试行
依据报送主要彩管、彩电生产企业报送的成本资
型企业的调研情况，对21英寸、25英寸两个品
、彩电的行业平均生产成本进行了测算，现予发
。请各彩管、彩电生产企业认真贯彻执行。生
于发布的行业平均生产成本销售，造成市场秩序
其他生产企业利益的，受损害的企业可向国家计

委、或者省、自治区、直辖市价格主管部门举报。对经调查
认定，确有不正当价格竞争行为的由政府价格主管部门贯令
改正，并视具体情况进行处罚。

本通知自发布之日起执行。

附表：部分规格品种彩管、彩电行业平均生产成本

21英寸彩管   440元/只      21英寸彩电  1130元/只
25英寸彩管   720元/只      25英寸彩电  1700元/只

信息产业部   1999年4月2日

## 彩虹电子集团公司文件阅办单

| 集团拟办意见: | 清美阅子 15/4-99 | 部拟办意见： |
| --- | --- | --- |

领导指示：

| 传阅时间 | 签 字 | 传阅时间 | 签 字 | 传阅时间 | 签 字 | 传阅时间 | 签 字 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| 求完成时间 | 处理结果 | | |
| --- | --- | --- | --- |
| | 传真已发 99年4月15日 | | 承办单位领导签字 |

CONFIDENTIAL

001



摘自中国电子报1999年4月13日第一版.

# 于发布彩色显像管、彩色电视机
# 分品种行业平均生产成本的通知

### 信部运〔1999〕287号

止彩色显像管、彩色电视机行业的不正当价格竞
维护正常的市场秩序，根据国家计委、信息产业部
止彩色显像管、彩色电视机不正当价格竞争的试行
成依据各主要彩管、彩电生产企业报送的成本资
典型企业的调研情况，对21英寸、25英寸两个品种
彩电的行业平均生产成本进行了测算，现予发
。请各彩管、彩电生产企业认真贯彻执行。生
止发布的行业平均生产成本销售，造成市场秩序
害其他生产企业利益的，受损害的企业可向国家计

委、或省、自治区、直辖市价格主管部门举报。对经调查
认定，确有不正当价格竞争行为的由政府价格主管部门贯令
改正，并视具体情况进行处理。

本通知自发布之日起执行。

附表：部分规格品种彩管、彩电行业平均生产成本

| | | | |
|---|---|---|---|
| 21英寸彩管 | 440元/只 | 21英寸彩电 | 1130元/只 |
| 25英寸彩管 | 720元/只 | 25英寸彩电 | 1700元/只 |

信息产业部 1999年4月2日

## 关于制止彩色显像管、彩色电视机
## 不正当价格竞争的试行办法的通知

各省、自治区、直辖市及计划单列市物价局(委员会)，电子
工业主管部门：

  为了制止彩色显像管、彩色电视机行业的不正当价格
竞争行为，维护正常的市场竞争秩序，国家计委、信息产业
部制定了《关于制止彩色显像管、彩色电视机不正当价格竞
争的试行办法》(以下简称《办法》)，现印发给你们，请认真
贯彻执行，并就有关事项通知如下：

— 1 —

CONFIDENTIAL

IRI-CRT-00031460

001



## 国家发展计划委员会
## 信息产业部 文件

计价格〔1999〕264 号

### 国家计委、信息产业部印发
### 关于制止彩色显像管、彩色电视机
### 不正当价格竞争的试行办法的通知

各省、自治区、直辖市及计划单列市物价局(委员会),电子
工业主管部门:

为了制止彩色显像管、彩色电视机行业的不正当价格
竞争行为,维护正常的市场竞争秩序,国家计委、信息产业
部制定了《关于制止彩色显像管、彩色电视机不正当价格竞
争的试行办法》(以下简称《办法》),现印发给你们,请认真
贯彻执行,并就有关事项通知如下:

— 1 —

CONFIDENTIAL

IRI-CRT-00031461



002

一、近几年来，由于产品供过于求，市场竞争日趋激烈，彩色电视机价格大幅度下降。在降价竞争中，一些彩色电视机、彩色显像管生产企业以低于生产成本的价格进行销售，扰乱了正常的价格秩序，损害了其他经营者和消费者的合法权益。各地价格、电子主管部门要会同计划、经贸等有关部门，加强领导，密切配合，共同做好《办法》的贯彻实施工作。

二、遵照国务院领导同志的指示精神，国家计委、信息产业部决定，将彩色显像管和彩色电视机作为 1999 年制止低价倾销、依法规范市场秩序的重点品种。各地要加强监督检查，检查的主要内容是：彩色显像管、彩色电视机生产企业的出厂价格是否低于其生产成本，经销企业的销售价格是否低于其进货成本；是否采取折扣、补贴、多给数量等手段低价销售；是否采取使用走私进口原材料和零配件、降低性能指标、以次充好、虚报成本等手段低价销售。

三、彩色显像管和彩色电视机生产企业要严格执行《办法》的各项规定，自觉规范价格行为，据实、准确记录与核定生产成本及进货成本，严禁少摊费用、虚置成本。同时要对有无不正当价格竞争行为进行自查自纠，并积极向价格主

— 2 —

009

管部门举报不正当价格竞争行为。

四、各地在贯彻实施《办法》和监督检查过程中存在的问题，请及时报告国家计委和信息产业部。

附件：关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法

中华人民共和国国家发展计划委员会

中华人民共和国信息产业部

一九九九年三月十五日

主题词：彩电　价格办法　通知

抄送：国务院办公厅、国家经贸委、财政部、海关总署，各省、自治区、直辖市及计划单列市计委（计经委）

— 3 —

CONFIDENTIAL
IRI-CRT-00031462

附件：

# 关于制止彩色显像管、彩色电视机
# 不正当价格竞争的试行办法

第一条　　为制止彩色显像管、彩色电视机行业的不正当价格竞争行为，维护公平、公开、合法的市场竞争和正常的价格秩序，维护国家利益，保护经营者和消费者的合法权益，根据《中华人民共和国价格法》(以下简称《价格法》)及国家其他有关法律，制定本办法。

第二条　　凡在中华人民共和国境内从事生产、销售彩色显像管、彩色电视机的经营者，均应执行本办法。

第三条　　本办法所称的不正当价格竞争行为是指，经营者为了排挤竞争对手或独占市场，以低于本企业成本销售，或者采取其它不正当手段降低成本低价销售，扰乱正常的生产经营秩序，损害国家利益或其它经营者合法权益的行为。

第四条　　彩色显像管、彩色电视机经营者的下列行为属于不正当价格竞争行为：

— 4 —

(一)生产企业的出厂价格低于其同一时期生产成本，经销企业的销售价格低于其同一时期进货成本；

(二)采取折扣、补贴、多给数量等方式，使生产企业的实际出厂价格低于本企业生产成本，经销企业实际销售价格低于本企业进货成本；

(三)使用走私进口原材料和零配件、降低性能标准、以次充好、虚报成本等手段低价销售；

(四)市场份额占较大优势的彩色显像管购买者利用其优势地位迫使彩色显像管生产企业低于其生产成本销售产品；

(五)采取其它方式，使生产企业的实际出厂价格低于其同一时期生产成本，或经销企业的实际销售价格低于其同一时期进货成本。

第五条　　信息产业部定期发布彩色显像管、彩色电视机主要品种、规格的行业平均生产成本。国家计委会同信息产业部确定和公布合理的下浮幅度。

第六条　　生产企业的出厂价格原则上不应低于行业平均生产成本；经销企业的销售价格不应低于正常进货成本。

— 5 —

IRI-CRT-00031463



　　第七条　生产企业以低于发布的行业平均生产成本销售，经销企业以低于其同期进货成本销售，造成市场价格秩序混乱、损害其它生产企业和经销企业利益的，受损害的生产企业和经销企业可向国家计委或者省、自治区、直辖市政府价格主管部门举报；政府价格主管部门根据情况立案调查。

　　第八条　举报人应当据实反映情况，提供被举报人不正当价格竞争行为的事实材料和被损害的情况。被举报的经营者，应当配合政府价格主管部门调查，如实提供相关的帐薄、单据、凭据以及其它资料。

　　第九条　经调查认定，被举报的彩色显像管、彩色电视机经营者确有本办法第四条所列不正当价格竞争行为的，由政府价格主管部门责令改正，并视具体情况依据《价格法》进行下列处罚：

　　（一）予以警告；

　　（二）处以罚款；

　　（三）责令其停业整顿；

　　（四）提请工商行政管理机关吊销其营业执照。

　　第十条　价格主管部门实施检查时，首先应以生产、

— 6 —

经营者的个别成本为主要判定依据。当个别成本难以认定时，以行业平均成本和合理的下浮幅度为主要判定依据。

　　第十一条　彩色显像管、彩色电视机经营者应当建立、健全内部价格管理及成本、费用核算制度，据实、准确记录与核定生产成本及进货成本，不得弄虚作假。

　　第十二条　各级电子工业主管部门及彩色显像管、彩色电视机行业协会应当督促彩色显像管、彩色电视机经营者执行本办法。对生产企业和经销企业违反本办法的，规劝其改正；规劝无效的，可向政府价格主管部门举报，要求立案调查。

　　第十三条　本办法由国家计委负责解释。

　　第十四条　本办法自1999年4月1日起施行。

— 7 —

CONFIDENTIAL

IRI-CRT-00031464

008

公文 收 51 号
99年4月2日

# 信息产业部文件

信部运〔1999〕287号

## 关于发布彩色显像管、彩色电视机部分

### 品种行业平均生产成本的通知

彩虹电子集团公司文件阅办单

| 集团拟办意见： | | | 部拟办意见： | | | |
|---|---|---|---|---|---|---|

领导指示：

| 传阅时间 | 签　字 | 传阅时间 | 签　字 | 传阅时间 | 签　字 | 传阅时间 | 签　字 |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| 要求完成时间 | 处理结果 | |
|---|---|---|
| | | |

承办单位领导签字

CONFIDENTIAL
IRI-CRT-00031465

008



# 信息产业部文件

信部运〔1999〕287号

## 关于发布彩色显像管、彩色电视机部分
## 品种行业平均生产成本的通知

各彩管、彩电生产企业：

  为了制止彩色显像管、彩色电视机行业的不正当价格竞争行为，维护正常的市场秩序，根据国家计委、信息产业部《关于制止彩色显象管、彩色电视机不正当价格竞争的试行办法》，我部依据各主要彩管、彩电生产企业报送的成本资料，结合典型企业的调研情况，对21英寸、25英寸两个品种规格彩管、彩电的行业平均生产成本进行了测算，现予发布（见附表）。请各彩管、彩电生产企业认真贯彻执行。生产企业以低于发布的行业平均生产成本销售，造成市场秩序混乱、损害其他生产企业利益的，受损害的企业可向国家计委、或者省、自

— 1 —

CONFIDENTIAL

009

治区、直辖市价格主管部门举报。对经调查认定,确有不正当
价格竞争行为的由政府价格主管部门责令改正,并视具体情
况进行处罚。

本通知自发布之日起执行。

附件:附表

主题词:彩管  彩电  成本  通知

抄  送:国家计委,国家经贸委,国家工商行政管理局。

信息产业部办公厅                  一九九九年四月十二日印发

— 2 —

010

附表:

### 部分规格品种彩管、彩电行业平均生产成本

| | |
|---|---|
| 21英寸彩管 | 440元／只 |
| 25英寸彩管 | 720元／只 |
| 21英寸彩电 | 1130元／台 |
| 25英寸彩电 | 1700元／台 |

— 3 —

CONFIDENTIAL

IRI-CRT-00031467

# 备　考　表

| | |
|---|---|
| 全　宗　号： | |
| 案卷目录号： | |
| 案卷顺序号： | |

本卷（或簿本）内的文件共有　　10　　张

**本卷**（或簿本）内的缺点或其他情况

立卷人：王跃芹　　　　　　　检查人：

2000 年 8 月 15 日　　　　　年　月　日

03513×821

# EXHIBIT 38

# EXHIBIT F





December 20, 2017

**Certification**

**Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of: 关于发布彩色显像管部分品种行业平均生产成本的通知

Hanna Kang

Project Manager

Project Number: BBLLP_1712_051

| File No. | Catalogue No. | Record No. | Sequence No. |
|---|---|---|---|
|  | [illegible] | 14 | 4 |

Document of the Ministry of Information Industry
Xin Bu Yun [2000] No. 843

Notification of Publishing Industrial Average Production Costs for Some Types of Color CRTs

To color CRT manufacturing enterprises:

To prevent actions of unfair price competition in the color CRT industry and maintain a normal market order, the industrial average production costs of three types of color CRTs, i.e. 21 inches, 25 inches, and 29 inches, are hereby published (see the attached table for details) pursuant to the Trial Measures to Prevent Unfair Price Competition Regarding Color CRTs and Color TVs by the State Planning Commission and the Ministry of Information Industry. All color CRT manufacturing enterprises are asked to seriously implement the costs. In the case where a manufacturing enterprise sells the products at prices lower than the published industrial average production costs to cause market disorders and harm the interests of other manufacturing enterprises, a harmed enterprise may file a report with the State Planning Commission or a competent department in charge of prices of a province, autonomous region or municipality directly under the Central Government. In the case where it is confirmed through investigation that there is indeed an action of unfair price competition, a competent government department in charge of prices shall order the responsible party to correct and impose penalties according to specific situations.

- 1 -

| Electronic Industry Archives | |
|---|---|
| Copy | No. 2017052 |

This Notification shall go into effect as of the date of issuance.


Attachment: Attached Table


September 13, 2000
(Seal of the Ministry of Information Industry of the People's Republic of China)


Keywords: color CRT, production cost, notification

Cc: The State Planning Commission, the State Economic and Trade Commission, and the State Administration for Industry and Commerce.

The General Office of the Ministry of Information Industry      Printed and distributed on September 14, 2000

- 2 -

Attached Table: Industrial average production costs for Some Sizes of Color CRTs

| 21" (regular flat) | 410 Yuan/piece |
|---|---|
| 25" (regular flat) | 670 Yuan/piece |
| 29" (ultra flat) | 1135 Yuan/piece |

信部运〔2000〕843号

# 信息产业部文件

信部运〔2000〕843号

## 关于发布彩色显像管
## 部分品种行业平均生产成本的通知

各彩管生产企业：

　　为了制止彩色显像管行业的不正当价格竞争行为,维护正常的市场秩序,按照国家计委、信息产业部《关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法》,现将21英寸、25英寸、29英寸三种规格彩管的行业平均成本予以发布(详见附表)。请各彩管生产企业认真贯彻执行。生产企业以低于发布的行业平均成本销售造成市场秩序混乱、损害其它生产企业利益的,受损害的企业可以

— 1 —

电子工业档案馆
复印 2011052 号

向国家计委或者省、自治区、直辖市价格主管部门举报。对经调查认定,确有不正当价格竞争行为的由政府价格主管部门责令改正,并视具体情况进行处罚。

本通知自发布之日起执行。

附件:附表



二〇〇〇年九月十三日

**主题词:彩管　生产成本　通知**

抄　送:国家计委,国家经贸委,国家工商行政管理局。

信息产业部办公厅　　　　　二〇〇〇年九月十四日印发

报。

格主

附表：部分规格彩管行业平均生产成本

| 21 英寸（普平） | 410 元/只 |
|---|---|
| 25 英寸（普平） | 670 元/只 |
| 29 英寸（超平） | 1135 元/只 |

印发