R. Alexander Saveri (173102)
  *rick@saveri.com*
Geoffrey C. Rushing (126910)
  *grushing@saveri.com*
Matthew D. Heaphy (227224)
  *mheaphy@saveri.com*
Sarah Van Culin (293181)
  *sarah@saveri.com*
SAVERI & SAVERI
706 Sansome Street
San Francisco, California 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Interim Lead Counsel for the*
*Direct Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-CV-5944-JST |
| | MDL No. 1917 |
| This Document Relates to: | **DIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION WITH RESPECT TO THE IRICO DEFENDANTS** |
| *ALL DIRECT PURCHASER ACTIONS* | |
| | Date:   March 31, 2022 |
| | Time:   2:00 p.m. |
| | Judge:  Hon. Jon S. Tigar |
| | Ctrm:   6, 2nd Floor |

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................... ii

I.      INTRODUCTION ....................................................................................................... 1

II.     ARGUMENT ............................................................................................................... 2

    A.  Irico Fails to Undermine DPPs' Showing That Common Issues Predominate. .................... 2

    B.  Irico's Plagiarism Accusation Is Baseless. ........................................................................ 3

    C.  Irico's Arguments That DPPs Lack Standing And Typicality Contravene The Court's
        Previous Rulings. ............................................................................................................. 7

        i.    Judge Conti And This Court Have Repeatedly Held That DPPs Satisfy Typicality ........ 7

        ii.   The Court Has Already Rejected Irico's Argument that DPPs Lack Standing ................ 8

    D.  Irico's Attacks on Dr. Johnson's Opinions Lack Merit ...................................................... 9

        i.    Irico's Criticisms Are Not Supported by Expert Analysis ........................................... 10

        ii.   The Irico Defendants' Criticisms of Dr. Johnson's Opinion That The Conspiracy
            "Targeted" the Top-Selling CRTs Is Baseless .............................................................. 10

        iii.  Irico Mischaracterizes Dr. Johnson's Target Price Regression and Testimony ............ 12

        iv.  Dr. Johnson's Correlation Analysis Shows That "Non-Targeted" CRTs Were Impacted
            ..................................................................................................................................... 13

        v.    Irico's Attacks On Dr. Johnson's Hedonic Regressions Mischaracterize Them ........... 13

        vi.   Irico's Criticisms of Dr. Johnson's CRT Price Structure Opinion Mischaracterize his
            Opinion and the Evidence .............................................................................................. 14

        vii.  Irico's Criticisms of Dr. Johnson's Damage Study Also Fail ....................................... 14

III. CONCLUSION ................................................................................................................ 15

i

DPPs' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION WITH
RESPECT TO IRICO DEFS.; Master File No. 07-CV-5944-JST

# **TABLE OF AUTHORITIES**

## **CASES**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960 (9th Cir. 2013) .......................... 10

*Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (2013) ...................................................... 5

*Deiter v. Microsoft Corp.,* 436 F.3d 461 (4th Cir. 2006) ................................................................. 7

*Easter v. American West Financial.,* 381 F.3d 948 (9th Cir. 2004) ................................................. 9

*Elosu v. Middlefork Ranch Inc.,* No. 21-35309, 2022 WL 534345 (9th Cir. 2022) ................... 5, 10

*In re Cathode Ray Tube (CRT) Antitrust Litig.* MDL No. 1917, Case No. C-07-5944 JST,
   2016 WL 7805628 (N.D. Cal. Aug. 4, 2016) .......................................................................... 9

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010) ................ 9

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d. 857 (N.D. Cal. 2012) ................ 9

*In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) ...................... 7

*In re Milk Products Antitrust Litig.*, 195 F.3d 430 (8th Cir. 1999) ................................................. 8

*In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311 (N.D. Cal. 2014) ................................... 7

*Moore v. BASF Corp.*, No. 11-1001, 2012 WL 6002831 (E.D. La. Nov. 30, 2012) ....................... 6

*Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513 (5th Cir. 2013) ...................................................... 6

*Raymo v. Sec'y of Health & Human Servs.,* No. 11-0654V, 2014 WL 1092274 (Fed. Cl. Feb
   24, 2014) ................................................................................................................................ 6

*Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, No. 6:15-cv-641-Orl-28TBS, 2017 WL
   11457208 (M.D. Fla. April 13, 2017) ..................................................................................... 6

## **RULES**

Federal Rule of Evidence 702 ................................................................................................ 1, 5, 6

ii

DPPs' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION WITH
RESPECT TO IRICO DEFS.; Master File No. 07-CV-5944-JST

1

## I.      INTRODUCTION

2          In their opposition ("Opp.") to Direct Purchaser Plaintiffs' (DPPs') motion for class

3 certification ("Motion" or "Mot."), the Irico Defendants ("Irico") fail to offer any substantial

4 argument or evidence contradicting DPPs' showings that: 1) DPPs are qualified to represent the

5 class (Mot. 17-18); 2) they have presented "a plausible methodology to demonstrate that antitrust

6 injury can be proven on a classwide basis" (Mot. 21); 3) DPPs have presented a reliable method for

7 determining damages (Mot. 23-25); and 4) that a class action is superior. Mot. 25. Irico fails to take

8 issue with Judge Conti's Order (ECF No. 3902) (the "Cert. Order") finding, after "rigorous" inquiry,

9 that these requirements were satisfied in virtually identical circumstances. Irico does not materially

10 challenge DPPs' account of the CRT conspiracy or its participation in it. Irico does not offer the

11 opinion of another expert economist contradicting Dr. Johnson's thorough report. Instead, Irico

12 continues its practice of avoiding the substance of the case in favor of a multitude of factual and

13 legal misstatements, and re-argument of matters long resolved.

14          Irico's principal argument is simply that the Court should exclude the Johnson Report and

15 then find that DPPs have failed to carry their burden. But it points to no substantive faults of Dr.

16 Johnson's report – in most respects, identical to the Leitzinger Report relied upon by Judge Conti in

17 the Cert. Order – to justify its draconian request. Rather, Irico's accusation of plagiarism is an

18 unfounded personal attack on Dr. Johnson, who stepped in as DPPs' expert because of Dr.

19 Leitzinger's unavailability. From the outset, Dr. Johnson led the team supporting Dr. Leitzinger,

20 worked closely with him on every report, and was the obvious choice to replace him. Moreover,

21 exclusion of the Johnson Report without any showing that it violates Rule 702 of the Federal Rules

22 of Evidence ("FRE 702") is impermissible.

23          Irico's assertions that the DPPs are not typical or adequate class representatives ignore the

24 Court's previous orders.

25          Finally, the criticisms Irico offers of Dr. Johnson's opinions lack merit. They mischaracterize

26 Dr. Johnson's work, the evidence in the case, and econometric practice. They cast no doubt on his

27 opinions that classwide evidence of impact exists, or the validity of his damage study.

28          DPPs respectfully submit that the Court should certify the proposed class.

1

1

## II.     ARGUMENT

2

### A.  Irico Fails to Undermine DPPs' Showing That Common Issues Predominate.

3

Irico fails to rebut DPPs' showings as to the key inquiry before the Court: whether classwide

4

issues predominate. First, Irico takes no material issue with DPPs' detailed account of the

5

extraordinary operations of the alleged conspiracy, or that it constitutes the overriding common issue

6

in this case. While trying to portray itself as a "disruptor," Opp. 6-7, Irico conspicuously fails to

7

deny participation in the conspiracy, including attendance at over 100 conspiratorial meetings, and

8

participation in conspiratorial agreements. Opp. 7:7-8; *see* Mot. 5-14.[1] Courts have found

9

predominance in conspiracy cases based on this factor alone. Mot. 19.

10

Second, while DPPs have identified multiple categories of common evidence of impact, Irico

11

has failed to show that any of them do not tend to prove that fact on a classwide basis. Irico takes no

12

material issue with the following:

13

14
- That conspiratorial output restraints would have resulted in classwide impact;

15
16
- That structural aspects of the CRT market – e.g., the conspiracy's market power, ability to rewrite prices, barriers to entry – meant that the conspiracy's pricing activities would have resulted in classwide impact;

17
18
- That the broad extent of communication and collusive activities of the alleged conspiracy, would have resulted in classwide impact; and

19
- That Dr. Johnson's damage model shows that virtually all purchasers of CRTs during the class period were damaged.

20

Mot. 21-23.

21

Further, while Irico offers some criticisms of the additional categories of proof set forth in

22

the Johnson Report and the Motion, it fails to show that they are not what DPPs say they are:

23

***common proof***. Irico's criticisms at best go to the weight of this evidence. But DPPs do not have to

24

show that they will succeed in proving classwide impact, only that there is a plausible way to

25

26

_____

[1] Irico's assertions of disruption rely on out of context statements and ignore other parts of documents showing its participation in conspiratorial agreements. *See, e.g.*, Carter Decl., Ex. 19 at

27

CHU00029170.01E-02E ("*Mr. Moon* said that he and Director Liu of CPT have communicated twice with *IRICO* and that *IRICO* has agreed to raise its 14" *ITC* prices from the original *USD* 26

28

to *USD* 29-30.").

2

determine that issue on a classwide basis. *See* Mot. 20-21. This evidence includes:

- Dr. Johnson's target price analysis showing that virtually all CRTs were the subject of price targets set by the conspirators;

- That Dr. Johnson's regression analysis showing that target prices set by the conspirators impacted the prices of targeted CRTs;

- Dr. Johnson's correlation analysis showing that non-targeted CRTs were impacted;

- Dr. Johnson's hedonic regression analysis showing that virtually all variation in CRT pricing was due to product characteristics; and

- Dr. Johnson's opinion that there was a pricing structure based on sizes and features of CRTs that would have resulted in broad impact.

In short, DPPs have advanced abundant classwide evidence of impact.

Third, Irico fails to invalidate Dr. Johnson's damage model – which applies the well-accepted "before and after" methodology, and which Judge Conti has already approved. Mot. 23-25.

DPPs respectfully submit that these failings require that the Court grant DPPs' motion.[2]

**B. Irico's Plagiarism Accusation Is Baseless.**

Irico's claim that Dr. Johnson committed plagiarism is entirely wrong. The facts are unremarkable: Dr. Johnson, an experienced senior economist and Managing Director at Econ One, like Dr. Leitzinger, has taken over as DPPs' expert witness due to Dr. Leitzinger's unavailability. Irico offers nothing to suggest that Dr. Johnson improperly appropriated Dr. Leitzinger's work; failed to do the work underlying his report; misrepresented the circumstances of his report; or did anything that undermines the reliability of his report or his credibility.

First, Irico offers no evidence that Dr. Johnson has improperly appropriated Dr. Leitzinger's work. It is undisputable that he replaced Dr. Leitzinger as DPPs' expert because Dr. Leitzinger was unavailable. Declaration of R. Alexander Saveri in Support of DPPs' Reply Memo. in Support of Their Mot. for Class Certification with Respect to the Irico Defendants, ¶ 2 ("Saveri Reply Decl."). He was the obvious choice: like Dr. Leitzinger, he is a Managing Director at Econ One, an

---

[2] Irico's argument that DPPs fail to satisfy "superiority" depends on its assertion of a lack of predominance, Opp. 25, and therefore also fails.

experienced and qualified expert economist, and has worked on this matter since Econ One's initial

retention. *See* Reply Expert Report of Phillip M. Johnson, Ph. D. (March 4, 2022) ("Reply Report"),

¶ 3; Saveri Reply Decl., ¶ 2.

Second, there is no question that Dr. Johnson performed the work underlying his opinions.

He has logged over 1,500 hours on this matter and led the team assisting Dr. Leitzinger. Reply

Report ¶ 3. Dr. Johnson noted his previous expert work on the CRT market on the first page of his

report (¶ 2), and his attached CV provides, under the heading "Summary of Engagements":

> In Re: CRT Antitrust Litigation. Analyzed economic issues relating to class certification,
> liability, and damages in a price-fixing case for a class of direct purchasers of cathode ray
> tubes against the major manufacturers. Class certified. Settled. 2011-2017.

Expert Report of Phillip M. Johnson, Ph.D. (ECF No. 5971-2) ("Johnson Report"), Ex. 1 at 3-4.

Dr. Johnson also testified that he performed the work underlying his report. Deposition of Phillip M.

Johnson, Ph.D., 134-138 (Jan. 11, 2022) ("Johnson Dep.") (attached as Ex. 1 to Saveri Reply Decl.).

The Johnson Report also contained substantial new work that built upon the studies contained in Dr.

Leitzinger's reports. *See* Mot. 23; Johnson Report at ¶¶ 62, 63, fig. 12, ¶¶ 65-67, figs. 14, 15, ¶¶ 81-

86, fig. 19. This work plainly required a deep understanding of the studies contained in the

Leitzinger Report that were also included in the Johnson Report.

Third, neither DPPs nor Dr. Johnson have misrepresented or concealed the relationship of

the Johnson Report to the Leitzinger Report. To the contrary, after describing Dr. Johnson's

"statistical analysis" – including his hedonic regressions, his regression and correlation analyses of

"price targets" found in the conspirators' meeting notes, his correlation analysis of prices of CRTs

for which price targets were not found, and his regression analysis showing conspiratorial

overcharges were reflected in the prices of finished products – the Motion plainly states: "*In these

regards, Dr. Johnson's statistical analysis and his conclusions are substantially identical to Dr.

Leitzinger's*." Mot. 23:4-5 (emphasis added). *DPPs also described Dr. Johnson's damage model as

"substantially identical" to Dr. Leitzinger's and even cited to Dr. Leitzinger's last study*. Mot.

23:4-24:13 (emphasis added). DPPs also noted that Dr. Johnson's conclusions that structural factors

of the CRT market proved classwide impact follow Dr. Leitzinger's. Mot. 23:14-18. DPPs also

explained how Dr. Johnson's report differed from Dr. Leitzinger's. *See id.* at 23:6-9.

Finally, that the Johnson Report shares common language and conclusions with the Leitzinger Report is self-evident. Indeed, that the reports were identical in substantial respects was – and still is – an important point, because Judge Conti has already validated the studies common to both reports in his Cert. Order. *See* Mot. 24.

Irico does not and cannot point to a single example of any misrepresentation by Dr. Johnson. Dr. Johnson freely acknowledged that the Johnson Report was identical in many respects to the Leitzinger Report in his deposition. Johnson Dep., 127:22-25; 130:24-131:23. Their suggestion that Dr. Johnson did not do so until "confronted" (Opp. 8) is ludicrous; he acknowledged the (already acknowledged) Leitzinger Report the first time he was asked. Johnson Dep., 117:2-122:24. Irico's assertion that he should have referred to the Leitzinger Report when asked about his source materials mischaracterizes the question posed. Irico's paraphrase in the Opp. (at 8) omits that he was asked if his list of source materials included everything that he "***relied on***" in forming his opinions. Johnson Dep., 114:14-22. Irico's criticism of Dr. Johnson's statement that he did not rely on the Leitzinger Report, Opp. 9, is also baseless. Dr. Johnson's testimony that he shared Dr. Leitzinger's opinions but that his opinions were his own and did not depend on Dr. Leitzinger's is entirely reasonable. Johnson Dep., 137:9-138:17. Further, it is natural for Dr. Johnson to agree with Dr. Leitzinger's reports, including the language in them, given his extensive work with Dr. Leitzinger on them. It would be strange if he did not.

Finally, Irico misstates the law. It has not made a motion under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (2013), or even cited FRE 702. It simply asks the Court to exclude Dr. Johnson's report as "unreliable" without consideration of its merits. Such relief would be improper. *See, e.g., Elosu v. Middlefork Ranch Inc.,* No. 21-35309, 2022 WL 534345, at *3-*4 (9th Cir. 2022) (Rule 702 controls admissibility of expert opinion) (*citing Daubert*, 509 U.S. at 586)).

FRE 702 allows expert testimony where:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and

1

(d) the expert has reliably applied the principles and methods to the facts of the case.

2

The Johnson Report clearly satisfies these requirements and Irico concedes the point. It does not

3

challenge Dr. Johnson's expert qualifications or that his analyses are proper subjects of expert

4

testimony under subsection (a) or argue that the Johnson Report fails to satisfy subsections (b), (c)

5

or (d). While it offers some criticisms of Dr. Johnson's report, Irico conspicuously fails to assert that

6

they justify exclusion under FRE 702, and they clearly do not. *See* section II. D below.

7

Nor do Irico's cases support such relief. In *Moore v. BASF Corp.*, No. 11-1001, 2012 WL

8

6002831 (E.D. La. Nov. 30, 2012), the court examined three opinions the expert offered and found

9

each substantively defective under FRE 702. *Id.* at *4, *7. The court addressed the plagiarism issue

10

only as to one portion of the expert's testimony, noting that it was "yet another reason the court

11

finds that Dr. Kura's opinions in general are unreliable." *Id.* at *7. The court's next sentence appears

12

to be a summing up of all of its holdings rather than a statement that it found the plagiarism issue to

13

justify the exclusion of the expert's testimony as a whole. *See id.* If it was the latter, the court cites

14

no authority for its action. *See id.* The plagiarism issue was unnecessary to the court's ruling, *see id.*,

15

and the Circuit Court affirmance doesn't mention it. *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513

16

(5th Cir. 2013).

17

Similarly, the court in *Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, No. 6:15-cv-641-Orl-

18

28TBS, 2017 WL 11457208 (M.D. Fla. April 13, 2017), excluded the expert's report in its entirety

19

under FRE 702 based on deficiencies unrelated to the plagiarism issue. *Id.* at *1-*2. The court cited

20

the fact that the expert had also copied material from another expert's report in a different case in

21

her report and actively concealed that fact as "further support[]" for its exclusion. *Id.* at *3. As in

22

*Moore*, the plagiarism issue was unnecessary to its holding. *Raymo v. Sec'y of Health & Human*

23

*Servs.,* No. 11-0654V, 2014 WL 1092274 (Fed. Cl. Feb 24, 2014), is also inapposite. It is a Vaccine

24

Act case in which the special master was the trier of fact. *Id.* at *13. The special master did not

25

purport to exclude the experts under FRE 702. *See id.* (FRE 702 is "an evidentiary rule not

26

applicable to Vaccine Act cases."). Rather, he stated that he would not rely on them. *Id.* at *16.[3]

27

28

---

[3] The facts of these cases are also not comparable to this case. Among other things, each involved experts who concealed lifting sections of their report from a report by a different expert in a

In short, Irico's accusation of plagiarism is completely unsupported.

**C.  Irico's Arguments That DPPs Lack Standing And Typicality Contravene The Court's Previous Rulings.**

       **i.**      **Judge Conti And This Court Have Repeatedly Held That DPPs Satisfy Typicality**

Judge Conti rejected arguments that DPPs do not satisfy typicality. Cert. Order at 10-11. And DPPs have repeatedly been found to meet the requirements for typicality in orders approving prior settlements. *See, e.g.*, Order Granting Class Certification and Prelim. Approval of Class Action Settlement with the Thomson & TDA Defs., ¶ 6 (June 12, 2015) (ECF No. 3872). Irico's attempt to relitigate this issue should be rejected.

Other courts have also rejected Irico's argument that DPPs are not typical because they purchased different quantities or paid different prices. To the contrary, typicality is satisfied, where, as here, the claims of plaintiffs and the class arise out of the same conduct by Defendants, depend on proof of the conspiracy, and seek the same "overcharge" on the price-fixed component. Mot. 16-17.

The cases Irico cites do not mandate a different result. In *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) ("*GPU*"), the Court held that typicality failed because of "overwhelming disparities" between the named plaintiffs' claims and those of absent class members. *Id.* at 490. The named plaintiffs purchased a single standardized graphics card at retail, whereas the unrepresented class members purchased enormous quantities of customized cards. *Id.* at 489. These "overwhelming disparities" are not implicated in this case where the proposed class representatives are stores, finished product manufacturers, and equipment suppliers and include Meijer, a large purchaser, a fact Judge Conti recognized. Cert. Order, 43 ("[T]he Court finds Mitsubishi's reliance on *GPU* unpersuasive."). In *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311 (N.D. Cal. 2014), the Court found that certification failed for other reasons before determining that the disparity between the named plaintiffs and others in the class was as "similarly acute" as that in *GPU* – a concern not implicated in this case. *Id.* at 317-18. *Deiter v. Microsoft*

---

different case. *See Moore,* 2012 WL 6002831, at *7 (conclusions copied verbatim from expert report in a different case); *Spiral Direct,* 2017 WL 11457208, at *2 (expert provided "no hint" that she had used another expert's report until confronted at her deposition); *Raymo,* 2014 WL 1092274, at *13 (expert plagiarized report from different expert in different case and gave misleading testimony).

*Corp.*, 436 F.3d 461 (4th Cir. 2006), unlike this case, was a Section 2 monopolization case where the Court found the relevant market was different for the individual class representatives and the excluded Enterprise customers. *Id*. at 467-68. *In re Milk Products Antitrust Litig.*, 195 F.3d 430 (8th Cir. 1999) is similarly inapposite. There, the sole class representative was a former convenience store owner who, *inter alia*, was found to lack standing to even bring an individual claim; testified that she sought to represent only small convenience store owners rather than all potential class members; and faced potential litigation over the ownership of her claim. *Id*. at 436-37.

Finally, Irico's argument that DPPs cannot represent the interests of larger purchasers is refuted by their long service on behalf of the class to date and the reaction of the class members themselves. The class has not objected to the appointment of these class representatives to represent their interests as members of the classes certified to date. Saveri Reply Decl., ¶ 4.

### ii. The Court Has Already Rejected Irico's Argument that DPPs Lack Standing

Irico's assertion that the DPPs lack standing to pursue claims for purchases of finished products because none purchased from entities it owned or controlled also reargues a long-resolved issue. It is directly contrary to the Court's order denying Defendant TDA's summary judgment motion on the ground that the DAPs needed to show purchases of finished products from an entity TDA owned or controlled to have standing, rather than entities of other conspirators:

> TDA argues that this evidence is irrelevant because it shows only that Plaintiffs purchased finished CRT products from direct purchasers owned or controlled by other conspirators, not by TDA. . . . ***But the Illinois Brick direct purchaser rule is a standing requirement, meaning the focus is on whether the plaintiff purchased from a controlled entity, not whether a particular defendant was doing the controlling. Eliminating any doubt on this point is the fact that "[n]othing in Illinois Brick displaces the rule of joint and several liability, under which each member of a conspiracy is liable for all damages caused by the conspiracy's entire output."*** *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002). [footnote omitted] In other words, if Plaintiffs can overcome Illinois Brick's standing requirement via the control exception, and TDA is a participant in the CRT conspiracy, TDA is jointly and severally liable for Plaintiffs' damages, even if TDA was not the conspirator who controlled the direct purchasers from whom Plaintiffs bought CRT products.

Order Denying in Part & Granting in Part Def. Techs. Displays Ams. LLC's Mot. for Summ. J. at 8-

9 (Jan. 25, 2017) (ECF No. 5105) ("TDA Order") (footnotes, cites omitted) (emphasis added).[4] This order disposes of Irico's argument entirely. Irico's attempted distinction – that "denying class status as to DPP's indirect purchaser in their claims against Irico would not 'displace the rule of joint and several liability,' as was the focus of this court's decision in TDA" (Opp. 13 n. 20) – is nonsense. As the Court explained, it misstates the principle of joint and several liability which provides that a conspirator is liable for all damages flowing from a conspiracy. TDA Order at 9 (citing *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002)).

Irico's argument that the owned and controlled exception is inapplicable because "market forces" do not preclude suit for purchasers of finished products is also incorrect, as the Court has explained. *See In re CRT*, 2016 WL 7805628, at *7-8, 20 ("The control exception under *Royal Printing*, however, does not require that market forces be superseded.").[5]

### D.  Irico's Attacks on Dr. Johnson's Opinions Lack Merit.

Irico offers numerous critiques of the Johnson Report which, it argues, are fatal to Dr. Johnson's conclusions that classwide impact can be shown by proof common to the class and the validity of his damages model. As noted above, Irico assertion is incorrect because its criticisms go to the weight of DPPs proffered evidence, not whether it constitutes common proof. *See* Mot. 20-25.

---

[4] Other orders also dispose of this argument. Judge Conti's denial of defendants' (including Irico) motion to dismiss, held that DPPs' allegations that they purchased CRTs or CRT Products from Defendants or their owned or controlled subsidiaries was sufficient to establish standing at the pleading stage. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1023 (N.D. Cal. 2010). Judge Conti's denial of Defendants' motion for summary judgment on this issue held that DPPs' evidence of purchases of finished products from owned or controlled subsidiaries of alleged conspirators was sufficient to create triable issues of fact as to DPPs' standing to seek relief for purchases of such products. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d. 857, 872 (N.D. Cal. 2012). And this Court's ruling on defendants' summary judgment motions attacking the DAPs' standing to pursue claims based on purchases of finished products held, *inter alia*, that a triable issue existed as to their standing to pursue claims based on purchases of finished products from Samsung Electronics Corporation ("SEC") based on its alleged ownership and control of conspirator Samsung SDI. *In re Cathode Ray Tube (CRT) Antitrust Litig.* MDL No. 1917, Case No. C-07-5944 JST, 2016 WL 7805628, at *25 (N.D. Cal. Aug. 4, 2016). Judge Conti also held that DPPs had standing to pursue claims based on purchases of finished products from entities owned or controlled by alleged conspirators. Cert. Order 24. While Judge Conti did not expressly address the issue, the conspirators who owned or controlled the entities from whom DPPs purchased had settled, so the situation was identical to the one before the Court now. *Id.* at 1–2 & n.1.

[5] *Easter v. American West Financial*, 381 F.3d 948, 962 (9th Cir. 2004), is inapposite. Among other things, it is not a conspiracy case. *Id.* at 962 ("[B]orrowers presented no evidence that their alleged injuries were the result of a conspiracy or concerted scheme").

For this reason, Irico's criticisms do not establish that impact and damages cannot be determined on a classwide basis. They also lack merit on their own terms. None are supported by expert analysis. All are bound up with myriad mischaracterizations of Dr. Johnson's methodologies and conclusions, the evidence, and econometric practice. In short, Irico's criticisms fail to rebut Dr. Johnson's conclusions that there are many types of evidence in this case that prove that the alleged conspiracy had a widespread impact on the class and that damages can be reliably calculated.

### i.   Irico's Criticisms Are Not Supported by Expert Analysis

Despite retaining no expert, Irico makes assertions regarding Dr. Johnson's expert opinions that are within the realm of expert testimony. It offers criticisms of Dr. Johnson's methodology, including the way he constructs his regression and correlation analyses, disagrees with the conclusions he draws from his analyses, and claims he should have conducted different analyses. Each is an implied expert opinion that Dr. Johnson "did it wrong." But Irico has identified no expert to stand behind them. It has provided no expert report explaining the detailed basis for them. It has produced no witness for deposition to defend them. Indeed, it is possible that no expert would endorse them. This is obviously improper and DPPs respectfully submit that the Court would be justified in refusing to consider Irico's criticisms. *See Elosu,* 2022 WL 534345, at *4 (expert opinion reliable where "***knowledge underlying it*** has a reliable basis in the knowledge and experience of the relevant discipline.") (citing *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)(emphasis added)). Alternatively, the Court should accord them little weight.

### ii.   The Irico Defendants' Criticisms of Dr. Johnson's Opinion That The Conspiracy "Targeted" the Top-Selling CRTs Is Baseless

Irico's attack on Dr. Johnson's conclusion that sizes and types of CRTs for which he found "target prices" accounted for over 98% of CDTs and 90% of CPTs shipped materially misrepresents his methodology and the evidence. First, Irico falsely claims that Dr. Johnson denominated a CRT as "targeted" if he found a single price target "at any point in time." Opp. 15. Irico simply ignores that Dr. Johnson identified at least 36 price targets (and as many as 77) for every CDT identified as targeted; and at least 9 price targets (and as many as 108) for every CPT so identified. Johnson Report, ¶ 52. Dr. Johnson's conclusions are well-supported.

Second, the chart Irico presents is materially inaccurate. Irico omits price targets and represents price targets expressly applying to quarters, or even multiple quarters, as applying only for a single month. Many of the "gaps" it purports to illustrate therefore do not exist. Reply Report ¶¶ 10-13. Irico also incorrectly includes a CRT with only a single identified target price in its chart (34" CPTs), Opp. 16, that Dr. Johnson **did not** identify as "targeted." *See* Johnson Report, ¶ 32, fig. 9; Reply Report, ¶ 11.[6]

Third, Irico's assertion that Dr. Johnson's report shows that CRTs sold during the "gaps" in its chart (or for which no price targets were found) were not impacted by the conspiracy, Opp. 15-16, is another mischaracterization. Dr. Johnson's report demonstrates the opposite. Dr. Johnson's report explains that price targeting was not the sole means by which the conspiracy operated to raise prices. Among other things, it also operated via output restrictions: "Defendants and co-conspirators utilized a range of activities that covered all CRT production and had the effect of elevating all CRT prices." Reply Report, ¶¶ 6-8. Dr. Johnson's regression analysis also showed that the effect of the price target generally persisted (and was statistically significant) for *two quarters after the quarter in which it was initially effective.* Reply Report, ¶¶ 13, 14. In other words, price targets impacted actual prices *nine months* later, further narrowing any purported gaps. *Id.* More broadly, Dr. Johnson specifically concludes based on both "qualitative evidence" as well as correlation analysis that CRTs for which target prices were not found were impacted by the conspiracy. Johnson Report ¶¶ 57-64; Reply Report ¶¶ 28-30. And beyond that, as noted, his report contains other analyses demonstrating broad impact of the conspiracy – i.e., across all CPTs and CDTs, including those for which price targets were not found.

Furthermore, it is likely that all price targets are not reflected in the discovery record. Reply Report, ¶ 15. For example, documents indicate the occurrence of meetings for which no records were produced. *Id.* And, the conspirators urged one another to destroy records. Mot. 14-15, n. 35. Additionally, some potential price targets were not usable in Dr. Johnson's regression analysis because they lacked clarity. Johnson Report, ¶ 50; Reply Report, ¶ 15. Thus, for example, several

---

[6] When DPPs asked, Irico refused to provide the backup for its chart. *See* Saveri Reply Decl., Exs. 2, 3.

documents exist showing that conspirators "targeted" 29 CPTs during the "gap" between 1999 and 2003 emphasized by Irico. Reply Report, ¶ 15.

Finally, Irico's claim that Dr. Johnson overstates the amount of "targeted" shipments ignores that the time periods without price targets for particular CRTs often have lower sales. *Id.* at ¶ 16. For this reason, even if one accepts Irico's incorrect assertions and excludes periods before the first "price target" and after the last one, the amount of commerce subject to price targets during the class period found in the record remains large – it includes nearly 75% of CRTs (81% of CDTs and 71% of CPTs) (without accounting for the nine-month persistence of target price impact after the last target price). If the periods before the first found price target are excluded, it includes about 87% of CRTs (94% of CDTs and 82% of CPTs). *Id.* Dr. Johnson's statement that his target price analysis "goes a long way towards establishing the existence of broad impact on the part of the alleged conspiracy" remains well supported by the study even if Irico's incorrect limitations are accepted.[7]

### iii. Irico Mischaracterizes Dr. Johnson's Target Price Regression and Testimony

Irico's attack on Dr. Johnson's target price regression, Opp. 17-19, also lacks merit. First, Irico misquotes Dr. Johnson's report. The full quote states regarding the target price regression: "The results reveal statistically strong evidence of a positive relationship between target prices and actual prices, separate and apart from the effects of other market factors." Reply Report, ¶ 20 (emphasis in original). The regression thus supports Dr. Johnson's conclusion that target prices had a "demonstrable effect" on actual prices. *Id.* Irico's assertion that Dr. Johnson "admitted" that his study did not demonstrate causation, Opp. 17, is false. Dr. Johnson agreed with Irico counsel's abstract question that "a high degree of correlation does not imply a causal relationship." Reply Report, ¶ 21. He never "admitted" that his target price regression does not do so. *Id.*

---

[7] Irico's reliance on the Report of Robert Willig, filed in 2013 in response to Dr. Leitzinger's first report, is also misplaced. First, the study Dr. Willig analyzed is not "identical" to Dr. Johnson's as Irico asserts. Opp. 16 n.24. Dr. Johnson's study contains roughly 40% more documents and records than Dr. Leitzinger's initial study. Reply Report, ¶ 18. Dr. Willig's analysis is also obviously incorrect, as is evident even from Irico's chart. He claimed that Dr. Leitzinger's target price analysis affected only 6% of CDT shipments and 24% of CPT shipments. To reach his conclusion, Dr. Willig improperly excluded almost half of the "target price" observations; ignored that price targets would impact prices beyond the immediate quarter; and ignored the effect of output limitations and other conspiratorial activity, among other things. Reply Report, ¶¶ 17, 18.

Irico's assertion that Dr. Johnson failed to include "basic and customary tests" to control for spurious correlations in his regression also misrepresents his analysis and displays a "fundamental misunderstanding" of econometrics. Dr. Johnson's target price regression "is, indeed, estimated in an error-correction form and includes controls that account for the possibility of a spurious relationship." Reply Report, ¶ 23; *see generally id.* at ¶¶ 22-27. Moreover, Dr. Johnson explains that this approach is superior to the "stationarity" tests Irico advocates. *Id.* at ¶ 24.

### iv.     Dr. Johnson's Correlation Analysis Shows That "Non-Targeted" CRTs Were Impacted

Irico's criticism of Dr. Johnson's correlation analysis showing that CRTs for which price targets were not found were also impacted is also based on a mischaracterization of the Johnson Report. Contrary to Irico's assertion that Dr. Johnson "masks substantial variation" in his presentation of his results, Figure 13 of the Johnson Report separately shows the results of the correlation analysis for each of 13 "Non-Targeted CRTs." Johnson Report, ¶ 64. Eight of these – accounting for over 97% of the sales of "non-targeted" CRTs – had coefficients over .8. *Id.* The lower correlated products accounted for only 2.5% of the "non-targeted" sales (and only .5% of all sales between 1995 and 2007), and their lower correlations likely result from the fact that they were based on a much smaller dataset. *Id.* As Dr. Johnson explains, the quantity weighted average coefficient -- .93 -- is the most appropriate way to summarize the analysis in evaluating whether impact was widespread. Reply Report, ¶¶ 28, 29. Irico's unsupported assertion that correlation analysis is "unreliable" is also wrong. As Dr. Johnson explains, "Correlations are well-accepted in analyzing price relationships." Reply Report, ¶ 30. "[I]t is nonsensical to presume that prices of various related products are unrelated and that the high correlations are merely spurious relationships." *Id.*[8]

### v.     Irico's Attacks On Dr. Johnson's Hedonic Regressions Mischaracterize Them

Irico's criticism of Dr. Johnson's hedonic regressions showing that CRT characteristics

---

[8] To the extent, Irico argues that regression and correlation analysis are not acceptable methods to analyze economic issues in antitrust cases, they are mistaken. *See, e.g.*, Cert. Order, 43-48 (The "use of regression and correlation analysis is well established as a means of providing classwide proof of antitrust injury and damages." *Id.* at 48.).

13

explain the vast majority of the variability of CRT prices during the class period is, again, premised on mischaracterizations of Dr. Johnson's analysis. First, contrary to Irico's assertion, Dr. Johnson did not attempt to "obscure" anything about his regression. He presents in Figure 7 of his report each and every one of 104 quarterly regressions, and specifically notes that the R-squared exceeded .7 "in all but four." Johnson Report, ¶ 29; Reply Report ¶¶ 44. Nor does Dr. Johnson combine "all CPT sizes and all CDT sizes together in a single quarterly regression" as Irico claims. Reply Report, ¶ 45. Irico's assertion that this would have "served to obscure additional variation in the fit of the chosen variables" is "incomprehensible" as a matter of econometrics. *Id.* Finally, that the 104 regressions showed some variability is to be expected and does not undermine Dr. Johnson's conclusions. *Id.*

### vi.   Irico's Criticisms of Dr. Johnson's CRT Price Structure Opinion Mischaracterize his Opinion and the Evidence

Irico's criticisms of Dr. Johnson's opinion that there were structural elements in CRT pricing that tended to link prices for CRTs of different types and sizes are based on mischaracterizations of his report and the evidence. Irico's claim that Dr. Johnson "lumps all products together" is simply wrong. Reply Report, ¶ 33. Irico also simply ignores Dr. Johnson's analysis of the testimony of the conspirators regarding the pricing structure of different sizes and configurations of CRTs and his correlation analyses of the various sizes and types of CRTs. *Id.* at ¶ 34. Finally, Irico's claim that switching production between CRT types and sizes was cost prohibitive and that Dr. Johnson's reliance on the testimony of a Toshiba executive to the contrary was a cherry-picked exception, Opp. 20-21, misrepresents the evidence. To the contrary, the evidence overwhelmingly supports Dr. Johnson's conclusion. As he explains, line status reports produced by conspirators show that:

> Every co-conspirator had several production lines capable of producing multiple CRT sizes. On some production lines, a range of sizes could be produced. For example, LPD's Korean Gumi facility had a line capable of producing 28-inch, 29-inch, 32-inch and 34-inch CPTs and a line producing 17-inch and 19-inch CDTs.

Reply Report, ¶ 37. The conspiracy documents also contain many examples of line flexibility. *See, generally, id.* at ¶¶ 31-42; *see also* Mot. 8, n.17. Irico's claim regarding "demand substitutability" is also "misguided" and does not undermine Dr. Johnson's analysis, as he explains. Reply Report, ¶ 42.

### vii.   Irico's Criticisms of Dr. Johnson's Damage Study Also Fail

14

1    Irico's critiques of Dr. Johnson's damage study fare no better. Its first argument – that the

2    overcharge model includes products that could not plausibly have been affected by the conspiracy,

3    Opp. 22, depends entirely on the assertion that there can be no impact unless a documented price

4    target has been located. As explained above, this is not correct. Reply Report, ¶¶ 47-49; Section II.

5    D. ii above.

6    Irico's claim that Dr. Johnson's damage study is deficient because it does not account for

7    purported price floors instituted by the Chinese government, Opp. 23, also lacks merit. Among other

8    things, this is a disputed issue. DPPs contend that these purported price floors had no practical effect

9    and Irico has provided no evidence that these regulations existed for any substantial period, how

10   they would have applied, or that they were ever enforced. Saveri Decl., ¶ 7. In any event, as Dr.

11   Johnson explains, "there is no reason to believe that these regulations would have had a measurable

12   effect on actual global market prices." Reply Report, ¶¶ 50-53.

13   Finally, Irico's claim that the damage model is incapable of excluding damages for time

14   periods it claims it cannot be liable, Opp. 25, reflects a lack of understanding of the model (or a

15   failure to examine Dr. Johnson's backup materials). The model generates a damage estimate for

16   each quarter of the class period. To the extent Irico is found liable for some period less than the full

17   class period, the appropriate amount of damages can be calculated. Reply Report, ¶¶ 54-55. DPPs

18   also dispute Irico's claim that it did not attend meetings until 1998. Saveri Reply Decl. ¶ 8.

19

20   **III. CONCLUSION**

21   For the foregoing reasons, DPPs respectfully submit that the Court should certify the class.

22

23

24

25

26

27

28

| | | |
|---|---|---|
| 1 | Dated: March 4, 2022 | Respectfully submitted, |
| 2 | | /s/ *R. Alexander Saveri* |
| 3 | | R. Alexander Saveri (173102)<br>Geoffrey C. Rushing (126910) |
| 4 | | Matthew D. Heaphy (227224)<br>Sarah Van Culin (293181) |
| 5 | | SAVERI & SAVERI, INC.<br>706 Sansome Street |
| 6 | | San Francisco, CA 94111<br>Telephone: (415) 217-6810 |
| 7 | | Facsimile: (415) 217-6813 |
| 8 | | *Interim Lead Counsel for*<br>*Direct Purchaser Plaintiffs* |
| 9 | | |
| 10 | | Joseph W. Cotchett<br>Adam J. Zapala |
| 11 | | COTCHETT, PITRE & McCARTHY, LLP<br>840 Malcolm Road |
| 12 | | Burlingame, CA 94010<br>Telephone: (650) 697-6000 |
| 13 | | |
| 14 | | Steven F. Benz<br>KELLOGG, HANSEN, TODD, FIGEL &<br>FREDERICK, P.L.L.C. |
| 15 | | 1615 M Street, N.W., Suite 400<br>Washington, DC 20036 |
| 16 | | Telephone: (202) 326-7900<br>Facsimile: (202) 326-7999 |
| 17 | | |
| 18 | | Douglas A. Millen<br>William H. London |
| 19 | | FREED KANNER LONDON & MILLEN<br>2201 Waukegan Road, Suite 130 |
| 20 | | Bannockburn, IL 60015<br>Telephone: (224) 632-4500<br>Facsimile: (224) 632-4519 |
| 21 | | |
| 22 | | *Attorneys for Plaintiffs* |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |