R. Alexander Saveri (173102)
  *rick@saveri.com*
Geoffrey C. Rushing (126910)
  *grushing@saveri.com*
Matthew D. Heaphy (227224)
  *mheaphy@saveri.com*
Sarah Van Culin (293181)
  *sarah@saveri.com*
SAVERI & SAVERI
706 Sansome Street
San Francisco, California 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Interim Lead Counsel for the*
*Direct Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-CV-5944-JST |
| | MDL No. 1917 |
| This Document Relates to: | **DECLARATION OF R. ALEXANDER SAVERI IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION WITH RESPECT TO THE IRICO DEFENDANTS** |
| *ALL DIRECT PURCHASER ACTIONS* | |
| | Date:   March 31, 2022 |
| | Time:   2:00 p.m. |
| | Judge:  Hon. Jon S. Tigar |
| | Ctrm:   6, 2nd Floor |

I, R. Alexander Saveri, declare:

1.      I am the Managing Partner of Saveri & Saveri, Inc., Interim Lead Counsel for Direct Purchaser Plaintiffs ("DPPs") in this action. I am a member of the Bar of the State of California and admitted to practice in the Northern District of California. I have been involved in virtually every aspect of this case from its outset in 2007. I make this Declaration in Support of DPPs' Reply Memorandum in Support of Their Motion for Class Certification with Respect to the Irico Defendants. Except as otherwise stated, I have personal knowledge of the facts stated below.

2.      In April, 2021 Dr. Leitzinger informed me that he was not available to prepare an expert report in support of DPPs' Motion for Class Certification with Respect to the Irico Defendants. Dr. Johnson was an obvious choice because, like Dr. Leitzinger, he is a Managing Director at Econ One, an experienced and qualified expert economist, and has worked on this matter since Econ One's initial retention. It is my understanding that Dr. Johnson has logged over 1,500 hours on this matter and led the team assisting Dr. Leitzinger.

3.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts of the deposition of Phillip M. Johnson, Ph.D., dated January 11, 2022.

4.      I am unaware of any objections by direct purchaser class members to the appointment of the following class representatives to represent their interests as members of the classes certified to date: Arch Electronics, Inc.; Crago Corp. d/b/a Dash Computers, Inc.; Meijer, Inc. and Meijer Distribution, Inc.; Nathan Muchnick, Inc.; Princeton Display Technologies, Inc.; Radio & TV Equipment, Inc.; Studio Spectrum, Inc.; and Wettstein and Sons, Inc. d/b/a Wettstein's.

5.      Attached hereto as Exhibit 2 is a true and correct copy of a letter from Geoffrey C. Rushing of Saveri & Saveri, Inc., counsel for DPPs, to Evan J. Werbel of Baker Botts LLP, counsel for the Irico Defendants, dated January 26, 2022.

6.      Attached hereto as Exhibit 3 is a true and correct copy of a letter from Mr. Werbel to Mr. Rushing, dated January 27, 2022.

7.      Irico's claim that its pricing-related conduct was compelled by the Chinese government is a disputed issue. DPPs contend that these purported price floors, if they existed, had

no practical effect.

8.      Irico's claim that it cannot be liable for damages prior to July 31, 1998 is a disputed issue. DPPs have recently discovered evidence showing Irico's attendance at conspiratorial meetings from the outset of the conspiracy. In addition, to the extent Irico joined the conspiracy at a later date, DPPs contend that it did so with knowledge of the prior existence of the conspiracy, and so would be liable for all damages.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of March, 2022 in San Francisco, California.

_/s/ R. Alexander Saveri_
R. Alexander Saveri

SAVERI DECL. IN SUPPORT OF DPPs' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
CLASS CERTIFICATION WITH RESPECT TO IRICO DEFS.; Master File No. 07-CV-5944-JST

# EXHIBIT 1

**In the Matter Of:**

*IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION*

*PHILLIP M. JOHNSON, PH.D.*

*January 11, 2022*



1

1      UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF CALIFORNIA

3            OAKLAND DIVISION

4

5  IN RE:  CATHODE RAY TUBE        )
   (CRT) ANTITRUST LITIGATION,    ) Case No.
6                                  ) 4:07-cv-05944-JST
   RELATED TO:                     )
7                                  ) MDL No.
   ALL DIRECT PURCHASER ACTIONS    ) 1917
8  _____ )

9

10

11

12

13

14

15          REMOTE VIDEOTAPED DEPOSITION OF

16            PHILLIP M. JOHNSON, Ph.D.

17            TUESDAY, JANUARY 11, 2022

18

19

20

21

22

23

24
       Reported in Stenotype by:
25     Cody R. Knacke, RPR, CSR No. 13691
       Job No.:  825149

                                                                    100

1    whatever region they occur.

2    BY MR. CARTER:

3        Q.   Did you do any analysis to determine

4    whether looking at other regions would bring more

5    idiosyncratic elements to be more at the fore, as

6    you put it?

7        A.   No, I haven't -- I haven't looked into that

8    question.

9        Q.   On the previous page, page 43, paragraph

10   66, you write, "Presumably then, a global

11   price-fixing conspiracy would have impacted the U.S.

12   and CRT prices in North America would track those

13   elsewhere in the world."

14           When you say "CRT prices in North America

15   would track those elsewhere in world," you're not

16   arguing that North America CRT price changes were

17   caused by price changes in the rest of the world,

18   are you?

19           MR. RUSHING:  Objection to form.

20           THE WITNESS:  I'm not making a -- as stated

21   here, this isn't a causal statement.  It's saying

22   that they track together, which is they move

23   together.  Certainly in terms of causal

24   relationships, I think there are -- there is a

25   causal connection here.  Talk about target prices

101

1    and those being collusion of the coconspirators and

2    that having a causal impact on pricing worldwide,

3    including in the U.S. and North America.  So there

4    are some causal relationships to talk about here,

5    but this statement as written here is talking about

6    co-movements.

7    BY MR. CARTER:

8        Q.   And your analysis in figures 14 and 15

9    doesn't show a causal relationship between

10   North American prices and China prices; correct?

11       A.   I don't think I would agree with that

12   necessarily.  There's -- I mean, when you say it

13   doesn't show a causal relationship, they're

14   connected, and I think that pricing changes in one

15   region or if there are -- there are pricing effects

16   in one region, how those can potentially flow across

17   to other regions.

18           But these are an illustration of price

19   movements in the price chart, so it doesn't go to

20   what is the nature of those connections, but showing

21   that there is the -- are those connections.

22       Q.   So it doesn't show that North American

23   prices are causing Chinese prices or vice versa;

24   correct?

25           MR. RUSHING:  Object to the form.

102

1          THE WITNESS:  By itself, it doesn't say

2    that.

3    BY MR. CARTER:

4      Q.   And it doesn't rule out that external

5    factors might be causing China prices and

6    North America prices to move in similar ways; right?

7          MR. RUSHING:  Object to the form.

8          THE WITNESS:  I'm sorry.  Let me just make

9    sure I got the question right.  You asked it doesn't

10   rule out that external factors might be causing

11   Chinese prices and rest of world prices to move in

12   the same way?  Is that your question?

13   BY MR. CARTER:

14     Q.   Similar ways.

15     A.   Similar ways.

16         MR. RUSHING:  Object to the form.

17         THE WITNESS:  Certainly there could be a --

18   common factors affecting -- that would affect both,

19   including the common factor of a cartel that is

20   impacting prices of both -- determining prices

21   worldwide, including both.

22   BY MR. CARTER:

23     Q.   And these charts don't show whether that

24   common factor might be a cartel or anything else;

25   correct?

103

1          MR. RUSHING:  Object to the form.

2          THE WITNESS:  It's a chart of prices.  It

3     doesn't -- yeah, it illustrates the relationship --

4     the relationship of prices across these regions.  It

5     doesn't break that relationship down into

6     components.

7     BY MR. CARTER:

8       Q.   Isn't it true that even a high degree of

9     correlation does not imply a causal relationship?

10         MR. RUSHING:  Objection to form.

11         THE WITNESS:  I would agree with that.  I

12    would just add that observances of high degrees of

13    correlation can be supportive of there being a

14    causal relation.  Also, it can depend upon the

15    nature of the correlations you examine.  But in and

16    of itself, correlation isn't causation.

17    BY MR. CARTER:

18      Q.   It's fair to say that looking at figures 14

19    and 15, the three price lines for North America,

20    China and rest of world price indices are all

21    trending downwards as CRT prices fell over time;

22    correct?

23         MR. RUSHING:  Objection to the form.

24         THE WITNESS:  I think as far as how I want

25    to address this trend would be done in different

112

1   gone through every page, but I presume it's the

2   report.

3           MR. TALADAY:  We'll represent to you that

4   it's the report we received.

5   BY MR. TALADAY:

6     Q.  Dr. Johnson, does the report that you

7   submitted in this case reflect your opinions with

8   respect to class certification?

9     A.  It reflects my opinions on the assignment I

10  was given, which was described there, which relates

11  to some economic questions related to class

12  certification.

13    Q.  And do those opinions reflect your judgment

14  about how to analyze those issues?

15          MR. RUSHING:  Object to the form.

16          THE WITNESS:  I analyzed them in this

17  matter, so I certainly judged that this is an

18  appropriate way to analyze those questions.

19  BY MR. TALADAY:

20    Q.  So it reflects your judgment then?

21    A.  My judgment, yes.

22    Q.  And does it reflect your judgment about the

23  variables to consider when you conduct the tests

24  that you used to analyze these issues?

25          MR. RUSHING:  Object to the form.

113

1          THE WITNESS:  I'm not sure what test you're

2    referring to.

3    BY MR. TALADAY:

4      Q.   Well, you conduct numerous tests, right,

5    throughout the report; is that correct?

6          MR. RUSHING:  Object to the form.

7          THE WITNESS:  I'm not sure that I do.  What

8    tests are you referring to?

9    BY MR. TALADAY:

10     Q.   Well, for example, the correlation studies,

11   there's a hedonic regression, there's a regression

12   analysis you used to estimate overcharges.  Those

13   are all tests within your report; is that correct?

14         MR. RUSHING:  Object to the form.

15         THE WITNESS:  I don't think I characterize

16   them as tests.  And I don't really think I agree

17   with that characterization either.  The --

18   BY MR. TALADAY:

19     Q.   How would you characterize them?

20     A.   Well, as you recall, the overcharges

21   analysis, that provides an estimate of the

22   overcharges.  So I would characterize that as an

23   estimation of overcharges in this matter.

24     Q.   Do the estimations and analyses that you

25   conducted in the course of your report reflect your

114

1   judgment about the variables to include in those

2   estimations and analyses?

3           MR. RUSHING:  Object to the form.

4           THE WITNESS:  Certainly I used my judgment

5   in these analyses and determined that they were

6   appropriate for the questions I'm addressing.

7   BY MR. TALADAY:

8       Q.   Ultimately this is your opinion and you

9   stand by the methodologies and conclusions that you

10  reached as you wrote this report; is that correct?

11          MR. RUSHING:  Object to the form.

12          THE WITNESS:  Yes, I do.

13  BY MR. TALADAY:

14      Q.   And you also provided a list of source

15  material that you relied on in preparing your

16  report; is that correct?

17      A.   Yes, I did.

18      Q.   And was that list of source material

19  complete and accurate?

20          MR. RUSHING:  Object to the form.

21          THE WITNESS:  To my knowledge, it should be

22  complete and accurate.

23          MR. TALADAY:  All right, Tom, could you

24  please bring up Exhibit 8545 and turn to paragraph 8

25  on page 3.

 1  BY MR. TALADAY:

 2      Q.    And, Dr. Johnson, I understand that you

 3  also have a hardcopy of this exhibit.  And if you

 4  prefer to refer to your hardcopy, I'm comfortable

 5  with that.

 6      A.    I'm comfortable either way.

 7      Q.    All right.  Could you please read the

 8  introductory clause of paragraph 8 prior to the

 9  subbullets.

10      A.    (As Read:)  "In the course of my work on

11  this assignment, my staff and I have reviewed

12  extensive data, documents and testimony developed

13  through the course of discovery in this case.  A

14  list of the materials we have reviewed is included

15  in Exhibit 2.  Based upon my review and analysis of

16  these materials, I have concluded that there is

17  evidence common to members of the proposed Class

18  that is sufficient to prove widespread impact.  This

19  evidence involves:" and it goes through the bullet

20  points where you asked me to stop.

21      Q.    So this reflects your conclusion that there

22  is evidence common to the members of the proposed

23  class; is that correct?

24          MR. RUSHING:  Object to the form.

25          THE WITNESS:  Yes.

116

```
 1   BY MR. TALADAY:

 2       Q.   And then beneath that there are ten

 3   subbullets that identify evidence supporting that

 4   conclusion.

 5           Could you please read the first eight of

 6   those bullet points.

 7       A.   "The broad extent of communication and

 8   cooperative activities within the alleged

 9   conspiracy; Activities that would have assisted the

10   alleged conspiracy in constraining outputs of CRTs;

11   The alleged conspiracy's control over the vast

12   majority of sales; Regression analysis showing

13   prices of CRTs to be largely determined by factors

14   that are common to Class Members; Jointly determined

15   'Target Prices' for CRTs representing the vast

16   majority of total sales; Structural elements in CRT

17   pricing that tended to link prices for CRTs of

18   different types and sizes; Regression analysis

19   showing that 'Target Prices' established through

20   alleged conspiracy had a demonstrable effect on

21   actual prices paid; The existence of other market

22   characteristics which would be expected, as an

23   economic matter, to cause the effects of

24   conspiratorial behavior to be felt broadly across

25   customers."
```

Case 4:07-cv-05944-JST   Document 5993-1   Filed 03/04/22   Page 16 of 69
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                    Phillip M. Johnson, Ph.D.
January 11, 2022

117

1    Q.   Thank you, Dr. Johnson.

2         MR. TALADAY:   Tom, could you please

3    identify as Exhibit 8548 the report of

4    Dr. Leitzinger in In Re:   Cathode Tube (CRT)

5    Antitrust Litigation, relating to Crago, d/b/a Dash

6    Computers, Inc., et al., the Mitsubishi

7    electronic -- Electric Corporation, et al., Case No.

8    14-CV-2058 SC.

9         We'll mark this as Exhibit 8548.

10        (Exhibit 8548 was marked for identification

11        by the Certified Shorthand Reporter, and a

12        copy is attached hereto.)

13   BY MR. TALADAY:

14   Q.   Dr. Johnson, do you recognize this

15   document?

16   A.   Yes, I do.

17   Q.   And who is Dr. Leitzinger?

18   A.   Dr. Leitzinger is a managing director at

19   Econ One Research.

20        MR. TALADAY:   Tom, could you please turn to

21   paragraph 6 of this report.

22   BY MR. TALADAY:

23   Q.   Dr. Johnson, could you please read

24   paragraph 6 of this report.

25   A.   (As Read:)   "In the course of my work on

118

1    this assignment, my staff and I have reviewed

2    extensive data, documents and testimony developed

3    through the course of discovery in this case.  A

4    list of the materials we have reviewed is included

5    as Exhibit 2.  Based upon my review and analysis of

6    these materials, I have concluded there is evidence

7    common to members of the proposed Class that is

8    sufficient to prove widespread impact.  This

9    evidence includes -- involves."

10        Q.   And, Dr. Johnson, is it correct that the

11   eight bullet points following the colon are

12   identical to the first eight bullet points in

13   paragraph 8 of your report?

14            MR. RUSHING:  Object to the form.

15            THE WITNESS:  Give me a moment to confirm

16   that.

17            With minor difference, yes, they're the

18   same words.

19   BY MR. TALADAY:

20        Q.   What minor difference do you note?

21        A.   The -- there's a different placement of the

22   word "and" in the Leitzinger list, as there are a

23   different number of elements in the list from my

24   report.

25        Q.   With the exception of the word "and," those

119

1    words are identical; is that correct?

2         A.    Through -- through the first eight bullet

3    points, I believe that's correct.

4         Q.    And looking again at Dr. Leitzinger's

5    report in paragraph 6, those are the words that

6    Dr. Leitzinger chose to reflect his opinion and the

7    evidence involved in reaching that opinion.

8              Is that how it appears to you?

9              MR. RUSHING:  Object to the form.

10             THE WITNESS:  Those are the words in

11   Dr. Leitzinger's report.

12   BY MR. TALADAY:

13        Q.    And that was Dr. Leitzinger's report.  It

14   wasn't someone else's report; correct?

15        A.    It was a report that was signed by

16   Dr. Leitzinger but was also worked on by a team of

17   individuals.

18        Q.    Are you saying these are not

19   Dr. Leitzinger's words that he chose to reflect his

20   opinion as written?

21        A.    No, I'm not saying that.

22        Q.    So these are Dr. Leitzinger's words that he

23   chose to reflect his opinion; correct?

24             MR. RUSHING:  Object to the form.

25             THE WITNESS:  In his report they are his

120

1   words.

2   BY MR. TALADAY:

3       Q.   Now, looking at your report in paragraph 8,

4   these are the words you used in your report that are

5   identical to Dr. Leitzinger's.  So you didn't choose

6   new words up to bullet point 8; correct?

7       A.   I didn't feel the need to choose new words.

8   I agree with those words.

9       Q.   Dr. Johnson, were you hired to endorse

10  Dr. Leitzinger's report?

11          MR. RUSHING:  Objection to the form.  Can

12  I -- I didn't quite hear that.

13          MR. TALADAY:  Yes.

14  BY MR. TALADAY:

15      Q.   Dr. Leitzinger, were you hired to endorse

16  Dr. -- excuse me.

17          Dr. Johnson, were you hired to endorse

18  Dr. Leitzinger's report?

19      A.   No.

20          MR. RUSHING:  Object to the form.

21          THE WITNESS:  No, I was not.

22  BY MR. TALADAY:

23      Q.   Were you hired to provide an independent

24  opinion?

25      A.   I was retained to address the questions in

IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION          Phillip M. Johnson, Ph.D.
January 11, 2022

121

1    my assignment and analyze those questions, which I

2    had done.

3        Q.   Were you retained to provide an independent

4    report?

5            MR. RUSHING:  Object to the form.

6            THE WITNESS:  I'm not sure what you mean by

7    "independent report."

8    BY MR. TALADAY:

9        Q.   Were you hired to -- anyone other than

10   yourself?

11       A.   I'm sorry.  Can you say that again?

12       Q.   Yes.

13           Were you hired to provide the opinion of

14   anyone other than yourself?

15           MR. RUSHING:  Object to the form.

16           THE WITNESS:  No, I was asked to present my

17   opinion.

18   BY MR. TALADAY:

19       Q.   You weren't hired to provide a communal

20   opinion of you and everyone else at Econ One;

21   correct?

22           MR. RUSHING:  Object to the form.

23           THE WITNESS:  That's correct.  These are my

24   opinions.

25   ///

122

1   BY MR. TALADAY:

2       Q.   You weren't hired simply to reiterate the

3   opinion of Dr. Leitzinger; is that correct?

4           MR. RUSHING:   Object to the form.

5           THE WITNESS:   I was not.

6   BY MR. TALADAY:

7       Q.   And do you contend that this report

8   reflects your independent opinion?

9           MR. RUSHING:   Object to the form.

10          THE WITNESS:   This report reflects my

11  opinion.   I'm not sure what the issue (audio

12  difficulties) the word independent means, but I was

13  not told by counsel or Dr. Leitzinger or anyone else

14  what opinions to take in this matter.   These are my

15  opinions.

16  BY MR. TALADAY:

17      Q.   So it's your opinion and not anyone else's

18  opinion; correct?

19          MR. RUSHING:   Object to the form.

20          THE WITNESS:   I wouldn't say it's not

21  anyone else's opinion.   I expect that Dr. Leitzinger

22  would agree with me based upon his earlier analysis

23  and maybe others might agree with me as well, but

24  certainly this report reflects my opinions.

25          MR. TALADAY:   Can we move -- please move to

123

1   paragraph 8 of Dr. Leitzinger's report.

2   BY MR. TALADAY:

3       Q.   Dr. Johnson, can I ask you to please read

4   paragraph 8 in Dr. Leitzinger's report.

5       A.   "CRTs were the dominant technology used in

6   televisions and computer monitors, automated teller

7   machines, gaming devices, measuring instruments and

8   electronic medical devices (collectively 'display

9   products') from the 1950s into the 2000s.  Since

10  then, liquid crystal displays ('LCDs' or 'TFT-LCDs')

11  have supplanted CRTs in most display applications."

12      Q.   Thank you.  Dr. Johnson, can you please

13  read paragraph 10 of your report.

14      A.   "CRTs were the dominant technology used in

15  televisions and computer monitors, automated teller

16  machines, gaming devices, measuring instruments and

17  electronic medical devices (collectively 'display

18  products') from the 1950s into the 2000s.  Since

19  then, liquid crystal displays ('LCDs' or 'TFT-LCDs')

20  have supplanted CRTs in most display applications."

21          MR. RUSHING:  Pardon me, but Dr. Johnson's

22  microphone seemed to have fizzled a bit at the end

23  of that.  Is that -- did everybody catch that?

24  BY MR. TALADAY:

25      Q.   Dr. Johnson, I'm afraid I'm going to have

124

1   to ask you to read that again.

2        MR. RUSHING:  Pardon me?  I can't hear you

3   either, John.

4   BY MR. TALADAY:

5     Q.   I said, Dr. Johnson, I'm afraid I'm going

6   to have to ask you to read that again.

7     A.   Okay.  I apologize if my microphone is not

8   a good amount.  Let me try again.

9        "CRTs were the dominant technology used in

10  televisions and computer monitors, automated teller

11  machines, gaming devices, measuring instruments and

12  electronic medical devices (collectively 'display

13  products') from the 1950s into the 2000s.  Since

14  then, liquid crystal displays ('LCDs' or 'TFT-LCDs')

15  have supplanted CRTs in most display applications."

16    Q.   Dr. Johnson, with the exception of

17  different numbers for the footnotes in that

18  paragraph, would you agree that your language in

19  your report is identical to Dr. Leitzinger's

20  language?

21    A.   Yes, I believe the --

22        MR. RUSHING:  Object to the form.

23        THE WITNESS:  I believe the words in the

24  two paragraphs, with the exception of the footnote

25  number, appear to be the same.

125

1   BY MR. TALADAY:

2       Q.   So the words that Dr. Leitzinger shows in

3   his report are the words that you adopted for your

4   report; is that correct?

5           MR. RUSHING:  Object to the form.

6           THE WITNESS:  These words that I chose for

7   my report reflect what I feel was appropriate to say

8   in this opening paragraph.

9   BY MR. TALADAY:

10      Q.   But it's not just the concept that you

11  agreed with; correct?  You used the exact same

12  words.

13          MR. RUSHING:  Object to the form.

14          THE WITNESS:  I felt no need to

15  artificially choose different words just for the

16  sake of using different words.  It conveys the

17  meaning and the words that I wish to convey.

18  They're my words.

19  BY MR. TALADAY:

20      Q.   They're your words?  Is that what you're

21  saying?

22          MR. RUSHING:  Object to the form.

23          THE WITNESS:  I put them into my report and

24  I stand behind them.  They're my words.

25  ///

126

1   BY MR. TALADAY:

2       Q.   Were they not Dr. Leitzinger's words?

3            MR. RUSHING:   Object to the form.

4            THE WITNESS:   He put them in his report.

5   They were his words and he stood behind them and

6   notably still stands behind them.   But in my report

7   they're my words and I stand behind them.

8   BY MR. TALADAY:

9       Q.   But you copied them from Dr. Leitzinger's

10  report; correct?

11           MR. RUSHING:   Object to the form.

12           THE WITNESS:    I brought material into these

13  reports from a variety of sources, work that I had

14  done and had been done previously and reviewed and

15  reestimated and redid these reports and confirmed

16  that I -- I choose these words and these analyses.

17  So regardless of their origin, they're my words now

18  and I stand behind them.

19  BY MR. TALADAY:

20      Q.   But their origin is that they were in

21  Dr. Leitzinger's report and you copied them and put

22  them in your report; is that correct?

23           MR. RUSHING:   Objection.   I mean, how many

24  times are you going to ask the same question, John?

25  ///

Case 4:07-cv-05944-JST   Document 5993-1   Filed 03/04/22   Page 26 of 69
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION          Phillip M. Johnson, Ph.D.
                                                      January 11, 2022

127

1    BY MR. TALADAY:

2        Q.   You can answer, Dr. Johnson.

3        A.   We don't disagree that Dr. Leitzinger had

4    these sentences in his report.  I'm not writing a

5    novel.  I'm presenting opinions on the matters that

6    I was asked to.  And these ways of expressing these

7    issues about the industry are ways that I feel are

8    good ways to express them.  I felt they were good at

9    the time they were done originally by Dr. Leitzinger

10   and I feel good about them being in this report, my

11   report.

12       Q.   When you were preparing and drafting this

13   report, were the words in paragraph 10 of your

14   report copied from Dr. Leitzinger's report?

15           MR. RUSHING:  Objection to the form.

16           THE WITNESS:  I don't recall whether -- the

17   exact mechanism of how we -- how I brought the words

18   into this report.  I don't know that they were

19   copied or retyped.  I don't recall the moment that

20   these words first came into being in my first draft.

21   BY MR. TALADAY:

22       Q.   It's not a coincidence that the words are

23   identical in your report to Dr. Leitzinger's report,

24   is it?

25       A.   No, not at all.

128

 1          MR. RUSHING:  Object to form.

 2          THE WITNESS:  I chose these words because I

 3   feel they're good words for expressing what I wish

 4   to express in my report.

 5   BY MR. TALADAY:

 6      Q.   You chose them from Dr. Leitzinger's

 7   report; correct?

 8          MR. RUSHING:  Object to the form.

 9          THE WITNESS:  I -- sure.  I chose them from

10   Dr. Leitzinger's report because I felt that these

11   expressed the things that I wanted to express.

12   BY MR. TALADAY:

13      Q.   You've never seen these words appear

14   anywhere other than Dr. Leitzinger's report, have

15   you?

16          MR. RUSHING:  Object to the form.

17          THE WITNESS:  I'm not sure whether or not

18   they might have been quoted in other places that I

19   have seen, maybe in briefs or somewhere else.

20   BY MR. TALADAY:

21      Q.   Are you saying that they appear in this

22   form, in this order, in this syntax elsewhere?

23          MR. RUSHING:  Object to the form.  I

24   mean...

25          THE WITNESS:  I don't know for a fact that

1   they do or that they don't.  Sometimes reports are

2   quoted in other places by opposing experts or by

3   briefs.  You asked me if they did, and I don't know

4   whether or not they do for a fact.

5   BY MR. TALADAY:

6       Q.  Dr. Johnson, would you please review

7   paragraph 11 of your report.

8       A.  Yes, I'm there.

9           MR. TALADAY:  May I ask you, Tom, could you

10  please display paragraph 9 -- you are displaying it,

11  I guess.

12  BY MR. TALADAY:

13      Q.  Could you compare those two, Dr. Johnson,

14  and tell me if that is the exact same language with

15  the exception of different footnote numbers?

16          MR. RUSHING:  Object to the form.

17          THE WITNESS:  Up to the word "deflection,"

18  the words appear to be the same.

19          MR. RUSHING:  Pardon me.  Which one did we

20  just -- what paragraph did we just do?

21          MR. TALADAY:  I was waiting for Dr. Johnson

22  to finish comparing paragraph 9 of Dr. Leitzinger's

23  report to paragraph 11 of his report.

24          MR. RUSHING:  Well, I thought you -- oh, I

25  see.  You just changed the page because he stopped

130

1   at the end of the page?  I can't see the first part

2   of paragraph 9.

3          MR. TALADAY:  Paragraph 9 was not displayed

4   in its entirety, but it's now the second part of it

5   being displayed.

6          MR. RUSHING:  And so what are you asking

7   him to do?

8          MR. TALADAY:  Geoff, there's a question

9   pending.

10         MR. RUSHING:  I thought he answered, but...

11         I take it you want him to read the rest of

12  the paragraph; is that right, John?

13         MR. TALADAY:  I believe he's doing that.

14  BY MR. TALADAY:

15    Q.   Dr. Johnson, have you finished comparing

16  the paragraph?

17    A.   Yes, I just finished.

18    Q.   And would you agree that it is identical

19  language?

20         MR. RUSHING:  Object to the form.

21         THE WITNESS:  I agree that the words are

22  the same in the two paragraphs.

23  BY MR. TALADAY:

24    Q.   Isn't it true, Dr. Johnson, that many of

25  the paragraphs in your report are identical or

131

1   virtually identical to the paragraphs in

2   Dr. Leitzinger's report?

3            MR. RUSHING:  Object to the form.

4            THE WITNESS:  I think that there certainly

5   are a number of instances where I utilized the same

6   language in my report that Dr. Leitzinger utilized

7   in his report.

8   BY MR. TALADAY:

9        Q.   In fact, it's many parts of your report

10   that utilize the exact same language that's in

11   Dr. Leitzinger's report; isn't that correct?

12            MR. RUSHING:  Object to the form.

13            THE WITNESS:  Yes, I'd agree with that.

14   BY MR. TALADAY:

15       Q.   Perhaps even a majority of your report is

16   (audio difficulties) of the language used in

17   Dr. Leitzinger's report; correct?

18            MR. RUSHING:  Object to the form.

19            THE WITNESS:  I feel that the language that

20   Dr. Leitzinger used, and to the extent that I used

21   the same language he did, I feel that it conveys

22   what I wish to convey in my report well and saw no

23   reason to use different language than that.

24            MR. TALADAY:  My apologies.  We can go back

25   on the record now, please.

132

1           MR. RUSHING:  I don't understand what just

2    happened.

3           MR. TALADAY:  Yeah.  So my apologies,

4    Geoff.  I got a note that my computer battery was

5    about to die --

6           MR. RUSHING:  Oh, I see.  Okay.  No

7    worries.

8           MR. TALADAY:  -- from my network and I had

9    to get a, you know, charge plug into it before it

10   died, so...

11          MR. RUSHING:  Okay, no worries.

12          MR. TALADAY:  Moment of panic.

13   BY MR. TALADAY:

14     Q.   Dr. Johnson, it wouldn't surprise you if a

15   majority of the language in your report was

16   identical to the language in Dr. Leitzinger's

17   report; is that correct?

18          MR. RUSHING:  Object to the form.

19          THE WITNESS:  I haven't gone through to do

20   an analysis on that, but it wouldn't surprise me,

21   no.

22   BY MR. TALADAY:

23     Q.   Is it fair to say, Dr. Johnson, that your

24   report is effectively a redline of Dr. Leitzinger's

25   report?

133

1          MR. RUSHING:  Object to the form.

2          THE WITNESS:  No, I wouldn't agree with

3    that.  It's -- this report is my report.

4    BY MR. TALADAY:

5      Q.   Did you basically take Dr. Leitzinger's

6    report and add some things to it for your report?

7          MR. RUSHING:  Object to the form.

8          THE WITNESS:  No, I wouldn't agree with

9    that characterization.

10          MR. TALADAY:  Tom, could you please display

11    figure 3 on page 8 of Dr. Leitzinger's report.

12    BY MR. TALADAY:

13      Q.   Dr. Johnson, this same chart appears in

14    your report as figure 3 on page 8.  Did you make any

15    changes to this analysis before including it in your

16    report?

17          MR. RUSHING:  Object to the form.

18          THE WITNESS:  There were certain analyses

19    that Dr. Leitzinger did where I did a similar

20    analysis, where there had been some changes to the

21    data from when Dr. Leitzinger did the analysis, such

22    as there was some changes in LPD data at points and

23    some analyses that I have done differ from his in

24    that respect.

25    ///

IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                    Phillip M. Johnson, Ph.D.
                                                                     January 11, 2022

                                                                                134

 1   BY MR. TALADAY:

 2       Q.    Is this one of those instances where your

 3   analysis differs from his?

 4       A.    It depends on which report of this it is

 5   that you're referencing.  I'm not recalling off the

 6   top of my head whether -- when he did this analysis

 7   in his report, whether it had that LPD data in it or

 8   not.  That was added after the initial phases of the

 9   case.

10       Q.    You mentioned LPD data.  Can you explain

11   that further, please?

12       A.    Well, LG Philips Display is -- was one of

13   the defendants, is one of the coconspirators.  And

14   as I recall, I think I have the entity correct as

15   being LPD.  At one point there was some additional

16   data that was produced or located that was

17   incorporated into the master dataset that was used

18   in the analysis.

19       Q.    Did you use the same master dataset that

20   Dr. Leitzinger used with the exception of the LPD

21   data?

22       A.    No, I think we -- I think I and my staff

23   recreated that dataset from the -- from the

24   original -- from the original data.

25       Q.    You recreated the dataset from the original

1   data?  You didn't use the same master dataset; is

2   that correct?

3          MR. RUSHING:  Object to the form.

4          THE WITNESS:  That's my recollection.  If

5   there were -- if there were changes that occurred

6   with the underlying data after he had created his

7   master dataset, we certainly -- certainly would have

8   had that recreated and -- to use the most current

9   data and, in the process of doing this analysis, ran

10  these analyses from the start.

11  BY MR. TALADAY:

12     Q.   Let me make sure I'm clear on this.  Are

13  you saying, Dr. Johnson, that you would not have

14  simply adjusted the master dataset that

15  Dr. Leitzinger used to reflect the changes to that

16  dataset, but that you would have abandoned that

17  dataset entirely, gone back to the source data for

18  every defendant to recompile that to create a new

19  master dataset?

20         MR. RUSHING:  Object to the form.

21         THE WITNESS:  Well, I'm not sure the

22  implications of your characterization of abandoning

23  it, but the analysis that is done in this report was

24  done for this report.

25  ///

136

1    BY MR. TALADAY:

2        Q.   Did the analysis that was done for this

3    report build on the dataset that was used by

4    Dr. Leitzinger in his report?

5            MR. RUSHING:   Object to the form.

6            THE WITNESS:   My recollection would be that

7    my staff would have recreated that dataset and not

8    used the actual data file that Dr. Leitzinger used.

9    So I think that that shouldn't -- that would have

10   been the case, although if the -- I didn't confirm

11   that, but that's my recollection of how we proceeded

12   in this case for this report.

13   BY MR. TALADAY:

14       Q.   So it wouldn't surprise you, then,

15   Dr. Johnson, to learn that paragraph 10 of your

16   report was the same as paragraph 8 of Dr. John --

17   excuse me -- of Dr. Leitzinger's report; 11 of your

18   report was the same as paragraph 9 of

19   Dr. Leitzinger's report; paragraph 12 of your report

20   was identical to paragraph 10 of Dr. Leitzinger's

21   report; your paragraph 13 was identical to his

22   paragraph 11; your paragraph 14 was identical to his

23   paragraph 12; and that many other paragraphs, which

24   I would be happy to identify for you, are identical.

25   That wouldn't surprise you if that was the case,

137

1   would it?

2          MR. RUSHING:  Object to the form.  I mean,

3   asked and answered among many other things.  I don't

4   know how many times we're going to go through this.

5          THE WITNESS:  No, it wouldn't surprise me

6   if many of the paragraphs contained many of the same

7   words as Dr. Leitzinger's report.

8   BY MR. TALADAY:

9      Q.   Did you rely on Dr. Leitzinger's report in

10  forming your opinions?

11         MR. RUSHING:  Object to the form.

12         THE WITNESS:  No, I wouldn't say I relied

13  on it.  His report and my report share an origin in

14  looking at a lot of the same materials, the same

15  documents and data.  And the analysis that is done

16  is done in very common ways.

17         But I don't -- I don't need to cite his

18  report because the analysis and the opinions and the

19  material that support those opinions and analysis

20  are contained within my report.

21  BY MR. TALADAY:

22     Q.   So is your testimony you didn't rely at all

23  on Dr. Leitzinger's report to form your opinion?

24         MR. RUSHING:  Object to form.

25         THE WITNESS:  I'm sorry.  You broke up

138

1   there, at least for me.  Could you say that again?

2   BY MR. TALADAY:

3       Q.   Yes.

4            So it's your testimony that you did not

5   rely at all on Dr. Leitzinger's report in forming

6   your opinion; is that correct?

7            MR. RUSHING:  Object to the form.

8            THE WITNESS:  The report is an expression

9   of Dr. Leitzinger's opinion, his report is an

10  expression of his opinions and analysis that he --

11  that's done in his report.

12           My report is a reflection of the analysis

13  done in my report, the materials reviewed in my

14  report, and contains the opinions.  It's --

15  Dr. Leitzinger's report is not a source document or

16  a piece of evidence in this case that I would rely

17  on.

18  BY MR. TALADAY:

19      Q.   I think you said before that it's no

20  coincidence that some of your language was identical

21  to Dr. Leitzinger's language; is that correct?

22           MR. RUSHING:  Object to the form.

23           THE WITNESS:  I don't recall whether I said

24  those words or not, but it's -- I wouldn't call it a

25  coincidence.

1    BY MR. TALADAY:

2       Q.   So it was purposeful that you used the same

3    words?

4           MR. RUSHING:   Object to the form.

5           THE WITNESS:   These words do a good job of

6    expressing the opinions that I have and the material

7    that I think is relevant to those opinions, and so I

8    saw no reason to artificially change to different

9    words to express the same opinions that I have.

10   BY MR. TALADAY:

11      Q.   (Audio difficulties).  I think we get the

12   gist.  Thank you.

13          MR. RUSHING:   Did somebody just say

14   something?

15          THE WITNESS:   It seemed like there was a

16   breakup there.  If there was a question, I didn't

17   hear it.

18   BY MR. TALADAY:

19      Q.   I just said thank you.

20          Could you please turn to paragraph 27 of

21   your report.

22      A.   Yes, I'm there.

23      Q.   (Audio difficulties) you state, "To

24   reflect product characteristics, I

25   included information from the transaction data

168

1          MR. RUSHING:  Objection to form.

2          THE WITNESS:  No, I did not.

3    BY MR. TALADAY:

4      Q.   Okay.  In paragraph 51 -- could I ask you

5    to read paragraph 51, please.

6          MR. RUSHING:  To himself?

7          MR. TALADAY:  No.  For the record, please.

8          THE WITNESS:  "The target prices that we

9    found through this effort involved a range of CRT

10   types and sizes that accounted for the vast majority

11   of CRT shipments.  As shown in Figure 9, the share

12   of shipments represented by the targeted CRTs was

13   over 98 percent for CPTs and over 90 percent for

14   CDTs.  This means that price targeting, if effective

15   in influencing actual prices just for the targeted

16   CRTs, would have directly impacted products

17   accounting for about 94 percent of CRT shipments

18   during the Class Period.  That result, by itself,

19   goes a long way towards establishing the existence

20   of broad impact on the part of the alleged

21   conspiracy."

22   BY MR. TALADAY:

23     Q.   Thank you.

24          So it was your conclusion that over

25   98 percent of CPTs and 90 percent of CDTs would have

169

1    been directly affected -- their prices would have

2    been directly affected by the target prices.

3            Did I summarize that roughly correctly?

4            MR. RUSHING:  Objection.  Form.

5            THE WITNESS:  Not -- not quite, actually,

6    no.  The sentence itself, they're referencing the

7    shared -- shipments represented by targeted CRTs and

8    how substantial those are in the sales of CRTs.  So

9    it's -- that's representing the universe of sales of

10   those targeted CRTs.

11   BY MR. TALADAY:

12       Q.   Okay.  So 98 percent of CPTs were affected

13   by the target prices.  Is that an accurate summary?

14       A.   Are you asking from my opinion or from my

15   opinion restricted to a certain analysis result?

16       Q.   I'm just asking if that's the sum and

17   substance of what paragraph 51 says.

18           MR. RUSHING:  Objection to the form.

19           THE WITNESS:  So there is a series of steps

20   here that I don't think we should leap over.  We

21   have the target price regressions that use the data

22   we have available to run those regressions, and we

23   know that those -- that analysis is limited to the

24   documents that were available.  There's holes in

25   that analysis, but it clearly shows that certain

170

1    types of products were actively and consistently

2    targeted by the cartel members.

3          This paragraph here is talking about the

4    significance of those products within the shipments

5    by defendants.

6          So my opinion is that those products were

7    impacted by the price targeting.  That opinion is in

8    part based upon the target price analysis, and also

9    in part based upon other documents that I have seen

10   and depositions referencing the breadth and the

11   extent of the cartel's price fixing efforts.

12   BY MR. TALADAY:

13     Q.   The last sentence says that, "That result,

14   by itself, goes a long way towards establishing the

15   existence of a broad impact on the part of the

16   alleged conspiracy."

17          What result is it that you're referring to

18   there?

19          MR. RUSHING:  Objection to form.

20          THE WITNESS:  It's the result about the

21   share of shipments accounted for by the products

22   which the cartel is known to have targeted, known to

23   have targeted with regard to price communication.

24   BY MR. TALADAY:

25     Q.   When a price target is set, how long does

 1    it last?

 2          MR. RUSHING:  Objection to form.

 3          THE WITNESS:  What do you mean by "how long

 4    does it last"?

 5    BY MR. TALADAY:

 6      Q.   For how long is that price target in

 7    effect?

 8      A.   Are you asking me how long the impact of

 9    that -- that price -- that collusion persists?

10      Q.   No.

11          What I'm asking is, based on your review

12    and analysis of all of the documents reflecting

13    price targets, when the competitors set a price

14    target, for how long typically was that price target

15    intended to be in effect with respect to their sales

16    of products?

17      A.   There were frequent meetings.  And the

18    meetings (audio difficulties) new price targets.  So

19    the -- I think that it depends upon the instance

20    that you're talking about.

21      Q.   And there were frequent meetings because --

22    well, why?  Why were there frequent meetings?

23          MR. RUSHING:  Objection to form.

24          THE WITNESS:  I'm not sure of all of the

25    reasons, but the way it's known as a matter of

172

1   economics, is a monopolist or a cartel will want to

2   adjust its conspiracy price for market conditions,

3   for the discipline in instances there are thought to

4   have been participants who are not fully

5   implementing the cartel price.  There could be a

6   whole range of things that cause the cartel to want

7   to make adjustments to its cartel or target price.

8   BY MR. TALADAY:

9        Q.   And there are instances with respect to

10  some sizes of some products where new price targets

11  were set almost monthly for periods of time; is that

12  correct?

13           MR. RUSHING:  Objection to form.

14           THE WITNESS:  I think, yeah.

15  BY MR. TALADAY:

16       Q.   And there are instances where you identify

17  multiple price targets for the same product in the

18  same month; isn't that correct?

19           MR. RUSHING:  Objection to form.

20           THE WITNESS:  There were -- there are

21  instances where there were ranges covering multiple

22  products of a type.  And there were, you know,

23  multiple meetings and multiple discussions.  So,

24  yes, that might be the case.

25  ///

Case 4:07-cv-05944-JST   Document 5993-1   Filed 03/04/22   Page 44 of 69
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                    Phillip M. Johnson, Ph.D.
                                                                   January 11, 2022

173

1   BY MR. TALADAY:

2       Q.   Do you think in part that was the result of

3   changing market conditions; is that correct?

4            MR. RUSHING:  Objection to form.

5            THE WITNESS:  I don't think that's an

6   accurate characterization of my answer.

7   BY MR. TALADAY:

8       Q.   I'm sorry, could you repeat that,

9   Dr. Johnson?

10      A.   I don't think that's an accurate

11  characterization of my view or the answer to that

12  question.

13      Q.   Did you state that market conditions could

14  be one of the reasons -- changing market conditions

15  could be one of the reasons that they would meet

16  frequently to reset price targets?

17           MR. RUSHING:  Objection to the form.

18           THE WITNESS:  I said that changing market

19  conditions could be one of the reasons for them to

20  adjust prices or price targets, yes.

21  BY MR. TALADAY:

22      Q.   Thank you.

23           And there were separate price targets set

24  for different sizes of products; isn't that correct?

25           MR. RUSHING:  Object to the form.

229

```
1            THE VIDEOGRAPHER:  The time is 6:19 p.m.,
2    and we are on the record.
3    BY MR. TALADAY:
4        Q.  Dr. Johnson, referring to your figure 9,
5    there would be a substantial portion of the
6    98.16 percent of CDT shipments that would not have
7    been affected by target price; isn't that right?
8            MR. RUSHING:  Objection to form.
9            THE WITNESS:  I'm not sure whether that's
10   the case or not.  We don't have full documentation
11   of every interaction between the defendants, so I
12   don't know that target prices that we utilized is
13   the full universe of target prices.
14   BY MR. TALADAY:
15       Q.  Based on the target prices you identified
16   in your analysis, that underpin figure 9, there
17   would be a substantial portion of the 98.16 percent
18   of CDT shipments that were not affected by target
19   prices; isn't that right?
20           MR. RUSHING:  Objection to form.
21           THE WITNESS:  I'm sorry.  What are you
22   saying is the basis for saying that they were not
23   affected by target prices?
24   BY MR. TALADAY:
25       Q.  I'm saying based on the target price data
```

IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION       Phillip M. Johnson, Ph.D.
January 11, 2022

230

1    that you provided as the basis for your figure 9,

2    there would be a substantial portion of the

3    98.16 percent of CDT shipments -- CDT shipments that

4    would not be affected by target prices; isn't that

5    right?

6       A.   I don't really agree with your phrasing of

7    that.

8       Q.   In what way don't you agree with my

9    phrasing?

10      A.   You're stating as a fact what is and isn't

11   affected by target prices, but I think that we

12   don't -- we don't know the full universe of target

13   prices.  We utilize what information we had in the

14   target price regression to identify a relationship

15   between target prices and actual prices.  That was

16   the purpose of that analysis.

17           This figure only utilizes -- doesn't

18   utilize the regression per se.

19           What it utilizes is the fact that these are

20   products for which there were target prices, and

21   then we're looking at the importance of these

22   target -- these products within the sales in the

23   datasets we have for defendants.

24           So it doesn't say that they weren't

25   affected by some target pricing.  Additionally, the

Case 4:07-cv-05944-JST   Document 5993-1   Filed 03/04/22   Page 47 of 69
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION          Phillip M. Johnson, Ph.D.
                                                            January 11, 2022

231

1    target prices had effects based upon the other

2    analysis that we had done about the relationships to

3    determine CRT prices that go beyond the immediate

4    term and carry over.

5              Furthermore, the activities of the

6    defendants goes beyond just the target pricing, so

7    the real question for this case is about impact.

8    And so the attempt to pare things down by utilizing

9    the extent of the documents that were available to

10   say these were and these were not affected is a

11   mistaken, misdirected approach.  It's not a way to

12   say these products weren't affected because there

13   wasn't a document showing a target price when the

14   impact of the conspiracy derives from the array of

15   activities that the defendants took place over time

16   and the effects over time of those activities.

17   Q.   So the mistake I'm making is that I am

18   looking solely at the target price analysis

19   represented in figure 9.  I am wrong to conclude

20   that the target price analysis is alone -- reflects

21   impact on all the products that you consider in the

22   target price analysis; is that right?

23             MR. RUSHING:  Objection to form.

24             THE WITNESS:  I don't agree with your

25   phrasing.

232

1   BY MR. TALADAY:

2       Q.   So the mistake I'm making is if I look

3   solely at the target price analysis that doesn't

4   tell me about the impact of the target prices on all

5   of the products involved in the conspiracy; is that

6   right?

7       A.   No, you're still misstating my analysis and

8   misstating -- misstating what's been done here.

9       Q.   Okay.  So what does the target price

10  analysis, standing alone, tell us about the impact

11  of the target prices on all sales of these product

12  sizes?

13          MR. RUSHING:  Objection to form.

14          THE WITNESS:  When you -- I'm a little bit

15  confused.  You keep referring to the target price

16  analysis, are you -- but you're referring to figure

17  9.  Or are you referring to the target price

18  regression analysis?  What are you referring to?

19  BY MR. TALADAY:

20      Q.   No.  I'm still focused just -- I apologize.

21          I'm focused just on figure 9.

22      A.   Well, I don't characterize figure 9 as the

23  target price analysis.  That's your phrasing.

24      Q.   So the analysis in figure 9 involving

25  target prices, do you accept that phrase?

233

1         MR. RUSHING:  Objection to form.

2         THE WITNESS:  Figure 9 is a summary of the

3    share of sales in the data of the prices -- of the

4    products that were targeted by defendants as

5    reflected in the documents that we had access to

6    that had target prices in them.  That's the most

7    accurate way to reflect -- to characterize that

8    figure.  So I don't know that you need to

9    recharacterize or rephrase it.  I think that it is

10   what it is.  I described it a number of times

11   exactly what those -- how that figure is created and

12   what the numbers within that figure mean and how

13   they're derived.

14        MR. TALADAY:  Tom, could you please bring

15   back up the spreadsheet.  And could you please

16   organize it as we did originally by ascending date,

17   irrespective of any other criteria or field.

18   BY MR. TALADAY:

19   Q.  Dr. Johnson, you see this entry for 1995

20   for 14-inch CDTs?  Do you see that?

21   A.  Yes, I see the entry on line 2.

22   Q.  Is it your opinion that that target price

23   standing alone for 14-inch CDTs in 1995 had an

24   impact on the prices of other sizes of CDTs?

25        MR. RUSHING:  Objection to the form.

234

1          THE WITNESS:   I don't believe I presented

2   an opinion on the impact of this single target price

3   in anywhere in my report standing alone, as you

4   phrase it.

5   BY MR. TALADAY:

6       Q.   Okay.   And does this target price for

7   14-inch CDTs in 1995, in your opinion, standing

8   alone, demonstrate an impact on any size of CPT

9   products?

10      A.   I don't utilize this entry standing alone

11  to reach a conclusion of impact.

12      Q.   So there's nothing about that entry

13  standing alone that would inform us about the impact

14  on other sizes or types of CDTs or CPTs?

15          MR. RUSHING:   Objection to form.

16  BY MR. TALADAY:

17      Q.   Is that right?

18      A.   I don't believe one should look at evidence

19  standing alone in analyzing impact.   I believe that

20  one should look at all the evidence, both

21  quantitative evidence, analytical evidence, as well

22  as documentary evidence, and use that evidence

23  together to form the opinions.

24          So it's -- this doesn't stand alone.   It

25  stands along with a lot of other evidence about the

Case 4:07-cv-05944-JST Document 5993-1 Filed 03/04/22 Page 51 of 69
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION          Phillip M. Johnson, Ph.D.
                                                              January 11, 2022

235

1  activities of the cartel and a lot of other evidence

2  about their meetings, their agreements about

3  production restraints, their agreements about target

4  prices, their characterizations of their activities.

5          So I don't present -- I don't believe an

6  analysis that one should use a single entry on a

7  document to stand alone to reach an opinion.  I

8  believe you should use all of the evidence that's

9  available and weigh that evidence together, and that

10 is what I have done in presenting my opinions.

11     Q.   Thank you, Dr. Johnson.  That wasn't my

12 question, so please listen to my question and try

13 and answer the question I'm asking.  Okay?

14          MR. RUSHING:  Objection, John.  You asked

15 your question and he'll answer it if it's a coherent

16 question.

17          MR. TALADAY:  All I'm asking him to do is

18 answer the question I ask.

19 BY MR. TALADAY:

20     Q.   So here's the question, Dr. Johnson.

21          Is there anything about that entry standing

22 alone that would inform us about the impact of

23 target prices on other sizes or types of CDTs or

24 CPTs?

25          MR. RUSHING:  Objection to the form.

IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION          Phillip M. Johnson, Ph.D.
                                                        January 11, 2022

236

1        THE WITNESS:  Can you tell me more what you

2   mean by standing alone?  We're looking at a

3   spreadsheet.  So standing alone, what do you mean by

4   that?

5   BY MR. TALADAY:

6      Q.   What I mean by that is when you see this

7   one entry of a target price for 14-inch CDTs in

8   1995, does that inform you about whether there is an

9   impact on that target price on other sizes or types

10  of CDTs, either in 1995 or in other years, without

11  reference to the other factors that you believe

12  should come into play?

13     A.   What does this --

14        MR. RUSHING:  Objection to the form.

15        THE WITNESS:  I'm not sure I understand

16  what this entry means standing alone.  I think I

17  have to utilize other information to be able to

18  interpret what this data means.

19  BY MR. TALADAY:

20     Q.   So that -- are you saying that you cannot

21  reach any conclusions based on that single entry?

22        MR. RUSHING:  Objection to the form.

23        THE WITNESS:  Standing alone, what does CDT

24  mean?  I have to utilize other information to know

25  what CDT means.  What is the market we're talking

Case 4:07-cv-05944-JST   Document 5993-1   Filed 03/04/22   Page 53 of 69
IN RE: CATHODE RAY TUBE ANTITRUST LITIGATION                    Phillip M. Johnson, Ph.D.
                                                                    January 11, 2022

                                                                                    237

1    about here?  Standing alone I don't know what we're

2    talking about.  You're telling me to have it

3    standing alone, but I don't know where the line is

4    drawn.  What is it you mean by this entry standing

5    alone?  What is it that I know about this entry?

6    BY MR. TALADAY:

7       Q.   Okay.  Well, let's move to figure 17 on

8    page 53.

9       A.   Yes, I'm on page 53.

10      Q.   Thank you.

11           Can you explain what figure 17 represents?

12           MR. RUSHING:  Objection to the form.

13           THE WITNESS:  Excuse me.  Figure 17 is the

14   quarterly weighted average actual and but-for prices

15   for CDTs between second quarter of 1995 and the

16   fourth quarter of 2007.

17   BY MR. TALADAY:

18      Q.   And what do you mean by but-for prices?

19      A.   Taking the prices that occur in the

20   defendants' transactional data and applying to them

21   the -- adjusting them for the overcharge found by

22   the overcharge regression.  This is what the price

23   is per the overcharge regression are -- would have

24   been applying those -- applying that adjustment.

25      Q.   So this is what you would expect to be the

246

1         Were you aware of Chinese price regulations

2    that set a floor price for certain sizes of CRT

3    tubes?

4         MR. RUSHING:  Objection to form.

5         THE WITNESS:  No, I'm not -- I'm not

6    familiar with those sorts of regulations.

7         MR. TALADAY:  All right.  I'm done with

8    this document.

9         Tom, I would ask you to publish the other

10   document that we discussed which will be marked as

11   Exhibit 8551.  And publish it when you can, Tom.

12         (Exhibit 8551 was marked for identification

13          by the Certified Shorthand Reporter, and a

14          copy is attached hereto.)

15         MR. TALADAY:  And, Geoff, for your

16   purposes, this document was an exhibit to one of our

17   motions filed, you can see 12/21/2017.

18         And, Tom, can you please go to the next

19   page.  And the next, please.

20         MR. RUSHING:  And are we -- are we marking

21   this?  Has this got an exhibit number?

22         MR. TALADAY:  Yeah, I believe I identified

23   this as Exhibit 8551.

24   BY MR. TALADAY:

25      Q.  Have you had a chance to review this page,

247

1    Dr. Johnson?

2        A.   Sorry.  Give me a moment to finish

3    reviewing this.

4            Okay.  I've read the paragraph.

5        Q.   I'm going to spare you, Dr. Johnson.  I

6    will read this paragraph instead of asking you to do

7    it, or at least portions of it.

8            So this is addressed -- there's a date at

9    the top of the year 2000.  There is a note that

10   says -- a line that says, "To color CRT

11   manufacturing enterprises."  And it says, it reads,

12   "To prevent actions of unfair price competition in

13   the color CRT industry and maintain a normal market

14   order, the industrial average production costs of

15   three types of color CRTs, i.e. 21 inches, 25 inches

16   and 29 inches, are hereby published (see the

17   attached table for details) pursuant to the Trial

18   Measures to Prevent Unfair Price Competition

19   Regarding Color CRTs and Color TVs by the State

20   Planning Commission and the Ministry of Information

21   Industry.  All color CRT manufacturing enterprises

22   are asked to seriously implement the costs.  In the

23   case where a manufacturing enterprise sells the

24   products at prices lower than the published

25   industrial average production costs to cause market

248

1  disorders and harm the interests of other

2  manufacturing enterprises, a harmed enterprise may

3  file a report with the State Planning Commission or

4  a competent department in charge of prices of a

5  province, autonomous region or municipality directly

6  under the Central Government.  In the cases where it

7  is confirmed through investigation that there is

8  indeed an action of unfair price competition, a

9  competent government department in charge of prices

10  shall order the responsible party to correct and

11  impose penalties according to specific situations."

12      Did I read that roughly accurately,

13  Dr. Johnson?

14      MR. RUSHING:  Objection to form.  I mean,

15  go ahead.

16      THE WITNESS:  I didn't listen to the whole

17  paragraph with an eye towards correcting, you know,

18  misstatements or misphrasings that you may have had,

19  so I don't want to be the -- that's what you have

20  the court reporter for.  But I see the document here

21  and I can read the document if I need to.

22  BY MR. TALADAY:

23      Q.  Were you aware of pricing regulations

24  established by the State Planning Commission and

25  administrative information industry on color CRT

249

1  manufacturing enterprises in the year 2000?

2          MR. RUSHING:  Objection to form.

3          THE WITNESS:  I don't recall as I sit here

4  having a great deal of information about that.  I

5  may have heard something about an issue there at

6  some point, and I may have -- I may have seen this

7  document before.  I don't really recall as I sit

8  here.

9  BY MR. TALADAY:

10     Q.   Okay.  It is possible, isn't it,

11 Dr. Johnson, that these price regulations, to the

12 extent that they imposed a price floor for CRT

13 manufacturers, could have impacted the ability of a

14 defendant subject to these regulations to charge the

15 but-for prices in your analysis; isn't that right?

16          MR. RUSHING:  Objection to form.

17          THE WITNESS:  I'm not really sure without

18 knowing anything about the constraints that they

19 purport to impose here about particular costs, how

20 this compared to prices and whether -- how they were

21 enforced or not enforced.  I mean, I suppose it's

22 also possible that if the market prices had been

23 different, maybe this ministry would have undertaken

24 a different action.  You know, it's -- this is --

25 this was issued in the context of the actual prices.

250

1   In a but-for world, I don't know whether this -- if

2   it had some -- posed some serious constraint,

3   whether that constraint would have been the same or

4   have had to have been revised.  I really don't have

5   the context to do a but-for analysis on this

6   document.

7   BY MR. TALADAY:

8       Q.   Would it have mattered to you in your

9   assessment of overcharges whether there were price

10  regulations establishing price floors above your

11  but-for prices?

12          MR. RUSHING:  Objection to form.

13          THE WITNESS:  My analysis utilized actual

14  prices.  So if there were things that affected

15  actual prices, it would be -- would be reflected or

16  would have impact on that analysis.  To the extent

17  that there are significant events in the global

18  market, I'm not sure that the actions of the

19  Ministry of Information in China by itself would

20  have been substantial to have a measurable

21  substantial effect on the analysis of global CRT

22  prices and the global CRT overcharge.

23          So I don't -- I would be surprised if

24  information of this type would have had an impact

25  on -- substantial impact on my analysis.

251

1    BY MR. TALADAY:

2        Q.   And you say that having not been aware of

3    these and having done no analysis of whether they

4    had an effect; right?

5            MR. RUSHING:  Objection to form.

6            THE WITNESS:  Well, they were the prices

7    that I had utilized in my analysis, so I utilized

8    them to that extent, but I don't see how this would

9    result in an impact on the analysis of prices paid

10   by class members or prices in the global market of

11   any substantial -- to any substantial extent.

12   BY MR. TALADAY:

13       Q.   But you didn't analyze that at all, did

14   you?

15           MR. RUSHING:  Objection to form.

16           THE WITNESS:  No, I haven't analyzed the

17   impact of the Ministry of Information's regulations

18   on what Irico's prices would have been.  I didn't

19   have Irico's transaction data because they didn't

20   provide it.

21   BY MR. TALADAY:

22       Q.   Thank you.

23           Can we move on to your report?

24           MR. TALADAY:  Tom, you can take that down,

25   please.

268

```
 1              DEPOSITION OFFICER'S CERTIFICATE

 2

 3    COUNTY OF LOS ANGELES,    )

 4    STATE OF CALIFORNIA,      )

 5

 6          I, Cody R. Knacke, hereby certify:

 7          I am a duly-qualified Registered

 8    Professional Reporter and Certified Shorthand

 9    Reporter in and for the State of California, holder

10    of Certificate Number CSR 13691, issued by the Court

11    Reporters Board of California and which is in full

12    force and effect.  (Fed. R. Civ. P. 28(a)).

13          I am authorized to administer oaths or

14    affirmations pursuant to California Code of Civil

15    Procedure, Section 2093(b) and prior to being

16    examined, the witness was first duly sworn by me.

17    (Fed. R. Civ. P. 28(a), 30(f)(1)).

18          I am not a relative or employee or attorney

19    or counsel of any of the parties, nor am I a

20    relative or employee of such attorney or counsel,

21    nor am I financially interested in this action.

22    (Fed. R. Civ. P. 28).

23          I am the deposition officer that

24    stenographically recorded the testimony in the

25    foregoing deposition and the foregoing transcript is
```

269

1   a true record of the testimony given by the witness.

2   (Fed. R. Civ. P. 30(f)(1)).

3          If requested, any changes made by the

4   deponent (and provided to the reporter) during the

5   period allowed, are appended hereto.  (Fed. R. Civ.

6   P. 30(e)).

7          In witness whereof, I have hereunto set my

8   hand this day:  _____, 2022.

9

10

11

12

13

14   _____
     CODY R. KNACKE, RPR, CSR No. 13691
15

16

17

18

19

20

21

22

23

24

25

1  READ/SIGN DEPOSITION OF: Phillip M. Johnson
    DATE OF DEPOSITION: 01/11/2022
2  IN THE MATTER OF: In Re: Cathode Ray Tube Antitrust Litigation

3       DO NOT WRITE ON THE DEPOSITION ITSELF

4  Page Line  Changes or corrections and reason

5  26:15   "hypothetical that" to "hypothetical what"   Transcript error

6  26:16    "that result" to "what result"   Transcript error

7  30:11   "which you'll see data" to "which you'll see in the data"   Transcript error

8  30:21 "have the compatibility" to "have the capability"  Transcript error

9  45:19 "wasn't necessarily" to "wasn't necessary" Transcript error

10  47:24 "from any defendant" to "from any defendant and co-conspirator" Misspoken

11  48:6 "purchasers, data" to "purchasers that can be made from the data" Transcript error

12  50:1 "their experts" to "other experts" Transcript error

13  57:16 "expects to how" to "expects in how" Transcript error

14  60:6 "Are the, I guess" to "They are the, I guess" Transcript error

15  64:9 "accepted for lots" to "accepted with lots" Misspoken

16  70:25 "defendant employees" to "defendant and co-conspirator employees" Misspoken

17  90:12 "it's used in the project called" to "it's called" Misspoken

18  92:4 "If doing" to "In doing" Transcript error

19  97:8 "When you say in more" to "When you say more" Misspoken

20  97:22 "the pricing experience of price" to "the pricing experience" Misspoken

21  99:24 "are those connections" to "are there connections" Transcript error

    I have inspected and read my deposition and
22  have listed all changes and corrections above,
    along with my reason therefor.
23

24  DATE: 2/18/2022 SIGNATURE: _____

```
1   READ/SIGN DEPOSITION OF:  Phillip M. Johnson
    DATE OF DEPOSITION:  01/11/2022
2   IN THE MATTER OF:  In Re: Cathode Ray Tube Antitrust Litigation

3          DO NOT WRITE ON THE DEPOSITION ITSELF

4   Page Line   Changes or corrections and reason
5   100:25 "Talk about" to "I talk about" Transcript error

6   101:1 "and those being collusion" to "and those being part of collusion" Transcript error

7   142:10 "progression results" to "regression results" Transcript error

8   143:12 "carry within different" to "carry with them different" Transcript error

9   152:4-5 "documents I record in the notes" to "documents on record reflecting the notes" Transcript error

10  166:16-19 "or is utilized in the data that utilizes" to "or utilizes the data" Misspoken

11  169:6 "they're referencing" to "is referencing" Misspoken

12  178:20 "informative or" to "informative of" Transcript error

13  190:25 "shared shipments" to "share of shipments" Transcript error

14  199:6 "instructed the staff" to "I instructed the staff" Transcript error

15  199:8 "of the other product" to "of the product" Transcript error

16  222:11 "ascending by size" to "ascending order by size" Transcript error

17  226:3 "used them identically" to "used them ideally" Transcript error

18  241:20 "can be different" to "can't be different" Transcript error

19  243:12 "It limits its analysis" to "It limited the analysis" Transcript error

20  251:6 "they were the prices" to "there were the actual prices" Misspoken

21
    I have inspected and read my deposition and
22  have listed all changes and corrections above,
    along with my reason therefor.
23
24  DATE: 2/18/2022   SIGNATURE: _____
```

# EXHIBIT 2

# SAVERI & SAVERI, INC.

706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

January 26, 2022

*VIA EMAIL*

Evan J. Werbel
Baker Botts LLP
700 K Street, N.W.
Washington, D.C. 20001
evan.werbel@bakerbotts.com

Re:   *In re Cathode Ray Tube (CRT) Antitrust Litigation* – MDL No. 1917,
      Master File No. 07-CV-5944-JST

Dear Evan:

We write regarding the Irico Defendants' opposition to Direct Purchaser Plaintiffs' ("DPPs") motion for class certification.

First, DPPs would like to take the deposition of Dr. Robert Willig, whose 2013 report is cited in the Irico Defendants' opposition. DPPs propose to depose Dr. Willig on February 8, 9, or 10, 2022, and to extend the expert discovery cut off date of February 4, 2022 accordingly. Please confirm that Irico has retained Dr. Willig and that he is available on one of those dates. Please let us know the answers to these questions as soon as possible.

Second, please produce all of the data and information required by paragraph 1 of the Stipulation and Order Regarding Procedures Governing Expert Discovery (ECF No. 583) ("Expert Stipulation"). We expect that this will include any work materials used to create the charts on page 16 of Irico's opposition brief. While we understand that the source for the charts is "Target Price Backup Data supplied by Dr. Johnson," we believe that the Expert Stipulation requires your clients to produce any underlying spreadsheets or other materials used the create the charts. *See* ECF No. 583 ¶ 1 ("'Data or other information relied upon' shall be deemed to include, but will not be limited to, underlying data, *spreadsheets*, computerized regression analysis and/or *other underlying reports and schedules* sufficient to reconstruct the expert witness's work") (emphases added).

Thank you.

Evan J. Werbel
1/26/2022
Page 2

Very truly yours,

*s/ Geoffrey C. Rushing*

Geoffrey C. Rushing

Cc:     John M. Taladay
        Thomas E. Carter
        Drew Lucarelli
        Kaylee Yang
        R. Alexander Saveri
        Matthew D. Heaphy
        Mario N. Alioto
        Lauren C. Capurro
        Daniel E. Birkhaeuser

crt.768

# EXHIBIT 3

# BAKER BOTTS LLP

700 K STREET, NW
WASHINGTON, D.C.
20001-5736

TEL  +1 202.639.7700
FAX  +1 202.639.7890
BakerBotts.com

AUSTIN
BRUSSELS
DALLAS
DUBAI
HONG KONG
HOUSTON
LONDON

MOSCOW
NEW YORK
PALO ALTO
RIYADH
SAN FRANCISCO
**WASHINGTON**

January 27, 2022

Evan Werbel
TEL: 202.639.1323
FAX: 202.585.4077
evan.werbel@bakerbotts.com

VIA E-MAIL (GEOFF@SAVERI.COM)

Geoffrey C. Rushing
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111

Re:    In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Master File
        No. 07-CV-944-JST

Dear Geoff:

I write in response to your January 26, 2022 letter regarding the Irico Defendants' opposition to Direct Purchaser Plaintiffs ("DPPs") motion for class certification.

As to your request to depose Dr. Willig, the Irico Defendants have not retained Dr. Willig in this matter.  We cited Dr. Willig's expert report that he filed regrading class certification from a previous related case as a reference for the Court in its consideration of the class certification issues.  In that expert report, Dr. Willig analyzed the findings of Dr. Leitzinger, whose analysis was largely copied by DPPs' current expert witness, Dr. Johnson.  DPPs had the opportunity to depose Dr. Willig at the time his initial report was filed.

Also, the Irico Defendants have not proffered any expert testimony pursuant to FRCP 26(a)(2) at this time. The Stipulation and Order regarding Procedures Governing Expert Discovery (ECF No. 583) is therefore inapplicable.  As DPPs acknowledge, the Irico Defendants have already disclosed that the source of the information depicted in the charts on page 16 of the Irico Defendants' opposition brief was the target price backup data supplied by Dr. Johnson.

Sincerely,

/s/ Evan Werbel
Evan Werbel

Active 71960773.1

**BAKER BOTTS** LLP

Geoffrey C. Rushing                             - 2 -                             January 27, 2022


cc:    R. Alexander Saveri
       Matthew D. Heaphy
       Lauren C. Capurro
       Mario N. Alioto
       Daniel E. Birkhauser