Mario N. Alioto (56433)
Joseph M. Patane (72202)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2001 Union Street, Suite 482
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415- 346-0679
Email: malioto@tatp.com
jpatane@tatp.com
laurenrussell@tatp.com

***Lead Counsel for the Indirect Purchaser
Plaintiffs for the 22 States***

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 4:07-cv-05944-JST |
| | MDL No. 1917 |
| This Document Relates to: | **DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF MOTION TO DISTRIBUTE ATTORNEYS' FEES, EXPENSES AND INCENTIVE AWARDS** |
| INDIRECT PURCHASER ACTIONS FOR THE 22 STATES | |
| | Hearing Date:  May 12, 2022 |
| | Time: 2:00 p.m. |
| | Courtroom: 6, 2nd Floor (Oakland) |
| | Judge:  Honorable Jon S. Tigar |

1    I, Mario N. Alioto, declare:

2    1.    I am an attorney duly licensed by the State of California and am admitted to

3    practice before this Court.  I am a partner with the law firm Trump, Alioto, Trump & Prescott,

4    LLP and my firm serves as the Court-appointed Lead Counsel for the Indirect Purchaser

5    Plaintiffs ("IPPs") for the 22 States in the above-captioned action.  I submit this Declaration in

6    support of the IPPs' Motion to Distribute Attorneys' Fees, Expenses, and Incentive Awards, filed

7    herewith.  The matters set forth herein are within my personal knowledge and if called upon and

8    sworn as a witness I could competently testify regarding them.

9    2.    Attached hereto as Exhibit A is a true and correct copy of the Petition for Writ of

10   Certiorari filed by the ORS and NRS objectors.

11   3.    IPPs are also working on finalizing claims and will be filing a separate motion to

12   disburse the settlement funds to claimants.

13   4.    The total amount to be distributed to IPP Counsel is $134,254,667 ("Total Fee

14   Distribution"). This amount consists of the Court's attorney fee award of $129,606,250 (23.66%

15   of the settlement funds), plus an estimated amount of interest earned on the attorney fee award,

16   less an amount being held back for settlements with other objectors.

17   5.    As previously disclosed to the Court, four groups of objectors voluntarily

18   dismissed their appeals of the original settlements pursuant to settlements with IPPs. *See* ECF

19   No. 5587 at 9. This was prior to the enactment of Fed. R. Civ. P. 23(e)(5)(B). No payment is due

20   to those objectors until the amended settlements and all fee proceedings are final, at which time

21   Lead Counsel intends to present these settlements to the Court.

22   6.    The proposed fee allocation formula that I devised in concert with my co-counsel

23   relies on two variables: (1) the firm's individual 2017 fee allocation ("Individual Firm 2017

24   Allocation"), as previously approved by this Court (ECF No. 5122), and (2) the firm's additional

25   lodestar, if any, devoted to work on the amended settlements from March 1, 2019 through Sept.

26   30, 2021 ("Amended Settlement Lodestar").  Those two sums (Individual Firm 2017 Allocation +

27   Amended Settlement Lodestar Amount) are combined for each firm to generate the numerator in

28   the pro-rata calculation.  Next, all firms' Individual 2017 Allocations + Amended Settlement

Lodestar Amounts are combined to generate an All Firms' 2017 Allocation + Amended Settlement Lodestar Amount, which serves as the denominator in the pro-rata calculation. The formula for calculating each individual firm's pro-rata allocation percentage is as follows:

| | |
|---|---|
| Individual Firm 2017 Allocation<br>+ Amended Settlement Lodestar Amount<br>All Firms' 2017 Allocation<br>+ Amended Settlement Lodestar Amount | =  Individual Firm New Allocation Percentage |

The Individual Firm New Allocation Percentage is then applied to the Total Fee Distribution above to determine each firm's new fee allocation.

7.      The proposed formula includes $6,103,876 in lodestar for work performed by certain firms from March 1, 2019 through September 30, 2022 in negotiating the amended settlements, obtaining approval of them, and defending them on appeal. That work included, *inter alia*:

    a.  Efforts to bring Massachusetts, Missouri and New Hampshire ("the Three States") into the 2016 Settlements after remand (*see, e.g.*, ECF No. 5416 at 7-10), which efforts were rejected by the ORS objectors (*id*. at 19-32);

    b.  Preparation for, briefing, and attendance at multiple case management conferences (ECF Nos. 5416, 5426, 5497, 5543, 5556);

    c.  Researching and drafting a motion to set trial date (ECF Nos. 5519, 5524, 5525, 5529);

    d.  Participation in mandatory settlement and discovery conferences before Judge Corley (ECF Nos. 5521, 5531, 5551, 5594, 5596, 5610, 5629);

    e.  Provision of extensive trial and discovery materials to ORS and NRS counsel pursuant to mediation before Judge Corley (ECF No. 5636);

    f.  Opposing the ORS objectors' motions to vacate the 2016 Settlements (ECF Nos. 5527, 5537, 5538, 5631, 5632);

    g.  Negotiating and drafting the amended settlements with Defendants;

1

h.   Responding to ORS/NRS objectors' motions to intervene for the purpose of

2

alleging their claims (ECF Nos. 5565, 5567, 5593, 5628, 5643, 5645, 5664);

3

i.   Successfully moving for preliminary approval of the amended settlements and

4

devising notice plan, including responding to ORS/NRS objections thereto (ECF

5

Nos. 5587, 5607, 5608, 5609, 5616, 5618);

6

j.   Successfully opposing the ORS/NRS objectors' motion to stay settlement

7

approval (ECF No. 5718, 5726, 5731, 5774) and successfully moving to dismiss

8

their improper appeal of the preliminary approval order (ECF Nos. 5709, 5711,

9

5712, 5733, 5738, 5753);

10

k.   Successfully moving and arguing for final approval of the amended settlements,

11

including responding to ORS/NRS objections, and moving to strike untimely

12

objections (ECF Nos. 5732, 5739-52, 5755, 5756, 5758, 5765, 5779, 5781, 5782,

13

5784, 5786, 5787, 5794, 5796, 5803, 5804, 5814);

14

l.   Successfully opposing the ORS/NRS objectors' further motions to intervene for

15

the purpose of objecting to and appealing settlement approval (ECF Nos. 5754,

16

5776, 5780, 5792, 5801, 5806, 5811, 5812, and their motion to stay final approval

17

(ECF Nos. 5791, 5797);

18

m.   Moving to dismiss objectors' appeals of settlement approval for lack of standing,

19

resulting in the dismissal of one of the five separate appeals;[1]

20

n.   Responding to the ORS/NRS objectors' appeals of this Court's denial of

21

intervention for the purpose of bringing their claims;[2] and,

22

23

---

24

[1] *See In re Cathode Ray Tube (CRT) Antitrust Litig.,* Appeal No. 20-16684, ECF No. 14 (Order granting motion to dismiss appeal); No. 20-16685, ECF No. 15 (Order denying motion to dismiss

25

appeal without prejudice to renewing arguments in answering brief); No. 20-16686, ECF No. 17 (Order denying motion to dismiss appeal without prejudice to renewing arguments in answering

26

brief); No. 20-16691, ECF No. 16 (Order denying motion to dismiss appeal without prejudice to renewing arguments in answering brief); and, No. 20-16699, ECF No. 22 (Order denying motion

27

to dismiss appeal without prejudice to renewing arguments in answering brief).

28

[2] *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, Lead Appeal No. 20-15697, ECF No. 53 (IPP Answering Brief).

o.  Successfully defending the amended settlements and fee award on appeal to the Ninth Circuit. *See In re Cathode Ray Tube (CRT) Antitrust Litig.,* Appeal No. 20-16685, ECF No. 42 (IPP Answering Brief); Appeal 20-15697, ECF No. 85 (Memorandum decision).

8.      None of the extensive work performed by my firm or certain other IPP firms to defend the original settlements during the three and three-quarters years from June 1, 2015 to February 28, 2019 is considered in this new allocation.

9.      The original fee of $158,606,250 was reduced to $129,606,250 to preserve the settlements for class members. The allocation formula starts from the premise that all firms should share in that reduction in proportion to the amount they were to receive under the 2017 Allocation. Thus, the formula—which I devised in consultation with the other core firms—starts with the 2017 Allocation and then gives consideration to the additional work performed on the amended settlements that benefitted settlement class members and the other IPP firms. I also conferred with the non-lead firms regarding their allocations and the formula being used to ensure they understood how it works and why it is fair. 47 out of the 50 firms that were included in the 2017 Allocation have agreed to their allocation amount generated by this formula.

10.     The fee amounts allocated to the three objecting firms by the Court in the 2017 Allocation represented a very small amount – approximately 2.3 percent – of the total fees allocated at that time.

11.     My co-counsel met and conferred with the three objecting firms regarding their proposed allocations and objections but were unable to resolve this dispute.

12.     Attached hereto as Exhibit B is a true and correct copy of the Supplemental Report and Recommendation of Special Master Re Allocation of Attorneys' Fees in the Indirect-Purchaser Class Action, ECF No. 7375, Case No. 3:07-md-01827-SI, *In re TFT-LCD Antitrust Litig.,* N.D. Cal.

13.     Two IPP class representatives (Daniel Riebow, the former Court-appointed representative of the Hawaii subclass, and Craig Stephenson, the former Court-appointed representative of the New Mexico subclass) and one former named plaintiff (Jerry Cook) have

1  died since early 2019. I am informed and believe that many other claimants have moved since

2  filing their claims in 2015, making it difficult (or even impossible) to get them their share of the

3  settlement funds.

4

5          I declare under penalty of perjury under the laws of the United States that the foregoing is

6  true and correct.  Executed this 22nd day of March, 2022 at San Francisco, California.

7

8                                            /s/ Mario N. Alioto
                                             Mario N. Alioto
9

10                                           ***Lead Counsel for the Indirect Purchaser Plaintiffs
                                             for the 22 States***

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF MARIO N. ALIOTO ISO MOTION TO DISTRIBUTE ATTORNEYS' FEES,
EXPENSES, AND INCENTIVE AWARDS; Master File No. 07-cv-05944-JST; MDL No. 1917

# EXHIBIT A

**No. _____**

In The
# Supreme Court of the United States

———— ♦ ————

TYLER AYRES, *et al.*,

*Petitioners,*

v.

INDIRECT PURCHASER PLAINTIFFS,
TOSHIBA CORPORATION, SAMSUNG SDI CO., LTD.,
KONINKLIJKE PHILIPS, N.V., THOMSON SA,
HITACHI LTD., PANASONIC CORPORATION, *et al.*,

*Respondents.*

———— ♦ ————

**On Petition For A Writ Of Certiorari
To The United States Court Of Appeals
For The Ninth Circuit**

———— ♦ ————

**PETITION FOR A WRIT OF CERTIORARI**

———— ♦ ————

TRACY R. KIRKHAM
JOHN D. BOGDANOV
COOPER & KIRKHAM, P.C.
357 Tehama Street,
   Second Floor
San Francisco, CA 94103
Telephone: (415) 788-3030
trk@coopkirk.com
jdb@coopkirk.com

JOHN G. CRABTREE
*Counsel of Record*

CHARLES M. AUSLANDER
BRIAN C. TACKENBERG
CRABTREE & AUSLANDER
240 Crandon Blvd.
Suite 101
Key Biscayne, FL 33149
Telephone: (305) 361-3770
jcrabtree@crabtreelaw.com

[Additional Counsel Listed On Inside Cover]

COCKLE LEGAL BRIEFS (800) 225-6964
WWW.COCKLELEGALBRIEFS.COM

FRANCIS O. SCARPULLA
PATRICK B. CLAYTON
LAW OFFICES OF
   FRANCIS O. SCARPULLA
3708 Clay Street
San Francisco, CA 94118
Telephone: (415) 751-4193
fos@scarpullalaw.com
pbc@scarpullalaw.com

THERESA D. MOORE
LAW OFFICES OF
   THERESA D. MOORE
One Sansome Street,
   35th Floor
San Francisco, CA 94104
Telephone: (415) 613-1414
tmoore@aliotolaw.com

BRIAN M. TORRES
BRIAN M. TORRES, P.A.
One S.E. Third Avenue,
   Suite 3000
Miami, FL 33131
Telephone: (305) 901-5858
btorres@briantorres.legal

ROBERT J. BONSIGNORE
BONSIGNORE, LLC
3771 Meadowcrest Drive
Las Vegas, NV 89121
Telephone: (781) 856-7650
rbonsignore@classactions.us

i

## QUESTIONS PRESENTED

On remand from an appeal successfully challenging a proposed nationwide settlement, class counsel and his clients stopped representing the class members in the Petitioners' states. The Petitioners, still members of the certified national class, moved to intervene-of-right as representatives for the members in their states.

Although agreeing that those class members needed representation, the district court found it lacked subject matter jurisdiction to allow the intervention because the case was within a multi-district litigation (MDL) proceeding under 28 U.S.C. § 1407. The Petitioners appealed. To ensure their appeal was not rendered moot, they later appealed a final judgment approving a new settlement that excised the claims of the class members in their states against the Respondents.

In a single decision, the Ninth Circuit: (i) affirmed the final judgment on the basis that the Petitioners lacked standing to challenge it; and (ii) dismissed the intervention appeal as moot because the court was affirming the final judgment.

The decision has deepened a circuit split that the Fourth and Fifth Circuits have expressly acknowledged.

The questions presented are:

1.   Does a final judgment moot a pending appeal from an order denying intervention-of-right?

2.   Does a district court possess subject matter jurisdiction to allow class members to intervene-of-right directly into a case coordinated in an MDL proceeding?

ii

## RULE 14.1 STATEMENT

In addition to the petitioner listed in the caption, the following individuals were the appellants below and are petitioners here: Kerry Murphy, Jay Erickson, John Heenan, Jeff Johnson, Chris Seufert, William J. Trentham, Nikki Crawley, Hope Hitchcock, D. Bruce Johnson, Mike Bratcher, Eleanor Lewis, Robert Stephenson, and Warren Cutlip.

The Indirect Purchaser Plaintiffs referred to in the caption as respondents were plaintiff-appellees below, representing themselves and a certified class, and are: Brian Luscher, Jeffrey Figone, Carmen Gonzalez, Dana Ross, Steven Ganz, Lawyer's Choice Suites, Inc., David Rooks, Sandra Reebok, Travis Burau, Southern Office Supply, Inc., Kerry Lee Hall, Lisa Reynolds, Barry Kushner, Misti Walker, Steven Fink, David Norby, Ryan Rizzo, Charles Jenkins, Gregory Painter, Conrad Party, Janet Ackerman, Mary Ann Stephenson, Patricia Andrews, Gary Hanson, Frank Warner, Albert Sidney Crigler, Margaret Slagle, John Larch, Louise Wood, Donna Ellingson-Mack, and Brigid Terry.

iii

## RULE 14.1 STATEMENT—Continued

In addition to the respondent entities listed in the caption, the following entities were defendant-appellees below and are respondents here: Samsung SDI America, Inc., Samsung SDI Mexico S.A. de C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung SDI Co., Ltd., Tianjin Samsung SDI Co., Ltd., Samsung SDI (Malaysia) San. Bhd., Philips North America LLC, Philips Taiwan Limited, Philips do Brasil, Ltda., Thomson Consumer Electronics, Inc., Technologies Displays Americas LLC, Hitachi Displays, Ltd. (n/k/a Japan Display, Inc.), Hitachi Asia, Ltd., Hitachi America, Ltd., Hitachi Electronic Devices (USA) Inc., Panasonic Corporation of North America, MT Picture Display Co., Ltd., Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, LLC, Toshiba America Electronic Components, Inc.

iv

## RELATED CASES

- *In Re Cathode Ray Tube (CRT) Litigation*, MDL No. 1917, Master File No. 4:07-cv-5944-JST, U.S. District Court for the Northern District of California. Judgment entered July 29, 2020.

- *Indirect Purchaser Plaintiffs v. John Finn, et al. v. Toshiba Corporation, et al.*, No. 16-16368, U.S. Court of Appeals for the Ninth Circuit. Judgment entered February 13, 2019.

- *Indirect Purchaser Plaintiffs v. Sean Hull, et al. v. Toshiba Corporation, et al.*, No. 16-16371, U.S. Court of Appeals for the Ninth Circuit. Judgment entered February 13, 2019.

- *Indirect Purchaser Plaintiffs v. Anthony Gianasca, et al. v. Toshiba Corporation, et al.*, No. 16-16373, U.S. Court of Appeals for the Ninth Circuit. Judgment entered February 13, 2019.

- *Indirect Purchaser Plaintiffs v. Donnie Clifton, et al. v. Toshiba Corporation, et al.*, No. 16-16374, U.S. Court of Appeals for the Ninth Circuit. Judgment entered February 13, 2019.

- *Indirect Purchaser Plaintiffs v. Dan L. Williams & Co., et al. v. Toshiba Corporation, et al.*, No. 16-16378, U.S. Court of Appeals for the Ninth Circuit. Judgment entered February 13, 2019.

- *Indirect Purchaser Plaintiffs v. Rockhurst University, et al. v. Toshiba Corporation, et al.*, No. 16-16379, U.S. Court of Appeals for the Ninth Circuit. Judgment entered February 13, 2019.

v

**RELATED CASES**—Continued

- *Indirect Purchaser Plaintiffs v. Anthony Gianasca, et al. v. Toshiba Corporation, et al.*, No. 16-16400, U.S. Court of Appeals for the Ninth Circuit. Judgment entered February 13, 2019.

- *Indirect Purchaser Plaintiffs v. Toshiba Corporation, et al. v. Tyler Ayres, et al.*, No. 20-15697, U.S. Court of Appeals for the Ninth Circuit. Judgment entered September 22, 2021.

- *Indirect Purchaser Plaintiffs v. Toshiba Corporation, et al. v. Tyler Ayres, et al.*, No. 20-15697, U.S. Court of Appeals for the Ninth Circuit. Judgment entered March 3, 2022.

- *Indirect Purchaser Plaintiffs v. Toshiba Corporation, et al. v. Eleanor Lewis*, No. 20-15704, U.S. Court of Appeals for the Ninth Circuit. Judgment entered September 22, 2021.

- *Indirect Purchaser Plaintiffs v. Toshiba Corporation, et al. v. Eleanor Lewis*, No. 20-15704, U.S. Court of Appeals for the Ninth Circuit. Judgment entered March 3, 2022.

- *Indirect Purchaser Plaintiffs v. Toshiba Corporation, et al. v. Anthony Gianasca, et al.*, No. 20-16081, U.S. Court of Appeals for the Ninth Circuit. Judgment entered September 22, 2021.

- *Indirect Purchaser Plaintiffs v. Toshiba Corporation, et al. v. Anthony Gianasca, et al.*, No. 20-16081, U.S. Court of Appeals for the Ninth Circuit. Judgment entered March 3, 2022.

vi

**RELATED CASES**—Continued

- *Indirect Purchaser Plaintiffs v. Toshiba Corporation, et al. v. Eleanor Lewis*, No. 20-16685, U.S. Court of Appeals for the Ninth Circuit. Judgment entered September 22, 2021.

- *Indirect Purchaser Plaintiffs v. Toshiba Corporation, et al. v. Eleanor Lewis*, No. 20-16685, U.S. Court of Appeals for the Ninth Circuit. Judgment entered December 23, 2021.

- *Indirect Purchaser Plaintiffs v. Jeff Speaect, et al. v. Toshiba Corporation, et al.*, No. 20-16686, U.S. Court of Appeals for the Ninth Circuit. Judgment entered September 22, 2021.

- *Indirect Purchaser Plaintiffs v. Jeff Speaect, et al. v. Toshiba Corporation, et al.*, No. 20-16686, U.S. Court of Appeals for the Ninth Circuit. Judgment entered December 23, 2021.

- *Indirect Purchaser Plaintiffs v. Toshiba Corporation, et al. v. Scott Caldwell, et al.*, No. 20-16691, U.S. Court of Appeals for the Ninth Circuit. Judgment entered September 22, 2021.

- *Indirect Purchaser Plaintiffs v. Toshiba Corporation, et al. v. Scott Caldwell, et al.*, No. 20-16691, U.S. Court of Appeals for the Ninth Circuit. Judgment entered December 23, 2021.

- *Indirect Purchaser Plaintiffs v. Toshiba Corporation, et al. v. Tyler Ayres, et al.*, No. 20-16699, U.S. Court of Appeals for the Ninth Circuit. Judgment entered September 22, 2021.

vii

**RELATED CASES**—Continued

- *Indirect Purchaser Plaintiffs v. Toshiba Corporation, et al. v. Tyler Ayres, et al.*, No. 20-16699, U.S. Court of Appeals for the Ninth Circuit. Judgment entered December 23, 2021.

viii

## TABLE OF CONTENTS

Page

QUESTIONS PRESENTED ................................   i

RULE 14.1 STATEMENT....................................   ii

STATEMENT OF RELATED CASES.................   iv

TABLE OF CONTENTS ....................................  viii

TABLE OF AUTHORITIES ...............................   xii

PETITION FOR A WRIT OF CERTIORARI .......   1

OPINIONS BELOW............................................   1

JURISDICTION...................................................   1

STATUTORY PROVISIONS INVOLVED ...........   2

STATEMENT.......................................................   2

    A.  Proceedings through the First Appeal ......   2

    B.  Post-Remand Proceedings and Second Appeal........................................................   6

REASONS FOR GRANTING THE PETITION .....   19

    I.  The courts of appeals are divided over whether a final judgment moots a pending appeal from an order denying intervention......................................................   21

        A.  The Ninth Circuit's decision directly conflicts with the decisions of seven circuits.................................................   21

        B.  The Second Circuit holds that dismissal of the underlying case moots a pending intervention appeal ...............   24

ix

TABLE OF CONTENTS—Continued

Page

C. The "divergent precedents" of the Ninth Circuit and the District of Columbia Circuit are occasionally (as here) wrong, and always fodder for confusion............................................ 25

II. The question presented regarding a denied intervenor's right to appellate review is important ................................... 31

A. The intervention-mootness issues in this case implicate the most basic notions of due process ......................... 31

B. Allowing parties—especially named class representatives and their counsel—to moot the appellate rights of would-be intervenors invites moral hazard.................................................. 33

C. The intervention-mootness issues are recurring............................................. 34

III. This case also presents an important federal jurisdictional and procedural issue arising out of the MDL statute.................. 34

CONCLUSION.................................................... 40

x

TABLE OF CONTENTS—Continued

Page

APPENDIX

United States Court of Appeals for the Ninth
  Circuit, Memorandum, September 22, 2021 ... App. 1

United States District Court for the Northern
  District of California, Order, August 27,
  2020 ................................................................ App. 11

United States District Court for the Northern
  District of California, Final Judgment, July
  29, 2020 .......................................................... App. 25

United States Court of Appeals for the Ninth
  Circuit, Order, July 22, 2020 ......................... App. 32

United States District Court for the Northern
  District of California, Order, July 13, 2020 .... App. 34

United States District Court for the Northern
  District of California, Order, June 25, 2020 ..... App. 77

United States District Court for the Northern
  District of California, Order, April 9, 2020 .... App. 89

United States District Court for the Northern
  District of California, Order, March 11,
  2020 ................................................................ App. 98

United States District Court for the Northern
  District of California, Order, February 4,
  2020 .............................................................. App. 130

United States District Court for the Northern
  District of California, Order, October 17,
  2019 .............................................................. App. 139

xi

TABLE OF CONTENTS—Continued

Page

United States District Court for the Northern
District of California, Order, October 15,
2019 .............................................................. App. 144

United States Court of Appeals for the Ninth
Circuit, Order, February 13, 2019 ............... App. 149

United States Court of Appeals for the Ninth
Circuit, Order Denying Petition for Rehear-
ing, December 23, 2021 ................................ App. 164

United States Court of Appeals for the Ninth
Circuit, Order Denying Petition for Rehear-
ing, March 2, 2022 ........................................ App. 173

Relevant Statutes and Rules .......................... App. 176

xii

TABLE OF AUTHORITIES

Page

CASES

*335-7 LLC v. City of New York*,
    524 F. Supp. 3d 316 (S.D.N.Y. 2021) .......................25

*Allied Concrete & Supply Co. v. Baker*,
    904 F.3d 1053 (9th Cir. 2018)...........................27, 28

*Alt. Research & Dev. Found. v. Veneman*,
    262 F.3d 406 (D.C. Cir. 2001) ..................................26

*Arbaugh v. Y&H Corp.*,
    546 U.S. 500 (2006) ................................................36

*Canatella v. California*,
    404 F.3d 1106 (9th Cir. 2005).....................16, 27, 28

*CE Design, Ltd. v. Cy's Crab House N., Inc.*,
    731 F.3d 725 (7th Cir. 2013)..............................22, 24

*Commissioner v. Estate of Bosch*,
    387 U.S. 456 (1967) .................................................31

*CVLR Performance Horses, Inc. v. Wynne*,
    792 F.3d 469 (4th Cir. 2015)............ 13, 19, 21, 22, 24

*DBSI/TRI IV Ltd. P'ship v. United States*,
    465 F.3d 1031 (9th Cir. 2006)...........................27, 29

*DeOtte v. State*,
    20 F.4th 1055 (5th Cir. 2021) ...........................*passim*

*Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*,
    445 U.S. 326 (1980) .................................................33

*Energy Transp. Grp., Inc. v. Mar. Admin.*,
    956 F.2d 1206 (D.C. Cir. 1992) ...............................25

*FDIC v. Jennings*,
    816 F.2d 1488 (10th Cir. 1987)...................23, 24, 33

xiii

TABLE OF AUTHORITIES—Continued

Page

*Glasstech, Inc. v. AB Kyro OY*,
  769 F.2d 1574 (Fed. Cir. 1985) ...............................36

*Hamilton v. County of Los Angeles*,
  46 F.3d 1141 (9th Cir. 1995)........................... 26, 28

*Hansberry v. Lee*,
  311 U.S. 32 (1940) ...........................................31, 32

*Hess v. Port Auth. Trans-Hudson Corp.*,
  513 U.S. 30 (1994) .................................................30

*Hiersche v. United States*,
  503 U.S. 923 (1992) ...............................................30

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) .................................................3

*In re Brewer*,
  863 F.3d 861 (D.C. Cir. 2017) ............... 25, 33, 36, 39

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  753 Fed. Appx. 438 (9th Cir. 2019) ........................20

*In re Cathode Ray Tube Antitrust Litig.*,
  20-15697, 2021 WL 4306895
  (9th Cir. Sept. 22, 2021) ...........................................1

*In re Cathode Ray Tube Antitrust Litig.*,
  4:07-CV-5944-JST, 2020 WL 5224343
  (N.D. Cal. July 29, 2020) ..........................................1

*In re Farmers Ins. Exch. Claims
  Representatives Overtime Pay Litig.*,
  MDL No. 33-1439, 2008 WL 4763029
  (D. Or. Oct. 28, 2008) ........................................34, 38

xiv

TABLE OF AUTHORITIES—Continued

Page

*In re Mortgage Elec. Registration Sys. (MERS)*
  *Litig.*,
  No. MD-09-02119-PHX-JAT,
  2016 WL 3931820 (D. Ariz. July 21, 2016) ............38

*In re Mortgage Elec. Registration Sys., Inc.,*
  *Litig.*,
  719 Fed. Appx. 550 (9th Cir. 2017) ........................38

*In re Plumbing Fixture Cases*,
  298 F. Supp. 484 (J.P.M.L. 1968) ...........................36

*In re Synthroid Mktg. Litig.*,
  264 F.3d 712 (7th Cir. 2001) ...................................22

*Inyo County, Cal. v. Paiute-Shoshone Indians*,
  538 U.S. 701 (2003) .................................................31

*Kunz v. N.Y. State Comm'n on Judicial*
  *Misconduct*,
  155 Fed. Appx. 21 (2d Cir. 2005) ............................24

*Lexecon, Inc. v. Milberg Weiss Bershad*
  *Hynes & Lerach*,
  523 U.S. 26 (1998) ..................................................37

*Marshak v. Original Drifters, Inc.*,
  2020 WL 1151564 (S.D.N.Y. Mar. 10, 2020) ............25

*Mausolf v. Babbitt*,
  125 F.3d 661 (8th Cir. 1997) ............................22, 24

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985) .................................................35

*Nat'l Bulk Carriers, Inc. v. Princess Mgmt.*
  *Co., Ltd.*,
  597 F.2d 819 (2d Cir. 1979) ....................................24

xv

TABLE OF AUTHORITIES—Continued

Page

*Neidig v. Rendina*,
  298 Fed. Appx. 115 (3d Cir. 2008)......................22, 24

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) .................................................35

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985) ................................................31

*Porter v. Nussle*,
  534 U.S. 516 (2002) ...............................................30

*Prete v. Bradbury*,
  438 F.3d 949 (9th Cir. 2006)...................................13

*Purcell v. BankAtlantic Fin. Corp.*,
  85 F.3d 1508 (11th Cir. 1996).................................23

*Reynolds v. Butts*,
  312 F.3d 1247 (11th Cir. 2002) ............................. 32

*Sommers v. Bank of Am., N.A.*,
  835 F.3d 509 (5th Cir. 2016)...................................22

*Stadnicki on Behalf of LendingClub Corp. v.
    Laplanche*,
  804 Fed. Appx. 519 (9th Cir. 2020) ........................27

*Standard Fire Ins. Co. v. Knowles*,
  568 U.S. 588 (2013) ................................................34

*Stromberg v. Qualcomm Inc.*,
  14 F.4th 1059 (9th Cir. 2021) ...................................3

*Taylor v. Sturgell*,
  553 U.S. 880 (2008) ................................................31

*Thiel v. Southern Pac. Co.*,
  328 U.S. 217 (1946) ................................................37

xvi

TABLE OF AUTHORITIES—Continued

Page

*United States v. Ford*,
650 F.2d 1141 (9th Cir. 1981) .........................14, 26

*United States v. Sprint Communications, Inc.*,
855 F.3d 985 (9th Cir. 2017)................. 14, 15, 27, 29

*W. Coast Seafood Processors Ass'n v. Nat. Res.
Def. Council, Inc.*,
643 F.3d 701 (9th Cir. 2011)...................................26

*Waller v. Fin. Corp. of Am.*,
828 F.2d 579 (9th Cir. 1987)............................16, 18

*Zipes v. Trans World Airlines, Inc.*,
455 U.S. 385 (1982) ...............................................36

CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V .................................................35

STATUTES AND RULES

28 U.S.C. § 1254(1)......................................................1

28 U.S.C. § 1407(a)....................................................35

Fed. R. Civ. P. 15.........................................................7

Fed. R. Civ. P. 23........................................ 10, 32, 35, 39

Fed. R. Civ. P. 23(d)(1)(B)(iii) ....................................32

Fed. R. Civ. P. 24.................................... 7, 10, 32, 35, 39

Fed. R. Civ. P. 62.1.......................................................4

xvii

TABLE OF AUTHORITIES—Continued

Page

OTHER AUTHORITIES

15A Charles Alan Wright, Arthur R. Miller &
   Edward H. Cooper, FEDERAL PRACTICE AND
   PROCEDURE § 3902.1 (2d ed. 1991) ..........................23

NEWBERG ON CLASS ACTIONS § 10:28 (5th ed.) ..............39

NEWBERG ON CLASS ACTIONS § 10:29 (5th ed.) ..............37

NEWBERG ON CLASS ACTIONS § 16:7 (4th ed. 2002)........34

Practical Law Antitrust, *State Illinois Brick
   Repealer Laws Chart*, Westlaw, https://bit.ly/
   3foROqr ....................................................................3

SHAPIRO ET AL., SUPREME COURT PRACTICE
   (10th ed. 2013)..................................................31, 36

United States Judicial Panel on Multidistrict
   Litigation, *Calendar Year Statistics*, https://
   www.jpml.uscourts.gov/sites/jpml/files/JPML_
   Calendar_Year_Statistics-2021.pdf (last visited
   Feb. 17, 2022) ........................................................37

United States Judicial Panel on Multidistrict
   Litigation, *MDL Statistics Report—Distribu-
   tion of Pending MDL Dockets by District*
   (Feb. 15, 2022), https://www.jpml.uscourts.
   gov/sites/jpml/files/Pending_MDL_Dockets_
   By_District-February-15-2022.pdf ........................37

United States Judicial Panel on Multidistrict
   Litigation, *MDL Statistics Report—Distribu-
   tion of Pending MDL Dockets by Actions
   Pending* (Feb. 15, 2022), https://www.jpml.
   uscourts.gov/sites/jpml/files/Pending_MDL_
   Dockets_By_Actions_Pending-February-15-
   2022.pdf..................................................................38

1

## PETITION FOR A WRIT OF CERTIORARI

The Petitioners pray that the Supreme Court grant a writ of certiorari to review the judgment of the court below.

————————◆————————

## OPINIONS BELOW

The opinion of the court of appeals (i) dismissing the Petitioners' denial-of-intervention appeal, and (ii) finding they had no standing to appeal the district court's later-entered final judgment (App. 1-10) is reported at *In re Cathode Ray Tube Antitrust Litig.*, 20-15697, 2021 WL 4306895 (9th Cir. Sept. 22, 2021). The final order of the district court denying the Petitioners' motion to intervene as sub-class representatives (App. 130a-138a) is unreported. The district court's final judgment (App. 25-30) is reported at *In re Cathode Ray Tube Antitrust Litig.*, 4:07-CV-5944-JST, 2020 WL 5224343 (N.D. Cal. July 29, 2020).

————————◆————————

## JURISDICTION

The judgment of the court of appeals was entered on September 22, 2021. (App. 1-10). A timely petition for rehearing and rehearing en banc was denied on December 23, 2021 as to appeal numbers 20-16685, 20-16686, 20-16691, and 20-16699 (App. 164-172) and on March 2, 2022 as to appeal numbers 20-15697, 20-15704, and 20-16081. (App. 173-175). The jurisdiction of this Court is invoked under 28 U.S.C. § 1254(1).

————————◆————————

2

## STATUTORY PROVISIONS INVOLVED

Pertinent statutory provisions are reproduced in the appendix to this petition. (App. 176-191).



## STATEMENT

### A. Proceedings through the First Appeal

1. a.   From the mid-1990s to the mid-2000s, some of the most dominant players in the technology industry conspired to fix the prices of cathode ray tubes (CRTs)—making televisions, computer monitors and similar products substantially more expensive than they would otherwise be. Once the conspiracy came to light, plaintiffs from around the country filed direct and indirect purchaser suits in federal courts in their home states. The Judicial Panel on Multidistrict Litigation coordinated the cases in the Northern District of California. (DE 122).

b.   After the cases were coordinated, the district court appointed lead class counsel (Lead Counsel) for a putative nationwide class of indirect purchasers of CRTs. (DE 282). Lead Counsel filed a Consolidated Amended Complaint that alleged: (1) federal antitrust claims under the Sherman Act and Clayton Act for equitable relief for persons in all 50 states; (2) violations of state antitrust laws; (3) violations of state consumer and unfair competition statutes; and

3

(4) claims for unjust enrichment and disgorgement of profits. (DE 437).[1]

2. a.   In 2015, Lead Counsel reached settlements with Phillips, Panasonic, Hitachi, Toshiba, Samsung SDI, Thomas, and TDA (the Defendants) with a proposed fund of over $576 million (DE 4351:9-10).

Under the terms of the settlement, only class members in 22 state subclasses would receive compensation; yet every indirect purchaser in the country would release their claims against the Defendants (i.e., the Respondents in this proceeding). (DE 3861:6-7, 26).

b.   Some class members objected to the settlement. (DE 4351:12). The scheme was unfair, they explained, because several of the 29 states not included in the monetary recovery were "repeater states" having laws that would allow their citizens to recover monetary damages. (DE 4351:31-41). The class members in those states were releasing their state law damages

_____

[1] Within the world of antitrust price-fixing litigation, the term "indirect product purchaser" refers to those persons who bought the product at issue from someone other than the defendant—typically from a retailer or wholesaler. Since the Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977), only indirect product purchasers residing in certain states may bring antitrust *damages* suits against product manufacturers. "Currently, thirty-five states and the District of Columbia effectively repealed *Illinois Brick* (known as "repealer states") in one form or another [to allow state-law damages claims by indirect purchasers], but fifteen states have not (known as "non-repealer states")." *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1064 (9th Cir. 2021) (citing Practical Law Antitrust, *State Illinois Brick Repealer Laws Chart*, Westlaw, https://bit.ly/3foROqr).

4

claims and, like the class member objectors in "non-repealer" states, their federal equitable claims for nothing. (DE 4351:38-41).

c.   Despite the class-member objections, the district court entered an order granting final approval to the settlement, and then entered a final judgment of dismissal with respect to the Defendants. (DE 4712: 36-37; 4717).

3. a.   Several class-member objectors appealed the district court's final approval order to the Ninth Circuit. At oral argument, the appellate panel expressed serious concerns about the settlement's fairness given that it released claims without providing compensation for their release. (DE 5335:4; 5335-1:transcript pages 38-53).

b.   Shortly after oral argument, Lead Counsel filed a motion in the district court for an indicative ruling under Federal Rule of Civil Procedure 62.1, asking whether the court would allow Lead Counsel to amend the settlement if the Ninth Circuit permitted it to do so through a limited remand. (DE 5335). Lead Counsel offered to reduce plaintiff class counsel's attorney's fee award by $6 million (from $158,606,250 to $152,606,250) and use that money to allow indirect purchasers in the three omitted repealer states that had appellant-objectors—Massachusetts, Missouri, and New Hampshire—to file claims against that fund. (DE 5335:5-9).

The district court denied the motion for an indicative ruling. (DE 5362). The court expressly agreed with

5

the objector-appellants that Lead Counsel's settlement had been unfair because it forced class members "to release their claims without compensation." (DE 5362:1). The court further conceded that, "with the benefit of hindsight," it should not have approved the settlement. *Id*.

The district court also expressed "concerns about the adequacy of the counsel who negotiated that settlement or whether they may have faced a conflict of interest" when doing so. *Id*. In the district court's view, even in seeking to amend their settlement mid-appeal, "Lead Counsel appear[ed] to be bargaining with the [district court] to reduce the perceived value of the claims of the class members in the Omitted Repealer States." (DE 5362:2). Such a conflict, the district court explained, would "require[] further exploration and potentially the appointment of separate counsel" for the ORS. *Id*.

c.    In light of the district court's concession, the Ninth Circuit "remand[ed] th[e] case so that the district court [could] reconsider its approval of the settlement." (App. 161-163). The Ninth Circuit cautioned that the settlement's unfairness "necessarily affect[ed]" other issues on appeal, including Lead Counsels' "adequacy of representation under Federal Rule[] of Civil Procedure 23" and "the attorneys' fees awarded to Lead Counsel." (App. 161). The Ninth Circuit expressly chose not to vacate the district court's final approval order—leaving the national certified class intact. (App. 163).

6

### B.  Post-Remand Proceedings and Second Appeal

1. a.   On remand, Lead Counsel and his named, representative clients pursued a renewed settlement, but only on behalf of the class members in the same 22 repealer states who were to be compensated in the failed, original settlement. They thus left class members in over half of the states that they had been representing without representation to continue their claims on remand. (DE 5587:2-3).

This no-longer-represented contingent was comprised of two groups of class members: (i) citizens of repealer states that had laws allowing for indirect purchasers to recover money in antitrust litigation (referred to in the lower courts as the Omitted Repealer States (ORS) because Lead Counsel had omitted them from the monetary relief in the first settlement); and (ii) citizens of non-repealer states, who while having no state-law damages claims, had federal equitable claims for monetary recovery (referred to as the Non-Repealer States (NRS)). (DE 5449:2; 5451-1:1).

As the district court recognized, with respect to those no-longer-represented groups there was an apparent "agreement among the parties that there [was] an adequacy of counsel issue which [was] sufficient to require the appointment of separate counsel" for the ORS and NRS. (DE 5444:15). The court accordingly appointed four law firms as "Interim Lead Counsel" for ORS and NRS subclasses. (DE 5518).

7

b.  Although there was still a certified national class seeking relief under federal price-fixing law, and the district court had appointed counsel to represent ORS and NRS subclasses, the court-appointed class representatives for the national class were not from ORS or NRS states. They thus could not make allegations specific to those states. Accordingly, members of the certified nationwide class from the ORS and NRS states would need to be promoted to named class representatives.

To fill those roles, the Petitioners—as ORS and NRS class members—moved to intervene-of-right under Federal Rule of Civil Procedure 24 and, simultaneously, sought leave, under Federal Rule of Civil Procedure 15, to amend the consolidated complaint that had always included them as national class members. (DE 5565; 5567). As they explained, the class members in the ORS and NRS states were already part of the case by virtue of their inclusion as members in the certified nationwide class, but they were no longer represented. Intervention would allow the creation of subclasses to remedy that defect. (DE 5567:2).

Relying on the relation-back doctrine, the ORS sub-class representatives sought to amend the consolidated MDL complaint to assert the ORS subclasses' state-law damages claims, which were based on the same or substantially similar underlying conduct as the pending federal price-fixing claims that had always been asserted on their behalf. (DE 5567:12-13,

8

16-19).[2] The NRS subclass representative, asserting only the pre-existing federal claims, sought to amend solely to plead the existence of the NRS subclass. (DE 5565:4).

Both the Defendants and Lead Counsel opposed intervention. The Defendants opposed primarily by arguing that the intervention motions were untimely. (DE 5592:5-11, 19-20). They claimed the Petitioners' motions were the product of a "decade-long delay," and that they should have been filed much earlier. (DE 5592:6). Alternatively, the Defendants argued that even if the intervention was timely it would serve no purpose, asserting that the Petitioners could bring their claims in a new lawsuit, so intervention was unnecessary. (DE 5592:11-15).

Lead Counsel objected on procedural grounds. Although taking "no position on whether the [ORS] and [NRS] Plaintiffs should be allowed to intervene," Lead Counsel contended that the Petitioners, despite being members of the national class he represented, "ha[d] no authority to make or amend the allegations" in the consolidated MDL complaint that Lead Counsel had filed for the national class he represented, and should not be allowed to do so. (DE 5593:1-2, 5-10).

---

[2] As the Defendants themselves conceded below, "IPPs in the 22 States, the ORS Subclass, and the NRS Subclass make the same basic antitrust allegations" and, accordingly, "much of the same evidence presented in a potential 22 States trial would have to be presented again in the subsequent trial for the [ORS and NRS Plaintiffs]." (DE 5525:5, 7).

9

The district court agreed. (App. 139-148). Although finding that the motions "may 'provide[] enough information to state a claim and for the court to grant intervention,'" the court decided the Petitioners would need to file a "separate pleading" setting forth their claims, instead of seeking to amend the consolidated MDL complaint that Lead Counsel had filed. (App. 142, 147).

c.   The Petitioners then filed renewed motions to intervene along with the court-ordered "separate pleadings." (DE 5643; 5645). Aside from attaching the "separate pleadings," their renewed motions remained substantively the same. *Id*.

The Defendants again opposed the motions to intervene raising each of their prior arguments (DE 5663:6-13, 27-28). But they added a new argument: latching onto the district court's "separate pleading" requirement, the Defendants contended the district court lacked subject matter jurisdiction to permit the Petitioners to file their complaints-in-intervention because the class action (where they were already class members) was located in an MDL proceeding. (DE 5663:21-23).

The Defendants argued that "[t]he subject-matter jurisdiction of an MDL court is limited to claims that have been filed in or removed to federal court and transferred to the MDL court." (DE 5663:22) From that, they argued that because the proposed ORS and NRS class representatives had not first filed separate actions in a "home federal court," the district court

10

lacked jurisdiction over the proposed subclass representatives and their claims for the class members in their states. (DE 5663:22-23).

Agreeing with the Defendants, the district court denied the motions to intervene. (App. 130-138). The court explained that "the MDL statute does not permit movants' direct intervention into the MDL proceedings, whether by filing separate complaints or amending IPP Plaintiffs' operative complaint." (App. 133). In the district court's view, even when a motion to intervene-of-right is filed by an actual class member seeking to remedy inadequate representation by enabling the court to create a subclass (a subclass the court itself said was necessary (DE 5444:15)), separate "[c]ases must already be pending in a federal court before they can be added to an existing MDL." (App. 134).

The Petitioners moved to alter or amend the order denying their renewed motions to intervene. (DE 5688; 5689). They argued that the court's jurisdictional determination amounted to clear error because, if it were correct, it would make Rule 24 intervention impossible in MDL proceedings, even though that rule indisputably provides the proper procedure for the intervention of unnamed class members to remedy inadequate representation. (DE 5688:2-3; 5689:6). Such a conclusion would, in turn, eviscerate the requisite procedural due process protections Rule 23 grants judges in class action litigation. (DE 5688:2).

11

2. a.   During the intervention proceedings, Lead Counsel entered into proposed amended settlements with the Defendants on behalf of the 22 states that would have been compensated in the original settlement. That new proposed global settlement was identical to the first, apart from three changes:

- Only the class members in the 22 state subclasses would explicitly release their price-fixing claims;

- All the other class members—the ORS and NRS members—would, instead of releasing their claims this time around, simply have their claims against the Defendants excised from the litigation because the Defendants would be entirely dismissed from the case; and

- The Defendants' settlement payment would be reduced by 5.35%, and IPP's attorney fee award would be reduced by $29 million (from $158,606,250 to $129,606,250) "to fully offset the reduction in the settlement amounts."

(DE 5587:3, 30-31).

b.   On its face, eliminating the ORS and NRS price-fixing claims against the Defendants in the MDL actions might not appear prejudicial; after all, there would be no explicit *release* of those claims, and ORS and NRS class members could re-file their claims in a new case. Any such appearance is misleading.

When the ORS and NRS Plaintiffs sought intervention-of-right, the nationwide price-fixing claims

12

had been pending for over 10 years. As long as those claims remained pending against the Defendants, the Petitioners could assert claims on behalf of the persons in their states that would relate back and, thus, would be protected against any statute-of-limitations defense. But a *newly-filed* suit would be subject to the defense that it was facially time-barred. Eliminating the ORS and NRS claims against the Defendants would thus be tantamount to a release of those claims and highly prejudicial to the ORS and NRS class members.[3]

The Petitioners raised those concerns in opposition to preliminary approval, explaining that, upon finality, all pending actions against the Defendants would be dismissed; thus, even if the Petitioners were successful in reversing the order denying their motions to intervene as class representatives, the claims of the Defendants in the actions into which they were entitled to intervene would no longer be pending. (DE 5607:5-6). They would be forced to file new actions, which the Defendants could (and would) argue were time-barred. (DE 5607:6).

c.   Between denying the motions to intervene and denying the motions to alter or amend the intervention order, the district court granted preliminary approval to the re-worked settlement. (App. 98-129). The

_____

[3] The Defendants were explicit that ORS and NRS claims were time-barred and that unless the Petitioners intervened directly into the class action, the relation-back argument would be lost: the "relation-back argument fails unless they are permitted to amend the existing complaint. . . ." (DE 5726:7).

13

court did not address the ORS and NRS opposition, concluding that—because the ORS and NRS claims were not being released by the amended settlements— ORS and NRS class members had "no standing to object" to the settlements. (App. 107).

    d.   Once their motion to alter or amend the order denying them intervention-of-right was denied (App. 89-97), the Petitioners filed notices of appeal. (DE 5709, 5711).[4] They then moved to stay the final approval proceedings—set for two months later—until the Ninth Circuit decided their intervention-of-right appeal. (DE 5718). In light of the Ninth Circuit's "divergent precedents" on whether a subsequently-entered final judgment moots an already-pending intervention appeal,[5] the Petitioners asserted that it was "possible" that final approval (and the entry of a corresponding final judgment) could moot their intervention appeal; accordingly, it was appropriate to stay those approval proceedings until their intervention appeal was resolved. (DE 5718:8-9).

    Both Lead Counsel and the Defendants opposed the motion to stay—arguing that there was no *possibility* that the entry of a final judgment post-final-approval could moot the pending intervention appeal. (DE 5726:8-9; 5727:5). Lead Counsel was particularly clear that final approval and entry of final judgment

---

    [4] Orders denying motions to intervene-of-right are deemed final orders for the denied movants. *Prete v. Bradbury*, 438 F.3d 949, 959 n.14 (9th Cir. 2006).

    [5] *DeOtte v. State*, 20 F.4th 1055, 1066 (5th Cir. 2021) (citing *CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 474 (4th Cir. 2015)).

14

*could not* moot the Petitioners' intervention appeal—citing the Petitioners' "opportunity to appeal any final judgment in this action" and stating, based on their opportunity to appeal the final judgment, that the Ninth Circuit could still "provide an effective remedy on appeal. . . ." (DE 5727:5) (quoting *United States v. Sprint Commc'ns, Inc.*, 855 F.3d 985, 990 (9th Cir. 2017)). Addressing the divergent branch of Ninth Circuit mootness precedent under which a final judgment may moot a pending intervention appeal, Lead Counsel argued that those cases simply "do not accurately represent the current state of the law" in the Ninth Circuit. (DE 5727:5 n.4).

The district court found that the Petitioners' mootness concerns were "unfounded," and denied their motion to stay. (App. 84-88).

3. a.   While their motion to stay was still pending, the Petitioners filed objections to the final approval of the amended settlement. (DE 5732). They explained that they had standing to object to the settlements because final approval would excise their claims against the Defendants and, thus, could moot their pending appeal from the district court's order denying their motions to intervene-of-right because "[o]nce the underlying litigation [was] dismissed following settlement approval, there may 'no longer [be] any action in which [to] intervene.'" (DE 5732:4) (quoting *United States v. Ford*, 650 F.2d 1141, 1143 (9th Cir. 1981)). They also re-asserted their argument that the new settlement adversely affected their rights because it exposed the Petitioners to an anticipated

15

statute-of-limitations challenge if they were forced to file new actions. (DE 5732:7-8).

In response to the Petitioners' contention that they had standing to object to the settlements, Lead Counsel and the Defendants again argued that the Petitioners' mootness concerns were unfounded, with each quoting the same Ninth Circuit holding from *Sprint Communications*: "the parties' settlement and dismissal of a case after the denial of a motion to intervene does not as a rule moot a putative-intervenor's appeal." (DE 5757:7; 5758:16) (quoting *Sprint Communications, Inc.*, 855 F.3d 990).

b.   After the district court denied the Petitioners' motion to stay, they filed a motion in the Ninth Circuit seeking to stay the final approval proceedings until the court of appeals could resolve their appeal from the order denying the motions to intervene. (Appellate DE 20-1 in Appeal No. 20-15704). Again acknowledging the Ninth Circuit's conflicting precedent on whether the entry of a final judgment moots a pending intervention appeal (*Id*. at 15-16), the Petitioners argued that a stay was appropriate. (*Id*. at 16).

For the third time, both the Defendants and Lead Counsel argued that those mootness concerns were "legally unsupportable." (Appellate DE 24 & 25 in Appeal No. 20-15704). The Defendants contended that Ninth Circuit law was clear: "an appeal from a denial of intervention * * * is not moot if the underlying litigation remains 'alive' in [the Ninth Circuit] because there is also an appeal pending from the final

16

judgment." (Appellate DE 24 in Appeal No. 20-15704 at 11-12) (citing *Canatella v. California*, 404 F.3d 1106, 1110 n.1 (9th Cir. 2005)). Lead Counsel was equally emphatic that mootness was a non-issue, arguing that the entry of a final judgment could not moot the intervention appeal. (Appellate DE 25 in Appeal No. 20-15704 at 8-9).

The Ninth Circuit denied the motion for stay—explicitly finding that the Petitioners had "not shown that they are likely to suffer irreparable injury in the absence of stay." (App. 33).

c. The district court then entered an order granting final approval to Lead Counsel's amended settlement. (App. 34-76). The court concluded—once again—that the Petitioners lacked standing to object. (App. 46-49).

Regarding the Petitioners' assertion that they had standing to object because the settlement could adversely impact them (by potentially mooting their pending intervention appeal or preventing them from utilizing the relation-back doctrine), the district court found that such a danger was not akin to the "[f]ormal legal prejudice" sufficient to allow a non-party to a settlement to object. (App. 48-49). In the district court's view, "[a]t most," the "settlement puts [them] at something of a tactical disadvantage in the continuing litigation." (App. 49) (quoting *Waller v. Fin. Corp. of Am.*, 828 F.2d 579, 584 (9th Cir. 1987) (alteration in original)).

17

After the trial court granted final approval to the settlement, the Petitioners moved to intervene in the district court for the limited purpose of appealing the final approval order. (DE 5792). The district court denied the motion to intervene. (App. 11-24). The court concluded they could not appeal the order rejecting their objections for the same reason they lacked standing to object in the first place: they were "not members of the settling class" and, therefore, "cannot show a protectable interest in the settlement." (App. 19). The ORS and NRS Plaintiffs timely appealed the orders denying them leave to intervene to appeal the final approval order and entering final judgment. (DE 5828, 5831).

4.   The Ninth Circuit consolidated the Petitioners' intervention-of-right appeal and their later appeal from the final judgment. A single panel was thus tasked with addressing: (1) the district court's order denying the Petitioners' motions to intervene-of-right and act as replacement class representatives; and (2) the later-entered orders granting final approval to the amended settlements, entering judgment, and denying the Petitioners' motion to intervene for the limited purpose of appealing that order.

The court of appeals resolved the issues in two steps that reversed the sequence that the district court entered the orders on review. *First*, the court addressed the appeal from the final judgment, concluding that the Petitioners lacked standing to appeal: "The ORS and NRS objectors [i.e., the Petitioners who earlier appealed the denial of their motion to intervene-of-right]

18

lack standing to appeal the district court's [later-entered] approval of the current settlement agreements." (App. 8).

The court reasoned that—because the ORS and NRS claims were not explicitly released by the settlement—the Petitioners could not show that they would suffer "formal legal prejudice as a result of the settlement." (App. 7) (quoting *Waller v. Fin. Corp. of Am.*, 828 F.2d 579, 583 (9th Cir. 1987)). The court acknowledged that affirmance could "weaken" the Petitioners' ability to use the relation-back doctrine,[6] but decided that was no more than the loss of a "tactical advantage" and was not "sufficient to create standing to appeal." (App. 7-8a). The court's standing analysis simply elided the fact that the Petitioners were simultaneously prosecuting an earlier-filed intervention appeal in which they were seeking to become parties to the very action the final judgment terminated. (App. 6-9).

*Second*, the Ninth Circuit held in the same order that the Petitioners intervention-of-right appeal was mooted because of the appellate court's concurrent affirmance of the later-entered final judgment approving the settlements: "Our affirmance of the amended settlements moots the pending appeals by the [A]ppellants related to intervention in the district court. . . .

---

[6] The court did not explain how a relation-back argument would survive the affirmance of the district court's order excising the ORS and NRS claims against the Defendants from the case.

19

There is no longer an action against Defendants into which the [A]ppellants can intervene." (App. 9).

The Petitioners filed a petition for rehearing and rehearing en banc. (Appellate DE 88 in Appeal No. 20-15697). The Ninth Circuit denied that petition. (App. 164-175).

———————◆———————

## REASONS FOR GRANTING THE PETITION

This case presents an acknowledged circuit split over whether a final judgment moots a prior-pending intervention appeal—a recurring issue that should be resolved by this Court. As the Fifth Circuit recently observed, "[T]he Third, Tenth, and Eleventh Circuits allow the appeal of a motion denying intervention to continue after dismissal, the Second Circuit does not, and the Ninth and D.C. Circuits have divergent precedents." *DeOtte v. State*, 20 F.4th 1055, 1066 (5th Cir. 2021) (citing *CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 474 (4th Cir. 2015)); *see also CVLR Performance Horses*, 792 F.3d at 474 ("Our circuit has not squarely addressed whether dismissal of the underlying action automatically moots a pending appeal of the district court's denial of a motion to intervene, and our sister circuits have differed in their approaches to the issue.").

Unfortunately for the Petitioners (and the citizens in the states they would represent), the Ninth Circuit has, once again, dismissed an intervention appeal as moot based on a final judgment that came after that

20

appeal had been lodged. This case presents the Court an opportunity to resolve the circuits' disarray over whether a later-entered final judgment moots an already-pending appeal from an order denying intervention-as-of-right.

This case also discretely presents an important federal jurisdictional and procedural issue arising out of the MDL statute. The Petitioners were members of a certified national class when they sought to intervene-of-right into their class action as class representatives for the persons in their states. It was undisputed that class counsel and the existing class representatives, on remand from *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 753 Fed. Appx. 438, 442 (9th Cir. 2019), were no longer representing the class members from those states. Because the class members in those states lacked any, let alone constitutionally-adequate, representation to continue their long-pending price-fixing claims, the district court appointed counsel for the no-longer-represented states, and the Petitioners sought to intervene as the subclass representatives for those states.

The district court ruled that it lacked subject matter jurisdiction to allow such direct intervention into the pending class action because the national class had been certified in actions coordinated within an MDL proceeding. The court held that any new class representatives would need to first to file a new case in a home district and then seek transfer into the ongoing MDL class proceedings.

21

The Court should grant certiorari, vacate the judgment below, and remand for further proceedings so that the Petitioners may intervene and represent the ORS and NRS subclass members.

## I. The courts of appeals are divided over whether a final judgment moots a pending appeal from an order denying intervention.

The circuits are divided over whether a final judgment moots a pending appeal from an order denying intervention. The Third, Fourth, Fifth, Seventh, Eighth, Tenth and Eleventh Circuits, *infra*, "allow the appeal of a motion denying intervention to continue after dismissal, the Second Circuit does not, and the Ninth and D.C. Circuits have divergent precedents." *DeOtte*, 20 F.4th at 1066 (citing *CVLR Performance Horses*, 792 F.3d at 474).

### A. The Ninth Circuit's decision directly conflicts with the decisions of seven circuits.

This case arises out of another decision in which the Ninth Circuit has followed the minority rule and denied a putative intervenor the right to appellate review because of a later-entered final judgment. The decision directly conflicts with the following decisions of the Third, Fourth, Fifth, Seventh, Eighth, Tenth and Eleventh Circuits:

22

    <u>Third Circuit</u>. *See Neidig v. Rendina*, 298 Fed. Appx. 115, 116 n.1 (3d Cir. 2008) ("The fact that the civil rights action has been dismissed, however, does not render [the intervenor's] appeal of the denial of his motion to intervene in that suit moot.").

    <u>Fourth Circuit</u>. *See CVLR Performance Horses*, 792 F.3d at 475 ("We find more persuasive the reasoning of those courts holding that dismissal of the underlying action does not automatically moot a preexisting appeal of the denial of a motion to intervene.").

    <u>Fifth Circuit</u>. *See Sommers v. Bank of Am., N.A.*, 835 F.3d 509, 513 n.5 (5th Cir. 2016) ("Our caselaw does not forbid intervention as of right in a jurisdictionally and procedurally proper suit that has been dismissed voluntarily."); *accord DeOtte v. State*, 20 F.4th 1055, 1066 (5th Cir. 2021).

    <u>Seventh Circuit</u>. *See CE Design, Ltd. v. Cy's Crab House N., Inc.*, 731 F.3d 725, 730 (7th Cir. 2013) (a later-entered final judgment in the underlying case does not render moot an appeal from an order denying intervention if the would-be intervenor also appeals the final judgment); *see also In re Synthroid Mktg. Litig.*, 264 F.3d 712, 716 (7th Cir. 2001) (a denied would-be intervenor can avoid appellate mootness by "fil[ing] two notices of appeal: one from the denial of intervention and a second springing or contingent appeal from the final judgment—which will kick in if [the intervenors] are successful on the first.").

    <u>Eighth Circuit</u>. *See Mausolf v. Babbitt*, 125 F.3d 661, 666 (8th Cir. 1997) ("'If final judgment is entered

23

with or after the denial of intervention, . . . the applicant should be permitted to file a protective notice of appeal as to the judgment, to become effective if the denial of intervention is reversed.' A contrary rule would prevent a prospective intervenor who successfully appeals the district court's denial of his intervention motion from securing the ultimate object of such motion—party status to argue the merits of the litigation—if, as was the case here, the appellate court does not resolve the intervention issue prior to the district court's final decision on the merits." (quoting 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3902.1, at 113 (2d ed. 1991))).

Tenth Circuit. *See FDIC v. Jennings*, 816 F.2d 1488, 1491 (10th Cir. 1987) ("To allow a settlement between parties to moot an extant appeal . . . might well provide incentives for settlement that would run contrary to the interests of justice.").

Eleventh Circuit. *See Purcell v. BankAtlantic Fin. Corp.*, 85 F.3d 1508, 1511 n.3 (11th Cir. 1996) ("[the intervenor] has standing to appeal the district court's denial of its motion to intervene. If we conclude that [the intervenor] is entitled to intervene as of right, then [the intervenor] has standing as a party to appeal the district court's judgment based on the approved settlement agreement, and we would review that judgment. If we determined that the district court abused its discretion in approving the settlement agreement, then we would reverse the judgment, which included vacatur of the jury verdict, and [the intervenor] would

24

be granted the relief it seeks. Because we can potentially grant [the intervenor] effective relief, this appeal is not moot [based on entry of final judgment].").

––––––

Even within these circuits, however, there is a conflict. Some circuits require the putative intervenor to lodge an appeal from the later-entered judgment. *See*, *e.g.*, *CE Design, Ltd.*, 731 F.3d at 730; *Mausolf*, 125 F.3d at 666. Others do not. *See*, *e.g.*, *CVLR Performance Horses*, 792 F.3d at 475; *Neidig*, 298 Fed. Appx. at 116 n.1; *DeOtte*, 20 F.4th at 1066; *Jennings*, 816 F.2d at 1491. As discussed *infra*, the Ninth Circuit has its own twist on this rule: the denied intervenor's appeal is rendered moot by a later-entered final judgment unless an actual "party" (as opposed to the would-be intervenor) fortuitously appeals the judgment.

## B. The Second Circuit holds that dismissal of the underlying case moots a pending intervention appeal.

The Second Circuit has long held—like the Ninth Circuit did in this case—that a denied intervenor loses the right to appellate review if the underlying case concludes before the intervenor's appeal is decided. *See Nat'l Bulk Carriers, Inc. v. Princess Mgmt. Co., Ltd.*, 597 F.2d 819, 825 (2d Cir. 1979) ("We need not reach the merits of [the putative intervenor's] appeal. We believe that our affirmance on the main appeal renders the intervention issue moot."); *see also Kunz v. N.Y. State Comm'n on Judicial Misconduct*, 155 Fed. Appx.

25

21, 22 (2d Cir. 2005) ("[W]here the action in which a litigant seeks to intervene has been discontinued, the motion to intervene is rendered moot.").

The district courts within the Second Circuit thus consistently hold that a motion to intervene becomes moot once an underlying case is otherwise concluded. *See Marshak v. Original Drifters, Inc.*, 2020 WL 1151564, at *6 (S.D.N.Y. Mar. 10, 2020) ("Given that the underlying petition is dismissed, [the] motion to intervene . . . is denied as moot." (collecting cases within circuit)); *see also 335-7 LLC v. City of New York*, 524 F. Supp. 3d 316, 337 (S.D.N.Y. 2021) ("Because Plaintiffs' complaint has been dismissed in its entirety, 312's motion to intervene is denied as moot." (citing *Marshak*, 2020 WL 1151564, at *6 n.8).

## C.  The "divergent precedents" of the Ninth Circuit and the District of Columbia Circuit are occasionally (as here) wrong, and always fodder for confusion.

The decisions within the court of appeals for the District of Columbia are themselves in conflict and do little to guide litigants or courts within that jurisdiction. *Compare Energy Transp. Grp., Inc. v. Mar. Admin.*, 956 F.2d 1206, 1210 (D.C. Cir. 1992) ("We first dismiss as moot the appeals from the district court orders denying intervention. The complaints in the underlying litigation were dismissed by agreement of the parties pursuant to the settlement, so there is no longer any action in which to intervene."); *with In re Brewer*,

26

863 F.3d 861, 870 (D.C. Cir. 2017) ("[I]f a motion to in-
tervene can survive a case becoming otherwise moot,
then so too can a motion to intervene survive a stipu-
lated dismissal."); *Alt. Research & Dev. Found. v. Vene-
man*, 262 F.3d 406, 410 (D.C. Cir. 2001) ("[O]ur
jurisdiction . . . is not affected by the fact that the dis-
trict court denied intervention after the stipulated dis-
missal was entered; the dismissal does not render the
appeal moot.").

As for the Ninth Circuit, this is hardly the first
time the court has dismissed a pending intervention
appeal as moot because the underlying litigation con-
cluded. *See W. Coast Seafood Processors Ass'n v. Nat.
Res. Def. Council, Inc*., 643 F.3d 701, 704 (9th Cir. 2011)
("Because the underlying litigation is over, we cannot
grant WCSPA any 'effective relief' by allowing it to in-
tervene now."); *Hamilton v. County of Los Angeles*, 46
F.3d 1141 (9th Cir. 1995) ("[the putative intervenor's]
appeal of the district court's denial of his motion to
intervene is moot because the underlying action has
been dismissed."); *United States v. Ford*, 650 F.2d
1141, 1143 (9th Cir. 1981) ("Since there is no longer
any action in which appellants can intervene, judicial
consideration of the [intervention] question would be
fruitless.").

Of course, it is also true that the Ninth Circuit,
like the District of Columbia Circuit has "divergent
precedents," *DeOtte*, 20 F.4th at 1066, and it has also
held—subject to a condition unique to the circuit, *infra*
at 27-28—that the dismissal of the underlying litiga-
tion does not moot an appeal from an earlier-denied

motion to intervene. *See Stadnicki on Behalf of Lend-ingClub Corp. v. Laplanche*, 804 Fed. Appx. 519, 520 (9th Cir. 2020) ("The district court's order granting [plaintiff's] motion to voluntarily dismiss the case does not moot [the pending intervention] appeal"); *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1066 (9th Cir. 2018) (an appeal from an order denying intervention-of-right does not become moot upon the entry of a final judgment where "a party has appealed some aspect of the case"); *United States v. Sprint Communications, Inc.*, 855 F.3d 985, 990 (9th Cir. 2017) ("[T]he parties' settlement and dismissal of a case after the denial of a motion to intervene does not as a rule moot a putative-intervenor's appeal."); *DBSI/TRI IV Ltd. P'ship v. United States*, 465 F.3d 1031, 1037 (9th Cir. 2006) (intervention controversy survived final judgment in underlying case because "if it were concluded on appeal that the district court had erred . . . the applicant would have standing to appeal the district court's judgment") (internal quotation marks omitted); *Canatella v. California*, 404 F.3d 1106, 1109 n.1 (9th Cir. 2005) (final judgment in the underlying litigation does not moot a putative intervenor's appeal from an order denying his motion to intervene where the plaintiff appealed that final judgment).

Because the Ninth Circuit has not applied its precedent consistently, trying to reconcile the court's decisions is difficult. Putting aside two anomalous decisions (discussed *infra* at 29), the Ninth Circuit has, however, established a rule at direct odds with the other courts of appeals: an appeal from an order

28

denying intervention is mooted by a subsequent final judgment unless a *party* happens to keep the case "alive" by appealing that final judgment.

The Ninth Circuit first held that a denied intervenor could not keep a case alive by appealing a final judgment in *Hamilton*. There, the court dismissed the intervention appeal as moot even though the putative intervenor had appealed both the order denying his motion to intervene and the subsequently-entered final judgment terminating the underlying litigation. 46 F.3d at 1141. The court explained that the putative intervenor's appeal from the final judgment could not keep the case alive because, as a non-party who had been denied intervention, "he lack[ed] standing" to appeal that final judgment. *Id.*

Consistent with its reasoning in *Hamilton*, the Ninth Circuit later held in *Canatella* that a final judgment did not moot a would-be intervenor's appeal because the losing *party* "ha[d] kept the underlying action alive by filing a notice of appeal" from the final judgment. 404 F.3d at 1109 n.1. The court then reached the same result in *Allied Concrete & Supply*, 904 F.3d at 1066, holding that an action remains alive and a pending intervention appeal is not moot where "a party has appealed some aspect of the case."

In this case, the Ninth Circuit did precisely what it did in *Hamilton*: it found the Petitioners lacked standing to appeal the final judgment approving the settlement and dismissed the intervention appeal as moot: "ORS and NRS objectors lack standing to appeal

29

the district court's approval of the current settlement agreements. . . . Our affirmance of the amended settlement agreements moots the pending appeals by the ORS and NRS appellants related to intervention in the district court." (App. 8, 9). That is consistent with the precedent above, but there are two Ninth Circuit decisions[7] that do not conform to that precedent.

In *United States v. Sprint Communications, Inc.*, 855 F.3d 985, 990 (9th Cir. 2017), and *DBSI/TRI IV Ltd. P'ship*, 465 F.3d at 1037, there was no appeal lodged from the final judgment terminating the underlying litigation (neither by the putative intervenor nor by a party). Nevertheless, the Ninth Circuit determined in each of the cases that the dismissal of the underlying case did not moot the pending intervention appeal. *See Sprint Communications, Inc.*, 855 F.3d at 989-90 (intervention appeal not moot despite un-appealed final judgment terminating the underlying litigation because "[i]f [the court] were to conclude [the intervenor] had a right to intervene in the Government's FCA action, he might be able to object to the settlement or otherwise seek his share of the proceeds from the Government."); *see also DBSI/TRI IV Ltd. P'ship*, 465 F.3d at 1037 (same).

\*       \*       \*

---

[7] The Petitioners also argued in their petition for rehearing en banc that the Ninth Circuit should abandon its requirement that an order denying intervention and any subsequent final judgment both be appealed for the intervention appeal to avoid mootness. (Appellate DE 88 in Appeal No. 20-15697 at 14).

30

As two circuits have now explicitly recognized, there is a split among the federal appellate courts as to whether an appeal of a motion denying intervention may continue after dismissal of the underlying action. The majority rule—followed by the Third, Fourth, Fifth, Seventh, Eighth, Tenth and Eleventh Circuits—holds that a final judgment does not moot a pending intervention appeal. The minority rule—followed by the Second Circuit, and a subset of the precedent from the District of Columbia and Ninth Circuits (including the order on review)—find to the contrary. There is also the complicating sub-split (the Third, Fourth, Fifth, and Tenth Circuits versus Seventh, Eighth, and Ninth Circuits) about whether a later-entered final judgment must be appealed to avoid mootness in an intervention appeal.

Such intercircuit conflict justifies review by this Court. *See Hiersche v. United States*, 503 U.S. 923, 925 (1992) ("This Court has a duty to resolve conflicts among the courts of appeal."); *see also Porter v. Nussle*, 534 U.S. 516, 523 (2002) ("grant[ing] certiorari to resolve an intercircuit conflict"); *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 32 (1994) (same).

An additional factor weighs in favor of granting review: the Ninth Circuit's precedent is, itself, in disarray with regard to the conflict issue. (*Supra* at 26-27). While intra-circuit conflict is not, by itself, a basis for certiorari review, "when the intracircuit conflict relates to a recurring and important issue or is accompanied by a 'widespread conflict among the circuits," it may become one of the factors inducing the Court to grant

31

certiorari. SHAPIRO ET AL., SUPREME COURT PRACTICE (10th ed. 2013) (quoting *Commissioner v. Estate of Bosch*, 387 U.S. 456, 457 (1967), and collecting cases). The Court should thus, as it did in *Inyo County, Cal. v. Paiute-Shoshone Indians*, 538 U.S. 701, 709 n.5 (2003), and grant certiorari to address a question where the Ninth Circuit has "divergent views."

## II. The question presented regarding a denied intervenor's right to appellate review is important.

### A. The intervention-mootness issues in this case implicate the most basic notions of due process.

Intervention-of-right is, of course, a right. If erroneously denied, review should not be frustrated by the happenstance of a later-entered final judgment. Nowhere, however, is the importance of such intervention greater than in the realm of class actions.

The Court has long held that the constitutionality of class action litigation depends on adequate representation by the named plaintiff. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) ("[T]he Due Process Clause . . . requires that the named plaintiff at all times adequately represent the interests of the absent class members.") (citing *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940)). In the absence of such representation, it would be unconstitutional for an absent class member to be bound by a case in which that member did not personally participate. *See Taylor v. Sturgell*,

32

553 U.S. 880, 884 (2008) (a non-party must be "adequately represented by a party who actively participated in the litigation") (citing *Hansberry*, 311 U.S. at 41).

When representation is inadequate and it is necessary to elevate an unnamed class member to serve as a class representative, the proper method is through intervention under Federal Rule of Civil Procedure 24. *See Reynolds v. Butts*, 312 F.3d 1247, 1250 (11th Cir. 2002) (intervention provides the mechanism through which absent class members protect their interests). Rule 23 expressly anticipates such a procedure, granting district courts the power to enter orders allowing unnamed class members "to intervene" when such intervention becomes necessary "to protect class members" interests. Fed. R. Civ. P. 23(d)(1)(B)(iii).

The Ninth Circuit's decision (following the minority rule) eviscerates an unnamed class member's ability to seek appellate review of an order denying a motion to intervene into a pending, certified class action and, thereby, protect the class member's interests in that class action. By eliminating the ability to seek review of the district court's order denying intervention, the Ninth Circuit's decision has effectively snuffed out a class member's very right to be heard in a case where the member's interests were being inadequately represented. Due process requires more.

33

## B. Allowing parties—especially named class representatives and their counsel—to moot the appellate rights of would-be intervenors invites moral hazard.

"To allow a settlement between parties to moot an extant appeal concerning intervention of right might well provide incentives for settlement that would run contrary to the interests of justice." *FDIC v. Jennings*, 816 F.2d at 1491. Nowhere is this more true than in the realm of class actions.

As the court of appeals explained in *In re Brewer*, "if a stipulated dismissal deprived the court of jurisdiction to hear a motion for intervention filed by absent members of a putative class, then a class action defendant could simply '"buy off" the individual private claims of the named plaintiffs' in order to defeat the class litigation." 863 F.3d at 870 (quoting *Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 338-39 (1980)). That, however, is "a strategy the Supreme Court has said 'would frustrate the objectives of class actions' and 'waste * * * judicial resources by stimulating successive suits' 'contrary to sound judicial administration.' " 863 F.3d at 870 (quoting *Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 338-39 (1980)).

34

## C. The intervention-mootness issues are recurring.

As the numerous cases cited above evidence, the intervention-mootness issues presented in this case come up repeatedly. They have done so for decades, and the split in the circuits remains unresolved. This case presents the Court an opportunity to bring clarity to this important area of law.

## III. This case also presents an important federal jurisdictional and procedural issue arising out of the MDL statute.

Because the constitutionality of class action litigation depends on adequate representation by the named plaintiff, the Court has explained that "'[m]embers of a class have a *right* to intervene if their interests are not adequately represented by existing parties.'" *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 594 (2013) (emphasis added) (quoting Newberg on Class Actions § 16:7, p. 154 (4th ed. 2002)).

Nevertheless, in the face of an undisputed absence of adequate representation, the district court concluded that it "lack[ed] subject matter jurisdiction" to allow the Petitioners to intervene directly into the MDL proceeding. (App. 134) (citing *In re Farmers Ins. Exch. Claims Representatives Overtime Pay Litig.*,

35

MDL No. 33-1439, 2008 WL 4763029, at *3 (D. Or. Oct. 28, 2008)).[8]

The district court's construction of the MDL statute stripped the Petitioners of the adequate-representation protections that Rules 23 and 24 provide for absent class members and, so, their due process protections of the Fifth Amendment. The court reached that result based on a purported *jurisdictional* bar created by the MDL statute that prohibits a class member from intervening directly into litigation within an MDL proceeding. In the district court's view, because the MDL statute speaks in terms of coordinating cases that are "pending in different districts" 28 U.S.C. § 1407(a), the only way to become a party to a case in an MDL is to already be a party in a case that is transferred into the proceeding. This reading of the MDL statute elevates its reference to an already-pending case to a jurisdictional pre-requisite that eliminates the possibility of intervention into an MDL proceeding, *id.*

But MDL consolidation amounts to no more than a temporary change of venue. The Judicial Panel of Multidistrict Litigation made this clear over 50 years

---

[8] The fact that the Ninth Circuit did not reach the district court's jurisdictional determination does not prevent this Court from addressing that important issue in the first instance. The Court has long held that a "purely legal question . . . is 'appropriate for [the Court's] immediate resolution' notwithstanding that it was not addressed by the Court of Appeals." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 743 n.23 (1982)).

36

ago, analogizing MDL coordination to traditional venue transfer, and stating that "a transfer under Section 1407 is a change of venue for pretrial purposes." *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 495 (J.P.M.L. 1968) (internal citation omitted) (emphasis added); *see also Glasstech, Inc. v. AB Kyro OY*, 769 F.2d 1574, 1576 (Fed. Cir. 1985) (same).

"The Supreme Court has repeatedly advised against giving jurisdictional significance to statutory provisions that do not clearly 'speak in jurisdictional terms.'" *In re Brewer*, 863 F.3d at 870 (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 502 (2006)). Yet that is precisely what the district court did. Although the MDL statute "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts," *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982), the district court construed the statute as placing a jurisdictional limitation on a district court's ability to let an unnamed class-member (or anyone for that matter) intervene into any case that happens to have been MDL-coordinated for pretrial purposes.

The subject matter jurisdiction question presented is important because it implicates the Court's "prime responsibility for the proper functioning of the federal judiciary." SHAPIRO ET AL., SUPREME COURT PRACTICE (10th ed. 2013). To fulfill that responsibility, the Court has granted certiorari in cases where the order on review "has so far departed from the accepted and usual course of proceedings, or sanctioned such a departure by a lower court, as to call for an exercise of this Court's supervisory power." *Id*. (collecting cases

37

including *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998); and *Thiel v. Southern Pac. Co.*, 328 U.S. 217, 225 (1946)).

The district court's jurisdictional determination will also have drastic ramifications on the administration of MDL proceedings, which involve some of the largest and most far-reaching litigation in the country.[9] As of February 15, 2022, there were 185 MDL proceedings pending across 45 districts.[10] These coordinated proceedings—which are utilized across a wide spectrum of practice areas (but are particularly important in the antitrust and products liability realms[11])—often involve hundreds or thousands of actions that would

---

[9] The district court's jurisdictional determination is also inconsistent with generally accepted practice within the federal judiciary. *See generally* NEWBERG ON CLASS ACTIONS § 10:29 (5th ed.) ("[N]ew litigants may file directly into the MDL forum itself, either because they are citizens of that forum and it is their natural forum, or because, for other reasons, they have decided that filing there is advantageous to them. Those skipping the MDL's tag-along process and lodging their new cases in the MDL court itself are referred to as 'direct filers.'").

[10] United States Judicial Panel on Multidistrict Litigation, *MDL Statistics Report—Distribution of Pending MDL Dockets by District* (Feb. 15, 2022), https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-February-15-2022.pdf.

[11] United States Judicial Panel on Multidistrict Litigation, *Calendar Year Statistics*, https://www.jpml.uscourts.gov/sites/jpml/files/JPML_Calendar_Year_Statistics-2021.pdf (last visited Feb. 17, 2022).

otherwise be proceeding independently through the federal court system.[12]

By construing the MDL statute in a way that creates a jurisdictional bar to intervention, the district court's decision has fundamentally shifted the way that MDL proceedings will be litigated around the country. After nearly 50 years of MDL proceedings, three district courts (including the district court here) have recently found a jurisdictional bar to intervention after a case is coordinated in an MDL. (App. 134); *see also In re Mortgage Elec. Registration Sys. (MERS) Litig.*, No. MD-09-02119-PHX-JAT, 2016 WL 3931820, at *5 (D. Ariz. July 21, 2016) ("As DeBaggis's case was never filed or pending in any court prior to its addition to the [MDL complaint] by Plaintiffs . . . this Court does not have subject-matter jurisdiction over DeBaggis's claims."), *aff'd sub nom. In re Mortgage Elec. Registration Sys., Inc., Litig.*, 719 Fed. Appx. 550, 553 n.1 (9th Cir. 2017) (affirming on other grounds and explaining that the court did "not need to resolve the challenge to the district court's conclusion that DeBaggis was not properly added as a plaintiff to the consolidated actions"); *In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litig.*, 2008 WL 4763029, at *5 ("I have discovered no authority for this court, as an MDL transferee court, to exercise

---

[12] United States Judicial Panel on Multidistrict Litigation, *MDL Statistics Report—Distribution of Pending MDL Dockets by Actions Pending* (Feb. 15, 2022), https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-February-15-2022.pdf.

39

subject matter jurisdiction over state law claims not transferred by the MDL Panel. . . . Consequently, I dismiss these four subclasses for lack of subject matter jurisdiction.").

Since "MDLs typically . . . encompass both individual actions and class actions,"[13] the district court's improper jurisdictional construction will have wide reaching effects within the MDL universe, eviscerating the protections that Rules 23 and 24 provide for absent class members in actions that happen to be coordinated in MDL proceedings. Because the district court's jurisdictional construction is precisely the type of analysis this Court has "repeatedly advised against," *In re Brewer*, 863 F.3d at 870, the Court should exercise its supervisory power and grant certiorari to review this important issue.

————◆————

---

[13] NEWBERG ON CLASS ACTIONS § 10:28 (5th ed.).

40

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,

TRACY R. KIRKHAM
JOHN D. BOGDANOV
COOPER & KIRKHAM, P.C.
357 Tehama Street,
   Second Floor
San Francisco, CA 94103
Telephone: (415) 788-3030
trk@coopkirk.com
jdb@coopkirk.com

JOHN G. CRABTREE
   *Counsel of Record*
CHARLES M. AUSLANDER
BRIAN C. TACKENBERG
CRABTREE & AUSLANDER
240 Crandon Blvd.
Suite 101
Key Biscayne, FL 33149
Telephone: (305) 361-3770
jcrabtree@crabtreelaw.com
causlander@crabtreelaw.com
btackenberg@crabtreelaw.com

FRANCIS O. SCARPULLA
PATRICK B. CLAYTON
LAW OFFICES OF
   FRANCIS O. SCARPULLA
3708 Clay Street
San Francisco, CA 94118
Telephone: (415) 751-4193
fos@scarpullalaw.com
pbc@scarpullalaw.com

BRIAN M. TORRES
BRIAN M. TORRES, P.A.
One S.E. Third Avenue,
   Suite 3000
Miami, FL 33131
Telephone: (305) 901-5858
btorres@briantorres.legal

THERESA D. MOORE
LAW OFFICES OF
   THERESA D. MOORE
One Sansome Street,
   35th Floor
San Francisco, CA 94104
Telephone: (415) 613-1414
tmoore@aliotolaw.com

ROBERT J. BONSIGNORE
BONSIGNORE, LLC
3771 Meadowcrest Drive
Las Vegas, NV 89121
Telephone: (781) 856-7650
rbonsignore@classactions.us

# EXHIBIT B

1

Martin Quinn
2
JAMS
Two EmbarcaderoCenter, Suite 1500
3
San Francisco, CA94111
Telephone: (415) 982-5267
4
Fax: (415) 982-5287

5

SPECIAL MASTER

6

7

8                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA
9
                    SAN FRANCISCO DIVISION
10

11

12  | IN RE: TFT-LCD (FLAT PANEL)     | **CASE NO. M: 07-cv-01827-si**
    | ANTITRUST  LITIGATION           |
13

14                                      **SUPPLEMENTAL REPORT AND**
                                        **RECOMMENDATION OF SPECIAL**
15                                      **MASTER RE ALLOCATION OF**
                                        **ATTORNEYS' FEES IN THE**
16                                      **INDIRECT-PURCHASER CLASS**
                                        **ACTION**
17
    This Order Relates to:
18
    INDIRECT-PURCHASER CLASS ACTION
19

20

21

22

23          On November 9, 2012, I issued a Report and Recommendation [Dkt. No. 7127] that,

24  among other recommendations, proposed a plan to allocate about $308 million in attorneys' fees

    among the 116 law firms that represented the IPP Class.   Fifteen law firms have submitted
25
    objections to my Report with respect only to the proposed allocation of fees.  This Supplemental
26
    Report accomplishes two tasks:  it rules on the fifteen objections, providing as to each firm a
27
    rationale for the amount of fees that I recommend allocating to it; and it makes other revisions to
28
    the proposed allocation based on new information and perspectives provided to me during the

                                                                                            1

1  objection process. Accordingly, I have not simply ruled on the objections, but have taken a
2  second comprehensive look at the entire allocation plan in an effort to improve its fairness and
3  consistency.

4      I interviewed each of the objecting firms, mostly in person and a couple by telephone. I
5  received and considered additional declarations, documents and analyses from them. I
6  conducted evidentiary hearings into the existence, terms and fairness of two alleged fee-splitting
7  agreements.

8
9                    **Principles Applied**

10     First, I determined that in dealing with the fifteen objections I would not recommend a
11 material increase in the total amount of attorneys' fees to be awarded to Class Counsel. My
12 recommendation to award 28.5% of the settlement fund as attorneys' fees was, I believe, correct.
13 Therefore, the original recommended total fee award was $308,226,250; the revised
14 recommended total award is $308,225,250. The fact that fifteen firms are unhappy with the
15 amounts allocated to them is no reason to increase the total amount of fees to be subtracted from
16 the class settlement fund. Therefore, to the extent that I recommended an increase in any firm's
17 allocation, I was obliged to rob Peter to pay Paul in order to find the funds.

18     Second, despite the objection by a couple of firms – notably the Alioto Law Firm – to the
19 use of lodestars and multipliers as the basic tool for making the allocation, I believe that is the
20 best available objective measure of both the effort each firm put into the case and the
21 contribution of each firm to the final result. The Alioto Firm's Objection [Dkt. No. 7205] states
22 that, "the Special Master abandoned the proper, accepted, fair and reasonable percentage method
23 and reverted instead to the unfair and unreasonable and repudiated lodestar method. In addition,
24 he applies a multiplication (the multiplier) to the various lodestars, which "multiplier" also is
25 discriminatory and unfair…." (Alioto Objection, 5:13-18) As an alternative, the Alioto Firm
26 says that I should have "recommended an equal percentage distribution to the Co-Lead Counsel
27 and a serious examination of the recommended percentages to the other counsel." (Id., 5:23-25)
28 There are two flaws with this complaint. First, the rationale and case law cited for using the

"percentage-of-the-fund" approach apply to the setting of a <u>total fee</u> – and I relied precisely on that methodology to set the 28.5% total fee. That rationale and case law does not apply at all to allocating a total fee among participating firms. Second, the Alioto firm does not suggest how I would conduct a "serious examination" of the percentage to be awarded each firm without (1) looking at what the firm did (i.e., hours, billing rates), and (2) using the various factors mentioned in my Report (i.e., complexity of work, contribution to litigation fund, efficiency of work and accuracy of billing, collaborative and professional behavior) to measure the degree to which the firm contributed to the overall effort. The lodestar captures the <u>amount</u> of work; the multiplier captures, albeit imperfectly and subjectively, the <u>quality</u> of the work and contribution to the result.

Third, I did not give sufficient weight in my original allocation to the amount and timing of each law firm's contribution to the litigation fund. Some of my allocations awarded inappropriately high multipliers to firms that contributed little or nothing to the fund, or made their contributions late in the game and were thus not exposed to the risk of losing their investments. This Supplemental Report makes some downward adjustments of allocations for the non-payors and late payors, and increases the allocation of other firms that had been under-rewarded for making early, significant investments.

Fourth, for firms that engaged principally in document review my original allocation lowered their billing rates for that work to about $350/hr. and valued the contribution of document review to the overall result less highly than the more complex work of writing motion papers, taking depositions, conducting settlement negotiations and preparing for trial. What I did not adequately appreciate is that varying levels of document review took place. There was the basic coding of the millions of documents obtained from defendants and third parties into a data base, and performing an initial review for relevance. This work had to be done, and done right, since it was the foundation for gathering evidence to prove the IPP case. But some firms engaged in more sophisticated, nuanced document review by selecting documents as deposition exhibits or as evidentiary support for important motions, providing foreign language reviewers, and writing evidentiary memos for depositions. For this latter type of work, I think higher billing

rates are appropriate. I also now weight that kind of review more heavily in assessing what each firm contributed to the ultimate result.

Fifth, I realized that it was inappropriate to reduce every firm's lodestar by 20%, although that calculation was suggested by Class Counsel. Therefore, for firms I could identify in which one or two lawyers did all the work, and firms with lodestars under $100,000, and other firms that exhibited outstanding efficiency, I used their full lodestar to calculate the recommended allocation. A couple of firms, based on additional input about their billing practices, received only 10% reductions.

Sixth, and most challenging for assessing each firm's contribution, Class Counsel were not a unified group. There was the Zelle, Hoffman group and the Alioto group. Each group has its passionate adherents. Each group believes that its members contributed most to the excellent result. I have tried as fairly as possible to discount the extreme views of both camps, to appreciate that overall the IPP effort benefited from having both skill-sets, and to make my own cold-blooded assessment of what each firm contributed without being swayed by intemperate rhetoric on both sides.

Seventh, and I say this with amusement not in criticism, each of the objecting firms exhibited the mindset reflected in Garrison Keillor's fictitious town of Lake Wobegon, where "all the children are above average." Almost every firm told me that its contribution to the effort was "above average" and that it, therefore, deserved a higher-than-average multiplier. Needless to say, it is impossible to rate them all as "above average."

## Ranges of Multipliers

I grouped firms loosely into five ranges of multipliers. Multipliers vary within those ranges, and sometimes fall above or below a firm's logical range, because I made adjustments to reflect the recommendation of lead and liaison counsel, to consider payment to the litigation fund, and for having a class representative client. Where a firm fell within the range also depended on input I received, if any, about the firm's efficiency, skill, contribution to the litigation fund, and accuracy of billing records. A firm whose client was a class representative

1   got an increase of about .2 in its multiplier. A firm that paid a maximum amount to the litigation
2   fund received an increase; firms that paid nothing received a decrease. The attached spreadsheet
3   shows for each firm: (1) its full lodestar, (2) its "lodestar less 20%," (3) its "applicable lodestar"
4   which is either its full lodestar, its lodestar less 20% or a lower percentage, or a lodestar adjusted
5   to eliminate billing rates over $1,000/hr., (4) the recommended allocation, which is the
6   "applicable lodestar" times a multiplier, and (5) the multiplier applied.

7       Firms with lodestars under $100,000: These firms basically did work for their own
8   clients. In addition they may have attended client meetings in person in San Francisco or via
9   telephone conference calls. But they did little, if any, document review or other work to
10  contribute to litigating the IPP case. I allowed multipliers in the 1.2-1.3 range to compensate
11  them for the delay in receiving their money. As noted above, I also applied the multiplier to their
12  full lodestars because there is unlikely to be much wasted time at such low billing levels.

13      Firms that performed virtually only document review: I applied multipliers in the 1.4-1.6
14  range, depending on whether they performed basic or more complex document review to the
15  extent I could discern that from the evidence submitted to me.

16      Firms that performed more complex work (motions, depositions): These firms received
17  multipliers in the 1.7-1.9 range.

18      Firms that were in the core group driving the IPP case: These firms received multipliers
19  in the 2.0-2.75 range.

20      Lead and liaison counsel, and selected outstanding contributors: These firms received
21  higher multipliers ranging from 3.24-4.24.

22

### Recommendations re Objecting Firms

23  

24  The Alioto Law Firm [Dkt Nos. 7186, 7190, 7205-7208, 7210, 7345, 7352, 7358-7360]

25      Recommending an appropriate allocation for the Alioto firm requires an assessment of
26  both the contribution the firm made to the substance of the IPP case and Mr. Alioto's
27  performance as co-lead counsel. To make that assessment I have relied on interviews of defense
28  counsel, mediators and other IPP counsel; on the evidence presented at the 12/14/12 hearing on

the alleged fee sharing agreement; on the Alioto objection and accompanying declarations; on the prior Alioto declaration [Dkt. No. 6666]; on the allocation recommendations provided to me confidentially by co-lead and liaison counsel; and on my personal observation of the performance of the Alioto firm and Mr. Alioto for the past 2 ½ years.

IPP counsel agreed in early 2008 that, in general, the Alioto firm and its "trial group" would be primarily responsible for the trial and trial preparation, the Zelle firm and other counsel would be primarily responsible for class certification and other legal issues, while the remainder of the case, including document review and organization and merits discovery would be their shared responsibility.

Mr. Alioto, a talented and experienced trial lawyer, had strong views about how to prepare and win this case. He was determined to go to trial against 2-3 defendants. He insisted that class members and their counsel from all over the country travel repeatedly to San Francisco for meetings to prepare them to testify so that the jury would know the case was about people, not lawyers. He initially insisted on deposing witnesses in Asia where he thought they would be more comfortable and talkative. He wanted to depose high-level corporate Apex witnesses first, while other lawyers preferred a bottom-up approach. Recording time contemporaneously and striving for efficiency were less important to him than the final result. Often Mr. Alioto was right, the lone correct voice crying in the wilderness, but he could also act as an unnecessary impediment to a unified effective plaintiffs' effort.

Four examples stand out. First, just before the merits expert report was due, the main IPP economic expert, Dr. Netz, insisted that part of the approximately $800,000 that was owed to her firm be paid. Mr. Alioto refused to permit any funds to be paid out of the litigation account, so co-lead counsel Francis Scarpulla had to ask other counsel to immediately pay large amounts directly to Dr. Netz's firm. I was required to intervene to help resolve that dispute. Second, after the IPP settlement funds were placed in escrow (and remained the property of defendants), Mr. Alioto questioned the investment decisions taken by Mr. Scarpulla and Ms. Schneider of the Missouri Attorney General's office, and refused to authorize reinvestment of the funds. Again I intervened. Third, the Alioto Firm never paid more than $250,000 in assessments, far less than

the firm was assessed and far less than the $700,000 paid by its co-lead counsel at the Zelle, Hoffman firm. Fourth, Mr. Alioto's own time records do not comply with the Court's directive to keep accurate daily time records. His "detailed" records lump together a number of vaguely-described activities and assign a number of hours spent over periods of one or two weeks. There is no indication of what he did each day, or any details of what he actually did. (His own records are distinguished from those of his colleagues at his firm who kept timely and proper records.)

Mr. Alioto quickly formed a small group of lawyers in whom he had confidence as trial lawyers. Often the work and weekly consultations of that group proceeded in near-isolation from the rest of the IPP effort. According to other counsel, the Alioto group's work product often did not reach the Zelle firm and was never filed in court. However, as trial approached in late 2011 and early 2012, there was substantial cooperation between some Alioto team members, such as Daniel Shulman of Gray, Plant Moody and Gary McAllister, and the Zelle firm. Alioto team members were intimately involved in preparation of witness examinations, exhibit lists and deposition designations.

Mr. Alioto and his colleagues, Theresa Moore and Thomas Pier, were heavily involved in the deposition process. Mr. Pier supervised the defense of class representative depositions all over the country, and generally managed the "client relationship." Ms. Moore had input on numerous motions, deposition preparation, expert and other meetings, settlement discussions and trial preparation, but rarely as the leader. I was informed that Mr. Alioto was the examining or defending attorney in 17 depositions and attended another 32 depositions, that Ms. Moore attended 22 depositions but never examined or defended, and that Mr. Pier examined or defended in three depositions and attended 57 others. Those figures may be imprecise, but they convey a sense of how deeply the firm was involved in the deposition process.

Mr. Alioto also made a contribution to the class in the mediation process – although often in a disruptive way. Often against the wishes of his IPP colleagues and the mediators, he insisted on all-cash settlements (no product or coupons or cy pres), he insisted that one settling defendant make four live witnesses available for trial, and he insisted on considerably higher dollar settlements than his colleagues were sometimes willing to accept. He deserves credit for being

obstinate in the best interests of the class, and for portraying the IPP Plaintiffs as ready and eager to try the case. However, his demeanor was often disruptive, uncooperative and intransigent toward the mediators and other plaintiffs' counsel.

In conclusion, the Alioto firm, Mr. Alioto in particular, and some members of the "Alioto trial group" made very real and important contributions. For leading and coordinating that effort, the firm should be rewarded. However, in his role as a co-lead counsel Mr. Alioto failed in his responsibility to cooperate, collaborate and work in tandem with other IPP counsel. His obstinancy made it necessary for other leading counsel to constantly spend time mollifying him, to work around him, and to try to find out what he and his group were doing. As noted above, on the good days pairing of the Zelle and Alioto approaches and skills worked well. But in the end, the overall contribution of the Alioto firm to the final result was considerably less than it might have been had Mr. Alioto adopted a more cooperative approach, and was materially less than the contribution of Zelle Hoffman and other lead firms.

Mr. Alioto's billing rate started at $1,000/hr. in 2007 and climbed to $1,250/hr., then to $1,500/hr. Although his personal clients may pay those rates, it is not appropriate for a court to approve rates at such elevated levels in a class case. As I have done with the portion of Mr. Scarpulla's rate over $1,000, I have recalculated the Alioto lodestar, first to take the 20% reduction that most firms incurred, and second to reduce his personal billing rate to $1,000.

The firm's full lodestar is $18,126,946. Reduced by 20%, it is $14,501,557. Adjusting Mr. Alioto's billing rate to $1,000 produces an appropriate lodestar of $11,677,895. The original allocation to the firm was $45,000,000. I conclude that an upward adjustment is appropriate to reflect Mr. Alioto's leadership of his team to prepare creatively and thoroughly for trial. Therefore, I recommend that the firm's allocation be increased to $47,000,000, which is a multiplier of 4.02 over its appropriate lodestar. However, his allocation must also reflect his failings as a co-lead counsel. These include his lack of cooperation with, and repeated intransigence toward, co-lead counsel, his failure to pay an equal share to the litigation fund, and his imprecise and vague time records. A multiplier of 4.02 is the second-highest of any firm, exceeded only by that of the Zelle firm (4.34). The difference in multipliers between the two co-

lead counsel is attributable not to any ranking of their legal skills or effort, but to their highly disproportionate contributions to the IPP effort in their roles as co-lead counsel.

Andrus Anderson LLP [Dkt. No. 7198]

This small (3-4 lawyers) firm performed document review, but at a relatively sophisticated level. They were one of about 12 lawyers who supervised other reviewers in performing second-level document review in connection with deposition preparation. Ms. Anderson supervised the collection of documents for six depositions – crafting search terms, checking the reviewers' work, reviewing the documents retrieved, and writing evidentiary memos. One of their reviewers was Chinese-speaking, and was thus in high demand. The firm performed some drafting work on a summary judgment motion, and did research for jury instructions and class certification. They also did some early corporate research at the request of Mr. Alioto. Their billing appears efficient with little duplication or wasted time. It had a blended hourly rate of $388. The firm paid all of its assessments ($60,000) in full and on time. Their client was a class representative.

The firm's full lodestar is $711,918. It originally was allocated $1,000,000, a 1.75 multiplier of the "lodestar less 20%" amount. Because of the firm's efficiency, contribution to the litigation fund, and its client's role as a class representative, I would increase that to $1,250,000, which is about a 1.75 multiplier of its full lodestar.

Law Offices of Brian Barry [Dkt. No. 7167]

Mr. Barry is an experienced antitrust and class action lawyer. This firm also performed largely document review, but much of it at the second-level of review to prepare for depositions. It also had a Chinese-language reviewer who worked almost full-time and was always in demand. A review of its daily billing records shows that the document reviewers were repeatedly logging 10-12 hours per day. The firm contributed $400,000 to the litigation fund, the full amount requested, of which $300,000 was contributed early in the case. Its client was not a class representative. The firm's blended billing rate was $501.

The firm's full lodestar was $4,198,469. Reduced by 20% its lodestar was $3,358,775. Its original allocation was $5,000,000, which represented a multiplier of 1.49. That amount

9

exceeded the recommendation of all three lead and liaison counsel. Although the firm made a major contribution to the litigation fund and performed some high-level document review, it also had a high billing rate even for sophisticated document review and its reviewers recorded unrealistic numbers of hours per day. Therefore, I recommend no change in the firm's allocation which is based on a multiplier right in the middle of the 1.4-1.6 range.

The Coffman Law Firm [Dkt. No. 7187]

This two-person Texas firm had a client who was a class representative. Its primary contribution to the case was not the performance of traditional legal work, but rather in locating and bringing into the IPP fold plaintiffs from twelve states, of whom four were ultimately named as class representatives. The firm worked on the complaints for these plaintiffs, and oversaw their consolidation into the MDL. Mr. Coffman and his client flew twice to San Francisco for trial preparation sessions. All the work was performed by Richard Coffman himself at a billing rate of $425 that was raised to $550 in 2012 (the blended rate for the entire case was $441). The firm paid an assessment of $50,000 in 2012 when it was first asked to pay. It also incurred about $5,200 in unreimbursed travel and other costs.

The firm's lodestar was $133,806. There is no reason to reduce it since there is no indication of any inefficiencies or excessive billing rates. The original allocation was $180,000, which was a 1.68 multiplier on its "lodestar less 20%" amount. In view of the firm's substantial contribution to the IPP effort by obtaining the inclusion of plaintiffs from twelve states, its representation of a class representative, the efficiency of its work, and its prompt and significant contribution to the litigation fund, I recommend that its allocation be increased to $225,000, which is about 1.7 times its full lodestar.

Cooper & Kirkham [Dkt. No. 7201]

This firm was an early, consistent and important part of the core group of lawyers leading the IPP effort. Although 45% of its contribution was to document review and deposition preparation, that does not capture the leadership role played by Ms. Kirkham in structuring the entire document discovery and ESI process. One of its attorneys was a key team leader in preparing for dozens of depositions. The firm also performed important drafting and editing

work on motions to dismiss, class certification, settlement approvals, summary judgment and Daubert motions, among others. Three of the firm's lawyers performed over 95% of the firm's work. The firm contributed $500,000 in assessments. Following the last settlements in early 2012, the Cooper firm has, along with the Zelle firm, continued to perform substantial work on obtaining settlement approval, setting up the distribution process, opposing objections – and expects to perform a large part of the future post-trial and appellate briefing and other tasks.

The firm's lodestar is $4,725,800. Its original allocation was $9,500,000, which was a 2.5 multiplier over its "lodestar less 20%" number. Given the efficiency of its staffing, it is appropriate to reduce its lodestar by only 10%, which is $4,253,220. Because of the firm's high level of experience and skill, its leadership role in strategy and settlement, its large contribution to the litigation fund, and its heavy continued role in uncompensated post-settlement work, I recommend that its allocation be increased to $10,500,000, which is about 2.5 times its "applicable lodestar".

Foreman & Brasso [Dkt. No. 7180]

Mr. Brasso is an experienced antitrust lawyer, and a long-time associate of Mr. Alioto. The work he performed was all at the direction of co-lead counsel Alioto. Although Mr. Brasso informed me that all his assignments "had to do with trial," he acknowledges that a primary assignment was to review every ECF filing and report the significant developments to Mr. Alioto. His hourly time records confirm that virtually all his time was spent reviewing ECF filings, attending meetings with other lawyers and attending the AUO criminal trial. All of this time by Mr. Brasso himself was billed at $450/hr. Less than 10% of his firm's time was spent doing any actual independent legal work. His time records confirm about 20 hours in April 2012 reviewing depositions and exhibits to locate important testimony. The firm paid assessments of $200,000. Its client was not a class representative.

Regardless of whether the work was assigned by co-lead counsel, it is inappropriate for a senior lawyer billing $450/hr. to charge for reviewing every ECF filing. That is paralegal work. Most firms in this case charged nothing for such "read and review" time. Reviewing and annotating deposition transcripts is similarly work for an experienced associate. Attending

11

meeting after meeting with other lawyers on the case is a guarantee of duplication and waste. That is not to say that meetings aren't necessary; nor is it to criticize Mr. Brasso's abilities as an antitrust lawyer. But based on my review of all the evidence submitted by Mr. Brasso, and the comments of other experienced antitrust lawyers on the case, I cannot find that Mr. Brasso's efforts did anything meaningful to move the IPP case forward.

The firm's lodestar is $1,412,150. Reduced by 20% it is $1,129,720. The original allocation awarded the firm $1,000,000 at a multiplier of .88 of its "lodestar less 20%." I recommend that the allocation not be changed.

Girardi/Keese [Dkt. No. 7192]

Mr. Girardi's participation consisted largely of high-level strategy meetings and settlement negotiations in which he played an important role. According to Exh. 2 to the firm's original declaration [Dkt. No. 6635-7], he recorded about 903 hours at a billing rate of $1,000/hr. It is difficult to tell how the firm spent the remainder of the 1,900 plus hours because its time records lack any specific detail. About 1,335 hours were spent in document review and deposition preparation, mostly at rates from $600-750/hr. Over 200 hours were spent in meetings by lawyers other than Mr. Girardi. The firm's blended billing rate was a quite high $718. The firm made a contribution of $80,000 to the litigation fund. The firm's original allocation of $3,500,000 was considerably higher than all the recommendations I received for this firm from lead and liaison counsel.

As noted below, I conclude that no weight should be given to the alleged fee-sharing arrangement between Mr. Girardi and Mr. Winters. The allocation for each of the two firms should be evaluated on its own merits without regard to the alleged agreement.

The firm's lodestar is $2,046,387. I think it is appropriate to reduce it by 20% to $1,637,110 in view of the vagueness of its billing records, the large number of hours that attorneys other than Mr. Girardi spent meeting with each other, and its very high billing rates for attorneys other than Mr. Girardi in light of the tasks they performed. Mr. Girardi made an important contribution to the settlement effort, but in other respects the firm provided almost no

information about how it contributed to the IPP effort. I recommend that the firm's allocation of $3,500,000, which is a 2.14 multiplier on its "applicable lodestar" not be changed.

Glancy, Binkow & Goldberg LLP  [Dkt. No. 7193]

This small firm, with highly-experienced antitrust lawyers, contributed a high-level document reviewer throughout the case. It also supplied a Japanese translator and an associate who performed lower-level document review. This work was performed at billing rates from $350-525/hr. The firm paid a large $250,000 assessment, of which $100,000 was paid early in the case. Its blended billing rate was a relatively high $427/hr. basically for document review of mixed complexity. Its detailed billing records show that day-after-day its reviewers logged between 7.5-9.5 hours.

Its lodestar is $1,484,959. Reduced by 20% it is $1,187,967. Its original allocation was $1,750,000, which was a 1.47 multiplier of its "lodestar less 20%" figure. Although the firm's recorded hours probably involve little duplication and were efficiently spent, its billing rates and hours recorded for document review – albeit some of it for sophisticated review – were somewhat high. Therefore, I think it is appropriate to work from the "lodestar less 20% figure." Because of its early financial commitment and employment of skilled reviewers, I recommend that its allocation be increased to the top of the 1.4-1.6 range, to $1,900,000, which is about 1.6 times its "applicable lodestar."

Gross Belsky Alonso LLP [Dkt. No. 7175]

This 7-person firm, with substantial antitrust experience, committed two high-quality full-time document reviewers to the case. The two reviewers billed at $400/hr. They performed second-level review to select exhibits for depositions and documents to support important motions. By all reports they were among the most skilled and reliable document reviewers. They also assisted with ESI issues, and with the mock trials toward the end of the case. They believe that the 20% reduction should not apply to them since there work was free of duplication and overlap. However, a review of their detailed billing records shows many days on which reviewers recorded 10-12 hours of time, which raises a question of whether all that time can

possibly be productively spent.  The firm contributed $245,000 to the assessment fund, of which $240,000 was paid early in the case.

The firm's lodestar is $5,917,336, the 8th highest of all Class Counsel.  The original allocation was $7,000,000, a 1.48 multiplier over the "lodestar less 20%" amount.  Because of the firm's early and consistent contribution of skilled reviewers and large dollars to the IPP effort, I recommend an increase in their allocation to $7,500,000, about a 1.6 multiplier.

Morrison, Frost, Olsen, Irvine & Schwartz, LLP [Dkt. No. 7184]

This firm represented a class representative.  It worked largely under the direction of the Gary McAllister firm, which was part of the Alioto trial team.  Virtually all the work was performed by name partner Rodney Olsen, billing at $450/hr. throughout the case.  Their work consisted largely of preparing for and attending depositions (in person and by telephone) prepared to question if necessary, but in the end not questioning any witnesses.  Mr. Olsen traveled from Kansas to Chicago and Omaha for two of those depositions.  He defended his client's deposition.  Mr. Olsen and his client traveled twice to San Francisco to attend client meetings.  The firm paid a $15,000 assessment, which was all it was asked to pay.  The firm incurred another $25,000 in unreimbursed travel and other expenses.  Mr. Olsen believes the firm's billings should not be reduced by 20% since he did the work without overlap or duplication.

The firm's lodestar was $365,135.  Its original allocation was $490,000, which was a 1.68 multiplier of its "lodestar less 20%" amount.  In light of the relative efficiency of the firm's work and the fact that it did not increase its billing rate for five years, I conclude that no reduction should be made in its lodestar.  The firm worked on deposition preparation, not document review, its client was a class representative, and it paid its full assessment.  Therefore, I recommend that its allocation be increased to $620,000, which is a 1.7 multiplier of its full lodestar.

Murray & Howard [Dkt. No. 7173]

Derek Howard was one of the core group of lead lawyers who worked primarily with the Alioto team.  He practiced at Murray & Howard before moving to Minami, Tamaki.  He was

14

involved on an almost daily basis for the entire length of the IPP case, and made major contributions to strategy, coordination among lawyers, sophisticated legal work and settlement negotiations. The firm took a significant risk in assuming such a large role in this case. An important contribution was to act as a bridge between the Alioto and Zelle Hoffman teams. Mr. Howard believes that a 20% reduction in the firm's billings is inappropriate as over 60% of the work was done by him personally without duplication or overlap with other lawyers. I examined a sampling of the firm's daily billing records to confirm that the time was kept meticulously and the tasks were largely actual legal work, not mere review of e-mails and court filings. However, I also noted some overlap of work: reading each other's e-mails, reviewing drafts of documents, and the like. Therefore, I do think it appropriate to apply the 20% reduction to the lodestar. The firm paid $75,000 in assessments, on time and in the full amount requested. Its client was a class representative.

The firm's lodestar is $1,750,993. Its original allocation was $2,900,000, a 2.07 multiplier over its "lodestar less 20%" amount. Because of the leadership role taken by Mr. Howard and the assessment contribution, I would recommend an increase in the firm's allocation to $3,150,000, which is a 2.25 multiplier of the "applicable lodestar."

Steyer LowenthalBoodrookas Alvarez & Smith LLP

The Steyer firm was one of the earliest and most consistent members of the core group of firms that provided leadership and high-level work for the case. The firm was one of the primary drafters and editors of class certification and summary judgment motions, among others. Jill Manning of the firm was one of the leaders in structuring and managing the overall document retrieval effort. Steyer lawyers examined witnesses at several depositions, and worked on the mock trials and other trial preparation efforts. However, approximately 63% of its work was spent on document review and deposition preparation. Its blended billing rate was $453. The firm paid $481,000 in assessments.

The firm's lodestar was $9,656,038, the 3rd highest of any IPP firm. It original allocation was $14,500,000, a 1.88 multiplier of its "lodestar less 20%" figure. Because of the firm's key leadership role, its consistent work on motions and locating documents, its large contribution to

15

the litigation fund, and the recommendations of a majority of the lead/liaison counsels, I recommend that its allocation be increased to $17,000,000, a multiplier of about 2.25 on the "applicable lodestar" figure.

Trump, Alioto, Trump & Prescott LLP [Dkt. No. 7202]

This experienced antitrust firm performed generally low-to-medium level document review, but provided a Japanese-language reviewer who was in great demand. Their client was a class representative. They made a large $250,000 contribution to the litigation fund early in the case. The recommended award was higher than the amounts recommended by all lead and liaison counsel. I recommend that the award of $4,500,000, which is a 1.7 multiplier of its "lodestar less 20%," be increased to $4,750,000, which is a 1.8 multiplier, in order to recognize its contribution of funds, its class representative client, and the specialized review talents.

Whitfield, Bryson & Mason LLP [Dkt. No. 7196]

This small District of Columbia firm performed largely at the request of the Goldman Scarlato firm. The work consisted almost entirely of document review, some of which was done by a partner at $570/hr. but associates also performed review at appropriate billing rates. A partner made four trips to San Francisco for meetings about discovery and strategy. The firm also prepared an extensive memo on the shape of the conspiracy and worked on jury instructions. Its blended billing rate was $318. It contributed $15,000 to the litigation fund.

The firm's full historic lodestar was $279,216. Its original allocation was $260,000, which was a 1.16 multiplier of its "lodestar less 20%" amount. The firm did not make a major contribution to the IPP effort, but it did what it was asked, appeared to have done it efficiently, and made some contribution to the litigation fund. I recommend that its allocation be increased to $325,000, a 1.45 multiplier of its "lodestar less 20%" amount.

Lingel H. Winters P.C. [Dkt. No. 7168]

Mr. Winters is a one-man firm who became part of the Alioto team. At the request of Mr. Alioto he was tasked with reviewing every ECF filing, and evidently reporting on the significant ones to Mr. Alioto. I note that this is precisely the same task for which Mr. Brasso billed. Mr. Winter's daily time records (handwritten so almost impossible to read) contain line

after line with .25 hr. charges to read ECF filings. He also recorded time for a small amount of document review, and many meetings with other counsel. His other major contribution to the case was to attend the AUO criminal trial virtually every day, and then to debrief the day's testimony at a nearby restaurant with Mr. Brasso, Mr. Alioto and Ms. Moore of the Alioto Law Firm who also attended the AUO trial. Mr. Winter's billing rate ranged from $650-950/hr. and the firm had a blended rate for the entire case of $877, one of the highest of any firm.

The firm's lodestar was $2,169,630. Its original allocation was $1,000,000, a .58 multiplier on its "lodestar less 20%" figure. I cannot discern any meaningful contribution that Mr. Winters brought to the IPP effort. To assign one expensive lawyer to review ECF filings is bad enough, but to ask two to do so is just bad case management. Moreover, it showed poor judgment for Mr. Winters to charge about $200 every time he reviewed an ECF filing. Similarly, for one or two IPP lawyers to attend the entire AUO trial had value. For four or more to do so cannot be justified with any compensation. I recommend that no change be made to the Winters allocation.

## Alleged Fee-Splitting Agreements

Since I issued my Report, two alleged fee-splitting arrangements have been brought to my attention: Mr. Alioto contended that he and Francis Scarpulla of Zelle Hoffman had agreed to split the total fees 50-50 between the "Alioto team" and the "Zelle Hoffman team." Mr. Winters contended that he and Mr. Girardi had agreed to split 50-50 the fees awarded to their two firms. I have held brief fact-finding hearings into both these situations.

Lawyers who enter into a fee-splitting agreement in a class action must inform the class action court of the terms of the agreement when it is made, or at least at the time of filing a petition for approval of a settlement. *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 216, 226 (2d Cir. 1987) ["counsel must inform the court of the existence of a fee-sharing agreement at the time it is formulated."]; *Wanninger v. SPNV Holdings, Inc*, No. 85-C-2081, 1994 WL 285071 at *2 (N.D. Ill. June 24, 1994) [counsel are required to disclose fee agreements to court "at the first opportunity"; failure to do so is not dispositive, but a factor weighing against

enforcement]; *Mark v. Spencer*, 166 Cal.App.4th 219 (2008) [disclosure required at time the parties seek approval of the settlement].

A court must scrutinize an alleged fee-sharing arrangement as part of its consideration of the fairness of an attorneys' fee award that is part of a class settlement. *In re FPI/Agretech Securities Litigation*, 105 F.3d 469 (9th Cir. 1997); *Alexander v. Chicago Park Dist.*, 927 F.2d 1014 (7th Cir. 1991)  However, the court is not obliged to enforce the fee-sharing arrangement, and should not do so if it would produce a result that is disproportionate to the amount of work and contribution each firm made to the class recovery. *In re "Agent Orange" Prod.Liab.Litig.,*818 F.2d at 222; *In re FPI/Agritech Sec. Litig.*, 105 F.3d at 474 [the "relative efforts of, and benefits conferred upon the class by, class counsel are proper bases for refusing to approve a fee allocation proposal."]  Therefore, the Court is not constrained by either of these fee-sharing arrangements.  It may, indeed must, allocate fees in accordance with the relative contributions that each firm made to obtaining the class recovery.

Alioto-Zelle Issue

Basic facts.  I find that the following facts are true based on the evidence submitted at the 12/14/12 fact-finding hearing.

Mr. Alioto contended that in March 2008 he and co-lead counsel Francis Scarpulla of the Zelle Hoffman firm agreed that the total fees awarded by the Court would be divided 50-50, and that each of them would distribute his half to attorneys working on their respective "teams," subject to Court approval.  Mr. Scarpulla acknowledged that this was their original concept, provided that each "team" did roughly equal work and contributed roughly equal amounts to the litigation fund, provided that Liaison Counsel Jack Lee agreed, provided that all Class Counsel and the State Attorneys General agreed to this approach, and provided that the Court accepted this method of division.  Mr. Scarpulla testified that on two or three occasions he had explained those conditions to Mr. Alioto.  There was no evidence that Mr. Alioto ever acknowledged or agreed to the conditions that Mr. Scarpulla said he insisted upon.

In March 2011, Mr. Scarpulla declared the alleged agreement to be ineffective because, according to him, the Alioto firm and "team" had not performed half the work and had not made

half the contributions to the litigation fund, Mr. Lee had not agreed to the arrangement, and no consent had been obtained from any other Class Counsel or the State Attorneys General. The two men met on March 9, 2011 with former federal district judge, Stephen Larson, whom they both respected and who had worked on the case for several years as part of the Girardi/Keese firm. Following the meeting, Judge Larson described in an e-mail (Alioto Exh. 33) the agreed allocation of work between the two groups (Zelle Hoffman to be primarily responsible for class certification and related issues, and the Alioto firm to be primarily responsible for pre-trial preparation and trial, with the remainder of the case to be a shared responsibility), and stated, "Although there has not been nor is there any actual agreement concerning the distribution of any potential attorneys' fees in this case, you both clearly indicated that you envision that, provided that everyone continues to fulfill their respective responsibilities, any fees awarded or approved by the Court should reflect the fair division of labor described above." Judge Larson testified that neither Mr. Scarpulla nor Mr. Alioto ever objected to his statement that no fee-sharing agreement existed.

The Court was not advised of this purported fee-sharing agreement when it was made in 2008, when IPP Plaintiffs petitioned for approval of the first round of settlements, when they petitioned for approval of Round 2 settlement, or when they petitioned the Court for a fee award. Nor did Mr. Alioto mention the 50-50 agreement in his Declaration in support of his Application for Attorneys Fees [Dkt. No. 6666] filed on 9/7/12. Nor did Mr. Alioto tell me about the 50-50 agreement when lead and liaison and State AG counsel met with me on September 12, 2012 to plan the fee allocation process. Nor did he mention it in his 10/2/12 confidential written recommendation to me regarding how fees should be allocated. Mr. Alioto first informed me of the purported agreement in an e-mail on October 9, 2012.

On August 29, 2012, the Court appointed me as Special Master to recommend an award of fees and an allocation among Class Counsel [Dkt. No. 6580]. The Court did not follow the process employed in the Direct-Purchaser settlement of allowing lead counsel to agree on a recommended allocation of fees.

Conclusions: I conclude that: (1) the existence and terms of the alleged agreement have

19

not been proven by a preponderance of the evidence; (2) any agreement would be unenforceable in any event; and (3) the Court should give no weight to the alleged agreement since a 50-50 division of fees between the two groups of Class Counsel would be disproportionate to the amount of work and their respective contributions to obtaining the class recovery.

I conclude that Mr. Alioto has not carried his burden of demonstrating that the parties had a meeting of the minds on a definitive agreement. Mr. Scarpulla agreed to a 50-50 division, but only subject to several conditions inherent in class action litigation. Mr. Alioto never accepted those conditions. Therefore, they did not agree on material terms of the alleged agreement. This conclusion is the same as Judge Larson's conclusion in March 2011 that "there has not been nor is there any actual agreement concerning the distribution of any potential attorneys' fees in this case." Moreover, there were massive gaps and rampant ambiguity in the "agreement." First, it was an oral understanding, although each of them alluded to it in various written communications. Second, there was no understanding as to which firms were in the "Alioto group," which in the "Zelle group," or what was to become of the dozens of firms that were not in either group. Mr. Alioto presented at the hearing (Exh. 47) a listing of the two groups, which he conceded he had just prepared, had never shown Mr. Scarpulla or the Court, and for which he had never obtained consent from any other firm. Therefore, the 50-50 concept was too indefinite to have ripened into an agreement.

Even if a definitive agreement had existed, it would have faced insurmountable hurdles to being enforceable. First, the Ninth Circuit has stated that fee-sharing arrangements among class counsel are not enforceable contracts. *In re FPI/Agretech Securities Litigation*, 105 F.3d at 473. Second, there is at least a substantial question as to whether the alleged agreement would violate California law because it was never approved by any of the clients in the IPP case. California Rules of Professional Conduct 2-200(A). Third, the failure to disclose the 50-50 "agreement" to the Court at least at the time approval was sought for the settlements or for an award of attorneys' fees may bar enforcement. Finally, as noted above, the Court would not be bound by a fee-sharing arrangement if it were disproportionate to the effort and results obtained by the firms involved.

Basically, the co-lead counsel agreed on a broad concept in 2008 on the assumption that the Court would permit them to determine how fees should be allocated, subject to overall Court supervision. That assumption proved to be wrong. The Court, having concluded that co-lead counsel had a history of disagreements, determined to make its own allocation with the assistance of a Special Master. Given this different approach, what effect, if any, should the Court give to the original 50-50 concept? I believe that it would be inappropriate to divide the fees equally among two groups of firms. Although at the top level a few lead firms worked with Alioto and a few others worked with Zelle, there is no rational basis at all for lumping the remaining 100 or so firms into one group or another. Moreover, a few important firms worked with both Zelle and Alioto, so assigning them to one group or another would be purely arbitrary. Therefore, I totally reject as unworkable and unfair the concept of dividing the total fees into two halves. (Mr. Alioto presented at the 12/14/12 hearing a pie chart showing that my original Report had allocated 68% of the fees to the Zelle group and only 32% to the Alioto group. Since I had no knowledge when I prepared the Report which firms supposedly belonged in one group or the other, my original allocation was certainly not conscious. And a disparate allocation was hardly unexpected, since the lodestar of the supposed Zelle group was far larger than that of the supposed Alioto group.)

Moreover, I believe, for the reasons stated in this Supplemental Report, that the contributions and work performed by the firms loosely associated with Zelle were greater than that of the firms loosely associated with Alioto. And some of the greatest contributions were made by firms that worked cooperatively with both groups. An equal division of fees between the Alioto firm and the Zelle firm, or between the Alioto group and the Zelle group, would be disproportionate to the work performed by the individual firms and their respective contributions to the excellent class settlements. Instead, I have recommended allocations based on the evidence submitted about the work and contribution of each <u>individual firm</u> without regard to the orbit in which it worked.

<u>Winters-Girardi Issue</u>

<u>Basic Facts</u>: I find that the following facts are true based on the evidence submitted at

the 12/13/12 fact-finding hearing.

On or about June 25, 2007, Lingel Winters and Thomas Girardi entered into a written agreement that stated, "Your firm [Girardi] will advance the costs and I [Winters] will refer the client for joint representation. After reimbursement of costs, the attorneys fees will be shared equally – 50% to your firm 50% to mine." The written agreement was signed by both lawyers and approved in writing by their client, EMW, Inc. (Winters, Exh. 4B) On or about August 9, 2007, Mr. Girardi confirmed the agreement in a voicemail to Mr. Winters stating, "I'm pretty sure I signed an agreement with you, [that] we're going to share fees equally. That being the case, it doesn't make too much difference how much work we do and stuff like that." (Winters, Exh. 10.

On June 12, 2012, Mr. Girardi repudiated the agreement in a letter stating, "As you know, I love you; however, this is not a personal injury case. We'll be happy to share equally any sums over our hourly submission." (emphasis added) On August 2, 2012, Mr. Girardi affirmed the repudiation in a letter stating, "Let's see if I get this correct. We put in thousands of hours and hundreds of thousands of dollars on a case in which fees are based on hours not contingency. You want half. Good luck!" (Winters Exh. 28).

Mr. Winters submitted a lodestar of $2,169,630. My original Report recommended that he receive an allocation of $1,000,000. Mr. Girardi submitted a lodestar of $2,046,387. I recommended that he receive an allocation of $3,500,000. Both lawyers objected to my Report and requested a higher allocation.

At the 12/13/12 fact-finding hearing, Mr. Girardi advanced three reasons why the agreement should not be enforced. First, Mr. Alioto had invited him to participate in the case before Mr. Winters did. Second, he intended that the phrase "after reimbursement of costs" in Exhibit 4B really meant "after reimbursement of costs and my normal hourly fees." Third, he intended the agreement to apply only to the work performed specifically for their client, EMW, Inc., not for the class as a whole.

Conclusion: There was an ascertainable, definite agreement to share equally all fees awarded to the two firms. Mr. Girardi's undisclosed subjective intentions regarding the meaning

of the agreement not only contradict the written terms, but are irrelevant to determine its meaning. Cal. Civil C. §1639. Mr. Girardi's disavowal of the agreement was unjustified.

However, for the reasons stated above with respect to the Alioto-Scarpulla issue, the contract is not enforceable in this context, nor is it binding on the Court. The contract was not disclosed to the Court until after the petitions for approval of the settlements and for an award of attorneys' fees. Neither party disclosed it to the Court in their respective declarations submitted with the petition for attorneys' fees. [Dkt. Nos. 6635-7, 6635-6]

For the reasons stated above in the discussions of the allocations to the two firms, an equal allocation of fees would be highly disproportionate to the work performed and their respective contributions to the class recovery. Mr. Winters work was of little value to the class. Mr. Girardi's efforts in connection with mediation and settlement were of considerable value.

### Other Adjustments to the Allocation

Lodestars less than $100,000: I reversed the 20% discount for these firms since the low number of hours makes it likely that they were efficiently spent. I adjusted multipliers as necessary to confirm to the guidelines stated above and to make them more consistent.

Consistency adjustments: I adjusted allocations by small amounts where necessary to make the resulting multipliers more consistent with the guidelines stated above.

Gray Plant Moody: By all accounts, Dan Shulman of this firm did a superb job in many important aspects of the case. He took the lead in many important depositions; he was intimately involved in discovery and pre-trial strategy; he personally prepared much of the input to pre-trial documents such as witness examinations, exhibits lists and the like. His rates and hours were strikingly economical. However, the original recommended award of $14,000,000 represented a multiplier of 5.22 over the "lodestar less 20%" figure. This multiplier would be substantially in excess of any other firm, and in my judgment cannot be justified. I have reversed the 20% discount for his firm in view of his obvious efficiency, and applied a multiplier of 3.73, for a revised award of $12,500,000. This multiplier is the third highest of any firm, lower only than that for the Alioto and Zelle firms. It is fully justified, but the original award was

23

1   disproportionately high.

2       <u>Straus & Boies</u>:  This firm was one of the core group of firms that took major

3   responsibility throughout the case.  Two of its clients were class representatives.  It led and

4   managed the foreign language document review process, drafted portions of key motions,

5   prepared witness memos for depositions, ran the translation objection discussions, took two

6   expert depositions, and was heavily involved in preparing pretrial submissions.  The firm made a

7   maximum and early payment to the litigation fund.

8       Its full lodestar was $5,930,764.  Adjusted by 20%, the lodestar was $4,744,611.  Its

9   original allocation was $14,000,000, which was a multiplier of 2.95 over the "lodestar less 20%

10   figure."  This multiplier was in excess of the "core" multiplier range of 2.0-2.75, and was

11   disproportionate to that of other firms doing equivalent work.  Therefore, I recommend reducing

12   the allocation to $13,000,000, for a multiplier of 2.74, the second highest multiplier in the "core"

13   group of firms after Gray Plant Moody.

14       <u>Zelle Hoffman</u>

15       The Zelle Hoffman firm, and co-lead counsel Francis Scarpulla, were the engines that

16   primarily drove the IPP effort to a successful conclusion.  Without meaning to detract from the

17   pre-trial efforts of the Alioto firm and its colleagues on the trial side, I note that the case was not

18   won at trial.  The case was won in a series of mediated settlements.  It was primarily the Zelle

19   firm that led the strategy and made it possible to obtain the victories that enabled the case to be

20   successfully settled.  The Zelle firm organized and coordinated the IPP group, and harmonized

21   the IPP effort with the Direct-Purchaser Plaintiffs, the Direct Action Plaintiffs and the State

22   Attorneys General.  The Zelle firm led the document discovery, translation and organization

23   effort.  The Zelle firm spearheaded the victory in class certification, and the success in winning

24   dozens of summary judgment motions.  The Zelle firm provided the IPP's lead economic expert,

25   Dr. Netz, and coordinated her work through deposition and *Daubert* motions.  During mediation,

26   Mr. Scarpulla set the tone and led the strategy to obtain the excellent settlements.  The Zelle firm

27   will also take the lead in defending the settlement at both the district and appellate courts, and in

28

implementing the distribution of funds to the class and counsel, for which it will receive no additional compensation.

This is not to suggest that the Zelle firm, or Mr. Scarpulla, did it all. As noted above, a core group of lawyers from both teams did immense amounts of productive work, as did lawyers from dozens of less-active participating firms. In many respects the Zelle lawyers played an administrative and coordinating role, rather than doing the hardcore legal work. But they were the indispensable force that made the IPP effort all work cohesively. As co-lead counsel, Mr. Scarpulla played precise the role expected of him, and according to every lawyer and mediator I spoke to, did so superbly. A not insignificant part of his job was to mesh the efforts of the two teams of lawyers, and to mollify the demands and objections of his co-lead counsel.

The firm's full lodestar was $22,269,334. Its time records were kept meticulously. It made a very large $700,000 contribution to the litigation fund. Reduced by 20%, its lodestar was $17,815,467. For the year 2011 Mr. Scarpulla billed at $1,250 an hour. Reducing that to $1,000 produces an applicable lodestar of $17,286,717. I originally recommended an award of $80,000,000, which would be a multiplier of 4.62 over the applicable lodestar. This, I believe, is excessive and disproportionate to the allocations and multipliers for other key firms. Therefore, I recommend reducing the firm's allocation to $75,000,000, which represents a multiplier of 4.34 over the applicable lodestar. This is the highest allocation and highest multiplier received by any firm – and deservedly so.

### Concluding Recommendations

I recommend that the total fee award be $308,225,250, which is 28.5% of the $1.1 billion settlement. I recommend that this amount be allocated among IPP counsel as shown on the attached spreadsheet. I further recommend that no additional compensation be allowed for post-settlement work. This is intended to be a full and final resolution of issues relating to attorneys' fees in the IPP case.

Dated: December 18, 2012

Martin Quinn, Special Master

**EXHIBIT A TO SUPPLEMENTAL REPORT AND RECOMMENDATION OF SPECIAL MASTER RE ALLOCATION OF ATTORNEYS FEES IN THE INDIRECT-PURCHASER CLASS ACTION**

| Firm Name | Lodestar | Lodestar minus 20% | Applicable Lodestar | Original Recommended Award | Revised Recommended Award | Multiplier of Applicable Lodestar |
|---|---|---|---|---|---|---|
| Zelle Hofmann et al. | $22,269,334 | $17,815,467 | $17,286,717 | $80,000,000 | $75,000,000 | 4.34 |
| Alioto Law Firm | $18,126,946 | $14,501,557 | $11,677,895 | $45,000,000 | $47,000,000 | 4.02 |
| Steyer Lowenthal | $9,656,038 | $7,724,830 | $7,724,830 | $14,500,000 | $17,000,000 | 2.20 |
| Minami Tamaki | $7,716,017 | $6,172,813 | $6,172,813 | $20,000,000 | $20,000,000 | 3.24 |
| Gustafson Gluek | $7,694,044 | $6,155,235 | $6,155,235 | $15,000,000 | $15,000,000 | 2.44 |
| Lovell Stewart | $6,482,537 | $5,186,030 | $5,186,030 | $10,000,000 | $10,500,000 | 2.02 |
| Straus & Boies | $5,930,764 | $4,744,611 | $4,744,611 | $14,000,000 | $13,000,000 | 2.74 |
| Gross Belsky Alonso | $5,917,336 | $4,733,869 | $4,733,869 | $7,000,000 | $7,500,000 | 1.58 |
| Cooper & Kirkham | $4,725,800 | $3,780,640 | $4,253,220 | $9,500,000 | $10,500,000 | 2.47 |
| Barry, L/O Brian | $4,198,469 | $3,358,775 | $3,358,775 | $5,000,000 | $5,000,000 | 1.49 |
| Goldman Scarlato | $3,825,835 | $3,060,668 | $3,060,668 | $6,000,000 | $6,000,000 | 1.96 |
| Gray Plant Mooty | $3,349,892 | $2,679,913 | $3,349,892 | $14,000,000 | $12,500,000 | 3.73 |
| Trump, Alioto | $3,278,644 | $2,622,915 | $2,622,915 | $4,500,000 | $4,750,000 | 1.81 |
| Reinhardt Wendorf | $3,198,534 | $2,558,827 | $2,558,827 | $5,500,000 | $5,500,000 | 2.15 |
| McCallister, Gary | $2,854,553 | $2,283,642 | $2,283,642 | $6,000,000 | $6,000,000 | 2.63 |
| Winters, Lingel H. | $2,169,630 | $1,735,704 | $1,735,704 | $1,000,000 | $1,000,000 | 0.58 |
| Girardi Keese | $2,046,387 | $1,637,110 | $1,637,110 | $3,500,000 | $3,500,000 | 2.14 |
| Mogin Law Firm | $1,952,306 | $1,561,845 | $1,561,845 | $3,000,000 | $3,000,000 | 1.92 |
| Gergosian & Gralewski | $1,946,170 | $1,556,936 | $1,556,936 | $3,000,000 | $3,000,000 | 1.93 |
| Schubert Jonckheer | $1,832,853 | $1,466,282 | $1,466,282 | $3,000,000 | $3,000,000 | 2.05 |
| Murray & Howard | $1,750,993 | $1,400,794 | $1,400,794 | $2,900,000 | $3,150,000 | 2.25 |
| Saunders Doyle | $1,550,082 | $1,240,066 | $1,240,066 | $3,250,000 | $3,250,000 | 2.62 |
| Green & Noblin | $1,519,801 | $1,215,841 | $1,215,841 | $2,500,000 | $2,500,000 | 2.06 |
| Glancy Binkow | $1,484,959 | $1,187,967 | $1,187,967 | $1,750,000 | $1,900,000 | 1.60 |
| Foreman & Brasso | $1,412,150 | $1,129,720 | $1,129,720 | $1,000,000 | $1,000,000 | 0.89 |
| Kirby Mcinerney | $1,357,310 | $1,085,848 | $1,085,848 | $2,500,000 | $2,300,000 | 2.12 |
| Miller Law | $1,162,964 | $930,371 | $930,371 | $1,750,000 | $1,750,000 | 1.88 |
| Sharp McQueen | $985,320 | $788,256 | $788,256 | $1,600,000 | $1,500,000 | 1.90 |
| Johnson & Perkinson | $809,825 | $647,860 | $647,860 | $800,000 | $900,000 | 1.39 |
| Liberty Law Office | $796,191 | $636,953 | $636,953 | $1,000,000 | $1,000,000 | 1.57 |
| Furth Firm | $781,444 | $625,155 | $625,155 | $900,000 | $900,000 | 1.44 |
| Hulett Harper Stewart | $770,709 | $616,567 | $616,567 | $1,000,000 | $1,000,000 | 1.62 |
| Boesche McDermott | $770,430 | $616,344 | $616,344 | $850,000 | $770,000 | 1.25 |
| Narine, L/O Krishna | $719,993 | $575,994 | $575,994 | $900,000 | $900,000 | 1.56 |
| Andrus Anderson | $711,918 | $569,534 | $711,918 | $1,000,000 | $1,250,000 | 1.76 |
| Schack, L/O Alexander | $700,875 | $560,700 | $560,700 | $850,000 | $850,000 | 1.52 |
| Kralowec Law Group | $629,858 | $503,886 | $503,886 | $900,000 | $925,000 | 1.84 |
| Chavez & Gertler | $570,408 | $456,326 | $456,326 | $800,000 | $770,000 | 1.69 |
| Amamgbo & Assoc. | $555,685 | $444,548 | $444,548 | $390,000 | $390,000 | 0.88 |
| Westlow, Edward J. | $540,585 | $432,468 | $432,468 | $425,000 | $475,000 | 1.10 |
| Rodanast | $519,986 | $415,989 | $415,989 | $625,000 | $625,000 | 1.50 |
| McManis Faulkner | $498,065 | $398,452 | $398,452 | $425,000 | $425,000 | 1.07 |
| Shepherd, Finkelman | $435,580 | $348,464 | $348,464 | $525,000 | $525,000 | 1.51 |
| Bonnett, Fairbourn | $434,149 | $347,319 | $347,319 | $580,000 | $580,000 | 1.67 |

**EXHIBIT A TO SUPPLEMENTAL REPORT AND RECOMMENDATION OF SPECIAL MASTER RE ALLOCATION OF ATTORNEYS FEES IN THE INDIRECT-PURCHASER CLASS ACTION**

| Firm Name | Lodestar | Lodestar minus 20% | Applicable Lodestar | Original Recommended Award | Revised Recommended Award | Multiplier of Applicable Lodestar |
|---|---|---|---|---|---|---|
| McCallum, Methvin | $407,078 | $325,662 | $325,662 | $500,000 | $500,000 | 1.54 |
| Papale, L/O Lawrence | $389,270 | $311,416 | $311,416 | $400,000 | $400,000 | 1.28 |
| Jenkins Mulligan | $375,480 | $300,384 | $300,384 | $550,000 | $500,000 | 1.66 |
| Morrison, Frost, Olsen | $365,135 | $292,108 | $365,135 | $490,000 | $620,000 | 1.70 |
| Keller Rohrback | $354,444 | $283,555 | $283,555 | $450,000 | $450,000 | 1.59 |
| Durrette Crump | $344,028 | $275,222 | $275,222 | $300,000 | $300,000 | 1.09 |
| Messina Law Firm | $331,400 | $265,120 | $265,120 | $750,000 | $750,000 | 2.83 |
| Freedman Boyd | $304,111 | $243,289 | $243,289 | $550,000 | $500,000 | 2.06 |
| Cohen & Malad | $302,202 | $241,762 | $241,762 | $450,000 | $450,000 | 1.86 |
| Boone, John | $283,150 | $226,520 | $226,520 | $675,000 | $675,000 | 2.98 |
| Whitfield Bryson | $279,216 | $223,373 | $223,373 | $260,000 | $325,000 | 1.45 |
| Perkins, L/O Jeffrey K. | $220,850 | $176,680 | $176,680 | $175,000 | $185,000 | 1.05 |
| McGowan Hood | $216,325 | $173,060 | $173,060 | $265,000 | $265,000 | 1.53 |
| Hellmuth & Johnson | $210,708 | $168,566 | $168,566 | $190,000 | $190,000 | 1.13 |
| Devereux Murphy | $191,234 | $152,987 | $152,987 | $235,000 | $245,000 | 1.60 |
| Terrell Law Group | $182,925 | $146,340 | $146,340 | $225,000 | $200,000 | 1.37 |
| Ekenna Law Firm | $168,363 | $134,690 | $134,690 | $100,000 | $145,000 | 1.08 |
| Nwajei, L/O Lawrence | $155,450 | $124,360 | $124,360 | $16,000 | $16,000 | 0.13 |
| Damrell Nelson | $153,855 | $123,084 | $123,084 | $200,000 | $200,000 | 1.62 |
| Wites & Kapetan | $139,124 | $111,299 | $111,299 | $170,000 | $170,000 | 1.53 |
| Futterman Howard | $137,894 | $110,315 | $110,315 | $170,000 | $170,000 | 1.54 |
| Emerson Poynter | $137,269 | $109,815 | $109,815 | $165,000 | $165,000 | 1.50 |
| Coffman Law Firm | $133,806 | $107,045 | $133,806 | $180,000 | $225,000 | 1.68 |
| Brill, L/O Thomas H. | $128,590 | $102,872 | $102,872 | $160,000 | $165,000 | 1.60 |
| Aylstock, Witkin Kreis | $117,462 | $93,970 | $93,970 | $150,000 | $150,000 | 1.60 |
| Parish & Small | $113,250 | $90,600 | $90,600 | $130,000 | $110,000 | 1.21 |
| Pastor Law Office | $111,395 | $89,116 | $89,116 | $130,000 | $130,000 | 1.46 |
| LaCava Law | $108,045 | $86,436 | $86,436 | $130,000 | $130,000 | 1.50 |
| Guerrieri, Clayman | $96,099 | $76,879 | $96,099 | $120,000 | $135,000 | 1.40 |
| Kassof, L/O Sherman | $82,693 | $66,154 | $82,693 | $85,000 | $90,000 | 1.09 |
| Dombroski, James M. | $76,615 | $61,292 | $76,615 | $80,000 | $85,000 | 1.11 |
| Smith Dollar | $75,655 | $60,524 | $75,655 | $85,000 | $80,000 | 1.06 |
| Wyatt & Blake | $75,430 | $60,344 | $75,430 | $90,000 | $110,000 | 1.46 |
| Spiva Law Firm | $60,230 | $48,184 | $60,230 | $70,000 | $85,000 | 1.41 |
| Melton Law Firm | $52,038 | $41,630 | $52,038 | $60,000 | $60,000 | 1.15 |
| Mallison & Martinez | $50,697 | $40,558 | $50,697 | $55,000 | $58,000 | 1.14 |
| Roberts Law Firm | $50,089 | $40,071 | $50,089 | $60,000 | $65,000 | 1.30 |
| Carey, Danis & Lowe | $50,010 | $40,008 | $50,010 | $5,000 | $5,000 | 0.10 |
| Lanham Blackwell | $46,210 | $36,968 | $46,210 | $60,000 | $70,000 | 1.51 |
| Davis, Unrein, Biggs | $44,240 | $35,392 | $44,240 | see Frieden | see Frieden | |
| Michaels Ward | $40,159 | $32,127 | $40,159 | $47,000 | $53,000 | 1.32 |
| Sachs Waldman | $38,737 | $30,990 | $38,737 | $48,000 | $60,000 | 1.55 |
| Mager & Goldstein | $35,620 | $28,496 | $35,620 | $35,000 | $40,000 | 1.12 |
| Frankovitch, Anetakis | $33,770 | $27,016 | $33,770 | $45,000 | $52,000 | 1.54 |

EXHIBIT A TO SUPPLEMENTAL REPORT AND RECOMMENDATION OF SPECIAL MASTER RE ALLOCATION OF ATTORNEYS FEES IN THE INDIRECT-PURCHASER CLASS ACTION

| Firm Name | Lodestar | Lodestar minus 20% | Applicable Lodestar | Original Recommended Award | Revised Recommended Award | Multiplier of Applicable Lodestar |
|---|---|---|---|---|---|---|
| Bangs McCullen | $33,300 | $26,640 | $33,300 | $40,000 | $50,000 | 1.50 |
| Godfrey & Kahn | $30,677 | $24,542 | $30,677 | $35,000 | $40,000 | 1.30 |
| Sommers Schwartz, PC | $26,169 | $20,935 | $26,169 | $29,000 | $29,500 | 1.13 |
| Thompson, Jason | $26,169 | $20,935 | $26,169 | $26,000 | $29,500 | 1.13 |
| Wienner & Gould | $22,995 | $18,396 | $22,995 | $28,000 | $35,000 | 1.52 |
| Jimenez, Graffam | $22,961 | $18,369 | $22,961 | $27,000 | $35,000 | 1.52 |
| Branstetter, Stranch | $17,595 | $14,076 | $17,595 | $17,000 | $20,000 | 1.14 |
| Serratore Law | $13,840 | $11,072 | $13,840 | $13,000 | $16,000 | 1.16 |
| Belancio, Michael | $12,805 | $10,244 | $12,805 | $13,000 | $15,000 | 1.17 |
| Wexler Wallace | $11,591 | $9,273 | $11,591 | $13,000 | $16,000 | 1.38 |
| Towe, Ball, Enright | $11,300 | $9,040 | $11,300 | $13,000 | $16,000 | 1.42 |
| Frieden Unrein/Davis Unrein | $11,000 | $8,800 | $11,000 | $55,000 | $60,000 | 5.45 |
| Bearman, Edward | $10,815 | $8,652 | $10,815 | $10,000 | $12,000 | 1.11 |
| Hisaka Yoshida | $10,485 | $8,388 | $10,485 | $13,000 | $16,000 | 1.53 |
| West, L/O George O. | $9,205 | $7,364 | $9,205 | $11,000 | $13,000 | 1.41 |
| Goldberg Katzman | $8,640 | $6,912 | $8,640 | $8,600 | $9,500 | 1.10 |
| Smith, Bundy, Bybee | $8,550 | $6,840 | $8,550 | $900 | $900 | 0.11 |
| Alderson Alderson | $7,400 | $5,920 | $7,400 | $7,250 | $8,200 | 1.11 |
| Rossabi Black | $6,893 | $5,514 | $6,893 | $700 | $700 | 0.10 |
| Fallick Law | $6,150 | $4,920 | $6,150 | $5,800 | $6,750 | 1.10 |
| Kirkpatrick & Goldsb... | $5,680 | $4,544 | $5,680 | $6,500 | $7,500 | 1.32 |
| Meierhenry Sargent | $4,598 | $3,678 | $4,598 | $4,500 | $5,100 | 1.11 |
| Albright Stoddard | $4,590 | $3,672 | $4,590 | $4,500 | $5,000 | 1.09 |
| Ferguson Stein | $3,258 | $2,606 | $3,258 | $3,200 | $3,600 | 1.10 |
| Lowther & Johnson | $3,025 | $2,420 | $3,025 | $3,100 | $3,500 | 1.16 |
| Tollison Law Firm | $2,000 | $1,600 | $2,000 | $2,500 | $2,600 | 1.30 |
| James Law Offices | $1,900 | $1,520 | $1,900 | $2,100 | $2,100 | 1.11 |
| LaMarca & Landry | $1,560 | $1,248 | $1,560 | $1,700 | $1,800 | 1.15 |
| Skinner Law Firm | $860 | $688 | $860 | $900 | $1,000 | 1.16 |
| | TOTAL | TOTAL | TOTAL | TOTAL | TOTAL | |
| | $148,247,730 | $118,598,184 | $116,879,364 | $308,226,250 | $308,225,250 | |