Mario N. Alioto (56433)
Joseph M. Patane (72202)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2001 Union Street, Suite 482
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415- 346-0679
Email: malioto@tatp.com
jpatane@tatp.com
laurenrussell@tatp.com

*Lead Counsel for the Indirect Purchaser
Plaintiffs for the 22 States*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 4:07-cv-05944-JST |
| | MDL No. 1917 |
| This Document Relates to: | **DECLARATION OF LAUREN C. CAPURRO RE: REPLY IN SUPPORT OF MOTION TO DISTRIBUTE ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS** |
| *INDIRECT PURCHASER ACTIONS FOR THE 22 STATES* | Hearing Date:  May 12, 2022<br>Time: 2:00 p.m.<br>Courtroom: 6, 2nd Floor (Oakland)<br>Judge:  Honorable Jon S. Tigar |

I, Lauren C. Capurro, declare:

1.　　I am an attorney duly licensed by the State of California and am admitted to practice before this Court.  I am a partner with the law firm Trump, Alioto, Trump & Prescott, LLP and my firm serves as the Court-appointed Lead Counsel for the Indirect Purchaser Plaintiffs ("IPPs") for the 22 States in the above-captioned action.  I submit this Declaration in support of the Reply In Support of IPPs' Motion to Distribute Attorneys' Fees, Expenses, and Incentive Awards, filed herewith.  The matters set forth herein are within my personal knowledge and if called upon and sworn as a witness I could competently testify regarding them, except as to those matters stated on information and belief and as to those matters I believe them to be true.

2.　　One of our co-counsel, Sherman Kassof, who contributed substantially to the result achieved for the 22 States, passed away in 2018. Mr. Kassof's firm was awarded a $2,688,284 fee that he personally will never receive.

3.　　I have been working on a regular basis over the last seven years with Joseph Fisher of The Notice Company, the Court-appointed Settlement Administrator. On my instructions, Mr. Fisher has been working to update claimants' addresses so that we are able to locate them and distribute their share of the settlement proceeds to them. Mr. Fisher has informed me that, based on the data he has received, many more people than usual moved during the pandemic and that he has been unable to get updated addresses for some claimants. I am informed and believe that this will make it much more difficult to pay their claims and will increase the costs of claims administration.

4.　　Mr. Fisher has also informed me that, due to both the excessive passage of time since claimants first filed their claims in 2015 (almost seven years ago), and the pandemic, a much higher proportion of business claimants than usual are now bankrupt or no longer exist. I am therefore informed and believe that these class members can never obtain their shares of the settlement funds either.

5.　　Attached hereto as Exhibit A is a true and correct copy of an excerpt of the January 5, 2016 transcript of the hearing on final approval of the original settlements before Special Master Martin Quinn.

DECL. OF LAUREN C. CAPURRO RE: REPLY ISO MOTION TO DISTRIBUTE ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS; Master File No. 07-cv-05944-JST; MDL No. 1917

6.      Under the objective formula we have proposed to allocate the aggregate fee award, C&K's pro rata share of the aggregate fee award (before the fifty percent cut) would have been $2,813,746; Scarpulla's pro rata share would have been $106,059; and Moore's pro rata share would have been $39,140.

7.      Eliminating the $6 million in additional lodestar from the formula for calculating C&K's fee allocation, but maintaining the fifty percent cut, results in a fee allocation of $1,460,959 to C&K—only $54,086 more than the $1,406,873.06 Lead Counsel proposes to allocate to C&K. These amounts are obtained by calculating C&K's 2017 fee allocation as a percentage of the original fee award ($3,452,040/$158,606,250 = 0.021764 or 2.1764%) and applying that percentage to the reduced fee plus interest: 2.1764% of $134,254,667 = $2,921,918. Fifty percent of $2,921,918 is $1,460,959.

8.      Applying the same methodology to Scarpulla's fee would increase it by a mere $2,015 from $53,029.73 to $55,044.41. The calculation is as follows: $130,118.88/$158,606,250 = 0.00082/0.082%; 0.082% of $134,254,667 = $110,088.83; 50% of $110,088.83 = $55,044.41.

9.      Applying the same methodology to Moore's fee would increase her fee allocation from $19,570.04 to $20,272—only $702 more. The calculation is as follows: $48,018.96/$158,606,250 = 0.000302/0.0302%; 0.0302% of $134,254,667 = $40,544.90; 50% of $40,544 = $20,272.45.

10.     I have been involved in some capacity in all of the work done since IPPs' original fee petition in 2015. The vast majority of the work performed since 2015, and included in the $6 million in additional lodestar, was necessary to defend the amended settlements from Objectors' meritless attacks. Most other work during this time involved claims administration. All other IPP firms have agreed to a pro rata reduction in their fees to compensate the firms that worked on the amended settlements.

11.     There were long periods in 2019 and 2020 when my co-counsel and I were working on multiple, back-to-back, and even overlapping motions. And in 2020 and 2021 before the Ninth Circuit, my co-counsel and I were working on eight separate appeals of preliminary and final approvals of the settlements and the denial of Objectors' motions for intervention. This

DECL. OF LAUREN C. CAPURRO RE: REPLY ISO MOTION TO DISTRIBUTE ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS; Master File No. 07-cv-05944-JST; MDL No. 1917

1  work included moving to dismiss certain appeals, opposing stay motions, researching and

2  drafting voluminous 85-page answering briefs requiring a review of the record dating back to

3  2007, and oral argument. During these periods, I oversaw multiple attorneys and paralegals who

4  were working full time on this case.

5          I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th

6  day of April 2022 at Novato, California.

7

8                                              /s/ Lauren C. Capurro
                                                Lauren C. Capurro
9
                                            **_Lead Counsel for the Indirect Purchaser Plaintiffs_**
10                                          **_for the 22 States_**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF LAUREN C. CAPURRO RE: REPLY ISO MOTION TO DISTRIBUTE ATTORNEYS' FEES,
EXPENSES, AND INCENTIVE AWARDS; Master File No. 07-cv-05944-JST; MDL No. 1917

# EXHIBIT A

Page 1

1             UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    _____

                                    )
5    IN RE:  CATHODE RAY TUBE        )
     (CRT) ANTITRUST LITIGATION      )
6    _____)  No. 3:07-cv-05944-SC
                                    )  MDL No. 1917
7    This Document Relates to:       )
                                    )
8    ALL ACTIONS                     )
     _____)

9

10

11

12

13

14

15               ORAL ARGUMENT HEARING

16            San Francisco, California

17            Tuesday, January 5, 2016

18

19

20

21

22

     Reported by:
23   SUZANNE F. BOSCHETTI
     CSR No. 5111

24

25

Page 2

1      UNITED STATES DISTRICT COURT
2     NORTHERN DISTRICT OF CALIFORNIA
3
4 _____
             )
5 IN RE: CATHODE RAY TUBE  )
  (CRT) ANTITRUST LITIGATION  )
6 _____) No. 3:07-cv-05944-SC
         ) MDL No. 1917
7 This Document Relates to:  )
             )
8 ALL ACTIONS        )
 _____)
9
10
11
12
13
14
15     ORAL ARGUMENT HEARING held before Special
16 Master Martin Quinn, at JAMS, 2 Embarcadero
17 Center, Suite 1500, San Francisco, California,
18 beginning at 9:55 a.m. and ending at 1:17 p.m.,
19 on Tuesday, January 5, 2015, before SUZANNE F.
20 BOSCHETTI, Certified Shorthand Reporter No.
21 5111.
22
23
24
25

Page 3

1 APPEARANCES:
2
3   JAMS
4   BY: MARTIN QUINN, SPECIAL MASTER
5   2 Embarcadero Center, Suite 1500
6   San Francisco, California 94111
7   (415) 982-5267
8
9
10 For the Indirect Purchaser Plaintiffs Class:
11 TRUMP ALIOTO TRUMP & PRESCOTT, ATTORNEYS LLP
12 BY: MARIO N. ALIOTO, ESQ.
13 BY: LAUREN C. CAPURRO, ESQ.
14   2280 Union Street
15   San Francisco, California 94123
16   (415) 563-7200
17   marioalioto@tatp.com
18   laurenrussell@tatp.com
19
20
21
22
23
24
25

Page 4

1 APPEARANCES (Continued):
2
3 FINE, KAPLAN AND BLACK, R.P.C.
4 BY: MATTHEW DUNCAN, ESQ.
5 BY: DONALD L. PERELMAN, ESQ.
6   1 South Broad Street, 23rd Floor
7   Philadelphia, Pennsylvania 19107
8   (215) 567-6565
9   mduncan@finekaplan.com
10   dperelman@finekaplan.com
11
12 FREEDMAN BOYD HOLLANDER GOLDBERG URIAS & WARD P.A.
13 BY: JOSEPH GOLDBERG, ESQ.
14   20 First Plaza, Suite 700
15   Albuquerque, New Mexio 87102
16   (505) 244-7520
17   jg@fbdlaw.com
18
19 KIRBY McINERNEY LLP
20 BY: ROBERT J. GRALEWSKI, JR., ESQ.
21   600 B Street, Suite 1900
22   San Diego, California 92101
23   (619) 398-4340
24   bgralewski@kmllp.com
25

Page 5

1 APPEARANCES (Continued):
2
3 ZELLE HOFMANN VOELBEL & MASON LLP
4 BY: CRAIG C. CORBITT, ESQ.
5 BY: CHRISTOPHER T. MICHELETTI, ESQ.
6   44 Montgomery Street, Suite 3400
7   San Francisco California 94104
8   (415) 693-0700
9   ccorbitt@zelle.com
10   cmicheletti@zelle.com
11
12 STRAUS & BOIES, LLP
13 BY: NATHAN CIHLAR, ESQ.
14   4041 University Drive, Fifth Floor
15   Fairfax Virginia 22030
16   (703) 764-8700
17   ncihlar@straus-boies.com
18
19 MILBERG LLP
20 BY: PAUL F. NOVAK
21   719 Griswold, Suite 620
22   Detroit, Michigan 48226
23   (313) 309-1761
24   pnovak@milberg.com
25

2 (Pages 2 - 5)

Page 6

1  APPEARANCES (Continued):
2
3     KAG LAW GROUP
4     BY:  SYLVIE K. KERN, ESQ.
5     2532 Lake Street
6     San Francisco California 94121
7     (415) 221-5763
8     sylviekern@yahoo.com
9
10    ANDRUS ANDERSON LLP
11    BY:  JENNIE LEE ANDERSON (By telephone)
12    155 Montgomery Street, Suite 900
13    San Francisco, California 94114
14    (415) 986-1400
15    jennie@andrusanderson.com
16
17    BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER
18    BY:  DANIEL E. BIRKHAUSER (By telephone)
19    2125 Oak Grove Road, Suite 120
20    Walnut Creek, California 94598
21    (925) 945-0200
22    dbirkhaeuser@bramsonplutzik.com
23
24
25

Page 7

1  APPEARANCES (Continued):
2
3  For Objecting IPPs:
4     COOPER & KIRKHAM, P.C.
5     BY:  JOSEF COOPER, ESQ.
6     BY:  TRACY KIRKHAM, ESQ.
7     BY:  JOHN D. BOGDANOV, ESQ.
8     357 Tehama Street, 2nd Floor
9     San Francisco, California 94103
10    (415) 788-3030
11    jdc@coopkirk.com
12    trk@coopkirk.com
13
14    LAW OFFICES OF FRANCIS O. SCARPULLA
15    BY:  FRANCIS O. SCARPULLA, ESQ.
16    BY:  PATRICK CLAYTON, ESQ.
17    456 Montgomery Street, 17th Floor
18    San Francisco California 94104
19    (415) 788-7210
20    fos@scarpullalaw.com
21
22
23
24
25

Page 8

1  APPEARANCES (Continued):
2  For Excluded IPPs:
3     BONSIGNORE TRIAL LAWYERS, PLLC
4     BY:  ROBERT J. BONSIGNORE, ESQ.
5     3771 Meadowcrest Drive
6     Las Vegas, Nevada 89121
7     (781) 350-0000
8     rbonsignore@classactions.us
9
10 For Objectors Rockhurst University, Harry Garavanian and
11 Gary Talewsky:
12    THERESA D. MOORE, ATTORNEY AT LAW
13    BY:  THERESA D. MOORE, ESQ.
14    One Sansome Street, 35th Floor
15    San Francisco, CA 94104
16    (415) 434-8900
17    tmoore@aliotolaw.com
18
19 For Objector Douglas St. John:
20    JOSEPH S. ST. JOHN, ATTORNEY AT LAW
21    BY:  JOSEPH S. ST. JOHN, ESQ.
22    514 Mockingbird Lane
23    Long Beach, Mississippi 39560
24    (410) 212-3475
25    j.scott.stjohn.public@gmail.com

Page 9

1  APPEARANCES (Continued):
2
3  For Objectors John Finn and Laura Fortman:
4     THE KRESS LAW FIRM LLC
5     BY:  JOHN KRESS, ESQ. (By telephone)
6     4247 South Grand Boulevard
7     St. Louis, Missouri 63111
8     (314) 631-3883
9     jckress@thekresslawfirm.com
10
11    STEVE A. MILLER, ATTORNEY AT LAW (By telephone)
12    1625 Larimer St., No. 2905
13    Denver, CO 80202-1539
14    sampco1@gmail.com
15
16 For Objector Sean Hull:
17    BANDAS LAW FIRM, P.C.
18    BY:  CHRISTOPHER A. BANDAS, ESQ. (By telephone)
19    500 N. Shoreline Boulevard, Suite 1020
20    Corpus Christi, Texas 78401
21    (361) 698-5200
22    cbandas@bandaslawfirm.com
23
24
25

3 (Pages 6 - 9)

Page 10

1 APPEARANCES (Continued):
2 For Hitachi Defendants:
3   KIRKLAND & ELLIS LLP
4   BY:  ELIOT A. ADELSON, ESQ.
5   555 California Street
6   San Francisco California 94104
7   (415) 439-1313
8   eadelson@kirkland.com
9
10 For Samsung SDI Defendants:
11   SHEPPARD MULLIN RICHTER & HAMPTON LLP
12   BY:  MICHAEL W. SCARBOROUGH, ESQ.
13   Four Embarcadero Center, 17th Floor
14   San Francisco California 94111-4109
15   (415) 434-9100
16   mscarborough@sheppardmullin.com
17
18 For Philips Defendants:
19   BAKER BOTTS LLP
20   BY:  ERIK T. KOONS, ESQ.
21   BY:  JOHN TALADAY, ESQ. (By telephone)
22   1299 Pennsylvania Avenue, NW
23   Washington, D.C. 40004-2400
24   erik.koons@bakerbotts.com
25   john.taladay@bakerbotts.com

Page 12

1 APPEARANCES (Continued):
2
3 For Chunghwa Picture Tube Defendants:
4   GIBSON DUNN & CRUTCHER LLP
5   BY:  RACHEL S. BRASS, ESQ. (By telephone)
6   555 Mission Street
7   San Francisco, California 94105--0921
8   (415) 393-8293
9   rbrass@gibsondunn.com
10
11 For the State of California:
12   DEPARTMENT OF JUSTICE
13   OFFICE OF THE ATTORNEY GENERAL
14   BY:  EMILIO VARANINI, ESQ.
15   455 Golden Gate Avenue, Suite 11000
16   San Francisco California 94102-7002
17   (415) 703-5908
18   emilio.varanini@doj.ca.gov
19
20
21
22
23
24
25

Page 11

1 APPEARANCES (Continued):
2 For Panasonic Defendants:
3   WINSTON & STRAWN LLP
4   BY:  MARTIN C. GEAGAN ESQ.
5   200 Park Avenue
6   New York, New York 10166
7   (212) 294-4615
8   mgeagan@winston.com
9
10 For Thomson Defendants:
11   FAEGRE BAKER DANIELS LLP
12   BY:  KATHY L. OSBORN, ESQ. (By telephone)
13   300 N. Meridian Street, Suite 2700
14   Indianapolis, Indiana 46204
15   (317) 237-8562
16   kathy.osborn@faegrebd.com
17
18 For Toshiba Defendants:
19   WHITE & CASE LLP
20   BY:  CHRISTOPHER M. CURRAN, ESQ. (By telephone)
21   BY:  J. MARK GIDLEY, ESQ. (By telephone)
22   701 Thirteenth Street, NW
23   Washington D.C. 20005-3807
24   (202 )626-3609
25   ccurran@whitecase.com

Page 13

1 APPEARANCES (Continued):
2
3 For Direct Purchaser Plaintiffs Class:
4   SAVERI & SAVERI, INC.
5   BY:  GUIDO SAVERI, ESQ.
6   706 Sansome Street
7   San Francisco, California 94111
8   (415) 217-6810
9   guido@saveri.com
10
11 Also Present:
12   MARLA COHEN, ESQ.:  Research Attorney
13
14
15
16
17
18
19
20
21
22
23
24
25

4 (Pages 10 - 13)

Page 14

1   San Francisco, California; Tuesday, January 5, 2016
2           10:09 a.m.
3           ---o0o---
4
5       SPECIAL MASTER:  Good morning.  I'd like you to
6   identify yourselves for my benefit if not the court
7   reporter's.  That would be good.
8       MR. ALIOTO:  Good morning.  Mario Alioto, lead
9   counsel for the indirect purchasers.
10      SPECIAL MASTER:  Okay.  And everyone has to
11  speak up, you know, without yelling at each other.  But
12  we have to almost yell at each other because we not only
13  have to be sure Ms. Cohen and I hear, but the people on
14  the phone have to hear.
15      MS. CAPURRO:  Good morning, Your Honor.  Lauren
16  Capurro for the indirect purchaser plaintiffs.
17      MR. DUNCAN:  Good morning, Your Honor.  Matthew
18  Duncan from Fine, Kaplan and Black in Philadelphia for
19  the IPPs.
20      MR. GOLDBERG:  Good morning, Mr. Quinn.  My
21  name is Joe Goldberg from Freedman Boyd Hollander
22  Goldberg Urias & Ward in Albuquerque, New Mexico, for
23  the IPPs.
24      SPECIAL MASTER:  I was just there.
25      MR. GOLDBERG:  So was I.

Page 15

1       MS. KIRKHAM:  Good morning.  Tracy Kirkham of
2   Cooper & Kirkham on behalf of the objecting indirect
3   purchaser plaintiffs.
4       MR. COOPER:  Josef Cooper, the second half of
5   the firm.
6       MR. SCARPULLA:  Francis Scarpulla, Your Honor,
7   from the Law Offices of Francis Scarpulla in
8   San Francisco for the same objectors.
9       MR. BONSIGNORE:  Robert Bonsignore on behalf of
10  the excluded plaintiffs.  Excuse me for yelling.
11      MR. ADELSON:  Eliot Adelson of Kirkland & Ellis
12  for Hitachi.
13      MR. SCARBOROUGH:  Michael Scarborough of
14  Shepard Mullin for the Samsung SDI defendants.
15      MR. KOONS:  Erik Koons, Baker Botts, on behalf
16  of Philips defendants.
17      MR. GEAGAN:  Martin Geagan, Winston & Strawn,
18  on behalf of the Panasonic defendants.
19      MR. CORBITT:  Good morning, Your Honor.  Craig
20  Corbitt for the IPPs.
21      MR. CIHLAR:  Nathan Cihlar from Straus & Boies
22  for the IPPs.
23      MR. NOVAK:  Paul Novak of Milberg for the IPPs.
24      MR. ST. JOHN:  Joseph St. John for objector
25  Douglas St. John.

Page 16

1       MS. MOORE:  Theresa Moore for objectors
2   Rockhurst University, Garavanian and Talewsky.
3       MR. VARANINI:  Emilio Varanini on behalf of the
4   California Attorney General's Office.
5       MR. SAVERI:  Guido Saveri.  I'm the lead
6   counsel for the direct purchasers.  I do not intend to
7   participate.  I'm here just as an observer, but I see a
8   lot of my friends here that I haven't seen for years.
9   Mr. Goldberg and the whole crowd, it's nice to see you.
10  Nice to see you again.  You have your problems.  The
11  direct purchase plaintiffs, as you know, are all
12  finished, and we're here to see what's going on.
13      SPECIAL MASTER:  Thank you.
14      MR. SAVERI:  Nice to see you.  I'd like to see
15  several of you later and renew old acquaintances.
16      SPECIAL MASTER:  We appreciate the support.
17      MS. KERN:  Sylvie Kern for the indirect
18  purchaser plaintiffs.
19      MR. GRALEWSKI:  Bob Gralewski, Kirby McInerney,
20  on behalf of the indirect purchaser plaintiffs.
21      MR. MICHELETTI:  Chris Micheletti with Zelle on
22  behalf of the IPPs.
23      MR. PERELMAN:  Don Perelman, Fine, Kaplan and
24  Black, for the IPPs.
25      MR. BOGDANOV:  John Bogdanov with Cooper &

Page 17

1   Kirkham, objecting IPPs.
2       MR. CLAYTON:  And Patrick Clayton from the Law
3   Offices of Francis O. Scarpulla for the objecting IPPs.
4       SPECIAL MASTER:  All right.  And on the phone,
5   if you could announce yourselves.
6       MR. BANDAS:  Chris Bandas for objector Sean
7   Hull.
8       MS. OSBORN:  This is Kathy Osborn for
9   defendants, the Thomson defendants.
10      MS. BRASS:  This is Rachel Brass for the
11  Chunghwa Picture Tube defendants.
12      SPECIAL MASTER:  Thank you.
13      MR. HOAG:  You have Frank Hogue and Chris
14  Curran from White & Case on behalf of the Toshiba
15  defendants.
16      MR. TALADAY:  John Taladay from Baker Botts on
17  behalf of the Philips defendants.
18      MR. KRESS:  John Kress on behalf of John Finn
19  and Laura Fortman.
20      SPECIAL MASTER:  Mr. Kress, who are you
21  representing?
22      MR. KRESS:  John Finn and Laura Fortman.
23      SPECIAL MASTER:  All right.
24      MR. BIRKHAEUSER:  One more, Your Honor.  Dan
25  Birkhauser of Bramson, Plutzik, Mahler & Birkhaeuser on

5 (Pages 14 - 17)

Page 18

1 behalf of the IPPs.
2      MS. ANDERSON:  And Jennie Lee Anderson of
3 Andrus Anderson on behalf of IPPs.
4      MR. MILLER:  And Steve Miller, co-counsel with
5 John Kress on behalf of Finn and Fortman.
6      SPECIAL MASTER:  All right.  Anyone else on the
7 phone who has not announced himself or herself?
8      All right.  Here comes the email address from
9 the court reporter.
10      (Reporter complies.)
11      SPECIAL MASTER:  Did everyone get that?
12      All right.  So there is no perfect way to run a
13 hearing like this.  I think what I'd like to do is go
14 issue by issue and take up, you know, the various issues
15 that are on my mind, and then at the end give you an
16 opportunity to raise any issues that we haven't covered.
17 And in no particular order, I've just jotted down five
18 issues that I'd like to cover.
19      First, the first is an issue that nobody raised
20 except me, which is is it premature for the special
21 master to be issuing a report and recommendation on the
22 appropriateness of the settlement when there's a motion
23 pending to appoint co-lead counsel that would
24 potentially impact that -- that -- you know, the
25 fairness and reasonableness of the settlement.

Page 19

1      Second, the issue of the appropriateness of
2 releasing the class members in non-repealer states and
3 releasing the class members in the three repealer states
4 that were omitted from the litigation class.
5      Third, the issue of the adequacy of the notice.
6      Fourth, issues that have been raised by
7 objectors relating to the Chunghwa settlement.
8      And fifth, the issue raised by the Attorney
9 General of -- as to whether the claim deadline should be
10 extended and other issues that the Attorney General has
11 raised in her statement of interest.
12      So those are the top items on my hit list, and
13 then we can certainly discuss anything after that.  For
14 those who haven't appeared before me, I mean, just
15 realize that Ms. Cohen and I have read all the briefs.
16 I get sort of restive when people repeat what's in their
17 briefs, particularly if they do so at great length.  So
18 please, you know, try to keep your -- your comments
19 succinct.
20      There are a lot of people who probably want to
21 talk today, and I want to have the chance to give
22 everybody a full and fair hearing.  On the other hand,
23 we have a lot to do to get this report and
24 recommendation in shape, and I don't want to spend an
25 unreasonable amount of time in an oral hearing.  So

Page 20

1 that's just words of caution.
2      So I guess I'd like to ask Mr. Cooper and/or
3 Mr. Scarpulla, is it premature for me to submit a report
4 and recommendation on these issues on the 15th when you
5 are going to have a hearing, I believe on January 17, on
6 your motion to be appointed co-lead counsel to represent
7 the interests of class members in -- in non-repealer
8 states?
9      MR. COOPER:  I guess we have debated that issue
10 back and forth, Your Honor, as to what to do before we
11 filed.  We debated that question before we filed a
12 motion.  And we know the schedule is the one that is
13 set, and we have not asked the court to change the
14 schedule or asked you to change the schedule.  We do not
15 have any intention, if appointed co-lead counsel, of
16 doing anything other than proceeding with the objections
17 which have been advanced.
18      So we would be proceeding with those objections
19 with or without the designation.  The defendants raised
20 the question in response to the motion to be appointed
21 as to whether we would be withdrawing from the
22 settlements.  And we said, you know, finally we filed
23 that we can't withdraw from a contract that Mr. Alioto
24 entered into.
25      We can object, and we can be the court

Page 21

1 designated people to actually advance and advocate for
2 this group, this large group of people, the non-repealer
3 states that have not had anyone advocating for them
4 where their rights and the interests have been
5 abandoned.  We think that the objections would be the
6 same.  So I don't think it would make any difference
7 whether you delayed or don't delay.  You would be
8 facing the same questions and issues.
9      SPECIAL MASTER:  Well, I mean, hypothetically
10 -- and I appreciate this isn't an issue for me, it's for
11 Judge Tigar, but hypothetically, if you were appointed
12 in some capacity, co-lead counsel or allocation counsel
13 or something, you know, would you want to do due
14 diligence?  Would you want to do discovery?  Would you
15 want to say to the court we object to the special
16 master's report and recommendation that just came out
17 two days ago and we essentially want a do-over?
18      MR. COOPER:  Well, we have -- we have a
19 schedule for objecting if necessary or we decide to, you
20 know, report recommendations.  The objections that we've
21 logged are the same.  It's showing that as has been made
22 by Mr. Alioto with regard to the propriety and adequacy
23 of the settlement is presumably the same.
24      We've asked for discovery with regard to the
25 fee matters, and I realize we're not doing that.  I

6 (Pages 18 - 21)

Page 22

1 believe some people have asked for discovery. But
2 there's been a showing, such as it is, with regard to
3 the adequacy of the settlement and why nothing is being
4 recovered in any way, shape or form for the non-repealer
5 state people. Those arguments are the same whether we
6 have the designation of co-lead counsel or not.
7     SPECIAL MASTER: Okay. So I take it your
8 answer is, to my question is no. It's not premature. I
9 should go ahead and issue the report and the
10 recommendation on the -- on the same schedule?
11     MR. COOPER: I guess that's the answer, yes.
12 Yes, it might be premature for other reasons. For
13 example, we've suggested with regard to the notice that
14 you ought to have an independent expert who can
15 actually, from an expert's perspective, evaluate the
16 notice issues that, to my knowledge, we've not acted on
17 that in any way. So that might be one reason why you
18 would -- it would be appropriate to do it.
19     But I guess what I'm trying to say is the
20 objections are the objections. If you feel that there's
21 a reason why designation as co-lead counsel -- and the
22 co-lead was to be Mr. Scarpulla and myself for this
23 group of people. It wasn't that we would be co-lead
24 with Mr. Alioto for the entire --
25     SPECIAL MASTER: I understand.

Page 23

1     MR. COOPER: Yeah.
2     SPECIAL MASTER: Mr. Scarpulla?
3     MR. SCARPULLA: Yes, Your Honor, just to follow
4 up on that. It probably makes a difference what Judge
5 Tigar does in terms of the responsibilities of any
6 co-leads if he decides to appoint them. So it might be
7 a good idea to ask him what -- what he wants.
8     MR. COOPER: I think it's clear from our answer
9 to your question, Your Honor, that there's some
10 ambivalence about that question which, as I said when we
11 started, we debated about as to whether that would or
12 would not be the appropriate way. And we came down on
13 the side of not asking the schedule be changed.
14     SPECIAL MASTER: Okay.
15     MR. COOPER: But we're acknowledging, I guess,
16 the legitimacy of your inquiry.
17     SPECIAL MASTER: Okay. Thank you.
18 Mr. Alioto?
19     MR. ALIOTO: Yes, thank you, Your Honor.
20 There's no ambivalence on our side. This matter is
21 squarely before Your Honor. There's a court order
22 scheduled in place. There's been no request for relief
23 to delay things. A lot of this matter is going to have
24 to be reviewed again by Judge Tigar de novo. The matter
25 is ripe. The matter is tee'd up. No ambivalence at all

Page 24

1 about it. We need to address the issues right now.
2     SPECIAL MASTER: All right. Thank you. At the
3 end of the table?
4     MR. BONSIGNORE: Can you hear me?
5     SPECIAL MASTER: Mr. Bonsignore, yes.
6     MR. BONSIGNORE: Okay. I didn't want to yell
7 again. My name is Robert Bonsignore, and I also put in
8 a request to be appointed co-lead. I would say that it
9 is premature because once the co-leads are appointed,
10 they have an interest to streamline the issues and also
11 to revisit what's been filed. Also a lot of things
12 weren't done. I personally think that it's premature,
13 especially given the authority that Judge Tigar is
14 likely, given the typical powers of appointment, the
15 powers that Judge Tigar is likely to give the co-leads
16 for these excluded plaintiffs.
17     So I take the opposite position of Mr. Cooper.
18 In framing the issue, you listed everything that I would
19 have put out there, and so I'm not going to bother
20 repeating myself -- yourself, rather.
21     SPECIAL MASTER: And just remind me. When did
22 you make this request to be appointed co-lead counsel?
23     MR. BONSIGNORE: Just -- I'll pull it up.
24     SPECIAL MASTER: So it was -- it was in --
25     MR. COOPER: It was in a reply brief.

Page 25

1     MS. KIRKHAM: It was on the schedule for the
2 opposition/response, that it was a joinder and request
3 -- a joinder in our motion and request to be added as
4 another lead counsel.
5     MR. BONSIGNORE: It was either December 24th or
6 25th because I remember the preparation was less
7 than popular in my office.
8     MR. COOPER: It was December 28th. It was
9 December 28th, the due date for the oppositions.
10     MS. MOORE: Your Honor?
11     SPECIAL MASTER: Ms. Moore.
12     MS. MOORE: First of all, I think the court has
13 changed the date of the hearing on the motion for
14 co-lead counsel to the 21st. So there's a little bit
15 more time. And I think that the court would be --
16     SPECIAL MASTER: There's more time for the
17 judge. There's not more time for me.
18     MS. MOORE: No more time for you.
19     It seems to me the judge would be interested in
20 hearing or seeing your report, and I think that that
21 would inform him on the motion.
22     SPECIAL MASTER: All right. Anyone else have
23 any thoughts on this before we get down --
24     MR. BONSIGNORE: I object to her logic. I
25 think it's self-serving and makes no sense to me.

7 (Pages 22 - 25)

Page 26

1    SPECIAL MASTER:  Noted.
2        All right.  All right.  Let's move on then.
3  Thank you for that.  Let's move on then to the issue of
4  the appropriateness of -- well, let me first ask a
5  preliminary question.
6        Mr. Alioto seemed to suggest in I think his
7  most recent filing that it might be possible to separate
8  the approval of the settlement amount with the
9  defendants, that is, the approval of the total amount of
10  the settlement as being fair, adequate and reasonable
11  and somehow separate or defer -- I wasn't quite sure
12  what was being suggested -- the issue of the fairness,
13  reasonableness and adequacy of the allocation plan.
14        Mr. Alioto, just before we get to the merits of
15  that issue, what did you have in mind there?
16        MR. ALIOTO:  Well, what I had in mind was this,
17  Your Honor.  The starting point for these settlements is
18  the settlement agreements themselves.  That sets out all
19  of the essential terms of the settlements.  That's what
20  we referred to as the settlement.
21        The plan of allocation is something that we,
22  the indirect purchaser lawyers, have put together.  It's
23  something that in our best judgment will effectuate the
24  settlements.  This is not all spelled out.  This plan of
25  allocations, the releases, the notice provisions, the

Page 27

1  various -- the various terms attendant to the underlying
2  settlements, they're not set out anywhere.  This is a
3  plan devised by indirect purchaser counsel in
4  consultation with experts and notice experts.
5        And what I meant to suggest there is that this
6  plan of allocation is reasonable.  This plan is
7  sustainable.  This plan ought to be implemented.  $576
8  million ought to be distributed to the claimants, but
9  our broader goal is to get something done.  And to the
10  extent Your Honor feels that yes, it's reasonable, but
11  I'd like to adopt plan B, which is also reasonable, or
12  plan C, which is also reasonable -- I have no pride of
13  authorship here.  I'm not dug in.  My goal is to get
14  this settlement approved.
15        That's what the thought is there when we cited
16  that law to you that says there's the underlying
17  settlements and there's the plan.  There may be
18  different ways to get this done to get everybody happy.
19  I don't -- I certainly am not advocating for these other
20  ways, but if those other ways meet due process and
21  they're fair and reasonable and we can accommodate
22  somebody's concerns, we're more than willing to do that
23  to get this done.
24        SPECIAL MASTER:  So hypothetically, and I
25  really mean hypothetically, would it create any problems

Page 28

1  in your mind if -- if I were to say all right, the
2  settlement vis-à-vis the defendants is fair, adequate
3  and reasonable.  $576 million, given all the factors
4  that you're supposed to consider, is an appropriate
5  settlement, but the plan of allocation proposed is
6  faulty in these ways.  That would have the result of not
7  sending you back to the negotiation table with the
8  defendants, but it would require you to do some in-house
9  tinkering perhaps with the allocation plan.
10        And I -- by suggesting it, I do not mean to
11  suggest I am headed in that direction.  I just throw
12  that out -- I just want to know if -- would that create
13  any procedural or legal problems if I were to proceed
14  that way?
15        MR. ALIOTO:  Yes.  No, that would be welcome.
16  One part of that would not be welcome was -- would be if
17  you were to come to the conclusion that our proposal was
18  not reasonable and not adequate, that -- that would
19  cause some concern.
20        But to the extent you felt that there were
21  other reasonable ways to approach this or other ways to
22  get this settlement approved and accommodate the
23  interests of objectors and the attorney general, we
24  would be open to that, and we would welcome this kind of
25  piecemeal approach, the underlying settlement approved,

Page 29

1  then get on to the approval of the allocation.  And I'm
2  not saying that has to be months apart.  But --
3        SPECIAL MASTER:  Well, the settlement
4  officially as proposed under this hypothetical would not
5  be approved.  The terms of the settlement vis-à-vis the
6  defendants would be approved, but you would have to go
7  back and propose another plan of allocation to fix
8  whatever defects I found.
9        MR. ALIOTO:  Yes.  And again, I don't know that
10  you have to determine that they are defects.  I think
11  you could -- you could identify matters that could be
12  addressed and solved in different ways.  And I'm sure we
13  could put our heads together and come up with something
14  that's very close to what we proposed and that would
15  moot concerns.
16        SPECIAL MASTER:  Okay.
17        MR. ALIOTO:  I mean --
18        SPECIAL MASTER:  So I don't -- anyone else have
19  any thoughts about this?  What about the defendants?  If
20  I were to proceed that way, would that cause any
21  heartburn for the defendants?
22        MR. SCARBOROUGH:  Your Honor, Mike Scarborough
23  for the Samsung SDI defendants, and I'll attempt to
24  articulate a general defense consensus.
25        I think what Your Honor outlined would be

8 (Pages 26 - 29)

Page 30

1 constructive, and I think it would be welcome for our
2 side. Our primary interest is in getting the
3 agreements, the contracts that we entered into approved
4 in terms of the amount of money being paid collectively
5 and the releases that we bargained for being approved as
6 fair, adequate and reasonable.
7     And we do believe that the allocation issues
8 logically can come later, later down the line. And so
9 we would like to get at least past that first hurdle of
10 the underlying agreements vis-à-vis the defendants are
11 fair, adequate and reasonable and deserving of a final
12 approval.
13     And we do view many of the objections as really
14 going to allocation issues, and as a general matter we
15 don't have a problem with some tinkering being done to
16 the plan of allocation proposed by lead counsel.
17     SPECIAL MASTER: Okay. Mr. Scarpulla.
18     MR. SCARPULLA: Yes, Your Honor. On that --
19 first of all, I think I heard Mr. Scarborough say
20 something about the releases. That's a different issue
21 than the amount of money because the releases, of
22 course, release claims by half the country for zero
23 consideration.
24     SPECIAL MASTER: No, but -- I'm sorry to
25 interrupt. But I mean hypothetically, you could say the

Page 31

1 releases are appropriate, but there's got to be some
2 compensation paid to those people --
3     MR. SCARPULLA: Correct.
4     SPECIAL MASTER: -- which is not an issue, I
5 take it, that would bother the defendants. They don't
6 care how the money -- to whom the money is paid, they
7 just want their releases.
8     MR. SCARPULLA: Yes, Your Honor, that is
9 correct, and I was getting to that point, which would
10 mean that the amount of money is therefore not
11 sufficient because you'd be spreading it out -- if they
12 settle for half the country, not the whole country, then
13 you'd be spreading it out over the whole country. You'd
14 have to give new notice to everybody. I mean, there are
15 all those issues.
16     And remember, as Your Honor may recall in LCDs,
17 we settled that case, including for the states,
18 $1.1 billion. The conspiracy here was of longer
19 duration. There were hundreds of meetings throughout
20 the world. Hundreds more than in LCDs. The affected
21 commerce was much larger, and the settlement was half
22 that amount and excluded three repealer states. So if
23 you include them in, you'll have to get more money from
24 somewhere, Your Honor, to --
25     SPECIAL MASTER: Okay. Got it.

Page 32

1     MR. COOPER: Can I supplement? Maybe I'm
2 saying the same thing in a different way. In order to
3 --
4     SPECIAL MASTER: Try not to.
5     MR. COOPER: In order to rule on the adequacy
6 of a settlement, you have to know what claims you're
7 settling. Here we know that the claims of over half the
8 country were valued at zero. And it seems very clear
9 from everything that's gone on, the amount of money that
10 was paid was paid for those claims which Mr. Alioto felt
11 had merit. Nothing was paid for those claims which had
12 no merit in Mr. Alioto's view.
13     So if you're now going to pay money to those
14 people, you've got to take it away under that procedure
15 from the claimants whose claims were being settled for a
16 fixed amount of money, which reduces it by $1 or more,
17 reduces the amount available.
18     There's been however many notices that have
19 gone out that have told people if you're not in those 21
20 jurisdictions, you're not going to get paid. You'd have
21 to be renoticing, seeing what objections there would be.
22     Now it might be possible to say that amount of
23 money takes care of the claims in 22 jurisdictions and
24 get rid of the national class and leave those
25 non-repealer people on to their own devices, to have a

Page 33

1 different counsel represent them, attempt to get class
2 certification or whatever went on; to litigate the
3 issues of whether they have claims, or, as Mr. Alioto
4 says, they have no claim.
5     But to try to separate them here without
6 knowing how much money that's going to go to those
7 people, whether that now leaves an adequate amount for
8 the non-repealer states and for the repealer states --
9 you know, are they going to get one dollar, are they
10 going to get 50 percent of the money. You'd need to
11 know all of those issues to be able to evaluate the
12 adequacy of the settlement. So what claims are being
13 settled is the first question.
14     SPECIAL MASTER: Okay. I don't want to spend
15 any more time on this. Anyone have something new that
16 hasn't been said before?
17     Ms. Moore.
18     MS. MOORE: Your Honor, in order to approve the
19 settlement, there's certain foundational evidence that
20 needs to be in the record, and one of the things that
21 needs to be is that everything is valued, and not all
22 the claims are valued.
23     There was nothing in the record that any of
24 these other claims were valued, any of these states that
25 were left out or any of these non-repealer or repealer

9 (Pages 30 - 33)

Page 34

1 states that were left out.  There was no evidence that
2 they were considered and valued.  Not until later on in
3 the reply after it was attacked did they say oh, there
4 was no value.
5        So essentially they didn't consider them at
6 all, which makes the $576 million completely
7 inappropriate.  And so you can't approve the settlement
8 at that amount when all of these people being released
9 were never even looked at and valued.
10       SPECIAL MASTER:  Okay.
11       MR. SCARPULLA:  Excuse me.  There's one other
12 thing I think that Judge Tigar raised in the directs
13 maybe about evidence of what each class member would get
14 if there had been a successful trial as opposed to how
15 much they get in this settlement.  And I don't recall
16 seeing that in the record yet.
17       MS. MOORE:  No, it has not come up in the
18 record, and we've asked multiple times.  In LCD we knew
19 exactly what each panel -- the damages were for each
20 panel, for each claimant.  So knowing the claims rate
21 and knowing the value of each is vitally important to
22 valuing the settlement.  And you can't approve the
23 settlement without that information.  And to this day,
24 it's still not in the record.  But we know that when
25 Janet Netz made her expert report and valued the whole

Page 35

1 case at $2.7 billion, there must have been an individual
2 damage analysis, which I know there was in LCD.
3        SPECIAL MASTER:  Did you want to respond to
4 that?
5        MR. ALIOTO:  Well, no.  We have certain issues
6 that we came prepared to address, and one of the things
7 that has not been addressed by objectors is the amount
8 of the settlement and the comparability to LCD and did
9 we get enough money.  I just want to note for the record
10 we -- we have enough issues to discuss here today.
11 That's something that has not been raised.
12       SPECIAL MASTER:  But the point --
13       MS. MOORE:  Well, it was raised.
14       SPECIAL MASTER:  Wait, wait.  The point that's
15 being made by Ms. Moore is you can't just -- the court
16 can't just say:  Okay, 576 million, that's a lot of
17 money, that's okay.
18       You have to know or have some sense of the
19 range of the value of each individual class member's
20 claim.  And they may be different values depending on
21 how they're situated and what they're going to get in
22 the settlement so that you can compare what a class
23 member would have gotten if they went to trial with what
24 they're getting in the settlement.  And Ms. Moore says
25 there's nothing to that effect in the record.

Page 36

1        MR. ALIOTO:  I'm pretty sure there is, Your
2 Honor.  And I know this for a fact, that we did that
3 analysis.  Our expert Janet Netz did that analysis.
4 What was the overcharge on tubes and monitors?  It was a
5 higher overcharge.  What was the overcharge on tubes in
6 small televisions?  What was the overcharge on tubes in
7 large televisions?  All of that analysis was done.
8        SPECIAL MASTER:  And is in her report --
9        MR. ALIOTO:  Yes.
10       SPECIAL MASTER:  -- which is in the record.
11       MR. ALIOTO:  Is in the record.  And it may have
12 also been cited when we filed our motion for preliminary
13 approval -- I'm going back a little ways here, but in
14 the northern district there is a rule that as part of a
15 preliminary approval motion, you have to make a -- as
16 part of your prove-up you have to show the damages and
17 the range of damages, and I'm quite sure that that
18 showing was made in our original papers.
19       SPECIAL MASTER:  All right.
20       MS. MOORE:  Your Honor --
21       MR. ALIOTO:  That's our response to that.
22       MS. MOORE:  It wasn't -- it's the panel --
23       SPECIAL MASTER:  You know, we've got to get on
24 with the meat of the objections here.
25       MS. MOORE:  Actually --

Page 37

1        SPECIAL MASTER:  I don't want to go on much
2 longer on this.
3        MS. MOORE:  May I say one thing?
4        SPECIAL MASTER:  Yes.
5        MS. MOORE:  It is important to this meet the
6 settlement.  You need the dollar amount per panel.  So
7 we know that for a panel it was $65 in damages in LCD.
8 We don't have that number in this case, so we can't
9 evaluate it.
10       MR. COOPER:  I would just request that Mr.
11 Alioto -- we're not aware of where Ms. Netz's report,
12 damage study report for trial is in the record.  So I'm
13 not certain what he's referring to.
14       SPECIAL MASTER:  Was her -- wait, please.
15       Was her deposition taken?
16       MR. ALIOTO:  Yes.
17       MR. COOPER:  And filed -- they're not filed.
18 They're not in the clerk's office.  They weren't filed.
19 They're not available to generally -- generally to
20 people.  We never saw them.  We're lawyers in the case,
21 and we weren't allowed to see them.
22       SPECIAL MASTER:  Was her report not made an
23 exhibit to her deposition?
24       MR. ALIOTO:  It was -- it was an exhibit to her
25 deposition.

10 (Pages 34 - 37)

Page 38

1 MR. COOPER: The deposition was confidential.
2 MR. ALIOTO: But they're counsel of record.
3 They've signed the protective order.
4 SPECIAL MASTER: All right.
5 MS. CAPURRO: It's also in the record. It was
6 filed as part of our opposition to summary judgment.
7 MR. COOPER: Not an unredacted --
8 SPECIAL MASTER: Was there a -- was there a --
9 MS. CAPURRO: And it's also referenced in --
10 SPECIAL MASTER: Was there a Daubert motion?
11 MR. ALIOTO: Yes.
12 SPECIAL MASTER: There was a Daubert motion.
13 So guess who ruled on it? And so I certainly saw her
14 report.
15 MR. ALIOTO: And when those are filed, Your
16 Honor, they're not in the court record, they're under
17 seal in the court record, but they go by separate email
18 to all of the indirect purchaser counsel because they're
19 parties to the protective order. So these folks have
20 all that information.
21 SPECIAL MASTER: Okay.
22 MR. BONSIGNORE: I just -- make -- I did not
23 get it by email at all. The information that would be
24 helpful to me in relationship to a case that I had that
25 was -- that we actually succeeded in doing what you're

Page 39

1 proposing was the claims rate. We don't have any
2 information yet on the claims rate. We don't know if
3 there's a surplus or whether people will get a cut down.
4 The excluded states, according to the terms of the
5 settlement agreement, you'd have to very carefully craft
6 language that would not cause them to waive their rights
7 to proceed in economic recovery. And I'm just going to
8 cut it there.
9 Just with a grain of salt, I approached Mr.
10 Alioto at least a dozen times before today and asked him
11 to let's talk about it. And although he's wide open to
12 the suggestion today, which is very positive, very good,
13 maybe it was something that you said, but before today,
14 he had dug in and wasn't going to change anything. So
15 this is -- you've already made progress.
16 SPECIAL MASTER: All right. So the next issue
17 really I want to talk about is the merits of the -- are
18 the merits of the objections that have been raised to
19 the failure of the allocation plan with any monetary
20 compensation to the residents or the purchasers in the
21 non-repealer states and the three omitted repealer
22 states.
23 So I really don't need all those arguments
24 repeated, but if there's someone has something eloquent
25 to say -- Ms. Kirkham, I see you're raising your hand.

Page 40

1 MS. KIRKHAM: I'll work on eloquent here and
2 brevity. Brevity perhaps more important than eloquence.
3 In the adequacy -- the adequacy of the
4 settlement with regard to the non-repealer state claims,
5 where we begin is with lead counsel's repeated
6 statements that they value the claims as zero. So I
7 think we can agree that that's been established as a
8 fact.
9 We know that, for example, the 500 plus million
10 dollar settlement is compared in their papers to Dr.
11 Netz's $2.8 billion damage number. That number is for
12 the 21 damage class states. So those are the purchases
13 that occurred in those states. We don't know -- we
14 could compute it if we actually had a per panel and some
15 information about sales of what it is in the other
16 states, but I don't believe Dr. Netz ever did that.
17 So we have, so we're beginning with the idea
18 that what we have, what you have before you and the real
19 fundamental question you have before you really is are
20 those claims valueless. Are they meritless. And are
21 they so demonstratively meritless that without affording
22 the possessors of those claims, the due process under
23 Rules 12 or 56, you can say that they should be released
24 here. They should be dismissed with prejudice because
25 the effect of approving this settlement is exactly the

Page 41

1 same effect as a ruling on summary judgment on those
2 claims or a ruling on Rule 12 on those claims.
3 So that's essentially what you're doing, but
4 not in -- not affording them the due process of those
5 procedures. So the claims have to be pretty
6 fundamentally meritless at the courthouse door for that
7 determination not to be made.
8 Now I'm not saying that determination is
9 impossible in a class action settlement, but generally
10 where you find judges and special masters being willing
11 to do that is where you have a situation in which you
12 have a factual disparity between two purported class
13 members so that you can look at one and you say you
14 bought the price fixed product. And in a period that we
15 have evidence that the price was artificially inflated
16 and therefore we say -- I can look at you and say -- for
17 settlement purposes certainly I can say you were
18 injured.
19 And you over here, Mr. Jones, you bought the
20 product, or if it's a securities case, you traded the
21 security during the period that the evidence suggests
22 that the price was in fact competitive. Maybe the
23 conspiracy was still going on, but it fell apart during
24 that period. There's some evidence in the case, some
25 way the person purchased, some evidence that those

11 (Pages 38 - 41)

Page 42

1 purchasers did not damage the individual.
2        Now we come to the situation that we have
3 here -- and I really think that if you read the Sullivan
4 case, you can see that the third circuit came to
5 grips with this idea.  Is what we have here is a
6 situation in which you have two class members for whom
7 you can say they bought the same product under the same
8 circumstances, inflated the same way.  The only
9 difference is that they're standing on opposite sides of
10 a geographic boundary called a state line.  And on the
11 one side of the state line it's we're home free, and on
12 the other side of the state line you say you, because of
13 that, despite your factual claim, you can't possibly
14 recover under the factual claim.
15        We don't have that situation here.  Illinois
16 Brick doesn't do that.  Illinois Brick is a rule of
17 evidence fundamentally.  The Supreme Court was faced
18 with the choice it felt of overruling Hanover Shoe and
19 allowing defendants to put in evidence of passthrough or
20 enunciating a rule that said what's sauce for the goose
21 is sauce for the gander, and the plaintiffs can't put
22 that evidence into.
23        So if you are a plaintiff and you need evidence
24 of passthrough in order to establish your claim, you're
25 probably out of luck under Illinois Brick.  You still

Page 43

1 actually have the right to come into court and attempt
2 to show why it doesn't apply to you.  It is not a rule
3 of standing.  It does not bar people at the courthouse
4 door, nor is it the indirect purchaser hostility act.
5        SPECIAL MASTER:  But why wouldn't it apply --
6 you know, assuming it's sound law and the Supreme Court
7 doesn't change its mind, why wouldn't it apply to all
8 the class members in these states?  What would be a
9 ground for someone saying I am --
10        MS. KIRKHAM:  It would --
11        SPECIAL MASTER:  -- I am entitled to make a
12 claim as an exception to Illinois Brick?
13        MS. KIRKHAM:  We're not -- we're not suggesting
14 exceptions to Illinois Brick.  We're not suggesting
15 claims and exceptions to Illinois Brick.  We're just
16 suggesting claims that fall outside of Illinois Brick.
17        SPECIAL MASTER:  All right.  Such as?
18        MS. KIRKHAM:  Okay.  Such as the claims for
19 equitable monetary relief.  They do not require proof of
20 pass on, and as soon as you have a claim that does not
21 require proof of pass on, Illinois Brick becomes a case
22 that sits over here and applies to other people.
23        What that is is a situation in which there is
24 the inherent power of the federal court to award in a
25 situation in which a person proves that the factual

Page 44

1 predicate of recovery, any recovery which appears in law
2 or in equity.  The Clayton Act specifically talks about
3 affording a recovery that is reversing, undoing the
4 overcharges the defendants collected.  There is
5 nothing -- the Ninth Circuit has never suggested -- in
6 fact, the Ninth Circuit has explicitly endorsed that
7 that is one of the policies of the antitrust laws.
8        The antitrust laws also -- there are tomes that
9 talk about the benefits that the antitrust laws convey
10 on society as a whole and the benefits of private
11 enforcement of those laws convey on society as a whole.
12        So there's not been probably a better situation
13 where someone is set up to make an equitable claim for
14 monetary relief than someone who is acting as a, quote,
15 private attorneys general and coming in and vindicating
16 a critical tenet of American not only jurisprudence, but
17 indeed of American economic theory and practice, and
18 that is competition.
19        SPECIAL MASTER:  Can I just interrupt a minute?
20 Am I correct that the state of the law on recovery of
21 equitable monetary relief in non-repealer states is
22 number one, everyone agrees there is no federal right to
23 such damage?
24        MS. KIRKHAM:  No, there is.
25        SPECIAL MASTER:  You're saying there is under

Page 45

1 the --
2        MS. KIRKHAM:  We're talking -- I'm talking
3 about someone who comes into federal court and alleges a
4 violation of the Sherman Act.
5        SPECIAL MASTER:  Okay.
6        MS. KIRKHAM:  Yes.
7        SPECIAL MASTER:  And then there are also -- you
8 maintain there would be cognizable state law claims for
9 equitable monetary relief in these non-repealer states,
10 yes?
11        MS. KIRKHAM:  Umm --
12        SPECIAL MASTER:  No?
13        MS. KIRKHAM:  Probably not in the non-repealer
14 states, only because a lot of their state courts have
15 said that -- well, let's put it this way:  There
16 wouldn't be unjust enrichment.  Whether there would be
17 the same kind of equitable monetary relief granted
18 simply for proof of the violation of the state law,
19 because the same argument about Illinois Brick that it's
20 a rule of evidence applies when it's applied in state
21 court to state law as well as when it's applied in
22 federal court to federal law.
23        But we're not talking -- there are a lot of
24 cases -- the cases that Mr. Alioto is citing about
25 unjust enrichment, we agree that they go the way they

12 (Pages 42 - 45)

**Page 46**

1  go.
2      When Illinois Brick first came down, lawyers
3  for plaintiffs tried to avoid Illinois Brick by pleading
4  unjust enrichment claims under state common law and
5  unjust enrichment, and the state court said hmm-mm,
6  we're not going to let you do that.  We're not going to
7  let you just recast an antitrust claim as an unjust
8  enrichment claim.
9      I'm not talking about going back and trying to
10  do that, to get that reversed, and I am focused and we
11  are focused on the federal recovery -- federal monetary
12  recovery that the court in KeySpan talked about and that
13  the court in LCDs, Judge Illston, talked about when she
14  first analyzed that there's a federal right to this.
15  And therefore, the state of Oregon, which was saying we
16  can do it under a state law, she then leapt over and
17  said your state law follows federal law.  I think
18  there's a federal right.  Then I think there's probably
19  a state right.  And that was her decision on that
20  subject.  That's why she talks about Oregon law.
21      But she's not -- her analysis doesn't begin
22  with Oregon law, it begins with KeySpan, it begins with
23  a federal right that arises under the antitrust laws
24  that if I prove a violation of the antitrust laws, I
25  might not be able to prove pass-on because Illinois

**Page 47**

1  Brick says I can't.  But if I prove this violation, I
2  can ask the court to give me a monetary equitable remedy
3  that is disgorgement or restitution.
4      SPECIAL MASTER:  Okay.  I can see that this
5  argument and this line of thought would be a wonderful
6  law review article, but is there any authority out there
7  that says in the federal context that there -- despite
8  Illinois Brick, we are going to allow you to pursue a
9  federal claim for equitable monetary relief?
10      MS. KIRKHAM:  There is the KeySpan case which
11  dealt with a governmental entity, and there is Judge
12  Illston's decision in LCDs.  There is judge -- the
13  adoption by Chief Judge Hamilton of Judge Renfrew's
14  report and recommendation in DRAM.  And then there are
15  the cases that we cited and the development of the law
16  this way that we cited in our brief from the antitrust
17  treatise that actually Mr. Varanini knows more about
18  than I do, since he was one of the editors or authors of
19  both.
20      SPECIAL MASTER:  And that's it?
21      MS. KIRKHAM:  And so far that's it.
22      SPECIAL MASTER:  Okay.
23      MS. KIRKHAM:  However, Your Honor, the decision
24  you're making is, is that enough that you can say all of
25  that goes away and zero is the right number, or does

**Page 48**

1  that raise the question that the claim is valuable?
2      SPECIAL MASTER:  You're saying, I guess, that
3  there is a legitimate split of authority on this issue,
4  and, therefore, if there's a split of authority, you
5  can't say the claims are worth zero?
6      MS. KIRKHAM:  Actually, there's nothing against
7  it.  It's just not been litigated.  The authority is
8  actually all on the side of the claim.  The cases that
9  are cited against it in the briefs are not considering
10  it.
11      SPECIAL MASTER:  They're dealing with state
12  law.
13      MS. KIRKHAM:  They're dealing with state law
14  unjust enrichment claims or there -- there is the Ninth
15  Circuit case that wouldn't give the certain kind of
16  relief in the motor vehicles case that got cited down
17  the line for people saying so if you can't give federal
18  disgorgement, but when you read the motor vehicles case,
19  that's not what the Ninth Circuit was saying.  On -- it
20  wasn't considering this kind of question, and it wasn't
21  saying you can never get money in an equitable situation
22  if you're an antitrust plaintiff.
23      SPECIAL MASTER:  Okay.  Before I leave you and
24  hear from other people, you cited Judge Renfrew's report
25  and recommendation and you cited like page 300 and

**Page 49**

1  something.  And the report and recommendation that I
2  have from Judge Renfrew only goes up to page 200.
3      Are you referring to some other report.
4      MS. KIRKHAM:  Yes, the Lexis -- I'm citing to
5  the pages of the -- of Judge Hamilton's order adopting
6  it, which attached the whole thing.  So the paging is
7  off.  If you've got one from him, you have what he filed
8  in federal court, so you'd have what it looks like in
9  the docket.  What I was citing to is a brief.  I'm sorry
10  for the confusion -- was a Lexis.
11      SPECIAL MASTER:  Okay.
12      MS. KIRKHAM:  So everyone would be able to have
13  it because you'd have to otherwise go to the DRAM
14  docket.
15      SPECIAL MASTER:  Okay.  Just for everybody's
16  information, I have access to Westlaw.  I do not have
17  easy access to Lexis.  Just --
18      MS. KIRKHAM:  We'll send -- Your Honor --
19      SPECIAL MASTER:  -- limited resources at JAMS.
20      MS. KIRKHAM:  -- I will submit a letter that
21  redoes the citations to the -- I don't know if it's
22  still on Westlaw, but to the docket version, the DRAM
23  docket version of the report and recommendation.
24      SPECIAL MASTER:  All right.  Thank you.
25      Now, on this issue, does anyone else have

13 (Pages 46 - 49)