Mario N. Alioto (56433)
Joseph M. Patane (72202)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2001 Union Street
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415- 346-0679
Email: malioto@tatp.com
jpatane@tatp.com
laurenrussell@tatp.com

*Class Counsel for the*
*Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MASTER FILE NO. 4:07-cv-5944-JST<br>Case No.: 4:13-cv-03234-JST |
| | MDL NO. 1917 |
| This Document Relates to:<br><br>INDIRECT PURCHASER ACTIONS FOR THE 22 STATES | **AMENDED DECLARATION OF JOSEPH M. FISHER RE: NOTICE, CLAIMS PROCESSING AND DISTRIBUTION OF SETTLEMENT FUNDS**<br><br>Hearing Date:<br>Time:<br>Courtroom:<br>Judge: |

1    I, Joseph M. Fisher, declare:

2                                **INTRODUCTION**

3    1.    <u>Identification</u>. I am the president of The Notice Company, Inc., a Massachusetts

4    corporation with offices at 94 Station Street, Hingham, MA 02043 ("The Notice Company" or

5    "Settlement Administrator"). The Notice Company is principally engaged in the administration of

6    class action settlements and lawsuits pending in courts around the United States, including the

7    dissemination of notice to class members, administering the claims process, and distributing the

8    proceeds of the litigation to the class.  I have over 15 years of experience assisting attorneys with class

9    action notices and claims administration.  I am also a member in good standing of the bars of the

10   Commonwealth of Massachusetts, the District of Columbia, and the Commonwealth of Virginia.  I

11   am over 21 years of age and not a party to this action.  I have personal knowledge of the facts set forth

12   herein and, if called as a witness, could and would testify thereto under oath.

13   2.    <u>Amendment</u>. On June 23, 2022, I prepared a declaration reporting on: (a) a summary

14   of Notice Procedures; (b) The Notice Company's processing and validating the claims received; (c)

15   calculating the total qualifying indirect purchases of "CRT Products" by "End Users" and "Resellers";

16   and (d) providing the methodology for calculating the *pro rata* share of the Net Settlement Funds to

17   be distributed to approved claimants. ECF No. 6025-2. After June 23, 2022, The Notice Company (i)

18   received and updated purchase numbers for certain claims that had previously been accepted and (ii)

19   received requests on behalf of certain claimants that their claims be withdrawn. The Notice Company

20   has reviewed its claims data and made the appropriate modifications to the claims exhibits attached

21   hereto (<u>Exhibits D and E</u>). I submit this Amended Declaration with the updated data.

22   3.    "CRT Products" refers to products containing Cathode Ray Tubes ("CRTs").  "End

23   Users" refers to persons or entities who purchased CRT Products for their own use and not for resale.

24   "Resellers" refers to persons or entities who purchased CRT Products for the purpose of resale. This

25   Declaration is limited to claims by indirect purchasers and excludes claims for purchases made directly

26   from any of the defendant manufacturers. "Class Member" refers to persons or entities who qualify as

27

28

members of any of the certified and approved Settlements for indirect purchasers of CRT Products as described below.

**SUMMARY OF NOTICE PROCEDURES**

4.      I previously reported on implementation of notice programs for indirect purchasers of CRTs in my declarations filed with the Court as follows:

* ECF No. 1063: Declaration of Joseph M. Fisher Reporting on the Class Notice Program for Settlement with Defendant Chunghwa Picture Tubes, Ltd., filed March 1, 2012;

* ECF No. 2511: Declaration of Joseph M. Fisher Reporting on the Class Notice Program for the Certified Class and the Settlement with LG Defendants, filed March 28, 2014;

* ECF No. 3863: Declaration of Joseph M. Fisher Re Notice Program in Support of Motion for Preliminary Approval of Class Action Settlements with the Philips, Panasonic, Hitachi, Toshiba and Samsung SDI Defendants, filed May 29, 2015;

* ECF No. 4371: Declaration of Joseph M. Fisher Reporting on Class Notice (Nationwide Class and Statewide Damages Classes), filed February 4, 2016;

* ECF No. 4372: Declaration of Joseph M. Fisher Re Objections to Notice, filed February 4, 2016;

* ECF No. 4488: Declaration of Joseph M. Fisher Re Notice of Chunghwa Plan of Distribution, filed March 15, 2016;

* ECF No. 4953-1: Declaration of Joseph M. Fisher Reporting on Chunghwa Notice, filed October 11, 2016;

* ECF No. 5587-2: Declaration of Joseph M. Fisher Re Amendments To The Settlements, filed September 16, 2019; and

* ECF No. 5758-1: Declaration of Joseph M. Fisher Re Implementation of Notice Plan, filed June 12, 2020;

5.      The Notice Company implemented notice programs for the indirect purchaser settlements as follows:

2

DECLARATION OF JOSEPH M. FISHER RE: NOTICE, CLAIMS PROCESSING AND DISTRIBUTION OF
SETTLEMENT FUNDS – Master File No. 4:07-cv-5944-JST

a.      Chunghwa Settlement: First Notice Program. Dissemination of notice relating to the Chunghwa Settlement Agreement ("Chunghwa Notice 1") began in October 2011, affording Class Members the opportunity to object to or request exclusion from the Settlement. Print notices appeared in *Parade Magazine*, *USA Weekend* magazine, *USA Today*, *The Sunday New York Times* and *El Nueva Dia*; a press release was distributed through *PR Newswire*, which was picked up and posted/published by 225 news organizations and media outlets, such as *Reuters* and *Yahoo Finance*; notices were posted online in both English and Spanish; and notice was sent by first-class mail to every Fortune 500 Company for each of the class years (1995 to 2007), to the largest private colleges, universities and private secondary schools in the United States, to major resellers of consumer electronic products, to the 50 largest hospitals in the United States, and to 57 attorneys general.

b.      Certified Class and LG Settlement Notice Program.  Dissemination of notice relating to the "Litigated Class" of indirect, end-user purchasers of CRTs and to the LG Settlement Class ("LG Notice") began in January 2014, affording Class Members the opportunity to object to or request exclusion from the Settlement. Print notices appeared in *The Sunday Parade Magazine*, *USA Weekend* magazine, *USA Today*, *New York Times* and *El Nueva Dia*; a press release was distributed through *PR Newswire*, which was picked up and posted/published by 239 news organizations and media outlets, such as *Reuters* and *Yahoo Finance*; notices were posted online in both English and Spanish; and notice was sent by first-class mail to every Fortune 500 Company for each of the class years (1995 to 2007), to the largest private colleges, universities and private secondary schools in the United States, to major resellers of consumer electronic products, to the 50 largest hospitals in the United States, and to 57 attorneys general.

c.      Notice of Five New Settlements, Including Notice of the Claims Process. Dissemination of notice relating to the "Nationwide Class" and "Statewide Damages Classes" of indirect, end-user purchasers of CRTs began in July 2015, affording Class Members the opportunity to submit claims and to object to or request exclusion from the five Settlements.

Print notices appeared in *The Sunday Parade Magazine*, *American Profile* Sunday magazine, *The Wall Street Journal*, *USA Today*, *The Sunday New York Times*, *San Francisco Chronicle*, *El Nueva Dia*, *People* magazine, *Time* magazine, *Sports Illustrated* and *TV Guide*; press releases in English and Spanish were distributed through *PR Newswire* and were picked up and posted/published by 284 news organizations and media outlets in the United States and at least 15 other countries; notices were posted online in both English and Spanish at [www.CRTclaims.com](www.CRTclaims.com) resulting in approximately 2 million page views; and notice was disseminated via paid digital media through *TVinsider.com*, *Parade.com*, *Facebook.com*, *Google Ads*, *Google Search*, and *Yahoo! Bing Search*. The digital and print media campaign reached an estimated 83% of the target demographic with an estimated frequency of 3.1. In addition to the digital and print media program, notice was sent by first-class mail to every Fortune 500 Company for each of the class years (1995 to 2007), to the largest private colleges, universities and private secondary schools in the United States, to major resellers of consumer electronic products and to the 50 largest hospitals in the United States. Further, more than 10.5 million notices were delivered by email, including emails delivered to more than 6.3 million consumers and to more than 1.4 million small businesses who were selected based on demographic characteristics consistent with the Class definition. All notices identified the Court-approved deadline of December 7, 2015, for the submission of claims.

   d. <u>Chunghwa Settlement: Second Notice Program</u>. Dissemination of notice relating to the Chunghwa Settlement Agreement ("Chunghwa Notice 2") began in July 2016, to notify Resellers of the distribution of Chunghwa funds, to afford Resellers the opportunity to object to the plan of distribution, to allow Resellers to submit claims for payment from the Chunghwa settlement, to inform end-user claimants of the distribution of Chunghwa funds, and to afford such End Users the opportunity to object to the plan of distribution. Notice was mailed to all Resellers qualifying under the Chunghwa Settlement as identified utilizing the North American Industry Classification System (NAICS); notice was sent by email to Resellers identified by the Consumer Technology Publishing Group (CTPG); and notices were

posted online in both English and Spanish at www.CRTclaims.com. Additional notice was provided through a digital program of paid website banner ads targeted to Resellers, print notice published in the national edition of *The Sunday New York Times*, and nationwide press releases, in both English and Spanish, distributed through *PR Newswire* that were picked up and posted/published by 360 news organizations. All end-user claimants were sent notice by email or, in the absence of a valid email address, by regular mail. All notices identified the Court-approved deadline of November 29, 2016, for the submission of claims by Resellers.

        e.      Notice of Amendments to the Settlements. Dissemination of notice relating to the Amendments to the Settlements[1] began in March 2020 to notify all claimants of the amendments and reduced fee award, to afford them an opportunity to submit objections or comments, and to inform them of the date of the Fairness Hearing. Notice was provided by email, or by regular mail in the absence of a valid email address, to all claimants or their designated representatives, to all persons who previously objected or requested exclusion from the Settlements, or who otherwise had contacted The Notice Company with a request that they be notified of developments in the case. The Notice List consisted of 94,321 entries. Notices in both English and Spanish were posted at the Settlement Website, www.CRTclaims.com.

6.    As part of each of the notice programs described above, The Notice Company established and maintained a dedicated website, toll-free phone line, and Post Office address where potential Class Members could access or request additional documents and information relating to the Settlements, including copies of the notices, claim forms, and other Court documents.

## REQUESTS FOR EXCLUSION

7.    Class Members were afforded the opportunity to request exclusion (opt out) from each of the settlements. Exclusion from one settlement did not preclude Class Members from participating in other settlements. For Class Member who were both End Users and Resellers, exclusion in one capacity did not preclude participation in the other capacity.  The Notice Company received a total of

---

[1] Amendments to the Settlements refers to the amendments that reduced the gross value of the Settlements by $29,000,000 accompanied by a corresponding reduction in attorneys' fees.

DECLARATION OF JOSEPH M. FISHER RE: NOTICE, CLAIMS PROCESSING AND DISTRIBUTION OF
SETTLEMENT FUNDS – Master File No. 4:07-cv-5944-JST

14 requests for exclusion from 4 individuals and 10 companies. The Court granted all exclusion requests. Attached hereto as Exhibit A is a list of all excluded persons and entities along with detail identifying to which settlement each exclusion applies.

## SUMMARY OF THE CLAIMS PROCESS

8.      Eligible Class Members were urged to submit a claim online at www.CRTclaims.com. The "Claim Form" could be found and completed or downloaded at www.CRTclaims.com, or Class Members could obtain a copy by calling the Settlement Administrator toll free at 1-800-649-0963 or by texting "CRTclaims" to 97000. The Claim Form, which was available in both English and Spanish, requested Class Members to verify their eligibility under the Class Settlements, to provide purchase data and contact information, and included a declaration of accuracy to be signed under penalty of perjury.  ECF Nos. 4371-5 and 4371-6. Online claims were required to be submitted on or before December 7, 2015. Claim Forms submitted by mail were required to be postmarked by December 7, 2015. The Court granted a request by the California Attorney General to extend the deadline for natural persons residing in California to submit claims to June 30, 2016. ECF No. 4339. "Timely Claims" for End Users means those claims submitted in accordance with the respective deadlines of December 7, 2015 and June 30, 2016. For Resellers, "Timely Claims" means claims submitted on or before November 29, 2016. Claims submitted after the Court-ordered deadlines are "Late Claims."

9.      Notices to Class Members clearly explained that CRT Products were being categorized as Standard CRT Televisions (screen size of less than 30 inches), Large CRT Televisions (screen size of 30 inches or larger), or CRT Computer Monitors. *See*, for example, the Detailed Notice disseminated in 2015 (ECF No. 4371-1 at p. 8, ¶ 9). Based on data obtained during the course of the litigation, the plan for distribution assigned weights to different types of CRT Products based on the overcharge evidence for each. Weights were assigned as follows: Claims for purchases of Standard CRT Televisions were weighted as 1; Claims for purchases of Large CRT Televisions were weighted as 4.3; and Claims for purchases of CRT Computer Monitors were weighted as 3. The Court approved these weightings, and the plans of allocation in which they were included, in its Final Approval Orders entered July 7, 2016 (ECF No. 4712), at pp. 26-29 and p. 37 ¶ 8, and November 11, 2016 (ECF No.

6

DECLARATION OF JOSEPH M. FISHER RE: NOTICE, CLAIMS PROCESSING AND DISTRIBUTION OF
SETTLEMENT FUNDS – Master File No. 4:07-cv-5944-JST

5040), and reaffirmed that approval in its Final Approval Order as to the amended settlements, entered July 13, 2020 (ECF No. 5786) at p. 20. "CRT Weighted Units" refers to the number of CRT Products calculated using the weights as described in this paragraph.

10.     The Settlement Administrator received a total of 156,467 claims through May 5, 2020, including more than 55,000 claims that were submitted as paper claims. End Users submitted 145,191 Timely Claims with CRT Weighted Units claimed totaling 399,331,586,327. Another 5,269 Timely Claims were submitted by Resellers[2] with CRT Weighted Units claimed totaling 1,267,379,393. As discussed below, the Settlement Administrator conducted an extensive review and audit process to verify these claims, resulting in the acceptance (a) for End Users: 133,449 Timely Claims for 22,683,423 CRT Products representing 65,208,303 CRT Weighted Units and (b) for Resellers: 4,912 Timely Claims for 65,565,186 CRT Products representing 188,050,280 CRT Weighted Units.

11.     Subsequent to the Court-approved deadlines for the submission of Timely Claims, the Settlement Administrator continued to receive claim submissions both electronically and by mail ("Late Claims" as defined above at ¶ 8). The Settlement Administrator continued to process and review Late Claims that were submitted through May 5, 2020 (the "Cutoff Date"). For End Users, the Settlement Administrator received 4,901 Late Claims submitted by the Cutoff Date amounting to 43,373,930 CRT Weighted Units. For Resellers, the Settlement Administrator received 1,113 Late Claims[3] submitted by the Cutoff Date amounting to 10,713,455 CRT Weighted Units. After review, the Settlement Administrator found acceptable (a) for End Users: 3,913 Late Claims for 4,858,656 CRT Products representing 13,702,049 CRT Weighted Units and (b) for Resellers: 1,099 Late Claims for 2,169,934 CRT Products representing 6,185,480 CRT Weighted Units.

---

[2] There were 6 Timely Claims from End Users where a portion of the claimed CRT Products had been purchased for resale. The Settlement Administrator allocated the relevant portions of those claims to the appropriate End User and Reseller categories. Thus, these 6 submitted claims resulted in 6 End User claims and 6 Reseller claims.

[3] There was 1 Late Claim from End Users where a portion of the claimed CRT Products had been purchased for resale. The Settlement Administrator allocated the relevant portions of this claim to the appropriate End User and Reseller categories. Thus, this 1 submitted claim resulted in 1 End User claim and 1 Reseller claim.

7

DECLARATION OF JOSEPH M. FISHER RE: NOTICE, CLAIMS PROCESSING AND DISTRIBUTION OF SETTLEMENT FUNDS – Master File No. 4:07-cv-5944-JST

12.     The Settlement Administrator reviewed each Claim form received by the Cutoff Date for compliance with the Settlements' requirements. Some claims were found to be deficient or incomplete. Among the various types of deficiencies found were the following:

- claims that were clearly outliers representing numbers that appear to be anomalies or that materially deviate from an expected range, for example, an individual claiming to have purchased billions of CRT Products ("Outlier Claims");

- claims submitted by a third-party representative or agent on behalf of a claimant ("Claims Aggregator") who failed to provide purchase quantities for CRT Products on the Claim Form or only partially completed this information so that the Claim Form showed "N/A" or "TBD" or "0" or was blank or some combination thereof (referred to as "Placeholder Claims");

- claimants who directly submitted (not through a Claims Aggregator) incomplete claim forms, including missing name and/or contact information, missing claim eligibility information, missing purchase quantities, or failure to sign the Proof of Claim form;

- claims for ineligible purchases, such as purchases of CRT Products directly from any of the Defendants, purchases of non-CRT Products, purchases of Sony-branded products, purchases made outside of the Class Period, purchases made outside of the United States, purchases made in a state that is not one of the 22 eligible states under the Settlements, or multi-state purchases where central purchasing of all CRT Products was asserted to have occurred in one of the eligible states;

- claims submitted by a Claims Aggregator on behalf of a claimant without an agreement demonstrating the authority of the Claims Aggregator to act as the claimant's agent or representative;

- duplicate claims submitted by the same corporate claimant, for example, a parent corporation submitting a claim that was inclusive of the CRT purchases of a subsidiary, where the subsidiary had already submitted its own claim for those purchases;

- duplicate claims submitted by the same individuals, for example, the same individuals submitting multiple claims with slight variations in their contact information, or multiple claims from persons residing at the same address that appeared to represent duplicate purchases of CRT Products;

- "Competing Claims" submitted by Claims Aggregators, where two Claims Aggregators each submitted a claim on behalf of the same claimant;

- inflated claims where claimants asserted that all CRT televisions purchased were Large rather than Standard sized (for which the overcharge and assigned CRT Weighted Units were significantly higher) or that CRT Products were replaced at twice the industry average;

13.    When an Outlier Claim was detected, the Settlement Administrator contacted the claimant and requested verification of the claim. In no instance was adequate verification or documentation received that could substantiate the extraordinary number of units claimed. The Settlement Administrator denied 25 End User Outlier Claims as unsubstantiated claims, resulting in the removal of 398,813,815,013 CRT Weighted Units. The Settlement Administrator denied 6 Reseller Outlier Claims as unsubstantiated claims, resulting in the removal of 843,588,656 CRT Weighted Units. All of these denied claimants were sent notice of the denial. After removal of the Outlier Claims, there were 150,067 claims by End Users for 142,115,475 CRT Products representing 561,145,244 CRT Weighted Units, and 6,376 claims by Resellers for 143,701,079 CRT Products representing 434,504,192 CRT Weighted Units.

14.    When Placeholder Claims submitted by Claims Aggregators were identified, the Settlement Administrator contacted the Claims Aggregator to request that the missing claims data be provided. If the Claims Aggregator did not provide the missing numbers of CRT Units by the Cutoff Date, the Settlement Administrator informed the Claims Aggregator that the claim would be denied.

15.    When the Settlement Administrator identified ineligible purchases in a claim submission, it contacted the claimant or its authorized representative, identified the issue and provided an opportunity for the claim to be corrected. In some cases, when data was available that would allow

DECLARATION OF JOSEPH M. FISHER RE: NOTICE, CLAIMS PROCESSING AND DISTRIBUTION OF
SETTLEMENT FUNDS – Master File No. 4:07-cv-5944-JST

the Settlement Administrator to correct the problem (for example, a portion of the CRT purchases identified as being made in an ineligible state), the Settlement Administrator would inform the claimant of a proposed adjustment to the submitted claim that would be applied in the absence of any further response from the claimant.

16.     When the Settlement Administrator identified duplicate claims, it issued notices of duplication with specific instructions and deadlines to resolve the duplicate issue. Examples of duplicate claims included exact matches between two claims, near-exact matches (such as two entities at the exact same address with slight variations in the name), overlapping claims within a household, or a parent-subsidiary duplicate. The Settlement Administrator informed claimants or their authorized representatives how the duplicate issue would be resolved if sufficient responses were not received. In the event that a set of duplicate claims were all submitted on the same date, the Settlement Administrator selected one claim and informed all the affected claimants of this selection. In the event that a set of duplicate claims were submitted on different dates, the Settlement Administrator  applied the following "Priority Rule": More recent submissions would be treated as an update to prior submissions and would be utilized, with one exception; if the more recent submission was a Late Claim, then the Settlement Administrator would utilize the last-filed Timely Claim. In all instances the affected claimants were afforded an opportunity to request a different approach for resolving their duplicate claim submissions.

17.     When the Settlement Administrator identified individual claims as potentially duplicative (for example, multiple claims submitted from a single mailing address or from a single IP address, excluding claims submitted by Claims Aggregators), the Settlement Administrator sent a Notice of Deficiency which included a request for supporting documentation. Where no response was provided, duplicative claims were rejected without further outreach or reduced to a minimum value of $25 when the Settlement Administrator determined that the claimant had a reasonable basis for asserting the purchase of at least one CRT Product. When responses were provided, the Settlement Administrator reviewed the responses and provided a determination.

18.    When the Settlement Administrator identified Competing Claims submitted by two Claims Aggregators, it informed the respective Claims Aggregators of the duplication and requested that they resolve the overlap among themselves and with the claimant. An agreement signed by both Claims Aggregators, or a letter of direction signed by the claimant, or the withdrawal by one of the Claims Aggregators of its competing claim submission, was sufficient to resolve the Competing Claims. If no resolution was received from the Claim Aggregators or the claimant, the Settlement Administrator implemented the Priority Rule identified above and informed the Claims Aggregators of its determination. As of the date hereof, all identified Completing Claims have been determined as described in this paragraph.

19.    When the Settlement Administrator identified inflated claims, claims from ineligible states, or claims based on assertions of company purchases made from a central office in one of the 22 eligible states, the Settlement Administrator was required to investigate and procure data regarding the types and frequency of CRT Product purchases by certain types of business during the Class Period, or investigate whether the claimant did, in fact, purchase their CRT Products from a central office located in one of the 22 States, which required numerous communications with the claimant or its representative to substantiate their claims.

20.    When the Settlement Administrator identified other deficiencies, it sent a "Notice of Deficiency" to claimants or their representatives and provided them with an opportunity to correct the incomplete or deficient nature of their claims. When no response was provided, the Settlement Administrator rejected the deficient claim and sent notice of such rejection or, when the Settlement Administrator determined that the claimant had a good-faith basis for asserting the purchase of at least one CRT Product, it reduced the claim to the minimum value of $25. When the claimant or its representative responded to a Notice of Deficiency, the Settlement Administrator reviewed the response and, if the response was adequate, corrected the deficiency as requested by the claimant. If the response was not adequate, the claimant or its representative was so informed and requested promptly to update its response.

21.     The Settlement Administrator issued its notifications to claimants on a rolling basis as claims were received and as warranted by reviews.  To the extent multiple claims could be addressed in a single notice to a Claims Aggregator, the notices were consolidated. All notices regarding the rejection (in whole or in part) of a claim contained a response deadline which could vary based on specific circumstances or discussions with the claimant. To the extent a claimant requested additional time to respond or submitted a response within a reasonable time after a given deadline, the Settlement Administrator considered those responses to be timely if relevant documentation or information was provided.

## AUDIT CRITERIA AND RESULTS

22.     All claims were subject to review and/or audit by the Settlement Administrator. For claims submitted directly by Class Members, the Settlement Administrator set an audit threshold at purchases of 30 CRT Products for individual claims, 100 CRT Products for small businesses, 250 CRT Products for medium businesses, and 1,000 CRT Products for large businesses, where business size was based on the number of employees as reported by the claimant. Where business size could not be determined, the audit threshold was set at the purchase of 50 CRT Products. Claimants were selected and placed into an audit pool consisting of 2,190 entities. For claims submitted by Claims Aggregators, the Settlement Administrator began by auditing large claims, meaning the top 5% of claims submitted by each Claims Aggregator. If the Settlement Administrator found that its audits resulted in substantial reductions of claimed purchases of CRT Products for a Claims Aggregator, then other claims submitted by that Claims Aggregator were added to the audit list. The Settlement Administrator also selected additional claims for audit based on comparisons of claim submissions by comparable companies.

23.     Considering all submitted claims, including Outlier Claims, reviews and audits were performed on claims that represent over 99% of all CRT Weighted Units claimed. Excluding Outlier Claims, reviews and audits were performed on 53,589 claims that accounted for over 98% of claimed CRT Weighted Units. The audit process involved reviewing voluminous purchase data and multiple sources of documentation for numerous claims. Other claims had little or no contemporaneous

purchase records available which required vetting by other means, such as investigations of publicly available records, CRT television and computer monitor industry data, and other third-party data sources. The Settlement Administrator reviewed and evaluated the claimed CRT Weighted Units as follows: 83% were directly reviewed or audited; 9% were submitted by a Claims Aggregator whose previous audits resulted in no (zero) reduction in units claimed, leading the Settlement Administrator to treat further audits of their claims as not justified; and over 6% were submitted by Claims Aggregators that previously resolved audits for other claims in a manner that demonstrated a reasonable process for validating the claims submission process and accepting the calculations utilized.

24.     Audit notices were sent to all audited claims, providing instructions to claimants or their representatives on how to respond to the audit and the deadline for responses.  If no response was received, a second-chance audit notice was sent, providing a new deadline for response and informing the claimant that if no response was received, then claimed purchases of numerous CRT Products would be reduced to a claim for a $25 minimum payment. When the Settlement Administrator received responses with sufficient support for the originally claimed units, or for revised purchase quantities submitted by the claimant or its authorized representative, the claims were accepted or revised and the audit was closed. For those audits where questions remained after audit responses were received and more information was required, the Settlement Administrator pursued follow-up communications until the audit was resolved with the claimant. In some cases Class Counsel was involved in assisting and resolving disputed audits.

25.     Timely Claims submitted by End Users were resolved as follows:

- 145,191 Timely Claims were submitted;

- 11,096 were withdrawn or marked as duplicates;

- 25 were denied as Outlier Claims;

- 621 were rejected due to claim deficiencies (for example, direct purchaser claims or purchases made in ineligible states);

- 4,203 were accepted with an adjustment in the number of CRT Products claimed;

- 31,209 were reduced to a minimum claim value of $25;

- 98,037 were accepted with no change from the original number of CRT Products claimed;

- a total of 133,449 claims were accepted, either partially or fully based on original submissions, representing 65,208,303 CRT Weighted Units in the aggregate; and

- an estimated 12,285 claims with relatively low numbers of CRT purchases will have their payment increased to $25 from what would otherwise result from a *pro rata* distribution of funds.

26.   Late Claims Submitted by End Users as of the Cutoff Date were resolved as follows:

- 4,901 Late Claims submitted;

- 626 were withdrawn or marked as duplicates;

- 362 were rejected due to claim deficiencies;

- 523 were accepted with a reduction in CRT Products claimed;

- 236 were reduced to a minimum claim value of $25;

- 3,154 were accepted with no change from the original number of CRT Products claimed;

- a total of 3,913 Late Claims will be accepted, either partially or fully based on original submissions, representing 13,702,049 CRT Weighted Units in the aggregate; and

- an estimated 493 Late Claims with relatively low numbers of CRT Product purchases will have their payment increased to $25 from what would otherwise result from a *pro rata* distribution of funds.

27.   Timely Claims submitted by Resellers were resolved as follows:

- 5,269 Timely Claims were submitted;

- 335 were withdrawn or marked as duplicates;

- 6 were denied as outliers;

- 16 were rejected due to claim deficiencies;

- 173 were accepted with a reduction in CRT Products claimed;

- 7 were reduced to a minimum claim value of $25;

- 4,732 were accepted with no change from the original number of CRT Products claimed;

- a total of 4,912 claims were accepted, either partially or fully based on original submissions, representing 194,235,760 CRT Weighted Units in the aggregate; and

- an estimated 4,471 claims with relatively low numbers of CRT Product purchases will have their payment increased to $25 from what would otherwise result from a *pro rata* distribution of funds.

28.     Late Claims submitted by Resellers as of the Cutoff Date were resolved as follows:

- 1,113 Late Claims submitted;

- 13 were withdrawn or marked as duplicates;

- 1 was rejected due to claim deficiencies;

- 18 were accepted with a reduction in CRT Products claimed;

- 1 was reduced to a minimum claim value of $25;

- 1,080 were accepted with no change from the original number of CRT Products claimed;

- a total of 1,099 claims will be accepted, either partially or fully based on original submissions, representing 6,185,480 CRT Weighted Units in the aggregate; and

- an estimated 1,047 claims with relatively low numbers of CRT Product purchases will have their payment increased to $25 from what would otherwise result from a *pro rata* distribution of funds.

29.     Late Claims, as reviewed above, are very large in terms of the number of claims, as well as the numbers of CRT Weighted Units which directly determine the monetary value of those claims. If all Late Claims were paid in full based on 100% of their CRT Weighted Units, the Late Claims would substantially dilute the value of Timely Claims.

30.     The Settlement Administrator's review process identified and eliminated invalid Outlier Claims for both End Users and Resellers. Excluding Outlier Claims, the Settlement

1    Administrator's review process identified and eliminated 88% of the CRT Weighted Units from End
2    User Timely Claims, 65% from End User Late Claims, 20% of the CRT Weighted Units from Reseller
3    Timely Claims and 27% of the CRT Weighted Units from Reseller Late Claims.

4        31.    The Settlement Administrator has notified all claimants or their representatives of the
5    final determination of claims that were disputed or subject to audit. If, subsequent to the date of this
6    Declaration, the Settlement Administrator becomes aware of information that would render an
7    approved claim invalid or would materially alter the calculation of CRT Weighted Units, the
8    Settlement Administrator may deny or alter such claim consistent with the practices described in this
9    Declaration, or withhold payment until such issues are resolved.

10                              **NET SETTLEMENT FUNDS AMOUNTS**

11       32.    Class Counsel administered the individual settlement funds and has confirmed to the
12   Settlement Administrator that after the addition of interest earned on the consolidated funds and after
13   the deduction of Court-authorized attorneys' fees and expenses, litigation expenses and costs, notice
14   and claims administration costs (including current and projected costs), and the class representative
15   incentive awards proportionately from each settlement fund, the balance of Settlement Funds to be
16   distributed is $420,040,926.21 as of the date of this declaration. This breaks out to:

17   • $    6,321,228.55 from the Chunghwa Settlement (the "Chunghwa Fund");

18   • $ 128,592,095.15 from the Philips Settlement (the "Philips Fund");

19   • $  51,294,912.91 from the Panasonic Settlement (the "Panasonic Fund");

20   • $  18,484,638.88 from the LG Settlement (the "LG Fund");

21   • $  21,793,495.45 from the Toshiba Settlement (the "Toshiba Fund");

22   • $  19,949,672.76 from the Hitachi Settlement (the "Hitachi Fund");

23   • $ 163,616,425.76 from the Samsung SDI Settlement (the "Samsung Fund"); and

24   • $    9,988,456.74 from the Thomson/TDA Settlement (the "Thomson Fund").

25       33.    To date, the Settlement Administrator has billed $2,803,183.42 in connection with five
26   (5) notice programs that began in 2011 for the Chunghwa settlement, with the most recent notice
27   program occurring in 2020 in connection with the amendments to the Settlements. The Settlement

28

Administrator submitted declarations that were filed with the Court reporting on each of these notice programs as listed above at  ¶ 4. The Settlement Administrator received payments for the notice programs totaling $2,721,843.42 from the Defendants' Escrow Accounts and $81,340.00 from Class Counsel.

34.     To date, the Settlement Administrator has billed $3,602,006.62 in connection with administration of the claims process for End Users and for Resellers that has lasted more than six and a half years starting in September 2015 through May 2022.  The Settlement Administrator received payments for such services totaling $1,685,519.84 from the Defendants' Escrow Accounts and $1,817,246.65 from the Future Expense Fund. The Settlement Administrator's billed but unpaid fees total $99,240.13. Finally, the Settlement Administrator estimates that the remaining work will cost between $500,000 and $600,000 in additional administration costs and fees associated with distribution of payments to Class Members, reaching claimants who submitted claims nearly seven years ago, ongoing communications with claimants and their representatives, and the closing of the case in The Notice Company's files. Attached hereto as <u>Exhibit B</u> is an accounting of the amounts incurred as well as the estimated amount of administration fees remaining.

35.     Additionally, the Settlement Administrator proposes that a reserve of $10,000,000 should be withheld, on a pro rata basis, from funds distributed to claimants being awarded $1 million or more, to address any contingencies that may arise with respect to claims, to pay for any unanticipated future fees or expenses that are authorized by the Court and incurred in connection with administering the Settlement, as well as any further escrow fees, taxes, and the costs of preparing appropriate tax returns. Should the requested reserve be approved, the funds remaining for distribution to approved claimants after withholding the reserve will be $410,040,926.21. The amount initially allocated for Resellers would be $3,068,846.70, calculated as 50% of the Chunghwa fund net of its *pro rata* share of the requested reserve fund.  The amount initially allocated for End Users would be $406,972,079.50, calculated as the balance of the Chunghwa fund plus the funds from the other settlements, all net of the requested reserve fund. The reserve fund, to the extent unused, would be

distributed to those claimants who participated in funding the reserve amount. Payments will be issued by check or electronically.

### CALCULATION OF APPROVED CLAIM AMOUNTS

36.     For End User claims, the distribution formula requires a weighted *pro rata* distribution to all members of the 22 Indirect Purchaser State Classes that filed valid claims, subject to a minimum payment of at least $25 per claimant and a maximum payment of three times the estimated money damages per claimant. The minimum payment will be achieved by first calculating payments by allocating funds based on each claimant's CRT Weighted Units, identifying those claims that would receive less than $25, and then going through a process of recalculating payments so that all claims are grossed up to a $25 minimum payment. Class Counsel has informed me that, subject to the $25 minimum payment requirement, payments per claimant will not exceed the allowable maximum amount so long as the Settlement Administrator calculates individual payments utilizing the assigned weights associated with the purchased CRT Products as described above at ¶ 9.

37.     The Chunghwa Fund, which is currently valued at $6,321,228.55, or $6,137,693.41 net of the reserve fund, is treated differently than funds from the other Settlements. The Court-approved Plan of Distribution for the Chunghwa Settlement allocates to the Attorneys General of Illinois and Oregon 8.59% and 2.37%, respectively, from the Chunghwa settlement fund. On January 25, 2019, the Court ordered the distribution of $540,788 to the Attorney General of Illinois and $149,204 to the Attorney General of Oregon. ECF No. 5376. Pursuant to the parties' Joint Stipulation, there will be no further payments to Illinois or Oregon. ECF No. 5372. The balance of the fund is to be allocated *pro rata* among the remaining 22 states (including the District of Columbia), where each state's *pro rata* share is determined by computing its population as a percentage of the total population of all 24 states that were eligible to participate in the Chunghwa Settlement using Census figures from the year 2000.  A chart showing the population percentages to be applied when calculating the *pro rata* shares of each state is attached as <u>Exhibit C</u> hereto. Resellers will receive up to 50% of each state's fund. The remaining balance of the states' funds will be allocated to each state's End User claims.

38.     In order to allow for payment of Late Claims submitted on or before the Cutoff Date, Class Counsel will seek Court approval of the following proposal for distribution of funds ("Distribution Proposal"): (a) Late Claims submitted prior to the Cutoff Date will be paid at 50% value, as compared to Timely Claims, which will be paid at 100% value; (b) application of the 50% reduction to Late Claims will not reduce the value of any such claim to less than the minimum payment of $25 (unless the minimum payment is reduced to less than $25 for all claimants); (c) Placeholder Claims which as of the Cutoff Date did not show good-faith, bona fide number of CRT units purchased will not be paid; and (d) if any residual remains in the Net Settlement Fund after distribution checks become stale, such residual will be shared as follows: (i) if the residual is less than or equal to $12 million, it will be shared *pro rata* by the Late Claimants who were previously paid (other than those awarded a minimum payment of $25), subject to a minimum threshold set at the Settlement Administrator's discretion, and (ii) if the residual is more than $12 million, it will be shared *pro rata* by all claimants who were previously paid (other than those awarded a minimum payment of $25), subject to a minimum threshold set at the Settlement Administrator's discretion. All claimants were informed of the Court-authorized deadlines for End Users, Resellers and California natural persons. The Settlement website continues to inform claimants that the Court has not yet decided whether Late Claims will be paid. The proposal to pay Late Claims at 50% value has been shared with the Aggregators and will be posted on the Settlement website. I believe the proposal properly balances the interests of all claimants.

39.     A schedule showing claims for End Users is attached hereto as Exhibit D. The schedule lists all approved End User claimants showing the number of CRT Weighted Units approved for each claim. The number of CRT Weighted Units is reduced by 50% for Late Claims submitted on or before the Cutoff Date, as provided in the Distribution Proposal. Assuming the Court approves the payments from the Settlement funds requested by Class Counsel and approves the calculation of the Net Settlement Funds set forth above, a single CRT Weighted Unit has a Settlement value for End Users of approximately $5.78 subject to a $25 minimum payment per claimant. Thus, for example, an individual End User claimant with an approved Timely Claim for one Large Television (4.3 CRT

DECLARATION OF JOSEPH M. FISHER RE: NOTICE, CLAIMS PROCESSING AND DISTRIBUTION OF SETTLEMENT FUNDS – Master File No. 4:07-cv-5944-JST

Weighted Units), one Standard Television (1 CRT Weighted Unit), and three computer monitors (9 CRT Weighted Units) would receive approximately $82.65 based on a total of 14.3 CRT Weighted Units. If this was a Late Claim, it would receive approximately $41.32. For End Users with claims valued at or greater than $1 million who are subject to the $10,000,000 reserve fund, their initial distribution would be based on a CRT Weighted Unit valued at $5.45.

40.     A schedule showing claims for Resellers is attached hereto as <u>Exhibit E</u>. The schedule lists all approved Reseller claimants showing the number of CRT Weighted Units approved for each claim. The number of CRT Weighted Units is reduced by 50% for Late Claims submitted on or before the Cutoff Date, as provided in the Distribution Proposal. Assuming the Court approves the payments from the Settlement funds requested by Class Counsel and approves the calculation of the Net Settlement Funds set forth above, a CRT Weighted Unit has a Settlement value for Resellers of approximately $0.01 subject to a $25 minimum payment per claimant.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed at Hingham, Massachusetts, this 30th day of June, 2022.

_____
JOSEPH M. FISHER