UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MDL No. 1917 |
| | Case No. 07-cv-05944-JST |
| This order relates to: | **ORDER GRANTING MOTION FOR CLASS CERTIFICATION** |
| ALL DIRECT PURCHASER ACTIONS | Re: ECF No. 5962 |

Before the Court is a motion for class certification brought by Direct Purchaser Plaintiffs ("DPPs") with respect to Defendants Irico Group Corporation and Irico Display Devices Co., Ltd. (collectively, "Irico"). ECF No. 5962. The Court will grant the motion.

**I.    BACKGROUND**

The factual and procedural background of this case is well-known to the parties and will not be repeated here. In brief, Plaintiffs allege that Irico and others conspired to fix prices, allocate market share, and restrict output of products containing cathode ray tubes ("CRTs") from March 1995 to November 2007. DPPs – direct purchasers of CRTs and finished products from Defendants, their co-conspirators, and/or their subsidiaries – have settled with all Defendants except for Irico on a classwide basis. They now seek certification of the following class:

> All persons and entities who, between March 1, 1995 and November 25, 2007, directly purchased a CRT Product in the United states from any Defendant or any subsidiary or affiliate thereof, or any co-conspirator or any subsidiary or affiliate thereof. Excluded from the class are defendants, their parent companies, subsidiaries or affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

ECF No. 5971 at 7.[1]  DPPs propose the following class representatives: Arch Electronics, Inc.; Crago, d/b/a Dash Computers, Inc.; Meijer, Inc., and Meijer Distribution, Inc.; Nathan Muchnick, Inc.; Princeton Display Technologies, Inc.; Radio & TV Equipment, Inc.; Studio Spectrum, Inc.; and Wettstein and Sons, Inc., d/b/a Wettstein's.  The Court previously certified a class with the same definition, and the same representatives, as to the Thomson and Mitsubishi Defendants.  *In re: CRT Antitrust Litig.*, 308 F.R.D. 606, 611, 630 (N.D. Cal. 2015) (also requiring DPPs "to specifically identify" the affiliates in the class definition and class notice "to enable the parties and class members to better determine who is in the class").

## II.  LEGAL STANDARD

To certify a class, a court must be satisfied, "after a rigorous analysis," that the plaintiffs meet the requirements of Rule 23 of the Federal Rules of Civil Procedure by a preponderance of the evidence.  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664-65 (9th Cir. 2022) (en banc) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).  "[P]laintiffs must make two showings." *Id.* at 663.  First, they must satisfy the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Second, they "must show that the class fits into one of three categories" under Rule 23(b).  *Olean*, 31 F.4th at 663.  DPPs invoke Rule 23(b)(3), which requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent – but only to the extent – that

---

[1] ECF No. 5971 is the unredacted version of DPPs' class certification motion, originally filed in redacted form at ECF No. 5962.

2

they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Thus, for example, "[i]n determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 666-67 (emphasis in original).

### III. DISCUSSION

#### A. Expert Report of Dr. Phillip Johnson

The Court first considers whether DPPs may rely on the expert report of Dr. Phillip Johnson in support of their motion. When seeking class certification of claims against other Defendants, DPPs previously relied on the expertise of Dr. Jeffrey Leitzinger. Leitzinger was unavailable to serve as an expert for this motion, and, as both DPPs and Irico acknowledge, much of the language in Johnson's report is the same as what appeared in Leitzinger's report.

Irico accuses Johnson of plagiarism and asserts that his report is unreliable and should be excluded. "In a class proceeding, defendants may challenge the reliability of an expert's evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Rule 702 of the Federal Rules of Evidence." *Olean*, 31 F.4th at 665 n.7. But Irico relies on neither *Daubert* nor Rule 702 it its effort to exclude Dr. Johnson's report. Instead, it relies on two district court cases and one case from the Court of Federal Claims, all of which are factually distinguishable. Johnson did not, for example, give "deliberately misleading" answers when asked about how he prepared his report and whether he consulted with an expert who authored an earlier report. *Raymo v. Sec'y of Health & Hum. Servs.*, No. 11-0654V, 2014 WL 1092274, at *13 (Fed. Cl. Feb. 24, 2014). Nor did he copy from a report written by an unrelated expert in a different case, as in *Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, No. 6:15-cv-641-Orl-28TBS, 2017 WL 11457208, at *2 (M.D. Fla. Apr. 13, 2017), and *Moore v. BASF Corp.*, Civ. Action No. 11-1001, 2012 WL 6002831, at *7 (E.D. La. Nov. 30, 2012). Unlike the facts of those cases, Johnson worked with Leitzinger on this case – spending "more than 1,500 hours over the course of nearly 12 years," including working on his report and "every aspect of every analysis done for the prior reports submitted by

3

Dr. Leitzinger." ECF No. 5993-2 ¶ 3. He "participated in the development of Dr. Leitzinger's analysis for his opinions" and has affirmatively stated that, "to the extent my opinions and words overlap with Dr. Leitzinger, it is because I also hold those opinions and believe those words most effectively express my own opinions." *Id.*; *see also, e.g.*, ECF No. 5989-2 at 35 ("These words do a good job of expressing the opinions that I have and the material that I think is relevant to those opinions, and so I saw no reason to artificially change to different words to express the same opinions that I have.").

Irico is free to raise the similarity between Leitzinger's and Johnson's reports to cast doubt on Johnson's credibility before the jury, but those arguments go to the weight and not the admissibility of the testimony. The Court will consider Johnson's report in determining whether DPPs have met their burden at class certification.

### B. Numerosity and Commonality

Irico does not challenge numerosity and commonality, and the Court finds these requirements to be satisfied. On numerosity, there is no dispute that the proposed class includes thousands of potential members. *E.g.*, ECF No. 2968-5 ¶ 2. The class size far exceeds the 40 members for whom "a presumption of impracticability of joinder" arises. *Smith v. City of Oakland*, 339 F.R.D. 131, 138 (N.D. Cal. 2021) (citation omitted). Irico presents no evidence or argument to overcome that presumption.

On commonality, Irico argues that common issues do not predominate – an issue the Court addresses below – but does not assert that there are no questions of law or fact common to the class. Nor could it. "Where an antitrust conspiracy has been alleged, courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *Wortman v. Air New Zealand*, 326 F.R.D. 549, 556 (N.D. Cal. 2018) (quotation marks and citation omitted).

### C. Typicality and Adequacy

Irico raises two challenges to typicality and adequacy. First, it asserts that DPPs' class representatives lack standing – and are therefore neither typical nor adequate – because they are primarily indirect purchasers who did not purchase any finished products from Irico or from any

4

entity that was owned or controlled by Irico. The Court has already rejected that argument. Irico does not argue that DPPs did not purchase finished products from controlled entities; it argues only that Irico did not itself control those entities. That assertion does not undermine DPPs' standing for the reasons the Court explained when it denied in part summary judgment to Defendant Technology Displays Americas LLC ("TDA"):

> TDA argues that this evidence . . . shows only that Plaintiffs purchased finished CRT products from direct purchasers owned or controlled by other conspirators, not by TDA. But the *Illinois Brick* direct purchaser rule is a standing requirement, meaning the focus is on whether the plaintiff purchased from a controlled entity, not whether a particular defendant was doing the controlling. Eliminating any doubt on this point is the fact that "[n]othing in *Illinois Brick* displaces the rule of joint and several liability, under which each member of a conspiracy is liable for all damages caused by the conspiracy's entire output." *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002). In other words, if Plaintiffs can overcome *Illinois Brick*'s standing requirement via the control exception, and TDA is a participant in the CRT conspiracy, TDA is jointly and severally liable for Plaintiffs' damages, even if TDA was not the conspirator who controlled the direct purchasers from whom Plaintiffs bought CRT products.

*In re: CRT Antitrust Litig.*, 2017 WL 11679812, at *5 (N.D. Cal. Jan. 30, 2017) (alteration in original) (footnotes and citations omitted); *see also In re: CRT Antitrust Litig.*, 911 F. Supp. 2d 857, 872 (N.D. Cal. 2012) ("[T]he Named DPPs have standing to sue for alleged overcharges passed on to them when they purchased [a finished product] containing an allegedly price-fixed CRT from an entity allegedly owned or controlled *by any allegedly conspiring Defendant*." (emphasis added)). The Court has also already rejected Irico's argument that the control exception does not apply to DPPs' claims because market forces are not superseded: "The control exception under *Royal Printing* . . . does not require that market forces be superseded." *In re: CRT Antitrust Litig.*, 2016 WL 7805628, at *20 (N.D. Cal. Aug. 4, 2016) (citing *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 326 n.4 (9th Cir. 1980)), *rev'd in part on other grounds*, 720 F. App'x 835 (9th Cir. 2017).

        Second, Irico argues that, even if DPPs' class representatives have standing, they are nonetheless atypical and inadequate because they "purchased only small quantities at standardized prices, whereas absent class members purchase[d] large quantities under individually negotiated

prices." ECF No. 5989 at 17. "In cases involving an alleged price-fixing conspiracy, the representative plaintiff's claim is often considered typical even where the plaintiff followed different purchasing procedures, purchased in different quantities or at different prices, or purchased a different mix of products than did the members of the class." *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 317 (N.D. Cal. 2014) ("*ODD*"). However, "overwhelming disparities [can] defeat typicality." *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 490 (N.D. Cal. 2008) ("*GPU*"). In *GPU*, for example, the named plaintiffs each purchased a single graphics card at a non-negotiable price, while the putative class included "wholesale purchasers who collectively comprised over 99.5% of defendants' business" and "purchased a vast array of products on individually negotiated terms." *Id.* at 489. The court concluded that the "representative plaintiffs simply do not have the appropriate incentive to establish antitrust violations with respect to all of the absent class members" based on those differences. *Id.* at 490. The *ODD* court, finding that case "remarkably similar" to *GPU*, concluded that the named plaintiffs' claims were atypical because they "purchased non-customized ODDs (or computers containing ODDs) from a defendant at nonnegotiable, list prices through a defendant's distribution subsidiary or retail website," and "the putative class encompasses a myriad of other ODD purchasers whose volumes and means of ODD purchases do not compare." *ODD*, 303 F.R.D. at 317. Irico seeks to rely on these cases, but the Court has already explained why *GPU* is "unpersuasive": "Here, customization was far more limited, there are far fewer types of CRT products at issue and wholesale purchases were rarely negotiated individually. *GPU* also did not include guilty pleas or ongoing criminal investigations (thus lacking 'extrinsic evidence of harm') and the products involved in GPU were customized and not fungible." *In re: CRT*, 308 F.R.D. at 627. This case does not present the type of overwhelming disparities that render the proposed class representatives atypical or inadequate. The history of this case – in which the proposed class representatives have settled on behalf of DPPs with all non-Irico Defendants, without objection from any DPP class members – further supports the conclusion that they are able to adequately represent the class, including large purchasers.

Irico does not challenge typicality or adequacy on any other grounds, and the Court finds

6

these requirements to be satisfied.

In addition, the Court has considered the qualifications of proposed class counsel, Saveri & Saveri, Inc., and finds that the firm meets the requirements of Rule 23(g) of the Federal Rules of Civil Procedure and is capable of fairly and adequately representing the class.

### D. Predominance and Superiority

Having found that DPPs satisfy all of the requirements of Rule 23(a), the Court now turns to the requirements of Rule 23(b)(3). "[T]o carry their burden of proving that a common question predominates, [plaintiffs] must show that the common question relates to a central issue in the plaintiffs' claim." *Olean*, 31 F.4th at 665. For antitrust cases, these elements are: "(i) the existence of an antitrust violation; (ii) 'antitrust injury' or 'impact' flowing from that violation (i.e., the conspiracy); and (iii) measurable damages." *Id.* at 665-66. Plaintiffs must show that "essential elements of the cause of action, such as the existence of an antitrust violation or antitrust impact, are capable of being established through a common body of evidence, applicable to the whole class," and that such common questions predominate over individual issues. *Id.* at 666 (quotation marks and citation omitted). The question is not whether plaintiffs would prevail at trial. To the contrary:

> a district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue. Rather, *Tyson Foods* established the rule that if "each class member could have relied on [the plaintiffs' evidence] to establish liability if he or she had brought an individual action," and the evidence "could have sustained a reasonable jury finding" on the merits of a common question, then a district court may conclude that the plaintiffs have carried their burden of satisfying the Rule 23(b)(3) requirements as to that common question of law or fact.

*Id.* at 667 (alteration in original) (citations omitted) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016)).

Here, Irico does not dispute, and the Court is persuaded, that the existence of the conspiracy and Irico's role in it, if any, are subject to common proof. Every class member could rely on the same evidence presented in DPPs' motion to attempt to establish that the conspiracy existed and, if it did exist, how it operated and Irico's involvement, if any. Likewise, although

7

1  Irico argues that there is no evidence that it joined any conspiracy before August 1998, DPPs
2  dispute that assertion, and Irico does not contend that any individualized questions must be
3  resolved to decide when, if at all, Irico joined the conspiracy.  "In price-fixing cases," like this
4  one, "courts repeatedly have held that the existence of the conspiracy is the predominant issue and
5  warrants certification even where significant individual issues are present."  *Thomas & Thomas*
6  *Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 167 (C.D. Cal. 2002)
7  (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 518 (S.D.N.Y. 1996)).

In addition, for the reasons discussed below, the Court agrees with DPPs that Johnson's expert analysis is capable of demonstrating antitrust impact and damages on a classwide basis. First, Irico does not dispute that evidence of a price-fixing conspiracy like the one at issue in this case can show classwide impact, but it contends that Johnson's conclusion that price targeting "directly impacted products accounting for about 94 percent of CRT shipments during the Class Period" is inaccurate.  ECF No. 5971-2 ¶ 51.  Irico's opposition includes charts that purport to show gaps during which target prices did not exist, ECF No. 5989 at 20, but Johnson explains in his reply report why he believes Irico's chart is misleading.  For example, Johnson asserts that Irico's chart fails to consider when prices were allegedly set for more than one quarter at a time; that price targets set in one quarter had statistically significant impacts on actual prices for two additional quarters; that price targets were not the only mechanism by which the conspiracy operated, and that output controls also led to higher prices; or that sales volume was lower during periods when no target prices were found.  ECF No. 5993-2 ¶¶ 6-16.  For these and other reasons, Johnson explains, the expert report of Dr. Robert Willig, on which Irico relies in a footnote, ECF No. 5989 at 20 n.24, is unpersuasive as to the percentage of shipments impacted by price targets.  ECF No. 5993-2 ¶¶ 17-18.

Irico also criticizes Johnson's regression models, arguing that they show only correlation between target and actual prices and not causation; that Johnson failed to "perform any of the basic and customary tests available to economists to test for, and weed out, *spurious* correlations from regression models," ECF No. 5989 at 22 (emphasis in original); and that Johnson inappropriately averaged correlation coefficients for non-targeted CRTs to "mask" discrepancies

8

between different non-targeted CRT products, *id.* at 23. These arguments are not persuasive, particularly in light of Irico's failure to submit any competing expert analysis. First, Irico attempts to make too much of Johnson's deposition testimony that a high degree of correlation does not imply a causal relationship. As Johnson persuasively explains, the question asked at deposition "was a general concept question of whether high correlation in and of itself implies causation, without a reference to the target price regression analysis" in Johnson's report. ECF No. 5993-2 ¶ 21. Second, Johnson adequately explains – for purposes of class certification analysis – why he did not perform the tests identified by Irico. *Id.* ¶¶ 22-27. For example, he discusses why, when he considered the possibility that the relationship between target and actual prices arose "solely from common time-series patterns, instead of actual economic relationships," he used an "error-correction" approach instead of other tests Irico argues he should have performed to "account for the possibility of a spurious relationship." *Id.* ¶¶ 23-24. He concludes that there is "statistically strong evidence of a positive relationship between target prices and actual prices, *separate and apart from the effects of other market factors*." ECF No. 5971-2 ¶ 55 (emphasis added). Finally, as to the non-targeted CRTs, Johnson calculated an "average correlation coefficient between prices for CRTs without targets and prices for a targeted CRT" of 0.93 based on "[w]eight[ing] by sales dollars." *Id.* ¶ 64. He also listed all median correlation coefficients for 18 different sizes and types of non-targeted CRTs, which ranged from -0.37 to 0.97. *Id.* & Fig. 13. He explains why a "quantity-weighted average correlation is . . . the most appropriate way to summarize the evidence":

> The sizes with negative correlations or correlations below 0.8 are sizes with the lower volume of sales, representing merely 2.5% of non-targeted product sales and less than 0.5% of all sales between 1995 and 2007. Lower or negative correlations for these low-volume sales do not suggest that those products were immune from the impact of the conspiracy but are, instead, likely the result of limitations in those data inhibiting the ability to accurately detect the relationships between those prices and the prices of other products.

ECF No. 5993-2 ¶ 29.

Irico next argues that Johnson failed to account for differentiations between CRT products, including the different demand that results from products that are not interchangeable, and the

9

difficulty with changing production lines from one product to another.  However, Johnson explains that his evaluation "included analyses of prices by CRT types, sizes, geographic regions, and customers."  ECF No. 5993-2 ¶ 33.  He further explains that some production lines could produce "a range of sizes" of CRTs; that "[e]very co-conspirator had several production lines capable of producing multiple CRT sizes"; and that "many conspiracy documents discuss how manufacturers were able to switch production between CRT types in response to changing demand conditions."  *Id.* ¶¶ 37, 41; *see also id.* ¶¶ 34-42.  Irico cites some evidence that converting production lines to produce different products would be expensive, ECF No. 5989 at 25, but this goes to the persuasiveness of Johnson's testimony and not whether it is capable of establishing classwide impact.

Finally, Irico criticizes Johnson for taking an average of R-squared values to conclude that variability between pricing among different CRT products can be explained by the product characteristics unrelated to the impact of the conspiracy.  Johnson's report presents "each of the 104 quarterly regressions associated with the two types of CRTs over the 13 years covered by the analysis."  ECF No. 5971-2 ¶ 29.  He observes that: "The median R-squared for the CPT hedonic regressions was 96 percent and 93 percent for CDTs.  The R-Squared exceeded 0.7 in all but four of the 104 results."  *Id.*  Thus, Johnson concludes, "the vast majority of the variability associated with prices can be explained statistically by factors other than the conspiracy."  *Id.*; *see also id.* ¶ 28 (explaining that R-squared values range from 0 to 1 and that, in this context, "reveal[] the percentage of the CRT customer price variation each quarter that can be explained by the product characteristics").  Contrary to Irico's criticisms, Johnson did not attempt to obscure variation between R-squared values or combine them into a single regression.  Additionally, Johnson explains that "[v]ariability in the R-square values from over 100 quarterly regressions is expected, at the very least, due to variations in the quarterly sales data and prices."  ECF No. 5993-2 ¶ 46.

In sum, although Irico criticizes Johnson's testimony, its criticisms go to the weight of the testimony and not to whether DPPs have put forth evidence that is capable of demonstrating classwide impact of the alleged conspiracy.  Even if Irico's "critique" of Johnson's models might "be persuasive to a jury at trial," the question at this stage is whether the "evidence [is] capable of

10

1    showing class-wide impact"; the Court is not tasked with determining whether Johnson's opinions
2    are correct on the merits. *Olean*, 31 F.4th at 676; *see also id.* at 679 ("A lack of persuasiveness is
3    not fatal at certification."). DPPs have satisfied their burden as to impact.
4        The Court next considers whether DPPs have demonstrated that damages can be
5    determined via classwide proof. Irico argues that Johnson's damages model fails to adequately
6    match damages to the alleged harm for three reasons: (1) it includes products that were not subject
7    to the alleged conspiracy; (2) it fails to consider the impact of mandatory price floors imposed by
8    the Chinese government during the class period; and (3) it includes "years for which Irico could
9    not be liable given their limited participation in any alleged conspiracy." ECF No. 5989 at 26.
10       None of Irico's arguments regarding damages is persuasive. First, as discussed above, a
11   factfinder could conclude from Johnson's analysis that the alleged conspiracy had an impact on
12   pricing of all products, not just those for which price targets have been documented. Second,
13   Johnson opines that the price regulations imposed by the Chinese government would not "have
14   had a measurable effect on actual global market prices (if any)," and also observes that "Irico
15   provided no information or analysis of the regulations, whether they were enforced or how they
16   might have been impacted by the existence of the cartel." ECF No. 5993-2 ¶ 51. He further
17   explains that "Irico provided no evidence that these regulations actually constrained its CRT prices
18   or would have but for the conspiracy," and that "the possibility of government punishment of
19   lower prices is an additional facilitating factor for the success of the cartel's efforts to keep prices
20   above competitive levels." *Id.* ¶¶ 52-53. Finally, Irico argues that it was not part of any alleged
21   conspiracy before 1998, three years after the start of the class period. As noted above, however,
22   this is a disputed question of fact that is capable of classwide resolution. Moreover, if a jury were
23   to find that Irico joined the alleged conspiracy after the start of the alleged class period, Johnson's
24   model can calculate damages "not only for the entire Class Period, but also for any subperiod for
25   which Irico might be found liable" because it calculates the difference between actual and but-for
26   prices by quarter. *Id.* ¶ 55; ECF No. 5971-2 ¶¶ 79-80. As the Court previously concluded when
27   considering Leitzinger's damages model, which is substantially similar to Johnson's, *compare id.*
28   ¶¶ 72-80 (Johnson) *with* ECF No. 5191-2 at 164-71 (¶¶ 64-72) (Leitzinger), the Court "is satisfied

11

that DPPs have shown by a preponderance of the evidence that there is a viable methodology DPPs could present at trial to show damages (irrespective of whether such a methodology would ultimately succeed)." *In re: CRT*, 308 F.R.D. at 629-30.

For the reasons set forth above, DPPs have met their burden of demonstrating that common issues predominate over individualized questions. Irico challenges the superiority of a class action only on the basis of predominance. In light of the Court's conclusion that common issues predominate, and for reasons the Court noted when certifying a prior DPP class, including the interests of judicial efficiency and that a class action "is likely the only means of recovery for many plaintiffs whose recovery would otherwise be too low to justify the cost of individual litigation," DPPs have satisfied the superiority requirement under Rule 23(b)(3). *Id.* at 630.

## CONCLUSION

DPPs have satisfied all of the requirements of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Accordingly, their motion for class certification is granted. The following entities are appointed as class representatives: Arch Electronics, Inc.; Crago, d/b/a Dash Computers, Inc.; Meijer, Inc., and Meijer Distribution, Inc.; Nathan Muchnick, Inc.; Princeton Display Technologies, Inc.; Radio & TV Equipment, Inc.; Studio Spectrum, Inc.; and Wettstein and Sons, Inc., d/b/a Wettstein's. Saveri & Saveri, Inc., is appointed as class counsel.

The parties shall appear for a case management conference on August 30, 2022, at 9:30 a.m. A joint case management statement is due by August 23, 2022. The statement shall include a proposed schedule for the remainder of the DPP actions, including a deadline for the parties to propose a plan for disseminating notice to the class.

**IT IS SO ORDERED.**

Dated: August 1, 2022

_____
JON S. TIGAR
United States District Judge