BAKER BOTTS LLP
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
202.639.7700
202.639.7890 (fax)
Email: john.taladay@bakerbotts.com
        evan.werbel@bakerbotts.com
        tom.carter@bakerbotts.com
        drew.lucarelli@bakerbotts.com

*Attorneys for Defendants*
*Irico Group Corp. and Irico*
*Display Devices Co., Ltd.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No.: 07-cv-05944 JST<br><br>MDL No. 1917 |
| This document relates to:<br><br>*ALL INDIRECT PURCHASER ACTIONS* | **DEFENDANTS IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD.'S NOTICE OF MOTION AND MOTION TO PARTIALLY EXCLUDE THE PROPOSED EXPERT TESTIMONY OF DR. JANET NETZ**<br><br>Date:        May 4, 2023<br>Time:        2:00 p.m.<br>Judge:       Hon. Jon S. Tigar<br>Courtroom:   6, 2nd Floor |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on May 4, 2023, at 2:00 p.m., or at such other date as is convenient for the Court, before the Honorable Jon S. Tigar, United States District Judge of the Northern District of California, Oakland Courthouse, located at Courtroom 6, 2nd Floor, 1301 Clay Street, Oakland, California, Defendants Irico Group Corp. and Irico Display Devices Co., Ltd., by and through their undersigned counsel, will and hereby do move for an order partially excluding the proposed expert testimony of Dr. Janet S. Netz.

This Motion is based on the Notice of Motion, the following Memorandum of Points and Authorities in support thereof, the accompanying Declaration of Evan Werbel, the accompanying Declaration of Margaret Guerin-Calvert, any materials found in the record, along with the argument of counsel and such other matters as the Court may consider.

## ISSUES TO BE DECIDED

1.  Whether the proposed testimony of Dr. Janet S. Netz regarding her estimated overcharge and damages fails to meet the admissibility requirements of either Federal Rule of Evidence 702 or the standards established by *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), and its progeny?

2.  Whether the proposed testimony of Dr. Janet S. Netz regarding Chinese pricing laws fails to meet the admissibility requirements of either Federal Rule of Evidence 702 or the standards established by *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), and its progeny?

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...........................................................................1

BACKGROUND ...........................................................................................3

A.      SUMMARY OF DR. NETZ'S ASSUMPTIONS, OPINIONS,
AND METHODOLOGY ..................................................................3

B.      IPPS ELECT NOT TO SUBMIT AN UPDATED EXPERT
OPINION IN THE CASE AGAINST IRICO ...................................4

LEGAL STANDARD.....................................................................................5

ARGUMENT ..............................................................................................7

I.      DR. NETZ'S OVERCHARGE MODEL IS FAULTY, UNSTABLE AND
UNRELIABLE ..........................................................................7

      A.      Dr. Netz's Proposed Damages Model Is Unreliable Because It Fails to
Account for Relevant Market Factors that Impact "But For" Prices of CRTs ........7

      B.      Dr. Netz's Model is Based on a Faulty Assumption of a Fixed Overcharge
That is Incapable of Giving a Reliable Estimate of Damages ..............................10

            1.  Dr. Netz's assumption of a fixed overcharge for 12
years is not economically reasonable..............................................10

            2.  Dr. Netz's assumption of a fixed overcharge is untested by
her and shown unreliable in testing by Irico's expert. ........................4

            3.  Testing Dr. Netz's assumption of a fixed overcharge reveals
that her model is unstable and her overcharge conclusions
are unreliable.........................................................................4

      C.      Dr. Netz's CPT Damages Model Fails to Consider Binding Government
Pricing Regulations...................................................................14

II.     DR. NETZ IS NOT QUALIFIED TO OFFER OPINIONS ABOUT CHINESE CRT
PRICING LAWS, AND ANY OPINIONS ABOUT THESE LAWS SHOULD BE
EXCLUDED ...........................................................................19

CONCLUSION............................................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Andrew v. Metro North Commuter R. Co.*,
  882 F.2d 705 (2d Cir. 1989)..................................................................................20

*Bazemore v. Friday*,
  478 U.S. 385 (1986)..............................................................................................6

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*,
  152 F.3d 588 (7th Cir.1998) ................................................................................17

*Casey v. Geek Squad® Subsidiary Best Buy Stores, L.P.*,
  823 F.Supp.2d 334 (D.Md. 2011) .......................................................................22

*Claar v. Burlington N. R.R. Co.*,
  29 F.3d 499 (9th Cir. 1994) ...................................................................................5

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) .............................................................................17

*Daubert v. Merrell Dow Pharma. Inc.*,
  509 U.S. 579 (1993)...................................................................................... *Passim*

*Gen. Elec. Co. v Joiner*,
  522 U.S. 136 (1997)............................................................................................5, 6

*In re Flash Memory Antitrust Litig.*,
  C 07-0086, 2010 WL 2332081 (N.D. Cal. June 9, 2010) .....................................2

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008) ..........................................................................2

*In re LIBOR-Based Fin. Instr. Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018)........................................................3, 21, 22

*In re Live Concert Antitrust Litig*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ........................................................6, 8, 9, 10

*In re Pool Prods. Dist. Mkt. Antitrust Litig.*,
  166 F. Supp. 3d 654 (E.D. La. 2016)....................................................................10

*In re Wholesale Grocery Prod. Antitrust Litig.*,
  No. 09-MD-2090 ADM/TNL, 2018 WL 3862773 (D. Minn. Aug. 14, 2018), *aff'd*, 946 F.3d
  995 (8th Cir. 2019)...............................................................................................17

*In re Wireless Tel. Servs. Antitrust Litig.*,
   385 F. Supp. 2d 403 (S.D.N.Y. 2005) ...................................................................10

*McGlinchy v. Shell Chemical Co.*,
   845 F.2d 802 (9th Cir. 1988) ....................................................................................6

*Mid-State Fertilizer Co. v. Exchange Nat'l Bank*,
   877 F.2d 1333 (7th Cir. 1989) ................................................................................20

*Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*,
   358 Fed.App'x. 643 (6th Cir.2009) ..........................................................................6

*Penk v. Or. State Bd. Of Higher Educ.*,
   816 F.2d 458 (9th Cir. 1987) ....................................................................................6

*Stein v. Pac. Bell*,
   No. 00-cv-2915-SI, 2007 WL 831750 (N.D. Cal. Mar. 19, 2007) ..........................21

*United States v. Hankey*,
   203 F.3d 1160 (9th Cir. 2000) ..................................................................................5

*United States v. Mamah*,
   332 F.3d 475 (7th Cir. 2003) ................................................................................5, 6

**RULES**

Fed. R. Evid. 702 ......................................................................................... *Passim*

**OTHER AUTHORITIES**

2A P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 399c, p. 447 (3d ed. 2006) ...........................6, 8

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Irico Group Corp. and Irico Display Devices Co., Ltd. ("Irico" or "Irico Defendants") respectfully move the Court for an order partially excluding the proposed expert testimony of Indirect Purchaser Plaintiffs' ("Plaintiffs" or "IPPs") economic expert, Dr. Janet S. Netz, as discussed below.

## PRELIMINARY STATEMENT

The expert report of Dr. Netz, offered by the Indirect Purchaser Plaintiffs ("IPPs") as proof of damages, is a fragile, faulty model that fails to account for major market factors and fails to distinguish alleged cartel damages from non-cartel price movements.  It does not provide a reliable basis for estimating damages, and her proposed testimony should be excluded.

*First*, Dr. Netz's model fails to account for market factors that significantly impacted market demand and cost for CDTs and CPTs.  By ignoring these factors, Dr. Netz's calculations conflate price variations attributable to market factors with damages attributable to the alleged cartel. Fundamental economic principles require that these factors be considered and show that Dr. Netz has materially miscalculated damages in this case.

*Second*, Dr. Netz erroneously assesses, without testing, a uniform and unitary price effect for nearly the entire period of the alleged cartel.  She assumes that no change in the overcharge could have occurred between the start of the alleged cartel in 1995 to its near-ending in 2006, despite dramatic changes in market conditions that include a significant spike in demand in the earlier years and a complete collapse of the market for CRTs by the latter years.  When her model is relaxed to allow the effects to vary by one-year, two-year or three-year periods to allow for interim market dynamics, it shifts dramatically, showing different overcharges both for the individual periods within 1995-2006, and a much different average overcharge. This reflects that her model and the assumption of a single, unyielding overcharge is unreliable.

*Third*, Dr. Netz's model fails to consider – and she wasn't even aware of – legally binding price regulations that establish a pricing floor for relevant CPT products made by Chinese CPT manufacturers, including Irico.  These regulations may well have impacted the "but-for" price of

CPT products that fit squarely within the alleged cartel.  Failing to consider this relevant and applicable regulatory pricing regime is another fatal flaw of her damages model.

Irico's expert, Margaret E. Guerin-Calvert, discusses the omitted market factors, and their importance, in her attached declaration and her prior expert reports.  The declaration examines, in detail, the economic errors of Dr. Netz's report and provides sound economic support for the exclusion of Dr. Netz's testimony on each of these bases.  Each of these issues standing alone demonstrate that Dr. Netz's proffered testimony should be inadmissible under the standards set forth in Rule 702 of the Federal Rules of Evidence and the U.S. Supreme Court's rulings in *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993), and its progeny.  When viewed cumulatively, there can be no doubt of the unreliability of Dr. Netz's proffered testimony. Notably, the fatal flaws discussed in this brief, and the accompanying declaration of Ms. Guerin Calvert, go to the fundamental structure of Dr. Netz's report.  They are not merely a critique of her questionable choice of variables used in her regression analysis.

*Fourth*, in addition to the flaws in her damages model, Dr. Netz also improperly purports to offer an expert opinion in response to Prof. Donald Clarke – Irico's expert on Chinese law – to refute his expert testimony on the Chinese pricing regulations.  Prof. Clarke, a highly qualified expert on Chinese law, identifies and confirms that a binding regulatory scheme governed CPT prices for a portion of the relevant period.  Dr. Netz admits that she is not qualified as an expert on Chinese law, yet offers her alternative interpretation of the laws in an attempt to downplay her failure to consider them.  Her proffered testimony in response to Dr. Clarke fails to meet the standards for expert testimony established by Rule 702 and should be excluded in its entirety.

This is far from Dr. Netz's first exposure to a motion to exclude her testimony.  Her prior opinions have the distinction of being excluded or found unreliable three times previously, including twice by this Court.  *See In re Flash Memory Antitrust Litig.*, C 07-0086, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ("*Flash Memory*") (holding that Dr. Netz did not produce a "reliable and meaningful method of calculating pass-through rates on a class-wide basis" at class certification); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) ("*GPU*") ("Dr. Netz

has demonstrated no class-wide formulae that would be reliable in assessing impact on each consumer."); *In re LIBOR-Based Fin. Instr. Antitrust Litig.*, 299 F.Supp.3d 430, 490 (S.D.N.Y. 2018) ("LIBOR") (striking Dr. Netz's "interpretation" of communications because "these opinions are not based on Dr. Netz's 'scientific, technical, or other specialized knowledge' as required by Rule 702(a)"). That she again employs flawed methods here to achieve her desired outcome is no surprise.

Importantly, the issues raised in this motion are unique to Dr. Netz's 2014 damages report. We are not re-arguing any of the issues previously considered by Judge Conti in granting the certification of the IPP class. Dr. Netz's 2014 damages report had not been prepared at the time of class certification and has not previously been considered.

For the reasons herein, the Court should grant Irico's motion.

## **BACKGROUND**

Although the Court is familiar with the extensive background of this case, Irico presents here the facts underpinning Irico's motion to strike Dr. Netz's opinions.

### A.   SUMMARY OF DR. NETZ'S ASSUMPTIONS, OPINIONS, AND METHODOLOGY

Dr. Netz stated that she "use[d] a regression analysis to isolate the impact of the cartel on CRT prices from the impact of other factors that may have contributed to any CRT price differences in the with- and without-cartel periods." Werbel Decl., Ex. 1 (Netz Rpt.) at 97-98.[1] Dr. Netz employed a "reduced-form price equation model," which incorporates a "single equation that relates prices to supply factors, consumer demand, and the competitiveness of the marketplace." *Id.* at 98. She ultimately opines that the alleged cartel injured all direct purchasers of CDTs through estimated overcharges of 22.0% for the period of 1995-2006, and 11.4% in 2007. Werbel Decl., Ex. 2 (Netz Rpt. Errata) at 1. For CPTs she estimates overcharges of 9.0% for 1995-2006, and 3.1% in 2007. *Id.* She concludes that close to or more than 100% of those damages were passed-through to indirect purchasers. Werbel Decl., Ex. 1 (Netz Rpt.) at 94. To

---

[1] All references to the "Werbel Decl." refer to the Declaration of Evan Werbel In Support of Defendants Irico Group Corp. and Irico Display Devices Co., Ltd's Motion to Partially Exclude the Expert Testimony of Dr. Janet Netz, filed herewith.

arrive at these figures, Dr. Netz used only the following variables in her regression: Price, Cartel Variable, Glass Price, GDP and Unemployment, LCD Market Share, Time, Screen Size, and Identity of the Manufacturer.  *See* Werbel Decl., Ex. 1 (Netz Rpt.) at 104.  A crucial question in examining the reliability of her report is whether these variables capture all market factors necessary to distinguish price effects caused by the alleged cartel from price effects caused by other market factors.

Defendants' economic experts Ms. Margaret Guerin-Calvert and Professor Robert Willig served responding expert reports regarding CDTs and CPTs respectively.  *See* Werbel Decl., Ex. 4 (Guerin-Calvert Rpt.); Werbel Decl., Ex. 3 (Willig Rpt.).  In their reports, Ms. Guerin-Calvert and Prof. Willig demonstrated that Dr. Netz had failed to account for major marketplace factors affecting the prices of CDTs and CPTs in her model referenced above.  *See* Werbel Decl., Ex. 4 (Guerin-Calvert Rpt.) ¶¶ 21-138; Werbel Decl., Ex. 3 (Willig Rpt.) ¶¶ 16-31.  Ms. Guerin-Calvert and Prof. Willig also demonstrated that Dr. Netz made a flawed assumption of a single overcharge for the 1995 to 2006 period.  *See* Werbel Decl., Ex. 4 (Guerin-Calvert Rpt.) ¶¶ 116-122, ; Werbel Decl., Ex. 3 (Willig Rpt.) ¶¶ 89-90, 100.  These errors are central to this motion to exclude Dr. Netz's proffered testimony.

## B.   IPPS ELECT NOT TO SUBMIT AN UPDATED EXPERT OPINION IN THE CASE AGAINST IRICO

Dr. Netz's Expert Report was filed on April 15, 2014, with an errata submitted on July 3, 2014.  This report purported to establish a comprehensive damages model applicable to all alleged conspirators for the entire duration of the alleged conspiracy from March 1, 1995 to November 25, 2007.  At the time of the report, Irico was not active in the litigation.

On January 12, 2021, following Irico's reactivation in the case, the Court held a Case Management Conference ("January 12 CMC") to discuss a pretrial schedule for the Indirect and Direct Purchaser Actions. *See* Case Management Order at 1, ECF No. 5907 ("CMO"). Prior to the January 12 CMC, the Parties submitted a Joint Case Management Statement in which IPPs argued that expert discovery had closed and Irico should be prohibited from conducting additional expert discovery. *See* ECF No. 5877 at 6-7. At the January 12 CMC, the Court denied that request and

1    determined that it would allow certain expert discovery in the IPP case, and offered IPPs the option

2    "to serve an addendum to their existing expert's already-filed reports on liability and damages."

3    CMO at 2.  On February 12, 2021, the Court ordered IPPs to file a declaration "stating whether

4    IPPs will 'be filing an addendum to Dr. Netz's report.'" Order, ECF No. 5905. On February 15,

5    2021, lead counsel for IPPs filed a declaration stating that IPPs would not file an addendum to Dr.

6    Netz's report. *See* ECF No. 5906.   Thus, the IPPs have passed on any opportunity to further

7    supplement Dr. Netz's report from 2014.

8                                              **LEGAL STANDARD**

9         Expert testimony is admissible under Rule 702 of the Federal Rule of Evidence and long-

10   standing case law only if "it is both relevant and reliable."  Fed. R. Evid. 702; *Daubert v. Merrell*

11   *Dow Pharma. Inc.*, 509 U.S. 579, 589-90, 592-93 (1993).  A purported expert opinion is reliable

12   only if it is (i) "based on sufficient facts or data" and (ii) "the product of reliable principles and

13   methods" that the expert properly applies to the facts of the case. Fed. R. Evid. 702 (b)-(d).   The

14   Ninth Circuit identifies five non-exclusive factors as guidelines for the trial court's assessment of

15   proposed expert testimony: (1) whether the opinion is based on scientific, technical, or other

16   specialized knowledge; (2) whether the expert's opinion would assist the trier of fact in

17   understanding the evidence or determining a fact in issue; (3) whether the expert has appropriate

18   qualifications—i.e. some special knowledge, skill, experience, training or education on the subject

19   matter; (4) whether the methodology or technique the expert uses "fits" the conclusions; and (5)

20   whether the probative value is substantially outweighed by the risk of unfair prejudice, confusion

21   of issues, or undue consumption of time.  *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir.

22   2000).  As the proponent of the proffered testimony, Plaintiffs carry the burden to establish its

23   admissibility by a preponderance of the evidence.  *See Daubert*, 509 U.S. at 592 n.10.

24        Courts are "both authorized and obligated to scrutinize carefully" the methodology behind

25   a proffered expert opinion.  *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 504 (9th Cir. 1994); *see*

26   *also Gen. Elec. Co. v Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the

27   Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to

28

existing data only by the ipse dixit of the expert"). In order to satisfy Rule 702, it is "critical" to establish "a link between the facts or data" and the opinion proffered by the expert. *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). Without such a link, a court may exclude the expert's opinion because "there is simply too great an analytical gap" between the opinion and the facts or data. *Gen. Elec.*, 522 U.S. at 146; *see also McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 807-08 (9th Cir. 1988) (affirming the exclusion of expert reports that "rest[ed] on unsupported assumptions and ignore[d] distinctions crucial to arriving at a valid conclusion").

Regarding the evaluation of an expert's damages model, the leading antitrust treatise confirms that:

> Damage estimates in antitrust cases hinge on careful statistical analysis, reasonable assumptions, reliable data, and the robustness of the results. If any of these areas are circumspect, then the analysis could provide faulty conclusions as to the existence or the amount of damages.

2A P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 399c, p. 447 (3d ed. 2006). The Supreme Court has held that, while some flaws in an expert's statistical analysis may be an issue of weight rather than admissibility, "[t]here may, of course, be some regressions so incomplete as to be inadmissible as irrelevant." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986); *see also Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*, 358 Fed.App'x. 643, 655 (6th Cir.2009) ("Perceived flaws in an expert's opinion go to weight only if they fall within the accepted norms of the discipline and have a non-speculative basis in fact."). The Ninth Circuit has confirmed that the holding in *Bazemore* "does not give blanket approval" to allow a disputed model to go forward if that model fails to account for "major variables" that might have impacted the damages analysis. *Penk v. Or. State Bd. Of Higher Educ.*, 816 F.2d 458, 464-65 (9th Cir. 1987). The "key question" in evaluating an expert's damages analysis therefore is whether it "account[s] for the *major factors*" including nonconspiratorial variables that would have caused prices to fluctuate during the conspiracy period. *In re Live Concert Antitrust Litig*, 863 F. Supp. 2d 966, 974 (C.D. Cal. 2012) ("*Live Concert*").

1

## ARGUMENT

## I.   DR. NETZ'S OVERCHARGE MODEL IS FAULTY, UNSTABLE AND UNRELIABLE

Dr. Netz's opinions relating to her overcharge model in Section IX of her merits report, as well as her corresponding damages opinions in Section XI of her merits report, including any modifications in her errata dated July 7, 2014, fail to meet the requirements of F.R.E. 702 and should be excluded because her model is unreliable and, therefore, her testimony would not assist the trier of fact in determining the amount of damages at trial.   There are three principle reasons for this: (1) Dr. Netz fails to consider important market factors that are necessary to distinguish alleged cartel damages from non-cartel market conditions; (2) her application of a single overcharge for a 12-year period cannot withstand basic testing without falling apart; and (3) her failure to incorporate the impact of binding Chinese CPT price regulations that relate to but-for pricing cannot be justified.

### A.   Dr. Netz's Proposed Damages Model Is Unreliable Because It Fails to Account for Relevant Market Factors that Impact "But For" Prices of CRTs

Dr. Netz claims that her overcharge model, discussed in Section IX of her merits report, is a reliable method for identifying the "but-for" price that direct purchasers of CRTs would have paid absent the alleged conspiracy. *See* Werbel Decl., Ex. 1 (Netz Rpt.) at 96-10.  But Dr. Netz is wrong: her model ignores major economic factors in the CDT and CPT markets that changed between the benchmark and the alleged cartel period, and within those periods.  As a result, her model cannot distinguish price changes resulting from market forces from price changes attributed to the alleged conspiratorial conduct – i.e., the fundamental purpose of the analysis.  As Ms. Guerin-Calvert explains:

> Dr. Netz's estimates of CRT overcharges are unreliable because they fail to account for changes in material market demand and cost factors including but not limited to changes in demand for CRT monitors and TVs, shipping costs and exchange rates. [The] omission [of these factors] from her analysis cause Dr. Netz's model to materially miscalculate overcharges for CDTs and CPTs.

*See* Guerin-Calvert Decl. ¶¶ 10a.

The alleged conduct at issue in this case runs from March 1, 1995, through November 25, 2007, a period of nearly thirteen years.  *See* Compl. ¶ 1.  The data that Dr. Netz used in her damages model exceeds even that period.  *See* Werbel Decl., Ex. 1 (Netz Rpt.) at 101.  Dr. Netz's "determination of 'but for' prices [] must take into account nonconspiratorial factors that would have caused prices to be different in the conspiracy period even if there had been no conspiracy." *Antitrust Law* ¶ 399c, p. 447 (accord *In re Live Concert Antitrust Litig*, 863 F. Supp. 2d 966, 974 (C.D. Cal. 2012) ("*Live Concert*").  As explained by Ms. Guerin-Calvert in her accompanying declaration, there were substantial changes in the CDT and CPT markets across and during the pre-period, damages period and post-period.  *See* Guerin-Calvert Decl. ¶¶ 19-23.  These include:

- Changes in demand ranging from rapid growth to rapid decline.[2]

- Significant shifts in consumer demand for different sizes and types of CRTs.[3]

- Major changes in the market shares of CRT manufacturers and the exit of numerous alleged cartel members from the industry.[4]

- Significant shifts in supply and demand for CDTs based on geography[5].

*See id*.  The "key question" in evaluating Dr. Netz's analysis is whether it "account[s] for the *major factors*." *Live Concert*, 863 F. Supp. 2d at 974 (emphasis added and internal quotations removed).  Ms. Guerin-Calvert demonstrates that Dr. Netz has not adequately controlled for these types of changes in her damages model.  *See* Guerin-Calvert Decl. ¶ 13; *see also Live Concert*, 863 F. Supp. 2d at 976, 978-79 (expert's failure to account for changes in market such as artist quality and venue size rendered his overcharge opinion unreliable).

Dr. Netz could have and should have made reasonable and economically sound corrections to her model to properly control for demand and cost conditions in both the CDT and CPT markets, but she did not.  *See* Guerin-Calvert Decl. ¶ 13-14.  Those changes include applying:

---

[2] *See* Werbel Decl., Ex. 4 (Guerin-Calvert Rpt.) ¶¶ 29, 91-93, and sources cited therein; Werbel Decl., Ex. 3 (Willig Rpt.) ¶¶ 17-21 , and sources cited therein.

[3] *See* Werbel Decl., Ex. 4 (Guerin-Calvert Rpt.) ¶¶ 29, 62-63, and 91-93, and sources cited therein; Werbel Decl., Ex. 3 (Willig Rpt.) ¶¶ 17-21, 79, and sources cited therein.

[4] *See* Werbel Decl., Ex. 4 (Guerin-Calvert Rpt.) ¶¶ 88-89, 100-101, and sources cited therein; Werbel Decl., Ex. 3 (Willig Rpt.) ¶¶ 28-31, and sources cited therein.

[5] *See* Werbel Decl., Ex. 4 (Guerin-Calvert Rpt.) ¶¶ 91-93 and sources cited therein.

- Indices for CDT and CPT shipping costs;

- Indices for varying exchange rates;

- An index for CDTs for Korean labor costs;

- An index for CDTs reflecting worldwide desktop shipments; and,

- An index for CPTs reflecting sales in electronics retail stores in the United States.

*See id.*, n.25. Dr. Netz does not deny that these metrics are relevant. Instead, she summarily rejected these critiques, reasoning that they "do not explain materially more of CRT price changes than the variables I [Dr. Netz] use." Werbel Decl., Ex. 5 (Netz Rebuttal Rpt.) at 5. However, courts have made clear that constructing a proper overcharge analysis requires more than offhand dismissal of important market factors that could have been included. *See Live Concert*, 863 F. Supp. 2d at 976 (rejecting expert's conclusory statement, in light of his failure to do a proper analysis of market, as "nothing more than a simple tautology"). The true economic test of their necessity is whether, when applied, they materially change the outcome: "If the addition of economically sensible variables related to cost and demand materially alters the estimated overcharges, then that is evidence of omission of major market factors." Guerin-Calvert Decl. ¶ 13; *see also* ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 154, 177 (2d ed. 2010). And the changes are indeed material: "Adding economically appropriate controls for the market factors omitted by Dr. Netz to her overcharge model to better control for changes in demand and cost conditions in the CDT marketplace significantly alters the results – changing the estimated overcharge for the March 1995-2006 period from 22% to 1.6% [and] . . . reducing the estimated CPT overcharge for the March 1995-December 2006 period from 9% to 2.3%." Guerin-Calvert Decl. ¶ 14.

The dramatic differences in overcharge rates identified when the economically appropriate adjustments are applied to the model demonstrate that Dr. Netz's proposed model fails to isolate the conduct of the alleged conspiracy. This confirms that her model was misspecified. Because Dr. Netz's model fails to account for "major factors," it must be excluded. *See Live Concert*, 863 F. Supp. 2d at 976 (excluding expert model that failed to include several economically significant

factors that affected prices); *see also In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 427 (S.D.N.Y. 2005) ("Where an expert conducts a regression analysis and fails to incorporate major independent variables, such analysis may be excluded as irrelevant.").  The degree of change exhibited by Dr. Netz's model when adding the necessary controls for market factors also points to misspecifications in the model, yet another basis for exclusion of Dr. Netz's testimony.  *See In re Pool Prods. Dist. Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 677-78 (E.D. La. 2016) (excluding model that included "misspecifications and weaknesses in the inferential procedures").

### B.  Dr. Netz's Model is Based on a Faulty Assumption of a Fixed Overcharge That is Incapable of Giving a Reliable Estimate of Damages

Dr. Netz's model also suffers from a second, equally untenable flaw.  Dr. Netz's model is built on the premise that a fixed, unwavering and constant overcharge is appropriate for the entire span of a 12-year period from 1995 to 2006.  *See* Werbel Decl., Ex. 1 (Netz Rpt.) at 104.  This assumption is not economically reasonable, and is rejected by her own model and her own testimony, resting solely on Dr. Netz's *ipse dixit*.  And it is another reason why her damages model should be excluded.

#### 1.  Dr. Netz's assumption of a fixed overcharge for 12 years is not economically reasonable.

For both CDTs and CPTs, Dr. Netz assumes a fixed, unwavering overcharge for 12 years of the alleged 13-year cartel.  She proffers that there is no reason to consider whether the overcharge may have varied for any reason in this period.  In other words, without testing the premise of invariability, she concludes that the overcharge for CDTs was 22% on day 1 of the conspiracy, was 22% on day 4,380 of the conspiracy, and was 22% on every single one of the 4,378 days in between.  She refuses to consider, and does not allow her model to consider, whether *any* variation in the overcharge occurred in the 12-year odyssey of the CDT industry, which witnessed a dramatic spike in CDT demand in the early years of that time frame and a total collapse by the end.  The exact same is true for her 9% overcharge assumption for CPTs – she refuses to consider any variation in this overcharge for any reason over 12 years.  Her willful

blindness is easy to understand: allowing the overcharge to vary – even on the same basis she applies to estimate an overcharge for year 13 of the damages period – causes her fragile model to shatter.

Dr. Netz's assumption of a fixed overcharge is at odds with proper economic analysis. As discussed by Ms. Guerin-Calvert, cartels remain subject to extraneous market forces such as changes in demand and the entry of new display technology in LCDs. *See* Guerin-Calvert Decl. ¶¶ 19-23. In the face of these extraneous factors, which were clearly present in this case, the effectiveness of a cartel will vary over time. *See, e.g.*, Compl. ¶ 134 (alleging 50% and 86% declines in CRT televisions sales between 2000 and 2006, and between 2006 and 2010, respectively); Werbel Ex. 1 (Netz Rpt.) at 20 (describing the declining CDT market, including the "double blow" of dot-com crash and a shift to LCD monitors around 2000). Dr. Netz avoids grappling with these changing market forces by assuming *uniform* impacts and locking the overcharge at a constant rate over the entire period.

2. Dr. Netz's assumption of a fixed overcharge is untested by her and shown unreliable in testing by Irico's expert.

Dr. Netz's herself undermines her assumption of a fixed overcharge for a 12-year period. First, in her report Dr. Netz claims that conditions for the alleged conspirators changed in 2007 (as a result of government investigations) and acknowledges that this requires a separate analysis of overcharges for that single year. *See* Werbel Decl., Ex. 1 (Netz Rpt.) at 99-100. In doing so, she demonstrates that data was available to test for a varying overcharge on a period-by-period basis. *See id.* at 101 (deeming 38 and 168 pricing observations in 2007 "sufficiently complete to provide a reasonable measure of the cartel overcharges"). She then admits in her deposition that the overcharge could vary across different years. *See* Werbel Decl, Ex. 5 (Netz Dep.) at 29 ("Q: Okay. So then you agree that you could use generally accepted economic techniques to calculate the overcharges in this case on a shorter period basis than 2006 to 1995 all averaged together,

right?   THE WITNESS: That is correct.").   But, despite all of that, she did not test her assumption by looking at anything other than a single monolithic 12-year period.[6]

Dr. Netz admits that she "allowed the model to estimate a separate conspiracy overcharge for (2007) so that if defendants had behaved differently in that period, the data would show us that effect."   But she did not consider whether any other significant factors prior to 2007 might have had an effect on the overcharge.   As discussed *supra* Section II.A, there were ample economic reasons, for which Dr. Netz did not account in her model, that should have caused her to question and test her assumption of a constant overcharge during the 1995-2006 period, but she failed to do so.   *See* Guerin-Calvert Decl. ¶ 14.   One of Dr. Netz's defenses for not testing any subset of 1995-2006 was her claim, which we shall see is false that the data were "not sufficient" to test for other years.   Werbel Decl., Ex. 6 (Netz Dep. (Oct. 31, 2014)) at 27:15-23 ("Q. Yes. In other words, did you do any testing of one year versus the other to determine whether there was any variation between years, any kind of economic test, statistical test, data test, any kind of test? A. Well, assuming that you're talking about 1995 to 2006 for CDTs, no, I did not do testing of overcharges year by year. The data are not sufficient to do such a thing.").

The data that she deemed appropriate to analyze overcharges for 2007 were comprised of 38 observations for CDTs and 168 observations for CPTs.   *See* Guerin-Calvert Decl. ¶ 30 and Tables 1 and 2.   The data available to her for other years that Dr. Netz deemed "not sufficient" far surpass the amount of data available for 2007.   For example, for CDTs, every year from 1995-2006 had between 45 and 146 observations, except 1995 which had 33 observations.   *See id.*, Table 1. For CPTs, every year from 1996-2006 had between 126 and 233 observations, except 1995 which had 83 observations.   *See id*, Table 2.   And if Dr. Netz was concerned that a single year of the 12

---

[6] We also note that the use of a uniform overcharge for 1995-2006, and the basis on which it was calculated, would render Dr. Netz's report unusable in the event that Irico is determined at summary judgment or trial not to have participated in the alleged conspiracy for that entire period and, in particular, prior to 1998.   This Court previously noted this potentially "meritorious" defense when questioning the scope of the allegations in the complaint and Plaintiffs' early briefing on Irico's alleged participation in the conspiracy: "There's nothing, even under the most generous interpretation, that would make the Irico defendants liable for anything that happened between '95 and '98 ...."   Hr'g Trans. (Jan. 11, 2018) at 32:5-10, ECF No. 5237.

years had too few observations, she could easily have combined the yearly observations into two- or three-year periods and would have had far more observations that she relied upon in 2007, while still allowing the overcharge to change as market conditions changed.  *See* Guerin-Calvert Decl., Tables 1 and 2.

Thus, it is clear based on Dr. Netz's own analysis of different overcharges in 2007 that adequate data were available to test potential variations in the overcharge, but that Dr. Netz blindfolded herself and declined to conduct any such tests in her report.  Ms. Guerin-Calvert, however, did perform tests on Dr. Netz's blind assumption.

3. Testing Dr. Netz's assumption of a fixed overcharge reveals that her model is unstable and her overcharge conclusions are unreliable

As discussed by Ms. Guerin-Calvert, a standard and economically prudent method of testing and assessing the impact of a cartel over a period of time such as the 1995 to 2006 period is to introduce dummy variables representing sub-periods.  *Id.* ¶ 13, n.25.  When Dr. Netz's rigid overcharge assumption is removed and the estimated overcharge is allowed to vary by period (with no other changes to her model), the results are condemning: not only does the analysis show that the overcharge varies wildly over the time she assumes it is constant, but the resulting average overcharge for the entire 1995-2006 period differs materially from Dr. Netz's estimate, revealing a fatal flaw.  Ms. Guerin-Calvert ran a number of tests on Dr. Netz's model, all of which confirmed this flaw:

**Table 3: CDT Overcharges Estimated by Dr. Netz's Overcharge Model when Overcharges Are Allowed to Vary for Sub-Periods Between March 1995 and December 2006**

| Sub-Periods for 1995-2006 | Estimated Overcharges for Each Period | | | | | | | | | | | | | Average Estimated Overcharge for Class Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | |
| 1-year | 24.4% | 27.1% | 2.2% | -13.6% | -0.4% | -6.5% | -15.0% | -16.4% | -3.8% | 1.7% | 0.3% | -7.1% | -4.8% | 2.2% |
| 2-year | 22.5% | | -6.3% | | 5.7% | | -0.8% | | 10.3% | | 1.3% | | 7.7% | 6.5% |
| 3-year | 28.4% | | | 13.6% | | | 0.2% | | | 12.0% | | | -1.0% | 16.8% |
| 12-year (Netz model) | 22.0% | | | | | | | | | | | | 11.4% | 22.0% |

*Sources: Backup to Expert Report of Janet S. Netz, Ph.D., September 26, 2014*

*Id.*, Table 3.

**Table 4: CPT Overcharges Estimated by Dr. Netz's Overcharge Model when Overcharges Are Allowed to Vary for Sub-Periods Between March 1995 and December 2006**

| Sub-Periods for 1995-2006 | Estimated Overcharges for Each Period | | | | | | | | | | | | | Average Estimated Overcharge for Class Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | |
| 1-year | 7.6% | 5.6% | 0.1% | -7.0% | -10.2% | -5.6% | -7.9% | -16.7% | -11.8% | -7.4% | -5.8% | -5.3% | -4.6% | -5.0% |
| 2-year | 9.3% | | 2.2% | | -1.7% | | -5.7% | | -0.9% | | 0.7% | | -3.2% | 0.8% |
| 3-year | 8.5% | | | -0.7% | | | -3.9% | | | 0.0% | | | -4.6% | 1.3% |
| 12-year (Netz model) | 9.0% | | | | | | | | | | | | 3.1% | 8.9% |

*Sources: Backup to Expert Report of Janet S. Netz, Ph.D., September 26, 2014*

*Id.*, Table 4.

As is evident, the results from allowing the overcharge to vary with market conditions are dramatically different than the estimates proffered by Dr. Netz. Importantly, this is not a question of whether the revised version of Dr. Netz's model reflected in the declaration of Ms. Guerin-Calvert produces a correct result. Rather, the fact that the average overcharge estimates are so vastly different – even when applying Dr. Netz's exact same model, using the same data and with all other specifications remaining the same – shows that the model is highly unstable and the results she portrays are unreliable. Rather, "[t]he fact that Dr. Netz's overcharge model yields such different—and in most cases lower— average class-period overcharges when the model is changed slightly to allow for the possibility that the overcharge varied over time indicates that Dr. Netz's model has failed to account for major market factors that affected CRT prices during the time period covered by her analysis." *See* Guerin-Calvert Decl. ¶¶ 34. On that basis, Ms. Guerin-Calvert finds Dr. Netz's approach unreliable.

## C.      Dr. Netz's CPT Damages Model Fails to Consider Binding Government Pricing Regulations

Irico has provided an expert report in this litigation from its expert on Chinese law, Prof. Donald Clarke. Prof. Clarke describes the authenticity and applicability of several laws and regulations directly governing CPT prices issued by Chinese government ministries. *See* Werbel Decl., Ex. 7 (Clarke Rpt.). Prof. Clarke is a tenured professor of law at the George Washington University Law School, has a long and distinguished career in academia focusing on Chinese law,

and also has experience in Chinese law matters through private practice. *Id.* ¶ 2. Prior to graduating from Harvard Law School, Prof. Clarke studied at Chinese universities and obtained a postgraduate degree in the Government and Politics of China from the University of London. *Id.* ¶ 4. Prof. Clarke is fluent in Mandarin Chinese and has published more than fifty articles and numerous other comments and published works on matters related to Chinese law, and has previously served as an expert in the field. *Id.* ¶ 3 and App'x 1. In short, he is a well-qualified expert in matters of Chinese law.

In his report, Prof. Clarke opines that a series of laws and regulations published between 1998 and 2000 (the "Chinese Pricing Regulations") formed a "regulatory framework" that "has the status of law in the Chinese legal system, and was binding and enforceable on producers in China." *Id.* ¶ 14. In reaching his expert conclusions, Prof. Clarke opined after careful review and verification that the following documents issued by the Chinese government supported the existence of a regulatory framework related to pricing for CPTs manufactured in China:

- November. 16, 1998: Notification and Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products. *Id.* ¶ 16-19 and App'x 2;

- March 1, 1999: Circular of the State Development Planning Commission on Issuing the Measures for the Determining of Cost of Low-price Dumped Industrial Products (Trial). *Id.* ¶ 20 and App'x 4;

- April 1, 1999: Notification and Trial Measures to Prevent Unfair Price Competition Regarding Color CRTs and Color TVs. *Id.* ¶ 21-22 and App'x 6;

- April 2, 1999: Notification of Publishing Industrial Average Production Costs for Some Types of Color CRTs and Color TVs. *Id.* ¶ 24 and App'x 6;

- August 25, 2000: Notification of Publishing Industrial Average Production Costs for Some Types of Color TVs. *Id.* ¶ 24 and App'x 8; and

- September 13, 2000: Notification of Publishing Industrial Average Production Costs for Some Types of Color CRTs. *Id.* ¶ 24 and App'x 9.

Based on Prof. Clarke's report, but without attempting to alter his opinions, Ms. Guerin-Calvert analyzed the potential impact of the pricing regulations on the prices of the affected CPTs. Ms. Guerin-Calvert provided tables comparing the price floor established by the government regulations to the but-for prices relied on by Dr. Netz, based on the sub-set of categories for which

Dr. Netz provided data.  *See* Werbel Decl., Ex. 12 (Guerin-Calvert 2022 Supp. Rpt.) ¶ 29.  Ms. Guerin-Calvert concluded that:

> The illustrative examples in Table 1 shows that Dr. Netz's implied but for price is below the corresponding government price floor in each of the three instances for which transactions data are available. … Dr. Netz presents no assessment indicating that Chinese CPT manufacturers would have charged prices at these levels below the government price floors as implied by her CPT overcharge estimate.

*See* Werbel Decl., Ex. 12 (Guerin-Calvert 2022 Supp. Rpt.) ¶ 30 (footnote omitted).  Dr. Netz's CPT model on the other hand fails to account for these regulations.  *See* Guerin-Calvert Decl. ¶ 38.

By contrast, IPPs did not put forward an expert on Chinese law to respond to Prof. Clarke's report.  Instead, as discussed below, IPPs attempt to have Dr. Netz, who acknowledges that she is not an expert in Chinese law, opine on the scope of the relevant Chinese pricing regulations.  *See* Werbel Decl., Ex. 9 (Netz 2022 Rebuttal Rpt.) at 6-8.  Moreover, IPPs declined the opportunity to depose Prof. Clarke, raise any questions as to his expertise or to test his opinion.

Dr. Netz admits that she did not account for these regulations when she developed her damages analysis in 2014 and has not amended her damages model or overcharge estimates to account for such regulations.  *See* Guerin-Calvert Decl. ¶ 38.  Moreover, Dr. Netz admitted in her deposition that she was not even *aware* of the existence of these regulations prior to reviewing Irico's opposition expert reports only last year:

> *Q: [] Prior to reviewing the expert reports of Professor Clark[e] and Ms. Guerin-Calvert submitted in March of this year, were you aware of Chinese regulations that may have impacted the price of CRTs sold in China?*
>
> *A: No, I was not aware of Chinese price floors.*

Werbel Decl., Ex. 8 (Netz Dep. (Jun. 9, 2022)) at 25:14-26:1; *see also* Guerin-Calvert Decl. ¶ 38, n.63.

It is not disputed that the price regulations existed and were legally binding.  Dr. Netz lacks any basis to conclude that they had no impact: "I do not make conclusions on whether these price floors are legally binding or appropriate."  Werbel Decl., Ex. 9 (Netz 2022 Rebuttal Rpt.) at 3-4.

She also does not identify or discuss in her report which CRTs were sourced from China or potentially subject to the price regulations.  Dr. Netz attempts to pass off the Chinese pricing regulations as a "thought experiment" that had no impact, but the truth is that she has no idea because her model did not account for those regulations and their potential impact on but-for pricing.  As Ms. Guerin-Calvert explained:

> [B]y failing to consider the implications of the Chinese government price floors, Dr. Netz's model likely would produce unreliable estimates of but-for prices and thus of the resulting overcharges.

*See* Werbel Decl., Ex. 12 (Guerin-Calvert 2022 Supp. Rpt.) ¶ 28; *see also Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 152 F.3d 588, 592 (7th Cir.1998) (excluding damages model that failed to account for "[a]ny nonconspiratorial factors likely" to account for higher prices).

Dr. Netz's failure to account for the facts of Irico's situation as a Chinese CPT manufacturer subject to these regulations (and that of any other manufacturer with CPT production in China) in her CPT model reinforces that her model and expert opinion are unreliable. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (excluding expert opinion that failed to "incorporate all aspects of the economic reality" of the market and "did not separate lawful from unlawful conduct"); *see also In re Wholesale Grocery Prod. Antitrust Litig.*, No. 09-MD-2090 ADM/TNL, 2018 WL 3862773, at *7 (D. Minn. Aug. 14, 2018), *aff'd*, 946 F.3d 995 (8th Cir. 2019) (same).

It is undisputed that given its status as a Chinese state-owned entity, Irico was bound to follow any regulations promulgated by the government, including the Chinese pricing regulations. Irico's former head of domestic sales, Wang Zhaojie, who was employed in Irico's Sales Department during the years 1999 and 2000, testified that "as a state owned entity" Irico "has to adhere to the regulations and contents" in the Chinese government's directives regarding price floors for CPTs: Werbel Decl., Ex. 10 (Wang Dep. (Sept. 22, 2022)) at 338:20-339:16; *see also* Werbel Decl., Ex. 11 (Yan Dep. (Sept. 29, 2022)) at 334:25-335:13 ("So, at Irico Group, as a state owned enterprise … we have the obligation to follow the laws and regulations.  And in the event of

any violation, Irico Group may be faced with fines or even have to bear corresponding legal

liability."). Mr. Wang and Mr. Yan further testified that Irico did follow the regulations. *See id.*

Werbel Decl., Ex. 10 (Wang Dep. (Sept. 22, 2022)) at 339:21-340:8 ("Q. When you say that

IRICO had to adhere to the regulations and contents set forth in the documents, what was your

understanding of the regulation and content set forth in the documents? A: First of all, one

regulation pertains to the prohibition of selling at low prices, meaning dumping. We're not allowed

to do that. Secondly, I remember there was once something that was published and it set forth the

regulations that we cannot sell at a price that's below -- that's below a certain threshold.")

(objections omitted); Werbel Decl., Ex. 11 (Yan Dep. (Sept. 29, 2022)) at 349:17-350:9 ("My

understanding is that the ex-factory prices of our Irico CRT products should not be below the

average production cost published by the national government agencies.").

Ms. Guerin-Calvert explained that a leading treatise on modeling economic damages lays

out a relevant framework for evaluating but-for prices and estimating damages must take applicable

laws into account.  Werbel Decl., Ex. 12 (Guerin-Calvert 2022 Supp. Rpt.) at 15, n.55.  She further

explained:

> [I]f the government regulations limited or influenced Chinese
> manufacturers' ability or incentive to charge prices below those
> floors (or at least their ability or incentive to set prices as far below
> the floors as potentially implied by Dr. Netz's overcharge
> estimates), it would imply that Dr. Netz has overstated the
> overcharges associated with the alleged cartel, at least for some
> CPTs. That is, by failing to consider the implications of the Chinese
> government price floors, Dr. Netz's model likely would produce
> unreliable estimates of but-for prices and thus of the resulting
> overcharges.

*Id.*

Ms. Guerin-Calvert illustrates, based on the scant data provided by Dr. Netz that addresses

this issue, that Chinese manufacturer's prices may well have been affected by the price regulations.

Nowhere in Dr. Netz's latest report—her first to address the Chinese pricing regulations—does she

suggest that Irico was <u>not</u> legally bound by these pricing regulations.  Instead, she makes an

attempt at damage control by attempting to minimize the importance of the regulations, arriving at

a *post hoc* justification for never having considered them in the first place. *See* Werbel Decl., Ex. 9 (Netz 2022 Rebuttal Rpt.) at 8-10. Failing to consider these binding price regulations on the but-for pricing of CPTs, however, renders her testimony on CPT damages unreliable. It should be excluded.

## II.   DR. NETZ IS NOT QUALIFIED TO OFFER OPINIONS ABOUT CHINESE CRT PRICING LAWS, AND ANY OPINIONS ABOUT THESE LAWS SHOULD BE EXCLUDED

As discussed in I.C., supra, Irico provided an expert report by Professor Donald Clarke regarding a "pricing regulatory framework in China involving color cathode ray tubes [] and color televisions [], and certain documents related thereto." Werbel Decl., Ex. 7 (Clarke Rpt.) ¶ 1. Prof. Clarke examined seven documents issued by the Chinese government related to CRT pricing during the period November 1998 to September 2000 ("Pricing Documents"). *Id*. ¶ 6. Prof. Clarke opined that the Pricing Documents are "genuine and authentic," and formed a "regulatory framework" that "has the status of enforceable law in the Chinese system." *Id.* ¶ 7; *see also id.* ¶ 12-25. Plaintiffs did not engage an expert on Chinese law to rebut the opinion of Dr. Clarke. They chose not to depose him, and did not contest his expertise.

In a separate report, relying on Prof. Clarke's opinion without reinterpretation, Irico's economic expert, Margaret Guerin-Calvert, examined Dr. Netz's CPT overcharge model to determine whether Dr. Netz's model accounted for the potential effects of the Pricing Documents. *See* Werbel Decl., Ex. 12 (Guerin-Calvert 2022 Supp. Rpt.) ¶ 28. Ms. Guerin-Calvert examined the price floors established in the April 1999, August 2000, and September 2000 pricing notifications and compared those prices to "the average but-for prices implied by Dr. Netz's estimated overcharge of 9.0% for 1995-2006" for CPTs manufactured in China. *Id.* ¶¶ 24-29. Ms. Guerin-Calvert opined that the results of this test showed that for these CPTs "Chinese manufacturers would have had to charge CPT prices below the contemporaneous price floor." *Id.* ¶ 30.

In response to the two separate reports of Prof. Clarke and Ms. Guerin-Calvert, IPPs offer a single responsive report from Dr. Netz entitled "Rebuttal to Supplemental Expert Report of Margaret E. Guerin-Calvert *and Expert Report of Donald Clarke*" (emphasis added). While Dr.

Netz may have had the expertise required to respond to Ms. Guerin-Calvert, she lacks any patina

of expertise in Chinese law to challenge the report of Prof. Clarke.  Once again, as in *In re LIBOR-*

*Based Fin. Instr. Antitrust Litig.*, Dr. Netz is over her skis in offering opinions that are "not based

on Dr. Netz's 'scientific, technical, or other specialized knowledge' as required by Rule 702(a)."

She readily admits her lack of required expertise:

> *Q. Do you consider yourself an expert on Chinese law?*
>
> *A. No, I do not.*
>
> *Q. Do you have any prior experience, education or training in analyzing or interpreting Chinese law?*
>
> *A. I do not.*

Werbel Decl., Ex. 8 (Netz Dep. Tr. (Jun. 9, 2022)) at 10:2-11.

Rule 702(a) of the Federal Rules of Evidence states that an expert's opinion may be

admitted only if "the expert's scientific, technical, or other specialized knowledge will help the

trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

Proffered expert opinions that fail to meet this standard are inadmissible. *See Daubert v. Merrell*

*Dow Pharma., Inc.*, 509 U.S. 579, 589-91 (1993). The Rule 702(a) standard incorporates two

prerequisites that are both mandatory for admissibility: (1) the expert must have "scientific,

technical, or specialized knowledge" in a specific subject area, and (2) that subject must go beyond

what "a jury is capable of understanding and deciding without the expert's help." *Andrew v. Metro*

*North Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).  Dr. Netz's opinions on Chinese pricing

laws cannot satisfy this standard.

By Dr. Netz's own admission, she possesses no "scientific, technical, or other specialized

knowledge" that satisfies Rule 702 related to those opinions. *See Mid-State Fertilizer Co. v.*

*Exchange Nat'l Bank*, 877 F.2d 1333, 1339-40 (7th Cir. 1989) (rejecting economist's opinion that

"examined materials produced in discovery and drew inferences from the record, speaking in legal

rather than economic terms"). And yet, Dr. Netz does exactly what she concedes she is unqualified

to do: offer a "reading of the [Chinese pricing] Notices" as to "the relevant metric" for mandatory

price floors governing CPTs sold by Chinese manufacturers.[7]  Werbel Decl., Ex. 9 (Netz 2022 Rebuttal Rpt.) 8.

Dr. Netz attempts to lull the reader into believing that she is only offering a response to the economic analysis of Ms. Guerin-Calvert, stating "I did review the Pricing Documents attached to Professor Clarke's report to inform the economic analysis of the implication of a price floor, assuming that these documents create a "price floor", a conclusion about which I do not offer an opinion," and "I do not have an opinion as to the merit of any legal assumptions."  But she promptly violates her dogma by offering her own opinions on the price floors, *inter alia*, in her section entitled "The existence and level of the price floors is ambiguous."  She then says: "In order to evaluate Ms. Guerin-Calvert's economic analysis of implications of my damages model in the presence of Chinese government price floors, I reviewed Professor Clarke's *characterization* of the price floors and the documents appended to his report, as well as Ms. Guerin-Calvert's characterization of these materials." (emphasis added).  As she foreshadows, she then re-characterizes Dr. Clarke's description and opinion by offering her own lay opinion of the Pricing Documents, from which she opines that she should apply "two production costs: (1) average industry production costs and (2) a manufacturer's own production costs." *Id*.  That is not "scientific, technical, or other specialized knowledge." *See Stein v. Pac. Bell*, No. 00-cv-2915-SI, 2007 WL 831750, at *11 (N.D. Cal. Mar. 19, 2007) (excluding expert testimony drawn solely from the contents of various documents as "based solely on speculation").  Yet, on this basis, Dr. Netz concludes, unsurprisingly, that her "(CPT) damages model is an economically reliable estimate of [] classwide damages."  Werbel Decl., Ex. 9 (Netz 2022 Rebuttal Rpt.) at 6.

As mentioned above, this is not the first time Dr. Netz has attempted to pass off her lay opinions as expert testimony. Her opinions regarding the interpretation of the Chinese pricing laws are remarkably similar to the most recent case in which her opinion was excluded, *In re LIBOR*

---

[7] This attempt to offer inexpert testimony is particularly galling given Dr. Netz's claim that the Chinese pricing laws are "ambiguous."  Werbel Decl., Ex. 9 (Netz 2022 Rebuttal Rpt.) at 6. If the laws are ambiguous as she claims, that makes it all the more important to consider the opinions of a *qualified* expert in Chinese law on the proper interpretation. Irico has put forward exactly that, *see* Werbel Decl., Ex. 7 (Clarke Rpt.), while IPPs have not.

*Based Financial Instruments Antitrust Litigation*, on the basis that it constituted improper lay testimony. 299 F. Supp. 3d 430, 489-90 (S.D.N.Y. 2018).  In *LIBOR*, Dr. Netz reviewed "documentary evidence of communications between traders" and offered opinions based on the contents of those documents. *Id.* at 489. The court excluded her opinions regarding the documents, holding that Dr. Netz's "interpretation" of the contents of trader communications was "not based on Dr. Netz's 'scientific, technical, or other specialized knowledge' as required by Rule 702(a)." *Id.* at 490. Thus, her "interpret[ations]" of the documents "address issues of fact that [the trier of fact] is capable of understanding without the aid of expert testimony." *Id.* (internal quotations and citations omitted); *see also Casey v. Geek Squad® Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 341 (D.Md. 2011) (excluding expert testimony where it is "more likely to mislead the trier of fact than to enlighten") (internal markings and citations omitted).

The same is true here: Dr. Netz is unqualified to render opinions regarding the Chinese pricing laws at issue, and her opinions regarding Chinese CRT pricing laws, as reflected in Section IV of her most recent report, should be excluded.

## **CONCLUSION**

For all the foregoing reasons, Irico respectfully requests that the Court grant Irico's Motion.

Dated: February 15, 2023

Respectfully submitted,

/s/ *John M. Taladay*
BAKER BOTTS LLP
JOHN M. TALADAY
EVAN J. WERBEL
THOMAS E. CARTER
ANDREW L. LUCARELLI
700 K Street, N.W.
Washington, D.C. 20001
202.639.7700
202.639.7890 (fax)
Email: john.taladay@bakerbotts.com
          even.werbel@bakerbotts.com
          tom.carter@bakerbotts.com
          drew.lucarelli@bakerbotts.com

*Attorneys for Defendants Irico Group Corp. and Irico Display Devices Co., Ltd.*