Highly Confidential

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br><br>This document relates to:<br>ALL INDIRECT PURCHASER ACTIONS | Master File No. 07-CV-5944-JST<br>MDL No. 1917 |

**DECLARATION OF MARGARET E. GUERIN-CALVERT IN SUPPORT OF MOTION BY IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD. TO EXCLUDE TESTIMONY OF DR. JANET NETZ**

02/15/2023

Highly Confidential

# TABLE OF CONTENTS

**I.**   **Introduction** ............................................................................................ **3**

    A.   Qualifications ................................................................................... 3

    B.   Overview and assignment ................................................................. 4

**II.**   **Overview of conclusions** ....................................................................... **7**

**III.**   **Dr. Netz's overcharge model is unreliable because it fails to control for relevant major market factors** .......................................................... **8**

    A.   Dr. Netz's overcharge model fails to account for major market factors that affected CRT prices as evidenced by the fact that minor changes of Dr. Netz's overcharge model to include additional cost and demand factors cause her overcharge estimates to change substantially ................................................................ 8

    B.   Minor changes to Dr. Netz's overcharge model to allow for the likelihood that the impact of the alleged conduct varied over time also cause her overcharge estimates to change substantially, which is indicative of her model's omission of major market factors ............................................................................................ 12

**IV.**   **Dr. Netz has not demonstrated it is unnecessary to account for CPT floor price regulations in China for her overcharge model to provide reliable overcharge estimates** ................................................................. **17**

**V.**   **Conclusion** ............................................................................................ **21**

**VI.**   **Appendix A** .......................................................................................... **23**

    *Table 1: CDT Observations by Sub-Period in Dr. Netz's CDT Overcharge Model* ............ 23

    *Table 2: CPT Observations by Sub-Period in Dr. Netz's CPT Overcharge Model* ............. 24

    *Table 3: CDT Overcharges Estimated by Dr. Netz's Overcharge Model when Overcharges Are Allowed to Vary for Sub-Periods Between March 1995 and December 2006* .................................................................................. 25

    *Table 4: CPT Overcharges Estimated by Dr. Netz's Overcharge Model when Overcharges Are Allowed to Vary for Sub-Periods Between March 1995 and December 2006* .................................................................................. 26

Highly Confidential

# I.    Introduction

## A. Qualifications

1.  I am Margaret E. Guerin-Calvert, President and Senior Managing Director of FTI Consulting, Inc. Center for Healthcare Economics and Policy, a business unit that specializes in healthcare economics and applied microeconomics. I am an industrial organization economist, which is the branch of economics that involves the study of firms, industries, consumer behavior, and pricing. I continue to serve on some matters as Senior Consultant with Compass Lexecon, an independent subsidiary of FTI Consulting, Inc., a firm which specializes in antitrust and applied microeconomics. I am a founding director of its predecessor, Compass (Competition Policy Associates).

2.  I have worked as an economist in public and private sectors on issues related to competition and competition policy involving a variety of industries since 1979. I served as Assistant Chief of the Economic Regulatory Section of the Antitrust Division, US Department of Justice, where among other matters I had primary responsibility for both merger and conduct matters for a variety of industries, including market power and regulatory analyses, as Economist at the Federal Reserve Board, and as an Adjunct Lecturer at Duke University's Sanford School of Public Policy (formerly the Institute of Policy Sciences). As an economic expert, I have reviewed a large number of competition issues and matters including mergers and claims of market power, coordinated effects as well as economic assessment of industry and market conditions. I have testified on matters involving economic analysis of class certification, merits/liability, and damages, among other issues. My credentials and experience encompass more than three decades of work in antitrust and regulatory policy, including qualification as an expert economist in the U.S., Canada, and New Zealand.

3.  My professional expertise, including a listing of peer-reviewed publications as well as presentations, is set out in detail in my curriculum vitae, which is attached as Appendix A. Appendix B contains a list of my testimony in the last four years at trial or deposition. Compass Lexecon is being compensated for my work at my customary hourly rate of $1450. This compensation is in no way connected to the outcome of this litigation.

Highly Confidential

## B. Overview and assignment

4.  Plaintiffs in this matter are indirect purchasers of computer monitors and televisions ("finished products") that contain color display tubes ("CDTs") and color picture tubes ("CPTs"), respectively, which are two types of cathode ray tubes ("CRTs"). Plaintiffs allege that the "Defendants conspired to fix, raise, maintain and/or stabilize prices of CRT Products sold in the United States. Because of Defendants' unlawful conduct, Plaintiffs and other Class Members paid artificially inflated prices for CRT Products and have suffered antitrust injury to their business or property."[1]

5.  The Indirect Purchaser Plaintiffs ("IPPs") have retained Dr. Janet Netz to offer expert economic testimony related to their claims. Dr. Netz concludes that "the cartel was successful in raising price above the competitive level."[2] In an expert report submitted in 2014, Dr. Netz also concludes that "class members were harmed as a result of the cartel's actions."[3] Dr. Netz attempts to estimate overcharges for CRTs, and concludes that, "the but-for CDT prices for 1995-2006 would have been 22.0% lower than the cartel price and for 2007 11.4% lower; the but-for CPT prices for 1995-2006 would have been 9.0% lower than the cartel price and for 2007 3.1% lower."[4] Dr. Netz also concludes that "at least 100% of the overcharge was passed through to class members."[5] Based on these estimates, Dr. Netz concludes that the alleged cartel "imposed damages of $2.8 billion on class members."[6] Specifically, Dr. Netz estimates that IPPs incurred damages of $2.026 billion on purchases of computer monitors containing CDTs and $0.743 billion on purchases of TVs containing CPTs.[7]

---

[1] Indirect Purchaser Plaintiffs' Fifth Consolidated Amended Complaint, In re: Cathode Ray Tube (CRT) Antitrust Litigation, September 19, 2019 (United States District Court Northern District of California San Francisco) ("IPP Complaint"), at ¶ 1.

[2] Expert Report of Janet S. Netz, Ph.D., April 15, 2014 ("Netz 2014 Report"), p. 6.

[3] Netz 2014 Report, p. 6.

[4] Errata to the Expert Report of Janet S. Netz, Ph.D, July 3, 2014 ("Netz 2014 Report Errata"), p. 1.

[5] Netz 2014 Report, p. 6.

[6] Netz 2014 Report Errata, p. 1.

[7] Netz 2014 Report Errata, Exhibit ER-81.

Highly Confidential

6.  Since Dr. Netz submitted her initial report in the merits phase of this matter, several additional expert reports have been submitted. In particular:

a)  I submitted an expert report on behalf of several Defendants[8] in which I assessed whether the economic analyses related to the impact of the alleged cartel among CDT manufacturers and the estimated overcharges on CDT sales provided by Dr. Netz provide a reliable and economically sound basis to estimate damages to the IPP class.[9]

b)  Similarly, Professor Robert D. Willig submitted an expert report on behalf of the same Defendants in which he assessed whether the economic analyses related to CPT damages provided by Dr. Netz provide a reliable and sound basis to estimate damages to the IPP class.[10]

c)  Dr. Netz subsequently submitted a rebuttal expert report in which she responded to, among other reports, my initial report and Professor Willig's initial report.[11]

d)  I subsequently submitted a surrebuttal expert report in which I responded to the CDT-related analyses and conclusions in Dr. Netz's rebuttal report.[12]

e)  Professor Willig also submitted a surrebuttal expert report that responded to the CPT-related analyses and conclusions in Dr. Netz's rebuttal report.[13]

f)  I submitted a supplemental expert report in 2022 considering the analyses and economic conclusions in the prior reports listed above in the context of IPPs'

---

[8] Specifically, I was retained by Winston & Strawn LLP representing Panasonic Corporation of North America, MT Picture Display Co., Ltd., and Panasonic Corporation (f/k/a Matsushita Electrical Industrial Co.); Kirkland & Ellis LLP representing Hitachi, Ltd., Hitachi Asia, Ltd., Hitachi America, Ltd., Hitachi Electronic Devices (USA), Inc., and Hitachi Displays, Ltd. (n/k/a Japan Display Inc.); White & Case LLP representing Toshiba America Consumer Products, L.L.C., Toshiba America Electronic Components, Inc., Toshiba America, Inc., Toshiba America Information Systems, Inc., and Toshiba Corporation; Sheppard, Mullin, Richter & Hampton LLP representing Samsung SDI America, Inc., Samsung SDI Co. Ltd., Samsung SDI (Malaysia) Sdn. Bhd., Samsung SDI Mexico S.A. De C.V., Samsung SDI Brasil Ltda., Shenzen Samsung SDI Co., Ltd., and Tianjin Samsung SDI Co., Ltd.; and Baker Botts LLP representing Koninklijke Philips N.V., Philips Electronics North America Corporation, Philips Taiwan Limited, and Philips do Brasil Ltda.

[9] Expert Report of Margaret E. Guerin-Calvert, August 5, 2014 ("Guerin-Calvert 2014 Report").

[10] Expert Report of Robert D. Willig, August 5, 2014 ("Willig 2014 Report").

[11] Rebuttal Expert Report of Janet S. Netz, Ph.D., September 26, 2014 ("Netz 2014 Rebuttal Report").

[12] Expert Surrebuttal Report of Margaret E. Guerin-Calvert, November 6, 2014 ("Guerin-Calvert 2014 Surrebuttal Report").

[13] Expert Surrebuttal Report of Robert D. Willig, November 6, 2014 ("Willig 2014 Surrebuttal Report").

claims against Irico.[14]   For this supplemental report, I also "reviewed the conclusions and underlying analyses presented in the expert reports that Professor Willig has previously submitted in this matter, considered and assessed the analyses detailed in his reports using my independent expertise and judgment, and I concur[red] with and adopt[ed] his conclusions and the underlying analysis in full as reflecting my own expert opinion."[15]

     g)     Professor Donald Clarke also submitted an expert report on behalf of Irico in which he assessed the authenticity and legal status of a set of Chinese laws and regulations regarding CPT pricing.[16]

     h)     Dr. Netz then submitted an additional rebuttal report in which she responded to my supplemental report and Professor Clarke's report.[17]

7.    Counsel for Defendants Irico Group Corp. ("Irico Group") and Irico Display Devices Co., Ltd. ("Irico Display," collectively, "Irico"), have now asked me to opine on (i) the reliability of Dr. Netz's opinions and methodology related to her overcharge model and damages in her initial merits report,[18] as modified by her errata,[19] as well as (ii) the implication for the reliability of Dr. Netz's opinions and methodology given she did not consider Chinese CPT pricing regulations in her initial 2014 report and taking into account Dr. Netz's opinions in her 2022 rebuttal report.[20]   My opinions below draw upon the analyses and conclusions from the various expert reports listed above, with further work grounded in the methodologies discussed in my prior reports to specifically test the reliability of Dr. Netz's opinions contained in her 2014 reports.

8.    My analysis is ongoing and I reserve the right to evaluate any responsive declarations or analysis produced by the Plaintiffs or their experts as well as to incorporate any new

---

[14] Supplemental Expert Report of Margaret E. Guerin-Calvert, March 16, 2022 ("Guerin-Calvert 2022 Supplemental Report").  For this supplemental report and my ongoing work on the case, I have been retained by Baker Botts L.L.P. representing Irico Group Corporation and Irico Display Devices Co., Ltd.

[15] Guerin-Calvert 2022 Supplemental Report, ¶ 14.  Professor Willig passed away on October 21, 2022.

[16] Expert Report of Donald Clarke, March 16, 2022 ("Clarke Report").

[17] Janet S. Netz, Ph.D. Rebuttal to Supplemental Expert Report of Margaret E. Guerin-Calvert and Expert Report of Donald Clarke, April 27, 2022 ("Netz 2022 Rebuttal Report").

[18] Netz 2014 Report.

[19] Netz 2014 Report Errata.

[20] Netz 2022 Rebuttal Report, pp. 5-10.

information into my analysis and opinions as necessary.

9.  A list of the materials I relied on for this declaration is attached as Appendix C.

## II.    Overview of conclusions

10. Based on an application of standard economic principles and methods used to evaluate economic modeling of claims and overcharges of alleged collusive conduct including potential impact on prices and other market conditions to the facts of this industry, and specifically to analyses and conclusions set out in Dr. Netz's testimony on her analyses and estimates of damages, I have reached the following conclusions:

   a)    Dr. Netz's estimates of CRT overcharges are unreliable because they fail to account for changes in material market demand and cost factors including but not limited to changes in demand for CRT monitors and TVs, shipping costs and exchange rates. Dr. Netz's overcharge model and data she relies on demonstrate that these are major market factors whose omission from her analysis causes Dr. Netz's model to materially miscalculate overcharges for CDTs and CPTs.

   b)    Dr. Netz assumes the price effects of the alleged cartel were uniform for most of the alleged cartel period (i.e., between March 1995 and December 2006) despite dramatic changes in CRT market conditions during that approximately 12-year period.  Dr. Netz does not test this assumption, claiming insufficient data, although she has sufficient data for such a test. Testing Dr. Netz's model by allowing it to estimate non-uniform overcharges rejects her assumption of uniform overcharges from 1995-2006. Moreover, estimating Dr. Netz's model with different class sub-periods reveals materially different average overcharge estimates for the entire alleged cartel period than the class-period overcharge estimated by Dr. Netz under her assumption of time-invariant cartel effects. This indicates that Dr. Netz's analysis and model omit major market factors and denote unreliable results.

   c)    Dr. Netz has failed to demonstrate that it is unnecessary to account for CPT floor price regulations in China in order for her overcharge model to provide reliable overcharge estimates for affected CPTs.

## III. Dr. Netz's overcharge model is unreliable because it fails to control for relevant major market factors

### A. Dr. Netz's overcharge model fails to account for major market factors that affected CRT prices as evidenced by the fact that minor changes to Dr. Netz's overcharge model to include additional cost and demand factors cause her overcharge estimates to change substantially

11. A reliable model of damages must control for all major market factors that changed between the alleged cartel period and the benchmark non-cartel periods so that the only major remaining difference between the cartel and non-cartel periods is the absence of the alleged conduct in the benchmark period.[21] Models that do not satisfy this requirement because they omit major market factors unrelated to the alleged cartel—factors that changed between the benchmark and alleged cartel periods—will be unable to distinguish between the impacts of an alleged cartel on prices and impacts of market factors unrelated to an alleged cartel.[22]

12. Consistent with this finding, an American Bar Association (ABA) treatise on estimating antitrust damages explains that when estimated overcharges change substantially when explanatory variables that have a sound economic rationale are added to a model, then the model is misspecified and unreliable due to the omission:

---

[21] See, e.g., Daniel Rubinfeld, "Antitrust Damages," Chapter 14 of *Research Handbook on the Economics of Antitrust Law*, Einer Elhauge (ed.) 2012, pp. 379-381 ("In essence, the benchmark approach involves using the periods before and/or after the alleged wrongful behavior as a benchmark. As with the yardstick approach, it is essential that the nonimpact period be as similar as possible to the impact period. This requires that one take into account any cost, demand, or competitive differences between the nonimpact behavior and the impact period, but-for the wrongful behavior… With either the forecasting or the dummy variable approach, it is essential to account for the effects of noncollusive variables on price. If these variables are not taken into account, it is quite possible that damages will be biased and highly inaccurate.")

[22] See, e.g., Daniel L. Rubinfeld, *Quantitative Methods in Antitrust*, in 1 ISSUES IN COMPETITION LAW AND POLICY 723 (ABA Section of Antitrust Law 2008), p. 738 ("Not all possible variables that might influence the dependent variable need be included for the analysis to be successful; some cannot be measured and others may make little difference. However, failure to include an important major explanatory variable that accounts for factors that differ between the period of alleged wrongdoing and other time periods can cause the measured effect of the dummy variable of interest to be biased, which in turn could lead to an invalid conclusion on liability. In general, omitted variables that are correlated with the dependent variable reduce the probative value of the regression analysis.")

Highly Confidential

> If these additional explanatory variables [added to a regression analysis based on economic reasoning] turn out to be statistically significant and the coefficient estimates on the previously included explanatory variables [such as the cartel indicator variable] change substantially when the additional variables are added, then **the regression model that omitted the additional explanatory variables likely is misspecified and its results are biased and unreliable**.

> [G]enerally speaking, one should exercise great care if potentially important variables are to be excluded from a model…It is rarely advisable to drop a theoretically important variable, especially if its coefficient is statistically significantly different from zero. Similarly, one generally should not drop a group of theoretically important variables when their coefficients are jointly statistically significantly different from zero (even if they are individually not statistically significantly different from zero).[23]

13. If the addition of economically sensible variables related to cost and demand materially alters the estimated overcharges, then that is evidence of omission of major market factors.[24] As Professor Willig and I have demonstrated, Dr. Netz's model fails to control for certain demand and cost factors that influence CRT prices. For example, she does not account for the cost of shipping CRTs and finished products despite the importance of international trade in these products. Nor does she control for U.S. dollar exchange rates with currencies of countries from where imports originated and labor costs in those countries. Her model also lacks proper controls for desktop PC sales (which are related to the demand for CRT monitors) and demand for CRT TVs.[25]

---

[23] ABA Section of Antitrust Law, "Proving Antitrust Damages: Legal and Economic Issues," (2D ED. 2010), pp. 154, 177 (hereinafter "Proving Antitrust Damages") (emphasis added). The theoretical importance of the market factors that I added to Dr. Netz's CDT overcharge model is explained in Guerin-Calvert 2014 Report, ¶¶ 118, 124-5. Professor Willig similarly explained the importance of the market factors that he added to Dr. Netz's CPT model in Willig 2014 Report, ¶ 100.

[24] See Proving Antitrust Damages, pp. 154, 177.  See Section III.B below for further discussion of the major market factors and changes in both the CDT and CPT marketplace.

[25] The economically appropriate corrections that I made to Dr. Netz's CDT overcharge model were: (i) I relaxed the arbitrary assumption of a constant overcharge over the entire 1995-2006 period by replacing Dr. Netz's single variable for 1995-2006 with three separate variables for 1995, 1996 and 1997-2006; (ii) because the evidence indicates that the estimated effects for 1995 and 1996 likely were caused by underlying economic conditions unrelated to the alleged conspiracy, I assumed that the overcharge in 1995 and 1996 was the same percentage (1.6 percent) as the overcharge that the modified model estimates

(footnote continued …)

Highly Confidential

14. Adding economically appropriate controls for the market factors omitted by Dr. Netz to her overcharge model to better control for changes in demand and cost conditions in the CDT marketplace significantly alters her results – changing the estimated overcharge for the March 1995-2006 period from 22% to 1.6%. The fact that a significant change results from these minor modifications demonstrates that Dr. Netz's model conflates changes in market conditions unrelated to the alleged cartel with the impacts of the alleged cartel, making it unreliable as a means of estimating damages. Furthermore, the change in the estimated overcharge when the additional market variables are included in Dr. Netz's CDT overcharge model reflects the impact of the conflation.[26] Similarly, Professor Willig showed that adding economically appropriate controls for market factors including shipping costs and the U.S. dollar-Korean Won exchange rates to better control for CPT cost and demand conditions—but otherwise leaving Dr. Netz' model unchanged—also produces a significant change in results, in that case reducing the estimated CPT overcharge for the March 1995-December 2006 period from 9% to 2.3%.[27]

15. The materiality of Dr. Netz's omissions of controls for these market factors is evidenced by the substantial impact that the inclusion of these market factors has on her model's estimation of CRT overcharges.

16. Dr. Netz does not deny that the market factors that Professor Willig and I have added to her CPT and CDT models respectively relate to major cost and demand factors in the CRT marketplace that could potentially influence prices of CRTs. Nor does she deny that these variables are statistically significant when added to her models.[28] Combined with the fact

---

for the years 1997-2006; and (iii) additional cost and demand variables (an index of shipping costs, Korean Won-USD exchange rate, an index of Korean labor costs and worldwide desktop shipments). Guerin-Calvert 2014 Report, ¶¶ 125, 130. The economically appropriate corrections that Professor Willig made to Dr. Netz's CPT overcharge model were to add the following control variables: (i) on the supply-side: a global shipping cost index, an index of labor cost in Korea, and the Korean Won-U.S. dollar exchange rate, (ii) on the demand-side, sales in U.S. electronics retail stores. Willig 2014 Report, ¶ 100.

[26] Guerin-Calvert 2014 Report, ¶¶ 16, 130-131 and Table 8; Guerin-Calvert 2014 Surrebuttal Report, ¶ 24.

[27] Willig 2014 Report, ¶¶ 100-101; Willig 2014 Surrebuttal Report, ¶ 12.

[28] The statistical significance of the additional cost and demand variables is noted in Guerin-Calvert 2014 Report, ¶ 125 and Willig 2014 Report, fn. 114. Dr. Netz does not rebut this finding in her rebuttal.

that use of these additional market factor variables substantially changes the coefficient estimates for Dr. Netz's explanatory cartel variable,[29] these demonstrate that her original model "likely is misspecified and its results are biased and unreliable" under generally accepted economic principles.[30]

17. Rather than confront this error, Dr. Netz incorrectly claims that the additional variables "do not explain materially more of CRT price changes than the variables I [Dr. Netz] use."[31] As an initial matter, for the purpose of estimating overcharges, the amount of CRT price changes that is explained by the model is only one criterion for selecting a model, and is not, in fact, the most important criterion. As a general principle, in choosing between multiple alternative overcharge regression models, it is more important that the chosen model provide an economically reasonable, unbiased and consistent estimate of the overcharge caused by the alleged cartel than it is for the model to explain the variation in prices.[32] However, in this case the additional variables that I have added to her model have substantially improved Dr. Netz's CDT model with respect to both criteria.[33] Professor Willig provides a similar rebuttal of Dr. Netz's claims.[34] The changes that Professor Willig and I made to Dr. Netz's model are tests of the reliability of her model. They show that that the model selected by Dr. Netz does not provide an economically reasonable, unbiased and consistent estimate of the overcharge in this case.

18. The economically appropriate changes that Professor Willig and I made to Dr. Netz's overcharge model to include these factors expose the failure of Dr. Netz's analysis to

---

[29] Guerin-Calvert 2014 Report, ¶¶ 16, 130-131 and Table 8; Guerin-Calvert 2014 Surrebuttal Report, ¶ 24; Willig 2014 Report, ¶¶ 100-101; Willig 2014 Surrebuttal Report, ¶ 12.

[30] Proving Antitrust Damages, pp. 154, 177. Also, econometric textbooks acknowledge the importance of omitted variable bias. See, e.g., James H. Stock and Mark W. Watson, *Introduction to Econometrics*, 3rd edition, Addison Wesley, 2011, pp. 180-182. ("The consequence [of omitted variable bias] is serious: the OLS estimator is biased. This bias does not vanish even in very large samples, and the OLS estimator is inconsistent.")

[31] Netz 2014 Rebuttal Report, p. 5.

[32] See footnotes 21, 22 and 23.

[33] Guerin-Calvert 2014 Surrebuttal Report, Section II.C.

[34] Willig 2014 Surrebuttal Report, Section III.A.

Highly Confidential

properly account for changing market conditions unrelated to the alleged cartel. Although our changes allow her overcharge model to better account for changes in market conditions during the relevant period, her analysis of CRT overcharges remains fundamentally unsound, as Professor Willig and I have explained.[35]

**B. Minor changes to Dr. Netz's overcharge model to allow for the likelihood that the impact of the alleged conduct varied over time also cause her overcharge estimates to change substantially, which is indicative of her model's omission of major market factors**

19. The economics literature makes clear that cartels can be and often are unstable, particularly in the face of changes in the marketplace, such as changes in demand conditions.[36] The relevant conduct is alleged to have lasted from March 1, 1995 through November 25, 2007, a period of nearly 13 years. Data from an even longer period is used by Dr. Netz to estimate damages (e.g., 1993-2008 for CDTs).  As explained in Professor Willig and my expert reports and other testimony, the CPT and CDT marketplaces experienced substantial changes during this period.

20. For instance, the CDT industry experienced a dramatic shift from rapid growth to rapid decline, displacement by LCDs, substantial changes in consumer demand for different sizes and types of CDTs, large changes in market shares and substantial exit from the industry by members of the alleged cartel, and significant changes in the geographic location of both CDT supply and demand.[37]

21. LCD TVs displaced CRT TVs by the end of the alleged cartel period. Moreover, the mix

---

[35] For the following reasons explained in reports by Professor Willig and me, the Netz overcharge model remains unreliable even after the changes made by Professor Willig and me: it likely omits additional market factors; it relies on worldwide CPT data to estimate overcharges for CPTs used in CRT TVs sold in North America; it assumes without support that the relationship between market controls and CRT prices remain stable between the benchmark and cartel periods and it fails to control for changes in the mix of products and costs during the relevant period. Guerin-Calvert 2014 Report, ¶¶ 14-16; Willig 2014 Report, ¶¶ 79-92, 101.

[36] See, e.g., Margaret C. Levenstein and Valerie Y. Suslow, "Studies of Cartel Stability: A Comparison of Methodological Approaches" in *How Cartels Endure and How They Fail: Studies of Industrial Collusion*, edited by Peter Grossman, Edward Elgar, 2004, pp. 9-52 at p. 27 ("In general, instability in the economic environment destabilizes cartels").

[37] See, Guerin-Calvert 2014 Report, ¶ 29.

of characteristics of CPTs changed substantially during the relevant period with flat CPTs displacing curved ones. The mix of CPT manufacturers changed during the alleged cartel period such that by the end of the alleged cartel period manufacturers such as Hitachi had exited the industry or reconfigured their participation.[38]

22. Dr. Netz claims that the advent of LCDs "did not eliminate the ability of the CRT cartel to impose an overcharge."[39] Even if that were correct, the growth of LCDs at the expense of CRTs very likely affected the ability of the alleged cartel to do so, i.e., it would likely impact the degree to which the alleged cartel could impose an overcharge, and thus the amount of overcharge. The economic literature recognizes that collusion can be more difficult in a declining industry such as the CRT industry was for much of the damages period. When the future of the industry is uncertain and demand is expected to be lower in the future, firms have an incentive to compete more aggressively for share today.[40]

23. Despite these dramatic changes in CDT and CPT market conditions, Dr. Netz assumes that the alleged conduct had a uniform impact on CRT prices between March 1995 and December 2006.[41] Given the many changes in the marketplace, the amount of time elapsed, and the omission of major market factors from her model, Dr. Netz improperly dismisses the possibility that the impacts of the alleged conduct were not uniform during the approximately 12-year period between March 1995 and 2006.

24. In our reports and testimony, Professor Willig and I test Dr. Netz's assumption of uniform overcharges over time. In my analysis of CDT overcharges and Dr. Netz's model and

---

[38] See, Willig 2014 Report, Section IV.

[39] Netz 2014 Report, p. 41.

[40] See Marc Ivaldi, Bruno Jullien, Patrick Rey, Paul Seabright, and Jean Tirole, "The Economics of Tacit Collusion," IDEI, Toulouse March 2003. The same is true for an individual firm that expects that it will be exiting the industry. See Margaret C. Levenstein and Valerie Y. Suslow, "Breaking Up Is Hard to Do: Determinants of Cartel Duration," *Journal of Law and Economics*, vol. 54 (May 2011), pp. 455-492.

[41] Deposition of Janet S. Netz, Ph.D., June 27, 2014, at pp. 113-114. Dr. Netz claims that it was reasonable to estimate a single overcharge for 1995-2006 because there were "no significant changes in the legal environment" in that time and because she believes changes in the macroeconomy are controlled for in her model. (*Id.*, p. 30) However, as explained in Section III A, not all major market factors and changes were controlled for by Dr. Netz in her overcharge model. Even if the exact timing of market changes are not known, it is economically reasonable to test for changes in alleged cartel effects within the alleged cartel period.

Highly Confidential

estimates, I noted there were significant changes in market conditions for CDTs in 1995-96 such as the rapid growth in demand for desktop computers and CDT capacity shortages that were unrelated to the alleged cartel conduct and that were not controlled for by Dr. Netz.[42] I made economically appropriate changes to Dr. Netz's CDT model including allowing the alleged cartel effects to be different for the 1997-2006 period than for the March 1995-1996 period. These changes resulted in substantially different overcharge estimates from Dr. Netz's uniform CDT overcharges for the 1995-2006 period.[43]

25. I also tested Dr. Netz's assumption of uniform overcharges by allowing her model to estimate differential overcharges for each year of the alleged cartel period.[44] Professor Willig did likewise.[45] We explained that—at least according to Dr. Netz's own model—the data used by Dr. Netz rejects her assumption of uniformity. Specifically, we estimated Dr. Netz's overcharge model while allowing for the possibility that the estimated overcharge may have varied from year to year. We found that the overcharges estimated by Dr. Netz's model vary greatly over time with no positive statistically significant overcharges after 1996.[46]

26. The changes likely indicate Dr. Netz's failure to control for major factors that affected CDT prices during this time period. In particular, as I explain in my report, the large overcharge estimates produced by Dr.Netz's model for 1995 and 1996 likely indicate the failure of her model to account for unexpectedly rapid growth in the demand for computer monitors, shifts in demand toward larger monitors, the introduction of monitors with higher resolution, tight CDT capacity, and glass shortages – factors that more plausibly explain

---

[42] Guerin-Calvert 2014 Report, ¶¶ 61-63, 113.

[43] Guerin-Calvert 2014 Report, ¶ 113; Table 6.

[44] Guerin-Calvert 2014 Report, ¶ 114.

[45] Willig 2014 Report, ¶ 73. For CPTs, the average overcharge for the entire alleged cartel period is 1.19% when allowing Dr. Netz's model to estimate overcharges annually – a much lower overcharge amount than the 8.94% that Dr. Netz's model estimates for CPTs for the entire alleged cartel period. (Willig 2014 Report, fns. 81-82.)

[46] Guerin-Calvert 2014 Report, Table 6; Willig 2014 Report, ¶ 73.

the pattern of substantially elevated prices for these two years.[47]

27. Dr. Netz estimates separate overcharges for the approximately 12-year period of March 1995-2006 and for 2007. (Dr. Netz breaks out 2007 because she contends that the impact of the alleged cartel may have been different that year since competition authorities began investigating CRT manufacturers in that year.[48]) In the process, she estimates a single overcharge for the nearly 12-year period from March 1995 to 2006. She testified that she assumes that this overcharge applied to "any day" of the almost 12-year period, i.e., the overcharge was the same each and every day during the March 1995-2006 period,[49] despite the fact that she subsequently acknowledged that the overcharges could have varied across years.[50]

28. Dr. Netz did not test her assumption of uniform impact from March 1995-2006. Although Dr. Netz did conduct such a test to compare the alleged cartel's effectiveness in 2007 with the period March 1995-2006,[51] she contends that the data are insufficient for such a test more generally, i.e., for other years.[52]

29. Dr. Netz's claim of inadequate data to test whether estimated overcharges varied over time—for example year by year—is belied by her own analysis of estimated overcharges for just 2007 and my evaluation of her dataset. She provides no explanation as to why there is inadequate data for previous years.

30. Evaluation of the dataset relied on by Dr. Netz to estimate overcharges shows in fact, for CDTs, there are more CDT transaction data in all years prior to 2007 (other than 1995)

---

[47] Guerin-Calvert 2014 Report, Section IV.B.

[48] Netz 2014 Report, pp. 99-100.

[49] Deposition of Janet S. Netz, Ph.D., June 27, 2014, at pp. 113-114 ("The best we can do is come up with an informed estimate, and my informed estimate is that for any day between 1995 and 2006, purchasers of monitor, of the CRT monitor, paid an overcharge of 25 percent relative to what they would have paid had the defendants followed the law.").

[50] Deposition of Dr. Janet Netz, October 31, 2014, at p. 26.

[51] Netz 2014 Report, fn. 310.

[52] Deposition of Dr. Janet Netz, October 31, 2014, at p. 26.

compared with 2007.[53] See Table 1. Alternatively, combining alleged cartel period years prior to 2007 into 2-year, or 3-year sub-periods, shows even larger gaps in the data count between these sub-periods and 2007.[54] See Table 1. For CPTs, nine of the 12 alleged cartel period years prior to 2007 have more data than 2007. See Table 2. Combining class-period years before 2007 into 2-year or 3-year periods between 1995 and 2006, shows that every sub-period has more data than 2007. See Table 2.

31. Estimating Dr. Netz's model using the dataset that she relied on and allowing her model to estimate overcharges for sub-periods within the March 1995-2006 period shows that her model estimates quite different overcharges across the sub-periods. Using 1-year, 2-year, and 3-year sub-periods as example periods yields substantial differences in estimated overcharges across the March 1995-2006 period.[55] See Tables 3 and 4. For example, when the March 1995-2006 period is segmented into two-year periods, Dr. Netz's model estimates a CDT overcharge of 22.5% for the two-year period of 1995-1996 and 1.3% for the two-year period of 2005-2006. See Table 3. For CPTs, the corresponding estimates are 9.3% and 0.7%. See Table 4.

32. Not only does Dr. Netz's overcharge model estimate very different overcharges for different sub-periods of the alleged cartel period but allowing for the possibility that the overcharge varied across these sub-periods yields a very different average overcharge for the entire alleged cartel period than what Dr. Netz estimates, which is indicative of the omission of major market factors from her overcharge model – factors that likely affected the impact of the alleged conduct.

---

[53] The count of data equals the number of observations in each year of the alleged cartel period in the dataset used by Dr. Netz in her regression analysis estimating overcharges. An "observation" in her regression is defined by the product-customer-manufacturer-quarter combination.

[54] These sub-periods are provided to illustrate the available data for sensitivity testing of Dr. Netz's model for her assumption of uniformity of cartel impacts and for omitted variables and not as alternative economically relevant periods.

[55] The dummy variables added to Dr. Netz's model in order to segment the 1995-2006 period are jointly statistically significant at the 1% level for all segmentations (1-year, 2-year, and 3-year segmentations). Moreover, the estimated overcharges for at least some sub-periods are statistically significantly different from others.

Highly Confidential

33. For example, for various segmentations (1-year, 2-year and 3-year) of the alleged cartel period, the average overcharge estimates for the entire alleged cartel period deviates substantially from each other and from Dr. Netz's estimates of 22% (for CDTs) and 8.9% (for CPTs). See Tables 3 and 4.  The average cartel period overcharge ranges from 2.2% to 16.8% for CDTs and -5% to 1.3% for CPTs, with all estimates well below Dr. Netz's estimates under her assumption of uniform cartel impact across 1995-2006. See Tables 3 and 4.[56]

34. The fact that Dr. Netz's overcharge model yields such different[57]—and lower— average class-period overcharges when the model is changed slightly to allow for the possibility that the overcharge varied over time indicates that Dr. Netz's model has failed to account for major market factors that affected CRT prices during the time period covered by her analysis.[58]

## IV. Dr. Netz has not demonstrated it is unnecessary to account for CPT floor price regulations in China for her overcharge model to provide reliable overcharge estimates

35. The foregoing discussion demonstrates the importance of inclusion of major market factors

---

[56] The cartel period segmentations in Tables 2 and 3 are illustrative examples; other segmentations may produce somewhat different results. Dr. Netz's model estimates estimate negative overcharges for one or more sub-periods. The average overcharges shown in Table 3 and Table 4 average across the positive and negative estimates when calculating a cartel period overcharge. If periods for which the model estimates negative overcharges are assumed to have had zero overcharges, then the weighted average estimated overcharge across all sub-periods (weighted as before) still ranges widely. For CDTs, the cartel period average ranges from 7.0% for the 1-year segmentation to 22% for Dr. Netz's version which assumes an uniform overcharge for the March 1995-2006 period. For CPTs, they range from 1.2% for the 1-year segmentation, to 8.9% for Dr. Netz's version which assumes an uniform overcharge for the March 1995-2006 period.

[57] The average (across sub-periods) overcharges for various segmentations shown in the final columns of Tables 3 and 4 are statistically significantly different from Dr. Netz's estimates.

[58] Another failing of Dr. Netz's model (even if it accurately estimates the overcharge for the March 1995-2006 period and 2007) is that it can only be applied to a defendant who was engaged in the alleged conduct for the entire alleged cartel period or only in 2007. For example, if a defendant joined the alleged cartel in 1998, then the Netz model provides no estimate of overcharges specifically in the period after that date. All it can provide is an estimate of overcharges for the March 1995-2006 period and for 2007, which is unlikely to be a reliable estimate relevant for that particular defendant.

17

Highly Confidential

in models of overcharges for the reliability of their estimates. Specifically, the discussion illustrates the importance of accounting for major market factors that influence prices separate from the alleged cartel impact in economic modeling. The preceding also demonstrates that inclusion of economically appropriate independent factors can result in different cartel impact and overcharge estimates, including ones that differ from uniform overcharges for an entire period.

36. Overcharge models involve estimation of the "but-for" prices that would likely have been paid by the defendants in the "but-for" world without the alleged activity.[59] Economically sound overcharge estimates involve accounting for factors that influence actual prices and factors that could affect the reasonableness of estimated "but-for" prices. These are both relevant for generating economically reliable overcharge estimates from an overcharge model.[60]

37. In this regard, regulations related to CRT price floors are one form of legal constraint that could matter for evaluating the reliability of a damages model to generate sound overcharge estimates. In my Supplemental Report, I noted that Prof. Clarke (on behalf of Irico) had identified five price floors set by the Chinese government for CPTs during the damages period.[61] I explained that if the but-for prices that Dr. Netz's overcharge model estimates for any CPTs subject to those prices floors were below the corresponding floor, and if the Chinese government regulations limited or influenced Chinese manufacturers' ability or incentive to charge such low "but-for" prices, Dr. Netz's failure to account for the effect

---

[59] "[I]t is necessary to construct a but-for price that the defendant would have charged lawfully. To isolate the effect of the violation and avoid awarding damages for conduct that would be lawful, it is important to modify the defendant's conduct in the but-for world only to the extent necessary to comply with the law." Proving Antitrust Damages, pp. 54-55.

[60] Some of these factors are addressed in prior reports, including my Supplemental Report (including on price regulation). I reserve the right to respond further to Dr. Netz's responses in her Rebuttal report on these topics.

[61] Guerin-Calvert Supplemental Report, ¶¶ 23-26. Specifically, I cited price floors identified by Prof. Clarke for 21-inch and 25-inch CPTs that took effect April 2, 1999 and for 21-inch, 25-inch, and 29-inch CPTs that took effect September 13, 2000. (Id., ¶¶ 25-26.)

of such price floors would cause her to overstate CPT overcharges for some CPTs.[62]

38. Dr. Netz does not deny that the Chinese government imposed floor price regulations during the relevant period. She did not account for these regulations when she developed her damages analysis in 2014 and has not amended her model or its application for estimating overcharges and damages to account for such regulations for any CPTs.[63] Dr. Netz opines that she does not need to make any such amendments for two reasons: (i) she purportedly has demonstrated that the but-for prices she estimates for two of the five price floors Prof. Clarke identified were above the corresponding floors,[64] and (ii) the revenues in China associated with the CPT sizes involved in the price floors Prof. Clarke identified, in the two quarters in which those regulations took effect, purportedly accounted for only 0.2% of the revenue in her CPT overcharge regression, which is "not sufficient to conclude that [Dr. Netz's] model is not an economically sound basis for the calculation of classwide damages."[65]

39. With regard to the first point claimed by Dr. Netz, her price comparisons are insufficient to reject the relevance of price floor regulations for reliable damages estimates for at least some CPTs. Dr. Netz bases her conclusion on comparison of predicted but-for prices with two price floors and does not compare but-for prices estimated by her damages model to three of the five price floors identified by Prof. Clarke.[66] The two price floors took effect

---

[62] Guerin-Calvert Supplemental Report, ¶ 28.

[63] Dr. Netz acknowledged that she was not aware of the floor price regulations in China prior to reviewing my 2022 expert report and the 2022 report of Professor Clark. Deposition of Janet S. Netz, June 9, 2022 (hereinafter "Netz 2022 Deposition"), pp.25-6.

[64] Netz 2022 Rebuttal Report, Table 1.

[65] Netz 2022 Rebuttal Report, p. 10.

[66] For the price floor effective April 2, 1999 for 21-inch CPTs, Dr. Netz states that she is not sure if the floor applied to "round, flat, or both CPTs" and thus she does not know which of her but-for prices to compare to the floor. (Netz 2022 Rebuttal Report, p. 9) For the prices floors effective April 2, 1999 and September 13, 2000 for 25-inch CPTs, it is not possible to identify any 25-inch CPTs manufactured in China in Q2 1999 or Q4 2000 in the dataset on which Dr. Netz relies. Nevertheless, presumably such CPTs were manufactured in China during that time since the Chinese government reported average industry costs for those products. ("Notification of Publishing Industrial Average Production Costs for Some Types of Color CRT and Color TVs," MII-PRC, April 2, 1999, Certified Translation; "Notification

(footnote continued …)

Highly Confidential

on September 13, 2000 for 21-inch and 29-inch CPTs. Dr. Netz observes that the average costs reported by the Chinese government for these two products were for "regular flat" and "ultra-flat" CPTs, respectively, and from this asserts that "a proper comparison should include prices and costs **only of flat CPTs**. (Emphasis added.)"[67] Dr. Netz has previously acknowledged different CPTs have different degrees of flatness,[68] and the degree of flatness influences a CPT's price.[69] However, there is no indication in the data on which Dr. Netz relies that the estimated but-for prices that she develops from her overcharge model and compares to these price floors are for "regular flat" or "ultra-flat" CPTs. Moreover, in Q4 2000, the quarter that shortly followed the floors taking effect, her data identify both the country of origin (e.g., China) and shape ("flat" or "round") for CPTs accounting for roughly 34% of 21-inch CPT revenue and 29% of 29-inch CPT revenue. For these reasons, there may have been a larger volume of CPTs in Dr. Netz's data subject to the Chinese price regulations for which Dr. Netz has not shown with her response on the two examples that their "but-for" prices would have been unaffected by the Chinese government's price floors.

40. With regard to the second point made by Dr. Netz, she asserts that the proportion or magnitude of revenues in China of the CPT sizes subject to price floor regulation in the quarters in which those regulations took effect is small relative to her overall revenues, estimating this at 0.2% of the revenues across the damages period in her CPT overcharge regression. From this 0.2% calculation she infers that this is "not sufficient to conclude that [Dr. Netz's] model is not an economically sound basis for the calculation of classwide damages."[70]   The calculation and conclusion, however, even assuming that Dr. Netz's estimate relies on comprehensive data on CRTs manufactured in China, would only be pertinent if the Chinese government price floors were only in effect for two quarters (Q2

---

of Publishing Industrial Average Production Costs for Some Types of Color CRTs," MII-PRC, September 13, 2000, Attached Table; and Expert Report of Donald Clarke, March 16, 2022, ¶¶ 12(g), 24.)

[67] Netz 2022 Rebuttal Report, p. 9.

[68] See, e.g., Netz 2014 Report, p. 9 and fn. 24.

[69] Netz 2022 Deposition, pp. 37 and 40-41

[70] Netz 2022 Rebuttal Report, p. 10.

Highly Confidential

1999 and Q4 2000). It is outside of my expertise to opine on the length of time for which these or any other Chinese government price floors were in effect, but there is nothing in Dr. Clarke's opinion on the applicability of these regulations, upon which I rely, indicating that they would only be in effect for two quarters.  If they would have been in effect for longer than two quarters (in total), then the share of potentially affected CPT sales would be greater. Furthermore, Dr. Netz's 0.2% CPT revenue estimate for revenues in her CPT overcharge regression includes CPT revenues across all time periods in her overcharge regression. She provides no economic basis for how this calculation and estimate, even if accurate, demonstrates the ability of her overcharge model to account for the impact of changing market factors, such as new regulations, on actual or estimated but-for prices and its ability thereby to provide reliable estimates of overcharges for affected CPTs.[71]

## V.    Conclusion

41. In sum, I conclude that Dr. Netz's overcharge model is unreliable because it fails to control for relevant market factors that likely influenced CRT prices.

---

[71] Dr. Netz's 0.2% estimate is based on dividing the estimated CPT revenues during the specific quarters for specific CPTs by total revenues of all CPTs across the full alleged damages period in her regression data (e.g., Q2 1995 – Q4 2007).  Any different time period for either the numerator or alternatively the denominator will tend to generate larger percentages.

Highly Confidential

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. This declaration was executed on the 15th day of February 2023 in Washington DC.

Margaret E. Guerin-Calvert

February 15, 2022

Highly Confidential

## VI.   Appendix A

## Table 1: CDT Observations by Sub-Period in Dr. Netz's CDT Overcharge Model

| Sub-Periods for 1995-2006 | Observations in Each Period | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| 1-year | 33 | 63 | 95 | 146 | 135 | 126 | 108 | 89 | 60 | 58 | 53 | 45 | 38 |
| 2-year | 96 | | 241 | | 261 | | 197 | | 118 | | 98 | | 38 |
| 3-year | 191 | | | 407 | | | 257 | | | 156 | | | 38 |
| 12-year (Netz model) | 1,011 | | | | | | | | | | | | 38 |

*Sources: Backup to Expert Report of Janet S. Netz, Ph.D., September 26, 2014*

*Notes:*

    *(1)   All rows use the same data used by Dr. Netz for her overcharge regressions – i.e., data at the application-manufacturer-size level.*

    *(2)   All sub-periods that include 1995 include only the last three quarters of that year.*

Highly Confidential

## Table 2: CPT Observations by Sub-Period in Dr. Netz's CPT Overcharge Model

| Sub-Periods for 1995-2006 | Observations in Each Period | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| 1-year | 83 | 126 | 146 | 186 | 216 | 186 | 187 | 233 | 219 | 199 | 183 | 191 | 168 |
| 2-year | 209 | | 332 | | 402 | | 420 | | 418 | | 374 | | 168 |
| 3-year | 355 | | | 588 | | | 639 | | | 573 | | | 168 |
| 12-year (Netz model) | 2,155 | | | | | | | | | | | | 168 |

*Sources: Backup to Expert Report of Janet S. Netz, Ph.D., September 26, 2014*

*Notes:*

    *(1)  All rows use the same data used by Dr. Netz for her overcharge regressions – i.e., data at the application-manufacturer-size level.*

    *(2)  All sub-periods that include 1995 include only the last three quarters of that year.*

Highly Confidential

# Table 3: CDT Overcharges Estimated by Dr. Netz's Overcharge Model when Overcharges Are Allowed to Vary for Sub-Periods Between March 1995 and December 2006

| Sub-Periods for 1995-2006 | Estimated Overcharges for Each Period | | | | | | | | | | | | | Average Estimated Overcharge for Class Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | |
| 1-year | 24.4% | 27.1% | 2.2% | -13.6% | -0.4% | -6.5% | -15.0% | -16.4% | -3.8% | 1.7% | 0.3% | -7.1% | -4.8% | 2.2% |
| 2-year | 22.5% | | -6.3% | | 5.7% | | -0.8% | | 10.3% | | 1.3% | | 7.7% | 6.5% |
| 3-year | 28.4% | | | 13.6% | | | 0.2% | | | 12.0% | | | -1.0% | 16.8% |
| 12-year (Netz model) | 22.0% | | | | | | | | | | | | 11.4% | 22.0% |

*Sources: Backup to Expert Report of Janet S. Netz, Ph.D., September 26, 2014*

*Notes:*

(1) *The overcharge for each period is estimated by estimating a regression that includes a dummy, which takes a value of 1 when an observation falls within the period, and 0 otherwise.*

(2) *All sub-periods that include 1995 include only the last three quarters of that year.*

(3) *The overcharge relative to actual price is calculated as in Dr. Netz's Errata: first, the coefficient is converted to percent terms using the formula: $p = e^{\left(b - \frac{1}{2} V(b)\right)}$, where b is the coefficient on the cartel dummy and $V(b)$ is the variance of b. The overcharge in terms of actual price is $OC = p/(1 + p)$.*

(4) *All specifications use the same data used by Dr. Netz for her overcharge regressions – i.e., data at the application-manufacturer-size level; additionally, the error correction method used by Dr. Netz (clustering on the panel variable) was maintained.*

(5) *All specifications use quantity weights (following Dr. Netz.)*

(6) *All specifications were estimated using the same control variables used by Dr. Netz: Bank of Korea glass PPI (also interacted with size and size squared), OECD GDP, unemployment and unemployment squared, revenue share of LCD monitors and its square, linear trend and linear trend squared.*

(7) *Each calendar year is weighted by its share of IPP members' total CDT expenditures.*

(8) *All rows in the table use Dr. Netz's overcharge model -- with added dummy variables to segment the March 1995-December 2006 period in the case of the first three rows. None of the results are from a model containing the market factors added in the Guerin-Calvert reports.*

Highly Confidential

# Table 4: CPT Overcharges Estimated by Dr. Netz's Overcharge Model when Overcharges Are Allowed to Vary for Sub-Periods Between March 1995 and December 2006

| Sub-Periods for 1995-2006 | Estimated Overcharges for Each Period | | | | | | | | | | | | | Average Estimated Overcharge for Class Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | |
| 1-year | 7.6% | 5.6% | 0.1% | -7.0% | -10.2% | -5.6% | -7.9% | -16.7% | -11.8% | -7.4% | -5.8% | -5.3% | -4.6% | -5.0% |
| 2-year | 9.3% | | 2.2% | | -1.7% | | -5.7% | | -0.9% | | 0.7% | | -3.2% | 0.8% |
| 3-year | 8.5% | | | -0.7% | | | -3.9% | | | 0.0% | | | -4.6% | 1.3% |
| 12-year (Netz model) | 9.0% | | | | | | | | | | | | 3.1% | 8.9% |

*Sources: Backup to Expert Report of Janet S. Netz, Ph.D., September 26, 2014*

*Notes:*

(1) *The overcharge for each period is estimated by estimating a regression that includes a dummy variable, which takes a value of 1 when an observation falls within the period, and 0 otherwise.*

(2) *All sub-periods that include 1995 include only the last three quarters of that year.*

(3) *The overcharge relative to actual price is calculated as in Dr. Netz's Errata: first, the coefficient is converted to percent terms using the formula: $p = e^{\left(b - \frac{1}{2}V(b)\right)}$, where b is the coefficient on the cartel dummy and V(b) is the variance of b. The overcharge in terms of actual price is $OC = p/(1 + p)$.*

(4) *All specifications use the same data used by Dr. Netz for her overcharge regressions – i.e., data at the application-manufacturer-size level; additionally, the error correction method used by Dr. Netz (clustering on the panel variable) was maintained.*

(5) *All specifications use quantity weights (following Dr. Netz.)*

(6) *All specifications were estimated using the same control variables used by Dr. Netz: Bank of Korea glass PPI (also interacted with size and size squared), OECD GDP, unemployment and unemployment squared, revenue share of LCD monitors and its square, linear trend and linear trend squared.*

(7) *Each calendar year is weighted by its share of IPP members' total CPT expenditures.*

(8) *All rows in the table use Dr. Netz's overcharge model -- with added dummy variables to segment the March 1995-December 2006 period in the case of the first three rows. None of the results are from a model containing the market factors added by Professor Willig.*

Center for Healthcare Economics and Policy



**FTI Center for Healthcare Economics and Policy**
**555 12th Street, NW**
**Washington, DC 20004**

**p: (202) 589-3451 | f: (202) 589-3480**
**www.fticonsulting.com**

## MARGARET E. GUERIN-CALVERT
Email: Margaret.Guerin-Calvert@fticonsulting.com

## EDUCATION

1976        A.B., Economics, Brown University

1979        M.P.A., (Masters in Public Affairs), Princeton School of Public and International
            Affairs, Princeton University

## PROFESSIONAL EXPERIENCE

2012-present  President, Center for Healthcare Economics and Policy and Senior Managing
              Director, FTI Consulting, Inc.

2012-2/2019   Senior Consultant, Compass Lexecon
              (continue as Senior Consultant on selected matters)

2008-2012     Vice Chairman and Senior Managing Director, Compass Lexecon
              (formerly Competition Policy Associates)

2003-2008     President, Competition Policy Associates (As of January 2006, also Senior
              Managing Director, FTI Consulting Inc.)

1994-2003     Principal, Economists Incorporated

1990-1994     Assistant Chief, Economic Regulatory Section, Economic Analysis Group,
              Antitrust Division, U.S. Department of Justice

1987-1990     Senior Economist, Economists Incorporated

1986-1987     Director of Analytical Resources Unit,
              Economic Analysis Group, Antitrust Division

1985-1986     Economist, Economic Analysis Group,
              Antitrust Division, U.S. Department of Justice

| | |
|---|---|
| 1982-1985 | Economist, Financial Structure Section, Division of Research and Statistics, Board of Governors of the Federal Reserve System |
| 1979-1982 | Economist, Economic Policy Office, Antitrust Division, U.S. Department of Justice |
| 1976-1977 | Research Associate, Energy Economics Group, Arthur D. Little, Inc. |

## TEACHING EXPERIENCE

| | |
|---|---|
| 1984 | Adjunct Lecturer, Sanford School of Public Policy (formerly Institute of Policy Sciences), Duke University |
| 1984-1989 | Executive Education for Top State Managers, conducted by The Institute of Policy Sciences, Duke University |
| 1983 | Lecturer, Board of Governors of the Federal Reserve System and American Institute of Banking |
| 1979 | Teaching Assistant, Princeton University |

## TESTIMONIES

Investigation into the Competitive Marketing of Air Transportation, CAB.

Arbitration Between First Texas Savings Association and Financial Interchange Network.

In Re "Apollo" Air Passenger Computer Reservation System (CRS) MDL DKT. No. 760 M-21-49-MP.

*U.S. v. Ivaco, Inc.; Canron, Inc.; and Jackson Jordan, Inc.*

Consent Order Proceeding before the Competition Tribunal, Canada Between The Director of Investigation and Research and Air Canada, Air Canada Services, Inc., PWA Corporation, Canadian Airlines International, and the Gemini Group Automated Distribution Systems Inc.

In the Matter of an Application by the Director of Investigation and Research under Section 79 of the Competition Act and in the Matter of certain practices by the D & B Companies of Canada Ltd. (Respondent), before the Competition Tribunal.

*Beville v. Curry, et al*.; Comanche County District Court, Case No. CJ-95-115.

*U.S. v. Northshore Health System, et al*.

2

Testimony before Committee on Banking and Financial Services, U.S. House of Representatives (April 29, 1998)
*Easy Gardener, Inc. v. Dalen Products, Inc.*

*Trigen – Oklahoma City Energy Corporation v. Oklahoma Gas & Electric Company.*

*State of California v. Sutter Health; Alta Bates; and Summit Medical Center.*

*Ernest T. Smith, III et al. v. N. H. Department of Revenue Administration, et al.*

*St. Luke's Hospital v. California Pacific Medical Center; Sutter Health System.*

In Re: Cigarette Antitrust Litigation and related cases, *Holiday Wholesale Grocery Co., et al. v. Philip Morris Inc., et al.*, MDL Docket No.: 1342 Civil Action No.: 1:00-cv-0447-JOF and *Artemio Del Serrone, Steven Ren, Heather Snay, Jon Ren, Keith Pine, and Bill Reed, on behalf of themselves and all others similarly situated v. Philip Morris Inc., R.J. Reynolds Tobacco Co., Brown & Williamson Tobacco Corp., Lorillard Tobacco Co., Liggett Group, Inc., and Brooke Group, Ltd.*, Case No. 00-004035 CZ, State of Michigan in the Circuit Court for the County of Wayne.

In Re: Vitamin Antitrust Litigation; Misc. No. 99-197 (THF) MDL No. 1285.

Economic Report in Response to European Commission's Statement of Objections Dated 22 May 2003.

European Commission Hearing, Case No Comp/E-2/37.533-Choline Chloride.

Report of Robert D. Willig and Margaret E. Guerin-Calvert to the NZCC *An Economic Analysis of the Consumer Benefits and Competitive Effects of the Proposed Alliance Between Qantas Airways and Air New Zealand* .

Report of Robert D. Willig and Margaret E. Guerin-Calvert to the NZCC *An Economic Assessment of Professor Tim Hazledine's Model of the Proposed Alliance Between Qantas and Air New Zealand.*

Presentations by Robert D. Willig and Margaret E. Guerin-Calvert to the NZCC *An Economic Analysis of the Consumer Benefits and Competitive Effects of the Proposed Alliance Between Qantas Airways and Air New Zealand; Consumer Benefits.*

*Erol Riza, M.D. et al., Plaintiffs v. Mercy Health System Physician Hospital Organization, et al, Defendants*, Case No. CO199904796/Case NO.CI0200104455.

*Federal Trade Commission, et al. v. Arch Coal, Inc., et al.* Case No.1:04CV00534 (JDB).

3

Comments of Margaret E. Guerin-Calvert, Competition Policy Associates, Inc., Washington, DC on Revision of Regulation (EEC) 2299/89 on a code of conduct for computerized reservation systems (CRS), July 8, 2004.

In the Matter of an Appeal from Determinations of the Commerce Commission, Between Air New Zealand Limited and Qantas Airways Limited and Commerce Commission, High Court of New Zealand, CIV 2003 404 6590.

Economic Assessment of Issues in FERC NOPR for the Alaska Natural Gas Pipeline, December 17, 2004.

*In Re: DRAM Antitrust Litigation*, Master File No. M-02-1486PJH, MDL No. 1486, United States District Court, Northern District of California.

*In Re: Carbon Black Antitrust Litigation*, MDL Docket No. 1543, No. 03-CV-10191-DPW (D. Mass.)

*Ryan Rodriguez, et.al. v. West Publishing Corporation, et. al.*, Central District of California, Case No. CV 05-3222 R(MCx).

*Neotonus, Inc. v. American Medical Association and American Urological Association,* In the United States District Court for the Northern District of Georgia Atlanta Division   Civil Case No. 1: 04-CV-2050.

*Budget Pest Prevention, Inc., et. al. v. Bayer Corporation, Bayer CropScience, L.P., and BASF Corporation,* In the United States District Court for the Western District of North Carolina Asheville Division, Case No. 1:05-CV-90.

*National Recycling, Inc. v. Waste Management of Massachusetts, Inc., Browning-Ferris Industries, Inc., and SEMASS Partnership LP,* United States District Court for the District of Massachusetts, Case No. 03-12174-NMG.

*In the Matter of Mechanical and Digital Phonorecord Delivery Rate Adjustment Proceeding,* Testimony before the Copyright Royalty Board of the Library of Congress, Washington, DC, Docket No. 2006-3 CRB DPRA.

In the matter of *United States v. ASCAP Application of America Online, Inc.; United States v. ASCAP, Application of RealNetworks, Inc.* and *United States v. ASCAP, Application of Yahoo! Inc.,* United States District Court Southern District of New York, Civil Action No. 41-1395 (WCC). May 4, 2007.

*Lockheed Martin Corporation*, Plaintiff, v. *L-3 Communications Corporation, Mediatech, Inc*., Kevin Speed, Steve Flemming, and Patrick St. Romain, Defendants.  *L-3 Communications Corporation*, Counterclaim and Third-Party Plaintiff, v. *Lockheed Martin Corporation,* Counterclaim Defendant, and Jack Kelly, Thomas Dorsey, Michael Homan, and Thomas Hull,

4

Third-Party Defendants. US District Court for the Middle District of Florida, Orlando Division, Case No. 6:05-cv- 1580-Orl-31KRS, Expert Report August 15, 2007.

*Abbott Laboratories*, an Illinois corporation, *Fournier Industrie et Sante*, a French corporation, and *Laboratoires Fournier, S.A.*, a French corporation, Plaintiffs, v. *Teva Pharmaceuticals USA, Inc.*, a Delaware corporation, Defendant; Civil Action No. 02-1512 (KAJ); *Teva Pharmaceuticals USA, Inc.*, a Delaware corporation, *Teva Pharmaceutical Industries, Ltd.*, an Israeli corporation, and *Novopharm, Ltd.*, a Canadian Corporation, Counterclaim Plaintiffs, v. *Abbott Laboratories*, an Illinois corporation, *Fournier Industrie et Sante*, a French corporation, and *Laboratoires Fournier, S.A.*, a French corporation, Counterclaim Defendants; *Abbott Laboratories*, an Illinois corporation, *Fournier Industrie et Sante*, a French corporation, and *Laboratoires Fournier, S.A.*, a French corporation, Plaintiffs, v. *Impax Laboratories, Inc.*, a Delaware corporation, Defendant; Civil Action No. 03-120-KAJ; *Impax Laboratories, Inc.*, a Delaware corporation, Counterclaim Plaintiff, v. *Abbott Laboratories*, an Illinois corporation, *Fournier Industrie et Sante*, a French corporation, and *Laboratoires Fournier, S.A.*, a French corporation, Counterclaim Defendants.; *in re TriCor direct purchaser antitrust litigation*; Civil Action No. 05-340 (KAJ); *in re TriCor indirect purchaser antitrust litigation*; Civil Action No. 05-360 (KAJ).

*State of California ex rel. Lockyer et al.*, Plaintiffs *v. Infineon Technologies AG et al.*, Defendants. Case No. C-06-04333 PJH  US District Court for the Northern District of California, San Francisco Division.

*Natchitoches Parish Hospital Service District, on behalf of itself and all others similarly situated, Plaintiff, v. Tyco International, Ltd., Tyco International, (U.S.), Inc., Tyco Healthcare Group, L.P., The Kendall Healthcare Products Company,* Civil Action No. 05-12024 PBS.

*Daniels Sharpsmart, Inc. v. Tyco International, (US) Inc., Tyco Healthcare Group, L.P., Becton Dickinson and Company, Novation, LLC, VHA, Inc., Premier Inc., Premier Purchasing Partners, and Consorta, Inc.*, United States District Court for the Eastern District of Texas, Texarkana Division, Civil Action No. 5:05-cv-169.

*In re Wellbutrin SR antitrust litigation (direct purchaser actions),* Civil Case no. 2:04-cv-5525 (E.D. Pa.); *Sheet Metal Workers Local 441 Health and Welfare Plan, et al. v. GlaxoSmithKline, plc, et al. (indirect purchaser actions),* Civil Case no. 2:04-cv-5898 (E.D. Pa.); *Medical Mutual of Ohio, Inc. v. GlaxoSmithKline, plc, et al.,* Civil Case no. 2:05-cv-396 (E.D. Pa.)

*In the Matter of the Form A Application by The Doctors Company, An Interinsurance Exchange, with Respect to the Acquisition of American Healthcare Indemnity Company*, Hearing before the Insurance Commissioner of the State of Delaware, Docket No. 678.

*L-3 Communications Integrated Systems, LP, Plaintiff v. Lockheed Martin Corporation, Defendant*, United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3-07CV0341.

*DataTreasury Corporation v. Wells Fargo & Company, et al., Defendants*, United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:06CV-72(DF).

*Federal Trade Commission and The State of Ohio v. ProMedica Health System, Inc.,* United States District Court for the Northern District of Ohio, Western Division, Case No. 3:11-cv-00047-DAK. Testimony before Pennsylvania Insurance Department regarding proposed affiliation between Highmark, Inc. and the West Penn Allegheny Health System (April 17, 2012) and Report (Economic Analysis Of Highmark's Affiliation with WPAHS and Implementation of an Integrated Healthcare Delivery System), April 2013.

Highmark Inc.'s Acquisition of Control of Blue Cross of Northeastern Pennsylvania and Subsidiaries, Pennsylvania Insurance Department.

In re: Cathode Ray Tube (CRT) Antitrust Litigation (United States District Court Northern District of California San Francisco Division).

*Commonwealth of Massachusetts, Plaintiff, v. Partners Healthcare System, Inc., South Shore Health and Educational Corp., and Hallmark Health Corp., Defendants,* Civil Action No. 14-2033-BLS, Expert Declaration of Robert D. Willig and Margaret E. Guerin-Calvert.

*Methodist Health Services Corporation v. OSF Healthcare System*, United States District Court for the Central District of Illinois, Peoria Division, Case No: 13-cv-1054.

In re: Lithium Ion Batteries Antitrust Litigation, United States District Court for the Northern District of California, Oakland Division, Case No. 13-md-0242 (YGR), August 5, 2016.

"Economic Assessment of International Comparison Of South African Price Levels (OECD Working Paper No. 85)," Presentation at Competition Commission South Africa, Health Market Inquiry Seminar: World Health Organisation / Organisation For Economic Co-Operation And Development Working Paper No. 85.

Evanston Northwestern Healthcare Corporation Antitrust Litigation, United States District Court Northern District of Illinois Eastern Division, No. 07-CV-4446.

*BRFHH Shreveport, L.L.C. d/b/a University Health Shreveport and Vantage Health Plan, Inc., v. Willis-Knighton Medical Center, d/b/a Willis-Knighton Health System*, United States District Court Western District of Louisiana Shreveport Division, No. 5:15-CV-02057.

*UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated v. Sutter Health; Sutter East Bay Hospitals; Sutter West Bay Hospitals; Edent Medical Center; Sutter Central Valley Hospitals; Mills-Peninsula Health Services; Sutter Health Sacramento Sierra Region; Sutter Coast Hospital; Palo Alto Medical Foundation for Healthcare, Research, and Education; and Sutter Medical Foundation*, Superior Court of the State of California for the City and County of San Francisco, Cas No. CGC-14-538451.

Proposed Merger of Mountain States Health Alliance and Wellmont Health System, State of Tennessee Certificate of Public Advantage.

6

*Response to HMI Provisional Findings and Recommendations Report* (with Jeremy Nighohossian, PhD), October 15, 2018.

Presentations to HMI on *Market Concentration – Facilities and Funders and Supply Induced Demand* (with Jeremy Nighohossian, PhD), April 9-12, 2019.

*In re: Opana ER Antitrust Litigation*, MDL No. 2580, Lead Case No. 14-cv-10150, United States District Court Northern District of Illinois Eastern Division.

*In re: In the Matter of Illumina, Inc., a corporation and GRAIL, Inc., a corporation,* United States of America Before the Federal Trade Commission Office of Administrative Law Judges, Docket No. 9401, Deposition, August 3, 2021 and Trial Deposition Testimony, September 30, 2021.

## RESEARCH, PUBLICATIONS AND PRESENTATIONS

"Stories of Innovation (Workforce, Building Economic Well-Being)," Panelist at NASEM Roundtable on Population Health Improvement's The Role of Business in Improving Health and Health Equity: A Workshop, Washington, D.C., December 13, 2022.

"Looking Back and Looking Forward: Insights on FTC Policy Perspectives on Certificate of Public Advantage," AHLA Antitrust Practice Group, November 22, 2022 (co-authored with Vic Domen, Norton Rose Fulbright US LLP).

"Economic Impact of Health Equity." Panelist at National Forum for Heart Disease & Stroke Prevention's 20th Annual Meeting: Health Equity Benefits Everyone, October 27, 2022.

"Health Disparities & Quality: Perspectives from the Pandemic and New Regulatory Response." Presentation at iFHP Biennial Vancouver Conference, October 5, 2022.

"What Business Leaders Need to Know About the Benefits of a Healthy Workforce." FTI Journal, with Bill Purcell and Michael Cropp, April 2022.

"Getting Your Deal Through: How to Advance Systemness, Promote Integrated Care Delivery, and Successfully Defend Vertical and Horizontal Transactions," Presentation at AHLA Annual Meeting, June 28-30, 2021.

"Mobilizing Faith-based and Trusted Community Leaders in Buffalo, New York to Improve Blood Pressure Control in Underserved Communities," Presentation at National Forum Mid-Year Virtual Convening: Answering the Surgeon General's Call to Action to Control Hypertension, May 6, 2021.

"Economic Impact of Health," Presentation at National Forum for Heart Disease & Stroke Prevention Value & Access Partner Spotlight Meeting, December 9, 2020.

"Cardiovascular Health – An Economic Imperative," Presentation at National Forum for Heart Disease & Stroke Prevention 18th Annual Meeting, October 15, 2020.

"Health & Economic Impact of COVID-19: Public-Private Partnership Opportunities for Health, Equity & Economic Vitality," Center for Healthcare Economics and Policy, FTI Consulting, Inc., October 2020 (co-authored with Rucha Kulkarni and Sherry Wang).

Nick Macchione, Wilma Wooten and Carey Riccitelli, "Antidote to Pandemics – Population Health Leadership in Action," Action Collaborative on Business Engagement in Building Healthy Communities is an ad-hoc activity associated with the National Academies of Sciences, Engineering, and Medicine's Roundtable on Population Health Improvement (Moderated webinar on July 21, 2020).

Maria Whyte, George Nicholas, and Raul Vasquez, "Faith, Community & Government – Health Collaboration to Address Health Disparities during the COVID-19 Pandemic," Action Collaborative on Business Engagement in Building Healthy Communities is an ad-hoc activity associated with the National Academies of Sciences, Engineering, and Medicine's Roundtable on Population Health Improvement (Moderated webinar on July 15, 2020).

Terry Williams and William Satterwhite, "A Conversation About Employer Covid19 Issues and Emerging Opportunities," Action Collaborative on Business Engagement in Building Healthy Communities is an ad-hoc activity associated with the National Academies of Sciences, Engineering, and Medicine's Roundtable on Population Health Improvement (Moderated webinar on May 22, 2020).

"The Economic Impact of Poor Health on Our WNY Community," Center for Healthcare Economics and Policy, FTI Consulting, Inc., October 2019.

"Some Thoughts on Cartel Sanction," (with Keith N. Hylton, Daniel L. Rubinfeld, Gregory J. Werden, Koren Wong-Ervin, and Terry Calva), The Antitrust Source, June 2019.

"Novant Health Economic Impact & Community Benefit Study," Center for Healthcare Economics and Policy, FTI Consulting, Inc., May 2019.

"Uncertainty: Driving New Partnerships," Presentation at Colorado Association of Healthcare Executives 2019 Annual Conference, May 3, 2019.

"Stifling Innovation, Is it Worse than Price-Fixing?" Presentation at 67th ABA Section of Antitrust Law Spring Meeting, March 26,-29 2019.

"Advanced Merger Economics," Presentation at ABA Antitrust Masters Course IX, October 19, 2018.

"Nashville Chamber Health Competitiveness Initiative," Webinar Presentation at the National Academies of Sciences, Engineering, and Medicine's Action Collaborative on Business Engagement in Building Health Communities, June 6, 2018.

"Employers as Levers of Change for Health and Economic Well-Being," Presentation at IBM Watson Health's Advantage Conference 2018: Remarkable Together, May 14-17, 2018.

"Protecting Brand and Distributor Investment on the Internet," Presentation at 66th ABA Section of Antitrust Law Spring Meeting, April 11-13, 2018.

"UnityPoint Health® Economic Impact & Community Benefit Study," Center for Healthcare Economics and Policy, FTI Consulting, Inc., July 2017.

"Nashville Region Health Competitiveness Initiative: 2017 Report," Center for Healthcare Economics and Policy, FTI Consulting, Inc. and The Research Center, Nashville Area Chamber of Commerce, May 2017.

 "Eyes on the 1-800 Prize: IP Restrictions and Online Competition", Presentation at 65th ABA Section of Antitrust Law Spring Meeting, March 29-31, 2017.

"Using Population Health Data for Facility Planning," Presentation at the Canadian Institute, Canadian Healthcare Infrastructure Conference, October 25, 2016.

"The Economic Impact of Novant Health in North Carolina," Center for Healthcare Economics and Policy, FTI Consulting, Inc., July 2016.

"Economic Assessment of International Comparison of South African Price Levels (OECD Working Paper No. 85)", May 23, 2016.

"Mergers: Providers & Payers," Presentation at ABA Health Law Section, ABA Section of Antitrust Law and the AHLA 2016 Antitrust in Healthcare Conference, May 12-13, 2016.

"Consumerization of Healthcare", Presentation at Brown University's Consumerization of Healthcare Event, May 11, 2016.

"The Intersection of Economics and Well-being," U.S. Chamber of Commerce's 4th Annual Health Care Summit, Optimizing the Next Generation of Health Care, October 20, 2015.

"Assessment of Nashville Region Health, Cost, Access, and Quality: Results of a Pilot Study," (with Jen Maki, Ph.D., lead author, Center for Healthcare Economics and Policy, FTI Consulting, Inc. and The Research Center, Nashville Area Chamber of Commerce), June 2015.

"Re-Aligning Prospective Hospital Merger Guidance: Moving Beyond Concentration to More Meaningful Approaches" (with Jen Maki and Bruce C. Vladeck), Working Paper, http://dx.doi.org/10.2139/ssrn.2593165, April 2015.

"Competitive Effects Analyses of Hospital Mergers: Are We Keeping Pace with Dynamic Healthcare Markets?," *Antitrust Bulletin*, Vol. 59, No. 3, Fall 2014.

"Public Health, Public Policy, and the Law: Organizational Change in Healthcare" Presentation at Summer Institute on Health Policy, RWJF Center for Health Policy at Meharry Medical College, June 2014.

"Issues in Consolidation–Industry Perspectives" Presentation at AHLA/ABA 2014 Antitrust in Health Care, May 2014.

"Do Health Care Mergers Deliver Better Health Care?" Presentation at ABA Section of Antitrust Law Spring Meeting, March 2014.

"Hospital Realignment: Mergers Offer Significant Patient and Community Benefits," (with Jen Maki) THE CENTER FOR HEALTHCARE ECONOMICS AND POLICY, January 2014.

"Assessing Hospital Mergers and Rivalry in an Era of Health Care Reform," (with Jeffrey Brennan) *Antitrust Magazine*, Summer 2013.

Presentation at the ABA Retrospective Analysis of Agency Determinations in Merger Transactions Symposium, Washington, DC, June 2013.

Signatory, Brief of Antitrust Economists as Amici Curiae before the Supreme Court, Federal Trade Commission v. Actavis, Inc., et al., No. 12-416 (February 28, 2013).

"The Direction and Economic Impact of Health Care Reform Post the Supreme Court Decision" Presentation at 2012 Ninth Circuit Judicial Conference, August 2012 (w/ Dawn Gideon, and Bruce Sokler).

Presentation to the Section of Antitrust Law Spring Meeting, March 2012, *Fundamentals – Antitrust Economics Analytical Tools.*

Presentation at Pepper Hamilton's Annual Antitrust Developments Update CLE Event, Philadelphia, PA, December 2011, *Antitrust-Intellectual Property Regulatory and Litigation Update.*

"Assessment of Cost Trends and Price Differences for U.S. Hospitals," (with Guillermo Israilevich), March 2011.

"U.S. Antitrust Law Developments," *Canadian Competition Record*, Winter 2010.

"A Critique of Recent Publications Claiming Provider Market Power," (with Guillermo Israilevich), October 2010.

Presentation at the Antitrust Masters Course V, Section of Antitrust Law, American Bar Association, Williamsburg, VA, September 2010, *Using Economists and Other Experts.*

"U.S. Antitrust Law Developments," *Canadian Competition Record*, Winter 2009.

Presentation at the Georgetown Global Antitrust Enforcement Symposium, September 2009, *Monopolization and Dominance: How Will New Economic Thinking Affect Enforcement?*

Presentation to the Section of Antitrust Law Spring Meeting, March 2009, *Resources for Class Action Litigation: A Demonstration of Critical Issues and Techniques to Deal with them, An Economist's Perspective.*

"Coordinated Effects Analysis: Cruise Line Mergers (2002)," in J. Kwoka Jr. and L. White, eds. *The Antitrust Revolution*, (5th edition), 2009.

Presentation at the Georgetown Global Antitrust Enforcement Symposium, September 2008, *Lost in Translation: Is Economics the Lingua Franca of International Merger Control?*
"U.S. Antitrust Law Developments," *Canadian Competition Record*, Spring 2008.

"U.S. Antitrust Law Developments," *Canadian Competition Record*, Summer 2007.
"U.S. Antitrust Law Developments," *Canadian Competition Record*, Fall 2006.

Presentation at the American Bar Association Spring Conference, March 28-30, 2006, *Using Economic Experts.*

"Merchant Benefits and Public Policy towards Interchange: An Economic Assessment," *The Review of Network Economics*, Vol. 4 Issue 4, December 2005. pp 384 - 414 (with Janusz A. Ordover, New York University and Competition Policy Associates), and also at the Federal Reserve Bank of New York and the Review of Network Economics conference on "Antitrust Activity in Card-Based Payment Systems: Causes and Consequences," September 15, 2005.

"The Role of the Economist/Economics in 'Proving' Coordinated Effects," the Milton Handler Annual Antitrust Review sponsored by the Association of the Bar of the City of New York. Published in *Columbia Business Law Review*. 2004 Milton Handler Antitrust Review, Colum. Bus. L. Rev. 345 Vol 2005 (2).

"U.S. Antitrust Law Developments," *Canadian Competition Record*, Fall 2005.

"U.S. Antitrust Law Developments," *Canadian Competition Record*, Fall 2004.

"U.S. Antitrust Law Developments," *Canadian Competition Record,* Spring 2004
Comments on "Regulations Amending the Canadian Computer Reservation Systems (CRS)," November 2003.

Testimony at the FTC and DOJ Hearings on Healthcare and Competition and Law and Policy, February – May 2003.

11

Presentation before the Computer Industry an Internet Committee Program, *Antitrust Counterclaims in Patent Infringement Lawsuits*, American Bar Association – Section of Antitrust Law, Spring Meeting, April 2-4, 2003.

"Economic Analysis of DOT Proposals to Change the CRS Rules," Appendix to Comments of Galileo International, (with I. Curtis Jernigan, and Gloria Hurdle), March 15, 2003.

"Economic Analysis of Healthcare Cost Studies Commissioned by Blue Cross Blue Shield Association," (with David Argue, Paul Godek, Barry Harris, Stephanie Mirrow), February 25, 2003.

"U.S. Antitrust Law Developments," *Canadian Competition Record*, Winter 2002-2003.

"What's New in Networks?" *Antitrust Litigator*, Summer 2002.

"Competition and Innovation in the Context of Network Economics," at the DOJ/FTC Hearings on Competition and Intellectual Property Law in the Knowledge-Based Economy, February 20, 2002.

"U.S. Antitrust Law Developments," Canadian Competition Record, Winter 2001-2002.

"Review of Selected Economic Literature on Merger Analysis," (with Stephanie Mirrow and Su Sun), July 2001. *Perspectives on the Concepts of Time, Change, and Materiality in Antitrust Enforcement*. Section of Antitrust Law, American Bar Association, (also presented at ABA Annual Meeting, August 2001).

"U.S. Antitrust Law Developments," Canadian Competition Record, Winter 2000-2001.

"Presenting Damages Evidence" before the Practicing Law Institute, Antitrust Litigation: Strategies for Success, November 30, 2000.

"Overview of B2Bs: Which Ones Raise Antitrust Issues?" before the Sixth Annual Health Care Forum, Northwestern University School of Law, November 2-3, 2000.

"An Economist's Perspective on B2Bs," Economists Ink, Fall 2000.

"How Do the New Competitor Collaboration Guidelines Address the New Economy?" before the ABA, Antitrust Section, Joint Ventures and Strategic Alliances, November 11-12, 1999.

"The Role of the Expert in Damages Analysis" before the Practicing Law Institute, November 8, 1999.

"Bank Mergers and the 1992 Merger Guidelines: The Bank of America/Security Pacific Transaction," (with Janusz Ordover), September 1999 (prepared for presentation at the 25th Anniversary of the Economics Analysis Group at the US Department of Justice).  *Review of Industrial Organization, 16: 151 – 165, 2000.*

"Maximizing current and future network competition in payment systems" (with Janusz Ordover) before the American Bar Association, Antitrust Section, Antitrust Issues in High-Tech Industries Workshop, Scottsdale, AZ, February 25-26, 1999.

Supplemental Analysis of "Inherent Reasonableness" Survey, prepared for HIMA (with Matthew Mercurio); February 1999.

Report on DMERC "Inherent Reasonableness" Survey, prepared for HIMA (with Matthew Mercurio); November 1998.

Summary Report: Interviews of Representative HIMA Members' Views on FASA, prepared for HIMA (with Matthew Mercurio); July 1997.

"Networks and Network Externalities: What the Antitrust Lawyer Needs to Know: Concepts and Theory," before the American Bar Association, Antitrust Section, 45th Annual Spring Meeting, Washington, DC, April 10, 1997.

"Insights into Efficiencies from Analyses of Efficiencies in Hospital and Bank Mergers," before the American Bar Association, Antitrust Law Section, Washington, DC, November 7-8, 1996.

"Issues in Managed Care "Markets," before the American Bar Association Forum on Health Law and Antitrust Law Section (with Robert B. Greenbaum), New Orleans, Louisiana, October 24-25, 1996.

"Current Merger Policy: Banking and ATM Network Mergers," *Antitrust Bulletin*, Vol. XLI, No. 2, Summer 1996.

"ATM and Bank Electronic Networks: Competitive Issues and Technological Change," for presentation at the 71st Annual WEA International Conference, June 29, 1996.

"Assessing the Implications of Kodak for Franchise Market Power Issues," before the American Bar Association, Antitrust Law Section, Spring Meeting, Washington, DC, March 27, 1996.

"Current Merger Policy: Banking and ATM Network Mergers," before the OCC Conference, November 1995.

"Economists and Empirical Analysis in the Merger Review Process: Beyond Market Share and HHI Calculations," before the American Bar Association, Antitrust Law Section and the International Bar Association Antitrust and Trade Law Committee, Washington, DC, November 9-10, 1995.

"Network Merger Analysis," for presentation at the 43rd Annual American Bar Association, Antitrust Law Section, April 6, 1995.

"Assessing the Implications of Bank Merger Transactions after Interstate Banking and Branching Legislation: Lessons to Be Drawn From Bank Merger Cases and Analysis in the '90's," for presentation at ACI Third Annual Bank Regulation Conference, Washington, DC, March 16, 1995.

"Key Issues in Antitrust Analysis of Bank Mergers in the 1990's," for presentation at the Bank Mergers and Acquisitions Program Practicing Law Institute, September 12-13, 1994.

"Economic Issues in Network Merger Analysis," for presentation at Mergers: The Cutting Edge before the American Bar Association, 1994 Annual Meeting, New Orleans, August 9, 1994.

"Vertical Integration as a Threat to Competition Airline Computer Reservation Systems," in J. Kwoka Jr. and L. White, eds. *The Antitrust Revolution*, (2nd edition), 1993.

"The 1992 Agency Horizontal Merger Guidelines and the Department of Justice's Approach to Bank Merger Analysis," *Antitrust Bulletin*, Vol. XXXVII, No. 3, Fall 1992, (with Janusz Ordover).

"The 1992 Agency Horizontal Merger Guidelines and the Department of Justice Approach to Bank Mergers," in *Proceedings of the 28th Annual Conference on Bank Structure and Competition*, May 1992, (with Janusz Ordover).

*Electronic Services Networks*: *A Business and Public Policy Challenge,* Praeger, 1991, (with S. Wildman).

"Computer Reservations Systems and their Network Linkages to the Airline Industry," in *Electronic Services, Networks: A Business and Public Policy Challenge*, Praeger, 1991, (with R. Noll).

"Electronic Services Networks Functions, Structures, and Public Policy" in *Electronic Services Networks: A Business and Public Policy Challenge*, Praeger, 1991, (with S. Wildman).

"New Developments in Airline Merger Analysis: Changes in the Industry and the Evidence," *Regulatory Reform*, January 1988.

"State and Federal Regulation in the Market for Corporate Control," EAG Discussion Paper, EAG 86-4, *Antitrust Bulletin*, Winter 1988, (with R. McGuckin and F. Warren-Boulton).

"Current Issues in Airline Mergers," presented at the Stanford Conference on Firm Ownership and Competition, June 19-20, 1987.

14

"The 1982 Department of Justice Guidelines: Applications to Banking Markets*," Issues in Bank Regulation*, Winter 1983, reprinted in T. Havrilesky, R. Schweitzer, and J. Boorman, ed. *Dynamics of Banking*, Harlan Davidson, Inc., 1985.

Department of Justice, *Report to Congress on the Computer Reservations Industry*, December 1985.

"New Rules of the Game: Modifying Bank Merger Analysis to Account for Regulatory Changes," presented at the Association of Public Policy and Management Conference, New Orleans, October 1984

"The Determinants of Thrift Institutions' Commercial Lending Activity," *Chicago Bank Structure and Competition Compendium*, September 1983, (with C. Dunham).

"How Quickly Can Thrifts Move into Commercial Lending?" *New England Economic Review*, November/December 1983, (with C. Dunham).

Department of Justice, *Report to Congress on Competition in the Coal Industry*, March 1982.

Direct and Rebuttal Testimony in the *Investigation into the Competitive Marketing of Air Transportation*, at the Civil Aeronautics Board, August 1980.

*National Benefits/Costs of Enhanced Oil Recovery Research Final Report*, Arthur D. Little, Inc., submitted to the Energy Research and Development Administration, August 1976, (with F. Mansvelt-Beck and T. Rothermal)

## OTHER PROFESSIONAL ACTIVITIES

Co-Chair, NASEM's Action Collaborative on Business Engagement in Building Healthy Communities

Co-Chair, Imagining Antitrust Law Section 2.0, and Chair, Financial Independence Task Force, Antitrust Law Section, American Bar Association

Associate Member, Section of Antitrust Law, American Bar Association and its Committees, including Healthcare and Pharmaceuticals

Member, American Economics Association

Member, AcademyHealth

Member, American Health Lawyers Association

Member, Brown University – The Warren Alpert Medical School's Advisory Council on Biology and Medicine

Member, NASEM Roundtable on Population Health Improvement

Member, NASEM Business Engagement in Obesity Solutions Innovation Collaborative

### PAST PROFESSIONAL ACTIVITIES

Chair, Interagency Task Force on Bank Competition (U.S. DOJ, Antitrust Division)

Co-Chair, Economics Task Force, Member, Technology and Financial Resources Task Force, Chair of the Membership Committee, Transition Task Force Member, Chair of the Exemptions and Immunities Task Force, Council Member, Chair, Financial Markets and Institutions Committee, Member Advisory Board on Section Reserves, International Task Force, Member Long Range Planning Committee, Section of Antitrust Law, American Bar Association

16

## Appendix B – Testimony at Deposition or Trial in the Last Four Years of Margaret E. Guerin-Calvert

Evanston Northwestern Healthcare Corporation Antitrust Litigation, United States District Court Northern District of Illinois Eastern Division, No. 07-CV-4446.

*BRFHH Shreveport, L.L.C. d/b/a University Health Shreveport and Vantage Health Plan, Inc., v. Willis-Knighton Medical Center, d/b/a Willis-Knighton Health System*, United States District Court Western District of Louisiana Shreveport Division, No. 5:15-CV-02057.

*UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated v. Sutter Health; Sutter East Bay Hospitals; Sutter West Bay Hospitals; Eden Medical Center; Sutter Central Valley Hospitals; Mills-Peninsula Health Services; Sutter Health Sacramento Sierra Region; Sutter Coast Hospital; Palo Alto Medical Foundation for Healthcare, Research, and Education; and Sutter Medical Foundation*, Superior Court of the State of California for the City and County of San Francisco, Cas No. CGC-14-538451.

*In re: Opana ER Antitrust Litigation*, MDL No. 2580, Lead Case No. 14-cv-10150, United States District Court Northern District of Illinois Eastern Division.

*In re: In the Matter of Illumina, Inc., a corporation and GRAIL, Inc., a corporation*, United States of America Before the Federal Trade Commission Office of Administrative Law Judges, Docket No. 9401, Deposition, August 3, 2021 and Trial Deposition Testimony, September 30, 2021.

*In re: Opana ER Antitrust Litigation*, MDL No. 2580, Lead Case No. 14-cv-10150, United States District Court Northern District of Illinois Eastern Division.

*In re: In the Matter of Illumina, Inc., a corporation and GRAIL, Inc., a corporation,* United States of America Before the Federal Trade Commission Office of Administrative Law Judges, Docket No. 9401, Deposition, August 3, 2021 and Trial Deposition Testimony, September 30, 2021.

Highly Confidential

## Appendix C – Materials Relied Upon by Margaret E. Guerin-Calvert

**Legal Filings**

Indirect Purchaser Plaintiffs' Fifth Consolidated Amended Complaint, *In re: Cathode Ray Tube (CRT) Antitrust Litigation*, United States District Court Northern District of California San Francisco, September 19, 2019

**Expert Materials**

Expert Report and backup of Janet S. Netz, Ph.D., April 15, 2014, with Errata, July 3, 2014

Expert Report of Margaret E. Guerin-Calvert, August 5, 2014, with Errata, September 23, 2014

Expert Report and reliance materials of Robert D. Willig, August 5, 2014, with Errata, September 10, 2014 and September 23, 2014

Expert Rebuttal Report and backup of Janet Netz, September 26, 2014

Expert Surrebuttal Report of Margaret E. Guerin-Calvert, November 6, 2014

Expert Surrebuttal Report of Robert D. Willig, November 6, 2014

Expert Report of Donald Clarke, March 16, 2022

Supplemental Expert Report of Margaret E. Guerin-Calvert, March 16, 2022, with Errata, March 21, 2022

Janet S. Netz, Ph.D. Rebuttal to Supplemental Expert Report of Margaret E. Guerin-Calvert and Expert Report of Donald Clarke, April 27, 2022

**Expert Depositions and Exhibits**

Deposition of Janet S. Netz, Ph.D., June 27, 2014

Deposition of Janet S. Netz, Ph.D., October 31, 2014

Deposition of Janet S. Netz, Ph.D., June 9, 2022

**Academic Texts and Articles**

American Bar Association Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, 2nd ed., ABA Publishing, 2010

Daniel Rubinfeld, "Antitrust Damages," Chapter 14 of *Research Handbook on the Economics of Antitrust Law*, Einer Elhauge (ed.), 2012

Highly Confidential

Daniel L. Rubinfeld, *Quantitative Methods in Antitrust*, in 1 ISSUES IN COMPETITION LAW AND POLICY 723 (ABA Section of Antitrust Law 2008)

James H. Stock and Mark W. Watson, *Introduction to Econometrics*, 3rd edition, Addison Wesley, 2011

Marc Ivaldi, Bruno Jullien, Patrick Rey, Paul Seabright, and Jean Tirole, "The Economics of Tacit Collusion," IDEI, Toulouse, March 2003

Margaret C. Levenstein and Valerie Y. Suslow, "Breaking Up Is Hard to Do: Determinants of Cartel Duration," *Journal of Law and Economics*, vol. 54 (May 2011), pp. 455-492

Margaret C. Levenstein and Valerie Y. Suslow, "Studies of Cartel Stability: A Comparison of Methodological Approaches" in *How Cartels Endure and How They Fail: Studies of Industrial Collusion*, Peter Grossman (ed.), Edward Elgar, 2004, pp. 9-52

**Notifications**

"Notification of Publishing Industrial Average Production Costs for Some Types of Color CRT and Color TVs," MII-PRC, April 2, 1999, Certified Translation

"Notification of Publishing Industrial Average Production Costs for Some Types of Color CRTs," MII-PRC, September 13, 2000, Attached Table