1    MARIO N. ALIOTO, ESQ. (56433)
     LAUREN C. CAPURRO, ESQ. (241151)
2    TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
     2001 Union Street, Suite 482
3    San Francisco, CA 94123
     Telephone: (415) 563-7200
4    Facsimile: (415) 346-0679
     E-mail: malioto@tatp.com
5    laurenrussell@tatp.com

6    *Lead Counsel for the Indirect-Purchaser Plaintiffs*

7

8

9

10                          **UNITED STATES DISTRICT COURT**

11                          **NORTHERN DISTRICT OF CALIFORNIA**

12                                  **OAKLAND DIVISION**

13
     IN RE CATHODE RAY TUBE (CRT)          )   Master File No. 4:07-cv-5944-JST
14   ANTITRUST LITIGATION                  )
                                           )   MDL No. 1917
15   ――――――――――――――――――――――                )
                                           )
16   This Document Relates to:            )   **INDIRECT PURCHASER PLAINTIFFS'**
                                           )   **RESPONSE IN OPPOSITION TO IRICO**
17   *ALL INDIRECT PURCHASER ACTIONS*      )   **DEFENDANTS' MOTION TO**
                                           )   **PARTIALLY EXCLUDE THE**
18                                         )   **PROPOSED EXPERT TESTIMONY OF**
                                           )   **DR. JANET NETZ**
19                                         )
                                           )   Hearing Date: May 4, 2023
20                                         )   Time: 2:00 p.m.
                                           )   Courtoom: Courtroom 6 – 2nd Floor
21                                         )
                                           )   The Honorable Jon S. Tigar
22                                         )
                                           )
23   ――――――――――――――――――――――                )

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUE TO BE DECIDED..................................................................1

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ....................................................................................................3

III.    LEGAL STANDARD.............................................................................................5

IV.     ARGUMENT .........................................................................................................7

    A.  Irico's "Relevant Market Factors" Argument Fails ..................................8

        1.  Challenges to Variables in Expert Models Affect Weight, not
           Admissibility ...........................................................................8

        2.  Dr. Netz's Model Accounts for Major Supply and Demand Factors ........10

    B.  Irico's "Fixed Overcharge" Argument Fails...........................................12

        1.  Dr. Netz's Model Identifies Economically Relevant Time Periods ..........13

        2.  Irico's "Sub-periods" Are Arbitrary .....................................16

    C.  Irico's "Government Pricing Regulations" Argument Fails.................................17

        1.  There Is No Factual Basis to Believe the Pricing Regulations Would
           Impact Dr. Netz's Analysis...........................................................18

        2.  Dr. Netz Did Not Offer Opinions as to Chinese Law. Rather, She
           Considered the Economic Import of Irico's Pricing Regulations
           Arguments and Explained Why Ms. Guerin-Calvert's Analysis
           Was Flawed................................................................................19

        3.  Dr. Netz Is Qualified to Opine, as Ms. Guerin-Calvert did, on the
           Impact of the Alleged Pricing Regulations (if Any) on Her Economic
           Analysis......................................................................................21

V.      CONCLUSION...................................................................................................23

i

IPP RESPONSE IN OPP'N TO IRICO DEFS.' MOT. TO EXCLUDE TESTIMONY OF DR. JANET NETZ
Master File No. 4:07-cv-5944-JST; MDL No. 1917

1

## <u>TABLE OF AUTHORITIES</u>

**Page**

2

3

<u>CASES</u>

4

*Apple iPod iTunes Antitrust Litig.,*
   No. 05-CV-0037-YGR, 2014 WL 4809288 (N.D. Cal. Sept. 26, 2014) ....................................7

5

*Arriaga v. Logix Fed. Credit Union,*
   No. CV-18-9128-CBM-AGRx, 2022 WL 3052318 (C.D. Cal. Apr. 22, 2022) ........................20

6

7

*Bazemore v. Friday,*
   478 U.S. 385 (1986)................................................................................................................8, 9

8

9

*Bernstein v. Virgin Am., Inc.,*
   No. 15-cv-02277-JST, 2016 WL 6576621 (N.D. Cal. Nov. 7, 2016)..........................................9

10

11

*Bigelow v. RKO Radio Pictures,*
   327 U.S. 251 (1946)....................................................................................................................6

12

13

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,*
   152 F.3d 588 (7th Cir. 1998) ....................................................................................................21

14

*Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.,*
   823 F. Supp. 2d 334 (D. Md. 2011).........................................................................................22

15

16

*Concord Boat Corp. v. Brunswick Corp.,*
   207 F.3d 1039 (8th Cir. 2000) ..................................................................................................21

17

18

*Cook v. Rockwell Int'l Corp.,*
   580 F. Supp. 2d 1071 (D. Colo. 2006).......................................................................................5

19

20

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
   509 U.S. 579 (1993).......................................................................................................... passim

21

*Doubletap Def., LLC v. Hornady Mfg. Co.,*
   No. 8:18CV492, 2021 WL 3631135 (D. Neb. Aug. 17, 2021)...................................................19

22

23

*Eastman Kodak Co. v. Southern Photo Materials Co.,*
   273 U.S. 359 (1927)....................................................................................................................6

24

25

*FTC v. BurnLounge, Inc.,*
   753 F.3d 878 (9th Cir. 2014) ......................................................................................................2

26

27

*Hamm v. Mercedes-Benz USA, LLC,*
   No. 5:16-cv-03370-EJD, 2021 WL 1238304 (N.D. Cal. Apr. 2, 2021) ................................8, 9

28

ii

IPP RESPONSE IN OPP'N TO IRICO DEFS.' MOT. TO EXCLUDE TESTIMONY OF DR. JANET NETZ
Master File No. 4:07-cv-5944-JST; MDL No. 1917

*Hemmings v. Tidyman's Inc.,*
   285 F.3d 1174 (9th Cir. 2002) ............................................................................9

*i4i Ltd. P'ship v. Microsoft Corp.,*
   598 F.3d 831 (Fed. Cir. 2010) *aff'd*, 564 U.S. 91 (2011) ........................................5

*In re Capacitors Antitrust Litig.,*
   No. 14-cv-03264-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ......................................15

*In re Capacitors Antitrust Litig.,*
   No. 14-cv-03264-JD, 2020 WL 870927 (N.D. Cal. Feb. 21, 2020) ......................................14

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   JAMS Ref. No. 1100054618, 2013 WL 5428139 (N.D. Cal. June 20, 2013,
   *report and recommendation adopted*, 2013 WL 5391159......................................................8

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013)........................3, 7, 8, 19, 20

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   No. 07-cv-5944-JST, 2018 WL 4775595 (N.D. Cal. Aug. 20, 2018)........................................19

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   No. 07-cv-05944-JST, 2022 WL 4596621 (N.D. Cal. Aug. 1, 2022)........................2, 17, 18, 20

*In re Flash Memory Antitrust Litig.,*
   No. C-07-0086-SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010)...........................................7

*In re Graphics Processing Units Antitrust Litig.,*
   253 F.R.D. 478 (N.D. Cal. 2008).............................................................................7

*In re High-Tech Emp. Antitrust Litig.,*
   No. 11-cv-02509-LHK, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ..................................5, 21

*In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.,*
   No. 19-md-02913-WHO, 2022 WL 1814440 (N.D. Cal. June 2, 2022) ..................................20

*In re LIBOR-Based Financial Instruments Antitrust Litig.,*
   299 F. Supp. 3d 430 (S.D.N.Y. 2018)........................................................................22

*In re Lidoderm Antitrust Litig.,*
   No. 14-MD-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ..................................5

*In re Live Concert Antitrust Litig.,*
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ......................................................................9

*In re Monosodium Glutamate Antitrust Litig.,*
   No. Civ.00-MDL-1328 (PAM), 2003 WL 244729 (D. Minn. Jan. 29, 2003) ..............................12

iii

*In re Optical Disk Drive Antitrust Litig.,*
    No. 10-md-02143-RS, 2017 WL 11513318 (N.D. Cal. 2017) ....................................10

*In re Polypropylene Carpet Antitrust Litig.,*
    996 F. Supp. 18 (N.D. Ga. 1997) .........................................................................19

*In re Polyurethane Foam Antitrust Litig.,*
    No. 1:10 MD 2196, 2014 WL 6461355 (N.D. Ohio Nov. 17, 2014)..........................15

*In re Pool Products Distribution Market Antitrust Litig.,*
    166 F. Supp. 3d 654 (E.D. La. 2016), *appeal dismissed* (5th Cir. Oct. 27, 2016)......................10

*In re Processed Egg Prods. Antitrust Litig.,*
    81 F. Supp. 3d 412 (E.D. Pa. 2015) .....................................................................19

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    No. M-07-1827-SI, 2012 WL 555090 (N.D. Cal. Feb. 21. 2012) ........................6, 7

*In re Wholesale Grocery Prods. Antitrust Litig.,*
    No. 09-MD-2090, 2018 WL 3862773 (D. Minn. Aug. 14, 2018) ............................21

*In re Wireless Telephone Services Antitrust Litig.,*
    385 F. Supp. 2d 403 (S.D.N.Y. 2005)...................................................................10

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.,*
    451 U.S. 557 (1981)..............................................................................................6

*Lewert v. Boiron, Inc.,*
    212 F. Supp. 3d 917 (C.D. Cal. 2016) *aff'd,* 742 F. App'x 282 (9th Cir. 2018) ........................21

*LivePerson, Inc. v. [24]7.ai, Inc.,*
    No. 17-cv-01268-JST, 2019 WL 3254266 (N.D. Cal. July 19, 2019)........................5

*Loeb Indus. Inc. v. Sumitomo Corp.,*
    306 F.3d 469 (7th Cir. 2002) ................................................................................6

*Maitland v. Univ. of Minn.,*
    155 F.3d 1013 (8th Cir. 1998) ...........................................................................8, 9

*McCrary v. Elations Co. LLC,*
    No. EDCV-13-0242-JGB, 2014 WL 12589137 (C.D. Cal. Dec. 2, 2014) ...............9

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.,*
    877 F.2d 1333 (7th Cir. 1989) ............................................................................22

*Obrey v. Johnson,*
    400 F.3d 691 (9th Cir. 2005) ................................................................................9

*Richan v. Fleetwood Motor Homes,*
   No. CV08-6790-SVW (VBKx), 2010 WL 11519497 (C.D. Cal. Dec. 9, 2010).........................21

*Stein v. Pac. Bell,*
   No. C00-2915 SI, 2007 WL 831750 (N.D. Cal. Mar. 19, 2007) ................................................22

*Sumotext Corp. v. Zoove, Inc.,*
   No. 16-CV-01370-BLF, 2020 WL 264701 (N.D. Cal. Jan. 17, 2020) .......................................6

*Todd v. Tempur-Sealy Int'l, Inc.,*
   No. 13-cv-04984-JST, 2016 WL 5462428 (N.D. Cal. Sept. 28, 2016) ......................................6

*United States v. Flores,*
   901 F.3d 1150 (9th Cir. 2018) ...........................................................................................2, 3

*United States v. Pac. Gas & Elec. Co.,*
   No. 14-CR-00175-TEH, 2016 WL 6804575 (N.D. Cal. Nov. 17, 2016) ...............................18

*Walnut Creek Manor, LLC v. Mayhew Ctr., LLC,*
   622 F. Supp. 2d 918 (N.D. Cal. 2009) ................................................................................19

*Wyler Summit P'ship v. Turner Broad. Sys., Inc.,*
   235 F.3d 1184 (9th Cir. 2000) ............................................................................................20

## RULES

Federal Rules of Evidence 702 ...............................................................................3, 5, 14

## OTHER AUTHORITIES

ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues*
   81 (2d ed. 2014) .................................................................................................................10

Areeda & Hovernkamp, *Antitrust Law* ¶ 392a ....................................................................6

Fed. Jud. Ctr., *Reference Guide on Estimation of Economic Damages* 432-33 (3d ed. 2011).........6

Peter Kennedy, *A Guide to Econometrics* 72 (6th ed. 2008) ................................................10

Robert Clark & Jean-Francois Houde, *The Effect of Explicit Communications on Pricing:
   Evidence from the Collapse of a Gasoline Cartel*, 62 J. Indus. Econ. 191-228 (2014)..............13

v

IPP RESPONSE IN OPP'N TO IRICO DEFS.' MOT. TO EXCLUDE TESTIMONY OF DR. JANET NETZ
Master File No. 4:07-cv-5944-JST; MDL No. 1917

1

## **GLOSSARY**

2

| | |
|---|---|
| 3  Capurro Decl. | Declaration of Lauren C. Capurro in Support of IPPs' Response in Opposition to Irico Defendants' Motion to Partially Exclude the Proposed Expert Testimony of Dr. Janet Netz |
| 4 | |
| 5 | |
| 6  CDTs | Color display tubes |
| 7  Clarke Rpt. | Expert Report of Donald Clarke (Mar. 16, 2022), ECF No. 6170-1, Ex. 7 |
| 8 | |
| 9  CPTs | Color picture tubes |
| 10  CRTs | Cathode ray tubes |
| 11  Defs.' Br. | Defendants Irico Group Corp. and Irico Display Devices Co., Ltd.'s Motion to Partially Exclude the Proposed Expert Testimony of Dr. Janet Netz, ECF No. 6149 |
| 12 | |
| 13  DPPs | Direct Purchaser Plaintiffs |
| 14  Guerin-Calvert 2022 Suppl. Rpt. | Supplemental Expert Report of Margaret E. Guerin-Calvert (Mar. 16, 2022), ECF No. 6170-1, Ex. 12 |
| 15 | |
| 16  Guerin-Calvert Decl. | Declaration of Margaret E. Guerin-Calvert in Support of Defendants Irico Group Corp. and Irico Display Devices Co., Ltd.'s Motion to Partially Exclude the Proposed Expert Testimony of Dr. Janet Netz, ECF No. 6149-1 |
| 17 | |
| 18 | |
| 19  Guerin-Calvert Rpt. | Expert Report of Margaret E. Guerin-Calvert (Aug. 5, 2014), ECF No. 6170-1, Ex. 4 |
| 20 | |
| 21  IPPs | Indirect Purchaser Plaintiffs |
| 22  Irico | Irico Group Corp. and Irico Display Devices Co., Ltd. |
| 23  LCD | Liquid-crystal display |
| 24  Netz 2014 Rebuttal Rpt. | Rebuttal Expert Report of Janet S. Netz, Ph.D. (Sept. 26, 2014), ECF No. 6170-1, Ex. 5 |
| 25 | |
| 26  Netz 2022 Rebuttal Rpt. | Janet S. Netz, Ph.D. Rebuttal to Supplemental Expert Report of Margaret E. Guerin-Calvert and Expert Report of Donald Clarke (Apr. 27, 2022), ECF No. 6170-1, Ex. 9 |
| 27 | |

28

| | |
|---|---|
| Netz *Daubert* Decl. | Declaration of Janet S. Netz, Ph.D. in Response to Irico Defendants' Motion to Partially Exclude Testimony |
| Netz Dep. | Deposition of Dr. Janet S. Netz (June 9, 2022) |
| Netz Rpt. | Expert Report of Janet S. Netz, Ph.D. (Apr. 15, 2014), ECF No. 6170-1, Ex. 1 |
| Netz Rpt. Errata | Errata to the Expert Report of Janet S. Netz, Ph.D. (July 7, 2014), ECF No. 6170-1, Ex. 2 |
| Werbel Decl. | Declaration of Evan Werbel in Support of Defendants Irico Group Corp. and Irico Display Devices Co., Ltd.'s Motion to Partially Exclude the Proposed Expert Testimony of Dr. Janet Netz, ECF No. 6170 |

1

## STATEMENT OF ISSUE TO BE DECIDED

2

Should the damages opinion of Indirect Purchaser Plaintiffs' expert, Dr. Janet Netz, be

3

excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its

4

progeny, where Dr. Netz is qualified to provide the required analysis to estimate damages and the

5

multiple regression methodology she used is sound and widely accepted by the courts and in the

6

economic literature?

7

## I.      INTRODUCTION

8

In a last-ditch effort to avoid liability for their participation in a global price-fixing cartel,

9

Irico Display Devices Co., Ltd. and Irico Group Corp. (collectively, "Irico") seek to exclude

10

Indirect Purchaser Plaintiffs' ("Plaintiffs" or "IPPs") expert, Dr. Janet Netz, from testifying at trial

11

on damages. Irico's belated criticisms of Dr. Netz's damages opinion are unfounded, procedurally

12

improper, and in any event do not go to the admissibility of Dr. Netz's opinions but go only to

13

their weight. Dr. Netz's testimony will assist the factfinders in assessing damages. Thus, the Court

14

should permit her to testify.

15

Dr. Netz is an experienced and well-regarded economist and econometrician with a B.A. in

16

economics from the University of California, Berkeley and M.A. and Ph.D. degrees in economics

17

from the University of Michigan. She was a tenured professor at Purdue University before she

18

founded the economic consulting firm applEcon, LLC in 2001. Applying her decades of

19

experience to the facts of this case, Dr. Netz used standard multiple regression techniques to

20

estimate aggregate, class-wide damages to indirect purchasers of cathode ray tubes ("CRTs")

21

caused by the defendants' well-documented, unlawful, worldwide conspiracy to fix the prices of

22

CRTs. Dr. Netz's analyses employ an econometric approach that is well-accepted by economists

23

and courts, account for key market variables (costs, supply, demand, and more), fit the data well

24

according to standard statistical tests, are robust to reasonable changes in specification, produce

25

economically sensible results, and demonstrate with a high degree of statistical confidence that the

26

class suffered $2.7 billion in damages as a result of the price-fixing cartel in which Irico

27

participated.

28

Irico does not dispute that Dr. Netz is a qualified economist and econometrician, nor that

1

1   multiple regression analysis is a standard and appropriate method for estimating class-wide

2   damages. In fact, during the pretrial proceedings in 2014, the many defendants who remained in

3   the case at that time—and had failed in their challenge to Dr. Netz's opinions at class

4   certification—did not move to exclude Dr. Netz's opinions on damages at trial. Notably, these

5   defendants filed *Daubert* motions against other plaintiffs' experts but not Dr. Netz. ECF Nos.

6   3172, 3174.

7          Irico's arguments for excluding Dr. Netz's damages opinion fail. ***First***, binding legal

8   authority recognizes that Irico's challenges to the variables in Dr. Netz's multiple regression model

9   affect the weight to be assigned her opinion, rather than its admissibility. *See* Section IV.A, *infra*.

10  ***Second***, there is nothing improper about estimating an overcharge for the 1995-2006 period using

11  standard well-accepted multiple regression techniques, as Dr. Netz does here. Dr. Netz identified

12  the 1995-2006 timeframe as an economically relevant period for purposes of her overcharge

13  analysis by applying widely accepted econometric principles and methods to this case's facts and

14  data. Ms. Guerin-Calvert's criticisms of the time structure of Dr. Netz's regression model are

15  based on mischaracterizations of Dr. Netz's regression model and its outputs and on economically

16  senseless and econometrically flawed analyses. *See* Section IV.B, *infra*. ***Finally***, Irico's

17  speculation about the possible impact of Chinese pricing regulations is unfounded. Dr. Netz has

18  never claimed to be a Chinese law expert, and her response to criticism of her economic opinions

19  is correct and is perfectly appropriate for an economist to articulate. Indeed, the Court rejected this

20  same argument when denying Irico's motion to exclude the Direct Purchaser Plaintiffs' ("DPPs")

21  expert and certifying the DPP class. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-

22  05944-JST, 2022 WL 4596621, at *6 (N.D. Cal. Aug. 1, 2022). *See* Section IV.C, *infra*.

23         In short, Irico's motion fails to meet the high bar set for excluding expert opinions under

24  *Daubert*. Unless an expert's testimony is shown to be completely unreliable, its assessment is to be

25  left in the hands of the factfinders.[1] Dr. Netz's well-supported analyses do not constitute the sort of

26

27  _____

    [1] "*Daubert* is meant to protect juries from being swayed by dubious scientific testimony. When the
    district court sits as the finder of fact, there is less need for the gatekeeper to keep the gate when
28  the gatekeeper is keeping the gate only for himself." *United States v. Flores*, 901 F.3d 1150, 1165
    (9th Cir. 2018) (citation omitted); *see also FTC v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir.

1    "junk science" Federal Rule of Evidence 702 was intended to exclude. *See, e.g.*, *United States v.*

2    *Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018). The Court should deny Irico's motion.

3    **II.    BACKGROUND**

4          In 2007, a more than decade-long secret price-fixing conspiracy in the CRT industry came

5    to light, and lawsuits on behalf of purchasers of CRT products followed. Irico was included among

6    the defendants. "After appearing and litigating in these proceedings for almost two years, the Irico

7    Defendants directed their counsel to cease representing them and failed to answer or otherwise

8    participate in their own defense in 2010. Meanwhile, this multidistrict litigation proceeded with

9    nine other defendant groups for about seven years." ECF No. 6112 at 2.

10         During Irico's absence, all other parties engaged in extensive discovery, including the

11   production of over seven million pages of documents, depositions of more than 250 witnesses, and

12   production of extensive transactional data, which is particularly relevant for antitrust damages

13   analyses and Dr. Netz's opinions challenged here. Not only did Irico not participate in the

14   litigation for seven years, but it also failed to preserve relevant documents and data directly

15   pertaining to the analyses it is now challenging.[2]

16         In 2012, Dr. Netz issued her thorough class certification report and was deposed. IPPs

17   served Irico with their class certification motion and Dr. Netz's report through its former counsel,

18   Pillsbury Winthrop Shaw & Pittman, LLP. Irico failed to respond.[3] The other defendants opposed

19   class certification and moved to strike Dr. Netz's expert opinion. The Court certified the class and

20   declined to strike Dr. Netz's opinion, holding that the defendants' arguments went to "the weight

21   of Dr. Netz's opinions, not their reliability or admissibility[,]" and that Dr. Netz's report

22   demonstrated that "IPPs have established a common method for proving that each class member

23   was injured." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013 WL

24   _____

25   2014). Here, the Court will be the finder of fact for Irico Group, and a jury will be the finder of
     fact for Irico Display. ECF No. 6070 at 2.

26   [2] Irico's spoliation of evidence is the subject of a sanctions motion currently pending before
     Special Master Vaughn Walker.

27   [3] Capurro Decl. ISO IPPs' Opp'n to *Daubert* Mot. ("Capurro Decl.") ¶ 2; *see also* ECF No. 732

28   (requiring Pillsbury to "continue to accept service of papers for the Irico Entities for forwarding
     purposes").

1   5391159, at *6, 9 (N.D. Cal. Sept. 24, 2013).

2   In 2014, Dr. Netz issued her merits report. Again, IPPs served the merits report on Irico

3   and again Irico failed to respond. Capurro Decl. ¶ 3. Part of Dr. Netz's assignment was to estimate

4   class-wide damages for the entire class damages period, from March 1, 1995, through November

5   24, 2007.[4] Dr. Netz analyzed two types of CRT products: (1) color display tubes ("CDTs"), which

6   are used in computer monitors, and (2) color picture tubes ("CPTs"), which are used in televisions.

7   Netz Rpt. 2. She decided to estimate damages for CPTs separately from CDTs due to differing

8   market conditions. In her report, Dr. Netz detailed her use of standard multiple regression

9   techniques to estimate these class-wide damages. *See id*. at 96-123. To relate prices to supply

10  factors, consumer demand, and the competitiveness of the market for each type of CRT, Dr. Netz

11  used a "reduced-form price equation model," which provides a widely accepted framework for

12  isolating the cartel's price-effect. *Id.* at 98-99. Based on her extensive analysis, Dr. Netz

13  determined that, absent the price-fixing conspiracy, CDT and CPT prices would have been 22.0%

14  and 9.0% lower, respectively, for most of the cartel period.[5] Applying the relevant overcharge

15  percentages, Dr. Netz concluded that the cartel imposed damages of more than $2.7 billion on

16  Plaintiffs. *See* Netz Rpt. Errata 1.

17  After merits expert discovery ended, including two additional depositions of Dr. Netz, the

18  other defendants (with Irico still absent from the litigation) determined not to file a *Daubert*

19  motion seeking to exclude her testimony, although they did seek to exclude the opinions of other

20  experts. As the case approached trial, the defendant groups that were still active settled. Thereafter,

21  on July 22, 2016, the Court entered a default against Irico for "fail[ure] to plead or otherwise

22  defend this action." ECF No. 4729 at 1. In 2018, the Court vacated the entry of default. ECF No.

23  5271. After spending more than two years unsuccessfully litigating jurisdictional issues, Irico

24  voluntarily dismissed its appeal of this Court's denial of its motion to dismiss on Foreign

25  Sovereign Immunities Act grounds following full briefing. On February 16, 2021, the Court set the

26

27  [4] *See* Werbel Decl., Ex. 1 ("Netz Rpt.") at 6, ECF No. 6170-1; Werbel Decl., Ex. 5 ("Netz 2014 Rebuttal Rpt.") at 54, ECF No. 6170-1.

28  [5] Werbel Decl., Ex. 2 ("Netz Rpt. Errata") at 1, ECF No. 6170-1.

4

1    parameters for the merits phase of the case against Irico, including allowing for "limited" expert

2    discovery. ECF No. 5907 at 2. Expert discovery closed on June 9, 2022, when Dr. Netz was

3    deposed for the fifth time. ECF No. 6016 at 2.

4        Now, more than nine months after the close of "limited" expert discovery, Irico has

5    included with its *Daubert* motion yet another expert report of Ms. Guerin-Calvert raising issues

6    and new econometric work that should have been raised in 2014 or in her 2022 report. In its

7    current motion, Irico did not include an additional report from Professor Donald C. Clarke, its

8    purported expert on Chinese law.

9    **III.    LEGAL STANDARD**

10       Federal Rule of Evidence 702 allows admission of expert opinions based on "scientific,

11   technical, or other specialized knowledge" if they would "help the trier of fact to understand the

12   evidence or to determine a fact in issue." Expert testimony under Rule 702 must be both relevant

13   and reliable. *See Daubert*, 509 U.S. at 589. Rule 702 "mandates a liberal standard for the

14   admissibility of expert testimony." *In re High-Tech Emp. Antitrust Litig.*, No. 11-cv-02509-LHK,

15   2014 WL 1351040, at *2 (N.D. Cal. Apr. 4, 2014) (quoting *Cook v. Rockwell Int'l Corp.*, 580 F.

16   Supp. 2d 1071, 1082 (D. Colo. 2006)).

17       For purposes of determining reliability, the Supreme Court instructed: "The inquiry

18   envisioned by Rule 702 is, we emphasize, a flexible one. . . . The focus, of course, must be solely

19   on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at

20   594-95; *see also LivePerson, Inc. v. [24]7.ai, Inc.*, No. 17-cv-01268-JST, 2019 WL 3254226, at *2

21   (N.D. Cal. July 19, 2019) (Tigar, J.) ("The reliability test under Rule 702 and *Daubert* is not the

22   correctness of the expert's conclusions but the soundness of his methodology." (quotation marks

23   and citation omitted)). Accordingly, "[w]hen the methodology is sound, and the evidence relied

24   upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy

25   (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *In re

26   Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2017 WL 679367, at *28 (N.D. Cal. Feb. 21,

27   2017) (quoting *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 564

28   U.S. 91 (2011)).

5

IPP RESPONSE IN OPP'N TO IRICO DEFS.' MOT. TO EXCLUDE TESTIMONY OF DR. JANET NETZ
Master File No. 4:07-cv-5944-JST; MDL No. 1917

1    *Daubert* emphasized that the jury is the ultimate assessor of the weight to be accorded to a

2    party's expert opinion at trial after "[v]igorous cross-examination" and the "presentation of

3    contrary evidence." 509 U.S. at 596; *see also Todd v. Tempur-Sealy Int'l, Inc.*, No. 13-cv-04984-

4    JST, 2016 WL 5462428, at *2 (N.D. Cal. Sept. 28, 2016) (Tigar, J.). Thus, "[r]elatively few

5    economists serving as damages experts succumb to *Daubert* challenges, because most damages

6    analyses operate in the familiar territory of measuring economic values using a combination of

7    professional judgment and standard tools." *Sumotext Corp. v. Zoove, Inc.*, No. 16-CV-01370-BLF,

8    2020 WL 264701, at *7 (N.D. Cal. Jan. 17, 2020) (citing Fed. Jud. Ctr., *Reference Guide on*

9    *Estimation of Economic Damages* 432-33 (3d ed. 2011), 2011 WL 7724259, at *4); *see also In re*

10   *TFT-LCD (Flat Panel) Antitrust Litig.*, No. M-07-1827-SI, 2012 WL 555090, at *8 (N.D. Cal. Feb.

11   21, 2012) (denying motion to exclude Dr. Netz's testimony because "[d]efendants' disagreements

12   with the bases for her opinion do not render that opinion so inherently suspect that it may not be

13   admitted at trial" but "are precisely the type of matter that is appropriate for cross-examination").

14   *Daubert*'s liberal admissibility standard also comports with Plaintiffs' relaxed burden for

15   proving antitrust damages. Antitrust plaintiffs are not required to estimate damages with a

16   watchmaker's precision. To the contrary, the Supreme Court has long emphasized that *reasonable*

17   estimates will suffice. *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565-66

18   (1981) ("The Court has repeatedly held that in the absence of more precise proof, the factfinder

19   may conclude as a matter of just and reasonable inference from the proof of defendants' wrongful

20   acts and their tendency to injure plaintiffs' business . . . that defendants' wrongful acts had caused

21   damage to the plaintiffs."); *see also Loeb Indus. Inc. v. Sumitomo Corp.*, 306 F.3d 469, 493 (7th

22   Cir. 2002) ("Since the days of *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359,

23   379 (1927), it has been established that in complicated antitrust cases plaintiffs are permitted to use

24   estimates and analysis to calculate a reasonable approximation of their damages.").

25   The reason for this long-settled relaxed standard is that "the most elementary conceptions

26   of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which

27   his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946); *accord*

28   Areeda & Hovenkamp, *Antitrust Law* ¶ 392a, at 333 ("[S]ince the defendant created the need for

6

1   damage estimation by violating the antitrust laws, it should bear the burden of uncertainty in

2   proving the consequent damages.").

3   **IV.   ARGUMENT**

4          In the instant motion, Irico challenges neither Dr. Netz's qualifications nor the relevance of

5   her proposed testimony. Irico does not attack Dr. Netz's pass-through analysis or seek to prevent

6   her from testifying about several of her conclusions, including that the CRT industry was

7   conducive to cartelization and that the cartel's success in raising prices above competitive levels

8   caused class-wide injury. And Irico does not dispute that Dr. Netz's methodology—multiple

9   regression analysis—"is a sound and, indeed, commonplace method for isolating the pricing

10  effects of alleged anticompetitive conduct." *Apple iPod iTunes Antitrust Litig.*, No. 05-CV-0037-

11  YGR, 2014 WL 4809288, at *4 (N.D. Cal. Sept. 26, 2014) (collecting cases). Instead, Irico objects

12  to three aspects of Dr. Netz's overcharge calculation: (1) her selection of supply and demand

13  variables; (2) her decision to represent class-wide damages as a single overcharge percentage for

14  the 1995-2006 period; and (3) the effect on her model of alleged Chinese pricing regulations. All

15  three objections lack merit for the reasons that we describe below.

16         Further, Irico's motion raises several issues that the defendants could have raised in their

17  2014 *Daubert* motions, and it belies Irico's purported commitment to "not re-arguing any of the

18  issues previously considered" at class certification. Irico Defs.' Mot. to Exclude Expert Testimony

19  of Dr. Janet Netz ("Defs.' Br.") 2-3. Specifically, Irico's motion rehashes previous criticisms of

20  Dr. Netz's opinions in *In re Flash Memory Antitrust Litigation*, No. C-07-0086-SBA, 2010 WL

21  2332081 (N.D. Cal. June 9, 2010), and *In re Graphics Processing Units Antitrust Litigation*, 253

22  F.R.D. 478 (N.D. Cal. 2008) ("*GPU*"). This Court has already concluded that *Flash Memory* and

23  *GPU* "are inapposite here" because "IPPs have submitted evidence that CRTs are not so variable

24  as flash memory or graphics processing units, which were highly customized and not generally

25  interchangeable." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013 WL

26  5391159, at *8 (N.D. Cal. Sept. 24, 2013). Irico also omits this Court's conclusion that the instant

27  case "is much more like [*In re TFT-LCD (Flat Panel) Antitrust Litigation*]," *id.*, a case from this

28  district in which "Judge Illston dismissed challenges to Dr. Netz's opinions on a class certification

7

1   motion, a motion to decertify, summary judgment motions, and a *Daubert* motion to strike her

2   testimony," *In re Cathode Ray Tube (CRT) Antitrust Litig.*, JAMS Ref. No. 1100054618, 2013 WL

3   5428139, at *11 (N.D. Cal. June 20, 2013), *report and recommendation adopted*, 2013 WL

4   5391159.

5        At bottom, Dr. Netz used reliable principles and methods to analyze the available facts and

6   data in this case. Given her unimpeachable qualifications and the broad acceptance her

7   methodology enjoys, this Court should reject Irico's attempt to usurp the factfinders' role.

8       **A.**     **Irico's "Relevant Market Factors" Argument Fails.**

9        Dr. Netz's regression methodology includes supply and demand (as well as other)

10   variables—selected after extensive economic research into the CRT market—allowing her to

11   isolate the cartel's impact on CRT prices. Irico contends that Dr. Netz's results and opinions

12   should be rejected because Dr. Netz did not employ Ms. Guerin-Calvert's preferred supply and

13   demand variables. But overwhelming authority—including binding Supreme Court and Ninth

14   Circuit precedent—recognizes that an expert's decision about which variables to include goes to

15   the weight of the expert's opinion, not its admissibility.

16       **1.**     <u>Challenges to Variables in Expert Models Affect Weight, not Admissibility.</u>

17       "[T]he U.S. Supreme Court has held that an expert's selection of certain variables to

18   include within a regression analysis will generally 'affect the analysis' probativeness, not its

19   admissibility.'" *Hamm v. Mercedes-Benz USA, LLC*, No. 5:16-cv-03370-EJD, 2021 WL 1238304,

20   at *14 (N.D. Cal. Apr. 2, 2021) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (per

21   curiam) (Brennan, J., concurring)[6] (reversing lower court's exclusion of regression analysis based

22   on its view that the analysis did not include proper selection of variables)). As the Supreme Court

23   explained, "a regression analysis that includes less than all measurable variables may serve to

24   prove a plaintiff's case." *Bazemore*, 478 U.S. at 400 (quotation marks omitted).

25       As such, "[a] regression analysis does not become inadmissible as evidence simply because

26   it does not include every variable that is quantifiable and may be relevant to the question

27

28   [6] "Justice Brennan's concurrence [in *Bazemore*] states the position of the entire court." *Maitland v. Univ. of Minn.*, 155 F.3d 1013, 1017 n.3 (8th Cir. 1998).

1    presented." *Obrey v. Johnson*, 400 F.3d 691, 695-96 (9th Cir. 2005) (quoting *Maitland v. Univ. of*

2    *Minn.*, 155 F.3d 1013, 1017 (8th Cir. 1998)). Instead, "[i]t is for the finder of fact to consider the

3    variables that have been left out of an analysis, and the reasons given for the omissions, and then to

4    determine the weight to accord the study's results." *Id.* at 696 (quoting *Maitland*, 155 F.3d at

5    1017). Permitting "[v]igorous cross-examination of a study's inadequacies allows the jury to

6    appropriately weigh the alleged defects and reduces the possibility of prejudice." *Hemmings v.*

7    *Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002).

8          Adhering to this authority, "district courts within and outside this district have often

9    concluded that experts' decisions about what data to use in their analysis bear on the weight, not

10   the admissibility, of expert testimony." *Hamm*, 2021 WL 1238304, at *14 (collecting cases);

11   *accord Bernstein v. Virgin Am., Inc.*, No. 15-cv-02277-JST, 2016 WL 6576621, at *5 (N.D. Cal.

12   Nov. 7, 2016) (Tigar, J.) (stating that an expert's "failure to consider a potentially relevant factor in

13   his analysis goes to the weight of the evidence, not its admissibility") (subsequent history omitted).

14         Irico contends that this well-recognized principle does not govern Dr. Netz's analysis

15   because "her model ignores major economic factors in the CDT and CPT markets that changed

16   between the benchmark and the alleged cartel period, and within those periods." Defs.' Br. 7. Irico

17   opines that Dr. Netz should have "correct[ed]" her model "to properly control for demand and cost

18   conditions." *Id.* at 8. As explained in Section IV.A.2, *infra*, Dr. Netz *does* include supply and

19   demand variables in her analysis, and her selection of those variables based on her economic

20   analysis as to which "proxies" most reasonably controlled for supply and demand falls squarely

21   within the realm of accepted practice. This is not a case in which an expert's regression is "so

22   incomplete as to be inadmissible as irrelevant." *Bazemore*, 478 U.S. at 400 n.10. Irico's objections

23   to Dr. Netz's variables go to her testimony's weight, not its admissibility.

24         Irico's "contrary" authority only underscores the rigor of Dr. Netz's analysis. Irico's sole

25   in-circuit authority, *In re Live Concert Antitrust Litigation*, 863 F. Supp. 2d 966, 974-79 (C.D. Cal.

26   2012), "involved the exclusion of an expert who failed to include *any* explanatory variables other

27   than the one being tested and thus attributed the *entire* effect on the dependent variable to that

28   single explanatory variable." *McCrary v. Elations Co. LLC*, No. EDCV-13-0242-JGB, 2014 WL

9

1   12589137, at *8 (C.D. Cal. Dec. 2, 2014) (distinguishing *Live Concert*). Irico's other authorities

2   fare no better. The expert in *In re Wireless Telephone Services Antitrust Litigation* failed to

3   "introduce *any* independent variables into his analysis" or test for "obvious and significant

4   alternative explanations." 385 F. Supp. 2d 403, 428 (S.D.N.Y. 2005). And the expert in *In re Pool*

5   *Products Distribution Market Antitrust Litigation* failed to "provide any evidence of his

6   calculations or any description of his results," leaving the court "unable to evaluate [his]

7   methodology." 166 F. Supp. 3d 654, 676 (E.D. La. 2016), *appeal dismissed* (5th Cir. Oct. 27,

8   2016). In contrast, Dr. Netz fully explains her methodological decisions, including her selection of

9   variables. *See* Section IV.A.2, *infra*.

10          Irico's argument is also inconsistent with the consensus among econometricians that, "[i]n

11   practice, it is virtually impossible to ensure that every relevant variable has been captured in a

12   regression model." ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical*

13   *Issues* 81 (2d ed. 2014). Further, "formulation and estimation choices typically depend on the

14   economics of the situation at hand and the types of data that are available." *Id.* "[T]here is no

15   accepted 'best way' of going about finding a correct specification," and "[c]onsiderable

16   controversy exists within the [econometrics] profession" about "the most appropriate

17   methodology" for choosing an empirical model's specification. Peter Kennedy, *A Guide to*

18   *Econometrics* 72 (6th ed. 2008).

19          This is a complex class action against a transnational price-fixing cartel that operated for

20   more than a decade. At bottom, "[i]t is not surprising that the parties disagree on what variables

21   should be entered into the overcharge calculation." *In re Optical Disk Drive Antitrust Litig.*, No.

22   10-md-02143-RS, 2017 WL 11513318, at *2 (N.D. Cal. 2017). Given Dr. Netz's unquestioned

23   qualifications and because "the methodology underlying [Dr. Netz's] calculation, the multiple

24   regression analysis, is sound," *id.*, the Court should allow the factfinders to consider her testimony

25   and assign it the appropriate weight.

26                  2.     Dr. Netz's Model Accounts for Major Supply and Demand Factors.

27          Irico's criticism also ignores that Dr. Netz's overcharge model *does* include variables

28   controlling for changes in CRT supply and demand, allowing her model to distinguish cartel

10

IPP RESPONSE IN OPP'N TO IRICO DEFS.' MOT. TO EXCLUDE TESTIMONY OF DR. JANET NETZ
Master File No. 4:07-cv-5944-JST; MDL No. 1917

1  damages from non-cartel market conditions. *See* Netz Rpt. 102-03 (discussing data about "CRT

2  manufacturing costs, the availability of potential substitutes, and indicators of world-wide

3  demand" included in Dr. Netz's overcharge analysis); Netz 2014 Rebuttal Rpt. 61 ("As explained

4  [in] my merits report, my cartel overcharge model includes variables capturing CRT supply and

5  demand factors to isolate the price-effect of the cartel."); Netz *Daubert* Decl. 5 ("It is also not true

6  that my 'overcharge model fails to account for major market factors that affected CRT prices[.]' I

7  did, in fact, include major supply and demand factors.") (alteration in original) (footnote omitted).

8       For example, because the defendants in this action failed to produce adequate cost data, Dr.

9  Netz had to look to public data as a representation of supply. She therefore included a CRT glass

10  price index in her model as a supply variable. *See* Netz 2014 Rebuttal Rpt. 61 ("Case evidence

11  indicates that glass comprises a significant portion of the manufacturing costs of CPTs and

12  CDTs."). Dr. Netz's additional supply and demand variables include, *inter alia*: (1) CRT screen

13  size, a proxy for input cost and a demand control; (2) Organisation for Economic Co-operation and

14  Development ("OECD") gross domestic product, a demand control; (3) OECD unemployment

15  rate, another demand control; and (4) LCD market share, another demand control. *See* Netz Rpt.

16  102-04. Dr. Netz also includes time variables allowing for seasonal and annual trending influences

17  on price. *Id.* at 103-04. Notably, defense experts *in this case* have adopted supply and demand

18  variables similar or identical to those employed by Dr. Netz. *See* Netz 2014 Rebuttal Rpt. 61

19  (explaining that Edward A. Snyder, an expert for Toshiba, "also identifies glass as a significant

20  part of the CRT unit price and uses the Bank of Korea glass index to measure CRT glass prices").

21       Dr. Netz's variables produce reliable results. The overcharge rates her model calculates

22  "are consistent with economic theory applied to the case evidence that Defendants organized and

23  participated in a long-standing cartel despite the substantial costs and risks of doing so." Netz Rpt.

24  105. The model's results are statistically significant, confirming that Dr. Netz's conclusions are not

25  the byproduct of chance. *See* Netz Rpt. 105; Netz *Daubert* Decl. 7. Further, Dr. Netz's chosen

26  metrics "explain over 95% of CDT price variation and over 98% of CPT price variation." Netz

27  2014 Rebuttal Rpt. 5, 61; Netz *Daubert* Decl. 7. Dr. Netz also performed a sensitivity analysis that

28  showed her model was robust to small changes in the demand variables, supply variables, and

1   cartel period. Netz *Daubert* Decl. 8. For each sensitivity analysis, the overcharge remains positive

2   and significant for both CDTs and CPTs. *Id.*

3           Conversely, Irico's suggested metrics are of questionable relevance. Contrary to Irico's

4   representation, Dr. Netz did not "summarily reject[]" these proposed variables. Defs.' Br. 9.

5   Instead, Dr. Netz analyzed the metrics and determined that "[i]ncluding the suggested variables

6   does not explain meaningfully more price variation" than Dr. Netz's variables do. *See* Netz 2014

7   Rebuttal Rpt. 62, Ex. RR-99. As Dr. Netz explained in 2014, "[t]here are a number of alternative

8   indices that proxy for the same types of information as the [suggested] variables." *Id.* at 61. For

9   example, although Ms. Guerin-Calvert opines that Dr. Netz should have included an exchange-rate

10  variable in her analysis, Dr. Netz controlled for exchange-rate factors by converting all currency-

11  related variables to U.S. dollars. *See, e.g.*, *id.* at 61 n.290 (explaining that Dr. Netz "converted the

12  [Korean glass price] index to U.S. prices"); *see also In re Monosodium Glutamate Antitrust Litig.*,

13  No. Civ.00-MDL-1328(PAM), 2003 WL 244729, at *2 (D. Minn. Jan. 29, 2003) ("[I]n multiple

14  regression analysis[,] any differences in currencies and exchange rates are usually accounted for in

15  different ways than in formulating a variable to take them into account."). Irico's suggested

16  variables are far from the only way to capture relevant market forces.

17          Ms. Guerin-Calvert is free to attempt to persuade the factfinders that her supply and

18  demand variables are superior to Dr. Netz's. But her disagreement with Dr. Netz's selection of

19  variables falls far short of requiring exclusion of Dr. Netz's analysis as "junk science."

20      **B.      Irico's "Fixed Overcharge" Argument Fails.**

21          After her economic investigation, including reviewing the relevant facts and available data

22  in this case, Dr. Netz structured her analysis by bifurcating the 1995-2007 class damages period

23  into two segments: before and after cartel members learned of criminal investigations into the LCD

24  price-fixing conspiracy. As Dr. Netz has explained, this bifurcation is economically and

25  econometrically sound. *See* Netz *Daubert* Decl. 3-4, 7. Irico takes issue with the first of these two

26  time periods, falsely characterizing Dr. Netz's results as producing a single "fixed overcharge"

27  over the twelve-year period of 1995-2006 and claiming that such an overcharge "is not

28  economically reasonable" in light of "extraneous market factors." Defs.' Br. 10-11. It argues that

1  Dr. Netz should have conducted a year-by-year analysis or "combined the yearly observations into

2  two- or three-year periods." *Id.* at 13.

3  　　　As a threshold matter, Irico's objection misapprehends Dr. Netz's analysis. Dr. Netz's

4  model does not produce a single "fixed overcharge" over the twelve-year period in question. *Id.* at

5  10-14. Instead, her overcharge estimate represents "a reliable overcharge estimate for all class

6  members over the entire period" from 1995-2006, consistent with her assignment to estimate class-

7  wide aggregate damages. Netz *Daubert* Decl. 3-4. Dr. Netz made no inherent assumption that the

8  overcharge is "fixed" at that or any other level. *See id.* Dr. Netz's method for selecting

9  economically relevant time periods is widely accepted by econometricians, rooted in this case's

10  facts and data, and supported by caselaw. Conversely, Ms. Guerin-Calvert offers no economic

11  justification for her proposed "sub-periods," which she "provide[s] to illustrate the available data

12  for sensitivity testing of Dr. Netz's model" and "*not as alternative economically relevant*

13  *periods*."[7] Indeed, as Ms. Guerin-Calvert's analysis demonstrates, introducing arbitrarily truncated

14  time periods into an econometric model can produce serious econometric flaws. Netz *Daubert*

15  Decl. 10-11; *see* Section IV.B.2, *infra*.

16  　　　　　1.　　Dr. Netz's Model Identifies Economically Relevant Time Periods.

17  　　　For the following reasons, Irico's misconceived attack on Dr. Netz's selection of

18  economically relevant time periods fails. ***First***, Dr. Netz's analysis is informed by established

19  econometric methods. To determine economically relevant time periods, Dr. Netz applied accepted

20  economic principles to the available facts and data in this case. For example, in choosing to

21  bifurcate the cartel period into pre- and post-LCD investigation segments, Dr. Netz relied on

22  empirical academic work demonstrating that competition agency investigations impact cartel

23  effects. *See, e.g.*, Robert Clark & Jean-François Houde, *The Effect of Explicit Communication on*

24  *Pricing: Evidence from the Collapse of a Gasoline Cartel*, 62 J. Indus. Econ. 191-228 (2014). Such

25  empirical work supports Dr. Netz's determination that she should separate the pre- and post-

26  periods, to control for whether the cartel changed its tactics after learning that international

27

28  [7] Decl. of Margaret E. Guerin-Calvert in Support of Irico Defs.' Mot. to Exclude Expert Testimony
of Dr. Janet Netz ("Guerin-Calvert Decl.") ¶ 30 n.54 (emphasis added), ECF No. 6149-1.

1    authorities were investigating several of its members for participating in a related price-fixing

2    conspiracy. Indeed, Dr. Netz's analysis confirmed that the pre-LCD overcharges were higher than

3    the post-investigation overcharges. *See* Netz Rpt. 105 & n.310. In contrast, the alternative "sub-

4    periods" Irico identifies lack economic justification. *See* Section IV.B.2, *infra.*

5            Further, in stating that Dr. Netz's selection of economically relevant time periods ignores

6    "extraneous market forces," Irico mischaracterizes Dr. Netz's model. Defs.' Br. 11. As explained

7    above, Dr. Netz's model captures relevant changes in competitive conditions. *See* Section IV.A.2,

8    *supra*. Notably, her analysis includes an LCD market share variable directly controlling for the rise

9    in LCDs, *see* Netz Rpt. 103, as well as a "flexible time trend," which "control[s] for the influence

10   of trends in CRT prices over time not otherwise captured by the model's supply and demand

11   variables," Netz 2014 Rebuttal Rpt. 57.

12           Although Irico may criticize Dr. Netz's selection of economically relevant time periods,

13   "[l]earned professionals can have strong disagreements about their analyses of facts, and the

14   strength of their disagreement does not mean that one or the other must be dismissed as a quack."

15   *In re Capacitors Antitrust Litig.*, No. 14-cv-03264-JD, 2020 WL 870927, at *2 (N.D. Cal. Feb. 21,

16   2020). Irico is free to raise any perceived weaknesses in Dr. Netz's selection of economically

17   relevant time periods at trial. *See id.* ("What [the plaintiffs' expert] did or did not take into account

18   in constructing his analysis may be grist for a good cross-examination at trial" but "do[es] not play

19   a material role in deciding whether [his] work should be admitted under Rule 702." (quotation

20   marks and citation omitted)).

21           ***Second***, Dr. Netz's supplemental analyses confirm that her selection of relevant time

22   periods produces reliable results. In response to this motion, Dr. Netz constructed alternative

23   overcharge models using shorter timeframes. For example, she broke the cartel period into three

24   economically relevant timeframes: (1) before LCDs became more prevalent than CRTs; (2) after

25   LCDs became more prevalent than CRTs; and (3) after cartel members learned of the LCD

26   investigation. *See* Netz *Daubert* Decl. 9-10. This model produced overcharges consistent with Dr.

27

28

Netz's original results. *Id.*[8] Although there is an economic justification for this tripartite structure, Dr. Netz remains of the opinion that the two-period specification in her expert report is the most reliable structure for analyzing the available data in this case. *Id.* at 10.

  **Third**, Irico cites no caselaw supporting its argument that Dr. Netz's regression model producing a single overcharge over a twelve-year period is so deficient as to render it inadmissible. To the contrary, courts have rejected challenges to single overcharge calculations *even when* the anticompetitive conduct spanned more than a decade. In *In re Capacitors Antitrust Litigation*, for example, Judge Donato rejected an objection to a damages model that was "based on the assumption that every purchaser of each of the three different types of capacitors at issue paid the same uniform overcharge . . . for all purchases during the twelve-year class period." No. 14-cv-03264-JD, 2018 WL 5980139, at *7 (N.D. Cal. Nov. 14, 2018) (quotation marks omitted). Judge Donato concluded that even if this criticism "were accepted for the sake of discussion," it "d[id] not warrant exclusion of [the expert's] work on *Daubert* grounds." *Id.*; *see also In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2014 WL 6461355, at *61-62 (N.D. Ohio Nov. 17, 2014) (rejecting defendants' criticism of expert who "assume[d] that the same collusive overcharge applie[d] to every one of the purchases in his data sample" during a proposed class period spanning more than a decade because the expert "provide[d] a reasonable basis" for declining to "estimat[e] impact coefficients by year").

  **Finally**, Irico contends that Dr. Netz's approach to calculating overcharges renders her analysis "unusable" if Irico is subsequently determined to have participated in the conspiracy for less than the entire 1995-2006 period. Defs.' Br. 12 n.6. But Dr. Netz has repeatedly explained that her damages model can accommodate such findings via "simple arithmetic adjustments."[9] *Accord Polyurethane Foam*, 2014 WL 6461355, at *56 ("If a factfinder determines . . . the conspiracy existed for only a portion of the Class Period, or extended to only a portion of the Defendants, . . . [the expert's] model can be re-run to accommodate a more limited conspiracy.").

---

[8] Dr. Netz also divided the 1995-2006 period into four-year and six-year subperiods, which produced *even higher damages* than Dr. Netz's bifurcated structure. Netz *Daubert* Decl. 11.

[9] Werbel Decl., Ex. 9 ("Netz 2022 Rebuttal Rpt.") at 15, ECF No. 6170-1.

1    For these reasons, Dr. Netz's selection of economically relevant time periods produces

2  reliable results. Irico remains free to cross-examine Dr. Netz about this decision.

3                2.    Irico's "Sub-periods" Are Arbitrary.

4    Irico's alternative "sub-periods" are arbitrary, as Ms. Guerin-Calvert offers no economic

5  justification why CRT overcharges would have varied from calendar year to calendar year. Ms.

6  Guerin-Calvert refuses to offer her identified "sub-periods" as *economically relevant periods*,"

7  but rather states that those periods only "illustrate the available data for sensitivity testing of Dr.

8  Netz's model." Guerin-Calvert Decl. ⁋ 30 n.54 (emphasis added). Because these proposed "sub-

9  periods" are untethered from this case's facts, the resulting analysis is flawed.

10    Introducing arbitrarily truncated "sub-periods" into a regression model can produce critical

11  econometric defects. *See* Netz *Daubert* Decl. 10-11. Ms. Guerin-Calvert's *ad hoc* changes

12  introduce unacceptable multicollinearity that undermines the reliability of her results. By slicing

13  the damages period into arbitrary tranches, Ms. Guerin-Calvert adds a host of collusion indicators

14  into Dr. Netz's existing model. *Id.* But that model already includes both linear and quadratic time

15  variables that "captur[e] the overall trend in CRT prices" and "address the 'spurious regression

16  problem' that can occur with data that vary over time." Netz Rpt. 103. Ultimately, Ms. Guerin-

17  Calvert's decision to add time-period collusion indicators to a model with existing time-trend

18  explanatory variables conflates legitimate and collusive price effects. Netz *Daubert* Decl. 10-11.

19  Because Ms. Guerin-Calvert's model introduces variables that unnecessarily increase

20  multicollinearity and make it more difficult for the model to separate non-collusive market effects

21  from conspiracy effects, it produces unreliable results. *Id.*

22    Further, Dr. Netz's supplemental analysis demonstrates that Ms. Guerin-Calvert's attempt

23  to discredit her selection of relevant time periods amounts to little more than data mining. For

24  example, Ms. Guerin-Calvert's back-up code reveals that she conducted an alternate analysis using

25  six-year sub-periods. *Id.* at 11. For CPTs, this analysis produces a similar overcharge to Dr. Netz's

26  model. *Id.* For CDTs, the six-year model produces an overcharge rate more than four percent

27  *higher* than Dr. Netz's model. *Id.* Ms. Guerin-Calvert did not report these results.

28    Irico also contends that "[t]he data available to her for other years that Dr. Netz deemed

16

'not sufficient' [to estimate annual overcharges] far surpass the amount of data available for 2007," the post-investigation year Dr. Netz analyzed separately. Defs.' Br. 12. As explained above, Dr. Netz separately analyzed 2007 not because of the quantum of available data, but because empirical academic work and available data suggest the CRT cartel changed its tactics after learning that international authorities were investigating its members for joining a related conspiracy. *See* Section IV.B.1, *supra*. Here again, Irico cites no authority requiring an expert to separately calculate "sub-period" overcharges, much less requiring her to do so *even absent indicia* that a long-running cartel fundamentally changed its operations during the conspiracy period.

For these reasons, Irico's challenge to Dr. Netz's selection of economically relevant time periods lacks merit. And, as with Irico's objection to Dr. Netz's chosen variables, this "sub-period" argument first surfaced nearly a decade ago.[10] It is time for the factfinders to weigh in.

## C.   Irico's "Government Pricing Regulations" Argument Fails.

Irico's "Chinese pricing regulations" argument fares no better. Irico is simply wrong when it argues that Dr. Netz failed to consider the possible impact of Chinese pricing regulations, and that she improperly offered an opinion on Chinese law.

As with Irico's other criticisms of Dr. Netz, these arguments are not a proper basis to exclude her testimony under *Daubert*. This Court recently rejected this same argument when it denied Irico's motion to exclude DPPs' expert, Dr. Phillip Johnson:

> Johnson opines that the price regulations imposed by the Chinese government would not "have had a measurable effect on actual global market prices (if any)," and also observes that "Irico provided no information or analysis of the regulations, whether they were enforced or how they might have been impacted by the existence of the cartel." He further explains that "Irico provided no evidence that these regulations actually constrained its CRT prices or would have but for the conspiracy," and that "the possibility of government punishment of lower prices is an additional facilitating factor for the success of the cartel's efforts to keep prices above competitive levels."

*In re CRT*, 2022 WL 4596621, at *6. This analysis and holding apply equally to Dr. Netz's opinions.

---

[10] *See, e.g.*, Werbel Decl., Ex. 4 ("Guerin-Calvert Rpt.") at ¶¶ 111-13, ECF No. 6170-1.

1.      <u>There Is No Factual Basis to Believe the Pricing Regulations Would Impact Dr. Netz's Analysis.</u>

Irico's "price floor"[11] argument should likewise be rejected because it lacks foundation. Irico speculates that Chinese manufacturers' prices "*may* well have been affected by the price regulations." Defs.' Br. 18 (emphasis added). Here, as in its opposition to the DPPs' motion for class certification, Irico has provided *no evidence* demonstrating that it (or any other CRT manufacturer) complied with the regulations, that the regulations were enforced, that they impacted CRT prices, or that they would have but for the conspiracy. *See In re CRT*, 2022 WL 4596621, at *6. Similarly, Irico's legal expert, Professor Clarke, did not offer any opinion about whether the alleged pricing regulations were ever enforced or whether Irico complied with them. Nor did he say how long they were purportedly in effect. Similarly, Ms. Guerin-Calvert admits that she does not know how long the alleged pricing regulations were in effect. Guerin-Calvert Decl. ¶ 40.

Moreover, Irico has not produced any company records showing it followed the regulations. By all indications, most of the documents attached to Professor Clarke's report come from the internet, not Irico's contemporaneous files.[12] The best that Irico can offer is self-serving and contrived testimony from its employees that "[w]e're not allowed to do that [selling at low prices]" and "[m]y understanding is that the ex-factory prices of our Irico CRT products *should* not be below the average production cost." Defs.' Br. 18 (emphasis added). This testimony falls far short of establishing that Irico in fact followed the regulations or that Irico's supposed following of the regulations impacted CRT prices during the relevant period. Ultimately, a jury should assess the witnesses' credibility and decide whether to believe their self-serving testimony. *See United States v. Pac. Gas & Elec. Co.*, No. 14-cr-00175-TEH, 2016 WL 6804575, at *5 (N.D. Cal. Nov. 17, 2016) ("The jury could have simply disbelieved the self-serving testimony of PG&E's employees . . . .").

A court should not reject an expert's methodology based "simply on inference and

---

[11] Professor Clarke did not use the term "price floors" in his report. This term comes from Irico's lawyers and from Ms. Guerin-Calvert, who is not an expert in Chinese law.

[12] *See* Werbel Decl., Ex. 7 ("Clarke Rpt.") at ¶ 12, ECF No. 6170-1.

18

1   speculation." *In re Polypropylene Carpet Antitrust Litig.*, 996 F. Supp. 18, 27 (N.D. Ga. 1997). As

2   this Court previously concluded, "vague deposition testimony" does not undermine the reliability

3   of an expert's opinions. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC,

4   2013 WL 5391159, at *9 (N.D. Cal. Sept. 24, 2013) (rejecting allegations that Dr. Netz relied on

5   false factual assumptions that were "based on vague deposition testimony, not demonstrative

6   falsity in the record"). Moreover, an expert "need not mention every speculative theory when

7   describing his methodology." *Walnut Creek Manor, LLC v. Mayhew Ctr., LLC*, 622 F. Supp. 2d

8   918, 927 (N.D. Cal. 2009); *see Doubletap Def., LLC v. Hornady Mfg. Co.*, No. 8:18CV492, 2021

9   WL 3631135, at *7 (D. Neb. Aug. 17, 2021) (rejecting *Daubert* challenge where omissions in the

10   expert's report did not "render the opinion wholly baseless or purely speculative"; while expert did

11   not include certain facts, plaintiff disputed whether those facts were relevant); *In re Processed Egg*

12   *Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 431 (E.D. Pa. 2015) ("The absent factors Defendants

13   fault Dr. Rausser for not including in his regression are far too speculative to render his regression

14   inadmissible.").

15         Moreover, given Irico's violations of federal law, disregard of court orders, and spoliation

16   of evidence—as well as its employees' questionable credibility—there is no reason to believe that

17   Irico would have complied with any pricing regulations that may have been in place. *See* ECF No.

18   6146 at 6-11 (finding plaintiffs made preliminary showing of spoliation and noting "inconsistent,

19   shifting testimony from the General Counsel of Irico Group, Yan Yunlong"); *In re Cathode Ray*

20   *Tube (CRT) Antitrust Litig.*, No. 07-cv-05944-JST, 2018 WL 4775595, at *2 (N.D. Cal. Aug. 20,

21   2018) (finding Irico employee Wenkai Zhang's "sworn statement . . . is at best incorrect. In its sur-

22   reply, Irico did not dispute the DPPs' assertion that Irico's declaration was untrustworthy.").

23               2.   <u>Dr. Netz Did Not Offer Opinions as to Chinese Law. Rather, She</u>

24                      <u>Considered the Economic Import of Irico's Pricing Regulations</u>
                        <u>Arguments and Explained Why Ms. Guerin-Calvert's Analysis Was Flawed.</u>

25         Irico is wrong when it states that Dr. Netz "fail[ed] to consider the implications of the

26   Chinese government price floors."[13] Despite the factual uncertainties regarding the pricing

27

28   _____
  [13] Werbel Decl., Ex. 12 ("Guerin-Calvert 2022 Suppl. Rpt.") at ¶ 28, ECF No. 6170-1.

19

IPP RESPONSE IN OPP'N TO IRICO DEFS.' MOT. TO EXCLUDE TESTIMONY OF DR. JANET NETZ
Master File No. 4:07-cv-5944-JST; MDL No. 1917

1  regulations, Dr. Netz considered them to see if they would change her analysis. *See* Netz 2022

2  Rebuttal Rpt. 6 ("I have reviewed Ms. Guerin-Calvert's analyses, Professor Clarke's opinions, and

3  the translated Pricing Documents attached to Professor Clarke's Report."); Capurro Decl., Ex. 1

4  (Netz Dep. (June 9, 2022)) at 27:6-7 ("So for this current rebuttal, I examined five specific price

5  floors."); Netz Dep. at 27:24-28:2 ("[I]t is not clear to me those are the correct price floors, but I

6  have assumed that they are correct price floors for my quantitative analysis.").

7       Dr. Netz explained why Ms. Guerin-Calvert's analysis is incorrect: it does not address Irico

8  prices; it compares implied but-for prices to industry average production costs (rather than a

9  manufacturer's own costs); and it does not account for CPT shape. *See* Netz 2022 Rebuttal Rpt. 7-

10  10.

11      Like DPPs' expert Dr. Johnson, who opined that the Chinese regulations would not "have

12  had a measurable effect on actual global market prices (if any)," *In re CRT*, 2022 WL 4596621, at

13  *6, Dr. Netz further explained that even if all three of Ms. Guerin-Calvert's price comparisons

14  were accurate, the price data Ms. Guerin-Calvert used "involve only 0.2% of [the] damages period

15  revenue." *See* Netz 2022 Rebuttal Rpt. 10. Thus, Ms. Guerin-Calvert's criticisms do not call into

16  question the reliability of Dr. Netz's damages model.

17      At best, the disagreement between Dr. Netz and Ms. Guerin-Calvert is an issue for the

18  factfinders. "Weighing the credibility of conflicting expert witness testimony is the province of the

19  jury." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 235 F.3d 1184, 1192 (9th Cir. 2000); *see

20  also In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013 WL 5391159, at *9

21  (N.D. Cal. Sept. 24, 2013) ("Defendants' criticism, mostly reliant on contrary expert evidence, is

22  an attack on the weight of Dr. Netz's opinions, not her methodology's scientific reliability . . . .");

23  *Lewert v. Boiron, Inc*., 212 F. Supp. 3d 917, 936 (C.D. Cal. 2016) ("[T]he Court declines to reject

24  one side's expert based solely on the testimony of the other side's expert."), *aff'd*, 742 F. App'x

25  282 (9th Cir. 2018); *Arriaga v. Logix Fed. Credit Union*, No. CV-18-9128-CBM-AGRx, 2022 WL

26  3052318, at *3 (C.D. Cal. Apr. 22, 2022) (The argument that an expert "failed to review certain

27  materials goes to weight, not admissibility . . . ."); *In re Juul Labs, Inc. Mktg., Sales Pracs. &

28  Prods. Liab. Litig*., No. 19-MD-02913-WHO, 2022 WL 1814440, at *2 (N.D. Cal. June 2, 2022)

1   ("JLI's related objections that plaintiffs' experts failed to consider or appropriately weigh the

2   impact of federal statutes, regulations, or agency guidance go to the weight of that testimony but

3   do not merit exclusion."); *Richan v. Fleetwood Motor Homes*, No. CV08-6790-SVW (VBKx),

4   2010 WL 11519497, at *5 (C.D. Cal. Dec. 9, 2010) ("[A]n expert's failure to consider certain facts

5   'bear[s] on the weight of the evidence rather than on its admissibility.'") (citation omitted).

6           Irico's caselaw is inapposite. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039,

7   1057 (8th Cir. 2000) (expert did not separate lawful from unlawful conduct); *Blue Cross & Blue*

8   *Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 592 (7th Cir. 1998) (expert corrected for

9   only one factor, other than anticompetitive conduct, that could have affected prices); *In re*

10  *Wholesale Grocery Prods. Antitrust Litig.*, No. 09-MD-2090, 2018 WL 3862773, at *7 (D. Minn.

11  Aug. 14, 2018) (expert did "not consider whether Stop & Shop's dramatically reduced prices were

12  a product of lawful factors unique to Stop & Shop"). Here, by contrast, Dr. Netz controlled for

13  numerous factors that could have affected prices. She explained, "I use regression analysis to

14  isolate the impact of the cartel on CRT prices from the impact of other factors that may have also

15  contributed to any CRT price differences between the with- and without-cartel periods." Netz Rpt.

16  97-98 (listing variables); *see also In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK,

17  2014 WL 1351040, at *18 n.39 (N.D. Cal. Apr. 4, 2014) (distinguishing *Blue Cross & Blue Shield*

18  *United of Wis.* and *Concord Boat*).

19                    3.    <u>Dr. Netz Is Qualified to Opine, as Ms. Guerin-Calvert did, on the Impact of
20                          the Alleged Pricing Regulations (if Any) on Her Economic Analysis.</u>

21          Finally, in a classic "heads I win, tails you lose" argument, Irico claims that Dr. Netz was

22  not qualified to offer an opinion about the alleged pricing regulations because she is not a Chinese

23  law expert. However, Dr. Netz never claimed to be a Chinese law expert and does not offer any

24  opinions that require expertise in Chinese law. Instead, as any economist would do, Dr. Netz

25  evaluates and responds to Ms. Guerin-Calvert's unfounded criticisms. Netz 2022 Rebuttal Rpt. 2.

26  As Dr. Netz explained:

27          I do not make conclusions on whether these price floors are legally binding or
28          appropriate. I did review the Pricing Documents attached to Professor Clarke's report

                                                    21

*to inform the economic analysis* of the implication of a price floor, assuming that these documents create a 'price floor,' a conclusion about which I do not offer an opinion.

*Id.* at 3-4 (emphasis added). This is what economics experts do and was in response to the same type of analysis that Ms. Guerin-Calvert (who is also not an expert in Chinese law) performed. Netz *Daubert* Decl. 13 ("Defendants may disagree with my conclusions, but I did what Ms. Guerin-Calvert did: I gathered 'price floors' from the documents and then compared them to but-for prices from my model and the data."). The difference between Dr. Netz's analysis and Ms. Guerin-Calvert's is that Dr. Netz is correct and Ms. Guerin-Calvert is wrong.

Contrary to Irico's assertion, this case is not "remarkably similar to" *In re LIBOR-Based Financial Instruments Antitrust Litigation*, 299 F. Supp. 3d 430 (S.D.N.Y. 2018). In that case, the court excluded Dr. Netz's "interpretation of trader communications to conclude that manipulation in fact occurred" because it was not based on "scientific, technical, or other specialized knowledge." *Id.* at 490. Here, however, Dr. Netz is applying her specialized economic expertise to estimate damages, not opining on whether certain conduct in fact occurred. Moreover, the court in *LIBOR* found that Dr. Netz's "methodology is sufficiently reliable to support her opinion that Rabobank's submissions could impact published LIBOR." *Id.* at 492 (rejecting "argument that Dr. Netz's opinion in unreliable because her . . . methodology relies on unsupported assumptions").

The other cases Irico cites are also inapposite. *See Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F.2d 1333, 1339 (7th Cir. 1989) (finding expert's nine-sentence-long affidavit provided "nothing but conclusions," and did not draw "on the skills of an economist"); *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 343-48 (D. Md. 2011) (excluding testimony of expert who opined that Geek Squad's actions caused electric shock but did no testing and did not "examine meaningfully other possible causes"); *Stein v. Pac. Bell*, No. C00-2915 SI, 2007 WL 831750, at *11 (N.D. Cal. Mar. 19, 2007) (noting expert merely "reviewed various documents and then restated as his 'opinions' the findings or allegations in those materials").

Here, by contrast, Dr. Netz used her economic expertise to determine whether the alleged pricing regulations affected her damages model. The issue is not whether Dr. Netz is a Chinese law

22

expert, but whether she is qualified to testify about her damages opinion. She clearly is. The motion should be denied.

## V.       CONCLUSION

For the foregoing reasons, the Court should deny Irico's motion to exclude Dr. Netz's testimony and allow the factfinders to assign her analysis the appropriate weight.


Dated:  March 20, 2023                    By:   */s/ Mario N. Alioto*

Mario N. Alioto (56433)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2001 Union Street, Suite 482
San Francisco, CA 94123
Telephone:      (415) 563-7200
Facsimile:      (415) 346-0679
Email:  malioto@tatp.com
Email:  laurenrussell@tatp.com

*Lead Counsel for Indirect Purchaser Plaintiffs*