1
2
3
4
5
6
7

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
202.639.7700
202.639.7890 (fax)
Email: john.taladay@bakerbotts.com
       evan.werbel@bakerbotts.com
       tom.carter@bakerbotts.com
       drew.lucarelli@bakerbotts.com

8
9

*Attorneys for Defendants*
*Irico Group Corp. and Irico*
*Display Devices Co., Ltd.*

10
11
12
13

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

14
15
16

IN RE: CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION

17
18

This document relates to:

*ALL INDIRECT PURCHASER ACTIONS*

19
20
21
22
23
24
25
26
27
28

Master File No.: 07-cv-05944 JST

MDL No. 1917

**REPLY IN SUPPORT OF DEFENDANTS
IRICO GROUP CORP. AND IRICO
DISPLAY DEVICES CO., LTD.'S
MOTION TO PARTIALLY EXCLUDE
THE PROPOSED EXPERT TESTIMONY
OF DR. JANET NETZ (ECF NO. 6149)**

Date:        May 4, 2023
Time:        2:00 p.m.
Judge:       Hon. Jon S. Tigar
Courtroom:   6, 2nd Floor

1
2

## **TABLE OF CONTENTS**

3
4
I.        DR. NETZ'S DAMAGES MODEL OMITS MAJOR FACTORS AND IS
          UNRELIABLE ........................................................................................................2

5
6
II.       DR. NETZ'S ASSUMPTION OF A SINGLE OVERCHARGE OVER A
          TWELVE-YEAR PERIOD IS UNRELIABLE....................................................8

7
8
III.      PLAINTIFFS FAIL TO ESTABLISH THAT DR. NETZ'S CPT MODEL IS
          COMPATIBLE WITH CHINESE PRICING LAWS .......................................10

9
IV.       PLAINTIFFS CONCEDE THAT DR. NETZ IS UNQUALIFIED TO PROVIDE
          OPINIONS ON CHINESE LAW .....................................................................13

10
V.        DR. NETZ'S PRIOR *DAUBERT* EXCLUSIONS ARE PLAINLY RELEVANT............14

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

4

*Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*,
  No. C 04-02266 JW, 2010 WL 11575000 (N.D. Cal. Aug. 30, 2010) .....................................15

*Bazemore v. Friday*,
  478 U.S. 385 (1986)..........................................................................................................................8

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
  152 F.3d 588 (7th Cir. 1998) .......................................................................................................11, 12

*Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*,
  823 F. Supp. 2d 334 (D. Md. 2011).................................................................................................14

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) .........................................................................................................12

*Doubletap Def., LLC v. Hornady Mfg. Co.*,
  No. 8:18CV492, 2021 WL 3631135 (D. Neb. Aug. 17, 2021).........................................................12

*Edwards v. Nat'l Milk Producers Fed'n*,
  No. C 11-04766 JSW, 2014 WL 4643639 (N.D. Cal. Sept. 16, 2014)..............................................8

*Gen. Elec. Co. v Joiner*,
  522 U.S. 136 (1997)..........................................................................................................................8

*Hamm v. Mercedes-Benz USA, LLC*,
  No. 5:16-cv-03370-EJD, 2021 WL 1238304 (N.D. Cal. Apr. 2, 2021) ...........................................7

*Hemmings v. Tidyman's Inc.*,
  285 F.3d 1174 (9th Cir. 2002) ..........................................................................................................7

*In re Capacitors Antitrust Litig.*,
  No. 14-cv-03264-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ...............................................9, 10

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  No. 07-cv-05944-JST, 2022 WL 4596621 (N.D. Cal. Aug. 1, 2022)................................................15

*In re Flash Memory Antitrust Litig.*,
  C 07-0086, 2010 WL 2332081 (N.D. Cal. June 9, 2010)................................................................14, 15

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008).....................................................................................................15

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*In re LIBOR-Based Fin. Instr. Antitrust Litig.*,
   299 F.Supp.3d 430 (S.D.N.Y. 2018) ..............................................................6, 13, 14, 15

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ........................................................................ passim

*In re Optical Disk Drive Antitrust Litig.*,
   No. 10-md-2413, 2017 WL 11513318 (N.D. Cal. 2017) ..................................................7

*In re Polyurethane Foam Antitrust Litig.*,
   No. 1:10 MD 2196, 2014 WL 6461355 (N.D. Ohio Nov. 17, 2014) ...............................9, 10

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
   166 F. Supp. 3d 654 (E.D. La. 2016) .................................................................................7

*In re Processed Egg Prods. Antitrust Litig.*,
   81 F. Supp. 3d 412 (E.D. Pa. 2015) ..................................................................................12

*In re REMEC Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010) ..............................................................................5

*In re Wireless Tel. Servs. Antitrust Litig.*,
   385 F. Supp. 2d 403 (S.D.N.Y. 2005) ................................................................................7

*Lang v. Kohl's Food Stores, Inc.*,
   217 F.3d 919 (7th Cir. 2000) .............................................................................................14

*McCrary v. Elations Co. LLC*,
   No. EDCV130242JGBSPX, 2014 WL 12589137 (C.D. Cal. Dec. 2, 2014) ....................4, 5

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988) ...............................................................................................8

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*,
   877 F.2d 1333 (7th Cir. 1989) ...........................................................................................14

*Obrey v. Johnson*,
   400 F.3d 691 (9th Cir. 2005) ...............................................................................................7

*Penk v. Or. State Bd. of Higher Educ.*,
   816 F.2d 458 (9th Cir. 1987) .........................................................................................4, 12

*Sali v. Corona Reg'l Med. Ctr.*,
   909 F.3d 996 (9th Cir. 2018) ...............................................................................................9

*Stein v. Pac. Bell*,
   No. C00-2915 SI, 2007 WL 831750 (N.D. Cal. Mar. 19, 2007) .......................................14

*Walnut Creek Manor, LLC v. Mayhew Ctr., LLC*,
    622 F. Supp. 2d 918 (N.D. Cal. 2009) ........................................................................12

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ...........................................................................................................9

Fed. R. Evid. 702 .............................................................................................2, 4, 6, 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs' response deploys a smokescreen of largely irrelevant arguments to obfuscate the central question: are there fatal flaws that render Dr. Netz's damages methodology unreliable?  *See* Indirect Purchaser Plaintiffs' Response to Irico Defendants' Motion to Partially Exclude the Proposed Expert Testimony of Dr. Janet Netz, ECF No. 6181 ("Opp'n"); Declaration of Janet S. Netz, Ph.D. in Response to Irico Defendants Motion to Partially Exclude Testimony, ECF No. 6181-2 ("Netz *Daubert* Decl.").  Plaintiffs attempt to cast this motion as a mere "battle of the experts" around the choice of regression variables, mischaracterizing the basis of Irico's motion and ignoring the guiding legal principles under *Daubert* and its progeny.  This is not a question of whether Dr. Netz used the choicest variables or whether her report is off the mark by degrees.  The only question addressed is whether her report is so fundamentally flawed as to undermine its utility to the finder of fact.  Plaintiffs' effort to devolve that critical question into a squabble about variables misses the point, and the Court should not take the bait.

Irico can simplify what Plaintiffs seek to complicate.  *First,* Dr. Netz's damages model wholly omits major factors that are essential to evaluate.  Because she ignores them, her model attributes price movements stemming from those market factors solely to the alleged conspiratorial conduct.  The most obvious is the huge spike in demand caused by the introduction of Windows 95 and the home PC revolution.  Dr. Netz attributes the pricing impact of this seismic event to the alleged cartel by failing to introduce any factor to account for its effect.  While this is the most glaring omission, it is not the only one, as revealed by the declaration of Irico's economic expert, Margaret Guerin-Calvert.  The omission of these major factors is what makes Dr. Netz's report unreliable and brings her model squarely into the framework of properly excluded expert opinions as reflected in cases such as *In re Live Concert Antitrust Litigation*, 863 F. Supp. 2d 966 (C.D. Cal. 2012) ("*Live Concert*").  *Second*, Dr. Netz goes to great pains to lump together years' worth of data in a single 12-year overcharge assumption, masking the significant impact and variability caused by these major factors when they occurred.  *Third*, Dr. Netz failed to consider the effects of binding Chinese pricing regulations that set bottom prices for CRTs sold in China during the relevant period.  Her response is to apply her own unqualified interpretation of Chinese law, and

1  then undertake an economic assessment of that interpretation based on products that are not even

2  covered by the regulation.

3  Dr. Netz's declaration studiously avoids confronting the missing major market factors

4  identified by Ms. Guerin-Calvert, or evaluating their impact, because she cannot justify their

5  omission.  Instead, she tries to paint the debate around the variables she chose and explain that her

6  analysis and results are consistent with those variables.  Her tautology holds true, but is part of the

7  diversion, as her recent declaration simply repeats and compounds her errors.  *See* Declaration of

8  Margaret Guerin-Calvert in Response to Declaration of Dr. Janet Netz Opposing Motion to

9  Partially Exclude the Testimony of Dr. Netz ("Guerin-Calvert Reply Decl."); *see also* Declaration

10  of Margaret Guerin-Calvert in Support of Motion by Irico Group Corp. and Irico Display Devices

11  Co., Ltd. to Exclude Testimony of Dr. Janet Netz ("Guerin-Calvert Decl.").  Plaintiffs' counsel

12  jump on board and argue, in essence, that because Dr. Netz used a kind of standard regression

13  analysis and because some other cases upheld regression analyses using longer time periods to

14  measure damages, Dr. Netz's analysis must also be validated.

15  But once the smokescreen created by Plaintiffs and Dr. Netz is cleared away and the central

16  question of reliability is measured by economic means, Dr. Netz's opinions fail to meet the

17  standards established by FRE 702 and *Daubert*.  Irico's motion should be granted.

## ARGUMENT

### I.    DR. NETZ'S DAMAGES MODEL OMITS MAJOR FACTORS AND IS UNRELIABLE

21  Irico has demonstrated that Dr. Netz's model omits major factors, and thereby fails to meet

22  the standards established under FRE 702 and *Daubert*.  *See Live Concert*, 863 F. Supp. 2d. at 974.

23  The assertions by Plaintiffs that Dr. Netz's qualifications are sound and her use of a regression

24  methodology is standard are not sufficient to defeat a *Daubert* inquiry.

25  As Ms. Guerin-Calvert explains in her attached Declaration, the economic test to evaluate

26  whether a regression analysis is unreliable is well established:

27  [I]f overcharges estimated by a regression model change
"substantially" when explanatory variables that have a sound

28

> economic rationale are added to a model, then the model that omits these variables is "misspecified and its results are biased and unreliable[.]"

Guerin-Calvert Reply Decl. ¶ 24 (citing ABA Section of Antitrust Law, "Proving Antitrust Damages: Legal and Economic Issues," (2d ed. 2010), pp. 154, 177); *see also* Guerin-Calvert Decl. ¶ 12.

The test is not disputed by Dr. Netz or Plaintiffs' counsel.  Dr. Netz also does not contest that when these additional factors are applied, the changes are statistically significant.  Thus, the only remaining question – and the one that is the focus of Dr. Netz's response – is whether the factors proposed by Ms. Guerin-Calvert have a sound economic rationale.  Dr. Netz does not really argue that the factors proposed by Ms. Guerin-Calvert are not relevant.  Rather, she argues that her model already adequately captures these factors.  But if that were true, then introducing those additional factors ***would not substantially change Dr. Netz's results***.  But they do.

Thus, the debate here is not a mere disagreement among experts about internecine variables, as Plaintiffs ask the Court to accept.  It is about her failure to address the major market factors necessary to provide reliable results that would actually assist the fact-finder.  The missing major market factors identified by Ms. Guerin-Calvert are significant both as a matter of common sense and common economic tests.  Those factors include:

- Demand and supply shocks for CDTs caused by the introduction of Windows 95 and capacity shortages in 1995 and 1996, none of which are captured by Dr. Netz's demand control or general economic condition variables.  Guerin-Calvert Reply Decl. ¶ 27.

- Shipping costs, which are plainly relevant given that CPTs and CDTs (and TVs or monitors incorporating them) are large, bulky products that were often shipped internationally.  *Id*. ¶¶ 28, 31.

- Exchange rates, which are particularly relevant given extreme fluctuations in those rates between the U.S. dollar and Asian currencies following the 1997 Asian financial crisis.[1]  *Id.*

- Labor costs, which reflect a major portion of the cost of production for CRTs.  *Id.* ¶¶ 26, 31.

---

[1] As explained by Ms. Guerin-Calvert, Dr. Netz's conversion of prices to U.S. dollars does not actually control for these changes in exchange rates.  Guerin-Calvert Reply Decl. ¶ 36.

- Shipments of desktop computers and U.S. electronics retailer sales, as direct controls for demand for CDTs and CPTs, respectively.  *Id.* ¶¶ 28, 31.

Ms. Guerin-Calvert identified and tested variables that control for each of these major factors missing from Dr. Netz's model.

Ms. Guerin-Calvert then explains how these economically significant variables that she added identify the failure of Dr. Netz's model:

> These [economically significant variables] were added to Dr. Netz's model to see if they do indeed affect CRT prices (i.e., were they statistically significant when included in Dr. Netz's model?) and whether the aggregate overcharge estimated by Dr. Netz's model changed substantially with their addition. Since both of these were true, the test indicates that her model excludes major market factors.

Guerin-Calvert Reply Decl. ¶ 26.[2]  Dr. Netz's report therefore falls into the category of "regressions so incomplete as to be inadmissible as irrelevant."  *Penk v. Or. State Bd. of Higher Educ.*, 816 F.2d 458, 465 (9th Cir. 1987) (*accord Live Concert*, 863 F. Supp. 2d at 973).

While Plaintiffs attempt to change the narrative in their Opposition, the cases cited in Irico's motion are on-point and confirm that models that omit major factors, like Dr. Netz's model, are unreliable and should be excluded.  *See* Mot. 8-10.  *Live Concert* firmly establishes that courts serve an essential gatekeeping function under *Daubert* and FRE 702 to probe the reliability of an expert's regression methodology in an antitrust case, rather than simply rubber-stamping any attempt at regression analysis.  *See Live Concert*, 863 F. Supp. 2d. at 973 (recognizing the "importance of accounting for 'major variables' . . . in the context of antitrust litigation").  Plaintiffs attempt to lower the bar for themselves in this case, arguing that *Live Concert* "involved the exclusion of an expert who failed to include any explanatory variables other than the one being tested and thus attributed the entire effect on the dependent variable to that single explanatory variable."  Opp'n 9 (citing *McCrary v. Elations Co. LLC*, No. EDCV130242JGBSPX, 2014 WL 12589137, at *9 (C.D. Cal. Dec. 2, 2014)).  But nowhere in *Live Concert* does the court say that

---

[2] After controlling for these common-sense variables and with no other changes, the aggregate damages estimated by Dr. Netz's model drop by a factor of 5 for CPTs and a factor of 10 for CDTs. Guerin-Calvert Reply Decl. ¶¶ 7, 29, 32.

the applicable test is whether *all* explanatory variables could be excluded.  In fact, in a case cited extensively in *Live Concert*, *In re REMEC Inc. Securities Litigation*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010) ("*REMEC*"), the challenged expert *did* consider multiple explanatory variables, but the expert's regression analysis was still excluded because it failed to account for other major factors that explained the price changes.  *Live Concert*, 863 F. Supp. 3d at 978 (noting that the *REMEC* analysis "accounted for two independent variables . . . in addition to" the alleged activity that impacted prices).

To distinguish *Live Concert*, Plaintiffs rely on *McCrary v. Elations Co.* as an example of an instance in which an expert model was not excluded despite a party's contention that it failed to consider major factors.  Opp'n 9.  But in *McCrary*, the challenged expert model survived because the court determined that the missing "variables suggested by Defendant . . . [we]re vague and Defendant fail[ed] to offer any explanation as to how they may have altered the regression analysis." *McCrary*, 2014 WL 12589137, at *8.  That is not the case here.  Irico's arguments about the omitted factors were clearly laid out in its opening motion and in Ms. Guerin-Calvert's declaration and reports, pointing in detail to the rationale for the added indexes for shipping costs, exchange rates, labor costs, shipments, and sales in retail stores.  Mot. 8-9.  Furthermore, Irico has provided a detailed explanation as to how the inclusion of the missing economically sound variables dramatically "altered the regression analysis."  Guerin-Calvert Decl. ¶¶ 13-14.

Ms. Guerin-Calvert, in her reply declaration, explains why, from an economic perspective, Dr. Netz's responses fail to meet commonly accepted economic principles (also recognized in *Live Concert*):

- The truism that an economic model cannot include every conceivable relevant variable does not excuse Dr. Netz from the need to control for all <u>major</u> market factors in order to generate reliable results.  Guerin-Calvert Reply Decl. ¶¶ 17-22.

- The omitted major market factors identified by Ms. Guerin-Calvert are economically significant and should have been controlled for in Dr. Netz's model.  Guerin-Calvert Reply Decl. ¶¶ 32.

- Dr. Netz's misleading claim that her model explains a large percentage of CRT price variation is only true because her model misattributes the price effects of <u>missing</u> major

market factors to the alleged cartel (i.e., it fails to extract the non-cartel effects from the alleged cartel effects). Guerin-Calvert Reply Decl. ¶¶ 38-39.

- Academic estimates of cartel effects in old, unrelated industries are irrelevant to the alleged cartel at issue. Guerin-Calvert Reply Decl. ¶¶ 58-59.

- Dr. Netz's arguments about supposed consistency with case evidence ignore the relevant question of her model's reliability. Guerin-Calvert Reply Decl. ¶¶ 60-61.

- The minor changes Dr. Netz proposes as "robustness tests" merely tweak the incomplete variables already in her model – repeating her original error – and do nothing to control for the missing major market factors. Guerin-Calvert Reply Decl. ¶ 62.

- Dr. Netz's claim that her results are internally "economically and statistically significant" has no bearing on the fact that they are unreliable due to the omission of major market factors.  Guerin-Calvert Reply Decl. ¶ 63.

Plaintiffs' suggestion is that, because she is a qualified economist utilizing a regression analysis, Dr. Netz can specify her model with complete impunity, and that her opinions are safeguarded from any challenge because any critique to her model would simply be an argument over variables.  *See, e.g.*, Opp'n 8.  That is not the law.  To be reliable, an economic model must be sufficiently robust to withstand testing for major market factors. Cases like *Live Concert*, *REMC*, and even Plaintiffs' cited case, *McCray*, unanimously confirm that the court's thorough examination of an expert's regression analysis is proper and required under Rule 702 and *Daubert*.

Plaintiffs further argue that Dr. Netz's conclusions that her model accounts for a high percentage of the pricing variations for CDTs and CPTs demonstrate its reliability.  Opp'n 11.  As noted above, Ms. Guerin-Calvert clarifies exactly how Dr. Netz's model invariably "explains" such a high percentage of pricing variation: it simply assigns blame to the alleged cartel for any price changes that were actually caused by the omitted major market factors.  Guerin-Calvert Reply Decl. ¶¶ 38-39. Consistent with Ms. Guerin-Calvert's explanation, courts have recognized that "[a] regression may be unreliable, and therefore excludable, despite having a high R-squared, for being misspecified (including by failing to account for significant explanatory variables)." *In re LIBOR-Based Fin. Instr. Antitrust Litig.*, 299 F.Supp.3d 430 (S.D.N.Y. 2018) (excluding as unreliable expert's regression with a "high coefficient of determination").

1    Plaintiffs take similar unsupported shots at the other cases cited by Irico that clearly

2    demonstrate that the failure to consider major factors renders an expert opinion unreliable.  In *In re*

3    *Wireless Telephone Services Antitrust Litigation*, 385 F. Supp. 2d 403, 428 (S.D.N.Y. 2005),

4    although the court did indeed criticize the expert's failure to consider any independent variables,

5    the court specifically noted that the "failure to test for these obvious and significant alternative

6    explanations," namely the shift from analog to digital technology and improvements in handset

7    quality, rendered the expert's analysis "essentially worthless." *Id.*  Ms. Guerin-Calvert's report

8    shows that Dr. Netz similarly failed to account for "significant alternative explanations." *See*

9    Guerin-Calvert Reply Decl. ¶¶ 38-39.  Plaintiffs also try to assign the result in *In re Pool Products*

10   *Distribution Market Antitrust Litigation*, 166 F. Supp. 3d 654 (E.D. La. 2016) ("*Pool Prods.*"), to a

11   failure of the expert to provide sufficient evidence for his calculations and descriptions of his

12   results.  Opp'n 10.  This elides the court's determination, separate from any failure to "show his

13   work," that the expert's methodology suffered from multiple "substantive problems" and – just like

14   Dr. Netz – failed to "follow[] the best practices prescribed by the very authorities he cites." *Pool*

15   *Prods.*, 166 F. Supp. 3d at 677-78; *see* Guerin-Calvert Reply Decl. ¶¶ 18-20 (explaining that ABA

16   treatise cited by Dr. Netz goes on to reject the very premise for which Dr. Netz cites it).

17       Finally, Plaintiffs try to downplay the misspecification of Dr Netz's model, citing a series

18   of cases standing for the proposition that "[c]hallenges to variables in expert models affect weight,

19   not admissibility."  Opp'n 8.  But this consideration is only relevant once a model passes the

20   threshold test of reliability, which Dr. Netz's model does not.  Thus, that line of cases is

21   inapposite, because none of the cases include any discussion of whether the expert models being

22   tested omitted major factors, nor do they reflect that such a claim was ever raised as part of the

23   challenge.[3]  *See generally Obrey v. Johnson*, 400 F.3d 691 (9th Cir. 2005); *Hemmings v.*

24   *Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)*; Hamm v. Mercedes-Benz USA, LLC*, No.

25   5:16-cv-03370-EJD, 2021 WL 1238304 (N.D. Cal. Apr. 2, 2021); *In re Optical Disk Drive*

26   *Antitrust Litig.*, No. 10-md-2413, 2017 WL 11513318 (N.D. Cal. 2017).  In fact, the case decided

27   _____

28   [3] A number of these cases also arise in the context of a motion for class certification, which operates
     under a relaxed standard as discussed *infra* in Section II.

by this Court that Plaintiffs cite, *Bernstein v. Virgin America, Inc.*, specifically acknowledges the holding in *Bazemore v. Friday*, 478 U.S. 385, 400 (1986), that an expert analysis that omits major factors is excludable.  No. 15-cv-02277-JST, 2016 WL 6576621, *5 (N.D. Cal. Nov. 7, 2016) (Tigar, J.) (citing *Edwards v. Nat'l Milk Producers Fed'n*, No. C 11-04766 JSW, 2014 WL 4643639 (N.D. Cal. Sept. 16, 2014)).

## II.   DR. NETZ'S ASSUMPTION OF A SINGLE OVERCHARGE OVER A TWELVE-YEAR PERIOD IS UNRELIABLE

Irico established in its Motion that Dr. Netz's decision to force her damages model to calculate a single overcharge is based solely on her own, unsupported conclusion that it was reasonable to assume a single average overcharge over a twelve-year period.  *See* Mot. 10-14. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v Joiner*, 522 U.S. 136, 146 (1997).  Indeed, Plaintiffs and Dr. Netz's attempts to defend Dr. Netz's ill-conceived decision reveal that she relied on nothing more than her own, flawed assumption (one that conveniently suggests that Plaintiffs should receive billions of dollars of aggregate damages) while doing no meaningful testing to establish that her methodology is reliable.  *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807-08 (9th Cir. 1988) (affirming the exclusion of expert reports that "rest[ed] on unsupported assumptions and ignore[d] distinctions crucial to arriving at a valid conclusion").

Dr. Netz's first defense to this failing is a red herring.  She argues that the notion that she made an assumption of uniform overcharge "is false because it insinuates that the model assumes that each class member suffered the same overcharges over the entire period."  Netz *Daubert* Decl. 3.  Whatever assumptions Dr. Netz makes about individual damages are completely beside the point of this motion.  Her damages model should be excluded not because it cannot calculate individual damages, but because it cannot reliably estimate *aggregate* damages using an untested, faulty assumption of a twelve-year uniform overcharge.  Guerin-Calvert Reply Decl. ¶¶ 40-42.

Dr. Netz next constructs a set of comparisons of her original twelve-year model to new, somewhat shorter periods ranging from four to eleven years each.  *See* Netz *Daubert* Decl. 9-12.

1   But far from vindicating her original model, these new *ad hoc* tests all repeat the same mistakes of

2   her original analysis by lumping together long time periods and ignoring rapid changes in market

3   conditions – which continue to showcase the instability of Dr. Netz's model.  As Ms. Guerin-

4   Calvert explains, Dr. Netz's freshly sliced models still cannot help but miss the effect of key

5   market events, particularly during several unusually dynamic years at the start of the alleged cartel

6   period resulting from events including the demand shock in CDTs caused by the introduction of

7   Windows 95, the Asian financial crisis in 1997-1998 that caused the value of the Korean Won to

8   collapse against the U.S. dollar, and a sharp drop in shipping costs in the period.  Guerin-Calvert

9   Reply Decl. ¶¶ 53-54.  Dr. Netz accounts for none of these market factors and her lengthy

10   overcharge period compounds the fault by further hiding their impact.  Dr. Netz's proffered

11   models—original or subdivided—equally fail to separate cartel effects from other changes over

12   time in the highly dynamic CPT and CDT markets, and thus do not produce a reliable estimate of

13   class-wide, aggregate damages.  *Id.* ¶ 52.

14        Plaintiffs cite two cases, *In re Capacitors Antitrust Litigation* and *In re Polyurethane Foam*

15   *Antitrust Litigation*, to support their assertion that courts have accepted expert models that estimate

16   an overcharge over long periods.  Both of these cases are evaluating expert opinion evidence at the

17   class certification stage under the standards of FRCP 23, which is not relevant here.  The Ninth

18   Circuit has recognized that the "manner and degree of evidence required at the preliminary class

19   certification stage is not the same as at the successive stages of the litigation."  *Sali v. Corona*

20   *Reg'l Med. Ctr.,* 909 F.3d 996, 1006 (9th Cir. 2018) (internal quotation marks and citations

21   omitted).  This more relaxed standard at the class certification stage clearly animated the courts'

22   decisions to allow the expert testimony cited by Plaintiffs in both cases.  *See In re Capacitors*

23   *Antitrust Litig.*, No. 14-cv-03264-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ("*Capacitors*")

24   (declining to exclude expert opinion because "Rule 23 does not require proof of impact on each

25   purchaser before a class can be certified"); *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD

26   2196, 2014 WL 6461355, *63 (N.D. Ohio Nov. 17, 2014) ("*Polyurethane Foam*") (declining to

27

28

exclude expert opinion because the court "must only determine whether Indirect Purchasers offer generalized proof showing impact is susceptible of class wide proof").

Even if one ignores that *Capacitors* and *Polyurethane Foam* were decided under different standards, they are plainly distinguishable.  In both cases, defendants challenged the reports on the basis that the experts' opinions did not allow for the assessment of individualized harm as to each class member.[4]  *See Capacitors*, 2018 WL 5980139, at *7; *Polyurethane Foam*, 2014 WL 6461355, at *62-63 (rejecting defendants' assertion that "impact coefficients should be estimated for each individual direct purchaser").  As noted above, that issue is irrelevant here.  Irico is not focused on whether Dr. Netz's model fails to show individualized damages to each class member, but rather that Dr. Netz's model is incapable of providing a reliable estimate of aggregate damages at trial.  *See*, *e.g.*, Mot. 7; Guerin-Calvert Reply Decl. ¶ 13.

## III.   PLAINTIFFS FAIL TO ESTABLISH THAT DR. NETZ'S CPT MODEL IS COMPATIBLE WITH CHINESE PRICING LAWS

In its Motion, Irico established that Dr. Netz's CPT model fails to account for pricing regulations in China, which likely would have impacted the prices Irico (and other China-based manufacturers) charged.  *See* Mot. 16-17; Declaration of Evan Werbel in Support of Irico Defendants' Motion to Partially Exclude the Proposed Expert Testimony of Dr. Janet Netz ("Werbel Decl."), Ex. 12 (Guerin-Calvert 2022 Supp. Rpt.) at 15, n.55 ("That is, by failing to consider the implications of Chinese government price floors, Dr. Netz's model likely would produce unreliable estimates of but-for prices and thus of the resulting overcharge.").

In defending her model's failure to account for these price regulations, Dr. Netz simply repeats the same arguments from her 2022 rebuttal report, which are inaccurate, contradict the record evidence, and reflect her opinion (despite her protestations) on Chinese law that she is not qualified to give.  First, she argues that she "showed that the level of price floors is ambiguous in the documents used by Ms. Guerin-Calvert, with references to both a manufacturer's cost and industry average costs," Netz *Daubert* Decl. 13-14, apparently doubling down on her lay opinion

[4] Irico also notes that it does not appear that there was a *Daubert* challenge in *Polyurethane Foam*, and in any event there was no discussion of FRE 702 or *Daubert* in the decision.

on the correct interpretation of Chinese law.  As discussed in Irico's motion, Mot. 19-22, and in Section IV, *infra*, Dr. Netz cannot reliably opine on the proper interpretation of Chinese law because that is a legal question, not an economic one.  In effect, she summarily dismisses the regulatory price floors on the basis that *she* finds them ambiguous.  Second, Dr. Netz criticizes Ms. Guerin-Calvert's analysis of her but-for prices because they are "not [prices] for Irico."  Netz *Daubert* Decl. 14.  But as Ms. Guerin-Calvert points out—based solely on her proper reliance on expert opinion of Prof. Donald Clarke—the Chinese regulations at issue "applied to all CPT manufacturers in China," not just Irico.  Guerin-Calvert Reply Decl. ¶ 66 n.99; Werbel Decl. Ex. 7 (Clarke Expert Rpt.), ¶ 14 (laying out Prof. Clarke's opinion that the "regulatory framework … was binding and enforceable on producers in China").  Third, Dr. Netz claims that she rebutted Ms. Guerin-Calvert's analysis of the potential impact of the Chinese pricing regulations on her estimated but-for prices by conducting her own analysis to "account for CPT shape."  Netz *Daubert* Decl. 14.  This could not be further from the truth.  What Dr. Netz actually did is analyze prices exclusively for a premium, "pure flat" type of CPT that is much more expensive than the types of CPTs covered by the pricing regulations – a cherry-picking exercise of the first order. Guerin-Calvert Reply Decl. ¶¶ 67-69; Declaration of Thomas Carter in Support of Irico Defendants' Reply on Motion to Partially Exclude Testimony of Dr. Janet Netz ("Carter Decl."), Ex. 1 (Li Miao Dep.) at 176:2-177:25, 246:15-247:1, 306:20-307:12 (noting that Irico sold "standard flat, ultra flat, and pure flat" CPTs, and that "pure flat" was more expensive).  In other words, she proved nothing at all about the likely effect of the regulations.  *Id.* ¶ 69 (Dr. Netz's use of "pure flat" prices "causes [her] analysis to be biased because "pure flat" are premium products with premium prices whose but-for prices are least likely to be below the announced price floors.")

Irico's authority cited in its opening brief supports the proposition that a reliable damages model must consider all nonconspiratorial factors likely to account for higher prices.  Plaintiffs' attempts to distinguish that authority are unavailing.  Plaintiffs' only attempt to distinguish *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588 (7th Cir. 1998) ("*Blue Cross*"), is to state that the expert there considered only one factor that impacted prices, other than

anticompetitive conduct, and that Dr. Netz has done more.  This is just a continuation of Plaintiffs'
efforts to detract from the key question of reliability: it is not the number of factors that is
important, but whether all major market factors were included.  The court in *Blue Cross* makes
clear that an expert must consider "any nonconspiratorial factors *likely to have made the prices
charged by [Defendant] higher* than the prices charged by other health-care providers . . . in order
to make a responsible estimate" of overcharges.  *Id.* at 593 (emphasis added); *see also Concord
Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (excluding expert opinion
that failed to "incorporate all aspects of the economic reality" of the market).  As further explained
by Ms. Guerin-Calvert, Dr. Netz's model "does not account for regulatory factors that could have
influenced the alleged cartel members' pricing in the but-for world," Guerin-Calvert Reply Decl. ¶
76, establishing exactly the kind of "nonconspiratorial factor likely to have made the prices . . .
higher" than otherwise.  *Blue Cross*, 152 F.3d at 593.

Plaintiffs' proffered cases, on the other hand, are distinguishable.  *In re Polypropylene
Carpet Antitrust Litigation* is yet another case decided at the class certification stage, where the
challenged expert had not even finished their analysis and "the question whether [the expert's]
study is admissible under *Daubert*" was not "before the court." 996 F. Supp. 18, 26 (N.D. Ga.
1997).  Plaintiffs' citations to *Walnut Creek Manor, LLC v. Mayhew Center, LLC*, 622 F. Supp. 2d
918 (N.D. Cal. 2009), *Doubletap Defense, LLC v. Hornady Manufacturing Co.*, No. 8:18CV492,
2021 WL 3631135 (D. Neb. Aug. 17, 2021), and *In re Processed Egg Products Antitrust
Litigation*, 81 F. Supp. 3d 412 (E.D. Pa. 2015), likewise miss the mark because Dr. Netz's ignoring
of Chinese pricing laws is not a "speculative theory."  The laws themselves were a matter of public
record, and Irico publicly announced their issuance in Irico Display's 1999 Annual Report,
reporting that "in order to standardize the color TV market, the relevant state departments
formulated the enterprise's self-discipline prices based on the average cost of the industry."  Carter
Decl., Ex. 2 (Irico Display 1999 Annual Report) at -944E.  Dr. Netz has admitted that she could
not have considered the regulations because she was "not aware of Chinese price floors."  Werbel
Decl., Ex. 8 (Netz Dep. (Jun. 9, 2022)) at 25:14-26:1.  Ms. Guerin-Calvert's analysis confirms that

1    these regulations would have impacted a substantial portion of global CPT sales at the time,[5] and

2    should have been considered by Dr. Netz.  Guerin-Calvert Reply Decl. ¶ 65 (explaining that "Dr.

3    Netz's failure to account for the effect of such price floors could cause her to misstate and

4    overstate CPT overcharges for at least some CPTs").

5    **IV.    PLAINTIFFS CONCEDE THAT DR. NETZ IS UNQUALIFIED TO PROVIDE
             OPINIONS ON CHINESE LAW**

6           Plaintiffs concede, as does Dr. Netz, that she is unqualified to offer expert testimony on

7    Chinese laws. Opp. at 21; Werbel Decl. Ex. 8 (Netz Dep. Tr. (Jun. 9, 2022)) at 10:2-11; Netz

8    *Daubert* Decl. at 13. Plaintiffs instead try to re-cast Dr. Netz's opinions as "economic expert[]"

9    work, and try to portray it as "the same type of analysis that Ms. Guerin-Calvert [] performed."

10   Opp. at 21-22.

11          The fatal flaw in Plaintiffs' logic is that Ms. Guerin-Calvert's economic analysis relied

12   solely on the expert opinion of an actual Chinese law expert, Prof. Donald Clarke, whose

13   impeccable qualifications have not been called into question.  Mot. at 19.  In contrast, Dr. Netz

14   introduced her own interpretation of the pricing regulations, which are the foundation of her

15   "further analysis." *See* Guerin-Calvert Reply Decl. ¶ 74 ("Dr. Netz appears to claim that it may

16   have been more appropriate to compare estimated but-for prices with a manufacturer's own cost

17   than with the industry average cost."). That lay interpretation is both inaccurate and directly

18   contrary to Dr. Clarke's expert opinion.  *See* Werbel Decl., Ex. 7 (Clarke Expert Rpt.), ¶ 24 (charts

19   from Chinese government ministry publishing industry average costs were "implementing the

20   minimum prices for CRTs and color TVs contemplated under the regulatory framework"). By

21   applying her own interpretation of how the law worked, it brings Dr. Netz's purported "economic

22   expert[]" work exactly in line with the type of analysis that the court in *In re LIBOR Based*

23   *Financial Instruments Antitrust Litigation* rejected.  *See* Mot. at 21 (citing 299 F. Supp. 3d 430,

24   489-90 (S.D.N.Y. 2018)).  Plaintiffs try to distinguish *LIBOR* by misleadingly directing the Court

---

[5] The CPT sizes covered by the Chinese pricing regulations made up between 20 and 34 percent of global CPT sales at the time contained in Dr. Netz's data set, with 6 to 8 percent comprised of CPTs manufactured in China.  Guerin-Calvert Reply Decl. ¶ 78.

1    to a part of the decision in which the court was analyzing a different aspect of Dr. Netz's opinion

2    which the court declined to exclude.  Opp'n 22.  But that portion of the *LIBOR* court's opinion

3    hinged on the "absence of any suggestion that she implemented her methodology in an unreliable

4    manner," *LIBOR,* 299 F. Supp. 3d at 492, and opining outside an expert's realm of expertise is

5    inherently unreliable.  In contrast, Ms. Guerin-Calvert based her analysis solely on Prof. Clarke's

6    expert opinions, establishing a reliable basis for her conclusions.  Guerin-Calvert Decl. ¶ 37.

7            Plaintiffs' arguments do little to dispute or distinguish the cases cited by Irico.  They attempt

8    to avoid *Mid-State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333, 1340 (7th

9    Cir. 1989), by noting that the short, conclusory affidavit in that case did not draw "on the skill of an

10   economist." Opp'n 22.  That is precisely the point.  In concluding that the pricing regulations related

11   only to "a firm's own production costs," Werbel Decl. Ex. 9 (Netz 2022 Rebuttal Report) at 8, Dr.

12   Netz relies on her own unsupported lay evaluation of the pricing regulations.  *See* Mot. 20-21.

13   Likewise, as to *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 343-48

14   (D. Md. 2011), Plaintiffs ignore the core of the decision: that the expert in the case drew conclusions

15   in a "field that is far broader than [the expert's] qualifications." *Id.* at 347.  That is the same factual

16   pattern here.  Finally, Plaintiffs criticize Irico's citation to *Stein v. Pacific Bell*, No. C00-2915 SI,

17   2007 WL 831750, at *11 (N.D. Cal. Mar. 19, 2007), arguing that the expert there merely "reviewed

18   various documents and then restated as his 'opinions' the findings or allegations in those materials."

19   First, that is exactly what Dr. Netz did.  Second, Plaintiffs' limited reading ignores the court's

20   holding that an "expert's work is only admissible if it is 'reasoned, *uses the methods of the [expert's]*

21   *discipline*, and is founded on data.'" *Id*. (emphasis added) (quoting *Lang v. Kohl's Food Stores,*

22   *Inc.*, 217 F.3d 919, 924 (7th Cir. 2000)).  Dr. Netz's creative re-interpretation of those regulations,

23   and how they were applied, was beyond "the methods of discipline" of an expert economist.

24   **V.     DR. NETZ'S PRIOR *DAUBERT* EXCLUSIONS ARE PLAINLY RELEVANT**

25           Plaintiffs grossly mischaracterize prior decisions in which Dr. Netz's opinions were

26   excluded as unreliable, including *Flash Memory* and *GPU*.  Opp'n 7.  Throughout their brief,

27   Plaintiffs tout Dr. Netz's "unimpeachable qualifications," *see*, *e.g.*, Opp'n 8, along with the notion

28

that "[r]elatively few economists serving as damages experts succumb to *Daubert* challenges,"

Opp'n 6.  Yet Dr. Netz has exactly that rare distinction of having her opinions excluded on not one

or two, but three occasions.  *See* Mot. 2-3 (*citing In re Flash Memory Antitrust Litig.*, C 07-0086,

2010 WL 2332081 (N.D. Cal. June 9, 2010) (holding that Dr. Netz did not produce a "reliable and

meaningful method of calculating pass-through rates on a class-wide basis" at class certification);

*In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) ("Dr. Netz has

demonstrated no class-wide formulae that would be reliable in assessing impact on each

consumer."); *LIBOR*, 299 F.Supp.3d at 490 (striking Dr. Netz's "interpretation" of

communications because "these opinions are not based on Dr. Netz's 'scientific, technical, or other

specialized knowledge' as required by Rule 702(a)")).  These prior exclusions, therefore, are

directly relevant to the current issues before the Court.  Plaintiffs' assertion that Irico's recitation

of this pattern of expert missteps by Dr. Netz is "re-arguing . . . issues previously considered at

class certification" is nonsensical because Dr. Netz had not even disclosed her damages model at

that point in the case.[6]

## CONCLUSION

For all the foregoing reasons, Irico respectfully requests that the Court grant Irico's Motion.

---

[6] In addition, Plaintiffs' repeated spurious references to the *Daubert* process in 2014, including the other defendants' decision not to file a motion to exclude Dr. Netz's testimony, Opp'n 2, 3-4, 7, are of no relevance to the Court's analysis here.  *See Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*, No. C 04-02266 JW, 2010 WL 11575000, at *4 (N.D. Cal. Aug. 30, 2010) ("[R]egardless of whether there was any previous challenge to [an expert], it is the Court's duty as a gatekeeper to exclude any expert testimony which is speculative and unreliable.").  Plaintiffs' claim that the Court already addressed the Chinese pricing regulations in relation to Dr. Phillip Johnson's expert declaration in the context of Direct Purchaser Plaintiffs' motion for class certification is incorrect.  Opp'n 17.  Irico did not seek to exclude Dr. Johnson's opinions under *Daubert*, and the expert reports of Ms. Guerin-Calvert and Prof. Clarke have now provided exactly the kind of "information [and] analysis" of the regulations' impact and enforceability that the Court noted were missing during DPP class certification.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-05944-JST, 2022 WL 4596621, at *2, *6 (N.D. Cal. Aug. 1, 2022).

1   Dated: April 5, 2023                    Respectfully submitted,

2

3                                           /s/ John Taladay
                                            BAKER BOTTS L.L.P.
4                                           JOHN M. TALADAY
                                            EVAN J. WERBEL
5                                           THOMAS E. CARTER
                                            ANDREW L. LUCARELLI
6                                           700 K Street, N.W.
                                            Washington, D.C. 20001
7                                           202.639.7700
                                            202.639.7890 (fax)
8                                           Email: john.taladay@bakerbotts.com
                                                   even.werbel@bakerbotts.com
9                                                  tom.carter@bakerbotts.com
                                                   drew.lucarelli@bakerbotts.com
10
                                            *Attorneys for Defendants Irico Group Corp. and*
11                                          *Irico Display Devices Co., Ltd.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28