# EXHIBIT A

Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone: (415) 434-8900
Email: jmalioto@aliotolaw.com

[Additional Counsel Listed on Last Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| Gabriel Garavanian, Katherine R. Arcell, Jose' M. Brito, Jan-Marie Brown, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Don Freeland, Donna Fry, Harry Garavanian, Yvonne Jocelyn Gardner, Valarie Ann Jolly, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Timothy Niebor, Deborah M. Pulfer, Bill Rubinsohn, Sondra K. Russell, June Stansbury, Clyde D. Stensrud, Gary Talewsky, Pamela S. Ward, Christine Whalen, <br><br> Plaintiffs, <br> v. <br><br> JETBLUE AIRWAYS CORPORATION and SPIRIT AIRLINES INC. <br><br> Defendants. | CASE NO.: 3:22-cv-6841 <br><br> **COMPLAINT TO PROHIBIT THE ACQUISITION OF SPIRIT AIRLINES INC. BY JETBLUE AIRWAYS CORPORATION IN VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT, 15 U.S.C. § 18** |

## INTRODUCTION

1. This is a private antitrust action seeking an Order of the Court prohibiting the proposed elimination of Spirit Airlines, Inc. (hereinafter referred to as "Spirit") by JetBlue Airways Corporation (hereinafter referred to as "JetBlue") as a violation of the antitrust laws.

2. The "threatened loss or damage" to the Plaintiffs and to the public at-large by the potential elimination of JetBlue's competitor, Spirit - the most innovative, passenger friendly, ultra-low cost and unique price-cutting airline in the industry - is substantial and foreboding.

3.     The proposed acquisition price is not trivial: $3.8 billion ($3,800,000,000.00).

4.     Spirit is a significant price-cutting rival of JetBlue, as well as a significant rival to the other domestic airlines, including the Legacy Carriers and the other Low-Cost Carriers.

5.     The current trend toward concentration, the lessening of competition and the tendency to create a monopoly in the airline industry is unmatched and unparalleled.

6.     The proposed acquisition is a violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18) because the direct effect of the elimination of Spirit may be "substantially to lessen competition, or tend to create a monopoly" in the passenger airline industry by the elimination of a significant competitor in a non-trivial transaction.[1]

7.     JetBlue would gain a majority market share on more than a dozen routes where neither it nor Spirit previously dominated and it would eliminate the price-cutting by Spirit. Therefore, JetBlue made an unsolicited tender offer to purchase Spirit in order to eliminate that competition.

8..    The Spirit Board,  its executives and its antitrust counsel all undertook a rigorous review of the JetBlue offer and concluded that the acquisition of Spirit by JetBlue could never be approved by regulators and was therefore "illusory".

9.     The Spirit Board rebuffed JetBlue's first tender offer to purchase Spirit based upon the following additional factors:

    a.     Fares would be increased;

    b.     Low Cost Airlines would be cut in half, losing 50% of capacity;

    c.     The largest price-cutting competition would be eliminated;

    d.     The claim that the acquisition would be legal is "illusory";

    e.     Spirit competition especially in the Northeast corridor from Boston to New York, Washington D.C., and Florida would be eliminated as an act in furtherance of the illegal agreement between JetBlue and American Airlines to continue to engage in *per se* violations of the antitrust law by sharing revenue and dividing markets and customers and acting as a *de facto* merger;

    f.     The acquisition of Spirit "will have lasting negative impacts on consumers;"

---

[1] Section 7 of the Clayton Antitrust Act provides in pertinent part as follows: "No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital … where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition *may* be substantially to lessen competition, or tend to create a monopoly." (Emphasis Added.)

g.      The acquisitions "would substantially raise fares for consumers"; and

h.      JetBlue is a high-fare airline acquiring a low fare airline and would therefore act to reduce capacity and increase prices to customers.

10.      Then, in the face of Spirit's assertions of numerous anti-competitive conduct and substantive and unequivocable lessening of, and probable destroying of, competition, JetBlue simply offered more money to Spirit. JetBlue offered to "sweeten the deal" by paying the shareholders $400 million, even if the proposed combination failed to go through. Thus the shareholders could move forward with the JetBlue combination without any risks. The $400 million to shareholders was to quiet the shareholders' knowledge of the illegality of the acquisitions.

11.      This acquisition eliminating the competition of Spirit and the ensuing hush money that is proposed to be paid to Spirit's shareholders must be enjoined and voided by this court; and any consideration, monetary or otherwise, that may have already been paid either to the company or to its shareholders must also be voided, divested and / or disgorged.

12.      The proposed acquisition is prohibited by the binding authority of the Supreme Court of the United States in its decisions in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963), *United States v. Aluminum Company of America*, 377 U.S. 271 (1964), *United States v. Von's Grocery Co*, 384 U.S. 270 (1966), *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966), and *United States v. Falstaff Brewing Corporation*, 410 U.S. 526 (1973).

13.      This private action is specifically authorized under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) which provides, in pertinent part, that "any person [including members of the public]…shall be entitled to sue and have injunctive relief …against threatened loss or damage by a violation of the antitrust laws."

14.      The remedy afforded to private plaintiffs includes divestiture, or the prohibition, of any potential unlawful acquisition. As was unequivocally stated by the United States Supreme Court in *California v. American Stores Company*, 495 U.S. 271, 283 (1990), "[T]he literal text of Section 16 is plainly sufficient to authorize injunctive relief [in favor of a private Plaintiff], including an order of divestiture, that will prohibit that conduct from causing that harm." [2] This proposed acquisition is a substantial threat of harm and injury to the

---

[2] This private action is specifically authorized by Section 16 of the Clayton Antitrust Act on the grounds that the proposed acquisition poses a threatened loss or damage to the Plaintiffs by reason of the potential lessening of competition in the airline market in violation of the antitrust laws.

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*

Plaintiffs in that they will face higher fares, fewer flights, less consumer choice than they otherwise would have, and they would be threatened with the inability to use air travel at all.

15.     Private actions to vigorously challenge anticompetitive acquisitions have been encouraged by the Congress and the Supreme Court of the United States in strong and unmistakable language: "The Act's other provisions manifest a clear intent to encourage vigorous private litigation against anticompetitive mergers." *California v. American Stores Company*, 495 U.S. 271, 284 (1990)

16.     Plaintiffs therefore bring this action under the authority of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) and allege that the pending elimination of Spirit by JetBlue Airlines constitutes a substantial threat of injury to these Plaintiffs because this acquisition may have the effect "substantially to lessen competition" and "tend to create a monopoly" in a "line of commerce" in a "section of the country" in violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18).  In addition, the contract to eliminate Spirit constitutes a non-trivial transaction eliminating a significant rival, which is not a failing company, that eliminates a substantial and growing, cost-cutting competitor from the market.

17.     The proposed acquisition substantially affects the interstate and foreign commerce of the United States in that flights, supplies, maintenance, parts and all the other necessities of the passenger airline industry are in the constant flow of the interstate and foreign commerce of the United States.  Because Defendants transact business in this judicial district, venue is proper in this Court pursuant to 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. § 1391.

18.     Plaintiffs seek an Order from this Court prohibiting the proposed acquisition by JetBlue of Spirit that would eliminate Spirit as a significant competitor.

19.     The relevant market is the entire United States for low-cost carriers and the entire United States for all carriers, along with the fourteen submarkets described in paragraph 84 infra.

---

Section 16 of the Clayton Act, 15 U.S.C. § 26, provides as follows: "Injunctive relief for private parties; exception; costs. Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: Provided, That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit for injunctive relief against any common carrier subject to the jurisdiction of the Surface Transportation Board under subtitle IV of Title 49. In any action under this section in which the Plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such Plaintiff."

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*

20.     The passenger airline industry is a critical and vital modern necessity to the commercial, social and political well-being of the United States. Competition rather than combination has been and should be enforced in the United States so that these Plaintiffs, and the public at large, may enjoy the benefits of competition, including, *inter alia*, the best possible services at the lowest possible prices. Vigorous enforcement of the antitrust laws by private persons is an essential part of the Congressional plan to ensure that competition rather than monopoly is, and remains, the rule of trade in the United States, including the airline industry.

21.     Spirit is the seventh largest airline in the United States with 4.9% of the national market share of airline seats by revenue in the United States.  Spirit initiated regular air passenger service in 1992 between Detroit and Atlantic City and Boston and Providence. Soon thereafter the major airlines began their furious feeding frenzy of mega-mergers which has resulted in the reduction of the major airlines from eight competitors to four, effectively halving the principal competitive air transportation choices to the passenger public.

22.     The vital and critical importance of the enthusiastic and innovative competition of Spirit and its presence in the airline markets can be measured against the near total lack of competition among the other major airlines and the abuses that have flowed and continue to flow as a result of their oligopoly.  The trend in the U.S. airline industry is rushing headlong toward concentration and is dramatically illustrated in this JetBlue acquisition.  Spirit stands out as an airline that offers low fares, and, indeed, for a large number of people, the chance to use air travel at all.

23.     This trend toward concentration was unanimously condemned by Chief Justice Warren in the Supreme Court opinion in *Brown Shoe Co. v. United States*, *supra*, which made it clear that the Court should and would take steps to curtail incipient mergers whose effect will be to eliminate competition in an industry:  "We cannot avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency, particularly when those tendencies are being accelerated through giant steps striding across a hundred cities at a time. In the light of the trends in this industry we agree with the Government and the court below that this is an appropriate place at which *to call a halt*."  *Id*. at 346.

24.     Spirit, with its innovative, low-cost service is an important bulwark against this almost unstoppable trend toward complete concentration and monopoly in the airline industry.

1  (See Chart Following.)



**Origins of Major Airlines (Partial)**
History of Mergers and Acquisitions

25.     In 2008 Delta Airlines swallowed its significant actual and potential rival, Northwest Airlines, to form the largest airline in the United States at the time. Less than two

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*

years later, in 2010, United Airlines devoured its significant actual and potential rival, Continental Airlines, to become the then-largest airline in the United States. In 2011, Southwest Airlines consumed its significant actual and potential Low-Cost Carrier rival, AirTran, to become the carrier with the largest number of passengers in the United States and the largest Low-Cost Carrier. And in 2013, American Airlines ingested its significant actual and potential competitor, USAir, becoming the largest airline in the United States. Since these airline mega-mergers began in 2008, capacity has been substantially reduced and airfares increased notwithstanding a strengthening economy and increased demand for air travel. According to a 2013 study, since 2007, scheduled domestic capacity in the 29 largest hubs has been reduced by 9%; in the 35 medium hubs, scheduled domestic capacity has been reduced by 26%; and in the 70 small hubs, scheduled domestic capacity has been reduced by 18%. The remaining flights have become more crowded.

26.     If JetBlue's proposed elimination of Spirit is consummated, low-cost air carrier capacity in the United States will be reduced by 50% and fares in the airline industry will be increased.

27.     Spirit, on the other hand, has countered the trend toward concentration and reduced capacity. In 2006, just when the Legacy Carriers had begun to cut back on capacity, Spirit, the cost-cutter, moved to compete more fiercely by exercising options to order 30 Airbus A320-200 aircraft for further expansion. In 2007, Spirit Plus was rebranded as the "Big Front Seat" and business class service was discontinued. Spirit was the "value" airline for the flyer on a budget, a frugal cost-cutter. In April 2010, Spirit Airlines became the first U.S. airline to charge passengers for carry-on bags. They were later followed by Allegiant Air and Frontier Airlines, the other low cost airlines.

28.     But Spirit nonetheless delivered on service. In November 2017, Spirit's on-time performance was second in the country. In February 2018, Spirit was the only airline in North America to make the list of the top 10 safest in the world.

29.     In May 2018, Spirit announced that it would be the first ultra-low-cost carrier to fit their aircraft with high-speed Wi-Fi access, starting in the fall of 2018. Satellite Wi-Fi, individual entertainment screens at each seat, amenities, personal and premium service at lower cost, new destinations, expansion and plans for substantial increases in capacity and other offerings attracted both business and pleasure budget-minded passengers.

30.     On December 23, 2019, Spirit Airlines announced its intention to purchase an

additional 100 new Airbus A320neo-family aircraft. Spirit was continuing to expand.

31.     Since 2007, while the Big Four were shrinking their services, initiating hidden charges, cutting back their flights and inflating their fares, relative newcomer Spirit was expanding and business was burgeoning. In 2021, Spirit achieved annual operating revenues of $3.231 billion. Pre-pandemic net income for 2019 was $569 million. By the end of June 2022, days before the announcement by JetBlue that it offered to buy Spirit, Spirit posted gross profits of $808 million. More than 30.77 million annual passengers fly on Spirit to 47 domestic destinations and 28 international destinations in 18 countries and the United States. Its fleet of aircraft has climbed to 186 Airbus and McDonnell Douglas airplanes with 4 new Airbus aircraft currently on order. Hubs have been established in Fort Lauderdale, Detroit, Chicago, Dallas/Fort Worth, Houston, Las Vegas, and Newark. In addition to these extraordinary successes and growth through increased capacity, Spirit is particularly well-positioned for the anticipated future post-Covid demand for air travel for business and pleasure. The future is "bullish" for low fare carriers and Spirit is on the rise. It is not a "failing company." It is a rising star.

32.     With such astonishing successes and an ever-increasing and loyal passenger base among younger, budget-minded flyers, Spirit was eyed as a very substantial and dangerous competitive threat to the status quo, and especially to its significant East Coast rival, JetBlue Airlines.

33.     On April 5, 2022, JetBlue, the sixth largest airline in the United States, announced its tender offer proposal to acquire Spirit, the seventh largest airline in the United States, for the equivalent of $3.6 billion. On May 2, Spirit announced that it would not consider JetBlue's proposal because the elimination of a low-cost carrier would increase fares for consumers and would exacerbate JetBlue's monopoly with American Airlines in the Eastern Corridor.

34.     Less than two months later, however, Spirit's board accepted JetBlue's enhanced offer for the equivalent of $3.8 billion, with additional inducements to be paid directly to Spirit shareholders of more than $400 million, and $200 million to the company, should the deal not close.

35.     Unless this merger of the sixth and seventh largest competitors in the national airline market is prohibited, the unified company will become the fifth-largest airline by revenue based in the United States with a national market share of 10.2%; and Spirit, the

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*

seventh largest airline by revenue, with a national market share of 4.9%, will be eliminated. (See Chart Below.)  Market concentrations with these numbers have in the past been held by the Supreme Court to constitute a violation of Section 7 of the Clayton Act.  See *United States v. Aluminum Company of America*, 377 U.S. 271 (1964) (elimination of Rome Cable with only 1.3% share of national market), *United States v. Von's Grocery Co*., 384 U.S. 270 (1966) (combination of nos. 3 and 6 becoming no. 2 with 7.5% of the Los Angeles market), and *United States v. Pabst Brewing Co*., 384 U.S. 546 (1966) (nos. 10 and 18 in the national market becoming no. 5 with 4.9%).



36.     JetBlue Airlines is the sixth largest airline in the United States.  It is headquartered in Long Island City, New York.  JetBlue commands 5.3% of the national market share of airline seats by revenue in the United States. JetBlue's most recent annual revenues for 2021 were $6.037 billion.  Pre-pandemic net income for 2019 was $569 million. JetBlue flies to 93 destinations across the United States, Mexico, the Caribbean, and Latin America with approximately 1000 departures per day. In 2021, JetBlue carried 30.09 million passengers. JetBlue's fleet of aircraft is comprised mostly of Airbus and Embraer planes totaling 254 aircraft.  JetBlue has admitted that the purchase of Spirit will require the consolidation of operations which will likely result in the firing of hundreds of Spirit

employees and the retrenchment from duplicative facilities that will affect the local economies where Spirit has hubs and branches – a manifest irreparable harm that once lost will never be revived. The combination will result in the eradication of consumer choice, along with other anticompetitive effects that may, and most probably will, flow from the elimination of Spirit from the market. If, however, JetBlue (instead of combining with Spirit) were to compete for market share rather than buying its way there, it has the wherewithal, the experience, the knowledge, and the ability to expand on its own, which would necessarily increase competition, lower prices, necessitate new jobs, increase consumer choice, invite investment, and otherwise allow the consumer to enjoy the benefits that competition always provides.

37. The United States Supreme Court found it fundamental to free-market economies that "Internal expansion [through competition] is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to *reduce* available consumer choice while providing *no increase in industry capacity, jobs or output*. It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small mergers that added to concentration in an industry." *Brown Shoe*, 370 U.S. at fn. 72 (Emphasis Added).

38. The proposed elimination of Spirit by JetBlue Airlines poses a substantial threat to the Plaintiffs, and to the public at large, in that the proposed elimination will only serve, as the Supreme Court warned, to "reduce available consumer choice while providing no increase in industry capacity, jobs or output", and may potentially cause loss to the Plaintiffs, and the public at large, in the form of higher fares, less availability and frequency of flights, less expansion to other destinations, curtailment of capacity, far less services and amenities, the elimination of consumer choice and other potential anticompetitive effects which deprive the Plaintiffs, and the public at large, of the salutary benefits of competition.

39. As is customary in these acquisitions, the first casualties of the removal of competition will be the firing of employees who were only needed when competition existed. These firings have not yet begun but are imminent. JetBlue has announced that it will drastically consolidate redundant operations with Spirit upon consummation of the merger. This announcement, made public, substantially advances the immediacy of action required to restore competition before JetBlue takes steps to entrench its intention to eliminate Spirit as a competitor. Although JetBlue has stated it will pass consolidation savings to customers,

economic studies have concluded that *post-merger prices generally do not decrease* but rather *increase* between 3 and 7 percent.

40.     The elimination of Spirit is manifestly an irreparable harm since competition of the likes of Spirit would be irretrievably lost. Spirit is a significant, unique and, in fact, the penultimate competitor of not only JetBlue, but also of the major carriers and other low-cost carriers. Spirit is a vigorous competitor impacting and constraining all the Carriers, both nationally and in many localized markets. Because Spirit offers diverse services at lower fares, the National Carriers are constrained from taking their oligopoly to absolutely obscene limits (although they are close) since, if they should attempt to do so, the traveling public could and would switch to Spirit, which many have in fact already done with frequency.

41.     Should the proposed elimination of Spirit go unchallenged, the nation would not only lose the competition of Spirit, but also the potential competition that JetBlue would provide by building its own national presence the old-fashioned way, by competing for passengers instead of buying them. The proposed elimination of Spirit, therefore, will not only eliminate the stout and particular competition of Spirit, but will also discourage continued vigorous competition by JetBlue and will ultimately lessen the economic ideal espoused by Congress and the Supreme Court for more consumer choice and more availability through competition.

THE PARTIES

Plaintiffs

42.     The Plaintiffs named below are individual citizens of the cities and states listed. Each Plaintiff is an air passenger, and some are travel agents, all with the express interest and intent in insuring that the unique qualities of Spirit are preserved as a competitive option for them and for their customers, now and in the future. Many of the Plaintiffs have flown on JetBlue and/or Spirit and/or American Airlines within the last four years. The potential elimination of Spirit will cause loss and harm to the Plaintiffs, and to the public at large, of the salutary benefits of the competition that Spirit brings, as well as the opportunity to fly and to continue to fly on Spirit.

Gabriel Garavanian, Tyngsboro, MA;
Katherine R. Arcell, New Orleans, LA;
Jose' M. Brito, Reno, NV;
Jan-Marie Brown, Carson City, NV;
Rosemary D'Augusta, Millbrae, CA;
Brenda K. Davis, Forney, TX;

Pamela Faust, Loveland, Ohio;
Carolyn Fjord, Winters, CA;
Don Freeland, Thousand Palms, CA;
Donna Fry, Colorado Springs, CO;
Harry Garavanian, Tyngsboro, MA;
Yvonne Jocelyn Gardner, Colorado Springs, CO;
Valarie Ann Jolly, Mabank, TX;
Michael C. Malaney, Grandville, MI;
Len Marazzo, Reno, NV;
Lisa McCarthy, Naples, FL;
Timothy Niebor, Clarkston, MI;
Deborah M. Pulfer, Sidney, OH;
Bill Rubinsohn, Jenkintown, PA;
Sondra K. Russell, Waco, TX;
June Stansbury, Reno, NV;
Clyde D. Stensrud, Kirkland, WA;
Gary Talewsky, Sharon, MA;
Pamela S. Ward, Garland, TX;
Christine Whalen, New Orleans, LA.

<u>Defendants</u>

43.     Spirit Airlines, Inc. is a Delaware corporation and a major American ultra-low-cost airline with its headquarters and principal place of business in Miramar, Florida, in the Miami Metropolitan Area. Spirit operates scheduled flights throughout the United States and in the Caribbean and Latin America. In 2020 Spirit was the largest ultra-low-cost carrier in North America.

44.     JetBlue Airways Corporation is a Delaware corporation founded in 1998 and headquartered in Long Island City, New York with corporate offices also in Utah and Florida. JetBlue is a major American low cost airline, and the seventh largest airline in North America by passengers carried. JetBlue operates over 1,000 flights daily and serves 100 domestic and international network destinations in the United States, Canada, Mexico, the Caribbean, Central America, South America, and Europe.

45.     In 2019, JetBlue flew over 42 million passengers to approximately 100 locations worldwide, taking in roughly $8 billion in revenues. JetBlue has a significantly lower cost structure than the legacy airlines, allowing it to operate profitably even when offering consumers lower fares. JetBlue offers two classes of service, which helps it compete effectively against the legacy carriers for higher-paying leisure and business customers.

46.    In 2007, JetBlue sold 19% of the company to Lufthansa.  By making use of JetBlue's North America routes as a feeder network, the agreement put Lufthansa in a position to operate quasi-hubs in New York–JFK and Boston Logan.

47.    On July 15, 2020, JetBlue entered into a codeshare agreement with American Airlines referred to as the Northeast Alliance which effectively gave JetBlue a shared monopoly with American over flights in the Boston / New York corridor.  Under this so-called alliance the two "competitors" have agreed to share their customers and share their revenues and coordinate which routes to fly, when to fly them, who will fly them and what size planes to use on flights to and from the four major airports in Boston and New York.

### ANTICOMPETITIVE EFFECTS OF THE TRANSACTION

#### The Agreement to Eliminate Spirit as a Competitor in the Airline Industry

48.    On July 28, 2022, JetBlue announced an agreement in which Spirit would be eliminated as a competitor in the airline industry.  JetBlue agreed to pay $3.8 billion in cash to eliminate Spirit.  This is a non-trivial transaction.

49.    JetBlue previously announced that the elimination of Spirit would close by mid 2023 and that the combined airline would operate under the JetBlue name.

50.    The proposed elimination will create the country's fifth largest airline with 10.2% of the national market and will effectively eliminate a significant rival and a price-cutter from the national and local markets in order to eliminate flights (so called "capacity discipline") and to raise prices where JetBlue and Spirit once used to compete on a plethora of overlapping routes.

#### Spirit Began as a Service-Oriented Innovator and "Price Cutter"

51.    Spirit was founded as the successor to Charter One Airlines on May 29, 1992 Spirit has always been known as a "price disruptor" in the industry.  Spirit provides a distinctive, inexpensive airline experience not offered by other domestic airlines today.

52.    Spirit is the most innovative, passenger-friendly, unique, low-cost airline in the industry.

53.    Spirit's service-oriented offerings are targeted towards attracting the small and budget-conscious business passengers as well as budget-minded leisure travelers.

54.    Spirit is known as an ultra-low-cost carrier (ULCC) – a no-frills airline but with high quality airplanes and top pilots.

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*

55.     Other airlines consider Spirit a major potential competitor with the ability to grow its market share (1) because of its innovations and its distinctive brand, (2) because of its expansion into new routes and (3) because of its willingness to compete head-to-head on price and service.

56.     Spirit is a significant rival of JetBlue, as well as the other Legacy and Low-Cost carriers, commanding 4.9% of the entire national domestic market share of U.S. Airlines.

57.     In February 2000, JetBlue began operations out of JFK Airport in New York City with service to Buffalo and Fort Lauderdale and since has grown into the seventh largest airline in the United States with 5.3% of the domestic market share of all U.S. airlines.  Spirit has categorized JetBlue as a "high-cost carrier."

58.     On July 15, 2020, JetBlue entered into a price-fixing agreement with American Airlines known as the Northeast Alliance (NEA), cementing its hold on flights in the Northeast corridor between Boston, New York and Washington.

59.     JetBlue and Spirit currently have an extensive number of overlapping routes flown within the United States and to Latin America and the Caribbean.  If the merger is consummated, JetBlue would gain a majority market share on more than a dozen routes where neither it nor Spirit previously dominated.  (See Chart Following.)



## Domestic and Latin America Flight Routes
### Spirit Airlines and JetBlue Airways

*Sources: www.flightconnections.com/route-map-spirit-airlines-nk, www.flightconnections.com/route-map-jetblue-b6*

60.     The alliance between JetBlue and American in the northeastern region of the United States allows American to sell seats on JetBlue planes, and Jet Blue to sell seats on American planes.  The main hubs for their alliance flights are Boston and New York.  The United States Department of Justice has filed a lawsuit to block this alliance as a violation of the antitrust laws because it reduces competition in the northeast and diminishes JetBlue's incentive to compete with American elsewhere.

61.     Spirit has said that JetBlue's offer to merge with Spirit was "illusory" because "it is not reasonably capable of being consummated" and that it was designed merely to break-up the proposed merger of Spirit and Frontier Airlines and to prevent the creation of a stronger combined competitor to American and JetBlue.  Spirit therefore knew that a combination with JetBlue would be an illegal combination in violation of the antitrust laws.

62.     JetBlue has admitted that, if Spirit were to merge with Frontier, "the combined airline is expected to be a larger competitor to JetBlue, which may affect our [JetBlue's] competitiveness." (See Chart Below.)

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*

1
2
3
4
5

> > > **JetBlue Has Publicly Admitted Its Concerns About Competing with a Combined Spirit / Frontier** 16

6

**Excerpt From Page 21 of JetBlue's 2021 10-K**

7
8

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
FORM 10-K
☒   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2021
☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from to
Commission file number 000-49728

9

## jetBlue

10

"...in February 2022, Frontier Airlines and Spirit Airlines announced an intention to merge. If the proposed merger meets regulatory and stockholder approval, **the combined airline is expected to be a larger competitor to JetBlue, which may affect our competitiveness."**

11
12

*JetBlue added a risk factor about the Spirit / Frontier combination to its 2021 10-K, thereby confirming the combination can impact their competitiveness given the potential fare reductions*

Source: JetBlue 2021 10-K.                                                                          **What Is JetBlue's Real Motivation?**

13
14
15
16

63.    Spirit has likewise publicly admitted that a JetBlue acquisition of Spirit would "remove [ ] the largest low-fare competitor, affecting millions of consumers across the U.S."

17
18
19

64.    Spirit has publicly argued that the JetBlue/American NEA is a "de facto merger between JetBlue and American Airlines (the largest in the world) in the Northeast and will have a major effect in the most lucrative air travel region in the U.S. and will harm air travelers across the country by significantly diminishing JetBlue's incentive to compete with American."

20
21
22
23

65.    Spirit has admitted that, should JetBlue and Spirit merge, JetBlue will "divest all of Spirit's assets in NYC and Boston" thereby eliminating the low-cost competitor alternative to JetBlue and American in that northeast market.  Spirit has in effect admitted that JetBlue, the "high-fare carrier" will effectively eliminate Spirit, "the low-fare carrier". American has promoted the merger of JetBlue and Spirit since, post-merger, JetBlue and American "will control most [of the] capacity from the Northeast." (See Chart Following.)

24
25
26
27
28

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*



66.     Spirit has admitted that "the NEA is an anticompetitive alliance between JetBlue and American Airlines, the largest airline in the world".  The Department of Justice has agreed that the "de facto merger between American and JetBlue" will have an "impact on consumers [that] extends far beyond Massachusetts and New York."  The DOJ has said that "The Northeast Alliance will cause hundreds of millions of dollars of harm to air passengers."

67.     Spirit has publicly admitted that "the Northeast Alliance is anticompetitive and should be blocked."

68.     Spirit has further admitted that it believes "a combination of JetBlue and Spirit would make the NEA even more anticompetitive than it is already."

69.     Up until the moment that the Spirit Board of Directors accepted JetBlue's second, sweetened merger offer, Spirit's Board admitted that it had "asked JetBlue to abandon the NEA if required to obtain approval for an acquisition of Spirit and it [JetBlue] has refused to do so."  The Spirit Board further stated that "it stretches credulity to believe a JetBlue acquisition [of Spirit] would be approved while DOJ is suing to block the NEA or if the NEA is allowed to remain in place."

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*

70.     Spirit has admitted that The JetBlue merger is, "at its core", simply a "high-fare carrier trying to buy a low-fare carrier" and that "JetBlue has stated it will reduce capacity and raise fares on Spirit routes."   (See Chart Following.)



71.     Spirit itself, therefore, has forcefully predicted the ineluctable *negative* anticompetitive effects of merging with JetBlue.  Spirit admits that a merger with JetBlue will remove approximately *50% of the ultra-low-cost-carrier capacity* in the United States and *will raise Spirit's ticket prices*.  (See Chart Following.)

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*

Shareholders Should Think About the Conversation with Regulators [8]

A JetBlue Acquisition of Spirit Will Have Lasting Negative Impacts on Consumers

❌ Raises Spirit's ticket prices

❌ Removes ~50% of the ULCC capacity in the U.S.

❌ Merges Spirit with a de facto combined JetBlue and American Airlines in the Northeast

❌ Represents a second major transaction for JetBlue while DOJ is in litigation to block the NEA transaction

JetBlue's Unrealistic Regulatory Analysis Results in an Illusory Offer

72.    Why then did Spirit agree to merge with JetBlue if it felt that its combination with JetBlue would be anticompetitive and bad for its passengers?  Spirit agreed because JetBlue increased its offer by an additional $200 million in merger value, PLUS JetBlue guaranteed an addition $200 million to be paid to Spirit AND an additional $400 million to be paid directly to Spirit's shareholders should the merger not be consummated.  The hush-money.

<u>The Anticompetitive Effects of the Proposed Elimination of Spirit</u>

73.    The proposed acquisition will eliminate Spirit as a substantial "price disruptor" in the national and local relevant markets.  Post-acquisition air fares may increase and there may be less discounting on the Spirit routes taken by JetBlue. Eliminating Spirit as a competitor may, and probably will, decrease competition on regional flights up and down the eastern seaboard and on short haul as well as transcontinental flights out of California.

74.    The proposed acquisition will eliminate management jobs and will increase market concentration in two of the largest cities in the United States, New York City and Boston, as well as nationally and on the East Coast and in Florida and California.

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*

75.     The potential elimination of Spirit will sound the death knell for Spirit's unique, budget-oriented brand of service.  Spirit has established an ardent following nationwide, on the East Coast, in California, and in Florida for scheduled air passenger service based upon its unique brand of attractive but lean, cost-cutting operations.

76.     The proposed elimination of Spirit may result in the cancellation of Spirit's order for new aircraft and its concomitant increase in capacity and expansion. JetBlue operates mostly Boeing aircraft.  Spirit, on the other hand, operates Airbus and the merger may require the cancellation of all or some of the Airbus aircraft currently on order by Spirit (Spirit Airlines announced its intention to has an order to purchase 100 new Airbus A320neo family aircraft).  As a result, if Spirit is eliminated, it is very probable that JetBlue may decide not to operate the new aircraft with which it is unfamiliar, and will cancel Spirit's pending order for new Airbus planes.  JetBlue's cancellation of the Airbus order may lead to further capacity reductions in the air carrier market and may exacerbate the industry-wide so-called "capacity discipline" agreements among the major airlines that have plagued passengers since the airline mergers began in 2008 and which have served only to drive prices upward - and passenger service and satisfaction downward.

77.     If Spirit is eliminated, JetBlue will operate in a highly concentrated market.  As a consequence, the potential for effective collusion among the remaining airlines may substantially increase while capacity and service may be cut, and fares may rise.  The competition from Spirit, which had openly challenged the traditional Network Carriers' mantra of higher prices and lower capacity by offering lower prices as well as excellent service, will have been eliminated.

78.     If the competition of Spirit is eliminated, JetBlue's potential competition against Spirit is also eliminated and the benefits of that competition are extinguished.

79.     Ultimately, JetBlue's proposed elimination of a cost-cutter such as Spirit may, and probably will, result in significant and irreparable harm and inconvenience to consumers, including the Plaintiffs, by propelling airfares higher, reducing the number of flights on particular routes, and eliminating the most innovative, imaginative, comfortable and low-priced premium airline in the industry.

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>The Relevant Markets Are Highly Concentrated</u>

<u>and the Proposed Elimination of Spirit</u>

<u>Will Result in Presumptively Unlawful Market Concentrations</u>

80.     The decrease in the number of major airlines over the past several years reflects a persistent and deliberate pattern of concentration and reduction of competition in the U.S. airline industry, a trend which the Supreme Court has said must be arrested in its incipiency.

81.     The elimination of Spirit by JetBlue will result in the elimination of a vibrant competitor and the creation of the fifth largest airline in the United States with over 10.2% of the scheduled air passenger service market in an already highly concentrated market where the biggest four airlines' market share is already over 80% of all domestic air travel.  The resulting 90.2% concentration of market share in five firms is unacceptably high and will ineluctably lead to collusion.

82.     Market concentration is one indicia of the level of competition in a market. The more concentrated a market, and the more a transaction may increase concentration in a particular market, the more likely it is that a transaction may result in a meaningful lessening in competition.

83.     JetBlue and Spirit currently have extensive overlapping destinations. Spirit is known as a "price disruptor" in the industry. If Spirit is eliminated, this acquisition may likely eliminate the actual and potential competition between JetBlue and Spirit on routes to these destinations as well, significantly harming consumers in the process.  In addition, the loss of Spirit's competition in these markets may increase the likelihood that the remaining airlines will coordinate with other airlines to raise prices, reduce output and diminish the quality of their services, thereby lessening competition in these overlapping markets.

84.     The two airlines currently compete head-to-head on 42 routes (or 84 if you count both directions for each route). That equates to roughly one in every six routes that the airlines operate. (See Chart Below.)



85.    In addition, JetBlue's elimination of Spirit will be virtually certain to cause substantial irreparable injury to Plaintiffs and to all consumers for domestic scheduled air passenger transportation services in the relevant geographic and product markets in that, among other reasons, Spirit, and the consumer choices that go with it, will be gone, and once gone, the harm would be irreparable.

86.    Plaintiffs are threatened with the loss of (1) the distinctive services and in-flight experience offered by Spirit; (2) a reduction in customer choice; (3) a reduction in capacity and the curtailment of flights thereby creating higher prices and severe inconvenience to consumers; and (4) ultimately, the loss of a vibrant, vigorous and innovative fare-cutting competitor.  The elimination of Spirit will further substantially threaten to harm U.S. passengers through increases in the price of tickets, checked bags and flight change fees, translating to billions of dollars of harm to consumers annually, and further threatens to deprive passengers of the unique comfort, style, service and especially affordability offered by Spirit.

87.    If Spirit is eliminated, Plaintiffs will sustain irreparable harm for which damages will be inadequate to compensate Plaintiffs in that the competition from a "price-

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*

disruptor" will be extirpated and customer choice for travel options eradicated. The imagination and initiative of Spirit will be snuffed out; modern jets and expansion plans will be jettisoned; customer convenience and satisfaction will be disregarded. Spirit's air service once lost cannot be restored.

88.     In addition, JetBlue's acquisition (1) threatens to derail Spirit's planned acquisition of additional aircraft, thereby lessening the passenger capacity of air traffic in the relevant markets; and (2) threatens to substantially reduce the work force of the two airlines through employee layoffs due to the elimination of competition.

89.     Moreover, since existing trade barriers will effectively preclude the introduction of a new airline, there will likely be no new startup entrants into the airline market because new entrants would face significant barriers to success, including difficulty in obtaining access to gate facilities; difficulty in competing with the effects of corporate discount programs offered by dominant incumbents; difficulty due to customer loyalty to existing frequent flyer programs; difficulty of promoting an unknown brand; and the risk of aggressive responses to new entry by the dominant incumbent carriers. The former CEO of United testified that only an established airline could now enter the major markets in the United States. Indeed, American's CEO Doug Parker further admitted that no new airline could enter the market because it would not even be able to cover its cost of capital.

90.     Since 2002, only Spirit has successfully entered the scheduled air passenger transportation markets as a major airline. The proposed elimination now seeks to swallow whole one of the only new competitors to enter the market in many years. David Cush, the former CEO of Virgin America, itself swallowed by Alaska Airlines in 2016, addressed the likelihood or possibility of a new competitor entering the market and admitted that "[t]he competitive environment probably would not allow it. So, I think it's going to be a long time before you see a national start up in the airline business again."

91.     Since the prospect of a new start-up entry is unlikely, the entry of new competitors in the marketplace cannot serve as a basis to mitigate the anticompetitive effects that may result from JetBlue's proposed acquisition.

92.     JetBlue as an existing airline, however, has the wherewithal, experience, financial ability, intent, and expertise to enter into the very markets and areas it seeks to gain by its elimination of Spirit. Such an entry by JetBlue on new routes and into new markets would increase competition, create new jobs, lower fares, increase capacity, increase

availability, and enhance consumer choice. The elimination of Spirit would do exactly the opposite.

93.     Neither JetBlue nor Spirit is a failing company.  Spirit today is competing vigorously, and revenue is up nearly double in 2021 to $3.23 billion.  It is not a failing airline. Spirit steadily increased the number of its passengers from 14.3 million in 2014 to 34.5 million in 2019 and has increased the number of aircraft flown from 65 in 2014 to 145 in 2019.  Spirit has also recently initiated a plan to grow the airline even further with new aircraft deliveries.

94.     Spirit has recently publicly stated that "As the leading ULCC serving price-sensitive leisure customers, Spirit is seeing a historically strong demand environment . . . Spirit's ultra-low-cost structure and fuel-efficient fleet makes us a relative winner in a higher field environment; we believe that the Street will catch-up to our long-term targets as we continue to outperform quarter over quarter."

95.     JetBlue also is profitable, thriving and growing. As of 2021, JetBlue doubled its revenues from 2020 to $6.04 billion.

96.     Both JetBlue and Spirit are strong, vigorous and viable actual and potential competitors in all the airline markets, and each is and has been ready, willing and able to compete against the other airlines for market share, including against the Big Four. As a result, there simply is no competitive need to eliminate Spirit as a competitor.  To the contrary, the continued vigorous competition of Spirit is one of the few, if not the principal, remaining competitive forces in the market. Its continued existence in the market is needed to preserve and protect the minimal amount of competition that exists in the airline industry today.  Indeed, if there is to be any restoration of competition in the airline industry, Spirit is the airline that will cause it.

97.     Accordingly, Plaintiffs bring this action for both preliminary and permanent injunctive relief against Defendants' proposed elimination of Spirit and seek an order prohibiting Defendants from acquiring Spirit.

/ / /
/ / /
/ / /
/ / /

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*

<u>VIOLATIONS ALLEGED</u>

Count One

<u>Clayton Act, Section 7, 15 U.S.C. § 18</u>

98.    Plaintiffs hereby incorporate the allegations of paragraphs 1 through 97 above as if set forth fully herein.

99.    The effect of the proposed acquisition may be substantially to lessen competition, or tend to create a monopoly, in interstate trade and commerce in the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

100.    Unless enjoined, the proposed acquisition may, and most probably would, have the following potential effects in the relevant markets, among others:

> (a) actual and potential competition between JetBlue and Spirit may be eliminated;
>
> (b) the elimination of Spirit, a significant competitor in a non-trivial transaction, may substantially lessen competition, or tend to create a monopoly in the passenger airline industry;
>
> (c) competition in general among other airlines may be lessened substantially;
>
> (d) ticket prices and ancillary fees may be higher than they otherwise would be;
>
> (e) industry capacity may be lower than it otherwise would be; and
>
> (f) service may be lessened.

101.    By reason of this violation, the Plaintiffs are threatened with loss or damage in the form of potentially higher ticket prices and diminished service, the potential elimination of a favored airline, as well as additional irreparable harm for which damages will be inadequate to compensate Plaintiffs.   Plaintiffs are entitled to bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief against this proposed acquisition, and to recover their costs of suit, including a reasonable attorney's fee.

/ / /

/ / /

/ / /

/ / /

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief from this Honorable Court:

A.       Declaring, finding, adjudging, and decreeing that the agreement of JetBlue to acquire Spirit violates Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, and must be enjoined.

B.       Permanently enjoining JetBlue from consummating the acquisition of Spirit, or, if necessary, ordering divestiture of any consideration that may have been made to Spirit and/or its shareholders during the pendency of this action.

C.       Declaring void any agreement to pay the Spirit shareholders $400 million - or any amount - by reason of the failure of the Spirit acquisition as an act in furtherance of the violations alleged;

D.        Declaring the merger contract between the Defendants and Spirit to be null and void and against the public policy of the United States which declares that competition rather than combination is the rule of trade in the United States;

E.       Permanently enjoining JetBlue from continuing its participation in the Northeast Alliance if this court or jury finds that the acquisition of Spirit by JetBlue was an act in furtherance of the *per s*e violations of the antitrust laws by reason of their sharing revenues, dividing customers, dividing markets and acting as a *de facto* merger pursuant to the Northeast Alliance;

F.       Awarding to Plaintiffs their costs of suit, including a reasonable attorney's fee, as provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26; and

G.       Granting to Plaintiffs such other and further relief to which they may be entitled and which the Court finds to be just and proper.

JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury as their right under the Seventh Amendment to the Constitution of the United States or as given by statute. Fed. R. Civ. P. 38.

Dated: November 3, 2022

By:____/s /Joseph M. Alioto_____
          Joseph M. Alioto (SBN 42680)
          Tatiana V. Wallace (SBN 233939)
          ALIOTO LAW FIRM
          One Sansome Street, 35th Floor
          San Francisco, CA  94104
          Telephone: (415) 434-8900
          Email:  jmalioto@aliotolaw.com

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G.
PAPALE
The Cornerstone Building
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Email: lgpapale@papalelaw.com

Christopher A. Nedeau (SBN 81297)
Attorney at Law
NEDEAU LAW FIRM
154 Baker Street
San Francisco, CA 94117
Telephone:  415-516-4010
Email:  cnedeau@nedeaulaw.net

Robert J. Bonsignore (SBN
BONSIGNORE TRIAL LAWYERS,
PLLC
23 Forest Street
Medford, MA 02155
Phone: 781-856-7650
Email: rbonsignore@classactions.us

Jeffery K. Perkins (CSBN 57996)
LAW OFFICE OF JEFFERY K.
PERKINS
1550-G Tiburon Boulevard, #344
Tiburon, California  94920
Telephone:  (415) 302-1115;
Email:  jefferykperkins@aol.com

Joseph M. Alioto, Jr. (SBN 215544)
ALIOTO LEGAL
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 398-3800
joseph@aliotolegal.com

Lingel H. Winters, Esq.
(State Bar No. 37759)
LAW OFFICES OF LINGEL H.
WINTERS
388 Market St. Suite 1300
San Francisco, California 94111
Telephone (415) 398-294
Email:  sawmill2@aol.com

Josephine Alioto (SNB 282989)
THE VEEN FIRM
20 Haight Street
San Francisco CA 94102
Telephone: (415) 673-4800
Email: jalioto@veenfirm.com

Theresa Moore (SBN 99978)
LAW OFFICE OF THERESA D. MOORE
PC
One Sansome Street, 35th Floor
San Francisco, CA 94104
Phone: (415) 613-1414
tmoore@aliotolaw.com

COUNSEL FOR THE PLAINTIFFS

*Complaint to Prohibit the Acquisition of Spirit by JetBlue Airways in Violation of Section 7 of the Clayton Act*