# EXHIBIT 54





120V~          60Hz     75W
MADE IN CHINA

MODEL NO:  20MS2331/17

SERIAL NO:  DN1A0449489306

1C

**Manufactured:**
**December,2004**

RECEPT
DE TELE

S

L03.2U

(2)this dev
including i

1  Mario N. Alioto, Esq. (56433)
   Lauren C. Russell, Esq. (241151)
2  TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
   2280 Union Street
3  San Francisco, CA 94123
   Telephone:   (415) 563-7200
4  Facsimile:   (415) 346-0679
   *malioto@tatp.com*
5  *laurenrussell@tatp.com*

6  *Interim Lead Counsel for the Indirect Purchaser Plaintiffs*

7

8

9            **UNITED STATES DISTRICT COURT**

10          **NORTHERN DISTRICT OF CALIFORNIA**

11             **SAN FRANCISCO DIVISION**

12
   | IN RE: CATHODE RAY TUBE (CRT) | Master File No. CV-07-5944 SC |
13 | ANTITRUST LITIGATION | |
   | | MDL No. 1917 |
14

15 | This Document Relates to: | **INDIRECT PURCHASER PLAINTIFFS'** |
   | | **AMENDED AND SUPPLEMENTAL** |
16 | ALL INDIRECT PURCHASER ACTIONS | **OBJECTIONS AND RESPONSES TO** |
   | | **DEFENDANT SAMSUNG SDI CO., LTD.'S** |
17 | | **FIRST SET OF INTERROGATORIES** |

18

19

20    **PROPOUNDING PARTY:**    **SAMSUNG SDI CO., LTD.**

21    **RESPONDING PARTY:**    **INDIRECT PURCHASER PLAINTIFFS**

22    **SET NUMBER:**    **ONE (1-16)**

23        Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Indirect Purchaser

24 Plaintiffs hereby object and respond to the First Set of Interrogatories propounded by Defendant

25 Samsung SDI Co., Ltd. ("Defendant"), as set forth below.

26

27 

28

INDIRECT PURCHASER PLAINTIFFS' AMENDED AND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO
DEFENDANT SAMSUNG SDI CO., LTD.'S FIRST SET OF INTERROGATORIES CASE NO. CV-07-5944 SC

**PRELIMINARY STATEMENT**

Each of the following responses is subject to all objections of and concerning relevance, materiality, and admissibility, as well as to all and any other objections on any ground requiring exclusion of any response if introduced in Court. All evidentiary objections and grounds accordingly are expressly reserved. Furthermore, Indirect Purchaser Plaintiffs' decision, now or in the future, to provide information notwithstanding the objectionable nature of the Interrogatories shall not be construed as: (a) an admission that they agree with any of Defendant's definitions or characterizations contained therein, or (b) an admission that the information sought likely will lead to the discovery of admissible evidence, or (c) an agreement that requests for similar information will be treated in a similar manner.

For purposes of these Interrogatories, Indirect Purchaser Plaintiffs define the term "CRT Products" as televisions and computer monitors containing CRTs.

Indirect Purchaser Plaintiffs' objections and responses to the First Set of Interrogatories are made without prejudice to their right to introduce any or all evidence of any kind in this case.

The specific objections and responses set forth below are based upon information now known. Indirect Purchaser Plaintiffs have not yet completed discovery or preparation for trial in this case, and, therefore, reserve the right to amend, modify, or supplement any general or specific objection or response.

Nothing in their objections and responses to these Interrogatories shall be construed as an admission by Indirect Purchaser Plaintiffs with respect to the competence, admissibility, relevance, or materiality of any fact or document, or as an admission of the truth or accuracy of any characterization of any information of any kind sought by these Interrogatories.

Indirect Purchaser Plaintiffs reserve their right to object to use of their objections and responses herein, or the subject matter thereof, on any ground in this or in any subsequent proceeding, including, without limitation, the right to object on any ground at any time to the use of such responses in any discovery procedures in this or any proceeding, and/or at trial.

1    The Indirect Purchaser Plaintiffs' responses to the Interrogatories are subject to the

2  provisions of the Stipulated Protective Order entered by the Court June 18, 2008 (Document

3  306) (the "Protective Order"). The Indirect Purchaser Plaintiffs' Amended and Supplemental

4  Interrogatory Objections and Responses hereby are designated "Confidential" in accordance with

5  the provisions of the Protective Order.

6    Each of the General Objections herein is considered applicable to and is hereby

7  incorporated into each and every response by Plaintiffs to the Interrogatories, and each response

8  is given without waiving any of the General Objections.  The assertion of any General Objection

9  in response to any Interrogatory should not be considered a waiver of the remaining General

10  Objections.  By making the responses herein, Plaintiffs do not concede that the information

11  provided is relevant to the claims or defenses of any party or reasonably calculated to lead to the

12  discovery of admissible evidence.

13    **GENERAL OBJECTIONS**

14    1.    Indirect Purchaser Plaintiffs object to, and will not answer, the Interrogatories to

15  the extent they seek discovery of information, legal analysis, and/or strategies concerning any

16  Class Certification motion Indirect Purchaser Plaintiffs may file under Rule 23 of the Federal

17  Rules of Civil Procedure.  Such information, legal analysis, and/or strategies are protected from

18  disclosure by the attorney-client privilege and/or the work-product doctrine.

19    2.    Indirect Purchaser Plaintiffs object to, and will not answer, the Interrogatories to

20  the extent Defendant intends or purports to impose obligations beyond those required or

21  permitted by the Federal Rules of Civil Procedure and the Local Rules of the Northern District of

22  California, or to the extent they are outside the scope of any order or opinion of this Court or of

23  the Special Master, or contrary to any applicable rules of law.

24    3.    Indirect Purchaser Plaintiffs object to, and will not answer, the Interrogatories to

25  the extent they comprise premature "contention interrogatories," the answers to which are

26  dependent on merits and/or expert discovery. Pursuant to Rule 33(a)(2) of the Federal Rules of

27  Civil Procedure, Indirect Purchaser Plaintiffs, as necessary or appropriate, will respond to proper

28

3

1   "contention interrogatories" after merits and expert discovery is complete, and/or after some

2   other time as directed by the Court or Special Master. *See, e.g., In re Convergent Technologies*

3   *Securities Litigation*, 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("There is considerable recent

4   authority for the view that the wisest general policy is to defer propounding and answering

5   contention interrogatories until near the end of the discovery period."); *In re eBay Seller*

6   *Antitrust Litigation*, No. C 07-1882 JF (RS), 2008 WL 5212170, at *1 (N.D. Cal. Dec. 11, 2008)

7   ("Courts using their Rule 33(a)(2) discretion generally disfavor contention interrogatories asked

8   before discovery is undertaken.").

9       4.   Indirect Purchaser Plaintiffs object to the Interrogatories, including the

10  Definitions and Instructions set forth therein, to the extent (a) they seek to elicit information

11  relating or referring to matters not raised by the pleadings, or (b) they seek to elicit information

12  that is not relevant to the claims or defenses of the parties to this action, or (c) they seek to elicit

13  information that is not within Indirect Purchaser Plaintiffs' possession, custody, or control, or (d)

14  they seek to elicit information not reasonably calculated to lead to the discovery of admissible

15  evidence.

16      5.   Indirect Purchaser Plaintiffs object to, and will not answer, the Interrogatories to

17  the extent they seek information protected by the attorney-client privilege, work-product

18  doctrine, or any other applicable privilege, protection, immunity, or rule (collectively,

19  "Privileged Information"), including, without limitation, information concerning

20  communications between Indirect Purchaser Plaintiffs' attorneys, and/or between Indirect

21  Purchaser Plaintiffs and their attorneys, made during, or in anticipation of, litigation.  Any

22  inadvertent disclosure of such information is not intended to, and shall not, constitute a general

23  or specific waiver, in whole or in part, of the foregoing privileges or immunities, or the subject

24  matter thereof. Relatedly, any inadvertent disclosure of such information is not intended to, nor

25  shall it, constitute a waiver of the right to object to any use of such information, and any such

26  disclosure shall be treated as specified in Rule 26(b)(5)(B) of the Federal Rules of Civil

27  Procedure.

28

6.      Indirect Purchaser Plaintiffs object to, and will not answer, the Interrogatories to the extent that (a) they seek the premature disclosure of expert material subject to Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure, and/or (b) they seek disclosure of information concerning any person or entity whom Indirect Purchaser Plaintiffs will not designate as an opinion or other witness at trial.

7.      Indirect Purchaser Plaintiffs object to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent they seek information that is equally accessible to Defendant as it is to Indirect Purchaser Plaintiffs, or that has been provided by other parties or witnesses.

8.      Indirect Purchaser Plaintiffs object to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent they are cumulative to or duplicative of other Interrogatories.

9.      Indirect Purchaser Plaintiffs object to, and will not answer, the Interrogatories to the extent that they seek confidential or proprietary business information and research.

10.     Indirect Purchaser Plaintiffs object to the purported definition of the terms "YOU" and "YOUR" because they are vague, ambiguous, overly broad, and unduly burdensome, as they seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible information. Responding further, Indirect Purchaser Plaintiffs object to the inclusion of "agents, attorneys, representatives, or other persons acting or purporting to act on behalf of the responding Plaintiff," within this Definition to the extent it purports to encompass information that is protected by attorney-client privilege and/or work-product doctrine, or any other applicable privilege, protection, immunity, or rule.

11.     Indirect Purchaser Plaintiffs object to the purported definition of the term "DOCUMENT" to the extent it attempts to impose burdens on them greater than or inconsistent with those imposed by the Federal Rules of Civil Procedure or the Local Rules for the United States District Court for the Northern District of California.

12.     Indirect Purchaser Plaintiffs object to the purported definition of the term

1  "COMPLAINT" as overly broad to the extent it is construed to refer to any Complaint other than

2  Indirect Purchaser Plaintiffs' Third Consolidated Amended Complaint filed December 11, 2010

3  in the United States District Court for the Northern District of California.

4       13.    Indirect Purchaser Plaintiffs object to the Interrogatories, including the

5  Definitions and Instructions set forth therein, to the extent any one or more or all of them assume

6  disputed facts or legal conclusions. Any response or objection herein is without prejudice to this

7  objection and Indirect Purchaser Plaintiffs' right to dispute such purported facts or legal

8  conclusions.

9  **SPECIFIC OBJECTIONS AND RESPONSES**

10  **INTERROGATORY NO. 1:**

11       IDENTIFY all PERSONS who participated or assisted in the preparation of YOUR

12  responses to these interrogatories.

13  **RESPONSE NO. 1:**

14       In addition to their General Objections listed above, Indirect Purchaser Plaintiffs object to

15  Interrogatory No. 1 because it calls for the disclosure of privileged information, including

16  without limitation, information subject to the attorney-client privilege and/or the work product

17  doctrine.  Indirect Purchaser Plaintiffs also object to Interrogatory No. 1 because it seeks

18  information that is neither relevant nor reasonably calculated to lead to the discovery of

19  admissible evidence.

20       Subject to and without waving the objections stated above, Indirect Purchaser Plaintiffs

21  respond by referring to Samsung Exhibit A-1 through A-25.

22  **INTERROGATORY NO. 2:**

23       Separately identify each acquisition of a CRT upon which YOU base any claim in this

24  action, including without limitation the date and place of acquisition, the type and manufacturer

25  of each CRT acquired, and the IDENTITY of each PERSON involved in the acquisition and the

26  time period and nature of each PERSON'S involvement.

27       As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports

28

6

1   YOUR response.

2   **RESPONSE NO. 2:**

3       In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to

4   Interrogatory No. 2 because the term "acquisition" is vague, ambiguous, and overly broad.

5       Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs

6   respond by stating that they are end users of CRT Products and did not acquire any stand-alone

7   CRTs during the relevant period.

8   **INTERROGATORY NO. 3:**

9       Separately identify each acquisition of a CRT PRODUCT upon which YOU base any

10  claim in this action, including without limitation the date and place of acquisition, the type and

11  manufacturer of each CRT PRODUCT acquired, and the IDENTITY of each PERSON involved

12  in the acquisition and the time period and nature of each PERSON'S involvement.

13      As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports

14  YOUR response.

15  **RESPONSE NO. 3:**

16      In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to

17  Interrogatory No. 3 because the term "acquisition" is vague, ambiguous, and overly broad.

18      Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs

19  respond by stating that they purchased CRT Products containing CRTs.  Responding further,

20  Indirect Purchaser Plaintiffs refer to Samsung Exhibit B-1 through B-25.

21  **INTERROGATORY NO. 4:**

22      For each acquisition of a CRT identified in Interrogatory No. 2, state all terms and

23  conditions that were a part of the acquisition, including without limitation all terms and

24  conditions RELATING TO pricing, taxes, tariffs, duties, freight charges, or any other fees paid

25  by any PERSON in connection with the acquisition.

26      As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports

27  YOUR response.

28

INDIRECT PURCHASER PLAINTIFFS' AMENDED AND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO
DEFENDANT SAMSUNG SDI CO., LTD.'S FIRST SET OF INTERROGATORIES CASE NO. CV-07-5944 SC

**RESPONSE NO. 4:**

In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to Interrogatory No. 4 because the term "acquisition" is vague, ambiguous, and overly broad.

Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs respond by stating that they are end users of CRT Products and did not acquire any stand-alone CRTs during the relevant period.

**INTERROGATORY NO. 5:**

For each acquisition of a CRT PRODUCT identified in Interrogatory No. 3, state all terms and conditions that were a part of the acquisition, including without limitation all terms and conditions RELATING TO pricing, taxes, tariffs, duties, freight charges, or any other fees paid by any PERSON in connection with the acquisition.

As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports YOUR response.

**RESPONSE NO. 5:**

In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to Interrogatory No. 5 because the term "acquisition" is vague, ambiguous, and overly broad.

Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs respond by referring to Samsung Exhibit B-1 through B-25.

**INTERROGATORY NO. 6:**

For each acquisition of a CRT identified in Interrogatory No. 2, state whether the CRT was acquired as part of a system or other bundled product (e.g., a CRT computer monitor acquired in conjunction with a computer, keyboard, speakers, warranty, service plan, or other services) and, if so, the value of each component of such system or bundled product.

As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports YOUR response.

**RESPONSE NO. 6:**

In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to

INDIRECT PURCHASER PLAINTIFFS' AMENDED AND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO
DEFENDANT SAMSUNG SDI CO., LTD.'S FIRST SET OF INTERROGATORIES CASE NO. CV-07-5944 SC

1   Interrogatory No. 6 because (a) the term "acquisition" and the phrase "acquired as part of a

2   system or other bundled product (*e.g.*, a CRT computer monitor acquired in conjunction with a

3   computer, keyboard, speakers, warranty, service plan, or other services)" are vague, ambiguous,

4   overly broad, and unduly burdensome, and (b) it seeks information that is neither relevant nor

5   reasonably calculated to lead to the discovery of admissible evidence. Responding further, to the

6   extent Defendant seeks discovery related to "the value of each component of such system or

7   bundled product," Indirect Purchaser Plaintiffs also object to Interrogatory No. 6 because it (a)

8   prematurely seeks to elicit prior to merits discovery legal theories, analysis, and other matters on

9   which opinion testimony may be required at trial, (b) purports to require a layperson to provide

10   answers on matters as to which opinion testimony may be required at trial, and (c) calls for legal

11   conclusions and compels the assumption of facts not yet in evidence, and (d) prematurely seeks

12   disclosure of expert material subject to Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure.

13        Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs

14   respond by stating that they are end users of CRT Products and did not acquire any stand-alone

15   CRTs during the relevant period.

16   **INTERROGATORY NO. 7:**

17        For each acquisition of a CRT PRODUCT identified in Interrogatory No. 3, state whether

18   the CRT PRODUCT was acquired as part of a system or other bundled product (e.g., a CRT

19   computer monitor acquired in conjunction with a computer, keyboard, speakers, warranty,

20   service plan, or other services) and, if so, the value of each component of such system or bundled

21   product.

22        As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports

23   YOUR response.

24   **RESPONSE NO. 7:**

25        In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to

26   Interrogatory No. 7 because (a) the term "acquisition" the phrase "acquired as part of a system or

27   other bundled product (*e.g.*, a CRT computer monitor acquired in conjunction with a computer,

28

keyboard, speakers, warranty, service plan, or other services)" are vague, ambiguous, overly broad, and unduly burdensome, and (b) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Responding further, to the extent Defendant seeks discovery related to "the value of each component of such system or bundled product," Indirect Purchaser Plaintiffs also object to Interrogatory No. 7 because it (a) prematurely seeks to elicit prior to merits discovery legal theories, analysis, and other matters on which opinion testimony may be required at trial, (b) purports to require a layperson to provide answers on matters as to which opinion testimony may be required at trial, and (c) calls for legal conclusions and compels the assumption of facts not yet in evidence, and (d) prematurely seeks disclosure of expert material subject to Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure.

Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs respond by referring to Samsung Exhibit B-1 through B-25.

**INTERROGATORY NO. 8:**

For each acquisition of a CRT identified in Interrogatory No. 2, identify any warranties, servicing plans or agreements, membership rewards, or other benefits received by YOU RELATING TO the acquisition.

As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports YOUR response.

**RESPONSE NO. 8:**

In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to Interrogatory No. 8 because (a) the terms "servicing plans or agreements, membership rewards, or other benefits" are vague, ambiguous, and overly broad, and (b) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs respond by stating that they are end users of CRT Products and did not acquire any stand-alone CRTs during the relevant period.

**INTERROGATORY NO. 9:**

For each acquisition of a CRT PRODUCT identified in Interrogatory No. 3, identify any warranties, servicing plans or agreements, membership rewards, or other benefits received by YOU RELATING TO the acquisition.

As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports YOUR response.

**RESPONSE NO. 9:**

In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to Interrogatory No. 9 because (a) the terms "servicing plans or agreements, membership rewards, or other benefits" are vague, ambiguous, and overly broad, and (b) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs respond by referring to Samsung Exhibit B-1 through B-25.

**INTERROGATORY NO. 10:**

Identify the purpose(s) for which YOU acquired each CRT during the RELEVANT PERIOD, including without limitation whether the CRT was acquired for resale and, if so, whether and under what terms and conditions it was resold.

**RESPONSE NO. 10:**

In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to Interrogatory No. 10 because it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs respond by stating that they are end users of CRT Products and did not acquire any stand-alone CRTs during the relevant period.

**INTERROGATORY NO. 11:**

Identify the purpose(s) for which YOU acquired each CRT PRODUCT during the RELEVANT PERIOD, including without limitation whether the CRT PRODUCT was acquired

1  for resale and, if so, whether and under what terms and conditions it was resold.

2  **RESPONSE NO. 11:**

3      In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to

4  Interrogatory No. 11 because it seeks information that is neither relevant nor reasonably

5  calculated to lead to the discovery of admissible evidence.

6      Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs

7  respond by stating that, as end users, they purchased CRT Products for their own use and not for

8  resale. Indirect Purchase Plaintiffs also respond by referring to Samsung Exhibit B-1 through B-

9  25.

10 **INTERROGATORY NO. 12:**

11     IDENTIFY all PERSONS with knowledge of the factors that influenced each of YOUR

12 decisions to acquire or not to acquire CRTs during the RELEVANT PERIOD.

13 **RESPONSE NO. 12:**

14     In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to

15 Interrogatory No. 12 because (a) it seeks information that is neither relevant nor reasonably

16 calculated to lead to the discovery of admissible evidence, and (b) it is harassing and invasive.

17     Subject to and without waiving the objections stated above, Indirect Purchase Plaintiffs

18 respond by stating that they are end users of CRT Products and did not consider acquiring any

19 stand-alone CRTs during the relevant period.

20 **INTERROGATORY NO. 13:**

21     IDENTIFY all PERSONS with knowledge of the factors that influenced each of YOUR

22 decisions to acquire or not to acquire CRT PRODUCTS during the RELEVANT PERIOD.

23 **RESPONSE NO. 13:**

24     In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to

25 Interrogatory No. 13 because (a) it seeks information that is neither relevant nor reasonably

26 calculated to lead to the discovery of admissible evidence, and (b) it is harassing and invasive.

27     Subject to and without waiving the objections stated above, Indirect Purchase Plaintiffs

28

1    respond by referring to Samsung Exhibit B-1 through B-25.

2    **INTERROGATORY NO. 14:**

3         IDENTIFY all trade publications, advertisements, or news articles RELATING TO the

4    price or product features of CRTs that YOU reviewed during the RELEVANT PERIOD.

5    **RESPONSE NO. 14:**

6         In addition to their General Objections listed above, Indirect Purchaser Plaintiffs object to

7    Interrogatory No. 14 because (a) the terms "all trade publications, advertisements, or news

8    articles" are vague, ambiguous, and overly broad, and (b) it seeks information that is neither

9    relevant nor reasonably calculated to lead to the discovery of admissible evidence.

10        Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs

11   respond by referring to Samsung Exhibit D-1 through D-25.

12   **INTERROGATORY NO. 15:**

13        IDENTIFY all trade publications, advertisements, or news articles RELATING TO the

14   price or product features of CRT PRODUCTS that YOU reviewed during the RELEVANT

15   PERIOD.

16   **RESPONSE NO. 15:**

17        In addition to their General Objections listed above, Indirect Purchaser Plaintiffs object to

18   Interrogatory No. 15 because (a) the terms "all trade publications, advertisements, or news

19   articles" are vague, ambiguous, and overly broad, and (b) it seeks information that is neither

20   relevant nor reasonably calculated to lead to the discovery of admissible evidence.

21        Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs

22   respond by referring to Samsung Exhibit D-1 through D-25.

23   **INTERROGATORY NO. 16:**

24        State whether, at any time during the RELEVANT PERIOD, YOU elected to acquire a

25   non-CRT television or computer monitor instead of a CRT PRODUCT and, if so, identify

26   YOUR reasons for making each such acquisition.

27

28
                                                13

1    **RESPONSE NO. 16:**

2         In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to

3    Interrogatory No. 16 because (a) the terms "elected to acquire" are vague, ambiguous, and overly

4    broad and (b) it seeks information that is neither relevant nor reasonably calculated to lead to the

5    discovery of admissible evidence.

6         Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs

7    respond by referring to Samsung Exhibit E-1 through E-25.

8

9    Dated: August 31, 2011                    By:    */s/ Mario N. Alioto*

10                                                    Mario N. Alioto (56433)
                                                      Lauren C. Russell (241151)
11                                                    TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
                                                      2280 Union Street
12                                                    San Francisco, CA 94123
                                                      Telephone:   (415) 563-7200
13                                                    Facsimile:   (415) 346-0679
                                                      malioto@tatp.com
14                                                    laurenrussell@tatp.com

15                                                    *Interim Lead Counsel for the*
                                                      *Indirect Purchaser Plaintiffs*
16

17

18

19

20

21

22

23

24

25

26

27

28
                                          14
     ─────────────────────────────────────────────────────────────────
     INDIRECT PURCHASER PLAINTIFFS' AMENDED AND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO
     DEFENDANT SAMSUNG SDI CO., LTD.'S FIRST SET OF INTERROGATORIES CASE NO. CV-07-5944 SC

**SAMSUNG EXHIBIT A1**

### PLAINTIFF JERRY COOK

Mr. Cook's claims have been dismissed.

Produced on 9/7/11

SAMSUNG EXHIBIT A2

**PLAINTIFF BRIAN LUSCHER**

Brian Luscher
5030 W. Laredo St.
Chandler, AZ  85226

Thomas G. Stack
RYLEY, CARLOCK & APPLEWHITE
One North Central Avenue, Suite 1200
Phoenix, AZ 85004-4417

Robert J. Gralewski, Jr.
KIRBY McINERNY LLP
825 Third Avenue
New York, NY  10022

2

Produced on 9/7/11

**SAMSUNG EXHIBIT A3**

**PLAINTIFF JEFFREY FIGONE**

Jeffrey Figone
370 School Road
Novato, CA 94945

Joseph M. Patane
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123

Robert J. Gralewski, Jr.
KIRBY McINERNY LLP
825 Third Avenue
New York, NY  10022

Produced on 9/7/11

SAMSUNG EXHIBIT A4

**PLAINTIFF CARMEN GONZALEZ**

Carmen Gonzalez
139 Seawell Court
San Jose, CA 94318

Marwa Elzankaly
McMANIS FAULKNER
50 W. Fernando Street, 10th Floor
San Jose, CA 95113

Robert J. Gralewski, Jr.
KIRBY McINERNY LLP
825 Third Avenue
New York, NY  10022

**SAMSUNG EXHIBIT A5**

**PLAINTIFF DANA ROSS**

Dana Ross
664 San Andres Circle
Thousand Oaks, CA 91360

Susan Kupfer
GLANCY, BINKOW & GOLDBERG LLP
One Embarcadero Center, Suite 760
San Francisco, CA 94111

Robert J. Gralewski, Jr.
KIRBY McINERNY LLP
825 Third Avenue
New York, NY  10022

Produced on 9/7/11

SAMSUNG EXHIBIT A6

**PLAINTIFF STEVEN GANZ**

Steven Ganz

Adam Belsky
GROSS & BELSKY, LLP
180 Montgomery Street, Suite 2200
San Francisco, CA 94104

Robert J. Gralewski, Jr.
KIRBY McINERNY LLP
825 Third Avenue
New York, NY  10022

Produced on 9/7/11

**SAMSUNG EXHIBIT A7**

**PLAINTIFF BRADY LANE COTTON**

Brady Lane Cotton
10302 Venitia Real Avenue
Apt. 108
Tampa, FL 33647

Robert G. Methvin, Jr.
McCALLUM, METHVIN & TERRELL, P.C.
2201 Arlington Avenue South
Birmingham, AL 35305

Robert J. Gralewski, Jr.
KIRBY McINERNY LLP
825 Third Avenue
New York, NY 10022

7

Produced on 9/7/11

**SAMSUNG EXHIBIT A8**

**PLAINTIFF COLLEEN SOBOTKA**

Colleen Sobotka
1716 Bennett's End
Ft. Walton Beach, FL 32547

Robert G. Methvin, Jr.
McCALLUM, METHVIN & TERRELL, P.C.
2201 Arlington Avenue South
Birmingham, AL 35305

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022

8

Produced on 9/7/11

**SAMSUNG EXHIBIT A9**

## PLAINTIFF DANIEL RIEBOW

Daniel Riebow
3155 Oahu Avenue
Honolulu, HI 96822

Jeff Crabtree
LAW OFFICES OF JEFF CRABTREE
820 Mililani Street, Suite 701
Honolulu, Hawaii 96813

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022

9

Produced on 9/7/11

**SAMSUNG EXHIBIT A10**

## PLAINTIFF TRAVIS BURAU

Travis Burau
6803 Inwood Lane NE
Cedar Rapids, IA 52402

David Syrios
ADEMI & O'REILLY
3620 East Layton Ave.
Cudahy, WI 53110

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

—— Produced on 9/7/11 ——

SAMSUNG EXHIBIT A11

**PLAINTIFF SOUTHERN OFFICE SUPPLY**

Tony McKee
417 N. Kansas Avenue
Liberal, KS 67901

Shirla McQueen & Christine M. Larson
SHARP MCQUEEN, P.A.
419 N. Kansas
Liberal, KS 67901

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022

Produced on 9/7/11

**SAMSUNG EXHIBIT A12**

## PLAINTIFF CHAD KLEBS

Chad Klebs
17630 Isleton Avenue West
Lakeville, MN 55044

Qienwei Fu
ZELLE, HOFMANN, VOELBEL & MASON, LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

**SAMSUNG EXHIBIT A13**

**PLAINTIFF DAVID NORBY**

David Norby
869 South McKnight Road
St. Paul, MN 55119

Seymour Mansfield
MANSFIELD, TANICK & COHEN, P.A.
220 South Sixth Street
Minneapolis, MN  55402

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

Produced on 9/7/11

**SAMSUNG EXHIBIT A14**

## PLAINTIFF RYAN RIZZO

Ryan Rizzo
15113 Fanning Drive North
Hugo, MN 55038

David Syrios
ADEMI & O'REILLY
3620 East Layton Ave.
Cudahy, WI 53110

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

14

**SAMSUNG EXHIBIT A15**

**PLAINTIFF CHARLES JENKINS**

Charles Jenkins
Box 55
Caledonia, MS 39740

Robert G. Methvin, Jr.
McCALLUM, METHVIN & TERRELL, P.C.
2201 Arlington Avenue South
Birmingham, AL 35305

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022

Produced on 9/7/11

SAMSUNG EXHIBIT A16

**PLAINTIFF DANIEL HERGERT**

Daniel Hergert
7350 Canyon Road
Lincoln, NE 68516

Lawrence Papale
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street #117
St. Helena, CA 94574

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

**SAMSUNG EXHIBIT A17**

## PLAINTIFF SAMUEL NASTO

Samuel Nasto
9100 Ironstone Avenue
Las Vegas, Nevada 89143

Robert Gerard
GERARD & ASSOCIATES, LLP
1516 Front Street
San Diego, CA 92101

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

17

Produced on 9/7/11

SAMSUNG EXHIBIT A18

**PLAINTIFF CRAIG STEPHENSON**

Craig Stephenson
1331 Park Avenue S.W.
Unit 410
Albuquerque, NM 87102

Lawrence Papale
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street #117
St. Helena, CA 94574

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

Produced on 9/7/11

**SAMSUNG EXHIBIT A19**

**PLAINTIFF GARY HANSON**

Gary Hanson
1202 – 27th Street South Suite A
Fargo, ND 58103

Joel Flom
JEFFRIES, OLSON & FLOM, P.A.
1202 27th Street South Suite A
Fargo, N.D. 58103

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

Produced on 9/7/11

**SAMSUNG EXHIBIT A20**

## PLAINTIFF DONNA MARIE ELLINGSON

Donna Ellingson
210 S. Canyon Road
Rapid City, SD  57702

Eric J. Pickar
BANGS, McCULLEN, BUTLER, FOYE & SIMMONS, LLP
333 West Boulevard, Suite 400
P.O. Box 2670
Rapid City, SD 57709-2670

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

———— Produced on 9/7/11 ————

**SAMSUNG EXHIBIT A21**

**PLAINTIFF FRANK WARNER**

Frank Warner
1039 Lake Rest Rd
Proctor, AR 72376-9510

Lawrence Papale
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street #117
St. Helena, CA 94574

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022

Produced on 9/7/11

**SAMSUNG EXHIBIT A22**

**PLAINTIFF ALBERT SIDNEY CRIGLER**

Albert Sidney Crigler
303 Salem Court
Franklin, TN 37064

Brent Irby & Eric Hoagland
McCALLUM, HOAGLAND, COOK & IRBY, LLP
905 Montgomery Street, Suite 201
Vestavia Hills, AL 35216

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022

——————— Produced on 9/7/11 ———————

**SAMSUNG EXHIBIT A23**

## PLAINTIFF MARGARET SLAGLE

Margaret Slagle
14 Hideaway Lane
Williston, VT 05495

Mary G. Kirkpatrick
KIRKPATRICK & GOLDSBOROUGH, PLLC
Lakewood Commons
1233 Shelburne Road, Suite E-1
South Burlington, VT 05401

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

23

Produced on 9/7/11

SAMSUNG EXHIBIT A24

**PLAINTIFF JOHN LARCH**

John Larch
113 Sharon Drive
Weirton, WV  26062

Michael G. Simon
FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON
337 Penco Road
Weirton, WV  26062

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

24

Produced on 9/7/11

**SAMSUNG EXHIBIT A25**

**PLAINTIFF BRIGID TERRY**

Brigid Terry
510 Oakland Avenue
Janesville, WI 53545

Seymour Mansfield
MANSFIELD, TANICK & COHEN, P.A.
220 South Sixth Street
Minneapolis, MN  55402

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

——— Produced on 9/7/11 ———

SAMSUNG EXHIBIT B1

**PLAINTIFF JERRY COOK**

Mr. Cook's claims have been dismissed.

1

Produced on 9/7/11

SAMSUNG EXHIBIT B2

**PLAINTIFF BRIAN LUSCHER**

1. **CRT PRODUCT:** Philips HDTV

2. **DATE OF PURCHASE:** 8/15/01

3. **LOCATION of PURCHASE:** Costco Wholesale – Tempe, Arizona

4. **PERSONS INVOLVED IN PURCHASE:** Brian Luscher (plaintiff)

5. **PRICE:** $549.99

6. **TAXES/FEES:** $44.55

7. **BUNDLE:** Not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000014.

— Produced on 9/7/11 —

**SAMSUNG EXHIBIT B3**

**PLAINTIFF JEFFREY FIGONE**

1. **CRT PRODUCT:**
   a. Sharp television – Model Number: 13K-M100
   b. Panasonic television – Model Number: C1332W

2. **DATE OF PURCHASE:**
   a. 1999 or 2000
   b. 2002 or 2003

3. **LOCATION of PURCHASE:**
   a. Target
   b. Target

4. **PERSONS INVOLVED IN PURCHASES:** Jeffrey Figone (plaintiff)

5. **PRICE:**
   a. Not available.
   b. Not available.

6. **TAXES/FEES:** The standard sales tax was applied to the purchases of the televisions.

7. **BUNDLE:** Neither of the televisions were purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000000157-167.

Produced on 9/7/11

**SAMSUNG EXHIBIT B4**

**PLAINTIFF CARMEN GONZALEZ**

1. **CRT PRODUCT:**  Hitachi television - S/N: 61SBX59B

2. **DATE OF PURCHASE:**  12/20/1999

3. **LOCATION of PURCHASE:**  Circuit City, 5353 Almaden Expy, San Jose, CA 95118

4. **PERSONS INVOLVED IN PURCHASE:**  Carmen Gonzalez (plaintiff)

5. **PRICE:** $2,250 (approximate)

6. **TAXES/FEES:**  The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:**  The television was purchased along with a two-year warranty for $294.99. This warranty was extended every two years until Circuit City ceased business operations.

9. **PURPOSE of PURCHASE:**  Personal use.

See also 000019-27 and CRT000419-496.

4

**SAMSUNG EXHIBIT B5**

**PLAINTIFF DANA ROSS**

1. **CRT PRODUCT:**
   a. Panasonic 21" Television
   b. Panasonic 35" Television

2. **DATE OF PURCHASE:**  Both televisions were purchased in 2004.

3. **LOCATION of PURCHASE:**  Both televisions were purchased at the Panasonic store at Universal Studios, Hollywood.

4. **PERSONS INVOLVED IN PURCHASE:**  Dana Ross (plaintiff)

5. **PRICE:**
   a. $150 (approximately)
   b. $600-650 (approximately)

6. **TAXES/FEES:**  The standard sales tax was applied to the purchases of the televisions.

7. **BUNDLE:**  Neither television was purchased as part of a bundle or system.

8. **WARRANTIES:**  None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:**  Personal use.

See also CRT000054-59 and CRT000562.

5

Produced on 9/7/11

SAMSUNG EXHIBIT B6

**PLAINTIFF STEVEN GANZ**

1. **CRT PRODUCT:**
   a.  27" Phillips Television
   b.  27" Toshiba Television

2. **DATE OF PURCHASE:**
   a.  May 22, 2001
   b.  May 2, 2005

3. **LOCATION of PURCHASE:**
   a.  Costco Wholesale – El Camino #475, South San Francisco, California
   b.  Best Buy - Colma, California

4. **PERSONS INVOLVED IN PURCHASE:**  Steven Ganz (plaintiff)

5. **PRICE:**
   a.  $279.99
   b.  $329.99

6. **TAXES/FEES:**  The standard sales tax was applied to the purchase of the televisions.

7. **BUNDLE:**  Neither television was purchased as part of a bundle or system.

8. **WARRANTIES:**  None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:**  Personal use.

See also CRT000239-371.

**SAMSUNG EXHIBIT B7**

**PLAINTIFF BRADY LANE COTTON**

1. **CRT PRODUCT:** Magnavox Television

2. **DATE OF PURCHASE:** 2005

3. **LOCATION of PURCHASE:** Either Best Buy or Walmart

4. **PERSONS INVOLVED IN PURCHASE:** Brady Lane Cotton (plaintiff) and Amy Cotton (plaintiff's wife)

5. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

6. **PRICE:** Not available.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000009-13.

Produced on 9/7/11

## PLAINTIFF COLLEEN SOBOTKA

1. **CRT PRODUCT:**
   a. Sharp television
   b. JVC television

2. **DATE OF PURCHASE:**
   a. 2004
   b. 2000 or 2001

3. **LOCATION of PURCHASE:**
   a. Eglin Air Force Exchange - Eglin Air Force Base
   b. Hurlburt Exchange - Hurlburt Field, Florida

4. **PERSONS INVOLVED IN PURCHASES:** Colleen Sobotka (plaintiff)

5. **PRICE**:
   a. Not available.
   b. Not available.

6. **TAXES/FEES:**  No taxes or fees were applied to the purchase of either television.

7. **BUNDLE:**   Neither television was purchased as part of a bundle or system.

8. **WARRANTIES:**  None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:**  Personal use.

See also CRT000046-50.

**SAMSUNG EXHIBIT B9**

**PLAINTIFF DANIEL RIEBOW**

1. **CRT PRODUCT:** Panasonic 27" television

2. **DATE OF PURCHASE:** 4/22/04

3. **LOCATION of PURCHASE:** Sears, Ala Moana Store, Hawaii

4. **PERSONS INVOLVED IN PURCHASE:** Daniel Riebow (plaintiff)

5. **PRICE:** $233.89

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** There was an extended warranty in connection with the purchase of this television.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000063-70.

Produced on 9/7/11

SAMSUNG EXHIBIT B10

## PLAINTIFF TRAVIS BURAU

1. **CRT PRODUCT:** TruTech television

2. **DATE OF PURCHASE:** Approximately 2006

3. **LOCATION of PURCHASE:** Target - Cedar Rapids, IA

4. **PERSONS INVOLVED IN PURCHASE:**  Travis Burau (plaintiff)

5. **PRICE:** $200 (approximately)

6. **TAXES/FEES:**  The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:**   The television was not purchased as part of a bundle or system.

8. **WARRANTIES:**  None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:**  Personal use.

See also CRT000372.

10

**SAMSUNG EXHIBIT B11**

**PLAINTIFF SOUTHERN OFFICE SUPPLY**

1. **CRT PRODUCT:**
   a. AOC computer monitor – S/N: P7732OROSBTBD
   b. GEM computer monitor –S/N: GRNAM94329767
   c. GEM computer monitor - S/N: GRNAM94329488
   d. KDS computer monitor - S/N: 6XB1C19162
   e. AOC computer monitor – S/N: D761VACOSPN2
   f. AOC computer monitor – S/N: D760TACOSPNB
   g. ORION computer monitor – S/N: Unknown

2. **DATE OF PURCHASE:**
   a. 2/02/2000
   b. 3/17/2000
   c. 3/31/2000
   d. 5/22/2000
   e. 11/16/2000
   f. 2/13/2003
   g. 4/24/2003

3. **LOCATION of PURCHASE:** All computer monitors were purchased from Elite Technology, Inc. in Kansas City, Kansas.

4. **PERSONS INVOLVED IN PURCHASE:** Tony McKee (owner of Southern Office Supply)

5. **PRICE:**
   a. $183.00
   b. $189.00
   c. $189.00
   d. $181.00
   e. $163.00
   f. $119.00
   g. $98.00

6. **TAXES/FEES:** There were no taxes or fees applied to any purchase of the computer monitors. Freight charges were paid COD.

7. **BUNDLE:** Except as to the Orion computer monitor, all other monitors were purchased separately and not as part of a bundle or system. The Orion computer monitor (g) was purchased as part of a bundled system.

11

——————— Produced on 9/7/11 ———————

8. **WARRANTIES:** All parts had a 1 year warranty except CPU parts had 25 days excluding physical damage.

9. **PURPOSE of PURCHASE:** Use within business and not for resale.

See also CRT000222-238.

**SAMSUNG EXHIBIT B12**

**PLAINTIFF CHAD KLEBS**

1. **CRT PRODUCT:** Insignia Television – M/N: IS-TV040920; S/N: T18527147

2. **DATE OF PURCHASE:** 6/05

3. **LOCATION of PURCHASE:** Best Buy - Omaha, Nebraska

4. **PERSONS INVOLVED IN PURCHASES:**  Chad Klebs (plaintiff)

5. **PRICE:** Not available.

6. **TAXES/FEES:**  The standard sales taxes were applied to the purchase of the television.

7. **BUNDLE:**   The television was not purchased as part of a bundle or system.

8. **WARRANTIES:**  None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000028-35.

Produced on 9/7/11

SAMSUNG EXHIBIT B13

**PLAINTIFF DAVID NORBY**

1. **CRT PRODUCT:** Magnavox television – S/N: YA1A0634025035

2. **DATE OF PURCHASE:** 1/06

3. **LOCATION of PURCHASE:** Target

4. **PERSONS INVOLVED IN PURCHASE:** David Norby (plaintiff)

5. **PRICE:** Not available.

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000015-16 and CRT000071-72.

14

**SAMSUNG EXHIBIT B14**

**PLAINTIFF RYAN RIZZO**

1. **CRT PRODUCT:** Toshiba television – S/N: 80664856

2. **DATE OF PURCHASE:** Approximately 1998

3. **LOCATION of PURCHASE:** Best Buy – Iowa City, Iowa

4. **PERSONS INVOLVED IN PURCHASE:**  Ryan Rizzo (plaintiff)

5. **PRICE:** $700 (approximately)

6. **TAXES/FEES:**  The standard sales tax was applied to the purchases of the television.

7. **BUNDLE:**   The television was not purchased as part of a bundle or system.

8. **WARRANTIES:**  None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:**  Personal use.

See also CRT000214-216.

Produced on 9/7/11

**SAMSUNG EXHIBIT B15**

**PLAINTIFF CHARLES JENKINS**

1. **CRT PRODUCT:**
   a. Durabrand 12" television
   b. Packard Bell computer monitor

2. **DATE OF PURCHASE:**
   a. 6/05
   b. 11/99

3. **LOCATION of PURCHASE:**
   a. Walmart – Columbus, Mississippi
   b. Rex's – Columbus, Mississipi

4. **PERSONS INVOLVED IN PURCHASE:**
   a. Charles Jenkins (plaintiff) & Margie Canon (plaintiff's girlfriend at the time)
   b. Charles Jenkins (plaintiff) & Angie Jenkins (plaintiff's former wife)

5. **PRICE:**
   a. Not available.
   b. Not available.

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television and the computer monitor.

7. **BUNDLE:** The television was not purchased as part of a bundle or system. The computer monitor was purchased as part of a bundle.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000036-45.

**SAMSUNG EXHIBIT B16**

**PLAINTIFF DANIEL HERGERT**

1. **CRT PRODUCT:** Panasonic television – S/N: LC02570860

2. **DATE OF PURCHASE:** 2000

3. **LOCATION of PURCHASE:** Best Buy – Lincoln, Nebraska

4. **PERSONS INVOLVED IN PURCHASE:** Daniel Hergert (plaintiff)

5. **PRICE:** Not available.

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranty.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000060-62.

SAMSUNG EXHIBIT B17

**PLAINTIFF SAMUEL NASTO**

1. **CRT PRODUCT:** Panasonic 42" Cinema Vision television

2. **DATE OF PURCHASE:** 2/19/2003

3. **LOCATION of PURCHASE:** Circuit City – Las Vegas, Nevada

4. **PERSONS INVOLVED IN PURCHASE:** Samuel Nasto (plaintiff)

5. **PRICE:** $1,469.98

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000217-221.

18

**SAMSUNG EXHIBIT B18**

**PLAINTIFF CRAIG STEPHENSON**

1. **CRT PRODUCT:**  MAG Technology computer monitor – S/N: FXHA 1709 1973U

2. **DATE OF PURCHASE:**  5/20/01

3. **LOCATION of PURCHASE:**  Best Buy, 338 W, Albuquerque, New Mexico

4. **PERSONS INVOLVED IN PURCHASE:**  Craig Stephenson (plaintiff)

5. **PRICE:** $57.13 (including tax)

6. **TAXES/FEES:**  The standard sales tax was applied to the purchase of the computer monitor.

7. **BUNDLE:**   The computer monitor was not purchased as part of a bundle or system.

8. **WARRANTIES:**  None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:**  Personal use.

See also CRT000051-53.

SAMSUNG EXHIBIT B19

**PLAINTIFF GARY HANSON**

1. **CRT PRODUCT:**
   a.  RCA Television  - S/N: S536412180
   b.  Toshiba Television – S/N: A2468602D
   c.  RCA Television – S/N: D384C72C7
   d.  Dell Computer Monitor – Model Number E772c; S/N: CN 09M556-64180-317-03YX
   e.  Dell Computer Monitor – Model Number E772c; S/N: CN 09M556-64180-338-006R

2. **DATE OF PURCHASE:**
   a.  1995
   b.  November or December 2002
   c.  2003
   d.  April 2003
   e.  April 2003

3. **LOCATION of PURCHASE:**
   a.  Best Buy – Fargo, North Dakota
   b.  Target/Best Buy/Wal-Mart – Fargo, North Dakota
   c.  Target – Fergus Falls, Minnesota
   d.  Dell
   e.  Dell

4. **PERSONS INVOLVED IN PURCHASE:**  Gary Hanson (plaintiff)

5. **PRICE:**
   a.  Not available
   b.  Not available
   c.  Not available
   d.  $770.00 (including computer and other items)
   e.  $770.00 (including computer and other items)

6. **TAXES/FEES:**  The standard sales tax was applied to the purchases of the televisions. Mr. Hanson was charged $7.41 in taxes in connection with each monitor purchase.

7. **BUNDLE:**  None of the televisions were purchased as part of a bundle or system. Both computer monitors were part of a bundle.

———————— Produced on 9/7/11 ————————

8. **WARRANTIES:** For the televisions, none other than any standard manufactuers' warranties. The computer monitors came with a 1 year limited warranty, and Mr. Hanson received a $100 rebate in connection with both monitor purchases.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000106-156 and CRT000497-504.

21

Produced on 9/7/11

SAMSUNG EXHIBIT B20

**PLAINTIFF DONNA MARIE ELLINGSON**

1. **CRT PRODUCT:**
   a. e-Machines computer monitor
   b. 25" Sharp television
   c. 27" Sharp television

2. **DATE OF PURCHASE:**
   a. 3/6/04
   b. 11/9/97
   c. 10/18/99

3. **LOCATION of PURCHASE:**
   a. Best Buy – Rapid City, South Dakota
   b. Rex TV & Appliance – Rapid City, SD
   c. Rex TV & Appliance – Rapid City, SD

4. **PERSONS INVOLVED IN PURCHASE:**  With respect to the computer monitor purchase: Donna Ellingson (plaintiff) & Russ Penning (plaintiff's friend).  With respect to the television purchases: Donna Ellingson (plaintiff).

5. **PRICE:**
   a. $209.99
   b. $306.34 (including tax)
   c. $348.69 (including tax)

6. **TAXES/FEES:**  The standard sales tax was applied to all purchases.

7. **BUNDLE:**  Neither of the televisions were purchased as part of a bundle or system.  The computer monitor was part of a bundle.

8. **WARRANTIES:**  Ms. Ellingson received Best Buy Reward Points for her purchase of the e-Machines computer.  She does not recall any other specific warranties (other than any standard manufacturers' warranties), servicing plans or agreements, membership rewards, or other benefits received relating to this acquisition.  She does not recall if she ever utilized the rewards points.  Ms. Ellingson also received a $100 rebate on the monitor.  With respect to the televisions, there were no warranties other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:**  Personal use.

See also CRT000075-103 and CRT000525-561.

Produced on 9/7/11

SAMSUNG EXHIBIT B21

**PLAINTIFF FRANK WARNER**

1. **CRT PRODUCT:**
   a. Compaq V720 computer monitor – S/N: 208CL26EC596
   b. Pixie 15" computer monitor - S/N: czc00807130
   c. Pixie 15" computer monitor - S/N: czc0807126
   d. KDS 14" computer monitor – UPC: 0781257141028
   e. KDS 17" computer monitor – UPC: 0088698200087
   f. AOC Color Monitor CT720G – S/N: K1PN4CA871647

2. **DATE OF PURCHASE:**
   a. After 2/02
   b. 10/23/00
   c. 10/23/00
   d. 3/18/98
   e. 4/5/99
   f. Not available

3. **LOCATION of PURCHASE:**
   a. Not available
   b. Comp USA, 3539 Riverdale Road, Memphis, TN 38115
   c. Comp USA, 3539 Riverdale Road, Memphis, TN 38115
   d. Ingram Micro TLP, 3820 Micro Drive, Millington, TN 38053
   e. Ingram Micro TLP, 3820 Micro Drive, Millington, TN 38053
   f. Envision Peripherals, 47490 Seabridge Drive, Fremont, CA 94538

4. **PERSONS INVOLVED IN PURCHASES:**  Frank Warner (plaintiff)

5. **PRICE:**
   a. Not available
   b. $119.99
   c. $119.99
   d. $86.50
   e. $222.50
   f. Not available

6. **TAXES/FEES:**  The standard sales tax was applied to the purchases of the computer monitors.

7. **BUNDLE:**  None of the computer monitors were purchased as part of a bundle or system.

23

Produced on 9/7/11

8.  **WARRANTIES:**  None other than any standard manufacturers' warranties.

9.  **PURPOSE of PURCHASE:**  Mr. Warner purchased certain of the computer monitors for personal use and certain ones for use in connection with his business and not for resale.

See also CRT000104-105 and CRT000565-571.

**SAMSUNG EXHIBIT B22**

**PLAINTIFF ALBERT SIDNEY CRIGLER**

1. **CRT PRODUCT:**
   a.  Sharp television – S/N: 653205
   b.  Gateway computer monitor – S/N: 7033364

2. **DATE OF PURCHASE:**
   a.  2004
   b.  Not available.

3. **LOCATION of PURCHASE:**
   a.  Target
   b.  Gateway

4. **PERSONS INVOLVED IN PURCHASE:** Albert Sidney Crigler (plaintiff)

5. **PRICE:**
   a.  Not available.
   b.  Not available.

6. **TAXES/FEES:**  The standard sales tax was applied to the purchases.

7. **BUNDLE:**
   a.  The television was not purchased as part of a bundle or system.
   b.  The computer monitor was purchased as part of a bundle.

8. **WARRANTIES:**  None other than standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:**  Personal use.

See also CRT000001-08.

Produced on 9/7/11

SAMSUNG EXHIBIT B23

**PLAINTIFF MARGARET SLAGLE**

1. **CRT PRODUCT:**
   a. Sylvania television – S/N: J39420241
   b. Magnavox television – S/N: 60HZ75W

2. **DATE OF PURCHASE:**
   a. 11/26/04
   b. 12/04

3. **LOCATION of PURCHASE:**
   a. Radio Shack, South Burlington, VT
   b. Radio Shack, South Burlington, VT

4. **PERSONS INVOLVED IN PURCHASES:** Margaret Slagle (plaintiff)

5. **PRICE:**
   a. $238.23 (including tax)
   b. Not available.

6. **TAXES/FEES:** The standard sales tax was applied to the purchases of the televisions.

7. **BUNDLE:** Neither television was purchased as part of a bundle or a system.

8. **WARRANTIES:** None other than standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000174-213 and CRT000505.

————————— Produced on 9/7/11 —————————

**SAMSUNG EXHIBIT B24**

**PLAINTIFF JOHN LARCH**

1. **CRT PRODUCT:** Curtis Mathes television

2. **DATE OF PURCHASE:** 6/22/04

3. **LOCATION of PURCHASE:** K-Mart – Weirton, West Virginia

4. **PERSONS INVOLVED IN PURCHASE:** John Larch (plaintiff)

5. **PRICE:** $389.99

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** John Larch purchased a "Smart Plan" warranty in connection with his purchase of the television.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000171-173.

Produced on 9/7/11

**SAMSUNG EXHIBIT B25**

**PLAINTIFF BRIGID TERRY**

1.  **CRT PRODUCT:** Toshiba television – S/N: 92567585

2.  **DATE OF PURCHASE:** 1997 or 1998

3.  **LOCATION of PURCHASE:** The Village – Janesville, Wisconsin

4.  **PERSONS INVOLVED IN PURCHASE:** Brigid Terry (plaintiff)

5.  **PRICE:** Not available.

6.  **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7.  **BUNDLE:** This television was not purchased as part of a bundle or system.

8.  **WARRANTIES:** None other than any standard manufacturers' warranty.

9.  **PURPOSE of PURCHASE:** Personal use.

See also CRT000017-18, CRT000073-74, and CRT000563-564.

**SAMSUNG EXHIBIT D1**

### PLAINTIFF JERRY COOK

Mr. Cook's claims have been dismissed.

Produced on 9/7/11

SAMSUNG EXHIBIT D2

## PLAINTIFF BRIAN LUSCHER

**CRTs**: Mr. Luscher does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Luscher believes he may have read something about the CRT TV he purchased.  Mr. Luscher normally does check before making a significant purchase.  However, Mr. Luscher does not recall what he read or have copies of it.  His two main sources for research would be the internet or magazines.

**SAMSUNG EXHIBIT D3**

**PLAINTIFF JEFFREY FIGONE**

**CRTs**: Mr. Figone does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Figone saw advertisements in newspapers and/or magazines related to CRT products during the relevant time period, but he did not pay particular attention to any such advertisements and does not recall anything specific.



Produced on 9/7/11

**SAMSUNG EXHIBIT D4**

PLAINTIFF CARMEN GONZALEZ

**CRTs**: Ms. Gonzales does not believe she reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Ms. Gonzales does recall seeing a Circuit City advertisement that came in the mail that listed the price of her CRT television that she then purchased.

**SAMSUNG EXHIBIT D5**

**PLAINTIFF DANA ROSS**

**CRTs**: Mr. Ross does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Ross does not recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period.

———————————— Produced on 9/7/11 ————————————

**SAMSUNG EXHIBIT D6**

## PLAINTIFF STEVEN GANZ

**CRTs**: Response pending.

**CRT Products**: Response pending.

**SAMSUNG EXHIBIT D7**

**PLAINTIFF BRADY LANE COTTON**

**CRTs**: Response pending.

**CRT Products**: Response pending.

Produced on 9/7/11

**SAMSUNG EXHIBIT D8**

PLAINTIFF COLLEEN SOBOTKA

**CRTs**: Ms. Sobotka does not believe she reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Ms. Sobotka recalls seeing at least one of her CRT televisions advertised in a BX (military base exchange) flyer.



Produced on 9/7/11

**SAMSUNG EXHIBIT D9**

**PLAINTIFF DANIEL RIEBOW**

**CRTs**: Mr. Riebow does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Riebow believes he read about a CRT computer monitor in a magazine called "Computer Shopper" or "Computer." Mr. Riebow also believes he probably looked at advertisements or magazines such as "Consumer Reports," but he has no specific recollection of looking at any particular publication.

9

——— Produced on 9/7/11 ———

SAMSUNG EXHIBIT D10

## PLAINTIFF TRAVIS BURAU

**CRTs**: Mr. Burau does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Burau has reviewed advertisements in the Cedar Rapids Gazette for CRT products.  He also believes he probably reviewed other advertisements for CRT products in various newspapers and online during the relevant time period.  Mr. Burau does not have specific recollection of the contents of any of the advertisements he saw.



Produced on 9/7/11

**SAMSUNG EXHIBIT D11**

**PLAINTIFF SOUTHERN OFFICE SUPPLY**

**CRTs**: Southern Office Supply does not believe it reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Southern Office Supply did review emails from their main hardware supplier about CRT products.

———— Produced on 9/7/11 ————

**SAMSUNG EXHIBIT D12**

## PLAINTIFF CHAD KLEBS

**CRTs**: Mr. Klebs does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Klebs does not recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period.

12


Produced on 9/7/11

**SAMSUNG EXHIBIT D13**

**PLAINTIFF DAVID NORBY**

**CRTs**: Mr. Norby does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Norby does not recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period.

13

———— Produced on 9/7/11 ————

**SAMSUNG EXHIBIT D14**

PLAINTIFF RYAN RIZZO

**CRTs**: Mr. Rizzo does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Rizzo has reviewed advertisements in Dell catalogues mailed to his home.  He has also reviewed advertisements for CRT products in various newspapers and online during the relevant time period.  Mr. Rizzo does not specifically recall the contents of any of the advertisements.

14

Produced on 9/7/11

**SAMSUNG EXHIBIT D15**

**PLAINTIFF CHARLES JENKINS**

**CRTs**: Response pending.

**CRT Products**: Response pending.

Produced on 9/7/11

SAMSUNG EXHIBIT D16

**PLAINTIFF DANIEL HERGERT**

**CRTs**: Mr. Hergert does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Hergert does not specifically recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period, but he may have reviewed an article in "Consumer Reports" about CRT products.

16

**SAMSUNG EXHIBIT D17**

**PLAINTIFF SAMUEL NASTO**

**CRTs**: Mr. Nasto does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Nasto generally recalls seeing Best Buy, Circuit City, and Fry's advertisements from time-to-time in his local newspaper.  He believes these advertisements contained information about CRT products, including price and product features, but he cannot recall any specifics about the advertisements he saw.

17

———————————— Produced on 9/7/11 ————————————

**SAMSUNG EXHIBIT D18**

## PLAINTIFF CRAIG STEPHENSON

**CRTs**: Mr. Stephenson does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Stephenson does not recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period.

18



Produced on 9/7/11

**SAMSUNG EXHIBIT D19**

**PLAINTIFF GARY HANSON**

**CRTs**: Mr. Hanson does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Hanson saw and reviewed a Dell direct advertising insert in his local newspaper and subsequently purchased his Dell CRT computer monitors.



Produced on 9/7/11

SAMSUNG EXHIBIT D20

PLAINTIFF DONNA MARIE ELLINGSON

**CRTs**: Ms. Ellingson does not believe she reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Ms. Ellingson did see advertisements from time to time regarding CRT products such as televisions and computer monitors, however she does not recall any advertisements specifically nor does she recall the contents of any of the advertisements.

20

—— Produced on 9/7/11 ——

**SAMSUNG EXHIBIT D21**

### PLAINTIFF FRANK WARNER

**CRTs**: Mr. Warner does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Warner does not recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period.

21



SAMSUNG EXHIBIT D22

**PLAINTIFF ALBERT SIDNEY CRIGLER**

**CRTs**: Mr. Crigler does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Crigler reviewed advertisements related to CRT products during the relevant time period, but he does not recall anything specific.



Produced on 9/7/11

**SAMSUNG EXHIBIT D23**

## PLAINTIFF MARGARET SLAGLE

**CRTs**: Ms. Slagle does not believe she reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Ms. Slagle does not recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period.

Produced on 9/7/11

**SAMSUNG EXHIBIT D24**

## PLAINTIFF JOHN LARCH

**CRTs**: Mr. Larch does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Larch reviewed advertisements related to CRT products during the relevant time period, but he does not recall anything specific.



Produced on 9/7/11

SAMSUNG EXHIBIT D25

**PLAINTIFF BRIGID TERRY**

**CRTs**: Ms. Terry does not believe she reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Ms. Terry does not recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period.

25

**SAMSUNG EXHIBIT E1**

**PLAINTIFF JERRY COOK**

Mr. Cook's claims have been dismissed.

———————— Produced on 9/7/11 ————————

SAMSUNG EXHIBIT E2

**PLAINTIFF BRIAN LUSCHER**

Mr. Luscher believes he may have bought a Mitsubishi large screen projection television and an LCD/plasma product during the class period.  He elected to acquire the non-CRT projection television because CRT products were not available in the 50" size range.  Mr. Luscher believes the LCD/plasma television was purchased around late 2005-early 2006.  The LCD/plasma television was approximately 40", and Mr. Luscher believes that he purchased it because there were no similar-sized CRTs, or if there were, the CRT products were too heavy or bulky.

**SAMSUNG EXHIBIT E3**

**PLAINTIFF JEFFREY FIGONE**

Mr. Figone purchased at least two LCD computer monitors and three LCD televisions during the relevant period.  He purchased the LCD computer monitors because he was buying computer packages from Dell and Apple and his recollection is that they only offered LCD monitors as part of their bundled packages, but he is not certain of that fact. He does not recall CRT monitors even being available at the time of these computer purchases.  Mr. Figone purchased the LCD televisions because they were smaller in dimension, lighter weight, and offered a digital picture.

———————————————— Produced on 9/7/11 ————————————————

**SAMSUNG EXHIBIT E4**

## PLAINTIFF CARMEN GONZALEZ

Ms. Gonzalez did not purchase a non-CRT television or computer monitor during the relevant time period.

**SAMSUNG EXHIBIT E5**

**PLAINTIFF DANA ROSS**

Mr. Ross did not purchase a non-CRT television or computer monitor during the relevant time period.

———————————————— Produced on 9/7/11 ————————————————

**SAMSUNG EXHIBIT E6**

**PLAINTIFF STEVEN GANZ**

Response pending.

————————————— Produced on 9/7/11 —————————————

**SAMSUNG EXHIBIT E7**

## PLAINTIFF BRADY LANE COTTON

Response pending.

———————————— Produced on 9/7/11 ————————————

**SAMSUNG EXHIBIT E8**

## PLAINTIFF COLLEEN SOBOTKA

Ms. Sobotka did not purchase a non-CRT television or computer monitor during the relevant time period.

Produced on 9/7/11

**SAMSUNG EXHIBIT E9**

**PLAINTIFF DANIEL RIEBOW**

Mr. Riebow did not purchase a non-CRT television or computer monitor during the relevant time period.

———————————————————— Produced on 9/7/11 ————————————————————

**SAMSUNG EXHIBIT E10**

**PLAINTIFF TRAVIS BURAU**

Mr. Burau purchased a Dell Flat Screen Monitor during the relevant time period. He purchased the Flat Screen Monitor because it was an upgrade as part of a computer package purchased from Dell. Mr. Burau may have purchased other non-CRT televisions or computer monitors during the relevant time period, but cannot state with certainty.

10

**SAMSUNG EXHIBIT E11**

**PLAINTIFF SOUTHERN OFFICE SUPPLY**

Southern Office Supply purchased between six and 11 LCD computer monitors during the relevant period.  Four were purchased because they took up less space, two were purchased for graphics use in Southern's print shop, and others were purchased because other monitors were wearing out.

Produced on 9/7/11

**SAMSUNG EXHIBIT E12**

**PLAINTIFF CHAD KLEBS**

Mr. Klebs did not purchase a non-CRT television or computer monitor during the relevant time period.

**SAMSUNG EXHIBIT E13**

**PLAINTIFF DAVID NORBY**

Mr. Norby did not purchase a non-CRT television or computer monitor during the relevant time period.

———— Produced on 9/7/11 ————

SAMSUNG EXHIBIT E14

**PLAINTIFF RYAN RIZZO**

Mr. Rizzo purchased a Philips LCD television and a Dell LCD computer monitor during the relevant time period.  He purchased the Philips television because of a superior picture quality.  He purchased the Dell monitor because it was an upgrade as part of a computer package.  Mr. Rizzo may have purchased other non-CRT televisions or computer monitors during the relevant time period, but he cannot state with certainty.

Produced on 9/7/11

**SAMSUNG EXHIBIT E15**

**PLAINTIFF CHARLES JENKINS**

Response pending.

———————————— Produced on 9/7/11 ————————————

**SAMSUNG EXHIBIT E16**

**PLAINTIFF DANIEL HERGERT**

Mr. Hergert purchased an LG HD plasma flat screen television during the relevant period.  He did so because the television was HD, takes up less space, and he wanted to hang it on a wall.

Produced on 9/7/11

**SAMSUNG EXHIBIT E17**

**PLAINTIFF SAMUEL NASTO**

Mr. Nasto acquired two LCD televisions during the relevant period because he believed that the LCD televisions were a newer technology, offered a better picture quality, and were thin as opposed to being bulky and very heavy.

17

——————————— Produced on 9/7/11 ———————————

**SAMSUNG EXHIBIT E18**

**PLAINTIFF CRAIG STEPHENSON**

Mr. Stephenson did not purchase a non-CRT television or computer monitor during the relevant time period.

———————————— Produced on 9/7/11 ————————————

**SAMSUNG EXHIBIT E19**

**PLAINTIFF GARY HANSON**

Mr. Hanson did not purchase a non-CRT television or computer monitor during the relevant time period.

———————————————— Produced on 9/7/11 ————————————————

SAMSUNG EXHIBIT E20

**PLAINTIFF DONNA MARIE ELLINGSON**

Ms. Ellingson did not purchase a non-CRT television or computer monitor during the relevant time period.

Produced on 9/7/11

**SAMSUNG EXHIBIT E21**

**PLAINTIFF FRANK WARNER**

Mr. Warner purchased non-CRT televisions during the relevant time period.  He elected to purchase flat screen televisions because the flat screens are HD and because they take up less space.

Produced on 9/7/11

SAMSUNG EXHIBIT E22

**PLAINTIFF ALBERT SIDNEY CRIGLER**

Mr. Crigler did not purchase a non-CRT television or computer monitor during the relevant time period.

——————————————— Produced on 9/7/11 ———————————————

**SAMSUNG EXHIBIT E23**

## PLAINTIFF MARGARET SLAGLE

Ms. Slagle elected to purchase a 42" plasma television to have better viewing with her son as they watched it in her living room.  The other CRT televisions were for smaller rooms.

———————————————————— Produced on 9/7/11 ————————————————————

**SAMSUNG EXHIBIT E24**

## PLAINTIFF JOHN LARCH

Mr. Larch did not purchase a non-CRT television or computer monitor for himself during the relevant time period.  He has purchased a flat screen television for his parents but cannot recall if he purchased it during the relevant time period.  He purchased the flat screen television because he believed it was better technology.

———— Produced on 9/7/11 ————

**SAMSUNG EXHIBIT E25**

**PLAINTIFF BRIGID TERRY**

Ms. Terry did not purchase a non-CRT television or computer monitor during the relevant time period.

# EXHIBIT 55

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4                      ---o0o---

5

6    In Re: CATHODE RAY TUBE (CRT)    )
     ANTITRUST LITIGATION,            )
7                                     )
                       Plaintiff,     )
8    _____)   Case No.
                                      )   07-5944 Sc
9                                     )   MDL No. 1917
     This Document Relates to:        )
10                                    )
     ALL ACTIONS,                     )
11   _____)

12

13

14

15

16        VIDEOTAPED DEPOSITION OF MARGARET SLAGLE

17              TUESDAY, MARCH 20, 2012

18

19

20

21

22

23

24

25   REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

                            2

Margaret Slagle

BARKLEY
Court Reporters

```
1              A P P E A R A N C E S

2                  ---oOo---

3  FOR THE INDIRECT PURCHASER PLAINTIFFS:

4       KIRBY McINERNEY LLP
        825 Third Avenue,
5       New York, New York  10022
        BY: ROBERT J. GRALEWSKI, JR., ESQ.
6       (212) 371-6600
        bgralewski@kmllp.com
7

8  FOR THE DEFENDANTS SAMSUNG ELECTRONICS CO., LTD.,
   AND SAMSUNG ELECTRONICS AMERICA, INC.:
9
        O'MELVENY & MYERS LLP
10      1625 Eye Street NW
        Washington, D.C.  20004
11      BY: BENJAMIN G. BRADSHAW, ESQ.
            COURTNEY C. BYRD, ESQ.
12      (202) 383-5300
        bbradshaw@omm.com
13      cbyrd@omm.com

14
   FOR THE DEFENDANTS KONINKLIJKE PHILIPS ELECTRONICS
15 N.V., PHILIPS ELECTRONICS NORTH AMERICA
   CORPORATION:
16
        BAKER BOTTS LLP
17      1299 Pennsylvania Avenue, N.W.
        Washington, D.C.  20004-2400
18      BY: CHARLES MALAISE, ESQ.
        (202) 639-7700
19      charles.malaise@bakerbotts.com

20

21

22

23

24

25
```

Margaret Slagle

BARKLEY
Court Reporters

```
1              A P P E A R A N C E S
                    ---o0o---
2
    FOR THE DEFENDANTS TOSHIBA CORPORATION, TOSHIBA
3   AMERICA, INC., TOSHIBA AMERICA INFORMATION SYSTEMS,
    INC., TOSHIBA AMERICA CONSUMER PRODUCTS, L.L.C.,
4   AND TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.:
    (Telephonic Appearance)
5
          WHITE & CASE LLP
6         701 Thirteenth Street, NW
          Washington, D.C.  20005-3807
7         BY: AARON McALLISTER, ESQ.
          (202) 626-3623
8         amcallister@whitecase.com

9
    ALSO PRESENT:
10
          Eric Fernald, Barkley Court Reporters
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

Margaret Slagle

BARKLEY
Court Reporters

1                    INDEX OF EXAMINATIONS

2                         ---oOo---

3

4    EXAMINATIONS                                        PAGE

5    MR. BRADSHAW                                          7

6    MR. MALAISE                                         130

7

8

9

10                    INDEX OF EXHIBITS

11     NO.                  DESCRIPTION                  PAGE

12     48    Notice of Deposition of Margaret             23
             Slagle (3 Pages)
13
       49    Photocopy of a Sears Gold MasterCard         29
14           Statement, Bates No. CRT000505

15     50    Two Color Photocopies of a Sylvania          75
             Television, Bates No. CRT00212 through
16           213

17     51    Two Color Photocopies of a Magnavox          81
             Television, Bates No. CRT00210 through
18           211

19     11    Indirect Purchaser Plaintiffs' Third         87
             Consolidated Amended Complaint (103
20           Pages)

21     52    Indirect Purchaser Plaintiffs' Amended      125
             and Supplemental Objections and
22           Responses to Defendant Samsung SDI
             Co., LTD.'s First Set of
23           Interrogatories (117 Pages)

24

25

                           5

Margaret Slagle

BARKLEY
Court Reporters

```
 1              BURLINGTON, VERMONT, MARCH 20, 2012

 2                      ---o0o---

 3              BE IT REMEMBERED that on Tuesday, the 20th

 4    day of March 2012, commencing at the hour of 9:10

 5    a.m. thereof, at 1233 Shelburne Road, Suite E1,

 6    Burlington, Vermont, before me, Balinda Dunlap, a

 7    Certified Shorthand Reporter in and for the County

 8    of San Francisco, State of California, personally

 9    appeared:

09:08 10             THE VIDEOGRAPHER:  We are on the record.

11    Good morning.  My name is Eric Fernald.  I am the

12    videographer associated with Barkley Court

13    Reporters, located at 1875 Century Park East, Suite

14    1300, Los Angeles, California 90067.

09:09 15             The date is March 20th, 2012.  The time is

16    now 9:10.  This deposition is taking place at

17    Kirkpatrick & Goldsborough LLC in the matter of

18    cathode ray tube antitrust litigation, Case No.

19    07-5944-SC.

09:09 20             This is the videotape deposition of

21    Margaret Slagle.  Would counsels for the parties

22    please identify themselves and state whom you

23    represent today.

24             MR. BRADSHAW:  Good morning.  Ben Bradshaw

09:09 25    with O'Melveny & Myers representing defendant
```

6

Margaret Slagle

BARKLEY
Court Reporters

         1     Samsung Electronics Company and Samsung Electronics

         2     Company America.

         3              Also with me --

         4              MR. McALLISTER:  Aaron McAllister from

09:10    5     White & Case on behalf of the Toshiba entities.

         6              MR. BRADSHAW:  I should speak up.  Also

         7     with me is Courtney Byrd from O'Melveny & Meyers,

         8     also for Samsung Electronics Company and Samsung

         9     Electronics America Incorporated.

09:10   10              MR. MALAISE:  Charles Malaise, Baker

        11     Botts, representing the Philips defendants.

        12              MS. KIRKPATRICK:  Mary Kirkpatrick with

        13     Kirkpatrick & Goldsborough representing plaintiff.

        14              MR. GRALEWSKI:  Bob Gralewski, Kirby

09:10   15     McInerney, for the plaintiff and the class.

        16              THE VIDEOGRAPHER:  The court reporter will

        17     now swear in the witness, please.

        18                      MARGARET SLAGLE

        19              called as a witness by the Defense, having

09:10   20     been sworn to tell the truth, the whole truth, and

        21     nothing but the truth, was examined and testified as

        22     follows:

        23                      ---oOo---

        24              EXAMINATION BY MR. BRADSHAW

09:10   25         Q.   Good morning, Ms. Slagle.  We met a few

                                    7

                           Margaret Slagle

1     minutes ago for the first time.  I'll reintroduce

2     myself.  My name is Ben Bradshaw, and I am an

3     attorney for two of the defendant companies in this

4     case.

09:11  5          So good morning and thank you --

6          A.   Good morning.

7          Q.   -- for your time.  Could you go ahead and

8     spell -- state your name and spell it for the

9     record, please.

09:11 10          A.   Yes.  Margaret, M-a-r-g-a-r-e-t, Haas,

11     H-a-a-s, Slagle, S-l-a-g-l-e.

12          Q.   Ms. Slagle, what is your current home

13     address?

14          A.   It is 30 Pine Street, South Burlington,

09:11 15     Vermont 05403.

16          Q.   Ms. Slagle, how long have you lived at

17     that address?

18          A.   Year and a half.

19          Q.   And where did you live before that?

09:11 20          A.   14 Highway Lane in Williston, Vermont.

21          Q.   What state, Williston?

22          A.   Yeah.

23          Q.   Williston is in Vermont?

24          A.   That's correct.

09:11 25          Q.   Okay.  And how long were you at the former

8

Margaret Slagle

BARKLEY
Court Reporters

1    address in Williston?

2          A.   In Williston, about a year and a half.

3          Q.   And where were you before that?

4          A.   Essex, Vermont.

09:11  5    Q.   Okay.  And how long were you in Essex?

6          A.   About a year and a half.

7          Q.   That seems to be a pattern here?

8          A.   Yeah.

9          Q.   And where were you before Essex?

09:12  10   A.   Before that it was Essex as well, and it

11   was a condo my church had.

12         Q.   How long have you lived in Vermont?

13         A.   I have lived in Vermont since 1988.

14         Q.   Okay.  And since 1988 until the present,

09:12  15   have you lived in Vermont on a continuous basis?

16         A.   Yes, I have.

17         Q.   Okay.  And your residence currently in

18   South Burlington, is that your primary residence?

19         A.   It is.

09:12  20   Q.   Okay.  And do you own that home?

21         A.   I rent it.

22         Q.   Okay.  Do you pay taxes here in Vermont?

23         A.   I do.  I work here.

24         Q.   Okay.  That's probably not a good

09:12  25   question.  "Unfortunately, yes."

9

BARKLEY
Court Reporters

```
 1              Okay.  Ms. Slagle, have you ever been
 2     deposed before?
 3        A.   With my divorce I have, yeah.
 4        Q.   One time?
09:12  5        A.   One time.
 6        Q.   And when was that?
 7        A.   I am not sure of the exact date, but it
 8     was between '04 and '08.
 9        Q.   Okay.  Since you've been through this
09:13 10   before, you probably have a pretty good idea what
11     the activities today will involve, and I am sure
12     your counsel has addressed it with you, but let me
13     just remind you that you are under oath, and you
14     have an obligation to answer my questions
09:13 15   completely and truthfully.
16              Do you understand that?
17        A.   I absolutely do.
18        Q.   And is there any reason today that you
19     cannot answer my questions completely, accurately,
09:13 20   and truthfully?
21        A.   No, no reason.
22        Q.   And certainly feel free to, if one of my
23     questions is unclear, which may or may not be the
24     case at some point today, feel free to clarify them
09:13 25   or ask for clarification.  I'll do my best to
```

10

BARKLEY
Court Reporters

1    clarify; is that okay?

2        A.   That's okay.

3        Q.   And certainly the court reporter you can

4    see to your right, she's taking down every word

09:13  5    that we say.  So that's important that we try not

6    to talk over each other.  It might happen

7    unintentionally throughout the course of the day

8    where you jump in to answer a question before I am

9    finished, or I'll jump in with a question before

09:14 10    you've finished your answer.

11            Let's do our best to try not to talk over

12    each other.  I'll wait for you to finish your

13    answer before I ask another question, and if you

14    would wait until I finish my question before you

09:14 15    answer, that would be appreciated.

16        A.   Certainly.

17        Q.   Okay.  Great.  Now, what is your

18    understanding, Ms. Slagle, if anything, as to why

19    you're here today?

09:14 20        A.   I'm here as a plaintiff for a class action

21    lawsuit about CRT tubes where they were allegedly

22    price-fixing the tubes, and I am an indirect

23    plaintiff basically because I am the end user.  I

24    am the one that bought the televisions.

09:14 25        Q.   And let me ask a couple follow-up

11

Margaret Slagle

BARKLEY
Court Reporters

```
 1    questions.  Have you ever actually purchased a CRT

 2    tube on its own, as a stand-alone product?

 3         A.   Not inside of a television?

 4         Q.   Not inside of a television.

 5         A.   No.

 6         Q.   Okay.  So your participation today is

 7    based on your purchase of televisions which include

 8    CRT tubes within them; is that correct?

 9         A.   That's correct.

10         Q.   Okay.  And when you say that there was

11    price-fixing of the tubes, can you just clarify

12    exactly what you mean?  Are you talking about -- is

13    it your understanding that the allegations in this

14    case refer to price-fixing of the actual CRT tubes?

15         A.   That's my understanding.

16         Q.   Okay.  So your understanding is that the

17    allegations in this case do not involve actual

18    price-fixing of the televisions themselves?

19              MR. GRALEWSKI:  Object to the form of the

20    question.  Calls for a legal conclusion.

21              You can answer.

22              THE WITNESS:  I can?

23              MR. GRALEWSKI:  You can answer if you

24    understand the question.

25              THE WITNESS:  Can you repeat that again?
```

12

Margaret Slagle

**BARKLEY**
Court Reporters

1     Q.   BY MR. BRADSHAW:  Sure.  Is it your

2    understanding that the allegations in this

3    complaint do not involve an allegation that the

4    televisions themselves, the price of the

09:16  5    televisions themselves, was price-fixed; is that

6    your understanding?

7     A.   That's not really clear to me.  Because it

8    seems like the vacuum tube is part of the

9    television.

09:16  10    Q.   Right.  But are you making an allegation

11    in this case that the manufacturers of televisions

12    coordinated the pricing of those televisions?

13    A.   No.

14    Q.   Okay.  So your allegation is that -- if I

09:16  15   understand correctly, your allegation is that the

16    manufacturers of tubes, the actual CRT tube,

17    price-fixed that product, the tube; is that

18    correct?

19    A.   That's correct.

09:16  20    Q.   Are you aware that my client, Samsung

21    Electronics Company, has never manufactured tubes?

22    A.   Am I aware?

23    Q.   Yeah.

24     MR. GRALEWSKI:  Object to the form of the

09:16  25   question.  Lacks foundation.

13

BARKLEY
Court Reporters

1    Q.   BY MR. BRADSHAW:  Are you aware of that?

2    Are you aware that my client, Samsung Electronics

3    Company, has never manufactured tubes?

4    A.   No, I am not aware of that.

09:17    5         MR. GRALEWSKI:  Same objections.

6    Q.   BY MR. BRADSHAW:  Are you also aware that

7    my client, Samsung Electronics Company America, has

8    never manufactured tubes?

9         MR. GRALEWSKI:  Same objection.

09:17   10    Q.   BY MR. BRADSHAW:  Did you know that?

11    A.   I didn't.

12    Q.   But you still sued my clients even though

13    they never manufactured tubes?

14         MR. GRALEWSKI:  Same objection.  Lacks

09:17   15    foundation.  Argumentative.

16    Q.   BY MR. BRADSHAW:  Is that correct?  You've

17    sued my clients claiming that they price-fixed

18    tubes even though they never made tubes?

19         MR. GRALEWSKI:  Same objection.

09:17   20         THE WITNESS:  That was my understanding,

21    yeah.

22    Q.   BY MR. BRADSHAW:  Your understanding was

23    what, what was your understanding?

24    A.   That they were --

09:17   25         MR. GRALEWSKI:  I just want to interpose

14

BARKLEY
Court Reporters

```
 1   an objection and caution the witness not to reveal

 2   any attorney-client communications, but to the

 3   extent you can answer the question without doing

 4   so, you can answer.

 5          THE WITNESS:  Okay.  Now you're going to

 6   have to ask me the question again.

 7          MR. BRADSHAW:  Why don't you read it back,

 8   because I think I was asking you to clarify

 9   something that you said.

10              (Reporter read back as requested.)

11          THE WITNESS:  Okay.

12      Q.  BY MR. BRADSHAW:  And you said "That was

13   my understanding."  So your understanding is that

14   you've made a decision to sue my clients claiming

15   that they price-fixed the price of tubes even

16   though they've never made tubes?

17          MR. GRALEWSKI:  Object to the form of the

18   question.

19      Q.  BY MR. BRADSHAW:  Is that your

20   understanding?

21          MR. GRALEWSKI:  Same objection.  Calls for

22   a legal conclusion.

23          THE WITNESS:  In general, that was my

24   understanding, yes.

25      Q.  BY MR. BRADSHAW:  Do you think it is
```

09:17  5
09:18 10
09:18 15
09:18 20
09:18 25

15

BARKLEY
Court Reporters

1     appropriate to sue somebody when they have never

2     even made the product?

3          MR. GRALEWSKI:  Object to the form of the

4     question.  Lacks foundation.  Argumentative.  Calls

09:18  5     for a legal conclusion.

6          THE WITNESS:  I think that in my knowledge

7     base, people that you can have production of an

8     item, but can also have people involved that make

9     the decisions that may not directly make it.

09:18 10     Q.   BY MR. BRADSHAW:  Okay.  But my question

11     is:  If a company doesn't make a product, do you

12     think it's appropriate to sue that company for

13     price-fixing of that product even though they've

14     never made the product?

09:19 15          MR. GRALEWSKI:  Object to the form of the

16     question.  Lacks foundation.  Calls for a legal

17     conclusion.

18          You can answer.

19          THE WITNESS:  Okay.  I guess the answer

09:19 20     would be no on that.

21     Q.   BY MR. BRADSHAW:  Okay.

22     A.   But I would also state that if they are

23     involved in any kind of connection with it, which

24     was my understanding that they were, so, you know,

09:19 25     like, business conversations or whatever.

16

Margaret Slagle

BARKLEY
Court Reporters

1          Q.    Anything else?  Did you want to add

2     anything else?

3          A.    No.

4          Q.    Ms. Slagle, what is your -- can you just

09:19  5     give me an overview of your educational background?

6          A.    Yeah, certainly can.  I am a registered

7     nurse.

8          Q.    And when did you receive your RN?

9          A.    In 1980.

09:20 10          Q.    Where did you receive that degree?

11          A.    Southwest Missouri State University,

12     Springfield Missouri.

13          Q.    When did you graduate from high school?

14          A.    1974.

09:20 15          Q.    And you went to Southwest Missouri State

16     University?

17          A.    It is Missouri State University now.

18          Q.    Missouri State University, when did you

19     start there?

09:20 20          A.    In '75.

21          Q.    Okay.  And when did you graduate?

22          A.    In 1980.

23          Q.    Do you have any other secondary education

24     besides your RN?

09:20 25          A.    No.  I have my bachelorette.

17

Margaret Slagle

BARKLEY
Court Reporters

1          Q.    What is that?

2          A.    Bachelorette in nursing.  It is a

3    four-year degree.  When I went to nursing school,

4    there was a three-year diploma program, and I went

09:20  5    on and got my bachelorette at the college level

6    after that.

7          Q.    Do you have any -- and you are an RN?

8          A.    I am an RN.

9          Q.    Okay.  And what is your area of nursing?

09:21  10    A.    Infection prevention.

11         Q.    And are you currently employed?

12         A.    I am.

13         Q.    Where are you currently employed?

14         A.    Visiting Nurse Association of Chittenden

09:21  15    and Grand Isle Counties.

16         Q.    So do you travel from different place to

17    place, to hospital to hospital?

18         A.    Homes, mostly home care.

19         Q.    Have you ever, in your professional life,

09:21  20    been involved in any capacity in the consumer

21    electronics business?

22         A.    I have not.

23         Q.    You ever been involved in the retail

24    business, selling retail?

09:21  25    A.    My first job when I was a kid.

18

Margaret Slagle

BARKLEY
Court Reporters

1          Q.    You worked in a store somewhere?

2          A.    I worked in a store, yeah.

3          Q.    Okay.  But in a professional capacity

4     since you graduated from college, have you been

09:22 5     involved in any way in the retail industry?

6          A.    I have not.

7          Q.    Ms. Slagle, did you do anything to prepare

8     for your deposition today?

9          A.    I reviewed the documents that I signed

09:22 10     previously.

11          Q.    Did you meet with your counsel?

12          A.    Uh-huh.

13          Q.    And who is that?

14          A.    Mary and Bob.

09:22 15          Q.    How many times did you meet with your

16     counsel?

17          A.    Just once, yeah.

18          Q.    When was that?

19          A.    I met last night with them.

09:22 20          Q.    How long did that meeting last?

21          A.    About an hour.

22          Q.    And you had -- in preparation for your

23     deposition, that was the only time that you spoke

24     with your counsel?

09:22 25          A.    I had a conversation on Friday.

19

Margaret Slagle

BARKLEY
Court Reporters

1      Q.   The conversation on Friday, this past

2   Friday, was that on the phone?

3      A.   Yes, it was.

4      Q.   And who was that with?

09:23  5      A.   Bob.

6      Q.   Mr. Gralewski, did I pronounce your name

7   correctly?

8           MR. GRALEWSKI:   Thank you.

9      Q.   BY MR. BRADSHAW:   And that was on the

09:23 10   phone?

11     A.   Yes.

12     Q.   Was Ms. Kirkpatrick on the phone as well?

13     A.   Yes.

14     Q.   And how long did that last again?

09:23 15     A.   It was about an hour, too.

16     Q.   And the meeting last night lasted about an

17   hour.  Did I get that right?

18     A.   Yeah, to my recollection, yeah.

19     Q.   Was there anybody else -- was that meeting

09:23 20   in-person?

21     A.   Uh-huh.

22     Q.   The call that you had with your counsel on

23   Friday, was anybody else on that call except for

24   the three of you?

09:23 25     A.   Huh-uh.

20

Margaret Slagle

BARKLEY
Court Reporters

1      Q.    And what about the meeting yesterday, was

2   anybody there other than the three of you?

3      A.    No.

4      Q.    Other than the one telephone conversation

09:23  5   and the meeting in person, did you do anything else

6   to prepare for your deposition?

7           MR. GRALEWSKI:  Object to the form of the

8   question.  Misstates testimony.

9           THE WITNESS:  Okay.  I just reviewed the

09:24 10   documents with them that I had signed previously.

11      Q.    BY MR. BRADSHAW:  Okay.  And then other

12   than reviewing those documents and the two

13   meetings, did you do anything else?

14      A.    I had dinner afterwards, went out to eat.

09:24 15      Q.    I am sure --

16      A.    It was time to eat.

17      Q.    I am sure you did a lot of things.  The

18   question, though -- at least the intent of the

19   question was did you do anything else in

09:24 20   preparation for your deposition?  I assume that

21   eating dinner was not in preparation.

22      A.    Yeah, no, no, no.  No.

23      Q.    Okay.  So you didn't do any research?  You

24   didn't look at any other documents?  You didn't

09:24 25   talk to anybody else in preparation for your

21

Margaret Slagle

BARKLEY
Court Reporters

1   deposition?

2        A.   No.

3             MR. GRALEWSKI:  Object to the form of the

4   question.  Vague and ambiguous.  Misstates

09:24  5   testimony.

6        Q.   BY MR. BRADSHAW:  Now, Ms. Slagle, have

7   you ever been a plaintiff before in a lawsuit?

8        A.   In my divorce.

9        Q.   Okay.  Other than your divorce --

09:25  10        A.   No.

11        Q.   -- have you ever been a plaintiff in a

12   lawsuit?  Have you ever been a defendant in a

13   lawsuit?

14        A.   No.

09:25  15        Q.   Have you ever participated in a class

16   action in any way?

17        A.   No.

18        Q.   Okay.  Have you ever participated in a

19   class action settlement, to the best of your

09:25  20   knowledge?

21        A.   I have not.

22        Q.   Okay.  So this is the first time that,

23   other than your divorce, where you've actually been

24   involved in a lawsuit --

09:25  25        A.   That's correct.

22

Margaret Slagle

BARKLEY
Court Reporters

1      Q.   -- is that correct?  When was the first

2  time that you met Mr. Gralewski?

3      A.   Last night I met him, yeah.

4      Q.   Okay.  When is the first time that you

09:25 5  spoke with him?

6      A.   I think it was Friday, yeah.

7      Q.   First time you ever spoke with him?

8      A.   That's correct.

9      Q.   Okay.  And what about Ms. Kirkpatrick,

09:25 10  when was the first time that you met

11  Ms. Kirkpatrick?

12      A.   That was '04 or '05.

13      Q.   And how long has Ms. Kirkpatrick been your

14  lawyer?

09:25 15      A.   Since '04, '05, until the divorce was

16  final.

17      Q.   And did Ms. Kirkpatrick represent you in

18  the divorce?

19      A.   Yes, she did.

09:26 20           (Reporter marked Exhibit No. 48 for

21           identification.)

22      Q.   BY MR. BRADSHAW:  Ms. Slagle, the court

23  reporter has just handed you a document marked as

24  Exhibit 48, which for the record has the title

09:27 25  "Notice of Deposition of Margaret Slagle."

23

Margaret Slagle

BARKLEY
Court Reporters

1          Go ahead and take a look at that.

2     A.    Okay.

3     Q.    Do you recognize the document?

4     A.    Yeah, it is a request to come here today.

09:27  5     Q.    And do you recognize this as the reason

6   why we are all here today to take your deposition?

7          MR. GRALEWSKI:  Object to the form of the

8   question.  Lacks foundation.  Vague and ambiguous.

9          You can answer.

09:27 10          THE WITNESS:  Yeah.

11     Q.    BY MR. BRADSHAW:  Now, Ms. Slagle, earlier

12   when I asked you about this lawsuit, you indicated

13   that your participation in this lawsuit drives from

14   your purchase of some televisions --

09:27 15     A.    That's correct.

16     Q.    -- is that correct?  How many televisions

17   have you purchased?

18     A.    Two.

19     Q.    Two.

09:28 20          MR. GRALEWSKI:  Can you remember to let

21   him finish his question.

22          THE WITNESS:  I'm sorry.  I am sorry.

23          MR. GRALEWSKI:  You're doing great.

24     Q.    BY MR. BRADSHAW:  I know you are not doing

09:28 25   it intentionally.  I'm sure I will do it at some

24

Margaret Slagle

BARKLEY
Court Reporters

```
 1    point in time.
 2              MR. GRALEWSKI:  Thank you.
 3              THE WITNESS:  I apologize.
 4         Q.   BY MR. BRADSHAW:  But it is wise advice
09:28  5    from your counsel.
 6              So just to clarify, with respect to the
 7    products that you are claiming damages for in this
 8    case, how many specific products have you purchased
 9    that you're claiming damages for in this case?
09:28 10         A.   Two.
11         Q.   Two.  Okay.  What are those two products?
12         A.   Two televisions.
13         Q.   What brand were the televisions?
14         A.   Magnavox -- one was a Magnavox, and one
09:28 15    was Sylvania, I believe.
16         Q.   Other than those two televisions, the
17    Magnavox and the Sylvania, are you claiming damages
18    in this case based on the purchase of any other
19    products?
09:29 20         A.   No.
21         Q.   All right.  Let's focus on the Magnavox,
22    the first one that you mentioned.  Is the Magnavox
23    television -- strike that.
24              Does the Magnavox television contain a CRT
09:29 25    tube within it?
```

Margaret Slagle

BARKLEY
Court Reporters

1    A.   Yes, that's my understanding that it does.

2    Q.   Okay.  Do you know one way or the other?

3    A.   Well, yeah, I mean, those were produced

4  before the flat screens were.

09:29  5    Q.   Well, when you say "flat screen," is the

6  Magnavox a flat screen?

7    A.   Huh-uh.

8         MR. GRALEWSKI:  And also remember to

9  answer with "yes" or "no" instead of shaking your

09:29  10  head.

11         THE WITNESS:  Okay.  I'm sorry.

12         MR. GRALEWSKI:  That's okay.  That's okay.

13    Q.   BY MR. BRADSHAW:  Have you actually

14  confirmed one way or the other whether the Magnavox

09:30  15  television contains a CRT?

16    A.   Confirmed as far as?

17    Q.   Looking at it, looking at the serial

18  number, opening it up?

19    A.   I didn't open it up.

09:30  20    Q.   Calling Magnavox to make sure?

21    A.   No.

22    Q.   Okay.  So your belief that it contains a

23  CRT is just based on the appearance --

24    A.   General knowledge.

09:30  25    Q.   -- and the appearance of the television?

26

Margaret Slagle

BARKLEY
Court Reporters

1        A.   Yes.

2        Q.   Okay.  Do you know who manufactured the

3   television?

4        A.   As far as I know, it was Magnavox.  No, I

09:30 5   guess.

6        Q.   Is Magnavox a defendant in this case?

7        A.   Not that I'm aware of.  I am not sure.

8   There's several defendants in the case.

9        Q.   Do you know whether or not Magnavox is a

09:30 10   defendant?

11        A.   I think it is, but I'm not sure.

12        Q.   Okay.  Do you know who manufactured the

13   CRT tube within the Magnavox television?

14        A.   No.

09:31 15        Q.   How big is the television?

16        A.   About like that.  I don't remember how

17   many inches it was.  I know it fit my room.

18        Q.   Okay.  But you don't know how many

19   inches -- generally televisions are measured --

09:31 20        A.   Geez, I have to look at that stuff that I

21   submitted.  I had a whole manual and stuff.  It's

22   in there.

23        Q.   Okay.  We'll look at that in a minute.

24   This is not a memory test --

09:31 25        A.   Okay.

27

Margaret Slagle

BARKLEY
Court Reporters

1      Q.   -- but I am just asking do you have any --

2  do you know, as you're sitting here right now, the

3  size of the screen of the television, the Magnavox

4  television?

09:31  5      A.   I can't state the exact inches, but I can

6  show you.  It is like this big.

7      Q.   Okay.  When did you purchase the Magnavox

8  television?

9      A.   It was either in the end of '04, beginning

09:31  10  of '05, yeah.

11      Q.   Where did you purchase it?

12      A.   RadioShack.

13      Q.   Do you know how much you paid for it?

14      A.   It was about 240, something like that.

09:32  15  $240.

16      Q.   Do you have a receipt?

17      A.   I think there's some here, yeah, on my

18  charge card.  It was a charge.

19      Q.   So you paid with a credit card?

09:32  20      A.   I did.

21      Q.   What were the circumstances that led to

22  the purchasing of the new television?

23      A.   I left my home from the divorce split and

24  had no televisions.  So I bought some when I moved

09:32  25  into my apartment.

28

Margaret Slagle

BARKLEY
Court Reporters

1        Q.   Okay.  The $240 that you believe that you

2    paid for the Magnavox television, does that include

3    sales tax?

4        A.   I suppose it would, because I have my

09:33  5    receipt from the charge card.  That was what the

6    charge was, I think so.

7                (Reporter marked Exhibit No. 49 for

8                identification.)

9        Q.   BY MR. BRADSHAW:  So Ms. Slagle, just so

09:33 10    we are eliminating any mysteries here, the court

11    reporter has handed you a document marked Exhibit

12    49, which bears the Bates stamp CRT000505.  Take a

13    minute to look at that.

14        A.   Yep.

09:34 15        Q.   Do you recognize that?

16        A.   It is a credit card statement from a

17    credit card.

18        Q.   Do you recognize this as a credit card

19    statement from your credit card?

09:34 20        A.   Uh-huh.

21        Q.   Okay.  Is that a "yes"?

22        A.   Yes, sorry.

23        Q.   Okay.  Thank you.  And the -- there's a

24    lot of information that's blacked out because I

09:34 25    assume that's --

                                29

Margaret Slagle

1          A.    Other purchases.

2          Q.    -- other purchases, but there is one line

3    that appears to be a purchase, RadioShack, South

4    Burlington, Vermont in the amount of 238.23.

09:34  5          Do you see that?

6          A.    I do.

7          Q.    Is it your testimony that this document,

8    Exhibit 49, reflects the purchase price for the

9    Magnavox television that we've been discussing?

09:35  10         A.    Yes.

11         Q.    Okay.   So the amount here, 238.23, does

12   that represent the total amount that you believe

13   you paid for the television?

14         A.    Yes.

09:35  15         Q.    Okay.   And does this refresh your

16   recollection as to when you purchased it?

17         A.    It does.   I remember going in there, and

18   that's when I first moved, yeah, from my friend's

19   house.

09:35  20         Q.    And when would that have been?

21         A.    That's November of '04, yeah.

22         Q.    I guess that's my question.   It doesn't

23   look like there's a year on this statement.   Is it

24   your understanding that the 11 -- see on the

09:35  25   left-hand column there there's "11/26" and "11/29"?

30

Margaret Slagle

BARKLEY
Court Reporters

```
1        A.   Yeah.

2        Q.   Do you know what those two make reference

3   to?

4        A.   Yeah, one's the purchase date and one's

5   the clear date, I believe, like when it was posted

6   to the bank account or whatever.  I believe that's

7   usually what that means.

8        Q.   Okay.  So do you think that 11/26 was the

9   purchase date?

10       A.   I think so.

11       Q.   Okay.  And would that be '04?

12       A.   Yes, yes.

13       Q.   Okay.  So back to the amount here, 238.23,

14   does that represent the total amount that you paid?

15       A.   Yes.

16       Q.   Okay.  So that would include sales tax?

17   Is there sales tax in Vermont?

18       A.   Yes.

19       Q.   Did you -- when you purchased the Magnavox

20   television, was it on sale?

21       A.   I don't really remember if it was on sale

22   or not.  Yeah, I don't really remember.

23       Q.   It could have been?

24       A.   Yeah.

25            MR. GRALEWSKI:  Object to the form.
```

31

Margaret Slagle

BARKLEY
Court Reporters

```
 1   Misstates testimony.  Lacks foundation.
 2        Q.   BY MR. BRADSHAW:  Do you recall whether
 3   the television that you purchased was a
 4   discontinued item?
 5        A.   I don't recall that.  It's too long ago.
 6        Q.   Yeah.  Was there a rebate associated with
 7   your purchase, a manufacturer's rebate?
 8        A.   Not that I'm aware of.
 9        Q.   Did you purchase the extended warranty?
10        A.   No.
11        Q.   Did you have the product delivered to your
12   home?
13        A.   No.  I think I put it in the back of my
14   car, yeah.
15        Q.   So you didn't pay for delivery?
16        A.   Huh-uh.
17        Q.   Did you -- well, strike that.
18             Why did you choose the Magnavox
19   television?
20        A.   I guess it was just a good price, I
21   thought, in comparison.  It was close to my house,
22   and I needed a TV.  It was like "I need a TV.
23   There's nothing in my apartment."  So I bought it.
24        Q.   I'm sorry.  I didn't mean to jump in.  Did
25   you have anything else?
```

09:37 5
09:37 10
09:37 15
09:37 20
09:38 25

32

Margaret Slagle

BARKLEY
Court Reporters

1      A.   No.

2      Q.   You said the RadioShack was close to your

3   --

4      A.   Where I was living.

09:38  5      Q.   -- where you were living?   Where was that?

6   Where was the RadioShack located?

7      A.   I think it was over close to Essex

8   Junction, five corners area.

9      Q.   Five corners, what is that?

09:38  10      A.   Oh, it is a place in Vermont where five

11   streets intersect.

12      Q.   What city is that in?

13      A.   It's in Essex, or South Burlington on the

14   edge.

09:38  15      Q.   So there was a convenience factor for you

16   because the RadioShack was close by?

17      A.   Yeah.

18      Q.   Okay.   Did you investigate televisions at

19   all before you purchased the Magnavox?

09:38  20      A.   Not really.   I just wanted to go buy a TV.

21      Q.   Did you look at ads in the newspaper?

22      A.   I did not.

23      Q.   Did you look at information about

24   televisions on the Internet?

09:38  25      A.   No.

33

Margaret Slagle

BARKLEY
Court Reporters

1    Q.   Did you go to any other stores to look for

2  televisions?

3    A.   Not that I remember.  Because I just --

4  no.

09:39  5    Q.   Are there other stores nearby that sell

6  televisions?

7    A.   Oh, absolutely.

8    Q.   What are some of those stores?

9    A.   There's a Best Buy, but it is further down

09:39  10  the road.  Any department --

11    Q.   Okay.  Is there a Sears nearby?

12    A.   Yeah, there's a Sears.  It is not really

13  by Essex, but yeah, there's one.

14    Q.   Was there a Circuit City close by?  Even

09:39  15  though Circuit Cities are now out of business.

16    A.   I was going to say, I think there was,

17  yeah, yeah.

18    Q.   Walmart, is there a Walmart close by?

19    A.   The Walmart was here then, yes.

09:39  20    Q.   Sam's Club, is there a Sam's Club?

21    A.   No, there is not.

22    Q.   Do you know what a Sam's Club is?

23    A.   I do, yeah, yeah.

24    Q.   Okay.  Any other electronics stores that

09:40  25  sell televisions?

34

Margaret Slagle

BARKLEY
Court Reporters

1          A.    In this area?  Oh, I am sure.

2          Q.    Other than the ones that I just mentioned?

3          A.    I am sure Costco has them.

4          Q.    Is there a Target?

09:40  5          A.    No.

6          Q.    But when you purchased the Magnavox, you

7     didn't go --

8          A.    No, I didn't.

9          Q.    You didn't go to any of these other stores

09:40 10    to shop around?

11         A.    I didn't.

12         Q.    When you purchased the television at

13    RadioShack, were there other brands that were being

14    sold?

09:40 15         A.    There were other TVs there, but I didn't

16    pay attention to what the brands were, you know

17    what I mean?

18         Q.    Why not?

19         A.    Because I think I was just like "I want to

09:40 20    get it.  I want to get it done, and I want to get

21    it there."

22         Q.    Because you needed a TV right away?

23         A.    I had no television.

24         Q.    We don't want to be without our

09:40 25    television.

Margaret Slagle

BARKLEY
Court Reporters

1          Okay.  When you purchased the television,

2    did you have any questions for the salesperson?

3          A.   Oh, no, I don't think so, other than what

4    you would normally ask, what the price is and

09:41 5    stuff.  I didn't -- I don't remember specifically

6    what I would have asked them.

7          Q.   And have you been satisfied with the

8    television since you purchased it?

9          A.   Yeah, worked well, yeah.

09:41 10          Q.   Do you still have it?

11          A.   I do.

12          Q.   No complaints with its function?

13          A.   No.

14          Q.   Do you understand that all of the other

09:41 15    stores that we discussed, the Targets, the Best

16    Buys, the Costcos, the Walmarts, do you

17    understand -- is it your understanding that

18    RadioShack competes with those other stores for the

19    sale of televisions?

09:41 20          A.   I am sure they do, yeah.

21          Q.   Do you have any reason to think that's not

22    the case?

23          A.   No.

24          Q.   When you purchased the television, other

09:42 25    than the immediacy and the convenience factor that

36

Margaret Slagle

BARKLEY
Court Reporters

1    you just told us about, were there any other

2    features of the television that were important to

3    you?

4         MR. GRALEWSKI:  Object to the form of the

09:42  5    question to the extent it misstates testimony.

6         You can answer.

7         THE WITNESS:  I think it was just the -- I

8    am trying to think of how to say this.  It was so

9    it -- there was something with televisions at that

09:42 10    point in time that they could play DVD players or

11    something well, and I looked for that.

12    Q.   BY MR. BRADSHAW:  But it didn't -- does

13    your television have a DVD player within it?

14    A.   No.

09:42 15    Q.   Okay.

16    A.   No.  It had the connections on the front

17    or something like this.  It was easier.

18    Q.   Now, when you purchased the television,

19    did you purchase it with any other products?  And I

09:43 20    am talking about the Magnavox television now.

21    We'll get to the other one in a minute.

22    A.   Did I purchase it with any other products?

23    Q.   Did you buy a DVD player with it, for

24    instance?

09:43 25    A.   Oh, no, no, no.

37

BARKLEY
Court Reporters

1          Q.   Did you buy a VCR with it?

2          A.   No.

3          Q.   So you didn't buy it together with any

4     other products?

09:43  5          A.   No.

6          Q.   Okay.  Did you buy any accessory when you

7     purchased the television, any accessories to go

8     with the television?

9          A.   No.

09:43 10          Q.   Okay.  So no -- sometimes you'll need

11    cables to connect the television to a VCR, for

12    instance?

13          A.   I don't remember doing that.

14          Q.   You know what I'm talking about, the

09:43 15    cable?

16          A.   Yeah, the things that hook in the back.

17          Q.   But you didn't buy anything like that?

18          A.   I don't think so.  I don't remember doing

19    it.

09:43 20          Q.   Now, is it your allegation in this case

21    that you were damaged because of the purchase of

22    that television?

23          A.   Yes.

24          Q.   And how have you been injured or how have

09:44 25    you been damaged because of the purchase of that

38

Margaret Slagle

BARKLEY
Court Reporters

1    television?

2        A.   Well, by making the cost go up for me for

3    the price of the television.

4        Q.   When you paid $283.23 for the television,

09:44  5    was that a competitive price when you paid it?

6            MR. GRALEWSKI:   Object to the form of the

7    question.   Calls for a legal conclusion.

8            THE WITNESS:   I have no idea.   I only go

9    to the -- and look at the prices that were on the

09:44  10   shelf.   That's what I did, and what was within my

11   budget.

12       Q.   BY MR. BRADSHAW:   What do you think you

13   should have paid for the television?

14           MR. GRALEWSKI:   Same objection.

09:44  15           THE WITNESS:   Well, not more than that, I

16   guess.

17       Q.   BY MR. BRADSHAW:   Not more than the

18   238.23?

19       A.   No.

09:44  20       Q.   Well, you didn't pay more, so?

21       A.   Right.

22       Q.   Do you have any belief as to what you

23   should have paid for the television?

24           MR. GRALEWSKI:   Object to the form of the

09:45  25   question.

39

Margaret Slagle

BARKLEY
Court Reporters

1          THE WITNESS:  No.

2          MR. GRALEWSKI:  Calls for a legal

3   conclusion.

4      Q.   BY MR. BRADSHAW:  Have you had any

09:45  5   interactions with anyone from Magnavox since the

6   purchase of your television?

7      A.   No.

8      Q.   Customer service calls or anything like

9   that?

09:45  10      A.   No.

11      Q.   What about with RadioShack?

12      A.   No.

13      Q.   Okay.  So you just bought it --

14      A.   Did I go back in -- I probably went back

09:45  15   in RadioShack and bought batteries or something in

16   that store.

17      Q.   But no interaction in connection with the

18   television?

19      A.   No.

09:45  20      Q.   Okay.  When you purchased the television,

21   the Magnavox television, was RadioShack selling

22   LCD -- flat screen LCD televisions?

23      A.   I don't remember.

24      Q.   Do you know whether any of the other

09:46  25   electronic stores that we talked about earlier,

40

Margaret Slagle

BARKLEY
Court Reporters

1    Best Buy, Circuit City, Costco, Walmart, Target,

2    did any of those stores sell LCD televisions?

3        A.  Yeah, sure they did.  I didn't look, but

4    yeah.

09:46  5        Q.  Did you consider purchasing an LCD

6    television?

7        A.  I didn't at that point, no.

8        Q.  And why not?

9        A.  Because they were newer on the market,

09:46  10   yeah, more expensive.

11       Q.  How do you know they were more expensive?

12       A.  Just from things I'd see in the paper and

13   stuff.

14       Q.  Ads in the paper?

09:46  15       A.  Yeah.

16       Q.  So you did look at ads in the paper --

17       A.  Well, not for the purpose of buying a

18   television prior to that.  You know how you get

19   your Sunday paper and you look through?  I didn't

09:47  20   have the intent of purchasing it at that point.

21       Q.  What about a plasma, do you know what a

22   plasma television is?  Did you consider purchasing

23   a plasma television --

24       A.  Not at that point.

09:47  25       Q.  -- in November 2004?

41

Margaret Slagle

1       A.   Not at that point.

2       Q.   And why not?

3       A.   Expense.

4       Q.   Okay.  Your belief is that they were more

09:47  5   expensive?

6       A.   Yeah, they were new.  I think they were a

7   couple thousand dollars then or something.

8       Q.   Okay.

9       A.   But at that point, I really didn't.  I

09:47 10   just went in, "I'm buying this television" that

11   night.

12      Q.   What do you mean "that night"?

13      A.   Just when all that happened to me, when I

14   didn't have any television.  I was in my old place

09:47 15   of residing, which I was no longer living at.

16      Q.   Okay.  Let's talk now about the Sylvania

17   television, the second television that you

18   mentioned.  When did you purchase it?

19      A.   It was shortly after the Magnavox, about a

09:48 20   couple months or so.

21      Q.   Just thought of something I need to ask.

22   Going back to the -- sorry to jump around, but

23   going back to the Magnavox --

24      A.   Magnavox.

09:48 25      Q.   -- do you know how much RadioShack paid

42

Margaret Slagle

BARKLEY
Court Reporters

1     for the television?

2          A.   I don't.

3          Q.   Do you know whether RadioShack sold it to

4     you below RadioShack's cost?

09:48 5     A.   I don't know that.

6          Q.   Have you ever heard of the term "loss

7     leader"?

8          A.   What?

9          Q.   Loss leader.

09:48 10    A.   No.

11          Q.   Okay.  Have you ever heard of the concept

12    where a retailer will sell a product below its cost

13    in order to get customers into its store to

14    purchase other things, have you ever heard of that?

09:49 15    A.   I haven't heard of that specifically

16    because it doesn't make sense economically, but...

17          Q.   How would it not make sense economically?

18          MR. GRALEWSKI:  Object to the form.  Calls

19    for a legal conclusion.

09:49 20          THE WITNESS:  Okay.  What I heard you say

21    was they are going to sell it below the cost they

22    bought it for.

23          Q.   BY MR. BRADSHAW:  Right, in order to get

24    customers into their store to buy other things.

09:49 25    And I think you said that doesn't make sense

43

BARKLEY
Court Reporters

1    economically.  And I was just curious why that

2    doesn't make since economically?

3          MR. GRALEWSKI:  Same objections.

4          THE WITNESS:  Because it's below their

09:49  5    cost.

6      Q.  BY MR. BRADSHAW:  Right.  But if they're

7    getting customers into their store to buy a lot of

8    other things --

9      A.  Then they'll buy other stuff, yeah.

09:49  10          MR. GRALEWSKI:  Object -- hold on.  You

11    can finish your question.  I'm sorry, and then I'd

12    like to make an objection.

13      Q.  BY MR. BRADSHAW:  So my question is:  If

14    by selling one particular item below its cost in

09:50  15    order to incentivize customers to come to the store

16    and buy other things, that could be economically

17    beneficial to the store, correct?

18          MR. GRALEWSKI:  Object to the form of the

19    question.  Vague and ambiguous.  Incomplete

09:50  20    hypothetical.  Lacks foundation.  Calls for a legal

21    conclusion.

22          THE WITNESS:  Okay.  I guess it calls

23    for --

24      Q.  BY MR. BRADSHAW:  Well, you have to answer

09:50  25    the question.

44

Margaret Slagle

BARKLEY
Court Reporters

1        A.    Now you have to ask it.

2             MR. GRALEWSKI:  She has to answer the

3    question if you understand the question.  If you

4    don't understand the question, you can ask him to

09:50   5    rephrase it.

6             THE WITNESS:  Can you rephrase it?

7             MR. GRALEWSKI:  Or to restate it.

8        Q.    BY MR. BRADSHAW:  Sure, sure, sure.  You

9    told me that the hypothetical I posed to you

09:50  10    doesn't make economic sense.  So here's a situation

11    where I am going to ask it again.  Wouldn't it be

12    the case that if a retailer sells a product below

13    its cost, a single product below its cost, as an

14    incentive to get customers into the store,

09:50  15    customers then buy other products, that that is an

16    economic benefit to the store; isn't that correct?

17             MR. GRALEWSKI:  Object to the form of the

18    question.  Misstates testimony.  Vague and

19    ambiguous.  Incomplete hypothetical.  Lacks

09:51  20    foundation.  Calls for a legal conclusion.  Calls

21    for expert testimony.

22             You can answer.

23             THE WITNESS:  I don't think I know enough

24    about it to answer it after that.  You know, I

09:51  25    guess from my standpoint as a layperson, if you

45

Margaret Slagle

 1  have more customers in the store, you would have

 2  more potential people buying it, but it is not

 3  guaranteed.

 4       Q.   BY MR. BRADSHAW:  Okay.  But you don't

09:51 5  know what Circuit City -- excuse me, RadioShack,

 6  you don't know what RadioShack paid for the

 7  Magnavox television --

 8       A.   I don't.

 9       Q.   -- it sold you?

09:51 10      A.   I have no clue.

11            MR. GRALEWSKI:  Object to the form of the

12  question.  Lacks foundation.

13            If you could let him finish his question

14  and then pause to allow me to object, especially

09:51 15  with questions that he's asked you again.

16            THE WITNESS:  Okay.

17       Q.   BY MR. BRADSHAW:  Okay.  Now let's go to

18  the Sylvania television.

19       A.   Okay.

09:52 20      Q.   Just so you know where I'm going, we are

21  now off Magnavox, and we are on to Sylvania.

22       A.   Okay.

23       Q.   All right.  You purchased that television,

24  I think you said, a couple months after the

09:52 25  Magnavox, so let's say the beginning of '05?

46

BARKLEY
Court Reporters

1        MR. GRALEWSKI:  Object to the form of the

2    question.  Misstates it -- object to the question.

3    It misstates it.  Sorry.

4        Q.   BY MR. BRADSHAW:  Ms. Slagle, how did I

09:52  5    misstate your testimony?

6        A.   Repeat what you just said.

7        Q.   I think you told me, and correct me if I'm

8    wrong, that you purchased the Sylvania a couple

9    months after the Magnavox?

09:52 10        MR. GRALEWSKI:  Counsel, the record will

11    reflect what she said.  Object to the question.

12    Misstates testimony.  But since you asked, she said

13    shortly thereafter, but you can continue.

14        THE WITNESS:  Okay.

09:52 15        Q.   BY MR. BRADSHAW:  Okay.  So when did you

16    purchase the Sylvania television?

17        A.   Shortly after the Magnavox.  When?  It was

18    in '05, I believe, the beginning of '05.

19        Q.   Okay.  So the beginning of '05, which

09:53 20    would be a couple months after November; is that

21    correct?

22        A.   Yes.

23        Q.   Thank you for that clarification.  Where

24    did you purchase the Sylvania television?

09:53 25        A.   I don't remember.  I think it was -- I

47

Margaret Slagle

BARKLEY
Court Reporters

1  really don't remember.   I think it was RadioShack,

2  but I am not sure.

3       Q.   Do you have a receipt?

4       A.   I don't have a receipt for that one.

09:53  5       Q.   Have you looked for a receipt?

6       A.   I have.

7       Q.   Okay.  Have you checked your credit card

8  statements?

9       A.   I did, yeah.

09:53  10       Q.   Do you know how you paid for the

11  television, the Sylvania television?

12       A.   I don't.  I don't.

13       Q.   If you paid by credit card, would it have

14  appeared on your credit card statement?

09:53  15       A.   It could have been, or it could have been

16  on other credit cards, I am not sure.

17       Q.   So you had other credit cards other than

18  this Sears Gold MasterCard?

19       A.   Uh-huh.

09:53  20       Q.   And you checked those statements as well?

21       A.   As best I could, yeah.

22       Q.   Do you have any recollection as to how you

23  paid for the Sylvania television?

24       A.   I don't.  That was also a purchase that

09:54  25  was done quickly.

48

BARKLEY
Court Reporters

1 Q. And why was it done quickly?

2 A. Because my son was coming over, and he

3 wanted one for his room.  So I got him one for his

4 room.

09:54 5 Q. But you needed it on an immediate basis?

6 A. Yeah.

7 Q. Do you know who manufactures the Sylvania

8 television?

9 A. I thought it was Sylvania.  No, I don't

09:54 10 know.

11 Q. Sylvania is not a defendant in this case?

12 A. Yeah, yeah.

13 Q. And I am just curious, if Sylvania made

14 the television, why haven't you sued Sylvania?

09:54 15 MR. GRALEWSKI:  Object to the form of the

16 question.  Calls for a legal conclusion.

17 THE WITNESS:  Well, it was my

18 understanding that they bought parts from people

19 that did make the CRT tubes that were put into the

09:54 20 televisions.

21 Q. BY MR. BRADSHAW:  Okay.  So your belief is

22 that Sylvania purchased the CRT from someone else?

23 A. Uh-huh.

24 Q. Who did Sylvania purchase the CRT from?

09:54 25 A. Who did they?

49

Margaret Slagle

BARKLEY
Court Reporters

1    Q.   Yeah.

2    A.   I don't know.

3    Q.   Do you know whether the Sylvania

4    television has a CRT tube in it?

09:55  5    A.   It's the same objective appearance as the

6    Magnavox and is that technology.

7    Q.   Have you --

8    A.   It wasn't a flat screen, so...

9    Q.   Have you done anything to confirm that the

09:55  10   Sylvania television has a CRT tube in it?

11   A.   No.

12   Q.   You haven't called Sylvania to make sure

13   or opened up the TV to make sure or done anything

14   else?

09:55  15   A.   No.

16   Q.   Do you know who manufactured the CRT that

17   you believe is in the Sylvania television?

18   A.   Do I know who manufactured, no.

19   Q.   And you believe you purchased it from

09:55  20   RadioShack?

21   A.   I believe, yes.

22   Q.   Same store --

23   A.   I believe so.

24   Q.   -- where you purchased the Magnavox?

09:55  25   A.   Yeah.

50

Margaret Slagle

BARKLEY
Court Reporters

1          Q.   Same location?

2          A.   I believe it is, but I am not 100 percent

3    sure on that because it was like, "Let's go get

4    one."

09:56  5          Q.   How much did you pay for it?

6          A.   I don't know.   It would be about the same

7    price.   I don't have an exact receipt anymore.

8          Q.   So you don't know?

9          A.   I don't know.

09:56 10          Q.   And when you say you think or believe that

11   it was the same -- roughly the same price, why do

12   you believe that?

13          A.   Because I wouldn't have paid a lot more

14   for that for something I bought a few months

09:56 15   earlier for equitable value, in my mind as a

16   consumer.

17          Q.   Is it the same size?

18          A.   It is, I believe, yes.

19          Q.   So it has the same --

09:56 20          A.   Like this.

21          Q.   Well, do you know whether it's the same

22   size?

23          A.   It's approximately the same size, yes.

24          Q.   Just to your eye --

09:56 25          A.   Wait a minute.   One might be a little bit

51

Margaret Slagle

BARKLEY
Court Reporters

1    smaller than the other.  They have the square

2    front, yeah.  To my eye, they were very similar.

3         Q.   Which one do you think is smaller than the

4    other?

09:57  5         A.   I'd have to look at them again to see.  I

6    think maybe the Magnavox is bigger.

7         Q.   Is it possible that you paid for the

8    Sylvania with cash?

9         A.   It's possible, yeah.

09:57 10         Q.   Possible you paid with check?

11         A.   It's possible, but I would have had a

12    record of that, I would have thought.

13         Q.   Did you look for a canceled check --

14         A.   Uh-huh.

09:57 15         Q.   -- in connection with this lawsuit?  You

16    did?

17         A.   I looked through the receipts for those --

18    for the years trying to find proof that I purchased

19    it, yes.

09:57 20         Q.   Do you have a special place where you keep

21    receipts?

22         A.   In different places, yeah.

23         Q.   And you searched those different places --

24         A.   I did.

09:57 25         Q.   -- to try to find a receipt for the

52

Margaret Slagle

BARKLEY
Court Reporters

1    Sylvania?

2         A.   Yes.

3         Q.   But you were not able --

4         A.   I was not.

09:57  5         Q.   -- to find it?

6              MR. GRALEWSKI:  Try to remember to let him

7    finish his question.

8              THE WITNESS:  Sorry.

9              MR. GRALEWSKI:  It's okay.

09:58  10         Q.   BY MR. BRADSHAW:  Now, when you purchased

11   the Sylvania television, did you research

12   televisions prior to the purchase?

13         A.   I didn't.

14         Q.   Did you consider the purchase either of

09:58  15   the Magnavox television or the Sylvania television

16   to be a big purchase, a significant purchase for

17   you?

18         A.   At that point in time it was, yes.

19         Q.   And do you normally not investigate or

09:58  20   research the products that you're purchasing when

21   you're purchasing something that's a significant

22   purchase?

23         A.   Do I normally not research it?  I'd say

24   50/50.  Sometimes I do and sometimes I don't.

09:58  25         Q.   When you purchased the Sylvania

53

Margaret Slagle

BARKLEY
Court Reporters

1    television, did you visit any of the other stores

2    that compete with RadioShack for the sale of

3    televisions to look for it?

4        A.   I don't recall going, like, from store to

09:59  5    store and comparison shopping, no.

6        Q.   So the answer's no, you didn't do that?

7        A.   Yeah, yeah.

8        Q.   Did you comparison shop on the Internet?

9        A.   No.

09:59  10       Q.   Do you do that today?

11       A.   Sometimes, like for car purchases or

12    something like that.

13       Q.   You would go on the Internet and collect

14    information and compare prices?

09:59  15       A.   Today.  Back then, no, not as much as

16    today.

17       Q.   And I think you mentioned that you

18    purchased the Sylvania television for your son; is

19    that correct?

09:59  20       A.   That's correct.

21       Q.   Okay.  So your son didn't have a

22    television, and he needed one?

23       A.   He wanted one.

24       Q.   I have kids, too.  I understand the

09:59  25    difference between "want" and "need."

54

Margaret Slagle

BARKLEY
Court Reporters

1                When you went to RadioShack, was the

2     Sylvania television on sale?

3          A.   I don't remember.

4          Q.   Do you know whether it had a

10:00  5     manufacturer's suggested retail price associated

6     with it?

7          A.   I don't remember that either.

8          Q.   Do you know whether --

9          A.   I imagine.

10:00  10         Q.   You imagine that there was a

11    manufacturer's suggested retail price associated

12    with the television?

13         A.   I really don't remember that.

14         Q.   Do you know whether the price you paid was

10:00  15    lower than the manufacturer's suggested retail

16    price?

17         A.   I don't.  I wouldn't have any idea.

18         Q.   And what about with the Magnavox, do you

19    know whether it had a manufacturer's suggested

10:00  20    retail price associated with it?

21         A.   They had a price on it in the store.  Is

22    that what you're referring to as the

23    "manufacturer's suggested retail"?

24         Q.   A lot of times there will be a

10:00  25    manufacturer's suggested retail price --

55

BARKLEY
Court Reporters

1      A.   And then lower.

2      Q.   -- and then there will actually be a price

3   that's lower than the manufacturer's suggested

4   retail.

10:01  5      A.   I don't remember that.

6           MR. GRALEWSKI:  Object to the form of the

7   question.  Lacks foundation.

8      Q.   BY MR. BRADSHAW:  Do you understand my

9   question?

10:01 10      A.   Yes.  I don't remember if they had that or

11   not.

12      Q.   Back to the Magnavox, and I'll ask the

13   same question for the Sylvania, did you negotiate

14   the price with the salesperson?

10:01 15      A.   No.

16      Q.   Did you attempt to?

17      A.   No.

18      Q.   Okay.  You just went in, saw the price,

19   sticker price, boom?

10:01 20      A.   Yes.

21      Q.   Bought it?

22      A.   Yes.

23      Q.   Same thing with the Sylvania?

24      A.   Yes.

10:01 25      Q.   Did you negotiate price at all?

56

BARKLEY
Court Reporters

1          A.    No.

2          Q.    Okay.  Did the salesperson offer you in

3     either case an extended warranty for the product?

4          A.    I don't recall.

10:01 5          Q.    For the Sylvania, did you purchase an

6     extended warranty?

7          A.    No.

8          Q.    Did you purchase the product with any

9     other products, and I am talking about the

10:01 10    Sylvania, you know, VCR, DVD player?  I don't know,

11    maybe your son wanted a DVD player to go with his

12    television.  Did you purchase any other products

13    together with the TV?

14         A.    Not that I recall.

10:02 15         Q.    Did you purchase any accessories to go

16    with it, cables --

17         A.    I don't recall that.

18         Q.    -- antenna, anything like that?

19         A.    No, not an antenna or cable.

10:02 20         Q.    So as far as you know, it was just the

21    television?

22         A.    Yes.

23         Q.    And why didn't you buy a Magnavox when you

24    went back to purchase the Sylvania?

10:02 25         A.    I don't remember.  I guess it was just the

                                57

BARKLEY
Court Reporters

1    price, and he liked it, and it fit his room.

2        Q.   Do you remember what other television

3    products were being sold by RadioShack at the time?

4        A.   No, I just walked up there, and there was

10:02  5    a wall of televisions.

6        Q.   Different sizes --

7        A.   Yeah.

8        Q.   -- different brands, different types of

9    television?

10:02 10    A.   Yes.

11        Q.   Big wall with all kinds of different

12    products?

13        A.   No, it wasn't a big store, but there were

14    other options.  There were other televisions there.

10:03 15        Q.   And why did you settle on the Sylvania?

16        A.   I don't --

17            MR. GRALEWSKI:  Object to the form of the

18    question.

19            You can answer.

10:03 20            THE WITNESS:  I don't know why other than

21    it fit the room, the size and the price.  My son

22    was okay with that.

23        Q.   BY MR. BRADSHAW:  When you say "the

24    price," can you describe what you mean when you say

10:03 25    "the price"?

58

Margaret Slagle

BARKLEY
Court Reporters

1       A.   Well, it was equitable for what I bought

2  the Magnavox for, from my recollection.

3       Q.   So you thought it was a good price?

4            MR. GRALEWSKI:   Object to the form.

10:03  5  Misstates testimony.

6            THE WITNESS:   I accepted the price.

7       Q.   BY MR. BRADSHAW:   After you purchased

8  it -- do you still have the television today?

9       A.   I do.

10:04  10  Q.   Have you had any issues with it?

11      A.   No.

12      Q.   Are you happy with its operation?

13      A.   Yes.

14      Q.   In either the case of the Magnavox or the

10:04  15  Sylvania television, after you purchased it, did

16  you investigate with any of the other retailers

17  that sell TVs what the prices of comparable

18  televisions were?

19      A.   I didn't because I had those and that was

10:04  20  off the list.

21      Q.   And you just thought -- didn't do anything

22  more about it.  Didn't check to see just to make

23  sure that you got a good price by checking another

24  alternative, you didn't do that?

10:04  25  A.   Not at that point, no.

59

BARKLEY
Court Reporters

1     Q.   Have you done it at any point?

2     A.   For those, no.

3     Q.   So at no point after you purchased those

4  products did you go back to another store, look at

10:04  5  a different brand or even the same brand to confirm

6  in your mind that you paid a good price?

7     A.   No.

8     Q.   Has your son been happy with the TV?

9     A.   Well, yeah.

10:05 10     Q.   Does your son know --

11     A.   He's in college now, so...

12     Q.   Is the television still at your place of

13  residence?

14     A.   Uh-huh.

10:05 15     Q.   Are both televisions still at your place

16  of residence?

17     A.   Uh-huh.

18     Q.   With respect to the Sylvania television,

19  do you know how much RadioShack paid for the

10:05 20  television?

21     A.   No, huh-uh.

22     Q.   Do you know whether RadioShack offered it

23  to you below RadioShack's cost?

24     A.   I don't know.

10:05 25     Q.   If it was higher than RadioShack's cost,

60

BARKLEY
Court Reporters

1   do you know how much higher?

2        A.   Repeat that again.

3        Q.   If the price that RadioShack sold you the

4   television was higher than what it paid for the

10:06  5   television, do you know by how much?

6        A.   No, huh-uh.

7        Q.   When you purchased the Sylvania, did you

8   consider -- did you have something to add?

9        A.   No, I was just trying to say Sylvania, we

10:06 10   are on Sylvania now?

11       Q.   I am trying to be clear if I'm going back

12   and forth or if I'm even talking about both.

13       A.   Okay.

14       Q.   Right now I am talking about Sylvania.

10:06 15       A.   Okay.

16       Q.   When you purchased the Sylvania

17   television, did you consider an LCD television?

18       A.   Did I, no.

19       Q.   Did you consider a plasma television?

10:06 20       A.   No.

21       Q.   Was the Sylvania television, as far as you

22   knew, a new television?

23       A.   When I bought it?

24       Q.   Yeah.

10:07 25       A.   Yeah.

61

Margaret Slagle

BARKLEY
Court Reporters

1       Q.   So it wasn't refurbished?

2       A.   No.

3       Q.   Same thing for the Magnavox?

4       A.   Correct.

10:07  5       Q.   And I think I asked you this with the

6    Magnavox, but was the Sylvania a display model or a

7    floor model?

8       A.   I don't know.

9       Q.   You know what I'm talking about, display

10:07  10    model, the one that's on display, and sometimes

11    they don't have any more in stock, but they say,

12    "I'll sell you the one that's right here"?

13       A.   I don't know.

14       Q.   Because a lot of time if that happens, if

10:07  15    because it is on display, they will sell it to you

16    at a lower price?

17       A.   Right.

18       Q.   But as far as you know --

19       A.   I don't believe it was.

10:07  20       Q.   As far as you know, it was brand-spanking

21    new?

22       A.   Yeah.

23       Q.   Right out of the box?

24       A.   Yes.

10:07  25       Q.   And the same thing for the Magnavox?

62

Margaret Slagle

BARKLEY
Court Reporters

1        A.    Yes.

2        Q.    With respect to -- well, we need to change

3    tapes, so why don't we go off the record.

4              THE WITNESS:  Okay.

10:07  5        THE VIDEOGRAPHER:  The time is now 10:09,

6    and we are going off the record.

7              (Whereupon a recess was taken.)

8              THE VIDEOGRAPHER:  The time is now 10:22,

9    and we are on the record.

10:21  10   Q.   BY MR. BRADSHAW:  Welcome back,

11   Ms. Slagle.  We are back on the record, and I would

12   just remind you that you are still under oath.

13             Do you understand that?

14        A.    I do.

10:21  15   Q.   Okay.  I had some follow-up questions on

16   the Sylvania television.  I may have asked these

17   questions.  If I did, I am not intentionally trying

18   to repeat.  But as far as you know, the product was

19   not on sale; is that correct?

10:21  20   A.   Correct.

21        Q.    Okay.  And did you pay for a delivery for

22   the product or did you just take it out of the

23   store with you?

24        A.    I believe I took it out of the store with

10:22  25   me.

63

Margaret Slagle

BARKLEY
Court Reporters

1          Q.   You didn't pay anybody at RadioShack to

2     come set it up for you?

3          A.   No.

4          Q.   And same thing for the Magnavox, you

10:22  5     didn't pay anybody to come set it up for you?

6          A.   No.

7          Q.   Did you pay tax on it, on the Sylvania?

8          A.   I am sure I did.  There's sales tax in

9     Vermont.

10:22  10         Q.   But you don't know how much you paid for

11    it?

12         A.   I don't.

13         Q.   Is it fair to say that you've produced in

14    this case all of the documentation, whether it's a

10:22  15    receipt or an invoice or a credit card statement or

16    a canceled check, whatever the documentation is,

17    that you produced all the documentation you've been

18    able to locate associated with either of the two

19    purchases?

10:22  20         A.   Yes.

21         Q.   Okay.  On the Sylvania, again, you didn't

22    purchase an extended warranty?

23         A.   No.

24         Q.   Did you get the warranty that came, the

10:23  25    standard manufacturer's warranty, to the best of

64

Margaret Slagle

BARKLEY
Court Reporters

1    your knowledge?

2        A.   I would assume that that would come with

3    the purchase.

4        Q.   Okay.  But you don't have any specific

10:23  5    knowledge one way or the other whether there was a

6    warranty, a manufacturer's standard warranty

7    associated with the television?

8        A.   That didn't affect me to buy it or not,

9    yeah.

10:23  10        Q.   Do you know whether RadioShack, when it

11   purchases its televisions, purchases them in bulk

12   quantities?

13        A.   I don't know that.

14        Q.   Do you know whether RadioShack is able to

10:23  15   negotiate a better price for the televisions that

16   it purchases because it purchases them in

17   significant quantities?

18            MR. GRALEWSKI:  Object to the form.  Calls

19   for speculation.  Lacks foundation.

10:24  20            THE WITNESS:  I don't know.

21        Q.   BY MR. BRADSHAW:  Is RadioShack located --

22   does RadioShack have stores across the country, as

23   far as you know?

24        A.   Yes.

10:24  25        Q.   So it's located really in all locations

65

Margaret Slagle

BARKLEY
Court Reporters

1    across the country?

2        A.   Yes.  They have more than one store, yeah.

3        Q.   Okay.  All right.  But you don't know

4    whether or not RadioShack is able to negotiate

10:24  5    better prices for the televisions that it purchases

6    because it's purchasing them in large quantities?

7            MR. GRALEWSKI:  Object to the form of the

8    question.  Asked and answered.  Calls for

9    speculation.  Lacks foundation.

10:24 10            THE WITNESS:  I don't know that.

11        Q.   BY MR. BRADSHAW:  With the Sylvania, you

12    didn't negotiate the price with the salesperson,

13    correct?

14        A.   Huh-uh.

10:24 15        Q.   Did you have any conversation with the

16    salesperson when you purchased the Sylvania set?

17        A.   I am sure I spoke to them.

18        Q.   Did you ask him or her some questions?

19        A.   I can't remember that.

10:24 20        Q.   Was your son with you when you purchased

21    the television?

22        A.   I don't remember that.  The first one

23    definitely not.  The first one --

24        Q.   The second one, the Sylvania?

10:25 25        A.   I don't recall if he was or not.  I know

66

BARKLEY
Court Reporters

1   he liked it, but I am not sure if he was there or

2   if it was when he came to my apartment.

3       Q.   Do you personally know how much CRT tubes,

4   just the tube --

10:25   5       A.   Excuse me, contact.

6       Q.   No problem.  Are you okay?

7       A.   Yes.

8       Q.   Do you know how much the actual cost of

9   the tube is in a television?

10:25  10       A.   No.

11       Q.   Do you know what percentage of the overall

12   price of a television, or cost of a television, the

13   cost of the tube is?

14       A.   No.

10:25  15       Q.   Do you know whether -- do you know whether

16   the price of CRT televisions has been going up or

17   has been going down?

18       A.   No.

19       Q.   Do you think if you were to purchase the

10:26  20   Magnavox television today, would it be lower in

21   price or higher in price than what you purchased in

22   2004?

23           MR. GRALEWSKI:  Object to the form.  Calls

24   for speculation.

10:26  25           THE WITNESS:  I don't know.

67

Margaret Slagle

BARKLEY
Court Reporters

1      Q.   BY MR. BRADSHAW:  You don't know?

2      A.   Don't know if it would be higher or lower?

3      Q.   Yes.

4      A.   No, I don't.

10:26  5      Q.   You have no idea what the prices of CRT

6   televisions have been doing over the years?

7      A.   Well, I could guess, but I don't know.  I

8   mean...

9      Q.   What's your guess?

10:26  10      MR. GRALEWSKI:  Object to the form of the

11   question.  Calls for speculation.

12      THE WITNESS:  Yeah, I want to answer it

13   honestly, and I really don't know.

14      Q.   BY MR. BRADSHAW:  And I am not trying to

10:26  15   be difficult.

16      A.   Okay.

17      Q.   You don't know whether the prices of CRT

18   televisions over time have been going up, have been

19   going down or have stayed the same, you just don't

10:27  20   know?

21      A.   I don't.

22      Q.   Never looked into it?

23      A.   I didn't.

24      Q.   What about prices of LCD televisions?

10:27  25      A.   Those were always more expensive to me

68

BARKLEY
Court Reporters

1    when I looked at them.

2        Q.   Do you know whether the price of an LCD

3    television, let's say a 30-inch television, 30-inch

4    LCD television, do you think the price is higher

10:27  5   today than it was in 2004 or 2005?

6        A.   I would have to guess on that.  I would

7    say it may be lower today.  I don't know.  I really

8    don't know.  I don't know.

9        Q.   Have you purchased -- I'm sorry.  Didn't

10:27 10  mean to cut you off.

11       A.   That's it, I just don't know.

12       Q.   Have you ever purchased an LCD television?

13       A.   Yes.

14       Q.   When did you purchase an LCD television?

10:28 15       A.   That was -- I'm thinking it was almost a

16   year after I purchased the other televisions, yes,

17   I did.

18       Q.   So roughly November of 2005 or January --

19       A.   Something like that.

10:28 20       Q.   -- January of 2006, February of 2006?

21       A.   It was later.  Because I was into my

22   apartment.  I had the other two TVs.

23       Q.   And do you know how much you paid for that

24   television?

10:28 25       A.   I don't know exactly, but it was over a

69

Margaret Slagle

BARKLEY
Court Reporters

```
 1    thousand dollars.
 2         Q.   And who did you purchase that from?
 3         A.   That from?  Best Buy, I think, yeah.
 4         Q.   Okay.  And how big is that television?
10:28 5    A.   Forty-two.
 6         Q.   Forty-two inches?
 7         A.   Yeah.
 8         Q.   Okay.  And to the best of your knowledge,
 9    it was over a thousand dollars?
10:28 10   A.   Yes.
11         Q.   Okay.  And you don't know one way or the
12    other if that same television, if you bought it
13    today, whether it would be higher or lower --
14         A.   I haven't even looked at prices, yeah.
10:29 15   Q.   With the Sylvania, was there a
16    manufacturer's rebate for the product --
17         A.   Not that I am aware of.
18         Q.   -- as far as you know?  So you don't
19    recall --
10:29 20   A.   Definitely didn't.
21         Q.   Let me just finish the question.
22         A.   I'm sorry.
23         Q.   I know you know where I'm going.  I know
24    you know what my questions are going to be, but
10:29 25   just for the record so it is clear.
```

70

BARKLEY
Court Reporters

1          You don't remember sending your receipt in

2     with a little form that you filled out to the

3     manufacturer for a $50 or $100 rebate or something

4     like that, you don't recall doing that?

10:30    5          A.   No.

6          Q.   Before you filed this lawsuit, Ms. Slagle,

7     did you research the companies that manufacture

8     CRTs?

9          A.   Did I research the companies, no.

10:30   10          Q.   Did you do anything to try to identify

11    specific companies that manufacture or sell CRT

12    tubes?

13          A.   No.

14          Q.   Didn't make any investigation along those

10:30   15    lines?

16          A.   No.

17          Q.   Did you make any effort to investigate or

18    research companies that sell televisions for

19    computer monitors?

10:30   20          A.   No.

21          Q.   Before you filed this lawsuit against my

22    clients and others, did you research the CRT

23    industry in any way?

24          A.   No.

10:31   25          Q.   Did you research the consumer electronics

Margaret Slagle

BARKLEY
Court Reporters

       1    industry in any way?

       2         A.    No.

       3         Q.    Did you research the retail industry in

       4    any way for the sale of consumer electronics?

10:31  5         A.    No.

       6         Q.    Have you had any interactions in any way

       7    with any representative from either of my clients,

       8    Samsung Electronics Company or Samsung Electronics

       9    America, Incorporated?

10:31  10        A.    No.

       11        Q.    What about any representatives from any of

       12   the other defendants in this case?

       13        A.    No.

       14        Q.    Okay.  So you've never interacted, had a

10:32  15   conversation, discussed or spoke with any

       16   representatives from any of the companies that are

       17   named as defendants in this case?

       18        A.    No.

       19        Q.    Did you make the decision who to sue?

10:32  20        A.    I relied upon my attorney.

       21        Q.    But did you personally make that decision

       22   or did you rely on your attorney's advice?

       23             MR. GRALEWSKI:  Just to be clear --

       24             THE WITNESS:  Sorry.

10:32  25             MR. GRALEWSKI:  Sorry.  You're talking

                                 72

                          Margaret Slagle

BARKLEY
Court Reporters

1      about who?

2            MR. BRADSHAW:  Yeah, which entities to

3      sue.

4         Q.   Did you --

10:32 5         A.   I relied on my attorneys.

6         Q.   So you didn't make the decision personally

7      about who to sue in this case?

8         A.   That's correct.

9         Q.   And I'm correct that this is the first

10:32 10     time that you've been a plaintiff in a lawsuit

11     other than your divorce proceeding, correct?

12            MR. GRALEWSKI:  Object to the form of the

13     question.  Asked and answered.

14            THE WITNESS:  Yes.

10:32 15        Q.   BY MR. BRADSHAW:  Was that a difficult

16     decision for you to make?

17        A.   What do you mean by that?

18        Q.   It's a serious decision --

19        A.   Yeah.

10:33 20        Q.   -- to decide to sue, to bring a lawsuit

21     and allege very serious allegations --

22        A.   Right.

23        Q.   -- against my clients.

24        A.   Right.

10:33 25        Q.   You made that decision to join the

73

Margaret Slagle

BARKLEY
Court Reporters

1    lawsuit.  And my question is:  Was that a serious

2    big decision for you?

3         A.   Yes.

4         Q.   But you didn't research any of the

10:33  5    industries involved before you decided to sue my

6    client and others --

7              MR. GRALEWSKI:  Object to the form.

8    Sorry.

9         Q.   BY MR. BRADSHAW:  -- isn't that correct?

10:33  10             MR. GRALEWSKI:  Object to the form of the

11   question.  Asked and answered and argumentative.

12             THE WITNESS:  Okay.  I relied on my

13   attorneys to do that.

14        Q.   BY MR. BRADSHAW:  But you personally, if I

10:33  15   understand your prior testimony, you did nothing to

16   research the CRT industry.  You did nothing to

17   investigate the consumer electronics industry, the

18   retail industry, the television industry before you

19   decided to sue my clients and others in this

10:34  20   lawsuit; isn't that correct?

21             MR. GRALEWSKI:  Counsel, that's the last

22   time I am going to let you ask that question.  I am

23   going to object to the form.  It's been asked and

24   answered, and it's argumentative.

10:34  25             You can answer.

74

Margaret Slagle

BARKLEY
Court Reporters

1          THE WITNESS:  I didn't.

2      Q.   BY MR. BRADSHAW:  So I haven't

3  mischaracterized your testimony in any way, shape

4  or form?

10:34  5      A.   Well, I relied on my attorneys for doing

6  that.

7      Q.   For doing what?  What did you rely on your

8  attorneys for?

9      A.   For investigating that.  I didn't

10:34  10  personally do research on that CRT tubes.

11      Q.   Have you ever spoken with an economic

12  expert or an industry expert in this case?

13      A.   No.

14      Q.   And I'm correct that the only person that

10:35  15  you've -- the only persons that you've discussed,

16  that you've had any conversation with in connection

17  with this case are your counsel?

18      A.   Correct.

19      Q.   Mr. Gralewski and Ms. Kirkpatrick,

10:35  20  correct?

21      A.   Correct.

22          (Reporter marked Exhibit No. 50 for

23          identification.)

24      Q.   BY MR. BRADSHAW:  Ms. Slagle, I have just

10:36  25  handed you a document marked as Exhibit 50.  Go

75

Margaret Slagle

BARKLEY
Court Reporters

 1   ahead and take your time, take a moment to look at

 2   that.

 3           MR. GRALEWSKI:  Counsel, while she's

 4   looking at the document, I just want to mention,

10:36  5   because it may not be apparent, that there are

 6   Bates numbers on this document.

 7           MR. BRADSHAW:  Oh, there are.

 8           THE WITNESS:  There are what?  Okay.

 9           MR. BRADSHAW:  Oh, that little red thing

10:37 10   down at a bottom.

11           MR. GRALEWSKI:  Yes.  And at a break, I

12   can clarify what those numbers are, if you don't

13   know, for the record.  But I think that either the

14   way the documents were produced to you when they

10:37 15   were printed, when they print out, they are

16   microscopic.  But anyway, they were produced to

17   you.

18           MR. BRADSHAW:  I didn't bring my bifocals.

19           MR. GRALEWSKI:  That still wouldn't help.

10:37 20   But anyway, that's all.

21               (Discussion off the record.)

22       Q.  BY MR. BRADSHAW:  Ms. Slagle, do you

23   recognize the document, documents that have been

24   marked as Exhibit 50?

10:38 25       A.  They are pictures of my television.

76

Margaret Slagle

BARKLEY
Court Reporters

1          Q.    And what television is that?

2          A.    It's the Sylvania.

3          Q.    And is it fair to say that the first page

4     of this document is the front of the television?

10:38   5          A.    Yes.

6          Q.    A picture of the front of the television?

7          A.    Yes.

8          Q.    And is it fair to say that the second page

9     of Exhibit 50 is a picture of the model number,

10:38  10     maybe it is on the back of the television or on the

11     side of the television somewhere?

12          A.    Right.

13          Q.    Is that fair to say?

14          A.    Yes.

10:38  15          Q.    Okay.  And this is the Sylvania television

16     that we've been discussing throughout the course of

17     this deposition?

18          A.    Okay.

19          Q.    Is that --

10:38  20          A.    Yes.

21          Q.    -- accurate?  Okay.  I assume it is, that

22     it is not some other Sylvania television?

23          A.    Correct.

24          Q.    This is the television that you purchased

10:38  25     --

77

Margaret Slagle

BARKLEY
Court Reporters

```
 1         A.    Yes.
 2         Q.    -- on or about January or February '05,
 3    correct?
 4         A.    Or December '04.
10:39  5   Q.    Or December -- okay.  All right.
 6         A.    I can't remember exactly.
 7         Q.    But this is the television that you
 8    purchased for your son, and it is the television
 9    that you are not sure what you paid for it,
10:39 10   correct?
11         A.    Yeah, I bought them both close together.
12    So...
13         Q.    But Ms. Slagle, all I am --
14         A.    This is -- okay.  Go ahead.
10:39 15   Q.    All I am trying to establish is that this
16    is not a picture of some other Sylvania television
17    set that we haven't been discussing today?
18         A.    Oh, correct, yeah.  I only had two.
19         Q.    So this is a picture of the television set
10:39 20   we have been discussing today --
21         A.    Yeah.
22         Q.    -- correct?
23         A.    Correct.
24         Q.    Did you take these pictures?
10:39 25   A.    I borrowed a camera and my boyfriend took
```

78

Margaret Slagle

BARKLEY
Court Reporters

1    it.

2         Q.   And did you take these pictures for the

3    purpose of this litigation?

4         A.   Yes.

10:40 5   Q.   Now, does anything you see in Exhibit 50

6    refresh your recollection about when you purchased

7    the product?

8         A.   Yeah, I'm looking at September '04.

9         Q.   Just to clarify, you're referencing Page 2

10:40 10  where it says, "Manufactured September 2004"?

11        A.   Yeah.

12        Q.   So the answer to the question is what?

13        A.   Repeat the question.

14        Q.   Does this refresh your recollection as to

10:40 15  when you purchased this product?

16        A.   Yeah, it was around that time, yeah.

17        Q.   Around September '04?

18        A.   Yeah.

19        Q.   So did you buy this before the Magnavox?

10:40 20  A.   Maybe.  I'd have to look at the stuff.

21   They were all together.  One was like at the end of

22   the month because I moved into that apartment and

23   bought one for myself, and the second one I bought

24   for my son shortly thereafter.

10:40 25       Q.   Okay.  All right.  But we know how much

79

Margaret Slagle

1   you paid for the Magnavox because we have the

2   credit card statement, correct?

3       A.   Right.

4       Q.   We don't know how much you paid for the

10:41   5   Sylvania because you didn't have the receipt?

6       A.   Yeah, one of them I didn't have the

7   receipt for, and one of them I had the credit card

8   statement for.

9       Q.   Right.  And when we looked at the credit

10:41   10   card statement, it is Exhibit 49, I believe, and

11   just so the record's clear, because it doesn't --

12   is that credit card --

13       A.   Says 11/26, yeah.

14       Q.   Is that credit card statement, does it

10:41   15   reflect the purchase of the Magnavox television?

16       A.   I guess.

17       Q.   I think that's what you testified to

18   earlier?

19       A.   Yeah, yes.

10:41   20       Q.   And going back to Exhibit 50 and looking

21   at Exhibit 50, does this exhibit refresh -- either

22   refresh your recollection or give you any idea who

23   manufactured the CRT tube in the television?

24       A.   No.

10:42   25       Q.   So you don't know if it was actually one

80

Margaret Slagle

BARKLEY
Court Reporters

1    of the defendants that manufactured the CRT in your

2    television?

3        A.   I just know it was manufactured by

4    Sylvania, that that was the...

10:42  5      Q.   The television was manufactured by

6    Sylvania, right?

7        A.   Yeah.

8        Q.   But the CRT, you don't know who

9    manufactured --

10:42  10     A.   I don't.

11               (Reporter marked Exhibit No. 51 for

12               identification.)

13                 (Discussion off the record.)

14               THE VIDEOGRAPHER:   The time is now 10:45,

10:43  15   and we are going off the record.

16               (Whereupon a recess was taken.)

17               THE VIDEOGRAPHER:   The time is now 10:46,

18   and we are on the record.

19       Q.   BY MR. BRADSHAW:   Ms. Slagle, we are back

10:45  20   on the record, and I would just remind you that you

21   are still under oath.

22               Do you understand that?

23       A.   I do.

24       Q.   And the court reporter has handed you a

10:45  25   document that's marked as Exhibit 51.

81

Margaret Slagle

BARKLEY
Court Reporters

1         A.    Yes.

2         Q.    Which does have Bates numbers on them,

3    which we will at some point clarify, although they

4    are microscopic, so we can't read them into the

10:45  5   record.

6              Have you had a chance to look at Exhibit

7    51?

8         A.    Yes.

9         Q.    What is Exhibit 51?

10:46 10       A.    It is a picture of my Magnavox television.

11        Q.    And just to clarify, the first page is a

12   picture of the front of the television; is that

13   correct?

14        A.    That's correct.

10:46 15       Q.    And then Page 2 of Exhibit 51, what is

16   that?

17        A.    It looks like the back of the TV with the

18   manufacturers and the barcodes.

19        Q.    Okay.  And that's for the Magnavox

10:46 20  television?

21        A.    Correct.

22        Q.    Did you take these pictures?

23        A.    With the camera, yeah, my boyfriend's

24   camera.

10:46 25       Q.    And did you take them for the purposes

82

Margaret Slagle

BARKLEY
Court Reporters

1    of -- for purposes of this litigation?

2        A.   Yes.

3        Q.   In looking at Exhibit 51, does anything in

4    Exhibit 51 give you any indication of who actually

10:46  5    manufactured the CRT tube in the television?

6        A.   No.

7        Q.   And you don't know which entity

8    manufactured the tube in your television, correct?

9        A.   No.

10:47 10        Q.   Going back to the Sylvania television --

11    when you purchased the product, is it your --

12    strike that.

13             Do you believe you've been damaged as a

14    result of your purchase of the Sylvania television?

10:47 15        A.   Economically.

16        Q.   In what way economically?

17        A.   Well, if the allegations are correct,

18    there was price-fixing, and that makes the cost go

19    up for the end consumer.

10:47 20        Q.   What if the allegations are incorrect,

21    have you been damaged?

22             MR. GRALEWSKI:  Object to the form of the

23    question.  Vague and ambiguous.  Calls for a legal

24    conclusion.

10:48 25             THE WITNESS:  If the allegations are

83

Margaret Slagle

BARKLEY
Court Reporters

1    incorrect, would I be damaged?  If the free market

2    economy was allowed to work, then I suppose the

3    answer would be no.

4        Q.   BY MR. BRADSHAW:  And if RadioShack sold

10:48  5    you the product, the Sylvania television, at a cost

6    that was lower than what it paid for the

7    television, would you have been damaged

8    economically?

9             MR. GRALEWSKI:  Sorry.  Object to the form

10:48 10    of the question.  Lacks foundation.  Calls for a

11    legal and expert testimony.

12             THE WITNESS:  Yeah, if -- repeat that

13    again.

14        Q.   BY MR. BRADSHAW:  If RadioShack had sold

10:49 15    you the television at a cost less -- at a price

16    less than what it paid for the television, have you

17    been damaged economically?

18             MR. GRALEWSKI:  Object to the form of the

19    question.  Lacks foundation.  Calls for legal and

10:49 20    expert testimony.  It's also an incomplete

21    hypothetical.

22             THE WITNESS:  Okay.  And I should still

23    answer it?  I guess.

24        Q.   BY MR. BRADSHAW:  Yes.  You're required to

10:49 25    answer it.

84

Margaret Slagle

BARKLEY
Court Reporters

         1        A.    Okay.  I don't know if I would be because

         2    I don't know all the components that go into that,

         3    but I guess as a straight answer there, from

         4    RadioShack's perspective, no.

10:49    5        Q.    If the manufacturers of CRTs, let's say

         6    hypothetically that they agreed to raise prices of

         7    the tubes, but they never actually implemented any

         8    of those price increases, okay, if that were the

         9    case, were you damaged economically when you

10:50   10    purchased your television?

        11            MR. GRALEWSKI:  Object to the form of the

        12    question.  Incomplete hypothetical.  Lacks

        13    foundation.  Vague and ambiguous and calls for

        14    legal and expert testimony.

10:50   15            THE WITNESS:  Gosh, I'd have to say I'd

        16    have to hear the experts talk about it.  So what

        17    you're asking me is that you -- if they did talk

        18    about it, but not implement it?

        19        Q.    BY MR. BRADSHAW:  Correct.

10:50   20        A.    Would I be damaged?  I don't know.

        21        Q.    That's your answer, you don't know?

        22        A.    Yeah, I really don't know.  It seems there

        23    are a lot of factors I don't know about, but I

        24    can't really give you -- it seems like not the

10:51   25    right thing to do.

                                   85

BARKLEY
Court Reporters

1    Q.   But you don't know whether or not you

2    would have been damaged economically in that

3    scenario?

4         MR. GRALEWSKI:  Object to the form of the

10:51  5    question.  Asked and answered.  Incomplete

6    hypothetical.  Lacks foundation.  Vague and

7    ambiguous.  Calls for legal and expert testimony.

8         THE WITNESS:  I don't know.

9    Q.   BY MR. BRADSHAW:  And what about if the

10:51  10    CRT in your television was manufactured by a

11    company that is not alleged to have participated in

12    the price-fixing conspiracy, if that were the case,

13    have you been damaged economically by the purchase

14    of your television?

10:52  15         MR. GRALEWSKI:  Object to the form.  Vague

16    and ambiguous.  Incomplete hypothetical.  Lacks

17    foundation.  Calls for legal and expert testimony.

18         THE WITNESS:  I would assume no.

19    Q.   BY MR. BRADSHAW:  And what if the scenario

10:52  20    hypothetically speaking is one in which the

21    entities that purchased the CRT tubes, for whatever

22    reason, were not able to pass along any increase in

23    the price of those tubes, incorporate that price

24    into the price of the television in that scenario,

10:53  25    would you have been damaged economically by the

86

Margaret Slagle

BARKLEY
Court Reporters

1    purchase of your television?

2              MR. GRALEWSKI:  Object to the form of the

3    question.  Vague and ambiguous.  Lacks foundation.

4    Incomplete hypothetical, and calls for legal and

10:53  5    expert testimony.

6              THE WITNESS:  Okay.  So I don't know.

7    There's a lot of things involved in it, it seems

8    like it to me.

9              MR. BRADSHAW:  Okay.  Why don't we go off

10:54  10    the record a moment.

11             THE VIDEOGRAPHER:  The time is now 10:55,

12    and we are going off the record.

13                  (Whereupon a recess was taken.)

14                  (Previously marked Exhibit No. 11 for

10:55  15                  identification.)

16             THE VIDEOGRAPHER:  The time is now 10:56,

17    and we are on the record.

18        Q.   BY MR. BRADSHAW:  We are back on the

19    record now, Ms. Slagle, and I am just reminding you

10:55  20    that you are under oath.

21             The court reporter has handed you a

22    document marked as Exhibit 11, which is titled

23    "Indirect Purchaser Plaintiffs' Third Consolidated

24    Amended Complaint."  This is an exhibit which has

10:55  25    been introduced in prior depositions, and I believe

87

Margaret Slagle

BARKLEY
Court Reporters

1    by agreement, rather than keep introducing the same

2    document as a new exhibit, we are using the exhibit

3    number from a prior deposition.

4            And Ms. Slagle, I would just note that the

10:55  5    copy that the court reporter has has a few little

6    notes on the front.  You can just ignore that and

7    pretend it's not there.  I think plaintiffs'

8    counsel is okay with that.

9            MR. GRALEWSKI:  Yeah, absolutely.  And

10:55 10    just to clarify, those notes are unrelated to the

11    litigation.

12            THE WITNESS:  Okay.

13        Q.   BY MR. BRADSHAW:  So Ms. Slagle, take a

14    moment to look at Exhibit 11.  Take as much time or

10:56 15    as little time as you need, but I will have some

16    questions about it.  And where I have a specific

17    question, I'll direct your attention to a specific

18    part of the document.  So I don't expect you to

19    have an encyclopedic memory of all 103 pages.

10:56 20        A.   Okay.

21        Q.   Do you recognize Exhibit 11, which is

22    "Indirect Purchaser Plaintiffs' Third Consolidated

23    Amended Complaint"?

24        A.   That's what it says it is, "Indirect

10:56 25    Purchaser Plaintiffs' Third Consolidated Amended

88

Margaret Slagle

BARKLEY
Court Reporters

Complaint."

Q.   Right.  My question is:  Do you recognize
it?  Do you recognize this document?  Have you seen
it before?

10:57   A.   I saw several documents come through since
the beginning of this.  So...

Q.   So the answer to the question is?

A.   I guess I recognize it as being one of the
documents that came through in the case.

10:57   Q.   Okay.  You do recognize it?

A.   Yes, I do.

Q.   Did you provide any information that is
included within Exhibit 11?

A.   I don't know.

10:57   Q.   Do you recall when you saw Exhibit 11?

A.   I don't recall when.

Q.   Was it --

A.   I see it is dated, isn't it?  File 2 of --
yeah, okay.  This is the third complaint amended.

10:58   Q.   The document, Exhibit 11, does have a date
on it.  I think it is dated December 10th, 2010?

A.   Right.

Q.   Here's my question for you:  Do you have a
recollection of seeing this document before

10:58   December 10th, 2010?

Margaret Slagle

BARKLEY
Court Reporters

1      A.   Not a specific one.  I saw documents that

2   came through, but I don't remember any specifics in

3   this, yeah.

4      Q.   Okay.  Do you recall seeing this document

10:58  5   recently?

6      A.   Yeah, I read -- I read one all the way

7   through.  I am not sure if it was this one really

8   completely.

9      Q.   I think my question -- I think my question

10:58 10   to you was do you recall seeing this document

11   recently, within the last few weeks?

12      A.   No.

13      Q.   Okay.  Again, did you provide any

14   information that is included within this document?

10:59 15      A.   Gosh, I'd have to ask you.

16          MR. GRALEWSKI:  Yeah, I think she wants to

17   answer your question, and it is 103-page document.

18   And I think you told her you don't want her to look

19   through the whole thing, but you are going to refer

10:59 20   to things.  So it is a hard question.

21          So I will object to the form.  Calls for a

22   legal conclusion.  Vague and ambiguous.

23          THE WITNESS:  I guess there's an answer in

24   here somewhere.

10:59 25      Q.   BY MR. BRADSHAW:  So the answer to my

90

Margaret Slagle

BARKLEY
Court Reporters

1    question is did you provide any information that's

2    included within this document, to the best of your

3    recollection and knowledge?

4          MR. GRALEWSKI:  Same objections.

10:59  5          THE WITNESS:  Yeah, it's so big, I'd have

6    to find the part.  I guess it's possible I did, I

7    just don't know where I would have had it.

8          Q.   BY MR. BRADSHAW:  Did you review this

9    document before it was filed?

11:00  10         A.   Did I?  Not in detail.  I read it.  It was

11    signed by Mary.

12         Q.   If you go, Ms. Slagle, to Paragraph 48 of

13    the document.  It's on Page 9, I believe.

14         A.   Okay.  Page 9.  Here's Page 9.

11:00  15         Q.   Paragraph 48, just going to direct your

16    attention to Paragraph 48.  I think you're looking

17    at Page 6.

18         A.   Sorry.  I was looking up top.

19         Q.   Understandable.

11:01  20         A.   Oh, that makes more sense.

21          MR. GRALEWSKI:  These are the paragraphs

22    here.

23          THE WITNESS:  Oh, yeah, here I am, yeah.

24         Q.   BY MR. BRADSHAW:  Have you had a chance to

11:01  25    look at Paragraph 48?

91

Margaret Slagle

BARKLEY
Court Reporters

1       A.   Yeah.

2       Q.   And in Paragraph 48 where it says that you

3  are a Vermont resident, that's a true statement,

4  correct?

11:01  5       A.   That's correct.

6       Q.   Okay.  And you've lived in Vermont since

7  1988, I think you said?

8       A.   That's correct.

9       Q.   By the way, do you own any homes or

11:01  10 properties anywhere else?

11      A.   I own property in Missouri with a

12 family -- it is part of a family farm.

13      Q.   Do you pay taxes in Missouri?

14      A.   Yes, on the farm, yeah.

11:01  15      Q.   And how long have you owned that property?

16      A.   Since my mom and dad passed away.  So '01.

17      Q.   Now, the second sentence, just directing

18 your attention back to Paragraph 48, it says:

19              "During the relevant period,

11:02  20             Ms. Slagle indirectly purchased CRT

21             products from one or more defendants

22             or their coconspirators and has been

23             injured by reason of the antitrust

24             violations alleged in this complaint."

11:02  25             Do you see that?

92

Margaret Slagle

BARKLEY
Court Reporters

1          A.    I do.

2          Q.    Now, the CRT products that you have

3     purchased are the two televisions that we have been

4     discussing today, the Magnavox television that's

11:02  5   reflected in Exhibit 51 and the Sylvania television

6     that's reflected in Exhibit 50, correct?

7          A.    That's correct.

8          Q.    And you've never purchased an actual CRT

9     tube?

11:02 10        A.    Except what was in the television.

11         Q.    I understand that, but as a stand-alone

12    product?

13         A.    No.

14         Q.    Okay.  So, for instance, you never --

11:02 15   let's say that the tube burned out and you had to

16    buy a replacement tube?

17         A.    Right.

18         Q.    As a stand-alone product, you've never

19    done that?

11:03 20        A.    No.

21         Q.    Okay.  Now, if you go back to Paragraph 1,

22    which is on Page 1, and I am looking at the page

23    numbers at the bottom of the page.

24         A.    Yes.

11:03 25        Q.    Do you see that paragraph?

93

Margaret Slagle

BARKLEY
Court Reporters

1      A.   Uh-huh, I do.

2      Q.   The second sentence of that paragraph

3   reads:

4              "Plaintiffs allege that during the

11:03  5              class period, the defendants conspired

6              to fix, raise, maintain and/or

7              stabilize prices of CRT products sold

8              in the United States."

9           Do you see that?

11:03  10      A.   I do.

11      Q.   Do you have any personal knowledge

12   regarding the allegation that I just read in that

13   sentence?

14      A.   I relied on my attorneys.

11:03  15      Q.   Well, I understand you relied on your --

16   what did you rely on your attorneys for?

17      A.   For educating me about the case, about CRT

18   tubes, that they were inside my television.

19      Q.   Okay.  But this specific paragraph --

11:04  20   excuse me, the sentence that I just read has an

21   allegation regarding a conspiracy to fix, raise,

22   maintain and/or stabilize prices of CRT products

23   sold in the United States.

24           Do you see that?

11:04  25      A.   I do.

94

BARKLEY
Court Reporters

1          Q.   Do you have any personal knowledge

2     regarding that allegation?

3          A.   No.

4          Q.   I'll get to several paragraphs, but do you

11:04  5     have any personal knowledge regarding any of the

6     allegations set forth in Exhibit 51 -- excuse me,

7     Exhibit 11, this complaint?

8          A.   You mean personal knowledge that I found

9     out on my own or read in the newspaper?

11:04  10          Q.   All of the above.

11          A.   No.

12          Q.   Do you have any personal knowledge

13     regarding any of the allegations in Exhibit 11?

14          A.   No.

11:05  15          MR. GRALEWSKI:  I am just going to --

16     sorry.

17          THE WITNESS:  Okay.  No.

18          MR. GRALEWSKI:  Just a belated objection

19     to the extent it mischaracterizes prior testimony,

11:05  20     but you can answer.

21          THE WITNESS:  Okay.

22          Q.   BY MR. BRADSHAW:  Why don't you turn to

23     page --

24          A.   I think I just don't understand the

11:05  25     question.  Okay.  Go ahead.

95

BARKLEY
Court Reporters

1      Q.   Well, I can ask it again.  Do you have any

2    personal knowledge regarding any of the allegations

3    in this complaint?  "Personal knowledge" meaning

4    you've had experience, you've read, you've

11:05  5    investigated, anything that provides a factual

6    basis for any of the allegations in this complaint,

7    do you have a personal knowledge or a personal

8    factual basis based on your understanding and your

9    knowledge regarding any of the allegations in the

11:05  10    complaint --

11      A.   Well, I --

12          MR. GRALEWSKI:  Object to the form of the

13    question as phrased.  It is misleading and

14    mischaracterizes prior testimony, but she can

11:06  15    answer.

16          THE WITNESS:  I knew about it because I

17    purchased the TVs.  That's it.  I didn't go out

18    and, like, research it.

19      Q.   BY MR. BRADSHAW:  Right.  So Paragraph 48,

11:06  20    you have personal knowledge regarding the fact that

21    you're a resident of Vermont, correct?

22      A.   Oh, yes.

23      Q.   And you have personal knowledge of the two

24    CRT -- the two televisions that you claim include a

11:06  25    CRT, you have personal knowledge regarding those

96

BARKLEY
Court Reporters

1    purchases, correct?

2         A.   Yes, I purchased them.

3         Q.   Is there anything else regarding any of

4    the other allegations in this complaint that you

11:06  5    have personal knowledge of?

6         A.   No.

7         Q.   Okay.  If you go to Page 12.

8         A.   I have it.

9         Q.   Paragraph 61.

11:07  10        A.   Okay.

11        Q.   Do you see that?

12        A.   I do.

13        Q.   Okay.  The second sentence there, if you

14   look at the second sentence?

11:07  15        A.   Yes.

16        Q.   Are you alleging that SEC, Samsung

17   Electronics Co., Ltd., manufactured, marketed, sold

18   or distributed CRT tubes?

19        A.   It says "products."

11:07  20        Q.   And I'm seeking clarification.  Are you

21   alleging in this paragraph that SEC manufactured,

22   marketed, sold or distributed CRT tubes?

23        A.   Yes.

24        Q.   You are making that allegation?

11:07  25        A.   I think -- it's my understanding that a

97

Margaret Slagle

BARKLEY
Court Reporters

 1   tube is part of a product.  It would be a CRT tube

 2   product.

 3        Q.   Are you alleging that SEC manufactured,

 4   marketed, sold or distributed on a stand-alone

11:07  5   basis the CRT tube?

 6        A.   I don't know.

 7        Q.   Did you have any --

 8        A.   Stand-alone basis?

 9        Q.   Does it make CRTs?  It's an easy question.

11:08 10        A.   Okay.

 11        Q.   Does SEC -- are you alleging that SEC

 12   manufacturers tubes?

 13             MR. GRALEWSKI:  Object to the form of the

 14   question.  I'll withdraw it.

11:08 15             You can answer if you understand the

 16   question.  Actually, I am going to interpose an

 17   objection to the preamble to the question, which

 18   was improper.

 19             You can answer the question.

11:08 20             THE WITNESS:  Okay.  Am I alleging that

 21   SEC manufactured CRT tubes?

 22        Q.   BY MR. BRADSHAW:  Tubes, did it make tubes

 23   ever?

 24             MR. GRALEWSKI:  Object to the form of the

11:08 25   question.  That question lacks foundation.  Vague

98

BARKLEY
Court Reporters

1    and ambiguous.

2           You can answer.

3           THE WITNESS:  Okay.  I don't know.

4      Q.   BY MR. BRADSHAW:  Okay.  So you don't know

11:08   5    whether SEC manufactured --

6      A.   I relied on my attorneys.

7      Q.   Okay.  But I understand that.  I

8    understand that.  And just so your testimony's

9    clear, you don't know whether you're alleging in

11:09  10    this paragraph -- let me finish the question.

11     A.   Sorry.

12     Q.   With all due respect, you are not sure,

13    based on what's being alleged here, whether SEC

14    manufactured, marketed, sold and/or distributed

11:09  15    tubes?

16           MR. GRALEWSKI:  Object to the form.  Asked

17    and answered.  Argumentative.

18           THE WITNESS:  I think that's what the

19    complaint's about.

11:09  20    Q.   BY MR. BRADSHAW:  So you think that's what

21    this allegation is actually stating?

22           MR. GRALEWSKI:  Same objections.

23           THE WITNESS:  That's what it says.

24     Q.   BY MR. BRADSHAW:  Well, no, it actually

11:09  25    says "distributed CRT products," and that's what

99

Margaret Slagle

BARKLEY
Court Reporters

1    I'm trying to get clarification on.

2        A.   That the tubes are part of the products?

3        Q.   No, I am just trying to understand whether

4    or not you're alleging here that during the class

11:10  5    period SEC manufactured, marketed, sold and/or

6    distributed tubes.

7            MR. GRALEWSKI:  That was a statement, not

8    a question.  So there's no question pending.

9        Q.   BY MR. BRADSHAW:  Did SEC manufacture

11:10 10    tubes?

11            MR. GRALEWSKI:  Object to the form.

12        Q.   BY MR. BRADSHAW:  And are you alleging it

13    in the complaint?

14            MR. GRALEWSKI:  Asked and answered.

11:10 15    Argumentative.

16            MR. BRADSHAW:  She hasn't answered it.

17        Q.   So go ahead.

18        A.   Yes.

19        Q.   Okay.  So you are alleging that.  And

11:10 20    what's your basis for alleging that?

21        A.   I relied on my attorneys to provide that

22    information.

23        Q.   Do you have any personal knowledge that

24    SEC manufactured tubes?

11:10 25        A.   No.

100

Margaret Slagle

BARKLEY
Court Reporters

1      Q.   Okay.  And do you have any basis for why
2  your attorneys would make that allegation?
3          MR. GRALEWSKI:  I'll instruct her not to
4  answer that question to the extent it would reveal
11:10  5  any communications with counsel.
6          She can answer the question based on her
7  own personal knowledge.  She can answer it.
8          Would you like the question back?
9          THE WITNESS:  Sure.
11:10 10          MR. BRADSHAW:  Go ahead.  Read it back.
11              (Reporter read back as requested.)
12          THE WITNESS:  Do I have any basis for why
13  my attorneys would make that allegation?  No.  I
14  mean, I don't know.  I guess I am not understanding
11:11 15  the question.
16      Q.   BY MR. BRADSHAW:  Okay.  Did you
17  investigate at all before filing and suing my
18  clients before --
19      A.   I relied on their --
11:11 20      Q.   Can I finish the question?
21      A.   You may, yeah.
22      Q.   Whether my clients actually manufactured
23  tubes, did you investigate that?
24          MR. GRALEWSKI:  Object to the form of the
11:11 25  question.  Asked and answered.  Argumentative.

101

Margaret Slagle

BARKLEY
Court Reporters

1            THE WITNESS:  I relied on my attorneys to

2     do that.

3        Q.   BY MR. BRADSHAW:  Do you know whether your

4     attorneys investigated whether my clients ever

11:11  5     manufactured tubes before suing my clients, before

6     you sued my clients?

7        A.   Do I know if they did?

8        Q.   Yeah.

9            MR. GRALEWSKI:  I'll just interpose an

11:11 10     objection.  If you can answer that question based

11     on your own knowledge, you can certainly answer.

12     Don't reveal any communications with your lawyers.

13            THE WITNESS:  Okay.  I assume they did.

14        Q.   BY MR. BRADSHAW:  Do you think it's

11:12 15     appropriate to have a good-faith basis to make an

16     allegation in a complaint before you actually make

17     that allegation?

18            MR. GRALEWSKI:  Object to the form of the

19     question.  Calls for a legal conclusion.

11:12 20     Argumentative.  Misleading.  Lacks foundation.

21     Vague and ambiguous.

22            THE WITNESS:  Okay.

23        Q.   BY MR. BRADSHAW:  Do you think it's

24     appropriate?  Do you think you should have --

11:12 25        A.   I trust them.

102

Margaret Slagle

BARKLEY
Court Reporters

1    Q.   No, do you think -- you personally, do you

2    think it is appropriate to have a good-faith basis

3    to make an allegation in a legal complaint before

4    actually making that complaint and making -- filing

11:12   5    that complaint and making the allegation?

6             MR. GRALEWSKI:  Same objections.

7             THE WITNESS:  Okay.  I want you to slow it

8    down and ask me that again.

9        Q.   BY MR. BRADSHAW:  Okay.  Should a

11:12   10   plaintiff in a lawsuit have a good-faith basis for

11   making allegations before it actually makes those

12   allegations in a complaint?

13       A.   Yeah.

14       Q.   Yeah, right.  You would agree with that

11:13   15   statement?

16       A.   Uh-huh.

17       Q.   Okay.  If you go to Page 62, or Paragraph

18   62, it's the paragraph right below the one we were

19   just looking at.

11:13   20       A.   Okay.  You said page.  This one right

21   here, "defendant Samsung"?

22       Q.   Samsung Electronics America, Inc.?

23       A.   Yep.

24       Q.   You see that?

11:13   25       A.   Uh-huh.

103

Margaret Slagle

BARKLEY
Court Reporters

1      Q.    And why don't you go ahead and read the

2   third sentence.

3          MR. GRALEWSKI:  "During"?

4          MR. BRADSHAW:  "During the class period,"

11:13  5   I think is the third sentence, if I am counting my

6   sentences correctly.

7          MR. GRALEWSKI:  Thank you.  I wanted to

8   make sure we were reading the right thing.

9          THE WITNESS:  Okay.

11:13  10      Q.    BY MR. BRADSHAW:  Is it your allegation

11   that SEAI manufactured CRT tubes?

12      A.    Yes, that's what it says.

13      Q.    That's what that sentence says?

14      A.    It says "products" again.

11:14  15      Q.    But you believe that includes --

16      A.    Yeah.

17      Q.    -- tubes?  Okay.  Do you have any basis

18   for making that allegation?

19      A.    I relied on my attorneys.

11:14  20      Q.    Do you have any personal knowledge that

21   SEAI manufactured tubes?

22      A.    No.

23      Q.    Do you think it would be appropriate to

24   allege that they manufactured tubes when, in fact,

11:14  25   they never have manufactured tubes ever?

104

Margaret Slagle

BARKLEY
Court Reporters

1          MR. GRALEWSKI:  Object to the form of the

2     question.  Calls for a legal conclusion.  Lacks

3     foundation.  Vague and ambiguous.

4          THE WITNESS:  Okay.  Repeat it again,

11:14  5     because I heard him.

6          Q.  BY MR. BRADSHAW:  Do you think it is

7     appropriate to allege that an entity manufactured

8     something that it has never manufactured?

9          MR. GRALEWSKI:  Same objections.

11:14  10          THE WITNESS:  No, not if they didn't

11     manufacture it.

12          Q.  BY MR. BRADSHAW:  If they didn't

13     manufacture it?

14          A.  Yeah.

11:14  15          Q.  But you never investigated that before

16     filing a lawsuit?

17          A.  I relied on my attorneys for that.

18          Q.  Do you know whether your attorneys

19     investigated it before they filed the lawsuit?

11:15  20          MR. GRALEWSKI:  You can answer the

21     question.

22          THE WITNESS:  Did I -- repeat.

23          Q.  BY MR. BRADSHAW:  Do you know whether your

24     attorneys investigated it before they filed the

11:15  25     lawsuit?

105

Margaret Slagle

BARKLEY
Court Reporters

1       A.   I assume they did.

2       Q.   But you don't know one way or the other?

3       A.   No.

4       Q.   If you go back to Paragraph 1.

11:15   5       A.   The introduction?

6       Q.   Yeah.

7       A.   Yes.

8       Q.   It is Paragraph 1.  I asked you some

9    questions earlier about the second sentence which

11:16   10   starts "Plaintiffs allege."

11      A.   Yes.

12      Q.   So again, that sentence says:

13           "Plaintiffs allege that during the

14           class period, the defendants conspired

11:16   15           to fix, raise, maintain and/or

16           stabilize prices of CRT products sold

17           in the United States."

18           Do you see that?

19      A.   I do.

11:16   20      Q.   Okay.  Do you have any personal knowledge

21   of whether SEC or SEAI conspired to fix the price

22   of tubes?

23      A.   I relied on my attorneys for that.

24      Q.   So is the answer to that question "no"?

11:16   25      A.   Correct.

Margaret Slagle

BARKLEY
Court Reporters

1          Q.   If you could go to Page 31 of the

2     complaint, Paragraph 134.  Go ahead and read that

3     paragraph, Ms. Slagle.

4          A.   Okay.

11:18  5    Q.   Is it your allegation that SEC and SEAI,

6     my clients, engaged in a contract, combination,

7     trust or conspiracy, the effect of which has been

8     to raise, fix, maintain and/or stabilize the prices

9     at which they sold CRT tubes.  Are you alleging

11:18 10    that?

11         A.   Yes, that's what it says.

12         Q.   Okay.  And you're making that allegation

13    even though SEC and SEAI have never, in fact,

14    manufactured tubes?

11:18 15         MR. GRALEWSKI:  Object to the form of the

16    question.  Argumentative.  Lacks foundation.  Calls

17    for a legal conclusion.

18         THE WITNESS:  I relied on my attorneys for

19    that.

11:18 20    Q.   BY MR. BRADSHAW:  Okay.  But the answer to

21    the question -- I understand you're relying on your

22    attorneys, but the answer to the question is "yes"

23    or "no."  And I'll repeat the question.

24         A.   Please.

11:19 25    Q.   Are you, in fact, alleging that SEC and

107

Margaret Slagle

BARKLEY
Court Reporters

```
 1    SEAI engaged in a conspiracy to fix the price of

 2    CRT tubes even though those entities have never

 3    manufactured or sold CRT tubes?

 4              MR. GRALEWSKI:  Lacks foundation.

 5    Argumentative.  Calls for a legal conclusion.

 6    Object to the form.

 7              THE WITNESS:  Okay.  Yes.  That's what it

 8    says.

 9         Q.  BY MR. BRADSHAW:  Yeah, okay.  Okay.  Have

10    you ever sold anything in your life?

11         A.  I worked in a retail store before I was a

12    nurse.

13         Q.  Uh-huh, and what did you sell?

14         A.  Jeans.

15         Q.  Jeans, right.  Okay.  And let's say

16    hypothetically that somebody said that you fixed

17    the price of shoes even though you were selling

18    jeans, would that be appropriate?

19              MR. GRALEWSKI:  Object to the form.

20    Incomplete hypothetical.  Calls for a legal

21    conclusion.

22              THE WITNESS:  No.

23         Q.  BY MR. BRADSHAW:  It wouldn't be right,

24    would it?

25         A.  Right.
```

108

BARKLEY
Court Reporters

```
 1            MR. GRALEWSKI:  Belated -- same objections

 2    to your last, "It wouldn't be right, would it"

 3    question.  Same objections.

 4        Q.   BY MR. BRADSHAW:  If you could turn to

 5    Paragraph 214.  Do you have the right paragraph?

 6        A.   I think so.  It says "Defendants'

 7    conspiracy to fix, raise."

 8        Q.   That's right.  Go ahead and read the first

 9    two sentences.

10        A.   Out loud?

11        Q.   No, I'll spare you.  Just read them to

12    yourself.

13        A.   Okay.  Thank you.

14        Q.   You see the second sentence there where it

15    says:

16                "The entire overcharge at issue was

17                passed on to plaintiffs and members of

18                the indirect purchaser classes."

19        Do you see that?

20        A.   I do.

21        Q.   What's your basis for making that

22    allegation?

23        A.   My basis would be that the end consumer,

24    the actual person, me, who purchased the TV, if the

25    prices were fixed, if they were manipulated in any
```

Margaret Slagle

BARKLEY
Court Reporters

1  manner, they would have made them go up for the end

2  consumer.

3      Q.   Right, but I don't think that's what that

4  sentence says.  The sentence says:

11:24  5          "The entire overcharge at issue was

6              passed on to the plaintiffs."

7      A.   "The entire overcharge at issue was passed

8              on to the plaintiffs and members of

9              the indirect purchaser classes."

11:24  10     Q.   Right.  What's your basis for alleging the

11  entire overcharge, assuming there was one, was

12  passed on to you?

13          MR. GRALEWSKI:  Object to the form.  Asked

14  and answered.  Argumentative.  Misstates testimony.

11:24  15          THE WITNESS:  My basis would be that if

16  someone paid a certain amount for something and

17  passed it on, and either that the end consumer

18  would be paying the most, you know.

19          MR. BRADSHAW:  Okay.  We have to go off.

11:24  20  We have to change tapes.

21          THE WITNESS:  Okay.

22          THE VIDEOGRAPHER:  The time is now 11:24,

23  and we are going off the record.

24          (Whereupon a recess was taken.)

11:34  25          THE VIDEOGRAPHER:  The time is now 11:36,

110

BARKLEY
Court Reporters

1   and we are on the record.

2        Q.   BY MR. BRADSHAW:  Welcome back,

3   Ms. Slagle.  We just took a short break, and we are

4   now back on the record, and I would just remind you

11:34  5   that you are still under oath.

6        A.   Correct.

7        Q.   Before we broke for that short break, I

8   was asking you about Paragraph 214 in the

9   complaint.  So why don't you turn back to that.  It

11:35  10  is Page 48.  And I think I had asked you some

11  questions about the second sentence in that

12  paragraph, the sentence that reads:

13             "The entire overcharge at issue was

14             passed on to plaintiffs and members of

11:35  15            the indirect purchaser classes."

16        Do you see that?

17        A.   I do.

18        Q.   Now, with respect to the two televisions

19  that you purchased, you don't know how much

11:35  20  RadioShack paid for those televisions, correct?

21        A.   Correct.

22        Q.   Okay.  Do you know whether to the extent

23  that there was an overcharge, whether RadioShack

24  passed those overcharges on to you, do you know

11:35  25  that for a fact?

111

Margaret Slagle

BARKLEY
Court Reporters

 1      A.   I relied on my attorneys to tell me that.

 2      Q.   Did your attorneys tell you that as a

 3 matter of fact -- let me ask the question.  She

 4 opened the door.

11:36  5      Let me ask you, did your attorneys tell

 6 you that RadioShack passed on any alleged

 7 overcharge in its entirety to you when you

 8 purchased the television?

 9      MR. GRALEWSKI:  Ms. Slagle, you are

11:36 10 instructed not to answer that question on the basis

 11 of the attorney-client privilege.

 12      Q.   BY MR. BRADSHAW:  Are you going to follow

 13 your counsel's advice?

 14      A.   Yes.

11:36 15      Q.   Okay.  So what did you mean when you said

 16 that you relied on your counsel?

 17      A.   What I meant was any of the information

 18 regarding charges or anything involved in this, I

 19 am not an expert witness, not a witness, but

11:36 20 information, I relied on them for that.

 21      Q.   Which expert witness?

 22      A.   I retracted that and said "expert," you

 23 know, any kind of investigation with this, I relied

 24 on them for the information.

11:36 25      Q.   Okay.  Well, let me ask you this:  Let's

                        112

BARKLEY
Court Reporters

1    say that RadioShack paid $210 for your Magnavox

2    television.  Got that?

3         A.    Uh-huh.

4         Q.    So $200 -- excuse me, $210.

11:37  5         A.    210.

6         Q.    And $10 of that was the hypothetically

7    alleged overcharge, okay?  Let's say that for

8    whatever reason, RadioShack decided it was going to

9    sell the product for $205 instead of $210, what it

11:37 10    paid for it, because it wanted to get rid of the

11    product, put it on sale, wanted to move it, okay?

12    If that were the case, were you actually -- has the

13    entire overcharge of $10 been passed on to you?

14         MR. GRALEWSKI:  Objection to the form.

11:37 15    Incomplete hypothetical.  Lacks foundation.  Calls

16    for legal and expert testimony.

17         THE WITNESS:  I would say I wouldn't have

18    enough information about what went into that to

19    make that decision.

11:37 20         Q.    BY MR. BRADSHAW:  Well, how would you not

21    have enough information?  RadioShack paid $210.

22    They sold it to you for $205, and under the

23    hypothetical $10 is the amount of the overcharge.

24    So how does that not -- how do you not have enough

11:38 25    information to determine whether or not the entire

113

Margaret Slagle

BARKLEY
Court Reporters

```
 1   $10 was passed on to you?
 2          MR. GRALEWSKI:  Object to the form of the
 3   question.  Compound.  Argumentative.  Incomplete
 4   hypothetical.  Lacks foundation.  Calls for legal
 5   and expert testimony.
 6      Q.   BY MR. BRADSHAW:  Go ahead.
 7      A.   For that very reason.
 8      Q.   That doesn't make any sense.
 9      A.   There's so much --
10      Q.   You --
11      A.   Well --
12          MR. GRALEWSKI:  Woe, woe, woe.  I just
13   want to caution the witness to respond to
14   questions.
15          THE WITNESS:  Okay.
16          MR. GRALEWSKI:  That's what we're here to
17   do today.
18          THE WITNESS:  Okay.  I guess I am.
19          MR. GRALEWSKI:  Maybe you should have the
20   question read back if you don't know what the
21   question is that's pending.
22          THE WITNESS:  Well, let me see.  You said
23   if RadioShack paid $210 for it.  So you're making
24   all this a hypothetical --
25      Q.   BY MR. BRADSHAW:  Sure.
```

11:38 (lines 5, 10, 15, 20, 25)

114

BARKLEY
Court Reporters

1    A.   -- question?

2    Q.   Sure.

3    A.   If they paid 210 and sold it to me for

4    205, would it be -- what are you saying again?

11:39  5    Q.   Would the $10 overcharge have been passed

6    on in its entirety to you?

7         MR. GRALEWSKI:  Object to the form of the

8    question.  Incomplete hypothetical.  Lacks

9    foundation.  Calls for legal and expert testimony.

11:39 10   Argumentative and compound.

11        THE WITNESS:  With those facts alone, I

12   would say no.

13   Q.   BY MR. BRADSHAW:  Okay.  Now, let's say

14   that RadioShack paid $210 for the television, a

11:39 15   hypothetical overcharge is $10, but instead of

16   passing on the full $10 to you, it only passed on 5

17   and charged you $215.  If that's the scenario, has

18   the entire overcharge been passed on to you?

19        MR. GRALEWSKI:  Object to the form.

11:39 20   Incomplete hypothetical.  Lacks foundation.  Calls

21   for legal and expert testimony.  Argumentative and

22   compound.

23        THE WITNESS:  I am reading it here.  No.

24   Q.   BY MR. BRADSHAW:  Why don't you turn to

11:40 25   Page 92 of the complaint.

115

BARKLEY
Court Reporters

1          MR. GRALEWSKI:  At the bottom, right?

2          MR. BRADSHAW:  Ninety-two at the bottom,

3     not the top.

4          MR. GRALEWSKI:  Yep, thank you.

11:40  5     Q.   BY MR. BRADSHAW:  Why don't you read

6     Paragraph 284 and 285.

7     A.   Okay.  I have read 284 and 285.

8     Q.   Right.  Do you have any personal knowledge

9     regarding the allegations made in 284 and 285?

11:41 10    A.   No.

11         MR. GRALEWSKI:  Belated objection; asked

12    and answered.

13         MR. BRADSHAW:  I am trying to get through

14    before lunch.

11:43 15    Q.   So if you could turn to Page 76, and

16    Paragraph No. 266.

17    A.   Okay.

18    Q.   If you look at -- I direct your attention

19    to Subpart (a) of Paragraph 266.

11:44 20         MR. GRALEWSKI:  Depending on what your

21    question is, I am going to ask that she be

22    permitted to read the whole paragraph.

23    Q.   BY MR. BRADSHAW:  Go ahead, if you want to

24    read the whole paragraph.

11:44 25         MR. GRALEWSKI:  Thank you.  Paragraph 266.

116

Margaret Slagle

BARKLEY
Court Reporters

```
 1                THE WITNESS:  Okay.  Okay.
 2        Q.   BY MR. BRADSHAW:  In Paragraph 266, Sub
 3   (a) it says:
 4                "Defendants agreed to, and did in
 5                fact, act in restraint of trade or
 6                commerce by affecting, fixing,
 7                controlling and/or maintaining, at
 8                artificial and/or noncompetitive
 9                levels, the prices at which CRT
10                products were sold, distributed or
11                obtained in Vermont."
12          Do you see that?
13        A.   I do.
14        Q.   Do you have any personal knowledge
15   regarding the allegations made in this paragraph?
16        A.   No.
17        Q.   And in Subparagraph (c) where it says:
18                "During the class period, defendants'
19                illegal conduct substantially affected
20                Vermont commerce."
21          Do you see that?
22        A.   I do.
23        Q.   Do you have any personal knowledge
24   regarding this allegation?
25        A.   No.
```

117

Margaret Slagle

BARKLEY
Court Reporters

1      Q.   Are you seeking to represent a class of

2      Vermont consumers, Ms. Slagle --

3      A.   Yes.

4      Q.   -- in this case?  And those are consumers

11:46  5      who purchased televisions or monitors that

6      contained CRT tubes for the period -- during the

7      period March 1, '95, through November 25th, I

8      think, 2007?

9      A.   Correct.

11:46  10     Q.   But it is just televisions and monitors,

11     right, that included CRTs?

12     A.   Yes.

13     Q.   Okay.  No other products?  You are not

14     seeking to represent a class of purchasers of other

11:47  15     products other than televisions and monitors?

16     A.   That's correct.

17     Q.   That's correct.  And you're not seeking to

18     represent a class of anybody who purchased actual

19     CRT tubes?

11:47  20     A.   Correct.

21     Q.   Ms. Slagle, when did you decide to sue the

22     defendants in this case?

23     A.   It was in 2008.

24     Q.   September 2008?

11:47  25     A.   I believe so.

118

Margaret Slagle

BARKLEY
Court Reporters

1      Q.   And was that the first time that you

2   learned --

3           MR. GRALEWSKI:  I don't think that -- she

4   said in 2008.  You said September 2008.  That's not

11:47  5   what she said.

6           MR. BRADSHAW:  Okay.  I misheard what you

7   said.

8           THE WITNESS:  I said in 2008.

9      Q.   BY MR. BRADSHAW:  Okay.  Sorry.  Sometime

11:47  10   in 2008, you made the decision to participate as a

11   plaintiff in this lawsuit; is that correct?

12      A.   That's correct.

13      Q.   Okay.  And how did that come about?

14      A.   Well --

11:48  15           MR. GRALEWSKI:  I am going to allow the

16   witness to answer the question but instruct her not

17   to reveal any communications with counsel.  To the

18   extent she can answer your question without doing

19   so, she can.  Otherwise, I instruct her not to

11:48  20   answer.

21           THE WITNESS:  I can't answer it.

22      Q.   BY MR. BRADSHAW:  You can't answer it?

23      A.   I can't answer it.

24      Q.   Okay.  So -- well, did you contact a

11:48  25   lawyer in 2008?

119

Margaret Slagle

BARKLEY
Court Reporters

1     A.   Yeah.

2     Q.   Who did you contact?

3     A.   My attorney.

4     Q.   Which attorney?

11:48  5     A.   Mary.

6     Q.   And why did you contact Ms. Kirkpatrick?

7  This is sometime in 2008?

8     A.   Uh-huh.

9     Q.   Why did you contact Ms. Kirkpatrick?

11:48 10     A.   She was my attorney in my divorce.  I know

11  her.

12     Q.   And you contacted her to participate in

13  this lawsuit?

14     A.   I don't know.

11:49 15       MR. GRALEWSKI:  Same objection.  Same

16  instruction.

17        THE WITNESS:  Okay.

18        MR. GRALEWSKI:  If you can answer the

19  question without revealing communications, you

11:49 20  certainly can.

21        THE WITNESS:  No.

22     Q.   BY MR. BRADSHAW:  You can't answer the

23  question?

24     A.   No.

11:49 25     Q.   You don't know why you contacted

Margaret Slagle

BARKLEY
Court Reporters

1    Ms. Kirkpatrick?

2         MR. GRALEWSKI:  Object to the form.

3    Misstates testimony.  Same instructions.

4         THE WITNESS:  Okay.  I am following my

11:49  5    attorney's advice.

6         Q.   BY MR. BRADSHAW:  Okay.  Well, whatever.

7    Did Ms. Kirkpatrick contact you before you

8    contacted her in connection with this case?

9         A.   We were talking a lot about my divorce,

11:49 10   yeah.

11        Q.   Right.  That's not what I asked you.  I

12   asked you in connection with this case.  Did she

13   contact you before you contacted her?

14        A.   I think that's -- is that --

11:49 15        MR. GRALEWSKI:  You can answer that

16   question.

17        THE WITNESS:  Okay.  Yeah.

18        Q.   BY MR. BRADSHAW:  She did?

19        A.   Yeah.

11:49 20        Q.   When was that?

21        A.   I think that was in 2008, but I'd have to

22   look at the document to see.

23        Q.   What document are you referring to?

24        A.   Well, the original complaint or whatever.

11:50 25   I think that was in 2008.

121

Margaret Slagle

BARKLEY
Court Reporters

1        Q.   The original complaint in this case?

2        A.   Yeah, yes.

3        Q.   So prior to the filing of the original

4   complaint, Ms. Kirkpatrick contacted you?

11:50  5        A.   Yes.

6        Q.   And that led to your involvement in the

7   case?

8        A.   Yes.

9        Q.   Okay.  Now, do you have a written

11:50 10   retention agreement either with Ms. Kirkpatrick or

11   with Mr. Gralewski?

12        A.   It would be, yes.

13        Q.   So the answer to the question is yes, you

14   do have one?

11:50 15        A.   Yes.

16        Q.   And are you paying your attorneys' fees?

17        A.   No.

18        Q.   Do you know when the retention agreement

19   was executed?

11:50 20        A.   I'd have to look at it.  Do you have it?

21        Q.   I don't have it, if you're asking me.

22        A.   I don't have it with me.  You're asking me

23   for the date.  It was back then.

24        Q.   In all fairness, I am just asking you if

11:50 25   you know.

122

Margaret Slagle

BARKLEY
Court Reporters

1      A.   Yeah, in '08.

2      Q.   You would say -- you can say "I would have

3   to look at the document."  That's fine.

4      A.   Okay.

11:51 5      Q.   But I'm asking you as you're sitting here

6   today, do you know when that agreement, the written

7   retention agreement, was executed?

8      A.   I'd have to look at the document to give

9   you the exact date.

11:51 10      Q.   Okay.  Was it before the filing of the

11   original complaint in this case?

12      A.   I believe so, yeah.

13      Q.   Okay.  All right.  So you retained your

14   attorneys before the filing of the claim -- the

11:51 15   first complaint in this case; is that correct?

16      A.   Yeah, in '08, yeah.

17      Q.   Have you been promised any award or

18   financial recovery of any sort in connection with

19   this case?

11:51 20      A.   None whatsoever.

21      Q.   And are you expecting a recovery if the

22   plaintiffs prevail in this case?

23          MR. GRALEWSKI:  Object to the form.  Vague

24   and ambiguous.

11:51 25          You can answer.

123

Margaret Slagle

BARKLEY
Court Reporters

1          THE WITNESS:  Not really, no.

2      Q.   BY MR. BRADSHAW:  Okay.  So you're not

3   expecting anything if the plaintiffs prevail?

4      A.   No.

11:52  5          MR. GRALEWSKI:  Same objection.

6          THE WITNESS:  Same objection, okay.  No, I

7   was not expecting.

8      Q.   BY MR. BRADSHAW:  Okay.  Okay.  And are

9   you expecting any recovery or anything in this

11:52  10   case, financial or otherwise, if the plaintiffs do

11   not prevail?

12      A.   No.

13      Q.   Okay.  So one way or the other, whether

14   you win or lose, you are not expecting anything?

11:52  15      A.   I wouldn't know what to expect.   Do not designate

16          MR. GRALEWSKI:  I am going to object to

17   the form.  It is vague and ambiguous and misleading

18   as phrased.

19      Q.   BY MR. BRADSHAW:  Do you recall at any

11:52  20   point in this case, Ms. Slagle, receiving a

21   document which listed document requests from the

22   defendants?

23      A.   Yes.

24      Q.   And did you receive that from your

11:53  25   counsel?

124

Margaret Slagle

BARKLEY
Court Reporters

1        A.    Yes.

2        Q.    Okay.  And did you look for and search for

3   any documents that might be responsive to those

4   requests?

11:53 5        A.    Yes, I think that's what the credit card

6   thing was, yes.

7        Q.    And anything that you found that was

8   responsive, you turned over to your counsel?

9        A.    Yes.

11:53 10             (Reporter marked Exhibit No. 52 for

11             identification.)

12        Q.    BY MR. BRADSHAW:  Ms. Slagle, the court

13   reporter's handed you a document that's marked as

14   Exhibit 52.  Go ahead and take a look at it.  For

11:53 15   the record, the document is titled "Indirect

16   Purchaser Plaintiffs' Amended and Supplemental

17   Objections and Responses to Defendant Samsung SDI

18   Co., Ltd.'s First Set of Interrogatories."

19        A.    Okay.

11:56 20             MR. GRALEWSKI:  Would you want to finish

21   paging through the document, or would you like

22   counsel to ask you a question?

23             THE WITNESS:  Oh, go ahead.

24        Q.    BY MR. BRADSHAW:  It is up to you.

11:56 25        A.    Yeah.

125

Margaret Slagle

BARKLEY
Court Reporters

1      Q.   Okay.  If you turn to Page 26 of Exhibit

2    52, the attachments, I think, Page 26, which up at

3    the top it says, "Samsung Exhibit B23" up in the

4    right?

11:56  5      A.   Yes.

6      Q.   Do you see that?

7      A.   I do.

8      Q.   We on the same page?

9      A.   Page 26.

11:56 10      Q.   Yeah.  And then it says, "Plaintiff

11    Margaret Slagle," and then it lists some

12    information?

13      A.   Right.

14      Q.   Why don't you take a minute and take a

11:56 15    look at that.

16      A.   Okay.

17      Q.   And I just want to ask you a couple

18    questions I think to clarify some of the earlier

19    testimony today.  Because I think we all want to

11:57 20    make sure that the testimony is clear.

21           And earlier I had asked you about the

22    credit card statement, which is Exhibit 49?

23      A.   Yes.

24      Q.   And the $238.23 figure that was listed on

11:57 25    that credit card statement which reflects a

126

Margaret Slagle

BARKLEY
Court Reporters

1   purchase in November of 26, and I just want to
2   clarify, is it, in fact, the Sylvania television
3   that's reflected on that credit card statement?
4       A.   Yes, it looks like the Sylvania was
11:58  5   purchased 11/26/04, yes.
6       Q.   And I am just trying to clarify because
7   that's how I read these responses.
8       A.   Yes, you're correct.
9       Q.   And you may have been confused earlier.
11:58  10   So, in fact, it is the Sylvania television that is
11   reflected on the credit card statement in Exhibit
12   49, and that is the product that you purchased on
13   November 26th and for which you know the price,
14   correct?
11:58  15       A.   Correct.
16       Q.   Okay.  By contrast, it is the Magnavox
17   television that you don't know the price for --
18       A.   That would be correct.
19       Q.   -- correct?
11:58  20       A.   Yeah.
21       Q.   And according to Exhibit 52, Page 2 here,
22   the date of purchase for the Magnavox television is
23   December '04?
24       A.   Yeah.
11:58  25       Q.   How do you know that it is December '04?

127

Margaret Slagle

BARKLEY
Court Reporters

1    A.   Well, it was a few months after.  I know

2  that because I moved into the apartment.  I bought

3  the TV, and then I bought another one right after

4  it.

11:59  5    Q.   Okay.

6    A.   Relatively speaking, when my son was there

7  so he could have one in his room.

8    Q.   Okay.  But was the Sylvania television for

9  your son's room or was the Magnavox television for

11:59 10  your son's room?

11    A.   It would have been the Magnavox and the

12  Sylvania would have been the first purchase.

13    Q.   Okay.  So you believe the Sylvania

14  television was the first --

11:59 15    A.   Yeah.

16    Q.   -- and that's what you purchased for you,

17  and then the Magnavox for your son?

18    A.   Right.

19    Q.   Now, Exhibit 52, Page 26, it indicates a

11:59 20  purchase date of 12/04.  Is that based on any

21  documentation, or is that just based on your

22  recollection?

23    A.   It is on my recollection that I know I

24  bought them back to back.

12:00 25    Q.   And the information listed on Page 26 of

128

Margaret Slagle

BARKLEY
Court Reporters

```
  1    Exhibit 52, the other information here --
  2         A.   Yes.
  3         Q.   -- is all of this information accurate and
  4    correct --
12:00 5    A.   Yes.
  6         Q.   -- to the best of your understanding?
  7         A.   It is.
  8              MR. BRADSHAW:  Okay.  I think we have the
  9    Bates number we can read it into the record.
12:00 10             MR. GRALEWSKI:  Okay.
  11             MR. BRADSHAW:  I believe for Exhibit 50,
  12   which is the pictures of the Sylvania, that the
  13   Bates numbers are CRT00212 through 213, and then
  14   for Exhibit 51, which are the two pictures
12:00 15  regarding the Magnavox television, I think the
  16   Bates numbers there, Counsel, are CRT00210 through
  17   211, just for the record.
  18             And I have no further questions.  So thank
  19   you for your time, Ms. Slagle.  I think my
12:01 20  co-counsel may have some questions.
  21             (Discussion off the record.)
  22             MR. MALAISE:  Let's go off the record.
  23             THE VIDEOGRAPHER:  The time is now 12:03,
  24   and we are going off the record.
12:03 25             (Whereupon a recess was taken.)
```

129

Margaret Slagle

BARKLEY
Court Reporters

1                    THE VIDEOGRAPHER:  The time is now 12:05,

2       and we are on the record.

3                    EXAMINATION BY MR. MALAISE

4            Q.    Ms. Slagle, I want to ask you a couple

12:03   5       quick questions regarding some of your earlier

6       testimony.

7                    You mentioned earlier that you bought an

8       LCD, a 42-inch TV; is that correct?

9            A.    That's correct.

12:03  10            Q.    And that was roughly in late 2005, early

11      2006?

12            A.    I believe so.

13            Q.    With respect to that TV when you purchased

14      it, did you look at purchasing any CRT television

12:04  15       at that time?

16            A.    No.

17            Q.    Why is that?

18            A.    Because my son wanted a big LCD TV.

19            Q.    At that time, were there big CRT

12:04  20       televisions available?

21            A.    Probably, yeah.

22            Q.    And to your knowledge, was there anything

23      that separated a big CRT television from a big LCD

24      television?

12:04  25                    MR. GRALEWSKI:  Object to the form of the

130

Margaret Slagle

BARKLEY
Court Reporters

```
  1   question.  Vague and ambiguous.
  2            THE WITNESS:  I wouldn't know.  The reason
  3   I bought it was my son wanted it, and he stuck it
  4   in the living room.
12:04  5   Q.   BY MR. MALAISE:  With respect to -- as a
  6   hypothetical, let's say you're going to go out
  7   tomorrow and buy a television.  Would you consider
  8   buying a CRT television?
  9            MR. GRALEWSKI:  Object to the form.
12:05 10   Incomplete hypothetical.
 11            THE WITNESS:  Today?
 12   Q.   BY MR. MALAISE:  If you went out tomorrow,
 13   would you buy a CRT television, or consider buying
 14   a CRT television?
12:05 15   A.   I have no need, so I wouldn't, yeah.
 16   Q.   Well, we'll go a little further then.
 17   With respect to the hypothetical, let's say your
 18   42-inch LCD broke tomorrow, and you had to go out
 19   and buy a new television.  If you went out and
12:05 20   bought a new television, would you consider buying
 21   a CRT television to replace the LCD television?
 22            MR. GRALEWSKI:  Object to the form.
 23   Incomplete hypothetical.
 24            Go ahead.
12:05 25            THE WITNESS:  Would I consider doing that?
```

131

Margaret Slagle

BARKLEY
Court Reporters

            1    In the circumstances I'm in now, no.

            2         Q.   BY MR. MALAISE:  Why is that?

            3         A.   Because I can afford a bigger one, you

            4    know.

12:05       5         Q.   Is there anything, in your opinion, that

            6    separates a CRT television today from an LCD

            7    television?

            8         A.   I don't think they --

            9              MR. GRALEWSKI:  Object to the form.  Vague

12:06      10    and ambiguous.

           11              THE WITNESS:  Okay.  They are not as

           12    modern-looking.

           13         Q.   BY MR. MALAISE:  And when you say

           14    "modern-looking," what do you mean by

12:06      15    "modern-looking"?

           16         A.   They are bigger.

           17         Q.   The CRT televisions are bigger?

           18         A.   Yes, yes, take up more space in the home

           19    than the flat screens do.

12:06      20         Q.   And are you aware if CRT televisions are

           21    even sold in the market today?

           22         A.   I think they are.  I have seen them, like,

           23    at Recycle North.

           24         Q.   And is Recycle North, is that a retail

12:06      25    store that sells used products?

                                     132

Margaret Slagle

BARKLEY
Court Reporters

1      A.   Yes, uh-huh.

2      Q.   With respect to an electronics store or

3   some other kind of store that's selling new

4   products, for instance, Best Buy, Target, Walmart,

12:07  5   to your knowledge today, are they selling CRT

6   televisions?

7      A.   I don't know today.  I haven't looked.  I

8   would think so, you know.  I think they still would

9   be.

12:07  10      Q.   Have you -- let's say within the last

11   year, with any retail store that's selling new

12   products, do you recall seeing any of these stores

13   selling a CRT television?

14      A.   I don't recall, but I didn't really look

12:07  15   either.  Because I wasn't in the market to buy

16   anything.

17      Q.   Sitting here today, do you consider a CRT

18   television to be of the same quality as, let's say,

19   an LCD television?

12:07  20      MR. GRALEWSKI:  Object to the form.  Vague

21   and ambiguous.

22      THE WITNESS:  I wouldn't know.  I have

23   heard different things about different TVs, you

24   know, depending on what people experience.

12:08  25      Q.   BY MR. MALAISE:  If I can, I would like to

133

Margaret Slagle

BARKLEY
Court Reporters

1     refer to Exhibit 11, the amended complaint, and

2     specifically Paragraph 193, which is on -- at the

3     bottom of the page.  It's Page 45.

4          A.   Okay.

12:08   5          Q.   If you could, just review 193.

6          A.   Okay.  I got it.  It's at the top of the

7     page?

8          Q.   Yes, ma'am.

9          A.   Okay.

12:08  10          Q.   You see at the beginning of Paragraph 193

11     it says, "During the class period"?

12          A.   Correct.

13          Q.   Do you know what the class period is?

14          A.   It was from '05 to -- yes, I do, but

12:09  15     where's the -- you need to know the exact dates?

16     It ended in '07, right?

17          Q.   March 1995 --

18          A.   Yes, to '07.

19          Q.   -- through November 2007?

12:09  20          A.   Yeah, '95 to '07.

21          Q.   Okay.

22          A.   Yep.

23          Q.   Starting with the second sentence, am I

24     reading it correct where it says:

12:09  25                "These price increases were despite

134

BARKLEY
Court Reporters

```
 1                    the declining demand due to the

 2                    approaching obsolescence of CRT

 3                    products caused by the emergence of a

 4                    new, potentially superior and clearly

12:09  5              more popular, substitutable

 6                    technology."

 7         A.    Correct, yes, I see that.

 8         Q.    And would you agree, the first sentence

 9    says during the class period, that at least through

12:09 10    the end of November 2007, that CRT products were

11    approaching obsolescence?

12         A.    Yeah, I mean, more people are buying the

13    big-screen TVs, absolutely, yeah.

14         Q.    So if in November 2007 CRT products were

12:10 15    almost obsolete, do you have any opinion with

16    respect to today whether CRT products are obsolete

17    or not?

18              MR. GRALEWSKI:  Object to the form.  Lacks

19    foundation.

12:10 20              THE WITNESS:  There are less -- I think in

21    my general knowledge, people buy the HD TVs and

22    stuff like that because their pictures, most people

23    want to buy, but I think the CRT tubes are still

24    used.  I have no knowledge.

12:10 25         Q.    BY MR. MALAISE:  With respect to you say
```

135

BARKLEY
Court Reporters

 1  you have CRT products that work, what are you

 2  speaking of?

 3       A.   Well, TVs, they are not digital flat

 4  screens.

12:11 5       Q.   And are they products that have been

 6  bought recently, to your knowledge?

 7       A.   I have no idea when V and A bought them.

 8       Q.   I want to refer again in Exhibit 11, the

 9  third amended complaint, specifically to Paragraph

12:11 10  266, and that's going to be at the bottom of Page

 11  76.

 12       A.   Okay.

 13       Q.   And if you look, you can review 266 again.

 14       A.   Okay.

12:12 15       Q.   I want to refer you specifically to the

 16  Subpart (d) as in David, which is on Page 77.

 17       A.   Yes.

 18       Q.   And just to read into the record:

 19            "As a direct and proximate result of

12:12 20            defendants' unlawful conduct, the

 21            Vermont plaintiff and members of the

 22            Vermont indirect purchaser class have

 23            been injured in their business and

 24            property and are threatened with

12:12 25            further injury."

                              136

Margaret Slagle

BARKLEY
Court Reporters

1        A.    Uh-huh.

2        Q.    Can you explain to me what your

3    allegations mean when it says "threatened with

4    further injury"?

12:12  5        A.    I would go to my attorneys to help me with

6    that as far as the legal ramifications of that.

7        Q.    Do you have any personal knowledge,

8    though, of what you're alleging here as being

9    further injury?

12:12  10       A.    No.

11       Q.    And as you sit here today, do you feel --

12    even if you assume that allegations in the

13    complaint are true, do you feel that you personally

14    are threatened with further injury?

12:13  15            MR. GRALEWSKI:  Object to the form.  Calls

16    for a legal conclusion.

17            THE WITNESS:  If I were to buy another CRT

18    tube TV, yes.

19       Q.    BY MR. MALAISE:  Referring back to your

12:13  20    earlier testimony, am I correct in saying that you

21    would not consider buying a CRT television; is that

22    correct?

23            MR. GRALEWSKI:  Object to the form.

24    Misleading.  Misstates prior testimony.  Incomplete

12:13  25    hypothetical.  Compound.

137

Margaret Slagle

BARKLEY
Court Reporters

1            THE WITNESS:  That's correct, in my

2      financial situation I'm in now.

3      Q.   BY MR. MALAISE:  Is there a certain

4      financial situation where you would consider buying

12:13  5      a CRT television?

6      A.   Yes, if I couldn't afford a different

7      kind, the more recent flat screens.

8      Q.   And with respect to if you couldn't

9      afford, would you purchase a CRT television from --

12:14 10      I forget the name, the retail store that was

11      selling used CRT televisions, or would you think

12      that you could go to an electronics store and buy a

13      CRT television?

14      A.   I don't know because I haven't looked.

12:14 15      Q.   For a hypothetical, assume with me that

16      CRT televisions, new CRT televisions are not being

17      sold currently in the United States?

18      A.   Okay.

19      Q.   If that is true, and based on the

12:14 20      allegations here in Paragraph 266, Subpart (d),

21      would there be any further injury that the

22      allegations are alleging?

23      A.   So you're saying --

24            MR. GRALEWSKI:  Object to the form.

12:14 25      Compound.  Lacks foundation.  Incomplete

138

Margaret Slagle

BARKLEY
Court Reporters

1    hypothetical and calls for a legal conclusion.

2              THE WITNESS:  I guess if -- I don't know

3    if they are being sold because I haven't looked.  I

4    know I use them at work and home still.

12:15  5    Q.   BY MR. MALAISE:  Let's assume -- again,

6    for a hypothetical, let's assume that in the United

7    States CRT televisions are not being sold, new CRT

8    televisions are not being sold in retail stores.

9         A.   Okay.

12:15  10   Q.   And assuming that is true, can you explain

11   to me in Paragraph 266 (d) what further injury you

12   would have assuming CRT televisions are no longer

13   being sold?

14             MR. GRALEWSKI:  Object to the form.  Vague

12:15  15   and ambiguous.  Compound.  Incomplete hypothetical.

16   Lacks foundation and calls for a legal conclusion.

17             THE WITNESS:  Okay.  If they are not being

18   sold in the U.S., I couldn't buy one in the U.S.,

19   correct?  So am I not answering your question?

12:16  20   Q.   BY MR. MALAISE:  Let me clarify.

21        A.   Okay.

22        Q.   See if I can make it a little bit more

23   clear.

24             For the sake of a hypothetical, assume

12:16  25   that CRT televisions are obsolete and are just no

139

BARKLEY
Court Reporters

1    longer being manufactured.

2         A.   Okay.

3         Q.   So they are not available in retail stores

4    new.

12:16  5       A.   Okay.

6         Q.   If that is the case, and referring again

7    to Paragraph 266 (d) --

8         A.   Okay.

9         Q.   -- what is the basis for your allegation

12:16 10   that you're being threatened with further injury?

11             MR. GRALEWSKI:  Object to the form.  Vague

12   and ambiguous.  Compound.  Incomplete hypothetical.

13   Lacks foundation.  Calls for a legal opinion.

14             THE WITNESS:  It wouldn't be because there

12:17 15   wouldn't be any way for me to purchase them if they

16   were not being sold in the U.S. anymore.

17        Q.   BY MR. MALAISE:  With respect to -- I want

18   to kind of switch gears for a little bit.

19             With respect to the Sylvania television

12:17 20   you bought, you remember testifying earlier that

21   you did not know who manufactured the CRT within

22   that television; is that correct?

23        A.   That's correct.

24        Q.   Did anyone ask to look inside that

12:17 25   television to find out if there was a CRT within it

140

Margaret Slagle

BARKLEY
Court Reporters

1    and who -- strike that.

2         Did you ever offer to look inside that

3    television and see if you could determine who

4    manufactured that CRT?

12:17  5         MR. GRALEWSKI:  I'll instruct you not to

6    answer that question to the extent it would reveal

7    communications with counsel.  Otherwise, you can

8    answer the question.

9         THE WITNESS:  Okay.  I won't answer it.

12:18 10    Q.   BY MR. MALAISE:  Would it be fair to say

11   then that you're not able, as you sit here today,

12   based on your personal knowledge, to identify

13   whether that CRT within the Sylvania television was

14   manufactured by any of the Philips defendants?

12:18 15         MR. GRALEWSKI:  Object to the form.  Asked

16   and answered.  Argumentative and harassing.

17         THE WITNESS:  My personal knowledge, I

18   wouldn't know.

19    Q.   BY MR. MALAISE:  And same question with

12:19 20   respect to the Magnavox, based on your personal

21   knowledge, you're not able, sitting here today, to

22   identify that the CRT within the Magnavox

23   television was manufactured by any of the Philips

24   defendants?

12:19 25         MR. GRALEWSKI:  Object to the form.  Asked

141

Margaret Slagle

BARKLEY
Court Reporters

1    and answered.  Argumentative and harassing.

2              THE WITNESS:  I would not know personally.

3              MR. MALAISE:  I don't have any further

4    questions.  Thank you for your time, Ms. Slagle.

12:19  5              MR. GRALEWSKI:  I have no questions.

6              THE VIDEOGRAPHER:  The time is now 12:21,

7    and this concludes the video deposition of Margaret

8    Slagle.

9                   (Whereupon the proceedings were

10                   concluded at 12:21 p.m.)

11                        ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Margaret Slagle

BARKLEY
Court Reporters

1              I have read the foregoing deposition

2     transcript and by signing hereafter, approve same.

3

4     Dated_____.

5

6

7                    _____
                          (Signature of Deponent)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BARKLEY
Court Reporters

```
 1              DEPOSITION OFFICER'S CERTIFICATE

 2   STATE OF CALIFORNIA      )
                              ) ss.
 3   COUNTY OF SAN FRANCISCO  )

 4

 5

 6         I, BALINDA DUNLAP , hereby certify:

 7         I am a duly qualified Certified Shorthand

 8   Reporter in the State of California, holder of

 9   Certificate Number CSR 10710 issued by the Court

10   Reporters Board of California and which is in full force

11   and effect.  (Fed. R. Civ. P. 28(a)).

12         I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a), 30(f)(1)).

17         I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22         I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                        / / /
```

144

Margaret Slagle

BARKLEY
Court Reporters

1    of the testimony given by the witness.  (Fed. R. Civ. P.

2    30(f)(1)).

3         Before completion of the deposition, review of

4    the transcript [XX] was [  ] was not requested.  If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed, are

7    appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9    Dated: APRIL 6, 2012

10

11

12                              _____

13

14

15

16

17

18

19

20

21

22

23

24

25

145

Margaret Slagle

BARKLEY
Court Reporters

## $

**$10 (7)**
113:6,13,23;114:1;
115:5,15,16
**$100 (1)**
71:3
**$200 (1)**
113:4
**$205 (2)**
113:9,22
**$210 (6)**
113:1,4,9,21;114:23;
115:14
**$215 (1)**
115:17
**$238.23 (1)**
126:24
**$240 (2)**
28:15;29:1
**$283.23 (1)**
39:4
**$50 (1)**
71:3

## 0

**01 (1)**
92:16
**04 (11)**
10:8;23:12,15;28:9;
30:21;31:11;78:4;79:8,
17;127:23,25
**05 (9)**
23:12,15;28:10;46:25;
47:18,18,19;78:2;134:14
**05403 (1)**
8:15
**07 (3)**
134:16,18,20
**07-5944-SC (1)**
6:19
**08 (3)**
10:8;123:1,16

## 1

**1 (5)**
93:21,22;106:4,8;
118:7
**10:09 (1)**
63:5
**10:22 (1)**
63:8
**10:45 (1)**
81:14
**10:46 (1)**
81:17
**10:55 (1)**
87:11
**10:56 (1)**
87:16

**100 (1)**
51:2
**103 (1)**
88:19
**103-page (1)**
90:17
**10th (2)**
89:21,25
**11 (12)**
30:24;87:14,22;88:14,
21;89:13,15,20;95:7,13;
134:1;136:8
**11/26 (3)**
30:25;31:8;80:13
**11/26/04 (1)**
127:5
**11/29 (1)**
30:25
**11:24 (1)**
110:22
**11:36 (1)**
110:25
**12 (1)**
97:7
**12/04 (1)**
128:20
**12:03 (1)**
129:23
**12:05 (1)**
130:1
**12:21 (2)**
142:6,10
**1233 (1)**
6:5
**1300 (1)**
6:14
**134 (1)**
107:2
**14 (1)**
8:20
**1875 (1)**
6:13
**193 (3)**
134:2,5,10
**1974 (1)**
17:14
**1980 (2)**
17:9,22
**1988 (3)**
9:13,14;92:7
**1995 (1)**
134:17

## 2

**2 (4)**
79:9;82:15;89:18;
127:21
**20 (1)**
6:1
**2004 (4)**
41:25;67:22;69:5;
79:10

**2005 (3)**
69:5,18;130:10
**2006 (3)**
69:20,20;130:11
**2007 (4)**
118:8;134:19;135:10,
14
**2008 (10)**
118:23,24;119:4,4,8,
10,25;120:7;121:21,25
**2010 (2)**
89:21,25
**2012 (3)**
6:1,4,15
**205 (1)**
115:4
**20th (2)**
6:3,15
**210 (2)**
113:5;115:3
**211 (1)**
129:17
**213 (1)**
129:13
**214 (2)**
109:5;111:8
**238.23 (4)**
30:4,11;31:13;39:18
**240 (1)**
28:14
**25th (1)**
118:7
**26 (6)**
126:1,2,9;127:1;
128:19,25
**266 (9)**
116:16,19,25;117:2;
136:10,13;138:20;
139:11;140:7
**26th (1)**
127:13
**284 (3)**
116:6,7,9
**285 (3)**
116:6,7,9

## 3

**30 (1)**
8:14
**30-inch (2)**
69:3,3
**31 (1)**
107:1

## 4

**42-inch (2)**
130:8;131:18
**45 (1)**
134:3
**48 (10)**
23:20,24;91:12,15,16,

25;92:2,18;96:19;
111:10
**49 (6)**
29:7,12;30:8;80:10;
126:22;127:12

## 5

**5 (1)**
115:16
**50 (9)**
75:22,25;76:24;77:9;
79:5;80:20,21;93:6;
129:11
**50/50 (1)**
53:24
**51 (10)**
81:11,25;82:7,9,15;
83:3,4;93:5;95:6;129:14
**52 (6)**
125:10,14;126:2;
127:21;128:19;129:1

## 6

**6 (1)**
91:17
**61 (1)**
97:9
**62 (2)**
103:17,18

## 7

**75 (1)**
17:20
**76 (2)**
116:15;136:11
**77 (1)**
136:16

## 9

**9 (3)**
91:13,14,14
**9:10 (2)**
6:4,16
**90067 (1)**
6:14
**92 (1)**
115:25
**95 (2)**
118:7;134:20

## A

**Aaron (1)**
7:4
**able (7)**
53:3;64:18;65:14;
66:4;86:22;141:11,21
**above (1)**
95:10

**absolutely (4)**
10:17;34:7;88:9;
135:13
**accepted (1)**
59:6
**accessories (2)**
38:7;57:15
**accessory (1)**
38:6
**according (1)**
127:21
**account (1)**
31:6
**accurate (2)**
77:21;129:3
**accurately (1)**
10:19
**across (2)**
65:22;66:1
**act (1)**
117:5
**action (3)**
11:20;22:16,19
**activities (1)**
10:11
**actual (7)**
12:14,17;13:16;67:8;
93:8;109:24;118:18
**actually (15)**
12:1;22:23;26:13;
56:2;80:25;83:4;85:7;
98:16;99:21,24;101:22;
102:16;103:4,11;113:12
**add (2)**
17:1;61:8
**address (3)**
8:13,17;9:1
**addressed (1)**
10:12
**ads (3)**
33:21;41:14,16
**advice (4)**
25:4;72:22;112:13;
121:5
**affect (1)**
65:8
**affected (1)**
117:19
**affecting (1)**
117:6
**afford (1)**
132:3;138:6,9
**afterwards (1)**
21:14
**again (20)**
12:25;15:6;20:14;
45:11;46:15;52:5;61:2;
64:21;84:13;90:13;96:1;
103:8;104:14;105:4;
106:12;115:4;136:8,13;
139:5;140:6
**against (2)**
71:21;73:23

**ago (2)**
8:1;32:5
**agree (2)**
103:14;135:8
**agreed (2)**
85:6;117:4
**agreement (5)**
88:1;122:10,18;123:6,
7
**ahead (15)**
8:7;24:1;76:1;78:14;
95:25;100:17;101:10;
104:1;107:2;109:8;
114:6;116:23;125:14,
23;131:24
**allegation (23)**
13:3,10,14,15;38:20;
94:12,21;95:2;97:24;
99:21;101:2,13;102:16,
17;103:3,5;104:10,18;
107:5,12;109:22;
117:24;140:9
**allegations (21)**
12:13,17;13:2;73:21;
83:17,20,25;95:6,13;
96:2,6,9;97:4;103:11,12;
116:9;117:15;137:3,12;
138:20,22
**allege (6)**
73:21;94:4;104:24;
105:7;106:10,13
**alleged (5)**
86:11;92:24;99:13;
112:6;113:7
**allegedly (1)**
11:21
**alleging (15)**
97:16,21;98:3,11,20;
99:9;100:4,12,19,20;
107:9,25;110:10;137:8;
138:22
**allow (2)**
46:14;119:15
**allowed (1)**
84:2
**almost (2)**
69:15;135:15
**alone (1)**
115:11
**along (2)**
71:14;86:22
**alternative (1)**
59:24
**although (1)**
82:3
**always (1)**
68:25
**ambiguous (20)**
22:4;24:8;44:19;
45:19;83:23;85:13;86:7,
16;87:3;90:22;99:1;
102:21;105:3;123:24;
124:17;131:1;132:10;

133:21;139:15;140:12
**Amended (7)**
87:24;88:23,25;89:19;
125:16;134:1;136:9
**America (5)**
7:2,9;14:7;72:9;
103:22
**amount (7)**
30:4,11,12;31:13,14;
110:16;113:23
**and/or (8)**
94:6,22;99:14;100:5;
106:15;107:8;117:7,8
**Angeles (1)**
6:14
**answered (13)**
66:8;73:13;74:11,24;
86:5;99:17;100:14,16;
101:25;110:14;116:12;
141:16;142:1
**answer's (1)**
54:6
**antenna (2)**
57:18,19
**antitrust (2)**
6:18;92:23
**anymore (2)**
51:7;140:16
**apartment (6)**
28:25;32:23;67:2;
69:22;79:22;128:2
**apologize (1)**
25:3
**apparent (1)**
76:5
**appearance (3)**
26:23,25;50:5
**appeared (2)**
6:9;48:14
**appears (1)**
30:3
**appreciated (1)**
11:15
**approaching (2)**
135:2,11
**appropriate (8)**
16:1,12;102:15,24;
103:2;104:23;105:7;
108:18
**approximately (1)**
51:23
**area (3)**
18:9;33:8;35:1
**Argumentative (16)**
14:15;16:4;74:11,24;
99:17;100:15;101:25;
102:20;107:16;108:5;
110:14;114:3;115:10,
21;141:16;142:1
**around (4)**
35:10;42:22;79:16,17
**artificial (1)**
117:8

**associated (7)**
6:12;32:6;55:5,11,20;
64:18;65:7
**Association (1)**
18:14
**assume (12)**
21:20;29:25;65:2;
77:21;86:18;102:13;
106:1;137:12;138:15;
139:5,6,24
**assuming (3)**
110:11;139:10,12
**attachments (1)**
126:2
**attempt (1)**
56:16
**attention (5)**
35:16;88:17;91:16;
92:18;116:18
**attorney (5)**
8:3;72:20;120:3,4,10
**attorney-client (2)**
15:2;112:11
**attorneys (24)**
73:5;74:13;75:5,8;
94:14,16;99:6;100:21;
101:2,13;102:1,4;
104:19;105:17,18,24;
106:23;107:18,22;112:1,
2,5;123:14;137:5
**attorney's (2)**
72:22;121:5
**attorneys' (1)**
122:16
**available (2)**
130:20;140:3
**award (1)**
123:17
**aware (10)**
13:20,22;14:1,2,4,6;
27:7;32:8;70:17;132:20
**away (2)**
35:22;92:16

**B**

**B23 (1)**
126:3
**bachelorette (3)**
17:25;18:2,5
**back (36)**
15:7,10;31:13;32:13;
38:16;40:14,14;42:22,
23;54:15;56:12;57:24;
60:4;61:11;63:10,11;
77:10;80:20;81:19;
82:17;83:10;87:18;
92:18;93:21;101:8,10,
11;106:4;111:2,4,9;
114:20;122:23;128:24,
24;137:19
**background (1)**
17:5

**Baker (1)**
7:10
**Balinda (1)**
6:6
**bank (1)**
31:6
**barcodes (1)**
82:18
**Barkley (1)**
6:12
**base (1)**
16:7
**based (12)**
12:7;25:18;26:23;
96:8;99:13;101:6;
102:10;128:20,21;
138:19;141:12,20
**basically (1)**
11:23
**basis (19)**
9:15;49:5;96:6,8;98:5,
8;100:20;101:1,12;
102:15;103:2,10;
104:17;109:21,23;
110:10,15;112:10;140:9
**Bates (5)**
29:12;76:6;82:2;
129:9,13,16
**batteries (1)**
40:15
**bears (1)**
29:12
**beginning (6)**
28:9;46:25;47:18,19;
89:6;134:10
**behalf (1)**
7:5
**belated (3)**
95:18;109:1;116:11
**belief (4)**
26:22;39:22;42:4;
49:21
**below (9)**
43:4,12,21;44:4,14;
45:12,13;60:23;103:18
**Ben (2)**
6:24;8:2
**beneficial (1)**
44:17
**benefit (1)**
45:16
**besides (1)**
17:24
**best (13)**
10:25;11:11;22:19;
34:9;36:15;41:1;48:21;
64:25;70:3,8;91:2;
129:6;133:4
**better (2)**
65:15;66:5
**bifocals (1)**
76:18
**big (12)**

27:15;28:6;53:16;
58:11,13;70:4;74:2;
91:5;130:18,19,23,23
**bigger (4)**
52:6;132:3,16,17
**big-screen (1)**
135:13
**bit (3)**
51:25;139:22;140:18
**blacked (1)**
29:24
**Bob (3)**
7:14;19:14;20:5
**boom (1)**
56:19
**borrowed (1)**
78:25
**both (3)**
60:15;61:12;78:11
**bottom (6)**
76:10;93:23;116:1,2;
134:3;136:10
**Botts (1)**
7:11
**bought (24)**
11:24;28:24;32:23;
40:13,15;43:22;49:18;
51:14;56:21;59:1;61:23;
70:12;78:11;79:23,23;
128:2,3,24;130:7;131:3,
20;136:6,7;140:20
**box (1)**
62:23
**boyfriend (1)**
78:25
**boyfriend's (1)**
82:23
**Bradshaw (123)**
6:24,24;7:6,24;8:2;
13:1;14:1,6,10,16,22;
15:7,12,19,25;16:10,21;
20:9;21:11;22:6;23:22;
24:11,24;25:4;26:13;
29:9;32:2;37:12;39:12,
17;40:4;43:23;44:6,13,
24;45:8;46:4,17;47:4,
15;49:21;53:10;56:8;
58:23;59:7;63:10;65:21;
66:11;68:1,14;73:2,15;
74:9,14;75:2,24;76:7,9,
18,22;81:19;84:4,14,24;
85:19;86:9,19;87:9,18;
88:13;90:25;91:8,24;
95:22;96:19;98:22;99:4,
20,24;100:9,12,16;
101:10,16;102:3,14,23;
103:9;104:4,10;105:6,
12,23;107:20;108:9,23;
109:4;110:19;111:2;
112:12;113:20;114:6,
25;115:13,24;116:2,5,
13,23;117:2;119:6,9,22;
120:22;121:6,18;124:2,

8,19;125:12,24;129:8,11
**brand (3)**
    25:13;60:5,5
**brands (3)**
    35:13,16;58:8
**brand-spanking (1)**
    62:20
**break (3)**
    76:11;111:3,7
**bring (2)**
    73:20;76:18
**broke (2)**
    111:7;131:18
**budget (1)**
    39:11
**bulk (1)**
    65:11
**BURLINGTON (6)**
    6:1,6;8:14;9:18;30:4;
    33:13
**burned (1)**
    93:15
**business (5)**
    16:25;18:21,24;34:15;
    136:23
**buy (28)**
    33:20;34:9;37:23;
    38:1,3,6,17;41:1;43:24;
    44:7,9,16;45:15;57:23;
    65:8;70:3;79:19;93:16;
    131:7,13,19;133:4,15;
    135:21,23;137:17;
    138:12;139:18
**buying (9)**
    41:17;42:10;46:2;
    131:8,13,20;135:12;
    137:21;138:4
**Buys (1)**
    36:16
**Byrd (1)**
    7:7

**C**

**cable (2)**
    38:15;57:19
**cables (2)**
    38:11;57:16
**California (2)**
    6:8,14
**call (2)**
    20:22,23
**called (2)**
    7:19;50:12
**Calling (1)**
    26:20
**Calls (38)**
    12:20;15:21;16:4,16;
    39:7;40:2,8;43:18;
    44:20,22;45:20,20;
    49:16;65:18;66:8;67:23;
    68:11;83:23;84:10,19;
    85:13;86:7,17;87:4;

90:21;102:19;105:2;
    107:16;108:5,20;
    113:15;114:4;115:9,20;
    137:15;139:1,16;140:13
**came (4)**
    64:24;67:2;89:9;90:2
**camera (3)**
    78:25;82:23,24
**can (54)**
    11:3;12:11,21,22,23,
    25;15:3,4;16:7,8,18;
    17:4,6;24:9,20;28:5;
    37:6;44:11;45:4,6,22;
    47:13;58:19,24;74:25;
    76:12;88:6;95:20;96:1,
    14;98:15,19;99:2;101:6,
    7,20;102:10,11;105:20;
    119:18,19;120:18,20;
    121:15;123:2,25;129:9;
    132:3;133:25;136:13;
    137:2;139:10,22;141:7
**canceled (2)**
    52:13;64:16
**capacity (2)**
    18:20;19:3
**car (2)**
    32:14;54:11
**card (21)**
    28:18,19;29:5,16,17,
    18,19;48:7,13,14;64:15;
    80:2,7,10,12,14;125:5;
    126:22,25;127:3,11
**cards (2)**
    48:16,17
**care (1)**
    18:18
**Case (42)**
    6:18;7:5;8:4;10:24;
    12:14,17;13:11;25:8,9,
    18;27:6,8;36:22;38:20;
    45:12;49:11;57:3;59:14;
    64:14;72:12,17;73:7;
    75:12,17;85:9;86:12;
    89:9;94:17;113:12;
    118:4,22;121:8,12;
    122:1,7;123:11,15,19,
    22;124:10,20;140:6
**cash (1)**
    52:8
**cathode (1)**
    6:18
**caused (1)**
    135:3
**caution (2)**
    15:1;114:13
**Century (1)**
    6:13
**certain (2)**
    110:16;138:3
**certainly (6)**
    10:22;11:3,16;17:6;
    102:11;120:20
**Certified (1)**

6:7
**chance (2)**
    82:6;91:24
**change (2)**
    63:2;110:20
**charge (4)**
    28:18,18;29:5,6
**charged (1)**
    115:17
**charges (1)**
    112:18
**Charles (1)**
    7:10
**check (4)**
    52:10,13;59:22;64:16
**checked (2)**
    48:7,20
**checking (1)**
    59:23
**Chittenden (1)**
    18:14
**choose (1)**
    32:18
**church (1)**
    9:11
**Circuit (4)**
    34:14,15;41:1;46:5
**circumstances (2)**
    28:21;132:1
**Cities (1)**
    34:15
**city (4)**
    33:12;34:14;41:1;46:5
**claim (2)**
    96:24;123:14
**claiming (5)**
    14:17;15:14;25:7,9,17
**clarification (4)**
    10:25;47:23;97:20;
    100:1
**clarify (14)**
    10:24;11:1;12:11;
    15:8;25:6;76:12;79:9;
    82:3,11;88:10;126:18;
    127:2,6;139:20
**class (16)**
    7:15;11:20;22:15,19;
    94:5;100:4;104:4;
    106:14;117:18;118:1,14,
    18;134:11,13;135:9;
    136:22
**classes (3)**
    109:18;110:9;111:15
**clear (9)**
    13:7;31:5;61:11;
    70:25;72:23;80:11;99:9;
    126:20;139:23
**clearly (1)**
    135:4
**client (4)**
    13:20;14:2,7;74:6
**clients (13)**
    14:12,17;15:14;71:22;

72:7;73:23;74:19;
    101:18,22;102:4,5,6;
    107:6
**close (7)**
    32:21;33:2,7,16;
    34:14,18;78:11
**Club (3)**
    34:20,20,22
**clue (1)**
    46:10
**Co (2)**
    97:17;125:18
**coconspirators (1)**
    92:22
**co-counsel (1)**
    129:20
**collect (1)**
    54:13
**college (3)**
    18:5;19:4;60:11
**column (1)**
    30:25
**combination (1)**
    107:6
**coming (1)**
    49:2
**commencing (1)**
    6:4
**commerce (2)**
    117:6,20
**communications (6)**
    15:2;101:5;102:12;
    119:17;120:19;141:7
**companies (6)**
    8:3;71:7,9,11,18;
    72:16
**Company (10)**
    7:1,2,8;13:21;14:3,7;
    16:11,12;72:8;86:11
**comparable (1)**
    59:17
**compare (1)**
    54:14
**comparison (3)**
    32:21;54:5,8
**compete (1)**
    54:2
**competes (1)**
    36:18
**competitive (1)**
    39:5
**complaint (28)**
    13:3;87:24;88:23;
    89:1,19;92:24;95:7;
    96:3,6,10;97:4;100:13;
    102:16;103:3,4,5,12;
    107:2;111:9;115:25;
    121:24;122:1,4;123:11,
    15;134:1;136:9;137:13
**complaints (1)**
    36:12
**complaint's (1)**
    99:19

**completely (2)**
    10:15,19;90:8
**components (1)**
    85:2
**Compound (7)**
    114:3;115:10,22;
    137:25;138:25;139:15;
    140:12
**computer (1)**
    71:19
**concept (1)**
    43:11
**concluded (1)**
    142:10
**concludes (1)**
    142:7
**conclusion (20)**
    12:20;15:22;16:5,17;
    39:7;40:3;43:19;44:21;
    45:20;49:16;83:24;
    90:22;102:19;105:2;
    107:17;108:5,21;
    137:16;139:1,16
**condo (1)**
    9:11
**conduct (2)**
    117:19;136:20
**confirm (2)**
    50:9;60:5
**confirmed (2)**
    26:14,16
**confused (1)**
    127:9
**connect (1)**
    38:11
**connection (7)**
    16:23;40:17;52:15;
    75:16;121:8,12;123:18
**connections (1)**
    37:16
**consider (13)**
    41:5,22;53:14;61:8,
    17,19;131:7,13,20,25;
    133:17;137:21;138:4
**Consolidated (3)**
    87:23;88:22,25
**conspiracy (5)**
    86:12;94:21;107:7;
    108:1;109:7
**conspired (3)**
    94:5;106:14,21
**consumer (9)**
    18:20;51:16;71:25;
    72:4;74:17;83:19;
    109:23;110:2,17
**consumers (2)**
    118:2,4
**contact (7)**
    67:5;119:24;120:2,6,
    9;121:7,13
**contacted (5)**
    120:12,25;121:8,13;
    122:4

**contain (1)**
25:24
**contained (1)**
118:6
**contains (2)**
26:15,22
**continue (1)**
47:13
**continuous (1)**
9:15
**contract (1)**
107:6
**contrast (1)**
127:16
**controlling (1)**
117:7
**convenience (2)**
33:15;36:25
**conversation (6)**
19:25;20:1;21:4;
66:15;72:15;75:16
**conversations (1)**
16:25
**coordinated (1)**
13:12
**copy (1)**
88:5
**corners (2)**
33:8,9
**correctly (3)**
13:15;20:7;104:6
**cost (16)**
39:2;43:4,12,21;44:5,
14;45:13,13;60:23,25;
67:8,12,13;83:18;84:5,
15
**Costco (2)**
35:3;41:1
**Costcos (1)**
36:16
**counsel (19)**
10:12;19:11,16,24;
20:22;25:5;47:10;74:21;
75:17;76:3;88:8;101:5;
112:16;119:17;124:25;
125:8,22;129:16;141:7
**counsels (1)**
6:21
**counsel's (1)**
112:13
**Counties (1)**
18:15
**counting (1)**
104:5
**country (2)**
65:22;66:1
**County (1)**
6:7
**couple (8)**
11:25;42:7,20;46:24;
47:8,8,20;126:17;130:4
**course (2)**
11:7;77:16

**Court (9)**
6:12;7:16;11:3;23:22;
29:10;81:24;87:21;88:5;
125:12
**Courtney (1)**
7:7
**credit (21)**
28:19;29:16,17,18,19;
48:7,13,14,16,17;64:15;
80:2,7,9,12,14;125:5;
126:22,25;127:3,11
**CRT (87)**
11:21;12:1,8,14;
13:16;25:24;26:15,23;
27:13;49:19,22,24;50:4,
10,16;67:3,16;68:5,17;
71:11,22;74:16;75:10;
80:23;81:1,8;83:5;
86:10,21;92:20;93:2,8;
94:7,17,22;96:24,25;
97:18,22;98:1,5,21;
99:25;104:11;106:16;
107:9;108:2,3;117:9;
118:6,19;130:14,19,23;
131:8,13,14,21;132:6,
17,20;133:5,13,17;
135:2,10,14,16,23;
136:1;137:17,21;138:5,
9,11,13,16,16;139:7,7,
12,25;140:21,25;141:4,
13,22
**CRT000505 (1)**
29:12
**CRT00210 (1)**
129:16
**CRT00212 (1)**
129:13
**CRTs (4)**
71:8;85:5;98:9;118:11
**curious (2)**
44:1;49:13
**current (1)**
8:12
**currently (4)**
9:17;18:11,13;138:17
**Customer (1)**
40:8
**customers (7)**
43:13,24;44:7,15;
45:14,15;46:1
**cut (1)**
69:10

**D**

**dad (1)**
92:16
**damaged (12)**
38:21,25;83:13,21;
84:1,7,17;85:9,20;86:2,
13,25
**damages (3)**
25:7,9,17

**date (10)**
6:15;10:7;31:4,5,9;
89:20;122:23;123:9;
127:22;128:20
**dated (2)**
89:18,21
**dates (1)**
134:15
**David (1)**
136:16
**day (2)**
6:4;11:7
**December (6)**
78:4,5;89:21,25;
127:23,25
**decide (2)**
73:20;118:21
**decided (3)**
74:5,19;113:8
**decision (10)**
15:14;72:19,21;73:6,
16,18,25;74:2;113:19;
119:10
**decisions (1)**
16:9
**declining (1)**
135:1
**defendant (8)**
6:25;8:3;22:12;27:6,
10;49:11;103:21;125:17
**defendants (13)**
7:11;27:8;72:12,17;
81:1;92:21;94:5;106:14;
117:4;118:22;124:22;
141:14,24
**Defendants' (3)**
109:6;117:18;136:20
**Defense (1)**
7:19
**definitely (2)**
66:23;70:20
**degree (2)**
17:10;18:3
**delivered (1)**
32:11
**delivery (2)**
32:15;63:21
**demand (1)**
135:1
**department (1)**
34:10
**Depending (2)**
116:20;133:24
**deposed (1)**
10:2
**deposition (12)**
6:16,20;19:8,23;21:6,
20;22:1;23:25;24:6;
77:17;88:3;142:7
**depositions (1)**
87:25
**describe (1)**
58:24

**despite (1)**
134:25
**detail (1)**
91:10
**determine (2)**
113:25;141:3
**difference (1)**
54:25
**different (11)**
18:16;52:22,23;58:6,
8,8,11;60:5;133:23,23;
138:6
**difficult (2)**
68:15;73:15
**digital (1)**
136:3
**dinner (2)**
21:14,21
**diploma (1)**
18:4
**direct (4)**
88:17;91:15;116:18;
136:19
**directing (1)**
92:17
**directly (1)**
16:9
**discontinued (1)**
32:4
**discussed (3)**
36:15;72:15;75:15
**discussing (5)**
30:9;77:16;78:17,20;
93:4
**Discussion (3)**
76:21;81:13;129:21
**display (4)**
62:6,9,10,15
**distributed (7)**
97:18,22;98:4;99:14,
25;100:6;117:10
**divorce (10)**
10:3;22:8,9,23;23:15,
18;28:23;73:11;120:10;
121:9
**document (32)**
23:23;24:3;29:11;
30:7;75:25;76:4,6,23;
77:4;81:25;87:22;88:2,
18;89:3,20,24;90:4,10,
14,17;91:2,9,13;121:22,
23;123:3,8;124:21,21;
125:13,15,21
**documentation (4)**
64:14,16,17;128:21
**documents (10)**
19:9;21:10,12,24;
76:14,23;89:5,9;90:1;
125:3
**dollars (3)**
42:7;70:1,9
**done (7)**
35:20;48:25;49:1;

**50:9,13;60:1;93:19**
**door (1)**
112:4
**down (6)**
11:4;34:9;67:17;
68:19;76:10;103:8
**drives (1)**
24:13
**due (2)**
99:12;135:1
**Dunlap (1)**
6:6
**During (10)**
92:19;94:4;100:4;
104:3,4;106:13;117:18;
118:6;134:11;135:9
**DVD (5)**
37:10,13,23;57:10,11

**E**

**E1 (1)**
6:5
**earlier (12)**
24:11;40:25;51:15;
80:18;106:9;126:18,21;
127:9;130:5,7;137:20;
140:20
**early (1)**
130:10
**easier (1)**
37:17
**East (1)**
6:13
**easy (1)**
98:9
**eat (2)**
21:14,16
**eating (1)**
21:21
**economic (3)**
45:10,16;75:11
**economically (13)**
43:16,17;44:1,2,16;
83:15,16;84:8,17;85:9;
86:2,13,25
**economy (1)**
84:2
**edge (1)**
33:14
**educating (1)**
94:17
**education (1)**
17:23
**educational (1)**
17:5
**effect (1)**
107:7
**effort (1)**
71:17
**either (1)**
28:9;53:14;55:7;57:3;
59:14;64:18;72:7;76:13;

80:21;110:17;122:10;
133:15
electronic (1)
40:25
Electronics (18)
7:1,1,8,9;13:21;14:2,
7;18:21;34:24;71:25;
72:4,8,8;74:17;97:17;
103:22;133:2;138:12
eliminating (1)
29:10
else (13)
17:1,2;20:19,23;21:5,
13,19,25;32:25;49:22;
50:14;92:10;97:3
emergence (1)
135:3
employed (2)
18:11,13
encyclopedic (1)
88:19
end (8)
11:23;28:9;79:21;
83:19;109:23;110:1,17;
135:10
ended (1)
134:16
engaged (2)
107:6;108:1
enough (4)
45:23;113:18,21,24
entire (8)
109:16;110:5,7,11;
111:13;113:13,25;
115:18
entirety (2)
112:7;115:6
entities (4)
7:5;73:2;86:21;108:2
entity (2)
83:7;105:7
equitable (2)
51:15;59:1
Eric (1)
6:11
especially (1)
46:14
Essex (7)
9:4,5,9,10;33:7,13;
34:13
establish (1)
78:15
even (14)
14:12,18;15:15;16:2,
13;34:14;60:5;61:12;
70:14;107:13;108:2,17;
132:21;137:12
exact (5)
10:7;28:5;51:7;123:9;
134:15
exactly (3)
12:12;69:25;78:6
EXAMINATION (2)

7:24;130:3
examined (1)
7:21
except (2)
20:23;93:10
excuse (5)
46:5;67:5;94:20;95:6;
113:4
executed (2)
122:19;123:7
Exhibit (49)
23:20,24;29:7,11;
30:8;75:22,25;76:24;
77:9;79:5;80:10,20,21,
21;81:11,25;82:6,9,15;
83:3,4;87:14,22,24;88:2,
2,14,21;89:13,15,20;
93:5,6;95:6,7,13;125:10,
14;126:1,3,22;127:11,
21;128:19;129:1,11,14;
134:1;136:8
expect (2)
88:18;124:15
expecting (5)
123:21;124:3,7,9,14
Expense (1)
42:3
expensive (4)
41:10,11;42:5;68:25
experience (2)
96:4;133:24
expert (16)
45:21;75:12,12;84:11,
20;85:14;86:7,17;87:5;
112:19,21,22;113:16;
114:5;115:9,21
experts (1)
85:16
explain (2)
137:2;139:10
extended (4)
32:9;57:3,6;64:22
extent (7)
15:3;37:5;95:19;
101:4;111:22;119:18;
141:6
eye (2)
51:24;52:2

F

fact (9)
96:20;104:24;107:13,
25;111:25;112:3;117:5;
127:2,10
factor (2)
33:15;36:25
factors (1)
85:23
facts (1)
115:11
factual (2)
96:5,8

fair (5)
64:13;77:3,8,13;
141:10
fairness (1)
122:24
family (2)
92:12,12
far (10)
26:16;27:4;57:20;
61:21;62:18,20;63:18;
65:23;70:18;137:6
farm (2)
92:12,14
features (1)
37:2
February (2)
69:20;78:2
feel (4)
10:22,24;137:11,13
fees (1)
122:16
Fernald (1)
6:11
few (5)
7:25;51:14;88:5;
90:11;128:1
figure (1)
126:24
File (1)
89:18
filed (5)
71:6,21;91:9;105:19,
24
filing (6)
101:17;103:4;105:16;
112:3;123:10,14
filled (1)
71:2
final (1)
23:16
financial (4)
123:18;124:10;138:2,
4
find (5)
52:18,25;53:5;91:6;
140:25
fine (1)
123:3
finish (10)
11:12,14;24:21;44:11;
46:13;53:7;70:21;99:10;
101:20;125:20
finished (2)
11:9,10
first (21)
8:1;18:25;22:22;23:1,
4,7,10;25:22;30:18;
66:22,23;73:9;77:3;
82:11;109:8;119:1;
123:15;125:18;128:12,
14;135:8
fit (3)
27:17;58:1,21

five (3)
33:8,9,10
fix (7)
94:6,21;106:15,21;
107:8;108:1;109:7
fixed (2)
108:16;109:25
fixing (1)
117:6
flat (8)
26:4,5,6;40:22;50:8;
132:19;136:3;138:7
floor (1)
62:7
focus (1)
25:21
follow (1)
112:12
following (1)
121:4
follows (1)
7:22
follow-up (2)
11:25;63:15
forget (1)
138:10
form (71)
12:19;13:24;15:17;
16:3,15;21:7;22:3;24:7;
31:25;37:4;39:6,24;
43:18;44:18;45:17;
46:11;47:1;49:15;56:6;
58:17;59:4;65:18;66:7;
67:23;68:10;71:2;73:12;
74:7,10,23;75:4;83:22;
84:9,18;85:11;86:4,15;
87:2;90:21;96:12;98:13,
24;99:16;100:11;
101:24;102:18;105:1;
107:15;108:6,19;
110:13;113:14;114:2;
115:7,19;121:2;123:23;
124:17;130:25;131:9,
22;132:9;133:20;
135:18;137:15,23;
138:24;139:14;140:11;
141:15,25
former (1)
8:25
forth (2)
61:12;95:6
Forty-two (2)
70:5,6
found (2)
95:8;125:7
foundation (31)
13:25;14:15;16:4,16;
24:8;32:1;44:20;45:20;
46:12;56:7;65:19;66:9;
84:10,19;85:13;86:6,17;
87:3;98:25;102:20;
105:3;107:16;108:4;
113:15;114:4;115:9,20;

135:19;138:25;139:16;
140:13
four-year (1)
18:3
Francisco (1)
6:8
free (3)
10:22,24;84:1
Friday (5)
19:25;20:1,2,23;23:6
friend's (1)
30:18
front (6)
37:16;52:2;77:4,6;
82:12;88:6
full (1)
115:16
function (1)
36:12
further (11)
34:9;129:18;131:16;
136:25;137:4,9,14;
138:21;139:11;140:1;
142:3

G

gears (1)
140:18
Geez (1)
27:20
general (3)
15:23;26:24;135:21
generally (1)
27:19
Gold (1)
48:18
Goldsborough (2)
6:17;7:13
Good (11)
6:11,24;7:25;8:5,6;
9:24;10:10;32:20;59:3,
23;60:6
good-faith (1)
102:15;103:2,10
Gosh (2)
85:15;90:15
graduate (2)
17:13,21
graduated (1)
19:4
GRALEWSKI (137)
7:14,14;12:19,23;
13:24;14:5,9,14,19,25;
15:17,21;16:3,15;20:6,8;
21:7;22:3;23:2;24:7,20,
23;25:2;26:8,12;31:25;
37:4;39:6,14,24;40:2;
43:18;44:3,10,18;45:2,7,
17;46:11;47:1,10;49:15;
53:6,9;56:6;58:17;59:4;
65:18;66:7;67:23;68:10;
72:23,25;73:12;74:7,10,

21;75:19;76:3,11,19;
83:22;84:9,18;85:11;
86:4,15;87:2;88:9;
90:16;91:4,21;95:15,18;
96:12;98:13,24;99:16,
22;100:7,11,14;101:3,
24;102:9,18;103:6;
104:3,7;105:1,9,20;
107:15;108:4,19;109:1;
110:13;112:9;113:14;
114:2,12,16,19;115:7,
19;116:1,4,11,20,25;
119:3,15;120:15,18;
121:2,15;122:11;
123:23;124:5,16;
125:20;129:10;130:25;
131:9,22;132:9;133:20;
135:18;137:15,23;
138:24;139:14;140:11;
141:5,15,25;142:5

**Grand (1)**
18:15
**Great (2)**
11:17;24:23
**guaranteed (1)**
46:3
**guess (20)**
16:19;27:5;30:22;
32:20;39:16;44:22;
45:25;57:25;68:7,9;
69:6;80:16;84:23;85:3;
89:8;90:23;91:6;101:14;
114:18;139:2

**H**

**Haas (1)**
8:10
**H-a-a-s (1)**
8:11
**half (3)**
8:18;9:2,6
**handed (6)**
23:23;29:11;75:25;
81:24;87:21;125:13
**happen (1)**
11:6
**happened (1)**
42:13
**happens (1)**
62:14
**happy (2)**
59:12;60:8
**harassing (2)**
141:16;142:1
**hard (1)**
90:20
**HD (1)**
135:21
**head (1)**
26:10
**hear (1)**
85:16

**heard (7)**
43:6,11,14,15,20;
105:5;133:23
**help (2)**
76:19;137:5
**here's (3)**
45:10;89:23;91:14
**high (1)**
17:13
**higher (7)**
60:25;61:1,4;67:21;
68:2;69:4;70:13
**Highway (1)**
8:20
**hold (1)**
44:10
**home (7)**
8:12;9:20;18:18;
28:23;32:12;132:18;
139:4
**Homes (2)**
18:18;92:9
**honestly (1)**
68:13
**hook (1)**
38:16
**hospital (2)**
18:17,17
**hour (4)**
6:4;19:21;20:15,17
**house (2)**
30:19;32:21
**Huh-uh (6)**
20:25;26:7;32:16;
60:21;61:6;66:14
**hypothetical (27)**
44:20;45:9,19;84:21;
85:12;86:6,16;87:4;
108:20;113:15,23;114:4,
24;115:8,15,20;131:6,
10,17,23;137:25;138:15;
139:1,6,15,24;140:12
**hypothetically (4)**
85:6;86:20;108:16;
113:6

**I**

**idea (6)**
10:10;39:8;55:17;
68:5;80:22;136:7
**identification (6)**
23:21;29:8;75:23;
81:12;87:15;125:11
**identify (4)**
6:22;71:10;141:12,22
**ignore (1)**
88:6
**illegal (1)**
117:19
**imagine (2)**
55:9,10
**immediacy (1)**

36:25
**immediate (1)**
49:5
**implement (1)**
85:18
**implemented (1)**
85:7
**important (2)**
11:5;37:2
**improper (1)**
98:18
**Inc (1)**
103:22
**incentive (1)**
45:14
**incentivize (1)**
44:15
**inches (4)**
27:17,19;28:5;70:6
**include (4)**
12:7;29:2;31:16;96:24
**included (4)**
89:13;90:14;91:2;
118:11
**includes (1)**
104:15
**Incomplete (18)**
44:19;45:19;84:20;
85:12;86:5,16;87:4;
108:20;113:15;114:3;
115:8,20;131:10,23;
137:24;138:25;139:15;
140:12
**incorporate (1)**
86:23
**Incorporated (2)**
7:9;72:9
**incorrect (2)**
83:20;84:1
**increase (1)**
86:22
**increases (2)**
85:8;134:25
**indicated (1)**
24:12
**indicates (1)**
128:19
**indication (1)**
83:4
**indirect (9)**
11:22;87:23;88:22,24;
109:18;110:9;111:15;
125:15;136:22
**indirectly (1)**
92:20
**industries (1)**
74:5
**industry (9)**
19:5;71:23;72:1,3;
74:16,17,18,18;75:12
**Infection (1)**
18:10
**information (17)**

29:24;33:23;54:14;
89:12;90:14;91:1;
100:22;112:17,20,24;
113:18,21,25;126:12;
128:25;129:1,3
**injured (3)**
38:24;92:23;136:23
**injury (7)**
136:25;137:4,9,14;
138:21;139:11;140:10
**in-person (1)**
20:20
**inside (5)**
12:3,4;94:18;140:24;
141:2
**instance (4)**
37:24;38:12;93:14;
133:4
**instead (3)**
26:9;113:9;115:15
**instruct (4)**
101:3;119:16,19;
141:5
**instructed (1)**
112:10
**instruction (1)**
120:16
**instructions (1)**
121:3
**intent (2)**
21:18;41:20
**intentionally (2)**
24:25;63:17
**interacted (1)**
72:14
**interaction (1)**
40:17
**interactions (2)**
40:5;72:6
**Internet (3)**
33:24;54:8,13
**interpose (3)**
14:25;98:16;102:9
**Interrogatories (1)**
125:18
**intersect (1)**
33:11
**into (16)**
28:25;43:13,24;44:7;
45:14;49:19;68:22;
69:21;79:22;82:4;85:2;
86:24;113:18;128:2;
129:9;136:18
**introduced (1)**
87:25
**introducing (1)**
88:1
**introduction (1)**
106:5
**investigate (7)**
33:18;53:19;59:16;
71:17;74:17;101:17,23
**investigated (5)**

96:5;102:4;105:15,19,
24
**investigating (1)**
75:9
**investigation (2)**
71:14;112:23
**invoice (1)**
64:15
**involve (3)**
10:11;12:17;13:3
**involved (9)**
16:8,23;18:20,23;
19:5;22:24;74:5;87:7;
112:18
**involvement (1)**
122:6
**Isle (1)**
18:15
**issue (4)**
109:16;110:5,7;
111:13
**issues (1)**
59:10
**item (3)**
16:8;32:4;44:14

**J**

**January (3)**
69:18,20;78:2
**Jeans (3)**
108:14,15,18
**job (1)**
18:25
**join (1)**
73:25
**jump (4)**
11:8,9;32:24;42:22
**Junction (1)**
33:8

**K**

**keep (2)**
52:20;88:1
**kid (1)**
18:25
**kids (1)**
54:24
**kind (5)**
16:23;112:23;133:3;
138:7;140:18
**kinds (1)**
58:11
**Kirby (1)**
7:14
**Kirkpatrick (16)**
6:17;7:12,12,13;
20:12;23:9,11,13,17;
75:19;120:6,9;121:1,7;
122:4,10
**knew (2)**
61:22;96:16

Case 4:07-cv-05944-JST   Document 6232-4   Filed 07/29/23   Page 272 of 866
In Re: Cathode Ray Tube (CRT) Antitrust Litigation
This Document Relates To: All Actions

Margaret Slagle
March 20, 2012

**knowledge (37)**
16:6;22:20;26:24;
65:1,5;70:8;91:3;94:11;
95:1,5,8,12;96:2,3,7,9,
20,23,25;97:5;100:23;
101:7;102:11;104:20;
106:20;116:8;117:14,
23;130:22;133:5;
135:21,24;136:6;137:7;
141:12,17,21

**L**

**Lacks (31)**
13:25;14:14;16:4,16;
24:8;32:1;44:20;45:19;
46:12;56:7;65:19;66:9;
84:10,19;85:12;86:6,16;
87:3;98:25;102:20;
105:2;107:16;108:4;
113:15;114:4;115:8,20;
135:18;138:25;139:16;
140:13

**Lane (1)**
8:20

**large (1)**
66:6

**last (9)**
19:19,20;20:14,16;
23:3;74:21;90:11;109:2;
133:10

**lasted (1)**
20:16

**late (1)**
130:10

**later (1)**
69:21

**lawsuit (20)**
11:21;22:7,12,13,24;
24:12,13;52:15;71:6,21;
73:10,20;74:1,20;
103:10;105:16,19,25;
119:11;120:13

**lawyer (2)**
23:14;119:25

**lawyers (1)**
102:12

**layperson (1)**
45:25

**LCD (17)**
40:22,22;41:2,5;
61:17;68:24;69:2,4,12,
14;130:8,18,23;131:18,
21;132:6;133:19

**leader (2)**
43:7,9

**learned (1)**
119:2

**least (2)**
21:18;135:9

**led (2)**
28:21;122:6

**left (1)**
28:23

**left-hand (1)**
30:25

**legal (33)**
12:20;15:22;16:5,16;
39:7;40:2;43:19;44:20;
45:20;49:16;83:23;
84:11,19;85:14;86:7,17;
87:4;90:22;102:19;
103:3;105:2;107:17;
108:5,20;113:16;114:4;
115:9,21;137:6,16;
139:1,16;140:13

**less (3)**
84:15,16;135:20

**level (1)**
18:5

**levels (1)**
117:9

**life (2)**
18:19;108:10

**liked (2)**
58:1;67:1

**line (1)**
30:2

**lines (1)**
71:15

**list (1)**
59:20

**listed (3)**
124:21;126:24;128:25

**lists (1)**
126:11

**litigation (4)**
6:18;79:3;83:1;88:11

**little (8)**
51:25;71:2;76:9;88:5,
15;131:16;139:22;
140:18

**live (1)**
8:19

**lived (5)**
8:16;9:12,13,15;92:6

**living (4)**
33:4,5;42:15;131:4

**LLC (1)**
6:17

**locate (1)**
64:18

**located (4)**
6:13;33:6;65:21,25

**location (1)**
51:1

**locations (1)**
65:25

**long (9)**
8:16,25;9:5,12;19:20;
20:14;23:13;32:5;92:15

**longer (3)**
42:15;139:12;140:1

**look (37)**
21:24;24:1;27:20,23;
29:13;30:23;33:21,23;

34:1;39:9;41:3,16,19;
52:5,13;54:3;60:4;76:1;
79:20;82:6;88:14;90:18;
91:25;97:14;116:18;
121:22;122:20;123:3,8;
125:2,14;126:15;
130:14;133:14;136:13;
140:24;141:2

**looked (10)**
37:11;48:5;52:17;
68:22;69:1;70:14;80:9;
133:7;138:14;139:3

**looking (10)**
26:17,17;76:4;79:8;
80:20;83:3;91:16,18;
93:22;103:19

**looks (2)**
82:17;127:4

**Los (1)**
6:14

**lose (1)**
124:14

**loss (2)**
43:6,9

**lot (9)**
21:17;29:24;44:7;
51:13;55:24;62:14;
85:23;87:7;121:9

**loud (1)**
109:10

**lower (9)**
55:15;56:1,3;62:16;
67:20;68:2;69:7;70:13;
84:6

**Ltd (1)**
97:17

**Ltd's (1)**
125:18

**lunch (1)**
116:14

**M**

**ma'am (1)**
134:8

**Magnavox (61)**
25:14,14,17,21,22,24;
26:6,14,20;27:4,6,9,13;
28:3,7;29:2;30:9;31:19;
32:18;33:19;35:6;37:20;
40:5,21;42:19,23,24;
46:7,21,25;47:9,17;50:6,
24;52:6;53:15;55:18;
56:12;57:23;59:2,14;
62:3,6,25;64:4;67:20;
79:19;80:1,15;82:10,19;
93:4;113:1;127:16,22;
128:9,11,17;129:15;
141:20,22

**maintain (4)**
94:6,22;106:15;107:8

**maintaining (1)**
117:7

**makes (3)**
83:18;91:20;103:11

**making (1)**
13:10;39:2;97:24;
103:4,4,5,11;104:18;
107:12;109:21;114:23

**MALAISE (18)**
7:10,10;129:22;130:3;
131:5,12;132:2,13;
133:25;135:25;137:19;
138:3;139:5,20;140:17;
141:10,19;142:3

**manipulated (1)**
109:25

**manner (1)**
110:1

**manual (1)**
27:21

**manufacture (5)**
71:7,11;100:9;105:11,
13

**manufactured (40)**
13:21;14:3,8,13;27:2,
12;50:16,18;79:10;
80:23;81:1,3,5,9;83:5,8;
86:10;97:17,21;98:3,21;
99:5,14;100:5,24;
101:22;102:5;104:11,21,
24,25;105:7,8;107:14;
108:3;140:1,21;141:4,
14,23

**manufacturer (1)**
71:3

**manufacturers (5)**
13:11,16;82:18;85:5;
98:12

**manufacturer's (11)**
32:7;55:5,11,15,19,23,
25;56:3;64:25;65:6;
70:16

**manufactures (1)**
49:7

**many (5)**
19:15;24:16;25:8;
27:17,18

**MARCH (5)**
6:1,4,15;118:7;134:17

**Margaret (6)**
6:21;7:18;8:10;23:25;
126:11;142:7

**M-a-r-g-a-r-e-t (1)**
8:10

**marked (13)**
23:20,23;29:7,11;
75:22,25;76:24;81:11,
25;87:14,22;125:10,13

**market (4)**
41:9;84:1;132:21;
133:15

**marketed (5)**
97:17,22;98:4;99:14;
100:5

**Mary (4)**

7:12;19:14;91:11;
120:5

**MasterCard (1)**
48:18

**matter (2)**
6:17;112:3

**may (9)**
10:23,23;16:9;63:16;
69:7;76:5;101:21;127:9;
129:20

**maybe (5)**
52:6;57:11;77:10;
79:20;114:19

**McAllister (2)**
7:4,4

**McInerney (1)**
7:15

**mean (15)**
12:12;26:3;32:24;
35:17;42:12;58:24;68:8;
69:10;73:17;95:8;
101:14;112:15;132:14;
135:12;137:3

**meaning (1)**
96:3

**means (1)**
31:7

**meant (1)**
112:17

**measured (1)**
27:19

**meet (2)**
19:11,15

**meeting (5)**
19:20;20:16,19;21:1,5

**meetings (1)**
21:13

**members (4)**
109:17;110:8;111:14;
136:21

**memory (2)**
27:24;88:19

**mention (1)**
76:4

**mentioned (5)**
25:22;35:2;42:18;
54:17;130:7

**met (5)**
7:25;19:19;23:2,3,10

**Meyers (1)**
7:7

**microscopic (2)**
76:16;82:4

**might (3)**
11:6;51:25;125:3

**mind (2)**
51:15;60:6

**minute (5)**
27:23;29:13;37:21;
51:25;126:14

**minutes (1)**
8:1

**mischaracterized (1)**

75:3

**mischaracterizes (2)**
95:19;96:14

**misheard (1)**
119:6

**misleading (4)**
96:13;102:20;124:17;
137:24

**Missouri (7)**
17:11,12,15,17,18;
92:11,13

**misstate (1)**
47:5

**Misstates (12)**
21:8;22:4;32:1;37:5;
45:18;47:2,3,12;59:5;
110:14;121:3;137:24

**model (4)**
62:6,7,10;77:9

**modern-looking (3)**
132:12,14,15

**mom (1)**
92:16

**moment (3)**
76:1;87:10;88:14

**monitors (4)**
71:19;118:5,10,15

**month (1)**
79:22

**months (6)**
42:20;46:24;47:9,20;
51:14;128:1

**more (20)**
39:15,17,20;41:10,11;
42:4;46:1,2;51:13;
59:22;62:11;66:2;68:25;
91:20;92:21;132:18;
135:5,12;138:7;139:22

**morning (5)**
6:11,24;7:25;8:5,6

**most (2)**
110:18;135:22

**mostly (1)**
18:18

**move (1)**
113:11

**moved (4)**
28:24;30:18;79:22;
128:2

**much (16)**
28:13;42:25;51:5;
54:15;60:19;61:1,5;
64:10;67:3,8;69:23;
79:25;80:4;88:14;
111:19;114:9

**Myers (1)**
6:25

**myself (2)**
8:2;79:23

**mysteries (1)**
29:10

# N

**name (5)**
6:11;8:2,8;20:6;
138:10

**named (1)**
72:17

**nearby (2)**
34:5,11

**need (8)**
32:22;38:10;42:21;
54:25;63:2;88:15;
131:15;134:15

**needed (4)**
32:22;35:22;49:5;
54:22

**negotiate (5)**
56:13,25;65:15;66:4,
12

**new (8)**
28:22;42:6;61:22;
62:21;88:2;131:19,20;
133:3,11;135:4;138:16;
139:7;140:4

**newer (1)**
41:9

**newspaper (2)**
33:21;95:9

**night (5)**
19:19;20:16;23:3;
42:11,12

**Ninety-two (1)**
116:2

**noncompetitive (1)**
117:8

**None (1)**
123:20

**normally (3)**
36:4;53:19,23

**North (3)**
132:23,24

**note (1)**
88:4

**notes (2)**
88:6,10

**Notice (1)**
23:25

**November (10)**
30:21;41:25;47:20;
69:18;118:7;127:1,13;
134:19;135:10,14

**number (4)**
26:18;77:9;88:3;129:9

**numbers (6)**
76:6,12;82:2;93:23;
129:13,16

**nurse (3)**
17:7;18:14;108:12

**nursing (3)**
18:2,3,9

# O

**o0o- (3)**
6:2;7:23;142:11

**oath (5)**
10:13;63:12;81:21;
87:20;111:5

**Object (72)**
12:19;13:24;15:17;
16:3,15;21:7;22:4;27:7;
31:25;37:4;39:6,24;
43:18;44:10,18;45:17;
46:11,14;47:1,2,11;
49:15;56:6;58:17;59:4;
65:18;66:7;67:23;68:10;
73:12;74:7,10,23;83:22;
84:9,18;85:11;86:4,15;
87:2;90:21;96:12;98:13,
24;99:16;100:11;
101:24;102:18;105:1;
107:15;108:6,19;
110:13;114:2;115:7,19;
121:2;123:23;124:16;
130:25;131:9,22;132:9;
133:20;135:18;137:15,
23;138:24;139:14;
140:11;141:15,25

**objection (15)**
14:9,14,19;15:1,21;
39:14;44:12;95:18;
98:17;102:10;113:14;
116:11;120:15;124:5,6

**objections (9)**
14:5;44:3;91:4;99:22;
103:6;105:9;109:1,3;
125:17

**objective (1)**
50:5

**obligation (1)**
10:14

**obsolescence (2)**
135:2,11

**obsolete (3)**
135:15,16;139:25

**obtained (1)**
117:11

**off (15)**
46:21;59:20;63:3,6;
69:10;76:21;81:13,15;
87:9,12;110:19,23;
129:21,22,24

**offer (2)**
57:2;141:2

**offered (1)**
60:22

**old (1)**
42:14

**O'Melveny (2)**
6:25;7:7

**once (1)**
19:17

**One (52)**

10:4,5,22;11:24;21:4;
25:14,14,22;26:2,14;
30:2;34:13;37:21;44:14;
48:4;49:3,3;51:4,25;
52:3;54:22,23;62:10,12;
65:5;66:2,22,23,24;
70:11;79:21,23,23;80:6,
7,25;86:20;89:8;90:1,6,
7;92:21;103:18,20;
106:2;110:11;122:14;
124:13;128:3,7;132:3;
139:18

**ones (1)**
35:2

**one's (2)**
31:4,4

**only (6)**
19:23;39:8;75:14,15;
78:18;115:16

**open (1)**
26:19

**opened (2)**
50:13;112:4

**opening (1)**
26:18

**operation (1)**
59:12

**opinion (3)**
132:5;135:15;140:13

**options (1)**
58:14

**order (3)**
43:13,23;44:15

**original (4)**
121:24;122:1,3;
123:11

**others (3)**
71:22;74:6,19

**Otherwise (3)**
119:19;124:10;141:7

**out (17)**
21:14;29:24;34:15;
62:23;63:22,24;71:2;
76:15;93:15;95:9;96:17;
109:10;131:6,12,18,19;
140:25

**over (9)**
11:6,11;33:7;49:2;
68:6,18;69:25;70:9;
125:8

**overall (1)**
67:11

**overcharge (13)**
109:16;110:5,7,11;
111:13,23;112:7;113:7,
13,23;115:5,15,18

**overcharges (1)**
111:24

**overview (1)**
17:5

**own (7)**
9:20;12:2;92:9,11;
95:9;101:7;102:11

**owned (1)**
92:15

# P

**page (32)**
77:3,8;79:9;82:11,15;
91:13,14,14,17;93:22,
22,23;95:23;97:7;
103:17,20;107:1;
111:10;115:25;116:15;
126:1,2,8,9;127:21;
128:19,25;134:3,3,7;
136:10,16

**pages (1)**
88:19

**paging (1)**
125:21

**paid (36)**
28:13,19;29:2;30:13;
31:14;39:4,5,13,23;
42:25;46:6;48:10,13,23;
51:13;52:7,10;55:14;
60:6,19;61:4;64:10;
69:23;78:9;80:1,4;84:6,
16;110:16;111:20;
113:1,10,21;114:23;
115:3,14

**paper (4)**
41:12,14,16,19

**Paragraph (38)**
91:12,15,16,25;92:2,
18;93:21,25;94:2,19;
96:19;97:9,21;99:10;
103:17,18;106:4,8;
107:2,3;109:5,5;111:8,
12;116:6,16,19,22,24,
25;117:2,15;134:2,10;
136:9;138:20;139:11;
140:7

**paragraphs (2)**
91:21;95:4

**Park (1)**
6:13

**part (6)**
13:8;88:18;91:6;
92:12;98:1;100:2

**participate (2)**
119:10;120:12

**participated (3)**
22:15,18;86:11

**participation (2)**
12:6;24:13

**particular (1)**
44:14

**parties (1)**
6:21

**parts (1)**
49:18

**pass (1)**
86:22

**passed (14)**
92:16;109:17;110:6,7,

12,17;111:14,24;112:6;
113:13;114:1;115:5,16,
18
**passing (1)**
115:16
**past (1)**
20:1
**pattern (1)**
9:7
**pause (1)**
46:14
**pay (10)**
9:22;32:15;35:16;
39:20;51:5;63:21;64:1,
5,7;92:13
**paying (2)**
110:18;122:16
**pending (2)**
100:8;114:21
**people (8)**
16:7,8;46:2;49:18;
133:24;135:12,21,22
**percent (1)**
51:2
**percentage (1)**
67:11
**period (11)**
92:19;94:5;100:5;
104:4;106:14;117:18;
118:6,7;134:11,13;135:9
**permitted (1)**
116:22
**person (3)**
21:5;75:14;109:24
**personal (24)**
94:11;95:1,5,8,12;
96:2,3,7,7,20,23,25;
97:5;100:23;101:7;
104:20;106:20;116:8;
117:14,23;137:7;141:12,
17,20
**personally (9)**
6:8;67:3;72:21;73:6;
74:14;75:10;103:1;
137:13;142:2
**persons (1)**
75:15
**perspective (1)**
85:4
**Philips (3)**
7:11;141:14,23
**phone (3)**
20:2,10,12
**phrased (2)**
96:13;124:18
**picture (4)**
77:6,9;78:16,19;
82:10,12
**pictures (7)**
76:25;78:24;79:2;
82:22;129:12,14;135:22
**Pine (1)**
8:14

**place (8)**
6:16;18:16,17;33:10;
42:14;52:20;60:12,15
**places (2)**
52:22,23
**plaintiff (11)**
7:13,15;11:20,23;
22:7,11;73:10;103:10;
119:11;126:10;136:21
**Plaintiffs (10)**
94:4;106:10,13;
109:17;110:6,8;111:14;
123:22;124:3,10
**Plaintiffs' (5)**
87:23;88:7,22,25;
125:16
**plasma (4)**
41:21,22,23;61:19
**play (1)**
37:10
**player (4)**
37:13,23;57:10,11
**players (1)**
37:10
**please (4)**
6:22;7:17;8:9;107:24
**pm (1)**
142:10
**point (14)**
10:24;25:1;37:10;
41:7,20,24;42:1,9;53:18;
59:25;60:1,3;82:3;
124:20
**popular (1)**
135:5
**posed (1)**
45:9
**possible (5)**
52:7,9,10,11;91:6
**posted (1)**
31:5
**potential (1)**
46:2
**potentially (1)**
135:4
**preamble (1)**
98:17
**preparation (4)**
19:22;21:20,21,25
**prepare (2)**
19:7;21:6
**present (1)**
9:14
**pretend (1)**
88:7
**pretty (1)**
10:10
**prevail (3)**
123:22;124:3,11
**prevention (1)**
18:10
**previously (3)**
19:10;21:10;87:14

**price (50)**
13:4;15:15;30:8;
32:20;36:4;39:3,5;51:7,
11;55:5,11,14,16,20,21,
25;56:2,14,18,19,25;
58:1,21,24,25;59:3,6,23;
60:6;61:3;62:16;65:15;
66:12;67:12,16,21,21;
69:2,4;84:15;85:8;
86:23,23,24;106:21;
108:1,17;127:13,17;
134:25
**price-fixed (4)**
13:5,17;14:17;15:15
**price-fixing (7)**
11:22;12:11,14,18;
16:13;83:18;86:12
**prices (15)**
39:9;54:14;59:17;
66:5;68:5,17,24;70:14;
85:6;94:7,22;106:16;
107:8;109:25;117:9
**pricing (1)**
13:12
**primary (1)**
9:18
**print (1)**
76:15
**printed (1)**
76:15
**prior (9)**
41:18;53:12;74:15;
87:25;88:3;95:19;96:14;
122:3;137:24
**privilege (1)**
112:11
**probably (4)**
9:24;10:10;40:14;
130:21
**problem (1)**
67:6
**proceeding (1)**
73:11
**proceedings (1)**
142:9
**produced (5)**
26:3;64:13,17;76:14,
16
**product (26)**
12:2;13:17;16:2,11,
13,14;32:11;43:12;
45:12,13;57:3,8;63:18,
22;70:16;79:7,15;83:11;
84:5;93:12;98:1,2;
113:9,11;127:12
**production (1)**
16:7
**products (35)**
25:7,8,11,19;37:19,22;
38:4;45:15;53:20;57:9,
12;58:3,12;60:4;92:21;
93:2;94:7,22;97:19;
99:25;100:2;104:14;

106:16;117:10;118:13,
15;132:25;133:4,12;
135:3,10,14,16;136:1,5
**professional (2)**
18:19;19:3
**program (1)**
18:4
**promised (1)**
123:17
**pronounce (1)**
20:6
**proof (1)**
52:18
**properties (1)**
92:10
**property (3)**
92:11,15;136:24
**provide (4)**
89:12;90:13;91:1;
100:21
**provides (1)**
96:5
**proximate (1)**
136:19
**purchase (47)**
12:7;24:14;25:18;
28:7,11;30:3,8;31:4,9;
32:7,9;37:19,22;38:21,
25;40:6;42:18;43:14;
47:16,24;48:24;49:24;
53:12,14,16,16,22;57:5,
8,12,15,24;64:22;65:3;
67:19;69:14;70:2;80:15;
83:14;86:13;87:1;127:1,
22;128:12,20;138:9;
140:15
**purchased (56)**
12:1;24:17;25:8;
30:16;31:19;32:3;33:19;
35:6,12;36:1,8,24;37:18;
38:7;40:20;46:23;47:8;
49:22;50:19,24;52:18;
53:10,25;54:18;59:7,15;
60:3;61:7,16;66:16,20;
67:21;69:9,12,16;77:24;
78:8;79:6,15;83:11;
85:10;86:21;92:20;93:3,
8;96:17;97:2;109:24;
111:19;112:8;118:5,18;
127:5,12;128:16;130:13
**Purchaser (8)**
87:23;88:22,25;
109:18;110:9;111:15;
125:16;136:22
**purchasers (1)**
118:14
**purchases (10)**
30:1,2;54:11;64:19;
65:11,11,16,16;66:5;
97:1
**purchasing (8)**
28:22;41:5,20,22;
53:20,21;66:6;130:14

**purpose (2)**
41:17;79:3
**purposes (2)**
82:25;83:1
**put (3)**
32:13;49:19;113:11

**Q**

**quality (1)**
133:18
**quantities (3)**
65:12,17;66:6
**quick (1)**
130:5
**quickly (2)**
48:25;49:1

**R**

**RadioShack (38)**
28:12;30:3;33:2,6,16;
35:13;36:18;40:11,15,
21;42:25;43:3;46:5,6;
48:1;50:20;54:2;55:1;
58:3;60:19,22;61:3;
64:1;65:10,14,21,22;
66:4;84:4,14;111:20,23;
112:6;113:1,8,21;
114:23;115:14
**RadioShack's (4)**
43:4;60:23,25;85:4
**raise (6)**
85:6;94:6,21;106:15;
107:8;109:7
**ramifications (1)**
137:6
**rather (1)**
88:1
**ray (1)**
6:18
**read (24)**
15:7,10;82:4;90:6,6;
91:10;94:12,20;95:9;
96:4;101:10,11;104:1;
107:2;109:8,11;114:20;
116:5,7,22,24;127:7;
129:9;136:18
**reading (3)**
104:8;115:23;134:24
**reads (2)**
94:3;111:12
**really (16)**
13:7;31:21,22;33:20;
34:12;42:9;48:1;55:13;
65:25;68:13;69:7;85:22,
24;90:7;124:1;133:14
**reason (9)**
10:18;21:24;5;36:21;
86:22;92:23;113:8;
114:7;131:2
**rebate (4)**
32:6,7;70:16;71:3

recall (16)
  32:2,5;54:4;57:4,14,
  17;66:25;70:19;71:4;
  89:15,16;90:4,10;
  124:19;133:12,14
receipt (11)
  28:16;29:5;48:3,4,5;
  51:7;52:25;64:15;71:1;
  80:5,7
receipts (2)
  52:17,21
receive (3)
  17:8,10;124:24
receiving (1)
  124:20
recent (1)
  138:7
recently (3)
  90:5,11;136:6
recess (5)
  63:7;81:16;87:13;
  110:24;129:25
recognize (10)
  24:3,5;29:15,18;
  76:23;88:21;89:2,3,8,10
recollection (11)
  20:18;30:16;48:22;
  59:2;79:6,14;80:22;
  89:24;91:3;128:22,23
record (32)
  6:10;8:9;23:24;47:10;
  52:12;63:3,6,9,11;70:25;
  76:13,21;81:13,15,18,
  20;82:5;87:10,12,17,19;
  110:23;111:1,4;125:15;
  129:9,17,21,22,24;
  130:2;136:18
record's (1)
  80:11
recovery (3)
  123:18,21;124:9
Recycle (2)
  132:23,24
red (1)
  76:9
refer (5)
  12:14;90:19;134:1;
  136:8,15
reference (1)
  31:2
referencing (1)
  79:9
referring (4)
  55:22;121:23;137:19;
  140:6
reflect (2)
  47:11;80:15
reflected (4)
  93:5,6;127:3,11
reflects (2)
  30:8;126:25
refresh (5)
  30:15;79:6,14;80:21,

22
refurbished (1)
  62:1
regarding (16)
  94:12,21;95:2,5,13;
  96:2,9,20,25;97:3;
  112:18;116:9;117:15,
  24;129:15;130:5
registered (1)
  17:6
reintroduce (1)
  8:1
Relatively (1)
  128:6
relevant (1)
  92:19
relied (18)
  72:20;73:5;74:12;
  75:5;94:14,15;99:6;
  100:21;101:19;102:1;
  104:19;105:17;106:23;
  107:18;112:1,16,20,23
rely (3)
  72:22;75:7;94:16
relying (1)
  107:21
remember (27)
  24:20;26:8;27:16;
  30:17;31:21,22;34:3;
  36:5;38:13,18;40:23;
  47:25;48:1;53:6;55:3,7,
  13;56:5,10;57:25;58:2;
  66:19,22;71:1;78:6;
  90:2;140:20
REMEMBERED (1)
  6:3
remind (4)
  10:13;63:12;81:20;
  111:4
reminding (1)
  87:19
rent (1)
  9:21
repeat (9)
  12:25;47:6;61:2;
  63:18;79:13;84:12;
  105:4,22;107:23
rephrase (2)
  45:5,6
replace (1)
  131:21
replacement (1)
  93:16
Reporter (15)
  6:7;7:16;11:3;15:10;
  23:20,23;29:7,11;75:22;
  81:11,24;87:21;88:5;
  101:11;125:10
Reporters (1)
  6:13
reporter's (1)
  125:13
represent (7)

6:23;23:17;30:12;
31:14;118:1,14,18
representative (1)
  72:7
representatives (2)
  72:11,16
representing (3)
  6:25;7:11,13
request (1)
  24:4
requested (2)
  15:10;101:11
requests (2)
  124:21;125:4
required (1)
  84:24
research (14)
  21:23;53:11,20,23;
  71:7,9,18,22,25;72:3;
  74:4,16;75:10;96:18
residence (4)
  9:17,18;60:13,16
resident (2)
  92:3;96:21
residing (1)
  42:15
respect (15)
  25:6;60:18;63:2;
  99:12;111:18;130:13;
  131:5,17;133:2;135:16,
  25;138:8;140:17,19;
  141:20
respond (1)
  114:13
Responses (2)
  125:17;127:7
responsive (2)
  125:3,8
restate (1)
  45:7
restraint (1)
  117:5
result (2)
  83:14;136:19
retail (18)
  18:23,24;19:5;55:5,
  11,15,20,23,25;56:4;
  72:3;74:18;108:11;
  132:24;133:11;138:10;
  139:8;140:3
retailer (2)
  43:12;45:12
retailers (1)
  59:16
retained (1)
  123:13
retention (3)
  122:10,18;123:7
retracted (1)
  112:22
reveal (5)
  15:1;101:4;102:12;
  119:17;141:6

revealing (1)
  120:19
review (3)
  91:8;134:5;136:13
reviewed (2)
  19:9;21:9
reviewing (1)
  21:12
rid (1)
  113:10
right (50)
  11:4;13:10;20:17;
  25:21;28:2;35:22;39:21;
  43:23;44:6;46:23;61:14;
  62:12,17,23;66:3;73:22,
  24;77:12;78:5;79:25;
  80:3,9;81:6;85:25;89:2,
  22;93:17;96:19;103:14,
  18,20;104:8;108:15,23,
  25;109:2,5,8;110:3,10;
  116:1,8;118:11;121:11;
  123:13;126:4,13;128:3,
  18;134:16
RN (4)
  17:8,24;18:7,8
Road (2)
  6:5;34:10
room (9)
  27:17;49:3,4;58:1,21;
  128:7,9,10;131:4
roughly (3)
  51:11;69:18;130:10

─────────────
S
─────────────

sake (1)
  139:24
sale (8)
  31:20,21;36:19;54:2;
  55:2;63:19;72:4;113:11
sales (4)
  29:3;31:16,17;64:8
salesperson (5)
  36:2;56:14;57:2;
  66:12,16
Same (40)
  14:5,9,14,19;15:21;
  39:14;44:3;50:5,22;
  51:1,6,11,11,17,19,21,
  23;56:13,23;60:5;62:3,
  25;64:4;68:19;70:12;
  88:1;91:4;99:22;103:6;
  105:9;109:1,3;120:15,
  15;121:3;124:5,6;126:8;
  133:18;141:19
Sam's (3)
  34:20,20,22
Samsung (14)
  7:1,1,8,8;13:20;14:2,
  7;72:8,8;97:16;103:21,
  22;125:17;126:3
San (1)
  6:8

satisfied (1)
  36:7
saw (4)
  56:18;89:5,15;90:1
saying (3)
  115:4;137:20;138:23
scenario (4)
  86:3,19,24;115:17
school (2)
  17:13;18:3
screen (5)
  26:5,6;28:3;40:22;
  50:8
screens (4)
  26:4;132:19;136:4;
  138:7
SDI (1)
  125:17
SEAI (6)
  104:11,21;106:21;
  107:5,13;108:1
search (1)
  125:2
searched (1)
  52:23
Sears (3)
  34:11,12;48:18
SEC (15)
  97:16,21;98:3,11,11,
  21;99:5,13;100:5,9,24;
  106:21;107:5,13,25
second (12)
  42:17;66:24;77:8;
  79:23;92:17;94:2;97:13,
  14;106:9;109:14;
  111:11;134:23
secondary (1)
  17:23
seeing (4)
  89:24;90:4,10;133:12
seeking (4)
  97:20;118:1,14,17
seems (5)
  9:7;13:8;85:22,24;
  87:7
sell (12)
  34:5,25;41:2;43:12,
  21;59:17;62:12,15;
  71:11,18;108:13;113:9
selling (9)
  18:24;40:21;44:14;
  108:17;133:3,5,11,13;
  138:11
sells (2)
  45:12;132:25
sending (1)
  71:1
sense (6)
  43:16,17,25;45:10;
  91:20;114:8
sentence (18)
  92:17;94:2,13,20;
  97:13,14;104:2,5,13;

106:9,12;109:14;110:4,
4;111:11,12;134:23;
135:8
**sentences (2)**
104:6;109:9
**separated (1)**
130:23
**separates (1)**
132:6
**September (5)**
79:8,10,17;118:24;
119:4
**serial (1)**
26:17
**serious (3)**
73:18,21;74:1
**service (1)**
40:8
**set (7)**
64:2,5;66:16;78:17,
19;95:6;125:18
**settle (1)**
58:15
**settlement (1)**
22:19
**several (3)**
27:8;89:5;95:4
**shaking (1)**
26:9
**shape (1)**
75:3
**Shelburne (1)**
6:5
**shelf (1)**
39:10
**shoes (1)**
108:17
**shop (2)**
35:10;54:8
**shopping (1)**
54:5
**short (2)**
111:3,7
**Shorthand (1)**
6:7
**shortly (4)**
42:19;47:13,17;79:24
**show (1)**
28:6
**side (1)**
77:11
**signed (3)**
19:9;21:10;91:11
**significant (3)**
53:16,21;65:17
**similar (1)**
52:2
**single (1)**
45:13
**sit (2)**
137:11;141:11
**sitting (4)**
28:2;123:5;133:17;

141:21
**situation (3)**
45:10;138:2,4
**size (5)**
28:3;51:17,22,23;
58:21
**sizes (1)**
58:6
**Slagle (39)**
6:21;7:18,25;8:11,12,
16;10:1;11:18;17:4;
19:7;22:6;23:22,25;
24:11;29:9;47:4;63:11;
71:6;75:24;76:22;78:13;
81:19;87:19;88:4,13;
91:12;92:20;107:3;
111:3;112:9;118:2,21;
124:20;125:12;126:11;
129:19;130:4;142:4,8
**S-l-a-g-l-e (1)**
8:11
**slow (1)**
103:7
**smaller (2)**
52:1,3
**sold (29)**
35:14;43:3;46:9;58:3;
61:3;84:4,14;94:7,23;
97:17,22;98:4;99:14;
100:5;106:16;107:9;
108:3,10;113:22;115:3;
117:10;132:21;138:17;
139:3,7,8,13,18;140:16
**somebody (2)**
16:1;108:16
**someone (2)**
49:22;110:16
**Sometime (2)**
119:9;120:7
**sometimes (5)**
38:10;53:24,24;54:11;
62:10
**somewhere (3)**
19:1;77:11;90:24
**son (14)**
49:2;54:18,21;57:11;
58:21;60:8,10;66:20;
78:8;79:24;128:6,17;
130:18;131:3
**son's (2)**
128:9,10
**sorry (19)**
24:22,22;26:11;29:22;
32:24;42:22;44:11;47:3;
53:8;69:9;70:22;72:24,
25;74:8;84:9;91:18;
95:16;99:11;119:9
**sort (1)**
123:18
**South (4)**
8:14;9:18;30:3;33:13
**Southwest (2)**
17:11,15

**space (1)**
132:18
**spare (1)**
109:11
**speak (1)**
7:6
**speaking (3)**
86:20;128:6;136:2
**special (1)**
52:20
**specific (7)**
25:8;65:4;71:11;
88:16,17;90:1;94:19
**specifically (5)**
36:5;43:15;134:2;
136:9,15
**specifics (1)**
90:2
**speculation (4)**
65:19;66:9;67:24;
68:11
**spell (2)**
8:8,8
**split (1)**
28:23
**spoke (5)**
19:23;23:5,7;66:17;
72:15
**spoken (1)**
75:11
**Springfield (1)**
17:12
**square (1)**
52:1
**stabilize (4)**
94:7,22;106:16;107:8
**stamp (1)**
29:12
**stand-alone (5)**
12:2;93:11,18;98:4,8
**standard (2)**
64:25;65:6
**standpoint (1)**
45:25
**start (1)**
17:19
**Starting (1)**
134:23
**starts (1)**
106:10
**State (10)**
6:8,22;8:8,21;16:22;
17:11,15,17,18;28:5
**statement (16)**
29:16,19;30:23;48:14;
64:15;80:2,8,10,14;92:3;
100:7;103:15;126:22,
25;127:3,11
**statements (2)**
48:8,20
**States (5)**
94:8,23;106:17;
138:17;139:7

**stating (1)**
99:21
**stayed (1)**
68:19
**sticker (1)**
56:19
**still (13)**
14:12;36:10;59:8;
60:12,15;63:12;76:19;
81:21;84:22;111:5;
133:8;135:23;139:4
**stock (1)**
62:11
**store (27)**
19:1,2;40:16;43:13,
24;44:7,15,17;45:14,16;
46:1;50:22;54:4,5;
55:21;58:13;60:4;63:23,
24;66:2;108:11;132:25;
133:2,3,11;138:10,12
**stores (14)**
34:1,5,8,24;35:9;
36:15,18;40:25;41:2;
54:1;65:22;133:12;
139:8;140:3
**straight (1)**
85:3
**Street (1)**
8:14
**streets (1)**
33:11
**strike (4)**
25:23;32:17;83:12;
141:1
**stuck (1)**
131:3
**stuff (7)**
27:20,21;36:5;41:13;
44:9;79:20;135:22
**Sub (1)**
117:2
**submitted (1)**
27:21
**Subparagraph (1)**
117:17
**Subpart (3)**
116:19;136:16;138:20
**substantially (1)**
117:19
**substitutable (1)**
135:5
**sue (10)**
15:14;16:1,12;72:19;
73:3,7,20;74:5,19;
118:21
**sued (4)**
14:12,17;49:14;102:6
**suggested (7)**
55:5,11,15,19,23,25;
56:3
**suing (2)**
101:17;102:5
**Suite (2)**

6:5,13
**Sunday (1)**
41:19
**superior (1)**
135:4
**Supplemental (1)**
125:16
**suppose (2)**
29:4;84:2
**sure (33)**
10:7,11;13:1;21:15,
17;24:25;26:20;27:7,11;
35:1,3;36:20;41:3;45:8,
8,8;48:2,16;50:12,13;
51:3;59:23;64:8;66:17;
67:1;78:9;90:7;99:12;
101:9;104:8;114:25;
115:2;126:20
**swear (1)**
7:17
**switch (1)**
140:18
**sworn (1)**
7:20
**Sylvania (70)**
25:15,17;42:16;46:18,
21;47:8,16,24;48:11,23;
49:7,9,11,13,14,22,24;
50:3,10,12,17;52:8;53:1,
11,15,25;54:18;55:2;
56:13,23;57:5,10,24;
58:15;59:15;60:18;61:7,
9,10,14,16,21;62:6;
63:16;64:7,21;66:11,16,
24;70:15;77:2,15,22;
78:16;80:5;81:4,6;
83:10,14;84:5;93:5;
127:2,4,10;128:8,12,13;
129:12;140:19;141:13

---

**T**

**talk (6)**
11:6,11;21:25;42:16;
85:16,17
**talked (1)**
40:25
**talking (9)**
12:12;37:20;38:14;
57:9;61:12,14;62:9;
72:25;121:9
**tapes (2)**
63:3;110:20
**Target (3)**
35:4;41:1;133:4
**Targets (1)**
36:15
**tax (5)**
29:3;31:16,17;64:7,8
**taxes (2)**
9:22;92:13
**technology (2)**
50:6;135:6

**telephone (1)**
21:4
**television (179)**
12:3,4;13:9;25:23,24;
26:15,25;27:3,13,15;
28:3,4,8,22;29:2;30:9,
13;31:20;32:3,19;35:12,
23,25;36:1,8,24;37:2,13,
18,20;38:7,8,11,22;39:1,
3,4,13,23;40:6,18,20,21;
41:6,18,22,23;42:10,14,
17,17;43:1;46:7,18,23;
47:16,24;48:11,11,23;
49:8,14;50:4,10,17;
53:11,15,15;54:1,18,22;
55:2,12;57:12,21;58:2,9;
59:8,15;60:12,18,20;
61:4,5,17,17,19,21,22;
63:16;65:7;66:21;67:9,
12,12,20;69:3,3,4,12,14,
24;70:4,12;74:18;76:25;
77:1,4,6,10,11,15,22,24;
78:7,8,16,19;80:15,23;
81:2,5;82:10,12,20;83:5,
8,10,14;84:5,7,15,16;
85:10;86:10,14,24;87:1;
93:4,5,10;94:18;112:8;
113:2;115:14;127:2,10,
17,22;128:8,9,14;
129:15;130:14,23,24;
131:7,8,13,14,19,20,21,
21;132:6,7;133:13,18,
19;137:21;138:5,9,13;
140:19,22,25;141:3,13,
23
**televisions (57)**
11:24;12:7,18;13:4,5,
11,12;24:14,16;25:12,
13,16;27:19;28:24;
33:18,24;34:2,6,25;
36:19;37:9;40:22;41:2;
49:20;53:12;54:3;58:5,
14;59:18;60:15;65:11,
15;66:5;67:16;68:6,18,
24;69:16;71:18;93:3;
96:24;111:18,20;118:5,
10,15;130:20;132:17,20;
133:6;138:11,16,16;
139:7,8,12,25
**term (1)**
43:6
**test (1)**
27:24
**testified (2)**
7:21;80:17
**testifying (1)**
140:20
**testimony (31)**
21:8;22:5;30:7;32:1;
37:5;45:18,21;47:5,12;
59:5;74:15;75:3;84:11,
20;85:14;86:7,17;87:5;
95:19;96:14;110:14;

113:16;114:5;115:9,21;
121:3;126:19,20;130:6;
137:20,24
**testimony's (1)**
99:8
**thereafter (2)**
47:13;79:24
**thereof (1)**
6:5
**thinking (1)**
69:15
**Third (7)**
87:23;88:22,25;89:19;
104:2,5;136:9
**though (10)**
14:12,18;15:16;16:13;
21:18;34:15;107:13;
108:2,17;137:8
**thought (6)**
32:21;42:21;49:9;
52:12;59:3,21
**thousand (3)**
42:7;70:1,9
**threatened (4)**
136:24;137:3,14;
140:10
**three (2)**
20:24;21:2
**three-year (1)**
18:4
**throughout (2)**
11:7;77:16
**times (2)**
19:15;55:24
**title (1)**
23:24
**titled (2)**
87:22;125:15
**today (33)**
6:23;10:11,18,24;
11:19;12:6;19:8;24:4,6;
54:10,15,16;59:8;67:20;
69:5,7;70:13;78:17,20;
93:4;114:17;125:8;
126:19;131:11;132:6,
21;133:5,7,17;135:16;
137:11;141:11,21
**together (4)**
38:3;57:13;78:11;
79:21
**told (4)**
37:1;45:9;47:7;90:18
**tomorrow (3)**
131:7,12,18
**took (3)**
63:24;78:25;111:3
**top (4)**
91:18;116:3;126:3;
134:6
**Toshiba (1)**
7:5
**total (2)**
30:12;31:14

**trade (1)**
117:5
**travel (1)**
18:16
**true (4)**
92:3;137:13;138:19;
139:10
**trust (2)**
102:25;107:7
**truth (3)**
7:20,20,21
**truthfully (2)**
10:15,20
**try (5)**
11:5,11;52:25;53:6;
71:10
**trying (11)**
37:8;52:18;61:9,11;
63:17;68:14;78:15;
100:1,3;116:13;127:6
**tube (22)**
6:18;12:2;13:8,16,17;
25:25;27:13;50:4,10;
67:4,9,13;80:23;83:5,8;
93:9,15,16;98:1,1,5;
137:18
**tubes (48)**
11:21,22;12:8,11,14;
13:16,21;14:3,8,13,18,
18;15:15,16;49:19;67:3;
71:12;75:10;85:7;86:21,
23;94:18;97:18,22;
98:12,21,22,22;99:15;
100:2,6,10,24;101:23;
102:5;104:11,17,21,24,
25;106:22;107:9,14;
108:2,3;118:6,19;135:23
**Tuesday (1)**
6:3
**turn (6)**
95:22;109:4;111:9;
115:24;116:15;126:1
**turned (1)**
125:8
**TV (14)**
32:22,22;33:20;35:22;
50:13;57:13;60:8;82:17;
109:24;128:3;130:8,13,
13;137:18
**TVs (8)**
35:15;59:17;69:22;
96:17;133:23;135:13,
21;136:3
**two (19)**
8:3;21:12;24:18,19;
25:10,11,11,12,16;31:2;
64:18;69:22;78:18;93:3;
96:23,24;109:9;111:18;
129:14
**types (1)**
58:8

|  |
| :-: |
| **U** |

**unclear (1)**
10:23
**under (6)**
10:13;63:12;81:21;
87:20;111:5;113:22
**Understandable (1)**
91:19
**Unfortunately (1)**
9:25
**unintentionally (1)**
11:7
**United (5)**
94:8,23;106:17;
138:17;139:6
**University (4)**
17:11,16,17,18
**unlawful (1)**
136:20
**unrelated (1)**
88:10
**up (17)**
7:6;26:18,19;39:2;
50:13;58:4;64:2,5;
67:16;68:18;83:19;
91:18;110:1;125:24;
126:2,3;132:18
**upon (1)**
72:20
**use (1)**
139:4
**used (3)**
132:25;135:24;138:11
**user (1)**
11:23
**using (1)**
88:2
**usually (1)**
31:7

|  |
| :-: |
| **V** |

**vacuum (1)**
13:8
**Vague (20)**
22:4;24:8;44:19;
45:18;83:23;85:13;86:6,
15;87:3;90:22;98:25;
102:21;105:3;123:23;
124:17;131:1;132:9;
133:20;139:14;140:11
**value (1)**
51:15
**VCR (3)**
38:1,11;57:10
**VERMONT (22)**
6:1,6;8:15,20,23;9:4,
12,13,15,22;30:4;31:17;
33:10;64:9;92:3,6;
96:21;117:11,20;118:2;
136:21,22

**video (1)**
142:7
**VIDEOGRAPHER (14)**
6:10,12;7:16;63:5,8;
81:14,17;87:11,16;
110:22,25;129:23;
130:1;142:6
**videotape (1)**
6:20
**violations (1)**
92:24
**visit (1)**
54:1
**Visiting (1)**
18:14

|  |
| :-: |
| **W** |

**wait (3)**
11:12,14;51:25
**walked (1)**
58:4
**wall (2)**
58:5,11
**Walmart (5)**
34:18,18,19;41:1;
133:4
**Walmarts (1)**
36:16
**wants (1)**
90:16
**warranty (8)**
32:9;57:3,6;64:22,24,
25;65:6,6
**way (18)**
19:5;22:16;26:2,14;
65:5;70:11;71:23;72:1,
4,6;75:3;76:14;83:16;
90:6;92:9;106:2;124:13;
140:15
**weeks (1)**
90:11
**Welcome (2)**
63:10;111:2
**What's (5)**
68:9;99:13;100:20;
109:21;110:10
**whatsoever (1)**
123:20
**where's (1)**
134:15
**Whereupon (6)**
63:7;81:16;87:13;
130:4;129:25;142:9
**White (1)**
7:5
**whole (5)**
7:20;27:21;90:19;
116:22,24
**Williston (5)**
8:20,21,23;9:1,2
**win (1)**
124:14

In Re: Cathode Ray Tube (CRT) Antitrust Litigation
This Document Relates To: All Actions

Margaret Slagle
March 20, 2012

**wise (1)**
　25:4
**withdraw (1)**
　98:14
**within (14)**
　12:8;25:25;27:13;
　37:13;39:10;89:13;
　90:11,14;91:2;133:10;
　140:21,25;141:13,22
**without (4)**
　15:3;35:24;119:18;
　120:19
**witness (109)**
　7:17,19;12:22,25;
　14:20;15:1,5,11,23;16:6,
　19;21:9;24:10,22;25:3;
　26:11;37:7;39:8,15;
　40:1;43:20;44:4,22;
　45:6,23;46:16;47:14;
　49:17;53:8;58:20;59:6;
　63:4;65:20;66:10;67:25;
　68:12;72:24;73:14;
　74:12;75:1;76:8;83:25;
　84:12,22;85:15;86:8,18;
　87:6;88:12;90:23;91:5,
　23;95:17,21;96:16;
　98:20;99:3,18,23;101:9,
　12;102:1,13,22;103:7;
　104:9;105:4,10,22;
　107:18;108:7,22;110:15,
　21;112:19,19,21;113:17;
　114:13,15,18,22;115:11,
　23;117:1;119:8,16,21;
　120:17,21;121:4,17;
　124:1,6;125:23;131:2,
　11,25;132:11;133:22;
　135:20;137:17;138:1;
　139:2,17;140:14;141:9,
　17;142:2
**woe (3)**
　114:12,12,12
**word (1)**
　11:4
**work (4)**
　9:23;84:2;136:1;139:4
**worked (4)**
　19:1,2;36:9;108:11
**written (2)**
　122:9;123:6
**wrong (1)**
　47:8

### Y

**Year (6)**
　8:18;9:2,6;30:23;
　69:16;133:11
**years (2)**
　52:18;68:6
**Yep (4)**
　29:14;103:23;116:4;
　134:22
**yesterday (1)**

21:1

# EXHIBIT 56

Page 1 of 4

## Al Guttman

**From:** "Dell Inc." <SMB_OnlineOrder_Resolution@Dell.com>
**To:** <LAWSUITES@ATT.NET>
**Sent:** Monday, March 20, 2006 5:55 PM
**Subject:** Dell Order Confirmation - 881079786

**DELL** Small Business

# Thank you
## for your recent purchase.



Desktops      Notebooks      Printers      Software & Peripherals      Service & Support

ORDER PROGRESS

Make the most of your system with our online classes!
Includes courses such as Wireless Networking, Microsoft® Office XP, QuickBooks and more

**Online Support**

We'd like to thank you again for your order. Below you will find your order details.

Track Your Order

To track your order and view your order details, visit Order Status.

**Customer number:** 65289009

**Order number(s):** 881079786

**Estimated shipping date¹:** Friday, March 24, 2006

**Customer Care**
**Rebate Information**
**Technical Support**
**Warranty Information**
**Contact Us**

**Experience Dell**

**Exclusive E-mail Savings**
**Shop Software & Peripherals**
**Learn about Dell's Award-Winning Service and Support**

Your Purchase Information

**Payment Method:**
Pay with one credit/debit card online

**Bill To:**
Alvin Guttman
Lawsuites@att.net

**Shipping/Handling Method:**
3-5 Day Delivery

**Ship To:**
Alvin Guttman
Lawsuites@att.net



3/20/2006

910 17th Street, NW 800
washington, DC 20006
(301) 6067239 (work)

910 17th Street, NW 800
washington, DC 20006
(301) 6067239 (work)

## Order Details

Order detail - order placed 2006-03 20 22 35 55

### Dimension 1100 P4
**Intel® Pentium® 4 Processor**
**(2.80GHz, 533 FSB), Genuine**
**Windows® XP Professional**

Qty: 1
Unit Price: $877.00

| | | | |
|---|---|---|---|
| Processor | Intel® Pentium® 4 Processor (2.80GHz, 533 FSB) | WP285B | [221-9743] |
| Memory | 512MB DDR SDRAM at 400MHz | 512M4 | [311-5384] |
| Keyboard | Dell USB Keyboard | EK | [310-5324] |
| Monitors | 17 inch E773 (16 inch viewable) Conventional CRT | E773 | [320-4544] |
| Video Cards | Integrated Intel® Extreme Graphics 2 | IV | [430-3900] |
| Internal Hard Drives | 80GB Ultra ATA/100 7200RPM Hard Drive | 80 | [340-3274] |
| Floppy Drive | 3.5 in Floppy Drive | FD | [341-2759] |
| | | | [412-0688] |
| | | | [412-0721] |
| | | | [420-4838] |
| Operating System | Genuine Windows® XP Professional | WPXP | [420-4927] |
| | | | [420-5477] |
| | | | [420-5789] |
| | | | [463-2282] |
| Mouse | Dell® 2-button USB mouse | SM | [310-6264] |
| Network Interface | Integrated 10/100 Ethernet | IN | [430-0441] |
| Modem | No Modem Requested | N | [313-3607] |
| Document Management | Adobe® Acrobat® Reader 6.0 | AAREAD | [412-0705] |
| CD or DVD Drives -- Read, Write and Store Data | Single Drive: 48x CD-RW Drive | 48CDRW | [313-4094] |
| | | | [420-5787] |
| Sound | Integrated 2.0 Channel Audio | IS | [313-2758] |
| Speakers | No speakers (Speakers are required to hear audio from your system) | N | [313-2196] |
| Productivity Software Pre-Installed | Microsoft Office Basic - Includes Word, Excel and Outlook email | BASIC | [412-0448] |
| | | | [412-0880] |
| Security Software Pre-Installed | No Security Subscription | NS2 | [412-0850] |
| Digital Music | Musicmatch by Yahoo! Music - Basic music software | MMBASE | [412-0813] |
| Digital Photography | Photo Album™ SE Basic | DPS | [412-0645] |
| | | | [412-0359] |
| | | | [950-9797] |
| Dell Service & Support Plans | 1 Year On-site Economy Plan | B111Y29 | [960-6380] |
| | | | [960-7430] |
| | | | [981-9288] |
| | | | [983-2207] |
| Onsite System Setup | No Onsite System Setup | NOINSTL | [900-9987] |
| Internet Access Service | 6 Months of America Online Membership Included | AOLSMB | [412-0586] |
| | | | [412 0687] |
| Mail-In Rebate | None | NONE | [464-5006] |
| Miscellaneous | Dimension 1100 | 11P4MIN | [464-6100] |
| Financial Software Pre-Installed | No QuickBooks package selected- Includes limited use trial | QBSSP | [420-5136] |
| Operating System Re-Installation CD | PC Restore recovery system by Symantec | PCR | [464-5503] |
| Purchase Intent | Purchase is not intended for resale. | NOT4SEL | [462-4506] |

Get $100 instantly off your

3/20/2006

CRT000908

Dimension 1100!  
Expires on 2006-03-24 05:59:59     - $100.00

ADDITIONAL DISCOUNTS AND COUPONS

Small Business customers receive  
FREE 3-5 day Shipping on select  
Systems and Servers! A $24     - $66.00  
handling charge will apply  
Expires on 2006-05-04 11:30:00

| | |
|---|---|
| **Sub-Total** | **$777.00** |
| **Shipping Discount** | -$66.00 |
| **Shipping** | $ 24.00 |
| **Tax** | $46.06 |
| **Total** | **$847.06** |

Important Things to Know

- Dell cannot be responsible for pricing or other errors, and reserves the right to cancel any orders arising from such errors. All sales are subject to Dell's Terms and Conditions of Sale located at http://www.dell.com/terms unless you have a separate agreement with Dell.
- Each order number represents a separate purchase and will be shipped and submitted for payment authorization separately. Consequently, some software and peripherals (including, but not limited to, monitors, scanners and printers) may be shipped to you separately from your system. Each order is subject to approval by Dell.
- If your method of payment was a credit card, a charge for the amount above was submitted to your card issuer and will be charged when your system or item ships.
- If your order contains downloadable software, you will receive an email with a link. This email should arrive to you in approximately 10 to 30 minutes. The email link will direct you to our download site. Click the link and follow the instructions to begin the download process.
- You can also contact us by sending an e-mail to SMB_onlineorder_resolution@dell.com, we will respond within 2 business hours. Or call 1-877-284-3355, option 4, Monday-Friday, 7 a.m. - 8 p.m. CST.

Thanks again for choosing Dell. We appreciate your business.

Sincerely,

**Dell Small Business**

3/20/2006

CRT000909

Produced on 9/17/12

**SAMSUNG EXHIBIT B33**

## PLAINTIFF LAWYER'S CHOICE SUITES, INC.

1. **CRT PRODUCT:** Dell 17 inch E773 Conventional CRT Monitor

2. **DATE OF PURCHASE:** 3/20/06

3. **LOCATION of PURCHASE:** Purchased online at Dell.com

4. **PERSONS INVOLVED IN PURCHASE:** Alvin Guttman

5. **PRICE**: $777

6. **TAXES/FEES:** $70.06

7. **BUNDLE:** Purchased as part of a Dell Dimension 1100 bundle

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Use within business and not for resale.

See also CRT000907-911.



1

Produced on 9/17/12

**SAMSUNG EXHIBIT B34**

**PLAINTIFF DAVID ROOKS**

1. **CRT PRODUCT:** Panasonic Television Model # CT 36HX41

2. **DATE OF PURCHASE:** 9/1/01

3. **LOCATION of PURCHASE:** Circuit City, Daytona Beach, Florida

4. **PERSONS INVOLVED IN PURCHASE:** David Rooks (plaintiff)

5. **PRICE:** $2,099.99

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** Not purchased as part of a bundle or system.

8. **WARRANTIES:** An extended service contract was purchased for $359.99.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000912-914.

2

———————————————— Produced on 9/17/12 ————————————————

**SAMSUNG EXHIBIT B35**

**PLAINTIFF PATRICIA ANDREWS**

1. **CRT PRODUCT:** Toshiba Television Model # 27A32; Serial Number 4982370607A

2. **DATE OF PURCHASE:** 2/15/03

3. **LOCATION of PURCHASE:** Best Buy, Hickory, North Carolina

4. **PERSONS INVOLVED IN PURCHASES:** Patricia Andrews (plaintiff)

5. **PRICE:** $249.99

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000766-851.

3

**SAMSUNG EXHIBIT B36**

**PLAINTIFF MISTI WALKER**

1. **CRT PRODUCT:** Philips Television

2. **DATE OF PURCHASE:** 1/19/02

3. **LOCATION of PURCHASE:** Best Buy, Omaha, Nebraska

4. **PERSONS INVOLVED IN PURCHASES:** Misti Walker (plaintiff)

5. **PRICE:** $329.96

6. **TAXES/FEES:** $21.45

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000917-918 and CRT000920-922.

4

Produced on 9/17/12

**SAMSUNG EXHIBIT B37**

**PLAINTIFF LOUISE WOOD**

1. **CRT PRODUCT:** Toshiba Television Model # 32A14

2. **DATE OF PURCHASE:** 11/21/04

3. **LOCATION of PURCHASE:** Costco, Queens, New York

4. **PERSONS INVOLVED IN PURCHASE:** Louise Wood (plaintiff)

5. **PRICE:** $299.99

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000919.

Produced on 9/17/12

**SAMSUNG EXHIBIT B38**

**PLAINTIFF GLORIA COMEAUX**

1.  **CRT PRODUCT:** Sanyo Television Model # 0531590

2.  **DATE OF PURCHASE:** Approximately 2002

3.  **LOCATION of PURCHASE:** Wal-Mart, Las Vegas, NV

4.  **PERSONS INVOLVED IN PURCHASE:**  Gloria Comeaux (plaintiff)

5.  **PRICE:** Approximately $250.00

6.  **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7.  **BUNDLE:** The television was not purchased as part of a bundle or system.

8.  **WARRANTIES:** None other than any standard manufacturers' warranties.

9.  **PURPOSE of PURCHASE:** Personal use.

See also CRT000852-853.

Produced on 9/17/12

**SAMSUNG EXHIBIT B39**

**PLAINTIFF JEFFREY SPEAECT**

1. **CRT PRODUCT:** Toshiba Television Model # MD24FP1

2. **DATE OF PURCHASE:** Approximately 2004

3. **LOCATION of PURCHASE:** Wal-Mart, Pierre, South Dakota

4. **PERSONS INVOLVED IN PURCHASE:**  Jeffrey Speaect (plaintiff)

5. **PRICE:** Between $250.00 and $300.00

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000915-916.

Produced on 9/17/12

**SAMSUNG EXHIBIT A40**

**PLAINTIFF STEVEN FINK**

1. **CRT PRODUCT:** Toshiba Television Model # 32AF53

2. **DATE OF PURCHASE:** 3/14/04

3. **LOCATION of PURCHASE:** Nebraska Furniture Mart, Omaha, Nebraska

4. **PERSONS INVOLVED IN PURCHASE:** Steven Fink

5. **PRICE:** $639.99

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000854-906.

# EXHIBIT 57



| SHIP TO | | SOLD TO | |
|---|---|---|---|
| 65289009 | CUSTOMER P.O. # | | SHIP NBR 12 |
| ORDER #<br>881079786 | | SHIP DATE<br>23-MAR-06 | INVC DATE<br>20-MAR-06 |
| SHIP VIA<br>UPS | | | |

| BOX | QTY | ITEM # | DESCRIPTION |
|---|---|---|---|
| | 1 | 221 4241 | |
| 2 | 1 | 320 4544 | |
| | 1 | 221 9247 | |
| | 1 | 311 2359 | |
| | 1 | 311 4094 | |
| | 1 | 311 5384 | |
| | 1 | 310 1274 | |
| | 1 | 412 0705 | ADOBE ACROBAT READER 6.0 |
| | 1 | 412 2596 | |
| | 1 | 420 5477 | DELL DIRECT DOWNLOAD DVD ESP INSF |
| | 1 | 412 3721 | DELL SUPPORT 3.0 DIM 2000 4HD2 PRO |
| | 1 | 310 6064 | DELL USB 2-BUTTON WHEEL DIM |
| | 1 | 310 5124 | DELL USB KEYBOARD |
| | 1 | 412 0688 | IMAGE RESTORE DIM |
| | 1 | 311 2758 | INTEGRATED AUDIO |
| | 1 | 420 5769 | ISP SEARCH ASST PORTAL DIM/INSF |
| | 1 | 412 3053 | MCAFEE 7.0 XP/LTRG 90DAY DIM INSF |
| | 1 | 410 0443 | MICROSOFT OFFICE 2003 BASIC EDITION DIM |
| | 1 | 412 2912 | MUSIC MATCH 10.1 BASIC DIM/INSF |
| | 1 | 410 0082 | NETZERO ISP DIM INSF |
| | 1 | 311 2708 | NO SETAKER RESOLUTED DIMENSION |
| | 1 | 412 0845 | PHOTO ALBUM 6.0 STARTER DIM INSF |

**SEE REVERSE SIDE FOR**
**IMPORTANT INFORMATION**
**LIFT HERE — PULL UP GENTLY TO REMOVE PACKING L**

W20JNr:P912881079786







**DELL**

SHIP DATE: 2 MAR06

30.06 LBS    1 OF 2

SHIP TO: ATTN: ALVIN H GUTTMAN
PHONE: 3016067299
LAWSUITES@ATT.NET
910 12TH STREET. NW 800

WASHINGTON   DC   20006

MD 200 0-89

**UPS Ground**
1Z E72 A78 42 1154 0936

Signature Required

W20JNF 7P91Q881079786

JNFZP91   SERVICE TAG

EXHIBIT
369
10/11/10 lba
PENGAD 800-631-6989

# EXHIBIT 58

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                 (SAN FRANCISCO DIVISION)

 4

 5

 6   IN RE:  CATHODE RAY TUBE (CRT)

 7   ANTITRUST LITIGATION                    Case No.

 8                                           07-5944 SC

 9                                           MDL No. 1917

10   - - - - - - - - - - - - - - - - - - - - -

11   This Document Relates to:

12   INDIRECT PURCHASER ACTIONS

13   - - - - - - - - - - - - - - - - - - - - -

14                 SUPERIOR COURT OF CALIFORNIA

15                 CITY AND COUNTY OF SAN FRANCISCO

16   - - - - - - - - - - - - - - - - - - - - -

17   STATE OF CALIFORNIA,

18             Plaintiffs

19      vs.                                  Case No.

20                                           CGC-11-51584

21   SAMSUNG SDI, INC., CO., LTD., et al.,

22

23             Defendants.

24   - - - - - - - - - - - - - - - - - - - - -

25
```

ALVIN GUTTMAN

BARKLEY
Court Reporters

1

2          VIDEOTAPED TRANSCRIPT of ALVIN GUTTMAN

3   in the above-entitled matter, as taken by and before

4   LORRAINE B. ABATE, a Certified Shorthand Reporter,

5   Registered Professional Reporter, and Notary Public,

6   held at the offices of White & Case, 701 Thirteenth

7   Street, NW, Washington, DC, on October 11, 2012,

8   commencing at time 10:03 a.m., pursuant to Notice.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

BARKLEY
Court Reporters

```
1

2    A P P E A R A N C E S:

3

4        KIRBY McINERNEY LLP

5        Attorneys for the Indirect

6        Purchaser Plaintiffs

7              825 Third Avenue

8              New York, New York  10022

9        BY:  ROBERT J. GRALEWSKI, JR., ESQ.

10

11       WHITE & CASE LLP

12       Attorneys for Defendants

13       Toshiba Corporation, Toshiba America, Inc.,

14       Toshiba America Information Systems, Inc.,

15       Toshiba America Consumer Products, LLC and

16       Toshiba America Electronic Components, Inc.

17             701 Thirteenth Street, NW

18             Washington DC  20005

19       BY: CHARISE NAIFEH, ESQ.

20           DANA FOSTER, ESQ.

21           LUCIUS B. LAU, ESQ.

22

23

24

25
```

4

BARKLEY
Court Reporters

```
 1

 2    A P P E A R A N C E S

 3   (VIA TELEPHONE)

 4

 5        WEIL GOTSHAL & MANGES, LLP

 6        Attorneys for Defendants Panasonic

 7        Corporation of North America,

 8        MT Picture Display Co., Ltd., and

 9        Panasonic Corporation (f/k/a

10        Matsushita Electric Industrial Co., Ltd.

11              767 Fifth Avenue

12              New York, New York  10153-0119

13        BY:  KEVIN GOLDSTEIN, ESQ.

14

15        BAKER BOTTS LLP

16        Attorneys for the Defendants Koninklijke

17        Philips Electronics N.V., Philips Electronics

18              North America Corporation

19              1299 Pennsylvania Avenue N.W.

20              Washington, DC  20004-400

21        BY:  CHARLES MALAISE, ESQ.

22

23

24

25
```

5

BARKLEY
Court Reporters

1

2   A P P E A R N C E S

3   (VIA TELEPHONE)

4

5        O'MELVENY & MYERS, LLP

6        Attorneys for Samsung Electronics Co, Ltd.

7        and Samsung Electronics America, Inc.

8             1625 Eye Street, NW

9             Washington, DC  20006

10       BY:  COURTNEY C. BYRD, ESQ.

11

12  A L S O   P R E S E N T:

13  (In Washington D.C.)

14       JT BEDFORD, Videographer

15

16

17

18

19

20

21

22

23

24

25

6

BARKLEY
Court Reporters

1

2                         I N D E X

3

4

5    WITNESS            EXAMINATION BY          PAGE

6    Alvin Guttman    Ms. Naifeh              10, 113

7                     Mr. Gralewski              216

8

9

10                       E X H I B I T S

11   EXHIBIT                                 PAGE

12   366   Notice of Deposition              15

13   367   E-Mail Order Confirmation         89

14   368   Shipping Contents List            118

15   369   Shipping Label                    119

16   370   Toshiba America Information Systems,

17         Inc.'s First Set of Requests for

18         Production of Documents to Indirect

19         Purchaser Plaintiffs              130

20   371   Plaintiff Verification            139

21   372   Samsung Exhibits A33 through A40  152

22   373   Samsung Exhibits B33 through B39

23         And A40                           154

24   374   Plaintiff Verification            155

25

ALVIN GUTTMAN

BARKLEY
Court Reporters

1

2                    E X H I B I T S

3                    (Continued)

4     EXHIBIT                                 PAGE

5     375   Indirect Purchaser Plaintiffs'

6           Notice of Motion and Motion for

7           Leave to Amend the Complaint       181

8     376   Samsung Exhibits D33 through

9           D39 and A40                        215

10    377   Samsung Exhibits E33 through E40   215

11    378   Toshiba Exhibits A33 through A40   216

12    379   Toshiba Exhibits B33 through

13          B39 and A40                        216

14    380   Toshiba Exhibits C33 through

15          C39 and A40                        216

16

17

18              DIRECTIONS NOT TO ANSWER

19                      PAGE

20          24, 27, 46, 47, 131, 132, 138, 183, 186

21

22

23              SECTIONS MARKED FOR COUNSEL

24                      PAGE

25                  197, 201, 202

                        8

BARKLEY
Court Reporters

```
 1                Guttman - October 11, 2012
 2           THE VIDEOGRAPHER:  Good morning.  My
 3      name is JT Bedford.  I'm the videographer
 4      associated with Barkley Court Reporters located
 5      at 1875 Century Park East, Suite 1300, Los
 6      Angeles, California 90067.  Today's date is
 7      October 11th, 2012.  The time is 10:03 a.m.
 8      This deposition is taking place at 701 13th
 9      Street Northwest, Washington, D.C. in the matter
10      of In Re: Cathode Ray Tube Antitrust Litigation,
11      case number 07-5944 SC.
12           This is the videotaped deposition of
13      Alvin Guttman being taken on behalf of the
14      plaintiff.
15           Will counsel for the parties please
16      identify themselves.
17           MS. NAIFEH:  I'm Charise Naifeh with
18      White and Case.
19           MR. FOSTER:  Dana Foster, White and Case
20      on behalf of the Toshiba defendants.
21           MR. GRALEWSKI:  This is Bob Gralewski
22      with Kirby McInerny on behalf of the witness and
23      the class.
24           THE VIDEOGRAPHER:  Thank you.  The court
25      reporter may now swear in the witness.
```

9

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2                    MR. GRALEWSKI:  Would you mind if we get

3          the appearances on the telephone.

4                    THE VIDEOGRAPHER:  No, that's fine.

5                    MR. GRALEWSKI:  Thank you very much.

6                    MR. FOSTER:  On the phone?

7                    MR. MALAISE:  This is Charles Malaise on

8          behalf of the defendants.

9                    MS. BYRD:  This is Courtney Byrd with

10         O'Melvveny & Myers on behalf of the SEC and SEA.

11   A L V I N    G U T T M A N,

12         Having been first duly sworn by a Notary

13         Public, was examined and testified as follows:

14   EXAMINATION BY

15   MS. NAIFEH:

16         Q.    My name is Charise Naifeh, and I'm an

17   attorney at White and Case.  I represent the Toshiba

18   defendants, and I'm here today on behalf of all the

19   defendants in your lawsuit.

20               Thank you for taking the time to be here

21   today, Mr. Guttman.  I'm going to ask you some

22   questions today.

23               If at any point during your deposition

24   you don't understand one of my questions, will you

25   agree to let me know so that I can ask the question

10

ALVIN GUTTMAN

BARKLEY
Court Reporters

1               Guttman - October 11, 2012

2   in a different way?

3        A.     I will.

4        Q.     Do you understand that you're testifying

5   under oath?

6        A.     I do.

7        Q.     I would like to ask you to please give

8   all of your answers orally so the court reporter can

9   accurately record what you say.  The court reporter

10  cannot record a nod or a head shake.

11              Occasionally, I might ask a question to

12  which your attorney has an objection.  Objections at

13  a deposition are generally used as a place holder for

14  the court and to be used later.  Obviously there is

15  no judge here to rule on any objections, so that I

16  ask that if your attorney objects, you must still

17  answer my question.  The one important exception to

18  that rule is that if your attorney believes that the

19  question calls for legal advice, he can instruct you

20  not to answer the question.

21              I'm sorry, if your attorney believes

22  that the question calls for privileged information,

23  and that is, communications between you and your

24  attorney for the purposes of seeking legal advice,

25  your attorney may object and advise you not to

                          11

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2    answer.  So unless your attorney specifically advises

3    you not to answer, you must answer my question.

4                    Do you understand that?

5         A.    I do.

6         Q.    Also, please let me finish my question

7    and give your attorney the opportunity to object

8    before responding so that we're not talking over one

9    another.  You understand that?

10        A.    I understand.

11        Q.    If you need a break at any time, please

12   let me know.  I would only ask that if we're in the

13   middle of a question, that you finish the -- answer

14   the question before we take the break.

15                    Can we agree to that?

16        A.    Okay.

17        Q.    Sometime it happens that you give an

18   answer as completely as you can and then later, you

19   remember some additional information from an earlier

20   question or perhaps some clarification.

21                    If that happens, please just tell us

22   that you would like to add something to your previous

23   answer and we can do that right there when it's fresh

24   in your mind.

25                    Is there any reason why you would not be

                              12

BARKLEY
Court Reporters

```
 1                  Guttman - October 11, 2012
 2   able to provide full and accurate testimony here
 3   today?
 4        A.    No.
 5        Q.    Is there anything that would impede your
 6   ability to understand my questions and provide
 7   complete, accurate and truthful testimony?
 8        A.    No.
 9        Q.    Okay.  Can you please state your name
10   for the record.
11        A.    Alvin M. Guttman.
12        Q.    And where do you currently live?
13        A.    Sarasota, Florida.
14        Q.    And where are you currently employed?
15        A.    Washington, D.C.
16        Q.    So do you commute back from Florida and
17   D.C.?
18        A.    I do.
19        Q.    Can you state the name of the entity
20   where you're employed.
21        A.    Lawyer's Choice Suites Incorporated.
22        Q.    Okay.  Going forward, I would like to
23   refer to Lawyer's Choice Suites Incorporated as
24   Lawyer's Choice.
25             Do you understand that?
```

13

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012
2        A.      I do.
3        Q.      Do you understand that you're here today
4   to give the deposition testimony on behalf of
5   Lawyer's Choice pursuant to Rule 30(b)6 of the
6   Federal Rules of Civil Procedure?
7        A.      I do.
8        Q.      And do you understand that your answers
9   here today are not just answers that you know
10  personally, but the answers of the company itself?
11       A.      I understand.
12               MR. GRALEWSKI:  Just a clarification.
13       We're here today for the witness to be providing
14       testimony on behalf of the corporation pursuant
15       to your notice.
16               MS. NAIFEH:  Okay.
17       Q.      Throughout the deposition, when I refer
18  to Lawyer's Choice or you, I mean the company, who is
19  a plaintiff in this case, Lawyer's Choice Suites
20  Incorporated.
21               Do you understand that?
22       A.      I do.
23       Q.      And if I intend to mean something
24  different, I will tell you.
25               Do you understand that?

                            14

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
1                  Guttman - October 11, 2012
2          A.     I do.
3          Q.     Okay.  When were you informed that you
4     were designated as Lawyer's Choice's corporate
5     representative for this deposition?
6          A.     I believe back in March of 2012.
7          Q.     Okay.  And who informed you of that?
8          A.     Well, the attorney that represents me.
9          Q.     And which attorney is that?
10         A.     The attorney specifically is Michael
11    Murphy, but it's in conjunction with a number of
12    other law firms.
13         Q.     Is Michael Murphy associated with a law
14    firm?
15         A.     Yes.
16         Q.     Do you know which one?
17         A.     Oliver -- well, actually, Mr. Gralewski
18    is my attorney today.  But the name of the firm is --
19    I believe it's Glassman.
20         Q.     Okay.
21                MS. NAIFEH:  Can you mark this.  I would
22         like to mark the next exhibit which I believe is
23         366.
24                (Exhibit 366, Notice of Deposition,
25         marked for identification, as of this date.)
```

                              15

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2        Q.    Please take a look at what has been

3   marked as Exhibit 366.

4              Have you seen this document before?

5        A.    Yes.

6        Q.    And what is it?

7        A.    Notice of deposition of Lawyer's Choice

8   Suites pursuant to Rule 30(b)6.

9        Q.    Have you looked over the questions and

10  categories of deposition topics in this notice?

11       A.    I have.

12       Q.    Are there any subject -- excuse me, are

13  you prepared to testify here today on these

14  deposition topics?

15       A.    I am.

16       Q.    Are there any subject areas that are

17  listed that you feel you cannot testify to today?

18       A.    I don't believe so.

19       Q.    What is the nature of Lawyer's Choice's

20  business?

21       A.    We are a management company.  We run

22  office suites in Washington D.C. and provide services

23  to individual subtenants.

24       Q.    Okay.  What kind of services do you

25  offer?

                          16

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2          A.     We provide office space, conference

3     rooms, phone systems, legal administrative support,

4     internet, and the like.

5          Q.     Okay.  Do you offer any products?

6          A.     We do not.

7          Q.     Do you sell or lease electronics when

8     renting out office space?

9          A.     We do not.

10         Q.     So it's just the office space itself?

11         A.     Precisely.

12         Q.     When was Lawyer's Choice founded?

13         A.     1997.

14         Q.     And do you know who founded it?

15         A.     My wife and I.

16         Q.     Okay.  Can you tell me your wife's name.

17         A.     Irmine H.  Guttman, G-U-T-T-M-A-N.

18    First name I-R-M-I-N-E, H.

19         Q.     So are you and your wife the owners of

20    Lawyer's Choice?

21         A.     We are.

22         Q.     Okay.  And how many -- does your wife

23    still work at Lawyer's Choice?

24         A.     My wife is an owner at Lawyer's Choice

25    Suites.

                          17

ALVIN GUTTMAN

1                   Guttman - October 11, 2012

2          Q.     Okay.  And she's not employed there?

3          A.     She's not directly employed.

4          Q.     Okay.

5          A.     Although she does serve as

6    vice-president.

7          Q.     I see.  How many employees work for

8    Lawyer's Choice?

9          A.     Two.

10         Q.     Okay.  Can you tell me their names.

11         A.     Courtney Wands, C-O-U-R-T-N-E-Y,

12   W-A-N-D-S and Lorraine Brown.  L-O-R-R-A-I-N-E Brown,

13   B-R-O-W-N.

14         Q.     And what are their responsibilities?

15         A.     Ms. Wands is responsible for

16   communication and some word processing and some

17   administrative support.  Lorraine Brown is my

18   manager.  She manages the entire operation.

19         Q.     Okay.  Do any of those individuals have

20   responsibility with respect to purchasing or using

21   CRT finished products?

22         A.     Yes.

23         Q.     In what capacity?

24         A.     Word processing, typing, Excel sheets.

25         Q.     So in using.  What about purchasing?

                              18

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                   Guttman - October 11, 2012

2          A.    I'm the ultimate purchaser --

3          Q.    Okay.

4          A.    -- as president of the corporation.

5          Q.    So no one else except you purchases CRT

6    finished products?

7          A.    That is correct.

8          Q.    Where is your corporate headquarters?

9          A.    Washington, D.C.

10         Q.    And how many locations does Lawyer's

11   Choice have?

12         A.    One.

13         Q.    So are you incorporated in Washington

14   D.C.?

15         A.    We are.

16         Q.    How is Lawyer's Choice organized as a

17   company?

18         A.    As a C Corp.

19         Q.    Okay.  Does it have any departments or

20   divisions?

21         A.    It does not.

22         Q.    And so what is your current position

23   besides owner of Lawyer's Choice?

24         A.    I'm a broker of record.  I'm president

25   of the corporation.  And I serve as a day-to-day

                            19

ALVIN GUTTMAN

BARKLEY
Court Reporters

Guttman - October 11, 2012

1   executive.

2   executive.

3       Q.      Have you held the position of broker of

4   record since Lawyer's Choice was founded in 1997?

5       A.      I have.

6       Q.      Have you held the position of president

7   since 1997?

8       A.      I have.

9       Q.      And executive as well?

10      A.      That is correct.

11      Q.      Would you please describe your

12  responsibilities as a broker of record.

13      A.      Well, my job is to make sure that the

14  tenants are happy, that the services that we provide

15  to them are exemplary, and that I continue to fill up

16  the space with tenants that create the income for the

17  corporation.

18      Q.      So does that include marketing?

19      A.      It does.

20      Q.      Advertising, that kind of thing?

21      A.      That is correct.

22      Q.      Okay.  Can you tell me about your

23  responsibilities as president.

24      A.      I would say that they're -- that they

25  certainly cross-reference each other.

20

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2        Q.      There is some overlap?

3        A.      There sure is.

4        Q.      Are there any additional

5   responsibilities as president?

6        A.      I sign the corporate returns, tax

7   returns, 941s, and I sign as president of the

8   corporation on bank loans and so forth.

9        Q.      Does your position include any contact

10  with entities that manufacture or sell cathode ray

11  tubes?

12       A.      Please repeat the question.

13       Q.      So does your position at Lawyer's Choice

14  include any contact with entities that sell or

15  manufacture cathode ray tubes?

16       A.      My relationship is with Dell which I

17  understand is a user of the cathode ray tube.

18       Q.      Okay.

19       A.      But I have no direct dealings whatsoever

20  with the manufacturer of the CRT.

21       Q.      What kind of relationship do you have

22  with Dell?

23       A.      I purchase my computers from Dell.

24       Q.      You purchase all of your computers from

25  Dell?

                            21

BARKLEY
Court Reporters

```
 1                  Guttman - October 11, 2012
 2         A.     Usually, yes.
 3         Q.     Do you have any sort of contract with
 4   Dell?
 5         A.     No, I don't.
 6         Q.     So it's not an exclusive relationship
 7   with Dell?
 8         A.     It is not.
 9         Q.     Is Dell the only company that you have
10   contact with that sells CRT products?
11         A.     No.
12         Q.     Can you list any other companies.
13         A.     I think I purchased an Ebay computer a
14   while back.
15         Q.     So you purchased a computer on EBay?
16         A.     I believe so.
17         Q.     Do you know what brand that computer
18   was?
19         A.     Dell.
20         Q.     So it was still a Dell computer?
21         A.     It was.
22         Q.     Okay.  Any other contact with other --
23         A.     Not that I'm aware of.
24         Q.     Mr. Guttman, what did you do to prepare
25   for your testimony here today?
```

22

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                   Guttman - October 11, 2012

2          A.    I just reviewed the interrogatories and

3     the documents that I had signed.

4          Q.    Okay.  Do you remember which

5     interrogatories?

6          A.    Not specifically, no.  Just any

7     documents I signed, I reviewed before this

8     deposition.

9          Q.    Do you remember when you signed those

10    documents?

11         A.    Well, I think the original retainer

12    agreement was in March of 2012.

13         Q.    Okay.  And that was with your counsel?

14         A.    Correct.

15         Q.    Which counsel?

16         A.    Mr. Murphy.

17         Q.    Okay.  So you read the retainer

18    agreement when you signed it in March 2012 and again,

19    in preparing for this deposition?

20         A.    That's correct.

21              MR. GRALEWSKI:  Just give me a second,

22         counsel.

23              I appreciate the opportunity to review

24         the notice, and I was going to object, but I'm

25         not.

                            23

BARKLEY
Court Reporters

```
 1                    Guttman - October 11, 2012

 2              MS. NAIFEH:  Okay.

 3       Q.    Did you suggest any changes to the

 4  retainer agreement before you signed it?

 5  (DIR)

 6              MR. GRALEWSKI:  I'm going to instruct

 7         the witness not to answer that question on the

 8         grounds of attorney-client privilege.

 9       Q.    Are you going to follow that

10  instruction?

11       A.    I'm going to listen to my attorney.

12       Q.    Okay.  Did the retainer agreement cover

13  payment of the attorney's fees?

14  (DIR)

15              MR. GRALEWSKI:  I'm going to instruct

16         the witness not to answer that question as

17         phrased on the grounds of the attorney-client

18         privilege.

19              If you would like to ask him what his

20         understanding is with respect to those topics, I

21         will permit that.

22              MS. NAIFEH:  Thank you.

23       Q.    What is your understanding of the

24  payment of attorney's fees in the retainer agreement?

25       A.    I believe that the retainer agreement
```

24

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                Guttman - October 11, 2012
 2  does not contain a payment provision.
 3                MR. GRALEWSKI:  Hold on a second.  I'm
 4        not going to -- I'm not going to allow you to
 5        testify regarding the contents of the retainer
 6        agreement or what it says.  Counsel's question
 7        is what is your understanding about how your
 8        lawyers get paid.  So you can testify -- if you
 9        have a general understanding about how your
10        lawyers are going to get paid in the case, you
11        can testify.  Otherwise, I'm instructing you not
12        to disclose what the agreement says.
13        A.    I believe it's a contingency fee.
14        Q.    Can you explain what that means.
15        A.    That the attorneys would receive some
16  sort of remuneration if they're successful in this
17  case.
18        Q.    And where would that remuneration come
19  from?
20        A.    I have no idea.
21        Q.    Not from you?
22        A.    No, it wouldn't.
23        Q.    Do you know who is responsible for your
24  attorney's litigation costs in this matter?
25        A.    I have no idea.
```

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                 Guttman - October 11, 2012
 2        Q.    Do you have an understanding of the
 3   extent of those costs?
 4        A.    I do not.
 5        Q.    Are you in any way responsible for your
 6   attorney's fees or costs?
 7        A.    No, I'm not.
 8        Q.    To the extent you know, what kind of
 9   costs are involved in pursuing this case as a class
10   action?
11        A.    I have no knowledge of that.
12        Q.    Do you know what notice to the class
13   means?
14        A.    Vaguely.
15        Q.    What does it mean?  What is your
16   understanding?
17        A.    Well, I received a notice of deposition,
18   if that's what you're referring to.
19        Q.    No.  This is different from that.  This
20   is a notice to the class.
21        A.    I'm not familiar with that.
22        Q.    Okay.  So do you know who is responsible
23   for providing notice to the class?
24             MR. GRALEWSKI:  Object -- I'll withdraw
25        my objection.  You can answer if you know.
```

26

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2        A.     No, I don't.

3        Q.     So you don't know who pays for the

4    notice?

5        A.     I do not.

6               MR. GRALEWSKI:  Object to the form.  It

7        lacks foundation.

8        Q.     Do you know who pays for --

9               MR. GRALEWSKI:  Calls for legal

10       conclusion.  I'm sorry, counsel.  I apologize.

11       Go ahead.

12       Q.     Do you know who pays for any other fees

13   or costs related to the class?

14              MR. GRALEWSKI:  Object to the form,

15       vague and ambiguous.

16       Q.     You can answer.

17       A.     I do not.

18       Q.     Okay.  So besides the retainer agreement

19   and the interrogatories, what other documents did you

20   review in preparing for your testimony here today?

21   (DIR)

22              MR. GRALEWSKI:  I instruct the witness

23       not to answer that question as phrased on the

24       grounds of attorney-client privilege.

25              MS. NAIFEH:  So I'm not asking what

                              27

ALVIN GUTTMAN                                    BARKLEY
                                                 Court Reporters

1              Guttman - October 11, 2012

2        attorneys -- what documents he reviewed with an

3        attorney.  I'm just asking what documents he

4        reviewed in preparation for this.

5              Do you still object?

6              MR. GRALEWSKI:  I do.  If you would like

7        to ask him what documents, if any, he reviewed

8        that refreshed his recollection with respect to

9        the matters we're here to discuss today, I'll

10       allow him to answer that question, but as

11       phrased, I maintain my objection.

12       Q.    Okay.  So did you review any documents

13  that refreshed your recollection of this litigation

14  in preparation for this deposition?

15       A.    I did.

16       Q.    Can you tell me what those were.

17             MR. GRALEWSKI:  I object to the form.

18       Asked and answered.  You can answer.

19       A.    I believe I reviewed an amended

20  complaint.

21       Q.    Okay.  Can you remember anything else

22  that refreshed your recollection?

23       A.    The retainer agreement.

24       Q.    Is there anything else?

25             MR. GRALEWSKI:  That refreshed your

                        28

ALVIN GUTTMAN

1                Guttman - October 11, 2012

2        recollection.

3        A.      Perhaps a verification.

4        Q.      Is that a verification that you signed?

5        A.      Yes.

6        Q.      Okay.  Is there anything else that

7    refreshed your recollection?

8        A.      Not that I can recall.

9        Q.      Okay.  Did you review any documents not

10   provided by your attorneys to prepare for today's

11   deposition?

12                MR. GRALEWSKI:  I object to the form.

13        Vague and ambiguous.

14        Q.      You can answer.

15        A.      No.

16        Q.      Okay.  How much time did you spend

17   preparing for today's deposition?

18        A.      Probably within an hour.

19        Q.      So about an hour?

20        A.      About an hour.

21        Q.      Okay.  Did you meet with an attorney?

22        A.      I did.

23        Q.      And when did you meet with an attorney?

24        A.      Last night.

25        Q.      So only last night in preparation for

                              29

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                  Guttman - October 11, 2012

2   this deposition?

3        A.      Correct.

4        Q.      Okay.  For how long?

5        A.      About an hour.

6        Q.      Who attended the meetings?

7        A.      Mr. Gralewski and myself.

8        Q.      Did you review any deposition

9   transcripts?

10       A.      I don't believe so.

11       Q.      Did you meet with anyone else other than

12  your lawyer to prepare for this deposition?

13       A.      No.

14       Q.      Okay.  Did you talk to any Lawyer's

15  Choice employees about this deposition?

16       A.      No.

17       Q.      Did you take any notes in preparing for

18  this deposition?

19       A.      No.

20       Q.      So in total, you spent one hour

21  preparing for this deposition.

22              Is that including the time that you

23  spent with your attorney?

24       A.      Yes.

25       Q.      Have you communicated with any of the

                          30

BARKLEY
Court Reporters

1                   Guttman - October 11, 2012

2    plaintiffs' experts?

3         A.    No.

4         Q.    Did you bring anything with you here

5    today?

6         A.    Nothing.

7         Q.    Any documents.  Okay.

8               Has Lawyer's Choice ever been deposed

9    before?

10        A.    No.

11        Q.    Have you personally ever been deposed

12   before?

13              MR. GRALEWSKI:  Object to the form.

14        Outside the scope.  You can answer the question.

15        A.    Deposed?

16              MR. GRALEWSKI:  And I'm sorry, outside

17        the scope of the deposition notice.

18        A.    No.

19        Q.    You never have been deposed before?

20        A.    No.

21        Q.    Okay.  Can you please tell me what

22   Lawyer's Choice's current address is.

23        A.    910 17th Street Northwest, Suite 800,

24   Washington, D.C. 20006.

25        Q.    Okay.  Thank you.

                        31

                   ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1              Guttman - October 11, 2012
 2              How long has Lawyer's Choice been at
 3    that address?
 4         A.    Since 1997.
 5         Q.    Okay.  Is this the primary business
 6    address?
 7         A.    It is.
 8         Q.    Does Lawyer's Choice have any other
 9    addresses outside the District of Columbia?
10         A.    It does not.
11         Q.    Does Lawyer's Choice pay taxes in the
12    District of Columbia?
13         A.    It does.
14         Q.    Can you please state your age and date
15    of birth.
16         A.    I'm 59.  February 9, 1953 I was born.
17         Q.    Did you graduate high school?
18         A.    I did.
19         Q.    When was that?
20         A.    1971.
21         Q.    Did you attend college?
22         A.    I did.
23         Q.    Where?
24         A.    The Ohio State University.
25         Q.    What years did you attend?
```

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                  Guttman - October 11, 2012

2        A.      1971 through 1975.

3        Q.      Did you earn any degrees?

4        A.      I did.

5        Q.      Which ones?

6        A.      Bachelor of arts.

7        Q.      Bachelor of arts in?

8        A.      In political science and history.

9        Q.      Okay.  Do you have any post graduate

10   education?

11       A.      I do.

12       Q.      And where was that?

13       A.      Duquesne University Law School.

14       Q.      Okay.  What years did you attend?

15       A.      '75 through 1979.

16       Q.      And what degrees did you earn?

17       A.      I earned a juris doctorate.

18       Q.      Okay.  Do you have any other degrees?

19       A.      I do not.

20       Q.      Do you have any other certifications or

21   courses?

22       A.      I am a broker of record in the District

23   of Columbia.

24       Q.      Did you have to go through any training

25   to become a broker of record?

33

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                 Guttman - October 11, 2012
 2        A.      I did.
 3        Q.      And where was that?
 4        A.      It was in conjunction with my law degree
 5   and taking various courses and passing a brokerage
 6   exam.
 7        Q.      So that was at the same school that you
 8   went to law school?
 9        A.      No. It was not.  There is a waive in
10   process where it's a fast track sort of speaking
11   where you can become a broker of record having
12   graduated and successfully passed a bar exam, which I
13   did.
14        Q.      I see.  Okay.
15                Did you then have to take some sort of
16   exam to become a broker of record?
17        A.      Yes, but it was a shortened type of
18   exam, and then I have to qualify every two years with
19   credits, CLE credits.
20        Q.      Okay.  Have you ever worked for a
21   company involved in cathode ray tubes or cathode ray
22   tube products?
23        A.      No.
24        Q.      Have you ever represented a company
25   involved in cathode ray tubes or cathode ray tube
```

34

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                   Guttman - October 11, 2012
 2   products?
 3              MR. GRALEWSKI:  Object to the form.
 4        Vague and ambiguous.
 5        A.    No.
 6        Q.    Since 1995, have you ever held stock in
 7   any of the defendant companies in this action?
 8        A.    No.
 9        Q.    Have you ever owned any mutual funds
10   that held stock or security in any defendant?
11        A.    I don't believe so.
12        Q.    You don't believe so, you don't know for
13   sure?
14        A.    I would have to check with my
15   accountant, but -- or my --
16              MR. GRALEWSKI:  You know, I want to
17        clarify something here.  Just maybe it will
18        streamline this.  I want to remind the witness
19        that when counsel says you, we are talking about
20        Lawyer's Choice Suites.
21              THE WITNESS:  That is correct.
22              MR. GRALEWSKI:  So to the extent you're
23        asking him about his personal holdings, we may
24        have at some point gotten a little astray.  To
25        the extent you're asking about his personal
```

35

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                    Guttman - October 11, 2012

 2          holdings, I'm going to object as outside the

 3          scope.

 4                    MS. NAIFEH:  Okay.

 5          Q.     So has Lawyer's Choice ever owned mutual

 6      funds that held stock in a security in a defendant?

 7          A.     No.

 8          Q.     Have you personally ever owned mutual

 9      funds or held stock or security in any defendant?

10                    MR. GRALEWSKI:  I object to the form.

11          Outside the scope.

12          Q.     You can still answer.

13          A.     I don't believe so.

14          Q.     Okay.  But you're not certain?

15                    MR. GRALEWSKI:  Same objection.

16          A.     Yes.

17                    MR. GRALEWSKI:  Asked and answered.

18          A.     I'm not certain.

19          Q.     Okay.

20                    MR. GRALEWSKI:  And while counsel is

21          pausing, just a remainder, it's different than

22          usual, but when counsel refers to you, unless

23          she instructs you otherwise, she's referring to

24          Lawyer's Choice.

25                    THE WITNESS:  Correct.
```

36

ALVIN GUTTMAN

BARKLEY
Court Reporters

1             Guttman - October 11, 2012

2             MR. GRALEWSKI:  I believe that's what

3      you said, right?

4             MS. NAIFEH:  That's correct.

5      Q.    Since 1995, has Lawyer's Choice ever

6  held stock in any manufacturer, buyer, seller or

7  distributor, of CRTs or CRT products?

8      A.    No.

9      Q.    Has Lawyer's Choice ever owned mutual

10  funds that held stock or securities in any

11  manufacturer, buyer, seller or distributor, of

12  cathode ray tubes or cathode ray tube products since

13  1995?

14             MR. GRALEWSKI:  And before you answer

15          that question, I mean, I don't see these listed

16          topics in your deposition notice, so I'm going

17          to object as outside the scope.

18             If you can point me to where these are,

19          I'll withdraw my objection, but I do think these

20          questions are outside the scope of the notice.

21          He can certainly still answer them, but the

22          objection is noted.

23      A.    The answer is no.

24      Q.    Okay.  Please describe the claim or

25  claims that you're asserting in this case.

                        37

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2         A.    I believe it's an anti -- Sherman Act

3    and conspiracy among manufacturers of CRTs.

4         Q.    I'm sorry, you said an anti Sherman act?

5         A.    Sherman Act, yeah.

6         Q.    Sherman Act?

7         A.    Sorry.

8         Q.    So Sherman Act claims?

9         A.    Antitrust.

10        Q.    Throughout this deposition, when I refer

11   to cathode ray tube or tubes, that means cathode ray

12   tube.  And when I refer to CRT finished product or

13   finished products, I'm referring to a product that

14   contains a CRT such as a television or monitor.

15              Do you understand that?

16        A.    I do.

17        Q.    Okay.  So are you alleging a tube

18   conspiracy?

19        A.    Yes.

20        Q.    Are you alleging a finished product

21   conspiracy?

22              MR. GRALEWSKI:  Counsel, can you just

23         give me one second.  I apologize.  You know, I

24         object as outside the scope of the notice.  The

25         witness can answer the question.  My objection

38

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                  Guttman - October 11, 2012

2            is noted on the prior question, too.  I'm

3            objecting as outside the scope.

4            A.    Can you repeat the question, please.

5            Q.    Are you alleging a finished product

6      conspiracy?

7            A.    I'm relying on my attorney's advice on

8      that.

9            Q.    So --

10           A.    I personally am not alleging.

11           Q.    Okay.  So but Lawyer's -- do you know is

12     Lawyer's Choice alleging a finished product

13     conspiracy?

14           A.    I believe that is part of the complaint,

15     yes.

16                 MR. GRALEWSKI:  The same objection,

17           outside the scope of the notice.

18           Q.    Has Lawyer's Choice ever purchased a

19     stand alone CRT?

20           A.    I don't believe so.

21           Q.    Has Lawyer's Choice ever purchased a

22     finished product that contained a CRT?

23           A.    Yes.

24           Q.    What type of products containing CRTs

25     has Lawyer's Choice purchased?

                            39

BARKLEY
Court Reporters

1             Guttman - October 11, 2012

2        A.      A package with a Dell computer.

3        Q.      By package, what do you mean?

4        A.      It contains a monitor, a mouse, a word

5    processing-type.

6        Q.      Word processing software?

7        A.      Correct.

8        Q.      Something like that.   Okay.

9                So this was a computer system?

10       A.      Yes, a computer system.

11       Q.      Okay.   Has Lawyer's Choice purchased any

12    other products containing CRT finished products?

13       A.      Other than?

14       Q.      Other than the computer package you just

15    described.

16       A.      Well, I've -- Lawyer's Choice has

17    purchased more than one computer package.

18       Q.      Okay.   Were those purchases made during

19    the class period?

20       A.      They may have been.

21       Q.      But you're not asserting claims on those

22    other purchases?

23       A.      No.

24       Q.      And why is that?

25       A.      I don't --

                          40

ALVIN GUTTMAN

BARKLEY
Court Reporters

1               Guttman - October 11, 2012
2               MR. GRALEWSKI:  And you can answer the
3       question, but in answering it, I want to caution
4       you not to reveal any communications between
5       yourself and your lawyers.
6               THE WITNESS:  Right.
7               MR. GRALEWSKI:  But go ahead, you can
8       answer the question with that instruction.
9       A.      I believe I could not authenticate those
10   purchases to a specific date.
11      Q.      Okay.
12      A.      So I did not include them.
13      Q.      Besides computers and computer monitors,
14   has Lawyer's Choice purchased any other types of CRT
15   products, finished products?
16      A.      No.
17      Q.      No?
18      A.      No.
19      Q.      So you have no televisions in your
20   conference rooms?
21      A.      No.
22      Q.      Okay.
23      A.      Well, let me rephrase that.
24              MR. GRALEWSKI:  I object to the form.
25      Vague and ambiguous as to time.

                           41

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2          A.     I have a television in one of my

3     conference rooms.  I did not purchase it within that

4     time frame.

5          Q.     You purchased it before that time frame

6     or after that time frame?

7          A.     Way before.

8          Q.     Okay.  When did you purchase that?

9          A.     The television?  I think I purchased it

10    from my wife back in 1985 or thereabouts.

11         Q.     Okay.  So your participation in this

12    lawsuit derives from your purchase of CRT products;

13    is that correct?

14         A.     Yes.

15         Q.     And you are alleging wrongful conduct on

16    the part of two manufacturers as well as finished

17    product manufacturers; is that correct?

18                MR. GRALEWSKI:  Object to the form.

19          Compound.  Misstates prior testimony.  Vague and

20          ambiguous, calls for a legal conclusion and

21          outside the scope of the notice.

22         Q.     You can answer.

23         A.     To the best of my knowledge, yeah.

24         Q.     So your understanding is that there was

25    both the CRT conspiracy and a finished products

42

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                 Guttman - October 11, 2012
 2   conspiracy?
 3              MR. GRALEWSKI:  Object to the form.
 4         Compound.  Calls for a legal conclusion.  Asked
 5         and answered and outside the scope of the
 6         notice.
 7         Q.    You can answer.
 8         A.    I'm relying on my attorneys.
 9         Q.    So does that mean you're not sure?
10              MR. GRALEWSKI:  Same objections.
11         A.    I'm relying on my attorney's expertise.
12         Q.    So do you know what is in your
13   complaint?
14         A.    Yes.
15         Q.    And what --
16              MR. GRALEWSKI:  Object to the form.
17         Overbroad.  Counsel, if you can point out to
18         me -- you are asking him a lot of questions
19         about the complaint, and I, frankly, I don't
20         want to object, but I don't think that they're
21         in your notice.
22              So I'm going to continue to object as
23         outside the scope to those questions unless you
24         can point me to something else.  So you can
25         proceed as you wish, of course.
```

43

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2          Q.     So what do you allege in your complaint?

3                  MR. GRALEWSKI:  Same objection.  Outside

4          the scope.

5          A.     You meaning president of Lawyer's Choice

6     Suites?

7          Q.     Yes.

8          A.     I allege a Sherman antitrust action and

9     conspiracy of the manufacturers of the CRT tube.

10         Q.     CRT tubes?

11         A.     The tubes.

12         Q.     Do you allege a conspiracy of CRT

13    finished products manufacturers?

14                MR. GRALEWSKI:  Outside the scope.

15         Asked and answered.

16         A.     I don't believe so.

17         Q.     You don't believe so?

18         A.     I think it's specifically dealing with

19    the CRT.

20         Q.     So your participation in this lawsuit is

21    based on a CRT finished product; is that right?

22                MR. GRALEWSKI:  Asked and answered.

23         Object to the form.

24         A.     I purchased a CRT finished product.

25         Q.     Okay.  And the wrongful conduct that

                           44

BARKLEY
Court Reporters

```
 1                Guttman - October 11, 2012
 2  you're alleging that was done was by the tube
 3  manufacturers of the -- is that right?
 4        A.    Yes.
 5        Q.    How did you come to be named -- a named
 6  plaintiff in this case?
 7        A.    Discussion with my attorney.
 8        Q.    And which attorney was this?
 9        A.    Michael -- the gentleman that I
10  mentioned earlier.  Michael Murphy.  Sorry.
11        Q.    When did you have those discussions?
12        A.    Probably in March of 2012.
13        Q.    Under what circumstances did you have
14  those discussions?
15              MR. GRALEWSKI:  Object to form, vague
16        and ambiguous.
17        A.    Could you repeat the question.
18        Q.    Under what circumstances did you have
19  these discussions with Mr. Murphy?
20              MR. GRALEWSKI:  Same objection.
21        A.    Probably under a social circumstance.
22  I'm an attorney, he's an attorney.  We talk.
23        Q.    So you met somewhere socially?
24        A.    In the offices.  It wasn't a formal
25  discussion.
```

45

ALVIN GUTTMAN

BARKLEY
Court Reporters

1       Guttman - October 11, 2012

2       Q.    By in the offices, do you mean Lawyer's

3   Choice Suites' offices?

4       A.    That's correct.

5       Q.    So does Mr. Murphy rent space in the

6   office suites?

7       A.    His law firm does.

8       Q.    His law firm does.  In Lawyer's Choice.

9   Okay.

10          So can you tell me a little bit more

11  about that conversation to the extent that you recall

12  what you talked about with Mr. Murphy.

13  (DIR)

14          MR. GRALEWSKI:  Object to the form.

15      Calls for narrative, compound, and as phrased,

16      may call for the disclosure of attorney-client

17      communications; and so to the extent it does, I

18      would instruct you not to answer.  To the extent

19      you can answer the question, go ahead.

20      A.    I have no response.

21      Q.    So you were initially talking to

22  Mr. Murphy in a social context.  You weren't seeking

23  legal advice; is that correct?

24          MR. GRALEWSKI:  Object to the form.

25      Misstates testimony.

46

ALVIN GUTTMAN

1                    Guttman - October 11, 2012

2          A.     I believe that's correct, yes.

3          Q.     Okay.  So can you tell me what was

4    discussed at that conversation at which you were not

5    seeking legal advice.

6    (DIR)

7                    MR. GRALEWSKI:  Object to the form of

8          the question.  Calls for a narrative.  Vague and

9          ambiguous, and to the extent it would -- your

10         testimony would reveal communications between

11         lawyer and client regarding legal advice, I

12         instruct you not to answer.  But you can answer

13         the question.

14         A.     No response.

15         Q.     Okay.  So did Mr. Murphy tell you or ask

16   you if you had purchased a CRT?

17         A.     Yes.

18         Q.     So who initiated the conversation about

19   CRT finished products?

20         A.     I really don't recall.

21         Q.     You don't recall?

22         A.     Who initiated it.

23         Q.     Okay.  And after this conversation, you

24   decided to join this lawsuit; is that correct?

25         A.     Yes.

                              47

ALVIN GUTTMAN                          BARKLEY
                                       Court Reporters

```
1                  Guttman - October 11, 2012
2        Q.     And what made you decide to join the
3   lawsuit?
4        A.     Well, I believe in good government.  I
5   try to buy American products.  And apparently, there
6   were issues on the manufacturers' actions with regard
7   to the CRTs.
8        Q.     So what motivated you to -- what
9   motivated you to address those actions?
10       A.     I believe in good government.  I believe
11  in the Sherman Act.  I'm against antitrust
12  violations.  And I felt that it would be a proper
13  thing for me as president of Lawyer's Choice Suites
14  to do.
15       Q.     When exactly did you decide to join the
16  litigation?
17       A.     Probably the day I signed the
18  contingency agreement.
19       Q.     Was that the retainer agreement?
20       A.     Retainer agreement, yes.
21       Q.     Okay.  And you stated that was in March
22  2012?
23       A.     Yes, I believe so.
24       Q.     How long after your conversation with
25  Mr. Murphy did you sign the retainer agreement?
```

48

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2          A.      Probably within two weeks.

3          Q.      Did you have any other conversations

4    with Mr. Murphy after that initial conversation and

5    before signing the retainer agreement?

6          A.      I can't recall.

7          Q.      You can't recall.  Okay.

8                  When was the first time you -- withdraw

9    that.

10                 Does Mr. Murphy represent other indirect

11   purchaser plaintiffs in this case?

12         A.      I'm not sure.

13         Q.      Okay.  How was Mr. Murphy involved in

14   this case?

15         A.      I believe his law firm is part of the

16   plaintiffs' counsel.

17         Q.      Do you know how they're part of the

18   plaintiffs' counsel?

19                 MR. GRALEWSKI:  Object to the form.

20         Vague and ambiguous.

21         A.      No, I don't.

22         Q.      Okay.  When was the first time that you

23   met with Mr. Gralewski?

24         A.      Yesterday.

25         Q.      Has he represented you in any other

                            49

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2   matters?

3        A.      No.

4        Q.      Has Mr. Murphy represented you in any

5   other matters?

6        A.      No.

7        Q.      Do you know the name of the law firm

8   that was appointed lead counsel for the entire group

9   of punitive and direct purchaser plaintiffs?

10       A.      No.

11               MR. GRALEWSKI:  I'm going to object to

12          that question as outside the scope of the

13          notice.

14       Q.      So your communications on this case have

15   been primarily with Mr. Murphy; is that correct?

16               MR. GRALEWSKI:  I object to the form.

17          Misstates prior testimony.  Vague and ambiguous.

18       A.      And Mr. Gralewski.

19       Q.      Okay.  So you have spoken with

20   Mr. Gralewski over the phone prior to yesterday?

21       A.      I did.

22       Q.      How many times did you speak with him on

23   the phone prior to yesterday?

24       A.      Once.

25       Q.      Have you had any other correspondence

                         50

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1              Guttman - October 11, 2012
 2  with Mr. Gralewski prior to yesterday?
 3       A.    Not directly, no.
 4       Q.    No e-mails, letters?
 5       A.    I don't think so.
 6       Q.    So other than Mr. Gralewski and
 7  Mr. Murphy, have you had any other contact with
 8  plaintiffs' counsel in this case?
 9       A.    Yes.
10       Q.    And with whom?
11       A.    Mr. Murke, M-U-R-K-E.
12       Q.    Okay.  Do you know what law firm he is
13  associated with?
14       A.    I can't recall.
15       Q.    Okay.  How many times -- I'm sorry, have
16  you met with Mr. Murke?
17       A.    No.
18       Q.    Have you talked with him on the phone?
19       A.    Yes.
20       Q.    How many times have you talked with him
21  on the phone?
22       A.    Two or three times.
23       Q.    Okay.  Have you corresponded with him by
24  e-mail?
25       A.    Not directly.  I think I had received
```

51

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2   some ccs.

3        Q.    Do you have any relationship with any

4   person affiliated with or employed by any of the

5   plaintiffs' law firms involved in this case?

6              MR. GRALEWSKI:  I'm sorry, can you say

7        that again, counsel.

8        Q.    Do you have any relationship with any

9   person affiliated with or employed by any of the

10  plaintiffs' law firms involved in this case?

11       A.    Yes.

12             MR. GRALEWSKI:  Object to the form.

13       Vague and ambiguous.

14       Q.    And with whom?

15       A.    Mr. Murphy's law firm.

16       Q.    Anyone else besides Mr. Murphy?

17       A.    His law firm.

18       Q.    I'm sorry, anyone else besides

19  Mr. Murphy's law firm?

20       A.    No.

21       Q.    When did you first communicate with

22  Mr. Murke in this case?

23       A.    Probably a couple of weeks after I

24  signed the retainer agreement.

25       Q.    So would that have been in March or

                            52

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2    April 2012?

3         A.    That's about right.

4         Q.    Okay.  When did you first communicate

5    with Mr. Gralewski in this case?

6         A.    Two days ago.

7         Q.    So that was two days ago you had your

8    first phone conversation with Mr. Gralewski?

9         A.    Correct.

10        Q.    Okay.  Have you given any documents to

11   class counsel?

12        A.    Yes.

13        Q.    Have those documents been produced in

14   this litigation?

15        A.    I don't know.

16        Q.    Did you read the papers that are filed

17   in this case?

18        A.    Yes.

19        Q.    Which papers did you read?

20        A.    Anything I sign my name to.

21        Q.    And what have you signed your name to?

22        A.    Answers to interrogatories,

23   verification, and the retainer agreement.

24        Q.    Okay.  So have you read anything else

25   that you haven't signed your name to?

                           53

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                   Guttman - October 11, 2012

2       A.     I did, yes.

3       Q.     And what was that?

4       A.     I believe it's the amended complaint.

5       Q.     Is there anything else besides that?

6       A.     No.

7       Q.     Do you know what a CRT is?

8       A.     Yes.

9       Q.     What is it?

10      A.     It's a cathode ray tube.

11      Q.     And what is that?

12      A.     It is the electronic device that's

13  inside televisions and monitors.

14      Q.     Have you personally ever purchased a

15  stand alone CRT?

16      A.     No.

17             MR. GRALEWSKI:  Asked and answered.

18      Q.     Mr. Guttman, can you please list for me

19  all electronic products containing a CRT that

20  Lawyer's Choice purchased during the March 1st, 1995

21  to November 25, 2007 period.

22      A.     Could you repeat that.

23      Q.     I asked you to list all electronic

24  products containing a CRT that Lawyer's Choice

25  purchased during the class period, March 1st, 1995

                            54

ALVIN GUTTMAN

BARKLEY
Court Reporters

1              Guttman - October 11, 2012

2   through November 25, 2007.

3              MR. GRALEWSKI:  Object to the form.

4       Asked and answered.  You can answer.

5       A.    Probably three or four computer

6   packages.

7              MR. GRALEWSKI:  If you're starting a new

8        line of questions, can we take a short break

9        now?  I don't want to necessarily interrupt your

10       line of questions, but I would like one.  I

11       don't want to go another half an hour.  You know

12       what I mean?  It's up to you.

13             MS. NAIFEH:  Sure.

14             MR. GRALEWSKI:  We're happy to continue.

15       I'm happy to continue a little while longer if

16       you want to go a little while longer.  Please

17       bear that in mind.  Thank you.

18             MS. NAIFEH:  Sure.  I'll keep that in

19       mind.  Let's go a few more minutes, and then

20       I'll get to a stopping point.

21             MR. GRALEWSKI:  Thanks.

22             MS. NAIFEH:  Can you please read back

23       his last answer.

24             (The record was read.)

25             MS. NAIFEH:  Thank you.

                        55

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2          Q.     Were these computer packages purchased

3     from Dell?

4                 MR. GRALEWSKI:   Object to the form.

5          Asked and answered.

6          A.     Yes.

7          Q.     All of them?

8                 MR. GRALEWSKI:   Same objection.

9          A.     Yes.

10         Q.     So you bought the computer systems and

11    they threw in the monitor with the system; is that

12    right?

13                MR. GRALEWSKI:   Object to the form.

14         Lacks foundation.

15         A.     The monitor was included in the package.

16         Q.     It was included.

17                MR. GRALEWSKI:   Vague and ambiguous,

18         also.

19         Q.     What about you personally, did you

20    purchase any CRT finished products during the period?

21                MR. GRALEWSKI:   Object to the form.

22         Outside the scope.   You're talking about Al

23         Guttman?

24                Outside the scope and I think asked and

25         answered, but I'm not sure about that.   But

                              56

ALVIN GUTTMAN                                    BARKLEY
                                                 Court Reporters

1          Guttman - October 11, 2012

2      please proceed.

3      A.    I bought my daughter a computer.  It's a

4  laptop.  I don't know if it contains a CRT.

5      Q.    Okay.  Any other CRT finished products

6  during that time?

7          MR. GRALEWSKI:  And you're asking him

8      about himself?

9          MS. NAIFEH:  Him personally.

10          MR. GRALEWSKI:  Okay.  I'm objecting as

11      outside the scope.

12      A.    I bought a television.

13      Q.    And that was a CRT television?

14      A.    It was an LCD television.

15      Q.    Okay.  Was there anything else?

16          MR. GRALEWSKI:  Is there anything else

17      what?

18          MS. NAIFEH:  Is there any other products

19      that he bought during that period.

20          MR. GRALEWSKI:  What kind of products?

21      And you're talking about himself?  I'm sorry to

22      give you a hard time, but I would like you to

23      ask clear questions so that the record is clear.

24      And I am also objecting to you asking the

25      witness to list all of the products that he

57

ALVIN GUTTMAN

BARKLEY
Court Reporters

1          Guttman - October 11, 2012

2      himself purchased when we're here today pursuant

3      to a 30(b)(6) notice, so I'm objecting as

4      outside the scope.

5      Q.    Mr. Guttman, did you personally purchase

6  any CRT finished products during the class period

7  besides the laptop and the LCD television that you

8  described?

9      A.    No.

10      Q.    Okay.  Have you ever sold an electronic

11  product containing a CRT?

12      A.    No.

13          MS. NAIFEH:  Okay.  Let's take a break.

14          THE VIDEOGRAPHER:  We are going off the

15      record at 11:06.

16          (Discussion off the record.)

17          THE VIDEOGRAPHER:  Back on the record at

18      11:30.

19          MR. GRALEWSKI:  Can we do an additional

20      notice or an additional appearance before we

21      start?

22          MS. NAIFEH:  Kevin?

23          MR. GRALEWSKI:  You might be on mute.

24          MS. NAIFEH:  Kevin, do you want to make

25      an appearance.

58

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2               MR. GOLDSTEIN:  Kevin Goldstein of Weil

3         Gotshal & Manges on behalf of the Panasonic

4         defendants.

5               MR. GRALEWSKI:  Thank you.  Thank you,

6         counsel.

7               MS. NAIFEH:  Okay.

8    BY MS. NAIFEH:

9         Q.    Mr. Guttman, before the break, you

10   stated that Lawyer's Choice had purchased three or

11   four computer packages during the class period; is

12   that correct?

13        A.    That is correct.

14        Q.    Okay.  So can you tell me about the

15   first computer system that you purchased.

16              What was that system?

17        A.    I believe it was Dell.

18        Q.    Do you remember the name of the product?

19        A.    I think it was a Latitude.

20        Q.    This is a desktop computer?

21        A.    Yes.

22        Q.    Did it -- was the monitor included in

23   the package?

24        A.    I think it was.

25        Q.    Do you remember when you purchased that?

59

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                  Guttman - October 11, 2012
 2        A.     No.
 3        Q.     No recollection?
 4        A.     Certainly between 1997 and 2006.
 5        Q.     So sometime during that period,
 6   that's --
 7        A.     Yes.
 8        Q.     Where were you when you purchased that
 9   system?
10        A.     Washington, D.C.
11        Q.     Did you purchase the system at an
12   on-line retailer?
13        A.     I'm not sure.  I may have utilized an
14   internet provider company to purchase that product.
15        Q.     Do you know what provider company that
16   was?
17        A.     It may have been Lime Leap, L-I-M-E
18   L-E-A-P, and I don't know if they're still in
19   business.
20        Q.     Was that a -- was that provider located
21   in the District of Columbia?
22        A.     Yes.
23        Q.     Are you claiming damages on this
24   computer system?
25        A.     Not specifically, because I don't have
```

60

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                  Guttman - October 11, 2012
 2   the documentation to back up the claim, specifically
 3   in terms of receipts.
 4        Q.    Do you know what happened to the
 5   receipts for that system?
 6        A.    No, I don't.
 7        Q.    How does Lawyer's Choice normally store
 8   their receipts for purchases?
 9        A.    Well, we have a miscellaneous receipt
10   file.
11        Q.    And you checked that file?
12        A.    I checked most of that file.  I have a
13   computer receipt file which I thoroughly checked and
14   couldn't find it.
15        Q.    So you have no recollection of what
16   happened to that computer receipt?
17        A.    I do not.
18        Q.    Okay.  Can you tell me about the second
19   computer system that you purchased.
20        A.    It's a Dell.
21        Q.    Do you remember the name of the product?
22        A.    I do not.
23        Q.    Was this also a desktop computer?
24        A.    Yes.
25        Q.    Did it also include a monitor?
```

61

BARKLEY
Court Reporters

```
 1                 Guttman - October 11, 2012
 2        A.      Probably.
 3        Q.      Probably.  You're not sure?
 4        A.      Again, I would have to check receipts on
 5  that as well.  This was a while back.
 6        Q.      Okay.  When was this?
 7        A.      Between 1997 and 2006.
 8        Q.      Okay.  So the same time period?
 9        A.      Yeah.
10        Q.      Do you remember where you were when you
11  made that purchase?
12        A.      I'm not sure.
13        Q.      You don't recall?
14        A.      It could have been Washington D.C. or
15  Sarasota, Florida.
16        Q.      Did you make the purchase on-line?
17        A.      I'm sorry, I don't remember.
18        Q.      You don't recall?
19        A.      I don't recall.
20        Q.      So when you say it could have been
21  Washington D.C., that could have been from a retailer
22  in Washington D.C. or an on-line retailer?
23        A.      Probably Dell directly.
24        Q.      And is that Dell.com?
25        A.      Yes.
```

62

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2        Q.      Is it possible that you were -- I'm

3   sorry, you stated it is possible you also might have

4   been in Florida when you purchased that?

5        A.      Yes.

6        Q.      From Dell.com?

7        A.      That's correct.

8        Q.      So are you claiming damages on that

9   system?

10        A.      No.

11        Q.      And why not?

12        A.      I don't have the documentation.

13        Q.      You don't know what happened to the

14   documentation?

15        A.      I'm not sure.  I'm sure it probably is

16   in an American Express account within the last 10

17   years.

18        Q.      Have you checked your American Express

19   statements for the time period?

20        A.      I have not.

21        Q.      Going back to the first product you

22   mentioned, Dell Latitude desktop, do you still own

23   that Dell Latitude desktop?

24        A.      Yes.

25        Q.      Do you still use it?

                          63

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2          A.     Yes.

3          Q.     And then the second product you

4     mentioned, the Dell desktop, do you still own that

5     product?

6          A.     Which one?

7          Q.     The second one you mentioned.

8          A.     I do.

9          Q.     Okay.  Do you still use that product?

10         A.     I do.

11         Q.     Okay.  Can you tell me about the third

12     computer package that you purchased.

13         A.     The one regarding this CRT case?

14         Q.     Is that the third one?  You mentioned

15     there were three or four packages.

16         A.     I'm not sure if it was two to three or

17     three to four, to be honest with you.

18         Q.     Okay.

19         A.     The 1100 Dell is the one that I do have

20     documentation for, purchased in 2006.

21         Q.     When exactly was that purchased?

22         A.     I don't have a date, but it was 2006.

23         Q.     Is there a document you could look at

24     that would refresh your recollection of when you

25     purchased that computer?

                            64

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                     Guttman - October 11, 2012

2          A.     Yes.

3          Q.     What document is that?

4          A.     Copy of my receipt.

5          Q.     Has that been produced in this

6     litigation?

7          A.     I'm not sure.

8                 MR. GRALEWSKI:  Can we go off the record

9          for one second.

10                THE VIDEOGRAPHER:  Going off the record

11         at 11:38.

12                (Discussion held off the record.)

13                THE VIDEOGRAPHER:  Back on the record at

14         11:39.

15    BY MS. NAIFEH:

16         Q.     Mr. Guttman, where were you when you

17    purchased the Dell 1100?

18         A.     Washington, D.C.

19         Q.     Were you at Lawyer's Choice?

20         A.     I was.

21         Q.     Where did you purchase the 1100 from?

22         A.     Dell.com.

23         Q.     You mentioned earlier that you live in

24    Florida.

25         A.     I do.

                              65

ALVIN GUTTMAN

BARKLEY
Court Reporters

Guttman - October 11, 2012

1

2      Q.      And you commute to D.C. for work?

3      A.      That is correct.

4      Q.      How often do you commute?

5      A.      From the fall through the spring,

6   usually on a weekly basis.

7      Q.      By weekly basis, what do you mean?

8              MR. GRALEWSKI:  I'm going to object to

9          these questions as outside the scope of the

10         deposition notice.

11     A.      I generally come to Washington Monday --

12  on Monday, and leave Thursday or Friday.

13     Q.      Okay.  And I'm sorry, I'm sorry, what

14  month do you say you commute?

15             MR. GRALEWSKI:  Same objection.

16     A.      In the spring to the fall.  In the

17  summertime, I tend to be in Washington D.C.

18  full-time, except for a two-week vacation.

19     Q.      So is it possible that you could have

20  been in Florida when you purchased the Dell 1100?

21     A.      No.

22     Q.      You recall being in D.C. when you made

23  that purchase?

24     A.      I do.

25     Q.      Okay.  So what was included in the

66

ALVIN GUTTMAN

                    Guttman - October 11, 2012
1  purchase of the Dell 1100?

2       A.      A monitor screen, a mouse, and a
3  keyboard.

4       Q.      Was there anything else?

5       A.      I don't believe so, no.

6       Q.      So the monitor, mouse and keyboard came
7  with the computer?

8       A.      As a package, that's correct.

9       Q.      You didn't purchase the monitor
10  separately; is that right?

11      A.      I did not.

12      Q.      What was the brand of the monitor?

13      A.      The name was Dell on the monitor itself.

14      Q.      So both the computer system and the
15  monitor were Dell?

16      A.      To the best of my knowledge, yes.

17      Q.      Do you remember the model number of the
18  monitor?

19      A.      I do not.

20      Q.      Is Dell a defendant in this case?

21      A.      I don't believe so.

22      Q.      Do you know why not?

23      A.      Dell is a packager of the product.
24  They're a -- they do not produce CRTs.

25                          67

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2          Q.      And so why aren't they included as a

3     defendant?

4          A.      I have no idea.  I rely on --

5                  MR. GRALEWSKI:  Object to the form.

6     Asked and answered.  You can continue.

7          A.      I rely on my lawyer's advice.

8          Q.      What did the monitor that came with the

9     Dell 1100 computer system looks like?

10         A.      It looked like the old television

11    monitor screen.  It was black.

12         Q.      How large was it?

13         A.      I can't recall.

14         Q.      Did you ever measure it?

15         A.      No.

16         Q.      Did you purchase that computer system

17    yourself?  Sorry, I want to clarify.

18                 Did you, as president and executive of

19    Lawyer's Choice, did you make that purchase on behalf

20    of Lawyer's Choice?

21         A.      Yes, I did.

22         Q.      Okay.  Do you know whether the monitor

23    that you bought had a manufacturer's suggested retail

24    price associated with it?

25         A.      I do not.

                              68

ALVIN GUTTMAN

BARKLEY
Court Reporters

1            Guttman - October 11, 2012

2       Q.     Do you know if you paid less than the

3   manufacturer's suggested retail price by purchasing

4   it in a bundle?

5            MR. GRALEWSKI:  Object to the form.

6       Lacks foundation.

7       A.     I do not.

8       Q.     What specific features of the computer

9   system were important to you when you purchased it?

10      A.     Speed, reliability.

11      Q.     Is there anything else?

12      A.     Price.

13      Q.     Did other products have those features?

14      A.     Could you rephrase that.

15      Q.     Were there any other products besides

16  the Dell computer that had those features that you

17  could have purchased?

18      A.     I assume.

19      Q.     You assume.  Did you --

20      A.     I went directly to Dell.com and made the

21  purchase.

22      Q.     Okay.  So did you research any other

23  brands?

24      A.     No.

25      Q.     Okay.  Why not?

69

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                   Guttman - October 11, 2012

2        A.    I have a comfort level with Dell.

3        Q.    Was the monitor important at all when

4   you made the purchase of the computer system?

5               MR. GRALEWSKI:  Object to the form.

6        Vague and ambiguous.

7        A.    Yes.

8        Q.    Why?

9        A.    It provided a central component to the

10  package.

11       Q.    Didn't it just come with the computer

12  system as an accessory, like the mouse and keyboard?

13              MR. GRALEWSKI:  I object to the form.

14       Asked and answered, misstates testimony, lacks

15       foundation.

16       A.    It was a --

17              MR. GRALEWSKI:  Vague and ambiguous.

18       Sorry.

19       A.    It was part of the package.  It was an

20  inclusive price.

21       Q.    Okay.  Would you say that the quality of

22  the computer system was more important to you than

23  the quality of the monitor?

24       A.    No, not necessarily.

25       Q.    But you testified earlier that you would

                              70

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2    be looking for a computer system that would be fast

3    and reliable; is that correct?

4                    MR. GRALEWSKI:  Object to the form.

5         Asked and answered, argumentative.

6         A.    I did state that, yes.

7         Q.    So those were the most important

8    reasons -- I'm sorry, the most important features in

9    the computer system?

10                   MR. GRALEWSKI:  Object to the form.

11        Vague and ambiguous.

12        A.    No.

13        Q.    What were some of the other important

14   features that you were looking for in the computer

15   system?

16        A.    Well, the monitor screen had to be

17   readable and large enough to handle a multitude of

18   tasks.  I was not likely to buy a stand alone

19   computer without a monitor, a mouse, and a keyboard.

20        Q.    Is there any specific reason why you

21   purchased the monitor that you did instead of other

22   monitors that were available?

23        A.    Yes.

24        Q.    What was that?

25        A.    It was part of a package that was

                              71

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                Guttman - October 11, 2012
 2  included in the price.  It was a packaged purchase.
 3       Q.    So you purchased the monitor because it
 4  was included in the package?
 5       A.    I specifically chose that monitor.
 6       Q.    How did you specifically choose that
 7  monitor?
 8       A.    I believe the Dell website gave you
 9  choices.
10       Q.    And do you remember what those other
11  choices were?
12       A.    I do not.
13       Q.    Okay.  What features of the monitor that
14  you chose were important to you?
15            MR. GRALEWSKI:  Object to the form.
16       Asked and answered.
17       A.    The size, the reliability, and the
18  pricing of the monitor.
19       Q.    What was the pricing of the monitor?
20       A.    I do not recall.
21       Q.    Didn't the monitor just come with the
22  computer package?
23       A.    Yes.
24       Q.    But you stated that you selected the
25  monitor.
```

72

BARKLEY
Court Reporters

1                  Guttman - October 11, 2012

2        A.    That's correct.

3        Q.    Were there other monitors that were more

4   expensive to choose from?

5        A.    Yes.

6        Q.    Were there other monitors that were less

7   expensive to choose from?

8        A.    I don't recall.

9        Q.    So do you believe that you chose the

10  least expensive monitor?

11       A.    I believe I chose the recommended

12  monitor with that package.

13       Q.    And recommended by whom?

14       A.    By Dell.

15       Q.    So of the options available to you,

16  there was a recommended model and then there were

17  other models; is that right?

18       A.    I believe that's correct, yes.

19       Q.    Do you remember on what basis Dell made

20  its recommendation?

21            MR. GRALEWSKI:  Object to the form.

22       Calls for speculation.

23       A.    I really -- I can't recall.

24       Q.    Was this a situation where if you bought

25  the computer, they gave you the monitor for free?

                              73

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                   Guttman - October 11, 2012

2                   MR. GRALEWSKI:  Object to form, lacks

3         foundation, argumentative, call for a legal

4         conclusion, asked and answered.

5         A.    No.

6         Q.    Okay.  So what percentage of the

7    purchase price did the monitor represent?

8         A.    I have no idea.

9         Q.    So you don't recall the price of the

10   monitor?

11        A.    I don't believe it was included in the

12   list to choose from.  It was the recommended monitor

13   for that particular package.

14        Q.    I see.  And the price wasn't listed with

15   the recommendation?

16        A.    Not for that monitor.

17        Q.    Not for that monitor.

18              Were the prices listed for other

19   monitors?

20        A.    Yes.

21        Q.    So you could pay an additional fee to

22   get other monitors; is that right?

23        A.    I believe so.

24        Q.    Because there was no purchase price,

25   though, does that mean that the monitor was

                          74

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                   Guttman - October 11, 2012

2    essentially free?

3          A.     No.

4                 MR. GRALEWSKI:  Objection to the form.

5          Lacks foundation.

6          Q.    How do you know that it wasn't free?

7                 MR. GRALEWSKI:  Same objection.

8          Argumentative, asked and answered.

9          A.     I believe that I could have eliminated

10   the monitor and saved more money.

11         Q.     You believe.  Are you sure about that?

12         A.     No.

13         Q.     Okay.  How much could you have saved?

14         A.     I can't recall that number.

15         Q.     Was the price you paid for the computer

16   a sales price?

17                 MR. GRALEWSKI:  I object to the form.

18         Vague and ambiguous.

19         Q.     Was it on sale?

20         A.     You mean below the listed price?

21         Q.     Correct.

22         A.     I really don't recall.

23         Q.     Did you get any discounts?

24         A.     As a package, I believe I did, yes.

25         Q.     Okay.  And why did you get discounts?

                           75

ALVIN GUTTMAN

1          Guttman - October 11, 2012

2      A.      Because it was on their website.

3      Q.      So their website was offering a

4  discount?

5      A.      It was a package.  If you take all the

6  elements separately, it would cost more.

7      Q.      So you got a discounted price because

8  you purchased the items together as a package?

9      A.      Yes.

10     Q.      And would that include a discounted

11  price on the monitor?

12     A.      I can't state to that fact.  I don't

13  know.

14     Q.      So you don't know what kind of discount

15  you might have gotten because you purchased the

16  monitor together with the computer system?

17          MR. GRALEWSKI:  Object to the form.

18      Misstates testimony.

19     A.      Could you repeat that, please.

20          MS. NAIFEH:  Do you mind repeating that.

21          (The record was read.)

22     A.      I don't know how to answer that.

23     Q.      So --

24     A.      Could you rephrase it, please.

25     Q.      So you stated earlier that you got a

76

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                  Guttman - October 11, 2012

2     discount by purchasing the package together; is that

3     correct?

4          A.    That's correct.

5          Q.    Okay.  You don't know how much of a

6     discount you got by purchasing the products together?

7          A.    That's correct, also.

8          Q.    Okay.  And so you don't know how much of

9     that discount you can attribute to the monitor; is

10    that correct?

11         A.    That is correct.

12         Q.    Okay.  Was the brand of the monitor

13    important to you?

14         A.    Yes.

15         Q.    Did you consider any other brands of

16    monitors?

17         A.    In this purchase?

18         Q.    Yes.

19         A.    No.

20         Q.    Was the size of the monitor important?

21         A.    Yes.

22         Q.    Why?

23         A.    So my employees could function properly

24    with the computer.

25         Q.    Okay.  What size were you looking for?

                            77

BARKLEY
Court Reporters

```
 1                    Guttman - October 11, 2012
 2         A.      Probably the one I purchased.
 3         Q.      And do you recall what size that was?
 4                 MR. GRALEWSKI:  Object to the form.
 5         Asked and answered.
 6         A.      It might have been 17 inches.
 7         Q.      Okay.  Was the manufacturer of the
 8    cathode ray tube inside the monitor important?
 9         A.      Yes.
10         Q.      And why was that important?
11         A.      Because that would affect the overall
12    operability of the monitor.
13         Q.      Do you know who the manufacturer of the
14    cathode ray tube in the monitor was?
15         A.      No.
16         Q.      Was the fact that the product contained
17    a CRT important to you when you purchased the
18    product?
19         A.      Could you rephrase that.
20         Q.      Was it important to you that there was a
21    CRT inside the product?
22         A.      If that was its function, yes.
23         Q.      And how so?
24         A.      I suppose I could have bought an LCD
25    screen also.
```

78

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2          Q.     And why didn't you buy an LCD?

3          A.     I was satisfied with the overall package

4    that Dell was offering me.

5          Q.     Was Dell offering you an LCD screen as

6    an alternative?

7          A.     Yes.

8          Q.     So could you explain why you chose a CRT

9    instead of the LCD that Dell was offering.

10         A.     I believe it was more economical and it

11   was with that package.

12         Q.     Okay.

13         A.     The recommended package.

14         Q.     So the price and because it was

15   recommended by Dell?

16         A.     And included.

17         Q.     And included in the package?

18         A.     Correct.

19         Q.     Okay.  So would you have had to pay

20   extra for an LCD monitor?

21         A.     I believe so, yes.

22         Q.     Okay.  Is it fair to say that you didn't

23   buy the LCD monitor because you were getting the CRT

24   monitor at no additional cost?

25                MR. GRALEWSKI:  Object to the form.

                              79

ALVIN GUTTMAN                                    BARKLEY
                                                 Court Reporters

1                Guttman - October 11, 2012

2        Asked and answered, lacks foundation, calls for

3        speculation.  Asked and answered.

4        A.    Could you repeat the question, please.

5              MS. NAIFEH:  Could you repeat the

6        question.

7              (The record was read.)

8              MR. GRALEWSKI:  Also, vague and

9        ambiguous.

10       A.    I don't know how to answer that.  I was

11   happy with the overall cost of the package.

12       Q.    And an LCD monitor would have cost more?

13       A.    That's correct.

14       Q.    And would not have been included in the

15   package?

16             MR. GRALEWSKI:  Object to the form.

17       Lacks foundation, calls for speculation,

18       misstates testimony.

19       A.    It would not have been included in the

20   same pricing as the package.

21       Q.    I see.  What kind of computer did you

22   purchase when you used the Dell 1100 -- did you use

23   when you purchased the Dell 1100 computer?

24       A.    Prior to that purchase?

25       Q.    When you were making the purchase of the

                        80

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                      Guttman - October 11, 2012

2    Dell 1100 on-line, what computer were you using?

3           A.      Probably another old Dell computer.

4           Q.      One of the two that we spoke of earlier?

5           A.      I'm not sure.

6           Q.      What other Dell computers do you have

7    that you might have been using?

8           A.      When I purchased the business in 1997, I

9    believe some of the offices contained computers.

10          Q.      And so you may have been using one of

11   those computers?

12          A.      That's correct.

13          Q.      I see.  Do you remember how many

14   computers came with the offices?

15          A.      I believe two.

16          Q.      Two.  Okay.

17                  And does Lawyer's Choice continue to use

18   those computers?

19                  MR. GRALEWSKI:  Object to the form.

20          Outside the scope.

21          A.      I don't believe so.

22          Q.      Was the computer that you made the

23   purchase of the Dell 1100 on a laptop or desktop?

24                  MR. GRALEWSKI:  Object to form.  Outside

25          the scope.

                            81

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2        A.    A desktop.

3        Q.    Did it have a stand alone monitor?

4              MR. GRALEWSKI:  Same objection.

5        A.    Yes.

6        Q.    What kind?

7        A.    CRT.

8        Q.    Do you remember the brand?

9        A.    I want to say Dell.

10       Q.    Okay.  And why aren't you claiming

11   damages for that monitor?

12             MR. GRALEWSKI:  Same objections.

13        Actually, I'm going to withdraw my objections to

14        your questions about the computer and monitor he

15        used or may have used to purchase the 1100.

16       A.    I had no receipts for that.

17       Q.    Okay.  So when you purchased the

18   computer at Dell.com, did you customize the computer

19   package that you wanted or was it -- was it -- I'll

20   just leave it at that.

21             Did you customize the computer package?

22       A.    No.

23       Q.    No.  So it was already just one package

24   and you selected that package?

25       A.    I believe that's correct.

                            82

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2        Q.     So you didn't specifically pick out the

3   processor size or amount of memory?

4        A.     I think it was included in the package.

5        Q.     Okay.  So the monitor -- in the same

6   way, the monitor was included in the package and you

7   didn't select a different monitor?

8               MR. GRALEWSKI:  Hold on a second.  I'm

9          going to object to that question as asked and

10         answered.  You have a right to ask questions.

11         I'm not going to instruct him not to answer the

12         question, but that is approximately the 10th

13         time you asked that same question.  And I would

14         ask you to ask him questions that you haven't

15         already asked him.  Thank you.

16       A.     Could you repeat the question, please.

17              MS. NAIFEH:  Do you mind repeating it.

18              (The record was read.)

19       A.     I did not select a different monitor.

20       Q.     Okay.  Did you deal with a customer

21   support person when you purchased the Dell 1100?

22       A.     No.

23       Q.     Could you have purchased the Dell 1100

24   anywhere else?

25       A.     I assume I could have through an

                            83

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                   Guttman - October 11, 2012
2    authorized dealer.
3          Q.    Do you know where?
4          A.    Well, there's lots of internet companies
5    that have relationships with Dell or Gateway or
6    Apple.  I presume I could have, yes.
7          Q.    From what other websites could you have
8    purchased the computer?
9          A.    I have no idea.  I went directly to
10   Dell.
11         Q.    Okay.  Did you shop around for the best
12   price?
13         A.    I don't understand the question.
14         Q.    When you bought your computer system,
15   did you look around to see where you could get that
16   system for the best price?
17         A.    Are you referring to within the Dell
18   website?
19         Q.    No.  I'm referring to other retailers or
20   other websites.
21         A.    No.
22         Q.    Okay.  So the prices at other stores or
23   on-line retailers could have been better than the one
24   that you paid?
25              MR. GRALEWSKI:  Object to the form.


                             84

ALVIN GUTTMAN                                    BARKLEY
                                                 Court Reporters

1                  Guttman - October 11, 2012

2          Lacks foundation, calls for speculation.

3          A.    I don't know.

4          Q.    You don't know because you didn't --

5          A.    That's correct.  I did not look.

6          Q.    Okay.  Did you wait to make the purchase

7     in hopes that the price would go down?

8          A.    No.

9          Q.    Did you review any marketing materials

10    or brochures?

11         A.    No.

12         Q.    Did you look for any sales or discounts?

13         A.    Yes.

14         Q.    Did you find any sales or discounts?

15         A.    Yes.

16         Q.    Where did you look?

17         A.    Dell.com.

18         Q.    Did you look anywhere else?

19         A.    No.

20         Q.    And what discounts did you find at

21    Dell.com?

22         A.    The packaged price.

23         Q.    Was there any other discount besides the

24    packaged price?

25         A.    No.

                           85

ALVIN GUTTMAN

BARKLEY
Court Reporters

                    Guttman - October 11, 2012

1

2          Q.     Okay.  Do you know where Dell bought the

3   computer system that you purchased?

4          A.     Could you repeat that, please.

5          Q.     Do you know where Dell.com purchased the

6   computer system that you purchased?

7          A.     I'm not aware if they purchased it or

8   they manufactured it.

9          Q.     Okay.  Do you know how much Dell paid

10  for or spent in purchasing or manufacturing your

11  computer system?

12         A.     No.

13         Q.     Do you still have this monitor, the

14  monitor that came with the Dell 1100?

15         A.     I'm not sure.

16         Q.     You're not sure if you still have it.

17                Do you know what you might have done

18  with it?

19         A.     I may have upgraded to an LCD screen.

20         Q.     You may have.

21         A.     Well, the 1100 Dell computer in the

22  office has another LCD screen connected to that

23  computer.

24         Q.     Okay.  For how long has it had that LCD

25  screen connected?

                          86

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2          A.    This LCD screen, probably about four or

3    five months.  There was another LCD screen that's

4    been there for two -- maybe two or three years.

5          Q.    Okay.  So you don't recall what happened

6    to the CRT monitor before the LCD screens were

7    purchased?

8          A.    Please repeat that.

9          Q.    I'm sorry.  I'll rephrase.

10               You don't know what happened to the

11   monitor of the Dell 1100 before the LC -- before you

12   replaced it with the LCD screens?

13         A.    It was used with the 1100.

14         Q.    But you don't know what happened to it

15   after you replaced it?

16         A.    I think it was recycled.

17         Q.    Recycled?

18         A.    Could have been, yes.

19         Q.    Okay.  Could it have been sold?

20         A.    No.

21         Q.    No.  Okay.

22               And -- but you don't think that Lawyer's

23   Choice still holds -- still has the monitor, that's

24   right?

25         A.    I don't believe so.

                              87

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2        Q.      You don't believe so.  Are you sure?

3        A.      No.

4        Q.      Okay.  What do you mean by recycled?

5        A.      The building sends a notice out asking

6    us to recycle electronics, monitors, whatever,

7    because it's considered the proper thing to do for

8    the environment, so any unused products for an

9    extended period of time, we'll remove.

10       Q.      Okay.  So you might have given it to

11   your building for that purpose?

12       A.      Yes.

13       Q.      Okay.  Do you know who in your office

14   would have been responsible for giving the monitor to

15   the building?

16       A.      Yes.

17       Q.      Who is that?

18       A.      Me.

19       Q.      You.  Okay.  So do you recall doing

20   that?

21       A.      No.

22       Q.      Not specifically?

23       A.      Correct.

24       Q.      Okay.  But it is your -- is it fair to

25   say that it's your practice to recycle electronic

                           88

ALVIN GUTTMAN

BARKLEY
Court Reporters

                    Guttman - October 11, 2012

1    products in this way?

2         A.    Yes.

3         Q.    Okay.

4               MS. NAIFEH:  I think it's time to switch

5         the tape.

6               THE VIDEOGRAPHER:  Going off the record

7         at 12:16.

8               (There was a recess taken.)

9               THE VIDEOGRAPHER:  Back on the record at

10        12:27.

11              MS. NAIFEH:  I would like to mark this

12        exhibit.

13              (Exhibit 367, E-Mail Order Confirmation,

14        marked for identification, as of this date.)

15   BY MS. NAIFEH:

16        Q.    Mr. Guttman, the court reporter has

17   handed you Exhibit 367.

18              Do you recognize this?

19        A.    Yes.

20        Q.    What is it?

21        A.    It's my recent purchase order.

22        Q.    Okay.  Is this an e-mail from SMB Online

23   Order Resolution at Dell.com?

24        A.    Yes.

                         89

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2          Q.     How do you know that this e-mail relates

3    to the CRT monitor for which you're claiming damages

4    in this case?

5          A.     It's the 1100.

6          Q.     The Dell 1100?

7          A.     Yes.

8          Q.     On its face, does this e-mail give any

9    indication that it is for a Dell monitor?

10         A.     Yes.

11         Q.     And where is that?

12         A.     Page 2 of 4.

13         Q.     So on page 2 of 4, it says Dimension

14   1100 P4, Intel Pentium 4 processor, and then below

15   that, it says monitors.

16                Is that what you're referring to?

17         A.     Yes.

18         Q.     Where it says 17 inch E773, 16 inch

19   viewable conventional CRT?

20         A.     Correct.

21                MS. NAIFEH:  For the record, I would

22         like to state that Exhibit 367 is CRT 000907 to

23         909.

24         Q.     So it looks like from this e-mail that

25   the computer was purchased and the monitor was

                         90

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2    included; is that correct?

3         A.    As part of the package.

4         Q.    Okay.

5         A.    Yes.

6         Q.    Did you order anything else at Dell.com

7    around this time?

8         A.    No.

9         Q.    So could this e-mail have been related

10   to any other product?

11        A.    No.

12        Q.    What is the date of this e-mail?

13        A.    According to the Exhibit, March 20,

14   2006.

15        Q.    And who is the e-mail to?

16        A.    Lawsuites@AT&T.net.

17        Q.    What e-mail address is that?

18        A.    It's the official address of Lawyer's

19   Choice Suites, Inc.

20        Q.    Okay.  So that's not a personal e-mail

21   address?

22        A.    It could be.

23        Q.    What do you mean by that?

24        A.    I tend to use the address for -- mostly

25   Lawyer's Choice Suites' business, but I do get

                           91

                      ALVIN GUTTMAN

BARKLEY
Court Reporters

1                Guttman - October 11, 2012

2  e-mails from time to time from friends.

3       Q.    Okay.  So you use this e-mail address in

4  your capacity as president of Lawyer's Choice, but

5  also, in a personal capacity; is that correct?

6       A.    That's correct.

7       Q.    Does anyone else have access to this

8  e-mail account?

9       A.    No.

10      Q.    So at the top of the document, it has

11  your name, Al Guttman.

12            Did you purchase this monitor in your

13  personal capacity?

14      A.    No.

15      Q.    And then at the bottom on the first

16  page, it says bill to, Alvin Guttman.

17            Does that indicate that you purchased

18  this in your personal capacity?

19      A.    No.

20      Q.    So why does it say bill to Alvin

21  Guttman?

22      A.    I'm president of the corporation.

23      Q.    And why doesn't it say bill to Lawyer's

24  Choice?

25            MR. GRALEWSKI:  Object to the form.


                          92

ALVIN GUTTMAN

BARKLEY
Court Reporters

1            Guttman - October 11, 2012

2        Calls for speculation.

3        A.    They asked me for my name.  I put the

4   name in the box.

5        Q.    And you couldn't have put Lawyer's

6   Choice in the box?

7        A.    Could have.  And in fact, I might have.

8        Q.    But it says -- I mean, it doesn't say

9   Lawyer's Choice in this case; is that right?

10       A.    I would have to look at the receipt.

11       Q.    So this document is not the receipt?

12       A.    No.

13       Q.    Do you have the receipt?

14       A.    Yes.

15       Q.    Has it been produced in this case?

16       A.    I don't know.

17       Q.    Have you provided it to your counsel?

18       A.    Yes.

19       Q.    Okay.

20            MR. GRALEWSKI:  Counsel, it may be CRT

21       000910.

22            MS. NAIFEH:  Okay.

23       Q.    So this e-mail is essentially an order;

24   is that right, an order that you placed?

25       A.    You're referring to me?

93

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                     Guttman - October 11, 2012

2          Q.     I'm referring to -- yes, to you.  You or

3     you as Lawyer's Choice.

4          A.     That's correct.

5          Q.     This is an order and not a receipt?

6          A.     That is correct.

7          Q.     Okay.  So what is the order for?

8          A.     I'm sorry?

9          Q.     Withdrawn.

10                 Let's go to the second page, Bates No.

11     908.  It lists order details at the top; is that

12     right?

13          A.     Yes.

14          Q.     So what did you get for your order?

15          A.     A Dimensional 1100.

16          Q.     And what did that include with it?

17          A.     Pentium processor, XP Professional

18     Windows, and a number of other items that came

19     included in the package.

20          Q.     And what were those other items?

21                 MR. GRALEWSKI:  Counsel -- go ahead.

22          A.     Would you like me to list -- to read off

23     this list?

24          Q.     No, that's not necessary.

25                 Is it fair that all of the -- is it fair

                            94

                     ALVIN GUTTMAN

                                                  BARKLEY
                                                  Court Reporters

1                  Guttman - October 11, 2012

2   to say that all of the items that came with the

3   package are listed on this -- on page 908?

4          A.    Yes.

5          Q.    What was the price of your order?

6          A.    According to the document in front of

7   me, it states unit price, $877.00.

8          Q.    How much of that price is represented by

9   the CRT monitor?

10         A.    I have no idea.

11         Q.    Can you give an estimate?

12         A.    Not really.

13         Q.    Do you think it's more than 10 percent?

14                MR. GRALEWSKI:  I'm going to object to

15         the form of the question.  It calls for expert

16         testimony.

17         A.    I don't know.

18         Q.    Does this e-mail indicate that you paid

19   sales tax?

20         A.    I think so.

21         Q.    How much?

22         A.    I don't know.  Actually, page 3 of 4

23   states the tax as $46.06.

24         Q.    Okay. So when this document was

25   produced, it was produced -- even though it says that

                            95

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                 Guttman - October 11, 2012

2    there were four pages, we only received three of

3    those pages.

4                 Do you know what happened to the fourth

5    page, page 4 of 4?

6         A.    I may still have it.  But I don't think

7    it included anything of relevance to the actual

8    shipping and items.

9         Q.    Okay.  Did you produce that page to your

10   counsel?

11        A.    I don't know.

12        Q.    If you do still have that page, we would

13   ask your counsel to produce it.

14                MR. GRALEWSKI:  I'm happy to talk with

15        you about that at the conclusion of the depo or

16        when you want to discuss it.

17                MS. NAIFEH:  Thank you.

18        Q.    Is there any indication from this e-mail

19   that the computer system was discounted?

20        A.    Yes.

21        Q.    And what is that?

22        A.    It looks like they gave me a $100 credit

23   for buying the package.

24        Q.    Where do you see that?

25        A.    Page 3 of 4.  At the top.

96

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2        Q.     You said $100 credit.  Is that a credit

3    or a discount?

4                MR. GRALEWSKI:  I object to the form.

5        Vague and ambiguous.

6        A.     I really don't know.

7        Q.     Okay.  Is there any other discounts?

8        A.     Free shipping.

9        Q.     Okay.  And so where it says additional

10   discounts and coupons, it says "Small business

11   customers receive free, three to five day shipping."

12               Is that what you're referring to?

13       A.     Yeah.

14       Q.     Okay.  And how much was that discount?

15       A.     According to the document, $66.

16       Q.     Okay.  So let's go back to the first

17   discount, the $100 discount where it says Dimension

18   1100 expires March 24th, 2006.

19               Was this a coupon that you used?

20       A.     It may have been.

21       Q.     You don't recall?

22       A.     I think it was a coupon on-line, kind of

23   like an on-line coupon.

24       Q.     Like a promotional coupon?

25       A.     I believe so.

97

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                  Guttman - October 11, 2012

2       Q.     Promotional code, something like that?

3       A.     Something like that, yes.

4       Q.     Do you know where you got that coupon?

5       A.     I have no idea.

6       Q.     Do you know if it was from Dell?

7       A.     In all probability, yeah.

8       Q.     Okay.  So this wasn't -- it wasn't a

9   sale that you recall; it was actually a code that you

10  would have had to enter?

11      A.     Or a click.

12      Q.     A click.  What do you mean by that?

13      A.     Perhaps it's an on-line icon that you

14  click for your $100 discount.

15      Q.     And that would have been on Dell.com?

16      A.     I believe so, yes.

17      Q.     Did you get any Dell newsletters or

18  e-mails with special offers?

19      A.     Yes.

20      Q.     Is that how you learned about the

21  coupon?

22      A.     I don't recall.

23      Q.     You don't recall.

24             MR. GRALEWSKI:  Object to the form.

25      Lacks foundation.

                        98

ALVIN GUTTMAN                                    BARKLEY
                                                Court Reporters

1                    Guttman - October 11, 2012

2        Q.    Did this $100 discount represent you

3   getting the monitor for free?

4              MR. GRALEWSKI:  Object to the form.

5        Asked and answered.  Lacks foundation.

6        Argumentative.

7        A.    I don't believe so.

8        Q.    Why not?

9              MR. GRALEWSKI:  Object to the form.

10       Lacks foundation.  Calls for speculation.  Calls

11       for legal and expert testimony.

12       A.    It was a package, an overall package.

13   If you purchased the package, you get a $100 discount

14   if you purchase it within a certain period of time.

15       Q.    So are you saying that the $100 discount

16   came because you purchased it as a package?

17       A.    Yes.

18       Q.    So this wasn't an addition to the

19   package price -- I'm sorry, I'm not stating that

20   clearly.

21              If you'll turn to 908, where it says

22   unit price, $877.

23       A.    Correct.

24       Q.    Does that represent the package price of

25   this unit?

                        99

ALVIN GUTTMAN                              BARKLEY
                                           Court Reporters

Guttman - October 11, 2012

1

2      A.      Yes.

3      Q.      So then the $100 discount on the page

4   909 would be an additional discount on the package

5   price; is that right?

6              MR. GRALEWSKI:  Object to the form.  The

7         document speaks for itself.  Asked and answered.

8         Argumentative.  Lacks foundation.

9      A.      Could you repeat the question.

10             MS. NAIFEH:  Do you mind repeating it.

11             (The record was read.)

12     A.      I believe so, yes.

13     Q.      So the discount is in addition to the

14   $100 -- I'm sorry, the $100 discount is in addition

15   to any discount you might have gotten from buying the

16   unit as a package?

17             MR. GRALEWSKI:  Object to the form.

18         Lacks foundation, calls for speculation, asked

19         and answered.

20     A.      I don't know.

21     Q.      Doesn't it seem clear from the document

22   that there was an additional $100 discount from the

23   package price from this order?

24             MR. GRALEWSKI:  Object to the form.

25         Argumentative, asked and answered, lacks

100

ALVIN GUTTMAN

BARKLEY
Court Reporters

1          Guttman - October 11, 2012

2          foundation, calls for speculation.

3          A.    Again, this was on-line.  And I may have

4    pushed an icon that allowed for a $100 discount

5    before I even saw the whole package.  I can't recall.

6          Q.    Okay.  Let's talk about the second

7    discount.

8                Was this free shipping discount a coupon

9    that you used?

10         A.    I don't recall.

11         Q.    Was it a sale or promotion from Dell

12   that expired on May 4th, 2006?

13         A.    According to page 3, it is, yes.

14         Q.    Do you know how you would have found out

15   about that promotion?

16         A.    On the website.

17         Q.    Could you have found out about it from a

18   newsletter or e-mail from Dell?

19         A.    It's possible.

20         Q.    The discount says it was for small

21   business customers.

22               Did Lawyer's Choice have to apply for

23   this discount?

24         A.    I believe I filled a form out that gave

25   me an ID number.

                        101

ALVIN GUTTMAN

BARKLEY
Court Reporters

1          Guttman - October 11, 2012

2     Q.    An ID number.

3           So when did you fill out that form?

4     A.    I don't recall.

5     Q.    Was it before you made this purchase?

6     A.    Probably.

7     Q.    Did you use that ID number in purchasing

8   the other computers that we talked about this

9   morning?

10    A.    I don't recall.

11    Q.    Do you recall making -- using that ID

12  number with any other purchase besides this Dell

13  computer, this Dell 1100?

14    A.    Yes.

15    Q.    And what computers were those?

16    A.    Computer upgrades.

17    Q.    Computer upgrades?

18    A.    Right.

19    Q.    When were those made?

20    A.    I don't recall.  I buy extra memory.

21    Q.    Did this $66 discount represent you

22  getting the monitor for free?

23          MR. GRALEWSKI:  Object to the form.

24    Asked and answered.

25    A.    I don't believe so.

102

ALVIN GUTTMAN

BARKLEY
Court Reporters

1               Guttman - October 11, 2012

2        Q.      Why not?

3               MR. GRALEWSKI:  Same objection.  I'll

4        withdraw that objection.

5        A.      Looks like a shipping discount to me.

6        Q.      And who would have -- where would that

7   shipping discount have come from?

8               MR. GRALEWSKI:  Object to the form.

9        Calls for speculation.  Vague and ambiguous.

10       A.      It looks to me to be from Dell.com.

11       Q.      So from the retailer that you purchased

12  the computer package from?

13       A.      To the best of my knowledge, yes.

14       Q.      So you got in total, $166 off the price

15  of this computer system; is that right?

16              MR. GRALEWSKI:  Object to the form.

17       Misstates testimony.  Lacks foundation.

18       A.      Could you rephrase that.

19       Q.      Adding together the first discount of

20  $100 and the second discount of $66, you got $166 off

21  of the price of the computer system?

22              MR. GRALEWSKI:  Object to the form.

23       Misstates testimony.  Lacks foundation.

24       A.      I can't determine the original retail

25  price of this computer.  I would have had to have

                        103

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                Guttman - October 11, 2012

2    gone back and see what it was being charged for a

3    month earlier.

4         Q.    Well, is it fair to say that you got a

5    $166 discount off of the $877 price on page 908?

6                MR. GRALEWSKI:  Object to the form.

7         Argumentative, lacks foundation.

8         A.    It appears, according to the document,

9    that I did receive a shipping discount and an overall

10   package discount.  But I have no idea what their

11   internal pricing is in terms of value.  For all I

12   know, the cost of the computer could have been more,

13   and then it went down again.  I don't know what its

14   original price was.

15        Q.    Okay.  Well, the price listed on page

16   908 was the price on Dell's website; is that correct?

17        A.    Yes.

18        Q.    And you paid $166 less than that price

19   according to page 909; is that correct?

20              MR. GRALEWSKI:  Object to the form.

21        Misstates the document.  Misstates testimony.

22        Lacks foundation.  Argumentative.

23        A.    According to the document, I received a

24   $166 price credit from the $877.00.  I have no idea

25   what specifically they were crediting me for except

                          104

ALVIN GUTTMAN

1                     Guttman - October 11, 2012

2    for what the document states.

3          Q.     And what do you mean by price credit?

4          A.     Simply $166.00 was reduced from $877.00.

5          Q.     Okay.  Do you think that the monitor

6    represented more of the price than that?

7          A.     Could you repeat that, please.

8          Q.     Do you think that the monitor

9    represented more than $166?

10                 MR. GRALEWSKI:  Object to the form.

11         Calls for expert testimony.

12         A.     I have no idea.

13         Q.     Do you know how much stand alone

14   monitors were selling for at that time?

15         A.     No.

16         Q.     Did you price them?

17         A.     No.

18         Q.     Why not?

19         A.     I was more interested in a package

20   because I needed a new computer with a monitor with

21   the mouse with the keyboard.  And this promotion met

22   my corporate needs.

23         Q.     Okay.  Did the seller offer you a low

24   price match guarantee?

25         A.     I don't believe so.

                              105

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                  Guttman - October 11, 2012

2        Q.      Were there any other promotions for the

3    product that you recall at the time?

4        A.      No.

5        Q.      Was there a rebate for the product?

6        A.      No.

7        Q.      Did the price go down after you

8    purchased it?

9        A.      I have no idea.

10       Q.      Did you purchase the product along with

11   any other products not listed on page 909?

12       A.      Could you repeat that, please.

13       Q.      So looking at page 909 -- I'm sorry, I

14   misspoke.  908.

15               Did you purchase any other product along

16   with the products listed on page 908?

17       A.      I don't think so.

18       Q.      Any printers or scanners or external

19   hard drives?

20       A.      I don't believe so.

21       Q.      Do you know how much of the total price

22   was attributed to each item listed on page 908?

23       A.      No, I don't.

24       Q.      Could you have purchased each of those

25   items separately?

                             106

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2          A.      I suppose I could have.

3          Q.      And why did you purchase them together?

4          A.      Because of the value of the package.

5          Q.      Were you required to purchase the

6    computer to get the price that you paid?

7          A.      I don't understand the question.

8          Q.      Were you required to purchase the

9    computer to get the price of the monitor?

10         A.      I don't know how to answer that.

11         Q.      Okay.  I'll withdraw that.

12                 Were you required to purchase any

13   additional products besides the computer to get the

14   price that you paid?

15         A.      No.

16         Q.      If you look on page 908, the 11th item

17   under order details is modem.  And it says no modem

18   requested.

19                 Does that indicate that you customized

20   this purchase?

21         A.      No.

22         Q.      So why does it say no modem requested?

23         A.      Because I didn't request a modem.

24         Q.      Did you have the opportunity to request

25   a modem?

                            107

ALVIN GUTTMAN                                    BARKLEY
                                               Court Reporters

1                    Guttman - October 11, 2012

2        A.    I'm sure I did.

3        Q.    Did you purchase a service package with

4    the product?

5        A.    A one-year support plan was included

6    within the overall purchase.

7        Q.    It was already included?

8        A.    I believe so.

9        Q.    You don't recall exactly?

10       A.    I do not.

11       Q.    So why did you choose the package that

12   you purchased?

13             MR. GRALEWSKI:  Object to the form.

14       Asked and answered.

15       A.    At the time, it appeared to meet my

16   corporate needs.

17       Q.    And those needs were what?

18       A.    Price, reliability, the name.

19       Q.    The name?

20       A.    The name Dell.

21       Q.    Brand?

22       A.    The branding.  Past experience and the

23   availability.

24       Q.    What do you mean by availability?

25       A.    It was something I could order and get

108

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                   Guttman - October 11, 2012

2    within 30 days or whatever.

3          Q.    Okay.  Does this e-mail indicate the

4    method you used to pay for the product?

5          A.    Yes.

6          Q.    And where does it say that?

7          A.    First page of four, pay with one,

8    credit/debit card on-line.

9          Q.    Is that consistent with your

10   recollection?

11         A.    Yes.

12         Q.    Okay.  At the time of purchasing the

13   product, how did you receive your credit card

14   statements?

15         A.    By mail.

16         Q.    By paper mail?

17         A.    Paper mail, yes.

18         Q.    Do you still have access to your credit

19   card statement from this purchase?

20         A.    Probably.

21         Q.    Have you produced your credit card

22   statement in this litigation?

23         A.    I don't believe so.

24         Q.    Have you given it to your counsel?

25         A.    I don't believe so.

                          109

BARKLEY
Court Reporters

```
1                    Guttman - October 11, 2012
2         Q.    Okay.  Do you know how much of the price
3   that you paid was for the CRT contained within the
4   product?
5         A.    No.
6         Q.    How would you find that out?
7               MR. GRALEWSKI:  I object to the form of
8         the question.  It calls for expert testimony.
9         A.    I'm not an expert.
10        Q.    So you don't know?
11        A.    I don't know how I would do that.
12        Q.    Okay.  Do you know how much a CRT costs
13  relative to the cost of the end product?
14        A.    No.
15        Q.    If you can turn to page 909.  Under the
16  second -- the bottom there, it says important thing
17  to know, the second bullet, where it says "Each order
18  number represents a separate purchase and will be
19  shipped and submitted for payment authorization
20  separately.  Consequently, some software and
21  peripherals including, but not limited to, monitors,
22  scanners and printers, may be shipped to you
23  separately from your system."
24              Do you see that?
25        A.    Yes.
```

110

ALVIN GUTTMAN

BARKLEY
Court Reporters

1          Guttman - October 11, 2012

2     Q.     What does peripheral mean?

3     A.     I assume they mean accessories to the

4  computer itself.

5     Q.     Okay.  Would you consider the monitor

6  peripheral to the purchase of your computer system?

7          MR. GRALEWSKI:  I object to the form.

8     Misstates the document.  Mischaracterizes the

9     prior testimony.  Lacks foundation.  Calls for

10    speculation.

11    A.     I don't know.

12    Q.     It appears that Dell does, doesn't it?

13         MR. GRALEWSKI:  I object to the form.

14    Lacks foundation.  Argumentative.

15    A.     Presumably, according to page 3 of 4, a

16  monitor, scanner and printer, seems to be parts of

17  the peripherals, but I don't know how to define

18  peripherals.  I've never gone to a dictionary to

19  determine what exactly a peripheral is.  I'm not that

20  technically minded.

21    Q.     Okay.  Thank you, Mr. Guttman.

22         All right.  I think we are going to go

23  off the record.

24         THE VIDEOGRAPHER:  Going off the record

25    at 1:03.

111

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2                 (There was a luncheon recess taken.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

112

ALVIN GUTTMAN

BARKLEY
Court Reporters

1              Guttman - October 11, 2012

2              A F T E R N O O N    S E S S I O N

3              THE VIDEOGRAPHER:  We're back on the

4      record at 1:56.

5   A L V I N    G U T T M A N,

6      Having been previously duly sworn was

7      examined and testified further as follows:

8   EXAMINATION BY

9   MS. NAIFEH: (CONTINUED)

10     Q.    Mr. Guttman, you understand you're still

11  under oath; is that correct?

12     A.    Yes.

13     Q.    Do you have a specific recollection of

14  purchasing the Dell 1100?

15     A.    No.

16     Q.    So you don't remember where you were

17  when you purchased it?

18              MR. GRALEWSKI:  I object to the form.

19     Asked and answered.

20     A.    Yes.  I was in Washington, D.C.

21     Q.    Okay.  Do you remember what time of day

22  it was?

23     A.    No.

24     Q.    If you look at 908 of Exhibit 367.

25     A.    367.

                        113

ALVIN GUTTMAN

BARKLEY
Court Reporters

1          Guttman - October 11, 2012

2      Q.    The order that we were looking at.

3            MR. GRALEWSKI:  She's referring to the

4      Bates No. 908.

5      Q.    So under order details, it says the

6  order was placed on March 20, 2006 at 2235.  So

7  that's 10:35 p.m.

8      A.    I'm simply reading the order detail.

9  2006, 3/20, 2235.59.  Okay.

10     Q.    Does that match your recollection?

11           MR. GRALEWSKI:  Object to the form.

12     Misstates testimony.

13     A.    I really do not recollect when I ordered

14  the computer.

15     Q.    But you recollect that you were at

16  Lawyer's Choice when you ordered the computer?

17     A.    I believe so.

18     Q.    Would you have been working at Lawyer's

19  Choice at 10:30 at night, is that a normal practice

20  for you?

21     A.    It's not extraordinary, but it's not

22  normal.

23     Q.    Okay.  So is it possible you could have

24  been at home?

25     A.    I don't think so.

114

ALVIN GUTTMAN

1                    Guttman - October 11, 2012

2          Q.     Why don't you think so?

3          A.     Well, I don't have a computer in

4   Washington D.C. that I typically use.  I don't think

5   we had smart phones back then.  So this is -- I guess

6   I would like to look at my original e-mail they

7   confirmed back immediately.  And I don't know if this

8   is an order that was placed by their computer or by

9   me.  I honestly don't know.

10         Q.     You don't know.  Okay.

11                So you couldn't have been at home in

12  Florida when you purchased this computer?

13                MR. GRALEWSKI:  Object to the form.

14         Badgering, asked and answered.  Argumentative.

15         A.     It's not likely.

16         Q.     Why do you say that?

17         A.     Because typically when I need something,

18  it's during my time in Washington.  It just

19  doesn't -- I can't see myself ordering a computer for

20  Washington D.C. out of Florida at 10:30 at night.  I

21  don't -- I really don't recall.

22         Q.     Okay.  Is it possible?

23         A.     It's conceivable, yeah.

24         Q.     Did you -- if I'm not mistaken, earlier

25  today when you were testifying about the -- one of

                              115

**ALVIN GUTTMAN**

BARKLEY
Court Reporters

                    Guttman - October 11, 2012

1   the other computers that you purchased from Dell and

2   you said you might have purchased that from

3   Washington or from Florida.

4        A.    That's correct.

5        Q.    So what is it about this computer in

6   particular that you think you would not have

7   purchased --

8        A.    Because this was used --

9        Q.    -- in Florida?

10       A.    This was used in Washington D.C.

11  specifically.

12       Q.    So the other computers that you

13  purchased that you might have purchased in Florida

14  wouldn't have been used for Washington D.C.?

15       A.    One of them was not.  The one that I

16  mentioned to you earlier was for my daughter.  It may

17  have been sent directly to Florida.

18       Q.    I see.  So when you mentioned the three

19  or four computer packages that you purchased earlier,

20  those weren't all for Lawyer's Choice?

21       A.    That's correct.

22       Q.    I see.  Okay.

23             And how many of those packages that you

24  mentioned were for Lawyer's Choice?

                            116

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                  Guttman - October 11, 2012

2          A.     At least two.

3          Q.     At least two?

4          A.     At least two, including the 1100.

5          Q.     Okay.   This product was shipped to D.C.;

6   is that correct?

7          A.     Yes.

8          Q.     But it is possible that you could have

9   ordered it in Florida and had it shipped to D.C.?

10              MR. GRALEWSKI:  I object to the form of

11         the question.  Asked and answered.

12         A.     I do not recall ordering this from

13  Florida.

14         Q.     Okay.  But is it possible?

15              MR. GRALEWSKI:  I object to the form.

16         Asked and answered.  You just asked him that

17         question like five minutes ago and he answered

18         it, but you can ask him again.

19         A.     When I travel, there are a multitude of

20  different places that one can order anything.  But I

21  recall, to the best of my ability, that this

22  Dimension 1100 was ordered on a Dell website outside

23  or inside my office in Washington, D.C.

24         Q.     Inside your office in Washington D.C.?

25         A.     I believe so.  I really do.

                           117

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2        Q.     Okay.  But you don't have a specific

3   recollection of that purchase?

4        A.     No.

5        Q.     So why do you believe that it was

6   purchased at your office in D.C.?

7               MR. GRALEWSKI:  Object to the form.

8        Asked and answered.

9        A.     Because it was specifically needed for

10  Washington, D.C.

11       Q.     Okay.

12               MS. NAIFEH:  Can you mark this, please.

13               (Exhibit 368, Shipping Contents Label,

14       marked for identification, as of this date.)

15       Q.     Okay.  Do you recognize this document?

16       A.     Yes.

17       Q.     And what is it?

18       A.     It's the receipt that was included in

19  the box that came to Washington including the

20  computer.

21       Q.     Okay.  So it was inside the box?

22       A.     I think it's like a shipping label that

23  they -- that you take off the box.

24       Q.     One of those in the plastic?

25       A.     Exactly.

                              118

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                 Guttman - October 11, 2012

 2      Q.    Okay.  And so you said it's a receipt.

 3            Does it have the sales price on the

 4  document?

 5      A.    I don't think so.  I don't see it.

 6      Q.    Okay.  So this might have just been a

 7  shipping label?

 8      A.    Yes.

 9      Q.    Okay.

10            MS. NAIFEH:  Can you please mark this.

11            (Exhibit 369, Shipping Label, marked for

12        identification, as of this date.)

13      Q.    Do you recognize this document?

14      A.    Yes.

15      Q.    And what is it?

16      A.    It's the same, continuation of the

17  shipping label that was sent to me.

18      Q.    Okay.  Of the --

19      A.    With the boxes.

20      Q.    So this is a continuation of Exhibit

21  368?

22      A.    I believe it is, yeah.

23      Q.    And this came on the outside of the

24  packaging?

25      A.    I can't recall.
```

ALVIN GUTTMAN

BARKLEY
Court Reporters

1             Guttman - October 11, 2012

2      Q.     You can't recall.  Okay.

3      A.     But...

4      Q.     So at the top of 369, where it says --

5  see kind of in the upper right-hand corner, it says

6  30.90 pounds, do you see that?

7      A.     Yeah.

8      Q.     What does that represent?

9      A.     No idea.

10     Q.     Could that represent the weight of the

11 box?

12     A.     Yeah.

13     Q.     Do you know how much of that weight

14 would be represented by the monitor?

15     A.     No.

16     Q.     Okay.  So in the response to various

17 discovery requests in this case, you've produced some

18 documents; is that correct?

19     A.     Yeah, I have.

20     Q.     And the documents that you have produced

21 are -- would have been marked as 3 -- Exhibits 367,

22 368, and 369 which are Bates labeled consecutively

23 CRT 907 through 911; is that right?

24     A.     Would you repeat that again, please.

25     Q.     So the documents that you produced have

                     120

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
1                  Guttman - October 11, 2012
2   been marked Exhibit 367, 368, and 369.
3        A.    Yes.
4        Q.    And those are Bates labelled
5   consecutively CRT 907 through 911?
6        A.    Yes.
7        Q.    Are these all of the documents that
8   Lawyer's Choice has in its possession, custody or
9   control that proves that it purchased a computer
10  system that included a monitor?
11       A.    Yes.
12       Q.    So do you have any other documents that
13  prove you purchased a CRT finished product?
14       A.    Not that I'm aware of.
15       Q.    Did you provide any -- your attorney
16  with any documents in response to discovery requests
17  that were not produced?
18       A.    No.
19       Q.    And the documents that you have produced
20  indicates that Lawyer's Choice purchased a Dell
21  computer system; is that right?
22       A.    Correct.
23       Q.    And included with that system was a
24  monitor; is that right?
25       A.    Correct.
```

121

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                 Guttman - October 11, 2012

2        Q.      Were these records maintained prior to

3    the production -- I'm sorry, where were those records

4    maintained prior to the production?

5        A.      In my file drawer.

6        Q.      Okay.

7        A.      Under computers.

8        Q.      At Lawyer's Choice?

9        A.      At Lawyer's Choice.

10       Q.      Is it the practice of Lawyer's Choice to

11   save the package slips of the products you receive?

12       A.      Yes.

13       Q.      Did a user manual or guide come with the

14   Dell 1100?

15       A.      I think so.

16       Q.      Do you have that?

17       A.      No.

18       Q.      Do you think you threw it away?

19       A.      Probably.

20       Q.      So you don't normally keep user manuals?

21       A.      No.

22       Q.      Okay.  How did you receive the product?

23       A.      By UPS.

24       Q.      Was it shipped to you directly?

25       A.      It was shipped to Lawyer's Choice

                           122

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2    Suites' corporate offices.

3        Q.    And where was it shipped from?

4        A.    According to this document, Exhibit 369,

5    Austin, Texas.

6        Q.    Okay.  Who paid for the shipping?

7        A.    I did.

8        Q.    Okay.  Was the cost of the shipping

9    included in the cost you paid for the product?

10       A.    No.

11       Q.    It was additional?

12       A.    Yes.

13       Q.    And how much was that?

14       A.    Lawyer's Choice paid $24 for the

15   shipping.

16       Q.    Okay.  Is the CRT monitor you purchased

17   a good product, in your opinion?

18       A.    In the present or in the past?

19       Q.    Both.

20       A.    In the present, I have no idea.  It

21   could be scrap.  In the past, it did function

22   properly.

23       Q.    It functioned properly.

24             Were you happy with the way -- with its

25   overall performance?

                         123

BARKLEY
Court Reporters

1              Guttman - October 11, 2012

2        A.    I had no problem with its performance.

3        Q.    Did you have any complaints?

4        A.    When?

5        Q.    While you were using the product.

6        A.    No.

7        Q.    Do you feel that you paid a competitive

8    price for the monitor?

9        A.    I don't know.

10       Q.    You don't know.  Why not?

11       A.    I don't know if it could have been

12   purchased for less.

13       Q.    Okay.

14       A.    I didn't spend a lot of time on that

15   specific issue.

16       Q.    You didn't spend a lot of time

17   researching other options?

18       A.    That's correct.

19       Q.    Okay.  Was the monitor new or used when

20   you purchased it?

21       A.    New.

22       Q.    Was it refurbished?

23       A.    I don't believe so.

24       Q.    Do you know whether the monitor

25   contained a CRT?

                      124

ALVIN GUTTMAN

BARKLEY
Court Reporters

1              Guttman - October 11, 2012

2      A.    Yes.

3      Q.    How do you know the monitor contained a

4  CRT?

5      A.    Well, it says so on the order, CRT.

6      Q.    Did you ever open the monitor to confirm

7  that it contained a CRT?

8      A.    No.

9      Q.    Did you review any technical

10  specifications of the product?

11      A.    No.

12      Q.    Do you know who manufactured the CRT

13  that you believe is contained in your product?

14      A.    No.

15      Q.    Do you know how much the manufacturer of

16  your product paid for the CRT?

17      A.    No.

18      Q.    Do you know if Dell manufacturers

19  monitors?

20      A.    No.

21      Q.    Is Dell one of the parties in this

22  lawsuit?

23          MR. GRALEWSKI:  Object to the form.

24      Asked and answered.

25      A.    I don't believe so.

125

ALVIN GUTTMAN

1                    Guttman - October 11, 2012

2        Q.     Do you know why not?

3               MR. GRALEWSKI:  Object to the form.

4        Asked and answered.  You asked those two

5        identical, identical questions this morning.

6        A.     Dell does not, in my knowledge,

7   manufacturer CRTs.

8        Q.     Is it possible that this CRT in your

9   monitor was manufactured by someone who was not a

10  defendant in this case?

11       A.     I don't know.

12       Q.     Is it possible?

13              MR. GRALEWSKI:  I object to the form.

14       Asked and answered, calls for speculation.

15       A.     I really don't know.

16       Q.     Have you ever testified in any trial or

17  administrative proceeding?

18       A.     Yes.

19       Q.     And what was that?

20       A.     I was involved in a personal injury,

21  personally, not corporately.

22       Q.     Okay.

23              MR. GRALEWSKI:  I object.  That -- I'll

24       withdraw the objection for now.

25       Q.     How long ago was that?

                         126

ALVIN GUTTMAN                                    BARKLEY
                                                 Court Reporters

1          Guttman - October 11, 2012

2          MR. GRALEWSKI:  Object to the form.

3     Outside the scope.

4     A.    I'm here to testify as president of

5  Lawyer's Choice Suites.  I don't --

6          MR. GRALEWSKI:  Hold on a second.  So I

7     just want to remind you that you need to answer

8     counsel's questions, not argue with counsel.

9          THE WITNESS:  Right.

10         MR. GRALEWSKI:  And it's my job to make

11    objections and speak with counsel.  So you can

12    ask him this question about when that was and in

13    this instance, I'm not going to allow you to ask

14    any more questions about this matter, because

15    not only is it completely unrelated to the case

16    and involves a personal nature, but it is

17    outside the scope.  If you want to meet and

18    confer with me about that, I'm happy to do that.

19    So you get this one answer and then I'm going to

20    instruct him not to answer anything else on his

21    personal injury matter.

22         MS. NAIFEH:  That's fine.

23    A.    Do you want to ask again?

24    Q.    Sorry.  I just asked when that was.

25    A.    Approximately five years ago.

127

ALVIN GUTTMAN

BARKLEY
Court Reporters

1          Guttman - October 11, 2012

2          Q.    Are you now or have you ever been a

3     party in any other lawsuit?

4               MR. GRALEWSKI:  And you means Lawyer's

5          Choice?

6          A.    No.

7          Q.    Any class actions?

8          A.    No.

9          Q.    Have you ever received notice you were a

10    member of a class in a class action lawsuit?

11         A.    Yes.

12         Q.    On how many occasions?

13         A.    Many.

14         Q.    Did you ever take any action in

15    response?

16         A.    No.

17         Q.    So what did you do?

18         A.    Ignored it.

19         Q.    What benefit, if any, did you obtain as

20    a result of those class suits?

21         A.    Nothing.

22         Q.    Why did you ignore them?

23         A.    I thought it was a waste of my time.

24         Q.    How so?

25               MR. GRALEWSKI:  I'm going to object to

                         128

ALVIN GUTTMAN

BARKLEY
Court Reporters

1          Guttman - October 11, 2012

2     the questions regarding Lawyer's Choice receipt

3     of notices and anything they did or did not do

4     as outside the scope of the notice.  You can

5     answer.

6     A.     I am sorry.  I would like to rephrase my

7  answer.

8               As to me personally, if that was the

9  question, but again, when you say you, you're

10  referring to Lawyer's Choice Suites.  The answer is

11  no.

12     Q.     You have not received any notices of

13  class action -- Lawyer's Choice Suites has not

14  received any notices of class actions?

15     A.     That is correct.

16     Q.     So your earlier answers were you

17  personally?

18     A.     Correct.

19     Q.     Okay.

20               MR. GRALEWSKI:  I'm objecting to those

21     questions as outside the scope of the 30(b)(6)

22     notice.

23     Q.     Were you involved in searching for

24  documents for the purpose of producing documents in

25  this litigation?

                        129

ALVIN GUTTMAN

1                    Guttman - October 11, 2012

2        A.    Yes.

3        Q.    Okay.  Were you the only person at

4   Lawyer's Choice involved in searching for documents

5   to produce in this litigation?

6        A.    Yes.

7              MS. NAIFEH:  Can you please mark this.

8              (Exhibit 370, Toshiba America

9         Information Systems, Inc.'s First Set of

10        Requests for Production of  Documents to

11        Indirect Purchaser Plaintiffs  marked for

12        identification, as of this date.)

13       Q.    Mr. Guttman, can you please take a look

14   at the exhibit that's been marked 370.

15             Have you seen this document?

16       A.    I don't believe so.

17       Q.    What is it?

18       A.    It looks like a request for production

19   of documents.

20       Q.    So is this the first time you're seeing

21   this document?

22       A.    I think so.

23       Q.    What kind of documents did you maintain

24   regarding the purchases of electronic products

25   containing CRTs?

ALVIN GUTTMAN

BARKLEY
Court Reporters

1     Guttman - October 11, 2012

2   A.  My receipts.

3   Q.  Anything else?

4   A.  The e-mail confirmation of the purchase.

5   Q.  So did you search for and produce

6 documents responsive to each of the requests in

7 Exhibit 370?

8     MR. GRALEWSKI:  Object to the form -- I

9   withdraw my objection.

10   A.  Would you repeat that, please.

11     MS. NAIFEH:  Can you repeat the

12   question.

13     (The record was read.)

14   A.  I know I consulted with my attorneys on

15 this in terms of --

16     MR. GRALEWSKI:  I just want to -- you

17   can answer the question, but I just want to

18   caution you not to reveal any communications

19   with lawyers in connection with your answer.

20     Would you like to finish the answer or

21   would --

22   A.  I would like it to be asked one more

23 time.  I'm finding it a little confusing.

24   Q.  Okay.  Did you search for the documents

25 that are responsive to each of these requests

131

ALVIN GUTTMAN

1                  Guttman - October 11, 2012

2    contained in this document?

3         A.    In part, yes.  But not as to every

4    single document up to number 17.  I would have to go

5    through that.

6         Q.    Okay.  Well, why don't we do that.

7               So did you search for documents in

8    response to request No. 1?

9               MR. GRALEWSKI:  Object to the form.

10        Vague and ambiguous.  Lacks foundation.

11        A.    I do not recall receiving or reading

12   completely through this document.

13        Q.    Okay.  So how did you know what to

14   search for in response to the defendants' document

15   requests?

16   (DIR)

17              MR. GRALEWSKI:  You're not allowed to

18        answer that question to the extent it would

19        reveal anything your lawyers told you.

20              If you can answer that question

21        independently of any communications with your

22        lawyers, you can do so.  Otherwise, I'll

23        instruct you not to answer.

24        A.    I did my very best in searching for

25   documents that I thought were relevant to this case.

                         132

ALVIN GUTTMAN

BARKLEY
Court Reporters

1        Guttman - October 11, 2012

2        Q.    Okay.  How did you determine what

3    documents were relevant?

4    (DIR)

5            MR. GRALEWSKI:  Same instruction.

6        You're not allowed to disclose anything your

7        lawyers told you or communications with counsel.

8            To the extent you can answer the

9        question independent of that, you can.

10       A.    I personally knew that the receipts had

11   relevancy as to this case.  Just as a common

12   knowledge, I had to show somehow, someway, that

13   Lawyer's Choice Suites purchased this product.

14   That's my answer.

15       Q.    Okay.  So did you search for any other

16   documents besides the receipts?

17       A.    No.

18       Q.    Okay.  You don't have the receipts for

19   the Dell 1100, though, do you?

20       A.    Yes.

21       Q.    And where are those receipts?

22       A.    In my drawer at Lawyer's Choice Suites,

23   Inc.

24       Q.    So have they been produced in this case?

25       A.    Yes.

133

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                     Guttman - October 11, 2012

2         Q.      Okay.  So the documents that we have

3     that you produced is Exhibit 367 which is the order,

4     the e-mail order confirmation, and which you stated

5     earlier, if I recall, that this was not the

6     receipt --

7         A.      No, it's not a receipt.  It's a

8     confirmation of order.

9         Q.      And then we have Exhibit 368, Bates No.

10    CRT 910 which was the shipping label and doesn't

11    contain the price.  So that's -- is that a receipt?

12        A.      Yes.

13        Q.      Even though it doesn't contain the

14    price?

15                MR. GRALEWSKI:  Object to the form.

16        Asked and answered.  Argumentative.

17        A.      I still consider it a receipt.

18        Q.      Okay.

19        A.      It's got the service tag number on it.

20    It's information I wanted to keep.

21        Q.      Okay.

22        A.      Which is why I still have it.

23        Q.      So earlier, if I recall, I think we said

24    this is a shipping label; is that correct?

25        A.      Yes, right.

134

ALVIN GUTTMAN                                   BARKLEY
                                                Court Reporters

```
 1                 Guttman - October 11, 2012
 2        Q.     And is that the same for Exhibit 369,
 3   CRT 911, this is also a shipping label?
 4        A.     Yes.
 5        Q.     Do you consider Exhibit 369 to be a
 6   receipt?
 7        A.     No.
 8        Q.     Okay.  But you do consider 368 to be a
 9   receipt?
10        A.     Yes.
11        Q.     As well as the shipping label?
12        A.     Which shipping label?
13        Q.     Well, you said that it came on the
14   outside of the shipping package; is that right?
15        A.     It came on the package.  I can't tell
16   you if it was inside or outside of the box.
17        Q.     Okay.  So you consider this to be a
18   receipt even though it doesn't have the price listed
19   on it?
20        A.     Yes.
21        Q.     Do you have any other receipt besides
22   these three documents?
23        A.     Not that I'm aware of.  I would presume
24   somewhere, my old American Express receipt is in our
25   storage basement somewhere --
```

135

ALVIN GUTTMAN

BARKLEY
Court Reporters

1              Guttman - October 11, 2012

2        Q.      Okay.

3        A.      -- from purchases made in 2006.

4        Q.      And have you searched for that?

5        A.      No.

6        Q.      Okay.  Did you withhold any documents on

7   the grounds of attorney-client privilege, work

8   product doctrine?

9        A.      No.

10       Q.      Did you withhold any documents because

11  they constituted confidential or proprietary

12  information?

13       A.      Did I withhold documents?  To whom?

14       Q.      To your attorney or to the defendant in

15  this case.

16       A.      No.

17       Q.      Did you withhold any documents pursuant

18  to any general objections?

19       A.      No.

20               MR. GRALEWSKI:  Object to the form.

21       Calls for a legal conclusion.

22       Q.      Does Lawyer's Choice use a computer

23  system?

24               MR. GRALEWSKI:  Just a second.  I object

25       as outside the scope of the notice.  You can

                         136

ALVIN GUTTMAN                                    BARKLEY
                                           Court Reporters

1              Guttman - October 11, 2012

2       answer.

3       A.     Yes.

4       Q.     And what kind of system is it?

5              MR. GRALEWSKI:  Object to the form.

6       Outside the scope of the 30(b)(6) notice.  You

7       can answer.

8       A.     Three Dell computers.

9       Q.     And what are those used for?

10      A.     Billing.

11             MR. GRALEWSKI:  I object to the form.

12      Outside the scope.  Please continue.

13      A.     Excel sheets, administrative, copies.

14      Q.     What kind of back up system does

15   Lawyer's Choice have?

16             MR. GRALEWSKI:  I object to the form.

17      Outside the scope.

18      A.     My cell phone has a back up system.  I

19   consider that to be Lawyer's Choice Suites' property.

20      Q.     Okay.  What kind of back up system does

21   your cell phone have?

22             MR. GRALEWSKI:  I object to the form.

23      Outside the scope.

24      A.     I don't know.  They tell me that it's

25   backed up.  If I lose addresses, that it's backed up

                          137

ALVIN GUTTMAN

1                    Guttman - October 11, 2012

2    by Verizon.

3         Q.    Okay.  But on the three Dell computers,

4    do you have any back up system?

5              MR. GRALEWSKI:  Object to the form.

6         Outside the scope.

7         A.    Not that I'm aware of.

8         Q.    Okay.  Does Lawyer's Choice have a

9    document retention program?

10        A.    Yes.

11        Q.    And what is it?

12        A.    Mostly billing.  We retain our monthly

13   billing statements every month.

14        Q.    Okay.  Is it a written retention

15   program?

16        A.    Yes.

17        Q.    Who wrote it?

18        A.    It's Quick Books.

19             MR. GRALEWSKI:  I object to the

20        question, both that question and the prior one

21        as outside the scope.

22        Q.    Can you describe the document retention

23   program.

24             MR. GRALEWSKI:  I object to the form.

25        Outside the scope.

138

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1              Guttman - October 11, 2012
 2       A.    It's a Quick Books billing program for
 3  our tenants.  We bill monthly, invoicing them for
 4  services.
 5       Q.    So is this more of a billing system?
 6       A.    Yes.
 7       Q.    And the documents are stored with the
 8  billing system?
 9       A.    Yes.
10             MR. GRALEWSKI:  Object to the form.
11       Outside the scope.
12       Q.    So does Lawyer's Choice have any sort of
13  written policy about the types of documents that are
14  maintained or retained and the length of time that
15  they are kept?
16       A.    No.
17  (DIR) Q.    Did your lawyers advise Lawyer's Choice
18  to preserve documents and e-mails pertinent to this
19  litigation?
20  (DIR)
21             MR. GRALEWSKI:  You're instructed not to
22       answer on the ground of attorney-client
23       privilege.
24             (Exhibit 371, Plaintiff Verification,
25       marked for identification, as of this date.)
```

139

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2        Q.      Mr. Guttman, do you recognize Exhibit

3    371?

4        A.      Yes.

5        Q.      When did you see it?

6                MR. GRALEWSKI:  Object to the form.

7    Vague and ambiguous.

8        A.      September 2012.

9        Q.      And where did you see it?  Where were

10   you when you saw it?

11       A.      It was e-mailed to me.

12       Q.      And were you here in Washington?

13       A.      Yes.

14       Q.      Under what circumstances did you see

15   this document?

16                MR. GRALEWSKI:  I object to the form.

17   Vague and ambiguous.

18       A.      General e-mail.

19       Q.      So it's dated September 29th.

20                Is that the date that you reviewed the

21   new indirect purchaser plaintiffs' objections and

22   responses to defendant Samsung SDI's limited's first

23   set of interrogatories?

24       A.      I may have held onto this document for a

25   day or two --

                              140

ALVIN GUTTMAN

BARKLEY
Court Reporters

Guttman - October 11, 2012

1

2      Q.      Okay.

3      A.      -- before signing it.  I can't recall.

4      Q.      Okay.  So you may have read that

5  document -- the document referenced in Exhibit 371,

6  perhaps, you say a day or two before --

7      A.      That's correct.

8      Q.      -- before signing it.

9              What other documents did you look at

10  prior to signing this verification?

11      A.      My retainer agreement and the amended

12  complaint.

13      Q.      Okay.  Is that all?

14      A.      There may have been two of these

15  verifications.  I'm not sure.

16      Q.      Do you recall reading the new indirect

17  purchaser plaintiffs' objections and responses to

18  defendant's Samsung's first set of interrogatories?

19      A.      I believe so, yes.

20      Q.      You believe so?

21      A.      I perused them.  I don't think I went

22  through them carefully.

23      Q.      Okay.  And you think this was done a few

24  days before September 29th?

25      A.      That I can't recall.

141

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                  Guttman - October 11, 2012
 2        Q.     Okay.  You don't recall when you
 3   received the documents?
 4        A.     Not offhand, no.
 5        Q.     Okay.  So can you look at the last
 6   sentence in this verification where it says --
 7   actually, looking at the first full paragraph, "I
 8   seek to be a plaintiff in the above-entitled action
 9   and verify that I have read the new indirect
10   purchaser plaintiffs' objections and responses to
11   defendant Samsung's first set of interrogatories
12   dated August 31st, 2011 and have also read the
13   exhibits associated with those objections and
14   responses applicable to me."
15                  Do you see that?
16        A.     Yes.
17        Q.     And then it says "Both the objections
18   and responses, as well as the exhibits applicable to
19   me, are true and correct to the best of my knowledge,
20   information and belief."
21                  Do you see that?
22        A.     Yes.
23        Q.     So did you -- you said you signed this
24   agreement without having read that document very
25   carefully?
```

142

ALVIN GUTTMAN

BARKLEY
Court Reporters

1            Guttman - October 11, 2012

2            MR. GRALEWSKI:  I object to the form.

3      Misstates testimony.  Argumentative.

4      A.      I rely on my attorney's expertise.

5      Q.      Okay.  But you -- this document asked

6  whether you had read the document, and that was true?

7      A.      I did read the document, yes.

8      Q.      And did you find them to be true and

9  correct to the best of your knowledge, information

10  and belief?

11      A.      Yes.

12      Q.      I'm going to show you a document that

13  has been previously marked Exhibit 22.

14            Have you seen this document before?

15      A.      I don't believe so.

16      Q.      What is it?

17      A.      It looks like a request for production

18  of documents.

19      Q.      Did you look for documents that might be

20  responsive to the requests contained in this

21  document?

22      A.      I don't know.

23      Q.      I'm sorry, I handed you the wrong

24  document.  This is the document that was previously

25  marked Exhibit 22.  I'm sorry about that.  We can

                        143

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2     discard the other document.

3                    MR. GRALEWSKI:  So I'm sorry, I was --

4          just to clarify, the one that you wanted us to

5          discard has on the bottom set No:1 1 to 4?

6                    MS. NAIFEH:  That's correct.

7                    MR. GRALEWSKI:  Okay.

8                    MS. NAIFEH:  Yep.

9                    MR. GRALEWSKI:  I was going through my

10         stack and I missed your clarification.

11         Q.    Mr. Guttman, I'm sorry about that.

12               Have you seen this document before?

13         A.    I think so.

14         Q.    And what is it?

15         A.    It's a request for production of

16    documents.

17         Q.    And when did you first see it?

18         A.    I can't recall.

19         Q.    Do you remember who showed it to you?

20         A.    I don't know if it was showed to me or

21    that I got it by e-mail.

22         Q.    Do you know who would have provided it

23    to you?

24         A.    Probably one of my attorneys.

25         Q.    Did you participate in responding to

                           144

ALVIN GUTTMAN

```
1                   Guttman - October 11, 2012
2   these or similar document requests?
3        A.      Could you define participate.
4        Q.      Did you help draft answers to any of --
5   I'm sorry, did you help draft the responses to these
6   requests?
7               MR. GRALEWSKI:  Before you answer that
8           question, I'm going to object to this question
9           and each of your prior questions regarding
10          Exhibit 370 and Exhibit 22 as outside the scope
11          of the deposition notice.
12              MS. NAIFEH:  Can you repeat the
13          question, please.
14              (The record was read.)
15              MR. GRALEWSKI:  Same objection.  Outside
16          the scope.  Also, object to the extent it's
17          vague, ambiguous, confusing and requires legal
18          testimony.
19       A.      I don't understand when you're saying
20   help.  I did produce the receipts.
21       Q.      Okay.  Is that all?
22       A.      That may have been part of help that
23   you're referring to in this request for production of
24   documents.
25       Q.      Is that the only thing that you did in
```

145

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                Guttman - October 11, 2012

2   responding to these requests for production of

3   documents?

4                MR. GRALEWSKI:   Object to the form of

5        the question.  Outside the scope of the 30(b)(6)

6        notice.

7        A.     To the best of my knowledge, yes.

8        Q.     Did you look for documents other than

9   the receipts that might be responsive to these

10  requests?

11               MR. GRALEWSKI:   I object to the form.

12       Outside the scope of the deposition notice.

13       A.     Yes.

14       Q.     Other than the receipts?

15               MR. GRALEWSKI:   Same objection.

16       A.     I looked for other receipts for other

17  monitors.  I couldn't find them.

18       Q.     Okay.  Did you look for any other kind

19  of documents?

20       A.     No.

21               MR. GRALEWSKI:   I object to the form of

22       that question, outside the scope of the 30(b)(6)

23       notice.

24       Q.     I'm going to hand you a document that's

25  been previously marked Exhibit 58.  It says Samsung

                              146

BARKLEY
Court Reporters

1              Guttman - October 11, 2012

2  SDI America Inc.'s First Set of Interrogatories to

3  Purchaser Plaintiffs.

4              Have you previously seen these

5  interrogatories to plaintiffs?

6       A.    I'm not sure.  I'm not sure.

7       Q.    You're not sure.

8              Do you know if you were involved in

9  responding to these interrogatories?

10      A.    Could you please repeat the question.

11      Q.    Do you know if you were involved in

12  responding to these interrogatories?

13      A.    No, I don't.

14      Q.    I'm going to show you a document that's

15  been previously marked as Exhibit 26.

16              MR. GRALEWSKI:  What was the prior one

17      marked as?

18              MS. NAIFEH:  58.

19              MR. GRALEWSKI:  And this one?

20              MS. NAIFEH:  26.

21              MR. GRALEWSKI:  Thanks.

22              THE VIDEOGRAPHER:  Can we go off the

23      record for one second.

24              (Discussion held off the record.)

25              THE VIDEOGRAPHER:  Back on the record at

147

ALVIN GUTTMAN

BARKLEY
Court Reporters

1          Guttman - October 11, 2012

2       2:53.

3       Q.    Okay.  Have you seen this document

4   before?

5       A.    I think so.

6       Q.    And what is it?

7       A.    First Set of Interrogatories to New

8   Indirect Purchaser Plaintiffs.

9       Q.    And that's Samsung SDI's first set of

10  interrogatories?

11      A.    According to the cover sheet, yes.

12      Q.    When did you see this document before?

13      A.    I don't know.

14      Q.    You don't remember?

15      A.    I don't.

16      Q.    Do you remember who showed it to you?

17      A.    No, I don't.

18      Q.    So you don't know where you got this

19  document?

20      A.    Either by e-mail or by an attorney

21  personally.  I can't recall.

22      Q.    By e-mail, you mean from one of your

23  attorneys?

24      A.    Right, correct.

25      Q.    If you could look on the second page of

                        148

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2     the document, under responding parties, it says

3     indirect purchaser plaintiffs, and then it says

4     Bedrock Management Company Incorporated.

5              Is Lawyer's Choice substituting Bedrock

6     Management Company Incorporated in this

7     interrogatory?

8              MR. GRALEWSKI:  As phrased, I'm going to

9         object to that question as vague and ambiguous,

10        confusing.

11        A.    Could you repeat that, please.

12        Q.    Sure.  Is -- I'll rephrase it.

13              Is Bedrock -- I'm sorry, is Lawyer's

14    Choice substituting Bedrock Management Company in

15    this litigation?

16        A.    Yes.

17        Q.    So is Lawyer's Choice substituting

18    Bedrock Management Company in these responses, in the

19    interrogatory responses?

20              MR. GRALEWSKI:  That --

21              MS. NAIFEH:  I'll withdraw that

22        question.

23              MR. GRALEWSKI:  Would you mind if I --

24        if we take a break.

25              MS. NAIFEH:  Sure.  That's fine.

                         149

BARKLEY
Court Reporters

```
 1                  Guttman - October 11, 2012

 2              MR. GRALEWSKI:  Thank you.

 3              THE VIDEOGRAPHER:  Going off the record

 4       at 2:56.

 5              (Discussion off the record.)

 6              THE VIDEOGRAPHER:  Back on the record at

 7       3:15.

 8  BY MS. NAIFEH:

 9       Q.    So before we took a break, we were

10  looking at what has previously been marked as Exhibit

11  26 which is Samsung SDI's first set of

12  interrogatories to the new indirect purchaser

13  plaintiffs.

14              Mr. Guttman, did you do anything to

15  respond to these interrogatories?

16       A.    Yes.

17       Q.    And what did you do?

18       A.    I reviewed my documents and I reviewed

19  documents that my lawyer provided me and asked if

20  they were in fact true.

21       Q.    Did you do anything else?

22       A.    No.

23       Q.    I'm going to hand you what has been

24  previously marked Exhibit No. 27.

25              Can you please identify this document.
```

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2        A.       This is the responses and objections to

3     the defendants' first set of interrogatories.

4        Q.       This is the new indirect purchaser

5     plaintiffs' objections and responses; is that right?

6        A.       Yes.

7        Q.       Have you previously seen this document?

8        A.       Yes.

9        Q.       When did you see it?

10       A.       Prior to me signing the verifications.

11       Q.       Is this the document referenced in the

12    verification page we looked at earlier, Exhibit 371?

13       A.       I think it is, yeah.

14       Q.       Is that your final answer?

15       A.       I signed two verifications.

16       Q.       Okay.

17       A.       And this was one of them.

18       Q.       Do you have Exhibit 371 in front of you?

19       A.       Yes.

20       Q.       Okay.  If you could please look at page

21    6 of Exhibit 27, interrogatory No. 1 which asked you

22    to identify all persons who participated or assisted

23    in your preparation -- in the preparation of your

24    responses, to these interrogatories.

25                Do you see that?

151

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                  Guttman - October 11, 2012

2          A.      Yes.

3          Q.      And in your response to interrogatory

4   No. 1, it refers to Samsung Exhibits A 26 through A

5   32.

6                  Do you see that?

7          A.      Yes.

8                  MS. NAIFEH:  Please mark this one.

9                  (Exhibit 372, Samsung Exhibits A 33

10         through Exhibit A 40, marked for identification,

11         as of this date.)

12         Q.      Can you please identify Exhibit 372.

13         A.      It says Exhibit A 33 through Exhibit A

14   40.

15         Q.      Okay.  Samsung Exhibit A 33 through A

16   40?

17         A.      Yeah -- yes.

18         Q.      Do you recognize this document?

19         A.      Yes.

20         Q.      Does this document contain Lawyer's

21   Choice's response to interrogatory No. 1 from Exhibit

22   27?

23         A.      Interrogatory No. 1?

24         Q.      Yes.  Interrogatory No. 1 that we looked

25   at earlier, it referred to Samsung Exhibit A 26

                          152

ALVIN GUTTMAN

BARKLEY
Court Reporters

1              Guttman - October 11, 2012

2  through A 32.

3       A.    I don't have A 26 in front of me.

4       Q.    A 26 was produced for other plaintiffs.

5  I'm asking if A 33 represents your answer to

6  interrogatory No. 1.

7       A.    Yes.

8       Q.    Okay.  If you look on the first page of

9  A 33, is the information there listed fully

10  responsive and accurate?

11      A.     In consultation with my lawyers, I

12  believe it is.

13      Q.     Turning back to Exhibit 27, if you look

14  at page 7, interrogatory No. 3, in response to

15  interrogatory No. 3, it lists Samsung Exhibit B 26

16  through B 22.

17             Do you see that?

18      A.     Yes.

19             MS. NAIFEH:   Can you mark this, please.

20             (Exhibit 373, Samsung Exhibits B 33

21  through B 39 and A 40, marked for

22  identification, as of this date.)

23             MR. GRALEWSKI:  For the record, despite

24        my reluctance, I'm going to state for the record

25        that plaintiffs have provided to defendants

153

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                     Guttman - October 11, 2012

2          voluntarily Exhibits 372 and 373, and as I

3          suspect others will be marked, that relate to

4          the newest group of plaintiffs that were subject

5          to a recent motion to amend.

6               As I discussed with counsel for Toshiba

7          prior to the start of the deposition, plaintiffs

8          did not provide to defendants new formal written

9          responses to update Exhibit 27 and perhaps, the

10         Toshiba written responses that have been also

11         marked or not.  I can't remember.

12              To the extent Toshiba or any defendant

13         wants us to provide amended new written

14         responses, we're happy to do that.  But to the

15         extent you're going to attempt to confuse the

16         witness by showing him numbers that don't match

17         up with the exhibits that you're showing him, I

18         think are -- is an unfair tactic.  These are his

19         interrogatory responses that we voluntarily

20         provided to you, and I'm referring to 372 and

21         373.

22              MS. NAIFEH:  So would you be willing to

23         state that all of the exhibits, the series of 26

24         through 32, can be answered by the 33 through 40

25         that we received?

ALVIN GUTTMAN

BARKLEY
Court Reporters

1          Guttman - October 11, 2012

2          MR. GRALEWSKI:  For purposes of this

3      deposition, that is correct.  And to the extent,

4      as we discussed prior to the start of the

5      deposition, to the extent it clarifies things,

6      plaintiffs are happy to provide further amended

7      and supplemental formal written responses which

8      as you know, we have not done.

9          MS. NAIFEH:  Okay.  Can we go off the

10     record.

11         THE VIDEOGRAPHER:  Going off the record

12     at 3:24.

13         (There was a recess taken.)

14         THE VIDEOGRAPHER:  Back on the record at

15     3:36.

16 BY MS. NAIFEH:

17     Q.    During the January 1st, 1995 to November

18 25, 2007 period, did you ever consider buying a CRT

19 finished product and then not end up buying it?

20     A.    Not that I can remember.

21     Q.    Okay.

22         MS. NAIFEH:  Could you please mark this

23     exhibit.

24         (Exhibit 374, Plaintiff Verification,

25     marked for identification, as of this date.)

155

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                   Guttman - October 11, 2012
 2        A.      Could you repeat the question one more
 3   time.
 4                   MS. NAIFEH:   Could you go ahead and
 5        repeat it, please.
 6                   (The record was read.)
 7        A.      No.
 8        Q.      Thank you.  Do you recognize Exhibit
 9   374?
10        A.      Yes.
11        Q.      What is it?
12        A.      It's my plaintiff's verification.
13        Q.      And verification for?
14        A.      Defendant Toshiba America Information
15   System, Inc. first set of interrogatories.
16        Q.      Thank you.  When did you see it?
17        A.      Probably about the same time as I saw
18   the other plaintiff verification.  Sometime in
19   September 2012.
20        Q.      Is that a few days before September
21   29th?
22        A.      Probably, yes.
23        Q.      Was this also e-mailed to you by your
24   counsel?
25        A.      I believe it was, yes.
```

156

ALVIN GUTTMAN

BARKLEY
Court Reporters

1        Guttman - October 11, 2012

2      Q.    What documents did you look at prior to

3  signing this verification?

4      A.    The Exhibit 373.  Specifically, Samsung

5  Exhibit B 33 or the Toshiba verification.  I may have

6  the two confused, but they were both signed

7  essentially at the same time.

8      Q.    Okay.  Did you look at anything else?

9      A.    Is there a Toshiba exhibit similar to

10  Exhibit 373 with Toshiba's name on it that I should

11  have in this file?

12      Q.    I haven't given that to you yet.

13      A.    I didn't think, yeah.  Okay.  Okay.

14      Q.    So that would be the only other thing?

15      A.    That would be the only other.

16      Q.    Okay.  I'm going to hand you a document

17  that's been previously marked Exhibit No. 23.

18            What is this document?

19      A.    This is the Toshiba America Information

20  System first set of interrogatories.

21      Q.    Have you previously seen this document?

22      A.    I don't believe so.

23      Q.    So your answer is no?

24      A.    My answer is I don't believe so.

25      Q.    So you don't know?

157

ALVIN GUTTMAN

BARKLEY
Court Reporters

1               Guttman - October 11, 2012

2       A.      It's more than likely that I did not see

3   this.

4       Q.      Okay.  I'm going to hand you what has

5   been previously marked as Exhibit No. 24.

6               Can you please identify this document.

7       A.      Yes.  This is the new indirect purchaser

8   plaintiffs' objections and responses to defendant

9   Toshiba American Information System's first set of

10  interrogatories.

11      Q.      Have you previously seen this document?

12      A.      Yes.

13      Q.      When?

14      A.      Sometime prior to me signing the

15  plaintiff verification.  I can't tell you when

16  exactly.

17      Q.      Is this document the one referenced in

18  Exhibit 374?

19      A.      I believe it is, yes.

20      Q.      So did you read this document prior to

21  signing the verification in Exhibit 374?

22      A.      I reviewed it.

23              MR. GRALEWSKI:  You're talking about

24      Exhibit 24, right?

25              MS. NAIFEH:  Yes.

                        158

BARKLEY
Court Reporters

1          Guttman - October 11, 2012

2          MR. GRALEWSKI:  Okay.  Thank you.

3     A.     Yeah.  I reviewed it.

4     Q.     So the answers applicable to you are

5  true and correct to the best of your knowledge,

6  information and belief?

7     A.     Yes.

8          MS. NAIFEH:  So counsel, I believe you

9          stated earlier that Toshiba Exhibits A, B and C

10         33 through 40 apply to the interrogatory

11         responses previously marked 26 through 32?

12         MR. GRALEWSKI:  Correct.  And you said

13         Toshiba, right?

14         MS. NAIFEH:  I did say Toshiba.  Yes,

15         yes.

16         MR. GRALEWSKI:  And as I said before,

17         plaintiffs are happy to discuss providing

18         further amended supplemental formal written

19         responses.

20         MS. NAIFEH:  Okay.

21         MR. GRALEWSKI:  Indicating exactly what

22         we just discussed.

23         MS. NAIFEH:  Okay.  Thank you.

24    Q.     Mr. Guttman, if you can turn in Exhibit

25  24 to page 9.

159

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2        A.      Right.

3        Q.      To interrogatory No. 6.

4        A.      Okay.

5        Q.      Which asked to "Describe in detail how,

6    when, the manner in which, and the extent to which

7    you believe that you have been damaged as a result of

8    the conduct alleged in the complaint."

9                Do you see that?

10       A.      Yes.

11       Q.      Okay.

12       A.      The question, please.

13       Q.      I'm getting there.

14       A.      I'm sorry.

15       Q.      And in response at the bottom, it says

16   "Responding further, new indirect purchaser

17   plaintiffs state that they suffered damage by paying

18   higher prices for CRT products than they would have

19    in the absence of defendants' conduct."

20                Do you see that?

21       A.      Yes.

22       Q.      How much higher?

23                MR. GRALEWSKI:  I object to the form.

24        Calls for expert testimony.

25        A.      I don't know.

                              160

ALVIN GUTTMAN                                    BARKLEY
                                                 Court Reporters

Guttman - October 11, 2012

1

2        Q.    Did this answer take into consideration

3  the fact that the monitor included in the bundle

4  computer system was at no additional cost?

5              MR. GRALEWSKI:  Object to the form.

6        Lacks foundation.  Calls for expert testimony.

7        Argumentative.

8        A.    No.  I don't see that as relevant.

9        Q.    So this answer doesn't take that into

10  consideration?

11              MR. GRALEWSKI:  Same objections.

12        A.    Taking what into consideration?

13        Q.    Taking into consideration the fact that

14  the monitor included in the bundle wasn't at an

15  additional cost.

16              MR. GRALEWSKI:  Same objections, lacks

17        foundation, argumentative, call for expert

18        testimony.

19        A.    I can't determine cost.  It was a total

20  package.

21        Q.    Okay.  Does the answer to interrogatory

22  No. 6 take into consideration the fact that the price

23  of the monitor may have been less than the amount

24  discounted from the price of the computer system?

25              MR. GRALEWSKI:  Object to the form.

161

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                Guttman - October 11, 2012
 2        Incomplete hypothetical, lacks foundation,
 3        argumentative, calls for expert testimony.
 4        A.    I'm really not in a position to answer
 5   that.  I don't know.
 6        Q.    Are these the only damages you suffered?
 7        A.    No.
 8        Q.    What else?
 9        A.    I think as an American, anybody that's
10   violating the law is damaging this country and our
11   products and our consumers.
12        Q.    Do you personally feel that you suffered
13   injury besides the higher prices?
14        A.    Yes, I do.
15        Q.    In the way you just described?
16        A.    Yes.  I don't like seeing foreign
17   companies taking advantage of American consumers or
18   violating U.S. antitrust laws.  I think of --
19   overall, our economic strength is based on
20   maintaining the laws in this country and enforcing
21   them.  So as an American citizen, I'm not happy to
22   see that these CRTs were produced in what I think was
23   price fixing.
24        Q.    Can you quantify those damages.
25        A.    No, I cannot.  Those damages I can't,
```

162

ALVIN GUTTMAN

BARKLEY
Court Reporters

1              Guttman - October 11, 2012

2  no.

3         Q.    What damages can you quantify?

4         A.    As an expert, none.  But obviously,

5  there is some kind of damage to the fact that these

6  CRT screens, CRTs, could have been produced at a

7  lower cost for me ultimately as the end user and to

8  Dell and to anybody else that has been buying these

9  products for the last 10 years.

10        Q.    Are these damages contained within your

11 complaint?

12             MR. GRALEWSKI:  I object to the form.

13        Vague and ambiguous.  Outside the scope of the

14        deposition notice.

15        A.    Well, I would specifically state that I,

16 as president of Lawyer's Choice Suites, one of the

17 plaintiffs, did in fact suffer damages by paying

18 higher prices for the CRT products.  That I can

19 verify, yes.

20        Q.    Would you agree that if the monitor was

21 included for free with your computer system, that you

22 suffered no damages?

23             MR. GRALEWSKI:  I object to the form.

24        Outside the scope of the notice, incomplete

25        hypothetical, lacks foundation, calls for

                        163

BARKLEY
Court Reporters

1              Guttman - October 11, 2012
2      speculation, argumentative.  Requires expert
3      testimony.
4      A.     It's very hard for me to determine in a
5  package what is in fact free and what is not.  I'm in
6  no position to distinguish between what the mouse
7  would have cost by itself, or the screen or the
8  keyboard.  I don't know.
9      Q.     Okay.  If the monitor were free, would
10  you have suffered any damages?
11             MR. GRALEWSKI:  I object to the form.
12      Asked and answered.  Incomplete hypothetical,
13      lacks foundation, calls for speculation, calls
14      for expert testimony, argumentative.
15      A.     If the screen were free, that doesn't
16  necessarily mean that another price in the package
17  wouldn't have been increased commensurate to that.
18  Again, I am viewing it as a total package.  I cannot
19  divorce the monitor from the package because I have
20  no idea what it cost them to produce.
21      Q.     Okay.  So are you saying as your answer
22  that -- I understand you're saying that you don't
23  know what the individual components cost.
24             Are you saying that if the monitor were
25  free, that there could have been -- you still could

ALVIN GUTTMAN

1                    Guttman - October 11, 2012

2   have suffered damages?

3                    MR. GRALEWSKI:  Object to the form.

4            Misstates testimony, compound, hypothetical,

5            lacks foundation, calls for expert testimony,

6            argumentative, calls for speculation, outside

7            the scope of the notice, asked and answered.

8            Did I say that?  I think so.  I withdraw that

9            second stated objection.  Go ahead.

10           A.    I really think that's a very

11  hypothetical question because free for a monitor may

12  be twice as much for the mouse.  Again, if you're

13  telling me that they're sending me a monitor from a

14  completely different order, and it has nothing to do

15  with the package, I probably could answer that.  But

16  that's not the case.  This was not free because it

17  was part of a package.  In my mind, if this

18  particular item was free, then perhaps, I would have

19  paid the difference for the mouse or the keyboard or

20  the computer or the drams in the computer or the

21  memory or the other items.

22                    I view this in totality.  I can't

23  separate the monitor from the package.  I purchased a

24  package.  I did not purchase a monitor.

25           Q.    Is it accurate to say retailers or

                                    165

ALVIN GUTTMAN                                    BARKLEY
                                                 Court Reporters

1                    Guttman - October 11, 2012

2   sellers of electronic products containing CRTs

3   generally competed for the business of their

4   customers?

5             MR. GRALEWSKI:  I object to the form.

6        Calls for speculation.  Outside the scope of the

7        notice.

8        A.    I have no idea.  I'm not a CRT

9   manufacturer.

10       Q.    Do retailers ever offer inducements to

11  customers to get their business?

12            MR. GRALEWSKI:  Object to the form.

13       Calls for speculation, lacks foundation.

14       Outside the scope of the notice.

15       A.    I suppose they do.

16       Q.    What type of inducements?

17            MR. GRALEWSKI:  I object to the form.

18       A.    For what products?

19            MR. GRALEWSKI:  Sorry, object to the

20       form, vague and ambiguous, lacks foundation,

21       calls for speculation, outside the scope of the

22       notice.

23       Q.    Let's talk about electronic products

24  containing CRTs.

25       A.    Containing CRTs?  Could you repeat the

                          166

ALVIN GUTTMAN                                    BARKLEY
                                            Court Reporters

1           Guttman - October 11, 2012

2   question, please.

3       Q.     So what type of inducements do retailers

4   or sellers of CRT products offer customers to get

5   their business?

6               MR. GRALEWSKI:  I object to the form.

7         Vague and ambiguous, lacks foundation, calls for

8         speculation, outside the scope of the notice.

9       A.     I have no idea.  I'm not a retailer of

10  CRT products.

11      Q.     As a customer, have you been offered

12  coupons by sellers or retailers of CRT products?

13              MR. GRALEWSKI:  Can you -- sorry, can

14        you please repeat that question.

15              (The record was read.)

16              MR. GRALEWSKI:  So before you answer

17        that, I want to withdraw my outside of the scope

18        objections to the prior two or three questions.

19        I think that those questions were contained

20        within the scope of the deposition notice, but

21        my other objections stand with respect to that

22        question.  I object to the form, foundation,

23        speculation and vague and ambiguous.

24              You can answer.  You probably need it

25        read back.  Sorry about that.

167

ALVIN GUTTMAN

BARKLEY
Court Reporters

1          Guttman - October 11, 2012

2     A.     Please read it back.

3            (The record was read.)

4     A.     Not to my knowledge.

5     Q.     Did you testify earlier that Dell had

6  offered you some sort of promotional coupon?

7     A.     They did.

8     Q.     For the CRT products?

9     A.     That was not for CRT products.  It was

10  for a package.

11     Q.     Okay.  It was for the computer system?

12     A.     It was for the computer system and all

13  of its accoutrements with that system.

14     Q.     Okay.  So you never remember receiving

15  any offers for TV sales or computer sales during the

16  relevant period?

17     A.     Television --

18            MR. GRALEWSKI:  And I just want to --

19        you means Lawyer's Choice.

20     A.     No.

21     Q.     What about you personally?

22            MR. GRALEWSKI:  Object to the form.

23        Outside the scope.  Vague and ambiguous.

24     A.     Could you repeat the question.

25            (The record was read.)

168

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2          A.     What is the relevant period?

3          Q.     That would be March 1st, 1995 through

4     November 25, 2007.

5                  MR. GRALEWSKI:  And this question is

6          posed to him as an individual?

7                  MS. NAIFEH:  Yes.

8                  MR. GRALEWSKI:  So objection, outside

9          the scope of the notice.

10         A.     I have no idea.

11         Q.     Do you believe that you paid too much

12    for the monitor included with your computer system?

13         A.     Could you repeat that question.

14         Q.     Do you believe that you paid too much

15    for the monitor included with your computer system?

16         A.     Yes.

17         Q.     Why?

18         A.     Because of the alleged conspiracy to

19    raise the price of the CRT.

20         Q.     How do you know that you paid more than

21    you should have?

22         A.     I wasn't asked if I know.  I was asked

23    if I think.

24         Q.     Okay.  Well, why do you think you paid

25    more than you should have?

                              169

ALVIN GUTTMAN                                    BARKLEY
                                                 Court Reporters

1                    Guttman - October 11, 2012

2        A.      Because price fixing increases prices,

3    in my opinion.

4        Q.      How do you know that there was price

5    fixing?

6        A.      Well, I did hear that one of the

7    defendants pleaded guilty, both to criminal

8    violations and another instance, to this class action

9    civilly.  Two separate companies.  It seems to me

10   that if somebody is going to plead guilty criminally,

11   they feel that they were responsible for the

12   allegations.

13       Q.      Does that mean that all of the

14   defendants in the case were involved in the

15   conspiracy, necessarily?

16       A.      No, no, but it's a smoking gun, in my

17   opinion.

18       Q.      What should the product have cost?

19              MR. GRALEWSKI:  I object to the form.

20       Calls for expert testimony.

21       A.      Less than what I paid.

22       Q.      How much less?

23       A.      I don't know.

24              MR. GRALEWSKI:  Same objection.

25       Q.      How do you know that the difference was

                              170

ALVIN GUTTMAN                                    BARKLEY
                                                 Court Reporters

```
 1                 Guttman - October 11, 2012
 2    passed on to you?
 3               MR. GRALEWSKI:  Same objection.  Calls
 4          for expert testimony.
 5          A.    It's my --
 6               MR. GRALEWSKI:  Legal and expert
 7          testimony.  I apologize.  Go ahead.
 8          A.    It's my opinion.
 9          Q.    Do you have any factual basis for your
10    opinion?
11          A.    Not with me.
12          Q.    Do you have any factual basis elsewhere?
13          A.    It's a common sense approach that
14    antitrust violations generally impede consumer
15    protection, and increase costs to consumers.
16          Q.    Is it possible that the difference was
17    not passed on to you?
18               MR. GRALEWSKI:  Object to the form.
19          Lacks foundation.  Outside the scope of the
20          notice, incomplete hypothetical, calls for
21          expert testimony.
22          A.    I have no opinion.
23          Q.    I don't know if that's --
24          A.    Do you want to repeat the question.
25          Q.    Sure.  So how do you know -- I'm sorry,
```

*Do not designate*

171

ALVIN GUTTMAN

BARKLEY
Court Reporters

1               Guttman - October 11, 2012

2   can you repeat the question.

3               (The record was read.)

4               MR. GRALEWSKI:  Did I object to that

5        question?  Same objection.

6        A.    Is it possible?  I don't know.  I don't

7   think it's likely.  I think the whole purpose of

8   price fixing is to get higher prices.

9        Q.    Is it possible that some other source

10  could have absorbed the difference, such as Dell or

11  someone else in the distribution chain?

12              MR. GRALEWSKI:  I object to the form.

13        Outside the scope of the notice, calls for

14        speculation, lacks foundation, incomplete

15        hypothetical.

16        A.    I don't have any expertise to answer

17  that.

18        Q.    So you don't know whether that would be

19  possible at all?

20              MR. GRALEWSKI:  Same objections.  Call

21        for speculation, outside the scope, lacks

22        foundation, incomplete hypothetical, calls for

23        expert testimony.

24        A.    I don't have the expertise to answer

25  that question.

172

ALVIN GUTTMAN

```
 1              Guttman - October 11, 2012
 2        Q.    When Lawyer's Choice's costs go up, does
 3   it always pass on all of those cost increases to its
 4   customers?
 5        A.    No.
 6        Q.    So is it possible that the retailers
 7   that sold you the product did not pass on the cost
 8   increase to its customers?
 9              MR. GRALEWSKI:  Hold on a second.  I'm
10        going to object to the prior question as outside
11        the scope of the deposition notice.  And I'm
12        objecting to this question as calls for
13        speculation, outside the scope, lacks
14        foundation, incomplete hypothetical, and calls
15        for expert testimony.
16              MS. NAIFEH:  Can you repeat the
17        question.
18              (The record was read.)
19        A.    It's unlikely, but it is possible.
20        Q.    Why doesn't Lawyer's Choice not always
21   pass all of the cost increases on to its customers?
22              MR. GRALEWSKI:  Object to the form.
23        Outside the scope of the notice.  Vague and
24        ambiguous.
25        A.    We try to please our tenants any way we
```

173

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                  Guttman - October 11, 2012
2    can.
3         Q.    So do you think that Dell might have
4    taken the same approach in not raising its costs of
5    your computer system?
6                  MR. GRALEWSKI:  I object to the form.
7          Calls for speculation, outside the scope of the
8          notice, lacks foundation, incomplete
9          hypothetical, calls for expert testimony.
10        A.    Oh, I could answer that question.  I
11   have leases in place.  I cannot breach the leases.
12   The cost that I come up with in a lease with my
13   subtenants is a lease cost that I have to abide by.
14   After the lease is renegotiated, that's different,
15   but I am obligated to maintain a certain price to my
16   tenants for a certain period of time.  It's a
17   commercial lease.
18        Q.    Okay.  I appreciate that, Mr. Guttman.
19                I'm not quite sure that you answered my
20   question.  So I basically just -- actually, could you
21   just repeat the question.
22                (The record was read.)
23        A.    No, I don't.
24        Q.    Why not?
25                MR. GRALEWSKI:  Let me give my

                              174

                        ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2          objection.  My objection is to the prior

3          question which stated same objections to the why

4          not question.  Speculation, outside the scope,

5          lacks foundation, incomplete hypothetical, calls

6          for expert testimony.

7          A.    Dell is entitled to change their pricing

8     any time they want.  I'm not once I've signed a lease

9     with a commercial tenant.

10         Q.    Can Dell make the decision not to

11    increase its prices?

12         A.    I suppose they can.

13               MR. GRALEWSKI:  I object to the form.

14         Outside the scope.  Calls for speculation, lacks

15         foundation.

16         Q.    Do you think it would do that in order

17    to please its customers?

18               MR. GRALEWSKI:  Object to the form.

19         Calls for speculation, lacks foundation.

20         Outside the scope.

21         A.    I don't know.  I'm not a marketing

22    advisor for Dell.

23         Q.    But it could do that in order to please

24    its customers?

25               MR. GRALEWSKI:  I object to the form.

                              175

ALVIN GUTTMAN                                    BARKLEY
                                                 Court Reporters

1          Guttman - October 11, 2012

2          Outside the scope, calls for speculation.  Lacks

3          foundation.

4          A.     It could do anything it wants, including

5     filing bankruptcy.

6          Q.     What is the total amount you believe the

7     defendants' conduct cost you?

8          A.     Could you rephrase that.  Total amount

9     of what, dollars?

10         Q.     Of money.

11         A.     I do not know.

12         Q.     What is the total amount you expect to

13    receive if you win this case?

14         A.     I haven't determined that.

15         Q.     Do you think that everyone in the class

16    should get the same amount of money?

17              MR. GRALEWSKI:  I object to the form to

18         the prior two, also as calling for legal and

19         expert testimony.

20         A.     Probably not.

21         Q.     Why not?

22         A.     Different products, different prices.

23    I'm in no position to answer that question.

24         Q.     Should class representatives get

25    additional or extra money?

176

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                     Guttman - October 11, 2012

2                     MR. GRALEWSKI:  I object to the form.

3          Outside the scope of the notice -- I'll withdraw

4          that.  Calls for legal testimony.  You can

5          answer.

6          A.     Not necessarily.

7          Q.     Why not?

8                     MR. GRALEWSKI:  Same objection.

9          A.     I think they're performing an important

10    duty.  It's almost like serving on jury duty or

11    something in that regard, kind of a civic duty.

12         Q.     Would you agree that a manufacturer is

13    entitled to make a profit on the products it

14    manufacturers?

15                    MR. GRALEWSKI:  I object to the form.

16         Outside the scope of the notice.

17         A.     How do you define profit?

18         Q.     The common meaning of the word -- how do

19    you understand profit?

20         A.     Well, I mean, I've heard that airlines

21    never make a profit, but --

22                    MR. GRALEWSKI:  Object to the form,

23         outside the scope of the notice.

24         Q.     So to gain more money than was spent in

25    costs, let's say?

177

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
1              Guttman - October 11, 2012
2              MR. GRALEWSKI:  I'm sorry, is there a
3       question pending?
4       Q.    So using that definition, would you
5   agree that a manufacturer is entitled to make a
6   profit in the products it manufacturers?
7              MR. GRALEWSKI:  I object to the form.
8          Outside the scope of the notice.  Calls for
9          legal and expert testimony.
10      A.    I really don't know how to answer that.
11  It's almost like a political question.  It's not a
12  legal question.
13      Q.    So you don't have an answer for this
14  question?
15      A.    I really don't, no.
16      Q.    If the prices for a CRT fell, would you
17  expect a manufacturer to increase its production?
18             MR. GRALEWSKI:  Object to the -- is that
19         the end of your question?  Object to the form,
20         outside of the scope.  Calls for speculation,
21         lacks foundation, incomplete hypothetical, calls
22         for expert testimony.
23      A.    Could you repeat that, please.
24      Q.    If the prices for a CRT fell, would you
25  expect a manufacturer to increase its production?
```

178

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2                    MR. GRALEWSKI:  Same objections.

3          A.     It's their own corporate decision.  It's

4     not mine.  They may make it up in volume.  I don't

5     know.

6          Q.     Would it be unreasonable for a

7     manufacturer to decrease its production?

8                    MR. GRALEWSKI:  I object to the form.

9          Outside the scope of the 30(b)(6) notice, calls

10         for speculation, lacks foundation, incomplete

11         hypothetical, calls for expert testimony.

12         A.     I don't really have an opinion on that.

13    Could you repeat it one more time, please.

14                   MS. NAIFEH:  Do you mind reading that

15         back.

16                   (The record was read.)

17                   MR. GRALEWSKI:  Same objections.

18         A.     Under what circumstances?

19         Q.     If the prices for a CRT fell.

20                   MR. GRALEWSKI:  Same objections.

21         A.     I think every corporation can make its

22    own decisions if it's not violating U.S. law.

23         Q.     Mr. Guttman, when did you first become

24    aware of your claim that you had been overcharged for

25    the purchase of the Dell computer?

                            179

ALVIN GUTTMAN                                    BARKLEY
                                                 Court Reporters

1                    Guttman - October 11, 2012

2         A.     March of this year -- or was that March

3    of last year?  When I signed the retainer agreement.

4         Q.     I believe you testified earlier that was

5    March of 2012.

6         A.     Yes, ma'am.  That is correct.

7         Q.     You understand that you are a plaintiff

8    class representative in a purported class action

9    against Toshiba and a number of other defendants; is

10   that correct?

11        A.     Yes.

12        Q.     What is your role in this lawsuit?

13        A.     I'm a class representative.

14        Q.     And what does that mean?

15        A.     That means that I represent the District

16   of Columbia as one member of a class.

17        Q.     Are there any other class members in the

18   District of Columbia?

19        A.     None that I'm aware of.

20        Q.     How many other plaintiffs are there in

21   the CRT antitrust litigation?

22        A.     I don't know.

23        Q.     What is your understanding of the

24   obligations of a class representative?

25        A.     To respond to the documents and requests

180

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                   Guttman - October 11, 2012

2  and appear in front of a deposition.

3          Q.     And how have you gone about fulfilling

4  those obligations?

5          A.     I think in a positive, honest, manner.

6          Q.     Other than preparing for this

7  deposition, how much time have you spent on this

8  case?

9          A.     I would estimate somewhere between five

10  and ten hours.

11          Q.     And that's since March of this year?

12          A.     That's correct.

13          Q.     Are you monitoring this case?

14          A.     Through my attorneys.

15          Q.     By any other means?

16          A.     No.

17          Q.     Have you been promised anything for

18  bringing this lawsuit other than a damage award?

19          A.     No.

20                 MS. NAIFEH:  Please mark this.

21                 (Exhibit 375, Indirect Purchaser

22          Plaintiffs' Notice of Motion and Motion for

23          Leave to Amend the Complaint marked for

24          identification, as of this date.)

25          Q.     Mr. Guttman, can you please identify

                            181

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                  Guttman - October 11, 2012
 2   this document.
 3          A.    This is an indirect purchaser
 4   plaintiffs' notice of motion and motion for leave to
 5   amend the complaint.
 6          Q.    Do you recognize this document?
 7          A.    Yes.
 8          Q.    Have you read it?
 9          A.    No, not in full.
10          Q.    You read --
11          A.    But I'm aware of it, though.
12          Q.    Have you read part of it?
13          A.    Yes.
14          Q.    Can you tell me which part of the
15   document you read.
16          A.    I think I read page 2 where it says
17   District of Columbia, where the current Bedrock
18   Management Company, Inc. is then transferred to a
19   proposed new plaintiff, that being Lawyer's Choice
20   Suites, Inc.
21          Q.    Do you know why you were substituted as
22   the class representative for the District of Columbia
23   instead of Bedrock Management?
24          A.    Yes.
25          Q.    Why is that?
```

182

ALVIN GUTTMAN

BARKLEY
Court Reporters

1              Guttman - October 11, 2012

2  (DIR)

3              MR. GRALEWSKI:  I'll instruct you not to

4       answer the question to the extent you would

5       reveal communications with your lawyers.

6              To the extent you can answer that

7       question without revealing communications, you

8       can do so.

9       A.    I can't answer that.

10      Q.    Do you know whether the court has

11  granted the indirect purchaser plaintiffs' motion to

12  amend the complaint?

13      A.    No.

14      Q.    I'm sorry, is that you don't know

15  whether it has granted?

16      A.    That's correct.

17      Q.    Okay.  Did you have any role in drafting

18  this motion?

19      A.    Not directly.

20      Q.    You had a role indirectly?

21      A.    Well, I allowed my company to become a

22  member of the class.

23      Q.    Did you make any suggestions about what

24  this motion should say?

25      A.    No.

                           183

ALVIN GUTTMAN                                    BARKLEY
                                              Court Reporters

```
 1                   Guttman - October 11, 2012
 2          Q.      Just below the District of Columbia,
 3   this chart refers to a list of other proposed new
 4   plaintiffs; David Rooks, Patricia Andrew, Misti
 5   Walker, Gloria Kamo, and Jeff Speaect.
 6                   Do you know any of these other
 7   plaintiffs?
 8          A.      I do not.
 9          Q.      Mr. Guttman, actually, this is Exhibit
10   11.  I believe you have a copy of that.
11                   Mr. Guttman, if you can, please identify
12   this document.
13          A.      It's an indirect purchaser plaintiffs'
14   third consolidated amended complaint.
15          Q.      Have you seen this document before in
16   preparation for this deposition?
17          A.      I think so.
18          Q.      Do you know when that was?
19          A.      I do not.
20          Q.      Have you read the complaint -- I'm
21   sorry, the amended complaint?
22          A.      Not in its entirety, no.
23          Q.      Have you read any portions of the
24   complaint?
25          A.      I may have in dealing with the CRT
```

184

ALVIN GUTTMAN

1                   Guttman - October 11, 2012

2    issues.

3          Q.     Do you recall when that would have been?

4          A.     I do not.

5          Q.     Did you read this complaint before it

6    was filed on December 10, 2010?

7          A.     No.

8          Q.     Do you believe the statements contained

9    within it to be true?

10         A.     Yes.

11         Q.     And what is the basis for that belief?

12         A.     Faith in my attorneys.

13         Q.     Do you have any other basis for your

14   belief?

15         A.     I think they've created a very similar

16   fourth consolidated amended complaint that, it's my

17   understanding, is very similar, simply replacing some

18   of the names.

19         Q.     Okay.  So besides this complaint and the

20   fourth amended complaint, do you have any other

21   factual basis for your belief that the statements in

22   this document are true?

23         A.     Again, I believe in what my attorneys

24   are doing.

25         Q.     Do you know the sources of the

                              185

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1              Guttman - October 11, 2012
 2   information contained in the complaint?
 3       A.    No, I don't.  I relied on my attorneys.
 4       Q.    Did you ask your attorneys if you could
 5   review any of the sources referenced in the
 6   complaint?
 7   (DIR)
 8              MR. GRALEWSKI:  Hold on.  I'm going to
 9         instruct you not to answer that question on the
10         ground of the attorney-client privilege.
11       Q.    So you're not going to answer that
12   question?
13       A.    No.
14       Q.    Do you know the time period alleged in
15   the complaint?
16       A.    Not specifically.
17       Q.    Is that your answer?
18       A.    I could spend time reading this and we'd
19   figure it out, yeah.
20              MR. GRALEWSKI:  Would you like to do
21         that to answer the question?
22              THE WITNESS:  No.
23       Q.    All right.  We'll move on.  In
24   general --
25              MR. GRALEWSKI:  I object to that
```

BARKLEY
Court Reporters

```
 1                Guttman - October 11, 2012

 2       question as outside the scope of the notice.

 3       Q.     In general, what is your knowledge of

 4  the allegations in the complaint?

 5       A.     Based upon my discussions with legal

 6  counsel.

 7       Q.     And what is your understanding of the

 8  legal claims being made?

 9              MR. GRALEWSKI:  Same objection.  Outside

10       the scope of the notice.

11       A.     Could you repeat that, please.

12       Q.     What is your understanding of the legal

13  claims being made in the complaint?

14       A.     What is my understanding of them?  That

15  they're legitimate.

16       Q.     Do you know what legal claims the

17  complaint makes?

18       A.     Yes.

19       Q.     And what are they?

20              MR. GRALEWSKI:  Outside the scope of the

21       notice.  Object to the form.  Go ahead.

22       A.     Antitrust violations, Sherman

23  violations, conspiracy, price fixing.

24       Q.     Do you know where the lawsuit is now

25  pending?
```

187

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2          A.     Northern District of California.

3          Q.     How did you make the decision to include

4     the specific defendants listed in the complaint?

5          A.     Could you repeat that, please.

6          Q.     How did you make the decision to include

7     the specific defendants listed in the complaint?

8                  MR. GRALEWSKI:  I object to the form.

9          Outside the scope.

10         A.     It was not my decision.  It was my

11    attorney's decisions.

12                 MS. NAIFEH:  Let's go off the record.

13                 THE VIDEOGRAPHER:  Going off the record

14         at 4:29.

15                 (There was a recess taken.)

16                 THE VIDEOGRAPHER:  Back on the record at

17         4:43.

18    BY MS. NAIFEH:

19         Q.     Okay.  Mr. Guttman, looking at Exhibit

20    11, is it your contention that each of the listed

21    defendants on page 9, starting on page 9 of the

22    amended complaint, was involved in the alleged

23    conspiracy?

24         A.     According to my legal counsel, yes.

25         Q.     Do you have any evidence in establishing

                              188

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2    the involvement of each?

3         A.    Not personally, no.

4         Q.    Do you have any evidence in establishing

5    the involvement of any defendant listed in this

6    complaint?

7         A.    I've been relying on legal counsel for

8    all of that.

9         Q.    So does that mean you don't have any

10   evidence?

11             MR. GRALEWSKI:  I object to the form.

12        Misstates testimony, and also, outside the scope

13        of the notice to this question and the prior

14        two.

15        A.    I'm relying on my attorneys to tell me

16   who the defendants are.

17        Q.    Earlier, you testified that you were

18   alleging a conspiracy to fix the prices of CRTs, not

19   to finished products; is that correct?

20        A.    Yes.

21        Q.    Some of the defendants listed in this

22   complaint do not manufacturer CRTs.

23             Did you know that?

24             MR. GRALEWSKI:  I object to the form.

25        Lacks foundation.  Outside the scope of the

                               189

ALVIN GUTTMAN

                    Guttman - October 11, 2012

1

2     notice.

3         A.    Could you repeat the question, please.

4               (The record was read.)

5         A.    I've been relying on my lawyers to tell

6     me who the defendants are.  The fact that they may

7     not be manufacturers, still may impact some

8     liability.  I am not aware of the specific defendants

9     and their specific causes of action.

10        Q.    Do you have anything else to add?

11        A.    I have to rely on my lawyers to tell me

12    what claims they feel are legitimate.

13        Q.    Do you believe that any other companies

14    besides those listed in your complaint were involved

15    in the alleged conspiracy?

16        A.    I have no idea.

17        Q.    So you don't know if Dell could have

18    been involved?

19        A.    I do not know.

20              MR. GRALEWSKI:  I object to the form of

21        this question and the last two, outside the

22        scope.

23        Q.    Okay.  If you could look at paragraphs

24    starting on page 5, paragraph 19 through paragraph 50

25    on page 9.  These are the named plaintiffs in this

                            190

ALVIN GUTTMAN

1                 Guttman - October 11, 2012

2    litigation.

3              Do you recognize any of the names in

4    those paragraphs?

5         A.    I recognize Bedrock Management.

6         Q.    How do you recognize Bedrock?

7              MR. GRALEWSKI:  Object to the form, this

8         question and the last one.  Sorry.  Outside the

9         scope of the notice.

10        A.    I saw my name being -- replacing

11   Bedrock.

12        Q.    Does Lawyer's Choice have any -- do

13   business with Bedrock Management?

14        A.    No.

15        Q.    Do you know anyone who works at Bedrock

16   Management?

17        A.    No.

18              MR. GRALEWSKI:  Object to the form.

19        Outside the scope.

20        Q.    So do you recognize any other plaintiffs

21   listed in paragraphs 19 through 50?

22              MR. GRALEWSKI:  I object to the form.

23        Outside the scope.

24        A.    No, I do not.

25        Q.    Do you have any personal knowledge of

                        191

ALVIN GUTTMAN

BARKLEY
Court Reporters

Guttman - October 11, 2012

1
2  any of the allegations listed in the complaint?

3      A.    Could you repeat that question.

4            MR. GRALEWSKI:  Object to the form.

5      Outside the scope.

6      Q.    Do you have any personal knowledge of

7  any of the claims listed in the complaint?

8            MR. GRALEWSKI:  Same objection.

9      A.    Do I have any personal knowledge of

10 the --

11     Q.    Allegations listed in the complaint.

12     A.    I have personal knowledge of the

13 allegations.

14     Q.    In what way?

15           MR. GRALEWSKI:  Same objection.  Outside

16     the scope.

17     A.    By reading the documents and speaking to

18 my attorneys.

19     Q.    Okay.  Do you have any personal

20 knowledge of the factual basis of those allegations?

21           MR. GRALEWSKI:  I object to the form.

22     Outside the scope.

23     A.    I don't really understand the question.

24 What is factual knowledge of the allegations?

25     Q.    Do you personally know any of these

192

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2    allegations to be true from your experience?

3                    MR. GRALEWSKI:  Object to the form.

4         Outside the scope.

5         A.    I've relied on counsel for these

6    allegations.

7         Q.    So does that mean you don't have any

8    personal knowledge of the allegations?

9         A.    I'm sorry.

10                   MR. GRALEWSKI:  I object to the form.

11        Outside the scope.

12        A.    I don't understand personal knowledge.

13   Are you referring to me opening up my CRT screen?  I

14   don't quite understand the question.

15        Q.    Okay.  Can you please turn to page 15,

16   paragraph 71.  Can you please read paragraph 71.  You

17   don't have to read it out loud.

18        A.    Okay.

19        Q.    Do you have any personal knowledge of

20   the facts in paragraph 71?

21                   MR. GRALEWSKI:  Object to the form.

22        Outside the scope.

23        A.    Well, I'm aware that Toshiba Corporation

24   is a Japanese corporation.

25        Q.    Okay.  Is there anything else?

                              193

ALVIN GUTTMAN                                    BARKLEY
                                                 Court Reporters

1               Guttman - October 11, 2012

2               MR. GRALEWSKI:  Same objection.  Outside

3        the scope.

4        A.     I know they're a defendant.

5        Q.     Is that it?

6               MR. GRALEWSKI:  Same objection.

7        A.     I believe they manufactured CRT products

8   in discussions with my attorneys and the common

9   knowledge that Toshiba is a Japanese corporation.

10       Q.     So would it be fair to say that your

11  understanding of the allegations contained in this

12  complaint are mostly based on what you learned from

13  your attorneys?

14              MR. GRALEWSKI:  I object to the form.

15       Outside the scope.

16       A.     No.  I'm aware that Toshiba is a

17  corporation that's made CRTs.

18              MR. GRALEWSKI:  Vague and ambiguous.

19       Q.     Can you please turn to page 31 of the

20  amended complaint.

21       A.     Okay.

22       Q.     Do you have personal knowledge of the

23  conspiracy allegations alleged in the complaint that

24  begin in paragraph 134?

25              MR. GRALEWSKI:  Object to the form.

194

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                  Guttman - October 11, 2012
 2        Outside the scope.
 3        A.     I would agree with that statement.
 4        Q.     And why would you agree with that
 5   statement?
 6               MR. GRALEWSKI:  I object to the form.
 7        Outside the scope.
 8        A.     Because I have faith in my attorneys.  I
 9   feel that if they make these claims, that they're
10   legitimate.
11        Q.     Do you have any other basis besides from
12   what your attorneys have told you to believe that
13   these allegations are true?
14               MR. GRALEWSKI:  I object to the form.
15        Outside the scope.  Asked and answered.
16        A.     Again, I don't understand the question
17   of personal knowledge.  I don't understand the
18   question.  What is personal knowledge?
19        Q.     Have you personally learned of the facts
20   alleged in this complaint from some other source
21   besides your attorneys?
22               MR. GRALEWSKI:  Object to the form.
23        Outside the scope.
24        A.     No.
25               MR. GRALEWSKI:  Vague and ambiguous.
```

195

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
1                 Guttman - October 11, 2012
2          Misleading.
3          Q.    The complaint alleges that during the
4    class period, you purchased CRT products from one or
5    more defendants.
6                 Is that an accurate statement?
7                 MR. GRALEWSKI:  I object to the form.
8          Outside the scope, lacks foundation.
9          A.    Say that again, please.
10                MS. NAIFEH:  Do you mind repeating it.
11                (The record was read.)
12         A.    Yes.
13         Q.    How do you know?
14                MR. GRALEWSKI:  I object to the form.
15         Outside the scope.  Lacks foundation.
16         A.    Well, I know at the very least, that
17   there was one product which was a CRT screen
18   connected with the 1100 Dell.
19         Q.    Okay.  And so that was a Dell computer
20   that came with a Dell monitor, right?
21         A.    Correct.
22         Q.    So what is the basis of your assertion
23   that you purchased a CRT product from one or more of
24   the defendants in this case?
25         A.    Where does it state that, counsel?
```

196

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2                    MR. GRALEWSKI:  I object to the question

3          as outside the scope.  Lacks foundation.

4          Q.    If you look at paragraph 1 of the

5     complaint.

6          A.    Page 1?

7          Q.    Yes.

8          A.    The third amended complaint.  It states

9     indirectly purchased CRT products.  I would agree

10    with that.

11         Q.    How do you know that you indirectly

12    purchased a CRT product from the defendants in this

13    case?

14                    MR. GRALEWSKI:  I'm sorry, can you read

15          that back, madam court reporter.

16                    (The record was read.)

17         A.    I'm relying on my attorneys for that.

18         Q.    Can you identify for us entities that

19    manufacture CRT products.

20         A.    Toshiba, Samsung, Chunghwa, quite a few

21    more.

22         Q.    Can you identify for us any entities

23    that sell CRT products.

24         A.    That sell CRT products?  Indirectly or

25    directly?

                              197

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2        Q.     Entities that sell televisions and

3   computer monitors.

4                MR. GRALEWSKI:  I object to the form.

5        Outside the scope.

6        A.     Are you talking about retailers or

7   manufacturers?

8        Q.     I'm talking about retailers that sell

9   CRT products.

10  (MKD)

11               MR. GRALEWSKI:  I object to the form.

12       Outside the scope.  I would like this portion of

13       the transcript marked, please.

14       A.     Could you please repeat the question.

15               (The record was read.)

16               MR. GRALEWSKI:  So my objection is

17       outside the scope.

18       A.     By asking me CRT products, are you

19   talking about televisions and monitors?

20       Q.     That's correct.

21       A.     Yes, I can.

22       Q.     Okay.  What are some of those entities?

23               MR. GRALEWSKI:  I object to the form.

24       Outside the scope.

25       A.     Dell, Toshiba, Samsung, probably LG,

                              198

BARKLEY
Court Reporters

1              Guttman - October 11, 2012

2   Chunghwa.  You want me to name more television and

3   monitor companies?

4         Q.    I think that's fine.

5              If we can turn back to paragraph 1 of

6   the complaint.  Line 17, it states that "The

7   defendants conspired to fix, raise, maintain and/or

8   stabilize prices of CRTs sold in the United States."

9              Do you see that?

10        A.    Yes.

11        Q.    What does it mean to fix prices?

12        A.    Sorry?

13        Q.    What does it mean to fix prices?

14             MR. GRALEWSKI:  I object to the form,

15        outside the scope.  Calls for legal testimony.

16        A.    To fix prices would probably include

17   having many of these agree to a specific price so

18   that it would be uncompetitive in advance.

19        Q.    And what is your basis for this

20   allegation?

21        A.    I'm relying on my attorneys.

22        Q.    Can you look on page 61, paragraph 249,

23   please.

24        A.    Correct.

25        Q.    So this says "Plaintiff Bedrock, DC

                          199

BARKLEY
Court Reporters

```
1              Guttman - October 11, 2012

2   plaintiff."  I understand that Lawyer's Choice will

3   be substituted in the new complaint.

4              Could you please read paragraph 249 to

5   yourself.

6              MR. GRALEWSKI:  You want him to read all

7        the subparts also?

8        Q.    Start off with -- let me know when you

9   finish subpart A.

10       A.    I finished that.

11       Q.    Okay.  So what is your basis for the

12  allegations in 249 A?

13             MR. GRALEWSKI:  Object to the form.

14       Outside the scope.

15       A.    Based upon my attorney's discussions.

16       Q.    Do you know which defendants agreed to

17  act in restraint of trade or commerce in the District

18  of Columbia?

19             MR. GRALEWSKI:  Object to the form.

20       Outside the scope.

21       A.    I'm not able to address that issue.

22       Q.    Is that because you don't know?

23       A.    I don't know if all or some of the

24  defendants are involved in distributing CRT products

25  in the District of Columbia.
```

200

ALVIN GUTTMAN

BARKLEY
Court Reporters

1        Guttman - October 11, 2012

2        Q.     In subpart A where it says "Artificial

3    and/or non-competitive levels," what does that mean?

4                MR. GRALEWSKI:  Object to the form.

5        Outside the scope.  Calls for legal testimony.

6        A.     Artificial is that it's a predetermined,

7    unmarket price.  It's based on an agreement versus

8    based on the market as we know it.

9        Q.     And what competition -- I'm sorry,

10   moving onto subpart B, if you could read that and let

11   me know when you're finished.

12       A.     Okay.

13       Q.     What competition was eliminated through

14   the District of Columbia from 249 B?

15               MR. GRALEWSKI:  I object to the form.

16       Outside the scope.  Overbroad, vague and

17       ambiguous.  Calls for legal testimony.

18       A.     I can't determine which specific

19   defendants had specific CRT products in the District

20   of Columbia.  But I feel comfortable that defendants

21   were in fact involved in restraining competition.

22       Q.     And how do you know that?

23               MR. GRALEWSKI:  Object to the form,

24       outside the scope, asked and answered.

25       A.     I'm relying on my attorney's expertise.

                          201

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                  Guttman - October 11, 2012

2        Q.    What does super competitive artificially

3    inflated prices mean in 249 B?

4              MR. GRALEWSKI:  Object to the form.

5        Outside the scope.  Calls for legal testimony.

6        A.    It lacked competition and was

7    artificially inflated.

8        Q.    And how was it artificially inflated?

9              MR. GRALEWSKI:  Object to the form.

10       Outside the scope.  Asked and answered.

11       A.    By conspiring to restrain trade.

12       Q.    And how do you know that?

13             MR. GRALEWSKI:  Object to the form.

14       Outside the scope, asked and answered.

15       A.    I'm relying on my attorneys.

16       Q.    If you could take a look at subpart C,

17   please.

18             What does substantially affected

19   District of Columbia commerce mean in 249 C?

20   (MKD)

21             MR. GRALEWSKI:  I would like this

22       portion of the transcript marked as well for my

23       later reference.  And I'm also going to object

24       as outside the scope and calls for legal

25       testimony.

                            202

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                   Guttman - October 11, 2012

2       A.      What does it mean?

3       Q.      Yes.

4       A.      It means that prices were paid by

5  District of Columbia entities and individuals that

6  paid more than they should have under the law.

7       Q.      And how do you know that?

8       A.      I'm relying on my attorneys.

9              MR. GRALEWSKI:  I object to the form.

10       Outside the scope.

11       Q.      Can you please read section or subpart D

12  for me and let me know when you're finished.

13       A.      Okay.

14       Q.      What unlawful conduct are you referring

15  to in 249 D?

16              MR. GRALEWSKI:  Object to the form,

17       outside the scope.  Asked and answered.

18       A.      Conspiracy, restraint of trade,

19  antitrust violations.

20       Q.      What do you mean by injured in their

21  business and property?

22  (MKD)

23              MR. GRALEWSKI:  I would like that

24       portion of the transcript marked.  I object to

25       the form.  Outside the scope, calls for legal

                         203

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2          testimony.

3          A.     They paid more than they should have.

4    They have less money in their bank accounts.

5          Q.     What further injury are you referring

6    to?

7                  MR. GRALEWSKI:  I object to the form.

8          Outside the scope.  Calls for legal testimony.

9          A.     I think every citizen is injured when

10   there are antitrust violations, including the

11   District of Columbia.

12         Q.     Did that constitute further injury?

13                MR. GRALEWSKI:  I object to the form.

14         Outside the scope.  Calls for legal testimony.

15         A.     Certainly could.

16         Q.     Subpart E refers to District of Columbia

17   Code Section 28 4501.

18                Are you familiar with that statute?

19                MR. GRALEWSKI:  Object to the form.

20         Outside the scope.

21         A.     Not specifically.

22         Q.     Do you know if Dell still sells CRT

23   monitors?

24         A.     I do not.

25                MR. GRALEWSKI:  I object to the form.

                           204

BARKLEY
Court Reporters

1              Guttman - October 11, 2012

2        Outside the scope.

3        Q.    Does any retailer still sell CRT

4    monitors?

5              MR. GRALEWSKI:  Outside the scope.

6        Object to the form.

7        A.    I'm not aware.

8              MR. GRALEWSKI:  Lacks foundation.  Calls

9        for speculation.

10       Q.    Does any retailer still sell CRT

11   televisions?

12       A.    Yes, I think so.

13             MR. GRALEWSKI:  Outside the scope, calls

14       for speculation.

15       Q.    I'm sorry, what was your answer?

16       A.    I believe so.  Maybe in terms of

17   resellers.

18             MR. GRALEWSKI:  Before you ask your next

19       question, I misspoke two or three questions ago

20       and I withdraw my foundation objection.

21       A.    You can find this stuff on EBay all the

22   time.

23       Q.    So these are CRT products that have --

24   that are used and are being resold?

25             MR. GRALEWSKI:  I object to the form.

                         205

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
1                    Guttman - October 11, 2012
2         Outside the scope.
3         Q.     Is that correct?
4         A.     In addition to retailers that may be
5    selling them directly, yes.
6         Q.     Do you know of any retailers that are
7    selling CRT products as new?
8                 MR. GRALEWSKI:  I object to the form.
9         Outside the scope.
10        A.     I'm not aware of them, no.
11        Q.     Would it be fair to say that CRTs are an
12   obsolete technology?
13                MR. GRALEWSKI:  I object to the form.
14        Outside the scope, vague and ambiguous.
15        A.     No.  I'm not knowledgeable enough to
16   make that opinion.
17        Q.     Do you think you'll ever buy a CRT
18   product again?
19                MR. GRALEWSKI:  I object to the form.
20        Outside the scope.
21        A.     I have no idea.
22        Q.     When is the last time you saw a CRT
23   product for sale at a retailer?
24                MR. GRALEWSKI:  I object to the form.
25        Outside the scope.
```

206

ALVIN GUTTMAN

BARKLEY
Court Reporters

1              Guttman - October 11, 2012

2      A.      Probably within 10 years.

3      Q.      So was that 10 years ago?

4      A.      Within 2002 to 2012, I think that there

5  were CRT screens being sold.

6      Q.      Have you seen any CRT screens being sold

7  in 2012?

8              MR. GRALEWSKI:  I object to the form.

9      Outside the scope.

10     A.      I can't recall.

11     Q.      What about since 2007?

12     A.      It's more likely --

13             MR. GRALEWSKI:  Object to the form.

14     Outside the scope.

15     Q.      Would you say that the number of CRT

16  products offered for sale has generally decreased

17  from 2007 until now?

18             MR. GRALEWSKI:  Object to the form.

19     Outside the scope.

20     A.      I'm not familiar with all CRT products

21  that -- there could be medicinal purposes.  There

22  could be a number of CRT sales that I personally, as

23  a consumer, are not aware of.

24     Q.      Okay.  Let me qualify my question to

25  just computer monitors and CRT television monitors.

207

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                 Guttman - October 11, 2012
 2       A.     Okay.
 3       Q.     No other type of CRT products.
 4       A.     Okay.
 5       Q.     Are you aware of those products being
 6  sold decreasing in sales from 2007 to 2012?
 7               MR. GRALEWSKI:  Object to the form.
 8       Outside the scope.
 9       A.     I can't address the sales issue, but I
10  have seen fewer of them on the shelf at retail
11  operations.
12       Q.     I believe you stated earlier that you
13  had replaced your CRT monitor with two subsequent LCD
14  monitors; is that correct?
15       A.     That's correct.
16               MR. GRALEWSKI:  Object to the form.
17       Outside the scope.
18       Q.     Are you likely to buy another CRT
19  monitor for Lawyer's Choice?
20               MR. GRALEWSKI:  I object to the form.
21       Outside the scope.
22       A.     I don't know what I'll be buying in the
23  future.  I can't predict what technology is going to
24  be out there.
25       Q.     When was the last time that you
```

208

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                  Guttman - October 11, 2012

2    purchased a computer system at Dell?

3         A.    I think it was 2006.

4         Q.    That was the last time you purchased a

5    computer system?

6         A.    Yes.  With Dell, right.

7         Q.    How are you at risk for further injury

8    from the alleged two conspiracies described in

9    paragraph 249?

10              MR. GRALEWSKI:  I object to the form.

11        Outside the scope.  Calls for legal testimony.

12        A.    How am I damaged?

13        Q.    How are you at risk for further injury?

14        A.    Lawyer's Choice Suites.

15              MR. GRALEWSKI:  Object to the form.

16        A.    I think it's very bad when foreign

17   companies are involved in unfair trade in this

18   country, and that there are a multitude of

19   implications for that in terms of employment,

20   productivity, job creation.  Antitrust violations can

21   affect our entire economy.

22        Q.    So are you claiming damages for those

23   implications?

24              MR. GRALEWSKI:  I object to the --

25        A.    Could you repeat that, please.


                            209

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2                    (The record was read.)

3                    MR. GRALEWSKI:  Actually, I object to

4          the form.  Outside the scope.

5          A.    Could we go before that.  Implications

6    regarding what, again?

7                    (The record was read.)

8                    MR. GRALEWSKI:  I object to the form.

9          Outside the scope.  Asked and answered.

10         A.    I don't know how to respond to that.

11   I'd have to rely on my attorneys to tell me if in

12   fact, those are part of the injuries.  I don't have

13   an answer.

14         Q.    Would you please turn to page 92,

15   paragraph 284.

16                   MR. GRALEWSKI:  Sorry.  Page what?

17                   MS. NAIFEH:  Page 92, paragraph 284.

18         A.    Okay.

19         Q.    So in that paragraph, you say that

20   throughout the relevant period, the defendants

21   affirmatively and fraudulently concealed their

22   unlawful claims against plaintiffs and the classes.

23         A.    It says unlawful conduct.

24         Q.    I'm sorry, unlawful conduct against

25   plaintiffs in the classes.  Thank you.

                              210

ALVIN GUTTMAN

1      Guttman - October 11, 2012

2           MR. GRALEWSKI:  Object to form.  Outside

3      the scope.

4      Q.    In what manner did defendants conceal

5  their supposed acts in furtherance of conspiracy?

6           MR. GRALEWSKI:  Same objection.

7      A.    By their antitrust allegations --

8  conduct.

9      Q.    I'm sorry, their antitrust conduct?

10     A.    By their antitrust conduct, correct.

11     Q.    Can you identify such an act?

12     A.    Price fixing.

13     Q.    And what is your basis for this

14  allegation?

15          MR. GRALEWSKI:  I object to the form.

16     Outside the scope.

17     A.    Advice from counsel.

18     Q.    If you could turn to the next page.

19  Paragraph 286, starts on page 92 and continues to 93.

20  If you could look specifically at 286 E.

21          You say that "The defendants

22  affirmatively concealed the alleged conspiracy by

23  giving false and pretextual reasons for the CRT

24  product price increases during the relevant period,

25  and by describing such pricing falsely as being the

211

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
 1                 Guttman - October 11, 2012
 2   result of external costs rather than collusion."
 3                 Can you identify any such pretextual
 4   statement?
 5                 MR. GRALEWSKI:  Object to the form.
 6         Outside the scope.
 7         A.    I'm relying on legal counsel on that
 8   issue.
 9         Q.    Did you read or hear this statement
10   during the class period?
11                 MR. GRALEWSKI:  Object to the form,
12         outside the scope.
13         A.    Class periods?
14         Q.    Yes.  March 1st, 1995 through November
15   25, 2007.
16         A.    Did I what again?
17         Q.    Did you read or hear this statement
18   during the class period?
19                 MR. GRALEWSKI:  I think he may be on a
20         different part than you are.
21                 Can you redirect him to where you want
22         him to be looking.
23                 MS. NAIFEH:  Sure.
24         Q.    So it's page 93 E.
25         A.    Okay.
```

ALVIN GUTTMAN

1              Guttman - October 11, 2012

2              MS. NAIFEH:  Thank you.

3        A.    Yes, I'm relying on counsel for that.

4        Q.    Okay.  So does that mean you did not

5   read or hear that statement during the class period?

6              MR. GRALEWSKI:  I object to the form.

7   Outside the scope.

8        A.    I'm sure I've read this statement.  I

9   can't tell you when, but it should have been during

10  the class period.

11             Could you please repeat the question.

12       Q.    Okay.  So it says that the defendants

13  gave false or pretextual reasons.

14             Did you hear any statement giving false

15  or pretextual reasons from the defendants during the

16  class period?

17       A.    No.  I have relied on my attorneys.

18       Q.    Okay.

19             MR. GRALEWSKI:  Object to the form.

20  Outside the scope.

21       Q.    If you could turn back to page 92,

22  paragraph 285.  It says that the plaintiffs could not

23  discover through the exercise of reasonable diligence

24  the defendants were violating the laws alleged herein

25  until shortly before this litigation was commenced.

                          213

BARKLEY
Court Reporters

1          Guttman - October 11, 2012

2          Do you see that?

3     A.    I think it reads plaintiffs and members

4  of the class did not discover and could not discover

5  through the exercise of reasonable diligence the

6  defendants violating laws as alleged herein.  Okay.

7     Q.    Why were you unable to discover the

8  existence of the alleged conspiracy?

9          MR. GRALEWSKI:  Object to the form.

10     Outside the scope.  Calls for legal testimony.

11     A.    I have to rely on my lawyer's expertise

12  on this issue.

13     Q.    Did you take any steps to discover the

14  conspiracy?

15          MR. GRALEWSKI:  Object to the form.

16     Outside the scope.

17     A.    I hired counsel.

18     Q.    Was that during the class period?

19     A.    When was the class period?

20          MR. GRALEWSKI:  Object to the form.

21     Outside the scope.

22     Q.    March 1st, 2000 -- I'm sorry.  March

23  1st, 1995 through November 25, 2007.

24     A.    No.  I wasn't involved at that time with

25  my attorneys.  I did not sign a fee agreement with

214

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                    Guttman - October 11, 2012

2    them at that time.

3        Q.    Okay.  So you didn't take any steps to

4    discover the conspiracy during the class period?

5                MR. GRALEWSKI:  I object to the form.

6        Outside the scope.

7        A.    I hired my attorneys to do that.

8        Q.    That was after the class period; is that

9    right?

10               MR. GRALEWSKI:  Object to the form.

11       Outside the scope.

12       A.    Yes.  It was 2012.

13               MR. GRALEWSKI:  I'm going to withdraw

14       that last objection.

15       Q.    If you can please turn to page 45,

16   paragraph 193.

17               THE VIDEOGRAPHER:  Going off the record

18       at 5:33.

19               (Discussion held off the record.)

20               THE VIDEOGRAPHER:  Back on the record at

21       5:44.

22               (Exhibit 376, Samsung Exhibits D 33

23       through D 39 and A 40, marked for

24       identification, as of this date.)

25               (Exhibit 377, Samsung Exhibits E 33

                          215

ALVIN GUTTMAN

BARKLEY
Court Reporters

1              Guttman - October 11, 2012

2          through E 40, marked for identification, as of

3          this date.)

4              (Exhibit 378, Toshiba Exhibits A 33

5          through A 40, marked for identification, as of

6          this date.)

7              (Exhibit 379, Toshiba Exhibits B 33

8          through B 39 and A 40, marked for

9          identification, as of this date.)

10             (Exhibit 380, Toshiba Exhibits C 33

11         through C 39 and A 40, marked for

12         identification, as of this date.)

13             MS. NAIFEH:  Mr. Guttman, thank you so

14         much for being here today.  I have no further

15         questions from the defendants.

16             Does anyone else on the line have any

17         further questions?

18    EXAMINATION BY

19    MR. GRALEWSKI:

20         Q.    Hearing no response from the other

21    defendants who were on the line earlier, I have a few

22    questions for you, Mr. Guttman.

23             As you know, my name is Bob Gralewski.

24    I'm with the law firm of Kirby McInerney.  I

25    represent you and the class in this case.  Thanks for

216

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                Guttman - October 11, 2012

2    your time today.

3        A.      You're welcome.

4        Q.      You recall earlier in the day, we looked

5    at your receipt for the Dimension 1100 that was

6    Exhibit 367.

7                MS. NAIFEH:  Objection.  Misstates prior

8        testimony.

9        Q.      You remember we looked at Exhibit 367

10   which was your order confirmation?

11       A.      Right.

12       Q.      Can you grab that.

13       A.      367.

14       Q.      So you have 367 in front of you,

15   correct?

16       A.      I do.

17       Q.      And do you recall that counsel asked you

18   some questions concerning how you knew that the

19   monitor you bought along with the CPU and the 1100

20   was a CRT?

21       A.      Yes.

22       Q.      And you indicated, correct, that order

23   confirmation identified it as a CRT and that's how

24   you know it was a CRT, correct?

25       A.      Correct.

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                  Guttman - October 11, 2012

2        Q.     Is there anything else that leads you to

3   believe it was a CRT?

4              MS. NAIFEH:  Objection.  Leading.

5        A.     The receipt that we received and the

6   shipping label.

7        Q.     Okay.

8        A.     Also, said CRT.

9        Q.     Are you familiar with, generally

10  speaking, the size and shape of CRTs versus other

11  monitor technology like flat screens?

12       A.     Yes.

13       Q.     What is your understanding of the size

14  and shape of a CRT monitor versus a flat screen one?

15       A.     Well, considering the size of the

16  screen, if they are both the same, a CRT is quite

17  heavier and bigger and bulkier.

18       Q.     And was the monitor that you purchased

19  in connection with the confirmation there in 367 one

20  of the bigger, bulkier models?

21       A.     Yes.

22       Q.     Okay.  I don't have any other questions

23  with respect to 367.

24              You recall there was some testimony

25  about the two verifications you signed in this case,

                          218

                    ALVIN GUTTMAN

BARKLEY
Court Reporters

1                   Guttman - October 11, 2012

2    correct?

3         A.      Correct.

4         Q.      That was Exhibit 371 and 374, correct?

5         A.      Correct.

6         Q.      Okay.  Prior to signing 371 and 374, did

7    you review Samsung Exhibit A 33?  That's Exhibit 372.

8    And Samsung Exhibit B 33, that's the first page of

9    Exhibit 373?

10                MS. NAIFEH:  Objection.  Leading.

11        A.      That was 371?

12        Q.      Yeah.  You want me to slow down a little

13   bit?

14        A.      I have 372 and Exhibit 373.

15        Q.      Why don't we do this, because you have

16   so much paper in front of you.  Why don't you put the

17   two verifications up here.  So that's 371, and then

18   374.  And then if you could place in front of you

19   Exhibit 372 and 373.  Why don't you put them side by

20   side.  Just put them in front of you, side by side.

21                You see how the first page of 372 and

22   the first page of 373 reference information under the

23   heading plaintiff Lawyer's Choice Suites, Inc.?

24        A.      Yes.

25        Q.      Now, prior to signing the verifications

                              219

ALVIN GUTTMAN

BARKLEY
Court Reporters

1                   Guttman - October 11, 2012

2    that you signed in 371 and 374, did you review the

3    information on the first page of 372 and 373?

4                   MS. NAIFEH:  Objection.  Leading.

5         A.     Yes, I did.

6         Q.     Okay.  So you can put 372 and 373 away.

7    And during the break, we premarked Exhibits 376, 77,

8    78, 79, and 80.  And if you could look at the first

9    page of each of those exhibits, I'll then have a

10   question for you.

11        A.     Okay.

12        Q.     So my question is prior to signing the

13   verifications contained in Exhibits 371 and 374, had

14   you reviewed the first page of Exhibits 376 through

15   380?

16                  MS. NAIFEH:  Objection.  Leading.

17        A.     I have, yes.

18        Q.     You had reviewed those prior to the time

19   you signed the verification?

20                  MS. NAIFEH:  Same objection.

21        A.     That is correct.

22                  MR. GRALEWSKI:  I have no other

23        questions.

24                  MS. NAIFEH:  No further questions.

25                  MR. GRALEWSKI:  Okay.

                              220

ALVIN GUTTMAN                                   BARKLEY
                                                Court Reporters

1              Guttman - October 11, 2012

2              THE VIDEOGRAPHER:  This ends the

3        deposition at 5:51.

4              (Time noted:  5:51 p.m.)

5

6

7

8

9

10             I have read the foregoing deposition

11    transcript and by signing hereafter, approve same.

12

13    Dated_____.

14

15

                          _____
16                          (Signature of Deponent)

17

18

19

20

21

22

23

24

25

ALVIN GUTTMAN

BARKLEY
Court Reporters

```
1              DEPOSITION OFFICER'S CERTIFICATE

2    STATE OF CALIFORNIA    )
                            ) ss.
3    COUNTY OF NEW YORK     )

4

5

6          I, LORRAINE B. ABATE , hereby certify:

7          I am a duly qualified Certified Shorthand

8    Reporter in the State of California, holder of

9    Certificate Number CSR XI01992 issued by the Court

10   Reporters Board of California and which is in full force

11   and effect.  (Fed. R. Civ. P. 28(a)).

12         I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a), 30(f)(1)).

17         I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22         I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                       / / /
```

222

ALVIN GUTTMAN

BARKLEY
Court Reporters

1    of the testimony given by the witness.   (Fed. R. Civ. P.

2    30(f)(1)).

3         Before completion of the deposition, review of

4    the transcript [XX] was [  ] was not requested.   If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed, are

7    appended hereto.   (Fed. R. Civ. P. 30(e)).

8

9    Dated: OCTOBER 25, 2012

10

11                  *Lorraine B. Abate*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ALVIN GUTTMAN

BARKLEY
Court Reporters

IN RE:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION
STATE OF CALIFORNIA v. SAMSUNG SDI, INC., CO., LTD.

ALVIN GUTTMAN
October 11, 2012

## $

**$100 (13)**
96:22;97:2,17;
98:14;99:2,13,15;
100:3,14,14,22;
101:4;103:20
**$166 (6)**
103:14,20;104:5,
18,24;105:9
**$166.00 (1)**
105:4
**$24 (1)**
123:14
**$46.06 (1)**
95:23
**$66 (3)**
97:15;102:21;
103:20
**$877 (2)**
99:22;104:5
**$877.00 (3)**
95:7;104:24;105:4

## A

**abide (1)**
174:13
**ability (2)**
13:6;117:21
**able (2)**
13:2;200:21
**above-entitled (1)**
142:8
**absence (1)**
160:19
**absorbed (1)**
172:10
**access (2)**
92:7;109:18
**accessories (1)**
111:3
**accessory (1)**
70:12
**According (11)**
91:13;95:6;97:15;
101:13;104:8,19,23;
111:15;123:4;
148:11;188:24
**account (2)**
63:16;92:8
**accountant (1)**
35:15
**accounts (1)**
204:4
**accoutrements (1)**
168:13
**accurate (5)**
13:2,7;153:10;
165:25;196:6
**accurately (1)**
11:9

**Act (8)**
38:2,4,5,6,8;48:11;
200:17;211:11
**action (10)**
26:10;35:7;44:8;
128:10,14;129:13;
142:8;170:8;180:8;
190:9
**actions (4)**
48:6,9;128:7;
129:14
**acts (1)**
211:5
**actual (1)**
96:7
**actually (8)**
15:17;82:13;
95:22;98:9;142:7;
174:20;184:9;210:3
**add (2)**
12:22;190:10
**Adding (1)**
103:19
**addition (4)**
99:18;100:13,14;
206:4
**additional (14)**
12:19;21:4;58:19,
20;74:21;79:24;
97:9;100:4,22;
107:13;123:11;
161:4,15;176:25
**address (11)**
31:22;32:3,6;48:9;
91:17,18,21,24;92:3;
200:21;208:9
**addresses (2)**
32:9;137:25
**administrative (4)**
17:3;18:17;
126:17;137:13
**advance (1)**
199:18
**advantage (1)**
162:17
**Advertising (1)**
20:20
**advice (8)**
11:19,24;39:7;
46:23;47:5,11;68:7;
211:17
**advise (2)**
11:25;139:17
**advises (1)**
12:2
**advisor (1)**
175:22
**affect (2)**
78:11;209:21
**affected (1)**
202:18
**affiliated (2)**
52:4,9

**affirmatively (2)**
210:21;211:22
**again (17)**
23:18;52:7;62:4;
101:3;104:13;
117:18;120:24;
127:23;129:9;
164:18;165:12;
185:23;195:16;
196:9;206:18;210:6;
212:16
**against (4)**
48:11;180:9;
210:22,24
**age (1)**
32:14
**ago (7)**
53:6,7;117:17;
126:25;127:25;
205:19;207:3
**agree (9)**
10:25;12:15;
163:20;177:12;
178:5;195:3,4;
197:9;199:17
**agreed (1)**
200:16
**agreement (22)**
23:12,18;24:4,12,
24,25;25:6,12;27:18;
28:23;48:18,19,20,
25;49:5;52:24;
53:23;141:11;
142:24;180:3;201:7;
214:25
**ahead (8)**
27:11;41:7;46:19;
94:21;156:4;165:9;
171:7;187:21
**airlines (1)**
177:20
**Al (2)**
56:22;92:11
**allegation (2)**
199:20;211:14
**allegations (15)**
170:12;187:4;
192:2,11,13,20,24;
193:2,6,8;194:11,23;
195:13;200:12;
211:7
**allege (3)**
44:2,8,12
**alleged (12)**
160:8;169:18;
186:14;188:22;
190:15;194:23;
195:20;209:8;
211:22;213:24;
214:6,8
**alleges (1)**
196:3
**alleging (8)**

38:17,20;39:5,10,
12;42:15;45:2;
189:18
**allow (3)**
25:4;28:10;127:13
**allowed (4)**
101:4;132:17;
133:6;183:21
**almost (2)**
177:10;178:11
**alone (5)**
39:19;54:15;
71:18;82:3;105:13
**along (3)**
106:10,15;217:19
**alternative (1)**
79:6
**Although (1)**
18:5
**Alvin (4)**
9:13;13:11;92:16,
20
**always (2)**
173:3,20
**ambiguous (33)**
27:15;29:13;35:4;
41:25;42:20;45:16;
47:9;49:20;50:17;
52:13;56:17;70:6,
17;71:11;75:18;
80:9;97:5;103:9;
132:10;140:7,17;
145:17;149:9;
163:13;166:20;
167:7,23;168:23;
173:24;194:18;
195:25;201:17;
206:14
**amend (4)**
154:5;181:23;
182:5;183:12
**amended (13)**
28:19;54:4;
141:11;154:13;
155:6;159:18;
184:14,21;185:16,
20;188:22;194:20;
197:8
**America (7)**
5:7,18;6:7;130:8;
147:2;156:14;
157:19
**American (8)**
48:5;63:16,18;
135:24;158:9;162:9,
17,21
**among (1)**
38:3
**amount (6)**
83:3;161:23;
176:6,8,12,16
**and/or (2)**
199:7;201:3

**Andrew (1)**
184:4
**Angeles (1)**
9:6
**answered (45)**
28:18;36:17;43:5;
44:15,22;54:17;
55:4;56:5,25;68:6;
70:14;71:5;72:16;
74:4;75:8;78:5;80:2,
3;83:10;99:5;100:7,
19,25;102:24;
108:14;113:19;
115:14;117:11,16,
17;118:8;125:24;
126:4,14;134:16;
154:24;164:12;
165:7;174:19;
195:15;201:24;
202:10,14;203:17;
210:9
**anti (2)**
38:2,4
**Antitrust (14)**
9:10;38:9;44:8;
48:11;162:18;
171:14;180:21;
187:22;203:19;
204:10;209:20;
211:7,9,10
**apologize (3)**
27:10;38:23;171:7
**apparently (1)**
48:5
**appear (1)**
181:2
**appearance (2)**
58:20,25
**appearances (1)**
10:3
**appeared (1)**
108:15
**appears (2)**
104:8;111:12
**Apple (1)**
84:6
**applicable (3)**
142:14,18;159:4
**apply (2)**
101:22;159:10
**appointed (1)**
50:8
**appreciate (2)**
23:23;174:18
**approach (1)**
173:13;174:4
**approximately (2)**
83:12;127:25
**April (1)**
53:2
**areas (1)**
16:16
**argue (1)**

127:8

**argumentative (18)**
71:5;74:3;75:8;
99:6;100:8,25;104:7,
22;111:14;115:14;
134:16;143:3;161:7,
17;162:3;164:2,14;
165:6

**around (3)**
84:11,15;91:7

**Artificial (2)**
201:2,6

**artificially (3)**
202:2,7,8

**arts (2)**
33:6,7

**asserting (2)**
37:25;40:21

**assertion (1)**
196:22

**assisted (1)**
151:22

**associated (5)**
9:4;15:13;51:13;
68:24;142:13

**assume (4)**
69:18,19;83:25;
111:3

**astray (1)**
35:24

**attempt (1)**
154:15

**attend (3)**
32:21,25;33:14

**attended (1)**
30:6

**attorney (25)**
10:17;11:12,16,18,
21,24,25;12:2,7;
15:8,9,10,18;24:11;
28:3;29:21,23;
30:23;45:7,8,22,22;
121:15;136:14;
148:20

**attorney-client (7)**
24:8,17;27:24;
46:16;136:7;139:22;
186:10

**Attorneys (30)**
5:6,16;6:6;25:15;
28:2;29:10;43:8;
131:14;144:24;
148:23;181:14;
185:12,23;186:3,4;
189:15;192:18;
194:8,13;195:8,12,
21;197:17;199:21;
202:15;203:8;
210:11;213:17;
214:25;215:7

**attorney's (10)**
24:13,24;25:24;
26:6;39:7;43:11;

143:4;188:11;
200:15;201:25

**attribute (1)**
77:9

**attributed (1)**
106:22

**August (1)**
142:12

**Austin (1)**
123:5

**authenticate (1)**
41:9

**authorization (1)**
110:19

**authorized (1)**
84:2

**availability (2)**
108:23,24

**available (2)**
71:22;73:15

**Avenue (2)**
5:11,19

**award (1)**
181:18

**aware (15)**
22:23;86:7;
121:14;135:23;
138:7;179:24;
180:19;182:11;
190:8;193:23;
194:16;205:7;
206:10;207:23;
208:5

**away (1)**
122:18;220:6

## B

**Bachelor (2)**
33:6,7

**back (32)**
13:16;15:6;22:14;
42:10;55:22;58:17;
61:2;62:5;63:21;
65:13;89:10;97:16;
104:2;113:3;115:5,
7;137:14,18,20;
138:4;147:25;150:6;
153:13;155:14;
167:25;168:2;
179:15;188:16;
197:15;199:5;
213:21;215:20

**backed (2)**
137:25,25

**bad (1)**
209:16

**Badgering (1)**
115:14

**BAKER (1)**
5:15

**bank (2)**
21:8;204:4

bankruptcy (1)
176:5

**bar (1)**
34:12

**Barkley (1)**
9:4

**based (7)**
44:21;162:19;
187:5;194:12;
200:15;201:7,8

**basement (1)**
135:25

**basically (1)**
174:20

**basis (14)**
66:6,7;73:19;
171:9,12;185:11,13,
21;192:20;195:11;
196:22;199:19;
200:11;211:13

**Bates (5)**
94:10;114:4;
120:22;121:4;134:9

**bear (1)**
55:17

**become (5)**
33:25;34:11,16;
179:23;183:21

**BEDFORD (2)**
6:14;9:3

**Bedrock (13)**
149:4,5,13,14,18;
182:17,23;191:5,6,
11,13,15;199:25

**begin (1)**
194:24

**behalf (10)**
9:13,20,22;10:8,
10,18;14:4,14;59:3;
68:19

**belief (6)**
142:20;143:10;
159:6;185:11,14,21

**believes (2)**
11:18,21

**below (3)**
75:20;90:14;184:2

**benefit (1)**
128:19

**besides (18)**
19:23;27:18;
41:13;52:16,18;
54:5;58:7;69:15;
85:23;102:12;
107:13;133:16;
135:21;162:13;
185:19;190:14;
195:11,21

**best (5)**
42:23;67:17;
84:11,16;103:13;
117:21;132:24;
142:19;143:9;146:7;

159:5

**better (1)**
84:23

**bigger (2)**
218:17,20

**bill (4)**
92:16,20,23;139:3

**Billing (6)**
137:10;138:12,13;
139:2,5,8

**birth (1)**
32:15

**bit (2)**
46:10;219:13

**black (1)**
68:11

**Bob (2)**
9:21;216:23

**Books (2)**
138:18;139:2

**born (1)**
32:16

**both (8)**
42:25;67:15;
123:19;138:20;
142:17;157:6;170:7;
218:16

**bottom (4)**
92:15;110:16;
144:5;160:15

**BOTTS (1)**
5:15

**bought (10)**
56:10;57:3,12,19;
68:23;73:24;78:24;
84:14;86:2;217:19

**box (7)**
93:4,6;118:19,21,
23;120:11;135:16

**boxes (1)**
119:19

**brand (5)**
22:17;67:13;
77:12;82:8;108:21

**branding (1)**
108:22

**brands (2)**
69:23;77:15

**breach (1)**
174:11

**break (8)**
12:11,14;55:8;
58:13;59:9;149:24;
150:9;220:7

**bring (1)**
31:4

**bringing (1)**
181:18

**brochures (1)**
85:10

**broker (7)**
19:24;20:3,12;
33:22,25;34:11,16

brokerage (1)
34:5

**Brown (3)**
18:12,12,17

**B-R-O-W-N (1)**
18:13

**building (3)**
88:5,11,15

**bulkier (2)**
218:17,20

**bullet (1)**
110:17

**bundle (3)**
69:4;161:3,14

**business (12)**
16:20;32:5;60:19;
81:8;91:25;97:10;
101:21;166:3,11;
167:5;191:13;
203:21

**buy (7)**
48:5;71:18;79:2,
23;102:20;206:17;
208:18

**buyer (2)**
37:6,11

**buying (6)**
96:23;100:15;
155:18,19;163:8;
208:22

**BYRD (1)**
6:10;10:9,9

## C

**California (2)**
9:6;188:2

**call (4)**
46:16;74:3;
161:17;172:20

**calling (1)**
176:18

**calls (66)**
11:19,22;27:9;
42:20;43:4;46:15;
47:8;73:22;80:2,17;
85:2;93:2;95:15;
99:10,10;100:18;
101:2;103:9;105:11;
110:8;111:9;126:14;
136:21;160:24;
161:6;162:3;163:25;
164:13,13;165:5,6;
166:6,13,21;167:7;
170:20;171:3,20;
172:13,22;173:12,
14;174:7,9;175:5,14,
19;176:2;177:4;
178:8,20,21;179:9,
11;199:15;201:5,17;
202:5,24;203:25;
204:8,14;205:8,13;
209:11;214:10

**came (12)**
67:7;68:8;81:14;
86:14;94:18;95:2;
99:16;118:19;
119:23;135:13,15;
196:20

**can (123)**
10:25;11:8,19;
12:15,18,23;13:9,19;
15:21;17:16;18:10;
20:22;22:12;25:8,11,
14;26:25;27:16;
28:16,18,21;29:8,14;
31:14,21;32:14;
34:11;36:12;37:18,
21;38:22,25;39:4;
41:2,7;42:22;43:7,
17,24,24;46:10,19;
47:3,12;52:6;54:18;
55:4,8,22;58:19;
59:14;61:18;64:11;
65:8;68:6;77:9;
95:11;110:15;
117:18,20;118:12;
119:10;127:11;
129:4;130:7,13;
131:11,17;132:20,
22;133:8,9;136:25;
137:7;138:22;142:5;
143:25;145:12;
147:22;150:25;
152:12;153:19;
154:24;155:9,20;
158:6;159:24;
162:24;163:3,18;
167:13,13,24;172:2;
173:16;174:2;
175:10,12;177:4;
179:21;181:25;
182:14;183:6,8;
184:11;193:15,16;
194:19;197:14,18,
22;198:21;199:5,22;
203:11;205:21;
209:20;211:11;
212:3,21;215:15;
217:12;220:6

**capacity (5)**
18:23;92:4,5,13,18

**card (4)**
109:8,13,19,21

**carefully (2)**
141:22;142:25

**case (40)**
9:11,18,19;10:17;
14:19;25:10,17;
26:9;37:25;45:6;
49:11,14;50:14;
51:8;52:5,10,22;
53:5,17;64:13;
67:21;90:4;93:9,15;
120:17;126:10;
127:15;132:25;

133:11,24;136:15;
165:16;170:14;
176:13;181:8,13;
196:24;197:13;
216:25;218:25

**categories (1)**
16:10

**Cathode (15)**
9:10;21:10,15,17;
34:21,21,25,25;
37:12,12;38:11,11;
54:10;78:8,14

**causes (1)**
190:9

**caution (2)**
41:3;131:18

**ccs (1)**
52:2

**cell (2)**
137:18,21

**central (1)**
70:9

**Century (1)**
9:5

**certain (5)**
36:14,18;99:14;
174:15,16

**certainly (4)**
20:25;37:21;60:4;
204:15

**certifications (1)**
33:20

**chain (1)**
172:11

**change (1)**
175:7

**changes (1)**
24:3

**charged (1)**
104:2

**Charise (2)**
9:17;10:16

**CHARLES (2)**
5:21;10:7

**chart (1)**
184:3

**check (2)**
35:14;62:4

**checked (4)**
61:11,12,13;63:18

**Choice (92)**
13:21,23,24;14:5,
18,19;16:7;17:12,20,
23,24;18:8;19:11,16,
23;20:4;21:13;
30:15;31:8;32:2,8,
11;35:20;36:5,24;
37:5,9;39:12,18,21,
25;40:11,16;41:14;
44:5;46:3,8;48:13;
54:20,24;59:10;
61:7;65:19;68:19,
20;81:17;87:23;

91:19,25;92:4,24;
93:6,9;94:3;101:22;
114:16,19;116:21,
25;121:8,20;122:8,9,
10,25;123:14;127:5;
128:5;129:2,10,13;
130:4;133:13,22;
136:22;137:15,19;
138:8;139:12,17;
149:5,14,17;163:16;
168:19;173:20;
182:19;191:12;
200:2;208:19;
209:14;219:23

**choices (2)**
72:9,11

**Choice's (5)**
15:4;16:19;31:22;
152:21;173:2

**choose (5)**
72:6;73:4,7;74:12;
108:11

**chose (5)**
72:5,14;73:9,11;
79:8

**Chunghwa (2)**
197:20;199:2

**circumstance (1)**
45:21

**circumstances (4)**
45:13,18;140:14;
179:18

**citizen (2)**
162:21;204:9

**civic (1)**
177:11

**Civil (1)**
14:6

**civilly (1)**
170:9

**claim (3)**
37:24;61:2;179:24

**claiming (5)**
60:23;63:8;82:10;
90:3;209:22

**claims (10)**
37:25;38:8;40:21;
187:8,13,16;190:12;
192:7;195:9;210:22

**clarification (3)**
12:20;14:12;
144:10

**clarifies (1)**
155:5

**clarify (3)**
35:17;68:17;144:4

**class (41)**
9:23;26:9,12,20,
23;27:13;40:19;
53:11;54:25;58:6;
59:11;128:7,10,10,
20;129:13,14;170:8;
176:15,24;180:8,8,

13,16,17,24;182:22;
183:22;196:4;
212:10,13,18;213:5,
10,16;214:4,18,19;
215:4,8;216:25

**classes (2)**
210:22,25

**CLE (1)**
34:19

**clear (3)**
57:23,23;100:21

**clearly (1)**
99:20

**click (3)**
98:11,12,14

**client (1)**
47:11

**Co (3)**
5:8;10;6:6

**code (3)**
98:2,9;204:17

**college (1)**
32:21

**collusion (1)**
212:2

**Columbia (17)**
32:9,12;33:23;
60:21;180:16,18;
182:17,22;184:2;
200:18,25;201:14,
20;202:19;203:5;
204:11,16

**comfort (1)**
70:2

**comfortable (1)**
201:20

**commenced (1)**
213:25

**commensurate (1)**
164:17

**commerce (2)**
200:17;202:19

**commercial (2)**
174:17;175:9

**common (4)**
133:11;171:13;
177:18;194:8

**communicate (2)**
52:21;53:4

**communicated (1)**
30:25

**communication (1)**
18:16

**communications (10)**
11:23;41:4;46:17;
47:10;50:14;131:18;
132:21;133:7;183:5,
7

**commute (4)**
13:16;66:2,4,14

**companies (8)**
22:12;35:7;84:4;
162:17;170:9;

13,16,17,24;182:22;
183:22;196:4;
212:10,13,18;213:5,
10,16;214:4,18,19;
215:4,8;216:25

190:13;199:3;
209:17

**company (15)**
14:10,18;16:21;
19:17;22:9;34:21,
24;60:14,15;149:4,6,
14,18;182:18;183:21

**competed (1)**
166:3

**competition (4)**
201:9,13,21;202:6

**competitive (2)**
124:7;202:2

**complaint (44)**
28:20;39:14;
43:13,19;44:2;54:4;
141:12;160:8;
163:11;181:23;
182:5;183:12;
184:14,20,21,24;
185:5,16,19,20;
186:2,6,15;187:4,13,
17;188:4,7,22;189:6,
22;190:14;192:2,7,
11;194:12,20,23;
195:20;196:3;197:5,
8;199:6;200:3

**complaints (1)**
124:3

**complete (1)**
13:7

**completely (4)**
12:18;127:15;
132:12;165:14

**component (1)**
70:9

**components (1)**
164:23

**Compound (4)**
42:19;43:4;46:15;
165:4

**computer (103)**
22:13,15,17,20;
40:2,9,10,14,17;
41:13;55:5;56:2,10;
57:3;59:11,15,20;
60:24;61:13,16,19,
23;64:12,25;67:8,15;
68:9,16;69:8,16;
70:4,11,22;71:2,9,
14,19;72:22;73:25;
75:15;76:16;77:24;
80:21,23;81:2,3,22;
82:14,18,18,21;84:8,
14;86:3,6,11,21,23;
90:25;96:19;102:13,
16,17;103:12,15,21,
25;104:12;105:20;
107:6,9,13;111:4,6;
114:14,16;115:3,8,
12,19;116:6,20;
118:20;121:9,21;
136:22;161:4,24;

163:21;165:20,20;
168:11,12,15;
169:12,15;174:5;
179:25;196:19;
198:3;207:25;209:2,
5
**computers (15)**
21:23,24;41:13;
81:6,9,11,14,18;
102:8,15;116:2,13;
122:7;137:8;138:3
**conceal (1)**
211:4
**concealed (2)**
210:21;211:22
**conceivable (1)**
115:23
**concerning (1)**
217:18
**conclusion (6)**
27:10;42:20;43:4;
74:4;96:15;136:21
**conduct (11)**
42:15;44:25;
160:8,19;176:7;
203:14;210:23,24;
211:8,9,10
**confer (1)**
127:18
**conference (3)**
17:2;41:20;42:3
**confidential (1)**
136:11
**confirm (1)**
125:6
**Confirmation (7)**
89:14;131:4;
134:4,8;217:10,23;
218:19
**confirmed (1)**
115:7
**confuse (1)**
154:15
**confused (1)**
157:6
**confusing (3)**
131:23;145:17;
149:10
**conjunction (2)**
15:11;34:4
**connected (3)**
86:22,25;196:18
**connection (2)**
131:19;218:19
**consecutively (2)**
120:22;121:5
**Consequently (1)**
110:20
**consider (8)**
77:15;111:5;
134:17;135:5,8,17;
137:19;155:18
**consideration (5)**

161:2,10,12,13,22
**considered (1)**
88:7
**considering (1)**
218:15
**consistent (1)**
109:9
**consolidated (2)**
184:14;185:16
**conspiracies (1)**
209:8
**conspiracy (22)**
38:3,18,21;39:6,
13;42:25;43:2;44:9,
12;169:18;170:15;
187:23;188:23;
189:18;190:15;
194:23;203:18;
211:5,22;214:8,14;
215:4
**conspired (1)**
199:7
**conspiring (1)**
202:11
**constitute (1)**
204:12
**constituted (1)**
136:11
**consultation (1)**
153:11
**consulted (1)**
131:14
**consumer (2)**
171:14;207:23
**consumers (3)**
162:11,17;171:15
**contact (5)**
21:9,14;22:10,22;
51:7
**contain (4)**
25:2;134:11,13;
152:20
**contained (16)**
39:22;78:16;81:9;
110:3;124:25;125:3,
7,13;132:2;143:20;
163:10;167:19;
185:8;186:2;194:11;
220:13
**containing (9)**
39:24;40:12;
54:19,24;58:11;
130:25;166:2,24,25
**contains (3)**
38:14;40:4;57:4
**contention (1)**
188:20
**contents (2)**
25:5;118:13
**context (1)**
46:22
**contingency (2)**
25:13;48:18

**continuation (2)**
119:16,20
**continue (7)**
20:15;43:22;
55:14,15;68:6;
81:17;137:12
**CONTINUED (1)**
113:9
**continues (1)**
211:19
**contract (1)**
22:3
**control (1)**
121:9
**conventional (1)**
90:19
**conversation (7)**
46:11;47:4,18,23;
48:24;49:4;53:8
**conversations (1)**
49:3
**copies (1)**
137:13
**Copy (2)**
65:4;184:10
**corner (1)**
120:5
**Corp (1)**
19:18
**corporate (7)**
15:4;19:8;21:6;
105:22;108:16;
123:2;179:3
**corporately (1)**
126:21
**Corporation (14)**
5:7,9,18;14:14;
19:4,25;20:17;21:8;
92:22;179:21;
193:23,24;194:9,17
**corresponded (1)**
51:23
**correspondence (1)**
50:25
**cost (22)**
76:6;79:24;80:11,
12;104:12;110:13;
123:8,9;161:4,15,19;
163:7;164:7,20,23;
170:18;173:3,7,21;
174:12,13;176:7
**costs (11)**
25:24;26:3,6,9;
27:13;110:12;
171:15;173:2;174:4;
177:25;212:2
**counsel (39)**
9:15;23:13,15,22;
27:10;35:19;36:20,
22;38:22;43:17;
49:16,18;50:8;51:8;
52:7;53:11;59:6;
93:17,20;94:21;

96:10,13;109:24;
127:8,11;133:7;
154:6;156:24;159:8;
187:6;188:24;189:7;
193:5;196:25;
211:17;212:7;213:3;
214:17;217:17
**Counsel's (2)**
25:6;127:8
**country (3)**
162:10,20;209:18
**couple (1)**
52:23
**coupon (8)**
97:19,22,23,24;
98:4,21;101:8;168:6
**coupons (2)**
97:10;167:12
**course (1)**
43:25
**courses (2)**
33:21;34:5
**Court (8)**
9:4,24;11:8,9,14;
89:17;183:10;
197:15
**COURTNEY (3)**
6:10;10:9;18:11
**C-O-U-R-T-N-E-Y (1)**
18:11
**cover (2)**
24:12;148:11
**CPU (1)**
217:19
**create (1)**
20:16
**created (1)**
185:15
**creation (1)**
209:20
**credit (8)**
96:22;97:2,2;
104:24;105:3;
109:13,18,21
**credit/debit (1)**
109:8
**crediting (1)**
104:25
**credits (2)**
34:19,19
**criminal (1)**
170:7
**criminally (1)**
170:10
**cross-reference (1)**
20:25
**CRT (112)**
18:21;19:5;21:20;
22:10;37:7;38:12,
14;39:19,22;40:12;
41:14;42:12,25;44:9,
10,12,19,21,24;
47:16,19;54:7,15,19,

24;56:20;57:4,5,13;
58:6,11;64:13;78:17,
21;79:8,23;82:7;
87:6;90:3,19,22;
93:20;95:9;110:3,
12;120:23;121:5,13;
123:16;124:25;
125:4,5,7,12,16;
126:8;134:10;135:3;
155:18;160:18;
163:6,18;166:8;
167:4,10,12;168:8,9;
169:19;178:16,24;
179:19;180:21;
184:25;193:13;
194:7;196:4,17,23;
197:9,12,19,23,24;
198:9,18;200:24;
201:19;204:22;
205:3,10,23;206:7,
17,22;207:5,6,15,20,
22,25;208:3,13,18;
211:23;217:20,23,
24;218:3,8,14,16
**CRTs (18)**
37:7;38:3;39:24;
48:7;67:25;126:7;
130:25;162:22;
163:6;166:2,24,25;
189:18,22;194:17;
199:8;206:11;
218:10
**current (3)**
19:22;31:22;
182:17
**currently (2)**
13:12,14
**custody (1)**
121:8
**customer (2)**
83:20;167:11
**customers (10)**
97:11;101:21;
166:4,11;167:4;
173:4,8,21;175:17,
24
**customize (2)**
82:18,21
**customized (1)**
107:19

**D**

**damage (3)**
160:17;163:5;
181:18
**damaged (2)**
160:7;209:12
**damages (22)**
60:23;63:8;82:11;
90:3;162:6,24,25;
163:3,10,17,22;
164:10;165:2;

Case 4:07-cv-05944-JST Document 6232-4 Filed 07/29/23 Page 521 of 866
IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION
STATE OF CALIFORNIA v. SAMSUNG SDI, INC., CO., LTD.

ALVIN GUTTMAN
October 11, 2012

209:22

**damaging (1)**
162:10

**Dana (1)**
9:19

**date (21)**
9:6;15:25;32:14;
41:10;64:22;89:15;
91:12;118:14;
119:12;130:12;
139:25;140:20;
152:11;153:22;
155:25;181:24;
215:24;216:3,6,9,12

**dated (2)**
140:19;142:12

**daughter (2)**
57:3;116:17

**David (1)**
184:4

**day (6)**
48:17;97:11;
113:21;140:25;
141:6;217:4

**days (5)**
53:6,7;109:2;
141:24;156:20

**day-to-day (1)**
19:25

**DC (30)**
5:20;6:9,13;9:9;
13:15,17;16:22;19:9,
14;31:24;60:10;
62:14,21,22;65:18;
66:2,17,22;113:20;
115:4,20;116:11,15;
117:5,9,23,24;118:6,
10;199:25

**deal (1)**
83:20

**dealer (1)**
84:2

**dealing (2)**
44:18;184:25

**dealings (1)**
21:19

**December (1)**
185:6

**decide (2)**
48:2,15

**decided (1)**
47:24

**decision (5)**
175:10;179:3;
188:3,6,10

**decisions (2)**
179:22;188:11

**decrease (1)**
179:7

**decreased (1)**
207:16

**decreasing (1)**
208:6

**defendant (15)**
35:7,10;36:6,9;
67:21;68:3;126:10;
136:14;140:22;
142:11;154:12;
156:14;158:8;189:5;
194:4

**Defendants (36)**
5:6,16;9:20;10:8,
18,19;59:4;153:25;
154:8;170:7,14;
180:9;188:4,7,21;
189:16,21;190:6,8;
196:5,24;197:12;
199:7;200:16,24;
201:19,20;210:20;
211:4,21;213:12,15,
24;214:6;216:15,21

**defendant's (1)**
141:18

**defendants' (4)**
132:14;151:3;
160:19;176:7

**define (3)**
111:17;145:3;
177:17

**definition (1)**
178:4

**degree (1)**
34:4

**degrees (3)**
33:3,16,18

**Dell (89)**
21:16,22,23,25;
22:4,7,9,19,20;40:2;
56:3;59:17;61:20;
62:23;63:22,23;64:4,
19;65:17;66:20;
67:2,14,16,21,24;
68:9;69:16;70:2;
72:8;73:14,19;79:4,
5,9,15;80:22,23;
81:2,3,6,23;82:9;
83:21,23;84:5,10,17;
86:2,9,14,21;87:11;
90:6,9;98:6,17;
101:11,18;102:12,
13;108:20;111:12;
113:14;116:2;
117:22;121:20;
122:14;125:18,21;
126:6;133:19;137:8;
138:3;163:8;168:5;
172:10;174:3;175:7,
10,22;179:25;
190:17;196:18,19,
20;198:25;204:22;
209:2,6

**Dellcom (12)**
62:24;63:6;65:22;
69:20;82:18;85:17,
21;86:5;89:24;91:6;
98:15;103:10

**Dell's (1)**
104:16

**departments (1)**
19:19

**depo (1)**
96:15

**deposed (4)**
31:8,11,15,19

**deposition (38)**
9:8,12;10:23;
11:13;14:4,17;15:5,
24;16:7,10,14,23;8,
19;26:17;28:14;
29:11,17;30:2,8,12,
15,18,21;31:17;
37:16;38:10;66:10;
145:11;146:12;
154:7;155:3,5;
163:14;167:20;
173:11;181:2,7;
184:16

**derives (1)**
42:12

**describe (4)**
20:11;37:24;
138:22;160:5

**described (4)**
40:15;58:8;
162:15;209:8

**describing (1)**
211:25

**designated (1)**
15:4

**desktop (7)**
59:20;61:23;
63:22,23;64:4;
81:23;82:2

**despite (1)**
153:23

**detail (2)**
114:8;160:5

**details (3)**
94:11;107:17;
114:5

**determine (6)**
103:24;111:19;
133:2;161:19;164:4;
201:18

**determined (1)**
176:14

**device (1)**
54:12

**dictionary (1)**
111:18

**difference (4)**
165:19;170:25;
171:16;172:10

**different (12)**
11:2;14:24;26:19;
36:21;83:7,19;
117:20;165:14;
174:14;176:22,22;
212:20

**diligence (2)**
213:23;214:5

**Dimension (4)**
90:13;97:17;
117:22;217:5

**Dimensional (1)**
94:15

**DIR (11)**
24:5,14;27:21;
46:13;47:6;132:16;
133:4;139:17,20;
183:2;186:7

**direct (2)**
21:19;50:9

**directly (11)**
18:3;51:3,25;
62:23;69:20;84:9;
116:18;122:24;
183:19;197:25;
206:5

**discard (2)**
144:2,5

**disclose (2)**
25:12;133:6

**disclosure (1)**
46:16

**discount (33)**
76:4,14;77:2,6,9;
85:23;97:3,14,17,17;
98:14;99:2,13,15;
100:3,4,13,14,15,22;
101:4,7,8,20,23;
102:21;103:5,7,19,
20;104:5,9,10

**discounted (4)**
76:7,10;96:19;
161:24

**discounts (7)**
75:23,25;85:12,14,
20;97:7,10

**discover (6)**
213:23;214:4,4,7,
13;215:4

**discovery (2)**
120:17;121:16

**discuss (3)**
28:9;96:16;159:17

**discussed (4)**
47:4;154:6;155:4;
159:22

**Discussion (7)**
45:7,25;58:16;
65:12;147:24;150:5;
215:19

**discussions (6)**
45:11,14,19;
187:5;194:8;200:15

**Display (1)**
5:8

**distinguish (1)**
164:6

**distributing (1)**
200:24

**distribution (1)**
172:11

**distributor (2)**
37:7,11

**District (18)**
32:9,12;33:22;
60:21;180:15,18;
182:17,22;184:2;
188:2;200:17,25;
201:14,19;202:19;
203:5;204:11,16

**divisions (1)**
19:20

**divorce (1)**
164:19

**doctorate (1)**
33:17

**doctrine (1)**
136:8

**document (67)**
16:4;64:23;65:3;
92:10;93:11;95:6,
24;97:15;100:7,21;
104:8,21,23;105:2;
111:8;118:15;119:4,
13;123:4;130:15,21;
132:2,4,12,14;138:9,
22;140:15,24;141:5,
5;142:24;143:5,6,7,
12,14,21,24,24;
144:2,12;145:2;
146:24;147:14;
148:3,12,19;149:2;
150:25;151:7,11;
152:18,20;157:16,
18,21;158:6,11,17,
20;182:2,6,15;
184:12,15;185:22

**documentation (4)**
61:2;63:12,14;
64:20

**documents (54)**
23:3,7,10;27:19;
28:2,3,7,12;29:9;
31:7;53:10,13;
120:18,20,25;121:7,
12,16,19;129:24,24;
130:4,10,19,23;
131:6,24;132:7,25;
133:3,16;134:2;
135:22;136:6,10,13,
17;139:7,13,18;
141:9;142:3;143:18,
19;144:16;145:24;
146:3,8,19;150:18,
19;157:2;180:25;
192:17

**dollars (1)**
176:9

**done (4)**
45:2;86:17;
141:23;155:8

**down (4)**

85:7;104:13;
106:7;219:12
**draft (2)**
145:4,5
**drafting (1)**
183:17
**drams (1)**
165:20
**drawer (2)**
122:5;133:22
**drives (1)**
106:19
**duly (2)**
10:12;113:6
**Duquesne (1)**
33:13
**during (23)**
10:23;40:18;
54:20,25;56:20;57:6,
19;58:6;59:11;60:5;
115:18;155:17;
168:15;196:3;
211:24;212:10,18;
213:5,9,15;214:18;
215:4;220:7
**duty (3)**
177:10,10,11

**E**

**E773 (1)**
90:18
**earlier (22)**
12:19;45:10;
65:23;70:25;76:25;
81:4;104:3;115:24;
116:17,20;129:16;
134:5,23;151:12;
152:25;159:9;168:5;
180:4;189:17;
208:12;216:21;
217:4
**earn (2)**
33:3,16
**earned (1)**
33:17
**East (1)**
9:5
**Ebay (3)**
22:13,15;205:21
**economic (1)**
162:19
**economical (1)**
79:10
**economy (1)**
209:21
**education (1)**
33:10
**Either (1)**
148:20
**Electric (1)**
5:10
**electronic (8)**

54:12,19,23;
58:10;88:25;130:24;
166:2,23
**Electronics (6)**
5:17,17;6:6,7;
17:7;88:6
**elements (1)**
76:6
**eliminated (2)**
75:9;201:13
**else (29)**
19:5;28:21,24;
29:6;30:11;43:24;
52:16,18;53:24;
54:5;57:15,16;67:5;
69:11;83:24;85:18;
91:6;92:7;127:20;
131:3;150:21;157:8;
162:8;163:8;172:11;
190:10;193:25;
216:16;218:2
**elsewhere (1)**
171:12
**e-mail (25)**
51:24;89:14,23;
90:2,8,24;91:9,12,
15,17,20;92:3,8;
93:23;95:18;96:18;
101:18;109:3;115:6;
131:4;134:4;140:18;
144:21;148:20,22
**e-mailed (2)**
140:11;156:23
**e-mails (4)**
51:4;92:2;98:18;
139:18
**employed (6)**
13:14,20;18:2,3;
52:4,9
**employees (3)**
18:7;30:15;77:23
**employment (1)**
209:19
**end (4)**
110:13;155:19;
163:7;178:19
**enforcing (1)**
162:20
**enough (2)**
71:17;206:15
**enter (1)**
98:10
**entire (3)**
18:18;50:8;209:21
**entirety (1)**
184:22
**entities (7)**
21:10,14;197:18,
22;198:2,22;203:5
**entitled (2)**
175:7;177:13;
178:5
**entity (1)**

13:19
**environment (1)**
88:8
**ESQ (3)**
5:13,21;6:10
**essentially (3)**
75:2;93:23;157:7
**establishing (2)**
188:25;189:4
**estimate (2)**
95:11;181:9
**even (4)**
95:25;101:5;
134:13;135:18
**everyone (1)**
176:15
**evidence (3)**
188:25;189:4,10
**exactly (7)**
48:15;64:21;
108:9;111:19;
118:25;158:16;
159:21
**exam (4)**
34:6,12,16,18
**EXAMINATION (3)**
10:14;113:8;
216:18
**examined (2)**
10:13;113:7
**Excel (2)**
18:24;137:13
**except (3)**
19:5;66:18;104:25
**exception (1)**
11:17
**exclusive (1)**
22:6
**excuse (1)**
16:12
**executive (3)**
20:2,9;68:18
**exemplary (1)**
20:15
**exercise (2)**
213:23;214:5
**exhibit (77)**
15:22,24;16:3;
89:13,14,18;90:22;
91:13;113:24;
118:13;119:11,20;
121:2;123:4;130:8,
14;131:7;134:3,9;
135:2,5;139:24;
140:2;141:5;143:13,
25;145:10,10;
146:25;147:15;
150:10,24;151:12,
18,21;152:9,10,12,
13,13,15,20,21,25;
153:13,15,20;154:9;
155:23,24;156:8;
157:4,5,9,10,17;

158:5,18,21,24;
159:24;181:21;
184:9;188:19;
215:22,25;216:4,7,
10;217:6,9;219:4,7,
7,8,9,14,19
**Exhibits (19)**
120:21;142:13,18;
152:4,9;153:20;
154:2,17,23;159:9;
215:22,25;216:4,7,
10;220:7,9,13,14
**existence (1)**
214:8
**expect (3)**
176:12;178:17,25
**expensive (3)**
73:4,7,10
**experience (2)**
108:22;193:2
**expert (25)**
95:15;99:11;
105:11;110:8,9;
160:24;161:6,17;
162:3;163:4;164:2,
14;165:5;170:20;
171:4,6,21;172:23;
173:15;174:9;175:6;
176:19;178:9,22;
179:11
**expertise (6)**
43:11;143:4;
172:16,24;201:25;
214:11
**experts (1)**
31:2
**expired (1)**
101:12
**expires (1)**
97:18
**explain (2)**
25:14;79:8
**Express (3)**
63:16,18;135:24
**extended (1)**
88:9
**extent (18)**
26:3,8;35:22,25;
46:11,17,18;47:9;
132:18;133:8;
145:16;154:12,15;
155:3,5;160:6;183:4,
6
**external (2)**
106:18;212:2
**extra (3)**
79:20;102:20;
176:25
**extraordinary (1)**
114:21
**Eye (1)**
6:8

**F**

**f/k/a (1)**
5:9
**face (1)**
90:8
**fact (13)**
76:12;78:16;93:7;
150:20;161:3,13,22;
163:5,17;164:5;
190:6;201:21;
210:12
**facts (2)**
193:20;195:19
**factual (5)**
171:9,12;185:21;
192:20,24
**fair (7)**
79:22;88:24;
94:25,25;104:4;
194:10;206:11
**Faith (2)**
185:12;195:8
**fall (2)**
66:5,16
**false (3)**
211:23;213:13,14
**falsely (1)**
211:25
**familiar (4)**
26:21;204:18;
207:20;218:9
**fast (2)**
34:10;71:2
**features (6)**
69:8,13,16;71:8,
14;72:13
**February (1)**
32:16
**Federal (1)**
14:6
**fee (3)**
25:13;74:21;
214:25
**feel (7)**
16:17;124:7;
162:12;170:11;
190:12;195:9;
201:20
**fees (4)**
24:13,24;26:6;
27:12
**fell (3)**
178:16,24;179:19
**felt (1)**
48:12
**few (5)**
55:19;141:23;
156:20;197:20;
216:21
**fewer (1)**
208:10

**Fifth (1)**
  5:11
**figure (1)**
  186:19
**file (6)**
  61:10,11,12,13;
  122:5;157:11
**filed (2)**
  53:16;185:6
**filing (1)**
  176:5
**fill (2)**
  20:15;102:3
**filled (1)**
  101:24
**final (1)**
  151:14
**find (7)**
  61:14;85:14,20;
  110:6;143:8;146:17;
  205:21
**finding (1)**
  131:23
**fine (4)**
  10:4;127:22;
  149:25;199:4
**finish (4)**
  12:6,13;131:20;
  200:9
**finished (25)**
  18:21;19:6;38:12,
  13,20;39:5,12,22;
  40:12;41:15;42:16,
  25;44:13,21,24;
  47:19;56:20;57:5;
  58:6;121:13;155:19;
  189:19;200:10;
  201:11;203:12
**firm (11)**
  15:14,18;46:7,8;
  49:15;50:7;51:12;
  52:15,17,19;216:24
**firms (3)**
  15:12;52:5,10
**first (36)**
  10:12;17:18;49:8,
  22;52:21;53:4,8;
  59:15;63:21;92:15;
  97:16;103:19;109:7;
  130:9,20;140:22;
  141:18;142:7,11;
  144:17;147:2;148:7,
  9;150:11;151:3;
  153:8;156:15;
  157:20;158:9;
  179:23;219:8,21,22;
  220:3,8,14
**five (5)**
  87:3;97:11;
  117:17;127:25;
  181:9
**fix (5)**
  189:18;199:7,11,

13,16
**fixing (6)**
  162:23;170:2,5;
  172:8;187:23;
  211:12
**flat (2)**
  218:11,14
**Florida (14)**
  13:13,16;62:15;
  63:4;65:24;66:20;
  115:12,20;116:4,10,
  14,18;117:9,13
**follow (1)**
  24:9
**follows (2)**
  10:13;113:7
**foreign (2)**
  162:16;209:16
**form (185)**
  27:6,14;28:17;
  29:12;31:13;35:3;
  36:10;41:24;42:18;
  43:3,16;44:23;
  45:15;46:14,24;
  47:7;49:19;50:16;
  52:12;55:3;56:4,13,
  21;68:5;69:5;70:5,
  13;71:4,10;72:15;
  73:21;74:2;75:4,17;
  76:17;78:4;79:25;
  80:16;81:19,24;
  84:25;92:25;95:15;
  97:4;98:24;99:4,9;
  100:6,17,24;101:24;
  102:3,23;103:8,16,
  22;104:6,20;105:10;
  108:13;110:7;111:7,
  13;113:18;114:11;
  115:13;117:10,15;
  118:7;125:23;126:3,
  13;127:2;131:8;
  132:9;134:15;
  136:20;137:5,11,16,
  22;138:5,24;139:10;
  140:6,16;143:2;
  146:4,11,21;160:23;
  161:5,25;163:12,23;
  164:11;165:3;166:5,
  12,17,20;167:6,22;
  168:22;170:19;
  171:18;172:12;
  173:22;174:6;
  175:13,18,25;
  176:17;177:2,15,22;
  178:7,19;179:8;
  187:21;188:8;
  189:11,24;190:20;
  191:7,18,22;192:4,
  21;193:3,10,21;
  194:14,25;195:6,14,
  22;196:7,14;198:4,
  11,23;199:14;
  200:13,19;201:4,15,

23;202:4,9,13;203:9,
  16,25;204:7,13,19,
  25;205:6,25;206:8,
  13,19,24;207:8,13,
  18;208:7,16,20;
  209:10,15;210:4,8;
  211:2,15;212:5,11;
  213:6,19;214:9,15,
  20;215:5,10
**formal (4)**
  45:24;154:8;
  155:7;159:18
**forth (1)**
  21:8
**forward (1)**
  13:22
**FOSTER (3)**
  9:19,19;10:6
**found (2)**
  101:14,17
**foundation (49)**
  27:7;56:14;69:6;
  70:15;74:3;75:5;
  80:2,17;85:2;98:25;
  99:5,10;100:8,18;
  101:2;103:17,23;
  104:7,22;111:9,14;
  132:10;161:6,17;
  162:2;163:25;
  164:13;165:5;
  166:13,20;167:7,22;
  171:19;172:14,22;
  173:14;174:8;175:5,
  15,19;176:3;178:21;
  179:10;189:25;
  196:8,15;197:3;
  205:8,20
**founded (3)**
  17:12,14;20:4
**four (8)**
  55:5;59:11;64:15,
  17;87:2;96:2;109:7;
  116:20
**fourth (3)**
  96:4;185:16,20
**frame (3)**
  42:4,5,6
**frankly (1)**
  43:19
**fraudulently (1)**
  210:21
**free (16)**
  73:25;75:2,6;97:8,
  11;99:3;101:8;
  102:22;163:21;
  164:5,9,15,25;
  165:11,16,18
**fresh (1)**
  12:23
**Friday (1)**
  66:12
**friends (1)**
  92:2

**front (8)**
  95:6;151:18;
  153:3;181:2;217:14;
  219:16,18,20
**fulfilling (1)**
  181:3
**full (3)**
  13:2;142:7;182:9
**full-time (1)**
  66:18
**fully (1)**
  153:9
**function (3)**
  77:23;78:22;
  123:21
**functioned (1)**
  123:23
**funds (4)**
  35:9;36:6,9;37:10
**further (11)**
  113:7;155:6;
  159:18;160:16;
  204:5,12;209:7,13;
  216:14,17;220:24
**furtherance (1)**
  211:5
**future (1)**
  208:23

**G**

**gain (1)**
  177:24
**Gateway (1)**
  84:5
**gave (5)**
  72:8;73:25;96:22;
  101:24;213:13
**general (5)**
  25:9;136:18;
  140:18;186:24;
  187:3
**generally (6)**
  11:13;66:11;
  166:3;171:14;
  207:16;218:9
**gentleman (1)**
  45:9
**given (4)**
  53:10;88:10;
  109:24;157:12
**giving (3)**
  88:14;211:23;
  213:14
**Glassman (1)**
  15:19
**Gloria (1)**
  184:5
**GOLDSTEIN (3)**
  5:13;59:2,2
**Good (4)**
  9:2;48:4,10;
  123:17

**GOTSHAL (2)**
  5:5;59:3
**government (2)**
  48:4,10
**grab (1)**
  217:12
**graduate (2)**
  32:17;33:9
**graduated (1)**
  34:12
**Gralewski (329)**
  9:21,21;10:2,5;
  14:12;15:17;23:21;
  24:6,15;25:3;26:24;
  27:6,9,14,22;28:6,
  17,25;29:12;30:7;
  31:13,16;35:3,16,22;
  36:10,15,17,20;37:2,
  14;38:22;39:16;
  41:2,7,24;42:18;
  43:3,10,16;44:3,14,
  22;45:15,20;46:14,
  24;47:7;49:19,23;
  50:11,16,18,20;51:2,
  6;52:6,12;53:5,8;
  54:17;55:3,7,14,21;
  56:4,8,13,17,21;
  57:7,10,16,20;58:19,
  23;59:5;65:8;66:8,
  15;68:5;69:5;70:5,
  13,17;71:4,10;72:15;
  73:21;74:2;75:4,7,
  17;76:17;78:4;
  79:25;80:8,16;81:19,
  24;82:4,12;83:8;
  84:25;92:25;93:20;
  94:21;95:14;96:14;
  97:4;98:24;99:4,9;
  100:6,17,24;102:23;
  103:8,16,22;104:6,
  20;105:10;108:13;
  110:7;111:7,13;
  113:18;114:3,11;
  115:13;117:10,15;
  118:7;125:23;126:3,
  13,23;127:2,6,10;
  128:4,25;129:20;
  131:8,16;132:9,17;
  133:5;134:15;
  136:20,24;137:5,11,
  16,22;138:5,19,24;
  139:10,21;140:6,16;
  143:2;144:3,7,9;
  145:7,15;146:4,11,
  15,21;147:16,19,21;
  149:8,20,23;150:2;
  153:23;155:2;
  158:23;159:2,12,16,
  21;160:23;161:5,11,
  16,25;163:12,23;
  164:11;165:3;166:5,
  12,17,19;167:6,13,
  16;168:18,22;169:5,

Case 4:07-cv-05944-JST    Document 6232-4    Filed 07/29/23    Page 524 of 866
IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION
STATE OF CALIFORNIA v. SAMSUNG SDI, INC., CO., LTD.

ALVIN GUTTMAN
October 11, 2012

8;170:19,24;171:3,6,
18;172:4,12,20;
173:9,22;174:6,25;
175:13,18,25;
176:17;177:2,8,15,
22;178:2,7,18;179:2,
8,17,20;183:3;186:8,
20,25;187:9,20;
188:8;189:11,24;
190:20;191:7,18,22;
192:4,8,15,21;193:3,
10,21;194:2,6,14,18,
25;195:6,14,22,25;
196:7,14;197:2,14;
198:4,11,16,23;
199:14;200:6,13,19;
201:4,15,23;202:4,9,
13,21;203:9,16,23;
204:7,13,19,25;
205:5,8,13,18,25;
206:8,13,19,24;
207:8,13,18;208:7,
16,20;209:10,15,24;
210:3,8,16;211:2,6,
15;212:5,11,19;
213:6,19;214:9,15,
20;215:5,10,13;
216:19,23;220:22,25

**granted (2)**
183:11,15

**ground (2)**
139:22;186:10

**grounds (4)**
24:8,17;27:24;
136:7

**group (2)**
50:8;154:4

**guarantee (1)**
105:24

**guess (1)**
115:5

**guide (1)**
122:13

**guilty (2)**
170:7,10

**gun (1)**
170:16

**Guttman (241)**
9:1,13;10:1,21;
11:1;12:1;13:1,11;
14:1;15:1;16:1;17:1,
17;18:1;19:1;20:1;
21:1;22:1,24;23:1;
24:1;25:1;26:1;27:1;
28:1;29:1;30:1;31:1;
32:1;33:1;34:1;35:1;
36:1;37:1;38:1;39:1;
40:1;41:1;42:1;43:1;
44:1;45:1;46:1;47:1;
48:1;49:1;50:1;51:1;
52:1;53:1;54:1,18;
55:1;56:1,23;57:1;
58:1,5;59:1,9;60:1;

61:1;62:1;63:1;64:1;
65:1,16;66:1;67:1;
68:1;69:1;70:1;71:1;
72:1;73:1;74:1;75:1;
76:1;77:1;78:1;79:1;
80:1;81:1;82:1;83:1;
84:1;85:1;86:1;87:1;
88:1;89:1,17;90:1;
91:1;92:1,11,16,21;
93:1;94:1;95:1;96:1;
97:1;98:1;99:1;
100:1;101:1;102:1;
103:1;104:1;105:1;
106:1;107:1;108:1;
109:1;110:1;111:1,
21;112:1;113:1,10;
114:1;115:1;116:1;
117:1;118:1;119:1;
120:1;121:1;122:1;
123:1;124:1;125:1;
126:1;127:1;128:1;
129:1;130:1,13;
131:1;132:1;133:1;
134:1;135:1;136:1;
137:1;138:1;139:1;
140:1,2;141:1;
142:1;143:1;144:1,
11;145:1;146:1;
147:1;148:1;149:1;
150:1,14;151:1;
152:1;153:1;154:1;
155:1;156:1;157:1;
158:1;159:1,24;
160:1;161:1;162:1;
163:1;164:1;165:1;
166:1;167:1;168:1;
169:1;170:1;171:1;
172:1;173:1;174:1,
18;175:1;176:1;
177:1;178:1;179:1,
23;180:1;181:1,25;
182:1;183:1;184:1,9,
11;185:1;186:1;
187:1;188:1,19;
189:1;190:1;191:1;
192:1;193:1;194:1;
195:1;196:1;197:1;
198:1;199:1;200:1;
201:1;202:1;203:1;
204:1;205:1;206:1;
207:1;208:1;209:1;
210:1;211:1;212:1;
213:1;214:1;215:1;
216:1,13,22;217:1;
218:1;219:1;220:1

**G-U-T-T-M-A-N (1)**
17:17

**H**

**half (1)**
55:11

**hand (4)**

146:24;150:23;
157:16;158:4

**handed (2)**
89:18;143:23

**handle (1)**
71:17

**happened (7)**
61:4,16;63:13;
87:5,10,14;96:4

**happens (2)**
12:17,21

**happy (11)**
20:14;55:14,15;
80:11;96:14;123:24;
127:18;154:14;
155:6;159:17;
162:21

**hard (3)**
57:22;106:19;
164:4

**head (1)**
11:10

**heading (1)**
219:23

**headquarters (1)**
19:8

**hear (5)**
170:6;212:9,17;
213:5,14

**heard (1)**
177:20

**Hearing (1)**
216:20

**heavier (1)**
218:17

**held (12)**
20:3,6;35:6,10;
36:6,9;37:6,10;
65:12;140:24;
147:24;215:19

**help (4)**
145:4,5,20,22

**herein (2)**
213:24;214:6

**high (1)**
32:17

**higher (5)**
160:18,22;162:13;
163:18;172:8

**himself (3)**
57:8,21;58:2

**hired (2)**
214:17;215:7

**history (1)**
33:8

**Hold (5)**
25:3;83:8;127:6;
173:9;186:8

**holder (1)**
11:13

**holdings (2)**
35:23;36:2

**holds (1)**

87:23

**home (2)**
114:24;115:11

**honest (2)**
64:17;181:5

**honestly (1)**
115:9

**hopes (1)**
85:7

**hour (6)**
29:18,19,20;30:5,
20;55:11

**hours (1)**
181:10

**hypothetical (13)**
162:2;163:25;
164:12;165:4,11;
171:20;172:15,22;
173:14;174:9;175:5;
178:21;179:11

**I**

**icon (2)**
98:13;101:4

**ID (4)**
101:25;102:2,7,11

**idea (19)**
25:20,25;68:4;
74:8;84:9;95:10;
98:5;104:10,24;
105:12;106:9;120:9;
123:20;164:20;
166:8;167:9;169:10;
190:16;206:21

**identical (2)**
126:5,5

**identification (15)**
15:25;89:15;
118:14;119:12;
130:12;139:25;
152:10;153:22;
155:25;181:24;
215:24;216:2,5,9,12

**identified (1)**
217:23

**identify (11)**
9:16;150:25;
151:22;152:12;
158:6;181:25;
184:11;197:18,22;
211:11;212:3

**ignore (1)**
128:22

**Ignored (1)**
128:18

**immediately (1)**
115:7

**impact (1)**
190:7

**impede (2)**
13:5;171:14

**implications (3)**

209:19,23;210:5

**important (16)**
11:17;69:9;70:3,
22;71:7,8,13;72:14;
77:13,20;78:8,10,17,
20;110:16;177:9

**Inc (7)**
6:7;91:19;133:23;
156:15;182:18,20;
219:23

**inch (2)**
90:18,18

**inches (1)**
78:6

**include (10)**
20:18;21:9,14;
41:12;61:25;76:10;
94:16;188:3,6;
199:16

**included (28)**
56:15,16;59:22;
66:25;68:2;72:2,4;
74:11;79:16,17;
80:14,19;83:4,6;
91:2;94:19;96:7;
108:5,7;118:18;
121:10,23;123:9;
161:3,14;163:21;
169:12,15

**including (6)**
30:22;110:21;
117:4;118:19;176:4;
204:10

**inclusive (1)**
70:20

**income (1)**
20:16

**Incomplete (11)**
162:2;163:24;
164:12;171:20;
172:14,22;173:14;
174:8;175:5;178:21;
179:10

**Incorporated (6)**
13:21,23;14:20;
19:13;149:4,6

**increase (5)**
171:15;173:8;
175:11;178:17,25

**increased (1)**
164:17

**increases (4)**
170:2;173:3,21;
211:24

**Inc's (2)**
130:9;147:2

**independent (1)**
133:9

**independently (1)**
132:21

**indicate (4)**
92:17;95:18;
107:19;109:3

**indicated (1)**
217:22
**indicates (1)**
121:20
**Indicating (1)**
159:21
**indication (2)**
90:9;96:18
**indirect (15)**
49:10;130:11;
140:21;141:16;
142:9;148:8;149:3;
150:12;151:4;158:7;
160:16;181:21;
182:3;183:11;
184:13
**indirectly (4)**
183:20;197:9,11,
24
**individual (3)**
16:23;164:23;
169:6
**individuals (2)**
18:19;203:5
**inducements (3)**
166:10,16;167:3
**Industrial (1)**
5:10
**inflated (3)**
202:3,7,8
**information (15)**
11:22;12:19;
130:9;134:20;
136:12;142:20;
143:9;153:9;156:14;
157:19;158:9;159:6;
186:2;219:22;220:3
**informed (2)**
15:3,7
**initial (1)**
49:4
**initially (1)**
46:21
**initiated (2)**
47:18,22
**injured (2)**
203:20;204:9
**injuries (1)**
210:12
**injury (7)**
126:20;127:21;
162:13;204:5,12;
209:7,13
**inside (7)**
54:13;78:8,21;
117:23,24;118:21;
135:16
**instance (2)**
127:13;170:8
**instead (3)**
71:21;79:9;182:23
**instruct (11)**
11:19;24:6,15;

27:22;46:18;47:12;
83:11;127:20;
132:23;183:3;186:9
**instructed (1)**
139:21
**instructing (1)**
25:11
**instruction (3)**
24:10;41:8;133:5
**instructs (1)**
36:23
**Intel (1)**
90:14
**intend (1)**
14:23
**interested (1)**
105:19
**internal (1)**
104:11
**internet (3)**
17:4;60:14;84:4
**interrogatories (20)**
23:2,5;27:19;
53:22;140:23;
141:18;142:11;
147:2,5,9,12;148:7,
10;150:12,15;151:3,
24;156:15;157:20;
158:10
**interrogatory (14)**
149:7,19;151:21;
152:3,21,23,24;
153:6,14,15;154:19;
159:10;160:3;
161:21
**interrupt (1)**
55:9
**into (5)**
161:2,9,12,13,22
**invoicing (1)**
139:3
**involved (19)**
26:9;34:21,25;
49:13;52:5,10;
126:20;129:23;
130:4;147:8,11;
170:14;188:22;
190:14,18;200:24;
201:21;209:17;
214:24
**involvement (2)**
189:2,5
**involves (1)**
127:16
**Irmine (1)**
17:17
**I-R-M-I-N-E (1)**
17:18
**issue (5)**
124:15;200:21;
208:9;212:8;214:12
**issues (2)**
48:6;185:2

**item (3)**
106:22;107:16;
165:18
**items (7)**
76:8;94:18,20;
95:2;96:8;106:25;
165:21

**J**

**January (1)**
155:17
**Japanese (2)**
193:24;194:9
**Jeff (1)**
184:5
**job (3)**
20:13;127:10;
209:20
**join (3)**
47:24;48:2,15
**JT (2)**
6:14;9:3
**judge (1)**
11:15
**juris (1)**
33:17
**jury (1)**
177:10

**K**

**Kamo (1)**
184:5
**keep (3)**
55:18;122:20;
134:20
**kept (1)**
139:15
**KEVIN (4)**
5:13;58:22,24;
59:2
**keyboard (7)**
67:4,7;70:12;
71:19;105:21;164:8;
165:19
**kind (17)**
16:24;20:20;
21:21;26:8;57:20;
76:14;80:21;82:6;
97:22;120:5;130:23;
137:4,14,20;146:18;
163:5;177:11
**Kirby (2)**
9:22;216:24
**knew (2)**
133:10;217:18
**knowledge (25)**
26:11;42:23;
67:17;103:13;126:6;
133:12;142:19;
143:9;146:7;159:5;
168:4;187:3;191:25;

192:6,9,12,20,24;
193:8,12,19;194:9,
22;195:17,18
**knowledgeable (1)**
206:15
**Koninklijke (1)**
5:16

**L**

**Label (11)**
118:13,22;119:7,
11,17;134:10,24;
135:3,11,12;218:6
**labeled (1)**
120:22
**labelled (1)**
121:4
**lacked (1)**
202:6
**lacks (47)**
27:7;56:14;69:6;
70:14;74:2;75:5;
80:2,17;85:2;98:25;
99:5,10;100:8,18,25;
103:17,23;104:7,22;
111:9,14;132:10;
161:6,16;162:2;
163:25;164:13;
165:5;166:13,20;
167:7;171:19;
172:14,21;173:13;
174:8;175:5,14,19;
176:2;178:21;
179:10;189:25;
196:8,15;197:3;
205:8
**laptop (3)**
57:4;58:7;81:23
**large (2)**
68:12;71:17
**Last (13)**
29:24,25;55:23;
63:16;142:5;163:9;
180:3;190:21;191:8;
206:22;208:25;
209:4;215:14
**later (3)**
11:14;12:18;
202:23
**Latitude (3)**
59:19;63:22,23
**law (19)**
15:12,13;33:13;
34:4,8;46:7,8;49:15;
50:7;51:12;52:5,10,
15,17,19;162:10;
179:22;203:6;
216:24
**laws (4)**
162:18,20;213:24;
214:6
**lawsuit (11)**

10:19;42:12;
44:20;47:24;48:3;
125:22;128:3,10;
180:12;181:18;
187:24
**Lawsuites@AT&Tnet (1)**
91:16
**lawyer (3)**
30:12;47:11;
150:19
**lawyers (12)**
25:8,10;41:5;
131:19;132:19,22;
133:7;139:17;
153:11;183:5;190:5,
11
**Lawyer's (100)**
13:21,23,24;14:5,
18,19;15:4;16:7,19;
17:12,20,23,24;18:8;
19:10,16,23;20:4;
21:13;30:14;31:8,
22;32:2,8,11;35:20;
36:5,24;37:5,9;
39:11,12,18,21,25;
40:11,16;41:14;
44:5;46:2,8;48:13;
54:20,24;59:10;
61:7;65:19;68:7,19,
20;81:17;87:22;
91:18,25;92:4,23;
93:5,9;94:3;101:22;
114:16,18;116:21,
25;121:8,20;122:8,9,
10,25;123:14;127:5;
128:4;129:2,10,13;
130:4;133:13,22;
136:22;137:15,19;
138:8;139:12,17;
149:5,13,17;152:20;
163:16;168:19;
173:2,20;182:19;
191:12;200:2;
208:19;209:14;
214:11;219:23
**LC (1)**
87:11
**LCD (17)**
57:14;58:7;78:24;
79:2,5,9,20,23;
80:12;86:19,22,24;
87:2,3,6,12;208:13
**lead (1)**
50:8
**Leading (4)**
218:4;219:10;
220:4,16
**leads (1)**
218:2
**Leap (1)**
60:17
**L-E-A-P (1)**
60:18

**learned (3)**
98:20;194:12;
195:19
**lease (6)**
17:7;174:12,13,14,
17;175:8
**leases (2)**
174:11,11
**least (5)**
73:10;117:2,3,4;
196:16
**leave (4)**
66:12;82:20;
181:23;182:4
**legal (35)**
11:19,24;17:3;
27:9;42:20;43:4;
46:23;47:5,11;74:3;
99:11;136:21;
145:17;171:6;
176:18;177:4;178:9,
12;187:5,8,12,16;
188:24;189:7;
199:15;201:5,17;
202:5,24;203:25;
204:8,14;209:11;
212:7;214:10
**legitimate (3)**
187:15;190:12;
195:10
**length (1)**
139:14
**less (8)**
69:2;73:6;104:18;
124:12;161:23;
170:21,22;204:4
**letters (1)**
51:4
**level (1)**
70:2
**levels (1)**
201:3
**LG (1)**
198:25
**liability (1)**
190:8
**likely (6)**
71:18;115:15;
158:2;172:7;207:12;
208:18
**Lime (1)**
60:17
**L-I-M-E (1)**
60:17
**limited (1)**
110:21
**limited's (1)**
140:22
**line (5)**
55:8,10;199:6;
216:16,21
**list (8)**
22:12;54:18,23;

57:25;74:12;94:22,
23;184:3
**listed (22)**
16:17;37:15;
74:14,18;75:20;
95:3;104:15;106:11,
16,22;135:18;153:9;
188:4,7,20;189:5,21;
190:14;191:21;
192:2,7,11
**listen (1)**
24:11
**lists (2)**
94:11;153:15
**Litigation (14)**
9:10;25:24;28:13;
48:16;53:14;65:6;
109:22;129:25;
130:5;139:19;
149:15;180:21;
191:2;213:25
**little (6)**
35:24;46:10;
55:15,16;131:23;
219:12
**live (2)**
13:12;65:23
**LLP (3)**
5:5,15;6:5
**loans (1)**
21:8
**located (2)**
9:4;60:20
**locations (1)**
19:10
**long (5)**
30:4;32:2;48:24;
86:24;126:25
**longer (2)**
55:15,16
**look (29)**
16:2;64:23;84:15;
85:5,12,16,18;93:10;
107:16;113:24;
115:6;130:13;141:9;
142:5;143:19;146:8,
18;148:25;151:20;
153:8,13;157:2,8;
190:23;197:4;
199:22;202:16;
211:20;220:8
**looked (7)**
16:9;68:10;
146:16;151:12;
152:24;217:4,9
**looking (9)**
71:2,14;77:25;
106:13;114:2;142:7;
150:10;188:19;
212:22
**looks (7)**
68:9;90:24;96:22;
103:5,10;130:18;

143:17
**Lorraine (2)**
18:12,17
**L-O-R-R-A-I-N-E (1)**
18:12
**Los (1)**
9:5
**lose (1)**
137:25
**lot (3)**
43:18;124:14,16
**lots (1)**
84:4
**loud (1)**
193:17
**low (1)**
105:23
**lower (1)**
163:7
**Ltd (3)**
5:8,10;6:6
**luncheon (1)**
112:2

---

## M

**ma'am (1)**
180:6
**madam (1)**
197:15
**mail (3)**
109:15,16,17
**maintain (4)**
28:11;130:23;
174:15;199:7
**maintained (3)**
122:2,4;139:14
**maintaining (1)**
162:20
**makes (1)**
187:17
**making (2)**
80:25;102:11
**MALAISE (3)**
5:21;10:7,7
**management (10)**
16:21;149:4,6,14,
18;182:18,23;191:5,
13,16
**manager (1)**
18:18
**manages (1)**
18:18
**MANGES (2)**
5:5;59:3
**manner (3)**
160:6;181:5;211:4
**manual (1)**
122:13
**manuals (1)**
122:20
**manufacture (3)**
21:10,15;197:19

**manufactured (4)**
86:8;125:12;
126:9;194:7
**manufacturer (14)**
21:20;37:6,11;
78:7,13;125:15;
126:7;166:9;177:12;
178:5,17,25;179:7;
189:22
**manufacturers (11)**
38:3;42:16,17;
44:9,13;45:3;
125:18;177:14;
178:6;190:7;198:7
**manufacturer's (2)**
68:23;69:3
**manufacturers' (1)**
48:6
**manufacturing (1)**
86:10
**many (12)**
17:22;18:7;19:10;
50:22;51:15,20;
81:13;116:24;
128:12,13;180:20;
199:17
**March (19)**
15:6;23:12,18;
45:12;48:21;52:25;
54:20,25;91:13;
97:18;114:6;169:3;
180:2,2,5;181:11;
212:14;214:22,22
**mark (10)**
15:21,22;89:12;
118:12;119:10;
130:7;152:8;153:19;
155:22;181:20
**marked (34)**
15:25;16:3;89:15;
118:14;119:11;
120:21;121:2;
130:11,14;139:25;
143:13,25;146:25;
147:15,17;150:10,
24;152:10;153:21;
154:3,11;155:25;
157:17;158:5;
159:11;181:23;
198:13;202:22;
203:24;215:23;
216:2,5,8,11
**market (1)**
201:8
**marketing (3)**
20:18;85:9;175:21
**match (3)**
105:24;114:10;
154:16
**materials (1)**
85:9
**Matsushita (1)**
5:10

**matter (4)**
9:9;25:24;127:14,
21
**matters (3)**
28:9;50:2,5
**may (31)**
9:25;11:25;35:23;
40:20;46:16;60:13,
17;81:10;82:15;
86:19,20;93:20;
96:6;97:20;101:3,
12;110:22;116:17;
140:24;141:4,14;
145:22;157:5;
161:23;165:11;
179:4;184:25;190:6,
7;206:4;212:19
**maybe (3)**
35:17;87:4;205:16
**McInerney (1)**
216:24
**McInerny (1)**
9:22
**mean (34)**
14:18,23;26:15;
37:15;40:3;43:9;
46:2;55:12;66:7;
74:25;75:20;88:4;
91:23;93:8;98:12;
105:3;108:24;111:2,
3;148:22;164:16;
170:13;177:20;
180:14;189:9;193:7;
199:11,13;201:3;
202:3,19;203:2,20;
213:4
**meaning (2)**
44:5;177:18
**means (8)**
25:14;26:13;
38:11;128:4;168:19;
180:15;181:15;
203:4
**measure (1)**
68:14
**medicinal (1)**
207:21
**meet (5)**
29:21,23;30:11;
108:15;127:17
**meetings (1)**
30:6
**member (3)**
128:10;180:16;
183:22
**members (2)**
180:17;214:3
**memory (3)**
83:3;102:20;
165:21
**mentioned (9)**
45:10;63:22;64:4,
7,14;65:23;116:17,

19,25
met (4)
  45:23;49:23;
  51:16;105:21
method (1)
  109:4
Michael (4)
  15:10,13;45:9,10
middle (1)
  12:13
might (16)
  11:11;58:23;63:3;
  76:15;78:6;81:7;
  86:17;88:10;93:7;
  100:15;116:3,14;
  119:6;143:19;146:9;
  174:3
mind (11)
  10:2;12:24;55:17,
  19;76:20;83:17;
  100:10;149:23;
  165:17;179:14;
  196:10
minded (1)
  111:20
mine (1)
  179:4
minutes (2)
  55:19;117:17
miscellaneous (1)
  61:9
Mischaracterizes (1)
  111:8
Misleading (1)
  196:2
missed (1)
  144:10
misspoke (2)
  106:14;205:19
Misstates (16)
  42:19;46:25;
  50:17;70:14;76:18;
  80:18;103:17,23;
  104:21,21;111:8;
  114:12;143:3;165:4;
  189:12;217:7
mistaken (1)
  115:24
Misti (1)
  184:4
MKD (3)
  198:10;202:20;
  203:22
model (2)
  67:18;73:16
models (2)
  73:17;218:20
modem (5)
  107:17,17,22,23,
  25
Monday (2)
  66:11,12
money (6)

75:10;176:10,16,
  25;177:24;204:4
monitor (108)
  38:14;40:4;56:11,
  15;59:22;61:25;
  67:3,7,10,13,14,16,
  19;68:8,11,22;70:3,
  23;71:16,19,21;72:3,
  5,7,13,18,19,21,25;
  73:10,12,25;74:7,10,
  12,16,17,25;75:10;
  76:11,16;77:9,12,20;
  78:8,12,14;79:20,23,
  24;80:12;82:3,11,14;
  83:5,6,7,19;86:13,
  14;87:6,11,23;88:14;
  90:3,9,25;92:12;
  95:9;99:3;102:22;
  105:5,8,20;107:9;
  111:5,16;120:14;
  121:10,24;123:16;
  124:8,19,24;125:3,6;
  126:9;161:3,14,23;
  163:20;164:9,19,24;
  165:11,13,23,24;
  169:12,15;196:20;
  199:3;208:13,19;
  217:19;218:11,14,18
monitoring (1)
  181:13
monitors (21)
  41:13;54:13;
  71:22;73:3,6;74:19,
  22;77:16;88:6;
  90:15;105:14;
  110:21;125:19;
  146:17;198:3,19;
  204:23;205:4;
  207:25,25;208:14
month (3)
  66:14;104:3;
  138:13
monthly (2)
  138:12;139:3
months (1)
  87:3
more (30)
  40:17;46:10;
  55:19;70:22;73:3;
  75:10;76:6;79:10;
  80:12;95:13;104:12;
  105:6,9,19;127:14;
  131:22;139:5;156:2;
  158:2;169:20,25;
  177:24;179:13;
  196:5,23;197:21;
  199:2;203:6;204:3;
  207:12
morning (3)
  9:2;102:9;126:5
most (3)
  61:12;71:7,8
mostly (3)

91:24;138:12;
  194:12
motion (8)
  154:5;181:22,22;
  182:4,4;183:11,18,
  24
motivated (2)
  48:8,9
mouse (9)
  40:4;67:3,7;70:12;
  71:19;105:21;164:6;
  165:12,19
move (1)
  186:23
moving (1)
  201:10
MT (1)
  5:8
much (24)
  10:5;29:16;75:13;
  77:5,8;86:9;95:8,21;
  97:14;105:13;
  106:21;110:2,12;
  120:13;123:13;
  125:15;160:22;
  165:12;169:11,14;
  170:22;181:7;
  216:14;219:16
multitude (3)
  71:17;117:19;
  209:18
Murke (3)
  51:11,16;52:22
M-U-R-K-E (1)
  51:11
Murphy (17)
  15:11,13;23:16;
  45:10,19;46:5,12,22;
  47:15;48:25;49:4,10,
  13;50:4,15;51:7;
  52:16
Murphy's (2)
  52:15,19
must (2)
  11:16;12:3
mute (1)
  58:23
mutual (4)
  35:9;36:5,8;37:9
MYERS (2)
  6:5;10:10
myself (2)
  30:7;115:19

## N

NAIFEH (77)
  9:17,17;10:15,16;
  14:16;15:21;24:2,
  22;27:25;36:4;37:4;
  55:13,18,22,25;57:9,
  18;58:13,22,24;59:7,
  8;65:15;76:20;80:5;

83:17;89:5,12,16;
  90:21;93:22;96:17;
  100:10;113:9;
  118:12;119:10;
  127:22;130:7;
  131:11;144:6,8;
  145:12;147:18,20;
  149:21,25;150:8;
  152:8;153:19;
  154:22;155:9,16,22;
  156:4;158:25;159:8,
  14,20,23;169:7;
  173:16;179:14;
  181:20;188:12,18;
  196:10;210:17;
  212:23;213:2;
  216:13;217:7;218:4;
  219:10;220:4,16,20,
  24
name (24)
  9:3;10:16;13:9,19;
  15:18;17:16,18;
  50:7;53:20,21,25;
  59:18;61:21;67:14;
  92:11;93:3,4;108:18,
  19,20;157:10;
  191:10;199:2;
  216:23
named (3)
  45:5,5;190:25
names (3)
  18:10;185:18;
  191:3
narrative (2)
  46:15;47:8
nature (2)
  16:19;127:16
necessarily (5)
  55:9;70:24;
  164:16;170:15;
  177:6
necessary (1)
  94:24
need (4)
  12:11;115:17;
  127:7;167:24
needed (2)
  105:20;118:9
needs (3)
  105:22;108:16,17
New (20)
  5:12,12;55:7;
  105:20;124:19,21;
  140:21;141:16;
  142:9;148:7;150:12;
  151:4;154:8,13;
  158:7;160:16;
  182:19;184:3;200:3;
  206:7
newest (1)
  154:4
newsletter (1)
  101:18

newsletters (1)
  98:17
next (3)
  15:22;205:18;
  211:18
night (4)
  29:24,25;114:19;
  115:20
No1 (1)
  144:5
nod (1)
  11:10
non-competitive (1)
  201:3
none (2)
  163:4;180:19
normal (2)
  114:19,22
normally (2)
  61:7;122:20
North (2)
  5:7,18
Northern (1)
  188:2
Northwest (2)
  9:9;31:23
Notary (1)
  10:12
noted (2)
  37:22;39:2
notes (1)
  30:17
notice (59)
  14:15;15:24;16:7,
  10;23:24;26:12,17,
  20,23;27:4;31:17;
  37:16,20;38:24;
  39:17;42:21;43:6,
  21;50:13;58:3,20;
  66:10;88:5;128:9;
  129:4,22;136:25;
  137:6;145:11;146:6,
  12,23;163:14,24;
  165:7;166:7,14,22;
  167:8,20;169:9;
  171:20;172:13;
  173:11,23;174:8;
  177:3,16,23;178:8;
  179:9;181:22;182:4;
  187:2,10,21;189:13;
  190:2;191:9
notices (3)
  129:3,12,14
November (6)
  54:21;55:2;
  155:17;169:4;
  212:14;214:23
number (15)
  9:11;15:11;67:18;
  75:14;94:18;101:25;
  102:2,7,12;110:18;
  132:4;134:19;180:9;
  207:15,22

Case 4:07-cv-05944-JST   Document 6232-4   Filed 07/29/23   Page 528 of 866

IN RE:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION
STATE OF CALIFORNIA v. SAMSUNG SDI, INC., v., LTD.

ALVIN GUTTMAN
October 11, 2012

**numbers (1)**
154:16
**NV (1)**
5:17
**NW (2)**
5:19;6:8

**O**

**oath (2)**
11:5;113:11
**object (209)**
11:25;12:7;23:24;
26:24;27:6,14;28:5,
17;29:12;31:13;
35:3;36:2,10;37:17;
38:24;41:24;42:18;
43:3,16,20,22;44:23;
45:15;46:14,24;
47:7;49:19;50:11,
16;52:12;55:3;56:4,
13,21;66:8;68:5;
69:5;70:5,13;71:4,
10;72:15;73:21;
74:2;75:17;76:17;
78:4;79:25;80:16;
81:19,24;83:9;
84:25;92:25;95:14;
97:4;98:24;99:4,9;
100:6,17,24;102:23;
103:8,16,22;104:6,
20;105:10;108:13;
110:7;111:7,13;
113:18;114:11;
115:13;117:10,15;
118:7;125:23;126:3,
13,23;127:2;128:25;
131:8;132:9;134:15;
136:20,24;137:5,11,
16,22;138:5,19,24;
139:10;140:6,16;
143:2;145:8,16;
146:4,11,21;149:9;
160:23;161:5,25;
163:12,23;164:11;
165:3;166:5,12,17,
19;167:6,22;168:22;
170:19;171:18;
172:4,12;173:10,22;
174:6;175:13,18,25;
176:17;177:2,15,22;
178:7,18,19;179:8;
186:25;187:21;
188:8;189:11,24;
190:20;191:7,18,22;
192:4,21;193:3,10,
21;194:14,25;195:6,
14,22;196:7,14;
197:2;198:4,11,23;
199:14;200:13,19;
201:4,15,23;202:4,9,
13,23;203:9,16,24;
204:7,13,19,25;

205:6,25;206:8,13,
19,24;207:8,13,18;
208:7,16,20;209:10,
15,24;210:3,8;211:2,
15;212:5,11;213:6,
19;214:9,15,20;
215:5,10
**objecting (6)**
39:3;57:10,24;
58:3;129:20;173:12
**objection (44)**
11:12;26:25;
28:11;36:15;37:19,
22;38:25;39:16;
44:3;45:20;56:8;
66:15;75:4,7;82:4;
103:3,4;126:24;
131:9;145:15;
146:15;165:9;169:8;
170:24;171:3;172:5;
175:2,2;177:8;
187:9;192:8,15;
194:2,6;198:16;
205:20;211:6;
215:14;217:7;218:4;
219:10;220:4,16,20
**Objections (24)**
11:12,15;43:10;
82:12,13;127:11;
136:18;140:21;
141:17;142:10,13,
17;151:2,5;158:8;
161:11,16;167:18,
21;172:20;175:3;
179:2,17,20
**objects (1)**
11:16
**obligated (1)**
174:15
**obligations (2)**
180:24;181:4
**obsolete (1)**
206:12
**obtain (1)**
128:19
**Obviously (2)**
11:14;163:4
**Occasionally (1)**
11:11
**occasions (1)**
128:12
**October (213)**
9:1,7;10:1;11:1;
12:1;13:1;14:1;15:1;
16:1;17:1;18:1;19:1;
20:1;21:1;22:1;23:1;
24:1;25:1;26:1;27:1;
28:1;29:1;30:1;31:1;
32:1;33:1;34:1;35:1;
36:1;37:1;38:1;39:1;
40:1;41:1;42:1;43:1;
44:1;45:1;46:1;47:1;
48:1;49:1;50:1;51:1;

52:1;53:1;54:1;55:1;
56:1;57:1;58:1;59:1;
60:1;61:1;62:1;63:1;
64:1;65:1;66:1;67:1;
68:1;69:1;70:1;71:1;
72:1;73:1;74:1;75:1;
76:1;77:1;78:1;79:1;
80:1;81:1;82:1;83:1;
84:1;85:1;86:1;87:1;
88:1;89:1;90:1;91:1;
92:1;93:1;94:1;95:1;
96:1;97:1;98:1;99:1;
100:1;101:1;102:1;
103:1;104:1;105:1;
106:1;107:1;108:1;
109:1;110:1;111:1;
112:1;113:1;114:1;
115:1;116:1;117:1;
118:1;119:1;120:1;
121:1;122:1;123:1;
124:1;125:1;126:1;
127:1;128:1;129:1;
130:1;131:1;132:1;
133:1;134:1;135:1;
136:1;137:1;138:1;
139:1;140:1;141:1;
142:1;143:1;144:1;
145:1;146:1;147:1;
148:1;149:1;150:1;
151:1;152:1;153:1;
154:1;155:1;156:1;
157:1;158:1;159:1;
160:1;161:1;162:1;
163:1;164:1;165:1;
166:1;167:1;168:1;
169:1;170:1;171:1;
172:1;173:1;174:1;
175:1;176:1;177:1;
178:1;179:1;180:1;
181:1;182:1;183:1;
184:1;185:1;186:1;
187:1;188:1;189:1;
190:1;191:1;192:1;
193:1;194:1;195:1;
196:1;197:1;198:1;
199:1;200:1;201:1;
202:1;203:1;204:1;
205:1;206:1;207:1;
208:1;209:1;210:1;
211:1;212:1;213:1;
214:1;215:1;216:1;
217:1;218:1;219:1;
220:1
**off (24)**
58:14,16;65:8,10,
12;89:7;94:22;
103:14,20;104:5;
111:23,24;118:23;
147:22,24;150:3,5;
155:9,11;188:12,13;
200:8;215:17,19
**offer (5)**
16:25;17:5;

52:1;53:1;54:1;55:1;
56:1;57:1;58:1;59:1;
60:1;61:1;62:1;63:1;
64:1;65:1;66:1;67:1;
68:1;69:1;70:1;71:1;
72:1;73:1;74:1;75:1;
76:1;77:1;78:1;79:1;
80:1;81:1;82:1;83:1;
84:1;85:1;86:1;87:1;
88:1;89:1;90:1;91:1;
92:1;93:1;94:1;95:1;
96:1;97:1;98:1;99:1;
100:1;101:1;102:1;
103:1;104:1;105:1;
106:1;107:1;108:1;
109:1;110:1;111:1;
112:1;113:1;114:1;
115:1;116:1;117:1;
118:1;119:1;120:1;
121:1;122:1;123:1;
124:1;125:1;126:1;
127:1;128:1;129:1;
130:1;131:1;132:1;
133:1;134:1;135:1;
136:1;137:1;138:1;
139:1;140:1;141:1;
142:1;143:1;144:1;
145:1;146:1;147:1;
148:1;149:1;150:1;
151:1;152:1;153:1;
154:1;155:1;156:1;
157:1;158:1;159:1;
160:1;161:1;162:1;
163:1;164:1;165:1;
166:1;167:1;168:1;
169:1;170:1;171:1;
172:1;173:1;174:1;
175:1;176:1;177:1;
178:1;179:1;180:1;
181:1;182:1;183:1;
184:1;185:1;186:1;
187:1;188:1;189:1;
190:1;191:1;192:1;
193:1;194:1;195:1;
196:1;197:1;198:1;
199:1;200:1;201:1;
202:1;203:1;204:1;
205:1;206:1;207:1;
208:1;209:1;210:1;
211:1;212:1;213:1;
214:1;215:1;216:1;
217:1;218:1;219:1;
220:1

105:23;166:10;
167:4
**offered (3)**
167:11;168:6;
207:16
**offering (4)**
76:3;79:4,5,9
**offers (2)**
98:18;168:15
**offhand (1)**
142:4
**office (10)**
16:22;17:2,8,10;
46:6;86:22;88:13;
117:23,24;118:6
**offices (5)**
45:24;46:2,3;81:9,
14;123:2
**official (1)**
91:18
**often (1)**
66:4
**Ohio (1)**
32:24
**old (3)**
68:10;81:3;135:24
**Oliver (1)**
15:17
**O'MELVENY (1)**
6:5
**O'Melveny (1)**
10:10
**Once (2)**
50:24;175:8
**one (52)**
10:24;11:17;12:8;
15:16;19:5,12;
30:20;38:23;40:17;
42:2;55:10;64:6,7,
13,14,19;65:9;78:2;
81:4,10;82:23;
84:23;109:7;115:25;
116:16,16;117:20;
118:24;125:21;
127:19;131:22;
138:20;144:4,24;
147:16,19,23;
148:22;151:17;
152:8;156:2;158:17;
163:16;170:6;
179:13;180:16;
191:8;196:4,17,23;
218:14,19
**ones (1)**
33:5
**one-year (1)**
108:5
**Online (1)**
89:23
**on-line (10)**
60:12;62:16,22;
81:2;84:23;97:22,
23;98:13;101:3;

109:8
**only (10)**
12:12;22:9;29:25;
96:2;127:15;130:3;
145:25;157:14,15;
162:6
**onto (2)**
140:24;201:10
**open (1)**
125:6
**opening (1)**
193:13
**operability (1)**
78:12
**operation (1)**
18:18
**operations (1)**
208:11
**opinion (8)**
123:17;170:3,17;
171:8,10,22;179:12;
206:16
**opportunity (1)**
12:7;23:23;107:24
**options (2)**
73:15;124:17
**orally (1)**
11:8
**Order (30)**
89:14,22,24;91:6;
93:23,24;94:5,7,11,
14;95:5;100:23;
107:17;108:25;
110:17;114:2,5,6,8;
115:8;117:20;125:5;
134:3,4,8;165:14;
175:16,23;217:10,22
**ordered (4)**
114:13,16;117:9,
22
**ordering (2)**
115:19;117:12
**organized (1)**
19:16
**original (4)**
23:11;103:24;
104:14;115:6
**others (1)**
154:3
**Otherwise (3)**
25:11;36:23;
132:22
**out (13)**
17:8;43:17;83:2;
88:5;101:14,17,24;
102:3;110:6;115:20;
186:19;193:17;
208:24
**Outside (145)**
31:14,16;32:9;
36:2,11;37:17,20;
38:24;39:3,17;
42:21;43:5,23;44:3,

Case 4:07-cv-05944-JST Document 6232-4 Filed 07/29/23 Page 529 of 866
IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION
STATE OF CALIFORNIA v. SAMSUNG SDI, INC., CO., LTD.

ALVIN GUTTMAN
October 11, 2012

14;50:12;56:22,24;
57:11;58:4;66:9;
81:20,24;117:22;
119:23;127:3,17;
129:4,21;135:14,16;
136:25;137:6,12,17,
23;138:6,21,25;
139:11;145:10,15;
146:5,12,22;163:13,
24;165:6;166:6,14,
21;167:8,17;168:23;
169:8;171:19;
172:13,21;173:10,
13,23;174:7;175:4,
14,20;176:2;177:3,
16,23;178:8,20;
179:9;187:2,9,20;
188:9;189:12,25;
190:21;191:8,19,23;
192:5,15,22;193:4,
11,22;194:2,15;
195:2,7,15,23;196:8,
15;197:3;198:5,12,
17,24;199:15;
200:14,20;201:5,16,
24;202:5,10,14,24;
203:10,17,25;204:8,
14,20;205:2,5,13;
206:2,9,14,20,25;
207:9,14,19;208:8,
17,21;209:11;210:4,
9;211:2,16;212:6,12;
213:7,20;214:10,16,
21;215:6,11

**over (3)**
12:8;16:9;50:20

**overall (8)**
78:11;79:3;80:11;
99:12;104:9;108:6;
123:25;162:19

**Overbroad (2)**
43:17;201:16

**overcharged (1)**
179:24

**overlap (1)**
21:2

**own (4)**
63:22;64:4;179:3,
22

**owned (4)**
35:9;36:5,8;37:9

**owner (2)**
17:24;19:23

**owners (1)**
17:19

---

**P**

**P4 (1)**
90:14

**package (65)**
40:2,3,14,17;
56:15;59:23;64:12;

67:9;70:10,19;
71:25;72:4,22;
73:12;74:13;75:24;
76:5,8;77:2;79:3,11,
13,17;80:11,15,20;
82:19,21,23,24;83:4,
6;91:3;94:19;95:3;
96:23;99:12,12,13,
16,19,24;100:4,16,
23;101:5;103:12;
104:10;105:19;
107:4;108:3,11;
122:11;135:14,15;
161:20;164:5,16,18,
19;165:15,17,23,24;
168:10

**packaged (3)**
72:2;85:22,24

**packager (1)**
67:24

**packages (6)**
55:6;56:2;59:11;
64:15;116:20,24

**packaging (1)**
119:24

**Page (53)**
90:12,13;92:16;
94:10;95:3,22;96:5,
5,9,12,25;100:3;
101:13;104:5,15,19;
106:11,13,16,22;
107:16;109:7;
110:15;111:15;
148:25;151:12,20;
153:8,14;159:25;
182:16;188:21,21;
190:24,25;193:15;
194:19;197:6;
199:22;210:14,16,
17;211:18,19;
212:24;213:21;
215:15;219:8,21,22;
220:3,9,14

**pages (2)**
96:2,3

**paid (25)**
25:8,10;69:2;
75:15;84:24;86:9;
95:18;104:18;107:6,
14;110:3;123:6,9,14;
124:7;125:16;
165:19;169:11,14,
20,24;170:21;203:4,
6;204:3

**Panasonic (3)**
5:6,9;59:3

**paper (3)**
109:16,17;219:16

**papers (2)**
53:16,19

**paragraph (18)**
142:7;190:24,24;
193:16,16,20;

194:24;197:4;199:5,
22;200:4;209:9;
210:15,17,19;
211:19;213:22;
215:16

**paragraphs (3)**
190:23;191:4,21

**Park (1)**
9:5

**part (14)**
39:14;42:16;
49:15,17;70:19;
71:25;91:3;132:3;
145:22;165:17;
182:12,14;210:12;
212:20

**participate (2)**
144:25;145:3

**participated (1)**
151:22

**participation (2)**
42:11;44:20

**particular (3)**
74:13;116:7;
165:18

**parties (3)**
9:15;125:21;149:2

**parts (1)**
111:16

**party (1)**
128:3

**pass (3)**
173:3,7,21

**passed (3)**
34:12;171:2,17

**passing (1)**
34:5

**Past (3)**
108:22;123:18,21

**Patricia (1)**
184:4

**pausing (1)**
36:21

**pay (5)**
32:11;74:21;
79:19;109:4,7

**paying (2)**
160:17;163:17

**payment (4)**
24:13,24;25:2;
110:19

**pays (3)**
27:3,8,12

**pending (2)**
178:3;187:25

**Pennsylvania (1)**
5:19

**Pentium (2)**
90:14;94:17

**percent (1)**
95:13

**percentage (1)**
74:6

**performance (2)**
123:25;124:2

**performing (1)**
177:9

**perhaps (6)**
12:20;29:3;98:13;
141:6;154:9;165:18

**period (29)**
40:19;54:21,25;
56:20;57:19;58:6;
59:11;60:5;62:8;
63:19;88:9;99:14;
155:18;168:16;
169:2;174:16;
186:14;196:4;
210:20;211:24;
212:10,18;213:5,10,
16;214:18,19;215:4,
8

**periods (1)**
212:13

**peripheral (3)**
111:2,6,19

**peripherals (3)**
110:21;111:17,18

**permit (1)**
24:21

**person (4)**
52:4,9;83:21;
130:3

**personal (20)**
35:23,25;91:20;
92:5,13,18;126:20;
127:16,21;191:25;
192:6,9,12,19;193:8,
12,19;194:22;
195:17,18

**personally (19)**
14:10;31:11;36:8;
39:10;54:14;56:19;
57:9;58:5;126:21;
129:8,17;133:10;
148:21;162:12;
168:21;189:3;
192:25;195:19;
207:22

**persons (1)**
151:22

**pertinent (1)**
139:18

**perused (1)**
141:21

**Philips (2)**
5:17,17

**phone (9)**
10:6;17:3;50:20,
23;51:18,21;53:8;
137:18,21

**phones (1)**
115:5

**phrased (5)**
24:17;27:23;
28:11;46:15;149:8

**pick (1)**
83:2

**Picture (1)**
5:8

**place (4)**
9:8;11:13;174:11;
219:18

**placed (3)**
93:24;114:6;115:8

**places (1)**
117:20

**plaintiff (13)**
9:14;14:19;45:6;
139:24;142:8;
155:24;156:18;
158:15;180:7;
182:19;199:25;
200:2;219:23

**plaintiffs (25)**
49:11;50:9;
130:11;147:3,5;
148:8;149:3;150:13;
153:4,25;154:4,7;
155:6;159:17;
160:17;163:17;
180:20;184:4,7;
190:25;191:20;
210:22,25;213:22;
214:3

**plaintiff's (1)**
156:12

**plaintiffs' (15)**
31:2;49:16,18;
51:8;52:5,10;
140:21;141:17;
142:10;151:5;158:8;
181:22;182:4;
183:11;184:13

**plan (1)**
108:5

**plastic (1)**
118:24

**plead (1)**
170:10

**pleaded (1)**
170:7

**please (72)**
9:15;11:7;12:6,11,
21;13:9;16:2;20:11;
21:12;31:21;32:14;
37:24;39:4;54:18;
55:16,22;57:2;76:19,
24;80:4;83:16;86:4;
87:8;105:7;106:12;
118:12;119:10;
120:24;130:7,13;
131:10;137:12;
145:13;147:10;
149:11;150:25;
151:20;152:8,12;
153:19;155:22;
156:5;158:6;160:12;
167:2,14;168:2;

173:25;175:17,23;
178:23;179:13;
181:20,25;184:11;
187:11;188:5;190:3;
193:15,16;194:19;
196:9;198:13,14;
199:23;200:4;
202:17;203:11;
209:25;210:14;
213:11;215:15
**pm (1)**
114:7
**point (6)**
10:23;35:24;
37:18;43:17,24;
55:20
**policy (1)**
139:13
**political (2)**
33:8;178:11
**portion (3)**
198:12;202:22;
203:24
**portions (1)**
184:23
**posed (1)**
169:6
**position (8)**
19:22;20:3,6;21:9,
13;162:4;164:6;
176:23
**positive (1)**
181:5
**possession (1)**
121:8
**possible (16)**
63:2,3;66:19;
101:19;114:23;
115:22;117:8,14;
126:8,12;171:16;
172:6,9,19;173:6,19
**post (1)**
33:9
**pounds (1)**
120:6
**practice (3)**
88:25;114:19;
122:10
**Precisely (1)**
17:11
**predetermined (1)**
201:6
**predict (1)**
208:23
**premarked (1)**
220:7
**preparation (6)**
28:4,14;29:25;
151:23,23;184:16
**prepare (3)**
22:24;29:10;30:12
**prepared (1)**
16:13

**preparing (6)**
23:19;27:20;
29:17;30:17,21;
181:6
**present (2)**
123:18,20
**preserve (1)**
139:18
**president (13)**
19:4,24;20:6,23;
21:5,7;44:5;48:13;
68:18;92:4,22;
127:4;163:16
**Presumably (1)**
111:15
**presume (2)**
84:6;135:23
**pretextual (4)**
211:23;212:3;
213:13,15
**previous (1)**
12:22
**previously (14)**
113:6;143:13,24;
146:25;147:4,15;
150:10,24;151:7;
157:17,21;158:5,11;
159:11
**price (67)**
68:24;69:3,12;
70:20;72:2;74:7,9,
14,24;75:15,16,20;
76:7,11;79:14;84:12,
16;85:7,22,24;95:5,
7,8;99:19,22,24;
100:5,23;103:14,21,
25;104:5,14,15,16,
18,24;105:3,6,16,24;
106:7,21;107:6,9,14;
108:18;110:2;119:3;
124:8;134:11,14;
135:18;161:22,24;
162:23;164:16;
169:19;170:2,4;
172:8;174:15;
187:23;199:17;
201:7;211:12,24
**prices (19)**
74:18;84:22;
160:18;162:13;
163:18;170:2;172:8;
175:11;176:22;
178:16,24;179:19;
189:18;199:8,11,13,
16;202:3;203:4
**pricing (6)**
72:18,19;80:20;
104:11;175:7;
211:25
**primarily (1)**
50:15
**primary (1)**
32:5

**printer (1)**
111:16
**printers (2)**
106:18;110:22
**prior (30)**
39:2;42:19;50:17,
20,23;51:2;80:24;
111:9;122:2,4;
138:20;141:10;
145:9;147:16;
151:10;154:7;155:4;
157:2;158:14,20;
167:18;173:10;
175:2;176:18;
189:13;217:7;219:6,
25;220:12,18
**privilege (6)**
24:8,18;27:24;
136:7;139:23;
186:10
**privileged (1)**
11:22
**probability (1)**
98:7
**Probably (26)**
29:18;45:12,21;
48:17;49:2;52:23;
55:5;62:2,3,23;
63:15;78:2;81:3;
87:2;102:6;109:20;
122:19;144:24;
156:17,22;165:15;
167:24;176:20;
198:25;199:16;
207:2
**problem (1)**
124:2
**Procedure (1)**
14:6
**proceed (2)**
43:25;57:2
**proceeding (1)**
126:17
**process (1)**
34:10
**processing (3)**
18:16,24;40:6
**processing-type (1)**
40:5
**processor (3)**
83:3;90:14;94:17
**produce (7)**
67:25;96:9,13;
130:5;131:5;145:20;
164:20
**produced (16)**
53:13;65:5;93:15;
95:25,25;109:21;
120:17,20,25;
121:17,19;133:24;
134:3;153:4;162:22;
163:6
**producing (1)**

129:24
**product (51)**
38:12,13,20;39:5,
12,22;42:17;44:21,
24;58:11;59:18;
60:14;61:21;63:21;
64:3,5,9;67:24;
78:16,18,21;91:10;
106:3,5,10,15;108:4;
109:4,13;110:4,13;
117:5;121:13;
122:22;123:9,17;
124:5;125:10,13,16;
133:13;136:8;
155:19;170:18;
173:7;196:17,23;
197:12;206:18,23;
211:24
**production (11)**
122:3,4;130:10,
18;143:17;144:15;
145:23;146:2;
178:17,25;179:7
**productivity (1)**
209:20
**products (69)**
17:5;18:21;19:6;
22:10;34:22;35:2;
37:7,12;38:13;
39:24;40:12,12;
41:15,15;42:12,25;
44:13;47:19;48:5;
54:19,24;56:20;57:5,
18,20,25;58:6;69:13,
15;77:6;88:8;89:2;
106:11,16;107:13;
122:11;130:24;
160:18;162:11;
163:9,18;166:2,18,
23;167:4,10,12;
168:8,9;176:22;
177:13;178:6;
189:19;194:7;196:4;
197:9,19,23,24;
198:9,18;200:24;
201:19;205:23;
206:7;207:16,20;
208:3,5
**Professional (1)**
94:17
**profit (5)**
177:13,17,19,21;
178:6
**program (4)**
138:9,15,23;139:2
**promised (1)**
181:17
**promotion (3)**
101:11,15;105:21
**promotional (3)**
97:24;98:2;168:6
**promotions (1)**
106:2

**proper (2)**
48:12;88:7
**properly (3)**
77:23;123:22,23
**property (2)**
137:19;203:21
**proposed (2)**
182:19;184:3
**proprietary (1)**
136:11
**protection (1)**
171:15
**prove (1)**
121:13
**proves (1)**
121:9
**provide (9)**
13:2,6;16:22;17:2;
20:14;121:15;154:8,
13;155:6
**provided (7)**
29:10;70:9;93:17;
144:22;150:19;
153:25;154:20
**provider (3)**
60:14,15,20
**providing (3)**
14:13;26:23;
159:17
**provision (1)**
25:2
**Public (1)**
10:13
**punitive (1)**
50:9
**purchase (50)**
21:23,24;42:3,8,
12;56:20;58:5;
60:11,14;62:11,16;
65:21;66:23;67:2,
10;68:16,19;69:21;
70:4;72:2;74:7,24;
77:17;80:22,24,25;
81:23;82:15;85:6;
89:22;92:12;99:14;
102:5,12;106:10,15;
107:3,5,8,12,20;
108:3,6;109:19;
110:18;111:6;118:3;
131:4;165:24;
179:25
**purchased (80)**
22:13,15;39:18,21,
25;40:11,17;41:14;
42:5,9;44:24;47:16;
54:14,20,25;56:2;
58:2;59:10,15,25;
60:8;61:19;63:4;
64:12,20,21,25;
65:17;66:20;69:9,
17;71:21;72:3;76:8,
15;78:2,17;80:23;
81:8;82:17;83:21,

23;84:8;86:3,5,6,7;
87:7;90:25;92:17;
99:13,16;103:11;
106:8,24;108:12;
113:17;115:12;
116:2,3,8,14,14,20;
118:6;121:9,13,20;
123:16;124:12,20;
133:13;165:23;
196:4,23;197:9,12;
209:2,4;218:18
**purchaser (18)**
19:2;49:11;50:9;
130:11;140:21;
141:17;142:10;
147:3;148:8;149:3;
150:12;151:4;158:7;
160:16;181:21;
182:3;183:11;
184:13
**purchases (7)**
19:5;40:18,22;
41:10;61:8;130:24;
136:3
**purchasing (9)**
18:20,25;69:3;
77:2,6;86:10;102:7;
109:12;113:14
**purported (1)**
180:8
**purpose (3)**
88:11;129:24;
172:7
**purposes (3)**
11:24;155:2;
207:21
**pursuant (5)**
14:5,14;16:8;58:2;
136:17
**pursuing (1)**
26:9
**pushed (1)**
101:4
**put (6)**
93:3,5;219:16,19,
20;220:6

**Q**

**qualify (2)**
34:18;207:24
**quality (2)**
70:21,23
**quantify (2)**
162:24;163:3
**Quick (2)**
138:18;139:2
**quite (4)**
174:19;193:14;
197:20;218:16

**R**

**raise (2)**
169:19;199:7
**raising (1)**
174:4
**rather (1)**
212:2
**Ray (15)**
9:10;21:10,15,17;
34:21,21,25,25;
37:12,12;38:11,11;
54:10;78:8,14
**Re (1)**
9:10
**read (55)**
23:17;53:16,19,
24;55:22,24;76:21;
80:7;83:18;94:22;
100:11;131:13;
141:4;142:9,12,24;
143:6,7;145:14;
156:6;158:20;
167:15,25;168:2,3,
25;172:3;173:18;
174:22;179:16;
182:8,10,12,15,16;
184:20,23;185:5;
190:4;193:16,17;
196:11;197:14,16;
198:15;200:4,6;
201:10;203:11;
210:2,7;212:9,17;
213:5,8
**readable (1)**
71:17
**reading (6)**
114:8;132:11;
141:16;179:14;
186:18;192:17
**reads (1)**
214:3
**really (4)**
47:20;73:23;
75:22;95:12;97:6;
114:13;115:21;
117:25;126:15;
162:4;165:10;
178:10,15;179:12;
192:23
**reason (2)**
12:25;71:20
**reasonable (2)**
213:23;214:5
**reasons (4)**
71:8;211:23;
213:13,15
**rebate (1)**
106:5
**recall (52)**
29:8;46:11;47:20,
21;49:6,7;51:14;
62:13,18,19;66:22;
68:13;72:20;73:8,
23;74:9;75:14,22;

78:3;87:5;88:19;
97:21;98:9,22,23;
101:5,10;102:4,10,
11,20;106:3;108:9;
115:21;117:12,21;
119:25;120:2;
132:11;134:5,23;
141:3,16,25;142:2;
144:18;148:21;
185:3;207:10;217:4,
17;218:24
**receipt (22)**
61:9,13,16;65:4;
93:10,11,13;94:5;
118:18;119:2;129:2;
134:6,7,11,17;135:6,
9,18,21,24;217:5;
218:5
**receipts (14)**
61:3,5,8;62:4;
82:16;131:2;133:10,
16,18,21;145:20;
146:9,14,16
**receive (7)**
25:15;97:11;
104:9;109:13;
122:11,22;176:13
**received (10)**
26:17;51:25;96:2;
104:23;128:9;
129:12,14;142:3;
154:25;218:5
**receiving (2)**
132:11;168:14
**recent (2)**
89:22;154:5
**recess (4)**
89:9;112:2;
155:13;188:15
**recognize (11)**
89:19;118:15;
119:13;140:2;
152:18;156:8;182:6;
191:3,5,6,20
**recollect (2)**
114:13,15
**recollection (12)**
28:8,13,22;29:2,7;
60:3;61:15;64:24;
109:10;113:13;
114:10;118:3
**recommendation (2)**
73:20;74:15
**recommended (6)**
73:11,13,16;
74:12;79:13,15
**record (62)**
11:9,10;13:10;
19:24;20:4,12;33:22,
25;34:11,16;55:24;
57:23;58:15,16,17;
65:8,10,12,13;76:21;
80:7;83:18;89:7,10;

90:21;100:11;
111:23,24;113:4;
131:13;145:14;
147:23,24,25;150:3,
5,6;153:23,24;
155:10,11,14;156:6;
167:15;168:3,25;
172:3;173:18;
174:22;179:16;
188:12,13,16;190:4;
196:11;197:16;
198:15;210:2,7;
215:17,19,20
**records (2)**
122:2,3
**recycle (2)**
88:6,25
**recycled (3)**
87:16,17;88:4
**redirect (1)**
212:21
**reduced (1)**
105:4
**refer (4)**
13:23;14:17;
38:10,12
**reference (2)**
202:23;219:22
**referenced (4)**
141:5;151:11;
158:17;186:5
**referred (1)**
152:25
**referring (16)**
26:18;36:23;
38:13;84:17,19;
90:16;93:25;94:2;
97:12;114:3;129:10;
145:23;154:20;
193:13;203:14;
204:5
**refers (4)**
36:22;152:4;
184:3;204:16
**refresh (1)**
64:24
**refreshed (5)**
28:8,13,22,25;29:7
**refurbished (1)**
124:22
**regard (2)**
48:6;177:11
**regarding (7)**
25:5;47:11;64:13;
129:2;130:24;145:9;
210:6
**relate (1)**
154:3
**related (2)**
27:13;91:9
**relates (1)**
90:2
**relationship (5)**

21:16,21;22:6;
52:3,8
**relationships (1)**
84:5
**relative (1)**
110:13
**relevance (1)**
96:7
**relevancy (1)**
133:11
**relevant (7)**
132:25;133:3;
161:8;168:16;169:2;
210:20;211:24
**reliability (3)**
69:10;72:17;
108:18
**reliable (1)**
71:3
**relied (3)**
186:3;193:5;
213:17
**reluctance (1)**
153:24
**rely (6)**
68:4,7;143:4;
190:11;210:11;
214:11
**relying (13)**
39:7;43:8,11;
189:7,15;190:5;
197:17;199:21;
201:25;202:15;
203:8;212:7;213:3
**remainder (1)**
36:21
**remember (23)**
12:19;23:4,9;
28:21;59:18,25;
61:21;62:10,17;
67:18;72:10;73:19;
81:13;82:8;113:16,
21;144:19;148:14,
16;154:11;155:20;
168:14;217:9
**remind (2)**
35:18;127:7
**remove (1)**
88:9
**remuneration (2)**
25:16,18
**renegotiated (1)**
174:14
**rent (1)**
46:5
**renting (1)**
17:8
**repeat (38)**
21:12;39:4;45:17;
54:22;76:19;80:4,5;
83:16;86:4;87:8;
100:9;105:7;106:12;
120:24;131:10,11;

145:12;147:10;
149:11;156:2,5;
166:25;167:14;
168:24;169:13;
171:24;172:2;
173:16;174:21;
178:23;179:13;
187:11;188:5;190:3;
192:3;198:14;
209:25;213:11
**repeating (4)**
76:20;83:17;
100:10;196:10
**rephrase (9)**
41:23;69:14;
76:24;78:19;87:9;
103:18;129:6;
149:12;176:8
**replaced (3)**
87:12,15;208:13
**replacing (2)**
185:17;191:10
**reporter (5)**
9:25;11:8,9;89:17;
197:15
**Reporters (1)**
9:4
**represent (10)**
10:17;49:10;74:7;
99:2,24;102:21;
120:8,10;180:15;
216:25
**representative (5)**
15:5;180:8,13,24;
182:22
**representatives (1)**
176:24
**represented (7)**
34:24;49:25;50:4;
95:8;105:6,9;120:14
**represents (3)**
15:8;110:18;153:5
**request (7)**
107:23,24;130:18;
132:8;143:17;
144:15;145:23
**requested (2)**
107:18,22
**requests (12)**
120:17;121:16;
130:10;131:6,25;
132:15;143:20;
145:2,6;146:2,10;
180:25
**required (3)**
107:5,8,12
**requires (2)**
145:17;164:2
**research (1)**
69:22
**researching (1)**
124:17
**resellers (1)**

205:17
**resold (1)**
205:24
**Resolution (1)**
89:24
**respect (5)**
18:20;24:20;28:8;
167:21;218:23
**respond (3)**
150:15;180:25;
210:10
**responding (7)**
12:8;144:25;
146:2;147:9,12;
149:2;160:16
**response (12)**
46:20;47:14;
120:16;121:16;
128:15;132:8,14;
152:3,21;153:14;
160:15;216:20
**responses (19)**
140:22;141:17;
142:10,14,18;145:5;
149:18,19;151:2,5,
24;154:9,10,14,19;
155:7;158:8;159:11,
19
**responsibilities (4)**
18:14;20:12,23;
21:5
**responsibility (1)**
18:20
**responsible (6)**
18:15;25:23;26:5,
22;88:14;170:11
**responsive (5)**
131:6,25;143:20;
146:9;153:10
**restrain (1)**
202:11
**restraining (1)**
201:21
**restraint (2)**
200:17;203:18
**result (3)**
128:20;160:7;
212:2
**retail (4)**
68:23;69:3;
103:24;208:10
**retailer (8)**
60:12;62:21,22;
103:11;167:9;205:3,
10;206:23
**retailers (11)**
84:19,23;165:25;
166:10;167:3,12;
173:6;198:6,8;206:4,
6
**retain (1)**
138:12
**retained (1)**

139:14
**retainer (17)**
23:11,17;24:4,12,
24,25;25:5;27:18;
28:23;48:19,20,25;
49:5;52:24;53:23;
141:11;180:3
**retention (3)**
138:9,14,22
**returns (2)**
21:6,7
**reveal (5)**
41:4;47:10;
131:18;132:19;
183:5
**revealing (1)**
183:7
**review (10)**
23:23;27:20;
28:12;29:9;30:8;
85:9;125:9;186:5;
219:7;220:2
**reviewed (13)**
23:2,7;28:2,4,7,19;
140:20;150:18,18;
158:22;159:3;
220:14,18
**right (35)**
12:23;37:3;41:6;
44:21;45:3;53:3;
56:12;67:11;73:17;
74:22;83:10;87:24;
93:9,24;94:12;
100:5;102:18;
103:15;111:22;
120:23;121:21,24;
127:9;134:25;
135:14;148:24;
151:5;158:24;
159:13;160:2;
186:23;196:20;
209:6;215:9;217:11
**right-hand (1)**
120:5
**risk (2)**
209:7,13
**role (3)**
180:12;183:17,20
**Rooks (1)**
184:4
**rooms (3)**
17:3;41:20;42:3
**rule (4)**
11:15,18;14:5;
16:8
**Rules (1)**
14:6
**run (1)**
16:21

### S

**sale (5)**

75:19;98:9;
101:11;206:23;
207:16
**sales (10)**
75:16;85:12,14;
95:19;119:3;168:15,
15;207:22;208:6,9
**same (44)**
34:7;36:15;39:16;
43:10;44:3;45:20;
56:8;62:8;66:15;
75:7;80:20;82:4,12;
83:5,13;103:3;
119:16;133:5;135:2;
145:15;146:15;
156:17;157:7;
161:11,16;170:24;
171:3;172:5,20;
174:4;175:3;176:16;
177:8;179:2,17,20;
187:9;192:8,15;
194:2,6;211:6;
218:16;220:20
**Samsung (19)**
6:6,7;140:22;
146:25;148:9;
150:11;152:4,9,15,
25;153:15,20;157:4;
197:20;198:25;
215:22,25;219:7,8
**Samsung's (2)**
141:18;142:11
**Sarasota (2)**
13:13;62:15
**satisfied (1)**
79:3
**save (1)**
122:11
**saved (2)**
75:10,13
**saw (5)**
101:5;140:10;
156:17;191:10;
206:22
**saying (5)**
99:15;145:19;
164:21,22,24
**SC (1)**
9:11
**scanner (1)**
111:16
**scanners (2)**
106:18;110:22
**school (4)**
32:17;33:13;34:7,
8
**science (1)**
33:8
**scope (141)**
31:14,17;36:3,11;
37:17,20;38:24;39:3,
17;42:21;43:5,23;
44:4,14;50:12;56:22,

24;57:11;58:4;66:9;
81:20,25;127:3,17;
129:4,21;136:25;
137:6,12,17,23;
138:6,21,25;139:11;
145:10,16;146:5,12,
22;163:13,24;165:7;
166:6,14,21;167:8,
17,20;168:23;169:9;
171:19;172:13,21;
173:11,13,23;174:7;
175:4,14,20;176:2;
177:3,16,23;178:8,
20;179:9;187:2,10,
20;188:9;189:12,25;
190:22;191:9,19,23;
192:5,16,22;193:4,
11,22;194:3,15;
195:2,7,15,23;196:8,
15;197:3;198:5,12,
17,24;199:15;
200:14,20;201:5,16,
24;202:5,10,14,24;
203:10,17,25;204:8,
14,20;205:2,5,13;
206:2,9,14,20,25;
207:9,14,19;208:8,
17,21;209:11;210:4,
9;211:3,16;212:6,12;
213:7,20;214:10,16,
21;215:6,11
**scrap (1)**
123:21
**screen (16)**
67:3;68:11;71:16;
78:25;79:5;86:19,22,
25;87:2,3;164:7,15;
193:13;196:17;
218:14,16
**screens (6)**
87:6,12;163:6;
207:5,6;218:11
**SDI (1)**
147:2
**SDI's (3)**
140:22;148:9;
150:11
**SEA (1)**
10:10
**search (5)**
131:5,24;132:7,
14;133:15
**searched (1)**
136:4
**searching (3)**
129:23;130:4;
132:24
**SEC (1)**
10:10
**second (19)**
23:21;25:3;38:23;
61:18;64:3,7;65:9;
83:8;94:10;101:6;

Case 4:07-cv-05944-JST   Document 6232-4   Filed 07/29/23   Page 533 of 866

IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION
STATE OF CALIFORNIA v. SAMSUNG SDI, INC., CO., LTD.

ALVIN GUTTMAN
October 11, 2012

103:20;110:16,17;
127:6;136:24;
147:23;148:25;
165:9;173:9
**section (2)**
203:11;204:17
**securities (1)**
37:10
**security (3)**
35:10;36:6,9
**seeing (2)**
130:20;162:16
**seek (1)**
142:8
**seeking (3)**
11:24;46:22;47:5
**seem (1)**
100:21
**seems (2)**
111:16;170:9
**select (2)**
83:7,19
**selected (2)**
72:24;82:24
**sell (9)**
17:7;21:10,14;
197:23,24;198:2,8;
205:3,10
**seller (3)**
37:6,11;105:23
**sellers (3)**
166:2;167:4,12
**selling (3)**
105:14;206:5,7
**sells (2)**
22:10;204:22
**sending (1)**
165:13
**sends (1)**
88:5
**sense (1)**
171:13
**sent (2)**
116:18;119:17
**sentence (1)**
142:6
**separate (3)**
110:18;165:23;
170:9
**separately (5)**
67:11;76:6;
106:25;110:20,23
**September (5)**
140:8,19;141:24;
156:19,20
**series (1)**
154:23
**serve (2)**
18:5;19:25
**service (2)**
108:3;134:19
**services (4)**
16:22,24;20:14;

139:4
**serving (1)**
177:10
**Set (13)**
130:9;140:23;
141:18;142:11;
144:5;147:2;148:7,
9;150:11;151:3;
156:15;157:20;
158:9
**shake (1)**
11:10
**shape (2)**
218:10,14
**sheet (1)**
148:11
**sheets (2)**
18:24;137:13
**shelf (1)**
208:10
**Sherman (8)**
38:2,4,5,6,8;44:8;
48:11;187:22
**shipped (7)**
110:19,22;117:5,
9;122:24,25;123:3
**shipping (22)**
96:8;97:8,11;
101:8;103:5,7;
104:9;118:13,22;
119:7,11,17;123:6,8,
15;134:10,24;135:3,
11,12,14;218:6
**shop (1)**
84:11
**short (1)**
55:8
**shortened (1)**
34:17
**shortly (1)**
213:25
**show (3)**
133:12;143:12;
147:14
**showed (3)**
144:19,20;148:16
**showing (2)**
154:16,17
**side (4)**
219:19,20,20,20
**sign (5)**
21:6,7;48:25;
53:20;214:25
**signed (18)**
23:3,7,9,18;24:4;
29:4;48:17;52:24;
53:21,25;142:23;
151:15;157:6;175:8;
180:3;218:25;220:2,
19
**signing (11)**
49:5;141:3,8,10;
151:10;157:3;

158:14,21;219:6,25;
220:12
**similar (4)**
145:2;157:9;
185:15,17
**Simply (3)**
105:4;114:8;
185:17
**single (1)**
132:4
**situation (1)**
73:24
**size (8)**
72:17;77:20,25;
78:3;83:3;218:10,13,
15
**slips (1)**
122:11
**slow (1)**
219:12
**Small (2)**
97:10;101:20
**smart (1)**
115:5
**SMB (1)**
89:23
**smoking (1)**
170:16
**social (2)**
45:21;46:22
**socially (1)**
45:23
**software (2)**
40:6;110:20
**sold (7)**
58:10;87:19;
173:7;199:8;207:5,
6;208:6
**somebody (1)**
170:10
**somehow (1)**
133:12
**someone (2)**
126:9;172:11
**Sometime (4)**
12:17;60:5;
156:18;158:14
**someway (1)**
133:12
**somewhere (4)**
45:23;135:24,25;
181:9
**sorry (49)**
11:21;27:10;
31:16;38:4,7;45:10;
51:15;52:6,18;
57:21;62:17;63:3;
66:13,13;68:17;
70:18;71:8;87:9;
94:8;99:19;100:14;
106:13;122:3;
127:24;129:6;
143:23,25;144:3,11;

158:14,21;219:6,25;
145:5;149:13;
160:14;166:19;
167:13,25;171:25;
178:2;183:14;
184:21;191:8;193:9;
197:14;199:12;
201:9;205:15;
210:16,24;211:9;
214:22
**sort (6)**
22:3;25:16;34:10,
15;139:12;168:6
**source (2)**
172:9;195:20
**sources (2)**
185:25;186:5
**space (5)**
17:2,8,10;20:16;
46:5
**Speaect (1)**
184:5
**speak (2)**
50:22;127:11
**speaking (3)**
34:10;192:17;
218:10
**speaks (1)**
100:7
**special (1)**
98:18
**specific (13)**
41:10;69:8;71:20;
113:13;118:2;
124:15;188:4,7;
190:8,9;199:17;
201:18,19
**specifically (18)**
12:2;15:10;23:6;
44:18;60:25;61:2;
72:5,6;83:2;88:22;
104:25;116:12;
118:9;157:4;163:15;
186:16;204:21;
211:20
**specifications (1)**
125:10
**speculation (31)**
73:22;80:3,17;
85:2;93:2;99:10;
100:18;101:2;103:9;
111:10;126:14;
164:2,13;165:6;
166:6,13,21;167:8,
23;172:14,21;
173:13;174:7;175:4,
14,19;176:2;178:20;
179:10;205:9,14
**Speed (1)**
69:10
**spend (4)**
29:16;124:14,16;
186:18
**spent (5)**

30:20,23;86:10;
177:24;181:7
**spoke (1)**
81:4
**spoken (1)**
50:19
**spring (2)**
66:5,16
**stabilize (1)**
199:8
**stack (1)**
144:10
**stand (6)**
39:19;54:15;
71:18;82:3;105:13;
167:21
**start (4)**
58:21;154:7;
155:4;200:8
**starting (3)**
55:7;188:21;
190:24
**starts (2)**
211:19
**state (12)**
13:9,19;32:14,24;
71:6;76:12;90:22;
153:24;154:23;
160:17;163:15;
196:25
**stated (10)**
48:21;59:10;63:3;
72:24;76:25;134:4;
159:9;165:9;175:3;
208:12
**statement (11)**
109:19,22;195:3,
5;196:6;212:4,9,17;
213:5,8,14
**statements (5)**
63:19;109:14;
138:13;185:8,21
**states (6)**
95:7,23;105:2;
197:8;199:6,8
**stating (1)**
99:19
**statute (1)**
204:18
**steps (2)**
214:13;215:3
**still (26)**
11:16;17:23;
22:20;28:5;36:12;
37:21;60:18;63:22,
25;64:4,9;86:13,16;
87:23,23;96:6,12;
109:18;113:10;
134:17,22;164:25;
190:7;204:22;205:3,
8
**stock (6)**
35:6,10;36:6,9;

37:6,10
**stopping (1)**
55:20
**storage (1)**
135:25
**store (1)**
61:7
**stored (1)**
139:7
**stores (1)**
84:22
**streamline (1)**
35:18
**Street (3)**
6:8;9:9;31:23
**strength (1)**
162:19
**stuff (1)**
205:21
**subject (3)**
16:12,16;154:4
**submitted (1)**
110:19
**subpart (6)**
200:9;201:2,10;
202:16;203:11;
204:16
**subparts (1)**
200:7
**subsequent (1)**
208:13
**substantially (1)**
202:18
**substituted (2)**
182:21;200:3
**substituting (3)**
149:5,14,17
**subtenants (2)**
16:23;174:13
**successful (1)**
25:16
**successfully (1)**
34:12
**suffer (1)**
163:17
**suffered (6)**
160:17;162:6,12;
163:22;164:10;
165:2
**suggest (1)**
24:3
**suggested (2)**
68:23;69:3
**suggestions (1)**
183:23
**Suite (2)**
9:5;31:23
**Suites (20)**
13:21,23;14:19;
16:8,22;17:25;
35:20;44:6;46:6;
48:13;91:19;127:5;
129:10,13;133:13,

22;163:16;182:20;
209:14;219:23
**Suites' (4)**
46:3;91:25;123:2;
137:19
**suits (1)**
128:20
**summertime (1)**
66:17
**super (1)**
202:2
**supplemental (2)**
155:7;159:18
**support (4)**
17:3;18:17;83:21;
108:5
**suppose (4)**
78:24;107:2;
166:15;175:12
**supposed (1)**
211:5
**sure (31)**
20:13;21:3;35:13;
43:9;49:12;55:13,
18;56:25;60:13;
62:3,12;63:15,15;
64:16;65:7;75:11;
81:5;86:15,16;88:2;
108:2;141:15;147:6,
6,7;149:12,25;
171:25;174:19;
212:23;213:8
**suspect (1)**
154:3
**swear (1)**
9:25
**switch (1)**
89:5
**sworn (2)**
10:12;113:6
**system (56)**
40:9,10;56:11;
59:15,16;60:9,11,24;
61:5,19;63:9;67:15;
68:9,16;69:9;70:4,
12,22;71:2,9,15;
76:16;84:14,16;86:3,
6,11;96:19;103:15,
21;110:23;111:6;
121:10,21,23;
136:23;137:4,14,18,
20;138:4;139:5,8;
156:15;157:20;
161:4,24;163:21;
168:11,12,13;
169:12,15;174:5;
209:2,5
**systems (3)**
17:3;56:10;130:9
**System's (1)**
158:9

**T**

**tactic (1)**
154:18
**tag (1)**
134:19
**talk (5)**
30:14;45:22;
96:14;101:6;166:23
**talked (4)**
46:12;51:18,20;
102:8
**talking (9)**
12:8;35:19;46:21;
56:22;57:21;158:23;
198:6,8,19
**tape (1)**
89:6
**tasks (1)**
71:18
**tax (3)**
21:6;95:19,23
**taxes (1)**
32:11
**technical (1)**
125:9
**technically (1)**
111:20
**technology (3)**
206:12;208:23;
218:11
**TELEPHONE (3)**
5:3;6:3;10:3
**television (11)**
38:14;42:2,9;
57:12,13,14;58:7;
68:10;168:17;199:2;
207:25
**televisions (5)**
41:19;54:13;
198:2,19;205:11
**telling (1)**
165:13
**ten (1)**
181:10
**tenant (1)**
175:9
**tenants (5)**
20:14,16;139:3;
173:25;174:16
**tend (2)**
66:17;91:24
**terms (5)**
61:3;104:11;
131:15;205:16;
209:19
**testified (6)**
10:13;70:25;
113:7;126:16;180:4;
189:17
**testify (7)**
16:13,17;25:5,8,

11;127:4;168:5
**testifying (2)**
11:4;115:25
**testimony (58)**
13:2,7;14:4,14;
22:25;27:20;42:19;
46:25;47:10;50:17;
70:14;76:18;80:18;
95:16;99:11;103:17,
23;104:21;105:11;
110:8;111:9;114:12;
143:3;145:18;
160:24;161:6,18;
162:3;164:3,14;
165:4,5;170:20;
171:4,7,21;172:23;
173:15;174:9;175:6;
176:19;177:4;178:9,
22;179:11;189:12;
199:15;201:5,17;
202:5,25;204:2,8,14;
209:11;214:10;
217:8;218:24
**Texas (1)**
123:5
**Thanks (3)**
55:21;147:21;
216:25
**thereabouts (1)**
42:10
**third (4)**
64:11,14;184:14;
197:8
**thoroughly (1)**
61:13
**though (6)**
74:25;95:25;
133:19;134:13;
135:18;182:11
**thought (2)**
128:23;132:25
**three (15)**
51:22;55:5;59:10;
64:15,16,17;87:4;
96:2;97:11;116:19;
135:22;137:8;138:3;
167:18;205:19
**threw (2)**
56:11;122:18
**Throughout (3)**
14:17;38:10;
210:20
**Thursday (1)**
66:12
**times (4)**
50:22;51:15,20,22
**today (18)**
10:18,21,22;13:3;
14:3,9,13;15:18;
16:13,17;22:25;
27:20;28:9;31:5;
58:2;115:25;216:14;
217:2

**Today's (3)**
9:6;29:10,17
**together (6)**
76:8,16;77:2,6;
103:19;107:3
**told (3)**
132:19;133:7;
195:12
**took (1)**
150:9
**top (4)**
92:10;94:11;
96:25;120:4
**topics (4)**
16:10,14;24:20;
37:16
**Toshiba (23)**
9:20;10:17;130:8;
154:6,10,12;156:14;
157:5,9,19;158:9;
159:9,13,14;180:9;
193:23;194:9,16;
197:20;198:25;
216:4,7,10
**Toshiba's (1)**
157:10
**total (8)**
30:20;103:14;
106:21;161:19;
164:18;176:6,8,12
**totality (1)**
165:22
**track (1)**
34:10
**trade (4)**
200:17;202:11;
203:18;209:17
**training (1)**
33:24
**transcript (3)**
198:13;202:22;
203:24
**transcripts (1)**
30:9
**transferred (1)**
182:18
**travel (1)**
117:19
**trial (1)**
126:16
**true (9)**
142:19;143:6,8;
150:20;159:5;185:9,
22;193:2;195:13
**truthful (1)**
13:7
**try (2)**
48:5;173:25
**Tube (13)**
9:10;21:17;34:22,
25;37:12;38:11,12,
17;44:9;45:2;54:10;
78:8,14

IN RE:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION                    ALVIN GUTTMAN
STATE OF CALIFORNIA v. SAMSUNG SDI, INC., CO., LTD.                    October 11, 2012

**tubes (8)**
  21:11,15;34:21,
  25;37:12;38:11;
  44:10,11
**turn (10)**
  99:21;110:15;
  159:24;193:15;
  194:19;199:5;
  210:14;211:18;
  213:21;215:15
**Turning (1)**
  153:13
**TV (1)**
  168:15
**twice (1)**
  165:12
**Two (32)**
  18:9;34:18;42:16;
  49:2;51:22;53:6,7;
  64:16;81:4,15,16;
  87:4,4;117:2,3,4;
  126:4;140:25;141:6,
  14;151:15;157:6;
  167:18;170:9;
  176:18;189:14;
  190:21;205:19;
  208:13;209:8;
  218:25;219:17
**two-week (1)**
  66:18
**type (5)**
  34:17;39:24;
  166:16;167:3;208:3
**types (2)**
  41:14;139:13
**typically (2)**
  115:4,17
**typing (1)**
  18:24

**U**

**ultimate (1)**
  19:2
**ultimately (1)**
  163:7
**unable (1)**
  214:7
**uncompetitive (1)**
  199:18
**under (14)**
  11:5;45:13,18,21;
  107:17;110:15;
  113:11;114:5;122:7;
  140:14;149:2;
  179:18;203:6;
  219:22
**unfair (2)**
  154:18;209:17
**unit (4)**
  95:7;99:22,25;
  100:16
**United (1)**

  199:8
**University (2)**
  32:24;33:13
**unlawful (4)**
  203:14;210:22,23,
  24
**unless (3)**
  12:2;36:22;43:23
**unlikely (1)**
  173:19
**unmarket (1)**
  201:7
**unreasonable (1)**
  179:6
**unrelated (1)**
  127:15
**unused (1)**
  88:8
**up (17)**
  20:15;55:12;61:2;
  132:4;137:14,18,20,
  25,25;138:4;154:17;
  155:19;173:2;
  174:12;179:4;
  193:13;219:17
**update (1)**
  154:9
**upgraded (1)**
  86:19
**upgrades (2)**
  102:16,17
**upon (2)**
  187:5;200:15
**upper (1)**
  120:5
**UPS (1)**
  122:23
**use (9)**
  63:25;64:9;80:22;
  81:17;91:24;92:3;
  102:7;115:4;136:22
**used (15)**
  11:13,14;80:22;
  82:15,15;87:13;
  97:19;101:9;109:4;
  116:9,11,15;124:19;
  137:9;205:24
**user (4)**
  21:17;122:13,20;
  163:7
**using (8)**
  18:20,25;81:2,7,
  10;102:11;124:5;
  178:4
**usual (1)**
  36:22
**Usually (2)**
  22:2;66:6
**utilized (1)**
  60:13

**V**

  vacation (1)
  66:18
**vague (33)**
  27:15;29:13;35:4;
  41:25;42:19;45:15;
  47:8;49:20;50:17;
  52:13;56:17;70:6,
  17;71:11;75:18;
  80:8;97:5;103:9;
  132:10;140:7,17;
  145:17;149:9;
  163:13;166:20;
  167:7,23;168:23;
  173:23;194:18;
  195:25;201:16;
  206:14
**Vaguely (1)**
  26:14
**value (2)**
  104:11;107:4
**various (2)**
  34:5;120:16
**verification (16)**
  29:3,4;53:23;
  139:24;141:10;
  142:6;151:12;
  155:24;156:12,13,
  18;157:3,5;158:15,
  21;220:19
**verifications (7)**
  141:15;151:10,15;
  218:25;219:17,25;
  220:13
**verify (2)**
  142:9;163:19
**Verizon (1)**
  138:2
**versus (3)**
  201:7;218:10,14
**VIA (2)**
  5:3;6:3
**vice-president (1)**
  18:6
**Videographer (23)**
  6:14;9:2,3,24;
  10:4;58:14,17;65:10,
  13;89:7,10;111:24;
  113:3;147:22,25;
  150:3,6;155:11,14;
  188:13,16;215:17,20
**videotaped (1)**
  9:12
**view (1)**
  165:22
**viewable (1)**
  90:19
**viewing (1)**
  164:18
**violating (5)**
  162:10,18;179:22;
  213:24;214:6
**violations (8)**
  48:12;170:8;

  171:14;187:22,23;
  203:19;204:10;
  209:20
**volume (1)**
  179:4
**voluntarily (2)**
  154:2,19

**W**

**wait (1)**
  85:6
**waive (1)**
  34:9
**Walker (1)**
  184:5
**Wands (2)**
  18:11,15
**W-A-N-D-S (1)**
  18:12
**wants (2)**
  154:13;176:4
**Washington (28)**
  5:20;6:9,13;9:9;
  13:15;16:22;19:9,
  13;31:24;60:10;
  62:14,21,22;65:18;
  66:11,17;113:20;
  115:4,18,20;116:4,
  11,15;117:23,24;
  118:10,19;140:12
**waste (1)**
  128:23
**way (9)**
  11:2;26:5;42:7;
  83:6;89:2;123:24;
  162:15;173:25;
  192:14
**website (7)**
  72:8;76:2,3;84:18;
  101:16;104:16;
  117:22
**websites (2)**
  84:7,20
**weekly (2)**
  66:6,7
**weeks (2)**
  49:2;52:23
**weight (2)**
  120:10,13
**WEIL (2)**
  5:5;59:2
**welcome (1)**
  217:3
**weren't (2)**
  46:22;116:21
**whatsoever (1)**
  21:19
**White (3)**
  9:18,19;10:17
**whole (2)**
  101:5;172:7
**wife (5)**

  17:15,19,22,24;
  42:10
**wife's (1)**
  17:16
**willing (1)**
  154:22
**win (1)**
  176:13
**Windows (1)**
  94:18
**wish (1)**
  43:25
**withdraw (14)**
  26:24;37:19;49:8;
  82:13;103:4;107:11;
  126:24;131:9;
  149:21;165:8;
  167:17;177:3;
  205:20;215:13
**Withdrawn (1)**
  94:9
**withhold (4)**
  136:6,10,13,17
**within (14)**
  29:18;42:3;49:2;
  63:16;84:17;99:14;
  108:6;109:2;110:3;
  163:10;167:20;
  185:9;207:2,4
**without (3)**
  71:19;142:24;
  183:7
**witness (15)**
  9:22,25;14:13;
  24:7,16;27:22;35:18,
  21;36:25;38:25;
  41:6;57:25;127:9;
  154:16;186:22
**word (5)**
  18:16,24;40:4,6;
  177:18
**work (4)**
  17:23;18:7;66:2;
  136:7
**worked (1)**
  34:20
**working (1)**
  114:18
**works (1)**
  191:15
**written (7)**
  138:14;139:13;
  154:8,10,13;155:7;
  159:18
**wrong (1)**
  143:23
**wrongful (2)**
  42:15;44:25
**wrote (1)**
  138:17

**X**

Case 4:07-cv-05944-JST   Document 6232-4   Filed 07/29/23   Page 536 of 866
IN RE:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION
STATE OF CALIFORNIA v. SAMSUNG SDI, INC., CO., LTD.

ALVIN GUTTMAN
October 11, 2012

**XP (1)**
94:17

**Y**

**year (3)**
180:2,3;181:11
**years (9)**
32:25;33:14;
34:18;63:17;87:4;
127:25;163:9;207:2,
3
**Yep (1)**
144:8
**Yesterday (4)**
49:24;50:20,23;
51:2
**York (2)**
5:12,12

**0**

**000907 (1)**
90:22
**000910 (1)**
93:21
**07-5944 (1)**
9:11

**1**

**1 (11)**
132:8;144:5;
151:21;152:4,21,23,
24;153:6;197:4,6;
199:5
**1:03 (1)**
111:25
**1:56 (1)**
113:4
**10 (6)**
63:16;95:13;
163:9;185:6;207:2,3
**10:03 (1)**
9:7
**10:30 (2)**
114:19;115:20
**10:35 (1)**
114:7
**10153-0119 (1)**
5:12
**10th (1)**
83:12
**11 (214)**
9:1;10:1;11:1;
12:1;13:1;14:1;15:1;
16:1;17:1;18:1;19:1;
20:1;21:1;22:1;23:1;
24:1;25:1;26:1;27:1;
28:1;29:1;30:1;31:1;
32:1;33:1;34:1;35:1;
36:1;37:1;38:1;39:1;
40:1;41:1;42:1;43:1;

44:1;45:1;46:1;47:1;
48:1;49:1;50:1;51:1;
52:1;53:1;54:1;55:1;
56:1;57:1;58:1;59:1;
60:1;61:1;62:1;63:1;
64:1;65:1;66:1;67:1;
68:1;69:1;70:1;71:1;
72:1;73:1;74:1;75:1;
76:1;77:1;78:1;79:1;
80:1;81:1;82:1;83:1;
84:1;85:1;86:1;87:1;
88:1;89:1;90:1;91:1;
92:1;93:1;94:1;95:1;
96:1;97:1;98:1;99:1;
100:1;101:1;102:1;
103:1;104:1;105:1;
106:1;107:1;108:1;
109:1;110:1;111:1;
112:1;113:1;114:1;
115:1;116:1;117:1;
118:1;119:1;120:1;
121:1;122:1;123:1;
124:1;125:1;126:1;
127:1;128:1;129:1;
130:1;131:1;132:1;
133:1;134:1;135:1;
136:1;137:1;138:1;
139:1;140:1;141:1;
142:1;143:1;144:1;
145:1;146:1;147:1;
148:1;149:1;150:1;
151:1;152:1;153:1;
154:1;155:1;156:1;
157:1;158:1;159:1;
160:1;161:1;162:1;
163:1;164:1;165:1;
166:1;167:1;168:1;
169:1;170:1;171:1;
172:1;173:1;174:1;
175:1;176:1;177:1;
178:1;179:1;180:1;
181:1;182:1;183:1;
184:1,10;185:1;
186:1;187:1;188:1,
20;189:1;190:1;
191:1;192:1;193:1;
194:1;195:1;196:1;
197:1;198:1;199:1;
200:1;201:1;202:1;
203:1;204:1;205:1;
206:1;207:1;208:1;
209:1;210:1;211:1;
212:1;213:1;214:1;
215:1;216:1;217:1;
218:1;219:1;220:1
**11:06 (1)**
58:15
**11:30 (1)**
58:18
**11:38 (1)**
65:11
**11:39 (1)**
65:14

**1100 (31)**
64:19;65:17,21;
66:20;67:2;68:9;
80:22,23;81:2,23;
82:15;83:21,23;
86:14,21;87:11,13;
90:5,6,14;94:15;
97:18;102:13;
113:14;117:4,22;
122:14;133:19;
196:18;217:5,19
**11th (2)**
9:7;107:16
**12:16 (1)**
89:8
**12:27 (1)**
89:11
**1299 (1)**
5:19
**1300 (1)**
9:5
**134 (1)**
194:24
**13th (1)**
9:8
**15 (1)**
193:15
**16 (1)**
90:18
**1625 (1)**
6:8
**17 (4)**
78:6;90:18;132:4;
199:6
**17th (1)**
31:23
**1875 (1)**
9:5
**19 (2)**
190:24;191:21
**193 (1)**
215:16
**1953 (1)**
32:16
**1971 (2)**
32:20;33:2
**1975 (1)**
33:2
**1979 (1)**
33:15
**1985 (1)**
42:10
**1995 (9)**
35:6;37:5,13;
54:20,25;155:17;
169:3;212:14;
214:23
**1997 (7)**
17:13;20:4,7;32:4;
60:4;62:7;81:8
**1st (1)**
54:20,25;155:17;
169:3;212:14;

214:22,23

**2**

**2 (3)**
90:12,13;182:16
**2:53 (1)**
148:2
**2:56 (1)**
150:4
**20 (2)**
91:13;114:6
**2000 (1)**
214:22
**20004-400 (1)**
5:20
**20006 (2)**
6:9;31:24
**2002 (1)**
207:4
**2006 (11)**
60:4;62:7;64:20,
22;91:14;97:18;
101:12;114:6,9;
136:3;209:3
**2007 (9)**
54:21;55:2;
155:18;169:4;
207:11,17;208:6;
212:15;214:23
**2010 (1)**
185:6
**2011 (1)**
142:12
**2012 (226)**
9:1,7;10:1;11:1;
12:1;13:1;14:1;15:1,
6;16:1;17:1;18:1;
19:1;20:1;21:1;22:1;
23:1,12,18;24:1;
25:1;26:1;27:1;28:1;
29:1;30:1;31:1;32:1;
33:1;34:1;35:1;36:1;
37:1;38:1;39:1;40:1;
41:1;42:1;43:1;44:1;
45:1,12;46:1;47:1;
48:1,22;49:1;50:1;
51:1;52:1;53:1,2;
54:1;55:1;56:1;57:1;
58:1;59:1;60:1;61:1;
62:1;63:1;64:1;65:1;
66:1;67:1;68:1;69:1;
70:1;71:1;72:1;73:1;
74:1;75:1;76:1;77:1;
78:1;79:1;80:1;81:1;
82:1;83:1;84:1;85:1;
86:1;87:1;88:1;89:1;
90:1;91:1;92:1;93:1;
94:1;95:1;96:1;97:1;
98:1;99:1;100:1;
101:1;102:1;103:1;
104:1;105:1;106:1;
107:1;108:1;109:1;

110:1;111:1;112:1;
113:1;114:1;115:1;
116:1;117:1;118:1;
119:1;120:1;121:1;
122:1;123:1;124:1;
125:1;126:1;127:1;
128:1;129:1;130:1;
131:1;132:1;133:1;
134:1;135:1;136:1;
137:1;138:1;139:1;
140:1,8;141:1;
142:1;143:1;144:1;
145:1;146:1;147:1;
148:1;149:1;150:1;
151:1;152:1;153:1;
154:1;155:1;156:1,
19;157:1;158:1;
159:1;160:1;161:1;
162:1;163:1;164:1;
165:1;166:1;167:1;
168:1;169:1;170:1;
171:1;172:1;173:1;
174:1;175:1;176:1;
177:1;178:1;179:1;
180:1,5;181:1;
182:1;183:1;184:1;
185:1;186:1;187:1;
188:1;189:1;190:1;
191:1;192:1;193:1;
194:1;195:1;196:1;
197:1;198:1;199:1;
200:1;201:1;202:1;
203:1;204:1;205:1,
12;216:1;217:1;
218:1;219:1;220:1
**22 (4)**
143:13,25;145:10;
153:16
**2235 (1)**
114:6
**2235.59 (1)**
114:9
**23 (1)**
157:17
**24 (3)**
158:5,24;159:25
**249 (8)**
199:22;200:4,12;
201:14;202:3,19;
203:15;209:9
**24th (1)**
97:18
**25 (6)**
54:21;55:2;
155:18;169:4;
212:15;214:23
**26 (10)**
147:15,20;150:11;
152:4,25;153:3,4,15;

Case 4:07-cv-05944-JST Document 6232-4 Filed 07/29/23 Page 537 of 866

IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION
STATE OF CALIFORNIA v. SAMSUNG SDI, INC., CO., LTD.

ALVIN GUTTMAN
October 11, 2012

154:23;159:11
**27 (5)**
150:24;151:21;
152:22;153:13;
154:9
**28 (1)**
204:17
**284 (2)**
210:15,17
**285 (1)**
213:22
**286 (2)**
211:19,20
**29th (3)**
140:19;141:24;
156:21

**3**

**3 (7)**
95:22;96:25;
101:13;111:15;
120:21;153:14,15
**3/20 (1)**
114:9
**3:15 (1)**
150:7
**3:24 (1)**
155:12
**3:36 (1)**
155:15
**30 (1)**
109:2
**30.90 (1)**
120:6
**30b6 (8)**
14:5;16:8;58:3;
129:21;137:6;146:5,
22;179:9
**31 (1)**
194:19
**31st (1)**
142:12
**32 (4)**
152:5;153:2;
154:24;159:11
**33 (16)**
152:9,13,15;153:5,
9,20;154:24;157:5;
159:10;215:22,25;
216:4,7,10;219:7,8
**366 (3)**
15:23,24;16:3
**367 (14)**
89:14,18;90:22;
113:24,25;120:21;
121:2;134:3;217:6,9,
13,14;218:19,23
**368 (6)**
118:13;119:21;
120:22;121:2;134:9;
135:8
**369 (7)**

119:11;120:4,22;
121:2;123:4;135:2,5
**370 (4)**
130:8,14;131:7;
145:10
**371 (11)**
139:24;140:3;
141:5;151:12,18;
219:4,6,11,17;220:2,
13
**372 (10)**
152:9,12;154:2,
20;219:7,14,19,21;
220:3,6
**373 (11)**
153:20;154:2,21;
157:4,10;219:9,14,
19,22;220:3,6
**374 (9)**
155:24;156:9;
158:18,21;219:4,6,
18;220:2,13
**375 (1)**
181:21
**376 (3)**
215:22;220:7,14
**377 (1)**
215:25
**378 (1)**
216:4
**379 (1)**
216:7
**380 (2)**
216:10;220:15
**39 (4)**
153:21;215:23;
216:8,11

**4**

**4 (9)**
90:12,13,14;
95:22;96:5,5,25;
111:15;144:5
**4:29 (1)**
188:14
**4:43 (1)**
188:17
**40 (11)**
152:10,14,16;
153:21;154:24;
159:10;215:23;
216:2,5,8,11
**45 (1)**
215:15
**4501 (1)**
204:17
**4th (1)**
101:12

**5**

**5 (1)**

190:24
**5:33 (1)**
215:18
**5:44 (1)**
215:21
**50 (2)**
190:24;191:21
**58 (2)**
146:25;147:18
**59 (1)**
32:16

**6**

**6 (3)**
151:21;160:3;
161:22
**61 (1)**
199:22

**7**

**7 (1)**
153:14
**701 (1)**
9:8
**71 (3)**
193:16,16,20
**75 (1)**
33:15
**767 (1)**
5:11
**77 (1)**
220:7
**78 (1)**
220:8
**79 (1)**
220:8

**8**

**80 (1)**
220:8
**800 (1)**
31:23

**9**

**9 (5)**
32:16;159:25;
188:21,21;190:25
**90067 (1)**
9:6
**907 (2)**
120:23;121:5
**908 (11)**
94:11;95:3;99:21;
104:5,16;106:14,16,
22;107:16;113:24;
114:4
**909 (6)**
90:23;100:4;
104:19;106:11,13;

110:15
**910 (2)**
31:23;134:10
**911 (3)**
120:23;121:5;
135:3
**92 (4)**
210:14,17;211:19;
213:21
**93 (2)**
211:19;212:24
**941s (1)**
21:7

# EXHIBIT 59

1 | Mario N. Alioto, Esq. (56433)
Lauren C. Russell, Esq. (241151)
2 | TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
3 | San Francisco, CA 94123
Telephone: (415) 563-7200
4 | Facsimile: (415) 346-0679
malioto@tatp.com
5 | laurenrussell@tatp.com

6 | *Interim Lead Counsel for the Indirect Purchaser Plaintiffs*

7

8

9 | **UNITED STATES DISTRICT COURT**

10 | **NORTHERN DISTRICT OF CALIFORNIA**

11 | **SAN FRANCISCO DIVISION**

12

| IN RE: CATHODE RAY TUBE (CRT) | Master File No. CV-07-5944 SC |
| ANTITRUST LITIGATION | |
| | MDL No. 1917 |

13

14

15 | | **INDIRECT PURCHASER PLAINTIFFS'** |
| This Document Relates to: | **RESPONSES TO DEFENDANT SAMSUNG SDI** |
16 | | **CO., LTD.'S FIRST SET OF** |
| ALL INDIRECT PURCHASER ACTIONS | **INTERROGATORIES** |

17

**DEPOSITION**
**EXHIBIT**
145

18

19 | **PROPOUNDING PARTY:** **SAMSUNG SDI CO., LTD.**

20 | **RESPONDING PARTY:** **INDIRECT PURCHASER PLAINTIFFS**

21 | **SET NUMBER:** **ONE**

22 |     Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Indirect Purchaser

23 | Plaintiffs hereby respond and object to the First Set of Interrogatories propounded by Defendant

24 | Samsung SDI Co., Ltd. ("Defendant"), as set forth below.

25 | **PRELIMINARY STATEMENT**

26 |     Each of the following responses is subject to all objections of and concerning relevance,

27 | materiality, and admissibility, as well as to all and any other objections on any ground requiring

28 |

INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT SAMSUNG SDI CO., LTD.'S
FIRST SET OF INTERROGATORIES CASE NO. CV-07-5944 SC

1   exclusion of any response if introduced in Court. All evidentiary objections and grounds

2   accordingly are expressly reserved. Furthermore, Indirect Purchaser Plaintiffs' decision, now or

3   in the future, to provide information notwithstanding the objectionable nature of the

4   Interrogatories shall not be construed as: (a) an admission that they agree with any of

5   Defendant's definitions or characterizations contained therein, or (b) an admission that the

6   information sought likely will lead to the discovery of admissible evidence, or (c) an agreement

7   that requests for similar information will be treated in a similar manner.

8        For purposes of these Interrogatories, Indirect Purchaser Plaintiffs define the term "CRT

9   Products" as televisions and computer monitors containing CRTs.

10        Indirect Purchaser Plaintiffs' responses to the within First Set of Interrogatories are made

11   without prejudice to their right to introduce any or all evidence of any kind in this case.

12        The specific responses and objections set forth below are based upon information now

13   known. Indirect Purchaser Plaintiffs have not yet completed discovery or preparation for trial in

14   this case, and, therefore, reserve the right to amend, modify, or supplement any general or

15   specific objection or response.

16        Nothing in their responses to these Interrogatories shall be construed as an admission by

17   Indirect Purchaser Plaintiffs going to the competence, admissibility, relevance, or materiality of

18   any fact or document, or as an admission of the truth or accuracy of any characterization of any

19   information of any kind sought by these Interrogatories.

20        Indirect Purchaser Plaintiffs reserve their right to object to use of their responses herein,

21   or the subject matter thereof, on any ground in this or in any subsequent proceeding, including,

22   without limitation, the right to object on any ground at any time to the use of such responses in

23   any discovery procedures in this or any proceeding, and/or at trial.

24        The Indirect Purchaser Plaintiffs' responses to the Interrogatories are subject to the

25   provisions of the Stipulated Protective Order entered by the Court June 18, 2008 (Document

26   306) (the "Protective Order"). The Indirect Purchaser Plaintiffs' Interrogatory Responses hereby

27   are designated "Confidential" in accordance with the provisions of the Protective Order.

28

INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT SAMSUNG SDI CO., LTD.'S
FIRST SET OF INTERROGATORIES CASE NO. CV-07-5944 SC

1   Each of the General Objections herein is considered applicable to and is hereby
2   incorporated into each and every response by Plaintiffs to the Interrogatories, and each response
3   is given without waiving any of the General Objections. The assertion of any General Objection
4   in response to any Interrogatory should not be considered a waiver of the remaining General
5   Objections. By making the responses herein, Plaintiffs do not concede that the information
6   provided is relevant to the claims or defenses of any party or reasonably calculated to lead to the
7   discovery of admissible evidence.

8
9                              **GENERAL OBJECTIONS**

10      1.      Indirect Purchaser Plaintiffs object to, and will not answer, the Interrogatories to
11  the extent they seek discovery of information, legal analysis, and/or strategies concerning any
12  Class Certification motion Indirect Purchaser Plaintiffs may file under Rule 23 of the Federal
13  Rules of Civil Procedure. Such information, legal analysis, and/or strategies are protected from
14  disclosure by the attorney-client privilege and/or the work-product doctrine.

15      2.      Indirect Purchaser Plaintiffs object to, and will not answer, the Interrogatories to
16  the extent Defendant intends or purports to impose obligations beyond those required or
17  permitted by the Federal Rules of Civil Procedure and the Local Rules of the Northern District of
18  California, or to the extent they are outside the scope of any order or opinion of this Court or of
19  the Special Master, or contrary to any applicable rules of law.

20      3.      Indirect Purchaser Plaintiffs object to, and will not answer, the Interrogatories to
21  the extent they comprise premature "contention interrogatories," the answers to which are
22  dependent on merits and/or expert discovery. Pursuant to Rule 33(a)(2) of the Federal Rules of
23  Civil Procedure, Indirect Purchaser Plaintiffs, as necessary or appropriate, will respond to proper
24  "contention interrogatories" after merits and expert discovery is complete, and/or after some
25  other time as directed by the Court or Special Master. *See, e.g., In re Convergent Technologies*
26  *Securities Litigation*, 108 F.R.D. 328, 336 N.D. Cal. 1985) ("There is considerable recent
27  authority for the view that the wisest general policy is to defer propounding and answering

28

INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT SAMSUNG SDI CO., LTD.'S
FIRST SET OF INTERROGATORIES CASE NO. CV-07-5944 SC

1  contention interrogatories until near the end of the discovery period."); *In re eBay Seller*

2  *Antitrust Litigation*, No. C 07-1882 JF (RS), 2008 WL 5212170, at *1 (N.D. Cal. Dec. 11, 2008)

3  ("Courts using their Rule 33(a)(2) discretion generally disfavor contention interrogatories asked

4  before discovery is undertaken.").

5       4.      Indirect Purchaser Plaintiffs object to the Interrogatories, including the

6  Definitions and Instructions set forth therein, to the extent (a) they seek to elicit information

7  relating or referring to matters not raised by the pleadings, or (b) they seek to elicit information

8  that is not relevant to the claims or defenses of the parties to this action, or (c) they seek to elicit

9  information that is not within Indirect Purchaser Plaintiffs' possession, custody, or control, or (d)

10  they seek to elicit information not reasonably calculated to lead to the discovery of admissible

11  evidence.

12       5.      Indirect Purchaser Plaintiffs object to, and will not answer, the Interrogatories to

13  the extent they seek information protected by the attorney-client privilege, work-product

14  doctrine, or any other applicable privilege, protection, immunity, or rule (collectively,

15  "Privileged   Information"),   including,   without   limitation,   information   concerning

16  communications between Indirect Purchaser Plaintiffs' attorneys, and/or between Indirect

17  Purchaser Plaintiffs and their attorneys, made during, or in anticipation of, litigation.   Any

18  inadvertent disclosure of such information is not intended to, and shall not, constitute a general

19  or specific waiver, in whole or in part, of the foregoing privileges or immunities, or the subject

20  matter thereof. Relatedly, any inadvertent disclosure of such information is not intended to, nor

21  shall it, constitute a waiver of the right to object to any use of such information, and any such

22  disclosure shall be treated as specified in Rule 26(b)(5)(B) of the Federal Rules of Civil

23  Procedure.

24       6.      Indirect Purchaser Plaintiffs object to, and will not answer, the Interrogatories to

25  the extent that (a) they seek the premature disclosure of expert material subject to Rule

26  26(a)(2)(C) of the Federal Rules of Civil Procedure, and/or (b) they seek disclosure of

27  information concerning any person or entity whom Indirect Purchaser Plaintiffs will not

28

4

1    designate as an opinion or other witness at trial.

2         7.     Indirect Purchaser Plaintiffs object to the Interrogatories, including the
3    Definitions and Instructions set forth therein, to the extent they seek information that is equally
4    accessible to Defendant as it is to Indirect Purchaser Plaintiffs, or that has been provided by other
5    parties or witnesses.

6         8.     Indirect Purchaser Plaintiffs object to the Interrogatories, including the
7    Definitions and Instructions set forth therein, to the extent they are cumulative to or duplicative
8    of other Interrogatories.

9         9.     Indirect Purchaser Plaintiffs object to, and will not answer, the Interrogatories to
10   the extent that they seek confidential or proprietary business information and research.

11        10.    Indirect Purchaser Plaintiffs object to the purported definition of the terms
12   "YOU" and "YOUR" because they are vague, ambiguous, overly broad, and unduly
13   burdensome, as they seek information that is neither relevant nor reasonably calculated to lead to
14   the discovery of admissible information. Responding further, Indirect Purchaser Plaintiffs object
15   to the inclusion of "agents, attorneys, representatives, or other persons acting or purporting to act
16   on behalf of the responding Plaintiff," within this Definition to the extent it purports to
17   encompass information that is protected by attorney-client privilege and/or work-product
18   doctrine, or any other applicable privilege, protection, immunity, or rule.

19        11.    Indirect Purchaser Plaintiffs object to the purported definition of the term
20   "DOCUMENT" to the extent it attempts to impose burdens on them greater than or inconsistent
21   with those imposed by  the Federal Rules of Civil Procedure or the Local Rules for the United
22   States District Court for the Northern District of California.

23        12.    Indirect Purchaser Plaintiffs object to the purported definition of the term
24   "COMPLAINT" as overly broad to the extent it is construed to refer to any Complaint other than
25   Indirect Purchaser Plaintiffs' Second Consolidated Amended Complaint filed May 10, 2010 in
26   the United States District Court for the Northern District of California.

27        13.    Indirect Purchaser Plaintiffs object to the Interrogatories, including the

28
                                                  5

1  Definitions and Instructions set forth therein, to the extent they purport to require Indirect
2  Purchaser Plaintiffs to identify documents supportive of a response on the ground that any such
3  information is subject to the attorney-client privilege and/or work product doctrine at this stage
4  of this case.

5       14.    Indirect Purchaser Plaintiffs object to the Interrogatories, including the
6  Definitions and Instructions set forth therein, to the extent any one or more or all of them assume
7  disputed facts or legal conclusions. Any response or objection herein is without prejudice to this
8  objection and Indirect Purchaser Plaintiffs' right to dispute such purported facts or legal
9  conclusions.

10                **SPECIFIC OBJECTIONS AND RESPONSES**

11  **INTERROGATORY NO. 1:**

12       IDENTIFY all PERSONS who participated or assisted in the preparation of YOUR
13  responses to these interrogatories.

14  **RESPONSE NO. 1:**

15       In addition to their General Objections listed above, Indirect Purchaser Plaintiffs object to
16  Interrogatory No. 1 because it calls for the disclosure of privileged information, including
17  without limitation, information subject to the attorney-client privilege and/or the work product
18  doctrine.  Indirect Purchaser Plaintiffs also object to Interrogatory No. 1 because it seeks
19  information that is neither relevant nor reasonably calculated to lead to the discovery of
20  admissible evidence.

21       Subject to and without waving the objections stated above, Indirect Purchaser Plaintiffs
22  respond by referring to Group Exhibit A-1 through A-30, annexed hereto, which represents their
23  current best efforts to supply the information requested.

24  **INTERROGATORY NO. 2:**

25       Separately identify each acquisition of a CRT upon which YOU base any claim in this
26  action, including without limitation the date and place of acquisition, the type and manufacturer
27  of each CRT acquired, and the IDENTITY of each PERSON involved in the acquisition and the

28

1   time period and nature of each PERSON'S involvement.

2       As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports
3   YOUR response.

4   **RESPONSE NO. 2:**

5       In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to
6   Interrogatory No. 2 because the term "acquisition" is vague, ambiguous, and overly broad.

7       Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs
8   respond by stating that they purchased CRT Products containing CRTs. Responding further,
9   Indirect Purchaser Plaintiffs refer to Group Exhibit B-1 through B-30, which represents their
10  current best efforts to supply the information requested.

11  **INTERROGATORY NO. 3:**

12      Separately identify each acquisition of a CRT PRODUCT upon which YOU base any
13  claim in this action, including without limitation the date and place of acquisition, the type and
14  manufacturer of each CRT PRODUCT acquired, and the IDENTITY of each PERSON involved
15  in the acquisition and the time period and nature of each PERSON'S involvement.

16      As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports
17  YOUR response.

18  **RESPONSE NO. 3:**

19      In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to
20  Interrogatory No. 3 because the term "acquisition" is vague, ambiguous, and overly broad.

21      Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs
22  respond by stating that they purchased CRT Products containing CRTs. Responding further,
23  Indirect Purchaser Plaintiffs refer to Group Exhibit B-1 through B-30, which represents their
24  current best efforts to supply the information requested.

25  **INTERROGATORY NO. 4:**

26      For each acquisition of a CRT identified in Interrogatory No. 2, state all terms and
27  conditions that were a part of the acquisition, including without limitation all terms and

28
                                    7

1   conditions RELATING TO pricing, taxes, tariffs, duties, freight charges, or any other fees paid

2   by any PERSON in connection with the acquisition.

3        As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports

4   YOUR response.

5   **RESPONSE NO. 4:**

6        In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to

7   Interrogatory No. 4 because the term "acquisition" is vague, ambiguous, and overly broad.

8        Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs

9   respond by referring to Group Exhibit B-1 through B-30, which represents their current best

10   efforts to supply the information requested.

11   **INTERROGATORY NO. 5:**

12        For each acquisition of a CRT PRODUCT identified in Interrogatory No. 3, state all

13   terms and conditions that were a part of the acquisition, including without limitation all terms

14   and conditions RELATING TO pricing, taxes, tariffs, duties, freight charges, or any other fees

15   paid by any PERSON in connection with the acquisition.

16        As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports

17   YOUR response.

18   **RESPONSE NO. 5:**

19        In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to

20   Interrogatory No. 5 because the term "acquisition" is vague, ambiguous, and overly broad.

21        Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs

22   respond by referring to Group Exhibit B-1 through B-30, which represents their current best

23   efforts to supply the information requested.

24   **INTERROGATORY NO. 6:**

25        For each acquisition of a CRT identified in Interrogatory No. 2, state whether the CRT

26   was acquired as part of a system or other bundled product (e.g., a CRT computer monitor

27   acquired in conjunction with a computer, keyboard, speakers, warranty, service plan, or other

28

1 | services) and, if so, the value of each component of such system or bundled product.

2 | As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports
3 | YOUR response.

4 | **RESPONSE NO. 6:**

5 | In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to
6 | Interrogatory No. 6 because (a) the term "acquisition" and the phrase "acquired as part of a
7 | system or other bundled product (*e.g.*, a CRT computer monitor acquired in conjunction with a
8 | computer, keyboard, speakers, warranty, service plan, or other services)" are vague, ambiguous,
9 | overly broad, and unduly burdensome, and (b) it seeks information that is neither relevant nor
10 | reasonably calculated to lead to the discovery of admissible evidence. Responding further, to the
11 | extent Defendant seeks discovery related to "the value of each component of such system or
12 | bundled product," Indirect Purchaser Plaintiffs also object to Interrogatory No. 6 because it (a)
13 | prematurely seeks to elicit prior to merits discovery legal theories, analysis, and other matters on
14 | which opinion testimony may be required at trial, (b) purports to require a layperson to provide
15 | answers on matters as to which opinion testimony may be required at trial, and (c) calls for legal
16 | conclusions and compels the assumption of facts not yet in evidence, and (d) prematurely seeks
17 | disclosure of expert material subject to Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure.

18 | Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs
19 | respond by referring to Group Exhibit B-1 through B-30, which represents their current best
20 | efforts to supply the information requested.

21 | **INTERROGATORY NO. 7:**

22 | For each acquisition of a CRT PRODUCT identified in Interrogatory No. 3, state whether
23 | the CRT PRODUCT was acquired as part of a system or other bundled product (e.g., a CRT
24 | computer monitor acquired in conjunction with a computer, keyboard, speakers, warranty,
25 | service plan, or other services) and, if so, the value of each component of such system or bundled
26 | product.

27 | As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports

28 |

9

1 YOUR response.

2 **RESPONSE NO. 7:**

3      In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to

4 Interrogatory No. 7 because (a) the term "acquisition" the phrase "acquired as part of a system or

5 other bundled product (*e.g.*, a CRT computer monitor acquired in conjunction with a computer,

6 keyboard, speakers, warranty, service plan, or other services)" are vague, ambiguous, overly

7 broad, and unduly burdensome, and (b) it seeks information that is neither relevant nor

8 reasonably calculated to lead to the discovery of admissible evidence. Responding further, to the

9 extent Defendant seeks discovery related to "the value of each component of such system or

10 bundled product," Indirect Purchaser Plaintiffs also object to Interrogatory No. 7 because it (a)

11 prematurely seeks to elicit prior to merits discovery legal theories, analysis, and other matters on

12 which opinion testimony may be required at trial, (b) purports to require a layperson to provide

13 answers on matters as to which opinion testimony may be required at trial, and (c) calls for legal

14 conclusions and compels the assumption of facts not yet in evidence, and (d) prematurely seeks

15 disclosure of expert material subject to Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure.

16      Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs

17 respond by referring to Group Exhibit B-1 through B-30, which represents their current best

18 efforts to supply the information requested.

19 **INTERROGATORY NO. 8:**

20      For each acquisition of a CRT identified in Interrogatory No. 2, identify any warranties,

21 servicing plans or agreements, membership rewards, or other benefits received by YOU

22 RELATING TO the acquisition.

23      As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports

24 YOUR response.

25 **RESPONSE NO. 8:**

26      In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to

27 Interrogatory No. 8 because (a) the terms "servicing plans or agreements, membership rewards,

28
INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT SAMSUNG SDI CO., LTD.'S
FIRST SET OF INTERROGATORIES CASE NO. CV-07-5944 SC

1  or other benefits" are vague, ambiguous, and overly broad, and (b) it seeks information that is
2  neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

3      Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs
4  respond by referring to Group Exhibit B-1 through B-30, which represents their current best
5  efforts to supply the information requested.

6  **INTERROGATORY NO. 9:**

7      For each acquisition of a CRT PRODUCT identified in Interrogatory No. 3, identify any
8  warranties, servicing plans or agreements, membership rewards, or other benefits received by
9  YOU RELATING TO the acquisition.

10     As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports
11  YOUR response.

12  **RESPONSE NO. 9:**

13     In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to
14  Interrogatory No. 9 because (a) the terms "servicing plans or agreements, membership rewards,
15  or other benefits" are vague, ambiguous, and overly broad, and (b) it seeks information that is
16  neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

17     Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs
18  respond by referring to Group Exhibit B-1 through B-30, which represents their current best
19  efforts to supply the information requested.

20  **INTERROGATORY NO. 10:**

21     Identify the purpose(s) for which YOU acquired each CRT during the RELEVANT
22  PERIOD, including without limitation whether the CRT was acquired for resale and, if so,
23  whether and under what terms and conditions it was resold.

24  **RESPONSE NO. 10:**

25     In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to
26  Interrogatory No. 10 because it seeks information that is neither relevant nor reasonably
27  calculated to lead to the discovery of admissible evidence.

28

1   Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs

2   respond by stating that they indirectly purchased CRT Products containing CRTs for their own

3   use and not for resale.

4   **INTERROGATORY NO. 11:**

5   Identify the purpose(s) for which YOU acquired each CRT PRODUCT during the

6   RELEVANT PERIOD, including without limitation whether the CRT PRODUCT was acquired

7   for resale and, if so, whether and under what terms and conditions it was resold.

8   **RESPONSE NO. 11:**

9   In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to

10   Interrogatory No. 11 because it seeks information that is neither relevant nor reasonably

11   calculated to lead to the discovery of admissible evidence.

12   Subject to and without waiving the objections stated above, Indirect Purchaser Plaintiffs

13   respond by stating that they indirectly purchased CRT Products containing CRTs for their own

14   use and not for resale.

15   **INTERROGATORY NO. 12:**

16   IDENTIFY all PERSONS with knowledge of the factors that influenced each of YOUR

17   decisions to acquire or not to acquire CRTs during the RELEVANT PERIOD.

18   **RESPONSE NO. 12:**

19   In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to

20   Interrogatory No. 12 because (a) it seeks information that is neither relevant nor reasonably

21   calculated to lead to the discovery of admissible evidence, and (b) it is harassing and invasive.

22   **INTERROGATORY NO. 13:**

23   IDENTIFY all PERSONS with knowledge of the factors that influenced each of YOUR

24   decisions to acquire or not to acquire CRT PRODUCTS during the RELEVANT PERIOD.

25   **RESPONSE NO. 13:**

26   In addition to the General Objections listed above, Indirect Purchaser Plaintiffs object to

27   Interrogatory No. 13 because (a) it seeks information that is neither relevant nor reasonably

28

12

1  calculated to lead to the discovery of admissible evidence, and (b) it is harassing and invasive.

2  **INTERROGATORY NO. 14:**

3  IDENTIFY all trade publications, advertisements, or news articles RELATING TO the

4  price or product features of CRTs that YOU reviewed during the RELEVANT PERIOD.

5  **RESPONSE NO. 14:**

6  In addition to their General Objections listed above, Indirect Purchaser Plaintiffs object to

7  Interrogatory No. 14 because it seeks information that is neither relevant nor reasonably

8  calculated to lead to the discovery of admissible evidence.

9  **INTERROGATORY NO. 15:**

10  IDENTIFY all trade publications, advertisements, or news articles RELATING TO the

11  price or product features of CRT PRODUCTS that YOU reviewed during the RELEVANT

12  PERIOD.

13  **RESPONSE NO. 15:**

14  In addition to their General Objections listed above, Indirect Purchaser Plaintiffs object to

15  Interrogatory No. 15 because it seeks information that is neither relevant nor reasonably

16  calculated to lead to the discovery of admissible evidence.

17  **INTERROGATORY NO. 16:**

18  State whether, at any time during the RELEVANT PERIOD, YOU elected to acquire a

19  non-CRT television or computer monitor instead of a CRT PRODUCT and, if so, identify

20  YOUR reasons for making each such acquisition.

21  **RESPONSE NO. 16:**

22  In addition to their General Objections listed above, Indirect Purchaser Plaintiffs object to

23  Interrogatory No. 16 because it seeks information that is neither relevant nor reasonably

24  calculated to lead to the discovery of admissible evidence.

25

26

27

28
                                        13

1

2   Dated: July 7, 2010                    By:   */s/ Mario N. Alioto*

3                                                 Mario N. Alioto (56433)
                                                  Lauren C. Russell (241151)
4                                                 TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
                                                  2280 Union Street
5                                                 San Francisco, CA 94123
                                                  Telephone:  (415) 563-7200
6                                                 Facsimile:   (415) 346-0679
                                                  malioto@tatp.com
7                                                 laurenrussell@tatp.com

8                                                 *Interim Lead Counsel for the*
                                                  *Indirect Purchaser Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDIRECT PURCHASER PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT SAMSUNG SDI CO., LTD.'S
FIRST SET OF INTERROGATORIES CASE NO. CV-07-5944 SC

**SAMSUNG EXHIBIT A1**

## PLAINTIFF JERRY COOK

Mr. Cook's claims have been dismissed.

**SAMSUNG EXHIBIT A2**

## PLAINTIFF BRIAN LUSCHER

Brian Luscher
5030 W. Laredo St.
Chandler, AZ  85226

Thomas G. Stack
RYLEY, CARLOCK & APPLEWHITE
One North Central Avenue, Suite 1200
Phoenix, AZ 85004-4417

Robert J. Gralewski, Jr.
KIRBY McINERNY LLP
825 Third Avenue
New York, NY  10022

**SAMSUNG EXHIBIT A3**

**PLAINTIFF JEFFREY FIGONE**

Jeffrey Figone
370 School Road
Novato, CA 94945

Joseph M. Patane
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123

Robert J. Gralewski, Jr.
KIRBY McINERNY LLP
825 Third Avenue
New York, NY 10022

————————————————————————— Produced on 9/7/11 —————————————————————————

**SAMSUNG EXHIBIT A4**

**PLAINTIFF CARMEN GONZALEZ**

Carmen Gonzalez
139 Seawell Court
San Jose, CA 94318

Marwa Elzankaly
McMANIS FAULKNER
50 W. Fernando Street, 10th Floor
San Jose, CA 95113

Robert J. Gralewski, Jr.
KIRBY McINERNY LLP
825 Third Avenue
New York, NY  10022

**SAMSUNG EXHIBIT A5**

## PLAINTIFF DANA ROSS

Dana Ross
664 San Andres Circle
Thousand Oaks, CA 91360

Susan Kupfer
GLANCY, BINKOW & GOLDBERG LLP
One Embarcadero Center, Suite 760
San Francisco, CA 94111

Robert J. Gralewski, Jr.
KIRBY McINERNY LLP
825 Third Avenue
New York, NY 10022

Produced on 9/7/11

**SAMSUNG EXHIBIT A6**

**PLAINTIFF STEVEN GANZ**

Steven Ganz

Adam Belsky
GROSS & BELSKY, LLP
180 Montgomery Street, Suite 2200
San Francisco, CA 94104

Robert J. Gralewski, Jr.
KIRBY McINERNY LLP
825 Third Avenue
New York, NY  10022

**SAMSUNG EXHIBIT A7**

## PLAINTIFF BRADY LANE COTTON

Brady Lane Cotton
10302 Venitia Real Avenue
Apt. 108
Tampa, FL 33647

Robert G. Methvin, Jr.
McCALLUM, METHVIN & TERRELL, P.C.
2201 Arlington Avenue South
Birmingham, AL 35305

Robert J. Gralewski, Jr.
KIRBY McINERNY LLP
825 Third Avenue
New York, NY 10022

7

Produced on 9/7/11

**SAMSUNG EXHIBIT A8**

**PLAINTIFF COLLEEN SOBOTKA**

Colleen Sobotka
1716 Bennett's End
Ft. Walton Beach, FL 32547

Robert G. Methvin, Jr.
McCALLUM, METHVIN & TERRELL, P.C.
2201 Arlington Avenue South
Birmingham, AL 35305

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022

—————————————————————— Produced on 9/7/11 ——————————————————————

**SAMSUNG EXHIBIT A9**

**PLAINTIFF DANIEL RIEBOW**

Daniel Riebow
3155 Oahu Avenue
Honolulu, HI 96822

Jeff Crabtree
LAW OFFICES OF JEFF CRABTREE
820 Mililani Street, Suite 701
Honolulu, Hawaii 96813

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022

Produced on 9/7/11

**SAMSUNG EXHIBIT A10**

## PLAINTIFF TRAVIS BURAU

Travis Burau
6803 Inwood Lane NE
Cedar Rapids, IA 52402

David Syrios
ADEMI & O'REILLY
3620 East Layton Ave.
Cudahy, WI 53110

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

Produced on 9/7/11

**SAMSUNG EXHIBIT A11**

**PLAINTIFF SOUTHERN OFFICE SUPPLY**

Tony McKee
417 N. Kansas Avenue
Liberal, KS 67901

Shirla McQueen & Christine M. Larson
SHARP MCQUEEN, P.A.
419 N. Kansas
Liberal, KS 67901

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

Produced on 9/7/11

**SAMSUNG EXHIBIT A12**

**PLAINTIFF CHAD KLEBS**

Chad Klebs
17630 Isleton Avenue West
Lakeville, MN 55044

Qienwei Fu
ZELLE, HOFMANN, VOELBEL & MASON, LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

Produced on 9/7/11

**SAMSUNG EXHIBIT A13**

## PLAINTIFF DAVID NORBY

David Norby
869 South McKnight Road
St. Paul, MN 55119

Seymour Mansfield
MANSFIELD, TANICK & COHEN, P.A.
220 South Sixth Street
Minneapolis, MN 55402

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022

———————————————————— Produced on 9/7/11 ————————————————————

**SAMSUNG EXHIBIT A14**

**PLAINTIFF RYAN RIZZO**

Ryan Rizzo
15113 Fanning Drive North
Hugo, MN 55038

David Syrios
ADEMI & O'REILLY
3620 East Layton Ave.
Cudahy, WI 53110

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

———————————————————— Produced·on 9/7/11 ————————————————————

SAMSUNG EXHIBIT A15

## PLAINTIFF CHARLES JENKINS

· Charles Jenkins
Box 55
Caledonia, MS 39740

Robert G. Methvin, Jr.
McCALLUM, METHVIN & TERRELL, P.C.
2201 Arlington Avenue South
Birmingham, AL 35305

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

15

**SAMSUNG EXHIBIT A16**

**PLAINTIFF DANIEL HERGERT**

Daniel Hergert
7350 Canyon Road
Lincoln, NE 68516

Lawrence Papale
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street #117
St. Helena, CA 94574

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022

Produced on 9/7/11

**SAMSUNG EXHIBIT A17**

**PLAINTIFF SAMUEL NASTO**

Samuel Nasto
9100 Ironstone Avenue
Las Vegas, Nevada 89143

Robert Gerard
GERARD & ASSOCIATES, LLP
1516 Front Street
San Diego, CA 92101

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

17

**SAMSUNG EXHIBIT A18**

## PLAINTIFF CRAIG STEPHENSON

Craig Stephenson
1331 Park Avenue S.W.
Unit 410
Albuquerque, NM 87102

Lawrence Papale
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street #117
St. Helena, CA 94574

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

18

**SAMSUNG EXHIBIT A19**

## PLAINTIFF GARY HANSON

Gary Hanson
1202 – 27th Street South Suite A
Fargo, ND 58103

Joel Flom
JEFFRIES, OLSON & FLOM, P.A.
1202 27th Street South Suite A
Fargo, N.D. 58103

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

Produced on 9/7/11

**SAMSUNG EXHIBIT A20**

## PLAINTIFF DONNA MARIE ELLINGSON

Donna Ellingson
210 S. Canyon Road
Rapid City, SD  57702

Eric J. Pickar
BANGS, McCULLEN, BUTLER, FOYE & SIMMONS, LLP
333 West Boulevard, Suite 400
P.O. Box 2670
Rapid City, SD 57709-2670

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

**SAMSUNG EXHIBIT A21**

**PLAINTIFF FRANK WARNER**

Frank Warner
1039 Lake Rest Rd
Proctor, AR 72376-9510

Lawrence Papale
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street #117
St. Helena, CA 94574

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022

21

Produced on 9/7/11

**SAMSUNG EXHIBIT A22**

**PLAINTIFF ALBERT SIDNEY CRIGLER**

Albert Sidney Crigler
303 Salem Court
Franklin, TN 37064

Brent Irby & Eric Hoagland
McCALLUM, HOAGLAND, COOK & IRBY, LLP
905 Montgomery Street, Suite 201
Vestavia Hills, AL 35216

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022

**SAMSUNG EXHIBIT A23**

## PLAINTIFF MARGARET SLAGLE

Margaret Slagle
14 Hideaway Lane
Williston, VT 05495

Mary G. Kirkpatrick
KIRKPATRICK & GOLDSBOROUGH, PLLC
Lakewood Commons
1233 Shelburne Road, Suite E-1
South Burlington, VT 05401

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022

23

———————————————————— Produced on 9/7/11 ————————————————————

**SAMSUNG EXHIBIT A24**

**PLAINTIFF JOHN LARCH**

John Larch
113 Sharon Drive
Weirton, WV 26062

Michael G. Simon
FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON
337 Penco Road
Weirton, WV 26062

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022

———————————————————— Produced on 9/7/11 ————————————————————

**SAMSUNG EXHIBIT A25**

## PLAINTIFF BRIGID TERRY

Brigid Terry
510 Oakland Avenue
Janesville, WI 53545

Seymour Mansfield
MANSFIELD, TANICK & COHEN, P.A.
220 South Sixth Street
Minneapolis, MN 55402

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022

**SAMSUNG EXHIBIT B1**

## PLAINTIFF JERRY COOK

Mr. Cook's claims have been dismissed.

**SAMSUNG EXHIBIT B2**

**PLAINTIFF BRIAN LUSCHER**

1. **CRT PRODUCT:** Philips HDTV

2. **DATE OF PURCHASE:** 8/15/01

3. **LOCATION of PURCHASE:** Costco Wholesale – Tempe, Arizona

4. **PERSONS INVOLVED IN PURCHASE:** Brian Luscher (plaintiff)

5. **PRICE:** $549.99

6. **TAXES/FEES:** $44.55

7. **BUNDLE:** Not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000014.

2

**SAMSUNG EXHIBIT B3**

## PLAINTIFF JEFFREY FIGONE

1. **CRT PRODUCT:**
   a. Sharp television – Model Number: 13K-M100
   b. Panasonic television – Model Number: C1332W

2. **DATE OF PURCHASE:**
   a. 1999 or 2000
   b. 2002 or 2003

3. **LOCATION of PURCHASE:**
   a. Target
   b. Target

4. **PERSONS INVOLVED IN PURCHASES:** Jeffrey Figone (plaintiff)

5. **PRICE:**
   a. Not available.
   b. Not available.

6. **TAXES/FEES:** The standard sales tax was applied to the purchases of the televisions.

7. **BUNDLE:** Neither of the televisions were purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000000157-167.

**SAMSUNG EXHIBIT B4**

**PLAINTIFF CARMEN GONZALEZ**

1. **CRT PRODUCT:** Hitachi television - S/N: 61SBX59B

2. **DATE OF PURCHASE:** 12/20/1999

3. **LOCATION of PURCHASE:** Circuit City, 5353 Almaden Expy, San Jose, CA 95118

4. **PERSONS INVOLVED IN PURCHASE:** Carmen Gonzalez (plaintiff)

5. **PRICE:** $2,250 (approximate)

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** The television was purchased along with a two-year warranty for $294.99. This warranty was extended every two years until Circuit City ceased business operations.

9. **PURPOSE of PURCHASE:** Personal use.

See also 000019-27 and CRT000419-496.

4

**SAMSUNG EXHIBIT B5**

**PLAINTIFF DANA ROSS**

1. **CRT PRODUCT:**
    a.  Panasonic 21" Television
    b.  Panasonic 35" Television

2. **DATE OF PURCHASE:**  Both televisions were purchased in 2004.

3. **LOCATION of PURCHASE:**  Both televisions were purchased at the Panasonic store at Universal Studios, Hollywood.

4. **PERSONS INVOLVED IN PURCHASE:**  Dana Ross (plaintiff)

5. **PRICE:**
    a.  $150 (approximately)
    b.  $600-650 (approximately)

6. **TAXES/FEES:**  The standard sales tax was applied to the purchases of the televisions.

7. **BUNDLE:**  Neither television was purchased as part of a bundle or system.

8. **WARRANTIES:**  None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:**  Personal use.

See also CRT000054-59 and CRT000562.

5

**SAMSUNG EXHIBIT B6**

**PLAINTIFF STEVEN GANZ**

1. **CRT PRODUCT:**
   a. 27" Phillips Television
   b. 27" Toshiba Television

2. **DATE OF PURCHASE:**
   a. May 22, 2001
   b. May 2, 2005

3. **LOCATION of PURCHASE:**
   a. Costco Wholesale – El Camino #475, South San Francisco, California
   b. Best Buy - Colma, California

4. **PERSONS INVOLVED IN PURCHASE:** Steven Ganz (plaintiff)

5. **PRICE:**
   a. $279.99
   b. $329.99

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the televisions.

7. **BUNDLE:** Neither television was purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000239-371.

**SAMSUNG EXHIBIT B7**

**PLAINTIFF BRADY LANE COTTON**

1. **CRT PRODUCT:**  Magnavox Television

2. **DATE OF PURCHASE:**  2005

3. **LOCATION of PURCHASE:**  Either Best Buy or Walmart

4. **PERSONS INVOLVED IN PURCHASE:**  Brady Lane Cotton (plaintiff) and Amy Cotton (plaintiff's wife)

5. **TAXES/FEES:**  The standard sales tax was applied to the purchase of the television.

6. **PRICE:** Not available.

7. **BUNDLE:**  The television was not purchased as part of a bundle or system.

8. **WARRANTIES:**  None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:**  Personal use.

See also CRT000009-13.

7

**SAMSUNG EXHIBIT B8**

## PLAINTIFF COLLEEN SOBOTKA

1. **CRT PRODUCT:**
   a. Sharp television
   b. JVC television

2. **DATE OF PURCHASE:**
   a. 2004
   b. 2000 or 2001

3. **LOCATION of PURCHASE:**
   a. Eglin Air Force Exchange - Eglin Air Force Base
   b. Hurlburt Exchange - Hurlburt Field, Florida

4. **PERSONS INVOLVED IN PURCHASES:** Colleen Sobotka (plaintiff)

5. **PRICE:**
   a. Not available.
   b. Not available.

6. **TAXES/FEES:** No taxes or fees were applied to the purchase of either television.

7. **BUNDLE:** Neither television was purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000046-50.

8

**SAMSUNG EXHIBIT B9**

**PLAINTIFF DANIEL RIEBOW**

1. **CRT PRODUCT:** Panasonic 27" television

2. **DATE OF PURCHASE:** 4/22/04

3. **LOCATION of PURCHASE:** Sears, Ala Moana Store, Hawaii

4. **PERSONS INVOLVED IN PURCHASE:** Daniel Riebow (plaintiff)

5. **PRICE:** $233.89

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** There was an extended warranty in connection with the purchase of this television.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000063-70.

9

**SAMSUNG EXHIBIT B10**

**PLAINTIFF TRAVIS BURAU**

1. **CRT PRODUCT:** TruTech television

2. **DATE OF PURCHASE:** Approximately 2006

3. **LOCATION of PURCHASE:** Target - Cedar Rapids, IA

4. **PERSONS INVOLVED IN PURCHASE:**  Travis Burau (plaintiff)

5. **PRICE:** $200 (approximately)

6. **TAXES/FEES:**  The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:**   The television was not purchased as part of a bundle or system.

8. **WARRANTIES:**  None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:**  Personal use.

See also CRT000372.

10

**SAMSUNG EXHIBIT B11**

## PLAINTIFF SOUTHERN OFFICE SUPPLY

1. **CRT PRODUCT:**
   a. AOC computer monitor – S/N: P7732OROSBTBD
   b. GEM computer monitor –S/N: GRNAM94329767
   c. GEM computer monitor - S/N: GRNAM94329488
   d. KDS computer monitor -  S/N: 6XB1C19162
   e. AOC computer monitor – S/N: D761VACOSPN2
   f. AOC computer monitor – S/N:  D760TACOSPNB
   g. ORION computer monitor – S/N: Unknown

2. **DATE OF PURCHASE:**
   a. 2/02/2000
   b. 3/17/2000
   c. 3/31/2000
   d. 5/22/2000
   e. 11/16/2000
   f. 2/13/2003
   g. 4/24/2003

3. **LOCATION of PURCHASE:**  All computer monitors were purchased from Elite Technology, Inc. in Kansas City, Kansas.

4. **PERSONS INVOLVED IN PURCHASE:**  Tony McKee (owner of Southern Office Supply)

5. **PRICE:**
   a. $183.00
   b. $189.00
   c. $189.00
   d. $181.00
   e. $163.00
   f. $119.00
   g. $98.00

6. **TAXES/FEES:**  There were no taxes or fees applied to any purchase of the computer monitors.  Freight charges were paid COD.

7. **BUNDLE:**  Except as to the Orion computer monitor, all other monitors were purchased separately and not as part of a bundle or system.  The Orion computer monitor (g) was purchased as part of a bundled system.

11

8. **WARRANTIES:**  All parts had a 1 year warranty except CPU parts had 25 days excluding physical damage.

9. **PURPOSE of PURCHASE:**  Use within business and not for resale.

See also CRT000222-238.

**SAMSUNG EXHIBIT B12**

**PLAINTIFF CHAD KLEBS**

1. **CRT PRODUCT:** Insignia Television – M/N: IS-TV040920; S/N: T18527147

2. **DATE OF PURCHASE:** 6/05

3. **LOCATION of PURCHASE:** Best Buy - Omaha, Nebraska

4. **PERSONS INVOLVED IN PURCHASES:** Chad Klebs (plaintiff)

5. **PRICE:** Not available.

6. **TAXES/FEES:** The standard sales taxes were applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000028-35.

**SAMSUNG EXHIBIT B13**

**PLAINTIFF DAVID NORBY**

1. **CRT PRODUCT:**  Magnavox television – S/N: YA1A0634025035

2. **DATE OF PURCHASE:**  1/06

3. **LOCATION of PURCHASE:**  Target

4. **PERSONS INVOLVED IN PURCHASE:**  David Norby (plaintiff)

5. **PRICE:** Not available.

6. **TAXES/FEES:**  The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:**   The television was not purchased as part of a bundle or system.

8. **WARRANTIES:**  None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:**  Personal use.

See also CRT000015-16 and CRT000071-72.

14

**SAMSUNG EXHIBIT B14**

**PLAINTIFF RYAN RIZZO**

1. **CRT PRODUCT:** Toshiba television – S/N: 80664856

2. **DATE OF PURCHASE:** Approximately 1998

3. **LOCATION of PURCHASE:** Best Buy – Iowa City, Iowa

4. **PERSONS INVOLVED IN PURCHASE:** Ryan Rizzo (plaintiff)

5. **PRICE:** $700 (approximately)

6. **TAXES/FEES:** The standard sales tax was applied to the purchases of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000214-216.

**SAMSUNG EXHIBIT B15**

**PLAINTIFF CHARLES JENKINS**

1. **CRT PRODUCT:**
   a. Durabrand 12" television
   b. Packard Bell computer monitor

2. **DATE OF PURCHASE:**
   a. 6/05
   b. 11/99

3. **LOCATION of PURCHASE:**
   a. Walmart – Columbus, Mississippi
   b. Rex's – Columbus, Mississipi

4. **PERSONS INVOLVED IN PURCHASE:**
   a. Charles Jenkins (plaintiff) & Margie Canon (plaintiff's girlfriend at the time)
   b. Charles Jenkins (plaintiff) & Angie Jenkins (plaintiff's former wife)

5. **PRICE:**
   a. Not available.
   b. Not available.

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television and the computer monitor.

7. **BUNDLE:** The television was not purchased as part of a bundle or system. The computer monitor was purchased as part of a bundle.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000036-45.

Produced on 9/7/11

**SAMSUNG EXHIBIT B16**

**PLAINTIFF DANIEL HERGERT**

1. **CRT PRODUCT:** Panasonic television – S/N: LC02570860

2. **DATE OF PURCHASE:** 2000

3. **LOCATION of PURCHASE:** Best Buy – Lincoln, Nebraska

4. **PERSONS INVOLVED IN PURCHASE:** Daniel Hergert (plaintiff)

5. **PRICE:** Not available.

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranty.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000060-62.

**SAMSUNG EXHIBIT B17**

**PLAINTIFF SAMUEL NASTO**

1. **CRT PRODUCT:** Panasonic 42" Cinema Vision television

2. **DATE OF PURCHASE:** 2/19/2003

3. **LOCATION of PURCHASE:** Circuit City – Las Vegas, Nevada

4. **PERSONS INVOLVED IN PURCHASE:** Samuel Nasto (plaintiff)

5. **PRICE:** $1,469.98

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000217-221.

**SAMSUNG EXHIBIT B18**

**PLAINTIFF CRAIG STEPHENSON**

1. **CRT PRODUCT:** MAG Technology computer monitor – S/N: FXHA 1709 1973U

2. **DATE OF PURCHASE:** 5/20/01

3. **LOCATION of PURCHASE:** Best Buy, 338 W, Albuquerque, New Mexico

4. **PERSONS INVOLVED IN PURCHASE:** Craig Stephenson (plaintiff)

5. **PRICE:** $57.13 (including tax)

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the computer monitor.

7. **BUNDLE:** The computer monitor was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000051-53.

19

**SAMSUNG EXHIBIT B19**

## PLAINTIFF GARY HANSON

1. **CRT PRODUCT:**
   a.  RCA Television  - S/N: S536412180
   b.  Toshiba Television – S/N: A2468602D
   c.  RCA Television – S/N: D384C72C7
   d.  Dell Computer Monitor – Model Number E772c; S/N: CN 09M556-64180-317-03YX
   e.  Dell Computer Monitor – Model Number E772c; S/N: CN 09M556-64180-338-006R

2. **DATE OF PURCHASE:**
   a.  1995
   b.  November or December 2002
   c.  2003
   d.  April 2003
   e.  April 2003

3. **LOCATION of PURCHASE:**
   a.  Best Buy – Fargo, North Dakota
   b.  Target/Best Buy/Wal-Mart – Fargo, North Dakota
   c.  Target – Fergus Falls, Minnesota
   d.  Dell
   e.  Dell

4. **PERSONS INVOLVED IN PURCHASE:**  Gary Hanson (plaintiff)

5. **PRICE:**
   a.  Not available
   b.  Not available
   c.  Not available
   d.  $770.00 (including computer and other items)
   e.  $770.00 (including computer and other items)

6. **TAXES/FEES:**  The standard sales tax was applied to the purchases of the televisions. Mr. Hanson was charged $7.41 in taxes in connection with each monitor purchase.

7. **BUNDLE:**  None of the televisions were purchased as part of a bundle or  system.  Both computer monitors were part of a bundle.

8. **WARRANTIES:** For the televisions, none other than any standard manufactuers' warranties. The computer monitors came with a 1 year limited warranty, and Mr. Hanson received a $100 rebate in connection with both monitor purchases.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000106-156 and CRT000497-504.

21

**SAMSUNG EXHIBIT B20**

## PLAINTIFF DONNA MARIE ELLINGSON

1. **CRT PRODUCT:**
   a. e-Machines computer monitor
   b. 25" Sharp television
   c. 27" Sharp television

2. **DATE OF PURCHASE:**
   a. 3/6/04
   b. 11/9/97
   c. 10/18/99

3. **LOCATION of PURCHASE:**
   a. Best Buy – Rapid City, South Dakota
   b. Rex TV & Appliance – Rapid City, SD
   c. Rex TV & Appliance – Rapid City, SD

4. **PERSONS INVOLVED IN PURCHASE:** With respect to the computer monitor purchase: Donna Ellingson (plaintiff) & Russ Penning (plaintiff's friend). With respect to the television purchases: Donna Ellingson (plaintiff).

5. **PRICE:**
   a. $209.99
   b. $306.34 (including tax)
   c. $348.69 (including tax)

6. **TAXES/FEES:** The standard sales tax was applied to all purchases.

7. **BUNDLE:** Neither of the televisions were purchased as part of a bundle or system. The computer monitor was part of a bundle.

8. **WARRANTIES:** Ms. Ellingson received Best Buy Reward Points for her purchase of the e-Machines computer. She does not recall any other specific warranties (other than any standard manufacturers' warranties), servicing plans or agreements, membership rewards, or other benefits received relating to this acquisition. She does not recall if she ever utilized the rewards points. Ms. Ellingson also received a $100 rebate on the monitor. With respect to the televisions, there were no warranties other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000075-103 and CRT000525-561.

22

———————————————————————— Produced on 9/7/11 ————————————————————————

**SAMSUNG EXHIBIT B21**

**PLAINTIFF FRANK WARNER**

1. **CRT PRODUCT:**
   a. Compaq V720 computer monitor – S/N: 208CL26EC596
   b. Pixie 15" computer monitor - S/N: czc00807130
   c. Pixie 15" computer monitor - S/N: czc0807126
   d. KDS 14" computer monitor – UPC: 0781257141028
   e. KDS 17" computer monitor – UPC: 0088698200087
   f. AOC Color Monitor CT720G – S/N: K1PN4CA871647

2. **DATE OF PURCHASE:**
   a. After 2/02
   b. 10/23/00
   c. 10/23/00
   d. 3/18/98
   e. 4/5/99
   f. Not available

3. **LOCATION of PURCHASE:**
   a. Not available
   b. Comp USA, 3539 Riverdale Road, Memphis, TN 38115
   c. Comp USA, 3539 Riverdale Road, Memphis, TN 38115
   d. Ingram Micro TLP, 3820 Micro Drive, Millington, TN 38053
   e. Ingram Micro TLP, 3820 Micro Drive, Millington, TN 38053
   f. Envision Peripherals, 47490 Seabridge Drive, Fremont, CA 94538

4. **PERSONS INVOLVED IN PURCHASES:** Frank Warner (plaintiff)

5. **PRICE:**
   a. Not available
   b. $119.99
   c. $119.99
   d. $86.50
   e. $222.50
   f. Not available

6. **TAXES/FEES:** The standard sales tax was applied to the purchases of the computer monitors.

7. **BUNDLE:** None of the computer monitors were purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Mr. Warner purchased certain of the computer monitors for personal use and certain ones for use in connection with his business and not for resale.

See also CRT000104-105 and CRT000565-571.

24

**SAMSUNG EXHIBIT B22**

**PLAINTIFF ALBERT SIDNEY CRIGLER**

1. **CRT PRODUCT:**
   a. Sharp television – S/N: 653205
   b. Gateway computer monitor – S/N: 7033364

2. **DATE OF PURCHASE:**
   a. 2004
   b. Not available.

3. **LOCATION of PURCHASE:**
   a. Target
   b. Gateway

4. **PERSONS INVOLVED IN PURCHASE:** Albert Sidney Crigler (plaintiff)

5. **PRICE:**
   a. Not available.
   b. Not available.

6. **TAXES/FEES:** The standard sales tax was applied to the purchases.

7. **BUNDLE:**
   a. The television was not purchased as part of a bundle or system.
   b. The computer monitor was purchased as part of a bundle.

8. **WARRANTIES:** None other than standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000001-08.

**SAMSUNG EXHIBIT B23**

**PLAINTIFF MARGARET SLAGLE**

1. **CRT PRODUCT:**
   a. Sylvania television – S/N: J39420241
   b. Magnavox television – S/N: 60HZ75W

2. **DATE OF PURCHASE:**
   a. 11/26/04
   b. 12/04

3. **LOCATION of PURCHASE:**
   a. Radio Shack, South Burlington, VT
   b. Radio Shack, South Burlington, VT

4. **PERSONS INVOLVED IN PURCHASES:** Margaret Slagle (plaintiff)

5. **PRICE:**
   a. $238.23 (including tax)
   b. Not available.

6. **TAXES/FEES:** The standard sales tax was applied to the purchases of the televisions.

7. **BUNDLE:** Neither television was purchased as part of a bundle or a system.

8. **WARRANTIES:** None other than standard manufacturers' warranties.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000174-213 and CRT000505.

26

Produced on 9/7/11

**SAMSUNG EXHIBIT B24**

**PLAINTIFF JOHN LARCH**

1. **CRT PRODUCT:** Curtis Mathes television

2. **DATE OF PURCHASE:** 6/22/04

3. **LOCATION of PURCHASE:** K-Mart – Weirton, West Virginia

4. **PERSONS INVOLVED IN PURCHASE:** John Larch (plaintiff)

5. **PRICE:** $389.99

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** The television was not purchased as part of a bundle or system.

8. **WARRANTIES:** John Larch purchased a "Smart Plan" warranty in connection with his purchase of the television.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000171-173.

**SAMSUNG EXHIBIT B25**

## PLAINTIFF BRIGID TERRY

1. **CRT PRODUCT:** Toshiba television – S/N: 92567585

2. **DATE OF PURCHASE:** 1997 or 1998

3. **LOCATION of PURCHASE:** The Village – Janesville, Wisconsin

4. **PERSONS INVOLVED IN PURCHASE:** Brigid Terry (plaintiff)

5. **PRICE:** Not available.

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** This television was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranty.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000017-18, CRT000073-74, and CRT000563-564.

Produced on 9/7/11

**SAMSUNG EXHIBIT D1**

**PLAINTIFF JERRY COOK**

Mr. Cook's claims have been dismissed.

———————————————————— Produced on 9/7/11 ————————————————————

**SAMSUNG EXHIBIT D2**

**PLAINTIFF BRIAN LUSCHER**

**CRTs**: Mr. Luscher does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Luscher believes he may have read something about the CRT TV he purchased. Mr. Luscher normally does check before making a significant purchase. However, Mr. Luscher does not recall what he read or have copies of it. His two main sources for research would be the internet or magazines.

2


Produced on 9/7/11

**SAMSUNG EXHIBIT D3**

### PLAINTIFF JEFFREY FIGONE

**CRTs**: Mr. Figone does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Figone saw advertisements in newspapers and/or magazines related to CRT products during the relevant time period, but he did not pay particular attention to any such advertisements and does not recall anything specific.

**SAMSUNG EXHIBIT D4**

**PLAINTIFF CARMEN GONZALEZ**

**CRTs**: Ms. Gonzales does not believe she reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Ms. Gonzales does recall seeing a Circuit City advertisement that came in the mail that listed the price of her CRT television that she then purchased.

4



**SAMSUNG EXHIBIT D5**

**PLAINTIFF DANA ROSS**

**CRTs**: Mr. Ross does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Ross does not recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period.

5

**SAMSUNG EXHIBIT D6**

**PLAINTIFF STEVEN GANZ**

**CRTs:** Response pending.

**CRT Products:** Response pending.

————————————————————— Produced on 9/7/11 —————————————————————

**SAMSUNG EXHIBIT D7**

**PLAINTIFF BRADY LANE COTTON**

**CRTs**: Response pending.

**CRT Products**: Response pending.

7



**SAMSUNG EXHIBIT D8**

## PLAINTIFF COLLEEN SOBOTKA

**CRTs**: Ms. Sobotka does not believe she reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Ms. Sobotka recalls seeing at least one of her CRT televisions advertised in a BX (military base exchange) flyer.

8

**SAMSUNG EXHIBIT D9**

**PLAINTIFF DANIEL RIEBOW**

**CRTs**: Mr. Riebow does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Riebow believes he read about a CRT computer monitor in a magazine called "Computer Shopper" or "Computer." Mr. Riebow also believes he probably looked at advertisements or magazines such as "Consumer Reports," but he has no specific recollection of looking at any particular publication.

9

——————————————————— Produced on 9/7/11 ———————————————————

**SAMSUNG EXHIBIT D10**

**PLAINTIFF TRAVIS BURAU**

**CRTs**: Mr. Burau does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Burau has reviewed advertisements in the Cedar Rapids Gazette for CRT products. He also believes he probably reviewed other advertisements for CRT products in various newspapers and online during the relevant time period. Mr. Burau does not have specific recollection of the contents of any of the advertisements he saw.

10

———————————————————— Produced on 9/7/11 ————————————————————

**SAMSUNG EXHIBIT D11**

## PLAINTIFF SOUTHERN OFFICE SUPPLY

**CRTs**: Southern Office Supply does not believe it reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Southern Office Supply did review emails from their main hardware supplier about CRT products.

11

—————————————————————— Produced on 9/7/11 ——————————————————————

**SAMSUNG EXHIBIT D12**

**PLAINTIFF CHAD KLEBS**

**CRTs**: Mr. Klebs does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Klebs does not recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period.

Produced on 9/7/11

**SAMSUNG EXHIBIT D13**

## PLAINTIFF DAVID NORBY

**CRTs**: Mr. Norby does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Norby does not recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period.



Produced on 9/7/11

**SAMSUNG EXHIBIT D14**

**PLAINTIFF RYAN RIZZO**

**CRTs**: Mr. Rizzo does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Rizzo has reviewed advertisements in Dell catalogues mailed to his home. He has also reviewed advertisements for CRT products in various newspapers and online during the relevant time period. Mr. Rizzo does not specifically recall the contents of any of the advertisements.

Produced on 9/7/11

**SAMSUNG EXHIBIT D15**

## PLAINTIFF CHARLES JENKINS

**CRTs**: Response pending.

**CRT Products**: Response pending.

15

———————————————————————— Produced on 9/7/11 ————————————————————————

**SAMSUNG EXHIBIT D16**

**PLAINTIFF DANIEL HERGERT**

**CRTs**: Mr. Hergert does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Hergert does not specifically recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period, but he may have reviewed an article in "Consumer Reports" about CRT products.

**SAMSUNG EXHIBIT D17**

**PLAINTIFF SAMUEL NASTO**

**CRTs**: Mr. Nasto does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Nasto generally recalls seeing Best Buy, Circuit City, and Fry's advertisements from time-to-time in his local newspaper. He believes these advertisements contained information about CRT products, including price and product features, but he cannot recall any specifics about the advertisements he saw.

**SAMSUNG EXHIBIT D18**

**PLAINTIFF CRAIG STEPHENSON**

**CRTs**: Mr. Stephenson does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Stephenson does not recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period.

**SAMSUNG EXHIBIT D19**

## PLAINTIFF GARY HANSON

**CRTs**: Mr. Hanson does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Hanson saw and reviewed a Dell direct advertising insert in his local newspaper and subsequently purchased his Dell CRT computer monitors.

—————————————————— Produced on 9/7/11 ——————————————————

**SAMSUNG EXHIBIT D20**

**PLAINTIFF DONNA MARIE ELLINGSON**

**CRTs**: Ms. Ellingson does not believe she reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Ms. Ellingson did see advertisements from time to time regarding CRT products such as televisions and computer monitors, however she does not recall any advertisements specifically nor does she recall the contents of any of the advertisements.

20

**SAMSUNG EXHIBIT D21**

### PLAINTIFF FRANK WARNER

**CRTs**: Mr. Warner does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Warner does not recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period.

21

——————————————— Produced on 9/7/11 ———————————————

**SAMSUNG EXHIBIT D22**

## PLAINTIFF ALBERT SIDNEY CRIGLER

**CRTs**: Mr. Crigler does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Crigler reviewed advertisements related to CRT products during the relevant time period, but he does not recall anything specific.



**SAMSUNG EXHIBIT D23**

**PLAINTIFF MARGARET SLAGLE**

**CRTs**: Ms. Slagle does not believe she reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Ms. Slagle does not recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period.

Produced on 9/7/11

**SAMSUNG EXHIBIT D24**

**PLAINTIFF JOHN LARCH**

**CRTs**: Mr. Larch does not believe he reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Mr. Larch reviewed advertisements related to CRT products during the relevant time period, but he does not recall anything specific.

24



**SAMSUNG EXHIBIT D25**

## PLAINTIFF BRIGID TERRY

**CRTs**: Ms. Terry does not believe she reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Ms. Terry does not recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period.

Produced on 9/7/11

**SAMSUNG EXHIBIT E1**

**PLAINTIFF JERRY COOK**

Mr. Cook's claims have been dismissed.

——————————————— Produced on 9/7/11 ———————————————

SAMSUNG EXHIBIT E2

**PLAINTIFF BRIAN LUSCHER**

Mr. Luscher believes he may have bought a Mitsubishi large screen projection television and an LCD/plasma product during the class period. He elected to acquire the non-CRT projection television because CRT products were not available in the 50" size range. Mr. Luscher believes the LCD/plasma television was purchased around late 2005-early 2006. The LCD/plasma television was approximately 40", and Mr. Luscher believes that he purchased it because there were no similar-sized CRTs, or if there were, the CRT products were too heavy or bulky.

**SAMSUNG EXHIBIT E3**

**PLAINTIFF JEFFREY FIGONE**

Mr. Figone purchased at least two LCD computer monitors and three LCD televisions during the relevant period.  He purchased the LCD computer monitors because he was buying computer packages from Dell and Apple and his recollection is that they only offered LCD monitors as part of their bundled packages, but he is not certain of that fact. He does not recall CRT monitors even being available at the time of these computer purchases.  Mr. Figone purchased the LCD televisions because they were smaller in dimension, lighter weight, and offered a digital picture.

3

——————————————— Produced on 9/7/11 ———————————————

**SAMSUNG EXHIBIT E4**

**PLAINTIFF CARMEN GONZALEZ**

Ms. Gonzalez did not purchase a non-CRT television or computer monitor during the relevant time period.

4

———————————————————— Produced on 9/7/11 ————————————————————

**SAMSUNG EXHIBIT E5**

**PLAINTIFF DANA ROSS**

Mr. Ross did not purchase a non-CRT television or computer monitor during the relevant time period.

-------------------------------------------- Produced on 9/7/11 --------------------------------------------

**SAMSUNG EXHIBIT E6**

**PLAINTIFF STEVEN GANZ**

Response pending.

——————————————————————————— Produced on 9/7/11 ———————————————————————————

**SAMSUNG EXHIBIT E7**

**PLAINTIFF BRADY LANE COTTON**

Response pending.

—————————————————————— Produced on 9/7/11 ——————————————————————

**SAMSUNG EXHIBIT E8**

**PLAINTIFF COLLEEN SOBOTKA**

Ms. Sobotka did not purchase a non-CRT television or computer monitor during the relevant time period.

**SAMSUNG EXHIBIT E9**

## PLAINTIFF DANIEL RIEBOW

Mr. Riebow did not purchase a non-CRT television or computer monitor during the relevant time period.

9

Produced on 9/7/11

**SAMSUNG EXHIBIT E10**

**PLAINTIFF TRAVIS BURAU**

Mr. Burau purchased a Dell Flat Screen Monitor during the relevant time period. He purchased the Flat Screen Monitor because it was an upgrade as part of a computer package purchased from Dell. Mr. Burau may have purchased other non-CRT televisions or computer monitors during the relevant time period, but cannot state with certainty.

———————————— Produced on 9/7/11 ————————————

**SAMSUNG EXHIBIT E11**

## PLAINTIFF SOUTHERN OFFICE SUPPLY

Southern Office Supply purchased between six and 11 LCD computer monitors during the relevant period.  Four were purchased because they took up less space, two were purchased for graphics use in Southern's print shop, and others were purchased because other monitors were wearing out.

———————————————— Produced on 9/7/11 ————————————————

**SAMSUNG EXHIBIT E12**

**PLAINTIFF CHAD KLEBS**

Mr. Klebs did not purchase a non-CRT television or computer monitor during the relevant time period.

**SAMSUNG EXHIBIT E13**

## PLAINTIFF DAVID NORBY

Mr. Norby did not purchase a non-CRT television or computer monitor during the relevant time period.

---------------------------------------------- Produced on 9/7/11 ----------------------------------------------

**SAMSUNG EXHIBIT E14**

## PLAINTIFF RYAN RIZZO

Mr. Rizzo purchased a Philips LCD television and a Dell LCD computer monitor during the relevant time period. He purchased the Philips television because of a superior picture quality. He purchased the Dell monitor because it was an upgrade as part of a computer package. Mr. Rizzo may have purchased other non-CRT televisions or computer monitors during the relevant time period, but he cannot state with certainty.

**SAMSUNG EXHIBIT E15**

## PLAINTIFF CHARLES JENKINS

Response pending.

**SAMSUNG EXHIBIT E16**

**PLAINTIFF DANIEL HERGERT**

Mr. Hergert purchased an LG HD plasma flat screen television during the relevant period. He did so because the television was HD, takes up less space, and he wanted to hang it on a wall.

**SAMSUNG EXHIBIT E17**

## PLAINTIFF SAMUEL NASTO

Mr. Nasto acquired two LCD televisions during the relevant period because he believed that the LCD televisions were a newer technology, offered a better picture quality, and were thin as opposed to being bulky and very heavy.

Produced on 9/7/11

**SAMSUNG EXHIBIT E18**

**PLAINTIFF CRAIG STEPHENSON**

Mr. Stephenson did not purchase a non-CRT television or computer monitor during the relevant time period.

Produced on 9/7/11

**SAMSUNG EXHIBIT E19**

**PLAINTIFF GARY HANSON**

Mr. Hanson did not purchase a non-CRT television or computer monitor during the relevant time period.

19

**SAMSUNG EXHIBIT E20**

**PLAINTIFF DONNA MARIE ELLINGSON**

Ms. Ellingson did not purchase a non-CRT television or computer monitor during the relevant time period.

Produced on 9/7/11

**SAMSUNG EXHIBIT E21**

## PLAINTIFF FRANK WARNER

Mr. Warner purchased non-CRT televisions during the relevant time period.  He elected to purchase flat screen televisions because the flat screens are HD and because they take up less space.

**SAMSUNG EXHIBIT E22**

## PLAINTIFF ALBERT SIDNEY CRIGLER

Mr. Crigler did not purchase a non-CRT television or computer monitor during the relevant time period.

**SAMSUNG EXHIBIT E23**

## PLAINTIFF MARGARET SLAGLE

Ms. Slagle elected to purchase a 42" plasma television to have better viewing with her son as they watched it in her living room.  The other CRT televisions were for smaller rooms.

**SAMSUNG EXHIBIT E24**

**PLAINTIFF JOHN LARCH**

Mr. Larch did not purchase a non-CRT television or computer monitor for himself during the relevant time period.  He has purchased a flat screen television for his parents but cannot recall if he purchased it during the relevant time period.  He purchased the flat screen television because he believed it was better technology.

Produced on 9/7/11

**SAMSUNG EXHIBIT E25**

### PLAINTIFF BRIGID TERRY

Ms. Terry did not purchase a non-CRT television or computer monitor during the relevant time period.



```
BIG KMART STORE 3318
250 THREE SPRINGS DR
WEIRTON, WV 26062
(304)723-0400

** WELCOME TO YOUR **
** KMART STORE 3318 **
CASHIER: SANDY
GENERAL MERCHANDISE
036725236028   COLOR TV     B   389.99 T
72951500383    SMART PLAN        29.99 T

**** TAX      25.20  BAL     445.18
        Cash                  200.00
XXXXXXXXXXXX5951
DEBIT APPROVAL 000000
AMOUNT DEBIT FROM CARD    $245.18
AMOUNT OF CASH BACK        $.00
VF      DEBIT                 245.18
        CHANGE                   .00

        YOUR TOTAL SAVINGS: 10.00

TOTAL NUMBER OF ITEMS = 2
```



```
Ø04 FE8 RWE Ø66 IZ1 8NA

06/22/04  3:07 PM 3318 34 3157 9054
```

You have purchased a Service Plan for
item(s) 03672523602.
This plan extends coverage for 1-year
after Manufacturer's Warranty has
expired. For your Service Related
Issues please return item(s) to Kmart
if within 30 days of the date of
purchase. Refer to Product Information
for Manufacturer's Warranty Detail.
After Manufacturer's Warranty
has expired, call 1-800-99Kmart.

Manufacturer's Warranty Coverage
for item(s) 03672523602,
includes  12 months Parts and
3 months Labor.


DEPOSITION
EXHIBIT
146
Otilia Larch

CRT000171

# EXHIBIT 60



DEPOSITION
EXHIBIT
149
6/1/12 Larch



CAUT... ...NENTLY BON...
T... ...DO NOT ATTEMP...
...M PICTURE TUBE. REPL...
...L TYPE INTEGRAL YOKE...
...BLY.

# TOSHIBA    A90AHH50X08 (V)

LR63755    E105827

EIA 455    Made in the USA from US and Imported Components

**CAUTION: HIGH VACUUM PICTURE TUBE IS DANGEROUS TO HANDLE. REFER SERVICING TO QUALIFIED SERVICE PERSONNEL.**

**X-RAY WARNING: When picture tubes are operated at very high voltage and when personal exposure is prolonged at close range, special shielding precautions against x-ray radiation may be needed.**

**WARNING:** THIS CATHODE RAY TUBE EMPLOYS INTEGRAL IMPLOSION PROTECTION. REPLACE WITH A CATHODE RAY TUBE OF THE SAME TYPE NUMBER FOR CONTINUED SAFETY.

**AVERTISSEMENT:** CE TUBE CATHODIQUE EST ÉQUIPÉ D'UN DISPOSTIF INTÉGRÉ DE PROTECTION CONTRE L'IMPLOSION. REMPLACER PAR UN TUBE DE MÊME MODÉLE POUR NE PAS COMPROMETTRE LA SÉCURITÉ.    TDD# 8158

DEPOSITION EXHIBIT
i50
6.Ti.12 March
PENGAD 800-631-6989

# EXHIBIT 61

1               UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4                       ---oOo---

5

6    In Re: CATHODE RAY TUBE (CRT)     )
     ANTITRUST LITIGATION,             )
7                                      )
                       Plaintiff,      )
8    _____) Case No.
                                      )  07-5944 Sc
9                                      )  MDL No. 1917
     This Document Relates to:        )
10                                     )
     ALL ACTIONS,                     )
11   _____)

12

13

14

15        VIDEOTAPED DEPOSITION OF JOHN LARCH

16             FRIDAY, JUNE 1, 2012

17

18

19

20

21

22

23

24

25   REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

                           2

BARKLEY
Court Reporters

```
1              A P P E A R A N C E S

2                    ---oOo---

3
   FOR THE INDIRECT PURCHASER PLAINTIFFS:
4
        KIRBY McINERNEY LLP
5       825 Third Avenue,
        New York, New York  10022
6       BY: ROBERT J. GRALEWSKI, JR., ESQ.
        (212) 371-6600
7       bgralewski@kmllp.com

8       FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON
        337 Penco Road
9       Weirton, West Virginia  26062-3828
        BY: MICHAEL G. SIMON, ESQ.
10          KEVIN PEARL, ESQ.
        (304) 723-4400
11

12 FOR THE DEFENDANTS KONINKLIJKE PHILIPS ELECTRONICS
   N.V., PHILIPS ELECTRONICS NORTH AMERICA
13 CORPORATION:
   (Telephonic Appearance)
14
        BAKER BOTTS LLP
15      1299 Pennsylvania Avenue, N.W.
        Washington, D.C.  20004-2400
16      BY: CHARLES MALAISE, ESQ.
        (202) 639-7700
17      charles.malaise@bakerbotts.com

18

19

20

21

22

23

24

25
```

3

BARKLEY
Court Reporters

```
 1              A P P E A R A N C E S
                      ---oOo---
 2
    FOR THE DEFENDANTS TOSHIBA CORPORATION, TOSHIBA
 3  AMERICA, INC., TOSHIBA AMERICA INFORMATION SYSTEMS,
    INC., TOSHIBA AMERICA CONSUMER PRODUCTS, L.L.C.,
 4  AND TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.:
    (Telephonic Appearance)
 5
            WHITE & CASE LLP
 6          701 Thirteenth Street, NW
            Washington, D.C.  20005-3807
 7          BY: AARON McALLISTER, ESQ.
            (202) 626-3623
 8          amcallister@whitecase.com

 9
    FOR THE DEFENDANTS SAMSUNG ELECTRONICS CO., LTD.,
10  AND SAMSUNG ELECTRONICS AMERICA, INC.:

11          O'MELVENY & MYERS LLP
            1625 Eye Street NW
12          Washington, D.C.  20004
            BY: COURTNEY C. BYRD, ESQ.
13          (202) 383-5300
            cbyrd@omm.com
14

15

16

17

18

19

20

21

22

23

24

25
```

4

BARKLEY
Court Reporters

```
1                    INDEX OF EXAMINATIONS
                          ---oOo---
2
   EXAMINATIONS                                    PAGE
3
   MS. BYRD                                          8
4  MR. GRALEWSKI                                    86
   MS. BYRD                                         88
5

6
                     INDEX OF EXHIBITS
7     NO.                DESCRIPTION              PAGE

8    140    Notice of Deposition of John Larch     19
            Dated May 17, 2012
9
     141    Samsung SDI America, Inc.'s First Set  27
10          of Requests for Production of
            Documents to Indirect Purchaser
11          Plaintiffs Dated March 8, 2010

12   142    Defendant Hitachi Displays, Ltd.'s     28
            First Set of Document Requests to the
13          Indirect Purchaser Plaintiffs Dated
            March 8, 2010
14
     143    First Set of Document Requests of      29
15          Samsung Electronics America, Inc., to
            the Indirect Purchaser Plaintiffs
16          Dated March 8, 2010

17   144    Samsung SDI America, Inc.'s First Set  30
            of Interrogatories to Indirect
18          Purchaser Plaintiffs Dated March 8,
            2010
19
     145    Indirect Purchaser Plaintiffs'         30
20          Responses to Defendant Samsung SDI
            Co., Ltd.'s First Set of
21          Interrogatories Dated July 7, 2010

22   146    Big K-Mart Receipt Dated June 22, 2004 58

23   147    Photocopy of a Photograph of a Curtis  61
            Mathes Television
24

25
```

John Larch

BARKLEY
Court Reporters

1
                         INDEX OF EXHIBITS
        NO.                 DESCRIPTION                    PAGE
2
        148     Photocopy of a Photograph of a Curtis       62
3               Mathes Television

4       149     Photocopy of a Photograph of a Curtis       63
                Mathes Television
5
        150     Photocopy of a Photograph of a Toshiba      64
6               Sticker

7        11     Indirect Purchaser Plaintiffs' Third        73
                Consolidated Amended Complaint Dated
8               December 11, 2010

9       151     Class Action Complaint Dated March 10,      86
                2008
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

John Larch

BARKLEY
Court Reporters

```
  1                WEIRTON, WEST VIRGINIA, JUNE 1, 2012

  2                          ---o0o---

  3                BE IT REMEMBERED that on Friday, the 1st

10:02  4    day of June 2012, commencing at the hour of

  5    a.m. thereof, at 337 Penco Road, Weirton, West

  6    Virginia, before me, Balinda Dunlap, a Certified

  7    Shorthand Reporter in and for the County of San

  8    Francisco, State of California, personally

  9    appeared:

10:00 10                THE VIDEOGRAPHER:  Good morning.  My name

 11    is Zackery Wilson.  I am a videographer associated

 12    with Barkley Court Reporters, located at 1875

 13    Century Park East, Suite 1300, Los Angeles,

 14    California 90067.

10:01 15                The date is June 1st, 2012.  Time is 10:02

 16    a.m.  This deposition is taking place at 337 Penco

 17    Road, Weirton, West Virginia In Re: Cathode Ray

 18    Tube Antitrust Litigation, Case No. 07-5344 SC.

 19                This is the videotape deposition of John

10:01 20    Larch being taken on behalf of the defendant.

 21                Will counsels for the parties please

 22    identify themselves.

 23                MS. BYRD:  Courtney Byrd, O'Melveny &

 24    Myers LLP, on behalf of defendants Samsung

10:01 25    Electronics Co., Ltd., and Samsung Electronics
```

7

BARKLEY
Court Reporters

 1    America, Inc.

 2          MR. SIMON:  Mike Simon and Kevin Pearl on

 3    behalf of the plaintiff John Larch, Frankovitch,

 4    Anetakis, Colantonio & Simon.

10:01  5          MR. GRALEWSKI:  Bob Gralewski, Kirby

 6    McInerney, on behalf of the witness and the class.

 7          MR. MALAISE:  Charles Malaise, Baker Botts

 8    LLP, on behalf of the Philips defendants.

 9          MR. McALLISTER:  Aaron McAllister, White &

10:02 10    Case, on behalf of the defendants Toshiba entities.

11                    JOHN LARCH

12          called as a witness by the Defense, having

13    been sworn to tell the truth, the whole truth, and

14    nothing but the truth, was examined and testified as

10:02 15    follows:

16                    ---o0o---

17          EXAMINATION BY MS. BYRD

18       Q.   Again, good morning, Mr. Larch.  We met

19    for the first time just a few minutes ago, but let

10:02 20    me reintroduce myself.  My name is Courtney Byrd,

21    and I am an attorney representing two of the

22    defendants in this case, one being Samsung

23    Electronics Co., Ltd., and today I am going to

24    refer to that entity as SEC for short, and the

10:02 25    second being Samsung Electronics America, Inc.,

8

BARKLEY
Court Reporters

1    which I am going to refer to as SEA.

2         A.    Thank you.

3         Q.    Thank you so much for your time here

4    today.  For the record, could you go ahead and

10:03 5    state and spell your name, please?

6         A.    John Larch, J-o-h-n, L-a-r-c-h.

7         Q.    Mr. Larch, what is your current home

8    address?

9         A.    14 Saint Charles Avenue, Wheeling, West

10:03 10    Virginia.

11         Q.    Okay.  Is that your primary residence?

12         A.    Yes.

13         Q.    And how long have you lived there?

14         A.    Approximately two and a half years.

10:03 15         Q.    And do you rent or own that home?

16         A.    I rent.

17         Q.    And where did you live before that?

18         A.    113 Sharon Drive, Weirton, West Virginia.

19         Q.    Okay.  And how long did you live there?

10:03 20         A.    Approximately 1996, '96 until a few years

21    ago.

22         Q.    Okay.  And was that your primary

23    residence?

24         A.    Yes.

10:03 25         Q.    Did you rent or own?

9

BARKLEY
Court Reporters

```
 1        A.    Owned.
 2        Q.    Okay.   And where did you live before that?
 3        A.    304 New York Boulevard, Weirton, West
 4   Virginia.
10:04  5    Q.    Okay.   And how long did you live there?
 6        A.    Approximately eight years.
 7        Q.    Okay.   How long have you lived in West
 8   Virginia?
 9        A.    My entire life.
10:04 10    Q.    Okay.   So you've lived here on a
11   continuous basis for your entire life?
12        A.    Yes.
13        Q.    Okay.   Do you pay taxes in West Virginia?
14        A.    Yes.
10:04 15    Q.    Do you own property in any other states?
16        A.    No.
17        Q.    Do you pay taxes in any other states?
18        A.    No.
19        Q.    Okay.   Mr. Larch, have you ever been
10:04 20   deposed before this morning?
21        A.    Once.
22        Q.    Once.   And what was the nature of that
23   case?
24        A.    It was representing my employer.
10:04 25    Q.    So your employer was the defendant in that
```

10

John Larch

BARKLEY
Court Reporters

1   matter?

2      A.   Yes.

3      Q.   You were not personally named --

4      A.   That's correct.

10:04   5      Q.   -- a defendant?  And when was that?

6      A.   I believe it was in the mid-'80s.

7      Q.   Okay.  So you've only been deposed once

8   before this morning?

9      A.   Yes.

10:04  10      Q.   And what was the nature of the suit

11   against your employer?

12      A.   It was a foreclosure action against a bank

13   customer.

14      Q.   Okay.  Have you ever served as a plaintiff

10:04  15   in any other lawsuits?

16      A.   No.

17      Q.   Ever served as a defendant in any other

18   lawsuits?

19      A.   No.

10:05  20      Q.   Okay.  Have you ever participated in a

21   class action settlement?

22      A.   No.

23      Q.   Have you ever participated in a class

24   action in any way?

10:05  25      A.   No.

11

BARKLEY
Court Reporters

1    Q.   Okay.  Well, it sounds like your previous

2    deposition experience was many years ago, but I'm

3    sure your counsel has addressed this with you

4    before this morning, but I just want to remind you

10:05  5    that you are under oath, and as a result, you have

6    an obligation to answer my questions completely,

7    accurately and truthfully.

8         Do you understand that?

9    A.   Yes.

10:05  10   Q.   Okay.  Is there any reason you can think

11   of as to why you would be unable to answer my

12   questions this morning completely, accurately and

13   truthfully?

14   A.   No.

10:05  15   Q.   Okay.  Mr. Larch, if my questions seem

16   unclear to you this morning, please don't hesitate

17   to ask me to clarify, and I'll do my best to do so.

18        Balinda sitting next to you here is our

19   court reporter for today, and everything she's

10:05  20   taking down will comprise the official record of

21   what we discuss this morning.

22        In order to keep a clean record and make

23   Balinda's job easy, we need to try not to talk over

24   one another, which means I'll do my best to wait

10:06  25   until you finish your response before I jump in

12

BARKLEY
Court Reporters

1    with my next question, and if you could just wait

2    until I have completed asking my question before

3    you start your response, that would be appreciated.

4    Balinda can only take down verbal responses.  She

10:06   5    can't take down shakes of our heads or nods.  So

6    please try to always respond verbally.

7            Do you understand that?

8    A.    I do, yes.

9    Q.    Do you have any questions?

10:06   10   A.    No.

11   Q.    Okay.  Mr. Larch, what, if anything, is

12   your understanding as to why you're here this

13   morning?

14   A.    My understanding is this case is based on

10:06   15   overcharging and price-fixing of cathode ray tubes

16   indirectly purchased by individuals and businesses.

17   Q.    Okay.  Let me just ask some follow-up

18   questions.  Have you ever purchased a cathode ray

19   tube on its own?

10:06   20   A.    No.

21   Q.    Okay.  So is it fair to say that your

22   claims in this case stem from the purchase of a

23   product containing a cathode ray tube?

24   A.    Yes.

10:07   25   Q.    Okay.  Is it your understanding that the

13

John Larch

BARKLEY
Court Reporters

```
 1    allegations in this case relate to the price-fixing
 2    of cathode ray tubes?
 3        A.   Yes.
 4        Q.   Okay.  Is it your understanding that the
 5    allegations in this case do not relate to the
 6    price-fixing of CRT products, meaning televisions
 7    containing CRTs or computer monitors containing
 8    CRTs?
 9        A.   Would you kindly repeat that one more
10    time, please?
11        Q.   Sure.  You testified just a moment ago
12    that it is your understanding that the price-fixing
13    in this case, the alleged price-fixing, relates to
14    cathode ray tubes.  Is it your understanding that
15    there are any allegations of price-fixing of the
16    price of CRT products, meaning TVs or monitors?
17        A.   No.
18        Q.   No, okay.  Are you aware, Mr. Larch, that
19    my client, SEC, has never manufactured CRTs?
20        A.   No.
21        Q.   Are you aware that SEC never sold CRTs?
22        A.   No.
23        Q.   Okay.  Are you aware that SEA never
24    manufactured CRTs?
25        A.   No.
```

14

John Larch

BARKLEY
Court Reporters

1        Q.   Are you aware that SEC never sold CRTs --

2   SEA, I'm sorry, never sold CRTs?

3        A.   No.

4        Q.   Okay.  Is it true, however, that you've

10:08  5   elected to bring suit against my clients, SEC and

6   SEA, although they never manufactured or sold

7   tubes?

8             MR. GRALEWSKI:  Object to the form of the

9   question.  Lacks foundation.  Compound.

10:08  10            You can answer the question.

11            THE WITNESS:  I base my participation and

12   full support of this suit with the knowledge I

13   received from my lawyers.

14        Q.   BY MS. BYRD:  Okay.  Do you know whether

10:08  15   your attorneys made any investigation into the fact

16   that neither SEC nor SEA ever manufactured CRTs?

17            MR. GRALEWSKI:  Object to the form of the

18   question.  Compound.  Lacks foundation.

19            You can answer the question if you

10:09  20   understand it, and just be careful not to reveal

21   any communications between yourself and your

22   lawyers.

23            THE WITNESS:  I am basing the information

24   I have on what I received from my lawyers.

10:09  25        Q.   BY MS. BYRD:  However, do you know whether

15

John Larch

BARKLEY
Court Reporters

1    they made any investigation into the matter?

2        A.   I can't speak for them.  I do not know.

3        Q.   You don't know.  Okay.  Do you think it's

4    appropriate to sue a company for fixing the price

10:09  5    of a product that it never made?

6             MR. GRALEWSKI:  Object to the form.  Lacks

7    foundation.  Calls for legal conclusion.

8             THE WITNESS:  I would be relying on my

9    lawyers to make that judgment.

10:09  10        Q.   BY MS. BYRD:  Do you personally think it

11   is appropriate?

12             MR. GRALEWSKI:  Object to the form of the

13   question.  Asked and answered.  Lacks foundation.

14   Calls for a legal conclusion.

10:09  15             THE WITNESS:  I absolutely -- restate the

16   question, please.

17        Q.   BY MS. BYRD:  Sure.  Do you personally

18   believe that it's appropriate to sue an entity for

19   fixing the price of a product that it never

10:10  20   manufactured?

21             MR. GRALEWSKI:  Object to the form of the

22   question.  Asked and answered.  Lacks foundation.

23   Incomplete hypothetical and calls for a legal

24   conclusion.

10:10  25        Q.   BY MS. BYRD:  You can answer.

16

John Larch

BARKLEY
Court Reporters

1      A.   I can't answer that.

2      Q.   You don't know one way or the other

3   whether you think it's appropriate?

4           MR. GRALEWSKI:  Same objections.

10:10  5           THE WITNESS:  I don't have enough

6   information at hand to know -- to answer that

7   question.  I'm relying on my lawyers.

8      Q.   BY MS. BYRD:  Okay.  Mr. Larch, did you

9   attend college?

10:10  10     A.   Yes.

11     Q.   Okay.  What college did you attend?

12     A.   West Liberty State College.

13     Q.   Okay.  And what year did you start at West

14   Liberty?

10:10  15     A.   1976.

16     Q.   And what did you study?

17     A.   Accounting.

18     Q.   Did you graduate?

19     A.   Yes.

10:10  20     Q.   Did you receive a degree?

21     A.   Yes.

22     Q.   Was it a degree in accounting?

23     A.   Yes.

24     Q.   And what was the degree?

10:10  25     A.   Bachelor of Science.

17

John Larch

BARKLEY
Court Reporters

1      Q.    Okay.  Other than your Bachelor of Science
2    from West Liberty, do you have any other
3    postgraduate education?
4      A.    I am a certified public accountant.
10:11 5      Q.    Okay.  Are you currently employed?
6      A.    Yes.
7      Q.    Currently employed as a CPA?
8      A.    No.
9      Q.    What's your current employment?
10:11 10      A.    I am self-employed.
11      Q.    Can you give me a little more detail on
12    your self-employment?
13      A.    I am a financial advisor.
14      Q.    Okay.  And how long have you been a
10:11 15    self-employed financial advisor?
16      A.    Twelve years.
17      Q.    And what kind of clients did you advisee,
18    on what kind of matters?
19      A.    Retirement planning, estate planning.
10:11 20      Q.    Have you ever in any capacity worked in
21    the consumer electronics industry?
22      A.    No.
23      Q.    Have you ever held any kind of retail
24    position?
10:11 25      A.    No.

18

BARKLEY
Court Reporters

1    Q.   Okay.

2         (Reporter marked Exhibit No. 140 for

3         identification.)

4    Q.   BY MS. BYRD:   Take your time and review

10:12  5  that and let me know when you're ready.

6    A.   I'm ready.

7    Q.   Okay.  Mr. Larch, do you recognize this

8    document?

9    A.   Yes.

10:12  10  Q.   Have you reviewed it before today?

11   A.   I think so, yes.

12   Q.   When do you believe you reviewed it before

13   this morning?

14   A.   Last evening, I think.

10:13  15  Q.   And who showed it to you?

16   A.   My lawyer.

17   Q.   Which of your counsel?  Could you answer

18   verbally?

19   A.   I'm trying to remember these two

10:13  20  gentlemen.  I was with two of my attorneys last

21   night, and I am not sure which one.

22   Q.   Okay.  We will get to that.  Mr. Larch, do

23   you recognize this document as the reason we've

24   come here today to take your deposition?

10:13  25        MR. GRALEWSKI:  Object to the form.  Vague

19

John Larch

```
 1   and ambiguous.

 2           THE WITNESS:  No.

 3           MR. GRALEWSKI:  Calls for a legal

 4   conclusion.

 5       Q.   BY MS. BYRD:  Okay.  You mentioned that

 6   you met with some of your attorneys last night; is

 7   that correct?

 8       A.   Yes.

 9       Q.   Okay.  How many times in connection with

10   your preparation for this deposition did you meet

11   with counsel?

12       A.   Twice.

13       Q.   Twice.  And when was the first time?

14       A.   Last Thursday.

15       Q.   Okay.  And was that a face-to-face meeting

16   or a telephonic meeting?

17       A.   It was both.

18       Q.   Both.

19       A.   I was with two of my lawyers face to face

20   and one of them by phone.

21       Q.   Okay.  And who were you with face to face?

22       A.   Attorney Simon and Attorney Kevin Pearl.

23       Q.   And was Mr. Gralewski on the phone?

24       A.   Yes.

25       Q.   Okay.  And about how long did that meeting
```

10:13 (line 5)
10:13 (line 10)
10:14 (line 15)
10:14 (line 20)
10:14 (line 25)

20

John Larch

BARKLEY
Court Reporters

1    last?

2         A.   Sixty to 90 minutes.

3         Q.   Okay.  And did you review documents during

4    that meeting?

10:14  5         MR. GRALEWSKI:  Object to the form of the

6    question, and I'll instruct him not to answer on

7    the basis of the attorney-client privilege.

8         MS. BYRD:  Whether or not you reviewed

9    documents in preparation for this is not privileged

10:15 10    information.

11         MR. GRALEWSKI:  You can ask him a

12    different question.  My objection stands.  He's

13    prepared to tell you if during his preparation he

14    reviewed any documents that refreshed his

10:15 15    recollection.  I think that's a proper question.

16    But I am not going to let you ask the question you

17    asked.

18         Q.   BY MS. BYRD:  During your meeting last

19    Thursday with your counsel, did you review any

10:15 20    documents in order to refresh your recollection to

21    prepare for this deposition?

22         A.   Yes.

23         Q.   You did.  What type of documents did you

24    review?

10:15 25         A.   The initial complaint, interrogatories,

21

John Larch

BARKLEY
Court Reporters

                1    the amended complaint, things of that nature.

                2        Q.   Okay.  And you said you met with your

                3    attorneys twice.  When did the second meeting take

                4    place?

    10:16       5        A.   Yesterday.

                6        Q.   Yesterday.  And was that meeting face to

                7    face?

                8        A.   Yes.

                9        Q.   Okay.  And who was present at that

    10:16      10    meeting?

               11        A.   Attorney Gralewski and Attorney Pearl.

               12        Q.   Okay.  About how long did that meeting

               13    take?

               14        A.   Approximately one and a half to two hours.

    10:16      15        Q.   Okay.  And during that meeting, did you

               16    review any documents to refresh your recollection

               17    in order to prepare for your deposition this

               18    morning?

               19        A.   Yes.

    10:16      20        Q.   Okay.  What type of documents did you

               21    review yesterday?

               22        A.   The initial complaint.  I think the

               23    amended complaint and some interrogatories.

               24        Q.   Okay.  When was the first time you met

    10:16      25    Mr. Gralewski?

                                        22

BARKLEY
Court Reporters

1          A.    Last Thursday.

2          Q.    Okay.  And Mr. Simon?

3          A.    Thirty years ago.

4          Q.    And what were the circumstances of your

10:17  5   meeting Mr. Simon 30 years ago?

6          A.    We both live in the same town.  Small

7    town, everybody knows everybody.

8          Q.    So you knew each other socially?

9          A.    Socially and professionally, yes.

10:17  10         Q.    And what was your professional

11   relationship?

12         A.    His firm has done a number of -- provided

13   a number of services for me when I worked at the

14   bank.

10:17  15         Q.    Okay.  So he's been your attorney in other

16   matters?

17         A.    Yes.

18         Q.    And what kind of matters?

19         A.    Principally title searches.

10:17  20         Q.    Title searches, okay.  Have the documents

21   you reviewed in order to refresh your recollection

22   for today's deposition been produced in this

23   litigation?

24         A.    I apologize.  I don't understand the

10:17  25   question.

23

John Larch

1    Q.   Have any of the documents you reviewed in

2    order to refresh your recollection been produced to

3    defendants in this litigation, turned over to

4    defendants, to the best of your knowledge?

10:18  5    A.   I'll have to rely on my lawyer to answer

6    that.  I don't know.

7    Q.   To the best of your knowledge, he can't

8    answer on your behalf.  If you don't know, you

9    don't know.

10:18 10    A.   I believe they have.

11    Q.   Okay.  Have you ever communicated,

12    Mr. Larch, with any of plaintiffs' economic experts

13    in this matter?

14    A.   No.

10:18 15    Q.   Have you ever communicated with any of

16    plaintiffs' industry experts in this matter?

17    A.   No.

18    Q.   Did you do any research in order to

19    prepare for your deposition this morning?

10:18 20    A.   No.

21    Q.   Okay.  Mr. Larch, how did you come to be

22    named a plaintiff in this matter?

23    A.   Through a conversation with my lawyer.

24    Q.   Okay.  And I think you testified just a

10:18 25    minute ago that you've known Mr. Simon for a number

24

John Larch

BARKLEY
Court Reporters

1    of years and that he's represented you in earlier

2    matters; is that correct?

3        A.   Yes.

4        Q.   Okay.  Without disclosing any of the

10:19 5    content of your communications with Mr. Simon or

6    other counsel, did you contact one of your counsel

7    in order to become a plaintiff in this litigation

8    or were you contacted?

9            MR. GRALEWSKI:  I'll let him answer that

10:19 10    question.  I'll let him answer that question.

11           THE WITNESS:  I had a conversation with my

12    lawyer.  He shared with me --

13           MR. GRALEWSKI:  That begins to go into

14    protected communications.  So I am going to

10:19 15    instruct you not to continue your answer.

16           THE WITNESS:  Okay.

17        Q.   BY MS. BYRD:  Okay.  When you had this --

18    which attorney were you speaking with with respect

19    to this conversation you're referencing?

10:19 20        A.   Attorney Aaron Frankovitch.

21        Q.   Attorney Aaron Frankovitch?

22        A.   Yes.

23        Q.   Before you began this conversation with

24    Mr. Frankovitch, were you aware of the existence of

10:20 25    the CRT litigation?

25

BARKLEY
Court Reporters

1        A.    No.

2        Q.    Mr. Larch, why did you bring suit in this

3    case?

4        A.    I was overcharged and other individuals

10:20  5    and small businesses in West Virginia were

6    overcharged due to this price-fixing.

7        Q.    Was your decision to become a named

8    plaintiff in this litigation a big decision for

9    you?

10:20  10        A.    Yes.

11        Q.    Yes.  It's something that you weighed

12    carefully?

13        A.    Yes.

14        Q.    Have you ever communicated with class

10:20  15    counsel in this case?

16        A.    No.

17        Q.    Have you ever turned over any documents to

18    class counsel in this case?

19            MR. GRALEWSKI:  I am going to object to

10:20  20    the previous question and this question as vague

21    and ambiguous.

22            You can answer the question.

23            THE WITNESS:  May I ask who "class

24    counsel" is?

10:21  25        Q.    BY MS. BYRD:  Have you ever turned over

26

BARKLEY
Court Reporters

1    any documents to, for example, Lauren Russell?

2        A.    No.

3        Q.    To Mario Alioto?

4        A.    No.

10:21  5        Q.    Okay.  Do you read the papers that are

6    filed in this case, the motions, the orders, things

7    of that nature?

8        A.    I have reviewed documents with my lawyers,

9    yes.

10:21  10        Q.    Do you routinely review the papers that

11    are filed in this case?

12        A.    No.

13        Q.    Okay.

14            (Reporter marked Exhibit No. 141 for

10:22  15            identification.)

16        Q.    BY MS. BYRD:  Just take a minute to review

17    that and let me know when you're ready.

18        A.    I'm ready.

19        Q.    Okay.  Mr. Larch, do you recognize this

10:22  20    document?

21        A.    I think so.

22        Q.    Okay.  Do you recall if you've seen it

23    before this morning?

24        A.    I don't recall.

10:22  25        Q.    Do you recall if you've reviewed it before

27

John Larch

BARKLEY
Court Reporters

 1    this morning?

 2        A.   I can't answer definitively.  I have seen

 3    many documents.  It looks like something I've seen.

 4        Q.   But you're not sure whether you've seen

10:23  5    this --

 6        A.   That's correct.

 7        Q.   -- specific document?  Okay.

 8             (Reporter marked Exhibit No. 142 for

 9             identification.)

10:24 10        THE WITNESS:  Okay.

11        Q.   BY MS. BYRD:  Okay.  Mr. Larch, do you

12    recognize this document?

13        A.   I think so.

14        Q.   Do you know if you've reviewed it before

10:24 15    this morning?

16        A.   I've seen many documents over the past

17    four years.  I can't say for certain.

18        Q.   Okay.  But you believe that you've

19    reviewed this document?

10:24 20        A.   I may have.

21        Q.   Okay.  And who showed it to you?

22        A.   It would have been one of my lawyers.

23        Q.   Okay.  And when do you believe they showed

24    this document to you?

10:25 25        A.   I don't recall.

                            28

BARKLEY
Court Reporters

1               (Reporter marked Exhibit No. 143 for

2               identification.)

3        Q.   BY MS. BYRD:  Mr. Larch, do you recognize

4   this document?

10:25  5        A.   I believe so.

6        Q.   Okay.  Do you believe you've reviewed it

7   before this morning?

8        A.   I think I have.

9        Q.   Okay.  And when do you believe you've

10:25  10   reviewed it?

11        A.   I only recall reviewing it with my

12   lawyers.  I don't know exactly when.

13        Q.   So is it your testimony that one of your

14   lawyers showed you this document?

10:26  15        A.   It's possible, but I can't say for

16   certain.

17        Q.   Okay.  So you don't know for sure?

18        A.   That's correct.

19        Q.   Okay.  Mr. Larch, what kinds of documents

10:26  20   did you maintain regarding your purchase of CRT

21   products?

22        A.   I had the receipt from the purchase.

23        Q.   Okay.  Anything else?

24        A.   No.

10:26  25        Q.   And have all of those documents that you

29

John Larch

BARKLEY
Court Reporters

1    maintained with relation to that transaction been

2    produced?

3        A.    Yes.

4              (Reporter marked Exhibit No. 144 for

10:27 5              identification.)

6            THE WITNESS:  Okay.

7        Q.    BY MS. BYRD:  Okay.  Mr. Larch, do you

8    recognize Exhibit 144?

9        A.    It's possible.

10:27 10       Q.    It's possible, but you're not sure?

11       A.    I am not certain, that's correct.

12       Q.    Okay.  Do you know, Mr. Larch, whether you

13   were involved in preparing answers to these

14   interrogatories?

10:27 15       A.    I was not.

16       Q.    You were not.

17            MR. GRALEWSKI:  Object to that question as

18   vague and ambiguous.  Calls for a legal conclusion.

19              (Reporter marked Exhibit No. 145 for

10:28 20              identification.)

21            MR. GRALEWSKI:  May I suggest to the

22   witness that you're going to get several more

23   documents, and it may be easier for you just to do

24   this.  And when counsel will refer to a document,

10:28 25   she'll refer to the number, otherwise you'll soon

30

BARKLEY
Court Reporters

 1    run out of space.

 2              THE WITNESS:  Thank you.

 3         Q.   BY MS. BYRD:  I realize this is a long

 4    document, so take as much time as you want, but

 5    I'll direct you to the extent -- to a specific

 6    place to the extent I need you to review it.

 7         A.   Okay.

 8         Q.   Okay.  Mr. Larch, you recognize this

 9    document?

10         A.   I think so.

11         Q.   Okay.  Do you believe that you've seen it

12    before this morning?

13         A.   Yes, I believe so.

14         Q.   Okay.  Who do you believe showed you this

15    document?

16         A.   My lawyers.

17         Q.   Okay.  Do you know when they showed it to

18    you?

19         A.   I do not.

20         Q.   Okay.  I'd like to briefly direct your

21    attention to Page 24 of Exhibit A?

22              MR. GRALEWSKI:  Counsel, you can certainly

23    ask your questions related to this document, but I

24    do want to put an objection on the record that I

25    believe this is actually two different documents.

31

John Larch

BARKLEY
Court Reporters

1    The exhibits to this document are actually exhibits

2    to amended responses, and those amended responses

3    are not the first part of the document.   My

4    objection's noted for the record.   You can proceed.

5         MS. BYRD:   Okay.

6         Q.   Take a minute and look at Page 24 of

7    Exhibit A.   Does this refresh your recollection as

8    to whether you were involved in preparing answers

9    to these interrogatories?

10        A.   No.

11        Q.   Okay.   Let's take a look at Page 27 of

12   Exhibit B.   Okay.   So Mr. Larch, were you involved

13   in preparing answers to these interrogatories

14   insofar as you provided information that's

15   contained within them?

16        A.   Yes.

17        Q.   Okay.   You can set that aside.

18             Earlier this morning I believe you

19   testified that you purchased a CRT television; is

20   that correct.

21        A.   Yes.

22        Q.   Okay.   How many televisions did you

23   purchase?

24        A.   One.

25        Q.   One CRT television?

32

John Larch

1          MR. GRALEWSKI:   Object to the form of the

2     question.   Vague and ambiguous as to time.

3          Q.   BY MS. BYRD:   Well, let me ask you this:

4     Is the CRT television that you're referencing the

10:31 5     product for which you are claiming damages in this

6     litigation?

7          A.   Yes.

8          Q.   Are you claiming damages for, in this

9     litigation, for any other televisions or products?

10:32 10     A.   No.

11          Q.   What specifically did you purchase?

12          A.   A Curtis Mathes 36-inch television.

13          Q.   Mr. Larch, is Curtis Mathes a defendant in

14     this litigation?

10:32 15     A.   No.

16          Q.   But it's your testimony that that was the

17     manufacturer of your television, correct?

18          A.   Their name is on the front of the

19     television.   I assume so, yes.

10:32 20     Q.   Why have you elected not to bring suit

21     against Curtis Mathes?

22          MR. GRALEWSKI:   Object to the form of the

23     question.   Calls for a legal conclusion.

24          I want to caution the witness not to

10:32 25     reveal any communications with counsel.   If you can

33

John Larch

1   answer the question without revealing

2   communications with counsel, you can do so.

3        THE WITNESS:  My understanding is the

4   conspiracy and price-fixing occurred among

10:33  5   manufacturers of cathode ray tubes, not necessarily

6   those that actually made the television.

7       Q.   BY MS. BYRD:  Are you aware that there are

8   manufacturers of cathode ray tubes who have not

9   been named as defendants in this litigation?

10:33  10      A.   Yes.

11      Q.   Why did you purchase the Curtis Mathes

12   television?

13      A.   It was an impulse purchase.

14      Q.   An impulse purchase?

10:33  15      A.   Yes.

16      Q.   Were there any specific features that drew

17   you to the Curtis Mathes television?

18      A.   No.

19      Q.   Not the size of the television?

10:33  20      A.   Not that I can recall.

21      Q.   Okay.  Not the brand of the television?

22      A.   Not that I can recall.

23      Q.   At the time you purchased the Curtis

24   Mathes television, were you aware of other

10:34  25   television brands that offered products with

34

BARKLEY
Court Reporters

```
 1    similar features to the television you purchased?
 2         A.   I'm sure there were.
 3         Q.   Can you think of what any of those brands
 4    were?
 5         A.   No.
 6         Q.   Was the fact that the Curtis Mathes
 7    television contained cathode ray tubes an important
 8    consideration for you in deciding to purchase it?
 9         A.   No.
10         Q.   If the fact that the TV contained a CRT
11    wasn't an important consideration for you in the
12    decision to make the purchase, did you consider
13    other technologies?
14              MR. GRALEWSKI:  Object to the form.  Vague
15    and ambiguous.  Compound.
16              THE WITNESS:  It was an impulse purchase.
17         Q.   BY MS. BYRD:  Are you familiar with LCD
18    televisions?
19         A.   Yes.
20         Q.   At the time you purchased the Curtis
21    Mathes TV, did you consider buying an LCD TV?
22         A.   This impulse purchase, I did no review of
23    other televisions.  Saw the television and
24    purchased it.
25         Q.   Are you familiar with plasma televisions?
```

10:34  5
10:34  10
10:34  15
10:35  20
10:35  25

35

BARKLEY
Court Reporters

1       A.   Yes.

2       Q.   Did you consider purchasing a plasma

3  television?

4       A.   This was not a -- this wasn't something I

10:35 5  studied.  It was just an impulse purchase.

6       Q.   Okay.  Where did you purchase your Curtis

7  Mathes television?

8       A.   K-Mart.

9       Q.   And where is the K-Mart located?

10:35 10       A.   Weirton, West Virginia.

11       Q.   Was that close to your home at the time?

12       A.   Yes.

13       Q.   Why did you decide to make the purchase

14  from that K-Mart?

10:35 15       A.   I just happened to be in the store, saw

16  the television and made an impulse purchase.

17       Q.   So you had gone to the K-Mart for other

18  reasons to purchase other products?

19       A.   Yes.

10:36 20       Q.   Okay.  Do you recall whether at the time

21  you made your purchase, K-Mart offered other brands

22  of televisions?

23       A.   I don't recall.

24       Q.   Is it possible that they offered other

10:36 25  brands of televisions?

36

John Larch

BARKLEY
Court Reporters

1        A.   I'm sure it's possible.

2        Q.   Do you recall whether at that time K-Mart

3    offered televisions containing other technologies?

4        A.   I don't know.

10:36  5        Q.   Is it possible that they did?

6        A.   It could be.

7        Q.   When you were in the K-Mart, did you deal

8    with a salesperson with respect to the purchase of

9    the Curtis Mathes television?

10:36 10        A.   No.

11        Q.   You didn't deal with a salesperson at all?

12        A.   No.

13        Q.   You found the TV on the shelf, took it off

14    the shelf and took it to the cash register?

10:36 15        A.   No.

16        Q.   Okay.  Can you explain for me how?

17        A.   Well, the television was a display model.

18        Q.   Okay.  So you saw the display model,

19    decided to purchase it and had someone box it up

10:37 20    for you?

21        A.   It actually wasn't put in a box.

22        Q.   Okay.  Did you negotiate the price of the

23    television at all?

24        A.   No.

10:37 25        Q.   Did you shop around at all to make sure

37

BARKLEY
Court Reporters

1    that you had gotten the best price?

2        A.    No.

3        Q.    Okay.  Did you review any television

4    prices on the Internet?

10:37 5        A.    No.

6        Q.    Did you review any newspaper ads for

7    televisions?

8        A.    No.

9        Q.    Did you go to any other stores to see what

10:37 10    their offerings were and what the prices were?

11        A.    No.

12        Q.    Mr. Larch, do you know where K-Mart bought

13    the television that you purchased?

14        A.    No.

10:37 15        Q.    Do you know how much K-Mart paid for the

16    television you purchased?

17        A.    No.

18        Q.    Do you know when K-Mart bought the

19    television that you purchased?

10:38 20        A.    No.

21        Q.    Do you know whether the purchase price for

22    your Curtis Mathes television was below K-Mart's

23    cost for the television?

24        A.    I have no knowledge of that.

10:38 25        Q.    So you don't know?

38

John Larch

BARKLEY
Court Reporters

```
 1          A.    No, I do not know.
 2          Q.    Okay.  Are there other retailers close to
 3     you or otherwise where you could have purchased the
 4     product?
10:38  5          MR. GRALEWSKI:  Object to the form.  Vague
 6     and ambiguous.
 7                You can answer.
 8                THE WITNESS:  Yes.
 9          Q.    BY MS. BYRD:  Yes.  Can you tell me what
10:38 10     some of those retailers were at the time?
11          A.    Walmart.
12          Q.    Any others?
13          A.    Not that I can recall.
14          Q.    There's not a Sears nearby?
10:38 15          A.    No.
16          Q.    A Target?
17          A.    No.
18          Q.    A RadioShack?
19          A.    Yes.
10:39 20          Q.    Okay.
21                MR. GRALEWSKI:  Object to the line of
22     questioning as vague and ambiguous, but continue.
23          Q.    BY MS. BYRD:  Was there a Circuit City
24     close to you?
10:39 25                MR. GRALEWSKI:  Object to the form.  Vague
```

39

John Larch

BARKLEY
Court Reporters

1     and ambiguous.

2          Q.   BY MS. BYRD:  You can answer.

3          A.   No.

4          Q.   Was there a Best Buy?

10:39   5          A.   No.

6               MR. GRALEWSKI:  Same objection.

7          Q.   BY MS. BYRD:  A Costco?

8               MR. GRALEWSKI:  Same objection.

9               THE WITNESS:  No.

10:39   10          Q.   BY MS. BYRD:  A Sam's Club?

11               MR. GRALEWSKI:  Same objections.

12          Q.   BY MS. BYRD:  You can answer.

13          A.   No.

14          Q.   Okay.  When did you make the purchase?

10:39   15          A.   In June of 2004.

16          Q.   Do you know the exact date?

17          A.   It was late June, June 24th, 2004,

18     perhaps.

19          Q.   Okay.  Do you have the receipt for the

10:39   20     television, Mr. Larch, not with you today --

21          A.   Yes.

22          Q.   -- but you maintained the receipt?  Do you

23     recall how you paid for the product?

24          A.   Yes.

10:40   25          Q.   How did you pay for the product?

40

John Larch

BARKLEY
Court Reporters

1      A.    I paid $200 in cash and used a debit card

2   for the balance.

3      Q.    In terms of your payment for the

4   television, did you pay all at once for the

10:40   5   television or did you set up any kind of payment

6   plan with K-Mart?

7      A.    All at once.

8      Q.    And 200 in cash; is that correct?

9      A.    Yes.

10:40   10   Q.    And the balance on a debit card?

11      A.    Yes.

12      Q.    Do you know what kind of debit card?

13      A.    Not offhand, no.

14      Q.    So you testified that you maintained the

10:40   15   receipt reflecting the transaction; is that

16   correct?

17      A.    Yes.

18      Q.    Did you maintain any other documents that

19   reflected the purchase of the television?

10:40   20   A.    No.

21      Q.    Nothing contained inside the packaging, a

22   user manual, product specifications?

23      A.    No.

24      Q.    Did you get a box with the television when

10:41   25   you purchased it?

41

John Larch

1        A.   No.

2        Q.   Okay.  How much did you pay for the

3   television?

4        A.   389.99.

10:41  5        Q.   Does the purchase price of 389.99 reflect

6   West Virginia sales tax?

7        A.   No.

8        Q.   Did you pay West Virginia sales tax on the

9   purchase?

10:41 10        A.   Yes.

11        Q.   Do you know how much?

12        A.   It was 20-some dollars.

13        Q.   Okay.  At the time you made the purchase,

14   did K-Mart offer you any kind of low price match

10:41 15   guarantee?

16        A.   No.

17        Q.   Of the 389.99 that you paid for the

18   television, do you know how much of that purchase

19   price reflects the cost of the cathode ray tube?

10:41 20        A.   No.

21        Q.   Do you know how you would find that

22   information out?

23             MR. GRALEWSKI:  Object to the form.  Calls

24   for a legal conclusion.

10:42 25             THE WITNESS:  I am relying on my lawyers

42

John Larch

BARKLEY
Court Reporters

1    to work with appropriate professionals to determine

2    that.

3         Q.   BY MS. BYRD:   But you don't know how you

4    personally would go about finding that information

10:42  5    out?

6         A.   No.

7         Q.   Do you know, Mr. Larch, how much a CRT

8    costs -- I mean, how much a CRT costs relative to

9    the end cost of a television?

10:42  10        A.   No.

11        Q.   Was the product you purchased on sale?

12        A.   No, it was a display unit.

13        Q.   Was it discounted in any way?

14        A.   I don't recall.

10:42  15        Q.   Okay.  And was K-Mart running any kind of

16    promotion with respect to the television that you

17    purchased?

18        A.   I am not aware of that, no.

19        Q.   Mr. Larch, are you aware whether the

10:43  20    television you purchased had an MSRP?  Do you know

21    what an MSRP is?

22        A.   No.

23        Q.   Okay.  It is a manufacturer's suggested

24    retail price.  Are you familiar with that?

10:43  25        A.   Yes.

43

John Larch

1          Q.   Okay.  Do you know whether the television

2     you purchased had an MSRP?

3          A.   I don't know.

4          Q.   Okay.  So you don't know whether the price

10:43  5     you paid was lower than MSRP?

6          A.   I do not.

7          Q.   Okay.  Or higher than MSRP?

8          A.   I do not.

9          Q.   Okay.  Did K-Mart offer a rebate for the

10:43 10     product that you purchased?

11         A.   Not that I can recall.

12         Q.   You didn't fill out any kind of K-Mart

13     rebate for the product?

14         A.   No, not that I can recall.

10:43 15         Q.   Do you know whether Curtis Mathes offered

16     a rebate for the product you purchased?

17         A.   Not that I can recall.

18         Q.   Mr. Larch, are you aware of whether the

19     price for the television you purchased went up

10:44 20     after you made the purchase?

21         A.   I don't know.

22         Q.   And you didn't do anything to confirm

23     whether the price went up or down after you made

24     the purchase?

10:44 25         A.   No.

44

John Larch

BARKLEY
Court Reporters

1    Q.   Okay.  Did you do anything to confirm

2    whether or not you had paid a competitive price for

3    the television after you made the purchase?

4    A.   No.

10:44  5        MR. GRALEWSKI:  Object to the form.  Vague

6    and ambiguous.

7    Q.   BY MS. BYRD:  You can answer.

8    A.   No.

9    Q.   You didn't visit any other stores?

10:44 10   A.   No.

11   Q.   You didn't go on the Internet?

12   A.   No.

13   Q.   You didn't go back to K-Mart?

14   A.   No.

10:44 15   Q.   So it's your testimony that you purchased

16   a floor model?

17   A.   Yes.

18        MR. GRALEWSKI:  Object to the form.  Asked

19   and answered.

10:44 20   Q.   BY MS. BYRD:  Can you tell me what that

21   means?

22   A.   I walked in the store.  They had this

23   television displayed on the floor.

24   Q.   Okay.  And did you receive a lower price

10:45 25   for the floor model than you would have for the

45

BARKLEY
Court Reporters

1    same television that had not been displayed on the

2    floor?

3         A.   I would assume so.

4         Q.   Okay.  Do you know whether the model you

10:45 5    purchased was discontinued?

6         A.   I don't know.

7         Q.   Okay.  When you purchased the television,

8    did you buy any accessories with it?  Did you buy

9    --

10:45 10         A.   I bought a smart package, a $29 protection

11   plan in case something happened to the TV, I think.

12         Q.   Okay.  So it was a warranty that you

13   purchased?

14         A.   Yes.

10:45 15         Q.   Okay.  Was it an extended warranty?

16         A.   Can't recall.

17         Q.   Okay.  And it was the manufacturer's

18   warranty?

19         A.   I don't know that either.

10:45 20         Q.   Okay.  Did you purchase any accessories in

21   terms of cables to hook up the TV or antenna to go

22   with the TV, anything like that?

23         A.   No.

24         Q.   Did you purchase any kind of customer

10:46 25   support from K-Mart or from Curtis Mathes?

46

John Larch

BARKLEY
Court Reporters

1       A.   No.

2       Q.   At the time that you purchased your Curtis

3   Mathes television, did you purchase any other

4   products along with it, excluding the warranty that

10:46   5   we've discussed just now?

6       A.   No.

7       Q.   No DVD players or VCRs?

8       A.   No.

9       Q.   You took the product home with you that

10:46  10   day; is that correct?

11      A.   Yes.

12      Q.   So it wasn't delivered to you or shipped

13  to you?

14      A.   No.

10:46  15      Q.   Mr. Larch, do you know whether K-Mart,

16  when it purchases televisions, purchases them in

17  bulk quantities?

18      A.   No.

19      Q.   Do you know whether K-Mart is able to

10:46  20  negotiate a better price for those televisions

21  because it buys them in bulk quantities?

22      A.   No.

23      Q.   Mr. Larch, what have you used the product

24  for?

10:47  25      A.   Everyday use, just watching television.

47

John Larch

BARKLEY
Court Reporters

1    Q.   Personal use?

2    A.   Personal use, yes.

3    Q.   Was the product in your home?

4    A.   Yes.

10:47  5    Q.   Okay.   Is the product still in your home?

6    A.   Yes.

7    Q.   Do you have any complaints with the

8    product?

9    A.   Other than learning about this

10:47  10   overcharging, no.

11   Q.   So you feel like it's been a good product?

12        MR. GRALEWSKI:  Object to the form.  Vague

13   and ambiguous.

14        You can answer.

10:47  15        THE WITNESS:  I feel like I've overpaid

16   and others have overpaid, but other than that, no,

17   it's been okay.

18   Q.   BY MS. BYRD:  You've never had occasion to

19   contact K-Mart with any technical difficulties or

10:47  20   complaints?

21   A.   No.

22   Q.   Ever had any occasion to contact Curtis

23   Mathes with any complaints?

24   A.   No.

10:48  25   Q.   Was your product new or used when you

48

BARKLEY
Court Reporters

1    purchased it?

2         A.   New.

3         Q.   And you still own the product?

4         A.   Yes.

10:48 5        Q.   Mr. Larch, how do you know your product

6    contained a cathode ray tube?

7         A.   My lawyers asked me to remove the back of

8    the television and provide them with a photograph

9    of the cathode ray tube.

10:48 10       Q.   Okay.   You did this at the request of your

11   lawyers?

12            MR. GRALEWSKI:   And I just want to remind

13   the witness that in answering the question, you

14   shouldn't reveal any communications with your

10:48 15   lawyers, and I am going to instruct him not to

16   answer that question.

17        Q.   BY MS. BYRD:   Okay.   Do you take the

18   advice of your counsel?

19        A.   Yes.

10:49 20       Q.   You personally removed the back of your

21   television and photographed the inside of the

22   television?

23            MR. GRALEWSKI:   You can answer that

24   question.

10:49 25            THE WITNESS:   Yes.

49

John Larch

1    Q.   BY MS. BYRD:  Okay.   And when did you do

2    this?

3          MR. GRALEWSKI:   Counsel's going to

4    continue to ask you questions, and you can answer

10:49  5    those questions as long as I don't object and

6    instruct you not to answer.

7          THE WITNESS:  Yesterday morning.

8    Q.   BY MS. BYRD:  Yesterday morning.   Okay.

9    Mr. Larch, when did you become a plaintiff in this

10:49  10   litigation?

11   A.   2008.

12   Q.   Okay.  So do you know when in 2008?

13   A.   I'm pretty sure that the complaint was

14   filed in March of 2008.  So would have been shortly

10:49  15   before that.

16   Q.   Shortly before March of 2008; is that

17   correct?

18   A.   Yes.

19   Q.   Before March of 2008, had you done

10:49  20   anything to confirm that there was a cathode ray

21   tube inside of your Curtis Mathes television?  You

22   can answer the question.

23   A.   No.

24   Q.   No.  Had you reviewed any product

10:50  25   specifications?

50

John Larch

BARKLEY
Court Reporters

1      A.   No.

2      Q.   Spoken with anyone at Curtis Mathes about

3   whether the television contained a CRT?

4      A.   No.

10:50  5      Q.   Okay.  So before March of 2008, actually,

6   until yesterday morning, what led you to believe

7   that there was a cathode ray tube contained inside

8   your television?

9      A.   Please restate that.

10:50 10      Q.   Okay.  Until yesterday morning when you

11   opened your television, why did you believe that

12   there was a cathode ray tube contained inside the

13   Curtis Mathes TV?

14      A.   Well, I have known there was a cathode ray

10:50 15   tube in that TV since early 2008.

16      Q.   Okay.  But how did you know that?

17             MR. GRALEWSKI:   You can answer the

18   question, just don't reveal any communications with

19   counsel.

10:50 20             THE WITNESS:   Just based on the size of

21   the television.

22      Q.   BY MS. BYRD:   Based on the size and

23   appearance of the television; is that correct?

24      A.   Yes.

10:51 25      Q.   But you've never done anything to confirm

51

John Larch

1    that there was a CRT inside of the television until

2    yesterday?

3            MR. GRALEWSKI:  Sorry, Counsel.  Object to

4    the form of the question.  Lacks foundation.

10:51  5    Misstates testimony.

6            THE WITNESS:  No.

7        Q.   BY MS. BYRD:  Okay.  And why had you not

8    done anything to confirm that there was a CRT

9    inside of your television until you opened it

10:51  10    yesterday?

11            MR. GRALEWSKI:  Object to the form.  Lacks

12    foundation.  Vague and ambiguous.  Misstates

13    testimony.

14            THE WITNESS:  I knew there was one inside

10:51  15    the television.

16        Q.   BY MS. BYRD:  So it's your testimony that

17    you knew that there was one, but you had done

18    nothing to confirm that there was one until

19    yesterday morning?

10:51  20            MR. GRALEWSKI:  Object to the form.  Vague

21    and ambiguous.  Lacks foundation.  Misstates

22    testimony.

23            THE WITNESS:  Yes.

24        Q.   BY MS. BYRD:  Okay.  When you opened the

10:51  25    product yesterday morning, were you able to

52

John Larch

BARKLEY
Court Reporters

1    identify the CRT component?

2         A.    Yes.

3         Q.    Okay.   Were you able to confirm who made

4    the CRT component contained inside your television?

10:52  5         A.    Yes.

6         Q.    And who was the manufacturer of the CRT

7    contained inside your television?

8         A.    Toshiba.

9         Q.    Toshiba.   And how did you know that

10:52  10   Toshiba was the manufacturer of the CRT inside of

11   your television?

12        A.    The Toshiba logo was on the CRT.

13        Q.    Do you know whether Toshiba is a defendant

14   in this action?

10:52  15        A.    Yes.

16        Q.    Okay.   Are you aware that there are

17   manufacturers of cathode ray tubes who have not

18   been named defendants in this litigation?

19             MR. GRALEWSKI:   Object to the form.   Asked

10:52  20   and answered.

21             THE WITNESS:   Yes.

22        Q.    BY MS. BYRD:   Is it possible that the CRT

23   that's inside your television was manufactured by

24   someone who is not a defendant in this litigation?

10:53  25        A.    I don't know.

53

John Larch

1          Q.   You don't know.  Mr. Larch, do you know
2     whether over the class period and to the present
3     the price of CRT televisions has gone up?
4          A.   Do I know that?  No, I am not aware of
10:53 5     that.
6          Q.   Do you know whether beginning from the
7     start of the class period and continuing to the
8     present, the price of CRT televisions has gone
9     down?
10:53 10          A.   No.
11               MR. GRALEWSKI:  Go ahead.
12          Q.   BY MS. BYRD:  Do you know whether the
13     prices have stayed the same over the same time
14     period?
10:53 15          A.   No.
16          Q.   Okay.  Have you done anything to monitor
17     the prices of CRT televisions over the time period?
18          A.   No, I am relying on my lawyers to do that
19     type of research.
10:54 20          Q.   You have done no personal research?
21          A.   No.
22          Q.   Mr. Larch, if you were to try to purchase
23     your Curtis Mathes television today, do you know
24     whether you would pay a price that's higher for the
10:54 25     television than what you paid in 2004?

54

BARKLEY
Court Reporters

1          A.    I wouldn't know.

2          Q.    Do you know whether you'd pay a price

3     that's lower?

4          A.    You just want me to speculate?

10:54  5     Q.    I'm asking you, do you know?

6          A.    I don't know.

7          Q.    Okay.  Do you know, Mr. Larch, whether the

8     price for LCD televisions have gone up or down from

9     the beginning of the start of the class period to

10:54 10    the present?

11         A.    Yes.

12         Q.    And what have the prices of LCD

13    televisions done?

14         A.    Generally gone down.

10:54 15    Q.    Okay.  Do you know whether the price of

16    plasma televisions have generally gone up or down

17    beginning at the start of the class period and

18    continuing to the present?

19         A.    Yes.

10:55 20    Q.    And what have those prices done?

21         A.    Generally gone down.

22         Q.    Okay.  Have you ever purchased a non- --

23    did you ever purchase a non-CRT television during

24    the relevant period?

10:55 25    A.    Yes.

55

John Larch

1     Q.   Okay.  But you're not claiming damages for

2  that product in this case?

3     A.   No.

4     Q.   And what was the technology contained in

10:55  5  that television?

6     A.   LCD.

7     Q.   And when did you buy that product?

8     A.   Early 2000s.

9     Q.   Did you buy it before you bought your

10:55 10  Curtis Mathes television?

11     A.   I don't recall the exact date.

12     Q.   Okay.  Do you know when you bought it?

13  I'm sorry, you don't know for certain when you

14  bought it?

10:55 15     A.   That's correct.

16     Q.   Do you know what you paid for it?

17     A.   Not offhand.

18     Q.   Do you know where you purchased it?

19     A.   Yes.

10:55 20     Q.   Where did you purchase it?

21     A.   Best Buy.

22     Q.   And what brand was the television?

23     A.   I don't recall.

24     Q.   Did you purchase it for personal use?

10:56 25     A.   I purchased it for my mom and dad.

John Larch

BARKLEY
Court Reporters

1       Q.   Okay.  So you didn't purchase it for

2   yourself.  You purchased it for your parents?

3       A.   That's correct.

4       Q.   It's never been in your home?

10:56   5       A.   Never.

6       Q.   Why did you select that technology as

7   opposed to a CRT television?

8       A.   My mom picked out that TV.

9       Q.   You didn't personally select the TV?

10:56  10       A.   No.

11       Q.   Okay.  Mr. Larch, you testified earlier

12   that there was a Walmart and a RadioShack that were

13   convenient to you at the time you purchased the

14   Curtis Mathes television?

10:56  15       A.   Yes.

16       Q.   Do you know whether Walmart or RadioShack

17   offered similarly-priced CRTs to the one that you

18   purchased?

19       A.   No.

10:57  20       Q.   Do you know whether they offered

21   televisions with similar specifications to the one

22   that you purchased?

23       A.   No.

24       Q.   Do you know whether they offered

10:57  25   televisions that contained LCD technology?

57

John Larch

1        A.    No.

2        Q.    Plasma technology?

3        A.    No.

4        Q.    And you never went into the stores to

10:57  5  confirm what their offerings were?

6        A.    No.

7              (Discussion off the record.)

8              THE VIDEOGRAPHER:  The time is 10:59 a.m.

9  We are going off the record.

10:57  10             (Whereupon a recess was taken.)

11             THE VIDEOGRAPHER:  Time is 11:16 a.m.  We

12  are back on the record.

13        Q.    BY MS. BYRD:  Mr. Larch, we just took a

14  short break.  Welcome back.  I'd just like to

11:17  15  remind you that you are still under oath.

16        A.    Yes, ma'am.

17             (Reporter marked Exhibit No. 146 for

18             identification.)

19        Q.    BY MS. BYRD:   Mr. Larch, do you recognize

11:17  20  this document?

21        A.    Yes.

22        Q.    Okay.  What is this document?

23        A.    K-Mart receipt for the purchase of my

24  television.

11:17  25        Q.    Okay.  The receipt appears to be dated

58

John Larch

BARKLEY
Court Reporters

1    June 22nd, 2004; is that correct?

2        A.    Yes.

3        Q.    Okay.   And I think earlier you may have

4    testified that you bought your television on June

11:18  5    24th.   Does this refresh your recollection as to

6    when you bought your television?

7        A.    I knew it was the end of June, yes.

8        Q.    Okay.   The receipt appears to reflect the

9    purchase of two items, the first being a color TV

11:18  10    for 389.99; is that correct?

11        A.    Yes.

12        Q.    And the second item being something called

13    a "smart plan" for 29.99; is that correct?

14        A.    Yes.

11:18  15        Q.    Okay.   Does this receipt, which by the way

16    is Bates labeled CRT000171, and it is a one-page

17    document, does this receipt reflect the purchase of

18    the Curtis Mathes television and the smart plan

19    warranty that we have been discussing this morning?

11:18  20        A.    Yes.

21        Q.    Does it reflect the amount of West

22    Virginia sales tax that you paid?

23        A.    Yes.

24        Q.    And what is the amount of the sales tax

11:18  25    that you paid?

59

John Larch

BARKLEY
Court Reporters

1    A.    25.20.

2    Q.    Okay.   And does this receipt reflect,

3  Mr. Larch, that you tendered $200 in cash?

4    A.    Yes.

11:19  5    Q.    And does it reflect that the balance of

6  the purchase price for the smart plan and the

7  television were paid for with a debit card?

8    A.    Yes.

9    Q.    Okay.   And what is the amount of the

11:19  10  balance that was paid for with the debit card?

11    A.    $245.18.

12    Q.    Mr. Larch, does Exhibit 146 refresh your

13  recollection as to what the smart plan that you

14  purchased entailed?

11:19  15    A.    Yes.

16    Q.    Okay.   And could you go into greater

17  detail for me as to what the smart plan entailed?

18    A.    The receipt confirms that it was a

19  one-year warranty, 12 months parts, three months

11:20  20  labor.

21    Q.    Does the receipt refresh your recollection

22  as to whether it was a manufacturer's warranty?

23    A.    Yes.

24    Q.    Was it a manufacturer's warranty?

11:20  25    A.    Yes.

60

John Larch

BARKLEY
Court Reporters

1       Q.   It is not a K-Mart warranty?

2            MR. GRALEWSKI:  I am going to object to

3    this question and the previous questions as to

4    form.  Document speaks for itself.  Best evidence.

11:20  5       You can answer.

6            THE WITNESS:  It states it's a

7    manufacturer's warranty.

8            MS. BYRD:  Okay.  You can set that aside.

9                 (Reporter marked Exhibit No. 147 for

11:21 10                 identification.)

11       Q.   BY MS. BYRD:  Okay.  This is Exhibit 147,

12    and it is a one-page document bearing the Bates No.

13    CRT000172.

14            Mr. Larch, do you recognize this document?

11:21 15       A.   Yes.

16       Q.   And what is it?

17       A.   It's a picture of the back of my

18    television.

19       Q.   Okay.  Did you take this photograph?

11:21 20       A.   Yes.

21       Q.   Okay.  Did you take this photograph for

22    purposes of this litigation?

23            MR. GRALEWSKI:  You can answer that

24    question "yes" or "no."  Just don't reveal any

11:21 25    communications.

61

John Larch

1          THE WITNESS:  Yes.

2      Q.    BY MS. BYRD:  Okay.  Just a second ago you

3    testified that this is a photograph of the back of

4    a television.  Is it your testimony that this is

11:22  5    the back of the Curtis Mathes television we've been

6    discussing this morning?

7      A.    Yes.

8      Q.    Okay.

9          (Reporter marked Exhibit No. 148 for

11:22  10          identification.)

11      Q.    BY MS. BYRD:  Exhibit 148 is a one-page

12    document bearing the Bates No. CRT000173?

13          Do you recognize this document, Mr. Larch?

14      A.    Yes.

11:22  15      Q.    And what is this document?

16      A.    This is a very blurry picture of the front

17    of my television.

18      Q.    Okay.  In spite of the blurriness of this

19    photograph, is it your testimony that this

11:23  20    photograph is a picture of the Curtis Mathes

21    television we've been discussing this morning?

22      A.    Yes.

23      Q.    Did you take this photograph?

24      A.    I did.

11:23  25      Q.    And did you take this photograph for

62

John Larch

BARKLEY
Court Reporters

1    purposes of this litigation?

2              MR. GRALEWSKI:   You can answer that.

3              THE WITNESS:   Yes.

4       Q.   BY MS. BYRD:   Okay.   And with respect to

11:23   5   both Exhibits 147 and 148, when did you take the

6    photographs contained in those exhibits?

7       A.   Within the last 60 days.

8              MS. BYRD:   Okay.   I'd like the record to

9    reflect that these documents don't have Bates

11:24  10   numbers and were produced last night, but counsel

11   plans to produce Bates numbered versions of these

12   documents in the future.

13              (Reporter marked Exhibit No. 149 for

14              identification.)

11:25  15      Q.   BY MS. BYRD:   Do you recognize this

16   document, Mr. Larch?

17      A.   Yes.

18      Q.   What is this document?

19      A.   A photograph of the back of my Curtis

11:25  20   Mathes television.

21      Q.   Okay.   And did you take this photograph?

22      A.   Yes.

23      Q.   Did you take it for purposes of this

24   litigation?

11:25  25      A.   Yes.

63

John Larch

1    Q.    And when did you take this photograph?

2    A.    Yesterday.

3    Q.    Does this photograph reflect the cathode

4    ray component inside of your television?

11:25   5    A.    Yes.

6    Q.    Okay.  Can you point it out?  Okay.  Thank

7    you.

8              (Reporter marked Exhibit No. 150 for

9              identification.)

11:26   10    Q.    BY MS. BYRD:  Do you recognize this

11   document, Mr. Larch?

12   A.    Yes.

13   Q.    Okay.  And what is this document?

14   A.    A photograph of the back of my Curtis

11:26   15   Mathes television.

16   Q.    Did you take this photo?

17   A.    Yes.

18   Q.    When did you take it?

19   A.    Yesterday.

11:26   20   Q.    And you took it for purposes of this

21   litigation?

22   A.    Yes.

23   Q.    Okay.  Thanks.

24         Okay.  Mr. Larch, earlier you testified

11:26   25   that you bought your Curtis Mathes television at a

64

John Larch

1   K-Mart in Weirton; is that correct?

2        A.   Yes.

3        Q.   Okay.  Is it your belief that K-Mart

4   competes with other retailers for the sale of

11:26  5   televisions?

6        A.   Yes.

7        Q.   Okay.  You mentioned, I believe, a

8   RadioShack and Walmart also being close to your

9   home?

11:27  10       A.   Yes.

11        Q.   Is it your testimony that K-Mart competes

12   with retailers such as Walmart and RadioShack for

13   the sale of televisions?

14        A.   Among other products, yes.

11:27  15       Q.   Okay.  Were you aware of TV retailers,

16   among them K-Mart, offering inducements to get

17   customers into their stores to purchase products?

18             MR. GRALEWSKI:  Object to the form.  Lacks

19   foundation.  Calls for speculation.  Vague and

11:27  20   ambiguous as to time.

21             THE WITNESS:  Yes.

22        Q.   BY MS. BYRD:  Yes, okay.  Are you familiar

23   with the concept of a loss leader?

24             MR. GRALEWSKI:  Object to the form.  Vague

11:28  25   and ambiguous.  Calls for a legal conclusion.

65

John Larch

BARKLEY
Court Reporters

1      Q.   BY MS. BYRD:  You can answer.

2           MR. GRALEWSKI:  May I?  You can answer

3      counsel's questions as long as I don't instruct you

4      not to answer and so long as you understand them.

11:28  5           If you don't understand them, you can ask

6      her to rephrase or you can say you don't

7      understand, but otherwise you can answer the

8      question unless I instruct you not to answer, and

9      I'll just state my objections for the record.

11:28 10           THE WITNESS:  Thank you.

11           MR. GRALEWSKI:  Yep.

12           THE WITNESS:  Yes.

13      Q.   BY MS. BYRD:  Can you explain to me what

14      the concept of a loss leader is?

11:28 15           MR. GRALEWSKI:  Object to the form.  Calls

16      for a legal and expert testimony.

17           THE WITNESS:  Companies sometimes offer

18      products at discount prices to induce customers to

19      become customers long term.

11:28 20      Q.   BY MS. BYRD:  Okay.  And is it possible

21      that K-Mart sold you your Curtis Mathes television

22      at a price that was below K-Mart's cost?

23           MR. GRALEWSKI:  Object to the form.  Lacks

24      foundation.  Calls for speculation.  Compound.

11:29 25           THE WITNESS:  I really don't know.

66

BARKLEY
Court Reporters

1      Q.   BY MS. BYRD:  You don't know whether it's

2    possible?

3           MR. GRALEWSKI:  Same objections.  Asked

4    and answered.

11:29  5           THE WITNESS:  I don't know.

6      Q.   BY MS. BYRD:  Is it possible that K-Mart

7    used the Curtis Mathes television that you

8    purchased as a loss leader?

9           MR. GRALEWSKI:  Object to the form.  Vague

11:29 10    and ambiguous.  Calls for legal and expert

11    testimony.  Lacks foundation.  Calls for

12    speculation.

13           THE WITNESS:  I don't know.

14      Q.   BY MS. BYRD:  Mr. Larch, did you shop

11:29 15    around to get a good deal on the television that

16    you purchased?

17           MR. GRALEWSKI:  Object to the form.  Asked

18    and answered.

19           THE WITNESS:  No.

11:29 20      Q.   BY MS. BYRD:  You did not.  Do you know if

21    you could have gotten a better deal if you had

22    purchased your Curtis Mathes television at another

23    retailer other than K-Mart?

24      A.   I have no idea.

11:29 25      Q.   So did you not look into it at all?

67

John Larch

BARKLEY
Court Reporters

1      A.   No.

2      Q.   Okay.  At the time that you purchased the

3   Curtis Mathes television, did you consider it to be

4   a significant purchase in terms of the amount of

11:30  5   money spent?

6      A.   No.

7      Q.   You did not.  Is it your general practice

8   to not shop around in terms of purchases that you

9   make?

11:30  10      A.   It is.

11      Q.   Okay.  Mr. Larch, when you paid 389.99 for

12   your Curtis Mathes television, was that a

13   competitive price?

14      A.   Well, at the time I believe it was.  I

11:30  15   wouldn't have bought it otherwise, but I now

16   believe I was overcharged.

17      Q.   Okay.  So it is now your testimony that

18   you now believe you paid too much for the

19   television?

11:30  20      A.   Yes.

21      Q.   How much more than you should have paid?

22      A.   I am going to have to rely on experts and

23   my lawyers to tell me that.  I don't know.

24      Q.   You personally do not know how much you

11:31  25   should have paid?

68

BARKLEY
Court Reporters

1      A.   No.

2      Q.   Okay.  You don't know what the product

3   should have cost?

4      A.   I do not.

11:31  5      Q.   How do you know, Mr. Larch, that the

6   alleged overcharge was passed on to you?

7      A.   Well, based on conversations with my

8   lawyers, I know at least one company is

9   cooperating, has admitted to this conspiracy of

11:31  10   price-fixing and has provided emails to that

11   effect.

12      Q.   You have no personal knowledge, however,

13   as to whether the overcharge was passed on to you?

14      A.   My knowledge is based on conversations

11:31  15   with my lawyers.

16      Q.   Okay.  No personal knowledge, meaning no

17   personal experience, no independent research?

18      A.   No.

19      Q.   Okay.  If the overcharge had not been

11:32  20   passed on to you, have you been injured?

21          MR. GRALEWSKI:  Object to the form.  Lacks

22   foundation.  Calls for speculation.  Calls for a

23   legal conclusion.

24          THE WITNESS:  I don't know.

11:32  25      Q.   BY MS. BYRD:  If the alleged price-fixing

69

John Larch

1    of a CRT tube resulted in the price being elevated

2    $10 more and that $10 more was absorbed completely

3    by the manufacturer of your Curtis Mathes

4    television, have you been injured?

11:32  5         MR. GRALEWSKI:  Object to the form of the

6    question.  Incomplete hypothetical.  Compound.

7    Vague and ambiguous.  Calls for speculation.  Calls

8    for legal and expert testimony, expert testimony

9    and a legal conclusion.

11:32 10         You can answer.

11         THE WITNESS:  Yeah, I am going to rely on

12   economists and other professionals that can

13   evaluate that.  It is a complex topic.  I am not

14   qualified to speak to that.

11:33 15    Q.   BY MS. BYRD:  So is it your testimony that

16   you don't know?

17    A.   Yes.

18    Q.   What is the total amount that you believed

19   defendants' alleged conduct has cost you?

11:33 20         MR. GRALEWSKI:  Object to the form.  Asked

21   and answered.

22         THE WITNESS:  Again, I am going to rely on

23   someone who does that type of analysis.  I am not

24   qualified to answer that.  I am going to rely on my

11:33 25   lawyers.

                           70

John Larch

BARKLEY
Court Reporters

1    Q.   BY MS. BYRD:  My question is not who you

2    would rely on to get that information.  My question

3    is do you personally know?

4          MR. GRALEWSKI:  Object to the form.  Asked

11:33  5    and answered.

6          THE WITNESS:  I am going to rely on my

7    lawyers.  I don't know the answer to that.

8    Q.   BY MS. BYRD:  You don't know the answer?

9    A.   Yeah.

11:33  10    Q.   Mr. Larch, what is the total amount you

11    expect to receive if you prevail in this case?

12    A.   I have no idea.

13    Q.   And do you think all of the members of the

14    class, yourself included, should receive the same

11:33  15    amount should you prevail?

16    A.   I think all the individuals and businesses

17    who indirectly purchased a CRT and were

18    economically harmed should be reimbursed.

19    Q.   Do you believe that they should receive

11:34  20    the same amount, was my question?

21    A.   I am going to rely on my lawyer and the

22    economists to tell me that.

23    Q.   Okay.  My question wasn't who you would

24    rely on to ascertain that information.  My question

11:34  25    was whether or not you believe that all of the

71

BARKLEY
Court Reporters

```
 1   class members should receive the same amount?
 2        A.   I believe if they were harmed in a similar
 3   manner, yes, but I am not the expert to determine
 4   that.
11:34  5        Q.   Okay.  And what if they were not harmed in
 6   a similar manner?
 7        A.   I would rely on those experts to tell us
 8   what the damages should be.  I am not in a position
 9   to answer that.
11:34 10        Q.   So is it your testimony you don't know
11   personally?
12        A.   Yes.
13        Q.   Okay.  Mr. Larch, whose decision was it to
14   bring this lawsuit?
11:35 15        A.   Well, I am one of the plaintiffs.
16        Q.   So was it your decision to bring this
17   lawsuit?
18        A.   Along with other plaintiffs, yes.
19        Q.   But I believe you testified earlier that
11:35 20   at the time that you learned of the CRT litigation,
21   it was already ongoing; is that correct?
22        A.   Yes.
23        Q.   Okay.  So the beginning of the lawsuit was
24   before you became a plaintiff; is that correct?
11:35 25        A.   But I think the original complaint was
```

72

John Larch

1    filed after I became a plaintiff.

2        Q.   Okay.  So whose initial decision was it to

3    bring this lawsuit?

4        A.   I don't know.

11:35   5    Q.   But it was not your decision initially?

6        A.   No.

7            MR. GRALEWSKI:  Object to the phrase --

8    the way you phrased that question was vague and

9    ambiguous, so I am going to object to the form of

11:35  10    it.

11            (Previously marked Exhibit No. 11 for

12            identification.)

13        Q.   BY MS. BYRD:  Mr. Larch, this is a long

14    document, over 100 pages.  So take as much time as

11:36  15    you would like, but to the extent you need to

16    review a specific portion of it, I'll direct you.

17        A.   Okay.

18        Q.   You ready?  Mr. Larch, do you recognize

19    this document?

11:36  20    A.   Yes.

21        Q.   Okay.  Have you reviewed this document

22    prior to this morning?

23        A.   Yes.

24        Q.   Do you know when you reviewed it?

11:37  25    A.   Yes.

73

John Larch

BARKLEY
Court Reporters

1      Q.    When did you review it?

2      A.    Yesterday.

3      Q.    And how many times did you review this

4   document?

11:37  5      A.    A number of times over the past -- I think

6   this is the amended one, but a handful of times.

7      Q.    Okay.  So in addition to yesterday, you've

8   reviewed this document on other occasions?

9      A.    Yes.

11:37  10      Q.    And who showed this document to you?

11      A.    My lawyer.

12      Q.    Do you know how many times you reviewed

13   it?

14      A.    A handful of times.

11:37  15      Q.    Okay.  Mr. Larch, were you involved in the

16   drafting of this complaint?

17      A.    No.

18      Q.    Okay.  In general, Mr. Larch, what is your

19   knowledge of the allegations contained in the

11:37  20   complaint?

21      A.    That a conspiracy among cathode ray tube

22   manufacturers took place where they agreed to fix

23   prices, limit the production, and these cathode ray

24   tubes were used in televisions and computer

11:38  25   monitors.

74

John Larch

BARKLEY
Court Reporters

1      Q.   Okay.  Do you have any personal knowledge

2   of the allegations contained in the complaint?

3      A.   No.

4      Q.   When did you first decide to sue

11:38  5   defendants?

6      A.   2008.

7      Q.   When did you first conclude that you had

8   been allegedly overcharged by the defendants in

9   this case?

11:38 10      A.   2008.

11      Q.   Okay.  Before you decided to sue

12   defendants, did you conduct any research on any of

13   the defendants, including my clients, SEC and SEA?

14      A.   No.

11:38 15      Q.   Did you research the television industry?

16      A.   No.

17      Q.   Did you research cathode ray tubes?

18      A.   No.

19      Q.   Mr. Larch, I believe you just testified

11:39 20   that you conducted no research on the defendants

21   named in this complaint before you brought suit; is

22   that correct?

23      A.   Yes.

24      Q.   Okay.  And how did you make the decision

11:39 25   to include the defendants named in this complaint?

75

John Larch

BARKLEY
Court Reporters

1          MR. GRALEWSKI:  I just want to caution the

2    witness not to reveal any communications with your

3    lawyers.  And to the extent you can answer the

4    question without revealing communications with your

11:39  5    lawyers, you can answer the question, and if you

6    can't, then you need to not answer the question.

7          THE WITNESS:  Conversations with my

8    lawyer.

9       Q.   BY MS. BYRD:  Did you personally have any

11:39  10   input into which defendants are named in this

11   complaint?

12          MR. GRALEWSKI:  I am going to instruct him

13   not to answer that question because I think it

14   calls for him to tell you what he told his lawyer,

11:40  15   and on that basis, I am going to instruct him not

16   to answer.

17          THE WITNESS:  I am going to accept the

18   advice of my lawyer.

19      Q.   BY MS. BYRD:  Okay.  The complaint

11:40  20   describes a class period that stretches from March

21   1st, 1995, through November 25th, 2007.  Why did

22   you choose this period as the relevant period for

23   this litigation?

24          MR. GRALEWSKI:  Same instruction.  If you

11:40  25   can answer the question without revealing

76

John Larch

1    communications, go ahead and answer the question.

2    If you can't, you shouldn't reveal any

3    communications with your lawyers.

4           THE WITNESS:   I have relied and continue

11:40  5    to rely on my lawyer, my team of lawyers on this

6    case.

7       Q.   BY MS. BYRD:   Okay.   Without going into

8    the content of any communications you've had with

9    any of your attorneys, do you personally know why

11:40  10   this period was chosen?

11      A.   No.

12      Q.   Okay.   Could you turn to Page 9, the page

13   numbers on the bottom, and review Paragraph 49 for

14   me and then let me know when you've had a chance to

11:41  15   read it?

16      A.   Okay.

17      Q.   Okay.   Paragraph 49 reads that you're a

18   West Virginia resident; is that correct?

19      A.   Yes.

11:41  20      Q.   Okay.   And you've lived in West Virginia

21   continuously for your entire life, you testified

22   earlier; is that correct?

23      A.   Yes.

24      Q.   Okay.   Paragraph 49 continues:

11:41  25           "During the relevant period, Mr. Larch

77

John Larch

BARKLEY
Court Reporters

```
 1                      indirectly purchased CRT products from
 2                      one or more of the defendants or their
 3                      co-conspirators and has been injured
 4                      by reason of the antitrust violations
11:41  5                alleged in this complaint."
 6            Did I read that correctly?
 7       A.   Yes.
 8       Q.   And the CRT product that you purchased is
 9  the Curtis Mathes CRT TV that we've been discussing
11:42 10  this morning?
11       A.   Yes.
12       Q.   Okay.  And you've never purchased a CRT
13  tube on its own; is that correct?
14       A.   No.
11:42 15       Q.   Okay.  Let's turn back to Page 1, please,
16  and take a moment and read Paragraph 1 to yourself.
17       A.   Okay.
18       Q.   Okay.  Do you have any person -- I'm
19  sorry.  Paragraph 1 states that:
11:43 20            "Defendants conspired to fix, raise,
21                   maintain and/or stabilize the prices
22                   of CRTs sold in the United States."
23            Do you have any personal knowledge of the
24  allegations contained in Paragraph 1 of the
11:43 25  complaint?
```

78

BARKLEY
Court Reporters

```
 1        A.   Other than companies pleading guilty.
 2        Q.   Personal knowledge, meaning personal
 3   experience, personal interactions, personal
 4   research?
11:43  5        A.   No, no.
 6        Q.   Okay.  Do you have any personal knowledge
 7   as to whether my clients, SEC or SEA, conspired to
 8   fix the price of CRTs?
 9        A.   Personal knowledge, I think, didn't
11:43 10   Samsung, they pled guilty, didn't they?
11        Q.   No.  Let me reask my question.
12        A.   Okay.
13             MR. GRALEWSKI:  Hold on a second.  Time
14   out.  You asked him if he had questions or needed
11:44 15   clarification, that he could ask you during the
16   course of the deposition.
17             MS. BYRD:  Okay.
18             MR. GRALEWSKI:  I believe he stated
19   something, and you just said something that was
11:44 20   false as phrased.  So I would like you to clarify
21   that.  Because what you've done is confuse the
22   witness, perhaps unintentionally.
23             MS. BYRD:  Unintentionally.
24        Q.   Neither my clients, SEC or SEA -- you used
11:44 25   the term "Samsung," right?
```

79

John Larch

BARKLEY
Court Reporters

1      A.    Uh-huh.

2      Q.    Neither my clients, SEC or SEA, has pled

3   guilty in this matter.  They continue to litigate

4   it, okay.

11:44  5          MR. GRALEWSKI:  Thank you, Counsel.

6      Q.    BY MS. BYRD:  Do you have any personal

7   knowledge as to whether my clients, SEC or SEA --

8      A.    No.

9      Q.    -- conspired to fix the price of tubes?

11:44 10      A.    I do not.

11      Q.    Okay.  Then what is your basis for the

12   allegations contained in Paragraph 1 of the

13   complaint, Mr. Larch?

14      A.    My basis is information provided to me by

11:44 15   my lawyers.

16      Q.    Okay.  Let's turn to Page 12.  Can you

17   take a minute and review Paragraph 61 of the

18   complaint?

19      A.    Okay.

11:45 20      Q.    Okay.  Are you alleging that my client,

21   SEC, manufactured cathode ray tubes?

22      A.    I think yes, in Paragraph 61, yes.

23      Q.    You're alleging in Paragraph 61 that they

24   manufactured cathode ray tubes?

11:45 25      A.    Either directly or indirectly.

John Larch

BARKLEY
Court Reporters

1      Q.   Okay.  And you testified earlier that you

2    are aware that my client, SEC, never manufactured

3    tubes; is that correct?

4           MR. GRALEWSKI:  Object to the form.  Lacks

11:46  5    foundation.  Misstates testimony.

6           THE WITNESS:  Yes.

7      Q.   BY MS. BYRD:  Okay.  Could you look at

8    Paragraph 62 right beneath that, please?

9           MR. GRALEWSKI:  Also calls for a legal

11:46 10    conclusion.

11           THE WITNESS:  Okay.

12      Q.   BY MS. BYRD:  Okay.  Same question, are

13    you alleging that my client, SEA, manufactured

14    tubes?

11:46 15      A.   Either directly or indirectly, yes.

16      Q.   Okay.  Was it also your testimony earlier

17    that my client, SEA, never manufactured tubes?

18           MR. GRALEWSKI:  Object to the form.  Lacks

19    foundation.  Misstates testimony.

11:46 20           THE WITNESS:  Yes.

21      Q.   BY MS. BYRD:  Okay.  Could you please turn

22    to Page 31 and review Paragraph 134?

23      A.   Okay.

24      Q.   Mr. Larch, is it your allegations that my

11:48 25    clients, SEC and SEA, engaged in a contract,

81

BARKLEY
Court Reporters

1    combination, trust or conspiracy, the effect of

2    which has been to raise, fix, maintain and/or

3    stabilize the prices at which they sold CRT tubes?

4        A.   Yes.

11:48  5        Q.   Even though neither SEC nor SEA has ever

6    manufactured tubes?

7            MR. GRALEWSKI:  Object to the form.  Lacks

8    foundation.

9            THE WITNESS:  Yes.

11:48 10            MR. GRALEWSKI:  Calls for a legal

11   conclusion.

12        Q.   BY MS. BYRD:  You believe it's appropriate

13   to allege this against my clients, SEC and SEA,

14   even though they never purchased tubes?

11:48 15            MR. GRALEWSKI:  Object to the form.  Lacks

16   foundation.  Calls for a legal conclusion.

17            THE WITNESS:  Yes.

18        Q.   BY MS. BYRD:  You believe that it is

19   appropriate to allege that a company fixed the

11:48 20   price of something that it never made?

21            MR. GRALEWSKI:  Object to the form.

22   Incomplete hypothetical.  Lacks foundation.  Calls

23   for a legal conclusion.  Asked and answered.

24            THE WITNESS:  Yes.

11:48 25        Q.   BY MS. BYRD:  And why do you think it's

82

John Larch

BARKLEY
Court Reporters

```
 1    appropriate?

 2        A.   Based on --

 3             MR. GRALEWSKI:  Same objections.

 4             You can answer.

11:49  5        THE WITNESS:  Based on information

 6    provided --

 7             MR. GRALEWSKI:  And I just want to caution

 8    you -- go ahead and answer the question.  Just

 9    don't reveal communications.

11:49 10        THE WITNESS:  Based on conversations with

11    my lawyers and evidence that they've discovered, I

12    firmly believe that these companies conspired to

13    artificially fix these prices which ultimately cost

14    consumers and small business owners.

11:49 15        Q.   BY MS. BYRD:  Are you aware whether your

16    attorneys ever made any investigation into whether

17    my clients, SEC or SEA, in fact, manufactured

18    tubes?

19        A.   I would be speculating.  I am not directly

11:49 20   aware, no.

21        Q.   You are not aware?

22        A.   Yes.

23        Q.   Okay.  Could you turn to Page 48, please,

24    and review Paragraph 214.

11:50 25        A.   Okay.
```

83

BARKLEY
Court Reporters

1     Q.   Okay.  What is your basis, Mr. Larch, of

2     making the allegation which is contained in the

3     second sentence of Paragraph 214 which reads:

4               "The entire overcharge at issue was

11:50  5               passed on to plaintiffs and members of

6               the indirect purchaser classes"?

7     A.   Basis of this charge is research done by

8     my lawyers.

9     Q.   And you have confirmed that your lawyers

11:51 10     have researched this issue?

11     A.   What would be an example of "confirmed"?

12     What do you mean "confirmed"?

13     Q.   Do you have any personal knowledge that

14     the overcharge at issue was passed on to you and to

11:51 15     other plaintiffs?

16     A.   Other than with conversations with my

17     lawyers.

18     Q.   No personal knowledge?

19     A.   No.

11:51 20     Q.   Okay.  And do you know how much K-Mart

21     paid for the TV that it sold to you?

22     A.   No.

23     Q.   Okay.  Do you know whether K-Mart passed

24     any overcharge, to the extent that one existed, on

11:51 25     to you?

84

John Larch

1        A.   No.

2        Q.   Okay.  Do you know whether K-Mart sold the

3    TV to you at below its own cost?

4        A.   I don't know.

11:52  5        Q.   Okay.  Would you turn to Page 92, please,

6    and take a moment and review Paragraphs 284 and

7    285.

8             MR. GRALEWSKI:  I am going to object to

9    the previous three questions as asked and answered

11:52 10    and lacking foundation and calls for speculation.

11             THE WITNESS:  Okay.

12        Q.   BY MS. BYRD:  Okay.  Mr. Larch, do you

13    have any personal knowledge of the allegations

14    contained in either Paragraph 284 or Paragraph 285?

11:53 15        A.   Other than the conversations with my

16    lawyers, no.

17        Q.   Okay.  Would you flip back to Page 77,

18    please.  Feel free to review the entirety of

19    Paragraph 267.  I am going to ask you questions

11:53 20    about Subparts (a) and (c).

21        A.   Okay.

22        Q.   Mr. Larch, do you have any personal

23    knowledge of the allegations contained in Paragraph

24    267, Subpart (a)?

11:54 25        A.   Other than conversations with my lawyers,

85

BARKLEY
Court Reporters

1   no.

2        Q.   Okay.  Do you have any personal knowledge

3   as to the allegations contained in Paragraph 267,

4   Subpart (c)?

11:54  5        A.   Other than conversations with my lawyers,

6   no.

7             MS. BYRD:  I think that is all the

8   questions that I have.

9             (Discussion off the record.)

11:54 10           THE VIDEOGRAPHER:  The time is 11:54 a.m.

11  We are going off the record.

12             (Whereupon a recess was taken.)

13             (Reporter marked Exhibit No. 151 for

14             identification.)

12:12 15           THE VIDEOGRAPHER:  Time is 12:12 p.m.  We

16  are back on the record.

17             EXAMINATION BY MR. GRALEWSKI

18        Q.   Good afternoon, Mr. Larch.

19        A.   Good afternoon.

12:12 20        Q.   Counsel for Toshiba and Philips have

21  indicated that they don't have any questions for

22  you today.  I have just a couple.  Thank you for

23  your time today.

24             Placed in front of you is a document that

12:13 25  I've asked the court reporter to mark as Exhibit

86

BARKLEY
Court Reporters

1  151 to your deposition.  Can you take a moment to

2  look at that and then tell me when you're finished

3  looking at it?

4       A.   Okay.

12:13  5  Q.   Have you seen Exhibit 151 before?

6       A.   Yes.

7       Q.   What is it?

8       A.   It's the complaint, the original complaint

9  that was filed in 2008.

12:13  10  Q.   Okay.  When was the first time you saw

11  Exhibit 151?

12       A.   Early 2008.

13       Q.   Okay.  Did you review Exhibit 151 prior to

14  March 10th, 2008?

12:13  15  A.   Yes.

16       Q.   Did you authorize your lawyers to file

17  Exhibit 151 on your behalf?

18       A.   Yes.

19       Q.   Do you recall earlier today counsel asked

12:14  20  you if it was your decision to file this

21  litigation?  Do you recall that question or

22  something like that?

23       A.   Yes.

24       Q.   And do you recall saying "no"?

12:14  25  A.   Yes, I recall.

87

John Larch

BARKLEY
Court Reporters

1    Q.   Can you explain what you meant when you
2    answered "no" to that question?
3    A.   I thought she was referring to litigation
4    that had been filed prior to this March 2008
12:14 5    complaint.
6         MR. GRALEWSKI:  Thank you, sir.  I have no
7    other questions.
8         MS. BYRD:  I have one or two questions.
9         FURTHER EXAMINATION BY MS. BYRD
12:14 10    Q.   I think you just testified, sir, that you
11    believed that I was referring to litigation filed
12    prior to March 10, 2008?
13    A.   Yes.
14    Q.   To what litigation are you referring?
12:15 15    A.   I am not sure.
16         MS. BYRD:  Thanks.
17         MR. GRALEWSKI:  Counsel on the phone, do
18    you have anything?  With that, I think we are done.
19    I have no redirect.  We can go off the record.
12:15 20         THE VIDEOGRAPHER:  The time is 12:14 p.m.
21    We are going off the record.  This concludes the
22    deposition.
23         (Whereupon the proceedings were
24         concluded at 12:14 p.m.)
25              ---o0o---

88

John Larch

BARKLEY
Court Reporters

1           I have read the foregoing deposition

2    transcript and by signing hereafter, approve same.

3

4    Dated_____.

5

6                    _____

7                       (Signature of Deponent)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

John Larch

BARKLEY
Court Reporters

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA     }
                        }    ss.
COUNTY OF SAN FRANCISCO}


I, Balinda Dunlap, hereby certify:

I am a duly qualified Certified Shorthand

Reporter in the State of California, holder of

Certificate Number CSR 10710 issued by the Court

Reporters Board of California and which is in full force

and effect.  (Fed. R. Civ. P. 28(a)).

I am authorized to administer oaths or

affirmations pursuant to California Code of Civil

Procedure, Section 2093(b) and prior to being examined,

the witness was first duly sworn by me.  (Fed. R. Civ.

P. 28(a), 30(f)(1)).

I am not a relative or employee or attorney or

counsel of any of the parties, nor am I a relative or

employee of such attorney or counsel, nor am I

financially interested in this action.  (Fed. R. Civ. P.

28).

I am the deposition officer that

stenographically recorded the testimony in the foregoing

deposition and the foregoing transcript is a true record

/ / /

90

BARKLEY
Court Reporters

1    of the testimony given by the witness.  (Fed. R. Civ. P.

2    30(f)(1)).

3           Before completion of the deposition, review of

4    the transcript [XX was ]  ] was not requested.  If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed, are

7    appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9    Dated: _____ JUN 1 8 2012 _____,

10

11                    _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

91

BARKLEY
Court Reporters

**$**

**$10 (2)**
70:2,2
**$200 (2)**
41:1;60:3
**$245.18 (1)**
60:11
**$29 (1)**
46:10

**0**

**07-5344 (1)**
7:18

**1**

**1 (6)**
7:1;78:15,16,19,24;
80:12
**10 (1)**
88:12
**10:02 (1)**
7:15
**10:59 (1)**
58:8
**100 (1)**
73:14
**10th (1)**
87:14
**11 (1)**
73:11
**11:16 (1)**
58:11
**11:54 (1)**
86:10
**113 (1)**
9:18
**12 (2)**
60:19;80:16
**12:12 (1)**
86:15
**12:14 (2)**
88:20,24
**1300 (1)**
7:13
**134 (1)**
81:22
**14 (1)**
9:9
**140 (1)**
19:2
**141 (1)**
27:14
**142 (1)**
28:8
**143 (1)**
29:1
**144 (2)**
30:4,8
**145 (1)**

30:19
**146 (2)**
58:17;60:12
**147 (3)**
61:9,11;63:5
**148 (3)**
62:9,11;63:5
**149 (1)**
63:13
**150 (1)**
64:8
**151 (6)**
86:13;87:1,5,11,13,17
**1875 (1)**
7:12
**1976 (1)**
17:15
**1995 (1)**
76:21
**1996 (1)**
9:20
**1st (3)**
7:3,15;76:21

**2**

**200 (1)**
41:8
**2000s (1)**
56:8
**2004 (4)**
40:15,17;54:25;59:1
**2007 (1)**
76:21
**2008 (14)**
50:11,12,14,16,19;
51:5,15;75:6,10;87:9,12,
14;88:4,12
**2012 (3)**
7:1,4,15
**20-somes (1)**
42:12
**214 (2)**
83:24;84:3
**22nd (1)**
59:1
**24 (2)**
31:21;32:6
**24th (2)**
40:17;59:5
**25.20 (1)**
60:1
**25th (1)**
76:21
**267 (3)**
85:19,24;86:3
**27 (1)**
32:11
**284 (2)**
85:6,14
**285 (2)**
85:7,14
**29.99 (1)**

59:13

**3**

**30 (1)**
23:5
**304 (1)**
10:3
**31 (1)**
81:22
**337 (2)**
7:5,16
**36-inch (1)**
33:12
**389.99 (5)**
42:4,5,17;59:10;68:11

**4**

**48 (1)**
83:23
**49 (3)**
77:13,17,24

**6**

**60 (1)**
63:7
**61 (3)**
80:17,22,23
**62 (1)**
81:8

**7**

**77 (1)**
85:17

**9**

**9 (1)**
77:12
**90 (1)**
21:2
**90067 (1)**
7:14
**92 (1)**
85:5
**96 (1)**
9:20

**A**

**Aaron (3)**
8:9;25:20,21
**able (3)**
47:19;52:25;53:3
**absolutely (1)**
16:15
**absorbed (1)**
70:2
**accept (1)**
76:17

**accessories (2)**
46:8,20
**accountant (1)**
18:4
**Accounting (2)**
17:17,22
**accurately (2)**
12:7,12
**action (4)**
11:12,21,24;53:14
**actually (5)**
31:25;32:1;34:6;
37:21;51:5
**addition (1)**
74:7
**address (1)**
9:8
**addressed (1)**
12:3
**admitted (1)**
69:9
**ads (1)**
38:6
**advice (2)**
49:18;76:18
**advisee (1)**
18:17
**advisor (2)**
18:13,15
**afternoon (2)**
86:18,19
**Again (2)**
8:18;70:22
**against (5)**
11:11,12;15:5;33:21;
82:13
**ago (8)**
8:19;9:21;12:2;14:11;
23:3,5;24:25;62:2
**agreed (1)**
74:22
**ahead (4)**
9:4;54:11;77:1;83:8
**Alioto (1)**
27:3
**allegation (1)**
84:2
**allegations (11)**
14:1,5,15;74:19;75:2;
78:24;80:12;81:24;
85:13,23;86:3
**allege (2)**
82:13,19
**alleged (5)**
14:13;69:6,25;70:19;
78:5
**allegedly (1)**
75:8
**alleging (3)**
80:20,23;81:13
**along (2)**
47:4;72:18
**although (1)**

**15:6**
**always (1)**
13:6
**ambiguous (17)**
20:1;26:21;30:18;
33:2;35:15;39:6,22;
40:1;45:6;48:13;52:12,
21;65:20,25;67:10;70:7;
73:9
**amended (5)**
22:1,23;32:2,2;74:6
**America (2)**
8:1,25
**among (4)**
34:4;65:14,16;74:21
**amount (2)**
59:21,24;60:9;68:4;
70:18;71:10,15,20;72:1
**analysis (1)**
70:23
**and/or (2)**
78:21;82:2
**Anetakis (1)**
8:4
**Angeles (1)**
7:13
**answered (11)**
16:13,22;45:19;53:20;
67:4,18;70:21;71:5;
82:23;85:9;88:2
**antenna (1)**
46:21
**Antitrust (2)**
7:18;78:4
**apologize (1)**
23:24
**appearance (1)**
51:23
**appeared (1)**
7:9
**appears (2)**
58:25;59:8
**appreciated (1)**
13:3
**appropriate (8)**
16:4,11,18;17:3;43:1;
82:12,19;83:1
**Approximately (4)**
9:14,20;10:6;22:14
**around (3)**
37:25;67:15;68:8
**artificially (1)**
83:13
**ascertain (1)**
71:24
**aside (2)**
32:17;61:8
**associated (1)**
7:11
**assume (2)**
33:19;46:3
**attend (2)**
17:9,11

**attention (1)**
    31:21
**attorney (9)**
    8:21;20:22,22;22:11,
    11;23:15;25:18,20,21
**attorney-client (1)**
    21:7
**attorneys (6)**
    15:15;19:20;20:6;
    22:3;77:9;83:16
**authorize (1)**
    87:16
**Avenue (1)**
    9:9
**aware (17)**
    14:18,21,23;15:1;
    25:24;34:7,24;43:18,19;
    44:18;53:16;54:4;65:15;
    81:2;83:15,20,21

**B**

**Bachelor (2)**
    17:25;18:1
**back (13)**
    45:13;49:7,20;58:12,
    14;61:17;62:3,5;63:19;
    64:14;78:15;85:17;
    86:16
**Baker (1)**
    8:7
**balance (4)**
    41:2,10;60:5,10
**Balinda (3)**
    7:6;12:18;13:4
**Balinda's (1)**
    12:23
**bank (2)**
    11:12;23:14
**Barkley (1)**
    7:12
**base (1)**
    15:11
**based (8)**
    13:14;51:20,22;69:7,
    14;83:2,5,10
**basing (1)**
    15:23
**basis (7)**
    10:11;21:7;76:15;
    80:11,14;84:1,7
**Bates (5)**
    59:16;61:12;62:12;
    63:9,11
**bearing (2)**
    61:12;62:12
**became (2)**
    72:24;73:1
**become (4)**
    25:7;26:7;50:9;66:19
**began (1)**
    25:23
**beginning (4)**

    54:6;55:9,17;72:23
**begins (1)**
    25:13
**behalf (8)**
    7:20,24;8:3,6,8,10;
    24:8;87:17
**belief (1)**
    65:3
**below (3)**
    38:22;66:22;85:3
**beneath (1)**
    81:8
**best (8)**
    12:17,24;24:4,7;38:1;
    40:4;56:21;61:4
**better (2)**
    47:20;67:21
**big (1)**
    26:8
**blurriness (1)**
    62:18
**blurry (1)**
    62:16
**Bob (1)**
    8:5
**both (4)**
    20:17,18;23:6;63:5
**bottom (1)**
    77:13
**Botts (1)**
    8:7
**bought (10)**
    38:12,18;46:10;56:9,
    12,14;59:4,6;64:25;
    68:15
**Boulevard (1)**
    10:3
**box (3)**
    37:19,21;41:24
**brand (2)**
    34:21;56:22
**brands (4)**
    34:25;35:3;36:21,25
**break (1)**
    58:14
**briefly (1)**
    31:20
**bring (6)**
    15:5;26:2;33:20;
    72:14,16;73:3
**brought (1)**
    75:21
**bulk (2)**
    47:17,21
**business (1)**
    83:14
**businesses (3)**
    13:16;26:5;71:16
**Buy (6)**
    40:4;46:8,8;56:7,9,21
**buying (1)**
    35:21
**buys (1)**

    47:21
**Byrd (85)**
    7:23,23;8:17,20;
    15:14,25;16:10,17,25;
    17:8;19:4;20:5;21:8,18;
    25:17;26:25;27:16;
    28:11;29:3;30:7;31:3;
    32:5;33:3;34:7;35:17;
    39:9,23;40:2,7,10,12;
    43:3;45:7,20;48:18;
    49:17;50:1,8;51:22;
    52:7,16,24;53:22;54:12;
    58:13,19;61:8,11;62:2,
    11;63:4,8,15;64:10;
    65:22;66:1,13,20;67:1,6,
    14,20;69:25;70:15;71:1,
    8;73:13;76:9,19;77:7;
    79:17,23;80:6;81:7,12,
    21;82:12,18,25;83:15;
    85:12;86:7;88:8,9,16

**C**

**cables (1)**
    46:21
**California (2)**
    7:8,14
**called (2)**
    8:12;59:12
**Calls (23)**
    16:7,14,23;20:3;
    30:18;33:23;42:23;
    65:19,25;66:15,24;
    67:10,11;69:22,22;70:7,
    7;76:14;81:9;82:10,16,
    22;85:10
**can (53)**
    12:10;13:4;15:10,19;
    16:25;18:11;21:11;
    26:22;31:22;32:4,17;
    33:25;34:2,20,22;35:3;
    37:16;39:7,9,13;40:2,12;
    44:11,14,17;45:7,20;
    48:14;49:23;50:4,22;
    51:17;61:5,8,23;63:2;
    64:6;66:1,2,5,6,7,13;
    70:10,12;76:3,5,25;
    80:16;83:4;87:1;88:1,19
**capacity (1)**
    18:20
**card (5)**
    41:1,10,12;60:7,10
**careful (1)**
    15:20
**carefully (1)**
    26:12
**Case (19)**
    7:18;8:10,22;10:23;
    13:14,22;14:1,5,13;26:3,
    15,18;27:6,11;46:11;
    56:2;71:11;75:9;77:6
**cash (4)**
    37:14;41:1,8;60:3

**Cathode (23)**
    7:17;13:15,18,23;
    14:2,14;34:5,8;35:7;
    42:19;49:6,9;50:20;
    51:7,12,14;53:17;64:3;
    74:21,23;75:17;80:21,24
**caution (3)**
    33:24;76:1;83:7
**Century (1)**
    7:13
**certain (4)**
    28:17;29:16;30:11;
    56:13
**certainly (1)**
    31:22
**Certified (2)**
    7:6;18:4
**chance (1)**
    77:14
**charge (1)**
    84:7
**Charles (2)**
    8:7;9:9
**choose (1)**
    76:22
**chosen (1)**
    77:10
**Circuit (1)**
    39:23
**circumstances (1)**
    23:4
**City (1)**
    39:23
**claiming (3)**
    33:5,8;56:1
**claims (1)**
    13:22
**clarification (1)**
    79:15
**clarify (2)**
    12:17;79:20
**class (13)**
    8:6;11:21,23;26:14,
    18,23;54:2,7;55:9,17;
    71:14;72:1;76:20
**classes (1)**
    84:6
**clean (1)**
    12:22
**client (5)**
    14:19;80:20;81:2,13,
    17
**clients (10)**
    15:5;18:17;75:13;
    79:7,24;80:2,7;81:25;
    82:13;83:17
**close (4)**
    36:11;39:2,24;65:8
**Club (1)**
    40:10
**Co (2)**
    7:25;8:23
**co-conspirators (1)**

    78:3
**Colantonio (1)**
    8:4
**college (3)**
    17:9,11,12
**color (1)**
    59:9
**combination (1)**
    82:1
**commencing (1)**
    7:4
**communicated (3)**
    24:11,15;26:14
**communications (14)**
    15:21;25:5,14;33:25;
    34:2;49:14;51:18;61:25;
    76:2,4;77:1,3,8;83:9
**Companies (3)**
    66:17;79:1;83:12
**company (3)**
    16:4;69:8;82:19
**competes (2)**
    65:4,11
**competitive (2)**
    45:2;68:13
**complaint (20)**
    21:25;22:1,22,23;
    50:13;72:25;74:16,20;
    75:2,21,25;76:11,19;
    78:5,25;80:13,18;87:8,8;
    88:5
**complaints (3)**
    48:7,20,23
**completed (1)**
    13:2
**completely (1)**
    12:6,12;70:2
**complex (1)**
    70:13
**component (3)**
    53:1,4;64:4
**Compound (5)**
    15:9,18;35:15;66:24;
    70:6
**comprise (1)**
    12:20
**computer (2)**
    14:7;74:24
**concept (2)**
    65:23;66:14
**conclude (1)**
    75:7
**concluded (1)**
    88:24
**concludes (1)**
    88:21
**conclusion (14)**
    16:7,14,24;20:4;
    30:18;33:23;42:24;
    65:25;69:23;70:9;81:10;
    82:11,16,23
**conduct (2)**
    70:19;75:12

**conducted (1)**
75:20
**confirm (8)**
44:22;45:1;50:20;
51:25;52:8,18;53:3;58:5
**confirmed (3)**
84:9,11,12
**confirms (1)**
60:18
**confuse (1)**
79:21
**connection (1)**
20:9
**consider (4)**
35:12,21;36:2;68:3
**consideration (2)**
35:8,11
**conspiracy (4)**
34:4;69:9;74:21;82:1
**conspired (4)**
78:20;79:7;80:9;83:12
**consumer (1)**
18:21
**consumers (1)**
83:14
**contact (3)**
25:6;48:19,22
**contacted (1)**
25:8
**contained (21)**
32:15;35:7,10;41:21;
49:6;51:3,7,12;53:4,7;
56:4;57:25;63:6;74:19;
75:2;78:24;80:12;84:2;
85:14,23;86:3
**containing (4)**
13:23;14:7,7;37:3
**content (2)**
25:5;77:8
**continue (5)**
25:15;39:22;50:4;
77:4;80:3
**continues (1)**
77:24
**continuing (2)**
54:7;55:18
**continuous (1)**
10:11
**continuously (1)**
77:21
**contract (1)**
81:25
**convenient (1)**
57:13
**conversation (4)**
24:23;25:11,19,23
**conversations (8)**
69:7,14;76:7;83:10;
84:16;85:15,25;86:5
**cooperating (1)**
69:9
**correctly (1)**
78:6

**cost (8)**
38:23;42:19;43:9;
66:22;69:3;70:19;83:13;
85:3
**Costco (1)**
40:7
**costs (2)**
43:8,8
**counsel (21)**
12:3;19:17;20:11;
21:19;25:6,6;26:15,18,
24;30:24;31:22;33:25;
34:2;49:18;51:19;52:3;
63:10;80:5;86:20;87:19;
88:17
**counsels (1)**
7:21
**Counsel's (2)**
50:3;66:3
**County (1)**
7:7
**couple (1)**
86:22
**course (1)**
79:16
**Court (3)**
7:12;12:19;86:25
**Courtney (2)**
7:23;8:20
**CPA (1)**
18:7
**CRT (31)**
14:6,16;25:25;29:20;
32:19,25;33:4;35:10;
43:7,8;51:3;52:1,8;53:1,
4,6,10,12,22;54:3,8,17;
57:7;70:1;71:17;72:20;
78:1,8,9,12;82:3
**CRT000171 (1)**
59:16
**CRT000172 (1)**
61:13
**CRT000173 (1)**
62:12
**CRTs (11)**
14:7,8,19,21,24;15:1,
2,16;57:17;78:22;79:8
**current (2)**
9:7;18:9
**currently (2)**
18:5,7
**Curtis (34)**
33:12,13,21;34:11,17,
23;35:6,20;36:6;37:9;
38:22;44:15;46:25;47:2;
48:22;50:21;51:2,13;
54:23;56:10;57:14;
59:18;62:5,20;63:19;
64:14,25;66:21;67:7,22;
68:3,12;70:3;78:9
**customer (2)**
11:13;46:24
**customers (3)**

65:17;66:18,19

# D

**dad (1)**
56:25
**damages (4)**
33:5,8;56:1;72:8
**date (3)**
7:15;40:16;56:11
**dated (1)**
58:25
**day (2)**
7:4;47:10
**days (1)**
63:7
**deal (4)**
37:7,11;67:15,21
**debit (5)**
41:1,10,12;60:7,10
**decide (2)**
36:13;75:4
**decided (2)**
37:19;75:11
**deciding (1)**
35:8
**decision (9)**
26:7,8;35:12;72:13,
16;73:2,5;75:24;87:20
**defendant (7)**
7:20;10:25;11:5,17;
33:13;53:13,24
**defendants (17)**
7:24;8:8,10,22;24:3,4;
34:9;53:18;75:5,8,12,13,
20,25;76:10;78:2,20
**defendants' (1)**
70:19
**Defense (1)**
8:12
**definitively (1)**
28:2
**degree (3)**
17:20,22,24
**delivered (1)**
47:12
**deposed (2)**
10:20;11:7
**deposition (12)**
7:16,19;12:2;19:24;
20:10;21:21;22:17;
23:22;24:19;79:16;87:1;
88:22
**describes (1)**
76:20
**detail (2)**
18:11;60:17
**determine (2)**
43:1;72:3
**different (2)**
21:12;31:25
**difficulties (1)**
48:19

**direct (3)**
31:5,20;73:16
**directly (3)**
80:25;81:15;83:19
**disclosing (1)**
25:4
**discontinued (1)**
46:5
**discount (1)**
66:18
**discounted (1)**
43:13
**discovered (1)**
83:11
**discuss (1)**
12:21
**discussed (1)**
47:5
**discussing (4)**
59:19;62:6,21;78:9
**Discussion (2)**
58:7;86:9
**display (3)**
37:17,18;43:12
**displayed (2)**
45:23;46:1
**document (36)**
19:8,23;27:20;28:7,
12,19,24;29:4,14;30:24;
31:4,9,15,23;32:1,3;
58:20,22;59:17;61:4,12,
14;62:12,13,15;63:16,
64:11,13;73:14,19,
21;74:4,8,10;86:24
**documents (21)**
21:3,9,14,20,23;22:16,
20;23:20;24:1;26:17;
27:1,8;28:3,16;29:19,25;
30:23;31:25;41:18;63:9,
12
**dollars (1)**
42:12
**done (12)**
23:12;50:19;51:25;
52:8,17;54:16,20;55:13,
20;79:21;84:7;88:18
**down (9)**
12:20;13:4,5;44:23;
54:9;55:8,14,16,21
**drafting (1)**
74:16
**drew (1)**
34:16
**Drive (1)**
9:18
**due (1)**
26:6
**Dunlap (1)**
7:6
**during (7)**
21:3,13,18;22:15;
55:23;77:25;79:15
**DVD (1)**

47:7

# E

**earlier (10)**
25:1;32:18;57:11;
59:3;64:24;72:19;77:22;
81:1,16;87:19
**early (3)**
51:15;56:8;87:12
**easier (1)**
30:23
**East (1)**
7:13
**easy (1)**
12:23
**economic (1)**
24:12
**economically (1)**
71:18
**economists (2)**
70:12;71:22
**education (1)**
18:3
**effect (2)**
69:11;82:1
**eight (1)**
10:6
**either (4)**
46:19;80:25;81:15;
85:14
**elected (2)**
15:5;33:20
**Electronics (5)**
7:25,25;8:23,25;18:21
**elevated (1)**
70:1
**else (1)**
29:23
**emails (1)**
69:10
**employed (2)**
18:5,7
**employer (3)**
10:24,25;11:11
**employment (1)**
18:9
**end (2)**
43:9;59:7
**engaged (1)**
81:25
**enough (1)**
17:5
**entailed (2)**
60:14,17
**entire (4)**
10:9,11;77:21;84:4
**entirety (1)**
85:18
**entities (1)**
8:10
**entity (2)**
8:24;16:18

estate (1)
18:19
evaluate (1)
70:13
Even (2)
82:5,14
evening (1)
19:14
everybody (2)
23:7,7
Everyday (1)
47:25
evidence (2)
61:4;83:11
exact (2)
40:16;56:11
exactly (1)
29:12
EXAMINATION (3)
8:17;86:17;88:9
examined (1)
8:14
example (2)
27:1;84:11
excluding (1)
47:4
Exhibit (25)
19:2;27:14;28:8;29:1;
30:4,8,19;31:21;32:7,12;
58:17;60:12;61:9,11;
62:9,11;63:13;64:8;
73:11;86:13,25;87:5,11,
13,17
exhibits (4)
32:1,1;63:5,6
existed (1)
84:24
existence (1)
25:24
expect (1)
71:11
experience (3)
12:2;69:17;79:3
expert (5)
66:16;67:10;70:8,8;
72:3
experts (4)
24:12,16;68:22;72:7
explain (3)
37:16;66:13;88:1
extended (1)
46:15
extent (5)
31:5,6;73:15;76:3;
84:24

F

face (6)
20:19,19,21,21;22:6,7
face-to-face (1)
20:15
fact (4)

15:15;35:6,10;83:17
fair (1)
13:21
false (1)
79:20
familiar (4)
35:17,25;43:24;65:22
features (2)
34:16;35:1
feel (3)
48:11,15;85:18
few (2)
8:19;9:20
file (2)
87:16,20
filed (7)
27:6,11;50:14;73:1;
87:9;88:4,11
fill (1)
44:12
financial (2)
18:13,15
find (1)
42:21
finding (1)
43:4
finish (1)
12:25
finished (1)
87:2
firm (1)
23:12
firmly (1)
83:12
first (8)
8:19;20:13;22:24;
32:3;59:9;75:4,7;87:10
fix (6)
74:22;78:20;79:8;
80:9;82:2;83:13
fixed (1)
82:19
fixing (2)
16:4,19
flip (1)
85:17
floor (4)
45:16,23,25;46:2
follows (1)
8:15
follow-up (1)
13:17
foreclosure (1)
11:12
form (37)
15:8,17;16:6,12,21;
19:25;21:5;33:1,22;
35:14;39:5,25;42:23;
45:5,18;48:12;52:4,11,
20;53:19;61:4;65:18,24;
66:15,23;67:9,17;69:21;
70:5,20;71:4;73:9;81:4,
18;82:7,15,21

found (1)
37:13
foundation (18)
15:9,18;16:7,13,22;
52:4,12,21;65:19;66:24;
67:11;69:22;81:5,19;
82:8,16,22;85:10
four (1)
28:17
Francisco (1)
7:8
Frankovitch (4)
8:3;25:20,21,24
free (1)
85:18
Friday (1)
7:3
front (3)
33:18;62:16;86:24
full (1)
15:12
FURTHER (1)
88:9
future (1)
63:12

G

general (2)
68:7;74:18
Generally (3)
55:14,16,21
gentlemen (1)
19:20
Good (6)
7:10;8:18;48:11;
67:15;86:18,19
graduate (1)
17:18
Gralewski (79)
8:5,5;15:8,17;16:6,12,
21;17:4;19:25;20:3,23;
21:5,11;22:11,25;25:9,
13;26:19;30:17,21;
31:22;33:1,22;35:14;
39:5,21,25;40:6,8,11;
42:23;45:5,18;48:12;
49:12,23;50:3;51:17;
52:3,11,20;53:19;54:11;
61:2,23;63:2;65:18,24;
66:2,11,15,23;67:3,9,17;
69:21;70:5,20;71:4;
73:7;76:1,12,24;79:13,
18;80:5;81:4,9,18;82:7,
10,15,21;83:3,7;85:8;
86:17;88:6,17
greater (1)
60:16
guarantee (1)
42:15
guilty (3)
79:1,10;80:3

H

half (2)
9:14;22:14
hand (1)
17:6
handful (2)
74:6,14
happened (2)
36:15;46:11
harmed (3)
71:18;72:2,5
heads (1)
13:5
held (1)
18:23
hesitate (1)
12:16
higher (2)
44:7;54:24
Hold (1)
79:13
home (8)
9:7,15;36:11;47:9;
48:3,5;57:4;65:9
hook (1)
46:21
hour (1)
7:4
hours (1)
22:14
hypothetical (3)
16:23;70:6;82:22

I

idea (2)
67:24;71:12
identification (13)
19:3;27:15;28:9;29:2;
30:5,20;58:18;61:10;
62:10;63:14;64:9;73:12;
86:14
identify (2)
7:22;53:1
important (2)
35:7,11
impulse (6)
34:13,14;35:16,22;
36:5,16
Inc (2)
8:1,25
include (1)
75:25
included (1)
71:14
including (1)
75:13
Incomplete (3)
16:23;70:6;82:22
independent (1)
69:17

indicated (1)
86:21
indirect (1)
84:6
indirectly (5)
13:16;71:17;78:1;
80:25;81:15
individuals (3)
13:16;26:4;71:16
induce (1)
66:18
inducements (1)
65:16
industry (3)
18:21;24:16;75:15
information (10)
15:23;17:6;21:10;
32:14;42:22;43:4;71:2,
24;80:14;83:5
initial (3)
21:25;22:22;73:2
initially (1)
73:5
injured (3)
69:20;70:4;78:3
input (1)
76:10
inside (13)
41:21;49:21;50:21;
51:7,12;52:1,9,14;53:4,
7,10,23;64:4
insofar (1)
32:14
instruct (8)
21:6;25:15;49:15;
50:6;66:3,8;76:12,15
instruction (1)
76:24
interactions (1)
79:3
Internet (2)
38:4;45:11
interrogatories (5)
21:25;22:23;30:14;
32:9,13
into (10)
15:15;16:1;25:13;
58:4;60:16;65:17;67:25;
76:10;77:7;83:16
investigation (3)
15:15;16:1;83:16
involved (4)
30:13;32:8,12;74:15
issue (3)
84:4,10,14
item (1)
59:12
items (1)
59:9

J

job (1)

12:23
**John (4)**
  7:19;8:3,11;9:6
**J-o-h-n (1)**
  9:6
**judgment (1)**
  16:9
**jump (1)**
  12:25
**JUNE (9)**
  7:1,4,15;40:15,17,17;
  59:1,4,7

**K**

**keep (1)**
  12:22
**Kevin (2)**
  8:2;20:22
**kind (10)**
  18:17,18,23;23:18;
  41:5,12;42:14;43:15;
  44:12;46:24
**kindly (1)**
  14:9
**kinds (1)**
  29:19
**Kirby (1)**
  8:5
**K-Mart (32)**
  36:8,9,14,17,21;37:2,
  7;38:12,15,18;41:6;
  42:14;43:15;44:9,12;
  45:13;46:25;47:15,19;
  48:19;58:23;61:1;65:1,
  3,11,16;66:21;67:6,23;
  84:20,23;85:2
**K-Mart's (2)**
  38:22;66:22
**knew (4)**
  23:8;52:14,17;59:7
**knowledge (19)**
  15:12;24:4,7;38:24;
  69:12,14,16;74:19;75:1;
  78:23;79:2,6,9;80:7;
  84:13,18;85:13,23;86:2
**known (2)**
  24:25;51:14
**knows (1)**
  23:7

**L**

**labeled (1)**
  59:16
**labor (1)**
  60:20
**lacking (1)**
  85:10
**Lacks (17)**
  15:9,18;16:6,13,22;
  52:4,11,21;65:18;66:23;
  67:11;69:21;81:4,18;

82:7,15,22
**Larch (64)**
  7:20;8:3,11,18;9:6,7;
  10:19;12:15;13:11;
  14:18;17:8;19:7,22;
  24:12,21;26:2;27:19;
  28:11;29:3,19;30:7,12;
  31:8;32:12;33:13;38:12;
  40:20;43:7,19;44:18;
  47:15,23;49:5;50:9;
  54:1,22;55:7;57:11;
  58:13,19;60:3,12;61:14;
  62:13;63:16;64:11,24;
  67:14;68:11;69:5;71:10;
  72:13;73:13,18;74:15,
  18;75:19;77:25;80:13;
  81:24;84:1;85:12,22;
  86:18
**L-a-r-c-h (1)**
  9:6
**Last (9)**
  19:14,20;20:6,14;
  21:1,18;23:1;63:7,10
**late (1)**
  40:17
**Lauren (1)**
  27:1
**lawsuit (4)**
  72:14,17,23;73:3
**lawsuits (2)**
  11:15,18
**lawyer (10)**
  19:16;24:5,23;25:12;
  71:21;74:11;76:8,14,18;
  77:5
**lawyers (34)**
  15:13,22,24;16:9;
  17:7;20:19;27:8;28:22;
  29:12,14;31:16;42:25;
  49:7,11,15;54:18;68:23;
  69:8,15;70:25;71:7;
  76:3,5;77:3,5;80:15;
  83:11;84:8,9,17;85:16,
  25;86:5;87:16
**LCD (6)**
  35:17,21;55:8,12;
  56:6;57:25
**leader (3)**
  65:23;66:14;67:8
**learned (1)**
  72:20
**learning (1)**
  48:9
**least (1)**
  69:8
**led (1)**
  51:6
**legal (17)**
  16:7,14,23;20:3;
  30:18;33:23;42:24;
  65:25;66:16;67:10;
  69:23;70:8,9;81:9;
  82:10,16,23

**Liberty (3)**
  17:12,14;18:2
**life (3)**
  10:9,11;77:21
**limit (1)**
  74:23
**line (1)**
  39:21
**litigate (1)**
  80:3
**Litigation (23)**
  7:18;23:23;24:3;25:7,
  25;26:8;33:6,9,14;34:9;
  50:10;53:18,24;61:22;
  63:1,24;64:21;72:20;
  76:23;87:21;88:3,11,14
**little (1)**
  18:11
**live (5)**
  9:17,19;10:2,5,23;6
**lived (4)**
  9:13;10:7,10;77:20
**LLP (2)**
  7:24;8:8
**located (2)**
  7:12;36:9
**logo (1)**
  53:12
**long (13)**
  9:13,19;10:5,7;18:14;
  20:25;22:12;31:3;50:5;
  66:3,4,19;73:13
**look (5)**
  32:6,11;67:25;81:7;
  87:2
**looking (1)**
  87:3
**looks (1)**
  28:3
**Los (1)**
  7:13
**loss (3)**
  65:23;66:14;67:8
**low (1)**
  42:14
**lower (3)**
  44:5;45:24;55:3
**Ltd (2)**
  7:25;8:23

**M**

**ma'am (1)**
  58:16
**maintain (4)**
  29:20;41:18;78:21;
  82:2
**maintained (3)**
  30:1;40:22;41:14
**making (1)**
  84:2
**MALAISE (2)**
  8:7,7

**manner (2)**
  72:3,6
**manual (1)**
  41:22
**manufactured (13)**
  14:19,24;15:6,16;
  16:20;53:23;80:21,24;
  81:2,13,17;82:6;83:17
**manufacturer (4)**
  33:17;53:6,10;70:3
**manufacturers (4)**
  34:5,8;53:17;74:22
**manufacturer's (5)**
  43:23;46:17;60:22,24;
  61:7
**many (7)**
  12:2;20:9;28:3,16;
  32:22;74:3,12
**March (8)**
  50:14,16,19;51:5;
  76:20;87:14;88:4,12
**Mario (1)**
  27:3
**mark (1)**
  86:25
**marked (13)**
  19:2;27:14;28:8;29:1;
  30:4,19;58:17;61:9;
  62:9;63:13;64:8;73:11;
  86:13
**match (1)**
  42:14
**Mathes (34)**
  33:12,13,21;34:11,17,
  24;35:6,21;36:7;37:9;
  38:22;44:15;46:25;47:3;
  48:23;50:21;51:2,13;
  54:23;56:10;57:14;
  59:18;62:5,20;63:20;
  64:15,25;66:21;67:7,22;
  68:3,12;70:3;78:9
**matter (6)**
  11:1;16:1;24:13,16,
  22;80:3
**matters (4)**
  18:18;23:16,18;25:2
**May (6)**
  26:23;28:20;30:21,23;
  59:3;66:2
**McAllister (2)**
  8:9,9
**McInerney (1)**
  8:6
**mean (2)**
  43:8;84:12
**meaning (4)**
  14:6,16;69:16;79:2
**means (2)**
  12:24;45:21
**meant (1)**
  88:1
**meet (1)**
  20:10

**meeting (7)**
  20:15,16,25;21:4,18;
  22:3,6,10,12,15;23:5
**members (3)**
  71:13;72:1;84:5
**mentioned (2)**
  20:5;65:7
**met (4)**
  8:18;20:6;22:2,24
**mid-'80s (1)**
  11:6
**Mike (1)**
  8:2
**minute (4)**
  24:25;27:16;32:6;
  80:17
**minutes (2)**
  8:19;21:2
**Misstates (5)**
  52:5,12,21;81:5,19
**model (5)**
  37:17,18;45:16,25;
  46:4
**mom (2)**
  56:25;57:8
**moment (2)**
  14:11;78:16;85:6;87:1
**money (1)**
  68:5
**monitor (1)**
  54:16
**monitors (3)**
  14:7,16;74:25
**months (2)**
  60:19,19
**more (7)**
  14:9;18:11;30:22;
  68:21;70:2,2;78:2
**morning (29)**
  7:10;8:18;10:20;11:8;
  12:4,12,16,21;13:13;
  19:13;22:18;24:19;
  27:23;28:1,15;29:7;
  31:12;32:18;50:7,8;
  51:6,10;52:19,25;59:19;
  62:6,21;73:22;78:10
**motions (1)**
  27:6
**MSRP (5)**
  43:20,21;44:2,5,7
**much (13)**
  9:3;31:4;38:15;42:2,
  11,18;43:7,8;68:18,21,
  24;73:14;84:20
**Myers (1)**
  7:24
**myself (1)**
  8:20

**N**

**name (4)**
  7:10;8:20;9:5;33:18

**named (8)**
11:3;24:22;26:7;34:9;
53:18;75:21,25;76:10
**nature (4)**
10:22;11:10;22:1;27:7
**nearby (1)**
39:14
**necessarily (1)**
34:5
**need (4)**
12:23;31:6;73:15;76:6
**needed (1)**
79:14
**negotiate (2)**
37:22;47:20
**neither (4)**
15:16;79:24;80:2;82:5
**New (3)**
10:3;48:25;49:2
**newspaper (1)**
38:6
**next (2)**
12:18;13:1
**night (3)**
19:21;20:6;63:10
**nods (1)**
13:5
**non- (1)**
55:22
**non-CRT (1)**
55:23
**nor (2)**
15:16;82:5
**noted (1)**
32:4
**November (1)**
76:21
**number (5)**
23:12,13;24:25;30:25;
74:5
**numbered (1)**
63:11
**numbers (2)**
63:10;77:13

## O

**o0o- (3)**
7:2;8:16;88:25
**oath (2)**
12:5;58:15
**Object (43)**
15:8,17;16:6,12,21;
19:25;21:5;26:19;30:17;
33:1,22;35:14;39:5,21,
25;42:3;45:5,18;48:12;
50:5;52:3,11,20;53:19;
61:2;65:18,24;66:15,23;
67:9,17;69:21;70:5,20;
71:4;73:7,9;81:4,18;
82:7,15,21;85:8
**objection (4)**
21:12;31:24;40:6,8

**objections (5)**
17:4;40:11;66:9;67:3;
83:3
**objection's (1)**
32:4
**obligation (1)**
12:6
**occasion (2)**
48:18,22
**occasions (1)**
74:8
**occurred (1)**
34:4
**off (7)**
37:13;58:7,9;86:9,11;
88:19,21
**offer (3)**
42:14;44:9;66:17
**offered (8)**
34:25;36:21,24;37:3;
44:15;57:17,20,24
**offering (1)**
65:16
**offerings (2)**
38:10;58:5
**offhand (2)**
41:13;56:17
**official (1)**
12:20
**O'Melveny (1)**
7:23
**Once (5)**
10:21,22;11:7;41:4,7
**one (23)**
8:22;12:24;14:9;17:2;
19:21;20:20;22:14;25:6;
28:22;29:13;32:24,25;
52:14,17,18;57:17,21;
69:8;72:15;74:6;78:2;
84:24;88:8
**one-page (3)**
59:16;61:12;62:11
**one-year (1)**
60:19
**ongoing (1)**
72:21
**only (3)**
11:7;13:4;29:11
**opened (3)**
51:11;52:9,24
**opposed (1)**
57:7
**order (7)**
12:22;21:20;22:17;
23:21;24:2,18;25:7
**orders (1)**
27:6
**original (2)**
72:25;87:8
**others (2)**
39:12;48:16
**otherwise (4)**
30:25;39:3;66:7;68:15

**out (7)**
31:1;42:22;43:5;
44:12;57:8;64:6;79:14
**over (10)**
12:23;24:3;26:17,25;
28:16;54:2,13,17;73:14;
74:5
**overcharge (2)**
69:6,13,19;84:4,14,24
**overcharged (4)**
26:4,6;68:16;75:8
**overcharging (1)**
13:15;48:10
**overpaid (2)**
48:15,16
**own (7)**
9:15,25;10:15;13:19;
49:3;78:13;85:3
**Owned (1)**
10:1
**owners (1)**
83:14

## P

**package (1)**
46:10
**packaging (1)**
41:21
**Page (11)**
31:21;32:6,11;77:12,
12;78:15;80:16;81:22;
83:23;85:5,17
**pages (1)**
73:14
**paid (17)**
38:15;40:23;41:1;
42:17;44:5;45:2;54:25;
56:16;59:22,25;60:7,10;
68:11,18,21,25;84:21
**papers (2)**
27:5,10
**Paragraph (19)**
77:13,17,24;78:16,19,
24;80:12,17,22,23;81:8,
22;83:24;84:3;85:14,14,
19,23;86:3
**Paragraphs (1)**
85:6
**parents (1)**
57:2
**Park (1)**
7:13
**part (1)**
32:3
**participated (2)**
11:20,23
**participation (1)**
15:11
**parties (1)**
7:21
**parts (1)**
60:19

**passed (6)**
69:6,13,20;84:5,14,23
**past (2)**
28:16;74:5
**pay (8)**
10:13,17;40:25;41:4;
42:2,8;54:24;55:2
**payment (2)**
41:3,5
**Pearl (3)**
8:2;20:22;22:11
**Penco (2)**
7:5,16
**perhaps (2)**
40:18;79:22
**period (12)**
54:2,7,14,17;55:9,17,
24;76:20,22,22;77:10,25
**person (1)**
78:18
**Personal (21)**
48:1,2;54:20;56:24;
69:12,14,17;75:1;78:23;
79:2,2,3,3,6,9;80:6;
84:13,18;85:13,22;86:2
**personally (12)**
7:8;11:3;16:10,17;
43:4;49:20;57:9;68:24;
71:3;72:11;76:9;77:9
**Philips (2)**
8:8;86:20
**phone (3)**
20:20,23;88:17
**photo (1)**
64:16
**photograph (13)**
49:8;61:19,21;62:3,
19,20,23,25;63:19,21;
64:1,3,14
**photographed (1)**
49:21
**photographs (1)**
63:6
**phrase (1)**
73:7
**phrased (2)**
73:8;79:20
**picked (1)**
57:8
**picture (3)**
61:17;62:16,20
**place (4)**
7:16;22:4;31:6;74:22
**Placed (1)**
86:24
**plaintiff (8)**
8:3;11:14;24:22;25:7;
26:8;50:9;72:24;73:1
**plaintiffs (4)**
72:15,18;84:5,15
**plaintiffs' (2)**
24:12,16
**plan (7)**

**41:6;46:11;59:13,18;**
60:6,13,17
**planning (2)**
18:19,19
**plans (1)**
63:11
**plasma (4)**
35:25;36:2;55:16;58:2
**players (1)**
47:7
**pleading (1)**
79:1
**please (13)**
7:21;9:5;12:16;13:6;
14:10;16:16;51:9;78:15;
81:8,21;83:23;85:5,18
**pled (2)**
79:10;80:2
**pm (3)**
86:15;88:20,24
**point (1)**
64:6
**portion (1)**
73:16
**position (2)**
18:24;72:8
**possible (10)**
29:15;30:9,10;36:24;
37:1,5;53:22;66:20;
67:2,6
**postgraduate (1)**
18:3
**practice (1)**
68:7
**preparation (3)**
20:10;21:9,13
**prepare (3)**
21:21;22:17;24:19
**prepared (1)**
21:13
**preparing (3)**
30:13;32:8,13
**present (5)**
22:9;54:2,8;55:10,18
**pretty (1)**
50:13
**prevail (2)**
71:11,15
**previous (4)**
12:1;26:20;61:3;85:9
**Previously (1)**
73:11
**price (29)**
14:16;16:4,19;37:22;
38:1,21;42:5,14,19;
43:24;44:4,19,23;45:2,
24;47:20;54:3,8,24;55:2,
8,15;60:6;66:22;68:13;
70:1;79:8;80:9;82:20
**price-fixing (10)**
13:15;14:1,6,12,13,15;
26:6;34:4;69:10,25
**prices (11)**

Case 4:07-cv-05944-JST Document 6232-4 Filed 07/29/23 Page 759 of 866
In Re: Cathode Ray Tube (CRT) Antitrust Litigation
This Document Relates To: All Actions

John Larch
June 1, 2012

38:4,10;54:13,17;
55:12,20;66:18;74:23;
78:21;82:3;83:13
**primary (2)**
9:11,22
**Principally (1)**
23:19
**prior (4)**
73:22;87:13;88:4,12
**privilege (1)**
21:7
**privileged (1)**
21:9
**proceed (1)**
32:4
**proceedings (1)**
88:23
**produce (1)**
63:11
**produced (4)**
23:22;24:2;30:2;63:10
**product (27)**
13:23;16:5,19;33:5;
39:4;40:23,25;41:22;
43:11;44:10,13,16;47:9,
23;48:3,5,8,11,25;49:3,
5;50:24;52:25;56:2,7;
69:2;78:8
**production (1)**
74:23
**products (11)**
14:6,16;29:21;33:9;
34:25;36:18;47:4;65:14,
17;66:18;78:1
**professional (1)**
23:10
**professionally (1)**
23:9
**professionals (2)**
43:1;70:12
**promotion (1)**
43:16
**proper (1)**
21:15
**property (1)**
10:15
**protected (1)**
25:14
**protection (1)**
46:10
**provide (1)**
49:8
**provided (5)**
23:12;32:14;69:10;
80:14;83:6
**public (1)**
18:4
**purchase (44)**
13:22;29:20,22;32:23;
33:11;34:11,13,14;35:8,
12,16,22;36:5,6,13,16,
18,21;37:8,19;38:21;
40:14;41:19;42:5,9,13,

18;44:20,24;45:3;46:20,
24;47:3;54:22;55:23;
56:20,24;57:1;58:23;
59:9,17;60:6;65:17;68:4
**purchased (42)**
13:16,18;32:19;34:23;
35:1,20,24;38:13,16,19;
39:3;41:25;43:11,17,20;
44:2,10,16,19;45:15;
46:5,7,13;47:2;49:1;
55:22;56:18,25;57:2,13,
18,22;60:14;67:8,16,22;
68:2;71:17;78:1,8,12;
82:14
**purchaser (1)**
84:6
**purchases (3)**
47:16,16;68:8
**purchasing (1)**
36:2
**purposes (4)**
61:22;63:1,23;64:20
**put (2)**
31:24;37:21

## Q

**qualified (2)**
70:14,24
**quantities (2)**
47:17,21

## R

**RadioShack (5)**
39:18;57:12,16;65:8,
12
**raise (2)**
78:20;82:2
**Ray (23)**
7:17;13:15,18,23;
14:2,14;34:5,8;35:7;
42:19;49:6,9;50:20;
51:7,12,14;53:17;64:4;
74:21,23;75:17;80:21,24
**Re (1)**
7:17
**read (4)**
27:5;77:15;78:6,16
**reads (2)**
77:17;84:3
**ready (5)**
19:5,6;27:17,18;73:18
**realize (1)**
31:3
**really (1)**
66:25
**reask (1)**
79:11
**reason (3)**
12:10;19:23;78:4
**reasons (1)**
36:18

**rebate (3)**
44:9,13,16
**recall (23)**
27:22,24,25;28:25;
29:11;34:20,22;36:20,
23;37:2;39:13;40:23;
43:14;44:11,14,17;
46:16;56:11,23;87:19,
21,24,25
**receipt (12)**
29:22;40:19,22;41:15;
58:23,25;59:8,15,17;
60:2,18,21
**receive (6)**
17:20;45:24;71:11,14,
19;72:1
**received (2)**
15:13,24
**recess (2)**
58:10;86:12
**recognize (13)**
19:7,23;27:19;28:12;
29:3;30:8;31:8;58:19;
61:14;62:13;63:15;
64:10;73:18
**recollection (9)**
21:15,20;22:16;23:21;
24:2;32:7;59:5;60:13,21
**record (15)**
9:4;12:20,22;31:24;
32:4;58:7,9,12;63:8;
66:9;86:9,11,16;88:19,
21
**redirect (1)**
88:19
**refer (4)**
8:24;9:1;30:24,25
**referencing (2)**
25:19;33:4
**referring (3)**
88:3,11,14
**reflect (8)**
42:5;59:8,17,21;60:2,
5;63:9;64:3
**reflected (1)**
41:19
**reflecting (1)**
41:15
**reflects (1)**
42:19
**refresh (8)**
21:20;22:16;23:21;
24:2;32:7;59:5;60:12,21
**refreshed (1)**
21:14
**regarding (1)**
29:20
**register (1)**
37:14
**reimbursed (1)**
71:18
**reintroduce (1)**
8:20

**relate (2)**
14:1,5
**related (1)**
31:23
**relates (1)**
14:13
**relation (1)**
30:1
**relationship (1)**
23:11
**relative (1)**
43:8
**relevant (3)**
55:24;76:22;77:25
**relied (1)**
77:4
**rely (11)**
24:5;68:22;70:11,22,
24;71:2,6,21,24;72:7;
77:5
**relying (4)**
16:8;17:7;42:25;54:18
**remember (1)**
19:19
**REMEMBERED (1)**
7:3
**remind (3)**
12:4;49:12;58:15
**remove (1)**
49:7
**removed (1)**
49:20
**rent (3)**
9:15,16,25
**repeat (1)**
14:9
**rephrase (1)**
66:6
**Reporter (15)**
7:7;12:19;19:2;27:14;
28:8;29:1;30:4,19;
58:17;61:9;62:9;63:13;
64:8;86:13,25
**Reporters (1)**
7:12
**represented (1)**
25:1
**representing (2)**
8:21;10:24
**request (1)**
49:10
**research (10)**
24:18;54:19,20;69:17;
75:12,15,17,20;79:4;
84:7
**researched (1)**
84:10
**residence (2)**
9:11,23
**resident (1)**
77:18
**respect (4)**
25:18;37:8;43:16;63:4

**respond (1)**
13:6
**response (2)**
12:25;13:3
**responses (3)**
13:4;32:2,2
**restate (1)**
16:15;51:9
**result (1)**
12:5
**resulted (2)**
70:1
**retail (2)**
18:23;43:24
**retailer (1)**
67:23
**retailers (5)**
39:2,10;65:4,12,15
**Retirement (1)**
18:19
**reveal (8)**
15:20;33:25;49:14;
51:18;61:24;76:2;77:2;
83:9
**revealing (3)**
34:1;76:4,25
**review (22)**
19:4;21:3,19,24;
22:16,21;27:10,16;31:6;
35:22;38:3,6;73:16;
74:1,3;77:13;80:17;
81:22;83:24;85:6,18;
87:13
**reviewed (17)**
19:10,12;21:8,14;
23:21;24:1;27:8,25;
28:14,19;29:6,10;50:24;
73:21,24;74:8,12
**reviewing (1)**
29:11
**right (2)**
79:25;81:8
**Road (2)**
7:5,17
**routinely (1)**
27:10
**run (1)**
31:1
**running (1)**
43:15
**Russell (1)**
27:1

## S

**Saint (1)**
9:9
**sale (3)**
43:11;65:4,13
**sales (4)**
42:6,8;59:22,24
**salesperson (2)**
37:8,11

**Same (15)**
17:4;23:6;40:6,8,11;
46:1;54:13,13;67:3;
71:14,20;72:1;76:24;
81:12;83:3

**Sam's (1)**
40:10

**Samsung (6)**
7:24,25;8:22,25;
79:10,25

**San (1)**
7:7

**Saw (4)**
35:23;36:15;37:18;
87:10

**saying (1)**
87:24

**SC (1)**
7:18

**Science (2)**
17:25;18:1

**SEA (16)**
9:1;14:23;15:2,6,16;
75:13;79:7,24;80:2,7;
81:13,17,25;82:5,13;
83:17

**searches (2)**
23:19,20

**Sears (1)**
39:14

**SEC (17)**
8:24;14:19,21;15:1,5,
16;75:13;79:7,24;80:2,7,
21;81:2,25;82:5,13;
83:17

**second (6)**
8:25;22:3;59:12;62:2;
79:13;84:3

**seem (1)**
12:15

**select (2)**
57:6,9

**self-employed (2)**
18:10,15

**self-employment (1)**
18:12

**sentence (1)**
84:3

**served (2)**
11:14,17

**services (1)**
23:13

**set (3)**
32:17;41:5;61:8

**settlement (1)**
11:21

**several (1)**
30:22

**shakes (1)**
13:5

**shared (1)**
25:12

**Sharon (1)**

9:18

**shelf (2)**
37:13,14

**shipped (1)**
47:12

**shop (3)**
37:25;67:14;68:8

**short (2)**
8:24;58:14

**Shorthand (1)**
7:7

**shortly (2)**
50:14,16

**showed (7)**
19:15;28:21,23;29:14;
31:14,17;74:10

**significant (1)**
68:4

**similar (4)**
35:1;57:21;72:2,6

**similarly-priced (1)**
57:17

**Simon (8)**
8:2,2,4;20:22;23:2,5;
24:25;25:5

**sitting (1)**
12:18

**Sixty (1)**
21:2

**size (3)**
34:19;51:20,22

**Small (3)**
23:6;26:5;83:14

**smart (6)**
46:10;59:13,18;60:6,
13,17

**socially (2)**
23:8,9

**sold (9)**
14:21;15:1,2,6;66:21;
78:22;82:3;84:21;85:2

**someone (3)**
37:19;53:24;70:23

**sometimes (1)**
66:17

**soon (1)**
30:25

**sorry (4)**
15:2;52:3;56:13;78:19

**sounds (1)**
12:1

**space (1)**
31:1

**speak (2)**
16:2;70:14

**speaking (1)**
25:18

**speaks (1)**
61:4

**specific (4)**
28:7;31:5;34:16;73:16

**specifically (1)**
33:11

**specifications (3)**
41:22;50:25;57:21

**speculate (1)**
55:4

**speculating (1)**
83:19

**speculation (6)**
65:19;66:24;67:12;
69:22;70:7;85:10

**spell (1)**
9:5

**spent (1)**
68:5

**spite (1)**
62:18

**Spoken (1)**
51:2

**stabilize (2)**
78:21;82:3

**stands (1)**
21:12

**start (5)**
13:3;17:13;54:7;55:9,
17

**State (4)**
7:8;9:5;17:12;66:9

**stated (1)**
79:18

**states (5)**
10:15,17;61:6;78:19,
22

**stayed (1)**
54:13

**stem (1)**
13:22

**still (3)**
48:5;49:3;58:15

**store (2)**
36:15;45:22

**stores (4)**
38:9;45:9;58:4;65:17

**stretches (1)**
76:20

**studied (1)**
36:5

**study (1)**
17:16

**Subpart (2)**
85:24;86:4

**Subparts (1)**
85:20

**sue (4)**
16:4,18;75:4,11

**suggest (1)**
30:21

**suggested (1)**
43:23

**suit (6)**
11:10;15:5,12;26:2;
33:20;75:21

**Suite (1)**
7:13

**support (2)**

15:12;46:25

**sure (12)**
12:3;14:11;16:17;
19:21;28:4;29:17;30:10;
35:2;37:1,25;50:13;
88:15

**sworn (1)**
8:13

T

**talk (1)**
12:23

**Target (1)**
39:16

**tax (1)**
42:6,8;59:22,24

**taxes (2)**
10:13,17

**team (1)**
77:5

**technical (1)**
48:19

**technologies (2)**
35:13;37:3

**technology (4)**
56:4;57:6,25;58:2

**telephonic (1)**
20:16

**television (93)**
32:19,25;33:4,12,17,
19;34:6,12,17,19,21,24,
25;35:1,7,23;36:3,7,16;
37:9,17,23;38:3,13,16,
19,22,23;40:20;41:4,5,
19,24;42:3,13;43:9,16,
20;44:1,19;45:3,23;46:1,
7;47:3,25;49:8,21,22;
50:21;51:3,8,11,21,23;
52:1,9,15;53:4,7,11,23;
54:23,25;55:23;56:5,10,
22;57:7,14;58:24;59:4,6,
18;60:7;61:18;62:4,5,17,
21;63:20;64:4,15,25;
66:21;67:7,15,22;68:3,
12,19;70:4;75:15

**televisions (23)**
14:6;32:22;33:9;
35:18,23,25;36:22,25;
37:3;38:7;47:16,20;
54:3,8,17;55:8,13,16;
57:21,25;65:5,13;74:24

**tendered (1)**
60:3

**term (2)**
66:19;79:25

**terms (4)**
41:3;46:21;68:4,8

**testified (14)**
8:14;14:11;24:24;
32:19;41:14;57:11;59:4;
62:3;64:24;72:19;75:19;
77:21;81:1;88:10

**testimony (20)**
29:13;33:16;45:15;
52:5,13,16,22;62:4,19;
65:11;66:16;67:11;
68:17;70:8,8,15;72:10;
81:5,16,19

**Thanks (2)**
64:23;88:16

**thereof (1)**
7:5

**Thirty (1)**
23:3

**though (2)**
82:5,14

**thought (1)**
88:3

**three (2)**
60:19;85:9

**Thursday (3)**
20:14;21:19;23:1

**times (6)**
20:9;74:3,5,6,12,14

**title (2)**
23:19,20

**today (10)**
8:23;9:4;12:19;19:10,
24;40:20;54:23;86:22,
23;87:19

**today's (1)**
23:22

**told (1)**
76:14

**took (6)**
37:13,14;47:9;58:13;
64:20;74:22

**topic (1)**
70:13

**Toshiba (7)**
8:10;53:8,9,10,12,13;
86:20

**total (2)**
70:18;71:10

**town (2)**
23:6,7

**transaction (2)**
30:1;41:15

**true (1)**
15:4

**trust (1)**
82:1

**truth (3)**
8:13,13,14

**truthfully (2)**
12:7,13

**try (3)**
12:23;13:6;54:22

**trying (1)**
19:19

**Tube (13)**
7:18;13:19,23;42:19;
49:6,9;50:21;51:7,12,15;
70:1;74:21;78:13

**tubes (20)**

13:15;14:2,14;15:7;
34:5,8;35:7;53:17;
74:24;75:17;80:9,21,24;
81:3,14,17;82:3,6,14;
83:18

**turn (6)**
77:12;78:15;80:16;
81:21;83:23;85:5

**turned (3)**
24:3;26:17,25

**TV (16)**
35:10,21,21;37:13;
46:11,21,22;51:13,15;
57:8,9;59:9;65:15;78:9;
84:21;85:3

**TVs (1)**
14:16

**Twelve (1)**
18:16

**Twice (3)**
20:12,13;22:3

**two (9)**
8:21;9:14;19:19,20;
20:19;22:14;31:25;59:9;
88:8

**type (4)**
21:23;22:20;54:19;
70:23

**U**

**ultimately (1)**
83:13

**unable (1)**
12:11

**unclear (1)**
12:16

**under (2)**
12:5;58:15

**unintentionally (2)**
79:22,23

**unit (1)**
43:12

**United (1)**
78:22

**unless (1)**
66:8

**up (8)**
37:19;41:5;44:19,23;
46:21;54:3;55:8,16

**use (4)**
47:25;48:1,2;56:24

**used (6)**
41:1;47:23;48:25;
67:7;74:24;79:24

**user (1)**
41:22

**V**

**Vague (17)**
19:25;26:20;30:18;
33:2;35:14;39:5,22,25;

45:5;48:12;52:12,20;
65:19,24;67:9;70:7;73:8

**VCRs (1)**
47:7

**verbal (1)**
13:4

**verbally (2)**
13:6;19:18

**versions (1)**
63:11

**VIDEOGRAPHER (7)**
7:10,11;58:8,11;
86:10,15;88:20

**videotape (1)**
7:19

**violations (1)**
78:4

**VIRGINIA (15)**
7:1,6,17;9:10,18;10:4,
8,13;26:5;36:10;42:6,8;
59:22;77:18,20

**visit (1)**
45:9

**W**

**wait (2)**
12:24;13:1

**walked (1)**
45:22

**Walmart (5)**
39:11;57:12,16;65:8,
12

**warranty (10)**
46:12,15,18;47:4;
59:19;60:19,22,24;61:1,
7

**watching (1)**
47:25

**way (5)**
11:24;17:2;43:13;
59:15;73:8

**weighed (1)**
26:11

**WEIRTON (7)**
7:1,5,17;9:18;10:3;
36:10;65:1

**Welcome (1)**
58:14

**WEST (18)**
7:1,5,17;9:9,18;10:3,7,
13;17:12,13;18:2;26:5;
36:10;42:6,8;59:21;
77:18,20

**What's (1)**
18:9

**Wheeling (1)**
9:9

**Whereupon (3)**
58:10;86:12;88:23

**White (1)**
8:9

**whole (1)**

8:13

**whose (2)**
72:13;73:2

**Wilson (1)**
7:11

**within (2)**
32:15;63:7

**Without (5)**
25:4;34:1;76:4,25;
77:7

**witness (59)**
8:6,12;15:11,23;16:8,
15;17:5;20:2;25:11,16;
26:23;28:10;30:6,22;
31:2;33:24;34:3;35:16;
39:8;40:9;42:25;48:15;
49:13,25;50:7;51:20;
52:6,14,23;53:21;61:6;
62:1;63:3;65:21;66:10,
12,17,25;67:5,13,19;
69:24;70:11,22;71:6;
76:2,7,17;77:4;79:22;
81:6,11,20;82:9,17,24;
83:5,10;85:11

**work (1)**
43:1

**worked (2)**
18:20;23:13

**Y**

**year (1)**
17:13

**years (9)**
9:14,20;10:6;12:2;
18:16;23:3,5;25:1;28:17

**Yep (1)**
66:11

**Yesterday (15)**
22:5,6,21;50:7,8;51:6,
10;52:2,10,19,25;64:2,
19;74:2,7

**York (1)**
10:3

**Z**

**Zackery (1)**
7:11

# EXHIBIT 62

———— Produced on 9/7/11 ————

**SAMSUNG EXHIBIT A25**

## PLAINTIFF BRIGID TERRY

Brigid Terry
510 Oakland Avenue
Janesville, WI 53545

Seymour Mansfield
MANSFIELD, TANICK & COHEN, P.A.
220 South Sixth Street
Minneapolis, MN  55402

Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY  10022



Produced on 9/7/11

**SAMSUNG EXHIBIT B25**

**PLAINTIFF BRIGID TERRY**

1. **CRT PRODUCT:** Toshiba television – S/N: 92567585

2. **DATE OF PURCHASE:** 1997 or 1998

3. **LOCATION of PURCHASE:** The Village – Janesville, Wisconsin

4. **PERSONS INVOLVED IN PURCHASE:** Brigid Terry (plaintiff)

5. **PRICE:** Not available.

6. **TAXES/FEES:** The standard sales tax was applied to the purchase of the television.

7. **BUNDLE:** This television was not purchased as part of a bundle or system.

8. **WARRANTIES:** None other than any standard manufacturers' warranty.

9. **PURPOSE of PURCHASE:** Personal use.

See also CRT000017-18, CRT000073-74, and CRT000563-564.

28

**SAMSUNG EXHIBIT D25**

**PLAINTIFF BRIGID TERRY**

**CRTs**: Ms. Terry does not believe she reviewed any trade publications, advertisements, or news articles relating to the price or product features of CRTs during the relevant time period.

**CRT Products**: Ms. Terry does not recall reviewing any trade publications, advertisements, or news articles relating to the price or product features of CRT products during the relevant time period.

25

--------- Produced on 9/7/11 ---------

**SAMSUNG EXHIBIT E25**

**PLAINTIFF BRIGID TERRY**

Ms. Terry did not purchase a non-CRT television or computer monitor during the
relevant time period.

# EXHIBIT 63

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

= = = = = = = = = = = = = = = = = = = = = = = = = =

IN RE:  CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION

                              Master File No.
                              CV-07-5944-SC

This Document Relates to:

                              MDL No. 1917

ALL INDIRECT PURCHASER ACTIONS

= = = = = = = = = = = = = = = = = = = = = = = = = =

Deposition of:

BRIGID TERRY

Janesville, Wisconsin

October 17, 2012

Reported by:  Taunia Northouse, RDR, CRR

**Brigid Terry**

```
 1                  I N D E X

 2    WITNESS                                  Page(s)

 3    BRIGID TERRY

 4              Examination by Ms. Chiu            6

 5              Examination by Mr. Feder          81

 6


 7                  E X H I B I T S

 8    No.          Description                Identified

 9    Exh 424      Defendant Hitachi Displays,     15
                   Ltd.'s Notice of Deposition
10
      Exh 425      Samsung Exhibit Nos. A25, B25,  26
11                 D25, and E25

12    Exh 426      Plaintiff Verification by       27
                   Brigid Terry
13
      Exh 427      Toshiba Exhibit A25 and B25     30
14
      Exh 428      Verification by Brigid Terry    31
15
      Exh 429      Copies of photographs           34
16                 CRT 17-18, CRT 73-74, CRT 563-564

17    Exh 430      Copy of photograph of serial    42
                   number
18
      Exh 431      Copy of photograph of Toshiba label  44
19
      Exh 432      Copy of photograph of CRT       46
20
      Exh 433      Copy of photograph of Model No. 47
21                 CX36G60

22    Exh 434      Copy of photograph of back of   49
                   television
23
      Exh 435      Copy of photograph of label     50
24                 with YS-59790

25    Exh 436      Class Action Complaint          76
```

2

**Brigid Terry**

```
1      No.        Description                    Identified

2           (Exhibits referred to but previously marked)

3      Exh 11     Indirect Purchaser Plaintiffs'      65
                  Third Consolidated Amended Complaint
4
       Exh 52     Indirect Purchaser Plaintiffs'      26
5                 Amended and Supplemental Objections
                  and Responses to Samsung
6
       Exh 66     Indirect Purchaser Plaintiffs'      23
7                 Amended and Supplemental Objections
                  and Responses to Samsung
8
       Exh 67     Indirect Purchaser Plaintiffs'      25
9                 Amended and Supplemental Objections
                  and Responses to Toshiba
10
       Exh 78     Indirect Purchaser Plaintiffs'      29
11                Responses to Toshiba

12
                  (Attached to the original
13
                  transcript and copies provided to
14
                  Attorneys Chiu, Malaise, and Feder)
15

16

17     (Original transcript filed with Attorney Chiu)

18

19

20

21

22

23

24

25
```

3

**Brigid Terry**

```
 1              DEPOSITION of BRIGID TERRY, a witness of

 2      lawful age, taken on behalf of Defendant Hitachi

 3      Displays, Ltd., wherein Indirect Purchasers are

 4      Plaintiffs, and Hitachi Displays, Ltd., et al., are

 5      Defendants, pending in the United States District

 6      Court for the Northern District of California,

 7      pursuant to notice, before Taunia Northouse, a

 8      Registered Diplomate Reporter and Notary Public in

 9      and for the State of Wisconsin, at the America's Best

10      Value Inn and Conference Center, 3900 Milton Avenue,

11      in the City of Janesville, County of Rock, and State

12      of Wisconsin, on the 17th day of October 2012,

13      commencing at 4:05 in the afternoon.

14                    A P P E A R A N C E S

15      LAWRENCE PAPOLE, Attorney
        LAW OFFICES OF LAWRENCE PAPOLE
16        1308 Main Street, Suite 117, St. Helena,
          California 94574, appearing on behalf of
17        the witness and Indirect Purchaser Plaintiffs.
                767-963-1704
18
        MICHELLE PARK CHIU, Attorney
19      MORGAN, LEWIS & BOCKIUS, LLP
          One Market, Spear Street Tower, San Francisco,
20        California 94105-1126, appearing on behalf of
          the Hitachi defendants.
21              mchiu@morganlewis.com  415-442-1000

22      CHARLES MALAISE, Attorney  (by telephone)
        BAKER & BOTTS, LLC
23        1299 Pennsylvania Avenue NW, Washington, D.C.
          20004-2400, appearing on behalf of the Philips
24        Defendants.
                charles.malaise@bakerbotts.com  202-639-1117
25
```

4

**Brigid Terry**

```
1                    APPEARANCES CONTINUED

2     KEVIN FEDER, Attorney  (by telephone)
      O'MELVENY & MYERS
3       1625 Eye Street NW, Washington, D.C. 2006,
        appearing on behalf of the Samsung Defendants.
4            kfeder@omm.com  202-383-5164

5     AARON McALLISTER, Attorney  (by telephone)
      WHITE & CASE, LLP
6       701 13th Street NW, Washington, D.C. 2005-3807,
        appearing on behalf of the Toshiba Defendants.
7            amcallister@whitecase.com  202-729-3807

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                          5
```

**Brigid Terry**

```
 1                     BRIGID TERRY,

 2          called as a witness, being first duly sworn,

 3          testified on oath as follows:

 4

 5                     EXAMINATION

 6    By Ms. Chiu:

 7    Q    Good afternoon, Ms. Terry.  How are you?

 8    A    I'm fine.  How are you?

 9    Q    We met off the record, but I just wanted to

10         reintroduce myself on the record.  My name is

11         Michelle Park Chiu.  I am with the firm

12         Morgan Lewis, and I represent the Hitachi

13         defendants, and I'll be taking your deposition

14         today.

15             So could you state your full name for the

16         record, please.

17    A    Brigid Terry.

18    Q    And, Ms. Terry, how old are you?

19    A    53.

20    Q    And have you ever been deposed before?

21    A    Not like this.  The only thing I've ever

22         participated in was the divorce proceedings that I

23         went through, but I don't remember ever --

24    Q    And about how long ago was that?

25    A    It was in 1996.
```

6

Brigid Terry

```
 1   Q   So if you don't mind, we'll go over some ground
 2       rules for this deposition before we get started;
 3       if that's okay with you.
 4   A   Sure.
 5   Q   You understand that you just took an oath?
 6   A   Uh-huh.
 7   Q   And that means that your testimony today is the
 8       same as if you were testifying in a court of law?
 9   A   Yeah.
10   Q   And if you don't understand my questions that I'll
11       be asking you today, please let me know.  If you
12       start answering a question and you don't ask for
13       clarification, I'm going to assume that you
14       understood my question; is that fair?
15   A   That's fair.
16   Q   And if you remember something later during the
17       deposition in an answer to one of my questions
18       that you forgot to mention, please let me know
19       right away.  We can either stop and get that other
20       answer or correction right on the record so we get
21       it before you forget.  Does that make sense?
22   A   Sure.
23   Q   This is the court reporter.  She'll be
24       transcribing everything that everyone says on the
25       record, so it's important to speak clearly like
```

7

**Brigid Terry**

1          you are already doing.

2     A    Okay.

3     Q    But it's also important to avoid nonverbal

4          responses like shaking your head or nodding or

5          saying --

6     A    Okay.

7     Q    -- or saying uh-huh or uh-uh.  It's hard for the

8          court reporter to get that into words.

9              Does that make sense?

10    A    I understand.

11    Q    Another thing is that we should try not to talk

12         over each other.  I know in normal conversation

13         sometimes people interrupt each other, but to make

14         sure the court reporter can get down everything

15         that is said, if you will let me finish my

16         question before you start your answer, that would

17         be helpful.  And I'll also try to not start my

18         next question before you're finished answering.

19    A    I understand.

20    Q    We can take a break whenever you want to.  You

21         just let me know if you'd like to take a break.

22         The only thing that I ask is if we can agree to

23         not take a break while a question is pending so we

24         don't take a break between my question and your

25         answer.

8

**Brigid Terry**

```
1    A    Sure.

2    Q    As you can see, there's water available here.  You

3         can help yourself whenever you need anything.

4         Just let me know again if you need to take a break

5         to use the restroom or anything like that.

6    A    Okay.

7    Q    Ms. Terry, is there any reason why you cannot

8         testify fully and truthfully today?

9    A    No.

10   Q    Throughout the deposition, your counsel,

11        Mr. Papale, may be objecting.  I'm entitled to an

12        answer even though he makes an objection unless he

13        instructs you not to answer for some reason.  And

14        at that point I'll discuss with your counsel on

15        the record.  Does that make sense?

16   A    Yes.

17   Q    So, Ms. Terry, what is your current home address?

18   A    510 Oakland Avenue, Janesville, Wisconsin.

19   Q    And how long have you lived at that address?

20   A    27 years.

21   Q    Is that your primary home?

22   A    It sure is.

23   Q    Do you own any other homes?

24   A    I do not.

25   Q    And in what states do you pay income taxes?
```

9

**Brigid Terry**

 1    A    Wisconsin.

 2    Q    Any other states?

 3    A    No.

 4    Q    And is Wisconsin the only state in which you earn

 5         an income?

 6    A    Correct.

 7    Q    And do you own a vehicle?

 8    A    I do.

 9    Q    And where is that vehicle registered?

10    A    Wisconsin.

11    Q    And do you -- is that just one -- is that a car?

12    A    It's a Honda CRV.

13    Q    And do you own any other vehicles?

14    A    Yes.  I own a Honda Civic.

15    Q    Is that registered in Wisconsin as well?

16    A    Yes.

17    Q    Any other vehicles?

18    A    No.

19    Q    And where are you registered to vote?

20    A    In Wisconsin, Rock County.

21    Q    Okay.  Ms. Terry, did you attend college?

22    A    I did.

23    Q    Where did you go?

24    A    I did my undergrad at the University of Wisconsin

25         in Eau Claire, and then I did a master's at

                                                                    10

**Brigid Terry**

```
 1        National Louis University in Illinois, and then
 2        I've taken 30 plus credits beyond.
 3    Q   Okay.  And did you -- what kind of degree did you
 4        get at the University of Wisconsin?
 5    A   I got a comprehensive education degree in
 6        elementary education and special education,
 7        cognitive disability emphasis.
 8    Q   And what did you get your master's in?
 9    A   Curriculum and instruction.
10    Q   And you said you got some additional credits
11        beyond that.  In what discipline were those
12        credits?
13    A   Reading mostly, yeah.
14    Q   Okay.  And, Ms. Terry, did you prepare for this
15        deposition?
16    A   In what way?  Yes, I prepared.  I looked at my --
17                  (Discussion off the record)
18    A   Yes, I prepared.
19    Q   So what did you do to prepare for this deposition?
20    A   Last week I spoke with Mr. Papale, and I met with
21        him yesterday, and we looked at some verification
22        documents and the pictures that I had taken of the
23        television.
24    Q   Okay.  Anything else?
25    A   Just looking at any paperwork that I had in my
```

11

**Brigid Terry**

```
 1        file about this suit.

 2    Q   Okay.  And how long did you speak with -- oh, I'm

 3        sorry.  You said you spoke with Mr. Papale last

 4        week.  Was that on the phone or in person?

 5    A   On the phone.

 6    Q   About how long was that conversation?

 7    A   I think it was about an hour and a half.

 8    Q   Did you look at any documents during that

 9        conversation, or was it just a telephone

10        conversation?

11    A   Just a telephone conversation.

12    Q   And when you met with Mr. Papale yesterday, how

13        long did you meet?

14    A   Maybe -- almost two hours maybe, yeah, almost two

15        hours.

16    Q   And you mentioned you looked at some verifications

17        and some pictures and other documents.  Were there

18        any documents that you looked at during that time

19        that refreshed your recollection about the facts

20        regarding this case?

21    A   Sure.  I mean, because I don't think about it all

22        the time, so sure, it refreshed my memory about

23        what this case is about.

24    Q   And what were those documents that refreshed your

25        recollection?
```

12

**Brigid Terry**

```
 1    A    A verification document that said that I did read

 2         the complaint and, you know, signed it.

 3    Q    Okay.  So, Ms. Terry, other than the conversation

 4         last week and the meeting yesterday, did you do

 5         anything else to prepare for this deposition

 6         today?

 7    A    No.

 8    Q    And you mentioned that Mr. Papale is your counsel.

 9         Do you have any other counsel?

10    A    Yes.  Seymour Mansfield was the initial counsel.

11         And then I understand that this is -- this

12         involves more than one attorney, more than one law

13         firm.

14    Q    Okay.  And do you know what the term "class

15         counsel" means?

16    A    I'd love to have you explain that to me.  Class

17         counsel.

18    Q    Okay.  So is the answer no?

19    A    Yeah.  It is no.  Class counsel?  No.

20    Q    Do you happen to know who is class counsel in this

21         case?

22    A    Class -- I mean, I can tell you what I'm thinking

23         is that it's the attorney that represents all the

24         people in this action, in this class action.  And

25         that's Alioto in California, San Francisco.  Is
```

13

**Brigid Terry**

```
 1        that right?  Am I -- I mean, is that what
 2        you're -- am I understanding your question
 3        correctly?
 4   Q    Yes, you are understanding my question correctly.
 5              So, Ms. Terry, do you have a retention
 6        agreement with Mr. Alioto in San Francisco?
 7   A    I have a retention agreement with
 8        Seymour Mansfield, and I don't know if that
 9        extends to Alioto or not, but that's who I signed
10        an agreement with.
11   Q    Okay.  And when you spoke with Mr. Papale last
12        week, was that the first time you spoke with him
13        in this matter?
14   A    Yes.  That was the first time we spoke.  We agreed
15        on -- via email I think, to contact, you know, to
16        call at 4 o'clock or whatever it was, but that was
17        the first time we spoke, yes.
18   Q    Okay.  Do you know who Mr. Bob Gralewski is?
19   A    I've heard his name, and I know he's an attorney
20        involved in this case; but no, I don't know him or
21        know, exactly, his role.
22   Q    Is he one of your attorneys in this matter?
23   A    I don't know.
24   Q    Did you take any notes while you were preparing
25        for this deposition?
```

14

**Brigid Terry**

```
1    A    Yes.

2    Q    Did you bring them today?

3    A    I did not.

4    Q    Okay.  And did you speak with any of plaintiffs'

5         experts in preparation for your deposition today?

6    A    No.  I mean, beyond my attorney; right?

7    Q    Right.  But none of plaintiffs' retained experts?

8    A    No.

9    Q    So I would like to hand you a document.

10                   MS. CHIU:  Could you please mark

11           this.

12   A    Then you're going to want me to have my glasses

13        on.

14   Q    Yes.

15                   (Exhibit No. 424 marked for

16                    identification)

17   Q    So, Ms. Terry, the court reporter has just handed

18        you -- or I've handed you a document that has been

19        marked as Exhibit No. 424 in this matter.

20   A    Uh-huh.

21   Q    Do you recognize this document?

22   A    Yes.  This is what invited me to this deposition.

23        Right?

24   Q    So for the record, the document title is Defendant

25        Hitachi Displays, Ltd.'s Notice of Deposition of
```

15

**Brigid Terry**

```
 1        Plaintiff Brigid Terry.  And when did you see this

 2        document previous to today?

 3   A    I don't know.

 4   Q    Have you seen it before today?

 5   A    Yeah.

 6   Q    And how did you receive it?

 7   A    I think I received this via email from my

 8        attorney.

 9   Q    And you understand that you are testifying today

10        pursuant to this deposition notice?

11   A    Yes.

12   Q    Okay.  You can set that aside.

13            Ms. Terry, are you employed?

14   A    I am.

15   Q    And where are you employed?

16   A    At Milton School District.

17   Q    How long have you worked there?

18   A    Right around 20 years.  I've been on and off, you

19        know, home with children and that kind of thing.

20        So I would say about 20 years.

21   Q    And what is your position or title at Milton High

22        School?

23   A    I'm a reading teacher there.

24   Q    Have you ever --

25   A    Did you say high school?
```

16

**Brigid Terry**

```
 1   Q   Was it not high school?  I'm sorry.

 2   A   No, Milton Elementary School.

 3   Q   My mistake.  You said you've been a reading

 4       teacher.  And have you been a reading teacher the

 5       entire time you've been with Milton?

 6   A   No.  I was a special education teacher and an

 7       early childhood teacher.  That's all, I think.

 8   Q   And before you worked at Milton Elementary School,

 9       did you work for any other company or school

10       district?

11   A   Yes.  I worked for St. Mary's School in

12       Janesville, and I worked long-term -- I worked in

13       Evansville for the elementary school there.  And I

14       did some long-term subbing before that.

15   Q   Ms. Terry, have you ever worked for a company that

16       manufactures CRTs or CRT products?

17   A   No.

18   Q   So before we get started about the case, I'd like

19       to -- can you -- excuse me.  Let me restart that.

20       Could you tell me what your understanding of a

21       cathode ray tube is?

22   A   Well, I've seen one now since I've taken the back

23       off of my television, and it's the tube in the

24       back of the television that makes it work.

25   Q   And during today's deposition, when I say CRT, I
```

17

**Brigid Terry**

1          mean cathode ray tube; is that fair?

2     A    That's fair.

3     Q    So could you describe in your own words the claims

4          or claim that you are asserting in this case

5          today.

6     A    Sure.  Manufacturers of this CRT conspired, met,

7          got together to set prices for those tubes, and

8          then that -- that in turn came to me as a consumer

9          when I purchased my television, and I ended up

10         paying more for my television than I would have if

11         those prices hadn't been fixed on that tube.

12         There would have been a free market for me to, you

13         know, shop for different -- different prices for a

14         television.  And instead I paid more than I needed

15         to pay for my television.

16    Q    Okay.  Now, do you know anything about a cathode

17         ray tube besides its name; for example, how it

18         works, the engineering behind the cathode ray

19         tube?

20    A    Definitely not.

21    Q    Now, mentioned that CRTs are used in televisions.

22         Do you know what other types of products that they

23         are used in?

24    A    I understand they're used in computer screens,

25         too.

18

**Brigid Terry**

1    Q    Anything else?

2    A    Not that I'm aware of.

3    Q    So during today's deposition, when I say CRT

4         products or CRT finished products, I'm going to

5         mean products containing a cathode ray tube; is

6         that fair?

7    A    Yes.

8    Q    Do you know some of the companies that manufacture

9         cathode ray tubes, the names of some of the

10        companies?

11   A    My television is Toshiba, so that would be a

12        manufacturer, Philips, Panasonic, Samsung.

13   Q    Okay.  And you mentioned that your television is a

14        Toshiba television.

15   A    Uh-huh.

16   Q    Were those companies that you just named your

17        understanding that they are manufacturers of the

18        cathode ray tubes or of the finished product

19        television?

20   A    I don't know for sure.  I'm thinking both.

21   Q    Okay.  Ms. Terry --

22                   MR. McALLISTER:  Vague and

23            ambiguous to which Toshiba entity.

24                   MR. PAPALE:  Okay, thanks.  Got it.

25   Q    Ms. Terry, how did you become a named plaintiff in

19

**Brigid Terry**

1    today's case?

2    A    My son worked for a law firm in Minneapolis in

3        their office, not as an attorney, but he was just

4        out of school.  And the person that he worked

5        for -- this is my understanding -- made

6        Seymour Mansfield aware of me as a person -- a

7        resident in Wisconsin that had a television that

8        was purchased between 1995 and 2007 that had a

9        cathode ray tube.  And so he contacted me, and I

10        called him back and agreed that I wanted to pursue

11        this.

12    Q    Okay.  So do you know the name of the person that

13        your son worked for?

14    A    Yes.

15    Q    What's his name?

16    A    Larry Schaefer.

17    Q    And is Mr. Schaefer an attorney at the same firm

18        as Seymour Mansfield?

19    A    No.  He is an attorney, but my understanding is

20        that they shared some common space somehow, office

21        space, or they were in close proximity on the same

22        floor or something like that, so that they knew

23        each other.

24    Q    Okay.  Now, how often do you speak with your

25        attorneys, either Mr. Mansfield, Mr. Papale,

                                                              20

**Brigid Terry**

```
 1        Mr. Gralewski, or any other plaintiffs' attorney?

 2        How often do you speak with them about this case?

 3    A   Depends on what's going on with the case.

 4        Molly -- Molly Scott is the person that would

 5        contact me from Mr. Mansfield's office.  And when

 6        things were happening, she would email and send me

 7        copies of the documentation like this.  And then

 8        so maybe a couple times, you know, more

 9        frequently, and then months would go by and I

10        wouldn't speak with them.

11    Q   Do you remember when, approximately month and

12        year, that Mr. Schaefer contacted you about this

13        case?

14    A   Well, it wasn't Mr. Schaefer that contacted me.

15        It was Mr. Mansfield.

16    Q   I'm sorry.  When Mr. Mansfield contacted you.

17    A   You know, I'm thinking it was in March of '98.  I

18        think that's right.

19    Q   You said 1998.

20    A   1998.  I think that's right.

21                    MR. PAPALE:  2008?

22                    THE WITNESS:  Did I say 1998?

23             2008.

24                    MR. PAPALE:  I did the same thing

25             today.
```

21

**Brigid Terry**

```
 1    A    I'm sorry, I'm sorry.

 2    Q    2008?

 3    A    Yeah.

 4    Q    And after you spoke with Mr. Mansfield, about how

 5         long after that did you decide to file suit in

 6         this case?

 7    A    I don't know.  I couldn't tell you.

 8    Q    Do you remember about when you decided to file a

 9         complaint in this matter?

10    A    It would have been months, I think.  It wasn't

11         years, but I don't know.

12    Q    And why did you decide to bring this lawsuit?

13    A    Because I never would have known about this as a

14         consumer.  And, frankly, I was incensed to think

15         that corporations would sit down at a table and

16         price fix something that a consumer would end up

17         paying for and have no knowledge of that unless

18         they were in a situation where, you know, they had

19         access to people who were aware of it.  And since

20         I did have access to people that were aware of it,

21         and I came to understand this, I most definitely

22         wanted to participate in this.

23    Q    Okay.  Do you read the papers that are filed in

24         this case?

25    A    The papers that are sent to me, the documents that
```

22

**Brigid Terry**

1    are sent to me?

2  Q   Well, there are papers that are filed on the

3        docket in this litigation.  Do you read all of

4        those that are filed, or only the ones that are

5        sent to you by your attorney?

6  A   Only the ones that are sent to me by my attorney.

7  Q   And are those sent to you by email you said?

8  A   Yes.  And do I read them with a fine tooth comb?

9        No.  But yes, I look them over.

10  Q   So, Ms. Terry, have you served as a plaintiff in a

11        class action case before today?

12  A   No.

13  Q   Have you ever been involved as a party, a

14        plaintiff or a defendant, in any other litigation

15        besides your divorce?

16  A   No.

17  Q   Were you involved in looking for documents to

18        produce in this case?

19  A   Yes.

20  Q   So I'm handing you a document that was previously

21        marked in this case as Exhibit No. 66, which is

22        Indirect Purchaser Plaintiffs' Amended and

23        Supplemental Objections and Responses to Samsung

24        SDI Co., Ltd.'s First Set of Requests for

25        Production of Documents.

                                                        23

**Brigid Terry**

1    A    Uh-huh.

2    Q    Have you seen this document before?

3    A    Yes, yes.

4    Q    And these are document requests that were issued

5         to indirect purchaser plaintiffs by a defendant in

6         this matter, Samsung SDI.  Do you recall searching

7         for documents responsive to the requests in this

8         document?

9    A    I looked for proof of purchase.  I looked for my

10        owner's manual.  I looked through my check, you

11        know, my check stubs.  And I talked to my bank to

12        see if I could find a receipt in terms of my

13        credit card, because I don't know exactly how I

14        paid for this and I -- so yes, I did search to

15        that extent.

16   Q    Okay.  And, Ms. Terry, do you recall receiving

17        this document and reading every request for

18        production looking for documents, or did your

19        attorneys ask you for specific documents to

20        collect?

21   A    My attorneys asked for specific, yeah.

22   Q    Okay.  And did you withhold any documents that you

23        found during your search on the basis of privilege

24        or relevance?

25   A    No.

                                                          24

**Brigid Terry**

1   Q   So you produced everything that you found?

2   A   Yeah.

3   Q   Okay.  You can set that aside.  I'd like to hand

4       you another document.  This exhibit was previously

5       marked as Exhibit No. 67.  This is Indirect

6       Purchaser Plaintiffs' Objections and Responses to

7       Toshiba America Information Systems, Inc.'s First

8       Set of Requests For Production of Documents to

9       Indirect Purchaser Plaintiffs.

10           Have you seen this document before?

11  A   Yes.

12  Q   And do you recall searching for documents

13      responsive to the requests in this document?

14  A   Inasmuch as I did for the other document, you

15      know, as I stated.

16  Q   And just for my understanding, your attorneys

17      asked you for certain documents that were

18      responsive to these requests; is that correct?

19  A   That's correct.

20  Q   And did you withhold any documents on the basis of

21      privilege or relevance with respect to these

22      document requests?

23  A   I did not.

24  Q   Okay.  You can set that aside.

25           Ms. Terry, I'm handing you a document that's

                                                              25

**Brigid Terry**

1       been previously marked in this case as

2       Exhibit No. 52.  I'm sorry that exhibit sticker is

3       pretty hard to read, but this document is titled

4       Indirect Purchaser Plaintiffs' Amended and

5       Supplemental Objections and Responses to Defendant

6       Samsung SDI Co., Ltd.'s First Set of

7       Interrogatories.  Do you recognize this document?

8  A   Uh-huh.

9  Q   Have you seen it before today?

10  A   Yes.

11  Q   And were you involved in preparing answers to

12      these interrogatories?

13  A   Yes.

14  Q   And you verified your responses to this document;

15      is that correct?

16  A   That's correct.

17  Q   So you can set this document aside.

18           (Exhibit No. 425 marked for

19            identification)

20  Q   Ms. Terry, the court reporter has just handed you

21      a document that's been marked as Exhibit No. 425

22      in this matter.

23  A   Uh-huh.

24  Q   And these are four pages of documents, Samsung

25      Exhibit A25, B25, D25, and E25.  And at the top of

26

**Brigid Terry**

```
 1          the page it says it was produced on September 7th,

 2          2011.  Do you see that?

 3     A    I do.

 4     Q    Have you seen these documents before?

 5     A    No.

 6     Q    Did you -- so today is the first day that you're

 7          seeing these pages?

 8     A    I believe so.

 9     Q    When you said -- you mentioned previously that you

10          verified the responses to the interrogatories, is

11          that correct, the Samsung interrogatories?

12     A    That's correct.

13     Q    And you signed a verification; is that correct?

14     A    That's correct.

15                    MS. CHIU:  We can mark that as the

16             next document in line, please.

17                    (Exhibit No. 426 marked for

18                      identification)

19     Q    Ms. Terry, I've handed you a document that has

20          just been marked as Exhibit No. 426.  That is

21          titled Plaintiff Verification.  Do you recognize

22          this document?

23     A    I do.

24     Q    And do you recall signing this verification on

25          September 17th, 2011?
```

27

**Brigid Terry**

1    A    I do.

2    Q    And the verification reads, "I am a plaintiff in

3         the above-entitled action and verify that I have

4         read the Indirect Purchaser Plaintiffs' Amended

5         and Supplemental Objections and Responses to

6         Defendant Samsung SDI Co., Ltd.'s First Set of

7         Interrogatories and have also read the exhibits to

8         that document applicable to me."

9              Did I read that correctly?

10   A    Yes.

11   Q    It says, "I further verify that the information

12        provided applicable to me is true and correct to

13        the best of my knowledge, information, and

14        belief"; is that correct?

15   A    It is correct.

16   Q    And after that it says, "I further declare under

17        penalty of perjury that the foregoing is true and

18        correct."  Did I read that correctly?

19   A    Yes.

20   Q    And that's your signature that appears next to the

21        word "signature"?

22   A    It is.

23   Q    So then just turning back to Exhibit No. 425,

24        these are Samsung Exhibits A25 through D25, and it

25        says for Plaintiff Brigid Terry; is that correct?

28

**Brigid Terry**

```
 1   A   Yes.

 2   Q   Now, are these the exhibits that are referenced in

 3       the verification where it says, "and have also

 4       read the exhibits to that document applicable to

 5       me"?

 6   A   Can you ask that question again?  Are these what?

 7   Q   The exhibits that have been marked as

 8       Exhibit No. 425, those four pages?

 9   A   Yes.

10   Q   Are these exhibits the exhibits that are

11       referenced in the verification on 426?

12   A   I don't recall.  Because I did -- I saw -- when I

13       read the interrogatories, there were other

14       documents that were given to me.  I don't

15       recognize these.  That doesn't mean that I -- that

16       these aren't the ones that were put in front of

17       me.

18   Q   All right.  So you can put those aside.  We may be

19       looking at them later.

20   A   Okay.

21   Q   But I will let you know by exhibit number if I

22       want to refer to those documents.

23   A   Okay.

24   Q   I'm going to hand you an exhibit that was

25       previously marked as No. 78 in this case.  And
```

29

**Brigid Terry**

1          this is titled Indirect Purchaser Plaintiffs'

2          Responses to Defendant Toshiba America Information

3          Systems, Inc.'s First Set of Interrogatories.

4                  Have you seen this document before today?

5     A    Yes.

6     Q    Do you recognize it?

7     A    I do.

8     Q    And these are interrogatories that were issued by

9          a defendant in this matter, Toshiba America

10         Information Systems.  Did you prepare the

11         responses to these interrogatories?

12    A    I did.  I contributed to -- yeah.

13    Q    Okay.  And do you recall verifying responses to

14         these interrogatories?

15    A    Yes.

16    Q    Okay.  So you can set No. 78 aside.

17                     MS. CHIU:  We can mark these as the

18             next exhibit in line, please.

19                        (Exhibit No. 427 marked for

20                         identification)

21    Q    Ms. Terry, I've handed you an exhibit that's

22         marked as 427.  Do you recognize these documents?

23    A    Not particularly, no.

24    Q    So you don't recall seeing them before today?

25    A    I don't recall.

                                                              30

Brigid Terry

```
 1                  (Exhibit No. 428 marked for

 2                   identification)

 3   Q    Ms. Terry, I've just handed you a document that's

 4        been marked as Exhibit No. 428 in this matter.

 5        And it is a verification pursuant to Federal Rules

 6        of Civil Procedure Rule 33(b)(3).  And it says --

 7        I'm sorry.  Have you seen this document before?

 8   A    Yes.

 9   Q    And is that your signature at the bottom on the

10        line?

11   A    It is.

12   Q    And do you recall signing this document on or

13        around July 14th, 2010?

14   A    Yes.

15   Q    Okay.  And I'll just read the verification.  It

16        says, "Brigid Terry, being duly sworn upon oath

17        deposes and says:  I am an indirect purchaser

18        plaintiff in the above-entitled action and have

19        read the first set of interrogatories served upon

20        me by Defendant Toshiba America Information

21        Systems, Inc.

22             I declare under penalty of perjury under the

23        Laws of the State of Wisconsin that the above

24        responses to those interrogatories are true and

25        correct according to the best of my knowledge,
```

31

**Brigid Terry**

```
 1        information, and belief."

 2             Did I read that correctly?

 3    A   Yes.

 4    Q   And in the responses to Toshiba's interrogatories

 5        is an Exhibit 78, is that correct, that we just

 6        looked at previously?

 7    A   Yes.

 8    Q   Okay.  And the exhibit that we just marked as

 9        427 --

10    A   Yes.

11    Q   -- those are also part of the responses to the

12        Toshiba set of interrogatories; is that correct?

13    A   Yes.

14    Q   So this verification that we've marked as

15        Exhibit No. 428 includes the information in the

16        Toshiba exhibits as well as Exhibit 78?

17    A   Yes, I think so.

18    Q   All right.  So you can set those aside.  We may be

19        looking at those exhibits later during the

20        deposition, but you can put them aside for right

21        now.

22             So, Ms. Terry, did you personally purchase an

23        electronic product containing a cathode ray tube?

24    A   I did.

25    Q   And what product was that?
```

32

**Brigid Terry**

1   A   A television.

2   Q   Is that the only product that you purchased

3       containing a cathode ray tube for which you are

4       claiming damages in this case?

5   A   Yes.

6   Q   Did you purchase any other products with CRTs in

7       them?

8   A   I may have.

9   Q   But you don't recall either way?

10  A   No.

11  Q   Have you ever -- did you resell the television

12      that you purchased?

13  A   No.

14  Q   Do you still own it?

15  A   I do.

16  Q   And you purchased a Toshiba television; is that

17      correct?

18  A   Correct.

19  Q   What size is that television?

20  A   It's a 30-inch screen with a 36-inch tube.  I

21      didn't understand that.  That's what I read.

22  Q   And where did you read that?

23  A   On the back of the television.

24  Q   And when you say it's a 30-inch screen, do you

25      mean horizontal, diagonal?

33

**Brigid Terry**

```
1    A    Horizontal.

2    Q    Horizontal, okay.  And did you measure that

3         yourself, or is that the information you read?

4    A    I measured that myself.

5    Q    30-inch horizontal?

6    A    Yes.  But I read the 36-inch tube.

7    Q    And where did you read that?

8    A    On the back of the television.

9    Q    And when you say "the back of the television," do

10        you mean the back of the case or somewhere else?

11   A    It was either on the back of the case.  There were

12        two stickers on the inside of the case, and then

13        there were stickers on the back of the television

14        itself.

15   Q    So you can't recall which, but it was either a

16        sticker on the back of the case when it was

17        assembled or the back -- on the inside of the back

18        of the television when you opened it?

19   A    Correct.

20   Q    Okay.

21                  (Exhibit No. 429 marked for

22                   identification)

23   Q    I'm handing you what has been just marked as

24        Exhibit No. 429 in this matter, which are pictures

25        that were produced in this litigation by
```

34

**Brigid Terry**

```
 1        plaintiffs, indirect purchaser plaintiffs, and

 2        they're Bates labeled CRT 000017 through 18, as

 3        well as CRT 000073 to 74, and CRT 000563 to 564.

 4   A    Uh-huh.

 5   Q    And, Ms. Terry, do you recognize these

 6        photographs?

 7   A    Yes.

 8   Q    Have you seen them before?

 9   A    Yes.

10   Q    Did you take these photographs?

11   A    I did.

12   Q    And what are these photographs of?

13   A    Well, they're the back of my television, but

14        they're not very clear.

15   Q    And did you take these pictures for this

16        litigation?

17   A    I did.

18   Q    Do you remember approximately when you took these

19        pictures?

20   A    At the end of September.  September -- of this

21        year.

22   Q    Of this year?

23   A    Yeah.

24   Q    You can set those aside for right now.  So,

25        Ms. Terry, where did you purchase this television?
```

35

**Brigid Terry**

1    A    At a place -- an appliance store called

2         The Village in Janesville.  It no longer is in

3         business.

4    Q    And when did you purchase the television?

5    A    I'm not positive, but I'm thinking 1997-98.  1998,

6         yeah.

7    Q    Do you have any documentation regarding that

8         purchase?

9    A    I do not.

10   Q    Do you remember how you purchased this television?

11   A    I don't.

12   Q    Do you remember if you paid cash?

13   A    I don't remember.

14   Q    Did you use a credit card?

15   A    I don't remember.

16   Q    Or did you write a check?

17   A    I most certainly did one of those three things,

18        and I don't remember what I did.

19   Q    Okay.

20   A    I doubt I paid cash.

21   Q    Do you remember about how much you paid for this

22        television?

23   A    Yes.  I believe it was between $600 and a thousand

24        dollars.  About $800 sticks out in my head.

25   Q    But you can't recall for sure?

36

**Brigid Terry**

1    A    I cannot.

2    Q    Did you look through your credit card statements

3         from the 1997 to '98 period to see if you had any

4         purchases at The Village?

5    A    I tried to do that.  I didn't have -- I don't have

6         those records personally anymore.  And when I went

7         to my bank, they said they didn't have those

8         available for me.

9    Q    And you checked all of your credit cards in your

10        checking account; is that right?

11   A    I did.

12   Q    And you mentioned you think it was 1997 or 1998.

13        Is it possible that you purchased the television

14        before 1997?

15   A    No.

16   Q    Why is it not possible?

17   A    I was divorced in 1996, and I know that I

18        purchased this television after I was divorced.  I

19        don't think it was that soon after.  That's my

20        memory.

21   Q    Okay.  And did you retain any manuals or documents

22        that came inside the box?

23   A    I did keep the owner's manual.  I believe that

24        Seymour Mansfield's office has that.

25   Q    And do you know whether that was produced to

37

**Brigid Terry**

1       defendants?

2    A    I'm sorry?

3    Q    Do you know if a copy of that manual was produced

4         in this case?

5    A    I don't know.

6              MS. CHIU:  So, Counsel, we would

7         request that if Ms. Terry has produced a

8         document of that -- or a copy of that manual

9         to her attorney, Mr. Mansfield, that a copy

10        be produced to defendants.

11             MR. PAPALE:  We'll certainly take a

12        look for it.  Are you certain that you didn't

13        get it?

14             MS. CHIU:  We did not see anything,

15        but we will take a look again, but we didn't

16        find anything.

17             MR. PAPALE:  Why don't you look

18        again and we'll do likewise.  But definitely,

19        if we've got it, we'll get it to you.

20             MS. CHIU:  Okay.  Thank you.

21   By Ms. Chiu: (Continuing)

22   Q    Ms. Terry, why did you purchase this television?

23        Was it for personal use?

24   A    Yes.

25   Q    And where did you use it in your home?

38

**Brigid Terry**

```
 1   A   In my family room.

 2   Q   And you testified just now that you estimate that

 3       the price of the product was between 600 and a

 4       thousand dollars.  Is it possible it could have

 5       been more than a thousand or maybe less than 600?

 6   A   It wasn't less than 600.  I'd be surprised if it

 7       were less than 600.

 8           I suppose it could have been more than a

 9       thousand, but I don't know for sure.

10   Q   So it's fair to say that you did not keep a

11       receipt for this purchase?

12   A   That is fair to say.

13   Q   Do you know when you disposed of it?

14   A   Nope.

15   Q   Ms. Terry, do you recall if you paid taxes on the

16       purchase of this television?

17   A   I imagine that I did, yes.

18   Q   Do you recall what taxes?  Was it sales tax?

19   A   I imagine, yeah.

20   Q   Do you remember what percent sales tax was applied

21       to the purchase of the television?

22   A   I don't remember.

23   Q   Do you recall if the Toshiba television was on

24       sale when you purchased it?

25   A   I do not recall that it was on sale, and I don't
```

39

**Brigid Terry**

```
 1          recall that it wasn't on sale.

 2    Q     So you just don't remember either way?

 3    A     No.

 4    Q     Do you recall --

 5               MR. McALLISTER:  This is

 6          Aaron McAllister.  I just want to make a

 7          standing objection, vague and ambiguous as to

 8          which Toshiba entity.

 9               MR. PAPALE:  He made an objection

10          for the record.  We don't have to worry about

11          it right now.

12    Q     So, Ms. Terry, the television that is the basis of

13          your claims today, you don't recall if it was on

14          any promotion The Village was offering any sort of

15          promotion?

16    A     I do not recall.

17    Q     Was there my manufacturer's rebate?

18    A     Not that I remember.

19    Q     Was there any rebate offered from The Village?

20    A     Not that I remember.

21    Q     You mentioned that you still own this television.

22          Is it still working?

23    A     It is.

24    Q     And where is it located physically?

25    A     In the same spot it found itself when it came to
```

40

**Brigid Terry**

```
 1       my home.
 2    Q  Okay.  Do you recall whether there were any
 3       warranties that were offered with the purchase of
 4       this television?
 5    A  My recollection is that it was just the
 6       manufacturer's warranty.  I did not purchase
 7       anything beyond that.
 8    Q  And --
 9    A  That's my recollection.
10    Q  Okay, sorry, excuse me.  I didn't mean to talk
11       over you.  And The Village didn't offer any sort
12       of extended warranty?
13    A  Not that I recall.  Or maybe they did and I just
14       didn't accept it.  But I don't recall a specific
15       warranty offered by The Village.
16    Q  Okay.  Ms. Terry, do you know if the television
17       that you purchased contained a CRT?
18    A  It does.
19    Q  And how do you know that?
20    A  Because I took the back off my television and
21       there it is.
22    Q  And was that the first time you'd seen a CRT?
23    A  Yes.
24    Q  And who manufactured the CRT inside the
25       television?
```

41

**Brigid Terry**

```
 1    A    I believe Toshiba.

 2    Q    So I'm going to hand you --

 3              MS. CHIU:  We only have one copy of

 4         this so could you mark this exhibit.

 5              (Exhibit No. 430 marked for

 6              identification)

 7    Q    So, Ms. Terry, I'm handing you a set of documents

 8         that has been marked as Exhibit No. 430.

 9              MS. CHIU:  I apologize.  We only

10         have one copy of this document.

11    Q    Do you recognize these pictures?

12    A    I do.

13    Q    What are these pictures of?

14    A    The stickers and tags on the back of my

15         television.

16    Q    And when you say "the back" of your television, do

17         you mean the back when it's fully assembled?

18    A    No.  I'm sorry.  The inside of the back of my

19         television is what this one is.

20    Q    So let's go through page by page.  These aren't

21         Bates numbered, so the first --

22              MR. PAPALE:  Do you want to number

23         them?  Do you want to just go 1, 2, 3, 4, 5

24         or whatever they are?

25              MS. CHIU:  Why don't we mark each
```

42

**Brigid Terry**

```
 1              page a different exhibit.

 2      Q   So let's start with Exhibit 430.  Could you tell

 3          me what that is a picture of.

 4      A   The code -- what do you call those -- the scanning

 5          code, whatever, that was on the back of the inside

 6          of my television, and then part of another sticker

 7          that was on the back of the inside of my

 8          television.

 9      Q   Do you mind if I just take a look at that?

10              And when you say the inside of your

11          television, you unscrewed the back of your

12          television; is that right?

13      A   I did.

14      Q   And was this sticker on the piece that you

15          unscrewed off, or was it somewhere else on the

16          television?

17      A   I believe it was on the back of the inside of my

18          television, not on the cover, on the back of the

19          television itself.

20      Q   Was it on the cathode ray tube?

21      A   No.

22      Q   So it was on some part of the case of the

23          television?

24      A   Yes.  The back of the television.  Yeah.  I

25          believe.
```

43

1    Q    Okay.

2    A    I have to go home and look.

3    Q    Let's mark this next one.  If we could put the

4         exhibit number like here so it doesn't mark the

5         text.

6                        (Exhibit No. 431 marked for

7                         identification)

8    Q    So, Ms. Terry, we've just marked the second

9         picture as Exhibit No. 431.  Have you seen this

10        photograph before?

11   A    Yes.

12   Q    And what is this a photograph of?

13   A    A sticker on the inside of the back of my

14        television.

15   Q    And did you take this photograph?

16   A    I did.  You know, can I see all of the

17        photographs?  Because I might be able to tell you

18        which ones were on the back of the inside cover

19        more easily.

20             That's the inside of the television itself.

21        This is like right there.  And this is on the base

22        of the tube.  So this could have been --

23                        MR. PAPALE:  When you say "this,"

24             you have to say what number it is.

25   A    No. 431, it's either on the inside of the back

                                                              44

**Brigid Terry**

1      cover of my television or it's on the back of the

2      television.  Do you understand?

3   Q   I think I understand.  It's not on the tube; is

4      that right?

5   A   I don't think it's on the tube, no.

6   Q   And so Exhibit No. 431, could you just read for me

7      what brand is indicated at the top of the label?

8   A   Toshiba.

9   Q   And all it says is "Toshiba"; is that correct?

10  A   Yes.

11  Q   And then there's a serial number or some sort of

12     model number next to it that says A90AHH50X02; is

13     that correct?

14  A   Yes.

15  Q   And so it's your recollection that this photograph

16     is of a sticker that is not on the cathode ray

17     tube but somewhere on the television set?

18  A   It is.  But this appeared twice on two different

19     stickers on the television, and I recall that on

20     one of the stickers it referred to the tube.

21     Somehow I thought that this was in reference to

22     the tube.

23  Q   And when you say "this"?

24  A   This No. A90AHH50X02 and a V in parentheses.

25     "Cathode ray tube employs integral implosion" --

45

**Brigid Terry**

```
 1        something or other -- "replace with a cathode ray

 2        tube of the same type for continued safety."

 3             So I believe that this number refers to the

 4        tube.  I don't think it was on the tube, but it

 5        refers to the tube.

 6   Q    Okay.  All right.

 7                      MS. CHIU:  So let's go ahead and

 8             mark the next photograph as Exhibit 432.

 9                      (Exhibit No. 432 marked for

10                      identification)

11   Q    So, Ms. Terry, we've just handed you an exhibit

12        that's been marked as Exhibit 432.  It's another

13        photograph.  Have you seen this photograph before

14        today?

15   A    I have.

16   Q    And did you take this picture?

17   A    I did.

18   Q    Can you tell us what this picture is of?

19   A    My understanding is this is the tube.

20   Q    Okay.  And how do you know that?

21   A    It was described to me that when I opened the back

22        of my television, that this is what a cathode ray

23        tube would look like.

24   Q    And who told you that?

25   A    My attorney.  Or Molly Scott, the legal assistant,
```

46

**Brigid Terry**

1        I think is the one who described that to me.

2   Q    And that's in Mr. Mansfield's office; is that

3        correct?

4   A    Correct.

5   Q    And from the picture there's nothing indicating

6        that this is -- it doesn't say "Toshiba" or

7        anything else on this picture?

8   A    Not on this picture, no.

9   Q    But you're telling us that you took the back off

10       the television that says Toshiba on the front and

11       that's what you saw inside?

12  A    Uh-huh, yes.  I'm so sorry, yes.

13  Q    You can set that one down.

14                  MS. CHIU:  So let's mark the next

15           photograph as Exhibit 433.

16                  (Exhibit No. 433 marked for

17                  identification)

18  Q    So, Ms. Terry, I've just handed you a photograph

19       that's been marked Exhibit 433.  Do you recognize

20       this document?

21  A    I do.

22  Q    Did you take this photograph?

23  A    I did.

24  Q    And what is it a photograph of?

25  A    This is a photograph of the sticker that is on the

47

Brigid Terry

1      inside of the back of the television on the

2      bottom.

3   Q  And when you say the back of your television,

4      perhaps you can help me understand better, is it

5      the case, the back of the case that you took off,

6      or is it somewhere else?

7   A  No, it's not on the cover, the case.  It's on the

8      actual television on the back of the inside of the

9      television.  So it actually was down there.

10  Q  So on the base section of the television?

11  A  Yes.

12  Q  And if you could just -- I'm sorry.

13  A  No.

14  Q  And the sticker on the picture in Exhibit 433 says

15     Model No. CX36G60; is that correct?

16  A  Correct.

17  Q  And it says Chassis No. TAC 9720; is that right?

18  A  Yes.

19  Q  Do you know if that's the model number for the

20     television or of the tube?

21  A  I don't know.

22  Q  And then it says underneath, "Manufactured:

23     March 1998"; is that correct?

24  A  Yes.

25  Q  And then the sticker reads, "Place of Manufacture

48

**Brigid Terry**

```
 1        Toshiba America Consumer Products, Incorporated,

 2        in Lebanon, Tennessee, zip code 37087."  Is that

 3        correct?

 4   A    Yes.

 5   Q    And then there's a serial number at the bottom of

 6        the sticker that says 92567585; is that right?

 7   A    Yes.

 8   Q    Okay.  You can set that aside.

 9                  MS. CHIU:  Let's mark this as the

10            next exhibit.

11                      (Exhibit No. 434 marked for

12                       identification)

13   Q    So I'm handing you what's been marked as

14        Exhibit No. 434, which is another photograph.  Do

15        you recognize this photograph?

16   A    I do.

17   Q    And did you take this photograph?

18   A    I did.

19   Q    And just for the record, all these photographs

20        that we've introduced today, you took those

21        pictures for the purposes of this litigation; is

22        that correct?

23   A    Yes.

24   Q    Okay.  Can you tell us what this is a picture of?

25   A    This is the back of the inside of my television.
```

49

**Brigid Terry**

1   Q   So after you removed the cover of the television

2       set; is that right?

3   A   That's right.

4   Q   And let's see.  Could you point out for me where

5       the tube is.

6   A   This is the tube (indicating).

7                   MS. CHIU:  And I'll just represent

8           for the record that the witness is pointing

9           to the center of the photograph.

10  Q   Okay.  You can set that aside.

11                  (Exhibit No. 435 marked for

12                   identification)

13  Q   Ms. Terry, I'm handing you what's been marked as

14      Exhibit 435, which is another photograph.  Do you

15      recognize this photograph?

16  A   I do.

17  Q   And did you take this photograph?

18  A   I did.

19  Q   Can you tell us what it is a picture of?

20  A   The sticker that was on the base of the tube close

21      to the back of the television.

22  Q   Okay.  And if you could just -- I'm going to read

23      for you the sticker.  It says YS-59790.  Did I

24      read that correctly?

25  A   Yes.

                                                        50

**Brigid Terry**

1   Q   And do you have any idea what that number refers

2       to with respect to the tube or the television?

3   A   No.

4   Q   You can just set that aside.

5           Okay.  So, Ms. Terry, do you know who

6       manufactured the television that you purchased

7       from The Village?

8   A   Toshiba.

9   Q   Okay.  And do -- how do you know that?

10  A   It says it on my television and on my owner's

11      manual.

12  Q   So the owner's manual is a Toshiba branded owner's

13      manual?

14          So what was your answer to that question?

15      The owner's manual is a Toshiba branded owner's

16      manual?

17  A   Yes.

18  Q   And when you say that it says Toshiba on your

19      television, where are you referring to on the

20      television that it says Toshiba?

21  A   It says it on the stickers on the back of the

22      inside of my television, and I believe that it

23      says it on the front of the television as well.

24      Because I knew I bought a Toshiba television

25      before I unscrewed the back of it and took it off

51

**Brigid Terry**

1        and saw the sign that said Toshiba.

2    Q   And just for the record, if you look at the first

3        page of Exhibit 429, which is CRT 000017, is that

4        what you're referring to where it says Toshiba?

5    A   There it is, yes.

6    Q   And do you know how much the manufacturer of the

7        television, Toshiba, paid for the CRT tube that's

8        inside it?

9    A   No.

10   Q   Do you know where the manufacturer purchased the

11       CRT tube that's inside it?

12   A   No.

13   Q   When you purchased this television, were there any

14       features that were particularly important to you?

15   A   The size.  I needed to fill a space.

16   Q   And what about the picture quality?

17   A   That was -- I mean, I assumed that a television

18       would have the quality that would be satisfactory

19       to me.  I'm not television savvy in terms of I

20       want this picture in a picture or this or that.  I

21       just wanted a television.

22   Q   Did you look at a floor model of this television

23       before you purchased it?

24   A   Yes.

25   Q   And was that at The Village?

                                                          52

**Brigid Terry**

1   A   Yes.

2   Q   And you were satisfied with what the picture

3       looked like before you purchased it?

4   A   Yes.

5   Q   And was the television you purchased a new one or

6       was it a model, floor model?

7   A   I believe it was a new television.

8   Q   Okay.  So the only feature that was really

9       important to you was the size of the screen, is

10      that correct, or I'm sorry, maybe -- was it the

11      size of the screen or the size of the entire

12      television set?

13  A   The size of the screen and the television set and

14      that it was a color television.

15  Q   Okay.  Were there other brands of televisions that

16      were for sale that were of the same size as the

17      one that you eventually purchased?

18  A   I believe there were.

19  Q   And what factors led you to select this Toshiba

20      television as opposed to another one?

21  A   I do not recall.

22  Q   Was it important to you that it was the Toshiba

23      brand television?

24  A   No.

25  Q   Was it important to you that the television had a

53

**Brigid Terry**

1        CRT inside of it?

2    A   No.

3    Q   Did you consider at the time purchasing a

4        television that used another type of technology,

5        for example, TFT-LTC?

6    A   No.

7    Q   And why not?

8    A   Because I couldn't afford to buy a TV like that.

9    Q   And why did you purchase this television set from

10       The Village?

11   A   Why did I purchase the television set or why did I

12       purchase it from The Village?

13   Q   Why did you purchase it from The Village?

14   A   Because it was a local business and they had

15       televisions and I needed a television, and so I

16       went there.

17   Q   Did you shop around at any other stores?

18   A   I did not.

19   Q   Did you look around online at all?

20   A   Absolutely not.

21   Q   Do you recall what other brands of CRT televisions

22       were available at The Village when you purchased

23       this set?

24   A   Not specifically, no.

25   Q   Did you speak with a salesperson when you made the

54

**Brigid Terry**

1       purchase?

2   A   Yes.

3   Q   About how long did you speak with that

4       salesperson, if you recall?

5   A   I don't recall.  But I can tell you that I went to

6       buy a television, and I left having purchased a

7       television.  So it wasn't like I had gone in, I

8       went home and thought about it, no.

9   Q   So the day that you walked into The Village and

10      spoke with a salesperson was the day that you

11      walked out with a television?

12  A   That is true.

13  Q   Did you discuss the television quality with the

14      salesperson?

15  A   I imagine I did, yes.

16  Q   But you don't recall for sure?

17  A   Nothing specific, no.

18  Q   Did you negotiate a price that you paid, or was it

19      the actual price that was listed on the set?

20  A   I believe that I paid the price that was listed on

21      the tag on the set.

22  Q   Did The Village deliver the television to you?

23  A   Yes.

24  Q   Did they do that for free, or did you pay for

25      that?

                                                      55

**Brigid Terry**

1    A    I don't recall.

2    Q    Did they set it up for you?

3    A    What do you mean by "set it up"?

4    Q    Did they plug it into your cable and set it up on

5         your furniture or anything like that?

6    A    I don't believe so.

7    Q    Do you think that the Toshiba television that you

8         purchased, was it for sale at other stores?

9    A    I don't know.  I imagine.

10   Q    But you didn't check around?

11   A    No.

12   Q    Did you look at any advertisements from

13        The Village before you went in to buy the

14        television?

15   A    No.

16   Q    And you didn't consult anything like consumer

17        reports or anything like that before you bought

18        the television?

19   A    I did not.

20   Q    Do you know where The Village purchased the

21        television that you eventually bought?

22   A    I do not.

23   Q    Do you know how much The Village paid for the

24        television you bought?

25   A    No.

56

**Brigid Terry**

```
1    Q    Do you know when The Village purchased the
2         television?
3    A    No.
4    Q    Did The Village offer a low price guarantee?
5    A    Not that I recall.
6    Q    Do you recall if the price went down or was
7         reduced after you bought the television?
8    A    I have no idea.
9    Q    So previously you estimated that the cost of the
10        TV that you bought was about $600 to a thousand
11        dollars?
12   A    Yes.
13   Q    Do you know how much of that cost can be
14        attributed to the cost of the CRT that's inside
15        the television?
16   A    I do not.
17   Q    Did the television come with any accessories?
18   A    A remote control.
19   Q    Was it part of a bundle?  Was there a VCR player,
20        a DVD player that came with it?
21   A    Not that I recall, no.
22   Q    Were there any feature discounts or incentives
23        that were offered either by the manufacturer of
24        the television or by The Village?
25   A    Not that I recall.
```

57

**Brigid Terry**

```
 1   Q   Have you been happy with the product, with the

 2       television?

 3   A   Sure.

 4   Q   Any complaints about its quality or its

 5       performance over the past 20 years almost?

 6   A   It's getting old.  It's not as clear.  The picture

 7       isn't as clear as it once was.

 8   Q   But in, let's say, the first ten years of your

 9       owning that television, it performed as you

10       expected it to?

11   A   Yes.

12               MS. CHIU:  So we've gone for about

13           an hour right now.  Maybe we can take a short

14           break if that would be okay.

15               MR. PAPALE:  Sure.

16               MS. CHIU:  Let's just go off the

17           record for five, ten minutes.

18               (Recess)

19   By Ms. Chiu:  (Continuing)

20   Q   So, Ms. Terry, before we start again, I just want

21       to remind you that you are under oath.

22   A   Yes.

23   Q   So, Ms. Terry, is it fair to say that retailers of

24       televisions competed for business -- competed with

25       each other for business of customers; is that
```

58

**Brigid Terry**

1     fair?

2                    MR. PAPALE:  Let me just say as an

3            objection that competition or the use of the

4            word "competition" is a term of art, legal,

5            and probably calls for a legal conclusion.

6            But beyond that, you can go ahead and answer.

7            The question.

8     A   And ask the question again.

9     Q   Sure.  Do stores that sell televisions --

10    A   Yes.

11    Q   -- do they compete for business with each other?

12    A   That's my understanding.

13    Q   Do you know if stores offered incentives or other

14        promotions to customers to get them to buy

15        products from their stores?

16    A   Yes, that happens.

17    Q   And could you give us some examples of some

18        promotions or sales that you might be aware of?

19    A   Fliers that you see in the newspaper or ads on

20        television that offer, you know, special prices or

21        conditions for buying something.

22    Q   And is it your understanding that stores offer

23        that during the time period 1995 to 2007?

24    A   I'm sure they did.

25    Q   Have you ever acquired a television or computer

                                                         59

**Brigid Terry**

```
 1        that does not contain a CRT during the time period

 2        1995 to 2007?

 3   A    No.

 4   Q    So you don't have a flat screen computer screen or

 5        anything like that?

 6   A    No.

 7   Q    Now, you mentioned earlier -- you testified

 8        earlier, Mrs. Terry, that you didn't really shop

 9        around other than walking to The Village to

10        purchase a television; is that right?

11   A    That's right.

12   Q    When you purchased the television from

13        The Village, did you think you got a competitive

14        price?

15                  MR. PAPALE:  Again, same objection

16            as to the use of the word "competitive."

17              But go ahead.

18   A    I don't know if it was competitive.  I didn't

19        compare it to anything else.  I just knew that it

20        was in the range of my ability to pay.

21   Q    Did you think it was a fair price?

22   A    Yes.

23   Q    Do you think that you paid a fair price today?

24   A    I don't know if I paid a fair price today given

25        the fact that there's a question about the cathode
```

60

**Brigid Terry**

```
 1        ray tube's cost as part of the cost of that

 2        television.  No, I don't know.

 3   Q    So the reason that you don't know is because of

 4        the issues that are in dispute in this litigation;

 5        is that right?

 6   A    That's correct.

 7   Q    Do you think you might have gotten a better deal

 8        on your television if you bought it somewhere

 9        besides The Village?

10   A    No, not necessarily.  I don't know.

11   Q    You don't know, okay.

12   A    I don't know.

13   Q    Do you believe today that you paid more than you

14        should have for your television?

15   A    Yes.

16   Q    Do you know how much?

17   A    No.

18   Q    So you don't know what the product should have

19        cost you?

20   A    I don't.

21   Q    Now, is it your understanding that the cathode ray

22        tube inside your television, you allege that it

23        was price fixed; is that right?

24   A    That's right.

25   Q    Do you know if the entire difference in price was
```

61

**Brigid Terry**

```
 1        passed on to you, the purchaser of the television?
 2    A   Yes.  I assume.  I understand that it was, that
 3        the price I paid for the television reflected
 4        100 percent of the cost of that tube.
 5    Q   So -- but my question wasn't about the cost of the
 6        tube.
 7    A   Oh, the cost of the television, I'm sorry.
 8    Q   So let's start over again.  So you allege that the
 9        cathode ray tube inside your television was price
10        fixed; is that right?
11    A   That's right.
12    Q   And that means that it was more expensive than it
13        should have been; is that right?
14    A   That's right.
15    Q   And so the difference in the price of what it
16        should have been versus what it actually cost --
17    A   Uh-huh, yes.
18    Q   -- was that entire difference passed on to you,
19        the purchaser of the television?
20    A   That's what I believe, yes.
21    Q   And what's the basis for that belief?
22    A   The information that my attorneys have provided
23        for me.
24    Q   And what do you think is the total amount that you
25        were damaged as a result of the alleged activity
```

62

**Brigid Terry**

```
1        in this case?

2   A    Are you asking for a dollar figure?

3   Q    Yes.

4   A    I have no idea.

5   Q    Do you have any idea how you get to that dollar

6        figure?

7   A    No.  I would have to rely on experts to do that.

8   Q    How much do you expect to receive if you win this

9        case?

10  A    I expect to be compensated for the difference

11       between the amount of money I paid and the amount

12       of money I should have paid.

13  Q    Do you think everyone in the class is going to get

14       the same amount?

15  A    I don't know.  Everybody paid different amounts of

16       money for their televisions, I imagine.

17  Q    Ms. Terry, do you know if televisions or computer

18       monitors containing CRTs are sold today?

19  A    I'm not sure.

20  Q    Do you remember the last time that you saw a

21       television or computer monitor containing a CRT

22       for sale?

23  A    I'm sure I saw that.  With my eyes did I register

24       it and pay any attention to that?  No.  I don't

25       know.
```

63

**Brigid Terry**

```
 1            So I don't know the last time I looked at a

 2       television in the store and said, oh, there's a

 3       CRT.  So no, I don't recall.

 4   Q   So you don't know if they're actually sold today?

 5   A   I don't know.

 6   Q   Ms. Terry, you are a class representative for the

 7       indirect purchaser plaintiffs in this case; is

 8       that right?

 9   A   That's right.

10   Q   And the defendants in this case include my

11       clients, the Hitachi defendants, as well as a

12       number of other defendants; is that correct?

13   A   That's my understanding.

14   Q   So can you explain to me in your own words what

15       your responsibilities are as a class

16       representative?

17   A   Okay.  So I need to communicate with my attorneys

18       and understand the case to the best of my ability.

19       I need to provide any documentation that I had

20       regarding my television and this case.  And I need

21       to provide this deposition.  And then I need to be

22       available for trial.

23   Q   And, Ms. Terry, can you describe -- when I say the

24       indirect purchaser plaintiffs, what does that mean

25       to you?
```

64

Brigid Terry

```
 1   A   My understanding is that indirect purchasers are

 2       people who did not purchase the tube but purchased

 3       the end product, the television, the computer

 4       screen that contained the tube.

 5   Q   Are you entitled to any compensation for serving

 6       as a class representative?

 7   A   I don't know if I'm entitled to that.  I

 8       understand that's happened before, but I have no

 9       expectation that that will happen.

10   Q   Were you promised anything for participating as a

11       class representative?

12   A   No.

13   Q   I would like to show you a document that was

14       previously marked as Exhibit 11.  And this is

15       "indirect purchaser plaintiffs' third consolidated

16       amended complaint."

17           Do you recognize this document?

18   A   I've seen lots of documents like this, documents

19       about the complaint.  And it's changed over time.

20       So I've had the first one, the second one, the

21       third.  I've seen them all.  Yes, I recognize

22       this.

23   Q   And so this one is dated December 11th, 2010, and

24       it's the third consolidated complaint in this

25       case.  Do you recall seeing this document before
```

65

**Brigid Terry**

1          it was filed?

2     A    No.

3     Q    But you've seen --

4     A    I don't know if it was before it was filed or

5          after it was filed, but I've seen this document.

6     Q    And you saw it before today?

7     A    Sure, yes.

8     Q    Sometime before today?

9     A    Yes.

10    Q    Were you involved in drafting this complaint?

11    A    No, not directly.  I provided information about my

12         situation, but I did not.

13    Q    And do you recall what information you provided

14         about your situation?

15    A    Yes.  That I purchased a television between 1995

16         and 2007, and that it contains a CRT, and that I

17         tried to find receipts about payment -- for

18         payment, and now these pictures of the television.

19    Q    Okay.  So, Ms. Terry, did you have any input in

20         deciding who the defendants would be that are

21         named in this complaint?

22    A    No.

23    Q    Do you have any personal knowledge of the

24         allegations in this complaint?

25    A    What do you mean?

                                                              66

**Brigid Terry**

1   Q   Do you know firsthand any of the allegations?

2   A   Not firsthand, no.

3   Q   And where did you get that information?

4   A   From my attorneys.

5   Q   So, Ms. Terry, when did you conclude that you had

6       been overcharged, allegedly, by the defendants in

7       this matter?

8   A   I was convinced that I was overcharged when I read

9       the interrogatories and saw sentences that said

10      that these companies met together at a table and

11      talked about fixing prices.

12  Q   And when you said "the interrogatories," whose

13      interrogatories are you talking about?

14  A   It was Samsung and Toshiba, if I remember

15      correctly.

16  Q   And when did you see those interrogatory

17      responses?

18  A   I could look and see when I signed the

19      verification, but I want to say it was it in

20      February of 2011?  Is that when I -- I don't know.

21      I'd have to look and see when I signed those.

22          So this one says July 14th of 2010, right,

23      "Verification Federal Rules of Civil Procedure

24      Rule."  This is not -- I don't know.  I'm not sure

25      of the date.

67

**Brigid Terry**

```
1    Q   Okay.  So I just wanted to clarify.  The

2        verifications that we looked at previously, those

3        are verifying your responses to questions

4        defendants had about your purchases; is that

5        right?

6    A   That's my understanding, yeah.

7    Q   So then are those the interrogatory responses that

8        you are saying convinced you that there had been

9        an alleged conspiracy in this matter?

10   A   That's my understanding in this matter, yes.  That

11       this is -- yes.

12           I have to tell you this is all very -- the

13       format of these documents, these are not familiar

14       to me in the sense that I work with these on any

15       regular basis.  So forgive me here, I'm looking

16       through stuff I don't -- I don't have a real

17       frequent experience with these documents.  That's

18       the fact of it all.

19   Q   That's okay.  So I just want to clarify.  You

20       mentioned there are interrogatory responses you

21       looked at that made you feel or made you believe

22       that there had been a conspiracy?

23   A   Yes, yes.

24   Q   Is it possible that those are interrogatory

25       responses from somebody other than yourself, so
```

68

**Brigid Terry**

```
 1         not your own answers but someone else's answers?

 2                   MR. PAPALE:  I'm not sure what you

 3          mean, Michelle.

 4    A    I don't know what you --

 5    Q    So let's step back.  These interrogatory responses

 6         we entered today, those are plaintiffs' responses

 7         to defendants' questions; is that correct?

 8    A    Yes.

 9    Q    So are you saying that based on plaintiffs'

10         responses to defendants' questions you believe

11         that there is a conspiracy?

12    A    And it was the complaint that I read.

13    Q    The complaint?

14    A    Yes.

15    Q    So not interrogatories; complaint.

16    A    I'm not sure because I don't know exactly --

17    Q    Which document it was?

18    A    Thank you.  I don't know which document I read it

19         in.  But I've read the complaint and I've read the

20         interrogatories, and there's a lot of legal

21         language in there that's very unfamiliar for me.

22         But in my reading, I came across this.

23    Q    Okay.

24    A    And so that's my understanding.

25    Q    So maybe I can clarify this way.  You, based on
```

69

**Brigid Terry**

```
1        reading documents filed in this litigation --
2    A   Thanks.
3    Q   -- you believe -- that's how you came to believe
4        that there was a conspiracy?
5    A   Yes.
6    Q   But it's not something that you knew of outside of
7        this litigation?
8    A   No.
9    Q   Thank you.
10   A   Thank you.  I'm sorry that it's --
11   Q   That's fine.  You are not a lawyer.  You're not
12       supposed --
13   A   Thanks.
14   Q   -- to be familiar with these documents.
15   A   I am not.
16   Q   So you mentioned that you don't recall exactly
17       when you saw this document that was previously
18       marked as Exhibit No. 11, but it was sometime
19       before today?
20   A   Yes.
21   Q   That's the Third Amended Complaint.
22   A   Yes.
23   Q   And you said that it was based on information you
24       received from your attorneys that you understand
25       is where these allegations came from; is that
```

70

**Brigid Terry**

```
 1       right?
 2   A   Yes.
 3   Q   So do you know what evidence there is, or can you
 4       tell me what evidence you know of regarding the
 5       defendants' involvement in this alleged
 6       conspiracy?
 7   A   Well, not firsthand.  I mean, I certainly don't
 8       have personal information.  But I understand from
 9       my attorneys that Samsung pled guilty to this, and
10       that -- is it Chunghwa?  Am I saying the name of
11       that corporation correctly?
12   Q   Uh-huh.
13   A   -- settled for a lot of money to avoid, you know,
14       further proceeding with this.  So that's all I
15       know.
16   Q   Okay.  And so other than information you received
17       from your attorneys, you don't have any other
18       evidence regarding these allegations?
19   A   I do not.
20   Q   Now, I'd like to -- if you could put
21       Exhibit No. 11 in front of you.  It's the really
22       large document.
23   A   Let's see.  Yes, okay.
24   Q   That one.  Now, if you could turn to page 9 for
25       me.  And so this is Section V.  It says
```

71

**Brigid Terry**

```
 1        "Defendants."  And from paragraph 51 to about

 2        paragraph 103, there are a variety of companies

 3        that are listed as defendants; is that correct?

 4   A    LG Electronics.  Is that what I'm seeing?

 5        Philips Electronics.  Am I reading this correctly?

 6   Q    Right.  I just --

 7   A    Okay, yeah.

 8   Q    And I'll represent to you that the defendants

 9        listed goes into paragraph 104 on page 24 of the

10        document.

11   A    Okay.

12   Q    Now, is it your understanding that these are all

13        the manufacturers of cathode ray tubes that there

14        were in the world?

15   A    I don't know.

16   Q    Is it possible that there are other companies that

17        manufactured CRTs that may not be listed as

18        defendants here?

19   A    I imagine that's possible.  I don't know.

20   Q    And do you know why some companies are named here

21        and some are not?

22   A    No.

23   Q    And is it your belief that all of the companies

24        named in this complaint from paragraph 51 to 104

25        were involved in the alleged conspiracy?
```

72

**Brigid Terry**

1    A    That would be my understanding.

2    Q    And what is that understanding based on?

3    A    Information from my attorneys.

4    Q    So flipping a few pages before, starting at

5         paragraph 19 which appears on page 5, you see a

6         Section IV, Plaintiffs.  Do you see that?

7    A    I do.

8    Q    And then starting with paragraph 19 it lists a

9         number of names who are plaintiffs in this

10        complaint.  Do you see that?

11   A    I do.

12   Q    Do you know any of these other plaintiffs that are

13        listed?  And you can flip through all of those

14        names.

15   A    I can tell you without even looking that I don't

16        know any of them.  I think I was introduced to

17        someone when I was in Mr. Mansfield's office.

18   Q    Do you know who that was?

19   A    No.  A man.

20   Q    Do you know what state that person represented?

21   A    I don't for sure, but now I look at paragraph 33

22        and I see David Norby is a Minnesota resident, and

23        so I wouldn't be surprised if that was the person

24        that I met.

25   Q    But you don't know for sure?

73

**Brigid Terry**

```
 1    A    I do not.

 2    Q    So you've never spoken with any of these

 3         individuals?

 4    A    No.

 5    Q    Other than Mr. Norby, who you may have met

 6         previously?

 7    A    Who I said hello to.

 8    Q    Okay.  So if you could turn to paragraph 1 of this

 9         complaint which appears on page 1, it reads that,

10         "Plaintiffs bring this antitrust class action on

11         behalf of individuals and entities that indirectly

12         purchased cathode ray tube products (as further

13         defined below) in the United States from

14         Defendants, their predecessors, any subsidiaries

15         or affiliates thereof, or any of their unnamed

16         co-conspirators, during the period beginning at

17         least as early as March 1, 1995, until at least

18         November 25th, 2007 (the Class Period)."

19              Did I read that correctly?

20    A    Yes.

21    Q    Do you know why the class period is being alleged

22         as March 1, 1995, until November 25th, 2007?

23    A    No.

24    Q    So then I'd like you to turn to page 35.  I'm

25         sorry.  Page 34.  And at the bottom of that page
```

74

**Brigid Terry**

```
 1          is paragraph 150.  And that paragraph reads -- I'm
 2          going to read just the first part of this
 3          paragraph which goes on to page 35.  It says, "The
 4          agreements reached at the Glass Meetings included
 5          agreements on CRT product prices, including
 6          establishing target prices, bottom prices, price
 7          ranges, and price guidelines."  That's 150-a.
 8               Did I read that correctly?
 9     A    Yes.
10     Q    Do you have any personal knowledge of these
11          alleged glass meetings?
12     A    I have no personal knowledge.
13     Q    And where did you get the information about these
14          meetings that led you to agree to including them
15          in this complaint?
16     A    From my attorneys.
17     Q    And is that the same as paragraph 150-j which is
18          on page 35; there are agreements to allocate
19          customers?
20     A    Yes.
21     Q    And for all of these subparagraphs of 150 you have
22          no personal knowledge; it's just information you
23          relied on from your attorneys; is that right?
24     A    That's correct.
25     Q    You can set this document aside.  I'm going to
```

75

**Brigid Terry**

| | | |
|---|---|---|
| 1 | | show you another document. |
| 2 | | MS. CHIU:  If we can mark this as |
| 3 | | the next exhibit, please. |
| 4 | | (Exhibit No. 436 marked for |
| 5 | | identification) |
| 6 | Q | I'm handing you what's been marked as |
| 7 | | Exhibit No. 436.  Do you recognize this document? |
| 8 | A | Yes. |
| 9 | Q | And this document is titled Class Action |
| 10 | | Complaint, and the plaintiffs listed are |
| 11 | | Brigid Terry, Anthony Gianasca, Brighid Flaherty, |
| 12 | | and Bridget Ten Eyck; is that correct? |
| 13 | A | Yes.  But if this is Brigid Terry, |
| 14 | | B-R-I-G-H-I-D -- |
| 15 | | MR. PAPALE:  No, that's another |
| 16 | | Brigid. |
| 17 | Q | So you are one of the plaintiffs listed on this |
| 18 | | document; is that right? |
| 19 | A | Yes. |
| 20 | Q | Do you recall seeing this document before today? |
| 21 | A | Yes. |
| 22 | Q | And when did you see it? |
| 23 | A | I don't know. |
| 24 | Q | Did you see it before it was filed? |
| 25 | A | I don't know. |

76

**Brigid Terry**

1    Q   And so I'll represent to you on the top of this

2        document there's a header that reads case

3        3:08-CV-1559-SC, and it says filed March 21st,

4        2008; is that right?

5    A   That's what it says.

6    Q   So you don't recall if you saw this document

7        before March 21st, 2008?

8    A   I don't recall.  I'm sorry.

9    Q   And just as a reminder.  I need to finish my

10       question first --

11   A   I know.  I'm sorry.

12   Q   -- before you start answering.  But that is your

13       name listed as the first plaintiff; is that

14       correct?

15   A   Yes.  I was distracted by the other spelling, and

16       yes, that's me.

17   Q   There are apparently three Brigids on this

18       complaint.

19   A   I see that.

20   Q   You are not the only Brigid on this complaint.

21       And did you read this document before today?

22   A   I looked at this document.

23   Q   Do you recall reading it -- reading it or looking

24       at it?

25   A   I did not read it word for word.

77

**Brigid Terry**

```
1    Q    Do you know what the differences are between this

2         complaint in Exhibit 436 and the allegations in

3         Exhibit No. 11?

4    A    I do not know those specific differences.  I would

5         absolutely rely on my attorneys to know those

6         differences.

7    Q    Okay.  So, Ms. Terry, you indicated previously --

8         or you testified previously that you -- based on

9         information filed in this case, you believe

10        defendants were participating in a conspiracy; is

11        that right?

12   A    Yes.

13   Q    Did you believe that before you first filed a

14        complaint in this case?

15   A    I didn't know about this before I learned that

16        there was a complaint.

17   Q    So this is your name on this complaint; is that

18        right?

19   A    Yes.

20   Q    And your attorneys filed this complaint on your

21        behalf; is that your understanding?

22   A    Yes.

23   Q    So sometime before March 21st, 2008, did you have

24        an understanding that you believe that the

25        defendants have engaged in a conspiracy; is that
```

78

**Brigid Terry**

1        right?

2    A    Yes.

3    Q    And so that was before March 21st, 2008?

4    A    Yes.

5    Q    Okay, all right.  You can set that aside.

6             Actually, I do have -- I'm sorry.  I do have

7         a couple questions about the smaller complaint,

8         Exhibit 436.  Were you involved in drafting the

9         complaint at all?

10   A    Not directly.

11   Q    I just wanted to turn your attention to paragraph

12        63 of that document, which is on page 17.  And at

13        paragraph 63 reads, "CRT products are

14        commodity-like products which are manufactured in

15        standard sizes.  One defendant's CRT product for a

16        particular application, such as a particular size

17        television set or computer monitor, is

18        substitutable for another's.  Defendants sell and

19        plaintiffs' (and Class members) purchases CRT

20        products primarily on the basis of price."

21            Did I read that correctly?

22   A    You did.

23   Q    Do you have personal knowledge of this allegation?

24   A    Not personal knowledge, no.

25   Q    And upon what information did you rely to agree to

                                                          79

**Brigid Terry**

1        include this allegation?

2    A   My attorneys.

3    Q   Did you rely upon your attorneys for all of the

4        allegations in this individual complaint?

5    A   Yes.

6    Q   So you don't have personal knowledge of any of the

7        allegations inside of it?

8    A   I do not.

9    Q   Now you can set it aside.

10            Ms. Terry, I just wanted to ask you:  Going

11       back to the television that you purchased that's

12       the basis of these claims, did you fill out any

13       warranty information or manufacturer's warranty

14       card?

15   A   Not that I recall.

16   Q   Do you remember if there was one in the box?

17   A   I think there was.  I do believe that there was.

18   Q   And you just don't recall if you filled it out or

19       not?

20   A   That's correct.

21   Q   At this time I'd like to ask you if you have any

22       answers to questions that you needed to supplement

23       or needed to change or something you forgot that

24       you need to mention.

25   A   No.

                                                          80

**Brigid Terry**

```
 1                    MS. CHIU:  Okay.  Then I am done

 2            with the deposition now unless counsel has

 3            any questions.

 4                    MR. PAPALE:  I have none, but we

 5            should ask the people on the phone.

 6                    MS. CHIU:  So counsel on the phone,

 7            we'd like to know if you have any questions

 8            for the witness at this time.

 9                    MR. MALAISE:  This is

10            Chuck Malaise.  No questions here.

11                    MR. McALLISTER:  No questions here

12            either.

13                    MR. FEDER:  This is Kevin Feder.  I

14            do have a quick question for the witness.

15

16                    EXAMINATION

17     By Mr. Feder:

18     Q   Ms. Terry, you referred to Samsung in a couple of

19         your answers today; do you recall that?

20     A   Yes.

21     Q   And do you know the specific name of the Samsung

22         entity you were referring to in those answers?

23     A   What do you mean by "specific Samsung entity"?

24     Q   Well, let me ask you this question.  You looked at

25         the complaint that was filed in this case in which
```

81

Brigid Terry

```
1        you're listed as a plaintiff; is that right?

2   A    Yes.

3   Q    And do you recall from looking at that complaint

4        that there was more than one Samsung entity listed

5        as a defendant in the case?

6   A    Yes.

7   Q    And in the answers you were referring to, do you

8        know which Samsung entity you were referring to?

9   A    No.

10                    MR. FEDER:  Okay.  Thank you.

11            That's all for me.

12                    MS. CHIU:  So I think we're

13            complete.  We're done.

14

15                (adjourning at 5:40 p.m.)

16

17

18

19

20

21

22

23

24

25
```

82

**Brigid Terry**

```
1    STATE OF WISCONSIN )
                         ) ss.
2    COUNTY OF DANE      )

3       I, Taunia Northouse, a Registered Diplomate Reporter

4    and Notary Public duly commissioned and qualified in and

5    for the State of Wisconsin, do hereby certify that

6    pursuant to notice, there came before me on the 17th day

7    of October 2012, at 4:05 in the afternoon, at the

8    America's Best Value Inn and Conference Center,

9    3900 Milton Avenue, the City of Janesville, County of

10   Rock, and State of Wisconsin, the following named

11   person, to wit:  BRIGID TERRY, who was by me duly sworn

12   to testify to the truth and nothing but the truth of her

13   knowledge touching and concerning the matters in

14   controversy in this cause; that she was thereupon

15   carefully examined upon her oath and her examination

16   reduced to typewriting with computer-aided

17   transcription; that the deposition is a true record of

18   the testimony given by the witness; and that reading and

19   signing was not waived.

20            I further certify that I am neither attorney

21   or counsel for, nor related to or employed by any of the

22   parties to the action in which this deposition is taken

23   and further that I am not a relative or employee of any

24   attorney or counsel employed by the parties hereto or

25   financially interested in the action.
```

83

**Brigid Terry**

1           In witness whereof I have hereunto set my

2      hand and affixed my notarial seal this 19th day of

3      October 2012.

4

5

                            Registered Diplomate Reporter
6                            Notary Public, State of Wisconsin

7

8      My commission expires
       May 17, 2015
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                    84

Brigid Terry

**A**

**Aaron** 5:5 40:6
**ability** 60:20 64:18
**able** 44:11
**above-entitled** 28:3
  31:18
**absolutely** 54:20
  78:5
**accept** 41:14
**access** 22:19,20
**accessories** 57:17
**account** 37:10
**acquired** 59:25
**action** 2:25 13:24
  13:24 23:11 28:3
  31:18 74:10 76:9
  83:22,25
**ACTIONS** 1:8
**activity** 62:25
**actual** 48:8 55:19
**additional** 11:10
**address** 9:17,19
**adjourning** 82:15
**ads** 59:19
**advertisements**
  56:12
**affiliates** 74:15
**affixed** 84:2
**afford** 54:8
**afternoon** 4:13 6:7
  83:7
**age** 4:2
**ago** 6:24
**agree** 8:22 75:14
  79:25
**agreed** 14:14 20:10
**agreement** 14:6,7,10
  75:18
**agreements** 75:4,5
  75:18
**ahead** 46:7 59:6
  60:17
**al** 4:4
**Alioto** 13:25 14:6,9
**allegation** 79:23
  80:1
**allegations** 66:24
  67:1 70:25 71:18
  78:2 80:4,7
**allege** 61:22 62:8
**alleged** 62:25 68:9
  71:5 72:25 74:21
  75:11
**allegedly** 67:6
**allocate** 75:18
**ambiguous** 19:23

40:7
**amcallister@whi...**
  5:7
**amended** 3:3,5,7,9
  23:22 26:4 28:4
  65:16 70:21
**America** 25:7 30:2,9
  31:20 49:1
**America's** 4:9 83:8
**amount** 62:24 63:11
  63:11,14
**amounts** 63:15
**another's** 79:18
**answer** 7:17,20 8:16
  8:25 9:12,13
  13:18 51:14 59:6
**answering** 7:12 8:18
  77:12
**answers** 26:11 69:1
  69:1 80:22 81:19
  81:22 82:7
**Anthony** 76:11
**antitrust** 1:4 74:10
**anymore** 37:6
**apologize** 42:9
**apparently** 77:17
**APPEARANCES** 5:1
**appeared** 45:18
**appearing** 4:16,20
  4:23 5:3,6
**appears** 28:20 73:5
  74:9
**appliance** 36:1
**applicable** 28:8,12
  29:4
**application** 79:16
**applied** 39:20
**approximately** 21:11
  35:18
**art** 59:4
**aside** 16:12 25:3,24
  26:17 29:18 30:16
  32:18,20 35:24
  49:8 50:10 51:4
  75:25 79:5 80:9
**asked** 24:21 25:17
**asking** 7:11 63:2
**assembled** 34:17
  42:17
**asserting** 18:4
**assistant** 46:25
**assume** 7:13 62:2
**assumed** 52:17
**Attached** 3:12
**attend** 10:21

**attention** 63:24
  79:11
**attorney** 3:17 4:15
  4:18,22 5:2,5
  13:12,23 14:19
  15:6 16:8 20:3,17
  20:19 21:1 23:5,6
  38:9 46:25 83:20
  83:24
**attorneys** 3:14
  14:22 20:25 24:19
  24:21 25:16 62:22
  64:17 67:4 70:24
  71:9,17 73:3
  75:16,23 78:5,20
  80:2,3
**attributed** 57:14
**available** 9:2 37:8
  54:22 64:22
**Avenue** 4:10,23 9:18
  83:9
**avoid** 8:3 71:13
**aware** 19:2 20:6
  22:19,20 59:18
**A25** 2:10,13 26:25
  28:24
**A90AHH50X02** 45:12
  45:24

**B**

**B** 2:7
**back** 2:22 17:22,24
  20:10 28:23 33:23
  34:8,9,10,11,13
  34:16,17,17 35:13
  41:20 42:14,16,17
  42:18 43:5,7,11
  43:17,18,24 44:13
  44:18,25 45:1
  46:21 47:9 48:1,3
  48:5,8 49:25
  50:21 51:21,25
  69:5 80:11
**BAKER** 4:22
**bank** 24:11 37:7
**base** 44:21 48:10
  50:20
**based** 69:9,25 70:23
  73:2 78:8
**basis** 24:23 25:20
  40:12 62:21 68:15
  79:20 80:12
**Bates** 35:2 42:21
**beginning** 74:16
**behalf** 4:2,16,20,23

5:3,6 74:11 78:21
**belief** 28:14 32:1
  62:21 72:23
**believe** 27:8 36:23
  37:23 42:1 43:17
  43:25 46:3 51:22
  53:7,18 55:20
  56:6 61:13 62:20
  68:21 69:10 70:3
  70:3 78:9,13,24
  80:17
**best** 4:9 28:13
  31:25 64:18 83:8
**better** 48:4 61:7
**beyond** 11:2,11 15:6
  41:7 59:6
**Bob** 14:18
**BOCKIUS** 4:19
**bottom** 31:9 48:2
  49:5 74:25 75:6
**BOTTS** 4:22
**bought** 51:24 56:17
  56:21,24 57:7,10
  61:8
**box** 37:22 80:16
**brand** 45:7 53:23
**branded** 51:12,15
**brands** 53:15 54:21
**break** 8:20,21,23,24
  9:4 58:14
**Bridget** 76:12
**Brighid** 76:11
**Brigid** 1:18 2:3,12
  2:14 4:1 6:1,17
  16:1 28:25 31:16
  76:11,13,16 77:20
  83:11
**Brigids** 77:17
**bring** 15:2 22:12
  74:10
**bundle** 57:19
**business** 36:3 54:14
  58:24,25 59:11
**buy** 54:8 55:6 56:13
  59:14
**buying** 59:21
**B-R-I-G-H-I-D** 76:14
**B25** 2:10,13 26:25

**C**

**C** 4:14
**cable** 56:4
**California** 1:1 4:6
  4:16,20 13:25
**call** 14:16 43:4

**Brigid Terry**

**called** 6:2 20:10
  36:1
**calls** 59:5
**car** 10:11
**card** 24:13 36:14
  37:2 80:14
**cards** 37:9
**carefully** 83:15
**case** 5:5 12:20,23
  13:21 14:20 17:18
  18:4 20:1 21:2,3
  21:13 22:6,24
  23:11,18,21 26:1
  29:25 33:4 34:10
  34:11,12,16 38:4
  43:22 48:5,5,7
  63:1,9 64:7,10,18
  64:20 65:25 77:2
  78:9,14 81:25
  82:5
**cash** 36:12,20
**cathode** 1:4 17:21
  18:1,16,18 19:5,9
  19:18 20:9 32:23
  33:3 43:20 45:16
  45:25 46:1,22
  60:25 61:21 62:9
  72:13 74:12
**cause** 83:14
**center** 4:10 50:9
  83:8
**certain** 25:17 38:12
**certainly** 36:17
  38:11 71:7
**certify** 83:5,20
**change** 80:23
**changed** 65:19
**CHARLES** 4:22
**charles.malaise...**
  4:24
**Chassis** 48:17
**check** 24:10,11
  36:16 56:10
**checked** 37:9
**checking** 37:10
**childhood** 17:7
**children** 16:19
**Chiu** 2:4 3:14,17
  4:18 6:6,11 15:10
  27:15 30:17 38:6
  38:14,20,21 42:3
  42:9,25 46:7
  47:14 49:9 50:7
  58:12,16,19 76:2
  81:1,6 82:12

**Chuck** 81:10
**Chunghwa** 71:10
**City** 4:11 83:9
**Civic** 10:14
**Civil** 31:6 67:23
**claim** 18:4
**claiming** 33:4
**claims** 18:3 40:13
  80:12
**Claire** 10:25
**clarification** 7:13
**clarify** 68:1,19
  69:25
**class** 2:25 13:14,16
  13:19,20,22,24
  23:11 63:13 64:6
  64:15 65:6,11
  74:10,18,21 76:9
  79:19
**clear** 35:14 58:6,7
**clearly** 7:25
**clients** 64:11
**close** 20:21 50:20
**code** 43:4,5 49:2
**cognitive** 11:7
**collect** 24:20
**college** 10:21
**color** 53:14
**comb** 23:8
**come** 57:17
**commencing** 4:13
**commission** 84:8
**commissioned** 83:4
**commodity-like**
  79:14
**common** 20:20
**communicate** 64:17
**companies** 19:8,10
  19:16 67:10 72:2
  72:16,20,23
**company** 17:9,15
**compare** 60:19
**compensated** 63:10
**compensation** 65:5
**compete** 59:11
**competed** 58:24,24
**competition** 59:3,4
**competitive** 60:13
  60:16,18
**complaint** 2:25 3:3
  13:2 22:9 65:16
  65:19,24 66:10,21
  66:24 69:12,13,15
  69:19 70:21 72:24
  73:10 74:9 75:15

**complaints** 58:4
**complete** 82:13
**comprehensive** 11:5
**computer** 18:24
  59:25 60:4 63:17
  63:21 65:3 79:17
**computer-aided**
  83:16
**concerning** 83:13
**conclude** 67:5
**conclusion** 59:5
**conditions** 59:21
**Conference** 4:10
  83:8
**consider** 54:3
**consolidated** 3:3
  65:15,24
**conspiracy** 68:9,22
  69:11 70:4 71:6
  72:25 78:10,25
**conspired** 18:6
**consult** 56:16
**consumer** 18:8 22:14
  22:16 49:1 56:16
**contact** 14:15 21:5
**contacted** 20:9
  21:12,14,16
**contain** 60:1
**contained** 41:17
  65:4
**containing** 19:5
  32:23 33:3 63:18
  63:21
**contains** 66:16
**continued** 5:1 46:2
**Continuing** 38:21
  58:19
**contributed** 30:12
**control** 57:18
**controversy** 83:14
**conversation** 8:12
  12:6,9,10,11 13:3
**convinced** 67:8 68:8
**copies** 2:15 3:13
  21:7
**copy** 2:17,18,19,20
  2:22,23 38:3,8,9
  42:3,10
**corporation** 71:11
**corporations** 22:15
**correct** 10:6 25:18

  76:10 77:18,20
  78:2,14,16,17,20
  79:7,9 80:4 81:25
  82:3
**correction** 7:20
**correctly** 14:3,4
  28:9,18 32:2
  50:24 67:15 71:11
  72:5 74:19 75:8
  79:21
**cost** 57:9,13,14
  61:1,1,19 62:4,5
  62:7,16
**counsel** 9:10,14
  13:8,9,10,15,17
  13:19,20 38:6
  81:2,6 83:21,24
**County** 4:11 10:20
  83:2,9
**couple** 21:8 79:7
  81:18
**court** 1:1 4:6 7:8
  7:23 8:8,14 15:17
  26:20
**cover** 43:18 44:18
  45:1 48:7 50:1
**co-conspirators**
  74:16
**credit** 24:13 36:14
  37:2,9
**credits** 11:2,10,12
**CRR** 1:25
**CRT** 1:4 2:16,16,16
  2:19 17:16,25
  18:6 19:3,4 35:2
  35:3,3 41:17,22
  41:24 52:3,7,11
  54:1,21 57:14
  60:1 63:21 64:3
  66:16 75:5 79:13
  79:15,19
**CRTs** 17:16 18:21
  33:6 63:18 72:17
**CRV** 10:12
**current** 9:17
**Curriculum** 11:9
**customers** 58:25
  59:14 75:19

Brigid Terry

CV-07-5944-SC 1:6
CX36G60 2:21 48:15

---

**D**

D 2:1
damaged 62:25
damages 33:4
DANE 83:2
date 67:25
dated 65:23
David 73:22
day 4:12 27:6 55:9
  55:10 83:6 84:2
deal 61:7
December 65:23
decide 22:5,12
decided 22:8
deciding 66:20
declare 28:16 31:22
defendant 2:9 4:2
  15:24 23:14 24:5
  26:5 28:6 30:2,9
  31:20 82:5
defendants 4:5,20
  4:24 5:3,6 6:13
  38:1,10 64:10,11
  64:12 66:20 67:6
  68:4 69:7,10 71:5
  72:1,3,8,18 74:14
  78:10,25 79:18
defendant's 79:15
defined 74:13
definitely 18:20
  22:21 38:18
degree 11:3,5
deliver 55:22
Depends 21:3
deposed 6:20
deposes 31:17
deposition 1:16 2:9
  4:1 6:13 7:2,17
  9:10 11:15,19
  13:5 14:25 15:5
  15:22,25 16:10
  17:25 19:3 32:20
  64:21 81:2 83:17
  83:22
describe 18:3 64:23
described 46:21
  47:1
Description 2:8 3:1
diagonal 33:25
difference 61:25
  62:15,18 63:10
differences 78:1,4

78:6
different 18:13,13
  43:1 45:18 63:15
Diplomate 4:8 83:3
  84:5
directly 66:11
  79:10
disability 11:7
discipline 11:11
discounts 57:22
discuss 9:14 55:13
Discussion 11:17
Displays 2:9 4:3,4
  15:25
disposed 39:13
dispute 61:4
distracted 77:15
district 1:1,1 4:5
  4:6 16:16 17:10
DIVISION 1:2
divorce 6:22 23:15
divorced 37:17,18
docket 23:3
document 1:6 13:1
  15:9,18,21,24
  16:2 23:20 24:2,4
  24:8,17 25:4,10
  25:13,14,22,25
  26:3,7,14,17,21
  27:16,19,22 28:8
  29:4 30:4 31:3,7
  31:12 38:8 42:10
  47:20 65:13,17,25
  66:5 69:17,18
  70:17 71:22 72:10
  75:25 76:1,7,9,18
  76:20 77:2,6,21
  77:22 79:12
documentation 21:7
  36:7 64:19
documents 11:22
  12:8,17,18,24
  22:25 23:17,25
  24:7,18,19,22
  25:8,12,17,20
  26:24 27:4 29:14
  29:22 30:22 37:21
  42:7 65:18,18
  68:13,17 70:1,14
doing 8:1
dollar 63:2,5
dollars 36:24 39:4
  57:11
doubt 36:20
drafting 66:10 79:8

duly 6:2 31:16 83:4
  83:11
DVD 57:20
D.C 4:23 5:3,6
D25 2:11 26:25
  28:24

---

**E**

E 2:1,7 4:14,14
earlier 60:7,8
early 17:7 74:17
earn 10:4
easily 44:19
Eau 10:25
education 11:5,6,6
  17:6
either 7:19 20:25
  33:9 34:11,15
  40:2 44:25 57:23
  81:12
electronic 32:23
Electronics 72:4,5
elementary 11:6
  17:2,8,13
else's 69:1
email 14:15 16:7
  21:6 23:7
emphasis 11:7
employed 16:13,15
  83:21,24
employee 83:23
employs 45:25
ended 18:9
engaged 78:25
engineering 18:18
entered 69:6
entire 17:5 53:11
  61:25 62:18
entities 74:11
entitled 9:11 65:5
  65:7
entity 19:23 40:8
  81:22,23 82:4,8
establishing 75:6
estimate 39:2
estimated 57:9
et 4:4
Evansville 17:13
eventually 53:17
  56:21
Everybody 63:15
evidence 71:3,4,18
exactly 14:21 24:13
  69:16 70:16
examination 2:4,5

6:5 81:16 83:15
examined 83:15
example 18:17 54:5
examples 59:17
excuse 17:19 41:10
Exh 2:9,10,12,13,14
  2:15,17,18,19,20
  2:22,23,25 3:3,4
  3:6,8,10
exhibit 2:10,13
  15:15,19 23:21
  25:4,5 26:2,2,18
  26:21,25 27:17,20
  28:23 29:8,21,24
  30:18,19,21 31:1
  31:4 32:5,8,15,16
  34:21,24 42:4,5,8
  43:1,2 44:4,6,9
  45:6 46:8,9,11,12
  47:15,16,19 48:14
  49:10,11,14 50:11
  50:14 52:3 65:14
  70:18 71:21 76:3
  76:4,7 78:2,3
  79:8
exhibits 3:2 28:7
  28:24 29:2,4,7,10
  29:10 32:16,19
expect 63:8,10
expectation 65:9
expected 58:10
expensive 62:12
experience 68:17
experts 15:5,7 63:7
expires 84:8
explain 13:16 64:14
extended 41:12
extends 14:9
extent 24:15
Eyck 76:12
Eye 5:3
eyes 63:23
E25 2:11 26:25

---

**F**

fact 60:25 68:18
factors 53:19
facts 12:19
fair 7:14,15 18:1,2
  19:6 39:10,12
  58:23 59:1 60:21
  60:23,24
familiar 68:13
  70:14
family 39:1

**Brigid Terry**

feature 53:8 57:22
features 52:14
February 67:20
Feder 2:5 3:14 5:2
  81:13,13,17 82:10
Federal 31:5 67:23
feel 68:21
figure 63:2,6
file 1:5 12:1 22:5
  22:8
filed 3:17 22:23
  23:2,4 66:1,4,5
  70:1 76:24 77:3
  78:9,13,20 81:25
fill 52:15 80:12
filled 80:18
financially 83:25
find 24:12 38:16
  66:17
fine 6:8 23:8 70:11
finish 8:15 77:9
finished 8:18 19:4
  19:18
firm 6:11 13:13
  20:2,17
first 6:2 14:12,14
  14:17 23:24 25:7
  26:6 27:6 28:6
  30:3 31:19 41:22
  42:21 52:2 58:8
  65:20 75:2 77:10
  77:13 78:13
firsthand 67:1,2
  71:7
five 58:17
fix 22:16
fixed 18:11 61:23
  62:10
fixing 67:11
Flaherty 76:11
flat 60:4
Fliers 59:19
flip 73:13
flipping 73:4
floor 20:22 52:22
  53:6
following 83:10
follows 6:3
foregoing 28:17
forget 7:21
forgive 68:15
forgot 7:18 80:23
format 68:13
found 24:23 25:1
  40:25

four 26:24 29:8
Francisco 1:2 4:19
  13:25 14:6
frankly 22:14
free 18:12 55:24
frequent 68:17
frequently 21:9
front 29:16 47:10
  51:23 71:21
full 6:15
fully 9:8 42:17
furniture 56:5
further 28:11,16
  71:14 74:12 83:20
  83:23

─────── G ───────
getting 58:6
Gianasca 76:11
give 59:17
given 29:14 60:24
  83:18
glass 75:4,11
glasses 15:12
go 7:1 10:23 21:9
  42:20,23 44:2
  46:7 58:16 59:6
  60:17
goes 72:9 75:3
going 7:13 15:12
  19:4 21:3 29:24
  42:2 50:22 63:13
  75:2,25 80:10
Good 6:7
gotten 61:7
Gralewski 14:18
  21:1
ground 7:1
guarantee 57:4
guidelines 75:7
guilty 71:9

─────── H ───────
H 2:7
half 12:7
hand 15:9 25:3
  29:24 42:2 84:2
handed 15:17,18
  26:20 27:19 30:21
  31:3 46:11 47:18
handing 23:20 25:25
  34:23 42:7 49:13
  50:13 76:6
happen 13:20 65:9
happened 65:8

happening 21:6
happens 59:16
happy 58:1
hard 8:7 26:3
head 8:4 36:24
header 77:2
heard 14:19
Helena 4:16
hello 74:1
help 9:3 48:4
helpful 8:17
hereto 83:24
hereunto 84:1
high 16:21,25 17:1
Hitachi 2:9 4:2,4
  4:20 6:12 15:25
  64:11
home 9:17,21 16:19
  38:25 41:1 44:2
  55:8
homes 9:23
Honda 10:12,14
horizontal 33:25
  34:1,2,5
hour 12:7 58:13
hours 12:14,15

─────── I ───────
idea 51:1 57:8 63:4
  63:5
identification
  15:16 26:19 27:18
  30:20 31:2 34:22
  42:6 44:7 46:10
  47:17 49:12 50:12
  76:5
Identified 2:8 3:1
Illinois 11:1
imagine 39:17,19
  55:15 56:9 63:16
  72:19
implosion 45:25
important 7:25 8:3
  52:14 53:9,22,25
Inasmuch 25:14
incensed 22:14
incentives 57:22
  59:13
include 64:10 80:1
included 75:4
includes 32:15
including 75:5,14
income 9:25 10:5
Incorporated 49:1
indicated 45:7 78:7

indicating 47:5
  50:6
indirect 1:8 3:3,4
  3:6,8,10 4:3,17
  23:22 24:5 25:5,9
  26:4 28:4 30:1
  31:17 35:1 64:7
  64:24 65:1,15
indirectly 74:11
individual 80:4
individuals 74:3,11
information 25:7
  28:11,13 30:2,10
  31:20 32:1,15
  34:3 62:22 66:11
  66:13 67:3 70:23
  71:8,16 73:3
  75:13,22 78:9
  79:25 80:13
initial 13:10
Inn 4:10 83:8
input 66:19
inside 34:12,17
  37:22 41:24 42:18
  43:5,7,10,17
  44:13,18,20,25
  47:11 48:1,8
  49:25 51:22 52:8
  52:11 54:1 57:14
  61:22 62:9 80:7
instruction 11:9
instructs 9:13
integral 45:25
interested 83:25
interrogatories
  26:7,12 27:10,11
  28:7 29:13 30:3,8
  30:11,14 31:19,24
  32:4,12 67:9,12
  67:13 69:15,20
interrogatory 67:16
  68:7,20,24 69:5
interrupt 8:13
introduced 49:20
  73:16
invited 15:22
involved 14:20
  23:13,17 26:11
  66:10 72:25 79:8
involvement 71:5
involves 13:12
issued 24:4 30:8
issues 61:4
IV 73:6

Brigid Terry

**J**

Janesville 1:20
  4:11 9:18 17:12
  36:2 83:9
July 31:13 67:22

**K**

keep 37:23 39:10
Kevin 5:2 81:13
kfeder@omm.com 5:4
kind 11:3 16:19
knew 20:22 51:24
  60:19 70:6
know 7:11,18 8:12
  8:21 9:4 13:2,14
  13:20 14:8,15,18
  14:19,20,21,23
  16:3,19 18:13,16
  18:22 19:8,20
  20:12 21:8,17
  22:7,11,18 24:11
  24:13 25:15 29:21
  37:17,25 38:3,5
  39:9,13 41:16,19
  44:16 46:20 48:19
  48:21 51:5,9 52:6
  52:10 56:9,20,23
  57:1,13 59:13,20
  60:18,24 61:2,3
  61:10,11,12,16,18
  61:25 63:15,17,25
  64:1,4,5 65:7
  66:4 67:1,20,24
  69:4,16,18 71:3,4
  71:13,15 72:15,19
  72:20 73:12,16,18
  73:20,25 74:21
  76:23,25 77:11
  78:1,4,5,15 81:7
  81:21 82:8
knowledge 22:17
  28:13 31:25 66:23
  75:10,12,22 79:23
  79:24 80:6 83:13
known 22:13

**L**

label 2:18,23 45:7
labeled 35:2
language 69:21
large 71:22
Larry 20:16
law 4:15 7:8 13:12
  20:2
lawful 4:2

LAWRENCE 4:15,15
Laws 31:23
lawsuit 22:12
lawyer 70:11
learned 78:15
Lebanon 49:2
led 53:19 75:14
left 55:6
legal 46:25 59:4,5
  69:20
let's 42:20 43:2
  44:3 46:7 47:14
  49:9 50:4 58:8,16
  62:8 69:5 71:23
Lewis 4:19 6:12
LG 72:4
likewise 38:18
line 27:16 30:18
  31:10
listed 55:19,20
  72:3,9,17 73:13
  76:10,17 77:13
  82:1,4
lists 73:8
litigation 1:4 23:3
  23:14 34:25 35:16
  49:21 61:4 70:1,7
lived 9:19
LLC 4:22
LLP 4:19 5:5
local 54:14
located 40:24
long 6:24 9:19 12:2
  12:6,13 16:17
  22:5 55:3
longer 36:2
long-term 17:12,14
look 12:8 23:9 37:2
  38:12,15,17 43:9
  44:2 46:23 52:2
  52:22 54:19 56:12
  67:18,21 73:21
looked 11:16,21
  12:16,18 24:9,9
  24:10 32:6 53:3
  64:1 68:2,21
  77:22 81:24
looking 11:25 23:17
  24:18 29:19 32:19
  68:15 73:15 77:23
  82:3
lot 69:20 71:13
lots 65:18
Louis 11:1
love 13:16

low 57:4

**M**

Main 4:16
Malaise 3:14 4:22
  81:9,10
man 73:19
Mansfield 13:10
  14:8 20:6,18,25
  21:15,16 22:4
  38:9
Mansfield's 21:5
  37:24 47:2 73:17
manual 24:10 37:23
  38:3,8 51:11,12
  51:13,15,16
manuals 37:21
manufacture 19:8
  48:25
manufactured 41:24
  48:22 51:6 72:17
  79:14
manufacturer 19:12
  52:6,10 57:23
manufacturers 18:6
  19:17 72:13
manufacturer's
  40:17 41:6 80:13
manufactures 17:16
March 21:17 48:23
  74:17,22 77:3,7
  78:23 79:3
mark 15:10 27:15
  30:17 42:4,25
  44:3,4 46:8 47:14
  49:9 76:2
marked 3:2 15:15,19
  23:21 25:5 26:1
  26:18,21 27:17,20
  29:7,25 30:19,22
  31:1,4 32:8,14
  34:21,23 42:5,8
  44:6,8 46:9,12
  47:16,19 49:11,13
  50:11,13 65:14
  70:18 76:4,6
market 4:19 18:12
Mary's 17:11
Master 1:5
master's 10:25 11:8
matter 14:13,22
  15:19 22:9 24:6
  26:22 30:9 31:4
  34:24 67:7 68:9
  68:10

matters 83:13
McALLISTER 5:5
  19:22 40:5,6
  81:11
mchiu@morganlew...
  4:21
MDL 1:7
mean 12:21 13:22
  14:1 15:6 18:1
  19:5 29:15 33:25
  34:10 41:10 42:17
  52:17 56:3 64:24
  66:25 69:3 71:7
  81:23
means 7:7 13:15
  62:12
measure 34:2
measured 34:4
meet 12:13
meeting 13:4
meetings 75:4,11,14
members 79:19
memory 12:22 37:20
mention 7:18 80:24
mentioned 12:16
  13:8 18:21 19:13
  27:9 37:12 40:21
  60:7 68:20 70:16
met 6:9 11:20 12:12
  18:6 67:10 73:24
  74:5
Michelle 4:18 6:11
  69:3
Milton 4:10 16:16
  16:21 17:2,5,8
  83:9
mind 7:1 43:9
Minneapolis 20:2
Minnesota 73:22
minutes 58:17
mistake 17:3
model 2:20 45:12
  48:15,19 52:22
  53:6,6
Molly 21:4,4 46:25
money 63:11,12,16
  71:13
monitor 63:21 79:17
monitors 63:18
month 21:11
months 21:9 22:10
Morgan 4:19 6:12
MYERS 5:2

**N**

**Brigid Terry**

**N** 2:1 4:14
**name** 6:10,15 14:19
    18:17 20:12,15
    71:10 77:13 78:17
    81:21
**named** 19:16,25
    66:21 72:20,24
    83:10
**names** 19:9 73:9,14
**National** 11:1
**necessarily** 61:10
**need** 9:3,4 64:17,19
    64:20,21 77:9
    80:24
**needed** 18:14 52:15
    54:15 80:22,23
**negotiate** 55:18
**neither** 83:20
**never** 22:13 74:2
**new** 53:5,7
**newspaper** 59:19
**nodding** 8:4
**nonverbal** 8:3
**Nope** 39:14
**Norby** 73:22 74:5
**normal** 8:12
**Northern** 1:1 4:6
**Northouse** 1:25 4:7
    83:3
**Nos** 2:10
**notarial** 84:2
**Notary** 4:8 83:4
    84:6
**notes** 14:24
**notice** 2:9 4:7
    15:25 16:10 83:6
**November** 74:18,22
**number** 2:17 29:21
    42:22 44:4,24
    45:11,12 46:3
    48:19 49:5 51:1
    64:12 73:9
**numbered** 42:21
**NW** 4:23 5:3,6

**O**

**Oakland** 9:18
**oath** 6:3 7:5 31:16
    58:21 83:15
**objecting** 9:11
**objection** 9:12 40:7
    40:9 59:3 60:15
**Objections** 3:5,7,9
    23:23 25:6 26:5
    28:5

**October** 1:21 4:12
    83:7 84:3
**offer** 41:11 57:4
    59:20,22
**offered** 40:19 41:3
    41:15 57:23 59:13
**offering** 40:14
**office** 20:3,20 21:5
    37:24 47:2 73:17
**OFFICES** 4:15
**oh** 12:2 62:7 64:2
**okay** 7:3 8:2,6 9:6
    10:21 11:3,14,24
    12:2 13:3,14,18
    14:11,18 15:4
    16:12 18:16 19:13
    19:21,24 20:12,24
    22:23 24:16,22
    25:3,24 29:20,23
    30:13,16 31:15
    32:8 34:2,20
    36:19 37:21 38:20
    41:2,10,16 44:1
    46:6,20 49:8,24
    50:10,22 51:5,9
    53:8,15 58:14
    61:11 64:17 66:19
    68:1,19 69:23
    71:16,23 72:7,11
    74:8 78:7 79:5
    81:1 82:10
**old** 6:18 58:6
**once** 58:7
**ones** 23:4,6 29:16
    44:18
**online** 54:19
**opened** 34:18 46:21
**opposed** 53:20
**original** 3:12,17
**outside** 70:6
**overcharged** 67:6,8
**owner's** 24:10 37:23
    51:10,12,12,15,15
**owning** 58:9
**o'clock** 14:16
**O'MELVENY** 5:2

**P**

**P** 4:14,14
**page** 27:1 42:20,20
    43:1 52:3 71:24
    72:9 73:5 74:9,24
    74:25,25 75:3,18
    79:12
**pages** 26:24 27:7

    29:8 73:4
**Page(s)** 2:2
**paid** 18:14 24:14
    36:12,20,21 39:15
    52:7 55:18,20
    56:23 60:23,24
    61:13 62:3 63:11
    63:12,15
**Panasonic** 19:12
**Papale** 9:11 11:20
    12:3,12 13:8
    14:11 19:24 20:25
    21:21,24 38:11,17
    40:9 42:22 44:23
    58:15 59:2 60:15
    69:2 76:15 81:4
**papers** 22:23,25
    23:2
**paperwork** 11:25
**PAPOLE** 4:1,15
**paragraph** 72:1,2,9
    72:24 73:5,8,21
    74:8 75:1,1,3,17
    79:11,13
**parentheses** 45:24
**Park** 4:18 6:11
**part** 32:11 43:6,22
    57:19 61:1 75:2
**participate** 22:22
**participated** 6:22
**participating** 65:10
    78:10
**particular** 79:16,16
**particularly** 30:23
    52:14
**parties** 83:22,24
**party** 23:13
**passed** 62:1,18
**pay** 9:25 18:15
    55:24 60:20 63:24
**paying** 18:10 22:17
**payment** 66:17,18
**penalty** 28:17 31:22
**pending** 4:5 8:23
**Pennsylvania** 4:23
**people** 8:13 13:24
    22:19,20 65:2
    81:5
**percent** 39:20 62:4
**performance** 58:5
**performed** 58:9
**period** 37:3 59:23
    60:1 74:16,18,21
**perjury** 28:17 31:22
**person** 12:4 20:4,6

    20:12 21:4 73:20
    73:23 83:11
**personal** 38:23
    66:23 71:8 75:10
    75:12,22 79:23,24
    80:6
**personally** 32:22
    37:6
**Philips** 4:23 19:12
    72:5
**phone** 12:4,5 81:5,6
**photograph** 2:17,18
    2:19,20,22,23
    44:10,12,15 45:15
    46:8,13,13 47:15
    47:18,22,24,25
    49:14,15,17 50:9
    50:14,15,17
**photographs** 2:15
    35:6,10,12 44:17
    49:19
**physically** 40:24
**picture** 43:3 44:9
    46:16,18 47:5,7,8
    48:14 49:24 50:19
    52:16,20,20 53:2
    58:6
**pictures** 11:22
    12:17 34:24 35:15
    35:19 42:11,13
    49:21 66:18
**piece** 43:14
**place** 36:1 48:25
**plaintiff** 2:12 16:1
    19:25 23:10,14
    27:21 28:2,25
    31:18 77:13 82:1
**plaintiffs** 3:3,4,6
    3:8,10 4:4,17
    15:4,7 21:1 23:22
    24:5 25:6,9 26:4
    28:4 30:1 35:1,1
    64:7,24 65:15
    69:6,9 73:6,9,12
    74:10 76:10,17
    79:19
**player** 57:19,20
**please** 6:16 7:11,18
    15:10 27:16 30:18
    76:3
**pled** 71:9
**plug** 56:4
**plus** 11:2
**point** 9:14 50:4
**pointing** 50:8

Brigid Terry

position 16:21
positive 36:5
possible 37:13,16
  39:4 68:24 72:16
  72:19
predecessors 74:14
preparation 15:5
prepare 11:14,19
  13:5 30:10
prepared 11:16,18
preparing 14:24
  26:11
pretty 26:3
previous 16:2
previously 3:2
  23:20 25:4 26:1
  27:9 29:25 32:6
  57:9 65:14 68:2
  70:17 74:6 78:7,8
price 22:16 39:3
  55:18,19,20 57:4
  57:6 60:14,21,23
  60:24 61:23,25
  62:3,9,15 75:6,7
  79:20
prices 18:7,11,13
  59:20 67:11 75:5
  75:6,6
primarily 79:20
primary 9:21
privilege 24:23
  25:21
probably 59:5
Procedure 31:6
  67:23
proceeding 71:14
proceedings 6:22
produce 23:18
produced 25:1 27:1
  34:25 37:25 38:3
  38:7,10
product 19:18 32:23
  32:25 33:2 39:3
  58:1 61:18 65:3
  75:5 79:15
production 23:25
  24:18 25:8
products 17:16
  18:22 19:4,4,5
  33:6 49:1 59:15
  74:12 79:13,14,20
promised 65:10
promotion 40:14,15
promotions 59:14,18
proof 24:9

provide 64:19,21
provided 3:13 28:12
  62:22 66:11,13
proximity 20:21
Public 4:8 83:4
  84:6
purchase 24:9 32:22
  33:6 35:25 36:4,8
  38:22 39:11,16,21
  41:3,6 54:9,11,12
  54:13 55:1 60:10
  65:2
purchased 18:9 20:8
  33:2,12,16 36:10
  37:13,18 39:24
  41:17 51:6 52:10
  52:13,23 53:3,5
  53:17 54:22 55:6
  56:8,20 57:1
  60:12 65:2 66:15
  74:12 80:11
purchaser 1:8 3:3,4
  3:6,8,10 4:17
  23:22 24:5 25:6,9
  26:4 28:4 30:1
  31:17 35:1 62:1
  62:19 64:7,24
  65:15
purchasers 4:3 65:1
purchases 37:4 68:4
  79:19
purchasing 54:3
purposes 49:21
pursuant 4:7 16:10
  31:5 83:6
pursue 20:10
put 29:16,18 32:20
  44:3 71:20
p.m 82:15

Q

qualified 83:4
quality 52:16,18
  55:13 58:4
question 7:12,14
  8:16,18,23,24
  14:2,4 29:6 51:14
  59:7,8 60:25 62:5
  77:10 81:14,24
questions 7:10,17
  68:3 69:7,10 79:7
  80:22 81:3,7,10
  81:11
quick 81:14

R

R 4:14
range 60:20
ranges 75:7
ray 1:4 17:21 18:1
  18:17,18 19:5,9
  19:18 20:9 32:23
  33:3 43:20 45:16
  45:25 46:1,22
  61:1,21 62:9
  72:13 74:12
RDR 1:25
reached 75:4
read 13:1 22:23
  23:3,8 26:3 28:4
  28:7,9,18 29:4,13
  31:15,19 32:2
  33:21,22 34:3,6,7
  45:6 50:22,24
  67:8 69:12,18,19
  69:19 74:19 75:2
  75:8 77:21,25
  79:21
reading 11:13 16:23
  17:3,4 24:17
  69:22 70:1 72:5
  77:23,23 83:18
reads 28:2 48:25
  74:9 75:1 77:2
  79:13
real 68:16
really 53:8 60:8
  71:21
reason 9:7,13 61:3
rebate 40:17,19
recall 24:6,16
  25:12 27:24 29:12
  30:13,24,25 31:12
  33:9 34:15 36:25
  39:15,18,23,25
  40:1,4,13,16 41:2
  41:13,14 45:19
  53:21 54:21 55:4
  55:5,16 56:1 57:5
  57:6,21,25 64:3
  65:25 66:13 70:16
  76:20 77:6,8,23
  80:15,18 81:19
  82:3
receipt 24:12 39:11
receipts 66:17
receive 16:6 63:8
received 16:7 70:24
  71:16
receiving 24:16

Recess 58:18
recognize 15:21
  26:7 27:21 29:15
  30:6,22 35:5
  42:11 47:19 49:15
  50:15 65:17,21
  76:7
recollection 12:19
  12:25 41:5,9
  45:15
record 6:9,10,16
  7:20,25 9:15
  11:17 15:24 40:10
  49:19 50:8 52:2
  58:17 83:17
records 37:6
reduced 57:7 83:16
refer 29:22
reference 45:21
referenced 29:2,11
referred 3:2 45:20
  81:18
referring 51:19
  52:4 81:22 82:7,8
refers 46:3,5 51:1
reflected 62:3
refreshed 12:19,22
  12:24
regarding 12:20
  36:7 64:20 71:4
  71:18
register 63:23
registered 4:8 10:9
  10:15,19 83:3
  84:5
regular 68:15
reintroduce 6:10
related 83:21
Relates 1:6
relative 83:23
relevance 24:24
  25:21
relied 75:23
rely 63:7 78:5
  79:25 80:3
remember 6:23 7:16
  21:11 22:8 35:18
  36:10,12,13,15,18
  36:21 39:20,22
  40:2,18,20 63:20
  67:14 80:16
remind 58:21
reminder 77:9
remote 57:18
removed 50:1

Brigid Terry

replace 46:1
Reported 1:25
reporter 4:8 7:23
  8:8,14 15:17
  26:20 83:3 84:5
reports 56:17
represent 6:12 50:7
  72:8 77:1
representative 64:6
  64:16 65:6,11
represented 73:20
represents 13:23
request 24:17 38:7
requests 23:24 24:4
  24:7 25:8,13,18
  25:22
resell 33:11
resident 20:7 73:22
respect 25:21 51:2
responses 3:5,7,9
  3:11 8:4 23:23
  25:6 26:5,14
  27:10 28:5 30:2
  30:11,13 31:24
  32:4,11 67:17
  68:3,7,20,25 69:5
  69:6,10
responsibilities
  64:15
responsive 24:7
  25:13,18
restart 17:19
restroom 9:5
result 62:25
retailers 58:23
retain 37:21
retained 15:7
retention 14:5,7
right 7:19,20 14:1
  15:6,7,23 16:18
  21:18,20 29:18
  32:18,20 35:24
  37:10 40:11 43:12
  44:21 45:4 46:6
  48:17 49:6 50:2,3
  58:13 60:10,11
  61:5,23,24 62:10
  62:11,13,14 64:8
  64:9 67:22 68:5
  71:1 72:6 75:23
  76:18 77:4 78:11
  78:18 79:1,5 82:1
Rock 4:11 10:20
  83:10
role 14:21

room 39:1
Rule 31:6 67:24
rules 7:2 31:5
  67:23

_____

S

s 2:7,9 4:14 15:25
  23:24 25:7 26:6
  28:6 30:3
safety 46:2
sale 39:24,25 40:1
  53:16 56:8 63:22
sales 39:18,20
  59:18
salesperson 54:25
  55:4,10,14
Samsung 2:10 3:5,7
  5:3 19:12 23:23
  24:6 26:6,24
  27:11 28:6,24
  67:14 71:9 81:18
  81:21,23 82:4,8
San 1:2 4:19 13:25
  14:6
satisfactory 52:18
satisfied 53:2
savvy 52:19
saw 29:12 47:11
  52:1 63:20,23
  66:6 67:9 70:17
  77:6
saying 8:5,7 68:8
  69:9 71:10
says 7:24 27:1
  28:11,16,25 29:3
  31:6,16,17 45:9
  45:12 47:10 48:14
  48:17,22 49:6
  50:23 51:10,18,20
  51:21,23 52:4
  67:22 71:25 75:3
  77:3,5
scanning 43:4
Schaefer 20:16,17
  21:12,14
school 16:16,22,25
  17:1,2,8,9,11,13
  20:4
Scott 21:4 46:25
screen 33:20,24
  53:9,11,13 60:4,4
  65:4
screens 18:24
SDI 23:24 24:6 26:6
  28:6

seal 84:2
search 24:14,23
searching 24:6
  25:12
second 44:8 65:20
section 48:10 71:25
  73:6
see 9:2 16:1 24:12
  27:2 37:3 38:14
  44:16 50:4 59:19
  67:16,18,21 71:23
  73:5,6,10,22
  76:22,24 77:19
seeing 27:7 30:24
  65:25 72:4 76:20
seen 16:4 17:22
  24:2 25:10 26:9
  27:4 30:4 31:7
  35:8 41:22 44:9
  46:13 65:18,21
  66:3,5
select 53:19
sell 59:9 79:18
send 21:6
sense 7:21 8:9 9:15
  68:14
sent 22:25 23:1,5,6
  23:7
sentences 67:9
September 27:1,25
  35:20,20
serial 2:17 45:11
  49:5
served 23:10 31:19
serving 65:5
set 16:12 18:7
  23:24 25:3,8,24
  26:6,17 28:6 30:3
  30:16 31:19 32:12
  32:18 35:24 42:7
  45:17 47:13 49:8
  50:2,10 51:4
  53:12,13 54:9,11
  54:23 55:19,21
  56:2,3,4 75:25
  79:5,17 80:9 84:1
settled 71:13
Seymour 13:10 14:8
  20:6,18 37:24
shaking 8:4
shared 20:20
She'll 7:23
shop 18:13 54:17
  60:8
short 58:13

show 65:13 76:1
sign 52:1
signature 28:20,21
  31:9
signed 13:2 14:9
  27:13 67:18,21
signing 27:24 31:12
  83:19
sit 22:15
situation 22:18
  66:12,14
size 33:19 52:15
  53:9,11,11,13,16
  79:16
sizes 79:15
smaller 79:7
sold 63:18 64:4
somebody 68:25
son 20:2,13
soon 37:19
sorry 12:3 17:1
  21:16 22:1,1 26:2
  31:7 38:2 41:10
  42:18 47:12 48:12
  53:10 62:7 70:10
  74:25 77:8,11
  79:6
sort 40:14 41:11
  45:11
space 20:20,21
  52:15
speak 7:25 12:2
  15:4 20:24 21:2
  21:10 54:25 55:3
Spear 4:19
special 11:6 17:6
  59:20
specific 24:19,21
  41:14 55:17 78:4
  81:21,23
specifically 54:24
spelling 77:15
spoke 11:20 12:3
  14:11,12,14,17
  22:4 55:10
spoken 74:2
spot 40:25
ss 83:1
St 4:16 17:11
standard 79:15
standing 40:7
start 7:12 8:16,17
  43:2 58:20 62:8
  77:12
started 7:2 17:18

Brigid Terry

starting 73:4, 8
state 4:9, 11 6:15
  10:4 31:23 73:20
  83:1, 5, 10 84:6
stated 25:15
statements 37:2
states 1:1 4:5 9:25
  10:2 74:13
step 69:5
sticker 26:2 34:16
  43:6, 14 44:13
  45:16 47:25 48:14
  48:25 49:6 50:20
  50:23
stickers 34:12, 13
  42:14 45:19, 20
  51:21
sticks 36:24
stop 7:19
store 36:1 64:2
stores 54:17 56:8
  59:9, 13, 15, 22
Street 4:16, 19 5:3
  5:6
stubs 24:11
stuff 68:16
subbing 17:14
subparagraphs 75:21
subsidiaries 74:14
substitutable 79:18
suit 12:1 22:5
Suite 4:16
supplement 80:22
Supplemental 3:5, 7
  3:9 23:23 26:5
  28:5
suppose 39:8
supposed 70:12
sure 7:4, 22 8:14
  9:1, 22 12:21, 22
  18:6 19:20 36:25
  39:9 55:16 58:3
  58:15 59:9, 24
  63:19, 23 66:7
  67:24 69:2, 16
  73:21, 25
surprised 39:6
  73:23
sworn 6:2 31:16
  83:11
Systems 25:7 30:3
  30:10 31:21

**T**

T 2:7

table 22:15 67:10
TAC 48:17
tag 55:21
tags 42:14
take 8:20, 21, 23, 24
  9:4 14:24 35:10
  35:15 38:11, 15
  43:9 44:15 46:16
  47:22 49:17 50:17
  58:13
taken 4:2 11:2, 22
  17:22 83:22
talk 8:11 41:10
talked 24:11 67:11
talking 67:13
target 75:6
Taunia 1:25 4:7
  83:3
tax 39:18, 20
taxes 9:25 39:15, 18
teacher 16:23 17:4
  17:4, 6, 7
technology 54:4
telephone 4:22 5:2
  5:5 12:9, 11
television 2:22
  11:23 17:23, 24
  18:9, 10, 14, 15
  19:11, 13, 14, 19
  20:7 33:1, 11, 16
  33:19, 23 34:8, 9
  34:13, 18 35:13, 25
  36:4, 10, 22 37:13
  37:18 38:22 39:16
  39:21, 23 40:12, 21
  41:4, 16, 20, 25
  42:15, 16, 19 43:6
  43:8, 11, 12, 16, 18
  43:19, 23, 24 44:14
  44:20 45:1, 2, 17
  45:19 46:22 47:10
  48:1, 3, 8, 9, 10, 20
  49:25 50:1, 21
  51:2, 6, 10, 19, 20
  51:22, 23, 24 52:7
  52:13, 17, 19, 21, 22
  53:5, 7, 12, 13, 14
  53:20, 23, 25 54:4
  54:9, 11, 15 55:6, 7
  55:11, 13, 22 56:7
  56:14, 18, 21, 24
  57:2, 7, 15, 17, 24
  58:2, 9 59:20, 25
  60:10, 12 61:2, 8
  61:14, 22 62:1, 3, 7

  62:9, 19 63:21
  64:2, 20 65:3
  66:15, 18 79:17
  80:11
televisions 18:21
  53:15 54:15, 21
  58:24 59:9 63:16
  63:17
tell 13:22 17:20
  22:7 43:2 44:17
  46:18 49:24 50:19
  55:5 68:12 71:4
  73:15
telling 47:9
ten 58:8, 17 76:12
Tennessee 49:2
term 13:14 59:4
terms 24:12 52:19
Terry 1:18 2:3, 12
  2:14 4:1 6:1, 7, 17
  6:18 9:7, 17 10:21
  11:14 13:3 14:5
  15:17 16:1, 13
  17:15 19:21, 25
  23:10 24:16 25:25
  26:20 27:19 28:25
  30:21 31:3, 16
  32:22 35:5, 25
  38:7, 22 39:15
  40:12 41:16 42:7
  44:8 46:11 47:18
  50:13 51:5 58:20
  58:23 60:8 63:17
  64:6, 23 66:19
  67:5 76:11, 13
  78:7 80:10 81:18
  83:11
testified 6:3 39:2
  60:7 78:8
testify 9:8 83:12
testifying 7:8 16:9
testimony 7:7 83:18
text 44:5
TFT-LTC 54:5
Thank 38:20 69:18
  70:9, 10 82:10
thanks 19:24 70:2
  70:13
thereof 74:15
thing 6:21 8:11, 22
  16:19 21:24
things 21:6 36:17
think 12:7, 21 14:15
  16:7 17:7 21:18
  21:20 22:10, 14

  32:17 37:12, 19
  45:3, 5 46:4 47:1
  56:7 60:13, 21, 23
  61:7 62:24 63:13
  73:16 80:17 82:12
thinking 13:22
  19:20 21:17 36:5
third 3:3 65:15, 21
  65:24 70:21
thought 45:21 55:8
thousand 36:23 39:4
  39:5, 9 57:10
three 36:17 77:17
time 12:18, 22 14:12
  14:14, 17 17:5
  41:22 54:3 59:23
  60:1 63:20 64:1
  65:19 80:21 81:8
times 21:8
title 15:24 16:21
titled 26:3 27:21
  30:1 76:9
today 6:14 7:7, 11
  9:8 13:6 15:2, 5
  16:2, 4, 9 18:5
  21:25 23:11 26:9
  27:6 30:4, 24
  40:13 46:14 49:20
  60:23, 24 61:13
  63:18 64:4 66:6, 8
  69:6 70:19 76:20
  77:21 81:19
today's 17:25 19:3
  20:1
told 46:24
tooth 23:8
top 26:25 45:7 77:1
Toshiba 2:13, 18 3:9
  3:11 5:6 19:11, 14
  19:23 25:7 30:2, 9
  31:20 32:12, 16
  33:16 39:23 40:8
  42:1 45:8, 9 47:6
  47:10 49:1 51:8
  51:12, 15, 18, 20, 24
  52:1, 4, 7 53:19, 22
  56:7 67:14
Toshiba's 32:4
total 62:24
touching 83:13
Tower 4:19
transcribing 7:24
transcript 3:13, 17
transcription 83:17
trial 64:22

Brigid Terry

**tried** 37:5 66:17
**true** 28:12,17 31:24
  55:12 83:17
**truth** 83:12,12
**truthfully** 9:8
**try** 8:11,17
**tube** 1:4 17:21,23
  18:1,11,17,19
  19:5 20:9 32:23
  33:3,20 34:6
  43:20 44:22 45:3
  45:5,17,20,22,25
  46:2,4,4,5,19,23
  48:20 50:5,6,20
  51:2 52:7,11
  61:22 62:4,6,9
  65:2,4 74:12
**tubes** 18:7 19:9,18
  72:13
**tube's** 61:1
**turn** 18:8 71:24
  74:8,24 79:11
**turning** 28:23
**TV** 54:8 57:10
**twice** 45:18
**two** 12:14,14 34:12
  45:18
**type** 46:2 54:4
**types** 18:22
**typewriting** 83:16

_____
### U

**uh-huh** 7:6 8:7
  15:20 19:15 24:1
  26:8,23 35:4
  47:12 62:17 71:12
**uh-uh** 8:7
**undergrad** 10:24
**underneath** 48:22
**understand** 7:5,10
  8:10,19 13:11
  16:9 18:24 22:21
  33:21 45:2,3 48:4
  62:2 64:18 65:8
  70:24 71:8
**understanding** 14:2
  14:4 17:20 19:17
  20:5,19 25:16
  46:19 59:12,22
  61:21 64:13 65:1
  68:6,10 69:24
  72:12 73:1,2
  78:21,24
**understood** 7:14
**unfamiliar** 69:21

**United** 1:1 4:5
  74:13
**University** 10:24
  11:1,4
**unnamed** 74:15
**unscrewed** 43:11,15
  51:25
**use** 9:5 36:14 38:23
  38:25 59:3 60:16

_____
### V

**V** 45:24 71:25
**vague** 19:22 40:7
**Value** 4:10 83:8
**variety** 72:2
**VCR** 57:19
**vehicle** 10:7,9
**vehicles** 10:13,17
**verification** 2:12
  2:14 11:21 13:1
  27:13,21,24 28:2
  29:3,11 31:5,15
  32:14 67:19,23
**verifications** 12:16
  68:2
**verified** 26:14
  27:10
**verify** 28:3,11
**verifying** 30:13
  68:3
**versus** 62:16
**Village** 36:2 37:4
  40:14,19 41:11,15
  51:7 52:25 54:10
  54:12,13,22 55:9
  55:22 56:13,20,23
  57:1,4,24 60:9,13
  61:9
**vote** 10:19

_____
### W

**waived** 83:19
**walked** 55:9,11
**walking** 60:9
**want** 8:20 15:12
  29:22 40:6 42:22
  42:23 52:20 58:20
  67:19 68:19
**wanted** 6:9 20:10
  22:22 52:21 68:1
  79:11 80:10
**warranties** 41:3
**warranty** 41:6,12,15
  80:13,13
**Washington** 4:23 5:3

  5:6
**wasn't** 21:14 22:10
  39:6 40:1 55:7
  62:5
**water** 9:2
**way** 11:16 33:9 40:2
  69:25
**week** 11:20 12:4
  13:4 14:12
**went** 6:23 37:6
  54:16 55:5,8
  56:13 57:6
**we'll** 7:1 38:11,18
  38:19
**we're** 82:12,13
**we've** 32:14 38:19
  44:8 46:11 49:20
  58:12
**whereof** 84:1
**WHITE** 5:5
**win** 63:8
**Wisconsin** 1:20 4:9
  4:12 9:18 10:1,4
  10:10,15,20,24
  11:4 20:7 31:23
  83:1,5,10 84:6
**wit** 83:11
**withhold** 24:22
  25:20
**witness** 2:2 4:1,17
  6:2 21:22 50:8
  81:8,14 83:18
  84:1
**word** 28:21 59:4
  60:16 77:25,25
**words** 8:8 18:3
  64:14
**work** 17:9,24 68:14
**worked** 16:17 17:8
  17:11,12,12,15
  20:2,4,13
**working** 40:22
**works** 18:18
**world** 72:14
**worry** 40:10
**wouldn't** 21:10
  73:23
**write** 36:16

_____
### X

**X** 2:1,7

_____
### Y

**yeah** 7:9 11:13
  12:14 13:19 16:5

  22:3 24:21 25:2
  30:12 35:23 36:6
  39:19 43:24 68:6
  72:7
**year** 21:12 35:21,22
**years** 9:20 16:18,20
  22:11 58:5,8
**yesterday** 11:21
  12:12 13:4
**YS-59790** 2:24 50:23

_____
### Z

**zip** 49:2

_____
### $

**$600** 36:23 57:10
**$800** 36:24

_____
### 0

**000017** 35:2 52:3
**000073** 35:3
**000563** 35:3

_____
### 1

**1** 42:23 74:8,9,17
  74:22
**100** 62:4
**103** 72:2
**104** 72:9,24
**11** 3:3 65:14 70:18
  71:21 78:3
**11th** 65:23
**117** 4:16
**1299** 4:23
**13th** 5:6
**1308** 4:16
**14th** 31:13 67:22
**15** 2:9
**150** 75:1,21
**150-a** 75:7
**150-j** 75:17
**1625** 5:3
**17** 1:21 79:12 84:8
**17th** 4:12 27:25
  83:6
**17-18** 2:16
**18** 35:2
**19** 73:5,8
**19th** 84:2
**1917** 1:7
**1995** 20:8 59:23
  60:2 66:15 74:17
  74:22
**1996** 6:25 37:17
**1997** 37:3,12,14

Brigid Terry

**1997-98** 36:5
**1998** 21:19,20,22
  36:5 37:12 48:23

## 2

**2** 42:23
**20** 16:18,20 58:5
**20004-2400** 4:23
**2005-3807** 5:6
**2006** 5:3
**2007** 20:8 59:23
  60:2 66:16 74:18
  74:22
**2008** 21:21,23 22:2
  77:4,7 78:23 79:3
**2010** 31:13 65:23
  67:22
**2011** 27:2,25 67:20
**2012** 1:21 4:12 83:7
  84:3
**2015** 84:8
**202-383-5164** 5:4
**202-639-1117** 4:24
**202-729-3807** 5:7
**21st** 77:3,7 78:23
  79:3
**23** 3:6
**24** 72:9
**25** 3:8
**25th** 74:18,22
**26** 2:10 3:4
**27** 2:12 9:20
**29** 3:10

## 3

**3** 42:23
**3:08-CV-1559-SC**
  77:3
**30** 2:13 11:2
**30-inch** 33:20,24
  34:5
**31** 2:14
**33** 73:21
**33(b)(3)** 31:6
**34** 2:15 74:25
**35** 74:24 75:3,18
**36-inch** 33:20 34:6
**37087** 49:2
**3900** 4:10 83:9

## 4

**4** 14:16 42:23
**4:05** 4:13 83:7
**415-442-1000** 4:21
**42** 2:17

**424** 2:9 15:15,19
**425** 2:10 26:18,21
  28:23 29:8
**426** 2:12 27:17,20
  29:11
**427** 2:13 30:19,22
  32:9
**428** 2:14 31:1,4
  32:15
**429** 2:15 34:21,24
  52:3
**430** 2:17 42:5,8
  43:2
**431** 2:18 44:6,9,25
  45:6
**432** 2:19 46:8,9,12
**433** 2:20 47:15,16
  47:19 48:14
**434** 2:22 49:11,14
**435** 2:23 50:11,14
**436** 2:25 76:4,7
  78:2 79:8
**44** 2:18
**46** 2:19
**47** 2:20
**49** 2:22

## 5

**5** 42:23 73:5
**5:40** 82:15
**50** 2:23
**51** 72:1,24
**510** 9:18
**52** 3:4 26:2
**53** 6:19
**563-564** 2:16
**564** 35:3

## 6

**6** 2:4
**600** 39:3,5,6,7
**63** 79:12,13
**65** 3:3
**66** 3:6 23:21
**67** 3:8 25:5

## 7

**7th** 27:1
**701** 5:6
**73-74** 2:16
**74** 35:3
**76** 2:25
**767-963-1704** 4:17
**78** 3:10 29:25 30:16
  32:5,16

## 8

**81** 2:5

## 9

**9** 71:24
**92567585** 49:6
**94105-1126** 4:20
**94574** 4:16
**9720** 48:17
**98** 21:17 37:3

# EXHIBIT 64



**TOSHIBA**

**A90AHH50X02 (V)**

Made in the USA from US and imported Components

© LMRPRO    R10EG87
ESA 435

THE CATHODE RAY PICTURE TUBE IS
PERMANENTLY BONDED TO
CABINET TUBE, DO NOT ATTEMPT TO
SEPARATE TUBE FROM CABINET. DO
NOT ATTEMPT TO REPLACE THE
ONLY WITH SAME PICTURE TUBE
TUBE ASSEMBLY. THE INTEGRAL YOKE PICTURE
ONLY WITH SAME TYPE INTEGRAL YOKE PICTURE
WHEN REPLACE PICTURE TUBE IS
REFER TO SERVICING 10

WARNING: THIS CATHODE RAY TUBE EMPLOYS INTEGRAL IMPLOSION
PROTECTION. REPLACE WITH A CATHODE RAY TUBE OF THE SAME TYPE
USED FOR CONTINUED SAFETY.

ATTISSEMENT: CE TUBE CATHODIQUE EST ÉQUIPÉ D'UN DISPOSI-
TIF DE PROTECTION CONTRE L'IMPLOSION. REMPLACER PAR UN
MÊME MODÈLE POUR NE PAS COMPROMETTRE LA SÉCURITÉ.

この陰極線管方式を採用しております。ブラウン管を交換
のときは、同じ品名のブラウン管を使用してください。

EXHIBIT
PENG40 B00-581-6689
431
TKN 10-17-12

# EXHIBIT 65

**TABLE 1. LIST OF CERTIFIED 22 STATES
AND THEIR RESPECTIVE CLASS REPRESENTATIVES**

| | | |
|---|---|---|
| 1. | AZ | Brian Luscher |
| 2. | | Steven Ganz |
| | CA | Jeffrey Figone |
| 3. | DC | Lawyer's Choice Suites, Inc. (Guttman) |
| 4. | FL | David Rooks |
| 5. | HI | Sandra Riebow (Now replacing the late Daniel Riebow) |
| 6. | IA | Travis Burau |
| 7. | KS | Southern Office Supply, Inc. |
| 8. | ME | Kerry Lee Hall |
| 9. | MI | Lisa Reynolds |
| 10. | | Barry Kushner |
| | MN | David Norby |
| 11. | MS | Charles Jenkins |
| 12. | ND | Gary Hanson |
| 13. | NE | Steven Fink |
| 14. | NM | Marylou Hilberg representing Craig Stephenson's Estate |
| 15. | NV | Gregory Painter |
| 16. | NY | Louise Wood |
| 17. | NC | Patricia Andrews |
| 18. | SD | Ellingson |
| 19. | TN | Albert Sidney Crigler |
| 20. | VT | Margaret Slagle |
| 21. | WV | John Larch |
| 22. | WI | Brigid Terry |