# EXHIBIT 8



info@certifiedtranslate.com | 2425 Olympic Blvd., Suite 4000W | usa 1-888-856-2228
www.certifiedtranslate.com | Santa Monica, CA 90404 | int +1-310-684-3153
| | fax +1-310-564-1944

## CERTIFIED TRANSLATION



A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: **David Y. Hwu** | Street Address: **706 Sansome Street** |
| Firm: **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
| --- |
| |
| **IRI-CRT-00003574E** |
| |
| |

| Source Language: **SIMPLIFIED CHINESE** | Target Language: **ENGLISH** |

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:** Sean Kirschenstein, Director      **Date:** February 27, 2019

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On _Feb. 27, 2019_ before me, ___Kristin Gail Chamberlain___, Notary Public, appeared ___Sean Kirschenstein___, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Kristi Clui_



KRISTIN GAIL CHAMBERLAIN
Notary Public - California
Los Angeles County
Commission # 2141880
My Comm. Expires Feb 7, 2020

Scanned and created by Camscanner [QR Code]

090

IRI-CRT-00003574E_Translation

# Caihong Electronics Group Company

## **Certificate of Account Transfer**

*March 30, 1998*

Transfer No. Z *69*

| | Debit | | | Credit | | | Summary | Amount | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| General | Subsidiary | √ | | General | Subsidiary | √ | | Hundred Millions | Ten Millions | Millions | Hundred Thousands | Ten Thousands | Thousands | Hundreds | Tens | Ones | Cents |
| Foreign Exchange Accounts Receivable | 007 | √ | | 505 Agency Export Sales Revenue | 999 | √ | *Transfer of revenue from acting as agent for Royal in exporting display devices* | | | | | 1 | 3 | 9 | 9 | 3 | 20 |
| | | | | | | | 8TY017   $1690 | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Total | | | | | | | *Thirteen thousand nine hundred and ninety-three yuan and twenty cents* | | | | ¥ | 1 | 3 | 9 | 9 | 3 | 20 |

Form completed by **_Dong Congfeng_**

Verified by **_Geng Jun_**

Recorded by _____

Supervisor _____

CONFIDENTIAL

CONFIDENTIAL

IRI-CRT-0000357 4

彩虹电子集团公司

转帐凭证

1 9 9 8 年 3 月 3 0 日

字 凭证编号 69

| 科 目 | 明细科目 | 方 | 贷 方 | 摘 要 | 金 额 |
|---|---|---|---|---|---|
| | | | 一级科目 明细科目 | | 亿千百十万千百十元角分 |

807

909

主管　　　　　　记帐　　　　　审核　　　　　出纳　　　　　制票

由 扫描全能王 扫描创建

CONFIDENTIAL

# 中国电子进出口彩虹公司

## CEIEC CHINA NATIONAL ELECTRONICS IMP&EXP CAIHONG COMPANY

### INVOICE

P.O.BOX NO. CAIHONG,
SHAANXI P.R.CHINA
Telex.7073 XYCEC CN
Cable.1717 XIANYANG
TEL(0910)3311391
FAX(0910)3311396
Postcode:712021

MESSRS. WESTY

| Invoice No. | Name of Vessel | Loading Port | Discharging Port | On or About | Licence No. |
|---|---|---|---|---|---|

| Invoice No. | 9701T | BY AIR | | | |
| Date | JAN.1.1998 | XIAN | U.S.A. | | |
| | B/L No. | L/C No. | Contract No. 98EN59HCT40201 | | |

| Marks & Nos | Description & Quantity | Unit Price | Amount |
|---|---|---|---|
| N/W | 14"MONITOR | USD106.00 | USD816.00 |
| | 15~ MONITOR | USD108.00 | USD408.00 |
| | 17"MONITOR | USD241.00 | USD964.00 |

(SAY:UNITED STATES DOLLARS ONE THOUSAND SIX HUNDRED AND NINETY ONE)

CHINA NATIONAL ELECTRONICS IMP&EXP
CAIHONG COMPANY

E. & O.E.

MANAGER

IRI-CRT-00003575

# EXHIBIT 9



# 彩虹集團電子股份有限公司
## IRICO GROUP ELECTRONICS COMPANY LIMITED*

（A joint stock company incorporated in the People's Republic of China with limited liability）

（Stock Code: 0438）

## 2010
## Annual Report

* For identification purposes only

# Contents

| | |
|---|---|
| 2 | Financial Highlights |
| 4 | Chairman's Statement |
| 8 | Management Discussion and Analysis |
| 20 | Profiles of Directors, Supervisors and Senior Management |
| 26 | Report of the Directors |
| 43 | Report of the Supervisory Committee |
| 44 | Corporate Governance Report |
| 57 | Independent Auditor's Report |
| 59 | Consolidated Statement of Comprehensive Income |
| 60 | Consolidated Statement of Financial Position |
| 62 | Statement of Financial Position |
| 64 | Consolidated Statement of Changes in Equity |
| 66 | Consolidated Statement of Cash Flows |
| 68 | Notes to the Consolidated Financial Statements |
| 162 | Five Year Financial Summary |
| 163 | Corporate Information |

1



# Financial Highlights

## 1. Results

|  | 2010 (RMB'000) | 2009 (RMB'000) | Increase/ (decrease) (RMB'000) | Percentage (%) |
|---|---|---|---|---|
| Turnover | 2,717,770 | 2,097,251 | 620,519 | 29.59 |
| Cost of sales | (2,311,974) | (2,188,395) | (123,579) | 5.65 |
| Gross profit/(loss) | 405,796 | (91,144) | 496,940 | (545.23) |
| Gross profit margin *(%)* | 14.93% | (4.35%) | 19.28% | N/A |
| Operating profit/(loss) | 132,745 | (1,515,475) | 1,648,220 | (108.76) |
| Operating profit margin | 4.88% | (72.26%) | 77.14% | N/A |
| Profit/(loss) for the year attributable to owners of the Company | 29,075 | (1,113,014) | 1,142,089 | (102.61) |
| Profit margin *(%)* | 1.07% | (53.07%) | 54.14% | N/A |
| Earnings/(loss) per share for the year attributable to owners of the Company *(expressed in RMB per share)* | 0.0136 | (0.5212) | 0.5348 | (102.61) |
| Dividend per share *(RMB)* | — | — | — | — |

2



*Financial Highlights* (Continued)

## 2.  Financial position

| | 2010<br>(RMB'000) | 2009<br>(RMB'000) |
|---|---|---|
| Property, plant and equipment | 5,830,486 | 1,718,922 |
| Net current assets | 2,043,997 | 241,765 |
| Cash and bank balances | 2,698,430 | 1,077,661 |
| Total liabilities | 5,106,823 | 3,150,959 |
| Short-term bank and other borrowings | 1,173,272 | 1,221,949 |
| Total equity | 5,737,699 | 1,901,194 |

## 3.  Operating indices

| | 2010 | 2009 |
|---|---|---|
| Returns on equity (on annualized basis) | 1.36% | (52.12%) |
| Inventory turnover (days) | 96 | 81 |
| Trade receivable turnover (days) | 64 | 157 |
| Trade payable turnover (days) | 112 | 66 |
| Current ratio | 1.88 | 1.1 |
| Debt to equity ratio | 1.71 | 1.52 |

3

# Chairman's Statement



Chairman's Statement

**Dear Shareholders,**

I am pleased to present the results of IRICO Group Electronics Company Limited ("IRICO" or the "Company") and its subsidiaries (together with the Company, "the Group") for the year ended 31 December 2010 (the "reporting period").

2010 is a critical year for the Group to achieve successful transformation by adjusting its structure and accelerating its growth. During the period, we received the guidance and care from leaders of related authorities such as the State-owned Assets Supervision and Administration Commission of the State Council (SASAC) as well as great support and help from all walks of life. In addition to speeding up the pace of transformation with effective operation of its traditional colour picture tube ("CPT") business, capitalizing on the favorable opportunities from the macro-economic recovery, the Group achieved good results by further optimizing the industrial structure to intensify resource optimization and adjustment, and enhancing the efficiency of technological innovations.

During the reporting period, the Group recorded the sales of RMB2,717,770,000, representing an increase of 29.59% over the corresponding period, gross profit margin of 14.93%, an increase of 19.28 percentage points over the corresponding period, the profits attributable to equity owners of RMB29,075,000, and has turned a loss-making enterprise into a profitable one.

## Rapid development of new businesses with initial success of strategic transformation

During the reporting period, the strategic transformation of the Group achieved initial success. In addition to the effective operation of its traditional CPT business, the Group witnessed rapid growth in its new businesses such as solar photovoltaic glass, liquid crystal display ("LCD") glass substrates, and luminous materials.

As to solar photovoltaic glass business, the Phase I project production line in Xianyang rapidly reached the production capacity with profits after its completion in February 2010, and its product quality is at the top level in China. The Phase II project production line in Xiannyang was completed at the end of 2010 with sales recorded. The construction of Phase III project in Xianyang and Hefei Project were officially commenced on 19 October 2010 and 10 November 2010, respectively. Currently, the project construction goes smoothly, and it is expected to be completed from and put into production in succession by the end of 2011. The preparation of Zhangjiagang project is still under way.

During the reporting period, the Group, as the first enterprise in China and the fifth one in the world with the manufacturing technology and production capacity of thin film transistor liquid crystal display ("TFT-LCD") glass substrate, constantly improved its product yield of LCD glass substrate Phase I project. The LCD glass substrate Phase II projects built in Xianyang, Zhangjiagang and Hefei went smoothly. Among those Phase II projects, the CX02 production line in Xianyang was completed on 16 January 2011, with qualified products generated from the assembly lines; the CZ01 production line in Zhangjiagang was completed on 28 December 2010 with qualified products generated from the assembly lines, and the CZ02 production line entered into the pilot production stage with furnace ignition on 9 February 2011; the CH01 production line in Hefei, being the first sixth generation glass substrate production line in China, successfully produced glass sheets at the



## **Chairman's Statement** *(Continued)*

first attempt on 30 January 2011. Currently, the Group was accredited by many LCD panel manufacturers in terms of its LCD glass substrate products, and is in the process of actively seeking accreditation from other customers. The Group has reached clear intention with some customers from Taiwan and Mainland China in respect of its sales, and the Group has commenced its supply to them.

As to luminous materials business, the sales volume of the Group's tri-phosphor fluorescent lamp powder in 2010 recorded an increase of approximately 50% over the corresponding period, being the definite No. 1 in China in terms of the market share. Cold cathode fluorescent lamp phosphor ("CCFL phosphor") for LCD backlight business and plasma display panel phosphor ("PDP phosphor") compatible production lines were put into full operation. The sales of CCFL phosphor exceeded 100 tonnes, representing an increase of approximately 3 times over last year. Electronic silver paste achieved sales in small quantities. In addition, the research and development and marketing of new products such as PDP phosphor, lithium battery powder, light emitting diode ("LED") phosphor ("LED phosphor") were in progress as scheduled.

The Group's production line project of the third generation display organic light-emitting diode ("OLED") in Foshan, Guangdong Province was put into trial production on 8 November 2010, and successfully illuminated the first OLED display made with the Group's proprietary technology on 21 December 2010. This symbolizes the critical breakthrough in the OLED technology by virtue of the independent research and development of IRICO, laying a solid foundation for the Group's scale development in the OLED industry.

6



*Chairman's Statement* (Continued)

## Future Prospects

Looking into 2011, the operations of the Group will usher in a new situation. The production capacity of solar photovoltaic glass will be among the top in China; the newly-built LCD glass substrate production lines will be put into full operation; and the luminous materials business will maintain steady growth. The Group will adhere to the operational guideline "achieving steadfast growth by adjustment and optimization" and strengthen its independent innovation in order to successfully realize its transformation by virtue of its foresights, advanced technology and stringent management.

The Company will further strengthen communications with shareholders and investors, and actively take advices and suggestions from investors as to the future development of the Group. With our strategic transformation taking shape, we believe that the Group will have a brighter prospect and bring better returns for its shareholders in the future.

## Acknowledgement

I have the pleasure to extend my gratitude on behalf of the board (the "Board") of directors (the "Directors") of the Company to the Company's shareholders (the "Shareholders"), business partners and members of the community for their care and support for the Company, and to express my heartfelt gratitude to all of our management members and employees for their dedicated hard work.

**IRICO Group Electronics Company Limited**
**Xing Daoqin**
*Chairman*

Xianyang, the People's Republic of China
30 March 2011

7

# Management Discussion and Analysis

## 1.    Industry Analysis

### (1)   Solar Photovoltaic Glass

In 2010, benefiting from the recovery growth in the traditional markets such as Germany, Italy, United States and Japan, as well as the rise of emerging markets such as Czech, France, China and Australia, photovoltaic batteries installed around the world for the whole year of 2010 amounted to 15.7GW, representing an increase of approximately 118% over the corresponding period. Meanwhile, as the largest production base and export base of solar photovoltaic batteries and modules in the world, China's output of photovoltaic modules for the whole year amounted to 8GW, representing an increase of approximately 83% over the corresponding period.

The global solar photovoltaic industry witnessed the growth beyond expectation in 2010, and benefiting from this, the global photovoltaic glass market remained prosperous during the reporting period, with total demand of approximately 120 million square meters, representing an increase of approximately 76% over the corresponding period. Accordingly, the output of solar photovoltaic glass also recorded a significant increase. However, the solar photovoltaic glass was in short supply to some extent during the reporting period since its growth lagged behind the increase in the output of solar photovoltaic modules over the same period.

Looking into 2011, in the context that some developed economies in Europe and America will adjust their subsidy policies regarding photovoltaic products, the growth rate of the global photovoltaic market will be slower than that in 2010. It is expected that the scale of the global photovoltaic market will reach 22.2GW, representing an increase of approximately 41% over corresponding period. In view that the governments at all levels actively promote the policy of energy conservation and emission reduction, the domestic needs of the PRC market will continue to maintain the high year-on-year growth of over 100%, and the scale of the domestic photovoltaic market in 2011 will reach 700MW, an increase of approximately 75%, becoming one of the regions with the fastest growth of the photovoltaic market in the world.



Forecast of global photovoltaic market scale (MW)

*Source:*   iSuppli Photovoltaic Glass Market Forecast Q4 2010

**Management Discussion and Analysis** *(Continued)*

## 1.   Industry Analysis *(continued)*

### (2)   TFT-LCD Glass Substrate

During the reporting period, benefiting from the steady growth of global TFT-LCD industry, the LCD glass substrate market continued the favorable trend. In 2010, the global demand for TFT-LCD glass substrates (including the glass substrates for color filters) amounted to 305 million square meters, representing an increase of approximately 26% over the corresponding period, while some models of those products were in obvious short supply during certain months in the first half of 2010. In the meantime, compared with most links of the TFT-LCD industry chain, the prices of glass substrates for the whole year of 2010 recorded a slight decline. Taking the fifth generation substrates as an example, the decrease of its price in 2010 was not less than 10%, so it ensures that the glass substrates can always be one of the most profitable products in the whole TFT-LCD industry chain.

As to the PRC market, with the increasingly vigorous LCD panel industry, the domestic demand for glass substrates continued to grow. In 2010, both the PRC imports and import amount of LCD glass substrates recorded a year-on-year increase of over 100%, amounting to US$650 million.

Looking forward, PRC has become another newly emerged production base of global TFT-LCDs, and with the continued growth of the LCD panel industry, its glass substrate industry is entering the golden development stage. It is expected that in the next five years, the PRC LCD glass substrate market will maintain high growth at the rate of about 50% per year. In addition, the market scale will exceed 100 million square meters during this period, and the local supply tends to be tight, so there will be huge market potentials for import substitutions. The domestic companies equipped with the glass substrate core technology will have huge market opportunities in the next few years.



**Forecast of PRC LCD glass substrate market in the next few years**
**(ten thousand square meters)**

*Source:*   AVC奧維諮詢，2011

**Management Discussion and Analysis** *(Continued)*

## 1.   Industry Analysis *(continued)*

### (3)   Luminous Materials and Others

During the reporting period, the environmental protection remained to be the dominant development trend in the luminous materials industry, so the markets for energy saving lamp phosphor, PDP phosphor, lithium battery powder, LED powder witnessed strong growth. As to the energy saving lamp phosphor, there were increasingly apparent effects after the developed countries and regions such as Europe, United States, Australia adopted the policy of prohibiting the use of incandescent lamp. The energy saving lamps gradually captured more market shares among the lighting products for their excellent cost performance. As the largest production and export base of energy saving lamps in the world, China sustained rapid growth in the output of energy saving lamps in 2010, and exports exceeded 3 billion units for the first time, representing an increase of approximately 37% over the corresponding period. Accordingly, the demand for the tri-phosphor fluorescent powder for energy saving lamps in 2010 saw substantial increase in 2010.

Looking into 2011, the global energy saving lamp market is expected to maintain good growth momentum, thus boosting the steady growth of energy saving lamp phosphor market. Moreover, the Chinese government strengthened the exports management of rare earth and rare earth related products in the second half of 2010; accordingly, China's pricing power will be significantly improved in the global energy saving lamp phosphor market and the policy will be favorable to the leading enterprises in the domestic luminous materials sector. With the adjustment of global industry pattern, there will be definite business opportunities in the PRC market for CCFL phosphor, PDP phosphor, electronic silver paste, lithium battery powder and LED phosphor in 2011.

### (4)   Display Devices

During the reporting period, the dominance of flat panel display in the global display devices industry was further strengthened, and the CRT (being the cathode ray tube which includes CPT) display technology tends to be marginal.

In 2010, the global output volume of CRT television sets amounted to 38.47 million units, representing a decrease of approximately 25% over the corresponding period. It is expected that the CRT business will continue the recession in 2011.

**Management Discussion and Analysis** *(Continued)*

## 1.   Industry Analysis

### (4)   Display Devices *(continued)*

In 2010, the global TFT-LCD industry continued the growth momentum, and the output volume of large size LCD panels (10 inches or above) for the whole year amounted to 665 million units, representing an increase of approximately 26% over the corresponding period. Meanwhile, the capital expenditure in the global TFT-LCD industry was close to the historical high, indicating that the TFT-LCD industry is still in its steady growth stage. In 2010, the production of LCD television sets in the PRC exceeded 80 million units for the first time, and the production of personal computers (including notebook computers) exceeded 200 million, therefore, it made Mainland China become the most important LCD consumption market in the world. At the same time, driven by the PRC government's policy of optimizing the industry structure and accelerating the industry upgrade, the production and construction of TFT-LCD panels in Mainland China speeded up continuously. The first production line of the sixth generation panels in the PRC was officially put into mass production. At the same time, there were another two high generation (over 7.5) panel production lines that obtained the approval from relevant PRC authority, thus entering the substantial construction stage.

In respect of PDP, benefiting from the rise of 3D display and further improvement of PDP cost performance, the PDP television sets market became increasingly vigorous in 2010, and its global output volume amounted to 18.09 million units, representing an increase of 28% over the corresponding period. Fueled by the rapid development of PDP panel supply in China and the promotion of related manufacturers, the PDP television sets market in China will further increase in 2011, and it is expected that the market scale of 2011 will be close to 2.90 million units, representing a year-on-year increase of over 30%. This will bring about better business opportunities to domestic PDP parts and components manufacturers.

In the field of OLED, benefiting from the continued growth of high-end smart mobile phones demand, during the reporting period, AM-OLED continued the significant growth, and increased over 100%for the whole year to 45.64 million, becoming the fastest growing display device technology. Looking into 2011, it is expected that the output volume of PM-OLED can be maintained basically on a par with that of 2010, and the sales of AM-OLED will reach approximately US$1.7 billion, representing an increase of approximately 50% over the same period. In addition, from the global perspective, the 4.5 generation AM-OLED production technology will be mature in 2011.

11

**Management Discussion and Analysis** *(Continued)*

## 2.   Business Review

### (1)   Operation Highlights

With continuous favorable global economy and rapid development of the Group's new businesses, the Group's results of 2010 recorded significant improvements over the same period last year. The sales of the Group in 2010 amounted to RMB2,717,770,000, representing an increase of RMB620,519,000 as compared to last year. Operating profits amounted to RMB132,745,000, representing an increase of RMB1,648,220,000 over last year. Gross profit margin was 14.93%, representing an increase of 19.28 percentage points as compared to the previous year (2009: -4.35%). Profits attributable to owners of the Company amounted to RMB29,075,000, representing a turnover from losses to profits.

During the reporting period, the strategic transformation of the Group achieved initial success. In addition to the effective operation of its traditional business, the Group witnessed rapid growth in its new businesses, such as solar photovoltaic glass, LCD glass substrates, and luminous materials.

### (2)   Progress of New Operations

•   *Solar Photovoltaic Glass*

In recent years, the low carbon economy, energy saving and emission reduction and the development of renewable energies have been the consensus among all governments of different countries. Currently, the solar photovoltaic has become one of the fastest growing sector in the new energy industry.

The solar photovoltaic glass business is the new business that has ample market potentials and good economic benefits, which can fully capitalize on its competitive advantages. During the reporting period, the Group commenced the scale development of the solar photovoltaic glass business in Xianyang, Hefei and Zhangjiagang.

As to solar photovoltaic glass business, the Phase I project production line in Xianyang rapidly reached the production capacity with profits after its completion in February 2010, and its product quality is at the top level in China. The Phase II Project production line in Xianyang was completed at the end of 2010 with sales recorded. The construction of Phase III Project in Xianyang and Hefei Project were officially commenced on 19 October 2010 and 10 November 2010, respectively. Currently, the project construction went smoothly, and is expected to complete and put into production in succession by the end of 2011. The preparation of Zhangjiagang Project is still under way.

12

**Management Discussion and Analysis** *(Continued)*

## 2.   Business Review *(continued)*

(2)   Progress of New Operations *(continued)*

• *TFT-LCD glass substrate*

In response to the development trend of flat panel display devices, and in light of the Group's competitive advantages, the Group invested more in the construction of the TFT-LCD glass substrate projects to constantly improve the Group's market competitiveness and profitability. During the reporting period, the Group constantly improved its product yield of LCD glass substrate, and became the first enterprise in China and the fifth one in the world with the manufacturing technology and production capacity of thin film transistor liquid crystal display glass substrate. During the reporting period, the Group continuously optimized and renovated the main equipment and craftsmanship of the production lines, and spare no efforts to speed up the progress of Phase II project construction in addition to steadily improving the comprehensive yield. Meanwhile, the Group incorporated the experience obtained from the Phase I Project construction into the construction of Phase II Project, so as to achieve effective resource allocation through overall planning. Currently, the Group's LCD glass substrate Phase II Project went smoothly, and.the construction of the first production lines were consecutively completed in Xianyang, Zhangjiagang and Hefei. The CX02 production line in Xianyang was completed on 16 January 2010, with qualified products generated from the assembly lines; the CZ01 production line in Zhangjiagang was completed on 28 December 2010 with qualified products generated from the assembly lines, and the CZ02 production line entered into the pilot production stage on 9 February 2011; the CH01 production line in Hefei, being the first sixth generation glass substrate production line in China, successfully produced glass sheets at the first attempt on 30 January 2011. Currently, the Group was accredited by many LCD panel manufacturers for its LCD glass substrate products, and is in the process of actively seeking accreditation from other customers. The Group has reached clear intention with some customers from Taiwan and Mainland China in respect of its sales, and the Group has commenced its supply to them.

13

**Management Discussion and Analysis** *(Continued)*

## 2. Business Review *(continued)*

### (2) Progress of New Operations *(continued)*

- *Luminous Materials*

  During the reporting period, the Group improved its sales results and brand image of energy saving lamp phosphors by vigorously adopting effective measures such as continuous technology upgrade of energy saving lamp phosphors, the development of high-end products and improvement of technical services. The sales volume of 2010 increased approximately 50% over last year, and the Group became the definite No. 1 in China in terms of the market share. During the reporting period, the construction of the Group's CCFL phosphor/PDP phosphor compatible production lines were smoothly completed and put into production. The sales of CCFL phosphor exceeded 100 tonnes, representing an increase of approximately 3 times over last year. As such, the CCFL phosphor business became the new growth driver of the Group's luminous materials business. Electronic silver paste achieved sales in small-medium quantities. In addition, the research and development and marketing of other luminous materials such as PDP phosphor, lithium battery powder, LED phosphor is progressing effectively.

- *FPD Devices*

  The Group's production lines of OLED, the third generation display device which commenced construction in Shunde District, Foshan, Guangdong Province in May 2009, started the trail production on 8 November 2010, and successfully illuminated the first IRICO-brand OLED product on 21 December 2010, laying a solid foundation for the Group's scale development in the OLED industry.

  The PDP and module project jointly established by the Company and Sichuan Changhong Electrical Group Co., Ltd.（四川長虹電子集團有限公司）were put into full mass production in January 2010, with the monthly comprehensive product yield reaching the designed standard.

### (3) Traditional Operations

While experiencing rapid development of its new businesses, the Group is also facing the severe market conditions with rapid contraction in the industry, with respect to its traditional CPT business. As such, the Group took a series of measures such as increasing marketing efforts, strengthening cost control, adjusting organizational structure, and streamlining human resources to achieve the effective operations of CPT business.

14

**Management Discussion and Analysis** *(Continued)*

## 3.   Future Prospects

Looking into 2011, the Group aims at achieving rapid growth in new businesses, and the effectiveness of strategic transformation will be further demonstrated.

The Group will consecutively complete a series of new solar photovoltaic glass projects by the end of 2011, and its production capacity will be among the top in the PRC market. In 2012, the production capacity will be further increased with apparent scale advantages. In addition, the Group has started developing the coated glass and other new businesses.

In 2011, the Group's 13 production lines in LCD glass substrates will begin to release their production capacity, and accordingly this business will go into full operation. The sale effect and competitive advantage of LCD glass substrate businesses will rapidly increase. The Group will be an important supplier of TFT-LCD glass substrates in China and even in the world.

As to the luminous material business, in 2011 the Group will further expand the production, sales and market share of its energy saving lamp phosphors, CCFL phosphor, electronic silver paste, and accelerate the development and industrialization of new products such as PDP phosphor, lithium battery powder and LED phosphor.

15



**Management Discussion and Analysis** *(Continued)*

## 4.   Financial Review

### (1)   Results Performance

#### Profit and loss data for 2006-2010 *(RMB'000)*

|  | 2006 | 2007 | 2008 | 2009 | **2010** |
|---|---|---|---|---|---|
| Turnover | 3,861,710 | 3,358,990 | 3,541,920 | 2,097,251 | **2,717,770** |
| Sales of CPTs | 3,342,888 | 2,914,351 | 3,079,428 | 1,303,672 | **1,190,897** |
| Sales of components and materials | 518,822 | 444,639 | 462,492 | 793,579 | **1,526,873** |
| Cost of sales | (3,356,160) | (3,002,987) | (2,913,300) | (2,188,395) | **(2,311,974)** |
| Gross profit | 505,550 | 356,003 | 628,620 | (91,144) | **405,796** |
| Operating expenses |  |  |  |  |  |
| Administrative expenses | (241,113) | (238,790) | (368,698) | (422,267) | **(244,762)** |
| a)   General administrative expenses | (215,196) | (216,112) | (342,119) | (395,501) | **(224,722)** |
| b)   Research and development | | | | | |
| expenses | (25,917) | (22,678) | (26,579) | (26,766) | **(20,040)** |
| Distribution expenses | (150,343) | (162,073) | (176,558) | (95,047) | **(107,415)** |
| Other operating expenses | (38,381) | (42,055) | (11,501) | (17,743) | **(18,592)** |
| Operating profit (loss) | 250,337 | 91,520 | 158,068 | (1,515,475) | **132,745** |
| Finance costs | (61,849) | (66,729) | (59,046) | (39,690) | **(64,530)** |
| Profit (loss) attributable to owners | | | | | |
| of the Company | 129,512 | 64,663 | 94,908 | (1,113,014) | **29,075** |

#### Turnover by products *(RMB'000)*

| Name | **2010** | 2009 | Increase/ (decrease) | Percentage of change |
|---|---|---|---|---|
| CPTs | **1,190,897** | 1,303,672 | (112,775) | (8.65%) |
| Components and materials | **1,526,873** | 793,579 | 733,294 | 92.40% |
| Total | **2,717,770** | 2,097,251 | 620,519 | 29.59% |

16

## 4.   Financial Review *(continued)*

(2)   Change over last year and reasons

- *Turnover and gross profit margin*

  In 2010, the Group recorded a turnover of RMB2,717,770,000, representing an increase of RMB620,519,000, or 29.59% from 2009. Turnover of the CPT business amounted to RMB 1,190,897,000 , representing a decrease of RMB112,775,000 or 8.65% from 2009. Turnover of the components and materials business amounted to RMB1,526,873,000, representing an increase of RMB733,294,000 or 92.40% from 2009. The overall gross profit margin of the Group increased from -4.35% in 2009 to 14.93% in 2010 mainly due to further improvement in sales and profitability of new business. In addition, a higher overall profit margin was achieved through strengthening cost control, reducing cost and optimizing product mix increase profit margin.

- *Administrative expenses*

  The Group's administrative expenses for 2010 decreased by RMB177,505,000, or 42.04%, to RMB244,762,000 from RMB422,267,000 for in 2009. The decrease in administrative expenses was mainly due to the increased efforts of the Group in marketing and its adjustment of product mix at proper time, which led to the effective utilization of capacity of traditional industries and significant reduction in shutdown losses.

- *Finance costs*

  The Group's finance costs in profit and loss for 2010 was RMB64,530,000 (net of interest expense capitalised amounting to RMB42,533,000), representing an increase of RMB24,840,000, or 62.59%, from RMB39,690,000 in 2009. The increase in finance cost was mainly attributable to significant increase in borrowings used to develop new industries.

17

**Management Discussion and Analysis** *(Continued)*

## 4.   Financial Review *(continued)*

### (3)   Current assets and financial resources

As at 31 December 2010, the Group's cash and bank balances amounted to RMB2,747,848,000, representing an increase of 154.98% from RMB1,077,661,000 as at 31 December 2009. For the year ended 31 December 2010, the Group's capital expenditures totalled RMB4,337,350,000 (31 December 2009: RMB578,560,000). Net cash from operating activities amounted to RMB307,075,000 (31 December 2009: RMB224,261,000), while net cash from financing activities and net cash from investing activities were RMB5,383,876,000 (31 December 2009: RMB776,928,000) and RMB-4,072,702,000 (31 December 2009: RMB-480,282,000) respectively. As at 31 December 2010, the Group's total borrowings was RMB3,620,040,000 of which borrowings due within one year amounted to RMB1,173,272,000 and borrowings with maturity beyond one year amounted to RMB2,446,768,000. As at 31 December 2009, the Group's total borrowings was RMB1,815,451,000, of which borrowings due within one year amounted to RMB1,221,949,000 and borrowings with maturity beyond one year amounted to RMB593,502,000.

As at 31 December 2010, the Group's bank loans amounting to approximately RMB238,000,000 (31 December 2009: RMB197,000,000) were secured by certain properties, plants and equipment, land use rights and inventories of the Group with an aggregate net book value of approximately RMB597,195,000 (31 December 2009: RMB228,811,000). As at 31 December 2010, the bank and other borrowings guaranteed by the Company's ultimate holding company amounted to approximately RMB2,653,768,000 (31 December 2009: RMB983,501,000).

For the year ended 31 December 2010, the turnover days for trade receivables of the Group was 64 days, representing an decrease of 93 days as compared to 157 days for the year ended 31 December 2009 which was mainly attributable to the intensified efforts made by the Group to recover trade receivables while expanding the market, which led to year-on-year increase of sales by 29.59% and year-on-year decrease of trade receivables by 47.33%. For the year ended 31 December 2010, the inventory turnover days of the Group was 96 days, representing an increase of 15 days from 81 days for the year ended 31 December 2009, which was mainly attributable to the increase in the inventory of raw materials, work in progress and finished goods resulted from the expansion in the scale of production.

## 4.   Financial Review *(continued)*

### (4)   Capital structure

As at 31 December 2010, the Group's borrowings were mainly denominated in Renminbi and US dollar, while its cash and bank balances were mainly denominated in Renminbi, Hong Kong dollar and US dollar. The Group intends to maintain a suitable ratio of share capital to liabilities, to ensure an effective capital structure. As at 31 December 2010, its total liabilities including bank loans was RMB3,620,040,000 (31 December 2009: RMB1,815,451,000) while cash and bank balances was RMB2,747,848,000 (31 December 2009: RMB1,077,661,000) and the gearing ratio (total liabilities/total assets) was 47% (31 December 2009: 62%).

### (5)   Dividend

The Company's dividend policy will remain unchanged. In light of the absence of undistributed surplus in 2010, the Company resolved not to distribute any final dividend.

### (6)   Foreign exchange risk

The Group's income and most of its expenses are denominated in Renminbi and US dollar. For the 12 months ended 31 December 2010, the operating cost of the Group increased by RMB6,637,000 (31 December 2009: RMB1,154,000) as a result of exchange rate fluctuations.

### (7)   Commitments

As at 31 December 2010, capital commitments of the Group amounted to RMB1,874,721,000 (as at 31 December 2009: RMB228,950,000), which were mainly financed by the Group's working capital.

### (8)   Contingent liabilities

As at 31 December 2010, the Group had no material contingent liability.

### (9)   Pledged assets

As at 31 December 2010, the Group's bank loans amounted to approximately RMB238,000,000 (31 December 2009: RMB197,000,000) was secured by certain properties, plants and equipment, land use rights and inventories of the Group with an aggregate net book value of approximately RMB597,195,000 (31 December 2009: RMB228,811,000).

19

## Profiles of Directors, Supervisors and Senior Management

## Directors

| Executive Directors | | |
| --- | --- | --- |
| **Name** | **Age** | **Title** |
| Xing Daoqin | 56 | Chairman |
| Tao Kui | 58 | Vice Chairman |
| Zhang Junhua | 52 | President |

| Non-executive Directors | |
| --- | --- |
| **Name** | **Age** |
| Guo Mengquan | 54 |
| Niu Xinan | 50 |
| Fu Jiuquan* | 41 |
| Zhang Weichuan | 56 |

| Independent Non-executive Directors | |
| --- | --- |
| **Name** | **Age** |
| Xu Xinzhong* | 47 |
| Feng Bing* | 44 |
| Wang Jialu | 50 |
| Lv Hua* | 54 |
| Zhong Pengrong* | 58 |

20

\*   Member of the Audit Committee

**Mr. Xing Daoqin** (邢道欽), aged 56, is an executive Director and the Chairman of the Company. Mr. Xing joined the Group in February 1982. Mr. Xing graduated from Xi'an Jiaotong University (西安交通大學) with master degree in automation. He also graduated from EMBA of Tsinghua University. In 1996, Mr. Xing was awarded a special government allowance for experts by the State Council of the PRC. He is a senior engineer at a professor level. Mr. Xing was the deputy general manager of IRICO Group since March 2001 and has been the general manager of IRICO Group since July 2005. Since November 2007, he has served as the Chairman of IRICO Display Devices Co., Ltd. He once was the factory manager of Caihong Glass Factory under IRICO Colour Picture Tube Plant ("CPT Plant"), the head of the Electronic Glass Department of IRICO Group and the deputy factory manager of CPT Plant.

**Mr. Tao Kui** (陶魁), aged 58, is an executive Director and the Vice Chairman of the Company. Mr. Tao joined the Group in September 1978. Mr. Tao graduated from South East University (東南大學) (formerly known as Nanjing Institute of Technology) with a bachelor's degree in electrical vacuum devices and is qualified as a senior engineer. Mr. Tao acted as a Director of IRICO Group from November 1995 to February 2001 and as the deputy general manager of IRICO Group since March 2001. Before that, he was the factory manager of both the phosphor powder factory and the glass factory under CPT Plant and the deputy factory manager of CPT Plant.

## Directors *(continued)*

**Mr. Zhang Junhua** (張君華), aged 52, is an executive Director and the President of the Company. He is fully responsible for overall management of the Company's operations. Mr. Zhang joined the Group in December 1984. Mr. Zhang graduated from Shaanxi Mechanical College (陝西機械學院) with a bachelor's Degree in Machinery Manufacturing and is a senior engineer. At present, he serves as the chairman of Xi'an New Century Club, the chairman of Xianyang IRICO Digital Display Technology Co., Ltd. On 9 December 2010, he was appointed as the deputy general manager of IRICO Group. Before that, he acted as the deputy head and the head of Metering & Energy - Conservation Department of No. 2 CPT Factory under CPT Plant, chairman of Xi'an Caihui Display Technology Co., Ltd., assistant to the general manager, the deputy general manager, the general manager, the vice chairman of IRICO Display Devices Co., Ltd, the general manager of Xianyang IRICO Digital Display Technology Co., Ltd. and Vice President of the Company.

**Mr. Guo Mengquan** (郭盟權), aged 54, is a non-executive Director of the Company. Mr. Guo joined the Group in September 1983. Mr. Guo graduated from Northwestern Polytechnical University (西北工業大學) with a bachelor's degree in control and manipulation of aviation fluid mechanics and from Shaanxi MBA College with an MBA degree. He is a senior engineer at a professor level. Mr. Guo has been acting as the deputy general manager of IRICO Group since March 2001. Since November 2007, Mr. Guo has served as the Vice Chairman of IRICO Display Devices Co., Ltd. He once was the factory manager of the glass plant under CPT Plant and the President of the Company.

**Mr. Niu Xinan** (牛新安), aged 50, was appointed as a non-executive Director of the Company. Mr. Niu joined the Group in August 1981. Mr. Niu graduated from Northwestern University (西北大學) with a bachelor's degree in administrative management and is a senior engineer. Mr. Niu has been serving as the party's Vice-secretary and Secretary to the disciplinary committee of IRICO Group. In June 2002, he was elected as the Chairman of the labor union of IRICO Group. Before that, Mr. Niu held such positions as the factory manager of No. 1 CPT factory under CPT Plant and the deputy Director of its design institute, the manager of Display Devices Department and the factory manager of No. 1 CPT factory under CPT Plant, the factory manager of the Inner Mongolia Television Factory (內蒙古電視機廠) and the deputy factory manager of CPT Plant. He served as a supervisor and chairman of the Supervisory Committee of the Company from September 2004 to August 2005.

**Mr. Fu Jiuquan** (符九全), aged 41, is a non-executive Director of the Company. Mr. Fu joined the Group in July 1990. Mr. Fu graduated from Guilin Electronic Industry College (桂林電子工業學院) with a bachelor's degree in finance and accounting. Mr. Fu has obtained a master qualification in Xi'an Jiaotong University. He is a senior accountant and currently the chief accountant of IRICO Group. Mr. Fu was appointed as the Director of the Finance Division of CPT Plant and the manager of the Assets Finance Department of IRICO Group. He was the shareholder supervisor of the Company from September 2004 to June 2008 and the chairman of the Supervisory Committee of the Company from August 2005 to June 2008.

**Mr. Zhang Weichuan** (張渭川), aged 56, is a non-executive Director of the Company. Mr. Zhang joined the Group in August 1978. He graduated from Northwestern Telecommunication Engineering College (西北電訊工程學院) with a bachelor's degree in electrical vacuum devices. He is a senior engineer at a researcher level. He is currently the manager of the Strategic Planning Department of IRICO Group, and had served as Director of the Quality Assurance Department of CPT Plant, the deputy chief engineer of CPT Plant, the manager of the Technology and Quality Department of IRICO Group, the manager of the Planning and Development Department of the Company and the general manager of IRICO (Zhangjiagang) Flat Panel Display Company Limited (彩虹(張家港)平板顯示有限公司). Mr. Zhang was a staff supervisor of the Company from September 2004 to June 2008.

21

**Profiles of Directors, Supervisors and Senior Management** *(Continued)*

## Directors *(continued)*

**Mr. Xu Xinzhong** (徐信忠), aged 47, is an independent non-executive Director of the Company and currently a professor in Finance in Guanghua Management College of Beijing University and Dean of its Faculty of Finance. Mr. Xu joined the Group in September 2004. Mr. Xu obtained his bachelor's degree in meteorology from Beijing University (北京大學), his MBA degree from Aston University in the United Kingdom and his doctoral degree in finance from Lancaster University in the United Kingdom. He worked as a lecturer and senior lecturer of the Faculty of Accounting and Finance at Manchester University in the United Kingdom and was a professor and a chair in Finance of the Faculty of Management at Lancaster University in the United Kingdom. Mr. Xu has been acting as a professor of Guanghua Management College of Beijing University and Dean of its Faculty of Finance since January 2002. Mr. Xu was also awarded the Prize for the Best Manuscript (最佳論文獎) by British Accounting Review in 1997.

**Mr. Feng Bing** (馮兵), aged 44, is an independent non-executive Director of the Company and currently the Chief Strategy Officer of Dare Technologies Global Co., Ltd (大亞科技集團有限公司首席戰略官). Mr. Feng joined the Group in September 2004. He obtained his bachelor's degree in computer software from Northwestern Polytechnical University, his master's degree in engineering from Calculation Technology Research Institute of Chinese Academy of Sciences (中國科學院計算技術研究所) and his master of science degree in finance from the School of Management at Syracuse University. He was a part-time tutor in optional practical training of the Faculty of Commerce at Syracuse University, a senior manager of Deloitte Touche Tohmatsu in the United States and an executive director and the deputy general manager of China Financial and Consulting Company (中華財務諮詢公司).

**Mr. Wang Jialu** (王家路), aged 50, is an independent non-executive Director of the Company and a partner of Commerce & Finance Law Office (通商律師事務所). Mr. Wang joined the Group in September 2004. He completed his course for master's degree in business administration from Guanghua Management College of Beijing University and the course for juris doctor from Marburg University of Germany, and received his MBA degree from Beijing University and the LLM degree from the law school of Marburg University of Germany. He is an arbitrator in the Beijing Arbitration Commission (北京仲裁委員會) and an adjunct lecturer for master's degree course in the Law Faculty of Beijing University.

**Mr. Lv Hua** (呂樺), aged 54, is an independent non-executive Director of the Company. He holds master degree. He is a certified accountant and a certified tax consultant in the PRC. Mr. Lv joined the Group in September 2007. He currently serves as the chairman (chief accountant) of Xian Xigema Certified Public Accountant Firm Limited as well as the vice chairman of Shaanxi Certified Public Accountants Association (陝西省註冊會計師協會), the vice chairman of Shaanxi Asset Appraisal Association, the executive member of Shaanxi Research Society of Restructuring the Economic Systems (陝西省體制改革研究會) and the vice chairman of General Chamber of Commerce of Xian City (西安市商業聯合會). He was consecutively awarded various titles such as "Excellent Youth Entrepreneur in Shaanxi Province" (陝西省傑出青年實業家), "New Long March Pioneer of Shaanxi Province" (陝西省新長征突擊手), "Top Ten News Figures of Finance and Financial System in Shaanxi Province" (陝西省財政、金融系統十大新聞人物) and "Top 10 Excellent Economic Figures of Shaanxi" (陝西十大傑出經濟人物).

**Mr. Zhong Pengrong** (鍾朋榮), aged 58, an independent non-executive Director of the Company. Mr. Zhong graduated from Zhongnan University of Economics with a master's degree in Economic Issues in the PRC. He joined the Group in September 2007. Mr. Zhong is the chairman of Beijing Shiye Consultancy Centre as well as professors of various universities such as Northwest University, Central University of Finance and Economics and Zhongnan University of Economics and Law. He also works as an economic consultant for numerous sizable enterprises and regional governments, formulating strategic proposal and restructuring proposal of over a hundred of enterprises alongside strategic development plans for more than sixty cities at regional and county level. Apart from working in the investigation and research office of the Central Office (中央辦公廳調研室), he has also issued hundreds of essays on economy on news papers such as "People's Daily", "Economic Daily, PRC" and "Guang Ming Daily". Various books written by him were published, such as "100 National Measures" (百條治國大計), "Macro-economics theory" (宏觀經濟論) and "Research on inflation in China" (中國通貨膨脹研究).

**Profiles of Directors, Supervisors and Senior Management** *(Continued)*

## Supervisors

| Name | Age | Title |
|------|-----|-------|
| Wang Qi | 52 | Shareholder Supervisor, Chairman of the supervisory committee |
| Fu Yusheng | 52 | Staff Supervisor |
| Tang Haobo | 51 | Staff Supervisor |
| Sun Haiying | 67 | Independent Supervisor |
| Wu Xiaoguang | 53 | Independent Supervisor |

## Supervisors:

**Ms. Wang Qi** (王琪), aged 52, is a shareholder supervisor of the Company and the Chair man of the Supervisory Committee. Ms. Wang joined the Group in July 1979. Ms. Wang obtained her tertiary diploma from Hangzhou Institute of Electronics Engineering (杭州電子工業學院) majoring in accounting and is now a senior accountant. She is now serving as the manager of the asset financial department (資產財務部部長) of IRICO Group. Ms. Wang was the head of the financial department (財務科) in IRICO Glass Factory and the chief accountant (總會計師) of Xi'an IRICO Electronic Industrial Co. Ltd.

**Mr. Fu Yusheng** (付玉生), aged 52, is a staff supervisor of the Company. Mr. Fu joined the Group in January 1981. Mr. Fu graduated from Northwest University majoring in Economic Management, with a tertiary diploma. Mr. Fu is currently the Head of IRICO Glass Factory. He has held positions including director of Screen Workshop of IRICO Glass Factory, Vice Head of IRICO Part Factory and Vice Head of IRICO Glass Factory.

**Mr. Tang Haobo** (唐浩波), aged 51, is a staff supervisor of the Company. Mr. Tang joined the Group in August 1981. Mr. Tang graduated from Xi'an School of Radio Industry majoring in Radio with the educational background of secondary technical school, and then obtained a tertiary diploma in corporate management from IRICO University for Staff and Workers. He is currently the General Manager of Operation Department and has held positions including Vice Head of Motor-driving Section of No. 2 Factory of CPTs, Head of Equipment Design Office, Deputy General Manager of Shenzhen IRICO Huangqi Company Limited (深圳彩虹皇旗公司), Vice Head of No. 1 Factory of CPTs, Manager of IRICO Equipment Company Limited, Vice Head of IRICO Electron Gun Factory, and Vice General Manager of Operation Department of IRICO.

**Mr. Sun Haiying** (孫海鷹), aged 67, is an independent supervisor of the Company and joined the Group in September 2004. Mr. Sun graduated from the Northwestern University in geography. He is currently the head and a professor of the Environmental Science and Engineering Technical Centre of Xi'an Jiaotong University, a member of the Standing Committee of the Chinese People's Political Consultative Conference and the head of the Department of Science and Technology of Shaanxi Province, an adjunct professor of the Institute for Enterprises of the Hong Kong Polytechnic University. He was a director of the Shaanxi Province Meteorological Bureau (陝西省氣象局), the director of Shaanxi Province Science and Technology Department (陝西省科學技術廳). He was a group leader of the Planning Strategy Study Group under the State Mid-and Long-term Science and Technology Development Planning Team (國家中長期科學和技術發展規劃領導小組的規劃戰略研究專題組) in August 2004.

23

**Profiles of Directors, Supervisors and Senior Management** *(Continued)*

## Supervisors *(continued)*

### Supervisors: *(continued)*

**Ms. Wu Xiaoguang** (吳曉光), aged 53, is an independent supervisor of the Company and joined the Group in September 2004. Ms. Wu received her bachelor's degree in economics from the Economic Management College of Northwestern University. She was a graduate majoring in accounting in management school of Xi'an Jiaotong University, and was awarded a master's degree of business administration upon graduation at the Faculty of Business of The Hong Kong Polytechnic University. She is currently a deputy professor of the Management Faculty at Xi'an Jiaotong University and the head of the ACCA (Association of Chartered Certified Accountants) Project Centre. Ms. Wu is a part-time professor of the Chinese (Hainan) Reform and Development Research Institute (中國（海南）改革發展研究院), the chairman and general manager of Xi'an Wanguantong Financial Management Consulting Co., Ltd., an expert consultant of Shaanxi Province Venture Capital Association. She holds positions as expert consultant in Beijing Jinrui Junan Taxation Co, China Tax Consulting Information Web, China Industry and Economic News Web and Beijing Zhongbao Weiye Information Consulting Firm.

### Other Senior Management:

| Name | Age | Title |
| --- | --- | --- |
| Zhang Chunning | 51 | Vice President |
| Zou Changfu | 52 | Vice President (Appointed on 17 May 2010) |
| Ma Jianchao | 52 | Chief Financial Controller (Appointed on 17 May 2010) |
| Chu Xiaohang | 41 | Joint Company Secretary |
| Lam Chun Lung | 38 | Qualified Accountant and Joint Company Secretary |

**Mr. Zhang Chunning** (張春寧), aged 51, Vice President of the Company. He is responsible for the sales and marketing of products, technology and quality and innovation of new products respectively. Mr. Zhang joined the Group in November 1985. Mr. Zhang graduated from the Faculty of Chemistry at Northwestern University with a bachelor's degree in science (chemistry) and from Xi'an Jiaotong University with a master's degree in management (business administration). He is now pursuing his doctorate education in management (business administration) at Xi'an Jiaotong University. He was the deputy officer and officer of the No. 2 Factory Workshop under CPT Plant, the factory manager of Caihong Phosphor Factory under CPT Plant, the general manager of Shaanxi IRICO Phosphor Materials Co., Ltd. (陝西彩虹熒光材料有限公司), the assistant to the president of the Company and the Joint Company Secretary of the Company.

24

**Profiles of Directors, Supervisors and Senior Management** *(Continued)*

## Supervisors *(continued)*

### Other Senior Management: *(continued)*

**Mr. Zou Changfu** (鄒昌福), aged 52, Vice President of the Company, is responsible for the operation of production, safety, environmental protection, fire safety, security and resources protection. Mr. Zou joined the Group in August 1981. Mr. Zou obtained a bachelor's degree in engineering and is a senior engineer. He was the general manager of Shenzhen Hongyang Industry and Trade Company Limited from February 2001 to February 2003; and the general manager in the head office of IRICO Kunshan Holdings (彩虹昆山實業) and the chairman of the board of IRICO Yingguang Electrics Limited Company (彩虹櫻光電子股份公司) from February 2003 to December 2005. He was the general manager of the Purchase Department of the Company from December 2005 to May 2010, and assistant to the President of the Company from December 2007 to 16 May 2010.

**Mr. Ma Jianchao** (馬建朝): aged 52, Chief Financial Officer of the Company. He joined the Group in January 1986. Mr. Ma graduated from Chengdu Radio Engineering College（成都電訊工程學院）(currently known as University of Electronic Science and Technology of China（電子科技大學）) with a bachelor's degree in computer science, and subsequently obtained the qualification of industrial accounting from Hangzhou Institute of Electronics Engineering（杭州電子工業學院）. He furthered his study in the master's program of accounting at the Xi'an Jiaotong University（西安交通大學）. He is a senior accountant and senior engineer. He served as chief financial officer and deputy general manager of Royal Rainbow Hotel in Australia from September 1995 to November 1997. He served as chief financial officer of China National Electronics Imp. & Exp Caihong Company（中國電子進出口彩虹公司）from March 1999 to March 2005, during which he served as vice director of Audit Department of IRICO Group Corporation from April 2001 to March 2002. He served as the general manager of the financial department of the Company from March 2005 to 16 May 2010. Mr. Ma has experience in finance, computer, foreign trade and hotel, especially over 20 years' experience in operation and financial management.

**Mr. Chu Xiaohang** (褚曉航), aged 41, Joint Company Secretary of the Company, is responsible for the securities management, legal matters and investor relations of the Company. Mr. Chu joined the Group in July 1991. Mr. Chu graduated from Northwest University with a bachelor's degree in computer science and is a senior engineer. He is currently studying in Graduate University of Chinese Academy of Sciences for a master's degree in project management. He worked at IRICO Glass Factory and the Strategic Planning Department of IRICO Group and served as senior project management engineer and head of the Board Office of the Company. He has been a Joint Company Secretary of the Company since November 2009.

**Mr. Lam Chun Lung** (林晉龍), aged 38, qualified accountant and Joint Company Secretary of the Company. Mr. Lam joined the Group in August 2006. Mr. Lam graduated from The Hong Kong University of Science and Technology with a first honour bachelor's degree in business administration (accounting) in May 1998, and from the City University of Hong Kong with a master's degree in business administration in July 2006. He had been the head of auditing in S C To & Co. (杜昭紹會計師事務所) and accounts and finance manager of Colliers Jardine International. Mr. Lam is a member of the Association of Chartered Certified Accountants and Hong Kong Institute of Certified Public Accountants.

## Changes of Directors, Supervisors and Senior Management

On details of changes of Directors, supervisors and senior management, please refer to the "Directors, Supervisors and Senior Management" section within the Report of the Directors.

25

# Report of the Directors

The Board hereby presents the report of the Directors and the audited financial report of the Group for the year ended 31 December 2010 to the Shareholders.

## Principal operations

The Group is principally engaged in the production and sales of solar photovoltaic glass, LCD glass substrates, phosphor materials as well as display devices and spare parts.

## Results and dividend

The turnover of the Group in 2010 was RMB2,717,770,000, operating profits amounted to RMB132,745,000, gross profit margin was 14.93% and profits attributable to owners of the Company amounted to RMB29,075,000 and the comprehensive income attributable to owners amounted to RMB32,506,000.

The annual results of the Group for the year ended 31 December 2010 and its financial status as at the same day prepared in accordance with accounting principles generally accepted in Hong Kong are set out on pages 59 to 161 of this annual report.

26

The Company's dividend policy will remain unchanged. In light of the absence of accumulated surplus in 2010, the Board has decided not to distribute any final dividend for the year ended 31 December 2010.

## Charity Donation

In 2010, the Group actively devoted to earthquake relief work. We timely donated money and materials and gave our love to the people in the disaster areas who suffered from the earthquake in Yushu, Qinghai and the heavy debris flow in Zhouqu, Gansu. Employees of the Group donated RMB187,338.5 in aggregate. In addition, 137 employees voluntarily participated in the activity of blood donation for the people in the disaster areas without payment and donated blood of 54,800 ml.

## Five year financial summary

A summary of the published results and assets, liabilities and minority interests of the Group for the last five years, as extracted from the audited and adjusted (if applicable) financial statements, is set out on page 162 of this annual report. This summary does not form part of the audited financial statements.

## Property, plant and equipment

Details of the movements of property, plant and equipment of the Group in the year are set out in note 17 to the financial statements.

*Report of the Directors (Continued)*

## Share capital

Details of the changes in the Company's share capital, together with the reasons therefor, are set out in note 33 to the financial statements.

1.   Capitalization Issue

In order to reward the support of the shareholders and increase the circulation of the Company's shares on the market, a capitalization issue (the "Capitalization Issue") was completed on the basis of one capitalization H share for every ten H shares and one capitalization domestic share for every ten domestic shares on 1 February 2010. The Capitalization Issue was approved by the Shareholders at the EGM held on 28 January 2010 and the new shares were issued to the Shareholders on 1 February 2010. For details, please refer to the Company's announcement dated 3 December 2009, the circular dated 14 December 2009 and the announcement on the results of the general meeting dated 28 January 2010.

Changes in the Company's share capital before and after the Capitalization Issue are set out in the table below.

| | Before the Capitalization Issue *(shares)* | After the Capitalization Issue *(shares)* |
|---|---|---|
| H Shares | 485,294,000 | 533,823,400 |
| Domestic Shares | 1,455,880,000 | 1,601,468,000 |
| Total share capital | 1,941,174,000 | 2,135,291,400 |

27

**Report of the Directors** *(Continued)*

## Share capital *(continued)*

2.   **Placing of H Shares**

In order to finance the development of the Company's new businesses and facilitate rapid realization of the Company's strategic transformation, on 23 June 2010, the Board considered and approved the proposal on the exercise of the general mandate granted to the Board at 2009 annual general meeting for the placing of H shares, and approvals were obtained from relevant administrative authorities, such as SASAC and CSRC.

On 18 November 2010, the Board considered and approved relevant specific matters, such as conditions of the placing of H shares, the placing agreement and transfer of securities, etc and entered into the placing agreement with the placing agent in relation to the placing, thereby the placing of H shares was completed on 29 November 2010 in accordance with terms and conditions of the placing agreement. An aggregate of 97,058,000 Placing Shares ("Placing Shares") has been successfully placed to not less than six placees at the placing price of HK$1.26 per Placing Share. The net proceeds from the placing (after deducting all applicable costs and expenses) amount to approximately HK$118 million, which was used to fund the construction of the Company's solar photovoltaic glass production line in accordance with the Company's development strategy. The Company has made disclosures in accordance with relevant requirements of the Listing Rules. For details, please refer to the Company's announcements dated 19 November and 29 November 2010.

The table below sets out the changes in the share capital of the Company immediately before and after the completion of the placing of Placing Shares.

| | Immediately before the completion of the placing of Placing Shares *(shares)* | Immediately after the completion of the placing of Placing Shares *(shares)* |
|---|---|---|
| H shares | 533,823,400 | 630,881,400 |
| Domestic Shares | 1,601,468,000 | 1,601,468,000 |
| Total share capital | 2,135,291,400 | 2,232,349,400 |

## Purchase, redemption and sale of shares of the Company

Neither has the Company nor any of its subsidiaries purchased, redeemed or sold any shares of the Company during this reporting period.

28

*Report of the Directors* *(Continued)*

## Reserves

Details of the movements of reserves of the Company and of the Group during 2010 are set out in note 34 to the financial statements.

## Major customers and suppliers

The percentage of purchases from and sales to the major suppliers and customers of the Group is set out as follows:

## Purchase

— largest supplier, accounting for 13% of the total purchase amount

— five largest suppliers, accounting for 28% of the total purchase amount

## Sales

— largest customer, accounting for 10% of the total sales amount

— five largest customers, accounting for 23% of the total sales amount

Due to the relatively large variety of materials required for the Company's production, the Company has not yet identified an established supplier with strength sufficient to provide a relatively high proportion of raw materials. Hence, the five largest suppliers accounted for only 28% of our total purchase amount. To the best knowledge of the Directors, none of the Directors, their respective associates or any Shareholder holding more than 5% of the issued share capital of the Company, had any interest in the above-mentioned major suppliers and customers.

29

**Report of the Directors** *(Continued)*

## Directors, Supervisors and Senior Management

Directors, supervisors and senior management of the Company for the year were as follows:

| Name | Positions | Date of appointment/re-designation/ resignation during the reporting period |
|---|---|---|
| Xing Daoqin | Executive Director and Chairman | |
| Tao Kui | Executive Director and Vice Chairman | |
| Zhang Junhua[3] | Executive Director, President and Authorized Representative | |
| Guo Mengquan | Non-executive Director | |
| Niu Xinan | Non-executive Director | |
| Fu Jiuquan | Non-executive Director | |
| Zhang Weichuan | Non-executive Director | |
| Xu Xinzhong | Independent non-executive Director | |
| Feng Bing | Independent non-executive Director | |
| Wang Jialu | Independent non-executive Director | |
| Lv Hua | Independent non-executive Director | |
| Zhong Pengrong | Independent non-executive Director | |
| Wang Qi | Supervisor and Chairman of the Supervisory Committee | |
| Tang Haobo | Supervisor | |
| Fu Yusheng | Supervisor | |
| Wu Xiaoguang | Supervisor | |
| Sun Haiying | Supervisor | |
| Zhang Chunning | Senior management and Vice President | |
| Zou Changfu[1] | Senior Management and Vice President | |
| Ma Jianchao[1] | Senior Management and Chief Financial Officer | |
| Ge Di[2] | Senior Management and Assistant to the President | |
| Wei Xiaojun[2] | Senior Management and Assistant to the President | |
| Chu Xiaohang[3] | Joint Company Secretary and Authorized Representative | |
| Lam Chun Lung | Joint Company Secretary and Qualified Accountant | |

*Report of the Directors* (Continued)

## Directors, Supervisors and Senior Management *(continued)*

Note 1:    On 17 May 2010, Mr. Zou Changfu was appointed as Vice President of the Company and Mr. Ma Jianchao was appointed as Chief Financial Officer of the Company.

Note 2:    On 31 March 2010, Mr. Ge Di and Mr. Wei Xiaojun ceased to be Assistants to the President of the Company due to internal reposting arrangement.

Note 3:    On 12 July 2010, Mr. Zhang Junhua and Mr. Chu Xiaohang were appointed as Authorized Representatives of the Company.

Brief biographical details of Directors, supervisors and senior management are set out on pages 20 to 25.

Each of the independent non-executive Directors has issued a confirmation in respect of the factors set out in Rule 3.13 of the Rules Governing the Listing of Securities (the "Listing Rules") on The Stock Exchange of Hong Kong Limited (the "Stock Exchange") concerning his independence. The Company considers all of the independent non-executive Directors to be independent.

## Remuneration of Directors and the Five Highest Paid Individuals

Details of the remuneration of Directors and the five highest paid individuals of the Group are set out in note 13 to the financial statements.

There were no arrangements under which a Director or supervisor of the Company had waived or agreed to waive any remuneration in respect of the year ended 31 December 2010.

31

**Report of the Directors** *(Continued)*

## Share Appreciation Rights Plan

Pursuant to the Share Appreciation Rights Plan of the Company (details of which were set out in the Company's prospectus dated 8 December 2004), up to 31 December 2010, the following Directors, supervisors and senior management members of the Company had been granted share appreciation rights by the Company as follows:

| Name | Number of Share Appreciation Rights (Shares) | Note |
|------|-----------------------------|------|
| Xing Daoqin | 2,800,000 | Director |
| Tao Kui | 2,120,000 | Director |
| Zhang Junhua | 1,630,000 | Director |
| Guo Mengquan | 1,860,000 | Director |
| Niu Xinan | 1,600,000 | Director |
| Fu Jiuquan | 1,050,000 | Director |
| Zhang Weichuan | 1,000,000 | Director |
| Fu Yusheng | 600,000 | Supervisor |
| Tang Haobo | 400,000 | Supervisor |
| Zhang Chunning | 1,170,000 | Senior Management |
| Zou Changfu | 1,000,000 | Senior Management |
| Ma Jianchao | 800,000 | Senior Management |
| Chu Xiaohang | 330,000 | Senior Management |

## Directors' and Supervisors' interests in contracts

Save as disclosed in this report, no contract of significance in relation to the Company's business to which the Company or its subsidiaries were a party and in which a Director or a supervisor had a material interest, whether directly or indirectly, subsisted at the end of the year or anytime during 2010.

## Directors' and Supervisors' service contracts

Each of the Directors and supervisors has entered into a service contract with the Company. None of the Directors or supervisors proposed for re-election at the forthcoming annual general meeting has an unexpired service contract which is not terminable by the Company or its subsidiaries within a year without payment of any compensation (other than statutory compensation).

32

*Report of the Directors* *(Continued)*

## Interests of Directors, Chief Executive and Supervisors in shares of the Company and its associated corporations

Save as the interests mentioned in the section headed "Share Appreciation Rights Plan" above, during the year ended 31 December 2010, none of the Directors, supervisors, or chief executive or their respective associates had any interests in the shares, underlying shares and/or debentures of the Company and/or any of its associated corporations (within the meaning of Part XV of the Securities and Futures Ordinance (the "SFO")) which are (a) required to be notified to the Company and the Stock Exchange pursuant to the provisions of Divisions 7 and 8 of Part XV of the SFO; (b) required to be recorded in the register of interests kept by the Company pursuant to section 352 of the SFO; (c) required to be notified to the Company and the Stock Exchange pursuant to the Model Code for Securities Transactions by Directors of Listed Companies (the "Model Code") as set out in Appendix 10 to the Rules Governing the Listing of Securities on the Stock Exchange (the "Listing Rules").

During the year ended 31 December 2010, none of the Directors, chief executives, supervisors, senior management, their spouses or children under the age of 18 was given the right to acquire shares, underlying shares or debentures of the Company or its associated corporations (within the meaning of the SFO).

## Interests and short positions of substantial shareholders and other parties

33

So far as the Directors are aware, each of the following persons, not being a Director, supervisor, chief executive or member of the Company's senior management, had an interest or short position in the Company's shares or underlying shares (as the case may be) as at 31 December 2010 and as entered in the register of interests to be kept pursuant to section 336 of the SFO:

IRICO Group had interests in 1,601,468,000 domestic shares of the Company (representing 100% of the domestic share capital), whereas HKSCC Nominees Limited had interests in 629,079,189 H Shares of the Company (representing 99.70% of the H Share capital). Xing Daoqin, Tao Kui, Guo Mengquan, Fu Jiuquan and Zhang Junhua, each being the Director of the Company and concurrently the general manager, the assistant general manager, the assistant general manager, the chief accountant and the assistant general manager of IRICO Group, respectively.

**Report of the Directors** *(Continued)*

## Interests and short positions of substantial shareholders and other parties *(continued)*

*Notes:*

As at 31 December 2010, based on the information available to Directors and so far as the Directors are aware, HKSCC Nominees Limited held 629,079,189 H Shares, among which:

Baystar Capital II, L.P. had beneficial interests in 49,554,000 H Shares of the Company (representing approximately 7.85% of the issued H shares of the Company). Each of Baystar Capital Management LLC, Mr. Derby Steven P., Mr. Goldfarb Lawrence and Mr. Lamar Steven M. was deemed to be interested in the same number of H shares of the Company by virtue of their direct or indirect control of Baystar Capital II, L.P.

J.P. Morgan Fleming Asset Management Holdings Inc. held 33,742,000 H shares of the Company (representing 5.35% of the issued H shares of the Company) in the capacity of investment manager and through its controlled corporations, of which 33,198,000 H shares of the Company were held by JF Asset Management Limited and the remaining 544,000 H shares of the Company were held by JF International Management Inc..

Pictet Asset Management Limited held direct interests in 27,488,000 H shares of the Company (representing approximately 4.36% of the share capital of H shares) on behalf of Pictet Funds Asian Equities (holding interests in 28,504,000 shares).

## Management contracts

No contracts concerning the management and administration of the whole or any substantial part of the business of the Company were entered into or existed during 2010.

## Designated deposit and overdue time deposit

As at 31 December 2010, the Group had no designated deposits in any financial institutions in the PRC. All of the Group's bank deposits are placed with commercial banks in the PRC, and are in compliance with the relevant laws and regulations. There were also no instances where the Group had failed to collect any of the time deposits upon maturity.

## Employees, retirement benefits and other benefits

As at 31 December 2010, the Group had 7,006* employees with various talents, of whom 8.7% were management and administrative personnel, 10.2% were technological personnel, 1.2% were accounting and audit personnel, 1.4% were sales and marketing personnel and 78.5% were production employees. The employment and remuneration policy including retirement schemes and other benefits of the Company remained the same as set out in the Company's prospectus dated 8 December 2004. With full enthusiasm in work, the Group's employees are committed to ensure the high quality and reliability of products and services.

*:   Excluding service despatch worker.

34

*Report of the Directors (Continued)*

## Connected transactions

The connected transactions recorded during the year are as follows:

## 1.   Continuing connected transactions during the year

For the year ended 31 December 2010, there were various continuing connected transactions (the "Continuing Connected Transactions") between the Group and the following connected persons of the Group (collectively, the "Connected Persons" and each a "connected person" under the Listing Rules):

(a)   IRICO Group, a substantial shareholder and the sole promoter of the Company and a connected person of the Company;

(b)   Xianyang Cailian Packaging Material Company Limited (咸陽彩聯包裝材料有限公司) ("Xianyang Cailian"), whose equity interest is owned as to 30% by IRICO Group. Xianyang Cailian was an associate of IRICO Group and therefore a connected person of the Company;

(c)   IRICO Display Devices Co., Ltd ("A Share Company"), which was owned as to 12.06% by IRICO Group after the completion of the issue of new shares by A Share Company in July 2010, was an associate of IRICO Group, and therefore a connected person of the Company after the completion of the aforesaid issue of new shares by A Share Company in July 2010.

35

**Report of the Directors** *(Continued)*

## Connected transactions *(continued)*

### 1.   Continuing connected transactions during the year *(continued)*

For the year ended 31 December 2010, the approved annual caps for each of the Continuing Connected Transactions (the "Annual Caps") and the actual revenue or expenditure in respect of each of the Continuing Connected Transactions are set out below:

| No. | Item | Annual Caps for Connected Transaction of 2010 RMB'000 | Amount of actual revenue or expenditure for Connected Transaction of 2010 RMB'000 |
|---|---|---|---|
| (i) | IRICO Group Master Supply Agreement Supply of fuel, industrial chemical products and raw materials to IRICO Group | 35,000 | 30,054 |
| (ii) | IRICO Group Master Purchase Agreement Purchase of foam plastics, wood brackets and raw materials from IRICO Group | 65,100 | 56,237 |
| (iii) | Xianyang Cailian Master Purchase Agreement Purchase of packaging materials and adhesive tapes from Xianyang Cailian | 25,800 | 24,955 |
| (iv) | Comprehensive Services Agreement (A)   Purchase of utilities and other services from IRICO Group | 486,300 | 352,700 |
|  | (B)   Engagement of social and ancillary services from IRICO Group | 1,600 | 1,589 |
| (v) | Five Premises Leasing Agreements Rental payable by members of the Group to IRICO Group | 40,863 | 37,992 |
| (vi) | Five Land Use Rights Leasing Agreements Land use rights leasing fees payable by members of the Group to IRICO Group | 6,132 | 6,132 |
| (vii) | Two Trademark Licensing Agreements Trademark licensing fees payable to IRICO Group by members of the Group and A Share Company | 2,350 | 1,816 |
| (viii) | A Share Company Master Supply and Purchase Agreement Supply from the Company and its subsidiaries (except A Share Company) of production parts such as glass bulbs (including glass panels and glass funnels), electron guns, deflection yokes, shadow masks and frames, phosphor, metal components, frit, rubber wedges and cathode sleeves to A Share Company | 796,000 | 691,879 *(Note 1)* |

36

*Report of the Directors* *(Continued)*

## Connected transactions *(continued)*

### 1.    Continuing connected transactions during the year *(continued)*

For each of the Continuing Connected Transactions, the consideration during each reporting period listed above is set out in the relevant agreements between the relevant Connected Persons and the Company, details of which were set out in the Company's circular dated 14 January 2010.

*Note 1:*    The actual amount for the connected transactions under item (viii) above was approximately RMB389,297,000 from July 2010, when the issue of new shares by A Share Company was completed, to 31 December 2010, and the actual amount for relevant transactions for the full year of 2010 was approximately RMB691,879,000.

The Board is of the view that the Continuing Connected Transactions (subject to the terms of the relevant agreements) are essential to the normal operations of the Company and is for the benefits of the Company. When the Company was listed, a waiver had been granted by the Stock Exchange from strict compliance with the Listing Rules in respect of the Company's Continuing Connected Transactions, which expired on 31 December 2006. All the renewed Continuing Connected Transactions constitute non-exempt continuing connected transactions under the Listing Rules and are required to be in compliance with the reporting, announcement and independent shareholders' approval requirements.

The Continuing Connected Transactions, subject to the terms and conditions of the relevant agreements and Annual Caps of each of such transactions, were approved by the independent Shareholders at the Company's extraordinary general meeting held on 2 March 2010. The Company had complied with the relevant disclosure requirements in accordance with Chapter 14A of the Listing Rules in its announcement dated 14 December 2009 and its circular dated 14 January 2010.

The independent non-executive Directors had reviewed these Continuing Connected Transactions and confirmed to the Board that these transactions have been entered into:

(1)    in the ordinary and usual course of business of the Group;

(2)    either on normal commercial terms or, if there are not sufficient comparable transactions to judge whether they are on normal commercial terms, on terms no less favourable to the Company than terms available to or from (as appropriate) independent third parties; and

(3)    in accordance with the relevant agreements governing them on terms that are fair and reasonable and in the interests of the shareholders of the Company as a whole.

37

**Report of the Directors** *(Continued)*

## Connected transactions *(continued)*

### 1.   Continuing connected transactions during the year *(continued)*

The auditor of the Company had provided a letter to the Directors of the Company, confirming that such Continuing Connected Transactions:

(1)   had been approved by the Board;

(2)   were in accordance with the pricing policies of the Company;

(3)   had been entered into in accordance with the relevant agreements governing these transactions; and

(4)   had not exceeded the Annual Caps.

### 2.   One-off connected transactions

(1)   Very substantial disposal and connected transactions and very substantial acquisition and connected transactions involving: (A) initial capital injection transactions comprising: (a) the first capital injection into Shaanxi IRICO Electronics Glass Company Limited ("IRICO Glass") by IRICO Display Device Co., Ltd. ("A Share Company"); (b) the first capital injection into IRICO (Zhangjiagang) Flat Panel Display Co., Ltd.("IRICO (Zhangjiagang)") and IRICO (Hefei) LCD Glass Company Limited ("IRICO (Hefei)") by IRICO Glass; (B) A share issue and related transactions comprising: (a) the issue of new A Shares by A Share Company; (b) the second capital injection into IRICO Glass by A Share Company; and (c) the second capital injection into IRICO (Zhangjiagang) and IRICO (Hefei) by IRICO Glass.

#### *(A)   Initial Capital Injection Transactions*

Initial capital injection transactions include: (a) the first capital injection of RMB475 million into IRICO Glass by A Share Company; (b) the capital injection of RMB500 million into IRICO (Zhangjiagang) and the capital injection of RMB15 million into IRICO (Hefei) by IRICO Glass, which had been completed in December 2009.

#### *(B)   A Share Issue and Related Transactions*

In July 2010, A Share Company issued 315,608,888 ordinary shares denominated in Renminbi (A Shares), to 10 specific investors, at an issue price of RMB11.25 per share. The total proceeds of the A share issue amounted to RMB3,550,599,990 and net proceeds amounted to RMB3,497,869,545.39. Subsequently, A Share Company further injected RMB3.5 billion into IRICO Glass and IRICO Glass injected RMB500 million into IRICO (Zhangjiagang) and RMB1.8 billion into IRICO (Hefei). Such capital injections have been completed pursuant to the relevant agreements during the reporting period. The successful completion of A share issue and related transactions injected capital for the development of TFT-LCD glass substrate business of the Group, which effectively promoted the construction of phase II expansion project of 12 TFT-LCD glass substrate production lines by the Group in Xianyang, Hefei and Zhangjiagang.

38

*Report of the Directors* *(Continued)*

## Connected transactions *(continued)*

### 2.    One-off connected transactions *(continued)*

(1)    *(continued)*

For details, please refer to the announcements of the Company dated 20 September 2009 and 22 October 2009, the circular dated 13 November 2009, the announcement on results of the general meeting dated 14 December 2009, and the announcements dated 31 May 2010, 30 June 2010 and 29 July 2010.

Following the completion of the A share issue and related transactions, as 12.06% of the equity interests of A Share Company (a subsidiary of the Company) is owned by IRICO Group (a connected person of the Company) (for details, please refer to the announcement of the Company dated 29 July 2010), A Share Company will become a connected person of the Company by virtue of Rule 14A.11(5) of the Listing Rules.

The Company has held an extraordinary general meeting on 2 March 2010 pursuant to Chapter 14A of the Listing Rules to obtain the Independent Shareholders' approval of the new continuing connected transaction with the A Share Company (the details of which is set out in the announcement of the Company dated 24 December 2009 and the circular of the Company dated 14 January 2010), as a non-exempted continuing connected transaction. The formal agreement in relation to the new continuing connected transactions were signed on 24 December 2009 and was generally and unconditionally approved, confirmed and ratified by independent shareholders. The terms and annual caps of the new continuing connected transaction were set out in the announcement of the Company dated 24 December 2009.

## Bank loans

As at 31 December 2010, details of bank loans of the Group are set out in note 31 to the financial statements.

## Pre-emptive rights

There are no provisions for pre-emptive rights under the Company's articles of association ("Articles of Association") or relevant laws and regulations which could oblige the Company to offer new shares on a pro-rata basis to existing Shareholders.

## Subsidiaries

Details of the subsidiaries of the Company are set out in note 21 to the financial statements.

39

**Report of the Directors** *(Continued)*

## External guarantee

The Group did not have any external guarantee during the year.

## Provision for Impairment of Fixed Assets

The directors of the Company conducted a review of the Group's manufacturing assets and determined that a number of those assets were impaired, due to physical damage and technical obsolescence. A provision for impairment of property, plant and equipment of the Group amounting to approximately RMB350,000 was made for 2010. Details of the provision for impairment of fixed assets are set out in note 17 to the financial statements.

## Material Litigation

As at 31 December 2010, save as disclosed below, the Directors were not aware of any other litigation or claim of material importance pending or threatened against any member of the Group.

40

- • Claims by Fanshawe College against the Company and A Share Company

  The Company and A Share Company received a statement of claim from the Ontario Superior Court of Justice Canada in respect of a litigation brought by the Fanshawe College of Applied Arts and Technology ("Fanshawe College") in August 2009 and July 2009 respectively. The plaintiff accused various global cathode ray tube (the "CRT") manufacturing enterprises, including the Company and A Share Company, of a conspiracy to sustain, control and stabilise the price of CRT since 1 January 1998, and a collusion to manipulate the market and to enter into agreements raising the price of CRT to an unreasonable level. All these were alleged to coerce the plaintiff and the public to pay an artificially high price for the CRT products which caused damage to their interests. Therefore, the plaintiff claimed for damages. Presently, Ontario Superior Court of Justice Canada has accepted the case. Upon respective investigations and as confirmed by the Company and A Share Company, the Company and A Share Company have not sold any CRT products in the market of Canada directly or via agency since 1998. The Company's preliminary assessment is that the claim will not pose any negative impact on the business operation of the Group.

*Report of the Directors* (Continued)

## Material Litigation *(continued)*

- **Claims by Curtis Saunders against the Company and A Share Company**

    In January 2010, IRICO Group, the Company and A Share Company received a statement of class action from Vancouver Registry of the Supreme Court of British Columbia, Canada（加拿大不列顛哥倫比亞省高級法院溫哥華市書記官處）. Curtis Saunders, the plaintiff, accused over 50 global CRT manufacturing enterprises, including IRICO Group, the Company and A Share Company, of a conspiracy or a collusion to enter into agreements raising the price of CRT to an unreasonable level and lifting the profits from selling CRT products from 1 January 1995 to 1 January 2008. All these were alleged to cause damage to the interests of the plaintiff and other buyers of CRT products. Therefore, the plaintiff claimed for damages. Presently, the Supreme Court of British Columbia Canada has accepted the case. Upon respective investigations and as confirmed by the Company, IRICO Group and A Share Company, the Company, IRICO Group and A Share Company have not sold any CRT products in the market of Canada directly or via agency since 1995. The Company's preliminary assessment is that the claim will not pose any negative impact on the business operation of the Group. Please refer to the announcement of the Company dated 25 January 2010 for the details of the class action.

- **Claims by American Crago Company against A Share Company**

    In January 2008, A Share Company, a subsidiary of the Company, received a statement of class action from the U.S. District Court, Northern District of California in respect of a class action being brought by American Crago Company on behalf of itself and other companies for the similar issue. The plaintiff accused various CRT manufacturing enterprises, including A Share Company, of a conspiracy to control the market which was in violation of antitrust law. It was alleged that the plaintiff and other members in the class proceedings paid more than that would have been determined by competitive market and therefore claimed for triple damages. At present, U.S. District Court, Northern District of California has accepted the case. Upon investigations, A Share Company has not sold any CRT products in the market of USA since 1995. The Company and A Share Company's preliminary assessment is that the claim will not pose any negative impact on normal business operation of the Group.

## Contingent Liabilities

As at 31 December 2010, the Group had no significant contingent liabilities.

**Report of the Directors** *(Continued)*

## Code on Corporate Governance Practices

The Board has reviewed the documents regarding the Company's adoption of relevant corporate governance practices, and is of the opinion that the documents are in compliance with the principles and code provisions of the Code on Corporate Governance Practices (the "Code") as set out in Appendix 14 to the Listing Rules.

The Directors are not aware of any information that would reasonably reflect the non-compliance of the Company or any of its Directors with the Code at any time in the year ended 31 December 2010. The Board considers that the Company has fully complied with the principles and code provisions set out in the Code during the reporting period.

## Model Code

The Company has adopted the Model Code for securities transactions by Directors of the Company. Having made specific enquiry of all Directors, the Company has confirmed that all Directors have complied with the requirements set out in the Model Code.

## Public Float

42

Based on the information that is publicly available to the Company and within the knowledge of the Directors, as at the date of this report, the Directors believe that the relevant minimum percentage applicable to listed securities was maintained throughout the reporting period.

## Audit Committee

The Audit Committee of the Company has reviewed the Company's consolidated financial statements for the year ended 31 December 2010, including accounting principles adopted by the Group.

## Auditor

SHINEWING (HK) CPA Limited was reappointed as the auditor of the Company for the year of 2010 at the annual general meeting held on 18 June 2010.

The financial statements of the Company have been audited by SHINEWING (HK) CPA Limited who will retire and, being eligible, offer themselves for re-appointment subject to approval by Shareholders at the annual general meeting to be held on 27 May 2011.

By order of the Board
**Xing Daoqin**
*Chairman*

Xianyang, the PRC
30 March 2011

# Report of the Supervisory Committee

In 2010, all members of the Supervisory Committee of the Company (the "Supervisory Committee") complied with the principle of integrity, were responsible to all Shareholders and sincerely performed the duties of Supervisor to practically safeguard the interests of the Shareholders in strict compliance with relevant provisions under relevant laws and regulations stipulated by the State and the Articles of Association. They supervised significant operating activities, the financial status of the Company, performance of duties by the Directors and senior management and the compliance with relevant laws and systems in 2010. I hereby present the report of 2010 as follows:

In the year, pursuant to the requirement of the Articles of Association, the Supervisory Committee reviewed financial reports regularly. In 2010, the Supervisory Committee held two meetings to review the following proposals: the 2009 report of the Supervisory Committee, the audited financial report of 2009 and the audited interim financial report of 2010. The convening of the two meetings was in compliance with the relevant requirements of the PRC Company Law and the Articles of Association.

In 2010, the supervisors of the Company attended all Board meetings of 2010 and general meetings of the Shareholders.

Pursuant to the PRC Company Law and other relevant laws and regulations and the Articles of Association, the Supervisory Committee performed serious supervision and examination on the procedures of Board meetings, resolutions, the execution by the Board of the resolutions passed in general meetings, the performance of duties by the senior management and the internal control system of the Company and its thorough execution.

The Supervisory Committee considered that the Directors and senior management of the Company operated strictly in compliance with the PRC Company Law and Securities Law of the PRC, the Articles of Association and other relevant regulations and rules of Hong Kong. The Committee members performed their duties with integrity and diligence, and executed various resolutions and authorization passed in general meetings, to ensure that the operation of various businesses complies with the requirements of applicable laws and regulations. Through the establishment of a series of rules, the Company further improved the corporate legal structure and the internal management system and established and improved the internal control system. In the process of the examination of the financial status of the Company and the supervision of the performance of the duties of the Directors and senior management of the Company, the Supervisory Committee did not find any behaviour prejudicial to the interest of the Company and the Shareholders, nor any behaviour in contravention to laws and regulations, the Articles of Association and various rules and systems.

The Supervisory Committee is confident in the prospect of the Company and will proceed to carry out effective supervision on the operation of the Company to safeguard the interests of the Shareholders and the Company as a whole.

By order of the Supervisory Committee
**Wang Qi**
*Chairman of the Supervisory Committee*

Xianyang, the PRC
30 March 2011

# Corporate Governance Report

The Company strives to uphold the corporate governance standard in accordance with statutory requirements and regulations. Through the establishment of a quality Board, a comprehensive internal control system and a stable corporate structure, the Company strives to ensure completeness and transparency in its information disclosure, enhance stable operation and consolidate and increase Shareholders' value and profit.

## 1.   Corporate Governance Practices

Improvement of the internal control system was made by the Company by reviewing the Company's corporate governance practices against Code to cater for the constant development and evolvement of corporate governance.

The Board has reviewed the Company's corporate governance practices. As at 31 December 2010, the Company had applied and complied with the principles and provisions of the Code, and has adopted most of the Recommended Best Practices contained in the Code. The code on corporate governance practices adopted by the Company includes but is not limited to the following documents: the Articles of Association, Work Rules for the Board, Organisation Rules for the Audit Committee, Organisation Rules for the Nomination Committee, Organisation Rules for the Strategic Committee and Organisation Rules for the Remuneration Committee. The Board also formulated Management Methods for Information Disclosure, Management Mechanism for Investor Relations and Management Mechanism for Implementation of Resolutions of the Board as relevant work rules of the Company.

The Company's code on corporate governance practices, in certain areas, exceeds the requirements of the Stock Exchange and the code provisions as set out in the Code, which mainly includes the following stricter areas:

*   The Company has established the Audit Committee, the Remuneration Committee, the Nomination Committee and the Strategic Committee.

*   Apart from one non-executive Director, all other members of the Audit Committee are independent non-executive Directors.

## 2.   The Board

### Duties of the Board

The Board is responsible for leading and monitoring the Company's affairs. All Directors are liable to act in the best interests of the Company and collectively assume the responsibility for overseeing and monitoring the Company's affairs. The Board makes regular assessment on the management's business objectives and performance as well as exercises other power in accordance with the Articles of Association, which mainly includes:

*   To oversee the implementation of resolutions passed at Shareholders' general meetings;

*   To approve the Company's business plans and investment schemes;

*   To formulate the Company's annual financial budget schemes;

44

*Corporate Governance Report (Continued)*

## 2. The Board *(continued)*

### Duties of the Board *(continued)*

• To formulate the Company's profit distribution plan;

• To formulate the Company's basic management system;

• To approve the Company's accounting policies and adjustment to the same;

• To approve various announcements including financial reports.

### Composition

The Board currently comprises 12 Directors, including 3 executive Directors, 4 non-executive Directors and 5 independent non-executive Directors, personal information of whom are set out on pages 20 to 22 in this annual report.

Directors (including non-executive Directors) are elected in general meetings with a term of three years from the date of their elections until the date of election of the next Board.

All Directors shall, upon their initial appointment, report to the Board in respect of the number and nature of any office assumed by them in other companies or institutions and the term of office, as well as disclose to the Company names of such companies or institutions. If the Board considers a Director has a conflicting interest in any proposal under consideration, such Director shall report his/her interests and abstain from voting and may, when necessary, apply for absence. The Board requires Directors to confirm whether there is any connected transaction between the Directors or their respective associates and the Company or its subsidiaries at each financial reporting period. Any material transactions relating to connected parties, which have been confirmed, will be disclosed in notes to the financial statements of an annual report.

The independent non-executive Directors of the Company possess wide professional expertise and experience, and can fully perform their important function of supervision and balance to protect the interests of the Shareholders and the Company as a whole. There are five independent non-executive Directors, representing over one-third of the Board. In determining the independence of a non-executive Director, the Director is considered independent only after the Board has confirmed that there is no direct or indirect material relationship between the Director and the Company. A Director is considered not independent after he/she has been a Director over nine years. The Board considers that the independent non-executive Directors are able to make independent judgment effectively and satisfy the guideline on assessing independence set out in Rule 3.13 of the Listing Rules.

The Company complies with the requirement concerning the appointment of sufficient independent non-executive Directors and that at least one of them should possess appropriate professional qualification or accounting or relevant financial expertise as set out in Rules 3.10(1) and 3.10(2) of the Listing Rules.

The Company has made appropriate arrangement to insure against the possible legal actions that the Directors and senior management may be involved. The Board reviews annually on the insurance arrangement.

45

**Corporate Governance Report** *(Continued)*

## 2. The Board *(continued)*

### The Chairman and the Chief Executive

The Chairman is responsible for operation and management of the Board while the President takes charge of the day-to-day management of the Company's business. To ensure a balanced distribution of functions and authorisations, roles of the Chairman and the Chief Executive are explicitly differentiated. The Chairman is Xing Daoqin and the President is Zhang Junhua. Under the assistance of the Vice Chairman, the Chairman leads and oversees the operation of the Board to ensure the performance of the Board is in the best interests of the Company.

Under the assistance of the Vice President and the assistants to the President, the President is responsible for managing the day-to-day affairs of the Company, organising and implementing resolutions of the Board and reporting to the Board on the overall operation of the Company. As the chief manager of the Company's day-to-day affairs, the President assumes the responsibilities for the formulation of annual business plans and investment schemes and basic management rules of the Company, as well as the direct responsibility for the operation of the Company.

The President, the Vice President and the assistants to the President make concerted efforts to collaborate with administrative departments of the Company to ensure the Board's and the Board committees' access to complete, reliable and proper information so that the Directors can make decisions with adequate data and to ensure proper implementation of the Board's resolutions. The President closely monitors the operation and financial results of the Company based on plans and budget and makes suggestions to the Board in respect of material events.

### Joint Company Secretaries

The Joint Company Secretaries report to the Board. All Directors are entitled to the Joint Company Secretaries' services. They notify the Board the latest information on governance and oversight on a regular basis, assist the Chairman in preparation of the agenda of the Board meetings, and prepare and dispatch meeting documents on a timely and comprehensive basis so as to ensure the efficiency and validity of the Board meetings. With the assistance of the Company's lawyers, the Joint Company Secretaries are in charge of arranging the announcement of annual and interim reports and disclosure of information and data in accordance with the Listing Rules and relevant rules of the Company. They make a regular enquiry to the Company's financial department for information on connected transactions to secure compliance with the Listing Rules in respect of such transactions.

The Joint Company Secretaries also take charge of preparing and keeping minutes of meetings of the Board and the Board committees together with any relevant documents, which are available to all Directors for their inspection at any reasonable time. All matters under consideration including any enquiry and objection by Directors shall be minuted in details. Within a reasonable timeframe after a meeting, a draft minutes shall be dispatched to all Directors for their comments.

46

**Corporate Governance Report** *(Continued)*

## 2.   The Board *(continued)*

### Board meetings

The Chairman is responsible for convening and presiding over the Board meeting. Assisted by the Joint Company Secretaries, the Chairman seeks to ensure all Directors' proper access to accurate, timely and sufficient data on the proposals to be considered by the Board to enable their wise decisions. While a 14 days' notice of a regular Board meeting is given, the agenda of meeting and the meeting documents attached are circulated at least 3 days prior to the holding of a Board meeting or a meeting of any special committee.

The Chairman encourages the Directors to be fully engaged in the Board's affairs and make contributions to the functions of the Board. The Board adopts sound corporate governance practices and procedures and takes appropriate steps to encourage the Directors' open and frank communication so as to ensure non-executive Directors may raise queries with each executive Director and the maintain effective communications between them.

It is expressly provided in the Work Rules for the Board that, in the event that a substantial Shareholder or Director of the Company has a conflict of interests in the matter to be considered at the Board meeting, such matter shall not be dealt with by Board committees or by way of circulation. Any Director who has a conflict of interests in the matters to be considered shall abstain from voting.

Four on-site meetings of the Board were held in the reporting period and three written votes of the Board were carried out. Details of attendance at Board meetings by each of the Directors are as follows:

| Directors | Positions | Board Meetings (Attendances in person/ supposed attendances) |
| --- | --- | --- |
| Xing Daoqin | Executive Director and Chairman | 4/4 |
| Tao Kui | Executive Director and Vice Chairman | 4/4 |
| Zhang Junhua | Executive Director and President | 4/4 |
| Guo Mengquan | Non-executive Director | 3/4 |
| Niu Xinan | Non-executive Director | 4/4 |
| Fu Jiuquan | Non-executive Director | 4/4 |
| Zhang Weichuan | Non-executive Director | 4/4 |
| Xu Xinzhong | Independent non-executive Director | 4/4 |
| Feng Bing | Independent non-executive Director | 3/4 |
| Wang Jialu | Independent non-executive Director | 3/4 |
| Lv Hua | Independent non-executive Director | 4/4 |
| Zhong Pengrong | Independent non-executive Director | 3/4 |

47

**Corporate Governance Report** *(Continued)*

## 2.   The Board *(continued)*

### Board meetings *(continued)*

In accordance with the Articles of Association, Directors, when necessary, may propose to convene an extraordinary Board meeting. They may also, when they consider necessary, obtain the Company's information and independent expert opinion, where expenses incurred are borne by the Company.

### Board committees

Four special committees are established under the Board, namely the Strategic Committee, the Audit Committee, the Nomination Committee and the Remuneration Committee. Their terms of reference are determined in accordance with the principles set out in the Code. The Board committees report to the Board. In order to perform their duties, the Board committees have the authority to engage lawyers, accountants or other professionals for professional advice when necessary, the expenses of which are borne by the Company.

### Nomination Committee

The Nomination Committee is chaired by Mr. Xing Daoqin and comprises six other members, namely, Mr. Tao Kui, Mr. Guo Mengquan, Mr. Niu Xinan, Mr. Feng Bing, Mr. Xu Xinzhong and Mr. Wang Jialu. The Nomination Committee provides the Board with its advice on appointment of Directors, assessment of the Board's composition and change of Directors in accordance with certain agreed standards. The relevant standards include a Director's proper professional knowledge and work experience, personal integrity and commitment of adequate time. The Nomination Committee is responsible for the selection and recommendation of director candidates, including consideration of recommendations by others and, when necessary, making use of public recruitment.

By reference to the Recommendation A.4 of the Code, the Board formulated the Organisation Rules for the Nomination Committee.

During the reporting period, as there was no change in members of the Board of Directors of the Company, the Nomination Committee did not hold such meetings.

### Audit Committee

The Audit Committee assumes the responsibilities for auditing the financial reports of the Company, reviewing internal control and corporate governance and providing advice in respect thereof to the Board. The Audit Committee comprises four independent non-executive Directors and one non-executive Director, namely Lv Hua, Xu Xinzhong, Feng Bing, Zhong Pengrong and Fu Jiuquan. The Audit Committee is chaired by Mr. Lv Hua, an independent non-executive Director. Mr. Lv has proper qualifications and financial experience.

48

**Corporate Governance Report** *(Continued)*

## 2.   The Board *(continued)*

### Audit Committee *(continued)*

By reference to the recommendations in A Guide for Effective Audit Committees issued by Hong Kong Institute of Certified Accountants and C.3 of the Code, the Board has formulated the Organisation Rules for the Audit Committee.

In 2010, the Audit Committee convened two meetings with an average attendance rate of 80%. The senior management and external auditor were invited to these meetings.

In 2010, the Audit Committee:

• considered the Company's financial statements and annual results announcement for the year ended 31 December 2009, together with the proposals to be approved by the Board;

• considered the proposals in relation to the provision for impairment of fixed assets, provision for impairment of inventory and the provision for bad debts for the year ended 31 December 2009 and submitted such proposals to the Board for approval;

• considered the report in relation to the execution of connected transactions for the year ended 31 December 2009, together with the proposals to be approved by the Board;

• considered the report in relation to the expenses of audit fees for the year ended 31 December 2009, together with the proposals to be approved by the Board;

• considered the audit fees and remuneration payable to the external auditor for the year ended 31 December 2009 and the proposal for reappointment of the auditor and submitted such matters to the Board for approval;

• considered the report of financial budget of the Company for 2010 and submitted it to the Board for approval;

• considered the Company's financial statements and interim results announcement for the half year ended 30 June 2010, together with the proposals to be approved by the Board;

• reviewed matters in relation to audit, internal control and financial reporting with the management and external auditor of the Company.

49

**Corporate Governance Report** *(Continued)*

## 2.   The Board *(continued)*

### Audit Committee *(continued)*

The attendance of each member of the Audit Committee in 2010 is detailed as follows:

| Directors | Meetings of Audit Committee (Attendances in person/supposed attendances) |
|---|---|
| Lv Hua | 2/2 |
| Fu Jiuquan | 2/2 |
| Xu Xinzhong | 2/2 |
| Feng Bing | 1/2 |
| Zhong Pengrong | 1/2 |

### Remuneration Committee

The Remuneration Committee is chaired by Mr. Tao Kui and comprises three other members, namely, Mr. Feng Bing, Mr. Wang Jialu and Mr. Lv Hua.

The Remuneration Committee is responsible for approval of the terms of services contracts and remuneration policies for all Directors and senior management members, including yearly distribution of share appreciation rights pursuant to the Company's share appreciation rights plan. It also assists the Company to formulate fair and transparent remuneration policies for Directors and senior management and determine their remunerations.

During the reporting period, the Remuneration Committee convened one meeting to consider the proposals in relation to the remuneration report of directors of the Company for 2009, the proposed authorization by the general meetings to the Board to determine the remuneration of directors and supervisors of the Company for 2010 and the granting plan for the Company's share appreciation rights for 2010.

The attendance of each member of the Remuneration Committee in 2010 is detailed as follows:

| Directors | Meetings of Remuneration Committee (Attendances in person/supposed attendances) |
|---|---|
| Tao Kui | 1/1 |
| Feng Bing | 0/1 |
| Wang Jialu | 1/1 |
| Lv Hua | 1/1 |

50

Corporate Governance Report *(Continued)*

## 2.  The Board *(continued)*

### Remuneration Committee *(continued)*

Remuneration policy for executive Directors: The remuneration portfolio policy for executive Directors is designed to link executive Directors' remuneration with their performance and the Company's missions to inspire their performance and re-election. In accordance with the Articles of Association, Directors may not determine or approve their own remunerations.

Five directors of the Company (including executive Directors and non-executive Directors) are the functionaries who fall within the management of the State-owned Asset Supervision and Administration Commission of the State Council, and hence are subject to Provisional Management Methods for Remunerations of Persons in Charge of Central Enterprises and Interim Measures for Assessment of the Operational Performance of Persons in Charge of Central Enterprises issued in 2004. These five directors' remunerations consist of basic salary, performance-linked salary and medium and long-term incentive-linked salary. The basic salary is the annual basic income of a functionary, which is determined by reference to the business scale of the enterprise, responsibilities, and the average salary of local enterprises, the industry and the enterprise itself. The performance-basic salary is linked with the operating results appraisal and based on the performance-linked salary, which is determined by reference to the appraisal grade and scores for the annual operating results of the enterprise representative. 60% of the performance-linked salary is paid in the relevant period while the payment of the remaining 40% will be deferred until the expiry of their term of office.

Based on their individual performance and the business performance of the Company, the Remuneration Committee approve and grant the share appreciation rights to the executive Directors pursuant to the share appreciation rights plan as approved by Shareholders.

Remuneration policy for non-executive Directors: Remunerations of non-executive Directors are subject to approval by Shareholders at general meetings and determined with reference to the complexity of the matters to be handled by them and their duties. Pursuant to the service contracts entered into between the Company and the non-executive Directors, the Company reimburses non-executive Directors for the out-of-pocket expenses incurred in performance of their duties (including attendance at the Company's meetings).

**Corporate Governance Report** *(Continued)*

## 2.  The Board *(continued)*

### Remuneration Committee *(continued)*

A Director's remuneration includes the amount paid by the Company and its subsidiaries for their management of affairs of the Company and its subsidiaries. Remunerations paid to each Director of the Company in 2010 were as follows:

*(Unit: RMB'000)*

| Name | Position | Remuneration and allowance | Directors' fee | Contribution to retirement benefits | Remarks |
|---|---|---|---|---|---|
| Xing Daoqin | Chairman | 271 | — | 18 | |
| Tao Kui | Vice Chairman | 271 | — | 18 | |
| Zhang Junhua | Director, President | 241 | — | 18 | |
| Guo Mengquan | Non-executive Director | 244 | — | 18 | |
| Niu Xinan | Non-executive Director | — | — | — | not received remuneration from the Company |
| Fu Jiuquan | Non-executive Director | — | — | — | not received remuneration from the Company |
| Zhang Weichuan | Non-executive Director | — | — | — | not received remuneration from the Company |
| Xu Xinzhong | Independent Director | — | 100 | — | |
| Feng Bing | Independent Director | — | 100 | — | |
| Wang Jialu | Independent Director | — | 100 | — | |
| Lv Hua | Independent Director | — | 100 | — | |
| Zhong Pengrong | Independent Director | — | 100 | — | |
| Total | | 1,027 | 500 | 72 | |

Pursuant to applicable regulations of the PRC, the Company currently participates in a series of pension schemes organized by the provincial and municipal governments, pursuant to which all production plants of the Company must contribute to such pension schemes according to certain proportions of the salaries, bonus and various allowance of the employees. As the production plants are located in different regions, the proportion of the contributions to the remuneration of the employees is also different.

**Corporate Governance Report** *(Continued)*

## 3.   Statement of financial responsibility of the Board

The Board prepares the Company's financial statements and takes the responsibility for the completeness and legitimacy of the financial data as well as the efficiency of the Company's internal control system and risk management process. The President is responsible for the daily management of the operation of the Company. The Board makes periodic reviews on the functions of and the rights authorised to the President.

The Directors acknowledge their responsibilities to prepare financial statements of the Company for each financial year, to report truly and fairly on the financial status of the Group, to comply with applicable accounting standards and adopt appropriate accounting policies in the preparation of the financial statements and to disclose the financial status of the Company accurately.

For auditor's reporting responsibilities, please refer to the auditor's report.

## 4.   Securities transactions by Directors

The Board has adopted the Model Code as the code of conduct regarding securities transactions by Directors of the Company. The Model Code is also applicable to special employees who may have certain price sensitive information that has been not disclosed, including such employees in the Company's subsidiaries and parent company. Upon appointment, any Director of the Company would receive a copy of the Model Code. After that, the Model Code is delivered twice a year, namely, one month prior to the Board meeting to approve the Company's interim results and two months prior to the Board meeting to approve the Company's annual results, together with an indicative notice to remind the Directors that they may not deal in the Company's shares until the publication of the results announcement.

All Directors of the Company confirm that as at 31 December 2010, all Directors and the specific employees who may have certain price sensitive information that has not been disclosed complied with the Model Code and none of the said persons has interests or short positions which are required to notify the Company and the Stock Exchange, or incur any conduct in violation of regulations.

## 5.   Control mechanism

### Internal control and internal audit

*Internal control system*

The Board is fully in charge of the Company's internal control system, including its overall financial and operational status, hence avoiding material financial omission or loss and omission or risk in relation to operation controls. Through its Audit Committee, the Board makes periodic review on the effectiveness of the internal control system of the Group, which includes controls over finance, operations, regulation compliance and risk management. Relevant results of 2010 have been reported to the Board through the Audit Committee.

**Corporate Governance Report** *(Continued)*

## 5.   Control mechanism *(continued)*

### Internal control and internal audit *(continued)*

#### Internal control system (continued)

The Board confirms that the Company has set up procedures and systems for efficient recognition, assessment and management of material operating risks. The Company has complied with the code provisions relating to internal control as set out in the Code on Corporate Governance Practices for the year ended 31 December 2010.

#### Internal audit

The Company has set up an internal audit department, which oversees the internal controls, ensures the achievement of the corporate goals and conducts independent reviews.

The internal audit department gives its prudent opinion as to whether the Company's operations have a comprehensive and efficient risk management system and reports to the Audit Committee accordingly. In 2010, all internal audit reports and opinions were submitted to the President and other executive Directors of the Company as well as the senior management of the audit department. The audit department also follows up on the issues identified during the audit and conducts follow-up audit to ensure that such issues have been satisfactorily resolved. In addition, a regular dialogue is maintained between the audit department and the external auditor so that both are aware of the significant factors that may affect their respective scope of work.

#### Risk management

The Board properly implements the operating risk management procedures across the Company and formulates policies and procedures which provide a framework for identification and management of risks.

The Board fulfils its oversight role over the Company and its subsidiaries in the following areas:

- establishment of the risk management system of the Company and identification of the risk portfolio of the Company;

- identification, assessment and management of the material risks faced by various units of the Company;

- review and assessment of the adequacy of the Company's risk management process, system and internal control;

- review and monitoring of compliance with the Company's risk management process, system and internal control including compliance with prudential and legal requirements governing the business of the Company.

54

*Corporate Governance Report (Continued)*

## 5. Control mechanism *(continued)*

### Internal control and internal audit *(continued)*

#### *Risk management (continued)*

The Board is fully in charge of overseeing the operations of the Company's business units. Personnel with proper experience and skills are appointed to the board of directors of the Company's subsidiaries and associated companies to attend their board meetings and to oversee the operations of those companies. Monitoring activities include review and approval of business strategies, budgets and plans as well as setting of key business performance targets. The identification, evaluation and report on the likelihood and potential financial impact of material business risks are left to the management of such companies.

#### *External auditor and their remunerations*

As approved in the annual general meeting held on 18 June 2010, the Board has continued to appoint SHINEWING (HK) CPA Limited as the auditor of the Company. The Audit Committee reviewed the letter from SHINEWING (HK) CPA Limited to confirm its independence and objectiveness, held meetings with the firm to discuss the audit scope and fees, and approved scope and fees for any non-audit service to be provided by the firm as required.

For the year ended 31 December 2010, the remuneration of the external auditor amounted to RMB2,850,000, all of which was for audit service, including RMB500,000 for A Share Company, a subsidiary of the Company. No non-audit service fee was incurred for the year. The audit fee has been approved by the Audit Committee and the Board.

## Interests of Shareholders and investor relations

### General meetings

The Company encourages Shareholders' attendance at annual general meetings and gives at least a 45 days' notice of such meetings. The Chairman should and Directors may attend the meetings to answer questions about the Company's businesses. All Shareholders have rights to request the convening of an extraordinary general meeting and put forward proposals for Shareholders' consideration in accordance with the Articles of Association. At the annual general meeting, each matter is put forward in the form of a separate proposal and voted by way of poll based on the number of shares. Voting results of the general meeting are released in the form of announcements and relevant details of the meeting are set out on the respective websites of the Stock Exchange and the Company.

On 28 January 2010, an extraordinary general meeting was held at the conference room of the office building of the Company in Xianyang, Shaanxi Province.

55

**Corporate Governance Report** *(Continued)*

## Interests of Shareholders and investor relations *(continued)*

### General meetings *(continued)*

On 2 March 2010, an extraordinary general meeting was held at the conference room of the office building of the Company in Xianyang, Shaanxi Province.

On 18 June 2010, the 2009 Annual General Meeting was held at the conference room of the office building of the Company in Xianyang, Shaanxi Province.

Details of the above general meetings are set out on the respective websites of the Stock Exchange and the Company.

The Joint Company Secretaries are responsible for day-to-day contacts between the Board and substantial Shareholders. Investors and the public may access the Company's website for detailed data on the Company's businesses. The Company's interim and annual results announcements can also be downloaded from the Company's website.

According to the information available to the Company and as far as the Directors are aware, at least 25% of the Company's total issued share capital has been held by public Shareholders.

### Information disclosure and investor relations

The Company undertakes that it shall make impartial disclosure and full and transparent reporting. The ultimate duty of the Chairman is to ensure efficient communication with the investors and the Board's understanding of the opinions of substantial Shareholders. After the Company's announcement of its interim and annual results, the Board is committed to provide Shareholders with clear and comprehensive results information of the Group by publishing interim and annual reports. The Company invests considerable efforts to maintain an open door of communication with investors and analysts, so as to facilitate a better understanding of the Group's management, financial condition, operation, strategies and plans. In addition, the Company arranges reverse road shows for analysts and investors, from time to time, to foster intercommunication and understanding between the investors and the management of the Company. Field visits by analysts and investors are welcomed for inspecting plants and business premises of the Company.

The Company is committed to increase transparency and improve investor relations and has attached much importance to Shareholders' responses in this regard. For any inquiry and advice, Shareholders can contact the Joint Company Secretaries through the hotline at (8629) 3333 3858 or by email chdz@ch.com.cn, or raise the questions directly at the annual general meeting or the extraordinary general meeting.

By order of the Board
**Chu Xiaohang      Lam Chun Lung**
*Joint Company Secretaries*

Xianyang, the PRC
30 March 2011

# INDEPENDENT AUDITOR'S REPORT



SHINEWING (HK) CPA Limited
43/F., The Lee Gardens
33 Hysan Avenue
Causeway Bay, Hong Kong

**TO THE SHAREHOLDERS OF**
**IRICO GROUP ELECTRONICS COMPANY LIMITED**
*(A joint stock company established in the People's Republic of China with limited liability)*

We have audited the consolidated financial statements of IRICO Group Electronics Company Limited (the "Company") and its subsidiaries (collectively referred to as the "Group") set out on pages 59 to 161, which comprise the consolidated and Company's statements of financial position as at 31 December 2010, and the consolidated statement of comprehensive income, consolidated statement of changes in equity and consolidated statement of cash flows for the year then ended, and a summary of significant accounting policies and other explanatory information.

## Directors' responsibility for the consolidated financial statements

The directors of the Company are responsible for the preparation of consolidated financial statements that give a true and fair view in accordance with Hong Kong Financial Reporting Standards issued by the Hong Kong Institute of Certified Public Accountants and the disclosure requirements of the Hong Kong Companies Ordinance, and for such internal control as the directors determine is necessary to enable the preparation of the consolidated financial statements that are free from material misstatement, whether due to fraud or error.

## Auditor's responsibility

Our responsibility is to express an opinion on these consolidated financial statements based on our audit and to report our opinion solely to you, as a body, and for no other purpose. We do not assume responsibility towards or accept liability to any other person for the contents of this report. We conducted our audit in accordance with Hong Kong Standards on Auditing issued by the Hong Kong Institute of Certified Public Accountants. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgement, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation of the consolidated financial statements that give a true and fair view in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by the directors, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

57

**INDEPENDENT AUDITOR'S REPORT** *(Continued)*

## Opinion

In our opinion, the consolidated financial statements give a true and fair view of the state of affairs of the Company and of the Group as at 31 December 2010 and of the Group's profit and cash flows for the year then ended in accordance with Hong Kong Financial Reporting Standards and have been properly prepared in accordance with the disclosure requirements of the Hong Kong Companies Ordinance.

**SHINEWING (HK) CPA Limited**
*Certified Public Accountants*
**Ip Yu Chak**

Practising Certificate Number: P04798

Hong Kong
30 March 2011

58

# CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME

*YEAR ENDED 31 DECEMBER 2010*

| | NOTES | 2010 RMB'000 | 2009 RMB'000 |
|---|---|---|---|
| Turnover | 7 | 2,717,770 | 2,097,251 |
| Cost of sales | | (2,311,974) | (2,188,395) |
| | | | |
| Gross profit (loss) | | 405,796 | (91,144) |
| Other operating income | 9 | 98,068 | 106,432 |
| Selling and distribution costs | | (107,415) | (95,047) |
| Administrative expenses | | (244,762) | (422,267) |
| Other operating expenses | | (18,592) | (17,743) |
| Finance costs | 10 | (64,530) | (39,690) |
| Impairment loss recognised in respect of property, plant and equipment | 17 | (350) | (995,706) |
| Share of loss of associates | 22 | (24,233) | (4,684) |
| | | | |
| Profit (loss) before tax | | 43,982 | (1,559,849) |
| Income tax expense | 11 | (5,277) | (4,834) |
| | | | |
| Profit (loss) for the year | 12 | 38,705 | (1,564,683) |
| | | | |
| **Other comprehensive income (expense)** | | | |
| | | | |
| Exchange differences arising on translation | | 2,520 | 148 |
| Share of exchange reserve of an associate | | 911 | (8,221) |
| | | | |
| Other comprehensive income (expense) for the year | | 3,431 | (8,073) |
| | | | |
| Total comprehensive income (expense) for the year | | 42,136 | (1,572,756) |
| | | | |
| Profit (loss) for the year attributable to: | | | |
| Owners of the Company | | 29,075 | (1,113,014) |
| Non-controlling interests | | 9,630 | (451,669) |
| | | | |
| | | 38,705 | (1,564,683) |
| | | | |
| Total comprehensive income (expense) attributable to: | | | |
| Owners of the Company | | 32,506 | (1,121,087) |
| Non-controlling interests | | 9,630 | (451,669) |
| | | | |
| | | 42,136 | (1,572,756) |
| | | | |
| | | *RMB* | *RMB* |
| Earnings (loss) per share (basic and diluted) | 16 | 0.0136 | (0.5212) |

59

## CONSOLIDATED STATEMENT OF FINANCIAL POSITION

*AS AT 31 DECEMBER 2010*

| | NOTES | 2010 RMB'000 | 2009 RMB'000 |
|---|---|---|---|
| **Non-current assets** | | | |
| Property, plant and equipment | 17 | **5,830,486** | 1,718,922 |
| Investment properties | 18 | **50,170** | 17,513 |
| Leasehold land and land use rights | 19 | **151,533** | 161,044 |
| Intangible assets | 20 | **1,631** | 1,383 |
| Interests in associates | 22 | **327,044** | 350,366 |
| Available-for-sale investment | 23 | **24,060** | 24,060 |
| Deposits paid for acquisition of property, plant and equipment | | **93,510** | 100,652 |
| | | **6,478,434** | 2,373,940 |
| **Current assets** | | | |
| Inventories | 24 | **609,019** | 486,343 |
| Trade and bills receivables | 25 | **477,457** | 906,489 |
| Other receivables, deposits and prepayments | 26 | **531,764** | 207,720 |
| Restricted bank balances | 27 | **49,418** | — |
| Bank balances and cash | 28 | **2,698,430** | 1,077,661 |
| | | **4,366,088** | 2,678,213 |
| **Current liabilities** | | | |
| Trade and bills payables | 29 | **711,943** | 400,152 |
| Other payables and accruals | 30 | **429,856** | 809,328 |
| Tax payables | | **3,773** | 2,204 |
| Bank and other borrowings - due within one year | 31 | **1,173,272** | 1,221,949 |
| Termination benefits | 32 | **3,247** | 2,815 |
| | | **2,322,091** | 2,436,448 |
| **Net current assets** | | **2,043,997** | 241,765 |
| **Total assets less current liabilities** | | **8,522,431** | 2,615,705 |

## CONSOLIDATED STATEMENT OF FINANCIAL POSITION *(Continued)*

*AS AT 31 DECEMBER 2010*

| | NOTES | 2010 RMB'000 | 2009 RMB'000 |
|---|---|---|---|
| **Capital and reserves** | | | |
| Share capital | 33 | 2,232,349 | 1,941,174 |
| Other reserves | 34 | 1,332,716 | 730,061 |
| Accumulated losses | | (1,450,790) | (1,479,865) |
| | | | |
| Equity attributable to owners of the Company | | 2,114,275 | 1,191,370 |
| Non-controlling interests | | 3,623,424 | 709,824 |
| | | | |
| **Total equity** | | 5,737,699 | 1,901,194 |
| | | | |
| **Non-current liabilities** | | | |
| Bank and other borrowings - due after one year | 31 | 2,446,768 | 593,502 |
| Deferred income | 35 | 323,230 | 104,801 |
| Termination benefits | 32 | 7,177 | 8,248 |
| Deferred tax liabilities | 36 | 7,557 | 7,960 |
| | | | |
| | | 2,784,732 | 714,511 |
| | | | |
| | | 8,522,431 | 2,615,705 |

The consolidated financial statements on pages 59 to 161 were approved and authorised for issuance by the board of directors on 30 March 2011 and are signed on its behalf by:

**Xing Daoqin**                              **Zhang Junhua**
*Chairman*                                   *Director*

61

IRICO GROUP ELECTRONICS COMPANY LIMITED

# STATEMENT OF FINANCIAL POSITION

*YEAR ENDED 31 DECEMBER 2010*

| | NOTES | 2010 RMB'000 | 2009 RMB'000 |
|---|---|---|---|
| **Non-current assets** | | | |
| Property, plant and equipment | 17 | 517,383 | 313,819 |
| Intangible assets | 20 | 532 | 877 |
| Investments in subsidiaries | 21 | 1,401,813 | 1,073,301 |
| Interest in an associate | 22 | 357,216 | 357,216 |
| | | 2,276,944 | 1,745,213 |
| **Current assets** | | | |
| Inventories | 24 | 262,391 | 225,639 |
| Trade and bills receivables | 25 | 129,799 | 243,846 |
| Other receivables, deposits and prepayments | 26 | 165,472 | 230,640 |
| Restricted bank balance | 27 | 6,000 | — |
| Bank balances and cash | 28 | 244,110 | 42,002 |
| | | 807,772 | 742,127 |
| **Current liabilities** | | | |
| Trade and bills payables | 29 | 479,897 | 454,361 |
| Other payables and accruals | 30 | 402,807 | 461,707 |
| Bank and other borrowings - due within one year | 31 | 425,272 | 390,950 |
| Termination benefits | 32 | 1,445 | 814 |
| | | 1,309,421 | 1,307,832 |
| **Net current liabilities** | | **(501,649)** | (565,705) |
| **Total assets less current liabilities** | | **1,775,295** | 1,179,508 |

## STATEMENT OF FINANCIAL POSITION *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

|  | NOTES | 2010 RMB'000 | 2009 RMB'000 |
|---|---|---|---|
| **Capital and reserves** |  |  |  |
| Share capital | 33 | **2,232,349** | 1,941,174 |
| Other reserves | 34 | **797,511** | 986,153 |
| Accumulated losses |  | **(1,639,977)** | (1,754,116) |
| **Total equity** |  | **1,389,883** | 1,173,211 |
| **Non-current liabilities** |  |  |  |
| Bank and other borrowings - due after one year | 31 | **380,000** | — |
| Deferred income | 35 | **400** | — |
| Termination benefits | 32 | **410** | 1,695 |
| Deferred tax liabilities | 36 | **4,602** | 4,602 |
|  |  | **385,412** | 6,297 |
|  |  | **1,775,295** | 1,179,508 |

**Xing Daoqin**
*Chairman*

**Zhang Junhua**
*Director*

63

# CONSOLIDATED STATEMENT OF CHANGES IN EQUITY

*YEAR ENDED 31 DECEMBER 2010*

| | Attributable to owners of the Company | | | | Non-controlling interests *RMB'000* | Total equity *RMB'000* |
|---|---|---|---|---|---|---|
| | Share capital *RMB'000* | Other reserves *RMB'000* *(Note 34)* | Accumulated losses *RMB'000* | Total *RMB'000* | | |
| At 1 January 2009 | 1,941,174 | 768,328 | (366,851) | 2,342,651 | 1,150,831 | 3,493,482 |
| Loss for the year | — | — | (1,113,014) | (1,113,014) | (451,669) | (1,564,683) |
| Other comprehensive expense for the year | — | (8,073) | — | (8,073) | — | (8,073) |
| Total comprehensive expense for the year | — | (8,073) | (1,113,014) | (1,121,087) | (451,669) | (1,572,756) |
| Deemed disposal of equity interests in subsidiaries | — | 8,651 | — | 8,651 | (8,651) | — |
| Merger reserve arising from common control combination — IRICO (Zhangjiagang) | — | (11,942) | — | (11,942) | 11,942 | — |
| Partial disposal of equity interests in a subsidiary | — | 13,075 | — | 13,075 | 12,959 | 26,034 |
| Capital reduction of a subsidiary *(Note 21 (vii))* | — | (39,978) | — | (39,978) | (37,022) | (77,000) |
| Capital contribution from non-controlling interests of subsidiaries | — | — | — | — | 34,400 | 34,400 |
| Dividend paid to non-controlling interests of subsidiaries | — | — | — | — | (2,966) | (2,966) |
| At 31 December 2009 | 1,941,174 | 730,061 | (1,479,865) | 1,191,370 | 709,824 | 1,901,194 |

64

## CONSOLIDATED STATEMENT OF CHANGES IN EQUITY *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

| | Attributable to owners of the Company | | | | Non-controlling interests | Total equity |
|---|---|---|---|---|---|---|
| | Share capital RMB'000 | Other reserves RMB'000 (Note 34) | Accumulated losses RMB'000 | Total RMB'000 | RMB'000 | RMB'000 |
| At 1 January 2010 | 1,941,174 | 730,061 | (1,479,865) | 1,191,370 | 709,824 | 1,901,194 |
| Profit for the year | — | — | 29,075 | 29,075 | 9,630 | 38,705 |
| Other comprehensive income for the year | — | 3,431 | — | 3,431 | — | 3,431 |
| Total comprehensive income for the year | — | 3,431 | 29,075 | 32,506 | 9,630 | 42,136 |
| Issue of shares | | | | | | |
| — by capitalisation of capital reserve *(Note 33 (i))* | 194,117 | (194,117) | — | — | — | — |
| — upon placing *(Note 33 (ii))* | 97,058 | 25,235 | — | 122,293 | — | 122,293 |
| Transaction costs attributable to issue of shares upon placing | — | (19,760) | — | (19,760) | — | (19,760) |
| Partial disposal of equity interests in a subsidiary *(Note 21 (iv))* | — | 59,605 | — | 59,605 | 76,759 | 136,364 |
| Capital contribution from non-controlling interests of subsidiaries | — | — | — | — | 89,600 | 89,600 |
| Deemed partial disposal of a subsidiary *(Note 21 (iii))* | — | 739,569 | — | 739, 569 | 2,758,301 | 3,497,870 |
| Acquisition of additional equity interests in subsidiaries *(Note 21 (ii) and (vi))* | — | 8,916 | — | 8,916 | (35,838) | (26,922) |
| Deemed acquisition of equity interests in subsidiaries *(Note 21 (v))* | — | (20,224) | — | (20,224) | 20,224 | — |
| Dividend paid to non-controlling interests of subsidiaries | — | — | — | — | (5,076) | (5,076) |
| At 31 December 2010 | 2,232,349 | 1,332,716 | (1,450,790) | 2,114,275 | 3,623,424 | 5,737,699 |

65

# CONSOLIDATED STATEMENT OF CASH FLOWS

*YEAR ENDED 31 DECEMBER 2010*

| | 2010 RMB'000 | 2009 RMB'000 |
|---|---|---|
| **OPERATING ACTIVITIES** | | |
| Profit (loss) before tax | **43,982** | (1,559,849) |
| Adjustments for: | | |
| Allowance for doubtful debts of trade and other receivables | **17,633** | 16,304 |
| Amortisation of deferred income on government grants received | **(9,726)** | (8,262) |
| Amortisation of leasehold land and land use rights and intangible assets | **5,587** | 3,791 |
| Cash-settled share-based payments expense | **11,463** | — |
| Depreciation for property, plant and equipment and investment properties | **58,113** | 237,110 |
| Dividend income from available-for-sale investment | **(1,863)** | — |
| Finance costs | **64,530** | 39,690 |
| (Gain) loss on disposal of leasehold land and land use rights | **(2,120)** | 6,557 |
| Gain on disposal of property, plant and equipment | **(11,296)** | (55,080) |
| Impairment loss on intangible assets | **—** | 271 |
| Impairment loss on interest in an associate | **—** | 2,784 |
| Impairment loss recognised in respect of property, plant and equipment | **350** | 995,706 |
| Interest income | **(3,117)** | (4,197) |
| Provision of warranty | **3,639** | 13,898 |
| Share of loss of associates | **24,233** | 4,684 |
| Write-down of inventories | **17,784** | 108,541 |
| | | |
| Operating cash flows before movements in working capital | **219,192** | (198,052) |
| (Increase) decrease in inventories | **(140,460)** | 113,591 |
| Decrease in trade and bills receivables and other receivables, deposits and prepayments | **89,144** | 233,774 |
| Decrease in trade and bills payables and other payables and accruals | **(84,206)** | (6,056) |
| Decrease in termination benefits | **(639)** | (2,732) |
| Increase in deferred income | **228,155** | 92,023 |
| | | |
| Cash generated from operations | **311,186** | 232,548 |
| Income tax paid | **(4,111)** | (8,287) |
| | | |
| NET CASH FROM OPERATING ACTIVITIES | **307,075** | 224,261 |

66

## CONSOLIDATED STATEMENT OF CASH FLOWS *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

|  | 2010<br>*RMB'000* | 2009<br>*RMB'000* |
|---|---:|---:|
| **INVESTING ACTIVITIES** | | |
| Purchases of property, plant and equipment | **(4,259,385)** | (283,575) |
| Increase in restricted bank balances | **(49,418)** | — |
| Acquisition of additional equity interests in subsidiaries | **(26,922)** | — |
| Purchases of intangible assets | **(1,559)** | — |
| Purchases of land use rights | **(66)** | (117,333) |
| Proceeds from partial disposal of equity interests in subsidiaries | **136,364** | 26,034 |
| Proceeds from disposal of property, plant and equipment | **117,672** | 67,036 |
| Proceeds from disposal of land use rights | **5,632** | 1,011 |
| Interest received | **3,117** | 4,197 |
| Dividend income received from available-for-sale investment | **1,863** | — |
| Deposit paid for acquisition of property, plant and equipment | **—** | (100,652) |
| Capital reduction of subsidiaries | **—** | (77,000) |
| **NET CASH USED IN INVESTING ACTIVITIES** | **(4,072,702)** | (480,282) |
| **FINANCING ACTIVITIES** | | |
| Capital contribution from non-controlling interests of subsidiaries | **3,587,470** | 34,400 |
| Bank borrowings raised | **2,386,538** | 1,819,949 |
| Proceeds from issue of shares upon placing | **122,293** | — |
| Repayments of bank and other borrowings | **(581,949)** | (996,205) |
| Interest expense paid | **(105,640)** | (78,250) |
| Expenses on issue of shares upon placing | **(19,760)** | — |
| Dividends paid to non-controlling interests of subsidiaries | **(5,076)** | (2,966) |
| **NET CASH FROM FINANCING ACTIVITIES** | **5,383,876** | 776,928 |
| **NET INCREASE IN CASH AND CASH EQUIVALENTS** | **1,618,249** | 520,907 |
| **CASH AND CASH EQUIVALENTS AT 1 JANUARY** | **1,077,661** | 556,606 |
| **EFFECT OF FOREIGN EXCHANGE RATE CHANGES** | **2,520** | 148 |
| **CASH AND CASH EQUIVALENTS AT 31 DECEMBER,**<br>represented by bank balances and cash | **2,698,430** | 1,077,661 |

67

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
*YEAR ENDED 31 DECEMBER 2010*

## 1.   GENERAL

IRICO Group Electronics Company Limited (the "Company") was incorporated in the People's Republic of China (the "PRC") on 10 September 2004 as a joint stock company with limited liability under the Company Law of the PRC. The Company's shares were listed on The Stock Exchange of Hong Kong Limited (the "Stock Exchange") on 20 December 2004. The addresses of its registered office and principal place of business are No.1 Caihong Road, Xianyang, Shaanxi Province, the PRC.

The Company and its subsidiaries (collectively referred to as the "Group") are engaged in the manufacturing and trading of colour picture tubes ("CPTs") for colored television sets and luminous materials, advanced glass and other products and trading of liquid crystal related products. The principal activities of its subsidiaries are set out in Note 21.

The directors of the Company consider that IRICO Group Corporation, a state-owned enterprise established in the PRC, is the Company's parent company and ultimate holding company.

The consolidated financial statements are presented in Renminbi ("RMB") which is also the functional currency of the Company.

68

## 2.   APPLICATION OF NEW AND REVISED HONG KONG FINANCIAL REPORTING STANDARDS ("HKFRSs")

### Application of new and revised standards and interpretations

In the current year, the Group has applied the following new and revised standards, amendments and interpretations ("new and revised HKFRSs") issued by the Hong Kong Institute of Certified Public Accountants (the "HKICPA").

| | |
|---|---|
| HKFRSs (Amendments) | Amendment to HKFRS 5 as part of Improvements to HKFRSs 2008 |
| HKFRSs (Amendments) | Improvements to HKFRSs 2009 |
| Hong Kong Accounting Standard ("HKAS") 27 (Revised) | Consolidated and Separate Financial Statements |
| HKAS 39 (Amendment) | Eligible Hedged Items |
| HKFRS 1 (Revised) | First-time Adoption of HKFRSs |
| HKFRS 1 (Amendment) | Additional Exemptions for First-time Adopters |
| HKFRS 2 (Amendment) | Group Cash-settled Share-based Payment Transactions |
| HKFRS 3 (Revised) | Business Combinations |
| Hong Kong — Interpretation ("INT") 5 | Presentation of Financial Statements — Classification by the Borrower of a Term Loan that Contains a Repayment on Demand Clause |
| Hong Kong (International Financial Reporting Interpretation Committee) ("HK (IFRIC)") — INT 17 | Distribution of Non-cash Assets to Owners |

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

## 2. APPLICATION OF NEW AND REVISED HONG KONG FINANCIAL REPORTING STANDARDS ("HKFRSs") *(continued)*

### HKFRS 3 (Revised) Business Combinations

The Group applies HKFRS 3 (Revised) Business Combinations prospectively to business combinations for which the acquisition date is on or after 1 January 2010. As there was no transaction during the current year in which HKFRS 3 (Revised) is applicable, the application of HKFRS 3 (Revised) had no effect on the consolidated financial statements of the Group for the current or prior accounting periods.

Results of the Group in future periods, may be affected by future transactions for which HKFRS 3 (Revised) are applicable.

### HKAS 27 (Revised) Consolidated and Separate Financial Statements

In prior years, there are no specific requirements in HKFRSs regarding changes in ownership interests in existing subsidiaries. Under HKAS 27 (Revised), all increases or decreases in such interests that do not result in the Group losing control over the subsidiaries are dealt with in equity, with no impact on goodwill or profit or loss.

The application of HKAS 27 (Revised) has not resulted in changes in the Group's accounting policies as it is the same with the Group's accounting policies in prior years.

In addition, under HKAS 27 (Revised), the definition of non-controlling interest has been changed. Specifically, under HKAS 27 (Revised), non-controlling interest is defined as the equity in a subsidiary not attributable, directly or indirectly, to a parent. The application of HKAS 27 (Revised) has had no effect on the consolidated financial statements of the Group for the current or prior accounting periods.

### Amendments to HKAS 17 Leases

As part of Improvements to HKFRSs issued in 2009, HKAS 17 Leases has been amended in relation to the classification of leasehold land. Before the amendments to HKAS 17, the Group was required to classify leasehold land as operating leases and to present leasehold land as prepaid lease payments in the consolidated statement of financial position. The amendments to HKAS 17 have removed such a requirement. The amendments require that the classification of leasehold land should be based on the general principles set out in HKAS 17, that is, whether or not substantially all the risks and rewards incidental to ownership of a leased asset have been transferred to the lessee.

In accordance with the transitional provisions set out in the amendments to HKAS 17, the Group reassessed the classification of unexpired leasehold land as at 1 January 2010 based on information that existed at the inception of the leases. The application of amendments to HKAS 17 had no material effect on the consolidated financial statements.

69

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 2. APPLICATION OF NEW AND REVISED HONG KONG FINANCIAL REPORTING STANDARDS ("HKFRSs") *(continued)*

### Hong Kong - INT 5 Presentation of Financial Statements - Classification by the Borrower of a Term Loan that Contains a Repayment on Demand Clause

Hong Kong - INT 5 clarifies that term loans that include a clause that gives the lender the unconditional right to call the loans at any time ("repayment on demand clause") should be classified by the borrower as current liabilities. The Group has applied Hong Kong - INT 5 for the first time in the current year which requires retrospective application. Under Hong Kong - INT 5, term loans with a repayment on demand clause are classified as current liabilities. The application of Hong Kong - INT 5 has had no impact on the consolidated financial statements of the Group for the current or prior accounting periods.

The adoption of the other new and revised HKFRSs in the current year had no material effect on the amounts reported in these consolidated financial statements and/or disclosures set out in these consolidated financial statements.

### New and revised standards and interpretations issued but not yet effective

The Group has not early applied the following new and revised standards, amendments or interpretations that have been issued but are not yet effective.

| | |
|---|---|
| HKFRSs (Amendments) | Improvements to HKFRSs 2010 except for the amendments to HKFRS 3 (Revised in 2008), HKFRS 7, HKAS 1 and HKAS 28[1] |
| HKFRS 1 (Amendment) | Limited Exemptions from Comparative HKFRS 7 Disclosures for First-time Adopters[3] |
| HKFRS 1 (Amendments) | Severe Hyperinflation and Removal of Fixed Dates for First-time Adopters[5] |
| HKFRS 7 (Amendments) | Disclosures — Transfers of Financial Assets[5] |
| HKFRS 9 | Financial Instruments[7] |
| HKAS 12 (Amendments) | Deferred Tax: Recovery of Underlying Assets[6] |
| HKAS 24 (Revised) | Related Party Disclosures[4] |
| HKAS 32 (Amendment) | Classification of Rights Issues[2] |
| HK (IFRIC) — INT 14 (Amendments) | Prepayments of a Minimum Funding Requirement[4] |
| HK (IFRIC) — INT 19 | Extinguishing Financial Liabilities with Equity Instruments[3] |

70

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

## 2.   APPLICATION OF NEW AND REVISED HONG KONG FINANCIAL REPORTING STANDARDS ("HKFRSs") *(continued)*

New and revised standards and interpretations issued but not yet effective *(continued)*

[1]     Effective for annual periods beginning on or after 1 July 2010 and 1 January 2011, as appropriate.

[2]     Effective for annual periods beginning on or after 1 February 2010.

[3]     Effective for annual periods beginning on or after 1 July 2010.

[4]     Effective for annual periods beginning on or after 1 January 2011.

[5]     Effective for annual periods beginning on or after 1 July 2011.

[6]     Effective for annual periods beginning on or after 1 January 2012.

[7]     Effective for annual periods beginning on or after 1 January 2013.

HKFRS 9 Financial Instruments issued in November 2009 and amended in October 2010 introduces new requirements for the classification and measurement of financial assets and financial liabilities and for derecognition.

- •     HKFRS 9 requires all recognised financial assets that are within the scope of HKAS 39 Financial Instruments: Recognition and Measurement to be subsequently measured at amortised cost or fair value. Specifically, debt investments that are held within a business model whose objective is to collect the contractual cash flows, and that have contractual cash flows that are solely payments of principal and interest on the principal outstanding are generally measured at amortised cost at the end of subsequent accounting periods. All other debt investments and equity investments are measured at their fair values at the end of subsequent accounting periods.

- •     The most significant effect of HKFRS 9 regarding the classification and measurement of financial liabilities relates to the accounting for changes in fair value of a financial liability (designated as at fair value through profit or loss) attributable to changes in the credit risk of that liability. Specifically, under HKFRS 9, for financial liabilities that are designated as at fair value through profit or loss, the amount of change in the fair value of the financial liability that is attributable to changes in the credit risk of that liability is recognised in other comprehensive income, unless the recognition of the effects of changes in the liability's credit risk in other comprehensive income would create or enlarge an accounting mismatch in profit or loss. Changes in fair value attributable to a financial liability's credit risk are not subsequently reclassified to profit or loss. Previously, under HKAS 39, the entire amount of the change in the fair value of the financial liability designated as at fair value through profit or loss was recognised in profit or loss.

HKFRS 9 is effective for annual periods beginning on or after 1 January 2013, with earlier application permitted.

71

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 2. APPLICATION OF NEW AND REVISED HONG KONG FINANCIAL REPORTING STANDARDS ("HKFRSs") *(continued)*

The directors of the Company anticipate that HKFRS 9 that will be adopted in the Group's consolidated financial statements for the annual period beginning 1 January 2013 and that the application of the new standard will have a significant impact on amounts reported in respect of the Group's financial assets and financial liabilities. However, it is not practicable to provide a reasonable estimate of that effect until a detailed review has been completed.

The amendments to HKFRS 7 Disclosures - Transfers of Financial Assets increase the disclosure requirements for transactions involving transfers of financial assets. These amendments are intended to provide greater transparency around risk exposures when a financial asset is transferred but the transferor retains some level of continuing exposure in the asset. The amendments also require disclosures where transfers of financial assets are not evenly distributed throughout the period. To date, the Group has not entered into transactions involving transfers of financial assets. However, if the Group enters into any such transactions in the future, disclosures regarding those transfers may be affected.

HKAS 24 Related Party Disclosures (Revised in 2009) modifies the definition of a related party and simplifies disclosures for government-related entities.

The disclosure exemptions introduced in HKAS 24 (Revised) will affect the Group because the Group is a government-related entity. The disclosures regarding related party transactions and balances in these consolidated financial statements may be affected when the revised version of HKAS 24 (Revised) is applied in future accounting periods.

The amendments to HKAS 12 Deferred Tax: Recovery of Underlying Assets mainly deal with the measurement of deferred tax for investment properties that are measured using the fair value model in accordance with HKAS 40 Investment Property. Based on the amendments, for the purposes of measuring deferred tax liabilities and deferred tax assets for investment properties measured using the fair value model, the carrying amounts of the investment properties are presumed to be recovered through sale, unless the presumption is rebutted in certain circumstances. The directors of the Company do not anticipate that the application of the amendments to HKAS 12 will have any significant impact on deferred tax recognised.

The amendments to HKAS 32 Classification of Rights Issues address the classification of certain rights issues denominated in a foreign currency as either an equity instrument or as a financial liability. To date, the Group has not entered into any arrangements that would fall within the scope of the amendments. However, if the Group does enter into any rights issues within the scope of the amendments in future accounting periods, the amendments to HKAS 32 will have an impact on the classification of those rights issues.

72

## 2.   APPLICATION OF NEW AND REVISED HONG KONG FINANCIAL REPORTING STANDARDS ("HKFRSs") *(continued)*

HK (IFRIC) - INT 19 provides guidance regarding the accounting for the extinguishment of a financial liability by the issue of equity instruments. To date, the Group has not entered into transactions of this nature. However, if the Group does enter into any such transactions in the future, HK (IFRIC) - INT 19 will affect the required accounting. In particular, under HK (IFRIC) - INT 19, equity instruments issued under such arrangements will be measured at their fair value, and any difference between the carrying amount of the financial liability extinguished and the fair value of equity instruments issued will be recognised in profit or loss.

The directors of the Company anticipate that the application of other new and revise standards, amendments or interpretations will have no material impact on the results and the financial position of the Group.

## 3.   SIGNIFICANT ACCOUNTING POLICIES

The consolidated financial statements have been prepared on the historical cost basis. Historical cost is generally based on the fair value of the consideration given in exchange for assets.

The consolidated financial statements have been prepared in accordance with HKFRSs issued by the HKICPA. In addition, the consolidated financial statements include applicable disclosures required by the Rules Governing the Listing of Securities on the Stock Exchange and by the Hong Kong Companies Ordinance.

The principal accounting policies are set out below.

### Basis of consolidation

The consolidated financial statements incorporate the financial statements of the Company and entities controlled by the Company (its subsidiaries). Control is achieved where the Company has the power to govern the financial and operating policies of an entity so as to obtain benefits from its activities.

The results of subsidiaries acquired or disposed of during the year are included in the consolidated statement of comprehensive income from the effective date of acquisition or up to the effective date of disposal, as appropriate.

Where necessary, adjustments are made to the financial statements of subsidiaries to bring their accounting policies into line with those used by other members of the Group.

All intra-group transactions, balances, income and expenses are eliminated in full on consolidation.

Non-controlling interests in subsidiaries are presented separately from the Group's equity therein.

73

## 3.  SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Basis of consolidation *(continued)*

#### *Allocation of total comprehensive income to non-controlling interests*

Total comprehensive income and expense of a subsidiary is attributed to the owners of the Company and to the non-controlling interests even if this results in the non-controlling interests having a deficit balance. Prior to 1 January 2010, losses applicable to the non-controlling interests in excess of the non-controlling interests in the subsidiary's equity were allocated against the interests of the Group except to the extent that the non-controlling interests had a binding obligation and were able to make an additional investment to cover the losses.

#### *Changes in the Group's ownership interests in existing subsidiaries*

Changes in the Group's ownership interests in subsidiaries that do not result in the Group losing control over the subsidiaries are accounted for as equity transactions. The carrying amounts of the Group's interests and the non-controlling interests are adjusted to reflect the changes in their relative interests in the subsidiaries. Any difference between the amount by which the non-controlling interests are adjusted and the fair value of the consideration paid or received is recognised directly in equity and attributed to owners of the Company.

When the Group loses control of a subsidiary, the profit or loss on disposal is calculated as the difference between (i) the aggregate of the fair value of the consideration received and the fair value of any retained interest and (ii) the previous carrying amount of the assets (including goodwill), and liabilities of the subsidiary and any non-controlling interests. When assets of the subsidiary are carried at revalued amounts or fair values and the related cumulative gain or loss has been recognised in other comprehensive income and accumulated in equity, the amounts previously recognised in other comprehensive income and accumulated in equity are accounted for as if the Company had directly disposed of the relevant assets (i.e. reclassified to profit or loss or transferred directly to retained earnings). The fair value of any investment retained in the former subsidiary at the date when control is lost is regarded as the fair value on initial recognition for subsequent accounting under HKAS 39 Financial Instruments: Recognition and Measurement or, when applicable, the cost on initial recognition of an investment in an associate or a jointly controlled entity.

### Merger accounting for business combination involving entities under common control

The consolidated financial statements incorporate the financial statement items of the combining entities or businesses in which the common control combination occurs as if they had been combined from the date when the combining entities or businesses first came under the control of the controlling party.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

## 3.  SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Merger accounting for business combination involving entities under common control *(continued)*

The net assets of the combining entities or businesses are consolidated using the existing book values from the controlling parties' perspective. No amount is recognised in respect of goodwill or excess of acquirer's interest in the net fair value of acquiree's identifiable assets, liabilities and contingent liabilities over cost at the time of common control combination, to the extent of the continuation of the controlling party's interest.

The consolidated statement of comprehensive income includes the results of each of the combining entities or businesses from the earliest date presented or since the date when the combining entities or businesses first came under the common control, where this is a shorter period, regardless of the date of the common control combination.

### Investments in subsidiaries

In the Company's statement of financial position, the investments in subsidiaries are stated at cost less accumulated impairment loss. The results of the subsidiaries are accounted for by the Company on the basis of dividends received and receivable.

### Interests in associates

An associate is an entity over which the investor has significant influence and that is neither a subsidiary nor an interest in a joint venture. Significant influence is the power to participate in the financial and operating policy decisions of the investee but is not control or joint control over those policies.

The results and assets and liabilities of associates are incorporated in these consolidated financial statements using the equity method of accounting. Under the equity method, investments in associates are carried in the consolidated statement of financial position at cost as adjusted for post-acquisition changes in the Group's share of the net assets of the associates, less any identified impairment loss. When the Group's share of losses of an associate equals or exceeds its interest in that associate (which includes any long-term interests that, in substance, form part of the Group's net investment in the associate), the Group discontinues recognising its share of further losses. Additional share of losses is provided for and a liability is recognised only to the extent that the Group has incurred legal or constructive obligations or made payments on behalf of that associate.

Any excess of the cost of acquisition over the Group's share of the net fair value of the identifiable assets, liabilities and contingent liabilities of an associate recognised at the date of acquisition is recognised as goodwill which is included within the carrying amount of the investment.

Any excess of the Group's share of the net fair value of the identifiable assets, liabilities and contingent liabilities over the cost of acquisition, after reassessment, is recognised immediately in profit or loss.

75

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 3.   SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Interests in associates *(continued)*

The requirements of HKAS 39 are applied to determine whether it is necessary to recognise any impairment loss with respect to the Group's investment in an associate. When necessary, the entire carrying amount of the investment (including goodwill) is tested for impairment in accordance with HKAS 36 Impairment of Assets as a single asset by comparing its recoverable amount (higher of value in use and fair value less costs to sell) with its carrying amount. Any impairment loss recognised forms part of the carrying amount of the investment. Any reversal of that impairment loss is recognised in accordance with HKAS 36 to the extent that the recoverable amount of the investment subsequently increases.

Where a group entity transacts with an associate, profits and losses resulting from the transactions with the associate are recognised in the Group's consolidated financial statements only to the extent of the interest in the associate that are not related to the Group.

In the Company's statement of financial position, investment in an associate is stated at cost less accumulated impairment losses. The result of an associate is accounted for by the Company on the basis of dividends received and receivable during the year.

### Revenue recognition

Revenue is measured at the fair value of the consideration received or receivable and represents amounts receivable for goods sold in the normal course of business, net of discounts and sales related taxes.

Revenue from the sale of goods is recognised when all the following conditions are satisfied:

- the Group has transferred to the buyer the significant risks and rewards of ownership of the goods;

- the Group retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold;

- the amount of revenue can be measured reliably;

- it is probable that the economic benefits associated with the transaction will flow to the Group; and

- the costs incurred or to be incurred in respect of the transaction can be measured reliably.

Rental income from operating leases is recognised in profit or loss on a straight-line basis over the term of the relevant lease.

76

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

## 3.   SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Revenue recognition *(continued)*

Interest income from a financial asset is recognised when it is probable that the economic benefits will flow to the Group and the amount of revenue can be measured reliably. Interest income from a financial asset is accrued on a time basis, by reference to the principal outstanding and at the effective interest rate applicable, which is the rate that exactly discounts the estimated future cash receipts through the expected life of the financial asset to that asset's net carrying amount on initial recognition.

Dividend income from investments is recognised when the shareholders' rights to receive payment have been established (provided that it is probable that the economic benefits will flow to the Group and the amount of revenue can be measured reliably).

### Property, plant and equipment

Property, plant and equipment including buildings held for use in the production or supply of goods, or for administrative purposes (other than construction in progress) are stated at cost less subsequent accumulated depreciation and accumulated impairment losses, if any.

Depreciation is provided to write off the cost of items of property, plant and equipment (other than construction in progress) less their residual values over their estimated useful lives, using the straight-line method. The estimated useful lives, residual values and depreciation method are reviewed at the end of each reporting period, with the effect of any changes in estimate accounted for on a prospective basis.

Construction in progress includes property, plant and equipment in the course of construction for production or for its own use purposes. Construction in progress is carried at cost less any recognised impairment loss. Costs include professional fees and, for qualifying assets, borrowing costs capitalised in accordance with the Group's accounting policy. Such properties are classified to the appropriate category of property, plant and equipment when completed and ready for intended use. Depreciation of these assets, on the same basis as other property assets, commences when the assets are ready for their intended use.

If an item of property, plant and equipment becomes an investment property because its use has changed as evidenced by end of owner-occupation, the carrying amount of that item is recognised as the cost at the date of transfer.

An item of property, plant and equipment is derecognised upon disposal or when no future economic benefits are expected to arise from the continued use of the asset. Any gain or loss arising on derecognition of the asset (calculated as the difference between the net disposal proceeds and the carrying amount of the item) is included in the profit or loss in the period in which the item is derecognised.

77

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 3.   SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Investment properties

Investment properties are properties held to earn rental and/or for capital appreciation.

On initial recognition, investment properties are measured at cost, including any directly attributable expenditure. Subsequent to initial recognition, investment properties are stated at cost less subsequent accumulated depreciation and any accumulated impairment losses. Depreciation is charged so as to write off the cost of investment properties over their estimated useful lives and after taking into account of their estimated residual values, using the straight-line method.

An investment property is derecognised upon disposal or when the investment property is permanently withdrawn from use and no future economic benefits are expected from its disposals. Any gain or loss arising on derecognition of the asset (calculated as the difference between the net disposal proceeds and the carrying amount of the asset) is included in the profit or loss in the period in which the item is derecognised.

### Leasing

Leases are classified as finance leases whenever the terms of the lease transfer substantially all the risks and rewards of ownership to the lessee. All other leases are classified as operating leases.

#### *The Group as lessor*

Rental income from operating leases is recognised in profit or loss on a straight-line basis over the term of the relevant lease.

#### *The Group as lessee*

Operating lease payments are recognised as an expense on a straight-line basis over the term of the relevant lease.

#### *Leasehold land and building*

When a lease included both land and building elements, the Group assesses the classification of each element as a finance or an operating lease separately based on the assessment as to whether substantially all the risks and rewards incidental to ownership of each element have been transferred to the Group. Specifically, the minimum lease payments (including any lump-sum upfront payments) are allocated between the land and the building elements in proportion to the relative fair values of the leasehold interests in the land element and building element of the lease at the inception of the lease.

78

## 3.  SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Leasing *(continued)*

To the extent the allocation of the lease payments can be made reliably, interest in leasehold land that is accounted for as an operating lease is presented as "leasehold land and land use rights" in the consolidated statement of financial position and is amortised over the lease term on a straight-line basis.

### Foreign currencies

In preparing the financial statements of each individual group entity, transactions in currencies other than the functional currency of that entity (foreign currencies) are recorded in the respective functional currency (i.e. the currency of the primary economic environment in which the entity operates) at the rates of exchanges prevailing on the dates of the transactions. At the end of the reporting period, monetary items denominated in foreign currencies are retranslated at the rates prevailing at that date.

Exchange differences arising on the settlement of monetary items, and on the retranslation of monetary items, are recognised in profit or loss in the period in which they arise.

79

For the purposes of presenting the consolidated financial statements, the assets and liabilities of the Group's foreign operations are translated into the presentation currency of the Group (i.e. RMB) at the rate of exchange prevailing at the end of the reporting period, and their income and expenses are translated at the average exchange rates for the year. Exchange differences arising, if any, are recognised in other comprehensive income and accumulated in equity under the heading of the exchange reserve (attributed to non-controlling interest as appropriate).

### Borrowings costs

Borrowing costs directly attributable to the acquisition, construction or production of qualifying assets, which are assets that necessarily take a substantial period of time to get ready for their intended use or sale, are added to the cost of those assets, until such time as the assets are substantially ready for their intended use or sale. Investment income earned on the temporary investment of specific borrowings pending their expenditure on qualifying assets is deducted from the borrowing costs eligible for capitalisation.

All other borrowing costs are recognised in profit or loss in the period in which they are incurred.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 3.   SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Government grants

Government grants are not recognised until there is reasonable assurance that the Group will comply with the conditions attaching to them and that the grants will be received.

Government grants are recognised in profit or loss on a systematic basis over the periods in which the Group recognises as expenses the related costs for which the grants are intended to compensate. Government grants related to depreciable assets are recognised as deferred income in the consolidated statement of financial position and transferred to profit or loss over the useful lives of the related assets. Other government grants are recognised as revenues over the periods necessary to match them with the costs for which they are intended to compensate, on a systematic basis. Government grants that are receivable as compensation for expenses or losses already incurred or for the purpose of giving immediate financial support to the Group with no future related costs are recognised in profit or loss in the period in which they become receivable.

### Retirement benefit costs

Payments to state-managed retirement benefit schemes are charged as an expense when employees have rendered service entitling them to the contributions.

#### *Pension and housing obligations*

The full time employees of the Group are covered by various government-sponsored pension plans under which the employees are entitled to a monthly pension based on certain formulas. These government-sponsored pension plans are responsible for the pension liability to these retired employees. The Group contributes on a monthly basis to these pension plans. Under these plans, the Group has no legal or constructive obligation for retirement benefits beyond the contributions made. Contributions to these plans are expensed as incurred. Voluntary payments made to certain former employees and which were not made pursuant to a formal or informal plan are expensed as paid.

Full time employees are also entitled to participate in various government-sponsored housing funds. The Group contributes on a monthly basis to these funds based on certain percentages of the salaries of the employees. The Group's liability in respect of these funds is limited to the contributions payable in each period.

#### *Termination benefits*

Termination benefits are payable when employment is terminated by the Group before the normal retirement date, or whenever an employee accepts voluntary redundancy in exchange for these benefits. The Group recognises termination benefits when it is demonstrably committed to either: (1) terminating the employment of current employees according to a detailed formal plan without possibility of withdrawal; or (2) providing termination benefits as a result of an offer made to encourage voluntary redundancy.

80

## 3.   SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Retirement benefit costs *(continued)*

#### *Early retirement benefits*

Employee early retirement benefits are recognised in the period in which the Group enters into an agreement with the employee specifying the terms of early retirement or after the individual employee has been advised of the specific terms. The specific terms vary among the early retired employees depending on various factors including position and length of services. Early retirement benefits falling due more than twelve months after the reporting date are discounted to present value.

### Taxation

Income tax expense represents the sum of the tax currently payable and deferred tax.

The tax currently payable is based on taxable profit for the year. Taxable profit differs from profit as reported in the consolidated statement of comprehensive income because it excludes items of income or expense that are taxable or deductible in other years and it further excludes items that are never taxable or deductible. The Group's liability for current tax is calculated using tax rates that have been enacted or substantively enacted by the end of the reporting period.

Deferred tax is recognised on temporary differences between the carrying amounts of assets and liabilities in the consolidated financial statements and the corresponding tax base used in the computation of taxable profit. Deferred tax liabilities are generally recognised for all taxable temporary differences. Deferred tax assets are generally recognised for all deductible temporary difference to the extent that it is probable that taxable profits will be available against which those deductible temporary differences can be utilised. Such assets and liabilities are not recognised if the temporary difference arises from goodwill or from the initial recognition (other than in a business combination) of other assets and liabilities in a transaction that affects neither the taxable profit nor the accounting profit.

Deferred tax liabilities are recognised for taxable temporary differences associated with investments in subsidiaries and associates, except where the Group is able to control the reversal of the temporary difference and it is probable that the temporary difference will not reverse in the foreseeable future. Deferred tax assets arising from deductible temporary differences associated with such investments and interests are only recognised to the extend that it is probable that there will be sufficient taxable profits against which to utilise the benefits of the temporary differences and they are expected to reverse in the foreseeable future.

Deferred tax assets and liabilities are measured at the tax rates that are expected to apply in the period in which the liability is settled or the asset is realised, based on tax rate (and tax laws) that have been enacted or substantively enacted by the end of the reporting period. The measurement of deferred tax liabilities and assets reflects the tax consequences that would follow from the manner in which the Group expects, at the end of the reporting period, to recover or settle the carrying amount of its assets and liabilities. Deferred tax is recognised in profit or loss, except when it relates to items that are recognised in other comprehensive income or directly in equity, in which case the deferred tax is also recognised in other comprehensive income or directly in equity respectively.

81

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 3.   SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Intangible assets

#### *Intangible assets acquired separately*

Intangible assets acquired separately and with finite useful lives are carried at costs less accumulated amortisation and any accumulated impairment losses (see the accounting policy in respect of impairment losses on tangible and intangible assets below). Amortisation for intangible assets with finite useful lives is provided on a straight-line basis over their estimated useful lives. The estimated useful life and amortisation method are reviewed at the end of each reporting period with the effect of any changes in estimate being accounted for on a prospective basis.

#### *Research and development expenditure*

Expenditure on research activities is recognised as an expense in the period in which it is incurred.

### Inventories

82

Inventories are stated at the lower of cost and net realisable value. Cost is calculated using the weighted average method.

### Cash and cash equivalents

Bank balances and cash in the consolidated statement of financial position comprise cash at banks and on hand and short-term deposits with a maturity of three months or less. For the purpose of the consolidated statement of cash flows, cash and cash equivalents consist of cash and short-term deposits as defined above.

### Financial instruments

Financial assets and financial liabilities are recognised in the consolidated statement of financial position when a group entity becomes a party to the contractual provisions of the instrument.

Financial assets and financial liabilities are initially measured at fair value. Transaction costs that are directly attributable to the acquisition or issue of financial assets and financial liabilities are added to or deducted from the fair value of the financial assets or financial liabilities, as appropriate, on initial recognition.

## 3.   SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Financial instruments *(continued)*

#### *Financial assets*

The Group's financial assets are classified into loans and receivables and available-for-sale investment. The classification depends on the nature and purpose of the financial assets and is determined at the time of initial recognition. All regular way purchases or sales of financial assets are recognised and derecognised on a trade date basis. Regular way purchases or sales are purchases or sales of financial assets that require delivery of assets within the time frame established by regulation or convention in the marketplace.

#### *Effective interest method*

The effective interest method is a method of calculating the amortised cost of a financial asset and of allocating interest income over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash receipts (including all fees paid or received that form an integral part of the effective interest rate, transaction costs and other premiums or discounts) through the expected life of the financial asset, or, where appropriate, a shorter period to the net carrying amount on initial recognition.

Interest income is recognised on an effective interest basis for debt instruments.

#### *Loans and receivables*

Loans and receivables are non-derivative financial assets with fixed or determinable payments that are not quoted in an active market. Subsequent to initial recognition, loans and receivables (including trade and bills receivables, other receivables, deposits, restricted bank balances and bank balances and cash) are carried at amortised cost using the effective interest method, less any identified impairment losses (see accounting policy on impairment losses on financial assets below).

#### *Available-for-sale investments*

Available-for-sale investments are non-derivatives that are either designated or not classified as financial assets at fair value through profit or loss, loans and receivables or held-to-maturity investments.

For available-for-sale equity investments that do not have a quoted market price in an active market and whose fair value cannot be reliably measured and derivatives that are linked to and must be settled by delivery of such unquoted equity instruments, they are measured at cost less any identified impairment losses at the end of the reporting period (see accounting policy on impairment losses on financial assets below).

83

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 3.   SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Financial instruments *(continued)*

### Financial assets (continued)

*Impairment losses on financial assets*

Financial assets are assessed for indicators of impairment at the end of the reporting period. Financial assets are impaired where there is objective evidence that, as a result of one or more events that occurred after the initial recognition of the financial asset, the estimated future cash flows of the financial assets have been affected.

For an available-for-sale equity investment, a significant or prolonged decline in the fair value of that investment below its cost is considered to be objective evidence of impairment.

For all other financial assets, objective evidence of impairment could include:

- significant financial difficulty of the issuer or counterparty; or

- breach of contract, such as default or delinquency in interest and principal payments; or

- it becoming probable that the borrower will enter into bankruptcy or financial re-organisation; or

- the disappearance of an active market for that financial asset because of financial difficulties.

For certain categories of financial asset, such as trade receivables and other receivables, assets that are assessed not to be impaired individually are subsequently assessed for impairment on a collective basis. Objective evidence of impairment for a portfolio of receivables could include the Group's past experience of collecting payments, and an increase in the number of delayed payments in the portfolio past the average credit period of 90 days.

For financial assets carried at amortised cost, an impairment loss is recognised in profit or loss when there is objective evidence that the asset is impaired, and is measured as the difference between the asset's carrying amount and the present value of the estimated future cash flows discounted at the original effective interest rate.

For financial assets carried at cost, the amount of the impairment loss is measured as the difference between the asset's carrying amount and the present value of the estimated future cash flows discounted at the current market rate of return for a similar financial asset. Such impairment loss will not be reversed in subsequent periods.

84

## 3.   SIGNIFICANT ACCOUNTING POLICIES *(continued)*

Financial instruments *(continued)*

*Financial assets (continued)*

*Impairment losses on financial assets (continued)*

The carrying amount of the financial asset is reduced by the impairment loss directly for all financial assets with the exception of trade receivables and other receivables, where the carrying amount is reduced through the use of an allowance account. Changes in the carrying amount of the allowance account are recognised in profit or loss. When a trade receivable or other receivable, is considered uncollectible, it is written off against the allowance account. Subsequent recoveries of amounts previously written off are credited to profit or loss.

For financial assets measured at amortised cost, if, in a subsequent period, the amount of impairment loss decreases and the decrease can be related objectively to an event occurring after the impairment losses was recognised, the previously recognised impairment loss is reversed through profit or loss to the extent that the carrying amount of the asset at the date the impairment is reversed does not exceed what the amortised cost would have been had the impairment not been recognised.

Impairment losses on available-for-sale equity investments will not be reversed in profit or loss in subsequent periods.

### *Financial liabilities and equity instruments*

Financial liabilities and equity instruments issued by a group entity are classified according to the substance of the contractual arrangements entered into and definitions of a financial liability and an equity instrument.

An equity instrument is any contract that evidences a residual interest in the assets of the group after deducting all of its liabilities.

The Group's financial liabilities are generally classified as other financial liabilities.

*Effective interest method*

The effective interest method is a method of calculating the amortised cost of a financial liability and of allocating interest expense over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash payments through the expected life of the financial liability, or, where appropriate, a shorter period.

Interest expense is recognised on an effective interest basis.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 3.   SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Financial instruments *(continued)*

#### Financial liabilities and equity instruments (continued)

*Financial liabilities at fair value through profit or loss*

Financial liabilities at fair value through profit or loss ("FVTPL") are measured at fair value, with changes in fair value arising on remeasurement recognised directly in profit or loss in the period in which they arise. The net gain or loss recognised in profit or loss includes any interest paid on the financial liabilities.

*Other financial liabilities*

Other financial liabilities including trade and bills payables, other payables and accruals, bank and other borrowings and termination benefits are subsequently measured at amortised cost, using the effective interest method.

*Equity instruments*

Equity instruments issued by the Company are recorded at the proceeds received, net of direct issue costs.

#### Derecognition

Financial assets are derecognised when the rights to receive cash flows from the assets expire or, the financial assets are transferred and the Group has transferred substantially all the risks and rewards of ownership of the financial assets.

On derecognition of a financial asset in its entirety, the difference between the asset's carrying amount and the sum of the consideration received and receivable and the cumulative gain or loss that had been recognised in other comprehensive income and accumulated in equity is recognised in profit or loss.

On derecognition of a financial asset other than in its entirety (e.g. when the Group retains an option to repurchase part of a transferred asset or retains a residual interest that does not result in the retention of substantially all the risks and rewards of ownership and the Group retains control), the Group allocates the previous carrying amount of the financial asset between the part it continues to recognise under continuing involvement, and the part it no longer recognises on the basis of the relative fair values of those parts on the date of the transfer. The difference between the carrying amount allocated to the part that is no longer recognised and the sum of the consideration received for the part no longer recognised and any cumulative gain or loss allocated to it that had been recognised in other comprehensive income is recognised in profit or loss. A cumulative gain or loss that had been recognised in other comprehensive income is allocated between the part that continues to be recognised and the part that is no longer recognised on the basis of the relative fair values of those parts.

86

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

## 3.   SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Financial instruments *(continued)*

#### *Derecognition (continued)*

Financial liabilities are decognised when the obligation specified in the relevant contract is discharged, cancelled or expires. The difference between the carrying amount of the financial liability derecognised and the consideration paid and payable is recognised in profit or loss.

### Provisions

Provisions are recognised when the Group has a present obligation as a result of a past event, and it is probable that the Group will be required to settle that obligation, and reliable estimate can be made of the amount of the obligation. Provisions are measured at the directors' best estimate of the consideration required to settle the present obligation at the end of the reporting period, taking into account the risks and uncertainties surrounding the obligation. Where a provision is measured using the cash flows estimated to settle the present obligation, its carrying amount is the present value of those cash flows (where the effect is material).

### Warranty

Provisions for the expected cost of warranty obligations under local sale of goods legislation are recognised at the date of sale of the relevant products, at the directors' best estimate of the expenditure required to settle the Group's obligation.

### Cash-settled share-based payment transactions

For cash-settled share-based payments, the Group measures the goods or services acquired and the liability incurred at the fair value of the liability. At the end of the reporting period, the liability is remeasured at its fair value until the liability is settled, with any changes in fair value recognised in profit or loss.

### Impairment losses on tangible and intangible assets

At the end of the reporting period, the Group reviews the carrying amounts of its tangible and intangible assets to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment loss, if any.

87

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 3.   SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Impairment losses on tangible and intangible assets *(continued)*

Where it is not possible to estimate the recoverable amount of an individual asset, the Group estimates the recoverable amount of the cash-generating unit to which the asset belongs. Where a reasonable and consistent basis of allocation can be identified, corporate assets are also allocated to individual cash-generating units, or otherwise they are allocated to the smallest group of cash-generating units for which a reasonable and consistent allocation basis can be identified.

Recoverable amount is the higher of fair value less costs to sell and value in use. In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset for which the estimates of future cash flows have not been adjusted.

If the recoverable amount of an asset is estimated to be less than its carrying amount, the carrying amount of the asset is reduced to its recoverable amount. An impairment loss is recognised as an expense immediately in profit or loss.

Where an impairment loss subsequently reverses, the carrying amount of the asset is increased to the revised estimate of its recoverable amount, but so that the increased carrying amount does not exceed the carrying amount that would have been determined had no impairment loss been recognised for the asset in prior years. A reversal of an impairment loss is recognised as income immediately in profit or loss.

## 4.   CRITICAL ACCOUNTING JUDGEMENTS AND KEY SOURCES OF ESTIMATION UNCERTAINTY

In the application of the Group's accounting policies, which are described in Note 3, the directors of the Company are required to make judgements, estimates and assumptions about the carrying amounts of assets and liabilities that are not readily apparent from other sources. The estimates and underlying assumptions are based on historical experience and other factors that are considered to be relevant. Actual results may differ from these estimates.

The estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to accounting estimates are recognised in the period in which the estimate is revised if the revision affects only that period, or in the period of the revision and future periods if the revision affects both current and future periods.

### Critical judgements in applying the entity's accounting policies

The followings are the critical judgements, apart from those involving estimations (see below), that the directors of the Company have made in the process of applying the entity's accounting policies and that have the most significant effect on the amounts recognised in the consolidated financial statements.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

## 4.   CRITICAL ACCOUNTING JUDGEMENTS AND KEY SOURCES OF ESTIMATION UNCERTAINTY *(continued)*

### Critical judgements in applying the entity's accounting policies

#### *De facto control over subsidiaries*

The Group's management exercises its critical judgement when determining whether the Group has de facto control over an entity by evaluating, among other things: (i) the amount of additional interests in the subsidiaries required to be acquired by the Group so as to obtain the legal rights to govern financial and operating policies; (ii) the ability to demonstrate effective control during the shareholders' meetings and board meetings; (iii) the extent of reliance of the subsidiaries on the financial and operational support from the Group; and (iv) the extent of involvement of directors of the subsidiaries nominated by the Group in its operational and financial policy setting and decision making.

The results, assets and liabilities of the subsidiaries are therefore consolidated into the Group's financial statements.

#### *Ownership of the leasehold land and buildings and land use rights*

Despite the Group has paid the full purchase consideration as detailed in Notes 17 and 19, certain of the Group's rights to the use of the leasehold land and buildings and land use rights were not granted formal titles from the relevant government authorities. Despite the fact that the Group has not obtained the relevant legal titles, the directors of the Company determine to recognise these leasehold land and buildings and land use rights that they expect the legal titles being obtained in future should have no major difficulties and the Group is in substance controlling these leasehold land and buildings and land use rights.

### Key sources of estimation uncertainty

The following are the key assumptions concerning the future, and other key sources of estimation uncertainty at the end of the reporting period, that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year.

#### *Income tax expense*

Determining income tax provisions involves estimation on the future tax treatment of certain transactions. The Group carefully evaluates tax implications of transactions and tax provisions are set up accordingly. The tax treatment of such transactions is reconsidered periodically to take into account all changes in tax legislations. Where the final tax outcome of these transactions is different from the amounts that were initially recorded, such differences will affect the income tax and deferred tax provisions in the period in which such determination is made.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 4.  CRITICAL ACCOUNTING JUDGEMENTS AND KEY SOURCES OF ESTIMATION UNCERTAINTY *(continued)*

### Key sources of estimation uncertainty *(continued)*

#### *Allowance for inventories*

The management of the Group reviews the ageing analysis at the end of the reporting period, and makes allowance for obsolete and slow-moving inventory items. The management estimates the net realisable value for finished goods based primarily on the latest invoice prices and current market conditions. The Company carries out an inventory review on a product-by-product basis at the end of the reporting period and makes allowance for obsolete items. During the year ended 31 December 2010, the Group recognised an impairment loss of approximately RMB17,784,000 (2009: RMB108,541,000) in respect of raw materials and finished goods to write-down the inventories to their net realisable values.

#### *Impairment of property, plant and equipment and investment properties*

The Group tests at the reporting date whether property, plant and equipment and investment properties have suffered any impairment in accordance with accounting policies stated in Note 3. The recoverable amounts of property, plant and equipment and investment properties have been determined based on the higher of their fair value less costs to sell and their value-in-use calculations. These calculations require the use of estimates.

The Group reviews property, plant and equipment and investment properties for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset exceeds its recoverable amount. The recoverable amount of an asset or a cash-generating unit is determined based on the higher of their fair value less costs to sell and their value-in-use calculations prepared on the basis of management's assumptions and estimates taking into account the existing business expansion plan going forward, the current sales orders on hand and other strategic new business development.

The management had reviewed the Group's property, plant and equipment and investment properties for impairment. The impairment loss for property, plant and equipment and investment properties are recognised for the amounts by which the carrying amounts exceed their recoverable amounts, in accordance with the Group's accounting policy. The recoverable amounts of property, plant and equipment and investment properties have been determined based on the higher of their fair value less costs to sell and their value-in-use calculations. These calculations require the use of estimates such as the future revenue and discount rates. During the year ended 31 December 2010, the Group recognised an impairment loss of approximately RMB350,000 (2009: RMB995,706,000) in respect of property, plant and equipment (Note 17). No impairment loss has been recognised in respect of investment properties for the two years ended 31 December 2010 and 2009.

90

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

# 4. CRITICAL ACCOUNTING JUDGEMENTS AND KEY SOURCES OF ESTIMATION UNCERTAINTY *(continued)*

## Impairment of available-for-sale investment

The Group follows the guidance of HKAS 39 to determine when an available-for-sale investment is impaired. This determination requires significant judgement. In making this judgement, the Group evaluates, among other factors, the duration and extent to which the fair value of an investment is less than its cost; and the financial health of and near-term business outlook for the investee, including factors such as industry and sector performance, changes in technology and operational and financing cash flow.

If all of the declines in the recoverable amount below cost were considered significant or prolonged, the Group would suffer an additional loss in the consolidated statement of comprehensive income for the year ended 31 December 2010. As at 31 December 2010 and 2009, the carrying amount of available-for-sale investment was approximately RMB24,060,000, net of accumulated impairment loss of approximately RMB5,940,000.

## Allowance for doubtful debts

Management regularly reviews the recoverability and age of the trade receivables and other receivables. Appropriate impairment for estimated irrecoverable amounts are recognised in the consolidated statement of comprehensive income when there is objective evidence that the asset is impaired.

In determining whether allowance for doubtful debts is required, the Group takes into consideration the current creditworthiness, the past collection history, age status and likelihood of collection. Specific allowance is only made for receivables that are unlikely to be collected and is recognised on the difference between the estimated future cash flow expected to receive discounted using the original effective interest rate and its carrying value. If the financial conditions of customers of the Group were to deteriorate, resulting in an impairment of their ability to make payments, additional allowance may be required. As at 31 December 2010, the carrying amount of trade and bills receivables is approximately RMB477,457,000 (2009: RMB906,489,000), net of allowance for doubtful debts of approximately RMB16,758,000 (2009: RMB48,643,000).

## Provision for warranty

The provision for warranty was made for warranties granted to the CPTs tubes customers for the free-of-charge materials and workmanship of particular removal devices and accessories, up to a period of three years from the date of installation.

Provision for warranty was made on an accrual basis by reference to the directors' best estimates of the expenditure required to settle the obligations, and was charged to the consolidated statement of comprehensive income in the period in which the related sales are made. The level of provision required was assessed by the directors of the Company annually based on the Group's past experience of warranty. As at 31 December 2010, the carrying amount of provision for warranty is approximately RMB2,714,000 (2009: RMB7,052,000).

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 4.  CRITICAL ACCOUNTING JUDGEMENTS AND KEY SOURCES OF ESTIMATION UNCERTAINTY *(continued)*

### Liabilities for cash-settled share-based payments

The fair value is expensed over the period until vesting with recognition of a corresponding liability. The cost of cash-settled transactions is measured initially at fair value at the grant date using the Binomial model, taking into account the terms and conditions upon which the instruments were granted. The liability is measured at the end of each reporting period up to and including the settlement date with changes in fair value and recognised in the consolidated statement of comprehensive income.

## 5.  CAPITAL RISK MANAGEMENT

The Group manages its capital to ensure that entities in the Group will be able to continue as a going concern while maximising the return to shareholders through the optimisation of the debt and equity balance. The Group's overall strategy remains unchanged from prior year.

The capital structure of the Group consists of debt, which includes the bank and other borrowings disclosed in Note 31, cash and cash equivalents and equity attributable to owners of the Company, comprising issued share capital, other reserves and accumulated losses.

The Group reviews the capital structure on a regular basis and monitors on the basis of the gearing ratio. As part of this review, the Group considers the cost of capital and the risks associated with each class of capital. Gearing ratio is calculated as the proportion of total debt to total capital.

The Group aimed at maintaining a gearing ratio of not more than 50%. Based on the recommendations of the Group's directors, the Group intends to maintain a suitable ratio of share capital to liabilities, so as to maintain an effective capital structure from time to time.

The gearing ratio at the end of the reporting period was as follows:

|  | 2010 RMB'000 | 2009 RMB'000 |
|---|---|---|
| Total debt [(a)] | 3,620,040 | 1,815,451 |
| Net debt [(b)] | 921,610 | 737,790 |
| Total equity | 5,737,699 | 1,901,194 |
| Total capital (based on total debt) [(c)] | 9,357,739 | 3,716,645 |
| Net capital (based on net debt) [(d)] | 6,659,309 | 2,638,984 |
| | | |
| Gearing ratio (based on total debt and total capital) (%) | 38.7 | 48.8 |
| Gearing ratio (based on net debt and net capital) (%) | 13.8 | 28.0 |

[(a)]    Total debt equals to bank and other borrowings.

[(b)]    Net debt equals to total debt less bank balances and cash.

[(c)]    Total capital (based on total debt) equals to total debt plus total equity.

[(d)]    Net capital (based on net debt) equals to net debt plus total equity.

92

## 6.   FINANCIAL INSTRUMENTS

### (a)   Categories of financial instruments

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010**<br>***RMB'000*** | 2009<br>*RMB'000* | **2010**<br>***RMB'000*** | 2009<br>*RMB'000* |
| **Financial assets** | | | | |
| Loans and receivables (including cash and cash equivalents) | | | | |
| Trade and bills receivables | **477,457** | 906,489 | **129,799** | 243,846 |
| Other receivables and deposits | **433,068** | 182,512 | **138,222** | 226,742 |
| Restricted bank balances | **49,418** | — | **6,000** | — |
| Bank balances and cash | **2,698,430** | 1,077,661 | **244,110** | 42,002 |
| | **3,658,373** | 2,166,662 | **518,131** | 512,590 |
| Available-for-sale investment | **24,060** | 24,060 | **—** | — |
| **Financial liabilities** | | | | |
| Financial liabilities measured at amortised cost | | | | |
| Trade and bills payables | **711,943** | 400,152 | **479,897** | 454,361 |
| Other payables | **427,142** | 802,276 | **402,807** | 461,707 |
| Bank and other borrowings | **3,620,040** | 1,815,451 | **805,272** | 390,950 |
| Termination benefits | **10,424** | 11,063 | **1,855** | 2,509 |
| | **4,769,549** | 3,028,942 | **1,689,831** | 1,309,527 |

### (b)   Financial risk management objectives and policies

The Group's and the Company's major financial instruments include available-for-sale investment, trade and bills receivables, other receivables, restricted bank balances, bank balances and cash, trade and bills payables, other payables, accruals, bank and other borrowings and termination benefits. Details of the financial instruments are disclosed in respective notes. The risks associated with these financial instruments include market risk (currency risk and interest rate risk), credit risk and liquidity risk. The policies on how to mitigate these risks are set out below. The management manages and monitors these exposures to ensure appropriate measures are implemented on a timely and effective manner.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 6.   FINANCIAL INSTRUMENTS *(continued)*

### (b)   Financial risk management objectives and policies *(continued)*

*Market risk*

*Currency risk*

The Group and the Company mainly operates in the PRC. Revenue and majority of its operating costs and cost of sales are denominated in RMB. Certain trade and bills receivables, bank balances and cash, and bank and other borrowings of the Group and the Company are denominated in the United States dollars ("USD"). Such USD denominated trade and bills receivables, bank balances and cash, and bank and other borrowings are exposed to fluctuations in the value of RMB against USD in which these trade and bills receivables, bank balances and cash, and bank and other borrowings are denominated. Any significant appreciation / depreciation of the RMB against the USD may result in significant exchange gain / loss which would be recorded in the consolidated statement of comprehensive income.

At the end of the reporting period, included in the trade and bills receivables, bank balances and cash, and bank and other borrowings are the following amount denominated in USD which is other than the functional currency of the relevant group entities to which it relates.

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Trade and bills receivables | **52,219** | 101,762 | **17,121** | 4,026 |
| Bank balances and cash | **74,692** | 17,507 | **12,458** | 6,127 |
| Bank and other borrowings | **(495,378)** | (218,502) | **—** | — |
| | **(368,467)** | (99,233) | **29,579** | 10,153 |

The Group currently does not have foreign currency hedging policy. However, management monitors currency risk and will consider hedging significant currency risk exposure should the need arise.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

## 6.   FINANCIAL INSTRUMENTS *(continued)*

(b)   Financial risk management objectives and policies *(continued)*

*Market risk (continued)*

*Sensitivity analysis*

As of 31 December 2010, if RMB had strengthened / weakened 10% (2009: 10%) against USD, with all other variables held constant, the Group's profit after tax would have been approximately RMB31,320,000 higher / lower (2009: loss after tax would have been RMB8,405,000 lower / higher), mainly as a result of foreign exchange gains / losses on translation of the USD denominated trade and bills receivables, bank balances and cash, and bank and other borrowings.

As of 31 December 2010, if RMB had strengthened / weakened 10% (2009: 10%) against USD, with all other variables held constant, the Company's profit after tax would have been approximately RMB2,514,000 lower / higher (2009: loss after tax would have been RMB863,000 higher / lower), mainly as a result of foreign exchange losses / gains on translation of the USD denominated trade and bills receivables, and bank balances and cash.

*Interest rate risk*

The Group and the Company are exposed to fair value interest rate risk in relation to fixed-rate bank and other borrowings (see Note 31 for details). The Group currently does not have an interest rate hedging policy. However, the management monitors interest rate exposure and will consider other necessary actions when significant interest rate exposure is anticipated.

The Group is also exposed to cash flow interest rate risk in relation to variable-rate restricted bank balances, bank balances, bank and other borrowings (see Notes 27, 28 and 31 respectively for details). It is the Group's policy to keep its bank and other borrowings at floating rate of interests so as to minimise the fair value interest rate risk.

The Company is not exposed to cash flow interest rate risk in relation to variable-rate restricted bank balances and bank balances (see Notes 27 and 28 respectively for details). The Company has no variable-rate bank and other borrowings and therefore is not exposed to cash flow interest rate risk in relation to variable-rate bank and other borrowings.

The Group's exposure to interest rates on financial liabilities is detailed in the liquidity risk management section of this note. The Group's cash flow interest rate risk is mainly concentrated on the fluctuation of London Interbank Offered Rate and the basic borrowing rate announced by the People's Bank of China arising from the Group's variable-rate bank and other borrowings.

The Company does not have exposure to interest rates on financial liabilities as the Company has no variable-rate bank and other borrowings.

95

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 6.   FINANCIAL INSTRUMENTS *(continued)*

(b)   Financial risk management objectives and policies *(continued)*

*Market risk (continued)*

*Sensitivity analysis*

The sensitivity analysis below have been determined based on the exposure to interest rates for non-derivative instruments at the end of the reporting period. The analysis is prepared assuming the amount of liability outstanding at the end of the reporting period was outstanding for the whole year. A 100 basis point (2009: 100 basis point) increase or decrease is used when reporting interest rate risk internally to key management personnel and represents management's assessment of the reasonably possible change in interest rates.

If interest rates had been 100 basis point (2009: 100 basis point) higher / lower and all other variables were held constant, the Group's profit after tax would decrease / increase by approximately RMB328,000 (2009: loss after tax would increase / decrease by RMB1,857,000). This is mainly attributable to the Group's exposure to interest rates on its variable-rate bank and other borrowings.

In management's opinion, the sensitivity analysis is not necessarily of the inherent interest rate risk as the year end exposure does not reflect the exposure during the year.

*Credit risk*

As at 31 December 2010, the Group and the Company's maximum exposures to credit risk which will cause a financial loss to the Group and the Company due to failure to discharge an obligation by the counterparties is arising from the carrying amount of the respective recognised financial assets as stated in the consolidated statement of financial position and the statement of financial position respectively.

The credit risk on bank balances is limited because the restricted bank balances and bank balances are maintained with state-owned banks or other creditworthy financial institutions in the PRC and Hong Kong.

The Group's concentration of credit risk by geographical locations is mainly in the PRC, which accounted for approximately 57% (2009: 80%) of the total trade and bills receivables as at 31 December 2010.

The Company's concentration of credit risk by geographical locations is mainly in the PRC, which accounted for approximately 91% (2009: 97%) of the total trade and bills receivables as at 31 December 2010.

## 6.   FINANCIAL INSTRUMENTS *(continued)*

### (b)   Financial risk management objectives and policies *(continued)*

*Credit risk (continued)*

For the year ended 31 December 2010, the Group has minimal concentration of credit risk as only 6% and 13% of the total trade and bills receivables was due from the Group's largest customer and the five largest customers respectively. For the year ended 31 December 2009, the Group had concentration of credit risk as 19% and 46% of the total trade and bills receivables was due from the Group's largest customer and the five largest customers respectively. Sales to the largest customer and aggregate sales to the five largest customers represents 10% (2009: 13%) and 23% (2009: 35%) of total turnover respectively.

The Company has concentration of credit risk as 9% (2009: 16%) and 58% (2009: 42%) of the total trade and bills receivables was due from the Company's largest customer and the five largest customers respectively. Sales to the largest customer and aggregate sales to the five largest customers represents 32% (2009: 56%) and 55% (2009: 70%) of total turnover respectively.

The Group and the Company have policies in place to ensure that sale of products are made to customers with an appropriate credit history. The Group and the Company also perform periodic credit evaluations of its customers and believes that adequate impairment loss of trade receivables have been made in the consolidated financial statements.

*Liquidity risk*

In the management of the liquidity risk, the Group and the Company monitor and maintain a level of cash and cash equivalents deemed adequate by the management to finance the Group and the Company's operations and mitigate the effects of fluctuations in cash flows. The management monitors the utilisation of bank and other borrowings and ensures compliance with loan covenants.

Prudent liquidity risk management implies maintaining sufficient cash, the availability of funding through an adequate amount of committed credit facilities and the ability to close out market positions. Due to the dynamic nature of the underlying businesses, senior management aims to maintain flexibility in funding by keeping committed credit lines available.

The following table details the Group and the Company's remaining contractual maturity for its financial liabilities based on the agreed repayment terms. The table has been drawn up based on the undiscounted cash flows of financial liabilities based on the earliest date on which the Group and the Company can be required to pay.

97

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 6.   FINANCIAL INSTRUMENTS *(continued)*

### (b)   Financial risk management objectives and policies *(continued)*

#### Liquidity risk (continued)

The table includes both interest and principal cash flows. To the extent that interest flows are floating rate, the undiscounted amount is derived from interest rate curve at the end of the reporting period.

**The Group**

| | On demand or within 1 year RMB'000 | 1–5 years RMB'000 | Over 5 years RMB'000 | Total undiscounted cash flows RMB'000 | Carrying amount at 31/12/2010 RMB'000 |
|---|---|---|---|---|---|
| **2010** | | | | | |
| Trade and bills payables | 711,943 | — | — | 711,943 | 711,943 |
| Other payables | 427,142 | — | — | 427,142 | 427,142 |
| Bank and other borrowings | 1,679,299 | 2,426,509 | 639,354 | 4,745,162 | 3,620,040 |
| Termination benefits | 3,247 | 7,177 | — | 10,424 | 10,424 |
| | 2,821,631 | 2,433,686 | 639,354 | 5,894,671 | 4,769,549 |

| | On demand or within 1 year RMB'000 | 1–5 years RMB'000 | Over 5 years RMB'000 | Total undiscounted cash flows RMB'000 | Carrying amount at 31/12/2009 RMB'000 |
|---|---|---|---|---|---|
| **2009** | | | | | |
| Trade and bills payables | 400,152 | — | — | 400,152 | 400,152 |
| Other payables | 802,276 | — | — | 802,276 | 802,276 |
| Bank and other borrowings | 1,221,949 | 426,992 | 274,294 | 1,923,235 | 1,815,451 |
| Termination benefits | 2,815 | 8,248 | — | 11,063 | 11,063 |
| | 2,427,192 | 435,240 | 274,294 | 3,136,726 | 3,028,942 |

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

## 6.   FINANCIAL INSTRUMENTS *(continued)*

(b)   Financial risk management objectives and policies *(continued)*

*Liquidity risk (continued)*

**The Company**

| | On demand or within 1 year RMB'000 | 1–5 years RMB'000 | Over 5 years RMB'000 | Total undiscounted cash flows RMB'000 | Carrying amount at 31/12/2010 RMB'000 |
|---|---|---|---|---|---|
| 2010 | | | | | |
| Trade and bills payables | **479,897** | **—** | **—** | **479,897** | **479,897** |
| Other payables | **402,807** | **—** | **—** | **402,807** | **402,807** |
| Bank and other borrowings | **366,322** | **512,775** | **—** | **879,097** | **805,272** |
| Termination benefits | **1,445** | **410** | **—** | **1,855** | **1,855** |
| | **1,250,471** | **513,185** | **—** | **1,763,656** | **1,689,831** |

| | On demand or within 1 year RMB'000 | 1–5 years RMB'000 | Over 5 years RMB'000 | Total undiscounted cash flows RMB'000 | Carrying amount at 31/12/2009 RMB'000 |
|---|---|---|---|---|---|
| 2009 | | | | | |
| Trade and bills payables | 454,361 | — | — | 454,361 | 454,361 |
| Other payables | 461,707 | — | — | 461,707 | 461,707 |
| Bank and other borrowings | 402,124 | — | — | 402,124 | 390,950 |
| Termination benefits | 814 | 1,695 | — | 2,509 | 2,509 |
| | 1,319,006 | 1,695 | — | 1,320,701 | 1,309,527 |

The amounts included above for variable interest rate instruments for non-derivative financial liabilities is subject to change if changes in variable interest rates differ to those estimates of interest rates determined at the end of the reporting period.

99

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 6.   FINANCIAL INSTRUMENTS *(continued)*

### (c)   Fair value

The fair value of financial assets and financial liabilities are determined as follows:

- The fair value of financial assets and financial liabilities with standard terms and conditions and traded in active liquid markets are determined with reference to quoted market bid prices and ask prices respectively; and

- The fair value of other financial assets and financial liabilities is determined in accordance with generally accepted pricing models based on discounted cash flow analysis; and

- The fair value of termination benefits equal the carrying amount, as the impact of discounting is not significant. The fair value of termination benefits is approximately RMB10,424,000 (2009: RMB11,063,000).

The directors of the Company consider that the carrying amounts of financial assets and financial liabilities recorded at amortised cost in the consolidated financial statements approximate their fair values due to their immediate or short term maturities.

The directors of the Company consider the carrying amounts of the long term bank and other borrowings approximate their fair values as the impact of discounting is not significant.

*Fair value measurements recognised in the consolidated statement of financial position*

The following table provides an analysis of financial instruments that are measured subsequent to initial recognition at fair value, grouped into Levels 1 to 3 based on the degree to which the fair value is observable.

- Level 1 fair value measurements are those derived from quoted market prices (unadjusted) in active market for identical assets or liabilities.

- Level 2 fair value measurements are those derived from inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly (i.e. as prices) or indirectly (i.e. derived from prices).

- Level 3 fair value measurements are those derived from valuation techniques that include inputs for the asset or liability that are not based on observable market data (unobservable inputs).

100

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

## 6. FINANCIAL INSTRUMENTS *(continued)*

### (c) Fair value *(continued)*

*Fair value measurements recognised in the consolidated statement of financial position (continued)*

|  | Level 2<br>*RMB'000* |
|---|---:|
| **As at 31 December 2010** | |
| *Financial liabilities at FVTPL* | |
| Liabilities for cash-settled share-based payments *(Note 30 (ii))* | **8,121** |
| | |
| **As at 31 December 2009** | |
| *Financial liabilities at FVTPL* | |
| Liabilities for cash-settled share-based payments *(Note 30 (ii))* | — |

There were no transfers between Level 1 and 2 during the year ended 31 December 2010 and 2009.

## 7. TURNOVER

Turnover represents revenue arising from production and sales of CPTs and luminous materials ("CPTs and luminous materials production and sales"), trading of liquid crystal related products and production and sales of advanced glass and other products ("Advanced glass and other products production and sales").

|  | 2010<br>***RMB'000*** | 2009<br>*RMB'000* |
|---|---:|---:|
| CPTs and luminous materials production and sales | **1,831,516** | 1,687,894 |
| Trading of liquid crystal related products | **747,605** | 409,357 |
| Advanced glass and other products production and sales | **138,649** | — |
| | **2,717,770** | 2,097,251 |

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 8.   SEGMENT INFORMATION

The Group's reportable segments, based on information reported to the chief executive officer, being the chief operating decision maker, with respect to resource allocation and performance assessment are as follows:

1.      CPTs and luminous materials production and sales

2.      Trading of liquid crystal related products

3.      Advanced glass and other products production and sales

Information regarding the above segments is reported below.

### Segment revenues and results

The following is an analysis of the Group's revenue and results by reportable segment.

**For the year ended 31 December 2010**

| | CPTs and luminous materials production and sales *RMB'000* | Trading of liquid crystal related products *RMB'000* | Advanced glass and other products production and sales *RMB'000* | Total *RMB'000* |
|---|---|---|---|---|
| REVENUE | | | | |
| External sales | **1,831,516** | **747,605** | **138,649** | **2,717,770** |
| | | | | |
| Segment profit | **91,752** | **22,357** | **25,168** | **139,277** |
| | | | | |
| Interest income | | | | **3,117** |
| Unallocated income | | | | **7,496** |
| Unallocated expenses | | | | **(17,145)** |
| Finance costs | | | | **(64,530)** |
| Share of loss of associates | | | | **(24,233)** |
| | | | | |
| Profit before tax | | | | **43,982** |

## 8.   SEGMENT INFORMATION *(continued)*

Segment revenues and results *(continued)*

**For the year ended 31 December 2009**

| | CPTs and luminous materials production and sales *RMB'000* | Trading of liquid crystal related products *RMB'000* | Advanced glass and other products production and sales *RMB'000* | Total *RMB'000* |
|---|---|---|---|---|
| REVENUE | | | | |
| External sales | 1,687,894 | 409,357 | — | 2,097,251 |
| | | | | |
| Segment (loss) profit | (1,509,536) | 8,798 | (15,323) | (1,516,061) |
| | | | | |
| Interest income | | | | 4,197 |
| Unallocated income | | | | 1,965 |
| Unallocated expenses | | | | (5,576) |
| Finance costs | | | | (39,690) |
| Share of loss of associates | | | | (4,684) |
| | | | | |
| Loss before tax | | | | (1,559,849) |

The accounting policies of the reportable segments are the same as the Group's accounting policies described in Note 3. Segment profit/loss represents the profit earned by/loss from each segment without allocation of central administration costs, directors' salaries, share of loss of associates, dividend income from available-for-sale investment, interest income and finance costs. This is the measure reported to the chief executive officer with respect to the resource allocation and performance assessment.

103

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 8.   SEGMENT INFORMATION *(continued)*

### Segment assets and liabilities

The following is an analysis of the Group's assets and liabilities by reportable segment:

### Segment assets

|  | 2010<br>*RMB'000* | 2009<br>*RMB'000* |
|---|---:|---:|
| CPTs and luminous materials production and sales | 1,502,119 | 2,161,776 |
| Trading of liquid crystal related products | 58,962 | 45,572 |
| Advanced glass and other products production and sales | 6,134,319 | 1,375,205 |
| Total segment assets | 7,695,400 | 3,582,553 |
| Unallocated assets | 3,149,122 | 1,469,600 |
| Consolidated total assets | 10,844,522 | 5,052,153 |

### Segment liabilities

|  | 2010<br>*RMB'000* | 2009<br>*RMB'000* |
|---|---:|---:|
| CPTs and luminous materials production and sales | 953,787 | 938,356 |
| Trading of liquid crystal related products | 57,642 | 30,274 |
| Advanced glass and other products production and sales | 445,479 | 345,651 |
| Total segment liabilities | 1,456,908 | 1,314,281 |
| Unallocated liabilities | 3,649,915 | 1,836,678 |
| Consolidated total liabilities | 5,106,823 | 3,150,959 |

For the purposes of monitoring segment performance and allocating resources between segments:

—   all assets are allocated to reportable segments other than interests in associates, investment properties, available-for-sale investment, restricted bank balances and bank balances and cash. Assets used jointly by reportable segments are allocated on the basis of the revenues earned by individual reportable segments; and

—   all liabilities are allocated to reportable segments other than tax payables, deferred tax liabilities, bank and other borrowings, termination benefits and liabilities for cash-settled share-based payments. Liabilities for which reportable segments are jointly liable are allocated in proportion to segment assets.

104

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

## 8.   SEGMENT INFORMATION *(continued)*

### Other segment information

**For the year ended 31 December 2010**

| | CPTs and luminous materials production and sales *RMB'000* | Trading of liquid crystal related products *RMB'000* | Advanced glass and other products production and sales *RMB'000* | Total *RMB'000* |
|---|---|---|---|---|
| **Amounts included in the measure of segment profit or loss or segment assets:** | | | | |
| Additions of non-current assets *(Note)* | 27,077 | 8,287 | 4,276,157 | 4,311,521 |
| Amortisation of leasehold land and land use rights and intangible assets | 3,558 | — | 2,029 | 5,587 |
| Depreciation of property, plant and equipment | 27,351 | 1,363 | 26,077 | 54,791 |
| Impairment losses on property, plant and equipment | 350 | — | — | 350 |
| Allowance for doubtful debts of trade and other receivables | 17,507 | 126 | — | 17,633 |
| Write-down of inventories | 17,784 | — | — | 17,784 |
| Gain on disposal of leasehold land and land use rights | (2,120) | — | — | (2,120) |
| Gain on disposal of property, plant and equipment | (11,296) | — | — | (11,296) |
| Reversal of allowance for doubtful debts of trade and other receivables | (49,506) | (138) | — | (49,644) |
| **Amounts regularly provided to the chief executive officer but not included in the measure of segment profit or loss or segment assets:** | | | | |
| Interests in associates | 327,044 | — | — | 327,044 |
| Share of loss of associates | 24,233 | — | — | 24,233 |
| Interest income | (1,566) | — | (1,551) | (3,117) |
| Finance costs | 62,593 | 755 | 1,182 | 64,530 |
| Income tax expenses | 4,487 | 790 | — | 5,277 |
| Depreciation of investment properties | 2,582 | 740 | — | 3,322 |

*Note:*   Non-current assets excluded investment properties, interests in associates and available-for-sale investment.

105

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 8.   SEGMENT INFORMATION *(continued)*

### Other segment information *(continued)*

**For the year ended 31 December 2009**

| | CPTs and luminous materials production and sales *RMB'000* | Trading of liquid crystal related products *RMB'000* | Advanced glass and other products production and sales *RMB'000* | Total *RMB'000* |
|---|---|---|---|---|
| **Amounts included in the measure of segment profit or loss or segment assets:** | | | | |
| Additions of non-current assets *(Note)* | 10,602 | — | 428,866 | 439,468 |
| Amortisation of leasehold land and land use rights and intangible assets | 3,619 | — | 172 | 3,791 |
| Depreciation of property, plant and equipment | 234,578 | 26 | 1,479 | 236,083 |
| Impairment losses on property, plant and equipment | 995,706 | — | — | 995,706 |
| Allowance for doubtful debts of trade and other receivables | 16,020 | 284 | — | 16,304 |
| Write-down of inventories | 108,541 | — | — | 108,541 |
| Impairment losses on intangible assets | 271 | — | — | 271 |
| Loss on disposal of leasehold land and land use rights | 6,557 | — | — | 6,557 |
| Gain on disposal of property, plant and equipment | (55,080) | — | — | (55,080) |
| Reversal of allowance for doubtful debts of trade and other receivables | (11,354) | — | — | (11,354) |
| | | | | |
| **Amounts regularly provided to the chief executive officer but not included in the measure of segment profit or loss or segment assets:** | | | | |
| Interests in associates | 350,366 | — | — | 350,366 |
| Share of loss of associates | 4,684 | — | — | 4,684 |
| Interest income | (4,197) | — | — | (4,197) |
| Impairment loss on interest in an associate | 2,784 | — | — | 2,784 |
| Finance costs | 39,150 | 540 | — | 39,690 |
| Income tax expenses | 4,131 | 703 | — | 4,834 |
| Depreciation of investment properties | 287 | 740 | — | 1,027 |

*Note:*   Non-current assets excluded investment properties, interests in associates and available-for-sale investment.


106

## 8. SEGMENT INFORMATION *(continued)*

### Geographical information

The Group's operation is located in the PRC (country of domicile).

The Group's revenue from external customers by geographical location is detailed below:

|  | 2010 RMB'000 | 2009 RMB'000 |
|---|---|---|
| The PRC (excluding Hong Kong) | 2,357,172 | 1,970,843 |
| Hong Kong | 154,820 | 22,430 |
| Europe | 110,541 | 34,184 |
| Other countries | 95,237 | 69,794 |
|  | 2,717,770 | 2,097,251 |

An analysis of non-current assets excluding financial instruments by geographical area in which the assets are located has not been presented as the Group's assets are all located in the PRC.

### Information about major customers

For the year ended 31 December 2010, revenue from the single customer of the Group amounting to approximately RMB260,819,000 (2009: RMB273,530,000) had individually accounted for over 10% of the Group's total revenue. The customer is same as the largest single customer for the year ended 31 December 2009. The turnover of this customer is from the CPTs and luminous materials production and sales for both years.

## 9. OTHER OPERATING INCOME

|  | 2010 RMB'000 | 2009 RMB'000 |
|---|---|---|
| Gain on disposal of property, plant and equipment | 11,296 | 55,080 |
| Interest income | 3,117 | 4,197 |
| Sales of raw materials, scraps and packaging materials | 10,128 | 19,229 |
| Reversal of allowance for doubtful debts of trade and other receivables | 49,644 | 11,354 |
| Dividend income from available-for-sale investment | 1,863 | — |
| Rental income | 5,290 | 1,965 |
| Gain on disposal of land use right | 2,120 | — |
| Amortisation of deferred income on government grants received *(Note 35)* | 9,726 | 8,262 |
| Others | 4,884 | 6,345 |
|  | 98,068 | 106,432 |

The direct operating expenses from investment properties that generated rental income amounted to approximately RMB780,000 (2009: RMB309,000) for the year ended 31 December 2010.

107

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 10. FINANCE COSTS

|  | 2010<br>RMB'000 | 2009<br>RMB'000 |
|---|---|---|
| Interest on: |  |  |
| Bank and other borrowings wholly repayable within five years | 66,493 | 35,752 |
| Bank and other borrowings wholly repayable over five years | 33,310 | 32,202 |
| Finance charge on discounted trade receivables to banks | 4,826 | 4,394 |
| Amount due to ultimate holding company *(Note 39 D (iii))* | 2,434 | 5,902 |
|  |  |  |
| Total borrowing costs | 107,063 | 78,250 |
| Less: amounts capitalised in the cost of qualifying assets | (42,533) | (38,560) |
|  |  |  |
|  | 64,530 | 39,690 |

Borrowing costs capitalised during the year arose on the general borrowing pool are calculated by applying a capitalisation rate of 6.40% (2009: 5.94%) per annum to expenditure on qualifying assets.


108

## 11. INCOME TAX EXPENSE

|  | 2010<br>RMB'000 | 2009<br>RMB'000 |
|---|---|---|
| Current tax | 5,680 | 4,672 |
| Deferred tax *(Note 36)* | (403) | 162 |
|  |  |  |
| Income tax expense | 5,277 | 4,834 |

No provision for Hong Kong Profits Tax has been made as the Group's income neither arises in, nor is derived from Hong Kong for the two years ended 31 December 2010 and 2009.

Under the Law of the PRC on Enterprise Income Tax (the "EIT Law") and Implementation Regulation of the EIT Law, the tax rate of certain subsidiaries of the Group in the PRC is 25% from 1 January 2008 onwards.

Companies are entitled to the preferential tax treatment for Opening Up of Western China ("OUWC Policy") if they are engaged in the projects listed in the Catalogue for Industries, Products and Technologies Currently and Particularly Encouraged by the State for Development (as amended in year 2000) as their principal business and the revenue from the principal operations account for over 70% of their total revenue. The applicable reduced preferential EIT rate under the OUWC Policy is 15%. From 10 September 2004, date of incorporation of the Company, the operations of the Company have met the requirements under the OUWC Policy, and accordingly, EIT has been provided at 15% since then.

The operations of IRICO Display Devices Co., Ltd. ("A Share Company") and Xian IRICO Zixun Co., Ltd have met the requirements under the OUWC Policy for the two years ended 31 December 2010 and 2009, and accordingly, EIT has also been provided at 15%.

## 11. INCOME TAX EXPENSE *(continued)*

Xianyang IRICO Electronics Shadow Mask Co., Ltd. ("IRICO Shadow Mask") is Sino-foreign equity joint ventures engaging in the production business and is exempted from taxation for the first two profitable years and a 50% relief from the national PRC income tax rate (also exempted from paying the 3% local income tax) for the next three profitable years thereafter. As a result, IRICO Shadow Mask which was established in 2003 and the entity is in the exemption period for the two years ended 31 December 2010 and 2009.

Certain subsidiaries of the Group, which are registered in a special economic zone or a technological economic development zone, are taxed at preferential rates ranging from 15% to 22% for the two years ended 31 December 2010 and 2009.

The income tax expense for the year can be reconciled to the profit (loss) per the consolidated statement of comprehensive income as follows:

| | 2010 RMB'000 | 2009 RMB'000 |
|---|---|---|
| Profit (loss) before tax | 43,982 | (1,559,849) |
| | | |
| Tax calculated at the statutory tax rate of 25% (2009: 25%) | 10,995 | (389,962) |
| Tax effect of share of loss of associates | 6,058 | 1,171 |
| Tax effect of expenses not deductible for tax purpose | 2,389 | 2,265 |
| Tax effect of income not taxable for tax purposes | (2,704) | (2,904) |
| Income under tax exemption and reduction | (331) | (4,943) |
| Tax effect of tax losses not recognised | 28,965 | 122,404 |
| Utilisation of tax losses previously not recognised | (41,582) | (496) |
| Tax effect of deductible temporary differences not recognised | 1,487 | 277,299 |
| | | |
| Income tax expense | 5,277 | 4,834 |

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 12. PROFIT (LOSS) FOR THE YEAR

Profit (loss) for the year has been arrived at after charging (crediting):

|  | 2010 RMB'000 | 2009 RMB'000 |
|---|---:|---:|
| Cost of inventories recognised as an expense | 2,311,974 | 2,188,395 |
| Depreciation for property, plant and equipment | 54,791 | 236,083 |
| Depreciation for investment properties | 3,322 | 1,027 |
| Amortisation of leasehold land and land use rights | 4,276 | 2,428 |
| Amortisation of intangible assets | 1,311 | 1,363 |
| Allowance for doubtful debts of trade and other receivables (included in administrative expenses) | 17,633 | 16,304 |
| Loss on disposal of land use rights | — | 6,557 |
| Research and development costs recognised as an expense | 20,040 | 26,766 |
| Write-down of inventories (included in cost of sales) | 17,784 | 108,541 |
| Impairment loss on interest in an associate (included in administrative expenses) | — | 2,784 |
| Impairment loss on an intangible asset (included in administrative expenses) | — | 271 |
| Operating lease rentals in respect of land use rights | 6,295 | 3,755 |
| Operating lease rentals in respect of property, plant and equipment | 36,252 | 36,252 |
| Net foreign exchange losses | 6,637 | 1,154 |
| Provision for warranty *(Note 30)* | 3,639 | 13,898 |
| Cash-settled share-based payments expense *(Note 30 (ii))* | 11,463 | — |
| Auditor's remuneration | 2,850 | 4,102 |
| Share of tax of associates (included in share of loss of associates) | (63) | (225) |

110

## 13. DIRECTORS', SUPERVISORS' AND SENIOR MANAGEMENT'S EMOLUMENTS

(a)  Directors', supervisors' and senior management emoluments

(i)  The emoluments of each director, supervisor and senior management for the year ended 31 December 2010 are set out below:

| Name | Fee *RMB'000* | Salary and allowance *RMB'000* | Retirement benefit contributions *RMB'000* | Total *RMB'000* |
|---|---|---|---|---|
| **Executive directors** | | | | |
| Mr. Tao Kui | — | 271 | 18 | 289 |
| Mr. Xing Daoqin | — | 271 | 18 | 289 |
| Mr. Zhang Junhua | — | 241 | 18 | 259 |
| **Non-executive directors** | | | | |
| Mr. Guo Mengquan | — | 244 | 18 | 262 |
| Mr. Niu Xinan | — | — | — | — |
| Mr. Fu Jiuquan | — | — | — | — |
| Mr. Zhang Weichuan | — | — | — | — |
| **Independent non-executive directors** | | | | |
| Mr. Lv Hua | 100 | — | — | 100 |
| Mr. Zhong Pengrong | 100 | — | — | 100 |
| Mr. Xu Xinzhong | 100 | — | — | 100 |
| Mr. Feng Bing | 100 | — | — | 100 |
| Mr. Wang Jialu | 100 | — | — | 100 |
| **Supervisors** | | | | |
| Ms. Wang Qi | — | — | — | — |
| Mr. Fu Yusheng | — | 199 | 18 | 217 |
| Mr. Tang Haobao | — | 199 | 18 | 217 |
| Mr. Sun Haiying | — | 80 | — | 80 |
| Ms. Wu Xiaoguang | — | 80 | — | 80 |
| **Senior management** | | | | |
| Mr. Zhang Chunning | — | 232 | 18 | 250 |
| Mr. Zho Changfu | — | 211 | 18 | 229 |
| Mr. Ge Di (Retired on 31 March 2010) | — | 32 | 8 | 40 |
| Mr. Wei Xiaojun (Retired on 31 March 2010) | — | 32 | 8 | 40 |
| Mr. Chu Xiaohang | — | 66 | 14 | 80 |
| Mr. Lam Chun Lung | — | 123 | — | 123 |
| Mr. Ma Jianchao (Appointed on 17 May 2010) | — | 187 | 18 | 205 |
| | **500** | **2,468** | **192** | **3,160** |

111

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

### 13. DIRECTORS', SUPERVISORS' AND SENIOR MANAGEMENT'S EMOLUMENTS *(continued)*

(a) Directors', supervisors' and senior management emoluments *(continued)*

(ii) The emoluments of each director, supervisor and senior management for the year ended 31 December 2009 are set out below:

| Name | Fee RMB'000 | Salary and allowance RMB'000 | Retirement benefit contributions RMB'000 | Total RMB'000 |
|---|---|---|---|---|
| **Executive directors** | | | | |
| Mr. Tao Kui | — | 237 | 15 | 252 |
| Mr. Xing Daoqin | — | 237 | 15 | 252 |
| Mr. Zhang Junhua | — | 226 | 15 | 241 |
| | | | | |
| **Non-executive directors** | | | | |
| Mr. Guo Mengquan | — | 214 | 15 | 229 |
| Mr. Niu Xinan | — | — | — | — |
| Mr. Fu Jiuquan | — | — | — | — |
| Mr. Zhang Weichuan | — | — | — | — |
| | | | | |
| **Independent non-executive directors** | | | | |
| Mr. Lv Hua | 100 | — | — | 100 |
| Mr. Zhong Pengrong | 100 | — | — | 100 |
| Mr. Xu Xinzhong | 100 | — | — | 100 |
| Mr. Feng Bing | 100 | — | — | 100 |
| Mr. Wang Jialu | 100 | — | — | 100 |
| | | | | |
| **Supervisors** | | | | |
| Ms. Wang Qi | — | — | — | — |
| Mr. Fu Yusheng | — | 201 | 15 | 216 |
| Mr. Tang Haobao | — | 156 | 15 | 171 |
| Mr. Sun Haiying | — | 80 | — | 80 |
| Ms. Wu Xiaoguang | — | 80 | — | 80 |
| | | | | |
| **Senior management** | | | | |
| Mr. Zhang Chunning | — | 205 | 15 | 220 |
| Mr. Zho Changfu | — | 208 | 15 | 223 |
| Mr. Ge Di | — | 195 | 15 | 210 |
| Mr. Wei Xiaojun | — | 132 | 9 | 141 |
| Mr. Chu Xiaohang (Appointed on 20 November 2009) | — | 55 | 12 | 67 |
| Mr. Liu Xiaodong (Retired on 20 November 2009) | — | 150 | 15 | 165 |
| Mr. Lam Chun Lung | — | 127 | — | 127 |
| | | | | |
| | 500 | 2,503 | 171 | 3,174 |

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

## 13. DIRECTORS', SUPERVISORS' AND SENIOR MANAGEMENT'S EMOLUMENTS *(continued)*

(a) Directors', supervisors' and senior management emoluments *(continued)*

For the two years ended 31 December 2010 and 2009, except for the emoluments for Mr. Fu Jiuquan, Mr. Zhang Weichuan, Mr. Niu Xinan and Ms. Wang Qi which are born by IRICO Group, other directors of the Company received no emolument from IRICO Group. No apportionment has been made as the directors of the Company consider that it is impracticable to apportion this amount between their services to the Group and their services to IRICO Group.

The cash-settled share-based payments expense of each director, supervisor and senior management for the year ended 31 December 2010 and 2009 are set out below:

| Name | 2010<br>RMB'000 | 2009<br>RMB'000 |
|------|------:|------:|
| **Executive directors** | | |
| Mr. Tao Kui | 965 | — |
| Mr. Xing Daoqin | 1,322 | — |
| Mr. Zhang Junhua | 773 | — |
| | | |
| **Non-executive directors** | | |
| Mr. Guo Mengquan | 887 | — |
| Mr. Niu Xinan | 912 | — |
| Mr. Fu Jiuquan | 480 | — |
| Mr. Zhang Weichuan | 302 | — |
| | | |
| **Supervisors** | | |
| Mr. Fu Yusheng | 190 | — |
| Mr. Tang Haobao | 113 | — |
| | | |
| **Senior management** | | |
| Mr. Zhang Chunning | 570 | — |
| Mr. Zho Changfu | 355 | — |
| Mr. Ge Di (Retired on 31 March 2010) | 358 | — |
| Mr. Wei Xiaojun (Retired on 31 March 2010) | 727 | — |
| Mr. Chu Xiaohang | 82 | — |
| Mr. Ma Jianchao (Appointed on 17 May 2010) | 450 | — |
| | | |
| | **8,486** | — |

113

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*
*YEAR ENDED 31 DECEMBER 2010*

## 13. DIRECTORS', SUPERVISORS' AND SENIOR MANAGEMENT'S EMOLUMENTS *(continued)*

### (b) Five highest paid individuals

During the year 2010 and 2009, the five individuals whose emoluments were the highest in the Group for the year include four directors and one senior management whose emoluments are reflected in the analysis presented above.

During the two years ended 31 December 2010 and 2009, no directors, supervisors and senior management or the five highest paid individuals of the Company waived any emoluments and no emolument was paid by the Group to any of the directors, supervisors and senior management or the five highest paid individuals as an inducement to join or upon joining the Group or as compensation for loss of office.

## 14. EMPLOYEES' EMOLUMENTS

| | 2010 RMB'000 | 2009 RMB'000 |
|---|---|---|
| Wages and salaries | 272,620 | 255,138 |
| Retirement benefit contributions | | |
| — pension obligations *(Note)* | 34,829 | 32,863 |
| — early retirement benefits *(Note 32)* | 23,298 | 468 |
| Welfare and social security costs | 73,988 | 67,191 |
| Cash-settled share-based payments expense | 2,832 | — |
| | 407,567 | 355,660 |

*Note:* As stipulated by the rules and regulations in the PRC, the Group has participated in state-managed defined contribution retirement plans for its employees in the PRC. The Group and the eligible employees are required to contribute 20% and 8% (2009: 20% and 8%) respectively, of the employee's basic salary. The state-sponsored retirement plans are responsible for the entire pension obligations payable to retired employees. The Group has no further pension obligation beyond the above contributions.

## 15. DIVIDEND

No dividend was paid or proposed during 2010, nor has any dividend been proposed since the end of the reporting period (2009: nil).

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(Continued)*

*YEAR ENDED 31 DECEMBER 2010*

## 16. EARNINGS (LOSS) PER SHARE

### (a) Basic

Basic earnings (loss) per share is calculated by dividing the profit (loss) for the year attributable to owners of the Company by the weighted average number of ordinary shares in issue during each of the year ended 31 December 2010 and 2009.

|  | 2010 | 2009 |
|---|---|---|
| Profit (loss) for the year attributable to owners of the Company *(RMB'000)* | 29,075 | (1,113,014) |
| Weighted average number of ordinary shares in issue *('000)* | 2,144,067 | 2,135,291 |

The weighted average number of ordinary shares outstanding during the year end 31 December 2009 have been adjusted for the effect of capitalisation of capital reserve and the new shares were issued to the shareholders on 1 February 2010.

### (b) Diluted

Diluted earnings (loss) per share was the same as the basic earning (loss) per share as there were no potential dilutive ordinary shares outstanding during the two years ended 31 December 2010 and 2009.

115

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 17.  PROPERTY, PLANT AND EQUIPMENT

### The Group

| | Buildings RMB'000 | Machinery for electronics production RMB'000 | Machinery for glass production RMB'000 | Other machinery RMB'000 | Office equipment and others RMB'000 | Construction in progress RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|---|
| **At 1 January 2009** | 234,677 | 1,092,012 | 172,055 | 266,720 | 4,624 | 872,421 | 2,642,509 |
| Additions | 4,071 | 3,526 | — | 10,176 | 5,417 | 298,945 | 322,135 |
| Reclassification upon completion | 27,474 | 2,380 | — | 962 | 79 | (30,895) | — |
| Reclassified to investment properties | (1,977) | — | — | — | — | — | (1,977) |
| Disposals | (2,694) | (3,068) | (4,702) | (1,296) | (196) | — | (11,956) |
| Depreciation charged for the year | (17,459) | (124,258) | (37,663) | (49,809) | (6,894) | — | (236,083) |
| Impairment loss recognised in the consolidated comprehensive income statement | — | (791,125) | (115,553) | (89,028) | — | — | (995,706) |
| **At 31 December 2009 and 1 January 2010** | 244,092 | 179,467 | 14,137 | 137,725 | 3,030 | 1,140,471 | 1,718,922 |
| Additions | — | 160 | 85,867 | 17,896 | 15,011 | 4,190,126 | 4,309,060 |
| Reclassification upon completion | 688,176 | 94,794 | 68,274 | 35,162 | 4,725 | (891,131) | — |
| Reclassified to investment properties | (35,979) | — | — | — | — | — | (35,979) |
| Disposals | (7,220) | (10,414) | (84,819) | (3,630) | (293) | — | (106,376) |
| Depreciation charged for the year | (14,956) | (5,782) | (14,611) | (15,632) | (3,810) | — | (54,791) |
| Impairment loss recognised in the consolidated comprehensive income statement | — | (350) | — | — | — | — | (350) |
| **At 31 December 2010** | 874,113 | 257,875 | 68,848 | 171,521 | 18,663 | 4,439,466 | 5,830,486 |
| **At 31 December 2010** | | | | | | | |
| Cost | 1,162,957 | 2,609,680 | 917,388 | 792,859 | 99,577 | 4,439,466 | 10,021,927 |
| Accumulated depreciation and impairment loss | (288,844) | (2,351,805) | (848,540) | (621,338) | (80,914) | — | (4,191,441) |
| Carrying value | 874,113 | 257,875 | 68,848 | 171,521 | 18,663 | 4,439,466 | 5,830,486 |
| **At 31 December 2009** | | | | | | | |
| Cost | 504,198 | 2,706,118 | 907,544 | 778,931 | 85,914 | 1,140,471 | 6,123,176 |
| Accumulated depreciation and impairment loss | (260,106) | (2,526,651) | (893,407) | (641,206) | (82,884) | — | (4,404,254) |
| Carrying value | 244,092 | 179,467 | 14,137 | 137,725 | 3,030 | 1,140,471 | 1,718,922 |

116

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 17. PROPERTY, PLANT AND EQUIPMENT *(continued)*

### The Company

| | Machinery for electronics production *RMB'000* | Machinery for glass production *RMB'000* | Other machinery *RMB'000* | Office equipment and others *RMB'000* | Construction in progress *RMB'000* | Total *RMB'000* |
|---|---|---|---|---|---|---|
| **At 1 January 2009** | 248,512 | 242,745 | 173,643 | 1,707 | 35,470 | 702,077 |
| Additions | 521 | — | 131 | 1,813 | 143,067 | 145,532 |
| Transfer | 119,487 | (76,748) | (42,739) | — | — | — |
| Reclassification upon completion | — | — | — | 79 | (79) | — |
| Disposals | (2,555) | (4,702) | (97) | (86) | — | (7,440) |
| Depreciation charged for the year | (54,650) | (36,051) | (7,415) | (3,330) | — | (101,446) |
| Impairment loss recognised in the statement of comprehensive income | (226,969) | (115,553) | (82,382) | — | — | (424,904) |
| | | | | | | |
| **At 31 December 2009 and** | | | | | | |
| **1 January 2010** | 84,346 | 9,691 | 41,141 | 183 | 178,458 | 313,819 |
| Additions | 143 | 85,866 | 101 | 212 | 229,082 | 315,404 |
| Reclassification upon completion | 94,794 | 75,774 | 33,304 | 3,019 | (206,891) | — |
| Disposals | (10,909) | (76,534) | (1,848) | (134) | — | (89,425) |
| Depreciation charged for the year | (5,775) | (14,611) | (967) | (1,062) | — | (22,415) |
| | | | | | | |
| **At 31 December 2010** | 162,599 | 80,186 | 71,731 | 2,218 | 200,649 | 517,383 |
| | | | | | | |
| **At 31 December 2010** | | | | | | |
| Cost | 571,460 | 706,270 | 274,380 | 49,475 | 200,649 | 1,802,234 |
| Accumulated depreciation and impairment loss | (408,861) | (626,084) | (202,649) | (47,257) | — | (1,284,851) |
| | | | | | | |
| Carrying value | 162,599 | 80,186 | 71,731 | 2,218 | 200,649 | 517,383 |
| | | | | | | |
| **At 31 December 2009** | | | | | | |
| Cost | 667,578 | 693,699 | 267,866 | 50,711 | 178,458 | 1,858,312 |
| Accumulated depreciation and impairment loss | (583,232) | (684,008) | (226,725) | (50,528) | — | (1,544,493) |
| | | | | | | |
| Carrying value | 84,346 | 9,691 | 41,141 | 183 | 178,458 | 313,819 |

117

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 17. PROPERTY, PLANT AND EQUIPMENT *(continued)*

The above items of property, plant and equipment are depreciated on a straight-line basis at the following rates per annum:

| | |
|---|---|
| Buildings | 10 to 40 years |
| Machinery for electronics production | 15 years |
| Machinery for glass production | 6 to 18 years |
| Other machinery | 18 years |
| Office equipment and others | 5 years |

The Group's depreciation charge of approximately RMB45,313,000 (2009: RMB187,886,000), RMB352,000 (2009: RMB546,000) and RMB9,126,000 (2009: RMB47,651,000) have been included in cost of sales, selling and distribution costs and administrative expenses respectively.

The Company's depreciation charge of approximately RMB21,355,000 (2009: RMB97,180,000), RMB24,000 (2009: RMB21,000) and RMB1,036,000 (2009: RMB4,245,000) have been included in cost of sales, selling and distribution costs and administrative expenses respectively.

The Group's buildings comprise:

| | The Group | |
|---|---|---|
| | **2010** | 2009 |
| | ***RMB'000*** | *RMB'000* |
| Buildings located in the PRC: | | |
| — between 10 to 50 years | **872,786** | 242,765 |
| — less than 10 years | **1,327** | 1,327 |
| | **874,113** | 244,092 |

The official property title certificates of the Group's buildings with carrying value of approximately RMB478,726,000 (2009: RMB25,286,000) have not yet been issued by the relevant local government authorities. The directors of the Company are of the opinion that the Group's right and interest in such buildings will not be therefore severely prejudiced and the application of the title certificates are in progress.

118

## 17. PROPERTY, PLANT AND EQUIPMENT *(continued)*

As at 31 December 2010, bank borrowings of the Group amounting to approximately RMB238,000,000 (2009: RMB197,000,000) are secured by the Group's buildings and machineries with the carrying value of approximately RMB487,613,000 (2009: RMB177,650,000) (Note 31).

During the year ended 31 December 2010, the directors of the Company conducted a review of the Group's manufacturing assets and determined that a number of those assets were impaired, due to physical damage and technical obsolescence. Accordingly, impairment loss of approximately RMB350,000 has been recognised in the consolidated statement of comprehensive income for the year ended 31 December 2010 in respect of machinery for electronic production which is used in the CPTs and luminous materials production and sales segment. The recoverable amounts of the relevant assets have been determined on the basis of their values-in-use.

During the year ended 31 December 2009, the Group had suffered significant loss from their CPTs manufacturing operation located at Shaanxi province of the PRC. As a result of the adverse operating environment and the change of market conditions, the directors of the Company revisited their business plans and decided to focus the Group's resources on the newly developed products and business. Some of the Group's manufacturing facilities of CPTs products will be ceased for production in the coming 2 to 5 years. The directors of the Company conducted a review of the Group's property, plant and equipment and determined that a number of those assets were impaired, due to the change of business plans as mentioned above. Accordingly, impairment losses of approximately RMB791,125,000, RMB115,553,000 and RMB89,028,000 had been recognised in the consolidated statement of comprehensive income for the year ended 31 December 2009 in respect of machinery for electronics production, machinery for glass production and other machinery in respectively.

During the year ended 31 December 2009, the recoverable amounts are determined based on the higher of fair value less cost of sale and its value-in-use in the impairment assessment,. Value-in-use calculation is the cash flow projection based on financial budgets covering from one-year to five-year period approved by senior management, depending on the management's expectation on the period the assets could generate further income. A discount rate of 7.36% is used which, in management's view, represents the rate that the market would expect on an investment of equivalent risk. To the extent that the carrying amount exceeds the recoverable amount, an impairment loss has been recognised in respect of the affected property, plant and equipment.

The Company had recognised impairment losses of approximately RMB226,969,000, RMB115,553,000 and RMB82,382,000 in the statement of comprehensive income for the year ended 31 December 2009 in respect of machinery for electronics production, machinery for glass production and other machinery respectively due to the same reason as mentioned above. No impairment has been recognised in the statement of comprehensive income for the year ended 31 December 2010.

119

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 18. INVESTMENT PROPERTIES — GROUP

|  | 2010<br>RMB'000 | 2009<br>RMB'000 |
|---|---:|---:|
| **At 1 January** | | |
| Cost | 18,976 | 16,999 |
| Accumulated depreciation | (1,463) | (436) |
| | | |
| Carrying value | 17,513 | 16,563 |
| | | |
| **At 1 January** | 17,513 | 16,563 |
| Reclassified from property, plant and equipment | 35,979 | 1,977 |
| Depreciation charged for the year | (3,322) | (1,027) |
| | | |
| **At 31 December** | 50,170 | 17,513 |
| | | |
| **At 31 December** | | |
| Cost | 54,955 | 18,976 |
| Accumulated depreciation | (4,785) | (1,463) |
| | | |
| Carrying value | 50,170 | 17,513 |

The above investment properties were depreciated on a straight-line basis at 3.33% per annum.

The investment properties were located in the PRC and were held to earn rentals or for capital appreciation. The investment properties are carried at cost less subsequent accumulated depreciation and any accumulated impairment losses.

For the year ended 31 December 2010, properties with carrying values of approximately RMB35,979,000 (2009: RMB1,977,000) were transferred from buildings to investment properties because the Group has changed its intention in respect of the use of these properties.

In the opinion of the directors of the Company, the fair values of the investment properties were approximated to their carrying values with reference to the recent market prices for similar properties in the same locations and conditions.

120

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 19. LEASEHOLD LAND AND LAND USE RIGHTS — GROUP

The Group's interests in leasehold land and land use rights represent prepaid operating lease payments and their carrying values are analysed as follows:

|  | 2010<br>RMB'000 | 2009<br>RMB'000 |
|---|---:|---:|
| **At 1 January** | | |
| Cost | **178,614** | 69,805 |
| Accumulated amortisation | **(15,142)** | (13,670) |
| Carrying value | **163,472** | 56,135 |
| **At 1 January** | **163,472** | 56,135 |
| Additions | **66** | 117,333 |
| Amortisation charged for the year | **(4,276)** | (2,428) |
| Disposals | **(3,512)** | (7,568) |
| **At 31 December** | **155,750** | 163,472 |
| **At 31 December** | | |
| Cost | **174,521** | 178,614 |
| Accumulated amortisation | **(18,771)** | (15,142) |
| Carrying value | **155,750** | 163,472 |

121

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 19. LEASEHOLD LAND AND LAND USE RIGHTS — GROUP *(continued)*

The Group's leasehold land and land use rights comprise:

|  | 2010 RMB'000 | 2009 RMB'000 |
|---|---|---|
| Leasehold land located in the PRC: |  |  |
| — between 10 to 50 years | 155,585 | 163,307 |
| — less than 10 years | 165 | 165 |
|  | 155,750 | 163,472 |
| Analysed for reporting purposes as: |  |  |
| — current asset (included in other receivables, deposits and prepayments) | 4,217 | 2,428 |
| — non-current asset | 151,533 | 161,044 |
|  | 155,750 | 163,472 |

As at 31 December 2010, bank borrowings of the Group amounting to approximately RMB238,000,000 (2009: RMB197,000,000) are secured by the Group's leasehold land and land use rights with the carrying value of approximately RMB22,537,000 (2009: RMB19,763,000) (Note 31).

As at 31 December 2009, the official property title certificates of the Group's leasehold land and land use rights with carrying value of approximately RMB6,400,000 had not yet been issued by the relevant local government authorities. All the official property title certificates of the Group's leasehold land and land use rights have been obtained during the year ended 31 December 2010.

122

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 20. INTANGIBLE ASSETS

The Group

| | Licences for technical knowledge *RMB'000* | Computer software *RMB'000* | Total *RMB'000* |
|---|---|---|---|
| **At 1 January 2009** | 1,605 | 1,412 | 3,017 |
| Impairment loss recognised in the consolidated income statement | (271) | — | (271) |
| Amortisation charged for the year | (705) | (658) | (1,363) |
| | | | |
| **At 31 December 2009 and 1 January 2010** | 629 | 754 | 1,383 |
| Additions | 1,534 | 25 | 1,559 |
| Amortisation charged for the year | (930) | (381) | (1,311) |
| | | | |
| **At 31 December 2010** | 1,233 | 398 | 1,631 |
| | | | |
| **At 31 December 2010** | | | |
| Cost | 367,175 | 3,419 | 370,594 |
| Accumulated amortisation and impairment loss | (365,942) | (3,021) | (368,963) |
| | | | |
| Carrying value | 1,233 | 398 | 1,631 |
| | | | |
| **At 31 December 2009** | | | |
| Cost | 365,641 | 3,394 | 369,035 |
| Accumulated amortisation and impairment loss | (365,012) | (2,640) | (367,652) |
| | | | |
| Carrying value | 629 | 754 | 1,383 |

123

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 20. INTANGIBLE ASSETS *(continued)*

### The Company

| | Licences for technical knowledge RMB'000 | Computer software RMB'000 | Total RMB'000 |
|---|---|---|---|
| **At 1 January 2009** | 571 | 1,217 | 1,788 |
| Amortisation charged for the year | (302) | (609) | (911) |
| **At 31 December 2009 and 1 January 2010** | 269 | 608 | 877 |
| Amortisation charged for the year | (42) | (303) | (345) |
| **At 31 December 2010** | 227 | 305 | 532 |
| **At 31 December 2010** | | | |
| Cost | 80,746 | 3,013 | 83,759 |
| Accumulated amortisation and impairment loss | (80,519) | (2,708) | (83,227) |
| Carrying value | 227 | 305 | 532 |
| **At 31 December 2009** | | | |
| Cost | 80,746 | 3,013 | 83,759 |
| Accumulated amortisation and impairment loss | (80,477) | (2,405) | (82,882) |
| Carrying value | 269 | 608 | 877 |

The above intangible assets have finite useful lives. Such intangible assets are amortised on a straight-line basis over the following periods:

| | |
|---|---|
| Licences for technical knowledge | 20 years |
| Computer software | 5 years |

The Group's amortisation of approximately RMB930,000 (2009: RMB705,000) has been included in cost of sales and approximately RMB381,000 (2009: RMB658,000) has been included in the administrative expenses.

The Company's amortisation of approximately RMB42,000 (2009: RMB302,000) has been included in cost of sales and RMB303,000 (2009: RMB609,000) has been included in the administrative expenses.

124

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 20. INTANGIBLE ASSETS *(continued)*

During the year ended 31 December 2009, the directors of the Company conducted a review of the Group's intangible assets and determined that a licence for technical knowledge used in CPTs and luminous materials production and sales segment was fully impaired, due to technical obsolescence. Accordingly, an impairment loss of approximately RMB271,000 had been recognised which is included in the administrative expenses as at 31 December 2009 (2010: nil).

All of the Group's and the Company's licenses for technical knowledge and computer software were acquired from third parties.

## 21. INVESTMENTS IN SUBSIDIARIES — COMPANY

|  | 2010 RMB'000 | 2009 RMB'000 |
|---|---|---|
| Investments, at cost : |  |  |
| Shares in a listed company in the PRC | 552,831 | 579,648 |
| Unlisted equity interest | 848,982 | 493,653 |
|  | 1,401,813 | 1,073,301 |
| Market value of listed shares | 3,149,810 | 2,085,406 |

As at 31 December 2010, The Group's shares in a listed company in the PRC represent a 22.36% (2009: 40.49%) equity interest in A Share Company, a company listed on the Shanghai Stock Exchange of the PRC.

On 28 July 2010, A Share Company, by way of non-public offering, issued 315,608,888 ordinary shares denominated in RMB ("A Shares Issue") to 10 specific investors, including IRICO Group Corporation, at an issue price of RMB11.25 per share and raised gross proceeds and net proceeds of approximately RMB3,550,600,000 and RMB3,497,870,000, respectively. Upon completion of the A Share Issue, total share capital of A Share Company increased from 421,148,800 shares to 736,757,688 shares. As the Company did not participate in the subscription, it continues to hold 172,081,000 shares of A Share Company, representing approximately 23.36% of A Share Company's enlarged total share capital, and remains as the largest shareholder of A Share Company.

During the period from 19 August 2010 to 29 September 2010, the Company disposed of its 1% equity interests in A Share Company at a total consideration of approximately RMB136,364,000 through the Shanghai Stock Exchange of the PRC, and resulted in a gain on partial disposal of approximately RMB59,605,000 which was included in the capital reserve of the Company.

During the year ended 31 December 2009, the Company disposed of its 0.95% equity interests in A Share Company at a total consideration of approximately RMB26,034,000 through the Shanghai Stock Exchange of the PRC, and resulted in a gain on partial disposal of approximately RMB13,075,000 which was included in the capital reserve of the Company.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 21. INVESTMENTS IN SUBSIDIARIES — COMPANY *(continued)*

The following list contains only the particulars of subsidiaries which in the opinion of the directors of the Company, those subsidiaries principally affect the results, assets and liabilities of the Group as at 31 December 2010 and 2009. To give details of other subsidiaries would in the opinion of the directors of the Company, result in particulars of excessive length.

As at 31 December 2010 and 2009, the Company had direct and indirect interests in the following subsidiaries, all of which were established and operated in the PRC. The particulars of the principal subsidiaries are set out below:

| Name | Registered / paid in capital | Proportion ownership interest held by the Company | | Principal activities |
| | | Directly | Indirectly | |
| --- | --- | --- | --- | --- |
| A Share Company | RMB736,757,688 (2009: RMB421,748,800) | 22.36% (2009: 40.49%) *(Notes (i), (ii), (iii) and (iv))* | — | Production and development of the electronic products and raw materials for colour display devices |
| IRICO Kunshan Industry Co., Ltd. ("Kunshan Industry") | RMB60,000,000 | 80% | 10% | Production of the rubber parts of CPTs |
| Shaanxi IRICO Phosphor Material Co., Ltd. ("IRICO Phosphor") | RMB95,000,000 | 47.89% | 28.42% | Production of phosphor for various types of CPTs |
| Xian IRICO Zixun Co., Ltd. | RMB130,000,000 | 100% | — | Production and sales of the parts and components for display devices and the electronic communication products |
| Xianyang Caiqin Electronic Device Co., Ltd. | RMB25,000,000 | 87.16% | — | Production and sales of pin, anode button, multi-form and frit for CPTs |
| Xianyang IRICO Electronic Parts Co., Ltd. | RMB55,000,000 | 60% | — | Sales of shadow mask, frames and electronic products for CPTs |

## 21. INVESTMENTS IN SUBSIDIARIES — COMPANY *(continued)*

| Name | Registered / paid in capital | Proportion ownership interest held by the Company | | Principal activities |
|------|------------------------------|----------|------------|---------------------|
| | | Directly | Indirectly | |
| IRICO (Foshan) Flat Panel Display Co., Ltd. | RMB100,000,000 | — | 51% | Research and development, manufacture, sales of panel display devices, electronic products and components |
| IRICO (Zhangjiagang) Flat Panel Display Co., Ltd. ("IRICO (Zhangjiagang)") | RMB1,023,000,000 (2009: RMB23,000,000) *(Note (v))* | — | 97.75% (2009:95.6%) *(Note (v) and (vii))* | Development of advanced thin film transistor liquid crystal display ("TFT-LCD") glass substrate production line project |
| IRICO (Hefei) LCD Glass Co., Ltd. ("IRICO (Hefei)") | RMB1,820,000,000 (2009: RMB5,000,000) *(Note (v))* | — | 99.37% (2009: 75%) *(Note (v))* | Setting up of project research of liquid crystal display ("LCD") glass substrate |
| IRICO Shadow Mask | US$5,000,000 | 75% | 25% | Development and production of the flat shadow mask and the coordinating products for CPTs |
| Zhuhai Caizhu Industrial Co., Ltd. | RMB50,000,000 | 75% | — | Manufacture of electronic devices and components |
| IRICO Display Technology Co., Ltd. | US$13,500,000 | 75% | — | Production and sale of CPTs, black and white picture tubes and ancillary electronic components |

127

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 21. INVESTMENTS IN SUBSIDIARIES — COMPANY *(continued)*

| Name | Registered / paid in capital | Proportion ownership interest held by the Company | | Principal activities |
|------|------|------|------|------|
| | | Directly | Indirectly | |
| Kunshan Caihong Yingguang Electronics Co., Ltd. | US$4,500,000 | — | 60% | Production of procession alloy and other products for color and black and white picture tubes |
| Nanjing Reide Phosphor Co., Ltd. ("Nanjing Reide") | US$443,300 | — | 45% *(Note (i))* | Production and processing of recycled phosphor and related products for various types of CPTs |
| Xian Caihui Display Technology Co., Ltd. | RMB10,000,000 | — | 90% | R&D, design, manufacture, sales of CPTs, deflection yoke and related component and part as well as the after sale services for the sold product |
| IRICO Group Electronics (Hong Kong) Company Limited ("IRICO (Hong Kong )") | HK$260,000 | 100% | — | Investment holding |
| Shaanxi IRICO Electronics Glass Company Limited ("IRICO Glass") | RMB3,984,357,537 (2009: RMB390,000,000) *(Note (v))* | 7.30% (2009: 33.09%) *(Note (v) and (vi))* | 90.21% (2009: 52.41%) *(Note (v))* | Production of LCD glass substrate |

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 21. INVESTMENTS IN SUBSIDIARIES — COMPANY *(continued)*

*Notes:*

(i)  As the Group has obtained de facto control over A Share Company and Nanjing Reide as set out in Note 4 and therefore A Share Company and Nanjing Reide became subsidiaries of the Group.

(ii)  During the year ended 31 December 2010, the Company acquired additional equity interests of 0.37% in A Share Company from the non-controlling interests at an aggregate consideration of approximately RMB5,362,000.

(iii)  On 28 June 2010, A Share Company issued 315,008,888 ordinary shares to 10 specific investors at an issue price of RMB11.25 per share. The net proceeds amounted to approximately RMB3,497,870,000 after deducting direct expenses of approximately RMB45,980,000. Upon completion of the share issue of A Share Company, the equity interest of A Share Company held by the Company decreased from 40.86% to 23.36%.

(iv)  During the period from 19 August 2010 to 29 September 2010, the Company disposed of 1% interest in A Share Company to the non-controlling shareholders at an aggregate consideration of approximately RMB136,364,000.

(v)  During the year ended 31 December 2010, IRICO (Zhangjiagang), IRICO (Hefei) and IRICO Glass increased the registered capital from the contribution of the owner for RMB1,000,000,000 RMB1,815,000,000 and RMB3,594,357,537 respectively.

(vi)  On 22 January 2010, the Company entered into a share transfer agreement with Hebei Dongxu Investment Group Limited to acquire 2.38% interest in IRICO Glass for a total consideration of RMB21,560,000.

(vii)  On 10 August 2009, an extraordinary shareholders' meeting was held to approve the reduction of IRICO (Zhangjiagang)'s registered capital from RMB500,000,000 to RMB23,000,000 and paid-up capital from RMB100,000,000 to RMB23,000,000. On 25 August 2009, the capital reduction had been verified by Suzhou Tian He Certified Public Accountants Co., Ltd.

As set out in the Company's announcement dated 15 October 2010, the Company has pledged 70,000,000 unrestricted tradable shares in A Share Company to China Foreign Economy and Trade Trust Co., Ltd. (中國對外經濟貿易信託有限公司) ("CFET") for a term of 36 months. The shares were pledged as security of a financing arrangement pursuant to which the Company received a loan of RMB300,000,000 from CFET. At the date of the announcement and the end of the reporting period, the Company holds 164,770,000 shares in A Share Company, representing approximately 22.36% of the total issued share capital of A Share Company.

129

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 22. INTERESTS IN ASSOCIATES

|  | The Group | | The Company | |
|---|---|---|---|---|
|  | **2010** | 2009 | **2010** | 2009 |
|  | **RMB'000** | *RMB'000* | **RMB'000** | *RMB'000* |
| Cost of investment in associates - unlisted equity interests in the PRC | **368,800** | 368,800 | **360,000** | 360,000 |
| Share of post-acquisition loss and other comprehensive income, net of dividends | **(38,972)** | (15,650) | **—** | — |
|  | **329,828** | 353,150 | **360,000** | 360,000 |
| Less: provision for impairment loss on investment in an associate | **(2,784)** | (2,784) | **(2,784)** | (2,784) |
|  | **327,044** | 350,366 | **357,216** | 357,216 |

An impairment loss of approximately RMB2,784,000 had been recognised and is included in the administrative expenses for the year ended 31 December 2009 (2010: nil).

As at 31 December 2010 and 2009, the Group had interests in the following associates:

| Name | Registered / paid in capital *RMB'000* | Proportion ownership interest held by the Company | | Principal activities |
|---|---|---|---|---|
|  |  | Directly | Indirectly |  |
| Sichuan Century Shuanghong Display Devices Co., Limited | 1,800,000 | 20% | — | Production, research and development and sale of plasma display panels ("PDP") and related materials |
| Shenzhen Ruisheng Phosphor Material Co., Ltd. | 4,000 | — | 40% | Production regenerated red, green and blue phosphor materials |
| Wujiang Shanyuan Caihong Electronic Co., Ltd. ("Wujiang Shanyuan") | 10,000 | — | 48% | Production of positive temperature coefficient thermostat and other electronic products |

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 22. INTERESTS IN ASSOCIATES *(continued)*

The summarised financial information in respect of the Group's associates is set out below:

| | 2010 RMB'000 | 2009 RMB'000 |
|---|---:|---:|
| Total assets | 1,656,294 | 2,112,468 |
| Total liabilities | (49,789) | (360,730) |
| Net assets | 1,606,505 | 1,751,738 |
| Group's share of net assets of associates | 329,828 | 353,150 |
| Revenue | 252,346 | 71,089 |
| Loss for the year | (124,053) | (22,790) |
| Group's share of results of associates | (24,233) | (4,684) |

## 23. AVAILABLE-FOR-SALE INVESTMENT — GROUP

| | 2010 RMB'000 | 2009 RMB'000 |
|---|---:|---:|
| Unlisted investments | 30,000 | 30,000 |
| Impairment loss | (5,940) | (5,940) |
| | 24,060 | 24,060 |

During the two years ended 31 December 2010 and 2009, the unlisted investments substantially comprise of the investment in equity interests in Western Trust & Investment Co., Ltd. ("WTI"), a state-owned trust enterprise in the PRC. WTI has a number of investments in unlisted enterprises which have no available information concerning their market values. These investments held by WTI are stated at cost in WTI's book.

The available-for-sale investment is measured at cost less impairment at the end of the reporting period because the range of reasonable fair value estimates is so significant that the directors of the Company are of the opinion that the fair value cannot be measured reliably.

131

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 24. INVENTORIES

|  | The Group | | The Company | |
|  | **2010**<br>***RMB'000*** | 2009<br>*RMB'000* | **2010**<br>***RMB'000*** | 2009<br>*RMB'000* |
|---|---|---|---|---|
| Raw materials | **234,521** | 153,672 | **147,510** | 170,385 |
| Work in progress | **59,398** | 15,370 | **—** | — |
| Finished goods | **333,461** | 432,500 | **116,235** | 140,013 |
| Consumables | **23,218** | 37,491 | **15,214** | 26,875 |
|  | **650,598** | 639,033 | **278,959** | 337,273 |
| Write-down to net realisable value | **(41,579)** | (152,690) | **(16,568)** | (111,634) |
|  | **609,019** | 486,343 | **262,391** | 225,639 |

There was a significant increase in the net realisable value of raw materials due to strong market demand in finished goods. As a result, a reversal of write-down of finished goods of approximately RMB128,895,000 (2009: RMB3,831,000) has been recognised and included in cost of sales for the year ended 31 December 2010.

Included in the above figures are raw materials of approximately RMB87,045,000 (2009: RMB51,161,000), which have been pledged as security for bank loans for the Group and the Company.

## 25. TRADE AND BILLS RECEIVABLES

|  | The Group | | The Company | |
|  | **2010**<br>***RMB'000*** | 2009<br>*RMB'000* | **2010**<br>***RMB'000*** | 2009<br>*RMB'000* |
|---|---|---|---|---|
| Trade receivables |  |  |  |  |
| — third parties | **227,204** | 298,132 | **60,514** | 118,207 |
| — related parties *(Note 39 G)* | **71,987** | 188,907 | **6,023** | 4,028 |
| — subsidiaries of the Company | **—** | — | **26,571** | 69,921 |
|  | **299,191** | 487,039 | **93,108** | 192,156 |
| Less: allowance for doubtful debts | **(16,758)** | (48,643) | **(18,208)** | (51,059) |
| Trade receivables - net | **282,433** | 438,396 | **74,900** | 141,097 |
| Trade bills receivable |  |  |  |  |
| — third parties | **156,295** | 229,277 | **54,899** | 20,817 |
| — related parties *(Note 39 G)* | **38,729** | 238,816 | **—** | — |
| — subsidiaries of the Company | **—** | — | **—** | 81,932 |
|  | **195,024** | 468,093 | **54,899** | 102,749 |
| Total trade and bills receivables | **477,457** | 906,489 | **129,799** | 243,846 |

132

## 25. TRADE AND BILLS RECEIVABLES *(continued)*

The Group allows an average credit period ranging from cash on delivery to 90 days to its trade customers. The following is an aged analysis of trade receivables net of allowance for doubtful debts presented based on the invoice date at the end of the reporting period.

| | The Group | | The Company | |
| --- | --- | --- | --- | --- |
| | **2010** | 2009 | **2010** | 2009 |
| | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| 0 to 90 days | **250,252** | 318,158 | **72,671** | 140,436 |
| 91 to 180 days | **15,923** | 100,027 | **2,007** | 103 |
| 181 to 365 days | **15,463** | 14,688 | **136** | — |
| Over 365 days | **795** | 5,523 | **86** | 558 |
| | **282,433** | 438,396 | **74,900** | 141,097 |

Included in the Group and the Company's trade receivables are debtors (see below for aged analysis) with aggregate carrying amount of approximately RMB32,181,000 (2009: RMB120,238,000) and RMB2,229,000 (2009: RMB661,000) respectively which are past due at the end of the reporting period for which the Group and the Company have not provided for allowance for doubtful debts. The directors of the Company determined that these receivables are due from customers of good credit quality with no history of default. The Group and the Company do not hold any collateral or other credit enhancements over these balances nor does it have a legal right of offset against any amounts owed by the Group to the counterparty.

Ageing of trade receivables which are past due but not impaired:

| | The Group | | The Company | |
| --- | --- | --- | --- | --- |
| | **2010** | 2009 | **2010** | 2009 |
| | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| 91 to 180 days | **15,923** | 100,027 | **2,007** | 103 |
| 181 to 365 days | **15,463** | 14,688 | **136** | — |
| Over 365 days | **795** | 5,523 | **86** | 558 |
| Total | **32,181** | 120,238 | **2,229** | 661 |

Based on the experience of the management and repayment record of the customers, trade receivables which are past due but not impaired are generally recoverable.

133

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 25. TRADE AND BILLS RECEIVABLES *(continued)*

The Group and the Company's neither past due nor impaired trade receivables mainly represent sales made to a large number of diversified and recognised and creditworthy customers. Customers who trade on credit terms are subject to credit verification procedures. No impairment loss is required for the past due balance based on the historical payment records. The Group and the Company do not hold any collateral over these balances.

The Group and the Company's trade receivables are individually determined to be impaired. The individually impaired receivables are recognised based on the credit history of its customers, such as financial difficulties or default in payments, and current market conditions. Consequently, specific impairment loss was recognised. The movement in the allowance for doubtful debts of trade receivables is as follows:

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| At 1 January | **48,643** | 43,810 | **51,059** | 62,390 |
| Impairment losses recognised on receivables | **17,619** | 16,164 | **11,496** | — |
| Amounts recovered during the year | **(49,504)** | (11,331) | **(44,347)** | (11,331) |
| At 31 December | **16,758** | 48,643 | **18,208** | 51,059 |

Included in the allowance for doubtful debts of the Group and the Company are individually impaired trade receivables with an aggregated balance of approximately RMB16,758,000 (2009: RMB48,643,000) and 18,208,000 (2009: RMB51,059,000) respectively which have either been placed under liquidation or in severe financial difficulties. The Group and the Company do not hold any collateral over these balances.

Included in trade receivables are factored debtors amounting to approximately RMB234,730,000 (2009: RMB192,252,000) and RMB109,484,000 (2009: RMB118,916,000) for the Group and the Company respectively. For factored debtors, the Group and the Company will need to repay the financial institutions if there are credit losses on the receivables before the end of factoring period, accordingly, the Group and the Company continue to recognise the full carrying amount of the debtors and has recognised the cash received as a secured borrowing (see Note 31).

134

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 26. OTHER RECEIVABLES, DEPOSITS AND PREPAYMENTS

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| Other receivables | **435,758** | 185,328 | **67,231** | 101,538 |
| Amounts due from subsidiaries | **—** | — | **71,653** | 125,866 |
| | **435,758** | 185,328 | **138,884** | 227,404 |
| Less: allowance for doubtful debts | **(2,690)** | (2,816) | **(662)** | (662) |
| | **433,068** | 182,512 | **138,222** | 226,742 |
| Deposits and prepayments | **98,696** | 25,208 | **27,250** | 3,898 |
| | **531,764** | 207,720 | **165,472** | 230,640 |

The Group and the Company's other receivables are individually determined to be impaired. The individually impaired receivables are recognised based on the credit history, such as financial difficulties or default in payments, and current market conditions. Consequently, specific impairment loss was recognised. The Group and the Company do not hold any collateral over these balances. The movement in the allowance for doubtful debts of other receivables is as follows:

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| At 1 January | **2,816** | 2,699 | **622** | 662 |
| Impairment losses recognised on receivables | **14** | 140 | **—** | — |
| Amounts recovered during the year | **(140)** | (23) | **—** | — |
| At 31 December | **2,690** | 2,816 | **662** | 662 |

135

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 27. RESTRICTED BANK BALANCES

All restricted bank balances are denominated in RMB.

Restricted bank balances are held in dedicated bank accounts under the name of the Group for the issuance of bank acceptance notes to suppliers.

As at 31 December 2010, the fixed interest rates on restricted bank balances, with maturities from 6 months to 1 year, are ranging from 0.36% to 4.14% per annum.

## 28. BANK BALANCES AND CASH

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| Time deposits | **19,013** | 25,000 | **—** | — |
| Other bank balances and cash | **2,679,417** | 1,052,661 | **244,110** | 42,002 |
| | **2,698,430** | 1,077,661 | **244,110** | 42,002 |

(a)  The carrying amounts of the Group's bank balances and cash included balance denominated in the following foreign currency.

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| USD | **74,692** | 17,507 | **12,458** | 6,127 |

(b)  As at 31 December 2010, the effective interest rates on time deposits, with initial terms mature from 90 days to 365 days (2009: 90 days to 365 days), are ranging from 1.71% to 3.78% (2009: 1.98% to 3.78%) per annum.

As at 31 December 2010 and 2009, the effective interest rate on other bank balances was 0.36% per annum.

(c)  The conversion of these RMB denominated balances into foreign currencies is subject to the rules and regulations of foreign exchange control promulgated by the PRC government.

136

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 29. TRADE AND BILLS PAYABLES

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Trade payables | | | | |
| — third parties | **526,291** | 360,706 | **181,268** | 293,648 |
| — related parties *(Note 39 G)* | **176,652** | 38,714 | **159,813** | 14,319 |
| — subsidiaries of the Company | **—** | — | **129,816** | 146,394 |
| | **702,943** | 399,420 | **470,897** | 454,361 |
| Trade bills payable | | | | |
| — third parties | **8,550** | 302 | **8,550** | — |
| — related parties *(Note 39 G)* | **450** | 430 | **450** | — |
| | **9,000** | 732 | **9,000** | — |
| Total trade and bills payables | **711,943** | 400,152 | **479,897** | 454,361 |

The following is an aged analysis of trade and bills payables presented based on the invoice date at the end of the reporting period.

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| 0 to 90 days | **610,704** | 255,666 | **415,289** | 414,568 |
| 91 to 180 days | **57,335** | 48,614 | **40,537** | 23,229 |
| 181 to 365 days | **26,186** | 69,498 | **22,027** | 12,161 |
| Over 365 days | **17,718** | 26,374 | **2,044** | 4,403 |
| | **711,943** | 400,152 | **479,897** | 454,361 |

The average credit period on purchases of goods is 90 days. The Group has financial risk management policies in place of ensure that all payables are settled within the credit timeframe.

137

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 30. OTHER PAYABLES AND ACCRUALS

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| Amount due to ultimate holding company *(Note 39 D (ii) and (iii))* | **154,621** | 270,878 | **122,778** | 163,584 |
| Amounts due to subsidiaries | **—** | — | **156,982** | 253,474 |
| Provision of warranty *(Note (i))* | **2,714** | 7,052 | **—** | — |
| Liabilities for cash-settled share-based payments *(Note (ii))* | **8,121** | — | **8,121** | — |
| Others | **264,400** | 531,398 | **114,926** | 44,649 |
| | **429,856** | 809,328 | **402,807** | 461,707 |

*Notes:*

(i)   The movement of the provision of warranty is as follows:

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| At 1 January | **7,052** | 8,553 | **—** | — |
| Charged to the consolidated statement of comprehensive income *(Note 12)* | **3,639** | 13,898 | **—** | 9,692 |
| Utilised during year | **(7,977)** | (15,399) | **—** | (9,692) |
| At 31 December | **2,714** | 7,052 | **—** | — |

Under the terms of the Group's sales agreements, the Group will rectify product defects arising within three years from the date of sales. Provision is therefore made for the best estimate of the expected settlement under these agreements in respect of sales made within the year prior to the end of the reporting period. The amount of provision takes into account the Group's recent claim experience, and the Group only makes provision where a claim is probable.

138

## 30. OTHER PAYABLES AND ACCRUALS *(continued)*

*Notes:* **(continued)**

(ii)   The Group implemented a share appreciation rights ("SARs") scheme to motivate and award the directors of the Company, supervisors, senior management and certain employees. Under this SARs scheme, SARs are granted in units representing one H share. No shares will be issued under the SARs scheme. Upon exercise of the SARs, a recipient will receive, subject to any applicable withholding tax, a cash payment in RMB, translated from the Hong Kong dollars amount equal to the product of the number of SARs exercised and the difference between the exercise price and market price of the Company's H shares at the date of exercise based on the applicable exchange rate between RMB and Hong Kong dollars at the date of the exercise. The Company recognises compensation expense of the SARs over the applicable vesting period.

The SARs scheme had been approved State-owned Assets Supervision and Administration Commission of the State Council on 15 February 2004.

Particulars of SARs scheme granted by the Group as at 31 December 2010 and 2009 are as follows:

| Scheme | Date of grant | Number of granted SARs | Exercise price (HK$) |
|---|---|---|---|
| 2006 (the "2006 Scheme") | 22 July 2006 | 10,190,000 | 0.38 |
| 2007 (the "2007 Scheme") | 13 March 2007 | 10,630,000 | 0.67 |
| 2008 (the "2008 Scheme") | 21 March 2008 | 9,320,000 | 0.46 |
| 2010 (the "2010 Scheme") | 21 March 2010 | 8,860,000 | 0.80 |

Under the scheme, all SARs had a contractual life of five to six years from the date grant. A recipient of the SARs could not exercise the rights in the first year after the date of grant for which the SARs were granted before 1 January 2008. As at each of the second, third and fourth year after the date of grant, the total number of SARs exercisable may not in aggregate exceed one-third, two-third and 100%, respectively, of the total SARs granted to such person.

A recipient of SARs could not exercise the rights in the first two years after the date of grant for which the SARs were granted after 1 January 2008. As at each of the third, fourth and fifth year after the date of grant, the total number of SARs exercisable may not in aggregate exceed one-third, two-third, and 100%, respectively, of the total SARs granted to such person.

139

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 30. OTHER PAYABLES AND ACCRUALS *(continued)*

*Notes:* **(continued)**

(ii)     *(continued)*

The SARs which have not been exercised after the expiration of the SARs scheme shall be lapsed.

During the year ended 31 December 2010, 3,918,148, 730,000 and 828,879 of the SARs granted under the 2006 Scheme, 2007 Scheme and 2008 Scheme, respectively, were exercised. As at 31 December 2010, the expiry dates of the outstanding SARs are one, two, four and six years for the SARs granted under the 2006 Scheme, 2007 Scheme, 2008 Scheme and 2010 Scheme respectively.

At 31 December 2010, the Group has recorded liabilities of approximately RMB8,121,000 and recorded total expenses of approximately RMB11,463,000 for the year then ended. During the year ended 31 December 2010, the total payment for the SARs scheme amounted to RMB3,342,000 (2009: nil). The fair value of the SARs is determined using the Binomial model based on the assumptions with expected volatilities of 38.82% to 66.01%, risk free rates of 0.31% to 1.76% and zero dividend yield. In the opinion of the directors of the Company, the fair value of the SARs scheme as at 31 December 2009 was insignificant.

140

## 31. BANK AND OTHER BORROWINGS

|  | The Group | | The Company | |
|---|---|---|---|---|
|  | **2010** | 2009 | **2010** | 2009 |
|  | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| Bank loans - secured | **238,000** | 197,000 | **140,000** | 54,000 |
| Bank loans - unsecured |  |  |  |  |
| — Guaranteed by the ultimate holding company | **2,653,768** | 983,501 | **337,000** | 302,000 |
| — Advanced from banks on discounted trade receivables | **28,272** | 34,950 | **28,272** | 34,950 |
| Other loans - secured | **300,000** | — | **300,000** | — |
| Other loans - unsecured | **50,000** | 50,000 | **—** | — |
| Bank loans - unguaranteed | **350,000** | 550,000 | **—** | — |
|  | **3,620,040** | 1,815,451 | **805,272** | 390,950 |

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 31. BANK AND OTHER BORROWINGS *(continued)*

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| Carrying amount repayable: | | | | |
| On demand or within one year | **1,173,272** | 1,221,949 | **425,272** | 390,950 |
| More than one year, but not exceeding two years | **—** | — | **—** | — |
| More than two years, but not more than five years | **1,932,921** | 320,000 | **380,000** | — |
| More than five years | **513,847** | 273,502 | **—** | — |
| | **3,620,040** | 1,815,451 | **805,272** | 390,950 |
| Less: Amounts shown under current liabilities | **(1,173,272)** | (1,221,949) | **(425,272)** | (390,950) |
| | **2,446,768** | 593,502 | **380,000** | — |

As at 31 December 2010, the Group's secured bank borrowing of approximately RMB238,000,000 (2009: RMB197,000,000) are secured by certain land use rights (Note 19), buildings and machineries of the Group (Note 17), certain factored debtors (Note 25) and inventories (Note 24) respectively.

As at 31 December 2010, the Company's secured bank borrowings of approximately RMB140,000,000 (2009: RMB54,000,000) are secured by certain factored debtors (Note 25) and inventories (Note 24) respectively.

Other loans represented a specific borrowing from an independent third party financial institution for purpose of acquiring plant and equipment specifically relating to the production of organic light-emitting diode. RMB30,000,000 was drawn in March 2009 and RMB20,000,000 was drawn in May 2009. The loan is repayable after eight years from date of drawdown.

As at 31 December 2010, the Group and the Company's secured other loans amounted to RMB300,000,000 were pledged with 70,000,000 unrestricted tradable shares in A Share Company, a subsidiary of the Company.

As at 31 December 2010, the Group and the Company's unguaranteed bank borrowings were secured by certain land and buildings with carrying values of approximately RMB82,834,000 (2009: RMB169,059,000) of its ultimate holding company. In addition to the above securities, 37.5% (2009: 37.5%) of the issued shares of the Company held by the ultimate holding company were pledged against the loan granted to the Group during the current year.

As at 31 December 2010, approximately RMB495,378,000 (2009: RMB218,502,000) of bank borrowings were denominated in USD while the remaining were denominated in RMB.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 31. BANK AND OTHER BORROWINGS *(continued)*

As at 31 December 2010 and 2009, all short term bank borrowings are based on fixed interest rate and long term borrowings are based on fixed and floating rate. The ranges of effective interest rates on the borrowings are as follows:

|  | 2010 | 2009 |
|---|---|---|
| Effective interest rates: |  |  |
| Short term bank borrowings at fixed rate | 4.86% to 5.56% | 4.86% to 5.31% |
| Long term bank borrowings at fixed rate | 2.92% to 8.00% | 2.92% |
| Long term bank borrowings at floating rate | 5.90% to 6.10% | 4.50% to 5.40% |
| Long term other borrowings at floating rate | 5.94% | 5.94% |

As at 31 December 2010, the unutilised banking facilities of the Group and the Company amounted to approximately RMB1,106,946,000 (2009: RMB305,553,000) and RMB993,035,000 (2009: RMB211,323,000) respectively.



## 32. TERMINATION BENEFITS

Termination benefits represent early retirement allowance payable to the employees of the Group.

The maturity profile of the termination benefits is as follows:

|  | The Group | | The Company | |
|---|---|---|---|---|
|  | **2010** | 2009 | **2010** | 2009 |
|  | **RMB'000** | *RMB'000* | **RMB'000** | *RMB'000* |
| At 1 January | **11,063** | 13,795 | **2,509** | 3,881 |
| Charged to consolidated statement of comprehensive income *(Note 14)* | **23,298** | 468 | **6,206** | 117 |
| Payments made during the year | **(23,937)** | (3,200) | **(6,860)** | (1,489) |
| At 31 December | **10,424** | 11,063 | **1,855** | 2,509 |
| Less: Amounts shown under current liabilities | **(3,247)** | (2,815) | **(1,445)** | (814) |
|  | **7,177** | 8,248 | **410** | 1,695 |

The amount represented early retirement allowance payable to the employees of the Group and the Company. Compensation for early retirement is recognised in the earlier of the periods in which the Group and the Company established a constructive obligation and created a valid expectation on the employee, entered into an agreement with the employee specifying the terms, or after the individual employee has been advised of the specific terms.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 33. SHARE CAPITAL

| | Domestic shares | | H shares | | Total | |
| --- | --- | --- | --- | --- | --- | --- |
| | Number of shares '000 | Amount RMB' 000 | Number of shares '000 | Amount RMB' 000 | Number of shares '000 | Amount RMB' 000 |
| Registered, issued and fully paid : | | | | | | |
| At 1 January 2009, 31 December 2009 and 1 January 2010 | 1,455,880 | 1,455,880 | 485,294 | 485,294 | 1,941,174 | 1,941,174 |
| Issue by capitalisation of capital reserve *(Note (i))* | 145,588 | 145,588 | 48,529 | 48,529 | 194,117 | 194,117 |
| Issue of shares upon placing *(Note (ii))* | — | — | 97,058 | 97,058 | 97,058 | 97,058 |
| At 31 December 2010 | 1,601,468 | 1,601,468 | 630,881 | 630,881 | 2,232,349 | 2,232,349 |

*Notes:*

(i)   On 3 December 2009, the board of directors of the Company approved a capitalisation issue to holders of H shares and domestic shares on the basis of one capitalisation H shares for every ten H shares and one capitalisation domestic shares for every ten domestic shares in issue on the relevant record date.

The capitalisation issue was approved by the shareholders at the extraordinary general meeting held on 28 January 2010 and the new shares were issued to the shareholders on 1 February 2010. The details are stated in the Company's announcement and circular dated 14 December 2009 and 3 December 2009 respectively.

(ii)  As set out in the Company's announcement dated 29 November 2010, 97,058,000 H shares of HK$1 each were issued and allotted to the independent third parties at HK$1.26 per placing share by placing.

These shares rank pari passu in all respects with the respective domestic shares and H shares in issue.

The H shares rank pari passu in all respects with the domestic shares and rank equally for all dividends or distributions declared, paid or made except that all dividends in respect of H shares are to be paid by the Company in Hong Kong dollars and H shares may only be subscribed for by, and traded in Hong Kong dollars between legal or natural persons of any other country other than the PRC. The transfer of the domestic shares is subject to such restrictions as the PRC laws may impose from time to time.

143

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 34. OTHER RESERVES

### The Group

| | Capital reserve (Note (i)) RMB'000 | Statutory surplus reserve (Note (ii)) RMB'000 | Merger reserve RMB'000 | Exchange reserve RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|
| At 1 January 2009 | 735,418 | 23,530 | 9,506 | (126) | 768,328 |
| Share of exchange reserve of an associate | — | — | — | (8,221) | (8,221) |
| Exchange difference arising on translation of foreign operations | — | — | — | 148 | 148 |
| Other comprehensive expense for the year | — | — | — | (8,073) | (8,073) |
| Partial disposal of equity interests in a subsidiary | 13,075 | — | — | — | 13,075 |
| Deemed partial disposal of equity interests in subsidiaries | 8,651 | — | — | — | 8,651 |
| Merger reserve arising from group reorganisation — IRICO (Zhangjiagang) | — | — | (11,942) | — | (11,942) |
| Capital reduction of a subsidiary — IRICO (Zhangjiagang) | — | — | (39,978) | — | (39,978) |
| | 21,726 | — | (51,920) | — | (30,194) |
| At 31 December 2009 | 757,144 | 23,530 | (42,414) | (8,199) | 730,061 |

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 34. OTHER RESERVES *(continued)*

### The Group *(continued)*

| | Capital reserve (Note (i)) RMB'000 | Statutory surplus reserve (Note (ii)) RMB'000 | Merger reserve RMB'000 | Exchange reserve RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|
| At 1 January 2010 | 757,144 | 23,530 | (42,414) | (8,199) | 730,061 |
| Share of exchange reserve of an associate | — | — | — | 911 | 911 |
| Exchange difference arising on translation of foreign operations | — | — | — | 2,520 | 2,520 |
| Other comprehensive income for the year | — | — | — | 3,431 | 3,431 |
| Issue of shares | | | | | |
| — by capitalisation of capital reserve | (194,117) | — | — | — | (194,117) |
| — upon placing | 25,235 | — | — | — | 25,235 |
| Transaction costs attributable to issue of shares | (19,760) | — | — | — | (19,760) |
| Partial disposal of equity interests in a subsidiary | 59,605 | — | — | — | 59,605 |
| Deemed partial disposal of a subsidiary | 739,569 | — | — | — | 739,569 |
| Acquisition of additional equity interests in subsidiaries | 8,916 | — | — | — | 8,916 |
| Deemed acquisition of equity interests in subsidiaries | (20,224) | — | — | — | (20,224) |
| | 599,224 | — | — | 3,431 | 602,655 |
| At 31 December 2010 | 1,356,368 | 23,530 | (42,414) | (4,768) | 1,332,716 |

145

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

### 34. OTHER RESERVES *(continued)*

#### The Company

| | Capital reserve (Note (i)) RMB'000 | Statutory surplus reserve (Note (ii)) RMB'000 | Total RMB'000 |
|---|---|---|---|
| At 1 January 2009, 31 December 2009 and 1 January 2010 | 962,623 | 23,530 | 986,153 |
| Issue of shares | | | |
| — by capitalisation of capital reserve | (194,117) | — | (194,117) |
| — upon placing | 25,235 | — | 25,235 |
| Transaction costs attributable to issue of shares | (19,760) | — | (19,760) |
| At 31 December 2010 | 773,981 | 23,530 | 797,511 |

*Notes:*

(i)     Capital reserve

Upon incorporation of the Company on 10 September 2004, the historical net value of the assets, liabilities and interests transferred to the Company were converted into the Company's capital with all the then existing reserves eliminated and the resulting difference dealt with in the capital reserve. Accordingly, a capital reserve, being the difference between the amount of share capital issued and historical net value of the assets, liabilities and interests transferred to the Company, was presented in the reserves of both the Group and the Company. Separate class of reserves, including retained profits, of the Group prior to the incorporation of the Company were not separately disclosed as all these reserves have been capitalised and incorporated in the capital reserve of the Group and the Company.

It also comprises of reserves from transactions with the non-controlling interests and deemed contributions from owners of the Company.

(ii)    Statutory surplus reserve

In accordance with the relevant PRC laws and financial regulations, every year the Company is required to transfer 10% of the profit after taxation determined in accordance with accounting principles and financial regulations applicable to PRC enterprises ("PRC GAAP") to the statutory surplus reserve until the balance reaches 50% of the paid-up share capital. Such reserve can be used to reduce any losses incurred and to increase share capital. Except for the reduction of losses incurred, any other usage should not result in this reserve balance falling below 25% of the registered capital.

## 35. DEFERRED INCOME

The deferred income is released to the consolidated statement of comprehensive income over the expected useful life of the relevant assets or when the assets are disposed of or written off. Movements of deferred income during the year are as follows:

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| At 1 January | **104,801** | 21,040 | **—** | — |
| Additions | **228,155** | 92,023 | **3,400** | — |
| Amortised during the year *(Note 9)* | **(9,726)** | (8,262) | **(3,000)** | — |
| At 31 December | **323,230** | 104,801 | **400** | — |

During the year ended 31 December 2008, the Group received government grants of RMB1,200,000 from Science and Technology Department of Shaanxi Province (陝西省科技廳) for the acquisition of machineries and equipment. The amount will be recognised as other operating income over the useful lives of such machineries and equipment. During the year, no deferred income has been recognised in the consolidated statement of comprehensive income as the machineries and equipment have not been put into use.

During the year ended 31 December 2008, the Group received government grants of RMB19,840,000 for research and development of technology and staff training costs for the production of TFT-LCD glass substrate, and for the development and design of the glass furnace used in production. During the year, such expenditure had not yet been incurred and thus no deferred income has been recognised in the consolidated statement of comprehensive income.

During the year ended 31 December 2009, the Group received government grants of RMB7,579,000 from PRC government for production, research and development on projects of plasma display panels. During the year ended 31 December 2009, the same amount had been incurred and the same amount out of the deferred income has been recognised as other operating income in the consolidated statement of comprehensive income.

During the year ended 31 December 2009, the Group received government grants of RMB618,000 from PRC government for compensation for relocation of certain factory premises of a subsidiary of the Company. During the year ended 31 December 2009, the same amount had been incurred and the same amount out of the deferred income has been recognised as other operating income in the consolidated statement of comprehensive income.

## 35. DEFERRED INCOME *(continued)*

During the year ended 31 December 2009, the Group received government grants of RMB60,000,000 from the People's Government of Shunde District, Foshan City, Guangdong Province (廣東省佛山市順德區人民政府) and Economic and Information Technology Commission of Guangdong Province (廣東省經濟和信息化委員會) together with Finance Department of Guangdong Province (廣東省財政廳), RMB30,000,000 for each respectively for research and development of technology and the acquisition of machineries and equipment. The amount used for the acquisition of machineries and equipment will be recognised as other operating income over the useful lives of such machineries and equipment. The amount used for the research and development will be recognised as other operating income when the expenditure is incurred. During the year, such expenditure had not yet been incurred and thus no deferred income has been recognised in the consolidated statement of comprehensive income.

During the year ended 31 December 2009, the Group received government grants of RMB13,920,000 for research and development of technology and staff training costs for the production of TFT-LCD glass substrate, and for the development and design of the glass furnace used in production. During the year, such expenditure had not yet been incurred and thus no deferred income has been recognised in the consolidated statement of comprehensive income.

During the year ended 31 December 2009, the Group received government grants of RMB9,106,000 for training, education and other miscellaneous projects. During the year ended 31 December 2009, such expenditure had not yet been incurred and thus no deferred income has been recognised in the consolidated statement of comprehensive income.

During the year ended 31 December 2009, the Group received government grants of RMB800,000 from Finance Bureau of Foshan City (佛山市財政局) for housing subsidies of the experts and staff. The amount will be recognised as other operating income once the relevant expenditure is incurred. During the year ended 31 December 2010, such expenditure of RMB735,000 (2009: RMB65,000) had been incurred and the same amount out of the deferred income has been recognised as other operating income in the consolidated statement of comprehensive income.

During the year ended 31 December 2010, the Group received government grants of RMB1,385,000 from Finance Bureau of Foshan City for housing subsidies of the experts and staff. The amount will be recognised as other operating income once the relevant expenditure is incurred. During the year, the same amount had been incurred and the same amount out of the deferred income has been recognised as other operating income in the consolidated statement of comprehensive income.

During the year ended 31 December 2010, the Group received government grants of RMB23,700,000 from the People's Government of Shunde District, Foshan City, Guangdong Province for research and development of technology and the acquisition of machineries and equipment. The amount used for the acquisition of machineries and equipment will be recognised as other operating income over the useful lives of such machineries and equipment. The amount used for the research and development will be recognised as other operating income when it is incurred. During the year, such expenditure had not yet been incurred and thus no deferred income has been recognised in the consolidated statement of comprehensive income.

148

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 35.  DEFERRED INCOME *(continued)*

During the year ended 31 December 2010, the Group received government grants of RMB17,634,000 from the PRC government for compensation for relocation of certain factory premises of a subsidiary of the Company during the year. The amount will be recognised as other operating income once the relevant expenditure is incurred. During the year, such expenditure of RMB1,034,000 had been incurred and the same amount out of the deferred income has been recognised as other operating income in the consolidated statement of comprehensive income.

During the year ended 31 December 2010 the Group received government grants of RMB103,220,000 for research and development of technology and staff training costs for the production of TFT-LCD glass substrate, and for the development and design of the glass furnace used in production. During the year, such expenditure had not yet been incurred and thus no deferred income has been recognised in the consolidated statement of comprehensive income.

During the year ended 31 December 2010, the Group received government grants of RMB33,000,000 for acquiring plant and equipment specifically relating to the production of organic light-emitting diode ("LED"). During the year, such expenditure had not yet been incurred and thus no deferred income has been recognised in the consolidated statement of comprehensive income.

During the year ended 31 December 2010, the Group received government grants of RMB38,713,000 from the PRC government for production, research and development on projects of plasma display panels. The amount will be recognised as other operating income once the relevant expediture is incurred. During the year, such expenditure of RMB3,572,000 had been incurred and the same amount out of the deferred income has been recognised as other operating income in the consolidated statement of comprehensive income.

During the year ended 31 December 2010, the Group received government grants of RMB7,103,000 for training, education and other miscellaneous projects. During the year, such expenditure had not yet been incurred and thus no deferred income has been recognised in the consolidated statement of comprehensive income.

During the year ended 31 December 2010, the Company received government grants of RMB3,000,000 from the PRC government for solar photovoltaic and LED productions lines. During the year, the same amount had been incurred and the same amount out of the deferred income has been recognised as other operating income has been recognised as other operating income in the consolidated statement of comprehensive income.

During the year ended 31 December 2010, the Company received government grants of RMB400,000 from the PRC government for solar photovoltaic glass production line project. During the year, such expenditure had not yet been incurred and thus no deferred income has been recognised in the consolidated statement of comprehensive income.

149

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 36. DEFERRED TAXATION

Deferred taxation is calculated in full on temporary differences under the liability method using principal taxation rate of 25% (2009: 25%) except for certain subsidiaries mentioned in Note 11 which are subject to tax concession to pay income tax at 15% (2009: 15%).

The following are the deferred tax liabilities recognised and movements thereof during the current and prior year:

|  | Accelerated tax depreciation | |
|  | The Group | The Company |
|  | *RMB'000* | *RMB'000* |
|  |  |  |
| At 1 January 2009 | **(7,798)** | (4,602) |
| Charged to the consolidated statement of comprehensive income | **(162)** | — |
|  |  |  |
| At 31 December 2009 and 1 January 2010 | **(7,960)** | (4,602) |
| Credited to the consolidated statement of comprehensive income | **403** | — |
|  |  |  |
| At 31 December 2010 | **(7,557)** | (4,602) |

The deferred income tax liabilities are to be recovered after more than 12 months.

Deferred income tax assets are recognised for tax loss carry-forwards and other deductible temporary differences to the extent that the realisation of the related tax benefit through the future taxable profits is probable. The Group has unused tax losses of approximately RMB690,601,000 (2009: RMB741,069,000) where, in the opinion of the directors of the Company, it is not probable that sufficient taxable profits will be available within the utilisation periods to allow utilisation of the tax losses. The Group's unrecognised deferred tax assets in respect of tax losses will expire progressively until 2015.

At the end of the reporting period, the Group has deductible temporary differences of approximately RMB1,177,049,000 (2009: RMB1,171,101,000). No deferred tax asset has been recognised in relation to such deductible temporary difference as it is not probable that taxable profit will be available against which the deductible temporary differences can be utilised.

150

## 37. MATERIAL LITIGATIONS

(i)   **The litigation of Curtis Saunders against the Company, A Share Company and IRICO Group Corporation**

As set out in the announcement published on the Shanghai Stock Exchange on 25 January 2010 by A Share Company, IRICO Group Corporation, the Company and A Share Company received a statement of claim from Supreme Court of British Columbia in respect of the litigation brought by Curtis Saunders.

Curtis Saunders, the plaintiff, accused approximately 50 global CRT manufacturers, including IRICO Group Corporation, the Company and A Share Company, of a collusion to manipulate the market and enter into agreements raising the price of CRT to an unreasonable level during the period from 1 January 1995 to 1 January 2008. All these coerced the plaintiff and the public to pay an artificially high price for the CRT products which caused damage to their interests. Hence, the parties filed a claim for damages. Supreme Court of British Columbia has accepted this claim but there is no judgement or ruling yet.

Upon inspection of the Company, the Company has never sold CRT products in the market of Canada directly or via agency since 1995. The Company considers that the above litigations will not pose any negative impact on its normal business operation.

In the opinion of the directors of the Company, the above cases did not have any material impact on the Group's consolidated financial statements for the year ended 31 December 2010 and 2009.

(ii)   **The litigation of The Fanshawe College of Applied Arts and Technology (hereafter referred as "Fanshawe College") against A Share Company**

As set out in the announcement published on the Shanghai Stock Exchange on 7 July 2009 by A Share Company, A Share Company received a statement of claim from Ontario Superior Court of Justice Canada in respect of the litigation brought by Fanshawe College.

Fanshawe College, the plaintiff, accused approximately 30 global CRT manufacturers, including A Share Company, of a conspiracy to maintain, control and stabilise the price of CRT since 1 January 1998, and a collusion to manipulate the market and enter into agreements raising the price of CRT products to an unreasonable level. All these coerced the plaintiff and the public to pay an artificially high price for the CRT products which caused damage to their interests. Hence, the parties filed a claim for damages. Ontario Superior Court of Justice Canada has accepted this claim but there is no judgement or ruling yet.

Upon inspection of the Company, the Company has never sold CRT products in the market of Canada directly or via agency since 1995. The Company considers that the above litigations will not pose any negative impact on its normal business operation.

In the opinion of the directors of the Company, the above cases did not have any material impact on the Group's consolidated financial statements for the year ended 31 December 2010 and 2009.

151

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 37. MATERIAL LITIGATIONS *(continued)*

(iii) The litigation of American Crago Company against A Share Company

As set out in the announcement published on the Shanghai Stock Exchange on 30 January 2008 by A Share Company, A Share Company received a statement of claim from the U.S. District Court, Northern District of California in respect of the litigation brought by American Crago Company.

American Crago Company, the plaintiff, accused various CRT manufacturing enterprises, including A Share Company, of a conspiracy to control the market which was in violation of antitrust law. It was alleged that the plaintiff and other members in the class proceedings paid more than that would have been determined by competitive market and therefore claimed for triple damages. U.S. District Court, Northern District of California has accepted the claim but there is no judgement or ruling yet.

Upon investigations of the Company, the Company has never sold CRT products in the market of USA directly or via agency since 1995. The Company considers that the above litigations will not pose any negative impact on normal business operation.

In the opinion of the directors of the Company, the above cases did not have any material impact on the Group's consolidated financial statements for the year ended 31 December 2010 and 2009.

## 38. COMMITMENTS

### Capital expenditure

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010**<br>***RMB'000*** | 2009<br>*RMB'000* | **2010**<br>***RMB'000*** | 2009<br>*RMB'000* |
| Contracted for but not provided in the consolidated financial statements: | | | | |
| — Construction of organic LED production lines | **533,044** | 132,256 | **—** | — |
| — Construction of photovoltaic glass production line | **215,168** | 63,326 | **215,168** | 63,326 |
| — Construction of LCD glass substrate production lines | **1,126,509** | 29,192 | **—** | — |
| — Construction of PDP/cold cathode fluorescent lamp production lines | **—** | 4,176 | **—** | — |
| | **1,874,721** | 228,950 | **215,168** | 63,326 |

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 38.  COMMITMENTS *(continued)*

### Operating leases

#### *As lessee*

At the end of the reporting period, the Group and the Company had commitments for future minimum lease payments under non-cancelable operating leases which fall due as follows:

| | The Group | | | | The Company | | | |
|---|---|---|---|---|---|---|---|---|
| | Land use rights | | Leasehold buildings | | Land use rights | | Leasehold buildings | |
| | **2010** | 2009 | **2010** | 2009 | **2010** | 2009 | **2010** | 2009 |
| | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| Within one year | **6,132** | 6,067 | **36,516** | 34,811 | **4,790** | 4,725 | **22,823** | 19,872 |
| In the second to fifth years inclusive | **6,132** | 12,134 | **36,271** | 68,137 | **4,790** | 9,449 | **22,823** | 39,744 |
| | **12,264** | 18,201 | **72,787** | 102,948 | **9,580** | 14,174 | **45,646** | 59,616 |

Operating lease payments represent rentals payable by the Group and the Company for certain of its land use rights and leasehold buildings. Leases are negotiated for an average term of three years respectively and rentals are fixed for an average of one and three years respectively.

#### *As lessor*

Property rental income earned during the year was RMB5,290,000 (2009: RMB1,965,000). Certain of the Group's properties held for rental purposes, with a carrying amount of approximately RMB50,170,000 (2009: RMB17,513,000). The remaining properties are expected to generate rental yields of 10.5% (2009:11.1%) on an ongoing basis. All the properties held have committed tenants for the next 1 year to 9 years (2009: 1 year to 9 years).

At the end of the reporting period, the Group had contracted with tenants for the following future minimum lease payments:

| | The Group | |
|---|---|---|
| | **2010** | 2009 |
| | **RMB'000** | RMB'000 |
| Within one year | **7,921** | 988 |
| In the second to fifth years inclusive | **16,290** | 926 |
| After five years | **8,157** | 594 |
| | **32,368** | 2,508 |

153

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 39. RELATED-PARTY TRANSACTIONS

The Group is controlled by IRICO Group Corporation (incorporated in the PRC), which owns 75% of the Company's shares. The remaining 25% of the shares are widely held.

Related parties include IRICO Group Corporation and its subsidiaries (other than the Group), associates and jointly controlled entities (hereinafter collectively referred to the "IRICO Group"), corporations in which the Company is able to control, jointly control or exercise significant influence, key management personnel of the Company and IRICO Group Corporation and their close family members. IRICO Group Corporation does not produce financial statements available for public use.

IRICO Group Corporation is controlled by the PRC government. In accordance with HKAS 24 "Related Party Disclosures", other state-owned enterprises and their subsidiaries, directly or indirectly controlled by the PRC government are also regarded as related parities of the Group and defined as "Other state-owned enterprise". For purpose of related transaction disclosure, the Group has in place procedures to assist the identification of the immediate ownership structure of its customers and suppliers as to whether they are state-owned companies. Many state-owned enterprises have multi-layered corporate structure and the ownership structures change over time as a result of transfers and privatisation programs. Nevertheless, in the opinions of directors of the Company, the majority of the Group's activities have been conducted with other state-owned enterprises in the Group's ordinary course of business. In the meantime, the meaningful information relating to related party transactions has been adequately disclosed.

The following transactions were carried out with related parties:

### A.   Sale of goods

| | 2010 RMB'000 | 2009 RMB'000 |
|---|---|---|
| Sales of goods to the IRICO Group *(Note)* | | |
| — Shenzhen Hongyang Industrial Trade Company | 6,239 | 8,483 |
| — Caihong Labour Service Company | 17,424 | 12,289 |
| — Shaanxi IRICO Photo Electronic Material Corporation | 3,098 | 2,920 |
| — The ultimate holding company | 124 | 384 |
| — Xianyang IRICO Thermoelectricity Co., Ltd. | 249 | 231 |
| — Color Picture Tube Plant | 3,122 | 2,473 |
| — IRICO Hospital | 61 | 51 |
| — Xianyang IRICO Display Co., Ltd. | 41 | 8 |
| | 30,358 | 26,839 |
| Other state-owned enterprises | 556,108 | 699,783 |

*Note:*   Sales to related parties were conducted with terms mutually agreed by both contract parties with reference to market prices.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 39. RELATED-PARTY TRANSACTIONS *(continued)*

B.  Purchases of goods and provision of services

|  | 2010 RMB'000 | 2009 RMB'000 |
|---|---|---|
| Purchases of goods from the IRICO Group *(Note (i))* | | |
| — Caihong Labour Service Company | 20,554 | 26,469 |
| — Xianyang Cailian Packaging Materials Co., Ltd. | 23,763 | 26,372 |
| — Xianyang Caihong Adhesive Belt Co., Ltd. | 1,199 | 1,985 |
| — Shenzhen Hongyang Industrial Trade Company | 15,578 | 12,730 |
| — Xianyang IRICO Electronic Materials Co., Ltd. | — | 336 |
| — Xianyang IRICO Display Co., Ltd. | 20,044 | 7,513 |
| — Xianyang IRICO Thermos Co., Ltd. | 28 | 1,033 |
| — Shaanxi IRICO Photo Electronic Material Corporation | 32 | 14,244 |
| | **81,198** | 90,682 |
| Other state-owned enterprises | **201,864** | 95,397 |
| Purchases of property, plant and equipments — Xianyang IRICO Digital Display Co., Limited | **812** | 7,547 |
| Other state-owned enterprises | — | 427 |
| Provision of services from the IRICO Group | | |
| — Rental expense to the ultimate holding company *(Note (ii))* | **44,124** | 41,049 |
| — Trademark license fee to the ultimate holding company *(Note (iii))* | **1,816** | 1,685 |
| — Network fee to the ultimate holding company | **285** | 191 |
| — IRICO Hospital | **565** | 3 |
| — Utility charges to Color Picture Tube Plant | **352,700** | 285,376 |
| — Miscellaneous charges to Color Picture Tube Plant | **923** | 705 |
| — Environmental expenses to Color Picture Tube Plant | — | 5,039 |
| | **400,413** | 334,048 |
| Other state-owned enterprises | **4,714** | 782 |

155

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 39.  RELATED-PARTY TRANSACTIONS *(continued)*

### B.  Purchases of goods and provision of services *(continued)*

*Notes:*

(i)  Purchases from related parties were conducted with terms mutually agreed by both contract parties with reference to market prices.

(ii)  From 1 January 2004, the Group is required to pay RMB14.5 (2009: RMB11) per square metre per annum for the use of land use rights and RMB9.5 (2009: RMB RMB9) and nil (2009: RMB30) per square metre per month for the use of buildings in Xianyang and Beijing respectively, pursuant to the Premises Leasing Agreement. Accordingly, rental charges for the year ended 31 December 2010 amounted to approximately RMB44,124,000 (2009: RMB41,048,000).

(iii)  License fee for using the trademark owned by the ultimate holding company was paid by the Group, at 0.1% of sales based on the terms stipulated in agreements. In accordance with the agreement signed by one of the subsidiaries, A Share Company, the term is initially for five years from 1998 but renewable automatically unless terminated by either party with a three-month prior notice, and it was revised to end on 31 December 2006. In accordance with the agreement signed by the other entities of the Group, the license fee is to be paid from 1 January 2004 and the agreement is for a term of 3 years up to 31 December 2006 unless terminated by either party with a three-month prior notice, and it was renewed for a term of 3 years up to 31 December 2012.

### C.  Acquisition of subsidiaries

Acquisition of equity interests in IRICO (Zhangjiagang) and IRICO (Hefei)

As mentioned in the circular of the Company dated 13 November 2009, on 17 September 2009, IRICO Group Corporation, IRICO Glass, a subsidiary of the Company, and other independent third parties, entered into agreements pursuant to which, IRICO Glass agreed to inject RMB500 million and RMB15 million capital into IRICO (Zhangjiagang) and IRICO (Hefei), respectively.

IRICO (Zhangjiagang) was established in October 2008 with registered capital of RMB23,000,000 and IRICO Group Corporation held 60% equity interests before the Capital Injection.

IRICO (Hefei) was established in August 2009 with registered capital of RMB5,000,000 and IRICO Group Corporation held 100% equity interests before the Capital Injection.

The Capital Injections were completed on 24 December 2009. Upon the completion of the Capital Injections, IRICO Glass owns 95.6% and 75% of the enlarged capital of IRICO (Zhangjiagang) and IRICO (Hefei), respectively, and the Group has effective interest of 52.40% and 41.11% in IRICO (Zhangjiagang) and IRICO (Hefei), respectively.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** *(continued)*

## 39. RELATED-PARTY TRANSACTIONS *(continued)*

D.   Balance with ultimate holding company

*(i)*   *Amount due from the ultimate holding company*

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Other receivables, deposits and prepayments | | | | |
| The ultimate holding company | **63,103** | 60,296 | **60,296** | 60,296 |

The balance is unsecured, non-interest bearing and repayable on demand.

*(ii)*   *Amount due to the ultimate holding company*

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Other payables and accruals | | | | |
| The ultimate holding company | **124,622** | 183,313 | **122,778** | 163,584 |

The balance is unsecured, non-interest bearing and repayable on demand.

*(iii)*   *Loans from the ultimate holding company — Group*

| | **2010** | 2009 |
|---|---|---|
| | ***RMB'000*** | *RMB'000* |
| At 1 January | **87,565** | 121,663 |
| Repayments | **(60,000)** | (40,000) |
| Interest expense *(Note 10)* | **2,434** | 5,902 |
| At 31 December | **29,999** | 87,565 |

Loans from the ultimate holding company are unsecured, bears interest at 5.47% to 6.22% (2009: 5.47% to 6.22%) per annum and are repayable on demand.

157

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 39. RELATED-PARTY TRANSACTIONS *(continued)*

D.  Balance with ultimate holding company *(continued)*

*(iv) Director's emolument born by the ultimate holding company*

During the year ended 31 December 2010 and 2009, the emoluments for Mr. Fu Jiuquan, Mr. Zhang Weichuan, Mr. Niu Xing and Ms. Wang Qi are born by IRICO Group Corporation (Note 13).

*(v) Guarantees granted or assets pledged by the ultimate holding company*

As at 31 December 2010 and 2009, the ultimate holding company granted a guarantee and pledged certain of its land and buildings for certain bank borrowings granted to the Company and the Group (Note 31).

As at 31 December 2010, the ultimate holding company had pledged its 37.5% (2009: 37.5%) equity interests in the Company for certain bank borrowings granted to the Group (Note 31).

E.  Amount due to a fellow subsidiary

| | The Group | | The Company | |
| --- | --- | --- | --- | --- |
| | **2010** | 2009 | **2010** | 2009 |
| | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| Other payables and accruals | | | | |
| Rui Bou Electronics (HK) Ltd | **9** | 69,076 | **—** | — |

The balance is unsecured, non-interest bearing and repayable on demand.

F.  Key management compensation

| | **2010** | 2009 |
| --- | --- | --- |
| | **RMB'000** | RMB'000 |
| Short-term benefits | **2,622** | 1,423 |
| Post-employment benefits | **210** | 67 |
| Cash-settled share-based payments expense | **8,631** | — |
| | **11,463** | 1,490 |

The remuneration of directors of the Company and key management is determined by the remuneration committee having regard to the performance of individuals and market trends.

158

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 39. RELATED-PARTY TRANSACTIONS *(continued)*

G.   Year-end balances arising from sales / purchases of goods / provision of services

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| Trade receivables from related parties *(Note)* | | | | |
| The IRICO Group | | | | |
| — Shaanxi IRICO Photo Electronic Material Corporation (previously known as Shaanxi IRICO General Service Corporation) | **65** | 744 | **—** | 2 |
| — Shaanxi IRICO Construction Engineering Co., Ltd. | **—** | 7 | **1** | 7 |
| — IRICO Hospital | **—** | 1 | **1** | 1 |
| — Shanghai Languang Technology Co. Ltd. | **2,045** | 2,044 | **2,045** | 2,044 |
| — 咸陽彩虹熱電有限公司 | **—** | 3 | **—** | — |
| — 彩虹集團勞動服務公司 | **71** | 18 | **—** | — |
| — IRICO Group Co. | **—** | 323 | **—** | 323 |
| — 彩虹彩色顯像管總廠 | **—** | 1 | **—** | 1 |
| — Xianyang IRICO Digital Display Co., Limited | **—** | 7 | **—** | 7 |
| — Shenzhen Hongyang Industrial Trade Company | **724** | 785 | **—** | 785 |
| | **2,905** | 3,933 | **2,047** | 3,170 |
| Other state-owned enterprises | **107,811** | 423,790 | **3,976** | 858 |
| | **110,716** | 427,723 | **6,023** | 4,028 |
| Representing: | | | | |
| Trade receivables *(Note 25)* | **71,987** | 188,907 | **6, 023** | 4,028 |
| Trade bills receivable *(Note 25)* | **38,729** | 238,816 | **—** | — |
| | **110,716** | 427,723 | **6, 023** | 4,028 |

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 39. RELATED-PARTY TRANSACTIONS *(continued)*

G.  Year-end balances arising from sales / purchases of goods / provision of services *(continued)*

| | The Group | | The Company | |
|---|---|---|---|---|
| | **2010** | 2009 | **2010** | 2009 |
| | ***RMB'000*** | *RMB'000* | ***RMB'000*** | *RMB'000* |
| Trade payables from related parties *(Note)* | | | | |
| The IRICO Group | | | | |
| — Caihong Labour Service Company | **1,917** | 6,979 | **1,208** | 11 |
| — Xianyang Cailian Packaging Materials Co., Ltd. | **21,476** | 5,588 | **20,158** | 4,342 |
| — Xianyang Caihong Adhesive Belt Co., Ltd. | **783** | 1,050 | **57** | — |
| — Shenzhen Hongyang Industrial Trade Company | **10,424** | 2,048 | **10,406** | 2,023 |
| — The ultimate holding company | **127,045** | 415 | **122,778** | 324 |
| — Shaanxi IRICO Photo Electronic Material Corporation (previously known as Shaanxi IRICO General Service Corporation) | **67** | 12 | **11** | — |
| — Xianyang IRICO Digital Display Co., Limited | **512** | 2,154 | **1** | 57 |
| — Shenzhen Caihong Electronics Co. Ltd. | **197** | — | **—** | — |
| — Color Picture Tube Plant | **3,210** | 12,209 | **—** | — |
| — Xianyang IRICO Electronic Materials Co., Ltd. | **212** | 184 | **—** | — |
| | **165,843** | 30,639 | **154,619** | 6,757 |
| Other state-owned enterprises | **11,259** | 8,505 | **5,644** | 7,562 |
| | **177,102** | 39,144 | **160,263** | 14,319 |
| Representing: | | | | |
| Trade payables *(Note 29)* | **176,652** | 38,714 | **159,813** | 14,319 |
| Trade bills payable *(Note 29)* | **450** | 430 | **450** | — |
| | **177,102** | 39,144 | **160,263** | 14,319 |

*Note:*   The trade balances in respect of sales and purchases are under the Group's normal trading terms.

160

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS *(continued)*

## 39. RELATED-PARTY TRANSACTIONS *(continued)*

H.  Bank balances in and loans from state-owned banks

|  | The Group | | The Company | |
| --- | --- | --- | --- | --- |
|  | **2010** | 2009 | **2010** | 2009 |
|  | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| Bank balances in state-owned banks | **2,666,431** | 795,286 | **244,105** | 226,428 |
| Short-term borrowings from state-owned banks | **1,073,272** | 992,000 | **225,272** | 782,000 |

|  | The Group | | The Company | |
| --- | --- | --- | --- | --- |
|  | **2010** | 2009 | **2010** | 2009 |
|  | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| Interest income from state-owned banks | **6,935** | 3,201 | **3,943** | 720 |
| Interest expenses to state-owned banks | **67,380** | 36,847 | **20,686** | 16,994 |

## 40. EVENT AFTER THE END OF THE REPORTING PERIOD

On 24 January 2011, Kunshan Industry disposed of its 48% equity interests in Wujiang Shanyuan, an associate of the Group, to the owner of Wujiang Shanyuan for a consideration of approximately RMB4,860,000.

161

# FIVE YEAR FINANCIAL SUMMARY

| | 2010 RMB'000 | 2009 RMB'000 | 2008 RMB'000 | 2007 RMB'000 | 2006 RMB'000 |
|---|---|---|---|---|---|
| | | **For the year ended 31 December** | | | |
| Results | | | | | |
| Turnover | **2,717,770** | 2,097,251 | 3,541,920 | 3,358,990 | 3,861,710 |
| Profit (loss) before tax | **43,982** | (1,559,849) | 125,427 | 77,919 | 187,543 |
| Income tax expenses | **(5,277)** | (4,834) | (7,851) | (8,420) | (19,828) |
| Profit (loss) before non- controlling interests | **38,705** | (1,564,683) | 117,576 | 69,499 | 167,715 |
| Non-controlling interests | **9,630** | (451,669) | 22,668 | 4,836 | 38,203 |
| Profit (loss) attributable to owners for the year | **20,954** | (1,113,014) | 94,908 | 64,663 | 129,512 |
| Assets, liabilities and non-controlling interests | **19,574,769** | 8,912,936 | 9,131,621 | 8,473,929 | 8,832,541 |
| Total assets | **10,844,522** | 5,052,153 | 5,737,136 | 5,495,330 | 5,515,063 |
| Total liabilities | **5,106,823** | 3,150,959 | 2,243,654 | 1,807,841 | 2,274,452 |
| Non-controlling interests | **3,623,424** | 709,824 | 1,150,831 | 1,170,758 | 1,043,026 |

162

## Corporate Information

## EXECUTIVE DIRECTORS

Xing Daoqin          Chairman
Tao Kui              Vice Chairman
Zhang Junhua         President

## NON-EXECUTIVE DIRECTORS

Guo Mengquan
Niu Xinan
Fu Jiuquan
Zhang Weichuan

## INDEPENDENT NON-EXECUTIVE DIRECTORS

Xu Xinzhong
Feng Bing
Wang Jialu
Lv Hua
Zhong Pengrong

163

## AUDIT COMMITTEE

Lv Hua
Fu Jiuquan
Feng Bing
Xu Xinzhong
Zhong Pengrong

## CHIEF FINANCIAL OFFICER

Ma Jianchao (Appointed on 17 May 2010)

## JOINT COMPANY SECRETARIES

Chu Xiaohang
Lam Chun Lung

## QUALIFIED ACCOUNTANT

Lam Chun Lung

## AUTHORIZED REPRESENTATIVES

Zhang Junhua (Appointed on 12 July 2010)
Chu Xiaohang (Appointed on 12 July 2010)

IRICO GROUP ELECTRONICS COMPANY LIMITED

**Corporate Information** *(Continued)*

## LEGAL ADDRESS IN THE PRC

No. 1 Caihong Road
Xianyang, Shaanxi Province
The People's Republic of China
Postal code: 712021

## PLACE OF BUSINESS IN HONG KONG

Unit 3103, 31st Floor
Office Tower, Convention Plaza,
1 Harbour Road, Wanchai, Hong Kong

## COMPANY WEBSITE

www.irico.com.cn



## LEGAL ADVISERS

Baker & McKenzie
14th Floor, Hutchison House
10 Harcourt Road, Hong Kong

## AUDITOR

SHINEWING (HK) CPA Limited
43/F., The Lee Gardens,
33 Hysan Avenue, Causeway Bay, Hong Kong

## REGISTRAR OF H SHARES

Computershare Hong Kong Investor Services Limited
Rooms 1712–1716, 17th Floor, Hopewell Center
183 Queen's Road East, Hong Kong

## INVESTOR AND MEDIA RELATIONS

Wonderful Sky Financial Group Limited
Unit 3103, 31st Floor
Office Tower, Convention Plaza,
1 Harbour Road, Wanchai, Hong Kong

# EXHIBIT 10



**certified**translate
A LANGUAGE FISH LLC COMPANY

info@certifiedtranslate.com | 2425 Olympic Blvd., Suite 4000W | usa 1-888-856-2228
www.certifiedtranslate.com | Santa Monica, CA 90404 | int +1-310-684-3153
| | fax +1-310-564-1944

## CERTIFIED TRANSLATION

A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: | **David Y. Hwu** | Street Address: | **706 Sansome Street** |
| Firm: | **Saveri & Saveri, Inc.** | City/State/Zip: | **San Francisco / CA / 94111** |

*Description of Document(s):*

|  |
| --- |
|  |
| **IRI-CRT-00001154E** |
|  |
|  |

| Source Language: | **SIMPLIFIED CHINESE** | Target Language: | **ENGLISH** |

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:** Sean Kirschenstein, Director          **Date:** September 25, 2018

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On _Sep. 25, 2018_ before me, ____Kristin Gail Chamberlain____, Notary Public, appeared ___Sean Kirschenstein___, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ___Kristin Chw___



KRISTIN GAIL CHAMBERLAIN
Commission # 2144880
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2020

# Purchase and Sales Contract for Industrial and Mineral Products

Supplier: IRICO Display Device Co., Ltd.

Purchaser: China National Electronics Import and Export Caihong Company

Contract Number: CHGF0207173

Place of signing: Xianyan, Shaanxi

Date of signing: June 26, 2002

I. Product name, trademark, model and quantity:

| Product Name | Trademark | Specification | Unit of Measure | Quantity | Price (yuan / unit) | Sum (yuan) | Delivery Date and Quantity |
|---|---|---|---|---|---|---|---|
| | | | | | | | July |
| Color tubes | Caihong | 21" | Unit | 4848 | 450.45 | 2183781.6 | |
| Color tubes | Caihong | 21" | Unit | 18112 | 377.91 | 6844705.92 | |
| Color tubes | Caihong | 25" | Unit | 1 | 530 | 530 | |
| Total amount (in words): nine million, twenty-nine thousand, seventeen yuan and fifty-two hundredths. | | | | | | | |

II. Quality requirements, technical standards, quality responsibility conditions and deadline for the supplier: implemented based on the technical specifications of the supplier .

III. Delivery / pickup location and method: warehouse of the supplier.

IV. Method of transportation, arrival station port and cost sharing: the buyer shall take care of transportation and freight.

V. Packing standards and supply and recovery of wrapping materials: use the original package of the supplier (plastic film packing), without recovering packing materials.

VI. Method and deadline of settlement: delivery upon payment.

VII. Liability for violation of contract: settlement negotiated by the two parties

VIII. Method to resolve contract disputes: in case of disputes during the execution of the contract, the two parties involved shall seek a negotiated settlement. If no agreement is reached through negotiation, they can file a suit at the people's court in the place of signing.

IX. Other agreed terms:

The purchaser shall notify the supplier in written form in advance of the specifications of the supplies and the parameters of the magnetic field of the color tubes.

X. This contract has four copies of the same format (the supplier retains two copies, and the purchaser retains two copies). The contract shall enter into effect upon being signed and stamped with the contract seal by both parties.

| Supplier | Purchaser |
|---|---|
| Company name (seal): IRICO Display Device Co., Ltd. | Company name (seal): |
| IRICO Display Device Co., Ltd. | IRICO Group Co., Ltd. |
| Special seal for contract use (2) [seal] | IRICO Import and Export Company [seal] |
| Company address: West Zone of High Tech Development Zone, Xi'an City, Shaanxi Province | Company address: |
| Legal representative: Wang Guojun [signature] | Legal representative: |
| Entrusted agent: | Entrusted agent: Gao Rongguo [signature] |
| Telephone: | Telephone: |
| Bank of deposit: Caihong Branch of Industrial and Commercial Bank of China in Xianyang City | Bank of deposit: |
| Account number: 2604020909022108284 | Account number: |
| Postal code: 712021 | Postal code:      Xu Haiyan [signature] |

Effective period: June 26, 2002 to July 28, 2002

# EXHIBIT 11

**FILED UNDER SEAL**

# EXHIBIT 12

## FILED UNDER SEAL

# EXHIBIT 13

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                 OAKLAND DIVISION

4

5    IN RE: CATHODE RAY TUBE (CRT)  ) MASTER FILE NO.
     ANTITRUST LITIGATION          ) CV-07-5944 JST
6    _____)
                                    )
7    THIS DOCUMENT RELATES TO:      )
                                    )
8    ALL INDIRECT PURCHASER ACTIONS )
     ALL DIRECT PURCHASER ACTIONS   )
9                                   )
             DEFENDANTS.            )
10   _____)

11

12

13        VIDEOTAPED DEPOSITION OF WANG ZHAOJIE

14                    VOLUME II

15          WEDNESDAY, SEPTEMBER 21, 2022

16               MACAU S.A.R., CHINA

17

18

19

20

21

22

23   JOB NO.  5436467

24   REPORTED BY  MARK McCLURE, CRR

25            CAL CSR 12203

                                        Page 1

```
 1              MAIN INTERPRETER:  Interpreter needs          14:18:47

 2     clarification.                                         14:18:48

 3              THE WITNESS:  I'm not quite clear about this. 14:18:57

 4     I only remember that he once worked in the company, but 14:18:59

 5     perhaps he worked in a different department.           14:19:03

 6     BY MR. HWU:                                            14:19:03

 7         Q.   Maybe something was missed in translation.    14:19:22

 8     I'll double-check with the witness.                    14:19:25

 9              Mr. Wang, did you just say Mr. Gao worked at  14:19:27

10     the import-export company?                             14:19:33

11         A.   I remember that he probably worked in that    14:19:34

12     import-export unit.                                    14:19:51

13         Q.   And was Mr. Gao's unit part of IRICO Group?   14:19:56

14         A.   I'm not clear about that.                     14:20:00

15              MR. HWU:  Mr. Heaphy, can we have Tab K.      14:20:23

16     BY MR. HWU:                                            14:20:23

17         Q.   Mr. Wang, did you know somebody at IRICO      14:20:32

18     called Yang Hong-Da?                                   14:20:34

19         A.   I don't.                                      14:20:46

20              MR. HWU:  I've marked Exhibit 8584.  It bears 14:21:04

21     the Bates numbers CHU00030303.                         14:21:09

22              (Exhibit 8584 marked for identification.)     14:21:09

23     BY MR. HWU:                                            14:21:09

24         Q.   I'm sharing my screen with Mr. Wang so he can 14:21:28

25     see it better.                                         14:21:34
```

                                                    Page 266

1          Mr. Wang, do you see this exhibit?                14:21:36

2      A.   I see it.                                         14:21:42

3      Q.   And, Mr. Wang, on the left-hand side in the      14:21:49

4  middle row, do you see Mr. Gao's business card?           14:21:57

5      A.   I see it, but I cannot be sure that's his        14:22:00

6  business card.                                            14:22:11

7      Q.   And that is IRICO's trademark on Mr. Gao's       14:22:13

8  card, correct?                                            14:22:18

9      A.   The trademark looks like IRICO's trademark.      14:22:25

10     Q.   And the card says Mr. Gao worked at IRICO        14:22:28

11  Group Company, correct?                                  14:22:36

12     A.   I do not know.  The text says what it says on    14:22:36

13  the business card.  I do not have an understanding about 14:22:59

14  this person.  I know of this person but I don't know     14:23:02

15  exactly what he did.                                     14:23:06

16     Q.   Mr. Wang, what do you know about Mr. Gao?        14:23:11

17     A.   I do not know or did not work in the same        14:23:25

18  company as he did.  I only know that he was the leader   14:23:28

19  of the import-export company.                            14:23:34

20     Q.   And the import-export company was under Group?   14:23:38

21     A.   I don't know.                                    14:23:57

22     Q.   Mr. Wang, is it your testimony you don't know    14:23:58

23  where Mr. Gao worked?                                    14:24:12

24     A.   I said that I knew he worked in another          14:24:13

25  company as the leader of an import-export company.       14:24:39

                                                   Page 267

1    Q.   But this card says -- this card shows Mr. Gao    14:24:46

2    worked at Group, correct?    14:24:51

3    A.   I don't know about this, and the way you asked    14:24:54

4    your question sounds very weird.   Whatever the text says    14:25:23

5    is what the text says.    14:25:28

6         I need to reiterate this.   I hope that you    14:25:41

7    won't ask me any more leading questions, okay?    14:25:45

8    Q.   Well, Mr. Wang, my job is to ask you    14:25:52

9    questions.   I'm not trying to ask you -- I'm trying to    14:25:55

10   ask the best questions I can, Mr. Wang.    14:25:59

11        Mr. Wang, do you see above Mr. Gao's business    14:26:14

12   card, it says "China National Electronics Import-Export    14:26:18

13   CAIHONG Co.," correct?    14:26:27

14   A.   That's what it says up there.    14:26:30

15   Q.   And you testified this was a client of    14:26:46

16   IRICO's, correct?    14:26:49

17   A.   Yes.    14:26:59

18   Q.   And you testified this company was not related    14:27:00

19   to IRICO, correct?    14:27:07

20   A.   It has been too long.   I don't remember this    14:27:09

21   clearly.    14:27:33

22   Q.   Well, Mr. Wang, you testified that CEIEC is    14:27:37

23   one of IRICO's clients, correct?    14:27:45

24        MR. LUCARELLI:   Object to form.    14:27:51

25        THE WITNESS:   It is one of the customers for    14:28:11

Page 268

| | | |
|---|---|---|
| 1 | the Sales Company. | 14:28:13 |
| 2 | BY MR. HWU: | 14:28:13 |
| 3 | Q.   Mr. Wang, did you ever sell CRTs to CEIEC? | 14:28:15 |
| 4 | A.   I'm not clear about the specific details. | 14:28:30 |
| 5 | Q.   Mr. Wang, based on your experience working at | 14:28:35 |
| 6 | Sales Company, is your testimony you don't remember | 14:28:38 |
| 7 | whether you sold CRTs to CEIEC? | 14:28:43 |
| 8 | A.   I hope that you can ask that question in a | 14:29:05 |
| 9 | different way because the way you asked it just now | 14:29:29 |
| 10 | makes me unable to answer the question.  I do not know | 14:29:33 |
| 11 | how to answer it.  The reason is that I was in charge of | 14:29:38 |
| 12 | the domestic sales and business.  A client such as this | 14:29:43 |
| 13 | one would not be my client, but I am not sure about the | 14:29:49 |
| 14 | specific details. | 14:29:53 |
| 15 | Q.   Mr. Wang, who from the Sales Company would | 14:30:02 |
| 16 | have been in charge of doing business with CEIEC? | 14:30:06 |
| 17 | A.   I do not know. | 14:30:14 |
| 18 | Q.   Or which department in Sales Company would | 14:30:26 |
| 19 | have been in charge of dealing with CEIEC? | 14:30:29 |
| 20 | A.   Actually, I was working on the domestic market | 14:30:32 |
| 21 | and I was in charge of the business dealings with TCL, | 14:31:11 |
| 22 | so regarding this part, I do not know the details. | 14:31:16 |
| 23 | Q.   Do you see on that CEIEC business card on the | 14:31:37 |
| 24 | top left, that address is the same address as Sales | 14:31:40 |
| 25 | Company's, right? | 14:31:45 |

Page 269

| | | | |
|---|---|---|---|
| 1 | A. | Yes, the same address is shown. | 14:32:01 |
| 2 | Q. | And if you look at that fax number, it says | 14:32:08 |
| 3 | | (0910) 3313101, right, Mr. Wang? | 14:32:14 |
| 4 | A. | Yes, that's what's shown. | 14:32:29 |
| 5 | Q. | And if you scroll down to Mr. Gao's business | 14:32:34 |
| 6 | | card, his fax number is also (0910) 3313101, correct? | 14:32:37 |
| 7 | | It's the same? | 14:32:46 |
| 8 | A. | The same number is shown. | 14:33:01 |
| 9 | Q. | Mr. Wang, why does IRICO Import-Export Co. | 14:33:09 |
| 10 | | share the same number as CEIEC? | 14:33:18 |
| 11 | A. | I do not know. | 14:33:30 |
| 12 | Q. | Did IRICO Import-Export Co. share the same fax | 14:33:32 |
| 13 | | machine with CEIEC? | 14:33:38 |
| 14 | A. | I don't know. | 14:33:51 |
| 15 | Q. | Based on your experience working at IRICO | 14:33:52 |
| 16 | | Sales Company, do you ever share your fax numbers with | 14:33:56 |
| 17 | | your customers? | 14:34:01 |
| 18 | | MR. LUCARELLI:  Object to form. | 14:34:07 |
| 19 | | THE WITNESS:  I don't know what you mean by | 14:34:25 |
| 20 | | share fax numbers.  I do not have a clear understanding | 14:34:28 |
| 21 | | about this. | 14:34:31 |
| 22 | | BY MR. HWU: | 14:34:31 |
| 23 | Q. | For example, Mr. Wang, you said you were in | 14:34:33 |
| 24 | | charge of selling to TCL, correct? | 14:34:36 |
| 25 | A. | Yes. | 14:34:39 |

Page 270

1       Q.    Did Sales Company have the same fax number as                 14:34:48

2    TCL?                                                                    14:34:53

3       A.    The Sales Company has the same fax number as                  14:34:54

4    TCL?                                                                    14:35:11

5             I'm not following your question.                              14:35:12

6       Q.    Mr. Wang, based on your experience in IRICO                   14:35:16

7    Sales Company, did you have the same fax number as TCL,                14:35:22

8    your client?                                                           14:35:27

9             MR. LUCARELLI:   Object to form.                              14:35:29

10            THE WITNESS:   I want to talk to the                          14:36:02

11   interpreter.                                                           14:36:03

12            I don't understand what counsel's question                    14:36:04

13   means.                                                                 14:36:06

14            What does he mean by having the same fax                      14:36:07

15   number with TCL?                                                       14:36:10

16            It's impossible for me to use the same fax                    14:36:17

17   number with TCL.                                                       14:36:20

18   BY MR. HWU:                                                            14:36:20

19      Q.    And it's impossible because they are a                        14:36:24

20   customer and you're a -- let me rephrase that.                         14:36:29

21            It's impossible because you're not the same                   14:36:34

22   company, right?                                                        14:36:37

23      A.    First of all, I still don't understand why                    14:36:37

24   you're saying that the Sales Company had the same fax                  14:37:20

25   number as TCL or they used the same fax number.                        14:37:23

                                                      Page 271

| | | |
|---|---|---|
| 1 | I simply am not following that part. | 14:37:27 |
| 2 | How is it I believe that TCL would use the | 14:37:31 |
| 3 | same fax number as the Sales Company? | 14:37:34 |
| 4 | We're not the same company.  That's the part | 14:37:36 |
| 5 | that I'm not clear about. | 14:37:39 |
| 6 | So my answer is that it's not possible for TCL | 14:37:41 |
| 7 | to have used the same fax number as our Sales Company. | 14:37:45 |
| 8 | Q.   So, Mr. Wang, CEIEC is not the same company as | 14:37:51 |
| 9 | IRICO Import-Export Company, right? | 14:37:59 |
| 10 | A.   I don't know.  I have not worked in this | 14:38:02 |
| 11 | company.  I'm not clear about that. | 14:38:22 |
| 12 | Q.   So, Mr. Wang, by "not clear," you mean you're | 14:38:26 |
| 13 | not sure if CEIEC and IRICO Import -- IRICO | 14:38:31 |
| 14 | Import-Export Co. is the same company?  One way or | 14:38:36 |
| 15 | another, you're not sure? | 14:38:41 |
| 16 | A.   It's not that I'm not sure.  I do not know.  I | 14:38:44 |
| 17 | am not with that company.  I did not work in that | 14:39:00 |
| 18 | company.  Regarding these matters that you're asking me | 14:39:04 |
| 19 | about, I do not know. | 14:39:07 |
| 20 | Q.   Mr. Wang, how is it possible that IRICO has | 14:39:22 |
| 21 | the same fax number as CEIEC, if they are two separate | 14:39:28 |
| 22 | companies? | 14:39:34 |
| 23 | A.   I don't know. | 14:39:34 |
| 24 | Q.   And if you look at the top-left business card, | 14:39:50 |
| 25 | do you see a home page, Mr. Wang, an internet home page? | 14:39:57 |

Page 272

| | | |
|---|---|---|
| 1 | A.   Yes. | 14:40:03 |
| 2 | Q.   And, Mr. Wang, is that an IRICO website? | 14:40:18 |
| 3 | A.   IRICO website?  Are you talking about the one | 14:40:24 |
| 4 | listed at the bottom? | 14:40:36 |
| 5 | Q.   Yes. | 14:40:38 |
| 6 | A.   It should be.  It should be.  Looking at the | 14:40:51 |
| 7 | format, it should be, but I have not logged on to the | 14:40:56 |
| 8 | website.  I'm not so sure. | 14:41:01 |
| 9 | Q.   Well, let's look at the middle row on the | 14:41:04 |
| 10 | left-hand side.  Let's look at Mr. Gao's card. | 14:41:09 |
| 11 | Do you see his email? | 14:41:12 |
| 12 | A.   I see it. | 14:41:13 |
| 13 | Q.   And the end of that, his email says | 14:41:24 |
| 14 | "irico.com.cn." | 14:41:30 |
| 15 | That's also an IRICO email? | 14:41:33 |
| 16 | A.   I don't know.  The email address we use is not | 14:41:45 |
| 17 | this one. | 14:41:49 |
| 18 | Q.   Mr. Wang, you testified you worked at IGE | 14:41:50 |
| 19 | during the class period, right? | 14:42:17 |
| 20 | MR. LUCARELLI:  Object to form. | 14:42:30 |
| 21 | THE WITNESS:  What did you say?  Where?  Where | 14:42:33 |
| 22 | did I work? | 14:42:43 |
| 23 | BY MR. HWU: | 14:42:43 |
| 24 | Q.   IRICO Group Electronics. | 14:42:45 |
| 25 | A.   IRICO Group Electronics -- I hope that you can | 14:43:00 |

Page 273

```
 1    BMCC-CRT000306758.  And I'll share my screen and       15:54:23

 2    maximize it so Mr. Wang can see it.                     15:54:45

 3              (Exhibit 8590 marked for identification.)     15:53:53

 4    MR. HWU:                                                15:53:53

 5        Q.   Mr. Wang, can you see the exhibit?             15:54:56

 6        A.   I see it.                                      15:55:01

 7        Q.   And this is the Mrs. Liang Yuan that we were   15:55:03

 8    just discussing, right, Mr. Wang?                       15:55:11

 9        A.   I'm not sure, but the name is the same.        15:55:17

10        Q.   Mr. Wang, you testified you worked with Liang  15:55:22

11    Yuan when she was in the export department of Sales     15:55:27

12    Company, correct?                                       15:55:32

13        A.   Whatever I said previously would be what I     15:55:48

14    said.                                                   15:55:50

15        Q.   This card says, at this time, Liang Yuan is an 15:55:51

16    employee of CNEIECC, correct, Mr. Wang?                 15:55:56

17        A.   I'm not clear about that.  The reason is that, 15:56:01

18    in the first place, we did not belong to the same       15:56:24

19    company, so I do not know.                              15:56:27

20        Q.   Mr. Wang, do you know why Group would award a  15:56:32

21    big-money award to Liang Yuan when she was a CNEIECC    15:56:36

22    employee?                                               15:56:46

23        A.   I don't know.                                  15:56:46

24              MR. HWU:  Can we go off the record for a      15:57:22

25    second?                                                 15:57:24
```

Page 291

# EXHIBIT 14

## FILED UNDER SEAL

# EXHIBIT 15

## FILED UNDER SEAL

# EXHIBIT 16

## FILED UNDER SEAL

# EXHIBIT 17



STATE of NEW YORK       )
                        )           ss:
COUNTY of NEW YORK      )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"Gang, Ding (2000, November 20). IRICO Won the Anti-Dumping Case. People's Daily. Retrieved from http://www.people.com.cn/GB/channel3/23/20001120/318925.html (Last visited on 9/14/18)"*, originally written in *Chinese*, is to the best of our knowledge and belief, a true, accurate and complete translation into *English*.

Dated: September 17, 2018

Seth Wargo
Consortra Translations

Sworn to and signed before ME this
___ day of _____,
2018.

Notary Public

JAMES G. MAMERA
Notary Public - State of New York
No. 01MA6157195
Qualified In New York County
My Comm. Expires Dec. 4, 2018

Your
legal
translation
partner

New York, NY  |  Washington, DC  |  Houston, TX  |  San Francisco, CA
Hong Kong

D☐P☐ Exhibit 8396
Deponent Zhang
Date 3/5/19  Rptr BW

7/3/2018                                                     IRICO won the anti-dumping case



GB   English   Japanese

Home > Finance > Enterprises                                              20 November 2000 02:18

## IRICO won the anti-dumping case

### Reporter   Ding Gang



The headquarters of IRICO Group Corp.

Currently, anti-dumping is one of the means commonly employed by all countries in regulating trading process, but there are indeed acts involving foreign countries' adoption of discriminatory policies and abuse of anti-dumping against China. For example, unreasonable 'surrogate country' is used as the basis of decision when calculating the dumping margin. In the face of anti-dumping, it is necessary for the government to make representations more actively to seek for the opposite party's confirmation of China's 'market economy' status as soon as possible. On the other hand, enterprises should have greater awareness of self-protection and actively respond to litigation. IRICO's way of dealing with it may inspire Chinese enterprises in this connection.
--- The Editor

In early September, China National Electronics Import & Export Caihong Co. (belonging to IRICO Group), received a notice from the European Commission notifying that anti-dumping tax would not be imposed on China-made 14-inch color cathode ray tubes (CRT). One and a half month later, the decision was passed at the European Commission meeting, marking IRICO's victory in the anti-dumping litigation.
'We have to do it even if training is needed.'
The case was initiated by Philips last June. Philips determined that dumping margin of the China-made 14-inch color CRTs was 48.4% using India as the surrogate country. Other countries being prosecuted included India and Malaysia.
On hearing the news, the first thing which came to IRICO's mind was how to respond to the litigation. Three years ago when IRICO began to expand its export, Wu Weiren, the President of the Group said at the meeting that attention must be paid to anti-dumping if IRICO was to enter the international market. This time, it was less than 10 minutes after he started listening to the report that he slapped the table and decided: 'Answer the suit! This is the first time that the Group deals with anti-dumping in its history, we have to do it even if training is needed.' After that, they hired the experienced solicitors Lucas and Wang Lei of the Brussels-based Stanbrook & Hooper as representative attorney.
This was followed by the tight schedule of preparation work for the litigation. Solicitor Wang Lei, who has handled several anti-dumping cases for Chinese enterprises as a representative agent, said, 'I was deeply moved by the IRICO people's spirit. These people, whether from the finance or sales team, actively cooperate and would come over at every summon no matter if it is the weekend or late in the night and provide the information needed in no time.'
As a state-owned enterprise, IRICO is not eligible for 'market economy status' so a surrogate country needs to be selected by the EU for price comparison. IRICO's biggest concern is being compared with India as the surrogate country because of its relatively great differences with China. As the price of IRICO is considerably high, a comparison against India would certainly result in a very high dumping margin. Relatively speaking, Malaysia is the only one of all prosecuted countries which is relatively similar to China. The solicitor requested comparison against Malaysia in his legal defense.
The solicitor then made further analysis based on the data provided by IRICO and confirmed that IRICO was the only enterprise in China which exported these kind of products to Europe with export share much less than the Eurostat data used by Philips. Pursuant to the EU regulations, dumping is determined based on dumping margin as well as whether it causes damage including higher unemployment in EU enterprises and lower profits. IRICO's export volume to Europe constituted no damage at all. Therefore, China confirmed that the case will be handled with 'no damage' as the target. Our solicitor pointed out that the color CRTs exported to Europe cost approximately US$30. The jointly-invested factory of the Philips produced with more advanced color CRT technology but it reported to customs that it cost US$26. If the price of Philips was a normal international market price, it would be unfair to deem China as dumping at the said price!
'The Chinese side made excellent comments.'
The hearing was held in Brussels on 7 March this year. After the hearing commenced, the solicitor quoted a lot of data and facts to explain that exports from IRICO constituted no damages to Philips and stated that IRICO was the only enterprise in China which exported this kind of products to Europe.
Then Liang Yuan, the representative of IRICO, analyzed the reasons for the price fall of color CRTs in the European market. She said during the investigation period of the case (1997), the sale of color CRTs from Philips surged. Its factory in Spain made minor modifications to the color CRTs manufactured in South America and exported them to the European market as locally made products. At the same time, Philips had two additional production lines in Europe. In the late investigation period, Philips' profits returned to the level of its prime years. As facts show, the price fall in the European market was associated with Philips, and export from China caused no damages.
Many European Commission officials were astonished at the Chinese side's deep knowledge of the market conditions. They continued to ask questions so the hearing was extended from the original 40 minutes to 2 hours. An official said on-site that the Chinese side made clear arguments and agreed that investigations into the related issues should continue. After the hearing, the Europe representative said, 'The Chinese side made excellent comments.'
In the several months that followed, IRICO cooperated closely with the solicitors to fight based on the merits. Eventually, the European Commission changed their mind and overruled the original decision of imposing an

7/3/2018

IRICO won the anti-dumping case

11% anti-dumping tax. As a result, IRICO satisfactorily resolved the case they had dealt with for more than one year.

It was not by chance that IRICO won the case. It reflects that the pioneering color CRT manufacturer in China is extending its footprint to the international market aggressively.

Three years ago, IRICO decided on its development strategy: To catch up with the international standard and expand export volume for shortline products; Synchronous research and development of longline products at the international level and strive to surpass them. In recent years, IRICO invested several ten million dollars in joint research and develop of new products with Tsinghua University and remarkable results have been achieved. Wu Weiren said, 'We aimed at the international market when we started to research and develop these products. For market development of new products, IRICO must actively participate in the international competition through international cooperation and the launch of premium products. This is the only way to avoid the weird loop of anti-dumping.'

People's Daily (20 November 2000 Page 9)

Related news

- Trend of anti-dumping development and policies against China (20 November 2000   01:23)
- 6 major Chinese steel enterprises were prosecuted by the US for dumping (19 November 2000   13:49)
- Philips's 'anti-dumping' plot (22 September 2000   11:14)
- In the face of anti-dumping: Who shall prosecute and who will benefit (18 September 2000   14:56)
- Ministry of Commerce of the PRC Department of Foreign Trade: Chinese enterprises should also learn to fight against dumping (18 September 2000   13:49)
- Senior management of the Philips first states their stance: Anti-dumping hurts emotion of Chinese people (5 September 2000   14:53)
- More than 10% probability to win for counter-'anti-dumping (21 August 2000   15:53)'
- Advice should be given to EU anti-dumping solicitors (23 June 2000   16:57)

 Go exchange at BBS           Tell your views in a letter

Close window

Home > Finance > Enterprise

Mirrors: USA   Japan   Education net   Technology net

About us   Site Map   Advertisement services   Contact us   Job Offer

Copyrights owned by People's Daily, reproduction or mirrors are forbidden without written authorization.

Email: info@peopledaily.com.cn
Tel: (010) 65092993
Advertisements: (010) 65091395   (010) 65092779   (010) 65092879

7/3/2018　　　　　　　　　　　　　　　　彩虹打赢了反倾销官司

人民网 people
www.people.com.cn

GB　　English　　日本语

用户注册　　新闻订阅　　个人定制　　免费邮件

检索

主页 > 财 经 > 企 业

2000年11月20日 02:18

## 彩虹打赢了反倾销官司

### 本报记者　　丁刚



反倾销是当前世界各国规范贸易程序普遍采用的手段之一，但国外确实存在着对华采用歧视政策和滥用反倾销的行为，例如，在计算倾销幅度时采用不合理的"替代国"作为裁定依据等。面对反倾销，除了政府要加大交涉力度，让对方尽早确认中国"市场经济"地位之外，企业也要强化自保意识，积极应诉。彩虹的做法或许能给我国企业以启示。
　　——编者

　　9月初，中国电子进出口彩虹公司（属彩虹集团）接到欧盟委员会通知，对原产中国的14英寸彩色显像管不征收反倾销税。一个半月之后这一决定在欧盟理事会上获得通过，这标志着彩虹打赢了这场反倾销官司。
　　"就算是练兵，也要干"
　　此案是去年6月由飞利浦发起的，飞利浦以印度为替代国，认定中国14英寸彩管的倾销幅度高达48．4％。同时被诉的还有印度、马来西亚等国。
　　听到这个消息，彩虹首先想到的就是如何应诉。三年前，彩虹开始大出口时，集团总裁吴维仁就在会上讲过，彩虹要走向国际市场，就必须关注反倾销。这一次，他听取汇报不到10分钟，就拍桌子作出了决定：."应诉！这是集团有史以来第一次应对反倾销，就算是练兵也要干。"随后，他们聘请了富有经验的布鲁塞尔史德华律师事务所的鲁夫夫和王磊为代理律师。
　　紧张的应诉准备工作开始了。曾多次为中国企业代理反倾销应诉的王磊律师说："彩虹人的精神令我们深为感动。无论是周末还是夜晚，不论是管财务的，还是管销售的，都是随叫随到，积极配合。非常迅速地拿出有关资料。"
　　因为是国企，彩虹不能获得"市场经济地位"，只能由欧盟选定一个替代国来做价格比较。彩虹最担心的就是拿印度来做替代，印度与中国差别较大，彩管价格相当，与其相比，倾销差额必然很高。比较而言，在被诉国中只有马来西亚与中国比较接近。律师进而提出法律抗辩，要求用马来西亚做替代。
　　接着，律师又根据彩虹提供的数据作了进一步分析，确定彩虹是中国唯一对欧出口此类产品的企业，出口份额要比飞利浦借用的欧洲统计局数据少得多。依据欧盟法规，倾销的认定除要看倾销幅度，还要看是否对欧盟企业造成失业增加、利润下降等方面的损害。而彩虹的对欧出口量根本不构成损害。由此，中方确定了以"无损害"为目标的应诉方案。我方律师指出，彩虹销往欧洲的彩管价格为30美元左右，而飞利浦会资厂生产的彩管技术更为先进，在亚洲海关的报价却是26美元。如果飞利浦的价格是正常的国际市场价格，而中国的价格却被视为倾销，哪里还有公正可言！
　　"中方的发言太精彩了"
　　今年3月7日，听证会在布鲁塞尔举行。听证会开始后，律师列举了大量数据和事实，说明彩虹的出口对飞利浦无损害，并指出彩虹是中国唯一对欧出口此类产品的企业。
　　接着，律师又代表彩援还分析了欧洲市场上彩管价格下跌的原因。她说，在本案调查期内（1997年），飞利浦彩管销量猛增，其在西班牙的一家工厂对南美生产的彩管做偷小改动就算作本地生产，投放欧洲市场。同时，飞利浦在欧洲还增加了两条生产线。调查期最后一段时间，飞利浦赢利回到了最好年份的水平。事实表明，欧洲市场价格下跌与飞利浦有关，中国口并未造成损害。
　　中方对市场情况如此了解，使不少欧委会官员深感意外。他们不断提问，使预计40分钟的听证延长至两个小时。有官员当场称中方论点清楚，并同意就有关问题继续调查。欧方代表会后称赞说："中方的发言太精彩了。"
　　在以后的几个月里，彩虹又与律师紧密合作，据理力争，最终使欧委会改变了初裁征收

7/3/2018

彩虹打赢了反倾销官司

11%反倾销税的决定。至此，彩虹一年多的应诉有了圆满结果。

彩虹的胜诉并不是偶然的，它从侧面反映出，这个中国彩管生产的老大正在雄心勃勃地向国际市场推进。

三年前，彩虹集团确定了发展战略：短线产品赶上国际水平，扩大出口；长线产品的研发与国际水平同时起步，争取领先。彩虹近年来投入了数千万元，与清华大学合作开展新品研究与开发，成果显著。吴维仁总裁说："一开始研制这些产品，我们就盯着国际市场。在新品的市场开发方面，彩虹要拿出拳头产品，通过加强国际合作积极参与国际竞争，这样才能摆脱总被反倾销的怪圈。"

《人民日报》 （2000年11月20日第九版）

 相 关 新 闻

- 对华反倾销的发展趋势及对策(2000年11月20日 01:23)
- 6家中国主要钢铁企业被美起诉倾销(2000年11月19日 13:49)
- 飞利浦的"反倾销"阴谋(2000年09月22日 11:14)
- 面对反倾销：谁应诉谁受益(2000年09月18日 14:56)
- 外经贸部：中国企业亦应学会反倾销(2000年09月18日 13:49)
- 飞利浦高层首次表态：反倾销伤害中国人感情(2000年09月05日 14:53)
- 反"反倾销"不止一成胜算(2000年08月21日 15:53)
- 应对欧盟反倾销欧洲律师提建议(2000年06月23日 16:57)

到BBS交流　　　　写信谈感想

关闭窗口

主页 ﹥ 财 经 ﹥ 企业

镜像：　美国　日本　教育网　科技网

关于我们　　本站导航　广告服务　联系我们　　招聘信息

人 民 日 报 社 版 权 所 有 ，未 经 书 面 授 权 禁 止 复 制 或 建 立 镜 像 。

Email: info@peopledaily.com.cn
电话：(010) 65092993
广告：(010)65091395  (010)65092779  (010)65092879

# EXHIBIT 18

## FILED UNDER SEAL