1  MARIO N. ALIOTO, ESQ. (56433)
   LAUREN C. CAPURRO, ESQ. (241151)
2  TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
   2001 Union Street, Suite 482
3  San Francisco, CA 94123
   Telephone: (415) 563-7200
4  Facsimile:  (415) 346-0679
   E-mail:      malioto@tatp.com
5                 laurenrussell@tatp.com
6
7  *Lead Counsel for the Indirect-Purchaser Plaintiffs*

8

9

10                 **UNITED STATES DISTRICT COURT**

11              **NORTHERN DISTRICT OF CALIFORNIA**

                      **OAKLAND DIVISION**
12
   IN RE CATHODE RAY TUBE (CRT)        )   MDL NO. 1917
13 ANTITRUST LITIGATION                )
                                       )   Case No. 07-cv-5944-JST
14 ─────────────────────────────────── )
   This Document Relates to:           )   **INDIRECT PURCHASER PLAINTIFFS'**
15                                      )   **OPPOSITION TO IRICO GROUP**
   Indirect Purchaser Class Action     )   **CORPORATION AND IRICO DISPLAY**
16                                      )   **DEVICES CO., LTD.'S MOTION FOR**
                                       )   **SUMMARY JUDGMENT**
17                                      )
                                       )   Hearing Date:  November 9, 2023
18                                      )   Time: 2:00 p.m.
                                       )   Courtroom: 6, 2nd Floor
19                                      )
                                       )   The Honorable Jon S. Tigar
20                                      )
                                       )
21 ─────────────────────────────────── )
22

23

24            **[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]**
25

26

27

28

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

    I.   IRICO'S CONTACTS WITH THE RELEVANT STATES ...............................2

        A.  Plaintiffs Bought Goods Containing Price-Fixed CRTs in the Relevant States ............2

        B.  The Conspiracy Harmed Class Members in Each State ..................................2

        C.  U.S. Consumers Bought Televisions Containing Irico CRTs from U.S. Retailers with Stores in Every State .......................................2

    II.  IRICO PARTICIPATED IN THE CRT CONSPIRACY PRIOR TO AUGUST 1998.......4

    III. CHINA'S PRICE LAW AND THE PRICING DOCUMENTS.........................7

        A.  The Price Law ........................................................................8

        B.  The "1998 Notice" ................................................................8

        C.  The 1999 and 2000 "Pricing Documents" .................................9

STANDARD OF REVIEW ..................................................................................................10

ARGUMENT .........................................................................................................................11

    I.   APPLICATION OF EACH STATE'S LAW IS CONSTITUTIONAL ..........11

        A.  Irico Group Lacks Due Process Rights .....................................11

        B.  Application of Each State's Law Comports with Due Process....................12

    II.  IPPS' EVIDENCE OF INTRASTATE ACTIVITY SATISFIES STATE-LAW REQUIREMENTS..................................................16

    III. A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO IRICO'S PARTICIPATION IN THE CONSPIRACY PRIOR TO AUGUST 5, 1998....................18

        A.  The Evidence Shows Irico's Participation in the Conspiracy Prior to August 5, 1998 ....................................................18

        B.  Even If Irico Joined the Conspiracy After August 5, 1998, It is Still Liable for Conduct that Occurred Before it Joined.....................20

    IV. IPPS CAN RECOVER DAMAGES UNDER NEW YORK LAW FOR PURCHASES BEFORE DECEMBER 23, 1998 .........................21

    V.  THE "INTERNATIONAL COMITY DOCTRINE" DOES NOT REQUIRE DISMISSAL OF IPPS' CLAIMS ..........................................22

        A.  The International Comity Doctrine.............................................22

        B.  There Is No True Conflict Between U.S. Antitrust Law and Chinese Law................24

        C.  *Vitamin C* Is Distinguishable .................................................27

D.  Even if the Court Considers the Other *Timberlane* Factors, Those Factors Do Not Support the Grant of Summary Judgment on Irico's Comity Defense ........................28

CONCLUSION ..........................................................................................................................30

INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO IRICO'S MOTION FOR SUMMARY JUDGMENT
MDL No. 1917; Case No. 07-cv-5944-JST

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF AUTHORITIES**

Page(s)

Cases

*Allstate Ins. Co. v. Hague*,
  449 U.S. 302 (1981) ............................................................................................... 12, 14

*Altmann v. Republic of Austria*,
  142 F. Supp. 2d 1187 (C.D. Cal. 2001) .................................................................. 12

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................... 11, 19

*Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*,
  480 U.S. 102 (1987) ............................................................................................... 14

*AT & T Mobility LLC v. AU Optronics Corp.*,
  707 F.3d 1106 (9th Cir. 2013) ............................................................................... 12

*Avalos v. Baca*,
  No. CV-05-07602 DDP SHX, 2006 WL 2294878 (C.D. Cal. Aug. 7, 2006) ........................ 10

*Beaver v. Inkmart, LLC*,
  No. 12-60028, 2012 WL 4005970, (S.D. Fla. Sept. 12, 2012) ................................. 17

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
  620 F.2d 1360 (9th Cir. 1980) ............................................................................... 11

*Bristol Window & Door, Inc. v. Hoogenstyn*,
  650 N.W.2d 670 (Mich. Ct. App. 2002) ................................................................. 17

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ............................................................................................... 14

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986) ............................................................................................... 27

*Carnival Corp. v. Rolls-Royce PLC*,
  No. 08-23318, 2009 WL 3861450 (S.D. Fla. Nov. 17, 2009) ................................. 17

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ............................................................................................... 19

*Cruz v. United States*,
  387 F. Supp. 2d 1057 (N.D. Cal. 2005) ................................................................. 12

iii

*Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*,
 752 So. 2d 582 (Fla. 2000)..................................................................................... 16

*Five for Entertainment v. Rodriguez*,
 877 F. Supp. 2d 1321 (S.D. Fla. 2012) .................................................................. 17

*Hartford Fire Ins. Co. v. California*,
 509 U.S. 764 (1993)........................................................................................... 23, 24

*In re Auto. Parts Antitrust Litig.*,
 50 F. Supp. 3d 836 (E.D. Mich. 2014)................................................................... 13

*In re Auto. Parts Antitrust Litig.*,
 No. 12-MD-02311, 2015 WL 1849138 (E.D. Mich. Apr. 22, 2015)....................... 13

*In re Auto. Parts Antitrust Litig.*,
 12-MD-02311, 2015 WL 13834708 (E.D. Mich. May 1, 2015) ............................ 16

*In re Broiler Chicken Antitrust Litig.*,
 290 F. Supp. 3d 772 (N.D. Ill. 2017) ..................................................................... 15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
 No. C-07-5944 SC, 2013 WL 4505701 (N.D. Cal. Aug. 21, 2013) ....................... 13

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
 No. C-07-5944 SC, 2014 WL 1091589 (N.D. Cal. Mar. 13, 2014)....................... 13

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
 No. 07-MD-1827 SI, 2014 WL 2905131 (N.D. Cal. June 26, 2014) ................... 12, 13, 14, 16

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
 No. C-07-5944 JST, 2016 WL 5725008 (N.D. Cal. Sep. 30, 2016)...................... 15, 28, 29, 30

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
 No. C-07-5944 JST, 2017 WL 5957654 (N.D. Cal. Feb. 27, 2017)................................. 11, 20

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
 No. C-07-5944 JST, 2018 WL 659084 (N.D. Cal. Feb. 1, 2018)........................................ 18, 20

*In re Digital Music Antitrust Litig.*,
 812 F. Supp. 2d 390 (S.D.N.Y. 2011)..................................................................... 17

*In re Flonase Antitrust Litig.*,
 692 F. Supp. 2d 524 (E.D. Pa. 2010) ...................................................................... 17

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1001 (N.D. Cal. 2007) ................................................................. 22

*In re High-Tech Emp. Antitrust Litig.*,
   856 F. Supp. 2d 1103 (N.D. Cal. 2012) ............................................................. 20, 21

*In re Intel Corp. Microprocessor Antitrust Litig.*,
   496 F. Supp. 2d 404 (D. Del. 2007) ....................................................................... 15

*In re K-Dur Antitrust Litig.*,
   338 F. Supp. 2d 517 (D.N.J. 2004) ........................................................................ 20

*In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*,
   172 F. Supp. 3d 724 (D.N.J. 2016) ........................................................................ 22

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
   710 F. Supp. 152 (E.D. Pa. 1989) .......................................................................... 20

*In re Magnesium Oxide Antitrust Litig.*,
   No. 10-cv-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011) ................................. 18

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   350 F. Supp. 2d 160 (D. Me. 2004) ................................................................. 15, 18

*In re OSB Antitrust Litig.*,
   No. 06-cv-826, 2007 WL 2253425 (E.D. Pa. Aug. 3, 2007) ................................. 16

*In re Packaged Seafood Products Antitrust Litig.*,
   No. 15-MD-2670 DMS (MDD), 2023 WL 3046073 (S.D. Cal. April 21, 2023) .................... 20

*In re Pork Antitrust Litig.*,
   495 F. Supp. 3d 753 (D. Minn. 2020) ............................................................. 16, 17

*In re Processed Egg Prods. Antitrust Litig.*,
   851 F. Supp. 2d 867 (E.D. Pa. 2012) .................................................................... 18

*In re Simon*,
   153 F.3d 991 (9th Cir. 1998) ................................................................................. 24

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   580 F. Supp. 2d 896 (N.D. Cal. 2008) .................................................................. 16

*In re Tableware Antitrust Litig.*,
   484 F. Supp. 2d 1059 (N. D. Cal. 2007) ............................................................... 11

*In re TFT LCD (Flat Panel) Antitrust Litig.*, No. 12-CV-4114 SI,
  2013 WL 3387652 (N.D. Cal. July 8, 2013)..................................................... 19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 10-4572 SI,
  2013 WL 6174683 (N.D. Cal. Nov. 20, 2013) .................................................. 13, 16

*In re Vitamin C Antitrust Litig.*,
  8 F.4th 136 (2d Cir. 2021) ............................................................................ 24, 28

*Indus. Bldg. Materials, Inc. v. Interchemical Corp.*,
  437 F.2d 1336 (9th Cir. 1970) ...................................................................... 20

*Millennium Communications & Fulfillment, Inc. v. OAG*,
  761 So. 2d 1256 (Fla. Dist. Ct. App. 2000) .................................................. 17

*Mujica v. AirScan Inc.*,
  771 F.3d 580 (9th Cir. 2014) ........................................................................ 23, 24

*Nissan Fire & Marine Ins. Co. v. Fritz Cos. Inc.*,
  210 F.3d 1099 (9th Cir. 2000) ...................................................................... 10

*Olsen by Sheldon v. Gov't of Mexico*,
  729 F.2d 641 (9th Cir. 1984) ........................................................................ 14

*Ortega v. Flores*,
  No. 19-CV-00319-HSG, 2023 WL 4771178 (N.D. Cal. July 26, 2023) ................ 11

*PLS.COM, LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) ......................................................................... 27

*Timberlane Lumber Co. v. Bank of Am., N.T. & S.A.*,
  549 F.2d 597 (9th Cir. 1976) ........................................................................ 23

*Town of Southampton v. New York State Dep't of Env't Conservation*,
  39 N.Y.3d 201 (N.Y. 2023) ........................................................................... 21

*Vitolo v. Dow*,
  634 N.Y.S.2d 362 (N.Y. Sup. Ct. 1995) ........................................................ 22

*Zhaoyin Wang v. Beta Pharma, Inc.*,
  No. 3:14-CV-01790 (VLB), 2015 WL 5010713 (D. Conn. Aug. 24, 2015) ............ 29

Statutes

Ariz. Rev. Stat. § 44–1402.................................................................................. 16
Cal. Bus. & Prof. Code § 17043 ......................................................................... 27
Mich. Comp. Laws § 445.772, 771(b) ................................................................ 17

N.D. Cent. Code § 51–08.1–01 ................................................................................ 18

N.Y. Gen. Bus. Law § 340(6) ........................................................................... 21, 22

N.Y. Gen. Bus. Law §§ 349 .................................................................................... 22

<u>Rules</u>

Fed. R. Civ. P. 56(a) ............................................................................................... 10

INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO IRICO'S MOTION FOR SUMMARY JUDGMENT
MDL No. 1917; Case No. 07-cv-5944-JST

The Indirect Purchaser Plaintiffs ("IPPs") submit this Opposition to the Motion for Summary Judgment, ECF No. 6225 (the "Motion") filed by Defendants Irico Group Corp. ("Group") and Irico Display Devices Co., Ltd. ("Display") ("Irico" or the "Irico Defendants").

## INTRODUCTION

Irico does not dispute that there is sufficient evidence of its participation in the conspiracy for this case to go to trial. Instead, it seeks summary judgment based on unfounded due process and international comity arguments. The Court could deny this Motion as a sanction for Irico's failure to preserve and produce documents and testimony as outlined in IPPs' motion for sanctions currently pending before Judge Walker, attached as Exhibit 1 to the Alioto Declaration. However, the Court need not reach the spoliation issue because Irico's Motion fails on the merits.

First, its due process argument is wrong as a matter of law. Class Representatives in every state at issue purchased a product containing a CRT manufactured by a conspirator. This alone is sufficient to constitutionally apply each state's law. But the evidence goes further and demonstrates that Irico and its co-conspirators targeted the U.S. market with the intent of raising prices in every state, and that televisions containing Irico CRTs were sold in every state at issue.

Second, Irico cannot meet its burden to demonstrate that there is no genuine issue of material fact with regard to Irico's conspiratorial conduct prior to August 1998. In any event, even if Irico joined the conspiracy after August 1998, it is still liable for conduct that occurred before it joined the conspiracy. Irico's claims that IPPs cannot recover damages under New York law for purchases prior to December 23, 1998 is also misplaced because IPPs bring claims not only under the Donnelly Act, but also under the New York Deceptive Practices Act.

Finally, Irico's 'international comity" argument must be rejected.  There is no "true conflict" between Chinese and U.S. law. Neither Chinese law nor the Chinese government required Irico to participate in the CRT price-fixing cartel or mandated the prices to be charged for Irico's products. Chinese law did not impose duties on Irico that were incompatible with U.S. law.

For these and all the reasons further explained below, Irico's Motion should be denied, and the case should proceed to trial on February 24, 2024. *See* ECF No. 6236.

1

## STATEMENT OF FACTS

2

**I.     IRICO'S CONTACTS WITH THE RELEVANT STATES**

3

### A.     Plaintiffs Bought Goods Containing Price-Fixed CRTs in the Relevant States

4

Irico moves for summary judgment on due process grounds with respect to all of the

5

jurisdictions under whose laws IPPs bring claims except California and Nevada. Motion at 6-9.

6

For each of the states at issue, it is undisputed that a Class Representative purchased a television

7

or computer monitor containing a CRT manufactured by a Defendant during the class period. *See*

8

ECF No. 6267 (Stipulation and Order Regarding Pls.' Facts For Trial).

9

### B.     The Conspiracy Harmed Class Members in Each State

10

Evidence demonstrates that class members were injured in each state at issue. IPPs' expert

11

economist, Dr. Janet S. Netz Ph.D., concluded that millions of class members in all 22 indirect

12

purchaser states were harmed by the CRT conspiracy because the unlawful overcharges on CRTs

13

were passed on to consumers in those states through higher prices for televisions and computer

14

monitors.[1] Further, Dr. Netz estimates that $17.5 billion of the revenue Defendants and their co-

15

conspirators enjoyed from CRT sales is attributable to class members' purchases in those 22 States.

16

*Id*. Ex. 1 at 121-23 & Ex. 80. Dr. Netz estimates that "[t]he cartel imposed damages of $2.8 billion

17

on class members" in these states. *Id.* ¶ 10, Ex. 2 (adopting prior opinions and calculations).

18

### C.     U.S. Consumers Bought Televisions Containing Irico CRTs from U.S. Retailers with Stores in Every State

19

20

The evidence clearly demonstrates that Irico knew that its Chinese television manufacturer-

21

customers were selling televisions containing Irico's CPTs to customers in the United States. For

22

example, TCL—one of Irico's major customers[2]—manufactured televisions containing Irico CPTs

23

for sale in the U.S. as an OEM for Philips, including a specific Philips television model,

24

"14MS2331/17 RF." *Id.* Exs. 4-5. Philips, Best Buy and Circuit City data confirm U.S. sales of

25

---

26

[1] *See* Decl. of Janet S. Netz, filed herewith ("Netz Summ. J. Decl."), ¶ 9, Ex. 1 (Expert Report of Janet S. Netz, Ph.D., Apr.15, 2014) at 1-2, 72-96, 111-18 & Exs. 57-78.

27

[2] Decl. of Mario N. Alioto ("Alioto Decl."), Ex. 2 at p.8; *id.* Ex. 3 at 8-9.

28

INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO IRICO'S MOTION FOR SUMMARY JUDGMENT
MDL No. 1917; Case No. 07-cv-5944-JST

this television model in 49 states plus the District of Columbia.[3] Another of Irico's major customers, Changhong,[4] was the "Apex Brand OEM" for Wal-Mart and Circuit City using CPTs from "all China vendors" for sale to U.S. consumers. *Id.* Ex. 8, Slides 4 & 7. *See also, e.g.*, Alioto Decl. Exs. 11-13. In addition, an Insignia (Best Buy brand) television "ISTV040919" containing Irico CPTs was sold in 49 states and the District of Columbia.[5] Two "Haier America" manuals also show that televisions containing Irico CPTs were sold in the U.S. Alioto Decl. Exs.15-17.

"Information Weekly" reports found in Chunghwa's production—which Irico admits were authored by its employees (*id.* Exs. 18 & 22)—confirm that Irico *knew* its customers were selling televisions containing its CPTs to U.S. customers.[6] Indeed, when a CRT television was intended for sale in the U.S., the CPTs had to be compatible with U.S. broadcasting and safety standards, which required adjustments to Irico's manufacturing process and were reflected in the model number.[7] Irico also acknowledged in a "Global Offering" prospectus published by Irico Electronics on December 8, 2004, that its "major customers" were the subject of an April 2004 U.S. anti-dumping order. *Id.* Ex. 25 at 33; *see also id.* Ex. 26.

Finally, the evidence shows that the sales of Irico's CRTs and products containing Irico's CRTs to the U.S. were no accident. Irico targeted the United States market. *See, e.g.*, *id.* Exs. 27-30. It sought and received United States U.L. safety certification for its CRTs (*id.* Exs. 31-34) and designed its CRTs to meet the preferences of U.S. consumers. *Id.* Ex. 35. Irico Group also formed Irico (USA), Inc. as a California corporation on July 5, 1995 (*id.* Ex. 36) to "expand provincial

---

[3] *See* Netz Summ. J. Decl. ¶¶ 3-8; Alioto Decl. Exs. 6-10.

[4] *Id.* Ex. 3 (showing Irico sales to Changhong of over $1 billion during the Class Period).

[5] *Id.* Exs. 14 & 15 (Insignia television manual shows an Irico CPT). Best Buy sales data shows this television was sold in 49 states and D.C. Netz Summ. J. Decl. ¶ 6.

[6] *Id.* Ex. 19 at CHU00124397E ("For 21"PF (new AK) produced for exporting to the United States, preparations for the early stage are being intensified."). *See also* Exs. 20 - 21.

[7] *Id.*, Ex. 23 (Li Miao Dep. Tr. (Vol. III) at 245:8– 247:1, 249:14 - 254:16) (testifying that tubes had different model numbers and product specifications for NTSC and PAL broadcasting standards, and that customers had to provide the specifications and safety standard); *see also id.* Ex. 24 (referring to U.S. ATSC broadcasting standard); Netz Summ. J. Decl. Ex. 1 at 74.

exports of electromechanical products to North America and deepen trade, investments, and cooperation between China and the U.S." *Id*. Ex. 37 at 10. From 1996 through 1999, Irico sold millions of dollars' worth of Irico-brand CRTs and CRT televisions, monitors, and components to Irico USA and other U.S. customers through its joint venture partner, China National Electronics Import & Export Caihong Company ("CNEIECC"). *See, e.g.,* Exs. 38-42. CNEIECC's "actual assets, personnel, and business all belong[ed] to Irico Group Corporation[,] and it "serve[d] as Irico Group Corporation's import and export business management department." *Id*. Ex. 43; *see also id*. Ex. 44 (organization chart showing CNEIECC as a "wholly owned company" of Group).[8]

## II.    IRICO PARTICIPATED IN THE CRT CONSPIRACY PRIOR TO AUGUST 1998

Contrary to Irico's claims, its August 5, 1998 meeting with Chunghwa, which was the first recorded "Mainland China *CDT* Maker meeting" (Alioto Decl. Ex. 45) was not Irico's initiation into the CRT conspiracy.

Indeed, Irico's minutes for a July 10, 1995 "Administrative Meeting," state that, "The CRT Industry Association will be holding a preparatory meeting in Beijing on July 17, and the founding meeting will be held in early August." *Id*. Ex. 46. The CRT Industry Association—also referred to as the "China CPT Industry Association,"[9] the "Color Tube Industry Association," and "Eight Major Color Tube Industry Association"[10]—was a trade association of Chinese *CPT* manufacturers, *i.e.*, color picture tubes (CPTs) for televisions, as opposed to color display tubes (CDTs) for monitors. The meetings of the CRT Industry Association were separate from the

---

[8] Irico attempts to dismiss these documents as "mistaken," but, "What possible motivation could someone have had to sit in a room and say, 'I know what I'll do. I'll put CNEIECC in an org. chart where it doesn't belong'?" ECF No. 5503 (May 30, 2019 Hearing Tr. at 9:21 – 10:15).

[9] *Id.* Ex. 47 at 7-8 (referring to the "China CPT Industry Association").

[10] *See, e.g.*, *id.* Ex. 48 █████████████████████████████████████
████████████████████ *id.* Ex. 49 ██████
███████████████████████████████████████████ *id.* Ex. 50 (July 19, 1999 Chinese news article reporting that "eight major CRT companies" agreed to stop CRT production for in June 1999).

1    "China *CDT* Maker Meetings" documented by employees of Chunghwa's Fuzhou factory, which

2    began on August 5, 1998,[11] and were focused on CDTs for computer monitors.[12]

3         Chunghwa was not a part of these pre-1998 China CPT Industry Association Meetings. It

4    was not invited to attend the China CPT Industry Association meetings until 2006-2007, and their

5    documents show that Chunghwa was previously unaware of those meetings.[13] Thus, Irico cannot

6    rely on Chunghwa's first China CDT Maker Meeting on August 5, 1998 or J.S. Lu's testimony to

7    argue they did not participate in the CRT conspiracy prior to that date. Motion at 13.

8         Irico's Wang Zhaojie has admitted to attending many meetings of the CRT Industry

9    Association.[14] He acknowledged that the other attendees were Irico's competitors, and that the

10   competitors exchanged CRT production and other market information. *Id.* Ex. 54 (Wang Zhaojie

11   Dep. Tr. (Vol. I)) at 69:15-74:11). Numerous meeting reports produced by other Defendants show

12   that the attendees—including Irico—reached anticompetitive agreements on CPT pricing and

13   production levels.[15]

14        Furthermore, Irico's "Administrative Meeting" reports demonstrate that the China CRT

15   Industry Association's anti-competitive purpose existed from its founding in 1995. For example,

16   another CRT Industry Meeting document produced by Chinese defendant Beijing Matsushita

17

18   [11] *See, e.g.*, Decl. of Evan J. Werbel, ECF No. 6226 (Werbel Decl.") Ex. 5. "CPTF" refers to
     Chunghwa's Fuzhou factory in China. Alioto Decl. Ex. 22 (Wang Zhaojie Dep. Tr. (Vol. II)) at
19   178:3-24).

20   [12] *See, e.g.*, *id.* Exs. 51 - 52 (examples of reports for "China *CDT* Maker Contact Meetings").

21   [13] *See, e.g., id.* Ex. 53 (CHU00725770-72E) (Chunghwa report on "Mainland China Color Tube
     Industry Association" meeting dated July 20-21, 2006: "After a period of interaction, it was
22   learned that the Mainland China color tube industry also has industry meetings similar to *GSM*
     [Glass Meetings] in Southeast Asia. After contacts and negotiations, we were allowed by the other
23   parties to attend the meeting"). *See also id.* Exs. 55-56 ("Color Tube Industry Association" report
     showing that Chunghwa Fuzhuo was only invited to attend in early 2007).

24   [14] *Id.* Ex. 54 (Wang Zhaojie Dep. Tr. (Vol. I)) at 67:13-15); *id.* Ex. 47 at 7-8 (admitting that Wang
25   Ximin, Chairman of Irico Display, also attended China CPT Industry Association meetings).

26   [15] *See id.* Exs. 55 ███████████████████████████████████████
     ███████████████████████████ *id.* Ex. 56 ████████████████████████
27   ███████████████████████████████████████████████████████████████
     ████████████████████████████ *see also id*. Exs. 48-49.

28

Color CRT Co., Ltd. ("BMCC"), is entitled "December CRT Industry Meeting Exchange," and signs off with "Irico Group Sales Company, November 30, 1995" (Werbel Decl. Ex. 48), indicating it was drafted by Irico and sent to BMCC in preparation for the meeting. Mr. Wang admitted that Irico's sales department referred to itself as "Irico Group Sales Company," but denied any knowledge of this document or the December 1995 meeting.[16] The content of the document likewise indicates it was drafted by Irico. It contains Irico's CPT production, sales, and inventory for 1995, as well as Irico's *planned future production* for 1996, and its planned export volumes. Werbel Decl. Ex. 48. Thus, Irico was sharing its confidential future production information with its competitor, BMCC (and likely with the other meeting attendees) in or around November or December 1995.[17] The last paragraph states, "we hope our CRT industry peers will unite, act in concert, and face our foreign enemies together." Werbel Decl. Ex. 48 at '91E.

The anticompetitive purpose of the CRT Industry Association Meetings in the mid-late '90s is further confirmed by BMCC's notes of a January 4, 1996 CRT Industry Association meeting where the participants agreed "[b]efore April 1, there will be no price reduction for CPT."[18] Likewise, Irico's minutes for an internal meeting on December 11, 1997 reported, "An industry meeting was held last week, and all tube makers set the price of 21" [CPTs] at RMB620." Werbel Decl. Ex. 50 at '36E. Another Irico Administrative Meeting report dated December 31, 1997, states, "An industry meeting will be held on the 4th day [of next month] . . .." *Id.* Ex. 51 at '42E. In other words, another CRT Industry Association meeting was to be held on January 4, 1998—one month after the last meeting.[19] Wang Zhaojie's reimbursement request for travel on

---

[16] Alioto Decl. Ex. 54 (Wang Zhaojie Dep. Tr. (Vol I) at 81:20 – 83:1).

[17] *See also* Werbel Decl. Exs. 11-43 (BMCC documents dated 1995- 1997 show that BMCC was in possession of Irico's and other Chinese competitors' detailed CRT production, inventory, sales, and export data, including future production plans). The references to "4400" or "Xianyang 4400" in these documents refer to Irico. *See* Alioto Decl. Ex. 57.

[18] *Id.* Ex. 49 (at '87-88E) (Irico also states, "it is definitely impossible to reduce the price of 21", at least not for now.").

[19] *See also* Alioto Decl. Ex. 58 (Dec. 1, 1998 meeting minutes state that the CRT Industry Meetings were held once each month).

January 3, 1998—the day before the January 4, 1998 meeting—shows that he met and had a meal with "Chief Jin" of "Huafei Tech." Alioto Decl. Ex. 59. Mr. Wang confirmed that Huafei is another of Irico's Chinese CRT competitors that attended the CRT Industry Association Meetings.[20]

Finally, there is also evidence that Irico was in regular contact with its CRT competitors during this pre-August 1998 period. For example, an August 12, 1997 "Administrative Meeting" reports an Irico visit to Taiwan to visit five companies, including its competitor Chunghwa. *Id.* Ex. 60 (". . .Taiwan can be a good cooperation partner."). Similarly, a May 15, 1998 Administrative Meeting reports Ma Jinquan's meeting with Chunghwa at its new Fuzhuo factory during which he gathered confidential information regarding Chunghwa's CDT capacity and production. Werbel Decl. Ex. 46. This meeting was likely a precursor to the first "China CDT Maker Meeting," which took place 2.5 months later. Irico was also in regular contact with defendant Toshiba Corporation during this period. *Id.* Ex. 27 at '61E; *see also* Werbel Decl Ex. 45. Irico's attendance at monthly meetings of the China CRT Industry Association—most of whose members were subsidiaries of the Glass Meeting attendees[21]— together with the evidence of Irico's competitor meetings prior to August 1998, also demonstrate that Irico would have been well-versed in the operation of the global CRT conspiracy prior to the August 5, 1998 meeting.

## III.   CHINA'S PRICE LAW AND THE PRICING DOCUMENTS

Irico argues that under China's Price Law (the "Price Law") and subsequent regulations and Notifications issued during the years 1998-2000 (collectively labeled by Irico's expert witness, Professor Clarke, as the "Pricing Documents"), it was "bound" to "government-mandated pricing measures and coordination of CRT prices." Motion at 17. Not so. No law or government edict required Irico to collude with its competitors.

---

[20] *Id.* Ex. 54 (Wang Zhaojie Dep. Tr. (Vol. I) at 102:19 – 108:21).

[21] *See id.* Exs. 53, 55, 56 (listing CRT Industry Association members). Defendant Panasonic and later MTPD owned a 50% share in BMCC. *Id.* Ex. 61 (at Slide 6). Defendant Philips owned 55% of Nanjing Huafei. *Id.* Ex. 62 (at Slide 25). Samsung SDI had two subsidiaries in Shenzhen and Tianjin. *Id.* Ex. 63. ███████████████████████████████ *Id.* Ex. 64. Finally, Thomson Guangdong was a subsidiary of defendant Thomson S.A. *Id.* Ex. 65.

1

2      **A.      The Price Law**

3          The Price Law, enacted in 1997, concerns the pricing of "commodities," defined as "all

4      kinds of visible products and invisible assets," and services. Werbel Decl., Ex. 55, Art. 2. It

5      provides that, except for an "extremely small number" of unidentified "commodities vital for the

6      development of the economy and people's life" (*Id.*, Art. 18), whose prices will be "government-

7      guided" or "government-set," the prices of ***all other*** products and services "shall be the market-

8      regulated prices," which shall be "practiced and determined autonomously by the operators." *Id.*,

9      Arts. 3, 6. Article 14 identifies eight types of "unfair price acts." The very first is "manipulation

10     of market price in collusion."[22]

11     **B.      The "1998 Notice"**

12         Irico also relies on a November 1998, "Notification" issued by the State Planning Council

13     ("SPC") and the State Economic and Trade Commission ("1998 Notice"), to which regulations

14     concerning the Price Law (the "Regulations") are attached.   Werbel Decl., Ex. 56, App'x 2. The

15     1998 Notice instructs manufacturers to "… participate in market competition with open, fair and

16     legitimate prices." *Id.,* at Art. 9.  The gravamen of the Regulations is to prevent "dumping"—*i.e.,*

17     selling at prices below a company's costs.[23]  Article 4 defines "unfair price actions through

18     dumping" as the "actions of a business operator to expel competitors or monopolizing the market,

19     such as a production enterprise sells industrial products at prices *lower than the enterprise's*

20

21
_____

22     [22] The State Planning Commission emphasized the illegality of price collusion in a later document
       entitled, "Notice of the State Planning Commission on Earnestly Stopping Price Dumping and
23     Carrying Out Inspection of Price Dumping, January 16, 1999," (the "1/16/99 Notice") stating, at
       ¶ 5: "The collusion between companies for price monopoly and oppression of other competitors,
24     or artificial inflation of prices for seeking interests shall be stopped…." Werbel Ex. 59.

25     [23] *See* Netz Summ. J. Decl. Ex. 3 at 6 ("In general, it appears that the purpose of the regulations is
       to prevent 'dumping' – pricing of products below cost – in order 'to protect fair, open and
26     legitimate market competition, to maintain a normal price order, and to safeguard legitimate rights
       and interests of business operators and consumers.'"). *See also* Alioto Decl. Ex. 66 (Expert Report
27     of Henry Gao ("Gao Report")) at ¶¶ 7(a), 8-33 ("The Pricing Documents prohibit manufacturing
       firms from … selling products at prices lower than a manufacturer's own production costs.").

28

1    *production costs....*" (emphasis added). Article 5 identifies eight "unfair price actions," which all

2    involve selling products at prices below its own costs.

3         The 1998 Notice provides that if a manufacturer "sells industrial products at prices lower

4    than industrial average production costs to disrupt the production and operation orders and harm

5    rights and interests of other business operators," any person or organization can complain, and if

6    a complaint is received, the relevant government department "*may* conduct an action to determine

7    whether those are indeed dumping actions." *Id.* at Art. 10 (emphasis added).[24] If the enterprise is

8    then found to have committed one of the "unfair pricing actions" flagged in the Regulations—

9    again, all of which involve selling for prices below **its own** costs—sanctions can be imposed. *Id*

10   .at Art. 12.[25] But as the 1/16/99 Notice, which interpreted the Regulations, makes clear,

11   "[c]ompanies selling below the average cost of the industry, but not below their own costs, shall

12   not be punished for price dumping." 1/16/99 Notice (Werbel Decl. Ex. 59), ¶ 5.[26]

13        C.    **The 1999 and 2000 "Pricing Documents"**

14        While the Price Law and 1998 Notice were applicable across industries, the SPC and/or

15   the Ministry of Information Industry ("MII"), in 1999 and 2000, published several Notifications

16   specifically addressing the color CRT and color TV industries. Werbel Decl. Ex. 56, Apps. 3 and

17   5-9. Taken together, these Notifications generally repeat the message that selling below **one's own**

18   costs is prohibited "dumping" (*e.g., Id.,* App. 5, p. 1, ¶ 2; & App. 6, p.3, ¶ 2), and that selling below

19

20   ───────────────────────

21   [24] *See* Alioto Decl. Ex. 66, ¶ 16 ("[I]f the authorities could verify the individual costs and such
     costs are below the selling prices, then the authorities shall not regard it as dumping.").

22   [25] Article 15 of the regulations provides that in one limited circumstance—where a company's
     sales at decreasing prices "severely disrupt the market order" and it is difficult to determine the
23   company's individual costs—the State Council may determine whether those actions are dumping
     actions by **temporarily** using industrial average production costs "and a reasonable range of price
24   decrease" – "temporarily," according to Irico's expert, until the enterprise's actual costs can be
     determined. Alioto Decl. Ex. 67 (Clarke Dep. Tr. at 64:4-66:15). There is no evidence that this
25   clause ever applied to Irico. Irico was obligated to report its costs to the government. Thus, it knew
     what its costs were and was therefore never a company whose costs were "difficult to determine."
26
     [26] *See id*. Ex. 67 (Clarke Depo. Tr. at 72:13-73:21, 77:17-83:17 (acknowledging that those who
27   sold below average costs, but not below their own costs, would not be punished).

28

industry average costs, if somebody complains, can lead to an investigation to determine whether a company has sold below cost. (*Id.*, Art. 7; Werbel Decl. Ex. 56, Apps. 8 & 9). Some of the Notifications request CRT manufacturers to report their costs for certain tube sizes,[27] and others publish average industry costs for those models for portions of 1999 or 2000 (Werbel Decl. Ex. 56, App. 6 at p. '466; App. 7, first page).[28] Irico's claim that these industry average costs were "price floors" is not borne out by the documents. While pricing below ***industry average*** costs could trigger an investigation if the government chose to initiate one, only selling below ***one's own*** costs would constitute dumping.[29] Thus, Professor Clarke was unable to say that industry average costs disseminated by the government constituted a "price floors"—even a *de facto* one.[30]

The evidentiary record does not include any "Cost Notifications" dated after September, 2000. There is no indication that the MII ever published any such Notifications after that date. Nor is there any evidence that the MII ever published industry average costs for CRT tube sizes other than those referenced in the Notifications issued in 1999 and 2000.

## <u>STANDARD OF REVIEW</u>

Summary judgment is proper only "if [Irico] shows that there is no genuine dispute as to any material fact and [Irico] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the moving party, Irico "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos. Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Because summary judgment is a "drastic device", Irico bears a "heavy burden" of demonstrating the absence of any triable issue of material fact. *See Avalos v. Baca*, No. CV.05-07602 DDP SHX, 2006 WL 2294878, at *1 (C.D. Cal. Aug. 7, 2006). "In

---

[27] Werbel Decl Ex. 56, Apps. 3 and 4 (21" and 25" models); Apps. 8 and 9 (21", 25" and 29").

[28] The SPC released a circular effective March 1, 1999, which provided measures for determining production and distribution costs. Werbel Decl., Ex. 65, at App'x 4.

[29] *See* Alioto Decl. Ex. 66 (Gao Report) at ¶ 18 ("Had selling at prices lower than the average industry production costs been automatically regarded as engaging in dumping as Professor Clarke suggested, there would have been no need for such investigation.").

[30] *Id.* Ex. 67 (Clarke Dep. Tr. at 91:14-97:15).

1  antitrust cases, these general standards are applied even more stringently and summary judgments

2  granted more sparingly." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2017

3  WL 5957654, at *2 (N.D. Cal. Feb. 27, 2017) (quoting *Beltz Travel Serv., Inc. v. Int'l Air Transp.*

4  *Ass'n*, 620 F.2d 1360, 1364 (9th Cir. 1980)).

5        At summary judgment, the Court is not "to weigh the evidence and determine the truth of

6  the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby,*

7  *Inc.*, 477 U.S. 242, 249 (1986). Any doubt regarding whether a genuine issue of material fact exists

8  must be resolved in favor of IPPs. *See In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1059, 1064

9  (N. D. Cal. 2007); *see also Ortega v. Flores*, No. 19-CV-00319-HSG, 2023 WL 4771178, at *7

10  (N.D. Cal. July 26, 2023) ("If the evidence produced by the moving party conflicts with evidence

11  produced by the nonmoving party, the court must assume the truth of the evidence submitted by

12  the nonmoving party.")

13                                    **<u>ARGUMENT</u>**

14  **I.    <u>APPLICATION OF EACH STATE'S LAW IS CONSTITUTIONAL</u>**

15        Irico Defendants' due process argument fails. First, Irico Group lacks due process rights.

16  Moreover, with respect to Irico Display and to the extent a due process analysis is appropriate for

17  Irico Group, each state at issue has sufficient contacts with the parties and the relevant transactions

18  such that the Court may constitutionally apply the state's law. Plaintiffs purchased CRT products,

19  the prices of which were inflated by the conspiracy in which Irico participated, in *every* state for

20  which they assert a claim, including the so-called "Non-Contact States." Motion at 6. That alone

21  is sufficient. But the evidence here goes even further and includes the important facts that: (1) Irico

22  and its co-conspirators targeted the entire U.S. market; and (2) TVs with Irico manufactured tubes

23  were sold in all 22 states at issue.

24        **A.    Irico Group Lacks Due Process Rights**

25        As an initial matter, Irico Group is an instrumentality of a foreign state and not a "person"

26  for purposes of the Due Process Clause. *See* ECF No. 5637 at 7 (holding that Irico Group is an

27

28

INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO IRICO'S MOTION FOR SUMMARY JUDGMENT
MDL No. 1917; Case No. 07-cv-5944-JST

instrumentality of China). Thus, it lacks due process rights. *See Cruz v. United States*, 387 F. Supp. 2d 1057, 1067 (N.D. Cal. 2005) (holding agencies and instrumentalities of the Mexican government were not "persons" for purposes of due Process); *see also Altmann v. Republic of Austria*, 142 F. Supp. 2d 1187, 1207 (C.D. Cal. 2001) ("[F]oreign sovereigns are not 'persons' for purposes of the Due Process Clause.") (subsequent history omitted).

## B.   Application of Each State's Law Comports with Due Process

Irico is wrong when it claims that "Irico's contacts in each state are lacking, such that the application of these state's laws would be arbitrary and fundamentally unfair." Motion at 9. "The Due Process Clause . . . requires a court to invalidate the application of a state's law only where the state has 'no significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction.'" *AT & T Mobility LLC v. AU Optronics Corp*., 707 F.3d 1106, 1111 (9th Cir. 2013) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 308, 320 (1981)); *see In re TFT-LCD (Flat Panel) Antitrust Litig*., 07-MD-1827 SI, 2014 WL 2905131, at *3 (N.D. Cal. June 26, 2014) (noting there must be "sufficient contacts . . . between the state and the facts of the case"). This is "a highly permissive standard." *AT & T*, 707 F.3d at 1111. In a price-fixing conspiracy case, "the occurrence or transaction giving rise to the litigation" is the sale of price-fixed goods and the defendants' conspiratorial conduct. *Id.* at 1109. Each state "has an important interest in protecting its residents from the harmful effects of anticompetitive conspiracies." *TFT-LCD*, 2014 WL 2905131, at *3.

Indeed, two prior opinions in this *CRT* litigation found that in-state purchases created sufficient contacts for due process. ***First***, in denying defendants' motion to dismiss the DirectAction Plaintiffs' (DAPs) state law claims, Judge Conti stated: "Defendants are alleged to have conspired to fix prices on CRT Products and then sold those goods to businesses and consumers in the various states alleged in the DAPs' complaints. This is not a slight and casual connection, nor is the application of those states' laws to Defendants' conduct arbitrary or unfair." *In re Cathode Ray Tube (CRT) Antitrust Litig*., No. C-07-5944-SC, 2013 WL 4505701, at *7 (N.D.

Cal. Aug. 21, 2013). Judge Conti rejected an argument much like the one Irico Defendants now make:

> Defendants seem to suggest that if the DAPs allege a sale within a state, but do not include detailed, defendant-by-defendant allegations of anticompetitive conduct in those states, due process would deny claims under those states' laws. . . . This misses the point of *AT & T*, which held that absence of a sale within a state did not preclude the application of that state's antitrust laws if other facts sufficiently tied the defendants' activities to that state. ***AT & T* did not hold that an in-state sale alone could not satisfy due process**, especially when, in context, it would be proper under due process to subject a defendant to the rules of that state.

*Id.* at *6 (emphasis added) (internal citations omitted).

**Second**, Judge Conti denied Defendant Thomson SA's motion to dismiss Sharp's claims based on allegedly insufficient contacts with New York. He concluded, "Thomson SA's alleged conduct resulted in a New York-based company [Plaintiff Sharp] being harmed, and this is sufficient to give New York an interest in applying its own law to the controversy, especially given *Allstate*'s 'modest restrictions on the application of forum law' and 'highly permissive standard.'" *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2014 WL 1091589, at *14 (N.D. Cal. Mar. 13, 2014) (citation omitted).

Other courts have agreed that in-state purchases, including of finished products containing the price-fixed goods, create an interest sufficient to render application of state law constitutional. *See TFT-LCD*, 2014 WL 2905131, at *3 (denying motion for partial summary judgment on due process grounds) ("Plaintiffs have established that they suffered an injury in Florida when they purchased price-fixed goods, the cause of which was defendants' anti-competitive conduct. The Court finds that plaintiffs' evidence is sufficient to establish the requisite contacts with Florida to satisfy due process."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 10-4572 SI, 2013 WL 6174683, at *4 (N.D. Cal. Nov. 20, 2013) (finding application of Minnesota law constitutional based on plaintiff Best Buy's Minnesota headquarters), *aff'd*, 637 F. App'x 981 (9th Cir. 2016).[31]

---

[31] *See also In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 836, 852 (E.D. Mich. 2014) ("EPPs' claims are connected to the various state laws under which they proceed because they reside in those states."); *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2015 WL 1849138, at *3

1    As such, Plaintiffs need not show that Irico engaged in conspiratorial conduct in each state

2    or that Irico sold CRTs in each state. *See TFT-LCD*, 2014 WL 2905131, at *3 (rejecting

3    defendants' argument "that the application of Florida law is unfair because they never sold their

4    products or engaged in any conspiratorial conduct in Florida"). Nor are IPPs required to

5    demonstrate purchases of CRT products ***containing Irico CRTs*** in each state:

> The effect of an anticompetitive conspiracy is to alter the price of all goods
> of a certain type — here, LCD panels and products. The scope and nature
> of this alleged conspiracy led to plaintiffs' purchase of price-fixed goods in
> Florida.  Whether all of the LCD products plaintiffs purchased contained
> panels manufactured by defendants is irrelevant.

*Id.* (denying motion for summary judgment).

10   Irico's citation to several cases addressing personal jurisdiction, rather than application of

11   a state's substantive law, is misleading. *See, e.g.*, *Asahi Metal Indus. Co. v. Superior Ct. of Cal.,*

12   *Solano Cnty.*, 480 U.S. 102 (1987); *Olsen by Sheldon v. Gov't of Mexico*, 729 F.2d 641 (9th Cir.

13   1984). The two inquiries are different. "[C]hoice-of-law analysis—which focuses on all elements

14   of a transaction, ***and not simply on the defendant's conduct***—is distinct from minimum-contacts

15   jurisdictional analysis—which focuses at the threshold solely on the defendant's purposeful

16   connection to the forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 481-82 (1985) (emphasis

17   added); *Allstate*, 449 U.S. at 317 n.23 ("[E]xamination of a State's contacts may result in divergent

18   conclusions for jurisdiction and choice-of-law purposes.").

19   Here, IPPs have produced evidence that is sufficient for a due process choice-of-law

20   analysis. ***First,*** it is undisputed that the Class Representatives purchased a television or computer

21   monitor containing a CRT manufactured by a Defendant or one of the alleged co-conspirators, and

22   that those purchases were made in the Representatives' home states. ECF No. 6267 (stipulation).

23

24

25

26

27   (E.D. Mich. Apr. 22, 2015) (finding sufficient contacts with Florida where "the object of the
     conspiracy … was parts incorporated into vehicles," and vehicles were purchased in Florida).

28

---

1  ***Second***, the evidence demonstrates that the conspiracy in which Irico participated[32] raised

2  the prices of CRT products sold throughout the U.S. *See CRT*, 2016 WL 5725008, at *5 ("The

3  United States was the world's largest market for CRTs during the relevant time frame, and

4  Defendants were well aware of the effect their price-fixing agreements were having on the prices

5  paid for CRTs and products containing CRTs."); *see also* ECF 5637 at 12 ("After weighing the

6  evidence presented by the parties, the Court concludes that Irico Group has failed to prove by a

7  preponderance of the evidence that either 1) it did not participate in the conspiracy or 2) the

8  conspiracy did not have the effect of raising prices in the United States."). Moreover, IPPs' expert

9  Dr. Janet S. Netz outlined the effect of the CRT conspiracy in the U.S. *See* Netz Summ. J. Decl.

10  Ex. 1 (Netz Merits Report) at 72-73 ("the cartel caused prices paid by U.S. class members to be

11  higher"), *id.* at 82-96 (concluding that "all class members were harmed by the cartel" in the form

12  of higher prices). When a conspiracy involves a product "purchased in substantial numbers

13  throughout the United States," it is reasonable to infer that sales were made in every U.S. state.

14  *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) (noting

15  "obvious fact that Broilers are purchased in substantial numbers throughout the United States" in

16  finding intrastate effects in District of Columbia and Washington).[33]

17  ***Third,*** although IPPs need not show purchases of products containing CRTs made by Irico,

18  there is evidence that Irico's television manufacturer customers were selling large quantities of

19  televisions containing Irico's CPTs to customers in the United States. *See* Section I.C., *supra*.

20

21

22  [32] Special Master Walker found that there is "overwhelming" evidence of a conspiracy to fix CRT
23  prices, and that the evidence points to "the obvious and most probable conclusion that Irico in fact
participated in the conspiracy in furtherance of it." ECF No. 6074 at 12, 19; ECF No. 6093.

24  [33] *See also In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 173 (D.
25  Me. 2004) ("concerted action by dealers to increase new car prices" throughout the country
"necessarily implicates substantial effects on commerce within Tennessee"); *In re Intel Corp.*
26  *Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 413-14 (D. Del. 2007) ("[I]t is reasonable to
infer from Class Plaintiffs' allegations of indirect purchaser injury throughout the United States
27  that Class Plaintiffs' allegations of anticompetitive conduct by Intel include the sale of the x86
microprocessor in Nevada markets.").

28

1   In short, the evidence establishes sufficient contacts with each state to render application

2   of each state's law consistent with due process. Irico's Motion should be denied.

3   **II.**   **IPPS' EVIDENCE OF INTRASTATE ACTIVITY SATISFIES STATE-LAW REQUIREMENTS**

4

5       Next, Irico argues it is entitled to summary judgment on IPPs' Arizona, Florida, Michigan,

6   and North Dakota claims because the record fails to reflect "*conduct by Irico within the territorial*

7   *boundaries*" of these states. Motion at 10 (emphasis added). This is not the law. In each of these

8   jurisdictions, it is sufficient for IPPs to establish—as they have—that state residents made in-state

9   purchases of products containing price-fixed CRTs.

10      *Arizona*—Arizona prohibits conspiracies "in restraint of . . . trade or commerce, any part

11  of which is within this state." Ariz. Rev. Stat. § 44–1402. The *SRAM* court interpreted nearly

12  identical language in South Dakota's statute as requiring that the "affected trade or commerce"—

13  rather than the *conspiracy itself*—occur in-state. *In re Static Random Access Memory (SRAM)*

14  *Antitrust Litig.*, 580 F. Supp. 2d 896, 906-07 (N.D. Cal. 2008); *see also In re OSB Antitrust Litig.*,

15  No. 06-cv-826, 2007 WL 2253425, at *15 (E.D. Pa. Aug. 3, 2007) ("[Arizona] require[s] that at

16  least some part of the *alleged injury* have occurred within the state and have affected [Arizona]

17  consumers" (emphasis added)).

18      *Florida*—Although the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")

19  lacks any express geographic restriction, some courts have held that the Act "precludes claims by

20  out-of-state consumers." *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 787-88 (D. Minn. 2020).

21  In *LCD*, Judge Illston rejected the defendants' argument that FDUTPA "applies only to conduct

22  occurring within Florida" and noted that the Act is "construed liberally" to protect consumers. *In*

23  *re TFT-LCD*, 2014 WL 2905131, at *3 (quoting Fla. Stat. § 501.202). Courts have reached similar

24  conclusions in other price-fixing actions. *See, e.g.*, *In re Auto. Parts Antitrust Litig.*, No. 12-MD-

25  02311, 2015 WL 13834708, at *7 (E.D. Mich. May 1, 2015) ("IPPs have satisfied [any intrastate

26  action] requirement" by, *inter alia*, alleging they "purchased parts and vehicles in Florida");

27  *Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*, 752 So. 2d 582, 585 (Fla. 2000) (noting that

28

action occurring outside of Florida gave rise to FDUTPA claim where the defendants "conspired to fix the wholesale price of their product throughout the United States, including Florida"). Irico's cited authority is not to the contrary, as those cases principally involve out-of-state consumers.[34] Here, IPPs seek to apply Florida law to Florida consumers.

*Michigan*—Michigan law prohibits conspiracies "in restraint of, or to monopolize, trade or commerce in a relevant market" and defines "relevant market" as "the geographical area of actual or potential competition in a line of trade or commerce, all or any part of which is within this state." Mich. Comp. Laws § 445.772, 771(b). The statute's prohibition on conspiracies in restraint of trade "was derived from the Uniform State Antitrust Act," *Bristol Window & Door, Inc. v. Hoogenstyn*, 650 N.W.2d 670, 673 (Mich. Ct. App. 2002), the comment to which provided that "[t]he term 'relevant market' has been defined so as to make it clear that *the effect* of the conduct constituting the offense need not be confined wholly to the state, but must be at least partially within the state," 8 Callmann on Unfair Competition, Trademarks & Monopolies, App'x 2 § 2.21 (4th ed.) (emphasis added). As such, it is the *effect* of the price-fixing conspiracy—not the conspiracy itself—that must occur at least partially within the "relevant market."[35]

*North Dakota*—Like Michigan, North Dakota law prohibits conspiracies "in restraint of, or to monopolize, trade or commerce in a relevant market," and it largely shares Michigan's definition of "relevant market." N.D. Cent. Code § 51–08.1–01, 02. On its face, North Dakota's

---

[34] *Millennium Communications & Fulfillment, Inc. v. OAG*, 761 So. 2d 1256 (Fla. Dist. Ct. App. 2000) and *Beaver v. Inkmart, LLC*, No. 12-60028, 2012 WL 4005970, (S.D. Fla. Sept. 12, 2012), involved application of FDUTPA to out-of-state consumers, and *Five for Entertainment v. Rodriguez*, 877 F. Supp. 2d 1321 (S.D. Fla. 2012), contained "no allegations of any relation to Florida consumers." *Pork*, 495 F. Supp. 3d at 788. And although *Carnival Corp. v. Rolls-Royce PLC*, No. 08-23318, 2009 WL 3861450 (S.D. Fla. Nov. 17, 2009), relied on *Millennium* to conclude that FDUTPA applies only to in-state conduct, other courts have disagreed. *See, e.g.*, *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 538 (E.D. Pa. 2010) ("*Millennium* . . . does not prevent application of the FDUTPA where some of the injury or the actionable conduct takes place outside of the state.").

[35] In *In re Digital Music Antitrust Litig.*, on which Irico relies, the court "assume[d] that an allegation of intrastate conduct is required in Michigan," and the plaintiffs apparently "accept[ed] the proposition." 812 F. Supp. 2d 390, 407 & n.8 (S.D.N.Y. 2011) (emphasis added).

statute "can plainly be construed" as requiring "only that some of the Defendants' conduct occurred, *or the effects of which were felt*, within the state." *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 888 (E.D. Pa. 2012) (emphasis added); *accord In re Magnesium Oxide Antitrust Litig.*, No. 10-cv-5943, 2011 WL 5008090, at *8 n.10 (D.N.J. Oct. 20, 2011) (describing North Dakota—as well as Arizona and Michigan—as jurisdictions "which require a showing that [violative] conduct occurred, *or whose effect was felt*, in-state" (emphasis added)).

Absent countervailing authority, the Court should decline to adopt Irico's restrictive reading of these four statutes, as "it is logical to assume that the state[s] intended [their] antitrust coverage to be as broad as possible." *New Motor Vehicles*, 350 F. Supp. 2d at 172. As such, IPPs need not establish that Irico had any "presence" or "corporate activity" in these states, or that "the allegedly competitive meetings or communications involving Irico" occurred there. Motion at 10. Instead, state residents' in-state purchases of price-fixed goods satisfy the relevant requirements. The record in this case supports such a showing. *See* Section I., *supra*.

## III.   A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO IRICO'S PARTICIPATION IN THE CONSPIRACY PRIOR TO AUGUST 5, 1998

As this Court has already recognized, there is evidence of the Irico Defendants' participation in "a single, overarching conspiracy." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2018 WL 659084, at *9 (N.D. Cal. Feb. 1, 2018). This evidence shows "representatives of the Irico Defendants participating in meetings involving the setting of prices and production levels for CRTs in concert with other CRT manufacturers." *Id*.  The only question here is whether Irico joined the conspiracy prior to August 1998 or, alternatively, whether even if it joined the conspiracy after August 1998, it is still liable for the conspiracy's conduct prior to that date.

### A.   The Evidence Shows Irico's Participation in the Conspiracy Prior to August 5, 1998

Contrary to Irico's arguments, the evidence shows Irico's participation in the conspiracy and their knowledge of the conspiracy's purpose and operation before August 5, 1998. *See* Section

1   II., *supra*. IPPs have identified multiple instances of Irico's participation in the conspiracy and
2   competitor contacts prior to August 5, 1998. That evidence includes a BMCC document dated
3   November 30, 1995 containing Irico's future CRT production data and stating "we hope our CRT
4   industry peers will unite, act in concert, and face our foreign enemies together" (Werbel Decl. Ex.
5   48); a January 4, 1996 CRT Industry meeting where the participants agreed "[b]efore April 1, there
6   will be no price reduction for CPT" (*id.* Ex. 49); and, a December 1997 CRT Industry Meeting at
7   which "all tube makers set the price of 21" [CPTs]" for televisions. *Id.* Ex. 50 at '36E.

8        Irico claims that its participation in the China CRT Industry Association meetings is
9   "legitimate trade association activities" and is "not evidence of participation in the alleged
10  conspiracy." Motion at 15. But the anticompetitive purpose of those meetings is evident from
11  contemporaneous documents. *See id.* Exs. 48-50; *see also* Alioto Decl. Exs. 48-50, 53, 55-56, 58.
12  Irico's reliance on J.S. Lu's testimony for the assertion that Irico "was a latecomer to the
13  conspiracy meetings" is misplaced. Motion at 13. The China CPT Industry Association meetings
14  that Irico was attending from August 1995 pre-dated Chunghwa's involvement in the Association.
15  *See* Section II., *supra*. While Irico may not agree with IPPs' interpretation of the evidence, that is
16  a disputed fact to be resolved by a jury, not by the Court on summary judgment. *Anderson*, 477
17  U.S. at 255 ("Credibility determinations, the weighing of the evidence and the drawing of
18  legitimate inferences from the facts are jury functions, not those of a judge.").

19       Irico's attempt to isolate IPPs' evidence is impermissible under *Continental Ore*. *Cont'l
20  Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect
21  of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only
22  by looking at it as a whole. . . . [T]he duty of the jury was to look at the whole picture and not
23  merely at the individual figures in it").

24       While Irico seeks to explain away these competitor interactions as legitimate, "such
25  disputes regarding the interpretation of evidence are not appropriate for resolution on summary
26  judgment." *In re TFT LCD (Flat Panel) Antitrust Litig.*, No. 12-CV-4114 SI, 2013 WL 3387652,
27  at *2 (N.D. Cal. July 8, 2013) (denying summary judgment). Indeed, in deciding Panasonic's

28

motion for summary judgment, this Court noted: "At bottom, there is conflicting evidence about the purpose of the bilateral meetings. A jury, not the Court, should determine whose characterization of those meetings is most credible." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2017 WL 5957654, at *4 (N.D. Cal. Feb. 27, 2017).

Finally, Irico's reliance on *In re Packaged Seafood Products Antitrust Litig.*, No. 15-MD-2670 DMS (MDD), 2023 WL 3046073 (S.D. Cal. April 21, 2023) is misplaced. In *Packaged Seafood*, the issue was whether there was sufficient evidence to support a finding that the conspiracy as a whole started before a certain date. *Id.* at *2, *9, *16. Here, the question is limited to when Irico joined a well-documented, existing conspiracy.

## B. Even If Irico Joined the Conspiracy After August 5, 1998, It is Still Liable for Conduct that Occurred Before it Joined

It is well established that a co-conspirator who joins a conspiracy "with knowledge of what has gone before" and "the intent to pursue the same objective" is liable "for actions taken before it joined the conspiracy." *CRT*, 2018 WL 659084, at *9 (quoting *Indus. Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970)); *see also In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538-39 (D.N.J. 2004) ("[A] co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy."); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 710 F. Supp. 152, 153-54 (E.D. Pa. 1989) (accepting the "general rule that one who joins an existing conspiracy is equally liable with the other conspirators for all damages occasioned by the conspiracy, including damages caused before joinder"). Moreover, a "co-conspirator need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012). Even if Irico did not formally join the conspiracy until August 5, 1998, the evidence supports a finding that Irico joined with the requisite knowledge and intent to be liable.

As demonstrated above, Irico attended monthly CRT Industry Association meetings with its Chinese CRT competitors during the pre-August 1998 period. *See, e.g.*, Alioto Decl. Ex. 58. The evidence shows that many of these Chinese competitors had parent companies that were

regularly attending the Glass Meetings. *See,* n. 21, *supra* (identifying attendees of CRT Industry Association meetings at their relationships with other Defendants). The evidence further shows that Irico met with Chunghwa on several occasions prior to the first documented conspiracy meeting with Chunghwa in August 1998. *See, e.g.*, Ex. 60.  Irico was also in regular contact with defendant Toshiba prior to August 1998, ostensibly regarding CDT technology licensing agreements and a CRT television manufacturing joint venture. *Id.* Ex. 27 & Werbel Ex. 45.

Collectively, even if the jury determined that the evidence was insufficient to show that Irico joined the conspiracy prior to August 1998, this evidence does demonstrate that when it joined the conspiracy, Irico had knowledge of its co-conspirators' actions before 1998.

## IV.   IPPS CAN RECOVER DAMAGES UNDER NEW YORK LAW FOR PURCHASES BEFORE DECEMBER 23, 1998

Irico argues that the Court should grant summary judgment on IPPs' claims under New York law as to conduct and damages prior to the December 23, 1998 Amendment to the Donnelly Act.[36] The Court should deny Irico's motion for two reasons. First, the New York Court of Appeals has never specifically decided whether indirect purchasers may sue for damages under the Donnelly Act for purchases occurring before the 1998 Amendment. New York courts require statutory interpretation to begin with the "language [of the statute] itself." *Town of Southampton v. New York State Dep't of Env't Conservation*, 39 N.Y.3d 201, 209 (N.Y. 2023). The plain language of the Amendment dictates that "any person who *has sustained* damages by reason of violation of this section." N.Y. Gen. Bus. Law § 340(6) (emphasis added). Reading this provision literally leads to only one plausible interpretation: the Donnelly Acts creates relief for persons who were already injured at the time when the Amendment was enacted.

Moreover, Irico's argument ignores IPPs' claims under the New York Deceptive Practices Act ("DPA"). N.Y. Gen. Bus. Law §§ 349, *et seq*. ECF No. 5589 (IPPs' Fifth CAC) ¶ 286. The New York DPA forbids deceptive practices and allows monetary relief to all persons injured by

---

[36] Motion at 12. New York's legislature amended the Donnelly Act to explicitly permit claims by indirect purchasers effective on December 23, 1998. *See* N.Y. Gen. Bus. Law § 340(6). Irico's reference to "December 3, 1998" in its motion is presumably a typo.

such practices, including indirect purchasers. N.Y. Gen. Bus. Law § 349; *Vitolo v. Dow*, 634 N.Y.S.2d 362, 366-367 (N.Y. Sup. Ct. 1995), *aff'd as modified*, 651 N.Y.S.2d 104 (N.Y. App. Div. 1996) (holding that there is no requirement of "privity, and victims of indirect injuries are permitted to sue under the Act" because § 349 allows "*any person* who has been injured due to a violation thereof the right to bring an action"). Nothing in the legislative history of the Donnelly Act or the case law suggests that the New York legislature, in amending the Donnelly Act in 1998, intended to remove an existing indirect damage remedy from the New York DPA. As such, IPPs have an independent basis to pursue recovery for conduct and damages before December 23, 1998 under the New York DPA. *See also In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*, 172 F. Supp. 3d 724, 752-53 (D.N.J. 2016) (discussing that "anticompetitive conduct can violate § 349 if it is deceptive in nature" when defendants tried to conceal an anticompetitive agreement, when defendants secretly agreed to raise prices, or when defendants entered into secret anticompetitive agreements); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1001, 1030 (N.D. Cal. 2007) (allowing "[a]ntitrust-type claims" to proceed under § 349(a) because defendants "hid the alleged conspiracy from plaintiffs").

## V.  THE "INTERNATIONAL COMITY DOCTRINE" DOES NOT REQUIRE DISMISSAL OF IPPS' CLAIMS

Irico argues that the "international comity doctrine" requires the entry of summary judgment dismissing all IPP claims against it because its "CRT pricing was subject to the foreign laws and regulations of the People's Republic of China" that "conflicted on their face with the antitrust and consumer protection laws" of the United States. Motion at 2. However, Irico's "international comity" argument is without merit.

### A.  The International Comity Doctrine

"International comity is a doctrine of prudential abstention, one that counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law." *Mujica v. AirScan Inc.*, 771 F.3d 580, 597 (9th Cir. 2014). There are two main types of international

comity: "prescriptive" comity, which "guides domestic courts as they decide the extraterritorial reach of federal statutes," and "adjudicatory" comity, which "may be viewed as a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state." *Id.* at 598–99. Irico invokes the "prescriptive comity" branch of the doctrine.

A party seeking a dismissal based on "prescriptive comity" must show that there is a "true conflict" between its duties under foreign law and the demands of U.S. law. *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798 (1993). To make that showing, Irico would have to establish that Chinese law "require[d] [it] to act in some fashion prohibited by the law of the United States." *Id.* at 799. "No conflict exists, for these purposes, where a person subject to regulation by two states can comply with the laws of both." *Id.* In *Hartford Fire*, the Supreme Court found that because there had been no showing that the British and U.S. laws in question conflicted and compliance with both was possible, there was "no need . . . to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on the grounds of international comity." *Id.*

Irico argues that whether there was a "true conflict" between its duties under Chinese law and U.S. law is only one factor to be considered in deciding whether to dismiss the case on comity grounds. Motion at 16. It asserts that the Court must also consider multiple criteria first set forth in a pre-*Hartford Fire* case, *Timberlane Lumber Co. v. Bank of Am., N.T. & S.A.*, 549 F.2d 597 (9th Cir. 1976). In addition to "the degree of conflict with foreign law or policy," those criteria include the nationality of the parties, the extent to which enforcement can achieve compliance, the extent to which there was explicit purpose to harm or affect American commerce, the foreseeability of such harm, the relative importance to the violations charged of conduct within the U.S. as compared with conduct abroad, and the relative significance of the effects on the U.S. as compared with those elsewhere (hereinafter, the "Other *Timberlane* Factors"). Motion at 16.

Irico misconstrues the proper legal standard. *Hartford Fire* makes clear that the Court "need not" consider the Other *Timberlane* Factors where there is no "true conflict" between the foreign law and U.S. law. *Hartford Fire*, 509 U.S. at 799. Moreover, Courts of Appeals applying *Hartford Fire* "have generally required proof of [a true] conflict . . . in cases where a claim of

prescriptive comity is at issue. *Mujica*, 771 F.3d at 600-01; *see also, e.g.*, *In re Simon*, 153 F.3d 991, 999 (9th Cir. 1998) (international comity "is limited to cases in which 'there is in fact a true conflict between domestic and foreign law.'") (quoting *Hartford Fire*, 509 U.S. at 798). Even in *In re Vitamin C Antitrust Litig.*, 8 F.4th 136 (2d Cir. 2021) ("*Vitamin C*"), where the Second Circuit did consider the Other *Timberlane* Factors, it acknowledged that whether there was a "true conflict" was the "***critical***" step in the analysis.

### B.      There Is No True Conflict Between U.S. Antitrust Law and Chinese Law

Irico fails to show a true conflict between Chinese and U.S. law. It has not pointed to any Chinese law, rule or decree that required it to agree with competitors to fix CRT prices or restrict output. Despite its claim that its CRT prices were impacted by government pricing laws, Irico has not shown that the government ever mandated any specific price or "minimum price" for CRTs at any point during the Class Period – and certainly not *throughout* the Class Period.  The "Pricing Documents did not "conflict on their face" with U.S. law.

Nor has Irico shown that it ever charged a price to any customer that had been mandated by the government. Indeed, it has not proffered any evidence that would show how it actually determined the prices it would charge.  Minutes of meetings produced by other Defendants in this action show that Irico ***agreed with its competitors*** to charge specific prices or to shut down production in order to prop up prices.[37] That evidence is sufficient, by itself, to disprove the claim that the prices Irico charged were government-mandated or controlled, and, therefore, to preclude summary judgment in Irico's favor on its comity defense. In those instances, at least, Irico's prices were set by the conspiracy – not by the government.

Irico argues that the Pricing Documents created a program of "government-mandated pricing measures and coordination of CRT prices." Motion at 17. At most, as demonstrated above, the Pricing Documents and the handful of additional documents that followed them prohibited

---

[37] *See, e.g.*, Alioto Decl. Ex. 51 (Dep. Ex. 1213, CHU00030679-83E) (in a meeting attended by Irico Sales Vice-President Wei Jan-Shei, the conspirators reached a "unanimous determination to increase prices" (at' 80E) and agree to "strictly control production volume" (at '82.01E) to stabilize prices); *see also id.* Exs. 52, 69, 70.

companies from "dumping" — selling their products at a price that was below their own costs of production. Those documents did not specify what prices they should charge or impose "minimum prices."[38]

A sale at a price below **industry average** production costs could, if someone complained, "trigger" an investigation to determine whether the manufacturer sold at prices below **its own** costs. *See* Gao Report at ¶¶ 18-33. This allowed manufacturers to price based on their own production costs, which likely varied by manufacturer. *See* Netz Summ. J. Decl. Ex. 3 at 6 ("A relatively efficient manufacturer could sell its products at prices below industry average production costs but above its own production costs."). But none of this amounted to the government mandating prices. Nor did it require collusion between competitors to fix CRT prices.

In any event, Irico hasn't shown what its production costs were or how they compared with the prices it charged or with average industry prices. There is no evidence that compliance with U.S. law would have required Irico to sell at prices below its own costs, or below average industry costs. There has been no showing that Irico was ever investigated, punished, or even threatened with investigation or punishment, for selling below costs, or that it would or might have been had it eschewed the conspiracy and charged honest prices.[39]

Indeed, other evidence indicates that the Price Law **did not** have an impact on Irico's prices. *See* Alioto Decl. Ex. 72 (Netz 6/9/2022 Dep. Tr. at 29:19–25 ("[B]ased on the BMCC prices, which are the only prices that we have -- we do not have Irico prices and BMCC is the only

---

[38] Irico asserts that "a number of" its communications with co-conspirators "involved coordination by, cost reporting to, and price guidance from[,] a Chinese government agency." Motion at 5 (citing Werbel Decl., Exs. 68-74). But none of the documents it cites in support of that contentionshow any government involvement in pricing, price-setting, "price-guidance" or price "coordination," let alone price-fixing.

[39] The sole evidence Irico cites for its awareness of and concern about the potential consequences of failing to adhere to the government's purported price mandates is a single deposition answer given in response to questioning by Irico's counsel by its witness Yan Yunlong. Motion at 21, citing Yan Yunlong Dep. Tr. (Vol. III) at 351:6-15). Mr. Yan's answer is inadmissible because it lacks foundation, calls for a legal conclusion, is vague as to time, and calls for the witness to give a hypothetical answer. IPPs object to it on those grounds.

manufacturer that produced CPTs in mainland China for which we have prices…there appears to be no evidence that there was an impact on Irico."). Notably, neither BMCC nor any of the other Chinese CRT maker Defendants[40] asserted that China's Price Law or any other government regulations dictated their CRT prices or required them to conspire with their competitors.

It is also important that the documents in which a government Ministry disseminated industry average costs—which Irico mischaracterizes as "minimum prices"—related only to particular tube sizes and were issued only during the years 1999 and 2000. There is no indication that any comparable documents were ever issued with respect to other tube sizes. Nor does it appear that any cost data was disseminated prior to 1999 or after 2000.[41] "Industry average costs" could not have constituted "minimum prices" binding on CRT companies during periods of time when the government did not even publish them.[42]

In sum, the Pricing Documents do not create a conflict with U.S. antitrust laws. U.S. law did not require Irico to sell at prices below its own costs or, for that matter, below industry average costs.[43] In prohibiting Irico from conspiring with its competitors, U.S. law did not require Irico to do anything Chinese law prohibited, nor did Chinese law impose legal duties on Irico that prevented it from complying with U.S. antitrust laws. Thus, Irico could have fully complied with Chinese law and, at the same time, refrained from violating U.S. law.

//

---

[40] In addition to Irico and BMCC, the other Defendants that had operations in China and would have been subject to Chinese law included Chunghwa Picture Tubes Fuzhou (CPTF), Shenzhen Samsung SDI Co., Ltd., Tianjin Samsung SDI Co., Ltd., and SEG Hitachi Color Display Devices. *See* ECF No. 5588 (IPPs' Fifth CAC) ¶¶ 66, 67, 89, 174.

[41] *See* Alioto Decl. Ex. 67 (Clarke Dep. Tr. at 85:5-19) (Irico's expert, Professor Clarke, did not know of any cost notifications after September 2000.).

[42] *Id.* Ex. 67 (Clarke Dep. Tr. at 88:16-20)

[43] Notably, like Chinese law, U.S. law prohibited "predatory pricing designed to eliminate competitors in the short run and reduce competition in the long run." *PLS.COM, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 832 (9th Cir. 2022), quoting *Cargill, Inc. v. Monfort of Colo., Inc*., 479 U.S. 104, 117-18 (1986); *see also* Cal. Bus. & Prof. Code § 17043 ("§ 17043") ("It is unlawful for any person engaged in business with this State to sell any article or product at less than the cost thereof to such vendor . . . for the purpose of injuring competition or destroying competition.").

### C.    *Vitamin C* Is Distinguishable

Irico argues that *Vitamin C*, where the Second Circuit dismissed price-fixing claims against four Chinese Vitamin C manufacturers under the doctrine of prescriptive comity, "provides a roadmap for this case." Motion at 16. On the contrary, the Chinese legal and regulatory scheme that led the *Vitamin C* Court to find a "true conflict" with U.S. antitrust law imposed a degree of government compulsion and control over pricing and production wholly absent from this case.

In *Vitamin C*, a Chinese ministry and a subordinate government entity called the "Chamber of Commerce" (the "Chamber") promulgated laws and regulations that:

- required Vitamin C companies to discuss and set "industry-wide negotiated prices," apparently including both specific prices and "minimum prices," which the government then monitored and enforced;
- established production quotas for Vitamin C;
- limited the amount of product each company could export;
- directed the four major Vitamin C companies to limit production "to stabilize the market;" and
- instituted a so-called "Price Verification and Chop system," under which only products that conformed to "industry wide price agreements" were affixed with the "chop" they needed to attest to Chinese customs officials that they complied with the requirements for export.

8 F.4th at 148-151. The *Vitamin C* court found that, "[t]aken at face value, the applicable Chinese law during the relevant period . . . required defendants, as Vitamin C manufacturers, to fix the price of Vitamin C sold on the international market." *Id.* at 151.

In *this* case, in contrast, as demonstrated above, no law, regulation or decree directed Irico, or any of its co-conspirators, to enter into any agreement to fix prices or limit production. No governmental entity enforced the prices the conspirators had agreed to. No law or regulation prescribed the prices to be charged. The government did not restrict the CRT manufacturers' ability to export their products to those who adhered to industry-agreed prices.[44] Thus, unlike the

---

[44] Moreover, in *Vitamin C*, China's Ministry of Commerce filed several briefs concerning the applicable laws and regulations arguing that the defendants, in fixing prices, had been acting as required under Chinese law. *Id.* at 154–55. In contrast, the Chinese government has filed nothing in this case.

defendants in *Vitamin C*, Irico has not and cannot prove that Chinese law imposed legal duties on it that prevented it from complying with U.S. law.

### D.   Even if the Court Considers the Other *Timberlane* Factors, Those Factors Do Not Support the Grant of Summary Judgment on Irico's Comity Defense

To the extent that the Court deems it necessary to consider the Other *Timberlane* Factors, those factors do not change the outcome.

**Chinese Nationality.** *First,* Irico's Chinese nationality and headquarters do not militate in favor of dismissing this action on international comity grounds. *Vitamin C*, which Irico cites, involved only four Chinese companies. This case, in contrast, arises from a global conspiracy. Irico's co-conspirators were located not only in China, but also in the U.S., Japan, Korea, Taiwan, the Netherlands, France, Brazil, Thailand, Mexico, India, and other countries. The conspiracy operated for more than a decade, and, as this Court found, there were "hundreds of conspiratorial meetings" that took place all over the world, including in the United States." *In re CRT*, 2016 WL 5725008, at *5. The CRT conspiracy had far-reaching consequences in the United States, which was "the world's largest market for CRTs during the relevant time frame." *Id.*

**Effect on the United States.** For the same reasons, Irico's contention that the effect of Irico's alleged conduct on the United States was insignificant should be rejected. Irico is legally responsible not only for its own conduct which affected the United States, but also for the effect of the conspiracy as a whole on the United States, which was enormous.[45] As this Court has found, "Defendants were well aware of the effect their price-fixing agreements were having on the prices paid for CRT and products containing CRTs." *In re CRT*, 2016 WL 5725008, at *5.

**Whether Enforcement Can Achieve Compliance.** Irico argues that the Court should abstain from exercising its jurisdiction in this case because "the Chinese government and Chinese courts *likely* will bar any enforcement efforts." Motion at 23 (citing Clarke Decl. at ¶¶ 9-15) (emphasis added). Irico relies on Article 289 of China's Civil Procedure Law, which prohibits the

---

[45] *See* Netz Summ. J. Decl. Ex. 2 (the CRT conspiracy inflicted overcharges of $2.8 *billion* on purchasers of CRT Products in the 22 States during the Class Period).

INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO IRICO'S MOTION FOR SUMMARY JUDGMENT
MDL No. 1917; Case No. 07-cv-5944-JST

enforcement of a foreign judgment that "contradicts the basic principles" of Chinese law. The argument must be rejected as speculative. To dismiss this case based on the mere assertion that it is "likely" a judgment will not be enforced or that a Chinese court might be "reluctant" to enforce it would be to abdicate jurisdiction based on mere conjecture.  Furthermore, on its face, Article 289 does not require a Chinese court to refuse to enforce any judgment that might be entered here, because Chinese law, like U.S. law, prohibits collusive anti-competitive conduct.[46] Therefore, such a judgment **would not** "contradict the basic principles" of Chinese law.[47]

**The Effects of Irico's Alleged Conduct on the United States, Compared to Those Elsewhere; Conduct within the United States vs. Conduct Abroad.**  Irico claims the effects of its conduct on the United States were relatively insignificant because its conduct was directed exclusively at China. As shown above, that is untrue. *See, e.g.*, Section I.  Irico exported millions of CRTs internationally every year and even set up a U.S. subsidiary to target the U.S. market. In any event, the issue is not what ***Irico*** exported. It is what the ***conspiracy*** exported. There can be no dispute that the effects of the conspiracy on the U.S. were massive.

**Explicit Purpose to Harm or Affect U.S. Commerce and Foreseeability.** Irico argues that it did not have an explicit purpose to harm or affect U.S. commerce, and that in any event, such harm was not foreseeable. It has made no showing in support of that assertion. To the contrary, as this Court has already found, the conspirators knew and intended that the higher prices they charged for CRTs would cause higher prices for televisions and computer monitors sold to

---

[46] *See* Section III., *supra* (discussing Price Law, Werbel Decl. Ex. 55., Art. 14, and 1/16/99 Notice, ¶ 5); *see also* Alioto Decl. Ex. 71 (Anti-Monopoly Law of China, enacted in 2007 and effective August 1, 2008, prohibiting "monopolistic agreements among business operators," "abuse of dominant market positions by business operators" and "concentration of business operators that eliminates or restricts competition or might be eliminating or restricting competition.")

[47] *See Zhaoyin Wang v. Beta Pharma, Inc*., No. 3:14-CV-01790 (VLB), 2015 WL 5010713, at *8 (D. Conn. Aug. 24, 2015) (rejecting an argument, supported by a Declaration from Professor Clarke, that a judgment against a party could not be enforced in China, and holding that while the difficulties of attempting to enforce a U.S. judgment in China are "legitimate," "they have not prevented federal courts from entering judgment granting relief in cases involving Chinese defendants")  (citing cases).

U.S. consumers. *In re CRT*, 2016 WL 5725008, at *5. Irico sold its products to television and computer companies that, in turn, sold their products in the U.S. *See* Section I.C., *supra*. The natural consequence of the global conspiracy was that the U.S. would be affected.

## CONCLUSION

For the foregoing reasons, IPPs respectfully request that this Court deny in its entirety Irico's Motion for Summary Judgment, ECF No. 6225.

Dated:  September 6, 2023

By:  */s/ Mario N. Alioto*

Mario N. Alioto (56433)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2001 Union Street, Suite 482
San Francisco, CA 94123
Telephone:  (415) 563-7200
Facsimile:   (415) 346-0679
Email:        malioto@tatp.com
                 laurenrussell@tatp.com

*Lead Counsel for Indirect Purchaser Plaintiffs*