# EXHIBIT 1

# (REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED)

**SAVERI & SAVERI, INC.**
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

*Trump Alioto Trump & Prescott*
ATTORNEYS LLP
2001 Union Street, Suite 482
San Francisco, California 94123
(415) 563-7200
FAX (415) 346-0679

March 20, 2023

*VIA EMAIL*

The Honorable Vaughn R. Walker
Law Office of Vaughn R. Walker
Four Embarcadero Center, Suite 2200
San Francisco, CA 94111
vrw@judgewalker.com

**Re:**   *In re Cathode Ray Tube (CRT) Antitrust Litigation* **– MDL No. 1917, Master File No. 07-CV-5944-JST**

Dear Judge Walker:

## INTRODUCTION

Direct Purchaser Plaintiffs ("DPPs") and Indirect Purchaser Plaintiffs ("IPPs") (together "Plaintiffs") submit this Motion for Terminating or Alternative Sanctions Against Defendants Irico Group Corporation and Irico Display Devices Co., Ltd. (collectively, "Irico" or the "Irico Defendants"). Plaintiffs submit this motion in accordance with the Court's order of December 6, 2022, ECF No. 6115 ("Su Order"). The Su Order invited Plaintiffs to "submit motions for sanctions for any discovery misconduct throughout the history of this case. . . . In particular, [Plaintiffs] may submit their motion for sanctions for Irico's failure to comply with the court's orders that Su's deposition be taken." *Id*. at 13.

The Court has the power under Fed. R. Civ. P. 37 and its inherent authority to issue terminating or other severe sanctions for Irico's intentional spoliation of evidence, its repeated violations of Court Orders, and its attempts to evade responsibility for those derelictions by misleading Plaintiffs and the Court.

As the Court has noted, the Irico Defendants are the last defendants in this litigation. They are last for a reason—their plain strategy to delay the case and to destroy or withhold evidence. From the very beginning, Irico has acted with breathtaking disregard for the law and this Court's authority.

First, Irico intentionally violated its legal obligations and defied this Court's Pretrial Order No. 1 (ECF No. 230) ("PTO No. 1") by choosing not to implement a litigation hold at the outset of the case. For years, Irico claimed that its failure to do so was due to an innocent misunderstanding of American law. However, the recent production of its former

The Honorable Vaughn R. Walker
3/20/2023
Page 2

counsel's clear and repeated explanations of its duty to preserve evidence demonstrates that Irico's persistent claims of innocence were false and that its failure to adopt a litigation hold was deliberate. Dire consequences ensued: Irico destroyed virtually *all* evidence relating to its participation in the conspiracy and its CRT pricing and production levels, including *all* emails and other documents from the files of those employees who participated in the conspiracy. This outrageous conduct has unnecessarily delayed this litigation and has severely prejudiced Plaintiffs and the just outcome of this case. This conduct alone merits harsh sanctions.

Second, Irico's disappearance from this litigation for over seven years has destroyed Plaintiffs' ability to obtain testimony from Irico witnesses with knowledge of its wrongful conduct. Virtually all of those who attended conspiracy meetings on Irico's behalf have left its employ, rendering them unavailable for deposition, and Irico has resisted producing those that remain. Most recently, Irico induced Plaintiffs to stipulate to a third extension of time to produce Su Xiaohua for his Court-ordered deposition when it *knew* he planned to resign to avoid being deposed. Mr. Su was one of only two remaining Irico employees who attended competitor meetings. As this Court found, the loss of his testimony "is highly detrimental to resolution of this litigation on its merits." Su Order at 12. Moreover, Irico's failure to produce Mr. Su violated two Court orders requiring him to appear.

Third, as this Court is aware, in 2010, Irico made a calculated, tactical decision to default and disappeared from the case for over seven years. Irico's default violated Court orders, constituted a fundamental and improper rejection of the Court's authority, and needlessly delayed this case. Further, Plaintiffs have recently discovered that Irico induced the Court to lift the defaults against it based on a false representation that its withdrawal was founded on a good faith belief that it was immune from suit.

Finally, Irico has brazenly violated several other discovery orders and has generally abused the discovery process throughout this case.

The Court should not countenance Irico's bad faith conduct. Its misconduct has deprived Plaintiffs and this Court of access to virtually all of its records and witnesses with personal knowledge of its participation in the conspiracy. Irico has defied the Court's authority and seriously impaired the Court's ability to reach a fair resolution of this case. Its conduct has caused years of delay and vast amounts of unnecessary work by the Court and Plaintiffs. Any one of the foregoing instances of misconduct should result in a severe sanction. Collectively, they justify the most severe sanction available to the Court—striking the answers of the Irico Defendants. Anything less would reward them for their conduct and encourage its continuation.

Alternatively, Plaintiffs request that the Court:

The Honorable Vaughn R. Walker
3/20/2023
Page 3

1.  Deem Irico's participation in the alleged conspiracy, and the other activities of the conspiracy alleged in the Complaint, as established as against the Irico Defendants and so instruct the jury;

2.  Instruct the Jury that the Irico Defendants failed to preserve relevant evidence and that it ***must*** infer that the evidence lost or destroyed by the Irico Defendants would have been unfavorable to them had it been produced and offered in evidence, and apply such an inference where the Court is the factfinder;

3.  Instruct the Jury that Irico was ordered to produce Su Xiaohua for a remote deposition in Macau and that it failed to do so, and that the Jury must infer based on Irico's failure to produce him, that Mr. Su's testimony would have been harmful to Irico, and apply such an inference where the Court is the factfinder;

4.  Strike the affirmative defenses of the Irico Defendants;

5.  Order that all meeting notes produced by other defendants are deemed authentic and admissible; and

6.  Order that all documents produced by the Irico Defendants are deemed authentic under FRE 901 and admissible as business records pursuant to FRE 803(6).

## RELEVANT FACTUAL AND PROCEDURAL HISTORY

## I.   Irico's Deliberate Decision Not To Implement A Litigation Hold Has Resulted In The Wholesale Spoliation Of Relevant Evidence

Irico failed to implement a proper litigation hold on relevant documents and electronically stored information (ESI) at the outset of this case as required by well-established law, an order of the Court, and the explicit and detailed advice of its experienced U.S. counsel. This decision was no mistake. Rather, it was taken after careful consideration by the committee established to manage Irico's response to this litigation (the "Litigation Committee") and calculated to avoid liability for its wrongful participation in the alleged conspiracy.

### A.   Irico Deliberately Defied Its Former Counsel's Instructions Regarding Evidence Preservation

The Court is familiar with the facts relating to Irico's failure to implement a litigation hold.[1] Since that Order, Irico has produced its former counsel's[2] communications relating to evidence preservation. The communications confirm that Irico had the benefit

---

[1] *See* Order Approving Special Master's Report & Recommendation On Plaintiffs' Motion to Compel Evidence Preservation Documents (ECF No. 6146) ("Lit. Hold Order").

[2] Irico's former counsel is Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury").

The Honorable Vaughn R. Walker
3/20/2023
Page 4

of a clear explanation of its duty to preserve relevant evidence. They refute Irico's claim that its failure to preserve evidence was due to a good faith misunderstanding of the law.

In the Lit. Hold Order, the Court found that Irico failed to implement the required document preservation notice when it received IPPs' summons and complaint in December 2007 alleging a global CRT conspiracy, despite hiring Pillsbury a month later. *Id.* at 2.[3] The Court explained:

> Irico confirms that it never issued a written litigation hold notice and, instead in the summer of 2008, Irico orally instructed key employees to preserve documents related to sales of CRT to the United States. 5/9/22 Irico Response at 2 and 8 ("no written litigation hold was issued by Irico"); 4/15/22 Capurro Decl, Exh I at 7 (Irico's Supp Response to Interrogatory No 2). Irico has admitted that it failed to implement a litigation hold until more than eight months after its duty to preserve was triggered by service of the complaint on December 25, 2007. *See* 4/15/22 Capurro Decl, ¶11, Ex I at 10-11. Irico also stated in its discovery response that "Irico acknowledges that at the time [of its oral instructions in 2008] it misunderstood the scope of document preservation in connection with the litigation in the United States and cannot be certain that all documents related to Irico's global sales of CRTs were preserved." 5/23/22 Plaintiffs' Reply at 4, citing 4/15/22 Capurro Dec, Ex I at 11 (Irico's Supplemental Response to Issue No 4).

Lit. Hold Order at 2. The Court also explained that Irico's purported "oral instruction" was not only inexcusably tardy but also grossly deficient. Among other things, Irico "failed to suspend its automatic email destruction practice," and, by limiting its application to sales of CRTs in the United States, failed to address "the full scope of relevant documents." *Id.* at 7.[4] The Court also noted Irico's excuse for the narrowness of its purported preservation efforts was that "it misunderstood the scope of document preservation." *Id.*

Irico's (redacted) communications with Pillsbury demonstrate, however, that Irico did not "misunderstand" its obligations. Rather, they irrefutably show that Irico **deliberately** defied this Court's PTO No.1 (and black-letter law) requiring it to provide companywide written instructions to preserve evidence relating to its worldwide CRT

---

[3] *See also* Declaration of Lauren C. Capurro ("Capurro Decl."), ¶ 2, Ex. A (Irico's Suppl. Objs. & Resps. To IPPs' Third Set Interrogs., Resp. to Interrog. No. 4) at 23–24.

[4] Irico's Legal Affairs Director, Yan Yunlong, also testified that he does not recall or is not aware of Irico (1) creating a back-up or "mirror image" of its computer system or querying its computer system to discover relevant documents in 2008, (2) creating a catalog of relevant documents, or (3) instructing its IT employees to turn off its email system's auto-delete function. Capurro Decl., ¶ 3, Ex. B (Yan Yunlong Dep. Tr. Vol. II at 158:21–165:23).

The Honorable Vaughn R. Walker
3/20/2023
Page 5

business. Pillsbury first advised Irico to preserve potentially relevant evidence shortly after it was retained. By email dated February 15, 2008, Pillsbury advised Yan Yunlong that "it is essential that Irico does not destroy or dispose of any potentially relevant documents, whether in paper, electronic or any other form."[5] Pillsbury further told Irico to "issue written instructions to the members of your company to retain all such documents as soon as possible[,]" and offered to "advise on appropriate written instructions." *Id.* That same day, Yan Yunlong forwarded the email to "Secretary Tao" (Tao Kui) and "Mr. Gao" (likely Gao Rongguo).[6] By its own admission, Irico ignored these instructions and did nothing until August 2008.[7]

On June 23, 2008, Pillsbury sent another email to Mr. Yan, enclosing a translation of the Court's Pretrial Order No. 1 requiring evidence preservation.[8] Pillsbury explained:

> The court issued its first pretrial order on April 4, 2008, with Article 13 being the most critical to Irico, which sets out the court's requirements for preservation of evidence (including information in electronic form). ***As we have discussed with Irico, this is an extremely important statutory requirement. If some potentially relevant information is lost or destroyed, this could have very serious consequences for Irico.***

*Id.* at IRI-SUPP-000012E (emphasis added). The email's reference to prior discussions about the importance of evidence preservation indicates that Pillsbury attorneys had previously spoken to Mr. Yan about evidence preservation in between the February and June 2008 emails, and possibly before the February email.[9] Yet, Irico still took no action to preserve relevant evidence.

Then, on August 18, 2008, Pillsbury sent another email to Yan Yunlong, this time attaching a memorandum to Irico regarding evidence preservation and a written litigation

---

[5] Capurro Decl. ¶ 4, Ex. C (IRI-SUPP-000001E–005E, at 01E).

[6] *Id.* ¶ 5, Ex. D (IRI-SUPP-000006-011E). Tao Kui, who was the Deputy General Manager of Irico Group at the time, was the most senior member of the Litigation Committee. *Id.* ¶ 6, Ex. I (Yan Yunlong Dep. Tr. Vol. I at 125:3–7). Mr. Yan also sat on the Litigation Committee and is the only remaining member. *Id.* Ex. A (Irico's Suppl. Objs. & Resps. to IPPs' Third Set of Interrogs., Interrog. No. 2, Resp. to Issue No. 4) at 11.

[7] *Id.* Ex. A (Irico Suppl. Resp. to Interrogatory No. 2, Issue Nos. 3 & 4) at 10–11 (describing the formation of the Litigation Committee in June 2008 and a meeting in August 2008 to discuss searching for and preserving evidence)).

[8] *Id.* ¶ 7, Ex. F (IRI-SUPP-000012–021E).

[9] *Id.* As further discussed below, neither the February 2008 email nor the June 2008 email was identified on Irico's privilege log as relating to evidence preservation. *See id.* ¶ 9 Ex. G (Irico Defs' Log of Privileged Documents).

The Honorable Vaughn R. Walker
3/20/2023
Page 6

hold notice entitled "Information Preservation Notice," all in Chinese.[10] The memorandum references Pillsbury's "previous communications and the Court's Order regarding preservation of evidence (a copy of which [they again] attach)," and states:

> [W]e believe that Irico Group Corporation and Irico Display Devices Co., Ltd. (collectively, "Irico") have notified the appropriate Irico personnel regarding the retention of information potentially relevant to the subject matter of the CRT Antitrust Litigation at issue. The purpose of this memorandum is to advise Irico to distribute forms and documents to employees in addition to the notifications already previously made, which are intended to remind Irico personnel of the importance of complying with U.S. law requiring the preservation of potentially relevant information.[11]

The attached "Information Preservation Notice" ("Notice") describes specific categories of "potentially relevant" information relating to Irico's "worldwide" CRT business that should be preserved for the period beginning January 1, 1995, including, *inter alia*, "communications, agreements, or meetings with competitors . . . relating to CRTs or CRT Products sold in the U.S. or worldwide."[12] The Notice also describes in detail the types of hard copy and electronic documents that should be preserved and where they are likely to be found.[13] Pillsbury instructed Irico to distribute the Notice to its employees,

---

[10] *Id.* ¶ 9, Ex. H (IRI-SUPP-000022E and IRI-SUPP-000023–028E). Irico also produced two different English-language memoranda dated August 7, 2008 (*id.* ¶ 10, Ex. I, IRI-SUPP-000029–30, & *id.* ¶ 11, Ex. J, IRI-SUPP-000034–36), and an English version of the Information Preservation Notice ¶ 12, (Ex. K, IRI-SUPP-0000000031–33). Irico's counsel states that these documents were "found in Pillsbury's internal casefile, and we have no indication [they were] ever sent to Irico." *Id.* ¶ 13, Ex. L (Werbel Letter dated Feb. 13, 2023). Plaintiffs believe that these memoranda were the original versions drafted by Pillsbury attorney Joseph Tiffany on August 7, 2008, and then transmitted to Pillsbury's Chinese-speaking attorneys for translation and transmittal to Irico. *Id.* ¶ 13.

[11] *Id.* Ex. H (IRI-SUPP-000023E). In the original August 7, 2008 memorandum (Ex. I, IRI-SUPP-000029–30), Pillsbury attorney Joseph R. Tiffany II wrote, ". . . we *assume* that Irico Group Corporation and Irico Display Devices … have already instructed appropriate IRICO personnel regarding the requirement to retain information. . . ." *Id.* at IRI-SUPP-000029 (emphasis added).

[12] *Id.*, Ex. H (IRI-SUPP-000026–28E).

[13] *Id.* at IRI-SUPP-000026E ("This Information Retention Notice applies to information and documents stored in personal offices, shared file cabinets, and outside locations. It also includes digital or electronic information retained in all locations (including desktop computers, laptops, home computers, personal digital assistants, server files, removable devices, cell phones, etc.").

The Honorable Vaughn R. Walker
3/20/2023
Page 7

including "persons most knowledgeable"[14] and others who "are reasonably likely to have documents or electronic information relating to any of the subjects identified in the Notice[,]" as well as those responsible for IT and records management. *Id.* Pillsbury further advised that Irico employees should sign the Notice to "remind [them] of the importance of retaining such information. The Information Preservation Notice should be supplemented by periodic oral instructions to appropriate IRICO personnel and careful monitoring of compliance." *Id.*

The Notice refers to "attached instructions for retaining electronic information[,]" but no such Chinese language instructions have been produced. Irico did produce a separate English-language Pillsbury memorandum, also dated August 7, 2008, entitled "Preservation of Documents and Electronically Stored Information."[15] This memorandum provides specific instructions on identifying and preserving "email and other electronically stored information ('ESI')[,]" and instructs Irico to suspend any automatic deletion of ESI, emphasizing that "it is very important for IRICO to take proper steps to preserve ESI, as well as information in other forms."[16] It also notes that Pillsbury "will need to have a thorough understanding of IRICO's computer system" and references a separate memorandum that it planned to provide on this subject.[17] No such memorandum has been produced. *Id.*

In short, Pillsbury's communications demonstrate that Irico has no excuse for its failure to implement a proper litigation hold. Irico was fully informed of its obligations to preserve documents, including (1) the Court's Order requiring it to do so; (2) that it was required to do so immediately; (3) that it was required to do so in a writing distributed to all individuals potentially possessing relevant materials; and (4) that relevant documents were not limited to its United States sales, but included documents relating to its worldwide CRT business. Irico made a conscious and fully informed decision to disobey the Court's clear order to preserve documents, well-established law, and the advice of its counsel.

---

[14] *Id.* at IRI-SUPP-000023E (emphasis added). The memorandum references an earlier July 14, 2008 memorandum entitled "Request for Information Pertaining to CRT Antitrust Litigation," which it says Irico should use to identify the employees who should receive the Notice. *Id.* This memorandum has not been produced and does not appear on Irico's privilege log.

[15] *Id.*, Ex. J (IRI-SUPP-000034–36). Irico's current counsel states that this memorandum was found in Pillsbury's casefile but there is "no indication it was sent to Irico." *Id.*, Ex. L (Werbel Letter dated Feb. 13, 2023). Given Irico's wholesale destruction of evidence and lack of candor on this issue, this assertion should be viewed with skepticism.

[16] *Id.* at IRI-SUPP-000035.

[17] *Id.*

The Honorable Vaughn R. Walker
3/20/2023
Page 8

**B.    Irico's Repeated Claims That It Misunderstood U.S. Law Were Deliberate Falsehoods**

The Pillsbury communications also make clear that Irico has engaged in a years-long effort to conceal its failure to preserve relevant evidence via false assertions that it innocently misunderstood its obligations.

In March 2019, Zhang Wenkai, as Irico's Fed. R. Civ. P. 30(b)(6) corporate representative on evidence preservation,[18] falsely testified that Irico did not issue a litigation hold notice because, "We did not aware that it is something we need to do."[19] In January 2022, Irico falsely claimed in an interrogatory response that its failure to implement a proper litigation hold was because it "misunderstood the scope of document preservation in connection with the litigation in the United States. . . ."[20] And in May 2022, Irico falsely asserted that it "undertook measures that it believed to be appropriate under the circumstances" and that its failures were due to its "limited understanding of the law and customs of the United States." Irico Response 5/9/22 at 6; Lit. Hold Order at 6.

Irico admitted that Pillsbury had sent an email and "memorandum regarding evidence preservation" to Irico's legal counsel, Yan Yunlong, on August 18, 2008 ("Pillsbury's August Instructions").[21] However, Irico refused to produce Pillsbury's August Instructions on privilege grounds for several months, forcing Plaintiffs to move to compel.[22] Irico also failed to identify the February and June 2008 emails on its privilege log as relating to evidence preservation. The descriptions of both emails misleadingly state that they "contain[] legal advice . . . regarding CRT litigation status and strategy."[23] There is also no indication on the privilege log that the June 23, 2008 email attached PTO No. 1. *Id.* PTO No. 1 is clearly not privileged. Thus, Irico should have produced the redacted email with PTO No. 1 attached. Its failure to do so is likely because doing so immediately would have revealed that Irico had ignored Pillsbury's instructions regarding evidence preservation. Thus, this is *yet another* example of Irico's (and its counsel's) attempts to mislead Plaintiffs and the Court and conceal its wrongful conduct.

---

[18] Capurro Decl. ¶ 14, Ex. M (Zhang Wenkai Deposition Notice, including the topic: "The preservation, or not, of evidence by Group and/or Display relevant to their FSIA defenses or the merits of this case, from 2008 to present.")

[19] *Id*. ¶ 15, Ex. N (Zhang Wenkai Dep. Tr. Vol. I at 84:11–24).

[20] *Id*. Ex. A (Irico's Suppl. Objs. & Resps. To IPPs' Third Set Interrogs., Resp. to Interrog. Nos. 2 & 4) at 11.

[21] Capurro Decl., Ex. G (Irico Defs.' Log of Privileged Documents identifying August 18, 2008 email and memorandum).

[22] *See* Capurro Decl. ¶ 16, Ex. O (April 15, 2022 Motion to Compel).

[23] *Id.*, Ex. G (Irico Defs.' Log of Privileged Documents).

The Honorable Vaughn R. Walker
3/20/2023
Page 9

In late September 2022—following months of delays by Irico—Plaintiffs deposed Yan Yunlong. Mr. Yan is "the only remaining Irico employee with knowledge of the dissemination of the oral instruction in 2008."[24] He is also the only Irico employee who communicated with Pillsbury and is the sole source for Irico's discovery responses regarding evidence preservation.[25] Mr. Yan initially testified that—consistent with Irico's interrogatory responses—Irico directed employees in 2008 to preserve only documents relating to U.S. sales.[26] But he later changed his testimony to claim that—contrary to Irico's interrogatory responses—the 2008 oral instruction was *not* limited to U.S. sales, and in fact extended to competitor meetings.[27] Irico had also insisted in response to Plaintiffs' motion to compel that there was no written litigation hold document to produce because it had only issued an "oral instruction" to employees.[28] But Mr. Yan testified that he provided Pillsbury's August Instructions to other Litigation Committee members.[29] He did not, however, personally instruct any other Irico employees to preserve relevant evidence.[30] Rather, he admitted that he relied on the other committee members (all of whom participated in the conspiracy) to do so, and that he does not know what instructions (if any) they gave to their subordinates.[31]

Almost two months after Mr. Yan's deposition—after the close of discovery, fifteen months of meet and confers, two motions to compel, and only after Plaintiffs pointed out the inconsistencies between his testimony regarding the 2008 litigation hold and Irico's discovery responses—Irico attempted to shift its story once again. On November 23, 2022, Irico amended its responses to IPPs' interrogatories and served an unsworn declaration

---

[24] Capurro Decl. Ex. A (Irico's Suppl. Objs. & Resps. to IPPs' Third Set of Interrogs., Interrog. No. 2, Resp. to Issue No. 4) ("All of the members of the 2008 Litigation Committee other than Yan Yunlong have retired or otherwise departed the company.")

[25] Capurro Decl. ¶ 17, Ex. P (Irico's Objs. & Resps. to IPPs' Fourth Set of Interrogs., Resp. to No. 4) at 14; Ex. A (Irico's Third Suppl. Objs. & Resps. to IPPs' Interrog. No. 2, Resp. to Issue No. 4) at 11 (Irico's "answers are based on the recollections of Yan Yunlong").

[26] *Id.*, Ex. E (Yan Yunlong Dep. Tr. Vol. I at 129:22–23) ("Q. And the instruction that was conveyed in 2008 was to preserve documents relating to U.S. sales, is that right? A. Yes."); *id.* at 136:21–24 ("Q. And the instruction that emanated from the committee in August of 2008 was to preserve documents relating to U.S. sales, correct? A. Yes.").

[27] *Id.* at 136:25–137:20.

[28] *See e.g., id.* ¶ 18, Ex. Q (Irico's May 9, 2022 Opp. to Plaintiffs' Motion to Compel) (arguing Plaintiffs' motion should be denied because the cases "prescribe only the production of a litigation hold notice and . . . Irico has confirmed that it did not issue a written litigation hold notice.").

[29] *Id.* Ex. E (Yan Yunlong Dep. Tr. Vol. I at 132:16–133:7).

[30] *Id.* at 130:20–23.

[31] *Id.* at 137:21–139:14.

The Honorable Vaughn R. Walker
3/20/2023
Page 10

from Mr. Yan that purported to re-write 17 pages of his deposition testimony regarding Irico's inadequate litigation hold.[32]

Setting aside for now that Mr. Yan cannot credibly contradict his sworn testimony, his new story purports to change two key facts: (1) Irico no longer contends that it only gave an oral litigation hold instruction because it now admits that Pillsbury's Instructions were distributed to Litigation Committee members;[33] and (2) Irico "no longer contends that its initial efforts to preserve documents in August 2008 were limited solely to documents regarding sales of CRTs to the United States[.]"[34] Critically, although Irico never expressly says so, *its supplemental responses also no longer claim that it "misunderstood" its document preservation obligations.* However, the supplemental responses now provide *no* information about what categories of information (if any) Litigation Committee members were instructed to preserve, whether any search took place, whether anything was found, or whether anything was preserved as a result.[35] In addition, both Irico and Mr. Yan disclaim any knowledge of whether the Litigation Committee members in fact instructed anyone else to preserve anything, or whether anything was preserved, because it was left up to each member to determine which subordinates to contact and what information should be relayed, and no effort was made to monitor implementation.[36]

In sum, Irico's recent and improper alterations of Mr. Yan's testimony and its previous interrogatory responses are far from exculpatory. Rather, they merely confirm—after 15 months of discovery—that (1) Irico did *nothing* to disseminate a written litigation hold in 2008; (2) it did so willfully, with a full understanding of its document preservation obligations and in defiance of its counsel's instructions; and (3) Irico has offered up a series of intentional misrepresentations to conceal these facts.

---

[32] *Id.* ¶ 19, Ex. R (Declaration of Yan Yunlong ("Unsworn Yan Decl.") dated Nov. 18, 2022, claiming he "was confused regarding some questions and gave inaccurate testimony . . . , as well as inaccurate input for the interrogatory responses . . . ."); *id.* ¶ 20, Ex. S (Irico's Third Suppl. Objs. And Resps. To IPPs' Third Set of Interrogs.); ¶ 21, Ex. T (Irico's Second Suppl. Objs. And Resps. To IPPs' Fourth Set of Interrogs.).

[33] *Id.*, Ex. S (Irico's Third Suppl. Resp. to IPPs' Interrog. No. 2) at 24–25 ("At this August 2008 meeting, the 2008 Litigation Committee *was provided with a copy of the Pillsbury legal advice.* . . .") (emphasis added); Ex. R (Yan Unsworn Decl.) ¶ 7.

[34] *Id.* Ex. S (Irico's Third Suppl. Resp. to Interrog. No. 2, Issue No. 5) at 26.

[35] *Id.* Ex. S (Irico's Third Suppl. Resp. to Interrog. No. 2) at 25–26; Ex. R (Unsworn Yan Decl.) ¶¶ 7–9.

[36] *Id.* Ex. S (Irico's Third Suppl. Resp. to Interrog. No. 2) at 24–26; Ex. R (Unsworn Yan Decl.) ¶¶ 8–10.

The Honorable Vaughn R. Walker
3/20/2023
Page 11

### C.     Irico Has Intentionally Spoliated Entire Categories Of Critical Evidence

Irico's willful failure to implement a litigation hold has resulted in Irico intentionally spoliating entire categories of evidence critical to this litigation. During the class period, Irico was the largest CPT manufacturer in China.[37] Yet, it has produced only 33,462 pages, a small fraction of the volume of documents produced by other similarly-sized defendants.[38] Indeed, the Court has already found, after a review of the evidence and consideration of Irico's arguments, that "[o]n balance, it appears highly likely that relevant evidence was destroyed or lost due to Irico's long-delayed and inadequately implemented litigation hold efforts." Lit. Hold Order at 9.

Irico has conceded that it failed to preserve relevant evidence. Irico's discovery responses concede that it does "not contend that the oral instruction in 2008 was effective in preserving all documents relating to its global sales of CRTs[,]" and it "cannot be certain that all documents relating to Irico's global sales of CRTs were preserved[.]"[39] In response to the Court's question about what documents would have been preserved if the oral instruction not been limited, Irico listed several types of documents "regarding Irico's global sales of CRTs that are more likely to have existed in the summer of 2008[,]" including sales reports, CRT sales contracts with customers, recent correspondence with customers, and handwritten notes regarding recent meetings.[40]

Irico has also admitted that emails were deleted from its server every 3 to 5 days;[41] that it did not turn off its automatic deletion of emails when it received notice of the

---

[37] *Id*. ¶ 22, Ex. U (Irico Electronics 2004 Annual Report) at 8. By 2007, Irico had increased its market share to 13.8% of the global market, making it the third largest CPT maker in the world. *Id*. ¶ 23, Ex. V (Irico Electronics 2007 Annual Report) at 13.

[38] For example, Beijing Matsushita Color CRT Co., Ltd. ("BMCC"), a much smaller Chinese CRT manufacturer, produced 598,701 pages and Taiwanese manufacturer, Chunghwa Picture Tubes, Ltd., produced 996,514 pages. *Id*. ¶ 24.

[39] Capurro Decl., Ex. S (Irico Third Suppl. Resps. to IPPs' Third Set of Interrogs., Resp. to Issue Nos. 4 & 5) at 11–12.

[40] *Id*. (Irico Resp. to Issue No. 6) at 12–13. Irico improperly limited this response to what would have existed in Summer 2008. Irico's duty to preserve relevant evidence was triggered no later than December 25, 2007, when it received IPPs' complaint. Thus, Irico should have stated what documents would have existed in December 2007.

[41] *Id*. (Resp. to Issue No. 8) at 16; *id*. ¶ 25, Ex. W (Irico Defs.' Fifth Suppl. Objs. & Resps. to DPPs' First Set Interrogs., Suppl. Resp. to Interrog. No. 16) at 11 ("Irico believes that its servers overwrote email data every three to five days on average due to storage limits for the period including and prior to 2007.").

The Honorable Vaughn R. Walker
3/20/2023
Page 12

litigation, or at any point thereafter;[42] that it recycled the computers of departing employees long after its duty to preserve was triggered;[43] and, that none of its "key employees"— namely, its high-level current and former employees, including the Litigation Committee members and others who attended conspiratorial meetings—"maintained any additional electronic or paper documents from the relevant period" other than what was preserved in Irico's archives pursuant to Chinese law.[44]

Irico has identified the types of documents it generated during the relevant period, including, *inter alia*, weekly and monthly sales reports containing "information regarding customers, competitors and general market information," and emails regarding CRT production and "the scheduling and planning of the China CPT Industry Association, a trade organization for manufacturers of CPTs[,]"[45] through which anticompetitive agreements were reached and enforced. But Irico has produced *none* of these highly relevant documents. Indeed, Irico has failed to produce entire categories of critically relevant documents, including:

- No emails from the relevant period from the files of *any* employees or executives—this includes no emails from the files of the 2008 Litigation Committee members who attended numerous meetings with competitors, and who received Pillsbury's August 2008 Instructions to preserve specific categories of documents, and none from Wang Zhaojie ("Mr. Wang"), who admitted to attending "many, many meetings" with Irico's competitors;
- No other electronic or hard copy documents from the relevant period from the files of any of its employees, including the Litigation Committee members;
- Virtually no documents relating to the more than 100 conspiratorial meetings that Irico representatives attended during the relevant period, as reflected by the other defendants' notes of those meetings;
- No correspondence between Irico and its customers regarding CRT sales;
- No CRT sales contracts with customers;
- No weekly or monthly sales and marketing reports, which Irico has admitted were generated on a regular basis;[46]
- No production reports from Irico's CRT factories; and

---

[42] *Id*. Ex. B (Yan Yunlong Dep. Tr. Vol. II at 165:2–23).

[43] *Id*., Ex. W (Irico's Fifth Suppl. Objs. & Resps. To DPPs' First Set Interrogs.) at 8.

[44] *Id*. ¶ 26, Ex. X (Irico's Fourth Suppl. Resps. to DPPs' FSIA RFPs, Resp. to No. 9) at 9.

[45] *Id*. Ex. S (Irico Third Suppl. Resps. to IPPs' Third Set Interrogs., Resp. to Issue No. 8) at 13–17.

[46] *Id*. (Resp. to Issue No. 8) at 14 (stating that Irico's "sales department prepared weekly- and monthly-summaries of information collected by its employees").

The Honorable Vaughn R. Walker
3/20/2023
Page 13

- Virtually no documents reflecting how Irico determined the prices it would charge for its products.[47]

Irico attempts to explain away its deficient production by claiming it is "unable to determine whether" these documents would have existed in late 2007, or with unsupported and self-serving claims that such documents "would not have been retained in the ordinary course of business and were unlikely to have existed at the end of 2007."[48] Irico relies on its purported limited server capacity and routine deletion of emails to claim that it is "not able to determine whether email created during the relevant time period existed at the end of 2007[.]"[49] But, as Your Honor noted, "Irico presents no information about investigating custodial files of 'key employees' who may have printed relevant emails, forwarded emails to their personal email accounts or downloaded emails to their work or personal computers or to portable hard drives." Lit. Hold Order at 9. In fact, Mr. Yan testified that he downloaded and saved his emails with Pillsbury to his hard drive.[50] It is therefore likely that other Irico employees did the same with important documents they received.

Significantly, as Your Honor recounted, Plaintiffs have identified Irico emails, meeting notes, sales and marketing reports, and other Irico documents (which should have been preserved and produced by Irico) in other defendants' productions. Lit. Hold Order at 9. Moreover, these documents date from 2006 and 2007—*i.e.*, not long before the November 2007 government raids on CRT makers, or when Irico received IPPs' complaint on December 25, 2007. *Id.* (discussing emails authored by Litigation Committee member and Irico's Head of Overseas Sales Department, Liang Yuan, to Chunghwa in 2006 and 2007, and attaching "meeting notes and production data").[51] As Your Honor concluded, "it was unlikely that they and all relevant emails in Liang Yuan's and others' files would have been discarded by the time the duty to preserve arose." Lit. Hold Order at 9.

Irico has likewise admitted that numerous sales and marketing reports found in Chunghwa's production—many of which contain highly sensitive, confidential information about Irico's future business plans, and reference competitor agreements on

---

[47] *Id.* ¶ 27. For example, in response to DPPs' interrogatory about CRT price increases or decreases during the class period, Irico identified only *eight* Irico documents. *Id.* ¶ 28, Ex. Y (Irico's Sixth Suppl. Objs. & Resps. to DPPs' First Set of Interrogs., Resp. to Interrog. No. 6) at 14. Moreover, the documents identified are voluminous collections of internal "Administrative Meetings," containing only sporadic, vague references to CRT prices.

[48] Ex. S (Irico Third Suppl. Resps. to IPPs' Third Set of Interrogs., Resp. to Issue No. 8) at 13-14.

[49] *Id.* Ex. S (Irico Resp. to Issue No. 8) at 16.

[50] *Id.* Ex. E (Yan Yunlong Dep. Tr. Vol. I at 93:15–95:13); Ex. B (Vol. II at 168:25–169:5).

[51] *See also, e.g., id.* ¶¶ 29-31, Exs. Z–BB (███████████████████████
███████████████████████████████████████████

The Honorable Vaughn R. Walker
3/20/2023
Page 14

CRT prices and production levels—were authored by Irico employees.[52]



[55] Other similar weekly reports show that, contrary to Irico's claims, Irico knew its customers were using Irico's CRTs to manufacture CRT televisions for sale in the United States.[56] Mr. Wang admitted that reports like these were produced by Irico's sales department on a weekly or monthly basis,[57] making it likely that at least some such reports existed in December 2007.

After reviewing the foregoing evidence, Your Honor concluded that, "[o]n balance, it appears highly likely that relevant evidence was destroyed or lost due to Irico's long-delayed and inadequately implemented litigation hold efforts. Irico's position, supported by its Rule 30(b)(6) witness' testimony, that weekly sales and marketing reports and notes of competitor meetings were not important and not likely to be kept appears implausible." Lit. Hold Order at 9.

---

[52] *See id*. ¶ 32, Ex. CC (Irico Defs.' Objs. & Resps. to IPPs' RFA No. 4).

[53] *Id*. ¶ 33, Ex. DD (Dep. Ex. 8566, CHU00123502–17E).

[54] *Id*. at CHU00123506E.

[55] *Id*. at CHU001235010E (emphasis added). *See also id*. ¶¶ 34-36, Exs. EE–GG (

[56] *See, e.g., id*. ¶ 37, Ex. HH (Dep. Ex. 8571, CHU00124396–99: an Irico report produced by Chunghwa entitled "Information Weekly, Sales Company, 70th Issue, July 8-15, 2005." At CHU00124397, in the first column of the table, the row relating to Haier, it states: "**For 21"PF (new AK) produced for exporting to the United States, preparations for the early stage are being intensified**." In the third column it states: "**Sample tubes of Irico 21" (new AK) have a low luminance and American engineers have arrived at Qingdao Haier by air on 15th day for consultation**." ); *id*. ¶ 38, Ex. II (Dep. Ex. 8572, CHU00124400–02: an Irico report produced by Chunghwa entitled "Information Weekly" dated August 6-12, 2005, states "**Irico 21" PF has been recognized by American customers and can be supplied**."); *id*. ¶ 39, Ex. JJ (Dep. Ex. 8573, CHU00124417–19: an Irico weekly report produced by Chunghwa entitled "Information Weekly" dated May 8–14, 2006: "**It is reported from Konka's U.S. customers that the 15" PF has an issue of barrel distortion, and Irico technical personnel are investigating and negotiating countermeasures with Shenzhen Konka R&D personnel . . .**").

[57] Capurro Decl. ¶ 40, Ex. KK (Wang Zhaojie 3/7/19 Rule 30(b)(6) Depo. Tr. at 79:4–82:22) (discussing weekly reports); *id*. ¶ 41, Ex. LL (Wang Zhaojie 9/20/22 Depo. Tr., at 119:7–120:9) (authenticating minutes of a sales/marketing meeting).

The Honorable Vaughn R. Walker
3/20/2023
Page 15

## II.   <u>Irico Has Failed To Produce Witnesses In Violation Of Court Orders</u>

Irico has also improperly denied Plaintiffs evidence by refusing to produce witnesses. Irico has used its withdrawal and delaying tactics to render most witnesses to its conduct unavailable to testify. At least 17 individuals—who attended scores of competitor meetings—left Irico's employ during the period of its withdrawal or during jurisdictional discovery.[58] Irico has thus claimed that it cannot produce these individuals for deposition, even though it interviewed a number of them as part of its investigation into the alleged conspiracy.[59]

### A.   **Su Xiaohua**

Most recently, Irico failed to produce Su Xiaohua for deposition after ten months of delays, and in violation of Court Orders requiring it to produce him.[60] As the Court recounted in the Su Order, Mr. Su is an important witness whom Irico identified as one of only two persons knowledgeable regarding "matters that are highly relevant to this litigation and is likely the only Irico witness with personal knowledge of key facts and events." Su Order at 10. Irico identified Mr. Su as one of only two witnesses knowledgeable about Irico's meetings and communications with its competitors and three affirmative defenses.[61] After three stipulated extensions of Court-ordered deadlines, Irico failed to produce Mr. Su for deposition, claiming he had resigned on May 25, 2022, in part "because he refused to travel to Macau for a deposition given the severe quarantine requirements that he would face upon his return to mainland China . . . ." ECF No. 6027-3; Su Order at 5-7, 12 (reciting chronology and noting that it "paints an unflattering picture of Irico.").

The Court identified three disputed issues relevant to this sanctions motion: (1) whether Irico's failure to produce Su Xiaohua violated a Court Order (*id*. at 7–8); (2) Irico's awareness of Mr. Su's intent to resign and resignation (*id*. at 8–9); and (3) whether Mr. Su's failure to appear was outside of Irico's control. *Id.* at 10. To inform the latter two issues, the Court ordered "targeted discovery" of documents relating to Mr. Su's

---

[58] Capurro Decl. ¶ 42, Ex. MM (2018-06-05 Irico Resp. to Letter re Potential Deponents (listing departed employees)); *id.* Ex. S (Irico Third Suppl. Objs. & Resps. to IPPs Third Set Interrogs., Resp. to Issue No. 2) at 9 (Wang Ximin departed in November 2013).

[59] Among others, Irico interviewed Guo Mengquan, Liang Yuan, Shen Xiaolin and Wei Jian-She during jurisdictional discovery. *Id.,* Ex. X (Irico's Fourth Suppl. Objs. & Resps. to DPP FSIA RFPs) at 9.

[60] *See further* ECF Nos. 6032 at pp. 2–7 & 6101 at pp. 2–5.

[61] *See* ECF No. 6032-1, ¶ 2, Ex. A (describing Irico's interrogatory responses identifying Mr. Su as knowledgeable about Irico's Third, Eighth and Tenth Affirmative Defenses, and attaching responses), & ¶ 11, Ex. J (describing Irico's interrogatory responses identifying Mr. Su as knowledgeable about Irico's meetings and communications with competitors and attaching responses).

The Honorable Vaughn R. Walker
3/20/2023
Page 16

deposition, his resignation (including when any Irico employee first learned of his intention to resign), his relationship(s) with Irico or its related entities, his employment status, Irico's efforts to comply with the order to produce Mr. Su for deposition, and Irico's continuing control of Mr. Su. *Id.* at 12–13. Irico produced responsive documents to Plaintiffs on December 22, 2022, along with an extensive privilege log.[62]

Irico's failure to produce Su Xiaohua violated Court Orders: As the Court recited in the Su Order, Irico waited until the June 30, 2022 deadline[63] for the depositions of Mr. Su and the other Irico witnesses to move for emergency relief from the May 25 Order. Su Order at 7. In addition, the Court denied the emergency motion because Irico failed to show good cause for relief from the May 25 Order. *Id.* at 8 (citing ECF No. 6047 at 12:10–36). "On this record," Your Honor correctly concluded that "Irico did violate the court's order (ECF No. 6016) by not producing witnesses for depositions by June 30, 2022 and by failing to demonstrate good cause to set aside that order." Su Order at 8.

Irico has contended that it did not violate the May 25 Order because the Court reset the deposition deadline for September 9, 2022, and that the August 22, 2022 Stipulated Order (ECF No. 6056) somehow vacated that deadline for Mr. Su. Not so. The August 11, 2022 Order (ECF No. 6047) did not [a]excuse Mr. Su from appearing for deposition or excuse Irico's violation of the May 25 Order. Indeed, the Court expressly stated that "if fewer than all of the witnesses testify," the parties could file a brief setting forth "the legal consequence of the witness' failure to appear." ECF No. 6047 at 13:10–14:7. Thus, the Court did not excuse the violation of the May 25 Order. In addition, the August 22, 2022 Stipulated Order only pertained to Messrs. Wang and Yan (*see* ECF No. 6056 at 1:7–8), as Your Honor correctly concluded. Su Order at 6. The parties never contemplated vacating the deadline for Mr. Su, much less agreed to do so, as confirmed by the parties' correspondence relating to the stipulation, which makes no mention of Mr. Su.[64] Thus, Irico's failure to produce Mr. Su violated both the May 25 Order and the August 11, 2022 Order requiring him to appear for deposition by September 9, 2022.

Irico was aware of Mr. Su's intent to resign by at least early April 2022: Yan Yunlong testified that Irico knew "[a]t some point in April" 2022 that Mr. Su was not willing to be deposed and intended to resign.[65] Irico has dismissed Mr. Yan's testimony as "hearsay" and "inaccurate," and claims it did not know that Mr. Su planned to resign before it happened. ECF No. 6101 at 10. But the only support for these statements is the Declaration of Zhang Wenkai, which the Court concluded "only speaks to his personal

---

[62] Capurro Decl. ¶ 43, Ex. NN (Irico Defendants' Log of Privileged Documents Responsive to December 6, 2022 Order).

[63] *See* ECF No. 6016 (the "May 25 Order") (setting June 25, 2022 deadline).

[64] Capurro Decl. ¶ 46. *See also id.* ¶ 44, Ex. OO (Plaintiffs' Aug. 19, 2022 Letter to Taladay); *id.* ¶ 45, Ex. PP (Taladay's Aug. 19, 2022 Letter to Plaintiffs).

[65] Capurro Decl. Ex. B (Yan Yunlong Dep. Tr. Vol. II at 230:15–231:2).

The Honorable Vaughn R. Walker
3/20/2023
Page 17

knowledge" and "cannot be considered 'reliable evidence' that Irico only learned of Mr. Su's decision to depart on May 25, 2022." Su Order at 9.

Irico is also attempting to re-write Mr. Yan's sworn testimony from "***in*** April" to "***after*** April" by way of erratum, asserting that he "mis-spoke."[66] This is plainly improper.[67] However, even if Mr. Yan's testimony is changed from "***in*** April" to "***after*** April," it would not exonerate Irico. Irico continued to assure Plaintiffs and the Court of Mr. Su's willingness to appear—and received extensions of the Court-ordered deadline to produce him—through May 20, 2022. ECF No. 6015. Indeed, IPPs lost their trial date because of this *third* extension of time. ECF Nos. 6016, 6024.[68] Yet, Irico did not disclose Mr. Su's resignation and unwillingness to appear until June 7, 2022.

Moreover, a document produced by Irico in response to the Court's targeted discovery corroborates Mr. Yan's original testimony that Irico knew "***in*** April" that Mr. Su would be unavailable. The redacted minutes of an April 7, 2022 meeting show that Irico approved Mr. Su's request to take *early* retirement on April 7, 2022, without requiring him to appear for deposition when it likely had the power to do so.[69] The meeting minutes state:

> **Regarding matters related to Su Xiao Hua reaching retirement age and departure**
> . . . Su Xiao Hua, the regional general manager for the Huanan area of Xianyang Irico Industrial Group Co., Ltd., has reached the upper age limit for employment in March 2022, and will leave his position as manager at the end of December to retire and rest. **Because he himself submitted a request to leave the position ahead of schedule, after discussion, it has been agreed that Su Xiao Hua may leave the position ahead of schedule** after reaching upper age limit for employment.

IRI-SU-000139E (emphasis added). At IRI-SU-000140E, it states "Copy: Relevant leaders of the Group company. Printed and distributed on April 8, 2022."

Thus, there is no doubt that Irico knew no later than *early* April that Mr. Su planned to resign early. The meeting minutes are ambiguous, however, as to when exactly he would

---

[66] Capurro Decl. ¶ 47, Ex. QQ (Yan Yunlong Deposition Errata 2022-09-28).

[67] *Id.* ¶ 48, Ex. RR (Plaintiffs' Letter re Errata, dated Jan. 27, 2023). Irico has refused to withdraw the erratum. *Id.* ¶ 49, Ex. SS (Email dated Feb. 16, 2023 from Evan Werbel). Thus, Plaintiffs will be presenting yet another dispute to the Special Master for resolution.

[68] Irico has claimed that IPPs lost their trial date because their expert could not be deposed before the close of expert discovery. This is false. Dr. Netz was deposed a mere two weeks after the close of expert discovery. Moreover, extending the close of expert discovery to depose Dr. Netz did not require any other pretrial dates to be moved.

[69] *Id.* ¶ 50, Ex. TT (IRI-SU-000137–40E).

The Honorable Vaughn R. Walker
3/20/2023
Page 18

resign. They state that Su "reached the upper age limit for employment in March 2022 and will leave his position as manager at the end of December[,]" but they also state that Su had "submitted a request to leave the position *ahead of schedule*[,]" which Irico approved. IRI-SU-000139E (emphasis added). It is unclear what "ahead of schedule" means.

Only one other pre-June 7, 2022[70] Irico document mentions Mr. Su's resignation. The document is entitled "Resignation Report" and is signed and dated by hand by Mr. Su, but the date is ambiguous: it is either dated 3/25/2022 or 5/25/2022.[71] After explaining that he is concerned about caring for his elderly mother, Mr. Su states:

> At this time, I have reached the upper limit of the employment age for managers. Due to the above personal reasons, *I would like to apply for early resignation* from my position as a manager and terminate my employment relationship with the company. Please be advised.

IRI-SU-000141E (emphasis added). Mr. Su's statement that he "would like to *apply* for early resignation" indicates that his Resignation Report was sent *before* the April 7, 2022 meeting at which Irico approved Mr. Su's early resignation. It makes no sense that Mr. Su would submit an application to resign early on May 25, 2022 when his early resignation had already been approved over a month before. Moreover, Irico has told Plaintiffs and the Court that May 25, 2022 is the date that Mr. Su "formally resigned."[72] Why then would Mr. Su be only applying for early resignation on that date? It is more logical that Mr. Su submitted the application on March 25, 2022 and that application was then approved at the April 7, 2022 meeting. However, only Irico knows the truth.[73]

Regardless of whether the Resignation Report is dated 3/25/2022 or 5/25/2022, Irico still knew by at least April 7, 2022 that Mr. Su intended to resign early, yet they concealed that fact from Plaintiffs and the Court.

---

[70] June 7, 2022 is the date Irico informed Plaintiffs of Mr. Su's resignation.

[71] *Compare* Mr. Su's handwritten date on IRI-SU-000141 (Capurro Decl. ¶ 51, Ex. UU) *with* Mr. Su's handwritten date on IRI-SU-000053. *Id.* ¶ 52, Ex. VV. The handwritten number "5" on IRI-SU-000053 is quite different from the number on IRI-SU-000141.

[72] ECF No. 6027-3 (Decl. of Wenkai Zhang) ¶ 6.

[73] The only other documents that mention Su's resignation are emails from June 7, 2022 onwards, *i.e.*, after his resignation, which appear to be Irico's counsel forwarding Plaintiffs' counsel's emails to Irico. Irico has withheld a substantial number of communications on privilege grounds. *See* Capurro Decl., Ex. NN (Irico Defendants' Log of Privileged Documents Responsive to December 6, 2022 Order). It is doubtful that there are only two documents relating to Mr. Su's resignation. Other such documents likely exist but are being withheld on privilege grounds.

The Honorable Vaughn R. Walker
3/20/2023
Page 19

<u>Irico has failed to demonstrate that Su Xiaohua's failure to appear was outside of its control.</u> Irico has asserted that it should not be sanctioned for its failure to produce Mr. Su because Mr. Su's non-appearance was outside of its control. ECF No. 6101 at 14. But, as the Court noted, "Irico provides no information supporting its assertions that Su Xiaohua's nonappearance was outside of its control or that Irico made efforts to persuade Su Xiaohua to appear for his deposition as Irico did for the two other witnesses." Su Order at 10. Thus, the Court ordered Irico to produce documents relating to "Irico's efforts to comply with the order to produce Su for deposition," and "Irico's continuing control or persuasive influence with respect to Su Xiaohua." *Id*. at 13.

None of Irico's recently produced documents demonstrate any effort by Irico to persuade Mr. Su to appear for his deposition. Indeed, the April 7, 2022 meeting minute suggests that far from attempting to persuade Mr. Su to appear for his deposition, Irico approved Mr. Su's request to "leave the position ahead of schedule[,]" without conditioning that approval on appearing for his deposition when it likely had the power to do so. IRI-SU-000139E (emphasis added). Thus, Irico has failed to demonstrate that Su Xiaohua's failure to appear was outside of its control.

## B.      Guo Mengquan

Irico's failure to produce Mr. Su for deposition is not the first time that Irico has failed to produce a witness for deposition in violation of a Court order. Irico engaged in similar tactics in connection with the deposition of Guo Menguan in 2018. Mr. Guo was a senior Group executive during the relevant period and thereafter who submitted a declaration in support of Irico's renewed motion to dismiss on FSIA grounds. ECF Nos. 5312-1, 5313-1, 5392-1, 5393-1. Mr. Guo also attended at least six competitor meetings.[74] Thus, Plaintiffs sought to depose him beginning in July 2018.

As with Mr. Su, Irico's misconduct required Mr. Guo's deposition to be rescheduled twice: the first time because Irico produced 2,200 pages of Chinese-language documents 10 days before the deposition was due to begin (ECF No. 5340), leaving Plaintiffs insufficient time to review and translate documents; and the second time because it failed to timely comply with Orders compelling production of documents.[75] The deposition was finally scheduled for March 4, 2019. But, one week before his deposition, Irico informed Plaintiffs that Mr. Guo—a former employee—would not appear due to an unspecified illness.[76]

---

[74] Capurro Decl. ¶ 53, Ex. WW (DPPs' May 27, 2021 Letter to Judge Walker re Irico Competitor Contacts) at 4–5.

[75] *Id.* ¶ 54, Ex. XX (10/9/18 DPP Email to Irico); *id.* ¶ 55, Ex. YY (2/5/19 DPP Ltr to Irico).

[76] *Id*. ¶ 56, Ex. ZZ (2/25/19 Irico email to Plaintiffs).

The Honorable Vaughn R. Walker
3/20/2023
Page 20

### III.    Irico Motion To Lift The Prior Default Was Based On False Testimony

The Court is also familiar with Irico's improper default. Shortly after it (and the other defendants) failed to obtain dismissal of Plaintiffs' claims, Irico disappeared from this litigation. For approximately seven years, Irico ignored Plaintiffs' discovery requests as well as the Court's various scheduling orders. After a motion for a default judgment was filed, Irico reappeared and prevailed on its motion to lift the defaults entered against it.[77] However, the Court made clear that Irico's withdrawal was improper and caused Plaintiffs significant prejudice through, *inter alia,* the loss of evidence and inordinate delay.[78]

It is now clear that the evidence Irico submitted to contend that its default was not in "bad faith" was a misrepresentation. As the Court characterized that evidence in its Default Order:

> According to a declaration by Wenkai Zhang, the legal counsel at Irico Group, Irico decided not to answer the complaint "because it believed that Irico Group and Irico Display were immune from suit in the United States," ECF No. 5215-1 ¶ 5.  The Irico entities . . . believed they were immune from DPPs' suit under notion of foreign sovereign immunity and accordingly did not participate in this action beyond joining a motion to dismiss."

ECF No. 5214 at 8.[79] However, the recent deposition testimony of Yan Yunlong makes clear that Mr. Zhang's declaration was false.

Irico's decision to cease participation in this lawsuit was not based on a belief in Irico's (non-existent) immunity under the FSIA, but rather was calculated to gain advantage. Mr. Yan, who was a member of the Litigation Committee, was examined over multiple days of deposition, including direct examination by his counsel, yet never identified immunity under the FSIA as playing any role in Irico's decision to default. Rather, he testified that Irico was concerned by the prospect of defending the case in conjunction with the other defendants, many of whom had been publicly identified by law enforcement as conspirators, and believed that Irico would be at a "disadvantage" if it did so.[80] He also explained: "I said earlier that Irico was waiting for the plaintiff – or plaintiffs to file a separate lawsuit against just Irico. Then we will make corresponding responses."[81]

---

[77] *In re Cathode Ray Tube* (*CRT*) Antitrust Litig., MDL No. 1917, No. C-07-5944-JST, 2018 WL 659084, at *8 (N.D. Cal. Feb. 1, 2018) (the "Default Order").

[78] *Id.* (DPPs "inarguably prejudiced by the Irico Defendants' decision to disappear from the case").

[79] Default Order, 2018 WL 659084, at *1.

[80] *See* Capurro Decl. Ex. E (Yan Yunlong Dep. Tr. Vol. I, at 118:5–120:21).

[81] *Id.*, Ex. B (Yan Yunlong Dep. Tr. Vol. II at 210:2–21). *See also id*., Ex. E Yan Yunlong Dep. Tr. Vol. I at 120:10–21 ("We also knew that it would be a long process for the

The Honorable Vaughn R. Walker
3/20/2013
Page 21

In sum, nothing in Mr. Yan's testimony supports the previous assertion that Irico's decision not to participate in this MDL litigation was based on belief in legal immunity. Rather, his testimony reveals that the reason for Irico's 2010 decision to disappear was a litigation strategy seeking to defend in a more advantageous context.

## IV.   Irico Has Repeatedly Flouted The Court's Authority Throughout The Litigation

Finally, Irico has also violated the Court's orders and discovery and other obligations throughout the case. *See* Su Order at 1–7 (describing "unflattering" chronology). Among many other things, Irico has refused to comply with at least three Court orders compelling discovery. First, during jurisdictional discovery, Irico defied the Court's order compelling it to produce documents relating to its attendance at competitor meetings and its U.S. sales, and to identify documents Zhang Wenkai reviewed in connection with his declaration. *See* ECF No. 5331 (enforcing order).

Second, Irico violated the Court's enforcement Order by falsely representing that it had performed an extensive search and found no documents relating to the (26) competitor meetings[82] when, in fact, it possessed travel and expense records corroborating at least seven of these meetings. This fact was confirmed when in October 2021—almost three years later—Irico finally produced these records.[83]

Third, as the Court is aware, Irico has also failed to comply with the Court's order requiring it to respond to interrogatories regarding its meetings and agreements with its competitors. ECF No. 5919. Following assurances that it would provide full responses, Irico failed to do so.[84] ECF No. 5944 at 2 ("No fair appraisal of Irico's responses to the interrogatories at issue can conclude that these responses are not plainly deficient.").

---

plaintiffs and the defendants to form the litigation groups and to actually go through the proceeding, so we were waiting for the plaintiffs to file an independent, separate lawsuit against Irico, and we wanted to wait until that time before we conducted any relevant investigation."); *id.* at 127:6–18 ("[W]e came to the conclusion that we would give up responding to the litigation before the plaintiffs filed any independent lawsuit against us.").

[82] Capurro Decl. ¶ 57, Ex. AAA (2018-10-10 Yan Declaration ISO Third Supp Resp DPPs FSIA RFPs); *see also* ECF No. 5228-1, Ex. 11 (chart summarizing 26 meetings).

[83] Capurro Decl., Ex. Y (Irico's Sixth Suppl. Objs. & Resps. To DPPs' First Set Interrogs., Third Suppl. Resp. to Interrog. No. 5) at 11–13 (admitting that Irico's travel reimbursement records show that Irico employees traveled to seven of the meetings with competitors alleged by Plaintiffs in ECF No. 5228-1, Ex. 11).

[84] *See* Capurro Decl. ¶ 58, Ex. BBB (Irico's Third Suppl. Objs. & Resps. to DPPs' First Set of Interrogs.) at 7.

The Honorable Vaughn R. Walker
3/20/2023
Page 22

## ARGUMENT

I.   <u>**Irico Had A Legal Duty To Preserve Evidence And Avoid Spoliation**</u>

"Spoliation" is the destruction or failure to preserve documents, ESI, or other property for another's use as evidence.[85] All litigants have an affirmative common-law duty to preserve evidence that is potentially relevant, or may lead to the discovery of relevant evidence, and to avoid spoliation.[86]

From the moment litigation is filed or reasonably anticipated, a party "must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation" of all documents and ESI "that [are] relevant to the claims or defenses of any party, or which [are] relevant to the subject matter involved in the action."[87] That includes an obligation to identify and locate such information as well to preserve it.[88] It is well-established that an oral litigation hold "is insufficient to reasonably protect against the spoliation of evidence."[89] The litigation hold must be in writing.[90]

Once a corporate party has put a litigation hold into place, it must take affirmative steps to make certain that all sources of potentially relevant information are identified and placed "on hold," and that they *remain* "on hold." As part of that process, the party must communicate with "key players" in the litigation to understand how they stored information and to ensure that it is located and preserved.[91] With respect to ESI, such as electronically stored documents, data and emails, the company must consult with IT personnel to ensure that its document retention policies, data retention architecture, and

---

[85] *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012) ("*Apple II*").

[86] *Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1051 (S.D. Cal. May 8, 2015) ("*Compass Bank*").

[87] *Zubulake v. UBS Warburg*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003).

[88] *Apple Inc. v. Samsung Elecs. Co*., 881 F. Supp. 2d 1132, 1137 (N.D. Cal. 2012) ("*Apple I*")

[89] *Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 46 (D.D.C. 2019).

[90] *See GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346, 357 (S.D.N.Y. 2012) (finding "a degree of culpability sufficient to permit the imposition of sanctions" where company failed to issue written litigation hold after it contemplated litigation); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456 ("*Pension Comm.*"), at 471 (S.D.N.Y. 2010) (it is "gross negligence not to issue a written litigation hold . . . .").

[91] *See Pension Comm.*, 685 F. Supp. 2d at 465 ("[T]he failure to collect records – either paper or electronic – from key players constitutes gross negligence or willfulness as does the destruction of email or certain backup tapes after the duty to preserve has attached.")

The Honorable Vaughn R. Walker
3/20/2023
Page 23

system-wide backup procedures are understood and harmonized with the document preservation regime.[92] The auto-deletion of emails must be terminated immediately.[93] Furthermore, if necessary, ESI must be preserved by creating backup tapes together with a mirror image of the company's computer system.[94] Finally, the organization must *publicize* the litigation hold to its managers and employees, *train* them in how to comply with it, and *monitor* their conduct to ensure that they comply.[95] The failure to do any or all of these things "constitutes gross negligence or willfulness as does the destruction of email or certain backup tapes after the duty to preserve has attached."[96]

Thus, for example, in *Apple I,* the court sanctioned defendant Samsung for spoliation and ordered that an adverse inference instruction be given to the jury.[97] Although Samsung had issued a written litigation hold, it did not train its employees how to comply with it, did not verify their compliance, and failed to disable the auto-delete function on its proprietary email system, so that most of the emails on that system were lost. *Id*. The court held that Samsung acted in "conscious disregard" of its obligations. *Id.*

In addition to the *common-law duty* to preserve evidence, the Court's Pretrial Order No. 1 required Irico to preserve documents and data that either "may be relevant to this action" or were "potentially relevant to the subject matter of this litigation." ECF No. 230.

## II.     The Court's Authority To Impose Sanctions For Spoliation And For Irico's Failure To Produce Su Xiaohua In Violation Of Court Orders

"There are two sources of authority under which a district court can sanction a party who has despoiled evidence and/or engaged in bad faith conduct: the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under [Fed.R.Civ.P.] 37[.]"[98]

---

[92] *Zubulake v. UBS Warburg LLC*, 229 F.R.D. at 432.

[93] *Pension Comm.*, 685 F. Supp. 2d at 471. *See DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 979 (N.D. Ill. 2021) ("[D]isabling an autodeletion function is universally understood to be one of the most basic and simple functions a party must do to preserve ESI.").

[95] *Apple I,* 881 F. Supp.2d at 1145–46, 1150.

[96] *Id.*; *Pension Comm.,* 685 F. Supp. 2d at 465.

[97] *Apple I,* 881 F. Supp. 2d at 1147.

[98] *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) ("*Leon*") (internal quotation marks omitted).

The Honorable Vaughn R. Walker
3/20/2023
Page 24

### A. Sanctions Pursuant to the Court's Inherent Authority

"[C]ourts have the inherent power to impose sanctions for abusive litigation practices,"[99] including "the authority to impose sanctions for the . . . spoliation of evidence"[100] and violations of court orders.[101] The policy underlying that inherent power is "the need to preserve the integrity of the judicial process in order to retain confidence that [it] works to uncover the truth."[102]

Available sanctions include giving an adverse inference jury instruction, precluding evidence, or imposing case-dispositive sanctions of dismissal or judgment.[103] The party seeking sanctions must show that (1) the party that lost the information had a duty to preserve it when it was destroyed; (2) the destruction was accompanied by a culpable state of mind; and (3) the spoliated information was relevant to the claims or defenses of the party that sought the discovery.[104] "A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'"[105]

While the court has discretion to impose spoliation sanctions, it must determine which sanction best (1) deters parties from future spoliation; (2) places the risk of an erroneous judgment on the spoliating party; and (3) restores innocent parties to their rightful litigation position.[106] The choice of appropriate sanctions should be commensurate to the spoliating party's motive or degree of fault in destroying the evidence. *Id.*

---

[99] *Young v. Off. of U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 65 (D.D.C. 2003).

[100] *Leon*, 464 F.3d at 958.

[101] *Harry & David v. Pathak*, No. CV 09-3013-CL, 2010 U.S. Dist. LEXIS 59837, *12, 2010 WL 2432071 (D. Or. 2010).

[102] *Pension Committee*, 685 F. Supp. 2d at 465.

[103] *Compass Bank*, 104 F.Supp.3d at 1052.

[104] *See Steves and Sons, Inc. v. JELD-WEN, Inc*., 327 F.R.D. 96, 104 (E.D. Va. 2018); *Moore v. Gilead Scis., Inc*., No. C 07-03850 SI, 2012 WL 669531, at *3 (N.D. Cal. Feb. 29, 2012).

[105] *Leon*, 464 F.3d at 959 (quoting *United States v. Kitsap Physicians Serv*., 314 F.3d 995, 1001 (9th Cir. 2002)). *See also Fink v. Gomez*, 239 F.3d 989, 993 (9th Cir. 2001) (sanctions pursuant to the Court's inherent authority "are available if the court specifically finds bad faith or conduct tantamount to bad faith").

[106] *Internmatch, Inc., v. Nxtbigthing*, LLC, No. 14-cv-05438-JST, 2016 WL 491483, at *4 (N.D. Cal. Feb. 8, 2016) ("*Internmatch*"); *Apple I*, 881 F. Supp. 2d at 1136.

The Honorable Vaughn R. Walker
3/20/2023
Page 25

### B. **Sanctions Under Rule 37**

Two subsections of Rule 37 provide additional authority for the imposition of sanctions for the imposition of sanctions here.

#### 1. **Rule 37(b)(2)(A)**

*First,* sanctions can be imposed under Rule 37(b)(2)(A), which provides that if a party "fails to obey an order to provide or permit discovery," the Court "may issue further just orders . . . ."[107] In determining what remedies are appropriate under Rule 37, courts consider (1) whether the non-complying party acted in bad faith, (2) the prejudice suffered by the opposing party, (3) the need for deterrence, and (4) whether less drastic sanctions would have been effective.[108]

Sanctions under Rule 37(b)(2)(A) may include, but are not limited to, "(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; . . . [or] (vi) rendering a default judgment against the disobedient party." Under Rule 37(b)(2)(A), disobedient conduct "not shown to be outside [a litigant's] control" can support a finding of willfulness, bad faith or fault that can justify entering a severe sanction against that party, up to and including the entry of a default judgment.[109]

#### 2. **Rule 37(e)**

*Second,* sanctions are available under Fed. R. Civ. P. 37(e) "if electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery . . . ." The severity of the sanction available under Rule 37(e) depends, in large part, on whether the spoliator "acted with the *intent* to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2) (emphasis

---

[107] *Leon*, 464 F.3d at 958. *See also WeRide Corp. v. Kun Huang*, No. 5:18-cv-07233-EJD, 2020 WL 1967209, at *11–12 (N.D. Cal. Apr. 24, 2020) ("*WeRide*") (awarding terminating sanctions under Rule 37(b) where defendants spoliated evidence in violation of a Court order); *Facebook, Inc. v. OnlineNIC Inc*., No. 19-CV-07071-SI (SVK), 2022 WL 2289067, at *1 (N.D. Cal. Mar. 28, 2022) ("*Facebook*") (recommending terminating sanctions under Rules 37(b) and 37(e), where, *inter alia*, parties deleted and withheld ESI), *Report and Recommendation adopted*, 2022 WL 17371092 (N.D. Cal. Oct. 17, 2022).

[108] *Belk v. Charlotte-Mecklenburg Bd. of Educ*., 269 F.3d 305, 348 (4th Cir. 2001) (*en banc*).

[109] *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2001); *Internmatch,* 2016 WL 491483, at *4.

The Honorable Vaughn R. Walker
3/20/2023
Page 26

added). In the absence of a finding of intent, the Court is limited to assessing sanctions "no greater than necessary to cure the prejudice" under Rule 37(e)(1). However, "[i]f the party that lost the evidence acted with the intent to deprive another party of the information's use in the litigation, more severe sanctions are available under Rule 37(e)(2), including a presumption that the lost information was unfavorable to the party, instructing the jury that it may or must apply such a presumption or even dismissing the action entirely."[110]

Notably, where the despoiling party has acted with intent, no showing is required that the spoliation has caused prejudice to the other party, "because the finding of intent . . . can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position."[111] A party deprived of ESI by spoliation need only demonstrate the adverse party's intent by *a preponderance of the evidence*.[112] Moreover, "[i]ntentional destruction and bad faith may be proved inferentially and with circumstantial evidence, and [the] Court need not leave experience and commonsense at the courthouse door when making its determination."[113] Thus, in *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 431 (W.D.N.Y. 2017) ("*Moody*"), key evidence was lost when the defendants destroyed or recycled an employee's laptop. Given the importance of the evidence, the court found the defendants' conduct was "so stunningly derelict as to evince intentionality." *Id.* at 432.

## III.    <u>The Legal Prerequisites For The Imposition Of Sanctions Are Present</u>

The legal prerequisites for the imposition of sanctions under the Court's inherent authority are present here. Irico had a duty to preserve relevant evidence when it was destroyed, and the spoliated evidence was highly relevant to the claims or defenses in the case.[114] In addition, the destruction of evidence was intentional, willful, and in bad faith

---

[110] *Matthew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-CV-04236-BLF, 2016 WL 2957133, at *3 (N.D. Cal. May 23, 2016) (citing Fed. R. Civ. P. 37(e)(2)).

[111] Advisory Committee Note to Fed. R. Civ. P. 37(e)(2) – 2015 Amendment.

[112] *Torgersen v. Siemens Bldg. Tech., Inc.*, No. 19-cv-4975, 2021 WL 2072151, at *4 (N.D. Ill. May 24, 2021) ("*Torgersen*").

[113] *Id.* at *4 (quoting *Sonrai Systems, LLC v. Anthony Romano, et al.*, No. 16 C 3371, 2021 WL 1418405, at *13 (N.D. Ill. Jan. 20, 2021)); *accord Estate of Bosco v. Cnty. of Sonoma*, No. 20-cv-04859-CRB, 2022 WL 16927796, at *9 (N.D. Cal. Nov. 14, 2022) ("Because courts are unable to ascertain precisely what was in a person's head at the time spoliation occurred, they must look to circumstantial evidence to determine intent.")

[114] Defendants should not escape sanctions because the exact identity of the documents that were destroyed or lost cannot be determined. Their wholesale destruction of entire categories of evidence is the reason it is not possible to determine precisely what evidence has been lost. *Pension Comm.,* 685 F. Supp. 2d at 479–480. *See also Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998) ("[H]olding the prejudiced party to too strict a

The Honorable Vaughn R. Walker
3/20/2023
Page 27

because Irico had been served with Complaints detailing Plaintiffs' claims and had received detailed instructions from counsel that it ignored. Thus, Irico was on notice that the evidence was potentially relevant to this case before it was destroyed.[115]

The requirements for sanctions under both Rule 37(b)(2)(A) and Rule 37(e) are also satisfied. Defendants' willful failure to impose a litigation hold and to locate and preserve potentially relevant evidence violated PTO No. 1 and Irico's common-law duties, including its duty to locate and ensure the preservation of ESI. That evidence was lost because Irico failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery. Irico's failure to produce Mr. Su for his Court-ordered deposition and its lack of candor with Plaintiffs and the Court have exacerbated the harm to Plaintiffs. Irico's improper withdrawal from the case, its violations of other orders, and its repeated misrepresentations to the Court also support the issuance of sanctions.

### A.   Irico Acted With Intent To Deprive Plaintiffs Of Relevant Evidence

Abundant evidence supports a finding that Irico's failure to take reasonable measures to preserve documents and ESI, and its other conduct, was intentional within the meaning of Rule 37(e). By not adopting prompt and reasonable measures to put potentially relevant evidence "on hold"—by not searching for it and not preserving it—Irico acted with the intent to deny that evidence to Plaintiffs.

The strongest evidence of Irico's intent is the gross inadequacy of its efforts. Irico waited *eight months* to do anything at all despite being instructed by Pillsbury as early as February 15, 2008 and on several occasions thereafter to preserve "any potentially relevant evidence." Then, instead of implementing a robust program to identify, locate and preserve relevant evidence, all Irico (allegedly) did was give Pillsbury's August 2008 Instructions to members of the "Litigation Committee." And there, for all we know, the matter was dropped. There is no evidence that anything was done to identify, find or preserve relevant documents or ESI. The auto-deletion of emails continued unabated—clear evidence of intent, under the caselaw[116]—resulting in the wholesale destruction of all Irico emails from the relevant period. To make such a tardy and transparently inadequate attempt to identify

standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse inference, and would allow parties who have intentionally destroyed evidence to profit from that destruction."); *Gutman v. Klein*, No. 03 CV 1570 (BMC) (RML), 2008 WL 4682208, at *7 (E.D.N.Y. Oct. 15, 2008) ("bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party.") (internal quotation marks and citation omitted).

[115] *Leon*, 464 F.3d at 959.

[116] Failure to disable auto-delete functionality ***itself*** satisfies the intent requirement of Rule 37(e)(2). *See Glaukos Corp. v. Ivantis, Inc.*, No. SACV18620JVSJDEX, 2020 WL 10501850, at *4 (C.D. Cal. June 17, 2020); *WeRide*, 2020 WL 1967209, at *15–16.

The Honorable Vaughn R. Walker
3/20/2023
Page 28

evidence and save it from destruction, Irico cannot have been seriously trying to find the evidence and preserve it. Irico's conduct was "so stunningly derelict as to evince intentionality."[117] Moreover, the insufficiency of Irico's efforts was not a result of a "misunderstanding," because we now know its counsel instructed it—as early as February, 2008, if not earlier—precisely how to satisfy its legal duties, and even wrote out instructions to be transmitted to Irico's employees.

The *magnitude* of the failure to preserve evidence also militates in favor of a finding of intent. That *all* of the key players' emails and other relevant documents and ESI were destroyed or lost suggests a thoroughness indicative of intent. Irico's misrepresentations regarding its evidence preservation efforts also bespeaks a desire to dissemble and conceal what happened, which itself is circumstantial evidence of intent and bad faith.[118] That the decision to disregard its obligation to preserve evidence was made by a Litigation Committee dominated by the very people who participated in the alleged conspiracy also demonstrates that Irico's conduct was intended to deprive Plaintiffs of evidence. As explained above, there is also little question that Irico's failure to produce Mr. Su, its withdrawal from the case, and its repeated violations of the Courts' orders were intentional.

## B.     Plaintiffs Have Suffered Severe Prejudice

Although a finding of prejudice is not necessary to support severe sanctions where a party has despoiled evidence with intent to deny an opposing party the use of that evidence, the loss of entire categories of critical evidence—and Irico's other conduct—has substantially prejudiced Plaintiffs here.

*First,* in the absence of any Irico-produced documents regarding its participation in anticompetitive meetings, communications and agreements, Plaintiffs will have to rely on documents from the files of other defendants to prove Irico's involvement. Almost all of those documents were not only *produced* by other defendants but also *authored* by them. Only a very limited number of documents authored by Irico were produced by the other defendants. And while the other defendants' meeting minutes provide strong evidence of Irico's participation in the conspiracy, Irico-authored documents would be stronger, because they would include direct admissions by Irico personnel.

*Second,* Irico has indicated that it intends to rely on the purported defense that the Chinese government compelled it to charge the prices it charged. But Irico has produced

---

[117] *Moody,* 271 F. Supp. 3d at 432. *See also John v. Cty. of Lake*, No. 18-cv-06935-WHA (SK), 2020 WL 3630391, at *7 (N.D. Cal. July 3, 2020) (intent found where, as here, the court had expressly instructed defendants to put in place policies to preserve evidence and to stop any policy of destruction, but defendants did not do so; "even without that warning, Defendants' failure to comply with the basic rules requiring that they preserve evidence after the claim shows their intent.").

[118] *Internmatch,* 2016 WL 491483 at *11; *Torgersen*, 2021 WL 2072151, at *5.

The Honorable Vaughn R. Walker
3/20/2023
Page 29

virtually no documents from the relevant period showing how it priced its CRTs.[119] If the files and emails of those responsible for pricing decisions had been preserved and produced instead of being destroyed, and Su Xiaohua had been produced for deposition, Plaintiffs might have been able to discover evidence showing that pricing was based on other factors, not on government compulsion. Likewise, Irico intends to assert that Plaintiffs claims are barred on jurisdictional grounds or because its conduct was neither directed to nor affected purchasers in the U.S. If Irico's internal communications and communications with its customers had been preserved and produced, and Su Xiaohua had been produced for deposition, Plaintiffs would likely have direct evidence showing that Irico knew its price-fixed CRTs were impacting the U.S. market.[120] Because Irico willfully failed to preserve documents relevant to these affirmative defenses and did not produce Mr. Su, Plaintiffs have been denied the opportunity to properly test them. The absence of this evidence makes it much more difficult for Plaintiffs to "prove a negative."[121]

Finally, Irico's spoliation of evidence, its failure to produce Mr. Su for a deposition, and its lack of candor about both of those instances of discovery misconduct, especially when considered in light of its prior manipulative and dilatory conduct in this litigation, has impeded the forward progress of this case and has materially postponed its fair and just resolution. The trial date is currently set for January 2024—more than sixteen years after this case was filed. The vast majority of that delay is attributable to Irico's misconduct. As this Court held in Bernstein v. Virgin America, Inc., No. 15-cv-02277-JST, 2018 WL 6199679, at *5 (N.D. Cal Nov. 28, 2018), "[d]isruption to the schedule of the court and other parties . . . is not harmless." (citations, internal quotation marks and ellipsis omitted).

## IV.  Irico's Misconduct Warrants Terminating Sanctions

As this Court has explained, the Court's power under its inherent authority, Rule 37(b), and Rule 37(e), includes imposing terminating sanctions. See., e.g., Internmatch, Inc., 2016 WL 491483, at *4 (reciting standard and collecting cases). Irico's long-running campaign to obstruct and delay this proceeding warrants a terminating sanction.

---

[119] See, e.g., Capurro Decl. ¶ __, Ex. Y (Irico's Sixth Suppl. Objs. & Resps. to DPPs' First Set of Interrogs., Suppl. Resp. to Interrog. No. 6) at 14 (listing only eight documents in response to interrogatory about pricing); Ex. X (Irico's Fourth Suppl. Objs. & Resps. To IPPs' First Set of Interrogs., Suppl. Resp. to Interrog. No. 7) at 12–14 (listing primarily documents produced by other defendants, and non-contemporaneous documents from the internet and government documents rather than Irico's own documents from the relevant period as support for Irico's affirmative defenses, including its defense that its "pricing-related conduct was compelled by the Chinese government").

[120] As noted, some of the Irico sales and marketing reports found in Chunghwa's files show that Irico was aware that its customers were manufacturing televisions containing its CRTs for the U.S. market. See fn. 56, supra, and Capurro Decl., Exs. HH–JJ.

[121] Williams v. Russ, 167 Cal. App. 4th 1215, 1222 (2008) ("How do we know what was destroyed? How do you prove a negative?")

The Honorable Vaughn R. Walker
3/20/2023
Page 30

Irico's wholesale destruction of entire categories of important evidence in direct and knowing violation of this Court's order to preserve relevant evidence is sufficient by itself to justify a terminating sanction.[122] In addition, Irico refused to produce Mr. Su in violation of this Court's orders, has unreasonably delayed proceedings, has lied to Plaintiffs and the Court about critical matters, and attempted to cover up its misdeeds. In sum, Irico has "willfully deceived the Court and engaged in conduct utterly inconsistent with the orderly administration of justice." *See Wyle,* 709 F. 2d at 589. Such conduct also justifies striking Irico's answers.

The factors the Ninth Circuit has enunciated for the imposition of terminating sanctions supports such a sanction. Those factors are:

> (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.

*Internmatch*, 2016 WL 491483, at *4.

The first two factors, as several courts have noted, weigh in favor of terminating sanctions where, as here, the circumstances involve the violation of court orders.[123] These factors weigh even more heavily in favor of terminating sanctions in this case given the years' long delays occasioned by Irico's conduct, the multiple orders Irico has violated, and its attempts to cover up its misconduct with misrepresentations.[124]

The third factor—prejudice to the opposing party—is the "'most critical [factor] for case-dispositive sanctions,' because it goes to 'whether the discovery violations

---

[122] *See, e.g., WeRide*, 2020 WL 1967209, at *10, *12; *Facebook,* 2022 WL 2289067, at *1; *Jones v. Riot Hosp. Grp. LLC*, 2022 WL 3682031, at *10–13 (D. Ariz. Aug. 24, 2022) ("*Jones*").

[123] *See, e.g., Fair Hous. of Marin v. Combs*, 285 F.3d at 906 (affirming imposition of default judgment sanction where defendant repeatedly flouted basic discovery obligations and violated court orders); *WeRide,* 2020 WL 1967209 at *10 (terminating sanctions were required to remedy prejudice to plaintiff and to address defendant's demonstrated disregard for the court's orders); *Jones,* 2022 WL 3682031, at *10–13 (terminating sanctions for intentional destruction of text messages and concluding that lesser sanctions would be ineffective given plaintiff's disregard of court orders and undermining of the evidentiary record).

[124] Irico's conduct during the jurisdictional phase of this case confirms its improper intent to delay the case. Among other things, Irico submitted no new arguments in support of immunity after the completion of one and a half years of jurisdictional discovery. *See* FSIA Order at 12 (Court did not invite "a belated motion for reconsideration."). Its appeal of the Court's order denying immunity also appears to have been instituted solely for delay inasmuch as it was dismissed shortly before oral argument. *See* ECF No. 5861.

The Honorable Vaughn R. Walker
3/20/2023
Page 31

threaten to interfere with rightful decision of the case.'" *WeRide*, 2020 WL 1967209, at
*10 (citing *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998)).
This factor also weighs heavily in favor of terminating sanctions. While Plaintiffs possess
strong evidence of Irico's liability, Plaintiffs' ability to rebut Irico's defenses herein, as in
*WeRide,* has been "irredeemably" compromised by the egregious destruction and loss of
virtually all of the documentary evidence in Irico's possession, including virtually all of
the witnesses with knowledge of the core issue in this case.

Irico contends that despite its attendance at numerous allegedly conspiratorial
meetings, it never ***agreed*** to fix CRT prices; that the meetings themselves were, to the
extent anyone can even remember, primarily social occasions; and that whatever
information was exchanged was false.[125] Irico also seizes on a handful of statements in the
voluminous meeting notes to assert that, even to the extent the other attendees fixed prices,
Irico was a "disruptor" and fierce competitor. *Id.* There is no question that Irico has
destroyed, improperly lost or put beyond the reach of discovery a vast amount of evidence
that is not only unquestionably relevant to these contentions but would also likely disprove
them. It would be a gross injustice if the factfinder herein were to credit any of them due
to the absence of that evidence.

Irico's misconduct, moreover, goes directly to the core issue in the case. Again,
Irico disregarded the Court's preservation order and destroyed virtually all of its records
relating to the over 100 competitor meetings the evidence shows it attended. Its improper
withdrawal from the case facilitated the destruction of these records and also resulted in
the "unavailability" for deposition of virtually all of the Irico meeting attendees. Indeed,
the Court has already found "inarguabl[e] prejudice" resulting from Irico's "decision to
disappear from the case" *See* Default Order at 15.[126] Its misrepresentations about its
intentions to produce Mr. Su and failure to compel his attendance at deposition resulted in
the further loss of testimony of one of only two remaining meeting attendees.

The fourth factor—public policy favoring disposition of cases on their merits—
weighs against terminating sanctions. But this is true in every case, and it cannot outweigh
the other factors by itself. *See, e.g., Internmatch*, 2016 WL 491483, at *12. Courts granting
terminating sanctions have found such sanctions appropriate where, as here, the loss of
evidence brings into question whether a decision "on the merits" is even possible. *See, e.g.,
WeRide*, 2020 WL 1967209, at *11 ("AllRide's destruction of evidence was so sweeping
that this case cannot be resolved on its merits"). As noted, the Court has already suggested

---

[125] *See, e.g.,* Capurro Decl. ¶ 59, Ex. CCC (Irico's Response to Plaintiffs' Conspiracy
Proffer, dated Apr. 11, 2022) at 3–5.

[126] The close relationship between Irico's wrongful conduct and the core issues in the case
amply satisfies any "due process" issues associated with terminating sanctions. *See
Internmatch*, 2016 WL 491483 at *4.

The Honorable Vaughn R. Walker
3/20/2023
Page 32

that the absence of testimony from Irico attendees at the competitor meetings "is highly detrimental to resolution of this litigation on its merits." Su Order at 12.

The fifth factor—the availability of less severe sanctions—also weighs heavily in favor of terminating sanctions. As this Court has explained:

> To evaluate this factor, the Court examines: "(1) whether the district court explicitly discussed the feasibility of less drastic sanctions and explained why such alternate sanctions would be appropriate; (2) whether the district court implemented alternative sanctions before ordering dismissal; and (3) whether the district court warned the party of the possibility of dismissal before ordering dismissal."

*Internmatch*, 2016 WL 491483, at *12. In *Internmatch*, a trademark infringement case, the Court declined to enter terminating sanctions in favor of an evidentiary sanction precluding any evidence of the apparently dispositive issue of prior use. *Id.* at *13–14. The sanctioned party's conduct, moreover, was apparently confined to that issue. *Id.* Plaintiffs respectfully submit that an alternative sanction—short of deeming Irico's liability established—would be insufficient here.

This case requires proof of Irico's participation in a conspiracy to fix prices over a 12-year period. Plaintiffs' proof is strong, but it is also voluminous and complex and Irico will attack every piece of it. As in *WeRide,* "any jury instruction or exclusion of evidence would be inappropriate here because the spoliation occurred on such a massive scale." 2020 WL 1967209, at *11. A jury instruction requiring a presumption "would leave [Plaintiffs] helpless to rebut any material that [Irico] would use to overcome that presumption." *Id.* To the extent Irico is able to exploit any potential gap in Plaintiffs' proof, exclude evidence, or deny or reduce its liability in any way would be a grave injustice given that Irico has destroyed or denied access to evidence that would likely rebut its arguments. Indeed, it would reward Irico for its wrongful conduct.

Other considerations also weigh heavily in favor of terminating sanctions. Unlike in *Internmatch,* Irico has repeatedly and intentionally defied Court Orders, including the Order to preserve evidence. *WeRide*, 2020 WL 1967209, at *11. Terminating sanctions would fulfill the important policy of deterring similar conduct. *See, e.g., Internmatch*, 2016 WL 491483, at *4. Additionally, alternative sanctions cannot rectify the years of delay caused by Irico's wrongful conduct—it has been over 12 years since Irico "disappeared" from this litigation. Irico had also been warned that its conduct could lead to severe sanctions. Among other things, Pillsbury notified Irico in 2008 that "*[i]f some potentially relevant information is lost or destroyed, this could have very serious consequences for Irico.*" Capurro Decl., Ex __ (IRI-SUPP-000012E).

Finally, a default judgment is appropriate because it would directly remedy the fact that Irico obtained the lifting of the defaults herein under false pretenses. In *Google LLC v. Starovikov*, No. 21cv10260-DLC, 2022 WL 16948296, at *6 (S.D.N.Y. Nov. 15, 2022),

The Honorable Vaughn R. Walker
3/20/2023
Page 33

after lifting a default, the Court imposed a default judgment sanction where defendants acted with an intent to deprive plaintiff of discoverable information and abused the court system and discovery rules. Like Irico, defendants used the default to facilitate the loss of evidence and misrepresented key facts in connection with their application to lift the default. *Id.* at \*6, \*10. The court concluded the default judgment sanction was "particularly appropriate" given that the original default was lifted based on false representations. *Id*. at \*12.

## V.   If the Court Does Not Grant Terminating Sanctions, It Should Impose Severe Alternative Sanctions on Irico

If the Court decides not to impose terminating sanctions, it should grant alternative relief that attempts to fully remedy the prejudice Irico's misconduct has caused and is commensurate with the seriousness of Irico's misconduct. Several separate and distinct alternative sanctions are both necessary and appropriate.

*First*, the Court should:

(1) Deem Irico's participation in the alleged conspiracy, and the other activities of the alleged conspiracy as set forth in the other defendants' meeting notes as established as against Irico, as the Special Master suggested as a sanction at the hearing held on May 13, 2021;

(2) Order that all documents produced by the Irico Defendants are deemed authentic under FRE 901, and are admissible as business records pursuant to FRE 803(6); and

(3) Order that all meeting notes produced by other defendants are deemed authentic and admissible. The meeting notes and other documents that the Court should deem admissible, should include, but not be limited to, (a) those that the Special Master, in his Report & Recommendation Re: Admissibility of Coconspirator Documents and Statements, ECF No. 6074, adopted by the Court by Order entered October 14, 2022 (ECF No. 6093) (the "Admissibility R&R"), recommended should be admitted for purposes of summary judgment, as well as (b) those considered by the Special Master in his Admissibility R&R but not yet admitted pending the submission of additional information specified by the Special Master, where Plaintiffs later proffer the additional information requested and the Special Master concludes that it is sufficient to demonstrate their admissibility.

Because Irico spoliated nearly all of its documents and ESI, there are very few Irico-produced documents on which Plaintiffs could rely to establish Irico's participation in the conspiracy, the authenticity of the few documents Irico produced, and the admissibility of meeting notes and documents produced by other Defendants. Moreover, Irico's wrongful failure to produce Messrs. Su and Guo, and other witnesses with contemporaneous knowledge, has left Plaintiffs unable to elicit testimony from Irico witnesses regarding

The Honorable Vaughn R. Walker
3/20/2023
Page 34

these matters. An order granting these sanctions would therefore help to cure the prejudice Plaintiffs have suffered due to Irico's misconduct.

*Second*, the Court should instruct the jury that it must infer that, had the documentary and electronic evidence been preserved and introduced at trial, and the witnesses had testified, it would have been unfavorable to Irico, and the Court should make a similar finding insofar as it acts as the factfinder.

Courts have imposed a strong adverse inference jury instruction where a party has engaged in intentional spoliation. This Court granted such relief in *Internmatch,* where, as here, defendants, ignoring their counsel's instructions, took no steps to preserve relevant information, and did not instruct their employees to do so.[127] Similarly, in *Torgersen*, where the plaintiff deleted his Facebook page, which might have shown him engaging in physical activities he claimed were no longer possible due to his alleged injuries, the court held it would instruct the jury that plaintiff had spoliated the evidence despite having been requested to produce it and having been instructed by counsel to preserve it, and that the evidence must be presumed to have been adverse to him had it been retained and produced. *Id.* at *6.[128]

The harshness of the instruction should be determined based on the nature of the spoliating party's conduct—the more egregious the conduct, the harsher the instruction. "In its most harsh form, when a spoliating party has acted willfully or in bad faith, a jury can be instructed that certain facts are deemed admitted and must be accepted as true. At the next level, when a spoliating party has acted willfully or recklessly, a court may impose a mandatory presumption."[129]

Because Irico's conduct here has been egregious, a strong adverse inference and a jury instruction that imposes a mandatory presumption is appropriate. Such a remedy would deter future spoliation, and it would place the risk of an erroneous judgment caused by the absence of the spoliated evidence on the parties that caused it to be destroyed or lost. Most importantly, an adverse inference and instruction would protect Plaintiffs from the

---

[127] *Internmatch*, 2016 WL 491483, at *4.

[128] *See also BenShot, LLC* v. *2 Monkey Trading LLC*, 2022 U.S. Dist. LEXIS 77422, *2 (E.D. Wisc. Apr. 28, 2022) (adverse inference instruction imposed where a party intentionally failed to preserve the emails of an important employee); *Fast*, 340 F.R.D. at 337 (adverse inference instruction given where plaintiff failed to preserve Facebook posts, emails, and text messages with intent to deprive defendants of their use in the litigation); *see also Sec. & Exch. Comm'n v. Hong*, No. CV2004080MCSRAOX, 2021 WL 4803497, at *7 (C.D. Cal. Sept. 17, 2021)*, report and recommendation adopted,* No. 220CV04080MCSRAO, 2021 WL 4923310 (C.D. Cal. Oct. 21, 2021) (where defendants failed to appear for deposition, the court held, *inter alia*, it would instruct the jury that had they testified, their testimony would have been harmful to them).

[129] *Pension Comm.*, 685 F. Supp. 3d at 470.

The Honorable Vaughn R. Walker
3/20/2023
Page 35

prejudice caused by the unavoidable fact that their proof at trial will be almost completely devoid of any Irico witnesses, or any Irico-*produced* documents or Irico-*authored* documents (except for the handful of such documents produced by other defendants) that address Irico's participation in conspiratorial meetings and agreements. Because that evidence is missing, Plaintiffs will be severely handicapped in proving their case. It is not possible to reconstruct what the missing evidence might have said, thus there is no satisfactory way to compensate for its absence.[130] Moreover, without a strong adverse inference instruction, the jury might wonder why so few Irico documents demonstrating its attendance at meetings and participation in the conspiracy are offered in evidence. An adverse inference instruction would explain to the jury members why so little Irico evidence has been shown to them.

*Finally*, the Court should strike Irico's affirmative defenses, but especially those as to which it identified Su Xiaohua as knowledgeable. In addition to preventing Plaintiffs from questioning Mr. Su regarding these defenses, Irico has spoliated documentary evidence relating to them, denying Plaintiffs the opportunity to fully discover the facts relating to them. To allow Irico to assert these defenses when it has destroyed the evidence Plaintiffs would need to rebut them would be fundamentally unfair. Courts have ordered similar issue sanctions in comparable situations. For example, in *Bernstein v. Virgin America, Inc.*, this Court held that merely excluding the withheld documents but allowing defendant Virgin America, Inc. to litigate its affirmative defense of waiver "would be an insufficient sanction, because Plaintiffs were not permitted to fully discover[] the facts of that defense during the discovery period."[131] Accordingly, the Court struck Virgin America's waiver defense. Similarly, in *Glaukos v. Invantis,* where, as here, Defendant failed to turn off the autodeletion of emails, the court granted not only an adverse inference instruction but also an issue sanction.[132] This Court should grant an issue sanction here and strike Irico's affirmative defenses.

---

[130] *See, e.g., id.* at 479–480 (holding that a rebuttable presumption arose that responsive, relevant documents were lost or destroyed, and that prejudice resulted, where parties failed to institute a timely written litigation hold, failed to adequately collect or preserve ESI, did not request documents from key players, delegated search efforts without any supervision from management, destroyed backup data and submitted misleading or inaccurate declarations).

[131] 2018 WL 6199679, at *5 (footnote omitted).

[132] 2020 WL 10501850, at *4; *see also Est. of Boyles v. Gree USA, Inc.,* No. 1:20-CV-276, 2021 WL 3570413, at *3 (M.D.N.C. Aug. 12, 2021) (where defendants violated order to produce witnesses for remote depositions in Hong Kong, the court precluded them from calling any corporate fact witnesses, struck their affirmative defenses, and prohibited them from introducing any evidence at trial beyond the cross-examination of plaintiffs' witnesses).

The Honorable Vaughn R. Walker
3/20/2023
Page 36

## CONCLUSION

In sum, Irico's spoliation of all ESI and almost every document relevant to the key issues in this case, its failure to produce Su Xiaohua in violation of Court Orders, its failure to make key discovery available in violation of numerous Court orders, its blatant attempts to conceal its misconduct, and its egregious delays of the case, have subjected Plaintiffs to severe prejudice. This is the rare case in which terminating sanctions are warranted. Alternatively, a strong adverse inference instruction and issue sanctions precluding Irico from asserting its affirmative defenses and the other relief requested herein would level the playing field for trial and impose appropriate punishment on Irico for its deliberate derelictions of duty.

Very truly yours,

*/s/ Lauren C. Capurro*

Lauren C. Capurro
Lead Counsel for Indirect Purchaser Plaintiffs

*/s/ R. Alexander Saveri*

R. Alexander Saveri
Lead Counsel for Direct Purchaser Plaintiffs

Cc:    Jay Weil (jay.weil@fedarb.com)
       John M. Taladay (john.taladay@bakerbotts.com)
       Evan J. Werbel (evan.werbel@bakerbotts.com)
       Thomas E. Carter (tom.carter@bakerbotts.com)
       Andrew L. Lucarelli (drew.lucarelli@bakerbotts.com)
       Kaylee Yang (kaylee.yang@nortonrosefulbright.com)

# EXHIBIT 2

# Contents

**IRICO GROUP ELECTRONICS COMPANY LIMITED**



**IRICO**

D☐P☐ Exhibit  84-19
Deponent  Wang
Date 3/7/19  Rptr

AE-CRT-CE-001821



**Corporate Profile**

2

# 1. Introduction

IRICO Group Electronics Company Limited (the "Company") was incorporated in Xianyang, Shaanxi Province, the People's Republic of China (the "PRC" or "China") on 10 September 2004. It was established with the contribution made by IRICO Group Corporation, the controlling shareholder and sole promoter of the Company, in respect of its assets of production and sales of color picture tubes ("CPTs") in its related core businesses and, the equity interests in its eight subsidiaries engaged in related operations. The Company's H Shares were successfully listed on the main board of The Stock Exchange of Hong Kong Limited (the "Stock Exchange") on 20 December 2004.

The Company and its subsidiaries (the "Group") are the largest CPTs manufacturer in China and one of the world's major CPTs and CPT components manufacturers. We also have the longest operating history amongst all CPTs manufacturers in China, with over 20 years of experience in CPTs production.

CPT is the core component of a cathode ray tube ("CRT") television set, accounting for about 50% of the aggregate cost of all of the components of a CRT television set. The Group manufactures CPTs with various sizes ranging from 14" to 29" and a majority of CPT components, including glass bulbs, electron guns, deflection yokes, shadow masks and their frames as well as phosphor and frit.

Major customers of the Group include TCL, Skyworth, Konka, Changhong and Hisense, which are major television producers in China.



AE-CRT-CE-001823

**Chairman's Statement**

## Business review

2004 was a remarkable year for the Company, as the Company completed its restructuring and stepped into the international capital market within the year. The Company's H Shares were listed on the main board of the Stock Exchange on 20 December 2004, issuing a total of 485,294,000 H Shares (including sale of 44,120,000 State-owned legal person shares) and raising a total fund of HK$766.8 million (including raised fund of HK$69.7 million from sale of 44,120,000 State-owned legal person shares).

In the past year, the Group continued to strengthen its colour CPTs operation and optimise it product structure. A production line for 21" colour CPTs with an annual production capacity of 2 million set of CPTs was established. The Group also utilised technology renovation to enhance the existing production capacity and product mix of the production line of colour CPTs. Besides, the production line of super large sized CPTs with high definition is under smooth construction. Further, in respect of CPT components, the Group continues to enhance the production capacity of key CPT components. The accomplishment of the supportive projects of glass bulb and shadow mask further reinforced the cost leverage of the Group. Meanwhile, the proportion of external sales of CPT components grew steadily. The sales revenue from CPT components in 2004 increased by 26.5% compared with 2003. In addition, the research and development of the new products of PDPs, colour CPTs, CPT components progressed smoothly, creating satisfactory conditions for the on-going development of the Group.

## Future prospects

As the PRC macro-economy is expected to maintain its speedy growth, the disposable income of the general population in the PRC will hopefully increase continuously. This is expected to drive the demand for colour television sets, thus the demand for CPTs will increase accordingly. Integration in the industry will bring about further opportunities for the Group. As production lines of CRT television sets and CPTs in Europe and America shut down and the trend of moving such production lines to developing countries such as the PRC continues, the PRC's role as the centre for manufacturing of colour television sets and CPTs in the world will be further enhanced. The PRC's status as a global manufacturing center for colour television sets and colour CPTs will be further strengthened. The export of colour television sets and CPTs in the PRC will keep growing fast and the Group has excellent prospects for future development.

8   However, competition in the display industry is becoming intense with declining prices for flat panel television sets as well as the increasing performance. The challenge posed by the development of flat panel display to CRT market will be ever more striking. CRT televisions and CPT industry are facing with intense competition more than ever. Particularly at the beginning of 2005 with sluggish market demand, the price of CPTs further declined while the cost of certain raw materials increased.

Facing a market environment with opportunities and challenges, the Group will fully utilize its competitive leverage to grasp every chance in the coming time. We will mobilise all the employees, economise operations and innovate technology to lower cost as well as to optimise the product mix. The Group strives to develop overseas market and step into global competition with low cost and high quality products, consolidating the leading position of the Group in CPT industry in the PRC, and endeavors to increase its global market shares. Also, the Group will proactively research and develop technology for flat panel display device such as PDPs. By being persistent, accumulating capability and capitalising on opportunities, we will continue to grow.

AE-CRT-CE-001829



**Management Discussion and Analysis**

## 1. Industry review

With the recovery in global economy and the increasing consumption as well as the successful holding of Greece Athens Olympics, the global colour television set market maintained a steady growth in 2004. According to the "Television Systems Market Tracker — Q4 2004" published by Stanford Resources in December 2004, global market sales of colour television sets in 2004 increased by 3.4% to 164 million units as compared with 2003. In 2008, the sales volume of global colour television sets is expected to amount to approximately 203 million units with a compound annual average growth rate of 5.3%.

Despite the noticeable decline in prices of FPD television set and its performance improved during last year, prices of FPD television set are still substantially higher than those of CRT television set of the same size. Most of consumers prefer to choose CRT television set, as there is apparent gradient consumption of colour television set and in terms of overall performance, FPD television set has no noticeable advantages as compared with CRT television set which owns cost performance advantages, although weakened. According to Stanford Resources, CRT television set continued its dominance in the global colour television market in 2004 with sales volume of approximately 148 million units, representing approximately 90% of the total global sales volume for 2004. In 2008, sales volume of CRT television sets is expected to amount to approximately 147 million units, representing 72.4% of the total global sales volume for that year.

10



AE-CRT-CE-001831

**Management Discussion and Analysis**

## 1.  Industry review *(continued)*

**Worldwide Sale Forecast for TV Sets Using Different Technologies**



| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| **LCD** | 3,632 | 8,662 | 13,749 | 20,111 | 28,716 | 36,701 |
| **PDP** | 885 | 1,972 | 3,694 | 5,966 | 8,654 | 11,828 |
| **Projection** | 5,037 | 5,674 | 6,434 | 6,814 | 7,090 | 7,496 |
| **CRT** | 149,289 | 148,002 | 151,574 | 150,072 | 147,245 | 147,161 |

*Resource: Stanford Resources, December 2004*

With its fast-growing economy, the PRC's GDP for 2004 amounted to RMB13,651.5 billion, representing an increase of 9.5% over last year based on comparable prices. In addition, residential income maintained a steady growth. Following the implementation of series of policies to improve farmers' income and alleviate their burden, farmers' income increased considerably. According to the Chinese National Bureau of Statistics, farmers' income for 2004 amounted to RMB2,936 per capita, up 12% over last year and hitting a historical high since 1997.

The sound macroeconomic background stimulated the rapid growth in demand for colour television sets and CPTs. According to the Chinese National Bureau of Statistics, the PRC output of colour television sets for 2004 increased by 12.4% over 2003 to 73.29 million units, accounting for approximately 45% of the total global output of colour television sets, which demonstrated the position of China as an obvious global centre for manufacturing of colour television sets. According to CCID, the PRC's output of CPTs in 2004 increased by 13% to approximately 64.91 million units as compared with 2003.

The rebounding global economy and international trade has provided a favourable external environment for the PRC export market. With the closure of some foreign production lines of CRT television sets and CPTs or shifting of such production lines to the PRC, the PRC continued to maintain a fast growth in export of CRT television sets and CPTs.

11

AE-CRT-CE-001832

**Management Discussion and Analysis**

## 1.  Industry review *(continued)*

**Export of the PRC colour television sets and CPTs**

|                                          | 2001   | 2002   | 2003   | 2004   |
|------------------------------------------|--------|--------|--------|--------|
| Colour television sets (million units)   | 11.63  | 18.82  | 22.77  | 27.72  |
| Growth rate                              | —      | 61.82% | 20.99% | 21.74% |
| CPTs (million units)                     | 9.36   | 13.47  | 15.95  | 18.13  |
| Growth rate                              | —      | 43.91% | 18.41% | 13.67% |

*Source: CCID, February 2005*

## 2.  Business review

Through substantial efforts in 2004, the Group maintained its leading position in the CPT industry in the PRC with satisfactory business results. The Group has strengthened its global market share, and maintained a continuous and steady growth in its operating revenue and profit.




Sales revenue (RMB'000)        Net profit (RMB'000)

12

### CPTs business

The Group currently produces CPTs with various sizes ranging from 14" to 29". As at 31 December 2004, the Group owned 8 production lines of CPTs.

By virtue of technology renovation, the Group improved its production capacity of CPTs production lines and further promoted flexible production capabilities, so as to address the diversifying market needs. A new CPT production line with annual production capacity of 2 million units of 21" CPTs was completed and put into operation, which enhanced large scale production capability of the Group. Meanwhile, faced with the immense commercial opportunities brought by digital television, the Group is constructing a super large-sized (32" - 36" PF 16:9) high definition CPT production line ("K Line") with designed annual production capacity of 1 million units. K Line is expected to commence trial operation in the second half of 2005 and to commence its full scale production in 2006. By then, the Group expects to further optimise the product mix of CPTs.

IRICO GROUP ELECTRONICS COMPANY LIMITED

AE-CRT-CE-001833

# 目錄



彩 虹 集 團 電 子 股 份 有 限 公 司

IRICO



公司簡介

## 1. 概況

彩虹集團電子股份有限公司(「本公司」)於2004年9月10日在
中華人民共和國(「中華人民共和國」或「中國」)陝西省咸陽市
註冊成立,是由控股股東及本公司唯一發起人彩虹集團公司
以與生產、銷售彩色顯像管之核心業務相關之資產,以及從
事相關業務之8家子公司之股權作價出資設立。本公司之
H股股票成功地於2004年12月20日在香港聯合交易所有限公
司(「聯交所」)主板掛牌交易。

本公司及其附屬公司(「本集團」)是中國最大之彩色顯像管生
產商及全球主要之彩色顯像管及配件製造商之一,亦是所有
中國彩色顯像管生產商中經營歷史最悠久之一家,在彩色顯
像管生產方面有逾20年經驗。

彩色顯像管是陰極射線管(「CRT」)電視機之核心配件,佔
CRT電視機所有配件總成本約50%。本集團目前生產14吋至
29吋之多個尺寸彩色顯像管,及大部份彩色顯像管配件,包
括玻殼、電子槍、偏轉線圈及蔭罩和框架,以及熒光粉和低
熔點玻璃粉等。

本集團之主要客戶中包括 TCL、創維、康佳、長虹和海信,
是中國主要之電視機生產商。

2



彩虹集團電子股份有限公司

董事長報告

## 業務回顧

2004年對本公司來説可謂意義非凡，在一年時間內完成了公司重組並踏上國際資本市場。本公司於2004年12月20日以H股形式在聯交所主板上市，此次共發行股份485,294,000股H股(其中包括境內股東出售其持有的44,120,000股國有法人股)，募集資金總數港幣7.668億元(其中包括境內股東出售其持有的44,120,000股國有法人股所籌得資金港幣0.697億元)。

在過去的一年，本集團繼續強化彩色顯像管業務並優化產品結構，新建成了一條年產200萬隻的21吋彩色顯像管生產線，並通過技術改造增強現有彩色顯像管生產線的生產能力和產品結構，超大螢幕高清晰彩色顯像管生產線正在順利建設中。其次，在配件方面，繼續增強關鍵配件之生產能力，玻殼、網版等配套項目的完成進一步強化了本集團的成本優勢。同時，零配件產品對外銷售比例穩定增長，零配件銷售收入與2003年相比增長26.5%。再次，PDP、彩色顯像管及配件的新品研發進展順利，為本集團後續之持續發展創造了理想的條件。

## 未來展望

展望未來，中國宏觀經濟預期將保持較快增長，居民收入有望持續上升，從而會帶動對彩色電視機和彩色顯像管之需求相應增長。而行業整合亦會為本公司帶來更多商機，歐美國家CRT電視機及彩色顯像管生產線關閉或向中國等發展中國家轉移之趨勢持續，中國作為全球彩色電視機及彩色顯像管製造中心之地位將進一步增強，中國之彩色電視機和彩色顯像管出口亦將繼續保持較快增長，為本集團之發展提供了良好的環境。

然而，顯示器件行業之競爭日益激烈，平板電視價格在未來會繼續下降，同時性能亦將進一步提高，平板顯示器件之發展對彩色顯像管市場的挑戰日益嚴峻。CRT電視及彩色顯像管行業也面臨更激烈的競爭，尤其於2005年初，出現了市場需求不旺，彩色顯像管價格進一步下降，一些材料面臨漲價等困難。

面對機遇與挑戰並存之市場環境，本集團將充分發揮競爭優勢，把握日後湧現之每個商機。我們將動員全體員工，節約、挖潛、技術創新，降低成本，優化產品結構，積極開拓海外市場，以低成本、高品質之產品和服務參與全球競爭，鞏固本集團在中國彩色顯像管行業之龍頭地位，力求提升全球之市場份額。同時本集團將積極研發PDP平板顯示器件技術，堅持不懈，厚積薄發，在未來不斷成長。

8

## 1. 行業概覽



管理層討論
與分析

隨著世界範圍內經濟的恢復和消費支出的增長，以及希臘雅典奧運會的成功舉辦，2004年全球彩色電視機市場繼續保持穩定增長。根據美國斯坦福資源（Stanford Resource）於2004年12月發表之《世界電視市場監測報告－2004年4季度》（「斯坦福資源」）之數據，2004年全球彩色電視機市場銷售量比2003年增長3.4%，增至1.64億台。預計到2008年全球彩色電視機之銷售量約為2.03億台，年複合平均增長率為5.3%。

雖然平板電視價格在過去一年下降幅度明顯，同時性能也有所提高，但其價格仍然大大高於同等尺寸之CRT電視；綜合性能也不具有相對於CRT之明顯優勢，CRT電視之性能價格比優勢有所削弱但依然存在，由於彩色電視機消費存在着明顯梯度性，絕大部分消費者在購買電視時仍然首選CRT電視。根據斯坦福資源之數據，CRT電視在2004年全球電視市場繼續佔據領導地位，其銷售量為1.48億台，大約佔2004年全球電視銷售量之90%。預計到2008年CRT電視之銷售量大約為1.47億台，仍將佔該年度全球電視銷售量之72.4%。

10



彩虹集團電子股份有限公司

管理層討論與分析

## 1. 行業概覽 *(續)*

全球使用不同技術電視機銷售量預測

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| 液晶體顯示屏 | 3,632 | 8,662 | 13,749 | 20,111 | 28,716 | 36,701 |
| 等離顯示器 | 885 | 1,972 | 3,694 | 5,966 | 8,654 | 11,828 |
| 投影 | 5,037 | 5,674 | 6,434 | 6,814 | 7,090 | 7,496 |
| 陰極射線管 | 149,289 | 148,002 | 151,574 | 150,072 | 147,245 | 147,161 |

*資料來源：斯坦福資源2004年12月*

中國經濟持續較快增長，2004年國內生產總值人民幣136,515億元，按可比價格計算，比上年增長9.5%，同時，居民家庭收入也保持了穩步增長。在中國政府實施一系列提高農民收入、減輕農民負擔之政策後，農民收入顯著增長，根據中國國家統計局之資料，2004年農民人均收入人民幣2,936元，比上年增長12%，為1997年以來增長幅度最高之一年。

良好之宏觀經濟背景，帶動了彩色電視機和彩色顯像管之需求快速增長。根據中國統計局之數據，2004年中國彩色電視機產量比2003年增長12.4%，增至7,329萬台，約佔全球彩色電視機出貨量的45%，中國作為全球彩色電視機製造中心之地位進一步明顯。根據CCID之數據，2004年中國CPT產量比2003年增長13%，增至約6,491萬台。

世界經濟形勢好轉和國際貿易回升，為中國之出口市場提供了一個良好之外部環境。隨著一些國外CRT電視機及CPT生產線關閉或逐步向中國轉移，中國之彩色電視機和彩色顯像管出口也繼續保持較快之增長。

11

## 1. 行業概覽 *(續)*

### 中國彩色電視機、彩色顯像管出口量

|  | 2001年 | 2002年 | 2003年 | 2004年 |
|---|---|---|---|---|
| 彩色電視機 (百萬台) | 11.63 | 18.82 | 22.77 | 27.72 |
| 增長率 | — | 61.82% | 20.99% | 21.74% |
| 彩色顯像管 (百萬隻) | 9.36 | 13.47 | 15.95 | 18.13 |
| 增長率 | — | 43.91% | 18.41% | 13.67% |

*數據來源：CCID，2005年2月*

## 2. 業務回顧

經過一年的不懈努力，本集團的業務取得令人滿意的成績，繼續穩居中國彩色顯像管(「彩管」)行業的龍頭地位，全球市場份額進一步擴大，營業收入和利潤獲得了持續穩定的增長。





12

### 彩管業務

本集團目前所生產之彩色顯像管之品種包括14吋到29吋多個尺寸的彩色顯像管。截至2004年底共有8條已經建成的彩色顯像管生產線。

本集團通過技術改造，使得現有彩色顯像管生產線的生產能力不斷擴大，柔性化製造程度進一步提升，以滿足市場不斷變化之需求。本集團新增的一條設計生產能力年產200萬隻的21吋彩色顯像管生產線建成投產，目前已投入正常生產，進一步擴大了本集團的規模化生產優勢。同時，面對數字電視所帶來之未來龐大商機，本集團正建造設計年產能力100萬隻的超大螢幕(32吋－36吋 PF16:9)高清晰度彩色顯像管之生產線(「K線」)。預期K線將於2005年下半年可開始試生產，並將於2006年全面投產。屆時，本集團預期彩色顯像管品種佈局將會更加完善。

# EXHIBIT 3

1  John Taladay (*pro hac vice*)
   john.taladay@bakerbotts.com
2  BAKER BOTTS LLP
   1299 Pennsylvania Ave., NW
3  Washington, D.C. 20004
   Telephone: (202)-639-7700
4  Facsimile: (202)-639-7890

5  Stuart C. Plunkett (State Bar No. 187971)
   stuart.plunkett@bakerbotts.com
6  Peter Huston (State Bar No. 150058)
   peter.huston@bakerbotts.com
7  BAKER BOTTS LLP
   101 California Street, Suite 3600
8  San Francisco, California 94111
   Telephone: (415) 291-6200
9  Facsimile: (415) 291-6300

10
   *Attorneys for Defendants*
11 *IRICO GROUP CORP. and*
   *IRICO DISPLAY DEVICES CO., LTD.*
12

13                    **UNITED STATES DISTRICT COURT**

14                   **NORTHERN DISTRICT OF CALIFORNIA**

15                       **SAN FRANCISCO DIVISION**

16

17 IN RE: CATHODE RAY TUBE (CRT)          Master File No. 3:07-cv-05944-JST
   ANTITRUST LITIGATION                   (N.D. Cal.)
18
                                          MDL No. 1917
19
   This Document Relates to:             **IRICO DEFENDANTS' CORRECTED**
20                                        **SUPPLEMENTAL OBJECTIONS AND**
   ALL INDIRECT PURCHASER ACTIONS        **RESPONSES TO INDIRECT**
21                                        **PURCHASER PLAINTIFFS' SECOND**
                                          **SET OF INTERROGATORIES**
22

23

24 PROPOUNDING PARTY:          Indirect Purchaser Plaintiffs

25 RESPONDING PARTIES:         Irico Group Corporation
                               Irico Display Devices Co., Ltd.
26
   SET NUMBER:                 Two
27

28
   IRICO'S CORRECTED SUPPLEMENTAL                    Master File No. 3:07-cv-05944-JST
   OBJECTIONS AND RESPONSES TO IPP'S                              MDL No. 1917
   SECOND SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby correct their responses to the Indirect Purchaser Plaintiffs' ("Plaintiff") Second Set of Interrogatories ("Interrogatories"). Irico reserves the right to amend or supplement these Objections and Responses (the "Responses") to the extent allowed by the Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California ("Local Rules"). Subject to and without waiving any of Irico's General and Specific Objections as set forth below, Irico is willing to meet and confer with Plaintiff regarding such General and Specific Objections.

The following Responses are made only for purposes of this case. The Responses are subject to all objections as to relevance, materiality and admissibility, and to any and all objections on any ground that would require exclusion of any response if it were introduced in court. All evidentiary objections and grounds are expressly reserved.

These Responses are subject to the provisions of the Stipulated Protective Order that the Court issued on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated "Confidential" in accordance with the provisions of the Protective Order.

## **GENERAL OBJECTIONS**

Irico makes the following General Objections to Plaintiff's Interrogatories:

1.      Irico's Responses are based upon information available to and located by Irico as of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states that it has conducted, or will conduct, a diligent search, reasonable in scope, of those files and records in its possession, custody, or control believed to likely contain information responsive to Plaintiff's Interrogatories.

2.      No express, incidental, or implied admissions are intended by these Responses and should not be read or construed as such.

3.      Irico does not intend, and its Responses should not be construed as, an agreement or acquiescence with any characterization of fact, assumption, or conclusion of law contained in

1 | or implied by the Interrogatories.

2 |        4.     To the extent that Irico responds to Plaintiff's Interrogatories by stating that Irico

3 | will produce or make available for examination responsive information or documents, Irico does

4 | not represent that any such information or documents exist. Irico will make a good faith and

5 | reasonable attempt to ascertain whether information responsive to Plaintiff's Interrogatories exists

6 | and is properly producible, and will produce or make available for examination non-privileged

7 | responsive materials to the extent any are located during the course of a reasonable search.

8 |        5.     Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad,

9 | unduly burdensome, oppressive, and duplicative to the extent that they seek information or

10 | documents that are already in the possession, custody, or control of Plaintiff.

11 |        6.     Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose

12 | obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any

13 | Order of this Court.

14 |        7.     Irico objects to Plaintiff's Interrogatories to the extent they seek information that is

15 | not relevant to jurisdictional issues or disproportionate to the needs of the case in resolving such

16 | jurisdictional issues.

17 |        8.     Irico objects to Plaintiff's Interrogatories to the extent that they are vague,

18 | ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such

19 | vague or ambiguous Interrogatories so as to provide for the production of responsive information

20 | that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of

21 | any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or

22 | amend its Responses.

23 |        9.     Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that

24 | are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous

25 | Interrogatories so as to provide for the production of responsive information that is proportionate

26 | to the needs of the case.

27 |       10.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information

28 |

that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico will provide only information that it believes to be non-privileged and otherwise properly discoverable. None of Irico's responses is intended nor should be construed as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any information or responsive documents subject to any such doctrine, privilege, protection or immunity from production shall not constitute a general, inadvertent, implicit, subject-matter, separate, independent or other waiver of such doctrine, privilege, protection or immunity from production.

11.     Irico objects to Plaintiff's Interrogatories to the extent that they call for information that is not in the possession, custody, or control of Irico. Irico also objects to the extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties, including but not limited to any of Irico's subsidiary or affiliated companies.

12.     Irico objects to Plaintiff's Interrogatories to the extent that responding would require Irico to violate the privacy and/or confidentiality of a third party or confidentiality agreement with a third party.

13.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily available from other sources.

14.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information or documents concerning transactions outside the United States. Such Interrogatories are unduly burdensome and irrelevant because they do not relate to actions by Irico in or causing a direct effect in the United States.  Such Interrogatories are also unduly burdensome and irrelevant to this pending action as Plaintiffs' class definition is confined to "individuals and entities that indirectly purchased Cathode Ray Tube Products . . . in the United States" (see Indirect Purchaser Plaintiffs' Fourth Consolidated Amended Complaint).

15.     Irico objects to Plaintiff's Interrogatories to the extent that compliance would

require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body of foreign jurisdictions.

16.     Irico's responses, whether now or in the future, pursuant to Plaintiff's Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

17.     Irico objects to Plaintiff's Interrogatories to the extent that compliance would require Irico to seek information stored on backup or archived databases or other systems that are not readily accessible or otherwise no longer active.

18.     Irico objects to Plaintiff's Interrogatories to the extent that they are compound and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

19.     Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for legal conclusions.

20.     Irico objects to the Interrogatories to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

21.     Irico objects that Plaintiff's Interrogatories are irrelevant and premature because the Court has not set a schedule for jurisdictional discovery or briefing that applies to Plaintiff.

22.     Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

## GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Irico objects to the definitions of "You" and "Your" to the extent that Plaintiff defines those terms to include the Irico's "present and former members, officer, agents, employees, and all other persons acting or purporting to act on their behalf." This definition is legally incorrect, overbroad, unduly burdensome, vague, and ambiguous. Irico also objects to the

inclusion of "all present and former directors, officers, Employees, agents, representatives or any Persons acting or purporting to act on behalf of" Irico within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

2.      Irico objects to the definition of "Affiliate" as overbroad, unduly burdensome, vague, and ambiguous. Irico further objects to the definition because it includes entities that are not, or were not during the relevant time period, affiliates of Irico.

3.      Irico objects to the definitions of "CRT" and "CRT Products" (Definitions No. 6 and 7) on the grounds that they are vague, ambiguous and overly broad. Irico further objects to the use of the term "CRT Products" to the extent that it is inconsistent with the definition of "CRT Products" as set forth in Plaintiff's pleadings.

4.      Irico objects to the Instructions to the extent they purport to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

## SPECIFIC RESPONSES TO INTERROGATORIES

## INTERROGATORY NO. 3

State by year and by size and type how many Irico CRTs and/or CRT Products (in both number of units and revenue in U.S. dollars) were sold by You or Your Affiliates to the following entities:

(1) Sichuan Changhong Electric Co., Ltd.;

(2) Konka Group Co. Ltd.;

(3) TCL Corporation;

(4) Skyworth Group Co., Ltd.;

(5) Hisense Electric Co. Ltd. Qingdao, China;

(6) Haier Electrical Appliances Co., Ltd.;

(7) Xiamen Overseas Chinese Electronic Co., Ltd.;

1  (8) Soyea Technology Co., Ltd.;

2  (9) Yisheng Technology Co., Ltd.;

3  (10) LG Electronics (Shenyang) Inc.;

4  (11) Hangzhou Jinlipu Electrical Co., Ltd.;

5  (12) Shenzhen Techtop Industrial Co., Ltd

6  (13) Suntrue International

7  (14) Starlight Marketing Macao Commercial Offshore, Ltd.; and

8  (15) Hangzhou Huashan Electric Co., Ltd

9 **RESPONSE TO INTERROGATORY NO. 3**

10  Irico reasserts and incorporates each of the General Objections and Objections to the

11 Definitions and Instructions set forth above.  Irico also objects that this interrogatory is

12 overbroad, unduly burdensome, and disproportionate to the needs of the case in resolving

13 jurisdictional issues.  Irico further objects that this interrogatory seeks information beyond the

14 scope of what is relevant to resolving jurisdictional issues.

15  Subject to and without waiving the objections stated above, Irico responds that its

16 investigation regarding this interrogatory is ongoing and it intends to supplement this response.

17 **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3**

18  Subject to and without waiving the objections stated above, Irico provides the information

19 in Attachment 1.  Irico further responds that its investigation regarding this interrogatory is

20 ongoing and it intends to supplement this response.

21 **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3**

22  Subject to and without waiving the objections stated above, Irico provides the information

23 in Attachment 2.  Irico further responds that its investigation regarding this interrogatory is

24 ongoing and it intends to supplement this response.

25 **THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3**

26  Subject to and without waiving the objections stated above and pursuant to IPPs' January

27 16th request, Irico provides the information in Attachment 4.

28

IRICO'S CORRECTED SUPPLEMENTAL  6  Master File No. 3:07-cv-05944-JST
OBJECTIONS AND RESPONSES TO IPP'S    MDL No. 1917
SECOND SET OF INTERROGATORIES

1

## CORRECTED SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3

2       Irico has identified mathematical errors that resulted in incorrect revenue information

3 contained in Attachment 2 regarding Irico Display's revenues from sales of CRTs to Sichuan

4 Changhong Electric Co., Ltd. and TCL Corporation.  Subject to and without waiving the

5 objections stated above, Irico hereby provides a corrected Attachment 2.

6

7

8 Dated:  April 11, 2019                           BAKER BOTTS LLP

9
                                                  */s/ Stuart C. Plunkett*
10                                                 Stuart C. Plunkett
                                                  Email:  stuart.plunkett@bakerbotts.com
11                                                 Peter Huston
                                                  peter.huston@bakerbotts.com
12                                                 BAKER BOTTS L.L.P.
                                                  101 California Street, Suite 3600
13                                                 San Francisco, CA 94111
                                                  Telephone: (415) 291 6203
14                                                 Facsimile: (415) 291 6303

15                                                 John Taladay (*pro hac vice*)
                                                  john.taladay@bakerbotts.com
16                                                 BAKER BOTTS LLP
                                                  1299 Pennsylvania Ave., NW
17                                                 Washington, D.C. 20004
                                                  Telephone: (202)-639-7700
18                                                 Facsimile: (202)-639-7890

19                                                 *Attorneys for Defendants*
                                                  *IRICO GROUP CORP. and*
20                                                 *IRICO DISPLAY DEVICES CO., LTD.*

21

22

23

24

25

26

27

28

IRICO'S CORRECTED SUPPLEMENTAL              7              Master File No. 3:07-cv-05944-JST
OBJECTIONS AND RESPONSES TO IPP'S                         MDL No. 1917
SECOND SET OF INTERROGATORIES

1

## CERTIFICATE OF SERVICE

2

**In re: Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917**

3    I declare that I am employed in Washington, District of Columbia.  I am over the age of

4    eighteen years and not a party to the within case; my business address is: Baker Botts L.L.P.,

5    1299 Pennsylvania Avenue, Washington, DC 20004.

6    On April 11, 2019, I served the following document(s) described as:

7    **IRICO DEFENDANTS' CORRECTED SUPPLEMENTAL OBJECTIONS AND
     RESPONSES TO INDIRECT PURCHASER PLAINTIFFS'**

8    **SECOND SET OF INTERROGATORIES**

9    on the following interested parties in this action:

10

11   Guido Saveri (guido@saveri.com)                    Mario N. Alioto (malioto@tatp.com)
     R. Alexander Saveri (rick@saveri.com)              Lauren C. Capurro (laurenrussell@tatp.com)
     Geoffrey C. Rushing (grushing@saveri.com)          Joseph M. Patane (jpatane@tatp.com)

12   Cadio Zirpoli (cadio@saveri.com)                   TRUMP ALIOTO TRUMP & PRESCOTT LLP
     Matthew D. Heaphy (mheaphy@saveri.com)             2280 Union Street

13   SAVERI & SAVERI, INC.                              San Francisco, CA 94123
     706 Sansome St # 200,

14   San Francisco, CA 94111

15   *Lead Counsel for the Direct Purchaser*            *Lead Counsel for the Indirect Purchaser*
     *Plaintiffs*                                       *Plaintiffs*

16

17   [X]    (BY ELECTRONIC MAIL) I caused such documents to be sent to the persons at the
     email addressed listed above.  I did not receive, within a reasonable time after the transmission,

18   any electronic message or other indication that the transmission was unsuccessful.

19        I declare under penalty of perjury under the laws of the State of California that the
     foregoing is true and correct.  Executed on April 11, 2019 in Washington, District of Columbia.

20

21                                                     */s/ Thomas Carter*
                                                       Thomas Carter

22

23

24

25

26

27

28

# ATTACHMENT 2

(CORRECTED)

**Irico Group CRT Sales 1995-2004**

**Irico Group CRT Sales to Sichuan Changhong Electric Co., Ltd.**

| Year | Annual Revenue (in RMB) |
|------|-------------------------|
| 1995 | 858,559,800 |
| 1996 | 700,069,860 |
| 1997 | 870,033,102 |
| 1998 | 436,229,630 |
| 1999 | 146,136,763 |
| 2000 | 61,870,953 |
| 2001 | 54,500,741 |
| 2002 | 124,523,818 |
| 2003 | 122,382,064 |
| 2004 | 99,291,088 |

**Irico Group CRT Sales to Konka Group Co. Ltd.**

| 1995 | 58,176,714 |
|------|------------|
| 1996 | 121,803,006 |
| 1997 | 148,306,895 |
| 1998 | 118,022,318 |
| 1999 | 350,819,262 |
| 2000 | 98,848,261 |
| 2001 | 22,108,068 |
| 2002 | 36,227,484 |
| 2003 | 90,466,477 |
| 2004 | 88,541,342 |

**Irico Group CRT Sales to TCL Corporation**

| 1995 | - |
|------|-----|
| 1996 | - |
| 1997 | 40,056,832 |
| 1998 | 24,304,026 |
| 1999 | 280,119,603 |
| 2000 | 82,989,692 |
| 2001 | - |
| 2002 | 13,519,368 |
| 2003 | 148,046,615 |
| 2004 | 143,262,496 |

**Irico Group CRT Sales to Skyworth Group Co., Ltd.**

| 1995 | 5,279,400 |
|------|-----------|
| 1996 | - |

| | |
|---|---|
| 1997 | 5,730,974 |
| 1998 | 1,922,308 |
| 1999 | 31,987,015 |
| 2000 | 3,532,308 |
| 2001 | 5,993,436 |
| 2002 | 3,944,410 |
| 2003 | 95,013,567 |
| 2004 | 134,696,231 |

**Irico Group CRT Sales to Hisense Electric Co. Ltd. Qingdao, China**

| | |
|---|---|
| 1995 | 34,323,197 |
| 1996 | 77,759,816 |
| 1997 | 104,972,990 |
| 1998 | 112,497,778 |
| 1999 | 138,228,288 |
| 2000 | 59,596,581 |
| 2001 | 3,694,833 |
| 2002 | 9,638,735 |
| 2003 | 51,702,624 |
| 2004 | 71,213,145 |

**Irico Group CRT Sales to Haier Electrical Appliances Co., Ltd.**

| | |
|---|---|
| 1995 | - |
| 1996 | - |
| 1997 | - |
| 1998 | 4,766,162 |
| 1999 | 22,710,274 |
| 2000 | 13,657,577 |
| 2001 | 20,242,874 |
| 2002 | 59,231,683 |
| 2003 | 38,800,272 |
| 2004 | 70,633,152 |

**Irico Group CRT Sales to Xiamen Overseas Chinese Electronic Co., Ltd.**

| | |
|---|---|
| 1995 | 50,227,441 |
| 1996 | 46,514,214 |
| 1997 | 51,910,862 |
| 1998 | 33,893,778 |
| 1999 | 75,527,293 |
| 2000 | 34,252,702 |
| 2001 | 3,454,771 |
| 2002 | 26,755,501 |
| 2003 | 19,537,911 |
| 2004 | 26,312,325 |

**Irico Group CRT Sales to Soyea Technology Co., Ltd.**

| Year | Amount |
|------|-------|
| 1995 | - |
| 1996 | - |
| 1997 | - |
| 1998 | - |
| 1999 | 19,340,855 |
| 2000 | - |
| 2001 | 18,462 |
| 2002 | 6,974,215 |
| 2003 | 6,554,082 |
| 2004 | 2,186,615 |

**Irico Group CRT Sales to LG Electronics (Shenyang) Inc.**

| Year | Amount |
|------|-------|
| 1995 | - |
| 1996 | - |
| 1997 | - |
| 1998 | - |
| 1999 | - |
| 2000 | 14,439,127 |
| 2001 | 48,442,431 |
| 2002 | 41,026 |
| 2003 | - |
| 2004 | - |

**Irico Group CRT Sales to Hangzhou Jinlipu Electrical Co., Ltd.**

| Year | Amount |
|------|-------|
| 1995 | - |
| 1996 | - |
| 1997 | - |
| 1998 | 17,863 |
| 1999 | 3,910,427 |
| 2000 | - |
| 2001 | 370,462 |
| 2002 | - |
| 2003 | 448,000 |
| 2004 | - |

**Irico Display CRT Sales 1995-2007**

**Irico Display CRT Sales to Sichuan Changhong Electric Co., Ltd.**

| Year | Annual Revenue (in RMB) |
|------|-------------------------|
| 1995 | 227,706,900 |
| 1996 | 551,131,400 |
| 1997 | 454,016,800 |
| 1998 | 420,617,900 |
| 1999 | 143,262,000 |
| 2000 | 329,579,500 |
| 2001 | 507,579,000 |
| 2002 | 492,712,800 |
| 2003 | 402,227,400 |
| 2004 | 368,406,100 |
| 2005 | 230,071,000 |
| 2006 | 344,879,900 |
| 2007 | 155,011,200 |

**Irico Display CRT Sales to Konka Group Co. Ltd.**

| Year | Annual Revenue (in RMB) |
|------|-------------------------|
| 1995 | 2,762,700 |
| 1996 | 97,588,900 |
| 1997 | 12,754,200 |
| 1998 | 218,267,800 |
| 1999 | 1,833,196,400 |
| 2000 | 327,381,200 |
| 2001 | 213,080,500 |
| 2002 | 482,104,200 |
| 2003 | 461,363,000 |
| 2004 | 463,421,800 |
| 2005 | 170,487,200 |
| 2006 | 303,186,500 |
| 2007 | 242,497,300 |

**Irico Display CRT Sales to TCL Corporation**

| Year | Annual Revenue (in RMB) |
|------|-------------------------|
| 1995 | - |
| 1996 | 3,500,900 |
| 1997 | - |
| 1998 | - |
| 1999 | 26,232,100 |
| 2000 | 180,190,200 |
| 2001 | 344,030,400 |
| 2002 | 544,187,900 |
| 2003 | 494,380,600 |

| | |
|---|---|
| 2004 | 690,334,900 |
| 2005 | 236,950,500 |
| 2006 | 201,086,700 |
| 2007 | 271,950,900 |

**Irico Display CRT Sales to Skyworth Group Co., Ltd.**

| Year | Annual Revenue (in RMB) |
|---|---|
| 1995 | - |
| 1996 | - |
| 1997 | - |
| 1998 | - |
| 1999 | - |
| 2000 | - |
| 2001 | - |
| 2002 | - |
| 2003 | - |
| 2004 | - |
| 2005 | 6,892,000 |
| 2006 | 64,955,100 |
| 2007 | 45,276,300 |

**Irico Display CRT Sales to Hisense Electric Co. Ltd. Qingdao, China**

| Year | Annual Revenue (in RMB) |
|---|---|
| 1995 | 6,845,500 |
| 1996 | 32,851,400 |
| 1997 | 26,468,700 |
| 1998 | 60,841,100 |
| 1999 | 65,057,400 |
| 2000 | 326,827,600 |
| 2001 | 396,683,300 |
| 2002 | 417,686,900 |
| 2003 | 325,748,200 |
| 2004 | 321,908,700 |
| 2005 | 178,289,700 |
| 2006 | 161,369,800 |
| 2007 | 54,062,700 |

**Irico Display CRT Sales to Haier Electrical Appliances Co., Ltd.**

| Year | Annual Revenue (in RMB) |
|---|---|
| 1995 | - |
| 1996 | - |
| 1997 | - |
| 1998 | - |
| 1999 | - |
| 2000 | 90,348,500 |

| 2001 | 586,380,500 |
| 2002 | 255,612,100 |
| 2003 | 252,054,000 |
| 2004 | 184,260,400 |
| 2005 | 75,545,000 |
| 2006 | 3,760,900 |
| 2007 | 24,730,600 |

**Irico Display CRT Sales to Xiamen Overseas Chinese Electronic Co., Ltd.**

| Year | Annual Revenue (in RMB) |
| --- | --- |
| 1995 | 19,453,900 |
| 1996 | 11,440,600 |
| 1997 | 16,884,800 |
| 1998 | 21,348,000 |
| 1999 | 62,778,000 |
| 2000 | 86,063,500 |
| 2001 | 83,823,400 |
| 2002 | 137,457,500 |
| 2003 | 106,081,600 |
| 2004 | 78,593,300 |
| 2005 | 55,923,300 |
| 2006 | 132,492,500 |
| 2007 | 11,533,000 |

**Irico Display CRT Sales to Soyea Technology Co., Ltd.**

| Year | Annual Revenue (in RMB) |
| --- | --- |
| 1995 | - |
| 1996 | - |
| 1997 | - |
| 1998 | - |
| 1999 | 19,773,200 |
| 2000 | 29,739,300 |
| 2001 | 26,952,900 |
| 2002 | 70,213,100 |
| 2003 | 87,400,400 |
| 2004 | 33,034,000 |
| 2005 | 12,072,500 |
| 2006 | 32,530,100 |
| 2007 | 3,081,500 |

**Irico Display CRT Sales to Yisheng Technology Co., Ltd.**

| Year | Annual Revenue (in RMB) |
| --- | --- |
| 1995 | - |
| 1996 | - |
| 1997 | - |

| | |
|---|---|
| 1998 | - |
| 1999 | - |
| 2000 | - |
| 2001 | - |
| 2002 | - |
| 2003 | - |
| 2004 | - |
| 2005 | 7,906,900 |
| 2006 | 21,573,600 |
| 2007 | 31,662,400 |

**Irico Display CRT Sales to LG Electronics (Shenyang) Inc.**

| Year | Annual Revenue (in RMB) |
|---|---|
| 1995 | - |
| 1996 | - |
| 1997 | - |
| 1998 | - |
| 1999 | - |
| 2000 | - |
| 2001 | - |
| 2002 | - |
| 2003 | - |
| 2004 | - |
| 2005 | - |
| 2006 | - |
| 2007 | 156,800 |

**Irico Display CRT Sales to Hangzhou Jinlipu Electrical Co., Ltd.**

| Year | Annual Revenue (in RMB) |
|---|---|
| 1995 | - |
| 1996 | - |
| 1997 | - |
| 1998 | 1,344,300 |
| 1999 | - |
| 2000 | - |
| 2001 | - |
| 2002 | 1,456,100 |
| 2003 | 9,047,900 |
| 2004 | 28,571,100 |
| 2005 | 14,742,600 |
| 2006 | 8,508,000 |
| 2007 | 7,411,000 |

**Irico Display CRT Sales to Shenzhen Techtop Industrial Co., Ltd**

| Year | Annual Revenue (in RMB) |
|---|---|

| Year | Annual Revenue (in RMB) |
|------|-------------------------|
| 1995 | - |
| 1996 | - |
| 1997 | - |
| 1998 | - |
| 1999 | - |
| 2000 | - |
| 2001 | - |
| 2002 | - |
| 2003 | - |
| 2004 | - |
| 2005 | 313,000 |
| 2006 | 6,020,000 |
| 2007 | 6,370,500 |

**Irico Display CRT Sales to Hangzhou Huashan Electric Co., Ltd**

| Year | Annual Revenue (in RMB) |
|------|-------------------------|
| 1995 | - |
| 1996 | - |
| 1997 | - |
| 1998 | - |
| 1999 | - |
| 2000 | - |
| 2001 | - |
| 2002 | - |
| 2003 | - |
| 2004 | - |
| 2005 | - |
| 2006 | - |
| 2007 | 317,900 |

# EXHIBIT 4

**To:**   "Stanley Cheung" <stanley@tcl.com>[.]; CN=Eric Yong KY/OU=SGP/OU=CE/O=PHILIPS@PHILIPS[.]; CN=Fanqun Xu/OU=SZH/OU=CE/O=PHILIPS@PHILIPS[.]; CN=Jan De Lombaerde/OU=SGP/OU=CE/O=PHILIPS@PHILIPS[.]; lrx@tcl.com[.]; CN=Ng KK/OU=SGP/OU=CE/O=PHILIPS@PHILIPS[.]; "Xiao Jun" <xiaojun@tcl.com>[.]; zss@tcl.com[.]

**Cc:**   []
**Bcc:**   []
**From:**   Alan Tan (alan.tan@philips.com)
**Sent:**   Wed 7/6/2005 5:42:25 AM
**Importance:**   High
**Subject:**   RE: TTE Q3 pricing
**MAIL_RECEIVED:**   Wed 7/6/2005 5:40:43 AM
<u>Release for CRT in OEM TTE update 01072005.xls</u>

Dear all,
FYI,
We made in attached file,  a more comprehensive overview to track the CRT release activities agreed for OEM TTE sets.   We also include in this file,  2 more actions needed (SDI 15RF AK and MTPDM 21RF Iron ARC)  that were not discussed last week's meeting.



Best regards,
Alan Tan
Philips Electronics Singapore Pte Ltd
620A Lorong 1 Toa Payoh
Singapore 319762
Telephone (65) 6882 3692
Fascimile (65) 6250 4593




          "Stanley Cheung" <stanley@tcl.com>
          2005-07-06 11:17 AM
                              To: Jan De Lombaerde/SGP/CE/PHILIPS@PHILIPS
                              cc: <lrx@tcl.com>
<zss@tcl.com>
Ng KK/SGP/CE/PHILIPS@PHILIPS
Fanqun Xu/SZH/CE/PHILIPS@PHILIPS
Alan Tan/SGP/CE/PHILIPS@PHILIPS
Eric Yong KY/SGP/CE/PHILIPS@PHILIPS
"Xiao Jun" <xiaojun@tcl.com>
                              Subject: RE: TTE Q3 pricing
                              Classification:



Dear Jan,

Appreciated the discussion with you last week. Please note that Mr. Xiao Jun is our windows for the CRT follow up actions. He will discuss with Mr. Alan Tan and Ms. Xu Fanqun.

By the way, I need the ccc from KK regarding the IRICO tube release.

Best regards,
Stanley Cheung
--------------------------------
TV Key Account BU
Tel: +86 755 2668 0230
Fax: +86 755 2686 4110
HK HP: + 852 9300 8946
China HP: +86 138 2354 1290
E-mail: stanley@tcl.com

CONFIDENTIAL                                                   PHLP-CRT-154896

-----Original Message-----
From: Jan De Lombaerde [mailto:jan.de.lombaerde@philips.com]
Sent: Tuesday, July 05, 2005 7:35 PM
To: stanley@tcl.com
Cc: lrx@tcl.com; zss@tcl.com; Ng KK; Fanqun Xu; Alan Tan; Eric Yong KY
Subject: TTE Q3 pricing


Stanley,
I appreciated the discussions last week on CRT pricing and hope that you can
agree with me, that in order to remain competitive, we worked out a good
compromise on the CRT pricing. In order to maintain this competitiveness, we
have also agreed to work on a number of new releases. All these action points
have been summarised in the attached file.


I have asked my colleagues Alan Tan and Xu Fanqun to make sure that all the
agreed actions are being followed up closely.  I have also organised that our
key suppliers have been informed separately about the basic allocation agreed.
It is important that the sourcing plan agreed with you is adhered to and that
all the planned releases are being managed properly. I would like to hear from
you who will be coordinating this follow-up within TCL.


kind regards,
Jan


Jan De Lombaerde

General Manager SBMT CRT Displays

Tel :  +65-6882-3161 (direct) or 6882-3509
Mobile : +65-92963662
E-mail:  jan.de.lombaerde@philips.com


The information contained in this message is confidential and may be legally
privileged. The message is intended solely for the addressee(s). If you are not
the intended recipient, you are hereby notified that any use, dissemination, or
reproduction is strictly prohibited and may be unlawful. If you are not the
intended recipient, please contact the sender by return e-mail and destroy all
copies of the original message.

CONFIDENTIAL

| Chassis | Region | Tube | Supplier | Tube type | Sourcing | CCR status | Chassis# designated | Phase A | Phase B | TR | PS intro | Release status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| L01 2K3SS (OEM TTE GW6 Huizhou) | Russia | 15RF | SDI | A36QDT352X001 | Change from Invar to AK (1USD savings) | CCR to be started (Alan Tan) | 15PT1727/60 15PT2767/60 | | | | | Sampling AK tube is available end June.  To be defined this release plan |
| L03SP (OEM TTE Huizhou) | Nafta | 14" | LPD Bekasi | A34KPU** | 2nd sourcing agreed for allocation in Q4 | | 13MT1431 13MT1532 | | | | | Target to complete this release by Q4 2005. Spec re: CPT type A34AGT13X95 |
| L03SP (OEM TTE Huizhou) | Nafta | 21FS | Irico | | 100K committed allocation in Q3. | CCC to be started (Ng KK) | 20MT1331 20MS2331 | | | | | To check phase B release status (Zhang Bin). Need to complete this release by August 2005. |
| M28A (OEM TTE Huizhou) | AP | 21FS | LPD Changsha | LPD to propose similar to released Bekasi tube | 20K planned prefer LPD China CRT source. | | 21PT2110 | | | | | 20K planned, but not yet in MTP.  LPD to propose Changsha tube similar to Bekasi type A51QAE320XA5 |
| L03SS (OEM TTE GW4 Huizhou) | Nafta | 21RF | LPD Changsha | | 240K committed allocation in Q3. Need release Changsha tube for supply flexibility | | 20PT6441 20PT6341 20PT6245 | | | | | LPD Nanjin tube A51ERF135X82 released. To check LPD Changsha proposal for supply flexibility. |
| L03SS (OEM TTE GW4 Huizhou) | Nafta | 21RF | MTPDM | A51LYZ290X01 | Change from Iron to Iron ARC for better doming | CCR approved PS04-315. | 20PT6441 20PT6341 20PT6245 | done | wk517 pending | | | CLD issue.  In progress actions to resolve for phase B  (Wilson/Zhang Bin) |
| L03SS (OEM TTE GW4 Huizhou) | Nafta | 21RF | CPTM | A51AKL13X10(M) | Change from Invar to Iron mask (2USD savings).  50K committed allocation in Q3 based on AK price | CCR  restarted 01Jul05 (Alan). Awaits regional project (Wilson). | 20PT6441 20PT6341 20PT6245 | | wk531 target complete | | | Need to complete the release by August 2005. |
| L03SS (OEM TTE GW4 Huizhou) | Nafta | 21RF | Irico | | Sourcing agreed for allocation in later quarter | CCC to be started (Ng KK) | 20PT6441 20PT6341 20PT6245 | | | | | To check Irico tube proposal (Must be AK tube). |
| M123A (OEM TTE Huizhou) | Nafta | 21RF | SDI Shenzhen | | 30K committed allocation in Q3. Need release AK tube for supply flexibility. | | 20MS3442 | | | | | Need to complete the release by Q4. |
| L01 2K3 SS (OEM TTE GW2 phase 2) | AP | 21RF | CPTM | A51AKL13X10,N,R(M) | Change from Invar to Iron mask (2USD savings). 43K committed allocation in Q3 based on AK price | CCR  restarted 01Jul05 (Alan). Awaits regional project (Lim CY). | 21PT3324 21PT2325 21PT4323 21PT2115 | | wk531 target complete | | | Need to complete the release by August 2005. |
| L01 2K3LS (OEM TTE GW2 Thailand) | AP | 29RF | LPD Nanjin | A68QCU770X73 | Alternate sourcing 22K committed allocation in Q3 (curent CRT source is  SDI) | | | | | | | LPD tube is released.  Partlist available at stage-0.  To be upgraded to stage-3 by wk527 (Tee LK), then transfer to TTE (Tan YC) |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Release actions aligned with allocation agreement TTE: wk526.

# EXHIBIT 5

To:     CN=Ng KK/OU=SGP/OU=CE/O=PHILIPS@PHILIPS[ng.kk@philips.com]; CN=Eric Yong
KY/OU=SGP/OU=CE/O=PHILIPS@PHILIPS[eric.yong.ky@philips.com]; CN=Fanqun
Xu/OU=SZH/OU=CE/O=PHILIPS@PHILIPS[fanqun.xu@philips.com]
Cc:     CN=Jan De Lombaerde/OU=SGP/OU=CE/O=PHILIPS@PHILIPS[jan.de.lombaerde@philips.com]
Bcc:    []
From:    Alan Tan (alan.tan@philips.com)
Sent:    Tue 9/13/2005 6:42:34 AM
Subject:    CRT Review for discussion with TTE this week
MAIL_RECEIVED:    Tue 9/13/2005 6:40:40 AM
TCL Supply Plan 05-09-2005 vs TTE feedback 06-09-2005.xls

Dear all,
As discussed with Jan, we use the latest TCL supply plan to compare with
feedback by TTE regarding their actual sourcing result.

In the file, you will 2 sheets :
(1) One sheet comparing Q3 agreement (30-06-2005) against actual (06-09-2005)
(2) Another sheet comparing the same for Q4. In this case, first proposal by
TTE for Q4 has been put into the agreement part (this has to be revised based
on agreed sourcing defined during this week's discussion with TTE). Actual
part to be completed later towards end of Q4.


Status update on the actions agreed during 30-06-2005 meeting with TTE :

(1) LPD Bekasi 14" for release in L03SP Nafta (Huizhou)
Two samplings so far not achieving drop in condition. Third sampling (revise
RV) requested to LPD wk536. Formal release plan to start wk542 until wk547.

(2) Irico 21FSQ for release in L03SP Nafta (Huizhou)
Released. Started production in Q3.

(3) LPD Changsha 21FSQ for release in TCL M28 AP (Huizhou)
PCE reconsider to remain with released LPD Bekasi tube which is more suitable
for AP (/69) model to avoid tariff.

(4) SDI Shenzhen 21RF AK for release in TCL M123 Nafta (Huizhou)
No progress, but need to start plan this release of AK to avoid later phase out
Invar situation.

(5) LPD Changsha 21RF for release in L03SS Nafta (Huizhou)
No proposal received from LPD. To discuss again with LPD regarding their
suppliability of current released Nanjin tube.

(6a) CPT Malaysia 21RF AK for release in L03SS Nafta (Huzhou)
Release planned to start wk538 until wk543

(6b) CPT Malaysia 21RF AK for release in L01S AP (Thailand)
Release planned to start wk540 until wk545

(7) Irico 21RF for release in L03SS Nafta (Huizhou)
Release need to be organised. TTE to update this status.

(8) MTPD Thailand 24vRF for L01 2K3 Nafta (Thailand)
Monthly nego in place.

(9) LPD Nanjin 29RF for L01 2K3 AP (Thailand)
Tube is released (partlist at stage3). Need to ensure that this tube starts
use in /56 and /79 versions.

New actions to be discussed during this week's discussion with TTE :

(1) MTPD Malaysia 29RF for release in L01 2K3 AP (Thailand)
Release started in Singapore (phase A). This should apply to /69 and /71
versions only. Next to organise 21 units for model built in wk538.
Phase B initial result targetted by end wk539, hence starting to place order
for MP in wk542/3. India set (based on /69) will also be designated with MTPDM
tube (it can be easily adapted by MTPDT for benefit FTA Thai-India).

CONFIDENTIAL             PHLP-CRT-155234

(2) SDI Malaysia 15RF AK for release in L01S Russia (Huizhou)
Current released SDI Invar tube to be phased out in Q4.  Release of AK plan to
start wk542 until wk547.

(3) MTPD Thailand 24vRF AK for release in L01 2K3 Nafta (Thailand)
Samples of AK tube will be available in early Oct.  To be planned this release
for starting use in Jan06 (Q1'06)

(4) MTPD Malaysia 21RF Iron ARC for release in L01 Russia (Huizhou)
Release need to planned.

(5) MTPD Malaysia 21RF Iron ARC for release in L03SS Nafta (Huizhou)
Release will be subject to price competitiveness/ sourcing decision.

(6) LPD Changsha 25RF for L01 2K3 AP (Thailand)
Tueb is released (partlist at stage3), also procurement started in small
quantities in Q3.  Need to allocate more (100%) towards LPD.  Also, study
requested to LPD for local backend in Asean for tariff benefit.  India set
(based on /69) will also be designated with LPD Changsha tube.


Best regards,
Alan Tan
Philips Electronics Singapore Pte Ltd
620A Lorong 1 Toa Payoh
Singapore 319762
Telephone (65) 6882 3692
Fascimile (65) 6250 4593

CONFIDENTIAL

| Model Number | Platform | Location | Picture | 05Q1 | 05Q2 | 05Q3 | 05Q4 | Year 2005 | Agree | LPD | Irico | SDI | CPT | MTPD | SEG | TCRT | Act | LPD | Irico | SDI | CPT | MTPD | SEG | TCRT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13MT1431/17 | L03SP NA | Huizhou | FSQ | 21240 | 16830 | 12,900 | 14,760 | 65730 | | | | | 100000 | | | | | | | | 76800 | | | |
| 13MT1432/17 | | | | 5040 | 0 | 0 | 0 | 5040 | | | | | | | | | | | | | | | | |
| 13MT1532/17 | L03SP NA | Huizhou | FSQ | 6720 | 12600 | 0 | 9240 | 28560 | | | | | | | | | | | | | | | | |
| 13MT1533/17 | | | | 0 | 1680 | 5040 | 0 | 6720 | | | | | | | | | | | | | | | | |
| 14PT2110/56R | TCL AP | Huizhou | FSQ | 0 | 0 | 0 | 0 | 0 | 14" | 16500 | 16500 | | | | | | 14" | 0 | 20000 | | | | | |
| 14PT2110/69R | | | | 0 | 1525 | 0 | 0 | 1525 | | | | | | | | | | | | | | | | |
| 14PT2115/56 | | | | 6100 | 21655 | 11590 | 16470 | 55815 | | | | | | | | | | | | | | | | |
| 14PT2115/69 | | | | 6100 | 23180 | 23790 | 10200 | 63270 | | | | | | | | | | | | | | | | |
| 14PT2115/94 | | | | 0 | 0 | 2745 | 9780 | 12525 | | | | | | | | | | | | | | | | |
| 14PT3005/44 | L03 SP LA | | | 0 | 33495 | 30450 | 15225 | 79170 | | | | | | | | | | | | | | | | |
| 14PT3005/55 | | | | 0 | 33640 | 42782 | 14063 | 90485 | | | | | | | | | | | | | | | | |
| **Total 14" FSQ** | | | | 45200 | 144605 | 129,297 | 89,738 | 408,840 | 133000 | 12.4% | 12.4% | | 75.2% | | | | 96800 | 0.0% | 20.7% | | 79.3% | | | |
| 20MT1331/17 | L03SP NA | Huizhou | FSQ | 142512 | 208320 | 388112 | 282376 | 1021320 | | 220000 | 100000 | 110000 | 100000 | | | 0 | | 66000 | 119000 | 76000 | 0 | | | 407000 |
| 20MS2331/17 | | | | 139839 | 97256 | 75044 | 98000 | 410139 | | | | | | | | | | | | | | | | |
| 20PT5441/37 | L03SS NA | | | 0 | 10472 | 1870 | 0 | 12342 | | 4000 | | | | | | | | | | | | | | |
| 21PT2110/56R | TCL AP | | | 2960 | 888 | 5476 | 8880 | 18204 | | 20000 | | | 0 | | | | | | | | 0 | | | 11500 |
| 21PT2110/69R | | | | 3404 | 1220 | 4440 | 10360 | 19424 | | | | | | | | | | | | | | | | |
| 21PT2110/79R | | | | 0 | 0 | 14208 | 5772 | 19980 | | | | | | | | | | | | | | | | |
| 21PT3005/55 | L03SP LA | | | 0 | 25462 | 39144 | 12731 | 77337 | | | | | | | | | | | | | | | | |
| 21PT3205/44 | | | | 0 | 22389 | 35559 | 16682 | 74630 | | | | | | | | | | | | | | | | |
| 21PT3205/55 | | | | 0 | 21246 | 41708 | 13407 | 76361 | | | | | | | | | | | | | | | | |
| 21PT2110/69R | TCL AP | | | 2700 | 7358 | 0 | 0 | 10058 | | | | | | | | | | | | | | | | |
| 21PT2115/56 | | TTET | | 0 | 4708 | 3860 | 0 | 8568 | | | | | | 10000 | | | | | | | | | 5000 | |
| 21PT2115/69 | L01 2K3 SS AP | | | 0 | 23868 | 4104 | 2156 | 30128 | | | | | | | | | | | | | | | | |
| 21PT2115/79 | | | | 0 | 4697 | 6624 | 0 | 11321 | | | | | | | | | | | | | | | | |
| **Total 20" & 21" FSQ** | | | | 291415 | 427884 | 620149 | 450364 | 1,789,812 | 564000 | 43.3% | 17.7% | 19.5% | 19.5% | | | 0% | 684500 | 9.6% | 17.4% | 11.1% | 0.7% | | | 61% |
| **14MS2331/17  RF** | **L03SP NA** | **Huizhou** | RF | 16438 | 41954 | 109774 | 53157 | **221,323** | 15RF | | 26000 | | 26000 | | | | 15RF | | 104000 | | 0 | | | |
| 15PT2767 / 60 | L01 2K3 SS EU | Huizhou | RF | 0 | 0 | 6252 | 7590 | 13842 | | | | | | | | | | | | | | | | |
| 15PT1727 / 60 | | | | 0 | 0 | 4506 | 6900 | 11406 | | | | | | | | | | | 12700 | | | | | |
| **Total 15" RF** | | | | 16438 | 41954 | 120532 | 67647 | **25,248** | 52000 | | 50% | 0% | 50% | | | | 116700 | | 89.1% | 10.9% | 0% | | | |
| 20MS3442/17 | TCL NA | Huizhou | RF | 48093 | 72716 | 42392 | 48975 | 212176 | | | | | 30000 | | 29000 | | | | | | 50000 | | | |
| 20DV6942/37 | | | | 8032 | 6240 | 4492 | 2576 | 21340 | | | | | | | | | | | | | | | | |
| 20PT6245/37 | | | | 0 | 105006 | 125356 | 814 | 231176 | | 240000 | | | 50000 | 30000 | | | | 230000 | | | | | | |
| 20PT6341/37 | L03SS NA | | | 0 | 57387 | 56573 | 19536 | 133496 | | | | | | | | | | | | | | | | |
| 20PT6441/37 | | | | 11517 | 43009 | 28967 | 32457 | 115950 | | | | | | | | | | | | | | | | |
| 21PT4205/44 | L03SS LA | | | 0 | 32912 | 8927 | 9350 | 51189 | | | | | | | | | | | | | | | | |
| 21PT6341/44 | | | | 0 | 25816 | 41846 | 16280 | 83942 | | | | | | | | | | | | | | | | |
| 21PT6441/44 | | | | 0 | 26873 | 20283 | 9772 | 56928 | | | | | | | | | | | | | | | | |
| 21PT2324/69 | | | | 0 | 0 | 0 | 8000 | 8000 | | | | | | | | | | | | | | | | |
| 21PT2324/71 | | | | 0 | 0 | 0 | 5500 | 5500 | | | | | | | | | | | | | | | | |
| 21PT2325/56 | | | | 0 | 5032 | 4896 | 7888 | 17816 | | | | | | 43000 | | | | | | | | | 43000 | |
| 21PT2325/69 | | | | 0 | 24208 | 7900 | 18768 | 50876 | | | | | | | | | | | | | | | | |
| 21PT2325/71 | | | | 0 | 3808 | 5032 | 5576 | 14416 | | | | | | | | | | | | | | | | |
| 21PT3324/56 | L01 2K3 SS AP | TTET | RF | 1360 | 5440 | 3808 | 5440 | 16048 | 21RF | | | | | | | | 21RF | | | | | | | |
| 21PT3324/69 | | | | 2176 | 7752 | 5168 | 12784 | 27880 | | | | | | | | | | | | | | | | |
| 21PT3324/71 | | | | 2176 | 8024 | 6412 | 5168 | 21780 | | | | | | | | | | | | | | | | |
| 21PT3324/79 | | | | 272 | 5032 | 8160 | 2992 | 16456 | | | | | | | | | | | | | | | | |
| 21PT3335/93 | L01 2K3 LS CH | Wuxi | | 0 | 0 | 132 | 14800 | 14932 | | | | | | | | | | | | | | | | |
| 21PT3355/93 | | | | 0 | 0 | 0 | 1600 | 1600 | | | | | | | | | | | | | | | | |
| 21PT3365/93 | L01S CH | | | 0 | 0 | 0 | 0 | 0 | | | | | | | | | | | | | | | | |
| 21PT3375/93 | | | | 0 | 0 | 0 | 2500 | 2500 | | | | | | | | | | | | | | | | |
| 21PT4323/69 | L2K3 AP | TTET | | 0 | 0 | 1863 | 3240 | 5103 | | | | | | | | | | | | | | | | |
| 21PT4323/79 | | | | 0 | 0 | 0 | 0 | 0 | | | | | | | | | | | | | | | | |
| 21PT5107S/60 | L2K3 EU | Huizhou | | 0 | 0 | 0 | 8800 | 8800 | | | | | | | | | | | | | | | 20100 | |
| 21PT5307S/60 | | | | 0 | 0 | 0 | 11200 | 11200 | | | | | | | | | | | | | | | | |
| 21PT5307 / 60 | L01 2K3 SS EU | Huizhou | | 0 | 0 | 3870 | 4085 | 7955 | | | | | | | | | | | | | | | | |
| 21PT5207 / 60 | | | | 0 | 0 | 7059 | 8027 | 15086 | | | | | | | | | | | | | | | | |
| 21PT1727 / 60 | | | | 0 | 0 | 4830 | 4188 | 9018 | | | | | | | | | | | | | | | | |
| 21HT3312 / 69R | iL04 AP | Wuxi | | 0 | 0 | 0 | 0 | 0 | | | | | | | | | | | | | | | | |
| 21HT3312 / 79R | | | | 0 | 0 | 132 | 924 | 1056 | | | | | | | | | | | | | | | | |
| **Total 20" & 21" RF** | | | | 73626 | 429255 | 388098 | 271240 | **1,162,219** | 422000 | 56.9% | 0% | 7.1% | 22.0% | 14.0% | | | 343100 | 67.0% | 0% | 14.6% | 12.5% | 5.9% | | |
| **23V FSQ** | | | | | | | | **0** | | | | | | | | | | | | | | | | |
| **24PT6341/37** | L01 2K3 LS NA | TTET | RF | 0 | 20100 | 45292 | 44488 | **109,880** | 60000 | | | | | | 60000 | | 45292 | | | | | | | |
| 25PT3323/56 | | | | 0 | 0 | 3447 | 2511 | 5958 | | 19000 | | | | | | | | | | 2800 | 13900 | | | |
| 25PT3323/69 | | TTET | | 0 | 0 | 6913 | 11583 | 18496 | | | | | | | | | | | | | | | | |
| 25PT3323/71 | L01 2K3 LS AP | | | 0 | 0 | 2538 | 2673 | 5211 | | | | | | | | | | | | | | | | |
| | | | RF | | | | | | 25RF | | | | | | | | 25RF | | | | | | | |

Case 07-09367 - Document 3 - Filed 09/06/23 - Page 78 of 538

| Model Number | Platform | Location | Picture | 05Q1 | 05Q2 | 05Q3 | 05Q4 | Tot 2005 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25PT3323/93 | | Wuxi | | 0 | 0 | 0 | | | | | | | | | | | | | | | | | | |
| 25PT3325/93 | | Wuxi | | 0 | 0 | 0 | | | | | | | | | | | | | | | | | | |
| 25HT3312/69R | | | | 0 | 0 | 0 | 1056 | 1056 | | | | | | | | | | | | | | | | |
| 25HT3312/93R | iL04 CH/AP | Wuxi | | 0 | 0 | 0 | 1200 | 1200 | | | | | | | | | | | | | | | | |
| 25HT3317/69Y | | | | 0 | 0 | 0 | 480 | 480 | | | | | | | | | | | | | | | | |
| 25HT3317/79Y | | | RF | 0 | 0 | 96 | 384 | 480 | 25RF | | | | | | | | | 25RF | | | | | | |
| 25HT3317/93Y | | | | 0 | 0 | 0 | 0 | | | | | | | | | | | | | | | | | |
| 25PT5307/60S | L01 2K3 LS EU | Huizhou | | 0 | 0 | 3840 | 0 | 3840 | | | | | | | | | | | | 5800 | | | | |
| 25PT5207/60S | | | | 0 | 0 | 0 | 0 | | | | | | | | | | | | | | | | | |
| **Total 25" RF** | | | | 0 | 0 | 16834 | 19887 | **36721** | 19000 | 100% | | | | | | | 22500 | 38.2% | | 61.8% | | | | |
| **27PT5245/37** | **TCL NA** | **Huizhou** | **RF** | 17280 | 2700 | 16834 | 0 | **19,980** | 0 | | | | | | | 0 | | | | | | | | |
| 29PT3223/56 | | | | 0 | 0 | 2784 | 2457 | 5241 | 22000 | | 22000 | | | | | | | | | 38900 | | | | |
| 29PT3223/69 | | | | 0 | 0 | 11025 | 9711 | 20736 | | | | | | | | | | | | | | | | |
| 29PT3223/71 | | | | 0 | 0 | 1575 | 819 | 2394 | | | | | | | | | | | | | | | | |
| 29PT3323/56 | | | | 0 | 0 | 1722 | 1311 | 3033 | | | | | | | | | | | | | | | | |
| 29PT3323/69 | L01 2K3 LS AP | TTET | | 0 | 0 | 6003 | 9108 | 15111 | 29RF 50Hz | | | | | | | 29RF 50Hz | | | | | | | | |
| 29PT3323/71 | | | | 0 | 0 | 4352 | 1656 | 6008 | | | | | | | | | | | | | | | | |
| 29PT3323/79 | | | | 0 | 0 | 8967 | 4707 | 13674 | | | | | | | | | | | | | | | | |
| 29PT3425/56 | | | | 0 | 0 | 630 | 1134 | 1764 | | | | | | | | | | | | | | | | |
| 29PT3425/69 | | | | 0 | 0 | 315 | 1008 | 1323 | | | | | | | | | | | | | | | | |
| 29PT3425/71 | | | | 0 | 0 | 441 | 1134 | 1575 | | | | | | | | | | | | | | | | |
| 29PT3425/79 | | | | 0 | 0 | 756 | 1764 | 2520 | | | | | | | | | | | | | | | | |
| 29PT3143/93R | TCL CH | Huizhou | | 1400 | 1720 | 0 | | 3120 | | | | | | | | | | | | | | | | |
| 29PT3225/93 | L04 CH | | | 0 | 4500 | 12050 | | 16550 | | | | | | | | | | | 4500 | | | | | |
| 29PT4325/93 | L04 SYRF CH | | | 0 | 0 | 0 | 14500 | 14500 | | | | | | | | | | | | | | | | |
| 29PT5005/56 | | Wuxi | | 0 | 0 | 0 | | 0 | | | | | | | | | | | | | | | | |
| 29PT5005/69 | | | | 0 | 0 | 0 | | 0 | | | | | | | | | | | | | | | | |
| 29PT5005/71 | | | | 0 | 0 | 0 | | 0 | | | | | | | | | | | | | | | | |
| 29PT7322/93G | | | RF | 0 | 1600 | 4427 | | 6027 | 22000 | | | | | | | | | | 4100 | 9600 | | | | |
| 29PT7333/93R | L04 T CH/AP | | | 0 | 5200 | 9818 | 2410 | 17428 | | | | | | | | | | | | | | | | |
| 29PT7325/69 | | | | 0 | 0 | 441 | 1134 | 1575 | | | | | | | | | | | | | | | | |
| 29PT8805/93 | | | | 0 | 0 | 0 | 5818 | 5818 | | | | | | | | | | | | | | | | |
| 29PT8825/93 | | | | 0 | 0 | 0 | 2438 | 2438 | 29RF 100Hz | | | | | | | 29RF 100Hz | | | | | | | | |
| 29PT8845/56 | L04T SYRFA CH/AP | Wuxi | | 0 | 0 | 0 | 664 | 664 | | | | | | | | | | | | | | | | |
| 29PT8845/69 | | | | 0 | 0 | 0 | 1140 | 1140 | | | | | | | | | | | | | | | | |
| 29PT8845/71 | | | | 0 | 0 | 0 | 744 | 744 | | | | | | | | | | | | | | | | |
| 29PT8845/79 | | | | 0 | 0 | 0 | 696 | 696 | | | | | | | | | | | | | | | | |
| 29PT8865/93 | | | | 0 | 0 | 0 | 14987 | 14987 | | | | | | | | | | | | | | | | |
| 29PT5107/60S | L01 2K3 LS EU | Huizhou | | 0 | 0 | 5120 | 0 | 5120 | | | | | | | | | | | | 19800 | | | | |
| | | | | | | | | | 29RF 50Hz | | | | | | | 29RF 50Hz | | | | | | | | |



Case 07-03-0504 Document 307-3 Filed 09/06/23 Page 79 of 538



| Model Number | Platform | Location | Picture | 05Q1 | 05Q2 | 05Q3 | 05Q4 | Year 2005 |
|---|---|---|---|---|---|---|---|---|
| 29PT5307 / 60S | | | | 0 | 1024 | 2048 | 0 | 3072 |
| 29PT5207 / 60S | | | | 0 | 0 | 8192 | 4096 | 12288 |
| 29PT5308 / 60 | L01 2K3 LS EU | Huizhou | | 0 | 0 | 1834 | 1572 | 3406 |
| 29PT5207 / 60 | | | | 0 | 0 | 1965 | 2096 | 4061 |
| 29HT3312 / 93Y | | | | 0 | 0 | 750 | 2300 | 3050 |
| 29HT3317 / 69Y | iL04 CH/AP | Wuxi | | 0 | 0 | 750 | 375 | 1125 |
| 29HT3317 / 79Y | | | | 0 | 0 | 75 | 300 | 375 |
| 29HT3317 / 93Y | | | | 0 | 0 | 100 | 0 | 100 |
| **Total 29" RF** | | | | 1400 | 14044 | 86140 | 90079 | **191,663** |
| 34PT4525/93 | L04 SYRF | | | 0 | 0 | 0 | 1070 | 1070 |
| 34PT3225/93 | | | | 0 | 500 | 6500 | 2100 | 9100 |
| 34PT7322/93G | L04T | | RF | 0 | 50 | 3708 | 0 | 3758 |
| 34PT7333/93R | | Wuxi | | 0 | 50 | 8609 | 0 | 8659 |
| 34PT8805/93 | | | | 0 | 0 | 0 | 1392 | 1392 |
| 34PT8825/93 | L04 T  SYRFA | | | 0 | 0 | 0 | 4484 | 4484 |
| 34PT8845/69 | | | | 0 | 0 | 0 | 790 | 790 |
| 34PT8865/93 | | | | 0 | 0 | 0 | 8895 | 8895 |
| **Total 34"  RF** | | | | 0 | 600 | 18817 | 18731 | **38,148** |

| | Q3 | | | | | | | | | Q3 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Agreement | LPD | Orion | Thomson | CPT | MTBF | SEG | PSDT | | LPD | Irico | SDI | CPT | MTPD | SEG | TCRT | |
| Total 29" RF | 66000 | 66.7% | | 33.3% | | | | | | 77100 | 11.2% | | 88.8% | | | | |
| Total 34" RF | 13000 | 100% | | | | | | | | 14800 | 100% | | | | | | |
| **Grand Total** | 1,329,000 | 576500 | 142500 | 162000 | 329000 | 119000 | 0 | 0 | 1,400,792 | 328000 | 243000 | 221100 | 124800 | 20100 | 418500 | 0 | |
| SHARE PER SUPPLIER | | 43% | 11% | 12% | 25% | 9% | 0% | 0% | | 23% | 17% | 16% | 9% | 1% | 30% | 0% | |

Grand Total (05Q1–Year 2005): 461,797 | 1,123,096 | 1,534,933 | 1,105,331 | 4,003,834

Legend: ■ released   ■ need release   ■ idea not formalise

| Model Number | Platform | Location | Picture | 05Q1 | 05Q2 | 05Q3 | 05Q4 | Year 2005 | TTE | LPD | Irico | SDI | CPT | MTPD | SEG | TCRT | Agree | LPD | Irico | SDI | CPT | MTPD | SEG | TCRT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13MT1431/17 | | | | 21240 | 16830 | 12,900 | 14,760 | 65730 | | | | | 40000 | | | | | | | | | | | |
| 13MT1432/17 | L03SP NA | Huizhou | FSQ | 5040 | 0 | | | 5040 | | | | | | | | | | | | | | | | |
| 13MT1532/17 | | | | 6720 | 12600 | 0 | 9240 | 28560 | | | | | | | | | | | | | | | | |
| 13MT1533/17 | | | | 0 | 1680 | 5040 | | 6720 | | | | | | | | | | | | | | | | |
| 14PT2110/56R | | | | 0 | 0 | 0 | | 0 | 14" | | 35000 | | | | | | 14" | | | | | | | |
| 14PT2110/69R | TCL AP | | | 0 | 1525 | 0 | | 1525 | | | | | | | | | | | | | | | | |
| 14PT2115/56 | | Huizhou | FSQ | 6100 | 21655 | 11590 | 16470 | 55815 | | | | | | | | | | | | | | | | |
| 14PT2115/69 | | | | 6100 | 23180 | 23790 | 10200 | 63270 | | | | | | | | | | | | | | | | |
| 14PT2115/94 | | | | 0 | 0 | 2745 | 9780 | 12525 | | | | | | | | | | | | | | | | |
| 14PT3005/44 | L03 SP LA | | | 0 | 33495 | 30450 | 15225 | 79170 | | | | | | | | | | | | | | | | |
| 14PT3005/55 | | | | 0 | 33640 | 42782 | 14063 | 90485 | | | | | | | | | | | | | | | | |
| **Total 14"  FSQ** | | | | 45200 | 144605 | 129,297 | 89,738 | 408,840 | 75000 | 0.0% | 46.7% | | 53.3% | | | | 0 | #DIV/0 | #DIV/0 | | #DIV/0 | | | |
| 20MT1331/17 | L03SP NA | | | 142512 | 208320 | 388112 | 282376 | 1021320 | | 140000 | 60000 | 50000 | 30000 | | 120000 | | | | | | | | | |
| 20MS2331/17 | | | | 139839 | 97256 | 75044 | 98000 | 410139 | | | | | | | | | | | | | | | | |
| 20PT5441/37 | L03SS NA | | | 0 | 10472 | 1870 | | 12342 | | | | | | | | | | | | | | | | |
| 21PT2110/56R | TCL AP | | | 2960 | 888 | 5476 | 8880 | 18204 | | | 0 | | | | 0 | | | | | | | | | |
| 21PT2110/69R | | Huizhou | | 3404 | 1220 | 4440 | 10360 | 19424 | | | | | | | | | | | | | | | | |
| 21PT2110/79R | | | FSQ | 0 | 0 | 14208 | 5772 | 19980 | | | | | | | | | | | | | | | | |
| 21PT3005/55 | | | | 0 | 25462 | 39144 | 12731 | 77337 | 21FS | | | | | | | | 21FS | | | | | | | |
| 21PT3205/44 | L03SP LA | | | 0 | 22389 | 35559 | 16682 | 74630 | | | | | | | | | | | | | | | | |
| 21PT3205/55 | | | | 0 | 21246 | 41708 | 13407 | 76361 | | | | | | | | | | | | | | | | |
| 21PT2110/69R | TCL AP | | | 2700 | 7358 | 0 | | 10058 | | | | | | | | | | | | | | | | |
| 21PT2115/56 | | | | 0 | 4708 | 3860 | | 8568 | | | | | | 0 | | | | | | | | | | |
| 21PT2115/69 | L01 2K3 SS AP | TTET | | 0 | 23868 | 4104 | 2156 | 30128 | | | | | | | | | | | | | | | | |
| 21PT2115/79 | | | | 0 | 4697 | 6624 | 0 | 11321 | | | | | | | | | | | | | | | | |
| **Total 20" & 21" FSQ** | | | | 291415 | 427884 | 620149 | 450364 | **1,789,812** | 400000 | 35.0% | 15.0% | 12.5% | 7.5% | | 30% | | 0 | #DIV/0 | #DIV/0 | #DIV/0 | | #DIV/0 | | |
| **14MS2331/17  RF** | **L03SP NA** | **Huizhou** | RF | 16438 | 41954 | 109774 | 53157 | **221,323** | | | | | 40000 | | | | | | | | | | | |
| 15FT2767 / 60 | L01 2K3 SS EU | Huizhou | RF | 0 | 0 | 6252 | 7590 | 13842 | 15RF | | | 5000 | | | | | 15RF | | | | | | | |
| 15FT1727 / 60 | | | | 0 | 0 | 4506 | 6900 | 11406 | | | | | | | | | | | | | | | | |
| **Total 15"  RF** | | | | 16438 | 41954 | 120532 | 67647 | **246,571** | 45000 | | 0% | 11% | 89% | | | | 0 | | #DIV/0 | #DIV/0 | #DIV/0 | | | |
| 20MS3442/17 | TCL NA | | | 48093 | 72716 | 42392 | 48975 | 212176 | | | 20000 | | | | | | | | | | | | | |
| 20DV6942/37 | | | | 8032 | 6240 | 4492 | 2576 | 21340 | | | | | | | | | | | | | | | | |
| 20PT6245/37 | | | | 0 | 105006 | 125356 | 814 | 231176 | | 60000 | | | | | | | | | | | | | | |
| 20PT6341/37 | L03SS NA | Huizhou | | 0 | 57387 | 56573 | 19536 | 133496 | | | | | | | | | | | | | | | | |
| 20PT6441/37 | | | | 11517 | 43009 | 28967 | 32457 | 115950 | | | | | | | | | | | | | | | | |
| 21PT4205/44 | | | | 0 | 32912 | 8927 | 9350 | 51189 | | | | | | | | | | | | | | | | |
| 21PT6341/44 | L03SS LA | | | 0 | 25816 | 41846 | 16280 | 83942 | | | | | | | | | | | | | | | | |
| 21PT6441/44 | | | | 0 | 26873 | 20283 | 9772 | 56928 | | | | | | | | | | | | | | | | |
| 21PT2324/69 | | | | 0 | 0 | 0 | 8000 | 8000 | | | | | | | | | | | | | | | | |
| 21PT2324/71 | | | | 0 | 0 | 0 | 5500 | 5500 | | | | | | | | | | | | | | | | |
| 21PT2325/56 | | | | 0 | 5032 | 4896 | 7888 | 17816 | | | | | | 50000 | | | | | | | | | | |
| 21PT2325/69 | | | | 0 | 24208 | 7900 | 18768 | 50876 | | | | | | | | | | | | | | | | |
| 21PT2325/71 | | | | 0 | 0 | 3808 | 5032 | 14416 | | | | | | | | | | | | | | | | |
| 21PT3324/56 | L01 2K3 SS AP | TTET | | 1360 | 5440 | 3808 | 5440 | 16048 | | | | | | | | | | | | | | | | |
| 21PT3324/69 | | | RF | 2176 | 7752 | 5168 | 12784 | 27880 | 21RF | | | | | | | | 21RF | | | | | | | |
| 21PT3324/71 | | | | 2176 | 8024 | 6412 | 5168 | 21780 | | | | | | | | | | | | | | | | |
| 21PT3324/79 | | | | 272 | 5032 | 8160 | 2992 | 16456 | | | | | | | | | | | | | | | | |
| 21PT3335/93 | L01 2K3 LS CH | | | 0 | 0 | 132 | 14800 | 14932 | | | | | | | | | | | | | | | | |
| 21PT3355/93 | | Wuxi | | 0 | 0 | 0 | 1600 | 1600 | | | | | | | | | | | | | | | | |
| 21PT3365/93 | L01S CH | | | 0 | 0 | 0 | | 0 | | 20000 | | | | | | | | | | | | | | |
| 21PT3375/93 | | | | 0 | 0 | 0 | 2500 | 2500 | | | | | | | | | | | | | | | | |
| 21PT4323/69 | L2K3 AP | TTET | | 0 | 0 | 1863 | 3240 | 5103 | | | | | | | | | | | | | | | | |
| 21PT4323/79 | | | | 0 | 0 | 0 | | 0 | | | | | | | | | | | | | | | | |
| 21PT5107S/60 | L2K3 EU | Huizhou | | 0 | 0 | 0 | 8800 | 8800 | | | | | | | 20000 | | | | | | | | | |
| 21PT5307S/60 | | | | 0 | 0 | 0 | 11200 | 11200 | | | | | | | | | | | | | | | | |
| 21PT5307 / 60 | | | | 0 | 0 | 3870 | 4085 | 7955 | | | | | | | | | | | | | | | | |
| 21PT5207 / 60 | L01 2K3 SS EU | Huizhou | | 0 | 0 | 7059 | 8027 | 15086 | | | | | | | | | | | | | | | | |
| 21PT1727 / 60 | | | | 0 | 0 | 4830 | 4188 | 9018 | | | | | | | | | | | | | | | | |
| 21HT3312 / 69R | iL04 AP | Wuxi | | 0 | 0 | 0 | | 0 | | | | | | | | | | | | | | | | |
| 21HT3312 / 79R | | | | 0 | 0 | 132 | 924 | 1056 | | | | | | | | | | | | | | | | |
| **Total 20" & 21" RF** | | | | 73626 | 429255 | 388098 | 271240 | **1,162,219** | 170000 | 47.1% | 0% | 11.8% | 29.4% | 11.8% | | | 0 | #DIV/0 | #DIV/0 | #DIV/0 | #DIV/0 | #DIV/0 | | |
| **23V FSQ** | | | | | | | | **0** | | | | | | | | | | | | | | | | |
| **24PT6341/37** | L01 2K3 LS NA | TTET | RF | 0 | 20100 | 45292 | 44488 | **109,880** | 44488 | | | | 44488 | | | | 45292 | | | | | | | |
| 25PT3323/56 | | | | 0 | 0 | 3447 | 2511 | 5958 | | 0 | 15000 | | | | | | | | | | | | | |
| 25PT3323/69 | L01 2K3 LS AP | TTET | | 0 | 0 | 6913 | 11583 | 18496 | | | | | | | | | | | | | | | | |
| 25PT3323/71 | | | | 0 | 0 | 2538 | 2673 | 5211 | | | | | | | | | | | | | | | | |
| | | | RF | | | | | | 25RF | | | | | | | | 25RF | | | | | | | |

Case: 07-09-0504 - List 2005 Document 307-6 Filed 09/06/23 Page 81 of 538



| Model Number | Platform | Location | Picture | 05Q1 | 05Q2 | 05Q3 | 05Q4 | Tot 2005 |
|---|---|---|---|---|---|---|---|---|
| 25PT3323/93 | | Wuxi | | 0 | 0 | 0 | 0 | 0 |
| 25PT3325/93 | | | | 0 | 0 | 0 | 0 | 0 |
| 25HT3312 / 69R | iL04 CH/AP | Wuxi | | 0 | 0 | 0 | 1056 | 1056 |
| 25HT3312 / 93R | | | | 0 | 0 | 0 | 1200 | 1200 |
| 25HT3317 / 69Y | | | RF | 0 | 0 | 0 | 480 | 480 |
| 25HT3317 / 79Y | | | | 0 | 0 | 96 | 384 | 480 |
| 25HT3317 / 93Y | | | | 0 | 0 | 0 | 0 | 0 |
| 25PT5307 / 60S | L01 2K3 LS EU | Huizhou | | 0 | 0 | 3840 | 0 | 3840 |
| 25PT5207 / 60S | | | | 0 | 0 | 0 | 0 | 0 |
| **Total 25"  RF** | | | | **0** | **0** | **16834** | **19887** | **36721** |
| | | | | | 21000 | 28.6% | 71.4% | |
| **27PT5245/37** | TCL NA | Huizhou | RF | 17280 | 2700 | 16834 | 19887 | **19,980** |
| 29PT3223/56 | | | | 0 | 0 | 2784 | 2457 | 5241 |
| 29PT3223/69 | | | | 0 | 0 | 11025 | 9711 | 20736 |
| 29PT3223/71 | | | | 0 | 0 | 1575 | 819 | 2394 |
| 29PT3323/56 | | | | 0 | 0 | 1722 | 1311 | 3033 |
| 29PT3323/69 | L01 2K3 LS AP | TTET | | 0 | 0 | 6003 | 9108 | 15111 |
| 29PT3323/71 | | | | 0 | 0 | 4352 | 1656 | 6008 |
| 29PT3323/79 | | | | 0 | 0 | 8967 | 4707 | 13674 |
| 29PT3425/56 | | | | 0 | 0 | 630 | 1134 | 1764 |
| 29PT3425/69 | | | | 0 | 0 | 315 | 1008 | 1323 |
| 29PT3425/71 | | | | 0 | 0 | 441 | 1134 | 1575 |
| 29PT3425/79 | | | | 0 | 0 | 756 | 1764 | 2520 |
| 29PT3143/93R | TCL CH | Huizhou | | 1400 | 1720 | 0 | 0 | 3120 |
| 29PT3225/93 | L04 CH | | | 0 | 4500 | 12050 | 0 | 16550 |
| 29PT4325/93 | L04 SYRF CH | | | 0 | 0 | 0 | 14500 | 14500 |
| 29PT5005/56 | | Wuxi | | 0 | 0 | 0 | 0 | 0 |
| 29PT5005/69 | | | | 0 | 0 | 0 | 0 | 0 |
| 29PT5005/71 | | | RF | 0 | 0 | 0 | 0 | 0 |
| 29PT7322/93G | L04 T CH/AP | | | 0 | 1600 | 4427 | 0 | 6027 |
| 29PT7333/93R | | | | 0 | 5200 | 9818 | 2410 | 17428 |
| 29PT7325/69 | | | | 0 | 0 | 441 | 1134 | 1575 |
| 29PT8805/93 | | Wuxi | | 0 | 0 | 0 | 5818 | 5818 |
| 29PT8825/93 | | | | 0 | 0 | 0 | 2438 | 2438 |
| 29PT8845/56 | L04T SYRFA CH/AP | | | 0 | 0 | 0 | 664 | 664 |
| 29PT8845/69 | | | | 0 | 0 | 0 | 1140 | 1140 |
| 29PT8845/71 | | | | 0 | 0 | 0 | 744 | 744 |
| 29PT8845/79 | | | | 0 | 0 | 0 | 696 | 696 |
| 29PT8865/93 | | | | 0 | 0 | 0 | 14987 | 14987 |
| 29PT5107 / 60S | L01 2K3 LS EU | Huizhou | | 0 | 0 | 5120 | 0 | 5120 |



Case: 07-cv-05944 - Document 89-2 Page 89 of 538

| Model Number | Platform | Location | Picture | 05Q1 | 05Q2 | 05Q3 | 05Q4 | Year2005 | TIF | LPD | Irico | SDI | CPT | MTPD | SEG | TCRT | | | Q4 LPD | Irico | SDI | CPT | MTPD | SEG | TCRT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 29PT5307 / 60S | | | | 0 | 1024 | 2048 | 0 | 3072 | | | | | | | | | | | | | | | | | |
| 29PT5207 / 60S | | | | 0 | 0 | 8192 | 4096 | 12288 | | | | | | | | | | | | | | | | | |
| 29PT5308 / 60 | L01 2K3 LS EU | Huizhou | | 0 | 0 | 1834 | 1572 | 3406 | | | | | | | | | | | | | | | | | |
| 29PT5207 / 60 | | | | 0 | 0 | 1965 | 2096 | 4061 | | | | | | | | | | | | | | | | | |
| 29HT3312 / 93Y | | | | 0 | 0 | 750 | 2300 | 3050 | 29RF 50Hz | | | | | | | | | 29RF 50Hz | | | | | | | |
| 29HT3317 / 69Y | iL04 CH/AP | Wuxi | | 0 | 0 | 750 | 375 | 1125 | | | | | | | | | | | | | | | | | |
| 29HT3317 / 79Y | | | | 0 | 0 | 75 | 300 | 375 | | | | | | | | | | | | | | | | | |
| 29HT3317 / 93Y | | | | 0 | 0 | 100 | 0 | 100 | | | | | | | | | | | | | | | | | |
| **Total 29" RF** | | | | 1400 | 14044 | 86140 | 90079 | **191,663** | 75000 | 26.7% | 73.3% | 0% | | | | | 0 | #DIV/0 | | #DIV/0 | | | | |
| 34PT4525/93 | | | | 0 | 0 | 0 | 1070 | 1070 | 34RF 50Hz | 5000 | | | | | | | | 34RF 50Hz | | | | | | | |
| 34PT3225/93 | L04 SYRF | | | 0 | 500 | 6500 | 2100 | 9100 | | | | | | | | | | | | | | | | | |
| 34PT7322/93G | L04T | | | 0 | 50 | 3708 | 0 | 3758 | | 0 | | | | | | | | | | | | | | | |
| 34PT7333/93R | | Wuxi | RF | 0 | 50 | 8609 | 0 | 8659 | | | | | | | | | | | | | | | | | |
| 34PT8805/93 | | | | 0 | 0 | 0 | 1392 | 1392 | 34RF 100Hz | | | | | | | | | 34RF 100Hz | | | | | | | |
| 34PT8825/93 | L04 T SYRFA | | | 0 | 0 | 0 | 4484 | 4484 | | | | | | | | | | | | | | | | | |
| 34PT8845/69 | | | | 0 | 0 | 0 | 790 | 790 | | | | | | | | | | | | | | | | | |
| 34PT8865/93 | | | | 0 | 0 | 0 | 8895 | 8895 | | | | | | | | | | | | | | | | | |
| **Total 34" RF** | | | | 0 | 600 | 18817 | 18731 | **38,148** | 5000 | 100% | | | | | | | 0 | #DIV/0 | | | | | | | |
| **Grand Total** | | | | 461,797 | 1,123,096 | 1,534,933 | 1,105,331 | 4,225,157 | 835,488 | 251000 | 95000 | 145000 | 160000 | 64488 | 120000 | 0 | 45,292 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SHARE PER SUPPLIER | | | | | | | | | 30% | 11% | 17% | 19% | 8% | 14% | 0% | | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |

■ released    ■ need release    ■ idea not formalise

# EXHIBIT 6

# 14MS2331
## 14" Real Flat™ Stereo TV

- **Stereo Sound**
- **SmartSound ™**
- **SmartPicture ™**
- **Front AV jacks**
- **Front Headphone jack**
- **Sleeptimer**
- **Remote Control**
- **Bilingual on screen display**
- **Auto programming**
- **181-channel capability**
- **Close Caption**



**Complete Model #: 14MS2331/17**

Available: April 2004

Carton dimensions: 16.25" L x 17.51" W x 15.03" H

Weight: 26.45 lbs.

HC 40 ft. Container Qty:  870

Country of Origin: China

UPC: 0 37849 94586 5

*Updated: 04/16/04*
*Preliminary specifications subject to change*

# EXHIBIT 7

# PHILIPS CONSUMER ELECTRONICS
## COMMERCIAL INVOICE

Page 1

Philips Consumer Electronics Co.
64 Perimeter Center East
Atlanta, GA 30346
Vendor No. 041600

**Invoice No**
TS050110

**Shipped Per**
COSCO VANCOUVER V.003E

**Date**
01/21/2005

**Sailing On/or About**
01/24/2005

**Manufacturer Address:**
TCL King Elec. App. Co., Ltd.
Sec. 19, Zhongkai Dev. Zone, New & High-level
Tech Indus., Huizhou, Guangdong, PR China

| **From** | **Country of Origin** | |
|---|---|---|
| YANTIAN | CHINA | |

**To**
LONG BEACH

**P.O. No:**
1232532

**Payment Terms** Within 45 days after inv. date

**Shipment Terms:** FOB    Yantian

**Consignee:**
Circuit City Stores, Inc.
9954 Mayland Drive
Richmond, VA 23233

**Ship to:**
Circuity City DC 717
501 South Cheryl Lane
Walnut, CA 91789

| Cartons | Quantity | Description of Goods | Unit Price-USD | Amount-USD |
|---|---|---|---|---|
| 870 | 870 | Magnavox 13" Color TV | $58.30 | $ 49,068.00 |
| | | Vendor Model No: 13MT143S | | |
| | | Accession No:    0020335-01 | | |
| | | Holder:    Philips Consumer Electronics, Knoxville, TN | | |
| | **Container No:** | TTNU9860953    Seal No:    U67314 | | |

| | **N.W. (KGS)** | **G.W. (KGS)** | **Measurement (CBM)** |
|---|---|---|---|
| | 8,700 | 10,962 | 69.025 |

| Cartons | Quantity | Description of Goods | Unit Price-USD | Amount-USD |
|---|---|---|---|---|
| 870 | 870 | Magnavox 13" Color TV | $58.30 | $ 49,068.00 |
| | | Vendor Model No: 13MT143S | | |
| | | Accession No:    0020335-01 | | |
| | | Holder:    Philips Consumer Electronics, Knoxville, TN | | |
| | **Container No:** | GVCU5149519    Seal No:    U67311 | | |

| | **N.W. (KGS)** | **G.W. (KGS)** | **Measurement (CBM)** |
|---|---|---|---|
| | 8,700 | 10,962 | 69.025 |

**TOTAL CTNS.** 1740    **TOTAL QTY.** 1740

**TOTAL WEIGHTS & MEASUREMENTS**

| | **N.W. (KGS)** | **G.W. (KGS)** | **Measurement (CBM)** |
|---|---|---|---|
| | 17,400 | 21,924 | 138.05 |

**TOTAL AMOUNT**    $98,136.00

| Cartons | Quantity | Description of Goods | Unit Price-USD | Amount-USD |
|---|---|---|---|---|
| 865 | 865 | Magnavox 14" Real Flat Stereo TV | $82.85 | $ 71,665.25 |
| | | Vendor Model No: 14MS2331/17 | | |
| | | Accession No:    0420108-00 | | |
| | | Holder:    TCL King Elec. Appl. Co. Ltd. Guangdong, China | | |
| | **Container No:** | CBHU1438781    Seal No:    U67316 | | |

| | **N.W. (KGS)** | **G.W. (KGS)** | **Measurement (CBM)** |
|---|---|---|---|
| | 8,650 | 10,899 | 65.256 |

**TOTAL CTNS.** 865    **TOTAL QTY.** 865

**TOTAL WEIGHTS & MEASUREMENTS**

| | **N.W. (KGS)** | **G.W. (KGS)** | **Measurement (CBM)** |
|---|---|---|---|
| | 8,650 | 10,899 | 65.256 |

**TOTAL AMOUNT**    $ 71,665.25

## PHILIPS CONSUMER ELECTRONICS
## COMMERCIAL INVOICE                    Page 2

Philips Consumer Electronics Co.
64 Perimeter Center East
Atlanta, GA 30346
Vendor No. 041600

**Invoice No.** TS050110               **Date:** 01/21/2005

**Shipped Per:**                                          **Sailing On/or About**
COSCO VANCOUVER V.003E                                    01/24/2005
**PO Number**                    **Manufacturer Address:**
      1232532                    TCL King Elec. App. Co., Ltd.
                                 Sec. 19, Zhongkai Dev. Zone, New & High-level
                                 Tech Indus., Huizhou, Guangdong, PR China

**Shipment Terms**
FOB    Yantian
**Consignee:**                            **Ship to:**
Circuit City Stores, Inc.                 Circuity City DC 717
9954 Mayland Drive                        501 South Cheryl Lane
Richmond, VA 23233                        Walnut, CA 91789
**From**        **Country of Origin**
YANTIAN         CHINA
**To**
LOS ANGELES
**Payment Terms**   Within 45 days after inv. date

| Cartons | Quantity | Description of Goods | Unit Price-USD | Amount-USD |
|---------|----------|----------------------|----------------|------------|
| Cartons 440 | Quantity 440 | Description of Goods | Unit Price-USD 76.25 | Amount-USD $33,550.00 |
| | | Maganvox 20" Mono TV | | |
| | | Vendor Model No: 20MT133S | | |
| | | Accession No: 0320072-00 | | |
| | **Container No:** | Holder: Philips Consumer Electronics, Knoxville, TN | | |
| | | CBHU9948272   Seal No: U67319 | | |
| | | N.W. (KGS) 8,380   G.W. (KGS) 9,637   Measurement (CBM) 73.489 | | |
| **TOTAL CTNS.** 440 | **TOTAL QTY.** 440 | | | |
| **TOTAL WEIGHTS & MEASUREMENTS** | | N.W. (KGS) 8,380   G.W. (KGS) 9,637   Measurement (CBM) 73.489 | | |

**TOTAL AMOUNT**                                            $33,550.00

| **GRAND TOTAL CTNS.** 3045 | **GRAND TOTAL QTY.** 3045 | | |
| **GRAND TOTAL WEIGHTS & MEASUREMENTS** | | N.W. (KGS) 34,430.00   G.W. (KGS) 42,460.00   Measurement (CBM) 276.795 | |

**GRAND TOTAL AMOUNT**                   $203,351.25

We Hereby Certify that:

A) All merchandise sold to Circuit City Stores did not employ forced labor, convict labor
or indentured child labor in any stage of its mining, production or manufacture.
B)Products From Vendors/Factories does not involve transhipment of merchandise
for the purpose of Mislabeling, Evading Quota, or Country of Origin Restrictions or
Avoiding Labor as defined by respective laws of that country.
C)Goods have been marked in accordance with U.S. Custom's regulations.
D)The shipment contains no solid wood packing materials.

*Charisse Matthews*
Charisse Matthews
Credit Associate

CC0118602

# PHILIPS CONSUMER ELECTRONICS
## PACKING LIST                                    Page 1

Philips Consumer Electronics Co.
64 Perimeter Center East
Atlanta, GA 30346
Vendor No. 041600

| Invoice No. | TS050110 | Date: | 01/21/2005 |
|---|---|---|---|

**Shipped Per:**
COSCO VANCOUVER V.003E

**Sailing On/or About**
01/24/2005

**PO Number**
1232532

**Manufacturer Address:**
TCL King Elec. App. Co., Ltd.
Sec. 19, Zhongkai Dev. Zone, New & High-level
Tech Indus., Huizhou, Guangdong, PR China

**Shipment Terms**
FOB     Yantian

**Consignee:**
Circuit City Stores, Inc.
9954 Mayland Drive
Richmond, VA 23233

**Ship to:**
Circuity City DC 717
501 South Cheryl Lane
Walnut, CA 91789

| From | Country of Origin |
|---|---|
| YANTIAN | CHINA |
| To | |
| LOS ANGELES | |

**Payment Terms**     Within 45 days after inv. date

| Cartons | Quantity | Description of Goods | | |
|---|---|---|---|---|
| 870 | 870 | Magnavox 13" Color TV | | |
| | | Vendor Model No:  13MT143S | | |
| | **Container No:** | TTNU9860953 | **Seal No:** U67314 | |
| | | N.W. (KGS) | G.W. (KGS) | Measurement (CBM) |
| | | 8,700 | 10,962 | 69.025 |
| 870 | 870 | Magnavox 13" Color TV | | |
| | | Vendor Model No:  13MT143S | | |
| | **Container No:** | GVCU5149519 | **Seal No:** U67311 | |
| | | N.W. (KGS) | G.W. (KGS) | Measurement (CBM) |
| | | 8,700 | 10,962 | 69.025 |
| **TOTAL CTNS.** | **TOTAL QTY.** | | | |
| 1740 | 1740 | | | |
| **TOTAL WEIGHTS & MEASUREMENTS** | | N.W. (KGS) | G.W. (KGS) | Measurement (CBM) |
| | | 17,400 | 21,924 | 138.05 |
| 865 | 865 | Magnavox 14" Real Flat Stereo TV | | |
| | | Vendor Model No:  14MS2331/17 | | |
| | **Container No:** | CBHU1436781 | **Seal No:** U67316 | |
| | | N.W. (KGS) | G.W. (KGS) | Measurement (CBM) |
| | | 8,650 | 10,899 | 65.256 |
| **TOTAL CTNS.** | **TOTAL QTY.** | | | |
| 865 | 865 | | | |
| **TOTAL WEIGHTS & MEASUREMENTS** | | N.W. (KGS) | G.W. (KGS) | Measurement (CBM) |
| | | 8,650 | 10,899 | 65.256 |
| **Cartons** | **Quantity** | **Description of Goods** | | |
| 440 | 440 | Maganvox 20" Mono TV | | |
| | | Vendor Model No:  20MT133S | | |
| | **Container No:** | CBHU9948272 | **Seal No:** U67319 | |
| | | N.W. (KGS) | G.W. (KGS) | Measurement (CBM) |
| | | 8,901 | 10,062 | 73.363 |
| **TOTAL CTNS.** | **TOTAL QTY.** | | | |
| 440 | 440 | | | |
| **TOTAL WEIGHTS & MEASUREMENTS** | | N.W. (KGS) | G.W. (KGS) | Measurement (CBM) |
| | | 8,901 | 10,062 | 73.363 |

CC0118603

# PHILIPS CONSUMER ELECTRONICS
## PACKING LIST

Page 2

Philips Consumer Electronics Co.
64 Perimeter Center East
Atlanta, GA  30346
Vendor No. 041600

**Invoice No.**  TS050110

**Date:**  01/21/2005

**Shipped Per:**
COSCO VANCOUVER V.003E

**Sailing On/or About**
01/24/2005

**PO Number**
1232532

**Manufacturer Address:**
TCL King Elec. App. Co., Ltd.
Sec. 19, Zhongkai Dev. Zone, New & High-level
Tech Indus., Huizhou, Guangdong, PR China

**Shipment Terms**
FOB     Yantian

**Consignee:**
Circuit City Stores, Inc.
9954 Mayland Drive
Richmond, VA 23233

**Ship to:**
Circuity City DC 717
501 South Cheryl Lane
Walnut, CA 91789

**From**              **Country of Origin**
YANTIAN            CHINA
**To**
LOS ANGELES

**Payment Terms**     Within 45 days after inv. date

GRAND TOTAL CTNS. GRAND TOTAL QTY.
3045              3045

| GRAND TOTAL WEIGHTS & MEASUREMENTS | N.W. (KGS) | G.W. (KGS) | Measurement (CBM) |
|---|---|---|---|
| | 34,430.00 | 42,460.00 | 276.795 |

**Shipping Marks:  Circuit City P.O.# 1232532**

CCY Model (SKU)# 13MT143S
Unit Count per Carton 1 piece
Carton #1-870 of 870
Gross Weight 22.5 pounds
Ctn. Dimensions (inches): 17.1L x 16.2W x 17.8H

CCY Model (Sku)# 14MS2331/17
Unit Count per Carton 1 piece
Carton# 1-865 of 865
Gross Weight 26.4 pounds
Ctn. Dimensions (inches): 17.5L x 15.0W x 16.2H

CCY Model (SKU)# 20MT133S
Unit Count per Carton 1 piece
Carton #1-440 of 440
Gross Weight 50.7 pounds
Ctn. Dimensions (inches): 22.2L x 21.0W x 22.9H

**Made in China**
**Retail Boxes–No Mark on Cartons**

We Hereby Certify that:

A) The shipment contains no solid wood packing materials.

*Charisse Matthews*

Charisse Matthews
Credit Associate

FEDERAL COMMUNICATIONS COMMISSION
Washington, D.C.

Approved OMB
3060-0059
Expires        08-31-2003

## STATEMENT REGARDING THE IMPORTATION OF RADIO FREQUENCY DEVICES CAPABLE OF CAUSING HARMFUL INTERFERENCE
*(Read instructions before completing from. Please type or print clearly in ink.)*

**Part I**

| Date of Entry | Entry Number | Port of Entry 1 | Harmonized Tariff Number 2 | Quantity of Item (Not number of containers)3 |
|---|---|---|---|---|
| | | | 8528.12.2025 | 870 |

| Device Model/Type Name or # | Trade Name | FCC ID | Description of Equipment |
|---|---|---|---|
| 13MT143S | Magnavox | N/R | 13" Color TV |

| Manufacturer's Name and Address | Consignee's Name and Address | Importer's Name and Address |
|---|---|---|
| TCL King Elec. App. Co., Ltd. Sec. 19, Zhongkai Dev. Zone, New & High-level Tech Indus., Huizhou, Guangdong, PR China | Circuit City Stores, Inc. 9954 Mayland Drive Richmond, VA 23233 | Circuit City Stores, Inc. 9954 Mayland Drive Richmond, VA 23233 |

| Printed or Typed Name of Importer or Consignee | Signature of Importer or Consignee | Date (Month/Day/Year) |
|---|---|---|
| Circuit City Stores, Inc. | | |

**Warning:** Any person who knowingly makes a false declaration may be fined not more than $250,000 or imprisoned not more than 5 years, or both, pursuant to U.S.C. S 1001

| **Part II** | |
|---|---|
| ☐ | 1.The FCC has issued a grant of equipment authorization for the FCC ID listed above |
| ☒ | 2. AN FCC grant of equipment authorization and an FCC ID are not required, but the equipment complies with FCC technical requirements. |
| ☐ | 3. The described equipment is being imported in limited quantities for testing and evaluation for compliance with technical requirements or marketing suitability. The equipment will not be offered for sale or otherwise marketed. (See instructions) |
| ☐ | 4. The described equipment is being imported in limited quantities for demonstration at industry trade shows and will not be offered for sale or otherwise marketed. ( See instructions) |
| ☐ | 5. The described equipment is being imported solely for export. It will not be offered for sale or otherwise marketed in the U.S. |
| ☐ | 5(a). The described equipment is a non-U.S. standard cellular phone that can only function outside the U.S. (See instructions) |
| ☐ | 6. The described equipment is being imported for use exclusively by the U.S. Government |
| ☐ | 7. Three or fewer radio receivers, computers, or other unintentional radiators as defined in Part 15 of the FCC Rules are being imported for an individual's personal use and are not intended for sale. |
| ☐ | 8. The described equipment is being imported for repair and will not be offered for sale or otherwise marketed. |

1. Port of Entry Use Schedule D – Classification of U.S. Customs Districts and Ports for U.S. Foreign Trade Statistics – a four digit code i.e. New York City, NY 1001.
2. Harmonized Tariff Number – Harmonized Tariff Schedule of the United States
3. This quantity must be total number of items, not number of cartons.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
PUBLIC HEALJH SERVICE
FOOD AND DRUG ADMINISTRATION

**DECLARATION FOR IMPORTED
ELECTRONIC PRODUCTS SUBJECT TO
RADIATION CONTROL STANDARDS**

*Form Approved OMB No. 00910-0025*
*Expiration Date: 10/31/2003*

INSTRUCTIONS
1. If submitting entries electronically through ACS/ABI. hold FDA-2877 in entry file. Do not submit to FDA unless requested
2. . If submitting paper entry documents, submit the following to FDA:
   a. 2 copies of Customs Entry Form (e.g. CF 3461, CF 3461 Alt, CF 7501, etc.)
   b. 1 copy of FDA 2877
   c. Commercial Invoice(s) in English.

| U.S. CUSTOMS PORT OF ENTRY | ENTRY NUMBER | DATE OF ENTRY |
|---|---|---|

| NAME & ADDRESS OF MANUFACTURING SITE; COUNTRY OF ORIGIN | NAME & ADDRESS OF IMPORTER & ULTIMATE CONSIGNEE *(if not importer)* |
|---|---|
| TCL King Elec. App. Co., Ltd. Sec. 19, Zhongkai Dev. Zone, New & High-level Tech Indus., Huizhou, Guangdong, PR China | Circuit City Stores, Inc. 9954 Mayland Drive Richmond, VA 23233 |

| PRODUCT DESCRIPTION | QUANTITY *(Items/Containers)* | MODEL NUMBER(S) & BRAND NAME(S) | |
|---|---|---|---|
| 13" Color TV | 1740/ 2 containers | 13MT143S | **Magnavox** |

DECLARATION: I / WE DECLARE THAT THE PRODUCTS IDENTIFIED ABOVE: *(Mark X applicable statements, till in blanks, & sign)*

☐ **A. ARE NOT SUBJECT TO RADIATION PERFORMANCE STANDARDS BECAUSE THEY:**
  ☐ 1. Were manufactured prior to the effective date of any applicable standard; Date of Manufacture _____
  ☐ 2. Are excluded by the applicability clause or definition in the standard or by FDA written guidance.
     Specify reason for exclusion _____
  ☐ 3. Are personal household goods of an individual entering the U.S. or being returned to a U.S. resident. (Limit: 3 of each product type).
  ☐ 4. Are property of a party residing outside the U.S. and will be returned to the owner after repair or servicing.
  ☐ 5. Are components or subassemblies to be used in manufacturing or as replacement parts (NOT APPLICABLE to diagnostic x-ray parts).
  ☐ 6. Are prototypes intended for on going product development by the importing firm, are labeled "FOR TEST/EVALUATION ONLY," and will be exported, destroyed, or held for future testing (i.e., not distributed). (Quantities Limited - see reverse.)
  ☐ 7. Are being reprocessed in accordance with P.L. 104-134 or other FDA guidance, are labeled "FOR EXPORT ONLY." and will not be sold, distributed, or transferred without FDA approval.

☒ **B. COMPLY WITH THE PERFORMANCE STANDARDS WHICH ARE APPLICABLE AT DATE OF MANUFACTURE AND THAT A CERTIFICATION LABEL OR TAG TO THIS EFFECT IS AFFIXED TO EACH PRODUCT. COMPLIANCE DOCUMENTED BY:**
  ☒ 1. Last annual report or Product/Initial report

    <u>0020335-01</u>         **Philips Consumer Electronics, One Philips Drive, Knoxville, TN**
    ACCESSION NUMBER of Report      Name of MANUFACTURER OF RECORD *(Filed report with FDA/CDRH*

  ☐ 2. Unknown manufacturer or report number; State reason: _____

☐ **C. DO NOT COMPLY WITH PERFORMANCE STANDARDS; ARE BEING HELD UNDER A TEMPORARY IMPORT BOND; WILL NOT BE INTRODUCED INTO COMMERCE; WILL BE USED UNDER A RADIATION PROTECTION PLAN; AND WILL BE DESTROYED OR EXPORTED UNDER U.S. CUSTOMS SUPERVISION WHEN THE FOLLOWING MISSION IS COMPLETE:**
  ☐ 1. Research, Investigations/Studies, or Training (attach Form FDA 766)
  ☐ 2. Trade Show/Demonstration; List dates & use restrictions _____

☐ **D. DO NOT COMPLY WITH PERFORMANCE STANDARDS; ARE HELD AND WILL REMAIN UNDER BOND; AND WILL NOT BE INTRODUCED INTO COMMERCE UNTIL NOTIFICATION IS RECEIVED FROM FDA THAT PRODUCTS HAVE BEEN BROUGHT INTO COMPLIANCE IN ACCORDANCE WITH AN FDA APPROVED PETITION. (See Form FDA 766.)**
  ☐ 1. Approved Petition is attached.     ☐ 2. Petition Request is attached.     ☐ 3. Request will be submitted within 60 days.

| **WARNING:** Any person who knowingly makes a false declaration may be fined not more than $10,000 or imprisoned not more than 5 years or both, pursuant to compliant electronic product may also be subject to civil Title is U.S.C. 1001. Any person importing a non-penalties of $1000 per violation, up to a maximum $300,000 for related violations pursuant to Title 21 U.S.C. | SIGNATURE OF IMPORTER OF RECORD |
|---|---|
| | NAME AND TITLE OF RESPONSIBLE PERSON |

Public reporting burden for this collection of information is estimated to average 0.2 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to:

    Food and Drug Administration
    CDRH (HFZ-342)
    2094 Gaither Road
    Rockville, MD 20850
*An agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number.*

FORM FDA 2877 (10/03)          PREVIOUS EDITION IS OBSOLETE

CC0118606

FEDERAL COMMUNICATIONS COMMISSION
Washington, D.C.

Approved OMB
3060-0059
Expires          08-31-2003

## STATEMENT REGARDING THE IMPORTATION OF RADIO FREQUENCY DEVICES CAPABLE OF CAUSING HARMFUL INTERFERENCE
*(Read instructions before completing from. Please type or print clearly in ink.)*

**Part I**

| Date of Entry | Entry Number | Port of Entry 1 | Harmonized Tariff Number 2 | Quantity of Item (Not number of containers)3 |
|---|---|---|---|---|
| | | | 8528.12.24.80 | 865 |

| Device Model/Type Name or # | Trade Name | FCC ID | Description of Equipment |
|---|---|---|---|
| 14MS2331/17 | Magnavox | N/R | 14" Real Flat Stereo TV |

| Manufacturer's Name and Address | Consignee's Name and Address | Importer's Name and Address |
|---|---|---|
| TCL King Elec. App. Co., Ltd. Sec. 19, Zhongkai Dev. Zone, New & High Level Tech Indus., Huizhou, Guangdong, PR China | Circuit City Stores, Inc. 9954 Mayland Drive Richmond, VA 23233 | Circuit City Stores, Inc. 9954 Mayland Drive Richmond, VA 23233 |

| Printed or Typed Name of Importer or Consignee | Signature of Importer or Consignee | Date (Month/Day/Year) |
|---|---|---|
| Circuit City Stores, Inc. | | |

**Warning:** Any person who knowingly makes a false declaration may be fined not more than $250,000 or imprisoned not more than 5 years, or both, pursuant to U.S.C. S 1001

| Part II | |
|---|---|
| ☐ | 1.The FCC has issued a grant of equipment authorization for the FCC ID listed above |
| ☒ | 2. AN FCC grant of equipment authorization and an FCC ID are not required, but the equipment complies with FCC technical requirements. |
| ☐ | 3. The described equipment is being imported in limited quantities for testing and evaluation for compliance with technical requirements or marketing suitability. The equipment will not be offered for sale or otherwise marketed. (See instructions) |
| ☐ | 4. The described equipment is being imported in limited quantities for demonstration at industry trade shows and will not be offered for sale or otherwise marketed. ( See instructions) |
| ☐ | 5. The described equipment is being imported solely for export. It will not be offered for sale or otherwise marketed in the U.S. |
| ☐ | 5(a). The described equipment is a non-U.S. standard cellular phone that can only function outside the U.S. (See instructions) |
| ☐ | 6. The described equipment is being imported for use exclusively by the U.S. Government |
| ☐ | 7. Three or fewer radio receivers, computers, or other unintentional radiators as defined in Part 15 of the FCC Rules are being imported for an individual's personal use and are not intended for sale. |
| ☐ | 8. The described equipment is being imported for repair and will not be offered for sale or otherwise marketed. |

1. Port of Entry Use Schedule D – Classification of U.S. Customs Districts and Ports for U.S. Foreign Trade Statistics – a four digit code i.e. New York City, NY 1001.
2. Harmonized Tariff Number – Harmonized Tariff Schedule of the United States
3. This quantity must be total number of items, not number of cartons.

CC0118607

DEPARTMENT OF HEALTH AND HUMAN SERVICES
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION

## DECLARATION FOR IMPORTED ELECTRONIC PRODUCTS SUBJECT TO RADIATION CONTROL STANDARDS

Form Approved OMB No. 00910-0025
Expiration Date: 10/31/2003

**INSTRUCTIONS**
1. If submitting entries electronically through ACS/ABI, hold FDA-2877 in entry file. Do not submit to FDA unless requested
2. . If submitting paper entry documents, submit the following to FDA:
   a. 2 copies of Customs Entry Form (e.g. CF 3461, CF 3461 Alt, CF 7501, etc.)
   b. 1 copy of FDA 2877
   c. Commercial Invoice(s) in English.

| U.S. CUSTOMS PORT OF ENTRY | ENTRY NUMBER | DATE OF ENTRY |
|---|---|---|

NAME & ADDRESS OF MANUFACTURING SITE; COUNTRY OF ORIGIN

TCL King Elec. App. Co., Ltd.
Sec. 19, Zhongkai Dev. Zone, New & High-level
Tech Indus., Huizhou, Guangdong, PR China

NAME & ADDRESS OF IMPORTER & ULTIMATE CONSIGNEE (if not importer)

Circuit City Stores, Inc.
9954 Mayland Drive
Richmond, VA 23233

| PRODUCT DESCRIPTION | QUANTITY (Items/Containers) | MODEL NUMBER(S) & BRAND NAME(S) | |
|---|---|---|---|
| 14" Real Flat Stereo TV | 865/1 container | 14MS2331/17 | Magnavox |

**DECLARATION: I / WE DECLARE THAT THE PRODUCTS IDENTIFIED ABOVE:** (Mark X applicable statements, fill in blanks, & sign)

☐ **A. ARE NOT SUBJECT TO RADIATION PERFORMANCE STANDARDS BECAUSE THEY:**
  ☐ 1. Were manufactured prior to the effective date of any applicable standard; Date of Manufacture _____
  ☐ 2. Are excluded by the applicability clause or definition in the standard or by FDA written guidance.
      Specify reason for exclusion _____
  ☐ 3. Are personal household goods of an individual entering the U.S. or being returned to a U.S. resident. (Limit: 3 of each product type).
  ☐ 4. Are property of a party residing outside the U.S. and will be returned to the owner after repair or servicing.
  ☐ 5. Are components or subassemblies to be used in manufacturing or as replacement parts (NOT APPLICABLE to diagnostic x-ray parts).
  ☐ 6. Are prototypes intended for on going product development by the importing firm, are labeled "FOR TEST/EVALUATION ONLY," and will be exported, destroyed, or held for future testing (i.e., not distributed). (Quantities Limited - see reverse.)
  ☐ 7. Are being reprocessed in accordance with P.L. 104-134 or other FDA guidance, are labeled "FOR EXPORT ONLY." and will not be sold, distributed, or transferred without FDA approval.

☒ **B. COMPLY WITH THE PERFORMANCE STANDARDS WHICH ARE** APPLICABLE AT DATE OF MANUFACTURE AND THAT A CERTIFICATION LABEL OR TAG TO THIS EFFECT IS AFFIXED TO EACH PRODUCT. COMPLIANCE DOCUMENTED IN:
  ☒ 1. Last annual report or Product/Initial report
      0420108-00                          TCL King Elec. Appl. Co., Ltd. Guangdong, China
      ACCESSION NUMBER of Report          Name of MANUFACTURER OF RECORD (Filed report with FDA/CDRH
  ☐ 2. Unknown manufacturer or report number. State reason: _____

☐**C. DO NOT COMPLY WITH PERFORMANCE STANDARDS; ARE BEING HELD UNDER A TEMPORARY IMPORT BOND; WILL NOT BE INTRODUCED INTO COMMERCE; WILL BE USED UNDER A RADIATION PROTECTION PLAN; AND WILL BE DESTROYED OR EXPORTED UNDER U.S. CUSTOMS SUPERVISION WHEN THE FOLLOWING MISSION IS COMPLETE:**
  ☐ 1. Research, Investigations/Studies, or Training (attach Form FDA 766)
  ☐ 2. Trade Show/Demonstration; List dates & use restrictions _____

☐**D. DO NOT COMPLY WITH PERFORMANCE STANDARDS; ARE HELD AND WILL REMAIN UNDER BOND; AND WILL NOT BE INTRODUCED INTO COMMERCE UNTIL NOTIFICATION IS RECEIVED FROM FDA THAT PRODUCTS HAVE BEEN BROUGHT INTO COMPLIANCE IN ACCORDANCE WITH AN FDA APPROVED PETITION. (See Form FDA 766.)**
  ☐ 1. Approved Petition is attached.     ☐ 2. Petition Request is attached.     ☐ 3. Request will be submitted within 60 days.

| **WARNING: Any person who knowingly makes a false** declaration may be fined not more than $10,000 or imprisoned not more than 5 years or both, pursuant to compliant electronic product may also be subject to civil Title is U.S.C. 1001. Any person importing a non-penalties of $1000 per violation, up to a maximum $300,000 for related violations pursuant to Title 21 U.S.C. | SIGNATURE OF IMPORTER OF RECORD |
| | NAME AND TITLE OF RESPONSIBLE PERSON |

Public reporting burden for this collection of information is estimated to average 0.2 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to:

Food and Drug Administration
CDRH (HFZ-342)
2094 Gaither Road
Rockville, MD 20850
An agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number.

FORM FDA 2877 (10/03)          PREVIOUS EDITION IS OBSOLETE

CC0118608

FEDERAL COMMUNICATIONS COMMISSION
Washington, D.C.

Approved OMB
3060-0059
Expires      08-31-2003

## STATEMENT REGARDING THE IMPORTATION OF RADIO FREQUENCY DEVICES CAPABLE OF CAUSING HARMFUL INTERFERENCE
*(Read instructions before completing from. Please type or print clearly in ink.)*

**Part I**

| Date of Entry | Entry Number | Port of Entry 1 | Harmonized Tariff Number 2 | Quantity of Item (Not number of containers)3 |
|---|---|---|---|---|
| | | | 8528.12.3238 | 440 |

| Device Model/Type Name or # | Trade Name | FCC ID | Description of Equipment |
|---|---|---|---|
| 20MT133S | Magnavox | N/R | 20" MONO TV |

| Manufacturer's Name and Address | Consignee's Name and Address | Importer's Name and Address |
|---|---|---|
| TCL King Elec. App. Co., Ltd. Sec. 19, Zhongkai Dev. Zone, New & High-level, Tech Indus., Huizhou, Guangdong, PR China | Circuit City Stores, Inc.9954 Mayland DriveRichmond, VA 23233 | Circuit City Stores, Inc.9954 Mayland DriveRichmond, VA 23233 |

| Printed or Typed Name of Importer or Consignee | Signature of Importer or Consignee | Date (Month/Day/Year) |
|---|---|---|
| | | |

**Warning: Any person who knowingly makes a false declaration may be fined not more than $250,000 or imprisoned not more than 5 years, or both, pursuant to U.S.C. S 1001**

**Part II**

| | |
|---|---|
| ☐ | 1.The FCC has issued a grant of equipment authorization for the FCC ID listed above |
| ☒ | 2. AN FCC grant of equipment authorization and an FCC ID are not required, but the equipment complies with FCC technical requirements. |
| ☐ | 3. The described equipment is being imported in limited quantities for testing and evaluation for compliance with technical requirements or marketing suitability. The equipment will not be offered for sale or otherwise marketed. (See instructions) |
| ☐ | 4. The described equipment is being imported in limited quantities for demonstration at industry trade shows and will not be offered for sale or otherwise marketed. ( See instructions) |
| ☐ | 5. The described equipment is being imported solely for export. It will not be offered for sale or otherwise marketed in the U.S. |
| ☐ | 5(a). The described equipment is a non-U.S. standard cellular phone that can only function outside the U.S. (See instructions) |
| ☐ | 6. The described equipment is being imported for use exclusively by the U.S. Government |
| ☐ | 7. Three or fewer radio receivers, computers, or other unintentional radiators as defined in Part 15 of the FCC Rules are being imported for an individual's personal use and are not intended for sale. |
| ☐ | 8. The described equipment is being imported for repair and will not be offered for sale or otherwise marketed. |

1. Port of Entry Use Schedule D – Classification of U.S. Customs Districts and Ports for U.S. Foreign Trade Statistics – a four digit code i.e. New York City, NY 1001.
2. Harmonized Tariff Number – Harmonized Tariff Schedule of the United States
3. This quantity must be total number of items, not number of cartons.

| DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>PUBLIC HEALTH SERVICE<br>FOOD AND DRUG ADMINISTRATION<br><br>**DECLARATION FOR IMPORTED<br>ELECTRONIC PRODUCTS SUBJECT TO<br>RADIATION CONTROL STANDARDS** | *Form Approved OMB No. 0910-0025*<br>*Expiration Date: 10/31/2003* |
|---|---|
| | **INSTRUCTIONS**<br>1. If submitting entries electronically through ACS/ABI, hold FDA-2877 in entry file. Do not submit to FDA unless requested<br>2. . If submitting paper entry documents, submit the following to FDA:<br>    a. 2 copies of Customs Entry Form (e.g. CF 3461, CF 3461 Alt, CF 7501, etc.)<br>    b. 1 copy of FDA 2877<br>    c. Commercial Invoice(s) in English. |

**U.S. CUSTOMS PORT OF ENTRY** | | ENTRY NUMBER | DATE OF ENTRY

| NAME & ADDRESS OF MANUFACTURING SITE; COUNTRY OF ORIGIN | NAME & ADDRESS OF IMPORTER & ULTIMATE CONSIGNEE *(if not importer)* |
|---|---|
| TCL King Elec. App. Co., Ltd.<br>Sec. 19, Zhongkai Dev. Zone, New & High-level<br>Tech Indus., Huizhou, Guangdong, PR China | Circuit City Stores, Inc.<br>9954 Mayland Drive<br>Richmond, VA 23233 |

| PRODUCT DESCRIPTION | QUANTITY *(Items/Containers)* | MODEL NUMBER(S) & BRAND NAME(S) |
|---|---|---|
| 20" Mono TV | 440 pcs/1 container | 20MT133S  Magnavox |

Mt133s

☐ **A. ARE NOT SUBJECT TO RADIATION PERFORMANCE STANDARDS BECAUSE THEY:**
   ☐ 1. Were manufactured prior to the effective date of any applicable standard; Date of Manufacture _____
   ☐ 2. Are excluded by the applicability clause or definition in the standard or by FDA written guidance. _____
       Specify reason for exclusion _____
   ☐ 3. Are personal household goods of an individual entering the U.S. or being returned to a U.S. resident. (Limit: 3 of each product type).
   ☐ 4. Are property of a party residing outside the U.S. and will be returned to the owner after repair or servicing.
   ☐ 5. Are components or subassemblies to be used in manufacturing or as replacement parts (NOT APPLICABLE to diagnostic x-ray parts).
   ☐ 6. Are prototypes intended for on going product development by the importing firm, are labeled "FOR TEST/EVALUATION ONLY," and will be exported, destroyed, or held for future testing (i.e., not distributed). (Quantities Limited - see reverse.)
   ☐ 7. Are being reprocessed in accordance with P.L. 104-1 34 or other FDA guidance, are labeled "FOR EXPORT ONLY," and will not be sold, distributed, or transferred without FDA approval.

☒ **B. COMPLY WITH THE PERFORMANCE STANDARDS WHICH ARE** APPLICABLE AT DATE OF MANUFACTURE AND THAT A CERTIFICATION LABEL OR TAG TO THIS EFFECT IS AFFIXED TO EACH PRODUCT. COMPLIANCE DOCUMENTED IN:
   ☒ 1. Last annual report or Product/Initial report
       <u>0320072-00</u>              **Philips Consumer Electronics, One Philips Drive, Knoxville, TN**
       ACCESSION NUMBER of Report        Name of MANUFACTURER OF RECORD *(Report filed with FDA/CDRH)*
   ☐ 2. Unknown manufacturer or report number; State reason: _____

☐ **C. DO NOT COMPLY WITH PERFORMANCE STANDARDS;** ARE BEING HELD UNDER A TEMPORARY IMPORT BOND; WILL NOT BE INTRODUCED INTO COMMERCE; WILL BE USED UNDER A RADIATION PROTECTION PLAN; AND WILL BE DESTROYED OR EXPORTED UNDER U.S. CUSTOMS SUPERVISION WHEN THE FOLLOWING MISSION IS COMPLETE:
   ☐ 1. Research, Investigations/Studies, or Training (attach Form FDA 766)
   ☐ 2. Trade Show/Demonstration; List dates & use restrictions

☐ **D. DO NOT COMPLY WITH PERFORMANCE STANDARDS;** ARE HELD AND WILL REMAIN UNDER BOND; AND WILL NOT BE INTRODUCED INTO COMMERCE UNTIL NOTIFICATION IS RECEIVED FROM FDA THAT PRODUCTS HAVE BEEN BROUGHT INTO COMPLIANCE IN ACCORDANCE WITH AN FDA APPROVED PETITION. *(See Form FDA 766.)*
   ☐ 1. Approved Petition is attached.      ☐ 2. Petition Request is attached.      ☐ 3. Request will be submitted within 60 days.

| **WARNING:** Any person who **knowingly makes a false declaration** may be fined not more than $10,000 or imprisoned not more than 5 years or both, pursuant to compliant electronic product may also be subject to civil Title is U.S.C. 1001. Any person importing a non-penalties of $1000 per violation, up to a maximum $300,000 for related violations pursuant to Title 21 U.S.C. | SIGNATURE OF IMPORTER OF RECORD<br><br><br>NAME AND TITLE OF RESPONSIBLE PERSON |
|---|---|

Public reporting burden for this collection of information is estimated to average 0.2 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to:

       Food and Drug Administration
       CDRH (HFZ-342)
       2094 Gaither Road
       Rockville, MD 20850
*An agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number.*

FORM FDA 2877 (10/03)            PREVIOUS EDITION IS OBSOLETE

CC0118610



PHILIPS

*Let's make things better.*

Philips Consumer Electronics Co.

January 21, 2005

**BENEFICIARY CERTIFICATE**

Invoice No:        TS050110
PO No.             1232532
Vendor Model No:   13MT143S
Container No(s).

        TTNU9860953
        GVCU5149519

We hereby certify that:

        Shipment complies with Circuity City request to attach a container manifest inside container.

FOR AND BEHALF OF PHILIPS CONSUMER ELECTRONICS CO.

*Charisse Matthews*
Charisse Matthews
Credit Associate
Credit Department

A Division of Philips Electronics
North America Corporation
64 Perimeter Center East
Atlanta, GA 30346-6400
TEL: (770) 821-2400

CC0118611



## PHILIPS
*Let's make things better*

**Philips Consumer Electronics Co.**

January 21, 2005

### COUNTRY OF ORIGIN CERTIFICATE

Invoice No:        TS050110
PO No.              1232532
Vendor Model No:    13MT143S
Country of Origin:  China

We hereby certify that:

The goods shipped do unequivocally conform to the United States Customs Services laws regarding Country of Origin and are marked with the country of origin.

FOR AND BEHALF OF PHILIPS CONSUMER ELECTRONICS CO.

*Charisse Matthews*

Charisse Matthews
Credit Associate
Credit Department

A Division of Philips Electronics
North America Corporation
64 Perimeter Center East
Atlanta, GA 30346-6400
TEL: (770) 821-2400

CC0118612



## PHILIPS

*Let's make things better.*

**Philips Consumer Electronics Co.**

January 21, 2005

### BENEFICIARY CERTIFICATE

Invoice No:        TS050110
PO No.             1232532
Vendor Model No:   14MS2331/17
Container No(s).

CBHU1438781

We hereby certify that:

Shipment complies with Circuity City request to attach a container manifest inside container.

FOR AND BEHALF OF PHILIPS CONSUMER ELECTRONICS CO.

*Charisse Matthews*
Charisse Matthews
Credit Associate
Credit Department

A Division of Philips Electronics
North America Corporation
64 Perimeter Center East
Atlanta, GA 30346-6400
TEL: (770) 821-2400

CC0118613



**PHILIPS**

*Let's make things better.*

## Philips Consumer Electronics Co.

January 21, 2005

### COUNTRY OF ORIGIN CERTIFICATE

Invoice No:      TS050110
PO No.           1232532
Vendor Model No: 14MS2331/17
Country of Origin:  China

We hereby certify that:

The goods shipped do unequivocally conform to the United States Customs Services laws regarding
Country of Origin and are marked with the country of origin.

FOR AND BEHALF OF PHILIPS CONSUMER ELECTRONICS CO.

*Charisse Matthews*
Charisse Matthews
Credit Associate
Credit Department

A Division of Philips Electronics
North America Corporation
64 Perimeter Center East
Atlanta, GA 30346-6400
TEL: (770) 821-2400

CC0118614



**PHILIPS**

*Let's make things better.*

**Philips Consumer Electronics Co.**

January 21, 2005

### BENEFICIARY CERTIFICATE

Invoice No:    TS050110
PO No.        1232532
Vendor Model No:  20MT133S
Container No(s).

CBHU9948272

We hereby certify that:

Shipment complies with Circuity City request to attach a container manifest inside container.

FOR AND BEHALF OF PHILIPS CONSUMER ELECTRONICS CO.

*Charisse Matthews*
Charisse Matthews
Credit Associate
Credit Department

A Division of Philips Electronics
North America Corporation
84 Perimeter Center East
Atlanta, GA 30346-6400
(770) 821-2400

CC0118615



**PHILIPS**

*Let's make things better.*

**Philips Consumer Electronics Co.**

January 21, 2005

### COUNTRY OF ORIGIN CERTIFICATE

Invoice No:        TS050110
PO No.             1232532
Vendor Model No:   20MT133S
Country of Origin:  China

We hereby certify that:

The goods shipped do unequivocally conform to the United States Customs Services laws regarding Country of Origin and are marked with the country of origin.

FOR AND BEHALF OF PHILIPS CONSUMER ELECTRONICS CO.

Charisse Matthews
Charisse Matthews
Credit Associate
Credit Department

A Division of Philips Electronics
North America Corporation
64 Perimeter Center East
Atlanta, GA 30346-6400
TEL: (770) 821-2400

CC0118616

## Circuit City Stores, Inc. SDR Waiver



**Comments:**

| | |
|---|---|
| **Date Issued:** | 09/10/2004 |
| **Vendor Name:** | Philips |
| **Vendor Number:** | 41600 |

| | |
|---|---|
| **Item Number:** | 13MT143S |
| **Item Description:** | 13" CRT color TV |
| **Factory Name:** | TCL King Elec. App. Co., Ltd. |
| **Factory Address:** | Sec. 19, Zhongkai Dev. Zone, New & High-Level Tech Indus., Huizhou, Guangdong, PR China |

As of the date of this document, an SDR waiver has been issued by Circuit City Stores, Inc. for the item listed. This waiver may be revoked by Circuit City at any time for failure to comply with the Direct Imports Vendor Guide. This includes late submission of documents, incomplete or incorrect documents, and change of factory. Once the waiver is revoked, the vendor must again submit shipping documents for an SDR, submitted with the packet of documents for the original FCR. Upon 5 successful SDRs issued (with no revisions required on the part of the vendor) another waiver may be issued at the discretion of Circuit City's Direct Imports team.

_____
Circuit City Stores, Inc.

09/10/2004
_____
Date

CC0118617



## Circuit City Stores, Inc. SDR Waiver

Comments:

**Date Issued:** 09/10/2004

**Vendor Name:** Philips
**Vendor Number:** 41600

**Item Number:** 14MS2331
**Item Description:** 14" CRT color TV
**Factory Name:** TCL King Elec. App. Co., Ltd.
**Factory Address:** Sec. 19, Zhongkai Dev. Zone, New & High-Level Tech
Indus., Huizhou, Guangdong, PR China

As of the date of this document, an SDR waiver has been issued by Circuit City Stores, Inc.
for the item listed. This waiver may be revoked by Circuit City at any time for failure to comply
with the Direct Imports Vendor Guide. This includes late submission of documents, incomplete
or incorrect documents, and change of factory. Once the waiver is revoked, the vendor must
again submit shipping documents for an SDR, submitted with the packet of documents for
the original FCR. Upon 5 successful SDRs issued (with no revisions required on the part of the
vendor) another waiver may be issued at the discretion of Circuit City's Direct Imports team.

_____
**Circuit City Stores, Inc.**

09/10/2004
_____
**Date**

CC0118618

# Circuit City Stores, Inc. SDR Waiver



**Comments:**

**Date Issued:** 09/10/2004

**Vendor Name:** Philips
**Vendor Number:** 41600

**Item Number:** 20MT133S
**Item Description:** 20" CRT color TV
**Factory Name:** TCL King Elec. App. Co., Ltd.
**Factory Address:** Sec. 19, Zhongkai Dev. Zone, New & High-Level Tech
Indus., Huizhou, Guangdong, PR China

As of the date of this document, an SDR waiver has been issued by Circuit City Stores, Inc.
for the item listed. This waiver may be revoked by Circuit City at any time for failure to comply
with the Direct Imports Vendor Guide. This includes late submission of documents, incomplete
or incorrect documents, and change of factory. Once the waiver is revoked, the vendor must
again submit shipping documents for an SDR, submitted with the packet of documents for
the original FCR. Upon 5 successful SDRs issued (with no revisions required on the part of the
vendor) another waiver may be issued at the discretion of Circuit City's Direct Imports team.

_____
**Circuit City Stores, Inc.**

09/10/2004
_____
**Date**

CC0118619

# EXHIBIT 8

# Nafta TV production shift to Asia

# Asian TV shipment to USA increa

Oct.7, 2002
CPT global sales optimization

**LG.PHILIPS** Displays

Look at the future

PWP-CRT-010946

# Information sources ;

- LPD Japan offices
- LPD Bankok office
- LPD Seoul supporting office
- LPD San Diego office
- LPD China marketing (China customs data)
- China CPT manufacturers

in-line with market information
except for product mix data.

Look at the future

LG.PHILIPS Displays



# China TV export to USA trend

A lot of indicators show China TV export has being increased sharply, especially for USA market. This trend to be accelerated as Philips CE joins ;

*China export trend to USA*

Sets

*China export trend to USA by product*

Jan ~ July (01 vs. 02)

*China export trend to Nafta*   K sets

| Country | 2001 Re. | 2002 REO | Jan ~ July '02 |
|---|---|---|---|
| USA | 828 | 3,900 | 2,067 |
| Canada | 52 | 80 | 38 |
| Mexico | 72 | 40 | 19 |
| Nafta total | 952 | 4,020 | 2,124 |

*Look at the future*

- Export products has drastically being shifted to Large and Jumbo category.

- Source : China customs data

LG. PHILIPS Displays

*PCE-USA plan to move their supply base partially from Mexico to China, meanwhile Changhong incredibly expand volume to USA.*

## Major TV exporters to USA

| Buyer | Supplier | Classification | Products | 2001 | 2002 | 2003 | CPT vendor |
|---|---|---|---|---|---|---|---|
| PCE(USA) | TCL(China) | OEM | 14" | 0 | 0 | 200 | Chaihong, (Indonesia) |
| | | (Maganvox brand) | 21" | | | 200 | Hitachi, (Changsa) |
| | | | 29" | | | 100 | |
| | | TCL supply total | | 0 | 0 | 500 | |
| | Suzou(China) | (Philips brand) | 21" | | | 290 | Huafei, (SDI) |
| | | | 21"RF | | | 80 | HuaFei |
| | | | 25"RF | | | 65 | SDI(Changsa) |
| | | | 29"SF&RF | | | 0 | Under study |
| | | Suzou supply total | | 28 | 100 | 435 | |
| | China supply total to PCE-USA | | | 28 | 100 | 935 | |
| Walmart Circuit City | Changhong | Apex brand OEM | 14"–34" | 174 | 3,100 | 4,000 | all China vendors |
| | Haier | | | 132 | 165 | 200 | |
| | Konka | | 14",21" | 87 | 80 | 150 | L&J ? |
| Best Buy | Greatwall | | 14",21" | 400 | 310 | 500 | L&J ? |
| | Skyworth | | 14",21" | 60 | 65 | 300 | L&J ? |
| | Others | | | | | | |
| Grand total | | | | 881 | 3,820 | 6,035 | |

CPT supply ?

-Source : China customs data('01~'02.7)

*Look at the future*

LG.PHILIPS Displays

# AP TV export to USA trend

According to LPD survey, 2002 export from AP to USA has been increased by 39%. And its trend to be slow down,but keep going.

39%
7% 2003
2002
2001

| Buyers surveyed | Supplier | Products | 2001 | 2002 | 2003 | CPT vendor & remarks |
|---|---|---|---|---|---|---|
| Orion(USA) | Orion(Thai) | 29"CV(sf) | 0 | 220 | 300 | BMCC |
| | | 34"CV | 0 | 60 | 60 | BMCC ? |
| | | 29"RF | 0 | 0 | 200 | Toshiba,MMEC |
| | | 14"~25" | 4,100 | 6,620 | 7,030 | 2003 : Assumed 10% increase |
| TCE(USA) | TCE(Thai) | 29"CV | 0 | 0 | 200 | TCE |
| | | 29"RF | 0 | 0 | 100 | LPD,SDI |
| | | 14"~25" | 1,530 | 2,205 | 1,980 | Will increase L&J portion from 2003. |
| Sharp(USA) | SREC(M'sia) | 14"~29"F | 830 | 850 | 850 | 14" & 20" are major. But 14" will be smaller 14" keep stay in Mexico for Latam market |
| Funai(USA) | Funai(M'sia) | 14"~34" | 6,080 | 7,450 | 7,875 | China plant planned in 2H.2003. L&J(29"~34"RF) increase 50% in 2003. |
| JVC | JVC(Thai) | | 0 | 0 | 0 | Nafta 14" will buy from Changhong in 2003. |
| Sanyo | Sanyo(I'sia) | | 0 | 0 | 0 | Local to local policy. |
| Toshiba(USA) | Toshiba(Thai) | 29"RF | 0 | 0 | 30 | Production move from USA,  from 2H,'03 |
| Grand total | | | 12,540 | 17,405 | 18,625 | |

CPT supply ?

Look at the future

© LG.PHILIPS Displays



## *Major AP supplier's policy for Nafta shipment ;*

- **Funai (M'sia)**
  - Will increase upon demand.
  - <u>China plant planned to get L&J CPT from China.</u>

- **Orion (Thai, All USA export)**
  - <u>Already production shift start partially from USA to Thai.</u> Toshiba ... EM ...uded
  - Will start Toshiba 29"RF OEM in Thai.

- **TCE (Thai)**
  - <u>L&J TV production to be shifted</u> ... from ...
  - China OEM and/or flat CPT ... anne

- **Sanyo (I'sia)**
  - Basically keep ... supply policy ... ocal.

- **JVC (Thai)**
  - Keep ... local policy ... uy 14" for USA is planned to buy from Changhong or stop.

- **Sharp (M'sia)**
  - Keep current export volume. 14" Mexico production also to be stayed for local sales.
  - Will move only 20" partially from Mexico to M'sia.

*Look at the future*

LG.PHILIPS Displays

# What's happening in USA Channel

APEX, Advent, and Sylvania brands are the main driver in importing TV sets from Asia. Retailors are squeezing Nafta suppliers with import products

**Walmart**

**K-Mart**

**Best Buy**

**Circuit City**

**Sears**

Changhong (China) → **APEX**

**Advent**

Funai (M'sia) → **Sylvania**

## 29"RF TV retail price in Oct. '02

U$549

U$499 (Sony)

U$449(=>399=>368) (Sanyo)

U$399(=>339, low:U$319) (Apex)

*Look at the future*

| Channel | TV M/S in USA |
|---------|---------------|
| Walmart | 27% |
| Best Buy | 12% |
| Circuit City | 12% |
| Sears | 12% |

LG.PHILIPS Displays

# In consequence of this trend ......

## In USA(Nafta)

- USA Consumer Electronic Consortium prepares filing suit for Anti-Dumping on China and M'sia origin TV,mainly targeting on Changhong and Funai.  Will PCE join??
- TV retail prices to be seriously eroded for months to come.
  - -> Again squeeze CPT prices
  - -> Customers will not recognize 15% price premium(=Nafta duty) on Nafta origin CPT in order to survive.
- Serious impact on PCE and Sanyo business for Walmart.....

## In Asia

- Serious short supply continues in Large and Jumbo(29"~34") category.
  - -> Prices to be stable or keep increasing.
- Industry's check and balance for Changhong's growing.
  - -> Already too big to control.
- China will start importing S & Medium(14"~20") from AP.
  - -> Help AP S & Medium line loading. Expected short supply during hot season.
- SEG-Hitachi and CPT is considering to buy old Hitachi L&Jumbo CPT lines.

*Look at the future*

(L) **LG.PHILIPS** Displays

# LPD action points to cope with......

## In USA(Nafta)

- Reshuffle of customer portfolio in 29"/29"RF in order to load Gomez lines ;
  - Lower down PCE portion.
  - More focus on customers like Sanyo,Sharp,JVC, and LGERS
  - More export to Manaus matching factory to cover Brazil local demand.
- Cost-down of Gomez tube in order to compete with China tube.
  - Should be ready to compete AP/China products !!
  (Not easy to get 15% of import tax premium)

## In Asia(GC+AP)

- Increase L & Jumbo prices through industry consensus.
- Indonesia(and Campos) 14" opportunity in China ;
  - TCL, Skyworth, TeamWay(=Old Greatwall),(and Changhong)
- Need more capacity in China ;
  - Huafei CDT line => to CPT line (?)
- Strategic alliance with Chinese customer like TCL.  Chonghong(?)
- Watch out USA Anti-dumping file.

*Look at the future*

LG.PHILIPS Displays

# EXHIBIT 9



June 26, 2013

**Certification**

**Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of the document with bates numbers range: CHU00029191 – CHU00029194.

_____

Abraham I. Holczer

Project Manager

Park Case # 40838

134 W. 29th Street 5th Floor • New York, N.Y. 10001
Phone: 212-581-8870 • Fax: 212-581-5577

**[TRANSLATION]**

→ Du

[Handwritten and Circled:] Secret

<u>Meeting Minutes</u>

Date: 1999/5/20

Attendees:   *SDD – Mr. I. Kim/ Mr. Michael Son/ Mr. Ha, OEC – Mr. H. C. Moon/*
*Mr. J.W. Moon/ Mr. Karl Min/ Mr. J. H. Moon, LGE – Mr. S. Y. Choi/*
*Mr. G. I. Choi/ Mr. S. H. Jo/ Mr. S. M. Ahn*

*CPT* :      President Lin/ Director Liu/ Section Chief Du/ Chun-Mei Hsieh

Meeting Subject: *CPT Top Management Meeting*

I.   Meeting agenda :
1.   *Summary of May 10 meeting at Seoul.*
2.   *Reconfirmation for sending 3rd Q. price notice letter.*
3.   *Decision of timing and condition for price up.*
4.   *Other Issue*

II.  Contents:
1.   *Summary of May 10 Meeting at Seoul*
     1) *Status of price notice* (as originally *SKDL* scheduled as below)

    *Price notice:*

| Customers | ORION | SREC | FUNAI | TCE | AIWA |
|---|---|---|---|---|---|
| Team leader | CPT | LGE | OEC | SDD | Thai |
| Noticed | April 30 | May 07 | April 14 | May 03 | May 13 |
| Methods | Explanation | Ver. Explanation | Explanation | Formal letter | Letter |
| Indicated price | | | 14" $30.00 Bare | 14" $30.00 Bare | 14" $33.00 ITC |
| | | | 20" $50.00 Bare | | |
| Agreed price | 14" $32.00 ITC | 14" $33.50 ITC | 14" $33.50 ITC | 14" $32.50 ITC | 14" $33.00 ITC |
| | 20" $53.00 ITC | 20" $54.50 ITC | 20" $54.50 ITC | 20" $53.50 ITC | 20" $54.00  ITC |
| | CIF A/S | ARR A/S | ARR A/S | CIF 45days | ARR A/S |
| | Orion | SREC | FUNAI | TCE | AIWA |
| Customer response | Very negative | Seem skeptical | 5/E-6/B Re-negotiation | Strongly demanded reconsideration | Understood, but requested reconsideration |

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL

FINAL TRANSLATION

Exhibit
1108-EF

CHU00029191E
Translation

1) Further explanation of various makers' progress:
   ① *CPT* – we indicated that we have already drafted the price-up notification letter and have also formally notified *Orion* – the customer CPT is responsible to notify – by faxing a letter to Orion's headquarters in Japan on 5/18.  In addition, we have verbally communicated to other customers – *SREC, TCE* and *FUNAI* about the impending price-up.  Letters will be formally sent out on 5/20.
   ② *Mr. I. Kim* of *SDD* also indicated that a formal facsimile was sent on 5/3 to *Thomson (Korea)*, although the reply expressed full understanding of the situation, it urged to reconsider.  In addition, a letter was sent to *FUNAI* on 5/19, while *SREC* was given a verbal explanation.  It was planned that the formal letter would go out on 5/22.
   ③ *L/G* – Mr. Choi said that on 5/17 the 3rd Q price-up issue was verbally explained to *SREC M.D. Mr. Terada* – the response was *not good*.  A formal price-up notice letter is ready, and would be sent out right after the meeting.  Subsequent visits would be made to *FUNAI* on 5/19, and to *TCE* on 5/20 to discuss the proposed price-up.
   ④ *OEC* – Mr. Moon indicated that: *THAI-CRT* had sent a formal letter to inform *AIWA* of the price-up.  *OEC* has notified its customer *FUNAI* as well, and the two sides would meet to further discuss the issue by the end of May or beginning of June.  Meanwhile, a letter would be sent to *SREC* on 5/22.

2. *Reconfirmation for sending 3rd Q price notice letter*
   In addition to notifying the *Key Account*s, formal notifications should be sent as soon as possible to customers such as *SREC, FUNAI, ORION, THOMSON* and *AWAI* respectively.  As for the time to send the letter, after makers' *Review* and discussion, *SKDL* was set as follows:

*Schedule of sending letter*

|  |  | ORION | SREC | FUNAI | TCE | AIWA |
|---|---|---|---|---|---|---|
| Team leader |  | CPT | LGE | OEC | SDD | Thai |
| Sending letter |  | May 18 | May 17 | May 14 | May 03 | May 13 |
| Team vendors | CPT |  | May 20 | May 20 | May 20 | May 20 |
|  | LGE | X |  | May 19 | May 19 | May 22 |
|  | OEC | X | May 22 | [blank] | X | X |
|  | SDD | X | May 22 | May 19 |  | May 22 |
|  | Thai | May 19 | X | X | May 19 |  |
|  | TSB | O | O | O | X | O |
| Remarks: OEC will inform TDD(I) of the above listed SKDL | | | | | | |

3. *Decision of timing & condition for price up:*
   1) 1999 Q1-Q3 (14"/20"/21") production capacity and order estimates of various makers are as follow:

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

*Demand & Supply*

| 14" | 99Q1 | | | 99Q2 | | | 99Q3 | | |
|---|---|---|---|---|---|---|---|---|---|
| **Maker** | **Demand** | **Supply** | **Surplus** | **Demand** | **Supply** | **Surplus** | **Demand** | **Supply** | **Surplus** |
| **TOT** | **1250** | **1660** | **410** | **1245** | **1350** | **105** | **1335** | **1350** | **15** |
| % | 75.3% | | | 92.2% | | | 98.9% | | |
| CPT | 230 | 360 | 130 | 260 | 300 | 40 | 380 | 360 | -20 |
| LGE | 140 | 170 | 30 | 165 | 170 | 5 | 165 | 170 | 5 |
| OEC | 270 | 340 | 70 | 190 | 190 | 0 | 90 | 90 | 0 |
| SDD | 380 | 520 | 140 | 400 | 420 | 20 | 420 | 420 | 0 |
| Thai | 110 | 120 | 10 | 110 | 120 | 10 | 130 | 160 | 30 |
| TSB | 120 | 150 | 30 | 120 | 150 | 30 | 150 | 150 | 0 |

**Remarks: CPT- 3/E 14" 0.5 Line Reduced/ SDD – 3/E 0.5 Line reduced**
**OEC – 2/E 14" 1.0 Line, 5/E 0.5 Line to reduce (plan), and 14" will be**
**produced only in Vietnam.**

## Medium

| Maker | 99Q1 | | | 99Q2 | | | 99Q3 | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Demand** | **Supply** | **Surplus** | **Demand** | **Supply** | **Surplus** | **Demand** | **Supply** | **Surplus** |
| **TOT** | **1200** | **1540** | **340** | **1168** | **1220** | **52** | **1117** | **1150** | **33** |
| % | 77.9% | | | 95.7% | | | 97.1% | | |
| CPT | 70 | 140 | 70 | 110 | 140 | 30 | 110 | 140 | 30 |
| LGE | 320 | 370 | 50 | 336 | 370 | 34 | 355 | 340 | -15 |
| OEC | 370 | 440 | 70 | 260 | 230 | -30 | 230 | 230 | 0 |
| SDD | 240 | 370 | 130 | 252 | 260 | 8 | 252 | 260 | 8 |
| Thai | 150 | 160 | 10 | 158 | 160 | 3 | 110 | 120 | 10 |
| TSB | 50 | 60 | 10 | 53 | 60 | 8 | 60 | 60 | 0 |

**Remarks: OEC-3/E 1.0 Line reduced, 5/E 0.5 Line to reduce (plan)/ SDD -3/E 0.5 Line reduced**

Demand & Supply *of* 14*": Overcapacity: Q*1 – 24.7% / *Q*2 – 7.8% / *Q*3 – 1.1%
*Medium:  Overcapacity: Q*1 – 22.1% / *Q*2 – 4.3% / *Q*3 – 2.9%

★★Best timing to raise price:

*CPT*'s President Lin indicated that customers such as *Orion* would be getting brisk orders in *3rd Quarter* as the U.S. market high season was drawing near.  *Funai* (*China*) factory has newly increased 14" orders, and together with the high season demands of customers such as *Thomson*,

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL
FINAL TRANSLATION

it was expected that our 14" order would increase from 260*k/M* to 380*k/M* in Q3. *SDD* also indicated that the situation of *SEC*'s orders in *CIS* and Middle East market are becoming better, and according to what we heard, *TDDI*'s orders in Q3 were already full. *LG* was getting more internal demands (*for CIS/M. East*), and, because it would switch to producing 21" *(Flat)* in Korea in August, *LGE-medium*'s supply and demand has become *tight*. Therefore, all makers agreed that as long as everyone synchronizes the price-up implementation, even at the risk of suffering slow business for one month because customers hesitated or were taking a wait-and-see attitude, eventually we would pull through and would definitely accomplish the price-hike targets according to schedule.

3. *Other Issue:*

   1) Regarding *THAI-CRT*'s attitude towards the Q3 price-up, *ORN-Mr. Moon* said although *THAI-CRT* was absent again with excuse, it would *follow* the resolution of the meeting.   But various makers, after discussion, decided to phone and contact its *M.D. Mr. Chaovallt* who said he would meet with everyone in Taipei on June 1 (Tuesday) to continue the discussion.

   2) About *China Market*:
      Sales of 14" and 25" in China market are okay.   However, imbalance between demand and supply on 21"/29" continues to exist.   The eight *CRT* major makers within Chinese territory are going to hold a meeting on 5/23 to discuss how to improve capacity planning.   We heard that someone suggested to shutting down for one month to resolve the problem.   However, *SDD* thought a shutdown of 7-10 workdays would be easier to carry out an *Audit* properly.

   3) *IRICO (Caihong, China)* and *BMCC*:
      *CPT* was elected as representative to convey the Q3 price-up news to *IRICO*, and ask it to *follow*; *SDD* would be responsible for delivering the message to *BMCC*, in order to prevent the two makers from using lower-prices to confuse customers currently being shipped by makers at the meeting.

      -- End of report --

Submitted for approval and instruction

[Initialed:] Liu 5/24
[Initialed:] Lin 5/24
[Initialed:] Chien 5/24
[Initialed:] Du 5/24

Respectfully submitted by staff, Chun-Mei Hsieh
1999/05/24

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL

FINAL TRANSLATION

CHU00029194E
Translation





# 中華映管股份有限公司業務處

楊梅廠 電話：(03)4858035 傳真：(03)4858093 桃園縣楊梅鎮行善路80號
桃園廠 電話：(03)3675151 傳真：(03)3667612 桃園縣八德市和平路1127號

## 會議記錄

時間: 88年5月20日

參會者: SDD-Mr.I..Kim/ Mr.Michael Son/ Mr.Ha、OEC-Mr.H.C.Moon/ Mr.J.W.Moon/ Mr.Karl Min/ Mr.J.H.Moon、L/G-Mr.S.Y.Choi/ Mr.G.I.Choi/ Mr.S.H.Jo/ Mr.S.M.Ahn

CPT: 林總經理/ 劉處長/ 杜課長/ 謝春美

**會議主題: CPT Top Management Meeting**

## (一)會議議題:

1. Summary of May 10 meeting at Seoul.
2. Reconfirmation for sending 3rd Q. price notice letter.
3. Decision of timing & condition for price up.
4. Other Issue

## (二)會議內容:

### 1. Summary of May 10 Meeting at Seoul

1) Status of price notice:(依原訂定SKDL如下)

**Price notice:**

| Customers | ORION | SREC | FUNAI | TCE | AIWA |
|---|---|---|---|---|---|
| Team leader | CPT | LGE | OEC | SDD | Thai |
| Noticed | Apr 30 | May 07 | Apr 14 | May 03 | May 13 |
| Methods | Explanation | Ver. Explanation | Explanation | Formal letter | Letter |
| Indicated price | | | 14" $30.00 Bare | 14" $30.00 Bare | 14" $33.00 ITC |
| | | | 20" $50.00 Bare | | |
| Agreed price | 14" $32.00 ITC | 14" $33.50 ITC | 14" $33.50 ITC | 14" $32.50 ITC | 14" $33.00 ITC |
| | 20" $53.00 ITC | 20" $54.50 ITC | 20" $54.50 ITC | 20" $53.50 ITC | 20" $54.00 ITC |
| | CIF A/S | ARR A/S | ARR A/S | CIF 45days | CIF A/S |
| | ORION | SREC | FUNAI | TCE | AIWA |
| 客戶反映 | Very negative | Seem skeptical | 5/E-6/B再議 | 強烈要求再檢討 | 瞭解但請再檢討 |

1

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00029191

1) 各家進展狀況再說明：

❶ CPT-我方表示已擬妥價格調漲之通知函，且對我方負責通知的客戶Orion 已於5/18日正式以傳真通知其日本總部。另亦分別口頭向客戶SREC、TCE 及FUNAI等表明了擬調漲價格；將於5/20正式發出信函。

❷ SDD-Mr. I. Kim亦稱：已於五月三日正式傳真通知Thomson(Korea)，對方回 覆雖充分瞭解狀況，但請求再考慮。另亦於5/19發函給FUNAI並已向SREC 口頭說明，擬於5/22發出正式信函。

❸ L/G-Mr. Choi表示5/17已向SREC M. D.-Mr. Terada口頭說明有關 3rd Q.價 格調漲件，對方反映 not good;正式的調漲函已備妥，將於會後隨即發 送。另將於5/19拜訪FUNAI、5/20拜訪TCE，商討該調漲件。

❹ OEC-Mr. Moon稱：THAI-CRT已於5/19正式發函通知AIWA有關價格擬調漲件. 而OEC亦於5/14通知客戶-FUNAI，雙方將於五月底或六月初再進一步會 談。另將於5/22發函給SREC。

2. Reconfirmation for sending 3rd Q price notice letter

各家除上述負責通知的Key Account之外，須分別儘速向SREC、FUNAI、ORION、 THOMSON、AWAI等客戶發出正式通知信函。發函時間，經各家Review與討論後， SKDL明訂如下：

### Schedule of sending letter

|  |  | ORION | SREC | FUNAI | TCE | AIWA |
|---|---|---|---|---|---|---|
| Team leader |  | CPT | LGE | OEC | SDD | Thai |
| Sending letter |  | May 18 | May 17 | May 14 | May 03 | May 13 |
| Team vendors | CPT | - | May 20 | May 20 | May 20 | May 20 |
|  | LGE | X | - | May 19 | May 19 | May 22 |
|  | OEC | X | May 22 | - | X | X |
|  | SDD | X | May 22 | May 19 | - | May 22 |
|  | Thai | May 19 | X | X | May 19 | - |
|  | TSB | O | O | O | X | O |
| Remarks: OEC will inform TDD(I) of the above listed SKDL |  |  |  |  |  |  |

3. Decision of timing & condition for price up:

1) '99年 1Q –3Q (14"/20"/21")各家生產線產能規劃及訂單量預估分別如下：

2

## Demand & Supply

| ** 14" | 99Q1 | | | 99Q2 | | | 99Q3 | | |
|---|---|---|---|---|---|---|---|---|---|
| Maker | Demand | Supply | Surplus | Demand | Supply | Surplus | Demand | Supply | Surplus |
| TOT | 1250 | 1660 | 410 | 1245 | 1350 | 105 | 1335 | 1350 | 15 |
| % | 75.3% | | | 92.2% | | | 98.9% | | |
| CPT | 230 | 360 | 130 | 260 | 300 | 40 | 380 | 360 | -20 |
| LGE | 140 | 170 | 30 | 165 | 170 | 5 | 165 | 170 | 5 |
| OEC | 270 | 340 | 70 | 190 | 190 | 0 | 90 | 90 | 0 |
| SDD | 380 | 520 | 140 | 400 | 420 | 20 | 420 | 420 | 0 |
| Thai | 110 | 120 | 10 | 110 | 120 | 10 | 130 | 160 | 30 |
| TSB | 120 | 150 | 30 | 120 | 150 | 30 | 150 | 150 | 0 |

Remarks: CPT- 3/E 14" 0.5 Line reduced /   SDD- 3/E 0.5 Line reduced
OEC- 2/E 14" 1.0 Line, 5/E 0.5 Line reduce (plan), and 14" will be produced only in Vietnam.

**Medium**

| Maker | 99Q1 | | | 99Q2 | | | 99Q3 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Demand | Supply | Surplus | Demand | Supply | Surplus | Demand | Supply | Surplus |
| TOT | 1200 | 1540 | 340 | 1168 | 1220 | 52 | 1117 | 1150 | 33 |
| % | 77.9% | | | 95.7% | | | 97.1% | | |
| CPT | 70 | 140 | 70 | 110 | 140 | 30 | 110 | 140 | 30 |
| LGE | 320 | 370 | 50 | 336 | 370 | 34 | 355 | 340 | -15 |
| OEC | 370 | 440 | 70 | 260 | 230 | -30 | 230 | 230 | 0 |
| SDD | 240 | 370 | 130 | 252 | 260 | 8 | 252 | 260 | 8 |
| Thai | 150 | 160 | 10 | 158 | 160 | 3 | 110 | 120 | 10 |
| TSB | 50 | 60 | 10 | 53 | 60 | 8 | 60 | 60 | 0 |

Remarks: OEC- 3/E 1.0 Line, 5/E 0.5 Line reduce (plan) /   SDD- 3/E 0.5 Line reduced

14"供、需: Overcapacity: Q1- 24.7% / Q2- 7.8% / Q3- 1.1%
Medium　　: Overcapacity: Q1- 22.1% / Q2- 4.3% / Q3- 2.9%
★★價格調漲契機:
　CPT-林總經理表示 3rd Quarter 我方客戶如 Orion 在美國市場的訂單將隨著旺季
　來臨而逐漸轉強, 而 FUNAI(China)廠 14"新增訂單, 以及 Thomson 等客戶旺季需

3

CHU00029193

求量轉旺情況下,預料第三季我方 14" 訂單量將可自 260k/M 增至 380k/M。SDD 亦表示 SEC 在 CIS 與中東市場訂單狀況轉好,且 TDDI 據悉第三季訂單已滿。而 LG 在內需(For CIS/M.East)需求量增,且因在 Korea 即將於八月份轉產 21"(Flat) 情況下,LGE-medium 供、需已轉 tight。因此各家一致認為第三季度只要大家同步實施調漲,即使是一個月期間可能因客戶遲疑或觀望而生意稍差,但相信只要撐下去,此次調漲一定能如期達成。

## 4. Other Issue:

1. 有關 THAI-CRT 對第三季價格調漲之態度,ORN-Mr.Moon 表示 THAI-CRT 再次因故缺席,但其表示將 follow 會議結論。惟各家商議當場再以電話跟其 M.D. Mr.Chaovallt 聯絡結果其表示將於六月一日(周二)於台北與各家再會談。

2. 有關 China Market:
   14" 及 25" 在中國市場銷售狀況尚可;然而 21"/29" 則供需失衡情況仍持續。中國境內八大家 CRT 廠商正擬於 5/23 召開會議研商如何做好產能規劃。據悉有人提議以停產一個月以解決問題;然 SDD 認為 7-10 天將較容易確實做好 Audit。

3. IRICO (Caihong,China) 與 BMCC:
   經由與會各家推派將由 CPT 代表向 IRICO 傳達第三季擬調漲價格訊息,並請其 follow;而 SDD 將負責向 BMCC 傳達,以免該兩廠商以較低價格擾亂到各家交貨中的客戶。

   一 以 上 報 告 一

   恭呈 核示

   職 謝春美敬 呈
   1999/05/24

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00029194

# EXHIBIT 10

**To:**       CN=Jan De Lombaerde/OU=SGP/OU=CE/O=PHILIPS@PHILIPS[jan.de.lombaerde@philips.com]; CN=Bonnie Zhu/OU=SZH/OU=CE/O=PHILIPS@PHILIPS[.]; CN=Cassio Brigide/OU=SAO/OU=CE/O=PHILIPS@PHILIPS[cassio.brigide@philips.com]; CN=Celso Ligo/OU=SAO/OU=CE/O=PHILIPS@PHILIPS[.]; CN=Chris Ulewicz/OU=KNX/OU=CE/O=PHILIPS@PHILIPS[.]; CN=Eric Yong KY/OU=SGP/OU=CE/O=PHILIPS@PHILIPS[.]; CN=Fanqun Xu/OU=SZH/OU=CE/O=PHILIPS@PHILIPS[.]; CN=Herman Hensen/OU=EHV/OU=CE/O=PHILIPS@PHILIPS[.]; CN=Ng KK/OU=SGP/OU=CE/O=PHILIPS@PHILIPS[.]; CN=Robson Esteves/OU=SAO/OU=CE/O=PHILIPS@PHILIPS[.]; CN=Sujian Ma/OU=SZH/OU=CE/O=PHILIPS@PHILIPS[.]
**Cc:**       []
**Bcc:**     []
**From:**    Alan Tan (alan.tan@philips.com)
**Sent:**    Sat 8/26/2006 6:10:03 AM
**Importance:**    High
**Subject:**  Re: Fw: 21FSQ delivery and increase request
**MAIL_RECEIVED:**   Sat 8/26/2006 6:09:42 AM

Dear all,
Please find the following summary on the supply situation for 21FSQ as discussed with most CRT suppliers this week.

CPT
60K was secured in August, but so far TTE did not buy in this stock and we are pushing for their action to do so immediately otherwise we risk losing this allocation.  Allocation in Sept is 70K, but will reduce to  50K in Oct due to factory shutdown one week (Malay holidays).  Current Q3 price at 28USD and we expect increases in Q4.

SEG-Hitachi
Prior to new WoW end June, TTE had normally procure 60-70K/ month tubes for Philips requirement.  At end June, when TTE cut off all communication with SEG-Hitachi pertaining to Philips requirement, we ended up with no allocation in July, and only 10K in August and subsequently 10K/month allocation.  Price with SEG-Hitachi is normally agreed on monthly basis.  August price was 28USD and we expect increases in Sept.   But based on structural discussion, we could not secure enough tubes (only 10K/month).  SEG-Hitachi proposed to supply 3 months quantities at 30USD price not negotiable.  We indicated our intention to consider 70K in Sept, 80K in Oct and 40K in Nov.  We will check by early next week, the detailed split quantities per model for Sept-Nov. Then we expect to reply SEG-Hitachi our acceptance of the 30USD price  based on those substantiated quantities.

LPD
We have allocation from Huafei 30K (16K to Masa, rest to Huizhou) in Sept and 35K (10-15K to Masa, rest to Huizhou) in Oct. Huafei will consider additional 5K in Sept.   From Changsha, we have 10K in Sept and 15K in Oct.  Changsha will consider additional 5K in Sept. Bekasi tube being organised for release in L03SP Nafta set.  Target release before end Oct, hence allocation 10K in Oct and 40K in Nov.  Current Q3 prices at 27.7USD. Increases expect in view of LPD factories indication that current prices already higher and expect 1-3USD increases in Q4.

SDI
We are allocated 10K in Sept and 20K in Oct.  But SDI indicated only 5K in Nov due to their production shift towards Slim tube.
Deliveries in recent past (July onwards) was badly compromised due to payment situation. Situation with Shenzhen immproving, but with Tianjin, overdues remain high with TTE.  We need TTE to start LC terms with SDI for all OEM Philips requirement to ensure that we are guaranteed  all allocation agreed. Jan has informed this to TTE for implementation.   TTE had been instructed to issue immediately the PO for 10K in Sept (price 27.8USD).  Q4 price will discussed during BRM with SDI in wk637.

Irico
Although we had Irico tube released in all Nafta/Latam sets, the current tube has now DY design change for cost.  Suggestion to develop new design to be compatible with previous model and type number.  Irico will start organise sampling next week for feasibility study at TTE.  Considering leadtime of 1 month for tube procurement and 1.5month for tube release, at best we can only start planning to use this tube in mid Nov.   Current price indicated at 28.5USD.  Their expectation this goes up to 29-30USD in Q4.

CONFIDENTIAL

Summing up the above, we have accessible 21FSQ supplies per month as follows :

September:
130K   from CPT  (we risk losing 60K August quantities if TT not out soon)
70K    from SEG-Hitachi  (Sep-Nov package deal)
40K    from LPD   (30K Huafei, 10K Changsha). Additional 5K each from Huafei
and Changsha to be updated next week.
10K    from SDI   (need LC)
250K   Total

October:
50K    from CPT
80K    from SEG-Hitachi  (Sep-Nov package deal)
60K    from LPD   (35K Huafei, 15K Changsha, 10K Bekasi to be released by then)
20K    from SDI   (Need LC)
210K   Total

November:
65K    from CPT
40K    from SEG-Hitachi (Sep-Nov package deal)
90K    from LPD  (35K Huafei, 15K Changsha, 40K Bekasi)
5K     from SDI    (need LC)
200K   Total


Deployment will be executed within next week.  Let me know if any concerns.
Hope to have clarifed.

Best regards,
Alan Tan
Philips Electronics Singapore Pte Ltd
620A Lorong 1 Toa Payoh
Singapore 319762
Telephone (65) 6882 3692
Fascimile (65) 6250 4593




Jan De Lombaerde
2006-08-23 11:47 PM

        To
        Ng KK/SGP/CE/PHILIPS@PHILIPS
        Eric Yong KY/SGP/CE/PHILIPS@PHILIPS
        Fanqun Xu/SZH/CE/PHILIPS@PHILIPS
        Alan Tan/SGP/CE/PHILIPS@PHILIPS
        Chris Ulewicz/KNX/CE/PHILIPS@PHILIPS
        Bonnie Zhu/SZH/CE/PHILIPS@PHILIPS
        Sujian Ma/SZH/CE/PHILIPS@PHILIPS
        Celso Ligo/SAO/CE/PHILIPS@PHILIPS
        Cassio Brigide/SAO/CE/PHILIPS
        Herman Hensen/EHV/CE/PHILIPS@PHILIPS
        Robson Esteves/SAO/CE/PHILIPS@PHILIPS
        cc

        Subject
        Fw: 21FSQ delivery and increase request
        Classification
        Unclassified

Dear All,
please find a copy of an e-mail just sent out re the critical delivery
situation for 21FSQ in the coming months.
I am sure that somehow you will be contacted to discuss this issue.  Please
support wherever you can to ensure timely feedback.
thanks
Jan


Jan De Lombaerde

Vice President PCE, Mainstream Displays
Purchasing Mgr BL CRT TV / Projection Displays

Tel :  +65-6882-3161 (direct) or 6882-3509, mobile : +65-92963662
E-mail:  jan.de.lombaerde@philips.com
----- Forwarded by Jan De Lombaerde/SGP/CE/PHILIPS on 2006-08-23 11:43 PM -----




Jan De Lombaerde
2006-08-23 11:43 PM

        To
        Andy Mintz/ATL/CE/PHILIPS@PHILIPS
Todd Richardson_2/ATL/CE/PHILIPS@PHILIPS
Alejandro Carullo/SAO/CE/PHILIPS@PHILIPS
Paulo Ferraz/SAO/CE/PHILIPS@PHILIPS
        cc
        Lou Schreurs/SGP/CE/PHILIPS@PHILIPS
Pieter Vervoort/SGP/CE/PHILIPS@PHILIPS
        Subject
        21FSQ delivery and increase request
        Classification
        Unclassified




Dear Andy/Todd/Paolo/Alejandro,

Some of you have been experiencing the critical situation on 21FSQ out of China
already very recently.  Especially Latam has been suffering already as, because
of the start of the 21FSQ in TTE Masa, we only had one tube (from LPD Hua Fei)
released and there is not enough capacity.  Nafta until now has been spared of
any shortages, because basically Chunghwa (out of Malaysia)  has been able to
follow demand.

Situation though is dramatically changing by the day :
1) demand keeps on increasing as everyone, especially in Nafta, seems to be
increasing orders
2) last week Asahi Singapore announced the urgent need for an overhaul of a
glass oven, which means that Chunghwa will be missing an output of about 50-70K
glass panels
3) more rumours that some local Chinese glass suppliers are loosing too much
money and they will not invest in new lines as planned and even reduce current
output
4) we have a particular problem with TTE, as they have been claiming more
capacity from Chinese suppliers based on their higher plans.  They have done
this with suppliers where we normally do not have good access like Irico and
SEG-Hitachi.

As we do not have enough tubes for the demand in September through November and

PHLP-CRT-172665

as Nafta has put an extra request of 150K for October-December, I have planned
a number of concrete actions :
1) discussions with all the supply base.  Today I met Hitachi, with whom we
normally do not do very much business
2) tomorrow Wednesday, Pieter and myself are meeting LPD mgt in Hong Kong to
study what Extra they can do.
3) another discussion is planned on Friday in Shenzhen with Samsung.  Here I am
not to hopeful though as SDI focuses very much on RF and Slim and from
experience, we know that their support will be limited, maybe max. 10K/month.
4) an extra negotiation is planned, also for Friday with Irico.

The reason that I am writing to you is quite extraordinary in a sense : today
in the meeting, a scenario developed whereby we see opportunities to secure an
extra number of tubes in the market.  Let me use the opportunity to stress that
everybody seems to realise that this is the last chance for Nafta, before the
mandate starts, to plan and sell extra 21FS sets.  That is why this shortage
is developing now for Q4, after which there will be no issue anymore.

Concrete proposal on the table is the following :
- current pricing for September is on average $28 for a 21FS tube
- current forecast and commitment from Hitachi is 10K/month
- our shortage at this moment is about 40K in September and 60K in October

After quite some negotiations, Hitachi came with the following proposal :
- in stead of 10K for September, October and November, they are prepared to
commit 70K for September, 80K for October and 40K for November on the condition
that we pay $30.  Price is not negotiable but quantity is still.
- they need an answer on the volume commitment that we are prepared to take by
Monday August 28.

Comment from my side at the moment :
- an excellent chance to tackle the shortage problem and avoid big issues with
deliveries for the coming 2/3 months
- good opportunity to take tubes away from competitors
- of course 'some kind of blackmailing' from the side of Hitachi, but
"understandable" in the current market environment where there will be huge
overcapacity from Q1 next year onwards
- this indeed means an extra $2 increase from September onwards, but
a) it secures extra quantities for the whole of Q4
b) it is still unclear what the other suppliers will do but it looks like they
will also come with increases.  So the $2 "premium" will after all probably be
smaller to the average price in the market.

My proposal to all of you is to accept this deal, but I need your commitment to
go for this.  I will keep on negotiating with the other suppliers and update
you at the end of the week.  I can assure that I will do everything possible to
limit the effects of the increases, but please be aware that the overall
pressure remains (plastics, copper, glass) and that there are very few
opportunities to save costs elsewhere.

In case that you would like to talk to me, feel free to give me a ring.  Pieter
and myself (and two of my guys) will be in LPD HK HQ tomorrow Thursday and in
the afternoon in Shenzhen to further negotiate.

thanks for really considering the above issue and feed back to us asap.

kind regards,
Jan


Jan De Lombaerde

Vice President PCE, Mainstream Displays
Purchasing Mgr BL CRT TV / Projection Displays

Tel :  +65-6882-3161 (direct) or 6882-3509, mobile : +65-92963662
E-mail:  jan.de.lombaerde@philips.com

The information contained in this message is confidential and may be legally
privileged. The message is intended solely for the addressee(s). If you are not

the intended recipient, you are hereby notified that any use, dissemination, or reproduction is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender by return e-mail and destroy all copies of the original message.

The information contained in this message is confidential and may be legally privileged. The message is intended solely for the addressee(s). If you are not the intended recipient, you are hereby notified that any use, dissemination, or reproduction is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender by return e-mail and destroy all copies of the original message.

CONFIDENTIAL

# EXHIBIT 11



**certified**translate
A LANGUAGE FISH LLC COMPANY

info@certifiedtranslate.com | 2425 Olympic Blvd., Suite 4000W | usa  1-888-856-2228
www.certifiedtranslate.com | Santa Monica, CA 90404 | int  +1-310-684-3153
| | fax  +1-310-564-1944

## CERTIFIED TRANSLATION

A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: | **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|---|
| Firm: | **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
|---|
| |
| **MTPD-0573273E** |
| |
| |

| Source Language:  **JAPANESE** | Target Language:   **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director          **Date:**   September 20, 2018

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On _Sept. 20, 2018_ before me, ___Kristin Gail Chamberlain___, Notary Public, appeared ___Sean Kirschenstein___, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

KRISTIN GAIL CHAMBERLAIN
Commission # 2141880
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2020

# Asia Sales Meeting

Sales & Marketing Team

Aug. 21-22, 2003

1

CONFIDENTIAL

# Discussion Topics

1. 21" PF Market Scale Outlook

2. Identifying Potential Customers and Approaches for the 21" PF

3. 25" PF Transfer Discussion

4. 20"/21" FS Transfer Discussion

5. 21" FS (TDDJ) Launch

6. Asian Sales Route Discussion

7. Sales Status & Identifying Items for Sales Expansion

8. Other

2

# a) Medium-Sized Flat-Tube Demand & Outlook

3

CONFIDENTIAL

MTPD-0573273.03E_Translation

# CTV Sales Trend (Y2002-Y2005)



Unit:Mil pcs

· Growth in CPT demand is almost flat.

· Growth in demand for medium-sized tube *[models]* is forecasted to be flat at 64-65 million per year.

4

CONFIDENTIAL

# Middle size CTV Sales (Y2002-Y2005)



Unit：Mil pcs

- ・In the major regions, growth in medium-sized tube demand is flat.
- ・*[Sales]* in the Indian market (included in R.O.W.) is forecasted to gradually increase (2-4% per year).

5

# 21" PF Tube & CTV Supply



## 21" PF CPT WW Capacity

### 1. Line details

(Unit : Mil pcs)

| | | | | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| MTPD | Thailand | Asean | Ph-2 | 1.6 | 1.6 | 1.6 |
| | Malaysia | Asean | | 1.5 | 1.5 | 1.5 |
| | China | China | | 0.5 | 1.7 | 1.7 |
| DDI | Indonesia | Asean | | | | 1.2 |
| SDI | China | China | | 3.2 | 3.6 | 3.6 |
| | Mexico | NAFTA | | 0.2 | 0.6 | 0.6 |
| | Hungary | Euro | | 0.2 | 0.6 | 0.6 |
| | Malaysia | Asean | | | 1.4 | 1.4 |
| | Brazil | S.America | | | 1.2 | 1.2 |
| LG | Korea | Korea | | 1.8 | 1.8 | 1.8 |
| | China | China | | 0.1 | 0.4 | 0.4 |
| | Indonesia | Asean | | | | |
| Philips | UK | Euro | | 0.8 | 1.2 | 1.2 |
| | China | China | | 0.1 | 0.6 | 0.6 |
| Orion | Korea | Korea | | 0.7 | 0.4 | |
| | Mexico | NAFTA | | 0.2 | 0.4 | 0.4 |
| | Vietnam | Asean | | | | 1.2 |
| CPT | Malaysia | Asean | | | 0.5 | 0.5 |
| TMM | Poland | Euro | | 0.1 | 0.4 | 0.4 |
| Novel | China | China | | | 0.4 | 0.4 |
| SEG-Hitachi | China | China | | | | 1.8 |
| Irico | China | China | | | 0.9 | 1.8 |
| Samtel | India | India | | | 0.4 | 0.4 |
| BDDL | India | India | | | | 0.2 |
| Hotline | India | India | | | 0.5 | 0.5 |
| T-CRT | Thailand | Asean | | 0.1 | 0.2 | 0.2 |
| Ekranas | Lithuania | Euro | | | 0.2 | 0.2 |
| Sony | Singapore | Asean | | 1.8 | 1.8 | 1.8 |
| | USA | NAFTA | | 1.2 | 1.3 | 1.3 |
| | UK | Euro | | 0.9 | 1.0 | 1.0 |
| TTL | | | | 15.0 | 24.6 | 29.5 |

### 2. Capacity by manufacturer

(Unit : Mil pcs)

| | 2002 | 2003 | 2004 |
|---|---|---|---|
| MTPD | 3.6 | 4.8 | 4.8 |
| DDI | | | 1.2 |
| SDI | 3.6 | 7.4 | 7.4 |
| LG | 1.9 | 2.2 | 2.2 |
| Philips | 0.9 | 1.8 | 1.8 |
| Orion | 0.9 | 0.8 | 1.6 |
| CPT | | 0.5 | 0.5 |
| TMM | 0.1 | 0.4 | 0.4 |
| Novel | | 0.4 | 0.4 |
| SEG-Hitachi | | | 1.8 |
| Irico | | 0.9 | 1.8 |
| Samtel | | 0.4 | 0.4 |
| BDDL | | | 0.2 |
| Hotline | | 0.5 | 0.5 |
| T-CRT | 0.1 | 0.2 | 0.2 |
| Ekranas | | 0.2 | 0.2 |
| Sony | 3.9 | 4.1 | 4.1 |
| TTL | 15.0 | 24.6 | 29.5 |

### 2. Capacity by region

(Unit : Mil pcs)

| | 2002 | 2003 | 2004 |
|---|---|---|---|
| Asean | 5.0 | 7.0 | 9.4 |
| China | 3.9 | 7.6 | 10.3 |
| NAFTA | 1.6 | 2.3 | 2.3 |
| S.America | | 1.2 | 1.2 |
| Euro | 2.0 | 3.4 | 3.4 |
| India | | 0.9 | 1.1 |
| Korea | 2.5 | 2.2 | 1.8 |
| TTL | 15.0 | 24.6 | 29.5 |

| | |
|---|---|
| Line increase from 2002 to 2003 | 8 lines |
| Capacity increase from 2002 to 2003 | 9.6 |

| | |
|---|---|
| Line increase from 2003 to 2004 | 4 lines |
| Capacity increase from 2003 to 2004 | 4.9 |

7

CONFIDENTIAL

# 21" PF Tube Market

1.   **Demand is increasing due to the medium-sized tube market changing to the flat *[models]***

   –   Most of Japan has changed to flat *[models]*.

   –   Verify the trends for changing to flat *[models]* in other major markets (N. America, Europe, Asia, China).

      →      Verification 1

2.   Capture demand by getting customers by entering new markets or increasing share

   –   Will any new manufacturers be entering the 21" PF market in the future?

      →      Probably not.

   –   Expand sales by getting customers we don't have yet and customers in new markets.

      →      See the Verification 2 map.

8

CONFIDENTIAL                                                    MTPD-0573273.08E_Translation

# 21" PF Verification 1

9

# Middle size PF CTV demand / PF CPT capacity



· Based on comparing and adjusting with EECA (Europe) and EIAK (S. Korea), the change to flat [models] will continue gradually.

 · Mass-production for things such as the 2003 SDI (M) and CPT (M) will start. The gap in the balance between supply and demand has increased.

10

## PF Trends in the Medium-Sized CTV Market (Major PF Markets)



| | 1st year | 2nd year | 3rd year | 4th year | 5th year | 6th year |
|---|---|---|---|---|---|---|
| Japanese market | 3% | 23% | 59% | 73% | 76% | 90% |
| N. American market | 3% | 10% | 20% | 31% | 60% | 70% |
| European market | 2% | 10% | 18% | 22% | 26% | 50% |
| Chinese market | 2% | 10% | 20% | 22% | 30% | 60% |
| Asian market | 5% | 15% | 20% | 30% | 40% | 60% |

The Japanese market accelerated at the point of 30% with the change to flat.

We will verify the balance between supply and demand assuming that *[sales in]* other major markets will expand in the same way as the Japanese market.

CONFIDENTIAL

## Middle size PF CTV Demand / PF CPT Capacity



As shown in the chart on the right, excessive supply will continue even in 2004, and a new increase in capacity is a major risk.

12

CONFIDENTIAL

# 21" PF Verification 2

Need to identify potential customers and approaches for individual items.

13

CONFIDENTIAL

# 21" PF Customers & CRT Correlation Map (PAVC/DM)

*[KP/M = Thousands of pcs. per month]*

| | | | MDDM | KP/M | BMCC | KP/M | TDDT | KP/M | SDI | KP/M | LPD | KP/M | OEC | KP/M | Others | KP/M | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Matsushita | PAVC | PAVC CA | | | | | | | ◎ | 7 | | | | | | | |
| | | PAVC CZ | | | | | | | | | ◎ | 12 | | | | | Philips(UK) |
| | | MTV | ○ | 20 | | | | | ○ | 10 | | | | | | | |
| | | SMT | | | ○ | 1 | | | | | | | | | | | |
| | | TAMACO | | | | | | | | | | | | | ○ | 1 | CPT(M) |
| | | TAVC | △ | | | | | | ◎ | 12 | | | | | | | |
| | | MEPCO | ◎ | 1 | | | | | | | | | | | | | |
| | | MTAIC | ◎ | 2 | | | | | | | | | | | | | |
| | | NABEL | ◎ | 3 | | | | | | | | | | | | | |
| | | MEV | ◎ | 3 | | | | | | | | | | | | | |
| | | MKI | | | | | | | ◎ | 5 | | | | | | | No production |
| | | MKA | | | | | | | | | | | | | | | |
| | | PANAMEX | ◎ | 8 | | | | | | | | | | | | | |
| | | PAM | | | | | | | | | | | | | | | No production |
| | | MELCOA | | | | | | | | | | | | | | | No production |
| | | PMC | ◎ | 2 | | | | | | | | | | | | | |
| Toshiba | DM | TJP | | | | | ◎ | 20 | ○ | 1 | | | | | | | |
| | | DLTV | | | | | ○ | 1 | ○ | 1 | | | | | | | |
| | | TVCP | | | | | ◎ | 3 | | | | | △ | | | | |
| | | KAWA | | | | | ◎ | 4 | | | | | | | | | |

Look for ways to incorporate an estimated 37 KP/M.

PAVC: PAVCA/MTV/TAVC/TAMCO/MKI

DM: Get *[business for]* the DLTV (SDI) Chinese model

14

# 21" PF Customers & CRT Correlation Map (Other Japanese)

*[KP/M = Thousands of pcs. per month]*

| | | | MDDM KP/M | BMCC KP/M | TDDT KP/M | SDI KP/M | LPD KP/M | OEC KP/M | Others KP/M | |
|---|---|---|---|---|---|---|---|---|---|---|
| Japanese | Sharp | SREC | | | ○ 8 | ○ 2 | ○ 2 | | | |
| | | STTM | ○ 1 | | ○ 3 | | | | | |
| | | SYI | | | ◎ 3 | | | | | |
| | | SPC | | | ◎ 1 | | | | | |
| | | NSEC | | | ○ 3 | ○ 3 | | | | |
| | | SEEDS | | | | | ○ 1 | | | |
| | | SMCA | | | | | | | | No production |
| | JMT | JMT | ○ 2 | | ○ 4 | ○ 10 | ○ 1 | | | |
| | | JET | ○ | | ○ 1 | ○ 4 | | | | |
| | | JMUK | | | | | | | | No production |
| | | JEM | | | | | | | | No production |
| | SANYO | SEI | | | ○ 3 | ○ 2 | | | | |
| | | HSE | | | | ◎ 5 | | | | |
| | | SESA | | | | | ◎ 1 | | | |
| | | SMC | | | | ◎ 4 | | | | |
| | MITSUBISHI | S/W | | | | | ○ 5 | | | |
| | AIWA | SONY(M) | | | | | | | | |
| | HITACHI | HCPI | | | | | ◎ 2 | | | |
| | | HCPT | | | | | ◎ 1 | | | |
| | ORION | WORLD | | | ○ 10 | | | | ◎ 30 | CPT |
| | | ORION(UK) | | | ○ | | | | ◎ | CPT |
| | FUNAI | | ○ 20 | | | ◎ 60 | | | ◎ 40 | CPT |

JMT/JET: Incorporates the SDI portion (14 KP/M)

Funai: DDI mass-production is scheduled to start in Feb. 2004.

WET: Incorporates the CPT portion.

Mitsubishi: Incorporates the Skyworth OEM portion (5 KP/M).

15

CONFIDENTIAL

MTPD-0573273.015E_Translation

# 21" PF Customers & CRT Correlation Map (Other)

*[KP/M = Thousands of pcs. per month]*

| | | | MDDM | KP/M | BMCC | KP/M | TDDT | KP/M | SDI | KP/M | LPD | KP/M | OEC | KP/M | Others | KP/M | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S. Korea | SAMSUNG | SAMEX | | | | | | | ◎ | 50 | | | | | | | |
| | | SAVINA | | | | | | | ◎ | 10 | | | | | | | |
| | | SDMA | | | | | | | ◎ | 3 | | | | | | | |
| | | SHE | | | | | | | ◎ | 17 | | | | | | | |
| | | SEIN | | | | | | | ◎ | 4 | | | | | | | |
| | | SIEL | | | | | | | ◎ | 17 | | | | | | | |
| | | SEC | | | | | | | ◎ | 32 | | | | | | | |
| | | TSE | | | | | ○ | 3 | ◎ | 40 | | | | | | | |
| | | TTSEC | | | | | | | ◎ | 27 | | | | | | | |
| | LG | | | | | | | | | | ◎ | | | | | | |
| | DEAWOO | | | | | | | | | | | | ◎ | | | | |
| | KTV | | | | | | | | | | ◎ | | | | | | |
| | AMAM | | | | | | | | | | | | | | | | No production |
| Europe & N. America | TMM | THAI | ○ | 2 | | | | | | | ○ | 2 | | | ◎ | 5 | CPT,T-CRT |
| | | POLAND | | | | | ○ | 4 | ○ | 2 | | | | | | | |
| | | KITMODEL | | | | | ○ | 1 | | | | | | | | | |
| | PHILIPS | EURO | | | | | | | | | ○ | 37 | | | | | |
| | | NAFTA | ○ | 3 | | | | | ◎ | 2 | | | | | | | |
| | | ASEAN | | | | | | | | | | | | | | | |
| | | CHINA | | | ◎ | 4 | | | ○ | 4 | ○ | 8 | | | | | |
| | | BRAZIL | | | | | | | ◎ | 6 | | | | | | | |
| Turkey | BEKO | | | | | | | | ○ | | | | | | | | |
| | VESTTEL | | | | | | ○ | 3 | ○ | | | | | | | | |
| | TERLA | | | | | | | | ○ | | | | | | | | |
| Other Eur. | RUBIN | | | | | | ○ | 1 | ○ | | ○ | | ○ | | | | |
| China | Changhong | | | | ○ | 17 | | | ○ | 27 | | | | | ○ | 17 | Irico,Novel |
| | TCL | | | | ○ | 2 | ○ | 2.5 | | | | | | | ○ | 8 | Novel |
| | KONKA | | | | ○ | 6 | | | ○ | 5 | | | | | | | Irico,Novel |
| | Skyworth | | | | | | | | ○ | 18 | ○ | 2.5 | | | | | Irico |
| | Hisence | | | | ○ | 8 | | | | | | | | | | | irico |
| | Haier | | | | ○ | 5 | | | | | | | | | | | |
| | Xoceco | | | | | | ○ | 5 | | | | | | | | | |
| Other Asia | DISTER | | ○ | | | | | | ○ | | | | | | ○ | | |
| | HARTONO | | ○ | | | | | | ○ | | | | | | | | |
| | PANGGUNG | | | | | | | | | | | | | | | | |
| | TCL(Vietnam) | | | | | | ○ | | | | | | | | | | |
| | BPL | | ○ | | | | | | ○ | | | | | | | | |
| | ONIDA | | ○ | | | | | | ○ | | | | | | | | |
| | VIDEOCON | | ○ | | | | | | ○ | | | | | | | | |
| | SAMPO | | | | | | ○ | | | | ○ | | | | | | |
| | TECO | | | | | | | | | | ◎ | | | | | | |
| | PROTON | | | | | | | | | | ◎ | | | | | | |

16

# MTPD(T) CPT Selling price trend (1Q01- 1Q04)

Unit : US$



| | 1Q 01 | 2Q 01 | 3Q 01 | 4Q 01 | 1Q 02 | 2Q 02 | 3Q 02 | 4Q 02 | 1Q 03 | 2Q 03 | 3Q 03 | 4Q 03 | 1Q 04 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TJP 21″FS (Bare) | 50.5 | 49.7 | 47.5 | 45.5 | 43 | 42 | 41.5 | 41.5 | 41 | 41.0 | 40.5 | 40.0 | 39.0 |
| TJP 21″PF (Bare) | 71 | 65 | 63 | 60 | 58 | 53 | 52 | 51 | 51 | 49.0 | 47.5 | 44.0 | 44.0 |
| World 21″PF (ITC) | 80.5 | 73 | 69.5 | 68 | 65 | 57 | 57 | 55 | 54.5 | 54.0 | 50.0 | 49.0 | 49.0 |
| DLTV 25″PF (Bare) | 103 | 95 | 94 | 90 | 87 | 84 | 80 | 79 | 79 | 78.0 | 76.0 | 72.0 | 72.0 |
| World 25″PF (ITC) | 120 | 115 | 110 | 108 | 107 | 102 | 98 | 95 | 93 | 90.0 | 88.0 | | |

21" PF Asian market price: $44/4Q04

17

CONFIDENTIAL

MTPD-0573273.017E_Translation

# b) 25" PF Transfer Discussion

CONFIDENTIAL

# Current 25" PF Customers & Approach for Taking Back *[Business]*

*[KP = Thousands of pcs.]*

(Unit:KP)

| | | | Actual expected work in the 2nd half of 2003 | |
|---|---|---|---|---|
| TDDT | 1) | JMT | 6 | |
| | 2) | JET | 6 | |
| | 3) | STTM | 9 | |
| | 4) | World | 150 | |
| | 5) | DLTV | 20 | |
| | 6) | TJP | 5 | |
| | 7) | TVCP | 1.5 | |
| | 8) | MTV | 24 | |
| | 9) | TAVC | 3 | |
| | 10) | SREC | 10.5 | |
| | 11) | EL ARABY | 5 | |
| | 12) | TMM | 6 | |
| | TTL | | 246 | 41 kp/M |
| MDDM | 13) | MTV | 36 | |
| | 14) | MEV | 6 | |
| | 15) | MTNC | 6 | |
| | TTL | | 48 | 8 kp/M |
| Take back SDI *[business]* | 16) | MTNC | 15 | |
| | 17) | MELUK | 10 | |
| | 18) | MTV | 30 | |
| | 19) | DLTV | 60 | |
| | TTL | | 115 | 19 kp/M |
| G-TTL | | | 409 | 68 kp/M |

If TDDT changes to a 3/6 line system, 75 KP/M (actual work basis) would be needed

1. MTNC
For items 15) and 16), *[omitted]* will start to approach MTNC Engineering by having personnel work in the US and linking with TDDT.

2. DLTV

Due to the special price measures for 19) in the fourth quarter of 2003, *[omitted]* was able to agree that switching models to up to 50% of the share would be advantageous. This will start to contribute to volume starting in the second half.

3. MTV

Along with taking back *[the business for]* models for Japan used by SDI, *[omitted]* will proceed with the transfer from MDDM. Need to consult about how to proceed.

4. MEV, MELUK

Need to consult about how to proceed.

19

# Identifying Potential Customers for the 25" PF (Map)

| | | | MTPD(T) | MTPD(M) | SDI | LPD | IRICO |
|---|---|---|---|---|---|---|---|
| Matsushita | PAVC | MTV | ○ | ○ | ○ | | |
| | | MTNC | | ○ | ○ | | |
| | | MEV | | ◎ | | | |
| | | MELUK | | | ○ | | |
| Toshiba | DM | DLTV | ○ | | ○ | | |
| | | TJP | ◎ | | | | |
| | | TVCP | ◎ | | | | |
| Other Japanese | SHARP | SREC | ○ | | ○ | | |
| | | NSEC | ○ | | ○ | | |
| | | STTM | ◎ | | | | |
| | JVC | JMT | ○ | | | ○ | |
| | | JET | ○ | | | ○ | |
| | SANYO | HSE | | | ○ | ○ | |
| | | SEI | | | ○ | ○ | |
| | Mitsubishi | Iiyama | | | | ○ | |
| | Hitachi | HCPI | | | | ○ | |
| | ORION | WORLD | ◎ | | | | |
| S. Korea | | SEC | | | ◎ | | |
| | | LG | | | | ◎ | |
| | | Daewoo | | | ◎ | | |
| China | | Changhong | | | ○ | | ○ |
| | | TCL | | | ○ | | ○ |
| | | Konka | | | ○ | | ○ |
| | | Skywaorth | | | ○ | | ○ |
| | | Hisence | | | ○ | | ○ |
| | | Haier | | | ○ | | ○ |
| | | Xoceco | | | ○ | | ○ |
| Europe & N. America | TMM | | ◎ | | | | |
| | Philips | | | | | ◎ | |
| Other | | SAMPO | ○ | | | ◎ | |
| | | TECO | ○ | | | ◎ | |

1. 25" CTV market:

Mainly Japan, China, and N. America (24 V). In ASEAN, Thailand and Vietnam only.

2. Manufacturers entering new models

For TMM (Thailand) production for N. America (24 V)

→ TDD is approaching them.

3. Capacity doesn't match for Sanyo, Mitsubishi, Hitachi, and S. Korea. (A59/A60)

4. Finding customers in the Chinese market

May incorporate the over-capacity portion for IRICO/SDI (Tianjin). With engineering support from Toshiba, IRICO is mechanically compatible with TDDT bulbs. IRICO customers can probably use them.

20

CONFIDENTIAL

# 25" PF Tube & CTV Supply



MTPD-0573273.021E_Translation

# c) 21" FS (TDDJ) Launch Discussion

See the separate document Progress Status (2) prepared by TDDJ

CONFIDENTIAL

**July 11, 2003**

**TDDJ [SMD]**

# General CTV Production Situation in Indonesia

*[KP = Thousands of pcs.]*

Compared to last year's 5.5 million, the 2003 TV production forecast is expected to increase by 16%. By size, the 14" round will decrease slightly, the 20% round will be flat, and the 21" round will increase dramatically.

In addition to the production increase (MKI) due to transferring the production of 21" round bulb sets for export, one factor in the production increase for domestic 21-inch TVs is that the luxury tax recently changed from 10% to 0% (starting in Feb. 2003).

## 21" Round Increased Significantly from 2002 to 2003

2002: 835 KP → 2003: 1,459 KP (+624 KP YOY)
　　　　Domestic: 2002: 427 KP → 2003: 609 KP (+182 KP YOY)
　　　　Export: 2002: 408 KP → 2003: 850 KP (+442 KP YOY)
(1) MKI (Matsushita Kotobuki) transferred production from MKA (Matsushita Kotobuki America) to Indonesia
　　　　 → Production started in Jan. 2003 (+267 KP YOY)
(2) Chinese manufacturers became aware of AFTA, and transferred their production locations (+100 KP YOY)
　　　　ex. (Current) China　　→　Malaysia tax: 25%
　　　　　　(Future) Indonesia →　Malaysia " :　5%

23

CONFIDENTIAL

# CTV Production Trends in Indonesia (Forecast 2002-2005)

**July 11, 2003**

**TDDJ [SMD]**

(Unit: KP *[thousands of pcs.]*)



| | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| For export | 2,628 | 3,255 | 3,560 | 3,710 |
| For Indonesia domestic | 2,885 | 3,160 | 3,502 | 3,900 |

| | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Total production | 5,513 KP | 6,415 KP | 7,062 KP | 7,610 KP |
| % of expansion | | 116% | 110% | 108% |

| | 2003 | 2004 | 2005 |
|---|---|---|---|
| Expansion for domestic (YOY) | 110% | 111% | 111% |

24

CONFIDENTIAL

MTPD-0573273.024E_Translation

July 11, 2003

# Size Trends (14" Round, 20" Round, 21" Round, 21" PF) TDDJ [SMD]

(Unit: KP [thousands of pcs.])



| | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Others | 528 | 588 | 880 | 1,010 |
| 21"PF | 449 | 887 | 1,140 | 1,590 |
| 21"FS | 835 | 1,459 | 1,666 | 1,900 |
| 20" | 1,055 | 1,051 | 976 | 710 |
| 14" | 2,646 | 2,430 | 2,400 | 2,400 |

| | | | | |
|---|---|---|---|---|
| Total demand | 5,513 KP | 6,415 KP | 7,062 KP | 7,610 KP |
| Above 4 sizes | 4,985 KP | 5,827 KP | 6,182 KP | 6,600 KP |
| Ratio | 90% | 91% | 88% | 87% |

25

CONFIDENTIAL

# Medium-Sized CTV Trends by Destination (20"/21"FS/21" PF)

**July 11, 2003**

**TDDJ [SMD]**

(Unit: KP *[thousands of pcs.]*)



| | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| ■ 20" for domestic | 775 | 733 | 666 | 430 |
| ■ 20" for export | 280 | 318 | 310 | 280 |
| □ 21" FS for domestic | 427 | 609 | 786 | 1080 |
| □ 21" FS for export | 408 | 850 | 880 | 820 |
| ■ 21" PF for domestic | 58 | 152 | 310 | 570 |
| ■ 21" PF for export | 391 | 735 | 830 | 1020 |

Because the luxury tax changed from 10% to 0%, demand for Indonesian 20" CTVs is switching toward the 21" CTVs

26

CONFIDENTIAL

MTPD-0573273.026E_Translation

# CTV Retail Price Trends in the Indonesian Market (Small and Medium-Sized)

**July 11, 2003**

**TDDJ [SMD]**

- Due to shrinking price differences and taxes being repealed, demand has shifted from the 20" FS to the 21" FS.
- There is a 55% price difference between the 21" PF and FS sets, and the PF is sluggish.



| Unit: Rupiah | '02/2Q | '02/3Q | '02/4Q | '03/1Q | '03/2Q | '03/3Q |
|---|---|---|---|---|---|---|
| 14″ | 1,321,920 | 1,231,200 | 1,164,780 | 1,123,200 | 1,119,000 | 1,119,000 |
| 20″ | 1,983,960 | 1,863,000 | 1,728,000 | 1,647,000 | 1,639,000 | 1,566,000 |
| 21″ | 2,192,400 | 2,079,000 | 1,998,000 | 1,787,400 | 1,755,000 | 1,650,000 |
| 21″PF | | 3,000,000 | 2,700,000 | 2,650,000 | 2,630,000 | 2,550,000 |

27

# Target Customers for Expanding Sales of the 21" Round

**July 11, 2003**

**TDDJ [SMD]**

## 2004 competitor status for the 21" round (KP/M *[Thousands of pcs. per month]*)

| | Target to capture | LPD | TDDT | MDDM | BMCC | OHPT | Shanghai Nobe | SEG Hitachi | SDI | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| TJP | 25 | | 10 | | | 5 | 10 | | | 25 |
| LG | | 8 | | | | | | | | 8 |
| MKI | | | | | 18 | | | | 3 | 21 |
| SYI | 8 | 16 | | | | | | | | 16 |
| SEI | 4 | 26 | | | | | | | | 26 |
| NABEL | 8 | | | 8 | | | | | | 8 |
| HARTONO | 5 | | | | | | 5 | | | 5 |
| PANGGUNG | 6 | | | | | | 6 | | | 6 |
| HITACHI | | 2 | | | | | | | | 2 |
| OTHERS | 8 | | | | | | | 24 | | 24 |
| | 63 | 51 | 10 | 8 | 18 | 5 | 21 | 24 | 3 | 139 |

Request basis: 47.5 KP

Volume increase factors other than the above targets:
1. For TJP: Production for N. American models starting in FY2004 (will transfer from OEM outsourcing to World)
2. For Funai: Incorporates the demand for the 21" FS

28

MTPD-0573273.028E_Translation

# 21" Round MN (φ29.1) Measures

July 11, 2003

TDDJ [SMD]

*The advantages of using MNN (φ22.5) are:*
*1. Changes to a common chassis with the 20" (TJP, SYI, NABEL, H/T, P/G)*
*2. Recommended advantage of a circuit cost decrease (DY, FBT)*

| | 20" round | | 21" round | |
|---|---|---|---|---|
| | **Neck** | **Panel** | **Neck** | **Panel** |
| **TJP** | MNN | Tint | MNN | Tint |
| **SYI** | MN/MNN | Tint | MN | Tint |
| **NABEL** | MN/MNN | Dark Tint | MN | Dark |
| HARTONO | MN/MNN | Tint | MN | Tint |
| PANGGUNG | MNN | Tint | MNN | Tint |
| SEI | MN | Tint | MN | Tint |
| Others | MN | Tint | MN | Tint |

*Note: For NABEL, please switch from a dark tint to a tint

29

CONFIDENTIAL

MTPD-0573273.029E_Translation

# d) 20"/21" FS (MDDM) Discussion

30

CONFIDENTIAL

# MDDM Medium-Sized FS-Tube Sales Status & Outlook

(Unit: KP *[thousands of pcs.]*)

| | | First half of 2003 (as of Aug. 6) | | | Second half of 2003 | | |
|---|---|---|---|---|---|---|---|
| | | Plan | Expected | Difference | Plan | Expected actual work | Difference |
| 20" | MTV | 12 | 0 | -12 | 0 | 0 | 0 |
| | NABEL | 12 | 0 | -12 | 12 | 0 | -12 |
| | MEPCO | 6 | 8 | 2 | 6 | 6 | 0 |
| | JVC | 20 | 16 | -4 | 20 | 0 | -20 |
| | SHARP | 24 | 0 | -24 | 26 | 0 | -26 |
| | Others | 12 | 0 | -12 | 12 | 0 | -12 |
| | TTL | 86 | 24 | -62 | 76 | 6 | -70 |
| 21" FS | MTV | 87 | 93 | 6 | 101 | 0 | -101 |
| | NABEL | 12 | 43 | 31 | 12 | 30 | 18 |
| | MEPCO | 12 | 15 | 3 | 12 | 18 | 6 |
| | JVC | 30 | 7 | -23 | 0 | 0 | 0 |
| | Others | 6 | 34 | 28 | 8 | 6 | -2 |
| | TTL | 147 | 192 | 45 | 133 | 54 | -79 |
| 21" PF | | 638 | 654 | 16 | 662 | 894 | 232 |
| C-21" PF | | 241 | 148 | -93 | 259 | 234 | -25 |
| G-TTL | | 1,112 | 1,018 | -94 | 1,130 | 1,188 | 58 |

Capacity

| | | | | | |
|---|---|---|---|---|---|
| M-1 (92 KP/M) | | 552 | | 552 | |
| M-3 (116 KP/M) | | 696 | | 696 | |
| TTL | | 1,248 | | 1,248 | |

| | | | | |
|---|---|---|---|---|
| Unused capacity | | 230 | | 60 |

In the second half of 2003, we expect to be able to cover the FS order deficit portion by expanding sales of the PF.

We need to discuss specific measures for getting orders for 220 KP of the 21" PF, which was not incorporated into the plan for the second half of 2003.

31

CONFIDENTIAL



32

# アジア営業会議

営業推進チーム

２００３年８月２１～２２日

# 議題

1.  21"PF市場規模の見方
2.  21"PF潜在顧客の洗い出しとアプローチ
3.  25"PFの移管討議
4.  20"/21"FSの移管討議
5.  21"FS(TDDJ)の立ち上げ
6.  アジア販売ルート討議
7.  販売状況と積上げ案件の洗い出し
8.  他

2

# a）中型FLAT管需要と展望

# CTV Sales Trend (Y2002-Y2005)

Unit：Mil pcs



・CPT需要はほぼ横ばい成長

・中型管需要は64～65Mil／年で横ばい成長と予測

4

# Middle size CTV Sales (Y2002-Y2005)

Unit：Mil pcs



・主要地域での中型管需要は横ばい成長

・インド（R．O．Wに含む）市場が緩やかに伸張（年率２～４％増）と予測[5]

# 21″PF  Tube & CTV supply



**① 予詳細**

(Unit : Mil pcs)

| | | | | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| MTPD | Thailand | Asean | Ph-2 | 1.6 | 1.6 | 1.6 |
| | Malaysia | Asean | | 1.5 | 1.5 | 1.5 |
| | China | China | | 0.5 | 1.7 | 1.7 |
| DDI | Indonesia | Asean | | | | 1.2 |
| SDI | China | China | | 3.2 | 3.6 | 3.6 |
| | Mexico | NAFTA | | 0.2 | 0.6 | 0.6 |
| | Hungary | Euro | | 0.2 | 0.6 | 0.6 |
| | Malaysia | Asean | | | 1.4 | 1.4 |
| | Brazil | S.America | | | 1.2 | 1.2 |
| LG | Korea | Korea | | 1.8 | 1.8 | 1.8 |
| | China | China | | 0.1 | 0.4 | 0.4 |
| | Indonesia | Asean | | | | |
| Philips | UK | Euro | | 0.8 | 1.2 | 1.2 |
| | China | China | | 0.1 | 0.6 | 0.6 |
| Orion | Korea | Korea | | 0.7 | 0.4 | |
| | Mexico | NAFTA | | 0.2 | 0.4 | 0.4 |
| | Vietnam | Asean | | | | 1.2 |
| CPT | Malaysia | Asean | | | 0.5 | 0.5 |
| TMM | Poland | Euro | | 0.1 | 0.4 | 0.4 |
| Novel | China | China | | | 0.4 | 0.4 |
| SEG-Hitachi | China | China | | | | 1.8 |
| Irico | China | China | | | 0.9 | 1.8 |
| Samtel | India | India | | | 0.4 | 0.4 |
| BDDL | India | India | | | | 0.2 |
| Hotline | India | India | | | 0.5 | 0.5 |
| T-CRT | Thailand | Asean | | 0.1 | 0.2 | 0.2 |
| Ekranas | Lituania | Euro | | | 0.2 | 0.2 |
| Sony | S'pore | Asean | | 1.8 | 1.8 | 1.8 |
| | USA | NAFTA | | 1.2 | 1.3 | 1.3 |
| | UK | Euro | | 0.9 | 1.0 | 1.0 |
| TTL | | | | 15.0 | 24.6 | 29.5 |

**② メカ別ペ**

(Unit : Mil pcs)

| | 2002 | 2003 | 2004 |
|---|---|---|---|
| MTPD | 3.6 | 4.8 | 4.8 |
| DDI | | | 1.2 |
| SDI | 3.6 | 7.4 | 7.4 |
| LG | 1.9 | 2.2 | 2.2 |
| Philips | 0.9 | 1.8 | 1.8 |
| Orion | 0.9 | 0.8 | 1.6 |
| CPT | | 0.5 | 0.5 |
| TMM | 0.1 | 0.4 | 0.4 |
| Novel | | 0.4 | 0.4 |
| SEG-Hitachi | | | 1.8 |
| Irico | | 0.9 | 1.8 |
| Samtel | | 0.4 | 0.4 |
| BDDL | | | 0.2 |
| Hotline | | 0.5 | 0.5 |
| T-CRT | 0.1 | 0.2 | 0.2 |
| Ekranas | | 0.2 | 0.2 |
| Sony | 3.9 | 4.1 | 4.1 |
| TTL | 15.0 | 24.6 | 29.5 |

**③ 地別ペ**

(Unit : Mil pcs)

| | 2002 | 2003 | 2004 |
|---|---|---|---|
| Asean | 5.0 | 7.0 | 9.4 |
| China | 3.9 | 7.6 | 10.3 |
| NAFTA | 1.6 | 2.3 | 2.3 |
| S.America | | 1.2 | 1.2 |
| Euro | 2.0 | 3.4 | 3.4 |
| India | | 0.9 | 1.1 |
| Korea | 2.5 | 2.2 | 1.8 |
| TTL | 15.0 | 24.6 | 29.5 |

| | |
|---|---|
| 02年 予増加 | 8 Line |
| 02年 6a増 | 9.6 |

| | |
|---|---|
| 03年 予増加 | 4 Line |
| 03年 6a増 | 4.9 |

# 21"PF管市場

1. 中型管市場のフラット化による需要増加
   - 日本はほぼFlat化した。
   - 他主要市場（北米、欧州、アジア、中国）でのフラット化動向を検証する。
     - ⇒　　検証－①
2. 新規市場参入客先若しくはシェアアップによる需要獲得
   - これから21"PFセット市場へ新規参入メーカーの有無。
     - ⇒　　無いと思われる。
   - 未獲得客先及び参入客先でのシェアアップによる拡販。
     - ⇒　　検証－②　MAP参照。

２１"ＰＦ　検証－
①



## Middle size PF CTV demand / PF CPT capacity



| | 1st year | 2nd year | 3rd year | 4th year | 5th year | 6th year |
|---|---|---|---|---|---|---|
| 日本場 | 3% | 23% | 59% | 73% | 76% | 90% |
| 北来場 | 3% | 10% | 20% | 31% | 60% | 70% |
| 欧州場 | 2% | 10% | 18% | 22% | 26% | 50% |
| 中国場 | 2% | 10% | 20% | 22% | 30% | 60% |
| アジ場 | 5% | 15% | 20% | 30% | 40% | 60% |

日本市場はフラット化３０％時点で加速した。

他主要市場も日本市場に準じる伸張をすると仮定し、需給バランスを検証する。

# Middle size PF CTV Demand / PF CPT Capacity



右図に示すように０４年でも供給過多は続き、新規能力増はリスク大。

# ２１"ＰＦ　検証－②

潜在顧客の洗い出しとアプローチ

を個別アイテム毎に要する。

# 21"PF客先とCRT相関マップ（PAVC／DM）

| | | | MDDM | KP／M | BMCC | KP／M | TDDT | KP／M | SDI | KP／M | LPD | KP／M | OEC | KP／M | Others | KP／M | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 松下 | PAVC | PAVC CA | | | | | | | ◎ | 7 | | | | | | | |
| | | PAVC CZ | | | | | | | | | ◎ | 12 | | | | | Philips(UK) |
| | | MTV | ○ | 20 | | 1 | | | ○ | 10 | | | | | | | |
| | | SMT | | | ○ | 1 | | | | | | | | | | | |
| | | TAMACO | | | | | | | | | | | | | ○ | 1 | CPT(M) |
| | | TAVC | △ | | | | | | ◎ | 12 | | | | | | | |
| | | MEPCO | ◎ | 1 | | | | | | | | | | | | | |
| | | MTAIC | ◎ | 2 | | | | | | | | | | | | | |
| | | NABEL | ◎ | 3 | | | | | | | | | | | | | |
| | | MEV | ◎ | 3 | | | | | | | | | | | | | |
| | | MKI | | | | | | | ◎ | 5 | | | | | | | |
| | | MKA | | | | | | | | | | | | | | | 生蘆し |
| | | PANAMEX | ◎ | 8 | | | | | | | | | | | | | |
| | | PAM | | | | | | | | | | | | | | | 生蘆し |
| | | MELCOA | | | | | | | | | | | | | | | 生蘆し |
| | | PMC | ◎ | 2 | | | | | | | | | | | | | |
| 東芝 | DM | TJP | | | | | ◎ | 20 | ○ | 1 | | | | | | | |
| | | DLTV | | | | | ○ | 1 | ○ | 1 | | | | | | | |
| | | TVCP | | | | | ◎ | 3 | | | | | △ | | | | |
| | | KAWA | | | | | ◎ | 4 | | | | | | | | | |

推定37KP／Mの取り込み可能性を探る。

PAVC ：PAVCA／MTV／TAVC／TAMCO／MKI

DM ：DLTV（SDI）中国モデルの獲得

14

# ２１"ＰＦ客先とＣＲＴ相関マップ（他日系）

| | | | MDDM | KP/M | BMCC | KP/M | TDDT | KP/M | SDI | KP/M | LPD | KP/M | OEC | KP/M | Others | KP/M | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 日系 | Sharp | SREC | | | | | ○ | 8 | ○ | 2 | ○ | 2 | | | | | |
| | | STTM | ○ | 1 | | | ○ | 3 | | | | | | | | | |
| | | SYI | | | | | ◎ | 3 | | | | | | | | | |
| | | SPC | | | | | ◎ | 1 | | | | | | | | | |
| | | NSEC | | | | | ○ | 3 | ○ | 3 | | | | | | | |
| | | SEEDS | | | | | | | | | ○ | 1 | | | | | |
| | | SMCA | | | | | | | | | | | | | | | 生廉し |
| | JMT | JMT | ○ | 2 | | | ○ | 4 | ○ | 10 | ○ | 1 | | | | | |
| | | JET | ○ | | | | ○ | 1 | ○ | 4 | | | | | | | |
| | | JMUK | | | | | | | | | | | | | | | 生廉し |
| | | JEM | | | | | | | | | | | | | | | 生廉し |
| | SANYO | SEI | | | | | ○ | 3 | ○ | 2 | | | | | | | |
| | | HSE | | | | | | | ◎ | 5 | | | | | | | |
| | | SESA | | | | | | | | | ◎ | 1 | | | | | |
| | | SMC | | | | | | | ◎ | 4 | | | | | | | |
| | MITSUBISHI | S/W | | | | | | | | | ○ | 5 | | | | | |
| | AIWA | SONY(M) | | | | | | | | | | | | | | | |
| | HITACHI | HCPI | | | | | | | | | ◎ | 2 | | | | | |
| | | HCPT | | | | | | | | | ◎ | 1 | | | | | |
| | ORION | WORLD | | | | | ○ | 10 | | | | | | | ◎ | 30 | CPT |
| | | ORION(UK) | | | | | ○ | | | | | | | | ◎ | | CPT |
| | FUNAI | | ○ | 20 | | | | | ◎ | 60 | | | | | ◎ | 40 | CPT |

ＪＭＴ／ＪＥＴ　　　　　：ＳＤＩ分取り込み（１４kp／Ｍ）

船井　　　　　　　　　：０４年２月～ＤＤＩ量産開始予定。

ＷＥＴ　　　　　　　　：ＣＰＴ分取り込み。

三菱　　　　　　　　　：Ｓｋｙｗｏｒｔｈ　ＯＥＭ分取り込み（５kp／Ｍ）

15

# 21"PF客先とCRT相関マップ（他）

| | | | MDDM KP/M | BMCC KP/M | TDDT KP/M | SDI KP/M | LPD KP/M | OEC KP/M | Others KP/M | |
|---|---|---|---|---|---|---|---|---|---|---|
| 韓國 | SAMSUNG | SAMEX | | | | ◎ 50 | | | | |
| | | SAVINA | | | | ◎ 10 | | | | |
| | | SDMA | | | | ◎ 3 | | | | |
| | | SHE | | | | ◎ 17 | | | | |
| | | SEIN | | | | ◎ 4 | | | | |
| | | SIEL | | | | ◎ 17 | | | | |
| | | SEC | | | | ◎ 32 | | | | |
| | | TSE | | | ○ 3 | ◎ 40 | | | | |
| | | TTSEC | | | | ◎ 27 | | | | |
| | LG | | | | | | ◎ | | | |
| | DEAWOO | | | | | | | ◎ | | |
| | KTV | | | | | | ◎ | | | |
| | AMAM | | | | | | | | | 生無し |
| 欧米 | TMM | THAI | ○ 2 | | | | ○ 2 | | ◎ 5 | CPT,T-CRT |
| | | POLAND | | | ○ 4 | ○ 2 | | | | |
| | | KITMODEL | | | ○ 1 | | | | | |
| | PHILIPS | EURO | | | | | ○ 37 | | | |
| | | NAFTA | | | | ◎ 2 | | | | |
| | | ASEAN | ○ 3 | | | | | | | |
| | | CHINA | | ◎ 4 | | ○ 4 | ○ 8 | | | |
| | | BRAZIL | | | | ◎ 6 | | | | |
| トルコ | BEKO | | | | | ○ | | | | |
| | VESTTEL | | | | ○ 3 | ○ | | | | |
| | TERLA | | | | | ○ | | | | |
| 欧他 | RUBIN | | | | ○ 1 | ○ | ○ | ○ | | |
| 中国 | Changhong | | | ○ 17 | | ○ 27 | | | ○ 17 | Irico,Novel |
| | TCL | | | ○ 2 | ○ 2.5 | | | | ○ 8 | Novel |
| | KONKA | | | ○ 6 | | ○ 5 | | | | Irico,Novel |
| | Skyworth | | | | | ○ 18 | ○ 2.5 | | | Irico |
| | Hisence | | | ○ 8 | | | | | | irico |
| | Haier | | | ○ 5 | | | | | | |
| | Xoceco | | | | ○ 5 | | | | | |
| アジ他 | DISTER | | | | | | | | ○ | |
| | HARTONO | | ○ | | | ○ | | | | |
| | PANGGUNG | | ○ | | | ○ | | | | |
| | TCL(Vietnam) | | | | ○ | | | | | |
| | BPL | | ○ | | | ○ | | | | |
| | ONIDA | | ○ | | | ○ | | | | |
| | VIDEOCON | | ○ | | | ○ | | | | |
| | SAMPO | | | | ○ | | ○ | | | |
| | TECO | | | | | | ◎ | | | |
| | PROTON | | | | | | ◎ | | | |

16

# MTPD(T) CPT Selling price trend (1Q01- 1Q04)



Unit：US$

| | 1Q01 | 2Q01 | 3Q01 | 4Q01 | 1Q02 | 2Q02 | 3Q02 | 4Q02 | 1Q03 | 2Q03 | 3Q03 | 4Q03 | 1Q04 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TJP 21" FS(Bare) | 50.5 | 49.7 | 47.5 | 45.5 | 43 | 42 | 41.5 | 41.5 | 41 | 41.0 | 40.5 | 40.0 | 39.0 |
| TJP 21" PF(Bare) | 71 | 65 | 63 | 60 | 58 | 53 | 52 | 51 | 51 | 49.0 | 47.5 | 44.0 | 44.0 |
| World 21" PF(ITC) | 80.5 | 73 | 69.5 | 68 | 65 | 57 | 57 | 55 | 54.5 | 54.0 | 50.0 | 49.0 | 49.0 |
| DLTV 25" PF(Bare) | 103 | 95 | 94 | 90 | 87 | 84 | 80 | 79 | 79 | 78.0 | 76.0 | 72.0 | 72.0 |
| World 25" PF(ITC) | 120 | 115 | 110 | 108 | 107 | 102 | 98 | 95 | 93 | 90.0 | 88.0 | | |

21"PFアジア市場価格：＄44／4Q04

17

# ｂ）２５”ＰＦ移管討議

# 25"PF　現行客先と奪回アプローチ

(Unit:KP)

| | | | 0年期働迅 | |
|---|---|---|---|---|
| TDDT | 1) | JMT | 6 | |
| | 2) | JET | 6 | |
| | 3) | STTM | 9 | |
| | 4) | World | 150 | |
| | 5) | DLTV | 20 | |
| | 6) | TJP | 5 | |
| | 7) | TVCP | 1.5 | |
| | 8) | MTV | 24 | |
| | 9) | TAVC | 3 | |
| | 10) | SREC | 10.5 | |
| | 11) | EL ARABY | 5 | |
| | 12) | TMM | 6 | |
| | TTL | | 246 | 41 kp/ M |
| MDDM | 13) | MTV | 36 | |
| | 14) | MEV | 6 | |
| | 15) | MTNC | 6 | |
| | TTL | | 48 | 8 kp/ M |
| SDI奪回 | 16) | MTNC | 15 | |
| | 17) | MELUK | 10 | |
| | 18) | MTV | 30 | |
| | 19) | DLTV | 60 | |
| | TTL | | 115 | 19 kp/ M |
| G- TTL | | | 409 | 68 kp/ M |

TDDT　3系列せる、7 5 /M勤へ対応要

①MTNC

15）、16）アイテムにつき、米国駐在とTDDT連携により、MTNC技術へアプローチ開始。

②DLTV

19）4Q03特価対応により、シェア50％までの機種切り替えにつき得意と合意できた。下期より数量寄与する。

③MTV

SDI採用日本向モデル奪回に合せMDDMからの移管を進める。進め方要協議。

④MEV、MELUK

進め方要協議。

19

# 25"PF　潜在客先の洗い出し（マップ）

| | | | MTPD(T) | MTPD(M) | SDI | LPD | IRICO |
|---|---|---|---|---|---|---|---|
| 松下 | PAVC | MTV | ○ | ○ | ○ | | |
| | | MTNC | | ○ | ○ | | |
| | | MEV | | ◎ | | | |
| | | MELUK | | | ○ | | |
| 東芝 | DM | DLTV | ○ | | ○ | | |
| | | TJP | ◎ | | | | |
| | | TVCP | ◎ | | | | |
| 他日系 | SHARP | SREC | ○ | | ○ | | |
| | | NSEC | ○ | | ○ | | |
| | | STTM | ◎ | | | | |
| | JVC | JMT | ○ | | | ○ | |
| | | JET | ○ | | | ○ | |
| | SANYO | HSE | | | ○ | ○ | |
| | | SEI | | | ○ | ○ | |
| | Mitsubishi | Iiyama | | | | ○ | |
| | Hitachi | HCPI | | | | ○ | |
| | ORION | WORLD | ◎ | | | | |
| 韓国系 | SEC | | | | ◎ | | |
| | LG | | | | | ◎ | |
| | Daewoo | | | | ◎ | | |
| 中国系 | Changhong | | | | ○ | | ○ |
| | TCL | | | | ○ | | ○ |
| | Konka | | | | ○ | | ○ |
| | Skywaorth | | | | ○ | | ○ |
| | Hisence | | | | ○ | | ○ |
| | Haier | | | | ○ | | ○ |
| | Xococo | | | | ○ | | ○ |
| 欧米系 | TMM | | ◎ | | | | |
| | Philips | | | | | ◎ | |
| 他 | SAMPO | | ○ | | | ◎ | |
| | TECO | | ○ | | | ◎ | |

①25"CTV市場：

日本、中国、北米（24V）をメインに

アセアンではタイ、ベトナムのみ。

②新規モデル参入するメーカー

TMM（タイ）生産北米向（24V）

⇒　TDDTがアプローチ中。

③三洋、三菱、日立、韓国系はキャビ合わず。

（A59／A60）

④中国市場客先の掘り起こし

IRICO／SDI（天津）のオーバーキャパ分の取り込みの可能性あり。IRICOは東芝技術援助でTDDT球とメカ互換性あり。IRICO客先へは採用可能と思われる。

20

# 25″PF  Tube & CTV supply



# ｃ）２１”ＦＳ（ＴＤＤＪ）立ち上げ討議

別紙　ＴＤＤＪ作成　進捗状況（２）参照

11.Jul.2003

TDDJ
【SMD】

# Indonesia　CTV生産概況

’03年TV生産予測は、昨年5.5milに対し16%の伸張見込。
Size別では14”丸が微減，20”丸が横バイ，21”丸が顕著に伸張。

輸出用21”丸球セットの生産移管による生産増（MKI)に加え、
国内21インチTVセットは新たに追加でLuxury tax＝10%→0%（O3年2月〜）
となったことが生産増の要因である。

## ’02→’03年 21”丸が大幅伸張

’02年835KP→’03年1,459KP（対前年+624KP）
　　　国内：’02年427KP→’03年609KP（対前年+182KP）
　　　輸出：’02年408KP→’03年850KP（対前年+442KP）
　　(1)MKI（松下寿）がMKA（松下寿アメリカ)よりIndonesiaへ生産移管
　　　　→03/1月より生産開始（対前年+267KP)
　　(2)中国メーカーがAFTAを意識し、製造拠点を移管（対前年+100KP）
　　 ex.　（現状）China　　　　→　Malaysia　Tax　25%
　　　　　（将来）Indonsia　　 →　Malaysia　〃　　5%

**11.Jul.2003**

**TDDJ**
**【SMD】**

# <u>Indonesia CTV生産動向（'02-'05年予測）</u>

（単位：KP）



| | 2002年 | 2003年 | 2004年 | 2005年 |
|---|---|---|---|---|
| 輸出 | 2,628 | 3,255 | 3,560 | 3,710 |
| インドネシア国内 | 2,885 | 3,160 | 3,502 | 3,900 |

| 総生産 | 5,513kp | 6,415kp | 7,062kp | 7,610kp |
|---|---|---|---|---|
| 伸張率 | | 116% | 110% | 108% |

| 国内向伸張（前年比） | | 110% | 111% | 111% [24] |
|---|---|---|---|---|

11.Jul.2003
TDDJ
【SMD】

# Size動向（14”丸/20”丸/21”丸/21”PF）

（単位：KP）



| | 2002年 | 2003年 | 2004年 | 2005年 |
|---|---|---|---|---|
| ■ Others | 528 | 588 | 880 | 1,010 |
| ■ 21" PF | 449 | 887 | 1,140 | 1,590 |
| □ 21" FS | 835 | 1,459 | 1,666 | 1,900 |
| □ 20" | 1,055 | 1,051 | 976 | 710 |
| □ 14" | 2,646 | 2,430 | 2,400 | 2,400 |

| | | | | |
|---|---|---|---|---|
| 総需要 | 5,513kp | 6,415kp | 7,062kp | 7,610kp |
| 上記 4 Size | 4,985kp | 5,827kp | 6,182kp | 6,600kp |
| 構成比率 | 90% | 91% | 88% | 87% |

25

11.Jul.2003

TDDJ
【SMD】

# 中型CTV向け先別動向（20"/21"FS/21"PF）

（単位：KP）



| | 2002年 | 2003年 | 2004年 | 2005年 |
|---|---|---|---|---|
| 2"0国向 | 775 | 733 | 666 | 430 |
| 2"0輸向 | 280 | 318 | 310 | 280 |
| 2"1 S国向 | 427 | 609 | 786 | 1080 |
| 2"1 S輸向 | 408 | 850 | 880 | 820 |
| 2"1 P国向 | 58 | 152 | 310 | 570 |
| 2"1 P輸向 | 391 | 735 | 830 | 1020 |

Luxury Tax 10%->0%　でインドネシア２０"CTV→２１"CTVへの需要変化

26

11.Jul.2003

TDDJ
【SMD】

# <u>Indonesia市場でのCTV小売価格推移（小型、中型）</u>

> • 価格差縮小／TAX撤廃により20"FS→21"FSへ需要がシフト。
>
> • 21"PF／FSセット価格差が55%あり、PFは伸び悩む。



単位：ルピア

| | '02/ 2Q | '02/ 3Q | '02/ 4Q | '03/ 1Q | '03/ 2Q | '03/ 3Q |
|---|---|---|---|---|---|---|
| 14" | 1,321,920 | 1,231,200 | 1,164,780 | 1,123,200 | 1,119,000 | 1,119,000 |
| 20" | 1,983,960 | 1,863,000 | 1,728,000 | 1,647,000 | 1,639,000 | 1,566,000 |
| 21" | 2,192,400 | 2,079,000 | 1,998,000 | 1,787,400 | 1,755,000 | 1,650,000 |
| 21" PF | | 3,000,000 | 2,700,000 | 2,650,000 | 2,630,000 | 2,550,000 |

**11.Jul.2003**
**TDDJ**
**【SMD】**

# 21"丸 拡販対象顧客

2004年 21"丸競合 状況（KP/M）

| | 攻略標 | LPD | TDDT | MDDM | BMCC | OHPT | 上海Nabel | SEG日立 | SDI | 合計 |
|---|---|---|---|---|---|---|---|---|---|---|
| TJP | 25 | | 10 | | | 5 | 10 | | | 25 |
| LG | | 8 | | | | | | | | 8 |
| MKI | | | | | 18 | | | | 3 | 21 |
| SYI | 8 | 16 | | | | | | | | 16 |
| SEI | 4 | 26 | | | | | | | | 26 |
| NABEL | 8 | | | 8 | | | | | | 8 |
| HARTONO | 5 | | | | | | 5 | | | 5 |
| PANGGUNG | 6 | | | | | | 6 | | | 6 |
| HITACHI | | 2 | | | | | | | | 2 |
| OTHERS | 8 | | | | | | | 24 | | 24 |
| | 63 | 51 | 10 | 8 | 18 | 5 | 21 | 24 | 3 | 139 |

申請ベース **47.5 kp**

上記Target以外の増量要素：
①TJP向け：2004年度から北米機種生産（WorldへのOEM委託から移管）
②船井向け：21"FSの需要取り込み

# 21"丸 MN（φ29.1）対策

> *MNN（φ22.5）使用メリットとして、*
> ①　*20"との共通シャーシ化（TJP, SYI, NABEL, H/T, P/G）*
> ②　*回路コストダウンメリット（DY, FBT）を推奨*

| | 20"丸 | | 21"丸 | |
|---|---|---|---|---|
| | **Neck** | **Panel** | **Neck** | **Panel** |
| TJP | MNN | Tint | MNN | Tint |
| SYI | MN/MNN | Tint | MN | Tint |
| NABEL | MN/MNN | Dark Tint | MN | Dark Tint |
| HARTONO | MN/MNN | Tint | MN | Tint |
| PANGGUNG | MNN | Tint | MNN | Tint |
| SEI | MN | Tint | MN | Tint |
| Others | MN | Tint | MN | Tint |

注※　　NEBALについては、Dark Tint→Tintへの切換をお願いする

# ｄ）２０”／２１”ＦＳ（ＭＤＤＭ）討議

# MDDM中型FS管　販売状況と見込

(Unit:KP)

| | | ０３年上期(８月６日付) | | | ０３年下期 | | |
|---|---|---|---|---|---|---|---|
| | | 計画 | 見込 | 差異 | 計画 | 実働見込 | 差異 |
| 20" | MTV | 12 | 0 | -12 | 0 | 0 | 0 |
| | NABEL | 12 | 0 | -12 | 12 | 0 | -12 |
| | MEPCO | 6 | 8 | 2 | 6 | 6 | 0 |
| | JVC | 20 | 16 | -4 | 20 | 0 | -20 |
| | SHARP | 24 | 0 | -24 | 26 | 0 | -26 |
| | Others | 12 | 0 | -12 | 12 | 0 | -12 |
| | TTL | 86 | 24 | -62 | 76 | 6 | -70 |
| 21"FS | MTV | 87 | 93 | 6 | 101 | 0 | -101 |
| | NABEL | 12 | 43 | 31 | 12 | 30 | 18 |
| | MEPCO | 12 | 15 | 3 | 12 | 18 | 6 |
| | JVC | 30 | 7 | -23 | 0 | 0 | 0 |
| | Others | 6 | 34 | 28 | 8 | 6 | -2 |
| | TTL | 147 | 192 | 45 | 133 | 54 | -79 |
| 21"PF | | 638 | 654 | 16 | 662 | 894 | 232 |
| C-21"PF | | 241 | 148 | -93 | 259 | 234 | -25 |
| G-TTL | | 1,112 | 1,018 | -94 | 1,130 | 1,188 | 58 |

能力

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| M-1 ( 92kp/M) | | | 552 | | | 552 | |
| M-3 (116kp/M) | | | 696 | | | 696 | |
| TTL | | | 1,248 | | | 1,248 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 生産余力 | | | 230 | | | 60 | |

０３年下期はPF拡販により、FS受注マイナス分をカバーする見込。

０３年下期計画組みのない21"PF220kpの具体的受注策を要討議。

31



# EXHIBIT 12



STATE of NEW YORK          )
                          )          ss:
COUNTY of NEW YORK        )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"MTPD-0523073 - MTPD-0523079"* originally written in *Japanese* is to the best of our knowledge and belief, a true, accurate and complete translation into *English*.

Dated: May 28, 2014

*Allison Carey*
Allison Carey
Consortra Translations

Sworn to and signed before ME this
28th day of May,
2014.

*[signature]*
Notary Public

JAMES G MAMERA
Notary Public. State of New York
No. 01MA6157195
Qualified in New York County
Commission Expires Dec. 4, 2014

Your
legal
translation
partner

Kazutaka Nishimura/tddt/th
05/26/2005        2:06:31 PM

To: Ayumu Kinoshita <kinosita.ayumu@jp.panasonic.com>
Cc:
Bcc:
Subject: Re: (MTPDT15PF) Hisense for USA, etc. 15, 21, 29PF, 32WPF [attachment icon]

Thanks in advance.
Nishimura
******************************************************
Kazutaka Nishimura
Sales & Marketing Department

MT Picture Display (Thailand) Co., Ltd.
142 Moo 5, Bangkadi Industrial Park,
Tivanon Road, Tumbol Bangkadi,
Amphur Muang, Pathumthani 12000, Thailand
Tel +66-2-963-9600, Ext,. 5910, +66-2-963-9626 (Direct)
Fax +66-2-963-9638
******************************************************
Ayumu Kinoshita <kinosita.ayumu@jp.panasonic.com>

Ayumu Kinoshita
<kinoshita.ayumu@jp.pan
asonic.com>

05/24/2005        5:22 PM

To: Kazutaka_Nishimura@mtpdt.mei.co.jp
Cc: Mr. Ohmori/MTPDT <masaru_ohmori@mtpdt.mei.co.jp>, Kazutaka Nishimura, Kazutaka Nishimura
        <nishimura.kazutaka@jp.panasonic.com>, Masaki Sanogawaya, Masaki Sanogawaya
        <sanogawaya.masaki@jp.panasonic.com>
Subject: Re: (MTPDT15PF) Hisense for USA, etc. 15, 21, 29PF, 32WPF

Dear Nishimura,

Thanks as always.
As expected, too high! That being said, it seems as though they are negotiating with IRICO and Thai CRT based on their demand price of $28. It looks impossible unless negotiations start at $30...
I will keep an eye on how it proceeds.

I plan to visit the week of June 6, so I will check on the actual situation then.

Kinoshita

On Monday, May 23, 2005        11:20:26 AM    +0900

Confidential

MTPD-0523073E_Translation

Kazutaka_Nishimura@mtpdt.mei.co.jp wrote:

>

> Dear Kinoshita,

>

> Sorry that the answer is from Shibu Chin, but please see the client's reply.

>

> Nishimura

>

>

>

> Ayumu Kinoshita                           To: Kazutaka_Nishimura@mtpdt.mei.co.jp

> <kinosita.ayumu@jp.pan              Cc: Ohmori/MTPDT <masaru_ohmori@mtpdt.mei.co.jp>, Kazutaka Nishimura, Kazutaka Nishimura

> asonic.com>                                   <nishimura.kazutaka@jp.panasonic.com>, Masaki Sanogawaya, Masaki Sanogawaya

>                                                      <sanogawaya.masaki@jp.panasonic.com>

> 05/20/2005    2:12 PM                     Subject: Re: (MTPDT15PF) Hisense for USA, etc. 15, 21, 29PF, 32WPF

>

>

>

>

> Dear Nishimura,

>

> Sorry for my delay in writing.

> Thank you for replying.

>

> For the time being, I will try replying to the customer one time.

> I will report to you if there is a response.

>

> Kinoshita

> On Thursday, May 19, 2005   7:31:38 PM +0900

> Kazutaka_Nishimura@mtpdt.mei.co.jp wrote:

>

>>

>> Kinoshita

>> Cc: Sanogawaya

>>

>> Sorry to be so late in replying.

>> Upon conferring in house, we could not come up with a satisfactory reply.

>> Sincere apologies.

>>

>> Asking: US $28-29 (ITC, CIF-QDC)

>> Reply: US $32 (ITC, FOB-BKK)
>>
>> We can only propose a price similar to that of the export model, about which Skyworth had inquired.
>> Please try throwing this out one time to the customer, and see what response you get.
>>
>> I wonder whether they will say that it is unsatisfactory.
>>
>> Nishimura
>>
>>
>>
>>
>
>> Ayumu Kinoshita
>
>> <kinosita.ayumu@jp.pan          To:       "Ohmori
> /MTPDT" <masaru_ohmori@mtpdt.mei.co.jp>, Kazutaka Nishimura, Kazutaka
>>                          asonic.com>                          Nishimura
> <nishimura.kazutaka@jp.panasonic.com>, Masaki Sanogawaya, Masaki Sanogawaya
>
>>
> <sanogawaya.masaki@jp.panasonic.com>
>
>>                          05/12/2005       3:11 PM          Cc:
>
>>                                                   Subject: Urgent (New
> inquiry) Hisense for USA, etc. 15, 21, 29PF, 32WPF
>>
>
>>
>>
>>
>> Nishimura
>> Cc: Ohmori, Sanogawaya
>>
>> Thank you as always.
>>
>> Coming straight to the point: Recently, during the GW period (Chinese workers' holiday) in accordance with the below information from Hisense
>> Import & Export Co., Ltd., an inquiry was received regarding 15PF.
>>
>> Plan summary:
>> · For US Walmart / BB
>> Mass production, starting in August

>> · Planned number of units: 20-30 K/M
>> · Asking price: $28-29/CIF-QDO
>> Order 1) Apparently snatched this one away from Orion.
>> Order 2) At present there is no movement from other companies. This is still being reviewed.
>>
>> In addition to this project, according to the below, it seems there is an order accepted for WM/BB, they are accepting orders for a household electronics air conditioner.
>> Since our company has been asked for an estimate, please give me your best answer in this regard, after
>> thinking it over.
>>
>> Sanogawaya has told us about the revenue and expenditure situation as to 15PF at your company, as well as the selling prices of other companies,
>> we therefore understand that the above requested price is a bit difficult.

>> I do not yet sufficiently comprehend your company's 15PF production position, but please do your best
>> for us at this time.
>>
>> I image it must be difficult, but I am just tossing this out to see how you respond.
>>
>> Kinoshita
>>
>> Forwarded by Ayumu Kinoshita <kinosita.ayumu@jp.panasonic.com>
>> Subject: (New inquiry) Hisense for USA, etc. 15, 21, 29PF, 32WPF
>> ----
>>
>> Dear Sanogawaya,
>>
>>
>> Thanks as always.
>> Coming straight to the point, new developments have come to light (recent information), so I am providing the following
>> report.
>>
>> 1. US Best Buy project
>> ① 21" PF
>> Concerning the US Best Buy project that has been under review for the past few days, it is surmised that, as
>> previously reported, this business has been successfully snatched away from Orion. As of yet, it looks like the only manufacturer we can confirm is accepting
>> orders is Hisense, but it looks as though multiple companies will receive orders.
>> Summary of the order received by Hisense: Mass production starting in May; planned number of units: 20 K/M
>> For the CRT vendor one IRCICO company has been chosen. However, all that has been decided on is that mass production will start in
>> May. The price finally agreed on with IRICO is $37.30 (CIF-Tsingtao). However, since IRICO is a Chinese local
>> manufacturer, it appears that the deal involves shipping, with export details to be handled using the Xian free trade zone.
>> In addition, the competing price proposal was $37.50 from LPD. Incidentally, BMCC is said to have proposed $39. Both
>> were dropped.
>> According to Tonny Yuan (in Purchasing), beginning in June, they will use the vendor who responds with the lowest
>> price. It looks as though they may take delivery from multiple vendors at peak time(s).

>>
>> ② 15" PF
>> An inquiry has been received for the 15" PF. This relates to Best Buy or Walmart. The inquiring party avoided saying
>> clearly who the end user would ultimately be, but it seems to be a major player.
>> Summary of the order received: Mass production, starting in August; planned number of units: 20-30 K/M
>> Our company has received an urgent request for an estimate.
>> An asking price of $28-29 would be very difficult for our company. As always, they are insisting on their asking price,
>> and so, I want to have our company make our best counteroffer to the Hisense Import & Export Co., Ltd. department concerned.
>> When they were making basic arrangements for this project, we received an urgent request for sample(s).
>> I would like to talk with you. Would you call MTPDT?
>>
>> ③ 29: PF/SF
>> For this project, as reported earlier, we are considering shipping from an OEM factory in Malaysia, in order to avoid violating
>> US antidumping regulations. On May 9-11, Hisense executives (Assistant CEO Sung, senior manager of the Sales Department, etc.)
>> will visit OEM factories in Malaysia (around 3-4 companies), and they plan to conclude a final contract. During that time, they
>> plan to visit MTPDM on May 10, in the morning. Our company's employees will also visit MTPDM in the afternoon/evening, including dinner, and
>> plan to respond in conjunction with MTPDM. During the meeting at MTPDM progress will be reviewed, and the aim will be to confirm the plan and obtain the
>> project.
>>
>> 2. Australia-oriented projects
>> ① 21" PF (South ITC)
>> For the 5 K in April, BMCC has responded with $39. It is expected that the May order will be received after
>> the May Day holiday. MTPDM/BMCC will respond in accordance with the quantity to be ordered and the asking price.
>>
>> ② 32" WPF (Southern Hemisphere/Himeji inventories)
>> A copy of the order form was obtained yesterday. It is expected that a copy of the L/C will be received today. The quantity requested will be changed from
>> 424 units → 520 units. Additional order. Based on our company's forecast of 424 units, an ETD of 5/13, after GW, is
>> anticipated, and there is an agreement to respond as to the delivery schedule for the additional quantity ordered after GW.
>> In addition, when we indicated that 1400 units in stock would be disposed of after handling the May shipment, they commented that
>> a purchase was possible within the present year. When we asked whether an order form could be issued, they replied in the
>> negative, saying that internal rules are such that only the end user can issue the order.
>> I would like to discuss our response on this matter with you before the final decision as to disposal is made at Takatsuki on
>> May 20.
>>
>> That's all for now; I know it is longwinded, but it is for your information.
>>
>> In addition, Mr. Pang of MTPDM has obtained information concerning the 21PF for 1-② BB, and since
>> he says it is his responsibility to report to Tomori (top priority), please send an inquiry from MTPD to MTPDM
>> Monday or thereafter.
>>
>> Kinoshita
>>
>> * My e-mail address has changed.
>> Changed my e-mail address!!
>> -------------------------------------------------------------------------------------------------

Confidential                                                                                          MTPD-0523077E_Translation

>> Beijing Matsushita Color CRT Co., Ltd. (BMCC)
>> Stationed at BMCC
>>
>> Ayumu Kinoshita / Ayumu Kinoshita
>>
>> Tel +86-10-6436-3168
>> Fax +86-10-6437-6154
>> E-mail: kinoshita.ayumu@jp.panasonic.com
>> -------------------------------------------------------------------------------------------------
>>
>> ------------------------------ Original Message Ends ------------------------------------

>> * My e-mail address has changed.
>> Changed my e-mail address!!
>> -------------------------------------------------------------------------------------------------
>> Beijing Matsushita Color CRT Co., Ltd. (BMCC)
>> Stationed at BMCC Beijing
>>
>> Ayumu Kinoshita / Ayumu Kinoshita
>>
>> Tel +86-10-6436-3168
>> Fax +86-10-6437-6154
>> E-mail: kinoshita.ayumu@jp.panasonic.com
>> -------------------------------------------------------------------------------------------------
>>
>>
>>
>>
>
> * My e-mail address has changed.
> Changed my e-mail address!!
> -------------------------------------------------------------------------------------------------
> Beijing Matsushita Color CRT Co., Ltd. (BMCC)
> Stationed at BMCC Beijing
>
> Ayumu Kinoshita / Ayumu Kinoshita
>
> Tel +86-10-6436-3168
> Fax +86-10-6437-6154
> E-mail: kinoshita.ayumu@jp.panasonic.com
> -------------------------------------------------------------------------------------------------
>
>
>

Confidential

>
* My e-mail address has changed.
Changed my e-mail address!!
---------------------------------------------------------------------------------------------------------------
Beijing Matsushita Color CRT Co., Ltd. (BMCC)
Stationed at BMCC Beijing

Ayumu Kinoshita / Ayumu Kinoshita

Tel +86-10-6436-3168
Fax +86-10-6437-6154
E-mail: kinoshita.ayumu@jp.panasonic.com
---------------------------------------------------------------------------------------------------------------

Confidential



Kazutaka Nishimura/tddt/th
2005/05/26 14:06

To　木下　歩 <kinoshita.ayumu@jp.panasonic.com>

cc

bcc

Subject　Re:【MTPDT15PF】Hisense米国向他15,21,29PF、32WPF□

よろしくお願いします。

西村
****************************************************
Kazutaka Nishimura
Sales & Marketing Department

MT Picture Display (Thailand) Co.,Ltd.
142 Moo 5, Bangkadi Industrial Park,
Tivanon Road, Tumbol Bangkadi,
Amphur Muang, Pathumthani 12000, Thailand
Tel +66-2-963-9600 Ext 5910, +66-2-963-9626(Direct)
Fax+66-2-963-9638
****************************************************
木下　歩 <kinoshita.ayumu@jp.panasonic.com>



木下　歩
<kinoshita.ayumu@jp.pan
asonic.com>
2005/05/24 17:22

To: Kazutaka_Nishimura@mtpdt.mei.co.jp
cc: 大森さん/MTPDT <masaru_ohmori@mtpdt.mei.co.jp>、ニシムラ カズタカ、西村 和孝 <nishimura.kazutaka@jp.panasonic.com>、サノガワヤ
マサキ、佐野川谷 昌樹 <sanogawaya.masaki@jp.panasonic.com>
Subject: Re:【MTPDT15PF】Hisense米国向他15,21,29PF、32WPF

西村さん

お世話になります。
やはり高い！とのことで、彼らの要望価格である$28をベースに、IRICOとタイ
CRTと交渉しているらしいです。$30を切らないと可能性はなさそうです。。。
引き続き、ウオッチします。

6月6日週に訪問予定ですので、その際に現場確認もします。

木下

On Mon, 23 May 2005 11:20:26 +0900

Confidential

MTPD-0523073

Kazutaka_Nishimura@mtpdt.mei.co.jp wrote:

> 
> 木下さん
> 
> 渋チンの回答で申し訳ありませんが、得意反応をみてください。
> 
> 西村
> 
> 
> 
>                      木下 歩            To:     Kazutaka_Nishimura@mtpdt.mei.co.jp
>                      <kinoshita.ayumu@jp.pan    cc:     大森さん/MTPDT <masaru_ohmori@mtpdt.mei.co.jp>, ニシムラ カズタカ、西村
> asonic.com>                              和孝
和孝
>                                         <nishimura.kazutaka@jp.panasonic.com>, サノガワヤ マサキ、佐野川谷 昌樹
>                      2005/05/20 14:12   <sanogawaya.masaki@jp.panasonic.com>
>                                         Subject:  Re: 【MTPDT１５PF】Hisense米国向他15,21,29PF、32WPF
> 
> 
> 
> 
> 
> 西村さん
> 
> ご無沙汰しております。
> ご回答、有難う御座います。
> 
> 取り合えず、本件、一度お客様へ回答をしてみます。
> 反応あり次第、ご報告致します。
> 
> 木下
> On Thu, 19 May 2005 19:31:38 +0900
> Kazutaka_Nishimura@mtpdt.mei.co.jp wrote:
> 
> > 
> > 木下さん
> > CC)佐野川谷さん
> > 
> > 回答遅くなり申し訳ございません。
> > 社内で協議しました結果、満足のいく回答ができません。
> > 重ね重ね申し訳けなし。
> > 
> > 要求  US$28-29(ITC,CIF-QDC)

Confidential                                                                                    MTPD-0523074

＞ ＞ 回答　US$32（ITC,FOB-BKK）
＞ ＞
＞ ＞ SKYWORTHから引き合いのあった輸出モデルにも同様な価格提示しかできず。
＞ ＞ これにて客先に一度投げかけてもらい反応を見てください。
＞ ＞
＞ ＞ 不満言われるかなー。
＞ ＞
＞ ＞ 西村
＞ ＞
＞ ＞
＞ ＞
＞ ＞
＞ ＞
＞
＞ ＞　　　　　　　　　　　　木下　歩
＞ ＞
＞ ＞　　　　　　　　　　　　〈kinoshita.ayumu@jp.pan　　　　To:　　　　"大森さん
＞ /MTPDT" 〈masaru_ohmori@mtpdt.mei.co.jp〉、ニシムラ　カズタカ、西村
＞ ＞　　　　　　　　　　　asonic.com〉　　　　　　　　　　　和孝
＞ 〈nishimura.kazutaka@jp.panasonic.com〉、サノガワヤ　マサキ、佐野川谷　昌樹
＞ ＞
＞ ＞
＞ 〈sanogawaya.masaki@jp.panasonic.com〉
＞
＞ ＞　　　　　　　　　　2005/05/12 15:11　　　　　cc:
＞ ＞
＞ ＞　　　　　　　　　　　　　　　　　　　Subject: 至急 【新
＞ 規引合】Hisense米国向他15,21,29PF、32WPF
＞ ＞
＞ ＞
＞ ＞
＞ ＞
＞ ＞
＞ ＞
＞ ＞ 西村さん
＞ ＞ cc:大森さん、佐野川谷さん
＞ ＞
＞ ＞ お世話になります。
＞ ＞
＞ ＞ 早速ですが、先日ＧＷ期間（中国労働節）中に、Hisense　Imp＆Exp社より下記
＞ ＞ 報告の通り、15PFの引合いを受けております。
＞ ＞
＞ ＞ 【企画概要】
＞ ＞ ・米国Wal　Mart　/　BB向け
＞ ＞ ・量産　8月〜

Confidential

＞＞・企画台数　20-30K/M
＞＞・要望価格　$28-29/CIF-QDO
＞＞注１）ORIONから奪取したようす。
＞＞注２）現時点の他社動向はなし。引き続き確認中。
＞＞
＞＞本プロジェクトの他にも、下記の通り、WM/BB向けに受注を得たようで、白物の
＞＞エアコンも受注しているそうです。
＞＞つきましては、当社への見積り要望がありますので、ご検討のうえ、ベスト回答
＞＞頂きたく。
＞＞
＞＞当方、貴社における15PFの収支状態・他社売り価格は、佐野川谷さんから教示し
＞＞てもらっておりますので、上記の要望価格は大変厳しいものと理解もしておりま
＞＞す。
＞＞
＞＞貴社における15PFの生産ポジションも十分に把握しておりませんが、何卒、現時
＞＞点のベストを頂ければと思います。
＞＞
＞＞難しいとは思いますが、それを一度投げかけ、反応を探ります。
＞＞
＞＞木下
＞＞
＞＞Forwarded by 木下　歩 <kinoshita.ayumu@jp.panasonic.com>
＞＞　Subject: 【新規引合】Hisense米国向他15,21,29PF、32WPF
＞＞ -----
＞＞
＞＞佐野川谷さん
＞＞
＞＞お世話になります。
＞＞早速ですが、首題の件、新たな展開（最新情報）を掴みましたので、ご報告いた
＞＞します。
＞＞
＞＞１．米国Best　Buyプロジェクト
＞＞①21″PF
＞＞先日から確認中の米国Best　Buy向けプロジェクトですが、既報の通り、本件
＞＞ORIONからの奪取に成功したものと推測されます。受注メーカーは、依然Hisense
＞＞社しか確認できておりませんが、複数社受注した様子。
＞＞Hisense社の受注概要は、『5月～量産　企画台数　20K/M』。
＞＞CRTベンダーは、IRICOの1社に決定。但し、決定しているのは、量産初月の5月の
＞＞み。IRICOとの最終決着価格は、$37.30（CIF-青島）です。但し、IRICOは中国地
＞＞場メーカーですので、西安のFTZを利用した輸出扱いの出荷販売のようす。
＞＞他、競合の提示価格ですが、LPDが$37.50。ちなみに、BMCCは$39とのこと。両者
＞＞ともドロップ。
＞＞Tonny　Yuan（購買）曰く、6月以降は、最安値対応したベンダーを採用するとの
＞＞こと。ピーク時には、複数社の納入もありえる様子です。

Confidential

```
＞＞
＞＞ ②15″PF
＞＞ 15″PFの引合いが来ました。これも、Best Buyか、Wal Mart系。最終エンドユー
＞＞ ザーは明言をさけておりますが、ビッグネームのようです。
＞＞ 受注概要は、『8月～量産　企画台数　20～30K/M』。
＞＞ 当社への至急見積もり依頼が、来ております。
＞＞ 要望価格は、$28-29と、大変厳しい価格です。いつもながら、あくまでも要望で
＞＞ すので、当社からHisense輸入部門へ出せるベスト回答を致したく。
＞＞ 大筋で本件まとまれば、至急サンプル対応の要求を受けております。
＞＞ ご相談いたしたく。MTPDTへ繋ぎますか？
＞＞
＞＞ ③29″PF/SF
＞＞ 本件、既報の通り、米国AntiDumping回避策として、マレーシアOEM工場から出荷
＞＞ 対応を検討。5月9-11日に、Hisense幹部（宋副総経理、営業部長他）が、マレー
＞＞ シアOEM工場（3～4社ほど）訪問し、最終契約を結び予定。その際、5月10日午前
＞＞ にMTPDMを訪問する予定。弊員MTPDM訪問し、前後・夕食も含め、MTPDMと協力し
＞＞ て対応予定。MTPDMでの打合せ時に、本案件の進捗確認と獲得を目指す。
＞＞
＞＞ ２．オーストラリア向プロジェクト
＞＞ ①21″PF（南ITC）
＞＞ 4月5kは、BMCCより$39で対応。5月注文については、Forecastをメーデー休暇明
＞＞ けに入手する予定。注文数・要望価格に応じて、MTPDM/BMCCで対応する。
＞＞
＞＞ ②32″WPF（南球/姫路在庫）
＞＞ 昨日、注文書コピーを入手。L/Cコピーも本日入手の予定。要望数が、424本⇒
＞＞ 520本へ。追加受注。当初の424本Forecastベースで、GW明け5/13ETDを予定し
＞＞ ており、追加受注分の対応は、GW明けに納期回答をすることで、合意。
＞＞ 尚、5月出荷対応後の1400本の在庫を廃棄する旨を伝えると、今年中に販売可能
＞＞ とのコメント。注文書を発行出来るかとの問いには、社内ルール上、注文はエン
＞＞ ドユーザーからの注文を以てのみ、発行出来るとのことで、ネガティブ。
＞＞ 本件、高槻での5月20日の廃棄処理最終判断時までに、対応についてご相談いた
＞＞ したく。
＞＞
＞＞ 以上、長くなりましたが、ご報告まで。
＞＞
＞＞ 尚、1-②BB向け21PFについては、MTPDM Pang氏が掴んだ情報であり、彼の職責
＞＞ 上、戸森さんへの報告が必要（最優先）とのことで、MTPDからMTPDMへの問い合
＞＞ わせは、月曜日以降でお願いします。
＞＞
＞＞ 木下
＞＞
＞＞ * メールアドレスが変更しました。
＞＞   Changed my email address!!
＞＞ ─────────────────────────────────────────────
```

Confidential

MTPD-0523077

```
> > Beijing  Matsushita  Color  CRT  Co.,  Ltd.   (BMCC)
> > BMCC駐在
> >
> > Ayumu Kinoshita / 木下　歩
> >
> > Tel +86-10-6436-3168
> > Fax +86-10-6437-6154
> > E-mail: kinoshita.ayumu@jp.panasonic.com
> > ------------------------------------------------------------
> >
> > -------------------- Original Message Ends --------------------
> >
> > * メールアドレスが変更しました。
> >   Changed my email address!!
> > ------------------------------------------------------------
> > Beijing  Matsushita  Color  CRT  Co.,  Ltd.   (BMCC)
> > BMCC一北京駐在
> >
> > Ayumu Kinoshita / 木下　歩
> >
> > Tel +86-10-6436-3168
> > Fax +86-10-6437-6154
> > E-mail: kinoshita.ayumu@jp.panasonic.com
> > ------------------------------------------------------------
> >
> >
> >
> >
>
> * メールアドレスが変更しました。
>   Changed my email address!!
> ------------------------------------------------------------
> Beijing  Matsushita  Color  CRT  Co.,  Ltd.   (BMCC)
> BMCC一北京駐在
>
> Ayumu Kinoshita / 木下　歩
>
> Tel +86-10-6436-3168
> Fax +86-10-6437-6154
> E-mail: kinoshita.ayumu@jp.panasonic.com
> ------------------------------------------------------------
>
>
>
```

Confidential

MTPD-0523078

＞

＊ メールアドレスが変更しました。
  Changed my email address!!
--------------------------------------------------------------------
Beijing Matsushita Color CRT Co., Ltd.  (BMCC)
BMCC—北京駐在

Ayumu Kinoshita / 木下　歩

Tel +86-10-6436-3168
Fax +86-10-6437-6154
E-mail: kinoshita.ayumu@jp.panasonic.com
--------------------------------------------------------------------

Confidential

# EXHIBIT 13



info@certifiedtranslate.com   2425 Olympic Blvd., Suite 4000W   usa  1-888-856-2228
www.certifiedtranslate.com     Santa Monica, CA 90404            int  +1-310-684-3153
                                                                 fax  +1-310-564-1944

## CERTIFIED TRANSLATION



A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name:  **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|
| Firm:  **Saveri & Saveri, Inc.** | City/State/Zip:  **San Francisco / CA / 94111** |

*Description of Document(s):*

**CHU00572096E - CHU00572097E**

| Source Language:  **SIMPLIFIED CHINESE** | Target Language:  **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director          **Date:**   February 21, 2019

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On ___Feb. 21, 2019___ before me, ___Kristin Gail Chamberlain___, Notary Public, appeared ___Sean Kirschenstein___, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____



KRISTIN GAIL CHAMBERLAIN
Notary Public - California
Los Angeles County
Commission # 2141880
My Comm. Expires Feb 7, 2020

**From:**        Tham Hoon Yip – APP
**Sent:**        Monday, September 05, 2005 10:06 AM
**To:**          Jimmy Chen – SAL; Chew Ka Sin – APP; Lee Shin Wei – SAL; Ho Chin Yan –
                 APP; Yeik Nai Soon – APP
**Subject:**     Report on strategy to increase Hisense orders

**Attachments:**   Haier Occupation List Aug01.xls

Dear Supervisors and Colleagues,

Joanne, would you please Double confirm the accuracy of the related materials?
And then please ask Director Chen and Director Zhou for their comments.


21" FS
a.   Price (Customer not satisfy with the price we offer to them.
The main entry barrier for the 21" FS is that quotes for color picture tubes on the mainland are far lower than CPTM's, which is reducing the customer's willingness to use CPTM's.
Although the customer's proposed price is lower than our variable cost (USD 28), it has been included for special strategic order acceptance consideration.
The customer said if our company accepts USD 25 as the price, they'll immediately order 30K.
We're quoting USD 27.5, which Haier Purchasing said they're unable to accept.
However, Sales has already secured a selling price of USD 27.5 with southern mainland TV factories (secured a Konka order of approximately 30K).
Sales is now negotiating with Haier, explaining to Haier Purchasing that the supply of 21" FS is likely to become critical in the next 3 months. The hope is to convince Haier to seize the moment, or else it might have to buy at an even higher price once the crunch happens.


21" RF
a.   Price (Customer not satisfy with the price we offer to them.
The main entry obstacle for the 21" RF is that quotes for color picture tubes on the mainland are far lower than CPTM's, which is reducing the customer's willingness to use CPTM's.
Other tube suppliers are currently supplying these at USD 33.
The customer is requesting USD 33, which is already lower than our variable cost (USD 34.8).
Plan of attack: Whether to pursue at USD 33 and fill Haier's Jiaonan plant's 50K 21" AK orders for US sales each month (for a monthly total of 100K). [Would Accounting please calculate whether the variable cost will match up with the quote after adding 50K?]
b.   Certificate (Customer did not use our CRT to apply certificate for target market.)
The 21" RF (Invar) has been approved for Haier's non-US models, and delivery can be made for markets including Southeast Asia, the Middle East, and Europe.
The 21" RF (AK) sample has not yet been approved. The customer's purchase intention is low here and has not listed our AK tube in its safety certification application.

Respectfully,
Tham


Thanks.
Best regards,
Tham Hoong Yip
Tel.: 03-5891 7614
Fax: 03-5891 7996
Email: tytham@cptm.com.my  <mailto: tytham@cptm.com.my> (Personal)
          appemail@cptm.com.my <mailto: appemail@cptm.com.my> (Application Division)

Application Engineer Division Product Manager
Chunghwa Picture Tube Malaysia Sdn. Bhd
Lot 1, Subang Hi-tech Industrial Park,
Batu Tiga, 40000 Shah Alam,
Selangor, Malaysia

CONFIDENTIAL - GRAND JURY MATERIAL



info@certifiedtranslate.com | 2425 Olympic Blvd., Suite 4000W | usa 1-888-856-2228
www.certifiedtranslate.com | Santa Monica, CA 90404 | int +1-310-684-3153
| | fax +1-310-564-1944

**certified**translate
A LANGUAGE FISH LLC COMPANY

## CERTIFIED TRANSLATION



A member of the American
Translators Association
ATA Member Number: 248719

Documents Translated For:

| Name: **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|
| Firm: **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

Description of Document(s):

| |
|---|
| |
| **CHU00572098E** |
| |
| |

| Source Language: **SIMPLIFIED CHINESE** | Target Language: **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:** Sean Kirschenstein, Director     **Date:** February 21, 2019

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On _Feb. 21, 2019_ before me, ___Kristin Gail Chamberlain___, Notary Public, appeared ___Sean Kirschenstein___, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Kristi Cllri_



KRISTIN GAIL CHAMBERLAIN
Notary Public - California
Los Angeles County
Commission # 2141880
My Comm. Expires Feb 7, 2020

**Master Monitoring File for Haier CRT Supplier Occupation Status Table.**

| Tube Type | Demand/M | CPTM | IRICO | Samsung | Beijing—Matsushita | LG | Saige | Occupation Status |
|-----------|----------|------|-------|---------|--------------------|----|-------|-------------------|
| 13VMnn | 50192 | 28000 | 12192 | 10000 | 0 | 0 | 0 | Normal |
|  |  | 56% | 24% | 20% | 0% | 0% | 0% |  |
| 14VRF | 25000 | 0 | 25000 | 0 | 0 | 0 | 0 | Bad |
|  |  | 0% | 100% | 0% | 0% | 0% | 0% |  |
| 20V FS | 23117 | 0 | 0 | 0 | 1101 | 0 | 22016 | Bad |
|  |  | 0% | 0% | 0% | 5% | 0% | 95% |  |
| 20VRF | 24740 | 0 | 0 | 0 | 21991 | 2744 | 0 | Bad |
|  |  | 0% | 0% | 0% | 89% | 11% | 0% |  |
| 27VRF | 7563 | 0 | 0 | 6722 | 841 | 0 | 0 | Bad |
|  |  | 0% | 0% | 89% | 11% | 0% | 0% |  |
| Total | 130612 | 28000 | 37192 | 16722 | 23933 | 2744 | 22016 |  |
|  |  | 21% | 28% | 13% | 18% | 2% | 17% |  |

Dear Supervisors and Colleagues:

**21" FS**
a. Price (Customer not satisfy with the price we offer to them.
The main entry obstacle for the 21" FS is that quotes for color picture tubes on the mainland are far lower than CPTM's, which is reducing the customer's willingness to use CPTM's.
Although the customer's asking price is lower than the variable cost (USD 28), it has been included for special strategic order acceptance consideration.
The customer said if our company accepts USD 25 as the price, they'll immediately order 30K. We're quoting USD 27.5, which Haier Purchasing said they're unable to accept.
However, Sales has already secured a price of USD 27.50 with southern mainland TV factories (secured a Konka order of approximately 30K).
Sales is now negotiating with Haier, explaining to Haier Purchasing that the supply of 21" FS is likely to become critical in the next 3 months. The hope is to convince Haier to seize the moment, or else it might have to buy at an even higher price once the crunch happens.

**21" RF**
a. Price (Customer not satisfy with the price we offer to them.
The main entry obstacle for the 21" RF is that quotes for color picture tubes on the mainland are far lower than CPTM's, which is reducing the customer's willingness to use CPTM's.
Other tube suppliers are currently supplying these at USD 33.
The customer is requesting USD 33, which is already lower than the variable cost (USD 34.8).
Plan of attack: Whether to pursue USD 33 and fill Haier's Jiaonan plant's 50K 21" AK orders for US sales each month (for a monthly total of 100K). [Would Accounting please calculate whether the variable cost will match up with the quote after adding 50K?]

b. Certificate (Customer did not use our CRT to apply certificate for target market)
The 21" RF (Invar) has been approved for Haier's non-US models, and delivery can be made for markets including Southeast Asia, the Middle East, and Europe.
The 21" RF (AK) sample has not yet been approved. The customer's purchase intention is low here and has not listed our AK tube in its safety certification application.

Back to Master file

**Effective Period:** Aug-05
**Update Week:** W533

**A.) Haier 13VMnn TV Export Order Occupation Table. (Base Haier Weekly Production Schedule)**

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 | Competitor 02 | Occupation Status |
|---|---|---|---|---|---|---|
| 14"Mnn | 1481 US | 846 | CPTM | IRICO | Samsung | Bad |
| | | | 6 | 840 | 0 | |
| | | | 1% | 99% | 0% | |
| | 1486 Netherlands | 1998 | CPTM | IRICO | Samsung | Bad |
| | | | 0 | 0 | 1998 | |
| | | | 0% | 0% | 100% | |
| | 1486 Spain | 10 | CPTM | IRICO | Samsung | Bad |
| | | | 0 | 10 | 0 | |
| | | | 0% | 100% | 0% | |
| | 1486 US | 4762 | CPTM | IRICO | Samsung | Bad |
| | | | 0 | 4762 | 0 | |
| | | | 0% | 100% | 0% | |
| | 1486 UK | 2514 | CPTM | IRICO | Samsung | Bad |
| | | | 0 | 2514 | 0 | |
| | | | 0% | 100% | 0% | |
| | 1489 UK | 421 | CPTM | IRICO | Samsung | Good |
| | | | 415 | 0 | 6 | |
| | | | 99% | 0% | 1% | |
| | 1490 Spain | 1814 | CPTM | IRICO | Samsung | Good |
| | | | 1814 | 0 | 0 | |
| | | | 100% | 0% | 0% | |
| | 1490 Australia | 20 | CPTM | IRICO | Samsung | Good |
| | | | 20 | 0 | 0 | |
| | | | 100% | 0% | 0% | |
| | 1490 UK | 6 | CPTM | IRICO | Samsung | Good |
| | | | 6 | 0 | 0 | |
| | | | 100% | 0% | 0% | |
| | 1496 Canada | 2448 | CPTM | IRICO | Samsung | Good |
| | | | 2448 | 0 | 0 | |
| | | | 100% | 0% | 0% | |
| | 1496 UK | 5040 | CPTM | IRICO | Samsung | Bad |
| | | | 0 | 0 | 5040 | |
| | | | 0% | 0% | 100% | |
| Sub Total | | 19879 | 4714 | 8130 | 7046 | Normal |
| | | | 24% | 41% | 35% | |



Haier 13VMnn CRT Supplier Occupation %

- CPTM, 24%
- IRICO, 41%
- Samsung, 35%

Note: Because the Haier weekly production schedule may change depending on shipping schedule, a compilation based on it will be somewhat incomplete and inaccurate.

**B. Haier 13VMnn Monthly Accumulated CRT Usage Occupation Rate.**

| Tube Type | Demand/M | CPTM | IRICO | Samsung | Occupation Status |
|---|---|---|---|---|---|
| Sub Total | 50192 | 28000 | 12192 | 10000 | Normal |
| | | 56% | 24% | 20% | |

Note: This information was obtained from Haier's internal report of the quantity of each size used from each CRT supplier each month. Therefore this information is fairly complete and accurate.
Color code for occupation rate: Green indicates healthy, yellow indicates normal, and red indicates unhealthy. Defined in collaboration with Sales & APP.

**1. Information on customer's development of new models**   PIC: Qingdao Support team

Because Samsung's tubes have a high NG rate, Haier will no longer be buying 14" tubes from Samsung going forward. Haier is currently just using up its inventory of Samsung 14" tubes.

**2. Information on plans to bring in competitor brands:**   PIC: Qingdao Support team

The customer has not brought in any new sources of 14" tubes.

**3. Analysis of usage occupation rates:**   PIC: Sales / APP
CPTM has a better occupation rate with Haier when it comes to 14" TVs. Currently a 56% occupation rate is considered a normal level of health.

**4. Defining occupation rate improvement targets:**   PIC: Sales / APP

Going forward, Samsung (Malaysia) will be pulling its 13VMnn tubes out of this competition, and Haier's 14" orders will be split between CPTM and IRICO.
We suggest that our company raise our occupation rate to at least 60-80% to gain the lead position.

**5. Defining entry obstacles:**   PIC: Sales / APP
a. Price (Customer not satisfy with the price we offer to them.)
Our current price is not that different from IRICO's prices and do not constitute an entry obstacle.
b. Certificate (Customer did not use our CRT to apply certificate for target market)
Certificates have been applied for for all models. This does not constitute an entry obstacle.
c. Performance/Technical (request Tighten specification)
The board matched to the CRT is good. This does not constitute an an entry obstacle.
d. Quality ()
CPTM's quality is the best among the three brands and does not constitute an entry obstacle.
e. Competitor (Check whether Competitor did set any entry barrier)
The number of suppliers has been reduced from three to two, and we have not heard anything about any competitor making any move to put up entry barriers. This does not constitute an entry barrier.
f. Timing (Missing phase-in stage)
Haier has not developed any new 14" models. This does not constitute an entry barrier.
g. New Product Development Time To Market
No competitor has new product development plans for the 14". This does not constitute an entry barrier.
h. Order response Time to Market (Lead time of get order till product ETA to Customer)
This is currently being addressed by limited additional warehouse space. For now this is meeting customers' lead time requirements for now. For now this does not constitute an entry barrier.

**6. Coordinating plans with related responsible parties**   PIC: Sales/APP/MRD/MED/…..

Pending discussion with responsible parties.

CHU00572098E (Haier 13VMnn,01)_Translation

Back to Master file
**Effective Period:**   **Aug-05**
**Update Week:**   **W533**

**Haier 14VRF TV Export Order Occupation Table. (Base Haier Weekly Production Schedule)**

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 | Occupation Status |
|-----------|------------|----------|------|---------------|-------------------|
|           | 1586 US    | 26525    | CPTM | IRICO         | Bad               |
|           |            |          | 0    | 26525         |                   |
|           |            |          | 9%   | 100%          |                   |
| 15"RF     | 1586 Canada | 9       | CPTM | IRICO         | Bad               |
|           |            |          | 0    | 9             |                   |
|           |            |          | 9%   | 100%          |                   |
|           | 1418A US   | 4860     | CPTM | IRICO         | Bad               |
|           |            |          | 0    | 4860          |                   |
|           |            |          | 9%   | 100%          |                   |
| Sub Total |            | 31394    | 0    | 31394         | Bad               |
|           |            |          | 0%   | 100%          |                   |

Note: Because the Haier weekly production schedule may change depending on shipping schedule, a compilation based on it will be somewhat incomplete and inaccurate.



Haier 14VRF CRT Supplier Occupation %

CPTM, 0%    IRICO, 100%

**B. Haier 14VRF Monthly Accumulated CRT Usage Occupation Rate.**

| Tube Type | Demand/M | CPTM | IRICO | Occupation Status |
|-----------|----------|------|-------|-------------------|
| Sub Total | 25000    | 0    | 25000 | Bad               |
|           |          | 9%   | 100%  |                   |

Note: This information was obtained from Haier's internal report of the quantity of each size used from each CRT supplier each month. Therefore this information is fairly complete and accurate.

Note:
Color code for occupation rate: Green indicates healthy, yellow indicates normal, and red indicates unhealthy. Defined in collaboration with Sales & APP.

**1. Information on customer's**   PIC: Qingdao Support team
**development of new models**

The 15" RF model that the customer is now producing is the 1586 for sale to the US. They are using IRICO tubes only. 5~10K each month.
New orders are for sales to US Walmart x 100K spot order. Originally this was to be spread over 3 months (August – October). Now applying [Source text ends abruptly here.]

**2. Information on plans to**   PIC: Qingdao Support team
**bring in competitor brands:**

There are no plans to bring in competitor brands.

**3. Analysis of usage**   PIC: Sales / APP
**occupation rates:**

We actually provided samples of the 14VRF in March 2004. Because the supply of 13VMnn was tight, CPTM strategically decided to avoid accepting 14VRF orders.

**4. Defining occupation rate**   PIC: Sales / APP
**improvement targets:**

We have few competitors when it comes to the 14VRF and should work toward an occupation rate of 30~50%. We are currently putting maximum effort into breaking through 0, applying for safety certificates, and pushing for going online with PP.

**5. Defining entry obstacles:**   PIC: Sales / APP
a. Price (Customer not satisfy with the price we offer to them.
Our current price is not that different from IRICO's prices and do not constitute an entry obstacle.
However, our current quote is 1 USD lower than our variable cost.
b. Certificate (Customer did not use our CRT to apply certificate for target market)
Because we were not brought in to Haier in 2004, they did not list our CPT in their safety application. The 1418A model for sale to the US (Walmart) has now been brought in, and the customer is asking us to pay for the safety fee (50~60K RMB). This will take 6 weeks.

By the time the application steps are complete, it will be close to delivery time for the last of this spot order. Only the last 30K will be left to be shared with IRICO. The effect we get out of this will not be substantial.

As far as what we will get out of squeezing in on the safety application late, considering the entry point for the 14VRF (AK) (complete the sample before October), the effect of paying the Invar tube safety fee may last for less than 6 months.
We also need to consider whether Haier will demand that CPTM next pay the safety fee for the AK tubes.
c. Performance/Technical (request Tighten specification)
The board matched to the CRT is good. The prototype successfully passed the subjective evaluation. This does not constitute an entry barrier.
d. Quality ()
Not yet put to use. No use quality status yet. This does not constitute an entry barrier.
e. Competitor (Check whether Competitor did set an entry barrier)
IRICO is now our only competitor. We are still investigating whether they have put up any entry barriers.
f. Timing (Miss phase in stage)
Because we were not brought in to Haier in 2004, they did not list our CPT in their safety application. The 1418A model for sale to the US (Walmart) has now been brought in, and the customer is asking us to pay for the safety fee (50~60K RMB). This will take 6 weeks.
g. New Product Development Time To Market
Haier has not used 14VRF (AK) tubes, and our competitor, IRICO, has not sent any samples. This does not constitute an entry barrier.
h. Order response Time to Market (Lead time of get order till product ETA to Customer)
This is currently being addressed by leasing additional warehouse space. This is meeting customers' lead time requirements for now. For now this does not constitute an entry barrier.

**6. Coordinating plans with**   PIC: Sales/APP/MRD/MED/…..
**related responsible parties**

APP proposal: The sample for the 1418 new model (spot order for 100K) has been OK'd. However, there has been no movement on P/P. They are demanding that we pay the safety fee (50~60K RMB) but not guaranteeing that having an order means locking in the position.

CONFIDENTIAL

Back to Master file
**Effective Period:**        Aug-05
**Update Week:**            W533

**Haier 20V FS TV Export Order Occupation Table. (Base Haier Weekly Production Schedule)**

| Tube Type | Model Name | Demand/M | | CPTM | Competitor 01 | Competitor 02 | Occupation Status |
|---|---|---|---|---|---|---|---|
| | | | | | Beijing—Matsushita | Saige | |
| | 2004D | 22016 | CPTM | 0 | 0 | 22016 | Bad |
| | | | 0% | 0% | 0% | 100% | |
| 21"FS | 21T3A | 1101 | CPTM | 0 | Beijing—Matsushita | Saige | Bad |
| | | | | 0 | 1101 | 0 | |
| | | | 0% | 0% | 100% | 0% | |
| | | | | | | | |
| | | | | | | | |
| Sub Total | | 23117 | | 0 | 1101 | 22016 | Bad |
| | | | | 0% | 5% | 95% | |

Note: Because the Haier weekly production schedule may change depending on shipping schedule, a compilation based on it will be somewhat incomplete and inaccurate.



Haier 20V FS CRT Supplier Occupation %

Beijing—Matsushita, 0% ■ CPTM, 0% ■ Saige, 95%

**B. Haier 20VFS Monthly Accumulated CRT Usage Occupation Rate.**

| Tube Type | Demand/M | CPTM | Beijing—Matsushita | Saige Hitachi | Occupation Status |
|---|---|---|---|---|---|
| Sub Total | 49672 | 0 | 9672 | 40000 | Bad |
| | | 0% | 19% | 81% | |

Note: This information was obtained from Haier's internal report of the quantity of each size used from each CRT supplier each month. Therefore this information is fairly complete and accurate.

Color code for occupation rate: Green indicates healthy, yellow indicates normal, and red indicates unhealthy. Defined in collaboration with Sales & APP.

**1. Information on customer's development of new models**        PIC: Qingdao Support team

Haier did not buy 21" FS tubes from Chunghwa in August, Everything was produced by Saige!

**2. Information on plans to bring in competitor brands:**        PIC: Qingdao Support team

There are no plans to bring in competitor brands.

**3. Analysis of usage occupation rates:**        PIC: Sales / APP

The main entry obstacle for the 21" FS is that quotes for color picture tubes on the mainland are far lower than CPTM's, which is reducing the customer's willingness to use CPTM's. Starting in May the original monthly delivery of 30K will drop to 0.

**4. Defining occupation rate improvement targets:**        PIC: Sales / APP

Quotes from Beijing—Matsushita and Saige are trending back up, and Haier Purchasing has mentioned that if we agree to USD 25, we could get an order for 30K.
Assuming the customer's proposed price of USD 25 and looking at Haier's August need for the 21" FS, we should be able to have an occupation rate of 60% or more.

**5. Defining entry obstacles:**        PIC: Sales / APP
a. Price (Customer not satisfy with the price we offer to them.
The main entry obstacle for the 21" FS is that quotes for color picture tubes on the mainland are far lower than CPTM's, which is reducing the customer's willingness to use CPTM's.
Although the customer's proposed price is lower than the variable cost (USD 28), it has been included for special strategic order acceptance consideration.
The customer said if our company accepts USD 25 as the price, they'll immediately order 30K. We're quoting USD 27.5, which Haier Purchasing said they're unable to accept.
However, Sales has already secured a selling price of USD 27.50 with southern mainland TV factories (secured a Konka order of approximately 30K).
Sales is now negotiating with Haier, explaining to Haier Purchasing that the supply of 21" FS is likely to become critical in the next 3 months. The hope is to convince
Haier to seize the moment, or else it might have to buy at an even higher price once the crunch happens.
b. Certificate (Customer did not use our CRT to apply certificate for target market)
Certificates have been applied for for all models. This does not constitute an entry obstacle.
c, Performance/Technical (request Tighten specification)
The board matched to the CRT is good. This does not constitute an entry barrier.
d. Quality ()
CPTM's quality is the best among the three brands and does not constitute an entry obstacle.
e. Competitor (Check whether Competitor did set any entry barrier)
Quotes from Beijing—Matsushita and Saige are trending back up. Haier Purchasing is busy figuring out how to respond.
f. Timing (Miss phase in stage)
Haier has not developed any new 14" models. This does not constitute an entry barrier. [Source says 14" here even though it looks like it should say 21" FS.]
g. New Product Development Time To Market
No competitor brand has new product development plans for the 21" FS. This does not constitute an entry barrier.
h. Order response Time to Market (Lead time of get order till product ETA to Customer)
This is currently being addressed by leasing additional warehouse space. This is meeting customers' lead time requirements for now. For now this does not constitute an entry barrier.

**6. Coordinating plans with related responsible parties**        PIC: Sales/APP/MRD/MED/…..

CONFIDENTIAL

Back to Master file
**Effective Period:** Aug-05
**Update Week:** W533

**Haier 20V RF TV Export Order Occupation Table.** (Base Haier Weekly Production Schedule)

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 Beijing—Matsushita | Competitor 02 LG | Competitor 03 Saige | Competitor 04 IRICO | Occupation Status |
|---|---|---|---|---|---|---|---|---|
| 21"RF | 21F9K | 13870 | CPTM | Beijing—Matsushita | LG | Saige | IRICO | |
| | | | 0 | 13870 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 21F9D | 2735 | CPTM | Beijing—Matsushita | LG | Saige | IRICO | |
| | | | 0 | 1 | 2734 | 0 | 0 | Bad |
| | | | 0% | 0% | 100% | 0% | 0% | |
| | 21F7A | 10 | CPTM | Beijing—Matsushita | LG | Saige | IRICO | |
| | | | 0 | 0 | 10 | 0 | 0 | Bad |
| | | | 0% | 0% | 100% | 0% | 0% | |
| | 2179D | 4507 | CPTM | Beijing—Matsushita | LG | Saige | IRICO | |
| | | | 0 | 4507 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2189 UK | 1035 | CPTM | Beijing—Matsushita | LG | Saige | IRICO | |
| | | | 0 | 1035 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2189 Netherlands | 38 | CPTM | Beijing—Matsushita | LG | Saige | IRICO | |
| | | | 0 | 38 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2189 Australia | 148 | CPTM | Beijing—Matsushita | LG | Saige | IRICO | |
| | | | 0 | 148 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2196PF Canada | 1357 | CPTM | Beijing—Matsushita | LG | Saige | IRICO | |
| | | | 0 | 1357 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2198 US | 10 | CPTM | Beijing—Matsushita | LG | Saige | IRICO | |
| | | | 0 | 5 | 0 | 5 | 0 | Bad |
| | | | 0% | 50% | 0% | 50% | 0% | |
| | 2198 Norway | 6 | CPTM | Beijing—Matsushita | LG | Saige | IRICO | |
| | | | 0 | 6 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2198 UK | 360 | CPTM | Beijing—Matsushita | LG | Saige | IRICO | |
| | | | 0 | 360 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 21F98-CD Korea | 363 | CPTM | Beijing—Matsushita | LG | Saige | IRICO | |
| | | | 0 | 363 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 21F3A-T | 301 | CPTM | Beijing—Matsushita | LG | Saige | IRICO | |
| | | | 0 | 301 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| Sub Total | | 24740 | 0 | 21991 | 2744 | 5 | 0 | |
| | | | 0% | 89% | 11% | 0% | 0% | |

Note: Because the Haier weekly production schedule may change depending on shipping schedule, a compilation based on it will be somewhat incomplete and inaccurate.

**Haier 20V RF CRT Supplier  Occupation %**

**B. Haier 20VRF Monthly Accumulated CRT Usage Occupation Rate.**

| Tube Type | Model Name | Demand/M | CPTM | Beijing—Matsushita | LG | Saige | IRICO | Occupation Status |
|---|---|---|---|---|---|---|---|---|
| Sub Total | | 28446 | 0 | 23346 | 0 | 0 | 5100 | |
| | | | 0% | 82% | 0% | 0% | 18% | |

Note: This information was obtained from Haier's internal report of the quantity of each size used from each CRT supplier each month. Therefore this information is fairly complete and accurate.
Color code for occupation rate: Green indicates healthy, yellow indicates normal, and red indicates unhealthy. Defined in collaboration with Sales & APP.

**1. Information on customer's development of new models**   PIC: Qingdao Support team
The 21F7A (LG tube) is mostly manufactured in Jiaonan.

**2. Information on plans to bring in competitor brands:**   PIC: Qingdao Support team
LPD got a 470K order from Jiaonan for sale to the US. The plan is to deliver over the course of 3~5 months starting in August.

**3. Analysis of usage occupation rates:**   PIC: Sales / APP
The main entry obstacle for the 21" RF is that quotes for color picture tubes on the mainland are far lower than CPTM's, which is reducing the customer's willingness to use CPTM's.
Originally, 2K northern tubes were to be delivered in March and were for the European market (Haier considered that Europe has high quality requirements and used CPTM Invar tubes). It never purchased any more after that.

**4. Defining occupation rate improvement targets:**   PIC: Sales / APP
Because Haier's 21" RF (AK) orders for US sales are steady, we should consider seizing 50% of the occupation to elevate the M plant.

**5. Defining entry obstacles:**   PIC: Sales / APP
a. Price (Customer not satisfy with the price we offer to them.
The main entry obstacle for the 21" RF is that quotes for color picture tubes on the mainland are far lower than CPTM's, which is reducing the customer's willingness to use CPTM's.
Other tube suppliers are currently supplying these at USD 33.
The customer is requesting USD 33, which is already lower than our variable cost USD 34.8).
Plan of attack: Whether to pursue at USD 33 and fill Haier's Jiaonan plant's 50K 21" AK orders for US sales each month (for a monthly total of 100K). [Would Accounting please calculate whether the variable cost will match up with the quote after adding 50K?]
b. Certificate (Customer did not use our CRT to apply certificate for target market)
The board matched to the 21" RF (Invar) has been approved for Haier's non-US models, and delivery can be made for markets including Southeast Asia, the Middle East, and Europe.
The 21" RF (AK) sample has not yet been approved, the customer's purchase intention is low here and has not listed our AK tube in its safety certification application.
c. Performance/Technical (request Tighten specification)
The board matched to the 21" RF (Invar) CRT is good. This does not constitute an entry barrier.
The 21" RF (AK) sample has not been matched yet. The matching assessment is expected to be completed in W534.
d. Quality ()
For the 21" RF (Invar), CPTM's quality is the best among the three brands and does not constitute an entry obstacle.
The 21" RF (AK) has not yet been put to use. There is no use quality status yet. This does not constitute an entry barrier.
e. Competitor (Check whether Competitor did set any entry barrier)
Currently three companies are supplying these tubes, and we have not heard anything about any competitor making any move to put up entry barriers. We are still investigating whether they are putting up such barriers.
f. Timing (Miss phase in stage)
Samples were sent to factories as early as late March 2004, as called for by Haier's 21" RF phase-in plan. However, that was when Haier's use of AK tubes in Thailand to stimulate the market met with strong objections.
In the end, to resolve the matter, 2K TVs were forcibly sent back to Qingdao to have their tubes switched back to Invar ones. The Haier higher-ups then scrapped the use of AK tubes in overseas markets. However, Haier continued switching to AK tubes for domestic orders.
All CRT factories on the mainland have a domestic sales advantage and, by getting in league with each other, all found opportunities to gradually expand themselves into Haier's export orders while Haier returned to using AK in its export orders in the 2nd quarter of 2005.
g. New Product Development Time To Market
Because Haier froze the use of AK tubes in its export orders in 2004, [the source text ends abruptly here]
h. Order response Time to Market (Lead time of get order till product ETA to Customer)
This is currently being addressed by leasing additional warehouse space. This is meeting customers' lead time requirements for now. For now this does not constitute an entry barrier.

**6. Coordinating plans with related responsible parties**   PIC: Sales/APP/MRD/MED/. .....

Back to Master file
**Effective Period:**   Aug-05
**Update Week:**   W533

**Haier 27V RF TV Export Order Occupation Table. (Base Haier Weekly Production Schedule)**

| Tube Type | Model Name | Demand/M | | Competitor 01 | Competitor 02 | Competitor 03 | Occupation Status |
|---|---|---|---|---|---|---|---|
| 29"RF | 29F9D | 4301 | CPTM | Beijing—Matsushita | IRICO | Samsung | |
| | | | | 0 | 0 | 4301 | Bad |
| | | | 0% | 0% | 0% | 100% | |
| | 29F9G | 6 | CPTM | Beijing—Matsushita | IRICO | Samsung | |
| | | | | 0 | 0 | 6 | Bad |
| | | | 0% | 0% | 0% | 100% | |
| | D29FV6-A | 908 | CPTM | Beijing—Matsushita | IRICO | Samsung | |
| | | | | 0 | 0 | 908 | Bad |
| | | | 0% | 0% | 0% | 100% | |
| | D29FA9-AK | 549 | CPTM | Beijing—Matsushita | IRICO | Samsung | |
| | | | | 549 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | |
| | 29F8A | 190 | CPTM | Beijing—Matsushita | IRICO | Samsung | |
| | | | | 0 | 0 | 190 | Bad |
| | | | 0% | 0% | 0% | 100% | |
| | 29T9D Malaysia | 292 | CPTM | Beijing—Matsushita | IRICO | Samsung | |
| | | | | 292 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | |
| | 29F3A | 210 | CPTM | Beijing—Matsushita | IRICO | Samsung | |
| | | | | 0 | 0 | 210 | Bad |
| | | | 0% | 0% | 0% | 100% | |
| Sub Total | | 7563 | | 0 | 841 | 0 | 6722 |
| | | | 0% | | 11% | 0% | 89% |

**Haier 27V RF CRT Supplier Occupation %**

- IRICO, 0%
- Beijing—Matsushita, 11%
- CPTM, 0%
- Samsung, 89%

Note: Because the Haier weekly production schedule may change depending on shipping schedule, a compilation based on it will be somewhat incomplete and inaccurate.

Note:
Color code for occupation rate: Green indicates healthy, yellow indicates normal, and red indicates unhealthy. Defined in collaboration with Sales & APP.

**1. Information on customer's development of new models**   PIC: Qingdao Support team

**2. Information on plans to bring in competitor brands:**   PIC: Qingdao Support team

**3. Analysis of usage occupation rates:**   PIC: Sales / APP

**4. Defining occupation rate improvement targets:**   PIC: Sales / APP

**5. Defining entry obstacles:**   PIC: Sales / APP
a. Price (Customer not satisfy with the price we offer to them.

b. Certificate (Customer did not use our CRT to apply certificate for target market)

c. Performance/Technical (request Tighten specification)

d. Quality ()

e. Competitor (Check whether Competitor did set any entry barrier)

f. Timing (Miss phase in stage)

g. New Product development Time To Market

h. Order response Time to Market (Lead time of get order till product ETA to Customer)
This is currently being addressed by leasing additional warehouse space. This is meeting customers' lead time requirements for now. For now this does not constitute an entry barrier.

**6. Coordinating plans with related responsible parties**   PIC: Sales/APP/MRD/MED/.....



info@certifiedtranslate.com
www.certifiedtranslate.com

2425 Olympic Blvd., Suite 4000W
Santa Monica, CA 90404

usa  1-888-856-2228
int  +1-310-684-3153
fax  +1-310-564-1944

## CERTIFIED TRANSLATION



A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: | **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|---|
| Firm: | **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
|---|
| |
| **CHU00572996E - CHU00572997E** |
| |
| |

| Source Language: | **SIMPLIFIED CHINESE** | Target Language: | **ENGLISH** |
|---|---|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director          **Date:**   September 20, 2018

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On _Sept. 20, 2018_ before me, _____Kristin Gail Chamberlain_____, Notary Public, appeared _____Sean Kirschenstein_____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____



KRISTIN GAIL CHAMBERLAIN
Commission # 2141860
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2020

**From:** Tham Hoong Yip – APP
**Sent:** Friday, August 26, 2005  7:53 AM
**To:** Jimmy Chen – SAL; Ng Lee Chiat – SAL; Lee Shin Wei – SAL; hongsp626; Hong Shanping
**Cc:** Chew Ka Sin – APP; Ho Chin Yan – APP; Yeik Nai Soon – APP; Fong Soon Fei – APP
**Subject:** [Qingdao Support Team] Haier CRT Supplier Occupation Rate investigation List

**Importance:** High

Attachments: 0825 [corrupted characters] Haier Occupation List a.xls; [corrupted characters] Haier CRT Supplier Occupation Rate investigation List.doc

If your system can't recognize this Traditional Chinese font, please refer to the file "Haier CRT Support Occupation Rate investigation List.doc"


Dear Supervisors and Colleagues:

Please see below the occupation rates for different sizes and models for Haier (Qingdao factory) provided by the Qingdao unit:

After discussion with the business office, the priority ranking for working on the various tubes based on their potential volume increase is as follows:

1. 21" FS
2. 21" RF(AK)
3. 15" RF
4. 20" Mnn
5. 14" Mnn
6. 29" RF


Thanks to the branch unit for their full cooperation in gathering this info.

Sales/PM attack strategy:

1. Factory M now holds a strategy meeting every Friday to focus on increasing internal competitiveness and dramatically improving cost composition.
   PMs intend to adopt aggressive measures toward specific customers that show potential, and detailed information from the branch unit will be crucial.
   The unit is currently collecting information in a set format. Although there's room for improvement in regards to comprehensiveness and accuracy, it's safe to say that results will be clearer and clearer in time.
   In the current expedient method, we can use these tables to compare the quantities of competitors' brands that our customers use each month for greater information reference.

2. Considering how Haier's export production capacity is distributed, the monthly full production capacity of Haier's Qingdao factory + Jiaonan totals 400 K.
   All indications are that the cooperation between Haier and Walmart of the U.S. looks to intensify. That is, in the upcoming 4th quarter high season, if we can seize this Haier rush export opportunity and grab 50% occupancy, that would greatly benefit our overall production capacity usage rate.
   At present, this is the major trend in Haier's export orders. Therefore, we need to reference its occupancy rate proportions in designing targeted strategies to improve our order hit rates and benefits.

3. If operating the way we are doing with the Haier case gets clear results, I suggest we define other core customers and develop them based on their relative influences.

We should target existing major core customers (Orion, Funai, etc.) and secure their orders as well as information about competitor brands' moves toward them to 1) prevent bleeding from competitor brands robbing our occupancy rate, and 2) understand whether there is any room for expansion in the rest of the models.

In addition, we should target customers showing potential (Haier…), learn and understand competitor brands' moves toward them, deploy targeted strategies, and do everything we can to gain orders from them.


Sincerely,
Tham Hoong Yip




-----Original Message-----
From: hongsp626 [mailto:hongsp626@126.com]
Sent: Friday, August 26, 2005  12:14 PM
To: Tham Hoong Yip – APP
Subject: kschew@cptm.com.my; nsyeik@cptm.com.my; cyho@cptm.com.my


I just sent you an email using the company email address!
I'm worried you didn't get it, so I'm resending it using an external email address!




HYPERLINK "http://www.126.com"\nNeed a free 2G email account?
More people in China use free NetEase email than any other email.

CONFIDENTIAL - GRAND JURY MATERIAL



**certified**translate
A LANGUAGE FISH LLC COMPANY

info@certifiedtranslate.com
www.certifiedtranslate.com

2425 Olympic Blvd., Suite 4000W
Santa Monica, CA 90404

usa  1-888-856-2228
int  +1-310-684-3153
fax  +1-310-564-1944

## CERTIFIED TRANSLATION



A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: | **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|---|
| Firm: | **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
|---|
| |
| |
| **CHU00572998E** |
| |
| |

| Source Language: | **SIMPLIFIED CHINESE** | Target Language: | **ENGLISH** |
|---|---|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

By:   Sean Kirschenstein, Director           Date:   September 20, 2018

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On _Sept. 20, 2018_ before me, ___Kristin Gail Chamberlain___, Notary Public, appeared ___Sean Kirschenstein___, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____



KRISTIN GAIL CHAMBERLAIN
Commission # 2141860
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2020

Master Monitoring Table for Haier CRT Supplier Occupation

| Tube Type | Demand/M | CPTM | Irico | Samsung | Beisong | LG | Saige | Occupation Status |
|-----------|----------|------|-------|---------|---------|-----|-------|-------------------|
| 13VMnn | 19879 | 4709 | 8126 | 7044 | 0 | 0 | 0 | Normal |
|  |  | 24% | 41% | 35% | 0% | 0% | 0% |  |
| 14VRF | 31394 | 0 | 31394 | 0 | 0 | 0 | 0 | Bad |
|  |  | 0% | 100% | 0% | 0% | 0% | 0% |  |
| 20V FS | 23117 | 0 | 0 | 0 | 1101 | 0 | 22016 | Bad |
|  |  | 0% | 0% | 0% | 5% | 0% | 95% |  |
| 20VRF | 24740 | 0 | 0 | 0 | 21991 | 2744 | 0 | Bad |
|  |  | 0% | 0% | 0% | 89% | 11% | 0% |  |
| 27VRF | 6456 | 0 | 0 | 5615 | 841 | 0 | 0 | Bad |
|  |  | 0% | 0% | 87% | 13% | 0% | 0% |  |



Back to Master file

**Effective Period:**     Aug-05
**Update Week:**          W533

**Haier 13VMnn TV Export Order Occupation**

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 | Competitor 02 | Occupation Status |
|---|---|---|---|---|---|---|
| 14"Mnn | 1481 U.S. | 846 | CPTM | Irico | Samsung | Bad |
| | | | 6 | 840 | 0 | |
| | | | 1% | 99% | 0% | |
| | 1486 Netherlands | 1998 | CPTM | Irico | Samsung | Bad |
| | | | 0 | 0 | 1998 | |
| | | | 0% | 0% | 100% | |
| | 1486 Spain | 10 | CPTM | Irico | Samsung | Bad |
| | | | 0 | 10 | 0 | |
| | | | 0% | 100% | 0% | |
| | 1486 U.S. | 4762 | CPTM | Irico | Samsung | Bad |
| | | | 0 | 4762 | 0 | |
| | | | 0% | 100% | 0% | |
| | 1486 U.K. | 2514 | CPTM | Irico | Samsung | Bad |
| | | | 0 | 2514 | 0 | |
| | | | 0% | 100% | 0% | |
| | 1489 U.K. | 421 | CPTM | Irico | Samsung | Good |
| | | | 415 | 0 | 6 | |
| | | | 99% | 0% | 1% | |
| | 1490 Spain | 1814 | CPTM | Irico | Samsung | Good |
| | | | 1814 | 0 | 0 | |
| | | | 100% | 0% | 0% | |
| | 1490 Australia | 20 | CPTM | Irico | Samsung | Good |
| | | | 20 | 0 | 0 | |
| | | | 100% | 0% | 0% | |
| | 1490 U.S. | 6 | CPTM | Irico | Samsung | Good |
| | | | 6 | 0 | 0 | |
| | | | 100% | 0% | 0% | |
| | 1496 Canada | 2448 | CPTM | Irico | Samsung | Good |
| | | | 2448 | 0 | 0 | |
| | | | 100% | 0% | 0% | |
| | 1496 U.K. | 5040 | CPTM | Irico | Samsung | Bad |
| | | | 0 | 0 | 5040 | |
| | | | 0% | 0% | 100% | |
| Sub Total | | 19879 | 4709 | 8126 | 7044 | Normal |
| | | | 24% | 41% | 35% | |

**Haier 13VMnn CRT Supplier Occupation %**



Notes:

Color coding for occupation rates: green indicates healthy; yellow indicates average, and red indicates unhealthy. Defined collaboratively by Sales and APP.

1. Information on customer new model launch: PIC: Qingdao Support Team

Because of Samsung's high defective rates, Haier will henceforth no longer purchase 14" tubes from Samsung. Currently it is only using up the 14" tubes in inventory.

2. Import plan information for competitor brands: PIC Qingdao Support Team

Back to Master file

**Effective Period:**          **Aug-05**
**Update Week:**               **W533**

**Haier 14VRF TV Export Order Occupation Table.**

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 | Occupation Status |
|---|---|---|---|---|---|
| 14"Mnn | 1586 U.S. | 26525 | CPTM | Irico | Bad |
| | | | 0 | 26525 | |
| | | | 0% | 100% | |
| | 1586 Canada | 9 | CPTM | Irico | Bad |
| | | | 0 | 9 | |
| | | | 0% | 100% | |
| | 1418A U.S. | 4860 | CPTM | Irico | Bad |
| | | | 0 | 4860 | |
| | | | 0% | 100% | |
| Sub Total | | 31394 | 0 | 31394 | Bad |
| | | | 0% | 100% | |

Notes:

Color coding for occupation rates: green indicates healthy; yellow indicates average, and red indicates unhealthy. Defined collaboratively by Sales and APP.

1. Information on customer new model launch:  PIC: Qingdao Support Team

2. Import plan information for competitor brands:  PIC Qingdao Support Team



**Haier 14VRF CRT Supplier Occupation %**



CPTM
0%

Irico,
100%

Back to Master file
**Effective Period:**          **Aug-05**
**Update Week:**               **W533**

Haier 20V FS TV Export Order Occupation Table.

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 | Competitor 02 | Occupation Status |
|---|---|---|---|---|---|---|
| | 2004D | 22016 | CPTM | Beisong | Saige | Bad |
| | | | 0 | 0 | 22016 | |
| | | | 0% | 0% | 100% | |
| 21"FS | 21T3A | 1101 | CPTM | Beisong | Saige | |
| | | | 0 | 1101 | 0 | |
| | | | 0% | 100% | 0% | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| Sub Total | | 23117 | 0 | 1101 | 22016 | Bad |
| | | | 0% | 5% | 95% | |



Haier 20V FS CRT Supplier Occupation %

Notes:
Color coding for occupation rates: green indicates healthy; yellow indicates average, and red

1. Information on customer new model launch:  PIC: Qingdao Support Team

<span style="color:red">Haier did not purchase any 21FS tubes from CPTM in August. They were all produced by Saige!</span>

2. Import plan information for competitor brands:  PIC Qingdao Support Team

Back to Master file
**Effective Period:**      **Aug-05**
**Update Week:**          **W533**

**Haier 27V RF TV Export Order Occupation Table.**

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 Beisong | Competitor 02 LG | Competitor 03 Saige | Competitor 04 Irico | Occupation Status |
|---|---|---|---|---|---|---|---|---|
| 29"RF | 21F9K | 13870 | 0 | 13870 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 21F9D | 2735 | 0 | 1 | 2734 | 0 | 0 | Bad |
| | | | 0% | 0% | 100% | 0% | 0% | |
| | 21F7A | 10 | 0 | 0 | 10 | 0 | 0 | Bad |
| | | | 0% | 0% | 100% | 0% | 0% | |
| | 21T9D | 4507 | 0 | 4507 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2189 UK | 1035 | 0 | 1035 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2189 Netherlands | 38 | 0 | 38 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2189 Australia | 148 | 0 | 148 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2196PF Canada | 1357 | 0 | 1357 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2198 U.S. | 10 | 0 | 0 | 0 | 5 | 0 | Bad |
| | | | 0% | 0% | 50% | 50% | 0% | |
| | 2198 Norway | 6 | 0 | 6 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2198 U.K. | 360 | 0 | 360 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 21F98-CD Korea | 363 | 0 | 363 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 21F3A-T | 301 | 0 | 301 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| Sub Total | | 24740 | 0 | 21991 | 2744 | 5 | 0 | |
| | | | 0% | 89% | 11% | 0% | 0% | |

Haier 27V RF CRT Supplier Occupation %

CPTM, 0%   Irico, 0%   Saige, 0%   LG, 11%   Beisong, 89%

Notes:
Color coding for occupation rates: green indicates healthy; yellow indicates average, and red

1. Information on customer new model launch:  PIC: Qingdao Support Team

Most 21F7A (LG tubes) are produced in Jiaonan.

2. Import plan information for competitor brands:  PIC Qingdao Support Team

Back to Master file
**Effective Period:**      Aug-05
**Update Week:**           W533

**Haier 20V RF TV Export Order Occupation Table.**

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 | Competitor 02 | Competitor 03 | Occupation Status |
|---|---|---|---|---|---|---|---|
| 21"RF | 29F9D | 4301 | CPTM | Beisong | Irico | Samsung | Bad |
| | | | 0 | 0 | 0 | 4301 | |
| | | | 0% | 0% | 0% | 100% | |
| | 29F9G | 6 | CPTM | Beisong | Irico | Samsung | Bad |
| | | | 0 | 0 | 0 | 6 | |
| | | | 0% | 0% | 0% | 100% | |
| | D29FV6-A | 908 | CPTM | Beisong | Irico | Samsung | Bad |
| | | | 0 | 0 | 0 | 908 | |
| | | | 0% | 0% | 0% | 100% | |
| | D29FA9-AK | 549 | CPTM | Beisong | Irico | Samsung | Bad |
| | | | 0 | 549 | 0 | 0 | |
| | | | 0% | 100% | 0% | 0% | |
| | 29F8A | 190 | CPTM | Beisong | Irico | Samsung | Bad |
| | | | 0 | 0 | 0 | 190 | |
| | | | 0% | 0% | 0% | 100% | |
| | 29T9D Malaysia | 292 | CPTM | Beisong | Irico | Samsung | Bad |
| | | | 0 | 292 | 0 | 0 | |
| | | | 0% | 100% | 0% | 0% | |
| | 29F3A | 210 | CPTM | Beisong | Irico | Samsung | Bad |
| | | | 0 | 0 | 0 | 210 | |
| | | | 0% | 0% | 0% | 100% | |
| Sub Total | | 6456 | 0 | 841 | 0 | 5615 | |
| | | | 0% | 13% | 0% | 87% | |

**Haier 20V RF CRT Supplier Occupation %**



Notes:

Color coding for occupation rates: green indicates healthy; yellow indicates average, and red indicates unhealthy. Defined collaboratively by Sales and APP.

1. Information on customer new model launch:  PIC: Qingdao Support Team

2. Import plan information for competitor brands:  PIC Qingdao Support Team



**certified**translate
A LANGUAGE FISH LLC COMPANY

info@certifiedtranslate.com  2425 Olympic Blvd., Suite 4000W   usa  1-888-856-2228
www.certifiedtranslate.com    Santa Monica, CA 90404          int  +1-310-684-3153
                                                              fax  +1-310-564-1944



## CERTIFIED TRANSLATION

A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: | **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|---|
| Firm: | **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

|  |
|---|
|  |
| **CHU00573026E** |
|  |
|  |

| Source Language: | **SIMPLIFIED CHINESE** | Target Language: | **ENGLISH** |
|---|---|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**  Sean Kirschenstein, Director                    **Date:**  September 20, 2018

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On _Sept 20, 2018_ before me, ____Kristin Gail Chamberlain____, Notary Public, appeared ____Sean Kirschenstein____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Kristi CMh_

KRISTIN GAIL CHAMBERLAIN
Commission # 2141880
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2020

| Date | Model | Quantity | Vendor Factory |
|---|---|---|---|
| 20050804 | 21F9K-T Fashionable | 1001 | Beisong AK |
| | BH2004D | 103 | Saige |
| | 21T9D Two Color | 705 | Beisong |
| | 25T9D-T Two Color | 1000 | Irico |
| | 37T86-CD U.K. | 10 | Irico |
| | 37T86-CD Denmark | 6 | CPT |
| | 1486 Spain | 10 | Irico |
| | 1489 U.K. | 6 | Samsung |
| | 21F3A-T Oman | 148 | Beisong AK |
| | DTA1496 U.K (Customer Model: TOCDV3001) | 800 | Samsung |
| | 34F9K-PY Two Color | 360 | Samsung DF |
| | 29F9D-PY Two Color | 445 | Samsung 100 Hz |
| | 25T3A-T Oman | 128 | Irico |
| | DTA2189 Australia CONWA | 2 | Beisong |
| | 37T6D-T U.A.E. | 2 | Irico |
| | 34P9B-T U.A.E.  Matching Cabinet : 34B-J | 2 | Saige |
| | 29F9G-S Samsung Infinite Flat Tube | 6 | Samsung |
| | D29FV6-A | 10 | Samsung |
| | 29F9D India | 6 | Samsung |
| 20050805 | 21F9K-T Fashionable | 500 | Beisong AK |
| | 21T9D Two Color | 1300 | Beisong |
| | DTA1486 Netherlands (Customer Model: ST-CRT14C-0526) | 696 | Samsung |
| | 1486 U.S. | 1142 | Irico |
| | 1481 U.S. | 6 | CPT |
| | 29F9D-T Two Color | 10 | Samsung |
| | D29FV6-A (720P) | 295 | Samsung |
| | 29F9D-T India (Hefei Core) | 526 | Samsung |
| | DTA1496 U.K. (Customer Model: TOCDV3001) | 1600 | Samsung |
| | 21F7A-P (LG Tube) | 10 | Saige |
| | D29FA9-AK | 20 | Beisong |
| | 21T98-CD U.S. | 10 | Beisong |
| 20050806 | 21F9K-T(L) Linkage, Two Color | 1000 | Beisong AK |
| | 25T9D-T Two Color | 800 | Irico |
| | BH2004D | 50 | Saige |
| | 1486 U.S. | 1820 | Irico |
| | HT-3768 Pakistan | 6 | Irico |
| | DTA-1490 U.K. | 6 | CPT |
| | DTA1496 U.K. (Customer Model: TOCDV3001) | 1400 | Samsung |
| | D25FV6-A8K | 864 | Samsung 100 Hz |
| | 29F9D-T Two Color | 190 | Samsung |
| | 29F9D-PY Two Color | 500 | Samsung 100 Hz |
| | DTA-2198 U.K. | 10 | Beisong |
| | DTA-2198 Norway | 6 | Beisong |
| 20050807 | DTA1486 Netherlands (Customer Model: ST-CRT14C-0526) | 1302 | Samsung |
| | 21T3A Oman | 360 | Beisong |
| | D34FV6-A Turbo | 474 | Samsung 100 Hz |
| | DTA1496 U.K. (Customer Model: TOCDV3001) | 1240 | Samsung |
| | D34FA9-AK | 300 | Samsung Detail Distance Tube |
| | D29FA9-AK | 200 | Beisong |

CONFIDENTIAL - GRAND JURY MATERIAL

| | | | |
|---|---|---|---|
| | 25F9K-T Fashionable | 10 | LG |
| 20050808 | BH2004D | 4350 | Saige |
| | DTA1486 U.S. | 1800 | Irico |
| | 34P9B-T U.A.E.  Matching Cabinet: 34B-J | 83 | Saige |
| | 37T6D-T U.A.E. | 1218 | Irico |
| | 25F9K-T Fashionable | 190 | LG |
| | 21F9K-T(L) Linkage, Two Color | 1000 | Beisong AK |
| 20050817 | 21F9K-T Fashionable | 1000 | Beisong AK |
| | 25F9K Fashionable | 200 | LG |
| | BH2004D | 3159 | Saige |
| | DTA1586 U.S. MEMOREX | 1702 | Irico Flat |
| | DTA2189 Australia CONWA | 146 | Beisong |
| | DTA1496 Canada ELECTROHOME | 1220 | CPT |
| | 1586 Canada | 3 | Irico |
| | DV1418A U.S. | 2 | Irico |
| | DTA1489 U.K. GOODMANS | 415 | CPT |
| | D29FA9-AK | 300 | Beisong |
| | D34FA9-AK | 207 | Samsung Detail Distance Tube |
| | 29F9K-D Australia | 5 | Samsung |
| | 21F9K-T Malaysia Whole Machine | 2 | Beisong AK |
| | DTA2196PF Canada ELECTROHOME | 3 | Beisong AK |
| | 2198 U.S. BESTBUY | 10 | Beisong Saige |
| | 29F3A Yugoslavia | 2 | Samsung |
| | 21T3A Yugoslavia | 2 | Beisong |
| | 21F3A Yugoslavia | 2 | Beisong AK |
| 20050818 | 21F9K-T(L) Linkage, Two Color | 1000 | Beisong AK |
| | BH2004D | 3575 | Saige |
| | DTA1496 Canada ELECTROHOME | 1228 | CPT |
| | DTA2198 U.K. | 350 | Beisong |
| | DV1418A U.S. | 1628 | Irico |
| | 29F9D-PY Two Color | 500 | Samsung 100 Hz |
| | D29FV6-A Turbo | 126 | Samsung 100 Hz |
| | D34FV6-A Turbo | 122 | Samsung AF |
| | 34F9K-PY Two Color | 59 | Samsung AF |
| | D32FA9-AK | 10 | Beisong Detail Distance Tube |
| | 29T9D Malaysia | 10 | Beisong |
| 20050819 | 21F9K-T Fashionable | 1000 | Beisong AK |
| | 21T9D-T Two Color | 500 | Beisong |
| | DV1418A U.S. | 800 | Irico |
| | DTA1586 U.S. MEMOREX | 2400 | Irico Flat |
| | DTA1586 U.S. MEMOREX | 1600 | Irico Flat |
| | D25FV6-A8K | 10 | Huafei |
| | DTA2196PF Canada CITIZEN | 3 | Beisong AK |
| 20050820 | 21F9K-T(L) Linkage, Two Color | 1139 | Beisong AK |
| | DTA1586 U.S. MEMOREX | 3158 | Irico Flat |
| | DTA1490 Spain | 2 | CPT |
| | 1586 Canada | 3 | Irico |
| | DTA1586 U.S. MEMOREX | 1600 | Irico Flat |
| | 29F9K-D Australia | 6 | Samsung |
| | DTA2196PF Canada CITIZEN | 3 | Beisong AK |
| | 29T9D Malaysia | 10 | Beisong |

| | | | |
|---|---|---|---|
| | DTA2196PF Canada ELECTROHOME | 3 | Beisong AK |
| | 29F3A Yugoslavia | 2 | Samsung |
| | 21F3A Yugoslavia | 2 | Beisong AK |
| 20050821 | DTA1586 U.S. MEMOREX | 800 | Irico Flat |
| | 21F9K-T Fashionable | 1100 | Beisong AK |
| | DTA1586 U.S. MEMOREX | 3200 | Irico Flat |
| | DTA1586 U.S. MEMOREX | 1700 | Irico Flat |
| 20050822 | 29F9D Germany – All-In-One (Customer Model TBA) | 10 | Samsung |
| | 21T9D-T Two Color | 930 | Beisong Irico |
| | 21F9K-T Fashionable | 1000 | Beisong AK |
| | BH2004D | 2000 | Saige |
| | DTA1586 U.S. MEMOREX | 3000 | Irico Flat |
| | DTA1486 U.K. (Customer Model: TVD1420) | 2 | Irico |
| | BH2004D | 2000 | Saige |
| | 21F9D-T Canada ELECTROHOME | 10 | LG |
| | 21F9D-T Canada CITIZEN | 10 | LG |
| | D29FV6-A Morocco | 10 | Samsung |
| | DTA2189PF U.K. GOODMANS | 20 | Beisong AK |
| | DTA2189PF Netherlands  PROLINE | 20 | Beisong AK |
| | 21F98-CD Korea | 10 | Beisong AK |
| 20050823 | DTA1586 U.S. MEMOREX | 2000 | Irico Flat |
| | DTA1490 Spain | 838 | CPT |
| | 29F9D-PY Two Color | 500 | Samsung 100 Hz |
| | 29T9D Malaysia | 136 | Beisong |
| | D29FV6-A Turbo | 74 | Samsung 100 Hz |
| | D34FV6-A Turbo | 330 | Samsung AF |
| | 34F9K-PY Two Color | 181 | Samsung AF |
| | DTA1490 Australia – All-In-One (Customer Model: KMP1489) | 10 | CPT |
| 20050824 | 21F9K-T Fashionable | 214 | Beisong AK |
| | BH2004D | 4009 | Saige |
| | DTA1586 U.S. MEMOREX | 2265 | Irico Flat |
| | 21F9K-T Malaysia Whole Machine | 269 | Beisong AK |
| | 25T9D Two Color | 26 | Irico |
| | DTA1490 Spain | 474 | CPT |
| | 1586 Canada | 3 | Irico |
| | D29FA9-AK | 29 | Beisong |
| | 29F9D-PY Two Color | 204 | Samsung 100 Hz |
| | D29FV6-A Turbo | 64 | Samsung 100 Hz |
| | D29FV6-A Qatar | 75 | Samsung 100 Hz |
| | D34FV6-A Qatar | 45 | Samsung DF |
| | D34FV6-A Turbo | 300 | Samsung AF |
| | 34F9K-PY Two Color | 111 | Samsung AF |
| | D34FA9-AK | 64 | Samsung Detail Distance Tube |
| | 29F3A Ukraine Part | 3 | Samsung 100 Hz |
| | D29FV6 Ukraine Part | 3 | Samsung 100 Hz |
| | DTA1490 Australia – All-In-One  (Customer Model: KMP1489) | 10 | CPT |
| | 21F9K Ukraine  Part | 3 | IricoAK |
| | 21F9K Ukraine  Part | 1 | Beisong |

| | | | |
|---|---|---|---|
| | 21F9D-T Canada CITIZEN | 10 | LG |
| | D29FV6-A Morocco | 10 | Samsung |
| | DTA2189PF U.K. GOODMANS | 15 | Beisong AK |
| | 21F98-CD Korea | 10 | Beisong AK |
| | 29F9D Germany – All-In-One (Customer Model TBA) | 10 | Samsung |
| | DTA2196PF Canada ELECTROHOME | 3 | Beisong AK |
| 20050825 | BH2004D | 2770 | Saige |
| | 21F9K-T(L) Linkage, Two Color | 1194 | Beisong AK |
| | DTA1486 U.K. (Customer Model: TVD1420) | 2512 | Irico |
| | DTA1490 Spain | 500 | CPT |
| | DTA1481(AC/DC) U.S. Haier Brand | 2 | Irico |
| | 21F9D Iran | 1 | Beisong AK |
| | 21T9D Iran | 1 | Beisong |
| | DV1418A U.S. | 1430 | Irico |
| | 29F8A Iran | 1 | Samsung Tube |
| | HT-3768 Ukraine  Part | 200 | Irico |
| | 29F8A-P Ukraine  Part | 189 | Samsung |
| | 21T3A Ukraine  Part | 370 | Beisong |
| | 34F9B-T Ukraine  Part | 22 | Samsung |
| | 21T6B Ukraine  Part | 610 | Irico |
| 20050826 | 21F9K-T(L) Linkage,  Two Color | 1000 | Beisong AK |
| | Set-Top Box | 3500 | |
| | DTA1586 U.S. MEMOREX | 1800 | Irico Flat |
| | 21F98-CD Korea | 343 | Beisong AK |
| | DTA2196PFELECTROHOME | 671 | Beisong AK |
| | DTA2189PF U.K. GOODMANS | 1000 | Beisong AK |
| | DV1418A U.S. | 1000 | Irico |
| | 29T9D Malaysia | 136 | Beisong |
| | D29FV6-A Morocco | 142 | Samsung |
| | 29F3A Ukraine  Part | 149 | Samsung 100 Hz |
| | D29FV6 Ukraine  Part | 99 | Samsung 100 Hz |
| | 21F9K Ukraine  Part | 447 | Irico AK |
| | DTA2189PF Netherlands  PROLINE | 18 | Beisong AK |
| 20050827 | 25F9K-T Fashionable | 1400 | LG |
| | 21T9D-T Two Color | 1071 | Beisong |
| | 21F9K-T(L), Linkage, Two Color | 1000 | Beisong AK |
| | 25F9K-T Fashionable | 1510 | LG |
| | DTA1586 U.S. MEMOREX | 1300 | Irico Flat |
| | DTA2196PF Canada CITIZEN | 671 | Beisong AK |
| | <span style="color:red">21T3A Colombia</span> | 10 | Beisong Flat Square |
| | HT-3728 Colombia | 10 | Samsung Flat Square |
| | 29F9D-T Two Color | 1400 | Samsung |
| | 29F3A Yugoslavia | 44 | Samsung |
| | 29F3A Colombia | 10 | Samsung |
| 20050828 | 21F9D-T Canada ELECTROHOME | 1352 | LG |
| | 21T3A Yugoslavia | 359 | Beisong |
| | 21F3A Yugoslavia | 149 | Beisong AK |
| | DTA1481(AC/DC) U.S. Haier Brand | 838 | Irico |
| | 21F9D-T Canada CITIZEN | 1352 | <span style="color:red">LG</span> |



info@certifiedtranslate.com  2425 Olympic Blvd., Suite 4000W  usa 1-888-856-2228
www.certifiedtranslate.com  Santa Monica, CA 90404  int +1-310-684-3153
fax +1-310-564-1944

**certified**translate
A LANGUAGE FISH LLC COMPANY

## CERTIFIED TRANSLATION



A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: | **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|---|
| Firm: | **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
|---|
| |
| **CHU00573034E – CHU00573035E** |
| |
| |

| Source Language: | **SIMPLIFIED CHINESE** | Target Language: | **ENGLISH** |
|---|---|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**  Sean Kirschenstein, Director          **Date:**  September 20, 2018

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On _Sep. 27 2018_ before me, ____Kristin Gail Chamberlain____, Notary Public, appeared ____Sean Kirschenstein____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____



KRISTIN GAIL CHAMBERLAIN
Commission # 2141980
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2020

Dear Supervisors and Colleagues:

Please see below the occupation rates for different sizes and models for Haier (Qingdao factory) provided by the Qingdao unit:

After discussion with the business office, the priority ranking for working on the various tubes based on their potential volume increase is as follows:

1. 21" FS
2. 21" RF(AK)
3. 15" RF
4. 20" Mnn
5. 14" Mnn
6. 29" RF

Thanks to the branch unit for their full cooperation in gathering this info.

Sales/PM attack strategy:

1. Factory M now holds a strategy meeting every Friday to focus on increasing internal competitiveness and dramatically improving cost composition.
   PMs intend to adopt aggressive measures toward specific customers that show potential, and detailed information from the branch unit will be crucial.
   The unit is currently collecting information in a set format. Although there's room for improvement in regards to comprehensiveness and accuracy, it's safe to say that results will be clearer and clearer in time.
   In the current expedient method, we can use these tables to compare the quantities of competitors' brands that our customers use each month for greater information reference.

2. Considering how Haier's export production capacity is distributed, the monthly full production capacity of Haier's Qingdao factory + Jiaonan totals 400 K.
   All indications are that the cooperation between Haier and Walmart of the U.S. looks to intensify. That is, in the upcoming 4th quarter high season, if we can seize this Haier rush export opportunity and grab 50% occupancy, that would greatly benefit our overall production capacity usage rate.
   At present, this is the major trend in Haier's export orders. Therefore, we need to reference its occupancy rate proportions in designing targeted strategies to improve our order hit rates and benefits.

3. If operating the way we are doing with the Haier case gets clear results, I suggest we define other core customers and develop them based on their relative influences.
   We should target existing major core customers (Orion, Funai, etc.) and secure their orders as well as information about competitor brands' moves toward them to 1) prevent bleeding from competitor brands robbing our occupancy rate, and 2) understand whether there is any room for expansion in the rest of the models.
   In addition, we should target customers showing potential (Haier…), learn and understand competitor brands' moves toward them, deploy targeted strategies, and do everything we can to gain orders from them.

CONFIDENTIAL - GRAND JURY MATERIAL

Sincerely,
Tham Hoong Yip

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00573035E_Translation

| | |
|---|---|
| **From:** | Tham Hoong Yip - APP |
| **Sent:** | Monday, September 05, 2005 10:06 AM |
| **To:** | Jimmy Chen - SAL; Chew Ka Sin - APP; Lee Shin Wei - SAL; Ho Chin Yan - APP; Yeik Nai Soon - APP |
| **Subject:** | 海爾訂單增量策略報告 |

**Attachments:**    Haier Occupation List Aug01.xls
各位主管與同仁：

請Joanne協助Double confirm相關資料是否正確？
再交由陳處長與周處長comment.


21"FS
a. Price (Customer not satisfy with the price we offer to them.
21"FS主要進入障礙為大陸彩管報價遠低於CPTM，致客戶採用意願低下。
唯目前客戶要價低於變動成本(USD28)，列入專案考慮策略接單中。
客戶告知若我司接受USD25價格，將立刻下單30K。我方報價為USD27.5，海爾採購表示無法接受。
唯業務已在大陸南部TV大廠取得USD27.5之售價(康佳取得訂單約30K)
業務正與海爾商討中，向其採購說明21"FS供應可能在未來3個月吃緊，期望說服海爾把握時機，否則一旦吃緊情況發，其必須以更高的價格採買。

21"RF
a. Price (Customer not satisfy with the price we offer to them.
21"RF主要進入障礙為大陸彩管報價遠低於CPTM，致客戶採用意願低下。
目前其他管源供貨價為USD33。
依客戶要求USD33，已低於變動成本(USD34.8)。
搶攻計劃：是否跟進USD33，分食海爾膠南廠每月50K(每月總量100K)的21"AK銷美訂單。[請主計計算加50K以後變動成本是否追得上報價]
b. Certificate (Customer did not use our CRT to apply certificate for target market)
21"RF (Invar)已承認予海爾非美國機種，包括東南亞/中東/歐洲皆可交貨。
21"RF (AK)樣品尚未承認，客戶採買意願低，未將我AK管列入申請安規認證行列。



以上
Tham




Thanks
Best regards
Tham Hoong Yip
Tel: 03-5891 7614
Fax: 03-5891 7996
email: tytham@cptm.com.my <mailto:tytham@cptm.com.my> (Personal)
        appemail@cptm.com.my <mailto:appemail@cptm.com.my> (Application Division)

CONFIDENTIAL – GRAND JURY MATERIAL                                                    CHU00572096

Application Engineer Division Product Manager
Chunghwa Picture Tube Malaysia Sdn. Bhd
Lot 1, Subang Hi-tech Industrial Park,
Batu Tiga, 40000 Shah Alam,
Selangor, Malaysia.

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00572097

**Master Monitoring File for Haier CRT Supplier Occupation Status Table.**

| Tube Type | Demand/M | CPTM | 彩虹 | 三星 | 北松 | LG | 樂桂 | Occupation Status |
|-----------|----------|------|------|------|------|------|------|-------------------|
| 13VMnn | 50192 | 28000 | 12192 | 10000 | 0 | 0 | 0 | Normal |
|        |       | 56% | 24% | 20% | 0% | 0% | 0% | |
| 14VRF | 25000 | 0 | 25000 | 0 | 0 | 0 | 0 | Bad |
|        |       | 0% | 100% | 0% | 0% | 0% | 0% | |
| 20V FS | 23117 | 0 | 0 | 0 | 1101 | 0 | 22016 | Bad |
|        |       | 0% | 0% | 0% | 5% | 0% | 95% | |
| 20VRF | 24740 | 0 | 0 | 0 | 21991 | 2744 | 0 | Bad |
|        |       | 0% | 0% | 0% | 89% | 11% | 0% | |
| 27VRF | 7563 | 0 | 0 | 6722 | 841 | 0 | 0 | Bad |
|        |       | 0% | 0% | 89% | 11% | 0% | 0% | |
| Total | 130612 | 28000 | 37192 | 16722 | 23933 | 2744 | 22016 | |
|        |       | 21% | 28% | 13% | 18% | 2% | 17% | |

各位主管與同仁：

**21"FS**

a. Price (Customer not satisfy with the price we offer to them.

21"FS主要進入障礙為大陸彩管報價遠低於CPTM，致客戶採用意願低下。

唯目前客戶要價低於變動成本(USD28)，列入專案考慮策略接單中。

客戶告知若我司接受USD25價格，將立刻下單30K。我方報價為USD27.5，海爾採購表示無法接受。

唯業務已在大陸南部TV大廠取得USD27.5之售價(康佳取得訂單約30K)

業務正與海爾商討中，向其採購說明21"FS供應可能在未來3個月吃緊，期望說服海爾把握時機，否則一旦吃緊情況發，其必須以更高的價格採買。

**21"RF**

a. Price (Customer not satisfy with the price we offer to them.

21"RF主要進入障礙為大陸彩管報價遠低於CPTM，致客戶採用意願低下。

目前其他管源供貨價為USD33。

依客戶要求USD33，已低於變動成本(USD34.8)。

搶攻計劃：是否跟進USD33，分食海爾膠南廠每月50K(每月總量100K)的21"AK銷美訂單。[請主計計算加50K以後變動成本是否追得上報價]

b. Certificate (Customer did not use our CRT to apply certificate for target market)

21"RF (Invar)已承認予海爾非美國機種，包括東南亞/中東/歐洲皆可交貨。

**21"RF (AK)樣品尚未承認，客戶採買意願低，未將我AK管列入申請安規認證行列。**

**CONFIDENTIAL**

Back to Master file

**Effective Period:** Aug-05
**Update Week:** W533

**A.) Haier 13VMnn TV Export Order Occupation Table.** (Base Haier Weekly Production Schedule)

| Tube Type | Model Name | Demand/M | | Competitor 01 | Competitor 02 | Occupation Status |
|---|---|---|---|---|---|---|
| 14"Mnn | 1481 美国 | 846 | CPTM 6 | 彩虹 840 | 三星 0 | Bad |
| | | | 1% | 99% | 0% | |
| | 1486 荷兰 | 1998 | CPTM 0 | 彩虹 0 | 三星 1998 | Bad |
| | | | 0% | 0% | 100% | |
| | 1486 西班牙 | 10 | CPTM 0 | 彩虹 10 | 三星 0 | Bad |
| | | | 0% | 100% | 0% | |
| | 1486 美国 | 4762 | CPTM 0 | 彩虹 4762 | 三星 0 | Bad |
| | | | 0% | 100% | 0% | |
| | 1486 英国 | 2514 | CPTM 0 | 彩虹 2514 | 三星 0 | Bad |
| | | | 0% | 100% | 0% | |
| | 1489 美国 | 421 | CPTM 415 | 彩虹 0 | 三星 6 | Good |
| | | | 99% | 0% | 1% | |
| | 1490 西班牙 | 1814 | CPTM 1814 | 彩虹 0 | 三星 0 | Good |
| | | | 100% | 0% | 0% | |
| | 1490 澳大利亚 | 20 | CPTM 20 | 彩虹 0 | 三星 0 | Good |
| | | | 100% | 0% | 0% | |
| | 1490 英国 | 6 | CPTM 6 | 彩虹 0 | 三星 0 | Good |
| | | | 100% | 0% | 0% | |
| | 1496 加拿大 | 2448 | CPTM 2448 | 彩虹 0 | 三星 0 | Good |
| | | | 100% | 0% | 0% | |
| | 1496 英国 | 5040 | CPTM 0 | 彩虹 0 | 三星 5040 | Bad |
| | | | 0% | 0% | 100% | |
| Sub Total | | 19879 | 4714 | 8130 | 7046 | Normal |
| | | | 24% | 41% | 35% | |



Haier 13VMnn CRT Supplier Occupation %

□ CPTM, 24%  ■ 彩虹, 41%  □ 三星, 35%

註：因海爾生產計劃週程可能提出當計劃而變更，以之作整合故完整性與準確性較差。

**B. Haier 13VMnn Monthly Accumulated CRT Usage Occupation Rate.**

| Tube Type | Demand/M | CPTM | 彩虹 | 三星 | Occupation Status |
|---|---|---|---|---|---|
| Sub Total | 50192 | 28000 | 12192 | 10000 | Normal |
| | | 56% | 24% | 20% | |

註：此資料由海爾內部整理每月各CRT使用佔有率，以可用量做出取出。故完整性與準確性較佳。
佔有率顏色管理方式，綠色為健康，黃色為一般，紅色為不健康。由 Sales & APP協同意識。

**1. 客戶新機型：** PIC: Qingdao Support team
因为三星管的不良率高，后续海尔不会向三星采购□寸管，目前只是在消化库存三星□寸管。

**2. 競爭牌導入：** PIC: Qingdao Support team
客戶未有導入新14"管源。

**3. 使用佔有率：** PIC: Sales / APP
CPTM於海爾的14"電視佔有率較佳，目前佔56%佔有率處屬一般健康水平。

**4. 佔有率提昇：** PIC: Sales / APP
後續三星(馬)13VMnn管退出戰局，海爾14"訂單大餅將由CPTM與彩虹共享。
建議我方將佔有率提昇至60~80%以上，以取得主導地位。

**5. 進入障礙定：** PIC: Sales / APP
a. Price (Customer not satisfy with the price we offer to them.)
目前與彩虹價價差小，不構成進入障礙。
b. Certificate (Customer did not use our CRT to apply certificate for target market)
全機種皆已申請，不構成進入障礙。
c. Performance/Technical (request Tighten specification)
CRT搭配機板狀況良好，不構成進入障礙。
d. Quality ()
CPTM品質為三家中最佳，不構成進入障礙。
e. Competitor (Check whether Competitor did set any entry barrier)
目前由三家供應減少至二家，亦未開競爭牌有任何設置進入障礙動作，不構成進入障礙。
f. Timing (Miss phase in stage)
海爾未有開發任14"新型型，不構成進入障礙。
g. New Product development Time To Market
各競爭牌針對14"未有新產品開發計劃，不構成進入障礙。
h. Order response Time to Market (Lead time of get order till product ETA to Customer)
目前以另租倉庫方式處理，暫可滿足客戶對Lead time要求，暫不構成進入障礙。

**6. 相關負責單：** PIC: Sales/APP/MRD/MED/…..
待與責任單位商議中。

Back to Master file
Case 4:07-cv-05944-JST   Document 6307-1   Filed 09/06/23   Page 246 of 538
Effective Period:
Update Week: WS33

**Haier 14VRF TV Export Order Occupation Table. (Base Haier Weekly Production Schedule)**

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 | Occupation Status |
|---|---|---|---|---|---|
| 15"RF | 1586美国 | 26525 | CPTM 彩虹 | 26525 | Bad |
| | | | 0 | 100% | |
| | 1586加拿大 | 9 | CPTM 彩虹 | 9 | Bad |
| | | | 0 | 100% | |
| | 1418A美国 | 4860 | CPTM 彩虹 | 4860 | Bad |
| | | | 0 | 100% | |
| Sub Total | | 31394 | 0 | 31394 | Bad |
| | | | 0% | 100% | |

註：因為欄位遮計數據兩可能提出與計數據變更，以之作整合以完整性與準確性較佳。



Haier 14VRF CRT Supplier Occupation %

CPTM, 0%   彩虹, 100%

**B. Haier 14VRF Monthly Accumulated CRT Usage Occupation Rate.**

| Tube Type | Demand/M | CPTM | 彩虹 | Occupation Status |
|---|---|---|---|---|
| Sub Total | 25000 | 0 | 25000 | Bad |
| | | | 100% | |

註：此資料由海爾內部整理每月各CRT供應商在各尺寸的用量報告中取出。故完整性與準確性較佳。

註：佔有率顏色管理方式，綠色為健康；黃色為一般；紅色為不健康。由Sales＆APP協同定議。

**1. 客戶新機型開發 PIC: Qingdao Support team**

客戶現有生產15"RF機種為1586銷美，僅使用彩虹管，每月5~10K。
新訂單銷美沃而瑪 x100K spot order，原定由分成3個月(8~10月)，目前申

**2. 競爭牌導入計劃 PIC: Qingdao Support team**

未有其他競爭牌導入計劃。

**3. 使用佔有率分析 PIC: Sales / APP**

14VRF實際於2004年3月份即已送樣，因當13VMnn供應量吃緊，CPTM策略性迴避14VRF接單。

**4. 佔有率提昇目標 PIC: Sales / APP**

14VRF競爭對手少，應朝有30~50%佔有率運作。目前全力進行0的突破，安規申請＋PP上線推動。

**5. 進入障礙定議： PIC: Sales / APP**

a. Price (Customer not satisfy with the price we offer to them.目前報價與彩虹價價差小，不構成進入障礙。
唯目前報價低於變動成本1USD。

b. Certificate (Customer did not use our CRT to apply certificate for target market)
因2004年未導入予海爾，未將CPT管列入安規申請行列。目前1418A銷美(沃而瑪)機種導入，客戶要求我方承擔安規費用(50~60KRMB)，需時6週。待完成安規申請工作，已近此Spot Order出貨之尾聲，僅餘最後一個月與彩虹共享，效應不大。
後續搶進安規申請費承擔之效應，因考量14VRF(AK)導入時間點(10月份前完成樣品)，Invar管安規費承擔效應或僅可維持不足半年。
另必考量海爾是否將要求CPTM繼承擔AK管安規費用。

c. Performance/Technical (request Tighten specification)
CRT搭配機板狀況良好，樣機主觀評價成功過關，不構成進入障礙。

d. Quality ()
尚未投用，無品質投用狀況，不構成進入障礙。

e. Competitor (Check whether Competitor did set any entry barrier)
目前競爭牌僅彩虹，是否設置進入障礙仍調查中。

f. Timing (Miss phase in stage)
因2004年未導入予海爾，未將CPT管列入安規申請行列。目前1418A銷美(沃而瑪)機種導入，客戶要求我方承擔安規費用(50~60KRMB)，需時6週。

g. New Product development Time To Market
海爾未使用14VRF (AK)管，競爭牌彩虹亦未送樣，不構成進入障礙。

h. Order response Time to Market (Lead time of get order till product ETA to Customer)
目前以另租倉庫方式處理，暫可滿足客戶對Lead time要求，暫不構成進入障礙。

**6. 相關負責單位聯 PIC: Sales/APP/MRD/MED/…..**

APP提案：現1418新Model (Spot order量100K)樣品已OK，但P/P無進行; 要求付安規費用(5萬~6萬人民幣)，但不擔保有訂單僅能卡位。

**CONFIDENTIAL**

CHU00572098 (Haier 14VRF.01)

Back to Master file
**Effective Period:**  Aug-05
**Update Week:**  W533

**Haier 20V FS TV Export Order Occupation Table. (Base Haier Weekly Production Schedule)**

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 | Competitor 02 | Occupation Status |
|---|---|---|---|---|---|---|
| | 2004D | 22016 | CPTM | | 22016 | Bad |
| | | | 0 | 0 | 22016 | |
| | | | | 0% | 100% | |
| 21"FS | 21T3A | 1101 | CPTM | 全松 | 赛格 | Bad |
| | | | 0 | 1101 | 0 | |
| | | | 0% | 100% | 0% | |
| Sub Total | | 23117 | 0 | 1101 | 22016 | Bad |
| | | | 0% | 5% | 95% | |

註：因為廠生產訂劃確竟可能視出貨狀況調整訂劃需管理，以公布整合在此完整性與準確性提高。

**B. Haier 20VFS Monthly Accumulated CRT Usage Occupation Rate.**

| Tube Type | | Demand/M | CPTM | 全松 | 赛格日立 | Occupation Status |
|---|---|---|---|---|---|---|
| Sub Total | | 49672 | 0 | 9672 | 40000 | Bad |
| | | | 0% | 19% | 81% | |

註：此資料以海爾內部整理統計各CRT供應商在各尺寸的用量彙整中調，狀況整技術準確性較佳，佔有率顏色管理方式：綠色為健康；黃色為一般；紅色為不健康，由Sales & APP協同討論。

**Haier 20V FS CRT Supplier Occupation %**



(Pie chart legend: CPTM, 全松..., 赛格, 95%)

**1. 客戶新機型**|PIC: Qingdao Support team
8月海爾未向中華採購21FS管，全部為賽格生產！

**2. 競爭牌導入**|PIC: Qingdao Support team
未有其他競爭牌導入計劃。

**3. 使用佔有率**|PIC: Sales / APP
21"FS主要進入障礙為大陸彩管報價遠低於CPTM，致客戶採用意願低下。由5月開始，原每月30K出貨降至0。

**4. 佔有率提昇**|PIC: Sales / APP
北松/賽格報價有回昇趨勢，海爾採購提議若我方同意USD25，可獲30K訂單。
若按客戶要價USD 25，比較海爾8月21"FS需求，應可有60%以上佔有率。

**5. 進入障礙**|PIC: Sales / APP
a. Price (Customer not satisfy with the price we offer to them.
21"FS主要進入障礙為大陸彩管報價遠低於CPTM，致客戶採用意願低下。
唯目前客戶要價低於變動成本(USD28)，列入專案考慮策略接單中。
客戶告知若我可接受USD25價格，將立刻下單30K。我方報價為USD27.5，海爾採購表示無法接受。
唯業務已在大陸南部TV大廠取得USD27.5之售價(康佳取得訂單的30K)
業務正與海爾商討中，向其採購說明21"FS供應可能在未來3個月吃緊，期望說服海爾把握時機，否則一旦吃緊情況發，其必須以更高的價格採買。
b. Certificate (Customer did not use our CRT to apply certificate for target market)
全機種皆已申請，不構成進入障礙。
c. Performance/Technical (request Tighten specification)
CRT搭配機板狀況良好，不構成進入障礙。
d. Quality ()
CPTM品質為三家中最佳，不構成進入障礙。
e. Competitor (Check whether Competitor did set any entry barrier)
北松/賽格報價有回昇趨勢，海爾採購積極步周中。
f. Timing (Miss phase in stage)
海爾未有開發往14"新機型，不構成進入障礙。
g. New Product development Time To Market
各競爭牌針對21"FS未有新產品開發計劃，不構成進入障礙。
h. Order response Time to Market (Lead time of get order till product ETA to Customer)
目前以另租倉庫方式處理，暫可滿足客戶對Lead time要求，暫不構成進入障礙。

**6. 相關負責單**|PIC: Sales/APP/MRD/MED/…..



Haier 20V RF TV Export Order Occupation Table. (Base Haier Weekly Production Schedule)

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 | Competitor 02 | Competitor 03 | Competitor 04 | Occupation Status |
|---|---|---|---|---|---|---|---|---|
| 21"RF | 21F9K | 13870 | 0 / 0% | 13870 / 100% | 0 / 0% | 0 / 0% | 0 / 0% | Bad |
| | 21F9D | 2735 | 0 / 0% | 1 / 0% | 2734 / 100% | 0 / 0% | 0 / 0% | Bad |
| | 21F7A | 10 | 0 / 0% | 0 / 0% | 10 / 100% | 0 / 0% | 0 / 0% | Bad |
| | 21T9D | 4507 | 0 / 0% | 4507 / 100% | 0 / 0% | 0 / 0% | 0 / 0% | Bad |
| | 2189天同 | 1035 | 0 / 0% | 1035 / 100% | 0 / 0% | 0 / 0% | 0 / 0% | Bad |
| | 2189向广 | 38 | 0 / 0% | 38 / 100% | 0 / 0% | 0 / 0% | 0 / 0% | Bad |
| | 2189出大利可 | 148 | 0 / 0% | 148 / 100% | 0 / 0% | 0 / 0% | 0 / 0% | Bad |
| | 2196PFF加拿大人 | 1357 | 0 / 0% | 1357 / 100% | 0 / 0% | 0 / 0% | 0 / 0% | Bad |
| | 2198瓦同 | 10 | 0 / 0% | 5 / 50% | 0 / 0% | 5 / 50% | 0 / 0% | Bad |
| | 2198澳域 | 6 | 0 / 0% | 6 / 100% | 0 / 0% | 0 / 0% | 0 / 0% | Bad |
| | 2198瓦同 | 360 | 0 / 0% | 360 / 100% | 0 / 0% | 0 / 0% | 0 / 0% | Bad |
| | 21F98-CD瓦同 | 363 | 0 / 0% | 363 / 100% | 0 / 0% | 0 / 0% | 0 / 0% | Bad |
| | 21F3A-T | 301 | 0 / 0% | 301 / 100% | 0 / 0% | 0 / 0% | 0 / 0% | Bad |
| Sub Total | | 24740 | 0 / 0% | 21991 / 89% | 2744 / 11% | 5 / 0% | 0 / 0% | |

註：以為廠生產伴廓每月能用比判計算的數弝模率，以之行報合在信情占無率指情情占非的非

B. Haier 20VRF Monthly Accumulated CRT Usage Occupation Rate.

| Tube Type | | Demand/M | CPTM | 大陸 | LG | 樣紅 | 彩紅 | Occupation Status |
|---|---|---|---|---|---|---|---|---|
| Sub Total | | 28446 | 0 / 0% | 23346 / 82% | 0 / 0% | 0 / 0% | 5100 / 18% | |

註：此調料作海廠内品整用自於20VRF信用比占予不作内用制備物作理計，指之以行介需非信作之
供有非制出宣回方式，枯也為建評：宜也為一枚：紅也鼠不建評。※Sales & APP區以可追溝。

**1. 客戶新機型開發**PIC: Qingdao Support team
21F7A（LG管）多在胶南生产

**2. 競爭牌導入計劃**PIC: Qingdao Support team
LPD取得於膠南廠470K銷美訂單，預計由8月份起，
分3~5月交貨。
原3月份交貨2K北管，屬交歐洲市場(海爾考量歐洲對品位要求高，而使用CPTM Invar管)。後續即未再採購。

**3. 使用佔有率分析**PIC: Sales / APP
21"RF主要進入障礙為大陸彩管報價遠低於CPTM，致
客戶採用意願低下。

**4. 佔有率提昇目標**PIC: Sales / APP
因海爾21"RF (AK)銷美訂單穩定，應考量搶
佔50%佔率，以提昇M廠

**5. 進入障礙定義**：PIC: Sales / APP

a. Price (Customer not satisfy with the price we offer to them.
21"RF主要進入障礙為大陸彩管報價遠低於CPTM，致客戶採用意願低下。
目前其他管源供貨價為USD33。
依客戶要求USD33，已低於變動成本(USD34.8)。
搶攻計劃：是否跟進USD33，分食海爾膠南廠每月50K(每月總量100K)的21"AK銷美訂單。[請主計計算
加50K以後變動成本是否追得上報價]

b. Certificate (Customer did not use our CRT to apply certificate for target market)
21"RF (Invar)已承認予海爾非美歐機種，包括東南亞/中東/歐洲皆可交貨。
21"RF (AK)樣品尚未承認，客戶採買意願低，未將我AK管列入申請安規認證行列。

c. Performance/Technical (request Tighten specification)
21"RF (Invar) CRT搭配機板狀況良好，不構成進入障礙。
21"RF (AK)樣品尚未搭配，預計W534可完成搭配評估工作。

d. Quality ()
21"RF (Invar) CPTM品質為三家中最佳，不構成進入障礙。
21"RF (AK) 尚未投用，無品質投用狀況，不構成進入障礙。

e. Competitor (Check whether Competitor did set any entry barrier)
目前由三家供應，亦未間競爭牌有任何設置進入障礙動作，是否設置進入障礙仍調查中。

f. Timing (Miss phase in stage)
海爾21"RF導入案，樣品單早於2004年3月底送抵工廠。唯當時適逢海爾泰國使用AK管引發市場強烈抱
怨，
最終以2千台電被迫送回青島換回Invar管結案。海爾高層遂針對海外市場下達暫停使用AK管，唯國內訂
單仍持續轉換使用AK管。
大陸各家CRT廠商積內銷優勢，使用綁樁方式，在海爾於2005年2Q恢復使用AK於外銷訂單時，彼即伺機逐
步擴散至海爾外銷單。

g. New Product development Time To Market
因海爾2004年凍結使用AK管於外銷定單，

h. Order response Time to Market (Lead time of get order till product ETA to Customer)
目前以另租倉庫方式處理，暫可滿足客戶於Lead time要求，暫不構成進入障礙。

**6 相關負責單位聯**PIC: Sales/APP/MRD/MED/…..

Back to Master file
**Effective Period:** Aug-05
**Update Week:** W533

**Haier 27V RF TV Export Order Occupation Table. (Base Haier Weekly Production Schedule)**

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 | Competitor 02 | Competitor 03 | Occupation Status |
|---|---|---|---|---|---|---|---|
| 29"RF | 29F9D | 4301 | CPTM | 北松 | 彩虹 | 三星 | Bad |
| | | | 0 | 0 | 0 | 4301 | |
| | | | 0% | 0% | 0% | 100% | |
| | 29F9G | 6 | CPTM | 北松 | 彩虹 | 三星 | Bad |
| | | | 0 | 0 | 0 | 6 | |
| | | | 0% | 0% | 0% | 100% | |
| | D29FV6-A | 908 | CPTM | 北松 | 彩虹 | 三星 | Bad |
| | | | 0 | 0 | 0 | 908 | |
| | | | 0% | 0% | 0% | 100% | |
| | D29FA9-AK | 549 | CPTM | 北松 | 彩虹 | 三星 | Bad |
| | | | 549 | 0 | 0 | 0 | |
| | | | 100% | 0% | 0% | 0% | |
| | 29F8A | 190 | CPTM | 北松 | 彩虹 | 三星 | Bad |
| | | | 0 | 0 | 0 | 190 | |
| | | | 0% | 0% | 0% | 100% | |
| | 29T9D马来西亚 | 292 | CPTM | 北松 | 彩虹 | 三星 | Bad |
| | | | 292 | 0 | 0 | 0 | |
| | | | 100% | 0% | 0% | 0% | |
| | 29F3A | 210 | CPTM | 北松 | 彩虹 | 三星 | Bad |
| | | | 0 | 0 | 0 | 210 | |
| | | | 0% | 0% | 0% | 100% | |
| Sub Total | | 7563 | 0 | 841 | 0 | 6722 | |
| | | | 0% | 11% | 0% | 89% | |



Haier 27V CRT Supplier Occupation %
彩虹, 0%   CPTM, 0%   北松, 11%   三星, 89%

註：因海爾年產計劃調整可能得出估計劃而變更，以У作整合故整件與準確件較善。

註：
估有率顏色管理方式，綠色為健康；黃色為一般；紅色為不健康。由Sales & APP協同定議。

**1. 客戶新機型開發** PIC: Qingdao Support team

**2. 競爭牌導入計劃** PIC: Qingdao Support team

**3. 使用佔有率分析** PIC: Sales / APP

**4. 佔有率提昇目標** PIC: Sales / APP

**5. 進入障礙定議：** PIC: Sales / APP
a. Price (Customer not satisfy with the price we offer to them.

b. Certificate (Customer did not use our CRT to apply certificate for target market)

c. Performance/Technical (request Tighten specification)

d. Quality ()

e. Competitor (Check whether Competitor did set any entry barrier)

f. Timing (Miss phase in stage)

g. New Product development Time To Market

h. Order response Time to Market (Lead time of get order till product ETA to Customer)
目前以另租倉庫方式處理，暫可滿足客戶對Lead time要求，暫不構成進入障礙。

**6. 相關負責單位聯** PIC: Sales/APP/MRD/MED/…..

**CONFIDENTIAL**

**CHU00572098(Haier 27VRF.01)**

From: Tham Hoong Yip - APP
Sent: Friday, August 26, 2005 7:53 AM

To: Jimmy Chen - SAL; Ng Lee Chiat - SAL; Lee Shin Wei - SAL; hongsp626; 洪善平
Cc: Chew Ka Sin - APP; Ho Chin Yan - APP; Yeik Nai Soon - APP; Fong Soon Fei - APP
Subject: [Qingdao Support Team]Haier CRT Supplier Occupation Rate investigation List.

Importance: High

Attachments: 0825海?各机种?查工作表格 Haier Occupation List a.xls; ?各??划表中粘?并?行包含??的??.xls; Haier CRT Supplier Occupation Rate investigation List.doc

If your system can't recognize this Traditional Chinese font, please refer to the file "Haier CRT Supplier Occupation Rate investigation List.doc"


各位主管與同仁：


請參考青島駐在回饋海爾(青島廠)各尺寸機種佔有率分佈如下：


經與業務商討，按各管種可能增量潛力擬定各管工作優先順序排程如下：

1. 21"FS

2. 21"RF(AK)

3. 15"RF

4. 20"Mnn

5. 14"Mnn

6. 29"RF


感謝駐在全力配合收集，。


Sales/PM搶攻策略：

1. 目前M廠每週五戰略會議集中力量進行內部競爭力提昇，針對成本體質進行強化改善。

　　相應PM擬針對特定有潛能客戶採(Aggressive Measure)侵略性積極動作，駐在詳實資料回饋是必要條件。

　　目前駐在以設計好的格式收集資料，雖完整性/精確性尚待提昇，可以確定經一段時間後其效應將越發明顯。

　　現行權宜作法，可將此表與客戶每月競爭牌用量比例進行比對，提昇資料參考性。


2. 考量海爾外銷產能佈局，海爾青島廠＋膠南月產能滿載合計400K。

　　多方消息顯示，海爾與美國沃爾瑪合作關係有深化趨勢，即將到來的4Q旺季，若我方可把握海爾出口量衝大時機，

　　搶佔50%佔有率，對我方整體產能利用率將大有助益。

　　目前此為海爾出口單大方向走勢，故需配合其佔有率比例作參考，方可作針對性的策略設計，提昇搶單命中率與效益。


3. 若海爾案方式操作成效顯著，建議可另行定議其他核心客戶，比照波及展開。

　　針對對象現有核心大戶(Orion, Funai等)，掌握客戶訂單與競爭牌之動態資訊，一則防止競爭牌搶佔有率而流血；

　　二則再瞭解其餘機種是否有再擴大訂單之空間。

　　另針對有潛力(海爾,...)的客戶，掌握競爭牌之動向，布署針對性策略，全力搶奪訂單。

CONFIDENTIAL – GRAND JURY MATERIAL

以上。

譚宏業




-----Original Message-----

From: hongsp626 [mailto:hongsp626@126.com]

Sent: Friday, August 26, 2005 12:14 PM

To: Tham Hoong Yip - APP

Subject: kschew@cptm.com.my;nsyeik@cptm.com.my;cyho@cptm.com.my


我刚才已经用公司邮箱发信件给你！

因为担心你们没收到，故再用外部邮箱发一下！




HYPERLINK "http://www.126.com" \n需要一个2000兆的免费邮箱吗？

网易免费邮箱是中国最多人使用的电子邮箱。

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00572997

Master Monitoring File for Haier CRT Supplier Occupation Status Table.

| Tube Type | Demand/M | CPTM | 彩虹 | 三星 | 北松 | LG | 赛格 | Occupation Status |
|-----------|----------|------|------|------|------|-----|------|-------------------|
| 13VMnn | 19879 | 4709 | 8126 | 7044 | 0 | 0 | 0 | Normal |
|        |       | 24% | 41% | 35% | 0% | 0% | 0% | |
| 14VRF | 31394 | 0 | 31394 | 0 | 0 | 0 | 0 | Bad |
|       |       | 0% | 100% | 0% | 0% | 0% | 0% | |
| 20V FS | 23117 | 0 | 0 | 0 | 1101 | 0 | 22016 | Bad |
|        |       | 0% | 0% | 0% | 5% | 0% | 95% | |
| 20VRF | 24740 | 0 | 0 | 0 | 21991 | 2744 | 0 | Bad |
|       |       | 0% | 0% | 0% | 89% | 11% | 0% | |
| 27VRF | 6456 | 0 | 0 | 5615 | 841 | 0 | 0 | Bad |
|       |      | 0% | 0% | 87% | 13% | 0% | 0% | |

CONFIDENTIAL - GRAND JURY MATERIAL                CHU00572998 (Master file.01)

Back to Master file

**Effective Period:**　　Aug-05
**Update Week:**　　W533

**Haier 13VMnn TV Export Order Occupation Table.**

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 | Competitor 02 | Occupation Status |
|---|---|---|---|---|---|---|
| 14"Mnn | 1481美国 | 846 | 彩虹<br>6<br>1% | 彩虹<br>840<br>99% | 三星<br>0<br>0% | Bad |
| | 1486荷兰 | 1998 | 彩虹<br>0<br>0% | 彩虹<br>0<br>0% | 三星<br>1998<br>100% | Bad |
| | 1486西班牙 | 10 | 彩虹<br>0<br>0% | 彩虹<br>10<br>100% | 三星<br>0<br>0% | Bad |
| | 1486美国 | 4762 | 彩虹<br>0<br>0% | 彩虹<br>4762<br>100% | 三星<br>0<br>0% | Bad |
| | 1486英国 | 2514 | 彩虹<br>0<br>0% | 彩虹<br>2514<br>100% | 三星<br>0<br>0% | Bad |
| | 1489英国 | 421 | 彩虹<br>415<br>99% | 彩虹<br>0<br>0% | 三星<br>6<br>1% | Good |
| | 1490西班牙 | 1814 | 彩虹<br>1814<br>100% | 彩虹<br>0<br>0% | 三星<br>0<br>0% | Good |
| | 1490澳大利亚 | 20 | 彩虹<br>20<br>100% | 彩虹<br>0<br>0% | 三星<br>0<br>0% | Good |
| | 1490美国 | 6 | 彩虹<br>6<br>100% | 彩虹<br>0<br>0% | 三星<br>0<br>0% | Good |
| | 1496加拿大 | 2448 | 彩虹<br>2448<br>100% | 彩虹<br>0<br>0% | 三星<br>0<br>0% | Good |
| | 1496美国 | 5040 | 彩虹<br>0<br>0% | 彩虹<br>0<br>0% | 三星<br>5040<br>100% | Bad |
| Sub Total | | 19879 | 4709<br>24% | 8126<br>41% | 7044<br>35% | Normal |



Haier 13VMnn CRT Supplier Occupation %

- CPTM, 24%
- 彩虹, 41%
- 三星, 35%

注：
�iu右颜色管理方式，绿色为健康；黄色为一般；红色为不健康。rn Sales & APP协同定议。

1. 交后新機型開發資訊： 　　PIC: Qingdao Support team
因为三星管的不良率高，后续海尔不会向三星采购口寸管，目前只是在消化库存三星口寸管

2. 競爭牌導入計劃資訊： 　　PIC: Qingdao Support team

CONFIDENTIAL - GRAND JURY MATERIAL　　　　　　　CHU00572998 (Haier 13VMnn.01)

Back to Master file

**Effective Period:**      **Aug-05**
**Update Week:**      **W533**

**Haier 14VRF TV Export Order Occupation Table.**

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 | Occupation Status |
|---|---|---|---|---|---|
| 14"Mnn | 1586美国 | 26525 | CPTM | 彩虹 | Bad |
| | | | 0 | 26525 | |
| | | | 0% | 100% | |
| | 1586加拿大 | 9 | CPTM | 彩虹 | Bad |
| | | | 0 | 9 | |
| | | | 0% | 100% | |
| | 1418A美国 | 4860 | CPTM | 彩虹 | Bad |
| | | | 0 | 4860 | |
| | | | 0% | 100% | |
| Sub Total | | 31394 | 0 | 31394 | Bad |
| | | | 0% | 100% | |



註：
佔有率圖色管理方式，綠色為健康；黃色為一般；紅色為不健康。由Sales & APP協同定讞。

1. 客戶新機型開發資訊：      PIC: Qingdao Support team

2. 競爭牌導入計劃資訊：      PIC: Qingdao Support team

Back to Master file

**Effective Period:**   **Aug-05**
**Update Week:**   **W533**

**Haier 20V FS TV Export Order Occupation Table.**

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 | Competitor 02 | Occupation Status |
|---|---|---|---|---|---|---|
| | 2004D | 22016 | CPTM | 北松 | 赛格 | Bad |
| | | | 0 | 0 | 22016 | |
| | | | 2% | 0% | 100% | |
| 21"FS | 21T3A | 1101 | CPTM | 北松 | 赛格 | |
| | | | 0 | 1101 | 0 | |
| | | | 0% | 100% | 0% | |
| | | | | | | |
| | | | | | | |
| Sub Total | | 23117 | 0 | 1101 | 22016 | Bad |
| | | | 0% | 5% | 95% | |



Haier 20V FS CRT Supplier Occupation %

注：
佔有率顏色管理方式，綠色為健康；黃色為一般；紅色為不健康。由Sales & APP協同定議。

1. 客戶新機型開發資訊   PIC: Qingdao Support team

8月海尔末向中华采购21FS管，全部为赛格生产！

2. 競爭牌導入計劃資訊   PIC: Qingdao Support team

Back to Master file
**Effective Period:** **Aug-05**
**Update Week:** **W533**

**Haier 27V RF TV Export Order Occupation Table.**

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 | Competitor 02 | Competitor 03 | Competitor 04 | Occupation Status |
|---|---|---|---|---|---|---|---|---|
| | 21F9K | 13870 | CPTM | 北松 | 口口 | 賽格 | 彩虹 | |
| | | | 0 | 13870 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 21F9D | 2735 | CPTM | 北松 | 口口 | 賽格 | 彩虹 | |
| | | | 0 | 1 | 2734 | 0 | 0 | Bad |
| | | | 0% | 0% | 100% | 0% | 0% | |
| | 21F7A | 10 | CPTM | 北松 | 口口 | 賽格 | 彩虹 | |
| | | | 0 | 0 | 10 | 0 | 0 | |
| | | | 0% | 0% | 100% | 0% | 0% | |
| | 21T9D | 4507 | CPTM | 北松 | 口口 | 賽格 | 彩虹 | |
| | | | 0 | 4507 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2189英国 | 1035 | CPTM | 北松 | 口口 | 賽格 | 彩虹 | |
| | | | 0 | 1035 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2189荷兰 | 38 | CPTM | 北松 | 口口 | 賽格 | 彩虹 | |
| | | | 0 | 38 | 0 | 0 | 0 | |
| | | | 0% | 100% | 0% | 0% | 0% | |
| 29"RF | 2189澳大利亚 | 148 | CPTM | 北松 | 口口 | 賽格 | 彩虹 | |
| | | | 0 | 148 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2196PF加拿大 | 1357 | CPTM | 北松 | 口口 | 賽格 | 彩虹 | |
| | | | 0 | 1357 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2198美国 | 10 | CPTM | 北松 | 口口 | 賽格 | 彩虹 | |
| | | | 0 | 5 | 0 | 5 | 0 | Bad |
| | | | 0% | 50% | 0% | 50% | 0% | |
| | 2198挪威 | 6 | CPTM | 北松 | 口口 | 賽格 | 彩虹 | |
| | | | 0 | 6 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 2198英国 | 360 | CPTM | 北松 | 口口 | 賽格 | 彩虹 | |
| | | | 0 | 360 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 21F98-CD韩国 | 363 | CPTM | 北松 | 口口 | 賽格 | 彩虹 | |
| | | | 0 | 363 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| | 21F3A-T | 301 | CPTM | 北松 | 口口 | 賽格 | 彩虹 | |
| | | | 0 | 301 | 0 | 0 | 0 | Bad |
| | | | 0% | 100% | 0% | 0% | 0% | |
| Sub Total | | 24740 | | 0 | 21991 | 2744 | 5 | 0 |
| | | | | 0% | 89% | 11% | 0% | 0% |

Haier 27V RF CRT Supplier Occupation %

註：
佔有率顏色管理方式，綠色為健康，黃色為一般，紅色為不健康，由Sales & APP協同定議。

1. 客戶新機型開發資訊：PIC: Qingdao Support team

21F7A（LG管）多在股南生產

2. 競爭牌導入計劃資訊：PIC: Qingdao Support team

Back to Master file
**Effective Period:**   Aug-05
**Update Week:**   W533

**Haier 20V RF TV Export Order Occupation Table.**

| Tube Type | Model Name | Demand/M | CPTM | Competitor 01 | Competitor 02 | Competitor 03 | Occupation Status |
|---|---|---|---|---|---|---|---|
| 21"RF | 29F9D | 4301 | CPTM | 北松 | 彩虹 | 三星 | Bad |
| | | | 0 | 0 | 0 | 4301 | |
| | | | 0% | 0% | 0% | 100% | |
| | 29F9G | 6 | CPTM | 北松 | 彩虹 | 三星 | Bad |
| | | | 0 | 0 | 0 | 6 | |
| | | | 0% | 0% | 0% | 100% | |
| | D29FV6-A | 908 | CPTM | 北松 | 彩虹 | 三星 | Bad |
| | | | 0 | 0 | 0 | 908 | |
| | | | 0% | 0% | 0% | 100% | |
| | D29FA9-AK | 549 | CPTM | 北松 | 彩虹 | 三星 | Bad |
| | | | 0 | 549 | 0 | 0 | |
| | | | 0% | 100% | 0% | 0% | |
| | 29F8A | 190 | CPTM | 北松 | 彩虹 | 三星 | Bad |
| | | | 0 | 0 | 0 | 190 | |
| | | | 0% | 0% | 0% | 100% | |
| | 29T9D马来西亚 | 292 | CPTM | 北松 | 彩虹 | 三星 | Bad |
| | | | 0 | 292 | 0 | 0 | |
| | | | 0% | 100% | 0% | 0% | |
| | 29F3A | 210 | CPTM | 北松 | 彩虹 | 三星 | Bad |
| | | | 0 | 0 | 0 | 210 | |
| | | | 0% | 0% | 0% | 100% | |
| | Sub Total | 6456 | 0 | 841 | 0 | 5615 | |
| | | | 0% | 13% | 0% | 87% | |



Haier 20V RF CRT Supplier Occupation %

註：
佔有率顏色管理方式，綠色為健康；黃色為一般；紅色為不健康。由Sales & APP協同定議。

1. 客戶新機型開發資訊：   PIC: Qingdao Support team

2. 競爭牌導入計劃資訊：   PIC: Qingdao Support team

   CHU00572998 (Haier 27VRF.01)

| 日期 | 机型 | 数量 | 厂商 |
|------|------|------|------|
| 20050804 | 21F9K-T时尚 | 1001 | 北松AK |
| | BH2004D | 103 | 赛格 |
| | 21T9D双色 | 705 | 北松 |
| | 25T9D-T双色 | 1000 | 彩虹 |
| | 37T86-CD英国 | 10 | 彩虹 |
| | 37T86-CD丹麦 | 6 | 华映 |
| | 1486西班牙 | 10 | 彩虹 |
| | 1489英国 | 6 | 三星 |
| | 21F3A-T阿曼 | 148 | 北松AK |
| | DTA1496英国（客户型号：TOC DV3001） | 800 | 三星 |
| | 34F9K-PY(双色) | 360 | 三星DF |
| | 29F9D-PY双色 | 445 | 三星100Hz |
| | 25T3A-T阿曼 | 128 | 彩虹 |
| | DTA2189澳大利亚CONWA | 2 | 北松 |
| | 37T6D-T阿联酋 | 2 | 彩虹 |
| | 34P9B-T阿联酋 配套机柜：34B-J | 2 | 赛格 |
| | 29F9G-S三星纯平显象管 | 6 | 三星 |
| | D29FV6-A | 10 | 三星 |
| | 29F9D印度 | 6 | 三星 |
| 20050805 | 21F9K-T时尚 | 500 | 北松AK |
| | 21T9D双色 | 1300 | 北松 |
| | DTA1486荷兰（客户型号：ST-CRT14C-0526） | 696 | 三星 |
| | 1486美国 | 1142 | 彩虹 |
| | 1481美国 | 6 | 华映 |
| | 29F9D-T双色 | 10 | 三星 |
| | D29FV6-A（720P） | 295 | 三星 |
| | 29F9D-T印度（合肥机芯） | 526 | 三星 |
| | DTA1496英国（客户型号：TOC DV3001） | 1600 | 三星 |
| | 21F7A-P (LG管) | 10 | 赛格 |
| | D29FA9-AK | 20 | 北松 |
| | 21T98-CD美国 | 10 | 北松 |
| 20050806 | 21F9K-T（L）连锁、双色 | 1000 | 北松AK |
| | 25T9D-T双色 | 800 | 彩虹 |
| | BH2004D | 50 | 赛格 |
| | 1486美国 | 1820 | 彩虹 |
| | HT-3768巴基斯坦 | 6 | 彩虹 |
| | DTA-1490英国 | 6 | 华映 |
| | DTA1496英国（客户型号：TOC DV3001） | 1400 | 三星 |
| | D25FV6-A8K | 864 | 三星100Hz |
| | 29F9D-T双色 | 190 | 三星 |
| | 29F9D-PY双色 | 500 | 三星100Hz |
| | DTA-2198英国 | 10 | 北松 |
| | DTA-2198挪威 | 6 | 北松 |
| 20050807 | DTA1486荷兰（客户型号：ST-CRT14C-0526） | 1302 | 三星 |
| | 21T3A阿曼 | 360 | 北松 |
| | D34FV6-A增强型 | 474 | 三星100HZ |
| | DTA1496英国（客户型号：TOC DV3001） | 1240 | 三星 |
| | D34FA9-AK | 300 | 三星细节距管 |
| | D29FA9-AK | 200 | 北松 |

| | | | |
|---|---|---|---|
| | 25F9K-T时尚 | 10 | LG |
| 20050808 | BH2004D | 4350 | 塞格 |
| | DTA1486美国 | 1800 | 彩虹 |
| | 34P9B-T阿联酋<br>配套的机柜：34B-J | 83 | 塞格 |
| | 37T6D-T阿联酋 | 1218 | 彩虹 |
| | 25F9K-T时尚 | 190 | LG |
| | 21F9K-T（L）连锁、双色 | 1000 | 北松AK |
| 20050817 | 21F9K-T时尚 | 1000 | 北松AK |
| | 25F9K时尚 | 200 | LG |
| | BH2004D | 3159 | 塞格 |
| | DTA1586美国MEMOREX | 1702 | 彩虹纯平 |
| | DTA2189澳大利亚CONWA | 146 | 北松 |
| | DTA1496加拿大ELECTROHO<br>ME | 1220 | 华映 |
| | 1586加拿大 | 3 | 彩虹 |
| | DV1418A美国 | 2 | 彩虹 |
| | DTA1489英国GOODMANS | 415 | 华映 |
| | D29FA9-AK | 300 | 北松 |
| | D34FA9-AK | 207 | 三星细节距管 |
| | 29F9K-D澳大利亚 | 5 | 三星 |
| | 21F9K-T马来西亚整机 | 2 | 北松AK |
| | DTA2196PF加拿大ELECTROH<br>OME | 3 | 北松AK |
| | 2198美国<br>BESTBUY | 10 | 北松<br>塞格 |
| | 29F3A南斯拉夫 | 2 | 三星 |
| | 21T3A南斯拉夫 | 2 | 北松 |
| | 21F3A南斯拉夫 | 2 | 北松AK |
| 20050818 | 21F9K-T（L）连锁、双色 | 1000 | 北松AK |
| | BH2004D | 3575 | 塞格 |
| | DTA1496加拿大ELECTROHO<br>ME | 1228 | 华映 |
| | DTA2198英国 | 350 | 北松 |
| | DV1418A美国 | 1628 | 彩虹 |
| | 29F9D-PY双色 | 500 | 三星100Hz |
| | D29FV6-A增强型 | 126 | 三星100HZ |
| | D34FV6-A增强型 | 122 | 三星AF |
| | 34F9K-PY<br>双色 | 59 | 三星AF |
| | D32FA9-AK | 10 | 北松细节距管 |
| | 29T9D马来西亚 | 10 | 北松 |
| 20050819 | 21F9K-T时尚 | 1000 | 北松AK |
| | 21T9D-T双色 | 500 | 北松 |
| | DV1418A美国 | 800 | 彩虹 |
| | DTA1586美国MEMOREX | 2400 | 彩虹纯平 |
| | DTA1586美国MEMOREX | 1600 | 彩虹纯平 |
| | D25FV6-A8K | 10 | 华飞 |
| | DTA2196PF加拿大CITIZEN | 3 | 北松AK |
| 20050820 | 21F9K-T（L）连锁、双色 | 1139 | 北松AK |
| | DTA1586美国MEMOREX | 3158 | 彩虹纯平 |
| | DTA1490西班牙 | 2 | 华映 |
| | 1586加拿大 | 3 | 彩虹 |
| | DTA1586美国MEMOREX | 1600 | 彩虹纯平 |
| | 29F9K-D澳大利亚 | 6 | 三星 |
| | DTA2196PF加拿大CITIZEN | 3 | 北松AK |
| | 29T9D马来西亚 | 10 | 北松 |

| | | | |
|---|---|---|---|
| | DTA2196PF加拿大ELECTROHOME | 3 | 北松AK |
| | 29F3A南斯拉夫 | 2 | 三星 |
| | 21F3A南斯拉夫 | 2 | 三星 |
| 20050821 | DTA1586美国MEMOREX | 800 | 彩虹纯平 |
| | 21F9K-T时尚 | 1100 | 北松AK |
| | DTA1586美国MEMOREX | 3200 | 彩虹纯平 |
| | DTA1586美国MEMOREX | 1700 | 彩虹纯平 |
| | 29F9D德国-<br>多合（客户型号TBA） | 10 | 三星 |
| 20050822 | 21T9D-T双色 | 930 | 北松<br>彩虹 |
| | 21F9K-T时尚 | 1000 | 北松AK |
| | BH2004D | 2000 | 赛格 |
| | DTA1586美国MEMOREX | 3000 | 彩虹纯平 |
| | DTA1486英国（客户型号TVD14<br>20） | 2 | 彩虹 |
| | BH2004D | 2000 | 赛格 |
| | 21F9D-<br>T加拿大ELECTROHOME | 10 | LG |
| | 21F9D-T加拿大CITIZEN | 10 | LG |
| | D29FV6-A摩洛哥 | 10 | 三星 |
| | DTA2189PF英国GOODMANS | 20 | 北松AK |
| | DTA2189PF荷兰PROLINE | 20 | 北松AK |
| | 21F98-CD韩国 | 10 | 北松AK |
| 20050823 | DTA1586美国MEMOREX | 2000 | 彩虹纯平 |
| | DTA1490西班牙 | 838 | 华映 |
| | 29F9D-PY双色 | 500 | 三星100Hz |
| | 29T9D马来西亚 | 136 | 北松 |
| | D29FV6-A增强型 | 74 | 三星100HZ |
| | D34FV6-A增强型 | 330 | 三星AF |
| | 34F9K-PY<br>双色 | 181 | 三星AF |
| | DTA1490澳大利亚-<br>多合（客户型号：KMP1489） | 10 | 华映 |
| 20050824 | 21F9K-T时尚 | 214 | 北松AK |
| | BH2004D | 4009 | 赛格 |
| | DTA1586美国MEMOREX | 2265 | 彩虹纯平 |
| | 21F9K-T马来西亚整机 | 269 | 北松AK |
| | 25T9D双色 | 26 | 彩虹 |
| | DTA1490西班牙 | 474 | 华映 |
| | 1586加拿大 | 3 | 彩虹 |
| | D29FA9-AK | 29 | 北松 |
| | 29F9D-PY双色 | 204 | 三星100Hz |
| | D29FV6-A增强型 | 64 | 三星100HZ |
| | D29FV6-A卡塔尔 | 75 | 三星100HZ |
| | D34FV6-A卡塔尔 | 45 | 三星DF |
| | D34FV6-A增强型 | 300 | 三星AF |
| | 34F9K-PY<br>双色 | 111 | 三星AF |
| | D34FA9-AK | 64 | 三星细节距管 |
| | 29F3A乌克兰散件 | 3 | 三星100Hz |
| | D29FV6乌克兰散件 | 3 | 三星100HZ |
| | DTA1490澳大利亚-<br>多合（客户型号：KMP1489） | 10 | 华映 |
| | 21F9K乌克兰散件 | 3 | 彩虹AK |
| | 21F9K乌克兰散件 | 1 | 北松 |

CONFIDENTIAL - GRAND JURY MATERIAL

| | | | |
|---|---|---|---|
| | 21F9D-T加拿大CITIZEN | 10 | LG |
| | D29FV6-A摩洛哥 | 10 | 三星 |
| | DTA2189PF英国GOODMANS | 15 | 北松AK |
| | 21F98-CD韩国 | 10 | 北松AK |
| | 29F9D德国-多合（客户型号TBA） | 10 | 三星 |
| | DTA2196PF加拿大ELECTROHOME | 3 | 北松AK |
| 20050825 | BH2004D | 2770 | 赛格 |
| | 21F9K-T（L）连锁、双色 | 1194 | 北松AK |
| | DTA1486英国（客户型号TVD1420） | 2512 | 彩虹 |
| | DTA1490西班牙 | 500 | 华映 |
| | DTA1481(AC/DC)美国海尔牌 | 2 | 彩虹 |
| | 21F9D伊朗 | 1 | 北松AK |
| | 21T9D伊朗 | 1 | 北松 |
| | DV1418A美国 | 1430 | 彩虹 |
| | 29F8A伊朗 | 1 | 三星管 |
| | HT-3768乌克兰散件 | 200 | 彩虹 |
| | 29F8A-P乌克兰散件 | 189 | 三星 |
| | 21T3A乌克兰散件 | 370 | 北松 |
| | 34F9B-T乌克兰散件 | 22 | 三星 |
| | 21T6B乌克兰散件 | 610 | 彩虹 |
| 20050826 | 21F9K-T（L）连锁、双色 | 1000 | 北松AK |
| | 机顶盒 | 3500 | |
| | DTA1586美国MEMOREX | 1800 | 彩虹纯平 |
| | 21F98-CD韩国 | 343 | 北松AK |
| | DTA2196PFELECTROHOME | 671 | 北松AK |
| | DTA2189PF英国GOODMANS | 1000 | 北松AK |
| | DV1418A美国 | 1000 | 彩虹 |
| | 29T9D马来西亚 | 136 | 北松 |
| | D29FV6-A摩洛哥 | 142 | 三星 |
| | 29F3A乌克兰散件 | 149 | 三星100HZ |
| | D29FV6乌克兰散件 | 99 | 三星100HZ |
| | 21F9K乌克兰散件 | 447 | 彩虹AK |
| | DTA2189PF荷兰PROLINE | 18 | 北松AK |
| 20050827 | 25F9K-T时尚 | 1400 | LG |
| | 21T9D-T双色 | 1071 | 北松 |
| | 21F9K-T（L）连锁、双色 | 1000 | 北松AK |
| | 25F9K-T时尚 | 1510 | LG |
| | DTA1586美国MEMOREX | 1300 | 彩虹纯平 |
| | DTA2196PF加拿大CITIZEN | 671 | 北松AK |
| | <span style="color:red">21T3A哥伦比亚</span> | 10 | 北松普平 |
| | HT-3728哥伦比亚 | 10 | 三星普平 |
| | 29F9D-T双色 | 1400 | 三星 |
| | 29F3A南斯拉夫 | 44 | 三星 |
| | 29F3A哥伦比亚 | 10 | 三星 |
| 20050828 | 21F9D-T加拿大ELECTROHOME | 1352 | LG |
| | 21T3A南斯拉夫 | 359 | 北松 |
| | 21F3A南斯拉夫 | 149 | 北松AK |
| | DTA1481(AC/DC)美国海尔牌 | 838 | 彩虹 |
| | 21F9D-T加拿大CITIZEN | 1352 | <span style="color:red">LG</span> |

各位主管與同仁：

請參考青島駐在回饋海爾(青島廠)各尺寸機種佔有率分佈如下：

經與業務商討，按各管種可能增量潛力擬定各管工作優先順序排程如下：
1. 21"FS
2. 21"RF(AK)
3. 15"RF
4. 20"Mnn
5. 14"Mnn
6. 29"RF

感謝駐在全力配合收集，。

Sales/PM 搶攻策略：
1. 目前 M 廠每週五戰略會議集中力量進行內部競爭力提昇，針對成本體質進行強化改善。
相應 PM 擬針對特定有潛能客戶採(Aggressive Measure)侵略性積極動作，駐在詳實資料回饋是必要條件。
　目前駐在以設計好的格式收集資料，雖完整性/精確性尚待提昇，可以確定經一段時間後其效應將越發明顯。
　現行權宜作法，可將此表與客戶每月競爭牌用量比例進行比對，提昇資料參考性。

2. 考量海爾外銷產能佈局，海爾青島廠＋膠南月產能滿載合計 400K。
　多方消息顯示，海爾與美國沃爾瑪合作關係有深化趨勢，即將到來的 4Q 旺季，若我方可把握海爾出口量衝大時機，
　搶佔 50%佔有率，對我方整體產能利用率將大有助益。
　目前此為海爾出口單大方向走勢，故需配合其佔有率比例作參考，方可作針對性的策略設計，提昇搶單命中率。

3. 若海爾案方式操作成效顯著，建議可另行定議其他核心客戶，比照波及展開。
　針對對象現有核心大戶(Orion, Funai 等)，掌握客戶訂單與競爭牌之動態資訊，一則防止競爭牌搶奪佔有率而流血；
　二則再瞭解其餘機種是否有再擴大訂單之空間。
　另針對有潛力的客戶，掌握競爭牌之動向，布署針對性策略，全力搶奪訂單。

CONFIDENTIAL – GRAND JURY MATERIAL

以上。
譚宏業

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00573035

# Exhibit 31

## UNREDACTED VERSION OF
## <u>DOCUMENT SOUGHT TO BE SEALED</u>

# EXHIBIT 14

# COLOR TELEVISION



# TK2026

# IS-TV040919

CRT001238

# CONTENTS

Safety instruction ·················································································· 1

General instruction ·············································································· 1

Alignment instructions ········································································ 2

Alignment methods ············································································· 2

Block diagram ····················································································· 14

Main IC ······························································································ 15

Wiring diagram ··················································································· 19

Schematic diagram ············································································· 20

**CRT001239**

Note: This service manual is only for professional service personnel's reference. Before servicing the unit, please read the following items carefully.

## Safety instruction

### 1. X-RAY radiation precaution

1.1 Excessive voltage will cause harmful X-ray. To avoid this radiation hazard, the high voltage should fall within the limitation. The appliance works at AC 120V, 60Hz. The high voltage of zero beam current (brightness, contrast and color is min) should be within 27.5kV on condition that the main power (B+) voltage is AC120V. And it should not exceed 29.5kV in any condition (21"SF CRT).

When servicing, please refer to the HIGH VOLTAGE CHECK procedure this service manual before check the high voltage and the high voltage meter should be reliable and accurate.
* Keep the main power voltage at 120V when checking the high voltage.
1.2 The primary source of X-RAY RADIATION is the CRT. The CRT of this TV set have gotten the approval of safety authentication inspection. The replacement CRT should be exactly the same type and specification CRT which has gotten a similar safety approval, and check the high voltage according to the HIGH VOLTAGE CHECK procedure.

### 2. Safety precaution
a. Since the power supply circuit of this receiver is directly connected to the AC power line, an isolation transformer is necessary during dynamic service to avoid possible shock hazard.
b. Always discharge the graphite layer conductor when moving the CRT.
c. Disconnect the power cord before replacing parts.
d. When replacing high-power resistor, keep the resistor 10 mm away from the circuit board.

### 3. Component safety precaution
Many electrical and mechanical parts in the chassis have special safety-related characteristics. These characteristics are often passed unnoticed by a visual inspection. Replacement parts which have these special safety characteristics are identified in this manual and its supplement electrical components having such features are shaded or marked by ⚠ on the schematic diagram and the parts list. Before replacing any of these components, read the parts list in this manual carefully. The use of substitute replacement parts which do not have the same characteristic as specified in the parts list may create shock, fire, X-RAY RADIATION or other hazards.

## General instruction

1. Copy the standard model data to let EEPROM (N702 24C08)of the chassis have those data before placing it on the unit, do "factory adjustment" if necessary. If use a blank EEPROM directly, you should preset IIC data and then do other common adjustment.

2.The adjustment should be done under following circumstances without additional instruction
a) Alternating current 120V/60Hz
b) Preheat at least 30 min

3.The unit has auto degaussing circuit, the auto degaussing process can be finished within 2s when the main power. Only when turn on the unit at least 20min after last time turn off TV does the auto degaussing circuit work.

CRT001240

4. If the CRT with magnetism affects color purity and convergence, when the auto degaussing eraser. if the color purity and convergence are still not very good, then corresponding adjustment should be done. Refer to picture tube adjustment method for adjustment.

## Alignment instruction

**1.  Debugging item**

    a)  adjust mode instruction
    b)  B+ voltage adjustment
    c)  RFAGC voltage adjustment
    d)  Focus adjustment
    e)  Screen-grid voltage white balance, sub brightness adjustment
    f)  filed scan center, line , amplitude adjustment
    g)  H-scan center adjustment

**2.  Alignment flow**



Fig-1      alignment flow

2

**CRT001241**

## 3. Factory menu adjustment methods

3.1 Enter/exit factory adjustment method

Use remote control, press "MENU" button, then press 6483, "Test" will appear on screen to show that you have entered the factory adjustment method, press "STANDBY" to exit it. Use factory remote control, press the "PRESET" and "TEST" button, then the screen display "Test" which means you have entered into the factory adjustment mode, press the "TEST" or "STANDBY" to exit.

3.2 select adjustment item and adjust data

After entering factory adjustment mode, press 1-4 number buttons to select menu 1- menu 4; to enter into MENU0, MENU5-MENU9, you may return to MENU1-MENU4 or just after you enter into "Test" interface, quickly press "CHILD LOCK" button and then the number button (0,5-9) to enter into relative menus. Press "CH+" and "CH-" to select and "V+" and "V-"to adjust.

At "program' item of MENU1, press    "V+", "V-" or the number button 0-9 to switch channel, only after exit the "program" item you can do other operation.

3.3 User purview

a). Factory adjustment mode menu1-menu4: only debugging worker, service checker, craftwork technician, designer may operate.

b). Factory adjustment mode menu0, menu5-menu9: only craftwork technician, designer may operate.

## 4. Alignment methods

4.1 B+ voltage adjustment

    a)   Connect B+ point with a digital voltmeter to measure the negative pole of VD524
    b)   Receive PHILIPS test pattern signal and set the picture to standard.
    c)   Adjust VR501 to let B+ voltage be appropriate value (see below chart).

B+ voltage requirement

| CRT brand | CRT model | B+ (V) |
|-----------|-----------|--------|
| NOVEL | 54SX503Y22-DC01 | 107 |
| IRICO | 54SX538Y22-DC01 | 107 |
| SAMSUNG | A51KQK99X01 | 105.5 |

4.2 AGC adjustment

    a)   receive VHF-H band,60 dB RF signal of color bar.
    b)   Select factory menu2 of "AGC".
    c)   Adjust AGC-TOP to let the picture just without noisy, and the voltage of tuner AGC is 3.7V±0.1V(DC).
    d)   exit factory menu

4.3 Normal temperature aging

    a) do not receive signals.
    b) under "Test" condition, set the accelerator to an appropriate point for aging.

4.4 Accelerator adjustment

    a) do not receive signals;
    b) select "SC" of factory menu3 to let the field scanning stop working.
    c) set the picture to standard, adjust acceleration potentiometer to let bright lines just appears on screen.
    d) exit factory menu.

4.5 High voltage check

3

CRT001242

Note: the main power voltage can affect the high voltage directly, so be sure to let the B+ power voltage accurate. Under any state, the high voltage should not exceed 29.5KV (21" SF CRT).

  a) connect an accurate high voltage meter between the second anode cap of picture tube and ground.

  b) turn on TV and receive testing card signal.

  c) set picture to standard, the high voltage of this receiver see below chart:

High voltage requirement

| CRT brand | CRT model | Value of extra high voltage |
|-----------|-----------|-----------------------------|
| NOVEL | 54SX503Y22-DC01 | 24.5KV+/-1KV |
| IRICO | 54SX538Y22-DC01 | 24.5KV+/-1KV |
| SAMSUNG | A51KQK99X01 | 25.5KV+/-0.75KV |

    d) the high voltage should not exceed 27.5KV for YONGXIN/IRICO CRT (28KV for SAMSUNG CRT) with minimum brightness, contrast and color.

4.6 Focus adjustment

    a) receive A12-PHILIPS (NTSC)signal

    b) adjust focus electrode potentiometer on FBT to optimize B area focus of screen.

4.7 White balance adjustment (color temperature $12000°K\pm 8MPCD, X=0.270\pm 0.008, Y=0.283\pm 0.008$)

    a) receive full white signal, set color is 0

    b) select factory menu3

    c) on the basis of blue gun "BD", select and adjust "RD, GD" item to make white balance respectively at brightness $Y=6cd/m^2$, $Y=80cd/m^2$ meet standard (color temperature $12000°K\pm 8MPCD$, $x=0.270\pm 0.008$, $y=0.283\pm 0.008$)

    d)If at brightness $Y=6cd/m^2$, white balance can not meet standard, you may adjust "RB, GB" item, then repeat step C) until white balance meet standard.

4.8 Field scanning adjustment (fig-2)

    a) Receive PAL–N(50HZ) (or D35) PHILIPS test pattern signal. set user control to "STANDARD" mode (only the unit in South America)

    b) Receive NTSC(or A12) PHILIPS test pattern signal. set user control to "STANDARD" mode (only the unit in North America)

    c) select factory menu1

    d) adjust V-SLOPE menu to let the horizontal center line of test pattern above blanking.

    e) select V-SHIFT menu and adjust to let the vertical center of picture coincide with vertical center of picture tube.

    f) Select V-SIZE menu and adjust to let the vertical reproduction ratio of picture acceptable 8%.

    g) Adjust V.SC to optimise the vertical S correction of picture.

    h) Receive NTSC(60HZ) A-12PHILIPS test pattern signal, repeat step d)~g) above.(only the unit in South America)



Horizontal line

Under part banking

Fig-2   field scan adjustment

4

CRT001243

4.9 Horizontal scanning adjustment (Fig-3)

a)   Receive PAL-N(50HZ)(or D35) PHILIPS signal, set user control to "STANDARD" mode (only the unit in South America).

b)   Receive NTSC(A12) PHILIPS signal, set user control to "STANDARD" mode (only the unit in North America).

c)   Select factory menu1.

d)   Select H.SHIFT menu and adjust to let the scanning horizontal center coincide with mechanical center of picture tube.

e)   Receive NTSC(60HZ) A12-PHILIPS test pattern signal, repeat step d) above.(only the unit in South America).

f)   Exit factory menu.



a

Fig-3    line scan adjustment

4.10 Sub-brightness adjustment

a)   Receive A12-PHILIPS(NTSC) signal

b)   Select "SB" of factory menu3

c)   Adjust "SB" to let things between the fourth and fifth grey scale clear. See Fig-3.

4.11 OSD adjustment

a)   Receive PAL-N(50HZ) or D35-PHILIPS signal.(only the unit in South America).

b)   Select and adjust OSD V.POS and H.POS of factory menu4. Let OSD at a specified place. (only the unit in South America).

c)   Receive NTSC(60HZ) A12-PHILIPS signal.

d)   Select and adjust OSD V.POS and H.POS of factory menu4. Let OSD at a specified place.

e)   Exit factory menu

## 5. Checking point

5.1 High voltage check

1)   Connect High Voltage meter between CRT second anode and GND.

2)   Receive A7 signal, set the control to "STANDARD", measure the high voltage value, the reading should be 24.5 kV±1.0kV for NOVEL/IRICO CRT (25.5KV±0.75 KV for SAMSUNG CRT)

3)   Set the brightness and contrast to minimum (zero beam current), measure the high voltage, the reading should not exceed 27.5kV for NOVEL /IRICO CRT (28KV for SAMSUNG CRT).

5.2 CRT filament voltage check

Receive A7 signal, set user control to "STANDARD" mode, use effective voltage meter to measure CRT filament voltage, the reading should be (6.3±0.3) Vrms

5.3 X-ray protection check

1)   Receive A7 signal, set user control to "STANDARD" mode.

2)   Use voltmeter to measure TP2 to GND voltage, the reading should be between 15.8 V~16.8 V.

3)   Use 300Ω resistor to touch the two terminals of TP2 ,TP3, X-Ray protection circuit should function, at this time the TV set should be without raster, without sound.

5

CRT001244

5.4 Picture and sound check

1)  Receive standard TV signal.

2)  Use picture control buttons to check color, contrast, brightness, sharpness, tint's function.

3)  Use sound control buttons to check volume control function.

5.5 MTS STEREO check(if the unit has MTS STEREO function)

1)  Receive appropriate TV signal.

2)  Use STEREO button on remote control to check MONO, STEREO, SAP function.

5.6 Sub-brightness check

Receive A7 signal, set brightness to 50, contrast to 50, color to 0, sharpness to 50, picture left side 1-6 lattices slightly light up, things between the sixth and seventh grey scale clear.

5.7   Color purity and convergence check (in normal way)

5.8 AV terminals IN/OUT check, S-VIDEO in check, Y,Cb,Cr in check.

5.9 Other buttons on the TV set and remote controller function check.

5.10 CCD function check: receive CCD signal, it should not lack character at 50dB

5.11 Degaussing

a)  The unit has an auto degaussing circuit, the degaussing circuit works several seconds after turning on TV

b)  If you want to move TV or change the direction, turn off TV and twenty minutes later the degaussing circuit will work

c)  For better degaussing effect, you can use magnetic eraser

d)   Move the magnetic eraser clockwise before your TV, when it is 2m away from your TV, turn off the magnetic eraser. If the effect is still not very good, you can adjust "color purity" and "convergence"

5.12 Color purity correction

a)  Turn on your TV

b)  At least 15 minutes later, use anti-magnetized coil for degaussing

c)  Obtain maximum brightness and contrast

d)  Select factory menu3 and adjust to let R and B be zero, then let only green raster appear on the screen at the moment

e)  Loosen screws of deflection yoke frame to let vertical green belt appear on screen only

f)   Move the rubber wedge

g)  Rotate along neck of picture tube and slide color-purity magnets until the green belt at the middle of screen and is vertical at the same time

h)  Slowly move the deflection yoke backward of forward until the whole green raster appears on screen, tighten the screws of the deflection yoke

i)   Check the color purity of red raster and blue raster

j)   Adjust white balance again to obtain white raster

5.13 Convergence correction

5.13.1 Central convergence correction

a)  Turn on your TV

b)  At least 15 minutes later, receive square test pattern signal

c)  Adjust brightness and contrast to get the best picture

d)  Adjust the angle of two tetrode magnetic rings to let the red vertical line coincide with the blue vertical line at middle of screen

e)  Keep the angle unchanged, move the two tetrode magnetic rings at the same time to let the red and blue horizontal lines coincide at middle of screen

6

CRT001245

f) Adjust two hexode magnetic rings to let the green line coincide with the mixed line of red and blue. Adjust the angle between them will affect the vertical line, move them together will affect the horizontal line.

g) Repeat d), e), f) and observe the movement of red, green and blue.

5.13.2 Ambient convergence correction

a) Turn on your TV

b) At least 15 minutes later, loosen the screws of the deflection yoke

c) Fixate the rubber wedge temporarily under the deflection yoke

d) Move the deflection yoke upward or downward to get best convergence, push the rubber wedge into space between picture tube and deflection yoke to fixate the deflection yoke temporarily

e) Place the rubber wedge whose overlay paper has been removed at the bottom space

f) Move the deflection yoke left and right to get best convergence

g) Keep the condition unchanged, place another rubber wedge whose overlay paper has been removed also at the upper space at the same time

h) Remove the interim rubber wedge, adhere it to picture tube and deflection yoke

i) After placing three rubber wedges, check all the convergence again

j) Stick three transparent viscous belts to the rubber wedge

## 6. Software adjustment instructions

6.1 instructions

For the unit in North America, this software contain MTS (option), English, Frence, Spanish and Potugues of OSD(some only has three OSD), CCD and Parental Control function, FS tuner mode, 181 channel.

For the unit in South America, this software contain MTS (option), English, Spanish and Potugues of OSD, CCD and Child Lock function, FS tuner mode, 181 channel.

6.2 factory adjustment mode see Chart 1, Chart 2, Chart 3

6.3 turn on the unit in the STANDBY state

Press CH+/CH- buttons turn on in the STANDBY state.

6.4 Information of software version

Enter MEU9 of the factory menu in the top.

6.5 "STANDARD", "COLORFUL" and " SOFTNESS" setting

a).Enter MENU5 Mode of the factory menu

b).charge their for seemly analog quantity, then return standard option.

Chart 1: **I$^2$C NOM8377-B-8NB** E$^2$PROM pre-set data (IRICO/YONGXIN CRT)

| MI | Items | Range | Preset |
|----|-------|-------|--------|
| M0 | SUBCON | 0-63 | 58 (sub-contrast) |
|    | SUBCOL | 0-63 | 56 (sub-chroma) |
|    | SUBSHP | 0-63 | 48(42-48) (sub-acutance) |
|    | SUBTINT | 0-63 | 31(sub-hue) |
|    |        |      |        |
| M1 | V.SLOPE | 0-63 | 36(field center adjustment) |
|    | V.SHIFT | 0-63 | 32(field point adjustment) |

CRT001246

| MI | Items | Range | Preset |
|---|---|---|---|
| | V.SIZE | 0-63 | 36(field amplitude adjustment) |
| | V.SC | 0-63 | 32(field line) |
| | HSHIFT | 0-63 | 32(line point adjustment) |
| | PROGRAMA.NO | | 2(channel) |
| | | | |
| M2 | AGCTAKE OVER | 0-63 | 23(AGC adjustment) |
| | SHIPPING | | 0(leave factory set) |
| | | | |
| M3 | BT | 0-100 | 75(adjust white balance of brightness) |
| | CT | 0-100 | 75(adjust white balance of brightness contrast) |
| | SC | | 0 |
| | RB | 0-63 | 32(red cut off level adjustment) |
| | GB | 0-63 | 32(green cut off level adjustment) |
| | RD | 0-63 | 32(red drive level adjustment) |
| | GD | 0-63 | 32(green drive level adjustment) |
| | BD | 0-63 | 32(blue drive level adjustment) |
| | SB | 0-63 | 40(sub brightness adjustment) |
| | | | |
| M4 | OSD.V.POSITION | 0-63 | 15(OSD position) |
| | OSD.H.POSITION | 0-63 | 25(OSD H-position) |
| | BTSC-MODE | MONO/STEREO | MONO(STEREO/SAP selection) |
| | BTSC-ST | 0-15 | 13 |
| | BTSC-SP | 0-15 | 12 |
| | BTSC-L1 | 0-15 | 6(5-6) |
| | BTSC-A1 | 0-31 | 12 |
| | BTSC-A2 | 0-31 | 0 |
| | BTSC-TC | 0-7 | 0 |
| | BTSC-STS | 0-1 | 0 |
| | BTSC-ADJ | | |
| | | | |
| M5 | MODE | | STANADARD (standard, soft, floweriness) |
| | BRIGHT | 0-100 | 75 |
| | CONTRAST | 0-100 | 75 |
| | COLOR | 0-100 | 50 |
| | SCBRIGHT | 0-63 | 23(20-28) |
| | YDELAYTV | 0-15 | 12 |
| | YDELAYAV | 0-15 | 12 |
| | | | |
| M6 | OSO | 0-1 | 1(field over-scan switch) |
| | AGCSPEED | 0-3 | 2(AGC of speed) |
| | FFI | 0-1 | 0(IF PLL SPEED) |
| | FMWS | 0-1 | 1(frequency range of sound OFF=225KHZ,ON=450KHZ) |

CRT001247

| MI | Items | Range | Preset |
|----|-------|-------|--------|
|    | RP0 | 0-3 | 0(pre-shock and over-shock scale) |
|    | NTSCMATRIX | USA/JAPAN | USA |
|    | VOLPIN | 0-1 | 0(1:push-pull output; 0: OC gate output.) |
|    | SOFT CLIP | 0-3 | 3(white level limit) |
|    | PEAK WHITE | 0-15 | 15(peak white limit) |
|    | CORING | 0-1 | 0(coring noise reduction) |
|    |  |  |  |
| M7 | AV2 | 0/1 | 1 |
|    | SVHS | 0/1 | 1 |
|    | YUV | 0/1 | 1 |
|    | BLUE SCREEN | 0/1 | 1 |
|    | VOLADJPOING |  | 1(volume value have: 1, 25, 50, 75) |
|    | VOLVALUE |  | 20(volume curve value: 35, 70, 80, 90) |
|    |  |  |  |
| M8 | CATHOOELEVEL | 0-15 | 7 (cathode level) |
|    | UOCVOLUME | 0/1 | 0( 0:PWM control    1:UOC internal audio amplify control) |
|    | FMATT | 0-63 | 45(UOC sound output of amplitude)   BTSC : 38 |
|    | COMB FILTRE | 0/1 | 0(NTSC comb filter) |
|    | HEADPHONE | 0-2 | 0(select headphone function) |
|    | VM OPTION | 0/1 | 0(select VM function) |
|    | FRANCE | 0/1 | 1 French |
|    | SPANISH | 0/1 | 1 Spanish |
|    | POTUGUES | 0/1 | 0 Portuguese |
|    |  |  |  |
| M9 | NOM8377-B-8NB |  |  |
|    | STARTON | 0-2 | 2(turn on) |
|    | START TIME | 6-15 | 8(turn on time) |
|    | IF OFFSET | 0-63 | 32(IF compensate) |
|    | TUNER | 0-2 | 0(BXATB011F---X/   BXATB108F---K/   BXATB015F---X/ BXATB021F---D), 1 (BXATB017F---K) ,2(XXX) |
|    | CALENDAR | 0-1 | 0 |
|    | GAME | 0-1 | 0 |
|    | LOGO | 0-1 | 0 |

Chart 2: **I$^2$C NOM8377-B-9NA/ NOM8377-B-9NB** E$^2$PROM pre-set data (IRICO/YONGXIN CRT)

| MI | Items | Range | Preset |
|----|-------|-------|--------|
| M0 | SUBCON | 0-63 | 58 (sub-contrast) |
|    | SUBCOL | 0-63 | 56 (sub-chroma) |
|    | SUBSHP | 0-63 | 48(42-48) (sub-acutance) |
|    | SUBTINT | 0-63 | 31(sub-hue) |

CRT001248

| MI | Items | Range | Preset |
|----|-------|-------|--------|
|    |       |       |        |
| M1 | V.SLOPE | 0-63 | 36(field center adjustment) |
|    | V.SHIFT | 0-63 | 32(field point adjustment) |
|    | V.SIZE | 0-63 | 36(field amplitude adjustment) |
|    | V.SC | 0-63 | 32(field line) |
|    | HSHIFT | 0-63 | 32(line point adjustment) |
|    | PROGRAMA.NO |  | 2(channel) |
|    |       |       |        |
| M2 | AGCTAKE OVER | 0-63 | 23(AGC adjustment) |
|    | SHIPPING |  | 0(leave factory set) |
|    | YUV HS.OFFSET | 0-15 | 8(only NOM8377-B-9NB) |
| M3 | BT | 0-100 | 75(adjust white balance of brightness) |
|    | CT | 0-100 | 75(adjust white balance of brightness contrast) |
|    | SC |  | 0 |
|    | RB | 0-63 | 32(red cut off level adjustment) |
|    | GB | 0-63 | 32(green cut off level adjustment) |
|    | RD | 0-63 | 32(red drive level adjustment) |
|    | GD | 0-63 | 32(green drive level adjustment) |
|    | BD | 0-63 | 32(blue drive level adjustment) |
|    | SB | 0-63 | 40(sub brightness adjustment) |
|    |       |       |        |
| M4 | OSD.V.POSITION | 0-63 | 15(OSD position) |
|    | OSD.H.POSITION | 0-63 | 25(OSD H-position) |
|    | BTSC(AN5832)-AGC | 0-1 | 1 |
|    |       |       |        |
| M5 | MODE |  | STANADARD (standard, soft, floweriness) |
|    | BRIGHT | 0-100 | 75 |
|    | CONTRAST | 0-100 | 75 |
|    | COLOR | 0-100 | 50 |
|    | SCBRIGHT | 0-63 | 23(20-28) |
|    | YDELAYTV | 0-15 | 12 |
|    | YDELAYAV | 0-15 | 12 |
|    |       |       |        |
| M6 | OSO | 0-1 | 1(field over-scan switch) |
|    | AGCSPEED | 0-3 | 2(AGC of speed) |
|    | FFI | 0-1 | 0(IF PLL SPEED) |
|    | FMWS | 0-1 | 1(frequency        range       of       sound OFF=225KHZ,ON=450KHZ) |
|    | RP0 | 0-3 | 0(pre-shock and over-shock scale) |
|    | NTSCMATRIX | USA/JAPAN | USA |
|    | VOLPIN | 0-1 | 0(1:push-pull output; 0: OC gate output.) |
|    | SOFT CLIP | 0-3 | 3(white level limit) |

CRT001249

| MI | Items | Range | Preset |
|---|---|---|---|
| | PEAK WHITE | 0-15 | 15(peak white limit) |
| | CORING | 0-1 | 0(coring noise reduction) |
| | | | |
| M7 | AV2 | 0/1 | 1 |
| | SVHS | 0/1 | 1 |
| | YUV | 0/1 | 1 |
| | BLUE SCREEN | 0/1 | 1 |
| | VOLADJPOING | | 1(volume value have: 1, 25, 50, 75) |
| | VOLVALUE | | 20(volume curve value: 35, 70, 80, 90) |
| | | | |
| M8 | CATHOOELEVEL | 0-15 | 7 (cathode level) |
| | UOCVOLUME | 0/1 | 0(0:PWM control    1:UOC internal audio amplify control) |
| | FMATT | 0-63 | 45(UOC sound output of amplitude)   BTSC : 28 |
| | COMB FILTRE | 0/1 | 0(NTSC comb filter) |
| | HEADPHONE | 0-2 | 0(select headphone function) |
| | VM | 0/1 | 0(select VM function) |
| | FRANCE | 0/1 | 1 French |
| | SPANISH | 0/1 | 1 Spanish |
| | POTUGUES | 0/1 | 0 Portuguese |
| | | | |
| M9 | NOM8377-B-9NA/9NB | | |
| | STARTON | 0-2 | 2(turn on) |
| | START TIME | 6-15 | 8(turn on time) |
| | IF OFFSET | 0-63 | 32(IF compensate) |
| | TUNER | 0-2 | 0(BXATB011F---X/  BXATB108F---K/  BXATB015F---X/ BXATB021F---D), 1 (BXATB017F---K),2(XXX) |
| | CALENDAR | 0-1 | 0 |
| | GAME | 0-1 | 0 |
| | LOGO | 0-2 | 0 |
| | LOGO TIME | 1-15 | 6 |

Chart 3: **I$^2$C NOM8377-B-9NA/9NB** E$^2$PROM pre-set data (SAMSUNG CRT)

| MI | Items | Range | Preset |
|---|---|---|---|
| M0 | SUBCON | 0-63 | 55 (sub-contrast) |
| | SUBCOL | 0-63 | 50 (sub-chroma) |
| | SUBSHP | 0-63 | 48 (sub-acutance) |
| | SUBTINT | 0-63 | 32(sub-hue) |
| | | | |
| M1 | V.SLOPE | 0-63 | 36(field center adjustment) |

11

**CRT001250**

| MI | Items | Range | Preset |
|---|---|---|---|
| | V.SHIFT | 0-63 | 43(field point adjustment) |
| | V.SIZE | 0-63 | 22(field amplitude adjustment) |
| | V.SC | 0-63 | 28(field line) |
| | H.SHIFT | 0-63 | 37line point adjustment) |
| | PROGRAMA.NO | | 12 (channel) |
| | | | |
| M2 | AGC TAKE OVER | 0-63 | 23(AGC adjustment) |
| | SHIPPING | | 0(leave factory set) |
| | YUV HS.OFFSET | 0-15 | 8   (only NOM8377-B-9NB) |
| | | | |
| M3 | BT | 0-100 | 75(adjust white balance of brightness) |
| | CT | 0-100 | 75(adjust white balance of brightness contrast) |
| | SC | | 0 |
| | RB | 0-63 | 32(red cut off level adjustment) |
| | GB | 0-63 | 32(green cut off level adjustment) |
| | RD | 0-63 | 32(red cut off level adjustment) |
| | GD | 0-63 | 32(green cut off level adjustment) |
| | BD | 0-63 | 32(blue cut off level adjustment) |
| | SB | 0-63 | 40(sub brightness adjustment) |
| | | | |
| M4 | OSD.V.POSITION | 0-63 | 15(OSD position) |
| | OSD.H.POSITION | 0-63 | 25(OSD H-position) |
| | BTSC-AGC | 0-1 | 1 BTSC(MTS)   0 NOTHING |
| | | | |
| M5 | MODE | | STANADARD (standard, soft, floweriness) |
| | BRIGHT | 0-100 | 75 |
| | CONTRAST | 0-100 | 75 |
| | COLOR | 0-100 | 50 |
| | SC BRIGHT | 0-63 | 30 |
| | YDELAYTV | 0-15 | 8 |
| | YDELAYAV | 0-15 | 8 |
| | | | |
| M6 | OSO | 0-1 | 1(field over-scan switch) |
| | AGCSPEED | 0-3 | 2(AGC of speed) |
| | FFI | 0-1 | 0(IF PLL SPEED) |
| | FMWS | 0-1 | 1(frequency range of sound OFF=225KHZ,ON=450KHZ) |
| | RP0 | 0-3 | 0(pre-shock and over-shock scale) |
| | NTSCMATRIX | USA/JAPAN | USA |
| | VOLPIN | 0-1 | 0(1:push-pull output; 0: OC gate output.) |
| | SOFT CLIP | 0-3 | 3(white level limit) |
| | PEAK WHITE | 0-15 | 15(peak white limit) |
| | CORING | 0-1 | 0(coring noise reduction) |

CRT001251

| MI | Items | Range | Preset |
|----|-------|-------|--------|
|    |       |       |        |
| M7 | AV2 | 0/1 | 1 |
|    | SVHS | 0/1 | 1 |
|    | YUV | 0/1 | 1 |
|    | BLUE SCREEN | 0/1 | 1 |
|    | VOLADJPOING |  | 1(volume value have: 1, 25, 50, 75) |
|    | VOLVALUE |  | 20(volume curve value: 35, 70, 80, 90) |
|    |       |       |        |
| M8 | CATHOO ELEVEL | 0-15 | 6 (cathode level) |
|    | UOCVOLUME | 0/1 | 0(0:PWM control   1:UOC internal audio amplify control) |
|    | FMATT | 0-63 | 45(UOC sound output of amplitude)   BTSC : 28 |
|    | COMB FILTRE | 0/1 | 0(NTSC comb filter) |
|    | HEADPHONE | 0-2 | 0(select headphone function) |
|    | VM | 0/1 | 0(select VM function) |
|    | FRANCE | 0/1 | 1 French |
|    | SPANISH | 0/1 | 1 Spanish |
|    | POTUGUES | 0/1 | 0 Portuguese |
|    |       |       |        |
|    |       |       |        |
| M9 | NOM8377-B-9NA/9NB |  |  |
|    | STARTON | 0-2 | 2(turn on) |
|    | START TIME | 6-15 | 8(turn on time) |
|    | IF OFFSET | 0-63 | 32(IF compensate) |
|    | TUNER | 0-2 | 0(BXATB011F---X/BXATB108F---K/BXATB015F---X/BXATB021F---D), 1 (BXATB017F---K),2(XXX) |
|    | CALENDAR | 0-1 | 0 |
|    | GAME | 0-1 | 0 |
|    | LOGO | 0-2 | 0 |
|    | LOGO TIME | 1-15 | 6 |

13

CRT001252

# Block diagram



CRT001253

# IC block diagram

## OM8370(South America) / OM8377(North America) (NO PAL DECODER)



## ICs functional description

### UOC  OM8377 / OM8370

| SYMBOL | PIN | DESCRIPTION |
|---|---|---|
| STAND BY output. | 1 | In STAND BY mode, high level (Power OFF). For Power ON this pin will be reduced to low. (**NOM8377-B-8NB/9NA**) |
| SCL | 2 | I$^2$C-bus clock line |
| SDA | 3 | I$^2$C-bus data line |
| TUNING | 4 | NC |
| P3.0/   STAND   BY output | 5 | In STAND BY mode, high level (Power OFF). For Power ON this pin will be reduced to low.(**NOM8377-B-9NB**) |
| KEY | 6 | Control keys input |
| VOL | 7 | Sound Volume control PWM output |
| MUTE | 8 | Sound mute output |
| VSSC/P | 9 | Digit ground for μ-controller core and periphery |
| BAND1 | 10 | NC |
| BAND2 | 11 | NC |
| VSSA | 12 | Analog ground of teletext decoder and digital ground of TV-processor |
| SECPLL | 13 | PLL decoupling |
| VP2 | 14 | 2nd supply voltage TV-processor(+8V) |

15

CRT001254

| SYMBOL | PIN | DESCRIPTION |
|---|---|---|
| DECDIG | 15 | decoupling digital supply of TV-processor |
| PH2LF | 16 | Phase-2 filter |
| PH1LF | 17 | Phase-1 filter |
| GND3 | 18 | Ground 3 for TV-processor |
| DECBG | 19 | Band gap decoupling |
| AVL/EWD | 20 | Automatic volume leveling /EAST-WEST drive output |
| VDRB | 21 | Vertical drive B output |
| VDRA | 22 | Vertical drive A output |
| IFIN1 | 23 | IF input 1 |
| IFIN2 | 24 | IF input 2 |
| IREF | 25 | Reference current input |
| VSC | 26 | Vertical sawtooth capacitor |
| TUNER AGC | 27 | Tuner AGC output |
| AUDEEM/SIFIN1 *1 | 28 | Audio deemphasis or SIF input |
| DECSDEM/SIFIN2 | 29 | decoupling sound demodulator or SIF input 2 |
| GND2 | 30 | ground 2 for TV processor |
| SNDPLL/SIFAGC *1 | 31 | narrow band PLL filter or AGC sound IF |
| AVL/SNDIF/REF0/ AMOUT *1 | 32 | Automatic Volume Levelling / sound IF input / subcarrier reference output / audio deemphasis |
| HOUT | 33 | horizontal output |
| FBISO | 34 | flyback input/sandcastle output |
| AUDEXT/QSSO/ AMOUT *1 | 35 | external audio output / QSS intercarrier out |
| EHTO | 36 | EHT/overvoltage protection input |
| PLL IF | 37 | IF-PLL loop filter |
| IFVO/SVO | 38 | IF video output / selected CVBS output |
| VP1 | 39 | supply voltage TV processor |
| CVBS INT | 40 | internal CVBS input |
| GND1 | 41 | ground for TV processor |
| CVBS/Y | 42 | CVBS/Y input |
| CHROMA | 43 | C input |
| AUDOUT/AMOUT *1 | 44 | audio output /AM audio output (volume controlled) |
| INSSW2 | 45 | 2nd RGB / YUV insertion input |
| R2/VIN | 46 | 2nd R input / V (R-Y) input / PR input |
| G2/YIN | 47 | 2nd G input / Y input |
| B2/UIN | 48 | 2nd B input / U (B-Y) input / PB input |
| BCLIN | 49 | beam current limiter input |
| BLKIN | 50 | black current input / V-guard input |
| RO | 51 | Red output |
| GO | 52 | Green output |
| BO | 53 | Blue output |

16

CRT001255

| SYMBOL | PIN | DESCRIPTION |
|---|---|---|
| VDDA | 54 | analog supply of Closed Caption decoder and digital supply of TV-processor (3.3 V) |
| VPE | 55 | OTP Programming Voltage |
| VDDC | 56 | digital supply to core (3.3 V) |
| OSCGND | 57 | oscillator ground supply |
| XTALIN | 58 | crystal oscillator input |
| XTALOUT | 59 | crystal oscillator output |
| RESET | 60 | reset |
| VDDP | 61 | digital supply to periphery (+3.3 V) |
| P1.0/INT1 | 62 | TV/AV (AV1) / AV2 /S-VHS mode Output. |
| P1.1/T0 | 63 | TV/AV (AV1) / AV2 /S-VHS mode Output. |
| P1.2/INT0 | 64 | Remote control signal input. |

**AN7522N / AN17821A**      Function : **audio output**

| Symbol | PIN | Function | Symbol | PIN | Function |
|---|---|---|---|---|---|
| Vcc | 1 | Power supply | GND | 7 | ground |
| Out 1 (+) | 2 | Ch 1 output (+) | In 2 | 8 | Ch 2 input |
| GND(out 1) | 3 | Ch 1Ground | VOL | 9 | Volume Control |
| Out 1 (-) | 4 | Ch 1 output (-) | Out 2 (-) | 10 | Ch 2 output (-) |
| Standby | 5 | Mute input | GND(out 2) | 11 | Ch 2 Ground |
| In 1 | 6 | Ch 1 input | Out 2 (+) | 12 | Ch 2 output (+) |

**STV9302A / LA78040**      Function : **vertical output**

| Symbol | PIN | Function | Symbol | PIN | Function |
|---|---|---|---|---|---|
| INV IN | 1 | Input | V OUT | 5 | Vertical  output |
| VCC1 | 2 | Power | VCC2 | 6 | Output power supply |
| PUMP UP | 3 | Pump up power | NON INV IN | 7 | Negative feedback |
| GND | 4 | Ground | | | |

# IC voltages

**OM8377 / OM8370**

| PIN | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| V | 2.8 | 3.8 | 3.6 | 3.3 | 3.5 | 3.5 | 0.1 | 0.1 | 0 | 5.4 | 0.1 | 0 | 2.3 | 8 | 5 | 3 |
| PIN | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 |
| V | 4 | 0 | 4 | 0.9 | 0.7 | 0.8 | 1.9 | 1.9 | 3.9 | 3.8 | 1.6 | 3.2 | 3.4 | 0 | 2.4 | 0.1 |
| PIN | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 |
| V | 0.6 | 0.5 | 3.7 | 1.7 | 2.4 | 3.1 | 8 | 3.8 | 0 | 3.4 | 1.5 | 3.6 | 2.3 | 2.6 | 2.6 | 2.6 |
| PIN | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 | 64 |
| V | 2.3 | 7.2 | 2.7 | 2.7 | 2.7 | 3.5 | 0 | 3.5 | 0.1 | 1.7 | 1.8 | 0 | 3.5 | 0.1 | 0.1 | 5 |

CRT001256

**STV9302A  / LA78040**

| PIN | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|-----|-----|-----|-----|-----|-----|-----|-----|
| V | 0.7 | 15 | -12 | -15 | 0.3 | 15.9 | -0.07 |

**AN 7522N / AN17821A**

| PIN | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| V | 12 | 7 | 0 | 7 | 3.3 | 1.4 | 0 | 1.4 | 0 | 7 | 0 | 7 | |

# 6. Test point Waveforms



CRT001257

# Wiring diagram



## 203-TK20260-12JL

CRT001258



602-TK2026-01

CRT001259

603-TK2026S-12
CRT001260
Ver.1.0

# EXHIBIT 15

1  BAKER BOTTS L.L.P.
   John M. Taladay (*pro hac vice*)
2  Evan J. Werbel (*pro hac vice*)
   Thomas E. Carter (*pro hac vice*)
3  Andrew L. Lucarelli (*pro hac vice*)
   700 K Street, N.W.
4  Washington, D.C. 20001
   (202)-639-7700
5  (202)-639-7890 (fax)
   Email: john.taladay@bakerbotts.com
6          evan.werbel@bakerbotts.com
           tom.carter@bakerbotts.com
7          drew.lucarelli@bakerbotts.com

8  Jonathan Shapiro (State Bar No. 257199)
   101 California Street, Suite 3600
9  San Francisco, California 94111
   (415) 291-6200
10 (415) 291-6300 (fax)
11 Email: jonathan.shapiro@bakerbotts.com

12 *Attorneys for Defendants*
   *IRICO GROUP CORP. and*
13 *IRICO DISPLAY DEVICES CO., LTD.*

14

15                    **UNITED STATES DISTRICT COURT**

16                   **NORTHERN DISTRICT OF CALIFORNIA**

17                            **OAKLAND DIVISION**

18

19 IN RE: CATHODE RAY TUBE (CRT)          Master File No. 07-cv-05944-JST
   ANTITRUST LITIGATION                   (N.D. Cal.)
20
                                          MDL No. 1917
21
   This Document Relates to:             **IRICO DEFENDANTS' FOURTH**
22                                        **SUPPLEMENTAL OBJECTIONS**
   ALL INDIRECT PURCHASER ACTIONS        **AND RESPONSES TO INDIRECT**
23                                        **PURCHASER PLAINTIFFS' FIRST**
                                          **SET OF INTERROGATORIES TO**
24                                        **DEFENDANTS**

25

26 PROPOUNDING PARTY:      Indirect Purchaser Plaintiffs

27 RESPONDING PARTIES:     Irico Group Corporation
                           Irico Display Devices Co., Ltd.
28 SET NUMBER:             One

   IRICO'S 4TH SUPPLEMENTAL OBJECTIONS          Master File No. 07-cv-05944-JST
   AND RESPONSES TO IPP'S FIRST SET             MDL No. 1917
   INTERROGATORIES

1    Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico

2    Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby provides its fourth

3    supplemental response to the Indirect Purchaser Plaintiffs' ("Plaintiff") First Set of Interrogatories

4    to Defendants, dated August 1, 2014 ("Interrogatories"). Irico reserves the right to amend or

5    supplement these Objections and Responses (the "Responses") to the extent allowed by the

6    Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the

7    United States District Court for the Northern District of California ("Local Rules"). Subject to

8    and without waiving any of Irico's General and Specific Objections as set forth below, Irico is

9    willing to meet and confer with Plaintiff regarding such General and Specific Objections.

10    The following Responses are made only for purposes of this case. The Responses are

11    subject to all objections as to relevance, materiality and admissibility, and to any and all

12    objections on any ground that would require exclusion of any response if it were introduced in

13    court. All evidentiary objections and grounds are expressly reserved.

14    These Responses are subject to the provisions of the Stipulated Protective Order issued by

15    the Court on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated

16    "Confidential" in accordance with the provisions of the Protective Order.

17    ## **GENERAL OBJECTIONS**

18    Irico makes the following General Objections to Plaintiff's Interrogatories:

19    1.    Irico's Responses are based upon information available to and located by Irico as

20    of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states

21    that it has conducted a diligent search, reasonable in scope, of those files and records in its

22    possession, custody, or control believed to likely contain information responsive to Plaintiff's

23    Interrogatories.

24    2.    No express, incidental, or implied admissions are intended by these Responses and

25    should not be read or construed as such.

26    3.    Irico does not intend, and its Responses should not be construed as, an agreement

27    or acquiescence with any characterization of fact, assumption, or conclusion of law contained in

28    or implied by the Requests.

IRICO'S 4TH SUPPLEMENTAL OBJECTIONS          1          Master File No. 07-cv-05944-JST
AND RESPONSES TO IPP'S FIRST SET                                 MDL No. 1917
INTERROGATORIES

4.      To the extent that Irico responds to Plaintiff's Interrogatories by stating that Irico will produce or make available for examination responsive information or documents, Irico has made a good faith and reasonable attempt to ascertain whether information responsive to Plaintiff's Interrogatories exists and is properly producible, and has produced or made available for examination non-privileged responsive materials located during the course of that reasonable search.

5.      Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiff.

6.      Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

7.      Irico objects to Plaintiff's Interrogatories to the extent they seek information that is not relevant or disproportionate to the needs of the case.

8.      Irico objects to Plaintiff's Interrogatories to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or amend its Responses.

9.      Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that are insufficiently or imprecisely defined. Irico has attempted to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case.

10.      Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico will provide only information that it believes to be non-privileged and

1  otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed

2  as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any

3  information or responsive documents subject to any such doctrine, privilege, protection or

4  immunity from production shall not constitute a general, inadvertent, implicit, subject-matter,

5  separate, independent or other waiver of such doctrine, privilege, protection or immunity from

6  production.

7       11.    Irico objects to Plaintiff's Interrogatories to the extent that they call for

8  information that is not in the possession, custody, or control of Irico. Irico also objects to the

9  extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties,

10  including but not limited to any of Irico's subsidiary or affiliated companies.

11       12.    Irico objects to Plaintiff's Interrogatories to the extent that responding would

12  require Irico to violate the privacy and/or confidentiality of a third party or confidentiality

13  agreement with a third party.

14       13.    Irico objects to Plaintiff's Interrogatories to the extent that they seek information

15  that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily

16  available from other sources.

17       14.    Irico objects to Plaintiff's Requests to the extent that they seek information or

18  documents concerning transactions outside the United States. Such Requests are unduly

19  burdensome and disproportionate to the needs of the case as Plaintiffs' class definition is confined

20  to "individuals and entities that indirectly purchased Cathode Ray Tube Products . . . in the

21  United States" (see Indirect Purchaser Plaintiffs' Fifth Consolidated Amended Complaint dated

22  September 19, 2019).

23       15.    Irico objects to Plaintiff's Interrogatories to the extent that compliance would

24  require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body

25  of foreign jurisdictions.

26       16.    Irico's responses to Plaintiff's Interrogatories should not be construed as either (i)

27  a waiver of any of Irico's general or specific objections or (ii) an admission that such information

28  or documents are either relevant or admissible as evidence.

17.     Irico objects to Plaintiff's Interrogatories to the extent that they are compound and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

18.     Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for legal conclusions.

19.     Irico objects to the Interrogatories to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

20.     Irico objects to the Interrogatories to the extent they seek information or documents that cannot be removed or transmitted outside China without violating the laws and regulations of that country, including but not limited to restrictions on the transmission of state secrets or trade secrets as those terms are defined under Chinese law.

21.     Irico objects to the Interrogatories to the extent that they are "contention interrogatories" regarding issues implicated by expert analysis and disclosures. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 Wl 9558055 (N.D. Cal. May 19, 2011). Irico objects to each Interrogatory to the extent that it is premature and/or to the extent that it: (a) conflicts with obligations that are imposed by the Federal Rules of Civil Procedure, the Civil Local Rules of this Court, and/or any other applicable rule; (b) seeks information that is the subject of expert testimony; and/or (c) seeks information that is dependent on depositions and documents of third-parties that have not been discovered.

22.     Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

## GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Irico objects to the definitions of "Bilateral Meeting" (Definition No. 1) on the grounds that it is vague, ambiguous and overly broad.

2.     Irico objects to the definition of "Communication" (Definition No. 2) on the grounds that it is vague, ambiguous, and overly broad. Irico further objects to this definition to the

1   extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of

2   Civil Procedure.

3       3.      Irico objects to the definitions of "CRT" and "CRT Product" (Definition No. 3) on

4   the grounds that they are vague, ambiguous and overly broad. Irico further objects to the use of

5   the term "CRT Products" to the extent that it is inconsistent with the definition of "CRT

6   Products" as set forth in Plaintiff's pleadings.

7       4.      Irico objects to the definition of "CRT Conspiracy" (Definition No. 4) on the

8   grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad.

9       5.      Irico objects to the definitions of "Defendant," "You," and "Your" (Definition

10  Nos. 5 and 14) to the extent that Plaintiff defines those terms to include the Irico's "present or

11  former employees, officers, directors, agents, predecessors, successors, parents, subsidiaries,

12  affiliates, joint ventures or any other person acting on their behalf." This definition is overbroad,

13  unduly burdensome, vague, and ambiguous. Irico also objects to the inclusion of all "present or

14  former employees, officers, directors, agents . . . or any other person acting on [the] behalf [of]"

15  Irico within this definition to the extent it purports to encompass information that is protected by

16  attorney-client privilege, work product protection or any other applicable doctrine, privilege,

17  protection or immunity or otherwise calls for a legal conclusion.

18      6.      Irico objects to the definition of "Document" (Definition No. 6) to the extent it

19  seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil

20  Procedure, the Local Rules, or any other applicable laws.

21      7.      Irico objects to the definition of "Employee" (Definition No. 7) on the grounds

22  that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico

23  further objects to this definition to the extent that it attempts to impose burdens on Irico beyond

24  those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to

25  the extent that it seeks information protected by the attorney client or other applicable privilege,

26  attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or

27  foreign law.

28      8.      Irico objects to the definitions of "Glass Meeting" (Definition No. 9) on the

IRICO'S 4TH SUPPLEMENTAL OBJECTIONS          5          Master File No. 07-cv-05944-JST
AND RESPONSES TO IPP'S FIRST SET                        MDL No. 1917
INTERROGATORIES

1   grounds that it is vague, ambiguous and overly broad.

2      9.      Irico objects to the definition of "Meeting" (Definition No. 11) on the grounds that

3   the definition is overly broad, unduly burdensome, and seeks information that is neither relevant

4   nor proportionate to the needs of the case.

5      10.     Irico objects to the definition of the "Class Period" (Definition No. 13) as

6   overbroad, unduly burdensome, and beyond the applicable statute of limitations.

7      11.     Irico objects to Instruction No. 2 (related to identification of persons) to the extent

8   that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized

9   under the Federal Rules of Civil Procedure, including, without limiting the generality of the

10  foregoing, Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the

11  extent that it purports to impose burdens or obligations broader than, inconsistent with, or not

12  authorized under, the Local Rules and any orders of the Court, and on the grounds that it is vague,

13  ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the

14  extent it seeks information that would disclose personal confidential information and/or violate

15  any and all rights of privacy under the United States Constitution or Article I of the Constitution

16  of the State of California, or any other applicable law or state constitution, or that is otherwise

17  prohibited from disclosure because to do so would cause Irico to violate legal and/or contractual

18  obligations to any other persons or entities.

19     12.     Irico objects to Instruction No. 3 (related to identification of an entity other than a

20  natural person) to the extent that it purports to impose burdens or obligations broader than,

21  inconsistent with, or not authorized under the Federal Rules of Civil Procedure or other applicable

22  rule or Order of this Court.

23     13.     Irico objects to Instruction No. 4 (identification of "CRT[s] or CRT Product[s]") to

24  the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not

25  authorized under the Federal Rules of Civil Procedure, including, without limiting the generality

26  of the foregoing, Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to

27  the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not

28  authorized under, the Local Rules and any orders of the Court, and on the grounds that it is vague,

1  ambiguous, and inconsistent with common usage. Irico also objects to this Instruction to the

2  extent that it compounds each and every Interrogatory in violation of Federal Rule of Civil

3  Procedure 33(a)(1).

4       14.     Irico objects to Instruction No. 5 (identification of events) to the extent that it

5  purports to impose burdens or obligations broader than, inconsistent with, or not authorized under

6  the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing,

7  Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the extent that it

8  purports to impose burdens or obligations broader than, inconsistent with, or not authorized

9  under, the Local Rules and any orders of the Court, and on the grounds that it is vague,

10 ambiguous, and inconsistent with common usage. Irico also objects to this Instruction to the

11 extent that it compounds each and every Interrogatory in violation of Federal Rule of Civil

12 Procedure 33(a)(1).

13      15.     Irico objects to Instruction No. 6 (related to the production of business records in

14 response to an interrogatory pursuant to Federal Rule of Civil Procedure 33(d)) on the grounds

15 that it is unduly burdensome and purports to impose burdens and obligations upon Irico beyond

16 those required by the Federal Rules of Civil Procedure or other applicable rule or Order of this

17 Court.

18 ## SPECIFIC RESPONSES TO INTERROGATORIES

19 ## INTERROGATORY NO. 1

20      Have You ever participated in any conspiracy to fix prices, limit production or capacity,

21 allocate customers and/or allocate market share of CRTs?

22 ## RESPONSE TO INTERROGATORY NO. 1

23      Irico reasserts and incorporates each of the General Objections and Objections to the

24 Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

25 contention interrogatory, served at the outset of the litigation, before the conduct of discovery

26 and/or expert analysis and disclosures. *See In re Convergent Technologies Securities Litig.*, 108

27 F.R.D. 328, 332-38 (N.D. Cal. 1985).

28      Subject to and without waiving the foregoing objections, Irico responds that, pursuant to

1    its obligations under Federal Rule of Civil Procedure 26(e), it will supplement its response to this

2    interrogatory at the appropriate time following substantial completion of other fact discovery.

3    **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1**

4        Irico reasserts and incorporates each of the General Objections, Objections to the

5    Definitions and Instructions, and specific objections to Interrogatory No. 1 set forth above.

6        Subject to and without waiving the foregoing objections, Irico states as follows: Irico

7    denies having participated in any conspiracy to fix prices, limit production or capacity, allocate

8    customers and/or allocate market share of CRTs.

9    **INTERROGATORY NO. 2**

10       If You contend that You withdrew from any CRT Conspiracy, state:

11       (a)    Why You withdrew from the conspiracy;

12       (b)    What specific acts You took to withdraw from the CRT Conspiracy;

13       (c)    Any co-conspirators or Law Enforcement Agents to whom You communicated

14   Your withdrawal;

15       (d)    Who withdrew from the CRT Conspiracy on your behalf;

16   **RESPONSE TO INTERROGATORY NO. 2**

17       Irico reasserts and incorporates each of the General Objections and Objections to the

18   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

19   contention interrogatory, served at the outset of the litigation, before the conduct of discovery

20   and/or expert analysis and disclosures. *See In re Convergent Technologies Securities Litig.*, 108

21   F.R.D. 328, 332-38 (N.D. Cal. 1985).

22       Subject to and without waiving the foregoing objections, Irico responds that, pursuant to

23   its obligations under Federal Rule of Civil Procedure 26(e), it will supplement its response to this

24   interrogatory at the appropriate time following substantial completion of other fact discovery.

25   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2**

26       Irico reasserts and incorporates each of the General Objections, Objections to the

27   Definitions and Instructions, and specific objections to Interrogatory No. 2 set forth above.

28       Subject to and without waiving the foregoing objections, Irico states as follows: Irico

1  understands that Plaintiff has alleged a single global conspiracy encompassing all CRTs,

2  including both color picture tubes ("CPTs") and color display tubes ("CDTs") sold during the

3  Relevant Period.  Irico denies participating in any such conspiracy, and also contends that the

4  conspiracy as alleged by plaintiffs is inappropriately broad as it includes multiple categories of

5  CRTs, including different sizes and types, that are not functional substitutes in use.  *See* Heiser

6  (Hitachi) Dep. 46:24-47:23; Michael Son (SDI) Dep. 318:20-319:9; Jae In Lee (SDI) Dep. 212:1-

7  213:2; Chih Chun Liu (Chunghwa) Dep. 502:2-19; Phillip Johnson Dep. 27:6-28:6.  Irico

8  contends that, if any CRT-related conspiracy existed, as a matter of economic feasibility it could

9  not encompass both CPTs and CDTs.

10  Irico contends that it ceased production and sale of CDTs no later than 2004 and thus

11  could not have participated in any conspiracy to fix prices or restrain production of CDTs, if any

12  such conspiracy existed, after that time.  Irico's exit from the market for sale of CDTs was open

13  and notorious in the CRT industry.

14  **INTERROGATORY NO. 3**

15  If Your answer to Interrogatory No. 2, above, is in the affirmative, identify all Evidence

16  upon which You intend to rely to prove such contention.

17  **RESPONSE TO INTERROGATORY NO. 3**

18  Irico reasserts and incorporates each of the General Objections and Objections to the

19  Definitions and Instructions set forth above. Irico also reasserts and incorporates its specific

20  objections to Interrogatory No. 2. Irico further objects that this Interrogatory is a contention

21  interrogatory, served at the outset of the litigation, before the conduct of discovery and/or expert

22  analysis and disclosures. *See In re Convergent Technologies Securities Litig.*, 108 F.R.D. 328,

23  332-38 (N.D. Cal. 1985).

24  Subject to and without waiving the foregoing objections, Irico responds that, pursuant to

25  its obligations under Federal Rule of Civil Procedure 26(e), it will supplement its response to this

26  interrogatory at the appropriate time following substantial completion of other fact discovery.

27  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3**

28  Irico reasserts and incorporates each of the General Objections, Objections to the

1    Definitions and Instructions, and specific objections to Interrogatory No. 3 set forth above.

2            Subject to and without waiving the foregoing objections, Irico states as follows: Irico

3    identifies the following evidence in support of its contention: Documents IRI-CRT-00031179

4    through -31215;  Heiser (Hitachi) Dep. 46:24-47:23; Michael Son (SDI) Dep. 318:20-319:9; Jae

5    In Lee (SDI) Dep. 212:1-213:2; Chih Chun Liu (Chunghwa) Dep. 502:2-19; Phillip Johnson Dep.

6    27:6-28:6; witnesses Wang Zhaojie and Su Xiaohua.  Irico further refers Plaintiff to the

7    forthcoming spreadsheet(s) summarizing its original CRT sales records.

8    **INTERROGATORY NO. 5**

9            Indicate whether You were notified at any time by any co-conspirator of any co-

10   conspirator's intent to withdraw from the CRT Conspiracy?

11   **RESPONSE TO INTERROGATORY NO. 5**

12           Irico reasserts and incorporates each of the General Objections and Objections to the

13   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

14   contention interrogatory, served at the outset of the litigation, before the conduct of discovery

15   and/or expert analysis and disclosures. *See In re Convergent Technologies Securities Litig.*, 108

16   F.R.D. 328, 332-38 (N.D. Cal. 1985).

17           Subject to and without waiving the foregoing objections, Irico responds that, pursuant to

18   its obligations under Federal Rule of Civil Procedure 26(e), it will supplement its response to this

19   interrogatory at the appropriate time following substantial completion of other fact discovery.

20   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5**

21           Irico reasserts and incorporates each of the General Objections, Objections to the

22   Definitions and Instructions, and specific objections to Interrogatory No. 5 set forth above.

23           Subject to and without waiving the foregoing objections, Irico states that it was not

24   notified at any time of any intent to withdraw from the CRT Conspiracy, if any such conspiracy

25   existed.

26   **INTERROGATORY NO. 6**

27           If Your answer to Interrogatory No.5 above, is in the affirmative, describe all

28   communication(s) between You and any person(s) regarding any co-conspirator's intent to

1  withdraw from the conspiracy, and identify all Evidence regarding such communications.

2  **RESPONSE TO INTERROGATORY NO. 6**

3        Irico reasserts and incorporates each of the General Objections and Objections to the

4  Definitions and Instructions set forth above. Irico also reasserts and incorporates its specific

5  objections to Interrogatory No. 5. Irico further objects that this Interrogatory is a contention

6  interrogatory, served at the outset of the litigation, before the conduct of discovery and/or expert

7  analysis and disclosures. *See In re Convergent Technologies Securities Litig.*, 108 F.R.D. 328,

8  332-38 (N.D. Cal. 1985).

9        Subject to and without waiving the foregoing objections, Irico responds that, pursuant to

10  its obligations under Federal Rule of Civil Procedure 26(e), it will supplement its response to this

11  interrogatory at the appropriate time following substantial completion of other fact discovery.

12  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6**

13        Irico reasserts and incorporates each of the General Objections, Objections to the

14  Definitions and Instructions, and specific objections to Interrogatory No. 6 set forth above.

15        Subject to and without waiving the foregoing objections, Irico states that no response is

16  required.

17  **INTERROGATORY NO. 7**

18        For each affirmative defense in your Answer, identify all Evidence supporting that

19  defense, or state that the defense will no longer be asserted.

20  **RESPONSE TO INTERROGATORY NO. 7**

21        Irico reasserts and incorporates each of the General Objections and Objections to the

22  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

23  contention interrogatory, served at the outset of the litigation, before the conduct of discovery

24  and/or expert analysis and disclosures. *See In re Convergent Technologies Securities Litig.*, 108

25  F.R.D. 328, 332-38 (N.D. Cal. 1985).

26        Subject to and without waiving the foregoing objections, Irico responds that, pursuant to

27  its obligations under Federal Rule of Civil Procedure 26(e), it will supplement its response to this

28  interrogatory at the appropriate time following substantial completion of other fact discovery.

1   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7**

2          Irico reasserts and incorporates each of the General Objections and Objections to the

3   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

4   contention interrogatory, served at the outset of the litigation, before the conduct of discovery

5   and/or expert analysis and disclosures. *See In re Convergent Technologies Securities Litig.*, 108

6   F.R.D. 328, 332-38 (N.D. Cal. 1985). Irico is responding to this Interrogatory on the basis that the

7   Indirect Purchaser Plaintiffs have identified this discovery relating to affirmative defenses as a

8   priority, but Irico continues to believe that such discovery is premature given that document

9   production is ongoing and no Irico witnesses have been deposed relating to merits issues. Irico

10  reserves all rights to further supplement its responses and renew any withdrawn defense at an

11  appropriate time following the substantial completion of other fact discovery.

12          **INTERROGATORY RESPONSE AS TO IRICO'S SEVENTH DEFENSE**

13          Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part,

14  by the applicable statute(s) of limitations.

15          **RESPONSE**

16          Subject to and without waiving the objections stated above, and based on its present

17  knowledge, Irico responds by stating that Irico withdraws its Seventh Defense.

18          **INTERROGATORY RESPONSE AS TO IRICO'S TENTH DEFENSE**

19          Plaintiffs' claims and claims of any putative class members are barred, in whole or in part,

20  because any acts or practices of [Group or Display] that are the subject of the Complaint were cost

21  justified or otherwise economically justified and resulted from a good faith effort to meet

22  competition or market conditions.

23          **RESPONSE**

24          Subject to and without waiving the objections stated above, Irico contends that its acts or

25  practices were cost justified or otherwise economically justified, and resulted from a good faith

26  effort to meet competition or market conditions. In addition, Irico asserts no evidence has been

27  brought in the above captioned matter that indicates any action or practice of Irico was not cost

28  justified, otherwise economically justified, or did not result from a good faith effort to meet

competition or market conditions. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Irico relies on the following evidence to support its contention that at all times its acts or practices were cost justified or otherwise economically justified, and resulted from a good faith effort to meet competition or market conditions: Reply Brief of Irico In Support of Motion to Set Aside Default at 10-11, ECF No. 5229; Exs. A – F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF Nos. 5229-02 through -07; BMCC-CRT000002761; BMCC-CRT000002762; CHU00029175E; CHU00029179E; CHU00029259E; CHU00030067E; CHU00030777E; CHU00030941E; CHU00030973E; CHU00031018E; CHU00031032; CHU00031044E; and, CHU00031070E.

**INTERROGATORY RESPONSE AS TO IRICO'S ELEVENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because the alleged conduct of [Group or Display] that is the subject of the Complaint was caused by, due to, based upon, or in response to directives, laws, regulations, policies, and/or acts of governments, governmental agencies and entities, and/or regulatory agencies, and such is non-actionable or privileged.

**RESPONSE**

Subject to and without waiving the objections stated above, Irico contends that Irico's pricing-related conduct was compelled by the Chinese government and based on duly enacted laws and/or regulations of the People's Republic of China. Irico relies on the following evidence to support this contention: Reply Brief of Irico In Support of Motion to Set Aside Default at 10-11, ECF No. 5229; and, Exs. A – F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF Nos. 5229-02 through -07.

**INTERROGATORY RESPONSE AS TO IRICO'S TWELFTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because the alleged conduct of [Group or Display] that is the subject of the Complaint was caused by or in response to duly enacted laws and/or regulations of the People's Republic of China and is therefore protected under the foreign sovereign compulsion doctrine, the act of state doctrine, and international comity.

**RESPONSE**

1    Subject to and without waiving the objections stated above, Irico contends that Irico's

2  pricing-related conduct was compelled by the Chinese government and based on duly enacted laws

3  and/or regulations of the People's Republic of China. Irico relies on the following evidence to

4  support this contention: Reply Brief of Irico In Support of Motion to Set Aside Default at 10-11,

5  ECF No. 5229; and, Exs. A – F to the Declaration of Stuart C. Plunkett in Support of Motion to Set

6  Aside Default, ECF Nos. 5229-02 through -07.

7    **INTERROGATORY RESPONSE AS TO IRICO'S FIFTEENTH DEFENSE**

8    To the extent that any actionable conduct occurred, Plaintiffs claims and the claims of any

9  putative class members against [Group or Display] are barred because all such conduct would have

10  been committed by individuals acting *ultra vires.*

11    **RESPONSE**

12    Subject to and without waiving the objections stated above, and based on its present

13  knowledge, Irico responds by stating that Irico withdraws its Fifteenth Defense.

14    **INTERROGATORY RESPONSE AS TO IRICO'S SEVENTEENTH DEFENSE**

15    Plaintiffs' claims are barred, in whole or in part, to the extent they are based on alleged acts,

16  conduct or statements that are specifically permitted by law.

17    **RESPONSE**

18    Subject to and without waiving the objections stated above, Irico contends that Irico's

19  pricing-related conduct was compelled by the Chinese government and based on duly enacted laws

20  and/or regulations of the People's Republic of China. Irico relies on the following evidence to

21  support this contention: Reply Brief of Irico In Support of Motion to Set Aside Default at 10-11,

22  ECF No. 5229; and, Exs. A – F to the Declaration of Stuart C. Plunkett in Support of Motion to Set

23  Aside Default, ECF Nos. 5229-02 through -07.

24    **INTERROGATORY RESPONSE AS TO IRICO'S EIGHTEENTH DEFENSE**

25    Plaintiffs' claims should be dismissed, in whole or in part, because Plaintiffs and/or certain

26  members of the putative class failed to take all necessary, reasonable, and appropriate actions to

27  mitigate their alleged damages, if any.

28    **RESPONSE**

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that Irico withdraws its Eighteenth Defense.

**INTERROGATORY RESPONSE AS TO IRICO'S NINETEENTH DEFENSE**

Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part, because Plaintiffs and/or certain members of the putative class would be unjustly enriched if they were allowed to recover any part of the damages alleged in the Amended Complaint.

**RESPONSE**

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that Irico withdraws its Nineteenth Defense.

**INTERROGATORY RESPONSE AS TO IRICO'S TWENTIETH DEFENSE**

Without admitting that Plaintiffs are entitled to recover damages in this matter, Group is entitled to set off from any recovery Plaintiffs may obtain against Group any amount paid to Plaintiffs by any other Defendants who have settled, or do settle, Plaintiffs' claims in this matter.

**RESPONSE**

Subject to and without waiving the objections stated above, Irico states that a plaintiff who recovers damages from one co-conspirator, whether by verdict or settlement, may not recover those same damages again from another co-conspirator. *See* Order Granting Final Approval, ECF No. 5786 (approving IPP settlements with Philips, Panasonic, Hitachi, Toshiba, Samsung, and Thomson/TDA); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 348 (1971); *Seymour v. Summa Vista Cinema, Inc.,* 809 F.2d 1385, 1389 (9th Cir. 1987); *Husky Refining Co. v. Barnes,* 119 F.2d 715, 716 (9th Cir. 1941); *In re Piper Aircraft,* 792 F. Supp. 1189, 1190-91 (N.D. Cal. 1992). While Irico maintains that the evidence does not prove that it conspired or entered into any agreements regarding the price of CRTs in the United States market, or violated any of the laws set forth in IPPs' Complaint, if it were proven that Irico conspired or agreed to fix prices, as alleged, any recovery would need to be reduced by settlements with other defendants in this or related matters.

Additionally, Irico states that applicable state law prohibits duplicative recovery by multiple direct or indirect purchasers. *See, e.g.,* N.Y. Gen. Bus. Law § 340(6) ("In actions where both direct

and indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for damages that the illegal overcharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of damages."); *Clayworth v. Pfizer, Inc.,* 49 Cal. 4th 758, 787 (2010) (holding that under California law, "[i]n instances where multiple levels of purchasers have sued, or where a risk remains they may sue . . . if damages must be allocated among the various levels of injured purchasers, the bar on consideration of the pass-on evidence must necessarily be lifted . . . ."); Haw. Rev. Stat. § 480-13 (2011) ("In class actions or de facto class actions where both direct and indirect purchasers are involved, or where more than one class of indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for compensatory damages that the illegal overcharge has been passed on or passed back to others who are themselves entitled to recover so as to avoid the duplication of recovery of compensatory damages."); Neb. Rev. Stat. § 59-821.01 (2012) ("A defendant may prove, as a partial or complete defense to a claim for damages under sections 59-801 to 59-831 and this section, that the illegal overcharge or undercharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of such damages . . . ."); N.D. Cent. Code § 51-08.1-08 ("In any action for damages under this section, any defendant, as a partial or complete defense against a claim for damages, is entitled to prove that the plaintiff purchaser, or seller in the chain of manufacture, production, or distribution, who paid any overcharge or received any underpayment passed on all or any part of the overcharge or underpayment to another purchaser or seller in that action.").

### INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-FIRST DEFENSE

To the extent that any actionable conduct occurred for which Group is liable, some or all of Plaintiffs' claims against Group are barred because Group withdrew from and/or abandoned any alleged conspiracy and thus Plaintiffs cannot establish liability or compensable damages as a matter of law on the basis that, among other things, Group withdrew and/or abandoned any alleged conspiracy prior to the commencement of the limitations period set forth in applicable statutes of limitations.

### RESPONSE

1    Subject to and without waiving the objections stated above, and based on its present
2    knowledge, Irico responds by stating that Irico withdraws its Twenty-First Defense.

3    **INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-SECOND DEFENSE**

4    Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part,
5    by the doctrines of waiver and/or estoppel.

6    **RESPONSE**

7    Subject to and without waiving the objections stated above, and based on its present
8    knowledge, Irico responds by stating that Irico withdraws its Twenty-Second Defense.

9    **INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-THIRD DEFENSE**

10    Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part,
11    by the equitable doctrine of laches.

12    **RESPONSE**

13    Subject to and without waiving the objections stated above, and based on its present
14    knowledge, Irico responds by stating that Irico withdraws its Twenty-Third Defense.

15    **INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-FOURTH DEFENSE**

16    Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part,
17    by the equitable doctrine of unclean hands.

18    **RESPONSE**

19    Subject to and without waiving the objections stated above, and based on its present
20    knowledge, Irico responds by stating that Irico withdraws its Twenty-Fourth Defense.

21    **INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-FIFTH DEFENSE**

22    Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part,
23    by Plaintiffs' and/or certain members of the putative class acquiescence and/or confirmation of any
24    and all conduct and/or omissions alleged as to [Group or Display].

25    **RESPONSE**

26    Subject to and without waiving the objections stated above, and based on its present
27    knowledge, Irico responds by stating that Irico withdraws its Twenty-Fifth Defense.

28

1     **INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-SIXTH DEFENSE**

2     Plaintiffs' claims are barred, in whole or in part, by the doctrine of accord and satisfaction.

3     **RESPONSE**

4     Subject to and without waiving the objections stated above, and based on its present

5 knowledge, Irico responds by stating that Irico withdraws its Twenty-Sixth Defense.

6 **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7**

7     Irico reasserts and incorporates each of the General Objections and Objections to the

8 Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

9 contention interrogatory, served at the outset of the litigation, before the conduct of discovery

10 and/or expert analysis and disclosures. *See In re Convergent Technologies Securities Litig.*, 108

11 F.R.D. 328, 332-38 (N.D. Cal. 1985). Irico is responding to this Interrogatory on the basis that the

12 Indirect Purchaser Plaintiffs have identified this discovery relating to affirmative defenses as a

13 priority, but Irico continues to believe that such discovery is premature given that document

14 production is ongoing and no Irico witnesses have been deposed relating to merits issues. Irico

15 reserves all rights to further supplement its responses and renew any withdrawn defense at an

16 appropriate time following the substantial completion of other fact discovery.

17     **INTERROGATORY RESPONSE AS TO IRICO'S FOURTEENTH DEFENSE**

18     Plaintiffs' claims and claims of any putative class members are barred, in whole or in part,

19 because any alleged injuries and/or damages were not legally or proximately caused by any acts or

20 omissions of [Group or Display] and/or were caused, if at all, solely and proximately by the conduct

21 of third parties including, without limitations, the prior, intervening or superseding conduct of such

22 third parties.

23     **RESPONSE**

24     Subject to and without waiving the objections stated above, Irico contends that Irico's

25 pricing-related conduct was compelled by the Chinese government and based on duly enacted laws

26 and/or regulations of the People's Republic of China, and such directives, laws and/or regulations

27 constitute third-party action. Irico relies on the following evidence to support this contention: Reply

28 Brief of Irico In Support of Motion to Set Aside Default at 10-11, ECF No. 5229; and, Exs. A – F

IRICO'S 4TH SUPPLEMENTAL OBJECTIONS     18      Master File No. 07-cv-05944-JST
AND RESPONSES TO IPP'S FIRST SET      MDL No. 1917
INTERROGATORIES

to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF Nos. 5229-02 through -07.

### INTERROGATORY RESPONSE AS TO IRICO'S THIRTIETH DEFENSE

Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part, for failure to join indispensable parties.

### RESPONSE

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds by stating that Irico withdraws its Thirtieth Defense.

### THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 20 set forth above.

### INTERROGATORY RESPONSE AS TO IRICO'S TWENTY-FIRST DEFENSE

To the extent that any actionable conduct occurred for which Group is liable, some or all of Plaintiffs' claims against Group are barred because Group withdrew from and/or abandoned any alleged conspiracy and thus Plaintiffs cannot establish liability or compensable damages as a matter of law on the basis that, among other things, Group withdrew and/or abandoned any alleged conspiracy prior to the commencement of the limitations period set forth in applicable statutes of limitations.

### SUPPLEMENTAL RESPONSE

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds as follows: Based on further investigation, Irico renews its Twenty-First Defense.  Irico understands that Plaintiff has alleged a single global conspiracy encompassing all CRTs, including both color picture tubes ("CPTs") and color display tubes ("CDTs") sold during the Relevant Period.  Irico denies participating in any such conspiracy, and also contends that the conspiracy as alleged by plaintiffs is inappropriately broad as it includes multiple categories of CRTs, including different sizes and types, that are not functional substitutes in use.  *See* Heiser (Hitachi) Dep. 46:24-47:23; Michael Son (SDI) Dep. 318:20-319:9; Jae In Lee (SDI) Dep. 212:1-213:2; Chih Chun Liu (Chunghwa) Dep. 502:2-19; Phillip Johnson Dep. 27:6-

28:6.  Irico contends that, if any CRT-related conspiracy existed, as a matter of economic feasibility it could not encompass both CPTs and CDTs.

Irico contends that it ceased production and sale of CDTs no later than 2004 and thus could not have participated in any conspiracy to fix prices or restrain production of CDTs, if any such conspiracy existed, after that time. Irico identifies the following evidence in support of its Twenty-First Defense: IRI-CRT-00031179 through -31215; witnesses Wang Zhaojie and Su Xiaohua.  Irico further refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT sales records.

**INTERROGATORY NO. 20**

For each year during the Class Period, state in U.S. dollars and by year Your business profits and losses realized from sales of CRTs by size and by country of destination, and Your profits and losses for Your business as a whole.

**RESPONSE TO INTERROGATORY NO. 20**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.

Subject to and without waiving the objections stated above, Irico responds that it will conduct a reasonable search for additional information responsive to this interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 20**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 20 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico's sales, profits and losses realized from the sales of all sizes of CRTs to the United States was zero for each year during the Class Period. Irico further directs Plaintiff to documents IRI-CRT-00031590 through -32471 for Irico Group and Irico Display's annual profits and losses under Federal Rule of Civil Procedure 33(d).  Irico has conducted a reasonable search for other information responsive to this Interrogatory and has located no additional information.

**INTERROGATORY NO. 21**

For each year during the Class Period, state in U.S. dollars and by year Your business

1 profits and losses realized from sales of CRT Products by size and type of CRT Products sold and
2 by country of destination, and Your profits and losses for Your business as a whole.

3 **RESPONSE TO INTERROGATORY NO. 21**

4 Irico reasserts and incorporates each of the General Objections and Objections to the
5 Definitions and Instructions set forth above.

6 Subject to and without waiving the objections stated above, Irico responds that it will
7 conduct a reasonable search for information responsive to this interrogatory, if any, and
8 supplement its response as necessary.

9 **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 21**

10 Irico reasserts and incorporates each of the General Objections, Objections to the
11 Definitions and Instructions, and specific objections to Interrogatory No. 21 set forth above.

12 Subject to and without waiving the foregoing objections, Irico states as follows: Irico's
13 sales, profits and losses realized from the sales of all sizes and types of CRT Products to the
14 United States was zero for each year during the Class Period. Irico further directs Plaintiff to
15 documents IRI-CRT-00031590 through -32471 for Irico Group and Irico Display's annual profits
16 and losses under Federal Rule of Civil Procedure 33(d).  Irico has conducted a reasonable search
17 for other information responsive to this Interrogatory and has located no additional information.

18 **INTERROGATORY NO. 22**

19 To the extent that You contend that prior to November 2007 Plaintiffs knew, should have
20 known, or were not reasonably diligent in discovery regarding the allegations in their Complaint,
21 identify all Evidence upon which You intend to rely to prove such contention.

22 **RESPONSE TO INTERROGATORY NO. 22**

23 Irico reasserts and incorporates each of the General Objections and Objections to the
24 Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a
25 contention interrogatory, served at the outset of the litigation, before the conduct of discovery
26 and/or expert analysis and disclosures. *See In re Convergent Technologies Securities Litig.*, 108
27 F.R.D. 328, 332-38 (N.D. Cal. 1985).

28 Subject to and without waiving the foregoing objections, Irico responds that, pursuant to

1    its obligations under Federal Rule of Civil Procedure 26(e), it will supplement its response to this

2    interrogatory at the appropriate time following substantial completion of other fact discovery.

3    **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 22**

4        Irico reasserts and incorporates each of the General Objections, Objections to the

5    Definitions and Instructions, and specific objections to Interrogatory No. 22 set forth above.

6        Subject to and without waiving the foregoing objections, Irico states that based on its

7    present knowledge, it does not contend that prior to November 2007 Plaintiffs knew, should have

8    known, or were not reasonably diligent in discovery regarding the allegations in their Complaint.

9    **INTERROGATORY NO. 23**

10       To the extent that You contend that You provided false information, or false commitments

11   relating to pricing or production of CRTs to competitors at Glass Meetings or Bilateral Meetings

12   with those competitors, identify each instance that you provided false information or a false

13   commitment and any Evidence related to it.

14   **RESPONSE TO INTERROGATORY NO. 23**

15       Irico reasserts and incorporates each of the General Objections and Objections to the

16   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

17   contention interrogatory, served at the outset of the litigation, before the conduct of discovery

18   and/or expert analysis and disclosures. *See In re Convergent Technologies Securities Litig.*, 108

19   F.R.D. 328, 332-38 (N.D. Cal. 1985).

20       Subject to and without waiving the foregoing objections, Irico responds that, pursuant to

21   its obligations under Federal Rule of Civil Procedure 26(e), it will supplement its response to this

22   interrogatory at the appropriate time following substantial completion of other fact discovery.

23   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 23**

24       Irico reasserts and incorporates each of the General Objections, Objections to the

25   Definitions and Instructions, and specific objections to Interrogatory No. 23 set forth above.  Irico

26   further objects that the undefined terms "false information" and "false commitment" are vague

27   and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not proportional

28   to the needs of the case.

IRICO'S 4TH SUPPLEMENTAL OBJECTIONS          22          Master File No. 07-cv-05944-JST
AND RESPONSES TO IPP'S FIRST SET                                MDL No. 1917
INTERROGATORIES

1    Subject to and without waiving the foregoing objections, Irico states that Irico did not

2    participate in any Glass Meetings as defined by these Interrogatories.  Irico further responds that,

3    to the extent Irico provided any information to competitors, it did not provide information that

4    was accurate or truthful.  *See* Wang Dep. 51:1-5; 64:12-21 ("Normally we would not exchange

5    true information.  Everybody aware of that fact."); 75:3-15 ("Between competitors … there are no

6    exchanges of true information."). Documents relied upon by Plaintiff purporting to show

7    competitor communications involving Irico also show distrust of alleged information or

8    commitments by CRT competitors.  *See* CHU00031032E; CHU00030973E.

9    **INTERROGATORY NO. 24**

10    To the extent that you contend that a competitor provided false information or a false

11    commitment relating to pricing or production of CRTs to You at Glass Meetings or Bilateral

12    Meetings, identify each instance, where such false information or false commitment was provided

13    to You and any Evidence related to it.

14    **RESPONSE TO INTERROGATORY NO. 24**

15    Irico reasserts and incorporates each of the General Objections and Objections to the

16    Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

17    contention interrogatory, served at the outset of the litigation, before the conduct of discovery

18    and/or expert analysis and disclosures. *See In re Convergent Technologies Securities Litig.*, 108

19    F.R.D. 328, 332-38 (N.D. Cal. 1985).

20    Subject to and without waiving the foregoing objections, Irico responds that, pursuant to

21    its obligations under Federal Rule of Civil Procedure 26(e), it will supplement its response to this

22    interrogatory at the appropriate time following substantial completion of other fact discovery.

23    **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 24**

24    Irico reasserts and incorporates each of the General Objections, Objections to the

25    Definitions and Instructions, and specific objections to Interrogatory No. 24 set forth above.  Irico

26    further objects that the undefined terms "false information" and "false commitment" are vague

27    and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not proportional

28    to the needs of the case.

1    Subject to and without waiving the foregoing objections, Irico states that Irico did not

2    participate in any Glass Meetings as defined by these Interrogatories.  Irico further responds that

3    it did not expect any information shared by competitors during any meeting or communication to

4    be accurate or truthful.  *See* Wang Dep. 51:1-5; 64:12-21 ("Normally we would not exchange true

5    information.  Everybody aware of that fact."); 75:3-15 ("Between competitors … there are no

6    exchanges of true information.").  Documents relied upon by Plaintiff purporting to show

7    competitor communications involving Irico also show distrust of alleged information or

8    commitments by CRT competitors.  *See* CHU00030665E; CHU00030679E; CHU00030684E;

9    CHU00030695E; CHU00030992E.

10   **INTERROGATORY NO. 25**

11   If Your response to any of the Indirect Purchaser Plaintiffs' First Set of Requests for

12   Admission was anything other than an unqualified admission, separately for each Request for

13   Admission:

14      (a)    state the number of the request for admission;

15      (b)    state all facts upon which You base Your response;

16      (c)    identify all Evidence upon which You intend to rely to support your response; and

17      (d)    identify each person who has knowledge of the facts upon which you base your

18   response.

19   **RESPONSE TO INTERROGATORY NO. 25**

20   Irico reasserts and incorporates each of the General Objections and Objections to the

21   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

22   contention interrogatory, served at the outset of the litigation, before the conduct of discovery

23   and/or expert analysis and disclosures. *See In re Convergent Technologies Securities Litig.*, 108

24   F.R.D. 328, 332-38 (N.D. Cal. 1985).  Irico also objects that Plaintiff has indicated that Irico

25   Defendants need not respond to requests for admission at this stage.

26   Subject to and without waiving the foregoing objections, Irico responds that, pursuant to

27   its obligations under Federal Rule of Civil Procedure 26(e), it will supplement its response to this

28   interrogatory at the appropriate time following substantial completion of other fact discovery and

any responses to Indirect Purchaser Plaintiffs' First Set of Requests for Admission.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 25**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 25 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico refers Plaintiff to its response to Interrogatory No. 8 of Indirect Purchaser Plaintiffs' Fourth Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd.


Dated:  February 23, 2022                    BAKER BOTTS L.L.P.


                                             /s/ John M. Taladay

                                             John M. Taladay (*pro hac vice*)
                                             Evan J. Werbel (*pro hac vice*)
                                             Thomas E. Carter (*pro hac vice*)
                                             Andrew L. Lucarelli (*pro hac vice*)
                                             700 K Street, N.W.
                                             Washington, D.C. 20001
                                             (202)-639-7700
                                             (202)-639-7890 (fax)
                                             Email: john.taladay@bakerbotts.com
                                                     tom.carter@bakerbotts.com
                                                     drew.lucarelli@bakerbotts.com

                                             Jonathan Shapiro (State Bar No. 257199)
                                             101 California Street, Suite 3600
                                             San Francisco, California 94111
                                             (415) 291-6200
                                             (415) 291-6300 (fax)
                                             Email: jonathan.shapiro@bakerbotts.com


                                             *Attorneys for Defendants*
                                             *IRICO GROUP CORP. and*
                                             *IRICO DISPLAY DEVICES CO., LTD.*

# EXHIBIT 16

# HAIER

# COLOR TELEVISION

# SERVICE MANUAL

# PART # TV-8888-36

HAIER AMERICA TRADING, LLC
www.haieramerica.com

1

CRT001134



# BH2404D

COLOUR TELEVISION

# Service Manual



MODEL :

BH2404D

USA

## Features

● 218 programs present

● Multiple picture modes

● On/off timer

● Child-lock、V-CHIP

● CCD、BTSC

# Haier Group

Manual code: M-AS-ML-BH2404-8378                    Edition: 2005.3.8

# Contents

1.   Features·································································.···..···. .3

2.   Specifications···························································..···. .4

3.   Safety Precaution·················································.···5

4.   Warning and cautions··········································.···7

5.   Parts and Functions············································13

6.   Remote controller Functions··························.····················..14

7.   Program Diagram··················································15

8.   Maintenance Service and Trouble Shooting················..·····..····21

9.                              Circuit Diagram········································..·····..·······...···.26

10.  Circuit Explanation··························································..·············.28

11.  Adjustment·······················································.··.·····34

12.  Exploded View················································.·······..37

13.  List of Parts·····················································.············38

14.  Information of Resistors and Capacitors·····················.·······..59

CRT001136

# 1. Features

1) 218 programs present

2) Multiple picture & volume modes

3) On/off timer

4) Child-lock、Program scan

5) Slide curtain power on/off display

CRT001137

# 2. Specifications

| NO | | FUNCTION | |
|----|---|---|---|
| 1 | | Main IC | UOC |
| 2 | | CRT | SF |
| 3 | PIC | Color system | NTSC |
| 4 | | Audio system | M |
| 5 | | NO.of channels | 218 |
| 6 | | OSD language | ENGLISH |
| 7 | | Multi-picture modes | YES |
| 8 | | AV stereo | YES |
| 9 | | Super woofer | |
| 10 | | Surrounding sound | |
| 11 | | Treble/bass boost | |
| 12 | AUDIO | Left/right balancer | |
| 13 | | NICAM | |
| 14 | | Multi-audio modes | |
| 15 | | Tone adjuster | |
| 16 | | MTS/SAP | YES |
| 17 | | Auto-volume leveling | |
| 18 | | AV input | YES |
| 19 | | AV output | |
| 20 | JIC | DVD terminal | |
| 21 | | S-video jack | YES |
| 22 | | Headphone socket | YES |
| 23 | | SCART socket | |
| 24 | | Digital curtain | |
| 25 | | Slow fading on & off | |
| 26 | | Semitransparent menu | YES |
| 27 | | Non-flshing channel changing | |
| 28 | | ZOOM | |
| 29 | | 16:9 mode | |
| 30 | | Games | |
| 31 | SOFTWARE | Calendar | YES |
| 32 | | Child-lock | YES |
| 33 | | Multi-functional lock | YES |
| 34 | | No-picture listening | |
| 35 | | Background light | |
| 36 | | Auto-timer on | YES |
| 37 | | CCD | YES |
| 38 | | V-CHIP | YES |

| NO | | FUNCTION | |
|----|---|---|---|
| 39 | | NO. of built-in speakers | 2 |
| 40 | | Audio output power(W) | 2*2W |
| 41 | | Total power input（W） | 120W |
| 42 | | Voltage range（V） | 120V |
| 43 | | Power frequency（Hz） | 50HZ |
| 44 | PARAMETER | Time of sleep timer(MINS) | |
| 45 | | Net weight(KG) | |
| 46 | | Gross weight(KG) | |
| 47 | | Net dimension(MM) | |
| 48 | | Packaged dimension(MM) | |
| 49 | | Quantity for 20' container | |
| 50 | | Quantity for 40' container | |
| 51 | | Quantiry for 40' high container | |
| 52 | APPROVAL | Acquired certificate | |
| 53 | | Suitable market | USA |

**CRT001138**

# 3. SAFETY PRECAUTIONS

## INPORTANT SAFETY NOTICE

1) Save these Instructions — the safety and operating instructions should be retained for future reference.

2) All warnings on the appliance and in the operating instructions should be followed.

3) Cleaning — Unplug TV from the wall outlet before cleaning. Do not use liquid cleaners or aerosol cleaners. Use only a damp cloth for cleaning.
   Exceptions: Some products are designed for uninterrupted service, eg. Cable TV converters, unplugging such accessories may result in loss of authorization codes. In such cases, please follow instructions for unplugging such devices as provided by the accessories manufacturer.

4) Attachments — do not use attachments not recommended by the TV manufacturer as they may cause hazards.

5) Water and moisture — do not place this TV near water, for example, near a bathtub, wash bowl, kitchen sink, or laundry tub, in a wet basement, or near a swimming pool.

6) Accessories — do not place this TV on an unstable cart, stand, tripod, bracket, or table. The TV may fall, causing serious injury to someone, and serious damage to the appliance. Use only with a cart, stand, tripod, bracket, or table recommended by the manufacturer, or sold with the TV. Any mounting of the appliance should follow the manufacturer's instructions and should use a mounting accessory recommended by the manufacturer. An appliance and cart combination should be moved with care. Quick stops, excessive force, and uneven surfaces may cause the appliance and cart combination to overturn.

7) Ventilation — Slots and openings in the cabinet and the back or bottom are provided for ventilation and to ensure overheating. These openings must not be blocked in a built in installation such a bookcase or rack unless proper ventilation is provided or the manufacturer instructions have been adhered to.

8) POWER Sources — this TV should be operated only from the type of power sources indicated on the electrical nameplate. If you are not sure of the type of power supply to your home, consult your appliance dealer or local power company. For TV's intended to operate from battery power or other source, refer to the operation instructions.

9) Grounding or polarization — This TV is equipped with a polarized alternating current line plug (a plug having one blade wider than the other is). This plug will fit into the power outlet only one way. This is a safety feature. If you are unable to inset the plug fully into the outlet, try reversing the plug. If the plug should still fail to fit, contact your electrician to replace your outlet. Don't defeat the safety purpose of the polarized plug.

10) Power cord protection — Power supply cords should be routed so that they are not likely to be walked on or pinched by items placed upon or against them, paying particular attention to cords or plugs, convenience receptacle, and the point where they exit from the appliance.

11) Outdoor antenna grounding — If an outside antenna or cable system is grounded so as to provide some protection against voltage surges and built up static charges. Article 810 of the National Electrical Code, ANSI/NFPA No.70, provided information with respect to proper grounding of the mast and supporting structure, grounding of the lead in wire to an antenna discharge unit, size of grounding conductors, location of antenna discharge unit, connection to grounding electrodes, and requirement for the grounding electrode. (Fig. A)



(Fig. A)

5

12) Lighting precaution — for added protection for this TV receiver during a lighting storm or when it is left unattended for long period of time, unplug it from the wall outlet and disconnect the antenna or cable system. This will prevent damage to the TV due to lighting and power line surges.

13) Object and liquid entry — never push objects of any kind into this TV through openings as they may touch dangerous voltage point or short out parts that could result in a fire or electric shock. Avoid spilling liquid of any kind on the TV.

14) Servicing — do not attempt to service the TV by yourself, as opening or removing covers may expose you to dangerous voltage or other hazards. Refer all servicing to qualified service personnel.

15) Damage Requiring Service — Unplug this TV from the wall outlet and refer servicing to qualified service personnel under the following conditions:

  a. When the power supply cord or plug is damaged or frayed.
  b. If liquid has been spilled, or objects have been fallen into the TV.
  c. If the TV has been exposed to rain or water.
  d. If the TV does not operate normally by following the operating instructions. Adjust only those controls that are covered by the operating instructions, as improper adjustment of other controls may result in damage and will often require extensive work by a qualified technician to restore the TV to its normal operation.
  e. If the TV has been dropped or damaged in any way.
  f. When the TV exhibits a distinct change in performance; this indicates a need for service.

16) Replacement parts — when replacement parts a required, be sure the service technician uses replacement parts specified by the manufacturer that have the same characteristics as the original part. Unauthorized substitutions may result in fire, electric shock, injury to persons or other hazards.

17) Safety check — Upon completion of any service of repairs to this TV, ask the service technician to perform routine safety checks to determine that the TV is in proper operation condition.

18) Heat — This TV product should be situated away from heat sources such as radiators, heat registers, stoves, or other products (Including amplifiers) that produce heat.

19) Modifications — Any changes or modifications not expressly approved by the Federal Comunications

20) Read these instructions.

21) Keep these instructions.

22) Heed all warnings.

23) Follow all instructions.

24) Do not use this apparatus near water.

25) Clean only with a dry cloth.

26) Do not block any ventilation openings. Install in accordance with the manufacturer's instructions.

27) Do not install near any hear sources such as radiators, heat registers, stoves, or other apparatus (including amplifiers) that produce heat.

28) Do not defeat the safety purposes of the polarized or grounding type plug. A polarized plug has two blades with one wider than the other. A grounding type plug has two blades and a third grounding prong. The wide blade or the third prong is provided for your safety. When the provided plug does not fit into your outlet, consult an electrician for replacement of the obsolete outlet.

29) Protect the power cord from being walked on or pinched particularly at plugs, convenience receptacles, and the point where they exit from the apparatus.

30) Only use the attachments/accessories specified by the manufacturer.

31) Unplug this apparatus during lightning storms or when unused for long periods of time.

32) Refer all servicing to qualified service personnel. Servicing is required when the apparatus has been damaged in any way, such as power supply cord or plug is damaged, liquid has been spilled or objects have fallen into the apparatus, the apparatus has been exposed to rain or moisture, does not operate normally, or has been dropped.

( Please save these instructions for future reference. )                          3

6

**CRT001140**

## General Guidance

An Isolation Transformer should always be used during the servicing of a receiver whose chassis is not isolated from the AC power line. Use a transformer of adequate power rating as this protects the technician from accidents that might result in personal injury caused by electrical shocks.

It will also protect the receiver and it's components from being damaged by accidental shorts of the circuitry that might be inadvertently introduced during the service operation.

If any fuse (or Fusible Resistor) in this TV receiver is blown, replace it with a specified one.

When replacing a high wattage resistor (Oxide Metal Film Resistor, over 1W), keep the resistor 10mm away from PCB.

Keep wires away from high voltage or high temperature parts.

Due to the high vacuum and large surface area of the picture tube, extreme care should be taken in handling the Picture Tube. Do not lift the Picture Tube by its Neck.

X-RAY Radiation

**Warning:**

The source of X-RAY RADIATION in this TV receiver is the High Voltage Section and the Picture Tube.

For continued X-RAY RADIATION protection, the replacement tube must be of the same type as specified in the Replacement Parts List.

Before returning the receiver to the customer,

Always perform an AC leakage current check on the exposed metallic parts of the cabinet, such as antennas, terminals, etc., to make sure that the set is safe to operate without any danger of electrical shock.

**Warning and Cautions**

# 4. Warning and Cautions




CRT001141

## Explanation on the display tube

Generally, it is not needed to clean the tube surface. However, if necessary, its surface can be cleaned with a dry cotton cloth after cutting off the power. Don't use any cleanser. If using hard cloth, the tube surface will be damaged.

**CAUTION:** Before servicing receivers covered by this service manual and its supplements and addenda, read and follow the **SAFETY PRECAUTIONS**.

**NOTE:** If unforeseen circumstances create conflict between the following servicing precautions and any of the safety precautions, always follow the safety precautions. **Remember : Safety First.**

## General Servicing Precautions

1. Always unplug the receiver AC power cord from the AC power source before:

   a. Removing or reinstalling any component, circuitboard module or any other assembly of the receiver.

   b. Disconnecting or reconnecting any receiver electrical plug or other electrical connection.

   c. Connecting a test substitute in parallel with an electrolytic capacitor in the receiver.

   **CAUTION:** A wrong substitution part or incorrect installation polarity of electrolytic capacitors may result in an explosion hazard.

   d. Discharging the picture tube anode.

2. Test high voltage only by measuring it with an appropriate high voltage meter or other voltage-measuring device (DVM, FETVOM, etc.) equipped with a suitable high voltage probe. Do not test high voltage by "drawing an arc".

3. Discharge the picture tube anode only by (a) first connecting one end of an insulated clip lead to the degaussing or kine aquadag grounding system shield at the point where the picture tube socket ground lead is connected, and then (b) touch the other end of the insulated clip lead to the picture tube anode button, using an insulating handle to avoid personal contact with high voltage.

4. Do not spray chemicals on or near this receiver or any of its assemblies.

5. Unless specified otherwise in this service manual, clean electrical contacts only by applying the following mixture to the contacts with a pipe cleaner, cotton-tipped stick or comparable n onabrasive applicator; 10% (by volume) Acetone and 90% (by volume) isopropyl alcohol (90%-99% strength)

   **CAUTION:** This is a flammable mixture.

   Unless specified otherwise in this service manual, lubrication of contacts is not required.

6. Do not defeat any plug / socket B+ voltage interlocks with which receivers

8

covered by this service manual might be equipped.

7.  Do not apply AC power to this instrument and/or any of its electrical assemblies unless all solid-state device heat sinks are correctly installed.

8.  Always connect the test receiver ground lead to the receiver chassis ground before connecting the test receiver positive lead.

Always remove the test receiver ground lead last.

9.  Use with this receiver only the test fixtures specified in this service manual.

**CAUTION:** Do not connect the test fixture ground strap to any heat sink in this receiver.

## Electrostatically Sensitive (ES) Devices

Some semiconductor (solid state) devices can be damaged easily by static electricity. Such components are usually called Electrostatically Sensitive (ES) Devices. Examples of typical ES devices are integrated circuits and some field effect transistors and semiconductor "chip" components. The following techniques should be used to help reduce the incidence of component damage caused by static electricity.

1.  Immediately before handling any semiconductor component or semiconductor-equipped assembly, drain off any electrostatic charge on your body by touching a known earth ground. Alternatively, obtain and wear a commercially available discharging wrist strap device, which should be removed to prevent potential shock prior to applying power to the unit under test.

2.  After removing an electrical assembly equipped with ES devices, place the assembly on a conductive surface such as aluminum foil, to prevent electrostatic charge buildup or exposure of the assembly.

3.  Use only a grounded-tip soldering iron to solder or unsolder ES devices.

4.  Use only an anti-static type folder removal device. Some solder removal devices not classified as "anti-static" can generate electrical charges sufficient to damage ES devices.

5.  Do not use freon-propelled chemicals. These can generate electrical charges sufficient to damage ES devices.

6.  Do not remove a replacement ES device from its protective package until immediately before you are ready to install it. (Most replacement ES devices are packaged with leads electrically shorted together by conductive foam, aluminum foil or comparable conductive material).

7.  Immediately before removing the protective material from the leads of a replacement ES device, touch the protective material to the chassis or circuit assembly into which the device will be installed.

**CAUTION:** Be sure no power is applied to the chassis or circuit, and observe all

9

other safety precautions.

8.   Minimize bodily motions when handling unpackaged replacement ES devices. (Otherwise even some normally harmless motions such as mutual brushing of your clothes' fabric or lifting of your foot from a carpeted floor might generate static electricity sufficient to damage an ES device.)

## General Soldering Guidelines

1.  Use a grounded-tip, low-wattage soldering iron and appropriate tip size and shape that will maintain tip temperature within the range of 500°F to 600°F.

2.  Use an appropriate gauge of RMA resin-core solder composed of 60 parts tin/40 parts lead.

3.  Keep the soldering iron tip clean and well tinned.

4.  Thoroughly clean the surfaces to be soldered. Use a mall wire bristle (0.5 inch, or 1.25cm) brush with a metal handle. Do not us   e freon-propelled spay-on cleaners.

5.  Use the following unsoldering technique

    a.  Allow the soldering iron tip to reach normal temperature. (500 F to 600 F)

    b.  Heating the component lead until the solder melts.

    c.  Quickly draw the melted solder with an anti -static, suction-type solder removal device with solder braid.

       **CAUTION:** Work quickly to avoid overheating the circuit board printed foil.

6.  Use the following unsoldering technique

    a.  Allow the soldering iron tip to reach normal temperature. (500F to 600F )

    b.  First, hold the soldering iron tip and solder the strand against the component lead until the solder melts.

    c.  Quickly move the soldering iron tip to the junction of the component lead and the printed circuit foil, and hold it there only until the solder flows onto and around both the component lead and the foil.

       **CAUTION:** Work quickly to avoid overheating the circuit board printed foil.

    d.  Closely inspect the solder area and remove any excess or splashed solder with a small wire-bristle brush.

## Remove /Replacement

Some chassis circuit boards have slotted holes (oblong) through which the IC leads are inserted and then bent flat against the circuit foil. When holes are of slotted type, the following technique should be used to remove and replace the IC. When working with boards using the familiar round hole, use the standard technique as outlined .

*Removal*

Desolder and straighten each IC lead in one operation by gently prying up on the lead with the soldering iron tip as the solder melts. **Warning and Cautions**

Draw away the melted solder with an anti-static suction-type solder removal device (or with solder braid) before removing the IC.

*Replacement*

Carefully insert the replacement IC in the circuit board.

Carefully bend each IC lead against the circuit foil pad and solder it.

Clean the soldered areas with a small wire-bristle brush. (It is not necessary to reapply acrylic coating to the areas).

### "Small-Signal" Discrete Transistor
### Removal/Replacement

Remove the defective transistor by clipping its leads as close as possible to the component body.

Bend into a "U" shape the end of each of three leads remaining on the circuit board.

Bend into a "U" shape the replacement transistor leads.

Connect the replacement transistor leads to the corresponding leads extending from the circuit board and crimp the "U" with long nose pliers to insure metal to metal contact then solder each connection.

### Power Output, Transistor Device
### Removal/Replacement

Heat and remove all solder from around the transistor leads.

Remove the heat sink mounting screw (if so equipped).

Carefully remove the transistor from the heat sink of the circuit board.

Insert new transistor in the circuit board.

Solder each transistor lead, and clip off excess lead.

Replace heat sink.

### Diode Removal/Replacement

Remove defective diode by clipping its leads as close as possible to diode body.

Bend the two remaining leads perpendicularly to the circuit board.

Observing diode polarity, wrap each lead of the new diode round the corresponding lead on the circuit board.

Securely crimp each connection and solder it.

11

**CRT001145**

Inspect (on the circuit board copper side) the solder joints of the two "original" leads. If they are not shiny, reheat them and if necessary, apply additional solder.

**Fuse and Conventional Resistor Removal/Replacement**                                 **Warning and Cautions**

1.  Clip each fuse or resistor lead at top of the circuit board hollow stake.

2.  Securely crimp the leads of replacement component around notch at stake top.

3.  Solder the connections

    **CAUTION:** Maintain original spacing between the replaced component and adjacent components and the circuit board to prevent excessive component temperatures.

**Circuit Board Foil Repair**

Excessive heat applied to the copper foil of any printed circuit board will weaken the adhesive that bonds foil to the circuit board causing the foil to separate from or "lift-off" the board. The following guidelines and procedures should be followed whenever this condition is encountered.

*At IC Connections*

To repair a defective copper pattern at IC connections use the following procedure to install a jumper wire on the copper pattern side of the circuit board. (Use this technique only on IC connections).

1.  Carefully remove the damaged copper pattern with a sharp knife. (Remove only as much copper as absolutely necessary).

2.  Carefully scratch away the solder resist and acrylic coating (if used) from the end of the remaining copper pattern.

3.  Bend a small "U" in one end of a small gauge jumper wire and carefully crimp it around the IC pin. Solder the IC connection.

4.  Route the jumper wire along the path of the out-away copper pattern and let it overlap the previously scraped end of the good copper pattern. Solder the overlapped area and clip off any excess jumper wire.

*At other connections*

Use the following technique to repair the defective copper pattern at connections other than IC Pins. This technique involves the installation of a jumper wire on the component side of the circuit board.

1.  Remove the defective copper pattern with a sharp knife.

    Remove at least 1/4 inch of copper, to insure that a hazardous condition will not exist if the jumper wire opens.

2.  Trace along the copper pattern from both sides of the pattern break and locate the nearest component that is directly connected to the affected copper pattern.

12

**CRT001146**

3. Connect insulated 20-gauge jumper wire from the lead of the nearest component on one side of the pattern break to the lead of the nearest component on the other side.

Carefully crimp and solder the connections.

**CAUTION:** Be sure the insulated jumper wire is dressed so that it does not touch components or sharp edges.

13

CRT001147

# 5. Parts and Funcitions

Front and rear panel of the TV set

## Front



## Rear



1. V-IN: Video Input
2. A-IN(L/R): Audio Input
3. Earphone
4. Menu: Access/Exit Main M (Menu)
5. VOL-: Decrease sound
6. VOL+: Increase sound
7. CH-: Select next lower channel
8. CH+: Select next higher channel
9. Power: Power on/off
10. Power Indicator
11. Sensor Windows

12. S-VIDEO: S-Video Input
13. ANT. IN: Antenna In

14

**CRT001148**

# 6. Remote Controller Functions

## Remote Control Functions



1. ⏻ : Power on/off
2. MENU: Access/Exit Main M
3. CH+/-: Select next higher or lower channel
4. VOL+/-: Increase or decrease sound
5. CHANNEL NUMBER BUTTON: Direct channel
   tuning (TV channel 02-69, CATV channel 01-125.)
6. RECALL: Return to previous channel
7. -/--:   Digital Selector
8. TV/AV: TV/AV selection
9. MTS/SAP：MTS/SAP selection
10. MUTE: Press key to Activate/deactivate Mute Function
11. PSTD: Picture Preference Select Button
12. DISPLAY: Display receiving channel
13.EXIT：Exit TV Menu

15

**CRT001149**

# 7. Program Diagram

## Video Set Up:

Pressing MENU button once will bring the Video Set Up menu on the TV.
The following is shown on your TV screen:

Follow the procedure below to adjust the
picture quality of your choice:
1. Press the CH(+) and CH(-) button to go
   up and down the menu.
2. Press the VOL(+) and VOL(-) button to
   increase and decrease the level to your
   preference for each item.



| Video | |
| --- | --- |
| Picture | 70 |
| Brightness | 32 |
| Color | 50 |
| Sharpness | 40 |
| Hue | 50 |
| Color Temp. | Neutral |

Adjustment of Picture Quality:

To adjust the picture quality from the factory preset read the following:

Picture: By increasing the level. It will adjust white areas of picture and by decreasing the level,
it will adjust black areas of picture.

Brightness: By increasing the level, it will add more light to dark parts of the picture and by
decreasing the level, it will add more dark to light parts of the picture.

Color: By increasing the level. It will adjust the low and the high level of the picture.

Sharpness: By increasing the level, it will show cleaner and clearer images and by decreasing
the level, it will make picture smoother.

Hue: You can adjust the tint of the picture by going into picture set up menu. By decreasing the
level, it will give red tint to skin color and by increasing the color it will give green tint to
skin color.

Color Temp : By pressing the VOL(+/-) buttons to select the three setting A)Neutral, B)Warm,
C)Cool.

## Audio Set Up:

By pressing MENU button , and then pressing VOL(-/+) button it will bring you to Audio
Set Up display. You will see the following menu on your TV screen:

Follow the procedure below to adjust the
sound quality:

Press VOL(+) button to increase and VOL(-)
button to decrease the level to your preference.



| Audio | |
| --- | --- |
| Volume | 45 |

16

## Timer Set Up:

By pressing MENU button , and then pressing VOL(-/+) button it will bring you to Timer Set Up display. You will see the following menu on your TV screen:

Follow the procedure below to select one of the above options:
1. Press the CH(+) and CH(-) button to go up and down the menu.
2. Press VOL(+) button or VOL (-) button to select your preference.



| Timer | |
|---|---|
| Clock | 17:18 |
| Time-On | 18:00 |
| Ch. Select | 1 |
| Time-Off | --:-- |
| Sleep Time | 0 |
| Remind Time | --:-- |
| Ch. Switch | 1 |

Clock: Press CH( +/-) buttons to scroll to Clock, then press VOL (-/+) buttons to set the hour after setting the hour press CH( +/-) buttons to go to minute mode and set by using VOL(+/-) buttons.

Time-On: Press CH( +/-) buttons to scroll to Clock, then press VOL (-/+) buttons to set the hour after setting the hour press CH(+/-) buttons to go to minute mode and set by using VOL(+/-) buttons.

Ch. Select: This exclusive feature switches you to your favorite channel at the appropriate set time. Press VOL(+) and VOL(-) buttons to select the channel.

Time-Off : Press CH( +/-) buttons to scroll to Clock, then press VOL (-/+) buttons to set the hour after setting the hour press CH(+/-) buttons to go to minute mode and et by using VOL(+/-) buttons.

Sleep Time: This feature allows you to turn off television in pre-selected minutes (180, 170,160, ........,10 and 0).

Remind time: Press CH( +/-) buttons to scroll to Clock, then press VOL (-/+) buttons to set the hour after setting the hour press CH( +/-) buttons to go to minute mode and set by using VOL(+/-) buttons.

Ch. Switch: This feature lets you store your favorite channel. Once you store the channel number in this function, when the set time is up, it will switch over to the set channel. This feature is used with the Exchange feature. Press VOL(+) or VOL(-) button to select the channel.

## Function Set Up:

By pressing the MENU button, and then pressing VOL-/+ button will bring you to Function Set Up menu. You will see the following menu on your screen:

Follow the procedure below to select one of the above options:

1. Press the CH(+) and CH(-) button to go up and down the menu.
2. Press the VOL(+) and VOL(-) button to increase and decrease the level to your preference for each item.



| Setup | |
|---|---|
| Language | English |
| Background | on |
| Black Stretch | on |
| VNR | on |
| C. Caption | off |
| Demo Mode | |

17

Language: Use VOL(+/-) to select the OSD in either English, French or Spanish.
Background: Press the VOL(+/-) buttons to select between Background ON or Background
    OFF. When the Background ON function is chosen, a moving "NO SIGNAL" sign will
    be displayed if there is no input signal to the set.
Black Stretch: Press VOL(+/-) buttons to turn the Black Stretch feature on or off. When the
    Black Stretch function is on the screen automatically increases the contrast range.
VNR: Press VOL (+/-) buttons to turn the VNR function on or off. VNR is a term for Video
    Noise Reduction, a built-in device on the set that reduces video noise interference
    so the viewer is assured a clear picture.
C.Caption: Press VOL (+/-) buttons to select the Closed Caption options.  Closed
    Captioning helps the hearing impaired with the broadcast program, as well as helping
    children learn how to read.  A built in decoder displays the audio portion of a program
    as text on the screen when this  option is selected.

OFF:  When OFF is displayed on TV means C.Caption is turned off.
CC1:  When CC1 displays on TV means C.Caption is turned on.
CC2 to CC4: For other modes of video related broadcast information.
T1: For program guide and other information displayed by broadcasters.
    (This blocks a large portion of the picture on your screen).
T2 to T4 : For other modes of information displayed by broadcasters.
    (This blocks a large portion of the picture on your screen).
Note: Select CC1 for full translation of the primary language such as English in your
area. Select CC2 for secondary language translation such as Spanish or any other
language that may be broadcast in your area.
Demo mode: This will display the main functions of the TV set.

## Channel set up:
By pressing MENU button ,and then pressing VOL-/+ button it will bring you to
Channel Set Up. You will see the following display on TV screen.

Follow the procedure below to select above
options:

1. Press the CH(+) and CH(-) button to go up
   and down the menu.
2. Press VOL(+) button or VOL (-) button to
   select your preference.



Channel System: Press  the VOL(-/+)  buttons to select the correct channel system.
     In general, you can set it as "AUTO" (AUTO,NTSC and NTSC443  will
     display in turn)
Antenna: Press VOL (+) button or VOL(-) button to select TV or CATV.
Channel Coverage by Antenna:

| Antenna Type | Channel Range |
|---|---|
| VHF | 2-13 |
| UHF | 14-69 |
| CATV | 1-125 |

18

CRT001152

Skip : Press VOL(+) button or VOL(-) button to add or delete the channel from the
      stored memory.
Current Ch. : Press VOL(+) button to go up and VOL (-) button to go down to set the
      channel position. The display will show the current playing channel.
Fine: If the picture and/or sound are poor, try using the  FINE  TUNE  feature.
Do not use this feature unless reception is poor.  Press VOL (+/-) to start the Fine
Tune function.
Auto Program: Press VOL (+) button or VOL (-) button to auto program in channels.
This search automatically adds only the active channels in your area to the TV's
memory. It deletes any channels on which there is no broadcast or a poor signal.
Note: The Auto Search function will scan the channels on the selected antenna
input.  If the TV is connected to cable, please select Cable under Antenna.

**Calendar:**
Your TV has been designed with a calendar. By pressing MENU button ,and then
pressing VOL-/+ button it will bring you to Calendar. You will see the following
display on TV screen.

Follow the procedure below to adjust the Calendar :
1. Press the CH+/- buttons to select the year
   item, the month item or the date item.
2. Press the VOL-/+ buttons to change
   calendar setup  {1901.1.1-2099.12.31}.
3. Press EXIT button to exit the calendar mode.



V-CHIP Set UP:
Press the MENU Button on your remote control to go to Password menu , then input
 the password {0000}. It will bring Parental Lock set up display on the screen. You
 will see the following menu on your screen:



This function enables you to block certain TV channels in accordance to the V-CHIP
requirement established by the FCC.

19

CRT001153

To set the V-CHIP function:
Select the TV Rating option. You will see the TV Rating menu on your TV screen:

1. Press CH(+/-) button to go up and down the menu.
2. Press VOL(+/-) button to go into TV Rating and Movie Rating menus.
3. Press MENU button to set the Parent lock ON and Parent lock OFF.
When TV rating is selected, you will see the following rating table on your TV screen.

| Rating | FV | D | L | S | V |
|--------|-----|---|---|---|---|
| TV-Y | >U | | | | |
| TR-Y7 | U U | | | | |
| TV-G | U | | | | |
| TV-PG | U | U | U | U | U |
| TV-14 | U | U | U | U | U |
| TV-MA | U | | U | U | U |

Note: You can press CH(+/-) buttons to go up and down the menu, then press VOL(+) button to select "B" or "U".

When Movie rating is selected, you will see the following rating table on your TV screen.

| MPAA Rating | |
|-------------|---|
| G | U |
| P G | U |
| P G - B | U |
| R | U |
| NC-17 | U |
| X | U |

Note: You can press CH(+/-) buttons to go up and down the menu, then press VOL(+) button to select "B" or "U".

• PARENT LOCK OFF means the lock function is turned off. If the PARENT LOCK is in "OFF" mode then V-CHIP function will not be active to accept the V-CHIP signal.

• PARENT LOCK ON means the lock function is turned on. If the lock is in the "ON" mode then V-CHIP function is activated to accept the V-CHIP signal.

Password
The "Default Password" preset by the manufacturer is "0000". If you want to change the preset password to your own password, just choose any four digits that can be easily remembered and set. Once you set password for a particular channel, that channel will be blocked. This channel can only be accessed with the password.

LOCK Menu
AV LOCK: When it is set ON, you cannot use the AV.
PROGRAM LOCK: When it is set ON, the current channel is locked, you can not see the program of this channel.

20

CRT001154

## V-Chip Technology:

The "V-Chip Technology" allow you to use U.S. And Canada Movies and TV

PROGRAMS Guide ratings to block certain types of TV programs and movies.

To understand clearly about TV programs rating codes, read the following list:

U.S. TV Program Ratings

NR: Not Rated-this means that programs are not rated or rating does not apply.

TV-Y: For all children-this type of rated programs are designed for a very young audience, including children from ages 2-6.

TV-Y7: Directed for older children - this type of rated programs may include comedic violence of mild physical, or may frighten children under the age of 7.

TV-G: General Audience-this type of rated programs contains little or no violence, no strong language, and little or no sexual dialogue and situations.

TV-PG: Parental Guidance Suggested-this type of rated programs may contain limited violence, some suggestive sexual dialogue and situations, and rare language.

TV-14: Parents strongly cautioned-this type of rated programs may contain sexual content, strong language and more intense violence.

TV-MA: Mature audience only-this type of rated programs may contain sexual violence, explicit sexual content and profane language.

FV: This type of rated programs contain Fantasy and cartoon violence.

Violence: This type of rated programs contain violence.

S: This type of rated programs contain sex.

L: This type of rated programs contain offensive language.

D: This type of rated programs contain dialogue with sexual content.

To understand clearly about movies rating codes, read the following list:

U.S. Movies Rating Chart

NR: This means movie is not rated yet. It is pending government rating approval.

G: General Audience-this type of movie rating means all ages admitted to see the movie.

PG-13: Parents Strongly Cautioned - this type of movie rating means some material may not be appropriate for children under 13.

R: Restricted- This type of movie rating means children under 17 of age requires to be with parent or guardian.

NC-17: This type of movie rating means no one 17 and under admitted.

X: This type of movie rating means adults only.

To understand clearly about Canadian programs rating codes, read the following list:

Canadian English Rating Chart

E: Exempt - this type of rated programs contain news, sports, documentaries, talk shows, music videos, and variety of other programs.

C: This type of rated programs are intended for children under age 8. There is no offensive language, nudity or sexual content.

C8+: This type of rated programs generally considered acceptable for children 8 years and over. There is no profanity, nudity or sexual content.

G: This type of rated programs generally suitable for all audiences.

PG: Parental Guidance Suggested -in this type of rated programs, some material may not be suitable for children.

14+: In this type of rated programs, some content may not be suitable for viewers under the age of 14. Parents are strongly cautioned not to have their children view 14+ rated programs by pre-teens and early teens.

18: Adults Only-this type of rated programs are only for adult viewers only.

21

CRT001155

# 8. Maintenance Service and Trouble Shooting

### a.  TROUBLESHOOTING PROCESS



**CRT001156**

## Horizontal bright line



## Disabled remote control



**CRT001157**

Pincushion distortion



**CRT001158**

TV program sound off



CRT001159

**Maintenance Service and Trouble Shooting**

b. **Troubleshooting guide**

• To assist in location possible faults use help guide below.

| BREAKDOWN PHENOMENON | | CHECKING |
|---|---|---|
| PICTURE | SOUND | |
| Picture with snow | Noise | The aerial direction and connection |
| Double or Triple Image | Normal | This is called ghosting which can be minimized with an outside aerial, and good quality cable and terminations.  Altering the aerial direction can also minimize this effect. |
| Disturb | Noise | Electrical interference which can be caused by cars, motorbikes etc, Fluorescent lamps and dirty insulators on overhead power cables. |
| Normal | No sound | Volume Sound mute |
| ? No Picture | No sound | Ensure that the power supply is connected to the TV set and turned on. Also ensure that the TV set is not  in "Listen Mode" or that the  brightness and contrast are not turned down. |
| No colour | Normal volume | Adjust colour control |
| Scramble | Normal or Weak Volume | Adjust channel again |
| Colour Spot | Normal volume | Colour Purity fault which can be caused by moving the TV set, placing magnets near the TV screen or turning on/off house hold appliances such as vacuum cleaners near the TV set. Turn the TV off with the mains power switch for 15 minutes. When the power is turn on again the TV set will automatically degauss the picture. In server cases leave the TV set turned off over night. |

Note:
1.If the fault can not be repaired using the above guide consult with your local authorized service center.
2.The TV set must only be repaired by a qualified registered service person.  Never attempt to remove the back cover as the TV set has dangerous voltages  in side that may cause a fatally or fire.
3. The cabinet may produce the occasional "snapping sound" This is normal and caused by the materials in the cabinet expanding with room temperature changes.

26

CRT001160

**Circuit Diagram**

# 9.  Circuit Diagram

## A.  Circuit Diagram



CRT001161

B.  PCB Diagram

CRT001162

# 10.   Circuit Explanation

The UOC module comprised of Philip super advanced CMOS chip OM8378 is used for model BH2404D color TV pictures. This product has $I^2C$ bus-mastering digital control system and S VEDIO terminals for auto sound identification, image mode for individual

preference, ccd, v-chip, btsc, and 218 channel storage.

I. Electrical circuits and integrated circuits of BH2404D TV receiver

1.1 Electrical circuits

Electric circuits of the BH2404D TV receiver are comprised of the following sections:

1.1.1 Microprocessor and signal processor: comprised of super single chip integrated circuit N201(OM8378), storage N202 (KS24C08).

1.1.2 Sound processing and amplifying: comprised of integrated circuit NN02 (TDA9850) for sound tone processing and integrated circuits N601 and N610 (TDA7522) for sound amplifing.

1.1.3 Integrated circuit for line and field scan output:comprised of integrated circuit N301
(TDA8359J) for field output, V403 (FQPF630----A-A ) for line output tube and T444 (BSC24-01N4021D) line output transformer.

1.1.4  Power supply control:   comprised of switch transformer  T801 (BCK-05E), power integrated circuit N801(KA5Q0765RTH-YDTU).

1.2 Main integrated circuits:

1.2.1 OM8378 Microprocessor / picture intermediate frequency / sound intermediate frequency / video processing / line field scanning / color decoding / text

1.2.2 TDA9850    Multi- function TV stereo sound tone processing integrated circuit

1.2.3 TDA8359J  Field output integrated circuit

1.2.4 TDA7522   Sound amplifying integrated circuit

1.2.5 KA5Q0765RF-YDTU   Power integrated circuit

2   Electric circuit analyses

2.1 Super single chip integrated circuit OM8378

29

**CRT001163**

As a super large-scale decoding and microprocessing integrated circuit, OM8378 is comprised of a microprocessor, picture image intermediate frequency amplification, sound intermediate frequency amplification, line and field scanning, dwarf signal processing, color decoding, sound filtering and auto identification, luminance separation, high voltage tracking and over voltage protection. It functions for $I^2C$ bus-mastering and automatic adjustment for transmeridional correction and dark balance.

Table 1 lists the pin function and test data of OM8378 as the reference for maintenance.

The data is to be tested under the mode of 49.75MHz, NTSC M and cylindrical color card muting, using a model FLUKE 79Ⅲ instrument.

Table 1

| Pin | Function | Working voltage (V) | Resistance to Ground   R | |
|---|---|---|---|---|
| | | | Forward Test (Ω) | Back Test (Ω) |
| 1. | STANDBY | 0 | 36K | 29K |
| 2. | SCL | 3.5 | 15K | 15K |
| 3. | SDA | 3.2 | 15K | 15K |
| 4. | VT | 3.0 | 20K | 20K |
| 5. | KEY | 3.4 | 36K | 30K |
| 6. | SYSTEM | 4.4 | 15K | 15K |
| 7. | MUTE | 5.1 | 15K | 15K |
| 8. | GND.MAG | 0 | Infinity | 2.9M |
| 9. | VSS C/P | 0 | 0 | 0 |
| 10. | BAND | 3.3 | 14.5K | 14K |
| 11. | BAND | 0 | 14.5K | 14K |
| 12. | VSSA | 0 | 0 | 0 |
| 13. | SEC.PLL | 2.3 | 6.4M | 4.3M |
| 14. | VP2 | 7.8 | 18K | 18K |
| 15. | DECD/G | 5.0 | 31.9K | 32K |
| 16. | PH2.LF | 2.9 | 6.4M | 4.2M |
| 17. | PH1.LF | 3.9 | 6.4M | 4.2M |
| 18. | GND3 | 0 | 0 | 0 |
| 19. | DEC.BG | 4.0 | 39.8K | 40K |
| 20. | EWD | 0.7 | 63K | 63K |
| 21. | V.DRB | 2.4 | 6.0M | 4.0M |
| 22. | V.BRA | 2.4 | 6.0M | 4.0M |
| 23. | IF.IN1 | 1.9 | 37.5K | 38K |
| 24. | IF.IN2 | 1.9 | 37.5K | 38K |
| 25. | I.REF | 3.85 | 38.8K | 38.8K |
| 26. | V.S.C. | 3.8 | 6.3M | 4.6M |
| 27. | TUNER.AGC | 1.7 | 4.9K | 4.9K |
| 28. | AU.DEEM | 3.2 | 6.1M | 3.6M |
| 29. | DECS.DEM | 2.4 | 5.9M | 3.6M |
| 30. | GND2 | 0 | 0 | 0 |
| 31. | SND.PLL | 2.4 | 6.3M | 4.7M |
| 32. | AVL | 0 | 6.2M | 3.8M |

30

CRT001164

| 33. | H. OUT | 0.6 | 21K | 21K |
|---|---|---|---|---|
| 34. | F. B. L. SO | 0.3 | 6.4M | 4.4M |
| 35. | AUO. EXT | 0 | 0 | 0 |
| 36. | EHTO | 1.7 | 21.8K | 22K |
| 37. | PLL. IF | 2.4 | 6.4M | 4.6M |
| 38. | IF. VO/SVO | 3.3 | 4.3M | 4.6M |
| 39. | VP1 | 7.8 | 18K | 18K |
| 40. | CVPS. INT | 3.9 | 5.4M | 4.1M |
| 41. | GND1 | 0 | 0 | 0 |
| 42. | CVBS/Y | 3.3 | 6.2M | 4.0M |
| 43. | CHROMA | 1.5 | 83K | 83K |
| 44. | AUD. OUT | 3.4 | 6.4M | 4.8M |
| 45. | INSS. W2（BL） | 2.1 | 0.86K | 0.86K |
| 46. | R2/V. IN | 2.5 | 6.3M | 4.5M |
| 47. | G2/Y. IN | 2.5 | 6.3M | 4.5M |
| 48. | B2/U. IN | 2.5 | 6.3M | 4.5M |
| 49. | BCL. IN | 1.5 | 216K | 239K |
| 50. | BLK. IN | 4.9 | 28K | 28K |
| 51. | R. OUT | 2.8 | 7.46K | 7.5K |
| 52. | G. OUT | 2.8 | 7.48K | 7.5K |
| 53. | B. OUT | 2.9 | 7.5K | 7.5K |
| 54. | VDD. A | 3.3 | 32K | 26K |
| 55. | VPE | 0 | 0 | 0 |
| 56. | VDD. C | 3.3 | 32K | 26.5K |
| 57. | OSC. GND | 0 | 14 | 13 |
| 58. | XTAL. IN | 1.8 | 3.0M | 2.7M |
| 59. | XTAL. OUT | 1.7 | 0.5M | 0.54M |
| 60. | RESET | 0 | 0 | 0 |
| 61. | VDDP | 3.4 | 32K | 26.6K |
| 62. | AV1/AV2 | 5.1 | 15K | 15K |
| 63. | AV/SVHS | 5.1 | 15K | 15K |
| 64. | INT. REM | 5.0 | 41K | 40.6K |

## 2.3 Analysis of common passage circuits

Having been received by antenna or fed by cable TV into the antenna input terminal of HF tuner TU101（ET-5A5E-AF108AT）, HF TV signals pass through tuning for station selection, HF amplification and frequency mixing inside the HF tuner and then, 45.75MHz IF picture signal and 41.25MHz IF sound signal will be transmitted from the IF terminal of TU 101 and be fed directly into (1) of the pre IF amplification the signals will be amplified to compensate for the insertion loss of the sound surface filter.

The sound surface filter SF101（D1510C）adopts single-terminal or double-terminal input according to differ ent system choices. The single –terminal or double –terminal input are controlled by the (6) of N201 via Q101 (BC548C): M signals in double channels. The sound surface filter K6264K is a wide range filter for single channel input, and is a narrow range filter for double-channel input, suitable for M sound signal. The IF signals which have passed through

31

CRT001165

sound carrier deep trap by sound surface filter will be sent to the (23) and (24) of N201 (OM8378). HF amplification AGC will be sent out from the (27) of N201 (OM8378) under the control of I²C bus for the gain control of HF tuner.

2.4  Analysis of signal trap option switch circuit

Video color signals will be sent out from (38) of N201 (OM8378) and emit and followed by triodes V208 and
, and then, divided into sub-flows which are fed into the wave traps Z201 respectively. All TV signals will be selected and pass through V209 and V212, which are rejector triodes and serve the function of switches here. When the 6 pins of N2010 (OM8378) export high level with sound below 4.5M, V212 will break over and the signals will pass through the wave traps Z201; and when the 6 pins send out low level with sound of 4.5M, V212 will stop and V209 break over, and the signals will go through the wave trap Z201. Video signals will be produced after all TV signals are trapped by the wave trap, and then, one sub-flow will go through R255 (430 Ω) and R256 (470Ω) for signal adjustment amplitude and enter into (40) of N201 (TDA9373), and another sub-flow will, after emit and followed by a triode V212, serve as AV output.

Both the video signal in AV signals and the Y signal in S terminal signals will be selected and passed through by N702 (HEF4053BP), and will then be fed into the (42) of N201 (OM8378); and the C signal of S terminal will be fed into the (43) of N201 (OM8378). Both the AV1 and AV2 video signals and the Y signal of S terminal will be selected and passed through by N702 (HEF4053BP) under the control of the (62) and (63) of N201 (OM8378).

2.5 Analysis of sound tone processing circuit

The sound tone processing circuit is comprised of an integrated circuit NN02 (TDA9850) and peripheral components. TDA9850 is a multi-function TV sound tone processing integrated circuit of Hi-Fi grade, inside which treble and bass frequency division processing, stereo processing and encircling sound processing are made.

The audio signals sent out by the (44) of N201, after emit and followed by V213, will be divided into two sub-flows which enter into the (3) and (5) of NN02 (TDA9850) respectively. Meanwhile, the audio signals from the left and right channels of AV1 terminal will be put into the (1) and (32) of NN02 (TDA9850). The audio signals of S terminal and AV1 share the same sub-flow.

2.6  Analysis of sound amplifying circuit

The sound amplifying circuit is comprised of an integrated circuit TDA7522 and peripheral components. TDA7522 is a double-channel stereo sound amplifying circuit featuring MUTE and POWER functions, with power output 2*1W. TDA7522 has a BTL sound output manner with no coupling capacitor in its output circuit, which has a wide range of power supply (6V∼18V) and the functions of short circuit protection and over-load protection.

2.7 Analysis of field output circuit

32

CRT001166

Field sync signals separated from the mixed sync signals trigger the field frequency division system. Once a certain sum of field sync pulse signals have been detected, the field frequency division system will start in action. Of the field sync pulse signals which are obtained from frequency division, one sub-flow will be fed into a sample pulse generator to, together with line feedback signal, produce sample pulses necessary for the circuit.

Another sub-flow will be sent to field saw-tooth wave generator. The field frequency saw-tooth wave that has undergone geometric processing will be sent from the (21) and (22) of N201 to the (1) and (2) of the field output N301. The external resistor R228 (39K $\Omega$) of the (25) of N201 will supply reference current to field saw-tooth wave generator, and the external capacitor C227 (104) of the (26) serves as the capacitor for field saw-tooth wave.

Field output integrated circuit N301 is a full bridge type current driving output circuit of with a bridge type output manner, and field deflection coil is directly connected to the middle of output amplifier. The positive and negative saw-tooth signals sent out from the (21) and (22) of N201 will enter into the (1) and (2) of N301 symmetrically, which, after being rectified and amplified by TDA8359J, will be sent out from the (9) and (5).

2.8 Analysis of line sync and scan output circuit

As the line oscillation circuit is inside N201 (OM8378), no external line oscillation components is needed and the oscillation frequency is under the control of PH-1 detector. A flow of luminance signals including mixed sync signals is sent to a sync separation circuit therein, which separate line and field sync pulse signals, among them, the line sync pulse signals are sent to PH1 detector. The PH1 detector functions to synchronize the line oscillation frequency with the frequency of input signals.

C221 (472)、R226 (15K $\Omega$) and C222 (1u) connected to N201 (17) are PH-1 phase-locked loop filters. The line oscillation signals that have been corrected by PH1 detector will be sent to PH2 detector, which functions to stabilize and control the phase of line drive pulse output for ensuring that the line linearity and center remain unchanged.

The external capacitor C218 (222) of (16) is a filter capacitor for PH-2 detector. Line pumping signals are sent out by the (33) of N201 and fed into a line driving triode V402 (KSC2331), and then, after being amplified by a triode V403 (FQPF630) switch, drive line deflection coil to produce magnetic field to control an electronic beam for horizontal scanning.

C414, C415 and C427 are the capacitors for line return stroke, C406 is the line S correction capacitor, and L402 is the linear inductance for line. E-W geometric correction signals are sent out by the (20) of N201 and fed into the (12) of N301, which, after being rectified, will be sent out from the (11) of N301 and, after being amplified by a triode V401 (FJAF6810D) and waveshaped by C403 and L401, put into line scanning circuit for a geometric correction in transmeridional direction.

33

CRT001167

Both VD404A and VD404B are modulating damper diodes, and T444 is a line output transformer. VD202, R275, R276, R259 and C256 constitute a HV tracking circuit to compensate HV variation caused by variation of luminance, hence an automatic correction of change of picture geometric sizes along with HV variation. R419, R249, VD201, R248 and C250 constitute a beam limit circuit.

Line return stroke pulses sent out by the (9) and (8) of line output transformer T444 will be rectified and filtered to produce DC voltage +16.5V and +46V, which are then fed into the (4) and (8) of N301 for supply power to the forward and return strokes of field output integrated circuit, , and, the voltage +16.5V will then be regulated

(7) sends out a heater voltage of 6.3Vrms ; (1) provides line sync signal to N201 (TDA9373) ; and the line return stroke pulse sent out by the (5) is rectified and filtered to obtain a DC voltage +180V for power supply to video amplification circuit.

2.9  Analysis of video amplification circuit

Video amplification circuit is peripheral components. R, G and B signals coming from the (51), (52) and (53) of N201 (OM8378) are sent to the (2), (3) and (1) , an integrated video amplification output circuit , contains three independent video amplifiers which amplify the input R, G and B, three basic color signals, which are fed into the cathode of picture tube by (7), (8) and (9).

2.10 Analysis of power switch circuit

A typical self-excited pulse power switch has been chosen for this TV receiver. When the power switch is in the ON position, the voltage from AC 120 V power grid will be rectified by a rectifying tube VD810 to produce a pulse voltage , which will be filtered by a capacitor C806 (220u) to form a DC voltage of about 300V, and the said DC voltage will be fed into the (1) of the power integrated circuit N801 (KA5Q0765RF-YDTU entry) by the (1)~(4) windings of switch transformer T801 (BCK-05E) ;

At start-up, the voltage from an AC single-phase power supply will be divided by starting resistors R803 and R802 to provide starting voltage to N801. After start up, an impulse voltage produced by (6)~(7) windings of T801 will be rectified and provided. Photo coupler PC801 (PC817C entry) serves the function of voltage regulation. The error message about the voltage exported by the switch transformer will be transmitted to the (4) of N801 by the photo coupler PC801, hence adjusting the oscillation parameters of N801.

During stand-by time, POWER signals will be at a lower level, which causes the triode V803 (KSC815) to stop. So a voltage +12V will be put into the photo coupler PC801 (PC817C entry) by resistor R849 and diode VD816, which feeds a special parameter to the (4) of N801 and makes the N801 enter a quasi-resonance working state, with the power supply voltage (3) being 11V~ 12V. In this way, the output voltage of the switch transformer T801 will drop a great deal,

34

resulting in a great reduction of stand-by power consumption.

The impulse voltage sent out by the (8) of the secondary of switch transformer will be rectified and filtered by VD805 (D5L60) and C816 (100u) to produce a DC voltage +25V for power supply to line output electrode;

The DC voltage +8V sent out by the (8) of N804 after a voltage regulation of secondary power supply will supply power to N2 decoding circuit, the DC voltage +3.3V obtained by the voltage regulation of 12V by the resistor R843 (2K), triode V801 (KSC815) and diode DZ808 (MTZ3.9B) will supply power to N201 micro-processing circuit, and the DC voltage +5V sent out by the (9) will supply power to a storage block N202 (KS24C08) circuit.

# 11.   Adjustment

Operating method: After a normal start-up, successively push the combination keys of mute, screen display, -/--, screen display and mute on the workshop remote controller to enter a maintenance menu.

Push numeric 0~7 keys for a rapid choice in the maintenance menu.
Push P+/- (CH+/-) key to choose items to be adjusted;
Push VOL+/- key to adjust the size of the present item;
Push MUTE key for mute/no mute switchover
Push the key for screen display retreat to retreat from the maintenance menu
Push the numeric 0 key   Screen voltage adjustment
VG2: INSIDE HIGH/LOW
Adjust acceleration electrode to change the screen display from VG2: OUTSIDE HIGH/LOW to VG2: INSIDE HIGH/LOW

Maintenance menu 1  Geometric distortion  (Table 8)
Table 8

| Item | Description | Adjusting range | Default | Remarks |
|------|-------------|-----------------|---------|---------|
| 6PAR | Correction of four corners | 0~63 | | |
| 6BOW | Bow-shape correction | 0~63 | | |
| 6HSH | Correction of line center | 0~63 | | |
| 6EWW | Correction of line width | 0~63 | | |
| 6EWP | Correction of pillow-shaped distortion | 0~63 | | |
| 6UCR | Correction of upper corners | 0~63 | | |
| 6LCR | Correction of lower corners | 0~63 | | |

Correction of geometric distortion will automatically fall into categories according to the present identifiable 60hz systems.

35

Push numeric 2 key:

Maintenance menu 2  Geometric distortion (Table 9)

Table 9

| Item | Description | Adjusting range | Default | Remarks |
|------|-------------|-----------------|---------|---------|
| 6EWT | Keystone correction | 0~63 | | |
| 6VSL | Field inclination correction | 0~63 | | |
| 6VAM | Field amplitude correction | 0~63 | | |
| 6SCL | Field S correction | 0~63 | | |
| 6VSH | Field center correction | 0~63 | | |
| 6VOF | OSD vertical position | 0~63 | 39 | |
| HOF | OSD horizontal position | | 25 | |
| VX | Vertical zoom | 0~63 | 25 | Unadjustable |

S correction will be adjusted according to the curvature of a picture tube, and the picture tubes of the same type possess the same S correction value.

Correction of geometric distortion will automatically fall into categories according to the present identifiable 50/60hz systems.


Push numeric 3 key:

Maintenance menu 3  Picture adjustment   (Table 10)


Table 10

| Item | Description | Adjusting range | Default | Remarks |
|------|-------------|-----------------|---------|---------|
| RED | Mild color (Red) | 0~63 | 32 | |
| GRN | Mild color (Green) | 0~63 | 32 | |
| WPR | White neutralizing red | 0~63 | | |
| WPG | White neutralizing green | 0~63 | | |
| WPB | White neutralizing blue | 0~63 | | |
| YDFN | Luminance delay NTSC | | | |
| YDAV | Luminance delay AV | | | |


White balance: Fully degauss the picture tube, consolidate R excitation, and adjust B and G excitation.


Push numeric 4 key:

Maintenance menu 4  (Table 11)


Table 11

| Item | Description | Adjusting range | Default | Remarks |
|------|-------------|-----------------|---------|---------|
| TOP | AGC control starting point | 0~63 | | |
| VOL | UOC Volume output | 0~63 | 44 | Unadjustable |
| 9860 | TDA9860 Secondary volume control | 0~100 | 59 | Unadjustable |
| HDOL | Cathode voltage | 0~15 | 5 | Unadjustable |
| AGC | AGC Velocity | 0~3 | 1 | Unadjustable |

36

CRT001170

| VG2B | VG2 Luminance | 0~100 | 42 | Unadjustable |
| IF0 | Off-set IF demodulator | 0~63 | 30 | Unadjustable |
| LCT | OSD BRITGHTNESS | 0~3 | 0 | Unadjustable |

Push numeric 5 key:

Maintenance menu 5   Analogue of picture mode (Table 12)

Table 12

| Item | Description | Adjusting range | Default | Remarks |
|------|-------------|-----------------|---------|---------|
| 0CON | Leisurely-listening mode contrast | 0~100 | 0 | Unadjustable |
| 0BRI | Leisurely-listening mode luminance | 0~100 | 0 | Unadjustable |
| 0COL | Leisurely-listening mode color | 0~100 | 50 | Unadjustable |
| 0SHP | Leisurely-listening mode definition | 0~100 | 50 | Unadjustable |
| 1CON | Soft mode contrast | 0~100 | 45 | Unadjustable |
| 1BRI | Soft mode luminance | 0~100 | 45 | Unadjustable |
| 1COL | Soft mode color | 0~100 | 50 | Unadjustable |
| 1SHP | Soft mode definition | 0~100 | 50 | Unadjustable |

Push numeric 6 key   Analogue of picture mode (Table 13)

Table 13

| Item | Description | Adjusting range | Default | Remarks |
|------|-------------|-----------------|---------|---------|
| 2CON | Standard mode contrast | 0~100 | 65 | Unadjustable |
| 2BRI | Standard mode luminance | 0~100 | 50 | Unadjustable |
| 2COL | Standard mode color | 0~100 | 70 | Unadjustable |
| 2SHP | Standard mode definition | 0~100 | 70 | Unadjustable |
| 3CON | Brilliant mode contrast | 0~100 | 80 | Unadjustable |
| 3BRI | Brilliant mode luminance | 0~100 | 50 | Unadjustable |
| 3COL | Brilliant mode color | 0~100 | 70 | Unadjustable |
| 3SHP | Brilliant mode definition | 0~100 | 70 | Unadjustable |

Push numeric 7 key

Maintenance menu 7   Function choice   (Table 14)

Table 14

| Item | Description | Adjusting range | Default | Remarks |
|------|-------------|-----------------|---------|---------|
| OPTION1 | Function choice | 0~255 | 99 | Unadjustable |
| OPTION2 | Function choice | 0~255 | 40 | Unadjustable |
| OPTION3 | Function choice | 0~255 | 8 | Unadjustable |
| OPTION4 | Function choice | 0~255 | 64 | Unadjustable |
| OPTION5 | Function choice | 0~255 | 199 | Unadjustable |
| OPTION6 | Function choice | 0~255 | 1 | Unadjustable |
| OPTION7 | Function choice | 0~255 | 0 | Unadjustable |

37

CRT001171

CRT001172

# 17. Information of Resistors and Capacitors

RESISTORS & CAPACITORS –PARTS NO. CODE

Notes:  1. part numbers are indicated on most mechanical parts.
Please use this part number for parts orders.
2. The unit of resistance is $\Omega$(ohm).K=1000$\Omega$,M=1000K$\Omega$
3. The unit of capacitance is $\mu$F(microfarad). P=$10^{-6}\mu$F.

Numbering system of Capacitor
Example

CL42   ----   17   ----   50V   ----   2F4   ----   104 *   ----   Z
Type                Voltage              Value(PF)   Toleance

CL21X   ----   100V   ----   223 *   ----   J
Type          Voltage      Value(PF)   Toleance

CL110X   ----   25V   ----   100$\mu$F   $\pm$   20%
Type          Voltage      Value          Toleance          * 10$\underline{4}$ =10×10$^4$   22$\underline{3}$=22×

10$^3$

Numbering system of Capacitor
Eaxmple

RY17S   ----   2W   ----   390   ----   J   ----   05-E-A
Type          Wattage   Value($\Omega$)   Toleance

RS11   ----   1/2W   ----   1.8K   ----   K
Type          Wattage   Value   Toleance

ABBREVIATION OF PART NAME AND DESCRIPTION

RESISTOR

| PART NAME & DESCRIPTION | | | |
|---|---|---|---|
| TYPE | | ALLOWANCE | |
| T | Carbon | F | $\pm$1% |
| S | Solid | J | $\pm$5% |
| J | Metal | K | $\pm$10% |
| Y | Oxide | M | $\pm$20% |
| F | Fuse | G | $\pm$2% |

CAPACITOR

| PART NAME & DESCRIPTION | | | |
|---|---|---|---|
| TYPE | | ALLOWANCE | |
| C | Ceramic | J | $\pm$5% |
| T | Ceramic | K | $\pm$10% |
| L | Film | L | $\pm$15% |
| D | Electroanalysis | M | $\pm$20% |
| A | Tantalum | P | +100%-0% |
| | | Z | +80%-0% |

56

**CRT001173**

# Terminal view of transistors



E C B

2SC4544----B-A
2SB1569A-E---B-A EXPORT
2SP2400A-E---B-A EXPORT
2SC3853(2SC3852)----E-A
3DD2553---B-A
3CA688----E-A
2SC3853(2SC3852)----B-A

2SD18887YD



B C E

KSR1010TA
KSR2010TA

2SC1815-Y-----F
2SA1015-Y-----F
2SC752GTM-Y-----F EXPORT
2SC2878-A(TEM)------F EXPORT
RN1204(DTC144ESATP) EXPORT
2SA562TM-Y------F
2SC3355------F EXPORT

57

**CRT001174**

# Sincere  Forever



# Haier Group

Tel: 86-532-8938356

Web site: http://www.haier.com

CRT001175

# EXHIBIT 17

# HAIER

# Color Television

# Service Manual

# PART    # AC-8888-04

HAIER AMERICA TRADING, LLC
www.haieramerica.com

CRT001176

**Table Of Contents**

Contents                                                                    2

TN201AUV/TN131AUV Color TV Receiver                                          3

TN201UV Using Manual                                                         6

TN201AUV Alignment                                                          7

WORKING METHOD OF HIGH VOLTAGE PROTECTION CIRCUIT OF                        12
TN201AUV CRT

**TN201AUV/TN131AUV Color TV Receiver**

Technical Notes

 I. General information
    TN201AUV 21 inch NTSC-M color TV receiver uses the single main chip
    LA76814, which is controlled by 12C bus, and the CPU chip is LC86F3348.
    This type of machine provides CCD and V-CHIP function and many other
    expended function, and enables high performance on the single PCB motherboard.

II. Major technical data:
    1.  Frequency compound digital turning;
    2.  All channel CATV, AIRTV receiving;

| Band | AIRTV Channels | CATV Channels | Channel Range (MHz) |
|------|----------------|---------------|---------------------|
| L | 2~6 | 2~6,A-5~A~3,A-2~B | 55.25~127.25 |
| M | 7~13 | C~KK | 133.25~361.25 |
| H | 14~69 | LL~125 | 367.25~801.25 |

    3.  Preset 125 Channels;
    4.  NTSC-M system;
    5.  CCD and V-CHIP function;
    6.  Built-in AV input socket in the front panel;
    7.  Full-function infrared remote control;
    8.  English/ French/Spanish on screen display;
    9.  Eight background color and foreground color;
    10. Direct program selector, program recall, program up/ down (skip programs
        which are set 'MEMORY=OFF');
    11. Brightness, contrast, tint, sharpness, color and volume 64-steps control
        through 12c bus;
    12. Timer on/off, sleep off mode, power on/off and blank signal 10-minutes Auto-
        off;
    13. Mute, blank signal auto-mute, auto-mute for programs which are set
        'MEMORY=OFF', and automatic search;
    14. Max. Audio output power large than 3w+3w;
    15. MTBF lowest limit not large than 20,000 hours;
    16. Power input 50/60Hz, 120±20V Ac;
    17. Antenna input resistance: 75Ω (non-balanced style);
    18. Screen size: 54cm (flat square angle tube);
    19. Max. Power consumption: not more than 75W (120V AC/60Hz);
    20. Dimensions: 495X460X460.5 (mm);
    21. Weight: app. 21Kg.

III Circuit working principle and functions:
    1.  Integrated circuit chip LA76814
        a)  This chip was created by SANYO in 1999. It is a NTSC-M system chip
            that integrated audio demodulator, filter, trap filter with the brightness
            delay line color decoder intermediate frequency filter. It is a highly
            integrated chip and yet has a well stability thus it requires less outer
            components for a color TV receiver. It also has the advance functions

3

CRT001178

of LA7687 and LA7688. It's a powerful chip and could be used in a wide range of circuits.

b) This chip can accomplish the following tasks: graphic audio intermediate frequency amplifying, graphic demodulation, accompany audio intermediate frequency amplifying, graphic demodulation, video amplifying, color decoding and work as a frame and line pulsate. Graphic demodulation, accompany audio demodulation, and color decoding are done with PLL phase lock demodulation, thus raised the stability and reliability with great scale and black level extension function. Bus geometry graphic regulation and 12C bus control function is added to this chip on base of LA7687. The graphic performance is highly improved.

c) The field output circuit is SANYO LA7840 frame output circuit chip, which is specially designed for bus-controlled color TV Receiver. The advantage of this chip is a large output current with less outer component required. The retrace is done under the pump function of power supply. Through connecting with LA76814, it can accomplish the frame range, frame center, frame linear and frame S regulation controlled under 12C bus.

2. The power supply system of this model is a frequenting floating parallel switch voltage stabilizer circuit. It can carry out pulsate and switch output function. The circuit is a simple and stable one with a thorough protection system. In order to maintain a stable output voltage and to raise the power reaction speed, the circuit opts a feed voltage stabilizing control system-pick the main power supply and test it with a highly sensitive stabilizing test circuit and send the test result back.  Then through the optical-electronic coupling, to the pilaster circuit and finally works to decide the on/off of the switch regulator tube after it has been regulated and amplified.

It's an efficient way to get a fine control and a fast power supply reaction and the stability of the output voltage also improved. Further more, using the optical-electronic coupling in handling the DC feedback Signal is a safe function for it separates the primary and secondary output.

2. The video amplifying output circuit incorporates a simple but efficient wide band amplifying circuit with a wide frequency band and high gain (RGB output range is beyond 100Vp-p). You can adjust the vertical and horizontal character during the compensation procedure of the amplifier's range frequency character by adjusting the resistor parallel and series to the capacitance to ensure a proper compensation.

3. The audio signal, after demodulated by LA76814, is switched with the outer audio Input signal through the audio switch output from the 1st pin. This machine incorporates LA4225A, small, high signal/noise ratio, and high power output. It can out put audio signal over 3w+3w.

4. CPU adopted for this machine is LC86F3348A, CCD and V-CHIP function enabled.  248 x 18 × 34 matrix OSD, 8 foregrounds and background color. The incorporation with al frequency 32.768KHz crystal pilaster and PLL phase lock technique results in lowest EMI. It can be connected to 3-bus control chips.

CRT001179

IV. Notes for using the machine
1.  Please read and remember the contents of the user's manual and the warnings on the back cover of TV set carefully before using the machine, especially the safety instructions.
2.  Keep the set away from heaters, ovens or such heating equipment.
3.  Keep well ventilated.
4.  Away from heavy dust and corrosive gas.
5.  Not exposed to rain or mixture.
6.  Away from strong magnetic object.
7.  Don't move the machine while it's on. Please do it after your have cut off the power.
8.  Remove the outdoor antenna connection during thundering weather.
9.  Remove the power plug from the socket for long-term power failure or absence.

5

**TN201UV Using Manual**

Connect the power plug to power socket (AC120V), connect the signal source, press the power button, the red power indicator comes on. For the following operations, follow the instructions:

I. Graphic menu
Press 'MENU' to call out the menu, press 'CH+' or 'CH-' to call out 'VIDEO' subdirectory, select the 'CONTRAST', 'BRIGHT', 'COLOR', 'SHARP', 'TINT' options, and press 'VOLUME+' or 'VOLUME-' to adjust the above items.

II. Clock menu
Press 'MENU' to call out the menu, press 'CH+' or 'CH-' to call out 'TIME' subdirectory, select the 'CLOCK', 'ON TIME', 'OFF TIME', 'SLEEP', 'CHANNEL' Options, set timer on on/off time, sleep mode time and timer on channel.

III. System menu
Press 'MENU' to call out the menu, press 'CH+' or 'CH-' to call out 'SETUP' subdirectory, select the 'LANGUAGE', RECEPTION AIR', 'AUTO PROGRAM', 'ADD/ DELETE', 'INPUT TV', options, by pressing 'VOL+' and 'VOL-', you can change the on screen display, receiving method (CATV/AIR), auto program search, add/delete program and switching between TV and AV input method.

IV. Specialized settings:
Press 'MENU' to call out the menu, press 'CH+' or 'CH-' to call out 'SPECIAL' subdirectory, select the 'C CAPTION', 'CCON MUTE', 'POWER RESTORE', 'AUTO TINT', 'MENU OFFSET', MENU B G C' options, use 'VOL+' to change the CCD method, and decide whether to display the CCD signal when mute, whether to standby on power connection, whether to use auto tint demodulation, or you can change the on screen position of the menu and the background color.

V. V-CHIP:
Press 'V-CHIP' to call out the 'V-CHIP' menu, use the 'CH-' to select 'TV RATING', 'MPAA RATING', 'BLOCK IN', 'OPTION MENU' items, and press 'MENU' to call out the options menu, use 'CH+', 'CH-'  'VOL+', 'VOL-' to the settings.

VI. Volume
Press 'VOL+' and 'VOL-' to adjust the volume.

VII. Other function keys on the remote controller:
1. 'TV/AV' key, switch between TV and AV method.
2. 'ON/OFF' key, by pressing this key, switch the TV set between standby mode and on mode.
3. 'RECALL' key, recall the last program, one more operation to return to the present one
4. 'MUTE' key, mute function key.

VIII. Keys and buttons on the set:
1. 'CH+' and 'CH-', press to select channel;
2. 'VOL+' and 'VOL-', press to adjust volume;
3. 'MENU', press to call out the main menu, use 'CH+', 'CH-', 'VOL+' and 'VOL-' to set the items within this menu;
4. 'TV/AV' key, switch between TV and AV method.

CRT001181

**TN201AUV Alignment**

The alignment and test processes should be taken under the standard NTSC-M audio and video conditions, and there should be V-CHIP and CCD contents in the test signal.

- If alignment:
  1. Test equipments:
     a. 45.75MHz sweep generator
     b. AC 120V/60Hz power supply (with short and over current proof)
     c. Digital multimode
  2. Alignment
     a. Connect position pen of digital multimode to 47 pin of N101 on main PCB:
     b. Connect 45.75MHz sweep generator to test top between W108 and C110:
     c. Connect 120V/60Hz power supply to outlet XS502A.
     d. Adjust T101 and make digital multimode display 3.6V.

7

CRT001182



CRT001183

- Adjusting focusing voltage and raster voltage:
  1. Input white field signal, press 'SCAN' key of the alignment remote controller to turn the raster to a bright line. Adjust the potential regulator of FBT to turn down the line to just visible, press the 'SCAN' key again.
  2. Input digital figure signal (5-circle figure), find and tune the focusing potential regulator on the FBT to gain the best display effect.

- Vertical and horizontal scan adjustment:
  1. Input digital figure signal (5-circle figure);
  2. Press 'GEO' key of the alignment remote controller to call out the scan parameter menu as follows:

| OSD | DESCRIPTION | RANGE | REFERENCE |
|---|---|---|---|
| H.PHASE | Horizontal phase | 0-30 | 16-17 |
| V.POSI | Frame center | 0-63 | 48 |
| V.SIZE | Frame range | 0-127 | 80 |
| NO SO POWER OFF | Blank signal auto-off | Yes/No | Yes |
| V SC | Fram s adjustment | 0-31 | 8 |
| VLIN | Fram linear adjustment | 0-31 | 10 |
| Note: Use the 'p+' and 'P-' to move the cursor to select a certain item; the selected item is highlighted with red while other unselected remain green. Use 'V+' and 'V-'to change the parameter of the selected item. | | | |

  1. Press the 'PICTURE' key of the alignment remote controller again to save the change parameter.

II. Factory configuration setting:
Press 'PROD' key to enter the first page of the main menu of factory configuration. There are 14 items under this menu; there are 6 more items listed below:

| OSD | Description | Range | Reference |
|---|---|---|---|
| CTTST | Test control | 0-1 | 0 |
| HFREQ | Horizontal frequency 0 | 0-63 | 29 |
| VSPUP | Field simultaneous sensitivity 0=High, 1=Low | 0-1 | 0 |
| GMODE | Gray mode, 0=100%, 1=50% | 0-1 | 0 |
| V-LIN | Fram linear (set in GEO) | 0-31 | 10 |
| RGDEF | R.G output compensation | 0-1 | 0 |
| BGSLC | B output compensation | 0-3 | 0 |
| AFG&G | AFC gain 0=high 1=low | 0-1 | 0 |
| OSCNT | OSD signal gain | 0-3 | 2 |
| CBYPS | Set the intermediate frequency parameter of Internal tint band-pass filter | 0-1 | 0 |

9

CRT001184

| CRB/W | Test mode: 0=normal, 1=dark field, 2=bright field 3=cross figure signal | 0-3 | 0 |
|---|---|---|---|
| HBLKL | Left blanking | 0-7 | 0 |
| HBLKR | Right blanking | 0-7 | 0 |
| BSHLD | ABL door limit | 0-7 | 3-4 |
| EMABL | Emergency ABL remove switch:0=on, 1=off | 0-1 | 0 |
| MDSTP | Use brightness to release ABL, 0=off, 1=on | 0-1 | 0 |
| FMLBL | FM output accuracy | 031 | 16 |
| BRABL | Brightness ABL switch 0=off, 1=on | 0-1 | 1 |
| VDLBL | Video demodulation output range 0=small, 1=large | 0-7 | 7 |
| PASSW | V-CHIP function 0=OFF, 1=ON | 0-1 | 1 |

3. Simulation preset
   1) Input color bar signal;
   2) Press 'MENU' key, set color, contrast, color saturation, tint at medium position;
   3) Press 'DP' key of the alignment remote controller to call out the menu which contains the following items:

| OSD | Description | Range | Reference |
|---|---|---|---|
| Sub brightness | Preset brightness | 0-127 | 60 |
| Contrast | Preset contrast | 0-27 | 27 |
| Tint | Preset tint | 0-77 | 35 |
| Color | Preset color saturation | 0-27 | 14 |

4) When done, press 'PICTURE' to save the result.

III.   Adjust the white level:
   1) Press 'GEO' of alignment remote controller, set the item 'NO SD POWER OFF YES' to 'NO', keep the TV power on for over 30 minutes:
   2) Degauss the CRT:
   3) Input bright field signal through AV channel:
   4) Connect white level test equipment to the set:
   5) Press 'W/B' key of the alignment remote controller to call out the following menu:

| OSD | Description | Range | Reference |
|---|---|---|---|
| RD | Red stimulate potential | 0-127 | 64 |
| GD | Green stimulate potential | 0-15 | 7 |
| BD | Blue stimulate potential | 0-127 | 64 |
| RB | Red stop potential | 0-255 | Preset 127,adjust 127 |

10

CRT001185

| GB | Green stop potential | 0-255 | Preset 127,adjust 250 |
| BB | Blue stop potential | 0-255 | Preset 127,adjust 220 |

Set the above items to medium position and then press 'SCAN', adjust the Raster potential regulator until the bright line on the screen turns to a dark line, which is just visible.

Adjust using the following keys until the line turns white {1 (RB+) /2 (RB) 3 (GB-) 5 (BB+) /6 (BB-)}, and then press 'SCAN' again, use the alignment remote controller 'V+', 'V-', 'P+', 'P-' to adjust 'RD', 'GD' and 'BD' until the whole screen turns white.

6) If white level test equipment is available, adjust the above until a proper effect is gained.
7) Press 'PICTURE' to save the results:
8) Press 'GEO' key, set back the 'NO SD POWER OFF' item to yes.

IV. Inter signal check:
Press the 'PIRN' key on the alignment remote controller to generate Internal signal check:

V. Audio check:
      1) Input graphic signal with 1KHz audio signal:
      2) Connect the oscillograph to the speaker input line:
      3) Press 'V+' key to reach the max volume, the 1KHz should not distort, and the audio should be fine and does not interfere the video signal.
      4) The tested non-distort output power should be less than 2W.

VI. Check with the keys on the set
Please refer to the user's manual.

VII. Check of the front AV input channel function:
Input AV signal, check the audio and video function.

IX. V-CHIP, CCD function
      1) Press the 'V-CHIP' to call out the V-CHIP menu, check the V-CHIP function
      2) Press the 'MENU' key and enter 'CCAPTION' item menu, check the CCD Function.

X. Voltage resistance and insulation utility test:
Input 1500V 1mA for 1sec; make that no component is broken.

CRT001186

**WORKING METHOD OF HIGH VOLTAGE PROTECTION CIRCUIT OF TN201AUV CRT**

1. The working method
   The electrical level masters the high voltage control system of this model of the 34th pin of the main decoding chip—LA76814, when the 34th pin output High voltage, LA76814 cuts the line square-wave output on 27th pin, thus the line triode V432 holds, and the line output amplifier stops and generate no more high voltages. This process is divided by R412 and R416. If the divided potential still can break the stabilizer diode VD12, it will direct the work on the LA76814 and raise the potential on its 34th pin, thus run the high voltage protection process. The time constant function by C412 and R414 will give a delay to the high voltage protection circuit.

Diagram as follows:



II. List of components that decides the X-ray generation

| No. | Description | Model | Origination |
|-----|-------------|-------|-------------|
| U901 | CRT | 54SX503-Y22 | IRICO |
| N101 | I.C | LA76814 | SANYO |
| V431 | Triode | 2SC2383-O | No.4 E-Component Firm, FoShan |
| T431 | H. Drive Amp. | JDT1904 | Jingshi, Shenzhen |
| V432 | Triode | 2SD1651-CTV-YB | No.4 E-Component Firm, FoShan |
| C436 | H. Volt. ceramic capacitor | CT81-2R-2KV-470PF-K | Hongming, Dongguan |
| T471 | H. Output Amp. | JF0510-191129 | Jingshi, Shenzhen |

CRT001187

| R471 | Cement resistor | RX27-5W-3.9Ω-J | Xinyang, Jiangsu |
|------|-----------------|----------------|------------------|
| R434 | Oxide film resistor | RY17-2W-3.3KΩ±5% | Yongxing, Sichuan |
| R412 | Carbon film resistor | RY13-1/6W-8.2KΩ±5% | No.6           Component electro. Firm, Zibo |
| VD412 | Stabilizer diode | H27L1/KEL-7V5B1 | Electronic       Component factory, Leshan |
| VD551 | Regulator diode | EU3A/RU3A | Electronic       Component factory, Leshan |

III. Key components which decides the X-ray generation:

| NO. | Description | Model | Short | Open |
|-----|-------------|-------|-------|------|
| N101 | IC | LA76814 | When LA76814 is idle, it is to say no square-wave generates from the 27th pin of N101, no high potential will generate and no X-ray exists. | |
| V431 | Triode | 2SC2383-O | When short B and E, the square-ware will no more work on T471. If short B, C, the square-wave will not get amplified. No high potential will generate, and no X-ray exists. | Cut the line output square-wave, T471 does not work, no high potential generate and no X-ray exists. |
| T431 | Line drive amplifier | JDT1904 | Square-wave will not reach T471, T471 does not work no high potential generate and no X-ray exists. | |
| V432 | Triode | 2SD1651-CTV-YB | When short B and E, the square-ware will no more work on T471.If short B, C, the square-wave will not get amplified. No high potential will generate, and no X-ray exists. | If V432 is open, no switch signal will generate, T471 does not work, no high potential generate and no X-ray exists. |
| C436 | High-voltage ceramic | CT81-2R-2KV-470P F-K | Output square-wave will not arrive T471, T471 does not | Reduces the high potential generated by T471 by means |

CRT001188

|  |  |  | work, no high potential generate and no X-ray exists. | of enlarging the reverse capacity, does not take effect on the X-ray. |
|---|---|---|---|---|
| T471 | Line output amplifier | JF0510-191129 | When T471 does not work, no high potential generate and no X-ray exists. |  |
| R471 | Cement resistance | RX27-5W-3.9Ω-J | The potential on the collector anode of V432 is raised and its static working point is changed, which make the potential output of T471 rise and possibly will generate X-ray. | No bias level on V432, no switch signal outputs from V432, T471 does not work, no high potential generate and no X-ray exists. |
| R434 | Oxide film resistance | RY17-2W-3.3KΩ± 5% | The potential on the collector anode of V431 is raised and the static working point is changed, which make the potential output of T471 rise and possibly will generate X-ray. | No bias level on V432, no switch signal outputs from V432, T471 does not work, no high potential generate and no X-ray exists. |
| R412 | Carbon film resistance | RY13-1/6W-8.2KΩ ±5% | When shorted, the voltage feedback from the 9th winding of T471 will not get divided, thus make VD412 more easier get PENETRATED and the X-ray production circuit more easier to start. | The feedback voltage from the 9th winding of T471 will never PENETRATE VD412, the X-ray protection circuit will not start. There might be X-ray generated. |
| VD412 | Voltage stabilizer diode | H27L1/KEL-7V5B1 | Same as r412 | Same as r412 |
| VD551 | Current Regulator Diode | EU3A/RU3A | Will not regulate the AC output current from the 9th winding of T511 and let it go | No main voltage exists, no X-ray will generate. |

CRT001189

| | | | through VD511, C561 and directly discharge to the ground, thus, main voltage will not exist, no X-ray will generate. | |
|---|---|---|---|---|

CRT001190

# EXHIBIT 18

1   BAKER BOTTS L.L.P.
    John M. Taladay (*pro hac vice*)
2   Evan J. Werbel (*pro hac vice*)
    Thomas E. Carter (*pro hac vice*)
3   Andrew L. Lucarelli (*pro hac vice*)
    700 K Street, N.W.
4   Washington, D.C. 20001
    (202)-639-7700
5   (202)-639-7890 (fax)
    Email: john.taladay@bakerbotts.com
6           evan.werbel@bakerbotts.com
            tom.carter@bakerbotts.com
7           drew.lucarelli@bakerbotts.com

8   Jonathan Shapiro (State Bar No. 257199)
    101 California Street, Suite 3600
9   San Francisco, California 94111
    (415) 291-6200
10  (415) 291-6300 (fax)
11  Email: jonathan.shapiro@bakerbotts.com

12  *Attorneys for Defendants*
    *IRICO GROUP CORP. and*
13  *IRICO DISPLAY DEVICES CO., LTD.*

14

15                  **UNITED STATES DISTRICT COURT**

16                  **NORTHERN DISTRICT OF CALIFORNIA**

17                          **OAKLAND DIVISION**

18
    IN RE: CATHODE RAY TUBE (CRT)          Master File No. 07-CV-5944-JST
19  ANTITRUST LITIGATION                   (N.D. Cal.)

20  ─────────────────────────────          MDL No. 1917

21  This Document Relates to:              **IRICO DEFENDANTS' OBJECTIONS
                                           AND RESPONSES TO INDIRECT
22  *ALL INDIRECT PURCHASER ACTIONS*       PURCHASER PLAINTIFFS' FIRST
                                           SET OF REQUESTS FOR ADMISSION
23                                         TO DEFENDANTS IRICO GROUP
                                           CORPORATION AND IRICO DISPLAY
24                                         DEVICES CO., LTD**

25
    ─────────────────────────────
26  PROPOUNDING PARTY:      Indirect Purchaser Plaintiffs.

27  RESPONDING PARTIES:     Irico Group Corporation
                            Irico Display Devices Co., Ltd.
28
    SET NUMBER:             One

    ─────────────────────────────────────────────────────────────────
    IRICO'S OBJECTIONS AND RESPONSES TO                  Master File No. 07-CV-5944-JST
    IPPS' FIRST SET OF REQUESTS FOR                                       MDL No. 1917
    ADMISSION

1          Pursuant to Federal Rules of Civil Procedure 26 and 36, Irico Group Corporation and Irico

2   Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby provides this

3   supplemental response to Indirect Purchaser Plaintiffs' ("IPPs" or "Plaintiffs") First Set of

4   Requests for Admission, dated December 15, 2021 ("IPPs' RFAs"). Irico reserves the right to

5   amend or supplement these Objections and Responses (the "Responses") to the extent allowed by

6   the Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before

7   the United States District Court for the Northern District of California ("Local Rules"). Subject to

8   and without waiving any of Irico's General and Specific Objections as set forth below, Irico is

9   willing to meet and confer with Plaintiff regarding such General and Specific Objections.

10          The following Responses are made only for purposes of this case. The Responses are

11   subject to all objections as to relevance, materiality and admissibility, and to any and all

12   objections on any ground that would require exclusion of any response if it were introduced in

13   court. All evidentiary objections and grounds are expressly reserved.

14          These Responses are subject to the provisions of the Stipulated Protective Order that the

15   Court issued on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated

16   "Confidential" in accordance with the provisions of the Protective Order.

17                                **GENERAL OBJECTIONS**

18          Irico makes the following General Objections to IPPs' RFAs:

19          1.      Irico's Responses are based upon information available to and located by Irico as

20   of the date of service of these Responses. In responding to IPPs' RFAs, Irico states that it has

21   conducted a diligent search, reasonable in scope, of those files and records in its possession,

22   custody, or control believed to likely contain information responsive to IPPs' RFAs.

23          2.      No express, incidental, or implied admissions are intended by these Responses and

24   should not be read or construed as such.

25          3.      Irico does not intend, and its Responses should not be construed as, an agreement

26   or acquiescence with any characterization of fact, assumption, or conclusion of law contained in

27   or implied by the RFAs.

28          4.      Irico objects to IPPs' RFAs to the extent that they are overly broad, unduly

1    burdensome, oppressive, and duplicative to the extent that they seek information or documents

2    that are already in the possession, custody, or control of IPPs.

3        5.      Irico objects to IPPs' RFAs to the extent that they seek to impose obligations on

4    Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this

5    Court.

6        6.      Irico objects to IPPs' RFAs to the extent they seek information that is not relevant

7    or disproportionate to the needs of the case.

8        7.      Irico objects to IPPs' RFAs to the extent that they are vague, ambiguous, or

9    susceptible to more than one interpretation. Irico shall attempt to construe such vague or

10   ambiguous RFAs so as to provide for the production of responsive information that is

11   proportionate to the needs of the case. If IPPs subsequently asserts an interpretation of any RFA

12   that differs from Irico's understanding, Irico reserves the right to supplement or amend its

13   Responses.

14       8.      Irico objects to IPPs' RFAs to the extent that they contain terms that are

15   insufficiently or imprecisely defined. Irico has attempted to construe such vague or ambiguous

16   RFAs so as to provide for the production of responsive information that is proportionate to the

17   needs of the case.

18       9.      Irico objects to IPPs' RFAs to the extent that they seek information that is

19   protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or

20   common interest privilege, self-evaluative privilege, or any other applicable privilege or

21   immunity. Irico has provided only information that it believes to be non-privileged and otherwise

22   properly discoverable. Nothing in Irico's responses is intended nor should be construed as a

23   waiver of any such privilege or immunity. The inadvertent or mistaken provision of any

24   information or responsive documents subject to any such doctrine, privilege, protection or

25   immunity from production shall not constitute a general, inadvertent, implicit, subject-matter,

26   separate, independent or other waiver of such doctrine, privilege, protection or immunity from

27   production.

28       10.     Irico objects to IPPs' RFAs to the extent that they call for information that is not in

---

IRICO'S OBJECTIONS AND RESPONSES TO          2          Master File No. 07-CV-5944-JST
IPPS' FIRST SET OF REQUESTS FOR                         MDL No. 1917
ADMISSION

1   the possession, custody, or control of Irico. Irico also objects to the extent that any of IPPs' RFAs

2   seek information from non-parties or third parties, including but not limited to any of Irico's

3   subsidiary or affiliated companies.

4          11.    Irico objects to IPPs' RFAs to the extent that responding would require Irico to

5   violate the privacy and/or confidentiality of a third party or confidentiality agreement with a third

6   party.

7          12.    Irico objects to IPPs' RFAs to the extent that they seek information that is publicly

8   available, already in IPPss' possession, custody, or control, or more readily available from other

9   sources.

10          13.    Irico objects to IPPs' RFAs to the extent that they seek information or documents

11   concerning transactions outside the United States. Such RFAs are unduly burdensome and

12   irrelevant to this pending action as IPPs' class definition is confined to "all persons . . . who

13   directly purchased a Cathode Ray Tube Product . . . in the United States" (see Direct Purchaser

14   Plaintiffs' Consolidated Amended Complaint dated March 16, 2009).

15          14.    Irico objects to IPPs' RFAs to the extent that compliance would require Irico to

16   violate the laws, regulations, procedures, or orders of a judicial or regulatory body of foreign

17   jurisdictions.

18          15.    Irico's responses to IPPs' RFAs should not be construed as either (i) a waiver of

19   any of Irico's general or specific objections or (ii) an admission that such information or

20   documents are either relevant or admissible as evidence.

21          16.    Irico objects to IPPs' RFAs to the extent that they state and/or call for legal

22   conclusions.

23          17.    Irico objects to the RFAs to the extent that they contain express or implied

24   assumptions of fact or law with respect to the matters at issue in this case.

25          18.    Irico objects to the RFAs to the extent they seek information or documents that

26   cannot be removed or transmitted outside China without violating the laws and regulations of that

27   country, including but not limited to restrictions on the transmission of state secrets or trade

28   secrets as those terms are defined under Chinese law.

19.    Irico objects to each RFAs to the extent that it is premature and/or to the extent that it: (a) conflicts with obligations that are imposed by the Federal Rules of Civil Procedure, the Civil Local Rules of this Court, and/or any other applicable rule; (b) seeks information that is the subject of expert testimony; and/or (c) seeks information that is dependent on depositions and documents of third parties that have not been discovered.

20.    Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each RFAs as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

## **GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1.    Irico objects to the definition of "and" to include "or" and vice versa, and Irico responds according to the natural meaning of "and" and "or."

2.    Irico objects to the definition of the term "Reflect(ing) or refer(ing) to" as overbroad, vague, and ambiguous.

3.    Irico objects to the definitions of "You," and "Your" to the extent that IPPs defines those terms to include Irico's "subsidiaries, affiliates, and their subsidiaries, and any employees, agents, representatives or any persons acting or purporting to act on Your behalf." This definition is legally incorrect, overbroad, unduly burdensome, vague, and beyond the scope of permissible discovery under the Federal Rules of Civil Procedure. Irico also objects to this definition on the ground that incorporating multiple corporate entities renders each Request that incorporates the term as overbroad and unduly burdensome because it seeks information or documents that are outside the possession, custody, or control of Irico. Irico interprets the terms "YOU," and "Your" as referring only to Irico Group Corporation or Irico Display Devices Co., Ltd.

4.    Irico objects to the definitions of "CRT" on the grounds that they are vague, ambiguous and overly broad.

5.    Irico objects to the IPPs' RFAs and the instructions therein, including but not limited to General Instructions Nos. 2, 3, and 4 to the extent it seeks to impose requirements that

1  are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, or any Order

2  of this Court.

3  **SPECIFIC RESPONSES TO REQUESTS FOR ADMISSION**

4  **REQUEST FOR ADMISSION NO. 1**

5        Admit each of the following email addresses were used by one of YOUR officers or

6  employees during the Relevant Period (respond separately for each email address):

7  A.     jingyuan@irico.com.cn

8  B.     Jill-yy@163.com

9  C.     yliang6699@163.com

10  D.     yliang@hotmail.com

11  E.     yliang@irico.com.cn

12  F.     pqwang@irico.com.cn

13  G.     xsgsyxb@ch.com.cn

14  H.     yht@ch.com.cn

15  I.     yj-xs@ch.com.cn

16  J.     ryz@ch.com.cn

17  K.     zhangjing@ch.com.cn

18  L.     fanxj@ch.com.cn

19  M.     rggao@irico.com.cn

20  N.     xjhao@irico.com.cn

21  O.     ly-xs@ch.com.cn

22  P.     lg@chyg.com

23  Q.     shatao@irico.com.cn

24  R.     lumimate@public.xa.sn.cn

25  S.     sxl-xs@ch.com.cn

26  T.     shs-xs@ch.com.cn

27  U.     Is7071@sina.com

28  V.     hywen@irico.com.cn

IRICO'S OBJECTIONS AND RESPONSES TO    5    Master File No. 07-CV-5944-JST
IPPS' FIRST SET OF REQUESTS FOR    MDL No. 1917
ADMISSION

1    W.   dqxing@ch.com.cn

2    X.   hdyang@irico.com.cn

3    Y.   wjp7858@sina.com

4    Z.   zhsw@ch.com.cn

5    AA.        ZLM-XS@ch.com.cn

6    BB.        chks@chinairico.com

7    CC.        zcf@ch.com.cn

8    **RESPONSE TO REQUEST NO. 1**

9         Subject to and without waiving its General Objections as stated above, Irico responds as

10   follows:

11        REQUEST NO. 1A

12        Deny.

13        REQUEST NO. 1B

14        Admit.

15        REQUEST NO. 1C

16        Admit.

17        REQUEST NO. 1D

18        Admit.

19        REQUEST NO. 1E

20        Deny.

21        REQUEST NO. 1F

22        Deny.

23        REQUEST NO. 1G

24        Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for

25   departmental and employee email addresses during a portion of the Relevant Time Period;

26   however, after conducting a reasonable search, Irico cannot identify a specific Irico employee

27   who used this email address during the Relevant Time Period, and therefore cannot admit or deny

28   the remainder of the request.

IRICO'S OBJECTIONS AND RESPONSES TO      6          Master File No. 07-CV-5944-JST
IPPS' FIRST SET OF REQUESTS FOR                            MDL No. 1917
ADMISSION

1     REQUEST NO. 1H

2         Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for

3     departmental and employee email addresses during a portion of the Relevant Time Period;

4     however, after conducting a reasonable search, Irico cannot identify a specific Irico employee

5     who used this email address during the Relevant Time Period, and therefore cannot admit or deny

6     the remainder of the request.

7     REQUEST NO. 1I

8         Admit.

9     REQUEST NO. 1J

10        Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for

11    departmental and employee email addresses during a portion of the Relevant Time Period;

12    however, after conducting a reasonable search, Irico cannot identify a specific Irico employee

13    who used this email address during the Relevant Time Period, and therefore cannot admit or deny

14    the remainder of the request.

15    REQUEST NO. 1K

16        Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for

17    departmental and employee email addresses during a portion of the Relevant Time Period;

18    however, after conducting a reasonable search, Irico cannot identify a specific Irico employee

19    who used this email address during the Relevant Time Period, and therefore cannot admit or deny

20    the remainder of the request.

21    REQUEST NO. 1L

22        Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for

23    departmental and employee email addresses during a portion of the Relevant Time Period;

24    however, after conducting a reasonable search, Irico cannot identify a specific Irico employee

25    who used this email address during the Relevant Time Period, and therefore cannot admit or deny

26    the remainder of the request.

27    REQUEST NO. 1M

28        Deny.

REQUEST NO. 1N

Deny.

REQUEST NO. 1O

Admit.

REQUEST NO. 1P

After conducting a reasonable search, Irico cannot determine whether this address was used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore cannot admit or deny the request.

REQUEST NO. 1Q

Deny.

REQUEST NO. 1R

After conducting a reasonable search, Irico cannot determine whether this address was used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore cannot admit or deny the request.

REQUEST NO. 1S

Admit.

REQUEST NO. 1T

Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for departmental and employee email addresses during a portion of the Relevant Time Period; however, after conducting a reasonable search, Irico cannot identify a specific Irico employee who used this email address during the Relevant Time Period, and therefore cannot admit or deny the remainder of the request.

REQUEST NO. 1U

After conducting a reasonable search, Irico cannot determine whether this address was used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore cannot admit or deny the request.

REQUEST NO. 1V

Deny.

1   REQUEST NO. 1W

2   Admit.

3   REQUEST NO. 1X

4   Deny.

5   REQUEST NO. 1Y

6   After conducting a reasonable search, Irico cannot determine whether this address was

7   used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore

8   cannot admit or deny the request.

9   REQUEST NO. 1Z

10   Admit.

11   REQUEST NO. 1AA

12   Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for

13   departmental and employee email addresses during a portion of the Relevant Time Period;

14   however, after conducting a reasonable search, Irico cannot identify a specific Irico employee

15   who used this email address during the Relevant Time Period, and therefore cannot admit or deny

16   the remainder of the request.

17   REQUEST NO. 1BB

18   After conducting a reasonable search, Irico cannot determine whether this address was

19   used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore

20   cannot admit or deny the request.

21   REQUEST NO. 1CC

22   Admit.

23   **REQUEST FOR ADMISSION NO. 2**

24   Admit that each of the email addresses listed in Request for Admission No. 1 above (A-

25   CC) were used by one of YOUR officers or employees during the Relevant Period in the regular

26   course of their duties for Irico (respond separately for each email address).

27   **RESPONSE TO REQUEST NO. 2**

28   Subject to and without waiving its General Objections above, Irico responds as follows:

IRICO'S OBJECTIONS AND RESPONSES TO          9          Master File No. 07-CV-5944-JST
IPPS' FIRST SET OF REQUESTS FOR                                    MDL No. 1917
ADMISSION

1    REQUEST NO. 2A

2    Deny.

3    REQUEST NO. 2B

4    Deny.

5    REQUEST NO. 2C

6    Deny.

7    REQUEST NO. 2D

8    Deny.

9    REQUEST NO. 2E

10   Deny.

11   REQUEST NO. 2F

12   Deny.

13   REQUEST NO. 2G

14   Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for

15   departmental and employee email addresses during a portion of the Relevant Time Period;

16   however, after conducting a reasonable search, Irico cannot identify a specific Irico employee

17   who used this email address during the Relevant Time Period, and therefore cannot admit or deny

18   the remainder of the request.

19   REQUEST NO. 2H

20   Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for

21   departmental and employee email addresses during a portion of the Relevant Time Period;

22   however, after conducting a reasonable search, Irico cannot identify a specific Irico employee

23   who used this email address during the Relevant Time Period, and therefore cannot admit or deny

24   the remainder of the request.

25   REQUEST NO. 2I

26   Admit.

27   REQUEST NO. 2J

28   Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for

1    departmental and employee email addresses during a portion of the Relevant Time Period;

2    however, after conducting a reasonable search, Irico cannot identify a specific Irico employee

3    who used this email address during the Relevant Time Period, and therefore cannot admit or deny

4    the remainder of the request.

5    REQUEST NO. 2K

6    Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for

7    departmental and employee email addresses during a portion of the Relevant Time Period;

8    however, after conducting a reasonable search, Irico cannot identify a specific Irico employee

9    who used this email address during the Relevant Time Period, and therefore cannot admit or deny

10   the remainder of the request.

11   REQUEST NO. 2L

12   Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for

13   departmental and employee email addresses during a portion of the Relevant Time Period;

14   however, after conducting a reasonable search, Irico cannot identify a specific Irico employee

15   who used this email address during the Relevant Time Period, and therefore cannot admit or deny

16   the remainder of the request.

17   REQUEST NO. 2M

18   Deny.

19   REQUEST NO. 2N

20   Deny.

21   REQUEST NO. 2O

22   Admit.

23   REQUEST NO. 2P

24   After conducting a reasonable search, Irico cannot determine whether this address was

25   used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore

26   cannot admit or deny the request.

27   REQUEST NO. 2Q

28   Deny.

1    REQUEST NO. 2R

2          After conducting a reasonable search, Irico cannot determine whether this address was

3    used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore

4    cannot admit or deny the request.

5    REQUEST NO. 2S

6    Admit.

7    REQUEST NO. 2T

8          Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for

9    departmental and employee email addresses during a portion of the Relevant Time Period;

10   however, after conducting a reasonable search, Irico cannot identify a specific Irico employee

11   who used this email address during the Relevant Time Period, and therefore cannot admit or deny

12   the remainder of the request.

13   REQUEST NO. 2U

14         Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for

15   departmental and employee email addresses during a portion of the Relevant Time Period;

16   however, after conducting a reasonable search, Irico cannot identify a specific Irico employee

17   who used this email address during the Relevant Time Period, and therefore cannot admit or deny

18   the remainder of the request.

19   REQUEST NO. 2V

20   Deny.

21   REQUEST NO. 2W

22   Admit.

23   REQUEST NO. 2X

24   Deny.

25   REQUEST NO. 2Y

26         After conducting a reasonable search, Irico cannot determine whether this address was

27   used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore

28   cannot admit or deny the request.

IRICO'S OBJECTIONS AND RESPONSES TO          12          Master File No. 07-CV-5944-JST
IPPS' FIRST SET OF REQUESTS FOR                              MDL No. 1917
ADMISSION

1   REQUEST NO. 2Z

2   Admit.

3   REQUEST NO. 2AA

4   Irico admits that the domain "@ch.com.cn" was used by Irico as a domain for

5   departmental and employee email addresses during a portion of the Relevant Time Period;

6   however, after conducting a reasonable search, Irico cannot identify a specific Irico employee

7   who used this email address during the Relevant Time Period, and therefore cannot admit or deny

8   the remainder of the request.

9   REQUEST NO. 2BB

10   After conducting a reasonable search, Irico cannot determine whether this address was

11   used by an Irico employee or maintained by Irico during the Relevant Time Period, and therefore

12   cannot admit or deny the request.

13   REQUEST NO. 2CC

14   Admit.

15   **REQUEST FOR ADMISSION NO. 3**

16   Admit that 0910-3313103 was a number that Irico used to send and receive documents by

17   facsimile transmission during the Relevant Period.

18   **RESPONSE TO REQUEST NO. 3**

19   Subject to and without waiving any of the General Objections above, Irico admits this

20   request.

21   **REQUEST FOR ADMISSION NO. 4**

22   Admit that Irico employees authored each of the following documents (respond separately

23   for each document):

24   A.   CHU00124396-399

25   B.   CHU00124400-402

26   C.   CHU00124403-410

27   D.   CHU00124411-412

28   E.   CHU00124413-416

1      F.     CHU00124417-419

2      G.    CHU00124420-421

3      H.    CHU00505498-501

4      I.     CHU00564370-374

5      J.     CHU00102755-764

6      K.    CHU00123489-501

7      L.     CHU00123502-517

8      M.   CHU00124663-674

9      N.    CHU00444555-564

10    O.    CHU00505502-513

11   **RESPONSE TO REQUEST NO. 4**

12      Admit as to Requests 4A through 4O.

13   **REQUEST FOR ADMISSION NO. 5**

14      Admit that the following documents contain true copies of Irico business cards (respond

15   separately for each document):

16   A.     BMCC-CRT000306758

17   B.     ME 00031378

18   C.     CHU00030303

19   D.     CHU00030304

20   **RESPONSE TO REQUEST NO. 5**

21      In addition to Irico's General Objections, which Irico incorporates by reference, Irico

22   specifically objects to this Request to the extent it is overbroad, unduly burdensome, and seeks

23   information that is maintained by and equally available to Plaintiffs or stated in publicly available

24   documents.

25      Subject to and without waiving the foregoing objections, Irico responds as follows:

26      REQUEST 5A

27      Deny.

28      REQUEST 5B

IRICO'S OBJECTIONS AND RESPONSES TO    14    Master File No. 07-CV-5944-JST
IPPS' FIRST SET OF REQUESTS FOR         MDL No. 1917
ADMISSION

1    Irico admits that the business cards bearing the "IRICO" logo on the page stamped "ME

2    0003138" are true copies of Irico business cards. The other business cards are not Irico business

3    cards, and therefore Irico denies the remainder of the request.

4    <u>REQUEST 5C</u>

5    Deny.

6    <u>REQUEST 5D</u>

7    Deny.

8    **REQUEST FOR ADMISSION NO. 6**

9    Admit that the business cards set forth in Request for Admission 6 above (A-D), were

10   used by Your employees during the Relevant Period (respond separately for each document).

11   **RESPONSE TO REQUEST NO. 6**

12   In addition to Irico's General Objections, which Irico incorporates by reference, Irico

13   specifically objects to this Request to the extent it is overbroad, unduly burdensome, and seeks

14   information that is maintained by and equally available to Plaintiffs or stated in publicly available

15   documents. Irico also assumes for purposes of responding to this Request that Plaintiffs meant to

16   refer to "Request for Admission 5 above" rather than "Request for Admission 6 above."

17   Subject to and without waiving the foregoing objections, Irico responds as follows:

18   <u>REQUEST 6A</u>

19   Deny.

20   <u>REQUEST 6B</u>

21   Irico admits that the business cards bearing the "IRICO" logo on the page stamped "ME

22   0003138" were used by Irico employees during the Relevant Period. The other business cards are

23   not Irico business cards, and therefore Irico denies the remainder of the request.

24   <u>REQUEST 6C</u>

25   Deny.

26   <u>REQUEST 6D</u>

27   Deny.

28   **REQUEST FOR ADMISSION NO. 7**

1      Admit that You lost and/or destroyed Documents and/or data relating to Irico's CRT

2  sales, pricing, marketing, and/or production after You were served with the Indirect Purchaser

3  Plaintiff's complaint on December 25, 2007.

4  **RESPONSE TO REQUEST NO. 7**

5      In addition to Irico's General Objections, which Irico incorporates by reference, Irico

6  specifically objects to this Request to the extent it is vague, overbroad, and unduly burdensome.

7      Subject to and without waiving the foregoing objections, Irico refers Plaintiffs to the Irico

8  Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' Third Set of

9  Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., dated January 21,

10  2022, which it incorporates by by reference. As detailed in the January 21, 2022 Responses, Irico

11  has made reasonable inquiry and that the information it knows or can readily obtain is insufficient

12  to enable it to admit or deny the request.

13  **REQUEST FOR ADMISSION NO. 8**

14      Admit that You lost and/or destroyed Documents and/or data relating to Irico's CRT

15  sales, pricing, marketing, and/or production after You retained the law firm Pillsbury,

16  Winthrop, Shaw & Pittman, LLP in mid-2008.

17  **RESPONSE TO REQUEST NO. 8**

18      In addition to Irico's General Objections, which Irico incorporates by reference, Irico

19  specifically objects to this Request to the extent it is vague, overbroad, and unduly burdensome.

20      Subject to and without waiving the foregoing objections, Irico refers Plaintiffs to the Irico

21  Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' Third Set of

22  Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., dated January 21,

23  2022, which it incorporates by reference. As detailed in the January 21, 2022 Responses, Irico has

24  made reasonable inquiry and that the information it knows or can readily obtain is insufficient to

25  enable it to admit or deny the request.

26  **REQUEST FOR ADMISSION NO. 9**

27      Admit that Irico Group Electronics Company Limited ("Electronics") was formed by

28  You in September 2004 to handle sales and export functions for all IRICO Companies." ECF

IRICO'S OBJECTIONS AND RESPONSES TO          16          Master File No. 07-CV-5944-JST
IPPS' FIRST SET OF REQUESTS FOR                                    MDL No. 1917
ADMISSION

No. 5220-10 at 1.

**RESPONSE TO REQUEST NO. 9**

Subject to and without waiving its General Objections, Irico admits this request.

**REQUEST FOR ADMISSION NO. 10**

Admit that Irico's "major customers" during the Relevant Period were TCL Corporation, Skyworth Group Co., Ltd., Konka Group Co., Ltd., Sichuan Changhong Electric Co., Ltd., and Hisense Electric Co., Ltd., as described in the "Global Offering Prospectus" published by Electronics on December 8, 2004 (ECF No. 5440-9 at 26).

**RESPONSE TO REQUEST NO. 10**

Subject to and without waiving its General Objections, Irico admits that the referenced document states that "[o]ur major customers include TCL King Electrical Appliances (Huizhou) Co., Ltd. ("TCL"), Shenzhen Skyworth-RGB Electronics Co. Ltd. ("Skyworth"), Konka Group Co., Ltd. ("Konka"), Sichuan Changhong Electric Co., Ltd. ("Changhong") and Qingdao Hisense Electric Appliance Co., Ltd. ("Hisense"), which are major television set manufacturers in the PRC." Irico further responds that the document speaks for itself and otherwise denies the request.

**REQUEST FOR ADMISSION NO. 11**

Admit that Irico's sales of CPTs to these "major customers" accounted for approximately 59.27% of Irico's total CRT sales in 2001, as stated in the December 8, 2004 Global Offering Prospectus (ECF No. 5440-9 at 26).

**RESPONSE TO REQUEST NO. 11**

Subject to and without waiving its General Objections, Irico admits that the document states that "[f]or the three years ended 31 December 2001, 2002 and 2003 and the six months ended 30 June 2004, the total sales to the above major customers accounted for approximately 59.27%, 59.35%, 63.53% and 67.09%, respectively, of our total sales." Irico further responds that the document speaks for itself and otherwise denies the request.

**REQUEST FOR ADMISSION NO. 12**

Admit that Irico's sales of CPTs to these "major customers" accounted for approximately 59.35% of Irico's total CRT sales in 2002, as stated in the December 8, 2004 Global Offering

1  Prospectus (ECF No. 5440-9 at 26).

2  **RESPONSE TO REQUEST NO. 12**

3          Subject to and without waiving its General Objections, Irico admits that the document

4  states that "[f]or the three years ended 31 December 2001, 2002 and 2003 and the six months

5  ended 30 June 2004, the total sales to the above major customers accounted for approximately

6  59.27%, 59.35%, 63.53% and 67.09%, respectively, of our total sales." Irico further responds that

7  the document speaks for itself and otherwise denies the request.

8  **REQUEST FOR ADMISSION NO. 13**

9          Admit that Irico's sales of CRTs to these "major customers" accounted for approximately

10  63.53% of Irico's total CRT sales in 2003, as stated in the December 8, 2004 Global Offering

11  Prospectus (ECF No. 5440-9 at 26).

12  **RESPONSE TO REQUEST NO. 13**

13          Subject to and without waiving its General Objections, Irico admits that the document

14  states that "[f]or the three years ended 31 December 2001, 2002 and 2003 and the six months

15  ended 30 June 2004, the total sales to the above major customers accounted for approximately

16  59.27%, 59.35%, 63.53% and 67.09%, respectively, of our total sales." Irico further responds that

17  the document speaks for itself and otherwise denies the request.

18  **REQUEST FOR ADMISSION NO. 14**

19          Admit that Irico's sales of CPTs to these "major customers" accounted for approximately

20  67.09% of Irico's total CRT sales in the first six months of 2004 as stated in the December 8,

21  2004 Global Offering Prospectus (ECF No. 5440-9 at 26).

22  **RESPONSE TO REQUEST NO. 14**

23          Subject to and without waiving its General Objections, Irico admits that the document

24  states that "[f]or the three years ended 31 December 2001, 2002 and 2003 and the six months

25  ended 30 June 2004, the total sales to the above major customers accounted for approximately

26  59.27%, 59.35%, 63.53% and 67.09%, respectively, of our total sales." Irico further responds that

27  the document speaks for itself and otherwise denies the request.

28  **REQUEST FOR ADMISSION NO. 15**

1    Admit that, during the Relevant Period, Irico sold CPTs to (respond separately for each

2  customer):

3       A.    Haier Electrical Appliances Co., Ltd.,

4       B.    Xiamen Overseas Chinese Electronic Co., Ltd.,

5       C.    Soyea Technology Co., Ltd.,

6       D.    Yisheng Technology Co., Ltd.,

7       E.    LG Electronics (Shenyang) Inc.,

8       F.    Hangzhou Jinlipu Electrical Co., Ltd.,

9       G.    Shenzhen Techtop Industrial Co., Ltd.,

10       H.    Suntrue International,

11       I.    Starlight Marketing Macao Commercial Offshore, Ltd., and

12       J.    Hangzhou Huashan Electric Co., Ltd.

13  **RESPONSE TO REQUEST NO. 15**

14    Subject to and without waiving its General Objections, Irico responds as follows:

15    REQUEST 15A

16    Admit.

17    REQUEST 15B

18    Admit.

19    REQUEST 15C

20    Admit.

21    REQUEST 15D

22    Admit.

23    REQUEST 15E

24    Admit.

25    REQUEST 15F

26    Admit.

27    REQUEST 15G

28    Admit.

---

IRICO'S OBJECTIONS AND RESPONSES TO        19        Master File No. 07-CV-5944-JST
IPPS' FIRST SET OF REQUESTS FOR                              MDL No. 1917
ADMISSION

1  REQUEST 15H

2      Irico states that it has made reasonable inquiry but is unable to find records of sales of

3  Irico CPTs to this entity during the Relevant Period. Irico therefore denies the request.

4  REQUEST 15I

5      Admit.

6  REQUEST 15J

7      Admit.

8  **REQUEST FOR ADMISSION NO. 16**

9      Admit that You knew that Irico's customers manufactured and sold televisions containing

10  Irico's CRTs to customers in the United States during the Relevant Period.

11  **RESPONSE TO REQUEST NO. 16**

12      In addition to Irico's General Objections, which Irico incorporates by reference, Irico

13  further objects to this Request on the grounds that the Request calls for a legal argument or legal

14  conclusion.

15      Subject to and without waiving the foregoing objections, Irico denies this request.

16  **REQUEST FOR ADMISSION NO. 17**

17      Admit that employees of Irico traveled to the United States for business purposes in May

18  1997, as reflected in IRI-CRT-00025756.

19  **RESPONSE TO REQUEST NO. 17**

20      In addition to Irico's General Objections, which Irico incorporates by reference, Irico

21  further objects to this Request on the grounds that the undefined term "business purposes" renders

22  the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

23      Subject to and without waiving the foregoing objections, Irico admits that the document

24  states that "总厂 97 年出国团组汇总表" and contains the following entry:

25 / 26

| 序号 | 团组名称 | 出国（境） | 人数 | 出国时间 | 停留时间（天） | 出国任务 |
|------|----------|-----------|------|----------|----------------|----------|
| 17 | 彩虹彩色显像管总厂 | 美国 | 1 | 97.05.12 | 720 | 工作 |

27      Irico further responds that the document speaks for itself, and otherwise denies the

28  request.

1   **REQUEST FOR ADMISSION NO. 18**

2   Admit that employees of Irico traveled to the United States for business purposes in

3   September 1997, as reflected in IRI-CRT-00025756.

4   **RESPONSE TO REQUEST NO. 18**

5   In addition to Irico's General Objections, which Irico incorporates by reference, Irico

6   further objects to this Request on the grounds that the undefined term "business purposes" renders

7   the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

8   Subject to and without waiving the foregoing objections, Irico admits that the document

9   states that "总厂 97 年出国团组汇总表" and contains the following entry:

| 序号 | 团组名称 | 出国（境） | 人数 | 出国时间 | 停留时间（天） | 出国任务 |
|---|---|---|---|---|---|---|
| 30 | 彩虹彩色显像管总厂 | 美国 | 2 | 97.09.19 | 12 | 考察 |

12   Irico further responds that the document speaks for itself, and otherwise denies the

13   request.

14   **REQUEST FOR ADMISSION NO. 19**

15   Admit that employees of Irico traveled to the United States for business purposes in

16   November 1997, as reflected in IRI-CRT-00025756.

17   **RESPONSE TO REQUEST NO. 19**

18   In addition to Irico's General Objections, which Irico incorporates by reference, Irico

19   further objects to this Request on the grounds that the undefined term "business purposes" renders

20   the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

21   Subject to and without waiving the foregoing objections, Irico admits that the document

22   states that "总厂 97 年出国团组汇总表" and contains the following entries:

| 序号 | 团组名称 | 出国（境） | 人数 | 出国时间 | 停留时间（天） | 出国任务 |
|---|---|---|---|---|---|---|
| 14 | 彩虹彩色显像管总厂 | 美国 | 5 | 97.11.26 | 10 | 商务洽谈 |
| 31 | 彩虹彩色显像管总厂 | 美国 | 1 | 97.11.15 | 14 | 考察 |

26   Irico further responds that the document speaks for itself, and otherwise denies the

27   request.

28

1

**REQUEST FOR ADMISSION NO. 20**

2

    Admit that employees of Irico traveled to the United States for business purposes in

3

March 1998, as reflected in IRI-CRT-00025758.

4

**RESPONSE TO REQUEST NO. 20**

5

    In addition to Irico's General Objections, which Irico incorporates by reference, Irico

6

further objects to this Request on the grounds that the undefined term "business purposes" renders

7

the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

8

    Subject to and without waiving the foregoing objections, Irico admits that the document

9

states that "总厂 98 年出国团组汇总表" and contains the following entries:

10

| 序号 | 团组名称 | 出国（境） | 人数 | 出国时间 | 停留时间（天） | 出国任务 |
|---|---|---|---|---|---|---|
| 3 | 彩虹彩色显像管总厂 | 美国 | 3 | 98.3.1 | 15 | 考察 |
| 22 | 彩虹彩色显像管总厂 | 美国 | 2 | 98.3.28 | 15 | 验收 |

13

14

    Irico further responds that the document speaks for itself, and otherwise denies the

15

request.

16

**REQUEST FOR ADMISSION NO. 21**

17

    Admit that employees of Irico traveled to the United States for business purposes in May

18

1998, as reflected in IRI-CRT-00025758.

19

**RESPONSE TO REQUEST NO. 21**

20

    In addition to Irico's General Objections, which Irico incorporates by reference, Irico

21

further objects to this Request on the grounds that the undefined term "business purposes" renders

22

the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

23

    Subject to and without waiving the foregoing objections, Irico admits that the document

24

states that "总厂 98 年出国团组汇总表" and contains the following entry:

25

| 序号 | 团组名称 | 出国（境） | 人数 | 出国时间 | 停留时间（天） | 出国任务 |
|---|---|---|---|---|---|---|
| 18 | 彩虹彩色显像管总厂 | 美国 | 2 | 98.5.20 | 10 | 会议 |

27

    Irico further responds that the document speaks for itself, and otherwise denies the

28

| IRICO'S OBJECTIONS AND RESPONSES TO | 22 | Master File No. 07-CV-5944-JST |
|---|---|---|
| IPPS' FIRST SET OF REQUESTS FOR | | MDL No. 1917 |
| ADMISSION | | |

1    request.

2    **REQUEST FOR ADMISSION NO. 22**

3        Admit that employees of Irico traveled to the United States for business purposes in

4    September 1998, as reflected in IRI-CRT-00025758.

5    **RESPONSE TO REQUEST NO. 22**

6        In addition to Irico's General Objections, which Irico incorporates by reference, Irico

7    further objects to this Request on the grounds that the undefined term "business purposes" renders

8    the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

9        Subject to and without waiving the foregoing objections, Irico admits that the document

10   states that "总厂98年出国团组汇总表" and contains the following entry:

| 序号 | 团组名称 | 出国（境） | 人数 | 出国时间 | 停留时间（天） | 出国任务 |
|---|---|---|---|---|---|---|
| 6 | 彩虹彩色显像管总厂 | 美国 | 1 | 98.9.30 | 21 | 培训考察 |

14       Irico further responds that the document speaks for itself, and otherwise denies the

15   request.

16   **REQUEST FOR ADMISSION NO. 23**

17       Admit that employees of Irico traveled to the United States for business purposes in

18   February 1999, as reflected in IRI-CRT-00025759.

19   **RESPONSE TO REQUEST NO. 23**

20       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

21   further objects to this Request on the grounds that the undefined term "business purposes" renders

22   the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

23       Subject to and without waiving the foregoing objections, Irico admits that the document

24   states that "总厂99年出国团组汇总表" and contains the following entry:

| 序号 | 团组名称 | 出国（境） | 人数 | 出国时间 | 停留时间（天） | 出国任务 |
|---|---|---|---|---|---|---|
| 5 | 彩虹彩色显像管总厂 | 美国 | 2 | 99.02.01 | 5 | 参加SID会议 |

28       Irico further responds that the document speaks for itself, and otherwise denies the

IRICO'S OBJECTIONS AND RESPONSES TO    23      Master File No. 07-CV-5944-JST
IPPS' FIRST SET OF REQUESTS FOR                MDL No. 1917
ADMISSION

1    request.

2    **REQUEST FOR ADMISSION NO. 24**

3         Admit that Ma Jinqaun and other Irico employees traveled to the United States for

4    business purposes from June 6 – 15, 2001, as reflected in IRI-CRT-00023164-66, 23170, and

5    23175.

6    **RESPONSE TO REQUEST NO. 24**

7         In addition to Irico's General Objections, which Irico incorporates by reference, Irico

8    further objects to this Request on the grounds that the undefined term "business purposes" renders

9    the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

10         Subject to and without waiving the foregoing objections, Irico admits that IRI-CRT-

11    00023164 states that "转账凭证 2001 年 8 月 23 日 摘要 转：马金泉等人出国费用 金额

12    36243.61 元." Irico further admits that IRI-CRT-00023165 states that:

13         人力资源部 请款单 2001 年 5 月 31 日 事由：马金泉 5 人赴美国技术交流

14         出差地点天数：12 天  金额： 10350 美元

15    Irico also admits that IRI-CRT-00023166 states as follows:

16    

| 日期 | 所在地 | 天数 |
|---|---|---|
| 6 月 6 日-6 月 8 日 | 旧金山 | 3 |
| 6 月 9 日 | 硅谷 | 1 |
| 6 月 10-6 月 11 | 洛杉矶 | 2 |
| 6 月 12-6 月 13 | 拉斯维加斯 | 2 |
| 6 月 14-6 月 15 | 拉斯维加斯-旧金山-东京-北京 | 2 |

23    Irico further admits that IRI-CRT-00023170 references "Great Wall Travel Inc." and under the

24    column "DESCRIPTION" lists:

25    • "6-19/11 RADISSON 2NIGHTS 3ROOMS;"

26    • "6-12 RIVERIA 1NIGHT 3ROOMS;" and,

27    • "6-13 TERRIBLE 1NIGHT 3ROOMS."

28

IRICO'S OBJECTIONS AND RESPONSES TO       24       Master File No. 07-CV-5944-JST
IPPS' FIRST SET OF REQUESTS FOR                                MDL No. 1917
ADMISSION

1  Irico also admits that IRI-CRT-00023175 is stamped "MATSUSONO, 1150 PALOMA AVE,

2  BURLINGAME, CA 94010."

3       Irico further responds that the document speaks for itself, and otherwise denies the

4  request.

5  **REQUEST FOR ADMISSION NO. 25**

6       Admit that Ma Jinqaun and other Irico employees met with Hisense USA Corporation in

7  the United States in June 2001, as reflected in IRI-CRT-0023169 and 23180.

8  **RESPONSE TO REQUEST NO. 25**

9       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

10  further objects to this Request on the grounds that the undefined term "business purposes" renders

11  the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

12       Subject to and without waiving the foregoing objections, Irico responds that the document

13  speaks for itself, and otherwise denies the request.

14  **REQUEST FOR ADMISSION NO. 26**

15       Admit that during the Relevant Period, Irico sought and received a United States safety

16  certification from Underwriter's Laboratory ("UL") for its "Irico brand" CRTs, as reflected in

17  IRI-CRT-00025700, 25703 and 25712.

18  **RESPONSE TO REQUEST NO. 26**

19       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

20  further objects to this Request on the grounds that the undefined term "safety certification"

21  renders the Request vague, overbroad, and/or calls for a legal argument or legal conclusion.

22       Subject to and without waiving the foregoing objections, Irico admits that IRI-CRT-

23  00025700 and IRI-CRT-00025703 state that "工厂生产的"彩虹牌"彩色显像管、显示管等

24  全部采用国际先进标准，并先后通过了 UL、BSI、VDE、CSA、和 ISO9000 等国际质量安

25  全认证." Irico further admits that IRI-CRT-00025712 states that "主导产品"彩虹牌"彩管全

26  部采用国际标准，该产品先后通过了美国 UL、英国 BSI、德国 VDE 和加拿大 CSA 安全认

27  证；" Irico further responds that the document speaks for itself, and otherwise denies the request.

28  **REQUEST FOR ADMISSION NO. 27**

1   Admit that the documents produced by Irico in this case are true and correct copies of the

2   originals.

3   **RESPONSE TO REQUEST NO. 27**

4   In addition to Irico's General Objections, which Irico incorporates by reference, Irico

5   further objects to this Request on the grounds that the term "authentic" calls for a legal argument

6   or legal conclusion. Irico also objects to this Request on the grounds that it is overly broad,

7   unduly burdensome, and oppressive as it seeks authentication of over one thousand documents

8   with no possibility that such an exhaustive list would ever be used at trial in the above captioned

9   matter. Plaintiffs have asked for authentication of every document produced by Irico during the

10  course of the litigation and have made no effort to provide a narrower list of potential trial

11  documents.

12  Subject to and without waiving its foregoing objections, Irico is willing to meet and confer

13  with Plaintiffs to discuss a more reasonable list of documents that could potentially be used at

14  trial.

15  **REQUEST FOR ADMISSION NO. 28**

16  Admit that the documents produced by Irico in this case are authentic and satisfy Fed. R.

17  Evid. 901.

18  **RESPONSE TO REQUEST NO. 28**

19  In addition to Irico's General Objections, which Irico incorporates by reference, Irico

20  further objects to this Request on the grounds that the term "authentic" calls for a legal argument

21  or legal conclusion. Irico also objects to this Request on the grounds that it is overly broad,

22  unduly burdensome, and oppressive as it seeks authentication of over one thousand documents

23  with no possibility that such an exhaustive list would ever be used at trial in the above captioned

24  matter. Plaintiffs have asked for authentication of every document produced by Irico during the

25  course of the litigation and have made no effort to provide a narrower list of potential trial

26  documents.

27  Subject to and without waiving its foregoing objections, Irico is willing to meet and confer

28  with Plaintiffs to discuss a more reasonable list of documents that could potentially be used at

IRICO'S OBJECTIONS AND RESPONSES TO        26        Master File No. 07-CV-5944-JST
IPPS' FIRST SET OF REQUESTS FOR                       MDL No. 1917
ADMISSION

1   trial.

2   **REQUEST FOR ADMISSION NO. 29**

3       Admit that the documents produced by Irico in this case were made at or near the time of

4   the event reflected in the document.

5   **RESPONSE TO REQUEST NO. 29**

6       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

7   further objects to this Request on the grounds that the terms "made at" and "near the time" call

8   for a legal argument or legal conclusion. Irico also objects to this Request on the grounds that it is

9   overly broad, unduly burdensome, and oppressive as it seeks authentication of over one thousand

10   documents with no possibility that such an exhaustive list would ever be used at trial in the above

11   captioned matter. Plaintiffs have asked for authentication of every document produced by Irico

12   during the course of the litigation and have made no effort to provide a narrower list of potential

13   trial documents.

14       Subject to and without waiving its foregoing objections, Irico is willing to meet and confer

15   with Plaintiffs to discuss a more reasonable list of documents that could potentially be used at

16   trial.

17   **REQUEST FOR ADMISSION NO. 30**

18       Admit that the documents produced by Irico in this case were made by someone with

19   knowledge of the contents or event reflected in the document.

20   **RESPONSE TO REQUEST NO. 30**

21       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

22   further objects to this Request on the grounds that the term "with knowledge" calls for a legal

23   argument or legal conclusion. Irico also objects to this Request on the grounds that it is overly

24   broad, unduly burdensome, and oppressive as it seeks authentication of over one thousand

25   documents with no possibility that such an exhaustive list would ever be used at trial in the above

26   captioned matter. Plaintiffs have asked for authentication of every document produced by Irico

27   during the course of the litigation and have made no effort to provide a narrower list of potential

28   trial documents.

1       Subject to and without waiving its foregoing objections, Irico is willing to meet and confer

2  with Plaintiffs to discuss a more reasonable list of documents that could potentially be used at

3  trial.

4  **REQUEST FOR ADMISSION NO. 31**

5       Admit that the documents produced by Irico in this case were prepared in the regular

6  course of Your business.

7  **RESPONSE TO REQUEST NO. 31**

8       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

9  further objects to this Request on the grounds that the term "regular course of Your business"

10  calls for a legal argument or legal conclusion. Irico also objects to this Request on the grounds

11  that it is overly broad, unduly burdensome, and oppressive as it seeks authentication of over one

12  thousand documents with no possibility that such an exhaustive list would ever be used at trial in

13  the above captioned matter. Plaintiffs have asked for authentication of every document produced

14  by Irico during the course of the litigation and have made no effort to provide a narrower list of

15  potential trial documents.

16       Subject to and without waiving its foregoing objections, Irico is willing to meet and confer

17  with Plaintiffs to discuss a more reasonable list of documents that could potentially be used at

18  trial.

19  **REQUEST FOR ADMISSION NO. 32**

20       Admit that the documents produced by Irico in this case satisfy Fed. R. Evid. 803(6).

21  **REPONSE TO REQUEST NO. 32**

22       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

23  further objects to this Request on the grounds that the term "satisfies Fed. R. Evid. 803(6)" calls

24  for a legal argument or legal conclusion. Irico also objects to this Request on the grounds that it is

25  overly broad, unduly burdensome, and oppressive as it seeks authentication of over one thousand

26  documents with no possibility that such an exhaustive list would ever be used at trial in the above

27  captioned matter. Plaintiffs have asked for authentication of every document produced by Irico

28  during the course of the litigation and have made no effort to provide a narrower list of potential

IRICO'S OBJECTIONS AND RESPONSES TO    28    Master File No. 07-CV-5944-JST
IPPS' FIRST SET OF REQUESTS FOR                 MDL No. 1917
ADMISSION

1   trial documents.

2        Subject to and without waiving its foregoing objections, Irico is willing to meet and confer

3   with Plaintiffs to discuss a more reasonable list of documents that could potentially be used at

4   trial.

5   ///

6   ///

7   Dated:  February 23, 2022          BAKER BOTTS L.L.P.

8

9                                      /s/ John M. Taladay

10                                     John M. Taladay (*pro hac vice*)
                                       Evan J. Werbel (*pro hac vice*)
11                                     Thomas E. Carter (*pro hac vice*)
                                       Andrew L. Lucarelli (*pro hac vice*)
12                                     700 K Street, N.W.
                                       Washington, D.C. 20001
13                                     (202)-639-7700
                                       (202)-639-7890 (fax)
14                                     Email: john.taladay@bakerbotts.com
                                               evan.werbel@bakerbotts.com
15                                             tom.carter@bakerbotts.com
                                               drew.lucarelli@bakerbotts.com
16
                                       Jonathan Shapiro (State Bar No. 257199)
17                                     101 California Street, Suite 3600
                                       San Francisco, California 94111
18                                     (415) 291-6200
                                       (415) 291-6300 (fax)
19                                     Email: jonathan.shapiro@bakerbotts.com

20
                                       *Attorneys for Defendants*
21                                     *IRICO GROUP CORP. and*
                                       *IRICO DISPLAY DEVICES CO., LTD.*
22

23

24

25

26

27

28

---

IRICO'S OBJECTIONS AND RESPONSES TO          29          Master File No. 07-CV-5944-JST
IPPS' FIRST SET OF REQUESTS FOR                                     MDL No. 1917
ADMISSION

# EXHIBIT 19



December 6, 2021

**Certification**

**Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of: IPP Motion to Compel - Exhibit 15 and IPP Motion to Compel - Exhibit 16

_____

Taylor Vereen

Project Manager

Project Number: BBLLP_1809_019

**Exhibit
Wang 8571**
9/20/2022
Wang Zhaojie - V2

**EXHIBIT 15**

# Information Weekly

**Sales Company**
**70th Issue**
**July 8-15, 2005**

| | Operating Conditions | Color TV Market | User Feedback | Industry News |
|---|---|---|---|---|
| **TCL** | 1. In January to June, a total of 4.675 million, 5.2473 million and 1.769 million sets of CTV were produced, sold and exported, with a decrease of 2%, 7% and 10%, respectively, compared with the same period last year;<br>2. Among them, a total of 1.07 million sets of 21"FS were produced, with a relatively large year-on-year decrease of 50%. A total of 0.52 million sets of 25"FS were produced, which was almost the same as that in last year. 0.647 million sets of 29"PF were produced, with a year-on-year increase of 50%;<br>3. A total of 0.595 million sets of 21"FS were exported, with a year-on-year decrease of 53%. A total of 1.769 million sets were sold overseas, accounting for 42% of total output. | 1. On July 14th, TCL Multimedia Group issued an announcement that they incorporated sales and marketing rights of TCL-Thomson Electronics Limited (TTE) in the North America and Europe held by Thomson at a price of 107.1 million Hongkong dollars;<br>2. From July 13 to July 31, a large environmental promotion campaign of "I consume and I am environmental–recycling electronic waste in your home" was brought out in each store of Suning and TCL in Beijing. Consumers who have an old color TV at home can buy any new electrical appliance at Suning at a discount by using the old color TV. Among them, consumers who want to buy a TCL color TV can get a discount of 100 Yuan to 500 Yuan depending on the depreciation condition. Old electrical appliances purchased by Suning and TCL will be sent to a national approved old electrical appliance recycling organization for harmless treatment, for which TCL may pay about one million Yuan, taking its responsibility as the world's largest color TV manufacturer. | 1. The priority is given to strategic partners, Thomson and Huafei, for purchase of color picture tube;<br>2. A great regret is given by OEM department for non-production of Irico 21"FS (thick);<br>3. It's required by "ERP" software system of TTE company that the supplier should deliver the goods according to the specified time and place, which hasn't been satisfied by Irico at present;<br>4. There are frequently unsmooth phenomena for handling of returned tubes;<br>5. Irico is ranked second for market share, which is only second to Thomson. | In July, Shenzhen Samsung transformed 29" compatible line body to produce 29" tubes with a shorter diameter. |
| **Skyworth** | 1. It has been officially announced by Skyworth Digital a few days ago that Zhang Xuebin, executive director and president of color TV division, succeeded Wang Dianfu as CEO and Wang Dianfu will only serve as the chairman of the board of directors. Zhang Xuebin, new CEO of Skyworth, denied that Skyworth had evaded tax of 0.68 billion Yuan which was quite inconsistent with the facts;<br>2. It has been officially announced by Skyworth that they will commence production in this week. | 1. A discount of 40% was given to Yongle special machines and Konka was withdrawn from Sundan and no improvement was made by Suning; the price of flat panel LCD TV was continuously decreased;<br>2. The price of TCL 32" was decreased from 14 thousand Yuan/set to 10 thousand Yuan/set, and the price of TCL 37" was decreased from 17 thousand Yuan/set to 14 thousand Yuan/set. | 1. Variety and mark of magnetic field of color picture tube for sales overseas should be shown clearly;<br>2. Supplier of color picture tube of most OEM color TV is determined by the customer in advance. | |

CHU00124396_T

| | | | | |
|---|---|---|---|---|
| **Konka** | 1. In January to June, a total of 2.92 million, 3.335 million and 0.91 million sets of color TV were produced, sold and exported respectively, with a year-on-year decrease of 18%, 6% and 5%;<br>2. In the second quarter, a total of 0.61 million sets of color TV were sold overseas, which doubled the amount in the first quarter;<br>3. It showed an increase for flat screen and a decrease of universal screen. For example, the amount of 21"FS were decreased from 1.26 million sets in the same period in 2004 to 0.605 million sets in 2005, with a decrease of 52%. Moreover, in January to June of this year, a total of 0.39 million sets of 21"PF were produced, with a year-on-year increase of 31.7%. | With dull market, sales volume of Konka color TV is decreased by 15%, compared with 600 thousand sets in the same period of last year. | 1. Replenishment or refund for returned tubes should be conducted by Dongguan Konka as soon as possible;<br>2. A special meeting for coordinating supplementation of Irico 14" DC15 tube is hold by Dongguan Konka, which requires speeding up certification of Irico 14". Trial orders in a small batch will be issued quickly. | Changsha LG plans to suspend production in the 21" line for 10 days, 25" line for a week and 29" line for 15 days in July. |
| **Chang hong** | 1. In June, sales volume of CRT color TV of Changhong were continuously decreased, with a year-on-year decrease of 31% (sales volume in the same period of last year was 0.742 million sets); the inventory of complete machines was increased by 6% compared with that in the last month (0.4831 million sets).<br>2. In August, production amount for internal sales was reduced, which meant that only 0.28 million sets were produced. | 1. From July 8 to July 11, large trade-in activities were hold by Skyworth in several large supermarkets in Chengdu urban area, such as Carrefour, Ren Le, Auchan, Trust-Mart and Century Mart;<br>2. In this year, depreciation price of Skyworth is increased to 300-600 Yuan, which lasts for four days. For digital signal television with 16:9 display mode, 16:9 Tianjiao series of televisions are specified by Skyworth to be included in the activity of "exchanging analog television for digital television". What's more, old television, regardless of its size, can be converted to 500Yuan, for buying 16:9 Tianjiao series. | 1. Order number of Changhong should be marked in the delivery notice;<br>2. Partial CRT was affected with damp. At present, they are followed in the line, without large adverse influence. | In this week, salesmen of color picture tube manufacturers, apart from Seg Hitachi, have attended Changhong activity. |
| **Hisense** | Production condition of Huangdao Hisense was basically normally, and workers can normally take a rest on Saturday and Sunday. In the last third of July, about 0.12 million sets were produced. | 1.Recently, Hisense has successfully seized back international famous trademark from Siemens, and defeated Japanese Sharp in the "Contending for Hegemony by Hisense and Sharp", proving that Chinese color TV has a wining cost performance;<br>2. In the Qingdao home appliance stores, customers mainly buy CTV special machines. Among them, 21"FS 699 Yuan, 21"PF 899 Yuan, 29"PF 1,499 Yuan and 29" HD 1,999 Yuan are sold well. | In this week, Irico tubes with good quality are used. Trial flow of 200 21"PF (new AK) is planned to be conducted on July 16. | 1.At present, Samsung 25"PF (AK) is being researched and developed by Hisense for certifying sample tubes;<br>2.Personnel of Samsung have arrived for technical support. |
| **Haier** | 1. In this week, production amount was slightly decreased, which was within normal adjustment. For 21"PF (new AK) produced for exporting to the United States, preparations | In the Qingdao and Hefei home appliance stores; there are limited customers, with poor sales of CTV and flat screen TV, of which the prices are stable. | 1. Sample tubes of Irico 21" (new AK) have a low luminance and American engineers have arrived at Qingdao Haier by air on 15th day for consultation; | 1. It's reflected by LG and BMCC that color picture tubes are sold poor;<br>2. In Hefei Haier, BMCC, Samsung |

| | | | | |
|---|---|---|---|---|
| | for the early stage are being intensified;<br>2. In this week, three lines were started by Hefei Haier, which were mainly for 14" and 21" export TV sets. | | 2. Irico 21"FS (thick) and 21" (new AK) made by Hefei Haier don't match with Haier machine core, as they have different pressure differences. If production is planned, it's necessary to increase voltage of high-voltage package at that time;<br>3. There are also quality problems for 29"PF (100HZ) of Hefei Haier. Machine core of Haier had been taken back yesterday for testing. | 21" light tube and its export volume have exceeded those of Irico. Domestic sales of large screen TV are relatively low. |
| **Prima** | 1. LCD production amount in this month will hit a new high. 0.1 million sets are planned to be produced; production volume of PDP is very low.<br>2. Supply volume of 34"32" is very low or none. | Customers have little interest in CTV and wait to buy flat panel television with cash in hand. | Products specified in the additional order should be delivered on time. | In the recent three to four months, CRT has been delivered in USD. The price of color picture tube is continuously decreased. |
| **Small and medium-sized enterprises in East China** | In January to June, a total of 643.43 thousand, 0.6295 million, 51.2 thousand and 0.341 million sets of Panda color TV had been produced, sold, stocked and exported, with a year-on-year increase of production and marketing of 11% and 4%, respectively. Consumed amount of Irico tube was increased by 1.56 times on a year-on-year basis and its occupation rate has reached about 25%, raising its rank from the 4th to the 1st together with LG. | On the one hand, air refrigerators are sold well; on the other hand, color TV is hard to be sold. | 1. It's requested that a favorable price should be given to Irico 14" and 21"FS (thick) color picture tubes;<br>2. Jiang Kui started to establish the factory in the last year and several new models were developed by Wuxi Xindong. In January to June, they each manufactured 80,000 sets of color TV, using 100% of Irico tubes, hoping to be equally treated as large factories. | LCD manufacturer, LG Philips Company announced on July 11 that they will increase a capital of 2,410 dollars to the subsidiary in Nanjing, China, so as to further expand its production capacity. |
| **Soyea** | 1. In July, production amount is less than 30 thousand sets. It's predicted to produce 3,000 sets in August;<br>2. At present, as partial color picture tubes are sold at a loss, once the market is initiated, the price of color picture tube will be increased. Therefore, users may hoard small amount of color picture tubes at a low price in August. | In the Hangzhou home appliance market, it's very weak. In each day, only 3-5 sets of color TV can be sold, even none. In the weekend, it can be slightly better. Shipping malls are not confident and can't timely pay to complete machine factory, resulting in out of stock of some machines with small and medium-sized screens. | 1. There are returned tubes for Hangzhou Jinlupu, which should be quickly hauled back by specified trucks as soon as possible;<br>2. Jinlipu has a residual payment of more than 300,000 Yuan in the import and export company. Please assist in investigation and transfer it to the sales company for payment. | Manager Fan of Novel Color Picture Tube visited Manager Sun, so as to discuss about next demand intention for 21"FS with Jinlipu. But Manager Sun expressed that they have good cooperation with Irico at present. We shouldn't be careless and unconcerned and should strengthen tackling and services of Jinlipu. |
| **Summary** | 1. CTV production and marketing and export of complete machine factory in the first half year had the following three characteristics:<br>The first was decreased overall index: In January to June, a total of 17.3618 million, 20.1208 million and 5.1696 million sets of CTV were produced, sold and exported by seven color TV | From July, Changhong, Skyworth and TCL and others strongly promote "old for new service" of color TV, which is recognized and responded by many consumers.<br>The first is to activate sales of color TV in the off-season, improve its market share of the brand, and speed up the update of color TV;<br>The second is to improve | 1. Sample tubes of Irico 21" (new AK) have a low luminance and American engineers have arrived at Qingdao Haier by air on 15th day for consultation;<br>2. It's required by "ERP" software system of TTE company that supplier should deliver the goods according to the specified | 1. It's predicted that Shanghai Novel Color Picture Tube will be completely suspended on the 20th day of this month and try to manufacture 21"PF and 25"PF (AK);<br>2. Manager Fan of Novel Color Picture |

CHU00124398_T

| | | | |
|---|---|---|---|
| | manufacturers, respectively, with a year-on-year decrease of 11%, 4% and 14%;<br>The second is that the three giants came a cropper one after another: 1. Output: a relatively large year-on-year decrease of Konka and Changhong was 18% and 51% respectively; 2. Sales volume: a year-on-year decrease of TCL, Konka and Changhong was 7%, 6% and 45% respectively; 3. Export volume: A year-on-year decrease of Changhong was 108%.<br>The third is that a strong phenomenon against the trend was shown by Haier and Panda: in the first half year of 2005, a year-on-year increase of production, sales and export volumes of Haier CTV was 15%, 15% and 55% respectively; a year-on-year increase of production and sales of Panda CTV was 11% and 4% respectively. | cognitive level of consumers for digital television and flat panel television and other high-end products;<br>The third is to facilitate handling purchasing psychology of consumers and provide the first-hand data for further adjustment of product structure by the factory. | time and place, which hasn't been satisfied by Irico at present;<br>3. Variety and mark of magnetic field of color picture tube for sales overseas should be shown clearly;<br>4. Supplier of color picture tube of most OEM color TV is determined by the customer in advance.<br>5. Small and medium-sized consumers hope to be equally treated as large factories in the off season. | Tube visited Manager Sun, so as to discuss about next demand intention for 21"FS with Jinlipu. |

CHU00124399_T

# 信 息 周 报

销售公司
第 70 期
05.7.08－7.15.

| | 经营状况 | 彩电市场 | 用户信息反馈 | 行业动态 |
|---|---|---|---|---|
| **TCL** | 1、1-6 月份 CTV 产 467.5 万台，销 524.73 万台、出口 176.9 万台。分别较去年同期减少 2%、7%和 10%；<br>2、其中 21″FS 生产 107 万台同比降幅较大为 50%。25″FS 生产 52 万台同比几乎持平。29″PF 生产 64.7 同比增长了 50%；<br>3、21″FS 出口 59.5 万台同比下降了 53%，外销量 176.9 万台占总产量的 42%。 | 1、7月 14 日 TCL 多媒体集团发布公告，该公司以 1.071 亿港元收编汤姆逊在 TCL-汤姆逊电子有限公司(TTE)北美、欧洲的销售和市场经营权；<br>2、7 月 13 日至 7 月 31 日在北京苏宁和 TCL 各门店推出"我消费、我环保——回收您家中的电子垃圾"大型环保促销攻势。凡家中有废旧彩电的消费者，都可以到苏宁折价换购任何一款新电器，其中购买 TCL 彩电可根据新旧程度折合 100 元至 500 元不等。而苏宁和 TCL 收购上来的废旧电器，将送到国家认证的废旧电器回收机构进行无害化处理。TCL 为此可能耗资近百万元，承担自己作为全球最大彩电制造商的一份责任。 | 1、采购彩管优先考虑战略伙伴汤姆逊和华飞；<br>2、OEM 部对彩虹 21″FS（粗）不生产感到遗憾；<br>3、TTE 公司"ERP"软件系统要求供应商按规定时间地点交货，目前彩虹还没有达到要求；<br>4、对退货管的办理，常常出现不顺畅的现象；<br>5、彩虹市场占有率仅次于汤姆逊，位居第二。 | 深圳三星 7 月对 29″兼容线体进行改造，将生产 29″短径管。 |
| **创维** | 1、创维数码日前正式宣布，公司执行董事兼彩电事业部总裁张学斌接替王殿甫担任首席执行官，王殿甫仅为董事会主席。创维新任 CEO 张学斌否认创维偷漏税 6.8 亿元，与事实严重不符；<br>2、创维公明工厂本周开工生产。 | 1、永乐特价机 6 折，顺电康佳撤柜，苏宁没有起色；平板液晶电视价格继续走低；　2、TCL32″1.4 万/台降至 1 万元/台，37″从 1.7/台万降到 1.4 万/台。 | 1、外销彩管需要将品种和磁场标识显示清楚；<br>2、绝大部分 OEM 彩电都是由客户事先确定彩管供应商。 | |

CHU00124396

| | | | | |
|---|---|---|---|---|
| **康佳** | 1、1-6月份彩电产量292万台较去年下降18%，销售333.5万台同比减少6%、出口91万台同比下降了5%；<br>2、第二季度外销彩电61万台，较一季度增长了一倍；<br>3、纯平增长，普屏下降例如：21″FS由04年同期126万台下降到05年的60.5万台，下降了52%，而21″PF今年1-6月份生产39万台，同比增长31.7%。 | 市场平淡，康佳彩电销售与去年同期60万台相比下降了15%。 | 1、莞康请尽快解决退货管的补退问题；<br>2、香康就彩虹14″DC15管专门召开增补协调会，会上要求加快彩虹14″的认证。小批量试做订单会很快下来。 | 长沙LG计划7月份21″线停产10天，25″线停产一星期，29″线停产15天。 |
| **长虹** | 1、6月份长虹CRT彩电销售总体继续下滑，与去年同期相比（74.2万台）下降了31%；整机库存较上月（48.31万台）增加6%；<br>2、8月份内销部分生产减量，只生产28万台。 | 1、7月8日到7月11日创维在成都市区家乐福、人人乐、欧尚、好又多、世纪联华几大超市举行大型的以旧换新活动；<br>2、创维今年的折旧价提升到300至600元，时间也延长到四天。应对数字信号电视的16：9显示格式，创维特推出16：9天骄系列参加"模拟电视换数字电视"活动，并且，不论大小，旧电视均按每台500元折价换购16：9天骄系列。 | 1、要求在发货单上注明长虹的定单号；<br>2、部分CRT受潮，目前在跟线，但没有造成太大的不良影响。 | 本周除赛格日立外各彩管厂家业务员均到长虹活动。 |
| **海信** | 黄岛海信生产基本正常，周六、周日正常休息。7月下旬生产12万台左右。 | 1、近日，海信成功地从西门手中夺回国际知名商标，并在"信普争霸"中击败日本厦普后就证明了中国彩电性价比制胜的势如破竹；<br>2、青岛家电商场主要购买CTV特价机，21″FS 699元、21″PF 899元、29″PF 1499元、29″高清1999元。这四个品种销的较好。 | 本周使用彩虹管，质量正常。21″PF（新AK）200只试流计划安排在7月16日。 | 1、三星25″PF（AK），目前，正在海信研发做样管认证；<br>2、三星已来人进行技术支持。 |
| **海尔** | 1、本周生产量有所下降，属正常调整，生产美国的21″PF（新AK）出口机正在加紧前期的准备工作；<br>2、合肥海尔本周开三条线生产，主要14″21″出口机。 | 在青岛和合肥家电商场，顾客很少，CTV彩电和平板电视均销售不畅，但其价格较稳定。 | 1、彩虹21″（新AK）样屏亮度低，美国工程师于15日飞抵青岛海尔协商；<br>2、合肥海尔彩虹21″FS（粗）和21″（新AK）与海尔机芯不配，压差有别，如果有计划生产，到时需 | 1、LG和BMCC反映彩管销售很困难；<br>2、在合肥海尔BMCC，三星21″光管及出口管已大于彩管，大屏幕 |

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00124397

| | | | 调高高压包电压；<br>3、合肥海尔 29″PF（100HZ）也出现质量问题，昨天已将海尔机芯带回测试。 | 内销较小。 |
|---|---|---|---|---|
| **厦华** | 1、本月 LCD 生产量将创历史新高，准备生产 10 万台；PDP 产量很少。<br>2、34″32″供货量很少或是没有供货。 | 顾客对 CTV 兴趣不大，对平板电视持币待购。 | 增加订单要按时到货。 | CRT 近三四个月全是美元供货，彩管价格不断下滑。 |
| **华东中小户** | 1-6 月份熊猫彩电产 64.343 万台、销 62.95 万台、存 5.12 万台、出口 34.1 万台，产销同比分别增长 11%、4%，彩虹管月同比增长了 1.56 倍，其占有率已达 25% 左右，由第四位升至为并列第一位（LG）。 | 一边空调热，另一边彩电凉。 | 1、要求彩虹 14″和 21″FS（粗）彩管给予较优惠价格；<br>2、江奎去年开始建厂，无锡新东开发了几个新机型，1～6 月份彩电各生产 8 万台，100% 用彩虹管，希望享受大厂平等待遇。 | 液晶显示器制造商 LG 飞利浦公司 7 月 11 日发布公告，表示将增资 2410 美元给中国南京的子公司，以进一步扩大产能。 |
| **数源** | 1、7 月份生产不足 3 万台，8 月份预计生产 0.3 万台；<br>2、目前，因彩管部分品种在亏本销售，一旦市场启动，彩管会涨价，所以，用户在 8 月份有低价少量囤积彩管的可能。 | 杭州家电市场非常淡，每日卖出 3—5 台彩电，有时甚至一天卖不出一台，双休日稍微好一点，商场也没有信心，不给整机厂及时付款，致使有些中小屏幕机子断货。 | 1、杭州金利普有退货管，请尽快指定车拉回；<br>2、金利普在进出口公司有 RMB30 万多余款，请协查并转到销售公司抵贷款。 | 永新范经理拜访孙总。与金利普商议下一步 21″FS 需求意向，但孙总表示，与彩虹目前合作良好。我们也不要麻痹大意，加强金利普的攻关和服务。 |
| **综述** | 一、上半年整机厂 CTV 产销出口呈现三大特点：<br>—是总体指标下降：1—6 月彩电 7 大厂家 CTV 产 1736.18 万台，销 2012.08 万台，出口 516.96 万台。同比分别减少 11%、4% 和 14%；<br>二是三巨头纷纷跑马：1、产量：康佳和长虹同比降幅较大分别为 18% 和 51%；2、销量：TCL、 | 7 月份以来，长虹、创维和 TCL 等厂家，纷纷强势出击彩电"以旧换新"，得到了许多消费者的认可和响应：一是激活了彩电淡季的销售，提高其品牌市场占有率，加速彩电的更新速度；二是提高消费者对数字电视和平板电视高端产品的认知水平；三是有利于掌握消费者的购买心里，为厂家下一步调整产品结构提供了第一手资料。 | 1、彩虹 21″（新 AK）样管亮度低，美国工程师已于 15 日飞抵青岛海尔协商；<br>2、TTE 公司"ERP"软件系统要求供应商按规定时间地点交货，目前彩虹还没有达到要求；<br>3、外销彩管需要购买品种和磁场标识显示清晰；<br>4、绝大部分 OEM 彩电都是 | 1、上海永新预计在本月二十日全线停产，试作 21″PF 和 25″PF（AK）；<br>2、永新范经理拜访孙总。与金利普商议下一步 21″FS 需求意向。 |

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00124398

| | | | |
|---|---|---|---|
| 康佳和长虹同比降幅分别为 7%、6%和 45%；3、出口量：长虹同比降幅108%。<br>三是海尔和熊猫逆势呈强：05年上半年海尔 CTV 产、销和出口分别同比增长 15%、15%和55%；熊猫 CTV 产和销同比分别增长 11%和4%。 | | 由客户事先确定彩管供应商。<br>5、中小用户希望在淡季享受大厂平等待遇。 | |

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00124399

# EXHIBIT 20



STATE of NEW YORK　　　)
　　　　　　　　　　　　　)　　　　ss:
COUNTY of NEW YORK　　)

### _CERTIFICATE OF ACCURACY_

This is to certify that the attached document, _"CHU00124400E – CHU00124402E"_, originally written in _Chinese,_ is to the best of our knowledge and belief, a true, accurate and complete translation into _English._

Dated: March 27, 2019

Seth Wargo
Consortra Translations

Sworn to and signed before ME this
27th day of March,
2019.

Notary Public

JAMES G MAMERA
Notary Public - State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires Dec. 4, 2022

> **Exhibit**
> **Wang 8572**
> 9/20/2022
> Wang Zhaojie - V2

Your
legal
translation
partner

# INFORMATION WEEKLY

<table>
<tr><td colspan="5">Sales Company<br>Issue No.: 74<br>05.8.06. – 8.12.</td></tr>
</table>

| | Operation condition | Color TV Market | User Feedback | Industry Trend |
|---|---|---|---|---|
| **TCL** | The total sales of TCL colour television dropped by 7% in the first half of the year. In order to change the adverse condition, much efforts has been made in June and July to increase the export of colour TV to overseas markets and explore new markets, thus making overseas sales of colour TV exceed one million in July. The overseas business of TCL exceed that of the local market. | 1. TCL announced on August 11 that TCL Multimedia Technology Holdings Ltd. (new name: TCL Electronic Holdings Limited) and Thomson Company of France had implemented the "Share Option Agreement";<br>2. The flat screen LCD TV of TCL has all landed in Brazil, Mexico, Argentina, and other South America areas and has become the main sales channel of colour TV. | 1. Please confirm with TCL about the delivery of the defective transistors at Thailand:<br>(1) Whether all the expenses to be borne by "Cai Hong";<br>(2) Whether the agent to be appointed by "Cai Hong" and make arrangement for shipment.<br>2. There are spark phenomena for the 14" (local sales). Factory one has been feedback and after-sales strategy has been analyzed in this regard. | |
| **Skyworth** | Skyworth mainly produced high-end colour TV in the first half of the year. Flat screen and large screen TV account for almost half of the proportion. However, the low income group is the majority and the demand for small screen TV still has relatively great potential in remote areas. Recently, relative great efforts has been made for promoting 21" FS and the result is apparent. It is expected that later on the demand is quite large for low priced colour TV in rural areas. | 1. Skyworth recently aims at the market in rural areas. It will jointly organize several cultural shows with the theme of "Love for Skyworth. Cultural Movement" together with CCTV in this week. The aim is to expand the markets at the third, fourth tier cities, and villages and towns. Before this, Skyworth has output a TV series aiming at the rural customers. | 1. In August, Skyworth is ready to start outsourcing the colour TV production process. At present, 4 factories have been identified.<br>2. To deal with the problem during production related to the magnetic plaster of 21" PF brought forward by Skyworth;<br>After discussion, the problem will be solved in two ways: (1) Skyworth shall improve the existing sucker equipment; (2) Cai Hong shall compensate for the affected production (to be determined). | |
| **Konka** | Konka is preparing for supplying colour TV for National Day. At present, the inventory is relatively little. In this week production will be carried out in full capacity as schedule. As the terminal market of colour TV has not been launched, the sales of colour TV of Konka is only so so. | 1. Konka has completed the development of the various specifications of 15" to 42" LCD and plasma flat screen TV;<br>2. After securing the order of 30,000 sets of colour TV from Carrefour, recently it signed a contract with American home electrical appliance chain company Best Buy for supplying 50,000 sets of LCD TV, thus making a record of the single largest export order. | 1. From August, the returned transistors will be deducted from the settlement bill, and request Cai Hong to replace all the "Guang-Kang" returned transistors before the end of month.<br>2. The delivery date for overseas sales of 15" shall be postponed from the original 8th day to the 10th day;<br>3. Hope to provide information about the 15" PF Cai Hong transistor corresponding magnetic field. | |

| | | | | |
|---|---|---|---|---|
| **Changhong** | 1. Production is basically normal. As restricted by the scale of acceptance by bank, payment still shall be made by spot exchange henceforth.<br>2. The scheduled production is stable for export products of Changhong. | 1. Changhong gradually shifts from traditional home electrical appliance enterprise to personal electronic products and technology, contents and services provider. "World Brand Laboratory" stressed that the annual revenue, brand additional value index and brand strength index of Changhong have great increase when compared with those in the same period last year.<br>2. The overall sales of CRT TV of Changhong has no significant change, but the sales of flat screen TV has a trend to rise and sales of 3 types of flat screen TV has been arranged at some of the tier 2 and tier 3 rural areas in Sichuan. | There are uneven white images at Cai Hong 21" FS | In this week, the sales personnel of various CRT manufacturer will attend event at Changhong. |
| **Hisense** | Production volume in August doubled compared to that of July. Currently all subsidiaries are in normal production. Hisense Huangdao will be closed on Sunday and be open on the rest of the days. | In this week, the sales volume of CTV was similar to that of last week, with signs of improvement in the rural area. Currently the sales volumes of 21"FS, 21"PF, 29"PF (HD) were similar to those of last week, with little fluctuation in the pricing of CTV. Sales of flat panel was better than that of last week, the reason being the Beer Festival to be held by Qingdao. | 1. Hisense's purchasing department suggested that in view of the high demand, IRICO is hoped to arrange shipping appropriately lest that production be affected.<br>2. The CRTs used this week were of normal quality. Trial run of 200 Huangdao 21"PF (New AK) tubes passed. On the 12th, batch production of 800 pcs will be carried out. | It was learnt that Shangyong's quote of 25"FS to Hisense was USD 34.5. |
| **Haier** | 1. Normal production and stable operation. Slight increase in production volume of two models of 21" and 25" regular screen, other than that, everything is normal.<br>2. Haier Hefei has 9 production lines running and will remain so for 1 week. The production volume will increase, and the market will see upward trend, with increasing volume of CRT and more models. | 1. Sales activities remain low, with a flattening trend compared to the previous week. There has not been sudden boost in sales. The quantity of regular flat screen TV is low, and the majority are flat-screen TV and flat-panel display TV. As far as volume is concerned, 21" flat-screen TVs sell well.<br>2. A cautious yet optimistic attitude towards the market. No idea what will happen next. Currently one is still replenishing supply. If the market turns well during the National Day holiday, one will be confident at the end of the year. | IRICO 21" PF has won recognition from US customers and supply can be commenced. | There has been obvious decrease in Chunghwa Picture Tubes' supply for Haier. |

| | | | | |
|---|---|---|---|---|
| **PRIMA** | This week, PRIMA's CRT and LCD have been in production at full capacity, but its PDP production is still very low. At present, the stock level of PRIMA is very low, with its serious funding issues. All the goods for export need to be delivered before September 15. | 1. PRIMA's CRT and LCD have been in production at full capacity, but its PDP production was still very small. At present, the inventory of PRIMA is very small, with its seniority fund facing severe problems. All the goods for export would be delivered before September 15.<br>2. The market of color TV is still weak, basically seeing no change of price. | The orders for September shall be finalized as soon as possible so that the application for transfer could be processed accordingly. | Samsung has provided PRIMA with 21" short-neck sample tubes and is promoting them actively. |
| **Panda** | According to Nanjing Panda Sales Company, the 21 " FS TV sets are selling well currently, and its production planning was added in August. | The best-selling TV sets on the Nanjing market this week were mainly 29 "PF HD and 21" FS TV sets, but sales did not differ much from last week, and prices did not change. | Wuxi Xindong required that 832 of the 14-inch export tubes be returned to the factory for replacement. | Nanjing Huafei halted production due to high temperature from 1st to 5th August 5. |
| **Small and Medium-sized Manufacturers in East China** | In order to achieve the annual target of 600,000 units, Soyea has increased production in the second half of this year and started to mobilize its funds, and planned to produce about 60,000 units per month from September. | 1. The market has not improved, but dealers have shifted their purchase from summer appliances to stock of TV sets.<br>2. According to Mr. Zhang, a department director in Soyea and Mr. Tian, a section chief in Soyea, the market condition showed no sign of optimism in the second half of the year, but in consideration of the realization of the production target for the whole year, it is necessary to increase production by purchasing color tubes. | 1. The returned tubes from Hangzhou Jinlipu shall be picked up as soon as possible.<br>2. USTAR requested that the freight denominated in RMB be converted into US dollars quickly and then remitted to the designated account. | 1. Shanghai Yusin does not have much stock of 21";<br>2. Shanghai Yusin has expanded its production plan of 21" PF, which failed;<br>3. After modification, the 29 " FS Line of Shanghai Yusin could produce 29" PF, and 8000 units of 21" PF have been produced for testing. The production of 21" FS and 25" FS have been normalized. |
| **Summary** | The reasons for TV set manufacturers' full-capacity production of color TV sets in August are as follows: 1. The price of color tube has dropped to a historic low; 2. The TV set manufacturers tried to complete their annual production target; 3. The market price of color TV set was basically stable in the later period. 4. The color TV sets were purchased to replenish stocks for the traditional peak season in August. | 1. The TV set manufacturers and dealers of color TV sets are rapidly replenishing their stocks in batches and launching various and large-scale color TV promotion activities;<br>2. Although there are signs of improvement in the market of color TV set, whether it would be prosperous depends on the inventory trend and fund recovery of the TV set manufacturers in September;<br>3. According to the special research results of the Development Research Center of the State Council, it is estimated that the total demand for color TV sets in rural market this year is 15.6 million, which has started to exceed the total demand in the urban market. | 1. The Rainbow Tubes used by Hisense this week were with normal quality. 200 tested units of Huang Dao 21"PF (New AK) have been qualified, with 800 units being mass produced on 12th.<br>2. Rainbow 21"PF has been approved by US customers and could be supplied.<br>3. The Purchasing Department of Hisense suggested that, in view of the large demand in the near future, the shipment of Rainbow Tubes shall be arranged well for its production not to be affected. | 1. The supply of CPT in Haier has decreased significantly;<br>2. Shanghai Yusin does not have much stock of 21 " ; it has increased production plan of 21 " PF, which failed; after modification, its 29 " FS Line could produce 29" PF, and 8000 units of 21" PF have been produced for testing. The production of 21" FS and 25" FS have been normalized.. |

# 信 息 周 报

| 销售公司 |
| --- |
| 第 74 期 |
| 05.8.06．—8.12. |

| | 经营状况 | 彩电市场 | 用户信息反馈 | 行业动态 |
| --- | --- | --- | --- | --- |
| **TCL** | TCL 彩电销售总量上半年下降7%,为了扭转不利局面,6 至 7 月份加大了彩电出口的力度,并开辟了新的市场,使得彩电海外销量 7 月份突破了百万大关,,TCL 海外业务现已超过国内业务; | 1、TCL 8 月 11 日公告称,子公司 TCL 多媒体已按此前与法国汤姆逊公司达成《换股选择权协议》的实施;<br>2、TCL 的平板液晶电视已全线登陆巴西,墨西哥,阿根廷等南美地区,并进入当地彩电销售的主流渠道。 | 1、TCL 关于泰国不良管的发运请确认:<br>(1) 是否所有费用由彩虹承担;<br>(2) 是否由彩虹指定代理并安排装运;<br>2 、14″(内销)出现打火现象,已分别反馈一厂及售后进行对策分析。 | |
| **创维** | 创维上半年彩电生产主做高端,其中纯平和大屏幕占比近一半,然而,现低收入层占比较大,偏远地区对小屏幕彩电,还有较大的需求潜力。最近对 21″FS 促销力度较大,效果明显,预计后期在农村彩电市场低价位的电视机需求量较大。 | 1、创维最近将目标瞄准农村市场,本周将联手 CCTV 举行数场主题为"创维情·文化行"的系列文艺义演活动。该活动旨在扩大农村三四级城市和乡镇市场。此前,创维还专门推出一系列针对农村消费人群的电视机。 | 1、创维 8 月份准备启动外协加工厂生产彩电,现暂确定 4 家工厂;<br>2、 处理创维提出的21″PF 贴磁块影响生产问题:<br>经沟通后从两方面解决:(1)创维对现有吸盘设施进行改进;(2)彩虹对影响生产进行适当补偿(待定)。 | |
| **″康佳** | 康佳彩电正在为国庆节备货,现彩电库存较小,本周按计划满负荷生产,因彩电终端市场还未启动,所以,康佳彩电销售一般。 | 1、康佳平板电视产品完成了从 15 寸到 42 寸各个规格的液晶电视和等离子电视的开发;<br>2、获得家乐福 3 万台彩电 订单之后,近日又与美国家电连锁零售商 Best一buy(百思买)签订了 5 万台液晶电视供货合同,创下了国内平板彩电出口最大单项订单纪录。 | 1、8 月份起,其退货管将从结算单中扣除,要求彩虹在月底前将莞康的退回管补齐;<br>2、外销 15″原交货时间由 8 号可延迟到 10 号;<br>3、希望提供 15″PF 彩虹管相对应磁场的管型情况。 | |

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00124400

| | | | | |
|---|---|---|---|---|
| **长虹** | 1、生产基本正常；受银行承兑规模的限制，以后付款仍为现汇。<br>2、长虹出口量按计划生产较平稳。 | 1、长虹逐步从传统家电企业向个人消费电子产品与技术、内容和服务供应商转型。世界品牌实验室强调，长虹年业务收益额、品牌附加值指数及品牌强度系数，相比去年同期，均出现较大幅度的增长。<br>2、长虹 CRT 电视销售总体上没有较为明显的变化，但是平板销售有上升势头，并已在四川部分二、三级农村市场投放三种型号的平板电视销售。 | 彩虹 21″FS 出现白场不均的现象。 | 本周各 CRT 厂家业务人员均到长虹活动。 |
| **海信** | 8月份生产比7月要增加1倍，目前各个分工司都已恢复正常生产。黄岛海信星期日休息，其他时间正常上班。 | 本周彩电销售与上周持平，农村市场有转好的迹象，目前 21″FS、21″PF、29″PF（高清）销售与上周持平，CTV 的价格变化不大。本周平板销售比上周要好，原因是青岛要举办啤酒节。 | 1、海信采购部提出，鉴于近期需求量较大，希望彩虹安排好发货，避免影响生产；<br>2、本周使用彩虹管，质量正常。黄岛 21″PF（新 AK）200 只试流已合格，12 日做 800 只批量生产。 | 据了解上永给海信 25″FS 报价 34.5 美元。 |
| **海尔** | 1、生产正常。经营稳定，21″ 两个品种，25″普平，产量都有小幅增加，其他正常。<br>2、合肥海尔九条线生产，一周不休息.产量加大,市场略显上升.用彩虹管数量加大.品种增多。 | 1、市场销售依然不旺，和上周相比，基本持平，没有出现突然旺销的现象，商场普平电视占主要的位置，从量上来说，21 寸纯平销得较好；<br>2、对市场谨慎乐观，心里没底。目前积极补库。如果国庆市场好起来，年底就有信心。 | 彩虹 21″PF 美国客户已经认可，可以供货。 | 中华映管在海尔的供应量明显萎缩。 |

CHU00124401

| | | | | |
|---|---|---|---|---|
| 厦华 | 本周厦华 CRT、LCD 都在开足马力生产，PDP 生产量仍很少；目前厦华的库存很少，资历金状况仍十分困难；9 月 15 日以前外销的货都要出完。 | 1、厦华 CRT、LCD 都在开足马力生产，PDP 生产量仍很少；目前厦华的库存很少，资金状况十分困难；9 月 15 日以前外销的货都要出完。<br>2、彩电市场仍十分清淡，彩电的价格基本未动； | 尽快谈定 9 月份订单，以便尽快办理结转申请表。 | 三星已向厦华提供 21″短管颈样管，正在积极促销。 |
| 熊猫 | 据南京熊猫销售公司反映目前 21″FS 电视机很好销售，8 月份追加了其生产计划。 | 本周南京市场上的电视机好销品种主要是 29″PF 高清、21″FS 电视机，但是销量与上周相差不大，价格也没有变化。 | 无锡新东要求把 14 寸 832 只（出口管子）退货管拉回厂退换。 | 南京华飞 8 月 1 日至 8 月 5 日放高温假。 |
| 华东中小户 | 数源为完成全年 60 万目标，下半年加大产量，着手调动资金，从 9 月份起计划每月生产 6 万台左右。 | 1、市场没有好转，但经销商已将资金从夏用电器转向电视机备货采购；<br>2、据数源张部长，田科长认为：下半年市场不容乐观，但考虑到全年生产目标的实现，增量采购彩管，加大生产量，非常必要。 | 1、杭州金利普有退货管请尽快拉回。<br>2、优势达要求速将运费人民币转换成美元后，汇到指定账户。 | 1、上海永新 21″库存不多；<br>2、上海永新加大了 21″PF 生产计划，但其不过关；<br>3、上海永新 29″FS 线，经改造可生产 29″PF，21″PF 试作了 8000 只，21″FS 和 25″FS 已正常生产。 |
| 综述 | 8 月份整机厂开足马力生产彩电的原因：一是彩管价格已降到历史低位；二是整机厂为完成全年生产目标；三是彩电市场价格后期基本稳定；四是为 8 月份传统旺季增补库存。 | 1、整机厂和彩电经销商正在快速批量补充货源，并采取形式多样的，且具规模的彩电促销活动；<br>2、彩电市场虽然有好转迹象，但研判后市是否旺销关键要看 9 月份整机厂的库存动向和资金回款情况；<br>3、据国务院发展研究中心专项据调研结果显示：预计今年农村彩电市场电视机的需求总量为 1560 万台，开始超过城市市场需求总量。 | 1、海信本周使用彩虹管，质量正常。黄岛 21″PF（新 AK）200 只试流已合格，12 日做 800 只批量生产。<br>2、彩虹 21″PF 美国客户已经认可，可以供货。<br>3、海信采购部提出，鉴于近期需求量较大，希望彩虹按排好发货，避免影响生产； | 1、中华映管在海尔的供应量明显萎缩。<br>2、上海永新 21″FS 库存不多；加大了 21″PF 生产计划，但其不过关；经改造可生产 29″PF，21″PF 试作了 8000 只，21″FS 和 25″FS 已正常生产。 |

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00124402

# EXHIBIT 21



**certified**translate
A LANGUAGE FISH LLC COMPANY

info@certifiedtranslate.com | 2425 Olympic Blvd., Suite 4000W | usa 1-888-856-2228
www.certifiedtranslate.com | Santa Monica, CA 90404 | int +1-310-684-3153
| | fax +1-310-564-1944

## CERTIFIED TRANSLATION



A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|
| Firm: **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
|---|
| |
| **CHU00124417E - CHU00124419E** |
| |
| |

| Source Language: **SIMPLIFIED CHINESE** | Target Language: **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director     **Date:**   February 21, 2019

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On ___Feb. 21, 2019___ before me, ___Kristin Gail Chamberlain___, Notary Public, appeared ___Sean Kirschenstein___, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ___Kristi Cur___



KRISTIN GAIL CHAMBERLAIN
Notary Public - California
Los Angeles County
Commission # 2141880
My Comm. Expires Feb 7, 2020

**Exhibit
Wang 8573**
9/20/2022
Wang Zhaojie - V2

Internal Material
Confidential

# Information Weekly

| Marketing Department | Issue 109 | 2006.5.8 - 2006.5.14 |
|---|---|---|

| Factory | User information |
|---|---|
| General information | 1. Suffered a great depression after the "May 1 [Labor Day]" holiday in the color television market, various color television factories decreased volume one after another in their production plans in May; 2. TCL delivered poor sales volume with poor financial returns, IRICO has a high inventory of CRTs, one month production suspension at the Chengdu factory; 3. Quality issues occurred in CRTs from Konka, Hefei Haier and Xoceco ; 4. The 21" small DY is undergoing sample tube certification at TCL and Hisense; 5. Changhong launched a series of "Build a New Countryside, Changhong Joyful Journey" activities, and began to launch and operate the third and fourth tier markets. Changhong plans to gradually increase its volume from July to ensure the planned output for the entire year; 6. Samsung has already accepted Hisense and Haier as its key strategic partners. Last week, He Houmu from Samsung paid a visit to Hisense and discussed the collaboration during the later period. |
| Overseas | 1. An order of 44704 units from SHIVAKI has been processed to arrange inland transportation and shipping. During the past two or three months, SHIVAKI enjoyed the most normal operation, enabling a loan payment and on time shipping as scheduled on a basic basis with a relatively large volume and a complete variety of products. <br> 2. During the recent period, the sales volume of SOKOL has been increasing steadily, which is noteworthy. In 2005, SOKOL had purchased CRTs of 21" thickness from IRICO, which was interrupted by poor material resources. Now it has been purchasing CRTs from SEG Hitachi; it plans to mobilize its certification and purchase of IRICO CRT models of 21" thickness. <br> 3. 3. A total of 30,000 units of 21" thick and 21" PF from START have been waiting for shipment in Shanghai for many days; it had originally been planned to complete the shipping at the beginning of this month, but the payment is still pending, which is said to be a result of the general election in Ukraine. Therefore, we should |
| TCL | 1. Low sales volume, poor financial returns, with a comparatively high CRT inventory of about 70,000 - 800,000 units; <br> 2. One-month suspension of production at the Chengdu factory; <br> 3. The sample tubes of the small coil 21" thick have been installed on the prototype on May 12; <br> 4. 4. During the "May 1" festival, TCL sold nearly 6000 LCDs, which is better than PDP. TCL believes that the LCD market is in an increasing trend, and the ascending trend of LCDs in Europe is greater than domestically in China. TCL expects LCDs to undergo rapid growth. |
| Konka | 1. A small batch of 32 units of 15" PFAK32 has undergone a pilot run on May 7 in Guankang, which were presented in good condition; <br> 2. It is reported from Konka's U. S. customers that the 15" PF has an issue of barrel distortion, and IRICO technical personnel are investigating and negotiating countermeasures with Shenzhen Konka R&D personnel. It plans to borrow a core unit and the signal test disc from Konka R&D, and to confirm whether there is any issue on the sample tube, then send a sample tube directly from Xianyang to Konka's Shanghaifor customer's further confirmation (a sample unit left in the last sample that was provided has not yet been sent to the U. S., and the core unit is still available); <br> 3. Hong Kong Konka Customs Group requested that all of the used quantities and retained quantities of the "Application Form for Deep Processing Carry-over for the Goods Export Zone of the Customs Export Processing Zone" which were confirmed to be archived by customs in the countries of both parties should be provided; <br> 4. In response to the request by Konka Components for the recall of IRICO 14" north magnetic and 21" FS north magnetic tubes, IRICO will send relevant technical supervisors and leaders from No. 1 Plant and Display management leaders to communicate with Konka's technical department and leaders: (1) IRICO products sold to Konka are still in the introductory period, when the performance of color tubes are still in a running in stage with matching models; (2) IRICO will carry out the experiment according to the requirements on magnetic center and magnetic field of Konka color televisions as soon as possible, and will reply to Konka by May 20; (3) the Guankang 14" and 21" FS inventory tubes will not be cleared and returned to the manufacturer; IRICO should provide a feasible solution to Konka's technical department with regard to the existing issues, and the return process can be closed only after the approval of Konka's management; (4) upon use of the inventory tubes later, IRICO shall send technical engineers to the site to jointly study and resolve problems, and shall ask IRICO to compensate for any impact on the production efficiency of Guankang; <br> 5. 5. The sales volume of 29" PF and 29" line by line color televisions were large during the "May 1" Festival; and the sales growth of two models of 25" color televisions was not large, of which the buyers |

AUTO PAGE

|  | |
|---|---|
|  | are mainly from cities; and the sales volume of two 21" models was mediocre. The flat panel televisions are selling well in the Shenzhen television market, where the prices of 46 inch and 47-inch LCD televisions were decreased to below 20,000 yuan, and the 42 inch and 37-inch LCD televisions were decreased to 14,000 yuan and 10,000 yuan, respectively; some 32-inch LCD televisions were decreased to below 5000 yuan. In addition, the price of 42-inch plasma televisions was also decreased to below 8000 yuan. In addition, high definition televisions have become a highlight of the color television sales. Among them, Konka's new double high definition LCD products have brought in a profit of nearly 100 million yuan in 7 days. |
| Skyworth | 1. 200 units of 21" FS produced during the pilot run using a new FBT high voltage transformer have turned out to be good in quality. The engineering department has placed an order for trials of another 2000 units, which is expected to be arranged on the 16th;<br>2. With the momentum of the "Spring Thunder Action" before the "May 1" Festival for the second time, Skyworth's sales of color televisions have seen a "blowout" growth during the "May 1" Festival Golden Week. According to the statistics, among them, the sales of LCD televisions during the "May 1" Festival have increased by 184.08% compared with the same period of last year, and the sales amount has increased by 153.57%. On May 2, LCD sales increased by 179%, and the amount increased by 193%.<br>3. Skyworth launched a new recordable LCD television with video and wireless technology during the "May 1" Festival Golden Week. This LCD television can support real time recording, background recording and recording timing, using a special multimedia coder and decoder, which ensures the quality of saved program images to match that of a DVD. Also, a wireless blue wave technology suitable for fans is applied, so that a user can enjoy the high-fidelity sound of the program alone through wireless headphones without disturbing his or her family. This technology is planned to be applied to other series of televisions in the future;<br>4. Recently, Skyworth Group has obtained the registration certificate for scientific and technological achievements from the Shenzhen Science and Technology and Information Bureau for its three independent research and development achievements as follows: Skyworth D/A compatible color television receiver, Skyworth digital optical background projection for health, and recordable television technology based on an embedded Linux operating system;<br>4. The Huang Hongsheng Case has entered the stage of statements before the case is closed. Huang Hongsheng's attorney, Lin Bingchang, said that he is expecting that the judgment will be declared before May 15. |
| Changhong | 1. CRT televisions saw the launch of high-end televisions and ultra-thin televisions during the "May 1" Festival and launched the 21" FS television for 599 yuan, but the sales were mediocre, which were the same as the same period in the last year.<br>2. During the "May 1" Festival, Changhong flat panel televisions saw a decrease in prices, enjoying good sales momentum. It is understood that the sales of flat panel televisions during the "May 1" Festival reached 800 million yuan;<br>3. Changhong plans to gradually increase its production beginning in July to ensure the realization of planned production throughout the year;<br>4. Changhong launched the "Build a New Countryside, Changhong Joyful Journey" activity, and began to launch and operate the third and fourth tier markets during this month; meanwhile, it is investing in the storefronts and showcases of the third and fourth tier markets to establish a solid foundation to ensure a stable market share in the rural markets;<br>5. The market in Mianyang City declined greatly after the "May 1" Festival, where the CRT televisions had almost no sales except for some high-end televisions in the Jiafulai supermarket, and the flat panel televisions were stable in sales. Due to the price cut of 32" LCD and 37" LCD, the sales volumes of 34" and 29" IRICO televisions have declined. At present, the sales are in an extremely depressed status in rural markets. Although the price of IRICO televisions has been reduced, there has still not been any increase in sales, and according to the dealers in the third and fourth tier, this situation will continue until August - September.<br>6. We are asking IRICO to send 300 units of 25 PF and 200 units of 25" FS to Urumqi using flexible transportation patterns; the Changhong quality department asked IRICO to reply as soon as possible to the feasibility of "ship back the returned tubes after confirmation from 13 points throughout the country". |
| Hisense | 1. During the second half of May, the production was planned to be reduced by 13,000 units, and a total of 173,000 units of CRT televisions were produced. In general, it depends on the sales volume in the market. During the "May 1" Festival, the sales of color televisions will be around 250,000 units from May 1 to 7, of which 42% will be high end televisions;<br>2. 21" thick small DY has been imported into two models, the sample tube has been installed, and currently prototype testing is ongoing;<br>3. Last week, He Houmu from Samsung paid a visit to Haixin to discuss the collaboration during the later period. Samsung has accepted Hisense and Haier as its key strategic partners.<br>4. 4. The market sales returned to the level before the holiday after the spectacular scene during the "May 1" Festival last week. Facing an undesirable market share, CRT televisions have achieved a very low sales volume, compared with a relatively good sales volume for LCD products. According to the market sales staff, during the "May 1" Festival, 29 high definition, and 34 high definition, LCD, and PDP sold well, while some of Hisense's LCD models were even completely sold out, and the market began to enter the offseason after the "May 1" Festival. |

AUTO PAGE

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00124418E_Translation

| | |
|---|---|
| Haier | Qingdao: 1. From June to November, there is an export order for 400,000 units of 21" PF, but it is required to use the original type of tube, and we hope that the IRICO leaders will agree on whether to supply the above units as soon as possible;<br>2. At present, many of Haier's orders for products to be exported to Europe have been rejected due to the increasing prices of raw materials, accessories failing to pass ROSH certification, and for other reasons.<br>Hefei:  1. The consistency of the size and positional deviation of the 14" (bonded) tube rings are strictly limited;<br>2. Depressed sales with very low popularity in various supermarkets. |
| Xoceco | 1. In April, the quality of the IRICO tubes was still outside of the required range, reaching 3200 ppm, although on site personnel were handling issues in a timely manner. The quality of 25" FS has improved, but 21" FS reached 3900 ppm, which is still not ideal. Water exists in some units of the 21"  FS that were shipped to Xoceco on the May 7 and May 8, causing rust in the explosion-proof belt;<br>2. 2. The models and quantities supplied by Yongxin to Xoceco have been further decreased. |
| Panda | 1. Panda is currently facing an abnormal situation in production and sales, and is also suffering from an extremely difficult dilemma in its funding situation. It has entered a rectification stage, and thus the production volume in May will be very small;<br>2. Huafei pays special attention to avoiding the risks that may be caused by poor management in Panda;<br>3. 3. After the "May 1" Festival, the Nanjing market will go back to a depressed situation; although some promotional activities are still ongoing, nonetheless the market has returned to the pre-holiday situation. |
| Soyea | 1. Production was very busy last week, and the work hours were extended to 9pm every day, with overtime work on Saturdays;<br>2. 2. The color televisions have suffered an extremely depressed market after the "May 1" Festival, with an average of 3 to 5 units being sold for various television brands every day. |
| Jinlipu | 100,000 units of 14" televisions (among which there were 50,000 units of model 110 and 50,000 units of model 139) and 50,000 units of 21" FS were exported in May. |

AUTO PAGE

CONFIDENTIAL - GRAND JURY MATERIAL

内部资料
注意保密



信息周报

| 营销部 | 第 109 期 | 2006.5.8-2006.5.14 |

| 厂家 | 用户信息 |
|---|---|
| 综述 | 1、"五一"节过后彩电市场非常萧条，整机厂纷纷减少 5 月份生产计划；2、TCL 销售不好，回款较差，彩管库存较高，成都工厂放假一个月；3、彩虹管在康佳、合肥海尔、厦华出现质量问题；4、21″ 粗小 DY 在 TCL、海信正在进行样管认证；5、长虹开展"建设新农村，长虹欢乐行"活动，并在本月开始启动和运作三、四级市场。长虹计划从 7 月份开始逐步上量来保证全年计划产量的实现；6、三星已将海信、海尔作为战略重点合作伙伴，上周三星河侯穆来海信拜访，洽谈后期的合作事宜。 |
| 海外 | 1、SHIVAKI 的 44704 只定单，现已经开始陆续安排内陆运输、船运。近两三个月，SHIVAKI 的运做最为正常，数量相对较大、品种齐备，基本可按计划进行货款支付、实现船运；<br>2、近一段时期，SOKOL 的销量稳步上升，值得注意。SOKOL 在 2005 年曾采购彩虹 21″粗，后因资源问题中断、现采购赛格日立的管子；计划动员其对彩虹 21″粗新型号进行认证及采购。<br>3、START 的 21″粗、21″PF 共计 3 万只已经在上海等待船运多日，原计划月初完成船运，但目前仍没有落实货款，据说是由于乌克兰国内正在进行大选，此批货物需重点关注。 |
| TCL | 1、销售不好，回款较差，彩管库存处于较高位置，约有 70—80 万；<br>2、成都工厂放假一个月；<br>3、彩虹 21″粗小线圈样管 5 月 12 日装样机；<br>4、TCL"五一"期间 LCD 销售近 6000 台，比 PDP 情况要好，TCL 认为 LCD 呈上升状态，在欧洲 LCD 上升状态要比国内更高，TCL 预计 LCD 将呈现高速增长状态。 |
| 康佳 | 1、内销 15″PFAK32 只小批量试流 5 月 7 日已在莞康进行，情况良好；<br>2、康佳美国客户反映 15″PF 存在桶形失真，彩虹技术人员与深康研发与设计师商谈对策：从康佳研发借机芯和信号测试光盘回咸阳确认样管是否无问题，然后从咸阳直接再发一只样管到康佳上海客户确认（上次送样留下一台样机未送美国，机芯还在）；<br>3、香族报关组要求提供双方海关已确认备案的所有"海关出口加工区货物出区深加工结转申请表"已用数量及留存数量；<br>4、针对康佳部品要求清退彩虹 14″北磁和 21″FS 北磁管事宜，彩虹派一厂和股份技术主管领导与康佳技术部门及领导进行交流和沟通：（1）彩虹产品在康佳外销上尚属导入期，彩管性能与机型的匹配还处于磨合期；（2）彩虹将尽快针对康佳彩电的磁心和磁场区域要求做摸底实验，5 月 20 日给康佳回复；（3）对莞康 14″、21″FS 库存管不做清退，但目前存在问题彩虹需提供一个可行方案给康佳技术部门，上交康佳领导审批后方可撤销清退通知；（4）库存管再次上线使用时，彩虹要派技术工程师到现场共同研究和解决问题，并要求彩虹对由此影响莞康生产效率作出补偿；<br>5、"五一"期间 29″PF 和 29″逐行彩电销量较大；25″两个品种销量增长不大，主要为城 |

AUTO PAGE

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00124417

| | |
|---|---|
| | 市消费者；21＂两个品种销售一般。深圳彩电市场平板电视销售较好，46 英寸、47 英寸液晶电视的价格降到 2 万元以内，42 英寸和 37 英寸液晶电视则分别降到 1.4 万元和 1 万元，部分 32 英寸液晶电视甚至跌破 5000 元。此外，42 英寸等离子也跌破 8000 元。另外，高清电视成为彩电销售的一大亮点，其中，康佳高倍高清液晶新品，7 天时间就进账近 1 亿元。 |
| 创维 | 1、21＂FS 使用新的高压包试生产 200 只，效果良好，工程部已下单再试做 2000 只，预计安排在 16 日；<br><br>2、借助"五一"前再次掀起"春雷行动"，创维在"五一"黄金周期间，彩电销售出现"井喷"式增长。其中表现尤为突出的是液晶电视，据统计 5 月 1 日销量较去年同期增长 184.08%，销售金额增长 153.57%；5 月 2 日液晶销量增长 179%，金额增长 193%；<br><br>3、创维在"五一"黄金周新上市的带录象和无线技术的可录液晶电视，该液晶电视可支持实时录像、后台录像和定时录像，采用专用多媒体解码，所保存的节目图像质量媲美 DVD 画质；还具有适合球迷的无线蓝波技术，通过无线耳机即可在不打扰家人的同时单独享受节目的高保真音效。该技术以后将运用到其他系列的电视机上；<br><br>4、近日创维集团又有三项自主研发的科技成果获深圳市科技和信息局科技成果登记证书，它们是：创维数模兼容彩色电视接收机、创维健康数字光学背投、基于嵌入式 Linux 操作系统的可录电视技术；<br><br>4、黄宏生案已进入结案陈述阶段，黄宏生代理律师林炳昌称预计 5 月 15 日前将做出判决。 |
| 长虹 | 1、CRT 电视在"五一"期间主推高端电视和超薄电视并推出 21″FS 电视 599 元，但销售情况一般，和去年同期持平。<br><br>2、"五一"期间长虹平板电视在价格方面进行了下调，销售势头较好，据了解"五一"期间平板电视销售额达 8 亿元；<br><br>3、长虹计划从 7 月份开始逐步上量来保证全年计划产量的实现；<br><br>4、长虹开展"建设新农村，长虹欢乐行"活动，并在本月开始启动和运作三、四级市场，对三、四级市场店面和展台进行投入，为在农村市场有个稳定的占有率打下坚实的基础；<br><br>5、绵阳"五一"节后市场下滑很大，在家福来 CRT 电视除个别高端电视外几乎没有销量，平板电视走势平稳。由于 32″LCD、37″LCD 价格下调，导致 34″、29″CRT 电视销量下滑。农村市场目前销售非常清淡，虽然 CRT 电视价格下调，但仍没有销量，据三四级市场经销商反映这种状况会持续到 8—9 月份。<br><br>6、恳请彩虹采取灵活的运输形式将 25″PF300 只、25″FS200 只发往乌鲁木齐；长虹质量部要求彩虹尽快回复"关于从全国 13 个点运回确认后的退货管"的可行性。 |
| 海信 | 1、5 月份下半月生产计划调减了 1.3 万台，CRTTV 总量为 17.3 万台。总体上来说，要看市场的销售情况。五一期间销售，5 月 1-7 日销售彩电 25 万台左右，其中 42% 为高端电视；<br><br>2、21″粗小 DY 已导入两个机型，样管已装机，目前正在做样机测试；<br><br>3、上周三星河侯穆来海信拜访，洽谈后期的合作事宜，三星已将海信、海尔作为战略重点合作伙伴。<br><br>4、上周市场销售经过"五一"市场的火暴后，又恢复到了节前的状态。市场销售不理想，CRTTV 销售很淡，LCD 相对好销一些。据市场销售人员讲五一期间，29 高清、34 高清、LCD、PDP 销的较好，海信的 LCD 部分品种都买脱销了，节后市场开始进入淡季。 |

AUTO PAGE

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00124418

| 海尔 | 青岛：1、从 6–11 月份，有一个 21″ PF 订单 40 万台的出口订单，但需要原来型号的管子，需彩虹领导尽快定他商是否供货；<br>2、海尔目前出口欧洲的单子，很多由于原材料涨价，配件没有通过 ROSH 认证等原因而不能接单。<br>合肥：1、对 14″（保税）管耳环的大小，移位的一致性要求严格；<br>2、销售平淡，各商场人气很淡。 |
|---|---|
| 厦华 | 1、4 月彩虹管的质量整体还是超标，达到了 3200ppm，由于有跟线人员在线及时处理问题，25″FS 质量有所改善，但 21″FS 质量达到 3900ppm，还是不理想。5 月 7 日、5 月 8 日两天运到厦华的部分 21″FS 存在进水的现象，导致防爆带生锈；<br>2、永新给厦华的供货品种、供货量进一步减少。 |
| 熊猫 | 1、熊猫当前的生产、销售都不正常，资金情况极度困难，处于调整时期，5 月份的生产量会很少；<br>2、华飞特别注重防范由于熊猫经营不善可能带来的风险；<br>3、"五一"节后南京市场又进入低迷状态，一些促销活动仍在继续，但市场又恢复到节前状态。 |
| 数源 | 1、上周生产很忙，每天延班到 9 点，周六不休息；<br>2、"五一"节过后彩电市场非常萧条，每天各品牌电视机平均卖 3 至 5 台。 |
| 金利普 | 5 月份出口订单 14″10 万只(110 型 5 万只, 139 型 5 万只)，21″FS5 万只。 |

AUTO PAGE

CONFIDENTIAL – GRAND JURY MATERIAL

# EXHIBIT 22

```
1                 UNITED STATES DISTRICT COURT
2               NORTHERN DISTRICT OF CALIFORNIA
3                      OAKLAND DIVISION
4
5   IN RE: CATHODE RAY TUBE (CRT)  ) MASTER FILE NO.
    ANTITRUST LITIGATION           ) CV-07-5944 JST
6   _____)
                                   )
7   THIS DOCUMENT RELATES TO:      )
                                   )
8   ALL INDIRECT PURCHASER ACTIONS )
    ALL DIRECT PURCHASER ACTIONS   )
9                                  )
            DEFENDANTS.            )
10  _____)
11
12
13          VIDEOTAPED DEPOSITION OF WANG ZHAOJIE
14                       VOLUME II
15           WEDNESDAY, SEPTEMBER 21, 2022
16                 MACAU S.A.R., CHINA
17
18
19
20
21
22
23  JOB NO.  5436467
24  REPORTED BY  MARK McCLURE, CRR
25               CAL CSR 12203
```

Page 1

| | | |
|---|---|---|
| 1 | Q.   Mr. Wang, where is IRICO Group located? | 08:16:17 |
| 2 | A.   I feel that question is very broad. | 08:16:23 |
| 3 | Q.   Is IRICO Group located in Xianyang? | 08:16:40 |
| 4 | MR. LUCARELLI:  Object to form. | 08:16:54 |
| 5 | THE WITNESS:  The locations where IRICO Group | 08:17:12 |
| 6 | has registered its business in have been in Beijing and | 08:17:15 |
| 7 | Xi'an, so I am not sure which location you're asking | 08:17:21 |
| 8 | about.  And the question sounds very broad, and I also | 08:17:24 |
| 9 | do not know what time frame you're referring to, so I | 08:17:28 |
| 10 | don't have an answer for you. | 08:17:32 |
| 11 | BY MS. CAPURRO: | 08:17:32 |
| 12 | Q.   Xi'an is next to Xianyang, correct? | 08:17:43 |
| 13 | MR. LUCARELLI:  Object to form. | 08:17:47 |
| 14 | THE WITNESS:  That's correct. | 08:17:48 |
| 15 | BY MS. CAPURRO: | 08:17:49 |
| 16 | Q.   In the list of attending companies here, | 08:17:56 |
| 17 | Chunghwa is not listed here, correct? | 08:18:23 |
| 18 | A.   The document says what it says. | 08:18:16 |
| 19 | Q.   You don't see Chunghwa listed here, do you, | 08:18:22 |
| 20 | Mr. Wang? | 08:18:25 |
| 21 | A.   If it's not written here, then it's not here. | 08:18:37 |
| 22 | Q.   So Liang Yuan, your colleague, sent Chunghwa a | 08:18:41 |
| 23 | copy of these meeting minutes to inform Chunghwa what | 08:18:46 |
| 24 | happened in the meeting, isn't that right? | 08:18:51 |
| 25 | MR. LUCARELLI:  Object to form. | 08:18:53 |

Page 13

```
 1              THE WITNESS:  I do not know.            08:19:07

 2   BY MS. CAPURRO:                                    08:19:08

 3       Q.   Directing your attention to the page Bates   08:19:09

 4   labeled CHU00102753.                               08:19:12

 5       A.   What page?                                08:19:32

 6            Let me take a look.                        08:19:32

 7       Q.   I'm showing you on the screen here.        08:19:34

 8       A.   Give me a moment.  You're talking about the   08:19:44

 9   page ending with --                                08:19:47

10       Q.   Yes.                                       08:19:52

11       A.   I see it.                                  08:19:53

12       Q.   Okay.  I'm showing you with the cursor the   08:19:55

13   passage that I want to ask you about.  It's the one   08:19:57

14   beginning "Chief Secretary Yang."                   08:20:00

15            Do you see that?                           08:20:13

16            It says -- no?                             08:20:27

17       A.   I see it.  Okay.                           08:20:28

18       Q.   It says:  "As for CPTF," that refers to    08:20:32

19   Chunghwa's Fuzhou factory, isn't that right?        08:20:36

20       A.   I'm not clear about that.  I do not know what   08:20:41

21   he's talking about.                                 08:20:59

22       Q.   Have you ever seen the acronym "CPTF" to refer   08:20:59

23   to Chunghwa's Fuzhou factory?                       08:21:04

24       A.   I have some memory of it.                  08:21:08

25       Q.   It says:  "As for CPTF, the country was    08:21:23
```

Page 14

```
 1    exporting all CDT made initially, now Fuzhou can do CPT    08:21:23

 2    business, and is a major shareholder of Huaxia."          08:21:34

 3          Can you translate that?                             08:21:35

 4       A.   I see this sentence.                              08:21:56

 5       Q.   It continues:  "The industry hopes to be able     08:21:57

 6    to send a representative to discuss with them and invite  08:21:59

 7    them into the industry to unify standards."               08:22:03

 8          Do you see that?                                    08:22:06

 9       A.   I see it.                                         08:22:07

10       Q.   So prior to this meeting in November 2006,        08:22:18

11    Chunghwa was not a member of the CRT Industry             08:22:23

12    Association, isn't that right?                            08:22:26

13       A.   That is your guess.  I cannot guess on this       08:22:27

14    matter.  I don't know.                                   08:22:47

15       Q.   That's what the document shows, Mr. Wang,         08:22:48

16    isn't that right?                                        08:22:51

17       A.   First of all, the text says what the text        08:22:52

18    says.  As for the content, I don't know about it.        08:23:06

19       Q.   Was the focus of the CRT Industry Association     08:23:12

20    meetings CPTs and not CDTs?                              08:23:15

21       A.   I don't know.                                    08:23:18

22       Q.   But you attended CRT Industry Association         08:23:32

23    meetings, isn't that right?                              08:23:39

24       A.   Correct.                                         08:23:45

25       Q.   And so, is it your testimony that you don't       08:23:48
```

Page 15

| | | |
|---|---|---|
| 1 | production and pricing information with competitors was | 09:59:32 |
| 2 | strictly prohibited, didn't you? | 09:59:35 |
| 3 | A.   I said that the requirement of doing my work | 09:59:38 |
| 4 | and my job tells me that such information should be | 10:00:06 |
| 5 | absolutely confidential. | 10:00:11 |
| 6 | Q.   But this document and several other documents | 10:00:16 |
| 7 | we've looked at today show that IRICO shared its | 10:00:19 |
| 8 | confidential production and pricing information with its | 10:00:22 |
| 9 | competitors, isn't that right? | 10:00:24 |
| 10 | MR. LUCARELLI:  Object to form. | 10:00:28 |
| 11 | THE WITNESS:  I don't know. | 10:00:48 |
| 12 | BY MS. CAPURRO: | 10:00:50 |
| 13 | Q.   Look at the table here on this document.  It's | 10:00:50 |
| 14 | entitled "2007 shutdown schedule and expected inventory | 10:00:54 |
| 15 | during the Spring Festival." | 10:01:18 |
| 16 | A.   I see the table. | 10:01:29 |
| 17 | Q.   And do you see down at the bottom, it says | 10:01:31 |
| 18 | "IRICO, February 15th to 28th"?  Do you see that? | 10:01:34 |
| 19 | A.   I see it. | 10:01:40 |
| 20 | Q.   So February 15th to the 28th of 2007 would | 10:01:53 |
| 21 | have been around the Chinese New Year holiday, isn't | 10:01:57 |
| 22 | that right? | 10:02:02 |
| 23 | A.   I don't remember it, but we can look it up. | 10:02:02 |
| 24 | Q.   So this would have been consistent with the | 10:02:18 |
| 25 | agreement reached at the November 2006 Shanghai meeting | 10:02:22 |

Page 206

| | | |
|---|---|---|
| 1 | by IRICO to shut down production during the Chinese New | 10:02:26 |
| 2 | Year holiday in 2007, isn't that right? | 10:02:31 |
| 3 | MR. LUCARELLI:  Object to form. | 10:02:40 |
| 4 | THE WITNESS:  I don't know about the content. | 10:03:02 |
| 5 | BY MS. CAPURRO: | 10:03:02 |
| 6 | Q.   This shutdown schedule indicates that the | 10:03:06 |
| 7 | meeting attendees agreed upon a production shutdown | 10:03:09 |
| 8 | schedule for 2007, isn't that right? | 10:03:12 |
| 9 | A.   I don't know.  I can only see the text and | 10:03:36 |
| 10 | what the text says, but I don't know about the content. | 10:03:41 |
| 11 | Q.   But that's what the text shows, Mr. Wang, | 10:03:43 |
| 12 | isn't that right? | 10:03:48 |
| 13 | A.   I don't know.  I don't know what the | 10:03:49 |
| 14 | circumstance was for the text. | 10:03:57 |
| 15 | MS. CAPURRO:  Okay, you can set that document | 10:04:01 |
| 16 | aside.  I'm going to mark the next exhibit.  I've shared | 10:04:03 |
| 17 | the next exhibit in order.  Let me just share my screen. | 10:05:04 |
| 18 | This is Exhibit No. 8571.  It's a document Bates labeled | 10:05:13 |
| 19 | CHU00124396. | 10:05:20 |
| 20 | (Exhibit 8571 marked for identification.) | 10:05:20 |
| 21 | BY MS. CAPURRO: | 10:05:20 |
| 22 | Q.   Please take a minute to review this document | 10:05:37 |
| 23 | and let me know when you're ready.  I have limited | 10:05:40 |
| 24 | questions about this document so you don't need to | 10:05:43 |
| 25 | review it all thoroughly. | 10:05:45 |

Page 207

| | | |
|---|---|---|
| 1 | A.   Okay.  I'm ready. | 10:05:59 |
| 2 | Q.   Okay.  Have you seen this document before, | 10:09:05 |
| 3 | Mr. Wang? | 10:09:12 |
| 4 | A.   I have not seen this document before. | 10:09:13 |
| 5 | Q.   I'm directing your attention to the top of the | 10:09:21 |
| 6 | page.  It's entitled "Information Weekly," and it states | 10:09:24 |
| 7 | "Sales Company, 70th Issue, July 8-15, 2005." | 10:09:28 |
| 8 | Do you see that? | 10:09:33 |
| 9 | A.   I see it. | 10:09:52 |
| 10 | Q.   This is another one of the weekly reports that | 10:09:53 |
| 11 | you previously testified you instructed your sales reps | 10:09:56 |
| 12 | to compile every week, isn't it? | 10:09:59 |
| 13 | A.   Yes, we have compiled weekly -- information | 10:10:14 |
| 14 | weekly reports. | 10:10:17 |
| 15 | Q.   And this is one of those reports, isn't that | 10:10:18 |
| 16 | right? | 10:10:26 |
| 17 | A.   I'm not sure. | 10:10:26 |
| 18 | Q.   Does it look like the reports that you asked | 10:10:28 |
| 19 | your sales reps to compile during the relevant period? | 10:10:33 |
| 20 | A.   First of all, it looks like one of those | 10:10:36 |
| 21 | reports, but I'm not sure if it is actually one of those | 10:11:08 |
| 22 | reports.  I'm talking about the "Information Weekly." | 10:11:12 |
| 23 | Q.   Is that what you called the reports, | 10:11:17 |
| 24 | "Information Weekly"? | 10:11:20 |
| 25 | A.   Call what? | 10:11:21 |

Page 208

| | | |
|---|---|---|
| 1 | Q. The weekly reports that you had your sales | 10:11:30 |
| 2 | reps compile, did you call those "Information Weekly"? | 10:11:32 |
| 3 | A. Correct. | 10:11:38 |
| 4 | Q. And where it says -- do you see where it says | 10:11:45 |
| 5 | "70th Issue"? | 10:11:49 |
| 6 | A. I see it. | 10:11:52 |
| 7 | Q. Does that indicate that there were 69 prior | 10:11:56 |
| 8 | Information Weeklys before this one? | 10:11:59 |
| 9 | A. I cannot be certain about that. | 10:12:01 |
| 10 | Q. But these reports were produced every week, is | 10:12:16 |
| 11 | that right? | 10:12:19 |
| 12 | A. I believe so. | 10:12:25 |
| 13 | Q. And they were -- so they were produced as part | 10:12:27 |
| 14 | of the regular course of business in IRICO's Sales | 10:12:30 |
| 15 | Company, isn't that right? | 10:12:33 |
| 16 | A. I think so. | 10:12:34 |
| 17 | Q. Down the side here, in the left column, it | 10:12:50 |
| 18 | says "TCL," "Skyworth," "Konka," "Chang Hong," | 10:12:53 |
| 19 | "Hisense," "Haier," and other Chinese entities. | 10:13:01 |
| 20 | Those are IRICO's customers, isn't that right? | 10:13:07 |
| 21 | MR. LUCARELLI: Object to form. | 10:13:17 |
| 22 | THE WITNESS: Correct. | 10:13:30 |
| 23 | BY MS. CAPURRO: | 10:13:30 |
| 24 | Q. And directing your attention to the third | 10:13:34 |
| 25 | column in the TCL row entitled "Color TV Market," at the | 10:13:36 |

Page 209

| | | |
|---|---|---|
| 1 | top here, it says:  "On July 14th, TCL Multimedia Group | 10:13:42 |
| 2 | issued an announcement that they incorporated sales and | 10:13:47 |
| 3 | marketing rights of TCL-Thomson Electronics Limited | 10:13:50 |
| 4 | (TTE) in North America and Europe held by Thomson at a | 10:13:56 |
| 5 | price of 107.1 million Hongkong dollars." | 10:14:01 |
| 6 | Do you see that? | 10:14:07 |
| 7 | A.   I see it. | 10:14:31 |
| 8 | Q.   So IRICO was aware that one of its major | 10:14:32 |
| 9 | competitors, TCL, was expanding its presence in North | 10:14:37 |
| 10 | America, is that right? | 10:14:41 |
| 11 | A.   I only speak for myself and I don't know about | 10:14:42 |
| 12 | this. | 10:15:07 |
| 13 | Q.   Directing your attention to the first column | 10:15:12 |
| 14 | and the row for Haier -- it's at the bottom of | 10:15:16 |
| 15 | CHU00124397 -- I'm showing it on my screen here. | 10:15:20 |
| 16 | A.   I see it. | 10:15:48 |
| 17 | Q.   And in the column -- the first column -- I'm | 10:15:49 |
| 18 | sorry, the second column stating -- entitled "Operating | 10:15:53 |
| 19 | Conditions," it says:  "For 21" PF (new AK) produced for | 10:15:56 |
| 20 | exporting to the United States, preparations for the | 10:16:04 |
| 21 | early stage are being intensified." | 10:16:08 |
| 22 | Do you see that? | 10:16:11 |
| 23 | A.   I see it. | 10:16:12 |
| 24 | Q.   And then in the third column it says:  "Sample | 10:16:40 |
| 25 | tubes of IRICO 21" (new AK) have a low luminance and | 10:16:43 |

Page 210

# EXHIBIT 23

```
1                UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF CALIFORNIA
3                      OAKLAND DIVISION
4
5    IN RE: CATHODE RAY TUBE (CRT) ) MASTER FILE NO.
     ANTITRUST LITIGATION          ) CV-07-5944 JST
6    _____)
                                    )
7    THIS DOCUMENT RELATES TO:      )
                                    )
8    ALL INDIRECT PURCHASER ACTIONS )
     ALL DIRECT PURCHASER ACTIONS   )
9                                   )
             DEFENDANTS.            )
10   _____)
11
12
13
14
15          VIDEOTAPED DEPOSITION OF LI MIAO
16                    VOLUME III
17             THURSDAY, MARCH 9, 2023
18                    HONG KONG
19
20
21
22
23
     FILE NO.  SF 5759557
24
     REPORTED BY  MARK McCLURE, CRR
25             CAL CSR 12203

                                        Page 234
```

```
 1    itself, and at certain locations on earth, there are      16:19:24

 2    also certain magnetic fields, and they might overlap.     16:19:29

 3           So to a certain extent, the yoke -- deflection     16:19:34

 4    yoke will not be affected by the earth's magnetic field,  16:19:41

 5    but the magnetic field it generates may overlap and       16:19:45

 6    interact with the earth's magnetic field.                 16:19:49

 7    BY MR. BIRKHAEUSER:                                        16:19:49

 8       Q.   So some of the five specifications will take      16:19:55

 9    into account whether the final television product is      16:20:02

10    intended for use in the northern hemisphere or the        16:20:10

11    southern hemisphere, is that true?                        16:20:15

12           MR. CARTER:   Object to form.                      16:20:32

13           THE WITNESS:   The specifications you              16:21:19

14    referenced earlier are for the deflection yoke.   There   16:21:21

15    are also specifications for the tube, and the             16:21:24

16    specification is a comprehensive consideration and        16:21:27

17    configuration.                                            16:21:32

18           There are also different specifications of the     16:21:33

19    tube for different regions.   So they would all be        16:21:36

20    reflected in the model number of the tube, in the end.    16:21:41

21    BY MR. BIRKHAEUSER:                                       16:21:49

22       Q.   Before I ask my next question, I wanted to        16:21:50

23    remind you, Mr. Li, that you are still under oath.   You  16:21:53

24    took the oath on the first day of your deposition, and I  16:22:00

25    wanted to ask if it's still your understanding that you   16:22:06
```

Page 245

```
1    are under the oath to tell the truth.              16:22:11

2         A.   Yes.                                      16:22:36

3         Q.   So you mentioned that the specification of the  16:22:37

4    deflection yoke is contained in the model number, is     16:22:46

5    that right?                                         16:22:49

6         A.   Yes.                                      16:22:50

7         Q.   What other attributes of the finished product  16:23:02

8    are reflected in the model number?                  16:23:07

9         A.   I did not understand the meaning of the   16:23:27

10   question.                                           16:23:29

11        Q.   Well, from what you just told me, the model  16:23:30

12   number is -- contains information about the tube, is  16:23:33

13   that right?                                         16:23:42

14        A.   Yes.                                      16:23:50

15        Q.   What type of information can be learned from  16:23:51

16   the model number of a tube that Irico produces?     16:24:05

17        A.   Information regarding the dimension, the size,  16:24:25

18   safety information, and also another piece of        16:24:33

19   information, which I'm not sure how to describe.     16:24:53

20             It's the information about whether it      16:24:56

21   satisfies the 50-hertz, 60-hertz, 110-hertz, and also  16:24:59

22   information regarding whether it's a standard flat,  16:25:17

23   ultra flat or pure flat, information regarding if it's a  16:25:20

24   long tube or a short tube.  That's the information.  16:25:35

25             I may not remember all of it, but that's the  16:25:41
```

Page 246

| | | |
|---|---|---|
| 1 | information. | 16:25:44 |
| 2 | Q.   Okay.  You mentioned something called a shadow | 16:25:44 |
| 3 | mask earlier. | 16:25:47 |
| 4 | Is information about the shadow mask contained | 16:25:50 |
| 5 | in the model number? | 16:25:54 |
| 6 | A.   Only in special circumstances.  In most | 16:25:55 |
| 7 | circumstances, it will not be contained in the model | 16:26:13 |
| 8 | number. | 16:26:16 |
| 9 | Q.   When would you include information about the | 16:26:17 |
| 10 | shadow mask in the model number? | 16:26:20 |
| 11 | A.   In the last two days, a lot of exhibits were | 16:26:22 |
| 12 | shown by the attorney to me, and only the one that has | 16:26:52 |
| 13 | AK in the model number would include the shadow mask | 16:26:58 |
| 14 | information.  All the others would not include the | 16:27:01 |
| 15 | shadow mask information in the model numbers. | 16:27:04 |
| 16 | Q.   Do you remember, after thinking about it now, | 16:27:10 |
| 17 | what the "AK" stands for? | 16:27:12 |
| 18 | A.   I don't understand your question. | 16:27:14 |
| 19 | What did you mean? | 16:27:29 |
| 20 | Q.   Does "AK" -- is that an acronym for a word? | 16:27:31 |
| 21 | A.   Yesterday, when I was asked about this, I gave | 16:27:37 |
| 22 | a positive answer.  Yes, AK is the abbreviation of a | 16:27:55 |
| 23 | phrase. | 16:28:01 |
| 24 | MR. BIRKHAEUSER:  Of what? | 16:28:02 |
| 25 | I didn't hear that, Miss Translator. | 16:28:04 |

Page 247

```
1          A.   In most cases, no.                         16:30:58

2          Q.   How would Irico determine what shadow mask was  16:30:59

3    required for a finished product?                      16:31:03

4          A.   I don't understand the meaning of this     16:31:27

5    question.                                             16:31:28

6          Q.   So let me just ask a different way.        16:31:30

7               Were there different broadcasting standards 16:31:34

8    that determined the type of shadow mask that would be 16:31:37

9    used?                                                 16:31:46

10              MR. CARTER:  Object to form.               16:31:58

11              THE WITNESS:  I still don't understand the  16:32:03

12   meaning of the question.                              16:32:05

13   BY MR. BIRKHAEUSER:                                   16:32:05

14         Q.   Have you ever heard of something called the 16:32:06

15   NTSC standard?                                        16:32:09

16         A.   Yes.                                        16:32:11

17         Q.   Have you ever heard of the PAL standard?    16:32:20

18         A.   Yes.                                        16:32:24

19         Q.   Would the type of shadow mask used change   16:32:31

20   based upon the NTSC standard or the PAL standard?     16:32:37

21         A.   There's no relationship between the two.  I 16:32:46

22   will answer it in a different way.                    16:33:17

23              The standards you referenced do not have    16:33:19

24   anything to do with the type of shadow mask.          16:33:22

25         Q.   Okay.  What part of the finished tube, if any, 16:33:27
```

Page 249

1    is affected by its intended use according to the NTSC    16:33:41

2    standard or the PAL standard?    16:33:52

3            MR. CARTER:  Object to form.    16:33:55

4            THE WITNESS:  I'm not following the question.    16:34:21

5            What exactly is the question asking?    16:34:22

6    BY MR. BIRKHAEUSER:    16:34:22

7        Q.   Would Irico produce the exact same kind of    16:34:28

8    tube to be used in the NTSC and the PAL standard?    16:34:31

9            MR. CARTER:  Object to form.    16:34:44

10            THE WITNESS:  They would be products that have    16:35:02

11    different model numbers.    16:35:03

12    BY MR. BIRKHAEUSER:    16:35:03

13        Q.   Would the manufacture of the tube be any    16:35:09

14    different if it was to be used under the NTSC standard    16:35:12

15    or the PAL standard?    16:35:17

16        A.   The main manufacturing process is the same.    16:35:37

17    There may be some minor places that would be different.    16:35:41

18        Q.   Do you recall any of the minor differences    16:35:47

19    that would be used under one standard or the other?    16:35:50

20        A.   Those would definitely be reflected in the    16:36:21

21    product specifications.    16:36:24

22            You're asking me about the exact or specific    16:36:26

23    differences between the two.  It's been too long.  I    16:36:29

24    don't remember them clearly, and I don't want to give    16:36:33

25    you inaccurate information.    16:36:36

Page 250

| | | |
|---|---|---|
| 1 | Q.   I appreciate that. | 16:36:39 |
| 2 | Besides the deflection yoke, what other | 16:36:44 |
| 3 | specifications would customers provide to Irico with | 16:36:51 |
| 4 | respect to the finished product? | 16:36:59 |
| 5 | MR. CARTER:   Object to form. | 16:37:06 |
| 6 | THE WITNESS:   You talked about the deflection | 16:37:19 |
| 7 | yoke already, right? | 16:37:24 |
| 8 | BY MR. BIRKHAEUSER: | 16:37:24 |
| 9 | Q.   Yes. | 16:37:25 |
| 10 | A.   They definitely have to give us the | 16:37:39 |
| 11 | specification of the heater, and also, they have to give | 16:37:41 |
| 12 | us the specification of the high voltage.   And they have | 16:37:49 |
| 13 | to give us the safety standard. | 16:38:03 |
| 14 | And I don't remember the others. | 16:38:11 |
| 15 | Q.   What types of safety standards were there? | 16:38:28 |
| 16 | A.   There are universal safety standards in | 16:38:42 |
| 17 | international society. | 16:38:45 |
| 18 | Different countries and different regions have | 16:38:57 |
| 19 | their own safety standards and they are universal. | 16:38:59 |
| 20 | The standards would not change simply because | 16:39:14 |
| 21 | of a certain manufacturer or a user.   They would not | 16:39:17 |
| 22 | change. | 16:39:22 |
| 23 | Q.   But the customer would tell Irico which safety | 16:39:29 |
| 24 | standard it was required to comply with, is that right? | 16:39:33 |
| 25 | A.   Yes. | 16:39:49 |

Page 251

1    Q.   And do you recall which safety standards          16:39:51

2  were -- strike that.                                     16:40:00

3           How many safety standards were there?           16:40:01

4    A.   I don't recall.  I don't recall, but there are    16:40:06

5  definitely a few safety standards, and I may not         16:40:37

6  remember the information very accurately, but I do       16:40:42

7  remember that Irico satisfied all of the safety          16:40:47

8  standards available in the world at that time.           16:40:51

9    Q.   Can you just tell me the ones that you            16:40:55

10 remember?                                                16:40:57

11   A.   There are definitely safety standards in          16:41:24

12 China, but I don't recall the names, and there is a      16:41:27

13 safety standard for Europe, also a safety standard for   16:41:30

14 America.  But you're asking me about the names.  I don't 16:41:35

15 remember the names.                                      16:41:40

16   Q.   Do you recall a safety standard in China          16:41:44

17 called CCC?                                              16:41:46

18   A.   I'm not certain about the specific names          16:41:49

19 anymore.  I don't remember them.  But I can tell you for 16:42:04

20 sure that our products all satisfied the safety          16:42:15

21 standards in China at that time.                         16:42:20

22   Q.   Okay.  Do you recall one -- strike that.          16:42:25

23           Do you recall a safety standard called UL?     16:42:27

24   A.   These all relate to a professional area, and I    16:42:33

25 don't remember those names very clearly.                 16:42:59

                                                   Page 252

| | | |
|---|---|---|
| 1 | Q.   Okay.   In any event, the safety standard that | 16:43:01 |
| 2 | the tube was manufactured to would be reflected in the | 16:43:08 |
| 3 | model number? | 16:43:12 |
| 4 | A.   Yes. | 16:43:29 |
| 5 | Q.   I believe, yesterday, you referred to | 16:43:32 |
| 6 | something called the reinforcement band, is that right? | 16:43:36 |
| 7 | A.   What did you say? | 16:43:58 |
| 8 | Q.   Do you recall -- strike that. | 16:44:02 |
| 9 | Is there something called a reinforcement band | 16:44:05 |
| 10 | that's part of the manufacturing process of the tube? | 16:44:08 |
| 11 | A.   It's called explosion-prevention band. | 16:44:28 |
| 12 | Q.   Is that something that a customer would | 16:44:33 |
| 13 | specify, also? | 16:44:36 |
| 14 | A.   The structure, the type and the manufacturing | 16:44:37 |
| 15 | processes regarding the explosion-prevention band are | 16:45:00 |
| 16 | very closely related to the safety standards. | 16:45:05 |
| 17 | Q.   In your role as the plant chief, did you | 16:45:26 |
| 18 | communicate with Irico's customers? | 16:45:34 |
| 19 | A.   We need to communicate with the users | 16:45:35 |
| 20 | regarding how to match the circuit with the tube when | 16:46:03 |
| 21 | they use our products.   Also, we provide after-sales | 16:46:08 |
| 22 | services to our users after they purchase our products. | 16:46:35 |
| 23 | Q.   What type of communications would you have | 16:46:45 |
| 24 | with customers before you manufactured a tube for them? | 16:46:49 |
| 25 | A.   It's mainly the discussions regarding how to | 16:46:55 |

Page 253

| | | |
|---|---|---|
| 1 | match the circuitry with a certain tube. | 16:47:13 |
| 2 | Q.   And then, was that part of your responsibility | 16:47:18 |
| 3 | as the plant chief, to speak with the customers? | 16:47:22 |
| 4 | A.   Generally speaking, I would not handle that | 16:47:27 |
| 5 | directly.  I have engineers who would communicate with | 16:47:48 |
| 6 | the customers regarding the design and providing | 16:48:08 |
| 7 | services. | 16:48:12 |
| 8 | Q.   Okay.  Would any other category of employee, | 16:48:14 |
| 9 | other than engineers, communicate with customers? | 16:48:21 |
| 10 | MR. CARTER:  Object to form. | 16:48:34 |
| 11 | THE WITNESS:  We would also send people to | 16:48:42 |
| 12 | provide guidance to the users as to the way to operate | 16:49:13 |
| 13 | our products after they started to use our products. | 16:49:16 |
| 14 | But that's only for the time when they just start to use | 16:49:32 |
| 15 | the products.  After they have used the product for a | 16:49:37 |
| 16 | while, we will not provide such guidance anymore. | 16:49:40 |
| 17 | BY MR. BIRKHAEUSER: | 16:49:40 |
| 18 | Q.   What customers do you remember purchasing | 16:49:47 |
| 19 | Irico tubes while you were in Plant No. 1? | 16:49:51 |
| 20 | A.   Almost all domestic TV makers have purchased | 16:49:55 |
| 21 | Irico tubes.  Regarding the overseas purchasers, based | 16:50:21 |
| 22 | on what I remember, they were from Thailand, Britain, | 16:51:05 |
| 23 | Turkey, and either Russia or Belarus.  I don't quite | 16:51:10 |
| 24 | remember. | 16:51:20 |
| 25 | Q.   Do you recall any other countries that | 16:51:21 |

Page 254

# EXHIBIT 24



info@certifiedtranslate.com | 2425 Olympic Blvd., Suite 4000W | usa  1-888-856-2228
www.certifiedtranslate.com | Santa Monica, CA 90404 | int  +1-310-684-3153
| | fax  +1-310-564-1944

# CERTIFIED TRANSLATION



A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: | **David Y. Hwu** | Street Address: **706 Sansome Street** |
|---|---|---|
| Firm: | **Saveri & Saveri, Inc.** | City/State/Zip: **San Francisco / CA / 94111** |

*Description of Document(s):*

| |
|---|
| **CHU00689067E - CHU00689068E** |
| |
| |

| Source Language: | **SIMPLIFIED CHINESE** | Target Language: | **ENGLISH** |
|---|---|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

By:   Sean Kirschenstein, Director          **Date:**   September 20, 2018

A copy of the translated version(s) is attached to this statement of certification.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On _Sept. 20, 2018_ before me, ____Kristin Gail Chamberlain____, Notary Public, appeared ____Sean Kirschenstein____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____



KRISTIN GAIL CHAMBERLAIN
Commission # 2111880
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2020

**From:** [corrupted characters] [chengqs@cptf.com.cn]
**Sent:** Thursday, May 31, 2007  4:24 AM
**To:** [corrupted characters]/ [corrupted characters]; CBU [corrupted characters]
**Cc:** [corrupted characters]/ [corrupted characters]
**Subject:** [corrupted characters]

**Attachments:** [corrupted characters]5.29-6.8.xls

Dear boss,

1.  The Haier Jiaonan factory's production volume during the 19 days from 5/21/07 to 6/8/07 is 57K (including LCDs; production for domestic sales is done mainly in Hefei; we don't have the data to compile specifics).
2.  The strategy for the 14" is still to use Irico for the U.S. 2nd generation ATSC and CPT for other customers.
3.  As for the volume of the 14", production was low in early May (less than 2K). From 5/E to 6/B, the quantity grew to 20K. In 6/B the quantity for the U.S. ATSC model jumped to 9.2K (it was only 2.5K in April), causing Irico's share to reach 10.4K. CPT's 9.7K share looks like it will also increase, but not as fast as for the ATSC model.

4.  Judging from the production volume, the quantity of CPT 14" in inventory through 6/8/07 is only 1K. Add to that the 3 cabinets in transit, and the total is 8K for use through June. Subsequent orders will depend on the demand in July.
5.  Throughout our contact with Haier, they've maintained very strong feelings that "CPT's prices are always higher than others'" (from our conversations, it sounds like our May prices are probably 0.2 USD higher than Irico's), that "negotiations about prices are never clean and easy; they're always difficult," and that "this doesn't feel like a strategic partnership."

6.  If we determine that Haier is a target that we want to go after, I wonder if we should have a strategy of keeping our prices even with our competitor brands so as to gain ATSC orders and subsequent opportunities to partner on domestic sales. We can deal with them flexibly in other areas as well.

Thank you for reading!


Sincerely,

Chen Qishuang
Business Office, Chunghwa Picture Tubes
Tel: (86) 591-83971357, ext. 2705
Email: HYPERLINK "mailto:chenqs@cptf.com.cn" chenqs@cptf.com.cn

-----Forwarded Message-----

Originally from: linlb@cptf.com.cn HYPERLINK "mailto:linlb@cptf.com.cn" linlb@cptf.com.cn
Originally to: chenqs@cptf.com.cn; liuyn@cptf.com.cn HYPERLINK mailto: "chenqs@cptf.com.cn"
    chenqs@cptf.com.cn; HYPERLINK "mailto: "liuyn@cptf.com.cn" liuyn@cptf.com.cn

Originally cc'd: linlb@cptf.com.cn HYPERLINK "mailto:linlb@cptf.com.cn" linlb@cptf.com.cn


Hi, Manager Chen!

The plan in this round is to use Irico for over 9K of the 14". We also learned from the Irico person in charge of Haier (who was in charge of XOC previously, which is why we're familiar with him) that Haier uses Irico for at least two-thirds of their volume and that Irico's delivered volume for the 14" is at least 10K. For now, we're

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00689067E_Translation

unable to confirm the reliability of this information. He also said that he came to Qingdao for about 20 days and played mahjong twice with Director Sun, losing thousands to him each time.


CPTF Optronics Co., Ltd.
Quality Service Department, General Office for Quality Assurance
Lin Libin
Email: linlb@cptf.com.cn
Tel: 132 102 88130
Address: 1 Xingye Road, Mawei Technology Park District, Fuzhou



==============================

**From:** 麻□邧 [chenqs@cptf.com.cn]
**Sent:** Thursday, May 31, 2007 4:24 AM
**To:** 莳呮窒/酴涤祓卩揭酴专; CBU 柵吨呫卩俴种酴专
**Cc:** 莳呮窒/輿踞傑卩揭酴专
**Subject:** 漆嫌輪□氾莉祛錶

**Attachments:** 蝶鰍甚趄T-7氾莉悟咀5.29-6.8.xls

Dear boss，

1. 从5/21'07~6/8'07 19天时间海尔胶南厂产量为57K(含LCD，内销主要在合肥生产，没有具体DATA无法统计)。

2. 14"策略上仍然保持IRICO用于美国ATSC二代，CPT用于其它各客户。

3. 14"量部分，5月上旬生产少(不到2K)，5/E~6/B量放大到20K。6/B 美国ATSC Model量突升到9.2K(4月ATSC量仅2.5K)，致IRICO SHARE量达10.4K；CPT SHARE 9.7K也呈增长势态，但不如ATSC Model增长快。

4. 照产量判断CPT 14"库存至6/8'07仅1K，加上海运途中3柜合计8K，供6月份使用，后续订单视7月份需求状况。

5. 与海尔接触过程中，客户保持很深观念，认为"CPT价格总是比别人高(从洽谈中判断5月价格大概比IRICO高0.2USD)，价格等谈判总是不干脆，很困难"，"不像策略合作"。

6. 如把海尔列为争取对象，是否策略上Keep与竞争牌同价，可能争取ATSC订单，及后续内销合作机会。其它方面也可灵活应对。

以上呈请了解。谢谢！

陈其双 敬上
中华映管 业务处
电话: (86)591-83971357 转 2705
邮箱: HYPERLINK "mailto:chenqs@cptf.com.cn"chenqs@cptf.com.cn

= = = = = = 下面是转发邮件 = = = = = = =

原邮件发件人：linlb@cptf.com.cn  HYPERLINK "mailto:linlb@cptf.com.cn"linlb@cptf.com.cn
原邮件收件人：chenqs@cptf.com.cn; liuyn@cptf.com.cn  HYPERLINK "mailto:chenqs@cptf.com.cn"chenqs@cptf.com.cn; HYPERLINK "mailto: liuyn@cptf.com.cn"liuyn@cptf.com.cn

原邮件抄送人：linlb@cptf.com.cn  HYPERLINK "mailto:linlb@cptf.com.cn"linlb@cptf.com.cn

陈经理，您好！

这次计划彩虹14``使用量为9K多。另外从彩虹负责海尔的业务员(之前负责XOC，所以熟悉)处了解到，下个月海尔14``使用

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00689067

量至少2/3用彩虹的，彩虹交货量至14``少10K以上。这消息可靠性暂时无法证实。他又说，来青岛20天左右，陪孙处长打了2次麻将，每次都是输K级。


华映光电股份有限公司

品保总处品质服务部

林李宾

E-Mail: linlb@cptf.com.cn

TEL： 132 102 88130

地址：福州市马尾科技园区兴业路1号


＝＝＝＝＝＝＝＝＝＝＝＝＝＝＝＝＝＝＝

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00689068

# EXHIBIT 25

# IMPORTANT

> **If you are in any doubt** about this prospectus, you should consult your stockbroker, bank manager, solicitor, professional accountant or other professional adviser.



**IRICO**

## 彩 虹 集 團 電 子 股 份 有 限 公 司
# IRICO Group Electronics Company Limited[*]

*(A joint stock company incorporated in the People's Republic of China with limited liability)*

## Global Offering

| | | |
|---|---|---|
| **Number of Offer Shares** | : | **485,294,000 H Shares (subject to the Over-allotment Option)** |
| **Number of Public Offer Shares** | : | **48,530,000 H Shares (subject to adjustment)** |
| **Number of Placing Shares** | : | **436,764,000 H Shares (subject to adjustment and the Over-allotment Option)** |
| **Offer Price** | : | **not more than HK$1.73 per H Share (payable in full in Hong Kong dollars on application, plus 1% brokerage, a SFC transaction levy of 0.005%, an investor compensation levy of 0.002% and the Stock Exchange trading fee of 0.005% and subject to refund)** |
| **Nominal Value** | : | **RMB1.00 for each H Share** |
| **Stock Code** | : | **438** |

### Global Coordinator, Bookrunner, Lead Manager and Sponsor



*C I C C*

## China International Capital Corporation (Hong Kong) Limited

The Stock Exchange of Hong Kong Limited and Hong Kong Securities Clearing Company Limited take no responsibility for the contents of this prospectus, make no representation as to its accuracy or completeness, and expressly disclaim any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this prospectus.

A copy of this prospectus, having attached thereto the documents specified in the section headed "Documents delivered to the Registrar of Companies and available for inspection" in Appendix IX to this prospectus, has been registered by the Registrar of Companies in Hong Kong as required by section 342C of the Companies Ordinance (Chapter 32 of the Laws of Hong Kong). The Securities and Futures Commission and the Registrar of Companies in Hong Kong take no responsibility for the contents of this prospectus or any other document referred to above.

We are incorporated, and our businesses are located in the PRC. Potential investors should be aware of the differences in the legal, economic and financial systems between the PRC and Hong Kong and that there are different risk factors relating to investment in companies incorporated in the PRC. Potential investors should also be aware that the regulatory framework in the PRC is different from that in Hong Kong, and should take into consideration the different nature of the market for our H Shares. Such differences and risk factors are outlined in the section headed "Risk Factors" and Appendix VI to this prospectus.

The Offer Price is expected to be determined by agreement among the Selling Shareholder, the Company and the Global Coordinator (on behalf of the Underwriters) on or around Monday, 13 December 2004 or such later date as may be agreed among the Selling Shareholder, the Company and the Global Coordinator but in any event no later than Thursday, 16 December 2004, otherwise the Global Offering will lapse.

**The Offer Price will be not more than HK$1.73 per H Share and is expected to be not less than HK$1.51 per H Share unless otherwise announced. Investors applying for the Public Offer Shares must pay, on application, the maximum offer price of HK$1.73 for each H Share together with a brokerage of 1%, a SFC transaction levy of 0.005%, an investor compensation levy of 0.002% and the Stock Exchange trading fee of 0.005%. The Global Coordinator (on behalf of the Underwriters, and with the consent of the Selling Shareholder and the Company) may reduce the indicative Offer Price range stated in this prospectus at any time prior to the morning of the last day for lodging applications under the Public Offer. In such a case, a notice of the reduction of the indicative Offer Price range will be published in the South China Morning Post (in English) and the Hong Kong Economic Times (in Chinese) not later than the morning of the last day for lodging applications under the Public Offer. If applications for Public Offer Shares have been submitted prior to the day which is the last day for lodging applications under the Public Offer, then even if the Offer Price is so reduced, such applications cannot subsequently be withdrawn.**

The obligations of the Public Offer Underwriters under the Public Offer Underwriting Agreement to subscribe for, and to procure applicants for the subscription for, the Public Offer Shares, are subject to termination by the Global Coordinator (on behalf of the Public Offer Underwriters) if certain events arise prior to 7:00 a.m. on the day that trading in the Offer Shares commences on the Stock Exchange. Such events are set out in the section headed "Underwriting" in this prospectus. It is important that you refer to that section for further details.

The Offer Shares have not been and will not be registered under the US Securities Act and may not be offered, sold, pledged or transferred within the United States or to, or for the account or benefit of US persons, except that Offer Shares may be offered, sold or delivered to QIBs in reliance on an exemption from registration under the US Securities Act provided by, and in accordance with the restrictions of, Rule 144A or outside the United States to non-US persons in offshore transactions in reliance on Regulation S.

*\* For identification purposes only*

8 December 2004

# EXPECTED TIMETABLE

2004[1]

Application lists open[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11:45 a.m. on Monday, 13 December

Latest time for the following:

- Lodging **WHITE** and **YELLOW** application forms . . . 12:00 noon on Monday, 13 December

- Giving electronic application instructions to
  HKSCC[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12:00 noon on Monday, 13 December

Application lists close . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12:00 noon on Monday, 13 December

Expected Price Determination Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Monday, 13 December

Announcement of the Offer Price, the indication of level
  of interest in the Placing and the results of applications in
  the Public Offer and the basis of allotment of the Public
  Offer Shares (together with the identification numbers of
  successful applicants (if applicable)) to be published in
  the South China Morning Post and in the
  Hong Kong Economic Times . . . . . . . . . . . . . . . . . . . . . . . . . . . . on or before Friday, 17 December

Despatch of H Share certificates and refund cheques[4][5] . . . . . . . . . . on or before Friday, 17 December

Dealings in the H Shares on the Stock Exchange expected
  to commence on . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Monday, 20 December

*Notes:*

(1)    All times refer to Hong Kong local time unless otherwise stated. Details of the structure of the Global Offering are set out in the section headed "Structure of the Global Offering" in this prospectus.

(2)    If there is a "black" rainstorm warning or a tropical cyclone warning signal number 8 or above in force in Hong Kong at any time between 9:00 a.m. and 12:00 noon on Monday, 13 December 2004, the application lists will not open and close on that day. Further information is set out in the section headed "How to apply for the Public Offer Shares — Effect of bad weather conditions on the opening of the application lists" in this prospectus.

(3)    Applicants who apply by giving electronic application instructions to HKSCC should refer to the section headed "How to Apply for the Public Offer Shares — How to apply by giving electronic application instructions to HKSCC via CCASS" in this prospectus.

(4)    Applicants who apply for 1,000,000 Public Offer Shares or more and have indicated on their Application Forms that they wish to collect their H Share certificates (if applicable) and refund cheques (if applicable) in person may do so from the Company's H Share registrar, Computershare Hong Kong Investor Services Limited at Rooms 1712–1716, 17th Floor, Hopewell Centre, 183 Queen's Road East, Hong Kong. Applicants being individuals who opt for personal collection must not authorize any other person to make their collection on their behalf. Applicants being corporations who opt for personal collection must attend by their authorized representatives bearing letters of authorization from their corporations stamped with the corporations' respective company chops. Both individuals and authorized representatives (if applicable) must produce, at the time of collection, evidence of identity acceptable to the Company's H Share registrar. Uncollected H Share certificates (if applicable) and refund cheques (if applicable) will be despatched by ordinary post at the applicants' own risk to the addresses specified in the Application Forms. Further details are set out in the section headed "Terms and Conditions of The Public Offer — If your application for the Public Offer Shares is successful (in whole or in part)" in this prospectus. Part of your Hong Kong Identity Card number/passport number, or, if you are joint applicants, part of the Hong Kong Identity Card number/passport number of the first-named applicant, provided by you may be printed on your refund cheque, if any. Such data would also be transferred to

# EXPECTED TIMETABLE

a third party for refund purpose. Your banker may require verification of your Hong Kong Identity Card number/passport number before encashment of your refund cheque. Inaccurate completion of your Hong Kong Identity Card number/passport number may lead to delay in encashment of or may invalidate your refund cheque.

(5)    Refund cheques will be issued in respect of wholly or partially unsuccessful applications and in respect of successful applications in the event that the Offer Price is less than the initial price per H Share payable on application.

H Share certificates will only become valid certificates of title provided that the Global Offering has become unconditional and not having been terminated in accordance with the terms of the respective Underwriting Agreements (which is expected to be at around 7:00 a.m. on 20 December 2004). Investors shall have to bear all the risks respectively of dealing in the Shares pursuant to the allotment information before the receipt of the H Share certificates or before the certificates have become valid certificates of title.

# CONTENTS

> *You should rely only on the information contained in this prospectus and the Application Forms to make your investment decision.*
>
> *We have not authorized any person to provide you with information that is different from what is contained in this prospectus.*
>
> *Any information or representation not included in this prospectus must not be relied on by you as having been authorized by us, the Selling Shareholder, the Global Coordinator, the Sponsor, the Underwriters, any of their respective directors or any other person or party involved in the Global Offering.*

*Page*

**Expected timetable** .................................................................... i

**Summary** .............................................................................. 1

**Definitions** ........................................................................... 11

**Glossary** ............................................................................. 19

**Risk factors** .......................................................................... 22

**Information about this prospectus and the Global Offering** ............................ 41

**Directors, Supervisors and parties involved in the Global Offering** ...................... 46

**Corporate information** ................................................................. 51

**Industry overview** .................................................................... 53

**History and Reorganization** ........................................................... 62

**Business** ............................................................................. 73

**Relationship with the Group Corporation** .............................................. 103

**Directors, Supervisors, senior management and staff** .................................... 118

**Substantial shareholder** ............................................................... 127

**Share capital** ......................................................................... 128

**Financial information** ................................................................. 130

**Future plans and use of net proceeds** .................................................. 168

**Underwriting** ......................................................................... 171

# CONTENTS

*Page*

**Structure of the Global Offering** ....................................................... 176

**How to apply for the Public Offer Shares** ............................................. 182

**Terms and conditions of the Public Offer** ............................................. 192

**Appendices**

**Appendix I** — **Accountants' report** ................................................ 203

**Appendix II** — **Unaudited pro forma financial information** ........................... 238

**Appendix III** — **Profit forecasts** .................................................. 242

**Appendix IV** — **Unaudited interim financial report**
  **of IRICO Display Devices Co., Ltd.** ............................... 245

**Appendix V** — **Property valuation** ................................................ 260

**Appendix VI** — **Summary of principal PRC and Hong Kong laws and regulations** ....... 292

**Appendix VII** — **Summary of Articles of Association** ................................. 326

**Appendix VIII** — **Statutory and general information** .................................. 354

**Appendix IX** — **Documents delivered to the Registrar of Companies**
  **and available for inspection** ...................................... 380

This summary is intended to give you an overview of the information contained in this prospectus. As this is a summary, it does not contain all of the information that may be important to you. You should read the entire prospectus before you decide to invest in the H Shares.

There are risks associated with any investment. Some of the particular risks in investing in the H Shares are summarized in the section headed "Risk Factors" in this prospectus. You should read that section carefully before you decide to invest in the H Shares.

## OVERVIEW

We are the largest CPT manufacturer in China and one of the world's major CPT and CPT component manufacturers. We also have the longest operating history among all Chinese CPT manufacturers, with over 20 years of experience in CPT production. In 2003, we were selected as one of the top hundred electronics companies in the world by Denpa Shinbun, an electronics industry trade newspaper published in Japan.

The CPT is the core component of a CRT television set, accounting for about 50% of the aggregate cost of all of the components of a CRT television set. We manufacture small, medium and large sized CPTs 14" to 29" in size and a majority of CPT components, including glass bulbs, electron guns, deflection yokes, shadow masks and their frames as well as phosphor and frit.

For the three years ended 31 December 2001, 2002 and 2003 and for the six months ended 30 June 2004, our sales were approximately RMB3,293,021,000, RMB3,999,378,000, RMB4,269,781,000 and RMB2,418,755,000, respectively. For the same periods, our profits attributable to shareholders were approximately RMB74,311,000, RMB277,103,000, RMB315,825,000 and RMB183,681,000, respectively. From 2001 to 2003, our compound annual growth rates for our sales and our profits attributable to shareholders were 13.86% and 106.16%, respectively. Our aggregate sales volume for CPTs was approximately 11.1 million for 2003 and approximately 6.5 million for the six months ended 30 June 2004.

Our CPT production lines and most of our CPT component production lines are located in Xianyang, Shaanxi Province. We were ranked first among vacuum electronic appliances enterprises in the China Electronics Industry Yearbook 2003 in categories including production and sales volume, total output, sales revenues and export revenues for that year. We were ranked 22nd among the Top Hundred Electronics and Information Technology Enterprises in terms of sales revenues in 2003 by the Ministry of Information Industry of the PRC.

## COMPETITIVE STRENGTHS

We believe that we have the following competitive strengths:

—    Leading position in the CPT industry in China;

—    Cost advantages based on mass production and vertical integration;

—    Experienced management team with in-depth industry knowledge;

—    Large pool of technical talent;

—    Long and stable customer relationships; and

—    Superior product quality and comprehensive customer service.

## BUSINESS STRATEGIES

Our goal is to maintain our leading position in the CPT industry in China. At the same time, we will make active efforts to develop new display devices with an aim to becoming a leading display devices and components provider in the world. Our key strategies are as follows:

— Strengthen our CPT operations and optimize our product mix;

— Strengthen our production capacity in key CPT components, enhance our cost advantage and explore new and profitable lines of business;

— Actively pursue the research and development of new display devices with a view to commencing mass production as soon as practicable; and

— Strengthen our cost control system and continue to improve the quality of our products.

## USE OF NET PROCEEDS

The Directors intend to use the net proceeds from the Global Offering to implement our future plans. Assuming that the Over-allotment Option is not exercised, and based on the Offer Price of HK$1.62 per H Share, which is the mid-point of the estimated range of the Offer Price, the net proceeds from the Global Offering, after deduction of the underwriting commissions and estimated expenses payable by us, are estimated to be approximately HK$651 million. The Directors currently plan to use such net proceeds as follows:

1. approximately RMB166 million (equivalent to approximately HK$157 million) is expected to be applied as part of the total investment of approximately RMB650 million (equivalent to approximately HK$613 million) for the construction of the K Line, and another RMB166 million (equivalent to approximately HK$157 million) will be applied to refund to the Group Corporation the same amount previously drawn on current account of the Group Corporation to fund part of our capital contribution towards K-Line Company, which will also be applied as part of the total investment in the K Line;

2. approximately RMB172 million (equivalent to approximately HK$162 million) is expected to be used to fund part of the total capital expenditures for the construction of production lines for key CPT components, including shadow masks, electron guns, large metal components and frames;

3. approximately RMB100 million (equivalent to approximately HK$94 million) is expected to be applied to the research and development of CPTs, CPT components and new display devices, as part of our planned expenditures under our research and development plans set forth in the section headed "Business — Research and Development Plans" in this prospectus;

4. approximately RMB80 million (equivalent to approximately HK$75 million) is expected to be used to fund part of the working capital requirements of our new projects, including (1) approximately RMB60 million (equivalent to approximately HK$57 million) for the construction of the H Line and (2) approximately RMB20 million (equivalent to approximately HK$18 million) for the construction of two production lines for glass panels that are used in the manufacture of 21" and 25" CPTs; and

5. the remaining amount will be used as general working capital.

## SUMMARY

In the event that any of our future plans does not materialize or proceed as planned, the Directors will carefully evaluate the situation and may re-allocate the intended funding to our other future plans and/or new projects and/or to hold such funds as short-term deposits for so long as the Directors consider it to be in our best interests. Should the Directors re-allocate the intended funding to our other future plans and/or to our new projects, we will comply with the appropriate requirements of the Listing Rules.

In the event that the Over-allotment Option is exercised in full, assuming that the Offer Price is at the mid-point of the estimated range of the Offer Price, we expect to use the additional net proceeds of approximately HK\$103 million (equivalent to approximately RMB109 million) as follows:

1.  approximately RMB80 million (equivalent to approximately HK\$75 million) is expected to be used to fund part of the working capital requirements of our new projects, including (1) approximately RMB50 million (equivalent to approximately HK\$47 million) for the construction of the H line and (2) approximately RMB30 million (equivalent to approximately HK\$28 million) for the construction of two production lines for glass panels that are used in the manufacture of 21" and 25" CPTs; and

2.  approximately RMB29 million (equivalent to approximately HK\$27 million) is expected to be used as general working capital.

To the extent that the net proceeds from the Global Offering are not immediately required, the Directors intend that the unused portion of such proceeds be placed in short-term deposits with licensed banks or financial institutions or used to purchase money market instruments.

The net proceeds from the sale of H Shares by the Selling Shareholder in the Global Offering after deducting underwriting commissions and related expenses payable by the Selling Shareholder are estimated to be about HK\$65 million or about HK\$75 million if the Over-allotment Option is exercised in full (assuming that the Offer Price is determined at the mid-point of the estimated range). In accordance with relevant PRC regulations, the Selling Shareholder will be required to contribute the net proceeds it receives from the Global Offering to the PRC National Social Security Fund. Neither the Company nor the Selling Shareholder will retain any of the proceeds from the sale of H Shares by the Selling Shareholder.

# SUMMARY

**TRADING RECORD**

The following is a summary of our historical combined results for the Track Record Period extracted from the Accountants' Report set out in Appendix I to this prospectus. The results have been prepared on the same basis of presentation as set out in the above mentioned Accountants' Report.

| | For the year ended 31 December | | | For the six months ended 30 June | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2003** | **2004** |
| | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* |
| Turnover[Note] | 3,293,021 | 3,999,378 | 4,269,781 | 1,943,478 | 2,418,755 |
| Costs of sales | (2,697,243) | (3,079,581) | (3,256,959) | (1,457,192) | (1,859,795) |
| Gross profit | 595,778 | 919,797 | 1,012,822 | 486,286 | 558,960 |
| Other revenues | 58,539 | 59,998 | 61,258 | 26,333 | 22,712 |
| Other income | 2,871 | 3,434 | 9,970 | 4,937 | 7,952 |
| Distribution expenses | (85,030) | (102,130) | (103,405) | (46,561) | (50,848) |
| Administrative expenses | (190,480) | (219,788) | (227,275) | (96,245) | (108,919) |
| Other operating expenses | (123,431) | (69,524) | (73,604) | (27,355) | (40,800) |
| Operating profit | 258,247 | 591,787 | 679,766 | 347,395 | 389,057 |
| Finance costs | (103,737) | (78,853) | (56,588) | (28,945) | (28,481) |
| Share of results of associated companies | (1,642) | (2,011) | (62) | (131) | (110) |
| Profit before taxation | 152,868 | 510,923 | 623,116 | 318,319 | 360,466 |
| Taxation | (37,292) | (129,891) | (173,936) | (83,982) | (97,955) |
| Profit after taxation | 115,576 | 381,032 | 449,180 | 234,337 | 262,511 |
| Minority interests | (41,265) | (103,929) | (133,355) | (74,821) | (78,830) |
| Profit for the year/period | 74,311 | 277,103 | 315,825 | 159,516 | 183,681 |
| Dividends | 64,826 | 87,614 | 146,084 | — | 165,809 |

# SUMMARY

*Note:*

Turnover represents gross revenues from sales of CPTs and CPT components.

An analysis of the turnover is set out below:

| | Years ended 31 December | | | Six months ended 30 June | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2003** | **2004** |
| | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* |
| Turnover | | | | | |
|    Sales of CPT | 3,152,040 | 3,723,889 | 3,888,156 | 1,780,541 | 2,202,497 |
|    Sales of CPT components | 140,981 | 275,489 | 381,625 | 162,937 | 216,258 |
| Total | 3,293,021 | 3,999,378 | 4,269,781 | 1,943,478 | 2,418,755 |

For additional information regarding the track record of the Company, see the section headed "Financial Information" and Appendix I to this prospectus.

## LIQUIDITY

Our principal sources of liquidity have been, and are expected to be, cash flow from operations, bank borrowings and, following completion of the Global Offering, the net proceeds from the Global Offering. Our principal uses of cash have been, and are expected to be, cost of sales, operating expenses, bank loan repayments and the construction of production lines. For detailed discussions of our liquidity and capital resources, see the section headed "Financial Information — Liquidity and Capital Resources" in this prospectus.

## FORECAST FOR THE YEAR ENDING 31 DECEMBER 2004

Forecast consolidated profit after tax and minority interests
  but before extraordinary items *(notes 1 and 2)*  . . . . . . . . . . . . . . . .   not less than RMB365,668,000
(approximately HK$344,969,811)

Forecast earnings per Share
  — weighted average *(note 3)*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   RMB0.24
(about HK$0.23)

  — pro forma *(note 4)*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   RMB0.19
(about HK$0.18)

*Notes:*

1. The bases and assumptions on which the above profit forecast for the year ending 31 December 2004 has been prepared are summarized in Appendix III to this prospectus.

2. The forecast of the Company's consolidated profit after tax and minority interests but before extraordinary items for the year ending 31 December 2004 prepared by the Directors is based on the Company's audited combined results for the six months ended 30 June 2004, unaudited combined results from the Company's management accounts for the month ended 31 July 2004 and a forecast of the consolidated results of the Company for the remaining five months ending 31 December 2004. The Directors are not aware of any extraordinary items which have arisen or are likely to arise during the year ending 31 December 2004. The above profit forecast has taken into account a downward adjustment of RMB18.8 million in connection with a provision we have made for our accounts receivable and inventory consigned with respect to Skyworth. We have made such a provision as a cautionary measure in view of recent news media reports regarding actions taken by the Independent Commission Against Corruption of Hong Kong relating to certain members of the management of Skyworth Digital Holdings Limited, the

— 5 —

## SUMMARY

parent company of Skyworth. (Please see the section headed "Business — major customers" in this prospectus for further details of our relationship with this major customer. The forecast has been prepared on the basis of the accounting policies consistent in all material aspects with those currently adopted by the Company as summarized in the Accountants' Report, which is set out in Appendix I to this prospectus.

3.  The calculation of forecast earnings per Share on a weighted average basis is based on the forecast consolidated profit after tax and minority interests but before extraordinary items of the Company for the year ending 31 December 2004 and a weighted average number of 1,514,464,721 Shares expected to be in issue during the entire year which assumes 1,500,000,000 Shares were issued to the Group Corporation as at 1 January 2004 and the Offer Shares (less the sales of H Shares by the Group Corporation) are issued since 20 December 2004. It does not take into account any H Shares which may be issued upon the exercise of the Over-allotment Option.

4.  The calculation of the pro forma forecast earnings per Share is based on the forecast consolidated profit after tax and minority interests but before extraordinary items of the Company for the year ending 31 December 2004 and a total of 1,941,174,000 Shares (comprising 1,455,880,000 Domestic Shares and 485,294,000 H Shares) in issue during the entire year. The calculation of the forecast earnings per Share takes no account of any H Shares which may be issued upon the exercise of the Over-allotment Option. If the Over-allotment Option is exercised in full, the number of Shares in issue would become 2,007,340,000 Shares (comprising 1,449,266,000 Domestic Shares and 558,074,000 H Shares), and the forecast earnings per Share on the fully diluted basis mentioned above would be RMB0.18 (about HK$0.17).

## SHARE OFFER STATISTICS

|  | Based on an Offer Price of HK$1.51 per H Share | Based on an Offer Price of HK$1.73 per H Share |
|---|---|---|
| Market capitalization of the H Shares *(note 1)* | HK$733 million | HK$840 million |
| Forecast price/earnings multiple | | |
| — weighted average *(note 2)* | 6.6 times | 7.5 times |
| — pro forma *(note 3)* | 8.4 times | 9.6 times |
| Adjusted net tangible asset value per Share *(note 4)* | HK$1.25 | HK$1.29 |

*Notes:*

1.  The calculation of the market capitalization of the H Shares is based on 485,294,000 H Shares in issue immediately after completion of the Global Offering but does not take into account any H Shares which may be issued upon exercise of the Over-allotment Option.

2.  The calculation of forecast price/earnings multiple on a weighted average basis is based on the forecast earnings per Share on a weighted average basis for the year ending 31 December 2004 of about RMB0.24 (about HK$0.23) at the respective Offer Price of HK$1.51 and HK$1.73 per H Share, and based on the assumption set out in note 1 above.

3.  The calculation of forecast price/earnings multiple on a fully diluted basis is based on the pro forma forecast earnings per Share of RMB0.19 (about HK$0.18) at the respective Offer Price of HK$1.51 and HK$1.73 per H Share assuming that the Over-allotment Option is not exercised and the 485,294,000 Shares (comprising 44,120,000 Domestic Shares and 441,174,000 H Shares) were in issue since 1 January 2004.

4.  The adjusted net tangible asset value per Share has been arrived at after the adjustments referred to in the section headed "Financial Information — Unaudited Pro Forma Adjusted Net Tangible Assets" in this prospectus and on the basis of a total of 485,294,000 Shares (comprising 44,120,000 Domestic Shares and 441,174,000 H Shares) in issue at the respective Offer Price of HK$1.51 and HK$1.73 per H Share immediately following completion of the Global Offering but without taking into account any H Shares which may be issued upon the exercise of the Over-allotment Option.

# SUMMARY

If the Over-allotment Option is exercised in full, based on the estimated range of the Offer Price of between HK\$1.51 and HK\$1.73 per H Share, the adjusted net tangible assets of the Company will range from approximately RMB1.33 (approximately HK\$1.25) to approximately RMB1.39 (approximately HK\$1.31) per H Share, while the earnings per Share on a weighted average and on a fully diluted basis will be diluted correspondingly to approximately RMB0.24 (approximately HK\$0.23) per H Share and approximately RMB0.18 (approximately HK\$0.17) per H Share. However, the Directors believe that this will not materially affect the shareholders of the Company.

## RISK FACTORS

Our operations involve certain risks, a summary of which is set out in the section headed "Risk Factors" in this prospectus. These risks can be classified as follows:

### Risks relating to the Company

- There is no assurance that we will be able to maintain our competitive edge in the research and development of new products. As a result, our business development and operating results may be affected.

- The construction of production lines involves certain risks and, as a result, we may not be able to realize our expected production capacity in a timely manner.

- If we fail to adjust our existing product mix in a timely manner in light of changes in market demand, our operations and profitability may be adversely affected.

- Absence of land use right certificate and property title certificate in connection with a factory used for our operations may have an adverse effect on our production and operations.

- Our operations may be adversely affected if the landlord of a property leased by us could not establish vested legal title to the property.

- We use leased land and buildings to conduct a substantial part of our operations.

- Our operations depend on stability of our core personnel; if we lose the services of or fail to retain any of our core team members or to recruit well-qualified and experienced new team members, our normal business operations may be adversely affected.

- Our intellectual property rights may be infringed upon and we may also become a party to litigation as a result of alleged infringement of other parties' intellectual property rights, either of which will adversely affect our business.

- Preferential tax treatments enjoyed by us will expire and may be reduced or revoked.

- We may be subject to unexpected risks relating to our PDP project.

- Our sales rely on major customers in the PRC, and any substantial decrease in sales to any of them could adversely affect our operating results.

- If we fail to strengthen and expand our business in overseas markets, our overall operating results could be adversely affected.

# SUMMARY

- Customers in our overseas markets may need some time to familiarize themselves with our newly established import and export department. In the short term, this could affect the normal operation of our overseas business.

- Our procurement of certain raw materials and CPT components is dependent upon certain major suppliers; any substantial disruption of supply from any of such suppliers or any substantial change in the terms of such supply may adversely affect our operating results.

- We may be required to invest more capital for environmental protection purposes due to changes in the PRC environmental laws and regulations, thereby increasing our operating cost.

- Increasing competition and market fluctuations may have an adverse impact on our inventory, creditors' and debtors' turnover periods.

- As the interests of A Share Company's minority shareholders may, in certain circumstances, be inconsistent with ours and our shareholders', such minority shareholders may withhold their approvals or the Shanghai Stock Exchange may not grant necessary waivers in respect of certain connected transactions between A Share Company and the Company (or our other subsidiaries) and, as a result, such transactions may not be consummated, which may adversely affect our overall operational efficiency.

- Certain of our production resources are provided by the Group Corporation. If the Group Corporation fails to continue to provide the production resources on the existing terms, our business operations may be adversely affected.

- The interests of the Group Corporation as our controlling shareholder may, in certain circumstances, conflict with those of our other shareholders, and the Group Corporation could cause us to make decisions that may not be in the best interests of our other shareholders.

- We may not be able to obtain external financing in time or on terms acceptable to us.

- We cannot guarantee that the growth of our revenues and/or profits will be sustained.

- Our payment of dividends depends on certain factors; there is no assurance that dividends will be distributed or in any particular form.

- Our historical financial information may not be an accurate indication of our future operating results.

- Our interests in our subsidiaries may be diluted.

- There may be changes to the use of proceeds and we may not be able to carry out our future plans.

- Our insurance coverage may not be sufficient to cover all the risks related to our operations.

**Risks relating to the industry**

- We face intense competition from domestic and international competitors. If we are unable to maintain or improve our competitiveness, our operating results and profitability may be adversely affected.

- If the demand of the CPT market decreases, our business and profitability may be adversely affected.

# SUMMARY

- Decrease in the prices of color television sets may have downward adjustment pressure on CPT prices.

- The market potential of new display devices poses a challenge to the traditional CPT industry.

- Any substantial increase in the prices of, or significant shortage in the supply of, raw materials and CPT components will have an adverse effect on the business and operating results of CPT manufacturers.

- Any anti-dumping and/or other protective trade barriers relating to CPTs or CRT television sets may have an adverse effect on the overseas sales of CPT manufacturers in China and, indirectly, on their CPT sales to Chinese CRT television set manufacturers that export their products.

## Risks relating to China

- The PRC's economic, political and social conditions, as well as government policies, could affect our business.

- Any economic slowdown in China may have a material adverse effect on our financial condition and operating results, as well as our future prospects.

- Government control of currency conversion may adversely affect our financial condition and operating results.

- Fluctuation of the Renminbi exchange rates and the movement of the interest rates of domestic banks towards meeting market conditions could adversely affect our operating results.

- Tax benefits may be discontinued due to China's accession to the WTO.

- Interpretation of PRC laws and regulation embodies uncertainties that may impair our business and operating results.

## Risks relating to H Shares and to the Reorganization

- Holders of our H shares may not be able to successfully enforce their shareholders' rights in China under the Company Law of the PRC or Hong Kong regulatory provisions.

- There can be no assurance of an active trading market for H Shares, and the Offer Price for H Shares may not be indicative of prices that will prevail in the trading market.

- Existing shareholders' interests in the Company may be diluted as a result of future equity fund raising.

- Holders of H Shares may be subject to PRC taxation.

- As a newly established independent entity, our management has no prior experience in operating an independent company listed on the Stock Exchange, which may have an adverse effect on our operations.

## Other Risks

- Any possible outbreak of severe acute respiratory syndrome or any other serious epidemic in China may have a material adverse effect on our business operations and operating results.

# SUMMARY

- Forward-looking statements may not be accurate and investors should not place undue reliance on statements of this kind.

- Certain information prepared on the basis of unaudited data and assumptions embodies uncertainties and investors should not place undue reliance on them.

- Certain statistics derived from official publications, PRC government agencies and various publicly available industry related sources may not be true and accurate and investors should not place undue reliance on them.

- Changes to Hong Kong accounting standards may result in changes in the future as to how our results and financial position are prepared and presented.

# DEFINITIONS

In this prospectus, unless the context otherwise requires, the following terms shall have the following meanings:

| | |
|---|---|
| "A Share Company" | IRICO Display Devices Co., Ltd. (彩虹顯示器件股份有限公司), a joint stock company established in the PRC on 29 July 1992 and listed on the Shanghai Stock Exchange (Stock Code: 600707). Unless the context otherwise requires, A Share Company shall mean IRICO Display Devices Co., Ltd. and its subsidiaries |
| "affiliate" | in relation to a company, any entity of, over or in which the company, alone or acting in concert with others, holds at least 30% of the issued share capital or exercises or controls the exercise of at least 30% of the voting power or has the power to elect a majority of the board of directors or otherwise exercises control |
| "Application Form(s)" | **WHITE** application forms and **YELLOW** application forms, or any one of the application forms as the context requires |
| "Articles of Association" or "Articles" | the articles of association of the Company, as amended from time to time |
| "associate(s)" | has the meaning ascribed to it under the Listing Rules |
| "Beijing Goldenbridge" | Beijing Goldenbridge Translation Portnetwork Co., Ltd. (北京金橋譯港網絡技術公司), a limited liability company established in the PRC on 17 May 2000 |
| "Board" | the board of Directors |
| "business day" | any day other than a Saturday, Sunday or public holiday in Hong Kong or the People's Republic of China |
| "Caihong Yingguang" | Kunshan Caihong Yingguang Electronics Co., Ltd. (昆山彩虹櫻光電子有限公司), a Sino-foreign joint venture established in the PRC on 24 November 1992 |
| "Caizhu Jinshun" | Zhuhai Caizhu Jinshun Electronic Industry Co., Ltd. (珠海市彩珠金順電子實業有限公司), a Sino-foreign joint venture established in the PRC on 16 October 1995 |
| "Caizhu Zhongshan" | Caizhu (Zhongshan) Electronic Glass Plant (彩珠(中山)電子玻璃廠), a state-owned enterprise established in the PRC on 16 November 1992 |
| "CCASS" | the Central Clearing and Settlement System established and operated by HKSCC |
| "CCASS Broker Participant" | a person admitted to participate in CCASS as a broker participant |
| "CCASS Custodian Participant" | a person admitted to participate in CCASS as a custodian participant |

# DEFINITIONS

| | |
|---|---|
| "CCASS Investor Participant" | a person admitted to participate in CCASS as an investor participant who may be an individual or joint individuals or a corporation |
| "CCASS Participant" | a CCASS Broker Participant, a CCASS Custodian Participant or a CCASS Investor Participant |
| "CNEC" | China National Electronics Imp. & Exp. Caihong Co. (中國電子進出口彩虹公司), a state-owned enterprise established in the PRC on 21 December 1984. It is a related party of the Company |
| "Companies Ordinance" | Companies Ordinance (Chapter 32 of the Laws of Hong Kong), as amended, supplemented or otherwise modified from time to time |
| "Company" or "our Company" or "we" or "us" | IRICO Group Electronics Company Limited (彩虹集團電子股份有限公司) (a joint stock company established in the PRC with limited liability on 10 September 2004), including, unless the context otherwise requires, its subsidiaries, and, where the context refers to any time prior to the Effective Date, those entities or businesses which were contributed to, and became part of, the Company pursuant to the Reorganization |
| "Company Law" | the Company Law of the PRC (中華人民共和國公司法) promulgated by the Standing Committee of the Eighth NPC on 29 December 1993 and which became effective on 1 July 1994, as amended, supplemented or otherwise modified from time to time |
| "CPT Plant" | IRICO Color Picture Tube Plant (彩虹彩色顯像管總廠), formerly known as Shaanxi Color Picture Tube Plant (陝西彩色顯像管總廠), a state-owned enterprise established in the PRC in August 1978 |
| "CSRC" | China Securities Regulatory Commission (中國證券監督管理委員會), a regulatory body responsible for the supervision and regulation of the securities market of the PRC |
| "Director(s)" | the director(s) of the Company |
| "Domestic Shares" | ordinary shares issued by the Company of RMB1.00 each, which are subscribed for and credited as fully paid in Renminbi |
| "Effective Date" | 31 December 2003, the date when the Reorganization became effective |
| "Foreign Investment Shares" | ordinary shares issued by the Company of RMB1.00 each, which are subscribed for and credited as fully paid in a currency other than Renminbi |
| "GDP" | gross domestic product (all references to GDP growth rates are to real as opposed to nominal rates of GDP growth) |
| "Global Offering" | Placing and Public Offer, collectively |

# DEFINITIONS

| | |
|---|---|
| "Group Corporation" | IRICO Group Corporation (彩虹集團公司), formerly known as IRICO Electronics Group Corporation (彩虹電子集團公司), a state-owned enterprise established in the PRC on 5 July 1989, including, unless the context otherwise requires, its subsidiaries apart from the Company |
| "H Line" | the Company's new production line for the production of 21" CPTs |
| "H Shares" | Foreign Investment Shares issued by the Company of RMB1.00 each, which shall be listed on the Stock Exchange and subscribed for and traded in Hong Kong dollars |
| "HK GAAP" | accounting principles generally accepted in Hong Kong |
| "HKSCC" | Hong Kong Securities Clearing Company Limited |
| "HKSCC Nominees" | HKSCC Nominees Limited, a wholly owned subsidiary of HKSCC |
| "Hong Kong" | the Hong Kong Special Administrative Region of the PRC |
| "IRICO Display" | IRICO Display Technology Co., Ltd. (西安彩瑞顯示技術有限公司), a Sino-foreign joint venture established in the PRC on 20 January 2004 |
| "IRICO Kunshan" | Kunshan IRICO Industry Co., Ltd. (昆山彩虹實業有限公司), a state-owned enterprise established in the PRC on 9 January 1990 and converted to a limited liability company on 2 September 2004 |
| "IRICO Parts" | Xianyang IRICO Electronics Parts Co., Ltd. (咸陽彩虹電子配件有限公司), a collectively-owned enterprise established in the PRC in February 1991 and converted to a limited liability company on 18 October 2002 |
| "IRICO Phosphor" | Shaanxi Rainbow Phosphor Material Co., Ltd. (陝西彩虹熒光材料有限公司), a Sino-foreign joint venture established in the PRC on 4 December 1995 |
| "IRICO Shadow Mask" | Xianyang IRICO Electronics Shadow Mask Co., Ltd. (咸陽彩虹電子網版有限公司), a Sino-foreign joint venture established in the PRC on 31 October 2003 |
| "IRICO Zixun" | Xian IRICO Zixun Co., Ltd. (西安彩虹資訊有限公司), a limited liability company established in the PRC on 9 March 2001 |
| "K Line" | the production line to be constructed by K-Line Company for the production of super large screen high definition CPTs |
| "K-Line Company" | Xianyang IRICO Digital Display Co., Ltd. (咸陽彩虹數碼顯示有限公司), a limited liability company established in the PRC on 30 September 2004 |
| "Latest Practicable Date" | 3 December 2004, being the latest practicable date for ascertaining certain information in this prospectus prior to its publication |
| "Listing" | listing of the H Shares on the Main Board of the Stock Exchange |

# DEFINITIONS

| | |
|---|---|
| "Listing Date" | the date, expected to be on or about 20 December 2004, on which the H Shares are listed and from which dealings therein are permitted to take place on the Stock Exchange |
| "Listing Rules" | the Rules Governing the Listing of Securities on the Stock Exchange |
| "Mandatory Provisions" | the Mandatory Provisions for Articles of Association of Companies to be Listed Overseas (到境外上市公司章程必備條款), for inclusion in the articles of association of companies incorporated in the PRC and to be listed overseas, which were promulgated by the former Securities Commission of the State Council and the former State Economic System Restructuring Commission on 27 August 1994, as amended and supplemented or otherwise modified from time to time |
| "Ministry of Commerce" or "MOC" | the Ministry of Commerce of the PRC (中國商務部), which in March 2003 assumed the functions of the former Ministry of Foreign Trade and Economic Co-operation of the PRC (中國對外經濟貿易合作部) ("MOFTEC") |
| "Ministry of Finance" or "MOF" | the Ministry of Finance of the PRC (中國財政部), the ministry responsible for the administration of the PRC government's policies on revenue and expenditure, finance and taxation and regulation of financial institutions |
| "Ministry of Information Industry" or "MII" | the Ministry of Information Industry of the PRC (中國信息產業部), the ministry responsible for the administration of electronics and information products manufacturing and the telecommunications and software industries |
| "Nanjing Reide" | Nanjing Reide Phosphor Co., Ltd. (南京瑞德熒光材料有限公司), a Sino-foreign joint venture established in the PRC on 2 August 2002 |
| "NDRC" | the National Development and Reform Commission of the PRC (中國國家發展和改革委員會), the predecessor of which was the State Development and Planning Commission of the PRC (中國國家發展計劃委員會) ("SDPC") |
| "NPC" | the National People's Congress of the PRC (中國全國人民代表大會) |
| "NSSFC" | the National Social Security Fund Council of the PRC (全國社會保障基金理事會) |
| "Offer Price" | the final offer price per Offer Share (exclusive of brokerage of 1%, SFC transaction levy of 0.005%, investor compensation levy of 0.002% and Stock Exchange trading fee of 0.005%), which is expected to be not more than HK$1.73 and not less than HK$1.51. Such price is to be agreed upon by the Selling Shareholder, the Company and the Global Coordinator (on behalf of the Underwriters) on or before the Price Determination Date |
| "Offer Shares" | Placing Shares and Public Offer Shares |

— 14 —

# DEFINITIONS

| | |
|---|---|
| "Over-allotment Option" | the option to be granted by the Selling Shareholder and the Company to the Placing Underwriters, exercisable by the Global Coordinator on behalf of the Placing Underwriters, to require the Selling Shareholder to sell up to an aggregate of 6,614,000 additional H Shares, and the Company to issue up to an aggregate of 66,166,000 additional H Shares, (in the aggregate representing approximately 15% of the H Shares initially being offered under the Global Offering) solely to cover over-allotments in the Placing, at any time within 30 days from the last day for lodging of applications under the Public Offer |
| "PBOC" | the People's Bank of China (中國人民銀行), the central bank of the PRC |
| "Placing" | the placing of the Placing Shares at the Offer Price pursuant to relevant conditions described in this prospectus |
| "Placing Shares" | 436,764,000 H Shares to be offered initially at the Offer Price pursuant to the Placing together, where relevant, with any additional H Shares which may be sold and issued pursuant to the exercise of the Over-allotment Option, but subject to re-allocation as described in the section "Structure of the Global Offering" in this prospectus |
| "Placing Underwriters" | the underwriters of the Placing, led by the Global Coordinator, who are expected to enter into the Placing Underwriting Agreement |
| "Placing Underwriting Agreement" | the underwriting agreement relating to the Placing to be entered into among the Selling Shareholder, the Company, the Placing Underwriters and the Global Coordinator on or around 13 December 2004 |
| "PRC" or "China" | the People's Republic of China; unless otherwise specified, the term "PRC" as used in this prospectus does not include Hong Kong, Macau and Taiwan |
| "PRC GAAP" | the accounting rules and regulations in the PRC |
| "PRC government" or "State" | the PRC government, including all the branch government departments (including provincial, municipal and other regional or local government authorities, and their subordinate regulatory bodies) |
| "Price Determination Date" | the date, expected to be on or around Monday, 13 December 2004 but no later than Thursday, 16 December 2004, on which the Offer Price is fixed for the purposes of Global Offering |
| "Public Offer" | the offer for subscription at the Offer Price of the Public Offer Shares by members of the public in Hong Kong, subject to the terms and conditions set out in this prospectus and the Application Forms |
| "Public Offer Shares" | 48,530,000 H Shares to be offered initially at the Offer Price pursuant to the Public Offer, subject to reallocation as described in the section "Structure of the Global Offering" in this prospectus |
| "Public Offer Underwriters" | the underwriters of the Public Offer set out in the section headed "Underwriting — Public Offer Underwriters" in this prospectus |

# DEFINITIONS

| | |
|---|---|
| "Public Offer Underwriting Agreement" | the underwriting agreement dated 7 December 2004 relating to the Public Offer entered into among the Selling Shareholder, the Company, the Public Offer Underwriters and the Global Coordinator |
| "QIB(s)" | qualified institutional buyer(s) within the meaning of Rule 144A |
| "Regulation S" | Regulation S under the US Securities Act |
| "Reorganization" | the reorganization of the Company and the Group Corporation for the purpose of the listing of the H Shares on the Stock Exchange, a description of which is set out in the section headed "History and Reorganization" in this prospectus |
| "Rule 144A" | Rule 144A under the US Securities Act |
| "SAFE" | the State Administration of Foreign Exchange of the PRC (中國國家外滙管理局) |
| "SAIC" | the State Administration for Industry and Commerce of the PRC (中國國家工商行政管理局) |
| "SASAC" | the state-owned Assets Supervision and Administration Commission of the State Council of the PRC (中國國務院國有資產監督管理委員會) |
| "Securities Law" | the Securities Law of the PRC (中華人民共和國證券法) enacted by the Standing Committee of the ninth NPC on 29 December 1998, and which became effective on 1 July 1999, as amended, supplemented or otherwise modified from time to time |
| "Selling Shareholder" | the Group Corporation (acting through the Company), which is offering the 44,120,000 H Shares and any additional H Shares pursuant to the exercise of the Over-allotment Option (subject and pursuant to the approval issued or to be issued by SASAC and the NSSFC) for sale under the Global Offering |
| "SETC" | the State Economic and Trade Commission of the PRC (中國國家經濟貿易委員會) |
| "SFC" | Securities and Futures Commission |
| "SFO" | Securities and Futures Ordinance (Chapter 571 of the Laws of Hong Kong), as amended, supplemented or otherwise modified from time to time |
| "Shanghai Stock Exchange" | Shanghai Stock Exchange, a stock exchange in the PRC |
| "Shares" | ordinary shares issued by the Company of RMB1.00 each, including the Domestic Shares and Foreign Investment Shares (including H Shares) |

# DEFINITIONS

| | |
|---|---|
| "Special Regulations" | the Special Regulations of the State Council on the Overseas Offering and Listing of Shares by Joint Stock Limited Companies (國務院關於股份有限公司境外募集股份及上市的特別規定) promulgated by the State Council on 4 August 1994, as amended, supplemented or otherwise modified from time to time |
| "Sponsor" or "Global Coordinator" | China International Capital Corporation (Hong Kong) Limited, acting as the global coordinator, bookrunner, lead manager and sponsor of the Global Offering, which is a deemed licensed corporation to carry out the regulated activities of dealing in securities, advising on securities, advising on corporate finance and asset management under the SFO |
| "State Council" | the State Council of the PRC |
| "State Restructuring Commission" | the State Council Office for Restructuring the Economic System, PRC (中國國院經濟體制改革辦公室) the predecessor of which was the State Commission for Restructuring the Economic System of the PRC (中國國家經濟體制改革委員會) |
| "Stock Exchange" | The Stock Exchange of Hong Kong Limited |
| "Supervisor(s)" | the member(s) of the Supervisory Committee of the Company |
| "Supervisory Committee" | the Supervisory Committee of the Company as established pursuant to the Company Law, the particulars of which are set out in the section headed "Directors, Supervisors, senior management and staff" in this prospectus |
| "Track Record Period" | the three years ended 31 December 2003 and the six months ended 30 June 2004 |
| "Underwriters" | the Placing Underwriters and the Public Offer Underwriters, collectively |
| "Underwriting Agreements" | the Placing Underwriting Agreement and the Public Offer Underwriting Agreement, collectively |
| "US GAAP" | generally accepted accounting principles in the United States |
| "US Securities Act" | the U.S. Securities Act of 1933, as amended |
| "US" or "United States" | the United States of America |
| "WTO" | the World Trade Organization |
| "Xian Guangxin" | Xian Guangxin Electronic Co., Ltd. (西安廣信電子有限公司), a Sino-foreign joint venture established in the PRC on 8 May 1995 |
| "Xianyang Cailian" | Xianyang Cailian Packaging Material Company Limited (咸陽彩聯包裝材料有限公司), a limited liability company established in the PRC on 15 December 2003 |

# DEFINITIONS

| | |
|---|---|
| "Xianyang Caiqin" | Xianyang Caiqin Electronics Device Co., Ltd. (咸陽彩秦電子器件有限責任公司), a domestic joint venture enterprise established in the PRC in October 1988 and converted to a limited liability company on 24 August 2000 |
| "Zhuhai Caizhu" | Zhuhai Caizhu Industrial Co., Ltd. (珠海彩珠實業有限公司), a state-owned enterprise established in the PRC on 20 June 1990 and converted to a limited liability company on 7 September 2004 |
| "HK$" | Hong Kong dollars, the lawful currency of Hong Kong |
| "RMB" or "Renminbi" | Renminbi, the lawful currency of the PRC |
| "US$" or "US dollars" | United States dollars, the lawful currency of the United States |
| "sq.m." | square meters |

*For the purpose of illustration only and unless otherwise specified in this prospectus, amounts denominated in RMB have been translated into HK$ at the rate of RMB1.06 = HK$1.00, and amounts denominated in US$ have been translated into HK$ at the rate of US$1.00 = HK$7.80. No representation is made that the HK$ amounts could have been, or could be, converted into US$ or RMB at such rates or at any other exchange rates.*

# GLOSSARY

This section contains the explanations of certain terms used in this prospectus in connection with the Company and its business. These terms and their given meanings may not correspond to standard industry meanings and usage of these terms.

"cathode ray tube" or "CRT"
a specialized vacuum tube in which images are produced when an electron beam strikes a phosphorescent surface. Cathode ray tubes are the most common type of video display. They are used in television sets and computer monitors as well as in projection televisions. Phosphor screens using multiple beams of electrons allow CRTs to display millions of colors

"CDT"
color display tube, a type of CRT used for displaying images in a computer monitor or certain other equipment

"cold maintenance"
an overhaul carried out on a glass melting furnace after the fire in the furnace has been turned off and the furnace has cooled down. Normally, a glass melting furnace can be used continuously for several years without being turned off. During cold maintenance, the furnace is reconstructed and an overhaul is also carried out on relevant production lines

"color picture tube" or "CPT"
a type of CRT used for displaying images in a television set

"CPT components"
various components and materials necessary for the production of CPTs, such as glass bulbs, electron guns, masks and frames, deflection yokes and phosphor

"deflection yoke"
a device that produces a magnetic field which deflects one or more electron beams. It is an assembly of one or more electromagnetic coils placed around the neck of a CRT. It is used in television images and in some oscilloscope tubes

"dolomite"
a white or light-colored mineral ($CaMg(Co_3)_2$) used in fertilizers or used as a furnace refractory or a construction or ceramic material. It is used in the manufacture of glass bulbs

"electron gun"
a device used in CRTs to generate electron beams. It typically shoots three tightly grouped electron beams. Each beam is dedicated to a type of phosphor that gives off a different color of light when struck: red, green or blue

"flat panel display" or "FPD"
a type of thin screen display devices that uses any of a number of technologies, such as liquid crystal display (LCD), plasma, and field emission display (FED)

"flat square" or "FS"
a spherical screen with radius of curvature of 1.5R(R: the equal curvature radius of external surface, 1R=1.767 x useful diagonal). Flat square is also called full square screen

"frit"
a glass powder made by quenching molten glass to a solid glass and breaking up the solid glass into powder. It can be used for sealing the panel and funnel together in CPT manufacturing

# GLOSSARY

| | |
|---|---|
| "glass bulb" | a generic name for the basic glassware of a CPT, which is comprised of panel, funnel, neck and stem. Apart from supporting and guaranteeing safety properties of the tube under vacuum status, it also acts as an insulator between the electrodes |
| "glass panel" | a rectangular panel which is coated with phosphor. It is also called screen. It is the core component of a CPT where the electron is converted into light and images are displayed |
| "inch" or """ | a unit of length, which is equal to approximately 2.54 cm |
| "large sized CPTs" or "large sized CRT television" | CPTs or CRT television sets with screen size ranging from 27" to 29" |
| "liquid crystal display" or "LCD" | a digital flat panel display device that uses liquid crystal cells, using photo effect or thermal lightening effect of liquid. It features the principal advantages of light weight, slimness and low energy consumption |
| "mask" or "shadow mask" | a perforated metal sheet used in CRT that rests between the electron gun and the phosphor-coated screen to ensure that the electron beams only strike the correct phosphor dots |
| "medium sized CPTs" or "medium sized CRT television" | CPTs or CRT television sets with screen size ranging from 21" to 26" |
| "organic light emitting diodes" or "OLED" | a self-luminous display device that consists of small dots of organic polymer that emit light when charged with electricity. It is also known as organic emitting light |
| "phosphor" | an element that emits visible light when it is bombarded by or stimulated by electrons. In a CRT, phosphor are coated on the inside of the screen. When the electron beam strikes the phosphor, it makes the screen glow. In a color screen, there are three phosphor arranged as dots or stripes that emit red, green and blue light |
| "plasma display panel" or "PDP" | a digital flat panel display device that is used for television, computer monitors and dynamic signage. It is also known as gas plasma display or plasma screen. It consists of two layers of glass surrounding cells of xenon and neon glass. Surrounding electrodes switch the cells on and off, causing them to emit light and create the picture |
| "projection" | a television system that employs lenses to project a video image onto a larger screen. Projection television includes rear projection and front projection |
| "pure flat" or "PF" | a pure flat panel, which is completely flat and produces higher quality and higher contrast pictures compared to spherical surface tubes. At present, it is the mainstream technology used in the CPT industry |

# GLOSSARY

"Six Sigma management"   a management philosophy developed by Motorola that emphasizes setting extremely high objectives, collecting data, and analyzing results to a fine degree as a way to reduce defects in products and services. There are two Six Sigma processes: Six Sigma DMAIC and Six Sigma DMADV, each term derived from the major steps in the process. Six Sigma DMAIC is a process that defines, measures, analyzes, improves, and controls existing processes that fall below the Six Sigma specification. Six Sigma DMADV defines, measures, analyzes, designs, and verifies new processes or products that are trying to achieve Six Sigma quality. All Six Sigma processes are executed by Six Sigma Green Belts or Six Sigma Black Belts, which are then overseen by a Six Sigma Master Black Belt

"small sized CPTs" or   CPTs or CRT television sets with screen size below 21"
"small sized CRT
television"

"spherical surface tube"   a CPT with spherical surface with radius of curvature of 1R (R: the equal curvature radius of external surface, 1R=1.767 x useful diagonal). It displays a picture with some distortion. It was used for older generations of CPTs

"super large sized CPTs" or   CPTs or CRT television sets with screen size above 30"
"super large sized CRT
television"

# RISK FACTORS

*You should carefully consider all of the information set out in this prospectus, including the risks and uncertainties described below before making an investment in the Offer Shares. You should pay particular attention to the fact that we are a PRC company and are governed by a legal and regulatory environment that in some respects differs from what prevails in other countries. Our business, financial condition or operating results could be affected materially and adversely by any of these risks. The trading price of our H shares could decline due to any of these risks and you may lose all or part of your investment. For more information concerning the PRC and certain related matters discussed below, see Appendix VI — "Summary of Principal PRC and Hong Kong Laws and Regulations" and Appendix VII — "Summary of Articles of Association" to this prospectus.*

## RISKS RELATING TO THE COMPANY

**There is no assurance that we will be able to maintain our competitive edge in the research and development of new products. As a result, our business development and operating results may be affected.**

We are engaged in the business of manufacturing electronic products. As the industry is characterized by rapid changes due to technological advances and the variation and individualization of products, the key factors affecting the continuous growth of enterprises in this industry are the abilities to predict technology development trends, to pursue the research and development of new varieties of existing products as well as new products and to successfully launch new varieties and new products in a timely manner so as to maintain their competitive edge. Our results of operation depend on our ability to keep pace with product innovations and technological changes. If we cannot respond quickly and effectively to technological changes, our profitability will be adversely affected.

In order to ensure our long-term development, we are committed to improving our existing products, workmanship and technology, as well as the development of new products. Most of the improvement and development projects in connection with our products, workmanship and technology are undertaken by ourselves, while some of the projects are carried out in cooperation with institutions of higher education in the PRC as well as domestic and overseas enterprises. Details of our research and development projects are set out in the section headed "Business — Technical Strengths and Principal Research and Development Capabilities" in this prospectus.

Technology advances may lead to declines in prices and sales volumes for products made with existing technologies, which may cause our products to become less competitive in the market place. As a result, we may be required to make substantial investments of various resources such as capital, human resources and technology to keep pace with such development. However, we cannot assure you that we will be able to obtain all necessary resources for our research and development activities, nor that any of our research and development projects will achieve the desired results, nor that the experimental results obtained thus far will be suitable for commercial production. In addition, although we have extensive experience in the enhancement of CPT technology and workmanship, our research and development of new flat panel displays are only at an early stage, when compared to leading international enterprises in the same industry segment in terms of the possession of advanced technology, resources, research and development personnel and capital support. If we were unable to improve our existing products or develop new varieties or new products in a timely manner, or to launch our products to the market at a competitive price, we may not be able to maintain our competitive edge in the fast-changing electronic manufacturing industry or may be placed at a disadvantageous position against our competitors, thereby adversely affecting our operating results and future development.

# RISK FACTORS

**The construction of production lines involves certain risks and, as a result, we may not be able to realize our expected production capacity in a timely manner.**

We are constructing and have plans to construct several production lines and other production facilities for CPTs and CPT components, including the K Line, the H Line (which has already reached trial production), four production lines for glass panels and several production lines for other CPT components. Details of our plans for the construction of production lines are set out in "Future Plans and Use of Proceeds" in this prospectus.

The costs and time involved in the construction of the above production lines may be affected by, among other matters, the shortage in supply and/or changes in the prices of equipment or materials, the level of technology required and the sufficiency of capital for the proposed construction of production lines and other production facilities. If our plans for constructing new production lines experience delays or even cancellations due to any of the above reasons, or the ramp-up period of any of the new production lines turns out to be substantially longer than we expected, or the production capacity of any of the new production lines fails to reach the originally designed levels, or the costs involved in the construction of any of the new production lines substantially exceed our original plans, we may not be able to attain the desired production capacity in a timely manner, which may adversely affect our business operations and operating results.

**If we fail to adjust our existing product mix in a timely manner in light of changes in market demand, our operations and profitability may be adversely affected.**

At present, our products that have high profit margins are mainly small or medium sized CPTs, which is attributable to our higher vertical integration rates, production capacity and capacity utilization rates in our production of these CPTs. If the sales of small or medium sized CPTs substantially decline in the future due to changes in market demand, our overall profit margin will decrease accordingly. If we fail to adjust our product mix in a timely and cost-effective manner, or fail to produce products that meet the market demand, our overall profitability will be adversely affected.

**Absence of land use right certificate and property title certificate in connection with a factory used for our operations may have an adverse effect on our production and operations.**

As advised by our PRC legal advisers, Nanjing Reide owns a factory building (the "Property") located in Nanjing with a floor area of approximately 1,000 sq.m.. Nanjing Reide uses the Property for production of recycled phosphor. However, as Nanjing Reide is unable to obtain the land use right certificate and property title certificate for the Property, our PRC legal advisers have advised that Nanjing Reide's valid legal title to the Property cannot be confirmed. If any disputes arise in connection with the legal title of the Property, Nanjing Reide may not be able to continue to use the Property. As a result, Nanjing Reide would incur additional cost, including relocation costs (which we believe would be relatively immaterial), and its operations may be adversely affected in the event that it is evicted from the Property. According to the undertaking given by the Group Corporation, the Group Corporation has agreed to indemnify us for the actual relocation costs and other losses if Nanjing Reide is unable to continue to use the Property. In the event the Group Corporation for whatever reason fails to perform its obligations under the undertaking, we may have to enforce the undertaking by taking legal action, despite the fact that such legal action may not fully recover the full amount in respect of which the Group Corporation has provided the relevant indemnity.

# RISK FACTORS

**Our operations may be adversely affected if the landlord of a property leased by us could not establish vested legal title to the property.**

IRICO Display leases from the Administration Committee of Xian Economic and Technology Development Zone (the "Landlord") a factory building (the "Factory") located in the Export Processing Zone, Xian, Shaanxi Province, with a total gross floor area of 3,780 sq.m. for a monthly rent of RMB34,020 for a term of eight months from 30 April 2004 to 29 December 2004. This leasing arrangement is intended to be a transitional arrangement. Following completion of the construction of a factory and warehouse to be built on the site acquired by IRICO Display in the Xian Economic and Technology Development Zone (the "Acquired Site") by September 2005, IRICO Display will relocate its production facilities to the Acquired Site. As the Landlord is unable to provide the land use right certificate and the property ownership certificate for the Factory, our PRC legal advisers' opinion is that legal title to the Factory could not be verified. If the Landlord does not have valid legal title to the Factory or does not have the right to lease the Factory to us, the lease agreement would not be valid under PRC law and regulations and may not be enforceable against third parties. Accordingly, the party who has valid title to the Factory may have the right to take possession and may request IRICO Display to vacate the Factory. IRICO Display would incur additional costs, including relocation costs, and its operations may be adversely affected in the event that IRICO Display is evicted from the Factory before the completion of the construction of the factory and the warehouse at the Acquired Site. According to the undertaking given by the Group Corporation, the Group Corporation has agreed to (i) provide an alternate property to IRICO Display to ensure that its normal operations would not be disrupted if it is unable to continue to use the Factory due to any reasons and (ii) indemnify us for the actual relocation costs and other losses (which we believe would be relatively immaterial) we may incur. In the event the Group Corporation for whatever reason fails to perform its obligations under the undertaking, we may have to enforce the undertaking by taking legal action, despite the fact that such legal action may not recover the full amount in respect of which the Group Corporation has provided the relevant indemnity.

**We use leased land and buildings to conduct a substantial part of our operations.**

We own a certain portion of the land and properties which we use for our operations, and approximately 54% of the land and approximately 59% of the properties which we use for our operations are leased from the Group Corporation. We further lease the Factory from the Administrative Committee of Xian Economic and Technology Development Zone, a third party, for our operations, as explained above. Among our production lines and facilities, three production lines for CPTs (the production capacity of which accounted for approximately 47.5% of our total CPT production capacity as at 30 June 2004), seven production lines for glass bulbs, eight production lines for electron guns, one production line for shadow masks and certain production facilities for large scale metal parts are located on the leased land and properties. We are constructing or plan to construct two production lines for CPTs, one production line for shadow masks, one production line for electron guns and certain production facilities for large scale metal parts located on the leased land and properties. Apart from the factory leased by IRICO Display in Xian as disclosed above, all of our other leased properties, with a total gross floor area of approximately 281,233 sq.m., are leased from the Group Corporation. We have entered into premises leasing agreements and land use rights leasing agreements with the Group Corporation which include provisions pursuant to which the Group Corporation has granted to us options to purchase from it the relevant land and properties, details of which are set out in the section headed "Relationship with the Group Corporation" in this prospectus. The leasing arrangements, in effect, provide us with a long-term right to use the relevant land and properties.

Notwithstanding the above safeguards, if unforeseeable circumstances arise which render it necessary for us to move out of any of our leased land and properties on a short notice and if we are not able to immediately identify alternative land and properties appropriate for relocating our business operations, our production and business operations will be adversely affected.

# RISK FACTORS

**Our operations depend on stability of our core personnel; if we lose the services of or fail to retain any of our core team members or to recruit well-qualified and experienced new team members, our normal business operations may be adversely affected.**

The success of our operations depends to a large extent on the expertise and experience of our core team, which consists of our directors, senior management and key technical personnel. Information regarding our Directors and senior management is set out in "Directors, supervisors, senior management and staff" in this prospectus. Whether we are able to retain members of our existing core team and recruit well-qualified and experienced personnel to join our core team is one of the key factors affecting our sustainable development.

In order to attract and retain key managerial and technical personnel, we have established incentive programs, details of which are set out in the section headed "Directors, supervisors, senior management and staff" in this prospectus. We expect that the demand for senior management and technical personnel from our competitors such as other CPT manufacturers and enterprises in related industries will continue to grow. Even though we have not encountered any difficulties in attracting and retaining key personnel in the past, there is no assurance that we will not encounter such difficulties in the future. If our directors or senior management cease to participate in our management, or if we fail to attract or retain certain key personnel, the operation and growth of our business could be adversely affected.

**Our intellectual property rights may be infringed upon and we may also become a party to litigation as a result of alleged infringement of other parties' intellectual property rights, either of which will adversely affect our business.**

We have obtained certain patents and are in the process of making patent applications for a number of our products and technologies. Details of these are set out in Appendix VIII to this prospectus — "Statutory and General Information". Our patents and proprietary technologies are one of the key factors contributing to the success of our business. Although we have implemented internal measures to protect our intellectual property rights, there is no assurance that such measures can effectively prevent or monitor infringement. Any serious infringement upon our intellectual property rights may have a material impact on our business. In addition, our competitors may also develop their own technologies similar to ours and may file or may have already filed applications for patents or registration of other intellectual property rights in respect of such technologies. Therefore, our use of any technology similar to that of any third party may constitute infringement upon its intellectual property rights. Even though presently we have not received any claim by any third party in respect of intellectual property right infringement, there is no assurance that there will be no such claims in the future.

We have also entered into certain agreements relating to technology licensing with major technology cooperation partners. Details of these agreements are set out in the section headed "Business — Technical Strengths and Principal Research and Development Capabilities" in this prospectus. If any of these agreements was to be terminated or the terms of these agreements were changed so that we would be unable to continue to use such technologies on reasonable terms, we may have to develop on our own the related technologies or obtain similar technologies through other sources. Apart from the high cost which we may incur, there is no assurance that we will be able to develop or obtain similar technologies or develop or obtain them in a timely manner. As a result, our production may be delayed or hindered, which will have an adverse effect on our business and operating results.

We may become a party to litigation or disputes in relation to intellectual property rights as a result of any litigation or dispute initiated by us for the protection of our intellectual property rights, or any litigation or dispute against us for any alleged infringement of intellectual property rights of other parties. There is no assurance that we will prevail in litigation regarding intellectual property rights. Any judgment against us

# RISK FACTORS

may prevent or limit us from using the relevant technologies and our business and operations may be adversely affected. Litigation and dispute resolutions may be time-consuming and/or result in large amounts of damages, either would have an adverse effect on our operations.

**Preferential tax treatments enjoyed by us will expire and may be reduced or revoked.**

We, and certain of our subsidiaries, including A Share Company, IRICO Zixun, IRICO Phosphor, IRICO Shadow Mask, IRICO Display and Zhuhai Caizhu are currently entitled to preferential tax treatments. Details of the preferential treatments are set out in the section headed "Financial Information — Taxation" in this prospectus. The Directors believe that we and our related subsidiaries will continue to be entitled to the preferential tax treatments during their respective terms pursuant to the PRC approvals and regulations currently in force. However, there is no assurance that such treatments will not be reduced or completely revoked, nor that we and our related subsidiaries will, upon the expiration of the current preferential treatment periods, be entitled to other related preferential tax policies.

In addition, any higher tax imposed on us as a result of changes in the existing PRC tax laws and regulations or other judicial interpretations will have an adverse impact on our profitability.

**We may be subject to unexpected risks relating to our PDP project.**

We have been developing PDP related technology since 1996. We developed the 40" PDP device jointly with the Gas Electric Discharge Devices Institute of Russia from 1997 to 2001. We established an experimental production line for 40"–50" PDP in 2001 and developed the prototypes for 40" and 42" PDP panels and devices in 2002 and 2004, respectively. We currently focus on the development and design of 42" and 50" PDP panels and modules on the above mentioned experimental production line. Details of our PDP project are set out in the section headed "Business — Technical Strengths and Principal Research and Development Capabilities" in this prospectus. In 2001, 2002 and 2003 and the first six months of 2004, our research and development expenses incurred for the PDP project were RMB25,138,000, RMB8,391,000, RMB12,613,000 and RMB6,664,000, respectively.

As there is always uncertainty in research and development, there is no assurance that we will be able to develop in a timely manner cost-effective PDP technology, or that such technology will meet the required standards in order for us to build PDP production lines for our expansion into the PDP business. If our PDP research and development project fails, we will have wasted our previous investments and expenses. On the other hand, if we succeed in the research and development of the PDP project and decide to put PDP into commercial production, a significant amount of capital may need to be injected, which may have an adverse effect on our operating results during the ramp-up period of the PDP production lines. Moreover, given the intense competition from international and domestic enterprises, as well as the market dynamics of PDP devices, we cannot assure you that the production lines, when completed, will result in the launch of our PDP products in the market in a timely manner, or at all, so as to generate profits for us.

**Our sales rely on major customers in the PRC, and any substantial decrease in sales to any of them could adversely affect our operating results.**

Our major customers include TCL King Electrical Appliances (Huizhou) Co., Ltd. ("TCL"), Shenzhen Skyworth-RGB Electronics Co. Ltd. ("Skyworth"), Konka Group Co., Ltd. ("Konka"), Sichuan Changhong Electric Co., Ltd. ("Changhong") and Qingdao Hisense Electric Appliance Co., Ltd. ("Hisense"), which are major television set manufacturers in the PRC. For the three years ended 31 December 2001, 2002 and 2003 and the six months ended 30 June 2004, the total sales to the above major customers accounted for approximately 59.27%, 59.35%, 63.53% and 67.09%, respectively, of our total sales. We have maintained good business relationships with those customers ranging from five years to ten

# RISK FACTORS

years, and the Directors believe that such relationships will continue. However, if for any reason we lose one or more of these customers, or if these customers cancel or reduce their orders or lower purchase prices, and if we are unable to find other comparable customers to replace them, our sales revenue may be significantly reduced, and our operating results may be adversely affected.

Excluding CNEC, Skyworth was our second largest outside customer for the year ended 31 December 2003 and our third largest outside customer for the six months ended 30 June 2004, accounting for RMB590,662,000, or 13.8%, of our total sales for 2003, and RMB304,205,000, or 12.6%, of our total sales for the first six months of 2004. It has been reported in the news media that certain members of the management of the listed parent company of Skyworth were detained by the Independent Commission Against Corruption of Hong Kong (the "ICAC") on 30 November 2004 and some of them have subsequently been charged with misappropriation of company funds.

There is no assurance that we will be able to procure orders from other customers for all of the CPTs we would have sold to Skyworth, that the process of securing orders from other customers will be completely smooth and that the prices at which our CPTs can be sold to them will compare favorably to those at which they would have been sold to Skyworth. Accordingly, if the ICAC inquiries should have a serious, long-term negative impact on Skyworth's operations and financial condition, our business may be negatively affected.

We have certain accounts receivable due from Skyworth and inventory on consignment to Skyworth. We cannot assure you that we will be able to recover all or any of such accounts receivable or inventory. If we are unable to recover any of the accounts receivable and inventory on consignment, our total net loss would be approximately RMB18.8 million, after taking into account the related tax impact on us. As a cautionary measure, we have made a provision for the entire amount of this possible loss.

## If we fail to strengthen and expand our business in overseas markets, our overall operating results could be adversely affected.

Our products entered into overseas markets in 1989. For each of the three years ended 31 December 2001, 2002 and 2003 and the six months ended June 30, 2004, the sales revenue of our CPTs sold to overseas markets through CNEC accounted for more than 10% of our total sales revenue during each of the relevant periods. We will continue to strengthen and expand our business in overseas markets. For details of our expansion in overseas markets, see the section headed "Business — Marketing and Sales" in this prospectus.

We market our products primarily through local agents on a commission basis in certain countries and regions which we believe have significant market potential but are not yet well-known to us, such as Russia and India. If we continue to rely on these agents and fail to develop local business relationships independently, it may have a negative impact on the overall expansion plan of our business in these areas. If we are unable to strengthen and expand our business in overseas markets in the future, our overall operating results could be adversely affected.

## Customers in our overseas markets may need some time to familiarize themselves with our newly established import and export department. In the short term, this could affect the normal operation of our overseas business.

For each of the three years ended 31 December 2001, 2002 and 2003 and the six months ended 30 June 2004, we sold over 10% of our CPTs ever produced to CNEC, which in turn sold them to overseas markets. We established an internal import and export department ("I&E Department") in September 2004 to transact our import and export business. Although we employed the key management team and business

personnel of I&E Department who previously worked for CNEC, our overseas customers may need some time to familiarize themselves with the newly established I&E Department. Although the Directors believe that there will not be an adverse impact on our business in the long run, our operations in the short term may nevertheless be affected.

**Our procurement of certain raw materials and CPT components is dependent upon certain major suppliers; any substantial disruption of supply from any of such suppliers or any substantial change in the terms of such supply may adversely affect our operating results.**

For the three years ended 31 December 2001, 2002 and 2003 and the six months ended 30 June 2004, the total purchases from our top five suppliers accounted for approximately 47.72%, 48.35%, 36.57% and 39.13%, respectively, of our total purchases. We have maintained business relationships with the top five suppliers ranging from five years to over ten years, and the Directors believe that the relevant relationships will continue. However, there is no assurance that the suppliers will continue to supply raw materials or CPT components to us on existing or similar terms. If, for any reason, the supply of raw materials or CPT components from these suppliers is interrupted or the terms of supply change substantially and we cannot obtain comparable replacements in a timely manner or on comparable terms or at all, our operating results could be adversely affected.

**We may be required to invest more capital for environmental protection purposes due to changes in the PRC environmental laws and regulations, thereby increasing our operating cost.**

In the course of our production, we discharge certain wastes including waste water, exhaust gas, dust, noise and solid waste. We have established various internal environmental protection control and monitoring measures and obtained the ISO 14001 Certification for Environmental Management System in 1999. We have also complied with relevant environmental protection laws and regulations of the PRC in all material aspects. For details of environmental protection, see the section headed "Business — Environmental Protection" in this prospectus.

However, we cannot assure you that our existing licenses and approvals in relation to environmental protection will be extended or that no other conditions will be imposed. Nor can we assure you that no amendments will be made to the current PRC environmental laws and regulations that may require us to comply with more stringent environmental protection requirements. As a result, we may have to invest more capital to improve or enhance our existing facilities or construct new environmental protection facilities. Any of these factors may result in an increase in our operating cost and may have an adverse impact on our profitability.

**Increasing competition and market fluctuations may have an adverse impact on our inventory, creditors' and debtors' turnover periods.**

The Directors believe that, as of 30 June 2004, our levels of inventory and accounts receivable were satisfactory.

Any decrease in our sales as a result of the decrease in market demand or otherwise may have an adverse impact on our inventory turnover. In addition, as the competition in the color television set and CPT industry becomes more intense, we may need to extend the credit terms of payments and our recovery rate of accounts receivable may decrease. All of these factors could adversely affect our financial condition.

As of 30 June 2004, our gearing ratio (i.e. debt/assets ratio) was 19% while our provision for diminution in value of inventory and accounts receivable totalled RMB118,754,000. The Directors are of the view that the provision is in line with usual practice of the industry and is adequate at the moment.

# RISK FACTORS

Nevertheless, we cannot assure you that there will be no uncertainties in our future business development that may prove such provision to be insufficient, which may have a negative impact on our financial condition.

**As the interests of A Share Company's minority shareholders may, in certain circumstances, be inconsistent with ours and our shareholders', such minority shareholders may withhold their approvals of, or the Shanghai Stock Exchange may not grant the necessary waivers in respect of, certain connected transactions between A Share Company and the Company (or our other subsidiaries); as a result, such transactions may not be consummated, which may adversely affect our overall operational efficiency.**

A Share Company must comply with a number of PRC regulations concerning the protection of the interests of its minority shareholders. For example, according to the listing rules of the Shanghai Stock Exchange, when shareholders of A Share Company vote by poll on major connected transactions, all connected parties must abstain from voting. If we (or our other subsidiaries) enter into certain transactions with A Share Company in the future, such transactions will be regarded as connected transactions under the listing rules of the Shanghai Stock Exchange. Even though such connected transactions may be approved by our shareholders and/or waived by the Stock Exchange from strict compliance with the Listing Rules, they will still require the approval of the minority shareholders of A Share Company or waivers by the Shanghai Stock Exchange. If we are unable to obtain the approvals from the minority shareholders of A Share Company or the necessary waivers from the Shanghai Stock Exchange, such transactions cannot be implemented, which could adversely affect our overall operational efficiency.

**Certain of our production resources are provided by the Group Corporation. If the Group Corporation fails to continue to provide the production resources on existing terms, our business operations may be adversely affected.**

As stated in "Relationship with the Group Corporation — Independence from the Group Corporation", in light of, among other matters, the clear delineation of businesses, the non competition undertaking given by the Group Corporation and the composition of the Board with five independent Directors, we are satisfied that we can carry on our business relating to CPTs and CPT components independently from the Group Corporation. However, due to historical reasons, we have maintained a close business relationship with the Group Corporation, and we have relied, and will continue to rely, on the Group Corporation for the supply of energy and other production-related resources and non-core and general components and materials, various social and ancillary services, the lease of certain of our existing plants and land use rights, as well as trademark licenses. Details of these are set out in the section headed "Relationship with the Group Corporation — Connected Transactions" in this prospectus.

The above resources provided by the Group Corporation are important to our production operations. Among those resources, based on our existing production plan, it is anticipated that the provision of utilities will increase in the future. If, due to any unforeseeable reason in the future, one or more of these supply arrangements between the Company and the Group Corporation were to be terminated or changes unfavorable to us were to be made to the terms of these arrangements, such as any significant increase in prices, our business and operating results may be adversely affected as we may not be able to timely replace the Group Corporation with another source, or replace it upon comparable terms.

# RISK FACTORS

**The interests of the Group Corporation as our controlling shareholder may, in certain circumstances, conflict with those of our other shareholders, and the Group Corporation could cause us to make decisions that may not be in the best interests of our other shareholders.**

The Group Corporation is our controlling shareholder. Upon completion of the Global Offering, the Group Corporation will hold 75% (assuming that the Over-allotment Option is not exercised) of our total share capital. In addition, some of the members of our senior management also serve as senior executives in the Group Corporation. As a result, the Group Corporation will effectively be able to control the composition of our Board and, through the Board, exercise a significant influence over our management and corporate decisions. Subject to our Articles of Association and applicable laws, the Group Corporation may, so long as it holds more than two-thirds of our Shares, be able to approve the increase or decrease of our share capital, determine the timing and amount of our dividend payments, approve the issuance of new Shares, amend our Articles of Association, and approve mergers and acquisitions and other major transactions. The Group Corporation may also be able to prevent us from taking actions or exercising our rights under agreements to which we are a party, including the agreements we entered into with the Group Corporation in connection with the Reorganization. As some conflicts of interest may, in certain circumstances, exist between the Group Corporation and our other shareholders, the Group Corporation could prevent or delay transactions that might be desirable to other shareholders, such as takeovers or changes in our control or management. Any of such activities undertaken by the Group Corporation could have an adverse impact on our business operation.

**We may not be able to obtain external financing in time or on terms acceptable to us.**

The proceeds from the Global Offering will not be sufficient to fund all of our future business and investment plans described in the section headed "Future Plans and Use of Proceeds" in this prospectus. In addition, we may undertake acquisition, merger or other development plans in the future which may require additional capital. Our ability to obtain financing may be affected by a variety of uncertainties, including our future financial condition, operating results and cash flows, the overall performance of the CPT industry, our Share price and future credit rating. We may not be able to obtain external financing or credit in time or on terms acceptable to us. If we are unable to obtain sufficient funds in time, our business and operating results may be adversely affected.

**We cannot guarantee that the growth of our revenues and/or profits will be sustained.**

For the three years ended 31 December 2001, 2002 and 2003, our operating results have maintained strong rates of growth. Our revenues increased by approximately 21.5% from RMB3,293,021,000 in 2001 to RMB3,999,378,000 in 2002 and by approximately 6.8% from RMB3,999,378,000 in 2002 to RMB4,269,781,000 in 2003. Our net profits also increased by approximately 273% between 2001 and 2002 and by approximately 14.0% between 2002 and 2003. Our gross profit margin increased from 18% in 2001 to 23% in 2002, and from 23% in 2002 to 23.7% in 2003.

Our CPT products are considered to be commodities and the price and demand for them depend on market forces outside our control. As a result, the Directors believe that the growth rate of our operating results depends on our ability to adapt to changing market conditions. Such adaptation would include adjusting production costs and allocating production efficiently on a timely basis, and offering products that meet our customers' requirements at competitive prices. (Details of some of these factors are set out in "Financial Information" in this prospectus). Therefore, there is no assurance that the revenue and/or profit can be maintained at any particular level. If the market demand for our products decreases or competition becomes more intense, our profitability may be adversely affected.

# RISK FACTORS

**Our payment of dividends depends on certain factors; there is no assurance that dividends will be distributed or in any particular form.**

Notwithstanding our dividend policy upon listing as detailed in "Financial Information" in this prospectus, there is no assurance that dividends will be distributed or in any particular form. Whether dividends will be distributed and the amount to be distributed, if any, will depend on factors such as our profitability, financial condition, business development requirements, future prospects, cash requirements and our cash on hand.

**Our historical financial information may not be an accurate indication of our future operating results.**

As our business had not been separated from that of the Group Corporation prior to the Reorganization, the audited combined financial information during the three years ended 31 December 2001, 2002 and 2003, respectively, set out in Appendix I to this prospectus includes some of the operating results of the businesses retained by the Group Corporation after the Reorganization. Therefore, such historical financial information should not be taken as the basis for an accurate prediction of our future operating results.

**Our interests in our subsidiaries may be diluted.**

Currently, we are holding controlling interests or substantial interests in ten subsidiaries including A Share Company which is listed on the Shanghai Stock Exchange. If it becomes necessary in the future for these subsidiaries to increase their registered capital or issue equity-linked securities such as new shares or convertible bonds, and if such capital increase or securities issues are not on a pro rata basis to the existing shareholders, our interests in those subsidiaries may be diluted.

**There may be changes to the use of proceeds and we may not be able to carry out our future plans.**

The business and investment plans described in the section headed "Future Plans and Use of Proceeds" in this prospectus are based on our current estimates and there is no assurance that we will be able to successfully implement the development plans as intended in the fast changing and intensely competitive CPT industry. In case of any unforeseen event which would result in our inability to apply the proceeds of the Global Offering as intended, the Directors will carefully evaluate the situation and may re-allocate the intended funding to our future plans and/or new projects and/or to hold such funds as short-term deposits for so long as the Directors consider to be in our best interests.

**Our insurance coverage may not be sufficient to cover all the risks related to our operations.**

Although we have not experienced major accidents in the course of our operations which have caused significant property damage and/or personal injuries, there is no assurance that we will not experience major accidents in the future. Although we have purchased the necessary insurance, including policies covering loss and damage in respect of fixed assets, which the Directors believe to be the insurance that is customary to our industry, the occurrence of any event or series of events such as an earthquake, war or flood, and the consequences resulting from them, may not be covered adequately or at all, by the insurance policies which we currently have. We also face exposure to product liability claims in the event that any of our products is alleged to have caused property damage, bodily injury or other adverse effects. Losses incurred or payments we may be required to make may have a material adverse effect on our operating results if such losses or payments are not fully insured.

# RISK FACTORS

## RISKS RELATING TO THE INDUSTRY

**We face intense competition from domestic and international competitors. If we are unable to maintain or improve our competitiveness, our operating results and profitability may be adversely affected.**

The Directors believe that the CPT industry involves substantial capital investment, advanced technologies, sophisticated production facilities, a long period for recovery of invested capital and high exit barriers. Therefore, fixed costs in the CPT industry are relatively high and unit cost should be controlled and reduced through efficient and large-scale production. Controlling production cost and improving production efficiency are the key factors for the development and competitiveness of this industry, and they are also the challenges encountered by the enterprises in this industry.

General competition in the production of CPTs is intense and is characterized by rapid technological advances, price declines and competition from domestic and international competitors. We are therefore operating in a competitive environment and our business will be harmed if we cannot compete successfully. We believe that the principal competitive factors in our targeted markets are product quality, pricing, functionality, performance and reliability, successful and timely development of new products, general economic conditions, and most important of all, production cost and production efficiency as mentioned above. If we are unable to compete successfully with our competitors and/or to effectively control our cost of production as well as our production efficiency, our profitability could be adversely affected.

**If the demand of the CPT market decreases, our business and profitability may be adversely affected.**

The CPT is the core part of a CRT television set. Therefore the market demand for CPTs to a great extent depends on the market demand for CRT television sets. The Directors believe that the demand for small and medium sized color television sets will remain relatively stable while the demand for super large sized CRT color televisions will grow rapidly. However, there can be no assurance that the CPT market will continue to grow or even remain at the same level. If the growth in this sector slows by reason of, among others, an acceleration in the market acceptance of new display devices, our business and profitability may be adversely affected.

**Decreases in the prices of color television sets may have downward adjustment pressure on CPT prices.**

Since 1996, all color television set manufacturers in China have lowered or even substantially lowered the selling prices of their products due to over-production. As a result, the profit margins of the color television set industry have decreased. As the CPT industry is the upstream industry of the color television set industry, the selling prices of CPTs also decreased. The Directors believe that the declining trend in the prices of color television sets has stabilized and any further decline in their prices will not have a material impact on our profitability. However, if such decline should turn out to be greater than what we expect, it may have a material adverse impact on our operating results.

**The market potential of new display devices poses a challenge to the traditional CPT industry.**

Globally, the high-end television industry is currently at the beginning of a fast growing period. The Directors expect that there will be greater potential for the development of new display devices such as LCD and PDP. With further upgrades in their technologies and improvement in their functions, as well as a decrease in their prices, consumers will more readily accept these new display devices and their market

# RISK FACTORS

share may gradually increase. All these factors may adversely affect the sales volumes and gross profit margins of the traditional CRT television set industry as well as those of CPT manufacturers such as our Company.

**Any substantial increase in the prices of, or significant shortage in the supply of, raw materials and CPT components will have an adverse effect on the business and operating results of CPT manufacturers.**

Prices of raw materials will be affected by changes in the demands of domestic and international markets. In recent years, the prices of certain raw materials used in the production of CPTs have increased. Any substantial increase in the prices of such raw materials may adversely affect the profit margin of the enterprises in this industry. In addition, although we produce most of our CPT components internally, we do purchase some CPT components from independent suppliers. Any substantial increases in the prices of CPT components or any shortage in the supply of such components will have a negative impact on our operations and profitability.

So far, we have not experienced any significant shortage or interruption of supply of raw materials or CPT components. However, we cannot assure you that it would not happen in the future.

**Any anti-dumping and/or other protective trade barriers relating to CPTs or CRT television sets may have an adverse effect on the overseas sales of CPT manufacturers in China and, indirectly, on their CPT sales to Chinese CRT television set manufacturers that export their products.**

In 1999, the European Union initiated legal actions against CPT manufacturers in Lithuania, India, Malaysia, Korea and China. It was finally held that the plaintiffs in these cases had suffered no losses and our CPT Plant therefore was not required to pay any anti-dumping penalties, even though it was determined that our CPT Plant had engaged in dumping activities. The cases did not adversely affected our business. Since then, we have not been aware of any similar anti-dumping litigation in connection with CPTs.

On 13 April 2004, the United States Department of Commerce announced its final determination that certain color television set producers/exporters had sold CRT television sets with CPTs over 21" in the United States market at less than fair values, with dumping margins ranging from 4.35% to 78.45%. Such Chinese CRT television set manufacturers include Changhong, TCL, Konka, Haier and Hisense, which are our major customers. Subsequently, on 14 May 2004, the United States International Trade Commission ("ITC") determined that a U.S. industry is being materially injured by reason of imports of certain color television sets from China. As a result of ITC's affirmative decision, the United States Department of Commerce issued an anti-dumping order with margins up to 78.45% on imports of these color television sets from China with effect from 3 June 2004. Consequently, the exports by Chinese color television set manufacturers of their products to the United States will be hindered directly and this could have certain indirect adverse effects on Chinese CPT manufacturers, especially on those manufacturers who produce CPTs with sizes over 21".

The Directors do not believe that the United States anti-dumping order will have a significant impact on our business, because we generate approximately 60% of our sales from CPTs that are 21" or smaller, which will not be affected by the dumping margin. Our CPTs that are over 21" in size, which constitute about 40% of our sales, are sold both in the domestic Chinese market and other foreign countries besides the United States. We estimate that only a small portion of our CPTs over 21" are used for television sets that are exported to the United States.

# RISK FACTORS

Any additional anti-dumping measures and/or other protective trade barriers, such as the increase of tariffs, imposition of import quotas or technical barriers, which may be imposed on CPTs or CRT television sets may have an adverse effect on the overseas sales of CPTs manufactured in China.

## RISKS RELATING TO CHINA

All of our assets are located in China and substantially all of our revenues are derived from our operations in China. Accordingly, our operating results, financial condition and prospects are subject, to a significant extent, to the economic, political and legal developments in China.

### The PRC's economic, political and social conditions, as well as government policies, could affect our business.

The PRC economy differs from the economies of most developed countries in many respects, including:

- extent of government involvement;

- level of development;

- growth rate;

- control of foreign exchange; and

- allocation of resources.

While the PRC economy has experienced significant growth in the past twenty years, growth has been uneven, both geographically and among various sectors of the economy. The PRC government has implemented various measures to encourage economic growth and guide the allocation of resources. Even though we believe that the economic reforms and macro-economic policies and measures implemented by the PRC government will have a positive effect on the economic development of China and we may also benefit from some of these policies and measures, some policies aimed at benefiting the overall economy of China may adversely affect our operating results and financial situation; for example, the change in monetary policy of the PRC government or in tax regulations.

The PRC economy has been transitioning from a planned economy to a more market-oriented economy. Although in recent years, the PRC government has implemented measures emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets and the establishment of sound corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the PRC government. In addition, the PRC government continues to play a significant role in regulating industry development by imposing industry policies. It also exercises significant control over PRC economic growth through the allocation of resources, controlling payment of foreign currency-denominated obligations, setting monetary policy and providing preferential treatment to particular industries or companies.

### Any economic slowdown in China may have a material adverse effect on our financial condition and operating results, as well as our future prospects.

We conduct most of our business and generate most of our revenues in China. As a result, the economic conditions in China have a significant effect on our financial condition and operating results, as well as our future prospects. Since 1978, China has been one of the world's fastest growing economies in

# RISK FACTORS

terms of gross domestic product. There is no assurance, however, that such growth will be sustained in the future. Moreover, the recent slowdown in the economies of the United States, the European Union and certain Asian countries may adversely affect economic growth in China. It is possible that our financial condition and operating results, as well as our future prospects, could be adversely affected by an economic downturn in China.

**Government control of currency conversion may adversely affect our financial condition and operating results.**

Under China's existing foreign exchange regulations, following the listing of the H Shares on the Stock Exchange we are able to pay dividends to the holders of H Shares in foreign currencies, without prior approval from the SAFE, by complying with certain procedural requirements. However, there is no assurance that the PRC government will not take measures in future to restrict access to foreign currencies for current account transactions (including but not limited to payment of dividends).

**Fluctuation of the Renminbi exchange rates and the movement of the interest rates of domestic banks towards meeting market conditions could adversely affect our operating results.**

The conversion of Renminbi into HK dollars and other foreign currencies fluctuates and is subject to various factors such as changes in PRC political and economic conditions. Since 1994, the conversion of Renminbi into foreign currencies, including HK dollars and US dollars, has been based on rates set by PBOC, which are set daily based on the previous day's interbank foreign exchange market rates of PBOC and with reference to the prevailing foreign exchange rates of the international financial market. Since 1994, the official exchange rate for the conversion of Renminbi to US dollars has generally been stable. Any devaluation of the Renminbi, however, may adversely affect the value of, and dividends, if any, payable on, our H Shares in foreign currency terms and the cost of import of raw materials and components, since we will receive all of our revenues, and express our profits, in Renminbi. On the other hand, appreciation in the value of Renminbi against other foreign currencies may adversely affect our export business. Our financial condition and operating results may be affected by the changes in the value of certain foreign currencies relative to Renminbi.

**Tax benefits may be discontinued due to China's accession to the WTO.**

China became a member of the WTO on 11 December 2001. On accession to the WTO, previous tax treatment and subsidies granted by the PRC government for exports from China may be regarded as unfair treatment to the other members of the WTO. Therefore, the tax and other preferential benefits currently enjoyed by domestic enterprises may be discontinued. If as a result we were required to pay the original national rate of income tax or disentitled to any financial subsidies, our profitability will be adversely affected.

**Interpretation of PRC laws and regulation embodies uncertainties that may impair our business and operating results.**

We are incorporated under the laws of the PRC and are governed by our Articles of Association. The PRC legal system is based on written statutes. While prior court decisions may be cited for reference, they are not binding on subsequent cases and have limited precedential value. Since 1979, the PRC government has promulgated a number of laws and regulations dealing with such economic matters as foreign investment, corporate organization and governance, commerce, taxation and trade in an attempt to develop a comprehensive commercial law system. However, the legal system of China has not been well-developed. Implementation of any existing laws or the performance of contracts in accordance with their terms in China may involve uncertainties. Judgments of other jurisdictions may not be enforced in a prompt and fair

# RISK FACTORS

manner or are hard to enforce. Since there is only a limited number of published cases in China, the result of litigation is more difficult to predict. In addition, government policies in response to political changes in China may affect the interpretation of laws and regulations.

## RISKS RELATING TO H SHARES AND TO THE REORGANIZATION

**Holders of our H shares may not be able to successfully enforce their shareholders' rights in China under the Company Law of the PRC or Hong Kong regulatory provisions.**

As we conduct our business in the PRC, our operations are governed principally by the laws and regulations of the PRC. As a PRC company offering and the listing H shares outside the PRC, we are subject to the Special Regulations and the Mandatory Provisions. Upon the listing of H shares on the Stock Exchange, the Listing Rules of the Stock Exchange will also become one of the main sources for the protection of shareholders' rights. The Listing Rules impose certain standards of conduct, fairness and disclosure on us, our Directors and our controlling shareholder.

The legal framework to which we are subject may be materially different from the Company Ordinance of Hong Kong in relation to, for example, the protection of minority shareholders. In addition, the mechanisms for enforcement of shareholders' rights under the corporate framework within the PRC legal system to which we are subject are also relatively undeveloped and untested compared to those in Hong Kong. In China, without the authorization of the Company, shareholders do not have the right to sue the directors, supervisors, officers or other shareholders on behalf of the corporation to enforce a claim against such party or parties which the corporation has itself failed to enforce.

Although we will be subject to the Listing Rules and the Hong Kong Codes on Takeovers and Mergers and Share Repurchases upon the listing of our H Shares on the Stock Exchange, the holders of H Shares will not be able to bring actions on the basis of violations of the Listing Rules and must rely on the Stock Exchange to enforce its rules. The Hong Kong Codes on Takeovers and Mergers and Share Repurchases do not have the force of law and provide only standards of commercial conduct considered acceptable for takeover and merger transactions and share repurchases in Hong Kong.

China does not have treaties providing for the reciprocal recognition and enforcement of judgments of courts with countries such as the United States, the United Kingdom and Japan, and therefore the recognition and enforcement in China of judgments of a court in any of these jurisdictions may be difficult or impossible. Our Articles of Association and the Listing Rules provide that most disputes between holders of H Shares and us, our Directors, Supervisors or other officers or holders of Domestic Shares, arising out of our Articles of Association or the Company Law of the PRC and related regulations concerning the affairs of our Company or with respect to the transfer of our H Shares, are to be resolved through arbitration by arbitration organizations in Hong Kong or China. On 21 June 1999, an arrangement was made between Hong Kong and China for the reciprocal enforcement of arbitral awards. This new arrangement was approved by the Supreme People's Court of China and the Hong Kong Legislative Council, and became effective on 1 February 2000. The arrangement was made in accordance with the spirit of the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards 1958. Under the arrangement, awards that are made by Chinese arbitral authorities recognized under the Arbitration Ordinance of Hong Kong can be enforced in Hong Kong. Hong Kong arbitration awards are also enforceable in China. So far as we are aware, no action has been brought in China by any holder of foreign investment shares issued by any joint stock company established in the PRC with limited liability (such as the H Shares to be issued by the Company) to enforce an arbitral award that is made by Chinese arbitral authorities or Hong Kong arbitral authorities and, as such, we are uncertain as to the outcome of any action brought in China to enforce an arbitral award made in Hong Kong in favor of shareholders.

# RISK FACTORS

**There can be no assurance of an active trading market for H Shares, and the Offer Price for H Shares may not be indicative of prices that will prevail in the trading market.**

Prior to the Global Offering, there has been no public market for H Shares. There can be no assurance that an active trading market for H Shares will develop or be sustained upon completion of the Global Offering. The Offer Price for H Shares will be determined by negotiations between us and the Global Coordinator, China International Capital Corporation (Hong Kong) Limited, (on behalf of the Underwriters) and may not be indicative of prices that will prevail in the trading market and may bear no relationship to the market price for H Shares after the Global Offering. Investors may not be able to resell their shares at the Offer Price or a higher price. Volatility in the price of our Shares may be caused by factors beyond our control and may be unrelated to the results of our operations.

**Existing shareholders' interests in the Company may be diluted as a result of future equity fund raising.**

We may need to raise additional funds in the future to finance new developments relating to our existing operations or new acquisitions. If additional funds are raised through the issuance of new equity or equity-linked securities other than on a pro rata basis to our existing shareholders, the percentage ownership of our shareholders may be diluted and such securities may have preferred rights, options and pre-emptive rights senior to H Shares.

**Holders of H Shares may be subject to PRC taxation.**

Under the PRC's current tax laws, regulations and requirements, dividends paid by us to the holders of H Shares outside the PRC are currently exempted from PRC income tax. In addition, gains realized by individuals or enterprises upon the sale or other disposition of H Shares are currently exempted from PRC income tax. If the exemptions are withdrawn in the future, the holders of H Shares may be required to pay withholding taxes on dividends, which are imposed currently at the rate of 20%, or enterprise income tax or individual income tax on the gains obtained from the disposal of H Shares, which currently may be imposed at the rate of 20%.

**As a newly established independent entity, our management has no prior experience in operating an independent company listed on the Stock Exchange, which may have an adverse effect on our operations.**

As part of the Reorganization, we were established as a joint stock limited company on 10 September 2004. Since then, we have separated from the Group Corporation and become an independent entity. Although our management is familiar with the day-to-day operations and management of the Company, they have no prior experience in operating a company listed on the Stock Exchange. Therefore, our management may need to make some adaptations to adjust to this change.

## OTHER RISKS

**Any possible outbreak of severe acute respiratory syndrome or any other serious epidemic in China may have a material adverse effect on our business operations and operating results.**

From December 2002 to June 2003, China and certain other countries experienced an outbreak of a new and highly contagious form of atypical pneumonia now known as severe acute respiratory syndrome or SARS. On 5 July 2003, the World Health Organization declared that SARS had been contained. While the outbreak of SARS or any other epidemic may increase the usage of televisions, an outbreak in the future may require us to quarantine our employees or implement other quarantine measures in our plants or

suspension of production and, as a result, our overall operation and operating results would be affected. Furthermore, the outbreak of SARS or any other serious epidemic would likely restrict the level of economic activities in affected areas, which would also impair our business and operating results.

**Forward-looking statements may not be accurate and investors should not place undue reliance on statements of this kind.**

Included in this prospectus are various forward-looking statements which include the use of forward-looking terminologies such as "may", "will", "expect", "intend", "anticipate", "plan", "estimate", "continue", "believe" or similar words. We have made forward-looking statements with respect to, among other things:

- the prospects of our company;

- our business plans, goals and development strategies;

- the development trends of the CPT industry and the prospects of market;

- our dividend distribution plans;

- any capital expenditure plans, particularly plans enhancing our production capacity in CPTs and key CPT components; and

- our profit forecast set forth in the section headed "Financial Information — Profit Forecast"

These statements are forward-looking and reflect our current expectations. They are based on the beliefs of our management subject to a number of risks and uncertainties out of our control, including, but not limited to, changes in the economic and political environment in the Asian region, technological development and changes in the market.

Furthermore, these forward-looking statements merely reflect our current view with respect to future events and are not a guarantee of future performances. Actual results may differ materially from the information contained in the forward-looking statements as a result of a number of factors, including, without limitation, the risk factors set out in section headed "Risk Factors" in this prospectus and the following:

- the effects of competition on the demand for and the prices of our products;

- the development of new display devices affecting our current and future business;

- changes in political, economic, legal and social conditions in China, including the PRC government's specific policies with respect to foreign investment in the electronic manufacturing industry, economic growth, inflation, foreign exchange and the availability of credit; and

- changes in population growth and GDP growth and the impact of those changes on the demand for our products.

# RISK FACTORS

We do not intend to update or otherwise revise the forward-looking statements in this prospectus, whether as a result of new information, future events or otherwise. Because of these risks, uncertainties or assumptions, the forward-looking events and circumstances discussed in this prospectus might not occur in the way we expect, or at all. Accordingly, you should not place undue reliance on any forward-looking information.

**Certain information prepared on the basis of unaudited data and assumptions embodies uncertainties and investors should not place undue reliance on them.**

In order to provide potential investors with an alternative method to evaluate our business performance, this prospectus contains certain unaudited data and other data based on various assumptions. Although we have exercised reasonable care in the reproduction of the above data, potential investors who read such data, including, without limitation, our turnover and profitability of various operating assets during the Track Record Period prior to their actual transfer from the Group Corporation to us (as set out in the section headed "Financial Information — Management's Discussion and Analysis of Financial Condition and Results of Operations" in this prospectus), the unaudited pro forma consolidated results (as set out in Appendix II to this prospectus) and our production capacity (as set out in the section headed "Business" in this prospectus), should bear in mind that these figures are inherently subject to uncertainties and contingencies and would likely vary should a full audit be conducted or any or all of the assumptions do not materialise.

**Certain statistics derived from official publications, PRC government agencies and various publicly available industry related sources may not be true and accurate and investors should not place undue reliance on them.**

Certain statistics relating to the display industry and display technology set out in the sections headed "Summary", "Industry Overview", "Business" and "Financial Information" in this prospectus are extracted from various official publications, PRC government agencies and various publicly available industry related sources that we believe to be reliable. However, we cannot guarantee the quality or reliability of such source materials. While our Directors have taken reasonable care in the reproduction of the information, they have not been prepared or independently verified by us, the Selling Shareholder, the Global Coordinator, the Sponsor or the Underwriters or any of our or their respective affiliates or advisers and, therefore, we make no representation as to the accuracy of such facts and statistics, which may not be consistent with other information compiled within or outside the PRC. Due to possibly flawed or ineffective collection methods or discrepancies between published information and market practice and other problems, the statistics herein may be inaccurate or may not be comparable to statistics produced for other economies and should not be unduly relied upon. Further, there is no assurance that they are stated or compiled on the same basis or with the same degree of accuracy as may be the case elsewhere. In all cases, investors should give consideration as to how much weight or importance they should attach to or place on such facts or statistics.

**Changes to Hong Kong accounting standards may result in changes in the future as to how our results and financial position are prepared and presented.**

The accountants' report set out in Appendix I to this prospectus has been prepared in accordance with accounting principles generally accepted in Hong Kong and complies with statements of standard accounting practice ("SSAPs") issued by the Hong Kong Institute of Certified Public Accountants ("HKICPA").

# RISK FACTORS

The HKICPA has announced, as part of its programme to converge with International Financial Reporting Standards, a number of new Hong Kong Financial Reporting Standards ("HKFRS") and revised Hong Kong Accounting Standards ("HKAS"), herein collectively referred to as HKFRSs.

The HKICPA released the first batch of converged HKAS in March 2004, incorporating revisions to existing SSAPs based on the equivalent revisions to International Accounting Standards as part of their improvement project. It also released new standards on financial instruments, share-based payment business combinations, insurance contracts and non-current assets held for sale and discontinued operations in the second and third quarters of 2004. These HKFRSs are effective for accounting periods beginning on or after 1 January 2005.

The HKICPA issued a series of exposure drafts in June 2004 to revise the remaining SSAPs currently in force. These exposure drafts are intended to take effect for accounting periods beginning on or after 1 January 2005.

These announced and proposed changes in HKFRSs may result in changes in the future as to how our results and financial position are prepared and presented.

# EXHIBIT 26



City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document "**IRI-CRT-00030258-263**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

_____
Dan McCourt

Sworn to before me this
September 14, 2022

_____
Signature, Notary Public



_____
Stamp, Notary Public

[stamp:] 001

| | [hw:] *2005* | [hw:] *325* |
|---|---|---|
| [hw:] *Business operation* | [hw:] *Long term* | [hw:] *15* |

# Document of IRICO Group

IRICO Human Resources (2005)          Issued by:
No. 76                                                    Jinquan Ma

## 2004 Business Performance Summary Report by Enterprise Person-in-charge

Performance Evaluation Bureau of State-owned Assets Supervision and Administration Commission (SASAC):

In 2004, IRICO Group earnestly studied and effectuated the spirit of the Third Plenary Session of the 16th Central Committee of the Communist Party of China (CPC), and actively put into action the spirit of the 2004 meeting of the SASAC on the business performance evaluation of the persons-in-charge of centrally-administered state-owned enterprises. In the face of the complex and ever-changing market, under the leadership of the Group's management and with the hard work of all employees, we took active measures to continuously refine internal management and built up courage and determination to challenge the limits, thereby achieving the results of exceeding the business performance targets for the entire year. The production volume and sales volume have hit a new record high since 2003, and the total profit has reached the best level in recent years. The specific situation is reported as follows:

1

IRI-CRT-00030258E
Translation

CONFIDENTIAL

1.    Completion of business performance targets

2004 business performance evaluation targets: total profit of RMB 380 million, return on net assets of 5.4% (due to the inaccurate prediction of the industry fluctuation cycle, the reported indicators for that year were low), technical input ratio of 1.5%, and current assets turnover ratio of 1.42.

Actual achievement of business performance targets in 2004: the total profit was RMB 782.2918 million, the return on net assets was 12.24%, the technical input ratio was 1.5%, and the current assets turnover ratio was 1.54. 205.87% of the target was achieved for total profit, the return on net assets was 6.84 percentage points higher than the target, the technical input ratio was 0.06 percentage points higher than the target, and the current assets turnover ratio was 0.12 higher than the target.

2.    Measures taken and completion of various other tasks

1.   The activities of "prioritizing quality, reducing costs, preventing wastage, and seeking savings" were continually and substantially implemented among all employees, and new ideas, new ways and new methods of reducing costs were explored to achieve in-depth changes and leaps.

(1)    Efforts were dedicated to technological innovation, and operational efficiency was improved and production costs were reduced by adopting new designs, new processes, new materials, and new methods. The Group issued 13 scientific and technological achievement awards in 2003. Some examples include the change of the one-page two-picture technology of the screen plate to one-page four-picture technology, which improved the equipment efficiency and material utilization rate, and increased the output by 65% without the need for additional equipment; the development of the 54 cm FS new anti-arching effect technology, which not only improved product quality, but also reduced material cost; and the independently developed 54 cm FS picture tube.

(2)    The "order-based" production organization and coordination mechanism that adapts to market changes with quick response was further improved to meet the customer needs of small batches and multiple varieties. A three-month rolling operational plan management model of "monthly planning, monthly goods arrival, monthly completion of sets, and minimal inventory" has been established, which reduces expenses and saves costs.

CONFIDENTIAL

IRI-CRT-00030259E
Translation

(3)   With the creation of a resource-saving enterprise as the starting point, activities were organized and implemented to reduce costs in an all-round way and optimize the environment, thereby realizing the combination of cost strategies, establishment of a resource-saving enterprise and creation of a green and environmentally friendly home.

(4)   In terms of material procurement, firstly, the price trend and supply and demand of raw materials were closely tracked and studied, and the purchase quantity was then determined according to the price trend and supply and demand situation. Secondly, the bidding method for material procurement was improved to adapt to the changing market environment. Taking the lowest price as the winning bid and following up with the supplier with the lowest price, supply was allocated according to the quotation, which broke the price alliance of suppliers and achieved good results. Thirdly, some external agency links were removed, which reduced management costs.

2.   In terms of marketing, we focused on studying the market, adapting to the market, and developing the market for flexible marketing, striving to seize all market opportunities to achieve good sales performance.

(1)   The CPT market is ever-changing, and opportunities are fleeting. In order to accurately grasp market opportunities, we have further strengthened market information collection, analysis and prediction, and responded to any changes that may occur in the market as soon as possible. A regular marketing meeting system has been established for advance decision-making and flexible marketing, to ensure that production, supply and sales are efficiently connected, and for the first time, the accuracy of market forecast was used as one of the KPI evaluation indicators for the manager of the sales company.

(2)   Marketable products were manufactured in conformance to market changes. "The United States' anti-dumping measures on Chinese color TVs" has dealt a heavy blow to the sales of large-sized color picture tubes in China. Some CPT companies had to reduce or suspend production of large-sized color picture tubes, and products are overstocked and prices are falling. However, small and medium-sized color picture tubes are selling very well because of this. We seized this opportunity by adopting flexible marketing strategies, fully leveraging on the flexible production capacity of the production line for the full range of products (that is, the same production line is compatible with the production of multiple varieties), adjusting the product structure just in time, increasing production efforts and ensuring continuous

3

CONFIDENTIAL

IRI-CRT-00030260E
Translation

operation to meet the needs of domestic and foreign customers to the greatest extent, effectively improving the economic benefits of the enterprise.

(3)      The market promotion of new products was strengthened. In this year, the plant has made large-scale investments and created many new products. The Group has formulated a scientific and reasonable new product promotion plan and coordinated the promotion in a timely manner. In the market promotion work, firstly, the direct communication between the sales department and customers, R&D department, and quality department was strengthened and a good cooperative relationship has been established; secondly, proper research and tracking of new products and new models for users were conducted to ensure a good understanding of the development and production schedule for new products. In addition, timely coordination among the relevant technology, quality and production departments in the plant was carried out to ensure proper corresponding technical support and batch production work, thereby facilitating the achievement of remarkable results in the market promotion of new products in the first half of the year. Products such as the 21" FS thick tube neck, 29" high-resolution tube, 21" PF AK-based tube, and 25" PF100Hz color picture tube have obtained the certification of many large CPT enterprises.

3.   Benchmarking was fully implemented in a bid to surpass the first-class. In accordance with the spirit of the SASAC's instructions, we started the benchmarking work in 2003. In 2004, we further intensified the benchmarking work and conducted in-depth research on many internationally renowned CRT companies, especially companies such as Chunghwa Picture Tubes, Thomson, Samsung, and LG, wherein analysis and research were conducted on their CRT output, quality and profits, and a benchmarking implementation plan was established. The subsidiaries of the Group also evaluated and compared outstanding entities in the same industry at home and abroad according to their own specific conditions to determine benchmarking goals, and specific benchmarking and overtaking measures were formulated and refined. Through benchmarking, we have taken a big step forward in production and distribution, especially in product management. At present, the production cycle of electron guns has been shortened from the original 12 days to 6 – 7 days. This alone saves RMB 3.5 million in work-in-progress funds.

4.   The technological transformation has lived up to expectations and has already achieved preliminary results. In 2004, we increased investment in technological innovation, and implemented five major technological

CONFIDENTIAL

IRI-CRT-00030261E
Translation

transformation projects based on the large-screen color picture tube, 21" thick tube neck, bulb, screen plate and kinetic energy support. On June 01, 2004, the 21" thick tube neck production line was launched and conforming products were manufactured. This line created the historical record of the shortest construction period of a CPT production line, wherein the demolition of the equipment to the production of conforming products only took eight months. In August 2004, the technical transformation project of the screen plate MB line supporting the 21" color picture tube was successfully tested. It only took half a year from the start of the project to the manufacturing of conforming products. At present, the 501 line in the third-phase glass screen supporting project has achieved mass production, and the 502 line has entered the trial production stage.

5. Bidding management has been fully implemented. In 2004, we implemented contract project management in an all-round way revolving the glass cone furnace and screen furnace cold repair projects as well as the H line, three glass, MB line, K line and kinetic energy supporting projects, and completed the contract project review and bidding with "the fastest speed, the shortest time, and minimum funds". In addition to the organization of bidding by the Group, we also employed other forms such as delegation of domestic and international bidding, and online bidding. Through the international bidding for large-scale equipment and critical components jointly implemented with Northwest International Tendering Bureau and Shenzhen International Tendering Bureau, about 10% of the funds can be saved for the large-screen color picture tube line as compared to the construction funds of the 29" line implemented in 2000. In the first half of the year alone, RMB 65 million was saved through project bidding.

6. The market-oriented operation of parts and components enterprises was pushed forward and the share of export sales was expanded. In 2004, we provided more active policies for the export sales of parts and components companies to encourage them towards refinement, expansion and superiority in their work. Through the market-oriented reform and operation of spare parts enterprises, the production scale has been greatly increased, and their share of spare parts in both domestic and international markets has been steadily increased. Phosphor powder, low-melting-point glass powder, deflection coils, convergence magnets, rubber wedges, pin anode caps and other CPT ancillary products have entered the domestic and foreign markets in an all-round way. Among them, the export sales of low-melting-point glass

CONFIDENTIAL

IRI-CRT-00030262E
Translation

powder, phosphor powder, pin anode caps, rubber wedges and convergence magnets accounted for 78%, 70%, 50%, 46% and 45%, respectively. This created a new profit growth point for the Group.

7.   IRICO Group Electronics Co., Ltd. was successfully listed in Hong Kong, and the separation of main and auxiliary work has also entered a substantial stage. The Group has also carried out three system reforms in the areas of personnel, labor and wages, and conducted general management innovation activities.

III.   During the evaluation year, the enterprise did not make any major decision-making mistakes, and was not involved in any major production safety liability accidents and quality liability accidents, serious environmental pollution accidents, and major disciplinary violations.

IV.   Progress of business performance evaluation of enterprises

As early as the 1990s, the Group implemented the economic responsibility system evaluation for its subordinate production and operation units. The main indicators of the evaluation are:  profit, cost, quality, safety, etc. In 2003, the Group revised the operation index evaluation system and established a more complete evaluation index system, including:  sales revenue, profit, return on total assets, capital preservation and appreciation rate, cost reduction rate, payment recovery rate, etc. In recent years, the Group has paid more attention to technological innovation, increased technological investment and incentives for technicians, developed a CRT picture tube with independent intellectual property rights, and achieved breakthrough results in the research and development of PDP. Since 2003, the group has implemented KPI evaluation for the "top leaders" of each unit, and one of the most important evaluation indicators is the economic responsibility system evaluation indicator.

The evaluation system and evaluation index system established by the Group have effectively guaranteed the completion of the business performance evaluation indicators issued by the SASAC. In 2005, we revised the internal evaluation indicators again based on the situation of severe competition faced by enterprises. Under the condition that the basic effect indicators remain unchanged, greater emphasis is now placed on the evaluation of cost reduction, technological innovation and labor cost input-output ratio.

CONFIDENTIAL

IRI-CRT-00030263.01E
Translation

[seal:] IRICO Group
May 11, 2005

|  |  |
| --- | --- |
|  | File (2) |
| Group Office | Printed on May 11, 2005 |

|  | Proofread by: | Number of copies: |
| --- | --- | --- |
| Printed by: Ying Wang | Rong Xue | 6 |

6

CONFIDENTIAL



# 彩虹集团公司文件

彩团人资〔2005〕76 号                    签发人：马金泉

_____

## 2004 年企业负责人经营业绩总结报告

国资委业绩考核局：

　　2004 年彩虹集团公司认真学习和贯彻十六届三中全会精神，积极落实国资委 2004 年度对中央企业负责人经营业绩考核会议精神，面对复杂多变的市场，在集团领导班子带领下，在全体员工的辛勤努力下，采取积极应对措施，不断细化内部管理，树立向极限挑战的勇气和决心，超额完成了全年经营业绩目标。生产量、销售量继 2003 年再创历史新高，利润总额为近年来最好水平。现将具体情况报告如

1

CONFIDENTIAL                                                    IRI-CRT-00030258

002

下：

一、经营业绩目标完成情况

2004 年经营业绩考核目标：利润总额 38000 万元、净资产收益率 5.4%（由于对行业波动周期预测不准，当年上报指标偏低），技术投入比率 1.5%、流动资产周转次数 1.42 次。

2004 年经营业绩目标的实际完成情况：利润总额 78229.18 万元、净资产收益率 12.24%、技术投入比率 1.50%、流动资产周转次数 1.54 次。利润总额完成了目标的 205.87%，净资产收益率比目标增加了 6.84 个百分点，技术投入比率比目标增加了 0.06 个百分点，流动资产周转次数比目标增加了 0.12 次。

二、采取的措施以及其他各项工作完成情况

1. 继续深入开展全员性的"抓质量、降成本、反浪费、求节约"活动，探索降低成本的新思路、新途径、新办法，实现深层次的变革和飞跃。

（1）在技术方面加大创新力度，通过采用新设计、新工艺、新材料、新方法，提高作业效率，降低生产成本。集团公司评出 2003 年度科技成果奖 13 项，如网版的一版两图改为一版四图技术，提高了设备效率和材料利用率，在不增加设备的情况下，产量提高了 65%；54cmFS 新型防拱效应技术开发，既提高了产品品位，又降低了材料成本；自主研发了 54cmFS 显像管。

（2）进一步完善适应市场变化，反应迅速的"定单型"生产组织协调机制，适应小批量、多品种，满足客户的需求。建立了"按月计划、按月到货、按月齐套、极少库存"的三个月滚动型作业计划管理模式，节约了费用，降低了成本。

2

IRI-CRT-00030259

003

（3）组织实施了以创建资源节约型企业为切入点的全面降低成本，优化环境的活动，把成本战略、创建资源节约型企业和创建绿色环保家园结合在一起。

（4）在物资采购方面，一是密切跟踪和研究原材料价格走势和供求情况，依据价格走势和供求状况，确定采购数量；二是完善物资采购招标办法，适应多变的市场环境，以最低报价为中标价，以最低价跟进者，按报价分配供应量，打破了供应商的价格联盟，取得了较好的效果，三是取消一些外部代理环节，降低了管理成本。

2. 在市场营销方面，我们着力于研究市场、顺应市场、开发市场，灵活营销，力争抓住一切市场机会，取得好的销售业绩。

（1）彩管市场变化多端，并且机会稍纵即逝，为了准确把握市场机遇，我们进一步加强了市场信息搜集和分析预测，及早应对市场可能出现的任何变化，提前决策，灵活营销，建立营销例会制度，使产、供、销高效衔接，并首次将对市场预测的准确性作为销售公司经理的 KPI 考核指标之一。

（2）顺应市场变化，生产适销对路产品。 "美国对中国彩电的反倾销"对中国大尺寸彩管的销售造成了重创，部分彩管企业的大尺寸彩管处于减产或停产的状况，并且产品积压，价格下降。而中小尺寸彩管却因此热销，我们抓住这一机遇，采取灵活的营销策略，发挥产品品种全和生产线具有的柔性化生产能力（即同一生产线可兼容生产多种品种），及时调整产品结构，加大马力生产，连续作业，最大限度地满足国内外客户需求，有效地提高了企业经济效益。

（3）加强新品市场推广力度。今年工厂投资规模大、新品多，集团公司制定科学合理的新品推进方案，及时协调推进。在市场推进

3

工作上，首先强化销售部门与客户、研发部门、质量部门的直接联系沟通，建立良好的协作关系；其次，做好用户新品、新机型的调研跟踪工作，掌握其新品研制、生产进度。另外，对内及时协调厂内相关技术、质量、生产部门，做好相应的技术支持和批量推进工作，使今年上半年新品市场推进取得了显著成效。21″ FS 粗管颈、29″ 高清管、21″ PF AK 材管、25″ PF100Hz 彩管等品种取得了多家大型彩管企业的认证。

3. 全面实施对标，争先赶超一流。根据国资委指示精神，我们在2003 年开始抓对标工作，2004 年又进一步加大了对标工作的力度，对众多国际知名 CRT 企业进行深入研究，特别是对华映、汤姆逊、三星、LG 等企业在 CRT 方面的产量、质量、利润进行了分析研究，建立对标实施计划。集团所属企业也根据自身具体情况，对国内外同行业优秀单位进行评估、比较，确定对标目标，制定并细化了具体的对标赶超措施，通过对标，使我们在生产流通，特别是在制品管理方面向前迈进了一大步，目前电子枪生产周期由原来的 12 天缩减到 6-7 天，仅此一项就节约在制品资金 350 万元。

4. 技术改造不负众望，并已初见成效。2004 年，我们加大了技术创新投入，实施了以超大屏幕彩管、21″ 粗管颈、玻壳、网版以及动能配套的五大技术改造项目。2004 年 6 月 1 日 21″ 粗管颈生产线打通生产线并生产出合格的产品，这条线创造了彩管生产线建设周期最短的历史记录，从设备拆迁到生产出合格产品，仅用了 8 个月；2004 年 8 月为 21″ 彩管配套的网版 MB 线技改项目一次试车成功，该项目从开工到生产出合格产品，仅仅用了半年的时间；目前三期玻屏配套工程中的 501 线已实现了量产，502 线已进入了试生产阶段。

5. 全面实施招投标管理。2004 年，我们围绕玻璃锥炉、屏炉冷修项目和 H 线、三玻璃、MB 线、K 线以及动能配套项目，全方位实施了合同项目管理，做到了"以最快的速度，最短的时间，最少的资金"完成合同项目审查、招标。除集团公司组织招投标外，我们还采取委托国内、国际招标、网上招标等多种形式，通过与西北国际招标局、深圳国际招标局联合实施的大型设备、关键件的国际招标，使超大屏幕彩管线与 2000 年实施的 29"线建设资金相比，可节约资金 10%左右。仅上半年，通过项目招投标，就节约资金 6500 万元。

6. 推进零部件企业市场化运作，扩大外销份额。2004 年，我们对零部件企业外销工作给予了更加积极的政策，鼓励零部件企业做精、做大、做强。通过零配件企业的市场化改革和运作，使生产规模得到大幅提高，稳步提高了零配件在国内国际两个市场的占有率。荧光粉、低玻粉、偏转线圈、会聚磁件、橡胶楔子、销钉阳极帽等彩管配套产品已全面进入国内外市场。其中，低玻粉、荧光粉、销钉阳极帽、橡胶楔子和会聚磁件等的外销量分别占到 78%、70%、50%、46%和 45%。为集团公司创造了新的利润增长点。

7. 彩虹集团电子股份公司在香港成功上市，主辅分离工作也进入了实质性阶段，集团公司还进行了人事、劳动、工资三项制度改革，开展了普遍性的管理创新活动。

三、考核年度内企业无重大决策失误、重大安全生产责任事故与质量责任事故、严重环境污染事故、重大违纪事件。

四、企业经营业绩考核工作开展情况

早在 90 年代，集团对下属生产经营单位就实行了经济责任制考核，考核的主要指标有：利润、成本、质量、安全等。2003 年集团

5

CONFIDENTIAL

IRI-CRT-00030262

006

对经营指标考核体系又进行了修订，建立了更为完善的考核指标体系，其中包括：销售收入、利润、总资产收益率、资本保值增值率、成本降低率、货款回收率等。近年来，集团公司更加注重技术创新，加大了技术投入和对技术人员的激励，开发出了具有自主知识产权的CRT显像管，在PDP的研发方面也取得了突破性成果。从2003年开始，集团对各单位"一把手"实行了KPI考核，其中最重要的考核指标之一就是经济责任制考核指标。

集团建立的考核体系和考核指标体系，切实保障了国资委下达的经营业绩考核指标的完成。2005年我们又根据企业所面临的严酷竞争形势，对内部考核指标又作了修订，在基本效益指标不变的情况下，加大了成本降低、技术创新和人工成本投入产出率方面的考核。



2005 年 5 月 11 日

| | 档（2） |
|---|---|
| | 2005 年 5 月 11 日印发 |
| 集团办公室 | |
| 打印：王英 | 校对：薛蓉　　　份数：6 |

6

# EXHIBIT 27



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document "**IRI-CRT-00004673_757-764**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

_____
Dan McCourt

Sworn to before me this
August 22, 2023

_____
Signature, Notary Public



_____
Stamp, Notary Public

[handwritten text is indicated in italics]

# Meeting Minutes

Name of the meeting: *Administrative office meeting*
Meeting time: *April 5, 1995 at 9:00*
Meeting location: *Conference room on the sixth floor of IRICO Hotel*
Hosted by: *Zhang Wenyi*
Attendees: *Wu Yingzhong, Ji Qing, Wang Liguang, Tao Kui, Li Zuoting*

Non-voting Attendees: *Zhou Chen, Sun Shuili, Wang Jun,*

Meeting agenda: *1.Determination and advertising of CIS design scheme*
               *2.Trade union to report on the building plan,*
               *3.Development issues outside the factory,*

Recorded by: *Li Wenfu*

Confidential

[handwritten text is indicated in italics]

# CAIHONG ELECTRONICS GROUP CORP

*First item: Report on the CIS design work, and determine the logo of IRICO Group.*

*~~Originally designed 119 types, 10 types were identified after screening, and the~~ opinions of the expert group were concentrated on No. 15 and No. 21.*

*Agreed on selecting No. 15 or No. 21, and to be decided by the expert group.*

*~~Shuili: Work should be strengthened in the introduction and dissemination of CI. At~~ present, IRICO is "actually the king but little known".*

*There are four aspects of advertising this year;*

*~~1. Good start and good end to complete the work of CIS;~~*

*2. Prepare some publicity materials,*

*3. The CI design will be finished in September, so the application needs to be carried out; ~~business cards, signs, work clothes, etc.;~~*

*4. Hold a press conference, organize a CI seminar, and invite experts to give lectures.*

*Make full use of the news media and do a good job of news publicity.*

*1. Advertise on CCTV for a period of three to six months;*

*2. Public reports on the six news outlets including People's Daily, China Electronics News, Shaanxi Daily, for a total of 600,000 yuan.*

*3. Set up semi-permanent billboards in Xi'an or Beijing,*

*4. Small advertisements;*

IRI-CRT-00004758E Translation

[handwritten text is indicated in italics]

## CAIHONG ELECTRONICS GROUP CORP

*III. Appropriately intervene in influential social activities.*

*~~1. World Women's Conference (September), 2. "China Tourism Encyclopedia", 1.5 million yuan~~, 3. Logo of "IRICO City",*

*4. The gifts in the factory should be unified.*

*Zhang Wenyi:  Speed up the CI design first, and set off a publicity climax after the logo is determined; follow up with an overall plan and come up with a budget, we will include it in our budget plan.*

*~~Li Zuoting: Report on the building plan.~~*

*Ze: 1. There are 1268 units now, 632 sets of commodity units, 636 sets of preferential units,*

*2. The key point is to guarantee houseless households;*

*~~3. In principle, for this time, we administratively will not participate in the housing~~ allocation plan.*

*67.19m$^2$ 176 units*

*~~88.3 m$^2$ 24 units~~*

*93.5 m$^2$ 72 units*

*78.92 m$^2$ 28 units*

*~~88.3 m$^2$ 142 units~~*

*The housing allocation plan and queuing method are determined by the trade union committee, and the administration does not participate.*

[handwritten text is indicated in italics]

# CAIHONG ELECTRONICS GROUP CORP

*Zhang Wenyi:*

*Our situation in the first quarter was quite good, with very good sales and benefits, and 25″ sales have also improved, and the annual volume is expected to exceed 25̶5̶500,000 pieces.  The profit and tax in April is estimated to be around 250 million.   Considering the situation of customs entry, 14″ will continue to be exported, and the price of 14″ will increase by 30 yuan, 490 yuan; 18″ will increase by 20 yuan; so our 21″ will be ready for export, which is actually exported, 21″ will go to the international market from now on, and the price will be close to the international price of USD $83. Through export to drive the 21″ market, whether to add another 30,000 to 50,000 pieces of 21″ for export this year.   The focus of sales should be tilted towards several major players.*

*Outside the factory:*

*1. The integration and planning workshops of the sixth institute went very smoothly.*

*[illegible]* ① *Industrial control needs to be developed.   20004-2 billion yuan.*

② *Workstation.*

③ *Monitor becomes a new growth point. 1 million units before 2000.*

④ *Stored program control exchange; user and bureau level exchange, 2 million lines*

⑤ *Microcomputer sales agent.*

*The total sales revenue in 2000 should reach RMB 6-7 billion, with profits and taxes RMB 1.6-1.7 billion.*

*Form the second industry of the group.*

*2. The Ministry talked with us about the three factories in Shenzhen.*

① *MAC, the electronics ministry accounted for 40%. The debt is USD $70 million.*

[handwritten text is indicated in italics]

# CAIHONG ELECTRONICS GROUP CORP

*②Zhong Kang: A total of 2.3 billion yuan in loans, accounting for 40% of the shares.*

*③Seg Hitachi:  So far so good.*

*Our general idea is to reject it if it can be rejected, and to lower the price as much as possible if it cannot be rejected. It is best if MAC goes bankrupt and only take over Zhong Kang and SEG Hitachi.   The overall situation is not clear now, and it may be delayed.*

*3. Three factories in the province.*

*Regarding the three in the province, we are currently taking a positive attitude, moving slowly and waiting for an opportunity. After the report comes out, we will go to the leader to discuss it.*

*Xianyang's tube capacity is almost the same. Communications are developed at the Sixth Institute. What is currently lacking is the complete machine. This time Chief Wu and I will go to Japan to discuss with Toshiba. The complete machine factory can be newly built via joint venture. The burden should be smaller than working on an old factory.*

*4.  We have negotiated with University of Electronic Science and Technology of China on the projection tube.   This is a future product, and it is not appropriate to talk about it to outsiders now, the school is under some pressure.   This time the contract we talked about takes effect. Li Guang needs to bring someone from equipment to have a look. In addition, the person who works on the technology must participate and integrate it technically as soon as possible.   If it is put on the market in one or two years, our next-generation product will be released.*

*Wang Liguang: The last time I went to Japan, related to Fujitsu.*

*Zhang:  Tell Director Li Manjun about the business card and ask them to get in touch.*

[handwritten text is indicated in italics]

# CAIHONG ELECTRONICS GROUP CORP

*Wang Liguang:* 1. *Report the progress of the 14″ reproduced line.*

*2. From April 9th to 11th, the review of super safety enterprises, with Li Yuxiang of the Ministry's Economic Operation Department as the team leader, the preparatory work has been completed.*

*3. Currently, the daily production averages 21,000 to 22,000 pieces of picture tubes, and the yield rate of the first factory is 96.3%. It is estimated that the annual output this year will be 5.6 million, and the quality and customer first past yield is 99.3%.*

*4. Regarding Changsha deflection yoke project,*

*①The start of construction is advanced, and ②the second phase is also advanced.*

*Zhang Wenyi:*

*Lin Guoliang asked us to build a new line in Fu and another line in the Philippines, and another Greek businessman wanted us to develop a 14″ post-processing line in Greece. Now we can contact them, and it will be clear after our 14″ reproduced line is completed. We can gain fame internationally.*

*Wu Yingzhong:*

*For the Changsha project, we can hold 15% of the technology shares, and then invest another 10% of the shares, accounting for 25%. It is enough.*

• *Agreed not to hold a controlling stake, but to occupy technology stocks, and invest a small amount.*

• *The other opinion is to sell technology and take on projects.*

*Tao Kui:*

*Report on last time's discussing with Toshiba about the phosphor powder joint venture project.*

*Zhang: I do not think that we should form a joint venture with Toshiba with respect to phosphor powder, the profit is too great,*

[handwritten text is indicated in italics]

# CAIHONG ELECTRONICS GROUP CORP

*The introduction of foreign investment in the phosphor powder project can only take a small share. It must be produced by us and operated by us, and our own foreign investors will also join in the foreign investment.*

*In addition, we can discuss a joint venture with Toshiba for lamp powder, because we already have the technology for picture tube powder.*

*Tao Kui:*

*Hongtian's matter has been dealt with, and 500,000 yuan has been returned.*

*Another thing is that Kunshan will be subject to inspection for acceptance in April, and the preparations have been done.*

*Zhang:*

*Now that the yen is constantly appreciating, Therefore, we need to tell the import and export company that regarding the equipment, etc. ordered in Japan, must open the US and European markets, and people can be organized to investigate and gradually transfer out of Japan.*

*Ji Qing:*

*The power and technology center has issues with foreign contracts and provisions for personnel going abroad.*

*Zhang: The equipment contract cannot be signed with the personnel going abroad, only the equipment contract can be signed; the personnel going abroad will be decided separately, and if they buy the same equipment, do they still need training. Discuss with the Human Resources Department.*

*Wu:*

*There are a lot of things in development recently, so we need to set the focus of development. I think the Xianyang Base and the information industry of the Six Institute are our development focuses,*

[handwritten text is indicated in italics]

# CAIHONG ELECTRONICS GROUP CORP

*In addition, the projection tube and the whole machine must also be developed, and the glass must also be developed. We need to reserve land in Xianyang, and then develop colored glass in Xianyang. I think it is necessary to report to the country now.*

*① Demand for display tubes has been very strong recently, and the price has also rebounded. We want to use this to promote the mass production of display tubes.   This time we go to Toshiba, we will also talk about the step-by-step implementation of CDT;*

*② Regarding the projection tube, factory manager Ji, Wang Liguang to discuss the matter of who is going, and decide on the person.*

*Zhang:  Mr. Wu and I will go, at the factory, Ji, Wang, and Tao, please take responsibility properly, it is still the quality and safety.*

# 会 议 记 录

**会议名称：** 行政办公会

**会议时间：** 1995年4月5日 9：00

**会议地点：** 新纪宾馆六楼会议室

**主 持 人：** 张文义

**出席人员：** 武英忠、吉诛、王季宁、陶魁、李作亭

**列席人员：** 周晨、孙水利、王军、

**会议议题：** 1. 关于CIS设计方案的确定和广告宣传
2. 工会汇报建房方案、
3. 厂外的发放问题、

**记 录 人：** 李温夫

Confidential



CAIHONG   ELECTRONICS   GROUP   CORP.

第一项：关于CIS设计工作汇报，以及确定彩虹集团的标志。

原设计了119种，经过筛选确定了10种，专家组的意见集中在15号和21号。

同意15号，21号中选定，由专家组定。

批判：在CI导入传播中要加强工作，眼前彩虹"实为王者，鲜为人知"。

今年广告宣传在四方面：

1. 善始，善终把CIS工作搞好；

2. 制做一些宣传品；

3. 九月CI设计结束，所以在应用方面要进行，名片，招牌，工装等。

4. 开一次新闻发布会，办一个CI研讨班，请专家讲课。

充分利用新闻媒体，做好新闻宣传。

1. 在中央电视台做为期三～六个月的广告宣传；

2. 人民日报，中国电子报，陕西日报打三家新闻业发报道，共六十万元。

3. 在西安戏北京树立半永久性广告牌。

4. 小的广告；

Confidential                                                                IRI-CRT-00004758



**CAIHONG ELECTRONICS GROUP CORP**

三、选择介入有影响的社会活动。

1. 世界妇女大会（九月份），2."中国旅游大全"，150万。

3.画"彩虹城"的标识。

4. 厂内的礼品要统一起来。

我的意义：先加快CI设计，待定下标志以后应接续起来一个宣传浪潮，拿一个整体方案，并拿出预算来，我们列入我们的预算计划中。

工作序：汇报进房方案

刘：1. 现1268套，商品房632套，优惠房636套。

2. 重点是保证无房困户。

3. 此次原则上行政上不争5分房方案。

67.19m² 176套
88.3 " 24 "
93.5 " 72 "
78.92 " 28 "
88.3 " 142 "

分房方案，排队办法都由工会委员会定，行政不争5。



# CAIHONG ELECTRONICS GROUP CORP.

羿文义：

我们一季度的情况相当好，销售、效益都非好，25"销售也好转了，全年预计超过50万只的房。四月份利税估计在2.5亿左右。考虑到入关的情况、14"出口继续做，14"每只涨价30元，490元；18"涨20元；所以我们的21"要准备出口了。这是真正的出口，21"从现在开始要往国际走了，价格上要接近国际市价83美金，通过出口带动21"的市场，是否今年再增加3—5万只21"用来出口。销售重点要向几大家倾斜。

厂外：

1. 六所接触和规划研讨会都非顺利。

① 工业控制方面要发展。2000年—20亿元。

② 工作站。

③ 显示器成为新生长点。2000年以前100万台。

④ 程控交换机，用户和局级交换机，200万户。

⑤ 微机销售代理。

总销售收入在2000年应达到60—70亿元，利税16—17亿元。成集团第二了事业。

2. 都里同我们谈深圳三了厂的了。

① MAC，电子都占40%。7000万美金的负债



**CAIHONG ELECTRONICS GROUP CORP.**

②中康：共23亿元货款，占40%股份。

③赛格日立：目前还不错。

　我们总的想法是能推掉就推掉，推不掉就尽量压价，最好是MAC破产，只接中康、赛格日立。具体现在是形势不明朗，可能会拖下去。

3. 省里三个厂的了。

　省里三家我们目前是积极态度，慢慢行动，等待时机，待报告发表后，我们再去找领导去谈。

　咸阳的管子力量就差不了了，虽倍在三所投，目前要缺的就是整机，这次我和就是去日本就要同东芝去谈，整机厂可以合资新建，把拉旧厂包袱要小。

4. 同成电的投影管已谈成。

　这是一个未来的产品，现在还不宜往外讲，学校有一些压力。这次我们谈的会同步就，李广要带好设备的人去看一下，另外把技术的人要去参与，尽早在技术上凑合一起。如果一、两年以后投放市场，就使我们的下一代产品出台了。

⑤李宁：上次我去日本，同富士还有关系。

张：　把名片告诉李广仪所长，让他们联系一下。



李厂：1. 汇报一下14"翻板线的进尺。

  2. 4月9日~11日报级安全生产评审，郭经运司李玉祥
  为国省，准备工作已完成。

  3. 现在日产率约2.1~2.2万只显象管，良品率一下96.3%，
  估计今年均能完成560万，质易，用户直运率99.3%。

  4. 关于长沙偏转线圈项目，
     ①开工时间提前   ②二期也提前。

张效义：
    林国良提出让我们给他至福新建一条线，在荷律
  宣建一条线，另外还有一个希腊商人想让我们且希腊拉
  一条14"后工制线，以上我们现在可少接配了，待我们
  14"翻板线生成后，就明朗了，可以至国际上打开名声。

戎克忠：
    长沙项目我们可少占15%的技术股，再投10%股份，
  占25%就行了。
  · 同意不控股，占技术股，再少努投一些。
  · 第二个意见是卖技术，包项目。

陶钟：
    上次同东美误费克勒台资项目汇报。
张：我认为美克勒不要同东美台资，它了利润太大了。



# CAIHONG ELECTRONICS GROUP CORP.

黄总：新项目引进外资只能占小股，必须由我们生产，我们经营，而且外资中还有我们们已的外商加进来。

另外可以同东芝走误灯粉的合资，因为显示管都我们有技术了。

陶总：

虹天的另已处理完了，50万元已军回来了。

另外一步子是昆山车月仿委验收，准备工作已做。

张：

现在日元在不断升值，所以要促进出口公司讲，在日本订的设备步要开辟至美国及欧州的市场，可以让以人去考察，还步从日本跑腿出来。

出张：

对外签合同和出国人员教的问题，动力和技术中心前色了。

张：签设备合同不能和出国人员在一起签。只能签设备合同，出国人员另签。另外买了同样的实习设备，还是不需要实习。和人力部商另一下。

武：

最近发展上的了比较复，要定一下发展的重点。我以为咸阳基地和二所信息产业是我们的发展重点，另外



CAIHONG  ELECTRONICS  GROUP  CORP.

投影管和整机也要发尺，玻璃也要发尺，送咸阳要留出地，送咸阳再上影玻。我觉得现在就要给国家打报告。

B 显子管市要的最近很猛，价格也有回弹，要借此推动显子管的另尺。这次市车艺也要谈 CDT 号岁奂艳的了。

C 投影管的了，吉力岁，王季宁商岁一下去人的了，把人定下来。

总：我和试宗岁去，厂卫去，王、陶负责好、还是质量和安全。