# EXHIBIT 45
# (FILED UNDER SEAL)

# EXHIBIT 46



info@certifiedtranslate.com | 2425 Olympic Blvd., Suite 4000W | usa 1-888-856-2228
www.certifiedtranslate.com | Santa Monica, CA 90404 | int +1-310-684-3153
| | fax +1-310-564-1944



**A member of the American
Translators Association
ATA Member Number: 248719**

# CERTIFIED TRANSLATION

*Description of Document(s):*

|  |
|---|
| **MEETING MINUTES RE:** |
| **CAIHONG ELECTRONICS GROUP CORPORATION** |
| **IRI-CRT-00004817 through IRI-CRT-00004823** |
|  |

| Source Language: **CHINESE** | Target Language: **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director                    **Date:**   March 18, 2022

A copy of the translated version(s) is attached to this statement of certification.

**Exhibit
Wang 8558**

Wang Zhaojie - V1

certified translate                                                                 www.certifiedtranslate.com

# Meeting Minutes

Meeting title: [Handwritten:] Group Corporation Administrative Meeting
Meeting time: [Handwritten:] July 10, 1995, 8:30
Meeting location: [Handwritten:]: Caihong Hotel, 6th Floor Meeting Room
Chairperson: [Handwritten:] Zhang Wenyi
Attendees: [Handwritten:] Wu Yingzhong, Wang Liguang, Wu Weiren, and Li Zuoting.

Observers: [Handwritten:] Niu Wenjun and Li Wenfu

Meeting topics: [Handwritten:]
1. Regarding cadre training
2. The subsidizing of retired workers and staff
3. Regarding an opinion on handling the Yellow River factory's TV set quality incident

Minutes taker: [Handwritten:] Li Wenfu.

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [].

certifiedtranslate                                                    www.certifiedtranslate.com

139

# CAIHONG ELECTRONICS GROUP CORPORATION
### *CAIHONG ELECTRONICS GROUP CORP.*

[Handwritten:]

Zhang Wenyi: We have some matters requiring this meeting.

1. Regarding the issue of cadre training and learning

The training at Xi'an Jiaotong University is mainly for technology cadres. They are master's degree students after graduation. The personnel department reported a list of 30 people.

The training at Renmin University is mainly for finance and trade. Reported 10 people. This is mainly training for high-level management cadres, including factory-level leaders.

2. This year's benefits are pretty good. All current workers are receiving these benefits. The issue is what to do about the retired workers and staff.

I think the issue with retired workers and staff is very complicated because of different years of employment. I suggest a one-size-fits-all approach where we give retired workers and staff a price subsidy. That is, we give retired workers and staff a subsidy of 15% of the average salary. Each would get a subsidy of approximately 40-50 yuan per month.

Another approach is to set the retiree subsidies at 30% of the salary increase for the current workers and staff.

03556X945                                          No.          Page

_____
English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [].

certifiedtranslate                                        www.certifiedtranslate.com

140

# CAIHONG ELECTRONICS GROUP CORPORATION

### *CAIHONG ELECTRONICS GROUP CORP.*

[Handwritten:]

△ All agreed to set the subsidies for retired workers and staff at 30% of the ^ average [inserted] salary increase. The subsidies will start in February 1995. The targets are workers and staff who are officially retiring. Caihong, the Sixth Institute, and the Devices Corporation are covered in this decision.

3. About closing the balcony and building the residential buildings

Regarding the balcony closure's incoming materials and project supervision, let's have the discipline inspection commission or the supervision send personnel in to participate. The office will send notification.

Regarding the spaces in the residential buildings being a bit small, some workers and staff have spoken up about this. However, the state's policy is below 4 $m^2$ per capita for poor households. Therefore, the 60 $m^2$ housing we built this time should not be too small. Explain this to workers and staff.

Regarding the remaining piece of land, we'll do the budgeting and planning in 1996 based on the actual situation.

_____

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [].

certifiedtranslate                                                          www.certifiedtranslate.com

141

# CAIHONG ELECTRONICS GROUP CORPORATION
### *CAIHONG ELECTRONICS GROUP CORP.*

[Handwritten:]

4. The quality issue with the Yellow River factory's TV sets.

On July 3, when we visited users, we found that some of the 21" color TVs produced by the Yellow River factory had burned and damaged CRT cathodes. The designed voltage on the filament of this batch of color TVs exceeded the limit, which accelerated the aging of the CRTs. More than 260K sets were produced in this batch. Replacing all of these would cost more than approximately 260 million yuan.

Currently, it's clear that the Yellow River factory is liable for this. My opinion is that this matter needs to be reported because Caihong was entrusted to manage the Yellow River factory. The second thing we need to do is to take steps to recall these 260K TV sets. The third is to find out who was responsible. --- The Yellow River factory will draft a report to be submitted. Caihong Group will do the same. Will submit the reports to the provincial government and a copy to the Technology Supervision Bureau.

_____

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [].

certifiedtranslate                                        www.certifiedtranslate.com

142

# CAIHONG ELECTRONICS GROUP CORPORATION

### *CAIHONG ELECTRONICS GROUP CORP.*

[Handwritten:]

Wu Yingzhong: 1. The CRT Industry Association will be holding a preparatory meeting in Beijing on July 17, and the founding meeting will be held in early August.

   2. Beijing headquarters building. There is a tower building next to Hangtian Bridge in Beijing. It costs approximately 180 million yuan. The space is approximately 15,000 $m^2$. Does Caihong want to purchase the entire building or some floors?

   △ Purchase the entire building.

   3. Report on the projection tube project. Went to visit the Sichuan Provincial Planning Commission with Plant Director Ji to discuss. Also visited two factory locations. Currently, three projection tubes have been integrated. Everything is progressing smoothly. Production will be finalized next year.

Wang Liguang: There has been no breakthrough in technology. We're still a ways from mass production. Therefore, I think we can discuss but hold off on acting.

Zhang Wenyi: As far as technology, we're actively advancing. However, it will take some time to go from batch production and marketing to building factories.

03556X945                                            No.          Page

_____

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [].

CONFIDENTIAL                                            IRI-CRT-00004821E_TRANSLATION

certifiedtranslate                                                                    www.certifiedtranslate.com

143

# CAIHONG ELECTRONICS GROUP CORPORATION
### *CAIHONG ELECTRONICS GROUP CORP.*

[Handwritten:]

4. Regarding Devices Corporation: Right now, the finances are being comprehensively straightened out. Will return to Beijing on the 12th to sort out materials. The plan for increasing salaries will be ready for launch after the report to the Group. Set up a team for phase II construction of the building to strictly control the fund. Preparing to hold a development and planning seminar in August. However, I think Devices Corporation's only promising area going forward is trade. Is organizing our import and export company, material supply, overseas companies, etc., into a Caihong Corporation a path forward? Regarding building a CRT project in Dalian, after visiting Caihong's factories, the representatives of the Dalian City government think that Caihong has great strength and that it is appropriate to work with Caihong. On the 18th, will go to Dalian to discuss setting up some teams. General team: Lu Xiyi. Whole set: Zhang Ningjing. CRT: Ding Wenhui. Power: Zhang Yuyan.

Wang Liguang:

      For the second half of the year, I diagnose that one of the management issues at Caihong's Xianyang base is the unevenness in personnel labor and time and the unreasonable personnel quota. Let's make it a goal to enhance cost management and labor

03556X945                                                            NO.            Page

_____
English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [].



144

# CAIHONG ELECTRONICS GROUP CORPORATION
### *CAIHONG ELECTRONICS GROUP CORP.*

[Handwritten:]

productivity and make this known to the lower levels.

Zhang Wenyi: The imbalance in management that Liguang brought up is a very important issue. We still need to work hard on further improving the management. Think about and draft a report on some measures that can be taken, including rewards to teams doing an exemplary job in basic management, cadre training, etc.

Wang Liguang: We've had a successful trial production of 21" thick neck tubes on the 25" line. Next year, we'll be able to produce 21", 22" and 25" on the 25" line and will be able to reduce the loss of 25" line capacity.

Zhang Wenyi: In 1996, our huge external and internal investments need to be reduced; we need to pause and regroup. Internally, we need to focus on tapping latent potentials and making modifications.

_____

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [].

# 会 议 记 录

会议名称：集团公司行政并公会

会议时间：1995年7月10日 8:30

会议地点：新世宾馆三楼会议室

主 持 人：张文义

出席人员：戎英忠、王孝宁、吴维仁、李作亭、

列席人员：毕文军、李温夫

会议议题：1. 关于干部培训问题；
2. 给离退休职工补贴问题；
3. 关于黄河了电视机质量及故问题的
处理意见。

记 录 人：李温夫

Confidential



CAIHONG  ELECTRONICS  GROUP  CORP.

微义武：有几个了开户会。

一、关于干部的培训和学习问题。

西安交通大学的培训主要是技术干部的培训，毕业生是硕士生。人事部报了30个人的名单。

人民大学的培训主要是金融、贸易，报了10人。这个主要是高层次的管理干部，包括厂级领导的培训。

二、今年效益不错，在职工人都享受到了。问题是退休的职工怎么办？

我认为退休职工因年限不同情况很复杂。我建议采取一刀切的办法，给予退休职工以物价补贴。即本的工资的15%补给退休职工。每人每月可补40—50元左右。

另外一种办法是按在职职工工资增长的30%

Confidential                                                                    IRI-CRT-00004818



CAIHONG ELECTRONICS GROUP CORP.

补贴给退休职工。出差的问题 ……

△ 大家同意按工资增长的30%补给退休职工，
从1995年2月份开始补起。对象是正式办理离
退休职工。范围：彩虹、云师、器件公司。

三、封阳台和进家属楼的了。

封阳台的进料和工程监督让纪委或监察
派人进入，参与进去。一由办公室通知。

关于进家属楼的面积大一些，有些职工有房
住。但国家的政策是贫困户是人均4m²·3下，所
以我们这次建的60m²的房应该是不多的，给
职工解释一下。

剩手的一块地96年再根据情况进行预算、规划。

Confidential



CAIHONG  ELECTRONICS  GROUP  CORP.

四. 黄河厂电视机出质量问题的了.

7月3日我们去进行用户走访时发现黄河厂出厂的一部分21"彩电将彩管阴极烧坏的现象. 这批彩电在设计上加在灯丝上的电压超过了极限值. 彩管加速老化。 这批电视一共生产了26万多台. 若全部更换的话约需2.6亿元以上.

现在责任是黄河厂的了实已分清. 我的看法是这件了要上报. 因黄河厂委托我们彩虹管理了. 第二个措施是采取办法收回26万台电视机. 第三个是要追查责任人。～～ 由黄河厂起草文件上报. 彩虹集团也起草一个报告上报，报有政府. 抄报有技术监督局。



CAIHONG  ELECTRONICS  GROUP  CORP.

模态：1.7月17日彩管行业协会在北京开筹备会，成立大会放在八月初召开。

2.北京总部大楼，在北京航天桥旁边有一栋塔楼，约需1.8亿元，面积约1.5万m²。彩虹是整栋楼买下，还是买几层？

△整栋楼都买下来。

3.投影管项目汇报。这次同志们去日本考察的收获让我了解一下，还看了两处厂址。目前三个投影管已实现了，进口很顺利，刚好均出生产定型。

建厂：技术上还没有突破。离量产还有一段距离，所以我认为建厂可以议而不动。

敬义：在技术上我们积极推进，但批量生产、市场和建厂问题还有一个时间过程。

Confidential                                    IRI-CRT-00004821



**CAIHONG ELECTRONICS GROUP CORP.**

4. 关于器件公司。现正在进行全面财务清理，12月
后回北京整理材料。发工资的方案报集团后批准
启动了。二期工程选抽成立了班子，对资金进行严格
控制。八月份准备开一次发展规划研讨会，但器
件公司有发展前途吗？我认为只有贸易上还可以，将
来把我们的进出口公司，物资，海外调节细成制
品商祝是不是一条路子。 大连也彩管项目了。大连
市政府代表团参观彩虹工厂后，认为彩虹实力很强，
认为同彩虹搞是合适的。18日去大连谈准备成立
几个组：综合组——吕希疆；整机——张宁静；彩管——丁文辉；
动力——张玉艳。

李厂：

    下半年我在诊断彩虹咸阳基地的管理问题，一个
是人员上劳时不均，定员不合理；成本管理和劳

03556×945                                    编号        页



**CAIHONG ELECTRONICS GROUP CORP.**

劳生产率的提子. 做为一个目标下达下去。

张文义：李广提出的管理上的不均衡是一个非常
重要的问题. 管理上的进一步深化还需要继续
努力, 包括基础管理中的模范班组的奖励, 干部
培训方面想一些办法, 拿出一个报告。

王李广：现在在25"线上试制成功了21"粗管颈管.
明年可在25"线上可生产21", 22", 25", 可以减少
25"线能力的短失. 文章 李德责

张文义：96年我们对外和内部大的投入要减少
了. 要休整一下, 内部以挖潜改造为主。

# EXHIBIT 47

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
        evan.werbel@bakerbotts.com
        tom.carter@bakerbotts.com
        drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 4:07-cv-05944-JST (N.D. Cal.) |
| | MDL No. 1917 |
| This Document Relates to: | **IRICO DEFENDANTS' SIXTH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DIRECT PURCHASER PLAINTIFFS' FIRST SET OF INTERROGATORIES** |
| ALL DIRECT PURCHASER ACTIONS | |

PROPOUNDING PARTY:    Direct Purchaser Plaintiffs

RESPONDING PARTIES:    Irico Group Corporation
                          Irico Display Devices Co., Ltd.

SET NUMBER:          One

1          Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico

2    Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby provides its sixth

3    supplemental responses to the Direct Purchaser Plaintiffs' ("Plaintiff") First Set of

4    Interrogatories, dated March 12, 2010 ("Interrogatories"). Irico reserves the right to amend or

5    supplement these Objections and Responses (the "Responses") to the extent allowed by the

6    Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the

7    United States District Court for the Northern District of California ("Local Rules"). Subject to

8    and without waiving any of Irico's General and Specific Objections as set forth below, Irico is

9    willing to meet and confer with Plaintiff regarding such General and Specific Objections.

10          The following Responses are made only for purposes of this case. The Responses are

11    subject to all objections as to relevance, materiality and admissibility, and to any and all

12    objections on any ground that would require exclusion of any response if it were introduced in

13    court. All evidentiary objections and grounds are expressly reserved.

14          These Responses are subject to the provisions of the Stipulated Protective Order issued by

15    the Court on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated

16    "Confidential" in accordance with the provisions of the Protective Order.

17                                    **GENERAL OBJECTIONS**

18          Irico makes the following General Objections to Plaintiff's Interrogatories:

19          1.          Irico's Responses are based upon information available to and located by Irico as

20    of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states

21    that it has conducted, or will conduct, a diligent search, reasonable in scope, of those files and

22    records in its possession, custody, or control believed to likely contain information responsive to

23    Plaintiff's Interrogatories.

24          2.          No express, incidental, or implied admissions are intended by these Responses and

25    should not be read or construed as such.

26          3.          Irico does not intend, and its Responses should not be construed as, an agreement

27    or acquiescence with any characterization of fact, assumption, or conclusion of law contained in

28    or implied by the Interrogatories.

---

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS          1          Master File No. 4:07-cv-05944-JST
AND RESPONSES TO DPP'S FIRST SET                              MDL No. 1917
INTERROGATORIES

4.      To the extent that Irico responds to Plaintiff's Interrogatories by stating that Irico will produce or make available for examination responsive information or documents, Irico does not represent that any such information or documents exist. Irico will make a good faith and reasonable attempt to ascertain whether information responsive to Plaintiff's Interrogatories exists and is properly producible, and will produce or make available for examination non-privileged responsive materials to the extent any are located during the course of a reasonable search.

5.      Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiff.

6.      Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

7.      Irico objects to Plaintiff's Interrogatories to the extent they seek information that is not relevant or disproportionate to the needs of the case.

8.      Irico objects to Plaintiff's Interrogatories to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or amend its Responses.

9.      Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case.

10.      Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico will provide only information that it believes to be non-privileged and

otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any information or responsive documents subject to any such doctrine, privilege, protection or immunity from production shall not constitute a general, inadvertent, implicit, subject-matter, separate, independent or other waiver of such doctrine, privilege, protection or immunity from production.

11. Irico objects to Plaintiff's Interrogatories to the extent that they call for information that is not in the possession, custody, or control of Irico. Irico also objects to the extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties, including but not limited to any of Irico's subsidiary or affiliated companies.

12. Irico objects to Plaintiff's Interrogatories to the extent that responding would require Irico to violate the privacy and/or confidentiality of a third party or confidentiality agreement with a third party.

13. Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily available from other sources.

14. Irico objects to Plaintiff's Interrogatories to the extent that they seek information or documents concerning transactions outside the United States. Such Interrogatories are unduly burdensome and irrelevant to this pending action as Plaintiffs' purported class definition is confined to "all persons . . . who directly purchased a Cathode Ray Tube Product . . . in the United States" (see Direct Purchaser Plaintiffs' Consolidated Amended Complaint dated March 16, 2009).

15. Irico objects to Plaintiff's Interrogatories to the extent that compliance would require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body of foreign jurisdictions.

16. Irico's responses, whether now or in the future, pursuant to Plaintiff's Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific

1   objections or (ii) an admission that such information or documents are either relevant or

2   admissible as evidence.

3        17.     Irico objects to Plaintiff's Interrogatories to the extent that they are compound

4   and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

5        18.     Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for

6   legal conclusions.

7        19.     Irico objects to the Interrogatories to the extent that they contain express or

8   implied assumptions of fact or law with respect to the matters at issue in this case.

9        20.     Irico objects to the Interrogatories to the extent they seek information or

10  documents that cannot be removed or transmitted outside China without violating the laws and

11  regulations of that country, including but not limited to restrictions on the transmission of state

12  secrets or trade secrets as those terms are defined under Chinese law.

13       21.     Irico reserves the right to assert additional General and Specific Objections as

14  appropriate to supplement these Responses.

15       These General Objections apply to each Interrogatory as though restated in full in the

16  responses thereto. The failure to mention any of the foregoing General Objections in the specific

17  responses set forth below shall not be deemed as a waiver of such objections or limitations.

18  ## GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

19       1.      Irico objects to the definitions of "Defendant," "You," "Your," and "Yourself"

20  (Definition Nos. 1 and 3) to the extent that Plaintiff defines those terms to include the Irico's

21  "present or former employees, officers, directors, agents, predecessors, successors, parents,

22  subsidiaries, affiliates, joint ventures or any other person acting on their behalf." This definition is

23  overbroad, unduly burdensome, vague, and ambiguous. Irico also objects to the inclusion of all

24  "present or former employees, officers, directors, agents . . . or any other person acting on [the]

25  behalf [of]" Irico within this definition to the extent it purports to encompass information that is

26  protected by attorney-client privilege, work product protection or any other applicable doctrine,

27  privilege, protection or immunity or otherwise calls for a legal conclusion.

28       2.      Irico objects to the definition of "Document" (Definition No. 4) to the extent it

---

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS              4        Master File No. 4:07-cv-05944-JST
AND RESPONSES TO DPP'S FIRST SET                          MDL No. 1917
INTERROGATORIES

1  seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil

2  Procedure, the Local Rules, or any other applicable laws.

3      3.    Irico objects to the definition of "Employee" (Definition No. 5) on the grounds

4  that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico

5  further objects to this definition to the extent that it attempts to impose burdens on Irico beyond

6  those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to

7  the extent that it seeks information protected by the attorney client or other applicable privilege,

8  attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or

9  foreign law.

10      4.    Irico objects to the definitions of "CRT" and "CRT Product" (Definition No. 6) on

11  the grounds that they are vague, ambiguous and overly broad. Irico further objects to the use of

12  the term "CRT Products" to the extent that it is inconsistent with the definition of "CRT

13  Products" as set forth in Plaintiff's pleadings.

14      5.    Irico objects to the definition of the "Relevant Time Period" (Definition No. 7) as

15  overbroad, unduly burdensome, and beyond the applicable statute of limitations.

16      6.    Irico objects to the definition of "Communication" (Definition No. 8) on the

17  grounds that it is vague, ambiguous, and overly broad. Irico further objects to this definition to the

18  extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of

19  Civil Procedure.

20      7.    Irico objects to the definition of "Meeting" (Definition No. 10) on the grounds that

21  the definition is overly broad, unduly burdensome, and seeks information that is neither relevant

22  nor proportionate to the needs of the case.

23      8.    Irico objects to Instruction No. 1 (related to identification of persons) to the extent

24  that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized

25  under the Federal Rules of Civil Procedure, including, without limiting the generality of the

26  foregoing, Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the

27  extent that it purports to impose burdens or obligations broader than, inconsistent with, or not

28  authorized under, the Local Rules and any orders of the Court, and on the grounds that it is vague,

ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the extent it seeks information that would disclose personal confidential information and/or violate any and all rights of privacy under the United States Constitution or Article I of the Constitution of the State of California, or any other applicable law or state constitution, or that is otherwise prohibited from disclosure because to do so would cause Irico to violate legal and/or contractual obligations to any other persons or entities.

9.      Irico objects to Instruction No. 2 (related to identification of an entity other than a natural person) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

10.     Irico objects to Instruction No. 3 (related to the production of business records in response to an interrogatory pursuant to Federal Rule of Civil Procedure 33(d)) on the grounds that it is unduly burdensome and purports to impose burdens and obligations upon Irico beyond those required by the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

## SPECIFIC RESPONSES TO INTERROGATORIES

## INTERROGATORY NO. 1

State the name, address, and relationship to You of each person who prepared or assisted in the preparation of the responses to these interrogatories. (Do not identify anyone who simply typed or reproduced the responses.)

## RESPONSE TO INTERROGATORY NO. 1

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico also objects to the extent that this request calls for information and documents that are privileged under the attorney-client privilege and work product doctrine.

Subject to and without waiving the objections stated above, Irico responds that the following employees assisted in the preparation of these responses:

- Wenkai Zhang

Irico will supplement its response to this interrogatory with any additional individuals who assist with preparation of supplemental responses.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 1 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico responds that the following additional employees assisted in the preparation of these responses:

- Yan Yunlong

**INTERROGATORY NO. 3**

Identify each employee with pricing authority who attended any trade association during the Relevant Time Period relating to CRT and/or CRT Products and state with respect to each employee:

(a)     the trade association attended;

(b)     the dates of attendance;

(c)     any offices, chairs or committee positions held in each of the trade associations; and

(d)     the dates which those offices, chairs or committee positions were held.

**RESPONSE TO INTERROGATORY NO. 3**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.

Subject to and without waiving the objections stated above, Irico responds that it will conduct a reasonable search for information responsive to this Interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 3 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows:  Irico has been able to confirm the attendance of the specific individuals listed below at trade association

1    meetings during the Relevant Period.

2            Wang Zhaojie attended meetings of the China CPT Industry Association on the following

3    dates: November 6, 1998; April 2, 1999; December 9, 1999; April 6, 2000; and September 14,

4    2000.  Mr. Wang recalls attending other meetings of the China CPT Industry Association during

5    the Relevant Period but cannot recall any specific dates.  Wang Zhaojie did not hold any offices,

6    chairs or committee positions in the China CPT Industry Association.

7            Wang Ximin attended meetings of the China CPT Industry Association during the

8    Relevant Period but cannot recall any specific dates.  Wang Ximin did not hold any offices, chairs

9    or committee positions in the China CPT Industry Association.

10   **INTERROGATORY NO. 5**

11           Identify any meeting or communication between You and other producers of CRT and/or

12   CRT Products during the Relevant Time Period, including the named Defendants in this

13   coordinated proceeding, regarding CRT and/or CRT Product pricing, price increase

14   announcements, terms or conditions of sales, profit margins or market share, production levels,

15   inventory, customers, auctions, reverse auctions, dynamic bidding events, or sales, and for each

16   such meeting or communication:

17           (a)     provide the date and location of the meeting or communication;

18           (b)     identify the person(s) who initiated, called, organized, attended or participated in

19   the meeting or communication;

20           (c)     describe the subject matter discussed and any information you provided or

21   received;

22           (d)     describe every action taken by you as a result of the meeting or communication;

23   and

24           (e)     identify all persons with knowledge relating to the meeting or communication.

25   **RESPONSE TO INTERROGATORY NO. 5**

26           Irico reasserts and incorporates each of the General Objections and Objections to the

27   Definitions and Instructions set forth above.  Irico also objects that this interrogatory is

28   duplicative and cumulative of other requests served on Irico, including during jurisdictional

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS        8        Master File No. 4:07-cv-05944-JST
AND RESPONSES TO DPP'S FIRST SET                    MDL No. 1917
INTERROGATORIES

1    discovery.

2          Subject to and without waiving the objections stated above, Irico responds that it has

3    already provided information responsive to this interrogatory to Plaintiff in its responses to

4    jurisdictional discovery, including Irico's response to Request No. 10 of Direct Purchaser

5    Plaintiff Studio Spectrum, Inc's First Set of Requests for Production.  Irico will conduct a

6    reasonable search for additional information responsive to this interrogatory, if any, and

7    supplement its response as necessary.

8    **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5**

9          Irico reasserts and incorporates each of the General Objections, Objections to the

10   Definitions and Instructions, and specific objections to Interrogatory No. 5 set forth above. Irico

11   also objects to this interrogatory to the extent it purports to require Irico to respond beyond the

12   scope of the modification to Interrogatory No. 5 removing CRT Products from the scope of this

13   interrogatory, as stated in the February 5, 2021 letter from R. Alexander Saveri to John Taladay.

14         Subject to and without waiving the foregoing objections, Irico states as follows: Wang

15   Zhaojie identifies the following meetings or communications with other producers of CRTs:

16        • November 6, 1998 meeting in Xi'an, People's Republic of China to discuss China

17           CDT market information attended by Wang Zhaojie.

18        • April 2, 1999 meeting in Nanjing, People's Republic of China to discuss China

19           CDT market information attended by Wang Zhaojie.

20        • April 6, 2000 meeting in Xiamen, People's Republic of China to discuss China

21           CDT market information attended by Wang Zhaojie.

22        • A meeting taking place on an unknown date at a SEG Hitachi factory in Shenzhen,

23           People's Republic of China, attended by Wang Zhaojie.

24         Wang Zhaojie believes that he may have attended additional meetings with other

25   producers of CRTs between 1998-2000, but he cannot recall the specifics of those meetings.

26   Such meetings may have occurred in Beijing and Changsha, People's Republic of China.  Wang

27   Zhaojie did not attend any meetings outside of China.  Wang Zhaojie believes he met with one or

28   more representatives of the following Chinese CRT producers: Shenzhen or Tianjin Samsung

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS          9          Master File No. 4:07-cv-05944-JST
AND RESPONSES TO DPP'S FIRST SET                        MDL No. 1917
INTERROGATORIES

1    SDI, Shanghai Yongxin, Changsha LG, Fuzhou Chunghwa, Beijing Matsushita, Shenzhen SEG

2    Hitachi, and/or Dongguan Fudi.  He could not recall the specific entities that participated in each

3    individual meeting.  Wang Zhaojie could not recall the names of the individual(s) from the

4    various entities who attended each meeting, but believes the various attendees included Wong

5    Lian (Changsha LG), Yang Guojun (Shenzhen SEG Hitachi), Li Mingzhi (either Shenzhen or

6    Tianjin Samsung SDI), and/or J.S. Lu (Fuzhou Chunghwa).  The subject matter of these

7    communications and meetings involved information on Chinese CRT issues and market

8    conditions.  Irico believes these meetings were largely connected to the China CPT Industry

9    Association.

10            In addition, Su Xiaohua, then the Deputy General Manager for Planning in the Irico Sales

11   Company, recalls attending an event, with an unknown Irico employee, hosted by Skyworth, a

12   Chinese television manufacturer and customer of Irico, at which he interacted with other CRT

13   manufacturers.  This event was organized by Skyworth and involved companies from throughout

14   Skyworth's supply chain, not just CRT manufacturers.  Irico is not aware of any discussions with

15   other CRT manufacturers at this meeting regarding pricing, price increase announcements, terms

16   or conditions of sales, profit margins or market share, production levels, inventory, other

17   customers, auctions, reverse auctions, dynamic bidding events, or sales.

18            Irico continues to conduct a reasonable search for information responsive to Interrogatory

19   No. 5 as reflected in the March 31, 2021 Special Master's Order re DPPs' Motion to Compel

20   Responses to Interrogatory Nos. 4 & 5, ECF No. 5919. Irico will provide an additional

21   supplemental response by May 10, 2021.

22   **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5**

23            Irico reasserts and incorporates each of the General Objections, Objections to the

24   Definitions and Instructions, and specific objections to Interrogatory No. 5 set forth above.

25            Subject to and without waiving the foregoing objections, Irico states as follows: Wang

26   Ximin believes that he attended no more than a few meetings with other producers of CRTs

27   during the relevant period but cannot recall the specifics of those meetings.  Such meetings may

28   have occurred in Xianyang or Dongguan, People's Republic of China.  Wang Ximin did not

1   attend any meetings outside of China.  Wang Ximin believes he met with one or more

2   representatives of the following Chinese CRT producers during these few meetings but cannot

3   recall specifically: Shenzhen Samsung SDI, Shanghai Yongxin, Changsha LG, Fuzhou

4   Chunghwa, Beijing Matsushita, Shenzhen SEG Hitachi, Nanjing LG Philips and/or Dongguan

5   Fudi. Wang Ximin could not recall the names of the individual(s) from the various entities who

6   attended each meeting or who attended each of the few meetings, but he believes the various

7   attendees would have included Yang Guojun (SEG Hitachi), Zhu Danlin (Shanghai Yongxin),

8   Fang Wenqiang (Beijing Matsushita), Qian Xiaolan (Dongguan Fudi), and/or Yang Xiangjie

9   (Fuzhou Chunghwa).  Wang Ximin also believes he may have spoken with some of these

10  representatives of other Chinese CRT producers by phone on a few occasions during the relevant

11  period but cannot recall the specifics of any such phone calls.  The subject matter of these

12  communications and meetings involved information on Chinese CRT issues and market

13  conditions.  Irico believes these meetings were largely connected to the China CPT Industry

14  Association.

15  ## THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5

16      Irico reasserts and incorporates each of the General Objections, Objections to the

17  Definitions and Instructions, and specific objections to Interrogatory No. 5 set forth above.

18      Subject to and without waiving the foregoing objections, Irico states as follows: Irico

19  identifies the following additional meetings or communications with other producers of CRTs:

20      • December 9, 1999 meeting in Suzhou, People's Republic of China attended by

21          Wang Zhaojie.  Mr. Wang does not recall the content of the meeting but recalls

22          that Song Shizhen accompanied him on this trip.

23      • January 13, 2000 meeting in Xi'an, People's Republic of China.  Irico's records

24          indicate that Yao Jun incurred a fee related to a CDT industry meeting at the Hotel

25          Royal Xi'an on January 13, 2000.  Following a reasonable search for other

26          responsive information, Irico could not ascertain any details of this meeting.

27      • September 14, 2000 meeting in Changsha, People's Republic of China attended by

28          Wang Zhaojie.  Mr. Wang does not recall the content of the meeting but recalls

1    that it was organized by LG and also attended by Yang Zhen, a representative of

2    another CRT producer.

3    Irico also provides the following information based on its review of its travel

4    reimbursement records from the Relevant Period:

5    • Irico understands that Plaintiff alleges that a meeting between CRT producers took

6       place in Fuzhou, People's Republic of China on October 9, 1998.  Irico's records

7       indicate that Wei Jianshe traveled to Fuzhou on or around this date.  Following a

8       reasonable search for other responsive information, Irico could not confirm that

9       Mr. Wei met with competitors during this trip, nor could it confirm the details of

10      the meeting as alleged by plaintiffs.

11   • Irico understands that Plaintiff alleges that meetings between CRT producers took

12      place in Beijing, People's Republic of China on December 8 through 10, 1998.

13      Irico's records indicate that Li Weisheng and Ma Jinquan traveled to Beijing on or

14      around these dates.   Following a reasonable search for other responsive

15      information, Irico could not confirm that Li Weisheng or Ma Jinquan met with

16      competitors during this trip, nor could it confirm the details of the meeting as

17      alleged by plaintiffs.

18   • Irico understands that Plaintiff alleges that a meeting between CRT producers took

19      place on June 22, 1999.  Irico's records indicate that Li Weisheng traveled to

20      Shanghai, People's Republic of China on or around this date.  Following a

21      reasonable search for other responsive information, Irico could not confirm that

22      Mr. Li met with competitors during this trip, nor could it confirm the details of the

23      meeting as alleged by plaintiffs.

24   • Irico understands that Plaintiff alleges that a meeting between CRT producers took

25      place in Nanjing, People's Republic of China on August 5, 1999.  Irico's records

26      indicate that Wang Zhaojie traveled to Nanjing on or around this date.  Mr. Wang

27      did not recall attending this alleged meeting.  Following a reasonable search for

28      other responsive information, Irico could not confirm that Mr. Wang met with

1      competitors during this trip, nor could it confirm the details of the meeting as

2      alleged by plaintiffs.

3      •   Irico understands that Plaintiff alleges that a meeting between CRT producers took

4          place in Tianjin, People's Republic of China on October 12, 1999.  Irico's records

5          indicate that Wang Zhaojie traveled to Tianjin on or around this date.  Mr. Wang

6          did not recall attending this alleged meeting.  Following a reasonable search for

7          other responsive information, Irico could not confirm that Mr. Wang met with

8          competitors during this trip, nor could it confirm the details of the meeting as

9          alleged by plaintiffs.

10     •   Irico understands that Plaintiff alleges that a meeting between CRT producers took

11         place in Nanjing, People's Republic of China on November 9, 2000.  Irico's

12         records indicate that Zhang Hushan traveled to Nanjing on or around this date.

13         Following a reasonable search for other responsive information, Irico could not

14         confirm that Zhang Hushan met with competitors during this trip, nor could it

15         confirm the details of the meeting as alleged by plaintiffs.

16     •   Irico understands that Plaintiff alleges that a meeting between CRT producers took

17         place in Shanghai, People's Republic of China on November 21, 2006.  Irico's

18         records indicate that Shen Xiaolin traveled to Shanghai on or around this date.

19         Following a reasonable search for other responsive information, Irico could not

20         confirm that Shen Xiaolin met with competitors during this trip, nor could it

21         confirm the details of the meeting as alleged by plaintiffs.

22     **INTERROGATORY NO. 6**

23         Identify each instance during the Relevant Time Period in which You or any other

24     producer of CRT and/or CRT Products, including the named defendants in this coordinated

25     proceeding, instituted a price increase or decrease for CRT and/or CRT Products, and for each

26     such instance:

27         (a)     when such price increase or decrease was announced publicly;

28         (b)     when such price increase or decrease was implemented;

(c)     the amount of the price increase or decrease;

(d)     whether such price increase or decrease was withdrawn;

(e)     each person with responsibility for implementing such price increase or decrease or its withdrawal; and

(f)     any explanation given for such price increase or decrease or withdrawal.

**RESPONSE TO INTERROGATORY NO. 6**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico also objects to the extent that this interrogatory calls for information regarding "any other producer" and thus seeks information outside of Irico's possession, custody or control.

Subject to and without waiving the objections stated above, Irico responds that it will conduct a reasonable search for information responsive to this Interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 6 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico has not identified any systematic tracking of its CRT prices or information on the announcement, implementation, withdrawal, or explanations for CRT price changes during the Relevant Period. Irico refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT and CRT Product sales records.  Irico further directs Plaintiff to documents IRI-CRT-00004295-303; IRI-CRT-00005349-400; IRI-CRT-00005401-515; IRI-CRT-00008843-880 IRI-CRT-00010133-204; IRI-CRT-00028958-964; IRI-CRT-00030226-241; and IRI-CRT-00030462-503 for the answer to this Interrogatory under Federal Rule of Civil Procedure 33(d).  Irico has conducted a reasonable search for other information responsive to this Interrogatory and has located no additional information beyond that described above.

**INTERROGATORY NO. 7**

Identify and describe all joint ventures, partnerships or other cooperative business

---

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS
AND RESPONSES TO DPP'S FIRST SET
INTERROGATORIES

14

Master File No. 4:07-cv-05944-JST
MDL No. 1917

1  relationships, during the Relevant Time Period, relating to CRT and/or CRT Products between

2  You and any other CRT or CRT Products producer.

3  **RESPONSE TO INTERROGATORY NO. 7**

4      Irico reasserts and incorporates each of the General Objections and Objections to the

5  Definitions and Instructions set forth above.  Irico also objects that this interrogatory is

6  duplicative and cumulative of other requests served on Irico, including during jurisdictional

7  discovery.

8      Subject to and without waiving the objections stated above, Irico responds that it has

9  already provided information responsive to this interrogatory to Plaintiff in its responses to

10 jurisdictional discovery, including documents produced in response to Request No. 2 of Direct

11 Purchaser Plaintiff Studio Spectrum, Inc.'s First Set of Requests for Production.  Irico will

12 conduct a reasonable search for additional information responsive to this interrogatory, if any, and

13 supplement its response as necessary.

14 **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7**

15     Irico reasserts and incorporates each of the General Objections, Objections to the

16 Definitions and Instructions, and specific objections to Interrogatory No. 7 set forth above.

17     Subject to and without waiving the foregoing objections, Irico states as follows:

18     **Shenzhen Irico-Huangqi Information Electronics Co. Ltd.**

19     Shenzhen Irico-Huangqi Information Electronics Co. Ltd. ("Irico Huangqi") was formed

20 on July 2, 1996 as a joint venture between Irico Group and Hong Kong Riyili Co., Ltd.  From

21 July 2, 1996 to August 15, 2002, Irico Group held 60% of the equity of Irico Huangqi and Hong

22 Kong Riyili Co., Ltd. held 40%.  From August 15, 2002 until Irico Huangqi's dissolution in 2006,

23 Irico Group held 33.13% of the company's equity, Gansu Languang Technology Corp. held

24 41.37%, and Hexin Technology Co., Ltd. held 25%.  Irico Huangqi was formally dissolved in

25 2006 and its remaining assets sold at auction.

26     Irico Huangqi's approved scope of business included the research, development,

27 manufacture, and sale of monitors, peripheral equipment, and other electronic devices.  Irico

28 Huangqi's primary business was the manufacture and sale of computer monitors, at least some of

1  which were manufactured using CDTs sold by Irico to Irico Huangqi.  Irico Huangqi did not sell

2  CRTs (except as integrated into monitors) and to Irico's knowledge did not export any products

3  outside of China.

4  **Irico (USA) Inc.**

5  Irico (USA) Inc. ("Irico USA") was incorporated in California on July 5, 1995 as a joint

6  venture between Irico (Hong Kong) Co. ("Irico Hong Kong"), China National Electronics Import

7  & Export Caihong Co. ("CNEIECC"), an independent state-owned entity, and two U.S.

8  individuals named Xueli Huang and Mike Huang.  Irico Hong Kong held a 45.7% stake in Irico

9  USA, while CNEIECC held at 34.3% stake and Xueli and Mike Huang each held 10%.  On

10  February 26, 1998, Xueli and Mike Huang divested from Irico USA, leaving Irico Hong Kong

11  and CNEIECC as the sole owners.  In 1999, CNEIECC sold its ownership stake to Irico Group.

12  On March 9, 2000, Irico Group authorized Liu Feng, General Manager of Irico USA, to sell Irico

13  USA and return the resulting funds to Irico Group.  However, on April 10, 2001, Irico

14  understands that Liu Feng sold the entire company to California-based INB Co. and absconded

15  with the proceeds.  At the time of the transaction, Liu Feng was listed as the operator of INB Co.

16  Then, on May 7, 2001, shortly after the transfer, Sun Xiaolin replaced Liu Feng as the registered

17  operator of INB Co.  Irico USA was dissolved on February 28, 2003.

18  According to the Shaanxi Province People's Government decree establishing Irico USA,

19  the purpose of establishing Irico USA was to expand provincial exports of electromechanical

20  products to North America and to develop trade, investment, and cooperation between China and

21  the United States.  (*See* IRI-CRT-00003498.)  Irico understands from CNEIECC invoice records

22  produced during jurisdictional discovery that CNEIECC sold small volumes of Irico CRTs to

23  Irico USA on several occasions between 1996 and 1999.  However, the invoices indicate that all

24  such sales were shipped to countries other than the United States, including South Africa, Egypt,

25  and China (*see* IRI-CRT-00003561 through -597) with no products delivered to the United States

26  or any United States customer.  Irico is not aware of Irico USA ever manufacturing, marketing,

27  selling, or distributing any CRTs or CRT Products in the United States.

28  Irico further directs Plaintiff to document IRI-CRT-00003490 for the answer to this

1    Interrogatory under Federal Rule of Civil Procedure 33(d).

2    **INTERROGATORY NO. 8**

3         Identify every channel used by You to sell, market, or distribute CRT and/or CRT

4    Products during the Relevant Time Period. If You used different channels at different points

5    within the Relevant Time Period, identify when You used each channel to sell, market, or

6    distribute CRT and/or CRT Products.

7    **RESPONSE TO INTERROGATORY NO. 8**

8         Irico reasserts and incorporates each of the General Objections and Objections to the

9    Definitions and Instructions set forth above.  Irico further objects to the undefined term "channel"

10   as vague, ambiguous, and subject to multiple interpretations.  Irico also objects that this

11   interrogatory is duplicative and cumulative of other requests served on Irico, including during

12   jurisdictional discovery.

13        Subject to and without waiving the objections stated above, Irico responds that it has

14   already provided information responsive to this interrogatory to Plaintiff in its responses to

15   jurisdictional discovery, including Irico's response to Interrogatory No. 18 of Indirect Purchaser

16   Plaintiff's First Set of Interrogatories.  Irico will conduct a reasonable search for additional

17   information responsive to this interrogatory, if any, and supplement its response as necessary.

18   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8**

19        Irico reasserts and incorporates each of the General Objections, Objections to the

20   Definitions and Instructions, and specific objections to Interrogatory No. 8 set forth above.

21        Subject to and without waiving the foregoing objections, Irico states as follows:  From

22   1995 to 2004, Irico Group and Irico Display sold CRTs through the Irico Sales Company, an

23   entity within Irico Group that was responsible at that time for sales of all companies under Irico

24   Group.  Sales during this period were made almost exclusively in China (99.2%) and negotiated

25   by the Irico Sales Company and recorded under the name of the specific company that produced

26   the CRT, *i.e.*, Irico Group or Irico Display.  Neither Irico Group nor Irico Display exported any

27   products to North America.

28        Following a corporate restructuring in 2004 that included the formation of Irico Group

1  Electronics Co. Ltd. ("Irico Electronics"), the Irico Sales Company transitioned to a sales

2  department responsible for the sales of Irico Display and Irico Electronics, and Irico Group

3  ceased the sale of CRTs under its own name.  Starting at that time and continuing through the

4  remainder of the Relevant Period, sales by Irico Display and Irico Electronics were made directly

5  by each company.  During this period, Irico Display and Irico Electronics also sold some CRTs

6  internally to Xi'an Caihui Display Technology Co. Ltd. ("Xi'an Caihui") and Xi'an Cairui

7  Display Technology Co. Ltd. ("Xi'an Cairui"), subsidiaries of Irico Display and Irico Group,

8  respectively, located within the Xi'an Export Processing Zone for the purpose of enjoying

9  preferential tax policies on their exports.  Neither Xi'an Caihui nor Xi'an Cairui exported any

10  products to the United States during the Relevant Period.

11  **INTERROGATORY NO. 9**

12       Identify every channel used by you to purchase CRT and/or CRT Products during the

13  Relevant Time Period. If You used different channels at different points within the Relevant Time

14  Period, identify when You used each channel to purchase CRT or CRT Products.

15  **RESPONSE TO INTERROGATORY NO. 9**

16       Irico reasserts and incorporates each of the General Objections and Objections to the

17  Definitions and Instructions set forth above. Irico further objects to the undefined term "channel"

18  as vague, ambiguous, and subject to multiple interpretations.

19       Subject to and without waiving the objections stated above, Irico responds that it will

20  conduct a reasonable search for information responsive to this Interrogatory, if any, and

21  supplement its response as necessary.

22  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9**

23       Irico reasserts and incorporates each of the General Objections, Objections to the

24  Definitions and Instructions, and specific objections to Interrogatory No. 9 set forth above.

25       Subject to and without waiving the foregoing objections, Irico states as follows: Irico has

26  conducted a reasonable search for information responsive to this Interrogatory and has located no

27  information regarding purchases by Irico of CRTs or CRT Products.

28

**INTERROGATORY NO. 10**

Identify the CRT and/or CRT Products that You manufactured or produced for each month within the Relevant Time Period, including the brand name, product number, and intended use.

**RESPONSE TO INTERROGATORY NO. 10**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico also objects that this interrogatory is duplicative and cumulative of other requests served on Irico, including during jurisdictional discovery.

Subject to and without waiving the objections stated above, Irico responds that it has already provided information responsive to this interrogatory to Plaintiff in its responses to jurisdictional discovery, including Irico's response to Interrogatory No. 16 of Indirect Purchaser Plaintiffs' First Set of Interrogatories.  Irico will conduct a reasonable search for additional information responsive to this interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 10 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows:  Irico refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT sales records, which contain information on specific sizes and types of CRTs sold by Irico at specific times during the Relevant Period.  Irico further directs Plaintiff to documents IRI-CRT-00031179 through -31215 for the answer to this Interrogatory under Federal Rule of Civil Procedure 33(d).

**INTERROGATORY NO. 11**

Identify the CRT and/or CRT Products You sold, marketed, or distributed for each month within the Relevant Time Period, including the brand name, product number, and intended use.

**RESPONSE TO INTERROGATORY NO. 11**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico also objects that this interrogatory is

1  duplicative and cumulative of other requests served on Irico, including during jurisdictional

2  discovery.

3        Subject to and without waiving the objections stated above, Irico responds that it has

4  already provided information responsive to this interrogatory to Plaintiff in its responses to

5  jurisdictional discovery, including Irico's response to Interrogatory No. 17 of Indirect Purchaser

6  Plaintiffs' First Set of Interrogatories.  Irico will conduct a reasonable search for additional

7  information responsive to this interrogatory, if any, and supplement its response as necessary.

8  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11**

9        Irico reasserts and incorporates each of the General Objections, Objections to the

10  Definitions and Instructions, and specific objections to Interrogatory No. 11 set forth above.

11        Subject to and without waiving the foregoing objections, Irico states as follows:  Irico

12  refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT sales records,

13  which contain information on specific sizes and types of CRTs sold by Irico at specific times

14  during the Relevant Period.  Irico has conducted a reasonable search for other information

15  responsive to this Interrogatory and has located no additional information beyond that

16  summarized in the spreadsheet.

17  **INTERROGATORY NO. 12**

18        Provide Your sales of CRT and/or CRT Products to the United States and globally for

19  each month from January 1, 1991 to the present. For each month during this period, state the

20  volume of sales, the U.S. dollar value of sales, the unit sale price, the per unit cost to produce

21  CRT and/or CRT Products, the per unit cost to distribute CRT and/or CRT Products (including

22  overseas freight, tariff, customs, duties, inland freight, storage, insurance, dealer commissions),

23  and the per unit profit earned.

24  **RESPONSE TO INTERROGATORY NO. 12**

25        Irico reasserts and incorporates each of the General Objections and Objections to the

26  Definitions and Instructions set forth above. Irico further objects to this interrogatory as

27  overbroad and unduly burdensome as it requests information outside of Plaintiff's purported

28  "Relevant Time Period."  Irico also objects that this interrogatory is duplicative and cumulative of

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS     20     Master File No. 4:07-cv-05944-JST
AND RESPONSES TO DPP'S FIRST SET                MDL No. 1917
INTERROGATORIES

1   other requests served on Irico, including during jurisdictional discovery.

2          Subject to and without waiving the objections stated above, Irico responds that it has

3   already provided information responsive to this interrogatory to Plaintiff in its responses to

4   jurisdictional discovery, including Irico's responses to Request No. 9 of Direct Purchaser Plaintiff

5   Studio Spectrum, Inc.'s Requests for Production and Interrogatories No. 1 and 3 of Indirect

6   Purchaser Plaintiffs' Second Set of Interrogatories.  Irico will conduct a reasonable search for

7   additional information responsive to this interrogatory, if any, and supplement its response as

8   necessary.

9   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12**

10          Irico reasserts and incorporates each of the General Objections, Objections to the

11   Definitions and Instructions, and specific objections to Interrogatory No. 12 set forth above.

12          Subject to and without waiving the foregoing objections, Irico states as follows: Irico

13   refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT and CRT Product

14   sales records.  Irico has conducted a reasonable search for other information responsive to this

15   Interrogatory and has located no additional information beyond that summarized in the

16   spreadsheet(s).

17   **INTERROGATORY NO. 13**

18          If You offered different prices to different markets, or on a spot market versus contract

19   basis, during the Relevant Time Period, so indicate in the statistical data supplied in response to

20   Interrogatory No. 6.

21   **RESPONSE TO INTERROGATORY NO. 13**

22          Irico reasserts and incorporates each of the General Objections and Objections to the

23   Definitions and Instructions set forth above.  Irico further objects to the terms "markets," "spot

24   markets" and "contract basis" as vague, ambiguous, and subject to multiple interpretations.

25          Subject to and without waiving the objections stated above, Irico responds that it will

26   conduct a reasonable search for information responsive to this Interrogatory, if any, and

27   supplement its response as necessary.

28   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13**

IRICO'S 6TH SUPPLEMENTAL OBJECTIONS          21          Master File No. 4:07-cv-05944-JST
AND RESPONSES TO DPP'S FIRST SET                                    MDL No. 1917
INTERROGATORIES

1  Irico reasserts and incorporates each of the General Objections, Objections to the

2  Definitions and Instructions, and specific objections to Interrogatory No. 13 set forth above.

3  Subject to and without waiving the foregoing objections, Irico states as follows: Irico

4  refers Plaintiff to the forthcoming spreadsheet(s) summarizing its original CRT and CRT Product

5  sales records.  Irico has conducted a reasonable search for other information responsive to this

6  Interrogatory and has located no additional information beyond that summarized in the

7  spreadsheet(s).

8  **INTERROGATORY NO. 14**

9  Provide Your aggregate purchases (in both number of units and revenue in U.S. dollars) of

10  CRT and/or CRT Products for each month from January 1, 1991 to the present.

11  **RESPONSE TO INTERROGATORY NO. 14**

12  Irico reasserts and incorporates each of the General Objections and Objections to the

13  Definitions and Instructions set forth above. Irico further objects to this interrogatory as

14  overbroad and unduly burdensome as it requests information outside of Plaintiff's purported

15  "Relevant Time Period."

16  Subject to and without waiving the objections stated above, Irico responds that it will

17  conduct a reasonable search for information responsive to this Interrogatory, if any, and

18  supplement its response as necessary.

19  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14**

20  Irico reasserts and incorporates each of the General Objections, Objections to the

21  Definitions and Instructions, and specific objections to Interrogatory No. 14 set forth above.

22  Subject to and without waiving the foregoing objections, Irico states as follows: Irico has

23  conducted a reasonable search for information responsive to this Interrogatory and has located no

24  information regarding purchases by Irico of CRTs or CRT Products.

25  **INTERROGATORY NO. 15**

26  Provide Your aggregate purchases (in units and U.S. dollars) of CRT or CRT Products

27  from each of the other named defendants in this coordinated proceeding, for the purpose of resale,

28  for each month during from January 1, 1991 to the present.

**RESPONSE TO INTERROGATORY NO. 15**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects to this interrogatory as overbroad and unduly burdensome as it requests information outside of Plaintiff's purported "Relevant Time Period."

Subject to and without waiving the objections stated above, Irico responds that it will conduct a reasonable search for information responsive to this Interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 15 set forth above.

Subject to and without waiving the foregoing objections, Irico states as follows: Irico has conducted a reasonable search for information responsive to this Interrogatory and has located no information regarding purchases by Irico of CRTs or CRT Products.

Dated:  January 7, 2022                     BAKER BOTTS L.L.P.


                                            */s/ John M. Taladay*

                                            John M. Taladay (*pro hac vice*)
                                            Evan J. Werbel (*pro hac vice*)
                                            Thomas E. Carter (*pro hac vice*)
                                            Andrew L. Lucarelli (*pro hac vice*)
                                            700 K Street, N.W.
                                            Washington, D.C. 20001
                                            (202)-639-7700
                                            (202)-639-7890 (fax)
                                            Email: john.taladay@bakerbotts.com
                                                   evan.werbel@bakerbotts.com
                                                   tom.carter@bakerbotts.com
                                                   drew.lucarelli@bakerbotts.com

                                            Jonathan Shapiro (State Bar No. 257199)
                                            101 California Street, Suite 3600
                                            San Francisco, California 94111
                                            (415) 291-6200

(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

1

<u>**CERTIFICATE OF SERVICE**</u>

2

**In re: Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917**

3

I declare that I am employed in Washington, District of Columbia.  I am over the age of

4

eighteen years and not a party to the within case; my business address is:  Baker Botts L.L.P., 700

5

K Street, N.W., Washington, D.C. 20001.

6

On January 7, 2022, I served the following document(s) described as:

7
8

**IRICO DEFENDANTS' SIXTH SUPPLEMENTAL OBJECTIONS AND RESPONSES
TO DIRECT PURCHASER PLAINTIFFS'
FIRST SET OF INTERROGATORIES**

9

on the following interested parties in this action:

10
11
12
13

R. Alexander Saveri (rick@saveri.com)
Geoffrey C. Rushing (grushing@saveri.com)
Matthew D. Heaphy (mheaphy@saveri.com)
SAVERI & SAVERI, INC.
706 Sansome St # 200
San Francisco, CA 94111

Mario N. Alioto (malioto@tatp.com)
Lauren C. Capurro (laurenrussell@tatp.com)
TRUMP ALIOTO TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123

14
15

*Lead Counsel for the Direct Purchaser
Plaintiffs*

*Lead Counsel for the Indirect Purchaser
Plaintiffs*

16
17
18
19

Joseph Goldberg (jg@fbdlaw.com)
FREEDMAN BOYD HOLLANDER
GOLDBERG URIAS & WARD P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
D (505) 305-1263

Dan Birkhaeuser
(dbirkhaeuser@bramsonplutzik.com)
BRAMSON, PLUTZIK, MAHLER &
BIRKHAEUSER, LLP
2125 Oak Grove Rd, Suite 125
Walnut Creek, CA 94598

20

*Counsel for the Indirect Purchaser
Plaintiffs*

*Counsel for the Indirect Purchaser
Plaintiffs*

21

22
23

[X]     (BY ELECTRONIC MAIL) I caused such documents to be sent to the persons at the
        email addressed listed above.  I did not receive, within a reasonable time after the
        transmission, any electronic message or other indication that the transmission was
        unsuccessful.

24
25

I declare under penalty of perjury under the laws of the District of Columbia that the
foregoing is true and correct.  Executed on January 7, 2022, in Washington, D.C.

26

27

*/s/ Thomas E. Carter*
Thomas E. Carter

28

# EXHIBIT 48

# (FILED UNDER SEAL)

# EXHIBIT 49
## (FILED UNDER SEAL)

# EXHIBIT 50



info@certifiedtranslate.com    2425 Olympic Blvd., Suite 4000W    usa   1-888-856-2228
www.certifiedtranslate.com    Santa Monica, CA 90404    int   +1-310-684-3153
  fax   +1-310-564-1944



**A member of the American
Translators Association
ATA Member Number: 248719**

# CERTIFIED TRANSLATION

*Description of Document(s):*

|  |
|---|
| **NEWS ARTICLE (JULY 19, 1999)** |
| **CRT: STOPPING PRODUCTION IS NOT THE REAL WAY OUT** |
|  |
|  |

| Source Language: | **CHINESE** | Target Language: | **ENGLISH** |
|---|---|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director       **Date:**   March 5, 2023

A copy of the translated version(s) is attached to this statement of certification.



www.certifiedtranslate.com

# CRT: Stopping production is not the real way out

1999-07-19   Source: Guangming Daily   Qu Guanjie   I have something to say

**This article was written by our commissioned writer, and the draft was completed on July 9. When the edition on the 15th was about to go to press, it was reported that some of the eight major CRT companies had resumed production before the end of this month, and it was said that several other companies would not continue to stop production until the original one-month period is up. For this reason, the background introduction in the first paragraph of this article cannot be said to be comprehensive and accurate, but we still insist on publishing it as the original text. We do this not only to leave some historical traces of the current vicissitudes of the CRT market, but more importantly, we believe that even if the eight major CRT companies have all resumed production ahead of schedule when this version comes out on the 19th, the point of view emphasized in this article that "stopping production is not the real way out, and the most urgent thing is to improve the level of scientific and technological progress and strength of enterprises" still has vivid reality and universal pertinence. – The Editor**

The suspicion that the eight giants of CRTs would jointly stop production for a month finally turned into cold raindrops: from June 26 to 28, Beijing Panasonic, Xianyang Irico, Nanjing Huafei, Guangdong Fudi, Shenzhen SEG Hitachi, Samsung Electronic Tubes, Shanghai Novel and LG Shuguang, these 8 CRT manufacturers stopped production one after another. The manufacturers said: This move is really a last resort. The eight enterprises will cut production of CRTs by 3 million to 4 million iby suspending production for one month. According to Beijing Panasonic's estimate: the one-month shutdown will bring them a net loss of 30 to 40 million yuan. The suspension of production will also affect the CRT component factories including glass bulbs and deflection yokes. So, what is the reason for the eight CRT factories to swing their swords so decisively to "sever their wrists"?

The answer is self-evident. But it's a long story!

The turmoil in the color television market determines the ups and downs of the CRT market. In recent years, sudden changes in the color television market have caused ups and downs in the CRT market several times. The direct cause of this act to suspend production is Changhong's price cut again in April this year.

Beginning in 1996, color television price wars continued in waves, and CRTs were the first to be affected. As the price of color television sets dropped steadily, the price of CRTs also dropped: the price of a 21-inch picture tube climbed to 980 yuan at its peak, and fell to the bottom of 480 yuan in the first half of 1998.

Just when the CRT factories were complaining and a large number of CRTs were waiting for a future home, Changhong took the opportunity to buy a large number of them. Many other color television manufacturers were caught off guard for a while, facing the peak season of color television sales and yet they had nothing to cook with and complained endlessly. The price of CRTs was like sesame seeds blooming, 21-inch CRTs climbed from 480 yuan to 580 yuan, and

E_TRANSLATION



www.certifiedtranslate.com

25-inch CRTs jumped from 770 yuan to 990 yuan. Some CRT manufacturers had accumulated 400,000 to 500,000 CRTs, and these also rushed out of the besieged city with happy faces. For a while, the CRT manufacturers were overjoyed, and they all went to work quickly.

Dreams don't last long. Due to the indigestion of CRTs swallowed in Changhong's stomach, in April this year, the fifth round of price cuts for color televisions took off, and the CRT industry oscillated accordingly. Plus imported CRTs increased rather than decrease, which was frost upon snow. The price of CRTs plummeted. In just over 20 days, the price of 21-inch CRTs dropped from 620 yuan to 510 yuan, far below the lowest at-cost price of 560 yuan. Some enterprises fell into losses, and CRT manufacturers were suddenly forced to the wall again. On May 23, the eight domestic CRT factories, which own 80% of the domestic CRT market, held a general managers meeting in Beijing and unanimously decided to suspend production for one month in order to avoid excessive competition in the industry and maintain the current price of color display tubes.

Why does the CRT industry have to follow the ups and downs of the color television industry? Responding to self-blame, it is not difficult for people to find that our country's CRT industry suffers from the edema of excess production capacity just like the color television industry. The production of the eight major enterprises will be reduced by 3 million to 4 million CRTs in just one month of suspended production, so the output in one year can only be imagined! According to the estimates of relevant departments: the annual demand from the color television market is about 25 million sets, and the production capacity of CRTs exceeds that by 10 million sets. There is a deficiency of fire and indigestion. If you want CRTs not to catch a cold and cough along with color televisions, it is really impossible! Excess production capacity is the underlying reason for the suspension of production.

In the past, some CRT factories have called for production suspension and restrictions many times, but they all became "dummy guns". This time, they really fired a "live gun". This is not only unique in China, but also extremely rare in the world. The eight CRT factories claimed that the move was not to engage in monopoly, but to prevent losses in the entire industry, nor to increase prices to grab monopoly profits, but only to maintain capital. Whether people from all walks of life believe these claims, and what the outcome of this joint action will be, although it is still unknown, discussions from relevant parties are already raging.

Most of the color television manufacturers affected by the suspension of CRT production expressed their support. Hisense believes that it is currently the low season for color television sales, which will not have much impact on production and sales. The suspension of CRT factories will help curb a new round of price wars among color television manufacturers. Skyworth believes that the suspension of CRT production will curb the continued decline in color television market prices. Changhong believes that this move can basically match the production and demand, and said that this is purely a corporate behavior, expressing its complete understanding.



www.certifiedtranslate.com

Currently, what people are discussing most is: Is this unified production suspension an act of price monopoly behavior? Yang Guojun, Secretary General of the Color Tube Industry Association, believes that the suspension of production is mainly for capital-guaranteed operations, and there is no high-price monopoly situation.

Experts clearly pointed out that: as a supporting industry for color television production, CRTs should rise and fall together with whole set color televisions. In developed countries, joining forces by manufacturers is suspected of monopoly, and is "unfair competition", and enterprises avoid it as much as possible. However, the bosses of our CRT factories held a press conference in an imperious, grand manner. Historical experience is worth noting that when a market is controlled by one or a few manufacturers, prices are often manipulated, resulting in low efficiency of resource allocation and harming the interests of consumers. The experience of the market economy has repeatedly proved that monopoly will devour the benefits brought by market competition, and any society that follows market rules must oppose monopoly. Some experts asked: what do we do if the eight manufacturers discuss price increases together? This is probably not a groundless worry.

The relevant person in charge of the Ministry of Information Industry said not without emotion: this situation should not happen. Faced with the rapid advancement of digital technology, multinational companies are racing against time to develop new technologies and products, but we not only don't do this, but spend most of our energy on low-level price wars. This reflects that our country's CRT industry is still quite naive.

Ma Jinquan, president of the Picture Tube Branch of the China Video Industry Association, pointed out that color televisions are now developing in the direction of high-definition, flat panels, and ultra-thin. To adapt to this demand, CPT must have the development and application of new technologies, and must be innovative. This is the only way out of this predicament. Due to the limitations of scale and capital, domestic enterprises are often eager for quick success, lacking impulse for innovation, and are slow in technological progress. New varieties of CRTs with advanced technologies and promising prospects such as flat screen, plasma, and high definition cannot yet be produced. It is an urgent task to further enhance the technological progress level and strength of Chinese enterprises.

E_TRANSLATION


English

| 时政 | 国际 | 时评 | 理论 | 文化 | 科技 | 教育 | 经济 | 生活 | 法治 | 军事 | 卫生 | 健康 | 女人 | 文娱 | 电视 |

光明新闻
news.gmw.cn

首页>首页 > 光明日报

# 彩管：停产不是真出路

1999-07-19 来源：光明日报 曲冠杰 我有话说

　　**本文是我们约作者采写的，完稿于7月9日。当15日本版即将付印时，传来八大彩管企业中有几家等不到本月末就已经恢复生产的消息，而且据说其它几家企业也不会将停产坚持到原说的一个月之期了。这样，本文开头一段的背景介绍就不能说比较全面和准确了，然而我们仍坚持按原文将之发表。我们这样做，不仅仅是为了给当前彩管市场的风云变幻留下一点历史的痕迹，更重要的是，我们认为，即使当本版19日面世时八大彩管企业已全部提前恢复了生产，本文所强调的"停产不是真出路，当务之急乃是提升企业的科技进步水平和实力"的观点，仍具有鲜活的现实性和普遍的针对性。——编者**

　　彩管八巨头联手停产一个月的疑云，终于变成冰凉的雨点落下：从6月26至28日，北京松下、咸阳彩虹、南京华飞、广东福地、深圳赛格日立、三星电管、上海永新、LG曙光8家彩管生产厂家先后停产。厂家表示：此举实乃不得已而为之。八家企业停产1个月将减产彩管300万至400万只。据北京松下估计：停产一个月，带给他们的将是三四千万元的净损失。停产还会影响到玻壳、偏转线圈等彩管配件厂。那么，究竟是什么原因促使八家彩管厂如此绝决地挥剑"断腕"？

　　答案不言而喻。然而说来话长！

　　彩电市场的风波决定了彩管市场的浮沉，近几年风云突变的彩电市场几次搅得彩管市场一波三折。此次停产行动的直接起因是长虹今年4月的再次降价。

　　从1996年开始，彩电价格大战波浪迭起，彩管首当其冲受到殃及。随着彩电整机价格的节节下挫，彩管价格也水降船低：21英寸显像管的价格最高时曾攀升至980元，1998年上半年跌至480元的谷底。

　　就在彩管厂叫苦连天、大批彩管待字闺中之时，长虹乘机大量收购。其他众多彩电厂家一时措手不及，面对彩电销售旺季却无米下锅，叫苦不迭。彩管价格犹如芝麻开花，21英寸彩管又从480元爬升到580元，25英寸彩管从770元上窜到990元。有的彩管厂家四五十万只积压彩管，也喜笑颜开地涌出了围城。一时间彩管厂家乐不可支，纷纷大干快上。

[值班总编
[值班总编
[值班总编

漫话天下


【光明网
一百"


"常回家
备

好梦不长。由于吞在长虹肚中的彩管消化不良，今年4月，彩电第五轮降价风潮陡起，彩管业随之振荡；而进口彩管又有增无减，雪上加霜。彩管价格暴跌，短短20多天时间里，21英寸彩管的价格已经从620元跌到510元，远远低于560元的最低成本价。一些企业陷入亏损，彩管厂家一下子又被逼到了墙脚。5月23日，占有国内彩管80%市场的国内8大彩管厂，在京召开总经理会议，一致决定：为避免业界过度竞争，维护彩管当前价格，停产一个月。

彩管业为什么一定要跟着彩电业载浮载沉？反躬自责，人们不难发现：我国的彩管行业与彩电行业一样患有生产能力过剩的浮肿病。八大企业停产仅一个月就要少生产300万—400万只彩管，一年的产量可想而知！据有关部门估计：彩电市场年需求量约为2500万台，彩管生产能力出超1000多万台。内有虚火，消化不良，要想彩管不跟着彩电感冒咳嗽，真正是不可得也！生产能力过剩是此次停产行动的深层原因。

过去，一些彩管厂也曾多次发出过停产限产的呼吁，但都成了"哑炮"，这一次是真正地放了一次"响炮"。这不仅在中国绝无仅有，在世界也极为罕见。八家彩管厂声称：此举不是搞垄断，而是为了防止全行业亏损，也不是提高价格攫取垄断利润，仅是为了保本经营。各界是否相信这些说法，此次联合行动结果如何，虽然目前尚不得而知，但有关方面的议论却已是如潮而至。

受彩管停产影响较大的彩电厂家大都表示支持。海信认为：目前正值彩电销售淡季，对生产和销售不会产生太大影响。彩管厂的停产有利于遏制彩电厂家新一轮的价格大战。创维认为：彩管停产会对彩电市场价格继续下跌起到遏止作用。长虹认为此举能使产需基本吻合，并说这纯属企业行为，表示完全理解。

目前，人们议论最多的是：这次联合停产是否属于垄断价格行为？彩管行业协会秘书长杨国军认为：这次停产主要是保本经营，不存在高价位垄断的情况。

专家则明确指出：彩管作为彩电生产的配套行业，本应与彩电整机共兴衰，而现在却出现了彩电厂家压价、彩管厂家联手保价的对立之势，实在令人担忧。在发达国家，厂家联手有垄断之嫌，属"不正当竞争"，企业避之唯恐不及。而我们的彩管厂老总们却堂而皇之、大张旗鼓地举行新闻发布会。历史经验值得注意，当一个市场由一个或少数几家厂商控制时，价格往往会被操纵，从而导致资源配置的低效率和损害消费者利益。市场经济的经验反复证明：垄断会吞噬市场竞争带来的益处，任何一个奉行市场规则的社会都必然要反对垄断。有专家设问：倘若八个厂家在一起商讨涨价怎么办？这恐非杞人忧天。

信息产业部有关负责人不无感慨地说：这一局面不应出现。面对突飞猛进的数字化技术，跨国公司都在争分夺秒研制新技术、开发新产品，而我们计不出此，却把大部分精力

用于低层次的价格战。这反映了我国彩管产业还相当幼稚。

　　中国视像行业协会显像管分会会长马金泉指出，现在彩电正向高清晰度、平面化、超薄方向发展。彩管要适应这一需求，必须有新技术的开发与应用，必须有所创新。这是摆脱困境的唯一出路。而国内企业由于规模和资金的限制，往往急功近利，创新冲动不足，技术进步缓慢，纯平、等离子、高清晰度等技术先进、前景广阔的彩管新品种还无法生产。进一步提升我国企业的科技进步水平和实力乃是当务之急。

**版权声明：**转载须经版权人书面授权并注明来源

---

光明日报社概况 | 关于光明网 | 报网动态 | 联系我们 | 法律声明 | 光明网邮箱 | 网站地图

光明网版权所有

# EXHIBIT 51



June 20, 2012

**Certification**

### Park IP Translations

This is to certify that the attached translation is, to the best of
my knowledge and belief, a true and accurate translation from Chinese
into English of the document with bates numbers range:
CHU00030679E – CHU00030683E.

Abraham I. Holczer

Project Manager

Park                    Case                    #                    29567

134 W. 29th Street 5th Floor • New York, N.Y. 10001
Phone: 212-581-8870 • Fax: 212-581-5577

D☐ P☐ Exhibit 8424
Deponent Wang
Date 3/8/19 Rptr BW

[TRANSLATION]

Mainland China *CDT Maker* Contact Meeting

[Handwritten:]
Respectfully Submitted to President Peng
Submitted for review
Urgent Document
Please deliver to Mr. Chung-Cheng (Alex) Yeh in Room 2705
*Fm:* Guang-Hui Dai, Total 4 pages.

Date:    *Oct.* 09, 1998

Location:    Fuzhou

Meeting Attendees:

*CPTF* - Senior Manager Jing-Song (Jason) Lu, Section Chief Chung-Cheng (Alex) Yeh, Guang-Hui Dai, Wei-Lie Yu

*PHS* - Zheng-Er Shao, (Huafei) President Jian-Zhong Sheng, (Huafei) Manager Bing Ma

*SSDD* – Department Manager Myoung-Sik Lee, Zhen Yang

*ORION* - Section Chief TAE SIK KONG *(TAE SIK KONG)*

*LG* - Section Chief J.B.PARK (*J.B.PARK*)

IRICO *(IRICO)* - Vice President Jian-She Wei

I.    Summary of the Production and Sales Situation/Production Plan for *CDT MAKER*S

1)    In September 1998, the production and sales situation/production line plan was as follows:

(Chart 1)

Unit: K PCS

| Maker | Size | Production, Sales, Inventory of Sept. 98 | | | '98 Q4 Planned Production Volume (SUPPLY) | | | | Planned Production Volume of '99 |
|---|---|---|---|---|---|---|---|---|---|
| | | Production | Sales | Inventory | October | | Planed Production of Nov. | Planned Production of Dec. | |
| | | | | | Planned Production | Planned Sales | | | |
| CPTF | 14" | 210 | 215 | 105 | 150 | 170 | 150 | 150 | 1800 |
| | 15" | | | | | | 30 | 60 | 1710 |
| SSDD | 14" | 180 | 185 | 5 | 150 | 160 | 150 | 150 | 1800 |
| | 15" | | | | | | | | |
| PHS Huafei | 14" | 180 | 180 | 20 | 120 | 70-100 | 120 | 120 | 1600 |
| | 15" | | | | | | | | 100(SKD) |
| BMCC | 14" | 25 | 25 | 25 | 30 | | 30 | 30 | |
| ORION | 14" | | 75 | | 50 | 25-50 | 40 | 30 | 300 |
| | 15" | | 10 | | 30 | 30 | 30 | 15 | 300 |
| Irico | 15" | 20 | 40 | 0 | 20 | | 30 | 40 | 1000 |
| LG | 14" | | 6 | | 10 | | 10 | 10 | 0 |
| | 15" | | 3 | | 10 | | 10 | 20 | 360 |
| | | | | | | | | | |
| TTL | 14" | 595 | 686 | 155 | 510 | 455-510 | 500 | 490 | |
| TTL: | 15" | 20 | 53 | 0 | 60 | | 100 | 125 | |

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL        CHU00030679.01E

Explanation of major points:

A) *CPTF*: 9/*E*, the actual inventory of 14" finished product reached 189*K*. The accumulated tube inventory reached 113*K*. However, in order to avoid concerns by all makers about excess inventory, certain inventory figures had been withheld. It was also explained that because of expected changes to the 15" line, it should be possible to digest 14" inventory in *Q*4. All makers did not question this matter. In 1999, depending on the 14" market situation, it can be expected that *ONE* production *LINE* each for 14" and 15" will be retained.

● *PHS CHALLENGES CPTF* → *PHS*'s Mr. Shao claimed that *CPTM* was heard to have engaged in sales of inferior tubes in the market, and would like clarification of this situation from us. We responded with clear indication that absolutely no such situation exists.

B) *SSDD* 14" production line's actual production capacity could reach 180 – 200*K/M*. Based on the production, sales and inventory data from September provided by its marketing department (deliveries to storage: 206.5*K*; sales: 216*K*; and inventory: 3.2*K*), it can clearly be seen that the September production and sales figures provided at the meeting were kept down. With respect to the large size production of 15" and 17", it is expected that in April 1999 and September 1999, Mainland China *TSDD* (Tianjin Samsung)/*SSDD* (Shenzhen Samsung) each plans to construct an additional production line for using in production (due to capital considerations, whether or not *SSDD* will establish a new line or import an old line from Korea has not been confirmed). A decision has not been made as to the sizes to be produced and as to which factory is to make such production. Additionally, *SSDD* has indicated that its domestic and export sales ratio is approximately 1/2 each. Department Manager Lee has also suggested that all makers propose to their headquarters that the price for 15" should be increased a bit more (maintain at least a *US* $15 price difference). In addition to profit considerations, this will also avoid hastening the decline of 14"

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL                CHU00030679.02E

II. General Assessment of Demand by Mainland Customers for 14" *CDT* in *Q*4 (*BY CUSTOMERS*)

(Chart 2)                                        Unit: K PCS

| Customer | Estimated Demand | CDT Domestic Sales Volume | TTL Demand | Remark |
|---|---|---|---|---|
| ACER(SZ) | 10K(CPTF) 8K(PHS) | 2K(PHS) | 20K | |
| AOC | 40K(CPTF) 40K(ORION) | | 80K | Estimates there are 30-40k FOR domestic Sales |
| ADI | 20K(SSDD) | | 20K | |
| COMPAL | 12K(CPTF) | | 12K | |
| EMC | 30K(SSDD) | | 30K | |
| GVC | 10K(SSDD) 10K(ORION) | | 20K | |
| IRIC | 10K(BMCC) 10K(PHS) | | 20K | |
| KFC | 8K(SSDD) | | 8K | |
| LI-ON | 40K(CPTF) | | 40 | |
| PHS(DG/SZ) | 45K(CPTF) | 45K(PHS) | 90K | Main domestic customer for Huafei is PHS (SZ) |
| SHAMROCK | 10K(CPTF) 6K(SSDD) | | 16K | |
| FIC | 3K(PHS) | | 3K | |
| MAG | 2K(SSDD) | | 2K | |
| DTS | 3K(PHS) 3K(ORION) | | 6K | |
| CHINA OTHERS | | 40K(ORION) 80K(SSDD) 40K(PHS) 10K(BMCC) 6K(LG) | 176K | Main customer for SSDD are Beijing Founder Electronic Co and Xoceco |
| | | | | |
| Total | 320K | 223K | 543K | |

[Handwritten in left margin:] 20   120 15   20   60   60   20
[Handwritten below chart:] 543 x

Explanation:
According to Chart 1, the total sales volume of 14" in September is 686*K*. Compared to the September production volume of 595*K*, there is an over sold phenomenon.   Additionally, the estimated sales volume in October was made on the understanding of information regarding current orders as provided by all *CDT MAKER*s.   According to the analysis of estimates of each maker on supply volume and sales volume (Chart 1) and demand according to customers (Chart 2), supply and demand still can basically remain even, which is favorable to a price increase. Additionally, with the exception of *SSDD*, who from the very beginning had doubts about an increase of their domestic sale price coefficient to 10.4, other makers have generally indicated unanimous determination to increase prices.   For this reason, each *CDT MAKER* should definitely *FLW* their headquarters, and have full confidence in a price increase.   However, *SSDD* Department Chief Lee has finally been persuaded by Huafei and *CPTF* to increase its domestic sales price quote coefficient to 10.4, and reached an agreement.

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL                    CHU00030680E

- *CPTF CHALLENGE*S *SSDD* → *OVER LOADING* its production capacity greatly, which resulted in a lack of confidence in the domestic sales price at the last meeting (export price multiplied by an coefficient of 10.4).   All makers also agreed.   In particular, *PHS* claims that its increase in the coefficient from 10 →10.4 has already been announced to customers.   From the very beginning, *SSDD* was not confident in the increased 10.4 coefficient.   However, after strong requests from all makers and President Sheng of Huafei saying that, even though *BMCC* did not attend the meeting, in previous communications it had already indicated that it would abide by the resolutions from the meeting, Department Manager Lee of *SSDD* reluctantly agreed after great concern.

- *ORION CHALLENGE*S *SSDD* → Supports its increase of the coefficient for domestic sales price and questions the low domestic price given to *LOCAL* customers by *SSDD* in southern China.

C) Huafei: Although Huafei has 2 short *LINES*, because of the unique feature of *PHS*'s system of weekly division, the working weeks for the months of 3/6/9/12 each reach 5 weeks.   In September, the production amount could reach 180*K*. The 15" production plan is to consider transferring 3 *LINES* from the Chubei factory to Mainland China.   (Mr. Shao stated that because the production line design is consecutive, if the Chubei factory 15" production facilities are shifted, the 3 *LINES* must be transferred together).   However, this plan has not been confirmed.   With respect to domestic sales, it is mainly supplied by *PHS(SZ)*. Additionally, it is claimed that *PHS(TWN)* still has a 14" inventory of 10 ~20*K FOR* the small monthly demand of its European customers.

- *CPTF CHALLENGE*S *PHS* → In October, the letter concerning the price increase to *ACER* was never issued following repeated delays.   *PHS* claimed that this was because its price quote for *ACER* was not formally confirmed until the middle of the month.   Also *MONITOR* customers (especially *IN USA*) are quite sensitive to "price monopolies."   Unless customers definitely require a written statement, it should be handled with the utmost caution.   However, the resolutions from headquarters will surely be followed.   Verbally, all determined to announce the price increase to customers.   On the other hand, *CPTF* indicated that *MONITOR* should be allowed to have some time to communicate with its customers regarding the price increases.   When the market situation is weak, it is understandable not to confirm the price until the middle of a month. However, it is currently at peak season, and the time when all makers are confirming and stabilizing their prices.   *PHS* was asked to improve its mid-month pricing practice.

D) *ORION*: The September sales figures listed above do not include sales of 50*K* to *AOC*.   In 9/*E*, the 14" inventory was below 30*K*. M*R*. Kong stated that the 15" facilities will be improved in 10/*M*, and that in the future it will continue to maintain 14" *ONE LINE*, 15" *ONE LINE*, and another *ONE LINE* (75% *FOR* 15", and 25% *FOR* 17").   The production capacity of each line is approximately 160 – 170*K/M*.

---

English words found in the original text arc *italicized*.
Translator's remarks are indicated in brackets [  ].

CONFIDENTIAL – GRAND JURY MATERIAL             CHU00030681.01E

- *PHS CHALLENGES ORION* → *ORION*'s China offices are grabbing customers to enhance their sales performance.   It has been said there was *US$56* appearing at market price for 15", so clarification regarding whether *A*-tube or *B*-tube has been sold was requested.   *ORION* claims that it has not made any sales to dealers, and ensures that there will be no customer overlap among its offices in Mainland China, and that all prices *FLW ORION H.Q.* prices.   It staunchly denied such market price exists.

- *CPTF CHALLENGES ORION* → An explanation was requested as to the disposal method for defective *AOC* tubes.   *ORION* replied: The defect rate of 14" in *AOC* averages at about 0.5%.   The cost of defective tubes is calculated at 75% of *A* tubes.   And using a production rate of 40*K/M* to calculate the amount of *B* tubes the volume should only be 200 *PCS.*   Volume should not be large.   *ORION* insists that its defect rate is indeed this low; however, the other makers doubt its low defect rate.

- *SSDD CHALLENGES ORION* → Upon investigation, Shenzhen customer *KTC* (Kangte) and *SRC* each purchased barely-passing tubes from *AOC* (*ORION'S TUBE*) in September, and it was also heard that the *ORION* 's September price for 14" was *US$43*.   There were also claims that even in September *S/T GLARE B+D* tube prices should not be at this market price.   *ORION* has staunchly denied that it sold inferior tubes, and that it *OFFER*ed a price of *US$43* in September.

E) *BMCC*: Basically because it is losing money, although it has not given up on the *CDT* market, it also won't consider selling more (14" production ≦30K).   With respect to 15", due to an assessment that it lacks competitive capability, temporarily its production won't be started.

F) *LG*: Currently only has a half-line 14" production line, with a production capacity of approximately 70~80*K/M.*   Internal self-use is 50*K/M.*   The remaining 20 *K/M* are sold to Southeast Asia and Mainland China. No consideration is given to the production of 14" in 1999.

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL                    CHU00030681.02E

3) 1999 CDI Maker Production Plan

(Chart 3)

Units: K PCS

|  | Q1 | Q2 | Q3 | Q4 | Remark |
|---|---|---|---|---|---|
| CPT | 300-375K/M | 300-375K/M | 300-375K/M | 300-375K/M | 2.5LINES |
| PHS | 130K/M | 130K/M | 130K/M | 130K/M | 2LINES |
| SSDD | 350K/M | 350K/M | 350K/M | 350K/M | 2LINES |
| ORION | 160K/M | 160K/M | 160K/M | 160K/M | 1LINE |
| LG | 40-80K/M | 40-80K/M | 40-80K/M | 40-80K/M | Might discontinue production of 14" |
| BMCC | 30K/M | 30K/M | 30K/M | 30K/M | |
| TTL | 1010-1125K/M | 1010-1125K/M | 1010-1125K/M | 1010-1125K/M | |

Explanation

If the supply of 14" in 1999 is estimated to be 1100*K/M*, the total annual supply volume will be approximately 13,200*K PCS*. However, *SSDD* and *PHS* all believe that the *TTL DEMAND* in 1999 (for 14"/15" /17") will be approximately 90,000*K PCS*. If the 15% estimate of *PHS/SSDD* for demand of 14" is used, the 1999 annual demand volume will be 13,500*K PCS*. From the above analysis, it can be expected that in 1999, the supply and demand relationship for 14" *CDT* will tend to be balanced.

III. *Conclusion*

1. Competition between *ORION* and *SSDD* for *LOCAL* customers in southern China is strong, and both parties doubt each other's claims that "domestic sale prices are unreasonable," and the sales behavior regarding "*A* or *B* tube." *ORION*, in addition to strongly denying the sale of *B* tubes and the behavior of quoting low prices, has also requested that *SSDD* provide accurate data for investigation and verification. Although *SSDD* eventually agreed to use 10.4 as the coefficient for the domestic sale price, it still appears to lack confidence in the increase of the domestic sale price.

2. *SSDD* has requested that all makers propose to their headquarters that the scale of price increase of the 15" be a bit larger, and that a price differential of at least *US*$15 should be maintained from 14."

3. Although *BMCC* did not participate in the meeting, it previously communicated with Huafei that it would abide by the meeting resolution. Huafei's President Sheng is responsible for relaying the agreement of using the coefficient of 10.4 for domestic sale price.

4. According to *Q4* of 1998 and 1999's supply and demand situation analysis, generally the supply and demand for 14" will be balanced whether it's in the Mainland China region or the worldwide market. Each *CDT MAKER* should strictly control production volume, and in particular, should not engage in *OVER*

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL                    CHU00030682.01E

*LOADING* the way *SSDD* did in September, in order to ensure the stability of prices.

5.  The next meeting will be convened by Irico. The time and location will be discussed separately.

- End of Report - Submitted for Approval

<div align="right">

Submitted by Employee Guang-Hui Dai
*OCT.* 11,1998

</div>

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [  ].

CONFIDENTIAL – GRAND JURY MATERIAL          CHU00030682.02E

[Handwritten telephone number:]

0512-5191028

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL     CHU00030683E

*(手寫註記)*

大陸 CDT MAKER 聯繫會議

時間：OCT.09, 1998
地點：福州
與會人員：
CPTF：呂經理、葉課長、戴光輝、余偉列
PHS：邵正璽、(華飛)盛建忠總經理、(華飛)馬冰經理
SSDD：李明植部長、楊真
ORION：孔泰植(TAE.SIK.KONG)課長
LG：朴鍾鳳(J.B. PARK)課長
彩虹 IRICO：魏建社副總

一、各 CDT MAKER 產銷概況／生產計劃
　　1)'98 年 9 月產銷概況／生產線計畫

(表一)　　　　　　　　　　　　　　　單位：K PCS

| 廠商 | 尺寸 | '98年9月產銷存 生產 | 銷售 | 庫存 | '98年Q4預計生產量(SUPPLY) 10月份 預計生產 | 預計銷售 | 11月 預計生產 | 12月 預計生產 | '99年 預計生產量 |
|---|---|---|---|---|---|---|---|---|---|
| CPTF | 14'' | 210 | 215 | 105 | 150 | 170 | 150 | 150 | 1800 |
|  | 15'' |  |  |  |  |  | 30 | 60 | 1710 |
| SSDD | 14'' | 180 | 185 | 5 | 150 | 160 | 150 | 150 | 1800 |
|  | 15'' |  |  |  |  |  |  |  |  |
| PHS 華飛 | 14'' | 180 | 180 | 20 | 120 | 70~100 | 120 | 120 | 1600 |
|  | 15'' |  |  |  |  |  |  |  | 100(SKD) |
| BMCC | 14'' | 25 | 25 | 25 | 30 |  | 30 | 30 |  |
| ORION | 14'' |  | 75 |  | 50 | 25~50 | 40 | 30 | 300 |
|  | 15'' |  | 10 |  | 30 | 30 | 30 | 15 | 300 |
| 彩虹 | 15'' | 20 | 40 | 0 | 20 |  | 30 | 40 | 1000 |
| LG | 14'' |  | 6 |  | 10 |  | 10 | 0 | 0 |
|  | 15'' |  | 3 |  | 10 |  | 10 | 20 | 360 |
| TTL | 14'' | 595 | 686 | 155 | 510 | 455~510 | 500 | 490 |  |
| TTL | 15'' | 20 | 53 | 0 | 60 |  | 100 | 125 |  |

重點說明：
A) CPTF：9/E 14''成品庫存實際達 185K，積管庫存達 113K，然因避免讓各家擔心庫存過多而將庫存數字做些保留，並解釋因預計改 15''線，Q4 應大致可消化 14''庫存，各廠家並未質疑此項。'99 年則俟 14''市況，可望保持 14''/15''各 ONE LINE 生產。
◎ PHS CHALLENGE CPTF→PHS 部'R 稱市場耳聞 CPTM 有銷售次行行為，向我方澄清是否有此情形。我方則明確表示絕無此事回應之。
B) SSDD 該廠 14''生產線實際產能可達 180~200K/M。而根據其市場先前提供之 9 月份產銷存資料(廠庫 206.5K，銷售 216K，庫存 3.2K) 顯見其會議中 9 月份之生產/銷售數字應有保留。15''/17''大尺寸生產預計於'99 年 4 月及 9 月分別於大陸 TSDD(天津三星)/SSDD(深圳三星)各計畫增設一線緩勵生產(因資金考量，SSDD 到底設新線或自韓國搬移審線未有定案)，而在那一個產生何種尺寸亦尚未定案。另 SSDD 表示其內外銷比例約各佔 1/2。李部長並建議各家向總部建議 15''應多派些(保持至少 US$15 價差)除利潤考量外亦可避免 14''加速萎縮。

CONFIDENTIAL - GRAND JURY MATERIAL
CHU00030679

二、大陸地區客戶 Q4 14"CDT 需求概估(BY CUSTOMERS)

(表二)

單位：K PCS

| 客戶 | 需求預估 | CDT 內銷量 | TTL 需求 | 備註 |
|------|---------|-----------|---------|------|
| ACER(SZ) | 10K(CPTF)<br>8K(PHS) | 2K(PHS) | 20K | |
| AOC | 40K(CPTF)<br>40K(ORION) | | 80K | 估計有 30~40K<br>FOR 內銷 |
| ADI | 20K(SSDD) | | 20K | |
| COMPAL | 12K(CPTF) | | 12K | |
| EMC | 30K(SSDD) | | 30K | |
| GVC | 10K(SSDD)<br>10K(ORION) | | 20K | |
| IRIC | 10K(BMCC)<br>10K(PHS) | | 20K | |
| KFC | 8K(SSDD) | | 8K | |
| LI-ON | 40K(CPTF) | | 40 | |
| PHS(DG/SZ) | 45K(CPTF) | 45K(PHS) | 90K | 華飛主要內銷客戶為<br>PHS(SZ) |
| SHAMROCK | 10K(CPTF)<br>6K(SSDD) | | 16K | |
| FIC | 3K(PHS) | | 3K | |
| MAG | 2K(SSDD) | | 2K | |
| DTS | 3K(PHS)<br>3K(ORION) | | 6K | |
| CHINA<br>OTHERS | | 40K(ORION)<br>80K(SSDD)<br>40K(PHS)<br>10K(BMCC)<br>6K(LG) | 176K | SSDD 主要內銷客戶<br>為北大方正及廈華 |
| 合計 | 320K | 223K | 543K | |

說明：
依(表一)所示，9 月份 14"共計銷售 686K，相較於 9 月份生產 595K 有超賣現象；另 10 月份預計銷售量係與會各 CDT MAKER 提供之目前訂單掌握情形。依(表一)各家預計供應量與銷售量並配合(表二)各客戶別需求現狀分析，供需仍大致可維持平衡，有利於價格調漲。而除了 SSDD 一開始對其內銷價係數調高為 10.4 沒信心外，其餘廠家普遍顯示有一致的調漲決心。因此，各 CDT MAKER 應確實 FLW 總部，對價格上漲有十足信心。但 SSDD 李部長最終在華飛與 CPTF 說服下亦同意 10 月份將其內銷報價係數調高為 10.4，達成協議。

3

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00030680

◎ **CPTF CHALLENGE SSDD→**LOADING OVER 其產能甚多而對上次會議之內銷價(外銷價乘以 10.4 係數)無信心,各家亦表贊同。尤其 PHS 稱其 10→10.4 係數之調漲之信心缺缺,SSDD 一開始對 10.4 係數調漲之信心缺缺,但在各家強烈要求及華飛總總經理表示,BMCC 雖未與會,但因事先已溝通過並表將遵循會議決議後,SSDD 李部長多所顧忌後才勉強答應。

◎ **ORION CHALLENGE SSDD→**支持內銷報價係數調高,並對 SSDD 在南中國 LOCAL 客戶內銷報低價表質疑。

C) 華飛: 雖有 2 LINES 短線,然因 PHS 週別劃分系統特殊,在 3/6/9/12 之工作週別均達 5 週,故 9 月份生產可達 180K。15"生產計畫考慮從竹北廠移轉 3 LINES 至大陸(邵'R 稱因生產線設計連結之故,若確定要移轉竹北廠 15"則一定是 3 LINES 一起移轉),然該計畫尚未定案。至於內銷部份則幾乎以 PHS(SZ)供應為主。另據稱 PHS(TWN)尚備有 14"約 10~20K 庫存 FOR 其歐洲客戶每月少量之需求。

◎ **CPTF CHALLENGE PHS→**10 月份對 ACER 漲價函一再延遲未發出。PHS 稱因其對 ACER 之報價作業一直係在月中左右才正式敲定,且 MONITOR 客戶(尤其 IN USA)對"價格壟斷"較敏感,除非客戶要求一定要書面聲明,否則處理上儘量謹慎,但保證均遵循總部決議,口頭上均有向客戶聲明漲價決心。CPTF 則表示漲價需讓 MONITOR 有部份時間去向其客戶反映,市況差時在月中才確認價格尚可理解,現正值旺季且各廠正凝聚穩定價格之際,請 PHS 改善月中報價作業。

D) ORION: 上列 9 月份銷售數字未含銷售於 AOC 之 50K。9/E 14"庫存約 30K 以下。孔'R 稱 10/M 將改好 15"設備,因此後續將維持 14" ONE LINE, 15" ONE LINE, 另 ONE LINE(75% FOR15",25%FOR17")。各線產能均為 160~170K/M

◎ **PHS CHALLENGE ORION→**ORION 在大陸各地區辦事處員了業績而搶客戶,據悉 15"有 US$56 行情出現並求證到底是否有銷售 A-管或 B 管行為。ORION 稱無銷售的經銷商情形並保證其大陸地區各辦事處之客戶不會重疊且均 FLW ORION H.Q.價格,堅決否認有此行情。

◎ **CPTF CHALLENGE ORION→**對 AOC 之不良管處理方式為何,請說明。ORION 回應:其 14"在 AOC 之不良率平均約 0.5%,不良管計價以 A 管之 75%處理,而以 40K/M 來換算 B 管之數量亦應才 200PCS,數量應不多。ORION 堅稱其不良率確實如此,惟各家對其不良率如此低亦頗質疑。

◎ **SSDD CHALLENGE ORION→**經察 9 月份深圳客戶 KTC(康特)及 SRC 各向 AOC 買下限管 2K( ORION'S TUBE)情形,且耳聞 ORION 9 月份 14"有 US$43 行情,並稱即使 S/T GLARE B+D 管在 9 月份亦不應有此行情。ORION 堅決否認有銷售次管並在 9 月份有 OFFER US$43 行情。

E) BMCC: 基本上因為賠錢,雖不放棄 CDT 市場但也不會想多賣(14"生產≦30K)。至於 15"因評估無競爭力,故亦暫不會投入生產。

F) LG: 目前僅華條 14"生產線,產能為 70~80K/M,內部自用則有 50K/M,餘量 20K/M 則銷往東南亞及大陸。'99 年則不考慮生產 14"。

2

CHU00030681

3) '99 年 CDT MAKER 生產計畫.

(表三)　　　　　　　　　　　　　　　　單位：K PCS

| | Q1 | Q2 | Q3 | Q4 | 備註 |
|---|---|---|---|---|---|
| CPT | 300~375K/M | 300~375K/M | 300~375K/M | 300~375K/M | 2.5LINES |
| PHS | 130K/M | 130K/M | 130K/M | 130K/M | 2 LINES |
| SSDD | 350K/M | 350K/M | 350K/M | 350K/M | 2 LINES |
| ORION | 160K/M | 160K/M | 160K/M | 160K/M | 1 LINE |
| LG | 40~80K/M | 40~80K/M | 40~80K/M | 40~80K/M | 可能停止 14"生產 |
| BMCC | 30K/M | 30K/M | 30K/M | 30K/M | |
| TTL | 1010~1125K/M | 1010~1125K/M | 1010~1125K/M | 1010~1125K/M | |

說明
'99 年 14"供給以 1100K/M 預估的話，全年供給量約 13,200K PCS。而 SSDD / PHS 均認為'99 年 TTL DEMAND (14"/15"/17")約 90,000K PCS，而 14"之需求比例若以 PHS/SSDD 估計之 15%衡量的話，則'99 年需求量約 13,500K PCS。由上分析，14"CDT 在'99 年之供需似亦可預測趨近平衡。

三、結論
1. ORION/SSDD 在南中國之 LOCAL 客戶彼此競爭強，且彼此也質疑相關"內銷價不合理"與"A-或 B 管"銷售行為。ORION 除堅決否認 B 管銷售及低報價格行為，並請 SSDD 提供確實數據以供查證。而 SSDD 雖最終亦同意 10.4 內銷報價係數，但始終對內銷價格上漲似乎信心缺缺。
2. SSDD 請各家向總部建議 15"調漲幅度應更大些，且與 14"應維持至少 US$15 價差。
3. BMCC 雖未與會，但因之前已與華飛溝通過並表示將遵循會議決議，華飛盛總經理則負責傳達內銷報價係數 10.4 之協議。
4. 依'98 年 Q4 及'99 年供需概況分析，14"不論在大陸地區或全球市場應大致可維持供需平衡。各 CDT MAKER 應嚴格控制產量，尤其不應該有如 SSDD 在 9 月份之 OVER LOADING 現象，以確保價格穩定。
5. 下一次會議由彩虹召開，時間及地點另議。

--以上報告--　呈核

職　戴光輝　敬呈
OCT. 11, 1998

4

0512- 191028

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00030683

# EXHIBIT 52



June 20, 2012


**Certification**

            **Park IP Translations**


This is to certify that the attached translation is, to the best of
my knowledge and belief, a true and accurate translation from Chinese
into English of the document with bates numbers range:
CHU00030684E - CHU00030687E.



_(signature)_
_____

Abraham I. Holczer

Project Manager

D☐P☐ Exhibit _8420_
Deponent _Wang_
Date _5/8/19_ Rptr _BU_

**[TRANSLATION]**

China *CDT MAKER* Contact Meeting

[Handwritten:]
Respectfully submitted
→ Each committee member
Yu, Chen 11/12'98, Chen 11/12'98, Hua Wu 11/13'98, Shue-Xing Jiang 11/23'98

Date: *NOV*.06, 1998

Location: Xian

Meeting Attendees:
*CPTF*:     Section Chief Chung-Cheng (Alex) Yeh, Guang-Hui Tai
*PHS*:      Sales Manager Zhen-Xi Shao, (Huafei) President Jian-Zhong Sheng,
            (Huafei) Manager Bing Ma
*SSDD*:     Department Manager Myoung Sik Lee, Zhen Yang
*ORION*:    Section Chief Tae Sik Kong (*TAE.SIK.KONG*)
IRICO *IRICO*: Vice President Jian-She Wei, Sales Manager Wei-Sheng Lee, Assistant
            Sales Department Manager Jun Yao, Zhao-Jie Wang
*BMCC*:     Xing-Wen Wang
Host:   IRICO          Chairperson:   *PHS* Zhen-Xi Shao

Meeting Content:

I.   Sales Information Exchange by Each *CDT MAKER*
     The main points of the *CRT* makers' sales information exchange are indicated as
     follows: Each *CDT MAKER*'s sales in *4Q* of year '98 and its estimated production
     volume in year '99 are attached.   (Attachment 1)

1)   *CPTF*: Meeting attendees are concerned about the progress of *CPTF* 15"*CDT*.
     *CPTF* claimed that because the *DY* material supply is tight, the estimated
     production sales in November are 30*K*. The estimated production for December is
     70*K*.

2)   *SSDD*: **estimates that 15"*CDT* of Samsung Factory, Tianjin will *M/P* in June
     of year '99, but *SSDD* (Samsung Shenzhen) will organize sales operations.
     *SSDD* will utilize a modified Fushan 14"*CDT* line to progress with 17"*CDT*
     production, estimated to *M/P* in September of year '99.** In addition, because
     Tianjin Samsung monitor factory has restricted production capacity, the
     production capacity in year '98 will only be about 40*K/M*. The estimated year '99
     production capacity is 300*K*/year (mainly 15" *CDT*). Furthermore, *MR*. Lee
     claimed that *SSDD* profited from *CPT* last month, but still not from *CDT*.

3)   Huafei:

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL                CHU00030684.01E
                                                  Translation

A) The November 14" sales orders were not good. Currently there are 40*K* orders confirmed. November's target is 70*K*. The main source of orders is still internal demand (the two companies *PH* Brazil/Dongguan, mainly).

**B) Because of problems with funding, *PHS*(Zhubei factory) may still not consider moving its 15"*CDT* to China in year '99, but plans to alter parts of the equipment to progress with 15"*CDT* production at Huafei. Therefore, even though the 14" orders are not good in November/December, the whole line will go into utilization. The purpose is to build some inventory for supplying during the possible line-stoppage period in year '99.** In year '99, the 14"/15" production plan may be 1600*K*/0*K* or 800*K*/400*K*. It all depends on the decision about whether to convert lines in the beginning of year '99.

C) In October, the 14" sales consisted mainly of the 60*K* *PHS*(Brazil/Suzhou) internal demand. It has been confirmed that the 40*K* November orders [Handwritten: "purchase"] also consist almost entirely of *PHS* (Brazil/Dongguan) internal demand, of which the Dongguan factory has 18*K*. According to news, there will be an increase of *PSH*'s(Brazil/Dongguan) orders. Therefore, given reason *B*) described above, the plans for December sales are higher than the November numbers. In addition, *Mr.* Shao claimed that *PHS* 15"*CDT* sales to Taiwan makers in China consist mainly of *AOC/EMC*, about 30*K* combined. Sales to *PHS*(*SZ*) should be above 40*K*.

4) *IRICO* (IRICO):

**A) 15"*CDT ONE LINE* will start to output in March of this year. This line's greatest production capacity is 60~70*K/M*. Because of main materials cannot be obtained easily from *TSB*, has high prices, and other such factors, in September, it will stop operation for one month, and begin utilization again in October. The estimated production target for year '98 is up to 200*K*/year, of which 80% will be sold to Caihuang.**

B) Since Japan *TSB CKD*'s costs are still higher than the selling price, the more it sold, the more it was in deficit. Only that under the policy of making purchasing autonomous, the IRICO deflecting factory can already supply 20*K/M* of *DY*, one of the main materials. In addition, *FUNNEL* can also be self-made beginning December.

1

5)

_____

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00030684.02E

Translation

*BMCC*:

A) Sales in October were not good. The main sales target was Matsushita Philippines. As far as *ACER(SZ)* goes, in the recent months, there has been no correspondence

**B) The individual production estimates for 14"/15" are 80K/400K in year '99, of which the 14"CDT production is estimated to end in February. Estimates are that after the February spring festival, the 15"CDT equipment alteration can be completed, still with a production capacity of 40~50K/M.**

6) *ORION*: In October, orders were not good mainly because China has recently strengthened its attack on smuggling. This greatly affects the import smuggling of monitor factories in the Huanan area that does primarily domestic sales. This is why according to its customer, there are still *14K* that have not been picked from the containers that stopped at Hong Kong in September.

7) *PHS* provided the China area 14"CDT production forecast for year '98/99 (please refer to attachment 1). The estimated China area makers' production volume in year '98 is about 7.405*KPCS*. In year '99, the estimate is about 5,630*KPCS*.

Year '98 October ~December Sales Status/Year 99 Estimated Production Volume (Table 1)                                                                    Unit: *K PCS*

| Maker | Size | '98 October Production/Sales Inventory | | | '98 November Production/Sales Inventory | | '98 December Production/Sales Inventory | | '99 Year planned volume | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Production | Sales | Inventory | Estimated Production | Estimated Sales | Estimated Production | Estimated Sales | | |
| CPTF | 14" | 210 | 140 | 175 | 60~70 | 130 | 60~70 | 140 | 1300~1400 | |
| | 15" | | | | | | | | 1600~1800 | |
| SSDD | 14" | 180 | 165 | 20 | 150~180 | 160 | 150~180 | 160 | | |
| | 15" | | 200 | | | 200 | | 200 | | SDD Sales to Taiwan costumers in China |
| PHS Huafei | 14" | 140 | 120 | 40 | 120 | 40~70 | 120 | 100 | 1600 or 800 | |
| | 15" | | | | | | | | 0 or 400 | |
| BMOC | 14" | 30 | 14 | 25 | 40 | 30 | 40 | 30 | | |
| ORION | 14" | | 10 | | | 20 | | 20 | 300K Not including Taiwan costumers | |
| | 15" | | 80 | | | 100 | | 70 | 300K not including Taiwan costumers | Oct. 20k for domestic sales, 60k for Taiwan maker export |
| IRICO IRICO | 15" | 20 | 20 | 0 | 30 | 30 | 40 | 40 | 600~700 | |
| LG | 14" | | 4 | | | 4 | | ? | | |
| | 15" | | 40 | | | 40 | | ? | | |

II. Price Review

_____

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL                         CHU00030685.01E

Translation

1) *ORION* reacted first. Because China recently strengthened its policy to attack smuggling, this greatly affects the customers of its monitor factories in the Huanan area that do primarily domestic sales. Currently, its outbound quote is 14"*S/S US*$50. Given the customer-related factors of freight costs, tariffs, and foreign exchange regulations, it cannot compare with China *LOCAL* supply to other *CRT* makers. Customers absolutely do not accept.

   [Hand-drawn star] ***ORION* indicated that they are in unison with *LG* They hope to lower the USD quote or raise the RMB pricing coefficient (currently 10.4.) Otherwise, with no orders at all, they can only back out of the regular *CRT MEETING*.** Each maker responded as follows:

   A) Because makers attending the meeting believe that lowering the USD quote already surpasses each factory's local authority, and because during the second wave *CRT* increase in October, China *MONITOR* makers did not fully react to its *BUYER*, therefore, currently, in the China area, there are no external conditions to support increasing the RMB quote.

   B) *SSDD MR*. Lee originally brought up the consideration to quote higher than *ORION* to give some of its import customers to *ORION* for continued sales. However, then, because *ORION*'s main customer are Xoceco, Beijing Founder Electric Co., and China Great Wall, *MR*. Lee finally negated his own suggestion because he cares about these customers.

   Conclusion: **Request that each factory reflect *ORION*'s problem to headquarters. *PSH Mr*. Shao will be responsible for notifying each factory of the headquarters' final decision.**

[Handwritten with arrow from hand-drawn star:]
   1. Currently, imports are quoted x 10.4. The integrated tax rate is about 25%, just the tax the *CRT* factory passes up. It also been completely reflected to customers. [Illegible and crossed out] It would be unreasonable to raise it any more. Customers would not accept it either.

   2. Lowering the USD quote would even further cause market frenzy. It is even less doable.
2)

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [  ].

CONFIDENTIAL – GRAND JURY MATERIAL                    CHU00030685.02E

                                                                    Translation

*IRICO*: Meeting attendees designated the bottom line price for 15"
internal/external transactions to *IRICO* as follows: (*BASED ON S/S ITC
TYPE*)

A) *IRICO*'s internal transaction price for Caihuang is (*US*$60x10.4=RMB
quote, tax included)

B) For its other customers, because *IRICO*'s quality and efficiency are poor
and the volume is limited, it uses (*US* $62 or 63X10.4=RMB quote, tax
included)

3) *BMCC*:

*BMCC*'s October orders were extremely bad (*14K*). Its main customers were
Caihuang and Founder Electronics, with demands of about 10*K/M* each.
BMCC, however, did not order in October either. With respect to its 2 main
customers, *BMCC* honestly admitted the it uses *US*$48X10.0 as the RMB
internal quote for the *S/S TYPE*. Nevertheless, the *CDT MAKER* at the
meeting all oppose *BMCC*'s double allowance with USD and RMB auditing
coefficients (The official domestic sales RMB quote should be *US*$50x10.4).
After negotiations, makers finally agreed to *BMCC*'s lowering its quotes to
its 2 main customer by *US*$1 (and to use *US*$47 as the *BASE* immediately),
but it must *KEEP* its domestic sales coefficient of 10.4. Also, meeting
attendees hope that everyone makes partial allowances. They hope that they
can use *US*$48x10.4 as the internal quote with *AOC*.

Conclusion: **BMCC will use *US*$47x10.4 as the quote to its main
customers (Caihuang/Founder Electronics); however, *CPTF* opposes
*AOC* using *US*$48x10.4 as its domestic sales quote. It believes that
currently it should coordinate the supplying of 14"/15"/17" with *AOC*.
Even if *BMCC* uses such pricing it would not have orders.**

4) *SSDD*:

A) *CPTF/PHS* both claim that there is often noise on the market with regard to
*SSDD* selling B tubes. *MR*. Lee replied with a slight tone of complaint that
without verification and definite evidence, *PHS* conveyed to headquarters that
*SSDD* is selling B tubes to a Beijing customer, causing the headquarter boss to
question him. *PHS*'s *Mr*. Shao explained that he will strengthen usual contact and
confirmations, and apologized to *MR*. Lee about *PHS*'s careless reaction process.

B) *CPTF/PHS* both claim that that they've heard about *SDD*'s having *F.O.C.* (*free
of charge*) on the market. It seems to be a disguised price decrease. *MR*. Lee then
claimed that because they did not recall the defective tubes, this is to discount the
defective tubes.
Conclusion: **CPTF/PHS suggested that *SSDD* recall the defective tubes or let
its engineers cut off or destroy the *PIN* to avoid their being used for sale. In**

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00030686.01E

Translation

addition, it requested that *SSDD* separately process its <u>*INVOICE* for normal shipments and *INVOICE* for discounts</u> [Underlined by hand]. ***SSDD*** agreed and asked *PHS* to supply related documents and procedures for reference. [Handwritten with arrow from underlined text:] It should be *replace*d. Because even if the *invoice* is handled separately, there is no way to distinguish whether it is a *rebate*.

III. Others:

1. In consideration and evaluation of the rapid atrophy of the 14"*CDT* and for the healthy development of the *CDT i*ndustry, *MS. Lee* promised to be responsible for contact, and to arrange an integration meeting with the makers of large size monitors in the China area.

2. Because each maker has heard a lot of noise on the 14" market, they believe that the price may loosen after 4*Q*. Therefore, the meeting attendees achieved a unified approach and a common understanding, hastening each sales department to deliver the message as follows: "It is impossible for the prices to drop. If there are signs of oversupply, then it will be handled with reducing production."

3. *BMCC* will run the next meeting in Beijing. Time: 12/4

– End of report –        Submitted for approval

[Handwritten:]
1. *CPT/PHS/ORION* all challenged [Illegible] *SSDD* about what they have heard about *SSDD* selling *B* tubes and disguising the *FOC* price decrease; however, *SSDD* denied this and argued that it was compensating for defective tubes. There would be no rumors if there were not some truth to it, so they requested that *SSDD* manage itself.

2. In 4*Q* of year '99, *SSDD* will still have 1 line each of 14"/15"/16" [Illegible] in China. In comparison, the competitive advantage has strengthened.

3. *ORION* threatened during the meeting that if the domestic sales coefficient were not increased, then it would lower the USD price. Meeting attendees think that it is natural for *ORION* not to be able to compete with the companies that have built factories in China. They cannot use this to unreasonably request that others increase their domestic sales price or independently lower USD quotes. Please have headquarters discuss this with *ORION* upper management.

Respectfully submitted by Employee Guang-Hui Tai *NOV.* 8, 1998

[Signed:] Chung-Cheng (Alex) Yeh 11/98

[Signed:] Afan Tseng 11/12'98

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL          CHU00030686.02E
                                                        Translation

30-OCT-1998 21:52 FROM PHILIPS CHUPEI          TO HUAFEII  P.05/08

[Handwritten:] (Attachment 1)
Provided by *PHS*
[Handwritten on right side of chart:] *BMCC*

## 14"Color Monitor Production in China
### 1st half v.s. 2nd half in 1998

Kpcs

| | Maker | 1st half | 2nd half | Total | Domestic Sales | Major Suppliers & Ratio |
|---|---|---|---|---|---|---|
| Taiwanese | Acer | 140 | 110 | 250 | 60 | C/P:6/4 |
| | ADI | 400 | 260 | 660 | 170 | S |
| | Compal | 100 | 80 | 180 | 0 | C |
| | FIC | 30 | 20 | 50 | 0 | ~~C/P:7~~/3 |
| | GVC | 80 | 120 | 200 | 0 | C/O:5/5 |
| | IRICO | 185 | 165 | 350 | 0 | P/B:8/2 |
| | Lite-on | 210 | 240 | 450 | 100 | C |
| | MAG | 45 | 10 | 55 | 0 | S |
| | Philips | 560 | 520 | 1,080 | 300 | C/P:5/5 |
| | Proview | 450 | 250 | 700 | 250 | S |
| | Shamrock | 140 | 120 | 260 | 0 | C/S:7/3 |
| | Top Victory | 660 | 440 | 1,100 | 450 | C/O/P:5/4/1 |
| | Others | 100 | 80 | 180 | 170 | |
| | Total | 3,100 | 2,415 | 5,515 | 1,500 | |
| Chinese | Founder | 250 | 150 | 400 | 320 | S/P:7/3 |
| | Great Wall | 90 | 50 | 140 | 120 | S |
| | Qing Hong | 300 | 40 | 340 | 300 | Closed in Aug. |
| | West Lake | 30 | 20 | 50 | 30 | |
| | Xoceco | 150 | 100 | 250 | 220 | S |
| | Yuki | 50 | 20 | 70 | 70 | S/P:7/3 |
| | Others | 70 | 50 | 120 | 90 | |
| | Total | 940 | 430 | 1,370 | 1,150 | |
| Korean | Daewoo | 100 | 70 | 170 | 150 | O |
| | LG | 0 | 0 | 0 | 0 | |
| | Samsung | 120 | 80 | 200 | 200 | S |
| | Total | 220 | 150 | 370 | 350 | |
| Japanese | NPG | 90 | 60 | 150 | 100 | |
| | Grand Total | 4,350 | 3,055 | 7,405 | 3,100 | |
| | 1st half vs 2nd half in 1998 is 59%:41% | | | | | |

Remark:   - Major CMT Suppliers, P:Philips, C:CPT, S:SDD, O:Orion, B:BMCC
- Domestic Sales: including QEM sales which sell to China.          Attachment #2

_____

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00030687E

Translation

大陸 CDT MAKER 聯繫會議

時間：NOV.06, 1998
地點：西安
與會人員：
CPTF：葉俊正課長、戴光輝
PHS：邵正璽業務經理、(華飛)盛建忠總經理、(華飛)馬冰經理
SSDD：李明植組長、楊真
ORION：孔泰植(TAE.SIK.KONG)課長
彩虹 IRICO：魏建社副總、李衛生銷售經理、姚軍營業部副部長、王昭杰
BMCC：黃新文
主辦：彩虹集團公司 主席：PHS 邵正璽
會議內容：

一、各 CDT MAKER 產銷訊息交流
    茲將 CRT 廠商產銷訊息交流重點說明如下：各 CDT MAKER'98 年 4Q 產銷及'99 年預計生產
    量狀況如後附(表一)

1) CPTF：與會各家關切 CPTF 15''CDT 進度。CPTF 稱因 DY 備料供應吃緊，11 月預計生產銷售
   30K，12 月預計生產 70K。

2) SSDD：*天津三星廠 15''CDT 預計於'99 年 6 月 MP，但由 SSDD(深圳三星)統籌銷售工作，*
   *而 SSDD 則將利用釜山 14''CDT 線加以修改以進行 17''CDT 生產，預計'99 年 9 月 M/P。*
   另，天津三星監視器廠因產能受限，'98 年產能約 40K/M，99 年產能則預計 300K/年(15''CDT
   為主)。此外，MR.李稱 SSDD 上個月 CPT 有獲利，但 CDT 則仍無獲利。

3) 華飛：
   A) 11 月 14''銷售訂單差，目前確認的訂單有 40K，11 月以 70K 為目標。主要訂單來源仍
      以內需(PH 巴西/東莞兩廠為主)。
   B) 因資金問題 *PHS(竹北廠)'99 年 15''CDT 可能仍不會考慮遷移至大陸，但擬改鄒份設*
      *備在華飛進行 15''CDT 生產。因此，14''11/12 月訂單雖不佳亦全線稼動，目的在稍些*
      *庫存以因應'99 年可能停線時之供應。*而'99 年 14''/15''生產規劃可能為 1600K/零 K
      或 800K/400K，全俟'99 年初是否改線之決策而定。
   C) 14''10 月份銷售上以內需 PHS(巴西/蘇州)60K 為主；11 月份已確定之訂單 40K 中亦幾
      乎為 PHS(巴西/東莞)內需，其中東莞達 18K；12 月份則據悉 PSH(巴西/東莞)之訂
      單應會增加，因此在上述 B)原因下，12 月產銷計畫高於 11 月份數量。另邵'R 稱
      PHS15''CDT 銷售於台商大陸的部份主要為 AOC/EMC，合計約 30K 左右，銷售於 PHS(SZ)
      則應在 40K 以上。

4) IRICO(彩虹集團)：
   A) *15''CDT ONE LINE 於今年 3 月始產出，該線最大產能為 60~ 70K/M，但因主要材料*
      *自 TSB 取得不易且價高等因素，9 月停工一個月，於 10 又重新稼動。'98 年預計達 200K/*
      *年生產目標，其中 80% 為銷售於彩皇。*
   B) 自日本 TSB CKD 之成本仍比售價高，故賣越多虧越多。惟在採購自主化政策下，主要
      材料中 DY 可由其彩虹偏轉廠供應 20K/M，另 FUNNEL 自 12 月始亦可以自製。

1

CHU00030684

5) BMCC：
A) 10 月份銷售差，主要銷售對象為菲律賓松下公司，至於 ACER(SZ)則近幾個月均無往來。

**B) '99 年 14''/15'' 分別預計生產 80K/400K。其中 14'' CDT 預計生產至 2 月份即結束，估計 2 月份春節過後即可完成 15'' CDT 之設備改造，產能上仍為 40~ 50K/M。**

6) ORION：10 月訂單差主要係因大陸近期加強打擊走私後，對杜絕華南一帶以內銷為主之顯示器廠走私進口影響甚大。值此是故，據稱其客戶 9 月份停在香港的貨櫃仍近 14K 尚未提貨。

7) PHS 提供'98/99 年 14'' CDT 大陸地區生產之預測(請參閱附件 1)。'98 年大陸地區廠商生產量估計約 7,405KPCS，'99 年則預計約 5,630KPCS。

'98 年 10~12 月產銷概況/99 預計生產量（表一）                    單位：K PCS

| 廠商 | 尺寸 | '98 年 10 月產存 | | | '98 年 11 月產存 | | '98 年 12 月產存 | | '99 年計畫量 | 備註 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 生產 | 銷售 | 庫存 | 預計生產 | 預計銷售 | 預計生產 | 預計銷售 | | |
| CPTF | 14'' | 210 | 140 | 175 | 60~70 | 130 | 60~70 | 140 | 1300~1400 | |
| | 15'' | | | | | | | | 1600~1800 | |
| SSDD | 14'' | 180 | 165 | 20 | 150~180 | 160 | 150~180 | 160 | | |
| | 15'' | | 200 | | | 200 | | 200 | | SDD 銷售大陸台商 |
| PHS 華飛 | 14'' | 140 | 120 | 40 | 120 | 40~70 | 120 | 100 | 1600 或 800 | |
| | 15'' | | | | | | | | 0 或 400 | |
| BMCC | 14'' | 30 | 14 | 25 | 40 | 30 | 40 | 30 | | |
| ORION | 14'' | | 10 | | | 20 | | 20 | 300K(未含台商) | |
| | 15'' | | 80 | | | 100 | | 70 | 300K(未含台商) | 10 月份 20K FOR 內銷，60K FOR 台商外銷 |
| IRICO 彩虹 | 15'' | 20 | 20 | 0 | 30 | 30 | 40 | 40 | 600~700K | |
| LG | 14'' | | 4 | | | 4 | | ? | | |
| | 15'' | | 40 | | | 40 | | ? | | |

二、價格檢討

1) ORION 首先反應，因大陸近期在加強打擊走私政策下，對其華南一帶以內銷為主之顯示器廠客戶影響至極。其現今對外報價 14''S/S US$50，在其客戶相關運輸費用、關稅、及外匯管理局管制等相關因素下，無法與大陸 LOCAL 供應之其他 CRT 廠商相比，客戶根本不接受。

**ORION 表示其與 LG 看法一致，防降低美金報價或提高人民幣計價之係數(目前為 10.4)，否則訂單全無情形下，只好退出 CRT 定期 MEETING。** 各廠商回應如下：

A) 因與會各家廠商認為調降美金報價已超過與會各廠之地方權限，而因 10 月份第二波 CRT 調漲，大陸 MONITOR 廠商並未充分反應於其 BUYER，因此調高人民幣報價在大陸地區目前亦沒有外在條件可支撐。

B) SSDD MR.李本提出考慮者價較 ORION 為高，讓出部份內銷客戶於 ORION 繼續進行銷售，但因因 ORION 主要客戶為廈華/北大方正/長城，MR.李最後又因在意該群客戶而于以否決自己之建議。

**結論：請各廠向總部反應 ORION 的問題，PSH 邵'R 並負責將總部最終之決議通知各廠。**

1.現內銷價 ×10.4 動，綜合稅率約 13%，開放在 CRT 廠形上漲的稅，已反至每家子客戶。□□□兩者稅高不太合理客戶也不會接受。

2.降美金報價更負遊戲市場秩亂，更不可行。

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00030685

2) IRICO：與會各家向 IRICO 訂出 15"之內/外部交易底線如下：(BASED ON S/S ITC TYPE)

　　A) IRICO 對彩皇內部交易價為(US$60X10.4=人民幣含稅報價)

　　B) IRICO 對其他客戶報價則因其品質效率較差且數量有限，因此以(US$62 或 63X10.4=人民幣含稅報價)

3) BMCC：

　　BMCC 10 月份訂單極差(14K)，主要客戶為彩皇與方正，需求各為 10K/M 左右；但彩皇 10 月亦不下單。針對其主要之兩家客戶，BMCC 坦承 S/S TYPE 以 US$48X10.0 作為人民幣內銷報價。惟與會各 CDT MAKER 均反對 BMCC 在美金與人民幣核算係數做雙重讓與(公定人民幣內銷報價應為 US$50X10.4)。經協議，各家最終同意 BMCC 在其兩家主要客戶再降低美金報價 US$1(亦即以 US$47 為 BASE)，但須 KEEP 內銷係數 10.4；另與會各家希望大家稍作部份退讓，希望能在 AOC 以 US$48X10.4 作為內銷報價。

　　*結論：BMCC 在其主要客戶(彩皇/方正)以 US$47X10.4 報價。但針對在 AOC 以 US$48X10.4 作為內銷報價，CPTF 則表反對，並認為目前與 AOC 係以 14"/15"/17"搭配供應，即使 BMCC 用該價格應也不會有訂單。*

4) SSDD：

　　A) CPTF/PHS 均稱市場上對 SSDD 銷售次管常有雜音。MR.李則略帶抱怨的回應，上個月因 PHS 未向其求證且無確切證據遽向總部反應 SSDD 對北京某客戶有次管銷售行為，因而被其總部老闆質詢。PHS 邵'R 則解釋爾後將多加強平時之聯繫與確認，並對 PHS 較粗率之反應過程向 MR.李致歉。

　　B) CPTF/PHS 均稱市場上常反應 SDD 有 F.O.C.(free of charge)之聲音，似乎成為變相降價。MR.李則稱因其不良管沒有回收，此乃不良管折讓之作法。

　　*結論：CPTF/PHS 建議 SSDD 對不良管要回收或與講其工程師將 PIN 剪挫破壞避免其再銷售利用，另講 SSDD 將正常出貨之數量 INVOICE 與折讓之 INVOICE 分開處理，SSDD 則表同意並請 PHS 提供相關文件作法供參考。*

與應該用 replace 才好，因即使 invoice 分開處理
也無法區別是否為 rebate.

三、其他

1. 考量 14"CDT 急速萎縮並為了 CDT 產業健康發展，MS.李承諾負責聯繫，整合大陸地區中大型監視器廠商召開整合會議。

2. 14"市場上因各家均聽到許多雜音，認為 4Q 以後可能價格會鬆動。因此，與會各家達成一致性口徑及共識，敦促各自業務說法如下：『價格不可能下跌，若有超額供給現象則以減產因應。』

3. 下次會議由 BMCC 主辦並於北京召開，時間：12/4

1. cpT/phs/oriwn 均對 SSDD 的 challenge 其專門 SSDD 賣 B 等人 F.O.C. 來拖降價位 SSDD 否認，並辯稱係不良管償所致。但無獲不能源，請 SSDD 自律

2. 11年 4Q SSDD 在大陸將有 14/15/17 各一線，恐將競爭狀勢增強

3. ORIWN 在各中直言，若內銷係扣不調高

則要調降美金價 眾人士認為
ORIWN 持不住大陸設廠的心引是自然的事，不能因此無理要求
其他人隨 內銷價或自行調低美金價值。望即請總結印向 RICRIOU
高層反应

--以上報告--

呈核

職 戴光輝 敬呈

NOV.8, 1998

CHU00030686

CONFIDENTIAL - GRAND JURY MATERIAL

(附件1)

PHS 提议

30-OCT-1998 .21:52   FROM  PHILIPS CHUPEI   TO  HUIFEII   P.25/28

# 14"  Color Monitor Production in China
## 1st half v.s. 2nd half in 1998

| | Maker | 1st half | 2nd half | Total | Domestic Sales | Major Suppliers & Ratio (Kpcs) |
|---|---|---|---|---|---|---|
| Taiwanese | Acer | 140 | 110 | 250 | 60 | C/P: 6/4 |
| | ADI | 400 | 260 | 660 | 170 | S |
| | Compal | 100 | 80 | 180 | 0 | C |
| | FIC | 30 | 20 | 50 | 0 | C/P:7/3 |
| | GVC | 80 | 120 | 200 | 0 | C/O:5/5 |
| | IRICO | 185 | 165 | 350 | 0 | P/B:8/2 |
| | Lite-on | 210 | 240 | 450 | 100 | C |
| | MAG | 45 | 10 | 55 | 0 | S |
| | Philips | 560 | 520 | 1080 | 300 | C/P:5/5 |
| | Proview | 450 | 250 | 700 | 250 | S |
| | Sharmrock | 140 | 120 | 260 | 0 | C/S:7/3 |
| | Top Victory | 660 | 440 | 1100 | 450 | C/O/P:5/4/1 |
| | Others | 100 | 80 | 180 | 170 | |
| | Total | 3100 | 2415 | 5515 | 1500 | |
| Chinese | Founder | 250 | 150 | 400 | 320 | S/P:7/3 |
| | Great Wall | 90 | 50 | 140 | 120 | S |
| | Qing Hong | 300 | 40 | 340 | 300 | closed in Aug. |
| | West Lake | 30 | 20 | 50 | 30 | |
| | Xoceco | 150 | 100 | 250 | 220 | S |
| | Yuki | 50 | 20 | 70 | 70 | S/P:7/3 |
| | Others | 70 | 50 | 120 | 90 | |
| | Total | 940 | 430 | 1370 | 1150 | |
| Korean | Daewoo | 100 | 70 | 170 | 150 | O |
| | LG | 0 | 0 | 0 | 0 | |
| | Samsung | 120 | 80 | 200 | 200 | S |
| | Total | 220 | 150 | 370 | 350 | |
| Japanese | NPG | 90 | 60 | 150 | 100 | |
| | Grand Total | 4350 | 3055 | 7405 | 3100 | |
| | 1st half vs 2nd half in 1998 is 59% : 41% | | | | | |

Remark: - Major CMT Suppliers, P: Philips, C: CPT, S: SDD, O: Orion, B: BMCC
        - Domestic Sales: including OEM sales which sell to China.

Attachment # 2

CHU00030687

# EXHIBIT 53

June 20, 2012

**Certification**

**Park IP Translations**

This is to certify that the attached translation is, to the best of
my knowledge and belief, a true and accurate translation from Chinese
into English of the document with bates numbers range:
CHU00725770E – CHU00725772.

_____

Abraham I. Holczer

Project Manager

134 W. 29th Street 5th Floor ☐ New York, N.Y. 10001
Phone: 212-581-8870 ☐ Fax: 212-581-5577

**[TRANSLATION]**

Report on Information Meeting of Mainland China Color Tube Industry Association

Meeting dates: 2006/07/20 ~ 2006/07/21

Meeting attendees: Representatives from 7 major color tube makers, representatives from 4 glass bulb makers, representatives from 2 *MASK* makers, representatives from 2 color TV makers, representatives from 1 research institute

CPT member: Director Mu-Lin (Jimmy) Chen, Chaw-Ping (Veronica) Yong

Meeting content: 7/20 – Color tube industry meeting
                         7/21 – Industry chain meeting

Introduction

I.     From 2005 up to now, with many major European color tube plants stopping production and shutting down businesses in succession, the global color tube production capacity have further gathered up in Mainland China/Southeast Asia/India etc.  As far as production capacity is concerned, the annual worldwide color tube production capacity could reach 200*M/YR* [Underlined by hand], including over 40% production capacity in Mainland China.  As far as demand is concerned, the annual demand for color tubes in Mainland China (including domestic/export sales) could reach 60*M/YR* [Underlined by hand], which makes up more than 1/3 of the worldwide color tube demand.  Hence, it's clear that the Mainland color tube industry is positioned to play decisive role.

II.    Sales understands the importance of the Mainland China color tube market. After a period time of interaction, it was learned that the Mainland China color tube industry also has industry meetings similar to *GSM* meetings in Southeast Asia.  After contacts and negotiations, we were allowed by the other parties to attend the meeting.  The main purpose of attending the meetings is to collect market information, especially to gain an overall understanding with regard to the change of the production line/utilization situation, and the general production, sales and inventory situation.

III.    In addition to the color tube makers, makers from upstream and downstream were also invited to attend the meeting.  It was the first time *CPT* attended. In addition to becoming familiar with the meeting procedures, we have exchanged contact methods with representatives of each party, the most important step for *CPT* to enter into the Mainland color tube industry chain.

IV.    This meeting report will divide and describe the meeting contents in three major sections:

    (1) The development of the eight major color tube makers

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

**CONFIDENTIAL – GRAND JURY MATERIAL**                    CHU00725770.01E

(2) *SLIM* market development trend

(3) Other related market information

The development of the eight major color tube makers

I.     With regard to the eight major color tube makers, except for *SDI*, who was absent from this meeting, the other makers (*BMCC/IRICO/THOMSON/LPD/NOVEL/SEG-H*) all sent people who are in charge of market information to attend this meeting.

II.    In the first half of the year, due to worldwide small and medium sized *CRT* products makers' production stoppages, the general utilization situation of Mainland China's small and medium sized products makers was good.    The demand for the large sized ones is still not clear.    Also in Mainland China (even globally) they were continuously eroded by *LCD*, and the utilization situation was not quite as good.    The utilization situation of Mainland China's eight makers in the first half of this year is as follows:

| CRT-MAKER | Utilization rate in the first half of this year | REMARK |
|---|---|---|
| IRICO | 80~85% | #9 started mass production in the latter part of the first half of this year. Therefore it was not included in the calculation. |
| BMCC | 87% | |
| SDI (T+S) | 72% | 1. Affected by T plants' major large sized products, the utilization situation was poor. 2. S plants 21" line FEB/MAR chose to stop production temporarily due to overly high inventory, which had some effect on the overall utilization in the first half of the year. |
| Huafei | 78% (including CDT) | # 6 CDT line JUN converted to entirely produce CPT |
| THOMSON (Dongguan + Fushan) | 88% | The utilization rate of medium sized products at Dongguan plant was good.    Fushan plant # 2 utilization was poor, however, because of small production capacity, its overall effect was small. |
| NOVEL | 52% | #3/#4 stopped production |
| Changsha LPD | 90% | |
| SEG-H | 75% | |

III.   Each maker was deeply concerned with regard to the current hot market demand situation, without excluding *TV-MAKER* stocking up inventories. Some believed that by *Q4* the demand would drop all-round.   Some even

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [  ].

CONFIDENTIAL – GRAND JURY MATERIAL                     CHU00725770.02E

believed that the color tube inventories would rise to the *MAY/JUN* level of last year, and that the price would then collapse completely.    As a matter of fact, based on the estimation of Mainland color tube industry, by *JUNE/E* the color tube inventories had already reached 6*M*, including 4*M* color tube inventories of color TV plants + 2*M* color tube inventories of color tube plants. If the production capacity of the color tube plants is calculated as 6~6.5*M/MO* per month, it is still considered reasonable for color tube plants to have 1/3 (the equivalent of about 10 days) of inventories per month. With respect to the color TV plants,

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [  ].

**CONFIDENTIAL – GRAND JURY MATERIAL**                    CHU00725770.03E

Translation

the TV set inventories were 8*M* by *JUNE/E*.   If calculating the production capacity at 4*M/MO* per month, the inventory level has been equivalent to two-months of production volume.   The color tube inventory accumulated by the color TV plants was at the one-month output level.

IV.   In spite of reservations about color TV makers' stocking up inventories, each *CRT* maker still held an optimistic attitude towards the shipment prospects for color tubes in the second half of the year.   They believed that this year's inventory level was still healthier than that of last year.   In addition, influenced by favorable factors such as the current boom season in the Indian market and the production stoppage by local makers, shipments to Indian market are expected to increase.   In the meantime, the meeting attendees all indicated that the South American market would be an important area for future color TV/color tube development because of its continuous strong market demand.

V.   *JAN~MAY* of this year, Mainland China's color tube export exceeded 8*M*, an increase of 23% compared to the same period of last year.   As for imports, the color tube import volume in *JAN~MAY* was 7.3*M*, a decrease from the same period last year.   On the other hand, the Hong Kong one-day-tour number also increased by 42% above the same period of last year.   *JAN~MAY* of this year the Hong Kong one-day-tour number exceeded 3*M*.   This year Mainland China's color tube production capacity has already reached 82*M*.   The active steps that the local color tube makers should take are to seek sales in overseas markets and to increase domestic shares in various ways to absorb production capacity.

VI.   The production capacity situation of small and medium sized products in Mainland China: (calculated based on maximum production capacity)

| CRT-MAKER | 14"/15" RF | 21"FS/21"RF |
|---|---|---|
| Huafei | 0 | 4.3 |
| Changsha LPD | 0 | 2.6 |
| SDI (T+S) | 0 | 7.2 |
| BMCC | 2.6 | 3.5 |
| THOMSON (Dongguan+Fushan) | 0 | 4.2 |
| NOVEL | 0 | 2.4 |
| SEG-H | 0 | 6.1 |
| IRICO | 4.4 | 8 |
| TOTAL CAPACITY | 7 | 38.3 |

1.   The small sized – *BMCC* 15"*AK* just started mass production; production volume is still small.

2.   Medium-sized makers indicated that the demand for medium-sized products looked promising, believed that they were the most important sizes for *CRT* products.   Each maker has completed line changes, and is expected to have

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [  ].

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00725771.01E

Translation

higher utilization flexibility in medium-sized products.

*SLIM* market development tendency

I.     The other focus of the meeting was to discuss the possibility of future
       development for *SLIM TUBE/TV*.   Regarding the *SLIM* market in which
       *LPD/SDI* have played leading roles, *LPD/SDI* Korean/Mainland China plants
       entered into mass production one after the other in 2006.   In the Mainland
       China region, Huafei currently produces a monthly output of 140*K/MO*
       21"*SLIM*.   In addition to selling them in the Mainland China market, they are
       mostly exported to *LG*'s whole set assembly plants in Europe and America.
       Changsha *LPD* mainly aims toward 29"*SLIM* and was heard to be mainly
       focused on domestic customers.   At present, it has two customers, and has
       not reached the mass production stage of large quantities.   The *SLIM*
       leading-in/general production situation of the eight major color tube makers is
       as follows:

| CRT-MAKER | 21"SLIM   [Circled by hand] | 29"SLIM | 32"SLIM |
|---|---|---|---|
| IRICO | Started to send samples recently; put into mixed production with the existing 21" line | No plan at this time | No plan at this time |
| BMCC | The samples are already out. At present there are still technology/quality issues to be solved. | No plan at this time | No plan at this time |
| SDI (T+S) | Already into mass production; plan to produce 2M this year | Already into mass production | Already into mass production |
| Huafei | Already into mass production, 140K/YR.   Mostly Mainland China customer; also exports to LG whole set plants in Europe and America | No plan at this time | No plan at this time |
| THOMSON (Dongguan + Fushan) | No plan at this time | Under planning | No plan at this time |

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [  ].

CONFIDENTIAL – GRAND JURY MATERIAL                    CHU00725771.02E
                                                                        Translation

| NOVEL | No plan at this time | No plan at this time | No plan at this time |
|---|---|---|---|
| Changsha LPD | No plan at this time | Sample delivery completed.    At present has two Mainland customers; still hasn't entered into mass production period. | No plan at this time |
| SEG-H | Under planning | No plan at this time | No plan at this time |

1.  Additionally, the new generation *SLIM* technology, or as it is commonly called, *ULTRA SLIM, SDI/LPD* is going to start production.    Based on information, *SDI* Mainland China plant plans to have an output of 300*K/YR* this year. Huafei's sample is *OK*, but still requires change in production lines.

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [  ].

CONFIDENTIAL – GRAND JURY MATERIAL

2.   The meeting attendees hold an optimistic opinion towards 21"*SLIM*'s development trend.   *LPD* thinks that the concept of *SLIM* is to extend the life of *CRT*.   21"*SLIM* has this kind of characteristic, and looks promising in both its tendency and appearance.

3.   The high degree of acceptance for 21"*SLIM* at the Mainland China's domestic market is one of the reasons to drive each maker to put 21"*SLIM* into production.   Also because the development of 29"/32"*SLIM* has been hindered by *LCD*'s obvious pressure.

II.    Demand Analysis: *LPD* indicated that this year's global demand for *SLIM-TV* would exceed 14*M*, including 7*M* of 21"*SLIM*; the remainder would be 29"/32"*SLIM* [Underlined by hand] [Handwritten notes on top of the underlined sentence: "At present, only *SDI* is into mass production.   It is impossible to have a demand of 7*M* in the second half of the year!"]; the demand would mainly come from Japan/Korea/Mainland China etc.   Sales inquired *LPD* about the degree of acceptance for *SLIM* in the European and American regions.   *LPD* indicated that at present the shipments mainly went to *LG* plants in Europe and America.   The market reaction was not bad.   In the meantime, it indicated that at one point 32"*SLIM* sales in the Korean area had been almost the same as 32"*LCD*, and there were even chances of surpassing 32"*LCD*.   In addition, with regard to the hot reaction to *SLIM* in the Russian market, currently *LPD* delivers its shipments from the Korean plants, and the shipment volume is not bad.   As for the Mainland China region, at present the color TV makers only focus on the domestic market, and hold a wait-and-see attitude towards the export market.

III.   With regard to the degree of market acceptance toward *SLIM*, as the market leader, both *LPD/SDI* indicated that the reaction has been good.   However, it is feared that a good command of the overall market situation won't be obtained by just listening to *LPD/SDI*'s one-sided opinions.   Putting the current *SLIM* shipments of *LPD/SDI* into analysis, the reaction from the Mainland China domestic market seems not bad, and there is also an increase in demand by the Russian market.   Other than that, it's not difficult to see that *LPD/SDI* still mainly makes shipments to its own *LG/SAMSUNG* color TV plants.

IV.    Besides the existing 21"/29"/32", for the *SLIM* family members, based on information, *SDI* is developing 24"/28".   Meanwhile, the two makers are also conducting R& D to further shorten *SLIM TUBE*, calling it *ULTRA SLIM*. The product varieties will be even more diversified.

V.    Although the participating glass bulb makers expressed concern with regard to the launch of *SLIM*, they were focused on expecting that *SLIM* would extend *CRT* life.   In the meantime, to those glass bulb makers who had suffered a huge loss, no matter what kinds of *SLIM* sizes of glass they develop, they will require a large amount of money.   Hence, in order to decrease the cost of

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00725772.01E
Translation

development investment, they urged each *CRT* maker to see whether they can have a more complete grasp with regard to the demand for each size. Regarding cost, the glass bulb plants indicated that, using 21" *SLIM* for example, the cost for glass bulbs would be a 10~15% increase over the earlier 21"*RF*.

VI.    As the leader in *SLIM*, *LPD/SDI*'s upstream and downstream layout can be considered perfect.    Upstream, they have supplies from their own glass bulb/*MASK* plants; downstream, they have *LG/SAMSUNG* taking care of absorbing production capacity.    The market extension is quite broad and complete.    Because of the resurgence in the domestic market, the Mainland China makers expressed their intentions of putting *SLIM* into production. Other than that, most of the other *CRT* makers still hold a wait-and-see attitude. Since investment in production lines/raw materials when leading-in *SLIM* will involve a large amount of money, and since the demand is not clear, the makers take conservative positions with regard to investment.

Others

I.    *LPD* and *ORION* Mexico plants have already stopped production and ceased business.    At present, *SDI* and *THOMSON* are the only *CRT* makers remaining in Mexico.

II.    The annual production capacity of the glass bulb makers in 2006 was 83*M*. Since the global *RMB* 1 billion loss in 05, they have been suffering continuous losses.    Meanwhile, the glass bulb makers clearly expressed that, the current global glass bulb inventory (including *CPT+CDT*) could only support one month.    The supply and demand for worldwide glass bulbs in the next two months would be even tighter.

III.

Conclusion

The market in *Q3* will still be hot.    There will be tight supply and demand in places such as Mainland China/Southeast Asia/India.    However, whether this is due to *TV* makers' stocking up inventory is yet to be observed.    It is predicted that the tight situation will gradually slow down in the end of *OCT* and return to the normal level. In the meantime, with respect to Mainland China's current annual production capacity of 82*M* color tubes, the active pursuit of overseas export with low prices will further impact the *CPT* global market situation.    As for *SLIM* development, each maker still cannot be sure about the degree of market acceptance.    Additionally, the makers in the upper stream are conservative about the development and investment of new products.

End of report
Respectfully submitted to       Manager Huang
                             Director Chen

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [  ].

**CONFIDENTIAL – GRAND JURY MATERIAL**

CHU00725772.02E
Translation

[Submitted by:] Employee, Chaw-Ping (Veronica) Yong
July 24, 2006

[Handwritten:]

1. At present, Mainland China's color tube and color TV inventory is as high as 6*M* and 8*M*.    In case the sales at the boom season are not good, it will collapse completely in November.    Need to watch carefully.

2. As for *Slim* portion, the market for 21" looks relatively promising.    *CPT* should speed up the launch.    Regarding 29"/32", only *SDI/LPD* are still in mass production.    The other makers are all taking a wait-and-see attitude.    Need to follow the market demand closely.

[Signed:] Lee-Chiat Huang 25/7/06

[Handwritten:]

1. Collect more market information to be used as reference for the sales to broaden the market.

2. In August, *GLASS* is very tight.    *PUR* is working hard at it.    Arrange production based on the *GLASS* quantities that can be obtained.    Sales need to prepare ahead of time with regard to choosing customers.

[Signed:] Hwang-Yun (Henry) Chen
26/7

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [  ].

**CONFIDENTIAL – GRAND JURY MATERIAL**                    CHU00725772.03E
                                                                              Translation

# 大陸彩管行業協會信息會議報告

會議日期：2006/07/20~2006/07/21
與會者 ：7 大家彩管行業代表、4 家玻殼廠代表、2 家 MASK 廠代表、2 家彩電廠代表、1 家研究機構代表
華映人員：陳木林處長，楊超萍
會議內容：7/20 － 彩管行業會議
7/21 － 產業鏈會議

前言

一、從 2005 年至今，隨著歐洲眾多彩管大廠陸續停產歇業，全球彩管產能進一步往大陸/東南亞/印度等地集中。就產能來看，全球彩管年產能目前可達 200M/YR，其中超過 40%產能集中在大陸；就需求面而言，大陸彩管年需求（含內/外銷）可達 60M/YR，占全球彩管需求的 1/3 以上。由此，足見大陸彩管業舉足輕重之地位。

二、業務了解到大陸彩管市場的重要性，經過一段時間的聯繫，獲悉大陸彩管業亦有類同東南亞 GSM 會議之行業大會；經接洽後，獲對方同意參與會議。參與會議的最主要目的，在於市場資訊之收集，尤其針對生產線變化/稼動情形、產銷存概況等有更全面的了解。

三、除彩管業者以外，大會也邀請上下游廠商參與。CPT 首次參與，除熟悉會議進行模式以外，與各造代表交換聯絡方式，作為 CPT 踏入大陸彩管產業鏈的最重要步驟。

四、本會議報告將把會議內容分三大部份撰寫：
（一）八大家彩管廠商動態
（二）SLIM 市場發展趨勢
（三）其它相關市場資訊

八大家彩管業廠商動態

一、八大家彩管業者，除 SDI 缺席本次會議外，其餘各家（BMCC/IRICO/THOMSON/LPD/NOVEL/SEG-H）等皆派出市場信息主管參與。

二、上半年彩管業受到全球中小尺寸 CRT 業者停產效應影響，大陸中小尺寸業者一般稼情況良好；大尺寸需求仍未見明朗，且在大陸（甚至是全球）持續受 LCD 侵蝕，稼動情況稍為遜色。大陸八大家上半年稼動情形如下：

| CRT MAKER | 上半年稼動率 | REMARK |
|---|---|---|
| IRICO | 80~85% | #9 上半年下旬始量產，因此未納入計算 |
| BMCC | 87% | |
| SDI(T+S) | 72% | 1. 受 T 廠主力大尺寸影響，稼動情況差。<br>2. S 廠 21" 線 FEB/MAR 應庫存過高選擇性暫時停產，對整體上半年稼動亦有所影響。 |
| 華飛 | 78%（含 CDT） | #6 CDT 線 JUN 全面轉產 CPT |
| THOMSON(東莞+佛山) | 88% | 東莞廠中尺寸稼動率佳；佛山廠#2 稼動差；但產能較小，對整體影響小。 |
| NOVEL | 52% | #3/#4 停產 |
| 長沙 LPD | 90% | |
| SEG-H | 75% | |

三、各家針對目前市場上需求熱絡情形深表擔憂，不排除 TV-MAKER 囤積庫存；有者認為到了 Q4 需求將全面下挫；甚至認為彩管庫存有可能上昇到去年 MAY/JUN 的水準，皆時價格必將全面崩盤。事實上，按大陸彩管行業的估計，截至 JUN/E 彩管庫存已達 6M；這其中包括彩電廠彩管庫存 4M，彩管廠彩管庫存 2M。如按彩管廠每月 6~6.5M/MO 產能計算，彩管廠每月 1/3（約等同於 10 天）之庫存仍算合理。彩電廠部份，整

織庫存截至 JUN/E 為 8M，如按每月 4M/MO 產能計算，則相當於兩個月產量之庫存水準；彩電廠所累積的彩管庫存為一個月之產量水準。

四、盡管對彩電廠園積庫存一事持保留態度，各 CRT 業者對下半年彩管出貨走勢仍持樂觀態度，認為今年的庫存水準仍較去年健康。另外，在印度市場旺季當頭及當地業者停產等有利因素影響下，對印度市場之出貨有望增加。同時，與各業者均表示南美市場需求持續強勁，是未來彩電/彩管發展重鎮。

五、今年 JAN-MAY，大陸彩管出口超過 8M，較去年同期成長 23%。進口部份，JAN-MAY 彩管進口量 7.3M，比去年同期下滑。另一方面，香港一日遊數量也較去年同期成長 42%，今年 JAN-MAY 透過香港一日遊突破 3M。大陸彩管產能今年已達 82M，尋求海外市場銷售以及各方法增加國內占有率是當地彩管業者消化產能的積極步驟。

六、大陸中小尺寸產能情況：（按最大產能計算）

| CRT-MAKER | 14"/15"RF | 21"FS/21"RF |
|---|---|---|
| 華飛 | 0 | 4.3 |
| 長沙 LPD | 0 | 2.6 |
| SDI(T+S) | 0 | 7.2 |
| BMCC | 2.6 | 3.5 |
| THOMSON（東莞+佛山） | 0 | 4.2 |
| NOVEL | 0 | 2.4 |
| SEG-H | 0 | 6.1 |
| IRICO | 4.4 | 8 |
| TOTAL CAPACITY | 7 | 38.3 |

1. 小尺寸-BMCC 15" AK 剛量產，產量仍小。

2. 中尺寸-業者對中尺寸需求表示看好，認為這是 CRT 產品最重要的尺寸；各家完成改線，期能在中尺寸有更高的稼動彈性。

### SLIM 市場發展趨勢

一、會議的另一重點在討論 SLIM TUBE/TV 未來發展的可能性。由 LPD/SDI 所主導的 SLIM 市場，2006 年 LPD/SDI 韓國/大陸等工廠陸續進入量產。大陸地區，華飛 21" SLIM 目前每月產量 140K/MO，除在大陸市場銷售外，主要出口到歐美 LG 整機組裝廠。長沙 LPD 主攻 29" SLIM，據悉以國內客戶為主，目前有兩家客戶，仍未達大量量產階段。八大家彩管業者 SLIM 導入/生產概況如下：

| CRT-MAKER | 21" SLIM | 29" SLIM | 32" SLIM |
|---|---|---|---|
| IRICO | 近期開始送樣，與現有 21" 線混接 | 暫無計畫 | 暫無計畫 |
| BMCC | 樣品已推出，目前仍有技術/品質問題待解決 | 暫無計畫 | 暫無計畫 |
| SDI(T+S) | 已量產，計畫今年做 2M | 已量產 | 已量產 |
| 華飛 | 已量產，140K/YR。大陸客戶為主，另出口歐美 LG 整機廠 | 暫無計畫 | 暫無計畫 |
| THOMSON（東莞+佛山） | 暫無計畫 | 計畫中 | 暫無計畫 |
| NOVEL | 暫無計畫 | 暫無計畫 | 暫無計畫 |
| 長沙 LPD | 暫無計畫 | 完成送樣，目前有兩家大陸客戶，仍未進入量產階段 | 暫無計畫 |
| SEG-H | 計畫中 | 暫無計畫 | 暫無計畫 |

1. 另外，新一代 SLIM 技術，或一般稱做 ULTRA SLIM，SDI/LPD 即將投產。據悉，SDI 大陸廠規劃今年產量 300K/YR；華飛樣品 OK，但仍需更改產線。

CONFIDENTIAL – GRAND JURY MATERIAL

二、與會者對於21" SLIM發展趨勢持樂觀看法。LPD認為，SLIM推出之概念乃延長CRT壽命，21" SLIM具有此種特性，走勢及賣相最被看好。

3.大陸內銷市場對於21" SLIM接受程度高是促使各家投產21" SLIM的原因之一；又因為29"/32" SLIM受21"SLIM及29"/32"電漿影響，大客戶不可能全部折入SLIM中。LCD擠壓明顯，發展受阻。

二、需求面分析：LPD表示，今年全球SLIM-TV需求將超過14M，其中21" SLIM將占7M，餘為29"/32" SLIM；需求主要來自日/韓/大陸等地。業務向LPD了解歐美地區對SLIM接受度的問題，LPD表示，目前主要出貨到LG歐美廠，市場反映還不錯。同時表示在韓國地區32" SLIM銷售一度與32" LCD持平，且有超越32" LCD的機會。另外，針對俄羅斯市場對SLIM的熱銷反應，LPD目前由韓國工廠出貨，且表示出貨量不俗。大陸地區部份，彩電業者目前僅鎖定內銷市場，外銷市場仍持觀望態度。

三、市場對SLIM的接受度為何，LPD/SDI做為市場先驅皆表示反應良好；但如果方面能LPD/SDI意見恐怕無法全面掌握市況發展。分析LPD/SDI目前對SLIM的出貨來看，除大陸內銷市場反應似乎還不錯外，俄羅斯市場需求也漸抬頭外；不難看出LPD/SDI主要仍以自家 LG/SAMSUNG 彩電廠之出貨為主。

四、SLIM家族成員除現有的21"/29"/32"外，據悉SDI在開發24"/28"。於此同時，兩家也在研發將SLIM TUBE進一步縮短，稱之為 ULTRA SLIM；產品種類看似日趨多樣化。

五、與會玻殼廠商對SLIM之推出盡管表示關注，但重點仍期待SLIM可延長CRT壽命。於此同時，對於虧損累累的玻殼廠商而言，無論開發何種SLIM尺寸之玻殼皆需投資一大筆金錢，因此也呼籲各家CRT業者是否能就各尺寸需求面有更完整的掌握，減少開發投入所需之成本。從成本面來看，玻殼廠表示，以21" SLIM為例，玻殼成本將較先有21" RF 增加10~15%。

六、LPD/SDI做為SLIM領導者，上下游佈局堪稱完善。上有自家玻殼/MASK供貨，下有 LG/SAMSUNG 負責消化產能，市場推導較為全面且完善。其餘CRT業者，除大陸業者因內銷市場需求漸抬頭表態有意願投入SLIM生產外，大部份業者仍持觀望態度。且因SLIM之導入涉足產線/原材料等大筆金額之投入，業者在需求未見明朗的情況下投資上採取保守。

其它
一、LPD及ORION墨西哥廠皆已停產歇業，墨西哥CRT業者目前僅剩SDI及THOMSON。
二、2006年玻殼廠年產能83M，自05年全球RMB10億虧損以來，持續處於虧損狀態。同時，玻殼廠商皆明確表態，目前全球玻殼庫存（含CPT:CDT）僅維持一個月，未來兩個月全球玻殼供需將更為緊張。
三、
結語
Q3市場仍將呈現熱絡，且無論大陸/東南亞/印度等地皆將出現供需緊張。然而是否為TV業者回貨現象仍需再觀察，預料此緊張局勢將在OCT尾將緩步下滑，回到正規水位。與此同時，以大陸目前82M彩管年產能來看，積極以低價尋求海外出口對CPT全球市場佈局將有進一步的衝擊。在SLIM開發上，市場之接受程度為何，各家仍無法斷定，且上游廠商對於新產品之開發及投入扞守。

以上報告。

敬呈　黃經理
　　　陳處長

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00725772

# EXHIBIT 54

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                    OAKLAND DIVISION

4

5   IN RE: CATHODE RAY TUBE (CRT)  ) MASTER FILE NO.
    ANTITRUST LITIGATION           ) CV-07-5944 JST
6   _____)
                                   )
7   THIS DOCUMENT RELATES TO:      )
                                   )
8   ALL INDIRECT PURCHASER ACTIONS )
    ALL DIRECT PURCHASER ACTIONS   )
9                                  )
          DEFENDANTS.              )
10  _____)

11

12

13         VIDEOTAPED DEPOSITION OF WANG ZHAOJIE

14                     VOLUME I

15           TUESDAY, SEPTEMBER 20, 2022

16              MACAU S.A.R., CHINA

17

18

19

20  JOB NO. 5436453

21

22  REPORTED BY  MARK McCLURE, CRR

23           CAL CSR 12203

24

25

                                        Page 1

| | | |
|---|---|---|
| 1 | Well, at that point, I was a mere salesperson, | 11:32:51 |
| 2 | and I do not want to speak -- talk randomly about who | 11:32:57 |
| 3 | those persons' positions were. | 11:33:02 |
| 4 | Q.   Directing your attention to the page Bates | 11:33:07 |
| 5 | stamped IRI-CRT 00004821.  It says, by Wu Yingzhong: | 11:33:11 |
| 6 | "The CRT Industry Association will be holding a | 11:33:32 |
| 7 | proprietary meeting in Beijing on July 17, and the | 11:33:36 |
| 8 | founding meeting will be held in early August." | 11:33:39 |
| 9 | Do you see that? | 11:33:42 |
| 10 | A.   Okay, if you share your screen, then I cannot | 11:33:43 |
| 11 | see -- | 11:34:10 |
| 12 | Q.   I am sharing my screen. | 11:34:11 |
| 13 | A.   Oh, yes, yes. | 11:34:18 |
| 14 | Q.   First two lines. | 11:34:26 |
| 15 | Do you see that? | 11:34:27 |
| 16 | A.   Yes, yes, I see them. | 11:34:27 |
| 17 | Q.   Have you ever heard of the CRT Industry | 11:34:30 |
| 18 | Association? | 11:34:38 |
| 19 | A.   I don't know.  Whatever is said here. | 11:34:38 |
| 20 | Q.   I asked you if you have ever heard of that CRT | 11:34:56 |
| 21 | Industry Association. | 11:35:03 |
| 22 | Independent of this document, have you ever | 11:35:04 |
| 23 | heard of that CRT Industry Association? | 11:35:06 |
| 24 | MR. LUCARELLI:  Object to form. | 11:35:22 |
| 25 | THE WITNESS:  I have. | 11:35:25 |

Page 66

```
 1    BY MS. CAPURRO:                                    11:35:25

 2         Q.   Do you remember hearing that this association    11:35:29

 3    would have its founding meeting in July 1995?     11:35:31

 4         A.   I am not clear.                          11:35:43

 5         Q.   What's not clear, Mr. Wang?              11:35:46

 6         A.   I am not clear about what you're talking about   11:35:49

 7    in your question.  In 1995, forming something, I do not    11:36:00

 8    know about that matter.                            11:36:08

 9         Q.   Did you ever hear that employees of Irico were   11:36:13

10    attending the CRT Industry Association meetings in July    11:36:20

11    of 1995?                                           11:36:25

12         A.   I'm not clear about it.                   11:36:27

13         Q.   Did you ever attend any meeting of the CRT    11:36:46

14    Industry Association?                              11:36:54

15         A.   I have.                                  11:36:54

16         Q.   When did you attend meetings of the CRT    11:37:00

17    Industry Association?                              11:37:09

18         A.   First of all, let me explain.  The      11:37:09

19    association -- what you're saying, this is not something   11:37:32

20    that is clear to me, because I've never joined the    11:37:36

21    association.  I feel that their description of this is    11:37:42

22    not clear.                                         11:37:47

23         Q.   You testified just a minute ago that you had    11:37:58

24    attended meetings of the CRT Industry Association, and    11:38:00

25    my question to you is:  When did you attend those    11:38:05
```

Page 67

```
 1   meetings?                                          11:38:08

 2        A.   Well, first of all, let me reiterate.  I did   11:38:08

 3   say that I have attended the meeting, but I don't know  11:38:54

 4   whether or not it was the meeting of the -- what's   11:39:00

 5   called "the association," because the question is not  11:39:04

 6   clear and it is not specific enough, so it's very easy  11:39:08

 7   to cause me to get confused.                        11:39:13

 8        Q.   I'm referring, Mr. Wang, to the CRT Industry  11:39:19

 9   Association that is referred to on the first two lines  11:39:23

10   of this document.                                   11:39:25

11        Can you read that for me.                      11:39:25

12        A.   You mean this paragraph?  Do I read No. 2?  11:39:27

13        Q.   No, the one that says No. 1, at the top of the  11:40:18

14   page.                                               11:40:22

15        MAIN INTERPRETER:  Mr. Wang just finished the  11:40:27

16   first two lines.                                    11:40:30

17        MS. CAPURRO:  Can you interpret it, please?    11:40:30

18   What did he say?                                    11:40:32

19        MAIN INTERPRETER:  He just read the statement.  11:40:34

20   Wu Yingzhong; Wu Yingzhong attended the preparation  11:40:49

21   meeting in Beijing on July 17th.  The formation meeting  11:40:50

22   will be in the beginning of August.                 11:41:08

23   BY MS. CAPURRO:                                      11:41:08

24        Q.   Okay.  What is your understanding of the CRT  11:41:17

25   Industry Association referred to in that paragraph,  11:41:24
```

Page 68

| | | |
|---|---|---|
| 1 | Mr. Wang? | 11:41:27 |
| 2 | A.   I am not clear about it. | 11:41:30 |
| 3 | Q.   When you testified that you had attended | 11:41:45 |
| 4 | meetings of the CRT Industry Association, about five | 11:41:47 |
| 5 | minutes ago, what association were you referring to? | 11:41:50 |
| 6 | A.   I said that I have participated in the -- at | 11:41:52 |
| 7 | the meeting of the association.  However, I do not know | 11:42:30 |
| 8 | the relationship between the association -- the meeting | 11:42:34 |
| 9 | of the association that I have attended and the | 11:42:40 |
| 10 | association you are referring to here today. | 11:42:43 |
| 11 | Q.   Okay.  That's -- that's fair. | 11:42:48 |
| 12 | But I want to know about the association that | 11:42:52 |
| 13 | you meant when you said you attended CRT Industry | 11:42:55 |
| 14 | Association meetings. | 11:42:59 |
| 15 | Do you recall when the first meeting of the | 11:43:13 |
| 16 | CRT Industry Association was that you attended? | 11:43:16 |
| 17 | A.   I cannot remember the specific time. | 11:43:20 |
| 18 | Q.   Do you remember anything about the meeting? | 11:43:36 |
| 19 | Perhaps, who else attended from Irico? | 11:43:39 |
| 20 | MR. LUCARELLI:  Object to form. | 11:43:41 |
| 21 | THE WITNESS:  I cannot remember. | 11:43:51 |
| 22 | BY MS. CAPURRO: | 11:43:51 |
| 23 | Q.   Do you remember whether the other members of | 11:43:55 |
| 24 | the CRT Industry Association were other manufacturers of | 11:43:57 |
| 25 | CRTs? | 11:44:02 |

Page 69

| | |
|---|---|
| 1 | MAIN INTERPRETER:  May interpreter have read | 11:44:04 |
| 2 | back the question?  I'm sorry. | 11:44:33 |
| 3 | (Record read by reporter: | 11:44:33 |
| 4 | "QUESTION:  Do you remember whether | 11:43:55 |
| 5 | the other members of the CRT Industry | 11:43:56 |
| 6 | Association were other manufacturers of | 11:43:59 |
| 7 | CRTs?") | 11:44:02 |
| 8 | THE WITNESS:  I'm not very clear about that. | 11:44:34 |
| 9 | BY MS. CAPURRO: | 11:44:34 |
| 10 | Q.   Do you remember any of the other attendees of | 11:44:39 |
| 11 | the CRT Industry Association's meetings? | 11:44:42 |
| 12 | A.   I feel that you should ask -- your question | 11:45:10 |
| 13 | should be more specific, more narrow because your | 11:45:12 |
| 14 | question is too broad.  I do not know how to answer it. | 11:45:18 |
| 15 | Q.   Did Beijing Matsushita Color CRT Company | 11:45:23 |
| 16 | attend the CRT Industry Association meetings? | 11:45:27 |
| 17 | A.   Beijing Matsushita, yes. | 11:45:30 |
| 18 | Q.   Did Samsung SDI attend the CRT Industry | 11:45:49 |
| 19 | Association meetings? | 11:45:54 |
| 20 | A.   I believe so. | 11:45:54 |
| 21 | Q.   Did Hua Fei attend the CRT Industry | 11:46:04 |
| 22 | Association meetings? | 11:46:09 |
| 23 | MAIN INTERPRETER:  I'm sorry, the name is? | 11:46:09 |
| 24 | MS. CAPURRO:  Hua Fei. | 11:46:15 |
| 25 | THE WITNESS:  It seems to me it did. | 11:46:21 |

Page  70

1    BY MS. CAPURRO:                                    11:46:21

2        Q.   Did LG Changsha attend the CRT Industry   11:46:24

3    Association meetings?                              11:46:31

4        A.   Yes.                                      11:46:31

5        Q.   Did SEG Hitachi attend the CRT Industry   11:46:37

6    Association meetings?                              11:46:43

7            MR. HWU:   Hitachi is translated as Ri Li.  11:47:02

8    Hitachi is Ri Li.                                  11:47:10

9            THE WITNESS:   I do not know.              11:47:26

10   BY MS. CAPURRO:                                    11:47:26

11       Q.   SEG Hitachi?                              11:47:30

12       A.   Are you referring to Sai Ge?             11:47:44

13       Q.   Yes.                                      11:47:51

14       A.   Yes, there was such a company.           11:47:55

15       Q.   Did Chunghwa attend the CRT Industry     11:47:59

16   Association meetings?                              11:48:03

17           MAIN INTERPRETER:   May the interpreter have  11:48:07

18   the spelling?                                      11:48:08

19           MS. CAPURRO:   C-h-u-n-g-h-w-a.            11:48:09

20           THE WITNESS:   What is it?                 11:48:23

21           Yes, it seems that it did.   I cannot remember  11:48:40

22   clearly.   I am aware of this Chunghwa.           11:48:44

23   BY MS. CAPURRO:                                    11:48:47

24       Q.   All of these companies that we've just listed,  11:48:47

25   they were all Irico's competitors during the relevant  11:48:50

Page  71

| | | |
|---|---|---|
| 1 | period, isn't that right? | 11:48:53 |
| 2 | A.   So from the broad sense, I believe so. | 11:48:55 |
| 3 | Q.   What was the purpose of the CRT Industry | 11:49:27 |
| 4 | Association meetings? | 11:49:30 |
| 5 | A.   It has past 11:30. | 11:49:34 |
| 6 | After this question, can we take a break? | 11:49:47 |
| 7 | Q.   I'd like to finish my line of questioning. | 11:49:50 |
| 8 | I'm nearly done. | 11:49:53 |
| 9 | A.   How long does it take? | 11:50:02 |
| 10 | I hope this series of questions will not drag | 11:50:12 |
| 11 | on too long because earlier we were talking about 11:30. | 11:50:14 |
| 12 | Q.   Mr. Wang, can you please answer my question? | 11:50:21 |
| 13 | We can take a break when we're done.  I'll try | 11:50:23 |
| 14 | to be as quick as I can. | 11:50:28 |
| 15 | A.   That's fine, but I hope it will not take too | 11:50:37 |
| 16 | long because it is lunchtime over here. | 11:50:41 |
| 17 | Q.   Can you answer my question:  What was the | 11:50:46 |
| 18 | purpose of the CRT Industry Association meetings? | 11:50:48 |
| 19 | A.   I am not clear about its purpose, but I just | 11:50:51 |
| 20 | attended this meeting a few times.  During the meeting, | 11:51:15 |
| 21 | we would communicate about some information.  Sometimes | 11:51:21 |
| 22 | we would communicate about the market information. | 11:51:26 |
| 23 | Q.   What kind of market information would you | 11:51:34 |
| 24 | discuss? | 11:51:40 |
| 25 | A.   Generally speaking, the supply and demand | 11:51:40 |

Page  72

| | | |
|---|---|---|
| 1 | issues and relationship. | 11:51:59 |
| 2 | Q.   Would you discuss CRT production levels? | 11:52:02 |
| 3 | A.   Are you talking about the cost? | 11:52:06 |
| 4 | Q.   No. | 11:52:26 |
| 5 | I'm talking about production levels, | 11:52:26 |
| 6 | production of CRT, how many each company was producing. | 11:52:28 |
| 7 | A.   We would.   But, however, I would not -- I | 11:52:48 |
| 8 | would not think that that information was true. | 11:52:55 |
| 9 | MS. CAPURRO:   I'd like to strike that last | 11:53:02 |
| 10 | part as nonresponsive. | 11:53:04 |
| 11 | MR. LUCARELLI:   Opposed. | 11:53:05 |
| 12 | BY MS. CAPURRO: | 11:53:12 |
| 13 | Q.   Did you discuss CRT pricing levels at the CRT | 11:53:13 |
| 14 | Industry Association meetings? | 11:53:19 |
| 15 | A.   I'm not clear about that. | 11:53:22 |
| 16 | Q.   What are you not clear about? | 11:53:31 |
| 17 | A.   I am not clear about whether we would discuss | 11:53:34 |
| 18 | the pricing or not, but based on my knowledge, we did | 11:53:51 |
| 19 | not. | 11:53:56 |
| 20 | Q.   Did anyone from Irico go with you to these CRT | 11:53:58 |
| 21 | Industry Association meetings? | 11:54:02 |
| 22 | A.   I believe so. | 11:54:04 |
| 23 | Q.   Who went with you to these meetings? | 11:54:17 |
| 24 | A.   It has been too long.   I really cannot | 11:54:24 |
| 25 | remember clearly.   I remember once -- only one time that | 11:54:37 |

Page  73

```
1    Shizheng Song went with me.                        11:54:53

2              MAIN INTERPRETER:   The name spelling is  11:54:55

3    S-h-i-z-h-e-n-g, last name S-o-n-g.                 11:54:56

4              THE WITNESS:   Shizheng Song took me there 11:55:05

5    once.                                               11:55:06

6    BY MS. CAPURRO:                                     11:55:06

7        Q.   Anyone else?                               11:55:10

8        A.   Okay, after this question we'll break, okay? 11:55:11

9        Q.   Okay.                                      11:55:18

10       A.   I cannot remember clearly.  I hope your    11:55:28

11   questions can be more specific, okay?               11:55:31

12             MS. CAPURRO:  Okay.  Let's go off the record. 11:55:36

13   We'll break for lunch.                              11:55:38

14             THE VIDEOGRAPHER:  We are off the record at 11:55:39

15   11:55 a.m.                                          11:55:41

16             (The lunch recess was taken.)             11:55:46

17             THE VIDEOGRAPHER:   We are back on the record 13:00:02

18   at 1:00 p.m.                                        13:00:11

19   BY MS. CAPURRO:                                     13:00:13

20       Q.   Good afternoon, Mr. Wang.                  13:00:15

21             Before the break, you testified that you could 13:00:17

22   not remember clearly anyone else who attended the CRT 13:00:21

23   Industry Association meetings with you.             13:00:26

24             Do you remember anyone who attended with you? 13:00:28

25       A.   I cannot be sure because it has been a long 13:00:32
```

Page 74

| | | |
|---|---|---|
| 1 | time.  For sure, there would be some other people, but I | 13:01:11 |
| 2 | just cannot remember. | 13:01:16 |
| 3 | Q.   But as I informed you at the beginning when we | 13:01:19 |
| 4 | were discussing the rules, I'm entitled to your best | 13:01:21 |
| 5 | recollection, so if you remember at all, I'm entitled to | 13:01:24 |
| 6 | that testimony. | 13:01:27 |
| 7 | Would you please tell me whether or not you | 13:01:29 |
| 8 | remember anyone else who attended these meetings with | 13:01:32 |
| 9 | you? | 13:01:36 |
| 10 | MR. LUCARELLI:  Object to form. | 13:01:36 |
| 11 | THE WITNESS:  It has been a long time.  I | 13:01:56 |
| 12 | cannot remember clearly. | 13:01:59 |
| 13 | BY MS. CAPURRO: | 13:01:59 |
| 14 | Q.   So it's your testimony that you don't remember | 13:02:02 |
| 15 | at all anyone else, other than the individual you | 13:02:04 |
| 16 | mentioned, Mr. Song?  You don't remember anyone else who | 13:02:07 |
| 17 | attended these meetings with you, is that correct? | 13:02:14 |
| 18 | MR. LUCARELLI:  Object to form. | 13:02:16 |
| 19 | THE WITNESS:  I do not remember very clearly. | 13:02:31 |
| 20 | BY MS. CAPURRO: | 13:02:31 |
| 21 | Q.   Mr. Wang, do you remember who told you to go | 13:02:39 |
| 22 | to the CRT Industry meetings? | 13:02:42 |
| 23 | A.   I cannot remember clearly because it has been | 13:02:46 |
| 24 | such a long time and I have had so many supervisors. | 13:03:01 |
| 25 | Q.   But you would have been instructed by your | 13:03:06 |

Page 75

| | | |
|---|---|---|
| 1 | (Exhibit 8559 marked for identification.) | 13:13:32 |
| 2 | MS. CAPURRO: | 13:13:32 |
| 3 | Q.   Mr. Wang, do you see the document? | 13:13:39 |
| 4 | Would you please take a minute to review the | 13:13:41 |
| 5 | document.  You don't need to read the whole thing.  I | 13:13:43 |
| 6 | only have a few questions about limited sections, which | 13:13:46 |
| 7 | I'll direct you to. | 13:13:51 |
| 8 | Let me know when you're ready, Mr. Wang. | 13:14:17 |
| 9 | The Chinese portion of the document starts on | 13:14:22 |
| 10 | page 5 of the PDF.  Sorry, on page 4. | 13:14:25 |
| 11 | A.   Okay. | 13:14:53 |
| 12 | MS. CAPURRO:  Can the interpreter see the | 13:14:54 |
| 13 | screen okay? | 13:14:56 |
| 14 | MAIN INTERPRETER:  I would appreciate if you | 13:14:57 |
| 15 | can make it larger. | 13:15:00 |
| 16 | MS. CAPURRO:  Better? | 13:15:02 |
| 17 | MAIN INTERPRETER:  That's fine. | 13:15:04 |
| 18 | BY MS. CAPURRO: | 13:15:04 |
| 19 | Q.   Mr. Wang, have you seen this document before? | 13:15:08 |
| 20 | A.   No. | 13:15:13 |
| 21 | Q.   Do you see, in the top of the document, it's | 13:15:16 |
| 22 | entitled "December CRT Industry Meeting Exchange"?  Do | 13:15:20 |
| 23 | you see that? | 13:15:25 |
| 24 | A.   I see that. | 13:15:28 |
| 25 | Q.   Have you seen documents like this before? | 13:15:39 |

Page 80

```
 1        A.   No.                                        13:15:49

 2        Q.   Did reviewing this document, sitting here  13:15:50

 3   today, refresh your recollection regarding the exchanges  13:15:56

 4   of information amongst the members of the CRT Industry  13:15:58

 5   Association?                                        13:16:04

 6             MR. LUCARELLI:  Object to form.           13:16:04

 7             THE WITNESS:  I do not dare to guess, but  13:16:29

 8   whatever is written on this document, then it is what it  13:16:32

 9   is.                                                 13:16:36

10             MR. HWU:  Can we go off the record?       13:16:51

11             I think our examining counsel's computer just  13:16:54

12   restarted by itself.  Apologies.                    13:16:57

13             MR. LUCARELLI:  Not a problem.            13:17:00

14             THE VIDEOGRAPHER:  We are off the record at  13:17:02

15   1:17 p.m.                                           13:17:03

16             (Discussion off the record.)             13:17:07

17             THE VIDEOGRAPHER:  We are back on the record  13:22:19

18   at 1:23 p.m.                                        13:23:02

19   BY MS. CAPURRO:                                     13:23:05

20        Q.   Okay.  Mr. Wang, we were talking about   13:23:09

21   Exhibit 8559 before my computer died.              13:23:15

22             Directing your attention to the final page of  13:23:27

23   the document, Bates stamped BMCC-CRT000113391, do you  13:23:33

24   see here at the bottom of the document where it states  13:24:00

25   "Irico Group Sales Company, November 30, 1995"?    13:24:05
```

                                                      Page 81

```
 1        A.    I see that.                                  13:24:09

 2        Q.    Irico Group Sales Company is how Irico Group 13:24:26

 3   referred to its sales department, isn't that right?    13:24:30

 4        A.    Correct.                                     13:24:33

 5        Q.    And Irico Group Sales Company's sign-off at  13:24:44

 6   the end of this document indicates that this document  13:24:48

 7   was authored by someone at Irico Sales Company, isn't  13:24:50

 8   that?                                                   13:24:53

 9        A.    I cannot guess about this.  Whatever is      13:25:19

10   written on this document, then it stands.              13:25:22

11        Q.    What other explanation is there for it saying 13:25:27

12   "Irico Group Sales Company," at the bottom of this     13:25:31

13   document?                                              13:25:34

14              MR. LUCARELLI:   Object to form.            13:25:36

15              THE WITNESS:   I'm not clear about that because 13:25:41

16   I've never seen this document.                         13:25:54

17   BY MS. CAPURRO:                                         13:25:54

18        Q.    But Irico Group Sales Company would have put 13:25:58

19   "Irico Group Sales Company" at the end of their        13:26:00

20   documents, right?                                      13:26:03

21        A.    Whatever is written here, then that is what it 13:26:04

22   is.                                                    13:26:23

23        Q.    Do you have any reason to doubt that this is 13:26:23

24   an Irico document?                                     13:26:26

25        A.    I have never seen this document.  I cannot  13:26:28
```

Page 82

1    evaluate it.                                              13:26:45

2        Q.   Is this the type of document that Irico Group    13:26:48

3    Sales Company prepared in advance of the CRT Industry     13:26:53

4    meetings?                                                 13:26:57

5            MR. LUCARELLI:   Object to form.                  13:27:00

6            THE WITNESS:   I'm not clear about this matter.   13:27:12

7    BY MS. CAPURRO:                                           13:27:28

8        Q.   Are you not clear about the question,            13:27:28

9    Mr. Wang?                                                 13:27:30

10       A.   Please repeat the question.                      13:27:31

11       Q.   The question was:  Is this the type of           13:27:42

12   document that Irico Group Sales Company prepared in       13:27:44

13   advance of the CRT Industry meetings?                     13:27:47

14       A.   I am not clear about this.  I am not aware of    13:27:49

15   this kind of matter.                                      13:28:09

16       Q.   But you said you attended the CRT Industry       13:28:11

17   Association meetings, correct?                            13:28:15

18       A.   Correct.                                         13:28:21

19       Q.   Were you aware of Irico Group Sales Company      13:28:24

20   preparing documents in advance of the CRT Industry       13:28:28

21   Association meetings?                                     13:28:33

22           MR. LUCARELLI:   Object to form.                  13:28:37

23           THE WITNESS:   For those meetings that I have    13:28:50

24   attended, there was no such type of document.            13:28:52

25                                                             13:28:52

                                                    Page 83

```
1    BY MS. CAPURRO:                                          13:28:52

2        Q.   Were you aware of members of the CRT Industry   13:29:07

3    Association exchanging materials in advance of the       13:29:12

4    meetings?                                                13:29:19

5        A.   I'm not clear about that.                       13:29:21

6        Q.   What are you not clear about, Mr. Wang?         13:29:35

7        A.   The matter you are referring to.                13:29:42

8        Q.   Did you -- did the members of the CRT Industry  13:29:48

9    Association exchange meeting materials or not?           13:29:52

10            MR. LUCARELLI:  Object to form.                 13:29:56

11            THE WITNESS:  What time are you referring to?   13:30:13

12   BY MS. CAPURRO:                                          13:30:13

13       Q.   I'm referring to any of the times that you      13:30:17

14   attended CRT Industry Association meetings.              13:30:19

15       A.   There would be oral exchanges of information.   13:30:35

16       Q.   Mr. Wang, I'm asking you whether there were     13:30:41

17   written materials exchanged prior to the meeting.        13:30:44

18            Are you telling me you don't remember whether   13:30:49

19   there were written materials exchanged or something      13:30:52

20   else?                                                    13:30:54

21            MR. LUCARELLI:  Object to form.                 13:30:55

22            THE WITNESS:  Based on my understanding of      13:31:08

23   this, I do not know.                                     13:31:11

24   BY MS. CAPURRO:                                          13:31:11

25       Q.   You do not know whether you don't remember?     13:31:16
```

Page 84

```
 1                    (Main interpreter Michelle Tan was relieved      14:31:11

 2               by main interpreter Amanda Lin.)                      14:31:29

 3                         AMANDA LIN                                  14:31:29

 4          was sworn to interpret the Chinese language.              14:31:29

 5                                                                     14:37:00

 6               THE VIDEOGRAPHER:  We are back on the record          14:37:00

 7     at 2:37 p.m.                                                    14:37:08

 8     BY MS. CAPURRO:                                                 14:37:10

 9          Q.   Mr. Wang, we've been looking at several              14:37:14

10     documents that were produced from Irico's archives in          14:37:18

11     the last couple of hours.                                      14:37:23

12               Are you familiar with Irico's archives?              14:37:24

13          A.   Can you please repeat the question?                  14:37:47

14               MAIN INTERPRETER:  The witness asked the             14:37:54

15     interpreter to re-render just the translation.                14:37:55

16               THE WITNESS:  I am not familiar with it.             14:38:12

17               MS. YANG:  I want to say something to Amanda.        14:38:17

18               (Speaking Chinese.)                                  14:38:22

19               THE WITNESS:  What archive or archive room are       14:38:40

20     you referring to?                                              14:38:44

21     BY MS. CAPURRO:                                                14:38:47

22          Q.   I don't know which archive room I'm referring        14:38:50

23     to.  I am not familiar with Irico's archives.                 14:38:53

24               I thought that, as an employee of Irico, you         14:38:56

25     might know that Irico stores documents in its archives.       14:38:59
```

Page 101

```
 1        A.    I'm not clear about that.                    14:39:25

 2        Q.    So you have never heard anyone refer to      14:39:29

 3   documents -- older documents being stored in some sort  14:39:33

 4   of archive, is that right?                              14:39:38

 5             MR. LUCARELLI:   Object to form.              14:39:42

 6             THE WITNESS:   I worked on sales work, and the 14:39:58

 7   storage and archiving of documents and files would not  14:40:11

 8   be within the scope of my job responsibility, so I do   14:40:15

 9   not have clear knowledge about this.                    14:40:19

10   BY MS. CAPURRO:                                         14:40:19

11        Q.    Are you aware that Chinese law requires Irico 14:40:24

12   to maintain certain records?                            14:40:27

13        A.    I'm not aware of that.                       14:40:37

14             MS. CAPURRO:   I'm going to mark another      14:40:45

15   exhibit.                                                14:40:47

16             MAIN INTERPRETER:   Counsel, since I just     14:41:14

17   joined the deposition, I don't have access to Exhibit   14:41:18

18   Share, do you mind sharing it on the screen, please?    14:41:20

19             MS. CAPURRO:   No problem.   I'm going to share 14:41:22

20   it on the screen.   This is Exhibit No. 8563.   This is a 14:41:24

21   document produced by Irico from its archives Bates      14:41:49

22   stamped IRI-CRT-00020490.                               14:41:52

23             (Exhibit 8563 marked for identification.)     14:41:52

24   BY MS. CAPURRO:                                         14:41:58

25        Q.    Mr. Wang, please take a moment to review the 14:42:20
```

Page 102

```
 1    document and let me know when you're ready.            14:42:23

 2          A.    Okay, let me take a look first.            14:42:34

 3                I'm ready.                                 14:43:03

 4          Q.    Do you recognize this document, Mr. Wang?  14:43:06

 5          A.    What do you mean by "recognize"?           14:43:08

 6          Q.    Do you know what this document is?         14:43:15

 7          A.    This is a certificate for the reimbursement of  14:43:18

 8    expenses.                                              14:43:27

 9          Q.    That's correct.  This is an Irico Group, Ltd.,  14:43:30

10    payment certificate dated January 13, 1998.           14:43:32

11                There are a number of invoices attached, isn't  14:43:48

12    that right?                                            14:43:56

13          A.    Correct.                                   14:43:56

14          Q.    Do you see, on the left-hand side of this  14:43:59

15    first page, in the summary, it says, "Wang Zhaojie    14:44:04

16    reports that it is used to entertain customers"?       14:44:10

17                Do you see that?                           14:44:13

18          A.    I see it.                                  14:44:15

19          Q.    And do you see below here where it says,   14:44:30

20    "Payee, Wang Zhaojie"?                                 14:44:37

21          A.    Yes.                                       14:44:41

22          Q.    Is that your signature, Mr. Wang?          14:44:47

23          A.    Yes, I believe so.                         14:44:55

24          Q.    So you prepared this document in order to get  14:44:56

25    reimbursement for your travel and expense -- travel and  14:45:01
```

Page 103

```
 1    expenses, is that correct?                        14:45:05

 2              MAIN INTERPRETER:   The interpreter is asked to   14:45:29

 3    repeat the translation.                            14:45:32

 4              THE WITNESS:   What do you mean by "prepared   14:45:41

 5    this document"?                                    14:45:42

 6              This should be a certificate of my       14:45:51

 7    reimbursement of expenses.   That's it.            14:45:54

 8    BY MS. CAPURRO:                                    14:45:54

 9       Q.   So this is showing the amount that you were   14:45:59

10    reimbursed, is that correct?                       14:46:01

11       A.   Yes.                                       14:46:09

12       Q.   Okay.   And you were reimbursed by Irico Group,   14:46:09

13    is that right?                                     14:46:15

14       A.   I was paid by the finance department or   14:46:18

15    division of the Sales Company at that time.        14:46:35

16       Q.   Okay.   And you were being reimbursed for   14:46:37

17    expenses that you incurred as part of your job for Sales   14:46:43

18    Company, is that right?                            14:46:47

19       A.   I did not quite understand the question.   14:47:07

20       Q.   The expenses that you were being reimbursed   14:47:16

21    for, you incurred those when you were working for Irico   14:47:19

22    Group, is that right?                              14:47:25

23       A.   Yes, yes, I believe so.                    14:47:39

24       Q.   Okay.   And the invoices that are attached to   14:47:42

25    the payment certificate, those are invoices that you   14:47:49
```

Page 104

1    provided to Irico Group, is that right?                    14:47:53

2         A.   It has been a long time but I would think so.    14:47:56

3         Q.   And you had an obligation to transmit accurate   14:48:15

4    information when you were submitting these expense         14:48:18

5    reimbursement requests, is that right?                     14:48:21

6              MAIN INTERPRETER:   The interpreter is asked to  14:48:44

7    repeat the translation.                                    14:48:46

8              The witness said the question sounds vague and   14:48:48

9    he did not quite understand it.                            14:48:51

10             May the interpreter repeat the translation?      14:48:56

11             MS. CAPURRO:   Yes, thank you.                   14:48:59

12             THE WITNESS:   May I ask counsel if counsel is   14:49:21

13   asking if I had any reasons for the reimbursement or       14:49:23

14   what information did I need to transmit?                   14:49:27

15   BY MS. CAPURRO:                                            14:49:27

16        Q.   No.                                              14:49:34

17             I'm asking whether the invoices that you         14:49:35

18   submitted with this payment certificate were true?        14:49:36

19             You did not submit false information in          14:49:42

20   support of your expense reimbursement, right?             14:49:44

21             MR. LUCARELLI:   Object to form.                 14:49:48

22             THE WITNESS:   I still am not clear as to what   14:50:11

23   the question is asking, and the invoices or the proof      14:50:35

24   may be true, may be authenticate.                          14:50:42

25                                                              14:50:51

Page 105

```
1    BY MS. CAPURRO:                                        14:50:51

2        Q.   Directing your attention to the page Bates    14:50:51

3    stamped IRI-CRT-00020501, I'm showing it here on the   14:50:56

4    screen.                                                 14:51:05

5             Do you see that?                               14:51:06

6        A.   You're talking about this invoice on the      14:51:08

7    screen, right?                                          14:51:20

8        Q.   I am, yes.                                     14:51:21

9        A.   I see it.                                      14:51:23

10       Q.   And at the top here, it says "Invoice of      14:51:26

11   Catering Industry and Xianyang City, Invoice copy."    14:51:30

12            Isn't that right?                              14:51:36

13       A.   Correct.                                       14:51:37

14       Q.   And the invoicing date here, on the left side, 14:51:46

15   says January 3, 1998, is that right?                   14:51:51

16       A.   Correct.                                       14:51:56

17       Q.   So this indicates that the meal expenses that  14:52:01

18   you were requesting reimbursement for occurred on      14:52:05

19   January 3, 1998, is that right?                        14:52:08

20       A.   The date indicated here would be the date on  14:52:30

21   which the invoice was created.                          14:52:33

22       Q.   And at the bottom of the invoice, down here   14:52:38

23   where I'm indicating with the cursor, it says "Xianyang 14:52:42

24   International Airport Hotel," isn't that right?         14:52:47

25       A.   Does it say "Xianyang Airport Hotel"?         14:53:08
```

Page 106

| | | |
|---|---|---|
| 1 | Q.   That's what I'm asking you. | 14:53:14 |
| 2 | That's what it says, correct? | 14:53:17 |
| 3 | A.   Yes, yes. | 14:53:19 |
| 4 | Q.   Okay.  So the meal you were requesting | 14:53:25 |
| 5 | reimbursement for occurred on January 3, 1998, at the | 14:53:28 |
| 6 | airport hotel in Xianyang, is that right? | 14:53:33 |
| 7 | A.   Yes. | 14:53:38 |
| 8 | Q.   Okay. | 14:53:51 |
| 9 | A.   Let me clarify on this and repeat one more | 14:54:18 |
| 10 | time. | 14:54:21 |
| 11 | The chop (phonetic) that's placed there is | 14:54:21 |
| 12 | placed there by that hotel, but right now, I am not sure | 14:54:24 |
| 13 | where the meal expense incurred. | 14:54:29 |
| 14 | Q.   Okay.  Directing your attention to the third | 14:54:33 |
| 15 | page of the document, Bates stamped IRI-CRT-00020502, at | 14:54:38 |
| 16 | the top of the page on that -- on the top of that page | 14:55:06 |
| 17 | there's a handwritten note that states "Entertained | 14:55:09 |
| 18 | Chief Jin of Hua Fei Tech at the airport." | 14:55:14 |
| 19 | Is that your handwriting, Mr. Wang? | 14:55:19 |
| 20 | A.   I think so. | 14:55:24 |
| 21 | Q.   And it says "Entertained Chief Jin of Hua Fei | 14:55:41 |
| 22 | at the airport"? | 14:55:51 |
| 23 | A.   That's what it says there. | 14:55:56 |
| 24 | Q.   And Hua Fei was a competitor of Irico, isn't | 14:56:00 |
| 25 | that right? | 14:56:11 |

Page 107

| | | |
|---|---|---|
| 1 | A.   Correct. | 14:56:11 |
| 2 | Q.   Hua Fei was one of the competitors that | 14:56:15 |
| 3 | attended the CRT Industry meetings, isn't that right? | 14:56:17 |
| 4 | A.   Are we still on this invoice, or are we asking | 14:56:21 |
| 5 | another, separate question? | 14:56:37 |
| 6 | Q.   No, we're still on this invoice, but I'm | 14:56:39 |
| 7 | asking you generally whether Hua Fei was one of the | 14:56:41 |
| 8 | companies that attended the CRT Industry Association | 14:56:46 |
| 9 | meetings. | 14:56:49 |
| 10 | A.   Correct, yes. | 14:57:06 |
| 11 | Q.   So you were entertaining Chief Jin of Hua Fei | 14:57:10 |
| 12 | at the airport on January 3, 1998, one day before the | 14:57:15 |
| 13 | next scheduled CRT Industry meeting on January 4, 1998, | 14:57:19 |
| 14 | that we saw in the last exhibit, isn't that right? | 14:57:23 |
| 15 | A.   I do not remember this clearly, nor do I | 14:57:56 |
| 16 | recall this, but if it says "entertaining," on the | 14:57:59 |
| 17 | invoice, then it would be entertaining. | 14:58:03 |
| 18 | Q.   Were you and Chief Jin traveling to the CRT | 14:58:12 |
| 19 | meeting on January 4, 1998? | 14:58:14 |
| 20 | A.   I cannot even remember who Chief Jin is at | 14:58:17 |
| 21 | this time. | 14:58:33 |
| 22 | MS. CAPURRO:   Okay, we can set that document | 14:58:47 |
| 23 | aside. | 14:58:49 |
| 24 | I'm going to mark the next exhibit. | 14:59:33 |
| 25 | For the record, this is Exhibit 8564, bearing | 15:00:20 |

Page 108

| | | |
|---|---|---|
| 1 | Bates number CHU0012479 to 85. | 15:00:24 |
| 2 | (Exhibit 8564 marked for identification.) | 15:00:24 |
| 3 | BY MS. CAPURRO: | 15:00:24 |
| 4 | Q.   Mr. Wang, this is a very long document.  You | 15:00:45 |
| 5 | can look through it, but there's no need to read the | 15:00:47 |
| 6 | entire document.  I'll read to you portions of the | 15:00:51 |
| 7 | document that I want to ask you about. | 15:00:56 |
| 8 | A.   Okay, allow me to take a look first. | 15:01:09 |
| 9 | Okay, I'm ready. | 15:02:37 |
| 10 | Q.   Okay.  This is a document entitled "Market | 15:02:39 |
| 11 | Alert," "Issue 0518." | 15:02:42 |
| 12 | At the top here, it says "Irico Group Sales | 15:02:47 |
| 13 | Company," "March 09, 2005," isn't that right? | 15:02:52 |
| 14 | A.   Correct. | 15:02:55 |
| 15 | Q.   At this time, on March 9, 2005, you would have | 15:03:12 |
| 16 | been the director of Irico Sales Company, isn't this | 15:03:15 |
| 17 | right? | 15:03:19 |
| 18 | A.   That's not correct. | 15:03:20 |
| 19 | Q.   You were a director of the sales department | 15:03:40 |
| 20 | within Irico Group Sales Company in March 2005, isn't | 15:03:43 |
| 21 | that right? | 15:03:51 |
| 22 | A.   I think that should be my role, around that | 15:03:51 |
| 23 | time, pretty much around that time, but I don't recall | 15:04:13 |
| 24 | clearly. | 15:04:16 |
| 25 | Q.   This document appears to have been produced by | 15:04:19 |

Page 109

# EXHIBIT 55
# (FILED UNDER SEAL)

# EXHIBIT 56
# (FILED UNDER SEAL)

# EXHIBIT 57



info@certifiedtranslate.com | 2425 Olympic Blvd., Suite 4000W | usa 1-888-856-2228
www.certifiedtranslate.com | Santa Monica, CA 90404 | int +1-310-684-3153
| | fax +1-310-564-1944



**A member of the American
Translators Association
ATA Member Number: 248719**

# CERTIFIED TRANSLATION

*Description of Document(s):*

| |
|---|
| **STATE-RUN PLANT 440 FORM RE:** |
| **CAIHONG ELECTRONICS GROUP CORPORATION** |
| **IRI-CRT-00023478 through IRI-CRT-00023479** |
| |

| Source Language: **CHINESE** | Target Language: **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**    Sean Kirschenstein, Director            **Date:**    March 18, 2022

A copy of the translated version (s) is attached to this statement of certification.

www.certifiedtranslate.com

002

## State-run Plant 4400 Form for Official Document (front)

Issuance signature:                                    Reviewed by: [Handwritten:] Ren Lian
[Handwritten:] Agree.  Zhang Wenyi 2/13/1995          Unit in charge: [Handwritten:] Personnel and Education
                                                                                      Department
Co-signature:                                          Leader of the unit in charge:        Urgency level:
                                                        Drafted by: [Handwritten:] Zhang Siqing Confidentiality level:

[Handwritten:] Cai Tuan Ren Jiao (1995) No. 27        [Handwritten figures except for 19:] February 10, 1995

Main report-to unit:

Planned issue-to units ["issue to" is handwritten over printed "report to"]: [Handwritten:] All business
departments of the Group Corporation and directly affiliated units

Send to ["Copy and send" is what's printed, but "Copy" is crossed out by hand]: Leaders of the Group Corporation
and chairman of the union

                                                       Archive: [Handwritten:] (2)
                                                       Attachment:

Title: [Handwritten:] Notice regarding hiring and removal of comrades Wang Ximin, etc.

To all business departments of Group Corporation and units directly affiliated:

Based on work needs, the Group Corporation's leaders researched and decided to hire:
    Comrade Wang Ximin as the First Vice Chief of the Technology Division of the Display Devices Business
    Department.
    Comrade Zhai Weiping as the Deputy Director of CRT Plant Two.

The employment terms of the above-mentioned comrades are the same as those of the Group Corporation's
General Manager.

                                                       Page _____

Translator's remarks are indicated in brackets [].

CONFIDENTIAL                                    IRI-CRT-00023478E_TRANSLATION

www.certifiedtranslate.com

003

## State-run Plant 4400 Form for Official Document

[Handwritten:]

Removals:
      Comrade Wang Tongjun is removed from the position of Deputy Director of CRT Plant Two;
      Comrade Lu Xianchang is removed from the position of Deputy Director of CRT Plant Two.
      Comrade Ma Shitai will no longer serve concurrently as the Chief of the Technology Division of the Display
            Devices Business Department.

Notification of the above is hereby given.

Binding
Line

             General Manager of Caihong Electronics Group Corporation:

Page _____

Translator's remarks are indicated in brackets [].



CONFIDENTIAL

IRI-CRT-00023478

003

# 国营四四○○厂公文稿纸

任期相同。

免去：

王同仁同志所管二厂副厂长职务；

卢贤芬同志所管二厂副厂长职务。

马世杰同志不再兼任显示器件

事业部技术处处长职务。

此通知

彩虹电子集团公司总经理：

第    页

CONFIDENTIAL                                                                          IRI-CRT-00023479

# EXHIBIT 58

STATE OF NEW YORK
CITY OF NEW YORK
COUNTY OF NEW YORK

CERTIFICATION

I, Dan McCourt, as an employee of TransPerfect Translations, Inc., do hereby certify, to the best of my knowledge and belief, that the provided Chinese into English translation(s) of the source document(s) listed below are true and accurate:

- IRI-CRT-00008425-IRI-CRT-00008432

TransPerfect Translations, Inc., a translation organization with over 90 offices on six continents, is a leader in professional translations. TransPerfect Translations, Inc. has over twenty years experience translating into the above language pair, its work being accepted by business organizations, governmental authorities and courts throughout the United States and internationally.

TransPerfect Translations, Inc. affirms that the provided translation was produced in according to our ISO 9001:2015 and ISO 17100:2015 certified quality management system, and also that the agents responsible for said translation(s) are qualified to translate and review documents for the above language pair, and are not a relation to any of the parties named in the source document(s).

_____

Dan McCourt, Project Assistant


Sworn to before me this
Monday, August 28, 2023

_____
Signature, Notary Public

WENDY POON
STATE
OF NEW YORK
NOTARY PUBLIC
Qualified in
Queens County
01PO6356754
MY COMMISSION EXPIRES 04-03-2025

_____
Stamp, Notary Public

[handwritten text is indicated in italics]

[logo:] IRICO Group
Corporation
IRICO Color Picture Tube
General Factory

172

Administrative Office Meeting


Time: December 1, 02: 00 PM

Location: Conference room on the sixth floor of IRICO Hotel

Topic:

1.       PDP equipment order situation (Wu Yingzhong)

2.       Sales situation (Ma Jinquan)

3. Housing reform (Tao Kui, Li Zuoting)

4.       Production situation (Xing Daoqin)

5. Progress of   projection TV (Ma Shitai)

6. Report on      technological transformation and measures (Xu Quancheng from the Legal Affairs Department)

7. Report on the        benefit forecast for 1999 (Liu Zhenzhu from the Finance Department)

*Hosted by: Wu Weiren*
*Attendees: Xue Baoming, Wu Yingzhong, Ma Jinquan, Tao Kui, Xing Daoqin, Li*
*          Zuoting, Mu Haoping; Ma Shitai*
*Non-voting attendees: Liu Zhenzhu, Xu Quancheng, Zhang Fengqin*
*Recorded by: Niu Wenjun*

0

CONFIDENTIAL

IRI-CRT-00008425E

[handwritten text is indicated in italics]

[logo:] IRICO Group                                                      173
Corporation
 IRICO Color Picture Tube
General Factory

*Wu Yingzhong: Report the PDP equipment order situation.*

*Approximately 100 million for bringing in the PDP production line equipment, the design costs 32 million, equipment costs USD 14 million, engineering still needs RMB 19 million, and the volume of 100,000 units globally this year.*

*Guo Cailin:*

*MgO equipment, screen printing machine, total cost USD 8 million, sintering furnace, air and gas equipment, slurry equipment, pure water machine, matching support [illegible] equipment, refining, cleaning: Drying equipment.*

*Wu Yingzhong:*

*At present, there are several test lines, and there are actually three laboratories. In this way, purchase a single machine for each sample for tests only. Therefore, the equipment cost is about USD 5 million.*

*Mu Haoping:*

*The laboratories only make 400 pieces, the key issue is how to grasp the performance, and the investment is of secondary importance.*

*Guo Cailin:Wu Yingzhong:*

*The construction cycle will take half of [illegible] time.*

*Tao Kui:*

*400 to 5000 in terms of volume. There is a big gap.*

1

CONFIDENTIAL                                                      IRI-CRT-00008426E

[handwritten text is indicated in italics]

[logo:] IRICO Group                                                           174
Corporation
IRICO Color Picture Tube
General Factory

*If the technology is similar, then if the volume is significant, the cost must be low, and there is certainty that the funds can withstand. I agree to increase the volume and do it in one step.*
*Ma Jinquan:*
    *To be safe, firstly, develop the laboratories' 400 – 320 pieces first, and master the technology, and for the second step, then develop up to 5000 -10,000 pieces*
*Xue Baoming:*
    *I agree with Factory Manager Ma's opinions, master the technology first. And enhance the quality, and lay a foundation first.*
*Wu Weiren:*
    *We need to purchase good equipment, split into two phases, lay a foundation before the production scale is increased.*
    *Ma Jinquan: Report the sales of the tubes*
    *1. The industry meeting, once a month, meeting in November concluded to discuss with Changhong once more about the price issue. The 21" import price being RMB 620 and Changhong's being RMB 580-590 [insertion mark:], 895 yuan, were analyzed. Changhong's opinion was that it agreed to the price increase, but the tube factories need to give 95% of the quantity to Changhong. Regarding the quantity to Changhong in January next year, we will follow the [illegible] in November and December for implementation.*

2

[handwritten text is indicated in italics]

[logo:] IRICO Group                                                                    175
Corporation
IRICO Color Picture Tube
General Factory

*Tao Kui: Report the housing reform.*

*Li Luoping:*

*According to market requirements, it was completed at the end of September, and the factory has reported it to the municipal level. 4,688 units, transition, reporting of several special circumstances, one style, motorcycle accident.*

*Based on double allowances.*

*No 20% will be added, and it will be paid according to the salary.*

*There are 8 group buildings in the new area, and the area was increased by 2 m². It would be handled if it works in the city; if it does not work, just drop it.*

*The houses of individual leaders and staff participate in the housing reform according to the location of the registered permanent address, (the house of Chief Wu should be considered as a borrowed house, and should not participate in the local housing reform, and for the houses of others, a portion of the payment should be refunded.*

*For the part of Rao Chenghui's house area exceeding the area, the payment should be made out of own pocket*

*Tao Kui:*

*1. Report the matter of Xi'an Radio No. One Factory's purchasing more than 10 mu of land. The property rights certificate of 15 mu of land has been held by the life insurance company.*

*The final land cannot be sold; in case that strikebreakers hassle, if the land is not sold, it can be used to compensate for some loss.*

3

CONFIDENTIAL                                                        IRI-CRT-00008428E

[handwritten text is indicated in italics]

[logo:] IRICO Group                                                            176
Corporation
IRICO Color Picture Tube
General Factory

*2. Report the production situation of the Xi'an Radio No. One Factory. Last week, Niu Xin'an started working over there as deputy factory director of the General Factory, the leadership team is revoked.*

*Xing Daoqin:*

*Report the production situation of 14″ color picture tubes, the 25″ deflection production situation, and the 15″ CDT deflection production situation and the production and use situation of natural gas.*

*Wu Yingzhong:*

*1. Report the product quality situation. The first factory once encountered a situation of blue spot, which has been basically controlled.*

*2. The response of 25″ leaf spring is problematic and now is being corrected.*

*Ma Shitai:*

*1. Report the progress of the projection TV work.*

*2. Origin of the packaging of projector: Shaanxi Xianyang or product code, each type is OK.*

*3. Report the progress of the cooperation for projector in Hu County.*

*Wu Yingzhong:*

*1. We need to continue to propel the cooperation in Fu County, and keep them*

CONFIDENTIAL                                                            IRI-CRT-00008429E

[handwritten text is indicated in italics]

[logo:] IRICO Group                                                                        177
Corporation
 IRICO Color Picture Tube
 General Factory

*2. The cooperation with University of Electronic Science and Technology in China for projector also needs to be promoted.*

*Xu Quancheng:*

*Report the technological transformation and measures. For next year, 158 items of technological transformation and measures, with a fund of RMB 2126.968 billion. After review and approval, implement 54 items, with a fund of RMB 17.8521 million.*

*△ ○ For the automation of screen coating, develop one line first. For the semi-automation of compressing mold, work on feasibility first and then demonstrate, and the technological transformation projects with relatively large investment may be implemented with international bidding.*

*Liu Zhenzhu:*

*Report the forecast of the benefits for next year.*

*According to 7.6 million units, the current prices are RMB 200 for 14″, RMB 400 for 21″, and RMB 500 for 25″ (all tax-excluded)*

*2.4 million units of 14″. RMB 220 ~ 260. RMB 256 - 300.*

*3.18 million units of 21″. RMB 427 ~ 550.*

*686,000 units of 15″. RMB 470 ~ 555.*

*Calculation results:*

*Sales revenue is RMB 3.9 billion.*

*15″ CDT: loss of RMB 55 million.*

*Glass RMB 50 million.*

CONFIDENTIAL                                                                      IRI-CRT-00008430E

[handwritten text is indicated in italics]

[logo:] IRICO Group                                            178
Corporation
IRICO Color Picture Tube
General Factory

*Electronic gun + RMB 16 million.*

*Fluorescent powder RMB 17.2 million.*

*Power plant RMB 27 million.*

*Shadow mask factory RMB 9.48 million.*

*Machinery plant RMB 3.36 million.*

*Tool factory RMB 230,000.*

*Material company RMB 11.8 million.*

*Sales Company: Balance (Profit & Loss)*

*Profit: RMB 328.95 million (240 million digest RMB 60 million)*

*Next year's profit: RMB 180 million, digest the burden.*

*Zhang Fengqin:*

*Report the guiding principles and goals for 1999*

*Goods return rate is set at 4%*

*Wu Yingzhong:*

*Report the new product work plan for 1999*

*Wu Weiren:*

*1. Do a good job in safe production*

*2. Secretary Tao to urgently negotiate two pieces of land*

*3. We need to enhance and improve next year's technology management system*

6

CONFIDENTIAL                                              IRI-CRT-00008431E

[handwritten text is indicated in italics]

*4. [illegible] management and functional management should be strengthened, especially those of the import and export company cannot be handled by the subordinates.*

*5. Financial director, issue a document to stop stockpiling*

*6. The economic situation is still very tough next year and still poses a certain threat to consumer goods.*

*7. In the next year, we need to appropriately increase investment. If the Xianyang factory does not invest in the renovation, it will halt without making progress. Transform or establish a new line, CDT and large screen tube (CRT), this requires huge fund investment, about RMB 1 billion or more, and the time is around two years. We need to control and consolidate the Xianyang base, where is the money coming from? It is still Stock Company, the branch factory listed in 1998 needs to do a good job in the fund, and the money should be centralized. If it is impossible to reach 2 billion, we could also work to reach more than 1 billion. The equipment should be advanced, and then use two ends to drive the middle. Next year, we will open the second battlefield in Xianyang, and the second battlefield is production.*

CONFIDENTIAL

172

# 行政办公会议

时间：12月1日14：00时

地点：彩虹宾馆六楼会议室

议题：

1、PDP设备订货情况（武英忠）

2、销售情况（马金泉）

3、房改情况（陶魁、李作亭）

4、生产情况（邢道钦）

5、投影电视进展情况（马世太）

6、技改、技措情况汇报（法律处徐全成）

7、99年效益预测汇报（财务处刘珍珠）

主持人：吴维仁，

参加人：薛宝收、武英忠、马金泉、
　　　　陶魁、邢道钦、李作亭、
　　　　马世太、马世太。

列席人：刘珍珠、徐全成、张师傅。

记录：牛文喜

CONFIDENTIAL
IRI-CRT-00008425

彩虹集团公司
**彩虹彩色显像管总厂**

张英忠：汇报PDP设备订货情况。

PDP生产线设备引进约一个亿，设计按3200万设计，设备费用1400万美金，2程高�ろ 1900万人民币。链能约10万台/年。

郭新林：

氧化铟设备，职网印刷机，费用800万美金，大室烧结，真空设备，浆料设备，倒扣机，孔层的转换设备，高喷、清洗？干燥室设备。

张英忠：

比照王家试验线。设比王家实验室，王程细科已购单机，已经试验。王程设备费大约2 5000万美金。

穆经理：

实验室已经4000万的量，关键现状2程把握性如何，投现第二阶段。

郭新林、张英忠：
建设问题室一步到位问。

陆璐：
从量上讲400到5000，是我们很大
                1

彩虹集团公司
## 彩虹彩色显像管总厂

如果技术上差不多。即公差是在这以千
件。好也好价。公宝儿承爱这么
我想以把层提大，一举到位。

马金东：

马经手的理 是技贵明东 400~500g
掌握技术，第二步再提到 5000到18
块。

薛宗以：

我问是小厂专的意见。是掌握 技术，
再把座层提上去，是接一个说子。

吴继仁：

设备多買好的設备，分好期定
生铺底。再加大号号地扩资。

马金东：以报看了的信件事先。
1.到公会议，每月十次。们月会议
设定了和专业再该一次任格河队
5新了以 岁以结了20え。岁以了
580~590之 影岁我以及问 号川岁价
但爱子广多把95石的号（岁以。以
专了仍价 任结的号接以，门同任'岁以

2

彩虹集团公司
**彩虹彩色显像管总厂**

执行.

陶总题: 汇报门改情况.

李法军:

按市有办公的规定成. 以工代报
到年止。4688房. 已过渡. 汇报小户按
建情况. 一号楼. 谱报告文故.

按改修 补处点.

不加20%, 按2省走.

新区建围棋8栋. 面积暗大2㎡. 职工些
够够地 处办. 路不通 处算了。

个别情景和小个人员的房主 按户小向在
地考虑 门改. (是总的住房算借房. 不考
办起地向 门改,) 书使人向房 起此部小
款项.

缺成责任房两抽 选此部了 化拘钱

陶总题:

小汇报起化一厂买10㎡ 高地向 多少高.
小高地 事权分 已交人价.
高停向土地不多卖 者成 此工阖
了, 不卖经几年 完毕这一些 搞出.

3



彩虹集团公司
**彩虹彩色显像管总厂**

176



彩虹集团公司

**彩虹彩色显像管总厂**

177

2、对电投资和技术改造也是措施.

徐剑说：

以技改、投产为借…

跟技改、技改项目158项，造金21269.68
万元,决心今同志实施54项,造金1785.21
万元.

△0完备自动化、自起一条线、扩搬
中…自起化自起技术改造，一定认识，投入
较大的技改项目审查新配置技术。

2】跨珠：

以扩规模产数管为21只项 精选.
技760万只、月产品价格 14" 200元.
21" 600元.   25" 500元.(彩虹气预)
14" 240万只.  220元~260元.2562-300元.
21" 318万只      427元-550元.
15" 68.6万只      470元-555元.

以销售收率:

销售收入 39亿元.
15"COT 3.5500万元.
利润 5000万元.

5



彩虹集团公司
彩虹彩色显像管总厂

178

电子枪 +1600万元.
荧光粉 1720万元
动力 2700万元
网版厂 948万元
机械厂 336万元.
2号厂 23万元
物资部 1180万元.
销售[illegible] 平衡了(略亏)
利润： 3.2895亿元 (2.4亿 消化600万元)
明年利润：1.8亿元，消化包袱.
张[illegible]：
1. 汇报99年资料目标
退货率定在4‰
武英杰：
1. 汇报99年预算计划
吴维仁：
1. 抓好安全生产.
2. 陶书记抓紧把班组地位[illegible]下来，
3. 明年的技术[illegible]

6

彩虹集团公司
彩虹彩色显像管总厂

170



# EXHIBIT 59



City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document "**IRI-CRT-00020490, and '501-'502**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

_____
Dan McCourt

Sworn to before me this
September 14, 2022

_____
Signature, Notary Public



_____
Stamp, Notary Public

Exhibit
Wang 8563
Wang Zhaojie - V1

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.400.8840  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

**Irico Group Co., Ltd.**

# <u>Payment Certificate</u>

| [illegible] account   101 Cash | | | *January 13, 1998* | | | | | | Certificate No. <u>*19*</u> | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Summary | Opposite account | | | Bookkeeping | Amount | | | | | | | | | | |
| | Debit account | Detailed account | Subaccount | | Ten Million | Million | Hundred Thousand | Ten Thousand | Thousand | Hundred | Ten | Yuan | Jiao | Fen |
| [illegible]*Wang Zhaojie reports that it is used to entertain customers* | 503[illegible] | *0906* | | | | | | RMB | *3* | *2* | *9* | *7* | *0* | *0* |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| Total: (in words) *Three thousand two hundred and ninety-seven yuan only* | | | | | | | | | | | | | | |

| Receiving unit | Payee *Wang Zhaojie* | | Check No. | | Attachment   *1* |
|---|---|---|---|---|---|
| Chief accountant | Bookkeeping | Reviewed by | Prepared by *Min Juanying* | | Cashier |

[QR Code] Created by Cam Scanner

CONFIDENTIAL

IRI-CRT-00020490E
Translation

**(If there is no cut-and-paste amount at the bottom of the invoice or the par value of the invoice is inconsistent with the cut-and-paste amount, it shall not be entered into the account)**

[seal: illegible]

**Cut-and-paste invoice of catering industry in Xianyang City**

**Invoice copy**

Xian Di Shui (97) catering third copy

[illegible] [illegible] [illegible]

Invoicing date: *January 3, 1998*                    No. 0250534

[illegible]

| Customer name | | | | Address | | | | | | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|
| Item | Unit | Quantity | Unit price | Amount | | | | | | |
| | | | | Thousand | Hundred | Ten | Yuan | Jiao | Fen | |
| *Meal expenses* | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| Total RMB (in words) | *One hundred and twenty* | | | *RMB* | *1* | *2* | *0* | *0* | *0* | |
| Invoicing unit (seal) | | Payee | | | Drawer | | | | | |

The second copy of reimbursement voucher

[seal: Xi'an Xianyang International Airport Hotel ]

[QR Code] Created by Cam Scanner

CONFIDENTIAL

IRI-CRT-00020501E
Translation

**(If there is no cut-and-paste amount at the bottom of the invoice or the par value of the invoice is inconsistent with the cut-and-paste amount, it shall not be entered into the account)**

[seal: illegible]

**Cut-and-paste invoice of catering industry in Xianyang City**

**Invoice copy**

*Entertained Chief Jin of Huafei Tech at the airport*                      Xian Di Shui (97) catering third copy

[illegible] [illegible] [illegible]

*Handled by Wang Zhaojie*

[illegible]   *January 3, 1998*                                            No. 0250534

| [illegible] | | | | Address | | | | | | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|
| Item | Unit | Quantity | Unit price | Amount | | | | | | |
| | | | | Thousand | Hundred | Ten | Yuan | Jiao | Fen | |
| *Meal expenses* | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| Total RMB (in words) | *One hundred and twenty* | | | *RMB* | *1* | *2* | *0* | *0* | *0* | |
| Invoicing unit (seal) | | Payee | | | Drawer | | | | | |

[seal: Xi'an Xianyang International Airport Hotel ]

[illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]

[QR Code] Created by Cam Scanner

CONFIDENTIAL

IRI-CRT-00020502E
Translation



彩 虹 集 团 公 司
# 付 款 凭 证

19 98 年 1 月 13 日          凭证编号 19

借方科目 101 现                 金

| 摘　　　　要 | 对　方　科　目 | | | | 记帐 | 金　　额 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 借方科目 | 明细科目 | 子 | 目 | | 千 | 百 | 十 | 万 | 千 | 百 | 十 | 元 | 角 | 分 |
| 王昭杰 报批待客户费用 | 503产品销售费用 | 0906 | | | | | | | ¥ | 3 | 2 | 9 | 7 | 0 | 0 |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |

合计(大写) 叁仟贰佰贰拾玖柒圆整

| 领款单位 | | 领款人 王昭杰 | 支票号 | | 附件 一 | 张 |
|---|---|---|---|---|---|---|
| 会计主管 | 记帐 | 审核 | 制表 闫娟英 | | 出纳 | |


扫描全能王 创建

CONFIDENTIAL                    IRI-CRT-00020490



 扫描全能王 创建



扫描全能王 创建

IRI-CRT-00020502