# EXHIBIT 60



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document "**IRI-CRT-00008191_205-208**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

_____
Dan McCourt

Sworn to before me this
August 22, 2023

_____
Signature, Notary Public



_____
Stamp, Notary Public

012

[handwritten text is indicated in italics]

# Meeting minutes

**Name of the meeting:**     *Administrative office meeting*

**Meeting time:**     *8/12/1997*

**Meeting location:**   *Three small*

**Hosted by:**    *Wang Liguang*

**Attendees:**    *Wang Liguang, Tao Kui, Xing Daoqin, Li Zuoting, Ma Shitai, and Mu Haoping*

**Non-voting Attendees:**

**Meeting agenda:**

**Recorded by:**     *Shi [illegible]zhong*

CONFIDENTIAL

IRI-CRT-00008205E

[handwritten text is indicated in italics]

---

**IRICO Group Corporation**
## IRICO Color Picture Tube General Factory

*Administrative office meeting*

*Time: 8/12/1997*

*Location: Three small*

*Personnel: Wang, Tao, Xing, Li, Mu, Ma*

*Wang:  1. I will report the situation of this trip. This time I visited five major companies in Taiwan: Chunghwa, Royal, Xingge [SYNCO], BenQ, and Qunlu.*

*① 15" cooperation, 17" cooperation, technical cooperation, automation, process change, give us help.*

*② Xingge, BenQ, Royal, after 15" is developed, have joint sales channels and the help for the development of the whole machine in the future.*

*③ Chunghwa formed independent technology, independently developed a. 17" technical assistance, b.Chemical grinding technology, equipment assistance, c. Anti [illegible], antistatic, d.automation, e. Projection television (liquid crystal) costs 20,000 yuan and produces 3000 sets per year, larger than the balance point, f.Self-developed power and power plant*

*④ BenQ:  Get display tubes developed as soon as possible, 16:9 multimedia TV photoelectric scanner, (Xingge is more advanced), the development system is changed to two parts: one for basic development and the other for application development.*

*⑤ Xingge's technology is the most advanced. Cooperate to produce 700 TVs. Use Xingge for export; for domestic sales, use IRICO, the location can be in Xi'an or Inner Mongolia. Conduct discussion in November.   The swivel flat panel display is placed on the television remote control.*

CONFIDENTIAL

[handwritten text is indicated in italics]

*⑥ Royal: DVD, cordless phone*

*2.   My deepest feeling is that technology is very essential to an enterprise, and the introduction of talents is the key. The foundation of introducing talents is the environment of using talents. Jointly create a good work environment.*

*3.   We cannot always focus on Japan, Taiwan can be a good cooperation partner.*

*4.   Some companies took the initiative to ask for cooperation, and we should study how to cooperate with others, and learn from others' strengths to make up for our own weaknesses.*

*Secretary: 1.  Regarding the issue of the development direction of IRICO School, the factory subsidizes 5.4 million yuan per year and becomes state-owned and privately run. After the specific plan is decided, give it to the Workers' Congress for passing.*

*2.   For cadre management, only a few tertiary company's managers and a few cadres of public welfare institutions are retained, and other cadres are left alone.*

*3.  The property management in the old area will be carried out after the new area is operated, and raises the price*

*4.   Small area greening is implemented by environmental protection companies*

*5.  National Day event, invite a troupe to perform*

*Factory Manager [illegible]:   There are more than 1.3 million pieces in stock, and we will produce at full capacity first, if it doesn't work, then we will arrange for rest on the National Day.*

*Chief [illegible]: The 15" CDT fee is to be decided after the headquarters consults Minister Zhang, the funds are tight*

*Chief [illegible]:  1. Do not open all lines of 4101 line 0 28 CDT, we can go to the furnaces of factory no. one and factory no. 2  to do it.*

*2. Regarding the progress of the projection television project, there will be an enterprise  report on the 20th, and a assembled prototype.*

CONFIDENTIAL

[handwritten text is indicated in italics]

*3.   The insulating liquid joint-stock company has been*

*unable to achieve the performance, so Wang Peng was*

*transferred over there*

*Factory Manager: Discussion on Factory No. One's plan*

*for changing the 25" and 29"*

*25" cost 942      29" cost 1340      glass shell 460*

*yuan*

CONFIDENTIAL

012



# 会议记录

会议名称：行政办公会.

会议时间：91. 8.12.

会议地点：三小

主 持 人：王寿广

出席人员：王寿广 陶剑 邢光琰 方作亭.
马世乐 蒋瑞平

列席人员：

会议议题：

记录人：石江中

CONFIDENTIAL

IRI-CRT-00008205

彩虹集团公司
**彩虹彩色显像管总厂**

行政办公会

时间：91. 8. 12.

地点：三办

人员：王、何、研、方、孩、马

*[以下为手写内容，字迹潦草，难以辨认]*

CONFIDENTIAL

IRI-CRT-00008206



彩虹集团公司
**彩虹彩色显像管总厂**

CONFIDENTIAL

IRI-CRT-00008207



IRI-CRT-00008208

# EXHIBIT 61

# For  Panamex様

**Beijing·Matsushita Color CRT Co., Ltd.**

Feb. 2006



# MTPD Company Profile



| | |
|---|---|
| Company Name | : Matsushita Toshiba Picture Display Co., Ltd. |
| Foundation | : 1 April 2003 |
| Head Quarter | : 1-1 Saiwai-cho, Takatsuki City, Osaka Japan |
| President | : Tatsuo Tobinaga |
| Vice President | : Taketoshi Shimoma |
| Directors | : 8 |
| Corporate Auditors | : 3 |
| Capital | : JPY10 Billion |
| Controlling Share | : Matsushita 64.5%  Toshiba 35.5% |
| Employees | : 13,797 in Global Basis (As of April 05) |



# MTPD Organization(1)

(1 July 2005)

President   T. Tobinaga
Vice President  T.Shimoma

MTPD

Personnel/General Affairs Group

Management Strategy Group

**Director  Masao Morishita**
- CSR/Legal Group
- Accounting Group
- Information System Group
- Global Cost Busting Promotion Office

- Development Group
- Design Group

**Director  Masayuki Nakamoto**
- Operation Planning & Promotion Group
- Purchasing Group
- Manufacturing Group
- Quality Assurance Group
- Components Manufacturing Group

**VP  Taketoshi Shimoma**
- MTPDA(OH) — President M. Yamanaka
- MTPDG — President E. Buettner
- MTPDM — President T. Hasegawa
- MTPDT — President H. Mitsunobu
- MTPDI — President Y. Otake
- DDI — President Y. Otake
- BMCC — President M. Yokomakura

Overseas Company

**Director  Hisashi Matsuda**
- Customer Engineering Support Group — Group Manager Tetsu Okada
- Global Sales Group — Group Manager Hirokazu Nishiyama



# MTPD Organization(2)



**Global Sales & Customer support**
Director: H. Matsuda

**Customer Engineering Support Group**
GM: T. Okada

**Team No. 1**
TL: M. Takita
ASEAN Customer
India Customer

**Team No. 2**
TL: T. Kikuchi
China Customer

Shenzhen office   *J. Shimokobe*

**Team No. 3**
TL: H. Yamazaki

**Global Sales Group**
GM: H. Nishiyama

**Marketing Team**
TL: Y. Yamamoto

**PRT & Industrial CRT Team**
TL: M. Muramatsu
PRT
VF Tube
CRT for cockpit

**Global Customer Team**
(Tokyo Branch)
TL: M. Sato
Eastern Japanese Customer

**Global Customer Team**
TL: K. Takagi
Western Japanese Customer

**Global Sales Team**
TL: M. Sanogawaya
Korea /India / CIS / Eastern Asia
Customers in Foreign Capitalized Company
Importation to China   (non BMCC CRT for China customers)

Shenzhen office   *S. Koga*
Beijing (BMCC)   *A. Kinoshita*



# MTPD Production Map in the World

**CPT Production Capacity: 23.4Mil pcs.**

MTPDG
Eslingen, Germany
L to VL-size: 1.5M

MTPDA (OH)
Troy, OH, U.S.
VL-size: 1.0M
PRT: 2.0M

**BMCC**
Beijing, China
S to VL-size: **8.2M**
PRT: **2.0M**

**MTPDT**
Patumtani, Thailand
M to VL-size: **4.7M**

**MTPDM**
Shah Alam, Malaysia
M to L-size: **5.5M**

**MTPDI / DDI**
Jakarta, Indonesia
S to M-size: **5.0M**

| | | PF (16:9) | | PF (4:3) | | | | | | | Round (4:3) | | | | | | | | | PRT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 28" | 32" | 36" | 10" | 15" | 21" | 25" | 29" | 34" | 38" | 10" | 14" | 20" | 21" | 29" | 33" | 37" | | 7" | 9" |
| China | BMCC | ○ | ○ | | | | ●/★■ | ★ | ●/○★ | ●/○ | | | ● | | | | | | | ● | ● |
| Asia | MTPDM | | ▣·▪ | | | | ●/★ | ★ | ○/★ | | | | | ● | ● | | ● | | | | |
| | MTPDT | | ▣·▪ | | | ●/★ | ●/★ | ●/★ | ○ | ○ | | | ● | | ● | | | | | | |
| | MTPDI | | | | | ● | ● | | | | | | | | | | | | | | |
| | DDI | | | | | | ● | | | | | | | | | | | | | | |
| USA | MTPDA(OH) | ○ | ○ | | | | | | | ○ | ○ | | | | | ● | | ● | | ● | ● |
| Europe | MTPDG | ○ | ○ | ITC | | | | | | | | | | | | ○ | | ● | | ● | ● |

●:Current   ○: D-COM   ●: Iron-ARC   ★ :Slim

# BMCC introduction

## Beijing·Matsushita Color CRT Co., Ltd.



FEB. 2006

Beijing·Matsushita Color CRT Co., Ltd.



# BMCC Company Profile

- Beijing·Matsushita Color CRT Co., Ltd.(BMCC)
- Establishment : 8 September, 1987
- Registered Capital : US$250 million
- Capital Ratio : MTPD 50%, Beijing 50%

- Employee : Approx. 5,000 persons
- Area : Land / 207,000 $m^2$, Building / 186,000 $m^2$
- Products : Color Picture Tube, Projection Tube
- Production : CPT 8.5 Mil pcs. / PRT 2 Mil pcs.
- Sales Amount : RMB34.5 Billion (2005) (approx. US$420 Million)

Beijing · Matsushita  Color CRT Co., Ltd.





# BMCC Factory Map

No.6Line : 29"PF,34"SF/PF,32W
No.5Line : 29"SF

No.4Line : 21"FS, 21"PF
No.3Line : 21"FS/PF, 29"SF/PF

PRT : 7"

No.2Line : 14"
No.1Line : 21"FS

Beijing·Matsushita  Color CRT Co., Ltd.







# BMCC Organization

Beijing · Matsushita  Color CRT Co., Ltd.

**President**
総経理
M.Yokomakura
横枕光則

**Vice-President**
副総経理
Fan Wenqiang (范 文強 )
Chen Xi (陳　曦 )

**人事部**
**Human**
**Resources**
**Dept.**

**財務部**
**Financial**
**Dept.**

**営業部**
**Marketing**
**& Sales**
**Dept.**

**採購部**
**Purchasing**
**Dept.**

**開発部**
**Products**
**Business**
**Promotion**
**Dept.**

**生産技術部**
**Production**
**Engineering**
**Dept.**

**品質技術部**
**Quality**
**Engineering**
**Dept.**

**製造部**
**Manufacturing**
**Dept.**

GM    : Li Daling  李大林
AGM : K. Ueda上田一人
MGR :Guo Jing  郭京
MGR : Luzia Ben  賁臨紅

GM  :Gu Xiang Chun 顧香春
AGM:Y. Nakakura 中倉好朗

GM   : Weng Mai Xin 翁邁新
AGM : T. Shosu 正司嘉謙

**overseas@bmcc.panasonic.com.cn**

# Road Map of New Products

| | Size | Site | FY04 | FY05 | FY06 |
|---|---|---|---|---|---|
| **1) Performance Oriented** | 32"w | BMCC | D-COM  MTPDA(OH)  MTPDM  MTPDG | D-COM Normal / SemiFine | |
| **2) Site Deploy** | 33"  34" | MTPDT | | SF1.7R  FS1.3R  D-COM | |
| **3) Cost Competitive** | 29" | MTPDT  MTPDM  MTPDG | D-COM | D-COM II  D-COM II  Planned by factor | D-COM II  Iron-ARC |
| | 28"w | MTPDM | | D-COM | |
| | 25" | BMCC  BMCC  MTPDT | | Iron-ARC (59cm) | Iron-ARC  Iron-ARC (60cm) |
| | 21" | MTPDM  MTPDT  MTPDI  BMCC | | Iron-ARC / Iron-ARC MNN  Iron-ARC / Iron-ARC | Iron-ARC MNN  Iron-ARC MNN |
| | 15" | MTPDT | | | Slim  AK |



Thank you
very much !

Beijing ▪ Matsushita Color CRT Co., Ltd

Beijing ▪ Matsushita  Color CRT Co., Ltd.



# Worldwide CTV demand projection(By device)



# Worldwide CRT-CTV demand projection(By AREA)

Unit:Mil pcs







# Worldwide CTV demand forecast

# EXHIBIT 62

# PHILIPS



Draft

# Winning in China to win globally

## China Strategy Review with Supervisory Board and Board of Management

### Pre-reading

August 30, 2007
Shanghai



KPENV
100%
Philips Electronics China B. V.
100%
Philips (China) Investment Co. Ltd.
Philips China Holding
21.66%
78.34%
Philips Lighting Electronics (Xiamen) Co.Ltd.
Manufacture of Lighting Components
100%
Philips Electronics Technology (Shanghai) Co., Ltd.
Production of UHP Lighting device
25%
Zhejiang Yankon Lighting Co. Ltd.
Manufacture of CFL Lighting Products
70.1%
Feidong Lighting Co. Ltd.
Manufacture of TL Lighting Products
100%
Philips Automotive Lighting Hubei Co. Ltd.
Manufacture of Automotive Lamps
2.3%
97.68%
Philips Electronic Components (Shanghai) Co. Ltd.
Manufacture of Optical Storage and LCD
10%
41%
Philips and Neusoft Medical Systems Co., Ltd.
Manufacture and sale of CT, MRI, X-ray etc.
100%
Philips Electronics Trading & Services (Shanghai) Co. Ltd.
Export/trading
33.33%
DTVIA Conditional Access System (ChinaCrypt) Co., Ltd.
Manufacture of conditional access system related products
100%
Philips Lighting Electronics (Shanghai) Co. Ltd.
Manufacture of Lighting Components
55%
Feixin Lighting Company, Limited
Develop, manufacture and sell lighting products and components thereof
100%
Philips Domestic Appliances and Personal Care Co. of Zhuhai SEZ, Ltd.
Manufacture of DAP Products
100%
Philips Domestic Appliances and Personal Care Co. of Suzhou Ltd.
Manufacture of DAP Products
60%
Philips & Yaming Lighting Co. Ltd.
Manufacture of Lighting Products
100%
Philips Lighting Luminaires (Shanghai) Co. Ltd.
Manufacture of Luminaire Products
26.65%
Advanced Semiconductor Manufacturing Corporation of Shanghai
Manufacture of Semiconductor Products
Philips Business Communication China B.V.
95%
Philips Telecommunication Systems Limited Co. of Suzhou
Assembly of PBC-products
100%
Philips Electronics (Zhuhai) Company Limited
Manufacture of DAP Products
100%
Philips Electronics (Shenzhen) Co., Ltd.
Manufacture of Audio + DVD Products
100%
Lighting Group PLI Holding N.V.
52%
Framas Lightings Ltd.
100%
Massive Production Ningbo Company
Massive Shenzhen processing plant
PHTP High Tech Plastics Holding B.V.
100%
Philips High Tech Plastics Suzhou Limited
Manufacture of Machinery, PMF and CFT
LG.Philips Displays International B.V.
Operating Center
55%
Hua Fei Colour Display Systems Company, Ltd.
Manufacture of colour display system products
80%
Nanjing Fei Jin Magnetic Products Co., Ltd.
Manufacture of ferrite and rare earth products
17.9%
TPO Displays Hong Kong Holding Limited
TPO Displays (Shanghai) Limited
Manufacture of LCD and display components
19.9%
Philips Semiconductors International B.V. (NXP)
40.84%
Beijing T3G Technology Company Limited
Manufacture of Multi Mode Chipset
60%
Philips Jilin Semiconductor Co., Ltd.
Manufacture of Semiconductor products
100%
Philips Semiconductors (Guangdong) Co., Ltd.
Manufacture of Discrete Semiconductors
100%
Philips Electronics (Beijing) Company Ltd.
Manufacture of audio & video products, speaker systems & acoustic devices
100%
Philips Semiconductors (Suzhou) Co., Ltd.
Assembly & Testing of integrated circuits
100%
Philips Semiconductors (Shanghai) Co., Ltd.

# EXHIBIT 63



LG.Philips Hongkong 44.7 24% 35.3 22%
Philips 50%
LG 50%
SDI Korea 22.9 12% 35.3 22%
Mitsubishi 1%
SG Warburg 5%
NEC 7%
Company US 7%
SEC 19%
Other 61%
Chunghwa Taiwan 11.1 6% 35.8 22%
Tatung
technical cooperation
Sony Japan 15.5 8% 10.3 6%
Collaboration agreement Thai CRT
Matsushita Japan 17.2 9% 3.0 2%
JV?
Thomson France 19.4 10%
Thomson SA 52%
Public 17%
Alcatel 7%
Microsoft 7%
NEC 7%
DirectTV 5%
Employees 5%
Orion Korea 8.3 4% 11.0 7%
Toshiba Japan 7.8 4% 10.1 6%
partnership Ekranaz
Irico China 8.1 4% 1.5 1%
Hitachi Japan 1.2 1% 7.9 5%
Thai CRT Thailand 5.1 3% 1.5 1%
Mitsubishi 26%
Siam Cement 47%
Collaboration agreement Sony
Mitsubishi Japan 5.8 4%
Novel China 5.1 3%
SEG-Hitachi China 3.4 2%
technology Hitachi
Shenzen Electronics 59%
Hitachi ??? 25%
Create Investments 4%
Pacific Rim Assets 2%
Maxform Enterprises 2%
Smart Hill Investment 2%
Zhanjia Int.l Dev. 1%
Other 5%
Dongguan China 3.4 2%
Teco Taiwan 3.3 2%
Teco Electric & Machinery
Ekranaz Lithuania 3.3 2%
partnership Toshiba
Employees 47%
Farimex 18%
Profilo Telra 15%
Foreign Investors 14%
Other shareholders 3%
Henley Trading 3%
Samtel India 2.8 2%
JCT India 2.2 1%
Hotline India 1.6 1%
BDDL India 1.0 1%
EI Servia 0.5 0%
Testla Czech Rep 0.5 0%
Austria Lebring 3.7 10%
Brazil Manaus
Brazil SJdC 6.3 14%
China Changsha 4.5 10% 1.1 3%
China Nanjing 4.5 10% 6.4 18%
Czech Rep Hranice 0.3 1%
France Dreux 3.0 7%
Germany Aachen 2.1 5%
Indonesia Jakarta 4.1 9%
Korea Changwon 3.4 8% 6.9 20%
Korea Kumi 2.5 6% 12.5 35%
Mexico Gomez Palacio 0.6 1%
Spain Barcelona 5.7 13%
UK Durham 3.3 7%
UK Newport 4.8 14%
USA Ottawa 4.4 10%
Brazil Manaus 2.1 6%
China Shenzhen 2.2 10% 4.5 13%
China Tianjing 1.5 7% 2.1 6%
Germany Berlin 3.4 15%
Korea Pusan 4.0 17% 11.7 33%
Korea Suwon 1.0 4% 9.4 27%
Malaysia Seremban 7.4 32% 5.5 16%
Mexico Tijuana 3.4 15%
China Fuzhou 12.8 36%
Malaysia Shah Alam 6.5 59% 11.2 31%
Taiwan Taoyuan 4.2 12%
Taiwan Yangmei 0.5 4% 7.7 21%
UK Motherwell 4.1 37%
China Shanghai 1.0 6%
Japan Inazawa 0.5 3% 6.0 58%
Japan Nagoya 2.1 14% 1.4 14%
Singapore Tuas 5.0 32%
UK Bridgend 2.4 16%
USA Pittsburgh 1.0 6%
USA San Diego 3.5 23% 2.9 28%
China Beijing 6.1 35%
Germany Esslingen 1.1 6%
Japan Hirade 1.2 40%
Japan Kiyohara 0.7 4%
Japan Takatsuki 0.5 3%
Malaysia Kuala Lumpur 5.5 32% 1.8 60%
USA Troy 3.4 20%
China Foushan 2.2 11%
Italy Anagni 2.8 14%
Mexico Mexicali 0.6 3%
Mexico Mexico City 1.0 5%
Poland Polkolor 5.5 28%
USA Marion 5.1 26%
USA Scranton 2.2 11%
France Longwy 1.9 23%
Korea Kumi 2.4 29% 9.0 82%
Mexico Mexicali 2.0 24% 2.0 18%
Vietnam Hanoi 2.0 24%
Indonesia Jakarta 2.3 29%
Japan Fukaya 1.2 15% 3.3 33%
Japan Himeji 1.6 20% 1.8 18%
Thailand Pathumthani 1.8 23% 4.7 46%
USA Horseheads 1.0 12% 0.4 3%
China Xiangyang 8.1 100% 1.5 100%
Japan 2.0 26%
Malaysia 1.8 23%
Singapore 4.1 52%
USA Greenville 1.2 100%
Thailand Sriracha 5.1 100% 1.5 100%
Japan Kyoto 3.8 66%
Mexico Mexicali 2.0 34%
China Shanghai 5.1 100%
China Shanghai 3.4 100%
China Dongguan 3.4 100%
Taiwan Guangyin 3.3 100%
Lithuania Panavecis 3.3 100%
India Delhi 2.8 100%
India Baroda 1.4 64%
India Mohali 0.8 36%
India Gwalior 1.6 100%
India Delhi 1.0 100%
Servia Nis 0.5 100%
Czech Rep Roznov 0.5 100%

# EXHIBIT 64
## (FILED UNDER SEAL)

# EXHIBIT 65

01.05.03.30

## AMENDMENT N°1 TO A CONSULTANCY AGREEMENT

Between:

**SELIGENT Limited**, a company organized and existing under the laws of Hong Kong with its place of business at Units C & D, 16/F., Trust Tower, 68 Johnston Road, Wanchai, Hong Kong, duly represented by **Mr. Raymond Young** acting in its capacity of General Manager,

hereinafter referred to as **"SELIGENT"**,

And:

**THOMSON TUBES & DISPLAYS S.A.,** a company duly organized and existing under the laws of France and having its place of business at 46, quai Alphonse Le Gallo, 92100 Boulogne-Billancourt, France, duly represented by **Mr. Didier Trutt**, acting in its capacity of Chairman,

hereinafter called **"TTD"**.

HIGHLY CONFIDENTIAL

Whereas TTD and Seligent (hereinafter "the Parties") signed a consultancy agreement (réf CO04C013J) dated February 1st, 2005 (hereinafter "the Consultancy Agreement").

Whereas the Parties wish now to amend this Consultancy Agreement as described below:

1.   Article 3 of the Consultancy Agreement is completed as follows:
Seligent shall (i) provide TTD and its Chinese subsidiary Thomson Guangdong Displays Co Ltd (TGDC) with appropriate assistance in order to realize the desired capital increase of TGDC, (ii) assist TGDC and TTD with the view to obtain from the competent local and governmental authorities all approvals and authorizations required to achieve this capital increase on or before August 31st, 2005.

2)   Article 5 of the Consultancy Agreement is completed as follows:
In consideration of Seligent's performance contemplated in Article 3 above, Seligent shall be entitled to receive a success fee of USD 3 (three) Million besides the fixed fee, to be paid at the closing date of the acquisition of Thomson's tubes business by a third party (referred to as Ceylan project between the Parties).

3.   All other provisions, obligations and stipulations of the Consultancy Agreement shall remain in full force and effect.

4.   This amendment shall be effective as of June, 24, 2005

The Parties have caused this Amendment to be signed by their duly authorized representative in two (2) originals, one having been returned to each Party.

**THOMSON TUBES & DISPLAYS SA**                **SELIGENT**

Name: Didier TRUTT                             Name: Raymond Young

Signature:                                     Signature:

Date:                                          Date:  30/6/2005
       3/01/2005

# EXHIBIT 66

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION,<br><br>THIS DOCUMENT RELATES TO:<br><br>*DIRECT PURCHASER ACTIONS* | Case No. 3:07-cv-05944-JST<br><br>MDL No. 1917 |

# EXPERT REPORT OF HENRY GAO

# MAY 26, 2023

1. I have been retained by the Direct Purchaser Plaintiffs ("DPPs") in the current action to provide an opinion about the existence and enforcement, if any, of a pricing regulatory framework in China involving color cathode ray tubes ("CRTs") and color televisions ("TVs").

2. I am currently a Professor of Law at Singapore Management University's Yong Pung How School of Law.  From 2003 to 2004, I was on the law faculty of the City University of Hong Kong.  From 2005 to 2007, I was on the law faculty of the University of Hong Kong.  I joined the School of Law of Singapore Management University in late 2007 and have been teaching various subjects including Chinese law since then.

3. I have published widely in the field of Chinese economic policy and international trade. A full copy of my curriculum vitae including a list of publications is attached hereto as Appendix 1.  I am a native speaker in Mandarin Chinese.  I am being compensated for my work at my customary hourly rate of $1,050 per hour.  This compensation is in no way connected to the outcome of this litigation.

4. I earned my Juris Doctor degree from Vanderbilt Law School in 2002, with a certificate of Law and Business from Vanderbilt's Owen Graduate School of Management.  Prior to law school, I earned an LL.M. from University College London in 1999, along with a Certificate in Law Teachers Program.  I earned an LL.B. from China Youth University of Political Studies in Beijing, China in 1998.

5. I have served as adviser or consultant on Chinese trade and economic law matters to a number of bodies, including the Ministry of Commerce of China, the World Bank, and the International Monetary Fund.  I have testified on aspects of the Chinese trade and economic law before the United States International Trade Commission, and Committee on International Trade of the European Parliament.

6. I have been asked to provide an opinion on the following matters:

   a. The legal interpretation of the documents attached to the March 16, 2022 Expert Report of Donald Clarke (the "Pricing Documents").

   b. The existence, if any, of an enforced pricing regulatory framework in China involving CRTs and TVs.

7. My conclusions, as set forth in more detail below, are as follows:

   a. The Pricing Documents prohibit manufacturing firms from dumping their industrial products at low prices, which are defined as selling products at prices lower than a manufacturer's own production costs.  Professor Clarke's interpretation conflates the average industry production costs and a manufacturer's own production costs, which leads to his incorrect conclusion that dumping determinations are based on industry-average production costs.

b. To search for evidence of enforcement actions, I conducted a search for terms including ("color CRTs" or "color TV") and ("low-price dumping" or "price war") in Google, baidu (the largest search engine in China), and China Academic Journals (CAJ, also known as CNKI), the most comprehensive, full-text database of Chinese journals in the world.  I did not find evidence showing the existence of systemic enforcement actions by the Chinese government.  While there were some sporadic private enforcement actions by a group (termed a "price alliance") of color TV manufacturers, these attempts were not supported by the government.  Instead, the government ruled that the attempts to implement the minimum pricing scheme violated higher-level pricing laws and ordered the price alliance to stop enforcing the pricing scheme.

## Legal Interpretation of Pricing Documents

8. The Pricing Documents were issued by various government agencies in China.  The Pricing Documents relate to low-price dumping, and in particular, the production costs of CRTs and TVs.

9. I was able to obtain three of the seven Pricing Documents from the Chinalawinfo Pkulaw Database[1], one of the leading commercial databases for Chinese law jointly launched by Peking University and Chinalawinfo and comparable to LexisNexis and Westlaw in the United States.  As to the other four documents, while I was not able to acquire copies of these documents on my own, they appear to be genuine and authentic because both their format and appearance, including the font, punctuation, paragraph spacing and margins, and their choices of wording and grammar are similar to the Chinese government regulatory documents I have seen in the past.

10. The Pricing Documents have the status of rules of departments, as defined in Article 71 of the Law on Legislation of China, and would have been binding and potentially enforceable on producers in China.  See Exhibit 1 at 8-9.  However, according to Article 79 of the Law on Legislation of China, "the effect of laws is higher than that of administrative regulations, local regulations, and rules."  Ex. 1 at 9.  Thus, the Pricing Documents are only binding and enforceable to the extent that they do not contravene the relevant laws, such as the Price Law of China.

11. In paragraph 13 of his March 16, 2022 Report, Professor Clarke summarized the regulatory framework in the Pricing Documents as follows:

> Producers are required to submit information about costs to the regulator. The regulator then issues a document containing minimum prices.  The producers may not price below those minima.  If they do, they are subject to a variety of sanctions, ranging from warnings to fines to the loss of their business license.

12. In my opinion, this legal interpretation is inaccurate because it conflates the average industry production costs and a manufacturer's own production costs, and suggests that

---

[1] www.pkulaw.com

dumping determinations are based on the industry-average production cost rather than a manufacturer's actual costs.  Instead, based on the clear wordings of the relevant regulations, I am of the view that the dumping determinations shall be based on a manufacturer's own costs.  Below, I will set out my opinion by referring to specific provisions in the Pricing Documents as referred to by Professor Clarke in his March 16, 2022 Report.

13. The first relevant document is the Notification of the State Planning Commission and the State Economic and Trade Commission regarding Issuing Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products and Strengthening Price Self-Discipline of Industries (国家计委、国家经贸委关于发布《关于制止低价倾销工业品的不正当价格行为的规定》和加强行业价格自律的通知), issued Nov. 16, 1998, effective Nov. 25, 1998 (the "1998 Notice"), which was attached as Appendix 2 to Professor Clarke's March 16, 2022 Report.

14. To start with, Article 4 of the 1998 Notice stated clearly that "[t]he unfair price actions through dumping of industrial products herein refer to actions of a business operator to expel competitors or monopolize the market, such as a production enterprise sells industrial products at prices lower than *the enterprise's production costs*" (emphasis added).  This is confirmed by Article 5, where all of the eight examples of dumping listed therein made explicit reference to "prices lower than *the enterprise's production costs*" (emphasis added).

15. Conversely, cases where the selling prices were lower than industrial average production costs were not necessarily regarded as dumping.  This is confirmed by Article 10, which stated that, "[i]n the case where a manufacturing enterprise sells industrial products at prices lower than industrial average production costs," while "any organization or individual may report the case to a competent government department in charge of prices," no determination of dumping actions would be made until there was a positive finding after an investigation.  Further confirmation is provided by Article 12, which stated that a positive finding would only be made when the investigation found the enterprise to "truly have one of the unfair price actions listed in Article 5 of the Regulations," which, as mentioned above, only referred to "prices lower than the enterprise's production costs" and did not mention "prices lower than industrial average production costs."

16. According to the 1998 Notice, the only cases where prices lower than industrial average production costs may be used "directly" as a basis for a determination of dumping is Article 15, but this is only done "temporarily" when it is "difficult "to verify *individual costs* thereof within a short period" (emphasis added).  In other words, if the authorities could verify the individual costs and such costs are below the selling prices, then the authorities shall not regard it as dumping.

17. The second relevant document is the Notification of Reporting Cost Information for Color TV and Color CRT Industry (关于报送彩电、彩管行业成本资料的通知), Feb. 3, 1999 (the "1999 Reporting Notice"), which was attached as Appendix 3 to Professor Clarke's March 16, 2022 Report.  Paragraph 2 of the 1999 Reporting Notice states that:

On the basis of production and cost information reported by the enterprises, this Ministry will estimate and publish industry average production costs of some of color TVs and color CRTs.  For enterprises with sales prices lower than the average industry production costs, this Ministry will work with the State Planning Commission and other departments to perform investigations pursuant to the Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products.  Enterprises found through the investigation to truly have actions of unfair price competition through dumping will be punished.

18. This is consistent with the 1998 Notice which states that firms that are selling at prices lower than the average industry production costs are not automatically regarded as engaging in dumping.  Instead, whether they are engaging in dumping shall be determined through an investigation pursuant to the Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products.  Had selling at prices lower than the average industry production costs been automatically regarded as engaging in dumping as Professor Clarke suggested, there would have been no need for such investigation.

19. The third relevant document is the Circular of the State Development Planning Commission on Issuing the Measures for Determining the Cost of Low-price Dumped Industrial Products (Trial) (国家计委关于印发《低价倾销工业品的成本认定办法（试行）》的通知), issued February 23, 1999, effective March 1, 1999 (the "March 1999 Circular"), which was attached as Appendix 4 to Professor Clarke's March 16, 2022 Report.  As can be seen from various provisions therein, the March 1999 Circular was designed to determine the unit costs of specific enterprises rather than average industry production costs.

20. For example, Article 9 of the March 1999 Circular, states in paragraph 2 that (emphasis added):

After a case is filed, if cost investigation is necessary, the government's price department can conduct cost investigation, or commission the industry regulator, industry association or an intermediary to do the job.  Investigators (No less than two persons) shall determine the *enterprise's cost* according to the Accounting Law of the People's Republic of China, the Accounting Standards for Business Enterprises, the General Rules for Enterprise Finance, and industry financial accounting systems, as well as authentic and reliable data provided by the enterprise, and issue a cost determination report.

21. The certified translation of Article 4 of the March 1999 Circular states that:

The cost of industrial products mentioned in the Measures refers to the unit cost incurred in the production and sales of such industrial products.

4

22. The English translation omits a word that appears in the original Chinese text. Completely translated, Article 4 reads as follows (emphasis added):

> The cost of industrial products mentioned in the Measures refers to the [*enterprise's*] unit cost incurred in the production and sales of such industrial products.

23. As mentioned above, in paragraph 13 of his March 16, 2022 Report, Professor Clarke summarized the regulatory framework in the Pricing Documents by stating that the producers may not price below the "document containing minimum prices" issued by the regulator. Based on the context of Professor Clarke's March 16, 2022 Report, such "document" apparently refers to a document establishing average industry production costs published by the government pursuant to the 1999 Reporting Notice. But this interpretation is erroneous as it is directly contravened by the provisions in the March 1999 Circular discussed above.

24. The fourth relevant document is the Notification that the State Planning Commission and the Ministry of Information Industry print and distribute Trial Measures to Prevent Unfair Price Competition Regarding Color CRTs and Color TVs (国家计委、信息产业部印发关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法的通知), issued March 15, 1999, effective April 1, 1999 (the "April 1999 Notice"), which was attached as Appendix 5 to Professor Clarke's March 16, 2022 Report. Article 3 of the Trial Measures to Prevent Unfair Price Competition Regarding Color CRTs and Color TVs attached to the April 1999 Notice explicitly states that (emphases added):

> The actions of unfair price competition herein refer to actions of a business operator to sell products at prices lower than *the enterprise's cost* or sell products at low prices by reducing costs using unfair means, so as to expel competitors or monopolize the market, which disrupt normal production and operation orders and harm the national interest or legitimate rights and interests of other business operators.

25. This is further confirmed by Article 4 of the April 1999 Notice, which states that (emphases added):

> The following actions of color CRT and color TV operators are actions of unfair price competition:
>
> (I) Ex-factory prices of a manufacturing enterprise are *lower than its production costs* in the same period, and sales prices of a marketing enterprise are lower than its purchasing costs in the same period;
> (II) Actual ex-factory prices of a manufacturing enterprise are made to be *lower than its production costs*, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by means of discounts, subsidies, and offering extra quantities;
> (III) Sales are made at low prices by means of using raw materials and parts and components imported through smuggling, lowering

performance indexes, using shoddy products as good products, reporting false costs, etc.;

(IV) A color CRT buyer with relatively great advantages in market shares uses its advantageous position to force a color CRT manufacturing enterprise to sell products at prices *lower than its production costs*;

(V) Actual ex-factory prices of a manufacturing enterprise are made to be *lower than its production costs* in the same period, or actual sales prices of a marketing enterprise are made to be lower than its purchasing costs in the same period by using other means.

26. In other words, other than section III of Article 4, which refers to the quality of the products and thus is unrelated to production costs, all of the four examples which refer to the costs of the products made clear that the reference point is the enterprise's own production costs.

27. This is also indirectly confirmed by Article 10 of the April 1999 Notice, which states that (emphasis added):

> When performing inspections, a competent department in charge of prices should first use *individual costs of producers or operators* as a main determination basis.  When it is difficult to confirm an individual cost, industrial average production costs and a reasonable amplitude of price decrease are used as main determination bases.

28. Moreover, while Article 7 of the April 1999 Notice provides for the possibility of investigation "where a manufacturing enterprise sells products at prices below published industrial average production costs, or a marketing enterprise sells products at prices below its purchasing costs in the same period, leading to market price disorder and harms to interests of other manufacturing enterprises or marketing enterprises," Article 9 made clear that the investigations are limited to "actions of unfair price competition listed in Article 4 of the Measures," which, as discussed above, refers to sales lower than the enterprise's own production costs.

29. In addition to the numerous confirmations from the texts of the regulations, the interpretation that dumping determinations shall be based on a manufacturer's actual costs instead of average industry production costs is also explicitly supported by the official reply by the Price Department of the State Planning Commission to the Price Bureau of Guangdong Province in January 1999 ("The 1999 Reply").  See Exhibit 2. This document was found through the Chinalawinfo Pkulaw Database mentioned above. In addition, it can also be found on the website of the Guangdong Provincial Development and Reform Commission.[2]  The 1999 Reply states that:

> According to the "Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products" (hereinafter referred to as the "Regulations") issued and implemented by the State Planning Commission

---

[2] http://drc.gd.gov.cn/ywgg/content/post_867871.html.

and the State Economic and Trade Commission, the determination and investigation of low-price dumping by a company should be conducted in accordance with the company's own costs. The competent department in charge of an industry, with the approval of the State Planning Commission, publish the average cost of the industry in order to guide companies in setting reasonable prices and strengthening price self-discipline. When a company sells at a price which is lower than the published industry average cost, other operators may report it accordingly. However, when the price department determines and investigates whether there is low price dumping by a company, it may not use the average cost of the industry as the basis for the determination and investigation of dumping (except in the case of the scenarios mentioned in Article 15 of the "Regulations"). As long as the company does not sell below its own cost, even if it is lower than the average cost of the industry, it is still not deemed to be low-price dumping.

30. Additional support for such interpretation can also be found by the interpretations given by the officials at the State Planning Commission, in two articles published in their official capacities. Both articles are published in the journal "Price: Theory and Practice" and were located in the CAJ database using the search terms mentioned above. In China, it has been very common for government ministries to establish journals under their auspices, so that the officials can publish their authoritative interpretations of various policy instruments before it is finalized as formal government documents. This is why the journal "Price: Theory and Practice" is regarded as the most authoritative journal in the field of price regulation because it was established under the auspices of the State Planning Commission and regularly features contributions by top officials in charge of China's price policy.

31. The first is a 1999 article by Bi Jingquan, Director General of the Price Department of the State Planning Commission titled "Carry out the Price Law and Promote Price Reform." See Exhibit 3. As its name suggests, the Price Department of the SPC is the main agency in the central government of China in charge of the formulation and enforcement of price policies and regulations. In the article, Bi explained that (emphases added):

> Upon research, we drafted the "Interim Regulations on Stopping Flat Glass Dumping at Low Prices", and determined that when an enterprise sell at a price that is *lower than not only the average industry cost but also its own cost*, it would be an unfair price behavior of low-price dumping. Each department in charge of a specific industry shall publish the average cost of the industry and use the average cost of the industry to guide enterprises to correctly set prices, not to blindly lower prices. *The average industry cost is a signal for reference*. If an enterprise sells products at prices lower than the average cost of the industry, others will report it, and the pricing department will investigate based on the report. *If the price is lower than its individual cost, then enforcement actions will follow immediately*.

7

32. Similarly, in another article published collectively by the State Planning Commission, Department of Economic Policy Coordination, Price Policy Laws and Regulations Division titled "Nine Color Television Companies Form Price Alliance in Violation of the 'Price Law'" in the journal "Price: Theory and Practice" in 2000 ("the State Planning Commission Article"), see Exhibit 4, the Division stated that (emphases added):

> These regulations all state that average production cost of an industry is to be determined and published by the pricing administrative department and the industry administrative department, and *only serves as guidance for society to use as a reference standard for reporting low price-dumping behavior*. The pricing administrative department holds the authority to determine and punish low price-dumping behavior.

33. To summarize, as confirmed by the four Pricing Documents, one official Reply, and two articles discussed above, the positive finding on dumping is only made when, upon investigation, the authorities determine that the firm is selling below its own production costs. The average industrial costs were to be used only as a trigger to start investigations.

## Lack of Evidence on the Existence of an Enforced Regulatory Regime

34. In addition, based on the available evidence, I do not think there has been systemic enforcement of the Pricing Documents, including the rules of departments, by the Chinese government. I also did not find evidence of government support for or enforcement of the minimum pricing scheme set by the Color TV Price Alliance ("the Alliance").

35. To search for evidence of systemic enforcement, I searched for terms including ("color CRTs" or "color tv") and ("low-price dumping" or "price war") in Google, baidu (the largest search engine in China), and China Academic Journals (CAJ, also known as CNKI), the most comprehensive, full-text database of Chinese journals in the world. If there were systemic enforcement actions, I would expect to find official government announcements, news reports, and journal articles discussing the enforcement actions by various government agencies. However, after extensive search in these websites and databases, I could not find any evidence of systemic enforcement.

36. At most, the available evidence shows some sporadic private enforcement actions by the Alliance, which was established in June 2000 by nine major color television enterprises in China, as discussed in the State Planning Commission Article.

37. The sporadic enforcement actions by the Alliance were not successful because both major TV manufacturers and major TV retailers refused to participate. Moreover, such private enforcement actions were not only not supported by the government, but also quickly called off by the government, which announced that the pricing scheme were in violation

8

of a national law known as the 1997 Price Law (the top law in the field of price regulation)[3] and ordered the Alliance to stop the enforcement actions.

38.   As an initial matter, the enforcement actions were not done by the government, but by the member firms of the Alliance.  This is confirmed by multiple articles published by officials at the State Planning Commission in their official capacities, including an article by Wei Dale, an official from the State Planning Commission's Department of Economic Policy Coordination titled "Create a Fair Environment for Market Price Competition - Written after the color television price alliance was dealt with in accordance with the law" published in the journal "Price: Theory and Practice" in 2000 ("the Wei Article"). See Exhibit 5.

39.   The State Planning Commission Article notes that "the summit participants jointly formed inspection teams," Ex. 4 at Section I, while the Wei Article noted "the summit organized price inspection teams to go to some main cities to carry out investigations on the implementation of the determined minimum at-cost prices," Ex. 5 at Section I.  There was never any mention of enforcement actions by the government.  To the contrary, the Wei Article explicitly states that "[a]ccording to the provisions of the Administrative Punishment Law and the Price Law, this kind of role can only be exercised by government price administrative law enforcement agencies, and price inspection by enterprises may only be a kind of market survey."  Ex. 5 at Section I.

40.   Further, such private enforcement actions, if any, were not successful for two additional reasons.  First, the duration of such enforcement actions was rather short.  According to the Wei Article, "the price inspection teams also conducted work for only a few days." Ex. 5 at Section I.  While the State Planning Commission Article stated that the enforcement actions lasted "more than a month," Ex. 4 at Section I, such actions could not have lasted more than two months because the Alliance was only formed on June 9, 2000 while the government order for the firms to stop the enforcement action was reported on August 8, 2000.  Second, the enforcement actions were not effective because of the lack of participation by the largest TV producer, the lack of cooperation by the retailors, and the lack of implementation by the member firms of the Alliance.  This is well summarized by the State Planning Commission Article, which noted that:

> Since the CTV price alliance was formed on June 9, the price of CTVs have not risen noticeably.  Major shopping malls paid no heed to the price limits of the price alliance out of consideration for their own interests. Most consumers felt relatively unbothered by the rising prices of certain CTVs, and purchasing behavior was rather rational.  The largest television producer in the country, Changhang Group, did not join the price alliance. Internally, the price alliance had its own conflicts, because restricting the price is equivalent to giving the market to other companies with lower costs.  Implementing the alliance's accord would mean giving away the market.  As members of the summit, Jinxing Color Television and Xihu Color Television did not implement the price restriction policy.  Judging

---

[3] See para. 15 of Professor Clarke's March 16, 2022 Report which refers to the "Price Law."

> by the market situation after more than a month since the 9 CTV
> enterprises implemented the minimum price, the price alliance did not
> achieve the expected effect in reality.  The specified alliance price has
> long been broken.  Various special promotions of CTVs are still going on,
> which means that market supply and demand and competition are still
> having a decisive effect.

Ex. 4 at Section I.

41. These enforcement actions were not supported by the government.  First of all, the
summit which led to the formation of the Alliance was only organized by the producers,
and there was no mention of backing by the government.  To the contrary, one month
after the formation of the Alliance, the State Planning Commission listed four reasons
why the Alliance is illegal, *i.e.*, violation of the Price Law, failing to comply with
regulations for prohibiting low-price dumping, lack of authority to inspect the market,
and being a price cartel in violation of the Price Law and the "Anti-Unfair Competition
Law."  Ex. 4 at Section II.4.  Second, upon deliberation, the government decided to call
off the Alliance and the enforcement actions, by announcing the following decision by
August 8, 2000:

> [O]rder the companies to self-rectify the illegal acts of the CTV alliance,
> stop implementation of alliance pricing, and announce the incident's
> course of events to news media.

Ex. 5 at Section I.

42. This decision was accepted by the TV producers, which announced through the media
their support of the government decision.  See Ex. 5.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:  May 26, 2023

_____

Henry Gao

**APPENDIX 1**

**HENRY GAO**

Yong Pung How School of Law
Singapore Management University (SMU)
55 Armenian Street
Singapore 179943
Email:  henrygao@smu.edu.sg
Office Phone:   +65 68280520

EDUCATION

JD, Vanderbilt University, United States of America, 2002
LLM, University College London, University of London, Great Britain, 1999
LLB, China Youth University of Political Studies, China, 1998

ACADEMIC APPOINTMENTS

Professor of Law, Yong Pung How School of Law, SMU, Jul 2022 – Present
Associate Professor of Law, Yong Pung How School of Law, SMU, Jan 2008 – Jun 2022
Lecturer of Law, Yong Pung How School of Law, SMU, Dec 2007 – Dec 2007
Assistant Professor of Law, Faculty of Law, University of Hong Kong, Jan 2005 – Nov 2007
Lecturer of Law, School of Law, City University of Hong Kong, Aug 2003 – Dec 2004
Consultant, Trade in Services Division, WTO Secretariat, Jan 2003 – Aug 2003
Intern, Appellate Body Secretariat, WTO, Sept 2002 – Dec 2002

## RESEARCH

PUBLICATIONS

### JOURNAL ARTICLES (REFEREED)

China's changing perspective on the WTO: From aspiration, assimilation to alienation, by GAO, Henry S. (2022). *World Trade Review, 21* (3), 342-358. https://doi.org/10.1017/S1474745622000088 (Published)

Regional mapping: Digital provisions play a key role in Asia Pacific agreements, by GAO, Henry. (2022). *East Asia Forum Quarterly, 14* (2), 25-27. https://search.informit.org/doi/abs/10.3316/informit.522332415717438 (Published)

The EU-China comprehensive agreement on investment: Between strategic opportunity and strategic autonomy, by GAO, Henry S. (2022). *Asian Yearbook of International Economic Law,* (Forthcoming)

Promising trail or perilous trap? Engaging China in the WTO and beyond, by GAO, Henry S. (2022). *American Journal of International Law Unbound, 116* 46-51. https://doi.org/10.1017/aju.2022.1 (Published)

Finding a rule-based solution to the appellate body crisis: Looking beyond the multiparty interim appeal arbitration arrangement, by GAO, Henry. (2021). *Journal of International Economic Law, 24* (3), 534-550. https://doi.org/10.1093/jiel/jgab031 (Published)

The role of law in Chinese value chains, by GAO, Henry S.; SHAFFER, Gregory. (2021). *Journal of Chinese Economic and Business Studies, 19* (3), 197-220. https://doi.org/10.1080/14765284.2021.1943183 (Published)

WTO reform: A China round, by GAO, Henry. (2021). *Proceedings of the ASIL Annual Meeting, 114* 23-32. https://doi.org/10.1017/amp.2021.4 (Published)

Trading through a pandemic: The Singaporean experience, by GAO, Henry; CHAINANI, Dhiraj G.; CHEW, Siu Farn. (2021). *Global Trade and Customs Journal, 16* (1), 11-24. (Published)

US-China trade war: A way out?, by ZHOU, Weihuan; GAO, Henry. (2020). *World Trade Review, 19* (4), 605-617. https://doi.org/10.1017/S1474745620000348 (Published)

A new Chinese economic law order?, by SHAFFER, Greg; GAO, Henry. (2020). *Journal of International Economic Law, 23* (3), 607-635. https://doi.org/10.1093/jiel/jgaa013 (Published)

'Overreaching' or 'Overreacting'? Reflections on the judicial function and approaches of WTO appellate body, by ZHOU, Weihuan; GAO, Henry S. (2019). *Journal of World Trade, 53* (6), 951-978. (Published)

Building a market economy through WTO-inspired reform of state-owned enterprises in China, by ZHOU, Weihuan; GAO, Henry S.; BAI, Xue. (2019). *International and Comparative Law Quarterly, 68* (4), 977-1022. https://doi.org/10.1017/S002058931900037X (Published)

Digital or trade? The contrasting approaches of China and US to digital trade, by GAO, Henry S. (2018). *Journal of International Economic Law, 21* (2), https://doi.org/10.1093/jiel/jgy015 (Published)

Dictum on Dicta: Obiter Dicta in WTO disputes, by GAO, Henry S. (2018). *World Trade Review, 17* (3), 509-533. https://doi.org/10.1017/S1474745618000162 (Published)

The WTO transparency obligations and China, by GAO, Henry. (2018). *Journal of Comparative Law, 12* (2), 329-355. (Published)

Regulation of digital trade in US Free Trade Agreements: From trade regulation to digital regulation, by GAO, Henry. (2018). *Legal Issues of Economic Integration, 45* (1), 47-70. https://ssrn.com/abstract=3070330 (Published)

China's rise: How it took on the U.S. at the WTO, by SHAFFER, Greg; GAO, Henry. (2018). *University of Illinois Law Review, [2018]* (1), 115-184. (Published)

The TPP: Threat or treat to China, by GAO, Henry S. (2016). *Journal of International Trade and Arbitration Law, 5* (2), 599-604. (Published)

Public-private partnership: The Chinese dilemma, by GAO, Henry S. (2014). *Journal of World Trade, 48* (5), 983-1005. (Published)

From the periphery to the centre: China's participation in WTO negotiations, by GAO, Henry S. (2012). *China Perspectives, 1*, 59-65. http://chinaperspectives.revues.org/5823 (Published)

Judicial review of trade remedy determinations in China: An untested theoretical possibility?, by GAO, Henry S. (2012). *Chinese Journal of International Law, 11* (1), 165-190. https://doi.org/10.1093/chinesejil/jmr054 (Published)

Google's China problem: A case study on trade, technology and human rights under the GATS, by GAO, Henry S. (2011). *Asian Journal of WTO and International Health Law and Policy, 6* 347-385. https://ssrn.com/abstract=1976611 (Published)

Elephants in the Room: Challenges of integrating China into the WTO system, by GAO, Henry S. (2011). *Asian Journal of WTO and International Health Law and Policy, 6* (1), 137-168. (Published)

Taking justice into your own hands: The TBI mechanism in China, by GAO, Henry. (2010). *Journal of World Trade, 44* (3), 633-659. (Published)

The Trans-Pacific Strategic Economic Partnership Agreement: A critical analysis, by GAO, Henry. (2010). *Legal Issues of Economic Integration, 37* (3), 221-240. (Published)

Globalization of telecommunication services: Lessons from the Mexico-Telecom case, by GAO, Henry. (2009). *Northeast Asian Law Review, 3* 69-149. (Published)

Saving the WTO from the risk of irrelevance: The WTO dispute settlement mechanism as a 'Common Good' for RTA disputes, by GAO, Henry; LIM, Chin Leng. (2008). *Journal of International Economic Law, 11* (4), 899-925. https://doi.org/10.1093/jiel/jgn036 (Published)

The mighty pen, the almighty dollar, and the holy hammer and sickle: An examination of the conflict between trade liberalization and domestic cultural policy with special regard to the recent dispute between the US and China on restrictions on certain cultural products, by GAO, Henry. (2007). *Asian Journal of WTO and International Health Law and Policy, 2* (2), 313-344. http://ssrn.com/abstract=1019394 (Published)

The bid challenge procedures under the WTO government procurement agreement: A critical study of the Hong Kong experience, by GAO, Henry. (2007). *Public Procurement Law Review, 16* 211-254. (Published)

Dancing with the dragon: Impact of China's participation in the WTO, by GAO, Henry S. (2007). *Sri Lanka Law College Law Review, [2007]* 186-192. (Published)

Evaluating alternative approaches to GATS negotiations: Sectoral, formulae and other alternatives, by GAO, Henry S. (2007). *Taiwanese Journal of WTO Studies, 7* 67-108. (Published)

Taming the dragon: China's experience in the WTO dispute settlement system, by GAO, Henry S. (2007). *Legal Issues of Economic Integration, 34* (4), 369-392. (Published)

China's participation in the WTO: A lawyer's perspective, by GAO, Henry S. (2007). *Singapore Year Book of International Law, 11* 41-74. http://law.nus.edu.sg/sybil/downloads/articles/SYBIL-2007/SYBIL-2007-41.pdf (Published)

Procedural issues in the anti-dumping regulations of China: A critical review under the WTO rules, by CHOI, Won-Mog; GAO, Henry S. (2006). *Chinese Journal of International Law, 5* (3), 663-682. https://doi.org/10.1093/chinesejil/jml038 (Published)

China's legal battles in the WTO, by GAO, Henry S. (2006). *Hong Kong Law Journal,* -26. http://hkjo.lib.hku.hk/exhibits/show/hkjo/browseArticle?book=b27720603&issue=5000031 6 (Published)

A legal analysis of the dispute on coke export quota between the EU and China, by GAO, Henry S. (2005). *Chinese Journal of International Economic Law [*国际经济法学刊*],12* (4), 321-337. (Published)

Amicus curiae briefs in the WTO dispute settlement system: Theory and practice, by GAO, Henry S. (2004). *Chinese Journal of International Economic Law [*国际经济法学刊*],11* 388-416. (Published)

Legal issues under WTO Rules on the Closer Economic Partnership Arrangement (CEPA) between Mainland China and Hong Kong, by GAO, Henry S. (2003). *Chinese Journal of International Law, 2* (2), 629-648. http://chinesejil.oxfordjournals.org/content/2/2.toc (Published)

### JOURNAL ARTICLES (NON-REFEREED)

WTO reform and China: Defining or defiling the multilateral trading system?, by GAO, Henry S. (2021). *Harvard International Law Journal, 62* 1-39. https://harvardilj.org/2021/07/wto-reform-and-china-defining-or-defiling-the-multilateral-trading-system/ (Published)

De la périphérie au centre: La participation de la Chine aux négociations OMC, by GAO, Henry S. (2012). *Perspectives Chinoises, 1* 61-67. https://perspectiveschinoises.revues.org/6229#quotation (Published)

### BOOKS (REFEREED)

*Between market economy and state capitalism: China's state-owned enterprises and the World Trading System* by GAO, Henry S.; ZHOU, Weihuan. (2022). Cambridge:  Cambridge University Press. https://doi.org/10.1017/9781108908795 (Published)

### BOOK CHAPTERS

China's Changing Perspective on the WTO: From Aspiration, Assimilation to Alienation, by Henry Gao . (2023). In Henry Gao, Damian Raess and Ka Zeng (Ed.), *China's accession to the WTO 20 years on: assessing the impact of China's economic rise* Cambridge University Press. (Forthcoming)

China's 20-Year Engagement with the WTO: Opportunities, Challenges, and Responses, by Henry Gao, Damian Raess and Ka Zeng. (2023). In Henry Gao, Damian Raess and Ka Zeng (eds) (Ed.), *China's accession to the WTO 20 years on: assessing the impact of China's economic rise* Cambridge University Press. (Forthcoming)

China and trade and investment liberalization, by GAO, Henry S. (2022). In Daniel Bethlehem, Donald McRae, Rodney Neufeld, & Isabelle Van Damme (Ed.), *The Oxford Handbook of International Trade Law* (pp. 341-373) Oxford: Oxford University Press. https://doi.org/10.1093/oxfordhb/9780192868381.013.14 (Published)

Chapters on Telecommunications Services, by GAO, Henry. (2022). In Rüdiger Wolfrum and Peter-Tobias Stoll (Ed.), *Max Planck commentaries on world trade law, VOLUME VI: "WTO – TRADE IN SERVICES"* Leiden: M. Nijhoff. (Accepted)

Data sovereignty and trade agreements: Three digital kingdoms, by GAO, Henry S. (2022). In Anupam Chander & Sun Haochen (Ed.), *Data sovereignty along the digital Silk Road* Oxford: Oxford University Press. (Accepted)

Digital services trade and trade agreements, by GAO, Henry S. (2022). In Jong Woo Kang, Matthias Helble, Rolando Avendano, Pramila Crivelli, & Mara Claire Tayag (Ed.), *Unlocking the potential of digital services trade in Asia and the Pacific* (pp. 128-155) Manila: Asian Development Bank. https://doi.org/10.22617/TCS220524-2 (Published)

The investment chapter in the Regional Comprehensive Economic Partnership: Enhanced rules without enforcement mechanism, by GAO, Henry S. (2022). In Kimura, F., S. Urata, S. Thangavelu, & D. Narjoko (Ed.), *Dynamism of East Asia and RCEP: The Framework for regional integration* (pp. 201-222) Jakarta: Economic Research Institute for ASEAN and East Asia (ERIA). https://www.eria.org/publications/dynamism-of-east-asia-and-rcep-the-framework-for-regional-integration/ (Published)

A Chinese perspective, by GAO, Henry S. (2022). In Xue Gong (Ed.), *Regional economic integration in the post-pandemic era* (pp. 17-24) Singapore:   S. Rajaratnam School of International Studies. (Published)

Models and data trade regulation and the road to an agreement, by GAO, Henry S. (2022). In Mark Findlay, Jolyon Ford, Josephine Seah, & Dilan Thampapillai (Ed.), *Regulatory insights on artificial intelligence* (pp. 262-276) Cheltenham: Edward Elgar. https://doi.org/10.4337/9781800880788.00020 (Published)

Export taxes and raw materials, by GAO, Henry S.; ZHOU, Weihuan. (2021). In Panagiotis Delimatsis, & Leonie Reins (Ed.), *Elgar Encyclopedia of Environmental Law, Volume X: Trade and Environmental Law* Cheltenham: Edward Elgar. https://doi.org/10.4337/9781783476985 (Published)

Emergency procurement and responses to COVID-19: The case of Singapore, by GAO, Henry S. (2021). In Sue Arrowsmith, et al (Ed.), *Public procurement in (a) crisis: Global lessons from the COVID-19 pandemic* (pp. 485-502) London: Hart Publishing. https://doi.org/10.5040/9781509943067.ch-020 (Published)

Across the great wall: E-commerce joint statement initiative negotiation and China, by GAO, Henry S. (2021). In PENG, Shin-yi, et al (Ed.), *Artificial intelligence and international*

*economic law* (pp. 295-318) Cambridge: Cambridge University Press.
https://doi.org/10.1017/9781108954006.016 (Published)

A new Chinese economic law order?, by SHAFFER, Gregory; GAO, Henry. (2021). In G.
Shaffer (Ed.), *Emerging powers and the world trading system: The past and future of
international economic law* (pp. 222-268) Cambridge: Cambridge University Press.
https://doi.org/10.1017/9781108861342.008 (Published)

How China took on the United States and Europe at the WTO, by SHAFFER, Gregory; GAO,
Henry. (2021). In G. Shaffer (Ed.), *Emerging powers and the world trading system: The
past and future of international economic law* (pp. 174-221) Cambridge: Cambridge
University Press. https://doi.org/10.1017/9781108861342.007 (Published)

Data regulation with Chinese characteristics,    by GAO, Henry S. (2021). In Mira Burri (Ed.),
*Big data and global trade law* (pp. 245 -267) Cambridge: Cambridge University Press.
https://doi.org/10.1017/9781108919234.017 (Published)

Data regulation in trade agreements: Different models and options ahead, by GAO, Henry.
(2021). In Maarten Smeets (Ed.), *Adapting to the digital trade era: Challenges and
opportunities* (pp. 322-335) World Trade Organization. (Published)

Lessons from the pandemic for future WTO subsidy rules, by AMBAW, Dessie; DRAPER,
Peter; GAO, Henry. (2020). In Simon Evenett, Richard Baldwin (Ed.), *Revitalising
Multilateralism: Pragmatic Ideas for the New WTO Director-General* CEPR Press.
(Published)

Changing internally to engage externally: China and the WTO, by SHAFFER, Greg; GAO,
Henry. (2020). In Carol J. Greenhouse, & Christina L. Davis (Ed.), *Legal system
landscapes of law: Practicing sovereignty in transnational terrain* (pp. 64-96) Philadelphia,
PA: University of Pennsylvania Press. https://worldcat.org/isbn/9780812252224
(Published)

Disruptive construction or constructive destruction? Reflections on the Appellate Body crisis, by
GAO, Henry S. (2020). In Chang-fa Lo, Jinji Nakagawa, and Tsai-yu Lin (Ed.), *The
Appellate Body of the WTO and its reform* (pp. 215-238) Cham: Springer.
https://doi.org/10.1007/978-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-2_13 (Published)

From paternalism to partnership: The development of WTO law capacity in China, by GAO,
Henry; SHAFFER, Greg. (2019). In David B. Wilkins; Sida Liu (Ed.), *The Chinese legal
profession in the age of globalization: The rise of the corporate legal sector and its impact
on lawyers and society* Cambridge: Cambridge University Press. (Forthcoming)

Dispute settlement provisions in ASEAN's external economic agreements with China, Japan and Korea, by GAO, Henry S. (2019). In Pasha L. Hsieh, & Bryan Mercurio (Ed.), *ASEAN law in the new regional economic order: Global trends and shifting paradigms* (pp. 64-82) Cambridge: Cambridge University Press. https://doi.org/10.1017/9781108563208.005 (Published)

Lessons from capacity building in China, by GAO, Henry; SHAFFER, Gregory. (2019). In Joost Pauwelyn & Mengyi Wang (Ed.), *Building Legal Capacity for a More Inclusive Globalization* (pp. 121-134) Geneva: The Graduate Institute. (Published)

The WTO's transparency obligations and China, by GAO, Henry. (2019). In Fu Hualing, Michael Palmer, and Zhang Xianchu (Ed.), *Transparency challenges facing China* (pp. 48-82) London: Wildy Simmonds & Hill.  https://worldcat.org/isbn/9780854902606 (Published)

The regulation of digital trade in the TPP: New trade rules for the digital age, by GAO, Henry S. (2018). In Julien Chaisse, Henry Gao and Chang-fa Lo (Ed.), *Paradigm shift in international economic law rule-making: TPP as a new model for trade agreements?* (pp. 345-362) Cham: Springer. http://doi.org/10.1007/978-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-0_20 (Published)

E-commerce in ChAFTA: New wine in old wineskins?, by GAO, Henry. (2017). In Colin Piker, Heng Wang & Weihuan Zhou (Ed.), *The China Australia Free Trade Agreement: A 21st-Century Model* (pp. 283-303) Hart Publishing. (Published)

Trade policies in the post-TPP era, by CHAISSE, Julien; GAO, Henry; LO, Chang-fa. (2017). In Julien Chaisse, Henry Gao and Chang-fa Lo (Ed.), *Paradigm Shift in International Economic Law Rule-Making: TPP as a New Model for Trade Agreements?* (pp. 1-17) Springer. (Published)

20 years of teaching, studying, researching and practising WTO law, by GAO, Henry S. (2016). In Yang Guohua & Shi Xiaoli (Ed.), 我与WTO:法律人的视角 (pp. 141-148) Beijing, China: 知识产权出版社. https://worldcat.org/isbn/9787513039338 (Published)

China-New Zealand free trade agreement, by GAO, Henry. (2016). In S. Lester, B. Mercurio & L. Bartels (Ed.), *Bilateral and regional trade agreements: Case studies* (pp. 77-96) Cambridge: Cambridge University Press. http://worldcat.org/isbn/9781107063761 (Published)

TPP, regulatory coherence and China's free trade strategy from A to Z, by GAO, Henry S. (2016). In Marc Bungenberg, Christoph Herrmann, Markus Krajewski & Jörg Philipp Terhechte (Ed.), *European yearbook of international economic law 2016* (pp. 507-533) Switzerland: Springer Verlag. https://worldcat.org/isbn/9783319292144 (Published)

The road less travelled: My experience as an intern in the WTO appellate body, by GAO, Henry S. (2015). In Yang Guo Hua & Shi Xiao Li (Ed.), *We in the WTO litigation /*我们在*WTO*打官司*/* Beijing: Intellectual Property Press. https://worldcat.org/isbn/9787513031820 (Published)

From the Doha Round to the China Round: China's growing role in WTO negotiations, by GAO, Henry. (2015). In Lisa Toohey, Colin Picker & Jonathan Greenacre (Ed.), *China in the international economic order: New directions and changing paradigms* (pp. 79-97) New York: Cambridge University Press. https://doi.org/10.1017/CBO9781107449480.007 (Published)

Selected issues in TPP negotiations and implications for China, by GAO, Henry S. (2014). In Jiaxing Hu & Matthias Vanhullebusch (Ed.), *Regional cooperation and free trade agreements in Asia* (pp. 77-98) Leiden: Brill. https://worldcat.org/isbn/9789004279858 (Published)

Telecommunications reform in China: Fostering competition through state intervention, by GAO, Henry S. (2014). In Aik Hoe Lim; Bart De Meester (Ed.), *WTO domestic regulation and services: Trade putting principles into practice* New York: Cambridge University Press. http://worldcat.org/isbn/9781107062351 (Published)

China: An untested theoretical possibility?, by GAO, Henry S. (2013). In Müslüm Yilmaz (Ed.), *Domestic Judicial Review of Trade Remedies: Experiences of the Most Active WTO Members* (pp. 313-336) Cambridge:  Cambridge University Press. http://worldcat.org/isbn/9781107022232 (Published)

Googling for the trade-human rights nexus in China: Can the WTO help?, by GAO, Henry. (2012). In Mira Burri and Thomas Cottier (Ed.), *Trade governance in the digital age: World Trade Forum* (pp. 247-275) Cambridge: Cambridge University Press. https://doi.org/10.1017/CBO9781139136716.014 (Published)

A love triangle: ASEAN, China and the TPP, by GAO, Henry S. (2012). In Keith E Flick; Kalyan M Kemburi (Ed.), *ASEAN-China free trade area : challenges, opportunities and the road ahead* (pp. 111-119) Singapore:  S. Rajaratnam School of International Studies, Nanyang Technological University. http://worldcat.org/isbn/9789810718503 (Published)

From the P4 to the TPP: Transplantation or transformation?, by GAO, Henry S. (2012). In C L Lim; Deborah Kay Elms; Patrick Low (Ed.), *The Trans-Pacific Partnership : a quest for a twenty-first century trade agreement* (pp. 64-81) New York:  Cambridge University Press. http://worldcat.org/isbn/9781107612426 (Published)

China's participation in Global Trade Negotiations, by GAO, Henry S. (2012). In Mingjiang Li (Ed.), *China joins global governance : cooperation and contentions* (pp. 57-74) http://worldcat.org/isbn/9781498515153 (Published)

The Shifting Stars: The Rise of China, Emerging Economies and the Future of World Trade Governance, by GAO, Henry S. (2012). In Ricardo Meléndez-Ortiz (Ed.), *The future and the WTO : confronting the challenges* (pp. 74-79) Geneva:  International Centre for Trade and Sustainable Development. (Published)

China in the WTO dispute settlement system: From passive rule-taker to active rule-maker?, by GAO, Henry S. (2011). In Ricardo Meléndez-Ortiz, Christophe Bellmann & Shuaihua Cheng (Ed.), *A decade in the WTO: Implications for China and global trade governance* (pp. 17-21) Geneva: International Centre for Trade and Sustainable Development. https://ssrn.com/abstract=2200915 (Published)

China's ascent in global trade governance: From rule taker to rule shaker and, maybe rule maker?, by GAO, Henry S. (2011). In Carolyn Deere Birkbeck (Ed.), *Making global trade governance work for development: Perspectives and priorities from developing countries* (pp. 153-180) Chicago: Cambridge University Press. http://worldcat.org/isbn/9781107007826 (Published)

The Politics of Competing Jurisdictional Claims in WTO and RTA Disputes: The Role of Private International Law Analogies,    by GAO, Henry Shuchao; LIM, Chin Leng. (2011). In Broude, Tomer; Busch, Marc L.; Porges, Amelia (Ed.), *The Politics of International Economic Law* (pp. 282-314) Cambridge MA: Cambridge University Press. http://www.worldcat.org/oclc/662154941 (Published)

The Design and Operation of a Bid Challenge Mechanism: The Experience of Hong Kong, China, by GAO, Henry Shuchao. (2011). In Arrowsmith, Sue; Anderson, Robert (Ed.), *WTO Regime on Government Procurement: Challenge and Reform* (pp. 532-558) Cambridge MA: Cambridge University Press. http://www.worldcat.org/oclc/690090157 (Published)

China's experience and challenges in utilising the WTO dispute settlement mechanism, by HAN, Liyu; GAO, Henry S. (2010). In Gregory Shaffer & Ricardo Meléndez-Ortiz (Ed.), *Dispute settlement at the WTO: The developing country experience* (pp. 137-173) Cambridge: Cambridge University Press. http://doi.org/10.1017/CBO9780511663192.005 (Published)

Foreign trade, by ZHANG, Yuejiao; LAPRES, Daniel A.; GAO, Henry S. (2008). In Daniel A Laprès; Yuejiao Zhang (Ed.), *Business law in China: Trade, investment, operations and finance* (pp. 153-194) Paris: International Chamber of Commerce. (Published)

Fourth Protocol to the GATS, by GAO, Henry Shuchao. (2008). In Wolfrum, Rüdiger; Stoll, Peter-Tobias; Feinäugle, Clemens (Ed.), *WTO - Trade in Services* (pp. 715-717) Leiden:Martinus Nijhoff. http://worldcat.org/isbn/9789004145689 (Published)

Reference Paper on Basic Telecommunications, by GAO, Henry Shuchao. (2008). In Wolfrum, Rüdiger; Stoll, Peter-Tobias; Feinäugle, Clemens (Ed.), *WTO - Trade in Services* (pp. 718-747) Leiden: Martinus Nijhoff. http://worldcat.org/isbn/9789004145689 (Published)

Annex on Telecommunications, by GAO, Henry Shuchao. (2008). In Wolfrum, Rüdiger; Stoll, Peter-Tobias; Feinäugle, Clemens (Ed.), *WTO - Trade in Services* (pp. 683-711) Leiden: Martinus Nijhoff. http://worldcat.org/isbn/9789004145689 (Published)

Chapter II: The RTA Strategy of China: A Critical Visit, by GAO, Henry Shuchao. (2007). *The New International Architecture in Trade and Investment: Current Status and Implications* Tokyo: Asia-Pacific Economic Cooperation. http://worldcat.org/isbn/9789810577254 (Published)

Chapter 19: Reflections on the Relationship between WTO Negotiations and Dispute Settlement - Lessons from the GATS, by GAO, Henry Shuchao. (2007). In Taniguchi, Yasuhei; Yanovich, Alan; Bohanes, Ian (Ed.), *The WTO in the Twenty-First Century: Dispute Settlement, Negotiations, and Regionalism in Asia* (pp. 367-380) Cambridge MA: Cambridge University Press. http://worldcat.org/isbn/9780521875691 (Published)

Chapter I: Synthesis Report, by GAO, Henry Shuchao. (2007). *The New International Architecture in Trade and Investment: Current Status and Implications* Tokyo: Asia-Pacific Economic Cooperation. http://worldcat.org/isbn/9789810577254 (Published)

Aggressive legalism: The East Asian experience and lessons for China, by GAO, Henry S. (2005). In Henry Gao & Donald Lewis (Ed.), *China's participation in the WTO* (pp. 315-351) London: Cameron. http://ssrn.com/abstract=897140 (Published)

The Closer Economic Partnership Arrangement (CEPA) between Mainland China and Hong Kong: Legal and Economic Analyses, by GAO, Henry Shuchao. (2004). In Davidson, Paul (Ed.), *Trading Arrangements in the Pacific Rim: ASEAN and APEC* (pp. 1-10) New York: Oceana Publications. https://ssrn.com/abstract=752785 (Published)

Legal issues on the Economic integration agreement between China, Taiwan, Hong Kong and Macau, by GAO, Henry S. (2004). In Wang Guiguo (Ed.), *A study on the Legal Issues Concerning Regional Arrangement* (pp. 75-96) Beijing, China: Peking University Press. (Published)

### EDITED BOOKS

*China and the WTO: A 20-Year Assessment,* edited by GAO, Henry; RAESS, Damian; ZENG, Ka. (2023). Cambridge: Cambridge University Press. (Accepted)

*Paradigm shift in international economic law rule-making: TPP as a new model for trade agreements?,* edited by CHAISSE, Julien; GAO, Henry; LO, Chang-fa. (2017). Economics, Law, and Institutions in Asia Pacific, 5. Singapore: Springer. http://doi.org/10.1007/978-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-0 (Published)

### BOOK REVIEWS

China and the WTO: Why multilateralism still matters, by André Sapir and Petros C. Mavroidis, eds., by GAO, Henry S. (2022). *Journal of Chinese Political Science, 27* (4), 807-809 https://doi.org/10.1007/s11366-022-09802-6 (Published)

Governing science and technology under the international economic order: Regulatory divergence and convergence in the age of megaregionals by Shin-yi Peng, Han-Wei Liu and Ching-Fu Lin, by GAO, Henry S.; ZHOU,Weihuan. (2021). *World Trade Review, 20* (3), 369-372 https://doi.org/10.1017/S1474745620000555 (Published)

Linking trade and security: Evolving institutions and strategies in Asia, Europe, and the United States by Vinod K. Aggarwal and Kristi Govella, by GAO, Henry. (2014). *World Trade Review, 13* (4), 725-728 (Published)

International trade regulation and the mitigation of climate change: World trade forum, Edited by Thomas Cottier, Olga Nartova and Sadeq Z. Bigdeli, by GAO, Henry. (2012).*Asian Journal of International Law, 2* (1), 200-202 (Published)

The WTO at ten: The contribution of the dispute settlement system edited by Giorgio Sacerdoti, Alan Yanovich and Jan Bohanes, by GAO, Henry S. (2007). *Chinese Journal of International Law, 6* (3), 781-784 https://doi.org/10.1093/chinesejil/jmm035 (Published)

China and the world trading system: Entering the new millennium, Deborah Z. Cass, Brett G. Williams & George Barker, by GAO, Henry S. (2006). *Hong Kong Law Journal, 36* 220-228 (Published)

### CONFERENCE PROCEEDINGS

Can WTO law keep up with the Internet?, by GAO, Henry S. (2017.0). *Proceedings of the ASIL Annual Meeting: Washington, DC, 2017 April 12-15,* (pp. 350-352) Washington, DC: American Society of International Law. https://doi.org/10.5305/procannmeetasil.108.0350 (Published)

China on the world stage: A trade law perspective, by GAO, Henry. (2010.0). *Proceedings of the ASIL Annual Meeting 2010,* (pp. 532-535) Washington DC: Cambridge University Press. https://doi.org/10.5305/procannmeetasil.104.0532 (Published)

The Trans-Pacific Strategic Economic Partnership Agreement: High standard or missed opportunity?, by GAO, Henry Shuchao. (2009.0). *Trade-led Growth: A sound strategy for Asia: Papers presented at the 5th Anniversary Conference of ARTNeT "Trade-Led Growth in Times of Crisis", 2-3 November 2009,* (pp. 79-95) Bangkok, Thailand: United Nations ESCAP. (Published)

Some Legal Problems in the Establishment of Economic Integration Agreements between China, Taiwan, Hong Kong and Macau, by GAO, Henry Shuchao. (2007.0). *Collected Papers of the Cross-Strait Forum on WTO Law,* (pp. 6-31) Beijing: Peking University. (Published)

### CONFERENCE PAPERS

China's visions for global trade governance, by GAO, Henry S. (2017.0). *International Seminar on Globalization and Multilateralism: Visions, Agendas and Instruments: The M11 in Times of Transition, Buenos Aires, Argentina, 2017 December 10-13,* Buenos Aires, Argentina. (Presented)

Digital or trade? The contrasting approaches of China and US to digital trade, by GAO, Henry S. (2017.0). *Thinking About Global Trade Governance for the 21st Century: Challenges and Opportunities on the Eve of the WTO's 11th Ministerial Conference, Buenos Aires, Argentina, 2017 December 13,* Buenos Aires, Argentina. (Presented)

WTO DSM: A trade court for the world, by GAO, Henry S. (2017.0). *Trade and Sustainable Development Symposium 2017, December 11-13,* Buenos Aires, Argentina. (Presented)

The past and present of RTA DSMs: An overview, by GAO, Henry S. (2017.0). *Trade and Sustainable Development Symposium, Buenos Aires, Argentina, 2017 December 11-12,* Buenos Aires, Argentina. (Presented)

China's FTAs: The new era, by GAO, Henry S. (2017.0). *16th Annual Conference on WTO and China, Beijing, China, 2017 November 12,* Beijing, China. (Presented)

Alternate reality: The development of the internet in China and implications under trade law, by GAO, Henry S. (2017.0). *European Policy for Intellectual Property 12th Annual Conference, Bordeaux, France, 2017 September 4-6,* Bordeaux, France. (Presented)

Judicial review of trade remedy determinations in China: An untested theoretical possibility?, by GAO, Henry S. (2017.0). *The Asian WTO Trade Forum 2017: Implementing International*

*Treaties in the Domestic Legal System and Its WTO Implications, Seoul, Korea, August 18,* Seoul, Korea. (Presented)

Dictum on dicta: Obiter dictum in WTO disputes, by GAO, Henry. (2017.0). *Asian WTO Research Network 2017 Annual Conference,* Taipei, Taiwan. (Presented)

Lessons from different models: China, by GAO, Henry S. (2017.0). *Dialogue on Ensuring Sustainability through Trade Agreements, Geneva, Switzerland, 2017 March 29,* Geneva, Switzerland. (Presented)

Developing countries in WTO dispute settlement system, by GAO, Henry S. (2016.0). *China and the Peaceful Settlement of Disputes, Beijing, China, 2016 November 26-27,* Beijing, China. (Presented)

The WTO transparency obligations and China, by GAO, Henry S. (2016.0). *Transparency Matters, Hong Kong University, 2016 June 24-25,* Hong Kong. (Presented)

E-commerce in the ChAFTA, by Henry Gao. (2016.0). *The ChAFTA: One year after its signing, Sydney, 2016 June 17-18,* Sydney. (Presented)

From trade regulation to digital regulation: The regulation of E-commerce in the TPP, by GAO, Henry S. (2016.0). *The Transpacific Partnership (TPP): A Paradigm Shift in International Trade Regulation? : Annual AWRN Conference 2016, Hong Kong, May 16-17,* Hong Kong. (Presented)

From trade regulation to digital regulation: The regulation of digital trade in the TPP, by GAO, Henry S. (2016.0). *Academic Symposium on Old Rules, New Problems: The WTO at 20, Cambridge, MA, USA, 2016 April 28-29,* Cambridge, MA, USA. (Presented)

The regulation of digital trade in the TPP: From trade regulation to digital regulation, by GAO, Henry S. (2015.0). *Peaceful Development and International Rule of Law, Institute of the International Law, Beijing China, 2015 December 10,* Beijing, China. (Presented)

New challenges for dispute settlement mechanisms in the global trading regime, by GAO, Henry S. (2015.0). *The WTO at 20 Conference: Embracing Regional Trading Arrangements in the WTO System: Coherence or Conflict?, Seoul, Korea, 2015 August 28,* Seoul, Korea. (Presented)

From paternalism to partnership: The development of the trade law capacity in China, by GAO, Henry S. (2015.0). *Globalization Lawyers and Emerging Economies (GLEE) China Conference, China, 2015 August 8 Law and Society Association 2015 Annual Meeting, Seattle 2015 May 28-31,* Shanghai, China. (Presented)

China's ascent in global trade governance, by GAO, Henry S. (2015.0). *International Conference of Asia Scholars ICAS9 2015 July 5-9,* Adelaide, Australia. (Presented)

China in WTO dispute settlement: Rule maker or breaker?, by GAO, Henry S. (2015.0). *WTO at 20*: *Multilateral Trading System, Dispute Settlement and Developing Countries, co-hosted by WTO Appellate Body and Tsinghua University, China, 2015 July 3-4,* Beijing, China. (Presented)

Renminbi internationalization, by GAO, Henry S. (2015.0). *2nd Fudan-SMU Global Forum: Global Governance, Global Cities, Global Innovations, Shanghai, China, 2015 April 10,* Shanghai, China. (Presented)

Searching for the Missing Link: Trade, Censorship and Human Rights in the Digital Era, by GAO, Henry Shuchao. (2010.0). *American Society of International Law International Economic Law Interest Group 2010 Biennial Meeting, 18-20 November 2010,* Minneapolis, MN, USA. (Published)

China's strategy for free trade agreements: Political battle in the name of trade, by GAO, Henry Shuchao. (2009.0). *Asian Regional Workshop on Free Trade Agreements: Towards Inclusive Trade Policies in Post-crisis Asia, 8-9 December 2009,* Bangkok, Thailand. http://www.networkideas.org/ideasact/dec09/pdf/Henry_Gao.pdf (Published)

The Trade Barrier Investigation Mechanism in China, by GAO, Henry Shuchao. (2009.0). *ICTSD International Dialogue: DSU Reform and Beyond - Enhancing Developing Countries' Capacity to Participate in WTO DSU, November 3-4, 2009: Proceedings,* Geneva, Switzerland. http://ictsd.org/downloads/2009/11/henry-gao-ictsd.pdf (Published)

China's Experience with Labor, Environment and Competition Provisions in RTAs, by GAO, Henry Shuchao. (2009.0). *Regional Trade Agreement Workshop, Beijing, 21-22 May 2009,* Beijing, China. (Published)

Saving the WTO from the Risk of Irrelevance: The WTO Dispute Settlement Mechanism as a 'Common Good' for RTA Disputes, by GAO, Henry Shuchao. (2008.0). *Conference on the Politics of International Economic Law: The Next Four Years, Biennial Conference organized by the International Economic Law Interest Group of the American Society of International Law, 13-15 November 2008,* Washington DC. (Published)

Existing and Future Challenges to the Multilateral Trading System in the New Millennium: New Research Priorities on Dispute Settlement, by GAO, Henry Shuchao. (2008.0). *Barcelona Dialogue on the Global Academic Network for Researchers on the WTO and Regional Integration, 28-29 May 2008,* Barcelona, Spain. (Published)

Does the WTO Accession Promote Good Governance in China?, by GAO, Henry Shuchao. (2008.0). *Colloquium on Challenges to Democracy Today, Queens University, 13 May 2008,* Belfast, UK. (Published)

Taming the Dragon: China's Experience in the WTO Dispute Settlement System, by GAO, Henry Shuchao. (2008.0). *European Centre for International Political Economy (ECIPE),* (Published)

Saving the WTO from the Risk of Irrelevance: The WTO Dispute Settlement Mechanism as a 'Common Good' for RTA Disputes, by GAO, Henry Shuchao. (2008.0). *Conference on the WTO in Difficult Times: New Challenges and New Prospects, organized by SMU and Asian WTO Research Network, 10-11 October 2008,* Singapore. (Published)

Who Moved Our Milk? A Primer on the Domestic and International Legal Issues in the Contaminated Milk Case in China, by GAO, Henry Shuchao. (2008.0). *Workshop on Public Health: International Trade and Domestic Legal Issues, hosted by the Asian Center for WTO and International Health Law and Policy, National Taiwan University,* (Published)

CSI Geneva: What Can Be Done to Save the DDA and the WTO?, by GAO, Henry Shuchao. (2008.0). *Conference on the WTO in Difficult Times: New Challenges and New Prospects, organized by SMU and Asian WTO Research Network, 10-11 October 2008,* Singapore. (Published)

Globalization and the Regulatory State: A Tale of Two Countries, by GAO, Henry Shuchao. (2008.0). *Southeastern Association of Law Schools 61st Annual Meeting, July 27-August 2, 2008, Palm Beach, Florida,* Palm Beach, FL, USA. (Published)

Taking Justice into your own Hands: The Trade Barrier Investigation Mechanism of China, by GAO, Henry Shuchao. (2008.0). *Inaugural Conference of the Society of International Economic Law,* (Published) China's Participation in the WTO, by GAO, Henry Shuchao. (2008.0). *International Study Centre, Queen's Univ,* (Published)

Applying ultimatum game theory to WTO negotiations, by GAO, Henry S. (2008.0). *Neuroeconomics and Decision Making RCE, Brainstorming-Conceptualizing-Structuring Workshop, National University of Singapore,* Singapore. (Presented)

Saving the WTO from the Risk of Irrelevance: The WTO Dispute Settlement Mechanism as a Common Good for RTA Disputes, by GAO, Henry Shuchao. (2008.0). *Workshop on WTO Institutional Reform Project, sponsored by the Emerging Dynamic Global Economies (EDGE) Network, Centre for International Governance Innovation (CIGI),* (Published)

China's Participation in the WTO: A Lawyer's Perspective, by GAO, Henry Shuchao. (2008.0). *World Trade Institute,* (Published)

### MAGAZINE ARTICLES

The Great Trade War between the US and China, by GAO, Henry Shuchao. (2010, August). *Hong Kong Economic Journal Monthly [*信報財經新聞*],* 32-36.
http://www.hkej.com/template/magazine/jsp/detail.jsp?journal_id=58&title_id=4966
(Published)

The Economic Crisis, Protectionism, and China\342\200\231s New Trade Policy, by GAO, Henry Shuchao. (2010, January). *Hong Kong Economic Journal Monthly [*信報財經新聞*],* 32-36.
http://www.hkej.com/template/magazine/jsp/detail.jsp?journal_id=50&title_id=4310
(Published)

The Past, Present and Future of the WTO, by GAO, Henry Shuchao. (2005, January). *Hong Kong Economic Journal Monthly [*信報財經新聞*],* 20-22. (Published)

**Other Outputs and Contributions**

### REPORTS

China's regulatory crackdowns and U.S.-China trade and investment relations, National Foundation for American policy, 02 Feb 2022 https://nfap.com/studies/chinas-regulatory-crackdowns-and-u-s-china-trade-and-investment-relations/

Rethinking China trade policy: Lessons learned and options ahead, National Foundation for American policy, 01 Jan 2021 https://nfap.com/wp-content/uploads/2021/01/Rethinking-China-Trade-Policy.NFAP-Policy-Brief.January-20 21-2.pdf

*Supporting China's regional trade agenda: China's strategies on negotiating competition, environment, and mode 4 provisions in its RTAs, consultancy report for the world bank* by GAO, Henry. (Published)

*China's export interests in services in Australia, consultancy report for the world bank* by GAO, Henry. (2007). (Published)

### BLOG POSTS

Beijing's Regulatory Crackdown Is Unlikely to End Any Time Soon, CIGI, 20 Mar 2023 https://www.cigionline.org/articles/beijings-regulatory-crackdown-is-unlikely-to-end-any-time-soon/

Economic Development and Trade: The Challenge of a Rising China, CIGI, 04 May 2020
https://www.cigionline.org/articles/economic-development-and-trade-challenge-rising-china/

US-China Phase One Deal: A Brief Account, Wolters Kluwer, Regulating for Globalization
Blog, 22 Jan 2020 http://regulatingforglobalization.com/2020/01/22/us-china-phase-one-deal-a-brief-account/

Slaying Concerns about the WTO's Faceless Bureaucrats, International Economic Law and
Policy Blog, 06 Jan 2020

The Resurrection of the Appellate Body: Three Proposals, International Economic Law and
Policy Blog, 22 Dec 2019 https://ielp.worldtradelaw.net/2019/12/the-resurrection-of-the-appellate-body-three-proposals.html

Murder on the Multilateral Express, Lowy Institute, The Interpreter, 10 Dec 2019
https://www.lowyinstitute.org/the-interpreter/murder-multilateral-express

Trade war: From a phase one deal to perpetual peace, Lowy Institute, The Interpreter, 18 Nov
2019 https://www.lowyinstitute.org/the-interpreter/trade-war-phase-one-deal-perpetual-peace

Myth busted: China's status as a developing country gives it few benefits in the World Trade
Organisation, The Conversation, 15 Oct 2019 https://theconversation.com/myth-busted-chinas-status-as-a-developing-country-gives-it-few-benefits-in-the-world-trade-organisation-124602

China's developing country status brings it few benefits in the WTO, East Asia Forum, 15 Oct
2019 https://www.eastasiaforum.org/2019/10/15/chinas-developing-country-status-brings-it-few-benefits-in-the-wto/

The resurrection of state capitalism in China, East Asia Forum, 06 Aug 2019
https://www.eastasiaforum.org/2019/08/06/the-resurrection-of-state-capitalism-in-china/

Much ado about nothing? The President's Memorandum on Reforming Developing-Country
Status in the WTO, International Economic Law and Policy Blog, 26 Jul 2019
https://ielp.worldtradelaw.net/2019/07/much-ado-about-nothing-the-presidents-memorandum-on-reforming- developing-country-status-in-the-wto.html

The end of the WTO and the last case?, East Asia Forum, 10 Jul 2019
https://www.eastasiaforum.org/2019/07/10/the-end-of-the-wto-and-the-last-case/

Seeking the best forum for regional trade agreement disputes, RTA Exchange, 15 May 2018 https://e15initiative.org/blogs/seeking-the-best-forum-for-regional-trade-agreement-disputes/

The WTO Dispute Settlement Mechanism: A Trade Court for the World, RTA Exchange, the International Centre for Trade and Sustainable Development (ICTSD) and the Inter-American Development Bank (IDB), 01 Apr 2018

Broken promises set a bad example for China in the WTO, East Asia Forum, 09 Mar 2018 https://www.eastasiaforum.org/2018/03/09/broken-promises-set-a-bad-example-for-china-in-the-wto/ World Trade Needs More Than a Nudge, RTA Exchange, 17 Jan 2018

China's evolving approach to environmental and labour provisions in regional trade agreements, ICTSD Bridges, RTA Exchange, 25 Aug 2017 https://ictsd.iisd.org/opinion/china-3

The potential collapse of the TPP: Implications for ASEAN, Brink News, 15 Dec 2016 https://www.brinknews.com/the-potential-collapse-of-the-tpp-implications-for-asean/

Bo Xilai's true crime, Project Syndicate, 2 Aug 2013 https://www.project-syndicate.org/blog/bo-xilai-s-true-crime-by-henry-gao

TLD Symposium: Comment on Jan Bohanes & Fernanda Garza, Going Beyond Stereotypes: Participation of Developing Countries in WTO Dispute Settlement, International Economic Law and Policy Blog, 09 Oct 2012 https://worldtradelaw.typepad.com/ielpblog/2012/10/tld-symposium-henry-gao-comment-on-participation-of- developing-countries-in-wto-dispute-settlement.html

**Papers Submitted for Review**

### BOOK CHAPTERS

CHINA AND WTO E-COMMERCE NEGOTIATIONS, by Henry Gao. (2023). In Michael Geist & David Collins (Ed.), *Research Handbook on Digital Trade* Edward Elgar Publishing. (Submitted)

**Research Grants**

### SINGAPORE MANAGEMENT UNIVERSITY

- Regulatory barriers to e-commerce in ASEAN, Garena Online Private Limited, PI (Project Level): Henry GAO, 2022, S$165,932

- The Belt Road Initiative (BRI): Infrastructures and Institutions, SMU Societal Challenge Research Capacity Building Grant, Singapore Management University

(SMU), PI(Project Level): Henry GAO, Co-PI (Project Level): Q Forrest ZHANG, 2018, S$150,000

- The China (Shanghai) Pilot Free Trade Zone: Promises, Prospects and Problems, SMU Internal Grant, Ministry of Education (MOE) Tier 1, PI (Project Level): Henry GAO, 2014, S$29,129.11

- Public-Private Partnership in Trade Law: The Chinese Dilemma, SMU Internal Grant, Ministry of Education (MOE) Tier 1, PI (Project Level): Henry GAO, 2012, S$39,992.89

- Judicial Review Mechanism for Trade Remedy Determinations in China, SMU Internal Grant, Ministry of Education (MOE) Tier 1, PI (Project Level): Henry GAO, 2011, S$26,245.56

- Google and Internet Censorship in China: A Case Study on the Link Between Trade and Human Rights, SMU Internal Grant, Ministry of Education (MOE) Tier 1, PI (Project Level): Henry GAO, 2010, S$24,631.04

- A Critical Analysis of The Trans-Pacific Strategic Economic Partnership Agreement, SMU Internal Grant, Ministry of Education (MOE) Tier 1, PI (Project Level): Henry GAO, 2009, S$22,513.38

- Taking Justice into Your Own Hand: The Trade Barrier Investigation Mechanism in China, SMU Internal Grant, Ministry of Education (MOE) Tier 1, PI (Project Level): Henry GAO, 2008, S$36,604.7

**Work in Progress**

Henry GAO, Joost Pauwelyn, Jennifer Hillman, Wolters Kluwer, Casebook on International Trade Law, 2023

Henry GAO, Data Sovereignty and Trade Agreements: Three Digital Kingdoms, in Anupam Chander and Sun Haochen (eds), Data Sovereignty along the Digital Silk Road, 2023

**TEACHING**

**Courses Taught**

SINGAPORE MANAGEMENT UNIVERSITY

Undergraduate Programmes:
- Ethics and Social Responsibility

- ▪ Introduction to Chinese History, Culture, Economy, Politics and Law
- ▪ Legal Issues in US-China Economic Relations
- ▪ World Trade Organization: Law and Policy

Postgraduate Professional Programmes :
- ▪ Legal Issues and Risks in Business Trade Regulation in a Global Age

### OTHER INSTITUTIONS

- • Faculty of Law, Undergraduate, The University of Hong Kong (HKU)

## OTHER ACADEMIC AND PROFESSIONAL ACTIVITIES

### MEDIA CONTRIBUTIONS AND CITATIONS

China Approves First Homegrown mRNA Covid-19 Vaccine, Wall Street Journal, 22 Mar 2023 https://www.wsj.com/articles/china-approves-first-homegrown-mrna-covid-19-vaccine-85a0a68a

Who Benefits From Confrontation With China? New York Times editorial, 11 Mar 2023 https://www.nytimes.com/2023/03/11/opinion/china-us-relationship.html

How globalisation gave way, Money Talks podcast by the Economist, 19 Jan 2023, https://www.economist.com/podcasts/2023/01/19/how-globalisation-gave-way

A Former Chinese Leader Was Ushered Out, Leaving Many Questions, New York Times, 22 Oct 2022 https://www.nytimes.com/2022/10/22/world/asia/hu-jintao-china-congress.html

Can Xi Jinping vanquish Covid without crushing China's economy? Financial Times, 11 May 2022 https://www.ft.com/content/69ac0449-c6f9-4b30-a346-bd6716e735e5

U.S. on Sidelines as China and Other Asia-Pacific Nations Launch Trade Pact, Wall Street Journal, 01 Jan 2022 https://www.wsj.com/articles/u-s-on-sidelines-as-china-and-other-asia-pacific-nations-launch-trade-pact-11 641038401

China's 20th anniversary as a WTO member triggers mixed emotions, Financial Times, 09 Dec 2021 https://www.ft.com/content/279ad518-7700-4200-ba00-55d038c9e1fb

Chinese Communist party clears way for Xi to tighten grip on power, Financial Times, 11 Nov 2021 https://www.ft.com/content/77f8dd89-fd16-42f9-b2a5-0f5e9ee93ace

It's essential to bring back binding WTO dispute settlement, The Hill, 27 Oct 2021 https://thehill.com/opinion/international/578148-its-essential-to-bring-back-binding-wto-dispute-settlement

China Targets News Media in Xi Jinping's Campaign to Expand Communist Party Control, Wall Street Journal, 12 Oct 2021

https://www.wsj.com/articles/china-targets-news-media-in-xi-jinpings-campaign-to-expand-communist-party-control-11634054123

Xi Jinping gambles on economic tumult to cement his legacy, Financial Times, 12 Oct 2021
https://www.ft.com/content/d4018362-7f61-48cc-931c-a4ebc216c10c

China's CPTPP entry closer than you think, Nikkei Asia, 20 Sep 2021
https://asia.nikkei.com/Opinion/China-s-entry-to-CPTPP-trade-pact-is-closer-than-you-think

Chinese media's social mania maddens markets, Reuters, 06 Aug 2021
https://www.reuters.com/breakingviews/chinese-medias-social-mania-maddens-markets-2021-08-06/

The G-7's Global Tax Deal Faces a China Test, Wall Street Journal, 09 Jun 2021
https://www.wsj.com/articles/the-g-7s-global-tax-deal-faces-a-china-test-11623241054

U.S. and Chinese trade experts among the WTO chief's new deputies, Reuters, 04 May 2021
https://www.reuters.com/article/us-trade-wto-idCAKBN2CL1CJ

The RCEP - Great Power Competition and Cooperation over Trade, Afronomics Law , 10 Feb 2021 https://www.afronomicslaw.org/category/analysis/rcep-great-power-competition-and-cooperation-over-trade

China Issues New Rules Aimed at Trump's Sanctions, New York Times, 24 Jan 2021
https://www.nytimes.com/2021/01/09/business/china-rules-trump-biden-sanctions.html

China to turn inward for growth prospects, but conflicts with the US will continue, Hinrich Foundation, 30 Oct 2020 https://www.chathamhouse.org/events/all/research-event/china-us-and-future-wto

14 Years after WTO Accession, China's Reforms Benefit the World (入世14年，中国改革惠及世界), People's Daily, international Tribune, 11 Dec 2015

Can the Bali Agreement Save the WTO? (巴厘岛协议能拯救世贸组织吗？), People's Daily, international Tribune, 26 Dec 2013

China's economy and the WTO: All change, The Economist, 10 Dec 2011
https://www.economist.com/asia/2011/12/10/all-change

Q+A-Is there a WTO case against Chinese Internet censorship?, Reuters, 10 Mar 2010
https://www.reuters.com/article/china-usa-internet-idINTOE62901W20100310

This is WTO Bashing, South China Morning Post, 08 Sep 2005

## EXTERNAL SERVICE – PROFESSIONAL

- Editorial Review Board Member, Journal of International Economic Law, 2021 – Present

- Member Board of Advisors, Asian Yearbook of International Economic Law, 2020 - Present

- Member Board of Advisors, Hinrich Foundation, 2019 – Present

- Member Board of Advisors, Digital Trade and Data Governance Hub, Elliott School of International Affairs at The George Washington University, 2019 – Present

- Member Board of Advisors, John H. Jackson Moot Court Competition, ELSA (European Law Students' Association), 2014 – Present

- Editorial Review Board Member, Decision (published by Indian Institute of Management [Calcutta]), 2014 – Present

- Editorial Review Board Member, Indonesian Journal of International Law (published by University of Indonesia), 2014 – Present

- Member Board of Advisors, Asia-Pacific Research and Training Network (ARTNeT), United Nations Economic and Social Commission for Asia and the Pacific, 2014 – Present

- Editorial Review Board Member, Journal of Financial Regulation, 2013 – Present

- Member Board of Advisors, WTO Chairs Program, World Trade Organization, 2009 – Present

## EXPERT TESTIMONY

- Invited by the Committee on International Trade of the European Parliament as an Expert Witness to testify on China's international economic policy at the hearing on the new anti-coercion instrument in the EU Trade Defence toolbox in March 2022;

- Invited by the United States International Trade Commission as an Expert Witness to testify on China's digital trade policies at the Hearings on Investigation (No. 332-561), Global Digital Trade I: Market Opportunities and Key Foreign Trade Restrictions in Apr 2017, Mar 2018 and June 2021.

**EXTERNAL SERVICE – PUBLIC SECTOR AND COMMUNITY SERVICE**

- Member, International Advisory Network, Forum on Trade, Environment & the SDGs, 2021 – Present

- Member, Working Group on MLETR – compliant methods to deal with electronic transferable bills of lading, Enterprise Singapore, 2021 – Present

- Member, Working Group on IDC Policy Innovation, IMDA, 2021 – Present

# Exhibit 1

npc.gov.cn

# laws

47–59 minutes

---

(Adopted at the third Session of the Ninth National People's Congress on March 15, 2000 and promulgated by Order No. 31 of the President of the People's Republic of China on March 15, 2000)

Contents

Chapter I General Provisions

Chapter II Laws

Section 1 Limits of Legislative Power

Section 2 Legislation Procedures for the National People's Congress

Section 3 Legislation Procedures for the Standing Committee of the National People's Congress

Section 4 Legal Interpretation

Section 5 Other Provisions

Chapter III Administrative Regulations

Chapter IV Local Regulations, Autonomous Regulations, Separate Regulations and Rules

Section 1 Local Regulations, Autonomous Regulations and Separate Regulations

Section 2 Rules

Chapter V Application and Record

Chapter VI Supplementary Provisions

Chapter I General Provisions

Article 1 This Law is enacted in accordance with the Constitution with a view to standardizing legislation, establishing a sound legislative system of the State, establishing and improving the socialist legal system with Chinese characteristics, safeguarding and developing socialist democracy, promoting the government of the country according to law and building a socialist country under the rule of law.

Article 2 This Law shall be applicable to the enactment, revision and nullification of laws, administrative regulations, local regulations, autonomous regulations and separate regulations.

The rules of the departments under the State Council and of the local governments shall be formulated, revised and nullified in accordance with the relevant provisions of this Law.

Article 3 Laws shall be made in compliance with the basic principles laid down in the Constitution, principles of taking economic development as the central task, adhering to the socialist road and the people's democratic dictatorship, upholding leadership by the Communist Party of China, upholding Marxism-Leninism, Mao Zetong Thought and Deng Xiaoping theory and persevering in reform and in opening to the outside world.

Article 4 Laws shall be made in accordance with the statutory limits of power and procedures, on the basis of the overall interests of the State and for the purpose of safeguarding the uniformity and dignity of the socialist legal system.

Article 5 Laws shall be made in order to embody the will of the people, enhance socialist democracy and guarantee that the people participate in legislative activities through various channels.

Article 6 Law shall be made by proceeding from reality and scientifically and rationally prescribing the rights and duties of citizens, legal persons and other organizations, and the powers and

responsibilities of State organs.

Chapter II Laws

Section 1 Limits of Legislative Power

Article 7 The National People's Congress and its Standing Committee exercise the legislative power of the State.

The National People's Congress enacts and amends basic laws governing criminal offences, civil affairs, the State organs and other matters.

The Standing Committee of the National People's Congress enacts and amends laws other than the ones to be enacted by the National People's Congress, and when the National People's Congress is not in session, partially supplements and amends laws enacted by the National People's Congress, but not in contradiction to the basic principles of such laws.

Article 8 The following affairs shall only be governed by law:

(1) affairs concerning State sovereignty;

(2) formation, organization, and the functions and powers of the people's congresses, the people's governments, the people's courts and the people's procuratorates at all levels;

(3) the system of regional national autonomy, the system of special administrative region, the system of self-government among people at the grassroots level;

(4) criminal offences and their punishment;

(5) mandatory measures and penalties involving deprivation of citizens of their political rights or restriction of the freedom of their person;

(6) requisition of non-State-owned property;

(7) basic civil system;

(8) basic economic system and basic systems of finance, taxation, customs, banking and foreign trade;

(9) systems of litigation and arbitration; and

(10) other affairs on which laws must be made by the National People's Congress or its Standing Committee.

Article 9 If laws have not been enacted on the affairs specified in Article 8 of this Law, the National People's Congress or its Standing Committee has the power to make a decision to authorize the State Council to formulate, according to actual needs, administrative regulations first on part of those affairs, except for the affairs concerning criminal offences and their punishment, mandatory measures and penalties involving deprivation of citizens of their political rights or restriction of the freedom of their person, and the judicial system.

Article 10 In a decision on authorization, the purpose and scope of the authorization shall be clearly defined.

The authorization organ shall exercise the power strictly in compliance with the authorized purpose and scope.

The authorized organ may not impart the authorized power to any other organs.

Article 11 After the administrative regulations on an affair formulated under authorization have been tested in parctice and when the conditions are ripe for making a law on the affair, the National People's Congress or its Standing Committee shall make a law on it in a timely manner. As soon as the law is made, the authorization with regard to that matter shall be terminated accordingly.

Section 2 Legislation Procedures for the National People's Congress

Article 12 The Presidium of the National People's Congress may submit to the National People's Congress legislative bills, which shall be deliberated by the session of the National People's Congress.

The Standing Committee of the National People's Congress, the State Council, the Central Military Commission, the Supreme People's Court, the Supreme People's Procuratorate and the special committees of the National People's Congress may submit to the National People's Congress legislative bills, which shall be put on the agenda of a session by decision of the Presidium.

Article 13 A delegation or a group of thirty or more deputies may submit a legislative bill to the National People's Congress. The Presidium shall decide whether or not to put it on the agenda of

the session, or shall refer do so after referring the bill to a relevant special committee for deliberation and for making a proposal as to whether to put it on the agenda.

When the special committee holds a meeting to deliberate the bill, it may invite the sponsoring person to attend the meeting and express opinions.

Article 14 A legislative bill to be submitted to the National People's Congress may be submitted first to the Standing Committee when the National People's Congress is not in session, and after the Standing Committee has deliberated on it at its meetings in accordance with the procedures stipulated in Section 3 of Chapter II of this Law and decides to submit it to the National People's Congress for deliberation, the Standing Committee or the sponsor shall make explanations to a plenary meeting of the session.

Article 15 When the Standing Committee decides to submit a legislative bill to a session of the National People's Congress for deliberation, it shall distribute the draft bill to the deputies one month before the session is convoked.

Article 16 The legislative bill that has been placed on the agenda of a session of the National People's Congress shall be deliberated on by all the delegations after the explanation made by the sponsor has been heard at a plenary meeting of the session.

When the delegations are deliberating on a legislative bill, the sponsor shall send people to listen to their opinions and answer inquiries.

When the delegations are deliberating on a legislative bill, the relevant organ or organization shall, at the request of the delegations, send people to give briefings therefor.

Article 17 The legislative bill that has been placed on the agenda of a session of the National People's Congress shall be deliberated by the relevant special committee which shall submit its deliberated opinions to the Presidium, and the opinions shall also be printed and distributed at the session.

Article 18 The legislative bill that has been placed on the agenda of a session of the National People's Congress shall be subject to a unified deliberation by its Law Committee on the basis of the deliberated opinions of the various delegations and the relevant special committee. The Law Committee shall submit to the Presidium a report on the result of its deliberation and a revised draft law; major dissenting views shall be stated in the report. After examination and approval by the Presidium, the report and the draft law shall be printed and distributed at the session.

Article 19 With regard to a legislative bill that has been placed on the agenda of a session of the National People's Congress, the executive chairmen of the Presidium may, when necessary, convene a meeting of the heads of the various delegations to hear and discuss the deliberated opinions of the delegations on major questions in the legislative bill, and report the result of the discussion and the opinions expressed to the Presidium.

The executive chairmen of the Presidium may also convene a meeting of the interested deputies recommended by the delegations to discuss the major, special questions in the legislative bill, and report the result of the discussion and the opinions expressed to the Presidium.

Article 20 With regard to a legislative bill that has been placed on the agenda of a session of the National People's Congress, if the sponsor requests its withdrawal before it is put to vote, he shall state the reasons, and deliberation of the bill at the session shall terminate as soon as the Presidium has accepted the request and reported the matter to the session.

Article 21 Where important questions raised during the deliberation on a legislative bill call for further study, the Congress may, by decision of a plenary meeting according to a proposal made by the Presidium, authorize the Standing Committee to further deliberate on the bill on the basis of deputies' opinions, to make a decision and to give a report on the decision to the next session of the National People's Congress; or the Standing Committee may be authorized to further deliberate on the bill on the basis of deputies' opinions, to work out a revision proposal and to submit it to the next session of the National People's Congress for deliberation and decision.

Article 22 After a revised draft of the legislative bill has been deliberated on by the various delegations, the Law Committee shall revise revised draft according to the deliberated opinions of the delegations and prepare a draft for vote, the Presidium shall submit it for vote to a plenary meeting of the session, and the draft shall be subject to adoption by a simple majority of all the deputies.

Article 23 A law adopted by the National People's Congress shall be promulgated by Order of the President signed by the President of the People's Republic of China.

Section 3 Legislation Procedures for the Standing Committee of the National People's Congress

Article 24 The Council of Chairmen may submit legislative bills to a meeting of the Standing Committee for deliberation.

The State Council, the Central Military Commission, the Supreme People's Court, the Supreme People's Procuratorate or a special committee of the National People's Congress may submit a legislative bill to the Standing Committee, and the Council of Chairmen shall decide whether to put it on the agenda of a meeting of the Standing Committee or to refer it first to the relevant special committee for deliberation before deciding whether to put it on the agenda of a meeting of the Standing Committee in light of the report submitted by the relevant special committee. If the Council of Chairmen believes that the legislative bill contains major questions calling for further study, it may advise the sponsor of the bill to revise and improve the bill before submitting it to the Standing Committee.

Article 25 Ten or more of the members of the Standing Committee may jointly submit a legislative bill to the Standing Committee, and the Council of Chairmen shall decide whether to put it on the agenda of a meeting of the Standing Committee, or to refer it first to the relevant special committee for deliberation before deciding whether to put it on the agenda of a meeting of the Standing Committee in light of the suggestions as to whether to put it on the agenda submitted by the relevant special committee. If the Council of Chairmen decides not to put the legislative bill on the agenda of a meeting of the Standing Committee, it shall report the matter to a meeting of the Standing Committee or give an explanation to the sponsor.

When a special committee holds a meeting to deliberate on a bill, the sponsor may be invited to attend the meeting and express opinions.

Article 26 When a legislative bill is placed on the agenda of a meeting of the Standing Committee, its draft shall, except under special circumstances, be delivered to the component members of the Standing Committee seven days before the meeting.

Article 27 As a rule, a legislative bill placed on the agenda of a meeting of the Standing Committee shall be put to vote after deliberations at three meetings of the Standing Committee.

When the Standing Committee is to deliberate on a legislative bill for the first time, it shall hear the explanation made by the sponsor at a plenary meeting, and then preliminary deliberation shall be conducted at group meetings.

When the Standing Committee is to deliberate on a legislative bill for the second time, it shall hear the report made by the Law Committee on the revision of the draft and the main problems thereof at a plenary meeting, and then further deliberation shall be conducted at group meetings.

When the Standing Committee is to deliberate on a legislative bill for the third time, it shall hear the report made by the Law Committee on the result of its deliberation on the draft at a plenary meeting, and then the revised draft of the legislative b8ill be deliberated on at group meetings.

When the Standing Committee is to deliberate on a legislative bill, it may, according to needs, convene joint group meetings or plenary meetings to discuss the main questions contained in the draft.

Article 28 If the various quarters have a consensus in the main on a legislative bill placed on the agenda of a meeting of the Standing Committee, the bill may be put to vote after deliberation at two meetings of the Standing Committee; if the various quarters have a consensus in the main on a legislative bill concerning partial amendment of a law, the bill may be put to vote after deliberated at one meeting only.

Article 29 When group meetings of the Standing Committee are held to deliberate on a legislative bill, the sponsor shall send people to listen to opinions and answer inquires.

When group meetings of the Standing Committee are held to deliberate on a legislative bill, the relevant organ or organization shall, at the request of any group, send people to give briefings thereof.

Article 30 The legislative bill placed on the agenda of a meeting of the Standing Committee shall be deliberated by the relevant special committee, which shall offer its opinions after deliberation and have them printed and distributed at the Standing Committee meeting.

When a special committee holds a meeting to deliberate on a legislative bill, members of other relevant special committees may be invited to attend the meeting and express opinions.

Article 31 With regard to a legislative bill placed on the agenda of a Standing Committee meeting, the Law Committee shall conduct a unified deliberation on the basis of the opinions expressed by members of the Standing Committee and relevant special committees after deliberation as well as the opinions offered by the various quarters, work out a revision report or a report on the result of its deliberation and a revised draft of the legislative bill, and state the major dissenting view in either of the two reports. It shall give feedback to the relevant special committees if their deliberated opinions of importance are not accepted.

When the Law Committee holds a meeting to deliberate on a legislative bill, members of other

relevant special committees may be invited to attend the meeting and express opinions.

Article 32 When a special committee is to deliberate on a legislative bill, it shall hold a plenary meeting and may, in light of need, request the relevant organ or organization to send the leading members concerned to make explanation.

Article 33 Where the special committees disagree on major questions contained in a draft law, the matter shall be reported to the Council of Chairmen.

Article 34 With regard to a legislative bill placed on the agenda of a Standing Committee meeting, the Law Committee, the relevant special committee and the working offices of the Standing Committee shall listen to opinions of the various quarters by holding forums, seminars, hearings, etc.

The working offices of the Standing Committee shall send copies of the draft law to the relevant organs, organizations and specialists to solicit their opinions and then sort out the opinions and submit them to the Law Committee and the relevant special committee and, where necessary, print and distribute them at a meeting of the Standing Committee.

Article 35 With regard to a legislative bill placed on the agenda of a Standing Committee meeting, it may, by decision of the Council of Chairmen, be published for soliciting opinions. Opinions gathered from the organs, organizations and citizens shall be sent to the working offices of the Standing Committee.

Article 36 With regard to a legislative bill placed on the agenda of a meeting of the Standing Committee, its working offices shall collect and sort out the deliberated opinions from group meetings and the opinions offered by the various quarters as well as other relevant information, and then send them to the Law Committee and the relevant special committee and, where necessary, print and distribute them at a meeting of the Standing Committee.

Article 37 With regard to a legislative bill placed on the agenda of a meeting of the Standing Committee, if the sponsor requests its withdrawal before it is put to vote, he shall state the reasons, and deliberation of the bill at the meeting shall terminate as soon as the Council of Chairmen has accepted the request and reported the matter to the Standing Committee.

Article 38 Where a legislative bill has been deliberated on by the Standing Committee at three meetings and there are still major questions calling for further study, the Council of Chairmen may propose, provided with the consent of a joint group meeting or a plenary meeting, not to put the bill to vote for the time being, and refer it to the Law Committee and the relevant committee for further deliberation.

Article 39 Where the deliberation of a legislative bill has been laid aside for two full years owing to significant disagreement among the various quarters on the necessity and feasibility of making the bill into a law, or where a legislative bill that has been proposed not to be put to vote for the time being has failed to be placed again on the agenda of a meeting of the Standing Committee for deliberation within two years, the Council of Chairmen shall report the matter to the Standing Committee and deliberation on the said bill shall terminate.

Article 40 After the revised draft of a law has been deliberated by the Standing Committee at its meeting, the Law Committee shall further revise it on the basis of the deliberated opinions of the members of the Standing Committee before preparing a draft for vote; then, the Council of Chairmen shall request the Standing Committee to put the draft to vote at a plenary meeting, and the draft shall be subject to adoption by a simple majority of the total membership of the Standing Committee.

Article 41 A law adopted by the Standing Committee shall be promulgated by Order of the President signed by the president of the People's Republic of China.

Section 4 Legal Interpretation

Article 42 The power of legal interpretation belongs to the Standing Committee of the National People's Congress.

A law shall be interpreted by the Standing Committee of the National People's Congress if:

(1) the specific meaning of a provision needs to be further defined; or

(2) after its enactment, new developments make it necessary to define the basis on which to apply the law.

Article 43 The State Council, the Central Military Commission, the Supreme People's Court, the Supreme People's Procuratorate, a special committee of the National People's Congress and the standing committee of the people's congress of a province, autonomous region or municipality directly under the Central Government may request the Standing Committee of the National People's Congress to give legal interpretation.

Article 44 The working offices of the Standing Committee shall study and work out a draft for the legal interpretation, which shall be put on the agenda of the Standing Committee meeting by decision of the Council of Chairmen.

Article 45 After a draft for legal interpretation has been deliberated by the Standing Committee at its meeting, the Law Committee shall, on the basis of the deliberated opinions of members of the Standing Committee, deliberate on the draft and revise it before working out a draft legal interpretation for vote.

Article 46 The draft legal interpretation for vote shall be subject to adoption by a simple majority of the total membership of the Standing Committee and be promulgated by the Standing Committee in an announcement.

Article 47 The legal interpretation adopted by the Standing Committee of the National People's Congress has the same effect as the laws enacted by it.

Section 5 Other Provisions

Article 48 When a legislative bill is submitted, a version of the draft law, its explanation and other necessary information shall be provided at the same time. The explanation on the draft law shall cover the necessity of its enactment and its main contents.

Article 49 With regard to a legislative bill submitted to the National People's Congress or its Standing Committee, the sponsor has the right to withdraw it before it is put on the agenda of a Congress session or Committee meeting.

Article 50 With regard to a legislative bill that has failed to pass the vote at a plenary meeting of the National People's Congress or its Standing Committee, if the sponsor still considers it necessary to enact the proposed law, he may submit the bill anew in accordance with the statutory procedures, and the Presidium or the Council of Chairmen shall decide whether to put it on the agenda of a session of the Congress or a meeting of the Standing Committee; for a bill that has failed to be adopted by the National People's Congress, the case shall be referred to the National People's Congress for deliberation and decision.

Article 51 In a law, the time for its entry into effect shall be clearly stipulated.

Article 52 In an Order of the President signed for promulgating a law, the organ that enacts the law, the date of its adoption and the time for its entry into effect shall be clearly stated.

Once a law is promulgated upon signing, it shall be published in the Bulletin of the Standing Committee of the National People's Congress and in the newspapers with a nationwide distribution.

The text of a law published in the Bulletin of the Standing Committee shall be the standard text.

Article 53 The procedures for revising or nullifying a law shall be governed by the relevant provisions in this Chapter.

Where only part of the articles of a law are revised or nullified, the new text of the law must be promulgated.

Article 54 According to the need of the contents, a law may consists of parts, chapters, sections, articles, paragraphs, subparagraphs and items.

The sequence of the different parts, chapters, sections and articles shall be marked in the order of Chinese numerals, the sequence of the paragraphs shall not be marked, that of subparagraphs shall be marked in the order of bracketed Chinese numerals and that of items marked with Arabic numerals.

In the note to the title of a law, the organ that enacts the law and the date of adoption shall be clearly stated.

Article 55 The working offices of the Standing Committee of the National People's Congress may reply, after study, to any legal inquiries regarding specific questions and shall report thereon to the Standing Committee for the record.

Chapter III Administrative Regulations

Article 56 The State Council shall, in accordance with the Constitution and laws, formulate administrative regulations.

The administrative regulations may be formulated to govern the following matters:

(1) matters requiring the formulation of administrative regulations in order to implement the provisions of law; and

(2) matters within the administrative functions and powers of the State Council as provided for in

Article 89 of the Constitution.

When the administrative regulations governing an affair which has been formulated first by the State Council under authorization decided on by the National People's Congress or its Standing Committee, an affair on which the National People's Congress or its Standing Committee is responsible to make a law, have been tested in practice and when the conditions are ripe for making a law on the affair, the State Council shall, in a timely manner, request the National People's Congress or its Standing Committee to make the law.

Article 57 The drafting of administrative regulations shall be arranged by the State Council. Where a relevant department under the State Council considers it necessary to formulate administrative regulations to govern a matter, it shall apply to the State Council for including the matter in its legislation list.

Article 58 In drafting administrative regulations, opinions from relevant organs, organizations and citizens shall be widely listened to, and forums, seminars, hearings, etc. may be held for the purpose.

Article 59 When the drafting of the administrative regulations is completed, the drafting unit shall submit the draft, its explanation, differing opinions from the various quarters on major questions in the draft and other relevant information to the legislative affairs department under the State Council for examination.

The legislative affairs department under the State Council shall submit an examination report and a revised draft to the State Council and in its examination report explain the major questions in the draft.

Article 60 The decision-making procedures for administrative regulations shall comply with the relevant provisions in the Organic Law of the State Council of the People's Republic of China.

Article 61 Administrative regulations shall be promulgated by Order of the State Council signed by the Premier of the State Council.

Article 62 After promulgation upon signing, the administrative regulations shall immediately be published in the Bulletin of the State Council and in newspapers with a nationwide distribution.

The text of the administrative regulations published in the Bulletin of the State Council shall be the standard text.

Chapter IV Local Regulations, Autonomous Regulations, Separate Regulations, and Rules

Section 1 Local Regulations, Autonomous Regulations and Separate Regulations

Article 63 The people's congresses or their standing committees of the provinces, autonomous regions and municipalities directly under the Central Government may, in light of the specific conditions and actual needs of their respective administrative areas, formulate local regulations, provided that such regulations do not contradict the Constitution, the laws and the administrative regulations.

The people's congresses or their standing committees of the comparatively larger cities may, in light of the specific local conditions and actual needs, formulate local regulations, provided that they do not contradict the Constitution, the laws, the administrative regulations and the local regulations of their respective provinces or autonomous regions, and they shall submit the regulations to the standing committees of the people's congresses of the provinces or autonomous regions for approval before implementation. The standing committees of the people's congresses of the provinces or autonomous regions shall examine the legality of such local regulations which are submitted for approval, and shall approve them within four months if they do not contradict the Constitution, the laws, the administrative regulations, and the local regulations of their respective provinces or autonomous regions.

When the standing committee of the people's congress of a province or autonomous region examines the local regulations of a comparatively larger city submitted for approval, it shall make a decision to deal with the matter if it finds that the said regulations contradict the rules of the people's government of the province or autonomous region.

A "comparatively larger city" used in this Law refers to a city where a provincial or autonomous regional people's government is located or where a special economic zone is located, or a city approved as such by the State Council.

Article 64 Local regulations may be formulated to govern the following matters:

(1) matters requiring the formulation of specific provisions in light of the actual conditions of an respective administrative area for implementing the provisions of laws or administrative regulations; and

(2) matters of local character that require the formulation of local regulations.

Except for the affairs provided for in Article 8 of this Law, the provinces, autonomous regions, municipalities directly under the Central Government and the comparatively larger cities may, in light of the specific local conditions and actual needs, first formulate local regulations on all other affairs for which the State has not yet formulated any laws or administrative regulations. Once the laws or administrative regulations formulated on such matters by the State come into effect, the provisions in local regulations which contradict the said laws or administrative regulations shall be null or void, and the organs that have formulated such regulations shall promptly amend or annul the provisions.

Article 65 The people's congresses or their standing committees of the provinces and cities where special economic zones are located may, upon authorization by decision of the National People's Congress, formulate regulations and enforce them within the limits of the special economic zones.

Article 66 The people's congresses of the national autonomous areas have the power to formulate autonomous regulations and separate regulations on the basis of the political, economic and cultural characteristics of the local nationality(nationalities). The autonomous regulations and separate regulations of the autonomous regions shall be submitted to the Standing Committee of the National People's Congress for approval and shall go into effect upon approval. The autonomous regulations and separate regulations of the autonomous prefectures or counties shall be submitted to the standing committees of the people's congresses of the relevant provinces, autonomous regions or municipalities directly under the Central Government for approval and shall go into effect upon approval.

Where certain provisions of the laws and administrative regulations are concerned, adaptation on the basis of the characteristics of the local nationality (nationalities) may be made in autonomous regulations and separate regulations, but such adaptation may not contradict the basis principles of the laws and administrative regulations; where the provisions of the Constitution and the Law on Regional National Autonomy as well as the provisions in other laws and administrative regulations specially formulated to govern the national autonomous areas are concerned, no adaptation may be made.

Article 67 Local regulations governing especially important matters of an administrative area shall be subject to adoption by the people's congress of the area.

Article 68 The procedures for submission, deliberation and voting of bills of local regulations, autonomous regulations or separate regulations shall be enacted by the people's congress at the corresponding level in accordance with the Organic Law of the People's Republic of China on Local People's Congresses and Local People's Governments and with reference to the provisions of Sections 2, 3 and 5 in Chapter II of this Law.

The organ in charge of unified deliberation of a draft of local regulations shall prepare a report on the result of its a conclusive report on deliberation and a revised draft of the regulations.

Article 69 Local regulations formulated by the people's congress of a province, autonomous region or municipality directly under the Central Government shall be promulgated by the presidium of the congress in an announcement.

Local regulations formulated by the standing committee of the people's congress of a province, autonomous region or municipality directly under the Central Government shall be promulgated by the standing committee in an announcement.

Local regulations formulated by the people's congress or its standing committee of a comparatively larger city shall, upon approval, be promulgated by the standing committee of the people's congress of the city in an announcement.

Autonomous regulations or separate regulations shall, upon approval, be promulgated by the standing committee of the local people's congress of the autonomous region, autonomous prefecture or autonomous county in an announcement.

Article 70 Once local regulations or autonomous regulations and separate regulations of an autonomous region are promulgated, they shall be published in the gazette of the standing committee of the local people's congress and in newspapers distributed within the administrative area.

The text of local regulations or autonomous regulations and separate regulations published in the gazette of the standing committee of the people's congress shall be the standard text.

Section 2 Rules

Article 71 The ministries and commissions of the State Council, the People's Bank of China, the State Audit Administration as well as the other organs endowed with administrative functions directly under the State Council may, in accordance with the laws as well as the administrative

regulations, decisions and orders of the State Council and within the limits of their power, formulate rules.

Matters governed by the rules of departments shall be those for the enforcement of the laws or the administrative regulations, decisions and orders of the State Council.

Article 72 With regard to a matter that falls within the limits of power of two or more departments under the State Council, the State Council shall be requested to formulate administrative regulations, or the departments concerned under the State Council shall jointly formulate rules.

Article 73 The people's governments of the provinces, autonomous regions, municipalities directly under the Central Government and the comparatively larger cities may, in accordance with laws and administrative regulations and the local regulations of their respective province, autonomous regions or municipalities, formulate rules.

Local governments may formulate rules to govern the following matters:

(1) matters requiring the formulation of rules to implement the provisions of laws, administrative regulations and local regulations; and

(2) specific administrative matters pertaining to their respective administrative areas.

Article 74 The procedures for formulating the rules of departments under the State Council and rules of local governments shall be enacted by the State Council with reference to the provisions in Chapter III of this Law.

Article 75 The Rules of departments shall be subject to decision by the executive meetings of ministries or meetings of commissions.

The rules of local governments shall be subject to decision by the executive meetings or plenary meetings of the respective governments.

Article 76 The rules of departments shall be promulgated by orders signed by the heads of the departments.

The rules of local governments shall be promulgated by orders signed by governors of provinces, chairmen of autonomous regions or mayors.

Article 77 the rules of departments shall, upon promulgation by signed orders, be promptly published in the gazette of the State Council or gazettes of the departments and in newspapers with a nationwide distribution.

The rules of local governments shall, upon promulgation by signed orders, be promptly published in gazettes of the local people's governments and in newspapers distributed within their respective administrative areas.

The text of rules published in the gazette of the State Council or of the department and in the gazette of the local people's government shall be the standard text.

Chapter V Application and Record

Article 78 The legal effect of the Constitution is the highest, and no laws, administrative regulations, local regulations, autonomous regulations, separate regulations or rules whatever may contradict it.

Article 79 The effect of laws is higher than that of administrative regulations, local regulations, and rules.

The effect of administrative regulations is higher than that of local regulations, and rules.

Article 80 The effect of local regulations is higher than that of the rules of the local governments at or below the corresponding level.

The effect of the rules formulated by the people's governments of the provinces or autonomous regions is higher than that of the rules formulated by the people's governments of the comparatively larger cities within the administrative areas of the provinces and autonomous regions.

Article 81 Where in autonomous regulations or separate regulations provisions are formulated in accordance with law to make adaptations with regard to certain provisions of laws, administrative regulations or local regulations, the provisions of the autonomous regulations or separate regulations shall apply in the autonomous areas concerned.

Where regulations of special economic zones are formulated, upon authorization, to make adaptations with regard to certain provisions of laws, administrative regulations or local regulations, the provisions of the regulations of special economic zones shall apply in the special economic zones concerned.

Article 82 The effect of the rules of different departments is equal between the departments, and the effect of the rules of departments and of the rules of local governments is equal between the departments and local governments; their application shall be confined to their respective limits of authority.

Article 83 With regard to laws, administrative regulations, local regulations, autonomous regulations, separate regulations or rules, if they are formulated by one and same organ and if there is inconsistency between special provisions and general provisions, the special provisions shall prevail; if there is inconsistency between the new provisions and the old provisions, the new provisions shall prevail.

Article 84 Laws, administrative regulations, local regulations, autonomous regulations, separate regulations and rules shall not be retroactive, but the regulations formulated specially for the purpose of better protecting the rights and interests of citizens, legal persons and other organizations are excepted.

Article 85 Where there is inconsistency between the new general provisions and the old special provisions in different laws governing one and the same matter and it is hard to decide which provisions shall prevail, a ruling shall be made by the Standing Committee of the National People's Congress.

Where there is inconsistency between the new general provisions and the old special provisions in different administrative regulations governing one and the same matter and it is hard to decide which provisions shall prevail, a ruling shall be made by the State Council.

Article 86 Where there is inconsistency between local regulations and rules, a ruling shall be made by the organ concerned according to the limits of power prescribed below:

(1) Where there is inconsistency between the new general provisions and the old special provisions formulated by one and the same organ, the said organ shall make a ruling;

(2) Where there is inconsistency between the provisions of local regulations and those of the rules of departments governing one and same matter and it is hard to decide which provisions shall prevail, the State Council shall make a decision; if it considers that the provisions of the local regulations should be applied, it shall decide that the provisions of the local regulations should be applied in the locality concerned; if it considers that the rules of departments should be applied, the case shall be submitted to the Standing Committee of the National People's Congress for a ruling; and

(3) Where there is inconsistency between the provisions in the rules of different departments or between the provisions in the rules of the departments and those in the rules of local governments governing one and the same matter, the State Council shall make a ruling.

Where there is inconsistency between the regulations formulated upon authorization and the provisions of laws and it is hard to decide which shall prevail, the Standing Committee of the National People's Congress shall make a ruling.

Article 87 Under any of the following circumstances, laws, administrative regulations, local regulations, autonomous regulations, separate regulations or rules shall be altered or annulled by the organ concerned in accordance with the limits of power prescribed in Article 88 of this Law:

(1) where the limits of power are transcended;

(2) where provisions of the legislation of lower levels contravene those of the legislation of upper levels;

(3) where, because of inconsistency between the provisions of different rules governing one and the same matter, it is ruled that the provisions of one side be altered or annulled;

(4) where the provisions of rules are considered inappropriate and should therefore be altered or annulled; or

(5) where legal procedures are violated.

Article 88 The limits of power for altering or annulling laws, administrative regulations, local regulations, autonomous regulations, separate regulations or rules are as follows:

(1) The National People's Congress has the power to alter or annul any inappropriate laws enacted by its Standing Committee, and to annul any autonomous regulations or separate regulations which have been approved by its Standing Committee but which contravene the Constitution or the provision of the second paragraph in Article 66 of this Law;

(2) The Standing Committee of the National People's Congress has the power to annul any administrative regulations which contradict the Constitution and laws, to annul any local regulations which contradict the Constitution, laws or administrative regulations, and to annul any autonomous regulations or separate regulations which have been approved by the standing committees of the

people's congresses of the relevant provinces, autonomous regions or municipalities directly under the Central Government but which contravene the Constitution or the provision of the second paragraph in Article 66 of this Law;

(3) The State Council has the power to alter or annul any inappropriate rules of the departments and of local governments;

(4) The people's congress of a province, autonomous region or municipality directly under the Central Government has the power to alter or annul any inappropriate local regulations formulated or approved by its standing committee;

(5) The standing committee of a local people's congress has the power to annul any inappropriate rules formulated by the people's government at the same level;

(6) The people's government of a province or autonomous region has the power to alter or annul any inappropriate rules formulated by people's governments at the next lower level; and

(7) The authorizing organ has the power to annul any of the regulations formulated by an authorized organ that transcends the authorized limits of power or contravenes the authorized purpose, and when necessary, may revoke the authorization.

Article 89 Administrative regulations, local regulations, autonomous regulations, separate regulations and rules shall, within 30 days from the date of promulgation, be reported to the organ concerned for the record in accordance with the following provisions:

(1) Administrative regulations shall be reported to the Standing Committee of the National People's Congress for the record;

(2) Local regulations formulated by the people's congresses or their standing committees of provinces, autonomous regions and municipalities directly under the Central Government shall be reported to the Standing Committee of the National People's Congress and the State Council for the record; local regulations formulated by the people's congresses or their standing committees of the comparatively larger cities shall be reported by the standing committees of the people's congresses of the relevant provinces and autonomous regions to the Standing Committee of the National People's Congress and the State Council for the record;

(3) Autonomous regulations and separate regulations formulated by autonomous prefectures and autonomous counties shall be reported by the standing committees of people's congresses of the relevant provinces, autonomous regions or municipalities directly under the Central Government to the Standing Committee of the National People's Congress and the State Council for the record;

(4) The rules of a department and of a local government shall be reported to the State Council for the record. The rules of a local government shall at the same time be reported to the standing committee of the people's congress at the same level for the record. The rules formulated by the people's government of a comparatively larger city shall simultaneously be reported to the standing committee of the people's congress and to the people's government of the relevant province or autonomous region for the record; and

(5) Regulations formulated upon authorization shall be reported to the organ specified by the authorization decision for the record.

Article 90 When the State Council, the Central Military Commission, the Supreme People's Court, the Supreme People's Procuratorate and the standing committees of the people's congresses of the provinces, autonomous regions and municipalities directly under the Central Government consider that administrative regulations, local regulations, autonomous regulations or separate regulations contradict the Constitution or laws, they may submit to the Standing Committee of the National People's Congress written requests for examination, and the working offices of the Standing Committee shall refer the requests to the relevant special committees for examination and suggestions.

When State organs other than the ones mentioned in the preceding paragraph, public organizations, enterprises and institutions or citizens consider that administrative regulations, local regulations, autonomous regulations or separate regulations contradict the Constitution or laws, they may submit to the Standing Committee of the National People's Congress written suggestions for examination, and the working offices of the Standing Committee shall study the suggestions and shall, when necessary, refer them to the relevant special committees for examination and suggestions.

Article 91 When after examination a special committee of the National People's Congress considers that administrative regulations, local regulations, autonomous regulations or separate regulations contradict the Constitution or laws, it may submit written suggestions to the organ that has formulated the regulations for examination; or the Law Committee and other relevant special committees may convene a joint meeting for examination and request the said organ to attend the meeting and give an explanation, and then after examination submit to the organ written comments

and suggestions. The organ that has formulated the regulations shall, within two months, study and put forth suggestions as to whether to revise the regulations, and shall give feedback to the Law Committee and other relevant special committees of the National People's Congress.

If, after examination, the Law Committee and other relevant special committees of the National People's Congress consider that administrative regulations, local regulations, autonomous regulations or separate regulations contradict the Constitution or laws and the organ that has formulated such regulations refuses to make revision, they may submit written comments and suggestions on the basis of their examination and propose a motion for annulment of the regulations to the Council of Chairmen, which shall decide whether to submit the motion to a meeting of the Standing Committee for examination and decision.

Article 92 Other authorities which receive local regulations, autonomous regulations, separate regulations or rules submitted to them for the record shall, in accordance with the principle of safeguarding legal uniformity, formulate procedures for the examination of such regulations or rules.

Chapter VI Supplementary Provisions

Article 93 The Central Military Commission shall, in accordance with the Constitution and laws, formulated military regulations.

The General Departments, the various services and arms and the military commands of the Central Military Commission may, in accordance with laws and the military regulations, decisions and orders of the Commission, formulate military rules within the limits of their power.

Military regulations and military rules shall be implemented within the armed forces.

Measures for formulating, revising and nullifying military regulations and military rules shall be formulated by the Central Military Commission in accordance with the principles laid down in this Law.

Article 94 This Law shall go into effect as of July 1, 2000.

Printer-Friendly E-Mail This

# Exhibit 2



info@certifiedtranslate.com | 2425 Olympic Blvd., Suite 4000W | usa  1-888-856-2228
www.certifiedtranslate.com | Santa Monica, CA 90404 | int  +1-310-684-3153
 | | fax  +1-310-564-1944



**A member of the American
Translators Association
ATA Member Number: 248719**

## CERTIFIED TRANSLATION

*Description of Document(s):*

| |
|---|
| **LETTER OF REPLY FROM THE PRICE DEPARTMENT OF THE STATE PLANNING COMMISSION** |
| **REGARDING THE COST BASIS FOR THE DETERMINATION OF LOW-PRICE DUMPING** |
| **DATE ISSUED: JANUARY 18, 1999** |
| |

| Source Language: | **CHINESE** | Target Language: | **ENGLISH** |
|---|---|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director          **Date:**   May 22, 2023

A copy of the translated version(s) is attached to this statement of certification.



www.certifiedtranslate.com

Peking University Law School                    [Chinalawinfo code] CLI.4.22066
PKULAW.COM

---

Letter of Reply from the Price Department of the State Planning Commission
Regarding the Cost Basis for the Determination of Low-Price Dumping

| | |
|---|---|
| Formulating agency: | National Development and Reform Commission (including the former State Development Planning Commission and the former State Planning Commission) History of the Organization |
| Document number: | Planning Commission Price Letter [1999] Number 5 |
| Date issued: | 1999.01.18 |
| Date implemented: | 1999.01.18 |
| Effectiveness: | Currently in effect |
| Hierarchy of effectiveness: | Departmental regulatory document |
| Category of regulation: | Price supervision and inspection |

Letter of Reply from the Price Department of the State Planning Commission
Regarding the Cost Basis for the Determination of Low-Price Dumping
(January 18, 1999   Planning Commission Price Letter [1999] Number 5)

To the Guangdong Province Price Bureau:

The "Request for Instructions Regarding the Determination of Unfair Price Practices of Low Price Dumping" (Guangdong Price [1998] Number 317) has been received from your Bureau. The basis for determining the cost of low price dumping is now clarified as follows:

According to the "Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products" (hereinafter referred to as the "Regulations") issued and implemented by the State Planning Commission and the State Economic and Trade Commission, the determination and investigation of low-price dumping by a company should be conducted in accordance with the company's own costs. The competent department in charge of an industry, with the approval of the State Planning Commission, publish the average cost of the industry in order to guide companies in setting reasonable prices and strengthening price self-discipline. When a company sells at a price which is lower than the published industry average cost, other operators may report it accordingly. However, when the price department determines and investigates whether there is low price dumping by a company, it may not use the average cost of the industry as the basis for the determination and investigation of dumping (except in the case of the scenarios mentioned in Article 15 of the "Regulations"). As long as the company does not sell below its own cost, even if it is lower than the average cost of the industry, it is still not deemed to be low-price dumping.

No related content

---

1/2                                               Date downloaded: 2023-05-17

[watermark: Peking University Law School   PKULAW.COM]



www.certifiedtranslate.com

Peking University Law School                [Chinalawinfo code] CLI.4.22066
PKULAW.COM

© Peking University Fabao: (www.pkulaw.com) Provides various professional solutions in the fields of legal information, legal knowledge and legal software. Beijing University Fabao provides you with rich reference materials. Please check with the standard text when citing legal provisions formally. You are welcome to view all products and services.

Fabao update: How can you quickly find the search results you need? What are the new features of Fabao V6?

[QR code]

Scan the QR code to read the original text

Original link: https://www.pkulaw.com/chl/761c405b427aadf3bdfb.html

E_TRANSLATION

【法宝引证码】CLI.4.22066

# 国家计委价格司关于判定低价倾销的成本依据问题的复函

| | |
|---|---|
| 制定机关： | 国家发展和改革委员会(含原国家发展计划委员会、原国家计划委员会)　机构沿革 |
| 发文字号： | 计司价格函〔1999〕5号 |
| 公布日期： | 1999.01.18 |
| 施行日期： | 1999.01.18 |
| 时效性： | 现行有效 |
| 效力位阶： | 部门规范性文件 |
| 法规类别： | 价格监督检查 |

国家计委价格司关于判定低价倾销的成本依据问题的复函

（一九九九年一月十八日　计司价格函〔１９９９〕５号）

广东省物价局：

你局《关于低价倾销不正当价格行为认定问题的请示》（粤价〔１９９８〕３１７号）收悉。现将低价倾销成本判定依据问题明确如下：

根据国家计委、国家经贸委颁布实施的《关于制止低价倾销工业品的不正当价格行为的规定》（下称《规定》），认定和查处企业低价倾销，要以企业自身成本为判定依据。行业主管部门经国家计委同意发布行业平均成本是为了指导企业合理定价，加强价格自律。当企业以低于发布的行业平均成本的价格销售时，其他经营者可以据此进行举报。但物价部门在认定和查处企业低价倾销时，不能以行业平均成本作为认定和查处的依据（《规定》第十五条情况除外）。只要企业不低于自身成本销售，即使低于行业平均成本，仍不属于低价倾销行为。

无相关内容

©北大法宝：（www.pkulaw.com）专业提供法律信息、法学知识和法律软件领域各类解决方案。北大法宝为您提供丰富的参考资料，正式引用法规条文时请与标准文本核对。 欢迎查看所有产品和服务。

法宝快讯： 如何快速找到您需要的检索结果？ 法宝 V6 有何新特色？



扫描二维码阅读原文

原文链接： https://www.pkulaw.com/chl/761c405b427aadf3bdfb.html

下载日期：2023-05-17

# Exhibit 3



info@certifiedtranslate.com | 2425 Olympic Blvd., Suite 4000W | usa 1-888-856-2228
www.certifiedtranslate.com | Santa Monica, CA 90404 | int +1-310-684-3153
| | fax +1-310-564-1944



**A member of the American
Translators Association
ATA Member Number: 248719**

## CERTIFIED TRANSLATION

*Description of Document(s):*

| |
|---|
| **NEWS ARTICLE** |
| **CARRY OUT THE PRICE LAW AND PROMOTE PRICE REFORM** |
| |
| |

| Source Language: **CHINESE** | Target Language: **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director                    **Date:**   May 11, 2023

A copy of the translated version(s) is attached to this statement of certification.



www.certifiedtranslate.com

SMU Classification: Restricted

DOI: 10.19851/j.cnki.cn11-1010/f.1999.05.004

☐ Monograph

# Carry out the Price Law and Promote Price Reform

Bi Jingquan

The Price Law is an important milestone in the establishment of our country's legal system, and it is also an important symbol of the legalization of our country's price work. The implementation of the Price Law has laid a legal cornerstone for our country's price work. Practice in the past year has proved that the formulation and implementation of the Price Law is scientific, in line with the direction of reform, and operable in actual work. On the occasion of the first anniversary of the implementation of the Price Law, we are very grateful to the former leaders who have worked hard for the formulation of the Price Law, including Comrade Cheng Zhiping, a member of the Finance and Economics Committee of the last National People's Congress and former Director-General of the State Price Bureau. Bian Yaowu, director of the Legislative Affairs Committee of the National People's Congress, comrades from the Legislative Affairs Office of the State Council, and Comrade Ma Kai, deputy secretary-general of the State Council and former deputy Director-General of the State Planning Commission, who led us to study and draft the Price Law. Now we report the relevant situation of implementing the Price Law in the past year as follows:

**I. Since the implementation of the Price Law for one year, we have actively promoted price reforms in accordance with the basic principles stipulated in the Price Law, rectified the price order, rationalized the price relationship, and fully implemented and carried out the Price Law**

1. Establish a price formation mechanism in which prices are mainly formed by the market under the state's macro-control. According to the provisions of the Price Law, our country implements and gradually improves the mechanism of primarily forming prices by the market under macroeconomic regulation and control. Over the past year, we have done a great deal of work in the transformation of grain prices, cotton prices, oil prices and electricity price formation mechanisms, and actively promoted the development in the direction of market formation of prices.

**Grain prices.** Along with reform of the grain distribution system, grain pricing has been changed from the central government setting purchase prices in the past to the central government setting principles, and provincial people's governments setting specific purchase prices. A protection price policy will be implemented for surplus grain other than quota grain purchased from farmers. The protection price is also formulated by the central government in principle, and the specific protection price level is formulated by the provincial people's government. Based on the progress in grain reform, the State Council has recently made a decision to further improve the grain price policy. The main reason is that in light of the phased oversupply of grain in our country at the present stage, price leverage is used to actively promote the adjustment of the grain production structure, encourage the production of high-quality grain, and appropriately restrict the production of high-yield, poor-quality, and unmarketable varieties.

**Cotton prices.** Last year we liberalized the sales price of cotton, and this year we will further liberalize the purchase price of cotton. Of course, after the price is liberalized, cotton prices will see a larger drop. This is an important measure, based on the situation where domestic cotton supply exceeds demand and international market prices continues to decrease, to urge farmers to adjust the industrial structure of agriculture.

**Oil prices.** Last year, two group companies of petroleum and petrochemicals were jointly established, combining the production and sales of crude oil and refined oil, and realized the connection with the international market in terms of oil price. Only the oil used in special industries such as reserve oil and military oil is subject to government pricing. The state sets guidance prices for refined oil sold by the two companies, and the two companies set specific prices, also achieving a uniform price in each province, decreasing the burden on farmers in rural areas.

12

(C) 1994-2023 China Academic Journal Electronic Publishing House. All Rights Reserved.    http://www



SMU Classification: Restricted

**Electricity prices.** In the past, two systems and two prices were implemented for rural areas and cities. Due to the small power consumption in rural areas, long transmission distances, high line losses, and high costs, electricity prices in rural areas were much, much higher than in urban areas. Last year, in combination with accelerating the construction of urban and rural infrastructure, with the approval of the State Council, the rural power management system was reformed to realize the unification of management, accounting, and price of urban and rural electricity; to transform rural power grids and reduce line losses; to strive to complete the mission of upgrading the grid in three years, achieving uniform grid and electricity prices for urban and rural areas. This can effectively avoid the confusion of rural electricity price management. This is also a major reform of our electricity price formation mechanism last year, and a great service for farmers.

2. Rectify the price order, standardize the price behavior, and stop the dumping of some industrial products at low prices. In the past year, we have done a lot of work in rectifying the price order and standardizing price behavior. We rectified the order of electricity prices, abolished 560 additional fee items on top of electricity prices, and the average level of electricity prices dropped by 5 cents, reducing the burden on enterprises and society by more than 40 billion yuan. To implement the spirit of the Zhongfa [1997] No. 14 document, to reduce the burden on enterprises and farmers, last year we abolished 157 items of various funds and surcharges, and 20 items of administrative fees, and clarified policies reducing and waiving fees related to enterprises undergoing restructuring and reform. Combined the adjustment of railway freight rates, rectification of miscellaneous railway transportation fees and extended service fees, abolition of local railway construction surcharges. In response to problems such as inflated drug prices, excessive discounts, and disordered distribution, the government has intensified efforts to rectify drug prices, and adopted measures to regulate discounting behaviors and reduce inflated drug prices. The price management of tobacco leaves has been standardized, and the price subsidy for tobacco leaves has been abolished. One of the important tasks from last year was to regulate the market order and the behavior of business operators in accordance with the Price Law to stop the dumping of industrial products at low prices. After the "soft landing" of the economy, the supply of many industrial products exceeded demand and the market price has fallen. Enterprises have adopted price cuts to promote product sales and to take over market share, which significantly affected the profits of enterprises and industries. In April of last year, in response to the relatively serious problem of low-price dumping of flat glass, the State Bureau of Building Materials hoped that the State Planning Commission would set a minimum price to safeguard the interests of the entire industry. After we conducted extensive deliberations, we thought that adopting the method of setting a minimum price to prohibit enterprises from lowering prices is inappropriate. First, flat glass has already implemented enterprise-level price-setting, so setting a minimum price by the government runs the risk of infringing the autonomy of enterprises; second, government price-setting must be based on the price catalogue. Products of this sort with a well-established competitive market should not be subject to government pricing; third, there are more and more commodities with oversupply, and if minimum prices are set for all of them, this will inevitably further expand the scope of government price-setting, which is not in line with the reform direction of market-formed prices. Fourth, history has proven that when supply is greater than demand, even if a minimum price is set, enterprises do not necessarily implement it, which would undermine the solemnity of government price-setting. But the problem of companies competing to cut prices must also be stopped, otherwise, disorderly competition will damage the entire industry. After extensive deliberations, it was decided to adopt legal norms to promote self-restraint of enterprises. Under the premise of respecting the autonomy of enterprises and encouraging competition among enterprises, low-price dumping shall be stopped in accordance with the law. The main basis is in Article 14 of the Price Law, "Operators shall not engage in the following unfair price behaviors", the second item, which states "Except for legally reducing prices to get rid of fresh and live commodities, seasonal commodities, overstocked commodities and other commodities, in order to drive out competitors or monopolize the market, dumping at a price lower than cost, disrupt the normal order of production and operation, and damage the national interests or the legitimate rights and interests of other operators". Upon research, we drafted the "Interim Regulations on Stopping Flat Glass Dumping at Low Prices", and determined that when an enterprise sell at a price that is lower than not only the average industry cost but also its own cost, it would be an unfair price behavior of low-price dumping. Each department in charge of a specific industry shall publish the average cost of the industry and use the average cost of the industry to guide enterprises to correctly set prices, not to blindly lower prices. The average industry cost is a signal for reference. If an enterprise sells products at prices lower than the average cost of the industry, others will report it, and the pricing department will investigate based on the report. If the price is lower than its individual cost, then enforcement actions will follow immediately. Because the Price Law states an item cannot be sold below the at-cost price. Since then, we have formulated price behavior regulations such as the "Interim Regulations on Stopping

(C) 1994-2023 China Academic Journal Electronic Publishing House. All Rights Reserved.    http://www



www.certifiedtranslate.com

SMU Classification: Restricted

Low-price Dumping of Steel Products", "Trial Measures on Stopping Unfair Price Competition of Color Picture Tubes and Color Televisions", and further made "Rules On Stopping Unfair Price Competition by Dumping Industrial Products at Low Prices". In order to enhance the operability of anti-low-price dumping work, methods for identifying individual costs of enterprises have also been formulated accordingly. During this period, some departments organized some industries to set self-disciplinary prices, mobilized some large enterprises to propose implementation of self-discipline prices, which led to debates on whether industry self-discipline prices should be established. Shall we set industry self-discipline prices, or just stop low-price dumping in accordance with the Price Law? The core questions are: First, the question of whether the pricing autonomy of enterprises is respected or not. Industry self-discipline prices are actually industry-set prices, department-set prices, which is equivalent to taking back the pricing autonomy given to enterprises. If we take back the pricing autonomy of enterprises in competitive industries, then we will have returned to planned prices and a planned economy again. Second, the question is whether prices shall be governed according to law or rely on administrative means to manage prices. There is no legal basis for setting industry self-discipline prices, and the self-discipline on pricing mentioned in the Price Law is not self-discipline prices. Self-discipline on pricing means that industries and enterprises should exercise self-restraint in terms of price, cost, quality, and after-sales service. And the formulation of industry self-discipline prices is the employment of administrative means to intervene in the formation of prices. The third question is whether it encourages or restricts competition. Set an industry self-discipline price, then even companies who can reduce prices are not allowed to reduce prices, so that everyone has something to eat. This prevents the realization of the principle of market competition and survival of the fittest. In fact, it protects laggards and hurts the advanced, which violates the principle of market competition. The debate on self-discipline prices in the industry is also a good thing. It has played a role in publicizing the Price Law, implementing the Price Law, and managing prices in accordance with the Price Law, so that everyone has received an education on the price legal system.

3. Study and implement the Price Law and explore new ways of price management. One of the major achievements of the Price Law is that it stipulates that when formulating government-guided prices and government-set prices related to the vital interests of the masses, such as public utility prices, public welfare service prices, and commodity prices under natural monopoly operations, a hearing system should be established where the competent government price department shall preside, solicit opinions from consumers, operators and relevant parties, and demonstrate its necessity and feasibility. At the end of last year, when adjusting postal and telecommunications prices, we made the first attempt at price hearings, holding a large-scale hearing, and organizing experts from various fields and representatives from various places to conduct public discussions of the postal and telecommunications price adjustment plans. This achieved good results, and the society has responded well. How to organize price hearings, what is the relationship between price hearings and government decision-making departments, what procedures should be followed, what form should price hearings take, and how to further improve its transparency and quality, these questions all need further research. The second major achievement of the "Pricing Law" is that the concept of "administrative fees" is no longer used, and replaced by the concepts of state agency fees, intermediary service fees, public service prices, and public utility prices. In fact, the Price Law divides existing charges into two major categories: administrative charges are changed to state agency charges, and the Price Law stipulates that specific management measures on these charges shall be formulated separately by the State Council. In accordance with the development of the market economy, institutional charges are changed to concepts such as intermediary service charges, public utility prices, and public service prices, which are included in the scope of the "Pricing Law" and managed according to market principles.

**II. Continue to implement the Price Law and carry out in-depth price reform and price management in accordance with the law**

1. Grasp the formulation of the central government pricing catalog. According to the requirements of the "Pricing Law", the scope for price-setting by the central government is based on the pricing catalog. The formulation of the government pricing catalog is an important manifestation of our establishment of a socialist market economic system and the establishment of a price formation mechanism based on market prices; it is an important step in our implementation of the Price Law; it is also an important supplementary documents when establishing the price legal system. We began this work when the Price Law was drafted and reported to the State Council, and now we have solicited opinions

(C) 1994-2023 China Academic Journal Electronic Publishing House. All Rights Reserved.    http://www

certifiedtranslate                                                                                            www.certifiedtranslate.com

SMU Classification: Restricted

from localities and departments twice. We need to further shift our mindset, and revise and formulate the central government's pricing catalog as soon as possible according to the requirements of primarily market-based pricing, so that the government's pricing behavior has legal bases.

2. Accelerate the reform of the fee system according to the Price Law. According to the Price Law, important public welfare prices, public utility prices, and intermediary service prices must be managed in accordance with the Price Law. At present, the fees of administrative institutions are still managed in accordance with the relevant regulations issued before the promulgation of the Price Law, which does not meet the requirements of the Price Law. In accordance with the requirements of establishing a new socialist market system and the progress of various reforms in recent years, the concept of public institutions has actually undergone major changes. For example, city water supplies were originally operated as a public institution, but now it is operated as an enterprise. Another example is various inspections and testing. In the past, each department had its own inspection and testing unit, but now the inspection, testing, notarization, and legal services have gradually decoupled from the government and become intermediary organizations, which has become an important part of social intermediary services, to be regulated in accordance with the relevant provisions of the Price Law. There are also some public welfare undertakings, such as education and medical care. These public welfare undertakings also implement paid services and should charge a certain fee. The key is to distinguish the responsibilities of the government and the market, so that the government fee can have a scientific basis when setting prices for public welfare undertakings. It is necessary to reform the institutional fee management system in accordance with the Price Law, promote fee reform, and reduce unreasonable burdens on all aspects of society.

3. Further transform the price formation mechanism and promote the reform of public utilities. Cooperate closely with relevant departments in power reform, introduce a competition mechanism in power generation, and strengthen management in power transmission and distribution. In the reform of public utilities, it is necessary to study and explore, and establish a price formation mechanism that can enable public transportation, subways, urban sewage treatment, garbage disposal and other industries to be self-accountable and self-developing, in order to promote the development of public utilities.

4. Further rectify and standardize the price order. It is necessary to carry out social supervision on all kinds of arbitrary charges and price increases, study and formulate relevant policies, strengthen the governance of high discounts, low-price dumping, and false price reductions, regulate the behavior of operators, reduce unreasonable social burdens, and promote economic development.

5. Accelerate the construction of supporting laws and regulations for the Price Law, formulate price hearing methods, and improve the price hearing system. Some legal experts asked whether we should organize a chairman's meeting for the hearing or a hearing committee. Who will be on the hearing committee? What would be the duties, rights and obligations of the commissioners during the price hearing process? Will price hearings take the form of regular meetings or be held without fixed schedule? Shall the public be allowed to participate in the hearing? Does the hearing need to form a consensus for the government's decision-making reference? What is the relationship between hearings and government decision-making? These all need to be regulated by law. For a monopolistic industry, the focus of the hearing is whether its cost and its various expenditures comply with the law. The government should have strict regulations on its cost composition, various expenditures and wage levels, and they should be placed under public supervision. We have not done enough in this regard, for monopolistic industries, there is a lack of strict regulations on their financial supervision, cost composition, and wage levels. Therefore, the Price Law needs a great deal of supporting regulations to further refine it. In this way, it can be more closely integrated with the price management work, and it is more operable in actual work.

The promulgation of the Price Law is only the first step forward in the establishment of our price legal system, and the road ahead will be longer. From the perspective of our price management work, there is still a long way to go. We should speed up the establishment of various supporting laws and regulations, further improve the price legal system, and shift our country's price management to the track of governing prices according to law.

(The author is the Director General of the Price Department of the State Planning Commission)

(C) 1994-2023 China Academic Journal Electronic Publishing House. All Rights Reserved.     http://www

E_TRANSLATION

DOI：10.19851/j.cnki.cn11-1010/f.1999.05.004

□本刊专论

# 贯彻《价格法》 推进价格改革

## 毕井泉

《价格法》是我国法制建设的一个重要里程碑,也是我国物价工作走向法制化的一个重要标志。《价格法》的实施,为我国物价工作奠定了法律上的基石。一年来的实践证明,《价格法》的制定和实施,是科学的,符合改革方向的,在实际工作中也是可以操作的。在《价格法》实施一周年之际,我们非常感谢为《价格法》的制定付出了辛勤劳动的老领导,包括上届全国人大财经委委员、原国家物价局老局长成致平同志,全国人大法工委卞耀武主任,国务院法制办公室的同志,以及领导我们研究起草《价格法》的国务院副秘书长、原国家计委副主任马凯同志。现将我们一年来贯彻《价格法》的有关情况汇报如下:

### 一、《价格法》实施一年来,我们按照《价格法》中规定的基本原则,积极推进价格改革,整顿价格秩序,理顺价格关系,全面贯彻和实施《价格法》

1.建立国家宏观调控下主要由市场形成价格的价格形成机制。根据《价格法》的规定,我国实行并逐步完善宏观经济调控下主要由市场形成价格的机制。一年来,我们在粮食价格、棉花价格、石油价格以及电价形成机制的转化方面,做了大量的工作,积极推进向市场形成价格的方向发展。

**粮食价格。**配合粮食流通体制的改革,把粮食定价由过去中央政府制定定购价,改为由中央制定原则,由省级人民政府制定具体收购价格。对农民定购粮以外的余粮,实行保护价政策。保护价也是由中央政府制定原则,由省级人民政府制定具体的保护价水平。根据粮改进展情况,最近国务院研究决定,进一步完善粮食价格政策。主要是对我国现阶段粮食出现阶段性的供大于求的状况,利用价格杠杆,积极促进粮食生产结构的调整,鼓励优质粮食的生产,适当限制产量较高、质量差、市场无销路的品种的生产。

**棉花价格。**去年我们放开了棉花的销售价格,今年要进一步放开棉花的收购价。当然,放开价格后,棉花价格会有一个较大幅度的下降,这是根据国内棉花供大于求,国际市场价格持续走低的状况采取的促使农民调整农业的产业结构的一项重要措施。

**石油价格。**去年结合组建石油、石化两个集团公司,将原油生产和成品油的生产和销售结合起来,在石油价格上实现了与国际市场的接轨。只对储备用油、军队用油等特殊行业用油实行政府定价,两个公司自行销售的成品油由国家制定指导价,两个公司制定具体价,并且实现了全省一价,减轻了边远地区农民的负担。

12

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.　　http://

电价。过去农村和城市实行两种体制、两种价格,由于农村用电量小、输电距离远、线损高、费用高,农村电价大大高于城市。去年结合加快城乡基础设施建设,经国务院批准,改革农村电力管理体制,实现城乡用电统一管理,统一核算,统一价格;改造农村电网,降低线损;力争在三年内完成电网改造任务,实现城乡用电同网同价。这样可以有效避免农村电价管理的混乱局面。这也是我们去年在电价形成机制上的一项重大改革,为农民做了一件大好事。

2. 整顿价格秩序,规范价格行为,制止部分工业品低价倾销。过去一年中,我们在整顿价格秩序、规范价格行为方面做了大量工作。整顿电价秩序,取消了附加在电价上的560项加价项目,电价平均水平下降5分钱,减轻企业和社会各方面负担400多亿元。贯彻中发[1997]14号文件精神,减轻企业负担和农民负担,去年公布取消了各种基金、附加157项,取消行政事业性收费20项,明确了对企业实施改组改革过程中有关收费进行减免的政策。结合铁路运价调整,整顿铁路运输杂费和延伸服务费,取消地方铁路建设附加费。针对药品虚高定价、折扣过高、流通秩序混乱等问题,加大了药品价格整顿力度,采取措施规范折扣行为,降低药品虚高价格。规范了烟叶的价格管理,取消了烟叶的价格补贴。开展制止低价倾销工业品行为,这是去年依据《价格法》规范市场秩序和经营者行为的一项重要工作。经济"软着陆"以后,很多工业品出现供大于求、市场价格下降的状况,企业纷纷采取降价的手段,来促进产品的销售、占领市场,极大影响了企业及行业的效益。去年4月,针对平板玻璃低价倾销问题比较严重的

情况,国家建材局希望由国家计委制定最低限价,来维护整个行业的利益。我们经过反复研究,觉得采取制定最低限价的办法来制止企业降价的做法不妥。一是平板玻璃已实行企业定价,制定最低限价有侵犯企业自主权之嫌;二是政府定价要以定价目录为依据,这类早已形成竞争的商品不应列入政府定价;三是供大于求的商品越来越多,都制定最低限价,这势必使国家定价范围进一步扩大,不符合市场形成价格的改革方向。四是历史经验证明,在供大于求的情况下,制定了最低限价,企业也未必执行,影响政府定价的严肃性。但企业竞相降价的问题也必须予以制止,否则,无序竞争,整个行业都会受到损害。经过反复研究,决定采取法律规范的办法来促使企业自我约束。在尊重企业自主权、鼓励企业竞争的前提下,依法制止低价倾销。主要依据就是《价格法》第十四条"经营者不得有下列不正当价格行为"之第二项"在依法降价处理鲜活商品、季节性商品、积压商品等商品外,为了排挤竞争对手或独占市场,以低于成本的价格倾销,扰乱正常的生产经营秩序,损害国家利益或者其他经营者的合法权益"的规定,研究起草了《关于制止平板玻璃低价倾销的暂行规定》,把低价倾销的不正当价格行为确定为企业以低于行业平均成本,同时低于其自身成本的价格销售的行为。由行业主管部门公布行业平均成本,用行业平均成本引导企业正确的制定价格,不要盲目降价;行业平均成本是一个参考性的信号,如果企业低于行业平均成本出售产品,别人就会举报,根据举报由物价部门调查,如低于其个别成本,即予以查处。因为《价格法》规定不能低于成本价销售。此后,我们又制定了《关于制止

13

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.    http://

价格倾销钢材的暂行规定》,关于《制止彩色显像管和彩色电视机不正当价格竞争的试行办法》,进一步做出了《关于制止低价倾销工业品不正当价格行为的规定》。为增强反低价倾销的可操作性,还相应地制定了企业个别成本认定办法。在此期间,有的部门组织一些行业制定自律价,发动一些大企业提出倡议,要进行价格自律,从而引起究竟应不应该搞行业自律价的争论。究竟是搞行业自律价,还是依照《价格法》制止低价倾销? 其核心的问题:一是尊重不尊重企业的定价自主权的问题。行业自律价实际上是行业定价、部门定价,等于是把给了企业的定价自主权又收回来,竞争性的行业把企业定价自主权收回,那我们又成为计划价格,计划经济了。二是依法治价还是依靠行政手段来管理价格的问题。制定行业自律价没有法律依据,《价格法》里面讲的价格自律不是自律价格。价格自律是指行业、企业在价格、成本、质量、售后服务等方面都应该自我约束。而制定行业自律价则是用行政手段来干预价格的形成。三是鼓励竞争还是限制竞争的问题。制定行业自律价,企业能降价的也不允许降价,大家都有饭吃,这就不能体现市场竞争、优胜劣汰的原则,实际上是保护了落后,打击了先进,违反市场竞争的原则。行业自律价的争论也是一个好事,起到了宣传《价格法》、贯彻《价格法》,依照《价格法》管理价格的作用,使大家受到了一次价格法制的教育。

3.学习贯彻《价格法》,探索价格管理的新路子。《价格法》的重大建树之一,是规定制定关系群众切身利益的公用事业价格、公益性服务价格、自然垄断经营的商品价格等政府指导价、政府定价,应当建立听证会制度,

由政府价格主管部门主持,征询消费者、经营者和有关方面意见,论证其必要性、可行性。去年年底,在调整邮政电信价格时,我们进行了价格听证会的第一次尝试,召开了一个大规模的听证会,组织各方面的专家和各地的代表.对邮政电信调价方案公开论证,收到了较好的效果,社会反映较好。对价格听证如何组织,价格听证与政府决策部门是什么关系,应按照什么程序进行,价格听证应采取什么形式,如何进一步提高其透明度及质量,都需要进一步研究。《价格法》重大建树之二,不再使用"行政事业性收费"的概念,取而代之的是国家机关收费、中介服务收费、公益服务价格和公用事业价格等概念。实际上,《价格法》将现有收费分为两大类:行政性收费改为国家机关收费,《价格法》规定具体管理办法由国务院另行制定。事业性收费则依据市场经济发展情况改为中介服务收费、公用事业价格、公益服务价格等概念,纳入《价格法》管理范围,按市场原则进行管理。

## 二、继续贯彻《价格法》,依法深入进行价格改革和价格管理工作

1.抓紧制定中央政府定价目录。按照《价格法》的要求,中央政府的定价范围是以定价目录为依据的。制定政府定价目录,是我们建立社会主义市场经济体制,建立以市场形成价格为主的价格形成机制的重要体现;是我们贯彻实施《价格法》的重要一步;也是价格法制建设的一个重要的配套性文件。这项工作在《价格法》起草报国务院时,我们就开始进行了,现在已经两次征求地方和部门

14

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved. http://

意见。我们要进一步转变观念，按照市场形成价格为主的要求来抓紧修订、制定中央政府定价目录，使政府的定价行为有法可依。

2. 依据《价格法》，加快收费体制改革。按照《价格法》的规定，重要的公益性价格、公用事业价格、中介服务价格都要依据《价格法》进行管理。现在行政事业单位的收费仍按照《价格法》颁布以前的有关规定管理，与《价格法》的要求不相适应。按照建立社会主义市场新体系的要求，以及近几年各项改革的进展，实际上事业单位的概念已经发生了重大的变化。比如，城市的供水原来是作为事业单位，但现在已改为企业来经营。又如，各种检验、检测，原来各个部门都有自己的检验检测单位，但现在的检验、检测和公证、法律服务已逐渐与政府脱钩，变成中介机构，成为社会中介服务的一个重要内容，要依照《价格法》的有关规定进行规范。还有一些公益事业，比如教育、医疗，这类公益事业也是实行有偿服务，应当收取一定费用，关键要分清政府的责任和市场的责任，使政府在制定公益性事业价格时能有个科学的依据。要依据《价格法》改革事业性收费管理体制，推进收费改革，减轻社会各方面不合理的负担。

3. 进一步转化价格形成机制，推进公用事业改革。在电力改革方面与有关部门密切配合，在发电环节引入竞争机制，在输电和配电环节加强管理。在公用事业改革方面要研究探索，建立起一套能使公共交通、地铁、城市污水处理、垃圾处理等行业能够自负盈亏、自我发展的价格形成机制，促使公用事业的发展。

4. 进一步整顿和规范价格秩序。对各种乱收费、乱涨价行为要进行社会监督，研究制定有关政策，对高折扣、低价倾销、假降价要加强治理力度，规范经营者的行为，减轻社会不合理的负担，促进经济的发展。

5. 加快《价格法》的配套法规建设，制定价格听证办法，完善价格听证制度。有的法律专家提出，是否组织听证会的主席团，或叫听证委员会。听证委员会由哪些人组成？在价格听证过程中，委员们的职责和权利、义务是什么？价格听证会是采取会议的形式还是不定期举行？是否允许公众参与旁听？听证会是否要形成一致意见供政府决策参考？听证会与政府决策究竟是个什么关系？这些都需要从法律上来规范。对垄断性行业，听证会审议的重点是它的成本和它的各项开支是否符合法律的规定，政府对其成本构成、各项开支及工资水平应有严格的规范，应置于公众的监督之下。这方面我们做得还不够，对垄断性行业，对其财务的监督、成本的构成、工资水平缺乏严格的规范。所以，《价格法》需要很多配套的法规来进一步细化。这样，才能和物价管理工作结合得更紧密，在实际工作中才更具有操作性。

《价格法》的颁布只是我们价格法制建设向前迈进的第一步，今后的道路还更长。从我们价格管理工作来说，还任重道远。我们应该加快各项配套法规建设，使价格法制进一步完善，把我国价格管理真正转到依法治价的轨道上来。

（作者是国家计委价格司司长）

15

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.　http://

# Exhibit 4



info@certifiedtranslate.com | 2425 Olympic Blvd., Suite 4000W | usa 1-888-856-2228
www.certifiedtranslate.com | Santa Monica, CA 90404 | int +1-310-684-3153
| | fax +1-310-564-1944



**A member of the American
Translators Association
ATA Member Number: 248719**

## CERTIFIED TRANSLATION

*Description of Document(s):*

| |
|---|
| **NEWS ARTICLE** |
| **NINE COLOR TELEVISION COMPANIES FORM PRICE ALLIANCE** |
| **IN VIOLATION OF THE "PRICE LAW"** |
| |

| Source Language: **CHINESE** | Target Language: **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director          **Date:**   May 11, 2023

A copy of the translated version(s) is attached to this statement of certification.

certifiedtranslate                                    www.certifiedtranslate.com

SMU Classification: Restricted

DOI: 10.19851/j.cnki.cn11-1010/f.2000.07.004

Comments on Major News                                                    Price: Theory and Practice
PRICE: THEORY & PRACTICE

Article / State Planning Commission, Department of Economic Policy Coordination, Price Policy Laws and Regulations Division

# Nine Color Television Companies Form Price Alliance in Violation of the "Price Law"

On June 9 of this year, leaders of nine major color television ("CTV") enterprises in the country met in Shenzhen and announced the establishment of the China Color Television Enterprise Summit. One important result of the summit was the establishment of a CTV price alliance, implementing a lower limit on the sales price of CTVs. There are even further plans to create a proposal to jointly limit the production. This matter has attracted attention from all sides and has created extensive and in-depth social debate. The State Planning Commission has been paying attention to the development of this matter and has asked the price bureaus of 9 provinces and cities, including Beijing, Shanghai, Nanjing, Shenzhen, Hanzhou, Dalian, Tsingdao, Guangzhou, and Sichuan to conduct market surveys, and has requested opinions from specialists and scholars regarding the relevant issues. Recently, the leaders of the State Council provided important instructions on the special report submitted by the State Planning Commission: Matters should be conducted in accordance with the law; fair competition should be ensured; under the premise of following the law, provide proper guidance and strengthen the self-discipline of the industry.

## I. Basic Details of the Price Alliance Among Color Television Companies

At this Color Television Enterprise Summit, 9 enterprises jointly set the minimum price for CTV sales (excluding expired inventory and refurbished units). Among them, the minimum prices for 21-inch, 25-inch, 29-inch and 34-inch CTVs are respectively 1050 yuan, 1700 yuan, 2600 yuan, and 4200 yuan, and it was announced there will be implemented nationwide beginning on June 9. Any products that are sold lower than the lowest prices are deemed to be inventory units, units with limited functions, or units that have been refurbished twice, and other products with quality issues. In order to ensure the effective implementation of the minimum price limit, the summit participants jointly formed inspection teams to conduct market inspections. On June 21, the 9 CTV enterprises held the second round of meetings for the summit in Nanjing, emphasizing that they want to thoroughly implement the alliance. The main topic of the discussion was still centered around the minimum protected price for the industry.

According to market research conducted by some provincial and city price bureaus, the "minimum price" or "lowest at-cost price" specified by the CTV price alliance has been implemented in most of the shopping malls in the cities mentioned above, and inspection teams formed by the 9 companies have also begun their work, indicating that the activities of the price alliance have entered the actual implementation stage. Since the CTV price alliance was formed on June 9, the price of CTVs have not risen noticeably. Major shopping malls paid no heed to the price limits of the price alliance out of consideration for their own interests. Most consumers felt relatively unbothered by the rising prices of certain CTVs, and purchasing behavior was rather rational. The largest television producer in the country, Changhang Group, did not join the price alliance. Internally, the price alliance had its own conflicts, because restricting the price is equivalent to giving the market to other companies with lower costs. Implementing the alliance's accord would mean giving away the market. As members of the summit, Jinxing Color Television and Xihu Color Television did not implement the price restriction policy. Judging by the market situation after more than a month since the 9 CTV enterprises implemented the minimum price, the price alliance did not achieve the expected effect in reality. The specified alliance price has long been broken. Various special promotions of CTVs are still going on, which means that market supply and demand and competition are still having a decisive effect.

## II. How to View the Illegality of the Price Alliance of Color Television Companies

Based on the issues regarding the color television companies' price alliance, combined with the impact on society since its implementation, we believe that:

**1. Color television enterprises establishing a price alliance and setting a "minimum price" has violated the Price Law.** Article 14 of the Price Law stipulates that: "business operators shall not collude with each other, manipulate market prices, and damage the rights and interests of other business operators or consumers." The 9 CTV enterprises formed the "color television alliance" to jointly establish the minimum cost price and announced that it will be implemented throughout the country. This is obviously an act of collusion and market price manipulation. Although the initial purpose of the "color television alliance" may have been to prevent low-price dumping and regulate price competition in the CTV market, however, in reality this has become a violation of the principle of market competition and the Price Law, and triggered a situation in which the order of market price competition has been thrown into chaos. Therefore, enterprises should be ordered to voluntarily dissolve the "price alliance" to avoid and reduce the chain reaction and the negative impact on society.

**2. In the name of preventing low-price dumping, color television enterprises set a minimum at-cost price and forced other companies to implement it. Such a practice does not comply with regulations for prohibiting low-price dumping.** Based on the Price Law, the National Planning Committee has formulated rules and regulations including "Regulations Regarding the Prohibition of Low-Price Dumping Behavior", "Trial Measures Regarding the Prohibition of Unfair Price Competition of Color Picture Tubes and Color Televisions." These regulations all state that average production cost of an industry is to be determined and published by the pricing administrative department and the industry administrative department, and only serves as guidance for society to use as a reference standard for reporting low price-dumping behavior. The pricing administrative department holds the authority to determine and punish low price-dumping behavior. The way that the CTV enterprises have determined the minimum at-cost price and forced other enterprises to implement it in the name of preventing low-price dumping does not comply with the regulations regarding the prevention of low-price dumping. The practice of the 9 CTV enterprises to regard products that are lower than the minimum at-cost price of the alliance as products with quality problems such as inventory units, units with limited functions, or units that have been refurbished twice will cause consumers who buy such products to have difficulty enjoying normal after-sales services. If we operate according to this method, the price rights of consumers and other business operators will be damaged. The key issue is, determining quality issues is not a collective power of the industry alliance, but rather the power of the product's manufacturer or the department supervising quality and technology.

(C) 1994-2023 China Academic Journal Electronic Publishing House. All Rights Reserved.        http://www.cnki.net

E_TRANSLATION

certified translate                                                                                      www.certifiedtranslate.com

SMU Classification: Restricted

| Price: Theory and Practice | Comments on Major News |
|---|---|
| | **PRICE: THEORY & PRACTICE** |

**3. The color television enterprise price alliance has no authority to inspect the market.** Article 33 of the Price Law stipulates that "pricing authorities of the people's governments at or above county level shall supervise and inspect pricing activities in accordance with the law and impose administrative penalties on price violations in accordance with the law." Therefore, market price inspections and penalties fall within the power of government pricing administration departments and constitute administrative law enforcement actions. Any enterprise or organization shall not exceed its powers without statutory authorization. The CTV alliance's creation of inspection teams to supervise and inspect the market usurps the government's exercise of administrative law enforcement powers, and is a type of illegal conduct.

**4. The color television price alliance is in essence a price cartel, which is a violation of our country's Price Law and the "Anti-Unfair Competition Law".** A price alliance is a monopolistic behavior against market competition, violates the principle of fair competition, and is contrary to our country's Price Law and "Anti-Unfair Competition Law". The series of actions by the CTV price alliance will mislead enterprises to shun market competition and not think about making progress, which will not help enterprises improve management and pursue technological progress, and will in reality have the effect of protecting laggards, which will not help realization of the survival of the fittest, increase the combined quality of the industry as well as the overall development of the industry. At the same time, the price alliance will undoubtedly greatly damage the legitimate rights and interests of non-alliance enterprises, harm the interests of consumers, cause disorder in the market price order, and is not conducive to guiding the price competition of other industries and enterprises. In actuality this is a type of industry monopoly which forces consumers to use high prices to support companies with low efficiency, which will undoubtedly bring about a negative impact on economic restructuring and enterprise reform, delaying the progress of our country's economic marketization, and plant hidden dangers for these industries after joining the WTO.

**III. Legal Liability for Price Alliance Behavior**

Paragraph 2 of Article 40 of the Price Law stipulates that acts of collusion, manipulation of market prices, and damage to the legitimate rights and interests of other business operators or consumers at a nationwide level shall be determined by the competent administrative pricing department of the State Council; those at the provincial or at regional levels below the province level shall be determined by the competent administrative pricing departments of the people's government of the province, autonomous region, or municipality under the direct supervision of the Central Government.

According to Article 40 of the Price Law and Article 4 of the "Regulations on Administrative Penalties for Illegal Price Behavior", business operators who have colluded with each other, manipulated market prices, or harmed the legitimate rights and interests of other business operators or consumers shall be ordered by the government's administrative pricing authority to make corrections, confiscate illegal gains, and may impose a fine of no more than five times the illegal gains. If there are no illegal gains, issue a warning, and may impose a fine of not less than 30,000 yuan but not more than 300,000 yuan. If the circumstances are serious, they may order a suspension of business for rectification, or the industrial and commercial administrative authority may revoke the business license.

The government's pricing department has established a reporting center for price violations, and any unit or individual has the right to report price violations. The competent administrative price department of the government encourages whistleblowers and is responsible for keeping the whistleblowers confidential.

**IV. Strengthen industry self-discipline, standardize and guide enterprise competition**

In a free competitive market economy environment, resources are allocated freely, an industry should have advances and retreats, and resources will be concentrated to the most efficient enterprises. Therefore, competition among enterprises is inevitable, but competition should not only focus on price, but on multiple aspects including service, brand, quality, technology and new product development. In addition, actively expanding exports and developing the rural market also provide ample space for the survival and development of CTV companies.

In the state of fierce competition in the domestic appliance industry, it is necessary to strengthen industry self-discipline, but the content and method of such self-discipline should be legal. It should be encouraged and supported that the 9 CTV companies can meet together to jointly study the development direction of the industry, carry out technical strategic collaboration, and explore foreign markets. It is also worth promoting through industry associations to coordinate the contradiction between supply and demand, exchange information, and guide the production and operation activities of enterprises. However, this kind of cooperation cannot engage in price fixing or limitations, and price competition must be carried out in accordance with the Price Law.

In light of the phenomenon of the repeated emergences of price alliances or price competition restrictions in some competitive domestic industries, the government's macro-control departments and industry authorities should make good use of the situation and formulate industry rules and active industry rescue policies in a timely manner. Our country's home appliance industry is an industry with outstanding competitiveness, and it is also the first industry to operate in accordance with the rules of a market economy. The essence of the existing problems is not vicious competition in price, but a problem with the survival of the fittest mechanism of market competition. Enterprises should be guided to compete in cooperation, through the establishment of strategic alliances, strengthen technical cooperation among enterprises, innovate business methods, realize complementary advantages in technology, service, and sales networks, promote the optimization of resource allocation methods, and truly improve competitiveness.

---

**"Global Link" significantly reduced or exempted twelve tariffs**

As has been approved by the Ministry of Information Industry, beginning on July 21, China Mobile Communications Corporation will implement 7 free and 5 reduced service measures for "Global Communication" mobile phone users.

It is understood that the fees for business items that will be canceled this time include:

The manual roaming registration fee is 50 yuan / event, the system occupation fee of the visited office (80 yuan for one month; 400 yuan for six months, 760 yuan for 12 months) and 0.6 yuan per minute for manual roaming calls;

The handling fee for phone maintenance is 10 yuan / event;

The service fee for changing the username is 40 yuan/event;

The transfer fee is 200 yuan / event;

A monthly usage fee for call holding;

A monthly usage fee for call waiting;

The monthly usage fee for call forwarding is reduced from 0.4 yuan / minute to 0.1 yuan / minute;

The original five charges of mobile secretary, short message, information on demand, mobile banking and wholesale of short message have all been lowered to varying degrees.

Lu Xiangdong, deputy general manager of China Mobile Communications Corporation, said that the substantial reduction or exemption of tariffs will make China Mobile's business tariffs more reasonable and enhance the transparency of tariff collection. The tariff adjustment this time is not an end goal, and as time goes by, further tariff adjustments in line with the laws of the mobile communication market will be made.

He said that China Mobile Communications Corporation currently has 31 subsidiaries across the country, and the subsidiaries must follow the instructions of the group company and unconditionally implement the announced tariff standards. Adjusting tariffs will reduce the group company's annual revenue by several hundred million yuan. However, the correction and reform of unreasonable fees cannot be stopped because of this. He welcomes scrutiny from the news media and consumers.

14

(C) 1994-2023 China Academic Journal Electronic Publishing House. All Rights Reserved.      http://www.cnki.net

DOI:10.19851/j.cnki.cn11-1010/f.2000.07.004

大事直评

PRICE:THEORY & PRACTICE



文／国家计委经济政策协调司价格政策处

# 九家彩电企业实行价格联盟

## 违反《价格法》

今年6月9日，国内九大彩电骨干企业领导人聚集深圳，宣布成立中国彩电企业峰会，峰会的一项重要内容是建立彩电价格联盟，对彩电实行最低限价销售，甚至打算进一步制定联合限价方案。此事引起了各方面的关注，并引发了广泛深入的社会争论。国家计委一直在关注着此的发展，并请北京、上海、南京、深圳、杭州、大连、青岛、广州和四川等9省市的物价局进行了市场调查，就有关问题征求了专家学者的意见。最近，国务院领导在国家计委的专题报告上做了重要指示：依法办事，确保公平竞争；在依法的前提下，正确引导，加强行业自律。

## 一、彩电企业价格联盟的基本情况

在这次彩电企业峰会上，9家企业联合制定了彩电销售最低限价（逾期库存及返修机除外）。其中，21英寸、25英寸、29英寸、34英寸彩电的最低限价分别为1050元、1700元、2600元、4200元，并宣布从6月9日起在全国范围内执行。凡此下最低销售的产品均视为库存机、功能欠缺机以及二次返修机等质量有问题的产品。为确保最低限价的有效执行，峰会单位联合组成巡查团进行市场巡回检查。6月21日，9家彩电企业在南京举行峰会第二轮会议，强调要将彩电同盟进行到底，主要内容仍是讨论行业最低限价护价。

根据部分省市物价局市场调查反映，彩电价格联盟规定的"最低限价"或"最低成本价"已经在上述大部分城市的商场挂牌实施，由9家企业组成的巡查团也已开始活动，标志着价格联盟的活动进入实际实施阶段，6月9日彩电价格联盟形成之后，彩电价格并没有明显回升，各大商场出于自身利益考虑，并不理睬价格联盟的限价规定。多数消费者对部分彩电价格上调，心态比较平稳，购买行为也比较理性。全国最大的彩电生产企业长虹集团没有参加价格联盟。价格联盟内部也是矛盾重重，因为限价等于拱手把市场让给了低成本的企业，谁执行盟约，谁就意味着要出让市场。作为峰会成员的金星彩电和西湖彩电并没有执行限价政策。从九家彩电企业实行最低限价以来一个多月的市场情况看，价格联盟实际上并未达到预期效果，所规定的联盟价格早已突破，各种特殊的彩电促销方式仍在进行。说明市场供求和竞争状况起着决定性作用。

## 二、如何看待彩电企业价格联盟的违法性

根据以上彩电企业价格联盟问题，结合其实施以来的社会影响，我们认为：

1. 彩电企业建立价格联盟，制定"最低限价"的做法，违反了《价格法》。《价格法》第十四条规定："经营者不得相互串通、操纵市场价格，损害其他经营者或者消费者的权益"。9家彩电企

业成立"彩电联盟"，联合最低成本价，并宣布在全国范围内执行。这是明显的相互串通、操纵市场价格的行为。虽然"彩电联盟"的初衷可能是出于制止低价倾销、规范彩电市场价格竞争，但是客观上却造成了违反市场竞争原则、抵触《价格法》的行为，并引发了市场价格竞争秩序混乱局面的相继发生。因此，应当责令企业自动解除"价格联盟"，避免和减少在社会上的连锁反应和负面影响。

2. 彩电企业以制止低价倾销的名义，制定最低成本价，并强制其他企业执行这种做法，不符合制止低价倾销行为的规定。国家计委依据《价格法》制定的《关于制止低价倾销行为的规定》、《关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法》等法规、规章都规定，行业平均生产成本由价格主管部门和行业主管部门制定和发布，而且只起社会指导作用，作为举报低价倾销行为的参考标准。低价倾销行为的认定和处罚权在价格主管部门。彩电企业以制止低价倾销的名义，制定最低成本价，并强制其他企业执行这种做法，不符合制止低价倾销行为的规定。9家彩电企业将低于联盟最低成本价销售的产品视为库存机、功能欠缺机以及二次返修机等有质量问题的产品的做法，会使购买这部分产品的消费者难以享受正常的售后服务，一旦按此运作必将损害消费者和其他经营者的价格权利。关键的问题是，认定质量问题，不是联盟企业的共同权限，而应该是本产品生产企业或质量技术监督部门的权限。

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

3. 彩电企业价格联盟无权对市场进行巡查。《价格法》第三十三条规定"县级以上各级人民政府价格主管部门依法对价格活动进行监督检查,并依法对价格违法行为实施行政处罚。"因此,对市场价格进行检查和处罚是政府价格主管部门的职权,是行政执法行为,任何企业和组织未经法定授权不得越权行使。彩电联盟组成巡查组,对市场进行监督检查的做法,是代替政府行使行政执法权,是一种违法行为。

4. 彩电价格联盟的实质是价格卡特尔,与我国《价格法》、《反不正当竞争法》相悖。价格联盟是一种反市场竞争的垄断行为,违反了公平竞争的原则,与我国《价格法》、《反不正当竞争法》相悖。彩电价格联盟的一系列行为会误导企业逃避市场竞争,不思进取,从而不利于企业改进管理、追求技术进步,客观起到了保护落后的作用,不利于实现优胜劣汰、行业综合素质的提高和产业的整体发展。同时,价格联盟毫无疑问会极大地损害非联盟企业的合法权益、损害消费者的利益,引起市场价格秩序的紊乱,也不利于引导其他行业和企业的价格竞争,实际上是行业垄断迫使消费者以高价来供养低效率的企业,无疑也会对经济结构调整和企业改革带来不利影响,延缓我国经济市场化进程,并为这些行业加入 WTO 后埋下隐忧。

## 三、价格联盟行为应当承担的法律责任

《价格法》第四十条第二款规定,有相互串通、操纵市场价格,损害其他经营者或者消费者合法权益的行为的,属于全国性的,由国务院价格主管部门认定;属于省及省以下区域性的,由省、自治区、直辖市人民政府价格主管部门认定。

根据《价格法》第四十条和《价格违法行为行政处罚规定》第四条规定,经营者有相互串通、操纵市场价格,损害其他经营者或者消费者合法权益的行为,由政府价格主管部门责令改正,没收违法所得,可以并处违法所得5倍以下的罚款;没有违法所得的,予以警告,可以并处3万元以上30万元以下的罚款;情节严重的,责令停业整顿,或者由工商行政管理机关吊销营业执照。

政府价格主管部门建立了价格违法行为举报制度,任何单位和个人有权对价格违法行为进行举报。政府价格主管部门对举报人员给予鼓励,并负责为举报者保密。

## 四、加强行业自律,规范和引导企业竞争

在自由竞争的市场经济环境下,资源自由配置、一个行业应该是有进有退,企业之间的效率最高的企业集中,因此,企业之间的竞争是不可避免的,但是竞争不应只是着力在价格方面,应当把着力点放在服务、品牌、质量、技术和新产品开发等多方面。另外,积极扩大出口、拓展农村市场对彩电企业的生存发展也有着广阔的空间。

在家电行业激烈竞争的状态下,加强行业自律是必要的,但是自律的内容和方式应当合法。九家彩电企业能够坐到一起,共同研究行业发展方向,进行技术战略合作,开拓国外市场等,应当鼓励和支持。通过行业协会协调供求矛盾,沟通信息,指导企业的生产经营活动,也是值得提倡的。但是,这种合作不能搞价格固定或限定,价格竞争必须依照《价格法》来进行。

鉴于国内一些竞争性行业不断出现价格联盟或限制价格竞争的现象,政府宏观调控部门和行业主管部门应该因势利导、及时制定行业规则和积极的产业拯救政策。我国家电产业是竞争力十分突出的行业,也是最早按市场经济规则运作的行业,目前存在的问题实质并非价格上的恶性竞争,而是市场竞争的优胜劣汰机制发生问题,应当引导企业在合作中竞争、通过建立战略联盟,加强企业间的技术合作,创新经营方式,在技术、服务、销售网络上实现优势互补、促进资源配置方式的优化,真正提高竞争力。

## "全球通"大幅减免十二项资费

经信息产业部批准,从7月21日开始,中国移动通信集团公司将对"全球通"移动电话用户实行7项免费和5项减费的服务措施。

据了解,这次取消的业务项目收费有:

人工漫游登记费50元/次、被访局系统占用费(一个月80元;六个月400元、十二个月760元)及人工漫游通话资费每分钟0.6元;

话机代维手续费10元/次;

更改用户名称手续费40元/次;

转让过户手续费200元/次;

呼叫保持月使用费;

呼叫等待月使用费;

呼叫转移月使用费,同时将原每次发生的呼叫转移通话资费0.4元/分钟下调为0.1元/分钟;

移动秘书、短消息、信息点播、手机银行和短消息的批发等原来的五项收费均作出不同程度的下调。

中国移动通信集团公司副总经理鲁向东表示,此次资费的大幅度减、免,将使中国移动业务资费更趋于合理化,增强资费收取的透明度。此次资费的调整,不是终止目标,随着时间的推移,还将做进一步符合移动通信市场规律的资费调整。

他称,中国移动通信集团公司目前在全国有31个子公司,子公司必须按照集团公司的指令,无条件执行公布的资费标准。调整资费会使集团公司每年减少几十亿元人民币的收入,但是,纠正和改革不合理的收费,不能因此停滞。他欢迎新闻媒体和消费者对此进行监督。

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

# Exhibit 5



info@certifiedtranslate.com    2425 Olympic Blvd., Suite 4000W         usa  1-888-856-2228
www.certifiedtranslate.com     Santa Monica, CA 90404                 int  +1-310-684-3153
                                                                      fax  +1-310-564-1944



**A member of the American
Translators Association
ATA Member Number: 248719**

# CERTIFIED TRANSLATION

*Description of Document(s):*

|  |
|---|
| **NEWS ARTICLE** |
| **CREATE A FAIR ENVIRONMENT FOR MARKET PRICE COMPETITION** |
|  |
|  |

| Source Language: | **CHINESE** | Target Language: | **ENGLISH** |
|---|---|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**    Sean Kirschenstein, Director                    **Date:**    May 11, 2023

A copy of the translated version(s) is attached to this statement of certification.

certifiedtranslate

www.certifiedtranslate.com

SMU Classification: Restricted

DOI: 10.19851/j.cnki.cn11-1010/f.2000.08.007

**Law System Overview**                                                                                        **Price: Theory and Practice**
PRICE: THEORY & PRACTICE

Article / Wei Dale

# Create a Fair Environment for Market Price Competition
# - Written after the color television price alliance was dealt with in accordance with the law

### I. The Process of how the Color Television Price Alliance Incident was Handled

The uproarious CTV price alliance incident finally came to a final conclusion. On August 3, the Ministry of Information Industry invited the State Planning Commission to convene in Beijing the "Working Seminar for the Regulation of the CTV Industry" to discuss the CTV alliance incident and issues including how to regulate market competition for CTVs. There were in-depth and detailed communications and explorations with the principals of ten CTV enterprises, including Konka, TCL, Skyworth, Lehua, Hisense, XOCECO, Xihu, Panda, SVA, and Changhong.

After a thorough investigation, the actual situation of the CTV summit was somewhat different from media reports. However, there were issues with how the CTV summit handled things in two respects, which are inconsistent with the Price Law and other laws.

First, on June 9, nine companies in the CTV industry held a corporate summit in Shenzhen to establish a loosely voluntary enterprise alliance, proposed minimum at-cost prices for the summit enterprises' main types of television sets, and announced that they would be implemented nationwide. This is a clear behavior of price collusion, which is prohibited by the Price Law.

Second, the summit organized price inspection teams to go to some main cities to carry out investigations on the implementation of the determined minimum at-cost prices. According to the provisions of the Administrative Punishment Law and the Price Law, this kind of role can only be exercised by government price administrative law enforcement agencies, and price inspection by enterprises may only be a kind of market survey.

Although the original intent of holding the CTV enterprise summit was to prevent low-price dumping and to regulate the order of competition in the CTV market, and the main substance of the summit was not limited to just fixing prices, and the price inspection teams also conducted work for only a few days. However, it is undeniable that limiting or fixing prices in the form of an alliance is a type of price collusion behavior, which is a violation of Article 14 of the Price Law, which can only lead to further chaos in the order of market price competition. This behavior should be rectified immediately.

In order to eliminate the adverse effects caused by the CTV summit on the issue of prices, the opinion issued by the department and committee for handling the CTV price alliance is: order the companies to self-rectify the illegal acts of the CTV alliance, stop implementation of alliance pricing, and announce the incident's course of events to news media. On August 8, various major news outlets reported the discipline opinion for this matter as well as the announcement from the nine major enterprises in support of the decision made by the government departments. Since then, CTV enterprises such as Konka and Changhong decreased prices significantly, setting off a new round of price competition.

### II. Content worthy of recognition from the color television enterprise summit

In the state of fierce competition in the domestic appliance industry, increasing self-discipline among enterprises and industry is imperative. As long as the content and methods of self-discipline are legal, the state should encourage and support them. The nine CTV companies can sit down together, establish dialogue, negotiation, self-discipline, and collaboration mechanisms, jointly study the direction of industry development, cooperate in technology and production, jointly explore foreign markets, and study the response to anti-dumping suits. This is supported and encouraged by the government. At the same time, we should encourage using industry associations to coordinate the contradiction between supply and demand and provide market information to guide the production and operation activities of enterprises.

### III. Fully understanding price competition is the prerequisite of doing price work well

Price competition includes various price strategies such as raising prices, keeping prices stable, and lowering prices. From the general point of view, price competition is an inevitable phenomenon in the development of China's socialist market economy. It is the basic completion of the socialist market economy framework. It is a positive reflection of the market price mechanism gradually playing a role. A socialist market economy cannot do without a cohesive and flexible market pricing system. The core of the market mechanism is the price mechanism. Price is the fundamental means by which resources are allocated, and is also the key source of a market economy's dynamism. Only when companies can consciously utilize pricing measures to compete in the market, and only when a price war does not cause excessive panic among companies and excessive government intervention, can our country's market economy be on the right track.

Currently some price wars are underway in the domestic market, including the price reduction of CTVs. It is an inevitable process of survival of the fittest. It is not just a special phenomenon in some industries with excess production capacity, but a common phenomenon that must inevitably emerge under market economy conditions. It is a reflection of the law of market economy. When a price war occurs, it shows that the market's elimination mechanism has begun to take effect. Only through survival of the fittest can the relative balance between production and supply and demand be achieved on a new basis. In the process of optimizing the allocation of resources through market mechanisms, price competition is an indispensable and unavoidable link. It is the prerequisite for corporate mergers and asset restructuring, the prelude to industry structural adjustment, and the only way for the survival of the fittest.

(C) 1994-2022 China Academic Journal Electronic Publishing House. All Rights Reserved.      http://www.cnki.net

certifiedtranslate
www.certifiedtranslate.com

SMU Classification: Restricted

**Price: Theory and Practice**                                                                **Law System Overview**
                                                                                    **PRICE: THEORY & PRACTICE**

The CTV price war is a type of economic phenomenon. To judge whether this phenomenon is reasonable or not, the key is whether the price competition is orderly or disorderly. Orderly price competition can promote reasonable competition in the market, and it is beneficial to economic development to promote cost reduction, structural adjustment, and the survival of the fittest among enterprises, which are encouraged and supported by laws such as the Price Law. And disorderly price competition, that is, the implementation of price monopoly, low-price dumping, and blindly fighting vicious price wars, is bound to bring harm to both sides, which is not only detrimental to economic development, but may also cause damage to productivity and the normal economic order. Especially in certain industries where there are primarily state-owned enterprises, and the property rights of these state-owned enterprises are not yet clear, and the self-restraint mechanism is not yet perfected, it is more likely to lead to the loss of state-owned assets and the reduction of national tax revenue. Therefore, for disorderly and unfair price competition, it should be sanctioned according to law.

The root cause of the CTV price war was the imbalance between supply and demand, and the large inventory of enterprises. In addition, domestic CTVs lack core technologies, product homogeneity is serious, market entry barriers are low, and local protectionism makes it difficult for enterprises to have a sound exit mechanism and for survival of the fittest to take effect. To regulate the current CTV market, in addition to structural adjustments to fundamentally improve the relationship between supply and demand, it is necessary to closely inspect and discipline vicious dumping at below cost while preventing price alliances and price fixing. For commercial enterprises that strongly impact society, in the case of price-cutting competition in collusion with manufacturing enterprises, the government's competent administrative department should take the initiative to intervene. To prevent low-price dumping, industry administrative departments should cooperate with pricing administrative departments to release the average cost of the industry in a timely manner, as a reference standard for reporting acts of low-price dumping, and so that enterprise competition have something to go by.

#### IV. Regulate the behavior of the government and enterprises to create a fair environment for market price competition

The CTV price alliance incident tells us that the price mechanism is the most basic competition mechanism of the market economy. Restricting the price mechanism from taking effect is essentially obstructing the process by which the market economy system is improved. If anti-market-economic price policies and price-setting actions are carried out using as a reason the imperfections of the market economic system, this is equivalent to strengthening and solidifying the current system's imperfections. In fact, in our country, most of the fields where actions restricting price competition have occurred in recent years are industries with a relatively fast marketization process. Every instance of restricting price competition is contrary to the principles of market economy, all because they are afraid that their own interests may be endangered by giving full play to the functions of the market economy, and so damaging the operating mechanism of the market economy.

Under the situation of fierce price competition, the behavior of the government must not only conform to the rules of the market economy, but also comply with the current laws and regulations. It must be based on laws and principles. In order to create a market environment for fair competition, the current government should fully exercise its functions of regulation, guidance and supervision, and focus on doing a good job in the following aspects:

First, it is necessary to speed up the reform of state-owned enterprises, strengthen the self-discipline and self-development mechanism of state-owned enterprises, improve the responsibility system for maintaining and increasing the value of state-owned assets, and establish an exit mechanism for state-owned enterprises;

Second, optimize the competition environment, regulate the competition order, 'breakup regional division and local protectionism, and establish and improve a unified market system as soon as possible;

Third, further administer according to law, accelerate the construction of the economic legal system, formulate and improve laws and regulations to stop monopoly and protect competition, in order to benefit fair competition in the market, improve the quality of products and services, and benefit the common development of various economic sectors, and provide benefit for protecting the legitimate rights and interests of consumers. At the same time, it is necessary to strengthen market supervision and law enforcement, and promptly stop companies that violate laws and regulations, engage in price alliances or low-price dumping, and investigate and deal with them in accordance with the law. In response to cases of sales at below cost, concrete analysis must be conducted. If outdated products are disposed of at price below cost for a short period of time for the purpose of promoting product upgrading, reducing inventory pressure or some special needs, it should not be treated as low-price dumping. We must resolutely and severely crack down on counterfeiting, shoddy workmanship, fraudulent substitution with inferior goods, and behaviors that endanger consumer safety;

Fourth, to adjust industrial policies, consumption policies and income distribution policies in a timely manner to encourage consumption and activate the market. Through the release of guiding documents, media publicity of domestic and foreign market trends and data, maintaining frequent contact with enterprises or industry associations, and conducting industry analysis and research, etc., so enterprises can keep abreast of the current situation and development trends of market competition, and adjust their own business and development tactics. Special attention should be paid to collecting and disseminating the supply and demand situation in my country's rural areas and changes in the international market, in order to guide enterprises to step out and explore the rural and international markets.

Fifth, support technology and management innovation. The fundamental way forward for an enterprise lies in technological innovation and continuous development of new products with high technology that is in line with international standards. Both government decisions and media reports should encourage technological innovation and management innovation.

Enterprises are the main entities of market competition, and the only way for enterprises to grow and develop is to actively participate in competition. If an enterprise wants to win space for survival and development, it must dare to compete and compete well. They cannot count on administrative intervention and local protectionism, and cannot limit the means of competition to price cuts. Instead, competition should be carried out in various aspects such as product quality, service management level, technological innovation ability, and comprehensive strength of enterprises. What our country's CTV industry needs most is innovation and other core competitiveness. At the present time, what enterprises especially need is to strengthen management, reduce costs, improve efficiency through technological progress and innovation and further explore rural and international markets.

(Author's unit: Department of Economic Policy Coordination, State Planning Commission)

---

**Important announcements in this publication**

Starting now, this magazine will begin to process the subscription procedures for 2001, and the annual price is 120 yuan. Anyone who wants to subscribe, please contact the publishing department of this magazine as soon as possible (appropriate discounts are available for collective subscriptions).
Telephone: (010) 68047375 68029447
Contact: Chen Xiaoqing

In view of the limited editing and proofreading capacity of this journal, this journal has now opened an E-mail account: price2000@btamail.net.cn. Authors are welcome to submit manuscripts by E-mail or by mailing floppy disks.

The editorial department of this journal declares again: All manuscripts or floppy disks submitted by the author will not be returned, and the author is requested to keep the original for himself. If the article is not used within three months, the author can submit it to others.

Thank you to all of the authors for your support of this journal!

(C) 1994-2022 China Academic Journal Electronic Publishing House. All Rights Reserved.     http://www.cnki.net

E_TRANSLATION

DOI:10.19851/j.cnki.cn11-1010/f.2000.08.007

法制经纬·

PRICE:THEORY & PRACTICE

价格理论与实践



文／韦大乐

# 创造市场价格竞争的公平环境

—— 写在彩电价格联盟被依法处理之后

## 一、彩电价格联盟事件的处理过程

沸沸扬扬的彩电价格联盟事件终于有了最终结论。8月3日，信息产业部邀请国家计委，在北京召开"规范彩电市场工作座谈会"。就彩电联盟事件以及如何规范彩电市场竞争等问题，与康佳、TCL、创维、乐华、海信、厦华、西湖、熊猫、上广电、长虹十家彩电企业负责人进行了深入细致的沟通和探讨。

经过调查，彩电峰会的实际情况和媒体的报道有些出入。但是，彩电峰会在两点做法上存在问题，与《价格法》和其他法律不符。

一是6月9日彩电行业九家企业在深圳召开企业峰会，成立了松散性、自愿性的企业联盟，提出了峰会企业主要品种彩电最低成本价，并宣布在全国范围内执行。这是一种明显的价格串通行为，是《价格法》所禁止的。

二是峰会组织了价格巡视小组，赴一些主要城市对确定的最低成本价执行进行巡查，根据《行政处罚法》和《价格法》的规定，这种职能只有国家价格行政执法机关才能行使，企业的价格逃查只能作为一种市场调研。

虽然举行彩电企业峰会的初衷是出于制止低价倾销、规范彩电市场竞争秩序，而且峰会的主要内容不是仅限于搞限价，价格巡视小组也仅仅进行了几天，但是，不容否认的是，以联盟形式进行价格限定或固定，是一种价格串通行为，违反了《价格法》第十四条的规定，只会引发市场价格竞争秩序进一步混乱。对这一行为应当立即纠正。

为消除彩电峰会在价格问题上所造成的不利影响，两部委对彩电价格联盟提出的处理意见是：责令企业自行纠正彩电联盟的违法行为，停止执行联盟价格，并向新闻媒体宣布事件经过。8月8日，各大新闻媒体均报道了此次事件的处理意见以及九大企业拥护政府部门所作决定的声明。随后，康佳、长虹等彩电企业大幅度降价，掀起新一轮价格竞争高潮。

## 二、彩电企业峰会中值得肯定的内容

在家电行业激烈竞争的状态下，加强企业间和行业自律是必要的，只要自律的内容和方式合法，国家应当鼓励和支持。九家彩电企业能够坐到一起，建立对话、协商、自律、合作机制，共同研究行业发展方向，进行技术和生产的合作，做好开拓国外市场、研究反倾销的应诉工作，这是政府支持和鼓励的。同时，应当提倡通过行业协会协调供求矛盾，沟通市场信息，指导企业的生产经营活动。

## 三、充分认识价格竞争是做好价格工作的前提

价格竞争包括提高价格、保持价格稳定和降低价格等不同的价格策略。从总体上看，价格竞争是我国社会主义市场经济发育过程中的必然现象，是社会主义市场经济框架基本建成、市场价格机制逐步发挥作用的积极反映。社会主义市场经济不能没有合理和灵活的市场定价制度。市场机制的核心是价格机制，价格是资源配置的基本手段，也是市场经济动力的重要来源。只有当企业能够自觉地运用价格手段进行市场竞争时，只有当价格战不会引起企业的过分惊恐和政府的过多干预时，我国的市场经济才算是走上正轨。

目前国内市场出现的包括彩电降价在内的价格战，是优胜劣汰的必然过程，并不仅仅是某些生产能力过剩的行业出现的一种特殊现象，而是市场经济条件下必然出现的普遍现象，是市场经济规律的反映。价格战的发生，说明市场淘汰机制开始发生作用，只有通过优胜劣汰，才能在新的基础上达到生产和供求的相对平衡。在以市场机制优化配置资源的过程中，价格竞争是一个不可缺少、不可回避的

(C)1994-2022 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

环节，它是企业兼并联合、资产重组的前提，是行业结构调整的前奏、是优胜劣汰的必由之路。

彩电价格战是一种经济现象，判断这种现象的合理与否，关键是看价格竞争是有序还是无序。有序的价格竞争可以促进市场合理竞争，推动成本降低、结构调整和企业的优胜劣汰，对经济发展是有利的，是《价格法》等法律所鼓励和支持的。而无序的价格竞争，即实行价格垄断、搞低价倾销、盲目地打恶性价格战，势必带来两败俱伤，不仅对经济发展不利，而且可能造成对生产力和正常经济秩序的破坏。特别是在我国现阶段，以国有企业为主，在这些国有企业的产权尚不明确、自我约束机制尚不健全的情况下，更容易导致国有资产流失、国家税收减少的结果。因此，对于无序的不正当价格竞争，要依法制裁。

彩电价格战的根本原因是供求关系失衡，企业库存量大。另外，国产彩电缺乏核心技术、产品同质化严重、市场进入门槛低，加上地方保护，使得企业退出机制不健全，难以发挥优胜劣汰的结果。要规范当前彩电市场，除了进行结构调整，从根本上改善供求关系外，要在制止价格联盟、固定价格的同时，重点检查和处罚低于成本的恶性倾销行为，对于社会反映强烈的商业企业与生产企业串通进行的降价竞争现象，政府价格主管部门应当主动介入。为了制止低价倾销行为，行业主管部门应当配合价格主管部门、及时发布行业平均成本，作为举报低价倾销行为的参考标准，也使企业竞争有所遵循。

## 四、规范政府和企业行为，为市场价格竞争创造公平的环境

彩电价格联盟事件告诉我们，价格机制是市场经济最基本的竞争机制，限制价格机制的作用，实质上就是阻碍市场经济体制的完善化过程，如果以市场经济体制不完善为理由来实行反市场经济的价格政策和定价行为，就等于强化和固化了现行体制的不完善性。实际上，我国近年来发生限制价格竞争行为的领域大都是市场化进程较快的产业，每一次限制价格竞争的行为都是与市场经济原理背道而驰的，都是因为害怕充分发挥市场经济的功能有可能危及自身利益而对市场经济运行机制的破坏。

在激烈的价格竞争形势下，政府的行为既要符合市场经济规律、也要符合现有法律规定、必须于法有据，于理可依。为了创造公平竞争的市场环境，当前政府应当充分行使调节、指导和监督职能，着重做好以下工作：

一是要加快国有企业改革、强化国有企业的自我约束、自我发展机制，健全国有资产保值增值的责任制度、建立国有企业的退出机制；

二是要优化竞争环境、规范竞争秩序，'打破地区分割和地方保护主义、尽快建立和完善统一的市场体系；

三是要进一步完善行政立法、加快经济法制建设，制定和完善有关制止垄断、保护竞争的法律法规，以有利于市场公平竞争，有利于提高产品和服务质量，有利于经济成分共同发展，有利于保护消费者的合法权益。同时要加强市场监管和执法力度，对违反法律规定、搞价格联盟或低价倾销的企业，要及时予以制止、直至依法查处。对低于本销售的情况要做具体分析，如果是为了推进产品更新换代、减少库存积压或某些特殊需要、而短期内低于成本的价格处理陈旧过时的产品，不应作为低价倾销处理。对于假冒伪劣、偷工减料、以次充好，危害消费者安全的行为要坚决从严打击；

四是要适时调整产业政策、消费政策和收入分配政策，鼓励消费，启动市场。通过发布指导性文件、媒体宣传国内外市场动向与数据资料、与企业或行业协会保持经常联系、开展行业分析研究等方式，使企业及时掌握市场竞争现状和发展趋势，调整自身的经营与发展策略。特别要注意收集和发布我国农村需求情况和国际市场的变化，引导企业走出去、开拓农村和国际市场。

五是要支持技术与管理创新。企业的根本出路在于技术创新，不断开发高技术含量的与国际水平接轨的新产品。政府决策与媒体报道都要鼓励技术创新与管理创新。

企业是市场竞争的主体、企业发展壮大的必由之路是积极参与竞争。企业要想赢得生存和发展的空间，既要敢于竞争，又要善于竞争。不能寄望与行政干预和地方保护、也不能将竞争的手段局限于降价，而应当在产品品质、服务管理水平、科技创新能力、企业综合实力等各方面开展竞争。我国彩电行业最需要的是创新等核心竞争力。当前企业尤其需要的是通过技术进步与创新、强化管理、降低成本，提高效率、进一步开拓农村市场和国际市场。

（作者单位：国家计委经调司）

---

## 本刊重要启事

本刊自即日起开始办理2001年订阅手续，全年定价120元。凡欲订阅者，请速与本刊发行部联系（集体订阅可适当优惠）。

电　话：(010) 68047375　68029447

联系人：陈晓清

鉴于本刊编辑校对力量有限，现本刊开通E－mail：price2000@btamail.net.cn，欢迎作者通过E-mail或邮寄软盘的方式投稿。

本刊编辑部再次声明：凡作者所投稿件或软盘，概不退还，请作者自留底稿，三个月内不予以使用的文章，作者可他投。

感谢广大作者对本刊的支持！

(C)1994-2022 China Academic Journal Electronic Publishing House. All rights reserved.　http://www.cnki.net

# EXHIBIT 67

1          UNITED STATES DISTRICT COURT

          NORTHERN DISTRICT OF CALIFORNIA

2               OAKLAND DIVISION

3     - - - - - - - - - - - - -x

4       IN RE: CATHODE RAY      :

                              Master File No.

5       TUBE (CRT) ANTITRUST   :   07-CV-5944-JST

6       LITIGATION.            :   MDL No. 1917

7     - - - - - - - - - - - - -x

                              Wednesday, August 16, 2023

8                              Washington, D.C.

9

10

11

12            Videotaped Deposition of:

13               DONALD CLARKE,

14    called for oral examination by counsel for the Direct

15    Purchaser Plaintiffs, pursuant to notice, at the law

16    offices of Norton Rose Fulbright US, LLP,

17    799 Ninth Street, Northwest, Suite 1000, Washington,

18    D.C. 20001, before Christina S. Hotsko, RPR, CRR, of

19    Veritext Legal Solutions, a Notary Public in and for

20    the District of Columbia, beginning at 9:15 a.m.,

21    when were present on behalf of the respective

22    parties:

                                        Page 1

```
 1                    A P P E A R A N C E S
 2    On behalf of Direct Purchaser Plaintiffs:
          ROBERT C. KLIPPER, ESQUIRE
 3        STEVEN F. BENZ, ESQUIRE
          Kellogg Hansen Todd Figel & Frederick, PLLC
 4        1615 M Street, Northwest, Suite 400
          Washington, D.C. 20036
 5        (202) 326-7900
          rklipper@kellogghansen.com
 6
          DAVID Y. HWU, ESQUIRE (Remote)
 7        Saveri & Saveri, Inc.
          706 Sansome Street
 8        San Francisco, California 94111
          (415) 217-6810
 9        dhwu@saveri.com
10
      On behalf of Irico Defendants:
11        ABRAHAM CHANG, ESQUIRE
          Norton Rose Fulbright US LLP
12        1301 McKinney, Suite 5100
          Houston, Texas 77010-3095
13        (713) 651-5151
          abraham.chang@nortonrosefulbright.com
14
15    Also Present:
          Orson Braithwaite, Video Technician
16
17
18
19
20
21
22
                                               Page 2
```

```
 1                    C O N T E N T S
 2    EXAMINATION BY:                              PAGE
 3       Counsel for Direct Purchaser Plaintiffs  06
 4
 5
 6    CLARKE DEPOSITION EXHIBITS:   *              PAGE
 7      Exhibit 8661   Declaration of Donald Clarke in  16
                       Support of Irico Defendants'
 8                     Motions to Dismiss for Lack of
                       Jurisdiction
 9
10      Exhibit 8662   Clarke Expert Report         20
11
12      Exhibit 8663   Clarke Declaration in Support  26
                       of Irico Group Corp. And Irico
                       Display Devices Co., Limited's
                       Motion for Summary Judgment
13      Exhibit 8664   Clarke Declaration, U.S. v. Ji  36
                       16 September 2021
14
15      Exhibit 8665   Clarke Declaration in Support  38
                       of Plaintiff's Opposition to
                       Motion of Defendant Sony
16                     Corporation to Dismiss the
                       Action on Grounds of Forum
17                     Non Conveniens and Related
                       Joinders, CYBERsitter vs.
18                     People's Republic of China,
                       et al.
19
        Exhibit 8666   The Chinese Legal System in    43
20                     U.S. Courts, Testimony Before
                       the U.S.-China Economic and
21                     Security Review Commission,
                       4 May 2023
22
```

Page 3

1    CLARKE DEPOSITION EXHIBITS:   *                    PAGE

2      Exhibit 8667    Article, Chinese Accounting is      105
                       Highly Questionable: Strategist
3                      26 February 2016

4      Exhibit 8668    Article, Audits of Chinese          107
                       Companies by KPMG and PwC Full
5                      of Holes, U.S. Watchdog Finds
                       10 May 2023

6

       Exhibit 8669    Certified Translation, Price        229
7                      Setting Catalog of the State
                       Planning Commission and Relevant
8                      Department of the State Council,
                       4 July 2021

9

       Exhibit 8670    Certified Translation,              240
10                     Excerpt: Article XIV: Business
                       Operators Shall Not Engage in
11                     the Following Unfair Price
                       Behaviors

12

13

14

15

16

17

18

19

20

21          *    (Exhibits attached to transcript.)

22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1                P R O C E E D I N G S

 2              VIDEO TECHNICIAN:  Good morning.  We are

 3      going on the record at 9:15 a.m. on August 16th,

 4      2023.

 5              Please note that the microphones are          09:14:31

 6      sensitive and may pick up whispering and private

 7      conversations.

 8              Please mute your phones at this time.

 9              Audio and video recording will continue

10      to take place unless all parties agree to go off     09:14:40

11      the record.

12              This is media unit 1 of the

13      video-recorded deposition of Professor Donald

14      Clarke in the matter of In Re: Cathode Ray Tube

15      Antitrust Litigation, filed in the United States      09:14:52

16      District Court, Northern District of California,

17      Oakland Division, case number 07-cv-05944-JST.

18              My name is Orson Braithwaite representing

19      Veritext Legal Solutions, and I am the

20      videographer.  The court reporter is Christina        09:15:08

21      Hotsko from the firm Veritext Legal Solutions.

22              Counsel will now state their appearances
```

Page 5

```
 1    and affiliations for the record.

 2              MR. KLIPPER:  Robert Klipper from

 3    Kellogg Hansen Todd Figel & Frederick for the

 4    direct purchaser plaintiffs, here today with

 5    Steven Benz from Kellogg Hansen.                    09:15:26

 6              MR. CHANG:  Abraham Chang from

 7    Norton Rose Fulbright and Evan Werbel from

 8    Baker Botts for the Irico defendants.

 9              MR. KLIPPER:  And on the phone with us

10    this morning we have David Hwu from the Saveri     09:15:40

11    firm.

12              VIDEO TECHNICIAN:  Thank you.  Will the

13    court reporter please swear in the witness.

14    Whereupon,

15                   DONALD CLARKE,

16    being first duly sworn or affirmed to testify to

17    the truth, the whole truth, and nothing but the

18    truth, was examined and testified as follows:

19              EXAMINATION BY COUNSEL FOR

20          THE DIRECT PURCHASER PLAINTIFFS             09:15:22

21    BY MR. KLIPPER:

22         Q.  Good morning.
```

Page 6

1    actions, pertains to pricing below individual

2    production costs, correct?

3        A.   That's correct.

4        Q.   Looking now at article 15 of the

5    1998 regulations, article 15 states that an --          10:44:17

6    industry average costs would be used for dumping

7    determinations only if certain conditions were

8    met, right?

9        A.   Not exactly.  It does say that here is

10   one case in which industrial average cost would be      10:44:51

11   used as a basis.  It doesn't specifically say that

12   that would be the only case, but it does say

13   that's one case.

14       Q.   Okay.  And at least according to

15   article 15 of the 1998 regulations, industry           10:45:01

16   average cost would be used when the offending

17   action, quote, severely disrupts the market order,

18   close quote, and it was difficult to verify

19   individual costs, correct?

20       A.   Correct.                                       10:45:16

21       Q.   And the use of the conjunctive "and"

22   shows that both conditions needed to be met before

Page 64

1     industry average cost was used, correct?

2          A.   Well, I would want to look at the Chinese

3     again to make sure if we're going to put a lot of

4     weight on the word "and."  So just a moment.

5              I'm sorry, this is going to take a while      10:45:45

6     because the print is very faint and my vision is

7     very bad.

8              All right.  I would say this about that:

9     That it's -- it's legitimate to read the

10    word "and" there.  On the other hand, my           10:46:27

11    experience in the way Chinese legislation,

12    especially at this level, is written is that

13    they -- you know, regulators are not typically

14    interpreting these documents in the very strict

15    way -- in this very strict logical way where it    10:46:49

16    sets forth two conditions and both must be

17    satisfied, because there's a conjunction "and"

18    there.

19             So it is legitimate to read the word

20    "and" there.  It appears to sets forth these two   10:47:06

21    conditions that must be satisfied.  Whether in

22    practice it would be read that way, I'm not sure.

Page 65

1      Q.   Okay.   According to the text of

2   article 15, industry average costs would only be

3   used to make a final dumping determination on a

4   temporary basis, correct?

5      A.   Let me read it again.                    10:47:51

6           I'm sorry.   So the question again?

7      Q.   The question is, according to article 15,

8   industry average cost would only be used to make a

9   final dumping determination on a temporary basis,

10  correct?                                         10:48:51

11     A.   So I would say it looks like it's saying

12  that industry average cost would be used to make

13  the dumping determination for the period within

14  which it was not possible to determine individual

15  costs.                                           10:49:16

16     Q.   Article 15 does not provide that industry

17  average costs alone would be used to make a

18  dumping determination, correct?

19     A.   Well, article 15 says industry average

20  costs, and then what it calls a reasonable range  10:49:40

21  of price decrease.

22     Q.   Is that phrase, a reasonable range of

Page 66

1    just don't recall whether it ever uses the word

2    "minimum price."

3        Q.  Okay.

4        A.  Do you want me to read it?

5        Q.  That's okay for now.                          10:56:42

6            Let's take a look at appendix 3 to your

7    March 2022 report.

8        A.  Sorry.  This one isn't tabbed, so it may

9    take me a few minutes to find it.

10       Q.  I understand.                                  10:57:03

11       A.  Appendix 3?  I'm getting there.  Okay.

12   Got it.

13       Q.  Okay.  Appendix 3 to your March 2022

14   report is the notification of reporting cost

15   information for color TV and color CRT industry,      10:57:52

16   which your report refers to as the 1999 notice,

17   correct?

18       A.  Well, let me check.  I can't remember

19   what I referred to it as.

20       Q.  And again, just for ease of flipping back     10:58:16

21   and forth, appendix B to your report in the binder

22   is the 2022 report.  I don't know if that will

Page 72

1   make it easier for you to manage all the papers in

2   front of you.

3       A.   Okay.   Notification of reporting cost

4   information...

5           Yes.   So I have referred to it as the        10:58:44

6   1999 reporting notice.

7       Q.   Okay.   And you opine at paragraph 21 of

8   your March 2022 report that the 1999 notice may be

9   viewed as specific implementation of the

10  regulations included in the 1998 notice, correct?    10:59:00

11      A.   That's correct.

12      Q.   Okay.

13      A.   The 1998 regulations.

14      Q.   Thank you.

15      A.   Yeah.                                          10:59:10

16      Q.   And when you say specific implementation

17  within the color CRT industry, is what you mean

18  that this document shows how the 1998 regulations

19  were meant to apply to the cathode ray tube

20  industry?                                              10:59:27

21      A.   Yes.   I think that's what I meant.

22      Q.   Okay.   And you were not able to

Page 73

1          Q.   And so the 1999 notice demonstrates that,

2     in the CRT industry specifically, producers would

3     only be punished if found to be pricing below

4     individual costs, correct?

5          A.   Correct.                                11:03:37

6          Q.   Professor, the term "price floor" does

7     not appear in the 1999 notice, correct?

8          A.   The April 1999 notice?

9          Q.   Yes.

10         A.   I don't believe so.                     11:03:51

11         Q.   And -- excuse me, take your time if you

12    need to look.

13              And the term "minimum price" does not

14    appear anywhere in the 1999 notice, correct?

15         A.   Well, now I'll have to look at it again.  11:04:01

16              That's correct.

17         Q.   Okay.  If you would, please turn to

18    appendix C to your 2023 report.  This one is

19    tabbed so hopefully --

20         A.   Okay.  This is --                        11:04:30

21         Q.   -- you'll have less of --

22         A.   -- the July 23rd, right?

Page 77

1        Q.   Correct.

2        A.   Sorry -- appendix C.   This is tabbed.

3        Q.   Yes.

4        A.   All right.   I've got it.

5        Q.   Great.   This document is titled, "Notice         11:04:49

6   on earnestly stopping price dumping and carrying

7   out inspection of price dumping," right?

8        A.   Correct.

9        Q.   And was this document issued by the

10   Guandong Provincial Development and Reform             11:05:24

11   Commission?

12        A.   No, it was -- no.

13        Q.   At the top of the document it says,

14   Guandong Provincial Development and Reform

15   Commission.                                            11:05:28

16            What government or agency entity?

17        A.   On its face it says the State Planning

18   Commission issued it.

19        Q.   And if this is a document issued by the

20   State Planning Commission, in your opinion, that      11:05:45

21   would be an authoritative statement of government

22   policy, correct?

Page 78

```
 1          A.   Yes.

 2          Q.   And this document was issued after the

 3   1998 notice and 1998 regulations attached as

 4   appendix 2 to your March 2022 report, correct?

 5          A.   Yes.  It states it was issued on        11:06:05

 6   January 16th, 1999.

 7          Q.   Okay.  And numbered paragraph 2,

 8   subparagraph (1) --

 9          A.   Just a moment.  I'm going to need -- I

10   came prepared for this.  I'm going to need a        11:06:29

11   magnifying glass.

12          Q.   Thank you for being prepared.

13               (Discussion off the record.)

14               THE WITNESS:  All right.  So what are we

15   talking about?  What paragraph?                     11:06:40

16   BY MR. KLIPPER:

17          Q.   This is numbered paragraph 2 --

18          A.   All right.

19          Q.   -- subparagraph (1).

20               And that refers to the regulation for   11:06:49

21   stopping unfair product behavior of price dumping

22   of industrial products promulgated by the State
```

Page 79

```
 1     Planning Commission, right?
 2          A.   It's in that notice, yes.   Okay.
 3          Q.   And those regulations are the regulations
 4     attached as appendix 2 to your March 2022 report,
 5     right?   The 1998 regulations?                        11:07:15
 6          A.   Sorry.   Ask the question again.
 7          Q.   Sure.
 8               So numbered paragraph 2 --
 9          A.   Yes, I see numbered paragraph 2.
10          Q.   -- subparagraph (1) --                       11:07:23
11          A.   Yes.
12          Q.   -- that refers to certain regulations,
13     right?   And those regulations are the regulation
14     for stopping unfair product behavior of price
15     dumping of industrial products promulgated by the    11:07:31
16     State Planning Commission.
17               My question is, those are the
18     1998 regulations we discussed earlier, right?
19          A.   Let me just compare the Chinese titles
20     for each just to make sure.                           11:07:45
21               Okay.   Yes.
22          Q.   Okay.   So -- all right.   So numbered
```

Page 80

1    paragraph 2, subparagraph (1), states that

2    government inspection shall look to whether the

3    factory prices of production companies contain the

4    behavior of price dumping set forth in article 5

5    of the 1998 regulations, right?                    11:09:02

6        A.  Yes.

7        Q.  And you testified earlier that each of

8    the behaviors of price dumping -- strike that.

9            You testified earlier that each of the

10   behaviors of unfair price competition set forth in   11:09:14

11   article 5 of the 1998 regulations referred to

12   individual producer costs, right?

13       A.  Yes.

14       Q.  Paragraph 5 of the document attached as

15   appendix C to your report that you're looking at    11:09:31

16   now --

17       A.  Uh-huh.

18       Q.  -- it states, "The identification,

19   investigation, and handling of price dumping

20   behavior must use the advanced and reasonable       11:09:42

21   individual costs of companies as the primary

22   judgment basis and the average cost of the

Page 81

1    industry published by the competent authorities as

2    a reference basis."

3        Do you see that?

4        A.   Yes.

5        Q.   And did I read that correctly?                11:09:56

6        A.   Yes.

7        Q.   What does the phrase "primary judgment

8    basis," as used in the sentence I just read, mean?

9        A.   I believe it means that the -- hold on,

10   sorry -- the advanced and reasonable individual        11:10:18

11   cost should be the main consideration.

12       Q.   And does "primary" mean first and only in

13   this context?

14       A.   I don't know whether it would mean only,

15   but I think it would mean certainly the main one.       11:10:46

16   In other words, if that -- again, consistent with

17   what the other documents say, that if that

18   information is available, that is the information

19   that should be used.

20       Q.   Okay.  And the next line of paragraph 5        11:10:58

21   states, "Companies selling their products below

22   the average cost of the industry, but not below

Page 82

1   their own costs, shall not be punished as price

2   dumping."

3          Do you see that?

4       A.   Yes.

5       Q.   And did I read that correctly?                11:11:21

6       A.   Yes.

7       Q.   So the language of this document states

8   that producers selling products not below their

9   own costs would not be punished for price dumping,

10  right?                                                 11:11:32

11      A.   Correct.

12      Q.   And the plain language of this document

13  also states that a company selling below average

14  industry cost would not be punished so long as

15  that company priced at a level not below its own     11:11:44

16  costs, right?

17      A.   Correct.

18      Q.   We're now going to go back to your

19  March 2022 report.

20          So your March 2022 report attaches three     11:12:04

21  documents that you referred to as cost

22  notifications, right?

Page 83

1    attached as appendix 9 to your report was

2    published in September 2000, correct?

3         A.  Let me just check the date on it.

4    September 2000.  That's correct.

5         Q.  And neither your March 2022 report nor        11:14:37

6    your July 2023 report cites any cost notification

7    published after September 2000, correct?

8         A.  I believe that's correct.

9    September 2000.  I don't recall any cost

10   notification after that.                               11:14:58

11        Q.  And while preparing your report, did you

12   review any cost notifications published after

13   September 2000?

14        A.  Not that I can recall.

15        Q.  And so as you're sitting here today, you      11:15:09

16   have no knowledge as to whether cost notifications

17   publishing industry average costs for cathode ray

18   tubes were published after September 2000, right?

19        A.  That's correct.

20        Q.  Professor, you were not able to               11:15:23

21   independently procure copies of the cost

22   notification documents attached as appendix 7, 8,

Page 85

1  manufacturers would not know the industry average

2  cost?

3          MR. CHANG:  Objection.  Form.

4          THE WITNESS:  That I'm not sure because I

5  guess -- I guess it's possible that the                    11:18:17

6  information could be conveyed in some, you know,

7  non-published way or a way that, you know, doesn't

8  show up.  I'm just not sure.

9  BY MR. KLIPPER:

10      Q.  Are you -- do you have knowledge, as you        11:18:38

11  sit here today, as to whether there was a source

12  for industry average cost information other than

13  that published by the Ministry of Information

14  Industry?

15      A.  No, I don't.                                     11:18:51

16      Q.  And you would also agree that a

17  manufacturer would not be able to set prices based

18  on industry average costs if it did not know

19  industry average costs, correct?

20      A.  I think that's true by definition.               11:19:04

21      Q.  Okay.

22          MR. KLIPPER:  Do you want to take a short

Page 88

1    that industry average cost was material because

2    pricing below that average cost could trigger an

3    investigation?

4         A.  Well, I'm not sure that Professor Gao

5    said that.  But what I was saying in this            12:20:29

6    declaration was that pricing below industry

7    average cost would trigger an investigation.  Yes.

8         Q.  Okay.  And the pricing documents are

9    clear that, so long as individual producer cost

10   information was available, that producer's          12:20:48

11   individual production costs would be the basis for

12   any dumping determination, right?

13        A.  Yes, that's correct.

14        Q.  So in paragraphs 31 and 32 of your 2023

15   report, you opine that industry average cost could  12:21:03

16   be a, quote, de facto, close quote, floor on

17   prices, right?

18        A.  Yes.

19        Q.  De facto has a different meaning that

20   de jure, correct?                                    12:21:18

21        A.  Yes.

22        Q.  And you agree that industry average cost

Page 91

1    was not a de jure price floor, right?

2         A.   Yes.

3         Q.   And de facto means as a matter of fact,

4    right?

5         A.   Well, what I mean here when I say          12:21:36

6    de facto is that the pricing documents established

7    a scheme that would discourage manufacturers from

8    pricing below average cost.

9         Q.   Okay.  And whether or not Chinese

10   manufacturers were, in fact, discouraged from        12:22:01

11   pricing below average cost is a question of fact,

12   right?

13             MR. CHANG:  Objection.  Form.

14             THE WITNESS:  I don't know what Chinese

15   manufacturers actually did with respect to their     12:22:19

16   pricing.

17   BY MR. KLIPPER:

18        Q.   And you would agree that deciding how to

19   price goods is part of operating a manufacturing

20   enterprise, right?                                   12:22:31

21        A.   Unless the government is telling you --

22   unless you're subject to government price controls

Page 92

```
 1    of some kind.
 2        Q.  Whether or not you're subject to
 3    government price controls of some kind, you would
 4    agree that deciding the final price of goods is
 5    part of operating a manufacturing enterprise,         12:22:49
 6    right?
 7        A.  Well, I guess I'm reluctant to make that
 8    kind of unqualified statement because, again, you
 9    know, especially in economies like China's, one
10    can imagine cases where price-setting is not done    12:23:09
11    by the enterprise, you know, and that it's done by
12    a government department.
13        Q.  And do you believe that you are qualified
14    to assess, as a factual matter, the operating
15    decisions of Chinese cathode ray tube              12:23:22
16    manufacturers in the late 1990s and early 2000s?
17        A.  No, I don't know about their actual
18    operations.
19        Q.  Okay.  And when you say you don't know
20    about their actual operations, does that also      12:23:35
21    include that you do not know about their actual
22    pricing decisions?
```

Page 93

1        A.   I guess I would say I don't know how they

2    specifically arrived at their actual pricing

3    decisions.

4        Q.   And Professor, you write that industry

5    average costs, quote, could have served, close          12:24:06

6    quote, as a de facto price floor, correct?

7        A.   Correct.

8        Q.   And you use the word "could" because you

9    do not know with certainty whether industry

10   average cost served as a de facto price floor,          12:24:17

11   right?

12       A.   That's correct.

13       Q.   And so you're speculating that industry

14   average cost might have set a lower bound on

15   manufacturer prices, right?                             12:24:32

16           MR. CHANG:   Objection.   Form.

17           THE WITNESS:   Well, speculating is always

18   a bad word.   I would say that looking at the

19   regulations and the set of incentives they appear

20   to establish and knowing what I know about how          12:24:45

21   Chinese enterprises operate in general, my opinion

22   is that it would have -- the regulations as -- as

Page 94

1    written would have discouraged them from pricing

2    below average cost.

3           MR. KLIPPER:  Could we pause here to go

4    off the record for one moment?

5           VIDEO TECHNICIAN:  The time is 12:25 p.m.    12:25:08

6    We're off the record.

7           (Discussion off the record.)

8           VIDEO TECHNICIAN:  The time is 12:26 p.m.

9    We're on the record.

10   BY MR. KLIPPER:                                        12:25:41

11        Q.  Professor Clarke, you do not opine that

12   industry average cost definitely served as a price

13   floor, right?

14        A.  Correct.

15        Q.  And you don't go so far in your report as    12:25:52

16   to say that industry average cost probably served

17   as a de facto price floor, right?

18        A.  I don't in my report state a probability.

19   I say they could have served as a price floor, and

20   then I explain the reasons why I believe.  If I        12:26:11

21   thought it was a trivial possibility, I wouldn't

22   mention it.

Page 95

1          Q.   Okay.   But you don't believe that it's

2     more likely than not that it served as a price

3     floor, do you?

4          A.   I cannot say at this particular time.

5     You know, what --                                      12:26:27

6          Q.   So you cannot --

7          A.   -- kind of level of probability, you

8     know, I would ascribe to it.   If it thought it was

9     trivial, I wouldn't have mentioned it.

10         Q.   So in your opinion, the possibility is      12:26:37

11    more than trivial but less than certain.

12         A.   Yes.

13         Q.   Do you think it is more likely than

14    not -- you know, 50 percent plus -- that the

15    industry average cost served as a de facto price      12:26:54

16    floor?

17         A.   I'm not prepared to put a probability on

18    it right now.

19         Q.   And just as a thought exercise, what kind

20    of information or data would you go about             12:27:05

21    collecting or trying to collect to arrive at a

22    more definitive conclusion regarding whether

Page 96

1   industry average cost was a de facto price floor?

2          A.   I would need to know what enterprises

3   were actually doing, I would need to know what

4   their actual costs were, and I would need to know

5   what the average costs were.                          12:27:29

6          Q.   I see.  And did you collect or consider

7   that information before writing your 2023 report?

8          A.   No.  I don't have that information.

9          Q.   Okay.  And so your opinion is simply that

10  it is possible that industry average cost served    12:27:42

11  as a de facto price floor, right?

12          MR. CHANG:  Objection.  Form.

13          THE WITNESS:  Yes.  That's why I said

14  could, and I believe it's more than a trivial

15  possibility.                                         12:27:54

16  BY MR. KLIPPER:

17          Q.   Okay.  At paragraph 33 of your 2023

18  report, you opine that it appears to be undisputed

19  that the pricing documents mandate average cost as

20  a starting point for a price floor when a           12:28:21

21  manufacturer cannot establish what its specific

22  manufacturing cost is.

Page 97

CERTIFICATE OF NOTARY PUBLIC

1
2         I, CHRISTINA S. HOTSKO, the officer before
3    whom the foregoing deposition was taken, do hereby
4    certify that the witness whose testimony appears in
5    the foregoing deposition was duly sworn by me; that
6    the testimony of said witness was taken by me in
7    stenotypy and thereafter reduced to typewriting under
8    my direction; that said statement is a true record of
9    the proceedings; that I am neither counsel for,
10   related to, nor employed by any of the parties to the
11   action in which this statement was taken; and,
12   further, that I am not a relative or employee of any
13   counsel or attorney employed by the parties hereto,
14   nor financially or otherwise interested in the
15   outcome of this action.
16
17
18
19             CHRISTINA S. HOTSKO
               Notary Public in and for the
20                 District of Columbia
21   My commission expires: 1 January 2027
22

                                          Page 244

# EXHIBIT 68

*（手寫字）嚴重影響經理、呈核、急沖，請載 2005房 坤後己先生 fm 戴忠輝 共4頁*

大陸 CDT MAKER 聯繫會議

時間：OCT.09, 1998
地點：福州
與會人員：
CPTF：呂經理、葉課長、戴光輝、余偉列
PHS：邵正聖 （華飛）盧建忠總經理、(華飛)馬冰經理
SSDD：李明植部長、楊真
ORION：孔泰植(TAE.SIK.KONG)課長
LG：朴鎮鳳(J.B. PARK)課長
彩虹 IRICO：魏建社副總

## 一、各 CDT MAKER 產銷概況/生產計劃

1)'98 年 9 月產銷概況/生產線計畫

（表一）　　　　　　　　　　　　　　　　單位：K PCS

| 廠商 | 尺寸 | '98年9月產銷存 | | | '98年Q4預計生產量(SUPPLY) | | | | | '99年 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 生產 | 銷售 | 庫存 | 10月份 | | 11月 | | 12月 | 預計生產量 |
| | | | | | 預計生產 | 預計銷售 | 預計生產 | 預計銷售 | 預計生產 | |
| CPTF | 14" | 210 | 215 | 105 | 150 | 170 | 150 | 150 | 150 | 1800 |
| | 15" | | | | | | 30 | 60 | | 1710 |
| SSDD | 14" | 180 | 185 | 5 | 150 | 160 | 150 | 150 | | 1800 |
| | 15" | | | | | | | | | |
| PHS 華飛 | 14" | 180 | 180 | 20 | 120 | 70~100 | 120 | | 120 | 1600 |
| | 15" | | | | | | | | | 100(SKD) |
| BMCC | 14" | 25 | 25 | 25 | 30 | | 30 | | 30 | |
| ORION | 14" | | 75 | | 50 | 25~50 | 40 | | 30 | 300 |
| | 15" | | 10 | | 30 | 30 | 30 | | 15 | 300 |
| 彩虹 | 15" | 20 | 40 | 0 | 20 | | 30 | | 40 | 1000 |
| LG | 14" | | 6 | | 10 | | 10 | | 10 | 0 |
| | 15" | | 3 | | 10 | | 10 | | 20 | 360 |
| TTL | 14" | 595 | 686 | 155 | 510 | 455~510 | 500 | | 490 | |
| TTL | 15" | | 53 | 0 | 60 | | | | 100 | 125 |

重點說明：

A) CPTF：9/E 14" 成品庫存實際達 189K，積管庫存達 113K，然因避免讓各家擔心庫存過多而將庫存數字做些保留，並解釋因預計改 15" 線，Q4 應大致可消化 14" 庫存，各廠家並未質疑此項。'99 年則俟 14" 市況，可望保持 14"/15" 各 ONE LINE 生產。

◎ **PHS CHALLENGE CPTF➔PHS 邵'R 稱市場耳聞 CPTM 有銷售次管行為，向我方澄清是否有此情形。我方則明確表示絕無此事回應之。**

B) SSDD 該條 14" 生產線實際產能可達 180~200K/M。而根據其市場近前提供之 9 月份產銷存資料(產庫 206.5K，銷售 216K，庫存 3.2K)顯見其會議中 9 月份之生產/銷售數字應有保留。15"/17" 大尺寸生產預計於 '99 年 4 月及 9 月分別於大陸 TSDD(天津三星)/SSDD(深圳三星)各計畫增設一線線動生產(因資金考量，SSDD 到底設新線或自韓國搬移舊線未有定案)，而在那一個廠生產何種尺寸亦尚未定案。另 SSDD 表示其內外銷比例約各佔 1/2，李部長並建議各家向總部建議 15" 應多漲些(保持至少 US$15 價差)除利潤考量外亦可避免 14" 加速萎縮。

1

CONFIDENTIAL - GRAND JURY MATERIAL

EXHIBIT
1312

CHU00030679

二、大陸地區客戶 Q4 14"CDT 需求概估(BY CUSTOMERS)

(表二)　　　　　　　　　　　　　　　　　單位：K PCS

| 客戶 | 需求預估 | CDT 內銷量 | TTL 需求 | 備註 |
|------|----------|-----------|----------|------|
| ACER(SZ) | 10K(CPTF) 8K(PHS) | 2K(PHS) | 20K | |
| AOC | 40K(CPTF) 40K(ORION) | | 80K | 估計有 30-40K FOR 內銷 |
| ADI | 20K(SSDD) | | 20K | |
| COMPAL | 12K(CPTF) | | 12K | |
| EMC | 30K(SSDD) | | 30K | |
| GVC | 10K(SSDD) 10K(ORION) | | 20K | |
| IRIC | 10K(BMCC) 10K(PHS) | | 20K | |
| KFC | 8K(SSDD) | | 8K | |
| LI-ON | 40K(CPTF) | | 40 | |
| PHS(DG/SZ) | 45K(CPTF) | 45K(PHS) | 90K | 華飛主要內銷客戶為 PHS(SZ) |
| SHAMROCK | 10K(CPTF) 6K(SSDD) | | 16K | |
| FIC | 3K(PHS) | | 3K | |
| MAG | 2K(SSDD) | | 2K | |
| DTS | 3K(PHS) 3K(ORION) | | 6K | |
| CHINA OTHERS | | 40K(ORION) 80K(SSDD) 40K(PHS) 10K(BMCC) 6K(LG) | 176K | SSDD 主要內銷客戶 為北大方正及廈華 |
| 合計 | 320K | 223K | 543K | |

說明：

依(表一)所示，9月份 14"共計銷售 686K，相較於 9 月份生產 595K 有超賣現象；另 10 月份預計銷售量係與會各 CDT MAKER 提供之目前訂單掌握情形。依(表一)各家預計供應量與銷售量並配合(表二)各客戶別需求現狀分析，供需仍大致可維持平衡，有利於價格調漲。而除了 SSDD 一開始對其內銷價係數調高為 10.4 沒個心外，其餘廠家普遍顯示有一致的調漲決心。因此，各 CDT MAKER 應確實 FLW 總部，對價格上漲有十足信心。但 SSDD 李部長最終在華飛與 CPTF 說服下亦同意 10 月份將其內銷報價係數調高為 10.4，達成協議。

3

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00030680

◎ **CPTF CHALLENGE SSDD➔**LOADING OVER 其產能甚多而對上次會議之內銷價(外銷價乘以 10.4 係數)無信心，各家亦表贊同。尤其 PHS 稱其 10➔10.4 係數之調漲已向客戶宣示，SSDD 一開始對 10.4 係數調漲之信心缺缺，但在各家強烈要求及華鵬廠總經理表示，BMCC 雖未與會，但因事先已溝通過並表將遵循會議決議議後，SSDD 李部長多所顧忌後才勉強答應。

◎ **ORION CHALLENGE SSDD➔**支持內銷價係數調高，並對 SSDD 在南中國 LOCAL 客戶內銷報低價表質疑。

C) 華飛：雖有 2 LINES 短線，然因 PHS 週別劃分系統特殊，在 3/6/9/12 月之工作週均達 5 週，故 9 月份生產可達 180K。15''生產計畫尚考慮從竹北廠移轉 3 LINES 至大陸(即'R 稱因生產線設計連結之故，若確定要移轉竹北廠 15''則一定是 3 LINES 一起移轉)，然該計畫尚未定案。至於內銷部份則幾乎以 PHS(SZ)供應為主。另據稱 PHS(TWN)尚備有 14''約 10~20K 庫存 FOR 其歐洲客戶每月少量之需求。

◎ **CPTF CHALLENGE PHS➔**10 月份對 ACER 漲價函一再延遲未發出。PHS 稱因其對 ACER 之報價作業一直係在月中左右才正式敲定，且 MONITOR 客戶(尤其 IN USA)對''價格塑膠''較敏感，除非客戶要求一定要書面聲明，否則處理上儘量謹慎，但保證均遵循總部決議，口頭上均有向客戶聲明漲價決心。CPTF 則表示漲價需讓 MONITOR 有部份時間去向其客戶反映，況況差時在月中才確認價格尚可理解，現正值旺季且各廠正凝聚穩定價格之際，請 PHS 改善月中報價作業。

D) ORION：上列 9 月份銷售數字未含銷售於 AOC 之 50K。9/E 14''庫存約 30K 以下。孔'R 稱 10/M 將改好 15''設備，因此後續將維持 14'' ONE LINE， 15'' ONE LINE， 另 ONE LINE(75% FOR15''，25%FOR17'')。各線產能均為 160~170K/M

◎ **PHS CHALLENGE ORION➔**ORION 在大陸各地區辦事處為了業績而搶客戶，據悉 15''有 US$56 行情出現並求證到底是否有銷售 A 管或 B 管行為。ORION 稱無銷售於經銷商情形並保證其大陸地區各辦事處之客戶不會重疊且均 FLW ORION H.Q.價格，堅決否認有此行情。

◎ **CPTF CHALLENGE ORION➔**對 AOC 之不良管處理方式為何，請說明。ORION 回應：其 14''在 AOC 之不良率平均約 0.5%，不良管計價上以 A 管之 75%處理，而以 40K/M 來換算 B 管之數量亦應才 200PCS，數量應不多。ORION 堅稱其不良率確實如此低，惟各家對其不良率如此低亦頗質疑。

◎ **SSDD CHALLENGE ORION➔**經銷 9 月份深圳客戶 KTC(康特)及 SRC 各向 AOC 買下限管 2K( ORION'S TUBE)情形，且耳聞 ORION 9 月份 14''有 US$43 行情，並稱即使 S/T GLARE B+D 管在 9 月份亦不應有此行情。ORION 堅決否認有銷售次管並在 9 月份有 OFFER US$43 行情。

E) BMCC：基本上因為賠錢，雖不放棄 CDT 市場但也不會想多賣(14''生產≦30K)。至於 15''因評估無競爭力，故亦暫不會投入生產。

F) LG：目前僅半條 14''生產線，產能為 70~80K/M，內部自用則有 50K/M，餘量 20K/M 則銷往東南亞及大陸。'99 年則不考慮生產 14''。

2



3) '99年 CDT MAKER 生產計畫.

<div align="center">(表三)</div>

單位：K PCS

|      | Q1          | Q2          | Q3          | Q4          | 備註          |
|------|-------------|-------------|-------------|-------------|-------------|
| CPT  | 300~375K/M  | 300~375K/M  | 300~375K/M  | 300~375K/M  | 2.5LINES    |
| PHS  | 130K/M      | 130K/M      | 130K/M      | 130K/M      | 2 LINES     |
| SSDD | 350K/M      | 350K/M      | 350K/M      | 350K/M      | 2 LINES     |
| ORION| 160K/M      | 160K/M      | 160K/M      | 160K/M      | 1 LINE      |
| LG   | 40~80K/M    | 40~80K/M    | 40~80K/M    | 40~80K/M    | 可能停止 14"生產 |
| BMCC | 30K/M       | 30K/M       | 30K/M       | 30K/M       |             |
| TTL  | 1010~1125K/M| 1010~1125K/M| 1010~1125K/M| 1010~1125K/M|             |

說明

'99年 14"供給以1100K/M 預估的話，全年供給量約 13,200K PCS。而 SSDD／PHS 均認為'99
年 TTL DEMAND (14"/15"/17")約 90,000K PCS，而 14"之需求比例若以 PHS/SSDD 估計之
15%衡量的話，則'99年需求量約 13,500K PCS。由上分析，14"CDT 在'99年之供需似亦可
預測趨近平衡。

三、結論

1.ORION/SSDD 在南中國之 LOCAL 客戶彼此競爭強，且彼此也質疑相關"內銷價不合理"
   與"A-或 B 管"銷售行為。ORION 除堅決否認 B 管銷售及低報價格行為，並請 SSDD 提供
   確實數據以供查證。而 SSDD 雖最終亦同意 10.4 內銷報價係數，但始終對內銷價格上漲似
   乎信心缺缺。

2.SSDD 請各家向總部建議 15"調漲幅度應更大些，且與 14"應維持至少 US$15 價差。

3.BMCC 雖未與會，但因之前已與華飛溝通過並表示將遵循會議決議，華飛盛總經理則負責
   傳達內銷報價係數 10.4 之協議。

4.依'98年 Q4 及'99年供需概況分析，14"不論在大陸地區或全球市場應大致可維持供需平衡。
   各 CDT MAKER 應嚴格控制產量，尤其不應該有如 SSDD 在 9 月份之 OVER LOADING 現
   象，以確保價格穩定。

5.下一次會議由彩虹召開，時間及地點另議。


--以上報告--   呈核

<div align="right">職 戴光輝 敬呈<br>OCT. 11, 1998</div>

<div align="center">4</div>

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00030682

0512- 5191028

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00030683



**PARK**
IP TRANSLATIONS

June 20, 2012

**Certification**

**Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of the document with bates numbers range: CHU00030679E – CHU00030683E.

Abraham I. Holczer

Project Manager

134 W. 29th Street 5th Floor • New York, N.Y. 10001
Phone: 212-581-8870 • Fax: 212-581-5577

EXHIBIT
1312E

**[TRANSLATION]**

Mainland China *CDT Maker* Contact Meeting

[Handwritten:]
Respectfully Submitted to President Peng
Submitted for review
Urgent Document
Please deliver to Mr. Chung-Cheng (Alex) Yeh in Room 2705
*Fm*: Guang-Hui Dai, Total 4 pages.

Date:          *Oct.* 09, 1998
Location:      Fuzhou
Meeting        *CPTF* - Senior Manager Jing-Song (Jason) Lu, Section Chief
Attendees:          Chung-Cheng (Alex) Yeh, Guang-Hui Dai, Wei-Lie Yu

               *PHS* - Zheng-Er Shao, (Huafei) President Jian-Zhong Sheng, (Huafei)
                    Manager Bing Ma

               *SSDD* – Department Manager Myoung-Sik Lee, Zhen Yang

               *ORION* - Section Chief TAE SIK KONG *(TAE SIK KONG)*

               *LG* - Section Chief J.B.PARK *(J.B.PARK)*

               IRICO *(IRICO)* - Vice President Jian-She Wei

I.    Summary of the Production and Sales Situation/Production Plan for *CDT MAKER*S

1)   In September 1998, the production and sales situation/production line plan was as follows:

(Chart 1)

Unit: K PCS

| Maker | Size | Production, Sales, Inventory of Sept. 98 | | | '98 Q4 Planned Production Volume (SUPPLY) | | | | Planned Production Volume of '99 |
|---|---|---|---|---|---|---|---|---|---|
| | | Production | Sales | Inventory | October | | Planned Production of Nov. | Planned Production of Dec. | |
| | | | | | Planned Production | Planned Sales | | | |
| CPTF | 14" | 210 | 215 | 105 | 150 | 170 | 150 | 150 | 1800 |
| | 15" | | | | | | 30 | 60 | 1710 |
| SSDD | 14" | 180 | 185 | 5 | 150 | 160 | 150 | 150 | 1800 |
| | 15" | | | | | | | | |
| PHS Huafei | 14" | 180 | 180 | 20 | 120 | 70-100 | 120 | 120 | 1600 |
| | 15" | | | | | | | | 100(SKD) |
| BMCC | 14" | 25 | 25 | 25 | 30 | | 30 | 30 | |
| ORION | 14" | | 75 | | 50 | 25-50 | 40 | 30 | 300 |
| | 15" | | 10 | | 30 | 30 | 30 | 15 | 300 |
| Irico | 15" | 20 | 40 | 0 | 20 | | 30 | 40 | 1000 |
| LG | 14" | | 6 | | 10 | | 10 | 10 | 0 |
| | 15" | | 3 | | 10 | | 10 | 20 | 360 |
| | | | | | | | | | |
| TTL | 14" | 595 | 686 | 155 | 510 | 455-510 | 500 | 490 | |
| TTL: | 15" | 20 | 53 | 0 | 60 | | 100 | 125 | |

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

**CONFIDENTIAL – GRAND JURY MATERIAL**          CHU00030679.01E

Explanation of major points:

A) *CPTF*: 9/E, the actual inventory of 14" finished product reached 189*K*.   The accumulated tube inventory reached 113*K*.   However, in order to avoid concerns by all makers about excess inventory, certain inventory figures had been withheld. It was also explained that because of expected changes to the 15" line, it should be possible to digest 14" inventory in *Q*4.   All makers did not question this matter. In 1999, depending on the 14" market situation, it can be expected that *ONE* production *LINE* each for 14" and 15" will be retained.

● *PHS CHALLENGE*S *CPTF* → *PHS*'s Mr. Shao claimed that *CPTM* was heard to have engaged in sales of inferior tubes in the market, and would like clarification of this situation from us.   We responded with clear indication that absolutely no such situation exists.

B) *SSDD* 14" production line's actual production capacity could reach 180 – 200*K/M*. Based on the production, sales and inventory data from September provided by its marketing department (deliveries to storage: 206.5*K*; sales: 216*K*; and inventory: 3.2*K*), it can clearly be seen that the September production and sales figures provided at the meeting were kept down.   With respect to the large size production of 15" and 17", it is expected that in April 1999 and September 1999, Mainland China *TSDD* (Tianjin Samsung)/*SSDD* (Shenzhen Samsung) each plans to construct an additional production line for using in production (due to capital considerations, whether or not *SSDD* will establish a new line or import an old line from Korea has not been confirmed).   A decision has not been made as to the sizes to be produced and as to which factory is to make such production. Additionally, *SSDD* has indicated that its domestic and export sales ratio is approximately 1/2 each.   Department Manager Lee has also suggested that all makers propose to their headquarters that the price for 15" should be increased a bit more (maintain at least a *US* $15 price difference).   In addition to profit considerations, this will also avoid hastening the decline of 14"

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [  ].

CONFIDENTIAL – GRAND JURY MATERIAL                    CHU00030679.02E

II. General Assessment of Demand by Mainland Customers for 14" *CDT* in *Q4* (*BY CUSTOMERS*)

(Chart 2)

Unit: K PCS

| Customer | Estimated Demand | CDT Domestic Sales Volume | TTL Demand | Remark |
|---|---|---|---|---|
| ACER(SZ) | 10K(CPTF) 8K(PHS) | 2K(PHS) | 20K | |
| AOC | 40K(CPTF) 40K(ORION) | | 80K | Estimates there are 30-40k FOR domestic Sales |
| ADI | 20K(SSDD) | | 20K | |
| COMPAL | 12K(CPTF) | | 12K | |
| EMC | 30K(SSDD) | | 30K | |
| GVC | 10K(SSDD) 10K(ORION) | | 20K | |
| IRIC | 10K(BMCC) 10K(PHS) | | 20K | |
| KFC | 8K(SSDD) | | 8K | |
| LI-ON | 40K(CPTF) | | 40 | |
| PHS(DG/SZ) | 45K(CPTF) | 45K(PHS) | 90K | Main domestic customer for Huafei is PHS (SZ) |
| SHAMROCK | 10K(CPTF) 6K(SSDD) | | 16K | |
| FIC | 3K(PHS) | | 3K | |
| MAG | 2K(SSDD) | | 2K | |
| DTS | 3K(PHS) 3K(ORION) | | 6K | |
| CHINA OTHERS | | 40K(ORION) 80K(SSDD) 40K(PHS) 10K(BMCC) 6K(LG) | 176K | Main customer for SSDD are Beijing Founder Electronic Co and Xoccco |
| | | | | |
| Total | 320K | 223K | 543K | |

[Handwritten in left margin:] 20   120 15   20   60   60   20
[Handwritten below chart:] 543 x

Explanation:
According to Chart 1, the total sales volume of 14" in September is *686K*.
Compared to the September production volume of *595K*, there is an over sold phenomenon.    Additionally, the estimated sales volume in October was made on the understanding of information regarding current orders as provided by all *CDT MAKERS*.    According to the analysis of estimates of each maker on supply volume and sales volume (Chart 1) and demand according to customers (Chart 2), supply and demand still can basically remain even, which is favorable to a price increase.
Additionally, with the exception of *SSDD*, who from the very beginning had doubts about an increase of their domestic sale price coefficient to 10.4, other makers have generally indicated unanimous determination to increase prices.    For this reason, each *CDT MAKER* should definitely *FLW* their headquarters, and have full confidence in a price increase.    However, *SSDD* Department Chief Lee has finally been persuaded by Huafei and *CPTF* to increase its domestic sales price quote coefficient to 10.4, and reached an agreement.

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [  ].

CONFIDENTIAL – GRAND JURY MATERIAL            CHU00030680E

- *CPTF CHALLENGES SSDD* → *OVER LOADING* its production capacity greatly, which resulted in a lack of confidence in the domestic sales price at the last meeting (export price multiplied by a coefficient of 10.4).   All makers also agreed.   In particular, *PHS* claims that its increase in the coefficient from 10 →10.4 has already been announced to customers.   From the very beginning, *SSDD* was not confident in the increased 10.4 coefficient.   However, after strong requests from all makers and President Sheng of Huafei saying that, even though *BMCC* did not attend the meeting, in previous communications it had already indicated that it would abide by the resolutions from the meeting, Department Manager Lee of *SSDD* reluctantly agreed after great concern.

- *ORION CHALLENGES SSDD* → Supports its increase of the coefficient for domestic sales price and questions the low domestic price given to *LOCAL* customers by *SSDD* in southern China.

C) Huafei: Although Huafei has 2 short *LINES*, because of the unique feature of *PHS*'s system of weekly division, the working weeks for the months of 3/6/9/12 each reach 5 weeks.   In September, the production amount could reach 180K. The 15" production plan is to consider transferring 3 *LINES* from the Chubei factory to Mainland China.   (Mr. Shao stated that because the production line design is consecutive, if the Chubei factory 15" production facilities are shifted, the 3 *LINES* must be transferred together).   However, this plan has not been confirmed.   With respect to domestic sales, it is mainly supplied by *PHS(SZ)*. Additionally, it is claimed that *PHS(TWN)* still has a 14" inventory of 10 ~20K *FOR* the small monthly demand of its European customers.

- *CPTF CHALLENGES PHS* → In October, the letter concerning the price increase to *ACER* was never issued following repeated delays.   *PHS* claimed that this was because its price quote for *ACER* was not formally confirmed until the middle of the month.   Also *MONITOR* customers (especially *IN USA*) are quite sensitive to "price monopolies."   Unless customers definitely require a written statement, it should be handled with the utmost caution.   However, the resolutions from headquarters will surely be followed.   Verbally, all determined to announce the price increase to customers.   On the other hand, *CPTF* indicated that *MONITOR* should be allowed to have some time to communicate with its customers regarding the price increases.   When the market situation is weak, it is understandable not to confirm the price until the middle of a month. However, it is currently at peak season, and the time when all makers are confirming and stabilizing their prices.   *PHS* was asked to improve its mid-month pricing practice.

D) *ORION*: The September sales figures listed above do not include sales of 50K to *AOC*.   In 9/E, the 14" inventory was below 30K. MR. Kong stated that the 15" facilities will be improved in 10/M, and that in the future it will continue to maintain 14" *ONE LINE*, 15" *ONE LINE*, and another *ONE LINE* (75% *FOR* 15", and 25% *FOR* 17"). The production capacity of each line is approximately 160 – 170K/M.

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL          CHU00030681.01E

- *PHS CHALLENGES ORION → ORION*'s China offices are grabbing customers to enhance their sales performance.   It has been said there was *US*$56 appearing at market price for 15", so clarification regarding whether *A*-tube or *B*-tube has been sold was requested.   *ORION* claims that it has not made any sales to dealers, and ensures that there will be no customer overlap among its offices in Mainland China, and that all prices *FLW ORION H.Q.* prices.   It staunchly denied such market price exists.

- *CPTF CHALLENGES ORION →* An explanation was requested as to the disposal method for defective *AOC* tubes.   *ORION* replied: The defect rate of 14" in *AOC* averages at about 0.5%.   The cost of defective tubes is calculated at 75% of *A* tubes.   And using a production rate of 40*K/M* to calculate the amount of *B* tubes the volume should only be 200 *PCS*.   Volume should not be large. *ORION* insists that its defect rate is indeed this low; however, the other makers doubt its low defect rate.

- *SSDD CHALLENGES ORION →* Upon investigation, Shenzhen customer *KTC* (Kangte) and *SRC* each purchased barely-passing tubes from *AOC* (*ORION'S TUBE*) in September, and it was also heard that the *ORION* 's September price for 14" was *US*$43.   There were also claims that even in September *S/T GLARE B+D* tube prices should not be at this market price.   *ORION* has staunchly denied that it sold inferior tubes, and that it *OFFER*ed a price of *US*$43 in September.

E) *BMCC*: Basically because it is losing money, although it has not given up on the *CDT* market, it also won't consider selling more (14" production ≦30*K*).   With respect to 15", due to an assessment that it lacks competitive capability, temporarily its production won't be started.

F) *LG*: Currently only has a half-line 14" production line, with a production capacity of approximately 70~80*K/M*.   Internal self-use is 50*K/M*.   The remaining 20 *K/M* are sold to Southeast Asia and Mainland China. No consideration is given to the production of 14" in 1999.

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL                 CHU00030681.02E

3) 1999 CDI Maker Production Plan

(Chart 3)

Units: K PCS

|  | Q1 | Q2 | Q3 | Q4 | Remark |
|---|---|---|---|---|---|
| CPT | 300-375K/M | 300-375K/M | 300-375K/M | 300-375K/M | 2.5LINES |
| PHS | 130K/M | 130K/M | 130K/M | 130K/M | 2LINES |
| SSDD | 350K/M | 350K/M | 350K/M | 350K/M | 2LINES |
| ORION | 160K/M | 160K/M | 160K/M | 160K/M | 1LINE |
| LG | 40-80K/M | 40-80K/M | 40-80K/M | 40-80K/M | Might discontinue production of 14" |
| BMCC | 30K/M | 30K/M | 30K/M | 30K/M | |
| TTL | 1010-1125K/M | 1010-1125K/M | 1010-1125K/M | 1010-1125K/M | |

Explanation

If the supply of 14" in 1999 is estimated to be 1100*K/M*, the total annual supply volume will be approximately 13,200*K PCS*.   However, *SSDD* and *PHS* all believe that the *TTL DEMAND* in 1999 (for 14"/15"/17") will be approximately 90,000*K PCS*.   If the 15% estimate of *PHS/SSDD* for demand of 14" is used, the 1999 annual demand volume will be 13,500*K PCS*.   From the above analysis, it can be expected that in 1999, the supply and demand relationship for 14" *CDT* will tend to be balanced.

III. *Conclusion*

1. Competition between *ORION* and *SSDD* for *LOCAL* customers in southern China is strong, and both parties doubt each other's claims that "domestic sale prices are unreasonable," and the sales behavior regarding "*A* or *B* tube."   *ORION*, in addition to strongly denying the sale of *B* tubes and the behavior of quoting low prices, has also requested that *SSDD* provide accurate data for investigation and verification.   Although *SSDD* eventually agreed to use 10.4 as the coefficient for the domestic sale price, it still appears to lack confidence in the increase of the domestic sale price.

2. *SSDD* has requested that all makers propose to their headquarters that the scale of price increase of the 15" be a bit larger, and that a price differential of at least *US*$15 should be maintained from 14."

3. Although *BMCC* did not participate in the meeting, it previously communicated with Huafei that it would abide by the meeting resolution.   Huafei's President Sheng is responsible for relaying the agreement of using the coefficient of 10.4 for domestic sale price.

4. According to *Q*4 of 1998 and 1999's supply and demand situation analysis, generally the supply and demand for 14" will be balanced whether it's in the Mainland China region or the worldwide market.   Each *CDT MAKER* should strictly control production volume, and in particular, should not engage in *OVER*

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL                    CHU00030682.01E

*LOADING* the way *SSDD* did in September, in order to ensure the stability of prices.

5. The next meeting will be convened by Irico. The time and location will be discussed separately.

- End of Report - Submitted for Approval

Submitted by Employee Guang-Hui Dai
*OCT.* 11,1998

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL            CHU00030682.02E

[Handwritten telephone number:]

0512-5191028

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL        CHU00030683E

# EXHIBIT 69



June 20, 2012

**Certification**

**Park IP Translations**

This is to certify that the attached translation is, to the best of
my knowledge and belief, a true and accurate translation from Chinese
into English of the document with bates numbers range:
CHU00030734 – CHU00030737.

_Abraham I. Holczer_

Abraham I. Holczer

Project Manager

D☐P☐ Exhibit _8421_
Deponent _Wang_
Date _5/8/19_   Rptr _BW_

Park Case # 29567

**[TRANSLATION]**

05/04  '99  18:07  591 3970507  CPTF  001

[Handwritten:]
Tai → Yu
*FAX To CPTC*
Submitted respectfully to Manager Wen-Chun (Tony) Cheng, / Director
→*Tony*
Respective Officers →Du
Submitted for approval

Contact Report

| | |
|---|---|
| Meeting Topic: | China *CDT MAKER* Market Information Exchange |
| Date: | 99/04/02 |
| Location: | Nanjing |
| Attendees: | *CPTF:*  Manager Jing -Song (Jason) Lu, Wei-Lie Yu |
| | *PHS:*  Manager Zheng-Er Shao, Director Dong Liu |
| | Mr. He Xu, Mr. Bing Ma |
| | *SSDD:*  Department Manager Ming-Zhi Li, Manager/Tianjin |
| | Samsung Market Department Yu-Huan Wu, |
| | Mr. Zhen Yang |
| | *ORION:*  Mr. Rong-Ji Hong/Shanghai Representative Office |
| | *IRICO:*  Mr. Zhao-Jie Wang |
| | *BMCC:*  Ms. Ping Zhang |

Content:

I.  Production and Sales Information Exchange for March and April 1999

| | | '99 MAR | | | | | '99 APR [Corrected by hand] | | | | | Plan in '99 | 15" import quantity on March |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | PROD | Sales (IN CHINA) | | | Inven-tory | PROD | Sales (IN CHINA) | | | Inven-tory | | |
| | | | total | over-seas | dom-estic | | | total | over-seas | dom-estic | | | |
| CPT | 14" | 123 | 99 | 99 | 0 | 92 | 95 | 126 | 126 | | 61 | 900 | |
| | 15" | 178 | 151 | 151 | 0 | 53 | 162 | 158 | | | 57 | 2,300 | 280 |
| Huafei | 14" | 81 | 85 | 40 | 45 | 186 | 60 | 80 | | | 165 | 500 | |
| | 15" | 48 | 40 | 10 | 30 | 8 | 50 | 50 | | | 8 | 900 | 50 |
| Samsung | 14" | 140 | 120 | 60 | 60 | 95 | 160 | 140 | | | 115 | 1,000 | |
| | 15" | 0 | 0 | | | 0 | 20 | 15 | | | 5 | 700/May B | 170 |
| | 17" | | | | | | | | | | | 500/August B | |
| IRICO | 15" | 62 | 67 | 10 | 57 | 13 | 60 | 63 | | | 10 | 900 | |
| Kitamatsu | 14" | 30 | 32 | | | 50 | 30 | 20 | | | 60 | 35K/M to June B | |
| | 15" | | | | | | | | | | | August B | |

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00030734.01E
Translation

| Daewoo | 14" | | 50 | | 50 | | 60 | 6 | | | | **230** | |
| | 15" | | | | 60 | 20 | 300 | 60 | | | | **3,800** | 60 |
| LG | 15" | | | | 70 | | | | | | | | 70 |
| TL | 14" | 386 | | | | | | | | | | **2,580** | |
| | 15" | 258 | | | | | | | | | | **4,950** | 630 |
| | 17" | | | | | | | | | | | **500** | |

*RE:* Cumulative 15" *CDT* sales volume in China for March 1999 was (258+630) = 888K.

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00030734.02E

Translation

Explanation:

1.  Samsung Electronics:

(1) Shenzhen Samsung originally planned to add one new 17" *CDT* line, but due to funding problems it converted the 14" *CDT* production line instead. It is expected that mass production will start in August of this year. The line conversion process will start in May. Department Manager Li indicated that this production line will be designed for a 14"/ 17" single-direction compatible production line.

(2) Starting in April, Tianjin Samsung will use *SKD* to import *ITC* for its 15" *CDT*s delivery. It's expected to officially start mass production in May.

(3) Department Manager Li also indicated that their single 15" *CDT* line in the Malaysian factory will be converted to production of *MINI-NECK* tubes (with mass production starting in April). The single 14" *TV* line will be converted to produce 17" *CDT* (mass production starts in May).

2.  Nanjing Huafei:
(1) Looking at the delivery situation for 15" equipment, it is expected that the present 14" *CDT* line will be converted to a 15" *CDT* at 6/*E~7/B*. At such time, two lines will be utilized for the production of 15"*CDT*, and it is planned that these will be 14" and 15" *CDT* compatible lines. 14" *CDT* production will be determined on the basis of the inventory and market situation at that time.

(2) Senior Manager Shao stated that since Huafei's 15" *CDT* mass production has increased, production in Taiwan will be reduced at the appropriate time. It is expected to move 2 of its 15" *CDT* production lines to Huafei in '99/*B*.

[Handwritten:] Chubei factory (currently has 15" *CDT Lines* x 5)

3.  IRICO:
(1) The cooperation plan with *TSB* for 17" *CDT* has been basically confirmed (capital and project set-up have been completed, and the technology contract was completed during the 15" *CDT* plan implementation). It will convert the current 14" *CPT* production line. The overall plan has not yet been confirmed.

(2) Compared with 1998, IRICO's 15" *CDT* import materials and parts costs have decreased, and its processing technology has been improved. At present, its electronic guns are manufactured by assembling imported spare parts. *DY*s are transferred from Xianyang, China, as well as provided by the Cai Dong Company. Mr. Wang indicated that the company will be striving to increase its production by about 800 ~ 900*K* in 1999 compared with the previous year, and also to reduce the level of losses by 1/2. [Handwritten:] It said that in 1998, from the 15" *CDT Line* alone, *loss*es exceeded 100,000,000 *RMB*].

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00030735.01E
Translation

(3) Mr. Wang indicated that handling of *ASC* and *A/G* tube surfaces of its 15" *CDT* products, are the same kind of product. [Handwritten:] That means there is only the *AS* tube model.

4.  Kitamatsu:

At present, their 14" *CDT* is still incompatible for mass production with *CPT* (1/2 line). At present, it has been decided that mass production of the 15" *CDT* will start in August. However, whether or not it will be a full line [illegible] utilization has not yet been determined. Since the 15" *CDT* equipment is already in place, there should be no plans for 17" *CDT* mass production this year.

5.  Daewoo:

Mr. Hong indicated that *CM* is their main purchaser in Shanghai. Originally, it used *SKD* as a transfer port, but 14" *CDT* trade will stop since Korea Daewoo will stop production in May. It is heard that *ORION*'s current 14" *CDT* inventory is around 100K. [Handwritten:] Mainly reserved for *AOC*.

6.  The mass production situations of the respective *CDT-MAKER*s in China, starting from August 1999, are as follows:

| VENDOR | Production Lines | Size | Production Capacity (K/M) |
|---|---|---|---|
| Huafei | 2 | 15" | 120 |
| CPT(F) | 0.5 | 14" | 80 |
|  | 1.5 | 15" | 240 |
| Samsung | 1(TSDD) | 15" | 150 |
|  | 1(SSDD) | 17" | 100 |
| IRICO | 1 | 15" | 80 |
| Kitamatsu | 0.5 (Temporary) | 15" | 30 |
| TOTAL (K/M) | 14"/80, 15"/630, 17"/100 | | |

[Handwritten:] But *PHS* and *SDD* can change back to producing 14" *CDT* at any time. Also, neither of them have low inventories of finished products.

[Illegible handwriting] 4/5/'99

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [  ].

CONFIDENTIAL – GRAND JURY MATERIAL                    CHU00030735.02E

[Illegible] 18:16          591 3970507          CPTF                          002

II.   Market Information Exchange

1.   Starting May 1st, the price of 17" *CDT* will officially be increased by *USD* 5 [Handwritten:"?"] (*BASE ON @ USD* 98/*MPR* 2).

2.   *CM W/W – CHN* Demand Situation and Estimated Volume of 15" *CDT* Domestic Sales in China.

Table 1:

|   |   | W/W | CHN |
|---|---|---|---|
|   | 98 | 85M | 21M (16.5M FOR EXPORT, 4.5M FOR DOMESTIC) |
|   | 99 | 94M | 33M (27M FOR EXPORT, 6M FOR DOMESTIC) |

Table 2:

|   |   | '98(4.5M) | '99(6M) | RE |
|---|---|---|---|---|
| 14" |   | 1.7M | 1M | '99.15" CDT Main Domestic Sale Volumes: |
| 15" |   | 2.3M | 3.2M | CPTF/700K,HF/500K,SDD/500K,LG/500K, |
| 17" |   | 0.5M | 0.8M | IRICO/800K, BMCC/100K, **T.L: 3,100K.** |

3.   Attendees complained that IRICO's 15" *CDT* sales price is already much lower than the current market price (which, calculated with 64*K/ASC.ITC*, should be *RMB* 665). Mr. Wang explained that their 15" (64*K/ASC.ITC*) price is currently *RMB* 630, and that this is the transaction price with Shenzhen IRICO and Weihai Daewoo. After a discussion, the following was decided: to prevent unreasonable prices affecting normal market prices, and since the transaction volume between these two makers is already about 90% of IRICO's production volume, the attendees agreed that this price is considered a price for internal transactions (Weihai had *DY* supply transactions with the other one). Both makers were asked to increase their external sales price to the current market price (which, calculated by using 64*K/MPR*2.*ITC*, should be *RMB* 675, and gradually decrease by *RMB* 10 for each level). [Handwritten:] That is the export price, @*USD* 65 as the price.

4.   Regarding Kitamatsu: at present the 14" *CDT* price is only *RMB* 420 – 430. This was calculated by using 48*K/STD.ITC,* though the current sales price of the 14" is lower than the current market price that was set previously (which is only about *RMB* 470 – 480, as calculated by using *STD/K*). In order to ensure that the 14" *CDT* sale prices are orderly and to avoid malicious competition, Kitamatsu was asked to strive to *KEEP* the prices at *RMB* 450. [Handwritten:] *SDD* and *PHS's* 14" domestic sales prices are probably also only *RMB* 470, or even lower!

---

English words found in the original text are *italicized.*
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL                          CHU00030736.01E

                                                                    Translation

III. Conclusion:

1. Except for the internal transaction prices given to Cai Huang and Weihai by IRICO, the 15" *CDT* sales price for the rest of the makers needs to *KEEP* at *RMB* 675 (calculated by using 64K/MPR2.ITC, it should be @RMB 675 and gradually decrease by *RMB* 10 for each level). Since 15" *CDT* and *CM* production and sales are roughly balanced in China, it is feared that overall the *W/W* supply is greater than demand which will affect the maintenance of the 15" price.

2. In reality, the 14" *CDT* price has now collapsed. Calculated using tube *STD/K*, it is currently only *RMB* 470~480 (this is approximately *USD* 46, lower than the industry standard price by *USD* 3). In addition, starting in August, 1999, except for CPT, all makers will suspend production of 14" *CDT*. (Huafei and Kitamatsu will convert it to produce 15" and Samsung will convert it to produce 17").

3. Because transactions in the China market are less standardized, especially with payment and tax issues, and we are currently in the *CM* slow season, the proposal originally submitted by *CPTF* for a review of the change of the USD and RMB exchange rate from 10.4 to 10.6, is now temporarily on *HOLD.* [Underlined by hand] and the price calculation coefficient of 10.4 shall be retained.

[Handwritten:] At this *meeting*, because we spoke up strongly, the unreasonable domestic sales prices was seriously reviewed. 15" is the main point in the future and everyone agreed to go back to the export base price of @USD 65 and a price calculation coefficient for domestic sales of 10.4. IRICO agreed to cooperate, which should be the key point.

[Submitted and Signed:] Wei-Lie Yu, 4/5'99
[Initialed:] Chen-Cheng (Tony) Chien, 4/6
[Initialed:] Chih-Chun (C.C.) Liu, 4/6
[Initialed:] Chieng-Yuan (C.Y.) Lin, 4/6
[Initialed:] Jing-Song (Jason) Lu, 4/5 '99

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00030736.02E

Translation

[Page Intentionally Omitted]

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00030737E

Translation

05/04 '99  18:07  ☎591 3970507        CPTF                                    ☒001

接 洽 报 告

会议主题：大陆 CDT MAKER 市场交流
时间：99/04/02
地点：南京
与会人员：
CPTF：吕经理，余伟列
PIIS：邵正奎经理，刘东处长，徐珂'R，马冰'R
SSDD：李明植部长，吴绍焕经理/天津三星市场部，杨真'R
ORION：洪荣基'R/上海代表处
彩虹：王昭杰'R
BMCC：张萍'S
内容：
一、'99.3/4 月产销讯息交换：

| | | '99.MAR | | | | | '99.APL | | | | | '99计划 | 3 月 15" 进口量 |
| | | PROD | 销售(IN CHINA) | | | 库存 | PROD | 销售(IN CHINA) | | | 库存 | | |
| | | | 总计 | 外销 | 内销 | | | 总计 | 外销 | 内销 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 华映 | 14" | 123 | 99 | 99 | 0 | 92 | 95 | 126 | 126 | | 61 | 900 | |
| | 15" | 178 | 151 | 151 | 0 | 53 | 162 | 158 | | | 57 | 2300 | 280 |
| 华飞 | 14" | 81 | 85 | 40 | 45 | 186 | 60 | 80 | | | 165 | 500 | |
| | 15" | 48 | 40 | 10 | 30 | 8 | 50 | 50 | | | 8 | 900 | 50 |
| 三星 | 14" | 140 | 120 | 60 | 60 | 95 | 160 | 140 | | | 115 | 1000 | |
| | 15" | 0 | 0 | | | | 20 | 15 | | | 5 | 700/5 月始 500/8 月始 | 170 |
| | 17" | | | | | | | | | | | | |
| 彩虹 | 15" | 62 | 67 | 10 | 57 | 13 | 60 | 63 | | | 10 | 900 | |
| 北松 | 14" | 30 | 32 | | | 50 | 30 | 20 | | | 60 | 35K/M 至 6 月 | |
| | 15" | | | | | | | | | | | 8 月开始 | |
| 大宇 | 14" | | 50 | | 50 | | 60 | 6 | | | | 230 | |
| | 15" | | | | 60 | 20 | 300 | 60 | | | | 3800 | 60 |
| 金星 | 15" | | 70 | | | | | | | | | | 70 |
| T.L | 14" | | 386 | | | | | | | | | 2580 | |
| | 15" | | 258 | | | | | | | | | 4950 | 630 |
| | | | | | | | | | | | | 500 | |

RE：'99.3 月 15"CDT 累计于大陆销售量为(258+630)=888K.

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00030734

说明:

**1. 三星电子:**

(1) 深圳三星原计划增加一条 17"CDT 新线,因资金问题现由 14"CDT 生产线改制.预计今年 8 月量产.改线动作将于 5 月开始,李部长表示,该生产线将设计为 14"/17"单向兼容生产线.

(2) 天津三星于 4 月开始进行 15"CDT 交货.预计于 5 月正式量产.

(3) 另李部长表示,其马厂一条 15"CDT 将改产 MINI-NECK 管(4 月量产):一条 14"TV 线改为 17"CDT(5 月开始量产).

**2. 南京华飞:**

(1) 视 15"设备到货状况.预计现有一线 14"CDT 将于 6/E~7/B 改产为 15"CDT,届时将有二线稼动 15"CDT 生产线规划为 14"/15"CDT 兼容线,14"CDT 视库存及市况再决定生产.

(2) 邵经理表称,由于华飞 15"CDT 量产增加,台湾部分将适时减产;预计'99/B 将移转 2 条 15"CDT 生产线到华飞. *针比较(达约有 15"CDT Lots × 5)*

**3. 彩虹:**

(1) 与 TSB 17"CDT 合作案已基本定案(资金/立项已完成,技术合同已在 15"CDT 案进行时完成),将由现 14"CPT 生产线改制,整体计划仍未确定.

(2) 与'98 年比较,彩虹 15"CDT 进口料件成本及制程技术均有所降低与提高,现其电子枪以进口零件组装方式进行,DY 由大陆咸阳偏转及彩东公司提供,王'R 表示其公司争取'99 较去年提高产量至约 800~900K,亏损减少 1/2 水平. *(据 98 年亏损约 CDT Lots,即 Loss超过 1 亿 RMB)*

(3) 另王'R 表示,其 15"CDT 产品管面除理 ASC 与 A/G 为同一种产品. *即尺有 AS 类型*

**4. 北松:**

现其 14"CDT 仍为与 CPT 兼容量产(1/2 线),现已定于 8 月开始量产 15"CDT,但是否满线稼动仍未确定;鉴于 15"CDT 设备亦已到位,17"CDT 今年应无量产计划.

**5. 大宇:**

洪'R 表示,其在上海主要系采购 CM,原以 SKD 方式转口 14"CDT 贸易亦因国韩国大宇即将于 5 月停产而停止,据悉现 ORION 14"CDT 库存约 100K. *(主基市/保密会合 80C)*

**6. '99.8 月起大陆各 CDT-MAKER 量产状况如下:**

| VENDOR | 生产线数 | 尺寸 | 产能(K/M) |
|---|---|---|---|
| 华飞 | 2 | 15" | 120 |
| 华映(F) | 0.5 | 14" | 80 |
|  | 1.5 | 15" | 240 |
| 三星 | 1(TSDD) | 15" | 150 |
|  | 1(SSDD) | 17" | 100 |
| 彩虹 | 1 | 15" | 80 |
| 北松 | 0.5(暂定) | 15" | 30 |
| TOTAL(K/M) |  | 14"/80,15"/630,17"/100 | |

*但 DMS 的 SS0 上增如何彩回生产 14"CDT,�u成品库存则不好.*

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00030735

18:16    ☎591 3970507           CPTF                              ☑002

二、市场讯息交换：

1. 自 5/1 起，17"CDT 正式调涨 USD5(BASE ON @USD98/MPR2)

2. CM W/W——CHN 需求状况及大陆 15"CDT 内销预计量

表一：

|      | W/W | CHN |
| --- | --- | --- |
| '98 | 85M | 21M  (16.5M FOR EXPORT,4.5M FOR DOMESTIC) |
| '99 | 94M | 33M  (27M FOR EXPORT,6M FOR DOMESTIC) |

表二：

|      | '98(4.5M) | '99(6M) | RE |
| --- | --- | --- | --- |
| 14" | 1.7M | 1M | '99.15"CDT 主要内销量为： |
| 15" | 2.3M | **3.2M** | CPTF:700K.HF/500K,SDD/500K.LG/500K |
| 17" | 0.5M | 0.8M | IRICO/800K,BMCC/100K.T.L:3100K. |

3. 与会者抱怨彩虹 15"CDT 售价远低于现市场行情(以 64K/ASC.ITC 计,应为 RMB665),王'R 解释其 15"(64K/ASC.ITC)售价现为 RMB630.此价系与深圳彩虹、威海大宇交易价格，经商定,为避免该不合理价格波及正常市场价格、且该两家交易量已占彩虹产量约 90%产量,与会者同意这两家因属国内部交易(威海与其有 DY 供货交易)之价格，请其在此两家以外售价调高到市场行情计。(以 64K/MPR2.ITC 计为@RMB675,逐级递减 RMB10). 即外销债@*65*一另*候*。

4. 关于北松 14"CDT 售价约 48K/STD.ITC 计现仅为 RMB420~430.尽管 14"现售价已底于顺定行情(以 STD/K 计仅约 470~480),但为使 14"CDT 售价有序以避免恶性竞争,请北松努力 KEEP 售价至 RMB450.    *SDD~5PH5 14"外销债不除市佳 *470* -是否*定低*!

三、结论：

1. 15"CDT 售价除彩虹与彩阜及威海两家内部交易价外，其余均需 KEEP 在@RMB675(以 64K/MPR2.ITC 计,规格逐级递减量为 RMB10).另在大陆 15"CDT 与 CM 产销基本平衡情况下,W/W 整体供过于求恐影响 15"售价之维持.

2. 14"CDT 售价 事实上现已崩盘,以 STD/K 管计,现仅约为 RMB470~480(约 USD46.较行规价低 USD3).另从 '99.8 月起,除中华外,均暂停产 14"CDT.(华飞及北松改作 15".三星改作 17").

3. 鉴于大陆市场交易特点为较不规范,尤其是付款及税负问题,再加上正处于 CM 淡季,愿 CPTF 提议检讨将美金与人民币比率由 10.4 改为 10.6 之动议暂 HOLD,仍维持 10.4 之计价系数.

*此次 *NEG7.M4* 达成方大高水评,请速核 *M4* 内力能通债等不会理过人，
*吃*者味事关，大众同意的归外销感情 @*m65* -八内销债 (*保*
*私* 10.4. 果实工市问意取合,还是关键。*

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00030737

# EXHIBIT 70



June 20, 2012


**Certification**

### Park IP Translations


This is to certify that the attached translation is, to the best of
my knowledge and belief, a true and accurate translation from Chinese
into English of the document with bates numbers range:
CHU00029050E – CHU00029051E.


_Abraham I. Holczer_
_____

Abraham I. Holczer

Project Manager


EXHIBIT
1315E

Park                              Case                              #                              29567

134 W. 29th Street 5th Floor • New York, N.Y. 10001
Phone: 212-581-8870 • Fax: 212-581-5577

[TRANSLATION]

[Fax header illegible]
[Entire Document Handwritten]

[Illegible] (*File CPT*)
To Section Chief Du      1/2

CPT Fuzhou Co., Ltd. Sales Department

<u>Customer Contact Report</u>

Contact Date:  6/22 '99

Name of Customer:     *CPT MEETING*

Contact Personnel:     *ORION*: Director Moon
                       *IRICO*: Manager Li, Manager Sha
                       *CPT*: Director Liu, Jing-Song (Jason) Lu

I.     *CPT* production status in China:

    1.  <u>In '99, it is estimated that the 8 major tube makers will produce about 32</u>
       <u>million units.   Among these: 14"x 3M units (*IRICO* x 2.5M, *BMCC* x 0.5M),</u>
       <u>21"x 14.5-15M units (*BMCC* x 2.1M, *HF* x 1.30M, *LG* x 1.5M, *HTC* x 2.6M,</u>
       <u>*IRICO* x 3M, Evernew x 1.5M, *SDD* x 2.1M, Fortune x 0.45M), 25"x 8M</u>
       <u>units, 29"x 6M</u> [Underlined by hand].

    2.  Export status:

       14" x 2.6M units (*IRICO* x 2.2M, *BMCC* x 0.4M)
       21" x 2M units (*SDD* and *LG* as the main.   In addition, *HTC*, *BMCC*, *HF*,
       *IRICO* also have a small amount to export.)
       25"/29" are basically not enough for self-use.

    3.  '99 China *CTV* production volume is estimated to be around 34-35M.

II.   Market status and price increases:

1.  Director Liu and Director Moon both explained the status of market supply and
    demand for 14"/20"/21".   Based on the fact that *CDT* has successfully
    maintained stable prices and that in the second half of the year demand has grown
    and production capacity has decreased, they asked *IRICO* to cooperate and
    synchronize the process of 14" *CPT* price increases.

2.  *IRICO* explained that the current 14" *CPT* sales price (*ITC* tube) to *VESTEL*
    [Circled by hand] is @*USD* 27 and to other customers is @*USD* 28↑.   They
    frankly admitted that their

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL                    CHU00029050E
                                                      Translation

[Illegible] (*File CPT*)

2/2

| CONTENT | CONTACT ITEMS |
|---------|---------------|

pricing is based on their real cost and that they seldom refer to the price of the industry.   They also claimed that the reason they sold to Turkey *VESTEL* at such a low price was because *SDD* (Shenzhen) was competing for the orders.   (*SDD* Shenzhen produced about 0.3M units of 14" *CPT* during the initial stage after starting production).   Since it has a significant ability to self-make accessories materials for 14" *CPT*, there is still some profit with the current sales price.

3.  They very much appreciated the market information provided by *CPT* and *ORION* and are willing to cooperate with the move to increase the price of 14"*CPT*, except that July orders have already been received.   They are willing to increase the overall price beginning in August.   In addition, their basic selling price is slightly lower than that of the big factories by *USD* 1-2.   That was understood by everyone.

4.  Their 21" *ITC* export price quote is *USD* 50, which is a little bit low.   They were asked to review the price and make an appropriate increase.

5.  To enhance *IRICO*'s interactions and information exchange with the outside, temporary agreement was reached that IRICO would be invited to participate in the regular *meeting*s or the irregular meetings arranged by *ORION* and *CPT* in Hong Kong or Shenzhen.

-   End of report –

Submitted respectfully to the President

[Submitted and Signed:] Employee Jing-Song (Jason) Lu
6/23 '99

[Initialed:] Y. M. Peng, *Jun* 24, '99

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00029051E
Translation

中華映管福州有限公司業務部

客戶接洽報告

接洽日期：

客戶名稱：CPT MEETING

接洽人員：ORION 文經理
ZRZCO 李經理、沈經理
CPT 劉處長、呂總裁

CHU00029050

EXHIBIT
1315



CONFIDENTIAL - GRAND JURY MATERIAL

CHU00029051

# EXHIBIT 71



# MINISTRY OF COMMERCE
# PEOPLE'S REPUBLIC OF CHINA

▸ **Home**
News
Policies
Topics
Statistics
Services
Photo Gallery

🔍 [_____]   Search

中文 ▸
Other languages ▸

Tue.7/1/2014

▸ Home > Policies > Policy

### News

- Significant News
- Spokesperson's Remarks
- Press Conference
- From Counselor's Office

### Policies

- Annoucement
- Policy Interpretation
- Gazette

### Statistics

- Brief Statistics
- Foreign Investment
- Foreign Trade Cooperation
- Regional Trade Statistics
- Import and Export Indicators

### Services

- Tax Law
- Int'l Labor Cooperation Companies
- List of China's Qualified Overseas Contractors
- China-New Zealand Identified Recruitment Agents
- Supply & Demand
- Inquiry & Answer

## Anti-monopoly Law of the People's Republic of China

August 30, 2007 - 14:32 BJT (18:32 GMT)

**No.68**

The Anti-monopoly Law of the People's Republic of China, which has been adopted at the 29th meeting of the Standing Committee of the 10th National People's Congress of the People's Republic of China on August 30, 2007, is hereby promulgated, and shall come into force as of August 1, 2008.

President of the People's Republic of China: Hu Jintao

August 30, 2007

**Anti-monopoly Law of the People's Republic of China**

(Adopted at the 29th meeting of the Standing Committee of the 10th National People's Congress of the People's Republic of China on August 30, 2007)

Contents

Chapter I General Provisions

Chapter II Monopoly Agreement

Chapter III Abuse of Market Dominance

Chapter IV Concentration of Business operators

Exhibit
8617
Yan Yunlong - V3

Chapter V Abuse of Administrative Power to Eliminate or Restrict Competition

Chapter VI Investigation into the Suspicious Monopolistic Conducts

Chapter VII Legal Liabilities

Chapter VIII Supplementary Provisions

## Chapter I General Provisions

**Article 1** This Law is enacted for the purpose of preventing and restraining monopolistic conducts, protecting fair competition in the market, enhancing economic efficiency, safeguarding the interests of consumers and social public interest, promoting the healthy development of the socialist market economy.

**Article 2** This Law shall be applicable to monopolistic conducts in economic activities within the People's Republic of China.

This Law shall apply to the conducts outside the territory of the People's Republic of China if they eliminate or have restrictive effect on competition on the domestic market of the PRC.

**Article 3** For the purposes of this Law, "monopolistic conducts" are defined as the following:

(1) monopolistic agreements among business operators;

(2) abuse of dominant market positions by business operators; and

(3) concentration of business operators that eliminates or restricts competition or might be eliminating or restricting competition.

**Article 4** The State constitutes and carries out competition rules which accord with the socialist market economy, perfects macro-control, and advances a unified, open, competitive and orderly market system.

**Article 5** Business operators may, through fair competition, voluntary alliance  concentrate themselves according to law, expand the scope of business operations, and enhance competitiveness.

**Article 6** Any business with a dominant position may not abuse that dominant position to eliminate, or restrict competition.

**Article 7** With respect to the industries controlled by the State-owned economy and concerning the lifeline of national economy and national security or the industries implementing exclusive operation and sales according to law, the state protects the lawful business operations conducted by the business operators therein. The state also lawfully regulates and controls their business operations and the prices of their commodities and services so as to safeguard the interests of consumers and promote technical progresses.

The business operators as mentioned above shall lawfully operate, be honest and faithful, be strictly self-disciplined, accept social supervision, shall not damage the interests of consumers by virtue of their dominant or exclusive positions.

**Article 8** No administrative organ or organization empowered by a law or administrative regulation to administer public affairs may abuse its administrative powers to eliminate or restrict competition.

**Article 9** The State Council shall establish the Anti-monopoly Commission, which is in charge of organizing, coordinating, guiding anti-monopoly work, performs the following functions:

(1) studying and drafting related competition policies;

(2) organizing the investigation and assessment of overall competition situations in the market, and issuing assessment reports;

(3) constituting and issuing anti-monopoly guidelines;

(4) coordinating anti-monopoly administrative law enforcement; and

(5) other functions as assigned by the State Council.

The State Council shall stipulate composition and working rules of the Anti-monopoly Commission.

**Article 10** The anti-monopoly authority designated by the State Council (hereinafter referred to as the Anti-monopoly Authority under the State Council) shall be in charge of anti-monopoly law enforcement in accordance with this Law.

The Anti-monopoly Authority under the State Council) may, when needed, authorize the corresponding authorities in the people's governments of the provinces, autonomous regions and municipalities directly under the Central Government to take charge of anti-monopoly law enforcement in accordance with this Law.

**Article 11** A trade association shall intensify industrial self-discipline, guide business operators to lawfully compete, safeguard the competition order in the market.

**Article 12** For the purposes of this Law,

"business operator" refers to a natural person, legal person, or any other organization that is in the engagement of commodities production or operation or service provision, and

"relevant market" refers to the commodity scope or territorial scope within which the business operators compete against each other during a certain period of time for specific commodities or services (hereinafter generally referred to as "commodities").

### Chapter II Monopoly Agreement

**Article 13** Any of the following monopoly agreements among the competing business operators shall be prohibited:

(1) fixing or changing prices of commodities;

(2) limiting the output or sales of commodities;

(3) dividing the sales market or the raw material procurement market;

(4) restricting the purchase of new technology or new facilities or the development of new technology or new products;

(5) making boycott transactions; or

(6) other monopoly agreements as determined by the Anti-monopoly Authority under the State Council.

For the purposes of this Law, "monopoly agreements" refer to agreements, decisions or other concerted actions which eliminate or restrict competition.

**Article 14** Any of the following agreements among business operators and their trading parties are prohibited:

(1) fixing the price of commodities for resale to a third party;

(2) restricting the minimum price of commodities for resale to a third party; or

(3) other monopoly agreements as determined by the Anti-monopoly Authority under the State Council.

**Article 15** An agreement among business operators shall be exempted from application of articles 13 and 14 if it can be proven to be in any of the following circumstances:

(1) for the purpose of improving technologies, researching and developing new products;

(2) for the purpose of upgrading product quality, reducing cost, improving efficiency, unifying product specifications or standards, or carrying out professional labor division;

(3) for the purpose of enhancing operational efficiency and reinforcing the competitiveness of small and medium-sized business operators;

(4) for the purpose of achieving public interests such as conserving energy, protecting the environment and relieving the victims of a disaster and so on;

(5) for the purpose of mitigating serious decrease in sales volume or obviously excessive production during economic recessions;

(6) for the purpose of safeguarding the justifiable interests in the foreign trade or foreign economic cooperation; or

(7) other circumstances as stipulated by laws and the State Council.

Where a monopoly agreement is in any of the circumstances stipulated in Items 1 through 5 and is exempt from Articles 13 and 14 of this Law, the business operators must additionally prove that the agreement can enable consumers to share the interests derived from the agreement, and will not severely restrict the competition in relevant market.

**Article 16** Any trade association may not organize the business operators in its own industry to implement the monopolistic conduct as prohibited by this Chapter.

### Chapter III Abuse of Market Dominance

**Article 17** A business operator with a dominant market position shall not abuse its dominant market position to conduct following acts:

(1) selling commodities at unfairly high prices or buying commodities at unfairly low prices;

(2) selling products at prices below cost without any justifiable cause;

(3) refusing to trade with a trading party without any justifiable cause;

(4) requiring a trading party to trade exclusively with itself or trade exclusively with a designated business operator(s) without any justifiable cause;

(5) tying products or imposing unreasonable trading conditions at the time of trading without any justifiable cause;

(6) applying dissimilar prices or other transaction terms to counterparties with equal standing;

(7) other conducts determined as abuse of a dominant position by the Anti-monopoly Authority under the State Council

For the purposes of this Law, "dominant market position" refers to a market position held by a business operator having the capacity to control the price, quantity or other trading conditions of commodities in relevant market, or to hinder or affect any other business operator to enter the relevant market.

**Article 18** The dominant market status shall be determined according to the following factors:

(1) the market share of a business operator in relevant market, and the competition situation of the relevant market;

(2) the capacity of a business operator to control the sales markets or the raw material procurement market;

(3) the financial and technical conditions of the business operator;

(4) the degree of dependence of other business operators upon of the business operator in transactions;

(5) the degree of difficulty for other business operators to enter the relevant market; and

(6) other factors related to determine a dominant market position of the said business operator.

**Article 19** Where a business operator is under any of the following circumstances, it may be assumed to be have a dominant market position:

(1) the relevant market share of a business operator accounts for1/2 or above in the relevant market;

(2) the joint relevant market share of two business operators accounts for 2/3 or above; or

(3) the joint relevant market share of three business operators accounts for 3/4 or above.

A business operator with a market share of less than 1/10 shall not be presumed as having a dominant market position even if they fall within the scope of second or third item.

Where a business operator who has been presumed to have a dominant market position can otherwise prove that they do not have a dominant market, it shall not be determined as having a dominant market position.


**Chapter IV Concentration of Business operators**


**Article 20**A concentration refers to the following circumstances:

(1) the merger of business operators;

(2) acquiring control over other business operators by virtue of acquiring their equities or assets; or

(3) acquiring control over other business operators or possibility of exercising decisive influence on other business operators by virtue of contact or any other means.

**Article 21** Where a concentration reaches the threshold of declaration stipulated by the State Council, a declaration must be lodged in advance with the Anti-monopoly Authority under the State Council, or otherwise the concentration shall not be implemented.

**Article 22** Where a concentration is under any of the following circumstances, it may not be declared to the Anti-monopoly Authority under the State Council:

(1) one business operator who is a party to the concentration has the power to exercise more than half the voting rights of every other business operator, whether of the equity or the assets; or

(2) one business operator who is not a party to the concentration has the power to exercise more than half the voting rights of every business operator concerned, whether of the equity or the assets.

**Article 23** A business operator shall, when lodge a concentration declaration with the Anti-monopoly Authority under the State Council, submit the following documents and materials:

(1) a declaration paper;

(2) explanations on the effect of the concentration on the relevant market competition;

(3) the agreement of concentration;

(4) the financial reports and accounting reports of the proceeding accounting year of the business operator; and

(5) other documents and materials as stipulated by the Anti-monopoly Authority under the State Council.

Such items shall be embodied in the declaration paper as the name, domicile and business scopes of the business operators involved in the concentration as well as the date of the scheduled concentration and other items as stipulated by the Anti-monopoly Authority under the State Council.

**Article 24** Where the documents or materials submitted by a business operator are incomplete, it shall submit the rest of the documents and materials within the time limit stipulated by the Anti-monopoly Authority under the State Council; otherwise, the declaration shall be deemed as not filed.

**Article 25** The Anti-monopoly Authority under the State Council shall conduct a preliminary review of the declared concentration of business operators, make a decision whether to conduct further review and notify the business operators in written form within 30 days upon receipt of the documents and materials submitted by the business operators pursuant to Article 23 of this Law. Before such a decision made by the Anti-monopoly Authority under the State Council, the concentration may be not implemented.

Where the Anti-monopoly Authority under the State Council decides not to conduct further review or fails to make a decision at expiry of the stipulated period, the concentration may be implemented.

**Article 26** Where the Anti-monopoly Authority under the State Council decides to conduct further review, they shall, within 90 days from the date of decision, complete the review, make a decision on whether to prohibit the concentration, and notify the business operators concerned

of the decision in written form. A decision of prohibition shall be attached with reasons therefor. Within the review period the concentration may not be implemented.

Under any of the following circumstances, the Anti-monopoly Authority under the State Council may notify the business operators in written form that the time limit as stipulated in the preceding paragraph may be extended to no more than 60 days:

(1) the business operators concerned agree to extend the time limit;

(2) the documents or materials submitted are inaccurate and need further verification;

(3) things have significantly changed after declaration.

If the Anti-monopoly Authority under the State Council fails to make a decision at expiry of the period, the concentration may be implemented.

**Article 27** In the case of the examination on the concentration of business operators, it shall consider the relevant elements as follows:

(1) the market share of the business operators involved in the relevant market and the controlling power thereof over that market,

(2) the degree of market concentration in the relevant market,

(3) the influence of the concentration of business operators on the market access and technological progress,

(4) the influence of the concentration of business operators on the consumers and other business operators,

(5) the influence of the concentration of business operators on the national economic development, and

(6) other elements that may have an effect on the market competition and shall be taken into account as regarded by the Anti-monopoly Authority under the State Council.

**Article 28** Where a concentration has or may have effect of eliminating or restricting competition, the Anti-monopoly Authority under the State Council shall make a decision to prohibit the concentration. However, if the business operators concerned can prove that the concentration will bring more positive impact than negative impact on competition, or the concentration is pursuant to public interests, the Anti-monopoly Authority under the State Council may decide not to prohibit the concentration.

**Article 29** Where the concentration is not prohibited, the Anti-monopoly Authority under the State Council may decide to attach restrictive conditions for reducing the negative impact of such concentration on competition.

**Article 30** Where the Anti-monopoly Authority under the State Council decides to prohibit a concentration or attaches restrictive conditions on concentration, it shall publicize such decisions to the general public in a timely manner.

**Article 31** Where a foreign investor merges and acquires a domestic enterprise or participate in concentration by other means, if state security is involved, besides the examination on the concentration in accordance with this Law, the examination on national security shall also be conducted in accordance with the relevant State provisions.

### Chapter V Abuse of Administrative Power to Eliminate or Restrict Competition

**Article 32** Any administrative organ or organization empowered by a law or administrative regulation to administer public affairs may not abuse

its administrative power, restrict or restrict in a disguised form entities and individuals to operate, purchase or use the commodities provided by business operators designated by it.

**Article 33** Any administrative organ or organization empowered by a law or an administrative regulation to administer public affairs may not have any of the following conducts by abusing its administrative power to block free circulation of commodities between regions:

(1) imposing discriminative charge items, discriminative charge standards or discriminative prices upon commodities from outside the locality,

(2) imposing such technical requirements and inspection standards upon commodities from outside the locality as different from those upon local commodities of the same classification, or taking such discriminative technical measures as repeated inspections or repeated certifications to commodities from outside the locality, so as to restrict them to enter local market,

(3) exerting administrative licensing specially on commodities from outside the locality so as to restrict them to enter local market,

(4) setting barriers or taking other measures so as to hamper commodities from outside the locality from entering the local market or local commodities from moving outside the local region, or

(5) other conducts for the purpose of hampering commodities from free circulation between regions.

**Article 34** Any administrative organ or organization empowered by a law or administrative regulation to administer public affairs may not abuse its administrative power to reject or restrict business operators from outside the locality to participate in local tendering and bidding activities by such means as imposing discriminative qualification requirements or assessment standards or releasing information in an unlawful manner.

**Article 35** Any administrative organ or organization empowered by a law or administrative regulation to administer public affairs may not abuse its administrative power to reject or restrict business operators from outside the locality to invest or set up branches in the locality by imposing unequal treatment thereupon compared to that upon local business operators.

**Article 36** Any administrative organ or organization empowered by a law or administrative regulation to administer public affairs may not abuse its administrative power to force business operators to engage in the monopolistic conducts as prescribed in this Law.

**Article 37** Any administrative organ may not abuse its administrative power to set down such provisions in respect of eliminating or restricting competition.

### Chapter VI Investigation into the Suspicious Monopolistic Conducts

**Article 38** The anti-monopoly authority shall make investigations into suspicious monopolistic conducts in accordance with law.

Any entity or individual may report suspicious monopolistic conducts to the anti-monopoly authority. The anti-monopoly authority shall keep the informer confidential.

Where an informer makes the reporting in written form and provides relevant facts and evidences, the anti-monopoly authority shall make necessary investigation.

**Article 39** The anti-monopoly authority may take any of the following measures in investigating suspicious monopolistic conducts:

(1) conducting the inspection by getting into the business premises of business operators under investigation or by getting into any other relevant place,

(2) inquiring of the business operators under investigation, interested parties, or other relevant entities or individuals, and requiring them to explain the relevant conditions,

(3) consulting and duplicating the relevant documents, agreements, account books, business correspondences and electronic data, etc. of the business operators under investigation, interested parties and other relevant entities or individuals,

(4) seizing and detaining relevant evidence, and

(5) inquiring about the business operators' bank accounts under investigation.

Before the measures as prescribed in the preceding paragraph are approved, a written report shall be submitted to the chief person(s)-in-charge of the anti-monopoly authority.

**Article 40** When inspecting suspicious monopolistic conducts, there shall be at least two law enforcers, and they shall show their law enforcement certificates.

When inquiring about and investigating suspicious monopolistic conducts, law enforcers shall make notes thereon, which shall bear the signatures of the persons under inquiry or investigation.

**Article 41** The anti-monopoly authority and functionaries thereof shall be obliged to keep confidential the trade secrets they have access to during the course of the law enforcement.

**Article 42** Business operators, interested parties and other relevant entities and individuals under investigation shall show cooperation with the anti-monopoly authority in performing its functions, and may not reject or hamper the investigation by the anti-monopoly authority.

**Article 43** Business operators, interested parties under investigation have the right to voice their opinions. The anti-monopoly authority shall verify the facts, reasons and evidences provided by the business operators, interested parties under investigation.

**Article 44** Where the anti-monopoly authority deems that a monopolistic conduct is constituted after investigating and verifying a suspicious monopolistic conduct, it shall make a decision on how to deal with the monopolistic conduct, and publicize it.

**Article 45** As regards a suspicious monopolistic conduct that the anti-monopoly authority is investigating, if the business operators under investigation promise to eliminate the impact of the conduct by taking specific measures within the time limit prescribed by the anti-monopoly authority, the anti-monopoly authority may decide to suspend the investigation. The decision on suspending the investigation shall specify the specific measures as promised by the business operators under investigation.

Where the anti-monopoly authority decides to suspend the investigation, it shall supervise the implementation of the promise by the relevant business operators. If the business operators keep their promise, the anti-monopoly authority may decide to terminate the investigation.

However, the anti-monopoly authority shall resume the investigation, where

(1) the business operators fail to implement the promise,

(2) significant changes have taken place to the facts based on which the decision on suspending the investigation was made; or

(3) the decision on suspending the investigation was made based on incomplete or inaccurate information provided by the business operators.

**Article 46** Where business operators reach an monopoly agreement and perform it in violation of this Law, the anti-monopoly authority shall order them to cease doing so, and shall confiscate the illegal gains and impose a fine of 1% up to 10% of the sales revenue in the previous year. Where the reached monopoly agreement has not been performed, a fine of less than 500,000 yuan shall be imposed.

Where any business operator voluntarily reports the conditions on reaching the monopoly agreement and provides important evidences to the anti-monopoly authority, it may be imposed a mitigated punishment or exemption from punishment as the case may be.

Where a guild help the achievement of a monopoly age8ment by business operators in its own industry in violation of this Law, a fine of less than 500,000 yuan shall be imposed thereupon by the anti-monopoly authority; in case of serious circumstances, the social group registration authority may deregister the guild.

**Article 47** Where any business operator abuses its dominant market status in violation of this Law, it shall be ordered to cease doing so. The anti-monopoly authority shall confiscate its illegal gains and impose thereupon a fine of 1% up to 10% of the sales revenue in the previous year.

**Article 48** Where any business operator implements concentration in violation of this Law, the anti-monopoly authority shall order it to cease doing so, to dispose of shares or assets, transfer the business or take other necessary measures to restore the market situation before the concentration within a time limit, and may impose a fine of less than 500,000 yuan.

**Article 49** The specific amount of the fines as prescribed in Articles 46 through 48 shall be determined in consideration of such factors as the nature, extent and duration of the violations.

**Article 50** Where any loss was caused by a business operator's monopolistic conducts to other entities and individuals, the business operator shall assume the civil liabilities.

**Article 51** Where any administrative organ or an organization empowered by a law or administrative regulation to administer public affairs abuses its administrative power to eliminate or restrict competition, the superior authority thereof shall order it to make correction and impose punishments on the directly liable person(s)-in-charge and other directly liable persons. The anti-monopoly authority may put forward suggestions on handling according to law to the relevant superior authority.

Where it is otherwise provided in a law or administrative regulation for the handling the organization empowered by a law or administrative regulation to administer public affairs who abuses its administrative power to eliminate or restrict competition, such provisions shall prevail.

**Article 52** As regards the inspection and investigation by the anti-monopoly authority, if business operators refuse to provide related materials and information, provide fraudulent materials or information, conceal, destroy or remove evidence, or refuse or obstruct investigation in other ways, the anti-monopoly authority shall order them to make rectification, impose a fine of less than 20,000 yuan on individuals, and a fine of less than 200,000 yuan on entities; and in case of serious circumstances, the anti-monopoly authority may impose a fine of 20,000 yuan up to 100,000 yuan on individuals, and a fine of 200,000 yuan up to one million yuan on entities; where a crime is constituted, the relevant business operators shall assume criminal liabilities.

**Article 53** Where any party concerned objects to the decision made by the anti-monopoly authority in accordance with Articles 28 and 29 of this Law, it may first apply for an administrative reconsideration; if it objects to the reconsideration decision, it may lodge an administrative lawsuit in accordance with law.

Where any party concerned is dissatisfied with any decision made by the anti-monopoly authority other than the decisions prescribed in the preceding paragraph, it may lodge an application for administrative reconsideration or initiate an administrative lawsuit in accordance with law.

**Article 54** Where any functionary of the anti-monopoly authority abuses his/her power, neglects his/her duty, seeks private benefits, or discloses trade secrets he/she has access to during the process of law enforcement, and a crime is constituted, he/she shall be subject to the criminal liability; where no crime is constituted, he/she shall be imposed upon a disciplinary sanction.

## Chapter VIII Supplementary Provisions

**Article 55** This Law does not govern the conduct of business operators to exercise their intellectual property rights under laws and relevant administrative regulations on intellectual property rights; however, business operators' conduct to eliminate or restrict market competition by abusing their intellectual property rights shall be governed by this Law.

**Article 56** This Law does not govern the ally or concerted actions of agricultural producers and rural economic organizations in the economic activities such as production, processing, sales, transportation and storage of agricultural products.

**Article 57** This Law shall enter into force as of August 1, 2008.

【Big Medium-sized Small】 【Print】

**Ministry of Commerce Website Copyright and Disclaimer Statement**

All articles marked with "Article type: Original" posted on the website of the Ministry of Commerce and its sub-sites are copyrighted by this Website and its sub-sites. Any reproduction or use by any other websites, media or individuals must be attached with a clear indication of "Source: Ministry of Commerce Website".

All articles posted on this website or its sub-sites marked with "Article type: reproduced" or "Article type: translated" and "Article type: redistributed" come from other media, and are provided solely for the user's information, which does not mean this Website or its sub-sites endorse the ideas thereof or assume any legal liability or responsibility for their authenticity. Any other media, websites or individuals must maintain the source of information indication on this Website or its sub-sites when using the information, and shall assume legal liability for the use.



Approved by: MINISTRY OF COMMERCE,PRC
Jing ICP Bei No.05004093
Add: No.2 Dong Chang'an Avenue,Beijing China(100731)

Supported by: Cofortune Information Technology Co., Ltd
Tel: +86-10-51651200-612/613/623 Fax: +86-10-65677512
E-mail: MOFCOM Mailbox

2022年09月26日 星期一

官方微信　｜　官方微博　｜　分享　｜　无障碍浏览



国家市场监督管理总局
State Administration for Market Regulation

请输入要查询的内容

首页　　机构　　新闻　　政务　　服务　　互动　　专题

你的位置:首页>政务>政府信息公开

标　　题：中华人民共和国反垄断法

索 引 号：2019-1566204038094

文　　号：无

主题分类：总局主要执行的法律

公布日期：2007年08月30日

# 中华人民共和国反垄断法

**(2007年8月30日第十届全国人民代表大会常务委员会第二十九次会议通过)**

## 目　　录

第一章　总则
第二章　垄断协议
第三章　滥用市场支配地位
第四章　经营者集中
第五章　滥用行政权力排除、限制竞争
第六章　对涉嫌垄断行为的调查
第七章　法律责任
第八章　附则

### 第一章　总则

第一条　为了预防和制止垄断行为，保护市场公平竞争，提高经济运行效率，维护消费者利益和社会公共利益，促进社会主义市场经济健康发展，制定本法。

第二条　中华人民共和国境内经济活动中的垄断行为，适用本法；中华人民共和国境外的垄断行为，对境内市场竞争产生排除、限制影响的，适用本法。

第三条　本法规定的垄断行为包括：

（一）经营者达成垄断协议；

（二）经营者滥用市场支配地位；

（三）具有或者可能具有排除、限制竞争效果的经营者集中。

第四条　国家制定和实施与社会主义市场经济相适应的竞争规则，完善宏观调控，健全统一、开放、竞争、有序的市场体系。

第五条　经营者可以通过公平竞争、自愿联合，依法实施集中，扩大经营规模，提高市场竞争能力。

第六条　具有市场支配地位的经营者，不得滥用市场支配地位，排除、限制竞争。

第七条　国有经济占控制地位的关系国民经济命脉和国家安全的行业以及依法实行专营专卖的行业，国家对其经营者的合法经营活动予以保护，并对经营者的经营行为及其商品和服务的价格依法实施监管和调控，维护消费者利益，促进技术进步。

前款规定行业的经营者应当依法经营，诚实守信，严格自律，接受社会公众的监督，不得利用其控制地位或者专营专卖地位损害消费者利益。

中华人民共和国反垄断法

第八条　行政机关和法律、法规授权的具有管理公共事务职能的组织不得滥用行政权力，排除、限制竞争。

第九条　国务院设立反垄断委员会，负责组织、协调、指导反垄断工作，履行下列职责：

（一）研究拟订有关竞争政策；

（二）组织调查、评估市场总体竞争状况，发布评估报告；

（三）制定、发布反垄断指南；

（四）协调反垄断行政执法工作；

（五）国务院规定的其他职责。

国务院反垄断委员会的组成和工作规则由国务院规定。

第十条　国务院规定的承担反垄断执法职责的机构（以下统称国务院反垄断执法机构）依照本法规定，负责反垄断执法工作。

国务院反垄断执法机构根据工作需要，可以授权省、自治区、直辖市人民政府相应的机构，依照本法规定负责有关反垄断执法工作。

第十一条　行业协会应当加强行业自律，引导本行业的经营者依法竞争，维护市场竞争秩序。

第十二条　本法所称经营者，是指从事商品生产、经营或者提供服务的自然人、法人和其他组织。

本法所称相关市场，是指经营者在一定时期内就特定商品或者服务（以下统称商品）进行竞争的商品范围和地域范围。

## 第二章　垄断协议

第十三条　禁止具有竞争关系的经营者达成下列垄断协议：

（一）固定或者变更商品价格；

（二）限制商品的生产数量或者销售数量；

（三）分割销售市场或者原材料采购市场；

（四）限制购买新技术、新设备或者限制开发新技术、新产品；

（五）联合抵制交易；

（六）国务院反垄断执法机构认定的其他垄断协议。

本法所称垄断协议，是指排除、限制竞争的协议、决定或者其他协同行为。

第十四条　禁止经营者与交易相对人达成下列垄断协议：

（一）固定向第三人转售商品的价格；

（二）限定向第三人转售商品的最低价格；

（三）国务院反垄断执法机构认定的其他垄断协议。

第十五条　经营者能够证明所达成的协议属于下列情形之一的，不适用本法第十三条、第十四条的规定：

（一）为改进技术、研究开发新产品的；

（二）为提高产品质量、降低成本、增进效率，统一产品规格、标准或者实行专业化分工的；

（三）为提高中小经营者经营效率，增强中小经营者竞争力的；

（四）为实现节约能源、保护环境、救灾救助等社会公共利益的；

（五）因经济不景气，为缓解销售量严重下降或者生产明显过剩的；

（六）为保障对外贸易和对外经济合作中的正当利益的；

（七）法律和国务院规定的其他情形。

属于前款第一项至第五项情形，不适用本法第十三条、第十四条规定的，经营者还应当证明所达成的协议不会严重限制相关市场的竞争，并且能够使消费者分享由此产生的利益。

第十六条　行业协会不得组织本行业的经营者从事本章禁止的垄断行为。

## 第三章　滥用市场支配地位

第十七条　禁止具有市场支配地位的经营者从事下列滥用市场支配地位的行为：

（一）以不公平的高价销售商品或者以不公平的低价购买商品；

（二）没有正当理由，以低于成本的价格销售商品；

（三）没有正当理由，拒绝与交易相对人进行交易；

（四）没有正当理由，限定交易相对人只能与其进行交易或者只能与其指定的经营者进行交易；

（五）没有正当理由搭售商品，或者在交易时附加其他不合理的交易条件；

（六）没有正当理由，对条件相同的交易相对人在交易价格等交易条件上实行差别待遇；

（七）国务院反垄断执法机构认定的其他滥用市场支配地位的行为。

本法所称市场支配地位，是指经营者在相关市场内具有能够控制商品价格、数量或者其他交易条件，或者能够阻碍、影响其他经营者进入相关市场能力的市场地位。

第十八条　认定经营者具有市场支配地位，应当依据下列因素：

（一）该经营者在相关市场的市场份额，以及相关市场的竞争状况；

（二）该经营者控制销售市场或者原材料采购市场的能力；

（三）该经营者的财力和技术条件；

（四）其他经营者对该经营者在交易上的依赖程度；

（五）其他经营者进入相关市场的难易程度；

（六）与认定该经营者市场支配地位有关的其他因素。

第十九条　有下列情形之一的，可以推定经营者具有市场支配地位：

（一）一个经营者在相关市场的市场份额达到二分之一的；

（二）两个经营者在相关市场的市场份额合计达到三分之二的；

（三）三个经营者在相关市场的市场份额合计达到四分之三的。

有前款第二项、第三项规定的情形，其中有的经营者市场份额不足十分之一的，不应当推定该经营者具有市场支配地位。

被推定具有市场支配地位的经营者，有证据证明不具有市场支配地位的，不应当认定其具有市场支配地位。

## 第四章　经营者集中

第二十条　经营者集中是指下列情形：

（一）经营者合并；

（二）经营者通过取得股权或者资产的方式取得对其他经营者的控制权；

（三）经营者通过合同等方式取得对其他经营者的控制权或者能够对其他经营者施加决定性影响。

第二十一条　经营者集中达到国务院规定的申报标准的，经营者应当事先向国务院反垄断执法机构申报，未申报的不得实施集中。

第二十二条　经营者集中有下列情形之一的，可以不向国务院反垄断执法机构申报：

（一）参与集中的一个经营者拥有其他每个经营者百分之五十以上有表决权的股份或者资产的；

（二）参与集中的每个经营者百分之五十以上有表决权的股份或者资产被同一个未参与集中的经营者拥有的。

第二十三条　经营者向国务院反垄断执法机构申报集中，应当提交下列文件、资料：

（一）申报书；

（二）集中对相关市场竞争状况影响的说明；

（三）集中协议；

（四）参与集中的经营者经会计师事务所审计的上一会计年度财务会计报告；

（五）国务院反垄断执法机构规定的其他文件、资料。

申报书应当载明参与集中的经营者的名称、住所、经营范围、预定实施集中的日期和国务院反垄断执法机构规定的其他事项。

第二十四条　经营者提交的文件、资料不完备的，应当在国务院反垄断执法机构规定的期限内补交文件、资料。经营者逾期未补交文件、资料的，视为未申报。

第二十五条　国务院反垄断执法机构应自收到经营者提交的符合本法第二十三条规定的文件、资料之日起三十日内，对申报的经营者集中进行初步审查，作出是否实施进一步审查的决定，并书面通知经营者。国务院反垄断执法机构作出决定前，经营者不得实施集中。

国务院反垄断执法机构作出不实施进一步审查的决定或者逾期未作出决定的，经营者可以实施集中。

第二十六条　国务院反垄断执法机构决定实施进一步审查的，应当自决定之日起九十日内审查完毕，作出是否禁止经营者集中的决定，并书面通知经营者。作出禁止经营者集中的决定，应当说明理由。审查期间，经营者不得实施集中。

有下列情形之一的，国务院反垄断执法机构经书面通知经营者，可以延长前款规定的审查期限，但最长不得超过六十日：

（一）经营者同意延长审查期限的；

（二）经营者提交的文件、资料不准确，需要进一步核实的；

（三）经营者申报后有关情况发生重大变化的。

国务院反垄断执法机构逾期未作出决定的，经营者可以实施集中。

第二十七条　审查经营者集中，应当考虑下列因素：

（一）参与集中的经营者在相关市场的市场份额及其对市场的控制力；

（二）相关市场的市场集中度；

（三）经营者集中对市场进入、技术进步的影响；

（四）经营者集中对消费者和其他有关经营者的影响；

（五）经营者集中对国民经济发展的影响；

（六）国务院反垄断执法机构认为应当考虑的影响市场竞争的其他因素。

第二十八条　经营者集中具有或者可能具有排除、限制竞争效果的，国务院反垄断执法机构应当作出禁止经营者集中的决定。但是，经营者能够证明该集中对竞争产生的有利影响明显大于不利影响，或者符合社会公共利益的，国务院反垄断执法机构可以作出对经营者集中不予禁止的决定。

第二十九条　对不予禁止的经营者集中，国务院反垄断执法机构可以决定附加减少集中对竞争产生不利影响的限制性条件。

第三十条　国务院反垄断执法机构应当将禁止经营者集中的决定或者对经营者集中附加限制性条件的决定，及时向社会公布。

第三十一条　对外资并购境内企业或者以其他方式参与经营者集中，涉及国家安全的，除依照本法规定进行经营者集中审查外，还应当按照国家有关规定进行国家安全审查。

## 第五章　滥用行政权力排除、限制竞争

第三十二条　行政机关和法律、法规授权的具有管理公共事务职能的组织不得滥用行政权力，限定或者变相限定单位或者个人经营、购买、使用其指定的经营者提供的商品。

第三十三条　行政机关和法律、法规授权的具有管理公共事务职能的组织不得滥用行政权力，实施下列行为，妨碍商品在地区之间的自由流通：

（一）对外地商品设定歧视性收费项目、实行歧视性收费标准，或者规定歧视性价格；

（二）对外地商品规定与本地同类商品不同的技术要求、检验标准，或者对外地商品采取重复检验、重复认证等歧视性技术措施，限制外地商品进入本地市场；

（三）采取专门针对外地商品的行政许可，限制外地商品进入本地市场；

（四）设置关卡或者采取其他手段，阻碍外地商品进入或者本地商品运出；

（五）妨碍商品在地区之间自由流通的其他行为。

第三十四条　行政机关和法律、法规授权的具有管理公共事务职能的组织不得滥用行政权力，以设定歧视性资质要求、评审标准或者不依法发布信息等方式，排斥或者限制外地经营者参加本地的招标投标活动。

第三十五条　行政机关和法律、法规授权的具有管理公共事务职能的组织不得滥用行政权力，采取与本地经营者不平等待遇等方式，排斥或者限制外地经营者在本地投资或者设立分支机构。

第三十六条　行政机关和法律、法规授权的具有管理公共事务职能的组织不得滥用行政权力，强制经营者从事本法规定的垄断行为。

第三十七条　行政机关不得滥用行政权力，制定含有排除、限制竞争内容的规定。

## 第六章　对涉嫌垄断行为的调查

第三十八条　反垄断执法机构依法对涉嫌垄断行为进行调查。

对涉嫌垄断行为，任何单位和个人有权向反垄断执法机构举报。反垄断执法机构应当为举报人保密。

举报采用书面形式并提供相关事实和证据的，反垄断执法机构应当进行必要的调查。

第三十九条　反垄断执法机构调查涉嫌垄断行为，可以采取下列措施：

（一）进入被调查的经营者的营业场所或者其他有关场所进行检查；

（二）询问被调查的经营者、利害关系人或者其他有关单位或者个人，要求其说明有关情况；

（三）查阅、复制被调查的经营者、利害关系人或者其他有关单位或者个人的有关凭证、协议、会计账簿、业务函电、电子数据等文件、资料；

（四）查封、扣押相关证据；

（五）查询经营者的银行账户。

采取前款规定的措施，应当向反垄断执法机构主要负责人书面报告，并经批准。

第四十条　反垄断执法机构调查涉嫌垄断行为，执法人员不得少于二人，并应当出示执法证件。

执法人员进行询问和调查，应当制作笔录，并由被询问人或者被调查人签字。

第四十一条　反垄断执法机构及其工作人员对执法过程中知悉的商业秘密负有保密义务。

第四十二条　被调查的经营者、利害关系人或者其他有关单位或者个人应当配合反垄断执法机构依法履行职责，不得拒绝、阻碍反垄断执法机构的调查。

第四十三条　被调查的经营者、利害关系人有权陈述意见。反垄断执法机构应当对被调查的经营者、利害关系人提出的事实、理由和证据进行核实。

第四十四条　反垄断执法机构对涉嫌垄断行为调查核实后，认为构成垄断行为的，应当依法作出处理决定，并可以向社会公布。

第四十五条　对涉嫌垄断行为，被调查的经营者承诺在反垄断执法机构认可的期限内采取具体措施消除该行为后果的，反垄断执法机构可以决定中止调查。中止调查的决定应当载明被调查的经营者承诺的具体内容。

反垄断执法机构决定中止调查的，应当对经营者履行承诺的情况进行监督。经营者履行承诺的，反垄断执法机构可以决定终止调查。

有下列情形之一的，反垄断执法机构应当恢复调查：

（一）经营者未履行承诺的；

（二）作出中止调查决定所依据的事实发生重大变化的；

（三）中止调查的决定是基于经营者提供的不完整或者不真实的信息作出的。

## 第七章　法律责任

第四十六条　经营者违反本法规定，达成并实施垄断协议的，由反垄断执法机构责令停止违法行为，没收违法所得，并处上一年度销售额百分之一以上百分之十以下的罚款；尚未实施所达成的垄断协议的，可以处五十万元以下的罚款。

经营者主动向反垄断执法机构报告达成垄断协议的有关情况并提供重要证据的，反垄断执法机构可以酌情减轻或者免除对该经营者的处罚。

行业协会违反本法规定，组织本行业的经营者达成垄断协议的，反垄断执法机构可以处五十万元以下的罚款；情节严重的，社会团体登记管理机关可以依法撤销登记。

第四十七条　经营者违反本法规定，滥用市场支配地位的，由反垄断执法机构责令停止违法行为，没收违法所得，并处上一年度销售额百分之一以上百分之十以下的罚款。

第四十八条　经营者违反本法规定实施集中的，由国务院反垄断执法机构责令停止实施集中、限期处分股份或者资产、限期转让营业以及采取其他必要措施恢复到集中前的状态，可以处五十万元以下的罚款。

第四十九条　对本法第四十六条、第四十七条、第四十八条规定的罚款，反垄断执法机构确定具体罚款数额时，应当考虑违法行为的性质、程度和持续的时间等因素。

第五十条　经营者实施垄断行为，给他人造成损失的，依法承担民事责任。

第五十一条　行政机关和法律、法规授权的具有管理公共事务职能的组织滥用行政权力，实施排除、限制竞争行为的，由上级机关责令改正；对直接负责的主管人员和其他直接责任人员依法给予处分。反垄断执法机构可以向有关上级机关提出依法处理的建议。

法律、行政法规对行政机关和法律、法规授权的具有管理公共事务职能的组织滥用行政权力实施排除、限制竞争行为的处理另有规定的，依照其规定。

第五十二条　对反垄断执法机构依法实施的审查和调查，拒绝提供有关材料、信息，或者提供虚假材料、信息，或者隐匿、销毁、转移证据，或者有其他拒绝、阻碍调查行为的，由反垄断执法机构责令改正，对个人可以处二万元以下的罚款，对单位可以处二十万元以下的罚款；情节严重的，对个人处二万元以上十万元以下的罚款，对单位处二十万元以上一百万元以下的罚款；构成犯罪的，依法追究刑事责任。

第五十三条　对反垄断执法机构依据本法第二十八条、第二十九条作出的决定不服的，可以先依法申请行政复议；对行政复议决定不服的，可以依法提起行政诉讼。

第五十四条　反垄断执法机构作出的前款规定以外的决定不服的，可以依法申请行政复议或者提起行政诉讼。

第五十四条　反垄断执法机构工作人员滥用职权、玩忽职守、徇私舞弊或者泄露执法过程中知悉的商业秘密，构成犯罪的，依法追究刑事责任；尚不构成犯罪的，依法给予处分。

## 第八章　附则

第五十五条　经营者依照有关知识产权的法律、行政法规规定行使知识产权的行为，不适用本法；但是，经营者滥用知识产权，排除、限制竞争的行为，适用本法。

第五十六条　农业生产者及农村经济组织在农产品生产、加工、销售、运输、储存等经营活动中实施的联合或者协同行为，不适用本法。

第五十七条　本法自2008年8月1日起施行。

打印本页　　关闭本页



相关链接　　🚗中国政府网　　│国务院部门│　│机关司局│

国家药品监督管理局　　国家知识产权局

📞联系方式　　🌐网站地图　　📄网站声明

 

版权所有：国家市场监督管理总局

网站标识码bm30000012　京ICP备18022388号　京公网安备 11010202008101号

地址：北京市西城区三里河东路八号　邮政编码：100820

官方微信　　官方微博

 

# EXHIBIT 72

**In the Matter Of:**

*In Re - CRT Antitrust Litigation*

---

*JANET NETZ*

*June 09, 2022*

---



```
 1                              VOLUME 1
                                PAGES:  1-73
 2                              EXHIBITS:  See Index

 3
                        UNITED STATES DISTRICT COURT
 4              FOR THE NORTHERN DISTRICT OF CALIFORNIA
                            OAKLAND DIVISION
 5

 6     _____
                                          )
 7     IN RE:  CATHODE RAY TUBE           )
       (CRT) ANTITRUST LITIGATION         )
 8                                        ) Master File
       THIS DOCUMENT RELATES TO:          ) No. 07-cv-05944-JST
 9                                        )
       ALL INDIRECT PURCHASER             ) MDL No. 1917
10     ACTIONS                            )
                                          )
11     _____)

12

13

14

15         VIDEOTAPED DEPOSITION of JANET S. NETZ, PH.D.

16              - CONDUCTED BY VIDEOCONFERENCE -

17                  Thursday, June 9, 2022

18              12:00 p.m. Eastern Daylight Time

19

20

21

22              Michelle Keegan, RMR, CRR

23                      Lexitas

24         508-478-9795 ~ 508-478.0595 (Fax)

25                 www.LexitasLegal.com
```

In Re - CRT Antitrust Litigation

Janet Netz
June 09, 2022

2

```
1    A P P E A R A N C E S:

2

3       FREEDMAN BOYD HOLLANDER GOLDBERG
        URIAS & WARD P.A.
4       By:  Joseph Goldberg, Esq.
        20 First Plaza, Suite 700
5       Albuquerque, New Mexico 87102
        Phone:  (505) 842-9960
6       Email:  jg@fbdlaw.com
        Counsel for Indirect Purchaser Plaintiffs and
7       the Witness

8

9       BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER LLP
        By:  Daniel E. Birkhaeuser, Esq.
10      2125 Oak Grove Road, Suite 125
        Walnut Creek, California 94598
11      Phone:  (925) 945-0200
        Email:  dbirkhaeuser@bramsonplutzik.com
12      Counsel for Indirect Purchaser Plaintiffs

13      TRUMP ALIOTO TRUMP & PRESCOTT ATTORNEYS LLP
        By:  Lauren C. Capurro, Esq.
14      By:  Mario Nunzio Alioto, Esq.
        2001 Union Street, Suite 482
15      San Francisco, California 94123
        Phone:  (415) 563-7200
16      Email:  laurenrussell@tatp.com
        Email:  malioto@tatp.com
17      Counsel for Indirect Purchaser Plaintiffs

18

19

20

21

22

23

24

25
```

In Re - CRT Antitrust Litigation

Janet Netz
June 09, 2022

3

```
 1    APPEARANCES (continued):

 2

 3       BAKER BOTTS L.L.P.
         By:  Andrew L. Lucarelli, Esq.
 4       By:  Thomas E. Carter, Esq.
         By:  Evan J. Werbel, Esq.
 5       By:  John M. Talady, Esq.
         700 K Street, N.W.
 6       Washington, D.C. 20001
         Phone:  (202) 639-7700
 7       Email:  drew.lucarelli@bakerbotts.com
         Email:  tom.carter@bakerbotts.com
 8       Email:  evan.werbel@bakerbotts.com
         Email:  john.taladay@bakerbotts.com
 9       Counsel for Defendants Irico Group Corp. and
         Irico Display Devices Co., Ltd.
10

11       LAW OFFICE OF VAUGHN R. WALKER
         Honorable Vaughn R. Walker
12       P.O. Box 26250
         San Francisco, California 94126
13       (415) 871-2995
         Special Master
14

15    Also Present:
         Aydaline Garcia, Videographer
16

17

18

19

20

21

22

23

24

25
```

4

1                    I N D E X

2

   Videotaped Deposition of:                    Page
3
   JANET S. NETZ, PH.D.
4
      By Mr. Lucarelli                          5
5

6  Telephonic Conference with Judge Walker    48 - 59

7

8                  E X H I B I T S

9  No.                                          Page

10 Exhibit 8552   Janet S. Netz, Ph.D., Rebuttal     7
                  to Supplemental Expert Report
11                of Margaret E. Guerin-Calvert
                  and Expert Report of Donald
12                Clarke, April 27, 2022, 32
                  pages without Bates numbering
13
   Exhibit 8553   Errata to the Expert Report of    12
14                Janet S. Netz, Ph.D., four
                  pages without Bates numbering
15
   Exhibit 8554   English- and Chinese-language     30
16                document with cover sheet
                  labeled "APPENDIX 3," 15 pages
17                without Bates numbering

18 Exhibit 8555   English- and Chinese-language     36
                  document with cover sheet
19                labeled "APPENDIX 9," nine
                  pages without Bates numbering
20

21
             PREVIOUSLY MARKED EXHIBITS
22
   Exhibit 3750                                      12
23

24

25

In Re - CRT Antitrust Litigation

Janet Netz
June 09, 2022

29

| | | |
|---|---|---|
| 12:52:32 | 1 | You can answer it if you can, Dr. Netz. |
| 12:52:38 | 2 | A. I have seen no evidence to support that |
| 12:52:40 | 3 | statement.  The evidence that I have seen suggests |
| 12:52:42 | 4 | that there was no impact at all. |
| 12:53:01 | 5 | I might also further clarify that neither |
| 12:53:03 | 6 | myself nor Ms. Guerin-Calvert have looked at |
| 12:53:07 | 7 | Irico's prices.  This analysis has been done |
| 12:53:11 | 8 | looking at BMCC prices. |
| 12:53:19 | 9 | Q. So you have no basis on which to state |
| 12:53:21 | 10 | that these Chinese pricing regulations did not |
| 12:53:25 | 11 | impact Irico.  Correct? |
| 12:53:27 | 12 | A. I have as a basis what I put forth in this |
| 12:53:34 | 13 | rebuttal report analysis, analyzing five pieces -- |
| 12:53:41 | 14 | sorry -- five price floors against BMCC prices, |
| 12:53:47 | 15 | where they exist. |
| 12:53:56 | 16 | Q. And is it your opinion that the analysis |
| 12:54:27 | 17 | of the price floors as to BMCC means that there |
| 12:54:36 | 18 | was no impact to Irico from these regulations? |
| 12:54:38 | 19 | A. It is my conclusion that based on the BMCC |
| 12:54:46 | 20 | prices, which are the only prices that we have -- |
| 12:54:51 | 21 | we do not have Irico prices and BMCC is the only |
| 12:54:58 | 22 | manufacturer that produced CPTs in mainland China |
| 12:55:03 | 23 | for which we have prices.  That based on that, |
| 12:55:06 | 24 | there appears to be no evidence that there was an |
| 12:55:09 | 25 | impact on Irico. |