1   BAKER BOTTS LLP
    John M. Taladay (*pro hac vice*)
2   Evan J. Werbel (*pro hac vice*)
    Thomas E. Carter (*pro hac vice*)
3   Andrew L. Lucarelli (*pro hac vice*)
    700 K Street, N.W.
4   Washington, D.C. 20001
    202.639.7700
5   202.639.7890 (fax)
    Email: john.taladay@bakerbotts.com
6          evan.werbel@bakerbotts.com
           tom.carter@bakerbotts.com
7          drew.lucarelli@bakerbotts.com

8
    *Attorneys for Defendants*
9   *Irico Group Corp. and Irico*
    *Display Devices Co., Ltd.*
10

11                  UNITED STATES DISTRICT COURT

12               NORTHERN DISTRICT OF CALIFORNIA

13                        OAKLAND DIVISION

14

15   IN RE: CATHODE RAY TUBE (CRT)          Master File No.: 07-cv-05944 JST
     ANTITRUST LITIGATION
16                                          MDL No. 1917

17   This document relates to:             **REPLY IN SUPPORT OF DEFENDANTS
                                           IRICO GROUP CORP. AND IRICO
18   *ALL INDIRECT PURCHASER ACTIONS*      DISPLAY DEVICES CO., LTD.'S
                                           MOTION FOR SUMMARY JUDGMENT
19                                         (ECF NO. 6225)**

20                                         Date:       November 9, 2023
21                                         Time:       2:00 p.m.
                                           Judge:      Hon. Jon S. Tigar
22                                         Courtroom:  Videoconference

23

24

25

26

27

28

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT .........................................................................................................................2

I.  PLAINTIFFS' FAIL TO IDENTIFY EVIDENCE SUFFICIENT TO CREATE A
    MATERIAL ISSUE OF FACT REGARDING IRICO'S CONTACTS WITH THE
    NON-CONTACT STATES ...........................................................................................2

    A.  Plaintiffs' Misreading of *AT&T Mobility* and Their Reliance on Motion to
        Dismiss Authority Does Not Disturb Irico's Demonstration of Grounds for
        Summary Judgment .........................................................................................2

    B.  Plaintiffs' Attempt to Demonstrate Indirect Sales of Irico CPTs Is Based on
        Unreliable and Inadmissible Evidence or Misrepresentations of the Record ..........5

II. THE CASES IDENTIFIED BY PLAINTIFFS DO NOT DISTURB THE
    CONCLUSION THAT EVIDENCE OF INTRASTATE CONDUCT BY EACH
    OF THE IRICO DEFENDANTS IS REQUIRED UNDER THE LAWS OF FOUR
    STATES ...................................................................................................................9

III. PLAINTIFFS ARGUMENTS REGARDING IRICO'S PRE-AUGUST 5, 1998
    CONDUCT DO NOT SHOW A MATERIAL ISSUE OF FACT AND INSTEAD
    SUPPORT IRICO'S MOTION..................................................................................11

    A.  Plaintiffs Have Not Shown that Irico Could Have Joined the Alleged
        Conspiracy Prior to August 5, 1998.......................................................................11

    B.  Irico Defendants Cannot Be Liable For Acts of the Alleged Conspiracy Prior
        to the Time They Were Shown to Have Joined ....................................................12

IV. IRICO IS ENTITLED TO SUMMARY JUDGMENT REGARDING
    PLAINTIFFS' DONNELLY ACT CLAIMS PRIOR TO DECEMBER 23, 1998,
    AND PLAINTIFFS SHOULD NOT BE ALLOWED TO RECOVER TREBLE
    DAMAGES FOR ANY CLAIMS PRIOR TO THAT DATE..........................................13

V.  PLAINTIFFS FAIL TO REBUT IRICO'S SHOWING THAT THE
    INTERNATIONAL COMITY DOCTRINE REQUIRES THEIR CLAIMS BE
    DISMISSED AS A MATTER OF LAW .....................................................................14

    A.  In the Ninth Circuit, Proof of a True Conflict "Is Not a Prerequisite to
        Comity," And Courts Must Also "Consider Other Factors" in Deciding
        Comity Dismissal..................................................................................................14

    B.  A True Conflict Exists Between the Chinese Regulations Controlling Prices
        and the U.S. Antitrust Laws, And the *Vitamin C* Case is Not Distinguishable .....15

C.    The Other Comity Factors, Which Must Be Considered, Continue to Dictate
Dismissal of the Claims Against Irico ...................................................................17

CONCLUSION.................................................................................................................................18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Hague*
    449 U.S. 302 (1981)...................................................................................3, 4

*AT&T Mobility LLC v. AU Optronics Corp.*
    707 F.3d 1106 (9th Cir. 2013) ..................................................................2, 3, 5

*In re Auto. Parts Antitrust Litig.*
    50 F. Supp. 3d 836 (E.D. Mich. 2014)............................................................5

*In re Auto. Parts Antitrust Litig.*
    No. 12-MD-02311, 2015 WL 1849138 (E.D. Mich. Apr. 22, 2015)........................5

*In re Broiler Chicken Antitrust Litig.*
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ..............................................................5

*Burger King Corp. v. Rudzewicz*
    471 U.S. 462 (1985)...................................................................................4

*Canada v. Blain's Helicopters, Inc.*
    831 F.2d 920 (9th Cir. 1987) .........................................................................6

*Carnival Corp. v. Rolls-Royce PLC*
    No. 08-23318, 2009 WL 3861450 (S.D. Fla. Nov. 17, 2009) ................................10

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*
    No. 1917, 2016 WL 6246736 (N.D. Cal. Oct. 26, 2016)......................................16

*In re Cathode Ray Tube (CRT) Antitrust Litig.*
    No. C-07-5944-SC, 2013 WL 4505701 (N.D. Cal. Aug. 21, 2013)....................4, 14

*In re Cathode Ray Tube (CRT) Antitrust Litig.*
    No. C-07-5944-SC, 2014 WL 1091589 (N.D. Cal. Mar. 13, 2014) .........................5

*In re Citric Acid Litig.*
    996 F. Supp. 951 (N.D. Cal. 1998) ................................................................12

*CompuCom Systems, Inc. v. Hitachi, Ltd.*
    No. 11–cv–06396 (N.D. Cal.) [ECF No. 1] (Nov. 14, 2011) ...................................5

*Devas Multi. Priv. Ltd. v. Antrix Corp. Ltd.*
    No. 20-36024, 2023 WL 4884882 (9th Cir. Aug. 1, 2023) .....................................2

*Hartford Fire Ins. Co. v. California*
  509 U.S. 764 (1993)..................................................................................................14

*Hollingsworth Solderless Terminal Co. v. Turley*
  622 F.2d 1324 (9th Cir. 1980) ...................................................................................6

*Indus. Bldg. Materials, Inc. v. Interchemical Corp.*
  437 F.2d 1336 (9th Cir. 1970) .................................................................................13

*In re Intel Corp. Microprocessor Antitrust Litig.*
  496 F. Supp. 2d 404 (D. Del. 2007).........................................................................5

*In re Magnesium Oxide Antitrust Litig.*
  No. 10-cv-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011) ..................................10

*Mattel, Inc. v. MGA Ent., Inc.*
  No. CV049049DOCRNBX, 2010 WL 11463911 (C.D. Cal. Sept. 3, 2010) .......13

*Mujica v. AirScan, Inc.*
  771 F.3d 580 (9th Cir. 2014) ................................................................2, 14, 15, 17

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*
  350 F. Supp. 2d 160 (D. Me. 2004) ...........................................................................5

*In re OSB Antitrust Litig.*
  No. 06-cv-826, 2007 WL 2253425 (E.D. Pa. Aug. 3, 2007) ..................................10

*In re Packaged Seafood Prod. Antitrust Litig.*
  332 F.R.D. 308 (S.D. Cal. 2019) ................................................................................3

*In re Packaged Seafood Prods. Antitrust Litig.*
  Case No. 15-MD-2670 DMS (MDD), 2023 WL 3046073 (S.D. Cal. Apr. 21,
  2023) ..................................................................................................................11, 12

*In re Processed Egg Prod. Antitrust Litig.*
  851 F. Supp. 2d 867 (E.D. Pa. 2012) ......................................................................10

*Quill Corp. v. North Dakota*
  504 U.S. 298 (U.S. 1992)............................................................................................4

*In re Static Random Access Memory (SRAM) Antitrust Litig.*
  580 F. Supp. 2d 896 (N.D. Cal. 2008) ..............................................................9, 10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
  No. 10-4572 SI, 2013 WL 6174683 (N.D. Cal. Nov. 20, 2013).............................3

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
  No. 11-2225 SI, 2014 WL 2905131 (N.D. Cal. June 26, 2014) .............................3

*Thomas P. Gonzalez Corp. v. Consejo Nacional De Produccion de Costa Rica*
   614 F.2d 1247 (9th Cir. 1980) ............................................................................2

*Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*
   549 F.2d 597 (1976)....................................................................................14

*United States v. Lothian*
   976 F.2d 1257 (9th Cir.1992) .............................................................12, 13

*In Re: Vitamin C Antitrust Litig.*
   8 F.4th 136 (2d Cir. 2021) ........................................................15, 16, 17

*In re Vitamins Antitrust Litig.*
   No. 1285, 2000 WL 1511376, at *2-6 (D.D.C. Oct. 6, 2000) .............13, 14

*Wilson v. City of Berkeley*
   995 F.2d 235 (9th Cir. 1993) ...............................................................6

*Zhaoyin Wang v. Beta Pharma, Inc.*
   2015 WL 5010713 (D. Conn. Aug. 24, 2015) ....................................18

**Rules**

Fed. R. Civ. P. 56(c) ...........................................................................6

Fed. R. Civ. P. 56(e) ...........................................................................6

Fed. R. Ev. 802 ..................................................................................6

Fed. R. Ev. 902 ..................................................................................6

## **INTRODUCTION**

The Indirect Purchaser Plaintiffs' Opposition to Irico Group Corporation and Irico Display Devices Co., Ltd.'s Motion for Summary Judgment, ECF No. 6306 ("Opp'n") plays fast and loose with evidence and procedure.  Plaintiffs cobble together mostly inadmissible and yet still inadequate evidence.  They pair this with a smear campaign dredging up every discovery complaint of which they can conceive, leaning on their sanctions motion that is still pending before the Special Master.  *See* Opp'n at 1 and Alioto Decl., Ex. 1.  This is procedurally impermissible and substantively wrong, as Irico has briefed.  *See* 2d Werbel Decl., Ex. 75.[1]

More importantly, Plaintiffs' arguments fail on the merits.  *First*, unable to contest the central fact that Irico itself had no substantive contacts with the Non-Contact States – they do not even try – Plaintiffs assert that remote, indirect sales of Irico's CPTs to the Non-Contact States will suffice.  This fails to establish sufficient contacts under Ninth Circuit law, but also as a matter of fact as their assertions are built largely on inadmissible evidence and vast assumptions.  *Second*, again conceding that Irico undertook no conduct within Arizona, Florida Michigan, and North Dakota, Plaintiffs' mistakenly assert the possibility of a downstream sale of a CRT product by an unrelated third party alone satisfies the state law requirements.  *Third*, Plaintiffs trip over themselves in defending against Irico's lack of participation in the conspiracy prior to August 5, 1998.  Plaintiffs counter Irico's affirmative showing by arguing that Chunghwa – the leniency applicant and centerpiece witness of Plaintiffs' case from the beginning who supplied Irico's affirmative proof – was *completely unaware* of Chinese CPT Industry Association meetings until 2006.  Yet, these are the *very same meetings* that the Plaintiffs contend place Irico in the "global conspiracy" with Chunghwa prior to August 1998. Plaintiffs also rely on outdated legal precedent rather than acknowledge that Irico cannot be held liable for actions taken by the conspiracy prior to its joining.  *Fourth*, Plaintiffs are flatly wrong that Irico is not entitled to summary judgment on Plaintiffs' Donnelly Act claims, as this Court has previously held.  *See* Mot. at 11-12.  *Finally*,

---

[1] All references to the "2d Werbel Decl." refer to the Second Declaration of Evan Werbel In Support of Defendants Irico Group Corporation and Irico Display Devices Co. Ltd.'s Motion for Summary Judgment, filed herewith.

Plaintiffs fail to rebut that the international comity doctrine mandates dismissal of their claims as a matter of law.  Irico reinforces its previous showing that all of the comity factors must be considered, and those factors support Irico's argument for dismissal.  *See Mujica v. AirScan, Inc.*, 771 F.3d 580, 599, 602 (9th Cir. 2014).

For the reasons discussed below, Irico respectfully requests that the Court grant its motion.

## ARGUMENT

### I. PLAINTIFFS FAIL TO IDENTIFY EVIDENCE SUFFICIENT TO CREATE A MATERIAL ISSUE OF FACT REGARDING IRICO'S CONTACTS WITH THE NON-CONTACT STATES

#### A. Plaintiffs' Misreading of *AT&T Mobility* and Their Reliance on Motion to Dismiss Authority Does Not Disturb Irico's Demonstration of Grounds for Summary Judgment

Irico established in its Motion that there are insufficient contacts with the Non-Contact States to support application of those states' laws under Fourteenth Amendment due process jurisprudence.[2]  Mot. at 6-9.  Ninth Circuit precedent, established in *AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106 (9th Cir. 2013) ("*AT&T*"), requires sufficient contacts between both the individual defendant *and* the transaction at issue. Mot. at 8 (citing *AT&T*, 707 F.3d at 1111).  Plaintiffs suggest a distorted reading of *AT&T*, whereby any evidence of an indirect, downstream sale of an allegedly price-fixed product by an unrelated third party, standing alone and without evidence of any contacts by Irico, would constitute sufficient contacts to satisfy due process.  Opp'n at 12.  Plaintiffs reading of *AT&T* would effectively erase any meaningful requirement to demonstrate sufficient contacts for *each defendant* in an antitrust case such as this one, and is at odds with the plain language of *AT&T*.  *See AT&T*, 707 F.3d at 1113 n.15.

*AT&T* held that the Due Process Clause invalidates the application of a state's law when the state has "no significant contact or significant aggregation of contacts, creating state interests,

---

[2] Plaintiffs are wrong in asserting that Irico Group is denied due process rights given the Court's determination that it is a foreign sovereign under the FSIA.  *See* Opp'n at 11-12.  As recently affirmed in an unpublished decision, the Ninth Circuit recognizes that foreign sovereigns are afforded due process rights.  *See Devas Multi. Priv. Ltd. v. Antrix Corp. Ltd.*, No. 20-36024, 2023 WL 4884882, *1 (9th Cir. Aug. 1, 2023) (unpubl.) (citing *Thomas P. Gonzalez Corp. v. Consejo Nacional De Produccion de Costa Rica*, 614 F.2d 1247 (9th Cir. 1980)).

1   with the parties *and* the occurrence or transaction." *Id.* at 1111 (quoting *Allstate Ins. Co. v. Hague*,

2   449 U.S. 302, 308 (1981)) (emphases added).  The Ninth Circuit found that a defendant's

3   conspiratorial conduct within the state could satisfy both prongs of the test, and that the sale of a

4   price fixed good by the defendant within the state could satisfy the "occurrence or transaction"

5   prong of this analysis. *Id.* at 1112.  But, logically, it did not hold that the "parties" prong would be

6   satisfied by an indirect sale. Plaintiffs assert indirect sales, but they do not argue that either of the

7   Irico Defendants – i.e., the ***parties*** – had any contacts with the Non-Contact States.  Instead, they

8   contend that *other parties* may have sold TVs in those states that contained Irico CPTs.[3]  But

9   *AT&T* is clear that "the requirements of the Due Process Clause must be satisfied individually with

10  respect to each defendant in a case." *Id.* at 1113 n.15.  Thus, even if Plaintiffs' offer of unreliable

11  evidence of indirect sales could be credited, which Irico confronts in detail below, Plaintiffs'

12  failure to offer any evidence that either Irico defendant had any contact with those states should be

13  dispositive on this issue.  *See In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308, 345

14  (S.D. Cal. 2019) (finding due process satisfied where Plaintiffs provided proof of in-state

15  conspiracy conduct "in addition to" harm to California residents).  Indeed, the only evidence of

16  direct conduct offered by Plaintiffs concern alleged sales to and by Irico USA in California,[4]

17  Opp'n at 4, and they have not put forward any other evidence or arguments as to aggregation of

18  contacts by the Irico Defendants.[5]

19          Next, Plaintiffs' statement that "Irico's citation to several cases addressing personal

20  jurisdiction, rather than application of a state's substantive law, is misleading," as well as their out

21

22  [3] Plaintiffs attempt (but fail) to show that Irico sold CPTs to Chinese manufacturers of TVs in China,
    who later sold those CRT products to U.S. retailers, who may have sold those products in the Non-

23  Contact States.

    [4] Irico strongly disagrees with Plaintiffs assertions about Irico USA – a short-lived and completely
24  unsuccessful venture – but will present those issues at trial, as they do not support Plaintiffs'
    contention of sales to Non-Contact States and require further discussion here. *See* Mot. at 2-3.

25  [5] Plaintiffs' citation to *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 11-2225 SI, 2014 WL
    2905131 (N.D. Cal. June 26, 2014), does not show otherwise.  There, the court examined the

26  significant in-state activities of Direct Action Plaintiffs, particularly the fact that "[a]ll negotiations,
    purchasing decisions and orders, and payments for LCD products took place in Florida."  *Id.* at *3;

27  *see also In re TFT-LCD (Flat Panel) Antitrust Litig*., No. 10-4572 SI, 2013 WL 6174683, at *4
    (N.D. Cal. Nov. 20, 2013) (same).  Such evidence of significant in-state activity is lacking here.

28

of context quote from *Allstate*, misconstrue the standards for determining relevant contacts for due process under the Fourteenth Amendment. Opp'n at 14.  As *Allstate* itself confirms in the same footnote cited by Plaintiffs, "both [personal jurisdiction and substantive due process] inquiries are often closely related and to a substantial degree depend upon similar considerations."  *Allstate*, 449 U.S. at 318 n.23; *see also Quill Corp. v. North Dakota*, 504 U.S. 298, 308 (U.S. 1992) (explaining that the "[c]omparable reasoning" of its personal jurisdiction rulings "justifie[d] the imposition of the collection duty on a mail-order house that is engaged in continuous and widespread solicitation of business within a State").  Likewise, Plaintiffs citation to *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 481-82 (1985), does not apply here. *Burger King* was a contract dispute case where the Supreme Court considered, *inter alia*, the choice of law provision in the contract between the parties. *Id.*  However, analysis of contacts for purposes of substantive due process is not a "choice of law" analysis and Plaintiffs cite no support other than their misreading of *Allstate*.

Plaintiffs also cannot rely on prior decisions that were rendered at the motion to dismiss stage of this case and in any event do not support Plaintiffs' position.  As discussed in Irico's Motion, Judge Conti's ruling at the motion to dismiss stage in the DAP cases made clear that it was limited to that stage of the litigation and affirmatively left open the door for "future due process challenges . . . pending the discovery of additional facts."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013 WL 4505701, at *7 (N.D. Cal. Aug. 21, 2013). Moreover, even in the passage cited by Plaintiffs, Judge Conti made clear, citing *AT&T Mobility*, that the absence of a sale within a state was not fatal "***if*** other facts sufficiently tied the defendants' activities to that state." *Id.* (emphasis added).[6]  *See* Mot. at 2-3.  In a footnote, Judge Conti concluded that "[t]he DAPs' pleadings alleging sufficient contacts with the various states at issue in this matter," and cited to numerous paragraphs of the various complaints in this matter.  *CRT*, 2013 WL 4505701, at *7 n.6.  But those allegations were far more extensive than mere indirect sales by third parties in the subject states.  *See, e.g.*, *CompuCom Systems, Inc. v. Hitachi, Ltd.*, No.

---

[6] Plaintiffs appear to rely heavily on Judge Conti's dicta that "*AT&T* did not hold that an in-state sale alone could not satisfy due process[.]"  Opp'n at 13.  But neither did Judge Conti conclude that *AT&T* held that an indirect in-state sale was sufficient to satisfy due process which, as discussed above, would be a mistaken reading.

11–cv–06396 (N.D. Cal.) [ECF No. 1] (Nov. 14, 2011) ¶ 178 (alleging that one defendant admitted in a guilty plea agreement that "acts in furtherance of the conspiracy were carried in California"); *Office Depot, Inc. v. Hitachi*, Ltd., No. 11–cv06276 (N.D. Cal.) [ECF No. 1] (Nov. 14, 2011) ¶ 177 (same).  Other cases cited by Plaintiffs ruling at the motion to dismiss stage, where broad contacts beyond mere indirect sales were alleged, miss the mark for similar reasons.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2014 WL 1091589, at *14 (N.D. Cal. Mar. 13, 2014) (accepting broad factual allegations in complaint as true); *see also In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) (same); *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2015 WL 1849138, at *3 (E.D. Mich. Apr. 22, 2015) (same); *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 836, 852 (E.D. Mich. 2014) (same); *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 413-14 (D. Del. 2007) (same); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 173 (D. Me. 2004) (same).  In short, it is one thing to allege broad contacts and have them accepted as true, as in the cases Plaintiffs rely on, but another to prove them with reliable evidence.  Here, Plaintiffs effectively concede that they have no evidence of any actual contacts by Irico with the Non-Contact States.  They cannot meet the threshold test in *AT&T* that requires Plaintiffs to demonstrate "significant contact[s] or significant aggregation of contacts, creating state interests, with the parties ***and*** the occurrence or transaction" as to "each defendant in the case."  *AT&T*, 707 F.3d at 1111, 1113 n.15.

### B.    Plaintiffs' Attempt to Demonstrate Indirect Sales of Irico CPTs Is Based on Unreliable and Inadmissible Evidence or Misrepresentations of the Record

Plaintiffs base the sufficiency of Irico's contacts with the Non-Contact States entirely on the theory that Irico CPTs were sold in China to television manufacturers, who then sold those televisions to large retailers outside of the Non-Contact States, who then sold those televisions to consumers in each of the relevant states.  Opp'n at 15.  As discussed above, these "triply indirect" sales categorically do not constitute contacts sufficient to satisfy *AT&T* and the Court should grant the Motion.  However, Plaintiffs' supporting evidence is rife with factual and evidentiary holes.[7]

---

[7] Note that Plaintiffs present no evidence that any ***CDTs*** manufactured by Irico were ever incorporated into monitors sold to the U.S.  Their proffered evidence relates solely to purported CPT television sales.  See Opp'n at 2-3.

1.    The key documents on which Plaintiffs' arguments depend are unreliable, inadmissible evidence that should not be considered by the Court.

Plaintiffs cite to numerous documents that bear no indicia of legal reliability, are clearly not admissible evidence, and should be excluded.  *See* Fed. R. Civ. P. 56(c)(2); *see also Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987) (declining to admit "evidence inadmissible in form" unless allowed by Rule 56(c)).  "Generally, only admissible evidence may be properly considered by a trial court" in ruling on a motion for summary judgment.  *Wilson v. City of Berkeley*, 995 F.2d 235, at *1 (9th Cir. 1993) (unpubl.) (citing Fed. R. Civ. P. 56(e); *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1445 n.9 (9th Cir. 1980)).  In particular:

- <u>"Insignia" Service Manual (Alioto Decl., Ex. 14: Color Television Service Manual, TK2006, IS-TV040919)</u>: Mr. Alioto attests that this is a "true and correct copy" of an "Insignia" manual, but "Insignia" does not appear anywhere on the document. Plaintiffs make no showing of the source or authenticity of the document and fail to lay any foundation for admissibility.  The IPP class representatives could not possibly be a source for these television manuals, given that no class representative claims to have purchased an Insignia or Haier television.  *See* ECF No. 6269.  The document is also hearsay, offered to prove the truth of the matter asserted, *i.e.*, that this particular TV model incorporates a CRT manufactured by Irico.

- <u>Haier Service Manuals (Alioto Decl., Ex. 16: Haier Color Television Service Manual, PART # TV-8888-36 & Alioto Decl., Ex. 17: Haier Color Television Service Manual, PART # AC-8888-04)</u>: Again, Mr. Alioto claims these are true and correct copies, but Plaintiffs make no showing of the source of the documents and fail to provide any indicia of authenticity.  They do not lay any foundation for the admissibility of the documents.  The documents are also hearsay and is being offered to prove the truth of the matter asserted, *i.e.*, that this particular TV model incorporates a CRT manufactured by Irico.

Almost all of the other documents relied upon by Plaintiffs are equally inadmissible because they: (1) have not been authenticated at deposition and lack any sponsoring witness (FRE 902); (2) are inadmissible hearsay (FRE 802); and, (3) bear no supporting affidavit establishing authenticity (FRCP 56(c)).[8]  *See* Alioto Decl., Exs. 4-7, 9-13, 20, 24.  Despite ample opportunity in the 15-year history of this case to seek discovery of these entities relating to these sales, or to

---

[8] Although Exs. 2, 8, and 25 of the Alioto Declaration were introduced at depositions, Plaintiffs failed to lay the foundation for authenticity or business record, so these documents are likewise inadmissible.

establish the authenticity of these documents, Plaintiffs have done *nothing* to attempt to authenticate any of the key documents on which they now rely.

> 2. Plaintiffs cannot substantiate claims that televisions were actually sold to class members in the Non-Contact States.

Even if the Court considers the contents of the unreliable documents, Plaintiffs still are unable to show that televisions manufactured with Irico CPTs were actually sold to class members in the Non-Contact states.  In fact, Plaintiffs assert only <u>two</u> situations in which TVs brands ostensibly incorporating Irico CPTs show sales in Non-Contact States: Insignia and Philips. The remainder of Plaintiffs evidence is a collection of flotsam that Plaintiffs do not even attempt to relate to television sales in the Non-Contact States.

<u>Insignia</u>: First, despite Plaintiffs' bedazzling of the unauthenticated "Insignia" service manual, the Insignia documents do not demonstrate sales of Irico CPTs in Non-Contact States:

- Plaintiffs point to Ex. 14 of the Alioto Declaration, page CRT001242, which shows a table listing three "CRT brand[s]," Novel, Irico and Samsung, with the same "CRT model" – 54SX538Y22-DC01 – listed for both NOVEL and IRICO.  Again, it is not even evident that this is an *Insignia* Service Manual as Plaintiffs claim. So even if we believe that document which Plaintiffs seem to have conjured from thin air, what *is* clear is that there are *multiple* companies that manufactured CPT model number 54SX538Y22-DC01.  Plaintiffs' self-declare that the Insignia TVs sold by Best Buy contain an "Irico CPT."  Opp'n at 3 n.5.  But other than their own proclamation, there is nothing to demonstrate that the televisions identified in the Best Buy data actually contained an *Irico* tube.

<u>Philips</u>: The argument that Philips TVs sold in Non-Contact States included Irico CPTs also fails on the evidence.

- <u>Philips 14MS2331/17</u>: Plaintiffs point to Ex. 5 as evidence that Irico CPTs were utilized in this model television, but Plaintiffs cannot connect the dots.  At best, Ex. 5 shows that Irico was *one* of the manufacturers of a CPT model in 2005, but it shows that Chunghwa was another supplier.  *See* Ex. 5 at 3, 6.  Moreover, the chart in Exhibit 5 is equivocal: it also identifies this model as having an Irico "15RF" or "15" RF" tube, whereas Exhibit 6, a 2004 document, describes a TV with this model number as a "14" Real Flat" TV with no reference to the origin of the tube.  *See Id.*, Ex. 6 at 1.  This makes unclear which for TV Irico was purportedly supplying this tube.  Moreover, the shipping manifests in Ex. 7 predates Ex. 5 by more than half a year and therefore does not support that the Irico CRTs discussed in Ex. 5 (i.e., produced later) were incorporated in these TVs (sold earlier).  Most fatally, Ex. 7 shows only that 865 TVs with this CRT model number were shipped to one location in *California*, which is *not* a Non-Contact State at issue in the Motion and does not reflect that Irico CPTs were

contained in those televisions. *Id*, Ex. 7. These flaws hollow-out Plaintiffs' suggestion that the Philips exhibits show sales of Irico CPTs to Non-Contact States.

      3.    Other documents cited by Plaintiffs do not demonstrate indirect sales to the Non-Contact States.

The other evidence offered by Plaintiffs does not even attempt to establish sales into the Non-Contact States.

- <u>Haier BH2404D</u>: As noted above, both Haier service manuals were produced from thin air and bear no indicia of authenticity. Plaintiffs argue that Ex. 16 "shows a CRT model number 64SX505Y22-DC02, which is a model number used by Irico for a 21" FS CPT." Alioto Decl. ¶ 17. However, as shown above, other Chinese CRT manufacturers frequently used identical model numbers to those made by Irico, making it impossible on this evidence to conclude that this television used an Irico CRT. Dr. Netz's declaration is also silent on *any* U.S. sales of these Haier televisions, and Plaintiffs cite no evidence that this model Haier television was ever sold in the U.S., let alone in the Non-Contact States. Plaintiffs' Ex. 13 also shows that Haier used some Irico CRTs only outside of the U.S. ("The 21" RF (Invar) has been approved for Haier's non-US models, and delivery can be made for markets including Southeast Asia, the Middle East, and Europe.).

- <u>Haier TN201AU</u>: Plaintiffs argue that Ex. 17 shows a "CRT model number as 54SX503-Y22 and the 'Origination' as 'IRICO.'" Alioto Decl. ¶ 18. However, Dr. Netz's declaration is silent on any U.S. sales of Haier televisions, and Plaintiffs cite no evidence that this model Haier television was ever sold anywhere in the U.S.

The remaining documents cited by Plaintiffs, grouped below, provide no evidence that Irico even supplied CRTs in these situations, let alone sold indirectly in the Non-Contact States.

- <u>Aspirational or potential future plans</u>. Plaintiffs cite to several documents showing only some interest in the U.S. market, or the possibility of future supply. *See* Alioto Decl., Ex. 28 (stating that in 1995 Irico's "strategy" involved "focusing on [the] Hong Kong and Southeast Asian markets," and, secondarily, "*developing into* European and American markets") (emphasis added); *Id.*, Ex. 27 (same); *Id.*, Ex. 29 (same); *Id.*, Ex. 30 (same); *Id.*, Ex. 20 (a 2005 Irico document speculating that the "Irico 21" PF . . . can be supplied," indicating that it was not yet actually in use); *Id.*, Ex. 10 (discussing sampling of Irico tubes); *Id.*, Ex. 11 (possible selection for future project).

    ○    Some of the same aspirational documents show that Irico's CPTs were unfit for use in the U.S. market. *See Id.*, Ex. 19 ("low luminance" flaw of sample Irico 21" tubes); Ex. 21 ("failed test of a 15" Irico CPT due to "barrel distortion").

- <u>Safety certification.</u>  The same is true of documents cited by Plaintiffs showing that Irico "sought and received United States U.L. safety certifications for its CRTs." Opp'n at 3. A safety certification is just that, an approval that the CRT meets certain criteria—it is not evidence of an actual sale to the United States. *See* Alito Decl., Ex. 32 (obtaining certification); *Id.*, Ex. 34 (same and indicating only "favorable

conditions" might allow the products to be sold internationally). Some of these same documents explicitly omit the U.S. as an export market. *See*, *e.g.*, *id.*, Ex. 33 at -8700E. Plaintiffs also point to the deposition testimony of the former manager of one of Irico Group's CPT plants, Li Miao, as evidence that Irico was adjusting its manufacturing process to account for "compatibil[ity] with U.S. broadcasting and safety standards." Opp'n at 3. Plaintiffs conveniently omit that Mr. Li later testified that he did not recall ever making those adjustments to the CPT plant. *See* 2d Werbel Decl., Ex. 76 (Li Dep. Tr.) at 323:1-14.

- <u>Reacting to China market conditions</u>. Other documents show only that Irico was reactive to market conditions *in* China. *See id.*, Ex. 26 (Irico changing product mix as U.S. antidumping measures impacted other Chinese CPT manufacturers).

- <u>Vague connections between China and North America</u>. In their zeal to paint Irico as price-fixers, Plaintiffs even meaningfully misquote one document, *Id.*, Ex. 31, changing the original language "[p]roducts have been sold to . . . regions such as Europe, *the Americas*, and Hong Kong" to "Europe, *America*, and Hong Kong"—a change with massive import given sales to other locations in North, Central, and South America are not sales to the United States. Other documents show only regional links and are not specific to the United States or the Non-Contact States. *See id.*, Exs. 4, 5, 8, 10. Still others show only the global movement of products by multiple manufacturers, which do not isolate Irico sales to the U.S. or the Non-Contact States. *See id.*, Exs. 11, 13.

Plaintiffs also recycle old arguments about CNEIECC and Irico USA, Opp'n at 3-4, that were addressed in Irico's Motion. *See* Mot. At 2-3, 7 n.3. Plaintiffs cite no new evidence here, and none of it raises the slightest possibility of even indirect sales to class members in the Non-Contact States. *See also supra*, Section I.A. In sum, when examined closely, Plaintiffs evidentiary offering does not show that Irico's CPTs were sold, even indirectly, into the Non-Contact States, and certainly do not establish the level contacts necessary to satisfy *AT&T*.

## II.    THE CASES IDENTIFIED BY PLAINTIFFS DO NOT DISTURB THE CONCLUSION THAT EVIDENCE OF INTRASTATE CONDUCT BY EACH OF THE IRICO DEFENDANTS IS REQUIRED UNDER THE LAWS OF FOUR STATES

Irico's Motion established the requirement under the laws of Arizona, Florida, Michigan, and North Dakota, that Plaintiffs demonstrate that *Irico Defendants* undertook some unlawful conduct (as opposed to mere contacts) *within* the territory of those states. Mot. at 9-11.

Plaintiffs' cases are distinguishable. (1) Arizona Law. Plaintiffs cite *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 906-07 (N.D. Cal. 2008), but this case interpreting *South Dakota* law merely decided that allegations that defendants "produced,

sold, marketed, and/or distributed" was sufficient at the motion to dismiss stage. *Id.* at 907.  The

case did not address whether a sale standing alone, without more, satisfied the requirements of

South Dakota law, let alone Arizona's.  Their second case, *In re OSB Antitrust Litig.*, No. 06-cv-

826, 2007 WL 2253425, at *15 (E.D. Pa. Aug. 3, 2007) also fails to consider the issues here.  In *In

re OSB*, again decided at the motion to dismiss stage, the court determined that failure to have *any*

class representatives from Arizona was fatal to plaintiffs' case.  *Id.*  The *OSB* court did not

consider the second step of the inquiry: whether plaintiffs had shown conduct by the relevant

defendants in Arizona.  (2) Florida Law.  Plaintiffs try to rely on decisions at the motion to dismiss

stage, which did not consider the sufficiency of evidence at summary judgment and did not

consider the lack of conduct by Irico.  *See* Opp'n at 16-17.  A best, these decisions reflect a

minority view in the case law, but the complete absence any substantive conduct by Irico in

Florida endorses the decision in *Carnival Corp. v. Rolls-Royce PLC*, No. 08-23318, 2009 WL

3861450 (S.D. Fla. Nov. 17, 2009); *see also* Mot. at 10.  (3) Michigan Law and (4) North Dakota

Law.  Plaintiffs again cite to cases at the motion to dismiss stage which do not confront the

complete absence of material fact following discovery.  Opp'n at 17-18.  *In re Processed Egg

Prod. Antitrust Litig.*, 851 F. Supp. 2d 867, 888 (E.D. Pa. 2012), did not analyze these issues

because the court concluded that its analysis of Article III standing did not require a determination

as to whether North Dakota law requires instrastate conduct.  Moreover, the court in *In re

Magnesium Oxide Antitrust Litig.*, No. 10-cv-5943, 2011 WL 5008090, at *8 n.10 (D.N.J. Oct. 20,

2011), analyzed a different issue, finding dismissal was warranted because none of the plaintiffs

were resident in North Dakota.  *Id.*  Because plaintiffs in *Magnesium Oxide* did not meet that

standard, the court did not need to examine whether defendants *also* had the requisite conduct

within the state.  Here, the plain reading of the statutes at issue make clear that conduct by each of

the Irico Defendants is a prerequisite to the application of their antitrust laws.  Plaintiffs have

failed to show, or even attempted to show, any material issue of fact on this point.

III. **PLAINTIFFS ARGUMENTS REGARDING IRICO'S PRE-AUGUST 5, 1998 CONDUCT DO NOT SHOW A MATERIAL ISSUE OF FACT AND INSTEAD SUPPORT IRICO'S MOTION**

In its Motion, Irico demonstrated that Plaintiffs do not create a material issue of fact as to Irico's participation in the alleged conspiracy prior to August 5, 1998. Mot. at 12-15. In response, Plaintiffs resort to contradicting their own allegations of a single, unified CRT conspiracy, arguing that the statements of the centrepiece cooperating witness their case, leniency applicant Chunghwa, must be ignored because Chunghwa wasn't even aware of purported CPT discussions in China. But this admission undermines, rather than supports, the proposition that Irico could not have joined the "global conspiracy" prior to August 1998.

A. **Plaintiffs Have Not Shown that Irico Could Have Joined the Alleged Conspiracy Prior to August 5, 1998**

In an effort to dodge Irico's affirmative evidence that Irico's first invitation to meet with the alleged co-conspirators was in an August 2008 CDT meeting, Plaintiffs point to Irico's attendance at China CRT Industry Association ("CCIA") meetings. But they admit that these CCIA *CPT* meetings were "***separate from*** the 'China *CDT* Maker Meetings' documented by employees of Chunghwa's Fuzhou factory," *Id*. at 4-5 (emphasis added). They further admit that "Chunghwa was not previously aware" of Chinese industry meetings until 2006. *Id.* at 5 (citing Alioto Decl., Ex. 53). This incongruous argument cannot be reconciled with Plaintiffs' longstanding insistence of a single, overarching global CRT conspiracy.[9] More appropriately, however, it confirms that the CCIA meetings that Plaintiffs assert as the central basis for Irico's participation prior to August 1998 were ***unrelated*** to the global CRT conspiracy alleged by Plaintiffs, evidenced by the fact that the central participant in the global conspiracy, Chunghwa, didn't know those meetings existed. The November 1995 note about the CCIA meetings cited by Plaintiffs reinforces this conclusion, where Irico states: "[W]e *hope* our CRT industry peers will unite, act in concert, and *face our foreign enemies together*." Werbel Decl., Ex. 48 at -3391E.[10]

---

[9] Indeed, Plaintiffs' argument, if accepted, would require at a minimum a judgment dismissing all claims against Irico relating to CDTs prior to August 1998.

[10] This message also clearly shows that Irico and the CCIA was *not* involved in an illegal agreement as of 1995 date. Legally, an "expression of hope [] is not direct evidence that [defendant] entered

Plaintiffs only effort to link CCIA meetings to the alleged global conspiracy is not evidentiary. They merely argue that some CCIA members "were subsidiaries of the Glass Meeting attendees" and rankly speculate this "demonstrate[s that] Irico would have been well-versed in the operation of the global CRT conspiracy prior to the Aug. 5, 1998 meeting." Opp'n at 7. But their assumption of knowledge by osmosis is undermined – and the opposite is demonstrated – by their admission that "global conspiracy" lynchpin Chunghwa was completely in the dark about the CCIA. Plaintiffs' assertion is unquestionable "urging the Court to peer through [multiple lenses] of speculation." *See In re Citric Acid Litig.*, 996 F. Supp. 951, 958 (N.D. Cal. 1998).

On the whole, Plaintiffs evidence and admissions affirm that: (a) Irico did not participate in any purported CDT conspiracy meeting prior to August 1998; (b) the CCIA CPT meetings were divorced from the alleged global CRT conspiracy, at least until well after the August 1998 date relevant to this motion; and (c) the CCIA meetings cannot be considered to create a material fact as to Irico's participating in the "global CRT" conspiracy alleged by Plaintiffs.

Plaintiffs other asserted facts do not alter these conclusions. Plaintiffs lump together some evidence from the China trade association meetings purporting to reflect information about Irico production, but which provide no source of that information, *see* Mot. at 14 and Werbel Decl., Exs. 11-43, and, irrespective of the source, "possession of [competitive] information does not permit an inference of an illegal agreement" *Packaged Seafood*, 2023 WL 3046073, at *14 (citations omitted).

### B.     Irico Defendants Cannot Be Liable For Acts of the Alleged Conspiracy Prior to the Time They Were Shown to Have Joined

Plaintiffs are mistaken that the decision in *Indus. Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970) ("*Interchemical*") controls as to Irico's liability for alleged conspiratorial acts committed prior to the date that Plaintiffs prove Irico Defendants joined the conspiracy. Instead, the Court should apply the Ninth Circuit's more recent holding that "a defendant cannot be held liable for substantive offenses committed before joining or after

into a conspiracy." *In re Packaged Seafood Prods. Antitrust Litig.*, Case No. 15-MD-2670 DMS (MDD), 2023 WL 3046073, at *10 (S.D. Cal. Apr. 21, 2023).

1   withdrawing from a conspiracy." *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir.1992)

2   (internal citations omitted).  Moreover, the more recent *Lothian* case is unqualified in its treatment

3   of the issue, while *Interchemical* requires both "knowledge of what has gone before" and "the

4   intent to pursue the same objective."  Plaintiffs' offering of a few earlier interactions with co-

5   defendants – where there is demonstrable evidence of legitimate business purpose and no

6   indication that either condition is met – does not raise an issue of material fact.

7       The only decision to consider the conflicting standards in *Lothian* and *Interchemical* is

8   *Mattel, Inc. v. MGA Ent., Inc.*, where the court opted to apply *Lothian* in a RICO case following an

9   analysis similar to that described above.  *See Mattel, Inc. v. MGA Ent., Inc.*, No.

10  CV049049DOCRNBX, 2010 WL 11463911, at *4 (C.D. Cal. Sept. 3, 2010).  The *Mattel* court

11  found that "civil recovery is only available for injuries caused by substantively wrongful acts, not

12  the agreement itself."  *Id*.  The court reasoned that it would be wrong to attach vicarious liability

13  for prior substantive torts when "one logically cannot contemplate acts committed in furtherance of

14  a conspiracy into which it has not yet entered."  *Id*.  The same result is warranted here.

15  **IV.   IRICO IS ENTITLED TO SUMMARY JUDGMENT REGARDING PLAINTIFFS'**
16  **DONNELLY ACT CLAIMS PRIOR TO DECEMBER 23, 1998, AND PLAINTIFFS**
    **SHOULD NOT BE ALLOWED TO RECOVER TREBLE DAMAGES FOR ANY**
17  **CLAIMS PRIOR TO THAT DATE**

18      Plaintiffs attempt to demonstrate the retroactive applicability of Donnelly Act claims prior

19  to December 23, 1998, Opp'n at 21-22 has no merit in the law.  In fact, the decision in *In re*

20  *Vitamins Antitrust Litig.* examined and rejected this same argument.  No. 1285, 2000 WL 1511376,

21  at *2-6 (D.D.C. Oct. 6, 2000).  The *Vitamins* court disagreed that indirect purchasers were entitled

22  to recover under the Donnelly Act before the enactment of § 340(6) because, "[w]hile it is true that

23  the New York Court of Appeals has not specifically considered or decided this issue, the majority

24  of New York lower courts that have faced this issue have barred indirect purchaser suits under the

25  Donnelly Act."  *Id*. at *2.  The Vitamins court also pointed to the legislative history of the

26  Donnelly Act as indicative that indirect purchasers did not qualify for relief prior to the

27  amendment—"[a]lthough bills authorizing indirect purchaser recovery under the Donnelly Act

28  were proposed twice prior to the enactment of § 340(6)—once in 1982 and again in 1989—such

28

legislation was not enacted until 1998 with the passage of § 340(6)." *Id.* The court concluded that "[s]ince retroactive application of § 340(6) raises potential ex post facto and due process concerns by likely causing significant increases in defendants' liability, the Court should interpret the 1998 Amendment to operate prospectively only." *Id.* at \*3-6. Judge Conti reached the same conclusions in dismissing DAP Donnelly Act claims prior to December 23, 1998. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-md-5944-JST, 2013 WL 4505701, at \*13 (N.D. Cal. Aug. 21, 2013). Even if some of Plaintiffs' New York law claims survive under another legal theory, Irico is still entitled to summary judgment on Plaintiffs' Donnelly Act claims prior to December 23, 1998.

## V. PLAINTIFFS FAIL TO REBUT IRICO'S SHOWING THAT THE INTERNATIONAL COMITY DOCTRINE REQUIRES THEIR CLAIMS BE DISMISSED AS A MATTER OF LAW

The comity doctrine dictates dismissal of the claims against Irico, pursuant to Ninth Circuit law and the Second Circuit's *Vitamin C* decision dismissing price-fixing claims against Chinese defendants. Plaintiffs' arguments in response do not dictate a different result.

### A. In the Ninth Circuit, Proof of a True Conflict "Is Not a Prerequisite to Comity," And Courts Must Also "Consider Other Factors" in Deciding Comity Dismissal

Plaintiffs first argue that Irico "must show" a "true conflict" between the Chinese and U.S. laws at issue. Opp'n at 23-24. Citing *Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993), Plaintiffs also argue that the Court "need not" consider any of the other Ninth Circuit comity factors from *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597 (1976). Plaintiffs' arguments are wrong. The Ninth Circuit's post-*Hartford Fire* precedent debunks each of Plaintiffs' arguments.

Specifically, in *Mujica v. AirScan Inc.*, 771 F.3d 580 (9th Cir. 2014), the Ninth Circuit explained that *Hartford Fire* "left unclear whether a 'true conflict' is a predicate to" dismissal under the comity doctrine and that the Ninth Circuit's precedents "suggest that proof of 'true conflict' **is not a prerequisite to comity**." *Id.* at 599, 602 (emphasis added). In short, while *Mujica* involved adjudicatory comity, the Ninth Circuit recognized that, in its "post-*Hartford* cases," including prescriptive comity cases, "[e]ven when we did not find a conflict, we did not end our inquiry but moved on to consider [the] other factors … set forth in *Timberlane I*." *Id.* at

602.

Ignoring this language from *Mujica*, Plaintiffs instead cite to the Ninth Circuit's observation that ***other*** circuits have required proof of a conflict.  Opp'n at 23-24.  That statement, which cited Second Circuit law at the time, reflects neither Ninth Circuit law nor current Second Circuit law.  In *Vitamin C*, the Second Circuit clarified that comity does not turn on the true-conflict analysis and that courts should consider other factors.  *See In Re: Vitamin C Antitrust Litig.*, 8 F.4th 136, 145 (2d Cir. 2021) ("[O]ur Circuit has favored the view that *Hartford Fire* did not mean to thereby extinguish the remaining comity factors *sub silentio*.  It is for this reason that we have described the 'conflict between domestic and foreign law' as merely 'an important criterion for a comity dismissal.'").

**B.     A True Conflict Exists Between the Chinese Regulations Controlling Prices and the U.S. Antitrust Laws, And the *Vitamin C* Case is Not Distinguishable**

Irico authenticated and detailed a series of Chinese pricing regulations that facially controlled prices and "self-discipline" by Chinese CRT manufactures and mandated that Chinese CRT manufacturers—including Irico—"seriously implement" the industry average costs published by the Chinese government.  Mot. at 18-21 (citing appendices attached to Ex. 56 and other exhibits).  Further, the Chinese regulations on their face provided that competitors and others could report and prompt government investigation of any CRT manufacturer who priced below the government-published thresholds.  *Id.*  These regulations make clear that, at the time, CRT prices were directly regulated by the Chinese government, and not, as Plaintiffs wrongly suggest, by the free market.  *Contra* Opp'n at 8.  Bound by these regulations that controlled prices and set a de facto minimum prices to avoid government investigation, Irico could not comply with both Chinese law and the U.S. laws asserted by the IPPs.

Notably, Plaintiffs ***do not*** dispute the authenticity, the binding nature, or the facial provisions (as translated) of any of the Chinese regulations at issue, or the facial requirement of price self-discipline that is explicit in the regulations and the contemporaneous documents.  *See* Werbel Decl., Ex. 55 at Art. 14; Ex. 56 at App'x 2 at 3, 5; Ex. 58 at 4; Ex. 64 at 208-09, Ex. 65 at 129.  Plaintiffs mainly argue that Irico has not shown that it actually priced according to the

regulations.  Opp'n at 24-26.[11]  That argument, however, does not impact the comity conflict analysis, which focuses "[e]xclusive attention to what foreign law *facially requires*."  *Vitamin C*, 8 F.4th at 146 (emphasis added).  As *Vitamin C* held, even if a defendant's implementation of the price regulations was "imperfect" (as it was in *Vitamin C*), a true conflict still exists if the Chinese regulations, "*taken at face value*, requires the defendants to act in a way that violates U.S. law."  *Id.* at 158 (emphasis added); *see also id.* at 158 n.36 ("we have reached the first conclusion on the basis of the regulations themselves … in light of what Chinese law *facially required* rather than the Chinese regulatory program's track record of enforcement. Thus, we find a true conflict even though the defendants did not always reach or adhere to a coordinated market price." (emphasis added)).

Plaintiffs' other arguments also fail.  Plaintiffs' contention that the Chinese government's regulation of certain tube sizes had no impact on other sizes directly conflicts with Plaintiffs' own "price-ladder theory" that "prices for different size products move in tandem."  *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 6246736, at *4 (N.D. Cal. Oct. 26, 2016).  Plaintiffs cannot have it both ways.  Plaintiffs' argument to limit the time period of the pricing regulations also fails in light of the fact that the regulations went "into effect as of the date of issuance" and do not, on their face, have an end date.  *See* Ex. 56 at App'x 9 at 4.

Finally, Plaintiffs' attempt to distinguish the *Vitamin C* comity decision misapply the law.  As an initial matter, Plaintiffs' focus on the "degree of government compulsion and control" is misplaced, Opp'n at 27, where the Second Circuit made clear that the comity-conflict "decision is based on the *prima facie* conflict between U.S. law and Chinese law rather than the degree of compulsion defendants faced."  *Vitamin C*, 8 F.4th at 151 n.25.[12]  Moreover, Plaintiffs ignore the clear parallels between the Chinese pricing regulations in *Vitamin C* and in this case.  Those parallels include, across both cases: explicit Chinese governmental intent to stabilize and maintain

---

[11] Irico disputes Plaintiffs' assertion that Irico's prices were set by the alleged conspiracy, but that dispute is immaterial to comity, as shown herein.

[12] Contrary to Plaintiffs' suggestion, government submissions are neither necessary nor required to show a true conflict under the Second Circuit's analysis and the Supreme Court decision in *Vitamin C*.

prices and to prevent low-price dumping; regulations that on their face controlled prices or require price self-discipline; the government publication of pricing thresholds; and a comprehensive government system of investigation and enforcement of the Chinese regulations.  *See id.* at 148-153; Mot. at 17-22.

Irico has established the conflict factor, which, with the other factors, dictates dismissal.

**C.    The Other Comity Factors, Which Must Be Considered, Continue to Dictate Dismissal of the Claims Against Irico**

As shown above, under Ninth Circuit law, the conflict analysis does "not end [the] inquiry" under the comity doctrine.  *Mujica*, 771 F.3d at 602.  The other comity factors, from *Timberlane* and reaffirmed in *Mujica*, continue to also dictate dismissal.  Plaintiffs have not shown otherwise.

**Irico's Chinese Nationality and Location:**  Importantly, Plaintiffs do not dispute that Irico is Chinese in nationality and location and that its alleged conduct took place entirely abroad in China.  *See* Mot. at 22.  Plaintiffs instead point to the non-Chinese alleged co-conspirators, with whom Irico did not allegedly meet, and the non-Chinese locations of meetings that Irico undisputedly did not attend.  None of that changes the analysis here.  Irico moves for summary judgment only as to the Irico Defendants as Chinese nationals, and not as to any other defendant.  There also is no conspiracy exception to the comity doctrine, which is not eviscerated because Plaintiffs allege a broader conspiracy.  In this context, China clearly has "legitimate interests in regulating conduct that occurs within [its] borders, involves [its] nationals, [and] impacts [its] public and foreign policies."  *Mujica*, 771 F.3d at 607.

**Whether Enforcement Can Achieve Compliance:**  That Plaintiffs will not be able to enforce or collect on an antitrust judgment against Irico—a Chinese state-owned enterprise ("SOE") and its subsidiary—is neither "speculative" nor "conjecture."  *Contra* Opp'n at 28-29.  Through cited Chinese law and expert evidence, Irico demonstrated that: (a) there is no treaty or official mechanism for Plaintiffs to enforce a judgment against Irico; (b) Chinese law prohibits Chinese courts from recognizing and executing any foreign judgment that contradicts Chinese law "or violates State sovereignty, security or the public interest," and (c) no Chinese court has ever recognized or enforced a U.S. antitrust, class action, or treble-damages judgment (much less one

against an SOE) and would be unlikely to given the political climate in China.  *See* Mot. at 23, Clark. Decl. ¶¶ 9–15; *see also* ECF 4734 (IPP letter conceding "the fact that any default judgment would not be enforceable in China").  In response, Plaintiffs do not even try to affirmatively argue or present evidence that they can, in fact, enforce a judgment against Irico—because they know that such efforts will be futile.  *See* ECF 4734.[13]

**The Relative Significance of the Effects and Irico's Conduct as to the United States vs. Elsewhere:**  Plaintiffs do not contest that the alleged effects of ***Irico's*** conduct were more significant in China, where Irico produced and sold its CRT products, than in the United States. Mot. at 24-25.  Plaintiffs instead try to divert focus with their tortured analysis speculating that some Irico CRTs may have been exported to U.S. by third parties, which ultimately is inaccurate as shown above, *supra*, Section I.B, and would in any event pale in comparison to the impact of Irico's sales in China.  Notably, Plaintiffs do not address the fact (deemed relevant in *Vitamin C*) that the U.S. DOJ chose not to prosecute Irico, while it prosecuted others, and that the Department of State has remained silent.  *See* Mot. at 24-25.

**Whether There is Explicit Purpose and Foreseeable Effect to Harm U.S. Commerce:** Finally, Irico has shown that its alleged conduct occurred exclusively abroad and that there is no evidence of Irico's explicitly intending or foreseeing harm to U.S. commerce.  *See supra*, Section I.A.

In sum, under Ninth Circuit law and as in *Vitamin C*, the comity factors dictate dismissal of the IPPs' claims against Irico, as Chinese nationals bound by conflicting Chinese regulations.

## CONCLUSION

For all the foregoing reasons, Irico respectfully requests that the Court grant Irico's Motion.

///

///

---

[13] Plaintiffs cite to a pre-*Vitamin C* case from within the Second Circuit that did not involve the comity doctrine but, rather, decided removal and joinder issues.  Opp. at 29 n.47.  Even in that context, the court recognized the "legitimate" difficulties of enforcing a state-law, breach-of-contract judgment, let alone a trebled, antitrust class judgment.  *Zhaoyin Wang v. Beta Pharma, Inc.*, 2015 WL 5010713, at *8 (D. Conn. Aug. 24, 2015).

Dated: September 20, 2023

Respectfully submitted,

/s/ *John M. Taladay*

BAKER BOTTS LLP
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
202.639.7700
202.639.7890 (fax)
Email: john.taladay@bakerbotts.com
even.werbel@bakerbotts.com
tom.carter@bakerbotts.com
drew.lucarelli@bakerbotts.com

*Attorneys for Defendants Irico Group Corp. and
Irico Display Devices Co., Ltd.*