# EXHIBIT 75

# BAKER BOTTS LLP

700 K STREET, N.W.
WASHINGTON, D.C.
20001

TEL  +1 202.639.7700
FAX +1 202.639.7890
BakerBotts.com

AUSTIN
BRUSSELS
DALLAS
DUBAI
HOUSTON
LONDON

MOSCOW
NEW YORK
PALO ALTO
RIYADH
SAN FRANCISCO
**WASHINGTON**

August 30, 2023

VIA E-MAIL [VRW@JUDGEWALKER.COM]

John Taladay
TEL: 2026397909
FAX: 2026391165
john.taladay@bakerbotts.com

The Honorable Vaughn R. Walker
Law Office of Vaughn R. Walker
Four Embarcadero Center, Suite 2200
San Francisco, CA 94111

Re:    **In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Master File No. 07-CV-944-JST/Plaintiffs' Motion for Sanctions/*In Camera* Submission**

Dear Judge Walker:

Defendants Irico Group Corp. and Irico Display Devices Co., Ltd. (collectively, "Irico") write in response to Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs' ("Plaintiffs") letter submitted to Your Honor on August 22, 2023. Plaintiffs' letter purports to relate to the previously submitted motion for sanctions against Irico. Irico addresses the issues raised by Plaintiffs in their August 22 letter only, and otherwise rests on the factual and legal arguments made in its April 21, 2023 Opposition to Plaintiffs' Sanctions Motion ("Opp'n"), its accompanying briefing and oral arguments, and its Motion for Summary Judgment, ECF No. 6225.

Plaintiffs argue that the Irico Defendants are trying to "exploit gaps in the evidence created by its willful and near-total spoliation of relevant evidence," but this is misdirection. Rather, Plaintiffs opportunistically blame all faults in their claim against Irico, and their failure to develop sufficient evidentiary support, on alleged spoliation. Moreover, they seek to misuse this discovery sanctions process to persuade the Special Master to prevent a determination on the merits of the summary judgment motion, which Judge Tigar undoubtedly is able to undertake in light of all relevant facts and circumstances.

Most importantly, however, Plaintiffs' claims that Irico's summary judgment arguments would be undermined by spoliated evidence is not supported by the facts. To believe in Plaintiffs' grievance, in light of the massive amount of affirmative evidence that *does* exist in support of Irico's arguments, would require an extraordinary flight of fantasy and speculation. To assist Your Honor in understanding the unnecessary diversion presented by Plaintiffs' letter, Irico addresses each of Plaintiffs' claims in turn.

## Irico's Lack of CRT Sales to the 20 Non-Contact States

Plaintiffs first suggest that they are prejudiced by Irico's failure to preserve documents regarding its communications with its customers because these documents "likely would have confirmed" Irico's communications with or about customers in the United States. Plaintiffs' Letter at 1. Plaintiffs claim this supposed evidence could help refute Irico's summary judgment argument

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                - 2 -

that due process precludes the application of the laws of 20 Non-Contact States[1] to Irico.  That assertion is not even plausible given the facts of the case.

First, Plaintiffs pretend that Irico preserved and produced no documents or ESI "showing communications with customers." Plaintiffs' Letter at 1.  That is not the case.  In fact, Irico preserved ***all*** of its invoices sent to customers from the relevant time period.  From these records, Irico prepared and produced to Plaintiffs detailed charts created from its actual invoices detailing sales of CRTs.  These spreadsheets included over 22,500 transactions by Irico entities with information on the date, customer, product, revenue, quantity, and, if applicable, ***export destination for each transaction***.  Tellingly, ***not one*** of these records identified a sale by Irico to the United States. Additionally, Irico produced two accounting databases used during the relevant time period, which enabled Plaintiffs to tie revenue line items to specific invoices and transactions. These databases further confirm that no Irico CRT sales were made to the United States. Thus, Irico provided extensive and detailed records that respond to, and undermine, the very point about which Plaintiffs complain. This is hardly surprising: as Plaintiffs' own expert acknowledges, Irico's major customers were Chinese manufacturers, not U.S. customers. *See* Netz Decl. at 109 (IPPs' expert acknowledging that *all* of Irico's major customers were Chinese TV manufacturers), ECF No. 1527. Irico Electronics' 2010 Interim Report corroborates this finding as Irico's internal investigation brought on by this litigation at the time found that "Irico Display have [sic] not sold any CRT products in the market of the USA since 1995." Ex. A at 22. None of the other significant discovery produced by Irico warrants a contrary inference. This additional discovery includes large volumes of documents from Irico archives, interrogatory responses, and deposition of five Irico employees (three of whom who worked at Irico during the relevant period), including a 30(b)(6) designee. In all of this, there is not a suggestion that runs contrary to the extensive, detailed evidence produced by Irico that shows no contact with the Non-Contact states.

Second, Plaintiffs also ignore the mountain of evidence obtained from third-party customers of CRTs, which further demonstrates that Irico made no sales in any of the Non-Contact States.  Bear in mind that the Irico defendants produced and sold CRTs, not CRT products like TVs and monitors.  Thus, their sales would have been made to (few) manufacturers of CRT products, not (many) retailers or end consumers. These "direct purchaser" customers of CRTs, many of whom opted out to bring their own cases as Direct Action Plaintiffs (but almost none of whom manufactured CRT products in the Non-Contact states), were the object of extensive discovery in this case.  And, of course, one of the central questions in the discovery was "from whom did you buy CRTs?"[2]

---

[1] The 20 Non-Contact States are Arizona, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin (collectively, "Non-Contact States"). *See* ECF No. 6225 at 6.

[2] As noted by Plaintiffs' expert witness, "Cartel members accounted for at least 85% of CPT and CDT sales" and, as Plaintiffs frequently tout, the large majority of CRTs purchased by U.S. customers were made by integrated subsidiaries of the other defendant manufacturers of CRTs.

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker          - 3 -

In fact, Plaintiffs issued dozens of subpoenas seeking CRT purchase data directed to third party and direct action plaintiffs who manufactured and/or purchased CRTs, televisions and monitors as well as vertically integrated defendants who sold CRT finished products. *See, e.g.*, Exs. B[3]; C[4], D[5]. These subpoenas provided Plaintiffs a staggering amount of transaction-level data for the entire relevant period for all televisions, computer monitors, and CRTs purchased and sold that were either shipped to a U.S. location or billed to a customer in the U.S., including data on the manufacturer of those products purchased and sold. *See* Exs. C, D. Yet, Plaintiffs fail to mention these gigabytes of data in their possession. This omission was likely no accident as the purchase and sales data collected from these parties revealed ***no instance of an Irico CRT that was sold***, or incorporated into products sold, to consumers in the United States, let alone a Non-Contact state. Therefore, Plaintiffs' claim that any allegedly lost Irico documents will somehow miraculously provide support for their summary judgment rebuttal as to the Non-Contact States, when no such documents exist in any other parties' files, is a fallacy that should be ignored.

Plaintiffs also had unlimited opportunity to depose CRT and finished product manufacturers and purchasers and failed to develop evidence of Irico CRTs destined for the U.S. In the hundreds of hours of questioning by Plaintiffs, however, there was not a single witness who testified as to having purchased an Irico CRT for sale to the United States—because no such sale exists. *See, e.g.*, Ex. E (Max Wasinger Dep. at 147:1-17) (an employee at Mitsubishi Electronics America, a vertically integrated maker that CRT finished products to U.S. retailers, testified to having never heard of Irico before); Werbel Decl., Ex. 1 (Yan Dep.) at 111:9-25, ECF No. 6226; 118:5-119:21, *Id.*, Ex. 3 (Wang Dep.) at 81:12-82:9 (Confirming that neither Group nor Display ever sold to the US)), *Id.*, Ex. 2 (Li Dep.) at 254:18-24 (same); *Id.*, Ex. 3 (Wang Dep.) at 346:15-348:6 (stating that Irico CDTs were never sold to the US).

---

Werbel Decl. Ex. 1 (Expert Report of Dr. Janet Netz) at 33 ("Cartel members accounted for at least 85% of CPT and CDT sales for years in which I have found reliable data (from 2000 through 2006 for CPTs and 1998 through 2006 for CDTs)."), ECF No. 6150. Indeed, the Direct Purchaser Plaintiffs legal standing is predicated in large part upon the fact that the other defendants sold their CRTs to downstream affiliated manufacturers of TVs and computer monitors and to one another.

[3] IPPs' Notice of Subpoena to third parties includes a list of subpoenas served on Amazon.com, Inc., AOC, Arrow Electronics, BenQ USA Corp., Best Buy Co., Inc., Buy.com, CDW Corporation, Costco, Dell Inc., Envision Display, Fry's Electronics, Inc., Funai Corporation, Inc., Gateway, Inc., Iiyama North America, Inc., Ingram Micro Inc., NEC Display Solutions of America, Newegg.com, Nexgen, nowdirect.com, Office Depot, Office Max, PC Connection, PC Mall, Proview Technology, Inc., RadioShack Corporation, Sam's Club, Sanyo North America Corporation, Sharp Electronics Corporation, Sony Corporation of America, Staples, SYNAP, Tech Data Corporation, Tech Depot, Wal-Mart Stores, Inc., Zenith Corporation, and Zones.
[4] Subpoena directed to Thomson Consumer Electronics, inc.
[5] Subpoena directed to Mitsubishi Electric US, Inc.

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                - 4 -

Admissions by the Plaintiffs ***themselves*** further confirm the lack of sales of Irico CRTs or sales of products containing Irico CRTs to consumers in the United States. IPPs have stipulated that none of the monitor or TV purchases upon which the class representatives base their claims contained a CRT manufactured by Irico.  ECF No. 6267 at ¶ 25.  Even more tellingly for Irico's summary judgment motion, DPPs have also stipulated that, of the 1,816 valid claim forms submitted by settlement class members in the DPP matter, ***not one claim*** involved the purchase of CRT manufactured by Irico.  *See* Werbel Decl., Ex. 7 (DPP Discovery Response) at 5, ECF No. 6226.

Plaintiffs have developed a bountiful discovery record that unearthed comprehensive information on sales and purchases of CRTs by U.S. customers. These efforts would have revealed any evidence tying the Irico defendants to the Non-Contact States. The evidence fails to do so, and Plaintiffs and now ask the Special Master to join in their delusion of believing that allegedly missing Irico documents would counter the massive weight of contrary evidence – and believe it so deeply as to interfere with Judge Tigar's evaluation of the issues on the merits.

### Irico's Lack of Participation in the Alleged Conspiracy Prior to August 5, 1998

Plaintiffs also boldly speculate that "[h]ad Irico's files and records been preserved, they would provide internal evidence of Irico's conduct" prior to August 5, 1998. Plaintiffs' Letter at 2. Unfortunately for Plaintiffs, that statement is directly contradicted by the affirmative evidence in this case.  Indeed, Plaintiffs themselves must not believe it, because it is Plaintiffs' affirmative assertion ***in their Complaint*** that "[t]he Chinese Glass Meetings began in 1998." *See* Indirect Purchaser Plaintiffs' Fifth Consolidated Amended Complaint at ¶ 150a, ECF No. 5589.  The lack of any conceivable participation by Irico prior to 1998 is also confirmed by the evidentiary record.

As the Special Master is aware, many of CRT manufacturers were quite methodical in documenting their alleged meetings with others in the industry.  This trove of information has allowed Plaintiffs to put forth submissions to the Court charting 1,100 examples of alleged incidents of competitor meetings and a separate chart of 81 documents compiled by Plaintiffs and ruled upon by Your Honor purporting to show Irico's participation in the alleged conspiracy. *See* Werbel Decl., Exs. 8, 11, ECF No. 6226. Yet none of these thousands of documents reliably demonstrate Irico's participation in the alleged conspiracy before August 5, 1998.  Indeed, the hundreds of examples of purported meeting notes before this date reflect that Irico was ***not present and had not yet been invited*** to meet.

Notes produced from a July 31, 1998 meeting among CRT manufactures confirm that Irico did not attend this meeting but suggests, for the first time, that ***Irico should be invited*** to join discussions with other defendants.  *See* Werbel Decl., Ex. 5 (CHU00030668) at -0668.01E, ECF No. 6226.  And then, on August 5, 1998 Irico's name appears ***for the first time*** in the notes of a competitor meeting that conceivably could be construed as part of the alleged conspiracy. Thus, the clear implication is that Irico was not engaged in the meetings that Plaintiffs assert comprised the conspiracy before that time.

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                - 5 -

Indeed, given the purported abundance of documents, so say Plaintiffs, detailing Irico's meetings with competitors after they were affirmatively invited to join the meeting on August 5, 1998, and the complete lack of documents that could be spun to tie Irico to the alleged conspiracy prior to August 5, 1998, Plaintiffs' argument that missing documents would somehow change history is plainly a far-fetched scenario.

Plaintiffs also ignore that Irico did produce files that further shine light on Irico's summary judgment arguments.  Irico preserved and produced travel and expense records from the relevant time period, and Plaintiffs have utilized these records in an effort to corroborate Irico's attendance at competitor meetings. *See* Opp'n at 24. But again, none of these records reflect Irico's attendance at an improper meeting with a competitor prior to August 1998.

Plaintiffs have been unable to find reliable evidence of Irico's participation in the alleged conspiracy – including in the meticulous records created and maintained by the supposed coconspirators with whom Irico would have met – prior to August 5, 1998. Indeed, the record evidence affirmatively reflects the opposite. Yet, to make up for that shortcoming, Plaintiffs again pin their hopes on being able to convince the Special Master that, since they can't counter (or accept) the voluminous record of affirmative fact that already exists and the clear story it tells, contrary evidence must have been destroyed. There is no plausible basis on which to reach this conclusion.

## Irico's International Comity Defense

Finally, Plaintiffs' argument that Irico's alleged failure to preserve documents that would have "shed light on how Irico actually determined the prices it would charge" somehow should preclude Irico's comity argument is similarly unavailing.  Indeed, Plaintiffs' grievance does not impact Irico's motion.  As explained in more detail in the Irico Defendants' Motion for Summary Judgment, ECF No. 6225 at 15-25, the conflict consideration of a comity analysis rests on "whether foreign law, ***taken at face value***, 'requires [the defendants] to act in some fashion prohibited by the law of the United States." *In Re: Vitamin C Antitrust Litigation*, 8 F.4th 136, 144–45 (2d Cir. 2021), *cert. denied*, 143 S. Ct. 85 (2022) (emphasis added).  As the Second Circuit held in *Vitamin C*, "***[e]xclusive attention to what foreign law facially requires*** makes sense in the context of international comity for several reasons" articulated in the Second Circuit's decision, including the purpose and aims of the doctrine.  *Id.* at 146 (emphasis added); *see also id.* at 147 ("we look to the laws of each country in turn to determine whether, taking those laws at face value, a true conflict exists.")*; id.* at 158 ("as we explained above, our international comity analysis focuses on whether Chinese law, taken at face value, requires the defendants to act in a way that violates U.S. law.").

With its timely expert disclosures and summary judgment motion, Irico has produced public versions of each of the Chinese laws and regulations, with undisputed expert authentication, on which Irico relies for its comity arguments. Werbel Decl. Exs. 56, 59-67, ECF No. 6226; Clarke Decl.in Support of Irico's Motion for Summary Judgment, ECF No. 6225-1.

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                - 6 -

Contrary to Plaintiffs' argument, evidence of how Irico actually priced CRTs or implemented prices in response to the law does not change the comity analysis because, as the Second Circuit held in *Vitamin C*, comity "focus[es] on the foreign state rather than the defendants," and, even if a defendant's implementation of the price regulations was "imperfect," the comity doctrine is still implicated if the applicable Chinese law and regulations, "[t]aken at face value," create a "*prima facie* conflict between U.S. law and Chinese law." 8 F.4th at 146-47, 151 & n. 25, 152-53; *see also id.* at 158 n.36 ("we have reached the first conclusion on the basis of the regulations themselves … we reach this conclusion in light of what Chinese law facially required rather than the Chinese regulatory program's track record of enforcement. Thus, we find a true conflict even though the defendants did not always reach or adhere to a coordinated market price."); ECF No. 6225 at 17.

Consequently, the conflict consideration of a comity analysis rests on the facial requirements of publicly available Chinese and U.S. regulations that Irico has produced to Plaintiffs to assess the degree of conflict between Chinese and U.S. law. Any evidence regarding Irico's pricing decisions therefore does not impact that analysis. Thus, there is no prejudicial impact on Plaintiffs' ability to rebut Irico's comity argument as a result of any potentially lost evidence. Moreover, as Irico has briefed in its opposition to Plaintiffs' sanctions motion, the purported lost evidence Plaintiffs complain of was likely not in existence at the time Irico's duty to preserve arose, given Irico's Chinese legal obligations, preservation practices, and nascent IT system and e-mail practices at the time. *See* Opp'n at 12-17.

Separately, it is striking for Plaintiffs to decry their lack of evidence to rebut Irico's comity arguments when IPPs had the opportunity to depose Irico's Chinese law expert who authenticated all of the Chinese pricing regulations yet declined to do so. IPPs' lack of diligence in developing the record to rebut Irico's comity arguments should not now be rewarded through claims of non-existent prejudice and the extreme sanctions they seek. Lastly, Plaintiffs' implied request for the Special Master to intervene on this point, where the application of the doctrine of international comity is currently pending before and rests within the discretion of the trial court, is misplaced. In effect, the Plaintiffs are asking the Special Master to preempt the process by applying his discretion on a dispositive issue in place of Judge Tigar's.

* * *

**Conclusion**

Plaintiffs ask the court to assume Plaintiffs' suffered prejudice; however, subjecting Plaintiffs' claims to slight examination reveals that they are overreaching. Plaintiffs are not prejudiced in their ability to answer any of Irico's summary judgment arguments. Plaintiffs have an extensive discovery record in this matter that stems from "tens of thousands" of relevant documents already produced in this litigation, countless interrogatory and requests for admission responses, and testimony from over 250 witnesses. *See* Opp'n at 24. According to Plaintiffs this record provides "overwhelming" evidence against Irico. *See, e.g.,* ECF No. 5191 at 12. All told, however, none of the allegedly "overwhelming" evidence gathered by Plaintiffs provides a reliable basis to show that Irico had any contact with the Non-Contact States, to demonstrate that Irico

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                    - 7 -


participated in the alleged conspiracy prior to August 5, 1998, or to dispel Irico's international comity argument. Plaintiffs' real complaint is not that the evidentiary record is incomplete but, rather, that it is robust but unfavorable to their cause.   Plaintiffs' claims of prejudice regarding Irico's summary judgment arguments therefore strain credulity and should be ignored.


                              Sincerely,

                              */s/ John M. Taladay*
                              John M. Taladay

# <u>Exhibit A</u>





彩 虹 集 團 電 子 股 份 有 限 公 司

**IRICO GROUP ELECTRONICS COMPANY LIMITED**<sup>*</sup>

*( A joint stock company incorporated in the People's Republic of China with limited liability )*

( Stock Code: 0438 )

Interim Report **2010**

\* For identification purposes only

## CONTENTS

*Page*

I.      Results Highlights ..................................... 2
II.     Management Discussion and Analysis ..................... 3
        (i)    Conditions of the Industry ..................... 3
        (ii)   Business Review ................................ 7
        (iii)  Financial Review ............................... 10
III.    Other Information ...................................... 16
        (i)    Share Appreciation Rights Plan ................. 16
        (ii)   Interests and Short Positions of Directors,
               Supervisors and Senior Management .............. 17
        (iii)  Interests and Short Positions of
               Substantial Shareholders and Other Persons ..... 17
        (iv)   Audit Committee ................................ 18
        (v)    Independent Non-executive Directors ............ 19
        (vi)   Corporate Governance Practices ................. 19
        (vii)  Model Code for Securities Transactions
               by the Directors of Listed Issuers ............. 19
        (viii) Purchase, Sale or Redemption of Shares ......... 19
        (ix)   Employees ...................................... 20
        (x)    Public Float ................................... 20
        (xi)   Significant Investments ........................ 20
        (xii)  Material Acquisition and Disposal .............. 21
        (xiii) Material Litigations ........................... 21
IV.     Corporate Information .................................. 23
Independent Review Report .................................... 25
Condensed Consolidated Statement of
    Comprehensive Income ..................................... 27
Condensed Consolidated Statement of Financial Position ....... 29
Condensed Consolidated Statement of Changes in Equity ........ 32
Condensed Consolidated Statement of Cash Flows ............... 34
Notes to the Condensed Consolidated Interim
    Financial Information .................................... 35

**IRICO GROUP ELECTRONICS COMPANY LIMITED**

## I.   RESULTS HIGHLIGHTS

| (RMB'000) | **First half of 2010** | First half of 2009 (Restated) | Increase/ (decrease) | Percentage Change (%) |
|---|---|---|---|---|
| Turnover | **1,281,585** | 818,277 | 463,308 | 56.62 |
| Gross profit/(loss) | **191,150** | (22,715) | 213,865 | (941.51) |
| Operating profit/(loss) | **55,286** | (176,239) | 231,525 | (131.37) |
| Profit/(loss) before tax | **20,263** | (191,475) | 211,738 | (110.58) |
| Profit/(loss) for the period | **16,528** | (191,445) | 207,973 | (108.63) |
| Attributable to: | | | | |
| Owners of the Company | **10,413** | (121,373) | 131,786 | (108.58) |
| Non-controlling interests | **6,115** | (70,072) | 76,187 | (108.73) |
| Total comprehensive income (expenses) for the period | **17,125** | (191,417) | 208,542 | (108.95) |
| Attributable to: | | | | |
| Owners of the Company | **11,010** | (121,345) | 132,355 | (109.07) |
| Non-controlling interests | **6,115** | (70,072) | 76,187 | (108.73) |
| Gearing ratio | **71%** | 62% | 9% | N/A |

## II.   MANAGEMENT DISCUSSION AND ANALYSIS

### (I)   Conditions of the Industry

#### 1.   Display Devices

During the reporting period, the global display device industry continued its shift towards flat panels.

During the first half of 2010, the output volume of global liquid crystal display ("LCD") panels accounted for 71,000,000 square metres, representing a year-on-year growth of 53%, of which the output volume of LCD panels for LCD television sets exceed 100,000,000 units, representing a year-on-year increase of 68%. In China, LCD industry is in fast growing stage. The domestic output volume of LCD panels accounted for 1,810,000 square metres in the first half of 2010, representing a year-on-year increase of 53%. Meanwhile, investment in the domestic LCD panel industry remained competitive. In the beginning of the year, a 8.5-generation LCD panel line in Shenzhen owned by another company had commenced construction while investment plans for several LCD panel lines are under review. Three years in the future, as more LCD panel lines being built and put into production, the output volume of domestic LCD panels will hopefully sustain rapid annual growth of approximately 85% in the next three years.

The performance of the global cathode ray tube ("CRT") (with colour picture tube ("CPT"), being a type of CRT) television set industry was broadly in line with expectation in the first half of 2010, with significantly narrowed loss despite continuing recession. In China, the production volume and exports of CRT television sets accounted for 10,385,000 units and 7,412,000 units in the first half of the year respectively, representing a year-on-year increase of 12.5% and 37.9%, respectively. Exports had then provided a strong underpinning to the partial recovery of the domestic CRT industry. As for CPTs, the production volume of CPTs in China increased by 13.8% year-on-year to 13,063,000 units in the first half of the year, well above the general estimate in the beginning of the year. Such growth was mainly attributed to the resume in demand for CRT television sets and CPTs from developing countries in the first half of the year. However, under continuous price downturn of flat TV, future for the CRT industry will still be exposed to substantial risks but further reorganization and adjustment in the industry as well as the shortage of CPT raw materials will present industry leaders with opportunities to run a successful business.

In the organic light-emitting diode ("OLED'') industry, the global output volume of PM-OLED ("Passive Matrix'') accounted for 25,200,000 units in the first half of the year, representing a modest increase of 3.1% while that of AM-OLED ("Active Matrix'') which will be the mainstream OLED in the future accounted for 18,650,000 units, representing a year-on-year increase of 127%. The annual output volume of AM-OLED products is expected to increase to 47,630,000 units with the year-on-year growth rate of more than 100%, which will exceed the annual output volume of PM-OLED for the first time.

2.    **LCD Glass Substrate**

Strong momentum in the global LCD panel industry in the first half of 2010 had also driven the thin film transistor liquid crystal display ("TFT-LCD'') glass substrate ("LCD glass substrate'') market to solid growth in the same period. In the first half of the year, the global LCD glass substrate market reached a scale of 142,000,000 square metres, representing a year-on-year increase of 53%, which is the fastest growth rate in the last three years. Due to an accelerating demand for LCD glass substrate, the global supply of LCD glass substrate in the first half of the year remained tight. For instance, the shortage of the fifth and sixth generation glass substrates in Taiwan region accounted for 10 to 20% of the total demand during the first quarter. Looking over the year as a whole, the demand for LCD glass substrates is expected to hurdle over 300,000,000 square metres over the year-on-year increase of nearly 40%. As for the market in Mainland China, the increase in capacity utilization of panel enterprises and the expansion of production of certain manufacturers in the first half of the year had stimulated demand for LCD glass substrates to increase by more than 50% year-on-year. With new panel lines to come on stream in China in the second half of the year, demand for LCD glass substrates is expected to grow substantially going forward.

3. **Solar Photovoltaic Glass**

   In recent years, low-carbon economy, energy saving and emission reduction as well as renewable energy development have become a consensus among governments around the world and solar photovoltaic has been one of the fastest-growing branches in the new energy industry up to date. The global solar photovoltaic market will have the better-than-expected growth in 2010, with installed global solar photovoltaic modules expected to increase by 93% year-on-year to 13.57GW. As the world's largest manufacturing and export base of photovoltaic modules, China had a year-on-year increase of 162% and 223% in its export volume and export value respectively in the first half of the year. In the same period, exports of domestic photovoltaic glass witnessed a strong growth. In the context of a booming photovoltaic module industry, the market of solar photovoltaic glass for encapsulation of photovoltaic modules is also expected to have the better-than-expected growth in 2010. Taking exports into account, the output volume of solar photovoltaic glass in Mainland China looks set to increase by nearly 50% year-on-year to over 100,000,000 square metres in 2010.

4. **Luminous Materials**

   Luminous materials are yet another business focus of the Group. As Australia and European Union launched policies to prohibit use of incandescent lamp, global energy saving lamp market recorded admirable growth in 2010. Further, in October 2009, European Union revoked anti-dumping duty which has been imposed on energy saving lamps exported from China for 8 years. Therefore, China's energy saving lamp industry operated in a more favourable environment in 2010. In the first half of the year, exports of China's energy saving lamps amounted to 1,456,000,000 units, representing a year-on-year increase of 64%. As a result, market demand for domestic energy saving lamp phosphors grew rapidly. Apart from energy saving lamp phosphors, cold cathode fluorescent lamp ("CCFL") phosphor ("CCFL phosphor") for LCD backlight business, light emitting diode ("LED") phosphor business and plasma display panel ("PDP") phosphor ("PDP phosphor") business in Mainland China also experienced varying degree of growth in the first half of 2010, thanks to the stable momentum of China's panel display industry.

**(II)   Business Review**

**1.   Operation Highlights**

During the reporting period, in light of the rapid expansion of its new businesses and the stable and effective operation of traditional CPTs, the Group turned from loss-making to profit-making. In the first half of 2010, the turnover of the Group amounted to RMB1,281,585,000, representing a year-on-year increase of 57%. Profit attributable to shareholders amounted to RMB10,413,000, representing a year-on-year increase of RMB131,786,000.

The Group has been shifting its business focus from traditional CPTs and spare parts to flourishing industries such as panel display devices and its relevant products, solar photovoltaic glass and luminous materials. With the commissioning and expansion of its new TFT-LCD glass substrate and solar photovoltaic glass projects, as well as further expansion of the luminous materials business, the Group's strategic transformation has been gradually drawing closer to completion.

**2.   Progress of New Operations**

(1)   TFT-LCD Glass Substrate Business

With regard to the Group's TFT-LCD glass substrate business, the phase I TFT-LCD glass substrate project, which is the first domestic production line of the fifth generation TFT-LCD glass substrate, has completed construction and is operating in good condition. Through adjusting and optimizing glass materials, production equipment and craftwork conditions, the quality yield of products was maintained at a relatively high level. Several customers orderly conducted the work of market certification, of which some achieved mass sales.

The Group has commenced the construction of the phase II project of 12 new production lines of TFT-LCD glass substrate in Xianyang, Hefei and Zhangjiagang. The construction is in smooth progress and the preliminary preparations of the trial production were carried out in an orderly manner. It is expected to be completed in phase and put into production gradually by the end of September 2010. Looking ahead, the Group will see continuous enhancement in the scale effect and competitiveness of its TFT-LCD glass substrate business and the Group is set to become a key supplier of TFT-LCD glass substrate across the nation and even the world.

(2)    Solar Photovoltaic Glass Business

During the reporting period, the Company has constructed a glass furnace with a daily melting capacity of 250 tons together with the ancillary construction of two 125 tons/day glass rolling production lines and two glass tempering production lines with a production capacity of 6,788,000 square metres/year, which have an annual production capacity of 5,026,000 square metres of tempered solar photovoltaic glass. Currently, the production lines have been put into full operation with mass production and sales. The product is of high quality. Phase II of the project (which has the same scale as Phase I) commenced construction in March 2010 and is expected to commence operation in October 2010 and put into trial production in November 2010. With an aim to swiftly expand its scale and with a hope of becoming an industry leader, the Company will steadily expand the business of solar photovoltaic glass according to market condition in the future.

(3)    Luminous Materials Business

As the global economy gradually regained its strength and relevant industries developed swiftly during the reporting period, the luminous materials business of the Group increased as compared to the corresponding period last year. With ceaseless efforts in improving product quality and enhancing its technical services, the Group saw a 96.66% growth in the sales of energy saving lamp phosphors as compared to the corresponding period last year. Driven by the commencement of operation of the new production line and the promotional measures of sales and marketing, sales volume of CCFL phosphor increased by over 20 times as compared to the corresponding period last year. Furthermore, the Group's PDP phosphor and electronic silver paste business have realised sales revenue whilst the industrialization and market promotion of lithium battery powder, LED phosphor and other new products are in full swing.

(4)    FPD Devices Business

The Group's production lines of OLED, the third generation display device, which officially commenced construction in Shunde District, Foshan, Guangdong Province in May 2009, has completed construction of the main parts of the project. Currently, the equipment are under installation preparations. Equipment installation and testing process are expected to be completed and undergo trial operation in October 2010.

As for the PDP project jointly established by the Company and Sichuan Changhong Electrical Group Co., Ltd. (四川長虹電子集團有限公司), in January 2010, the monthly comprehensive quality yield of products has reached the designed and planned level and the project has been put into full production.

**IRICO GROUP ELECTRONICS COMPANY LIMITED**

3.    **Traditional CPT Business**

During the reporting period, the domestic CRT television and CPT industry saw a rally. The Group achieved effective operation of CPT business by increasing marketing efforts, strengthening cost control and adjusting organisational structure. CPT sales volume of the Group amounted to 4,301,000 units in the first half of 2010, representing an increase of 848,000 units or approximately 24.56% as compared with the corresponding period last year; turnover was RMB702,548,000, representing an increase of RMB129,568,000 or approximately 22.61% as compared to the corresponding period last year.

**(III)   FINANCIAL REVIEW**

1.    **Overall performance**

The overall gross profit margin of the Group increased from -2.78% for the first half of 2009 to 14.92% for the first half of 2010, which was mainly attributable to the increased profitability of CPT as a result of the increase in the price of CPT and the continuous reduction in costs due to strengthened cost control initiatives. Besides, the profitability of our new business segments was further enhanced, increasing the gross profit margin of the Group as a whole.

**IRICO GROUP ELECTRONICS COMPANY LIMITED**

## 2.   Business Results

*1)*   *Unaudited profit and loss (RMB'000)*

|  | \multicolumn{4}{c}{**For the six months ended 30 June**} |
| (RMB'000) | **2010** | 2009 (Restated) | Increase/ (decrease) | Percentage Change (%) |
|---|---|---|---|---|
| Turnover | **1,281,585** | 818,277 | 463,308 | 56.62 |
| Sales of CPTs | **702,548** | 572,979 | 129,569 | 22.61 |
| Sales of components and materials | **579,037** | 245,298 | 333,739 | 136.05 |
| Cost of sales | **(1,090,435)** | (840,992) | (249,443) | 29.66 |
| Gross profit/(Gross loss) | **191,150** | (22,715) | 213,865 | (941.51) |
| Operating expenses |  |  |  |  |
| Administrative expenses | **(104,502)** | (137,559) | 33,057 | (24.03) |
| a)   General administrative expenses | **(95,686)** | (127,924) | 32,238 | (25.20) |
| b)   Research and development expenses | **(8,816)** | (9,635) | 819 | 8.5 |
| Selling and distribution costs | **(53,259)** | (37,973) | (15,286) | 40.25 |
| Other operating expenses | **(2,246)** | (764) | (1,482) | 193.98 |
| Operating profit/(loss) | **55,286** | (176,239) | 231,525 | (131.37) |
| Finance costs | **(35,060)** | (18,423) | (16,637) | 90.31 |
| Profit/(loss) for the period | **16,528** | (191,445) | 207,973 | (108.63) |
| Attributable to: |  |  |  |  |
| Owners of the Company | **10,413** | (121,373) | 131,786 | (108.58) |
| Non-controlling interests | **6,115** | (70,072) | 76,187 | (108.73) |
| Total comprehensive income (expenses) for the period | **17,125** | (191,417) | 208,542 | (108.95) |

**IRICO GROUP ELECTRONICS COMPANY LIMITED**

2)   *Turnover*

Turnover by product *(RMB'000)*

| Name | 2010 | 2009 | Increase/ (decrease) | Change (%) |
|------|------|------|----------|------------|
| CPTs | **702,548** | 572,979 | 129,569 | 22.61 |
| Components and materials | **579,037** | 245,298 | 333,739 | 136.05 |
| Total | **1,281,585** | 818,277 | 463,308 | 56.62 |

**3.   Change Over Corresponding Period Last Year and Reasons**

**1)   Turnover and gross profit margin**

In the first half of 2010, the turnover of the Group increased by RMB463,308,000 or 56.62% to RMB1,281,585,000, as compared to the corresponding period in 2009. Of which, turnover from CPT increased by RMB129,569,000 or 22.61% to RMB702,548,000 when compared to that of the corresponding period in 2009. Turnover from components and materials increased by RMB333,739,000 or 136.05% to RMB579,037,000 as compared to the corresponding period in 2009. The overall gross profit margin of the Group increased from -2.78% in the first half of 2009 to 14.92% in the first half of 2010, mainly due to the increase in gross profit margin of the whole Group as a result of the increased profitability of our new business segments and the increased profitability of our products due to continuous reduction in costs through strengthened cost control initiatives and optimization of product mix.

**2)      Administrative expenses**

The Group's administrative expenses in the first half of 2010 decreased by RMB33,057,000 or approximately 24.03%, to RMB104,502,000 from RMB137,559,000 for the corresponding period in 2009. The decrease in administrative expenses was mainly attributable to the increase in production capacity of traditional business segments and significant decrease in losses arising from suspension of production as a result of the strengthening of marketing efforts and timely adjustment of product mix.

**3)      Finance cost**

The Group's finance costs in the first half of 2010 was RMB35,060,000 (excluding interest expense capitalized amounting to RMB9,500,000), representing an increase of RMB16,637,000 or approximately 90.31%, from RMB18,423,000 for the corresponding period in 2009. The increase in finance cost was mainly attributable to an increase in borrowings due to the development of new business segments.

**4.      Current assets and financial resources**

As at 30 June 2010, the Group's cash and bank balances aggregated to RMB1,394,251,000, representing an increase of RMB316,590,000 or 29.38%, from RMB1,077,661,000 as at 31 December 2009. For the half year ended 30 June 2010, the Group's capital expenditures totaled RMB1,408,797,000 (as at 30 June 2009: RMB64,494,000). Net cash flow from operating activities was RMB297,458,000 (as at 30 June 2009: RMB214,600,000), while net cash flow from financing activities and used for investing activities were RMB1,309,645,000 (as at 30 June 2009: RMB45,231,000) and RMB1,291,110,000 (as at 30 June 2009: RMB61,783,000), respectively.

**IRICO GROUP ELECTRONICS COMPANY LIMITED**

As at 30 June 2010, the Group's total borrowings aggregated to RMB3,169,656,000, of which borrowings due within one year amounted to RMB2,189,548,000 and borrowings with maturity beyond one year amounted to RMB980,108,000. As at 31 December 2009, the Group's borrowings was RMB1,815,451,000, of which borrowings due within one year amounted to RMB1,221,949,000 and borrowings with maturity beyond one year amounted to RMB593,502,000. As at 30 June 2010, bank loans amounted to approximately RMB343,000,000 (as at 31 December 2009: RMB197,000,000) were secured by certain land and land use rights, buildings, equipment, trade receivables and inventories of the Group.

For the half year ended 30 June 2010, the turnover period for accounts receivable of the Group was 105 days, representing a decrease of 71 days from 176 days for the half year ended 30 June 2009. The decrease in the turnover days for accounts receivable was mainly attributable to the quickening of the turnover of trade receivable following a 56.62% year-on-year increase in turnover along with a 17.15% decrease in trade receivable as compared with the beginning of the year under doubled efforts in the collection of trade receivables during the Group's market expansion. For the half year ended 30 June 2010, the inventory turnover days of the Group decreased by 90 days from 164 days for the half year ended 30 June 2009 to 74 days, mainly attributable to the Group's strengthening of marketing efforts as well as its sales-oriented approach to production, which led to scientific and logical production and procurement as well as the reduction of inventories and fund appropriation.

**5.    Capital structure**

As at 30 June 2010, the Group's borrowings were mainly denominated in Renminbi and US dollars, while its cash and bank balances were mainly denominated in Renminbi, Hong Kong dollars and US dollars. The Group intends to maintain an appropriate ratio of share capital to liabilities, so as to ensure that an effective capital structure is maintained from time to time. As at 30 June 2010, its total liabilities including bank borrowings aggregated to RMB4,662,730,000 (as at 31 December 2009: RMB3,150,959,000) with cash and bank balances aggregated to RMB1,394,251,000 (as at 31 December 2009: RMB1,077,661,000) and a gearing ratio (i.e. total liabilities divided by total assets) of 71% (as at 31 December 2009: 62%).

**6.    Interim dividend**

As there was no accumulated surplus in the first half of 2010, the Board resolved not to distribute any interim dividends.

**7.    Foreign exchange risk**

The Group's income and most of its expenses are denominated in Renminbi and US dollars. For the six months ended 30 June 2010, the operating cost of the Group increased by RMB976,000 as a result of exchange rate fluctuations (as at 30 June 2009: RMB426,000). There was no material impact on the operating capital or liquidity as a result of exchange rate fluctuations.

**8.    Commitments**

As at 30 June 2010, capital commitments of the Group amounted to RMB2,146,751,000 (31 December 2009: RMB228,950,000).

**9.    Contingent liabilities**

As at 30 June 2010, the Group had no material contingent liability.

**10. Pledged assets**

As at 30 June 2010, bank loans of the Group amounted to approximately RMB343,000,000, which were secured by certain leasehold land and land use rights, buildings, equipment, trade receivables and inventories of the Group.

As at 31 December 2009, the bank loans of the Group amounted to approximately RMB197,000,000, which were secured by certain leasehold land and land use rights, buildings, equipment and trade receivables of the Group.

## III.  OTHER INFORMATION

**(1)  Share Appreciation Rights Plan**

Pursuant to the Share Appreciation Rights Plan of the Company (details of which were set out in the Company's prospectus dated 8 December 2004), as at 30 June 2010, the following Directors, Supervisors and senior management members were granted share appreciation rights by the Company:

| Name | Number of Share Appreciation Rights<br>*(Shares)* | Note |
|------|---------------------------------------------------|------|
| Xing Daoqin | 3,600,000 | Director |
| Tao Kui | 2,920,000 | Director |
| Zhang Junhua | 1,950,000 | Director |
| Guo Mengquan | 2,460,000 | Director |
| Niu Xinan | 1,600,000 | Director |
| Fu Jiuquan | 1,050,000 | Director |
| Zhang Weichuan | 1,320,000 | Director |
| Fu Yusheng | 600,000 | Supervisor |
| Tang Haobo | 400,000 | Supervisor |
| Zhang Chunning | 1,570,000 | Senior Management |
| Zou Changfu | 1,320,000 | Senior Management |
| Ma Jianchao | 1,120,000 | Senior Management |
| Chu Xiaohang | 330,000 | Senior Management |

**(2)    Interests and Short Positions of Directors, Supervisors and Senior Management**

Save as disclosed in (1) above, as at 30 June 2010, none of the Directors, Supervisors, chief executive or senior management members of the Company or their respective associates had any interest or short position in the shares, underlying shares and/or debentures (as the case may be) of the Company and/or any of its associated corporations (within the meaning of Part XV of the Securities and Futures Ordinance (SFO)) which was required to be notified to the Company and the Stock Exchange pursuant to the provisions of Divisions 7 and 8 of Part XV of the SFO (including interest and short positions which any such Directors, Supervisors, chief executive or senior management members was deemed or taken to have under provisions of such chapters of the SFO), or which was otherwise required to be entered in the register to be kept by the Company pursuant to section 352 of the SFO, or which was otherwise required to be notified to the Company and the Stock Exchange pursuant to the Model Code for Securities Transactions by Directors of Listed Issuers (the "Model Code") as set out in Appendix 10 to the Rules Governing the Listing of Securities on the Stock Exchange (the "Listing Rules").

**(3)    Interests and Short Positions of Substantial Shareholders and Other Persons**

So far as the Directors are aware, each of the following persons, not being a Director, Supervisor, chief executive or member of senior management of the Company, had an interest or short position in the Company's shares or underlying shares (as the case may be) as at 30 June 2010 and as entered in the register of interests to be kept pursuant to section 336 of the SFO: IRICO Group Corporation had interests in 1,601,468,000 domestic shares of the Company (representing 100% of the Domestic Share capital), whereas HKSCC (Nominees) Limited had interests in 531,899,189 H shares of the Company (representing 99.63% of the H share capital). Xing Daoqin, Tao Kui, Guo Mengquan and Fu Jiuquan are the Company's Directors, and are IRICO Group Corporation's General Manager, Vice General Manager, Vice General Manager and Chief Accountant respectively.

*Notes:*

*As at 30 June 2010, based on the information available to Directors and so far as the Directors are aware, HKSCC (Nominees) Limited held 531,899,189 H shares, among which:*

*Baystar Capital II, L.P. had beneficial interests in 54,509,400 H shares of the Company (representing approximately 10.21% of the issued H shares of the Company). Each of Baystar Capital Management LLC, Mr. Derby Steven P., Mr. Goldfarb Lawrence and Mr. Lamar Steven M. was deemed to be interested in the same tranche of H shares of the Company by virtue of their direct or indirect control of Baystar Capital II, L.P..*

*J.P. Morgan Fleming Asset Management Holdings Inc. held 37,116,200 H shares of the Company (representing 6.95% of the issued H shares of the Company) in the capacity of investment manager and through its controlled corporations, of which 36,517,800 H shares of the Company were held by JF Asset Management Limited and 598,400 H shares of the Company were held by JF International Management Inc..*

*Pictet Asset Management Limited held direct interests in 30,236,800 H shares (representing approximately 5.66% of the H Share capital) in the Company on behalf of Pictet Funds Asian Equities, which had interests in 31,354,400 shares.*

**(4)    Audit Committee**

In compliance with the provisions set out in the Code on Corporate Governance Practices (the "Code") in Appendix 14 to the Listing Rules, the Company has established the Audit Committee.

The Board adopted all contents set out in Code Provisions C.3.3 of the Code as the terms of reference of the Audit Committee. The Audit Committee has considered and reviewed the accounting standards and methods adopted by the Company and other matters relating to the auditing, internal control and financial reporting, which included the unaudited interim financial statements for the six months ended 30 June 2010.

**(5)   Independent Non-executive Directors**

The Group has complied with the requirement concerning the appointment of sufficient independent non-executive Directors and that at least one of them possesses appropriate professional qualification or appropriate accounting or relevant financial management expertise set out in Rule 3.10(1) and 3.10(2) of the Listing Rules. The Company has appointed five independent non-executive Directors, one of whom possesses financial management expertise.

**(6)   Corporate Governance Practices**

The Board has reviewed the documents regarding the Company's adoption of relevant corporate governance, and is of the opinion that they have met the principles and code provisions set out in the Code.

The Directors are not aware of any information that would reasonably reflect the non-compliance of the Company or any of the Directors with the Code during the period ended 30 June 2010. The Board considers that the Company has fully complied with the principles and code provisions set out in the Code during the reporting period.

**(7)   Model Code for Securities Transactions by the Directors of Listed Issuers**

For the six months period ended 30 June 2010, the Company has adopted a model code for securities transactions by Directors and Supervisors of the Company which is no less exacting than the standard stipulated by the Model Code. Having made specific enquiry in the reporting period, the Company has confirmed that all Directors and Supervisors have complied with the requirements set out in the Model Code.

**(8)   Purchase, Sale or Repurchase of Shares**

During the reporting period, the Group had not purchased, sold or repurchased any of the shares in the Company in issue.

**IRICO GROUP ELECTRONICS COMPANY LIMITED**

**(9)   Employees**

As at 30 June 2010, the Group has a total of 5,796* employees. Of which, approximately 9.3% are management and administrative staff, 7.9% are technicians, 1.4% are financial and auditing staff, 1.6% are sales and marketing staff, 77.5% are production workers and others are 2.3%.

The Company's employment and remuneration policies remain unchanged from those described in the prospectus of the Company dated 8 December 2004. The Group's employees are enthusiastic about their work and are committed to the provision of high quality products and reliable services.

*   *Excluding service dispatch worker*

**(10)   Public Float**

Based on the information that is publicly available to the Company and within the knowledge of the Directors of the Company, as at the date of this report, the Directors believe that the percentage of shares of the Company in public hands at all times during the reporting period was in compliance with the prescribed level of the minimum public float as set out in Rule 8.08 of the Listing Rules.

**(11)   Significant Investments**

During the reporting period, save as disclosed below, the Company had not made any other significant investment.

Leveraging on the successful establishment of the first phase of the self-developed photovoltaic glass production line project, the Company further established the second phase of the solar photovoltaic glass production line project with an investment of RMB187.26 million in March 2010. According to the project plan, a glass furnace with a daily melting capacity of 250 tons will be built together with the ancillary construction of two 125 tons/day glass rolling production lines and two glass tempering production lines with a production capacity of 6,788,000 square metres/year, which have an annual production capacity of 5,026,000 square metres of tempered solar photovoltaic glass. The project is expected to commence operation in October 2010 and will commence trial production in November 2010.

**(12)   Material Acquisition and Disposal**

During the reporting period, the Company did not have any material acquisition or disposal of subsidiaries and associated companies.

**(13)   Material Litigations**

As at 30 June 2010, save as disclosed below, the Directors were not aware of any other litigation or claim of material importance pending or threatened against any member of the Group.

*   Claims by Curtis Saunders against the Company and IRICO Display

    In January 2010, IRICO Group Corporation ("IRICO Group"), the Company and IRICO Display Device Co., Ltd. ("IRICO Display") received a statement of class action from the Registry of Supreme Court of British Columbia, Vancouver, Canada (加拿大不列顛哥倫比亞省高級法院溫哥華市書記官處). Curtis Saunders, the plaintiff, accused over 50 global CRT manufacturing enterprises, including IRICO Group, the Company and IRICO Display, of a conspiracy or a collusion to enter into agreements raising the price of CRT to an unreasonable level and lifting the profits from selling CRT products from 1 January 1995 to 1 January 2008. All these were alleged to cause damage to the interests of the plaintiff and other buyers of CRT products. Therefore, the plaintiff claimed for damages. As at the date of this report, Supreme Court of British Columbia Canada has accepted the case. Upon respective investigations and as confirmed by the Company, IRICO Group and IRICO Display, the Company, IRICO Group and IRICO Display have not sold any CRT products in the market of Canada directly or via agency since 1995. The Company's preliminary assessment is that the claim will not pose any negative impact on the business operation of the Group. Please refer to the announcement of the Company dated 25 January 2010 for the details of the class action.

- Claims by Fanshawe College against the Company and IRICO Display

  The Company and IRICO Display received statement of claim from Ontario Superior Court of Justice Canada in respect of a litigation brought by the Fanshawe College of Applied Arts and Technology ("Fanshawe College") in August 2009 and July 2009 respectively. The plaintiff, accused various global CRT manufacturing enterprises, including the Company and IRICO Display, of a conspiracy to sustain, control and stabilise the price of CRT since 1 January 1998, and a collusion to manipulate the market and to enter into agreements raising the price of CRT to an unreasonable level. All these were alleged to coerce the plaintiff and the public to pay an artificially high price for the CRT products which caused damage to their interests. Therefore, the plaintiff claimed for damages. As at the date of this report, Ontario Superior Court of Justice Canada has accepted the case. Upon respective investigations and as confirmed by the Company and IRICO Display, the Company and IRICO Display have not sold any CRT products in the market of Canada directly or via agency since 1998. The Company's preliminary assessment is that the claim will not pose any negative impact on the business operation of the Group.

- Claims by American Crago Company against IRICO Display

  In January 2008, IRICO Display, a subsidiary of the Company, received a statement of class action from the U.S. District Court, Northern District of California in respect of a class action being brought by American Crago Company on behalf of itself and other companies for the similar issue. The plaintiff accused various CRT manufacturing enterprises, including IRICO Display, of a conspiracy to control the market which was in violation of antitrust law. It was alleged that the plaintiff and other members in the class proceedings paid more than that would have been determined by competitive market and therefore claimed for triple damages. At present, U.S. District Court, Northern District of California has accepted the case. Upon investigations, IRICO Display have not sold any CRT products in the market of USA since 1995. The Company and IRICO Display's preliminary assessment is that the claim will not pose any negative impact on our ordinary business operation.

  In the opinion of the Directors, the above case did not have any material impact on the Group's interim financial statements for the six months ended 30 June 2010.

# **<u>Exhibit B</u>**

MARIO N. ALIOTO (56433)
LAUREN C. RUSSELL (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA  94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
malioto@tatp.com
laurenrussell@tatp.com

*Interim Lead Counsel for Indirect*
*Purchaser Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Case No. CV-07-5944-SC |
| | MDL No. 1917 |
| **This Document Relates to:** | **NOTICE OF SERVICE OF SUBPOENAS** |
| **ALL INDIRECT PURCHASER ACTIONS** | |

NOTICE IS HEREBY GIVEN that the Indirect Purchaser Plaintiffs in the above-captioned action shall serve subpoenas for production of documents on the entities listed below.  Subpoenas for the production of documents from these entities are attached hereto as the exhibit listed.

| **Exhibit** | **Entity Subpoenaed** |
|---|---|
| A. | Amazon.com, Inc. |
| B. | AOC |
| C. | Arrow Electronics |
| D. | BenQ USA Corp. |
| E. | Best Buy Co., Inc. |
| F. | Buy.com |
| G. | CDW Corporation |
| H. | Costco |
| I. | CTX Technology |
| J. | Dell Inc. |
| K. | Envision Display |
| L. | Fry's Electronics, Inc. |
| M. | Funai Corporation, Inc. |
| N. | Gateway, Inc. |
| O. | Iiyama North America, Inc. |
| P. | Ingram Micro Inc. |
| Q. | NEC Display Solutions of America |
| R. | Newegg.com |
| S. | Nexgen |
| T. | nowdirect.com |
| U. | Office Depot |
| V. | Office Max |
| W. | PC Connection |
| X. | PC Mall |
| Y. | Proview Technology, Inc. |
| Z. | RadioShack Corporation |
| AA. | Sam's Club |
| BB. | Sanyo North America Corporation |
| CC. | Sharp Electronics Corporation |
| DD. | Sony Corporation of America |
| EE. | Staples |
| FF. | SYNAP |
| GG. | Tech Data Corporation |
| HH. | Tech Depot |
| II. | Wal-Mart Stores, Inc. |
| JJ. | Zenith Corporation |
| KK. | Zones |

//

//

2

1    Dated:  November 9, 2009            By:    /s/ Mario N. Alioto

2                                              Mario N. Alioto (56433)
                                               Lauren C. Russell (241151)
3                                              TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
                                               2280 Union Street
4                                              San Francisco, CA  94123
                                               Telephone: (415) 563-7200
5                                              Facsimile: (415) 346-0679
                                               malioto@tatp.com
6                                              laurenrussell@tatp.com

7                                              *Interim Lead Counsel for Indirect
                                               Purchaser Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    3

# <u>Exhibit C</u>

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | | |
|---|---|---|
| In Re: Cathode Ray Tube (CRT) Antitrust Litigation | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   3:07-cv-5944-SC MDL No. 1917 |
| | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.)
c/o Registered Agent Solutions, Inc., 1220 S St. STE 150, Sacramento, CA 95811

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: See Exhibit A

| Place: Perkins Coie LLP | Date and Time: |
|---|---|
| 1201 3rd Ave Suite 4900 Seattle, WA 98101 | 12/12/2013 5:00 pm |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: ___11/12/2013___

*CLERK OF COURT*

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*      Costco Wholesale
Corporation _____ , who issues or requests this subpoena, are:

Steven D. Merriman, Perkins Coie LLP, 1201 3rd Ave Suite 4900, Seattle, WA 98101.
Telephone: (206) 359-3495. Email: smerriman@perkinscoie.com

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   3:07-cv-5944-SC MDL No. 1917   .

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*

was received by me on *(date)*

☐ I served the subpoena by delivering a copy to the named person as follows:

_____    on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                                                *Server's signature*

                                                            _____
                                                                *Printed name and title*

                                                            _____
                                                                *Server's address*

Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

  (1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

  (2) *Command to Produce Materials or Permit Inspection.*

  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

  (i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

  (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  (3) *Quashing or Modifying a Subpoena.*

  (A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

  (i) fails to allow a reasonable time to comply;

  (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

  (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

  (iv) subjects a person to undue burden.

  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

  (i) disclosing a trade secret or other confidential research, development, or commercial information;

  (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

  (iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

  (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

  (ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

  (1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  (2) *Claiming Privilege or Protection.*

  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

  (i) expressly make the claim; and

  (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

# EXHIBIT A

*In Re: Cathode Ray Tube (CRT) Antitrust Litigation*

**Master File No. 3:07-md-05944-SC / MDL No. 1917**

### EXHIBIT "A" TO SUBPOENA DIRECTED TO
### THOMSON CONSUMER ELECTRONICS, INC. (n/k/a TECHNICOLOR USA, INC.)

## I.   DEFINITIONS

The words and phrases used in these requests shall have the meanings ascribed to them under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Northern District of California.  In addition, the following terms shall have the meanings set forth below whenever used in any Request for Production of Documents.

1.   The words "all," "any," and "each" mean "each and every."

2.   The words "and" and "or" are both conjunctive and disjunctive as necessary.

3.   "Communications" means, without limitation, the transmittal of information (in the form of facts, ideas, inquiries or otherwise) between individuals or companies whether oral, written, electronic, or otherwise, and whether direct or through an intermediary.

4.   "Concerning" or "concerns" means discussing, relating to, contradicting, referring to, reflecting, analyzing, describing, constituting, evidencing, containing or disclosing or supporting the referenced matter.

5.   "Document" and "documents" shall have the meaning ascribed to them under the Federal Rules of Civil Procedure and shall also mean all electronically stored information ("ESI") including, without limitation, electronic data or data compilations, electronic files, email and other electronic communications saved to or located on hard disks, file servers, floppy disks, CDs, DVDs, backup tapes, thumb drives, or any other electronic media, whether or not in tangible or electronic form.

1

6.      The term "CRT" means cathode ray tube and includes cathode ray tubes used in color televisions and color computer monitors.

7.      The term "CRT Product" means a television or computer monitor containing a CRT.

8.      "Identify," when used with reference to an entity, means to state the full name, present or last known address, and present or last known telephone number of such entity.

9.      "Identify," when used with reference to documents, other than those under claim of privilege, means to identify the documents by each author, sender, addressee, date, subject, recipient, place of recording, and custodian.

10.     "Identify" or "identification," when used in reference to an individual person, means to state his or her full name, present or last known address, present or last known telephone number, and present or last known position and business affiliation.

11.     "Identify," "describe," "explain," or "state," when used in reference to any fact, act occurrence, transaction, statement, communication, document, or other matter, means to describe and identify the facts constituting such matter.

12.     "Including" or "includes" means without limitation.

13.     "Reflect(ing) or refer(ring) to" means a statement or communication about, relating to, concerning, describing, containing, identifying, or in any way pertaining to the subject matter in the request.

14.     The term "person" or "persons" includes any natural person, public entity, partnership, corporation, association, firm, trust, joint venture, agency, board, authority, commission or other such entity.

15.     "Supplier" means any supplier, manufacturer, or seller of CRT or CRT Products.

2

16.     "You" or "Your" means Thomson Consumer Electronics, Inc., as well as: its current and former parent(s), including but not limited to Thomson SA (n/k/a Technicolor SA); its current and former subsidiaries, including but not limited to Thomson Displays Americas, LLC (n/k/a Technologies Displays Americas, LLC); its affiliates and their subsidiaries; any employees, agents, representatives or any persons acting or purporting to act on Your behalf, including each of Your attorneys.

## II.     INSTRUCTIONS

1.     In responding to this subpoena, You are requested to produce all documents in Your possession, custody, or control, wherever located, including without limitation any document available to You upon request from Your parents, affiliates, subsidiaries, employees, officers, directors, attorneys, accountants, financial advisors, consultants, private investigators, or other agents or persons acting or purporting to act on Your behalf, as required by the Federal Rules of Civil Procedure and the applicable local rules.

2.     If any part of a document is responsive to any request herein, produce the entire document, including any attachments or exhibits.

3.     All documents should be produced as maintained in the ordinary course of business.

4.     Any noun used in the singular form shall be construed and applied so as to include the plural, form also, and vice versa.

5.     If You are not producing any documents in response to any of the Requests herein, Your response should make it clear that You are not producing any documents in response to that Request.

3

THOMSON SUBPOENA EXHIBIT A
LEGAL28335091.1

6.     If only a part of a Request is objectionable, the response shall identify with particularity any document or other tangible thing falling within any category of item in the request to which an objection is being made, and shall set forth clearly the extent of and the specific ground for the objection.

7.     Each Document Request shall be construed independently, and no Document Request shall be viewed as limiting the scope of any other Document Request.

8.     Unless a different time is specified, the term "Relevant Period" means the period beginning March 1, 1995 and continuing through the present.

## III. REQUESTS FOR PRODUCTION

### Finished Goods Sales Data

1.     Please produce transaction-level data maintained in the ordinary course of business, in a standard machine-readable format, for all sales of CRT Products sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S.  Please include fields that identify:

        a.     the date when You shipped the CRT Product;

        b.     the quantity of CRT Products associated with each transaction, along with the units of measure for each quantity field in the data;

        c.     the date when You billed each customer for the CRT Product;

        d.     the location from which You shipped the CRT Product in each transaction;

        e.     the name of each customer to whom You shipped the CRT product in each transaction;

        f.     the name of each customer whom You billed for each CRT Product in each transaction;

4

g.    the location to which You shipped the CRT Products in each transaction;

h.    the location of the customer whom You billed for the CRT Products in each transaction;

i.    the product code/model number for the CRT Product and the description of the CRT Product

j.    the gross and net Price of each CRT Product You sold in each transaction;

k.    any discounts, rebates, credits, freight allowances, free goods and/or any other price adjustments You made in connection with each transaction;

l.    the gross and net total amount paid by the customer for the CRT Products You sold in each transaction;

m.    any taxes, customs, tariffs, duties or other fees paid on the CRT Products in each transaction;

n.    the invoice number, purchase order number, and/or any other data sufficient to identify a unique transaction.

2.    Please produce documents or databases sufficient to identify all physical characteristics You use to identify each unique CRT Product contained in the data produced in response to Request No. 1.

3.    For each unique CRT Product identified in the data produced in response to Request No. 1, documents and or data sufficient to identify the supplier of the CRT for that unique CRT Product, the part number of the CRT contained in that CRT Product, and all information You maintain regarding the specifications and characteristics of the CRT contained in each unique CRT Product.

4.     Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 1. Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 1.

**Finished Goods Cost Data**

5.     Please produce transaction-level data maintained in the ordinary course of business, in a standard, machine-readable format, sufficient to show for all sales of CRT Products sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S. the costs You incurred in connection with the manufacture and sale of those CRT Products, including cost of goods sold (COGS). If this level of data is unavailable, then please provide COGS data at the most disaggregated level available.

    a.     COGS data should be produced with information sufficient to identify the corresponding sales data (see Request No. 1) for each particular transaction.

6.     Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 5. Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 5.

**CRT Purchase Data**

7.     For each unique CRT Product identified in the data produced in response to Request No. 1, please produce transactional-level data maintained in the ordinary course of business, in a standard machine-readable format, reflecting Your purchases of CRTs in connection with the manufacture and sale of those CRT Products, from January 1995 through December 2009, including, but not limited to documents or data evidencing:

6

      a.      the date when You received the CRT;

      b.      the quantity of CRTs associated with each transaction, and the units of measure for each quantity field in the data;

      c.      the location from where You took delivery of the CRTs;

      d.      the manufacturer of the CRTs;

      e.      the specific entity that shipped the CRTs to You;

      f.      data or information used to identify the specifications of each CRT, including but not limited to part numbers, serial numbers or any other unique identifier, complete product descriptions, and size;

      g.      the gross and net Price of each CRT You purchased in each transaction;

      h.      any discounts, rebates, credits, freight allowances, free goods and/or any other Price adjustments You made in connection with each transaction involving an CRT;

      i.      the gross and net total amount paid for the CRT You or Your Affiliates purchased in connection with each such transaction;

      j.      any taxes, customs, tariffs, duties or other fees paid on each CRT You or Your Affiliates purchased;

      k.      the invoice number, purchase order number, and/or any other data sufficient to identify a unique transaction.

      8.      Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 7. Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 7.

7

**CRT Sales Data**

9.      Please produce transaction-level data maintained in the ordinary course of business, in a standard machine-readable format, for all sales of CRTs sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S. Please include fields that identify:

    a.      the date when You shipped the CRT;

    b.      the quantity of CRTs associated with each transaction, along with the units of measure for each quantity field in the data;

    c.      the date when You billed each customer for the CRT;

    d.      the location from which You shipped the CRT in each transaction;

    e.      the name of each customer to whom You shipped the CRT in each transaction;

    f.      the name of each customer whom You billed for each CRTs in each transaction;

    g.      the location to which You shipped the CRTs in each transaction;

    h.      the location of the customer whom You billed for the CRTs in each transaction;

    i.      the product code/model number for the CRTs and the description of the CRTs

    j.      the gross and net Price of each CRT You sold in each transaction;

    k.      any discounts, rebates, credits, freight allowances, free goods and/or any other price adjustments You made in connection with each transaction;

8

2a96faa9b727bc41

l.      the gross and net total amount paid by the customer for the CRTs You sold in each transaction;

m.     any taxes, customs, tariffs, duties or other fees paid on the CRTs in each transaction;

n.      the invoice number, purchase order number, and/or any other data sufficient to identify a unique transaction.

10.     Please produce documents or databases sufficient to identify all physical characteristics You use to identify each unique CRT contained in the data produced in response to Request No. 9.

11.     Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 9.  Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 9.

**CRT Cost Data**

12.     Please produce transaction-level data maintained in the ordinary course of business, in a standard, machine-readable format, sufficient to show for all sales of CRTs sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S., Your costs incurred in connection with the manufacture and sale of those CRTs, including cost of goods sold (COGS).  If this level of data is unavailable, then please provide COGS data at the most disaggregated level available.

a.      COGS data should be produced with information sufficient to identify the corresponding sales data (see Request No. 9) for each particular transaction.

9

13. Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 12. Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 12.

10

# __Exhibit D__

 **CT Corporation**

**Service of Process Transmittal**
11/22/2013
CT Log Number 523942473

TO:     Perry A. Pappous, Executive VP and General Counsel
        Mitsubishi Electric & Electronics America, Inc.
        5900-A Katella Avenue
        Cypress, CA 90630-5019

RE:     **Process Served in California**

FOR:    Mitsubishi Electric US, Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Cathode Ray Tube (CRT) Antitrust Litigation, et al., Pltfs. vs. Hitachi, Ltd., et al., Dfts. // To: Mitsubishi Electric US, Inc. |
| **DOCUMENT(S) SERVED:** | Letter, Subpoena, Proof of Service, Attachment(s), Exhibit(s) |
| **COURT/AGENCY:** | Northern District - U.S. District Court, CA<br>Case # 307CV05944SC |
| **NATURE OF ACTION:** | Subpoena - Business records – Pertaining to database sufficient to identify all physical characteristics use to identify each unique CRT Product contained in the data produced (See documents for additional requested information) |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/22/2013 at 14:10 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | 12/12/2013 at 10:00 a.m. (Document(s) may contain additional answer dates) |
| **ATTORNEY(S) / SENDER(S):** | Jill S. Cassekman<br>Robins, Kaplan, Miller & Ciresi L.L.P.<br>2049 Century Park East<br>Suite 3400<br>Los Angeles, CA 90067<br>310-552-0130 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 797235135260<br>Image SOP<br>Email Notification, Perry A. Pappous perry.pappous@meus.mea.com<br>Email Notification, Joan Albritton JOAN.ALBRITTON@MEUS.MEA.COM<br>Email Notification, Nancy Oleson nancy.oleson@meus.mea.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Nancy Flores |
| **ADDRESS:** | 818 West Seventh Street<br>Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

SUITE 3400
2049 CENTURY PARK EAST
LOS ANGELES, CA 90067-3208
TEL: 310-552-0130  FAX: 310-229-5800
www.rkmc.com

ATTORNEYS AT LAW

**JILL S. CASSELMAN**
310-229-5435

November 22, 2013

**VIA PERSONAL SERVICE**
Mitsubishi Electric US, Inc.
c/o Agent for Service of Process C T Corporation System
818 W. Seventh Street
Los Angeles CA 90017

      Re:    *In Re: Cathode Ray Tube (CRT) Antitrust Litigation;* **Master File No. 3:07-md-05944-SC / MDL No. 1917**
              **Our File No.: 011082.3574**

Dear Counsel:

      I represent Best Buy in the above referenced litigation.  I write to request that Mitsubishi Electric US, Inc. produce certain cost and sales data for its CRT finished products.

      Enclosed is a subpoena for the production of documents, issued pursuant to Federal Rule of Civil Procedure 45.  Please review Exhibit "A" to the subpoena which describes the requests for production.  Any responsive documents shall be due on December 12, 2013, and may be mailed to:

      Robins, Kaplan, Miller & Ciresi L.L.P.
      c/o Jill Casselman
      2049 Century Park East, Suite 3400
      Los Angeles, CA  90067

      Please call me at your earliest convenience so that we can discuss your response to the subpoena so that we may proceed in the most efficient and least disruptive manner.

      Best regards,

      ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

      Jill S. Casselman

JSC/jc
Enclosures

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern                    District of   California

In Re: Cathode Ray Tube (CRT) Antitrust Litigation
Best Buy Co., Inc., et al.

| | | |
|---|---|---|
| _Plaintiff_ | ) | MDL No. 1917 |
| v. | ) | Civil Action No. 3:07-CV-05944-SC |
| Hitachi, Ltd., et al. | ) | |
| | ) | (If the action is pending in another district, state where: |
| _Defendant_ | ) | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Mitsubishi Electric US, Inc.
c/o CT Corporation System
818 W. Seventh Street, Los Angeles, CA 90017

☒ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: See Exhibit A

| Place: Robins, Kaplan, Miller & Ciresi L.L.P. | Date and Time: |
|---|---|
| 2049 Century Park East, Suite 3400, Los Angeles, CA 90067 | December 12, 2013 at 10:00 a.m. |

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: November 22, 2013

CLERK OF COURT                                      OR

_____                    _____
_Signature of Clerk or Deputy Clerk_                Jill S. Casselman    _Attorney's signature_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_  Best Buy Co., Inc.; Best Buy Purchasing LLC; Best Buy Enterprise Services, Inc.; Best Buy Stores, L.P.; BestBuy.com, L.L.C.; and Magnolia Hi-Fi, Inc. _____ , who issues or requests this subpoena, are:

Jill S.Casselman, Robins, Kaplan, Miller & Ciresi L.L.P., 2049 Century Park East, Suite 3400, Los Angeles, CA 90067
Telephone: (310) 552-0130

AO-88B

AO 88B  (Rev.  06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                                    *Server's signature*

                                         _____
                                                    *Printed name and title*

                                         _____
                                                    *Server's address*

Additional information regarding attempted service, etc:

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

# EXHIBIT A

*In Re: Cathode Ray Tube (CRT) Antitrust Litigation*

**Case No. 11-cv-06275**

**Master File No. 3:07-md-05944-SC / MDL No. 1917**

**EXHIBIT "A" TO SUBPOENA DIRECTED TO
MITSUBISHI ELECTRIC US, INC.**

## I.    DEFINITIONS

The words and phrases used in these requests shall have the meanings ascribed to them under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Northern District of California. In addition, the following terms shall have the meanings set forth below whenever used in any Request for Production of Documents.

1.    The words "all," "any," and "each" mean "each and every."

2.    The words "and" and "or" are both conjunctive and disjunctive as necessary.

3.    "Communications" means, without limitation, the transmittal of information (in the form of facts, ideas, inquiries or otherwise) between individuals or companies whether oral, written, electronic, or otherwise, and whether direct or through an intermediary.

4.    "Concerning" or "concerns" means discussing, relating to, contradicting, referring to, reflecting, analyzing, describing, constituting, evidencing, containing or disclosing or supporting the referenced matter.

5.    "Document" and "documents" shall have the meaning ascribed to them under the Federal Rules of Civil Procedure and shall also mean all electronically stored information ("ESI") including, without limitation, electronic data or data compilations, electronic files, email and other electronic communications saved to or located on hard disks, file servers, floppy disks,

1

CDs, DVDs, backup tapes, thumb drives, or any other electronic media, whether or not in tangible or electronic form.

6.      The term "CRT" means cathode ray tube and includes cathode ray tubes used in color televisions and color computer monitors.

7.      The term "CRT Product" means a television or computer monitor containing a CRT.

8.      "Identify," when used with reference to an entity, means to state the full name, present or last known address, and present or last known telephone number of such entity.

9.      "Identify," when used with reference to documents, other than those under claim of privilege, means to identify the documents by each author, sender, addressee, date, subject, recipient, place of recording, and custodian.

10.     "Identify" or "identification," when used in reference to an individual person, means to state his or her full name, present or last known address, present or last known telephone number, and present or last known position and business affiliation.

11.     "Identify," "describe," "explain," or "state," when used in reference to any fact, act occurrence, transaction, statement, communication, document, or other matter, means to describe and identify the facts constituting such matter.

12.     "Including" or "includes" means without limitation.

13.     "Reflect(ing) or refer(ring) to" means a statement or communication about, relating to, concerning, describing, containing, identifying, or in any way pertaining to the subject matter in the request.

14.     The term "person" or "persons" includes any natural person, public entity, partnership, corporation, association, firm, trust, joint venture, agency, board, authority, commission or other such entity.

15.     "Supplier" means any supplier, manufacturer, or seller of CRT or CRT Products.

16.     "You" or "Your" means Mitsubishi Electric US, Inc., as well as: its current and former parents(s), including but not limited to Mitsubishi Electric Corporation; its current and former subsidiaries; its affiliates and their subsidiaries; and any employees, agents, representatives or any persons acting or purporting to act on Your behalf, including each of Your attorneys.

## II.     INSTRUCTIONS

1.     In responding to this subpoena, You are requested to produce all documents in Your possession, custody, or control, wherever located, including without limitation any document available to You upon request from Your parents, affiliates, subsidiaries, employees, officers, directors, attorneys, accountants, financial advisors, consultants, private investigators, or other agents or persons acting or purporting to act on Your behalf, as required by the Federal Rules of Civil Procedure and the applicable local rules.

2.     If any part of a document is responsive to any request herein, produce the entire document, including any attachments or exhibits.

3.     All documents should be produced as maintained in the ordinary course of business.

4.     Any noun used in the singular form shall be construed and applied so as to include the plural, form also, and vice versa.

3

5.      If You are not producing any documents in response to any of the Requests herein, Your response should make it clear that You are not producing any documents in response to that Request.

6.      If only a part of a Request is objectionable, the response shall identify with particularity any document or other tangible thing falling within any category of item in the request to which an objection is being made, and shall set forth clearly the extent of and the specific ground for the objection.

7.      Each Document Request shall be construed independently, and no Document Request shall be viewed as limiting the scope of any other Document Request.

9.      Unless a different time is specified, the relevant time period for each document request is January 1, 1995 through December 31, 2009.

## III. REQUESTS FOR PRODUCTION

**Finished Goods Sales Data**

1.      Please produce transaction-level data maintained in the ordinary course of business, in a standard machine-readable format, for all sales of CRT Products sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S. Please include fields that identify:

      a.      the date when You shipped the CRT Product;

      b.      the quantity of CRT Products associated with each transaction, along with the units of measure for each quantity field in the data;

      c.      the date when You billed each customer for the CRT Product;

      d.      the location from which You shipped the CRT Product in each transaction;

4

e.    the name of each customer to whom You shipped the CRT product in each transaction;

f.    the name of each customer whom You billed for each CRT Product in each transaction;

g.    the location to which You shipped the CRT Products in each transaction;

h.    the location of the customer whom You billed for the CRT Products in each transaction;

i.    the product code/model number for the CRT Product and the description of the CRT Product

j.    the gross and net Price of each CRT Product You sold in each transaction;

k.    any discounts, rebates, credits, freight allowances, free goods and/or any other price adjustments You made in connection with each transaction;

l.    the gross and net total amount paid by the customer for the CRT Products You sold in each transaction;

m.    any taxes, customs, tariffs, duties or other fees paid on the CRT Products in each transaction;

n.    the invoice number, purchase order number, and/or any other data sufficient to identify a unique transaction.

2.    Please produce documents or databases sufficient to identify all physical characteristics You use to identify each unique CRT Product contained in the data produced in response to Request No. 1.

3.    For each unique CRT Product identified in the data produced in response to Request No. 1, documents and or data sufficient to identify the supplier of the CRT for that

5

unique CRT Product, the part number of the CRT contained in that CRT Product, and all information You maintain regarding the specifications and characteristics of the CRT contained in each unique CRT Product.

4.      Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 1.  Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 1.

**Finished Goods Cost Data**

5.      Please produce transaction-level data maintained in the ordinary course of business, in a standard, machine-readable format, sufficient to show for all sales of CRT Products sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S., the costs You incurred in connection with the manufacture and sale of those CRT Products, including cost of goods sold ("COGS").  If this level of data is unavailable, then please provide COGS data at the most disaggregated level available.

a.      COGS data should be produced with information sufficient to identify the corresponding sales data (see Request No. 1) for each particular transaction.

6.      Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 5.  Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 5.

**CRT Purchase Data**

7.    For each unique CRT Product identified in the data produced in response to Request No. 1, please produce transactional-level data maintained in the ordinary course of business, in a standard machine-readable format, reflecting Your purchases of CRTs in connection with the manufacture and sale of those CRT Products, from January 1995 through December 2009, including, but not limited to documents or data evidencing:

a.    the date when You received the CRT;

b.    the quantity of CRTs associated with each transaction, and the units of measure for each quantity field in the data;

c.    the location from where You took delivery of the CRTs;

d.    the manufacturer of the CRTs;

e.    the specific entity that shipped the CRTs to You;

f.    data or information used to identify the specifications of each CRT, including but not limited to part numbers, serial numbers or any other unique identifier, complete product descriptions, and size;

g.    the gross and net Price of each CRT You purchased in each transaction;

h.    any discounts, rebates, credits, freight allowances, free goods and/or any other Price adjustments You made in connection with each transaction involving an CRT;

i.    the gross and net total amount paid for the CRT You or Your Affiliates purchased in connection with each such transaction;

j.    any taxes, customs, tariffs, duties or other fees paid on each CRT You or Your Affiliates purchased;

k.    the invoice number, purchase order number, and/or any other data sufficient to identify a unique transaction.

7

8.   Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 7. Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 7.

**CRT Sales Data**

9.   Please produce transaction-level data maintained in the ordinary course of business, in a standard machine-readable format, for all sales of CRTs sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S. Please include fields that identify:

a.   the date when You shipped the CRT;

b.   the quantity of CRTs associated with each transaction, along with the units of measure for each quantity field in the data;

c.   the date when You billed each customer for the CRT;

d.   the location from which You shipped the CRT in each transaction;

e.   the name of each customer to whom You shipped the CRT in each transaction;

f.   the name of each customer whom You billed for each CRTs in each transaction;

g.   the location to which You shipped the CRTs in each transaction;

h.   the location of the customer whom You billed for the CRTs in each transaction;

i.   the product code/model number for the CRTs and the description of the CRTs

8

j.      the gross and net Price of each CRT You sold in each transaction;

k.      any discounts, rebates, credits, freight allowances, free goods and/or any other price adjustments You made in connection with each transaction;

l.      the gross and net total amount paid by the customer for the CRTs You sold in each transaction;

m.      any taxes, customs, tariffs, duties or other fees paid on the CRTs in each transaction;

n.      the invoice number, purchase order number, and/or any other data sufficient to identify a unique transaction.

10.      Please produce documents or databases sufficient to identify all physical characteristics You use to identify each unique CRT contained in the data produced in response to Request No. 9.

11.      Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 9. Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 9.

**CRT Cost Data**

12.      Please produce transaction-level data maintained in the ordinary course of business, in a standard, machine-readable format, sufficient to show for all sales of CRTs sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S., the costs You incurred in connection with the manufacture and sale of those CRTs, including COGS. If this level of data is unavailable, then please provide COGS data at the most disaggregated level available.

a.      COGS data should be produced with information sufficient to identify the corresponding sales data (see Request No. 9) for each particular transaction.

13.     Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 12.  Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 12.

# Exhibit E

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4
 5   IN RE CATHODE RAY TUBE (CRT)
 6   ANTITRUST LITIGATION
                                    No. 14-CV-2058 (SC)
 7   _____
                                    MDL No. 1917
     This Document Relates to:
 8
     ALL DIRECT PURCHASER ACTIONS
 9
     _____
10
11
12         VIDEOTAPED DEPOSITION of MAX WASINGER
13               Los Angeles, California
14               Thursday, July 16, 2015
15
16
17
18
19
20
21
22
23   Reported by
     Daryl Baucum, RPR, CRR, RMR, CSR No. 10356
24
25
```

Page 2

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4

5   IN RE CATHODE RAY TUBE (CRT)

6   ANTITRUST LITIGATION

    _____   No. 14-CV-2058 (SC)

7                                        MDL No. 1917

    This Document Relates to:

8

    ALL DIRECT PURCHASER ACTIONS

9

    _____

10

11

12

13

14

15          VIDEOTAPED DEPOSITION of MAX WASINGER, at

16       633 West Fifth Street, Suite 3600, Los Angeles,

17       California, beginning at 9:03 a.m. and ending

18       at 2:02 p.m., on Thursday, July 16, 2015,

19       before Daryl Baucum, RPR, CRR, RMR,

20       CSR No. 10356.

21

22

23

24

25

```
                                              Page 3

 1    APPEARANCES OF COUNSEL:

 2

 3

 4        FOR THE DIRECT PURCHASER PLAINTIFFS:

 5

 6            SAVERI & SAVERI

 7            BY:  R. ALEXANDER SAVERI, ATTORNEY AT LAW

 8                 DAVID Y. HWU, ATTORNEY AT LAW

 9            706 Sansome Street

10            San Francisco, California  94111

11            415.217.6810

12            Rick@Saveri.com

13            DHwu@Saveri.com

14

15

16        FOR THE LG DEFENDANTS:

17

18            MUNGER, TOLLES & OLSON

19            BY:  JESSICA BARCLAY-STROBEL, ATTORNEY AT LAW

20            355 South Grand Avenue

21            Suite 3500

22            Los Angeles, California  90071

23            213.683.9100

24            Jessica.Barclay-Strobel@MTO.com

25
```

                                              **Page 4**

1    APPEARANCES OF COUNSEL (CONTINUED):

2

3

4         FOR THE SEARS AND K-MART PLAINTIFFS:

5

6              KENNY, NACHWALTER

7              BY:  KEVIN J. MURRAY, ATTORNEY AT LAW

8              1100 Miami Center

9              201 South Biscayne Boulevard

10             Miami, Florida  33131

11             305.373.1000

12             KMurray@KNPA.com

13

14

15         FOR ALFRED H. SIEGEL (CIRCUIT CITY TRUST):

16

17             KLEE, TUCHIN, BOGDANOFF & STERN

18             BY:  KATHRYN ZWICKER, ATTORNEY AT LAW

19             1999 Avenue of the Stars

20             Suite 3900

21             Los Angeles, California  90067

22             310.407.4076

23             KZwicker@KTBSLaw.com

24

25

```
                                          Page 5
1    APPEARANCES OF COUNSEL (CONTINUED):

2

3        FOR MITSUBISHI ELECTRIC and THE DEPONENT:

4

5            JENNER & BLOCK
6            BY:  GABRIEL A. FUENTES, ATTORNEY AT LAW
7            353 North Clark Street
8            Chicago, Illinois  60654
9            312.222.9350
10           GFuentes@Jenner.com

11

12

13       FOR THE HITACHI ENTITIES:

14

15           KIRKLAND & ELLIS
16           BY:  ELIOT A. ADELSON, ATTORNEY AT LAW
17           555 California Street
18           San Francisco, California  94104
19           415.439.1413
20           EAdelson@Kirkland.com

21

22

23

24

25
```

```
                                       Page 6
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2

 3       FOR THE SAMSUNG SDI DEFENDANTS:

 4

 5            SHEPPARD, MULLIN, RICHTER & HAMPTON

 6            BY:  LEO CASERIA, ATTORNEY AT LAW

 7            333 South Hope Street

 8            Suite 4300

 9            Los Angeles, California  90071

10            213.620.1780

11            LCaseria@SheppardMullin.com

12

13

14       FOR THE PHILLIPS DEFENDANTS:

15

16            BAKER, BOTTS

17            BY:  TIFFANY B. GELOTT, ATTORNEY AT LAW

18            1299 Pennsylvania Avenue, NW

19            Washington, D.C.  20004

20            202.639.7700

21

22

23

24

25
```

Page 7

1   APPEARANCES OF COUNSEL (CONTINUED):

2

3        FOR THE TOSHIBA DEFENDANTS:

4

5             WHITE & CASE

6             BY:  JONATHAN C. BLACK, ATTORNEY AT LAW

7             701 Thirteenth Street, NW

8             Washington, D.C.  20005

9             202.626.3618

10            Jonathanc.Black@WhiteCase.com

11

12

13       FOR THE PANASONIC DEFENDANTS:

14

15            WEIL, GOTSHAL & MANGES

16            BY:  MARJAN HAJIBANDEH, ATTORNEY AT LAW

17            767 Fifth Avenue

18            New York, New York  10153

19            212.310.8192

20            Marjan.Hajibandeh@Weil.com

21

22

23

24

25

Page 8

1    APPEARANCES OF COUNSEL (CONTINUED):

2

3

4        ALSO PRESENT:

5            Maksimilian V. Sklyarov

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 147

| | | |
|---|---|---|
| 1 | or what their positions were. | 13:25:30 |
| 2 | Q    So it would be the same answer that you | 13:25:31 |
| 3 | gave to Hitachi?  It was probably somebody that you | 13:25:33 |
| 4 | may run into at the trade association or the group | 13:25:36 |
| 5 | buying groups but you don't specifically recall it? | 13:25:38 |
| 6 | A    It's very possible to say, yeah, same | 13:25:40 |
| 7 | situation. | 13:25:43 |
| 8 | Q    Now, I'm going to ask you when I refer to | 13:25:45 |
| 9 | "Irico," have you heard of a company called "Irico"? | 13:25:47 |
| 10 | A    No. | 13:25:52 |
| 11 | Q    That if I -- when I refer to "Irico," I am | 13:25:54 |
| 12 | referring collectively to the Irico Group | 13:25:58 |
| 13 | Electronics, Irico displays. | 13:26:01 |
| 14 | Do you ever recall during the '95 to 2000 | 13:26:04 |
| 15 | period when you were at MELA having any | 13:26:07 |
| 16 | conversations with anybody from Irico? | 13:26:09 |
| 17 | A    No. | 13:26:11 |
| 18 | Q    Do you recall ever running into anybody at | 13:26:12 |
| 19 | Irico during that time period at any trade | 13:26:14 |
| 20 | associations? | 13:26:17 |
| 21 | A    No, I never heard of the company. | 13:26:18 |
| 22 | Q    Did you ever hear of anybody on your staff | 13:26:21 |
| 23 | running into anybody from Irico? | 13:26:23 |
| 24 | A    No. | 13:26:25 |
| 25 | Q    Have you heard of LG? | 13:26:28 |