# EXHIBIT B

Mario N. Alioto (56433)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2001 Union Street, Suite 482
San Francisco, CA  94123
Telephone:      (415) 563-7200
Facsimile:      (415) 346-0679
malioto@tatp.com
laurenrussell@tatp.com

*Lead Counsel for the Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| **IN RE:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | MDL NO. 1917 |
| | Case No. 07-cv-5944-JST |
| This Document Relates To:<br><br>ALL INDIRECT PURCHASER ACTIONS | **DECLARATION OF LAUREN C. CAPURRO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' SURREPLY IN OPPOSITION TO IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:  December 14, 2023<br>Time: 2:00 p.m.<br>Courtroom: 6, 2nd Floor<br><br>The Honorable Jon S. Tigar |

I, Lauren C. Capurro, declare:

1.        I am a partner with Trump, Alioto, Trump & Prescott, LLP, Lead Counsel for the Indirect Purchaser Plaintiffs ("IPPs") in the above-captioned action.  I am a member of the Bar of the State of California and admitted to practice before this Court.  I make this declaration in support of the IPPs' Surreply In Opposition to Irico Group Corp. and Irico Display Devices Co., Ltd.'s Motion for Summary Judgment.  Except where otherwise stated, the matters set forth herein are within my personal knowledge and if called upon and sworn as a witness I could competently testify regarding them.

2.        Attached hereto as Exhibit 1 is a true and correct copy of IPPs' Settlement Agreement with defendant Chunghwa Picture Tubes, Ltd., which requires Chunghwa to cooperate with IPPs in the prosecution of the case against the other defendants. *See* para. 24.

3.        Attached hereto as Exhibit 2 is a true and correct copy of IPPs' Settlement Agreement with defendant Philips, which requires Philips to cooperate with IPPs by providing an affidavit or statement showing that the documents it produced in this litigation are authentic and, to the extent possible, admissible. *See* para. 24.

4.        Attached hereto as Exhibit 3 is a true and correct copy of IPPs' Settlement Agreement with defendants Panasonic Corporation and MT Picture Display Co., Ltd., which requires those former defendants to cooperate with IPPs' in the prosecution of the case against the other defendants. *See* para. 23.

5.        IPPs have similar cooperation agreements with the other settling defendants.

6.        Attached hereto as Exhibit 4 is a true and correct copy of an excerpt of the deposition transcript of Jan De Lombaerde taken in this matter on October 9, 2014. Mr. De Lombaerde is a former employee of defendant Philips.

7.        Attached hereto as Exhibit 5 is a true and correct copy of any excerpt of the deposition transcript of Jim Smith taken in this matter on December 12, 2013. Mr. Smith is a former employee of defendant Philips and its joint venture, LG.Philips Displays.

DECLARATION OF LAUREN C. CAPURRO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS'
SURREPLY IN OPPOSITION TO IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD.'S
MOTION FOR SUMMARY JUDGMENT; CASE NO. 07-cv-5944-JST, MDL NO. 1917

8.      Attached hereto as Exhibit 6 is a true and correct copy of a document produced by defendant Chunghwa Picture Tubes, Ltd. in this litigation Bates-stamped CHU00029191-94E and marked as Deposition Exhibit 1108 and 1108E. I inadvertently attached a version of this document as Exhibit 9 to the Declaration of Mario N. Alioto in support of IPPs' opposition to summary judgment (ECF No. 6307, "Alioto Decl.") that is not marked with the deposition exhibit number.

9.      Attached hereto as Exhibit 7 is a true and correct copy of an excerpt of the deposition transcript of C.C. Liu taken in this matter on February 19, 2013. Mr. Liu was a then-employee of defendant Chunghwa.

10.      On or around August 30, 2022, I downloaded the Insignia Color Television Service Manual attached as Exhibit 14 to Alioto Declaration from the website: https://adjuntos.yoreparo.com/default/0006/55/4924c3ec920af531ed8dbc2530d2381ff034a239.pdf . I last accessed the website on November 2, 2023 and confirmed that the manual is still available to view and download. That Exhibit 14 is in fact an Insignia television manual is demonstrated by a data file produced by Best Buy in this litigation, which maps SKUs to the manufacturer product number (BBYCRT000080) and shows that the TV model IS-TV040919 is listed as having a Manufacturer Name of "INSIGNIA", and a Brand Owner Name of "Insignia."

11.      On or around August 30, 2022, I downloaded the Haier Color Television Manual published by Haier America Trading, LLC that is attached as Exhibit 16 to the Alioto Declaration from the website: https://www.manualslib.com/products/Haier-Tv-8888-36-12474362.html. I last accessed this website on November 2, 2023 and confirmed that the manual is still available to view and download.

12.      On or around August 30, 2022, I downloaded the Haier Color Television Manual published by Haier America Trading, LLC that is attached as Exhibit 17 to the Alioto Declaration from  https://www.manualslib.com/manual/1029851/Haier-Tn201auv.html.  I last accessed this website on November 2, 2023 and confirmed that the manual is still available to view and download.

2

13.     In April 2019, I downloaded the Irico Group Electronics Co. Ltd. Global Offering Prospectus, dated December 8, 2004 (the "Prospectus"), which is attached as Exhibit 25 to the Alioto Declaration, from Irico's website, http://www.irico.com.cn/en/wp-content/uploads/2014/04/LTN20041208000.pdf.   IPPs filed the Prospectus as Exhibit 18 to the Alioto Declaration filed in support of IPPs' opposition to Irico's motion to dismiss on FSIA grounds. *See* ECF No. 5440-1 ¶ 18. When I attempted to re-access the website prior to filing IPPs' opposition to Irico's motion for summary judgment and again in connection with IPPs' Surreply, I found that the link is broken. I searched for the Prospectus on Irico's website, but it is no longer available.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of November 2023 in Novato, California.

*/s/ Lauren Capurro*
Lauren Capurro

DECLARATION OF LAUREN C. CAPURRO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' SURREPLY IN OPPOSITION TO IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD.'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 07-cv-5944-JST, MDL NO. 1917

# EXHIBIT 1

## CRT INDIRECT-PURCHASER CLASS SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into this 8th day of April, 2009, by and between defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa") and the plaintiff class representatives ("Plaintiffs"), both individually and on behalf of a settlement class of indirect purchasers of Cathode Ray Tube ("CRT") products (the "Class") as more particularly defined in paragraph A.1 below.

WHEREAS, Plaintiffs are prosecuting the *In re Cathode Ray Tube (CRT) Antitrust Litigation*, MDL No. 1917 (N.D. Cal.) (the "Action") on their own behalf and on behalf of the Class against, among others, Chunghwa;

WHEREAS, Plaintiffs allege that Chunghwa participated in an unlawful conspiracy to raise, fix, maintain, or stabilize the price of CRT products at artificially high levels in violation of various federal and state statutes;

WHEREAS, Chunghwa denies Plaintiffs' allegations and believes it has defenses to Plaintiffs' claims;

WHEREAS, Plaintiffs have conducted an investigation into the facts and the law regarding the Action and have concluded that resolving claims against Chunghwa according to the terms set forth below is in the best interest of Plaintiffs and the Class;

WHEREAS, Chunghwa, despite its belief that it is not liable for the claims asserted and has good defenses thereto, has nevertheless agreed to enter into this Agreement to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, and to obtain the releases, orders, and judgment contemplated by this Agreement, and to put to rest with finality all claims that have been or could have been asserted against Chunghwa based on the allegations of the Action, as more particularly set out below;

NOW, THEREFORE, in consideration of the covenants, agreements, and releases set forth herein and for other good and valuable consideration, it is agreed by and among the undersigned that the Action be settled, compromised, and dismissed on the merits with prejudice as to Chunghwa, as defined below, and except as hereinafter provided, without costs to Plaintiffs, the Class, or Chunghwa, subject to the approval of the Court, on the following terms and conditions:

A.    Definitions.

1.    For purposes of this Agreement, "the Class" and "Class Period" are as defined in Plaintiffs' operative complaint at the time this Agreement is presented for preliminary approval, except that "the Class" shall include all indirect purchasers of CRT products during the Class Period who could assert antitrust or similar claims against Chunghwa under the laws of the United States or any State (except to the extent the claims are included in the direct purchaser settlement class).

2.    For purposes of this Agreement, "CRT products" are defined to mean cathode ray tubes of any type (e.g., color display tubes, color picture tubes, and monochrome display tubes) and products containing cathode ray tubes.

3.    "Chunghwa Releasees" shall refer to Chunghwa and to all of its respective past and present, direct and indirect, parent companies, subsidiaries, and affiliates; the predecessors, successors and assigns of any of the above; and each and all of the present and former principals, partners, officers, directors, supervisors, employees, representatives, insurers, attorneys, heirs, executors, administrators, and assigns of each of the foregoing. "Chunghwa Releasees" does not include defendants Tatung Company, Tatung Company of America, Inc. or any other defendant in the Action other than Chunghwa.

2

4.     "Class Member" means each member of the Class who has not timely elected to be excluded from the Class.

5.     "Releasors" shall refer to the plaintiff class representatives and Class Members, and to their past and present officers, directors, employees, agents, stockholders, attorneys, servants, representatives, parent companies, subsidiaries, affiliates, partners, insurers and all other persons, partnerships or corporations with whom any of the former have been, or are now, affiliated, and the predecessors, successors, heirs, executives, administrators and assigns of any of the foregoing.

6.     "The Settlement Fund" shall be $10,000,000 in United States Dollars, plus accrued interest on said deposits as set forth in paragraph 17.

7.     "Lead Counsel" shall refer to:

Trump, Alioto, Trump & Prescott LLP
2280 Union Street
San Francisco, CA 94123
c/o Mario N. Alioto

B.     Approval Of This Agreement And Dismissal Of Claims Against Chunghwa.

8.     Plaintiffs and Chunghwa shall use their best efforts to effectuate this Agreement, including cooperating in seeking the Court's approval for the establishment of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23(c) and (e)) to secure the prompt, complete, and final dismissal with prejudice of the Action as to the Chunghwa Releasees only.

9.     Plaintiffs shall, at such time as they see fit, submit to the Court a motion for authorization to disseminate notice of the settlement, class certification, and final judgment contemplated by this Agreement to all Class Members (the "Motion"). If notice to the Class is

3

given jointly with any other settling defendant, for purposes of paragraph 19 below, the costs of

notice and claims administration shall be prorated with any other such defendant based on their

respective settlement amounts. The Motion shall include: (i) a proposed form of, method for,

and date of dissemination of notice; and (ii) a proposed form of order and final judgment. The

text of the foregoing items (i) and (ii) shall be agreed upon by Plaintiffs and Chunghwa before

submission of the Motion. The Motion shall recite and ask the Court to find that the proposed

form of and method for dissemination of the notice of settlement constitutes valid, due, and

sufficient notice to the Class, constitutes the best notice practicable under the circumstances, and

complies fully with the requirements of Federal Rules of Civil Procedure 23.

           10.     Plaintiffs and Chunghwa shall jointly seek entry of an order and final

judgment, the text of which Plaintiffs and Chunghwa shall agree upon. The terms of that order

and final judgment will include, at a minimum, the substance of the following provisions:

           (a)     certifying the Class described in paragraph 1, pursuant to Rule 23 of the

Federal Rules of Civil Procedure, for purposes of this settlement;

           (b)     as to the Action, approving finally this settlement and its terms as being a

fair, reasonable, and adequate settlement as to the Class Members within the meaning of Rule 23

of the Federal Rules of Civil Procedure and directing its consummation according to its terms;

           (c)     as to the Chunghwa Releasees, directing that the Action be dismissed with

prejudice and, except as provided for in this Agreement, without costs;

           (d)     reserving sole and exclusive jurisdiction over the settlement and this

Agreement, including the administration and consummation of this settlement, to the United

States District Court for the Northern District of California; and

4

(e)    determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing that the judgment of dismissal as to the Chunghwa Releasees shall be final.

11.    This Agreement shall become final when (i) the Court has entered a final order certifying the Class described in paragraph 1 and approving this Agreement under Federal Rule of Civil Procedure 23(e), and a final judgment dismissing the Action with prejudice as to the Chunghwa Releasees against all Class Members and without costs other than those provided for in this Agreement, and (ii) the time for appeal or to seek permission to appeal from the Court's approval of this Agreement and entry of a final judgment as to the Chunghwa Releasees described in (i) hereof has expired or, if appealed, approval of this Agreement and the final judgment as to the Chunghwa Releasees have been affirmed in their entirety by the court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further appeal or review.  It is agreed that the provisions of Rule 60 shall not be taken into account in determining the above-stated times. On the date that Plaintiffs and Chunghwa have executed this Agreement, Plaintiffs and Chunghwa shall be bound by its terms and this Agreement shall not be rescinded except in accordance with paragraphs 17, 18, 24 or 28 of this Agreement.

12.    Neither this Agreement (whether or not it should become final) nor the final judgment, nor any and all negotiations, documents and discussions associated with them, shall be deemed or construed to be an admission by Chunghwa (or the Chunghwa Releasees) or evidence of any violation of any statute or law or of any liability or wrongdoing whatsoever by Chunghwa (or the Chunghwa Releasees), or of the truth of any of the claims or allegations contained in any complaint or any other pleading filed by Plaintiffs in the Action, and evidence

5

thereof shall not be discoverable or used directly or indirectly, in any way, whether in the Action

or in any other action or proceeding. Neither this Agreement, nor any of its terms and

provisions, nor any of the negotiations or proceedings connected with it, nor any other action

taken to carry out this Agreement by any of the settling parties shall be referred to, offered as

evidence or received in evidence in any pending or future civil, criminal, or administrative action

or proceedings, except in a proceeding to enforce this Agreement, or defend against the assertion

of Released Claims, or as otherwise required by law.

C.    Release, Discharge, And Covenant Not To Sue.

13.    In addition to the effect of any final judgment entered in accordance with

this Agreement, upon this Agreement becoming final as set out in paragraph 11 of this

Agreement, and in consideration of payment of the Settlement Fund, as specified in paragraph 16

of this Agreement, and for other valuable consideration, the Chunghwa Releasees shall be

completely released, acquitted, and forever discharged from any and all claims, demands,

actions, suits, causes of action, whether class, individual, or otherwise (whether or not any Class

Member has objected to the settlement or makes a claim upon or participates in the Settlement

Fund, whether directly, representatively, derivatively, or in any other capacity) that Releasors, or

each of them, ever had, now has, or hereafter can, shall, or may have on account of, or in any

way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or

unsuspected injuries, damages, and consequences thereof in any way arising out of or relating in

any way to any act or omission of the Chunghwa Releasees (or any of them) concerning the

manufacture, supply, distribution, sale or pricing of CRT products up to the date of execution of

this Agreement, including but not limited to any conduct alleged, and causes of action asserted or

that could have been alleged or asserted, in class action complaints filed in this Action, including

6

those arising under any federal or state antitrust, unfair competition, unfair practices, price discrimination, unitary pricing, or trade practice law (the "Released Claims"). However, the Released Claims shall only include sales of CRT products that are subject to the antitrust laws of the United States or any State, and further, the Released Claims shall not preclude Plaintiffs from pursuing any and all of their claims against other defendants for the sale of products that contain CRTs made by Chunghwa. Releasors shall not, after the date of this Agreement, seek to establish liability against any Chunghwa Releasee based, in whole or in part, upon any of the Released Claims or conduct at issue in the Released Claims. Nothing in this Agreement shall be construed to release any other claims, including but not limited to claims for product defect or personal injury.

14.   In addition to the provisions of paragraph 13 of this Agreement, Releasors hereby expressly waive and release, upon this Agreement becoming final, any and all provisions, rights, and benefits conferred by § 1542 of the California Civil Code, which states:

> CERTAIN CLAIMS NOT AFFECTED BY GENERAL
> RELEASE.  A GENERAL RELEASE DOES NOT
> EXTEND TO CLAIMS WHICH THE CREDITOR DOES
> NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR
> AT THE TIME OF EXECUTING THE RELEASE,
> WHICH IF KNOWN BY HIM MUST HAVE
> MATERIALLY AFFECTED HIS SETTLEMENT WITH
> THE DEBTOR[ ];

or by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code. Each Releasor may hereafter discover facts other than or different from those which he, she, or it knows or believes to be true with respect to the claims which are the subject matter of the provisions of paragraph 13 of this Agreement, but each Releasor hereby expressly waives and fully, finally, and forever settles and releases, upon this Agreement becoming final, any known or unknown, suspected or

7

unsuspected, contingent or non-contingent claim with respect to the subject matter of the
provisions of paragraph 13 of this Agreement, whether or not concealed or hidden, without
regard to the subsequent discovery or existence of such different or additional facts.

15.     The release, discharge, and covenant not to sue set forth in paragraph 13
of this Agreement does not include claims by any of the Class Members other than the Released
Claims and does not include other claims, such as those solely arising out of product liability or
breach of contract claims in the ordinary course of business not covered by the Released Claims.
Further, the release, discharge, and covenant not to sue set forth in paragraph 13 of this
Agreement includes only indirect-purchaser claims.

D.      Settlement Amount.

16.     Subject to the provisions hereof, and in full, complete, and final settlement of the
Action as provided herein, defendant Chunghwa shall pay $10,000,000 in United States Dollars
into an escrow account to be administered in accordance with the provisions of paragraph 17 of
this Agreement (the "Escrow Account") as follows: $1,000,000 to be paid by August 1, 2009;
$4,500,000 to be paid by January 10, 2010; and $4,500,000 to be paid by January 10, 2011.
Interest on unpaid amounts shall accrue from 30 days after the execution of this Agreement at the
rate specified in 18 U.S.C. § 3612(f)(2). Any amount paid is nonrefundable in the event
Chunghwa fails to pay any portion of the remaining amount as required by this paragraph (the
"Nonrefundable Amount"). Plaintiffs may retain any Nonrefundable Amount without having to
obtain final approval of this settlement from the Court. Chunghwa agrees that Class Counsel
may apply to the Court to disburse any Nonrefundable Amount for use by Class Counsel in the
prosecution of this litigation. The Settlement Fund will not be reduced by any settlement
between Chunghwa and a Class Member nor by any request for exclusion from the Class.

8

17.     Escrow Account.

(a)     The Escrow Account will be established at Wells Fargo Bank, National Association, with such Bank serving as escrow agent ("Escrow Agent") subject to escrow instructions mutually acceptable to Plaintiffs' Lead Counsel and Chunghwa's attorneys, such escrow to be administered under the Court's continuing supervision and control.

(b)     The Escrow Agent shall cause the funds deposited in the Escrow Account to be invested in instruments backed by the full faith and credit of the United States Government or fully insured by the United States Government or any agency thereof, or money market funds invested substantially in such instruments, and shall reinvest any income from these instruments and the proceeds from these instruments as they mature in similar instruments at their then current market rates.

(c)     All funds held in the Escrow Account shall be deemed and considered to be in custodia legis of the Court, and shall remain subject to the sole and exclusive jurisdiction of the Court, until such time as such funds shall be distributed pursuant to this Agreement and/or further order(s) of the Court.

(d)     Plaintiffs and Chunghwa agree to treat the Settlement Fund as being at all times a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B-1. In addition, the Escrow Agent shall timely make such elections as necessary or advisable to carry out the provisions of this paragraph 17, including the "relation-back election" (as defined in Treas. Reg. § 1.468B-1) back to the earliest permitted date. Such elections shall be made in compliance with the procedures and requirements contained in such regulations. It shall be the responsibility of the Escrow Agent to timely and properly prepare and deliver the necessary documentation for signature by all necessary parties, and thereafter to cause the appropriate filing to occur.

9

(e)     For the purpose of § 468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" shall be the Escrow Agent. The Escrow Agent shall timely and properly file all informational and other tax returns necessary or advisable with respect to the Settlement Fund (including without limitation the returns described in Treas. Reg. § 1.468B-2(k)(1)). Such returns (as well as the election described in paragraph 17(d)) shall be consistent with paragraph 17(d) and in all events shall reflect that all Taxes, as defined below (including any estimated Taxes, interest, or penalties). on the income earned by the Settlement Fund shall be paid out of the Settlement Fund as provided in 17(f) hereof.

(f)     All (i) taxes (including any estimated taxes, interest, or penalties) arising with respect to the income earned by the Settlement Fund, including any taxes or tax detriments that may be imposed upon Chunghwa or any other Chunghwa Releasee with respect to any income earned by the Settlement Fund for any period during which the Settlement Fund does not qualify as a "qualified settlement fund" for federal or state income tax purposes ("Taxes"); and (ii) expenses and costs incurred in connection with the operation and implementation of paragraphs 17(d) through 17(f) (including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) the returns described in this paragraph 17(g) ("Tax Expenses")), shall be paid out of the Settlement Fund.

(g)     Neither Chunghwa nor any other Chunghwa Releasee nor their respective counsel shall have any liability or responsibility for the Taxes or Tax Expenses. Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of the Settlement Fund and shall be timely paid by the Escrow Agent out of the Settlement Fund

10

without prior order from the Court and the Escrow Agent shall be obligated (notwithstanding anything herein to the contrary) to withhold from distribution to any claimants authorized by the Court any funds necessary to pay such amounts including the establishment of adequate reserves for any Taxes and Tax Expenses (as well as any amounts that may be required to be withheld under Treas. Reg. § 1.468B-2(1)(2)). Neither Chunghwa nor any other Chunghwa Releasee is responsible nor shall they have any liability therefore. Plaintiffs and Chunghwa agree to cooperate with the Escrow Agent, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of paragraphs 17(d) though (f).

(h)     If this Agreement does not receive final Court approval, or if the Action is not certified as a class action for settlement purposes, then all amounts paid by Chunghwa into the Settlement Fund (other than notice costs expended in accordance with paragraph 19(a)) shall be promptly returned to Chunghwa from the Escrow Account by the Escrow Agent along with any interest accrued thereon. If this Agreement does not receive final Court approval because Chunghwa fails to make a payment and Plaintiffs are excused from obtaining final Court approval as set forth in paragraph 16, any Nonrefundable Amount as defined in that paragraph shall not be returned.

18.     Exclusions. Lead Counsel will cause copies of requests for exclusion from the Class to be provided to counsel for Chunghwa. To the extent that Class Members (or any of them) reasonably believed by Chunghwa to represent purchases of more than $100,000,000 of CRT products from Chunghwa during the Class Period opt out of the Class, Chunghwa may, if acting reasonably and in good faith, terminate the Agreement within sixty (60) days of receipt of the final list of exclusions.

11

19.    Payment Of Expenses.

(a)    Chunghwa agrees to permit use of a maximum of $500,000 of the Settlement Fund towards notice to the Class and notice administration costs. The $500,000 in notice and administration expenses are not recoverable if this settlement does not become final. Other than as set forth in this paragraph 19(a) and except as Plaintiffs' counsel ("Class Counsel") shall apply for reimbursement of costs and attorneys' fees pursuant to paragraph 23 below, neither Chunghwa nor any of the other Chunghwa Releasees under this Agreement shall be liable for any of the costs or expenses of the litigation of the Action, including attorneys' fees; fees and expenses of expert witnesses and consultants; and costs and expenses associated with discovery, motion practice, hearings before the Court or any Special Master, appeals, trials or negotiation of other settlements, or for Class administration and costs.

(b)    If Lead Counsel enters into any other settlements on behalf of the Class before notice of this Agreement is given to the Class, Lead Counsel shall use their reasonable best efforts to provide a single notice to prospective Class Members of all of the settlements.

E.    The Settlement Fund.

20.    Releasors shall look solely to the Settlement Fund for settlement and satisfaction against the Chunghwa Releasees of all Released Claims, and shall have no other recovery against Chunghwa or any other Chunghwa Releasee.

21.    After this Agreement becomes final within the meaning of paragraph 11, the Settlement Fund shall be distributed in accordance with the plan to be submitted at the appropriate time by Plaintiffs, subject to approval by the Court. In no event shall any Chunghwa Releasee have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, or administration of the Settlement Fund, including, but not limited to,

12

the costs and expenses of such distribution and administration, with the sole exception of the provisions set forth in paragraph 19(a) of this Agreement.

22.     Plaintiffs and Class Counsel shall be reimbursed and indemnified solely out of the Settlement Fund for all expenses. The Chunghwa Releasees shall not be liable for any costs, fees, or expenses of any of Plaintiffs' or the Class' respective attorneys, experts, advisors, agents, or representatives, but all such costs, fees, and expenses as approved by the Court shall be paid out of the Settlement Fund.

23.     Class Counsel's Attorneys' Fees And Reimbursement Of Expenses.

(a)     After this Settlement becomes final, Class Counsel may submit an application or applications to the Court for payment of attorneys' fees and reimbursement of expenses (the "Fee and Expense Application") for distribution to them from the Settlement Fund. Chunghwa shall not oppose such application(s) for: (i) an award of attorneys' fees not in excess of one-third of the Settlement Fund; plus (ii) reimbursement of expenses and costs incurred, or to be incurred, in connection with prosecuting the Action, plus interest on such attorneys' fees, costs, and expenses at the same rate and for the same period as earned by the Settlement Fund (until paid) as may be awarded by the Court (the "Fee and Expense Award"). Class Counsel reserve the right to make additional applications for fees and expenses incurred, but in no event shall Chunghwa Releasees be responsible to pay any such additional fees and expenses except to the extent they are paid out of the Settlement Fund. In addition, after final approval, Class Counsel may apply to use any amount paid by Chunghwa to pay the past or future expenses of this litigation.

(b)     The Fee and Expense Award, as approved by the Court, shall be paid solely from the Settlement Fund. Lead Counsel shall allocate the attorneys' fees among Class

13

Counsel in a manner which they in good faith believe reflects the contributions of such counsel to the prosecution and settlement of the Action.

(c) The procedure for and the allowance or disallowance by the Court of the application by Class Counsel for attorneys' fees, costs and expenses to be paid out of the Settlement Fund are not part of this Agreement, and are to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the settlement, and any order or proceeding relating to the Fee and Expense Application, or any appeal from any such order shall not operate to terminate or cancel this Agreement, or affect or delay the finality of the judgment approving settlement.

(d) Neither Chunghwa nor any other Chunghwa Releasee under this Agreement shall have any responsibility for, or interest in, or liability whatsoever with respect to any payment to Class Counsel of any Fee and Expense Award in the Action.

(e) Neither Chunghwa nor any other Chunghwa Releasee under this Agreement shall have any responsibility for, or interest in, or liability whatsoever with respect to the allocation among Class Counsel, and/or any other person who may assert some claim thereto, of any Fee and Expense Award that the Court may make in the Action.

F. Cooperation.

24. Chunghwa agrees to cooperate with Plaintiffs, to the extent consistent with Chunghwa's obligations to the U.S. Department of Justice ("DOJ"), by (i) promptly providing a full account to Lead Counsel of all facts known to Chunghwa that are relevant to the Action, (ii) producing in the United States relevant documents relating to sales, pricing, capacity, production, and damages, including English translations to the extent reasonably required, as well as documents (including English translations) sufficient to evidence any collusive meetings among

14

CRT makers and the manner in which any alleged conspiracy was formed, implemented, and enforced, to the extent known by Chunghwa, (iii) making available appropriate employees for such interviews and depositions as are reasonably required by Lead Counsel, and (iv) producing at trial in person, by deposition, or affidavit, whichever is legally necessary and reasonably possible, representatives to testify as reasonably required by Lead Counsel. Nothing in this paragraph 24, or any other part of this Agreement, shall be construed or interpreted to be inconsistent with the discovery stay in place in this Action. Any cooperation by Chunghwa pursuant to this paragraph 24 will be consistent with the terms of the discovery stay and Chunghwa's continuing obligations to the DOJ. If Chunghwa fails to cooperate as set forth in this paragraph 24, Plaintiffs may, if acting reasonably and in good faith, terminate the Agreement.

25.    Plaintiffs and Lead Counsel agree they will not use the information provided by Chunghwa as part of its cooperation for any purpose other than pursuit of the Action and, even after the lifting of the discovery stay, will not publicize the information beyond what is reasonably necessary for the prosecution of the Action or as otherwise required by law. Any documents and other information provided will be deemed "Highly Confidential" and subject to the protective order entered in the Action as if they had been produced in response to discovery requests.

26.    Except as provided in paragraph 24 of this Agreement, Chunghwa need not respond to formal discovery from Plaintiffs, respond to the complaint, or otherwise participate in the Action during the pendency of the Agreement. Neither Chunghwa nor Plaintiffs shall file motions against the other during the pendency of the Agreement. In the event that the Agreement is not approved by the Court, or Chunghwa fails to timely make the

15

payments required under paragraph 16, or the Agreement otherwise terminates, Chunghwa and Plaintiffs will each be bound by and have the benefit of any rulings made in the Action to the extent they would have been applicable to Chunghwa or Plaintiffs had Chunghwa been participating in the Action.

27.     Chunghwa agrees that it will not disclose publicly or to any other defendant the terms of this Agreement until the Agreement is submitted to the Court for approval. Chunghwa also agrees that it will not disclose publicly or to any other defendant the information provided to Plaintiffs pursuant to this Agreement, except as otherwise required by law.

G.     Rescission If This Agreement Is Not Approved Or Final Judgment Is Not Entered.

28.     If the Court refuses to approve this Agreement or any part hereof, or if such approval is modified or set aside on appeal, or if the Court does not certify for purposes of this settlement the Class described in paragraph 1, or if the Court does not enter the final judgment. or if final judgment is entered and appellate review is sought, and on such review, such final judgment is not affirmed in its entirety, then Chunghwa and the Plaintiffs shall each, in their sole discretion, have the option to rescind this Agreement in its entirety. Written notice of the exercise of any such right to rescind shall be made according to the terms of paragraph 39. A modification or reversal on appeal of any amount of Class Counsel's fees and expenses awarded by the Court from the Settlement Fund shall not be deemed a modification of all or a part of the terms of this Agreement or such final judgment.

29.     In the event that this Agreement does not become final, then this Agreement shall be of no force or effect and any and all parts of the Settlement Fund caused to be deposited in the Escrow Account (including interest earned thereon) shall be returned

16

forthwith to Chunghwa less only disbursements made in accordance with this Agreement. If this Agreement does not become final because Chunghwa fails to make a payment and Plaintiffs are excused from obtaining final Court approval as set forth in paragraph 16, any Nonrefundable Amount as defined in that paragraph shall not be returned. Chunghwa expressly reserves all of its rights if this Agreement does not become final. Further, and in any event, Plaintiffs and Chunghwa agree that this Agreement, whether or not it shall become final, and any and all negotiations, documents, and discussions associated with it, shall not be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing whatsoever by Chunghwa (or the Chunghwa Releasees), or of the truth of any of the claims or allegations contained in the complaint or any other pleading filed by Plaintiffs in the Action, and evidence thereof shall not be discoverable or used directly or indirectly, in any way, whether in the Action or in any other action or proceeding.

30.     This Agreement shall be construed and interpreted to effectuate the intent of the parties, which is to provide, through this Agreement, for a complete resolution of the relevant claims with respect to each Chunghwa Releasee as provided in this Agreement.

31.     The parties to this Agreement contemplate and agree that, prior to final approval of the settlement as provided for in paragraph 10 of this Agreement, appropriate notice of (a) the settlement; and (b) a hearing at which the Court will consider the approval of this Settlement Agreement will be given to Class Members.

H.      Miscellaneous.

32.     This Agreement does not settle or compromise any claim by Plaintiffs or any Class Member asserted in the complaint against any defendant or alleged co-conspirator other than the Chunghwa Releasees. All rights against such other defendants or alleged co-

17

conspirators are specifically reserved by Plaintiffs and the Class. Chunghwa's sales to the Class shall not be removed from the Action.

33.    This Agreement shall not affect whatever rights Releasors or any of them may have (i) to seek damages or other relief from any other person with respect to any purchases of CRT products that are not subject to the antitrust laws of the United States; (ii) to participate in or benefit from, where appropriate, any relief or other recovery as part of a settlement or judgment in any action on behalf of any indirect purchasers of CRT products; (iii) to participate in or benefit from any relief or recovery as part of a judgment or settlement in this action against any other party named as a defendant (other than a Chunghwa Releasee); or (iv) to assert any product liability or breach of contract claims in the ordinary course of business which are not covered by the Released Claims.

34.    The United States District Court for the Northern District of California shall retain sole and exclusive jurisdiction over the implementation, enforcement, and performance of this Agreement, and shall have sole and exclusive jurisdiction over any suit, action, proceeding, or dispute arising out of or relating to this Agreement or the applicability of this Agreement that cannot be resolved by negotiation and agreement by Plaintiffs and Chunghwa. This Agreement shall be governed by and interpreted according to the substantive laws of the state of California without regard to its choice of law or conflict of laws principles.

35.    This Agreement constitutes the entire, complete, and integrated agreement between Plaintiffs and Chunghwa pertaining to the settlement of the Action against Chunghwa, and supersedes all prior and contemporaneous undertakings of Plaintiffs and Chunghwa in connection herewith. This Agreement may not be modified or amended except in writing executed by Plaintiffs and Chunghwa, and approved by the Court.

18

36.     This Agreement shall be binding upon, and inure to the benefit of, the
successors and assigns of Plaintiffs and Chunghwa. Without limiting the generality of the
foregoing, each and every covenant and agreement made herein by Plaintiffs or Lead Counsel
shall be binding upon all Class Members and Releasors. The Chunghwa Releasees (other than
Chunghwa, which is a party hereto) are third-party beneficiaries of this Agreement and are
authorized to enforce its terms applicable to them.

37.     This Agreement may be executed in counterparts by Plaintiffs and
Chunghwa, and a facsimile signature shall be deemed an original signature for purposes of
executing this Agreement.

38.     Neither Plaintiffs nor Chunghwa shall be considered the drafter of this
Agreement or any of its provisions for the purpose of any statute, case law, or rule of
interpretation or construction that would or might cause any provision to be construed against the
drafter of this Agreement.

39.     Where this Agreement requires either party to provide notice or any other
communication or document to the other, such notice shall be in writing, and such notice,
communication, or document shall be provided by facsimile or letter by overnight delivery to the
undersigned counsel of record for the party to whom notice is being provided.

41.     Each of the undersigned attorneys represents that he or she is fully
authorized to enter into the terms and conditions of, and to execute, this Agreement, subject to
Court approval.

19

Dated: March 21, 2009

_Mario N. Alioto_

Mario N. Alioto
Trump, Alioto, Trump & Prescott LLP
2280 Union Street
San Francisco, CA 94123

*Interim Lead Counsel and Attorneys for the*
*Indirect Purchaser Class*

Dated: March 28, 2009

_H Y CHUANG YZ_

*Officer of Chunghwa Picture Tubes, Ltd.*

Dated: April 8, 2009

_Joel S. Sanders_

Joel S. Sanders
Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105

*Attorney for Chunghwa Picture Tubes, Ltd.*

100597709_2 DOC

20

# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT)<br>ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL INDIRECT-PURCHASER<br>ACTIONS | Master File No. CV-07-5944 SC<br><br>MDL No. 1917 |

<u>SETTLEMENT AGREEMENT</u>

This Settlement Agreement ("Agreement") is made and entered into this 26th day of January, 2015 ("Execution Date"), by and between Koninklijke Philips N.V. (f/n/a Koninklijke Philips Electronics N.V.), Philips Electronics North America Corporation, Philips Taiwan Limited (f/n/a Philips Electronics Industries (Taiwan), Ltd.), and Philips do Brasil, Ltda. (f/n/a Philips da Amazonia Industria Electronica Ltda.) (collectively "Philips") and the indirect-purchaser plaintiff class representatives ("Plaintiffs"), both individually and on behalf of a settlement class ("The Class") of indirect purchasers of Cathode Ray Tube (CRT) Products as more particularly defined in paragraphs A.1 and 2 below.

WHEREAS, Plaintiffs are prosecuting the above *In Re Cathode Ray Tube* (CRT) *Antitrust Litigation*, MDL No. 1917 (N.D. Cal.) (the "Action") on their own behalf and on behalf of the Class against, among others, Philips;

WHEREAS, Plaintiffs allege that Philips participated in an unlawful conspiracy to raise, fix, maintain, or stabilize the price of CRT Products at artificially high levels in violation of Section 1 of the Sherman Act and various state statutes;

WHEREAS, Philips denies Plaintiffs' allegations and has asserted defenses to Plaintiffs' claims;

WHEREAS, Plaintiffs have conducted an investigation into the facts and the law regarding the Action and have concluded that resolving claims against Philips according to the terms set forth below is in the best interest of Plaintiffs and the Class;

WHEREAS, Philips, despite its belief that it is not liable for the claims asserted and has good defenses thereto, has nevertheless agreed to enter into this Agreement to avoid

1

further expense, inconvenience, and the distraction of burdensome and protracted litigation, and to obtain the releases, orders, and judgment contemplated by this Agreement, and to put to rest with finality all claims that have been or could have been asserted against Philips based on the allegations of the Action, as more particularly set out below;

NOW, THEREFORE, in consideration of the covenants, agreements, and releases set forth herein and for other good and valuable consideration, it is agreed by and among the undersigned that the Action be settled, compromised, and dismissed on the merits with prejudice as to the Philips Releasees, as defined below, and except as hereinafter provided, without costs as to Plaintiffs, the Class, or Philips, subject to the approval of the Court, on the following terms and conditions:

A.      Definitions.

1.      For purposes of this Agreement, "the Class" and "Class Period" are defined in Plaintiffs' Fourth Consolidated Amended Complaint or, if that Complaint is amended, the operative complaint at the time this agreement is presented for preliminary approval. The parties to this Agreement hereby stipulate for purposes of this settlement only that the requirements of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure are satisfied.

2.      For purposes of this Agreement, "CRT Products" shall have the meaning as defined in the Fourth Consolidated Amended Complaint or, if that Complaint is amended, the operative complaint at the time this agreement is presented for preliminary approval.

3.      "Philips Releasees" shall refer, jointly and severally, individually and collectively, to the entities that are referred to collectively as "Philips" in paragraph 58 of the Fourth Consolidated Amended Complaint, and to all of its respective past and present, direct and indirect, parents, subsidiaries, affiliates, unincorporated entities, divisions, and groups; the predecessors, successors and assigns of any of the above, and each and all of the present and former principals, partners, officers, directors, supervisors, employees, agents, representatives, insurers, attorneys, heirs, executors, administrators, and assigns of each of the foregoing. "Philips Releasees" does not include any defendant in the Action other than "Philips." For avoidance of doubt, Released Claims include those against Philips Releasees relating to, arising out of, or based on any ownership, agency, management, or financial or other relationship between Philips Releasees, on the one hand, and LP Display International, Ltd. ("LPDI"), LG.Philips Displays Holding B.V. ("LPDH") or any of LPDI's or LPDH's subsidiaries or

affiliates, on the other hand.

      4.   "Class Member" means each member of the Class who has not timely elected to be excluded from the Class.

      5.   "Releasors" shall refer to the indirect-purchaser plaintiff class representatives and the indirect-purchaser plaintiff Class Members, and to their past and present officers, directors, employees, agents, stockholders, attorneys, servants, representatives, parents, subsidiaries, affiliates, partners, insurers and all other persons, partnerships or corporations with whom any of the former have been, or are now, affiliated, and the predecessors, successors, heirs, executives, administrators and assigns of any of the foregoing.

      6.   "The Settlement Fund" shall be $175,000,000 as specified in paragraph 16, plus accrued interest on said deposits set forth in paragraph 17.

      7.  "Class Counsel" shall refer to :

        Mario N. Alioto

        Trump, Alioto, Trump & Prescott LLP

        2280 Union Street

        San Francisco, CA 94123

    B.    <u>Approval of this Agreement and Dismissal of Claims Against Philips</u>.

      8.  Plaintiffs and Philips shall use their best efforts to effectuate this Agreement, including cooperating in seeking the Court's approval for the establishment of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23 (e)) to secure the complete, and final dismissal with prejudice of the Action as to Philips Releasees only.

      9.   Plaintiffs shall, at such time as they see fit, but without unreasonable delay, submit to the Court a motion for authorization to disseminate notice of the settlement and final judgment contemplated by this Agreement to all Class Members (the "Motion"). If notice to the class is given jointly with a notice of settlement(s) with any other settling defendant, for purposes of paragraph 19 below, the costs of notice and claims administration shall be prorated with any other such defendant based on their respective settlement amounts. The Motion shall include (i) a proposed form of, method for, and date of dissemination of notice; and (ii) a proposed form of order and final judgment. The text of the foregoing items (i) and (ii) shall be agreed upon by Plaintiffs and Philips before submission of the Motion. The Motion shall recite and ask the Court to find that the proposed form of and method for dissemination of the notice of settlement constitutes valid, due and sufficient notice to the

Class, constitutes the best notice practicable under the circumstances, and complies fully with the requirements of Federal Rule of Civil Procedure 23. The costs and expenses of notice and claims administration shall be paid solely from the Settlement Fund, as provided in paragraph 19(a).

10. Plaintiffs shall seek, and Philips will not object unreasonably to the entry of an order and final judgment, the text of which Plaintiffs and Philips shall agree upon. The terms of that order and the final judgment will include, at a minimum, the substance of the following provisions that:

a. as to the Action, approving finally this settlement and its terms as being a fair, reasonable and adequate settlement as to the Class Members within the meaning of Rule 23 of the Federal Rules of Civil Procedure and directing its consummation according to its terms;

b. as to Philips, directing that the action be dismissed with prejudice and, except as provided for in this Agreement, without costs;

c. reserving exclusive jurisdiction over the settlement and this Agreement, including the administration and consummation of this settlement to the United States District Court for the Northern District of California; and

d. determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing that the judgment of dismissal as to Philips shall be final.

11. This Agreement shall become final when (i) the Court has entered a final order approving this Agreement under Federal Rule of Civil Procedure 23(e) and a final judgment dismissing the Action with prejudice as to Philips Releasees against all Class Members and without costs other than those provided for in this Agreement, and (ii) the time for appeal or to seek permission to appeal from the Court's approval of this Agreement and entry of a final judgment as to Philips Releasees described in (i) hereof has expired or, if appealed, approval of this Agreement and the final judgment as to Philips Releasees have been affirmed in their entirety by the Court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further appeal or review. It is agreed that the provisions of Rule 60 of the Federal Rules of Civil Procedure shall not be taken into account in determining the above-stated times. Upon the Execution Date, Plaintiffs and Philips shall be bound by the terms of this Agreement and this Agreement shall not be rescinded except in accordance with paragraphs 17(h), 24 or 28-29 of this Agreement.

12.     Neither this Agreement (whether or not it should become final) nor the final judgment, nor any and all negotiations, documents and discussions associated with them, shall be deemed or construed to be an admission by Philips (or the Philips Releasees) or evidence of any violation of any statute or law or of any liability or wrongdoing whatsoever by Philips (or the Philips Releasees), or of the truth of any of the claims or allegations contained in any complaint or any other pleading filed by Plaintiffs in the Action, and evidence thereof shall not be discoverable or used directly or indirectly, in any way, whether in the Action or in any other action or proceeding.  Neither this Agreement, nor any of its terms and provisions, nor any of the negotiations or proceedings connected with it, nor any other action taken to carry out this Agreement by any of the settling parties shall be referred to, offered as evidence or received in evidence in any pending or future civil, criminal, or administrative action or proceedings, except in a proceeding to enforce this Agreement, or to defend against the assertion of Released Claims, or as otherwise required by law.

C.     Release, Discharge, and Covenant Not to Sue.

13.     In addition to the effect of any final judgment entered in accordance with this Agreement, upon this Agreement becoming final as set out in Paragraph 11 of this Agreement, and in consideration of payment of the Settlement Amount, as specified in Paragraph 16 of this Agreement, into the Settlement Fund, and for other valuable consideration, the Philips Releasees shall be completely released, acquitted, and forever discharged from any and all claims, demands, actions, suits, causes of action, whether class, individual, or otherwise in nature (whether or not any Class Member has objected to the settlement or makes a claim upon or participates in the Settlement Fund, whether directly, representatively, derivatively or in any other capacity) that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected, actual or contingent, liquidated or unliquidated claims, injuries, damages, including damages based on any joint and several liability basis or theory, liabilities of any kind, including costs or losses of any kind or nature, expenses or penalties, including any treble or enhanced damages of any kind, and the consequences thereof in any way arising out of or relating in any way to any act or omission of the Philips Releasees (or any of them) concerning the manufacture, supply, distribution, sale or pricing of CRT Products up to the date of execution of this Agreement, including but not limited to any conduct alleged, and causes of action asserted or that could have been alleged or asserted, in any class action complaints filed in the Action, including those arising under any

federal or state antitrust, unfair competition, unfair practices, price discrimination, unitary pricing, or trade practice law, (the "Released Claims"). However, the Released Claims shall only include sales of CRT Products that are subject to the antitrust laws asserted in the Fourth Consolidated Amended Complaint or, if that Complaint is amended, the operative complaint at the time this agreement is presented for preliminary approval and further, the Released Claims shall not preclude Plaintiffs from pursuing any and all claims against other defendants for the sale of CRT Products by those defendants, or their co-conspirators, which contain Philips' CRT Products. Releasors shall not, after the Execution Date, seek to establish liability against any Philips Releasee based, in whole or in part, upon any of the Released Claims or conduct at issue in the Released Claims, except that Releasors may continue to assert that Philips participated in the alleged conspiracy for purposes of establishing alleged liability as to defendants other than Philips Releasees. Nothing in this Agreement shall be construed to release any other claims, including but not limited to the claims for product defect or personal injury.

14. In addition to the provisions of Paragraph 13 of this Agreement, Releasors hereby expressly waive and release, upon this Agreement becoming final, any and all provisions, rights, and benefits conferred by § 1542 of the California Civil Code, which states:

> CERTAIN CLAIMS NOT AFFECTED BY GENERAL RELEASE. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR;

or by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to §1542 of the California Civil Code. Each Releasor may hereafter discover facts other than or different from those which he, she, or it knows or believes to be true with respect to the claims which are the subject matter of the provisions of Paragraph 13 of this Agreement, but each Releasor hereby expressly waives and fully, finally, and forever settles and releases, upon this Agreement becoming final, any known or unknown, suspected or unsuspected, contingent or non-contingent claim with respect to the subject matter of the provisions of Paragraph 13 of this Agreement, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts.

15. The release, discharge, and covenant not to sue set forth in Paragraph 13 of this Agreement does not include claims by any of the Class Members other than the Released Claims and does not include other claims, such as those solely arising out of product

liability or breach of contract claims in the ordinary course of business not covered by the Released Claims. The Releasors hereby covenant and agree that they shall not, hereafter, sue or otherwise seek to establish liability against any of the Philips Releasees based, in whole or in part, upon any of the Released Claims.

        D.     <u>Settlement Amount</u>.

        16.     Subject to the provisions hereof, and in full, complete and final settlement of the Action as provided herein, defendant Philips shall pay the Settlement Amount of $175,000,000 in United States Dollars (the "Settlement Amount"). The Settlement Amount shall be paid into an escrow account in United States Dollars to be administered in accordance with the provisions of Paragraph 17 of this Agreement (the "Escrow Account") thirty (30) days after the Execution Date.

        17.     <u>Escrow Account</u>.

        a.     The Escrow Account will be established at Wells Fargo Bank, National Association, with such Bank serving as escrow agent ("Escrow Agent") subject to escrow instructions mutually acceptable to Class Counsel and Philips, such escrow to be administered under the Court's continuing supervision and control.

        b.     The Escrow Agent shall cause the funds deposited in the Escrow Account to be invested in short-term instruments backed by the full faith and credit of the United States Government or fully insured in writing by the United States Government, or money market funds rated Aaa and AAA, respectively by Moody's Investor Services and Standard and Poor's, invested substantially in such instruments, and shall reinvest any income from these instruments and the proceeds of these instruments as they mature in similar instruments at their then current market rates.

        c.     All funds held in the Escrow Account shall be deemed and considered to be in <u>custodia legis</u> of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant to this Agreement and/or further order(s) of the Court.

        d.     Plaintiffs and Philips agree to treat the Settlement Fund as being at all times a qualified settlement fund within the meaning of Treas. Reg. §1.468B-l. In addition, the Escrow Agent shall timely make such elections as necessary or advisable to carry out the provisions of this paragraph 17, including the relation-back election (as defined in Treas. Reg. §1.468B-1) back to the earliest permitted date. Such elections shall be made in compliance with the procedures and requirements contained in such regulations. It shall be

the responsibility of the Escrow Agent to timely and properly prepare and deliver the
necessary documentation for signature by all necessary parties, and thereafter to cause the
appropriate filing to occur.

   e. For the purpose of §468B of the Internal Revenue Code of 1986,
as amended, and the regulations promulgated thereunder, the administrator shall be the
Escrow Agent.  The Escrow Agent shall timely and properly file all informational and other
tax returns necessary or advisable with respect to the Settlement Fund (including without
limitation the returns described in Treas. Reg. §1.468B-2(k)(l)).  Such returns (as well as the
election described in paragraph 17(d)) shall be consistent with paragraph 17(d) and in all
events shall reflect that all Taxes, as defined below (including any estimated Taxes, interest or
penalties), on the income earned by the Settlement Fund shall be paid out of the Settlement
Fund as provided in paragraph 17(f) hereof

   f. All (i) taxes (including any estimated taxes, interest or penalties)
arising with respect to the income earned by the Settlement Fund, including any taxes or tax
detriments that may be imposed upon Philips or any other Philips Releasee with respect to any
income earned by the Settlement Fund for any period during which the Settlement Fund does
not qualify as a qualified settlement fund for federal or state income tax purposes ("Taxes");
and (ii) expenses and costs incurred in connection with the operation and implementation of
paragraphs 17(d) through 17(f) (including, without limitation, expenses of tax attorneys and/or
accountants and mailing and distribution costs and expenses relating to filing (or failing to
file) the returns described in this paragraph 17(g) ("Tax Expenses")), shall be paid out of the
Settlement Fund.

   g. Neither Philips nor any other Philips Releasee nor their
respective counsel shall have any liability or responsibility for the Taxes or the Tax Expenses.
Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of
administration of the Settlement Fund and shall be timely paid by the Escrow Agent out of the
Settlement Fund without prior order from the Court and the Escrow Agent shall be obligated
(notwithstanding anything herein to the contrary) to withhold from distribution to any
claimants authorized by the Court any funds necessary to pay such amounts including the
establishment of adequate reserves for any Taxes and Tax Expenses (as well as any amounts
that maybe required to be withheld under Treas. Reg. §1.468B-2(1)(2)). Neither Philips nor
any other Philips Releasee is responsible nor shall they have any liability therefor.  Plaintiffs
and Philips agree to cooperate with the Escrow Agent, each other, and their tax attorneys and

accountants to the extent reasonably necessary to carry out the provisions of paragraphs 17(d) through 17(f).

        h.      If this Agreement does not receive final Court approval, or if this Agreement is terminated by Philips pursuant to this Agreement, including but not limited to Paragraphs 28 or 29 hereof, then all amounts paid by Philips into the Settlement Fund (other than notice costs expended in accordance with paragraph 19(a)) shall be returned to Philips from the Escrow Account by the Escrow Agent along with any interest accrued thereon within thirty (30) calendar days.

        18.      <u>Withdrawal of Pending Motions and Stay and Dismissal of State Court Proceedings</u>.

        a.      Within five (5) business days after the Execution Date, Philips shall withdraw all pending motions for summary judgment, solely as they relate to the Indirect Purchaser Plaintiffs' claims against Philips, subject to reinstatement in the event this Agreement does not become final.

        b.      The parties understand, agree, and acknowledge that, within five (5) business days after the Execution Date, the parties shall seek a stay of: (1) any objection by the IPP class or any IPP Class member, as to the state court's approval of the settlement between Philips and the Attorney General of California (acting on behalf of the State of California and as *parens patriae*,) in *The State of California, et al. and the City and County of San Francisco, individually, and on behalf of all others similarly situated, v. Chunghwa Picture Tubes, LTD., et al.* (CGC-11-515786) (the "California State Court Action"), as well as (2) any appeal of that settlement approval including the proceedings currently pending before the Superior Court in the California State Court Action, and before the Court of Appeal of the State of California, First Appellate District, Division Five (No. A 140908) (the "Appeal"). The parties shall seek a stay pending the finality of the approval of the Agreement, subject to the lifting of the stay should the approval of this Agreement not become final.

        c.      The parties further understand, agree, and acknowledge that, within ten (10) business days after the approval of the Agreement becomes final, the Appeal shall be dismissed with prejudice and no further objection will be asserted by the IPP Class or any IPP Class member challenging the state court's approval of the settlement between Philips and the Attorney General of California.

9

19.     Payment of Expenses.

        a.      Philips agrees to permit use of a maximum of $525,000 of the Settlement Fund towards notice to the class and administration costs. The $525,000 in notice and claims administration expenses are not recoverable if this settlement does not become final. Other than as set forth in this paragraph 19(a), each party shall be liable for its own costs or expenses of the litigation of the Action, including attorneys' fees; fees and expenses of expert witnesses and consultants; and costs and expenses associated with discovery, motion practice, hearings before the Court or any Special Master, appeals, trials or the negotiation of other settlements, or the negotiation of other settlements, or for Class administration and costs.

        b.      If Class Counsel enter into any other settlements on behalf of the Class before notice of this Agreement is given to the Class, Class Counsel shall use its reasonable efforts to provide a single notice to prospective Class Members of all of the settlements.

    E.      The Settlement Fund.

        20.     Releasors shall look solely to the Settlement Fund for settlement and satisfaction against the Philips Releasees of all Released Claims, and shall have no other recovery against Philips or any other Philips Releasee.

        21.     After this Agreement becomes final within the meaning of Paragraph 11, the Settlement Fund shall be distributed in accordance with a plan to be submitted at the appropriate time by Plaintiffs, subject to approval by the Court. In no event shall any Philips Releasee have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such distribution and administration, with the sole exception of the provisions set forth in paragraph 19(a) of this Agreement.

        22.     Plaintiffs and Plaintiffs' counsel shall be reimbursed and indemnified solely out of the Settlement Fund for all expenses. The Philips Releasees shall not be liable for any costs, fees, or expenses of any of Plaintiffs' or the Class' respective attorneys, experts, advisors, agents, or representatives, but all such costs, fees, and expenses as approved by the Court shall be paid out of the Settlement Fund.

        23.     Class Counsel's Attorneys' Fees And Reimbursement of Expenses.

        a.      Class Counsel may submit an application or applications to the Court (the "Fee and Expense Application") for distribution to them from the Settlement Fund

10

and Philips shall not oppose such application for: (i) an award of attorneys' fees not in excess of one-third of the Settlement Fund; plus (ii) reimbursement of expenses and costs incurred in connection with prosecuting the Action, plus interest on such attorneys' fees, costs and expenses at the same rate and for the same period as earned by the Settlement Fund (until paid) as may be awarded by the Court (the "Fee and Expense Award"). Class Counsel reserve the right to make additional applications for fees and expenses incurred, but in no event shall Philips Releasees be responsible to pay any such additional fees and expenses except to the extent they are paid out of the Settlement Fund. In addition, after final approval, Class Counsel may apply to use any amount paid by Philips to the Settlement Fund to pay for past or future expenses of this litigation. In the event the Settlement is reversed on appeal, any Plaintiffs' counsel that received awards of fees and/or reimbursement of costs that are subject to reduction shall, within ten (10) business days from receiving notice of the applicable court order, refund to the Settlement Fund the required amounts. Each such Plaintiffs' counsel's law firm, as a condition of receiving such fees, expenses and costs, on behalf of itself and each partner and/or shareholder of it, agrees that the law firm and its partners and/or shareholders are subject to the jurisdiction of the Court for the purpose of enforcing this paragraph 23(a).

b.       The Fee and Expense Award, as approved by the Court, shall be paid solely from the Settlement Fund. After this Agreement becomes final within the meaning of Paragraph 11, the Fee and Expense Award shall be paid to Class Counsel within ten (10) business days. Class Counsel shall allocate the attorneys' fees among Plaintiffs' counsel in a manner which Class Counsel in good faith believes reflects the contributions of such counsel to the prosecution and settlement of the Action.

c.       The procedure for and the allowance or disallowance by the Court of the application by Class Counsel for attorneys' fees, costs and expenses to be paid out of the Settlement Fund are not part of this Agreement, and are to be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the Settlement, and any order or proceeding relating to the Fee and Expense Application, or any appeal from any such order shall not operate to terminate or cancel this Agreement, or affect or delay the finality of the judgment approving the settlement.

d.       Neither Philips nor any other Philips Releasee under this Agreement shall have any responsibility for, or interest in, or liability whatsoever with respect to any payment to Plaintiffs' counsel of any Fee and Expense Award in the Action.

e.       Neither Philips nor any other Philips Releasee under this

Agreement shall have any responsibility for, or interest in, or liability whatsoever with respect to the allocation among Plaintiffs' counsel, and/or any other person who may assert some claim thereto, of any Fee and Expense Award that the Court may make in the Action.

       F.    <u>Cooperation</u>.

       24.    In further consideration for the Release, and at Plaintiffs' reasonable request, Philips shall make a good faith effort to provide an affidavit or statement as is reasonably necessary and reasonably possible to assist Plaintiffs in showing that documents produced by Philips in the CRT Litigation bearing the production prefix PENAC, PHLP-CRT, EIN, or PNV are authentic and, to the extent possible, admissible. Plaintiffs shall only seek an affidavit or statement of authenticity and/or admissibility for documents that Plaintiffs reasonably expect they may seek to introduce at any trial against any other defendant(s) in the Action. In no event shall Plaintiffs seek an affidavit or statement of authenticity and/or admissibility from Philips for more than 50 documents. Philips will be afforded a reasonable period of time to respond to Plaintiffs' request for such an affidavit or statement, and in no event shall Philips have fewer than thirty (30) calendar days to respond to any such request.

       25.    In the event that this Agreement fails to receive final approval by the Court as contemplated in Paragraphs 8-11 hereof, or in the event that it is terminated by either party under any provision herein, the parties agree that neither Plaintiffs nor Plaintiffs' counsel shall be permitted to introduce into evidence, at any hearing, or in support of any motion, opposition or other pleading in this action or in any other federal or state action alleging a violation of any antitrust or unfair competition law relating to the subject matter of this Action, any document authenticated pursuant to the cooperation provisions of Paragraph 24.

       26.    Except as provided in Paragraph 24 of this Agreement, Philips need not respond to formal discovery from Plaintiffs, or otherwise participate in the Action during the pendency of the Agreement. Neither Philips nor Plaintiffs shall file motions against the other during the pendency of the Agreement. In the event that the Agreement is not approved by the Court, or otherwise terminates, Philips and Plaintiffs will each be bound by and have the benefit of any rulings made in the Action to the extent they would have been applicable to Philips or Plaintiffs had Philips been participating in the Action.

       27.    Philips agrees that it will not disclose publicly or to any other defendant the terms of this Agreement until this Agreement is submitted to the Court for approval. After execution of this Settlement Agreement by both parties, a Party may disclose solely the fact of the settlement memorialized herein (without referencing terms thereof): (i) to other plaintiffs or

defendants in the MDL Proceedings; or (ii) in responding to any inquiry, investigation or claim by any Party's shareholders. A Party may also disclose the fact of and/or the terms of the Settlement Agreement to the Court or the Special Master. Philips may disclose the fact of and/or the terms of the Settlement Agreement to the extent required by securities laws.

G.     Rescission if this Agreement is Not Approved or Final Judgment is Not Entered

28.     If the Court refuses to approve this Agreement or any part thereof, or if such approval is modified or set aside on appeal, or if the Court does not enter the final judgment provided for in paragraph 10 of this Agreement, or if the Court enters the final judgment and appellate review is sought, and on such review, such final judgment is not affirmed in its entirety, then Philips and the Plaintiffs shall each, in their sole discretion, have the option to rescind this Agreement in its entirety except as provided in paragraph 19(a). Written notice of the exercise of any such right to rescind shall be made according to the terms of paragraph 39. A modification or reversal on appeal of any amount of Class Counsel's fees and expenses awarded by the Court from the Settlement Fund shall not be deemed a modification of all or a part of the terms of this Agreement or such final judgment.

29.     In the event that this Agreement does not become final, then any and all parts of the Settlement Fund caused to be deposited in the Escrow Account (including interest earned thereon) shall be returned forthwith to Philips less only disbursements made in accordance with Paragraph 19 of this Agreement, and thereafter, this Agreement shall be of no force or effect. Philips expressly reserves all of its rights and defenses if this Agreement does not become final. Further, and in any event, Plaintiffs and Philips agree that this Agreement, whether or not it shall become final, and any and all negotiations, documents, and discussions associated with it, shall not be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing whatsoever by Philips (or the Philips Releasees), or of the truth of any of the claims or allegations contained in the complaint or any other pleading filed by Plaintiffs in the Action, and evidence thereof shall not be discoverable or used directly or indirectly, in any way, whether in the Action or in any other action or proceeding.

30.     This Agreement shall be construed and interpreted to effectuate the intent of the parties, which is to provide, through this Agreement, for a complete resolution of the relevant claims with respect to each Philips Releasee as provided in this Agreement.

31.     The parties to this Agreement contemplate and agree that, prior to final

approval of the settlement as provided for in Paragraphs 8-11 hereof, appropriate notice 1) of the settlement; and 2) of a hearing at which the Court will consider the approval of this Settlement Agreement will be given to Class Members.

      H.   <u>Miscellaneous</u>.

      32.   This Agreement does not settle or compromise any claim by Plaintiffs or any Class Member asserted in the Fourth Consolidated Amended Complaint or, if amended, any subsequent Complaint, against any defendant or alleged co-conspirator other than the Philips Releasees.  All rights against such other defendants or alleged co conspirators are specifically reserved by Plaintiffs and the Class.  Philips' sales to the Class shall not be removed from the Action.  Notwithstanding the foregoing, Plaintiffs expressly release any claims for damages against Philips or any Philips Releasees based on the conduct or alleged conduct of any alleged co-conspirator including, but not limited to, any claim for damages against Philips or any Philips  Releasees, based on joint and several liability.

      33.   This Agreement shall not affect whatever rights Releasors or any of them may have (i) to seek damages or other relief in a judicial forum outside the United States of America, under the laws of countries other than the United States, from any person with respect to any CRT Products purchased indirectly from the manufacturer (or any subsidiary or affiliate thereof) outside the United States; (ii) to participate in or benefit from any relief or other recovery as part of a settlement or judgment in any action on behalf of any indirect purchasers of CRT Products so long as such benefit, relief or recovery is not duplicative in whole or part of any Released Claim; (iii) to participate in or benefit from any relief or recovery as part of a judgment or settlement in this action against any other party named as a defendant (other than a Philips Releasee); or (iv) to assert any product liability or breach of contract claims in the ordinary course of business which are not covered by the Released Claims.

      34.   The United States District Court for the Northern District of California shall retain jurisdiction over the implementation, enforcement, and performance of this Agreement, and shall have exclusive jurisdiction over any suit, action, proceeding, or dispute arising out of or relating to this Agreement or the applicability of this Agreement that cannot be resolved by negotiation and agreement by Plaintiffs and Philips. This Agreement shall be governed by and interpreted according to the substantive laws of the State of California without regard to its choice of law or conflict of laws principles.

      35.   This Agreement constitutes the entire, complete and integrated agreement among Plaintiffs and Philips pertaining to the settlement of the Action against

Philips, and supersedes all prior and contemporaneous undertakings of Plaintiffs and Philips in connection herewith. This Agreement may not be modified or amended except in writing executed by Plaintiffs and Philips, and approved by the Court.

36.     This Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of Plaintiffs and Philips. Without limiting the generality of the foregoing, each and every covenant and agreement made herein by Plaintiffs, Class Counsel or Philips shall be binding upon, respectively, all Class Members, Releasors and Releasees. The Philips Releasees (other than Philips, which is a party hereto) are third party beneficiaries of this Agreement and are authorized to enforce its terms applicable to them.

37.     This Agreement may be executed in counterparts by Plaintiffs and Philips, and a facsimile signature shall be deemed an original signature for purposes of executing this Agreement.

38.     Neither Plaintiffs nor Philips shall be considered to be the drafter of this Agreement or any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement.

39.     Where this Agreement requires either party to provide notice or any other communication or document to the other, such notice shall be in writing, and such notice, communication, or document shall be provided by email, facsimile or letter by overnight delivery to each of the undersigned counsel of record for the party to whom notice is being provided.

40.     Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Agreement, subject to Court approval.

Dated: January 26, 2015

Mario N. Alioto
TRUMP, ALIOTO, TRUMP & PRESCOTT
LLP
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
malioto@tatp.com

15

*Class Counsel and Attorneys for the Indirect Purchaser Class*

John M. Taladay
Telephone: (202) 639-7909
Facsimile: (202) 639-1165
john.taladay@bakerbotts.com
Baker Botts LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004

Erik T. Koons
Telephone: (202) 639-7973
Facsimile: (202 585-1086
erik.kooons@bakerbotts.com
Baker Botts LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004

*Attorneys for Defendants Philips Koninklijke N.V., Philips Electronics North America Corporation, Philips Taiwan Limited, and Philips do Brasil, Ltda.*

# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-SC <br><br> MDL No. 1917 |
| This Document Relates to: <br><br> ALL INDIRECT-PURCHASER ACTIONS | |

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into this 28th day of January, 2015 (the "Execution Date"), by and between Panasonic Corporation (f/k/a Matsushita Electric Industrial Co., Ltd.), Panasonic Corporation of North America, MT Picture Display Co., Ltd. (collectively "Panasonic") and the indirect-purchaser plaintiff class representatives ("Plaintiffs"), both individually and on behalf of a settlement class of indirect purchasers of Cathode Ray Tube (CRT) Products ("the Class"), as more particularly defined in Paragraph 1 below.

WHEREAS, Plaintiffs are prosecuting the above *In Re Cathode Ray Tube (CRT) Antitrust Litigation,* MDL No. 1917 (N.D. Cal.) (the "Action") on their own behalf and on behalf of the Class against, among others, Panasonic and Beijing Matsushita Color CRT Co., Ltd. ("BMCC");

WHEREAS, Plaintiffs allege that Panasonic and BMCC participated in an unlawful conspiracy to raise, fix, maintain, or stabilize the price of CRTs at artificially high levels in violation of Section 1 of the Sherman Act and various state statutes;

WHEREAS, Panasonic and BMCC deny Plaintiffs' allegations and have asserted defenses to Plaintiffs' claims;

WHEREAS, Plaintiffs have conducted an investigation into the facts and the law regarding the Action and have concluded that resolving claims against Panasonic and BMCC according to the terms set forth below is in the best interest of Plaintiffs and the

1

Class;

WHEREAS, Panasonic, despite its belief that it is not liable for the claims asserted and has good defenses thereto, has nevertheless agreed to enter into this Agreement to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, to obtain the releases, orders, and judgment(s) contemplated by this Agreement, and to put to rest with finality all claims that have been or could have been asserted against Panasonic and BMCC, based on the allegations of the Action, as more particularly set out below;

NOW, THEREFORE, in consideration of the covenants, agreements, and releases set forth herein and for other good and valuable consideration, it is agreed by and among the undersigned that the Action be settled, compromised, and dismissed on the merits with prejudice as to the Panasonic Releasees, as defined below, and except as hereinafter provided, without costs as to Plaintiffs, the Class, Panasonic or BMCC, subject to the approval of the Court, on the following terms and conditions:

A.    Definitions.

1.    For purposes of this Agreement, "the Class" and "Class Period" are defined in Plaintiffs' Fourth Consolidated Amended Complaint or, if that complaint is amended to expand the definition of either term, the operative complaint at the time this Agreement is presented for preliminary approval. The parties to this Agreement hereby stipulate for purposes of this settlement only that the requirements of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure are satisfied.

2.    For purposes of this Agreement, "CRT Products" are defined in Plaintiffs' Fourth Consolidated Amended Complaint or, if that complaint is amended to expand the definition of CRT Products, the operative complaint at the time this Agreement is presented for preliminary approval. For purposes of clarity, the term "CRT Products" includes not only cathode ray tubes ("CRTs"), but also electronic devices containing cathode ray tubes, such as televisions and computer monitors.

3.    "Panasonic Releasees" means Panasonic and all of its respective past and present, direct and indirect, parents, subsidiaries, and affiliates, including BMCC, and all of their respective past and present, direct and indirect, parents,

2

subsidiaries, affiliates, unincorporated entities, divisions, and groups; the predecessors, successors, and assigns of any of the above; and each and all of the present and former principals, partners, officers, directors, supervisors, employees, agents, representatives, insurers, attorneys, heirs, executors, administrators, and assigns of each of the foregoing. "Panasonic Releasees" does not include any defendant in the Action other than Panasonic and BMCC.

4.      "Class Member" means each member of the Class who has not timely elected to be excluded from the Class.

5.      "Releasors" means the indirect-purchaser plaintiff Class representatives and the indirect-purchaser plaintiff Class Members, and all of their past and present officers, directors, employees, agents, stockholders, attorneys, servants, representatives, parents, subsidiaries, affiliates, partners, insurers and all other persons, partnerships or corporations with whom any of the former have been, or are now, affiliated, and the predecessors, successors, heirs, executives, administrators and assigns of any of the foregoing, as well as to anyone claiming by, for, or through the Releasors.

6.      "The Settlement Fund" shall be $70,000,000 USD, as specified in Paragraph 16, plus accrued interest on said deposits as set forth in Paragraph 17.

7.      "Class Counsel" shall refer to:

Mario N. Alioto
Trump, Alioto, Trump & Prescott LLP
2280 Union Street
San Francisco, CA 94123

B.      Approval of this Agreement and Dismissal of Claims Against the Panasonic Releasees.

8.      Plaintiffs and Panasonic shall use their best efforts to effectuate this Agreement, including cooperating in seeking the Court's approval for the establishment of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23(c) and (e)) to secure the complete and final dismissal with prejudice of the Action, without undue delay, as to the Panasonic Releasees only.

9.      Plaintiffs shall, at such time as they see fit, submit to the Court a motion for authorization to disseminate notice of the settlement and final judgment

contemplated by this Agreement to all Class Members (the "Motion"). If notice to the Class is given jointly with a notice of settlement(s) with any other settling defendant, for purposes of Paragraph 18 below, the costs of notice and claims administration shall be prorated with any other such defendant based on their respective settlement amounts. The Motion shall include (i) a proposed form of, method for, and date of dissemination of notice; and (ii) a proposed form of order. The text of the foregoing items (i) and (ii) shall be agreed upon by Plaintiffs and Panasonic before submission of the Motion. The Motion shall recite and ask the Court to find that the proposed form of and method for dissemination of the notice of settlement constitutes valid, due and sufficient notice to the Class, constitutes the best notice practicable under the circumstances, and complies fully with the requirements of Federal Rule of Civil Procedure 23.

10. Plaintiffs and Panasonic shall jointly seek the entry of an order and final judgment, the text of which Plaintiffs and Panasonic shall agree upon. The terms of that order and final judgment will include, at a minimum, the substance of the following provisions:

(a) certifying the Class described in Paragraph 1, pursuant to Rule 23 of the Federal Rules of Civil Procedure, solely for purposes of this settlement as a settlement class;

(b) as to the Action, approving finally this settlement and its terms as being a fair, reasonable and adequate settlement as to the Class Members within the meaning of Rule 23 of the Federal Rules of Civil Procedure and directing its consummation according to its terms;

(c) as to the Panasonic Releasees, directing that the Action be dismissed with prejudice and, except as provided for in this Agreement, without costs;

(d) reserving exclusive jurisdiction over the settlement and this Agreement, including the administration and consummation of this settlement, to the United States District Court for the Northern District of California; and

(e) determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing that the judgment of dismissal as to the Panasonic Releasees shall be final.

11. This Agreement shall become final when (i) the Court has

4

entered a final order certifying the Class described in Paragraph 1 and approving this
Agreement under Federal Rule of Civil Procedure 23(e) and a final judgment
dismissing the Action with prejudice as to Panasonic Releasees against all Class
Members and without costs other than those provided for in this Agreement, and (ii) the
time for appeal or to seek permission to appeal from the Court's approval of this
Agreement and entry of a final judgment as to Panasonic Releasees described in
item (i) hereof has expired or, if appealed, approval of this Agreement and the final
judgment as to Panasonic Releasees have been affirmed in their entirety by the Court of
last resort to which such appeal has been taken and such affirmance has become no
longer subject to further appeal or review. It is agreed that the provisions of Rule 60
of the Federal Rules of Civil Procedure shall not be taken into account in determining
the above-stated times. On the Execution Date, Plaintiffs and Panasonic shall be bound
by its terms and this Agreement shall not be rescinded except in accordance with
Paragraphs 17(h), 18(a), 27, or 28 of this Agreement.

        12.    Neither this Agreement (whether or not it should become final) nor
the final judgment, nor any and all negotiations, documents and discussions
associated with them, shall be deemed or construed to be an admission by Panasonic
(or the Panasonic Releasees) or evidence of any violation of any statute or law or of
any liability or wrongdoing whatsoever by Panasonic (or the Panasonic Releasees),
or of the truth of any of the claims or allegations contained in any complaint or any
other pleading filed in the Action, and evidence thereof shall not be discoverable or
used directly or indirectly, in any way, whether in the Action or in any other action or
proceeding. Neither this Agreement, nor any of its terms and provisions, nor any of
the negotiations or proceedings connected with it, nor any other action taken to carry
out this Agreement by any of the settling parties shall be referred to, offered as
evidence or received in evidence in any pending or future civil, criminal, or
administrative action or proceeding, except in a proceeding to enforce this Agreement,
or to defend against the assertion of Released Claims, or as otherwise required by law.

        C.    <u>Release, Discharge, and Covenant Not to Sue.</u>

        13.    In addition to the effect of any final judgment entered in
accordance with this Agreement, upon this Agreement becoming final as set out in
Paragraph 11 of this Agreement, and in consideration of payment of the Settlement

Amount, as specified in Paragraph 16 of this Agreement, and for other good and valuable consideration, the Panasonic Releasees shall be completely released, acquitted, and forever discharged from any and all claims, demands, judgments, actions, suits, causes of action, whether class, individual, or otherwise (whether or not any Class Member has objected to the settlement or makes a claim upon or participates in the Settlement Fund, whether directly, representatively, derivatively, or in any other capacity) that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected injuries, damages, and consequences thereof in any way arising out of or relating in any way to any act or omission of the Panasonic Releasees (or any of them) or any other entity concerning the manufacture, supply, distribution, sale or pricing of CRT Products up to the date of execution of this Agreement, including but not limited to any conduct alleged, and causes of action asserted or that could have been alleged or asserted, in complaints filed in this Action, including those arising under any federal, state, or foreign antitrust, unfair competition, unfair practices, price discrimination, unitary pricing, unjust enrichment, contract, or trade practice law (the "Released Claims"). However, the Released Claims shall not preclude Plaintiffs from pursuing any and all of their claims against other defendants, except the Panasonic Releasees, for the sale of CRT Products by those other defendants, or any subsidiary or affiliate thereof, or their co-conspirators, including claims against those other defendants for sales of CRT Products manufactured by Panasonic. Releasors shall not, after the date of this Agreement, sue or otherwise seek to establish liability against any Panasonic Releasee based, in whole or in part, upon any of the Released Claims or conduct at issue in the Released Claims, except that Releasors shall continue to assert that Panasonic and BMCC participated in the alleged conspiracy to fix prices and continue to respond to motions filed to date. In addition, the released claims shall not preclude the California Attorney General from pursuing any and all of her claims against any defendant for the sale of CRT Products.

14. In addition to the provisions of Paragraph 13 of this Agreement, Releasors hereby expressly waive and release, upon this Agreement becoming final, any and all provisions, rights, and benefits conferred by § 1542 of the California Civil Code, which states:

CERTAIN CLAIMS NOT AFFECTED BY GENERAL RELEASE. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR;

or by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code. Each Releasor may hereafter discover facts other than or different from those which he, she, or it knows or believes to be true with respect to the claims which are the subject matter of the provisions of Paragraph 13 of this Agreement, but each Releasor hereby expressly waives and fully, finally, and forever settles and releases, upon this Agreement becoming final, any known or unknown, suspected or unsuspected, contingent or non-contingent claim with respect to the subject matter of the provisions of Paragraph 13 of this Agreement, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts.

15. The release, discharge, and covenant not to sue set forth in Paragraph 13 of this Agreement does not include claims by any of the Class Members other than the Released Claims and does not include other claims, such as those solely arising out of product liability, personal injury, or breach of contract claims not related to the subject matter of the Action in the ordinary course of business not covered by the Released Claims.

D. Settlement Amount.

16. Subject to the provisions hereof, and in full, complete and final settlement of the Action as provided herein, Panasonic shall pay the Settlement Amount of $70,000,000 (the "Settlement Amount"). The Settlement Amount shall be paid into an escrow account in United States Dollars to be administered in accordance with the provisions of Paragraph 17 of this Agreement (the "Escrow Account") within sixty (60) business days after the Execution Date.

17. Escrow Account.

(a) The Escrow Account will be established at Wells Fargo Bank, National

7

Association, with such Bank serving as escrow agent ("Escrow Agent") subject to escrow instructions mutually acceptable to Plaintiffs' Class Counsel and Panasonic, such escrow to be administered under the Court's continuing supervision and control.

(b)     The Escrow Agent shall cause the funds deposited in the Escrow Account to be invested in short-term instruments backed by the full faith and credit of the United States Government or fully insured in writing by the United States Government, or money market funds rated Aaa and AAA, respectively by Moody's Investor Services and Standard and Poor's, invested substantially in such instruments, and shall reinvest any income from these instruments and the proceeds of these instruments as they mature in similar instruments at their then current market rates.

(c)     All funds held in the Escrow Account shall be deemed and considered to be in custodia legis of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant to this Agreement and/or further order(s) of the Court.

(d)     Plaintiffs and Panasonic agree to treat the Settlement Fund as being at all times a qualified settlement fund within the meaning of Treas. Reg. §1.468B-1. In addition, the Escrow Agent shall timely make such elections as necessary or advisable to carry out the provisions of this Paragraph 17, including the relation-back election (as defined in Treas. Reg. §1.468B-1) back to the earliest permitted date. Such elections shall be made in compliance with the procedures and requirements contained in such regulations. It shall be the responsibility of the Escrow Agent to timely and properly prepare and deliver the necessary documentation for signature by all necessary parties, and thereafter to cause the appropriate filing to occur.

(e)     For the purpose of § 468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the administrator shall be the Escrow Agent. The Escrow Agent shall timely and properly file all informational and other tax returns necessary or advisable with respect to the Settlement Fund (including without limitation the returns described in Treas. Reg. § 1.468B-2(k)(1)). Such returns (as well as the election described in Paragraph 17(d)) shall be consistent with Paragraph 17(d) and in all events shall reflect that all Taxes, as defined below (including any estimated Taxes, interest or penalties), on the income earned by the

8

Settlement Fund shall be paid out of the Settlement Fund as provided in Paragraph 17(f) hereof.

(f)     All (i) taxes (including any estimated taxes, interest or penalties) arising with respect to the income earned by the Settlement Fund, including any taxes or tax detriments that may be imposed upon Panasonic or any other Panasonic Releasee with respect to any income earned by the Settlement Fund for any period during which the Settlement Fund does not qualify as a qualified settlement fund for federal or state income tax purposes ("Taxes"); and (ii) expenses and costs incurred in connection with the operation and implementation of Paragraphs 17(d) through 17(f) (including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) the returns described in this Paragraph 17(f)) ("Tax Expenses"), shall be paid out of the Settlement Fund.

(g)     Neither Panasonic nor any other Panasonic Releasee nor their respective counsel shall have any liability or responsibility for the Taxes or the Tax Expenses. Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of the Settlement Fund and shall be timely paid by the Escrow Agent out of the Settlement Fund without prior order from the Court and the Escrow Agent shall be obligated (notwithstanding anything herein to the contrary) to withhold from distribution to any claimants authorized by the Court any funds necessary to pay such amounts including the establishment of adequate reserves for any Taxes and Tax Expenses (as well as any amounts that may be required to be withheld under Treas. Reg. § 1.468B-2(1)(2)). Neither Panasonic nor any other Panasonic Releasee is responsible nor shall they have any liability therefor.  Plaintiffs and Panasonic agree to cooperate with the Escrow Agent, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of Paragraphs 17(d) through 17(f).

(h)     If this Agreement does not receive final Court approval, including final approval of "the Class" as defined in Plaintiffs' Fourth Consolidated Amended Complaint (or, if that complaint is amended to expand the definition of "the Class," the operative complaint at the time this Agreement is presented for preliminary approval) or if the Action is not certified as a class action for settlement purposes, then

9

all amounts paid by Panasonic into the Settlement Fund (other than costs expended in accordance with Paragraph 18(a)) shall be returned to Panasonic from the Escrow Account by the Escrow Agent along with any interest accrued thereon within thirty (30) calendar days after respective denial of approval or certification as the case may be.

        18.    <u>Payment of Expenses</u>.

        (a)    Panasonic agrees to permit use of a maximum of $525,000 of the Settlement Fund towards notice to the class and the costs of administration of the Settlement Fund set forth in Paragraph 17. The $525,000 in notice and administration expenses are not recoverable if this settlement does not become final to the extent such funds are expended for notice and administration costs. Other than as set forth in this Paragraph 18(a), neither Panasonic nor any of the other Panasonic Releasees under this Agreement shall be liable for any of the costs or expenses of the litigation of the Action, including attorneys' fees; fees and expenses of expert witnesses and consultants; and costs and expenses associated with discovery, motion practice, hearings before the Court or any Special Master, appeals, trials or the negotiation of other settlements, or for Class administration and costs.

        (b)    If Class Counsel enters into any other settlements on behalf of the Class before notice of this Agreement is given to the Class, Class Counsel shall use its reasonable best efforts to provide a single notice to prospective Class Members of all of the settlements.

        E.    <u>The Settlement Fund</u>.

        19.    Releasors shall look solely to the Settlement Fund for settlement and satisfaction against the Panasonic Releasees of all Released Claims, and shall have no other recovery against Panasonic or any other Panasonic Releasee.

        20.    After this Agreement becomes final within the meaning of Paragraph 11, the Settlement Fund shall be distributed in accordance with a plan to be submitted at the appropriate time by Plaintiffs, subject to approval by the Court. In no event shall any Panasonic Releasee have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such

distribution and administration, with the sole exception of the provisions set forth in Paragraph 18(a) of this Agreement. The Panasonic Releasees shall be dismissed from this Action prior to any distribution of this Settlement Fund.

21.  Plaintiffs and Class Counsel shall be reimbursed and indemnified solely out of the Settlement Fund for all expenses. The Panasonic Releasees shall not be liable for any costs, fees, or expenses of any of Plaintiffs' or the Class' respective attorneys, experts, advisors, agents, or representatives, but all such costs, fees, and expenses as approved by the Court shall be paid out of the Settlement Fund.

22.  Class Counsel's Attorneys' Fees And Reimbursement of Expenses.

(a)  Class Counsel may submit an application or applications to the Court for payment of attorneys' fees and reimbursement of expenses (the "Fee and Expense Application") for distribution to them from the Settlement Fund. The Panasonic Releasees shall not oppose such application(s) for: (i) an award of attorneys' fees not in excess of one-third of the Settlement Fund; plus (ii) reimbursement of expenses and costs incurred, or to be incurred, in connection with prosecuting the Action, plus interest on such attorneys' fees, costs and expenses at the same rate and for the same period as earned by the Settlement Fund (until paid) as may be awarded by the Court (the "Fee and Expense Award"). Class Counsel reserves the right to make additional applications for fees and expenses incurred, but in no event shall Panasonic Releasees be responsible to pay any such additional fees and expenses except to the extent they are paid out of the Settlement Fund. In addition, after final approval, Class Counsel may apply to use any amount paid by Panasonic, and to be paid out of the Settlement Fund, to pay the past or future expenses of this litigation.

(b)  The Fee and Expense Award, as approved by the Court, shall be paid solely from the Settlement Fund within five (5) Court days after this Agreement becomes final as set forth in Paragraph 11 of this Agreement. Class Counsel shall allocate the attorneys' fees among class counsel in a manner which he in good faith believes reflects the contributions of such counsel to the prosecution and settlement of the Action. In the event the Settlement is reversed on appeal or awards of attorneys' fees and reimbursement of costs are reduced on appeal, any Plaintiffs' counsel that received awards of fees and/or reimbursement of costs that are subject to reduction shall, within ten (10) business days from receiving notice of the applicable court order, refund to the

11

Settlement Fund the required amounts.  Each such Plaintiffs' counsel's law firm, as a condition of receiving such fees, expenses and costs, on behalf of itself and each partner and/or shareholder of it, agrees that the law firm and its partners and/or shareholders are subject to the jurisdiction of the Court for the purpose of enforcing this paragraph 22(b).

(c)     The procedure for and the allowance or disallowance by the Court of the application by Class Counsel for attorneys' fees, costs and expenses to be paid out of the Settlement Fund are not part of this Agreement, and are to be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the Settlement, and any order or proceeding relating to the Fee and Expense Application, or any appeal from any such order shall not operate to terminate or cancel this Agreement, or affect or delay the finality of the judgment approving the settlement.

(d)     Neither Panasonic nor any other Panasonic Releasee under this Agreement shall have any responsibility for, or interest in, or liability whatsoever with respect to any payment to Plaintiffs' counsel of any Fee and Expense Award in the Action.

(e)     Neither Panasonic nor any other Panasonic Releasee under this Agreement shall have any responsibility for, or interest in, or liability whatsoever with respect to the allocation among Plaintiffs' counsel, and/or any other person who may assert some claim thereto, of any Fee and Expense Award that the Court may make in the Action.

F.     Cooperation.

23.     Upon execution of the Agreement, Panasonic shall reasonably cooperate with Class Counsel as set forth specifically below:

(a)     Panasonic agrees to provide a declaration or stipulation to establish, to the best of its ability, where it is possible to do so, authenticity and foundation for up to 25 documents selected by Plaintiffs for trial.  Class Counsel may also continue to pursue their pending motion to compel Panasonic to authenticate documents.

(b)     Panasonic will not preclude Class Counsel from any discovery that is ongoing.  In addition, Panasonic will not preclude Class Counsel from calling any witness for deposition, and, if necessary at trial, to provide information, to the best of

12

their ability, with respect to any matter pertinent to the allegations of Plaintiffs' Fourth Amended Complaint, to the extent permitted by Rule 45 of the Federal Rule of Civil Procedure.

24.     Except as provided in Paragraphs 13 and 23 of this Agreement, Panasonic and BMCC need not respond to formal discovery from Plaintiffs or otherwise participate in the Action during the pendency of the Agreement.  In the event that the Agreement is not approved by the Court, or otherwise terminates, the Panasonic Releasees and Plaintiffs will each be bound by and have the benefit of any rulings made in the Action to the extent they would have been applicable to the Panasonic Releasees or Plaintiffs had the Panasonic Releasees been participating in the Action.  Neither Panasonic nor Plaintiffs shall file motions against the other during the pendency of this Agreement. Within five (5) business days after the Execution Date, Panasonic shall withdraw all pending motions for summary judgment, solely as they relate to the Indirect Purchaser Plaintiffs' claims against Panasonic, subject to reinstatement in the event this Agreement does not become final.

25.     Panasonic Releasees and Plaintiffs agree not to disclose publicly or to any other defendant or third party the terms of this Agreement until this Agreement is submitted to the Court for approval.  Plaintiffs or Panasonic Releasees may, however, disclose the fact and amount of this Settlement to the Special Master or the Court. Panasonic Releasees may disclose the fact that they have settled the claims of the Class to the other defendants in the Action.

G.     Rescission if this Agreement is Not Approved or Final Judgment is Not Entered.

26.     If the Court refuses to approve this Agreement or any part hereof, including if the Court does not certify a settlement class in accordance with the specific class definition set forth in Plaintiffs' Fourth Consolidated Amended Complaint (or, if that complaint is amended to expand the definition of the Class, the operative complaint at the time this Agreement is presented for preliminary approval), or if such approval is modified or set aside on appeal, or if the Court does not enter the final judgment provided for in Paragraph 10 of this Agreement, or if the Court enters the final judgment and appellate review is sought, and on such review, such final judgment is not affirmed in its entirety, then Panasonic and the Plaintiffs shall each, in their sole discretion, have the option to rescind this Agreement in its entirety, except as

provided in paragraph 18 (a). Written notice of the exercise of any such right to rescind shall be made according to the terms of Paragraph 37.  A modification or reversal on appeal of any amount of Class Counsel's fees and expenses awarded by the Court from the Settlement Fund shall not be deemed a modification of all or a part of the terms of this Agreement or such final judgment.

27.     In the event that this Agreement does not become final, then this Agreement shall be of no force or effect and any and all parts of the Settlement Fund caused to be deposited in the Escrow Account (including interest earned thereon) shall be returned forthwith to Panasonic less only disbursements made in accordance with Paragraph 18(a) of this Agreement.  Plaintiffs expressly reserve all their claims and Panasonic Releasees expressly reserve all of their rights and defenses if this Agreement does not become final.

28.     Further, and in any event, Plaintiffs and Panasonic agree that this Agreement, whether or not it shall become final, and any and all negotiations, documents, and discussions associated with it, shall not be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing whatsoever by Panasonic (or the Panasonic Releasees), or of the truth of any of the claims or allegations contained in the complaint or any other pleading filed in the Action, or by any person or entity in any other action, and evidence thereof shall not be discoverable or used directly or indirectly, in any way, whether in the Action or in any other action or proceeding.

29.     This Agreement shall be construed and interpreted to effectuate the intent of the parties, which is to provide, through this Agreement, for a complete resolution of the relevant claims with respect to each Panasonic Releasee as provided in this Agreement.

30.     The parties to this Agreement contemplate and agree that, prior to final approval of the settlement as provided for in Paragraphs 8-11 hereof, appropriate notice (i) of the settlement; and (ii) of a hearing at which the Court will consider the approval of this Settlement Agreement will be given to Class Members.

H.     Miscellaneous

31.     This Agreement does not settle or compromise any claim by

14

Plaintiffs or any Class Member asserted in Plaintiffs' Fourth Consolidated Amended Complaint or, if amended, any subsequent Complaint, against any defendant or alleged co-conspirator other than the Panasonic Releasees. All rights against such other defendants or alleged coconspirators are specifically reserved by Plaintiffs and the Class. Panasonic's sales to the Class shall not be removed from the Action.

32. The United States District Court for the Northern District of California shall retain jurisdiction over the implementation, enforcement, and performance of this Agreement, and shall have exclusive jurisdiction over any suit, action, proceeding, or dispute arising out of or relating to this Agreement or the applicability of this Agreement that cannot be resolved by negotiation and agreement by Plaintiffs and Panasonic. This Agreement shall be governed by and interpreted according to the substantive laws of the State of California without regard to its choice of law or conflict of laws principles.

33. This Agreement constitutes the entire, complete and integrated agreement among Plaintiffs and Panasonic pertaining to the settlement of the Action against Panasonic Releasees, and supersedes all prior and contemporaneous undertakings of Plaintiffs and Panasonic in connection herewith. This Agreement may not be modified or amended except in writing executed by Plaintiffs and Panasonic, and approved by the Court.

34. This Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of Plaintiffs and Panasonic. Without limiting the generality of the foregoing, each and every covenant and agreement made herein by Plaintiffs, Class Counsel or Panasonic shall be binding upon all Class Members, Releasors, and Panasonic. The Panasonic Releasees (other than Panasonic which is a party hereto) are third party beneficiaries of this Agreement and are authorized to enforce its terms applicable to them.

35. This Agreement may be executed in counterparts by Plaintiffs and Panasonic, and a facsimile signature shall be deemed an original signature for purposes of executing this Agreement.

36. Neither Plaintiffs nor Panasonic (nor any Panasonic Releasee) shall be considered to be the drafter of this Agreement or any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or

15

might cause any provision to be construed against the drafter of this Agreement.

37. Where this Agreement requires either party to provide notice or any other communication or document to the other, such notice shall be in writing, and such notice, communication, or document shall be provided by email, facsimile or letter by overnight delivery to the undersigned counsel of record for the party to whom notice is being provided.

38. Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Agreement, subject to Court approval.

Dated: Jan 26, 2015

Mario N. Alioto

Mario N. Alioto
malioto@tatp.com
Lauren C. Capurro
laurenrussell@tatp.com
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200

**Class Counsel and Attorneys for the Class**

Dated: Jan 25, 2015

Jeffrey L. Kessler

Jeffrey L. Kessler (pro hac vice)
Email:Jkessler@winston.com
Eva Cole (pro hac vice)
Email:ewcole@winston.com
WINSTON & STRAWN LLP
200 Park Avenue

16

New York, NY 10166
Telephone: (212)294-6700

**Attorneys for Defendants Panasonic
Corporation (f/k/a Matsushita Electric
Industrial Co., Ltd.), Panasonic
Corporation of North America, MT
Picture Display Co., Ltd.**

17

# EXHIBIT 4

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
 4                Case No. CV075944SC
 5                   MDL No. 1917
 6   _____X
 7   IN RE CATHODE RAY TUBE (CRT)
 8   ANTITRUST LITIGATION
 9   This Document Relates to:
10   ALL ACTIONS
11   _____X
12        SUPERIOR COURT OF THE STATE OF CALIFORNIA
13            CITY AND COUNTY OF SAN FRANCISCO
14                     Case No.: CGC11515784
15   STATE OF CALIFORNIA, et al.
16                   Plaintiffs
17   v.
18   SAMSUNG SDI, INC., CO., LTD. et al.
19                   Defendants.
20   _____X
21                          Washington, D.C.
22                          October 9, 2014
23                           9:07 a.m.
24            VIDEOTAPED DEPOSITION OF:
25               JAN DE LOMBAERDE
```

Page 35

```
 1         DE LOMBAERDE - HIGHLY CONFIDENTIAL
 2    organization, so Philips Holland, Philips
 3    Netherlands.
 4         Q    Have you ever heard the abbreviation
 5    KPNV?
 6         A    I did.
 7         Q    What does that mean?
 8         A    That is the overall holding company of
 9    Philips.
10         Q    Is that who you were employed by when
11    you were the manager of the Leverage Group?
12         A    No, I was not.
13         Q    Is Philips Consumer Electronics, is that
14    a global company?
15              MR. MALAISE:  Object to form.
16              MR. ROTTNER:  Sorry, strike that.  Was
17         that a global division?
18              MR. MALAISE:  Same objection.
19              THE WITNESS:  It was global.
20         Q    Has that ever been abbreviated as PCE?
21         A    Yes.
22         Q    I see some notes where it just says CE.
23    Has it ever been just referred to as CE?
24         A    That is basically the same.
25         Q    When you switched back to Philips
```

CRT Transcripts
Confidential Depo Vol
Jan De Lombaerde

Page 36

```
 1           DE LOMBAERDE - HIGHLY CONFIDENTIAL
 2    Consumer Electronics in 2000, and you said you
 3    worked with audio, what is audio, radios, things
 4    like that?
 5        A    Radios, clock radios, speakers.  How do
 6    they call them?  Combination of cassette
 7    recorders and radios, so the combis, combi
 8    units, CD.  So all activities related to CDs
 9    were in there.
10        Q    And you would manage the purchasing
11    aspect of that business?
12        A    I did.
13        Q    The business group, the audio business
14    group was located in Hong Kong?
15        A    That's right.
16        Q    But you were not in Hong Kong?
17        A    No, I was not.
18        Q    But you managed the purchasing division
19    in Hong Kong?
20        A    Right.
21        Q    How long were you in the audio --
22        A    Only for a little bit, one and a half
23    year.
24        Q    Then where did you go?
25        A    And then I went -- or I became manager
```

Page 37

```
 1        DE LOMBAERDE - HIGHLY CONFIDENTIAL
 2   of the supply-base team displays.
 3        Q    Is that January 5th, 2001?
 4        A    That's right.
 5        Q    And as manager of the supply-base team
 6   you were still with Philips Consumer
 7   Electronics?
 8             MR. MALAISE:  Objection to form.
 9             THE WITNESS:  I was with Philips Holland.
10        I remained with Philips Holland in that
11        function, because I was stationed in Holland.
12        And I was a member of Philips Netherlands.
13        Q    So you were or were not working for
14   Philips Consumer Electronics?
15             MR. MALAISE:  Same objection.
16             THE WITNESS:  Philips Consumer Electronics
17        was a term referring to all the business that
18        was related to consumer electronics, but that
19        was not a legal entity.
20        Q    It was just a name that Philips gave
21   that --
22        A    To all the businesses related to
23   electronics.
24        Q    It's not separately incorporated or
25   anything like that?
```

```
 1         DE LOMBAERDE - HIGHLY CONFIDENTIAL
 2     A    No, it was not.
 3     Q    So you just considered yourself to be an
 4  employee of Philips?
 5         MR. MALAISE:  Objection to form.
 6         THE WITNESS:  Of Philips Holland at that
 7     time, indeed.
 8     Q    How long were you in that position?
 9     A    I was in that position until
10  October 2007.
11     Q    Did you have a title?
12     A    I was -- my title was supply-base
13  manager of displays.
14     Q    Were you ever promoted?
15     A    I was promoted after two years to VP in
16  that function.
17     Q    Was that in 2002?
18     A    No.  I think it was end of 2003.
19     Q    Were you vice president until you left
20  in 2007?
21     A    I was vice president until I left --
22  retired from Philips.
23     Q    Right.  That was a bad question.
24         So you were vice president until you no
25  longer worked on the supply-base management
```

```
 1        DE LOMBAERDE - HIGHLY CONFIDENTIAL
 2   team?
 3            MR. MALAISE:  Objection to form.
 4            THE WITNESS:  I became a vice president in
 5       2003, and I remained vice president until I
 6       retired from Philips.
 7   BY MR. ROTTNER:
 8       Q    And where were you located at that time?
 9       A    I started the supply-base management
10   team responsibility in Eindhoven, and so where I
11   had the responsibility of all displays related
12   to both TV activities.  And then in 2004, so
13   that included all the start-up of LCD television
14   in -- at the back end of 2002.
15            And as it became clear that the whole
16   business of LCD television would require a major
17   focus we -- Philips decided to change its
18   organization and to bring all CRT TV related
19   activity into one unit in Philips Singapore.
20            At that time, so my responsibility
21   changed from the display business to only those
22   activities, those tubes that were used in the TV
23   business.  That is where I moved to Singapore in
24   May 2004.
25       Q    So prior to 2004 you had responsibility
```

CRT Transcripts
Case 4:07-cv-05944-JST   Document 6334-2   Filed 11/03/23   Page 69 of 94
De Lombaerde, Jan Vol
Jan De Lombaerde

Page 40

```
 1          DE LOMBAERDE - HIGHLY CONFIDENTIAL
 2     for both --
 3          A     CRT.
 4          Q     Computer monitors and --
 5          A     Not monitors, only TV business or the
 6     TRTs, or TV business, and the LCDs for TV
 7     business.
 8          Q     You had no responsibility for CDTs for
 9     computer monitors?
10          A     No.
11          Q     At no point between 2001 and 2007 did
12     you have responsibility for CDTs?
13          A     Later on I had when we switched -- when
14     I switched to Singapore, I also became
15     responsible for the monitors used for the
16     Philips business.
17          Q     Can you generally describe your
18     responsibilities for me as a supply-base
19     manager?
20              MR. MALAISE:  Objection to form.
21              THE WITNESS:  My basic responsibility was
22         to lead a team of five regional buyers.  One
23         guy that was responsible for all technology
24         issues, and one guy that was responsible for
25         all quality and specification issues that there
```

```
 1        DE LOMBAERDE - HIGHLY CONFIDENTIAL
 2      would be.
 3            My main activity would be to work very
 4      closely with all the regional buyers and
 5      coordinate with these guys all the
 6      negotiations, all the business relationships,
 7      and make sure we had the best possible deals
 8      for Philips.
 9      Q    Was that always the goal, to get the
10   best possible deal for Philips?
11            MR. MALAISE:  Objection to form.
12            THE WITNESS:  It was -- I believe when I
13      say Philips I talk about the TV business, of
14      course.
15      Q    What you were working in?
16      A    Exactly.  I was responsible for my
17   business and that was my task to get the best
18   possible deal for that business.
19      Q    Was that the same when you became
20   responsible for computer monitors in 2004?
21      A    It was.
22      Q    I want to go back.  You said that you
23   were a leader of a team of five regional buyers.
24   Do you know what those five regions were?
25      A    Yes.  We had Europe, North America,
```

# EXHIBIT 5

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

Page 1

1                  UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
2                    SAN FRANCISCO DIVISION

3    _____

     In Re:  CATHODE RAY TUBE (CRT)   No. 3:07-cv-05944-SC
4    ANTITRUST LITIGATION
                                      MDL No.1917
5

     _____
6

7        SUPERIOR COURT OF THE STATE OF CALIFORNIA
8            CITY AND COUNTY OF SAN FRANCISCO
9    _____
10   STATE OF CALIFORNIA, et al,
11           Plaintiffs,
12   v
13   SAMSUNG SDI, INC, CO., LTD., et al.
14           Defendants
15   _____
16
17          Thursday, December 12, 2013, 9:35 a.m.
18
19   Videotaped deposition of JIM SMITH, Volume 1,
20   held at Hilton Hotel, Newcastle Gateshead,
21   England, UK.
22
23
24
25

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

Page 303

1        (Exhibit 2262 marked for identification)        20:01:03

2             Sir, I'm throwing at you - I don't mean to -   20:01:04

3    to you and your counsel what I've marked as Exhibit    20:01:06

4    2262.  Take a look at that.  I will for the record     20:01:09

5    state it is a NAFTA TV production shift to Asia.       20:01:28

6    Asian TV shipment to USA increase, October 7th 2002    20:01:30

7    power point presentation of LPD.                       20:01:38

8             MR ROSS:  Is there a Bates number?  I just    20:01:44

9    noticed that. I believe the Bates number               20:01:46

10   PHLP-CRT-010948.  It's a native format.  In fact, if   20:01:49

11   you'll hand me the exhibit back, I'll write that down  20:01:57

12   so it's on there for the record.                       20:02:01

13             MR BOGDANOV:  Does that have                 20:02:19

14   a confidentiality state.                               20:02:20

15             MR ROSS:  I am guessing it did. I don't know 20:02:23

16   as I sit here, but let's treat it as confidential.     20:02:24

17   BY MR ROSS                                             20:02:55

18             Q.  Sir, have you finished reviewing the     20:02:55

19   document?                                              20:02:55

20             A.  Yes.                                     20:02:55

21             Q.  Is this a presentation you recall seeing 20:02:56

22   while you were at LPD?                                 20:02:58

23             A.  I don't think I ever saw this document.  20:03:01

24   I see it's dated October 7th, 2002.  I was back in     20:03:02

25   Europe at that time and the document is not familiar   20:03:13

Page 304

1    to me.  I don't recall any document with Walmart,        20:03:15
2    Kmart, Best Price, Circuit City...  I don't recall any    20:03:17
3    document with any of these companies mentioned on it.    20:03:25
4            MR ROSS:  One of those companies that you        20:03:28
5    just mentioned was Circuit City, the forerunner of my    20:03:30
6    client?                                                   20:03:34
7            A.  Yes.                                          20:03:35
8            Q.  If you could turn to the third page of       20:03:36
9    the power point presentation.  It talks about "China     20:03:38
10   TV export to USA trend"?                                  20:03:44
11           A.  Yes.                                          20:03:50
12           Q.  Whether you saw this document or not,         20:03:51
13   were you generally familiar with the concept that in      20:03:52
14   this time period, 2002 time period, that Chinese          20:03:55
15   television exports to the USA were going up and           20:03:58
16   increasing rather rapidly?                                20:04:02
17           MR. TALADAY:  Objection, lack of foundation,      20:04:03
18   calls for speculation.                                    20:04:06
19           A.  I'm not.  I wasn't responsible for China      20:04:07
20   anymore, so I wasn't really conscious of this.  I see     20:04:10
21   the numbers start very small, so -- and it's a very       20:04:14
22   short time period, so I don't see how I would, even       20:04:25
23   with occasional contact with other regions in             20:04:28
24   meetings, I'm not aware of this.                           20:04:31
25           MR ROSS:  Do you see on the two more pages        20:04:33

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

Page 305

| | | |
|---|---|---|
| 1 | in where it says "AP TV export to USA trend"? | 20:04:34 |
| 2 | A.  Yes. | 20:04:43 |
| 3 | Q.  It shows the 2002 export from AP to USA | 20:04:43 |
| 4 | has increased by 39 per cent? | 20:04:47 |
| 5 | A.  Does it say 39 per cent -- oh, yes. | 20:04:50 |
| 6 | Q.  Is that something you were generally | 20:04:55 |
| 7 | aware of at this time? | 20:04:56 |
| 8 | A.  No. | 20:04:57 |
| 9 | MR. TALADAY:  Objection, lack of foundation, | 20:04:58 |
| 10 | calls for speculation. | 20:05:01 |
| 11 | MR ROSS:  Then if you turn to the next page, | 20:05:03 |
| 12 | you see "Major AP suppliers policy for NAFTA | 20:05:05 |
| 13 | shipment". | 20:05:10 |
| 14 | A.  Yes. | 20:05:15 |
| 15 | Q.  And you see the list of companies that | 20:05:16 |
| 16 | are supplying televisions from the Asian region to the | 20:05:20 |
| 17 | NAFTA region? | 20:05:29 |
| 18 | A.  Yes. | 20:05:30 |
| 19 | MR. TALADAY:  Objection, mis-characterizes | 20:05:34 |
| 20 | the document. | 20:05:35 |
| 21 | MR ROSS:  Do you see at the bottom one of | 20:05:37 |
| 22 | them is Sharp, Malaysia? | 20:05:38 |
| 23 | A.  Yes, I see that. | 20:05:40 |
| 24 | Q.  Sir, we found the email that this was | 20:05:48 |
| 25 | attached to.  I'm just going to mark that for the | 20:05:51 |

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

Page 306

| | | |
|---|---|---|
| 1 | record and show that to you.  What I've marked as | 20:05:53 |
| 2 | Exhibit 2263. | 20:06:01 |
| 3 | (Exhibit 2263 marked for identification) | 20:06:03 |
| 4 | It's an email Bates labelled | 20:06:05 |
| 5 | PHLP-CRT-010945? | 20:06:08 |
| 6 | A.  Yes. | 20:06:15 |
| 7 | Q.  It's dated October 8th 2002.  It says, | 20:06:15 |
| 8 | "Subject, NAFTA supply shift to AP/China." | 20:06:19 |
| 9 | A.  Yes. | 20:06:25 |
| 10 | Q.  Do you see that you're one of the CCs up | 20:06:28 |
| 11 | there, about five down, first one on the line? | 20:06:31 |
| 12 | A.  I see that. | 20:06:35 |
| 13 | Q.  Okay.  And the fact that you're seeing | 20:06:36 |
| 14 | an email that attached the previous exhibit, does that | 20:06:39 |
| 15 | refresh your recollection in any way of receiving that | 20:06:43 |
| 16 | power point presentation? | 20:06:46 |
| 17 | A.  No, it doesn't.  This appears to come | 20:06:48 |
| 18 | from business information.  These guys drown you with | 20:06:59 |
| 19 | stuff and I would not read a lot of that stuff. | 20:07:02 |
| 20 | I can't be categorical, but region Asia Pacific was of | 20:07:07 |
| 21 | no interest to me after I came back. | 20:07:13 |
| 22 | Q.  Can you give us an indication as to why | 20:07:15 |
| 23 | -- what was the section that you said sent it, | 20:07:18 |
| 24 | business? | 20:07:21 |
| 25 | A.  Business information. | 20:07:22 |

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

Page 307

```
 1              Q.  Can you give us any informed reason why    20:07:23
 2    business information was sending you this document       20:07:27
 3    since you were no longer -- since you were in Europe     20:07:31
 4    and not in Asia?                                         20:07:34
 5              MR. TALADAY:  Objection, calls for             20:07:37
 6    speculation.                                             20:07:38
 7              A.  Only that they had a tendency to send      20:07:39
 8    everything to everybody.                                 20:07:41
 9              MR ROSS:  Well, there are several people on    20:07:48
10    the email, but not everybody, right, sir?                20:07:50
11              MR. TALADAY:  Objection, argumentative.        20:07:53
12              MR ROSS:  Okay -- strike that.  Can you tell   20:07:55
13    us why Mr. Johnson was sending it to this select group   20:07:56
14    of people?                                               20:08:01
15              MR. TALADAY:  Objection, calls for             20:08:02
16    speculation.                                             20:08:02
17              A.  I knew Mr. Johnson well.  Maybe he         20:08:14
18    thought I would be interested in this.  I don't          20:08:19
19    recognize why these specific people should be on this    20:08:23
20    email.                                                   20:08:29
21              MR ROSS:  Putting that aside, and you can      20:08:30
22    put that down, weren't you aware while you were at LPD   20:08:32
23    that there was this switch of NAFTA production,          20:08:35
24    production that was previously in the NAFTA countries    20:08:39
25    to Asia or elsewhere?                                    20:08:42
```

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

Page 308

1       MR. TALADAY:  Objection, vague as to the      20:08:45
2    company and also calls for speculation, and asked and   20:08:47
3    answered.                                            20:08:49
4       A.  No, I wasn't.  As I mentioned to you,       20:08:51
5    I noticed that the graph started at very low numbers   20:08:53
6    in 2002.  So, it was -- I had already been out of    20:08:56
7    Asia.  So I don't recall being aware of that.        20:09:04
8       MR ROSS:  You were just never, while at LPD,    20:09:06
9    generally aware of that type of switch.              20:09:08
10      MR. TALADAY:  Asked and answered.                20:09:12
11      A.  No.                                          20:09:13
12      MR ROSS:  Okay.  Just to finish up,              20:09:14
13   Mr. Smith and I do appreciate your time today, I know   20:09:16
14   it's been a long day.  Earlier today you said that you   20:09:18
15   would never exchange capacity information with your   20:09:22
16   competitors in Europe.  Did I get that right?        20:09:24
17      A.  The recorder would have to repeat,           20:09:30
18   I don't recall saying exactly those words.           20:09:33
19      MR ROSS:  Do I have it generally right, the      20:09:36
20   concept?                                             20:09:38
21      A.  I think when we -- when I visited Sony,      20:09:41
22   for example, I might well tell them what our broad    20:09:46
23   capacity figures were.                               20:09:51
24      Q.  Okay.  So you're now telling us that you     20:09:53
25   would -- or you might well tell --                   20:09:54

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

Page 309

```
 1            A.  I'm telling you of a specific instance    20:09:58
 2    where I might tell them.  This is information of no    20:10:01
 3    consequence.                                           20:10:07
 4            Q.  You saw the type of capacity information   20:10:11
 5    that was included in these reports from the Asian      20:10:14
 6    meetings, right, sir?                                  20:10:18
 7            MR. TALADAY:  Objection, vague and             20:10:19
 8    mis-characterizes testimony.                           20:10:21
 9            A.  Yes, I.  Saw that information in the        20:10:24
10    meetings held in Asia.                                 20:10:27
11            MR ROSS:  Right.  Is that the type of          20:10:29
12    capacity information that you would feel comfortable    20:10:31
13    giving to your competitors in Europe?                  20:10:34
14            MR. TALADAY:  Objection, vague as to the       20:10:36
15    type of capacity information.                          20:10:37
16            A.  No, I wouldn't.                            20:10:40
17            MR ROSS:  Okay.  Why not?                      20:10:42
18            A.  They don't need to know it.                20:10:44
19            Q.  Why then did you do that in Asia?          20:10:46
20            MR. TALADAY:  Objection, argumentative.        20:10:48
21            MR. FOSTER:  Mis-characterizes previous        20:10:51
22    testimony.                                             20:10:51
23            A.  Because it was already known.  It was      20:10:53
24    already in the system.                                 20:10:55
25            MR ROSS:  Because it had been done before      20:10:59
```

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

Page 310

1    you got there?  Is that what you're saying?        20:11:02

2              A.  Yes.                                  20:11:05

3              Q.  And you saw no reason to change that  20:11:05

4    once you arrived?                                   20:11:06

5              MR WILSON:  Objection, asked and answered?  20:11:10

6              MR FOSTER:  Mis-characterizes prior       20:11:13

7    testimony.                                          20:11:13

8              A.  I'm not saying there's anything       20:11:14

9    admirable in that position.  I'm merely saying      20:11:16

10   I continued with it.                                20:11:19

11             MR ROSS:  Thank you, sir.  I appreciate your  20:11:21

12   time.  I think we're done for the day.              20:11:23

13             THE VIDEOGRAPHER:  This is the end of DVD 5  20:11:33

14   and the video deposition today, to be continued with  20:11:35

15   Mr. Jim Smith.  We're now going off the record at   20:11:39

16   8:13 p.m. as indicated on the video screen.         20:11:41

17

18

19        (The deposition was adjouned at 20.13 p.m.

20           and to be continued on December 13th)

21

22

23

24

25

# EXHIBIT 6



June 20, 2012

**Certification**

**Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of the document with bates numbers range: CHU00029191E – CHU00029194E.

*[signature]*

_____

Abraham I. Holczer

Project Manager

Park                         Case                         #                         29567

134 W. 29th Street 5th Floor • New York, N.Y. 10001
Phone: 212-581-8870 • Fax: 212-581-5577



[TRANSLATION]

→ Du

[Handwritten and Circled:] Secret

## Meeting Minutes

Date: 1999/5/20

Attendees:  *SDD – Mr. I. Kim/ Mr. Michael Son/ Mr. Ha, OEC -- Mr. H. C. Moon/*
*Mr. J.W. Moon/ Mr. Karl Min/ Mr. J. H. Moon, LGE -- Mr. S. Y. Choi/*
*Mr. G. I. Choi/ Mr. S. H. Jo/ Mr. S. M. Ahn*

*CPT* :  President Lin/ Director Liu/ Section Chief Du/ Chun-Mei Hsieh

Meeting Subject: *CPT Top Management Meeting*

I.   Meeting agenda :
1.  *Summary of May 10 meeting at Seoul.*
2.  *Reconfirmation for sending 3rd Q. price notice letter.*
3.  *Decision of timing and condition for price up.*
4.  *Other Issue*

II.  Contents:
1.  *Summary of May 10 Meeting at Seoul*
    1)  *Status of price notice* (as originally *SKDL* scheduled as below)

*Price notice:*

| Customers | ORION | SREC | FUNAI | TCE | AIWA |
|---|---|---|---|---|---|
| Team leader | CPT | LGE | OEC | SDD | Thai |
| Noticed | April 30 | May 07 | April 14 | May 03 | May 13 |
| Methods | Explanation | Ver. Explanation | Explanation | Formal letter | Letter |
| Indicated price | | | 14" $30.00 Bare | 14" $30.00 Bare | 14" $33.00 ITC |
| | | | 20" $50.00 Bare | | |
| Agreed price | 14" $32.00 ITC | 14" $33.50 ITC | 14" $33.50 ITC | 14" $32.50 ITC | 14" $33.00 ITC |
| | 20" $53.00 ITC | 20" $54.50 ITC | 20" $54.50 ITC | 20" $53.50 ITC | 20" $54.00 ITC |
| | CIF A/S | ARR A/S | ARR A/S | CIF 45days | ARR A/S |
| | Orion | SREC | FUNAI | TCE | AIWA |
| Customer response | Very negative | Seem skeptical | 5/E-6/B Re-negotiation | Strongly demanded reconsideration | Understood, but requested reconsideration |

---

English words found in the original text are *italicized.*
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00029191E
Translation

1) Further explanation of various makers' progress:
   ① *CPT* – we indicated that we have already drafted the price-up notification letter and have also formally notified *Orion* – the customer CPT is responsible to notify – by faxing a letter to Orion's headquarters in Japan on 5/18. In addition, we have verbally communicated to other customers – *SREC, TCE* and *FUNAI* about the impending price-up. Letters will be formally sent out on 5/20.
   ② *Mr. I. Kim* of *SDD* also indicated that a formal facsimile was sent on 5/3 to *Thomson (Korea)*, although the reply expressed full understanding of the situation, it urged to reconsider. In addition, a letter was sent to *FUNAI* on 5/19, while *SREC* was given a verbal explanation. It was planned that the formal letter would go out on 5/22.
   ③ *L/G – Mr. Choi* said that on 5/17 the 3rd *Q* price-up issue was verbally explained to *SREC M.D. Mr. Terada* – the response was *not good*. A formal price-up notice letter is ready, and would be sent out right after the meeting. Subsequent visits would be made to *FUNAI* on 5/19, and to *TCE* on 5/20 to discuss the proposed price-up.
   ④ *OEC – Mr. Moon* indicated that: *THAI-CRT* had sent a formal letter to inform *AIWA* of the price-up. *OEC* has notified its customer *FUNAI* as well, and the two sides would meet to further discuss the issue by the end of May or beginning of June. Meanwhile, a letter would be sent to *SREC* on 5/22.

2. *Reconfirmation for sending 3rd Q price notice letter*
   In addition to notifying the *Key Accounts,* formal notifications should be sent as soon as possible to customers such as *SREC, FUNAI, ORION, THOMSON* and *AWAI* respectively. As for the time to send the letter, after makers' *Review* and discussion, *SKDL* was set as follows:

*Schedule of sending letter*

|  |  | ORION | SREC | FUNAI | TCE | AIWA |
|---|---|---|---|---|---|---|
| Team leader |  | CPT | LGE | OEC | SDD | Thai |
| Sending letter |  | May 18 | May 17 | May 14 | May 03 | May 13 |
| Team vendors | CPT |  | May 20 | May 20 | May 20 | May 20 |
|  | LGE | X |  | May 19 | May 19 | May 22 |
|  | OEC | X | May 22 | [blank] | X | X |
|  | SDD | X | May 22 | May 19 |  | May 22 |
|  | Thai | May 19 | X | X | May 19 |  |
|  | TSB | O | O | O | X | O |
| Remarks: OEC will inform TDD(I) of the above listed SKDL | | | | | | |

3. *Decision of timing & condition for price up:*
   1) 1999 *Q1-Q3* (14"/20"/21") production capacity and order estimates of various makers are as follow:

---

English words found in the original text are *italicized.*
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL        CHU00029192E
                                                 Translation

*Demand & Supply*

| 14" | 99Q1 | | | 99Q2 | | | 99Q3 | | |
|---|---|---|---|---|---|---|---|---|---|
| Maker | Demand | Supply | Surplus | Demand | Supply | Surplus | Demand | Supply | Surplus |
| TOT | 1250 | 1660 | 410 | 1245 | 1350 | 105 | 1335 | 1350 | 15 |
| % | 75.3% | | | 92.2% | | | 98.9% | | |
| CPT | 230 | 360 | 130 | 260 | 300 | 40 | 380 | 360 | -20 |
| LGE | 140 | 170 | 30 | 165 | 170 | 5 | 165 | 170 | 5 |
| OEC | 270 | 340 | 70 | 190 | 190 | 0 | 90 | 90 | 0 |
| SDD | 380 | 520 | 140 | 400 | 420 | 20 | 420 | 420 | 0 |
| Thai | 110 | 120 | 10 | 110 | 120 | 10 | 130 | 160 | 30 |
| TSB | 120 | 150 | 30 | 120 | 150 | 30 | 150 | 150 | 0 |

*Remarks: CPT- 3/E 14" 0.5 Line Reduced/ SDD – 3/E 0.5 Line reduced*
*OEC – 2/E 14" 1.0 Line, 5/E 0.5 Line to reduce (plan), and 14" will be*
*produced only in Vietnam.*

## Medium

| Maker | 99Q1 | | | 99Q2 | | | 99Q3 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Demand | Supply | Surplus | Demand | Supply | Surplus | Demand | Supply | Surplus |
| TOT | 1200 | 1540 | 340 | 1168 | 1220 | 52 | 1117 | 1150 | 33 |
| % | 77.9% | | | 95.7% | | | 97.1% | | |
| CPT | 70 | 140 | 70 | 110 | 140 | 30 | 110 | 140 | 30 |
| LGE | 320 | 370 | 50 | 336 | 370 | 34 | 355 | 340 | -15 |
| OEC | 370 | 440 | 70 | 260 | 230 | -30 | 230 | 230 | 0 |
| SDD | 240 | 370 | 130 | 252 | 260 | 8 | 252 | 260 | 8 |
| Thai | 150 | 160 | 10 | 158 | 160 | 3 | 110 | 120 | 10 |
| TSB | 50 | 60 | 10 | 53 | 60 | 8 | 60 | 60 | 0 |

*Remarks: OEC-3/E 1.0 Line reduced, 5/E 0.5 Line to reduce (plan)/ SDD -3/E 0.5 Line*
*reduced*

Demand & Supply *of 14": Overcapacity: Q*1 – 24.7% / *Q*2 – 7.8% / *Q*3 – 1.1%
*Medium: Overcapacity: Q*1 – 22.1% / *Q*2 – 4.3% / *Q*3 – 2.9%

✱✱Best timing to raise price:

*CPT*'s President Lin indicated that customers such as *Orion* would be getting brisk orders in *3rd Quarter* as the U.S. market high season was drawing near. *Funai (China)* factory has newly increased 14" orders, and together with the high season demands of customers such as *Thomson*,

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL      CHU00029193E
Translation

it was expected that our 14" order would increase from 260*k/M* to 380*k/M* in Q3. *SDD* also indicated that the situation of *SEC*'s orders in *CIS* and Middle East market are becoming better, and according to what we heard, *TDDI*'s orders in Q3 were already full. *LG* was getting more internal demands (*for CIS/M. East*), and, because it would switch to producing 21" *(Flat)* in Korea in August, *LGE-medium*'s supply and demand has become *tight*. Therefore, all makers agreed that as long as everyone synchronizes the price-up implementation, even at the risk of suffering slow business for one month because customers hesitated or were taking a wait-and-see attitude, eventually we would pull through and would definitely accomplish the price-hike targets according to schedule.

3. *Other Issue:*

   1) Regarding *THAI-CRT*'s attitude towards the Q3 price-up, *ORN-Mr. Moon* said although *THAI-CRT* was absent again with excuse, it would *follow* the resolution of the meeting. But various makers, after discussion, decided to phone and contact its *M.D. Mr. Chaovallt* who said he would meet with everyone in Taipei on June 1 (Tuesday) to continue the discussion.

   2) About *China Market*:
      Sales of 14" and 25" in China market are okay. However, imbalance between demand and supply on 21"/29" continues to exist. The eight *CRT* major makers within Chinese territory are going to hold a meeting on 5/23 to discuss how to improve capacity planning. We heard that someone suggested to shutting down for one month to resolve the problem. However, *SDD* thought a shutdown of 7-10 workdays would be easier to carry out an *Audit* properly.

   3) *IRICO (Caihong, China)* and *BMCC*:
      *CPT* was elected as representative to convey the Q3 price-up news to *IRICO*, and ask it to *follow*; *SDD* would be responsible for delivering the message to *BMCC*, in order to prevent the two makers from using lower-prices to confuse customers currently being shipped by makers at the meeting.

   -- End of report --

   Submitted for approval and instruction

   [Initialed:] Chih-Chun (C.C.) Liu 5/24
   [Initialed:] Chieng-Yuan (C.Y.) Lin 5/24
   [Initialed:] Chen-Cheng (Tony) Chien 5/24
   [Initialed:] Ching-Yuan (Michael) Du 5/24

   Respectfully submitted by staff, Chun-Mei Hsieh
   1999/05/24

---

English words found in the original text are *italicized*.
Translator's remarks are indicated in brackets [ ].

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00029194E
Translation



 **中華映管股份有限公司業務處**

楊梅廠 電話：(03)4858035 傳真：(03)4858093 桃園縣楊梅鎮行善路 80 號
桃園廠 電話：(03)3675151 傳真：(03)3667612 桃園縣八德市和平路 1127 號

## 會議記錄

時間：88年5月20日
參會者：SDD-Mr.I..Kim/ Mr.Michael Son/ Mr.Ha、OEC-Mr.H.C.Moon/ Mr.J.W.Moo
　　　n/ Mr.Karl Min/ Mr.J.H.Moon、L/G-Mr.S.Y.Choi/ Mr.G.I.Choi/　Mr.S.H.Jo/
　　　Mr.S.M.Ahn
CPT：林總經理/ 劉處長/ 杜課長/ 謝春美

**會議主題：CPT Top Management Meeting**

**(一)會議議題：**
1. Summary of May 10 meeting at Seoul.
2. Reconfirmation for sending 3rd Q. price notice letter.
3. Decision of timing & condition for price up.
4. Other Issue

**(二)會議內容：**
1. **Summary of May 10 Meeting at Seoul**
　1) Status of price notice:(依原訂定SKDL如下)
　　**Price notice:**

| Customers | ORION | SREC | FUNAI | TCE | AIWA |
|---|---|---|---|---|---|
| Team leader | CPT | LGE | OEC | SDD | Thai |
| Noticed | Apr 30 | May 07 | Apr 14 | May 03 | May 13 |
| Methods | Explanation | Ver. Explanation | Explanation | Formal letter | Letter |
| Indicated price | | | 14" $30.00 Bare | 14" $30.00 Bare | 14" $33.00 ITC |
| | | | 20" $50.00 Bare | | |
| Agreed price | 14" $32.00 ITC | 14" $33.50 ITC | 14" $33.50 ITC | 14" $32.50 ITC | 14" $33.00 ITC |
| | 20" $53.00 ITC | 20" $54.50 ITC | 20" $54.50 ITC | 20" $53.50 ITC | 20" $54.00 ITC |
| | CIF A/S | ARR A/S | ARR A/S | CIF 45days | CIF A/S |
| | ORION | SREC | FUNAI | TCE | AIWA |
| 客戶反映 | Very negative | Seem skeptical | 5/E-6/B再議 | 強烈要求再檢討 | 瞭解但請再檢討 |

1

CONFIDENTIAL - GRAND JURY MATERIAL



CHU00029191

1)各家進展狀況再說明：
  ❶ CPT-我方表示已擬妥價格調漲之通知函，且對我方負責通知的客戶Orion
    已於5/18正式以傳真通知其日本總部。另亦分別口頭向客戶SREC、TCE
    及FUNAI等表明了擬調漲價格；將於5/20正式發出信函。
  ❷ SDD-Mr. I. Kim亦稱：已於五月三日正式傳真通知Thomson(Korea)，對方回
    覆雖充分瞭解狀況，但請求再考慮。另亦於5/19發函給FUNAI並已向SREC
    口頭說明，擬於5/22發出正式信函。
  ❸ L/G-Mr. Choi表示5/17已向SREC M. D.-Mr. Terada口頭說明有關 3rd Q. 價
    格調漲件，對方反映 not good;正式的調漲函已備妥，將於會後隨即發
    送。另將於5/19拜訪FUNAI、5/20拜訪TCE，商討該調漲件。
  ❹ OEC-Mr. Moon稱：THAI-CRT已於5/19正式發函通知AIWA有關價格擬調漲件.
    而OEC亦於5/14通知客戶-FUNAI，雙方將於五月底或六月初再進一步會
    談。另將於5/22發函給SREC。

2. Reconfirmation for sending 3rd Q price notice letter
   各家除上述負責通知的Key Account之外，須分別儘速向SREC、FUNAI、ORION、
   THOMSON、AWAI等客戶發出正式通知信函。發函時間，經各家Review與討論後，
   SKDL明訂如下：

### Schedule of sending letter

|  |  | ORION | SREC | FUNAI | TCE | AIWA |
|---|---|---|---|---|---|---|
| Team leader |  | CPT | LGE | OEC | SDD | Thai |
| Sending letter |  | May 18 | May 17 | May 14 | May 03 | May 13 |
| Team vendors | CPT | - | May 20 | May 20 | May 20 | May 20 |
|  | LGE | X | - | May 19 | May 19 | May 22 |
|  | OEC | X | May 22 | - | X | X |
|  | SDD | X | May 22 | May 19 | - | May 22 |
|  | Thai | May 19 | X | X | May 19 | - |
|  | TSB | O | O | O | X | O |
| Remarks: OEC will inform TDD(I) of the above listed SKDL | | | | | | |

3. Decision of timing & condition for price up:

   1) '99 年 1Q −3Q (14"/20"/21")各家生產線產能規劃及訂單量預估分別如下:

2

### Demand & Supply

| ** 14" | 99Q1 | | | 99Q2 | | | 99Q3 | | |
|---|---|---|---|---|---|---|---|---|---|
| Maker | Demand | Supply | Surplus | Demand | Supply | Surplus | Demand | Supply | Surplus |
| TOT | 1250 | 1660 | 410 | 1245 | 1350 | 105 | 1335 | 1350 | 15 |
| % | 75.3% | | | 92.2% | | | 98.9% | | |
| CPT | 230 | 360 | 130 | 260 | 300 | 40 | 380 | 360 | -20 |
| LGE | 140 | 170 | 30 | 165 | 170 | 5 | 165 | 170 | 5 |
| OEC | 270 | 340 | 70 | 190 | 190 | 0 | 90 | 90 | 0 |
| SDD | 380 | 520 | 140 | 400 | 420 | 20 | 420 | 420 | 0 |
| Thai | 110 | 120 | 10 | 110 | 120 | 10 | 130 | 160 | 30 |
| TSB | 120 | 150 | 30 | 120 | 150 | 30 | 150 | 150 | 0 |

Remarks: CPT- 3/E 14" 0.5 Line reduced / SDD- 3/E 0.5 Line reduced

OEC- 2/E 14" 1.0 Line, 5/E 0.5 Line reduce (plan), and 14" will be produced only in Vietnam.

### Medium

| Maker | 99Q1 | | | 99Q2 | | | 99Q3 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Demand | Supply | Surplus | Demand | Supply | Surplus | Demand | Supply | Surplus |
| TOT | 1200 | 1540 | 340 | 1168 | 1220 | 52 | 1117 | 1150 | 33 |
| % | 77.9% | | | 95.7% | | | 97.1% | | |
| CPT | 70 | 140 | 70 | 110 | 140 | 30 | 110 | 140 | 30 |
| LGE | 320 | 370 | 50 | 336 | 370 | 34 | 355 | 340 | -15 |
| OEC | 370 | 440 | 70 | 260 | 230 | -30 | 230 | 230 | 0 |
| SDD | 240 | 370 | 130 | 252 | 260 | 8 | 252 | 260 | 8 |
| Thai | 150 | 160 | 10 | 158 | 160 | 3 | 110 | 120 | 10 |
| TSB | 50 | 60 | 10 | 53 | 60 | 8 | 60 | 60 | 0 |

Remarks: OEC- 3/E 1.0 Line, 5/E 0.5 Line reduce (plan) / SDD- 3/E O.5 Line reduced

14"供、需: Overcapacity: Q1- 24.7% / Q2- 7.8% / Q3- 1.1%
Medium : Overcapacity: Q1- 22.1% / Q2- 4.3% / Q3- 2.9%
★★價格調漲契機:
 CPT-林總經理表示 3rd Quarter 我方客戶如 Orion 在美國市場的訂單將隨著旺季
來臨而逐漸轉強, 而 FUNAI(China)廠 14"新增訂單, 以及 Thomson 等客戶旺季需

3

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00029193

求量轉旺情況下,預料第三季我方 14"訂單量將可自 260k/M 增至 380k/M。SDD 亦表示 SEC 在 CIS 與中東市場訂單狀況轉好,且 TDDI 據悉第三季訂單已滿。而 LG 在內需(For CIS/M.East)需求量增,且因在 Korea 即將於八月份轉產 21"(Flat) 情況下,LGE-medium 供、需已轉 tight。因此各家一致認為第三季度只要大家同步實施調漲,即使是一個月期間可能因客戶遲疑或觀望而生意稍差,但相信只要撐下去,此次調漲一定能如期達成。

4. Other Issue:

1. 有關 THAI-CRT 對第三季價格調漲之態度,ORN-Mr.Moon 表示 THAI-CRT 再次因故缺席,但其未將 follow 會議結論。惟各家商議當場再以電話跟其 M.D. Mr.Chaovallt 聯絡結果其表示將於六月一日(周二)於台北與各家再會談。

2. 有關 China Market:
14"及 25"在中國市場銷售狀況尚可;然而 21"/29"則供需失衡情況仍持續。中國境內八大家 CRT 廠商正擬於 5/23 召開會議研商如何做好產能規劃。據悉有人提議以停產一個月以解決問題;然 SDD 認為 7-10 天將較容易確實做好 Audit。

3. IRICO (Caihong, China) 與 BMCC:
經由與會各家推派將由 CPT 代表向 IRICO 傳達第三季擬調漲價格訊息,並請其 follow;而 SDD 將負責向 BMCC 傳達,以免該兩廠商以較低價格擾亂到各家交貨中的客戶。

一 以 上 報 告 一

恭呈 核示

職 謝春美敬 呈
1999/05/24

4

CONFIDENTIAL - GRAND JURY MATERIAL                                        CHU00029194

# EXHIBIT 7

Page 1

1          *** HIGHLY CONFIDENTIAL ***

2          UNITED STATES DISTRICT COURT

3         NORTHERN DISTRICT OF CALIFORNIA

4              SAN FRANCISCO DIVISION

5   Case No. 3:07-cv-05944 SC

6   MDL No. 1917

7   ----------------------------------x

8   IN RE:  CATHODE RAY TUBE (CRT)

9          ANTITRUST LITIGATION

10  ----------------------------------x

11  This Document Relates to:

12  ALL ACTIONS

13  ----------------------------------x

14                          Taipei 101 Tower

15                          Xinyi Road

16                          Taipei City, 11049

17                          Taiwan

18

19                          February 19, 2013

20                            9:41 a.m.

21          Volume I of III

22          DEPOSITION of CHIH CHUN-LIU, held at the

23  aforementioned time and place, before Audrey

24  Shirley, Qualified Realtime Reporter, MBIVR

25

```
                                           Page 109
 1    maintained in the ordinary course of business at    16:08:38
 2    Chunghwa?                                            16:08:41
 3         A.   Yes.                                       16:08:53
 4         MR. SAVERI:  1108.                              16:09:06
 5      (Whereupon Deposition Exhibit No. 1108/1108E       16:09:08
 6           was marked for identification.)               16:09:13
 7    BY MR. SAVERI:                                       16:09:13
 8         Q.   Mr. Liu, the court reporter has now        16:09:14
 9    handed you what has been designated Plaintiffs'      16:09:15
10    Exhibit 1108.  If you could review it and then       16:09:20
11    let me know when you're ready.                       16:09:22
12         A.   Yes.                                       16:09:36
13         Q.   What is this document?                     16:09:36
14         MR. LAU:  Sorry, could you wait for             16:09:39
15    a moment?  We're still trying to distribute          16:09:40
16    these.                                               16:09:44
17         MR. SAVERI:  One minute, Mr. Liu, we're         16:09:44
18    getting copies down at the end of the gallery.       16:09:46
19         THE WITNESS:  Okay.                             16:09:49
20         MR. SAVERI:  Are we all set?                    16:10:37
21    BY MR. SAVERI:                                       16:10:39
22         Q.   Mr. Liu, the court reporter has just       16:10:40
23    handed you Plaintiffs' Exhibit 1108 which bears      16:10:43
24    the Bates numbers CHU00029191 through '194.          16:10:45
25    Mr. Liu, what is this document?                      16:10:54
```

```
                                               Page 110
 1        A.   This is the minutes for the group      16:10:57

 2   meeting of top -- top group meeting.  Date 1999,   16:11:00

 3   May 20.                                           16:11:06

 4        Q.   Does this document show that you        16:11:09

 5   attended this meeting on May 20, 1999?            16:11:10

 6        A.   Yes.                                    16:11:13

 7        Q.   Who prepared this document?             16:11:15

 8        A.   Miss Hsieh.                             16:11:19

 9        Q.   Did you sign and date this document?    16:11:22

10        A.   Yes.                                    16:11:24

11        Q.   Does your signature mean that you       16:11:25

12   confirm the document accurately reflects the      16:11:27

13   content of the meeting?                           16:11:31

14        A.   I confirm.                              16:11:32

15        Q.   Was this made and submitted to you in   16:11:33

16   the ordinary course of business at Chunghwa?      16:11:36

17        A.   Yes.                                    16:11:38

18        Q.   Was it kept in the ordinary course of   16:11:39

19   business at Chunghwa?                             16:11:41

20        A.   Yes, it is.                             16:11:42

21        Q.   Was it maintained in the files of       16:11:43

22   Chunghwa in the ordinary course of business?      16:11:45

23        A.   Yes, we do that.                        16:11:47

24        MR. SAVERI:  1109.                           16:12:03

25     (Whereupon Deposition Exhibit No. 1109/1109E    16:12:08
```