**NORTON ROSE FULBRIGHT US LLP**
JEFFREY MARGULIES (BAR NO. 126002)
KAYLEE YANG (BAR NO. 303464)
555 California Street
Suite 3300
San Francisco, California 94104
Telephone:     (213) 892-9200
Facsimile:      (213) 892-9494
jeff.margulies@nortonrosefulbright.com
kaylee.yang@nortonrosefulbright.com

**NORTON ROSE FULBRIGHT US LLP**
GERALDINE YOUNG (admitted *pro hac vice*)
1301 McKinney, Suite 5100
Houston, Texas 77010
Telephone:     (713) 651-5151
Facsimile:      (213) 651-5246
geraldine.young@nortonrosefulbright.com

Attorneys for Defendants
IRICO GROUP CORP. AND
IRICO DISPLAY DEVICES CO., LTD

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No.: 07-cv-05944 JST |
| | MDL No. 1917 |
| This document relates to: | **DEFENDANTS IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |
| *ALL INDIRECT PURCHASER ACTIONS* | |
| *ALL DIRECT PURCHASER ACTIONS* | Date:        August 1, 2024 |
| | Time:        02:00 P.M. |
| | Judge:       Hon. Jon S. Tigar |
| | Courtroom:  Videoconference |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on August 1, 2024, or at such other date as is convenient for the Court, before the Honorable Jon S. Tigar, United States District Judge of the Northern District of California, Oakland Courthouse, located at Courtroom 6, 2nd Floor, 1301 Clay Street, Oakland, California, Defendants Irico Group Corp. and Irico Display Devices Co., Ltd., by and through their undersigned counsel, will and hereby do move, pursuant to Federal Rules of Civil Procedure 44.1 and 56, for an Order granting summary judgment for Irico as to claims in the Indirect Purchaser Plaintiffs' Fifth Consolidated Amended Complaint, ECF No. 5589, and Direct Purchaser Plaintiffs' Consolidated Amended Complaint, ECF No. 436.

This Motion is based on the Notice of Motion, the following Memorandum of Points and Authorities in support thereof, the accompanying Declaration of Geraldine Young ("Young Decl."), the accompanying Declaration of Donald Clarke ("Clarke Decl."), any materials found in the record, along with the argument of counsel and such other matters as the Court may consider.

### ISSUES TO BE DECIDED AS TO INDIRECT PURCHASER PLAINTIFFS AND DIRECT PURCHASER PLAINTIFFS

1. Whether Plaintiffs' claims against Irico must be dismissed as a matter of law pursuant to the doctrine of international comity and Rule 44.1 of the Federal Rules of Civil Procedure?

2. Whether Irico is entitled to summary judgment because Plaintiffs have failed to create a material issue of fact as to Irico's purported participation in the alleged conspiracy prior to August 5, 1998?

### ISSUES TO BE DECIDED AS TO INDIRECT PURCHASER PLAINTIFFS

1. Whether Irico is entitled to summary judgment on due process grounds regarding the Indirect Purchaser Plaintiffs' claims brought under the laws of Arizona, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin pursuant to Ninth

Circuit precedent applying the Fourteenth Amendment, Section 1 of the Constitution of the United States?

2. Whether Irico is entitled to summary judgment regarding the Indirect Purchaser Plaintiffs' claims brought under the laws of Arizona, Florida, Michigan, and North Dakota due to Irico's lack of intrastate conduct within those states, which is required under the respective state statutes?

3. Whether Irico is entitled to summary judgment on Indirect Purchaser Plaintiffs' New York claims prior to December 1, 1998 based on the Court's prior ruling in the Direct Action Plaintiff actions?

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................1

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ........................................................................................2

1.  IRICO OPERATED IN CHINA, DID NOT SELL CRTS TO THE UNITED STATES, AND LACKED CONDUCT AND CONTACTS IN THE RELEVANT STATES ..................................................................................................2

2.  IRICO'S ATTENDANCE AT ALLEGED COMPETITOR MEETINGS, STARTING IN 1998, CONFIRMS IRICO'S LIMITED ALLEGED PARTICIPATION ......................................................................................4

3.  IRICO'S PRICING CONDUCT WAS MANDATED BY DULY ENACTED LAWS AND REGULATIONS OF THE PEOPLE'S REPUBLIC OF CHINA ...............5

LEGAL STANDARD ...............................................................................................6

ARGUMENT ...........................................................................................................7

I.  THE INTERNATIONAL COMITY DOCTRINE REQUIRES DISMISSAL OF PLAINTIFFS' CLAIMS AS A MATTER OF LAW .........................................7

A.  A True Conflict Exists Because the Chinese Government Coordinated CRT Prices .................................................................................................8

B.  Irico's Chinese Nationality and the Chinese Location of Irico's Alleged Conduct Weigh Heavily in Favor of Dismissal ...................................16

C.  Enforcement is not Expected to Achieve Compliance .........................17

D.  The Effect of Irico's Alleged Conduct on the United States, Compared to China and Elsewhere, Is Insignificant ...................................................18

E.  The Remaining Comity Factors Favor Dismissal of the Claims against Irico ......19

II.  IRICO IS ENTITLED TO SUMMARY JUDGMENT REGARDING IRICO'S LACK OF PARTICIPATION IN THE CONSPIRACY PRIOR TO AUGUST 5, 1998 ..................................................................................................20

A.  DPPs Have Not Identified Any Evidence of Irico's Involvement In the Alleged Conspiracy Prior to August 5, 1998 ...........................................22

B.  IPPs' Scant Evidence Does Not Create An Issue of Material Fact As To Whether Irico Participated In the Alleged Conspiracy Prior to August 5, 1998 ..............................................................................................22

III.  IRICO IS ENTITLED TO SUMMARY JUDGMENT FOR CERTAIN OF IPPS'
      STATE LAW CLAIMS ON DUE PROCESS GROUNDS DUE TO LACK OF
      CONTACTS WITH THESE STATES.................................................................24

IV.   IPPS HAVE FAILED TO IDENTIFY SUFFICIENT EVIDENCE OF
      INTRASTATE CONDUCT TO ESTABLISH A CLAIM UNDER CERTAIN
      STATE LAWS..................................................................................................28

V.    IRICO IS ENTITLED TO SUMMARY JUDGMENT ON IPPS' NEW YORK
      CLAIMS PRIOR TO DECEMBER 3, 1998.......................................................30

CONCLUSION......................................................................................................31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aldini AG v. Silvaco, Inc.*,
   No. 21-CV-06423-JST, 2022 WL 20016826 (N.D. Cal. Aug. 3, 2022)...............................26

*Allstate Ins. Co. v. Hague*,
   449 U.S. 302 (1981)...........................................................................................27, 57

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).............................................................................................7

*Andren v. Alere, Inc.*,
   No. 16CV1255-GPC(AGS), 2017 WL 6509550 (S.D. Cal. Dec. 20, 2017) ...........................25

*Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*,
   138 S. Ct. 1865 (2018)........................................................................................7, 9

*Asahi Metal Indus. Co. Ltd. v. Super. Ct. of Cal.*,
   480 U.S. 102 (1987).............................................................................................26

*AT&T Mobility LLC v. AU Optronics Corp.*,
   707 F.3d 1106 (9th Cir. 2013) ........................................................................2, 24, 26

*Beaver v. Inkmart, LLC*,
   No. 12-60028, 2012 WL 4005970 (S.D. Fla. Sep. 12, 2012) ...................................28

*California v. ARC Am. Corp.*,
   490 U.S. 93 (1989)...............................................................................................29

*In re Capacitors Antitrust Litig.*,
   No. 17-MD-02801-JD, 2020 WL 6462393 (N.D. Cal. Nov. 3, 2020)....................................24

*Carnival Corp. v. Rolls-Royce PLC*,
   No. 08-23318, 2009 WL 3861450 (S.D. Fla. Nov. 17, 2009) ...................................28

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. 07-md-5944-JST, 2013 WL 4505701 (N.D. Cal. Aug. 21, 2013) ...............................2, 30

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. C-07-5944 JST, 2016 WL 5725008 (N.D. Cal. Sept. 30, 2016)..............................26, 27

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...............................................................................................6

*In re Citric Acid Antitrust Litig,*
    191 F.3d 1090 (9th Cir. 1999) ...................................................................................22

*In re Citric Acid Litig.,*
    996 F. Supp. 951 (N.D. Cal. 1998) ............................................................................24

*In re Digital Music Antitrust Litig.,*
    812 F. Supp. 2d 390 (S.D.N.Y. 2011) ........................................................................28

*Five for Entm't v. Rodriguez,*
    877 F. Supp. 2d 1321 (S.D. Fl. 2012) .........................................................................28

*Hartford Fire Ins. Co. v. California,*
    509 U.S. 764 (1993)......................................................................................................8

*In re Hitachi Television Optical Block Cases,*
    No. 08cv1746 DMS, 2011 WL 9403 (S.D. Cal. Jan. 3, 2011) ...................................25

*Illinois Brick Co. v. Illinois,*
    431 U.S. 720 (1977)....................................................................................................30

*Indirect Purchaser Plaintiffs, et al. v. Irico Group Corp., et al.* (2020)
    (No. 19-17428)............................................................................................................18

*Lennon v. Philip Morris Cos.,*
    734 N.Y.S.2d 374 (N.Y. Sup. Ct. 2001) ....................................................................30

*Marsh v. First Bank of Del.,*
    No. 11-CV-05226-WHO, 2014 WL 554553 (N.D. Cal. Feb. 7, 2014) ......................25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986).........................................................................................6, 22, 23

*Mattel, Inc. v. MGA Ent., Inc.,*
    No. CV 04-9049 DOC (RNBx), 2010 WL 11463911 (C.D. Cal. Sept. 3, 2010) ...................19

*Millennium Commc'ns & Fulfillment, Inc. v. Office of Att'y Gen.,*
    761 So.2d 1256 (Fla. Dist. Ct. App. 2000) .................................................................28

*Morrison v. Nat'l Austl. Bank Ltd.,*
    561 U.S. 247 (2010).....................................................................................................27

*Mujica v. AirScan Inc.,*
    771 F.3d 580 (9th Cir. 2014) ..........................................................................1, 7, 8, 16

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.,*
    210 F.3d 1099 (9th Cir. 2000) ......................................................................................6

*Olsen by Sheldon v. Gov't of Mexico*,
   729 F.2d 641 (9th Cir. 1984) ................................................................................25

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
   629 F.3d 697 (7th Cir. 2011) ...............................................................................23

*In re Packaged Seafood Antitrust Litig.*,
   332 F.R.D. 308 (S.D. Cal. 2019) .........................................................................27

*In re Packaged Seafood Antitrust Litig.*,
   Case No.: 15-MD-2670 DMS (MDD), 2023 WL 3046073 (S.D. Cal. Apr. 21,
   2023) ...............................................................................................................22, 23

*Sullivan v. Barclays PLC*, 13-cv-2811(PKC), 2017 WL 685570, at *22, n.13
   (S.D.N.Y. Feb. 21, 2017) .....................................................................................27

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2011 WL 3738985 (N.D. Cal. Aug. 24, 2011) .....................................................30

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   785 F. Supp. 2d 835 (N.D. Cal. 2011) .................................................................29

*Tidwell v. Thor Indus., Inc.*,
   Civil No. 05cv2088-L(BLM), 2007 WL 8083631 (S.D. Cal. Mar. 26, 2017) .......25

*Timberlane Lumber Co. v. Bank of Am., N.T. and S.A.*,
   549 F.2d 597 (9th Cir. 1976) ...................................................................... *passim*

*U.S. v. Hui Hsiung*,
   778 F.3d 738 (9th Cir. 2015) ...............................................................................26

*U.S. v. Lothian*,
   976 F.2d 1257 (9th Cir. 1992) .............................................................................19

*U.S. v. Silverman*,
   861 F.2d 571 (9th Cir. 1998) ...............................................................................24

*In Re: Vitamin C Antitrust Litigation*,
   8 F.4th 136 (2d Cir. 2021) ........................................................................ *passim*

*In re Vitamins Antitrust Litig.*, Misc. No. 99-197 (TFH), 2000 WL 1511376, at *5
   (D.D.C. Oct. 6, 2000) ...........................................................................................30

*Waldman v. Palestine Liberation Org.*,
   835 F.3d 317 (2d Cir. 2016) ................................................................................27

**Constitutions**

U.S. Const. Amendment XIV, § 1 .................................................................................6

**Statutes**

Arizona Rev. Stat. Ann. § 44-1402 (West 2023) ...............................................................28

Florida Stat. Ann. §501.201 *et seq.* (West 2023) .............................................................28

Mich. Comp. Laws Ann. § 445.771 (West 2023) ..............................................................28

N.D. Cen. Code Ann. §§ 51-08.1 *et seq.* (West 2023) ......................................................28

N.Y. Gen. Bus. § 340(6) .......................................................................................................30

**Rules**

Fed. R. Civ. P. 56(c) ..............................................................................................................6

Fed. R. Civ. P. 44.1.............................................................................................................1, 7

**Statutes, Regulations, and Regulatory Notifications of the People's Republic of China**

Circular of the State Development Planning Commission on Issuing the Measures
  for Determining the Cost of Low-price Dumped Industrial Products (Trial),
  issued Feb. 23, 1999, effective March 1, 1999 .................................................5, 13

Civil Procedure Law of the People's Republic of China, Art. 289 (2022)....................17

Notice on Earnestly Stopping Price Dumping and Carrying out Inspection of Price
  Dumping, Jan. 16, 1999 ......................................................................................5, 12

Notification of Publishing Industrial Average Production Costs for Some Types of
  Color CRTs, Sept. 13, 2000 ...............................................................................5, 14

Notification of Publishing Industrial Average Production Costs for Some Types of
  Color CRTs and Color TVs, April 2, 1999 ...............................................................14

Notification of Publishing Industrial Average Production Costs for Some Types of
  Color TVs, Aug. 25, 2000 ........................................................................................14

Notification of Reporting Cost Information for Color TV and Color CRT Industry,
  Feb. 3, 1999 ..............................................................................................................13

Notification of the State Planning Commission and the State Economic and Trade
  Commission regarding Issuing Regulations on Preventing Unfair Price Actions
  through Dumping of Industrial Products and Strengthening Price Self-Discipline
  of Industries, issued Nov. 16, 1998, effective Nov. 25, 1998................................5, 10

Notification that the State Planning Commission and the Ministry of Information
  Industry print and distribute Trial Measures to Prevent Unfair Price Competition
  Regarding Color CRTs and Color TVs, issued March 15, 1999, effective April
  1, 1999..................................................................................................................13, 14

Price Law of the People's Republic of China, promulgated Dec. 29, 1997, effective
May 1, 1998 ................................................................................................5, 19, 10, 12

**Other Authorities**

Hague Conference on Private International Law, CONVENTION ON THE
RECOGNITION AND ENFORCEMENT OF FOREIGN JUDGMENTS IN
CIVIL OR COMMERCIAL MATTERS, July 2, 2019, *available at*
https://assets.hcch.net/docs/806e290e-bbd8-413d-b15e-8e3e1bf1496d.pdf
(accessed on July 13, 2023) ...........................................................................................17

Hague Conference on Private International Law, STATUS TABLE FOR
CONVENTION ON THE RECOGNITION OF FOREIGN JUDGMENTS IN
CIVIL OR COMMERCIAL MATTERS, May 16, 2023, *available at*
https://www.hcch.net/en/instruments/conventions/status-table/?cid=137
(accessed on July 13, 2023) ...........................................................................................17

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Irico Group Corp. and Irico Display Devices Co., Ltd. ("Irico" or "Irico Defendants") respectfully ask that the Court dismiss Indirect Purchaser Plaintiffs' ("IPPs") and Direct Purchaser Plaintiffs' ("DPPs'") (collectively, "Plaintiffs") federal antitrust claims in their entirety pursuant to the international comity doctrine and Federal Rule of Civil Procedure 44.1. Irico also moves the Court for summary judgment pursuant to Rule 56 as to the IPPs' and DPPs' federal antitrust claims based on Irico's lack of participation in the alleged conspiracy prior to August 5, 1998.

Irico also moves the Court for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to certain state law claims brought by IPPs.

## PRELIMINARY STATEMENT

Plaintiffs fail to present genuine issues of material fact on several specific claims against Irico. Summary judgment as a matter of law on these issues is therefore warranted.

*First*, Irico requests that the Court find as a matter of law that the doctrine of international comity warrants judgment in favor of Irico based on Ninth Circuit law. Irico's conduct related to CRT pricing was subject to the foreign laws and regulations of the People's Republic of China, which conflicted on their face with the antitrust laws underlying Plaintiffs' claim. As shown below, the other international comity considerations also dictate dismissing Plaintiffs' claim against Irico. *See Timberlane Lumber Co. v. Bank of Am., N.T. and S.A.*, 549 F.2d 597, 614 (9th Cir. 1976); *Mujica v. AirScan Inc.*, 771 F.3d 580, 602 (9th Cir. 2014).

*Second*, there is no genuine dispute of fact as to Irico's purported participation in the alleged conspiracy prior to August 5, 1998. The evidence that Plaintiffs have developed throughout discovery in this case points to a single date, August 5, 1998, when Irico first attended a meeting that even conceivably could be construed as part of the alleged conspiracy. *See* Young Decl. at ¶ 3; *id.*, Ex. 1 (CHU000300661E). Indeed, this aligns with the allegation in Plaintiffs' complaints regarding the period of time Irico participation in group meetings. ECF No. 5589 ("IPP Compl.") at ¶ 150a ("[t]he Chinese Glass Meetings began in 1998" ); ECF No. 436 ("DPP Compl.") at 159 ("Irico…participated in…group meetings from 1998 to 2006"). Plaintiffs' scraps of documents

before this date show legitimate business contacts and trade association meetings that do not create a material issue of fact, and Irico is entitled to summary judgment on this issue.

*Third*, IPPs have failed to adduce sufficient (or indeed any) authenticated or admissible evidence of contacts by Irico with twenty states whose classes they represent, such that application of those states' laws fail to meet the standards of Fourteenth Amendment Due Process and Ninth Circuit precedent. *See AT&T Mobility LLC v. AU Optronics Corp.,* 707 F.3d 1106 (9th Cir. 2013).

*Fourth*, IPPs' claims under four state laws suffer from fatal flaws: the asserted laws in four states *require* that IPPs demonstrate that Irico, not merely one of its alleged coconspirators, engaged in anticompetitive conduct within the territory of that state, a burden that IPPs cannot meet.

*Fifth,* despite a prior ruling from the Court on this subject that constitutes the law of the case, IPPs are attempting to recover damages for claims under New York Law prior to the statute's enactment on December 1, 1998, which the Court has already precluded. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-md-5944-JST, 2013 WL 4505701, at *13 (N.D. Cal. Aug. 21, 2013).

For the reasons discussed below, Irico respectfully requests that the Court grant its motion.

## STATEMENT OF FACTS

Although the Court is familiar with the lengthy background and facts of this case, Irico sets forth below those facts relevant to the present motion for summary judgment.

### 1. IRICO OPERATED IN CHINA, DID NOT SELL CRTS TO THE UNITED STATES, AND LACKED CONDUCT AND CONTACTS IN THE RELEVANT STATES

The Irico Defendants are Chinese companies whose business focus has always been on China. It is undisputed that the Irico Defendants are Chinese state-owned companies headquartered in China, whose CRT production occurred exclusively in China. *See* Am. Decl. of Zhaojie Wang ¶¶ 19, 39, ECF No. 5409-1 ("Wang Decl.") (Irico Group and Irico Display's principal place of business in Xianyang City, Shaanxi Province, China).

Moreover, Irico has never sold CRTs to customers in the United States. *See* ECF 1527 at 109 (Netz Decl.) (IPPs' expert acknowledging that all of Irico's major customers were Chinese TV manufacturers); *see also* Wang Decl. at ¶¶ 12-13; Young Decl., Ex. 2 (Yan Dep.) at 111:12-25,

118:5-119:21; *id.*, Ex. 3 (Wang Dep.) at 81:12-82:9, 346:15-348:6 (confirming that neither Group nor Display ever sold to the US and that Irico Group CDTs were never sold to the US), *id.*, Ex. 4 (Li Dep.) at 254:18-24 (same); Wang Decl. at ¶¶ 12-13 ("neither Irico Group nor Irico Display, nor any other subsidiary of Irico Group sold any CRTs to the United States at any time from 1995-2007"). Indeed, DPPs have verified that none of the DPP class members purchased an Irico CRT product or product with an Irico CRT in the United States. Young Decl., Ex. 77 (DPPs' Supp. Obj. and Responses to Irico's First Set of Interrogs. to DPPs) at 6 ("[DPPs] have no records from any third party documenting direct purchases of Irico CRTs or televisions or monitors containing Irico CRTs in the United States.").

Irico has never had any office, real property, manufacturing or sales facility, bank account, mailing address, telephone listing, or employees in the United States, including—and this is undisputed—in Arizona, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, or Wisconsin. That fact is not changed by the short-lived legal entity, Irico USA, that never undertook U.S. business and that is not a defendant in this case. *See id.*, Ex. 75 (Dep. Ex. 8392) (Irico USA Audit Report).[1]

The voluminous discovery obtained by Plaintiffs and gathered to support their claim of an alleged conspiracy confirms the lack of connection between Irico and the United States. *See id.*, Ex. 76 (Indirect Purchaser Pls.' Obj. and Resps. to Def. Hitachi Ltd.'s 1st Req. Set of Interrogs. to the Indirect Purchaser Pls, Attachment A) ("IPPs' Attachment A"); *id.*, Ex. 5 (DPPs' Supp. Obj. and Respons. to Irico's Second Set of Interrogs. to DPPs) at 26 and Exs. 6-74 (documents cited in DPPs'

---

[1] Plaintiffs have wrongly alleged that sales of CRTs by an ***unrelated*** state-owned company, China National Electronics Import and Export Caihong Co. ("CNEIECC"), to Irico USA, are actually U.S. sales of Irico. *See, e.g.*, Young Decl., Ex. 5 (DPPs' Supp. Obj. and Responses to Irico's Second Set of Interrogs. to DPPs) at 33-38. This is false. *See* ECF 5463 at 25-29. CNEIECC was owned and controlled by a different and separate state-owned company, China Electronics Import-Export Corporation ("CEIEC") for the entire time period relevant to this lawsuit, and had no ownership relationship with Irico. *Id.* Because there is no affiliation between CNEIECC and Irico Group, CNEIECC's sales cannot be imputed to Irico Group.

Plaintiffs have also wrongly alleged that sales by CNEIECC to another non-defendant entity, Irico USA, a former indirectly- and partly-owned subsidiary of Irico Group that was sold in 2001, are actually U.S. sales of Irico. *See, e.g.*, Young Decl., Ex. 5 (DPPs' Supp. Obj. and Responses to Irico's Second Set of Interrogs. to DPPs) at 33-38. This is false. *See* ECF 5463 at 25-29. All of the sales by CNEIECC to Irico USA were shipped to countries other than the United States despite being billed to Irico USA. *Id.*

Supp. Obj. and Responses to Irico's Second Set of Interrogs. to DPPs); Notice of Entry of Order by Special Master, ECF No. 6074 ("Documents R&R"). *All* of the alleged meetings or communications identified by Plaintiffs that purportedly involved Irico occurred in China. *See id.*; *see also id.* at ¶ 82. Likewise, of the 74 alleged conspiracy meetings or communications asserted by IPPs to have occurred in the United States (of more than 1,100 total meetings alleged by IPPs), not one involved Irico. *See id.* at ¶ 82, Ex. 76 (U.S. meetings identified in IPPs' Attachment A).

## 2.   IRICO'S ATTENDANCE AT ALLEGED COMPETITOR MEETINGS, STARTING IN 1998, CONFIRMS IRICO'S LIMITED ALLEGED PARTICIPATION

Discovery also confirmed that Irico did not attend any of the alleged cartel meetings before August 5, 1998. Of the 81 alleged meetings[2] or communications involving Irico, the first identified meeting attended by Irico is on August 5, 1998. *See* Young Decl. at ¶ 3; *id.*,  Ex. 7 (DPPs' Supp. Obj. and Responses to Irico's Second Set of Interrogs. to DPPs) (referencing CHU000300661) at 6-8; *id.*, Ex. 1 (CHU000300661) (first identified meeting attended by Irico dated August 5, 1998). Indeed, affirmative evidence dated July 31, 1998, indicates that Irico had not attended any meetings as of that date. *See* Young Decl. at ¶ 83, Ex. 79 (CHU00030668) at -0668.01E. In an attempt to dodge the clear implications of the evidence for this motion, IPPs try to point to a few earlier communications and/or meetings, but these can only be read as legitimate business meetings or ordinary course trade association meetings; they do not create a genuine issue of material fact that Irico participated in the alleged conspiracy prior to August 5, 1998. *See id.*, Ex. 80 (IPP 2022 Discovery Resps.) at 10, 14-16 and Exs. 81-121 (documents cited in IPPs 2022 Discovery Resps.). Witnesses relied on by Plaintiffs for their conspiracy claim, including witnesses from amnesty applicant Chunghwa Picture Tubes, have further corroborated Irico's "isolated" position relative to other CRT manufacturers and that Irico "had no reference, no participation" in the alleged conspiracy prior to that time. *See id.*,  Ex. 122 (Lu Dep.) at 189:16-190:4 and Ex. 123 (Dep. Ex. 1315) at -9051E.

---

[2] IPPs allege that 81 meetings occurred involving Irico. *See* Young Decl., Ex. 76 (IPPs' Attachment A). This is the same number of meetings identified by Special Master Hon. Vaughn R. Walker in the Documents R&R.

### 3.   IRICO'S PRICING CONDUCT WAS MANDATED BY DULY ENACTED LAWS AND REGULATIONS OF THE PEOPLE'S REPUBLIC OF CHINA

After a price war in the color TV industry in the mid-1990s that led to the collapse of CRT prices in China, the Chinese government intervened by passing laws and regulations to establish CRT price floors and prevent the dumping of low-price CRTs. Young Decl., Ex. 124 at 69, 75, Tomoo Marukawa, "The Chinese Television Industry: An Example of Gradual Transition, in *China's Industries in Transition* (Jiang Xiaojuan ed., 2001). The Chinese government's pricing actions, starting with the Price Law of China, effective May 1, 1998, and continuing with CRT-specific pricing regulations governed the pricing of CRTs within China and allowed for the Chinese government to "guide or fix the prices for" CRTs and other vital products. *Id.*, Ex. 125 (1997 Price Law) at Arts. 2, 18, 20. In November 1998, the Chinese State Planning Commission and China's State Economic and Trade Commission jointly issued a regulation that ordered "[i]ndustrial organizations" to "proactively" engage in "organizing enterprises to perform price self-discipline, and coordinating relations between enterprises." *Id.*, Ex. 126 (Clarke IPP Rep.) at App'x 2 at 3; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24 (incorporating fully opinions regarding the pricing documents in IPP report), App'x B at 12. These regulations were reaffirmed four separate times in 1999 in China. *Id.*, Ex. 128, "Notice on Earnestly Stopping Price Dumping and Carrying out Inspection of Price Dumping," Jan. 16, 1999 (January Notification); *id.*, Ex. 126 (Clarke IPP Rep.) at App'x 4 (February Notification); *id.*, at App'x 6 (April Notification); *id.*, at App'x 9 (September Notification); *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 35, 55, 109..

The regulations were binding and enforceable on Chinese manufacturers, including Irico. *Id.*, Ex. 126 (Clarke IPP Rep.) at ¶ 14; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B ¶ 14.[3] The first evidence of Irico's alleged attendance at a competitor meeting that forms the basis of Plaintiffs' allegations is on August 5, 1998—shortly after the Price Law became effective. *See* Documents R&R at 30-31, ¶ 27B, ECF No. 6074; Young Decl., Ex. 5 (DPPs' Supp. Obj. and Responses to Irico's Second Set of Interrogs. to DPPs) (referencing CHU000300661) at 26; *id.*, Ex. 1

---

[3] DPPs' expert, Henry Gao, does not dispute that the regulations were binding and enforceable on Chinese manufacturers. Young Decl., Ex. 127 (Clarke DPP Rep.) at ¶ 24 ("I first note that the Gao Report does not challenge the authenticity and binding nature of the Pricing Documents...Professor Gao confirmed at his deposition that he does not challenge the authenticity and binding nature of the Pricing Documents"); *id.*, Ex. 129 (Gao Dep.) at 53:12-55:16.

(CHU000300661) (first identified meeting attended by Irico dated August 5, 1998); *id.*, Ex. 125 (1997 Price Law) at Arts. 2, 18, 20. Consistent with a company operating in accordance with Chinese law, a number of the alleged meetings, communications, and joint decisions among Chinese CRT manufacturers (including Irico) directly involved coordination by, cost reporting to, and price guidance from a Chinese government agency, and were contemporaneously reported on publicly available sources. *See* Young Decl., Ex. 130, BMCC-CRT000181673 to -1677; *id.*, Ex. 131, BMCC-CRT000142685; *id.*, Ex. 132, BMCC-CRT000138732 to -8735; *id.*, Ex. 133, BMCCCRT000139461 to -9463; *id.*, Ex. 134, BMCC-CRT000054691; *id.*, Ex. 135, CHU00047273; *id.*, Ex. 136, IRI-CRT-00029680 at -9696, -9698, -9725, -9727.

This active involvement by the Chinese government extended to its efforts to enforce the regulations. *Id.*, Ex. 137 (ECF No. 6183-2) at 4; *see also id.*, Ex. 2, (Yan Dep.) at 351:6-15. Irico's contemporaneous records documented the active role the government took in formulating Irico's "self-discipline [on] price based on the average cost of the industry." *Id.*, Ex 137 (ECF No. 6183-2) at 4. The government's efforts also extended to potential punishment for Irico if it failed to comply with the regulations. *See id.*, Ex. 2, (Yan Dep.) at 351:6-15. *See also* Clarke Decl. at ¶¶ 17-20.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Id.* at 323. To carry its burden on summary judgment, a moving party must "show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party, however, cannot defeat summary judgment by merely demonstrating "that there is some metaphysical doubt as to the

material facts." *Id.* "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

Irico also asserts its comity arguments in this Motion pursuant to Federal Rule of Civil Procedure 44.1. That rule provides that a court's determination of foreign law, at any stage, "must be treated as a ruling on a question of law," "rather than as a finding of fact," and, in making that determination, "the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible . . . ." Fed. R. Civ. P. 44.1; *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018).

## <u>ARGUMENT</u>

## I.   THE INTERNATIONAL COMITY DOCTRINE REQUIRES DISMISSAL OF PLAINTIFFS' CLAIMS AS A MATTER OF LAW

The undisputed facts of this case squarely implicate the international comity doctrine, which requires dismissal of all of Plaintiffs' claims against Irico. *See Mujica v. AirScan Inc.*, 771 F.3d 580, 596–97 (9th Cir. 2014) (recognizing that the "federal common law doctrine of international comity" can dictate the dismissal of federal and state-law claims). Relevant in this case is "legislative or 'prescriptive' comity, which guides [U.S.] courts as they decide the extraterritorial reach of federal [and state] statutes," vis-à-vis the interests and laws of a foreign state. *Id.* at 598.

A multi-factor test governs whether prescriptive comity requires dismissal:

> The elements to be weighed include [1] the degree of conflict with foreign law or policy, [2] the nationality or allegiance of the parties and the locations or principal places of businesses or corporations, [3] the extent to which enforcement by either state can be expected to achieve compliance, [4] the relative significance of effects on the United States as compared with those elsewhere, [5] the extent to which there is explicit purpose to harm or affect American commerce, [6] the foreseeability of such effect, and [7] the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.

*Timberlane Lumber Co. v. Bank of Am., N.T. & S.A.*, 549 F.2d 597, 614 (9th Cir. 1976); *see also Mujica*, 771 F.3d at 602 (affirming the Ninth Circuit's continued adherence to "the seven comity factors set forth in *Timberlane I*").

Unanimity of the factors is not required, but in this case, these comity factors weigh heavily in favor of dismissing the Plaintiffs' claims against Irico.

### A.   A True Conflict Exists Because the Chinese Government Coordinated CRT Prices

The comity analysis in this case starts with the conflict between Chinese CRT price regulations and notifications and the U.S. laws that are the bases of Plaintiffs' complaint. A "true conflict" between U.S. and Chinese law exists and is the first factor to warrant dismissal under the comity doctrine. *See Mujica*, 771 F.3d at 599-600; *see also In Re: Vitamin C Antitrust Litigation*, 8 F.4th 136, 144–45 (2d Cir. 2021), *cert. denied*, 143 S. Ct. 85 (2022) ("*Vitamin C*") (finding a "true conflict" between U.S. and Chinese laws, reversing judgment, and dismissing price-fixing claims against Chinese defendants).

The recent *Vitamin C* decision—in which the Second Circuit cited Ninth Circuit comity factors—provides a roadmap for this case and supports dismissal of the Plaintiffs' claims. In *Vitamin C*, the Second Circuit looked at "whether foreign law, taken at face value, 'requires [the defendants] to act in some fashion prohibited by the law of the United States'" and explained that "a true conflict is present even where the foreign government grants the defendants some discretion in choosing how to carry out the legally mandated conduct, so long as 'compliance with the laws of both countries is . . . impossible.'" 8 F.4th at 146-47 (quoting *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 799 (1993)). In determining what Chinese law "facially require[d]," the court considered first the Chinese price regulations and their context, noting that the Ministry of Commerce issued notices that targeted "dumping" (or "severe low-priced competition") and tasked a subcommittee or organization with coordinating Vitamin C prices. *Id.* at 148-150, 152.

The Second Circuit held that, even though implementation of the price regulations was "imperfect," the applicable Chinese law and regulations, "[t]aken at face value," created a "*prima facie* conflict between U.S. law and Chinese law." *Id.* at 151 & n.25, 152–53.

The court then found, on balance, that other evidence—including records that referenced government-initiated price coordination and U.S. Trade Representative reports that broadly recognized China's price controls for products of both state-owned enterprises ("SOEs" like Irico)

and private enterprises—corroborated the conflict. *Id.* at 151-52 & n.26. The Second Circuit last considered the Chinese Ministry's submissions, weighing them in light of their submission in a litigation context. 8 F.4th at 156-57 (citing *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018)). Despite the plaintiffs' evidence disputing that Chinese law conflicted with U.S. law, after considering the price notices and other comity factors (outlined below), the Second Circuit held that comity "required the district court to dismiss this action." *Id.* at 140.

The same result is required here, where the evidence shows that starting in 1998, in response to concerns about CRT prices in China, the Chinese government intervened to prevent the dumping and low prices of CRTs.  *See* Statement of Facts § 3, *supra* (citing Young Decl., Ex. 124 at 69, 75). As one of multiple Chinese CRT manufacturers, and especially as a state-owned entity, Irico was bound by the resulting government-mandated pricing measures and coordination of CRT prices, outlined below[4]:

**China's Price Law:** In 1997, China's National People's Congress Standing Committee passed China's Price Law (the "Law"), which became effective May 1, 1998. Young Decl., Ex. 126 (Clarke IPP Rep.) at  ¶ 15; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B ¶ 15. The Law governs pricing "within" China, including the prices of "commodities," which it defines as "all kinds of visible products and invisible assets." *Id.*,  Ex. 125 (1997 Price Law) at Art. 2. The Law provided that "[t]he government may enforce government-guided prices or government-set prices when necessary for the prices of . . . an extremely small number of commodities vital for the development of the national economy and people's life" and that those "prices shall be based on the average costs of society," among other factors. *Id.* at Arts. 18, 21. Prices subject to "government-guided prices and government-set prices" are expressly excepted from other provisions of the Law. *Id.* at Art. 6. The Law also requires that industry organizations "abide by price laws, regulations and strengthen ***price***

---

[4] Irico vehemently disputes Plaintiffs' allegations that Irico participated in an alleged price-fixing conspiracy, outside of Irico's mandated compliance with Chinese law and regulations, and Irico fully reserves, and nothing herein is intended to waive or concede, Irico's arguments in defense of the alleged conspiracy or conspiracies.

*self-discipline* and accept the guidance in the work by . . . the government." *Id.* at Art. 14 (emphasis added).

In China, "self-discipline" with regard to prices is "a synonym for government intervention in price competition among enterprises" and "force[s] enterprises to sell their products according to 'coordinated prices,' which the government sets without their prior consent." Young Decl., Ex. 138, Wang Xiaoye, *The Prospect of Antimonopoly Legislation in China*, 1 Wash. U. Global Stud. L. Rev. 201, 208-09 (2002); *see also Vitamin C*, 8 F.4th at 158 n.36 ("terms like 'industry self-discipline' and 'voluntary restraint' referred to the Chinese government's expectation that private firms engage in self-regulation with respect to agreed prices and quotas . . . .").

**1998 Notice:** In November 1998, China's State Planning Commission and State Economic and Trade Commission jointly issued a Notification regarding "Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products and Strengthening Price Self-Discipline of Industries" ("1998 Notice"). Young Decl., Ex. 126 (Clarke IPP Rep.) at ¶¶ 12a, 16; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at ¶¶ 12a, 16. The two issuing bodies "are roughly equivalent to ministries under the State Council, the highest executive body in China's central government, but have a slightly higher bureaucratic rank than ordinary ministries." Young Decl., Ex. 126 (Clarke IPP Rep.) at ¶ 16; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at ¶ 16.  The 1998 Notice represented "important measures by the state to regulate prices on the market of industrial products and important rules to prevent dumping of" those products. *Id.*, Ex. 126 (Clarke IPP Rep.) at App'x 2 at 3; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 12.[5]

The 1998 Notice ordered "[i]ndustrial organizations" to "proactively" engage in "organizing enterprises to perform *price self-discipline*, and *coordinating relations between enterprises*." *Id.*

---

[5] The 1998 Notice and other Chinese regulations and notices are originally in Chinese. They are accompanied, in the exhibits, by certified English translated versions, which this Motion quotes.

(emphasis added). The term "price self-discipline" also appears in China's Price Law, as shown above. The 1998 Notice also directs industry organizations to "coordinat[e] relations between enterprises." *Id*. Similarly, in *Vitamin C*, the government ministry delegated authority to the sub-committee organization to "coordinate" prices and relevant business activities. *See* 8 F.4th at 150.

The 1998 Notice also sets forth a regulatory framework for reporting, investigating, and determining pricing violations. The Regulations dictate that the product prices of a "manufacturing enterprise shall not be lower than industrial average production costs in principle," and they allow for state agencies to publish such average costs "to act as an alert level for price self-discipline by enterprises." Young Decl., Ex. 126 (Clarke IPP Rep.) at App'x 2 at 3, 5; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 12. They further provide that, upon report by "any organization or individual," the government may investigate a manufacturer if it "sells industrial products at prices lower than industrial average production costs . . . ." Young Decl., Ex. 126 (Clarke IPP Rep.) at App'x 2 at 5; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 14. If the government finds the manufacturer dumped products below "its production costs" or alternatively the industrial average costs if no actual costs are available, the manufacturer may face a host of possible "punishments," including fines, business suspension, and revocation of its business license. *Id.*

Finally, the 1998 Notice directs industry trade associations to urge their members to implement the regulations. Young Decl., Ex. 126 (Clarke IPP Rep.) at App'x 2 at 6; *id.*, Ex. 127 (Clarke DPP Rep.) at App'x B at 15. It is well-recognized that, before 2007, Chinese legislators intended for "trade associations" in China to "promote 'self-discipline' among competitors" and to "eliminate 'vicious competition,' or cutthroat price wars." *Id.*, Ex. 139, Yong Huang, *Pursuing the Second Best: The History, Momentum, and Remaining Issues of China's Anti-Monopoly Law*, 75 Antitrust L. J. 117, 129 (2008).

Chinese provincial government records show that, even before the 1998 Notice, government agencies focused on regulating and investigating CRT prices. *See* Young Decl., Ex. 140, "Stop Unfair Price Behavior," Second Round of Shandong Provincial Annals Price Chronicles (1997-2005) ("From 1997 to the first half of 1998, the provincial Price Bureau focused on inspecting products sold below the average industry cost, such as flat glass, steel, ***color cathode ray tubes***, color TVs, and sugar, and maintained the market price competition order in related industries." (emphasis added)).

After the 1998 Notice, China's State Planning Commission ("SPC") and Ministry of Information Industry ("MII") published a number of "Notifications," outlined below, reaffirming and implementing the 1998 Notice specifically within the CRT industry. Those Notifications applied to Irico as a CRT manufacturing enterprise and state-owned entity. The two governmental bodies involved, the SPC and MII, were at the time directly under China's State Council, which was the "highest executive body in China's central government," and both the SPC and MII possessed the authority to create and enforce the regulatory framework set forth in the pricing notifications. Young Decl., Ex. 126 (Clarke IPP Rep.) at ¶¶ 10, 25; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24 and App'x B at ¶¶ 10, 25. Like China's Price Law and the 1998 Notice, the subsequent Notifications, outlined below, had the status of law in China and were binding and enforceable on Chinese manufacturers, particularly SOEs like Irico. *Id.*, Ex. 126 (Clarke IPP Rep.) ¶ 14; *id.*, Ex. 127 (Clarke DPP Rep.), at ¶¶ 24, 38-39; *see also id.*, Ex. 141, IRI-CRT-00026139, at -233 ("For big and middle sized SOE, the country is our boss. . . . we should follow the instructions from the government.").

- **January 1999 Notification:**  China's SPC issued a Notification on January 16, 1999, directing that "***all areas shall investigate*** the companies, which sell products below the average cost of the industry and shall focus their inspection work on the prices of flat glass, steel, ***color cathode ray tubes***, color TV sets and sugar in the first half of 1999." Young

Decl., Ex. 128, "Notice on Earnestly Stopping Price Dumping and Carrying out Inspection of Price Dumping," Jan. 16, 1999 (emphasis added).

- **February 1999 Notification:** On February 3, 1999, China's MII issued a "Notification of Reporting Cost Information for Color TV and **Color CRT Industry**." Young Decl., Ex. 126 (Clarke IPP Rep.) at App'x 3 at 3 (emphasis added); *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 23. Consistent with the 1998 Notice, the Ministry stated its plans to "publish average industry production costs of some types of color TVs and color CRTs" and directed certain enterprises to report their cost information, starting in the 4th quarter of 1998 and for "each subsequent quarter." *Id.*, Ex. 126 (Clarke IPP Rep.) at App'x 3 at 3-4; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 23-24. The Ministry's list of CRT enterprises that were required to report their cost information expressly identified Irico (as Caihong Group Corp.[6]). *Id.*, Ex. 126 (Clarke IPP Rep.) at App'x 3 at 6; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 26. Also in February 1999, China's State Development Planning Commission issued further "Measures" to regulate "low-price" dumping. *Id.*, Ex. 126 (Clarke IPP Rep.) at App'x 4; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 35.

- **April 1999 Notifications:** China's SPC and MII issued a Notification on "Trial Measures to Prevent Unfair Price Competition Regarding **Color CRTs** and Color TVs" on March 15, 1999, to be effective as of April 1, 1999. Young Decl., Ex. 126 (Clarke IPP Rep.) at App'x 5 at 3; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 27. Irico received the Notification in April 1999. *Id.*, Ex. 126 (Clark IPP Rep.) at App'x 6 at IRI-CRT-00031461-64; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 55. The Notification represents further implementation of the 1998 Notice within the color CRT industry. *Id.*, Ex. 126 (Clarke Rep.) at ¶ 21; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at ¶ 21. The Notification states that, due to sharp decreases in prices, the Chinese government has deemed color CRTs (and TVs) "key products" for "dumping" prevention, regulation, and "strengthen[ed] monitoring and inspection." *Id.*, Ex. 126 (Clarke IPP Rep.) at App'x 5 at 3 ¶ 2; *id.*, Ex. 127 (Clarke DPP

---

[6] "Caihong Group Corp." is a direct translation of Irico's Chinese name. *See* Young Decl., Ex. 141, IRI-CRT-00026139, at -6139.

Rep.) at ¶ 24, App'x B at 47.  The Notification also states that, in addition with complying with the set forth measures, "[a]ll color CRT" manufacturers "must … consciously regulate pricing actions," and "must check and correct, ***on their own***, any action of unfair price competition." *Id.*, Ex. 126 (Clarke IPP Rep.) at App'x 5 at 3-4 ¶ 3 (emphasis added); *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 47–48 ¶ 3. Consistent with the 1998 Notice, the Notification provided for the reporting and investigation of any CRT manufacturers that priced below the collectively reported industrial average CRT costs and provided for punishment for those who priced below their costs. *Id.*, Ex. 126 (Clarke IPP Rep.) at App'x 5 at 5; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 49. On April 2, 1999, China's MII issued a "Notification of Publishing Industry Average Production Costs for Some Types of Color CRTs and Color TVs." *Id.,* Ex. 126 (Clarke IPP Rep.) at App'x 7 at 3; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 49. That Notification provided estimated average costs for two CRT sizes and directed "[a]ll color CRT" manufacturers to "implement" those average costs. *Id.* Irico also received this Notification in April 1999. *Id.*, Ex. 126 (Clarke IPP Rep.) at App'x 6; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 55.

- **September 2000 Notification:**   On September 13, 2000, China's MII issued another "Notification of Publishing Industrial Average Production Costs for Some Types of Color CRTs." *Id.*, Ex. 126 (Clarke IPP Rep.) at App'x 9 at 3; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 102. Like the April 1999 Notification, this Notification published average costs for 3 CRT sizes and directed all CRT manufacturers to "implement" those costs, whereby any manufacturers selling below the published average costs could be reported by competitors and punished if selling below their own costs. *Id.* The MII issued a similar notification for color TVs in August 2000.  *Id.,* Ex. 126 (Clarke IPP Rep.) at App'x 8; *id.*, Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 90.

The Chinese regulations that became effective in May 1998 and that were repeatedly reaffirmed and implemented by the Chinese government from 1998 onward expressly provided that competitors and others could report and prompt government investigation of any CRT manufacturer who priced below the government-published thresholds. These regulations make clear that, starting

in May 1998, CRT prices were directly regulated by the Chinese government and not by the free market.

In addition to the official government notifications coordinating CRT prices, other evidence corroborates the mandatory nature of the Chinese price regulations and CRT notifications, and supports finding a true conflict. First, Irico's contemporaneous records confirm the Chinese government's role, in 1999, in formulating Irico's "self-discipline [on] price based on the average cost of the industry," which helped "ensure[] that the market price of color tubes basically returned to the normal level." *Id.*, Ex 137 (ECF 6183-2) at 4. Second, Irico's witnesses corroborated that Irico understood that it would be punished if it did not comply with the coordinated prices from the 1998 Notice and later Notifications. *See id.*, Ex. 2 (Yan Dep.) at 351:6-15. Third, the timing of the 1998 Notice and subsequent Notifications as to the CRT industry align with Irico's alleged participation, starting in August 1998, in Chinese CRT industry meetings and the alleged conspiracy. *See* Section II. Fourth, from 1998 to 2007, a number of the meetings, communications, and/or joint decisions among Chinese CRT manufacturers, including Irico, were publicly reported, and/or directly involved coordination by, cost reporting to, and price guidance from the Chinese Ministry (the MII).[7] Fifth, official Chinese government statements, in 1999 and 2000, reinforce the 1998 Notice's requirement of "price self-discipline" and subsequent CRT Notifications.[8] Sixth, while enforcement of a foreign law is not required to demonstrate a true conflict,[9] contemporaneous Chinese records show that the

---

[7] *See* Young Decl., Ex. 124 at 75, Tomoo Marukawa, "The Chinese Television Industry: An Example of Gradual Transition, in *China's Industries in Transition* (Jiang Xiaojuan ed., 2001) ("In June 1999, eight major color CRT makers, including sino-foreign joint ventures, made a joint declaration to stop operation for a month to cease the collapse of CRT prices"); *Id.*, Ex. 130, BMCC-CRT000181673 to 181677; *Id.*, Ex. 131, BMCC-CRT000142685; *Id.*, Ex. 132, BMCC-CRT000138732 to 138735; *Id.*, Ex. 133, BMCC-CRT000139461 to 139463; *Id.*, Ex. 134, BMCC-CRT000054691; *Id.*, Ex. 135, CHU00047273; *Id.*, Ex. 136, IRI-CRT-00029680 at -9696, -9698, -9725, -9727.

[8] Young Decl., Ex. 126 (Clarke IPP Rep.) at App'x 2 ("Relevant state agencies in charge of industries may study and propose industrial average production costs…which will be published regularly to the society upon approval by the State Planning Commission *to act as an alert level for price self-discipline by enterprises*, to restrict pricing actions of enterprises, and to prevent dumping by enterprises.") (emphasis added); id., Ex. 127 (Clarke DPP Rep.) at ¶ 24, App'x B at 12; *id.*, Ex. 142, National Development and Reform Commission, *The State Planning Commission Issued Eight Measures to Inspect Prices and Charges* (Jan. 6, 2000) ("[T]he masses are expected to actively participate in price supervision so as to prompt enterprises to strengthen price self-discipline and establish and improve the price self-restraint mechanism of the industry."; *see also* Ex. 143, *Premier of the State Council, Zhu Rongji, Issued Instructions to Firmly Prevent Unfair Low-price Dumping Behaviors*, 1999:3 GUANGXI ECON. AND TRADE 4 (1999); *id.*, Ex. 144, *Interpretation of the Price Law of the People's Republic of China*, Nov. 25, 2000.

[9] The Second Circuit made clear in *Vitamin C* that the comity-conflict "decision is based on the *prima facie* conflict between U.S. law and Chinese law rather than the degree of compulsion defendants faced." *Vitamin C*, 8 F.4th at 151 n.25.

government actively investigated below-average prices and enforced the 1998 Notice and anti-dumping measures in the related color TV industry. *See* Clarke Decl. ¶¶ 17-20; Young Decl., Ex. 127 (Clarke DPP Rep.) at ¶¶ 45-58; *see also Vitamin C*, 8 F.4th at 158 n.36 ("Because our analysis turns on the existence of a true conflict, we reach this conclusion in light of what Chinese law facially required rather than the Chinese regulatory program's track record of enforcement.").

Because Irico could not comply with both the Chinese CRT price regulations coordinating CRT prices and the U.S. laws on which Plaintiffs base their claims, a true conflict exists, establishing the first prong of the comity test firmly in favor of dismissal of the Plaintiffs' claims against Irico.

**B.    Irico's Chinese Nationality and the Chinese Location of Irico's Alleged Conduct Weigh Heavily in Favor of Dismissal**

The second comity factor—the nationality and business locations of the parties—also favors dismissal of the Plaintiffs' claims. *Timberlane*, 549 F.2d at 614. Not only are both Irico Group and Display exclusively Chinese in nationality and location, but their alleged conduct took place entirely abroad and in China. *See* Statement of Facts, § 1, *supra*.

Alongside nationality considerations, courts "should consider where the conduct in question took place" and "afford[] far less weight, for comity purposes, to U.S. or state interests when the activity at issue occurred abroad." *Mujica v. AirScan Inc.*, 771 F.3d 580, 604–05 (9th Cir. 2014). That is because "[f]oreign states,… have legitimate interests in regulating conduct that occurs within their borders, involves their nationals, impacts their public and foreign policies, and implicates universal norms." *Id.* at 607. Here, there is no dispute that Irico's alleged conduct—participation in alleged conspirator meetings and setting prices and selling of CRT products—all occurred "abroad" in China.

The Second Circuit's *Vitamin C* decision is again instructive with respect to this factor. There, the court found that both the defendants and the location of the relevant conduct were all foreign, and those facts "weigh[ed] in favor of dismissal under international comity principles." 8 F.4th at 160 (citing *Timberlane*, 549 F.2d at 615). It did not matter that the plaintiffs were American or that the defendants sold vitamin C on the international market.

1    Here, Irico Group is state-owned and, as the Court found, an "instrumentality of China," and

2    Display is partially owned by Group, making the case for international comity on nationality grounds

3    even stronger. *See* ECF 5637 at 7. "The international comity concerns … therefore apply fully in

4    this context." *See Vitamin C*, 8 F.4th at 160.

5        **C.    Enforcement is not Expected to Achieve Compliance**

6        The third comity factor, the extent to which enforcement by either state can be expected to

7    achieve compliance, provides further support for dismissal, as the Chinese government and Chinese

8    courts likely will bar any enforcement efforts by Plaintiffs against Irico. *See Timberlane*, 549 F.2d

9    at 614.

10       China and the United States have no bilateral treaty for the recognition and enforcement of

11   foreign judgments, and China has not signed the Hague Convention on the Recognition and

12   Enforcement of Foreign Judgments in Civil or Commercial Matters.[10] Young Decl., Ex. 145 (Clarke

13   Decl. ISO Irico's Mtn. to Dismiss) at ¶ 12. It is highly unlikely that either the Chinese government

14   or a Chinese court would allow enforcement on or collection of a trebled antitrust judgment against

15   the state-owned Irico Group and its subsidiary Display.[11] *Id.* at ¶¶ 9-15 (explaining that Chinese

16   courts have never recognized or enforced a judgment from a U.S. antitrust class action and are

17   unlikely to). Among other provisions, Article 289 of China's Civil Procedure Law mandates that

18   Chinese courts "shall refuse to recognize and execute" any foreign "judgment or ruling" that

19   "contradicts the basic principles of the law of the People's Republic of China or violates State

20   sovereignty, security or the public interest." *Id.* at ¶ 10.

21

22

23

24   [10] "Contracting parties" are listed at https://www.hcch.net/en/instruments/conventions/status-table/?cid=137 (accessed
     on July 13, 2023). Even under the Hague Convention, the Plaintiffs could not enforce a judgment in this case against
25   Irico. By its terms, the Convention "shall not apply" to foreign judgments arising from "anti-trust (competition) matters"
     except for those "based on … anti-competitive agreement[s] or concerted practice[s] … where such conduct and its
26   effect both occurred in the State of origin," and courts are also afforded substantial discretion in enforcing judgments on
     public policy grounds, among other grounds. CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN
27   JUDGMENTS IN CIVIL OR COMMERCIAL MATTERS, July 2, 2019, *available at* https://assets.hcch.net/docs/806e290e-bbd8-
     413d-b15e-8e3e1bf1496d.pdf, at 1-2 (accessed on July 13, 2023).
28   [11] IPPs previously conceded that a default judgment would not be enforceable in China. *See* ECF 4734 (conceding "the
     fact that any default judgment would not be enforceable in China").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.      The Effect of Irico's Alleged Conduct on the United States, Compared to China and Elsewhere, Is Insignificant**

The fourth comity factor—"the relative significance of effects on the United States as compared with those elsewhere"—favors dismissal here, where Irico's alleged conduct was directed exclusively at China. *Timberlane*, 549 F.2d at 614. Indeed, DPPs admit that no DPP class member purchased an Irico CRT or product containing an Irico CRT in the United States. Young Decl., Ex. 5 (DPPs' Supp. Obj. and Responses to Irico's First Set of Interrogs. to DPPs) at 6 (confirming DPPs have no records from any third party documenting direct purchases of Irico CRTs or televisions or monitors containing Irico CRTs in the United States).

The effect, if any, of Irico's alleged conduct within the United States is insignificant when compared to the effect of the same conduct in China, where Irico produced and sold its CRT products. *See* ECF 1527 at 109 (Netz Decl.) (IPPs' expert acknowledging that all of Irico's major customers were Chinese TV manufacturers); Young Decl., Ex. 148 at 87:6-24 (Johnson Dep.) (DPPs' expert acknowledging that he is only aware of one "small" Irico transaction in the United States which "wasn't a large percentage of US volume of commerce"). As shown above, at best, the evidence may show that Irico allegedly attended meetings in China starting in 1998, years after the alleged conspiracy began and potentially impacted U.S. prices and after Chinese regulation of pricing had commenced. *See supra* at Statement of Facts § 2. There is no evidence that Irico's alleged conduct impacted or facilitated any other alleged co-conspirators' sales or prices in the United States. By contrast, the Chinese government actively regulated Irico's pricing decisions to address state concerns about the domestic Chinese CRT industry and market. China's interests in regulating Irico's alleged conduct greatly outweigh any interest of the United States. Indeed, while the U.S. Department of Justice actively investigated and prosecuted other CRT entities, it did not investigate or prosecute Irico as part of its larger investigation of the CRT industry.[12]

In *Vitamin C*, the Second Circuit considered the facts that the DOJ "has not brought criminal antitrust enforcement actions against these defendants" and that "the Department of State has not

---

[12] *See* Brief for United States of America as Amici Curiae Supporting Appellees, *Indirect Purchaser Plaintiffs, et al. v. Irico Group Corp., et al.* (2020) (No. 19-17428) ("[T]he United States did not prosecute Irico Group Corp. (Group) or Irico Display Devices Co., Ltd. (Display).").

weighed in" as favoring dismissal of the claims against the Chinese defendants based on comity. 8 F.4th at 163.[13] The same facts are true here and require the same result.

### E.    The Remaining Comity Factors Favor Dismissal of the Claims against Irico

The remaining comity factors, which rely on overlapping facts, dictate dismissal as well.

As to the fifth comity factor, neither Irico Group nor Display had any "explicit purpose to harm or affect American commerce." *Timberlane*, 549 F.2d at 614. Irico's CRT sales and business, as well as its alleged conduct, were confined to China, and no evidence shows such "explicit purpose" as to U.S. commerce. Young Decl. at ¶ 82; *id.*, Ex. 3 (DPPs' Supp. Obj. and Responses to Irico's First Set of Interrogs. to DPPs) at 6.; *id.*, at ¶ 151; *id.*, Ex. 76 (IPPs' Attachment A) and Ex. 147. Rather, the record amply demonstrates that Irico's pricing actions were directed at the Chinese market, based on direction from the Chinese government.

The sixth comity factor is "the foreseeability of such effect" on American commerce. *Timberlane*, 549 F.2d at 614. Here, where Irico's CRT business and alleged conduct were focused entirely on China, there was no foreseeable effect on American commerce.[14]

Finally, the seventh comity factor—"the relative importance to the violations charged of conduct within the United States as compared with conduct abroad"—weighs in favor of dismissing the Plaintiffs' claims. *Timberlane*, 549 F.2d at 614. As detailed throughout this motion, Plaintiffs **do not** allege or have evidence that Irico committed any unlawful "conduct within the United States." Instead, all evidence shows that Irico's alleged conduct occurred "abroad" entirely within China. Moreover, Plaintiffs have already settled with, and the DOJ has prosecuted, defendants who conducted CRT business in the United States.

In sum, the factors that the Court must weigh in considering application of the international comity doctrine heavily favor dismissal of Plaintiffs' claims. *See Vitamin C*, 8 F.4th at 162–63

---

[13] The Second Circuit explained that, although the Office of the Solicitor General filed briefs in the *Vitamin C* case, those briefs did not "report the views of the Executive Branch or the Department of State" on the case's effect on foreign relations, as those are the only U.S. government bodies able to comment on "ramifications for foreign relations." 8 F.4th at 163 n.46.

[14] The absence of conduct connected to the United States distinguishes this case from the *Vitamin C* case and the foreseeability finding there, where the Chinese defendants in *Vitamin C* allegedly price-fixed vitamin C exported into the United States. Irico did not export to the United States.

1

2

3

4

(dismissing antitrust claims against Chinese defendants after considering comity factors, which weighed both for and against dismissal). The Court, therefore, should dismiss the Plaintiffs' claims on the basis of international comity.

## II. IRICO IS ENTITLED TO SUMMARY JUDGMENT REGARDING IRICO'S LACK OF PARTICIPATION IN THE CONSPIRACY PRIOR TO AUGUST 5, 1998

5

6

7

8

9

10

11

12

13

There is no genuine dispute that Irico did not join the alleged conspiracy before August 5, 1998.  The Ninth Circuit has held that "a defendant cannot be held liable for substantive offenses committed before joining or after withdrawing from a conspiracy." *U.S. v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992) (internal citations omitted); *see also Mattel, Inc. v. MGA Ent., Inc.*, 2010 WL 11463911, at *4 (C.D. Cal. Sept. 3, 2010) (applying *Lothian* and holding that "one logically cannot contemplate acts committed in furtherance of a conspiracy into which [it] has not yet entered."). Because the materials facts of this case show that Irico cannot be held liable for the alleged conspiracy before August 5, 1998, Irico is entitled to summary judgment on this ground as well.

14

15

16

17

18

19

20

21

22

Plaintiffs themselves have confirmed Irico's late and limited participation in the alleged conspiracy, in their pleadings and filings in this case, as informed at that time by the voluminous discovery conducted as to the other defendants in this case. Specifically, Plaintiffs pleaded and continue to plead that Irico's participation began in 1998 (not 1995), which is further confirmed by the evidentiary record, developed over more than a decade of vigorous discovery, reflecting no genuine issue of material fact that Irico's purported participation in the alleged conspiracy could have started earlier than August 1998.  ECF No. 5589 ("IPP Compl.") at ¶ 150a ("[t]he Chinese Glass Meetings began in 1998" ); ECF No. 436 ("DPP Compl.") at 159 ("Irico…participated in…group meetings from 1998 to 2006").

23

24

25

26

27

28

This issue is also not new to the Court.  In the Cour's 2018 Order Setting Aside Default, the Court itself identified the lack of pre-1998 evidence against Irico in this case, stating that "the first event involving Irico . . . occurs in 1998," and observing that "at a minimum, the Irico Defendants have a defense as to the scope of their participation in the conspiracy." ECF No. 5240 at 17. The lack of such evidence persists.

Prior discovery and the discovery against Irico has only confirmed that the earliest alleged conspiracy meeting Irico may have participated in was on August 5, 1998. *See* Young Decl. at ¶3; *id.*, Ex. 5 (DPPs' Supp. Obj. and Responses to Irico's Second Set of Interrogs. to DPPs) (referencing CHU000300661) at 26, 10-13; *Id.*, Ex. 1 (CHU000300661) (first identified meeting attended by Irico dated August 5, 1998); *id.*, at ¶¶ 81-82; *id.*, Ex. 76 (IPPs' Attachment A) (reflecting no Irico meetings prior to October 1998); *id.*, at ¶ 151; Alioto FSIA Decl. ¶¶ 1-39, ECF No. 5440-1 (identifying no exhibits or testimony prior to August 1998); Saveri Decl., Ex. 11, ECF No. 5226-1 (chart identifying meetings allegedly connected to Irico beginning on Oct. 9, 1998); Special Master's Report and Recommendation Re Admissibility of Coconspirator Documents and Statements, ECF No. 6074 at 4, 48 (ruling that 81 documents "that the [Direct and Indirect Purchaser Plaintiffs] contend reflect Irico's participation in the conspiracy to fix and manipulate prices and terms for the sale of CRTs that is the subject of this litigation.").

Specifically, a document produced by former defendant and amnesty applicant Chunghwa appears to reflect a July 31, 1998 meeting not attended by Irico, that states only that Irico would be invited for the first time to an August 5, 1998 meeting relating to CDTs, or color display tubes that were used in computer monitors. *See* Young Decl., Ex. 79 (CHU00030668) at -0668.01E. Nearly a year later, a June 22, 1999 CPT meeting note, also produced by Chunghwa, reflects that Irico was not attending meetings at that time, related to CPTs or color picture tubes that were used in color televisions. *See* Young Decl., Ex. 123 (Dep. Ex. 1315) at -9051E ("temporary agreement was reached that IRICO would be invited to join regular meetings or irregular meetings") (emphasis in original). Deposition testimony from other defendants regarding Irico's alleged participation in the meetings further confirms that Irico was a latecomer to the meetings. J.S. Lu, one of the key employees of amnesty applicant Chunghwa, testified that, for many years of the alleged conspiracy, Irico "remained quite isolated, without information or participation [in] regular meetings of other major CPT or CRT makers." Young Decl., Ex. 122 (Lu Dep.) at 189:16-190:4. Notably, Mr. Lu went on to add that Irico "always took its own action on prices. It had no reference, no participation." *Id.* Plaintiffs' later assertions that Irico's participation in the conspiracy began three years earlier in March 1995 at the beginning of the alleged conspiracy period do not create a genuine issue of fact.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.  DPPs Have Not Identified Any Evidence of Irico's Involvement In the Alleged Conspiracy Prior to August 5, 1998

In response to Irico's request for DPPs to admit they have no evidence of any meeting between Irico and a defendant or alleged co-conspirator prior to July 31, 1998, DPPs denied the lack of evidence and referred Irico to 73 documents supposedly showing Irico's participation in the conspiracy prior to July 31, 1998.[15]  *Id.*; Young Decl., ¶ 80 and Ex. 7 (DPPs' Objections and Responses to Irico's First Set of Requests for Admissions to DPPs, dated Feb. 23, 2022); *id.*, ¶ 7 and Ex. 5 (DPPs' Supplemental Objections and Responses to Irico's Second Set of Interrogatories Directed to DPPs, Sept. 1, 2022) at 26, 10-13. ***None of the 73 documents*** cited by DPPs show Irico's involvement prior to August 1998; the earliest alleged conspiracy communication involving Irico reflected in the 73 documents occurred on ***August 11, 1998***. *Id.*; Young Decl., Ex. 1 (CHU00030661.01E). Irico is therefore entitled to summary judgment as to DPPs' claims because DPPs have failed to create a material issue of fact as to Irico's purported participation in the alleged conspiracy prior to August 5, 1998.

### B.  IPPs' Scant Evidence Does Not Create An Issue of Material Fact As To Whether Irico Participated In the Alleged Conspiracy Prior to August 5, 1998

IPPs have attempted to identify instances of communication between Irico and other CRT manufacturers prior to August 1998, to manufacture an earlier alleged conspiracy timeline as to Irico. *See* Young Decl., Ex. 80 (IPP 2022 Discovery Responses) at 10, 14-16. Under any reasonable reading, however, this smattering of documents cited by IPPs does not create an issue of material fact as to whether Irico participated in the alleged conspiracy to fix CRT prices prior to August 1998. Although they try, IPPs cannot create an issue of material fact based on "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The decision in the *In re Packaged Seafood Antitrust Litigation* is instructive on evaluating IPPs' proffered evidence. There, the court granted defendants' motion for summary judgment on

---

[15] DPPs also referred to "Binder Documents" supposedly showing Irico's participation in the conspiracy. These documents do not show any involvement by Irico prior to August 1998. *See* Young Decl., Ex. 5 at 10; *id.*, at ¶¶ 81-82. DPPs also referred to two documents dated October 13, 2003, which do not show Irico's involvement prior to August 1998.

1    opt-out plaintiffs' claims that predated the earliest time range of the DOJ's guilty pleas in related

2    criminal cases. *In re Packaged Seafood Antitrust Litig.*, 2023 WL 3046073, at \*10, 16 (S.D. Cal.

3    Apr. 21, 2023) ("*Packaged Seafood*"). The plaintiffs conceded, and the court agreed, that "evidence

4    of a post-2011 conspiracy is *not* direct evidence that Defendants were involved in a conspiracy pre-

5    2011." *Id.* at \*10 (emphasis in original).[16] The court rejected plaintiffs' purportedly direct evidence

6    on the grounds that each piece of evidence required an inference, rendering it circumstantial at best.

7    *Id.* Finding only circumstantial evidence of agreements prior to 2011, the *Packaged Seafood* court

8    applied a two-part test: 1) evaluating defendants' claims of legitimate business purpose, and 2)

9    shifting the burden to plaintiffs to demonstrate impermissible behaviour. *Id.* at \*11 (citing *In re*

10   *Citric Acid Antitrust Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999). The court then determined that

11   each category of the plaintiffs' circumstantial evidence did not demonstrate an anticompetitive

12   agreement.

13        IPPs' evidence here suffers from similar infirmities. First, they cite to a few documents from

14   other defendants' files that purport to reflect some information about Irico without an indication of

15   its source. Young Decl., Exs. 81-113 (charts and market notes produced by defendant BMCC). But

16   even if the information came from Irico (which is not established), "not every exchange of

17   information between competitors rises to the level of an illegal conspiracy." *Packaged Seafood*, 2023

18   WL 3046073, at \*13 (citations omitted); *see also id.* at \*14 (holding that defendants "possession of

19   [competitive] information does not permit an inference of an illegal agreement") (citations omitted).

20        Next, IPPs point to several documents that demonstrate unquestionably legitimate business

21   discussions regarding topics such as technology development and potential joint ventures. *See*

22   Young Decl, Ex. 115 (Dep. Ex. 8557) at -4770E to 4773E (discussion of joint venture with Toshiba);

23   *Id.*, Ex. 120 (Dep. Ex. 8561) (discussing training of junior employees at Samsung and MAC); *Id*,

24   Ex. 116 (IRI-CRT-00008248) at -8317E (discussing potential technology transfer with Chunghwa)

25   and -8359-8360 (discussions of potential sales to and technology transfer with Thomson). These are

---

[16] *See also In re Citric Acid Antitrust Litig.*, 191 F.3d 1090, 1104 n.8 (9th Cir. 1999) ("The document is not direct evidence of conspiracy because there remains a gap between the document and the conclusion that [Defendant] was a conspirator, a gap that can be bridged only by making some sort of inference.") (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999) ("Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.")).

not evidence of illegal conspiracy activity to fix prices. *See Matsushita*, 475 U.S. at 588 ("[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.") (internal citations omitted); *see also, e.g., Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 709-710 (7th Cir. 2011) (the exchange of competitively sensitive information during merger talks does not, standing alone, constitute anticompetitive conduct).

Finally, IPPs identified industry meetings of Chinese CRT manufacturers, often organized by or involving the Chinese government, that do not support Irico's participation in the alleged conspiracy. *See* Young Decl, Ex. 117 (Dep. Ex. 8558) at -4821E (discussion of preparatory meeting for CRT Industry Association); *Id.*, Ex. 118 (Dep. Ex. 8559) at -3389E (memorandum prepared in advance of industry meeting); *Id.*, Ex. 119 (BMCC-CRT000113384) (notes of CPT industry meeting); *Id.*, Ex. 120 (Dep. Ex. 8561) at 8263E (discussing December 1997 industry meeting); *Id.*, Ex. 121 (Dep. Ex. 8562) at -8241E (discussing January 1998 industry meeting) and -8244E (discussing "provincial-level meetings about the electronic industry of Shaanxi Province"). Irico's participation in legitimate trade association activities is not evidence of participation in the alleged conspiracy. *See In re Citric Acid Litig.*, 996 F. Supp. 951, 958 (N.D. Cal. 1998) (finding that "plaintiffs are urging the Court to peer through a triple lens of speculation: to speculate that [the trade association] was a monitoring tool for the conspiracy, to speculate that [defendant] knew that, and to speculate that [defendant] joined in order to reassure the conspirators that it would not disrupt the conspiracy. The evidence for each link in the chain is weak at best."); *see also U.S. v. Silverman*, 861 F.2d 571, 578 (9th Cir. 1998) (innocuous conduct by the defendant rarely establishes proof of defendant's participation in an alleged conspiracy). This is especially true here where the body of evidence points to August 1998 as the earliest date of Irico's involvement in the alleged conspiracy.

## III.   IRICO IS ENTITLED TO SUMMARY JUDGMENT FOR CERTAIN OF IPPS' STATE LAW CLAIMS ON DUE PROCESS GROUNDS DUE TO LACK OF CONTACTS WITH THESE STATES

Pursuant to Ninth Circuit precedent, Irico is entitled to summary judgment on due process grounds because IPPs have failed to provide any authenticated or admissible evidence to support their claims that applying the laws of Arizona, the District of Columbia, Florida, Hawaii, Iowa,

1   Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, New Mexico, New York, North

2   Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin (the

3   "Non-Contact States") to Irico would satisfy due process. *See AT&T Mobility LLC v. AU Optronics*

4   *Corp.,* 707 F.3d 1106 (9th Cir. 2013). In the absence of such evidence, it would be arbitrary and

5   unfair to apply the laws of these states against Irico.[17] *See id.* at 1114; *see also* U.S. Const. amend.

6   XIV, § 1. As discussed below, Irico is entitled to summary judgment as to IPPs' claims under the

7   laws of the Non-Contact States in their entirety.

8   　　　"[The] requirements of the Due Process Clause must be satisfied *individually* with respect to

9   *each defendant* in a case." *AT&T,* 707 F.3d at 1113 n.15 (emphasis added); *see also In re Capacitors*

10  *Antitrust Litig.*, No. 17-MD-02801-JD, 2020 WL 6462393, at *5 (N.D. Cal. Nov. 3, 2020) (same).

11  The Due Process Clause of the Fourteenth Amendment and the Full Faith and Credit Clause require

12  that: "for a State's substantive law to be selected in a constitutionally permissible manner, that State

13  must have a significant contact or significant aggregation of contacts, creating state interests, such

14  that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449

15  U.S. 302, 312–13 (1981); *see also Olsen by Sheldon v. Gov't of Mexico*, 729 F.2d 641, 648 (9th Cir.

16  1984) *abrogated on other grounds Broidy Cap. Mgmt., LLC v. State of Qatar*, 982 F.3d 582 (9th

17  Cir. 2020) (analyzing a foreign-state-defendant's contacts with the forum state to determine if

18  applying the forum-state's law would exceed the constitutional limits imposed by the Due Process

19  Clause). The primary factors in a significant aggregation of contacts analysis include: (1) the location

20  of the defendant's headquarters, (2) the location of the harm, and (3) the location of the (alleged)

21  wrongdoing. *See Marsh v. First Bank of Del.*, No. 11-CV-05226-WHO, 2014 WL 554553, at *11

22  (N.D. Cal. Feb. 7, 2014). An analysis of the facts shows that Irico had ***no*** contacts with the Non-

23  Contact States and there is no basis to apply their laws to Irico.

24

25

26

27  _____

[17] No dispositive motion on this issue has been resolved by this Court on the merits, although prior motions were filed. *See* ECF No. 4596 at 1 (due process motion brought by Chunghwa dismissed as moot due to intervening settlement); ECF No. 4733 at 1 (denying as moot joint defendants' due process summary judgment motion); ECF No. 5105 at 3 (granting state law portion of TDA motion as unopposed).

28

Irico's headquarters, manufacturing, and sales activity all occurred in China.[18] ECF No. 5409-1 ("Wang Decl.") at ¶¶ 19, 39; *see also id.* at ¶¶ 12-13. Irico did not sell CRTs to the United States at all, and thus did not sell in the Non-Contact States.[19] *See* ECF 1527 at 109 (Netz Decl.) (IPPs' expert acknowledging that all of Irico's major customers were Chinese TV manufacturers); *see also* Wang Decl. ¶¶ 12-13; Statement of Facts, § 1, *supra*.  Likewise, there were no direct sales to any customers in these states,[20] nor have IPPs identified any indirect sales of finished products incorporating Irico CRTs to a class member in one of the Non-Contact States.[21]

As to the location of the wrongdoing, IPPs have also failed to identify evidence that any of Irico's allegedly conspiratorial activities were carried out in the Non-Contact States. Of the more than 1,100 alleged conspiracy meetings or communications documented in IPPs' discovery responses, IPPs identified only 74 such instances that purportedly occurred in the United States, none involving Irico. *See* Young Decl. at ¶ 151 and Exs. 76, 147 (U.S. meetings identified in IPPs' Attachment A). Merely pointing to some acts by the alleged conspiracy (that were not undertaken by Irico) within that state is insufficient to confer jurisdiction. *See AT&T*, 707 F.3d at 1112, 1113 n.5 (Due Process requires a "sufficient aggregation of contacts . . . with the parties **and** the occurrence or transaction," and must satisfied as to each defendant) (emphasis added); *see also Aldini AG v. Silvaco, Inc.*, No. 21-CV-06423-JST, 2022 WL 20016826, at *12 (N.D. Cal. Aug. 3,

---

[18] Moreover, numerous cases have concluded that corporate presence alone is insufficient to satisfy due process. *See Tidwell v. Thor Indus., Inc.*, Civil No. 05cv2088-L(BLM), 2007 WL 8083631, at *8 (S.D. Cal. Mar. 26, 2017) (claim under California law not sustainable because defendant headquartered in California did not have sufficient contacts to satisfy due process.); *In re Hitachi Television Optical Block Cases*, No. 08cv1746 DMS, 2011 WL 9403, at *7 (S.D. Cal. Jan. 3, 2011) (same); *Andren v. Alere, Inc.*, No. 16CV1255-GPC(AGS), 2017 WL 6509550, at *14–16 (S.D. Cal. Dec. 20, 2017) (same).

[19] IPPs have wrongly alleged that sales of CRTs by an unrelated company, China National Electronics Import and Export Caihong Co. ("CNEIECC"), to Irico USA, are actually U.S. sales of Irico. *See, e.g.*, Pls.' Opp'n to the Irico Defs.' Mot. to Dismiss at 8-10, ECF No. 5440. This is patently false. *See* ECF 5480 at 22-26. But even if true, it would not change the analysis for purposes of this motion because those wrongly attributed "Irico" sales are only to Irico USA which, as noted above, is in California, a state not relevant to this issue.

[20] As proof of Irico's lack of sales to the United States, the Direct Purchaser Plaintiffs have admitted that they received no claims from any class member related to any purchases of Irico CRTs or CRT products. *See* Young Decl., Ex. 5 (DPP Discovery Responses) at 26.

[21] Although IPPs have asserted that Irico CRTs *might* have been incorporated in finished products with some alleged connection to the United States, they have presented no evidence that any Irico CRTs were incorporated in products actually sold to consumers in the United States, let alone to one of their class members. *See, e.g.,* Decl. of Mario N. Alioto In Support Of Indirect Purchaser Pls.' Opp'n to the Irico Defs.' Mot. to Dismiss, ECF No. 5440-1 ("Alioto FSIA Decl."), and Exs. 1-39. Nor would this alone be sufficient to establish the requisite contacts. *Asahi Metal Indus. Co. Ltd. v. Super. Ct. of Cal.*, 480 U.S. 102, 112 (1987) (noting that the "placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State.").

2022) (noting that "the Ninth Circuit has not adopted [a conspiracy jurisdiction] theory") (internal quotation marks and citations omitted).

The Court's previous decision on summary judgment, related to the Foreign Trade Antitrust Improvement Act ("FTAIA"), is not relevant to this question. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2016 WL 5725008, *7 (N.D. Cal. Sept. 30, 2016) ("FTAIA Order"). Whether the FTAIA is satisfied for purposes of application of the Sherman Act or not, it does not obviate the need for Plaintiffs to demonstrate that the Irico-specific contacts with each state are sufficient to meet the requirements of the Due Process Clause. In the Ninth Circuit, "the FTAIA is not a subject-matter jurisdiction limitation" but rather "a component of the merits of a Sherman Act claim." *U.S. v. Hui Hsiung*, 778 F.3d 738, 751 (9th Cir. 2015). Therefore, the applicability of any holding on FTAIA is limited because "the issue of what conduct [the FTAIA] prohibits is a merits question, not a jurisdictional one." *Id.* at 752-53 (*quoting Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010)) (internal marks omitted); *see also Sullivan v. Barclays PLC*, 13-cv-2811(PKC), 2017 WL 685570, at *22, n.13 (S.D.N.Y. Feb. 21, 2017) (stating that the FTAIA "may apply a less exacting standard than the due process threshold to exercise personal jurisdiction over a foreign defendant") (*citing Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 339 (2d Cir. 2016) (holding that whether "harm in the forum is foreseeable" is not relevant to the assertion of personal jurisdiction under the anti-terrorism act)). Moreover, given that the Court was considering only Sherman Act claims, not state claims, in the FTAIA Order, *see CRT*, 2016 WL 5725008 at *3, the Court was not evaluating the question relevant to this motion, which is whether there is evidence that Irico had sufficient contacts with specific states to support application of each state's law in a way that comports with Due Process. *See In re Packaged Seafood Antitrust Litig.*, 332 F.R.D. 308, 345 (S.D. Cal. 2019) (finding Due Process satisfied only after "[t]he record evidence . . . show[ed] that *all* Defendants carried out conspiracy related conduct" in the forum state "*in addition to the fact* that Defendants alleged conspiracy-related conduct caused harm" to residents in the forum state) (emphasis added). There is no material question of fact: Irico's contacts in each state are lacking, such that the application of these state's laws would be arbitrary and fundamentally unfair. *Allstate*,

1   449 U.S. at 312–13; *AT & T*, 707 F.3d at 1113 n.15. Irico respectfully requests that the Court grant

2   summary judgment as to IPPs' claims under the laws of the Non-Contact States.

3   **IV.   IPPS HAVE FAILED TO IDENTIFY SUFFICIENT EVIDENCE OF INTRASTATE CONDUCT TO ESTABLISH A CLAIM UNDER CERTAIN STATE LAWS**

4   IPPs have failed to provide any authenticated or admissible evidence of unlawful conduct

5   (not merely contacts) by Irico occurring within the states of Arizona, Florida, Michigan, or North

6   Dakota, whose applicable statutes require specific evidence of such conduct. *See* ECF No. 5589 (IPP

7   Compl.) at ¶ 258 (Arizona); *id.* ¶ 282 (Florida); *id.* ¶ 265 (Michigan); *id.* ¶ 273 (North Dakota).

8   Absent such authenticated or admissible evidence of acts committed by the Irico defendants within

9   these states, IPPs cannot support their claims and Irico is entitled to summary judgment.

10  The applicable state laws require evidence of violative conduct ***within each state***:

11  - **Arizona:** Arizona law explicitly includes language that anticompetitive activity must

12  take place "within this state." ARIZ. REV. STAT. ANN. § 44-1402 (West 2023) ("A

13  contract, combination or conspiracy between two or more persons in restraint of, or to

14  monopolize, trade or commerce, any part of which is within this state, is unlawful.").

15  - **Florida:** Likewise, Florida courts have routinely interpreted the Florida Deceptive and

16  Unfair Trade Practices Act ("FDUTPA"), FLORIDA STAT. ANN. §501.201 *et seq.* (West

17  2023), as requiring meaningful conduct within the territorial boundaries of the state. *See*

18  *Millennium Commc'ns & Fulfillment, Inc. v. Office of Att'y Gen.*, 761 So.2d 1256, 1262

19  (Fla. Dist. Ct. App. 2000) ("As we read FDUTPA, it seeks to prohibit unfair, deceptive

20  and/or unconscionable practices which have transpired within the territorial boundaries

21  of this state."); *see also Five for Entm't v. Rodriguez*, 877 F. Supp. 2d 1321, 1330 (S.D.

22  Fl. 2012) ("FDUTPA applies only to actions that occurred within the state of Florida.");

23  *Beaver v. Inkmart, LLC*, No. 12-60028, 2012 WL 4005970, at *3 (S.D. Fla. Sep. 12,

24  2012) (dismissing FDUTPA claims "[b]ecause none of the alleged misconduct occurred

25  within Florida"); *Carnival Corp. v. Rolls-Royce PLC*, No. 08-23318, 2009 WL 3861450,

26  at *6 (S.D. Fla. Nov. 17, 2009) (noting that "FDUTPA applies only to action that

occurred within the state of Florida" and dismissing claims based on actions that occurred outside of Florida).

- **Michigan:** Michigan explicitly requires the unlawful restraint of trade to occur within the "relevant market," MICH. COMP. LAWS ANN. § 445.771 (West 2023), which it defines as an area of competition "all or any part of which is within the state." *Id.* § 445.771(b); *see In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 407 n.8 (S.D.N.Y. 2011) (holding that Michigan antitrust law requires intrastate conduct).

- **North Dakota:** The language of the North Dakota antitrust statute is nearly identical to Michigan's law above, although no court has interpreted the law. *Compare* MICH. COMP. LAWS ANN. § 445.771 *with* N.D. CENT. CODE ANN. §§ 51-08.1-02 (West 2023); *see also* N.D. CEN. CODE ANN. §§ 51-08.1-01 (West 2023) ("Relevant market means the geographical area of actual or potential competition in a line of commerce, all or any part of which is within this state.").

IPPs fail to demonstrate that there was any conduct by Irico within the territorial boundaries of Arizona, Florida, Michigan, or North Dakota. IPPs' evidence detailing the alleged conspiracy meetings show that none of the allegedly anticompetitive meetings or communications involving Irico took place in Arizona, Florida, Michigan, or North Dakota. *See generally*, Young Decl., Ex. ¶ 151 and Ex. 76, 147 (U.S. meetings identified in IPPs' Attachment A) and Documents R&R. Irico neither had any presence in these states, nor is such a presence alleged by Plaintiffs, and Plaintiffs cannot demonstrate any corporate activity by Irico in or directed at any of those four states. Finally, Irico did not sell any CRTs or CRT products to the United States, and by extension did not sell to any customer in any of those four states. *See* Statement of Facts § 1, *supra*.

Again, the Court's previous FTAIA decision is not relevant here. It does not address the requirement – under the individual state laws that the IPPs seek to invoke—to establish Irico's conduct within each of those four states. *See California v. ARC Am. Corp.*, 490 U.S. 93, 102 (1989) ("Congress intended the federal antitrust laws to supplement, not displace, state antitrust remedies."); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 785 F. Supp. 2d 835, 844 (N.D. Cal. 2011) (separately analyzing the defendants' Rule 12(b)(6) arguments under the FTAIA and the

Illinois Antitrust Act). Additionally, as acknowledged, the Court evaluated solely Sherman Act claims. *Id*. at *3. Thus, the FTAIA Order decided neither Irico's present motion nor the factual findings as to conduct required under these states' laws.

Given the absence of authenticated or admissible evidence demonstrating conduct by Irico within these states, Irico is entitled to summary judgment on IPPs' Arizona, Florida, Michigan, and North Dakota claims.

## V.   IRICO IS ENTITLED TO SUMMARY JUDGMENT ON IPPS' NEW YORK CLAIMS PRIOR TO DECEMBER 3, 1998

IPPs seek damages for violations under New York law from a time period before that state's repealer law was enacted. *See* ECF No. 5589 (IPP Compl.) at ¶ 271; *see also id.* ¶ 245 (alleging class claims under various states' laws, including New York, "at any time during the period from at least March 1, 1995 through at least November 25, 2007").

Indirect purchasers cannot sue for damages under the federal antitrust laws and can only sue under state "repealer" laws. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 737-48 (1977). New York passed its repealer law in 1998. *See* N.Y. Gen. Bus. § 340(6). The Court previously agreed with a line of cases holding that retroactive claims are not permitted under the 1998 revisions. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-md-5944-JST, 2013 WL 4505701, at *13 (N.D. Cal. Aug. 21, 2013); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 3738985, *4 (N.D. Cal. Aug. 24, 2011); *In re Vitamins Antitrust Litig.*, Misc. No. 99-197 (TFH), 2000 WL 1511376, at *5 (D.D.C. Oct. 6, 2000); *Lennon v. Philip Morris Cos.*, 734 N.Y.S.2d 374, 382 (N.Y. Sup. Ct. 2001) ("[C]ourts interpreting provisions of the General Business Law have rejected retroactive application of amendments creating new private rights of action . . . . Without allegations of events that postdate the 1998 amendment, the plaintiffs' complaint fails to sufficiently state a claim."). The Court should apply that decision in this action and grant Irico summary judgment on Plaintiffs' claims under New York law, as to alleged conduct and damages prior to December 3, 1998.

1

## **<u>CONCLUSION</u>**

2

For all the foregoing reasons, Irico respectfully requests that the Court grant Irico's Motion.

3

4

Dated: May 10, 2024                    Respectfully submitted,

5

*/s/ Jeffrey Margulies*

6

JEFFREY B. MARGULIES (Bar No. 126002)
KAYLEE YANG (BAR NO. 303464)

7

Norton Rose Fulbright US LLP
555     California     Street,     Suite     3300

8

San Francisco, California 94104
Telephone: (213) 892-9200

9

Facsimile: (213) 892-9494
jeff.margulies@nortonrosefulbright.com

10

kaylee.yang@nortonrosefulbright.com

11

GERALDINE YOUNG (admitted *pro hac vice*)
1301 McKinney, Suite 5100

12

Houston, Texas 77010
Telephone: (713) 651-5151

13

Facsimile: (213) 651-5246
Geraldine.young@nortonrosefulbright.com

14

15

*Attorneys for Defendants Irico Group Corp. and Irico Display Devices Co., Ltd.*

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing **Notice of Motion and Motion for Summary Judgment** was filed via CM/ECF on May 10, 2024, and as a result has been served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: *Jeffrey Margulies*
Jeffrey Margulies