# Exhibit 127

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION, | Case No.: 07-cv-05944 JST |
| | MDL No. 1917 |
| THIS DOCUMENT RELATES TO: | |
| *ALL DIRECT PURCHASER ACTIONS* | |

**EXPERT REPORT OF DONALD CLARKE**

**July 21, 2023**

# Exhibit 110

## *I. Introduction and Statement of Qualifications*

1.  I am currently a Professor of Law and the David A. Weaver Research Professor at the George Washington University Law School. From 1988 through 2004, I was on the faculty of the University of Washington School of Law, and I have been a visiting professor at New York University Law School, University of California at Los Angeles School of Law, and Duke Law School. From 1995 to 1998, I was on a leave of absence from UWLS and worked as an attorney at Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss"), a large United States law firm with a substantial China business practice. During that period, I visited China and Hong Kong approximately twice a year in the course of my work, a substantial amount of which was related to China. From 1998 through 2003, I regularly worked with Paul, Weiss as a consultant on Chinese law matters. Since that time I have maintained an independent consulting practice.

2.  I have published widely in the field of Chinese law; a list of my publications is set forth in my curriculum vitae, attached hereto as Appendix A. I am fluent in Mandarin Chinese (speaking, reading, and writing).

3.  I graduated *cum laude* from Harvard Law School in 1987, where my studies focused on East Asian legal systems and I served as an editor of the *Harvard Law Review*. I earned a graduate degree (M.Sc. with Honours) in the Government and Politics of China from the School of Oriental and African Studies at the University of London in 1983. I also studied Chinese history for two years at Beijing University and Nanjing University in China from 1977 to 1979. I earned my undergraduate degree from Princeton University in 1977.

4.  I have served as adviser or consultant on Chinese law matters to a number of bodies, including the Asian Development Bank, the Agency for International Development, and the World Bank's Financial Sector Reform and Strengthening Initiative. I have testified on aspects of the Chinese legal system before the Congressional-Executive Commission on China and the United States-China Economic and Security Review Commission. In 2005, I was appointed to the Academic Advisory Group to the US-China Working Group of the United States Congress. I was admitted to practice in the State of New York in 1988, and am a member of the Council on Foreign Relations.

## *II. Purpose of Report*

5.  I have been asked by counsel for Irico Group Corporation ("Irico Group") and Irico Display Devices Co., Ltd. ("Irico Display" and, together with Irico Group, "Irico" or "Irico Defendants") for my opinions on the conclusions offered in the expert report dated May 26, 2023 submitted by Professor Henry Gao (the "Gao Report") on behalf of the direct purchaser plaintiffs. The Gao Report responds to my expert report dated March 16, 2022 (the "Clarke 2022 Report"), attached as Appendix B,[1] which I submitted in the separate indirect purchaser plaintiffs action. My opinions specifically regard—

    a.  the status of Irico within the Chinese economy, and relevant attributes of the Chinese economy, during the time period relevant to this litigation, which provides relevant context for my subsequent discussion of the pricing regulatory framework in

---

[1] Because Appendix A to this Report contains an outline of my qualifications, the Clarke 2022 Report attached as Appendix B does not include the qualifications in Appendix 1 to that Report, in order to avoid confusion and duplication.

China regarding the products and time period at issue;

b.  the Gao Report's proffered legal interpretation of the Pricing Documents, as defined in the Clarke 2022 Report, discussed in Paragraphs 8 through 33 of the Gao Report; and

c.  the existence of an enforced pricing regulatory framework in China involving cathode ray tubes ("CRTs") and color televisions ("TVs"), discussed in Paragraphs 34 through 42 of the Gao Report.

### III. Documents Reviewed

6.  In the course of preparing this report, I have considered the following documents, in addition to any documents specifically referred to in the report.

a.  The seven documents listed in Paragraph 6 of the Clarke 2022 Report (Appendix B), which I submitted in the separate indirect purchaser plaintiffs action:

  i.  Notification of the State Planning Commission and the State Economic and Trade Commission regarding Issuing "Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products" and Strengthening Price Self-Discipline of Industries (国家计委、国家经贸委关于发布《关于制止低价倾销工业品的不正当价格行为的规定》和加强行业价格自律的通知), issued Nov. 16, 1998, effective Nov. 25, 1998 (the "1998 Notice," attached as Appendix 2 to the Clarke 2022 Report);

  ii.  Notification of Reporting Cost Information for Color TV and Color CRT Industry (关于报送彩电、彩管行业成本资料的通知), Feb. 3, 1999 (the "1999 Reporting Notice," attached as Appendix 3 to the Clarke 2022 Report);

  iii.  Circular of the State Development Planning Commission on Issuing the Measures for Determining the Cost of Low-price Dumped Industrial Products (Trial) (国家计委关于印发《低价倾销工业品的成本认定办法（试行）》的通知), issued Feb. 23, 1999, effective March 1, 1999 (the "March 1999 Circular," attached as Appendix 4 to the Clarke 2022 Report);

  iv.  Notification that the State Planning Commission and the Ministry of Information Industry print and distribute Trial Measures to Prevent Unfair Price Competition Regarding Color CRTs and Color TVs (国家计委、信息产业部印发关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法的通知), issued March 15, 1999, effective April 1, 1999 (the "April 1999 Notice," attached as Appendix 5 to the Clarke 2022 Report);

  v.  Notification of Publishing Industrial Average Production Costs for Some Types of Color CRTs and Color TVs (关于发布彩色显像管、彩色电视机部分品种行业平均生产成本的通知), April 2, 1999 (the "April 1999 Cost Notification," attached as Appendix 7, with an additional copy attached as pages IRI-CRT-00031466 through IRI-CRT-00031467 of Appendix 6 to the Clarke 2022 Report);

2

vi.  Notification of Publishing Industrial Average Production Costs for Some Types of Color TVs (关于发布彩色电视机部分品种行业平均生产成本的通知), Aug. 25, 2000 (the "August 2000 Cost Notification," attached as Appendix 8 to the Clarke 2022 Report);

vii.  Notification of Publishing Industrial Average Production Costs for Some Types of Color CRTs (关于发布彩色显像管部分品种行业平均生产成本的通知), Sept. 13, 2000 (the "September 2000 Cost Notification," attached as Appendix 9 to the Clarke 2022 Report);

b.  Notice on Earnestly Stopping Price Dumping and Carrying out Inspection of Price Dumping (关于认真做好制止低价倾销工作及开展对低价倾销进行检查的通知), Jan. 16, 1999 (the "Dumping Circular," attached as Appendix C);[2]

c.  Price Law of the People's Republic of China (中华人民共和国价格法), promulgated Dec. 29, 1997 (the "Price Law," attached as Appendix D);

d.  Interpretation of the Price Law of the People's Republic of China (中华人民共和国价格法释义), Nov. 25, 2000 (the "Price Law Explanation," attached as Appendix E);

e.  The Gao Report and its exhibits and attachments; and

f.  The certified deposition transcript of Professor Gao's deposition, taken on July 10, 2023 (the "Gao Depo Tr.").

## IV. Analysis and Opinions

### A. Background Information Concerning the Chinese Economy and Irico's Status Within It

**Irico Ownership and Control**

7.  Irico's status in the Chinese economy, as well as the particular attributes of the Chinese state's involvement in the Chinese economy, provide a broader context for understanding the pricing regulatory framework in China with respect to the relevant products and time period in this litigation.

8.  As I have previously opined in this case, during the relevant period in this litigation, Irico Group was directly owned by the Chinese state, with no intermediate corporate layers. ECF No. 5392-3 at ¶¶ 19-23. Also in my opinion, based on the evidence that I have reviewed and my knowledge of Chinese law, Irico Display was, at the time in question, officially considered at the very least a state-controlled entity, and in some contexts a state-owned entity. *Id.* at ¶¶ 24-30.

**The Chinese Government's Role in the Chinese Economy**

9.  In 1978, at the beginning of the post-Mao era of economic reform, "China's industry was made up of thousands of similar, publicly owned organizations."[3] Production was carried

---

[2] In order to avoid confusion, the document names in English in this report are exactly as they appear in the translations by Park IP Translations with which Irico's counsel has supplied me and which will be before the Court, even if I might have translated them somewhat differently myself.

[3] BARRY NAUGHTON, THE CHINESE ECONOMY: TRANSITIONS AND GROWTH 299 (2007).

out by government ministries; the Ministry of Chemical Industry, for example, was not so much the *regulator* of the chemical industry as it simply *was* the chemical industry. State-owned enterprises ("SOEs") in a given sector operated under the jurisdiction of the relevant ministry, and were essentially factories within the conglomerate that was the ministry.[4]

10. As described by a leading expert on the Chinese economy, Professor Barry Naughton of the University of California at San Diego,

> The traditional SOE—the "work unit" integrated into the government bureaucracy—dominated the scene, as it had since the 1950s. SOEs produced 77% of industrial output.[5]

11. In addition to production, SOEs performed substantial social and political functions, such as overseeing workers' health, welfare, personal lives, and political indoctrination.

12. Economic reform in the 1980s and 1990s allowed more non-SOEs to operate in the industrial economy, such that the SOE share of total output fell from 77% in 1978 to 33% in 1996.[6]  Furthermore, SOEs underwent organizational reforms. Instead of being a factory within a ministry conglomerate, SOEs were re-organized into companies with shares. This reorganization did not change the substance of state ownership; the shareholders were state organs (for example, the central ministry in charge of the enterprise).

13. The 1990s saw a gradual change in the role of ministries, with an effort to transform them from *participants in* industry to *regulators of* industry. Many ministries were abolished, and large conglomerates (often known as group companies) were established to take over their productive functions. At the central level, formal ownership of these companies was often lodged in China's State Council (particularly in cases where the original ministry had disappeared).

14. In 2003, concomitant with the establishment of the State-Owned Assets Supervision and Administration Commission ("SASAC"), nominal ownership of industrial enterprises owned by the Chinese state at the central level was transferred from the entity then holding it (in many cases, the State Council) into the hands of SASAC. This transfer was purely a matter of internal management by the central state of its enterprises and in no way affected the governmental character of the state owner. SASAC is a governmental body under the State Council much like a regular ministry.[7]  In Naughton's words, "SASAC's core mission is to carry out the government's functions as investor and owner of state assets, and thus separate these tasks from the government's role as public manager of society as a whole."[8]  The "government functions as investor and owner of state assets" referred to by Naughton are not, however, simply the pursuit of profit, as will be explained below. With respect to Irico, nominal ownership of Irico Group in 2003 passed from the State Council to SASAC, and

---

[4] In Naughton's words, "The enterprise was like a branch plant of the single vast undertaking that was Socialism, Incorporated." *Id.* at 308.

[5] *Id.*

[6] *See id.* at 300.

[7] *See id.* at 302-03; *see generally* Barry Naughton, *The Transformation of the State Sector: SASAC, the Market Economy, and the New National Champions*, in STATE CAPITALISM, INSTITUTIONAL ADAPTATION, AND THE CHINESE MIRACLE 46 (Barry Naughton & Kellee S. Tsai ed. 2015)

[8] BARRY NAUGHTON, *supra* note 3, at 316.

SASAC approval and appraisal were required for certain actions by Irico Display (taken in 1995 and 2006). ECF No. 5392-3 ¶¶ 21, 25, 26.

15. Despite decades of economic reform in the post-Mao era, the Chinese state still participates extensively in the Chinese economy. Part of this participation is via direct and indirect ownership of productive enterprises such as Irico. Another key part of the Chinese state's extensive participation in the Chinese economy, as discussed below and as shown in the Pricing Documents, is the state's regulation, coordination, and setting of prices for productive enterprises such as Irico.

16. With respect to the first part, the Chinese government has continuously repeated that this policy of extensive enterprise ownership will continue and that the state has no intention of changing it. As I wrote in 2010:

> The state remains firmly committed to retaining control over enterprises in several sectors: national security-related industries, natural monopolies, sectors providing important goods and services to the public, and important enterprises in pillar industries and the high-technology sector.[9]

17. The fact that this firm policy of enterprise ownership exists necessarily implies that the state's goals in owning enterprises are not purely commercial. As I wrote in 2003:

> The state wants the enterprises it owns to be run efficiently, but not solely for the purpose of wealth maximization. If the state owned simply for the purpose of maximizing the economic value of its holdings, there would be no need for a policy mandating state ownership of enterprises. If the enterprise would be worth more managed by another, the state should seek a share of that increased value by selling. A policy of wealth maximization for the state requires simply that the state acquire, maintain, or relinquish control according to whatever will realize the most wealth for the state.

> Because the Chinese government clearly does not have such a policy, it follows that a necessary element of state control of an enterprise must be the use of that control for purposes other than the maximization of its wealth as a shareholder—purposes such as the maintenance of urban employment levels, direct control over sensitive industries, or politically-motivated job placement.[10]

18. Thus, while it is clear that enterprises with direct and indirect state investment are generally expected to make money (whether or not they actually do so), it is equally clear that if making money were the sole goal, there would be no need for a policy mandating state investment in specific sectors or indeed in any sector. Nor does the existing policy single out especially profitable sectors. Instead, it singles out sectors believed by the government to be of strategic importance to the state, such as national defense and high technology.

19. Much like the state's ownership and investment in certain enterprises, the state's regulation of prices focuses on sectors believed by the government to be of strategic importance to the state, including the CRT industry, as shown by the Pricing Documents as discussed further

---

[9]  Donald C. Clarke, *Law Without Order in Chinese Corporate Governance Institutions*, 30 NW. J. INT'L L. & BUS. 131, 144 (2010).

[10]  Donald C. Clarke, *Corporate Governance in China: An Overview*, 14 CHINA ECON. REV. 494, 494-95 (2003) (internal citations omitted).

below.

20. Historically as part of its planned economy, the Chinese state exercised direct control over prices not just for SOEs, but also for the tiny private sector. Even as post-Mao economic reform increasingly incorporated market elements, price controls (such as shown in the Pricing Documents) were retained in certain sectors.

21. Such pricing controls show that the policy goals of the Chinese state go well beyond maximizing Chinese consumer welfare through low prices. Rather, they reflect a concern with protecting the profits of Chinese industries in order to maintain employment levels, subsidize international competitiveness, or address other central planning goals that go beyond consumer welfare.

22. The Pricing Documents offer a clear example of these policy goals. The April 1999 Notice explicitly states as its justification for regulating CRT and color television prices a desire to target "fierce market competition" and maintain a "normal price order" in the marketplace. While using the term "dumping" to describe the targeted actions, the Pricing Documents differ from typical anti-dumping regulations in other countries in that they also apply to *domestic* commerce within China, rather than simply aiming to insulate Chinese industries from foreign low-price competition. As such, the Pricing Documents evince a Chinese state policy to prioritize market stability and a minimum profit level for CRT and color television industry participants over the benefits of lower prices for Chinese consumers.

### B. Legal Interpretation of the Pricing Documents

23. This section of my report responds to Paragraphs 8 through 33 of the Gao Report.

### Authenticity

24. I first note that the Gao Report does not challenge the authenticity and binding nature of the Pricing Documents, or my qualifications and opinions authenticating the Pricing Documents in the Clarke 2022 Report.[11]  Professor Gao confirmed at his deposition that he does not challenge the authenticity and binding nature of the Pricing Documents.[12]  As the matter does not appear to be in dispute, therefore, I will incorporate fully by reference those undisputed opinions in the Clarke 2022 Report, attached as Appendix B. For the reasons set forth in the Clarke 2022 Report, I continue to believe the Pricing Documents to be authentic.

25. I have independently verified additional documents, related to the Pricing Documents, to be authentic. In my opinion, the Dumping Circular is both authentic and valid in the same way that the Pricing Documents are valid, as discussed below at Paragraphs 38 *et seq.* I have confirmed the existence of the Dumping Circular on the website of the Guangdong Provincial Development and Reform Commission, a government body.

26. In my opinion, the Price Law is both authentic and valid. I have confirmed the existence of the Price Law on the website of China's central government at the following URLs: https://www.gov.cn/banshi/2005-09/12/content_69757.htm (Chinese) and http://english.www.gov.cn/archive/laws_regulations/2014/08/23/content_281474983043 640.htm (English translation).

---

[11]  *See* Gao Report, Para. 10.

[12]  *See* Gao Depo Tr., at 53:12-55:16.

27. The Price Law Explanation is a document that appears on the official website of the National People's Congress, China's highest legislative body. The NPC's Standing Committee issued the Price Law, of which this document is an explanation. It is not a formal piece of legislation, but should be considered a highly authoritative explanation and interpretation. In my opinion. it is authentic; I have confirmed its existence on the website of the NPC and archived it at https://perma.cc/ZU7H-HU4K.

**The Regulatory Scheme of the Pricing Documents**

28. The Gao Report primarily takes issue with Paragraph 13 of the Clarke 2022 Report and, in doing so, greatly overstates its significance. That report focused on authenticating the Pricing Documents, which Professor Gao does not dispute, and not on analyzing their content. Paragraph 13 of that report, which contains a brief summary of the content of the Pricing Documents, was intended simply to explain the Pricing Documents at a high level.

29. In this report, by contrast, I elaborate more fully on my opinions as to the content of the regulatory scheme ("Pricing Scheme") set forth in the Pricing Documents. I do not dispute the Gao Report's quotation of the language from various regulatory documents that speaks of individual manufacturer costs as compared with industry average costs, and indeed noted this same language in the detailed description of the various Pricing Documents that I provided in the Clarke 2022 Report. To the extent that the Gao Report suggests that industry average production costs are immaterial under the Pricing Documents, however, I disagree. As I explain below, both industry average production costs and the manufacturing cost of each specific seller are material to the prices set by manufacturers pursuant to the Pricing Documents and related regulatory framework.

30. With respect to the cost provisions in the Pricing Documents that the Gao Report discusses, the Gao Report does not appear to dispute that manufacturers were required to submit data on costs, and that a price below industrial average cost could be reported by any competitor or member of the public. Such a price, while not deemed unlawful dumping *per se*, would trigger an investigation by a Chinese government agency.[13]  The Gao Report also does not dispute that Irico, as a manufacturer of CRT industrial products, was subject to the Pricing Documents in its pricing and conduct.

31. Because of its undisputed role in triggering reporting to and an investigation by Chinese governmental authorities, on the face of the Pricing Documents, industry average cost could have served as a *de facto* state-mandated floor on prices. That is consistent with the 1998 Notice, which states that "[p]rices of products sold by a manufacturing enterprise shall not be lower than industrial average production costs in principle."

32. Industry average cost could be a *de facto* floor in at least two ways. First, a price below average cost focuses government attention on the firm and its books. Such attention is unlikely to be welcome and likely something Chinese firms, including state-owned entities, would actively seek to avoid. If a government investigation is triggered by pricing below average cost, not only must the firm spend resources and employee time in responding to the investigation, but the investigation may uncover issues in both related and unrelated areas that had not previously attracted government attention. Firms pricing below average cost would find price administration authorities, the State Development Planning Commission, and the Ministry of Information Industry descending upon them for a joint

---

[13]  *See* Gao Report, Para. 33.

investigation,[14] a process that Professor Gao believes might take "anywhere between a few months to maybe one year or two."[15] This cannot have been an attractive prospect.

33. Second, it appears to be undisputed from the face of the Pricing Documents that the Pricing Scheme does in fact mandate average cost as a starting point for a floor price[16] when a manufacturer cannot establish what its specific manufacturing cost is. This would happen when the manufacturer did not keep good books and records. A key question, therefore, is whether Chinese manufacturers often fail to keep good books and records. The answer to this question is yes; and Professor Gao agreed in his deposition.[17] Moreover, while certain CRT and color TV manufacturers were required to report cost-related data to the Chinese government for calculation of the average costs, whether that cost data of individual firms would later satisfy governmental authorities investigating those firms is not certain. Standards for investigation of violations of the Pricing Scheme could well be more stringent than standards for reporting.

34. Chinese corporate accounting has long been known to be "highly questionable."[18] For example, a recent Public Company Accounting Oversight Board inspection of the Chinese affiliates of the Big Four auditing firms found deficiencies in 100% of the audits conducted by KPMG Huazhen and in 75% of those conducted by PwC Hong Kong.[19] Those audits were of major companies listed on U.S. stock exchanges. If the books of such major firms were of such poor quality in the present day as to result in so many audit failures, it is likely that the books of smaller or less internationally oriented domestic Chinese firms are in even worse shape and were so twenty years ago.

35. Research on domestically listed firms confirms this picture. One study found that "up to a quarter of listed firms in mainland China explicitly admitted the poor quality of their financial information by restating their previous financial reports between 1999 and 2005."[20] Again, if this is a problem in large listed firms, it is surely an even greater problem in smaller firms.

---

[14] *See 国务院总理朱镕基对坚决制止采取不正当手段低价倾销行为做出批示 (Premier of the State Council, Zhu Rongji, Issued Instructions to Firmly Prevent Unfair Low-price Dumping Behaviors)*, 1999:3 广西贸易 (GUANGXI ECON. AND TRADE) 4 (1999) (attached as Appendix F).

[15] Gao Depo Tr., at 108:17-109:1.

[16] Article 10 of the Trial Measures attached to the April 1999 Notice states: "When it is difficult to confirm an individual cost, industrial average production costs and a reasonable amplitude of price decrease are used as main determination bases."

[17] Gao Depo Tr., at 116:2-118:12.

[18] Kalyeena Makortoff, *Chinese Accounting Is 'Highly Questionable': Strategist*, CNBC (Feb. 26, 2016), https://www.cnbc.com/2016/02/26/chinese-accounting-is-highly-questionable-strategist.html (last visited June 25, 2023).

[19] *See* Julia Horowitz, *Audits of Chinese Companies by KPMG and PwC Full of Holes, US Watchdog Finds | CNN Business*, CNN (May 10, 2023), https://www.cnn.com/2023/05/10/business/us-china-audit-companies-report/index.html (last visited June 25, 2023).

[20] Xia Wang & Min Wu, *The Quality of Financial Reporting in China: An Examination from an Accounting Restatement Perspective*, 4 CHINA J. OF ACCT. RSCH. 167, 167 (2011), https://linkinghub.elsevier.com/retrieve/pii/S1755309111000268 (last visited June 25, 2023).

36. Therefore, it is by no means certain that a manufacturer, when faced with an ongoing government investigation, could prove to the satisfaction of the authorities what exactly its production cost was pursuant to accepted standards—and if it could not, under the Pricing Documents, it would be penalized for pricing below the industry average cost less a "reasonable amplitude of price decrease."[21]

37. In short, the message in the Pricing Documents is clear: pricing below industry average cost was clearly discouraged. As one Chinese analysis characterized, the State Development Planning Commission viewed "average industry costs . . . as a pricing red line that enterprises should not undercut . . . ."[22]

**Legal Enforceability of the Pricing Documents**

38. The Gao Report does not appear to question the legal enforceability of the Pricing Documents, stating that "[t]he Pricing Documents have the status of rules of departments, as defined in Article 71 of the Law on Legislation of China, and would have been binding and potentially enforceable on producers in China."[23]

39. Professor Gao then adds the qualification that under China's legislative hierarchy, the Pricing Documents are binding and enforceable only to the extent that they do not contravene higher-ranking laws, such as the Price Law of China.[24]  This qualification is puzzling and unnecessary, since the Gao Report does not at any point suggest that the Pricing Documents in fact *do* contravene higher-ranking laws and are therefore not binding and enforceable. Nor, when questioned at his deposition, did Professor Gao identify any elements of the Pricing Documents, on their face or in the abstract, that contravened the Price Law.[25]  Thus, it seems undisputed that the Pricing Documents are in fact valid and enforceable.[26]

*C. The Existence of an Enforced Pricing Regulatory Framework in China*

40. This section of my report responds to Paragraphs 34 through 42 of the Gao Report.

41. As discussed above, the Gao Report does not challenge either the authenticity or formal validity and enforceability of the Pricing Documents and the Pricing Scheme they establish. Professor Gao does, however, state that he failed to find evidence of "system[at]ic

---

[21] *See supra* note 16.

[22] *See supra* note 14.

[23] Gao Report, Para. 10.

[24] *See id.*

[25] *See* Gao Depo Tr., at 58:4-60:7.

[26] Even if the Pricing Documents did contravene a higher-ranking law, it is a widely acknowledged fact about the Chinese legal system that very often the actual hierarchy is the reverse of the formal hierarchy, with the rules issued by one's direct regulatory authority being the ones one must follow, regardless of whether they conflict with higher-level rules. In the words of one bureaucrat with several years of experience in the Legislative Affairs Office of the State Council, China's highest executive body, "The Constitution and Legislation Law stipulate the rank of legal instruments: among laws, regulations, rules, circulars and decisions, from highest to lowest. In practice, however, it went in a totally different direction." Xingxiang Zhang, *Feeling the Rhythm of China's Legal Transformation: My Experience in Government and Business in China* 6 (Indiana University RCCPB Working Paper #38, April 2015), https://perma.cc/YR95-UU2C. For several examples of lower-level rules and practices openly and successfully contravening higher-level rules, *see* Donald C. Clarke, *Order and Law in China*, 2022 U. OF ILL. LAW REV. 541, 572-575 (2022).

enforcement" of the Pricing Documents.[27]

42. It is important to note what the Gao Report does *not* say here. It does not say that the Pricing Documents were not legally valid and enforceable. It does not say that the Pricing Documents were not in fact enforced. It does not even say that they were not *systematically* enforced. It says only that Professor Gao *failed to find evidence* of their systematic enforcement.

43. I designed my own search for evidence of enforcement as follows:

    a.  The following databases were searched:

        i.  Google

        ii.  Baidu (a Chinese tool for searching the internet, designed for Chinese sources)

        iii.  China National Knowledge Infrastructure (CNKI) (a Chinese commercial database of newspapers and academic journal articles)

        iv.  Fazhi Ribao (Legal System Daily, a Chinese source on legal matters)

        v.  Website of the National Development and Reform Commission (the successor to the State Planning Commission and the State Development and Planning Commission)

    b.  The following keywords were used:

        i.  Type of action:

            1.  倾销 *qingxiao* (dumping)

            2.  不正当价格 *bu zhengdang jiage* (unfair price)

        ii.  Industry:

            1.  彩色显像管 *caise xianxiang guan* (color cathode ray tube)

            2.  彩管 *cai guan* (color CRT) (abbreviation of the above)

            3.  彩色电视机 *caise dianshi ji* (color television)

            4.  彩电 *cai dian* (color TV) (abbreviation of the above)

        iii.  Regulator: Various ways of writing "State Planning Commission" or its counterpart at a given time; using only one variant would be too narrow.

            1.  计划委员会 *jihua weiyuan hui* (Planning Commission)

            2.  发展计划委员会 *fazhan jihua weiyuanhui* (Development and Planning Commission)

            3.  计委 *ji wei* (SPC)

        iv.  Regulations in the Pricing Documents: I compiled a list of the names in Chinese of each of the Pricing Documents.

    c.  I looked within CNKI for academic articles and news reports about enforcement

---

[27] Gao Report, Para. 34.

actions by searching for items that mentioned *either* of the types of action and any of the industry keywords. I then narrowed the search further by requiring that one of the regulator keywords be mentioned. This resulted in a few hundred hits. I reviewed the list of articles and reports and selected the ones that seemed likely candidates for reports on enforcement actions on the basis of their headlines.

    d.    The databases other than CNKI were searched by a Chinese-fluent attorney for Irico using my research instructions and various combinations of the above keywords, and the search results were reported directly to me through discussions with the attorney.

44.    If I understand Professor Gao's search strategy correctly, I believe my use of many alternative terms allowed my search to uncover reports that Professor Gao missed. For example, his search using the Chinese term "*dijia qingxiao* 低价倾销" (low-price dumping) would have missed all items that spoke merely of "dumping" without the modifier "low-price." It also appears that Professor Gao searched for only the abbreviated Chinese terms for "color television" and "cathode ray tube" (彩电 *caidian* and 彩管 *caiguan* respectively),[28] which again would have missed reports that used only the full terms. It is like searching only for "color TV" and "CRT" but not for "color television" and "cathode ray tube."

45.    My research found evidence that the Pricing Documents were enforced, as summarized below. Even with my added terms and variations, I believe there are probably enforcement actions that I did not find. Among other things, it is likely that not all investigations and other enforcement actions by Chinese governmental authorities were made public.

    a.    Some investigations are deliberately kept non-public. As Professor Gao remarked, investigations can be a "black box"[29] with little transparency or predictability.

    b.    Even for investigations that could in principle be made public, there was not in the late 1990s and early 2000s, when the Internet was new in China, a practical way to publicize them.

**Evidence of Enforcement**

46.    The best-known case of enforcement, which my search strategy found and which Professor Gao did not appear to find, involved a number of color television manufacturers each accusing the other of dumping. In 2000, the following report appeared in the *Price Yearbook of China*:

> In April 1999, Xiamen Overseas Chinese Electronic Co., Ltd. (Xiamen Overseas Company) reported to the State Planning Commission that Sichuan Changhong Electric Co., Ltd. (Changhong Company) had significantly reduced its color TV product prices nationwide since April, with the presence of dumping behaviors for some of the products. Later, Changhong Company reported to the State Planning Commission that Shenzhen Konka Group Co., Ltd. (Konka Company) and Xiamen Overseas Company had some color TV products with the presence of dumping behaviors. In response to the situation, the State Planning Commission promptly established a case according to the "Price Law" and relevant provisions on deterring low-price dumping, formed a joint

---

[28]  This is my understanding of Professor Gao's written response during his deposition to a question about his search strategy and search terms, *see* Ex. 8660 to Gao Deposition.

[29]  Gao Depo Tr, at 127:13-128:15.

investigation team with the Ministry of Information Industry, and invited certified public accountants to participate in the investigation at the above three companies. After four months of investigation and evidence collection, it was preliminarily determined that the three companies of Changhong, Xiamen Overseas, and Konka all had some types/models of color TV products with actual factory prices being lower than production costs. The three companies did not dispute the investigation results. The State Planning Commission, in conjunction with the Ministry of Information Industry, held a meeting where they issued a verbal warning against the behaviors of the three companies, the companies were ordered to immediately make rectifications, and the enterprises were required to, from now on, earnestly learn and strictly enforce national policies and comply with relevant laws and regulations.[30]

47. The above case was investigated by central government authorities, but local governments were also active in conducting other investigations.

48. My search strategy described above identified several articles describing these local government investigation and enforcement actions. These governments included Beijing,[31] Hangzhou,[32] Guangzhou,[33] and Shandong.[34]

49. Chinese authorities pursued price-support schemes in other industries as well. An article in the 1999 *Price Yearbook of China* lauded the success in the flat glass and steel industries of price-support schemes similar to the Pricing Scheme in this case.[35]  One report from

---

[30] 程行云 (CHENG Xingyun), *深入开展依法制止低价倾销工作* (*Deepen the Lawful Deterrence of Low-Price Dumping*), 2000 中国物价年鉴 (PRICE YEARBOOK OF CHINA) 45, 47 (2000) (attached as Appendix G).

[31] *See* 北京市物价局 (Beijing Price Bureau), *关于立即停止低于进货价格销售彩电行为的函* (*Letter on Immediate Cessation of Selling Color TVs Below the Purchase Price*) (Apr. 19, 2001) (reported by 110 Net at www.110.com/fagui/law_284807.html) (last visited June 12, 2023) (describing an investigation carried out by the Beijing Price Bureau, prompted by reporting tips from the public, against certain consumer retailers for selling color televisions below their purchase cost) (attached as Appendix H).

[32] *See* 王永明, 杭州市市长 (WANG Yongming, Mayor of Hangzhou), 政府工作报告  *（1999年1月23日在杭州市第九届人民代表大会第四次会议上）* (*Government Working Report (On January 23, 1999, at the Fourth Session of the Ninth Hangzhou People's Congress)*), 1999 Supp. No. 1 HANGZHOU POL. NEWS 3, 9, 16 (1999), https://perma.cc/ALV7-CRW2 (stating that in 1999 the Hangzhou Municipal Government will focus on, *inter alia*, "investigat[ing] and handl[ing] unfair price behaviors, such as industry price monopoly and low-price dumping") (attached as Appendix I).

[33] *See* 刘伯饶 & 陶小淳 (LIU Borao and TAO Xiaochun), *广州惊爆"超低价"* (*Shocking "Ultra-low Prices" in Guangzhou*), 人民日报 (副刊) (PEOPLE'S DAILY (Supplement)), Jan. 13, 2003 (describing efforts of Guangdong provincial and Guangzhou municipal authorities respectively to investigate and suppress low-price dumping of many products, including color televisions) (attached as Appendix J).

[34] *See* 制止不正当价格行为 (*Stop Unfair Price Behavior*), 二轮山东省志  物价志(1997-2005) (SECOND ROUND OF SHANDONG PROVINCIAL ANNALS PRICE CHRONICLES (1997-2005)), Book IV, Chapter I, Section 3, https://perma.cc/5GXE-5LJP ("From 1997 to the first half of 1998, the provincial Price Bureau focused on inspecting products sold below the average industry cost, such as flat glass, steel, color cathode ray tubes, color TVs, and sugar, and maintained the market price competition order in related industries.") (attached as Appendix K).

[35] *See* 程行云 (CHENG Xingyun), *依法制止工业品低价倾销* (*Lawfully Curbing Low-Price Dumping of Industrial Products*), 1999 中国物价年鉴 (PRICE YEARBOOK OF CHINA), 43, 43 (1999) (attached as Appendix L).

Shanghai specifically states not only that investigations were conducted, but that violations were found:

> Shanghai has made exploration in the field of anti-unfair price competition, and handled some cases of low-price dumping and price fraud according to law.[36]

50. In addition to the above specific actions, reports and documents from the time in question leave little doubt that government authorities were concerned with low-price dumping and determined to take moves to prevent it, both in the CRT and TV industries and across the Chinese economy more generally.

51. In January 1999, the State Development and Planning Commission (the "SDPC"),[37] issued the Dumping Circular, which directed that "all areas shall investigate the companies, which sell products below the average cost of the industry and shall focus their inspection work on the prices of flat glass, steel, **color cathode ray tubes**, color TV sets and sugar in the first half of 1999."[38]

52. In March 1999, Zeng Peiyan, the chairman of the SDPC, reported to the National People's Congress, China's highest legislative body, as follows:

> The main tasks for national economic and social development in 1999 are: . . . (IV) To further deepen price reform and vigorously rectify market order . . . Rectifying market order, standardizing price-related behavior . . . . Formulating laws and regulations in line with the Price Law, and investigating and punishing unfair pricing behaviors such as low-price dumping . . . .[39]

53. In the same year, an official identified as from the Price Department of the State Planning Commission stated:

> [Low-price] dumping in the color TV market has become widespread, and is no longer limited to a few manufacturers. . . . . In fact, [low-price] dumping in the color TV

---

[36] 中华人民共和国国家发展和改革委员会 (National Development and Reform Commission), *2000年价格监督检查成绩显著* (*Great Achievements Were Made in Price Supervision and Inspection in 2000*) (Jan. 3, 2001), https://perma.cc/B42N-5KWK (attached as Appendix M). The report does not specify which industries were involved.

[37] The State Development and Planning Commission was at the time, and remains, the top body for economic policymaking and enforcement within the Chinese government, having a rank slightly higher than a regular ministry. From 1952 to 1998, it went under the name of the State Planning Commission, and from 2003 until the present has been known as the State Development and Reform Commission. Although the name has changed over time, it has remained essentially the same body. Regulations issued when it had one name remain (unless repealed) effective regulations under the authority of the renamed body.

[38] 关于认真做好制止低价倾销工作及开展对低价倾销进行检查的通知 (Notice on Earnestly Stopping Price Dumping and Carrying out Inspection of Price Dumping) (Jan. 16, 1999) (attached as Appendix C) (emphasis added).

[39] 曾培炎 (ZENG Peiyan), *关于1998国民经济和社会发展计划执行情况与1999国民经济和社会发展计划草案的报告--1999年3月6日在第九届全国人民代表大会第二次会议上* (*Report on the Implementation of the 1998 National Economic and Social Development Plan and the Draft of 1999 National Economic and Social Development Plan -- Presented at the Second Session of the Ninth National People's Congress on March 6, 1999*) (1999), https://perma.cc/4PVL-MAHR (attached as Appendix N).

industry has become a widespread issue.[40]

54. The message was repeated in 2000:

[T]he State Planning Commission requires price authorities at all levels to set up price reporting agencies, improve the reporting network, timely accept the reporting of the masses on price dumping . . . , and strictly comply with the Price Law and relevant regulations and rules.[41]

55. It was repeated in 2001:

Since the beginning of this year [(2001)], the State Planning Commission has taken the prevention of unfair price competition as a major task for the price department to rectify and standardize the market economic order during the "Tenth Five-Year Plan" period. In particular, the investigation and punishment of . . . low price dumping and other price violations has become an important work of the price department.[42]

56. It was repeated in 2002:

The general requirements for price supervision and inspection in 2002 are as follows: . . . (IV) To stop unfair pricing practices and effectively safeguard the legitimate rights and interests of consumers and business operators: Price fraud, price discrimination, low-price dumping, profiteering and other unfair price acts that disrupt market order and undermine the legitimate rights and interests of consumers and business operators must be resolutely stopped.[43]

57. In 2004, the SDPC again called attention to the prohibition on dumping of products at below cost:

In order to protect the rights of citizens, legal persons or other organizations to report price violations according to law, further facilitate the masses to report price violations, and improve the work efficiency of the price authorities, the National Development and Reform Commission recently issued the "Regulations on Reporting Price Violations" with the Director's Order No. 15, which will be implemented from October 1, 2004. According to these Regulations, citizen legal persons or other organizations can report to the local price authorities if they find any of the following 13 categories of price

---

[40] 李亢 (LI Kang), 制止彩电低价倾销要标本兼治 (*Curbing the Dumping of Low-Priced Color TVs Requires a Comprehensive Approach*), 1999:9 价格理论与实践 (PRICE THEORY AND PRAC.) 22, 22 (1999) (attached as Appendix O).

[41] 中华人民共和国国家发展和改革委员会 (National Development and Reform Commission), 国家计委出台八项价格、收费检查措施 (*The State Planning Commission Issued Eight Measures to Inspect Prices and Charges*) (Jan. 6, 2000), https://perma.cc/P9T5-GMEG (attached as Appendix P).

[42] 中华人民共和国国家发展和改革委员会 (National Development and Reform Commission), 规范市场价格秩序又添新规 (*New Regulations Enacted for Regulating Market Price Order*) (Nov. 21, 2001), https://perma.cc/E53N-SG9Q (attached as Appendix Q).

[43] 中华人民共和国国家发展和改革委员会 (National Development and Reform Commission), 国家计委部署2002年价格监督检查工作---加大执法力度，注重标本兼治 整治群众反映强烈的价格和收费问题 (*The State Planning Commission Deployed the Price Supervision and Inspection Work in 2002 - To Strengthen Law Enforcement, and Rectify the Problems of Prices and Fees That the People Seriously Complain about Focusing on Both Manifestations and Root Causes*) (Jan. 10, 2002), https://perma.cc/Q7P7-BPW7 (attached as Appendix R).

> violations: . . . (II) acts of dumping goods at a price below cost in order to exclude competitors or monopolize the market, which disrupts the normal order of production and business, and harms the interests of the state or the legitimate rights and interests of other business operators, except for selling fresh goods, seasonal goods, or overstocked goods at reduced prices according to law. . . .[44]

58. There is no mistaking the picture painted by these repeated statements from the SDPC. It was very serious about its campaign against manufacturers pricing below cost, which included investigating those who priced below average cost.

**The Price Alliance**

59. The Gao Report focuses much of its attention on the Color TV Price Alliance (the "Alliance"). The Gao Report does not define the Alliance in any detail or identify its members, but it appears to be a purely private consortium of color television manufacturers. Based on the documents attached to the Gao Report, the Alliance does not appear to include Irico or other CRT manufacturers. Professor Gao devotes a large portion of his report to the Alliance, arguing that he found no evidence of government support for, or enforcement of, a minimum price scheme that he states was set by the Alliance, a scheme that he states the Chinese government shut down.

60. I did not in the Clarke 2022 Report express any opinion about the Alliance. Because the Gao Report discusses it, however, I explain below how the Alliance has no bearing on the enforcement of and regulatory scheme related to the Pricing Documents, and how it does not change my opinions.

61. Whether or not the Chinese government condoned the Alliance does not bear on the enforcement of and regulatory scheme related to the Pricing Documents. That the Chinese government may not have supported a minimum price scheme established by a small group of color TV manufacturers at that specific point in time, outside of the government's purview, tells us nothing about the existence, legal validity, or enforceability of the state-enacted minimum price scheme set forth in the Pricing Documents or CRT manufacturers' conduct pursuant to those Pricing Documents. I also note that Professor Gao in his report does not report, and I am not aware of, any similar government response or condemnation with respect to any individual or joint actions by CRT manufacturers. If Professor Gao's point is that the government actively ended the joint actions of a private group of color TV manufacturers, it should be noted that the government apparently did not do so with respect to the alleged conspiracy in this case.

62. Once we eliminate the irrelevant discussion of the Alliance (Paragraphs 36 through 42 of the Gao Report), there is virtually nothing left in the Gao Report to support the claim that the state-enacted Pricing Scheme of the Pricing Documents was not systematically enforced.

---

[44] 中华人民共和国国家发展和改革委员会 (National Development and Reform Commission), *十三类价格违法行为 可以向价格主管部门举报 (Thirteen Kinds of Price Violations Can Be Reported to the Price Authorities)* (Aug. 19, 2004), https://perma.cc/3AQ2-W3YQ (attached as Appendix S).

## V. Conclusion

63. For the reasons set forth above, I conclude that the Pricing Scheme was what it appears to be: no mere paper tiger, but a seriously intended, enforceable, and enforced state project to carry out an important state policy of suppressing price competition among CRT and TV manufacturers and sustaining prices.

Donald Clarke

July 21, 2023

16

# APPENDIX A

# DONALD C. CLARKE

Professor of Law
David A. Weaver Research Professor
George Washington University Law School
2000 H Street
Washington, DC 20052
Tel. (202) 994-2830
E-mail: donaldclarke@law.gwu.edu
Website: http://donaldclarke.net

## CURRENT POSITION

• Professor, George Washington University Law School, Washington, DC (from Jan. 2005)

<div style="margin-left:2em">

Courses taught:     • Chinese Law
   • Chinese Business Law
   • Business Organizations
   • Law and Development

</div>

## OTHER POSITIONS AND VISITORSHIPS

• Visiting Professor, Interdisciplinary Center, Herzliya, Israel (April-May 2013)
• Visiting Professor, Duke University Law School, Durham, NC (Spring 2012)
• Visiting Professor, University of California at Los Angeles School of Law, Los Angeles, CA (Fall 2008)
• Visiting Professor, New York University School of Law, New York, NY (2007-08)
• Professor, University of Washington School of Law, Seattle, Washington (1988-2004)
• Attorney, Paul Weiss Rifkind Wharton & Garrison, New York, New York (Sept. 1995-Aug. 1998) (on leave from University of Washington)
    Areas of practice: Corporate, East Asia (focusing on China)
• Lecturer in Commercial Law of the Far East, Department of Law, School of Oriental and African Studies, University of London, UK (Sept. 1985-July 1988)

## EDUCATION

• *Harvard Law School*, Cambridge, Mass., USA (1983-85, 1986-87)—JD cum laude 1987
    Activities:     Editorial Board, *Harvard Law Review*
                     *Harvard International Law Journal*
• *School of Oriental and African Studies*, University of London, UK (1981-83)—MSc 1983 in Government and Politics of China
    Honors: Award of Distinction for thesis
• *Beijing University and Nanjing University*, People's Republic of China (1977-79)— Non-degree academic exchange program
    Major area of study: Chinese history
• *Princeton University*, Princeton, New Jersey, USA (1973-77)—BA cum laude 1977
    Major areas of study: International affairs (Woodrow Wilson School of Public and International Affairs); Certificate of Proficiency in East Asian Studies

**SCHOLARSHIPS AND FELLOWSHIPS**

• Law and Public Affairs Fellowship, Princeton University, 2020-21 academic year
• Rowdget Young Visiting Fellow, Faculty of Law, University of Hong Kong, June 2005
• Fulbright Research Fellowship, 2003 (Tsinghua University Faculty of Law, Beijing)
• Visiting Fellow, China Law Center, Yale Law School, Fall 2001
• Research Fellowship, National Program, Committee on Scholarly Communication with the People's
   Republic of China, 1991-92
• Foreign Language and Area Studies Fellowship, 1986-87 (Harvard Law School)
• Foreign Language and Area Studies Fellowship, 1984-85 (Harvard Law School)
• Commonwealth Scholarship, 1981-83 (University of London)
• Canada-China Exchange Scholarship, 1977-79 (Peking University, Nanking University)

**PROFESSIONAL ASSOCIATIONS AND MEMBERSHIPS**

• Member, Council on Foreign Relations
• Member, National Committee on US-China Relations
• Member, New York Bar
• Member, Advisory Board, *China Journal of Democracy*
• Member, Advisory Board, Inter-Parliamentary Alliance on China
• Member, Executive Editorial Board, *American Journal of Comparative Law*
• Member, Editorial Board, *The China Quarterly*
• Member, Editorial Board, *Journal of Comparative Law*
• Affiliate Professor, University of Washington School of Law

**CONSULTANCIES (SELECTED)**

• U.S. Department of Justice (2019)
• Public Company Accounting Oversight Board (2016-2017)
• Securities and Exchange Commission (2013-2013)
• Financial Sector Reform and Strengthening (FIRST) Initiative, *Amendments to the Securities Law of the People's Republic of China*, 2004-2005
• Asian Development Bank, *Economic Law in the People's Republic of China: Retrospect and Prospect*, 2004-2005
• Asian Development Bank, *Amendments to the Company Law of the People's Republic of China*, 2001-2005
• Agency for International Development, *Commercial Law Reform in the Former Soviet Republics*, 2002
• Asian Development Bank, *China's Legal and Administrative System*, 2001

**PUBLICATIONS**

### Books

*China's Legal System: New Developments, New Challenges* (Cambridge University Press, 2008) (edited volume)

## Articles and Monographs

"Law and the Political System in Xi Jinping's China: The Decline of the Party/State Distinction," in Daniel Lynch & Stanley Rosen (ed.), *Chinese Politics: State, Society and the Market* (Routledge, forthcoming 2024)

"An Exchange on Legal Orientalism: Response to Professor Ruskola," *American Journal of Comparative Law*, vol. ___, no. ___ (online publication June 21, 2023)

"Judging China: The Chinese Legal System in U.S. Courts," *University of Pennsylvania Journal of International Law*, vol. 44, no. 3 (2023): 455-618

"Order and Law in China," *University of Illinois Law Review*, vol. 2022, no. 2 (2022): 541-595

"Anti Anti-Orientalism, or Is Chinese Law Different?", *American Journal of Comparative Law*, vol. 68, no 1 (2020): 55-94

"Form and Function in China's Urban Land Regime: The Irrelevance of 'Ownership'," *Land Use Policy*, vol. 79 (Dec. 2018): 902-912

"The Bonding Effect in Chinese Cross-Listed Companies: Is It Real?", in Nicholas C. Howson & Robin Hui Huang (ed.), *Enforcement of Corporate and Securities Law: China and the World* (Cambridge University Press 2017): 88-100 [Working paper version: "The Bonding Effect in Cross-Listed Chinese Companies: Is It Real?", Dec. 31, 2015, GWU Studies Research Paper No. 2015-55, available at http://ssrn.com/abstract=2710717]

"The Law of China's Local Government Debt: Local Government Financing Vehicles and Their Bonds" (with Fang Lu), *American Journal of Comparative Law*, vol. 65 (2017): 751-798

"Don't Ask, Don't Sell: The Criminalization of Business Intelligence in China and the Case of Peter Humphrey," *UCLA Pacific Basin Law Journal*, vol. 33, no. 2 (2016): 109-153

"Blowback: How China's Efforts to Bring Private-Sector Standards into the Public Sector Backfired," in Curtis Milhaupt & Benjamin Liebman (ed.), *Regulating the Visible Hand? The Institutional Implications of Chinese State Capitalism* (Oxford University Press 2015): 29-48

"Zai fanyizhong yishi? Jianping Zhongguo gongsi fa zhong de yizhiti" (Lost in Translation? Legal Transplants in Chinese Corporate Law), in Ge Pingliang & Liang Jiaolong (ed.), *Waiguo Xuezhe Lun Zhongguo Fa Congshu—Gongsi Fa Fenjuan* (Collection of Works of Foreign Scholars Discussing Chinese Law—Company Law Volume) (Zhongguo Dabaike Quanshu Chubanshe (Great Encyclopedia of China Publishers), forthcoming 2015)

"Judicial Innovation in Chinese Corporate Law," in John O. Haley & Toshiko Takenaka (ed.), *Legal Innovations in Asia: Judicial Law-Making and the Influence of Comparative Law* (Edward Elgar, 2014): 259-272

"China's Stealth Urban Land Revolution," *Am. J. Comp. L.*, vol. 62, no. 2 (Spring 2014): 323-366

"Derivative Actions in the People's Republic of China" (with Nicholas C. Howson), in Dan W. Puchniak, Harald Baum & Michael Ewing-Chow (ed.), *The Derivative Action in Asia: A Comparative and Functional Approach* (Cambridge University Press, 2012): 243-295; *translated as* "Tongwang xiao gudong baohu zhi lujing: Zhongguo paisheng susong," in Ge Pingliang & Liang Jiaolong (ed.), *Waiguo Xuezhe Lun Zhongguo Fa Congshu—Gongsi Fa Fenjuan* (Collection of

Works of Foreign Scholars Discussing Chinese Law—Company Law Volume) (Zhongguo Dabaike Quanshu Chubanshe (Great Encyclopedia of China Publishers), forthcoming 2015)

"'Nothing But Wind'? The Past and Future of Comparative Corporate Governance," *Am. J. Comp. L.*, vol. 59, no. 1 (Winter 2011): 75-110

"Law Without Order in Chinese Corporate Governance Institutions," *Nw. J. Int'l L. & Bus.*, vol. 30 (2010): 131-199; *translated as* "Zhongguo gongsi zhili zhidu: you fa er wu zhixu," in <u>Ge</u> Pingliang & <u>Liang</u> Jiaolong (ed.), *Waiguo Xuezhe Lun Zhongguo Fa Congshu—Gongsi Fa Fenjuan* (Collection of Works of Foreign Scholars Discussing Chinese Law—Company Law Volume) (Zhongguo Dabaike Quanshu Chubanshe (Great Encyclopedia of China Publishers), forthcoming 2015)

"The Private Attorney-General in China: Potential and Pitfalls," *Wash. U. Global Studies L. Rev.*, vol. 8, no. 2 (2009): 241-255

"The Role of Non-Legal Institutions in Chinese Corporate Governance," in Curtis Milhaupt, Kon-Sik Kim and Hideki Kanda (ed.), *Transforming Corporate Governance in East Asia* (Routledge, 2008): 168-192

"The Role of Law in China's Economic Development" (with Peter Murrell and Susan Whiting), in Thomas Rawski and Loren Brandt (ed.), *China's Great Economic Transformation* (Cambridge University Press, 2008): 375-428

"China: Creating a Legal System for a Market Economy," Nov. 7, 2007 (report prepared for the Asian Development Bank) (available at http://ssrn.com/abstract=1097394)

"The Chinese Legal System Since 1995: Steady Development, Striking Continuities," *China Quarterly*, no. 191 (Sept. 2007): 555-566

"Legislating for a Market Economy in China," *China Quarterly*, no. 191 (Sept. 2007): 567-585

"Three Concepts of the Independent Director," *Delaware Journal of Corporate Law*, vol. 32, no. 1 (2007): 73-111 (available at http://ssrn.com/abstract=975111)

"How Do We Know When an Enterprise Exists? Unanswerable Questions and Legal Polycentricity in China," *Columbia Journal of Asian Law*, vol. 19, no. 1 (2005 [2006]): 50-71

"The Independent Director in Chinese Corporate Governance," *Delaware Journal of Corporate Law*, vol. 31, no. 1 (2006): 125-228 (available at http://ssrn.com/abstract=895588)

"Zhengfu chigu yu Zhongguo gongsi zhili" (Government Shareholding and Chinese Corporate Governance), *Hongfan Pinglun* (Hongfan Review [Journal of Legal and Economic Studies]), vol. 2, no. 2 (Sept. 2005): 230-248

"Yige bing buyuan de waiguo yueliang: Meiguo fan neimu jiaoyi falü zhidu" (A Foreign Moon That Is not Round: America's Anti-Insider Trading Legal Regime), *Hongfan Pinglun* (Hongfan Review [Journal of Legal and Economic Studies]), vol. 2, no. 1 (March 2005): 225-238

"Zhongguo xiuding 'Xing Fa' pingjia" (An Assessment of China's Revisions to the "Criminal Law"), in Xu Chuanxi (ed.), *Zhongguo Shehui Zhuanxing Shiqi de Falü Fazhan* (The Development of Law in China's Transitional Society) (Beijing: Falü Chubanshe [Law Press], 2004): 448-492

"Corporate Governance in China: An Overview," *China Economic Review*, vol. 14, no. 4 (2003): 494-507

"Empirical Research in Chinese Law," in Erik Jensen & Thomas Heller (eds.), *Beyond Common Knowledge: Empirical Approaches to the Rule of Law* (Stanford: Stanford University Press, 2003): 164-192

"Duli dongshi yu Zhongguo gongsi zhili" (The Independent Director and Chinese Corporate Governance), in Fang Liufang (ed.), *Fa Da Pinglun* (China University of Politics and Law Review), vol. 2 (Beijing: Zhongguo Zheng-Fa Daxue Chubanshe [China University of Politics and Law Press], 2003): 99-122 (also in Hamada Michiyo & Wu Zhipan (ed.), *Gongsi Zhili yu Ziben Shichang Jianguan—Bijiao yu Jiejian* (Corporate Governance and the Regulation of Capital Markets: Comparisons and Lessons) (Beijing: Beijing Daxue Chubanshe [Beijing University Press], Jan. 2003)

"The Independent Director in Chinese Corporate Governance and the 'Guidance Opinion on the Establishment of an Independent Director System in Listed Companies'," in Wang Baoshu (ed.), *Touzizhe Liyi Baohu* (The Protection of Investors' Interests) (Beijing: Shehui Kexue Wenxian Chubanshe [Social Sciences Documentation Press], 2003): 142-165

"Economic Development and the Rights Hypothesis: The China Problem," *American Journal of Comparative Law*, vol. 51 (2003): 89-111

"China's Legal System and the WTO: Prospects for Compliance," *Washington University Global Studies Law Review*, vol. 2, no. 1 (2003): 97-118

"Puzzling Observations in Chinese Law: When Is a Riddle Just a Mistake?" in C. Stephen Hsu (ed.), *Understanding China's Legal System* (New York: New York University Press, 2003): 93-121

"Zhongguo de jiufen jiejue" (Dispute Resolution in China), in Jiang Shigong (ed.), *Tiaojie, Fazhi yu Xiandaixing: Zhongguo Tiaojie Zhidu Yanjiu* (Mediation, Legality, and Modernity: Studies in the Chinese Mediation System) (Beijing: Zhongguo Fazhi Chubanshe [China Legal System Press], 2001)

"Zhongguo tudi shiyong guanli zi xia er shang de celüe" (A Bottom-Up Strategy for Land Use Regulation in China), in Chi Fulin (ed.), *Zouru 21 Shiji de Zhongguo Nongcun Tudi Zhidu Gaige* (China's Rural Land System Reform Going Into the 21st Century) (Beijing: Zhongguo Jingji Chubanshe [China Economics Press], 2000): 299-303

"Chûgokuhô kenkyû no apurôchi: 'hô no shihai' paradaimu wo koete" (Approaches to Chinese Law: Beyond the 'Rule of Law' Paradigm), *Hikaku Hôgaku* (Studies in Comparative Law), vol. 34, no. 1 (2000): 73-91

"Alternative Approaches to Chinese Law: Beyond the 'Rule of Law' Paradigm," *Waseda Proceedings of Comparative Law*, vol. 2 (1998-1999): 49-62

"China and the World Trade Organization," in Freshfields (ed.), *Doing Business in China* (Yonkers, N.Y.: Juris Publishing, 1999): I-11.1 to I-11.30

"Private Enforcement of Intellectual Property Rights in China," *NBR Analysis*, vol. 10, no. 2 (April 1999): 29-41

*Wrongs and Rights: A Human Rights Analysis of China's Revised Criminal Code* (New York: Lawyers Committee for Human Rights, December 1998)

"Power and Politics in the Chinese Court System: The Execution of Civil Judgments," *Columbia Journal of Asian Law*, vol. 10, no. 1 (Spring 1996): 1-125

"The Creation of a Legal Structure for Market Institutions in China," in John McMillan & Barry Naughton (eds.), *Reforming Asian Socialism: The Growth of Market Institutions* (Ann Arbor: University of Michigan Press, 1996): 39-59

"The Execution of Civil Judgments in China," *China Quarterly*, no. 141 (March 1995): 65-81; translated into Japanese as "Chûgoku ni okeru minji hanketsu no kyôsei shikkô," in Hikota Koguchi (ed.), *Chûgoku no Keizai Hatten to Hô* (Tokyo: Waseda University Institute of Comparative Law, 1998): 343-367

"Antagonistic Contradictions: Criminal Law and Human Rights in China" (with James V. Feinerman), *China Quarterly*, no. 141 (March 1995): 135-154

"Justice and the Legal System," in Robert Benewick & Paul Wingrove (eds.), *China in the 1990s* (London: Macmillan, 1995): 83-93

"GATT Membership for China?," *University of Puget Sound Law Review*, vol. 17, no. 3 (Spring 1994): 517-531

"Regulation and Its Discontents:  Understanding Economic Law in China," *Stanford Journal of International Law*, vol. 28, no. 2 (Spring 1992): 283-322

"Dispute Resolution in China," *Journal of Chinese Law*, vol. 5, no. 2 (Fall 1991): 245-296

"What's Law Got to Do with It?  Legal Institutions and Economic Reform in China," *UCLA Pacific Basin Law Journal*, vol. 10, no. 1 (Fall 1991): 1-76

"Law, the State and Economic Reform in China," in Gordon White (ed.), *The Chinese State in the Era of Economic Reform:  The Road to Crisis* (London: Macmillan, 1991): 190-211

"Political Power and Authority in Recent Chinese Literature," *China Quarterly*, no. 102 (June 1985): 234-252

"Concepts of Law in the Chinese Anti-Crime Campaign," *Harvard Law Review*, vol. 98, no. 8 (June 1985): 1890-1908

### Short Articles, Comments, and Book Reviews

"Enforcing Chinese Judgments: A Response," *Transnational Litigation Blog*, Oct. 10, 2022, https://perma.cc/85LU-9F4J

"Robin Munro, 1952-2021," *Journal of Comparative Law*, vol. 16, no. 2 (2021): 691-696, https://perma.cc/5ETJ-D9C8

"Will I Return to China?" *ChinaFile*, June 21, 2021, https://perma.cc/FNQ3-MKT6

"New Zealand's Troubling Precedent for China Extradition," *Lawfare*, June 15, 2021, https://perma.cc/BQY2-GYW5

"Hong Kong National Security Law: New Institutions Show China's True Intent," *South China Morning Post*, July 17, 2020, http://bit.ly/dccscmp

"Hong Kong's National Security Law: An Assessment," *China Leadership Monitor*, July 13, 2020, https://perma.cc/6KNA-2MFW

Review of Kwai Hang Ng & Xin He, Embedded Courts: Judicial Decision-Making in China, *China Quarterly*, no. 237 (March 2019): 266-67

"Winter Settles on Chinese Universities: What Does Xu Zhangrun's Punishment Mean for Hopes of Academic Freedom?", *Foreign Policy*, April 1, 2019, https://perma.cc/JV3K-6KFK

"China's Hostage Diplomacy," *Lawfare*, Jan. 11, 2019, https://perma.cc/W67K-NWWP

"China Is Holding Two Canadians as Hostages. It's Not Even Denying It." *Washington Post*, Dec. 17, 2018, https://perma.cc/SH5U-E5CD

"No, New Xinjiang Legislation Does not Legalize Detention Centers," *Lawfare*, Oct. 11, 2018, https://perma.cc/NWX9-TP3X

"*Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co.*: Respect but Verify: Foreign Government Statements of Foreign Law Do Not Get Conclusive Deference," *Geo. Wash. L. Rev. on the Docket* (June 21, 2018), https://www.gwlr.org/animal-science-products-inc [https://perma.cc/6B96-7NKM]

"Do Western Media Focus Too Much on Human Rights Issues in China," *Hong Kong Free Press*, Jan. 13, 2018, https://perma.cc/ER6L-3LCF

"Has China Restored Private Land Ownership?", *Foreign Affairs*, May 16, 2017, https://perma.cc/FBH9-Z6L7

"The Paradox at the Heart of China's Property Regime," *Foreign Policy*, Jan. 19, 2017, https://perma.cc/65UD-9TDA

"China's Legal System and the Fourth Plenum," *Asia Policy*, no. 20 (July 2015), pp. 10-16, *available at* http://www.nbr.org/publications/issue.aspx?id=319

"Alibaba Shareholder Disenfranchisement: Worse than You Think," *FT Alphaville*, Oct. 20, 2014, http://on.ft.com/1vUEjQl

"The Significance of Recent Detentions for the Rule of Law in China," testimony before the Congressional-Executive Commission on China, in *Understanding China's Crackdown on Rights Advocates: Personal Accounts and Perspectives*, April 8, 2014, *available at* http://1.usa.gov/1j31ZK3

"Why Hefei?", *Caixin Online*, July 27, 2012, http://english.caixin.com/2012-07-27/100416240.html

"Waizi kongzhile Zhongguo hulianwang ma?" (Does Foreign Capital Control the Chinese Internet?), *Caixin Wang* (Caixin Online), July 22, 2011, http://www.caing.com/2011-07-22/100282578.html (Chinese-language version of "Who Owns the Chinese Internet" below)

"Who Owns the Chinese Internet?", *Caixin Online*, July 15, 2011, http://english.caing.com/2011-07-15/100279928.html, also in *Caixin Weekly*, no. 36 (July 25, 2011): 58-60

"China's Jasmine Crackdown and the Legal System," *East Asia Forum* (Australian National University), May 26, 2011, http://www.eastasiaforum.org/2011/05/26/china-s-jasmine-crackdown-and-the-legal-system/ (alternate URL: http://bit.ly/k8eI2U)

"New Approaches to the Study of Political Order in China," *Modern China*, vol. 36, no. 1 (2010): 87-99

"Lawyers and the State: Recent Developments," testimony before the Congressional-Executive Commission on China, Washington, D.C., October 7, 2009

"Lawsuits as Criticism," in "Room for Debate: China's New Rebels," *New York Times*, June 2, 2009, http://nyti.ms/kKt9sl

"Law, Institutions, and Property Rights in China" (with Peter Murrell and Susan Whiting), *Woodrow Wilson International Center for Scholars Asia Program Special Report*, no. 129, 2005: 42-47

"Xintuo zeren de zhenzheng yiyi -- yu Lang Xianping jiaoshou shangque" (The True Meaning of Fiduciary Liability: A Discussion with Professor Lang Xianping), *Zhongguo Zhengquan Bao* (China Securities News), Dec. 5, 2003

"Ruhe quezhi yijia gongsi de cunzai: Zhongguo fa shang de kunhuo he falù duoyuan zhuyi" (How Do We Know When an Enterprise Exists? Unanswerable Questions and Legal Polycentricity in Chinese Law), in Wang Baoshu (ed.), *Quanqiu Jingzheng Tizhi Xia de Gongsi Fa Gaige* (Company Law Reform in a System of Global Competition) (Beijing: Shehui Kexue Wenxian Chubanshe [Social Sciences Documentation Press], 2003): 74-76

"Corporatisation, Not Privatisation," *China Economic Quarterly*, vol. 7, no. 3 (2003): 27-30

Review of Peter Murrell (ed.), *Assessing the Value of Law in Transition Economies* (Ann Arbor: Univ. of Michigan Press, 2001), in *Journal of Economic Literature*, vol. 41 (June 2003): 624-625

"China" (with Nicholas Howson and Lester Ross), in *Insolvency & Restructuring 2003* (London: Law Business Research, 2003): Chapter 9

Statement Before the Congressional-Executive Commission on China (June 6, 2002), in "WTO: Will China Keep Its Promises? Can It?", *Hearing Before the Congressional-Executive Commission on China*, 107th Congress, Second Session (Washington, D.C.: U.S. Government Printing Office, 2002): 66-78

Statement Before the United States-China Security Review Commission (Jan. 18, 2002) [on China's accession to the World Trade Organization], in *Compilation of Hearings Held Before the U.S.-China Security Review Commission*, 107th Congress, First and Second Sessions (Washington, D.C.: U.S. Government Printing Office, 2002): 1171-1181

"China" (with Lester Ross), in *Insolvency & Restructuring 2002* (London: Law Business Research, 2002): 57-63 (Chapter 9)

"Dispute Resolution in China: The Arbitration Option" (with Angela H. Davis), in Asia Law and Practice (ed.), *China 2000: Emerging Investment, Funding and Advisory Opportunities for a New China* (Hong Kong: Euromoney Publications (Jersey) Limited, 1999): 151-162

"State Council Notice Nullifies Statutory Rights of Creditors," *East Asian Executive Reports*, vol. 19, no. 4 (April 15, 1997): 9-15

"China's New Partnership Law" (with Nicholas Howson and Gangliang Qiao), *The China Business Review*, July-August 1997: 30-33

"Shanghai Measures on Land Use by FIEs: An Indication of Coming Changes in the National System?" (with Nicholas C. Howson), *East Asian Executive Reports*, vol. 18, no. 11 (November 15, 1996): 9-13

"Bill Jones: An Appreciation," *Washington University Law Quarterly*, vol. 74 (Fall 1996): 545-546

"Methodologies for Research in Chinese Law," *University of British Columbia Law Review*, vol. 30, no. 1 (1996): 201-209

"One Step Back Permits Two Steps Forward," *China Rights Forum*, Fall 1996: 8-11

"Developing P.R.C. Property and Real Estate Law:  Revised Land Registration Rules" (with Nicholas C. Howson), *East Asian Executive Reports*, vol. 18, no. 4 (April 15, 1996): 9, 13-17

"Implementation of Central Policy and the Law in China," *European Association for Chinese Law Information Bulletin* (1991)

"Foreign Economic Laws and Bureaucracy in China," *European Association for Chinese Law Information Bulletin*, vol. 5, no. 4 (December 1989): 3-7

Review of Frank K. Upham, *Law and Social Change in Postwar Japan* (1987), in *Bulletin of the School of Oriental and African Studies* (1989)

Contribution on the People's Republic of China for "Crime and Punishment" section of the *Encyclopaedia Britannica* (1989)

Review of Michael J. Moser (ed.), *Foreign Trade, Investment, and the Law in the People's Republic of China* (2nd ed. 1987), in *Lloyd's Maritime and Commercial Law Quarterly*, 1989, Part 1: 129-130 (February 1989)

"Relief on the Way for Foreign Investors," *South* (June 1987): 32

Review of J. Oldham (ed.), *China's Legal Development* (1986), in *China Quarterly*, no. 109 (March 1987): 122-123

Review of D.T.C. Wang, *Les sources du droit de la République populaire de Chine* (1982), in *China Quarterly*, no. 108 (December 1986): 727-728

Review of M.D. Pendleton, *Intellectual Property Law in the People's Republic of China* (1986), in *European Intellectual Property Review*, vol. 8, no. 10 (October 1986): 323-324

Review of D. Solinger, *Chinese Business Under Socialism.  The Politics of Domestic Commerce, 1949-1980* (1984), in *China Quarterly*, no. 106 (June 1986): 348-350

Review of P. Gladwin & A. Hameed, *Guide to the Patent Law of the People's Republic of China* (1985), in *European Intellectual Property Review*, vol. 8, no. 5 (May 1986): 160

"China's New Rule of Law," *Britain-China*, no. 31 (Spring 1986): 11-14

"Proposed Consent Agreement Between General Motors Corporation and Toyota Motor Corporation," *Harvard International Law Journal*, vol. 25, no. 2 (Spring 1984): 421-427

**Unpublished Working Papers**

"Who Owns Huawei?" (with Christopher Balding), May 8, 2019, available at https://ssrn.com/abstract=3372669

"The Zhong Lun Declaration on the Obligations of Huawei and Other Chinese Companies under Chinese Law," March 28, 2019, available at https://ssrn.com/abstract=3354211

"Lost in Translation? Corporate Legal Transplants in China" (July 3, 2006), GWU Law School Public Law Research Paper No. 213, available at http://ssrn.com/abstract=913784

"The Enforcement of United States Court Judgments in China: A Research Note" (May 27, 2004), available at http://ssrn.com/abstract=943922

**Blogs**

*The China Collection*, http://thechinacollection.org/

Co-blogger (occasional), *ChinaFile*, http://www.chinafile.com (sponsored by the Asia Society)

**Translations**

"The Management Liability of Directors," *Law in Japan*, vol. 20 (1987): 150-172 (translation from Japanese of M. Kondô, "Torishimariyaku no keiei sekinin")

LECTURES, INTERVIEWS, PRESENTATIONS, AND CONFERENCE APPEARANCES

Featured speaker, "Judging China: Illiberal Legal Systems in U.S. Courts," Council on Foreign Relations Virtual Roundtable, Jan. 13, 2022

"Judging China," paper presented at George Washington University Law School Faculty Workshop, Nov. 5, 2021

Speaker, "Judging China: Chinese Law in U.S. Courts," panel on *When Domestic Courts Evaluate Foreign Legal Systems: The Case of China*, International Law Weekend (99th Annual Meeting of the American Branch of the International Law Association), Oct. 29, 2021

Visiting lecturer, "Order and Law in China," Göttingen Summer School on Chinese Law, Max-Planck-Institut für ausländisches und internationals Privatrecht, Hamburg, Sept. 20. 2021

Speaker, "Legal Aspects of Xinjiang Detentions: Points of Argument Regarding Chinese Domestic Law," at *The Xinjiang Crisis: Genocide, Crimes Against Humanity, Justice*, Conference at Newcastle University, UK, Sept. 3, 2021

Featured speaker, "Order and Law in China," in *Rethinking Cultural Constructions of Law in East Asia* (speaker series) (University of Toronto Faculty of Law, Cornell Law School, Yale Law School), June 25, 2021

Panelist, *We Must Not Remain Silent: China's Uyghur Genocide and What You Can Do About It*, Symposium and CLE presented by The Cardozo Society, Jewish Federation of Greater Seattle, and Middle Eastern Legal Association of Washington, June 3, 2021

Commentator, *US-China Rule of Law Dialog*, sponsored by National Committee on US-China Relations, New York, NY, April 26-27, 2021

Featured speaker, "Order and Law in China," Princeton University East Asian Studies Program, March 29, 2021

Speaker, "The Xinjiang Crisis and Chinese Law," *Human Rights Symposium*, George Washington University Law School, March 25, 2021

Presenter, *Research in the Chinese Legal System*, Princeton University School of Public and International Affairs, March 16, 2021

Panelist, *International Law and the Uyghur Crisis*, Columbia Law School, March 15, 2021

Commentator, Works-in-Progress Workshop, American Society of Comparative Law, Princeton University, March 12, 2021

Featured speaker, "Judging China: How US Courts Look at the Chinese Legal System," Program in Law and Public Affairs, Princeton University, Feb. 26, 2021

Discussant, *Securities Regulatory Cooperation Over Cross-Border Listings and Transactions*, Chinese University of Hong Kong, Dec. 10-11, 2020

Moderator, *The Uyghur Human Rights Crisis: What Are the Legal Options*, George Washington University Law School, Nov. 10, 2020

Featured speaker, "Order and Law in China," Harvard Law School Comparative Law Seminar, Nov. 9, 2020

Visiting lecturer, "Anti Anti-Orientalism," Göttingen Summer School on Chinese Law, Max-Planck-Institut für ausländisches und internationals Privatrecht, Hamburg, Sept. 21. 2020

Panelist, *The Future of Hong Kong's Separate Legal System under the National Security Law*, University of London, School of Oriental & African Studies China Institute Roundtable, Sept. 9, 2020

Featured speaker, "Approaches to the Study of Chinese Law," New York University Law School, Aug. 27, 2020

Speaker, *Policy Forum: Organ Procurement and Extrajudicial Killing in China: Confronting the Evidence*, sponsored by International Coalition to End Transplant Abuse in China (ETAC), Uyghur Human Rights Project, Victims of Communism Memorial Foundation, Washington, DC, March 10, 2020

Speaker, *China's Ideological Ambitions*, workshop organized by Brookings Institution, Washington, DC, March 10, 2020

Panelist, *China and the Rule of Law: Addressing Key Human Rights Challenges Together*, workshop organized by Department of Human Rights and Labor, Department of State, Washington, DC, March 2, 2020

"China's Legal Non-Construction Project," paper presented at George Washington University Law School Faculty Workshop, Jan. 15, 2020

Panel chair, *Going Global* (seminar on business in East Asia), George Washington University, Washington, DC, Nov. 14, 2019

"China's Legal Non-Construction Project," paper presented at *China's Legal Construction Program at 40 Years—Towards an Autonomous Legal System?*, University of Michigan, Oct. 11, 2019

Presentation at *China Reform Forum*, Georgetown Law School, Washington, DC, Aug. 10, 2019

"China's Legal Non-Construction Project," keynote speech, 2019 Annual General Conference of the European China Law Studies Association, Durham University, Durham, UK, July 27, 2019

Presentation on China policy issues to Policy Planning Office, Department of State, July 11, 2019

Presentation on Chinese legal system. University of Ottawa (Certificate Program in Public Sector Leadership and Governance for federal civil servants at Director General level), Ottawa, Canada, July 5, 2019

"Of cell phones and seed prices: The Chinese legal system in theory and practice," *ChinaEconTalk*, June 21, 2019, http://bit.ly/2RAlxQo (podcast interview)

Panelist, *Confronting Atrocities in China: The Global Response to the Uyghur Crisis*, George Washington University, June 7, 2019

Commentator, Chinese Law Workshop, Columbia Law School, May 14, 2019

"The Chinese Legal System," presentation to China Policy Centre, Ottawa, Canada, April 16, 2019

Organizer and panelist, *Mass Detentions in Xinjiang, China: Issues of Law and Human Rights*, George Washington University Law School, April 15, 2019

"Arbitrary Detention in China," presentation at Council on Foreign Relations, Washington, DC, April 12, 2019

Panelist, *The U.S. Supreme Court Says "No" to China: Lessons Learned from the Vitamin C Case & the Implications for Cross-Border Litigation*, ABA Section on International Law Annual Conference, Washington, DC, April 11, 2019

Commentator, *Authoritarian Police and Legality in Asia*, conference at Faculty of Law, University of Hong Kong, Hong Kong, Feb. 22-23, 2019

Panel moderator, *DC Residency Lecture Series: The Chinese Dream & What It Means to the World*, Graduate School of Political Management, George Washington University, Washington, DC, July 18, 2018

"The Supreme Court's Vitamin C Antitrust Case," presentation at George Washington University Law School Faculty Workshop, Washington, DC, June 6, 2018

"The Law of Local Government Debt in China," presentation at *A Legal Revolution: Evolving Jurisprudence in Present Day China*, symposium sponsored by George Washington University International Law Review, Washington, DC, April 2018

"Corporate Governance in China," invited lecture at Columbia Law School, New York, NY, March 2018

"Local Government Debt in China," presentation at Center for Chinese Law, Columbia Law School, New York, NY, March 2018

"Anti Anti-Orientalism," paper presented at *Comparative Law Works in Progress Workshop*, sponsored by American Society of Comparative Law, Princeton, NJ, February 2018

"China's Law on Supervision," presentation at *US-China Rule of Law Dialog*, sponsored by National Committee on US-China Relations, New York, NY, November 2017

Panelist, *Containing the Fallout from the North Korea Crisis: What Role for U.S. and International Law?*, George Washington University Law School, Washington, DC, Sept. 6, 2017

Panelist, *Anti-Corruption Forever? Xi Jinping's Signature Policy in a Fraught Political Year*, Woodrow Wilson International Center for Scholars, Washington, DC, March 24, 2017

"Short- and Long-Term Perspectives on Legal Developments in China," presentation at *Fourth Annual China Law Conference*, University of Toronto Faculty of Law, Toronto, Canada, Feb. 18, 2017

Panelist, *Reinvigorating Human Rights Policy Toward China*, conference sponsored by McCain Institute for International Leadership (Arizona State University) and Robert Strauss Center for International Security and Law, Washington, DC, Nov. 15-16, 2016

"Chinese Law and Chinese Language," paper presented at conference on *How and Why Language Learning Is Useful in China Careers*, sponsored by Princeton in Beijing, Princeton, NJ, Oct. 21-23, 2016

Participant, Roundtable discussion on China's Overseas NGO Law, Department of State, Washington, DC, May 13, 2016

Panel moderator and discussant, *Judicial Reform, Legal Reform and IP in China: A Roundtable Discussion*, United States Patent and Trademark Office, Alexandria, VA, April 14, 2016

Presentation at *World Development Report 2017 on Governance and the Law, Symposium on The Role of Law in Governance*, World Bank, Washington, DC, April 13, 2016

"Anti Anti-Orientalism, or Is Chinese Law Different?", invited lecture, University of British Columbia Law School, Vancouver, Canada, March 30, 2016

"Legal and Regulatory Reform – or Not: Implications for Business," presentation at *Third Annual China Law Conference*, University of Toronto Faculty of Law, Toronto, Canada, March 26, 2016

Participant in *Sixth Sino-American Dialogue on the Rule of Law and Human Rights*, sponsored by the National Council on US-China Relations and the China Foundation for Human Rights Development, Beijing, China, Dec. 6-10, 2015

"Legal Issues of the Fourth Plenum," presentation at *5th Annual NYU Conference on Chinese Capital Markets: Assessing the Progress of China's Economic and Legal Reforms*, New York University, New York, NY, Dec. 5, 2015

Invited participant, conference on *The Chinese State & Market: Toward the 13th Five-Year Plan*, Center for Strategic and International Studies, Washington, DC, Nov. 24, 2015

"Is the Xi Administration Interested in the Rule of Law?", invited lecture at USPTO's Global IP Academy, Alexandria, VA, July 14, 2015

"Recent Developments in American Insider Trading Law: Why China Should Not Learn from the US," invited lecture, China Securities Regulatory Commission, Beijing, China, May 25, 2015

"Anti Anti-Orientalism, or Is Chinese Law Different?", invited lecture, University of Michigan Center for Chinese Studies Occasional Lecture Series, Ann Arbor, MI, March 25, 2015

"Anti Anti-Orientalism, or Is Chinese Law Different?", keynote address, *Law and the Legal Profession in China Conference*, University of Pittsburgh School of Law, Pittsburgh, PA, Feb. 27, 2015

"The Bonding Effect in Cross-Listed Chinese Companies: Is It Real?", conference paper presented at *Public and Private Enforcement of Company Law and Securities Regulation—China and the World*, sponsored by Chinese University of Hong Kong, University of Michigan Law School, and University of Michigan Center for Chinese Studies, Hong Kong, Dec. 13, 2014

"China's Stealth Urban Land Revolution," invited lecture at Fall 2014 Speaker Series, Institute for the Study of International Development, McGill University, Montreal, Canada, Nov. 27, 2014

"Fourth Plenum Legal Reforms and Their Implications for US-China Relations," talk presented at conference on *Corruption, Constitutionalism & Control: Implications of the 4th Plenum for China and U.S.-China Relations*, Woodrow Wilson International Center for Scholars, Washington, DC, Nov. 25, 2014

"Local Government Financing Vehicles in China and their Debt: The Legal Picture," talk presented at Sigur Center for Asian Studies, George Washington University, Nov. 25, 2014

"Legal Developments in China Since the Third Plenum," panel presentation at American Association for Chinese Studies Annual Meeting, Washington, DC, Oct. 11, 2014

"Blowback: How China's Efforts to Bring Private-Sector Standards into the Public Sector Backfired," paper presentation at conference on *Chinese State Capitalism and Institutional Change: Domestic and Global Implications*, Columbia Law School, New York, NY, June 13-14, 2014

"The Significance of Recent Detentions for the Rule of Law in China," testimony before the Congressional-Executive Commission on China, Washington, DC, April 8, 2014

Interviewed for the United States-China Policy Foundation's *China Forum*, available at http://youtu.be/7hfwjStUcDs, April 2, 2014

Moderator for panel on "Wider Implications of Asian Maritime Tensions," Mansfield Foundation conference on *Maritime and Territorial Disputes in East Asian Waters*, Washington, DC, Feb. 12, 2014

Speaker at Third Annual China Intellectual Property Conference, George Washington University Law School, Washington, DC, Dec. 11, 2013

"Legal Aspects of Entrepreneurship in China," presentation at US-China Legal Exchange (co-organized by U.S. Department of Commerce and P.R.C. Ministry of Commerce), George Washington University Law School, Washington, DC, Dec. 3, 2013

"China's Stealth Urban Land Revolution," seminar presentation, Yale Law School, April 4, 2013

"China's Stealth Urban Land Revolution," seminar presentation, Columbia Law School, March 1, 2013

Participant in *Fourth Sino-American Dialog on Rule of Law and Human Rights*, sponsored by the National Council on US-China Relations and the China Foundation for Human Rights Development, Haikou, China, Dec. 3-7, 2012

Discussant at *Festschrift Conference in Honor of Professor John Haley: Law in Japan and Its Role in Asia—Between East and West*, University of Washington School of Law, Seattle, Oct. 19, 2012

"China's Stealth Urban Land Revolution," invited lecture at University of Amsterdam, June 18, 2012

"China's Informal Constitutional Order," presentation at *Social Change and the Constitution: A Conference on the Occasion of the 30th Anniversary of the 1982 Constitution of the People's Republic of China*, Free University of Berlin, June 15-17, 2012

"Local Government Bonds in China: What's Behind Them?", presentation at *Shanghai Forum 2012*, sponsored by Fudan University and Korean Foundation for Advanced Studies, Shanghai, May 27, 2012 (in Chinese)

"China's Stealth Urban Land Revolution," presentation at *Perspectives on Chinese Law* conference, George Washington University Law School, Washington, DC, April 13, 2012

Panelist in "Who Makes Your iPhone? China Migration, Labor, and Human Rights," *Program in Public Law*, Duke Law School, Durham, NC, April 4, 2012

Panelist in "China's Environmental Policy," Duke Law School, Durham, NC, March 29, 2012

Interviewed by Radio Australia on recent developments in Chinese law, Mar. 21, 2012

Roundtable participant in conference on *Democracy in China and Southeast Asia: Local and National Perspectives*, Princeton University, Princeton, NJ, March 15, 2012

"China's Stealth Urban Land Revolution," Duke Law School, Durham, NC, Feb. 29, 2012

Participated in panel on "The Rule of Law and Economic Background" at conference on *Patents, Trade, and Innovation in China*, George Washington University Law School, Washington, DC, Dec. 13, 2011

Panelist at NYU Law School's *17th Annual Timothy A. Gelatt Dialogue on the Rule of Law in Asia, China's Quest for Justice: Law and Legal Institutions Since the Empire's Collapse*, Nov. 7, 2011

"Zhongguo de yinxing chengshi tudi geming" (China's Stealth Urban Land Revolution), presentation to Hongfan Institute of Law and Economics, Beijing, June 25, 2011 (in Chinese)

"Recent Developments in China's Legal System and Their Implications for Rule of Law," presentation sponsored by Economist Intelligence Unit, Shanghai, May 27, 2011

"Derivative Actions in China," invited lecture at Hong Kong University Faculty of Law, Hong Kong, May 12, 2011

Commentator, conference on *Criminal Justice in China: Comparative Perspectives*, sponsored by Chinese University of Hong Kong, Hong Kong, May 7-8, 2011

"Derivative Actions in China," presentation to faculty at Fordham University Law School, New York, March 7, 2011

"Derivative Actions in China," presentation to faculty at Duke University Law School, Durham, March 3, 2011

Discussant, *Second Sino-American Dialogue on the Rule of Law and Human Rights*, sponsored by the National Council on US-China Relations and the China Foundation for Human Rights Development, Xiamen, Dec. 7-8, 2011

"Transnational Litigation Involving China," presentation at conference on *Law and Business inChina*, sponsored by the Faculty of Law and the Asian Studies Program of Pontificia Universidad Católica de Chile, Santiago, Nov. 25-26, 2010

"Understanding the Chinese Legal System: Searching for the Right Paradigm," invited lecture at University of Buenos Aires Faculty of Law, Buenos Aires, Nov. 22,2010

"Is Chinese Law Different?", invited lecture at Universidad Torcuato Di Tella Faculty of Law, Buenos Aires, Nov. 22, 2010

"Governance and China's Evolving Relationship with Its Citizens," panel presentation at *Economist* conference *China Summit: China and the New World Disorder*, Beijing, Nov. 3, 2010

"Derivative Actions in the People's Republic of China," presentation at conference on *The Prospect of Structural Reform of the Corporate Legal System*, sponsored by Tsinghua University Faculty of Law, Beijing, Oct. 30-31, 2010

"The Interface Between the Regulation of China's Internal Market and the Global Trading System," seminar presentation, Yale Law School, Oct. 5, 2010

"The Interface Between the Regulation of China's Internal Market and the Global Trading System," seminar presentation, Columbia Law School, New York, Sept. 28, 2010

Commentator at conference on *The Global Financial Crisis and China's Development*, sponsored by the University of Chicago Center in Beijing and Renmin University School of Economics, Beijing, July 30-31, 2010

"Local Experimentation in the Chinese Legislative System," paper presented at *China-US Rule of Law Dialogue*, sponsored by the China-US Exchange Foundation, Beijing, July 29-30, 2010

"Shareholder Derivative Suits in China," invited lecture, Hong Kong University Faculty of Law, Hong Kong, June 1, 2010

Panelist on "Business Law" panel at George Washington University Law School- Georgetown University Law Center conference *Six Decades of Asian Law: A Celebration of Professor Jerome Cohen*, Washington, D.C., February 19, 2010

"Lawyers and the State in China: Recent Developments," testimony at hearing on *Human Rights and Rule of Law in China*, Congressional-Executive Commission on China, Washington, D.C., October 7, 2009

"Trends in Comparative Corporate Law Scholarship," panel presentation at Association of American Law Schools Mid-Year Conference, Long Beach, California, June 9, 2009

"Who and What Matters in Chinese Stock Markets: Implications for Regulation," presentation at symposium *A New Era Dawns for Asian Capital Markets*, Asia Law Society, University of Michigan Law School, Ann Arbor, 21 March 2009

"The Concept of the Extra-Legal in Chinese Law," presentation at Global Law Workshop, George Washington University Law School, Washington, D.C., 23 February 2009

"Is Chinese Law Different?", lecture presented at United States Naval Academy, Annapolis, Maryland, 13 February 2009

"Does Chinese Law Matter?", presentation to United States Treasury Department, Washington, D.C., 12 February 2009

"The Concept of the Extra-Legal in Chinese Law and Its Significance," lecture presented at seminar *Are Politics Really in Command? China and the Rule of Law*, Norwegian Centre for Human Rights, China Programme, Oslo, 16 January 2009

"Private Enforcement of the Public Interest in China: Potential and Pitfalls," lecture presented at UCLA Center for Chinese Studies, Los Angeles, 24 November 2008

"The Ecology of Corporate Governance in China," presentation at UCLA School of Law Faculty Colloquium, Los Angeles, 14 November 2008

"Selfishness in the Public Interest? The 'Private Attorney-General' in China," lecture presented at School of International Relations and Pacific Studies, University of California at San Diego, 30 October 2008

"New Developments in Chinese Property Law," presentation at 2008 US-China Business Law Conference at UCLA, Los Angeles, 24 October 2008

"The Ecology of Corporate Governance in China," presentation at University of Illinois Law School Faculty Workshop, Champaign, Ill., 20 October 2008

"Delaware's Dysfunctional Derivative Suit Doctrine," lecture presented at Faculty of Law, Renmin University, Beijing, 11 June 2008 (in Chinese)

"Three Concepts of the Independent Director," paper presented at Contemporary Corporate Law Scholarship Reading Group (seminar course conducted by Prof. Jeffrey Gordon, Columbia Law School), 23 April 2008

"Chinese Corporate Governance in Global Context," lecture presented at Yale University, sponsored by Yale Working Group on Corporate Governance and Millstein Center for Corporate Governance and Performance, 22 April 2008

"Corporate Governance Institutions in China," presentation at New York University School of Law Faculty Workshop, 14 April 2008

Commentator at *Conference on Law, Commerce and Development*, New York University School of Law, New York, 12 April 2008

Discussant at panel on *New Dimensions in China Watching: Internet Forums and the Study of Contemporary China*, Association for Asian Studies Annual Meeting, Atlanta, 3 April 2008

"Chinese Corporate Governance: All Sizzle, No Steak?", roundtable presentation at Council on Foreign Relations, New York, 19 November 2007

"The Institutional Environment of Chinese Corporate Governance," lecture presented at China House series on *The Legal Infrastructure of New China*, New York University, New York, 14 November 2007

"Forum Non Conveniens Issues in China-Related Litigation," presentation at *Global Justice Forum*, Columbia Law School, New York, 2 November 2007

"The Ecology of Chinese Corporate Governance," presentation at Chinese Law Workshop, Yale Law School, New Haven, 29 October 2007

"Private Attorney-General Litigation in China," paper presented at conference on *Chinese Justice*, Fairbank Center for East Asian Research, Harvard University, 12 October 2007

"The Ecology of Chinese Corporate Governance," lecture delivered at Max Planck Institute, Hamburg, Germany, 30 July 2007

Discussant at panel on *Comparative Corporate Governance: Law in Context*, Law and Society Association Annual Meeting, Berlin, 26 July 2007

"The Ecology of Chinese Corporate Governance," paper presented at panel on *Law and Development: The China Consensus?*, Law and Society Association Annual Meeting, Berlin, 26 July 2007

"China: Creating a Legal System for a Market Economy," report delivered at symposium on *Development and Reform of China's Legal and Judicial System: Review and Prospect*, sponsored by the Asian Development Bank, Beijing, 14-15 May 2007

Commentator, conference on *China's Financial System Reforms and Governance*, School of Advanced International Studies, Johns Hopkins University, Washington DC, 16 April 2007

"Is Chinese Law Different?", public lecture sponsored by East Asian Studies Program, Princeton University, Princeton, New Jersey, 10 April 2007

"The Role of Law in China's Economic Development," public lecture sponsored by Department of Economics, Middlebury College, Middlebury, Vermont, 5 April 2007

Panelist, "The Academic Perspective and Recent Research," *OECD-China Policy Dialogue on Corporate Governance*, sponsored by the OECD, Shanghai Stock Exchange, State Assets Supervision and Administration Commission, Chinese Securities Regulatory Commission, Development Research Center, Government of Japan, Global Corporate Governance Forum, and Millstein Center for Corporate Governance and Performance at Yale School of Management, 29-30 March 2007

Public lecture, "The Ecology of Chinese Corporate Governance," sponsored by Asian Institute of International Financial Law, Faculty of Law, University of Hong Kong, 2 March 2007

"The Rule of Law in China," roundtable discussion (with Jerome A. Cohen), MITRE Corporation, Washington, DC, 2 February 2007

Guest lecturer, National Taiwan University Faculty of Law, "The Institutional Environment of Corporate Governance in China" (in Chinese), 22 December 2006

Guest lecturer, New York University Law School, "Chinese Constitutional Law", 14 November 2006

"The Institutional Environment of Corporate Governance in China", lecture presented as part of Clarke Program Colloquium Series, Cornell Law School, 3 November 2006

"The Role of Non-Legal Institutions in Chinese Corporate Governance", paper presented at authors' workshop on *A Decade After Crisis: The Transformation of Corporate Governance in East Asia* sponsored by the Center of Excellence Program in Soft Law at the University of Tokyo, the Center on Financial Law at Seoul National University, and the Center for Japanese Legal Studies at Columbia Law School, Tokyo, 1 October 2006

"The Institutional Environment of Chinese Corporate Governance", paper presented at panel on *Legal Aspects of the Economic Transformation in China*, annual conference of the International Society for New Institutional Economics, Boulder, Colorado, 23 September 2006

"Law and the Economy in China: The Past Decade", paper presented at authors' workshop on *Developments in Chinese Law: The Last Ten Years*, sponsored by *The China Quarterly* and All Souls College, Oxford University, Oxford, UK, 15 September 2006

"The Institutional Environment of Corporate Governance in China and Its Policy Implications", paper presented at conference on *Corporate Governance in East Asia: Culture, Psychology, Economics and Law*, Berkeley Center for Law, Business and the Economy, Boalt Hall School of Law, 5 May 2006

Guest lecturer, Yale Law School, "Recent Revisions to China's Securities Law", 4 April 2006

Commentator, Roundtable on "China's Emerging Financial Markets: Opportunities and Obstacles," Transactional Studies Program, Columbia Law School, New York, 19 January 2006

Speaker at Timothy A. Gelatt Memorial Dialog on Law and Development in Asia, New York University Law School, New York, 18 January 2006

Speaker and participant in workshop on administrative rule-making under China's new Securities Law, sponsored by the FIRST Initiative, the Finance and Economics Committee of the National People's Congress, and the World Bank, Beijing, 14-15 January 2006

Panelist, "The Globalization of American Law? Comparative Law and the New Legal Transplants", Section on Comparative Law, American Association of Law Schools annual meeting, Washington, DC, 5 January 2006

Panelist, "Improving the Fairness and Transparency of Judicial Decisions", conference on *Rule of Law Developments in China*, sponsored by the Bureau of Democracy, Human Rights, and Labor, Department of State, Washington, DC, 7 November 2005

Interviewed on BBC World Service on recent developments in death penalty procedures in China, 26 October 2005

"Lost in Translation: Legal Transplants in Chinese Corporate Law", Rowdget Young Visiting Fellow Lecture, University of Hong Kong Faculty of Law, Hong Kong, 4 June 2005

"The Independent Director in Chinese Corporate Governance", invited paper presented at 4th Asian Corporate Governance Conference, co-hosted by Asian Institute of Corporate Governance, Korea University and Center for Financial Law, Seoul National University, sponsored by World Bank Global Corporate Governance Forum, Seoul, 19-20 May 2005

"The Legacy of History in China's Legal System", paper presented at conference on *The Rule of Law: Chinese Law and Business*, Centre for Socio-Legal Studies, Oxford University, May 11-13, 2005

"The Emerging Private Sector and China's Legal System", paper presented at conference on *China's Economic and Sociopolitical Transformation: Measuring China's Emerging Private Sector and Its Impact*, Washington, DC, 22 April 2005

"How Do We Know When an Enterprise Exists? Unanswerable Questions and Legal Polycentricity in China", paper presented at conference on *New Scholarship in Chinese Law: A Celebration in Honor of Stanley Lubman*, Center for Chinese Legal Studies, Columbia Law School, New York, 15 April 2005

"Lost in Translation? Corporate Law in China", paper presented at conference on *Asia in a Globalizing World*, Center for East Asian and Pacific Studies, University of Illinois at Urbana-Champaign, 9 April 2005

Guest lecturer in course on "China and Globalization", Prof. Reuven Avi-Yonah, University of Michigan Law School, Ann Arbor, 1 April 2005

"Law, Institutions, and Property Rights", paper presented at conference on *China's Economy: Retrospect and Prospect*, Woodrow Wilson International Center for Scholars, Washington, DC, 2 March 2005

"Insider Trading Law in the United States and China", lecture presented in Chinese at East China University of Politics and Law, Shanghai, 25 November 2004

"Law, Property Rights, and Institutions" (with Peter Murrell and Susan Whiting), paper presented at conference on *China's Economic Transition: Origins, Mechanisms, and Consequences* (Part II), University of Pittsburgh, 5-7 November 2004

"The Independent Director in Chinese Corporate Governance", opening paper presented at conference on *Amendment of the Company Law* organized by the Legislative Affairs Office of the State Council, the China Securities Regulatory Commission, and the Shanghai Stock Exchange, 10 October 2004

"Insider Trading Law in the United States and China", talk presented to Shanghai Institute of Law and Economics, Beijing, 28 September 2004

"China's Proposed Bankruptcy Law", commentator at conference on *Legal and Financial Infrastructure Requirements for Residential Mortgage Securitization in China* organized by Beijing University School of Law, Center for Real Estate Law and Financial Law Institute, Beijing, 17 July 2004

"Does Law Matter in China?", talk presented at Global Business Center, University of Washington School of Business, 15 January 2004

"Why China Should Not Adopt United States Insider Trading Law", paper presented at conference on *Corporate Fraud and Governance: American and Chinese Perspectives* organized by Shanghai Jiaotong University and New York University School of Law, Shanghai, 16 December 2003

"Human Rights and Culture", paper presented at conference on *Sino-U.S. Human Rights Conference* organized by Georgetown University Law Center, Beijing, 14 December 2003

"The History of Corporate Governance in China", commentator at conference organized by Shanghai Institute of Law and Economics, Beijing, 15 November 2003

"Professional Ethics of Defense Lawyers", commentator at conference on *The Defense Functions of Lawyers and Judicial Justice* organized by the All-China Lawyers Association, the American Bar Association, Renmin University of China, and New York University School of Law, Beijing, 21 September 2003

"The Independent Director in Chinese Corporate Governance", lecture presented at Tsinghua University Faculty of Law, Beijing, 10 April 2003

"The Independent Director in Chinese Corporate Governance", paper presented to the School of Business and Management, Hong Kong University of Science and Technology, 7 March 2003

"Assessing the Value of Law in China's Economy" (with Peter Murrell and Susan Whiting), paper presented at conference on *China's Economic Transition: Origins, Mechanisms, and Consequences* (Part I), University of Toronto, 15-17 November 2002

"China's Entry into the WTO: Prospects for Compliance", paper presented at conference on *China's Accession to the World Trade Organization*, Georgetown University Law Center, 10 Oct. 2002

"How Do We Know When an Enterprise Exists? Unanswerable Questions and Legal Polycentricity in China", paper presented at conference on *The Reform of Corporate Law Under Global Competition*, Commercial Law Research Center of the Faculty of Law, Tsinghua University, Beijing, China, 15 Sept. 2002

"Zhongguo youdai fazhan duoyuanhua de jiandu jizhi" (China Has Yet to Develop a Multidimensional Monitoring Mechanism), *21 Shiji Jingji Baodao* (21st Century Economic Report), 19 Aug. 2002, p. 39, col. 1 (interview)

Testified before the Congressional-Executive Commission on China, Washington, D.C., on issues relating to China's compliance with its WTO commitments, 6 June 2002

"Business Regulation in the Bureaucratic State: Enterprise Law in China", paper presented at panel on *The Rule of Law and Enterprise Reform in China*, Association for Asian Studies annual meeting, 5 April 2002

"What WTO Accession Does *Not* Mean for China", paper presented at panel on *WTO and the International Rule of Law*, American Society of International Law annual meeting, 15 March 2002

Testified before United States-China Security Review Commission, Washington, DC, on issues relating to China's WTO accession, 18 Jan. 2002

"The Independent Director in Chinese Corporate Governance", paper presented at conference on "Protection of Investors' Interests: International Experience and Chinese Practice", Commercial Law Research Center of the Faculty of Law, Tsinghua University, Beijing, China, 18-19 November 2001

"Economic Development and the Rights Hypothesis: The China Problem", paper presented at conference on *Law Reform in Developing and Transitional Economies*, Ulaanbaatar, Mongolia, 2-3 July 2001

Interviewed for feature entitled "Detained in China", broadcast on PBS, *The News Hour with Jim Lehrer*, 18 May 2001 <http://www.pbs.org/newshour/bb/asia/jan-june01/detained_05-18.html>

"Empirical Research in Chinese Law," paper presented to Rule of Law Workshop, Stanford Law School, 18 April 2001

"Transparency in China's Regulation of International Trade," presentation made to audiences from Chinese government, business, and academia in Beijing and Shanghai as part of 5-member United States government mission, 13-25 March 2000

"Courts and Markets in Post-Socialist Transition: China," paper presented at workshop on *Courts and Markets in Post-Socialist Transition*, University of Wisconsin School of Law, 3 March 2000

"Incentives and the Top-Down Model of Regulation in Chinese Land Law," paper presented (in Chinese) at *International Conference on the Legal Framework for Rural Land Use Rights in China*, China Institute for Reform and Development, Haikou, Hainan Province, China, 12-14 January 2000

"Corporate Governance in China," paper presented to members of Project on Corporate Governance in China, Stanford University, Stanford, California, 29 October 1999

"Alternative Approaches to Chinese Law," lecture delivered at UCLA School of Law, Los Angeles, 28 October 1999

Panelist on "Rule of Law in China – Recent Developments and Prospects," Inaugural Session of Global Business Briefing Series, Pacific Council on International Relations, Los Angeles, 28 October 1999

"Misunderstanding Chinese Law: The Lure of the 'Rule of Law' Paradigm," lecture delivered at Faculty of Law, City University of Hong Kong, 27 September1999

Guest lecturer, Chinese administrative law class of Prof. Wang Xixin, Beijing University Faculty of Law, Beijing, China, 23 September 1999

"Bankruptcy in Capitalist and Reforming Socialist Economies," brief course taught to delegation of North Korean legal officials and academics at Beijing University, Beijing, China, 20-23 September 1999

"Misunderstanding Chinese Law: The Lure of the 'Rule of Law' Paradigm," lecture delivered at Faculty of Law, Waseda University, Tokyo, Japan, 23 June 1999

"The Enforcement of Civil Judgments in China," lecture delivered at Faculty of Law, Waseda University, Tokyo, Japan, 19 June 1999

"China's Revised Criminal Law," paper presented at conference on *Contemporary Chinese Legal Development*, sponsored by Chinese Law Society of America, Harvard Law School, Cambridge, Mass., 26-27 March 1999

"Alternative Approaches to Chinese Law," lecture delivered at Yale Law School, 25 March 1999

Commentator, conference on *Administrative Law Reform in China*, sponsored by UCLA Center for Chinese Studies, International Studies & Overseas Programs, UCLA School of Law and Southern California China Colloquium, Los Angeles, 6 March 1999

Participant, *U.S.-China Symposium on the Legal Protection of Human Rights*, The Aspen Institute, 11-13 December 1998

"Private Enforcement of Intellectual Property Rights," paper presented at *Sino-U.S. Conference on Intellectual Property Rights and Economic Development: 1998 Chongqing*, sponsored by the National Bureau of Asian Research, Chongqing, China, 16-18 September 1998

Commentator, conference on *Law and Development in Asia*, co-sponsored by Asian Development Bank and Harvard University, Council on Foreign Relations, New York, 21 May 1998

"Introduction to U.S. Capital Markets for Chinese Enterprises," speech (in Chinese) presented at Investment Promotion Forum sponsored by United Nations Industrial Development Organization, Beijing, 31 March 1998

"Legal Order as a Prerequisite for Cooperation: The China Problem," paper presented at *Inaugural University of California at San Diego Social Sciences Research Conference on Cooperation Under Difficult Conditions*, Graduate School of International Relations and Pacific Studies, 18 October 1997

"Recent Developments in Criminal and Administrative Punishments in China," paper presented at University of Washington School of Law Conference on Asian Law, Seattle, Washington, 3 August 1996

"Enforcement of International Awards Involving China and Hong Kong," paper presented at EuroForum conference on *Dispute Resolution in China and Hong Kong*, London, 31 May 1996

"China and the WTO," paper presented at American Conference Institute conference on *Doing Business in China and Hong Kong*, New York, 10 May 1996

"Recent Developments in Chinese Foreign Investment Law," talk presented at conference on *Trade and Investment in Emerging Markets: China and India*, New York University School of Law, 17 November 1995

Commentator on China at *Timothy A. Gelatt Dialogue on Law and Development in Asia*, New York University School of Law, 14 September 1995

"Round Pegs and Square Holes: China and the GATT," paper presented at panel on *China in the World Economic Order* at the annual meeting of the Association for Asian Studies, Washington, DC, April 1995

"Civil Rights in China," talk delivered to Civil Rights Committee of the Seattle-King County Bar Association, Seattle, March 1995

"Foreign Business Law and China's Application to the GATT/WTO," paper presented at 1990 Institute Conference on Chinese Foreign Trade and Investment Law, San Francisco, March 1995

"China and the GATT/WTO," talk delivered to the World Affairs Club, Juneau, Alaska, March 1995

"The Chinese Court System," paper presented at *Winter Workshop on East Asian Law*, Center for Pacific Rim Studies, University of California at Los Angeles, January 1995

"Enforcement of Civil Judgments in a Changing Society: A Chinese Example," paper presented at annual meeting of the Law and Society Association, Phoenix, Arizona, 17 June 1994

"The Enforcement of Civil and Economic Judgments in China," paper presented at symposium on *The Chinese Legal System*, sponsored by the China Quarterly and the School of Oriental and African Studies, University of London, London, U.K., 10-12 May 1994

"GATT Membership for China?," paper presented at symposium on *Pacific Rim Trade*, University of Puget Sound School of Law, Washington, 5 November 1993

"The Creation of a Legal Structure for Market Institutions in China," paper presented at conference on *The Evolution of Market Institutions in Transition Economies*, Graduate School of International Relations and Pacific Studies, University of California, San Diego, 14-15 May 1993

Chair/discussant at panel on "Theoretical Perspectives in China's Legal Reform," conference on *Chinese Law -- A Re-Examination of the Field: Theoretical and Methodological Approaches to the Study of Chinese Law*, Faculty of Law, University of British Columbia, Vancouver, 22 March 1993

"Research Methodologies in Chinese Law," paper presented at conference on *Chinese Law -- A Re-Examination of the Field: Theoretical and Methodological Approaches to the Study of Chinese Law*, Faculty of Law, University of British Columbia, Vancouver, 22 March 1993

"Enforcement of Civil Judgments in China," talk delivered at *China Studies Seminar*, University of British Columbia, October 1992

Discussant at conference on *The Modernization of Chinese Law on Both Sides of the Taiwan Straits*, National Taiwan University College of Law, September 1992

"Enforcement of Civil Judgments in the People's Republic of China: Notes from the Field," talk delivered at Attorney-General's Chambers, Hong Kong, August 1992

"Dispute Resolution in China," talk delivered at Chinese University of Hong Kong, November 1991

Interviewed on modern Chinese law for program on East Asian legal systems broadcast by BBC World Service (London), September 1991

Discussant at panel on *New Perspectives on Chinese Economic Development*, Western Economic Association Annual Conference, Seattle, 30 June-3 July 1991

"The Trials of the June 4th Defendants," talk delivered at *East Asian Legal Studies Lunchtime Colloquium*, Harvard Law School, 22 March 1991

"What's Law Got to Do with It?  Legal Institutions and Economic Reform in China," talk delivered at *East Asian Legal Studies Workshop*, Harvard Law School, 21 March 1991

Guest lecturer, Chinese law class of Prof. William C. Jones, Washington University School of Law, St. Louis, Missouri, 30 January 1991

"Legal Problems of Industrial Economic Reform in China," talk delivered to *Faculty Forum*, Washington University School of Law, St. Louis, Missouri, 30 January 1991

Speaker and panel chairman, "Chinese Business Law," at *China Trade Update: Doing Business with China in the 1990s*, conference sponsored by the Washington State China Relations Council, Seattle, Washington, 5 November 1990

"The Future of Democracy in China," panel discussion sponsored by the Council of International Organizations, Citizens International Center, Seattle, Washington, 21 April 1990

"Why Laws Fail: Central Legislation and the Structure of the Chinese Polity," paper delivered at *Winter Workshop on East Asian Law*, Center for Pacific Rim Studies, University of California at Los Angeles, 20 January 1990

"The Legal Background to the Behavior of State-Owned Enterprises," paper delivered at conference on *Ownership Reforms and Efficiency of State-Owned Enterprises* sponsored by the Institute of Economics of the Chinese Academy of Social Sciences and the Ford Foundation, Shenzhen, China, 6 January 1990

"Implications of Recent Events in China for Sino-U.S. Relations," panel discussion sponsored by U.S.-China People's Friendship Association and the East Asian Resource Centre, University of Washington, 11 July 1989

"Law and Economic Reform in China," *London China Seminar*, School of Oriental and African Studies, University of London, 19 May 1988

"Urban Enterprises and the Role of Law in China's Economic Reforms," Conference on *The Chinese Developmental State: Change and Continuum*, Institute of Development Studies, University of Sussex, 7-9 April 1988

Interviewed for feature entitled "How is China Run?", broadcast on BBC World Service, *The World Today*, 25 March 1988

"The 13th Congress of the Chinese Communist Party and China's Legal Reforms," Asian Studies Centre, St. Antony's College, Oxford University, 8 March 1988

"Chinese Economic and Legal Reforms," John F. Kennedy School of Government, Harvard University, 24 March 1987

Co-organizer and discussant, Conference on *China: Law and Trade 1986*, School of Oriental & African Studies, University of London, 30 June 1986

"The Role of Law in Modern China," Great Britain China Centre, London, 17 April 1986

"The Foreign Economic Contract Law," Law-China Society Seminar on China's Economic Laws, London, 17 April 1986

# APPENDIX B

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

IN RE: CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION,

THIS DOCUMENT RELATES TO:

*ALL INDIRECT PURCHASER ACTIONS*

Case No. 3:07-cv-05944-JST

MDL No. 1917

# EXPERT REPORT OF DONALD CLARKE

## March 16, 2022

1. I have been retained by defendants Irico Group Corp. and Irico Display Devices Co., Ltd. ("Irico") in the current action to provide an opinion about a pricing regulatory framework in China involving color cathode ray tubes ("CRT") and color televisions ("TV") and certain documents related thereto.

2. I am currently a Professor of Law and the David A. Weaver Research Professor at the George Washington University Law School. From 1988 through 2004, I was on the faculty of the University of Washington School of Law ("UWLS"), and I have been a visiting professor at New York University Law School, University of California at Los Angeles School of Law, and Duke Law School. From 1995 to 1998, I was on a leave of absence from UWLS and worked as an attorney at Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss"), a large United States law firm with a substantial China business practice. During that period, I visited China and Hong Kong approximately twice a year in the course of my work, a substantial amount of which was related to China. From 1998 through 2003, I regularly worked with Paul, Weiss as a consultant on Chinese law matters. Since that time I have maintained an independent consulting practice.

3. I have published widely in the field of Chinese law; a full copy of my curriculum vitae including a list of publications is attached hereto as Appendix 1. I am fluent in Mandarin Chinese (speaking, reading, and writing). I am being compensated for my work at my customary hourly rate of $1,050 per hour. This compensation is in no way connected to the outcome of this litigation.

4. I graduated *cum laude* from Harvard Law School in 1987, where my studies focused on East Asian legal systems and I served as an editor of the *Harvard Law Review*. I earned a graduate degree (M.Sc. with Honours) in the Government and Politics of China from the School of Oriental and African Studies at the University of London in 1983. I also studied Chinese history for two years at Beijing University and Nanjing University in China from 1977 to 1979. I earned my undergraduate degree from Princeton University in 1977.

5. I have served as adviser or consultant on Chinese law matters to a number of bodies, including the Asian Development Bank, the Agency for International Development, and the World Bank's Financial Sector Reform and Strengthening Initiative. I have testified on aspects of the Chinese legal system before the Congressional-Executive Commission on China and the United States-China Economic and Security Review Commission. In 2005, I was appointed to the Academic Advisory Group to the US-China Working Group of the United States Congress. I was admitted to practice in the State of New York in 1988, and am a member of the Council on Foreign Relations.

6. I have been asked to provide an opinion on the following matters:

   a. Whether the following documents attached to this report (the "Pricing Documents") are genuine and authentic:[1]

---

[1] In order to avoid confusion, the document names in English in this list are exactly as they appear in the translations by Park IP Translations with which Irico's counsel has supplied me and which will be before the court, even if I might have translated them somewhat differently myself.

i.  Notification of the State Planning Commission and the State Economic and Trade Commission regarding Issuing "Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products" and Strengthening Price Self-Discipline of Industries (国家计委、国家经贸委关于发布《关于制止低价倾销工业品的不正当价格行为的规定》和加强行业价格自律的通知), issued Nov. 16, 1998, effective Nov. 25, 1998 (the "1998 Notice," attached as Appendix 2);

ii.  Notification of Reporting Cost Information for Color TV and Color CRT Industry (关于报送彩电、彩管行业成本资料的通知), Feb. 3, 1999 (the "1999 Reporting Notice," attached as Appendix 3);

iii.  Circular of the State Development Planning Commission on Issuing the Measures for Determining the Cost of Low-price Dumped Industrial Products (Trial) (国家计委关于印发《低价倾销工业品的成本认定办法（试行）》的通知), issued Feb. 23, 1999, effective March 1, 1999 (the "March 1999 Circular," attached as Appendix 4);

iv.  Notification that the State Planning Commission and the Ministry of Information Industry print and distribute Trial Measures to Prevent Unfair Price Competition Regarding Color CRTs and Color TVs (国家计委、信息产业部印发关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法的通知), issued March 15, 1999, effective April 1, 1999 (the "April 1999 Notice," attached as Appendix 5, with an additional copy attached as pages IRI-CRT-00031461 through IRI-CRT-00031464 of Appendix 6[2]);

v.  Notification of Publishing Industrial Average Production Costs for Some Types of Color CRTs and Color TVs (关于发布彩色显像管、彩色电视机部分品种行业平均生产成本的通知), April 2, 1999 (the "April 1999 Cost Notification," attached as Appendix 7, with an additional copy attached as pages IRI-CRT-00031466 through IRI-CRT-00031467 of Appendix 6);

vi.  Notification of Publishing Industrial Average Production Costs for Some Types of Color TVs (关于发布彩色电视机部分品种行业平均生产成本的通知), Aug. 25, 2000 (the "August 2000 Cost Notification," attached as Appendix 8);

vii.  Notification of Publishing Industrial Average Production Costs for Some Types of Color CRTs (关于发布彩色显像管部分品种行业平均生产成本的通知), Sept. 13, 2000 (the "September 2000 Cost Notification," attached as Appendix 9).

---

[2] Appendix 6, which I understand to be produced from Irico's files, appears to be a bound copy of the April 1999 Notice and April 1999 Cost Notification, combined with various cover pages, routing slips, and a newspaper clipping.

   b.  The legal status of the regulatory framework constituted by the Pricing Documents.

7.  My conclusions, as set forth in more detail below, are as follows:

   a.  Based on details below regarding the origin of some of the Pricing Documents, I believe the Pricing Documents to be genuine and authentic.

   b.  The regulatory framework constituted by the Pricing Documents has the status of enforceable law in the Chinese legal system.

## Authenticity of the Pricing Documents

8.  In order to verify the authenticity of the Pricing Documents, I independently searched available online resources, including Chinese government websites and Chinese publications. I also reviewed the documents themselves for indicia of reliability based on my knowledge of and experience with Chinese laws and regulations.

9.  In terms of content and structure, the Pricing Documents are similar to many documents of a similar nature that I have seen over the course of my studies of Chinese law.

10. Unlike regulations issued by the U.S. federal government, regulatory frameworks implemented by Chinese government ministries are not always regularly published or codified in an official legal code or register. The State Council, the institution at the apex of what may loosely be analogized to China's executive branch of government, issues a publication called the State Council Gazette many times a year. The State Council Gazette publishes some (but not all) documents issued by the State Council itself, including regulations of various kinds, and some (but not all) documents issued by ministries and equivalent-level bodies under the State Council, also including regulations of various kinds. The ministries and equivalent-level bodies typically do not have this kind of regular publication. To the best of my knowledge the State Planning Commission and its successor bodies have never had such a publication.

11. An example of the unsystematic nature of publication can be seen in the fact that whereas the 1998 Notice of the State Planning Commission was, as discussed below, published in the State Council Gazette, other documents relating to the same regulatory framework issued by the State Planning Commission or its successors were not, even though they can be found on some other official government websites.

12. For the specific reasons explained below, I conclude that the Pricing Documents are genuine and authentic:

   a.  The 1998 Notice: I was able to independently confirm the existence of this document by finding it in the State Council Gazette.[3] It is also posted on the official website of the Development and Reform Commission of Guangdong Province in China, a regional arm of the National Development and Reform Commission,[4] which is the successor agency to the State Planning Commission

---

[3] STATE COUNCIL GAZETTE (国务院公报), No. 3, 1999 (Feb. 26, 1999), at 83, http://www.gov.cn/gongbao/shuju/1999/gwyb199903.pdf [https://perma.cc/H4UP-GJQH].

[4] http://drc.gd.gov.cn/gfxwj5633/content/post_861015.html [https://perma.cc/UD5E-GS8T].

that jointly issued the 1998 Notice.  The content of the 1998 Notice found in the State Council Gazette and on the official website of the Development and Reform Commission of Guangdong Province appears identical to that of the notice attached as Appendix 2.

b.  <u>The 1999 Reporting Notice</u>: I have not been able to independently procure a copy of this document on my own; the copy attached as Appendix 3 has been supplied to me by Irico's counsel. It appears to me to be genuine, based on its appearance, format, and content, which is consistent with other Chinese ministry regulations I have seen in the past. I also note that the 1999 Reporting Notice bears a seal labeled "Electronic Industry Archives" along with a copy number (2017049). I am informed by counsel that this document is a certified copy obtained from the Electronic Industry Archives maintained by the Chinese Ministry of Industry and Information Technology in Beijing, China.[5] Assuming that to be true, I believe the document to be a genuine and authentic copy of a notification issued by the Ministry of Information Industry.

c.  <u>The March 1999 Circular</u>: I was able to independently confirm the existence of this document by finding it on the official website of the Development and Reform Commission of Guangdong Province in China.[6]  The content of the March 1999 Circular found on the official website of the Development and Reform Commission of Guangdong Province appears identical to that of the notice attached as Appendix 4.

d.  <u>The April 1999 Notice</u>: I was able to independently confirm the existence of this document by finding it on the official website of the Development and Reform Commission of Guangdong Province in China.[7]  The content of the April 1999 Notice found on the official website of the Development and Reform Commission of Guangdong Province appears identical to that of the notice attached as Appendix 5, as well as the copy produced from Irico's files, bearing the Bates stamp IRI-CRT-00031457 *et seq.* and attached as Appendix 6, at pages IRI-CRT-00031461 through IRI-CRT-00031464.

e.  <u>The April 1999 Cost Notification</u>: I was not able to find a copy of the complete text of this document independently of the copies supplied to me by Irico's counsel. The copy produced from Irico's files bearing the Bates stamp IRI-CRT-00031457 *et seq.* and attached as Appendix 6 includes at IRI-CRT-00031459 a photocopy of what purports to be a newspaper clipping reproducing the text of the April 1999 Cost Notification from page 1 of the April 13, 1999 issue of a Chinese industry newspaper called the China Electronics News (中国电子报). It was a common practice for Chinese government ministries to publish rules in national newspapers, and to do so in an industry newspaper would be quite normal. Therefore, the presence of a contemporaneous newspaper clipping tends to

---

[5] The Ministry of Industry and Information Technology is the successor ministry to the Ministry of Information Industry, which originally issued the 1999 Reporting Notice.

[6] http://drc.gd.gov.cn/gfxwj5633/content/post_861460.html [https://perma.cc/7GT2-XEAE].

[7] http://drc.gd.gov.cn/gfxwj5633/content/post_861921.html [https://perma.cc/KER3-PFPL].

confirm the authenticity of the April 1999 Cost Notification. What purports to be a photocopy of The April 1999 Cost Notification also appears in Irico's files at IRI-CRT-00031466 through IRI-CRT00031467. An additional copy of this document, attached as Appendix 7, bears a seal labeled "Electronic Industry Archives" along with a copy number (2017048). I am informed by counsel that this document is a certified copy obtained from the Electronic Industry Archives maintained by the Ministry of Industry and Information Technology in Beijing, China. Assuming that to be true, I believe the document to be a genuine and authentic copy of a notification issued by the Ministry of Information Industry.

f.  The August 2000 Cost Notification: I have not been able to independently procure a copy of this document on my own; the copy attached as Appendix 8 has been supplied to me by Irico's counsel. It appears to me to be genuine, based on its appearance, format, and content, which is consistent with other Chinese ministry regulations I have seen in the past. I also note that the August 2000 Cost Notification bears a seal labeled "Electronic Industry Archives" along with a copy number (2017053). I am informed by counsel that this document is a certified copy obtained from the Electronic Industry Archives maintained by the Chinese Ministry of Industry and Information Technology in Beijing, China. Assuming that to be true, I believe the document to be a genuine and authentic copy of a notification issued by the Ministry of Information Industry.

g.  The September 2000 Cost Notification: I have not been able to independently procure a copy of this document on my own; the copy attached as Appendix 9 has been supplied to me by Irico's counsel. It appears to me to be genuine, based on its appearance, format, and content, which is consistent with other Chinese ministry regulations I have seen in the past. I also note that the September 2000 Cost Notification bears a seal labeled "Electronic Industry Archives" along with a copy number (2017052). I am informed by counsel that this document is a certified copy obtained from the Electronic Industry Archives maintained by the Chinese Ministry of Industry and Information Technology in Beijing, China. Assuming that to be true, I believe the document to be a genuine and authentic copy of a notification issued by the Ministry of Information Industry.

## Legal Status of Regulatory Framework

13. The regulatory framework set out in the Pricing Documents can be summarized as follows: Producers are required to submit information about costs to the regulator. The regulator then issues a document containing minimum prices. The producers may not price below those minima. If they do, they are subject to a variety of sanctions, ranging from warnings to fines to the loss of their business license.

14. In my opinion, as explained in more detail below, the regulatory framework set out in the Pricing Documents has the status of law in the Chinese legal system, and was binding and enforceable on producers in China.

15. China's highest legislative authorities are the National People's Congress (the "NPC") and its Standing Committee (the "NPCSC"). China's Law Against Unfair Competition, passed in 1993, prohibits pricing below cost (i.e., dumping) in order to gain competitive

advantage.[8] China's Price Law, passed in 1997 (the "Price Law"), similarly prohibits (in Article 14) "dumping commodities at prices lower than production cost in order to drive out rivals or monopolize the market[.]"[9] It further provides:

> Any operator who commits any of the acts listed in Article 14 of this Law shall be ordered to make amends and his illegal gains shall be confiscated; he may also be fined not more than five times his illegal gains; if he has no illegal gains, he shall be given a disciplinary warning and may also be fined; if the circumstances are serious, he shall be ordered to suspend business for rectification, or his business license shall be revoked by the administrative department for industry and commerce.[10]

16. The 1998 Notice contains the "Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products" (the "1998 Regulations") issued jointly by the State Planning Commission and the State Economic and Trade Commission. Both these commissions are roughly equivalent to ministries under the State Council, the highest executive body in China's central government, but have a slightly higher bureaucratic rank than ordinary ministries. The State Planning Commission, which has subsequently undergone some name changes, was authoritatively described in 2009 as follows: "Most famously, the planning commission remains a powerful agency in China 30 years after the start of market reform, where it is 'first among equals' among the super-ministries."[11]

17. The State Planning Commission and other relevant departments under the State Council have authority under Articles 5, 33, and 34 of the Price Law to implement its provisions.

18. Article 5 of the 1998 Regulations sets forth a variety of "unfair price actions" in the nature of dumping (*i.e.*, selling below cost) that are specifically prohibited. Article 9 requires manufacturers to set prices at a level that reflects costs plus a reasonable profit. Article 10 states that anyone may report below-cost pricing, and that the competent government department—in this case, the State Planning Commission, which had jurisdiction over pricing—shall then investigate. Article 11 states that the producer being investigated must cooperate by supplying information. Article 12 states that when a producer is found to have committed one of the "unfair price actions" listed in Article 5, the competent government department shall order the producer to correct its actions and may in addition impose one or more of the following punishments: (1) warning, (2) fine, (3) suspension of business for a period of rectification, and (4) loss of business license (if approved by the State Administration of Industry and Commerce).

---

[8] Law Against Unfair Competition (反不正当竞争法), passed by National People's Congress Standing Committee Sept. 2, 1993, effective Dec. 1, 1993, art. 11, https://perma.cc/92AU-43SW (in Chinese).

[9] Price Law (价格法), passed by National People's Congress Standing Committee Dec. 29, 1997, effective May 1, 1998, art. 14(2), https://perma.cc/Y58D-U6A5 (in Chinese).

[10] *Id.*, art. 40.

[11] Christine Wong, *Rebuilding Government for the 21st Century: Can China Incrementally Reform the Public Sector?*, 2009 CHINA QUARTERLY (no. 200) 929, 934 n.9.

19. Article 14 of the 1998 Regulations states that trade associations are directed to urge their member producers to implement the 1998 Regulations.

20. The March 1999 Circular contains the "Measures for Determining the Cost of Low-price Dumped Industrial Products (Trial)" (the "Trial Measures") issued by the State Planning Commission. The Trial Measures set forth procedures for determining production costs in order to determine whether a product is being sold for below cost (*i.e.*, dumped). Article 9(2) states that the investigation may be carried out by a government department or by a trade association, among others.

21. The April 1999 Notice contains the "Trial Measures to Prevent Unfair Price Competition Regarding Color CRTs and Color TVs" (the "Trial CRT Measures") issued jointly by the State Planning Commission and the Ministry of Information Industry (the "MII"). The Trial CRT Measures may be viewed as a specific implementation within the color CRT and color TV industry of the 1998 Regulations.

22. Article 5 of the Trial CRT Measures provides that the MII shall regularly publish average production costs of the main sizes and types of color CRTs and color TVs, and Article 6 provides that ex-factory prices shall not in principle be lower than those average production costs. The Trial CRT Measures apply by their own terms to ex-factory prices of "[a]ny business operator engaging in production and sales of color CRTs and color TVs within the People's Republic of China" (Article 2). The Trial CRT Measures also provide for the reporting, investigation, and punishment of violators.

23. The sanctions prescribed for violations of the Trial CRT Measures are all explicitly authorized by China's 1998 Law on Administrative Punishments.[12]

24. The April 1999, August 2000, and September 2000 Cost Notifications each contain charts of average CRT and/or color TV production costs that appear to have been published under the process described in Article 5 of the Trial CRT Measures, implementing the minimum prices for CRTs and color TVs contemplated under the regulatory framework.

25. The issuers and enforcers of the Pricing Documents—the State Planning Commission, the State Economic and Trade Commission, the State Administration of Industry and Commerce, and the Ministry of Information Industry—are or were at the time government departments directly under the State Council, and possessed of appropriate authority in China's legal system to create and enforce the regulatory framework set forth in the Pricing Documents.

Donald Clarke

March 16, 2022

---

[12] Law on Administrative Punishments (行政处罚法), passed by the National People's Congress March 17, 1996, effective Oct. 1, 1996, art. 8, https://perma.cc/7PHV-2RN3 (in Chinese).

# APPENDIX 2

# EXHIBIT A



December 20, 2017

**Certification**

       **Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of: 国家计委、国家经贸委关于发布《关于制止低价倾销工业品的不正当价格行为的规定》和加强行业价格自律的通知

Hanna Kang

Project Manager

Project Number: BBLLP_1712_051

15 W. 37th Street 8th Floor
New York, NY 10018
212.581.8870
ParkIP.com

Notification of the State Planning Commission and the State Economic and Trade Commission regarding Issuing Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products and Strengthening Price Self-Discipline of Industries

Date: November 16, 1998 Source:

Bureau of Commodity Prices (Councils) of all provinces, autonomous regions, municipalities directly under the Central Government, and municipalities with independent planning status, the State Economic and Trade Commission, the Ministry of Information Industry, the Bureau of Domestic Trade, the State Administration of Metallurgical Industry, the State Administration of Building Materials, the State Administration of Nonferrous Metal Industry, the State Administration of Petrochemical Industry, the State Administration of Machinery Industry, the State Administration of Coal Industry, the State Administration of Textile Industry, and the State Administration of Light Industry,

To prevent unfair price actions through dumping, to protect fair, open and legitimate market competition, to maintain a normal price order, and to safeguard legitimate rights and interests of business operators and consumers, the State Planning Commission and the State Economic and Trade Commission formulated the Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products (hereinafter the "Regulations") pursuant to the Price Law of the People's Republic of China and related laws and regulations of the state. The Regulations are hereby promulgated, and related issues are notified as follows:

1. The Regulations are important measures taken by the state to regulate prices on the market of industrial products and important rules to prevent dumping of industrial products, which have legal effect. The promulgation and implementation of the Regulations will have an important impact on maintaining normal production and operation orders of industrial enterprises, promoting a healthy development of the entire industry, and forming a good environment of competition. All places must seriously implement the Regulations, prevent dumping according to the law, standardize the market order, and standardize price behaviors of enterprises.

2. Relevant state agencies in charge of industries may study and propose industrial average production costs pursuant to Article 8 of the Regulations and related product dumping situations, which will be published regularly to the society upon approval by the State Planning Commission to act as an alert level for price self-discipline by enterprises, to restrict pricing actions of enterprises, and to prevent dumping by enterprises. For industrial products with prices decided by the government or prices under the guidance by the government, prices stipulated by the government must still be strictly implemented.

3. Competent departments in charge of prices at all levels must strengthen monitoring and inspection on implementation of the Regulations, seriously accept and process reported cases, and investigate and punish, strictly according to laws and regulations, dumping actions. Any actions involving those under Article 5 of the Regulations shall be investigated and punished as dumping actions according to the law.

4. Industrial organizations must accept work guidance from competent government departments in charge of prices, urge and guide enterprises to seriously implement the Regulations, help competent departments in charge of the industries measure and determine industrial average costs, promptly gather and summarize industrial cost and price information, and proactively play the role of industrial organizations in preventing dumping, organizing enterprises to perform price self-discipline, and coordinating relations between enterprises.

5. All regions and all related departments must organize manufacturing enterprises and marketing enterprises to seriously study the Regulations and consciously implement the Regulations. Prices of products sold by a manufacturing enterprise shall not be lower than industrial average production costs in principle, and the sales prices of a marketing enterprise shall not be lower than its purchasing costs. All manufacturing and marketing enterprises must promptly report on actions that violate the Regulations and constitute dumping actions, proactively cooperate with competent government departments in charge of prices in price monitoring and inspection, and practically prevent dumping actions.

Any situation or issue occurred during implementation of the Regulations will be coordinated by the State Planning Commission and the State Economic and Trade Commission according their respective scope of responsibilities.

Attachment: Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products Attachment:

Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products

Article 1 To prevent unfair price actions through dumping, to protect fair, open and legitimate market competition, to maintain a normal price order, to protect the national interest, and to safeguard legitimate rights and interests of business operators and consumers, the Regulations are hereby formulated pursuant to the Price Law of the People's Republic of China (hereinafter the "Price Law") and other related laws of the state.

Article 2 The Regulations are applicable to industrial products with prices subject to the market.

Article 3 Any business operator engaging in production and sales of industrial products within the People's Republic of China shall implement the Regulations.

Article 4 The unfair price actions through dumping of industrial products herein refer to actions of a business operator to expel competitors or monopolize the market, such as a production enterprise sells industrial products at prices lower than the enterprise's production costs or a marketing enterprise sells industrial products at prices lower than the enterprise's purchasing costs, which disrupt normal production and operation orders and harm the national interest or legitimate rights and interests of other business operators. A production enterprise's production cost refers to the entire cost in a current month that the enterprise produces an industrial product, including manufacturing cost and to-be-allocated management expenses, financial expenses and sales expenses; a marketing enterprise's purchasing cost includes the purchasing cost in a current month and related shipment and miscellaneous expenses when the marketing enterprise carries an industrial product.

Article 5 The following actions are unfair price actions:

(I) Ex-factory prices of industrial products sold by a manufacturing enterprise are lower than its production costs, and sales prices of a marketing enterprise are lower than its purchasing costs;

(II) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by means of disguised price decreases, such as using high grade and high level products as low grade and low level products;

(III) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by means of discounts, subsidies, and the like. Means of discounts, subsidies, and the like include: (1) direct discounts to sales prices, (2) cash discount and price discount for prices at an interest higher than bank loan interests in the same period according to time length and amount of customer prepayments, (3) different price discounts offered to customers in different sales seasons for non-seasonal products, and (4) freight subsidies in certain amount for all or a part of shipping and miscellaneous expenses of customers;

(IV) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by means of unequal exchanges of goods and materials;

(V) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by means of using goods and materials to pay back debts other than bankruptcy according to the law;

(VI) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by means of issuing invoices in amounts less than those of shipping goods or not issuing invoices;

(VII) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by means of disguised price decreases, such as providing extra quantities, bulk discounts, and the like;

(VIII) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by other means.

Article 6 The following two situations are not treated dumping actions:

(I) A manufacturing enterprise or a marketing enterprise lowers prices of seasonal industrial products and overstocked industrial products to below costs pursuant to Article 14, Paragraph 2 of the Price Law;

(II) Due to relatively high costs, a manufacturing enterprise or a marketing enterprise sells industrial products at prices lower than the enterprise's costs but not lower than the industrial average costs, and without harming the national interest or legitimate rights and interests of other business operators.

Article 7 When a manufacturing enterprise or a marketing enterprise lowers prices of seasonal industrial products and overstocked industrial products for sales pursuant to Article 14, Paragraph 2 of the Price Law, the prices must be clearly labelled according to the stipulated items.

Article 8 According to dumping situations in an industry, a state competent department in charge of the industry may send a proposal to the competent department of the State Council in charge of prices that industrial average costs need to be published, and as entrusted by the competent department of the State Council in charge of prices, measures, determines, and regularly publishes industrial average costs thereof.

Article 9 Manufacturing enterprises or marketing enterprises shall use costs plus reasonable profits as a goal when deciding prices of industrial products and participate in market competition with open, fair and legitimate prices. Ex-factory prices of a manufacturing enterprise shall not be lower than the industrial average production costs in principle; and sales prices of industrial products sold by a marketing enterprise shall not be lower than normal purchasing costs. Manufacturing enterprises or marketing enterprises shall decide specific prices by following the principle of pricing according quality and according to standards, specifications and levels of industrial products promulgated by the state, and prohibit sales by mixing grades or selling as gradeless goods.

Article 10 In the case where a manufacturing enterprise sells industrial products at prices lower than industrial average production costs or a marketing enterprise sells industrial products at prices lower than purchasing costs to disrupt the production and operation orders and harm rights and interests of other business operators, any organization or individual may report the case to a competent government department in charge of prices above the provincial level, and the competent government department in charge of prices may conduct investigation into the case to determine whether those are indeed dumping actions.

Article 11 A reporting party shall truthfully report a case by providing factual information regarding unfair price actions of a reported party and details of damages. A reported manufacturing enterprise or marketing enterprise shall cooperate with the competent government department in charge of prices in investigations by truthfully providing requested books, bills, vouchers and other materials.

Article 12 In the case where a reported manufacturing enterprise or marketing enterprise is found through the investigation to truly have one of the unfair price actions listed in Article 5 of the Regulations, the competent government department in charge of prices may order the manufacturing enterprise or the marketing enterprise to correct the action and impose the following punishments according to the Price Law and specific situations:     (1) issue a warning; (2) impose a fine; (3) order the manufacturing enterprise or the marketing enterprise to suspend business for rectification; and (4) file a request with an administration for industry and commerce for revocation of its business license.

Article 13 A manufacturing enterprise or a marketing enterprise of industrial products shall establish and improve internal price management, and cost and expense accounting systems to truthfully and accurately record and approve production and purchasing costs of the industrial products, and no fraud will be tolerated.

Article 14 Competent departments at all levels in charge of industries and trade associations of industries shall urge operators of industrial products in respective industries to implement the Regulations. Manufacturing enterprises with sales prices lower than industrial average production costs and marketing enterprises with sales prices lower than purchasing costs may be advised for correction; in the case where an enterprise refuses to accept advice and is suspected of dumping, the enterprise may be directly reported to a competent government department in charge of prices.

Article 15 For actions of sales by decreasing prices that severely disrupt the market order and are difficult to verify individual costs thereof within a short period, the competent department of the State Council in charge of prices may determine whether those actions are dumping actions by temporarily and directly using industrial average production costs and a reasonable range of price decrease.

Article 16 The competent department of the State Council in charge of prices will work with related departments to formulate, according to the Regulations, measures to determine cost of industrial products that are dumped.

Article 17 Imported industrial products shall be subject to the Anti-Dumping and Anti-Subsidy Regulations of the People's Republic of China.

Article 18 The Regulations shall be subjected to interpretation by the State Planning Commission.

Article 19 The Regulations shall go into effect as of November 25, 1998.

国家计委、国家经贸委关于发布《关于制止低价倾销工业品的不正当价格行为的规定》和加强行业价格自律的通知

日期: 1998-11-16 来源:

各省、自治区、直辖市及计划单列市物价局（委员会）、经贸委，信息产业部、国内贸易局、国家冶金局、国家建材局、国家有色局、国家石化局、国家机械局、国家煤炭局、国家纺织局、国家轻工局：

为制止低价倾销的不正当价格竞争行为，维护公平、公开、合法的市场竞争和正常的价格秩序，保护经营者、消费者的合法权益，根据《中华人民共和国价格法》及国家有关法律、法规，国家计委、国家经贸委制定了《关于制止低价倾销工业品的不正当价格行为的规定》（以下简称《规定》），现予发布，并将有关事项通知如下：

一、《规定》是国家对工业品市场价格进行调控所采取的重要措施，是制止低价倾销工业品的重要规章，具有法律效力。《规定》的发布实施，对维持正常的工业企业生产经营秩序，促进整个工业行业的健康发展，形成良好的竞争环境将产生重要影响。各地要认真贯彻执行《规定》，依法制止低价倾销，规范市场秩序，规范企业的价格行为。

二、国家有关行业主管部门可根据《规定》第八条的有关规定和有关产品低价倾销情况，研究提出有关具体品种的行业平均成本，经国家计委同意后，定期向社会发布，作为企业价格自律的警戒线，以约束企业定价行为，防止企业低价倾销。实行政府定价、政府指导价的工业品，仍要严格按照政府规定的价格执行。

三、各级价格主管部门要加强对《规定》执行情况的监督检查，认真受理举报案件，从严查处低价倾销行为。凡涉及《规定》第五条所列行为的，均应作为低价倾销行为依法进行查处。

四、行业组织要接受政府价格主管部门的工作指导，督促、指导企业认真执行《规定》，协助行业主管部门测定行业平均成本，及时掌握、汇总行业成本、价格信息，积极发挥行业组织在制止低价倾销、组织企业进行 价格自律和协调企业之间关系等方面的作用。

五、各地区和各有关部门要组织生产企业和经销企业认真学习《规定》，自觉执行《规定》。生产企业销售的产品价格原则上不应低于行业平均生产成本，经销企业的销售价格不应低于其进货成本。各生产、经销企业对违反《规定》，构成低价倾销行为的要及时举报，并积极配合政府价格主管部门进行价格监督检查，切实制止低价倾销行为。

《规定》执行中出现的情况和问题由国家计委、国家经贸委根据各自的工作职责范围进行协调。

附：《关于制止低价倾销工业品的不正当价格行为的规定》

附：

关于制止低价倾销工业品的

不正当价格行为的规定

第一条 为制止低价倾销工业品的不正当价格行为，维护公平、公开、合法的市场竞

争和正常的价格秩序，维护国家利益，保护经营者和消费者的合法权益，根据《中华人民

共和国价格法》（以下简称《价格法》）及国家其他有关法律，制定本规定。

第二条 本规定适用于实行市场调节价格的工业品。

第三条 凡在中华人民共和国境内从事生产、销售工业品的经营者，均应执行本规定。

第四条 本规定所称低价倾销工业品的不正当价格行为是指经营者为了排挤竞争对手

或独占市场，生产企业以低于本企业生产成本销售工业品，经销企业以低于本企业进货成

本销售工业品，扰乱正常的生产经营秩序，损害国家利益或者其他经营者合法权益的行为。

生产企业生产成本是指企业生产该工业品的当月完全成本，包括制造成本和应分摊的管理

费用、财务费用、销售费用；经销企业进货成本包括经销企业经营该工业品时的当月进货

价格和相关运杂费。

第五条 以下行为属于低价倾销不正当价格行为：

（一）生产企业销售工业品的出厂价格低于本企业生产成本的，经销企业的销售价格

低于本企业进货成本的；

（二）采用高规格、高等级充抵低规格、低等级等手段，变相降低价格，使生产企业

实际出厂价格低于本企业生产成本，经销企业实际销售价格低于本企业进货成本的；

（三）通过采取折扣、补贴等手段，使生产企业实际出厂价格低于本企业生产成本，

经销企业实际销售价格低于本企业进货成本的。折扣、补贴等手段包括：（1）对销售价格

直接折扣，（2）根据用户提前付款的时间长短和金额多少的不同，以高于银行同期贷款利

率，在价格上给予现金折扣和价格折让，（3）对非季节性产品在不同销售季节对用户给予

不同价格折让，（4）对用户全部或部分承担运杂费或给予一定数量的运费补贴；

（四）进行非对等物资串换，使生产企业实际出厂价格低于本企业生产成本，经销企

业实际销售价格低于本企业进货成本的；

（五）除依法实行破产外，通过以物抵债，使生产企业实际出厂价格低于本企业生产

成本，经销企业实际销售价格低于本企业进货成本的；

（六）采取多发货少开票或不开票方式经销，使生产企业实际出厂价格低于本企业生

产成本，经销企业实际销售价格低于本企业进货成本的；

（七）通过多给数量、批量优惠等方式，变相降低价格，使生产企业实际出厂价格低于本企业生产成本，经销企业实际销售价格低于本企业进货成本的；

（八）采用其他方式使生产企业实际出厂价格低于本企业生产成本，经销企业实际销售价格低于本企业进货成本的。

第六条　以下两种情况不视为低价倾销行为：

（一）生产企业或经销企业依据《价格法》第十四条第二款规定，以低于成本的价格降价处理季节性、积压性工业品的；

（二）生产企业或经销企业由于成本较高，以低于本企业成本但不低于行业平均成本的价格销售，未对国家利益或者其他经营者利益造成损害的。

第七条　生产企业或经销企业依据《价格法》第十四条第二款规定，对季节性工业品、积压工业品降价出售时，必须按规范的项目明码标价。

第八条　国家工业行业主管部门可根据本行业产品低价倾销情况，向国务院价格主管部门提出需发布行业平均成本的工业品品种建议，并接受国务院价格主管部门的委托，测定和定期发布其行业平均生产成本。

第九条　生产企业或经销企业制定工业品价格应以成本加合理利润为目标，以公开、公正、合法的价格参与市场竞争。生产企业的工业品出厂价格原则上不应低于行业平均生产成本；经销企业的工业品销售价格不应低于正常进货成本。生产企业或经销企业应当遵循按质论价原则，按照国家颁布的工业品标准和规格、等级制定具体价格，禁止混等和按统货出售。

第十条　生产企业以低于行业平均生产成本或经销企业以低于进货成本销售工业品，造成生产经营秩序混乱，并损害了其他经营者权益，任何单位和个人都可以向省级以上政府价格主管部门举报，政府价格主管部门可以根据情况立案调查，以确定是否属低价倾销行为。

第十一条　举报人应据实反映情况，提供被举报人不正当价格行为的事实材料及被损害情况。被举报的生产企业或经销企业应当配合政府价格主管部门调查，如实提供所需的帐簿、单据、凭证以及其它资料。

第十二条　经调查认定，被举报的生产企业或经销企业确有本规定第五条所列不正当价格行为之一的，政府价格主管部门可以责令其改正，并视具体情况依据《价格法》进行下列处罚：（1）予以警告；（2）处以罚款；（3）责令其停业整顿；（4）提请工商行政

管理

机构吊销其营业执照。

第十三条 工业品生产企业或经销企业应当建立、健全内部价格管理及成本、费用核算制度，据实、准确记录与核定工业品的生产成本及进货成本，不得弄虚作假。

第十四条 各级工业行业主管部门、工业行业协会要督促本行业工业品经营者执行本规定。对生产企业低于行业平均生产成本销售的、经销企业低于正常进货成本销售的，可以规劝其改正；对于不接受规劝，有低价倾销嫌疑的，可以向政府价格主管部门直接举报。

第十五条 国务院价格主管部门对严重扰乱市场秩序、短期内难以核实其个别成本的降价销售行为，可临时采取直接依据行业平均成本和合理的下浮幅度的办法认定其是否为低价倾销行为。

第十六条 国务院价格主管部门将会同有关部门依据本规定制定低价倾销工业品的成本认定办法。

第十七条 进口工业品适用《中华人民共和国反倾销和反补贴条例》。

第十八条 本规定由国家计委负责解释。

第十九条 本规定自 1998 年 11 月 25 日起执行。

# APPENDIX 3

# EXHIBIT D



December 20, 2017

**Certification**

                                **Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of:
关于报送彩电、彩管行业成本资料的通知

Hanna Kang

Project Manager

Project Number: BBLLP_1712_051

| File No. | Catalogue No. | Record No. | Sequence No. |
|---|---|---|---|
| | [illegible] | 2 | 2 |

P 1

Document of the Ministry of Information Industry
Xin Bu Yun [1999] No. 121

Notification of Reporting Cost Information for Color TV and Color CRT Industry

To all relevant enterprises:

To prevent actions of unfair price competition through dumping in the color TV and color CRT industry, to protect fair, open and legitimate market competition, to maintain a normal price order, and to safeguard legitimate rights and interests of business operators and consumers, this Ministry plans to estimate and publish average industry production costs of some types of color TVs and color CRTs through consultation with and upon approval by the State Planning Commission pursuant to instructions by leaders of the State Council and the Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products Ji Jia Ge (1998) No. 2332 by the State Planning Commission and the State Economic and Trade Commission. To successfully complete this task, this Ministry hereby sends you a notification of related requirements as follows:

1. Enterprises on the list (see Attached Table 1) shall fill in the attached Tables 2 and 3 with their respective production and cost information of 21" and 25" color TVs or color CRTs in the 4th quarter of 1998, and report the information by February 10, 1999. Information for each subsequent quarter shall be reported within 10 days after said each quarter. Each enterprise shall designate a specific person to be in charge of this task and periodically report relevant information. This Ministry will rigorously keep confidentiality of the information reported by enterprises to prevent leakage of business secrets of the enterprises.

- 1 –

| Electronic Industry Archives | |
|---|---|
| Copy | No. 2017049 |

2

     2. On the basis of production and cost information reported by the enterprises, this Ministry will estimate and publish average industry production costs of some of color TVs and color CRTs. For enterprises with sales prices lower than the average industry production costs, this Ministry will work with the State Planning Commission and other departments to perform investigations pursuant to the Regulations on Preventing Unfair Price Actions through Dumping of Industrial Products. Enterprises found through the investigation to truly have actions of unfair price competition through dumping will be punished.

     3. The Department of Economic System Reform and Economic Operations of this Ministry is in charge of this task of estimation and publication of average industry production costs for the color TV and color CRT industry.

     Telephone: 010-68208341, 68208342.
Fax: 010-68277286
Contacts: Fusuo Bao, Tingru Liu
Address: No. 27 Wanshou Road, Beijing
Zip code: 100846
This Notification shall go into effect as of the date of issuance.

     Attachments: 1. List of enterprises to report production and cost information of color TVs or color CRTs
                2. Table of quarterly production and cost information of color TVs
                3. Table of quarterly production and cost information of color CRTs

| Keywords: |
| --- |
| Cc |
| Information |

- 2 -

3

(No text on this page)

February 3, 1999
(Seal of the Ministry of Information Industry of the People's Republic of China)

Keywords: color TV, color CRT, cost, notification

Cc: The State Planning Commission and the State Economic and Trade Commission.

The General Office of the Ministry of Information Industry          Printed and distributed on February 3, 1999

4

Attachment 1

 List of enterprises to report production and cost information of color TVs or color CRTs

1. Sichuan Changhong Electronic Group Co., Ltd.
2. Konka Group Co., Ltd.
3. TCL Group Co., Ltd.
4. Shenzhen Chuangwei-RGB Electronics Co., Ltd.
5. Qingdao Hisense Group Co., Ltd.
6. Xiamen Overseas Chinese Electronic Co., Ltd.
7. Panda Electronics Group Co., Ltd.
8. Shanghai Guangdian (Group) Co., Ltd.
9. Beijing Peony Electronic Group Co., Ltd.
10. Guangdong Gaoluhua TV Co., Ltd.
11. Caihong Group Corporation
12. Beijing Matsushita Color CRT Co., Ltd.
13. Shanghai Novel Color Picture Tube Co., Ltd.
14. Huafei Color Display Systems Co., Ltd.
15. Shenzhen SEG Hitachi Display Component Co., Ltd.
16. Guangdong Color Picture Tube Co., Ltd.
17. Lejin Shuguang Electronic Co., Ltd.
18. Shenzhen Samsung Electronic Tube Co., Ltd.


Attachment 2 Table of quarterly production and cost information of color TVs

- 4 -

5

Attachment 2

Table of quarterly production and cost information of color TVs

Filled by (company seal affixed)                                    Unit: Yuan

| | Size | Production quantity (unit) | Sales quantity (unit) | Unit cost | | | | | Ex-factory price | | | Inventory at end of quarter (unit) |
| | | | | Manufacturing cost | Financial expenses | Sales expenses | Management expenses | Total cost | Sales tax and surtaxes | Average ex-factory price | Lowest ex-factory price | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Verified number for the previous quarter | 21" | | | | | | | | | | | |
| | 25" | | | | | | | | | | | |
| Predicted number for the current quarter | 21" | | | | | | | | | | | |
| | 25" | | | | | | | | | | | |

Filled by:                    Telephone:                    Filled on:

Instructions: if there are different models for the same size, the model with a lower cost shall be filled in the table.

6

Attachment 3

### Table of quarterly production and cost information of color CRTs

Filled by (company seal affixed)                                    Unit: Yuan

| | Size | Production quantity (piece) | Sales quantity (piece) | Unit cost | | | | | Ex-factory price | | | Inventory at end of quarter (piece) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Manufacturing cost | Financial expenses | Sales expenses | Management expenses | Total cost | Sales tax and surtaxes | Average ex-factory price | Lowest ex-factory price | |
| Verified number for the previous quarter | 21" | | | | | | | | | | | |
| | 25" | | | | | | | | | | | |
| Predicted number for the current quarter | 21" | | | | | | | | | | | |
| | 25" | | | | | | | | | | | |

Filled by:                    Telephone:                    Filled on:

Instructions: if there are different models for the same size, the model with a lower cost shall be filled in the table.

信息产业部文件

信部运〔1999〕121号

# 关于报送彩电、彩管行业成本资料的通知

各有关企业：

　　为制止彩电、彩管行业低价倾销的不正当价格行为，维护公平、公开、合法的市场竞争和正常的价格秩序，保护经营者、消费者的合法权益，根据国务院领导的批示和国家计委、国家经贸委计价格（1998）2332号《关于制止低价倾销工业品的不正当价格行为的规定》，经商国家计委同意，我部拟对彩电、彩管部分品种测定和发布其行业平均生产成本。为做好这项工作，现将有关要求通知如下：

　　1、列入名单的企业（见附表一）要在99年2月10日前，将本企业21英寸、25英寸彩电或彩管98年四季度的产量、成本资料按附表二、三的内容填报后上报。以后每季度后10日内及时

— 1 —

电子工业档案馆
复印 2017069 号

上报。各企业要设专人负责此项工作，并定期上报有关资料。我部将对企业上报资料严格保密，以避免企业商业机密的泄漏。

2、在企业上报产量、成本资料的基础上，我部将测算出部分彩电、彩管的行业平均生产成本，并予以公布。对低于行业平均生产成本销售的企业，我部将配合国家计委等部门，按照《关于制止低价倾销工业品的不正当价格行为的规定》进行调查。对经调查认定确有低价倾销不正当价格行为的企业，将进行处罚。

3、我部经济体制改革与经济运行司负责彩电、彩管行业平均生产成本的测算与发布工作。

联系电话：010—68208341、68208342。

传真：010—68277286

联系人：暴福锁 刘廷儒

地址：北京万寿路27号

邮编：100846

本通知自下发之日起执行。

附件：一、上报彩电、彩管成本、价格资料的企业名单
　　　二、彩电季度成本、价格资料表
　　　三、彩管季度成本、价格资料表

資
密

部　業
照
調　將

業

（此页无正文）



一九九九年二月三日

**主题词：彩屯　彩管　成本　通知**

抄　送：国家计委，国家经贸委。

信息产业部办公厅　　　　一九九九年二月三日印发

附件一

## 上报彩电、彩管成本、价格资料企业名单

1、四川长虹电子集团公司

2、康佳集团股份有限公司

3、TCL集团有限公司

4、深圳创维－RGB电子有限公司

5、青岛海信集团公司

6、厦门华侨电子企业有限公司

7、熊猫电子集团股份有限公司

8、上海广电(集团)有限公司

9、北京牡丹电子集团公司

10、广东高路华电视机有限公司

11、彩虹集团公司

12、北京松下彩管有限公司

13、上海永新彩色显象管有限公司

14、华飞彩色显示系统有限公司

15、深圳赛格日立显示器件有限公司

16、广东彩色显象管有限公司

17、乐金曙光电子有限公司

18、深圳三星电管有限公司

彩色电视机季度成本、价格资料表

附件二

附件二

## 彩色电视机季度成本、价格资料表

填报单位(加盖公章)：

单位：元

| 规格 | | 生产数量<br>(台) | 销售数量<br>(台) | 单 位 成 本 | | | | | 出 厂 价 | | | | 季末<br>库存<br>(台) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 制造<br>成本 | 财务<br>费用 | 销售<br>费用 | 管理<br>费用 | 完全<br>成本 | 销售税金<br>及附加 | 平均<br>出厂价 | 最低<br>出厂价 | | |
| 上季核定 | 21英寸 | | | | | | | | | | | | |
| | 25英寸 | | | | | | | | | | | | |
| 本季预测 | 21英寸 | | | | | | | | | | | | |
| | 25英寸 | | | | | | | | | | | | |

填报人：　　　　　　　　　　　　　　　　　联系电话：　　　　　　　　　　　　　　　　填报时间：

填表说明：同一规格中如有不同型号，按成本低的型号填写。

附件三

# 彩色显象管季度成本、价格资料表

单位:元

填报单位(加盖公章):

| 规格 | 生产数量<br>(只) | 销售数量<br>(只) | 单　位　成　本 | | | 出　厂　价　格 | | | 季末<br>库存<br>(只) |
|---|---|---|---|---|---|---|---|---|---|
| | | | 制造<br>成本 | 财务<br>费用 | 销售<br>费用 | 管理<br>费用 | 完全<br>成本 | 销售税金<br>及附加 | 平均<br>出厂价 | 最低<br>出厂价 | |
| 上季<br>核<br>定 | 21英寸 | | | | | | | | |
| | 25英寸 | | | | | | | | |
| 本<br>季<br>实<br>测 | 21英寸 | | | | | | | | |
| | 25英寸 | | | | | | | | |

填报人:　　　　　　　　　　联系电话:　　　　　　　　　填报时间:

填表说明:同一规格中如有不同型号,按成本低的型号填写。

9

# APPENDIX 4



February 14, 2022

**Certification**

**Park IP Translations**

**TRANSLATOR'S DECLARATION:**

    I, Samuel Chong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of:

国家计委关于印发《低价倾销工业品的成本认定办法（试行）》的通知（1999年3月1日起执行）

_____

Samuel Chong

Project Number: BBLLP_2202_P0002

15 W. 37th Street 8th Floor
New York, NY 10018
212.581.8870
ParkIP.com

# Circular of the State Development Planning Commission on Issuing the Measures for Determining the Cost of Low-price Dumped Industrial Products (Trial)

Issued on February 23, 1999; Effective on March 1, 1999    Effective

## Basic information

Document No: JJG[1999]177

Level of validity

Validity: Currently effective

Date of publication: February 23, 1999

Date of implementation: March 1, 1999

Published by the State Development Planning Commission

## Text

Price bureaus (commissions) of provinces, autonomous regions, municipalities directly under the central government and municipalities with independent planning status, the Ministry of Information Industry, the State Administration of Internal Trade, the State Administration of Metallurgical Industry, the State Administration of Construction Materials Industry, the State Administration of Machinery Industry, the State Administration of Chemical Industry, the State Administration of Nonferrous Metals Industry, the State Administration of Coal Industry, and the State Administration of Textile Industry:

In order to prevent low-price dumping of industrial products, we have drafted the Measures for Determining the Cost of Low-price Dumped Industrial Products (Trial) according to the Provisions on Stopping Unfair Price Behaviors of Dumping Industrial Products at Low Prices, which were jointly published by the State Development Planning Commission and the State Economic and Trade Commission. The Measures have been issued, and you shall implement them and report to the State Development Planning Commission when you find any problems in the implementation process.

### Measures for Determining the Cost of Low-price Dumped Industrial Products (Trial)

Article 1   The Measures are drafted in order to stop unfair price behaviors of dumping industrial products at low prices, and in accordance with the Provisions on Stopping Unfair Price Behaviors of Dumping Industrial Products at Low Prices, as well as other financial & accounting laws, regulations, and systems.

Article 2   The Measures are applicable to industrial products with average costs estimated and released in accordance with the Provisions on Stopping Unfair Price Behaviors of Dumping Industrial Products at Low Prices.

Article 3   When an enterprise sells industrial product at price lower than the average cost released by industry regulators, and it's reported by other enterprises and individuals, the government's price authorities should look into the case and determine the product's cost according to the measures.

Article 4   The cost of industrial products mentioned in the Measures refers to the unit cost incurred in the production and sales of such industrial products. The cost of a manufacturing enterprise includes manufacturing cost, expenses (administrative expenses, sales expenses and financial expenses) that should

be reasonably apportioned, as well as sales tax and surcharges incurred for the sale of the product. The cost of a distribution enterprise includes the unit purchase price of the industrial product, the unit freight and miscellaneous expenses that should be apportioned and tax that should be paid.

Article 5   The State Council and provincial price authorities determine the cost of low-price dumped industrial products.

Article 6    Cost of low-price dumped industrial products shall be determined according to the following principles:

1. Cost shall be determined according to relevant provisions in the *Accounting Law of the People's Republic of China, the Accounting Standards for Business Enterprises, the General Rules for Enterprise Finance*, and industry financial accounting systems.

2. Cost shall be determined in line with the basic and general principles of accounting and according to the actual cost. When production expenses are accumulated and allocated, direct expenses are directly included in cost accounting, indirect expenses are apportioned in cost accounting according to the specified standard or a certain proportion. Once an enterprise's cost calculation and apportionment method is determined, it shall not be changed arbitrarily. After the cost allocation standard of indirect expenses is determined, it shall not be changed within one accounting year.

3. When determining the cost, the depreciation cost difference generated within a range specified by the state is generally recognized. However, the cost difference caused by the following circumstances shall not be recognized and shall be added at the time of cost determination:

(1) Cost difference caused by the enterprise's depreciation rate that is lower than the minimum depreciation rate specified by the state;

(2) Cost difference caused by special preferential policies enjoyed by the enterprise;

(3) Cost difference caused by expenses that have not been accrued and amortized because the enterprise does not carry out accounting practices on the accrual basis;

(4) Cost difference caused by the enterprise adopting inappropriate measures to reduce cost.

4. When determining the cost, a production enterprise shall take the cost of the previous month as the accounting basis, and if necessary, cost in the past can also be taken into account;  a distribution enterprise shall take the actual cost of the current batch of products as the accounting basis.

Article 7   The unit full cost of a production enterprise shall be calculated according to the following provisions:

1. Manufacturing cost is based on the accurate, true and reliable data of the corresponding products and specifications in the enterprise's cost report.

2. Period cost allocation. Firstly, calculate the ratio of the current period expenses (deducting sales expenses of specific products) to the total manufacturing cost (or total manufacturing hours) of all completed products as the apportionment coefficient. Secondly, the apportionment coefficient is multiplied by the unit manufacturing cost (or unit manufacturing hours) of the corresponding products and specifications to determine the period cost to be apportioned for the product. The formula is shown below:

(1) A product's unit period expense to be apportioned = the product's unit manufacturing cost (or unit manufacturing hours) × apportionment coefficient

(2) Apportionment coefficient = Total period expenses (deducting sales expenses for specific products) ÷ total manufacturing cost (or total manufacturing hours) of all completed products

3. Apportionment of sales tax and surcharges. Firstly, check the sales tax, surcharges and sales revenue in the income statement, figure out the proportion of sales tax and surcharges in the sales revenue and take it as the apportionment coefficient. Secondly, the apportionment coefficient is multiplied by the sales price of the corresponding products and specifications, to calculate the unit sales tax and surcharges to be apportioned. The formula is shown below:

(1) A product's sales tax and surcharges to be apportioned = the product's unit price × apportioned coefficient

(2) Apportionment coefficient = Sales tax and surcharges for all products sold in a period ÷ total sales revenue for all products sold in the period

Article 8   The cost of a distribution enterprise shall be calculated according to the sum of the purchase price, the freight cost and miscellaneous expenses and tax payable. The formula is shown below:

1. A merchandise's unit cost = unit purchase price + unit freight cost to be apportioned + unit tax payable

2. Unit freight cost to be apportioned = unit purchase price × apportionment coefficient

3. Apportionment coefficient = Total freight expenses in a purchase ÷ total purchase price

Article 9   Cost of low-price dumped industrial products shall be determined according to the following procedures:

1. The competent price department of the government shall file a case against suspected low-cost dumping reported by relevant units and individuals due to market disorder caused by selling at a price lower than the average cost of the industry.

2. After a case is filed, if cost investigation is necessary, the government's price department can conduct cost investigation, or commission the industry regulator, industry association or an intermediary to do the job. Investigators (No less than two persons) shall determine the enterprise's cost according to the Accounting Law of the People's Republic of China, the Accounting Standards for Business Enterprises, the General Rules for Enterprise Finance, and industry financial accounting systems, as well as authentic and reliable data provided by the enterprise, and issue a cost determination report.

3. Based on a review of the cost determination report, the government's price department shall determine whether the enterprise has dumped products at unreasonably low prices, and impose fines according to the law if dumping practices are substantiated.

Article 10   If the information provided by the investigated enterprise is incomplete, making it difficult to determine the cost, or to verify the cost in the short term, but the enterprise's price reduction has obviously had a significant impact on the market order and the national economy and seriously damaged the interests of other business operators, which must be stopped in time, the price department under the State Council may temporarily determine whether it is a low-cost dumping by adopting the average cost of the industry and a reasonable downward floating range. The downward floating range shall be determined by the price department of the State Council in conjunction with the industry department according to market conditions and the advanced production level of the industry.

Article 11     The Measures will be revised and explained by the State Development Planning Commission.

Article 12   The Measures will be implemented from March 1, 1999.

在线律师

**法律快车** Lawtime.cn
**法律法规**
专业权威的法律法规法律频道

知识 ▾

**12,980**
在线等待为您

详细描述问题　律师细致解

您的位置：法律快车 > 法规细览 > 国家计委关于印发《低价倾销工业品的成本认定办法（试行）》的通知

# 国家计委关于印发《低价倾销工业品的成本认定办法（试行）》的通知

颁布时间：1999-02-23　　实施日期：1999-03-01　　有效

**快速咨**

湖北女子4年7次诉讼
国办文严厉打击代孕
小偷尾随老人偷8000元
农家乐老板种1438株
男子因病厌世街头持刀
工伤鉴定是自己还是单
工伤鉴定书单位没有给
工伤鉴定书被单位拿走
女企业家实名举报索财

## 基本信息

发文字号　计价格[1999]177号
效力级别
时效性　　现行有效
颁布日期　1999-02-23
实施日期　1999-03-01
发布机关　国家发展计划委员会

## 正文

各省、自治区、直辖市及计划单列市物价局（委员会）、信息产业部、国家内贸局、国家冶金局、国家建材局、国家机械局、国家化工局、国家有色局、国家煤炭局、国家纺织局：

　　为制止低价倾销工业品的不正当价格行为，根据国家计委、国家经贸委颁布的《关于制止低价倾销工业品的不正当价格行为的规定》，我们制定了《低价倾销工业品的成本认定办法（试行）》，现印发给你们，请认真贯彻执行。执行中出现的问题，请及时向国家计委反映。

**低价倾销工业品的成本认定办法（试行）**

　　第一条　为制止低价倾销工业品的不正当价格行为，根据《关于制止低价倾销工业品的不正当价格行为的规定》和国家有关财务会计法律、法规及制度，制定本办法。

　　第二条　本办法适用于依据《关于制止低价倾销工业品的不正当价格行为的规定》测定发布行业平均成本的工业品。

　　第三条　当企业以低于国家有关行业主管部门发布的行业平均成本的价格销售工业品，受到有关单位和个人举报时，政府价格主管部门应及时立案调查并依据本办法组织进行该工业品成本认定。

　　第四条　本办法所称工业品成本是指企业生产、销售该工业品发生的相关单位成本费用。生产企业的成本包括制造成本和应合理分摊的期间费用（管理费用、销售费用和财务费用）以及销售该产品而发生的销售税金和附加。经销企业的成本包括该工业品单位进价和应分摊的单位运杂费以及应纳价内税。

　　第五条　国务院和省级政府价格主管部门是低价倾销工业品的成本认定机构。

## 热门标签

婚姻继承　　知识产权
程序法　　　合同债权
劳动　　　　公司法
房地产　　　医疗保险

## 咸阳推荐律师



**白鹏君律师**
177-3062-1777　　18

第六条　低价倾销工业品的成本认定应遵循以下原则：

一、成本认定按照《中华人民共和国会计法》、《企业会计准则》、《企业财务通则》和行业财务会计制度的规定进行。

二、成本认定遵循会计核算的基本原则和一般原则，按照实际成本认定。生产费用归集和分配时，直接费用直接计入成本核算对象，间接费用按规定的标准或一定的比例分摊计入成本核算对象。企业成本计算及分摊方法一经确定，不得随意变更。间接费用的分配标准确定后，一个会计年度内不得变动。

三、成本认定时，一般承认在国家规定的折旧提取范围内产生的折旧成本差异。但以下情况造成的成本差异不予承认，应在成本认定时追加：

（一）企业折旧率低于国家规定的低限折旧率造成的成本差异；

（二）企业因享受特殊优惠政策造成的成本差异；

（三）企业未按权责发生制进行核算，期间费用应提未提、应摊未摊造成的成本差异；

（四）企业采取不正当手段降低成本造成的成本差异。

四、成本认定时，生产企业按上月成本为确认依据，必要时可根据情况考核企业以前的成本；经销企业按当批商品的实际发生成本为确认依据。

第七条　生产企业单位完全成本按以下规定核算：

一、制造成本以企业成本报表中对应品种、规格的准确、真实、可靠的数据为依据。

二、期间费用分配。首先计算出当期期间费用（扣除特定产品销售费用）与全部完工产品总制造成本（或总制造工时）的比率，作为分摊系数。其次，用分摊系数分别乘对应品种、规格的单位制造成本（或单位制造工时），确定该产品应分摊的期间费用。计算公式如下：

（一）该产品应分摊的单位期间费用＝该产品单位制造成本（单位制造工时）×分摊系数

（二）分摊系数＝当期全部期间费用（扣除特定产

品销售费用）÷当期全部完工产品总制造成本（总制造工时）

三、销售税金及附加的分配。首先根据损益表中的销售税金及附加和销售收入，计算出销售税金及附加占销售收入的比例，作为分摊系数。其次，用分摊系数乘以对应品种、规格的销售价格，作为应分摊的单位销售税金及附加。具体计算公式如下：

（一）该产品应分摊的产品销售税金及附加＝该产品单位售价×分摊系数

（二）分摊系数＝当期全部产品销售税金及附加÷当期全部产品销售收入之和

第八条　经销企业成本按进货价格与相应发生的运杂费及应纳价内税之和计算。具体计算公式如下：

在线律师

**12,980**

在线等待为您

详细描述问题　律师细致解

快速咨询

一、某商品单位成本＝该商品单位进价＋该商品应分摊的单位运杂费＋该商品应纳价内税

二、该商品应分摊的运杂费＝该商品单位进价×分摊系数

三、分摊系数＝本次采购发生的全部运杂费÷本次采购全部商品进价之和

第九条　低价倾销工业品的成本按以下程序认定：

一、政府价格主管部门对以低于发布行业平均成本的价格销售，造成市场秩序混乱，受到有关单位和个人举报的涉嫌低价倾销行为要及时立案。

二、涉嫌低价倾销案件立案后，需要进行成本调查的，政府价格主管部门可直接进行成本调查，也可委托有关行业主管部门或行业协会组织、中介机构进行成本调查。调查人员（不得少于2人）应按照《中华人民共和国会计法》、《企业会计准则》、《企业财务通则》及行业财务会计制度和企业真实、可靠数据，认定企业成本。在核实确认的基础上，出具成本认定报告。

三、政府价格主管部门在审核成本认定报告基础上，做出被调查企业是否低价倾销的判定，确属低价倾销行为的，依法进行处罚。

第十条　如被调查企业提供资料不全，使成本认定难以进行，或短期内难以核定其成本，但企业的降价行为已明显对市场秩序和国民经济造成重大影响，严重损害了其他经营者利益，必须及时制止时，国务院价格主管部门可临时采取直接依据行业平均成本和合理下浮幅度的办法认定其是否为低价倾销行为。行业平均成本下浮幅度由国务院价格主管部门会同行业主管部门根据市场状况、行业先进生产水平等情况确定。

第十一条　本办法由国家计委负责修订和解释。

第十二条　本办法自1999年3月1日起施行。

免责声明：法律快车法律法规文件均转载自：政府网、政报、媒体等公开出版物，对本文的真实性、准确性和合法性，请核对正式出版物、原件和来源。

全国客服热线：400-666-0996。

下载：TXT DOC 字号：A A A　　　　　　　　　　　　打印　分享　全屏阅读

关于我们　市场合作　联系我们　在线支付　友情链接　法律声明　网站地图　侵权投诉

我是公众　　　　　　　　　　　　　　　　我是律师

找律师　　　　　　　　　　　　　　　　　律师注册

查法规　　　　　　　　　　　　　　　　　加盟合作　　　　法律快车展

https://law.lawtime.cn/d448076453170.html

# APPENDIX 5

# EXHIBIT B



December 20, 2017

**Certification**

                              **Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of:
国家计委、信息产业部印发关于制止彩色显像管、彩色电视机不正当价格竞争试行办法的通知

Hanna Kang

Project Manager

Project Number: BBLLP_1712_051

15 W. 37th Street 8th Floor
New York, NY 10018
212.581.8870
ParkIP.com

Notification that the State Planning Commission and the Ministry of Information Industry print and distribute Trial Measures to Prevent Unfair Price Competition Regarding Color CRTs and Color TVs

| Date of distribution: June 27, 2008 | Number of browses: 4 | Font: [large medium small]      Share |
|---|---|---|

Bureau of Commodity Prices (Councils) and Competent Departments in Charge of the Electronic Industry of all provinces, autonomous regions, municipalities directly under the Central Government, and municipalities with independent planning status:

To prevent actions of unfair price competition through dumping in the color TV and color CRT industry and to maintain a normal market competition order, the State Planning Commission and the Ministry of Information Industry formulated the Trial Measures to Prevent Unfair Price Competition Regarding Color CRTs and Color TVs (hereinafter the "Measures"), which is hereby printed and distributed to you. You are asked to seriously implement the Measures. Related issues are hereby notified as follows:

1. Prices of color TVs have fallen sharply over recently years due to the oversupply of products and increasingly fierce market competition. In the price cutting competition, some color TV and color CRT manufacturing enterprises sell the products at prices lower than production costs, which disrupts normal price order and harm legitimate rights and interests of other business operators and consumers. The competent departments in charge of price and electronics in all places must work with related departments in planning, economic and trade, strengthen leadership, and work closely to implement the Measures.

2. According to the spirit of instructions of leading comrades of the State Council, the State Planning Commission and the Ministry of Information Industry have decided to treat color TVs and color CRTs as key products for Preventing dumping and regulating the market order according to the law in 1999. All places must strengthen monitoring and inspection, and the main content of inspection includes: whether ex-factory prices of color CRT and color TV manufacturing enterprises are lower than their production costs, and whether the sales prices of marketing enterprises are lower than their purchasing costs; whether sales are made at low prices by means of discounts, subsidies, and offering extra quantities; whether sales are made at low prices by means of using raw materials and parts and components imported through smuggling, lowering performance indexes, using shoddy products as good products, reporting false costs, etc.

3. All color CRT and color TV manufacturing enterprises must strictly comply with all provisions in the Measures, consciously regulate pricing actions, truthfully and accurately record and verify

production costs and purchasing costs, strictly prohibit allocating less expenses and falsely reporting costs. At the same time, the enterprises must check and correct, on their own, any action of unfair price competition and actively report actions of unfair price competition to competent departments in charge of prices.

4. Please promptly report any problem occurred in the process of implementing the Measures, monitoring and inspection in all places to the State Planning Commission and the Ministry of Information Industry.

Attachment: Attachment of Trial Measures to Prevent Unfair Price Competition Regarding Color CRTs and Color TVs

Trial Measures to Prevent Unfair Price Competition Regarding Color CRTs and Color TVs

Article 1 To prevent actions of unfair price competition in the color TV and color CRT industry, to protect fair, open and legitimate market competition, to maintain a normal price order, to protect the national interest, and to safeguard legitimate rights and interests of business operators and consumers, the Measures are hereby formulated according to the Price Law of the People's Republic of China (hereinafter the "Price Law") and other related laws of the state.

Article 2 Any business operator engaging in production and sales of color CRTs and color TVs within the People's Republic of China shall implement the Measures.

Article 3 The actions of unfair price competition herein refer to actions of a business operator to sell products at prices lower than the enterprise's cost or sell products at low prices by reducing costs using unfair means, so as to expel competitors or monopolize the market, which disrupt normal production and operation orders and harm the national interest or legitimate rights and interests of other business operators.

Article 4 The following actions of color CRT and color TV operators are actions of unfair price competition:

(I) Ex-factory prices of a manufacturing enterprise are lower than its production costs in the same period, and sales prices of a marketing enterprise are lower than its purchasing costs in the same period;

(II) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs, and actual sales prices of a marketing enterprise are made to be lower than its purchasing costs by means of discounts, subsidies, and offering extra quantities;

(III) Sales are made at low prices by means of using raw materials and parts and components imported through smuggling, lowering performance indexes, using shoddy products as good products, reporting false costs, etc.;

(IV) A color CRT buyer with relatively great advantages in market shares uses its advantageous position to force a color CRT manufacturing enterprise to sell products at prices lower than its production costs;

(V) Actual ex-factory prices of a manufacturing enterprise are made to be lower than its production costs in the same period, or actual sales prices of a marketing enterprise are made to be lower than its purchasing costs in the same period by using other means.

Article 5 The Ministry of Information Industry regularly publishes industrial average production costs of main types and sizes of color CRTs and color TVs. The State Planning Commission and the Ministry of Information Industry determine and publish a reasonable amplitude of price decrease.

Article 6 Ex-factory prices of a manufacturing enterprise shall not be lower than the industrial average production costs in principle; and the sales prices of a marketing enterprise shall not be lower than normal purchasing costs.

Article 7 In the case where a manufacturing enterprise sells products at prices below published industrial average production costs, or a marketing enterprise sells products at prices below its purchasing costs in the same period, leading to market price disorder and harms to interests of other manufacturing enterprises or marketing enterprises, the harmed manufacturing enterprises or marketing enterprises may report the issue to the State Planning Commission or a competent department in charge of prices of a province, autonomous region or municipality directly under the Central Government; and the competent government department in charge of prices shall perform investigation into the case according to the situation.

Article 8 A reporting party shall truthfully report a case by providing factual information regarding actions of unfair price competition of a reported party and details of damages. A reported business operator shall cooperate with a competent government department in charge of prices in investigations by truthfully providing related books, bills, vouchers and other materials.

Article 9 In the case where a reported operator of color CRTs and color TVs is found through the investigation to truly have actions of unfair price competition listed in Article 4 of the Measures, the competent government department in charge of prices shall order the operator to correct the action and impose the following punishments according to the Price Law and specific situations:

(I) Issue a warning;

(II) Impose a fine;

(III) Order the operator to suspend business for rectification;

(IV) File a request with an administration for industry and commerce for revocation of its business license.

Article 10 When performing inspections, a competent department in charge of prices should first use individual costs of producers or operators as a main determination basis. When it is difficult to confirm an individual cost, industrial average production costs and a reasonable amplitude of price decrease are used as main determination bases.

Article 11 An operator of color CRTs and color TVs shall establish and improve internal price management, and cost and expense accounting systems to truthfully and accurately record and approve production and purchasing costs, and no fraud will be tolerated.

Article 12 Competent departments at all levels in charge of the electronic industry and the color CRT and color TV trade association shall urge operators of color CRTs and color TVs to implement the Measures. For manufacturing enterprises and marketing enterprises that violate the Measures, they shall be advised to correct; in case where the advice is invalid, and a report may be filed with a competent department in charge of prices for official investigations.

Article 13 The Measures shall be subjected to interpretation by the State Planning Commission.

Article 14 The Measures shall go into effect as of April 1, 1999.

国家计委、信息产业部印发关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法的通知

发布日期：2008-06-27 浏览次数：4 字体：[ 大 中 小 ] 分享

各省、自治区、直辖市及计划单列市物价局（委员会），电子工业主管部门：

为了制止彩色显像管、彩色电视机行业的不正当价格竞争行为，维护正常的市场竞争秩序，国家计委、信息产业部制定了《关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法》（以下简称《办法》），现

印发给你们，请认真贯彻执行，并就有关事项通知如下：

一、近几年来，由于产品供过于求，市场竞争日趋激烈，彩色电视机价格大幅度下降。在降价竞争中，一些彩色电视机、彩色显像管生产企业以低于生产成本的价格进行销售，扰乱了正常的价格秩序，损害了其他经

营者和消费者的合法权益。各地价格、电子主管部门要会同计划、经贸等有关部门，加强领导，密切配合，共同做好《办法》的贯彻实施工作。

二、遵照国务院领导同志的指示精神，国家计委、信息产业部决定，将彩色显像管和彩色电视机作为 1999 年制止低价倾销、依法规范市场秩序的重点品种。各地要加强监督检查，检查的主要内容是：彩色显像管、彩色电视机生产企业的出厂价格是否低于其生产成本，经销企业的销售价格是否低于其进货成本；是否采取折扣、补贴、多给数量等手段低价销售；是否采取使用走私进口原材料和零配件、降低性能指标、以次充好、虚报成本等手段低价销售。

三、彩色显像管和彩色电视机生产企业要严格执行《办法》的各项规定，自

觉规范价格行为，据实、准确记录与核定生产成本及进货成本，严禁少摊费用，虚置成本。同时要对有无不正当价格竞争行为进行自查自

纠，并积极向价格主管部门举报不正当价格竞争行为。

四、各地在贯彻实施《办法》和监督检查过程中存在的问题，请及时报告国家计委和信息产业部。

附件：关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法附件

关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法

第一条　　为制止彩色显像管、彩色电视机行业的不正当价格竞争行为，维护公平、公开、合法的市场竞争和正常的价格秩序，维护国家利益，保护经营者和消费者的合法权益，根据《中华人民共和国价格法》（以下简称《价格法》）及国家其他有关法律，制定本办法。

第二条　　凡在中华人民共和国境内从事生产、销售彩色显像管、彩色电视机的经营者，均应执行本办法。

第三条　本办法所称的不正当价格竞争行为是指，经营者为了排挤竞争对手或独占市场，以低于本企业成本销售，或者采取其它不正当手段降低成本低价销售，扰乱正常的生产经营秩序，损害国家利益或其它经营

者合法权益的行为。

第四条　彩色显像管、彩色电视机经营者的下列行为属于不正当价格竞争行

为：

（一）生产企业的出厂价格低于其同一时期生产成本，经销企业的销售价格低于其同一时期进货成本；

（二）采取折扣、补贴、多给数量等方式，使生产企业的实际出厂价格低于本企业生产成本，经销企业实际销售价格低于本企业进货成本；

（三）使用走私进口原材料和零配件、降低性能标准、以次充好、虚报成本等手段低价销售；

（四）市场份额占较大优势的彩色显像管购买者利用其优势地位迫使彩色显像管生产企业低于其生产成本销售产品；

（五）采取其它方式，使生产企业的实际出厂价格低于其同一时期生产成本，或经销企业的实际销售价格低于其同一时期进货成本。

第五条　信息产业部定期发布彩色显像管、彩色电视机主要品种、规格的行业平均生产成本。国家计委会同信息产业部确定和公布合理的下浮幅度。

第六条　生产企业的出厂价格原则上不应低于行业平均生产成本；经销企业的销售价格不应低于正常进货成本。

第七条　生产企业以低于发布的行业平均生产成本销售，经销企业以低于其同期进货成本销售，造成市场价格秩序混乱、损害其它生产企业和经销企业利益的，受损害的生产企业和经销企业可向国家计委或省、

自治区、直辖市政府价格主管部门举报；政府价格主管部门根据情况立案调查。

第八条　举报人应当据实反映情况，提供被举报人不正当价格竞争行为的事实材料和被损害的情况。被举报的经营者，应当配合政府价格主管部门调查，如实提供相关的帐薄、单据、凭证以及其它资料。

第九条 经调查认定，被举报的彩色显像管、彩色电视机经营者确有本办法第四条所列不正当价格竞争行为的，由政府价格主管部门责令改正，并视具体情况依据《价格法》进行下列处罚：

（一）予以警告；

（二）处以罚款；

（三）责令其停业整顿；

（四）提请工商行政管理机关吊销其营业执照。

第十条 价格主管部门实施检查时，首先应以生产、经营者的个别成本为主要判定依据。当个别成本难以认定时，以行业平均成本和合理的下浮幅度为主要判定依据。

第十一条 彩色显像管、彩色电视机经营者应当建立、健全内部价格管理及成本、费用核算制度，据实、准确记录与核定生产成本及进货成本，不得弄虚作假。

第十二条 各级电子工业主管部门及彩色显像管、彩色电视机行业协会应当督促彩色显像管、彩色电视机经营者执行本办法。对生产企业和经销企业违反本办法的，规劝其改正；规劝无效的，可向政府价格主管部

门举报，要求立案调查。

第十三条 本办法由国家计委负责解释。

第十四条 本办法自 1999 年 4 月 1 日起施行。

# APPENDIX 6



January 10, 2022

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, Johnson Wong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: IRI-CRT-00031457

_____

Johnson Wong

Project Number: BBLLP_2201_P0001



15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

| IRICO Group Corporation | | |
|---|---|---|
| C06 Enterprise Management | | |
| Notice on Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs and Notice on Publishing Industrial Average Production Costs of Some Types of Color CRTs and Color TVs | | |
| From March 1999 to April 1999 | Retention period | Long term |
| There are ten pages in this volume | Filing No. | |

| Whole volume No. | Catalog No. | Docket No. |
|---|---|---|
| | | |

CONFIDENTIAL

IRI-CRT-00031457

## In-Volume Catalog

| S.N. | Document author | Original document No. | Document receipt No. | Confidentiality level | Document date | Title | No. of Page |
|------|-----------------|-----------------------|----------------------|-----------------------|---------------|-------|-------------|
| 1 | Ministry of Information Industry | Ji Jia Ge (99) 264 | 46 | | March 15, 1999 | Notice of the State Planning Commission and the Ministry of Information Industry on Distributing Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs | 1-7 |
| 2 | Id. | Xin Yun Bu (99) 287 | 51 | | April 2, 1999 | Notice on Publishing Industrial Average Production Costs of Some Types of Color CRTs and Color TVs | 8-10 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

CONFIDENTIAL                                                                                              IRI-CRT-00031458

Mr. Wu: please review this document.   April 15, 1999
         001

| Official document | Receipt No. 46 April 14, 1999 |
|---|---|

From the first page of China Electronics Daily, April 13, 1999

Notice on Publishing Industrial Average Production Costs of Some Types of Color CRTs and Color TVs

Xin Bu Yun [1999] No. 287

To curb unfair price competition in the color CRT and color TV industry and maintain normal market order, we have estimated the industrial average production costs of two types of color CRTs and color TVs, i.e. 21-inch and 25-inch, pursuant to the Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs by the State Planning Commission and the Ministry of Information Industry, the cost materials submitted by major manufacturers of color CRTs and color TVs, and the results of survey on typical enterprises. The estimation is hereby published (see the attached table). All color CRT and color TV manufacturers are asked to conscientiously implement the estimation. In case where a manufacturer sells its products at the prices lower than the published industrial average production costs, causing market disorders and harming the interests of other manufacturers, a harmed enterprise may file a report with the State Planning Commission or a competent department in charge of prices of a province, autonomous region and municipality directly under the Central Government. If it is found through investigation that, such manufacturer indeed engages in unfair price competition, a competent government department in charge of prices shall order such manufacturer to correct and impose penalties on it in light of the specific circumstance.

This Notice will be implemented from the date of publication.

Attached Table: Industrial Average Production Costs of Some Sizes and Types of Color CRTs and Color TVs

| 21" Color CRT | RMB440/piece | 21" Color TV | RMB1,130/set |
| 25" Color CRT | RMB720 /piece | 25" Color TV | RMB1,700/set |

Ministry of Information Industry, April 2, 1999

IRICO Group Corporation Document Review List

| Group's proposed opinion: Mr. Wu: please review this document. April 15, 1999 | Department's proposed opinion: |
|---|---|

Leader's instructions:

| Circulation time | Signature | Circulation time | Signature | Circulation time | Signature | Circulation time | Signature |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

| Required completion time | Processing result Fax sent April 15, 1999 |
|---|---|
|  | Signature from the leader of the handling organization |

CONFIDENTIAL

IRI-CRT-00031459

Mr. Wu: please review this document.   April 15, 1999
      001

| Official document | Receipt No. 46 April 14, 1999 |
|---|---|

From the first page of China Electronics Daily, April 13, 1999

Notice on Publishing Industrial Average Production Costs of Some Types of Color CRTs and Color TVs

Xin Bu Yun [1999] No. 287

To curb unfair price competition in the color CRT and color TV industry and maintain normal market order, we have estimated the industrial average production costs of two types of color CRTs and color TVs, i.e. 21-inch and 25-inch, pursuant to the Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs by the State Planning Commission and the Ministry of Information Industry, the cost materials submitted by major manufacturers of color CRTs and color TVs, and the results of survey on typical enterprises. The estimation is hereby published (see the attached table). All color CRT and color TV manufacturers are asked to conscientiously implement the estimation. In case where a manufacturer sells its products at the prices lower than the published industrial average production costs, causing market disorders and harming the interests of other manufacturers, a harmed enterprise may file a report with the State Planning Commission or a competent department in charge of prices of a province, autonomous region and municipality directly under the Central Government. If it is found through investigation that, such manufacturer indeed engages in unfair price competition, a competent government department in charge of prices shall order such manufacturer to correct and impose penalties on it in light of the specific circumstance.

This Notice will be implemented from the date of publication.

Attached Table: Industrial Average Production Costs of Some Sizes and Types of Color CRTs and Color TVs

| 21" Color CRT | RMB440/piece | 21" Color TV | RMB1,130/set |
|---|---|---|---|
| 25" Color CRT | RMB720 /piece | 25" Color TV | RMB1,700/set |

Ministry of Information Industry, April 2, 1999

Notice on Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs

      Bureaus (Commissions) of Commodity Prices and Competent Departments in Charge of the Electronic Industry of provinces, autonomous regions, municipalities directly under the Central Government, and municipalities specifically designated in the state plan:

      To curb unfair price competition and maintain normal market competition order, the State Planning Commission and the Ministry of Information Industry have formulated the Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs (hereinafter referred to as the "Measures"), which are hereby distributed for your earnest implementation. Related issues are hereby notified as follows:

-1-

CONFIDENTIAL                                                                     IRI-CRT-00031460

Mr. Wu: please review this document.   April 15, 1999
     001

| Official document | Receipt No. 46 April 14, 1999 |
|---|---|

## National Development Planning Commission    Document
## Ministry of Information Industry

Ji Jia Ge [1999] No. 264

## Notice of the State Planning Commission and the Ministry of Information Industry on Distributing Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs

    Bureaus (Commissions) of Commodity Prices and Competent Departments in Charge of the Electronic Industry of provinces, autonomous regions, municipalities directly under the Central Government, and municipalities specifically designated in the state plan:

    To curb unfair price competition and maintain normal market competition order, the State Planning Commission and the Ministry of Information Industry have formulated the Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs (hereinafter referred to as the "Measures"), which are hereby distributed for your earnest implementation. Related issues are hereby notified as follows:

-1-

CONFIDENTIAL                                                                 IRI-CRT-00031461

002

1. Prices of color TVs have plunged in recent years due to the oversupply of products and increasingly fierce market competition. In the price cut competition, some color TV and color CRT manufacturers sell their products at the prices lower than production costs, which disrupts normal price order and harm legitimate rights and interests of other business operators and consumers. The competent departments in charge of price and electronics in all places must work closely with related departments in planning, economic and trade to strengthen leadership and ensure the sound implementation of the Measures.

2. According to the principles of instructions from the leading comrades of the State Council, the State Planning Commission and the Ministry of Information Industry have decided <u>to focus on color TVs and color CRTs during the campaign of preventing dumping and regulating the market order according to the law in 1999</u>. All places must step up supervision and inspection, with the focus on: whether ex-factory prices of color CRT and color TV manufacturers are lower than their production costs, and whether the sales prices of distributors are lower than their purchasing costs; whether sales are made at low prices by means of discount, subsidy and extra quantity; whether sales are made at low prices by means of using raw materials and parts and components imported through smuggling, lowering performance indicators, using shoddy products as good products, falsely reporting costs, etc.

3. All color CRT and color TV manufacturers must strictly comply with all provisions in the Measures, consciously regulate pricing, truthfully and accurately record and verify production and purchasing costs, and strictly prohibit less amortization and false reporting of costs. At the same time, the enterprises must correct the unfair price competition found in self-inspection and actively report the unfair price competition to competent departments in charge of prices.

-2-

003

4. All places should promptly report any problem arising in the implementation of the Measures, supervision and inspection to the State Planning Commission and the Ministry of Information Industry.

Attachment: Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs

*(Seal of the National Development Planning Commission of the People's Republic of China)*

National Development Planning Commission

March 15, 1999

*(Seal of the Ministry of Information Industry of the People's Republic of China)*

Ministry of Information Industry

Keywords: color TV, price measures, Notice

Cc: The General Office of the State Council, the State Economic and Trade Commission, the Ministry of Finance, the General Administration of Customs, and the Planning Commissions (Planning and Economic Commissions) of all provinces, autonomous regions, municipalities directly under the Central Government and cities specifically designated in the state plan

-3-

CONFIDENTIAL

IRI-CRT-00031462

004

Attachment:

# Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs

Article 1 To curb unfair price competition in the color TV and color CRT industry, protect fair, open and legitimate market competition, the national interest and the legitimate rights and interests of business operators and consumers, and maintain normal price order, the Measures are hereby formulated according to the Price Law of the People's Republic of China (hereinafter referred to as the "Price Law") and other applicable laws of the state.

Article 2 Any business operator engaging in production and sales of color CRTs and color TVs within the People's Republic of China shall implement the Measures.

Article 3 The unfair price competition herein refers to misconduct of a business operator to sell products at the prices lower than their cost or sell products at low prices by reducing costs using unfair means, so as to expel competitors or monopolize the market, which disrupts normal production and operation orders and harms the national interest or legitimate rights and interests of other business operators.

Article 4 The following misconducts of color CRT and color TV operators constitute unfair price competition:

-4-

005

(I)  Ex-factory prices of a manufacturer are lower than its production costs over the same period, and sales prices of a distributor are lower than its purchasing costs over the same period;

(II)  Actual ex-factory prices of a manufacturer are made lower than its production costs, and actual sales prices of a distributor are made lower than its purchasing costs by means of discount, subsidy and extra quantity;

(III)  Sales are made at low prices by means of using raw materials and parts and components imported through smuggling, lowering performance indicators, using shoddy products as good products, falsely reporting costs, etc.;

(IV)  A color CRT buyer takes advantage its big market share to force a color CRT manufacturer to sell products at the prices lower than its production costs;

(V)  Actual ex-factory prices of a manufacturer are lower than its production costs over the same period, or actual sales prices of a distributor are lower than its purchasing costs over the same period by other means.

Article 5 The Ministry of Information Industry regularly publishes industrial average production costs of main types and sizes of color CRTs and color TVs. The State Planning Commission and the Ministry of Information Industry determine and publish a reasonable range of price decrease.

Article 6 Ex-factory prices of a manufacturer shall not be lower than the industrial average production costs in principle; and the sales prices of a distributor shall not be lower than normal purchasing costs.

-5-

CONFIDENTIAL

IRI-CRT-00031463

006

Article 7 In case where a manufacturer sells its products at the prices lower than published industrial average production costs, or a distributor sells its products at the prices lower than its purchasing costs over the same period, leading to market price disorder and harms to the interests of other manufacturers or distributors, the harmed manufacturers or distributors may report the same to the State Planning Commission or a competent department in charge of prices of a province, autonomous region or municipality directly under the Central Government; and the competent government department in charge of prices will launch investigation into the case in light of the circumstance.

Article 8 The reporting party shall truthfully report the case by providing factual information regarding unfair price competition of the reported party and details of damages. A reported business operator shall cooperate with a competent government department in charge of prices in the investigation by truthfully providing related books, bills, vouchers and other materials.

Article 9 If it is found through the investigation that, the reported operator of color CRTs and color TVs is indeed committing unfair price competition set forth in Article 4 of the Measures, the competent government department in charge of prices shall order the operator to make correction and impose the following penalties according to the Price Law and specific circumstances:

(I)  Issue a warning;

(II)  Impose a fine;

(III)  Order the operator to suspend business for rectification; and

(IV)  File a request with an administration for industry and commerce for revocation of its business license.

-6-

007

Article 10 When performing inspection, a competent department in charge of prices should first take individual costs of manufacturers or operators as a main basis. When it is difficult to confirm an individual cost, industrial average production costs and a reasonable range of price decrease will be used as the main bases.

Article 11 An operator of color CRTs and color TVs shall establish and improve internal price management, cost and expense accounting systems to truthfully and accurately record and verify production and purchasing costs, with no false statement.

Article 12 Competent departments at all levels in the electronic industry and the color CRT and color TV trade association shall urge operators of color CRTs and color TVs to implement the Measures. For manufacturers and distributors that violate the Measures, they shall be advised to correct; in case where the advice doesn't work, a report may be submitted to a competent department in charge of prices for official investigation.

Article 13 The Measures shall be interpreted by the State Planning Commission.

Article 14 The Measures shall go into effect as of April 1, 1999.

-7-

CONFIDENTIAL                                                                                    IRI-CRT-00031464

| Official document | Receipt No. 51 April 21, 1999 |
|---|---|

# Document of the Ministry of Information Industry

Xin Bu Yun [1999] No. 287

## Notice on Publishing Industrial Average Production Costs of Some Types of Color CRTs and Color TVs

IRICO Group Corporation Document Review List

| Group's proposed opinion: | Department's proposed opinion: |
|---|---|

Leader's instructions:

| Circulation time | Signature | Circulation time | Signature | Circulation time | Signature | Circulation time | Signature |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

| Required completion time | Processing result |
|---|---|
|  | Signature from the leader of the handling organization |

CONFIDENTIAL                                                                      IRI-CRT-00031465

008

| Official document | Receipt No. 51 April 21, 1999 |
|---|---|

# Document of the Ministry of Information Industry

Xin Bu Yun [1999] No. 287

## Notice on Publishing Industrial Average Production Costs of Some Types of Color CRTs and Color TVs

Color CRT and Color TV manufacturers:

To curb unfair price competition in the color CRT and color TV industry and maintain normal market order, we have estimated the industrial average production costs of two types of color CRTs and color TVs, i.e. 21 inches and 25 inches, pursuant to the Trial Measures to Curb Unfair Price Competition Regarding Color CRTs and Color TVs by the State Planning Commission and the Ministry of Information Industry, the cost materials submitted by major manufacturers of color CRTs and color TVs, and the results of investigation into typical enterprises. The estimation is hereby published (see the attached table). All color CRT and color TV manufacturers are asked to conscientiously implement the estimation. In case where a manufacturer sells its products at the prices lower than the published industrial average production costs, causing market disorders and harming the interests of other manufacturers, a harmed enterprise may file a report with the State Planning Commission or a competent department in charge of prices of a province,

-1-

CONFIDENTIAL                                                                          IRI-CRT-00031466

009

autonomous region or municipality directly under the Central Government. If it is found through investigation that, such manufacturer indeed engages in unfair price competition, a competent government department in charge of prices shall order such manufacturer to correct and impose penalties on it in light of specific circumstances.

This Notice shall go into effect as of the date of distribution.

Attachment: Table

April 2, 1999

(Seal of the Ministry of Information Industry of the People's Republic of China)

Keywords: color CRT, color TV, cost, Notice

Cc: The State Planning Commission, the State Economic and Trade Commission, and the State Administration for Industry and Commerce.

The General Office of the Ministry of Information Industry        Distributed on April 12, 1999

-2-

010

Table:

Industrial Average Production costs for Some Sizes and Types of Color CRTs and Color TVs

| | |
|---|---|
| 21" Color CRT | RMB440/piece |
| 25" Color CRT | RMB720/piece |
| 21" Color TV | RMB1,130/set |
| 25" Color TV | RMB 1,700/set |

-3-

CONFIDENTIAL                                                                     IRI-CRT-00031467

Note

| | |
|---|---|
| Whole volume No.: | |
| Catalog No.: | |
| Docket No.: | |
| There are a total of 10 pages within this volume (or book) | |
| Defects or other situations of this volume (or book) | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| Volume prepared by: Wang Yueqin | Checked by: |
| August 15, 2000 | Date: |

03513 x 824



CONFIDENTIAL                                                IRI-CRT-00031468

# 彩虹集团公司

## C06 企业管理

关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法反发布彩管、彩电部分品种行业平均生产成本的通知

| 自九九年 三 月至九九年 四 月 | 保管期限 | 长 期 |
|---|---|---|
| **本卷内共 十 张** | 归档号 | |

| 全宗号 | 目录号 | 案卷号 |
|---|---|---|
| | | |

CONFIDENTIAL

IRI-CRT-00031457

# 卷 内 目 录

| 顺序号 | 文件作者 | 文件原编字号 | 文件收文编号 | 秘别 | 文件日期 | 标　　题 | 文件所在张号 |
|---|---|---|---|---|---|---|---|
| 1 | 信息产业部 | 计价格(99)264 | 46 | | 99.3.15 | 国家计委、信息产业部印发关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法的通知 | 1~7 |
| 2 | 〃 | 信运部(99)287 | 51 | | 99.4.2 | 关于发布彩色显像管、彩色电视机部分品种行业平均生产成本的通知 | 8~10 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

CONFIDENTIAL

IRI-CRT-00031458

001



摘自中国电子报1999年4月13日第一版

# 于发布彩色显像管、彩色电视机
# 分品种行业平均生产成本的通知

信部运〔1999〕287号

止彩色显像管、彩色电视机行业的不正当价格竞
护正常的市场秩序，根据国家计委、信息产业部
彩色显像管、彩色电视机不正当价格竞争的试行
部依据上报各主要彩管、彩电生产企业报送的成本资
型企业的调研情况，对21英寸、25英寸两个品
彩电的行业平均生产成本进行了测算，现予发
。请各彩管、彩电生产企业认真贯彻执行。生
低于发布的行业平均生产成本销售，造成市场秩序
其他生产企业利益的，受损害的企业可向国家计

委、或者省、自治区、直辖市价格主管部门举报。对经调查
认定，确有不正当价格竞争行为的由政府价格主管部门责令
改正，并视具体情况进行处罚。

本通知自发布之日起执行。

附表：部分规格品种彩管、彩电行业平均生产成本

| | |
|---|---|
| 21英寸彩管 440元/只 | 21英寸彩电 1130元/只 |
| 25英寸彩管 720元/只 | 25英寸彩电 1700元/只 |

信息产业部   1999年4月2日

## 彩虹电子集团公司文件阅办单

| 集团拟办意见 清美阅示 15/4-99 | 部拟办意见： |
|---|---|

领导指示：

| 传阅时间 | 签　字 | 传阅时间 | 签　字 | 传阅时间 | 签　字 | 传阅时间 | 签　字 |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| 求完成时间 | 处理结果 | | |
|---|---|---|---|
| | 传真已发 99年4月15日 | | 承办单位领导签字 |

CONFIDENTIAL

001

潘黄家园 （signature） 5/4 99



公文 收 46 号
99年4月14日

摘自中国电子报 1999年4月13日第一版.

# 于发布彩色显像管、彩色电视机
# 分品种行业平均生产成本的通知

信部运〔1999〕287号

制止彩色显像管、彩色电视机行业的不正当价格竞
维护正常的市场秩序，根据国家计委、信息产业部
彩色显像管、彩色电视机不正当价格竞争的试行
戏成依据各主要彩管、彩电生产企业报送的成本资
典型企业的调研情况，对21英寸、25英寸两个品
彩电的行业平均生产成本进行了测算，现予发
报）。请各彩管、彩电生产企业认真贯彻执行。生
任于发布的行业平均生产成本销售，造成市场秩序
害其他生产企业利益的，受损害的企业可向国家计

委、或省、自治区、直辖市价格主管部门举报。对经调查
认定，确有不正当价格竞争行为的由政府价格主管部门贲令
改正，并视具体情况进行处罚。

本通知自发布之日起执行。

附表：部分规格品种彩管、彩电行业平均生产成本

| | |
|---|---|
| 21英寸彩管 440元/只 | 21英寸彩电 1130元/只 |
| 25英寸彩管 720元/只 | 25英寸彩电 1700元/只 |

信息产业部 1999年4月2日

## 关于制止彩色显像管、彩色电视机
## 不正当价格竞争的试行办法的通知

各省、自治区、直辖市及计划单列市物价局(委员会)，电子
工业主管部门：

为了制止彩色显像管、彩色电视机行业的不正当价格
竞争行为，维护正常的市场竞争秩序，国家计委、信息产业
部制定了《关于制止彩色显像管、彩色电视机不正当价格竞
争的试行办法》(以下简称《办法》)，现印发给你们，请认真
贯彻执行，并就有关事项通知如下：

— 1 —

CONFIDENTIAL

IRI-CRT-00031460

001



公文 收 46 号
99年4月14日

# 国家发展计划委员会
# 信息产业部 文件

计价格〔1999〕264 号

## 国家计委、信息产业部印发
## 关于制止彩色显像管、彩色电视机
## 不正当价格竞争的试行办法的通知

各省、自治区、直辖市及计划单列市物价局(委员会),电子
工业主管部门:

　　为了制止彩色显像管、彩色电视机行业的不正当价格
竞争行为,维护正常的市场竞争秩序,国家计委、信息产业
部制定了《关于制止彩色显像管、彩色电视机不正当价格竞
争的试行办法》(以下简称《办法》),现印发给你们,请认真
贯彻执行,并就有关事项通知如下:

CONFIDENTIAL

IRI-CRT-00031461



002

一、近几年来，由于产品供过于求，市场竞争日趋激烈，彩色电视机价格大幅度下降。在降价竞争中，一些彩色电视机、彩色显像管生产企业以低于生产成本的价格进行销售，扰乱了正常的价格秩序，损害了其他经营者和消费者的合法权益。各地价格、电子主管部门要会同计划、经贸等有关部门，加强领导，密切配合，共同做好《办法》的贯彻实施工作。

二、遵照国务院领导同志的指示精神，国家计委、信息产业部决定，将彩色显像管和彩色电视机作为 1999 年制止低价倾销、依法规范市场秩序的重点品种。各地要加强监督检查，检查的主要内容是：彩色显像管、彩色电视机生产企业的出厂价格是否低于其生产成本，经销企业的销售价格是否低于其进货成本；是否采取折扣、补贴、多给数量等手段低价销售；是否采取使用走私进口原材料和零配件、降低性能指标、以次充好、虚报成本等手段低价销售。

三、彩色显像管和彩色电视机生产企业要严格执行《办法》的各项规定，自觉规范价格行为，据实、准确记录与核定生产成本及进货成本，严禁少摊费用、虚置成本。同时要对有无不正当价格竞争行为进行自查自纠，并积极向价格主

— 2 —

009

管部门举报不正当价格竞争行为。

四、各地在贯彻实施《办法》和监督检查过程中存在的问题，请及时报告国家计委和信息产业部。

附件：关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法

一九九九年三月十五日

主题词：彩电　价格办法　通知

抄送：国务院办公厅、国家经贸委、财政部、海关总署，各省、自治区、直辖市及计划单列市计委（计经委）

— 3 —

附件:

# 关于制止彩色显像管、彩色电视机
# 不正当价格竞争的试行办法

第一条　　为制止彩色显像管、彩色电视机行业的不正当价格竞争行为，维护公平、公开、合法的市场竞争和正常的价格秩序，维护国家利益，保护经营者和消费者的合法权益，根据《中华人民共和国价格法》(以下简称《价格法》)及国家其他有关法律，制定本办法。

第二条　　凡在中华人民共和国境内从事生产、销售彩色显像管、彩色电视机的经营者，均应执行本办法。

第三条　　本办法所称的不正当价格竞争行为是指，经营者为了排挤竞争对手或独占市场，以低于本企业成本销售，或者采取其它不正当手段降低成本低价销售，扰乱正常的生产经营秩序，损害国家利益或其它经营者合法权益的行为。

第四条　　彩色显像管、彩色电视机经营者的下列行为属于不正当价格竞争行为：

(一)生产企业的出厂价格低于其同一时期生产成本，经销企业的销售价格低于其同一时期进货成本；

(二)采取折扣、补贴、多给数量等方式，使生产企业的实际出厂价格低于本企业生产成本，经销企业实际销售价格低于本企业进货成本；

(三)使用走私进口原材料和零配件、降低性能标准、以次充好、虚报成本等手段低价销售；

(四)市场份额占较大优势的彩色显像管购买者利用其优势地位迫使彩色显像管生产企业低于其生产成本销售产品；

(五)采取其它方式，使生产企业的实际出厂价格低于其同一时期生产成本，或经销企业的实际销售价格低于其同一时期进货成本。

第五条　　信息产业部定期发布彩色显像管、彩色电视机主要品种、规格的行业平均生产成本。国家计委会同信息产业部确定和公布合理的下浮幅度。

第六条　　生产企业的出厂价格原则上不应低于行业平均生产成本；经销企业的销售价格不应低于正常进货成本。

— 4 —

— 5 —

CONFIDENTIAL

IRI-CRT-00031463

第七条　生产企业以低于发布的行业平均生产成本销售，经销企业以低于其同期进货成本销售，造成市场价格秩序混乱、损害其它生产企业和经销企业利益的，受损害的生产企业和经销企业可向国家计委或者省、自治区、直辖市政府价格主管部门举报；政府价格主管部门根据情况立案调查。

第八条　举报人应当据实反映情况，提供被举报人不正当价格竞争行为的事实材料和被损害的情况。被举报的经营者，应当配合政府价格主管部门调查，如实提供相关的帐薄、单据、凭据以及其它资料。

第九条　经调查认定，被举报的彩色显像管、彩色电视机经营者确有本办法第四条所列不正当价格竞争行为的，由政府价格主管部门责令改正，并视具体情况依据《价格法》进行下列处罚：

（一）予以警告；

（二）处以罚款；

（三）责令其停业整顿；

（四）提请工商行政管理机关吊销其营业执照。

第十条　价格主管部门实施检查时，首先应以生产、

— 6 —

经营者的个别成本为主要判定依据。当个别成本难以认定时，以行业平均成本和合理的下浮幅度为主要判定依据。

第十一条　彩色显像管、彩色电视机经营者应当建立、健全内部价格管理及成本、费用核算制度，据实、准确记账与核定生产成本及进货成本，不得弄虚作假。

第十二条　各级电子工业主管部门及彩色显像管、彩色电视机行业协会应当督促彩色显像管、彩色电视机经营者执行本办法。对生产企业和经销企业违反本办法的，规劝其改正；规劝无效的，可向政府价格主管部门举报，要求立案调查。

第十三条　本办法由国家计委负责解释。

第十四条　本办法自1999年4月1日起施行。

— 7 —

IRI-CRT-00031464

008

# 信息产业部文件

信部运〔1999〕287号

## 关于发布彩色显像管、彩色电视机部分
## 品种行业平均生产成本的通知

彩虹电子集团公司文件阅办单

| 集团拟办意见： | | | | 部拟办意见： | | | |
|---|---|---|---|---|---|---|---|

领导指示：

| 传阅时间 | 签 字 | 传阅时间 | 签 字 | 传阅时间 | 签 字 | 传阅时间 | 签 字 |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| 要求完成时间 | 处理结果 | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | 承办单位领导签字 | | |

CONFIDENTIAL

IRI-CRT-00031465

008



# 信息产业部文件

信部运〔1999〕287号

## 关于发布彩色显像管、彩色电视机部分
## 品种行业平均生产成本的通知

各彩管、彩电生产企业：

　　为了制止彩色显像管、彩色电视机行业的不正当价格竞争行为，维护正常的市场秩序，根据国家计委、信息产业部《关于制止彩色显象管、彩色电视机不正当价格竞争的试行办法》，我部依据各主要彩管、彩电生产企业报送的成本资料，结合典型企业的调研情况，对21英寸、25英寸两个品种规格彩管、彩电的行业平均生产成本进行了测算，现予发布（见附表）。请各彩管、彩电生产企业认真贯彻执行。生产企业以低于发布的行业平均生产成本销售，造成市场秩序混乱、损害其他生产企业利益的，受损害的企业可向国家计委、或者省、自

— 1 —

009

治区、直辖市价格主管部门举报。对经调查认定,确有不正当
价格竞争行为的由政府价格主管部门责令改正,并视具体情
况进行处罚。

本通知自发布之日起执行。

附件:附表

010

附表:

## 部分规格品种彩管、彩电行业平均生产成本

| | |
|---|---|
| 21英寸彩管 | 440元／只 |
| 25英寸彩管 | 720元／只 |
| 21英寸彩电 | 1130元／台 |
| 25英寸彩电 | 1700元／台 |



主题词:彩管 彩电 成本 通知

抄 送:国家计委,国家经贸委,国家工商行政管理局。

信息产业部办公厅

一九九九年四月十二日印发

— 2 —

— 3 —

CONFIDENTIAL

IRI-CRT-00031467

# 备　考　表

| | |
|---|---|
| 全　宗　号： | |
| 案卷目录号： | |
| 案卷顺序号： | |
| 本卷（或簿本）内的文件共有 10 张 | |
| **本卷**（或簿本）内的缺点或其他情况 | |

立卷人：王跃芹

2000 年 8 月 15 日

检查人：

年　月　日

03513×824

CONFIDENTIAL

IRI-CRT-00031468

# APPENDIX 7

# EXHIBIT C



December 20, 2017

**Certification**

**Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of:
关于发布彩色显像管、彩色电视机部分品种行业平均生产成本的通知

Hanna Kang

Project Manager

Project Number: BBLLP_1712_051

| File No. | Catalogue No. | Record No. | Sequence No. |
|---|---|---|---|
| | [illegible] | 2 | 3 |

P5

Document of the Ministry of Information Industry
Xin Bu Yun [1999] No. 287

Notification of Publishing Industrial Average Production Costs for Some Types of Color CRTs and Color TVs

To prevent actions of unfair price competition in the color CRT and color TV industry and maintain a normal market order, this Ministry performed estimation on the industrial average production costs of two types of color CRTs and color TVs, i.e. 21 inches and 25 inches, pursuant to the Trial Measures to Prevent Unfair Price Competition Regarding Color CRTs and Color TVs by the State Planning Commission and the Ministry of Information Industry. The estimation was made according to cost materials reported by major manufacturers of color CRTs and color TVs and combined with the results of investigation on typical enterprises. The estimation is hereby published (see the attached table). All color CRT and color TV manufacturing enterprises are asked to seriously implement the estimation. In the case where a manufacturing enterprise sells the products at prices lower than the published industrial average production costs to cause market disorders and harm the interests of other manufacturing enterprises, a harmed enterprise may file a report with the State Planning Commission or a competent department in charge of prices of a province, autonomous region or municipality directly under the Central Government. In the case where it is confirmed through investigation that there is indeed an action of unfair price competition, a competent government department in charge of prices shall order the responsible party to correct and impose penalties according to specific situations.

- 1 -

| Electronic Industry Archives | |
|---|---|
| Copy | No. 2017048 |

This Notification shall go into effect as of the date of issuance.

Attachment: Attached Table

April 2, 1999
(Seal of the Ministry of Information Industry of the
 People's Republic of China)

Keywords: color CRT, color TV, cost, notification

Cc: The State Planning Commission, the State Economic and Trade Commission, and the State Administration for Industry and Commerce.

The General Office of the Ministry of Information Industry          Printed and distributed on
                                                                    April 12, 1999

Attached Table:

Industrial average production costs for Some Sizes and Types of Color CRTs and Color TVs

| | |
|---|---|
| 21" Color CRT | 440 Yuan/piece |
| 25" Color CRT | 720 Yuan/piece |
| 21" Color TV | 1130 Yuan/set |
| 25" Color TV | 1700 Yuan/set |

信息产业部文件

信部运〔1999〕287号

## 关于发布彩色显像管、彩色电视机部分
## 品种行业平均生产成本的通知

　　为了制止彩色显像管、彩色电视机行业的不正当价格竞争行为，维护正常的市场秩序，根据国家计委、信息产业部《关于制止彩色显象管、彩色电视机不正当价格竞争的试行办法》，我部依据各主要彩管、彩电生产企业报送的成本资料，结合典型企业的调研情况，对21英寸、25英寸两个品种规格彩管、彩电的行业平均生产成本进行了测算，现予发布（见附表）。请各彩管、彩电生产企业认真贯彻执行。生产企业以低于发布的行业平均生产成本销售，造成市场秩序混乱、损害其他生产企业利益的，受损害的企业可向国家计委、或者省、自治区、直辖市价格主管部门举报。对经调查认定，确有不正当

－ 1 －

电子工业档案馆
复印 2017 048 号

价格竞争行为的由政府价格主管部门责令改正,并视具体情况进行处罚。

本通知自发布之日起执行。

附件:附表



一九九九年四月二日

**主题词:**彩管 彩电 成本 通知

抄 送:国家计委,国家经贸委,国家工商行政管理局。

信息产业部办公厅 一九九九年四月十二日印发

— 2 —

情

附表：

## 部分规格品种彩管、彩电行业平均生产成本

| | |
|---|---|
| 21英寸彩管 | 440元／只 |
| 25英寸彩管 | 720元／只 |
| 21英寸彩电 | 1130元／台 |
| 25英寸彩电 | 1700元／台 |

一
发

# APPENDIX 8

# EXHIBIT E



December 20, 2017

**Certification**

**Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of:
关于发布彩色电视机部分品种行业平均生产成本的通知

Hanna Kang

Project Manager

Project Number: BBLLP_1712_051

15 W. 37th Street 8th Floor
New York, NY 10018
212.581.8870
ParkIP.com

| File No. | Catalogue No. | Record No. | Sequence No. |
|---|---|---|---|
| | [illegible] | 14 | 3 |

Document of the Ministry of Information Industry
Xin Bu Yun [2000] No. 789

Notification of Publishing Industrial Average Production Costs for Some Types of Color TVs

To color TV manufacturing enterprises:

To prevent actions of unfair price competition in the color TV industry and maintain a normal market order, the industrial average production costs of three types of color TVs, i.e. 21 inches, 25 inches, and 29 inches, are hereby published (see the attached table for details) pursuant to the Trial Measures to Stop Unfair Price Competition Regarding Color CRTs and Color TVs by the State Planning Commission and the Ministry of Information Industry. All color TV manufacturing enterprises are asked to seriously implement the costs. In the case where a manufacturing enterprise sells the products at prices lower than the published industrial average production costs to cause market disorders and harm the interests of other manufacturing enterprises, a harmed enterprise may file a report with the State Planning Commission or a competent department in charge of prices of a province, autonomous region or municipality directly under the Central Government. In the case where it is confirmed through investigation that there is indeed an action of unfair price competition, a competent government department in charge of prices shall order the responsible party to correct and impose penalties according to specific situations.

- 1 -

| Electronic Industry Archives | |
|---|---|
| Copy | No. 2017053 |

This Notification shall go into effect as of the date of issuance.


Attached Table: Industrial average production costs for Some Sizes of Color TVs




August 25, 2000
(Seal of the Ministry of Information Industry of the
People's Republic of China)








Keywords: color TV, production cost, notification

Cc: The State Planning Commission, the State Economic and Trade Commission, and the State
Administration for Industry and Commerce.

The General Office of the Ministry of Information Industry          Printed and distributed on
                                                                    August 25, 2000

Attached Table: Industrial average production costs for Some Sizes of Color TVs

| 21" | 970 Yuan/set |
|-----|--------------|
| 25" | 1420 Yuan/set |
| 29" | 2170 Yuan/set |

# 信息产业部文件

信部运〔2000〕789号

## 关于发布彩色电视机
## 部分品种行业平均生产成本的通知

各彩电生产企业：

为了制止彩色电视机行业的不正当价格竞争行为，维护正常的市场秩序，按照国家计委、信息产业部《关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法》，现将21英寸、25英寸、29英寸三种规格彩电的行业平均成本予以发布（详见附表）。请各彩电生产企业认真贯彻执行。生产企业以低于发布的行业平均成本销售造成市场秩序混乱、损害其它生产企业利益的，受损害的企业可以

— 1 —

电子工业档案馆
复印 2011053 号

向国家计委或者省、自治区、直辖市价格主管部门举报。对经调查认定，确有不正当价格竞争行为的由政府价格主管部门责令改正，并视具体情况进行处罚。

　　本通知自发布之日起执行。

　　　附表：部分规格彩电行业平均生产成本



　　　　　　　　　　　　　　　二〇〇〇年八月二十五日

主题词：彩电　生产成本　通知

抄　送：国家计委，国家经贸委，国家工商行政管理局。

信息产业部办公厅　　　　　二〇〇〇年八月二十五日印发

附表：

## 部分规格彩电行业平均生产成本

| 21英寸 | 970元／台 |
|--------|-----------|
| 25英寸 | 1420元／台 |
| 29英寸 | 2170元／台 |

# APPENDIX 9

# EXHIBIT F



December 20, 2017

**Certification**

**Park IP Translations**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of:
关于发布彩色显像管部分品种行业平均生产成本的通知

Hanna Kang

Project Manager

Project Number: BBLLP_1712_051

| File No. | Catalogue No. | Record No. | Sequence No. |
|---|---|---|---|
| | [illegible] | 14 | 4 |

Document of the Ministry of Information Industry
Xin Bu Yun [2000] No. 843

Notification of Publishing Industrial Average Production Costs for Some Types of Color CRTs

To color CRT manufacturing enterprises:

     To prevent actions of unfair price competition in the color CRT industry and maintain a normal market order, the industrial average production costs of three types of color CRTs, i.e. 21 inches, 25 inches, and 29 inches, are hereby published (see the attached table for details) pursuant to the Trial Measures to Prevent Unfair Price Competition Regarding Color CRTs and Color TVs by the State Planning Commission and the Ministry of Information Industry. All color CRT manufacturing enterprises are asked to seriously implement the costs. In the case where a manufacturing enterprise sells the products at prices lower than the published industrial average production costs to cause market disorders and harm the interests of other manufacturing enterprises, a harmed enterprise may file a report with the State Planning Commission or a competent department in charge of prices of a province, autonomous region or municipality directly under the Central Government. In the case where it is confirmed through investigation that there is indeed an action of unfair price competition, a competent government department in charge of prices shall order the responsible party to correct and impose penalties according to specific situations.

- 1 -

| Electronic Industry Archives | |
|---|---|
| Copy | No. 2017052 |

This Notification shall go into effect as of the date of issuance.


Attachment: Attached Table



September 13, 2000
(Seal of the Ministry of Information Industry of the People's Republic of China)










Keywords: color CRT, production cost, notification

Cc: The State Planning Commission, the State Economic and Trade Commission, and the State Administration for Industry and Commerce.

The General Office of the Ministry of Information Industry   Printed and distributed on September 14, 2000

- 2 -

Attached Table: Industrial average production costs for Some Sizes of Color CRTs

| 21" (regular flat) | 410 Yuan/piece |
| 25" (regular flat) | 670 Yuan/piece |
| 29" (ultra flat) | 1135 Yuan/piece |

信息产业部文件

信部运〔2000〕843号

# 关于发布彩色显像管
# 部分品种行业平均生产成本的通知

各彩管生产企业：

　　为了制止彩色显像管行业的不正当价格竞争行为，维护正常的市场秩序，按照国家计委、信息产业部《关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法》，现将21英寸、25英寸、29英寸三种规格彩管的行业平均成本予以发布（详见附表）。请各彩管生产企业认真贯彻执行。生产企业以低于发布的行业平均成本销售造成市场秩序混乱、损害其它生产企业利益的，受损害的企业可以

－ 1 －

电子工业档案馆
复印 2011052 号

向国家计委或者省、自治区、直辖市价格主管部门举报。对经调查认定,确有不正当价格竞争行为的由政府价格主管部门责令改正,并视具体情况进行处罚。

本通知自发布之日起执行。

附件:附表



二〇〇〇年九月十三日

**主题词:彩管 生产成本 通知**

抄 送:国家计委,国家经贸委,国家工商行政管理局。

信息产业部办公厅 二〇〇〇年九月十四日印发

— 2 —

报。

格主

附表：部分规格彩管行业平均生产成本

| 21 英寸（普平） | 410 元/只 |
| 25 英寸（普平） | 670 元/只 |
| 29 英寸（超平） | 1135 元/只 |

印发

# APPENDIX C



July 17, 2023

**Certification**

<p align="center">**Welocalize Translations**</p>

**TRANSLATOR'S DECLARATION:**

I, **Samuel Chong**, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 关于认真做好制止低价倾销工作及开展对低价倾销进行检查的通知.pdf

*(Digital or printed signature here above the line)*

_____

**Samuel Chong**
**Project Number: BBLLP_2306_P0022**

<p align="center">15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870</p>

Guangdong Provincial Development and Reform Commission - Notice on Earnestly Stopping Price Dumping and Carrying out Inspection of Price Dumping

# Guangdong Provincial Development and Reform Commission

July 12, 2023 Wednesday
The website supports IPv6

Guangdong Provincial Development and Reform Commission

Home   Government Transparency   Government Affairs   Interaction   Special Columns   Query & Download

Please enter search content...

⊙ Your location: Home > Government Transparency > Policy Documents > Normative Documents

## Notice on Earnestly Stopping Price Dumping and Carrying out Inspection of Price Dumping

Information source: This website    Time: March 12, 2003 00: 00: 00    Font: [Large] [Medium] [Small]

**Notice of State Planning Commission on Earnestly Stopping Price Dumping and Carrying out Inspection of Price Dumping**

**January 16, 1999    JJG [1999] No. 42**

Price bureaus (commissions) of all provinces, autonomous regions, municipalities directly under the Central Government, cities specifically designated in the state plan, and sub-provincial provincial capitals:

In order to implement the spirit of the instructions of the leading comrades of the State Council and earnestly stop price dumping, the relevant matters are hereby notified below:

1. In recent years, with the development of the economy, product oversupply and price-reduced competition among companies appear in some industries. Price competition among companies helps promote product sales and the balancing of total market supply and demand, prompts companies to strengthen internal management and reduce production costs, drives the progress and new-product development of companies and facilitates economic restructuring and rational allocation of resources. However, some companies sell at prices lower than product cost and some companies resort to price dumping by using smuggled raw materials or reducing product quality or by other illegal means, disrupting the normal price order and damaging the legitimate rights and interests of business operators and consumers. Therefore, price departments at all levels shall fully understand the necessity and urgency of stopping price dumping, and according to a series of regulatory documents for stopping price dumping promulgated by the State Planning Commission, shall resolutely stop price dumping and other price misconducts according to law to maintain the normal economic order while protecting and promoting competition.

2. In order to effectively stop price dumping, all areas shall investigate the companies, which sell products below the average cost of the industry and shall focus their inspection work on the prices of flat glass, steel, color cathode ray tubes, color TV sets and sugar in the first half of 1999. The inspection includes the following specific content:

(1)  Do the factory prices of production companies and the sales prices of distribution companies contain the behavior of price dumping set forth in Article 5 of the Regulation for Stopping Unfair Product Behavior of Price Dumping of Industrial Products promulgated by the State Planning Commission and the State Economic and Trade Commission and prescribed in the regulations for stopping price dumping of flat glass, steel and other products;

(2)  Do the factory prices of production companies and the sales prices of distribution companies contain the behavior of cost reduction and price dumping by using smuggled raw materials, parts and accessories, using shoddy goods for quality goods, reducing functions, lowering quality, or misstating or understating costs or by other illegal means;

(3)  Are the factory prices of production companies and the sales prices of distribution companies lower than the lower limits of the government-guided prices.

Each area can, according to the actual situation, determine by itself the key products for stopping price dumping and carry out inspection.

3. Before carrying out inspection, each area shall go deep into the grassroots, make a good investigation and research, figure out the situation and determine the organizations and product varieties to be inspected, and shall do a good job in pilot inspection, and properly organize centralized inspection on the basis of accumulating experience.

4. For the products included in the list for stopping price dumping, the companies can be required to first conduct self-inspection, and forces shall be organized to inspect some key companies. The companies, which are found using smuggled raw materials, parts and accessories, reducing functions, using shoddy goods for quality goods, or misstating cost, shall be ordered to make correction and be punished according to the relevant regulations until the relevant departments are requested to revoke their business licenses. All areas shall seriously accept the reports of price dumping behavior, and shall timely investigate and deal with the companies reported to have the problem of price dumping.  The State Planning Commission will set up working groups, which will organize relevant departments to conduct special investigations during supervision and guidance in some areas.

5. In the process of stopping price dumping and other improper price behaviors, all areas shall pay attention to the protection of fair, proper and lawful price competition and shall not limit competition and protect the backward. The identification, investigation and handling of price dumping behavior must use the advanced and reasonable individual costs of companies as the primary judgment basis, and the average cost of the industry published by the competent authorities as a reference basis. Companies selling their products below the average cost of the industry, but not below their own costs, shall not be punished as price dumping. The collusion between companies for price monopoly and oppression of other competitors, or artificial inflation of prices for seeking interests shall be stopped according to the relevant provisions of the Price Law.

6. Given the strong policy orientation and high difficulty of the work of stopping price dumping, the price departments at all levels shall, under the unified leadership of local governments, accurately grasp the price boundaries, administer according to law, and enforce the laws strictly. Typical price dumping cases with serious circumstances and bad nature shall be publicly exposed to prompt the companies to restrain themselves and consciously comply with relevant state price laws, regulations and policies, thus effectively stopping blind price cuts and vicious competition among companies.

7. All areas shall report their experience, problems and major typical cases in the work of stopping price dumping to the State Planning Commission in a timely manner.

**Shared to** ⭐ 🔵 🟠 🟢



✕Close the window          🖨 Print the paper.

| Related Websites ∨ | Bureaus/subordinates of the Commission ∨ | Agencies directly under provincial jurisdiction ∨ | Prefecture-level development and reform bureaus (commissions) ∨ | National and Provincial/municipal development and reform commissions ∨ | Other links |
|---|---|---|---|---|---|

**About Us | Site Map | Technical Support | Contact Us | Privacy | Copyright**

Organizer: Guangdong Provincial Development and Reform Commission   Undertaker: Guangdong Investment and Credit Center
Address: Building 5, No. 305 Dongfeng Middle Road, Guangzhou (Zip Code: 510031)   Business consulting telephone: 12345
Copyright: Guangdong Provincial Development and Reform Commission   Reproduction or mirroring without written authorization is prohibited
Yue ICP Bei 2022065133    ☆ YGWAB 44010402001448   Website ID 4400000058

Government Websites
Find errors
Party Affairs Organ





2023年7月12日 星期三
网站支持IPv6

# 广东省发展和改革委员会
## Guangdong Provincial Development and Reform Commission

首页　政务公开　政务服务　互动交流　专题专栏　查询下载　　请输入搜索内容...

您所在的位置：首页 > 政务公开 > 政策文件 > 规范性文件

## 关于认真做好制止低价倾销工作及开展对低价倾销进行检查的通知

信息来源：本网　　　　时间：2003-03-12 00:00:00　　　　　字体：[大] [中] [小]

**国家计委关于认真做好制止低价**

**倾销工作及开展对低价倾销进行检查的通知**

一九九九年一月十六日　　　　计价格[1999]42号

各省、自治区、直辖市及计划单列市、副省级省会城市物价局（委员会）：

为了贯彻落实国务院领导同志的批示精神，认真做好制止低价倾销工作，现就有关事项通知如下：

一、近年来，随着经济的发展，一些行业出现了产品供过于求、企业间降价竞争的现象。企业间的价格竞争有利于促进产品销售和市场供求总量的平衡，促使企业加强内部管理降低生产成本，推动企业的技术进步和新产品开发，促进经济结构调整和资源的合理配置。但有些企业以低于产品成本的价格销售，有的企业采取使用私原材料、降低产品质量等非法手段降低成本降低成本非本价销售，扰乱了正常的价格秩序，损害了其他经营者和消费者的合法权益。因此，各级物价部门要充分认识制止低价倾销的必要性和紧迫性，根据国家计委颁布的一系列制止低价倾销的法规性文件，在保护竞争、促进竞争的同时，坚决依法制止低价倾销等不正当价格行为，维护正常的经济秩序。

二、为了切实做好制止低价倾销工作，各地要对低于行业平均成本销售产品的企业进行调查，把平板玻璃、钢材、彩色显像管、彩色电视机、食糖等产品价格作为1999年上半年检查工作的重点。检查的具体内容是：

（一）生产企业的出厂价格、经销企业的销售价格，是否存在国家计委、国家经贸委颁发的《关于制止低价倾销工业品的不正当价格行为的规定》第五条系列的及制止低价倾销平板玻璃、钢材等法规中规定的低价倾销行为；

（二）生产企业的出厂价格、经销企业的销售价格，是否采取使用非私原材料和零配件、以次充好、减少功能、降低质量和虚报少列成本等非法手段降低成本，进行低价倾销的行为；

（三）生产企业的出厂价格、经销企业的销售价格，是否低于政府指导价格的下罪界限。

各地可以根据实际情况，自行确定制止低价倾销的重点产品进行检查。

三、各地在开展检查前要深入基层，搞好调查研究，摸清情况，确定检查的单位和产品品种。并要认真做好检查的试点工作，在取得经验的基础上，组织好集中的检查。

四、对列入制止低价倾销的产品，可要求企业首先进行自查，并组织力量选择一些重点企业进行检查，对检查中使用非私原材料和零配件的企业，以及采取减少功能、以次充好、虚报成本的企业，要勒令其改正，并依据有关法规进行处罚。对于提请有关部门加强监督，认真做好低价倾销问题的举报，对被举报有低价倾销问题的企业，要及时进行查处。国家计委将组成工作组到部分地区督促、指导，必要时将组织有关部门进行专项调查。

五、各地在开展检查制止低价倾销工作的过程中要注意方法，要注意保护公平、正当、合法的价格竞争，保护规则竞争，保护落后。认定和查处低价倾销行为应坚持以法先进、合理的行政手段、行业主管部门公布的行业平均成本作为参照依据。企业低于行业平均成本，但不低于自身成本销售其产品，不应作为低价倾销行为处罚。对企业间相互串通，进行价格垄断，压迫其他竞争对手，或人为抬高价格牟取不正当利益的，要依据《价格法》的有关规定予以制止。

六、鉴于制止低价倾销工作的政策性强，难度大，各级物价部门要在当地政府的统一领导下，准确把握政策界限，依法行政，严格执法。对情节严重、性质恶劣的低价倾销典型案件要公开曝光，以促使企业增强自我约束能力，自觉遵守国家有关价格法律、法规和政策，有效制止企业间盲目降价、恶性竞争。

七、各地在制止低价倾销工作中的经验、存在问题和重大典型案件请及时报告国家计委。

分享到　⭐️ ☁️ 🔴 🟢 🟣　　　　　　　　　　　　　✕ 关闭窗口　　🖨 打印文档



相关网站 ▼　　委管局/直属单位 ▼　　省直单位 ▼　　地市发改局（委）▼　　国家及省市发改委 ▼　　其他链接 ▼

关于本站 ｜ 网站地图 ｜ 技术支持 ｜ 联系我们 ｜ 隐私保护 ｜ 版权声明

主办单位：广东省发展和改革委员会　承办单位：广东省投资和信用中心
地址：广州市东风中路305号5号楼（邮编：510031）　业务咨询电话：12345
版权所有：广东省发展和改革委员会　未经书面授权禁止复制和建立镜像
粤ICP备2022065133号　　粤公网安备 44010402001448号　网站标识码4400000058

政府网站 找错

# APPENDIX D

**ENGLISH.GOV.CN**

THE STATE COUNCIL
THE PEOPLE'S REPUBLIC OF CHINA

App | 中文 | 19 July 2023

HOME          NEWS          INSTITUTIONS          POLICIES          ARCHIVE          中文

# Price Law of the People's Republic of China

english.mofcom.gov.cn
Updated: Jan 19,2017 10:29 AM



### SERVICES

## Chapter I General Provisions

Article 1 This Law is enacted with a view to standardizing the price acts, giving play to the role of price in the rational allocation of resources, stabilizing the overall price level of the market, protecting the lawful rights and interests of the consumers and operators and promoting the sound development of the socialist market economy.

Article 2 This Law shall be applicable to price acts taking place within the territory of the People's Republic of China.

The prices referred to in this Law include the prices of commodities and the prices of services.

The prices of commodities mean the prices of all kinds of visible products and invisible assets. The prices of services mean collection of fees for all kinds of paid-for services.

Article 3 The State practises and gradually perfects the price mechanism shaped mainly by the market under macroeconomic regulation and control. Determination of prices shall be in line with the law of value, prices of most commodities and services shall be the market-regulated prices and prices of an extremely small number of commodities and services shall be the government-guided prices or the government-set prices.

Market-regulated prices mean those prices determined autonomously by the operators and formed through market competition.

The operators referred to in this Law mean the legal persons, other organizations or individuals engaging in the production and management of commodities or provision of paid services.

Government-guided prices mean those prices determined to guide the operators by the competent departments of price of the government or other departments concerned, the baseline prices and their range of fluctuations in accordance with the pricing authority and scope in pursuance of the provisions of this Law.

Government-set prices mean those prices determined by the competent departments of price of the government or other departments concerned in accordance with the pricing authority and scope in pursuance of the provisions of this Law.

Article 4 The State supports and promotes fair, open and lawful market competition, maintains normal price order and carries out administration, supervision and necessary regulation and control over price activities.

Article 5 The competent department of price under the State Council shall be uniformly responsible for the work related to prices nation wide. Other departments concerned under the State Council shall be responsible for the work related to prices concerned within their respective functions, responsibilities and scope.

The competent departments of price under local people's governments at or above the county level shall be responsible for the work related to prices within their respective administrative areas. Other departments concerned under local people's governments at or above the county level shall be responsible for the work related to prices concerned within their respective functions and responsibilities.

**Chapter II Price Acts of the Operators**

Article 6 Market regulated prices shall be practised and determined autonomously by the operators in pursuance of this Law for commodity prices and services prices except those to which government-guided prices and government-set prices shall apply pursuant to the provisions of Article 18 of this Law.

Article 7 The operators shall, in determining prices, abide by the principle of fairness, being in conformity with law, honesty and credibility.

Article 8 Production and management costs and market supply and demand situation shall be the fundamental basis for the determination of prices by the operators.

Article 9 The operators shall exert efforts to improve the administration of production and management, reduce the cost of production and management, provide commodities and services for the consumers at reasonable prices and gain lawful profits in market competition.

Article 10 The operators shall, in accordance with their management conditions, establish and perfect internal price control system, accurately record and verify the production and management costs of commodities and services and must not indulge in fraudulent practices.

Article 11 The operators have the following rights in the conduct of price activities:

(1)autonomous determination of prices under market regulation;

(2)determination of prices within the range prescribed by government guided prices;

(3)determination of prices for trial sale of new products within the scope of products of government-guided prices and government-set prices with the exception of specific products; and

(4)report or filing a charge against acts infringing on his/her right of autonomous determination of prices in accordance with law.

Article 12 The operators shall, in conducting price activities, abide by laws and regulations, and observe the intervention measures and emergency measures of government-guided prices, government-set prices and legal prices determined in accordance with law.

Article 13 The operators shall, in selling, procuring commodities and providing services, display the clearly marked price in accordance with the provisions of the competent departments of price of the government, annotate relevant information such as the name, place of manufacture, specifications, grade, unit of price calculation and price of a commodity or the services item and rates.

The operators shall not sell commodities with additional price besides the marked price and shall not collect any fee not indicated.

Article 14 The operators shall not commit the following unfair price acts:

(1)manipulation of market price in collusion to the detriment of the lawful rights and interests of other operators or consumers;

(2)dumping at the lower-than-the-cost price and disrupting the normal production and management order to the;

(2)dumping at the lower-than-the-cost price and disrupting the normal production and management order to the detriment of national interests or the lawful rights and interests of other operators for the purpose of squeezing out other competitors or of sole occupancy of the market in addition to the disposal of such commodities as fresh and living commodities, seasonal commodities and overstocked commodites at reduced prices in accordance with law;

(3)concoction and spreading of price-hike information, jacking up prices and pushing up over rise in commodities prices;

(4)luring consumers or other operators to conclude transactions with it by employing falsified or misleading price means;

(5)practising price discrimination towards other operators with identical trading conditions in providing identical commodities or services;

(6)procuring, selling commodities or providing services at prices raised or reduced in disguised form by adopting such means as raising or lowering the grade;

(7)seeking exorbitant profits in violation of the provisions of laws and regulations; and

(8)other unfair price acts prohibited by laws and administrative regulations.

Article 15 All types of intermediate agencies shall abide by the provisions of this Law in the collection of fees in providing paid-for services. Where laws have other provisions, the relevant provisions shall be observed.

Article 16 The operators shall abide by the relevant provisions of this Chapter and maintain the order of the domestic market in selling import commodities and procuring export commodities.

Article 17 Industries organizations shall abide by price laws, regulations and strengthen price self-discipline and accept the guidance in the work by the competent departments of price of the government.

## Chapter III The Government's Pricing Act

Article 18 The government may enforce government-guided prices or government-set prices when necessary for the prices of the following commodities and services:

(1)the prices of an extremely small number of commodites vital for the development of the national economy and people's life;

(2)the prices of a small number of commodities the resources of which are rare or short;

(3)the prices of commodities under natural monopoly management;

(4)the prices of essential public utilities; and

(5)the prices of essential non-profit services.

Article 19 The pricing catalogs of the Central Government and local governments shall be the basis for the pricing authority and specific applicable scope of government-guided prices and government-set prices.

The Central Pricing Catalog shall be compiled and revised by the competent department of price under the State Council and published upon approval of the State Council after submission.

Local Pricing Catalogs shall be compiled by the competent departments of price of people's governments of the provinces, autonomous regions and municipalities directly under the Central Government in pursuance of the pricing authority and specific applicable scope provided for in the Central Pricing Catalog and published upon examination and finalization of the competent department of price under the State Council after the verification and approval of the people's governments at the corresponding level.

Local people's governments at all levels below people's governments of the provinces, autonomous regions and municipalities under the Central Government shall not compile pricing catalogs.

Article 20 The competent department of price and other departments concerned under the State Council shall determine the government-guided prices and government-set prices in pursuance of the pricing authority and the specific applicable scope provided for in the Central Pricing Catalog; among which the government-guided prices and government-set prices of the prices of essential commodities and services shall be submitted to the State Council for approval in accordance with provisions.

The competent departments of price and other departments concerned of people's governments of the provinces, autonomous regions and municipalities directly under the Central Government shall determine the government-guided prices and government-set prices for implementation in their respective areas in pursuance of the pricing authority and specific applicable scope provided for in Local Pricing Catalogs.

Municipal and county people's governments may, in accordance with the authorization of people's governments of the provinces, autonomous regions and municipalities directly under the Central Government and in pursuance of the pricing authority and specific applicable scope provided for in Local Pricing Catalogs, determine the government-guided prices and government-set prices for implementation in their respective areas.

Article 21 Determination of the government-guided prices and government set prices shall be based on the average costs of society and market supply and demand situation of relevant commodities or services, requirements of national economic and social development and tolerance of society and difference in prices in procurement and marketing, wholesale and retail, regions and seasons shall be followed.

Article 22 Competent departments of price and other departments concerned of the government shall, in determining the government-guided prices and government-set prices, conduct price and cost survey and solicit the views of the consumers, operators and the quarters concerned.

When the competent departments of price of the government conduct price and cost survey of the government-guided prices and government-set prices, the units concerned shall truthfully report the information and provide necessary account books, documents as well as other materials.

Article 23 The system of testimony shall be established under the chairmanship of the competent departments of price of the government to solicit the views of the consumers, operators and the quarters concerned to authenticate its necessity and feasibility in determining the government guided prices and government-set prices of the prices of public utilities, prices of nonprofit services and prices of commodities under natural monopoly management which involve the vital interests of the masses.

Article 24 The government-guided prices and government-set prices shall, upon determination, be released by the department determining the prices to the consumers and operators.

Article 25 The specific applicable scope and price level of the government-guided prices and government-set prices shall be adjusted at an appropriate time in the light of the economic performance and in pursuance of the pricing authority and procedures provided for.

The consumers and operators may come up with proposals for adjustment of the government-guided prices and government-set prices.

## Chapter IV Regulation and Control of Overall Price Level

Article 26 Stabilization of the overall market price level constitutes an important macro-economic policy goal of the State. The State determines the regulatory goals of the overall market price level on the basis of the requirements of the development of the national economy and tolerance of society, integrate them into the national economic and social development plan and bring about their realization through comprehensive employment of monetary, fiscal, investment, import-export and other policies and measures.

Article 27 The government may establish essential commodities reserve system and establish the price regulatory fund to regulate prices and stabilize the market.

Article 28 To keep up with the requirements of price regulation and administration, the competent departments of price of the government should establish the price monitoring system to monitor the change in prices of essential commodities and services.

Article 29 The government may bring into effect the protective prices in procurement when the market purchasing prices of such essential farm produce as food grains and other produce are too low, and adopt corresponding economic measures to guarantee its realization.

Article 30 When there is a marked rise in the prices of essential commodities and services or there exists the possibility of a marked rise, the State Council and people's governments of the provinces, autonomous regions And municipalities directly under the Central Government may take such intervention measures as restricting the price differential ratio or profit ratio, prescribe the restricted price, practise the price rise submission system and the price adjustment record system with respect to part of the prices.

People's governments of the provinces, autonomous regions and municipalities directly under the Central Government shall, in adopting the intervention measures prescribed in the preceding paragraph, submit the same to the State Council for the record.

Article 31 When drastic fluctuations and other abnormal conditions occur in the overall market price level, the State Council may take emergency measures of temporarily concentrated pricing authority, partial or comprehensive price freeze nationwide or in parts of the regions.

Article 32 Upon elimination of the circumstances for the implementation of the intervention measures and emergency measures in pursuance of the provisions of Articles 30 and 31 of this Law, the intervention measures and emergency measures shall be lifted in time.

## Chapter V Price Supervision and Inspection

Article 33 The competent departments of price of people's governments at or above the county level shall conduct supervision and inspection over price activities in

accordance with law and impose administrative sanctions against law-breaking acts in price in pursuance of the provisions of this Law.

Article 34 The competent departments of price of the government may, in conducting price supervision and inspection, exercise the following powers:

(1)inquire the interested party or the person involved and demand that he/she provides testimonial materials and other information relating to law-breaking acts in price;

(2)inquire into and duplicate the account books, invoices, vouchers, documents and other materials relating to law-breaking acts in price, and check the bank information relating to law-breaking acts in price;

(3)investigate the properties relating to law-breaking acts in price, and may order the interested party to suspend the relevant business when necessary; and

(4)may register for safekeeping in advance under circumstances that the evidences may be destroyed and lost or may be difficult to obtain later, the interested party and the person involved must not transfer, conceal or destroy the same.

Article 35 When subject to the supervision and inspection of the competent departments of price of the government, the operators should truth fully provide the account books, invoices, vouchers, documents and other materials necessary for supervision and inspection.

Article 36 Functionaries in charge of price of government departments must not use the materials or information obtained in accordance with law for any purposes other than price control in accordance with law and must not divulge the business secrets of the interested party.

Article 37 Consumer organizations, price supervision organizations of workers and staff members, neighborhood committees, villagers' committees and other organizations as well as the consumers have the right to conduct social supervision over price activities. The competent departments of price of the government should give full play to the supervisory role of the masses in price.

Media units have the right to exercise supervision over price through public opinion.

Article 38 The competent departments of price of the government should establish the reporting system of law-breaking acts in price.

All units and individuals have the right to report on law-breaking acts in price. The competent departments of price of the government should give encouragement to the informants and be responsible to keep the secret for the informants.

**Chapter VI Legal Liability**

Article 39 Any operator who fails to implement the government-guided prices, government-set prices and legal price intervention measures and emergency measures shall be ordered to make a rectification, confiscated of the illegal gains and may be concurrently imposed a fine of less than five times of the illegal gains; where there is no illegal gains, a fine may be imposed; where the circumstances are serious, an order shall be issued for the suspension of business operations for consolidation.

Article 40 Any operator who commits any of the acts listed in Article 14 of this Law shall be ordered to make a rectification, confisticated of the illegal gains and may be concurrently imposed a fine of less than five times of the illegal gains; where there is no illegal gains, a warning shall be administered and a fine may be imposed; where the circumstances are serious, an order shall be issued for the suspension of business operations for consolidation, or the business license revoked by the agency of industry and commerce administration. In the case of separate provisions of relevant

laws on penalties and penalty authorities for acts listed in Article 14 of this Law, the provisions of relevant laws may be observed.

Acts listed in Item (1) and Item (2) of Article 14 of this Law national in nature shall be confirmed by the competent department of price under the State Council; those of the provinces and below the provinces regional in nature shall be confirmed by the competent departments of price of people's governments of the provinces, autonomous regions and municipalities directly under the Central Government.

Article 41 Any operator who causes consumers or other operators to pay more prices for illegal price acts should refund the portion overpaid; where damage has been caused, liability for compensation shall be borne according to law.

Article 42 Any operator who violates the provision of clearly marking prices shall be ordered to make a rectification, confisticated of the illegal gains and may be concurrently imposed a fine of less than RMB 5,000 Yuan.

Article 43 Any operator who has been ordered to suspend relevant business operations but does not suspend the operations, or transfers, conceals and destroys properties registered for safekeeping in accordance with law shall be imposed a fine of more than 100% less than three times of the relevant business revenue or of the value of the properties transferred, concealed or destroyed.

Article 44 Whoever refuses to provide information required for supervision and inspection in accordance with the provisions or provides false information shall be ordered to make a rectification and administered a warning; whoever fails to make a rectification on expiry of the specified time period may be imposed a fine.

Article 45 Local people's governments at all levels or the departments concerned of people's governments at all levels that violate the provisions of this Law, overstep the pricing authority and scope in determining and adjusting prices without authorization or fail to implement the legal price intervention measures and emergency measures shall be ordered to make a rectification and may be criticized in a circular; the person-in-charge held directly responsible and other persons directly responsible shall be given administrative sanctions according to law.

Article 46 Any functionary in charge of price who divulges state secrets, business secrets and abuses power, indulges in self-seeking misconducts, neglects duties, extorts and accepts bribes constituting a crime shall be investigated of the criminal liability in accordance with law; where a crime has not been constituted, sanctions shall be imposed according to law.

## Chapter VII Supplementary Provisions

Article 47 Fee collection by state administrative agencies should be effected in accordance with law, items for fee collection put under stringent control and scope of fee collection and rates restricted. Specific control measures for fee collection shall be worked out separately by the State Council.

Provisions of relevant laws and administrative regulations apply to interest rates, exchange rates, premium rates, and securities and futures prices, and this Law shall not be applicable thereto.

Article 48 This Law shall enter into force as of May 1, 1998.

*(All information published in this website is authentic in Chinese. English is provided for reference only.)*

Copyright© www.gov.cn | About us | Contact us

Registration Number: 05070218

All rights reserved. The content (including but not limited to text, photo, multimedia information, etc) published in this site belongs to www.gov.cn.

Without written authorization from www.gov.cn, such content shall not be republished or used in any form.

# APPENDIX E



June 30, 2023

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, **Samuel Chong**, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 中华人民共和国价格法释义_第二部分 释义 第六章 法律责任_中国人大网.pdf

*(Digital or printed signature here above the line)*

_____

**Samuel Chong**
**Project Number: BBLLP_2306_P0022**

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

Home | Chairman of Wu Bangguo | Congress Meetings | Standing Committee Meetings | Thematic Collection | Live Broadcast | Interviews | Pictures | Deputies | Literature | Laws and Regulations | English



Current location: Legal interpretation and Q&A >> Economic laws >> Interpretation of the Price Law of the People's Republic of China

## Part 2 Interpretation Chapter 6 Legal Liability

| www.npc.gov.cn | Date: November 25, 2000 | Browsing size: Small  medium  large |

Print this page        Close the window

Article 39      Business operators who refuse to implement the government-set or guided prices, legal price intervention measures or emergency measures shall be ordered to correct, have their illegal proceeds confiscated and be fined concurrently for an amount less than five times the illegal proceeds. In cases of no illegal proceeds involved, a fine may still be imposed. For serious cases, they shall be ordered to stop business operation and make correction.

[Interpretation]     This article specifies the legal liability that the business operators who refuse to implement the government-set or guided prices, legal price intervention measures or emergency measures shall bear.

Article 12 of this Law specifies that in their work related to prices, business operators shall strictly keep up with laws, regulations, government guided-prices, government-set prices, legal price intervention measures and emergency measures adopted by the government according to law. It is a provision on the obligation that business operators in price activities shall perform. If the business operators refuse to implement the government-set or guided prices, legal price intervention measures or emergency measures, in other words, violate the legal obligation and price-related laws, they shall bear the corresponding legal liability. The so-called legal liability refers to the legal consequences that the perpetrator shall bear due to the violation of the law. If the perpetrator makes the act prohibited by law or fails to perform the obligation prescribed by law, he shall bear the legal consequences caused by such illegal act. The investigation of legal liability is mandatory by the state and can only be implemented by the organs authorized by law, and the principle of legality of illegal acts must be adhered to. Because of different natures and harm degrees of the illegal acts, the perpetrators shall bear different legal liabilities, which can be classified into civil liability, criminal liability and administrative liability. The legal liability in the Price Law refers to the legal consequences that the price violator shall bear. It is a kind of mandatory sanction against the price violator and an important part of the Price Law.

Business operator's act of refusing to implement the government-set or guided prices, legal price intervention measures or emergency measures violates the legal provision on the obligation that business operators shall perform. It is a kind of price violation and shall bear the corresponding administrative liability and be given administrative punishment according to law. We know that the government-set or guided prices, legal price intervention measures or emergency measures formulated according to law are important means for the government to carry out effective macro-control and necessary moderate intervention on market prices according to law, and the needs to stabilize the overall level of market price, and they tally with the overall and long-term interests of the society, take into account fairness and efficiency, and are of great significance to ensuring the

sustainable, stable and healthy development of the national economy. If business operators in price activities refuse to implement the government-set or guided prices, legal price intervention measures or emergency measures, it will inevitably endanger the government's price management and disrupt the market price order. For such price violations, the price department responsible for supervision and inspection of price activities according to law must investigate their administrative liability, correct the illegal acts and give administrative punishment in order to maintain the normal market price order and stabilize the overall market price level.

In accordance with the provisions of this article, for such price violations, the business operators shall first be ordered to correct the illegal acts, and then according to the seriousness of the circumstances, have their illegal proceeds confiscated, be fined and even be ordered to stop business operation and make correction. According to the provisions of the Chinese administrative punishment law, the administrative organ implementing administrative punishment shall order the party to correct the illegal act or correct the illegal act within a time limit. It is a provision on the principle that before implementation of administrative punishment, the illegal act must be corrected. The fundamental purpose of implementing administrative punishment is to maintain public interests and social order and correct illegal acts. Therefore, when dealing with administrative punishment cases, no matter what kind of administrative punishment is to be imposed on the violator, the administrative organ shall first ask the violator to correct the illegal act in time, and shall not substitute punishment for correction. In accordance with this principle and the administrative punishment methods set forth in this article, business operators who refuse to implement the government-set or guided prices, legal price intervention measures or emergency measures shall first be ordered to correct, and then have their illegal proceeds confiscated, that is, have the illegal proceeds of the business operators confiscated by force according to law. Generally speaking, the total price difference between the actual transaction price of the business operator and the price stipulated by the government can be identified as illegal proceeds. It is a digital material for confirming the amount of illegal proceeds of the perpetrator from the price violations and the economic losses and other losses caused by the price violations to the state, other business operators and consumers, and is a basis of punishment seriousness and a quantitative limit of punishment. On theses grounds, the business operators can be fined concurrently for an amount less than five times the illegal proceeds. In cases of no illegal proceeds involved, a fine may still be imposed. A fine is an additional financial punishment in addition to the confiscation of illegal proceeds. In general, the fine in the law is in two expression forms: times of illegal proceeds and absolute number. This article adopts two forms depending on whether there are illegal proceeds or not. Such provision is more scientific and reasonable and helps prevent arbitrariness in law enforcement. Finally, for business operators in a serious case, the competent price department shall order them to stop business operation and make correction, which is also the most severe administrative punishment for the perpetrators of price violations. In short, by adopting this series of punishment means, the ultimate purpose is to correct illegal acts and ensure the enforcement of laws, thus maintaining the public interests and the normal order of market prices.

Article 40      Business operators who have violated one of the acts listed in Article 14 of this law shall be ordered to correct, have their illegal proceeds confiscated and be fined concurrently for an amount less than five times the illegal proceeds. In cases of no illegal proceeds involved, a warning shall be issued, together with a fine. For serious cases, they shall be ordered to stop operation for correction or have their business licenses revoked by the administrative authority for industry and commerce. If other laws have stipulations concerning the punishments for acts listed in Article 14 of this law, the related laws shall prevail.

Whether acts listed in 1, 2 of Article 14 and are of national in nature shall be upon the judgment of the State Council price department and whether the acts are regional in nature, they shall be confirmed by price departments of provincial, autonomous regional and municipal people's governments.

[Interpretation]      This article specifies the legal liability of business operators with illicit price acts.

Article 14 of the Price Law defines and prohibit illicit price acts. Therefore, the business operators who violate these provisions shall be investigated for legal liability. The relevant contents of this article will be interpreted below:

1.    Business operators are the subjects of the illegal acts specified in this article, so if it is determined in the very beginning that the business operators have illicit price acts, they shall be investigated for legal liability, so that they become the liability bearers of the illegal acts. The definition of business operators as illegal subjects with illicit price acts shall be based on the provisions on business operators in Article 3 of the Price Law.

2.    One of the acts listed in Article 14 of the Price Law as referred to in this article indicates that violation of any of the eight illicit price acts listed in the Price Law shall be investigated by law and bear the corresponding legal liability. The eight illicit price acts listed in Article 14 of the Price Law are all independent acts, and the wrongdoers can be held accountable independently, without any need to be linked together as a premise or consequence. If a business operator has more than two kinds of illegal acts at the same time, those acts can be investigated for legal liability at the same time, which is different from and not in conflict with the administrative punishment law, which stipulates that it is not allowed to give two or more punishments to the same illegal act of the party. The key is to distinguish between one illegal act and two illegal acts.

3.    Order to correct the illicit price acts. Ordering to correct is mandatory, and the illegal business operators must correct their illegal acts. The way of correction varies with the content and form of the violation. For example, if the business operator fabricates and spreads price rise information for pushing up the prices, it must immediately stop the act of fabricating and spreading price rise information and make correction initiatively to restore the original price.

4.    Have their illegal proceeds confiscated and be fined concurrently for an amount less than five times the illegal proceeds. This provision is made to address the characteristics of business operators' illicit price acts, that is, the purpose of business operator's violations is to seek illicit interests, and all kinds of illicit price acts are always linked with economic interests, so their illegal proceeds must be confiscated and returned to the state, followed by financial punishments, and fines shall be imposed for some business operators.

5.    In cases of no illegal proceeds involved, a warning shall be issued, together with a fine. This means that some business operators have illicit price acts, but they have not achieved the expected profit purpose, that is, they have not obtained illegal proceeds. In this case, the illegal acts of the business operators cannot be negated, and punishments shall still be imposed, one is warning as an administrative punishment, and the other is economic sanction, and a fine can be imposed at the same time of warning. Such fine serves both as a warning to the business operator and as compensation for the harm caused by the illegal act of the business operator to recognize that the illegal act of the business operator though without illegal proceeds will still cause harm and damage the interests of the state and the public.

6.    Order to stop operation for correction or have the business license revoked. These two administrative punishments are for serious cases of illicit price acts, so the business operators shall bear heavier liability. Ordering to stop operation for correction is to cease its right to operate by force and urge it to correct its illegal acts in order to return to the state of lawful operation. It is a punishment that still gives the opportunity to correct because the business operator still has the opportunity to resume business. Revocation of the business license is a more severe punishment, that is, to cancel the business qualification of those business operators who cause serious harm, to drive them out of the market. Since the business license is issued by the administrative authority for industry and commerce, the Price Law stipulates that this punishment is still implemented by the administrative authority for industry and commerce.

7.    Links of relevant laws. It means that in addition to the Price Law, if relevant laws

otherwise specify the punishment of illicit price acts, and the punishment authority, the provisions of the relevant laws can be followed to harmonize the implementation of the provisions of laws and avoid conflicts.

8.    Identification of business operator's acts of control of market prices and price dumping. Firstly, it should be noted that control of market prices and price dumping are both relatively extensive price acts, and it is very complex to identify them, so it is determined that the price authority at a higher level is responsible for the identification. For example, to identify the control of market prices, it is necessary to compare normal prices with abnormal prices within a certain market scope and to investigate the acts related to price control; for another example, to identify price dumping, it is necessary to compare the price of the allegedly dumped commodity with its cost of production and operation, which shall also take into account the specific circumstances of average cost and individual cost. In addition, the market impact and harm are also an important part of the investigation. Whether the acts of control of market prices and price dumping are national or regional at or below provincial level shall be judged based on: firstly, the market situation and the scope of role; and secondly, coordination between the State Council and the provincial-level price departments. In the process of adhering to and improving the socialist market economy, the identification and sanction of these two illicit price acts will be increasingly important and require a higher level of law enforcement. It is necessary and timely to make relevant provisions in the Price Law.

Article 41    Whereas business operators have caused overpayment by consumers or other business operators in violation of price law, the part in excess of the due payment shall be returned. If damages are done, the business operators shall undertake to compensate for the losses.

[Interpretation]    This article specifies the civil legal liability that business operators with illegal price acts shall bear.

Civil legal liability is also referred to as civil liability, which is the civil legal consequences that the business operator as a civil subject who has price violations and infringes on the legitimate rights and interests of the legitimate right holders, namely: consumers or other business operator, in price activities, shall bear according to law. It is the concrete application of the prevailing principles of civil law in price relations. Although business operators in violation of price laws have been subjected to administrative punishments according to law, even been given severe punishments according to the law, their civil liability still cannot be exempted because these are two different legal relations. Administrative punishment is a sanction imposed on a business operator who has the act of violating the administrative order and bears the administrative legal liability. The civil liability in the price relation is a kind of economic liability. The price relation is actually a kind of economic relation. The General Principles of the Civil Law of the People's Republic of China specifies in Article 134 that the main methods of bearing civil liability shall be: (1) cessation of infringements; (2) removal of obstacles; (3) elimination of dangers; (4) return of property; (5) restoration of original condition; (6) repair, reworking or replacement; (7) compensation for losses; (8) payment of breach of contract damages; (9) elimination of ill effects and rehabilitation of reputation; and (10) extension of apology. The Price Law specifies the civil liability of business operators in violation of price law in Article 41 according to the nature and characteristics of price violations and the general provisions of the General Principles of the Civil Law.

The two methods specified in the Price Law including: return of the part in excess of the due payment and compensation for the losses are consistent and mutually linked with the provisions of the General Principles of the Civil Law. That business operators have caused overpayment by consumers or other business operators in violation of price law may have multiple forms of manifestation, and exists in various kinds of commodities and different transaction links. For example, in the verification of production and operating costs, the business operators commit falsification and inflate cost to raise the pricing; in the implementation of government-guided prices, the price exceeds the permitted range of fluctuation and is overcharged; the price marking violates relevant provisions, the price is above the marked price and fees not specified are collected; in the process of control of

market prices and price dumping, not only the interests of consumers will be damaged but also other business operators will suffer losses; pushing up prices and cheating consumers or other business operators by deceptive price means will inevitably result in losses of their interests; as an unfair transaction, price discrimination will damage the legitimate interests of some business operators; when raising or lowering the price in a disguised way, the business operators will benefit, but the interests of consumers or other business operators will be damaged correspondingly; the profiteering behavior of business operators is always based on making consumers pay too much, and under certain conditions, will also make some other business operators suffer losses; after the government-guided prices and government-set prices are determined, the refusal of the business operators to implement them in order to obtain illegitimate interests will cause damage to consumers or other business operators; when the market price rises significantly or the general price level fluctuates abnormally, the refusal of the business operators to implement legal price intervention measures or emergency measures in order to seek unlawful interests in the illegal acts may cause harm to consumers and other business operators. These illegal acts may directly or indirectly cause overpayment by consumers and cause other business operators to suffer losses. Of course, consumers may also suffer other losses in addition to overpayment. Here the Price Law has made clear and specific provisions: in case of overpayment, the part in excess of the due payment shall be returned, that is, the difference between the normal price and the abnormal price; of course, there is a premise here, that is, only when the transaction still exists, can the method of returning the part in excess of the due payment be adopted. If the original transaction relationship no longer exists due to the illegal price act of the business operator, the handling method will not be limited to returning the part in excess of the due payment. Where the price violation of the business operator has caused damage to consumers or other business operators, the Price Law determines firstly, undertaking to compensate for the losses, which is a legal principle that shall be followed; secondly, the ways of compensation, which shall comply with laws. Some of the ways of bearing civil liability stipulated in the General Principles of the Civil Law can be applied, and the relevant provisions in other laws shall also be taken as the basis.

Article 42    Whereas business operators violate the provisions about price marking, they shall be ordered to correct, have their proceeds confiscated and be fined concurrently for an amount of less than RMB5,000.

[Interpretation]    This article specifies the legal liability that the business operators in violation of price marking shall bear.

In order to regulate the price behavior of business operators, maintain the normal order of market prices, create a market environment of fair competition, and effectively protect the legitimate rights and interests of consumers, the law stipulates that business operators shall, when selling and purchasing goods and providing services, clearly mark the prices in accordance with the provisions of the government price departments. Practice has proved that price marking is not only conducive to business operators to sell goods, but also conducive to consumers to buy goods; not only conducive to the cooperation of manufacturers and merchants, but also conducive to accepting the supervision of the masses, and also conducive to preventing the use of price for unfair competition. Therefore, Article 13 of this Law expressly stipulates that in marketing and purchasing merchandises or providing services, business operators should clearly tap the related prices, specify names, places of origin, specifications, grades, price units, prices or items, fee collection standards and other related information according to the government's regulations. Business operators must not sell merchandises at prices above the marked prices or collect fees not specified. This provision on business operator's obligation to mark prices is an important legal system for price management in market economy, and also a clear requirement for business operators' price behavior. Business operators have the obligation to strictly implement it in accordance with legal provisions and consciously abide by the law. If business operators violate the legal provisions of price marking, they will go to the opposite of the normal market price order maintained by the law, constituting a price violation, which shall be investigated for legal liability according to law. Since this behavior is mainly caused by violation of

the law, it shall bear the corresponding administrative liability according to law.

In real life, the main problem of the price marking system is serious fiction of clearly marked prices. For the commodities and service items that shall adopt marked prices according to law, a small number of business operators in the process of independent pricing, afraid of the power of the law, do not dare to explicitly counter the law without marking the prices. However, they play with the tricks of clearly marked fictitious prices, other than follow the principles of fairness, legality and honesty or accord with production and operation costs and market supply and demand. They, by all means, ask sky-high prices, mark false prices, coax and cheat consumers who do not know the truth, and overcharge them as far as possible; a small number of business operators resort to deceptive pricing, deliberately make the prices ambiguous or the terms of payment unclear, and make a favorable explanation to the marked prices after consumers bite at a bait, forcing consumers to admit their bad luck. It should be pointed out that the meaning of clearly marked price and that of clearly marked fictitious prices are completely different. The clearly marked prices as required by law should be true other than fictitious prices marked arbitrarily. Therefore, this ill phenomenon is also an obvious price violation. According to the law, on the one hand, consumers should take up legal weapons to resolutely fight against this illegal behavior and safeguard their legitimate rights and interests in accordance with the law, and on the other hand, the government price departments should also strengthen the supervision of false price information in the market and punish this illegal behavior according to the law.

According to the provisions of this article, a business operator in violation of the provisions about price marking shall bear administrative liability. The price department of the government firstly orders it to correct according to law, and then imposes an administrative punishment of confiscating its illegal proceeds, and fining it concurrently for an amount of less than RMB5,000. It should be noted here that in the current Chinese laws and regulations, more than half of the means of administrative punishment have the provisions of ordering to correct, but any kind of illegal behavior should be corrected from the jurisprudence, so in fact, ordering to correct should not be a punishment, but a mandatory measure that must be taken first when implementing administrative punishment. Therefore, the implementation of administrative punishment for violation of price marking also must first order the business operators to correct their illegal acts before economic sanctions. As for what administrative punishments should be applied to what illegal acts, the basic principle is that the administrative punishment should be equivalent to the facts, nature, circumstances and social harm of the illegal acts. This article specifies that whereas business operators violate the provisions about price marking, they shall be ordered to correct, have their proceeds confiscated and be fined concurrently for an amount of less than RMB5,000. It is formulated in accordance with the above principle of equivalence of punishment to fault. The above administrative punishment for such price violations is more practical and feasible, so it is a powerful legal weapon to ensure that the price system can be fully implemented.

Article 43      For business operators who refuse to stop operation for correction as ordered or remove, hide or destroy things recorded for keeping according to law, a fine ranging from over one time to less than three times the value of the things removed, hidden or destroyed shall be imposed.

[Interpretation]      This article specifies the administrative liability that the business operators who refuse to comply with the provisions of the government price departments on stopping business operation and registering and keeping some evidences shall bear.

Article 34 of the Price Law specifies that in exercising monitoring and checking of prices, government price departments shall have the right to check property related to the price law violating acts and, if necessary, order the people concerned to stop related business operation. Such provision helps the government price departments stop price violations in a timely manner and find out illegal facts in time. If the business operators refuse to stop operation for correction as ordered, they have hindered the management behavior of the government price departments and shall be subjected to administrative punishment. Meanwhile, Article 34 of the Price Law also specifies that in exercising monitoring and checking of prices, government price departments may register and keep some evidences that are liable to be destroyed or kept out of hand or is hard to obtain for which people

concerned or related personnel must not in any cases remove, hide or destroy. The government price departments decide to register and keep some evidences for the purpose of preserving the evidences to facilitate the collection of evidence and the handling of price violations. The people concerned or related personnel shall cooperate. If the people concerned or related personnel remove, hide or destroy the registered and kept finance, it is an act of damaging and destroying evidence, which will disrupt the investigation and handling of price violations by government price departments, and is an act in violation of administrative order and should be subjected to administrative punishment. Therefore, this article specifies administrative liability for these two acts in violation of the administration of the government price departments.

Administrative liability is a kind of legal liability, which is a kind of administrative sanction given by a specific administrative organ against the violation of laws, regulations or rules, generally for minor illegal acts or disciplinary violations. Administrative liability includes two categories, namely: administrative punishment and disciplinary sanction. This article specifies administrative punishment. Administrative punishment refers to the punishment given by state administrative organs or organizations authorized by laws and regulations with the function of managing public affairs for the acts violating administrative order according to law, including warning, fine, confiscation of illegal proceeds, confiscation of illegal property, ordering to stop production or business operations, temporary suspension or revocation of permits, temporary suspension or revocation of licenses, administrative detention and other administrative punishments prescribed by laws and administrative regulations. The type of administrative punishment provided for in this article is fine, which is an economic sanction for illegal acts. Generally speaking, the amount of fine is expressed with an absolute number, such as 100,000 yuan, or with the times of the illegal proceeds. The latter method is adopted in this article. The specific provisions are as follows:

1.    For business operators who refuse to stop operation for correction as ordered, a fine ranging from over one time to less than three times the related business income. It should be emphasized that the fine provided for in this article is based on the related business income rather than its entire business income. Article 34 of the Price Law specifies that the government price departments may, if necessary, order the people concerned to stop related business operation, rather than stop all business operation. For example, when a party sells a product without implementing the government-set price, and the government price department orders it to stop related business operation, the government price department can only order the party to stop the business operation of this product. Therefore, the fine is also based on the illegal proceeds in the period when the sale of the product should be stopped, but is not stopped.

2.    For business operators who remove, hide or destroy things recorded for keeping according to law, a fine ranging from over one time to less than three times the value of the things removed, hidden or destroyed shall be imposed.

Article 44       Business operators who refuse to provide materials needed for price monitoring and checking or provide false materials shall be ordered to correct, with a warning. Whereas they refuse to correct within the prescribed time limit, a fine can be imposed.

[Interpretation]    This article specifies the administrative liability that the business operators who refuse to provide materials needed for price monitoring and checking as stipulated by government price departments or provide false materials shall bear.

Administrative liability is a kind of legal liability, which is a kind of administrative sanction given by a specific administrative organ against the violation of laws, regulations or rules, generally for minor illegal acts or disciplinary violations. Administrative liability includes two categories, namely: administrative punishment and disciplinary sanction. This article specifies administrative punishment. Administrative punishment refers to the punishment given by state administrative organs or organizations authorized by laws and regulations with the function of managing public affairs for the acts violating administrative order according to law, including warning, fine, confiscation of illegal proceeds, confiscation of illegal property, ordering to stop production or business operations, temporary suspension or revocation of permits, temporary suspension or revocation of licenses, administrative detention and other administrative punishments prescribed by laws and administrative regulations. The types of administrative punishment provided for in this article are warning and fine,

for the act of refusing to provide materials needed for price monitoring and checking as stipulated by government price departments.

It is a mandatory obligation of business operators to provide true information in accordance with the provisions of the government price departments, because Article 5 of the Price Law specifies that the State Council department in charge of prices shall be responsible for the administration of the work related to prices in the whole country, and the price departments of the people's governments at and above the county level shall be responsible for the work related to prices within the regions under their jurisdiction, and Article 33 of the Price Law specifies that the price departments of the people's governments at and above the county level exercise monitoring and checking over pricing activities according to law and mete out administrative punishments on acts that violate the law. As the subjects of price activities, business operators are of course the objects of monitoring and checking of the government price departments, and accepting the monitoring and checking by government price departments is the obligation that the business operators shall perform. Article 34 of the Price Law specifies that in exercising monitoring and checking of prices, government price departments shall have the right to inquire into people concerned or related personnel and demand for evidences or other materials relating to law-violating acts; and have the right to look into and duplicate account books, bills, vouchers, documents or other materials related to price law violating acts and verify banking materials associated with price law violating acts. Therefore, when accepting the monitoring and checking by government price departments, the business operators shall provide materials according to the provisions of the government price departments. Meanwhile, Article 35 of the Price Law specifies that in accepting the monitoring and checking by government price departments, business operators should provide their account books, bills and vouchers, documents or other materials needed for such monitoring and checking. That is to say, accepting the monitoring and checking by government price departments -- providing materials according to the provisions of the government price departments – truthfully providing these materials, are a few aspects of business operator's acceptance of the monitoring and checking by government price departments, and must be complied with by the business operators. At the same time, on the other hand, the information and relevant materials provided by the business operators are one of the bases for the government price departments to find problems and investigate and punish illegal price acts. If the business operators do not provide such information truthfully, it will not be conducive to the government price departments to carry out their work and also not conducive to the monitoring and checking of the business operators by the government price departments, and it is an act that impedes administrative management. Therefore, this article specifies administrative liability. This article specifies the following specific illegal acts: (1) refusing to provide materials needed for price monitoring and checking, for example, refusing to provide some of the materials specified by government price departments, or refusing to provide materials according to the time specified by government price departments. (2) providing false materials, i.e., providing materials according to the provisions, but the materials are untrue and have been falsified to evade the monitoring and punishment of the government price departments. The administrative punishment specified in this article is that business operators who refuse to provide materials needed for price monitoring and checking or provide false materials shall be ordered to correct, with a warning. In other words, business operators who refuse to provide materials are ordered to provide the materials within a certain period of time; business operators who provide false materials are ordered to provide true materials within a certain period of time. Whereas they refuse to provide materials or refuse to provide true materials within the prescribed time limit, a fine can be imposed by government price departments. Here it does not specify the specific extent of fine and specifies "a fine can be imposed". The Chinese administrative punishment law specifies that where the law has stipulated administrative punishments for offences against law, but specific stipulations are necessary in administrative regulations, stipulations on the behavior that should receive administrative punishments and the types and extent of punishments must be formulated within the limits provided by law. Rules and regulations formulated by ministries and commissions under the State Council may, within the limits provided by law and administrative regulations, make specific stipulations on the behavior that should receive administrative punishments and on types and extent of the punishments. Therefore, the administrative regulations or department rules can specify the time of fining the illegal act of refusing to provide materials needed for price monitoring and checking within the time limit or providing false materials, and the amount

of the fine according to the above provisions of the administrative punishment law. This article does not specify the subject of liability, while Article 34 of the Price Law specifies that in exercising monitoring and checking of prices, government price departments require the people concerned or related personnel, i.e., business operators or personnel related to them, to provide materials.

Article 45    Whereas local people's governments at all levels or related government departments at all levels fix or adjust prices beyond their terms of reference or refuse to implement price intervention measures or emergency measures, they shall be ordered to correct and may be criticized by issuing circulars. People in charge or related people directly responsible shall be given administrative punishments according to law.

[Interpretation] This article specifies the liability that local people's governments at all levels or related government departments at all levels in violation of law in price work shall bear.

1.    Whereas local people's governments at all levels or related government departments at all levels fix or adjust prices beyond their terms of reference, a punishment shall be given according to law. The government and its departments shall exercise their functions and powers in accordance with the law, and exercising powers beyond the scope of legal powers is an illegal act and shall be punished accordingly. Article 19 of this Law specifies that scope of specific items and uses for government-set or guided prices shall depend on the price catalogs issued by the central and local governments. At the same time, the relevant articles of this Law also stipulate the division of price setting authority from the following six aspects: firstly, catalogs of central government-set prices shall be fixed by the price department of the State Council, catalogs of local government-set prices shall be fixed by the price department of provincial people's government within its power according to scope of specific items and uses as set in the central price catalog; secondly, local people's governments below the provincial level shall not make their own price catalogs; thirdly, State Council price department and other related departments shall fix government-set and guided prices according to scope of items and uses as set in the central prices; fourthly, price departments and other related departments of the provincial people's governments shall fix indicative local government-set and guided prices within their respective power according to scope of items and uses as set in the local price catalogs; fifthly, people's governments of cities and counties may fix government-set and guided prices for their localities within their own power authorized by provincial people's governments according to scope of items and uses as prescribed in the local price catalogs; sixthly, the government-set and guided prices shall be adjusted according to scope of items. The act that local people's governments at all levels or related government departments at all levels violate the above provisions is an act of fixing or adjusting prices beyond the scope of specific items and uses as stipulated in this Law, and shall be punished.

2.    Whereas local people's governments at all levels or related government departments at all levels refuse to implement price intervention measures or emergency measures, a punishment shall be given according to law. In the course of administrative management, the government has the obligation to perform its duties according to law, and if it violates its statutory obligations, it shall bear the corresponding legal liability. According to the provisions in Article 30 and Article 31 of this Law, whereas prices of major merchandises or services rise sharply or are likely to rise sharply, the State Council and the people's governments of provinces, autonomous regions and municipalities may set limit at disparity of prices or rate of profitability for part of the merchandises, fix price ceilings or introduce other measures for intervention such as a system for announcing or recording price rises; When such abnormalities as violent fluctuation in the general price level occur nationwide, the State Council shall introduce power for the concentrated fixation of prices in the whole country or part of the regions for the time being or adopt such emergency measures as freezing part or all prices. Therefore, price intervention measures and emergency measures are mandatory price control measures taken under specific circumstances, and have effect on any organization and individual in the period and regional scope of the implementation of statutory price intervention measures and emergency measures. Related local people's governments and related government departments at all levels shall strictly implement the statutory price intervention measures and emergency measures. Failure to implement statutory intervention measures or emergency measures is a violation of statutory duties and shall be punished.

3.    Those with the illegal acts specified in this article shall be ordered to correct and may be criticized by issuing circulars. People in charge or related people directly responsible shall be given

administrative punishments according to law. Where a local government commits an illegal act as specified in this article, the administrative punishment against it shall be made by the government at a higher level. If related departments of the people's government at all levels commit illegal acts specified in this Law, punishments can be made by the government at the same level or the department at a higher level

Article 46      Whereas government personnel in charge of prices have leaked State secrets, commercial secrets or abused their power, resort to deception for personal gains, commit dereliction of duty or accept bribes and the cases are serious enough as to constitute crimes, criminal responsibilities shall be affixed. If a case is not serious enough to constitute a crime, an administrative punishment shall be meted out.

[Interpretation]      This article specifies the criminal liability and administrative liability that personnel in charge of prices who have leaked State secrets, commercial secrets or abused their power, resort to deception for personal gains, commit dereliction of duty or accept bribes shall bear.

1.     Criminal liability. Criminal liability refers to the legal consequences that the perpetrator must bear when he commits the act prohibited by the criminal law, that is, the criminal act. The illegal acts of personnel in charge of prices provided for in this article mainly involve the following contents specified in the criminal law:

(1)     Article 398 of the Criminal Law specifies that any functionary of a State organ who, in violation of the provisions of the Law on Guarding State Secrets, intentionally or negligently divulges State secrets, if the circumstances are serious, shall be sentenced to fixed-term imprisonment of not more than three years or criminal detention; if the circumstances are especially serious, he shall be sentenced to fixed-term imprisonment of not less than three years but not more than seven years. Any person who is not a functionary of a State organ commits the crime mentioned in the preceding paragraph shall, in the light of the circumstances, be punished in accordance with the provisions of the preceding paragraph. State secrets herein refer to matters that concern the security and interests of the state, are determined in accordance with legal procedures, and are known only to a certain number of persons within a certain period of time. According to the Law of the People's Republic of China on Guarding State Secrets, state secrets shall include secrets concerning major policy decisions on state affairs; secrets in the building of national defense and in the activities of the armed forces; secrets in diplomatic activities and in activities related to foreign countries as well as secrets to be maintained as commitments to foreign countries; secrets in national economic and social development; secrets concerning science and technology; secrets concerning activities for safeguarding state security and the investigation of criminal offences; and other matters that are classified as state secrets by the state secret-guarding department. Secrets of political parties that conform to the above provisions shall be state secrets. State secrets shall fall into three categories: most confidential, classified and confidential. The Criminal Law stipulates that the people liable for the crime of divulging state secrets are state functionaries, and also stipulates that non-state functionaries who commit this crime shall be punished as appropriate according to the criminal penalties imposed on state functionaries. "Punished as appropriate" means to be punished as appropriate according to specific circumstances within the range of punishment for state functionaries. The personnel in charge of prices in this article include both state functionaries engaged in price work and non-state functionaries engaged in price work. Therefore, the provisions in this article of the criminal law are applicable. The crime of divulging state secrets includes two circumstances: intentional and negligent. Negligent divulgence of state secrets means that a state functionary who should foresee that his act may cause divulgence of state secrets and result in a consequence that endangers state security and interests, but he fails to do so due to negligence, or although he has foreseen it, he readily believes that it can be avoided, causing loss or spread of the state secrets. Intentional divulgence of state secrets means that a state functionary is fully aware that his act will cause divulgence of state secrets, but he hopes or allows such a result to occur, resulting in a consequence that endangers state security and interests. The crime of divulging state secrets is objectively manifested as that the state functionaries violate the provisions of the Law on Guarding State Secrets by informing the secrets they are in charge of or know to those who should not know the secrets and the circumstance is serious. The divulgence is in various forms, and can be verbal or written. "The circumstance is serious" mainly means that the act of divulging state secrets causes or is enough to cause harmful consequences, and the method or means of divulgence is bad.

(2)     Article 219 of the Criminal Law specifies that  whoever commits any of the following acts of infringing on business secrets and thus causes heavy losses to the obligee shall be sentenced to fixed-term imprisonment of not more than three years or criminal detention and shall also, or shall

only, be fined; if the consequences are especially serious, he shall be sentenced to fixed-term imprisonment of not less than three years but not more than seven years and shall also be fined: 1. obtaining an obligee's business secrets by stealing, luring, coercion or any other illegitimate means; 2. disclosing, using or allowing another to use the business secrets obtained from the obligee by the means mentioned in the preceding paragraph; or 3. in violation of the agreement on or against the obligee's demand for keeping business secrets, disclosing, using or allowing another person to use the business secrets he has. Whoever obtains, uses or discloses another's business secrets, which he clearly knows or ought to know falls under the categories of the acts listed in the preceding paragraph, shall be deemed an offender who infringes on business secrets. The crime of infringing on business secrets is objectively manifested as that in addition to the above acts, heavy losses must be caused to the obligee. "Business secrets" refers to technology information or business information which is unknown to the public, can bring about economic benefits to the obligee, is of practical use and with regard to which the obligee has adopted secret-keeping measures. Specifically speaking, business secrets shall meet the following conditions: they must be technical information and business information not known to the public, and be confidential; the obligee has taken confidential measures for the technical information and business information to prevent outsiders from easily obtaining the information. If the obligee has not taken confidential measures, the information shall not be considered as business secrets; the information has economic values and can bring about economic benefits to the obligee, is of practical use.

(3)   Clause 1, Article 397 of the Criminal Law specifies that  any functionary of a State organ who abuses his power or neglects his duty, thus causing heavy losses to public money or property or the interests of the State and the people, shall be sentenced to fixed-term imprisonment of not more than three years or criminal detention; if the circumstances are especially serious, he shall be sentenced to fixed-term imprisonment of not less than three years but not more than seven years, except as otherwise specifically provided in this Law. Clause 2, Article 397 of the Criminal Law specifies that   any functionary of a State organ who engages in malpractice for personal gain and commits the crime mentioned in the preceding paragraph shall be sentenced to fixed-term imprisonment of not more than five years or criminal detention; if the circumstances are especially serious, he shall be sentenced to fixed-term imprisonment of not less than five years but not more than 10 years, except as otherwise specifically provided in this Law. The crime of abuse of power is objectively manifested as the act of exercising power in violation or excess of the authority and procedure prescribed by law, resulting in heavy losses of public property and state and people's interests. The perpetrator must have power and the abuse of power has a direct causal relationship with the harmful result. If the perpetrator does not have this power, or even if he has the power, the exercise of the power does not have a direct causal relationship with the harmful result, it does not constitute this crime and shall be dealt with in accordance with other provisions. The crime of dereliction of duty is objectively manifested as the act of not performing the duties prescribed by law or not performing the duties seriously and correctly, resulting in heavy losses to public property and state and people's interests. Not performing duties means that any functionary of a State organ does not perform the obligation for the duties that he should and can perform, such as leaving his post without permission. Not performing the duties seriously and correctly means that any functionary of a State organ violates the requirements of his duties in the performance of his duties, works hastily and carelessly and is extremely irresponsible. Any functionary of a State organ engages in malpractice for personal gain and commits the crime mentioned in the preceding paragraph. It means that the functionary commits the crime mentioned in the preceding paragraph in order to seek personal gains or personal relationship with relatives and friends. The functionaries of State organs bear the responsibility of managing state affairs and must enforce the law impartially. Engagement in malpractice for personal gain is based on personal interests and disregards national interests, so the subjective culpability of the mind is more serious than that of the act provided for in the preceding paragraph. Therefore, the Criminal Law provides a heavier penalty for those who commit the crime of engaging in malpractice for personal gain than that for those committing the crime in the preceding paragraph. As stipulated in Article 397 of the Criminal Law, the subjects of liability for the crime of abusing his power or neglecting his duty are functionaries of State organs. Therefore, only the personnel in charge of prices who are in State organs meet the conditions for subjects of liability stipulated in Article 397 of the Criminal Law. If the personnel in charge of prices who are not in State organs have the above acts, constituting a crime, they shall bear liability in accordance with the relevant provisions of the Criminal Law.

(4)     Article 385 of the Criminal Law specifies that any State functionary who, by taking advantage of his position, extorts money or property from another person, or illegally accepts another person's money or property in return for securing benefits for the person shall be guilty of acceptance of bribes. Any State functionary who, in economic activities, violates State regulations by accepting rebates or service charges of various descriptions and taking them into his own possession shall be regarded as guilty of acceptance of bribes and punished for it. Article 388 of the Criminal Law specifies that any State functionary who, by taking advantage of his own functions and powers or position, secures illegitimate benefits for an entrusting person through another State functionary's performance of his duties and extorts from the entrusting person or accepts the entrusting person's money or property shall be regarded as guilty of acceptance of bribes and punished for it. Article 386 of the Criminal Law specifies that whoever has committed the crime of acceptance of bribes shall, on the basis of the amount of money or property accepted and the seriousness of the circumstances, be punished in accordance with the provisions of Article 383 of this Law. Whoever extorts bribes from another person shall be given a heavier punishment. The crime of acceptance of bribes is objectively manifested as by taking advantage of his position, extorting money or property from another person, or illegally accepting another person's money or property in return for securing benefits for the person. It mainly includes two aspects. One aspect is to by taking advantage of his position, illegally accept another person's money or property in return for securing benefits for the person. "Taking advantage of his position" means taking advantage of the power within his position, i.e., the convenience brought about by his power of being in charge of, responsible for or undertaking certain public affairs. "Illegally accept another person's money or property" refers to the act that the state functionaries illegally accept the money or property initiatively given by the perpetrator. "Secure benefits for the person" means that state functionaries take advantage of their power to work for the briber. Whether the interests sought for others are justified and whether the interests sought for others are realized shall not affect the establishment of the crime of acceptance of bribes. The other aspect is to by taking advantage of his position, extort money or property from another person. "Extort money or property from another person" means that state functionaries initiatively extort money or property from another person in their job activities. Extorting bribes is a serious act of accepting bribes, which has greater subjective culpability of the mind and social harm than ordinary acceptance of bribes does, so the Criminal Law does not define "secure benefits for the person" as a precondition for extorting money or property from another person, which can constitute a crime of acceptance of bribes no matter whether benefits have been secured for the person. The Criminal Law specifies that the subjects of liability for the crime of acceptance of bribes are state functionaries, and meanwhile the Criminal Law specifies that "State functionaries" as mentioned in this Law refers to persons who perform public service in State organs. Persons who perform public service in State-owned companies or, enterprises, institutions or people's organizations, persons who are assigned by State organs, State-owned companies, enterprises or institutions to companies, enterprises or institutions that are not owned by the State or people's organizations to perform public service and the other persons who perform public service according to law shall all be regarded as State functionaries. Therefore, as long as the personnel in charge of prices specified in this article conform to the provisions on state functionaries in the Criminal Law, they all may become the subjects of liability for the crime of acceptance of bribes as prescribed in the Criminal Law. If the personnel in charge of prices who are not in state-owned companies or enterprises, i.e., the personnel in charge of prices who are not state functionaries, extort or accept bribes, they shall be punished according to the provisions in Article 163 of the Criminal Law. Article 163 of the Criminal Law specifies: Where an employee of a company or enterprise who, taking advantage of his position, demands money or property from another person or illegally accepts another person's money or property in return for the benefits he seeks for such person, if the amount involved is relatively large, he shall be sentenced to fixed-term imprisonment of not more than five years or criminal detention; if the amount is huge, he shall be sentenced to fixed-term imprisonment of not less than five years and may also be sentenced to confiscation of property. Any employee of a company or enterprise who, violating State regulations in economic activities, accepts rebates or service charges of various descriptions and takes them into his own possession shall be punished in accordance with the provisions in the preceding paragraph.

If the personnel in charge of prices have the acts of divulging state secrets and business secrets, abusing their power, engaging in malpractice for personal gains, neglecting their duties or extorting or accepting bribes in the process of price management, and meet the above criminal conditions, they shall bear the criminal liability according to law.

2.     Administrative liability. If the acts of the personnel in charge of prices to divulge state

secrets and business secrets, abuse their powers, engage in malpractice for personal gains, neglect their duties or extort or accept bribes do not constitute a crime, or the circumstance is obviously minor and the harm is not heavy and no crime is recognized, a punishment shall be meted out. Punishments include the punishments imposed by state organs on their personnel in charge of prices, and the punishments imposed by companies, enterprises and public institutions on their personnel in charge of prices. The specific forms of punishment include warning, demerit, serious demerit, relegation, demotion, removal from his post, probation and dismissal.

Source:

Editor in Charge:

## Related papers

| Prince this page | Close the window | Back to top |

Copyright © 2007 www.npc.gov.cn All Rights Reserved        (To browse the homepage of this website, it is recommended to set the resolution of the computer screen to 1024*768)

All Rights Reserved: NPC Information Center        Sitemap | Contact Us | Submission Mailbox        Jing ICP Bei 06005931



首页 | 吴邦国委员长 | 代表大会会议 | 常委会会议 | 专题集锦 | 直播 | 访谈 | 图片 | 代表名单 | 文献资料 | 法律法规 | English

当前位置： 法律释义与问答 > 经济法类 > 中华人民共和国价格法释义

# 第二部分 释义 第六章 法律责任

中国人大网 www.npc.gov.cn    日期： 2000-11-25    浏览字号： 小 中 大

打印本页    关闭窗口

　　第三十九条　　经营者不执行政府指导价、政府定价以及法定的价格干预措施、紧急措施的，责令改正，没收违法所得，可以并处违法所得五倍以下的罚款；没有违法所得的，可以处以罚款；情节严重的，责令停业整顿。

　　【释义】　　本条是对经营者不执行政府指导价、政府定价以及法定的价格干预措施、紧急措施应承担法律责任的规定。

　　根据本法第十二条的规定，经营者进行价格活动，应当遵守法律、法规，执行依法制定的政府指导价、政府定价和法定的价格干预措施、紧急措施，这是对经营者进行价格活动应当履行义务的规定。如果经营者不执行政府指导价、政府定价以及法定的价格干预措施、紧急措施，也就是违反了法律规定的义务，构成了价格违法行为，依法应承担相应的法律责任。所谓法律责任，是指行为人由于违反了法律规定而应承担的法律后果，行为人作出法律所禁止的行为或者不履行法律规定的义务，就要承担这种违法行为所引起的法律后果。追究法律责任，具有国家强制性，只能由法律授权的机关实施，同时必须贯彻违法行为法定原则。由于违法行为的性质和危害程度不同，所以行为人要承担的法律责任也是不同的，法律责任具体可分为民事责任、刑事责任和行政责任三种。价格法中的法律责任，是指价格违法行为人应当承担的法律后果，是针对价格违法行为人的一种强制性制裁，是价格法的重要组成部分。

　　经营者不执行政府指导价、政府定价以及法定的价格干预措施、紧急措施的行为，违反了法律对经营者应履行义务的规定，是一种价格违法行为，要承担相应的行政责任，依法给予行政处罚。我们知道，依法制定的政府指导价、政府定价和法定的价格干预措施、紧急措施是政府依法对市场价格进行有效的宏观调控和必要的适度干预的重要手段，是稳定市

场价格总水平的需要，它符合社会的整体利益、长远利益，兼顾了公平与效率，对保证国民经济持续、稳定、健康发展具有十分重要意义。如果经营者进行价格活动，不执行政府指导价、政府定价以及法定的价格干预措施、紧急措施，必然危害政府的价格管理，扰乱市场的价格秩序，对于这种价格违法行为，依法负有对价格活动进行监督检查职责的价格主管部门必须追究其行政责任，纠正违法行为，给予行政处罚，以维护正常的市场价格秩序，稳定市场价格总水平。

按照本条的规定，对这种价格违法行为首先应当责令经营者改正违法行为，然后可根据情节轻重实施没收违法所得、罚款直至责令停业整顿的行政处罚。根据我国行政处罚法的规定，行政机关实施行政处罚，应当责令当事人改正或者限期改正违法行为，这是关于实施行政处罚必须首先纠正违法行为原则的规定。实施行政处罚的根本目的是为了维护公共利益和社会秩序，纠正违法行为，因此行政机关在处理行政处罚案件时，无论准备对违法行为人处以何种行政处罚，都应首先要求违法行为人及时纠正违法行为，不能以罚代改。依据这一原则及本条所设定的行政处罚方式，对不执行政府指导价、政府定价以及法定的价格干预措须紧急措施的经营者，首先是责令其改正价格违法行为，然后是没收违法所得，也就是依法强制收缴经营者的非法收入，一般来讲经营者的实际成交价格与政府规定价格的全部价差金额可认定为是违法所得，确认价格违法行为的实施者从中获取多少非法收入，价格违法行为给国家、其他经营者、消费者造成的经济损失及其他损失的数字材料，是决定如何处罚的情节依据和处罚多少的数量界限，据此可以对经营者并处违法所得五倍以下的罚款，对没有违法所得的，也可以处以罚款，罚款是在没收全部违法所得之外追加的经济处罚，通常法律规定中的罚款采用违法所得的倍数、绝对数两种表述形式，本条就是考虑不同情况以有无违法所得作为标准分别采用两种形式的，这样规定更为科学合理也有利于防止执法中的随意性。最后对于情节严重的经营者，价格主管部门应当责令其停止营业进行整顿，这也是对这种价格违法行为人最重的一种行政处罚了。总之，通过采取这一系列的处罚手段，其最终目的是纠正违法行为、保证法律的执行，从而维护社会公共利益和市场价格正常秩序。

第四十条    经营者有本法第十四条所列行为之一的，责令改正，没收违法所得，可以并处违法所得五倍以下的罚款；没有违法所得的，予以警告，可以并处罚款；情节严重的，责令停业整顿，或者由工商行政管理机关吊销营业执照。有关法律对本法第十四条所列行为的处罚及处罚机关另有规定的，可以依照有关法律的规定执行。

有本法第十四条第（一）项、第（二）项所列行为，属于是全国性的，由国务院价格主管部门认定；属于是省及省以下区域性的，由省、自治区、直辖市人民政府价格主管部门认定。

【释义】    本条是对经营者不正当价格行为的法律责任作出规定。

　　价格法第十四条对不正当价格行为作出了界定，并同时作出了禁止性的规定，因此对违反这些规定的经营者追究法律责任，下面就本条有关内容进行解释：

　　一、经营者是本条所规定的违法行为的主体，所以在一开始就确定经营者有不正当价格行为的，就应当追究其法律责任，使该经营者成为违法行为的责任承担者。对于作出不正当价格行为的违法主体经营者的界定，应当依据价格法第三条中对经营者的规定。

　　二、这一条中所指的价格法第十四条所列行务之一的，就是表明在价格法所列八种不正当价格行为中，只要违反了其中任何一项规定的，都应当受到法律的追究，承担相应的法律责任。价格法第十四条所列八种不正当价格行为，都是各自独立的行为，可以独立地追究违法者的责任，不需要将某一项作为某一项前提或后果联系在一起。如果某一个经营者同时有两种以上的违法行为，那就可以同时追究其法律责任，这和行政处罚法中所规定的，对当事人的同一个违法行为不得给予两项以上处罚，属于是不同的概念，并不冲突，关键在于分清是一个违法行为还是两个违法行为。

　　三、责令改正不正当价格行为。责令改正是带有强制性的，违法的经营者必须改正自己的违法行为。违法的内容和形式不同，改正的方式也有区别，比如，捏造、散布涨价信息，哄抬价格的，必须立即停止捏造、散布涨价信息的行为，并主动纠正，恢复原有价格。

　　四、没收违法所得，可以并处违法所得五倍以下的罚款。这是针对经营者的不正当价格行为所具有的特点而作的规定，就是经营者违法的目的在于牟取不正当利益，种种不正当的价格行为总是与经济利益联系在一起，因此，必须没收其违法所得，将不正当的获利收归国家所有，同时给予经济上惩罚，对一些经营者并处罚款。

　　五、没有违法所得的，予以警告，可以并处罚款。这是指有一些经营者有不正当的价格行为，但是没有实现预期的谋利目的，也就是还没有获取违法所得。对于这种情况，并不能否定经营者的违法行为，而是仍然应当给予处罚，一是给予警告的行政处罚，二是从经济上进行制裁，可以在予以警告的同时，并处罚款，这种罚款既是对经营者的一种警戒，也是对经营者违法行为造成的危害的一种补偿，在作出这种处罚时，还应当承认，经营者有违法行为而无违法所得的情况下，仍然会产生危害，损害国家的和社会公众的利益。

　　六、关于责令停业整顿和吊销营业执照。这两种行政处罚都是针对情节严重的不正当价格行为的，经营者应当承担更重的责任。责令停业整顿，是强制地停止其经营权利，督促其改正违法行为，以恢复到合法经营的状态，这是一种仍然给予改正机会的处罚，因为它仍然有恢复营业的机会。吊销营业执照，这是一种更为严厉的处罚，就是对那些造成严重危害的经营者，取消其经营资格，逐出市场。由于营业执照是工商行政管理机关颁发的，因而价格法规定此项处罚仍由工商行政管理机关实施。

　　七、关于相关法律的衔接。这就是指对于不正当价格行为，除了价格法对其作出规

定外有关法律如果对这种行为的处罚及处罚机关另有规定的，可以依照有关法律的规定执行。这样使法律的规定在执行中协调起来，避免了冲突。

　　八、关于对经营者操纵市场价格和低价倾销行为的认定。这首先要考虑操纵市场价格和低价倾销都是涉及面比较广的价格行为，而且在认定中有相当的复杂性，因此确定由层次较高的价格主管部门负责认定。比如，对操纵市场价格的认定，就要在一定的市场范围内，进行正常价格与非正常价格的比较，同时要调查与控制价格的有关行为；又比如，对低价倾销行为的认定，就要进行被指控倾销的商品价格与其生产经营成本的比较，至于这个成本还要考虑平均成本与个别成本的具体情况，此外，对于造成的市场影响和危害也是调查的重要内容。对于什么是属于是全国性的，什么是省及省以下区域性的操纵市场价格和低价倾销的行为，一是根据市场上出现的情况，考虑其作用的范围；二是具体的由国务院和省一级价格主管部门之间的协调。在坚持与完善社会主义市场经济过程中，对这两项不正当价格行为的认定与制裁，将会显得日益重要并要求有更高的执法水平，在价格法中作出有关规定是必要的、及时的。

　　**第四十一条**　　经营者因价格违法行为致使消费者或者其他经营者多付价款的，应当退还多付部分；造成损害的，应当依法承担赔偿责任。

　　**【释义】**　　本条是对经营者因价格违法行为而承担民事法律责任的规定。

　　民事法律责任又简称为民事责任，这是由于作为民事主体的经营者，在价格活动中具有价格违法行为，侵害了合法权利人即消费者或者其他经营者的合法权益，而应当依照有关法律承担的民事法律后果。这是通行的民事法律的原则在价格关系中的具体运用，经营者有了价格违法行为，依法受到了行政处罚，甚至被依法给予了严厉的处罚，也不能免除他应承担的民事责任，因为这是两种不同的法律关系。行政处罚是由于经营者具有违反行政管理秩序的行为，承担行政法律责任而受到的制裁。而在价格关系中的民事责任，则是一种经济方面的责任，价格关系实际上是一种经济关系，调整这种关系，承担民事责任的方式，在民法通则第一百三十四条中规定主要有：（一）停止侵害；（二）排除妨碍；（三）消除危险；（四）返还财产；（五）恢复原状；（六）修理、重作、更换；（七）赔偿损失；（八）支付违约金；（九）消除影响、恢复名誉；（十）赔礼道歉。价格法根据价格违法行为性质和特点与民法通则中所作的一般规定，从而对经营者在价格违法行为中的民事责任作出了第四十一条的规定。

　　价格法中所作的退还多付价款和承担赔偿责任两种方式，与民法通则的规定是一致的、相互衔接的。经营者在价格违法行为中，使消费者或者其他经营者多付价款或受到损害的，可以有多种表现形式，存在于不同种类的商品和不同的交易环节之中，比如，在核定生产经营成本方面，经营者弄虚作假，虚列成本，抬高定价；在执行政府指导价时，超出允许

的浮动的幅度，多收价款；在明码标价时违反有关规定，在标价之外又实行加价，在标明的费用之外又加收费用；在操纵市场价格和低价倾销过程中，既会使消费者利益受损，也会使其他经营者蒙受损失；哄抬价格和以欺诈的价格手段诱骗消费者或者其他经营者，势将造成他们的利益损失；价格歧视作为不公平的交易，就会使一部分经营者的合法利益受损；变相提高或者压低价格的过程中，使经营者自身得益，就会相应地损害了消费者或其他经营者的利益；经营者的暴利行为，总是建立在使消费者过多地支付价款基础上的，在一定的条件下，也会使一些其他的经营者受损；政府指导价、政府定价制定后，经营者为了获取不正当利益而不执行，也就造成了对消费者或者其他经营者的损害；当市场价格显著上涨或者价格总水平出现异常波动时，经营者不执行法定的价格干预措施和紧急措施，以求在违法行为中谋求非法利益，这样对消费者和其他经营者也有可能造成损害等。这些违法行为，都可能直接或者间接地使消费者多支付价款，使其他经营者遭受损失，当然，消费者在除了多付价款之外，也会受到其他的损失。在这里价格法作出了明确具体的规定，属于是多付价款的，应当退还多付的部分，也就是正常价格与非正常价格之间的差额；当然这里有一个前提，就是该交易仍然存在的情况下，才能采取退还多付部分的做法，如果由于经营者的违法价格行为，原先的交易关系不复存在，则不限于是退还多付价款的处置方法。在经营者的违法价格行为中给消费者或者其他经营者造成损害的，价格法所确定的一是要承担赔偿责任，这是应当遵循的法律原则；二是如何赔偿，则依法进行，民法通则中所规定的一些承担民事责任的方式可以运用，其他法律中有关的规定也应当作为依据。

第四十二条　经营者违反明码标价规定的，责令改正，没收违法所得，可以并处五千元以下的罚款。

【释义】　本条是对经营者违反明码标价规定应承担法律责任的规定。

为了规范经营者的价格行为，维护市场价格的正常秩序，创造公平竞争的市场环境，切实保护消费者的合法权益，法律规定经营者在销售、收购商品和提供服务时，应当按照政府价格主管部门的规定实行明码标价。实践证明，明码标价既有利于经营者出售商品，也有利于消费者购买商品；既有利于厂家商家的协作，也有利于接受群众的监督，还有利于防止利用价格进行不正当竞争。因此，本法第十三条明确规定，经营者销售、收购商品和提供服务，应当按照政府价格主管部门的规定明码标价，注明商品的品名、产地、规格、等级、计价单位、价格或者服务的项目、收费标准等有关情况。经营者不得在标价之外加价出售商品，不得收取任何未予标明的费用。这项对经营者明码标价义务的规定是市场经济价格管理的一项重要法律制度，也是对经营者价格行为的一项明确要求，经营者有义务依照法律规定严格执行，自觉守法。如果经营者违反了明码标价的法律规定，就走向了法律所维护的市场价格正常秩序的反面，构成了一种价格违法行为，依法应追究其法律责任，由于这种行

为主要是因违反法律而引起，所以依法要承担相应的行政责任。

现实生活中，实行明码标价制度的主要问题是明码虚价现象比较严重，按照法律规定应当实行明码标价的商品和服务项目，少数经营者在自主定价过程中，慑于法律的威力，不敢不标价来明晃晃的对抗法律。但却大玩明码虚价的花招，不是遵循公平、合法和诚实信用的原则，也不是依据生产经营成本和市场供求状况，而是不择手段漫天要价、虚假标价，对不明真相的消费者连哄带骗、能宰则宰；还有少数经营者则采取欺骗性标价的手法，故意使标价含混或付款条件不明，等消费者上当后再对其所标价格作出有利于自己的解释，迫使消费者自认倒霉，有苦难言。应当指出，明码虚价与明码标价的含义是完全不同的，法律要求明码标价所标的价格应是真实的，绝不是随便标一个虚价就可以对付的，因此这种不良现象同时也是一种明显的价格违法行为，依据法律规定一方面消费者要勇于拿起法律武器与这种违法行为作坚决的斗争，依法维护自身的合法权益，另一方面政府的价格主管部门也要加强对市场虚假价格信息的监管，依法对这种违法行为给予惩处。

按照本条的规定，经营者违反明码标价规定要承担的行政责任，首先是由政府的价格主管部门依法责令改正，然后给予没收违法所得、可以并处五千元以下罚款的行政处罚。这里需要说明，在我国现行的法律、法规中，一半以上行政处罚的手段上都有责令改正的规定，然而对任何一种违法行为从法理上讲都应当予以纠正，因此实际上责令改正不应当是一种处罚，但却又是在实施行政处罚时必须首先要采取的强制措施，所以对违反明码标价违法行为实施行政处罚，同样首先要责令经营者改正违法行为，再做经济制裁。至于什么样的违法行为应当适用什么种类的行政处罚，其基本原则是给什么行政处罚，要与违法行为的事实、性质、情节以及社会危害程度相当，本条规定经营者违反明码标价规定的，没收违法所得，可以并处五千元以下罚款的处罚，正是遵循了上述过罚相当的原则制定出来的，应当讲对这种价格违法行为给予上述行政处罚是比较切实可行的，因此它是确保明码标价制度能够得到全面贯彻实施的有力法律武器。

第四十三条    经营者被责令暂停相关营业而不停止的，或者转移、隐匿、销毁依法登记保存的财物，处相关营业所得或者转移、隐匿、销毁的财物价值一倍以上三倍以下的罚款。

【释义】    本条是对经营者不遵守政府价格主管部门关于暂停相关营业和登记保存规定的行政责任的规定。

价格法第三十四条规定，政府价格主管部门在进行监督检查时，有权检查与价格违法行为有关的财物，必要时可以责令当事人暂停相关营业。这样规定，便于政府价格主管部门及时制止价格违法行为，及时查清违法事实。如果经营者被责令暂停相关营业而不停止，则妨碍了政府价格主管部门的管理行为，应当受到行政处罚。同时，价格法第三十四条还规

定，政府价格主管部门在进行监督检查时，在证据可能灭失或者以后难以取得的情况下，可以依法先行登记保存，当事人或者有关人员不得转移、隐匿或者销毁。政府价格主管部门作出先行登记保存的决定，是为了保全证据，以利于取证和对价格违法行为的处理，当事人或者有关人员应当予以配合。如果当事人或者有关人员将登记保存的财务转移、隐匿或者销毁，是一种破坏证据、毁坏证据的行为，会扰乱政府价格主管部门的调查及处理价格违法行为，是一种违反行政管理秩序的行为，应当受到行政处罚。因此，本条对这两种违反政府价格主管部门管理的行为规定了行政责任。

行政责任是法律责任的一种，是由特定的行政机关对违反法律、法规或者规章的行为所给予的一种行政制裁，一般是对轻微的违法行为或者违纪行为实施的。行政责任包括行政处罚和行政处分两大类，具体到本条，是对行政处罚的规定。行政处罚是国家行政机关或者法律、法规授权的具有管理公共事务职能的组织依法对违反行政管理秩序的行为给予的惩处，包括警告、罚款、没收违法所得、没收非法财物、责令停产停业、暂扣或者吊销许可证、暂扣或者吊销执照、行政拘留及法律、行政法规规定的其他行政处罚。本条规定的行政处罚种类是罚款，是对违法行为的一种经济制裁。一般来讲，罚款数额以绝对数比如十万元，或者以违法所得的倍数来表示，本条采用了后一种方法。具体规定是：

一、经营者被责令暂停相关营业而不停止的，处相关营业所得一倍以上三倍以下的罚款。需要强调的是，本条规定的罚款是针对相关的营业所得而言的，而不是其全部营业所得。因为价格法第三十四条规定，政府价格主管部门必要时可以责令当事人暂停相关营业，而不是暂停全部营业，比如当事人销售的某产品未执行政府定价，政府价格主管部门责令当事人暂停相关营业时，只能责令当事人暂停对该产品的营业，因此，罚款也是针对该产品应当停止销售而未停止这一期间的违法所得而言的。

二、经营者对政府价格主管部门登记保存的财务进行转移、隐匿或者销毁的，处转移、隐匿或者销毁的财务价值一倍以上三倍以下的罚款。

第四十四条    拒绝按照规定提供监督检查所需资料或者提供虚假资料的，责令改正，予以警告；逾期不改正的，可以处以罚款。

【释义】    本条是对拒绝按照政府价格主管部门的规定提供监督检查所需资料或者提供虚假资料的行政责任的规定。

行政责任是法律责任的一种，包括行政处罚和行政处分两种形式。具体到本条，是对行政处罚的规定。行政处罚是国家行政机关或者法律、法规授权的具有管理公共事务职能的组织依法对违反行政管理秩序的行为给予的惩处，包括警告、罚款、没收违法所得、没收非法财务、责令停产停业、暂扣或者吊销许可证、暂扣或者吊销执照、行政拘留及法律、行政法规规定的其他行政处罚。本条规定的行政处罚种类是警告和罚款，针对的具体行为是拒

绝按照政府价格主管部门的规定提供监督检查所需资料或者提供虚假资料。

　　按照政府价格主管部门的规定如实提供资料，是经营者必须履行的一项义务。因为价格法第五条规定，国务院价格主管部门统一负责全国的价格工作。县级以上地方各级人民政府价格主管部门负责本行政区域内的价格工作。价格法第三十三条规定，县级以上各级人民政府价格主管部门，依法对价格活动进行监督检查，并依照本法的规定对价格违法行为实施行政处罚。经营者作为价格活动的主体，当然是政府价格主管部门监督检查的对象，接受政府价格主管部门的监督检查是经营者应当履行的义务。价格法第三十四条规定，政府价格主管部门在进行监督检查时，有权询问当事人或者有关人员，并要求其提供证明材料和与价格违法行为有关的其他资料；有权查询、复制与价格违法行为有关的帐簿、单据、凭证、文件及其他资料，核对与价格违法行为有关的银行资料。因此，经营者在接受政府价格主管部门的监督检查时，应当按照政府价格主管部门的规定提供资料。同时，价格法第三十五条规定，经营者接受政府价格主管部门的监督检查时，应当如实提供价格监督检查所必需的帐簿、单据、凭证、文件以及其他资料。这就是说，接受政府价格主管部门的监督检查——按照政府价格主管部门的规定提供这些资料——如实提供这些资料，是经营者接受政府价格主管部门监督检查的几个方面，经营者必须遵守。同时，从另一方面讲，经营者提供的情况和有关资料，是政府价格主管部门发现问题，查处价格违法行为的依据之一，如果经营者不如实提供这些资料，不利于政府价格主管部门开展工作，也不利于政府价格主管部门对经营者的监督检查，是妨碍行政管理的行为，因此，本条对此规定了行政责任。本条规定的具体违法行为是：（一）拒绝按照规定提供监督检查所需资料，比如对政府价格主管部门规定的某些资料拒绝提供、拒绝按照政府价格主管部门规定的时间提供资料等。（二）提供虚假资料，即虽然按照规定提供资料，但这些资料不真实，已经被弄虚作假，以逃避政府价格主管部门的监管及处罚。本条规定的行政处罚是，对拒绝按照规定提供监督检查所需资料或者提供虚假资料的，责令其在一定期间内改正，予以警告。即对拒绝按照规定提供资料的，责令其在一定期间内提供；对提供虚假资料的，责令其在一定期间内重新提供真实的资料。对超过规定期间仍不提供资料或者不提供真实资料的，政府价格主管部门可以处以罚款。这里没有规定具体的罚款幅度，而且规定是"可以处以罚款"。我国行政处罚法规定，法律对违法行为已经作出行政处罚规定，行政法规需要作出具体规定的，必须在法律规定的给予行政处罚的行为、种类和幅度的范围内规定。国务院部、委员会制定的规章可以在法律、行政法规规定的给予行政处罚的行为、种类和幅度的范围内作出具体规定。因此，对逾期仍不提供监督检查所需资料或者提供虚假资料这一违法行为，在什么情况下处以罚款，以及具体罚款数额，可以由行政法规、部门规章依据行政处罚法的以上规定作出具体规定。本条未明确规定责任主体，从价格法第三十四条规定的政府价格主管部门行使监督检查权时要求提供资料的对象

看，应当包括当事人或者有关人员，即经营者或者与之有关的人员。

　　第四十五条　　地方各级人民政府或者各级人民政府有关部门违反本法规定，超越定价权限和范围擅自制定、调整价格或者不执行法定的价格干预措施、紧急措施的，责令改正，并可以通报批评；对直接负责的主管人员和其他直接责任人员，依法给予行政处分。

　　【释义】　　本条是对地方各级人民政府或者各级人民政府有关部门在价格工作中的违法责任所作的规定。

　　一、地方各级人民政府或各级人民政府有关部门超越定价权限和范围擅自制定、调整价格，应当依法受到处分。政府及政府部门应当依法行使职权，超越法定的权力范围行使权力，是违法行为，应当受到相应的处分。按照本法第十九条的规定，政府指导价、政府定价的定价权限和具体适用范围，以中央的和地方的定价目录为依据。同时，本法在有关条文中，又对定价权限的划分从以下六个方面作了规定：一是中央定价目录由国务院价格主管部门制定，地方定价目录由省级人民政府价格主管部门按照中央定价目录规定的定价权限和具体适用范围制定；二是省级以下各级地方人民政府不得制定定价目录；三是国务院价格主管部门和其他有关部门应当按照地方定价目录规定的定价权限和具体适用范围制定政府指导价、政府定价；四是省级人民政府价格主管部门和其他有关部门按照地方定价目录规定的定价权限和具体适用范围制定政府指导价、政府定价；五是市、县人民政府根据省级人民政府的授权，按照地方定价目录规定的定价权限和具体适用范围制定政府指导价、政府定价；六是政府指导价、政府定价应当按照规定的定价权限进行调整。地方各级人民政府或者各级人民政府有关部门违反上述规定的行为，就是本条所规定的违反本法规定超越定价权限和具体适用范围擅自制定、调整价格的行为，应当给予处分。

　　二、地方各级人民政府或者各级人民政府有关部门，不执行法定的价格干预措施、紧急措施的行为，应当依法给予处分。政府在进行行政管理的过程中，负有依法履行职责的义务，违反法定义务的，就应承担相应的法律责任。按照本法第三十条、第三十一条的规定，当重要商品和服务价格显著上涨或者有可能显著上涨，国务院和省、自治区、直辖市人民政府可以对部分价格采取限定差价率或者利润率、规定限价、实行提价申报制度和调价备案制度等干预措施；当市场价格总水平出现剧烈波动等异常状态时，国务院可以在全国范围内或者部分区域内采取临时集中定价权限、部分或者全面冻结价格的紧急措施。因此，价格干预措施和紧急措施是在特定情况下采取的强制性价格管制措施，在实行法定的价格干预措施、紧急措施的期间和区域范围内，对于任何单位和个人都具有效力。有关的地方人民政府和各级人民政府有关部门应当严格执行法定的价格干预措施、紧急措施。不执行法定的干预措施、紧急措施，就是违反了法定职责，应当受到处分。

　　三、有本条规定的违法行为的，责令改正，并可以通报批评；对直接负责的主管人

员和其他直接责任人员，依法给予行政处分。地方政府有本条规定的违法行为的，对其的行政处分应当由其上级政府作出。各级人民政府有关部门有本法规定的违法行为的，可以由其本级政府或者上级部门对其进行处分。

第四十六条　价格工作人员泄露国家秘密、商业秘密以及滥用职权、徇私舞弊、玩忽职守、索贿受贿，构成犯罪的，依法追究刑事责任；尚不构成犯罪的，依法给予处分。

【释义】　本条是对价格工作人员泄露国家秘密、商业秘密以及滥用职权、徇私舞弊、玩忽职守、索贿受贿的刑事责任和行政责任的规定。

一、刑事责任。刑事责任是指行为人实施了刑法所禁止的行为即犯罪行为而必须承担的法律后果。本条规定的价格工作人员的违法行为，主要涉及刑法规定的以下内容；

（一）刑法第三百九十八条规定，国家机关工作人员违反保守国家秘密法的规定，故意或者过失泄露国家秘密，情节严重的，处三年以下有期徒刑或者拘役；情节特别严重的，处三年以上七年以下有期徒刑。非国家机关工作人员犯前款罪的，依照前款的规定酌情处罚。这里规定的国家秘密是指关系国家的安全和利益，依照法定程序确定，在一定时间内只限一定范围的人员知悉的事项。根据保守国家秘密法的规定，国家秘密包括国家事务的重大决策中的秘密事项；国防建设和武装力量活动中的秘密事项；外交和外事活动中的秘密事项以及对外承担保密义务的事项；国民经济和社会发展中的秘密事项；科学技术中的秘密事项；维护国家安全活动和追查刑事犯罪中的秘密事项；其他经国家保密部门确定应当保守的国家秘密事项。政党的秘密事项中符合上述规定的，也属于国家秘密。国家秘密的密级分为"绝密"、"机密"、"秘密"三级。刑法规定泄露国家秘密罪的责任主体是国家机关工作人员，同时规定，非国家机关工作人员犯此罪的，依照对国家机关工作人员的刑罚酌情处罚。"酌情处罚"是指在对国家机关工作人员的处罚幅度内，根据具体情节予以适当处罚。本条规定的价格工作人员，既包括国家机关从事价格工作的人员，也包括非国家机关中从事价格工作的人员。因此，均适用刑法这一条的规定。泄露国家秘密罪，包括故意和过失两种情况。过失泄露国家秘密，是指国家机关工作人员应当预见其行为可能发生国家秘密的泄露，造成危害国家安全和利益的后果，因为疏忽大意而没有预见，或者已经预见而轻信能够避免，以至使国家秘密遗失或者外传。故意泄露国家秘密，是指国家机关工作人员明知自己的行为会造成国家秘密的泄露，而希望或放任这种结果的发生，造成危害国家安全和利益的结果。泄露国家秘密罪的客观方面表现为国家机关工作人员违反保守国家秘密法的规定，将自己掌管或者知悉的秘密让不应知悉者知悉，且情节严重的行为。泄露的方式是多种多样的、可以是口头泄露，也可以是书面泄露，"情节严重"主要是指泄露国家秘密的行为造成了或者足以造成危害后果，泄露的方法、手段恶劣等。

（二）刑法第二百一十九条规定，有下列侵犯商业秘密行为之一，给商业秘密的权

利人造成重大损失的，处三年以下有期徒刑或者拘役，并处或者单处罚金；造成特别严重后果的，处三年以上七年以下有期徒刑，并处罚金。1．以盗窃、利诱、胁迫或者其他不正当手段获取权利人的商业秘密的；2．披露、使用或者允许他人使用以前项手段获取的权利人的商业秘密的；3．违反约定或者违反权利人有关保守商业秘密的要求，披露、使用或者允许他人使用其所掌握的商业秘密的。明知或者应知上述行为，获取、使用或者披露他人的商业秘密的，以侵犯商业秘密论。侵犯商业秘密罪的客观方面表现为除上述行为外，还必须具有给权利人造成重大损失的情节。商业秘密是指不为公众所知悉、能为权利人带来经济利益，具有实用性并经权利人采取保密措施的技术信息和经营信息。具体来讲，商业秘密应当具备下列条件：必须是不为公众所知悉的技术信息和经营信息，具有秘密性；权利人对这些技术信息和经营信息采取了保密措施，以防止外人轻而易举地获取这些信息。如果权利人未采取保密措施，就不能视为商业秘密；这些信息具有经济价值，能为权利人带来经济利益，具有实用性。

（三）刑法第三百九十七条第一款规定，国家机关工作人员滥用职权或者玩忽职守，致使公共财产、国家和人民利益遭受重大损失的，处三年以下有期徒刑或者拘役；情节特别严重的，处三年以上七年以下有期徒刑。本法另有规定的，依照规定。刑法第三百九十七条第二款规定，国家机关工作人员徇私舞弊，犯前款罪的，处五年以下有期徒刑或者拘役；情节特别严重的，处五年以上十年以下有期徒刑。本法另有规定的，依照规定。滥用职权罪的客观方面表现为违反或者超越法律规定的权限和程序行使职权，致使公共财产、国家和人民利益遭受重大损失的行为。必须是行为人手中有权，并且滥用权力，与危害结果有直接的因果关系。如果行为人手中没有此项权力，或者虽然有权，但行使权力与危害结果没有直接的因果关系，则不能构成此罪，而应当按照其他规定处理。玩忽职守罪的客观方面表现为不履行法律所规定的职责或者不认真、不正确履行职责，致使公共财产、国家和人民利益遭受重大损失的行为。不履行职责是指国家机关工作人员对于自己应当履行而且能够履行的职责，不尽履行的义务，如擅离职守。不认真、不正确履行职责是指国家机关工作人员在履行职责中违背职责要求，工作草率马虎，极端不负责任。国家机关工作人员因徇私舞弊行为犯第一款罪，是指国家机关工作人员为徇个人私利或者亲友私情而犯第一款罪。国家机关工作人员担负着管理国家事务的职责，必须秉公执法，徇私舞弊行为是从个人利益出发，置国家利益于不顾，所以主观恶性要比第一款规定的行为严重，因此，刑法对因徇私舞弊行为犯第一款罪的，规定了比第一款更重的刑罚。刑法第三百九十七条规定的滥用职权罪、玩忽职守罪的责任主体是国家机关工作人员，因此，本条规定的价格工作人员中，只有国家机关中从事价格工作的人员才符合刑法第三百九十七条规定的责任主体的条件。非国家机关中从事价格工作的人员因为上述行为构成犯罪的，应当依照刑法的有关规定承担责任。

（四）刑法第三百八十五条规定，国家工作人员利用职务上的便利，索取他人财物的，或者非法收受他人财物，为他人谋取利益的，是受贿罪。国家工作人员在经济往来中，违反国家规定，收受各种名义的回扣、手续费，归个人所有的，以受贿论处。刑法第三百八十八条规定，国家工作人员利用本人职权或者地位形成的便利条件，通过其他国家工作人员职务上的行为，为请托人谋取不正当利益，索取请托人财物或者收受请托人财物的，以受贿论处。刑法第三百八十六条规定，对犯受贿罪的，根据受贿所得数额及情节，依照刑法第三百八十三条关于贪污罪的规定处罚。索贿的从重处罚。受贿罪在客观方面表现为利用职务上的便利，索取他人财物，或者非法收受他人财物，为他人谋取利益。主要包括两个方面。一是利用职务上的便利，非法收受他人财物，为他人谋取利益。"利用职务上的便利"是指利用本人职务范围内的权力，即自己职务上主管、负责或者承办某种公共事务的职权所造成的便利条件。"非法收受他人财物"是指行为人向国家工作人员主动给予财物时，国家工作人员非法收受的行为。"为他人谋取利益"是指国家工作人员利用职权为行贿人办事，至于为他人谋取的利益是否正当，为他人谋取的利益是否实现，不影响受贿罪的成立，二是利用职务上的便利，索取他人财物。"索取他人财物"是指国家工作人员在职务活动中主动向他人索要财物。索贿是严重的受贿行为，比一般受贿具有更大的主观恶性和社会危害性，因此，对索要他人财物的，刑法没有规定要以"为他人谋取利益"为条件，不论是否为他人谋取利益，都可以构成受贿罪。刑法规定受贿罪的责任主体是国家工作人员，同时刑法规定，本法所称国家工作人员，是指国家机关中从事公务的人员。国有公司、企业、事业单位、人民团体中从事公务的人员和国家机关、国有公司、企业、事业单位委派到非国有公司、企业、事业单位、社会团体从事公务的人员，以及其他依照法律从事公务的人员，以国家工作人员论。因此，本条规定的价格工作人员，只要符合刑法关于国家工作人员的规定，均可以成为刑法规定的受贿罪的责任主体。同时，对非国有公司、企业单位中的价格工作人员，即价格工作人员中的非国家工作人员赌受贿的，依照刑法第一百六十三条的规定处罚。刑法第一百六十三条的规定是：公司、企业的工作人员利用职务上的便利，索取他人财物或者非法收受他人财物，为他人谋取利益，数额较大的，处五年以下有期徒刑或者拘役；数额巨大的，处五年以上有期徒刑，可以并处没收财产。公司、企业的工作人员在经济往来中，违反国家规定，收受各种名义的回扣、手续费，归个人所有的，依照前款规定处罚。

价格工作人员在进行价格管理过程中，如果有泄露国家秘密、商业秘密以及滥用职权、徇私舞弊、玩忽职守、索贿受贿的行为，并符合上述犯罪要件的，就要依法承担刑事责任。

二、行政责任。价格工作人员泄露国家秘密、商业秘密以及滥用职权、徇私舞弊、玩忽职守、索贿受贿行为未构成犯罪的，或者情节显著轻微危害不大，不认为是犯罪的，应

当给予处分。处分包括国家机关对其价格工作人员的处分，以及公司、企业、事业单位等对
其价格工作人员的处分。具体处分形式有警告、记过、记大过、降级、降职、撤职、留用察
看和开除等。

来源：

责任编辑：

**相关文章**

| 打印本页 | 关闭窗口 | 返回顶部 |

Copyright © 2007 www.npc.gov.cn All Rights Reserved　　　　（浏览本网主页，建议将电脑显示屏的分辨率调为1024*768）

版权所有：全国人大信息中心　　网站地图 | 联系我们 | 投稿信箱　　　　　　　京ICP备06005931号

# APPENDIX F



July 10, 2023

**Certification**

<div align="center">

**Welocalize Translations**

</div>

**TRANSLATOR'S DECLARATION:**

I, Johnson Wong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 国务院总理朱镕基对坚决制止...当手段低价倾销行为作出批示.pdf

*(Digital or printed signature here above the line)*

_____

Johnson Wong
**Project Number: BBLLP_2306_P0022**

<div align="center">

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

</div>

# Premier of the State Council, Zhu Rongji, issued instructions to firmly prevent unfair low-price dumping behaviors

Recently, Premier Zhu Rongji made important instructions on the "Request for Prevention of Unfair Price Competition and Promotion of Healthy Development of Color Cathode Ray Tube Industry" submitted to the State Council by the National Development Planning Commission and the Ministry of Information Industry that "it should be clear that the pricing regulatory department (the Development Planning Commission) and the industry regulatory department (the Ministry of Information Industry) should jointly investigate enterprises that sell products below the industrys average cost. Enterprises that dump products at low prices by unfair means (such as using smuggled imported parts, reducing functions, passing off substandard products as good ones, and falsely reporting costs) must be ordered to correct their actions, up to the revocation of their business licenses."

In response to the recent problem of low-price dumping in market competition, the National Development Planning Commission, in conjunction with relevant departments, have successively formulated and promulgated two specific regulations, "Interim Provisions on Prevention of Unfair Competition Behaviors of Low-Price Dumping of Flat Glass" and "Interim Provisions on Prevention of Unfair Competition Behaviors of Low-Price Dumping of Steel." On November 16, 1998, the National Development Planning Commission and the State Economic and Trade Commission further issued the "Provisions on Prevention of Unfair Price Behavior of Low-Price Dumping of Industrial Products," which went into effect starting from November 25. This is an important comprehensive regulation guiding the prevention of low-price dumping and standardizing enterprise price behavior. It is a significant embodiment to implement the "Price Law."

Preventing low-price dumping according to the law is currently a key task for pricing regulatory departments at all levels. Pricing regulatory departments at all levels must follow Premier Zhu Rongjis requirements, unify their thoughts, effectively take on the responsibility of preventing low-price dumping, and perform their duties diligently to prevent low-price dumping. Recently, the National Development Planning Commission has organized and guided relevant regulatory departments to promptly determine and announce average industry costs of color cathode ray tubes and other main industrial products, as a pricing red line that enterprises should not undercut, guiding enterprises to reasonably set prices. All regions should strengthen the inspection and supervision of product prices such as flat glass, steel, color cathode ray tubes, and color TVs, seriously handle reports of low-price dumping behaviors, and promptly investigate enterprises reported to have suspicions of low-price dumping. For enterprises that use unfair means such as using smuggled parts, reducing functions, passing off substandard products as good ones, and falsely reporting costs for low-price dumping, they should be ordered to suspend operations for rectification or relevant departments should be asked for the revocation of business licenses, so as to maintain normal price and competition order, protect the legal rights and interests of operators and consumers, and promote the healthy development of the national economy.

## The State Economic and Trade Commission proposed this years goal for state-owned enterprises (SOEs) to get out of trouble - to eliminate losses in 1/3 of loss-making enterprises.

Zheng Silin, deputy director of the State Economic and Trade Commission, recently proposed at the first training class for operators of key enterprises in trouble held at Handan Steel: The alleviation of SOEs is of utmost importance to the economic work. This year, it is necessary to eliminate losses in 1/3 of the loss-making enterprises. At present, we must recognize the situation, have confidence, and make breakthrough progress in the alleviation of large and medium-sized loss-making state-owned enterprises.

Zheng Silin said that based on the new enterprise classification standards, the State Economic and Trade Commission has identified about 2,300 key enterprises for relief. The task this year is for 1/3 of loss-making enterprises to eliminate losses. By the end of 2000, the loss ratio of large and medium-sized industrial enterprises owned or controlled by the state should be reduced to 15% or less.

(C) 1994-2023 China Academic Journal Electronic Publishing House. All rights reserved. http://www.cnki.net

经贸政策与要闻

# 国务院总理朱镕基对坚决制止采取不正当手段低价倾销行为作出批示

最近，朱镕基总理在国家发展计划委员会、信息产业部上报国务院的《关于制止彩色显像管不正当价格竞争、促进彩色显像管工业健康发展的请示》上作出重要批示："应明确由价格主管部门（发展计划委员会）和行业主管部门（信息产业部）共同对以低于行业平均成本销售的企业进行调查，凡以不正当手段（如使用走私进口件、减少功能，以次充好、虚报成本等）进行低价倾销的企业，要勒令改正，直至吊销其营业执照"。

针对近一段时期市场竞争中出现的低价倾销问题，去年以来，国家发展计划委员会会同有关部门，先后制定颁布了《关于制止低价倾销平板玻璃的不正当竞争行为的暂行规定》和《关于制止低价倾销钢材的不正当竞争行为的暂行规定》两个专项法规。1998 年 11 月 16 日，国家发展计划委员会、国家经贸委又印发了《关于制止低价倾销工业品的不正当价格行为的规定》，并从 11 月 25 日起施行，这是指导制止低价倾销工作，规范企业价格行为的一个重要的综合性法规，是贯彻《价格法》的重要体现。

依法做好制止低价倾销工作，是当前各级物价部门要重点抓好的一项重要工作。各级物价部门一定要按照朱镕基总理的要求，统一思想，切实承担起制止低价倾销工作的责任，认真做好制止低价倾销工作。近期，国家发展计划委员会会组织指导有关主管部门抓紧测定并发布彩色显像管等主要工业品的行业平均成本，作为企业不应跌破的价格警戒线，引导企业合理制定价格。各地要加强对平板玻璃、钢材、彩色显像管、彩色电视机等产品价格的检查监督，认真受理对低价倾销行为的举报，对被举报有低价倾销嫌疑的企业，要及时立案调查，对违反规定的企业要从严查处。对使用走私零配件、减少功能、以次充好、虚报成本等不正当手段进行低价倾销的企业，要勒令停业整顿或提请有关部门吊销营业执照，维护正常的价格秩序和竞争秩序，保护经营者、消费者的合法权益，促进国民经济的健康发展。

## 国家经贸委提出今年国企脱困目标——
# 1/3 亏损企业消除亏损

国家经贸委副主任郑斯林最近在邯钢举办的重点脱困企业经营者首期培训班上讲话提出：国企脱困是经济工作的重中之重，今年要使 1/3 的亏损企业消除亏损。当前要认清形势，坚定信心，务求国有大中型亏损企业脱困取得突破性进展。

郑斯林说，根据新的企业划型标准，国家经贸委确定了重点脱困企业有 2300 户左右。今年的任务是 1/3 的亏损企业要消除亏损。到 2000 年底，要使国有及国有控股大中型工业企业的亏损面下降到 15％以下。

· 4 ·

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

# APPENDIX G



July 19, 2023

**Certification**

<div align="center">

**Welocalize Translations**

</div>

**TRANSLATOR'S DECLARATION:**

I, Johnson Wong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 中国物价年鉴_程行云_深入开展依法制止低价倾销工作.pdf

*(Digital or printed signature here above the line)*

_____

Johnson Wong
**Project Number: BBLLP_2306_P0022**

<div align="center">

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

</div>



## Deepen the Lawful Deterrence of Low-Price Dumping

In 1999, the focus of deterring deterring low-price dumping was to guide companies to strengthen self-discipline, improve laws and regulations, and carry out investigations of illegal activities.

**I. Release of industry average costs to guide companies in reasonable pricing and deter low-price dumping.**

The State Planning Commission, in accordance with relevant provisions on deterring low-price dumping behaviors and in conjunction with relevant departments, successively released the industry average costs of color TVs, color tubes, small four-wheel tractors, single-cylinder diesel engines, wires and cables, regular paper-faced gypsum boards, steel, tungsten products, and other industrial products, and adjusted the industry average costs of flat glass and some steel products in a timely manner, which included both industrial consumables and industrial production materials, and included both products for domestic sales and exported products. The goals for releasing the industry average costs are 1. to guide companies in reasonable pricing and striving to reduce operating costs. Determining and publishing average industry costs usually involves using the advanced costs within the industry as a standard. This practice is effective in guiding companies with above-average costs to strive towards better management and to reduce their operating expenses, enabling them to better adapt to market competition. Additionally, it serves as a benchmark for both

self-regulation within industries and companies and as a basis for reporting instances of low-cost dumping. Companies that disrupt market order by selling goods at prices below the average industry cost can be reported to the price control departments of the provincial or higher level government by the businesses that have suffered harm due to these practices."

Among the products with released average costs, two have special significance. One is tungsten products, and the other is regular paper-faced gypsum boards. The former are export products facing the international market directly; the latter are mostly manufactured by wholly foreign-owned enterprises even though they are products for domestic sales. These two categories require special caution in policy treatment. China has 70% of the worlds tungsten reserves and 60% of tungsten product exports, holding an absolute dominant position in the international market. But due to lack of necessary management of tungsten production and export, over-mining and multi-exporting are serious, and some companies even sell below direct costs, causing Chinese tungsten products in the international market to the new "Regulation on the Punishment of Price Violations" (Order No. 1 of the State Planning Commission in 1999), approved by the State Council was enacted on August 1, 1999, which significantly increased penalties for violations such as low-price dumping that did not result in illegal gains. The new "Regulation on Punishment of Price Violations"

(C) 1994-2023 China Academic Journal Electronic Publishing House. All rights reserved. http://www.cnki.net

stipulates that for operators who violate Article 14 of the Price Law and collude with each other to manipulate market prices, damaging the legal rights and interests of other operators or consumers; for those who, except for legally reducing the price of perishable goods, seasonal goods, overstocked goods, etc., in order to squeeze out competitors or monopolize the market, dump goods at prices lower than the cost, disrupt the normal order of production and operation, and damage national interests or the legal rights and interests of other operators; for those who offer the same products or services, and practice price discrimination against other operators under the same trading conditions, they shall be ordered to correct their behaviors, shall have their illegal income confiscated, and may be fined up to 5 times the illegal income; if there is no illegal income, they shall be warned, and may be fined between 30,000 and 300,000 yuan; if the circumstances are serious, they shall be ordered to suspend business for rectification, or the business license may be revoked by the administration for industry and commerce. According to the new "Regulations on Penalties for Price Violations", the maximum fine for low-price dumping can be up to 300,000 yuan, which legally solves the problem of lenient economic punishment and improves the work to stop low-price dumping. In addition, the new " Regulation on the Punishment of Price Violations" also stipulates that if an operator refuses to provide the information required for price supervision and inspection or provides false information, they shall be ordered to correct it and be given a warning; if they do not correct it within the time limit, they can be fined up to 50,000 yuan, and disciplinary actions can be taken against directly responsible supervisors and other directly responsible persons. These provisions provide a strong basis for the industry authorities to release industry average costs and for the enforcement inspection of price supervision and inspection personnel.

3. The release of the "Regulations on Deterrence of Low-Price Dumping". In view of the fact that low-price dumping has extended from industrial products to all goods and services, to thoroughly and comprehensively carry out the work of deterring low-price dumping, the State Planning Commission, on the basis of summarizing the experience and lessons of the industrial sector in deterring low-price dumping, studied and formulated the universally applicable "Regulations on Deterrence of Low-Price Dumping" (Order No. 2 of the State Planning Commission in 1999), which had been issued and implemented on August 3, 1999, in accordance with the "Price Law of the Peoples Republic of China." The main differences compared with previous regulations on deterring low-price dumping are: (1) It was issued in the form of a department order, enhancing the seriousness and authority of the law. (2) It expanded the scope of deterring low-price dumping from industrial products to all goods; from products for general distribution and sales to commodities sold in various ways including bidding. (3) The authority to determine low-price dumping is clarified. Low-price dumping behaviors that span provinces shall be determined by the price authority of the State Council. The price authority of the State Council may entrust provincial price authorities to investigate as needed; for low-price dumping behaviors in provinces and areas below the level of

provinces, they are determined by the price authorities of the provincial, autonomous region, and municipality peoples governments. Provincial price authorities may entrust local government price authorities to investigate as needed. (4) The application of the hearing system to penalties for low-price dumping behaviors is clarified. Before a governments price authority makes an administrative decision on a low-price dumping behavior, they should inform the parties involved of their right to request a hearing; if the parties request a hearing, the governments price authority should organize the hearing. The hearing procedures shall be implemented in accordance with relevant provisions of the "Administrative Penalty Law of the Peoples Republic of China." (5) It is clarified that when selling legally discounted goods, in addition to normally labeling the contents of the commodity prices that should be indicated, operators should also clearly and accurately indicate the original price, the reduced price or discount, and the content of the free commodity or service.

### III. Lawful investigation and handling of low-price dumping behaviors

In April 1999, Xiamen Overseas Chinese Electronic Co., Ltd. (Xiamen Overseas Company) reported to the State Planning Commission that Sichuan Changhong Electric Co., Ltd. (Changhong Company) had significantly reduced its color TV product prices nationwide since April, with the presence of dumping behaviors for some of the products. Later, Changhong Company reported to the State Planning Commission that Shenzhen Konka Group Co., Ltd. (Konka Company) and Xiamen Overseas Company had some color TV products with the presence of dumping behaviors. In response to the situation, the State Planning Commission promptly established a case according to the "Price Law" and relevant provisions on deterring low-price dumping, formed a joint investigation team with the Ministry of Information Industry, and invited certified public accountants to participate in the investigation at the above three companies. After four months of investigation and evidence collection, it was preliminarily determined that the three companies of Changhong, Xiamen Overseas, and Konka all had some types/models of color TV products with actual factory prices being lower than production costs. The three companies did not dispute the investigation results. The State Planning Commission, in conjunction with the Ministry of Information Industry, held a meeting where they issued a verbal warning against the behaviors of the three companies, the companies were ordered to immediately make rectifications, and the enterprises were required to, from now on, earnestly learn and strictly enforce national policies and comply with relevant laws and regulations.

Local price inspection departments have also investigated and handled low-price dumping behaviors. The Shanghai Municipal Price Bureau investigated and punished, according to law, a supermarket selling laundry powder at a price lower than the cost and a dairy company selling milk at a low price. Heilongjiang, Guangdong, and other places also investigated some local behaviors suspected of low-price dumping. (By Cheng Xingyun)

(C) 1994-2023 China Academic Journal Electronic Publishing House. All rights reserved. http://www.cnki.net



# 深入开展依法制止低价倾销工作

1999 年,制止低价倾销工作的重点是引导企业加强自律、完善法律法规和开展对违法行为的检查。

**一、发布行业平均成本,指导企业合理定价和开展制止低价倾销工作**

国家计委依据制止低价倾销行为的有关规定,会同有关部门先后发布了彩电、彩管、小四轮拖拉机、单缸柴油机、电线电缆、普通纸面石膏板、钢材、钨品等多种工业品行业平均成本,适时调整了平板玻璃、部分钢材品种的行业平均成本,其中,既有工业消费品,也有工业生产资料;既有内销产品,也有出口产品。发布行业平均成本的目的,一是指导企业合理定价,努力降低经营成本。测定和发布行业平均成本一般采用行业先进成本,这样可以引导成本偏高的企业努力改进管理,降低经营成本,以适应市场竞争的需要。二是作为行业和企业自律及举报低价倾销行为的依据。对以低于行业平均成本销售,造成市场秩序混乱的企业,受损害的企业可以向省级以上政府价格主管部门举报。

发布行业平均成本的产品中,有两个品种有特殊意义。一个是钨品,另一个是普通纸面石膏板。前者是出口产品,直接面对国际市场;后者虽是内销产品,但生产者大多是外商独资企业。对这两个品种在政策处理上需特别慎重。我国拥有占世界 70％的钨存储量和 60％的钨品出口量,在国际市场上占绝对的主导地位。但由于对钨品生产和出口缺乏必要管理,过度开采、多头出口现象严重,一些企业甚至低于直接成本销售,导致我国钨品在国际市场上

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

1999 年 8 月 1 日,经国务院批准,新的《价格违法行为处罚规定》(国家计委 1999 年 1 号令)公布出台,其中对低价倾销等没有违法所得的违法行为处罚力度明显加大。新的《价格违法行为处罚规定》规定,经营者违反价格法第十四条,有相互串通,操纵市场价格,损害其他经营者或消费者合法权益的;除依法降低处理剩余鲜活商品、季节性商品、积压商品等商品外,为了排挤竞争对手或独占市场,以低于成本的价格倾销,扰乱正常的生产经营秩序,损害国家利益或其他经营者合法权益的;提供相同商品或者服务,对具有同等交易条件的其他经营者实行价格歧视的,要责令改正,没收违法所得,可以并处违法所得 5 倍以下罚款;没有违法所得的,予以警告,可以并处 3 万元以上 30 万元以下罚款;情节严重的,责令停业整顿,或者由工商行政管理机关吊销营业执照。根据新的《价格违法行为处罚规定》,对低价倾销者最高可处以 30 万元罚款,从法律上解决了经济处罚过轻问题,完善了制止低价倾销工作。此外,新的《价格违法行为处罚规定》还规定,经营者拒绝提供价格监督检查所需资料或者提供虚假资料的,要责令改正,给予警告;逾期不改的,可以处 5 万元以下罚款,对直接负责的主管人员和其他直接责任人给予纪律处分。这些规定,对行业主管部门发布行业平均成本、价格监督检查人员执法检查提供了有力依据。

3、出台《关于制止低价倾销行为的规定》。针对低价倾销行为有从工业产品向所有商品和服务扩展的情况,为了深入、全面开展制止低价倾销工作,国家计委在总结工业行业制止低价倾销工作经验和教训的基础上,依据《中华人民共和国价格法》,研究制定了在所有商品中通用的《关于制止低价倾销行为的规定》(国家计委 1999 年 2 号令),于 1999 年 8 月 3 日发布实施。与以前的制止低价倾销法相比,其主要区别是:(1)以部门令形式下发,增强了法律的严肃性和权威性;(2)将制止低价倾销范围由工业产品扩大到所有商品;由一般经销商品扩大到包括招投标等各种方式销售的商品。(3)明确低价倾销认定权限。属于跨省区的低价倾销行为,由国务院价格主管部门认定。国务院价格主管部门可以根据需要委托省级价格主管部门进行调查;属于省及省以下区域性的低价倾销行为,由省、自治区、直辖市人民政府价格主管部门认定。省级价格主管部门可以根据需要委托当地政府价格主管部门进行调查。(4)明确对低价倾销行为的处罚适用听证制度。政府价格主管部门对低价倾销行为作出行政决定之前,应告知当事人有要求举行听证的权利;当事人要求听证的,政府价格主管部门应当组织听证。听证程序依照《中华人民共和国行政处罚法》的有关规定执行。(5)明确经营者在销售依法降价处理的商品时,除正常标注应当标明的商品价格内容外,还应当清晰、准确地标示降价前的价格或者折扣、赠送的商品或者服务内容。

### 三、依法调查、处理低价倾销行为

1999 年 4 月,厦门华侨电子股份有限公司(简称厦华公司)向国家计委举报,四川长虹电器股份有限公司(简称长虹公司)从 4 月份起在全国范围内大幅度降低其彩电产品价格,实行低价倾销行为。之后,长虹公司也向国家计委举报,深圳康佳集团股份有限公司(简称康佳公司)、厦华公司部分彩电存在低价倾销行为。针对这一情况,国家计委依据《价格法》和制止低价倾销行为有关规定及时立案,与信息产业部成立了联合调查组,并请会计师事务所的注册会计师参加,到上述三家公司进行了调查。经过 4 个月的调查取证,初步查清了有关情况。长虹、厦华、康佳等三家公司均存在部分品种规格的彩电实际出厂价格低于生产成本的问题。三家公司对调查结果没有提出异议。国家计委会同信息产业部召开会议,对三家公司进行口头警告,责令其立即改正,要求企业今后要认真学习,严格执行国家政策,遵守有关法律法规。

各地物价检查部门也对低价倾销行为进行了查处。上海市物价局对某超市以低于成本的价格销售洗衣粉、某乳品公司低价销售牛奶的行为依法进行了查处。黑龙江、广东等地也对本地一些涉嫌低价倾销的行为进行了调查。　　　　(程行云)

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.　　http://www.cnki.net

# APPENDIX H



July 10, 2023

**Certification**

Welocalize Translations

**TRANSLATOR'S DECLARATION:**

I, Johnson Wong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 关于立即停止低于进货价格销售彩电行为的函 - 法规库 - 110 网.pdf

*(Digital or printed signature here above the line)*

_____

Johnson Wong
**Project Number: BBLLP_2306_P0022**

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

6/12/23, 4:33 PM                    PM Letter on Immediate Cessation of Selling Color TVs Below the Purchase Price  - Regulatory library - 110 net



Letter on Immediate Cessation of Selling Color TVs Below the Purchase Price

Status: active     Release date: 2001-04-19     Effective date: 2001-04-19

Issuing department: Beijing Price Bureau

Issue number: Jing Jia (Jian) Zi [2001] No. 108

Gome Electric Appliances Co., Ltd., Dazhong Electric Appliances Co., Ltd., Yiteng Electric Appliance Mall Co., Ltd., and Ultrasonic Audio Garden:

In response to public reports, our bureau formed an investigation team with the National Development and Planning Commission and conducted an investigation in September 2000 on the prices of color TVs sold by 5 companies, including the city department store.

The investigation focused on color TVs of 29 inches and 34 inches. The results showed that among the five sales companies, only the city department store seriously implemented the relevant price regulations, abiding by the law, and there was no phenomenon of selling color TVs below the purchase price. Beijing Gome Electric Appliances Co., Ltd., Dazhong Electric Appliances Co., Ltd., and Yiteng Electric Appliance Mall Co., Ltd. all have varying degrees of problems of selling color TVs below the purchase price. A total of 12 models of color TVs were investigated for Beijing Gome Electric Appliances Co., Ltd., of which 7 models were sold below the purchase cost. For example, the purchase cost of Changhong 29N18 color TV was 1760 yuan, the selling price was 1704 yuan, and the actual selling price after the discount was 38.4 yuan below the purchase cost. 52 models of color TVs from Dazhong Electric Appliances Co., Ltd. were investigated, 47 of which were sold below the purchase cost. For example, the purchase cost of SONY LS29T99 color TV was 7589 yuan, and the selling price was 7236 yuan, which was 353 yuan below the purchase cost. 6 models of color TVs from Yiteng Electric Appliance Mall Co., Ltd. were investigated, all of which were sold below the purchase cost. For example, the purchase cost of Changhong 29E18 color TV was 3780 yuan, and the selling prices were 3740 yuan and 3690 yuan, respectively, 40 yuan and 90 yuan below the purchase cost, respectively.

During the investigation, Ultrasonic Audio Garden was not actively cooperating with the price department's work, did not provide the relevant data as required, and delayed the completion of the investigation.

According to the requirements of the National Development and Planning Commission's "Letter on Recommending the Beijing Municipal Price Bureau to Reprimand and Advise Some Businesses for Selling Color TVs Below the Purchase Price" (Ji Si Price Inspection Letter [2001] No. 3), it has been decided after discussion that the city department store is to be praised for abiding by the law and earnestly implementing price policies; the behavior of Beijing Gome Electric Appliances Co., Ltd., Dazhong Electric Appliances Co., Ltd., and Yiteng Electric Appliance Mall Co., Ltd. selling color TVs below the purchase price to some extent hinders fair market competition, and considering that the amount involved is not large and has not caused significant damage to the market, these three companies are reprimanded, who shall seriously study related price regulations in the future, develop corporate advantages through fair competition, establish market reputation, and obtain maximum benefits. At the same time, Ultrasonic Audio Garden is severely reprimanded for its uncooperative behavior in the investigation, who shall study price laws and regulations seriously in the future, strictly abide by the relevant provisions of the "Price Law of the People's Republic of China," and fulfill corporate responsibilities.

All enterprises should inform our bureau of feedback within 10 days from the date of receipt of this letter.

Mailing address: No. 7, Dongbinhe Road, Xicheng District, Beijing

Postal Code: 100011 Telephone Fax: 62352489 Attachments:

April 19, 2001



Related legislation: price, lower than, stop, Beijing Price Bureau, color TV, immediately, behavior, purchase, sale



6/12/23, 4:33 PM        PM Letter on Immediate Cessation of Selling Color TVs Below the Purchase Price - Regulatory library - 110 net



Did not find what you need? You can **post a legal consultation**, our lawyers are always at your service online

**\* Title:** Please enter the question title

**\* Content:**

The more detailed the question, the more precise the answer, and I wish your problem will be resolved as soon as possible!        **Post now**

## Recommended Laws and Regulations

- Jiangsu Medical Security Regulations
- Jiangsu Provincial Science and Technology Progress Regulations
- Measures for the Implementation of the Electric Power Law of the People's Republic of China in Anhui Province
- The Department of Land and Resources of Sichuan Province on the public selection of evaluation institutions to undertake in 2011
- Datong Intermediate People's Court, Datong People's Procuratorate, Datong Public Security Bureau
- Beijing Municipal Commission of Housing and Urban-Rural Development on Printing and Distributing the "Beijing State-Owned Land

- Jiangsu Province City Appearance and Environmental Sanitation Management Regulations
- Anhui Electric Bicycle Management Regulations
- Measures for the implementation of the "Vocational Education Law of the People's Republic of China" in Anhui Province
- Beijing Municipal Intellectual Property Office held the first phase of patent attorney practice in Beijing
- Beijing Municipal Bureau of Justice on issuing the "Beijing Municipal Bureau of Justice Legal Professional Qualification Recognition"
- Public Security Traffic Management Bureau of Beijing Municipal Public Security Bureau on the construction period of Maju Bridge in Tongzhou District

List of National Professional Lawyers

Find a lawyer by region

Legal documents

**Kind Reminder:** Dear users, if you have legal questions, please click here for **free legal consultation post** or **online instant consultation with lawyers**

Advertising Services | Contact information | Recruitment | Links | Sitemap

Loading time: 0. 05378 seconds copyright©2006 110. com inc. all rights reserved.
Copyright: 110.com

用户名 [　　　] 密码 [　　　] ☑记住我 [登陆] [免费注册] [忘记密码] 加入收藏

110.com 法律法规 Regulations 全国站 [进入分站]

"宅"中问 "云"解答
110法律微信携万名律师与您一起共战"疫"
免费法律咨询 扫码关注

网站首页　法律咨询　找律师　律师在线　律师热线　法治资讯　法律法规　资料库　法律文书

发布咨询　找律师　一对一咨询　法律人才　法律咨询　律师合作　案件委托　律师合作　求职信息　招聘信息

您的位置：首页 >> 法规库 >> 法规正文　　　　　　　　　　　[　　　　　　　] 搜索全

# 关于立即停止低于进货价格销售彩电行为的函

状态：有效 发布日期：2001-04-19 生效日期：2001-04-19

金融分析师　　如何分析数据

销售培训　　　进货批发网

个人如何做跨境电商　销售软件

如何做销售　　销售管理系统

销售技巧和话术　销售与管理

投放广告平台　　货源网一件代发

投放广告　　　货源批发网　　批发百货

发布部门：北京市物价局
发布文号：京价（检）字[2001]108号

国美电器有限公司、大中电器有限公司、亿腾电器商城有限公司、超音波音响花园：

根据群众举报，我局配合国家发展计划委员会组成调查组，于2000年9月对括市百货大楼在内的5家企业销售彩电价格情况进行了调查。

此次调查的是29英寸、34英寸2种规格的彩电，调查结果在5家销售企业中仅有市百货大楼认真贯彻执行价格政策法规，遵纪守法，未发现有低于进货价格销售彩电的现象。北京国美电器有限公司、大中电器有限公司、亿腾电器商城有限公司三家企业均不同程度地存在着低于进货价格销售彩电的问题。对北京国美电器有限公司调查了 12 个型号的彩电，其中有7个型号的彩电存在低于进货成本销售的情况，如销售长虹 29N18 彩电，进货成本 1760元，销售价格1704元。扣除折扣实际销售价格低于进货成本价8.4元；大中电器有限公司调查了52个型号的彩电，其中47个型号的彩电存在低于进货成本销售的情况，如：SONY LS29T99彩电进货成本7589元，销售价格 7236元，低于进货成本353元；亿腾电器商城有限公司调查了6个型的彩电，均存在低于进货成本销售的情况，如：长虹29E18彩电进货成本3780元，销售价格分别为3740元、3690元，分别低于进货成本40元、90元。

在调查过程中，超音波音响花园对物价部门的工作不积极配合，未按要求及时提供有关数据，影响了调查工作按时完成。

根据国家发展计划委员会《关于建议北京市价局对部分商家低于进货价格销售彩电进行批评劝告的函》（计划价检函[2001]3号）的要求，经研究决定，对市货大楼遵纪守法、认真执行价格政策的作法给予表扬；北京国美电器有限公司、大中电器有限公司、亿腾电器商城有限公司三家企业存在的低于进货价格销售彩电的行为，在一定程度上妨碍了市场公平竞争秩序，鉴于涉及的数据不大，尚未对市场造成明显损害，对北京国美电器有限公司、大中电器有限公司、亿腾电器商城有限公司三家企业提出批评，今后要认真学习相关的价格法规，通过公平竞争发挥企业优势，建立市场信誉，获取最大利益；同时，对超音波音响花园不积极配合调查的行为给予严肃批评，今后要认真学习价格法规，严格按照《中华人民共和国价格法》有关条款，履行企业职责。

各企业自接到此函之日起，10日内将反馈意见告知我局。

通讯地址：北京市西城区东滨河路7号

邮政编码：100011 电话传真：62352489附件：

二○○一年四月十九日


律师热线
只需一个电话
就能解决你的法律问题

相关法规：价格 低于 停止 北京市物价局 彩电 立即 行为 进货 销售


110.com
中国最知名的
免费法律咨询平台
法律微问
免费咨询 >>

与律师面对面
直播现场提问
点击进入 >>
律师直播

推荐律师
 蒙克军律师 陕西西安
 吴建弘律师 浙江杭州
刘同发律师 河北保定
 陈宇律师 福建福州
 陈皓元律师 福建厦门
年遇春律师 广东深圳
 王运洋律师 湖北襄阳
 胡律助理律师 四川成都
李波律师 广西柳州

最新已解决问题
· 全权受委托代理人可否代委托人在答辩 李保忠律师
· 18年前打架的，被关一晚上，到现在付 王运洋律师
· 免费听机 王运洋律师
· 12岁男孩子洗澡时父亲拍下裸照发给别 郝廷玉律师
· 教育机构不退款违法吗 王运洋律师
· 你有，我申请网贷签了合同，但对方说 陈皓元律师

按地域查找法规
北京 上海 重庆 河北 山西 内蒙古
辽宁 吉林 黑龙江 江苏 浙江 安徽 福建
江西 山东 河南 湖北 湖南 广东 广西
海南 四川 贵州 云南 西藏 陕西 甘肃
宁夏 青海 新疆 香港 澳门 台湾

按类别查找法规
宪法制度 刑法总类 民法总类 物权合同 婚姻家庭



没找到您需要的？ 您可以 发布法律咨询 ，我们的律师随时在线为您服务

*标题： 请您输入问题标题

*内容：

问题越详细，回答越精确，祝您的问题早日得到解决！ 马上发布

**推荐法规**

- 江苏省医疗保障条例
- 江苏省科学技术进步条例
- 安徽省实施《中华人民共和国电力法》办法
- 四川省国土资源厅关于公开选择评估机构承担二〇一一年
- 大同市中级人民法院、大同市人民检察院、大同市公安局
- 北京市住房和城乡建设委员会关于印发《北京市国有土地
- 江苏省城市市容和环境卫生管理条例
- 安徽省电动自行车管理条例
- 安徽省实施《中华人民共和国职业教育法》办法
- 北京市知识产权局关于举办北京市第一期专利代理人实务
- 北京市司法局关于发布《北京市司法局法律职业资格认可
- 北京市公安局公安交通管理局关于通州区马驹桥施工期间

公safe安 民事诉讼 刑事诉讼 行政诉讼 军刑业务
检察业务 纪检监察 行政管理 司法行政 法制工作
仲裁公证 质检价格 工业行业 教育科技 医疗卫生
文化体育 劳动人事 工商经贸 公司企业 土地矿产
城乡建设 房屋物业 资源能源 交通运输 食品药品
金融保险 税收审计 财政会计 证券期货 货币外汇
国有资产 电信邮政 新闻出版 广播影视 环境保护
农林水利 防震减灾 生产安全 民政宗教 人口计生
计划统计 动物检疫 标准专业 消费维权 外贸海关
知识产权 民族自治 国家赔偿 律师法顾 港澳台侨
外事国防 其他法律

**全国专业律师列表**

债务追讨 合同纠纷 交通事故 工伤赔偿 医疗纠纷
婚姻家庭 房产纠纷 拆迁安置 刑事辩护 常年顾问
金融证券 保险理赔 遗产继承 劳动纠纷 知识产权
抵押担保 海事海商 股份转让 私人产权 企业改制

**按地域找律师**

北京律师 上海律师 天津律师 重庆律师 河北律师
山西律师 内蒙律师 辽宁律师 吉林律师 江苏律师
浙江律师 安徽律师 福建律师 江西律师 山东律师
河南律师 湖北律师 湖南律师 广东律师 广西律师
海南律师 四川律师 贵州律师 云南律师 西藏律师
陕西律师 甘肃律师 宁夏律师 青海律师 新疆律师
香港律师 澳门律师 台湾律师 黑龙江

**法律文书**

宪政权利 民事诉讼 刑事诉讼 行政诉讼 仲裁程序
执行拍卖 复议申控 纪检监察 行政执法 行政处罚
公安执法 司法行政 国家赔偿 工商税务 劳动社保
银行保险 证券期货 信托投资 房屋物业 土地矿产
建设建筑 招标投标 公证证明 团体协会 企业设立
企业运营 企业制度 企业终止 企业诉讼 律师非讼
法律顾问 知识产权 网络软件 会计审计 统计票据
国有资产 交通运输 医疗卫生 质检价格 食品药品
环境资源 农林牧渔 广告影视 科教文体 电信邮政
出版印刷 海事海商 物权维权 公民家庭 个体经营
民政宗教 留学移民 涉外事务 其他法律

温馨提示：尊敬的用户，如果您有法律问题，请点此进行 免费发布法律咨询 或者 在线即时咨询律师 。

# APPENDIX I



July 19, 2023

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, Johnson Wong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 杭州市政府工作报告.pdf

*(Digital or printed signature here above the line)*

_____

Johnson Wong
Project Number: BBLLP_2306_P0022

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870



**Publication of Hangzhou Municipal People's Government**

# Hangzhou Political News

The core force leading our cause is the Communist Party of China

The Fourth Session of the Ninth People's Congress of Hangzhou City

The theoretical basis guiding our thinking is Marxism-Leninism

Album of the Fourth Session of the Ninth People's Congress of Hangzhou City

Supplement No. 1

1999

HANG ZHOU ZHENG BAO



# Government Working Report

(On January 23, 1999, at the Fourth Session of the Ninth Hangzhou People's Congress)

Wang Yongming, Mayor of Hangzhou

Representatives,

I represent the municipal people's government and submit this work report to the assembly for your consideration. I also invite the members of the Municipal Political Consultative Conference and other attendees to provide comments.

**I. A review of the work done in 1998**

The just-passed year of 1998 was an extraordinary one, a year in which the spirit of the Party's Fifteenth Congress was fully implemented, the challenges of reform and opening up and modernization construction were met, and new significant victories were achieved. Over the past year, under the leadership of the Zhejiang Provincial Committee of the Communist Party of China, the Provincial Government, and the Hangzhou Municipal Committee, we have upheld the great banner of Deng Xiaoping Theory, thoroughly implemented the spirit of the Fifteenth Congress of the Party, and closely relied on and led the people of the city to uplift their spirits, meet challenges, overcome difficulties, work solidly, and satisfactorily completed the tasks proposed by the Third Session of the Ninth People's Congress of the city, pushing the construction of the two civilizations in our city to a new level.

**1. The national economy continued to maintain stable development**

In the past year, the Asian financial crisis has caused a huge impact on our country's economy, the domestic demand constraints have further strengthened, and the difficulty of economic development has significantly increased. According to the requirements and deployment of the Party Central Committee and the State Council, and in combination with the actual situation in Hangzhou, we have taken proactive countermeasures. Focusing on achieving the economic growth target for the whole year, we have worked hard to do a solid job in all aspects and maintained the continuous and stable development of the national economy. According to the statistical express report, the city's GDP reached 113.5 billion yuan, a comparable price increase of 11.2% over

the previous year, achieving the economic growth target set at the beginning of the year. At the same time, the economic structure has been further optimized, and the quality and efficiency of the economy have been further improved.

Agriculture and rural economy have developed steadily. Governments at all levels have continued to strengthen their leadership in agricultural and rural work from the strategic height of strengthening the foundation of the national economy. The city's total grain output reached 1.75 million tons, achieving the target set at the beginning of the year. The quantity of "food basket" commodities is plentiful, the variety is rich, and the price is stable. Developmental agriculture has achieved remarkable results. The process of optimizing the agricultural industrial structure has accelerated. We have initially established an agricultural leading industry with regional characteristics, and through policy support and increased investment, we have accelerated the pace of agricultural industrialization. The total economic volume of township enterprises has maintained steady growth, and the quality of operation has improved. Great achievements have been made in invigorating agriculture through science and technology, afforestation, and the construction of major water conservancy facilities. The conditions for agricultural production and the ecological environment have been improved, and the capacity to resist disasters has been strengthened. The total agricultural output value of the city reached 13.7 billion yuan, an increase of 5.2% over the previous year at constant prices. The total rural economic income was 114 billion yuan, an increase of 10% over the previous year. New achievements have been made in poverty alleviation work.

Industrial economy has grown steadily. In the face of increasing constraints on industrial economic growth, governments at all levels have further strengthened leadership, guided enterprises to focus on expanding the market, adjusting product…

…also further strengthening the confidence in constructing great enterprises. This year, we will celebrate the 50th anniversary of the founding of the People's Republic of China and the successful return of Macao, which will undoubtedly provide a strong political impetus for reform and construction. These are all advantageous conditions for our work this year. At the same time, we should soberly see that the trend of multipolarity in the world and the economic globalization, the rapid progress of science and technology, and the emergence of the knowledge economy are profoundly changing the face of the world. The negative impact of the Asian financial crisis is still deepening, the uncertainty and risk of the economy are increasing, and the world economy is entering a period of adjustment with slower growth. The domestic market's final consumption demand is not vigorous, the new industrial structure has not yet been fully formed, and enterprises' new mechanisms to adapt to the market have not been fully established. Some deep-seated contradictions in economic and social life still exist. If not handled well, they will affect the progress of reform and development as well as the social stability. All of these require us to keep a clear mind, stay confident, move forward in the face of difficulties, seize opportunities correctly, bravely meet challenges, and take more proactive and effective measures to ensure the continuous and healthy development of the national economy this year, as well as push Hangzhou's construction of the two civilizations of socialism to a new stage, and usher a vibrant Hangzhou into the new century.

The guiding ideology of the government's work in 1999 is: **to hold high the great banner of Deng Xiaoping Theory, deeply implement the spirit of the Fifteenth Congress and the Third Plenary Session of the Fifteenth Central Committee of the Party, aim at "building an economically strong city and creating a culturally famous city," earnestly implement the spirit of the provincial and municipal party congresses, stabilize the agricultural foundation, intensify the efforts to overcome difficulties in reform, speed up structural adjustment, strive to expand domestic demand, develop domestic and foreign markets, strengthen infrastructure construction, advance urbanization, create new advantages in economic development, ensure social stability, achieve sustained, rapid, and healthy development of the national economy and comprehensive social progress, and greet the 50th anniversary of the founding of the People's Republic and the new century with excellent achievements in the construction of the two civilizations.** According to this guiding ideology and a comprehensive analysis of various domestic and international factors, the main expected control targets for the city's economic and social development this year are: a GDP growth of around 10%; a total fiscal revenue growth of 12%; a retail price increase of commodities within 2%; a registered urban unemployment rate controlled within 3.4%; and a natural population growth rate controlled within 4‰. These expected targets are mainly due to the consideration that Hangzhou, as a

relatively developed central city, should also be able to seize opportunities, overcome difficulties, meet challenges, maintain a moderately rapid economic growth, contribute to the national and provincial economic development, and also provide protection for our city to expand employment, increase fiscal revenue, improve people's living standards, promote the sustained development of the economy and society, and maintain social stability. The focus of the work should be placed on "building an economically strong city, creating a culturally famous city," sticking to the unity of speed, structure, quality, and efficiency, and insisting on the coordinated development of economy and society, and of material civilization construction and spiritual civilization construction. According to these requirements, we should focus on nine aspects of work this year.

**1. Stabilize and Strengthen Agriculture, Speed Up the Modernization of Agriculture and Rural Areas in Hangzhou**

We will fully implement the spirit of the Third Plenary Session of the 15th Central Committee of the Party, aiming at the goal of developed coastal areas taking the lead in achieving agricultural modernization. We will further deepen rural reforms, vigorously promote the industrialization of agriculture and the development of township enterprises, strive to increase farmers' income, maintain social stability in rural areas, and create a new situation for agricultural and rural work.

We will continue to deepen rural reforms. Maintain the dual-tier management system based on family contracting for the long term. We will unswervingly implement the policy of extending the land contract period by another 30 years, effectively manage the second round of land contracting, strengthen collective ownership, issue land contracting rights to farmers, and grant farmers long-term and guaranteed land use rights. In areas where the second round of land contracting has been carried out, especially where large-scale operations have been strongly implemented in the past few years, we should improve our work in accordance with the requirements of the central government, handle the relationship between land contract rights and the legal and reasonable circulation of land use rights correctly. While implementing land contract rights, we should stabilize the contract of large grain growers and protect their interests. In a few places where conditions really exist, we should adhere to the principles of legality and compensation, and guide and actively and steadily carry out moderate scale operations of land in various forms on the basis of improving the intensification of agriculture and the voluntary basis of the masses. We will push forward the comprehensive reform of the collective asset management system in rural areas, manage collective assets well, develop and strengthen the collective economy in rural areas, and enhance its function of serving farmers. Adjust and improve…

Hangzhou Political News                                    Supplement No. 1

…strengthen the family planning management of the floating population, and further improve the family planning management and service level, control the population, and improve the quality of the population. Pay attention to the issues of persons with disabilities and population aging. Do a good job for old people and caring for the next generation.

Protect and reasonably exploit resources according to the law, and improve the efficiency of resource utilization. Implement the new Land Management Law, strengthen macro-control of land use, promote agricultural production by protecting cultivated land, and promote sustainable development by intensive land use. Deepen the reform of the land use system, optimize the allocation of construction land resources, improve the land reserve mechanism, standardize land asset transaction behaviors, and enhance the government's ability to regulate the land market. Intensify efforts to rectify rural homesteads, and strengthen the planning and management of farmers' land for building houses.

Further implement the basic national policy of environmental protection, strictly implement environmental protection regulations, and strengthen supervision and remediation of environmental pollution. Pay close attention to the implementation of the "Blue Water, Blue Sky, Green, Quiet" environmental protection project. Intensify efforts to control water environmental pollution, and strengthen urban industrial and domestic sewage collection and management work. Accelerate the implementation of the comprehensive rectification project of the Hangzhou section of the canal, substantially complete the pollution interception and treatment project of the Hangzhou section of the canal, do a good job in urban river rectification, implement the West Lake silt dredging and treatment project, and further improve the water quality of the canal, urban rivers, and West Lake. Strengthen air pollution control and urban noise control. This year, we should make obvious progress in controlling the total emissions of pollutants, achieving standard emissions from industrial pollution sources, and meeting environmental quality standards in functional areas. Consolidate and improve the results of water pollution prevention and control in the Taihu Basin. Strengthen the protection of the water bodies in the Qiandao Lake and the Xin'an River, Fuchun River, Qiantang River, and Shaoxi River basins. Pay attention to afforestation, enhance the protection of forest resources and management of forestland, and promote soil and water conservation. Implement the reclamation of rivers and lakes and the conversion of farmland to forests to protect the ecological environment in a planned and step-by-step manner.

**7. Strengthen the regulation and supervision of economic operations to create a favorable economic operating environment**

Organize and lead the economic work of this year, all levels of government should fully play the role of market mechanisms, stimulate the vitality of economic development, and seriously implement a series of national macroeconomic control policies, strengthen the regulation and supervision of economic operations according to the law, and strive to optimize the environment for economic development.

Do a good job in fiscal, financial, and price work. Implement national fiscal policies, support key investment projects and infrastructure construction, and manage the use and management of special national debt loans from the central government. Actively cultivate financial resources, strengthen tax collection and management according to the law, crack down on tax evasion and other illegal activities, vigorously organize fiscal revenue, and maintain continuous and steady growth in local fiscal revenue. Change fiscal functions, standardize fiscal expenditure systems, optimize expenditure structures, ensure timely and full payment of statutory expenditures such as basic living expenses for laid-off workers from state-owned enterprises and reemployment funds as well as agriculture, science and technology, and education, improve the level of fiscal guarantees for social public projects, reduce fiscal expenditures in competitive and operational areas, strictly control all kinds of unreasonable expenses, and achieve basic fiscal balance. Actively cooperate with and support the reform of the People's Bank's management system, creating conditions for the central bank to perform its duties according to the law and various financial institutions to carry out normal business activities. Run Hangzhou Commercial Bank well. Pay high attention to and actively prevent and resolve local financial risks. Strengthen price management, and continue to maintain overall price stability.

Actively promote the reform of the social security system, and gradually improve the social security system. Deepen and improve the reform of pension, unemployment, and other insurance systems, and further expand the implementation scope of social insurance. Do a good job in the overall collection and payment of social insurance funds. Actively promote the reform of the medical insurance system for urban employees according to the deployment of the State Council, and accelerate the establishment of a basic medical insurance system that combines social pooling and personal accounts. Deepen the reform of the housing system, gradually implement the monetization of housing allocation for organs, enterprises, and public institutions. Introduce a reform plan for the housing system of administrative institutions, and urgently study and formulate a reform plan for the enterprise housing system. Actively create conditions for the listing and trading of reformed houses, appropriately relax the policy of buying houses and registering households, gradually realize the commercialization of housing, and make housing construction an important growth point for promoting economic development.

Rectify and standardize the economic order, and maintain a fair competition market environment. Regulate market price behavior, and investigate and handle unfair price behaviors, such as industry price monopoly and low-price dumping, according to the law. Do a good job in the reform of the industrial and commercial administration system. Severely crack down on economic crimes such as the production and sale of counterfeit

Hangzhou Political News

and inferior products, financial fraud, smuggling, etc. Establish and improve a comprehensive economic monitoring system. Strengthen auditing work and strictly supervise financial accounting. Carry out statistical work according to the law, improve the authenticity of statistical data, oppose false reporting and exaggeration, and serve the government's guidance for economic development.

州市人民政府机关刊物

# 杭州政报



杭州市第九届人民代表大会第四次会议专辑

增刊第1期

1999

增刊第 1 期 杭州政报

# 政 府 工 作 报 告

（1999 年 1 月 23 日在杭州市第九届人民代表大会第四次会议上）

杭州市市长 王永明

各位代表：

我代表市人民政府向大会作工作报告，请予审议，并请市政协各位委员和其他列席人员提出意见。

## 一、一九九八年工作的回顾

刚刚过去的 1998 年是极不平凡的一年，是全面贯彻落实党的十五大精神，改革开放和现代化建设经受严峻考验并取得新的重大胜利的一年。一年来，我们在中共浙江省委、省政府和杭州市委的领导下，高举邓小平理论伟大旗帜，认真贯彻党的十五大精神，紧紧依靠和带领全市人民，振奋精神，迎接挑战，克服困难，扎实工作，较好地完成了市九届人大三次会议提出的各项任务，把全市社会主义两个文明建设推上了一个新台阶。

### 1、国民经济继续保持稳定发展

过去的一年，亚洲金融危机对我国经济造成巨大的冲击，国内需求约束进一步增强，经济发展难度明显加大。我们根据党中央、国务院的要求和部署，结合杭州实际情况，比较主动地采取了应对措施，围绕实现全年经济增长目标，扎实努力地做好各项工作，保持了国民经济持续稳定发展。根据统计快报，全市实现国内生产总值 1135 亿元，按可比价计算，比上年增长 11.2%，实现了年初提出的经济增长目标。同时，经济结构也进一步优化，经济质量和经济效益得到进一步提高。

农业和农村经济稳定发展。各级政府从加强国民经济基础地位的战略高度，继续加大对农业和农村工作的领导力度。全市粮食总产量达到 175 万吨，完成年初目标。菜篮子商品数量充裕，品种丰富，价格平稳。开发性农业成效显著。农业产业结构优化进程加快。初步确立具有区域特色的农业主导产业，并通过政策扶持，增加投入，加快了农业产业化经营步伐。乡镇企业经济总量保持平稳增长，运行质量有所提高。科技兴农、绿化造林和重大水利设施建设取得了较大成绩，农业生产条件和生态环境有所改善，抗灾能力得到增强。全市实现农业总产值 137 亿元，按不变价计算，比上年增长 5.2%。农村经济总收入 1140 亿元，比上年增长 10%。扶贫工作取得新成果。

工业经济平稳增长。各级政府在工业经济增长约束因素增多的形势下，进一步加强领导，引导企业着力加大市场开拓，调整产品

增刊第1期

化建设伟大事业的信心也进一步增强。今年又将迎来建国50周年和澳门的胜利回归，必将为改革和建设提供强大的政治动力。这些都是我们做好今年工作十分有利的条件。同时，也要清醒地看到，世界多极化和经济全球化趋势，科技进步的突飞猛进和知识经济的初露端倪，正在深刻地改变着整个世界的面貌。亚洲金融危机的负面影响仍在加深，经济不确定性和风险性加大，世界经济将进入增长趋缓的调整期。国内市场最终消费需求不旺，新的产业结构尚未完全形成，企业适应市场的新机制还没有完全建立起来，经济社会生活中的一些深层次矛盾仍将存在，如果处理不好，将会影响改革发展的进程和社会稳定。所有这些，都要求我们保持清醒头脑，坚定信心，知难而进，正确把握机遇，勇敢迎接挑战，采取更加积极有效的措施，确保实现今年国民经济持续健康发展，把杭州社会主义两个文明建设推进到一个新阶段，把一个充满生机和活力的杭州带入新的世纪。

1999年政府工作的指导思想是：**高举邓小平理论大旗帜，深入贯彻党的十五大和十五届三中全会精神，以"建经济强市、创文化名城"为目标，认真落实省、市党代会精神，稳定农业基础，加大改革攻坚力度，加快结构调整，努力扩大内需，开拓国内外市场，加强基础建设，推进城市化进程，增创经济发展新优势，确保社会稳定，实现国民经济持续快速健康发展和社会全面进步，以两个文明建设的优异成绩，迎接建国50周年和新世纪。** 按照上述指导思想，综合分析国内外各种因素，今年全市经济和社会发展的主要预期调控目标是：国内生产总值增长10%左右；财政总收入增长12%；商品零售价格涨幅在2%以内；城镇登记失业率控制在3.4%以内；人口自然增长率控制在4‰以内。提出这样的预

期目标，主要考虑到杭州作为经济比较发达的中心城市，应该也有条件抓住机遇，克服困难，迎接挑战，保持经济适度快速增长，为全国、全省经济发展作出贡献，同时也为我市扩大就业、增加财政收入、改善人民生活，促进经济社会持续发展和维护社会稳定提供保障。工作的着力点要放在"建经济强市、创文化名城上"，坚持速度、结构、质量和效益的统一，坚持经济与社会、物质文明建设与精神文明建设的协调发展。按照上述要求，今年要着重抓好9个方面的工作。

**1、稳定和加强农业，加快杭州农业和农村现代化进程**

全面贯彻落实党的十五届三中全会精神，围绕沿海发达地区要率先基本实现农业现代化的目标，进一步深化农村改革，大力推进农业产业化经营和乡镇企业的发展，努力增加农民收入，保持农村社会稳定，开创农业和农村工作的新局面。

继续深化农村改革。长期稳定以家庭承包经营为基础的双层经营体制。坚定不移地贯彻土地承包期再延长30年的政策，认真抓好第二轮土地承包工作，强化集体所有权，核发农户土地承包权证，赋予农民长期而有保障的土地使用权。前几年已经开展土地二轮承包特别是实行规模经营力度比较大的地区，要按照中央要求做好完善工作，正确处理好土地承包权和土地使用权依法合理流转的关系，在落实土地承包权的同时，稳定种粮大户承包合同，保护种粮大户的利益。在少数确实具备条件的地方，应在提高农业集约化程度和群众自愿的基础上，坚持依法、有偿的原则，正确引导和积极稳妥地开展多种形式的土地适度规模经营。推进农村集体资产管理体制综合改革，管好集体资产，发展壮大农村集体经济，增强为农民服务的功能。调整和完

务,加强流动人口计划生育管理,进一步提高计划生育管理和服务水平,控制人口数量,提高人口素质。重视残疾人和人口老龄化问题。做好老龄和关心下一代工作。

依法保护和合理开发资源,提高资源利用效率。贯彻执行新的《土地管理法》,强化土地利用宏观调控,以保护耕地促进农业生产,以集约用地促进可持续发展。深化土地使用制度改革,优化建设用地资源的配置,完善土地储备机制,规范土地资产交易行为,增强政府对土地市场的调控能力。加大农村宅基地整治力度,加强农民建房用地规划管理。

进一步落实环境保护基本国策,严格执行环境保护法规,加强对环境污染的监管和整治。认真抓好环境保护“碧水、蓝天、绿色、清静”工程的实施。加大水环境污染治理力度,加强城市工业和生活污水纳污进管工作。加快实施运河杭州段综合整治工程,基本完成运河杭州段截污处理工程,抓好市区河道整治,实施西湖淤泥疏浚处理工程,进一步改善运河、市区河道和西湖水质。加强大气污染治理和市区噪声控制。今年要在实行污染物排放总量控制、工业污染源达标排放、环境质量达到功能区标准方面取得明显进展。巩固和提高太湖流域水污染防治成果。加强千岛湖及新安江、富春江、钱塘江、苕溪流域的水体保护。抓好绿化造林,强化森林资源保护和林地管理,搞好水土保持。有计划有步骤地实施退田还江还湖,退田还林,保护生态环境。

**7、加强经济运行的调节和监督,创造良好的经济运行环境**

组织领导好今年的经济工作,各级政府既要充分发挥市场机制的作用,激发经济发展的活力,又要认真贯彻执行国家对经济宏观调控的一系列方针政策,依法加强对经济运行的调节和监督,努力优化经济发展的环

境。

认真做好财政金融物价工作。贯彻落实国家财政政策,支持重点投资项目和基础设施建设,做好中央特别国债的转贷使用和管理工作。积极涵养财源,依法强化税收征管,严厉打击偷抗骗税等违法犯罪活动,大力组织财政收入,保持地方财政收入持续稳定增长。转变财政职能,规范财政支出制度,优化支出结构,确保国有企业下岗职工基本生活费和再就业经费以及农业、科技、教育等法定支出的及时足额到位,提高财政对社会公共项目的保障程度,压缩竞争性领域和经营性领域的财政支出,严格控制各种不合理开支,实现财政收支基本平衡。积极配合和支持人民银行管理体制的改革,为中央银行依法履行职责和各金融机构开展正常的业务活动创造条件。办好杭州市商业银行。高度重视和积极防范化解地方金融风险。加强价格管理,继续保持价格总水平的基本稳定。

积极推进社会保障制度改革,逐步完善社会保障体系。深化和完善养老、失业等保险制度改革,进一步扩大社会保险的实施范围。切实抓好社会保险基金的统筹征缴工作。根据国务院的部署,积极推进城镇职工医疗保险制度改革,加快建立社会统筹与个人帐户相结合的基本医疗保险制度。深化住房制度改革,逐步实行机关、企事业单位住房分配货币化。出台实施政府事业单位住房制度改革方案,抓紧研究制订企业住房制度改革方案。积极创造条件,使房改房上市交易,并适当放宽购房入户政策,逐步实现住房商品化,使住房建设成为促进经济发展的一个重要增长点。

整顿和规范经济秩序,维护公平竞争的市场环境。规范市场价格行为,依法查处行业价格垄断、低价倾销等不正当价格行为。认真

做好工商行政管理体制改革工作。严厉打击生产经销假冒伪劣产品、金融诈骗、走私等经济犯罪活动。建立健全综合经济监测体系。加强审计工作,严格财务会计监督。依法做好统计工作,提高统计数据的真实性,反对虚报浮夸,为政府指导经济发展服务。

# APPENDIX J



July 18, 2023

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, **Huo Gejun**, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 广州惊爆"超低价"_本报记者__刘伯饶__陶小淳.pdf

*(Digital or printed signature here above the line)*

Huo Gejun

_____

**Huo Gejun**
**Project Number: BBLLP_2306_P0022**

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

Supplement
People's Daily / January 13, 2003

## 80 Cents for a Roast Chicken, 0 Yuan for a Refrigerator?

## Shocking "Ultra-low Prices" in Guangzhou

By Our Reporters LIU Borao and TAO Xiaochun

Event

The two supermarkets, Vanguard and PARKnSHOP, engaged in a fierce battle over the price of roast chicken, resulting in a roast chicken selling for only 80 cents

On November 8, 2002, China Resources Vanguard Tianhe North Store was opened on the bustling Tianhe North Road, Guangzhou. As a special promotion, Vanguard offered an "opening special" of RMB5.90 per roast chicken, attracting flocks of consumers to the supermarket. Soon after, PARKnSHOP Jintian Store, more than 200 meters away, lowered its price from RMB6.80 to RMB5.80 per roast chicken. Immediately, Vanguard further reduced its price to RMB4.90 per roast chicken. At 4:00 pm that day, PARKnSHOP lowered its price of roast chicken to RMB4.80.

Afterwards, the competition between the two supermarkets further escalated. On November 10, roast chicken and eggs hit their lowest prices: 80 cents for a roast chicken and 10 cents for 500 grams of eggs.

The battle over roast chicken has ignited an ultra-low price war in the Guangzhou retail market, where all the major supermarkets were involved in the "battle": PriceSmart launched a "10 cents" promotion plan, and A.Best took the "5 cents for 500 grams of Bok choy" action. The price war among supermarkets in Guangzhou went from "Yuan" to "cents" and then from "cents" to "pennies". The "battle" was so intense.

Not only have the large supermarkets engaged in the ultra-low price war, but the electrical appliances chain retailers have also launched a fierce price war. Since GOME opened its first store in Guangzhou in October 2002, TORNADO has started a 'tug-of-war' with GOME, with both retailers continuously pushing down the prices of their appliances. As a result, TORNADO took advantage of the opening of its Sanyuanli Store to offer ultra-low-priced items such as RMB1.00 telephone sets and RMB1.00 hairdryers, while GOME immediately launched RMB0.00 refrigerators, hairdryers, water dispensers, electric shavers, etc., as a response.

Argument

Some merchants in Guangzhou believe that low-price promotions are not low-price dumping, while some experts consider that merchants in Guangzhou selling products below cost are indeed suspected of dumping

As early as in August 1999, the State Planning Commission issued the "Regulations on Preventing Low-Price Dumping Practices" to promote open, fair and legal market price competition. The so-called low-price dumping refers to the act of business operators, in addition to selling commodities at reduced prices according to law, dumping goods below cost, thereby disrupting the normal order of production and operation and damaging the national interests or the legitimate rights and interests of other business operators, so as to crowd out competitors or monopolize the market. So, is the ultra-low price war in Guangzhou an act of low-price dumping?

In this regard, some merchants in Guangzhou said that "low-price promotions" were not "low-price dumping", because the promotion period usually lasts for a few days only, and it is impossible to operate below cost for a long time. Moreover, the promotional goods are limited, and the low price is only to give discounts and rewards to customers.

According to the director of an electrical appliances marketing centre in Guangzhou, the merchants' price cuts mainly rely on the advantage of sales volume and support from manufacturers. Manufacturers enter the market with low prices for the purpose of expanding brand awareness, while merchants are trying to gather popularity rather than defeat their rivals. So this is not considered as a dumping behavior.

YANG Jianhua, Director of the Department of Business at the School of Management of Jinan University, pointed out that, according to the current circumstances, the ultra-low price war among supermarkets in Guangzhou is only a short-term phenomenon, so it is not appropriate to simply define it as low-price dumping. However, such ultra-low prices deviate too much from the normal price level of the market, which is abnormal and irrational.

Many experts think that low-price dumping exists not only in international trade, but also in domestic trade. The merchants in Guangzhou, who are

(C) 1994-2023 China Academic Journal Electronic Publishing House. All rights reserved, http:// http://www.cnki.net

engaged in an ultra-low price war and sell goods below cost in a variety of ways, are indeed suspected of low-price dumping.

The supermarkets being engaged in a price war has pleased consumers the most. Some consumers have even bustled between neighboring supermarkets, comparing prices and buying from whoever has the cheapest stuff. However, consumers may sometimes have troubles, such as waiting for more than an hour to buy a cheap roast chicken. To buy cheap electrical appliances, they have to wait for days or even make several trips to negotiate with a shopping mall before receiving the goods.

Some experts point out that, in the long run, manufacturers can only make profits by lowering production standards and service levels in the face of lower selling prices across the industry, which will ultimately damage the interests of consumers. From a deeper perspective, as normal profits for goods are not guaranteed, the average profit margin of an industry will decrease, which will be detrimental to reproduction of the whole society.

Government

Recently, the price department of Guangdong Province has required a halt to three types of sales below cost. The State Planning Commission has dispatched special persons to Guangzhou to investigate the event

A 21-inch Hisense color TV is sold for RMB399.00 only, a Haier mobile phone for RMB199.00 only, an IDALL VCD for RMB86.00 only, a SID razor for RMB2.00 only, etc. Recently, a household appliances mall located on Zhongshan Second Road in Guangzhou is bustling with consumers, where they even wait in a long line at the entrance to buy ultra-low-priced goods.

Since the end of last year, many large supermarkets both at home and abroad have been rushing to Guangzhou and launching rounds of "ultra-low price war" in a fierce battle. This scene is just a microcosm of the war.

On January 7, Guangdong Provincial Price Bureau and Guangzhou Municipal Price Bureau convened more than 40 large retailers, warning them not to sell goods in three ways below cost: firstly, do not sell goods directly at prices below the cost of purchase, especially household appliances including color TVs, air conditioners, and microwave ovens; secondly, do not sell goods at so-called special offers, discounts, or rebates that are actually below cost; thirdly, do not sell goods below cost under the disguise of giving away goods, offering more in quantity, etc.

According to the director of Guangzhou Municipal Price Bureau, the Municipal Price Bureau will actively intervene in the investigation and supervision of unfair price competition behaviors and correct or deal with all kinds of unfair price competition practices.

It is reported that the State Planning Commission has recently dispatched personnel to Guangzhou to investigate the event.

**How Did Hong Kong Deal with Pork Price Cuts?**

The pork price cut has caused a stir

In early May last year, two large chain supermarkets in Hong Kong, "PARKnSHOP" and "Wellcome", announced a significant reduction in pork retail prices, from nearly HK$30 to about HK$19 per 500g of pork, representing a decrease of more than 30%. The citizens applauded such reduction.

However, the sharp price reduction has affected the interests of the pork "buyers" (local wholesalers) and the market butchers. The "buyers" boycotted the live pig auction in the slaughterhouse on May 6, while the market butchers suspended the supply of fresh pork the next day. The "buyers" even accused in high profile the two supermarkets of conducting "predatory pricing", in an attempt to monopolize the pork retail market.

The main argument against price cuts by the supermarkets is that the two large supermarkets are so economically powerful that they try to drive out small business owners through "cutthroat" price reduction. Once monopolizing the market, they will absolutely raise the prices again, leaving consumers at their disposal. The two supermarkets issued a statement refuting that it was still profitable and not a loss-making business even at the selling price of HK$19. They also pledged that the price cuts would be a long-term strategy and they would even lower the selling prices further in the future.

Conclusion upon Exhaustive Investigation

Despite the upsurge of public opinion, the Hong Kong Government has not intervened in market pricing, and officials in charge have repeatedly stressed that the hand of the market would regulate itself. However, the Hong Kong "Competition Policy Advisory Group" has commissioned the Health, Welfare and Food Bureau of the Hong Kong Government to conduct an investigation into the competition in the pork supply chain, to see if there is any unfair competition from the place of origin, importers to wholesalers and retailers.

The Legislative Council's Panel on Food Safety and Environmental Hygiene was also concerned about the event and held a special hearing. The semi official Consumer Council submitted an "Opinion on Fresh Pork Supply" to the Legislative Council to analyze the competition policies involved in this event. Instead of following the crowd, some serious financial newspapers in Hong Kong sent reporters to gain an in-depth understanding of the operation of the pork supply chain and backed up the claims of the two supermarkets

(C) 1994-2023 China Academic Journal Electronic Publishing House. All rights reserved, http:// http://www.cnki.net

with actual data.

The investigation report, which was issued by the Competition Policy Advisory Group last year, concluded that the two supermarkets were selling pork at a small profit rather than below cost, without the so-called "predatory pricing" involved. The report concludes that the Hong Kong Government currently does not need to take any action to intervene in the market. Over the past seven or eight months, not only has the promised selling price of pork in supermarkets been maintained, but the prices at market pork stalls have also dropped significantly. As the price storm subsided, citizens have benefited a lot.

Government may intervene in any violation of rules

Currently, there is no "fair competition law" or a corresponding "fair competition commission" in Hong Kong, but Hong Kong has formulated a "Statement on Competition Policy" a few years ago and established a "Competition Policy Advisory Group" chaired by the Financial Secretary. This Statement is the first guideline issued by Hong Kong on business practices in violation of the recognized competition rules, while the "Competition Policy Advisory Group" is responsible for conducting investigations after receiving relevant complaints. In addition, the "Statement on Competition Policy" publicly states that the Hong Kong Government may take administrative or legal measures where necessary to deter any business practices in violation of the recognized competition rules.

(C) 1994-2023 China Academic Journal Electronic Publishing House. All rights reserved. http:// http://www.cnki.net

副刊 人民日报/2003 年/01 月/13 日/

## 烤鸡 8 角钱一只,冰箱零元一台?

# 广州惊爆"超低价"

本报记者 刘伯饶 陶小淳

事件

万佳和百佳超市在烤鸡价格上展开恶战,结果一只烤鸡只卖 8 角钱

2002 年 11 月 8 日,在广州繁华的天河北路,华润万佳天河北店开业了。作为优惠促销,万佳打出了烤鸡每只 5.9 元的"开业特价",消费者纷纷入市购买。很快,相距 200 多米的百佳金田店将烤鸡价格由每只 6.8 元下调到 5.8 元。随即,万佳又将烤鸡价格降到每只 4.9 元。当日下午 4 点,百佳又将烤鸡价格调低至 4.8 元。

此后,双方竞争进一步升级。11 月 10 日,烤鸡、鸡蛋创下价格最低点:一只烤鸡 8 角钱,500 克鸡蛋 1 角钱。

烤鸡之争引爆了广州零售市场上的超低价大战,广州各大超市纷纷卷入"战局";普尔斯马特推出"1 角钱"促销计划,新一佳采取"5 分钱 500 克青菜"行动。广州超市价格战从"元"打到"角",再从"角"打到"分","战况"十分激烈。

不仅是大型超市进行了超低价大战,电器连锁店的价格战也烽烟四起。从国美电器于 2002 年 10 月在广州开设第一家分店以来,东泽电器就与之进行"拉锯战",双方把电器价格不断压低。最终的结果是,东泽电器借三元里店开业推出 1 元电话机、1 元电吹风等超低价商品,国美电器则立即推出零元冰箱、电吹风、饮水机、电动剃须刀等商品进行应对。

争论

广州一些商家认为,低价促销不属于低价倾销,有专家认为,广州商家以低于成本的价格销售,确有倾销嫌疑

早在 1999 年 8 月,国家计委就出台了《关于制止低价倾销行为的规定》,以促进公开、公平、合法的市场价格竞争。所谓低价倾销,是指经营者在依法降价处理商品之外,为排挤竞争对手或独占市场,以低于成本的价格倾销商品,扰乱正常生产经营秩序,损害国家利益或者其他经营者合法权益的行为。那么,广州的超低价大战是否属于低价倾销行为呢?

对此,一些广州商家说,商家的"低价促销"不属于"低价倾销",因为一般的促销期只有短短几天,不可能长期低于成本经营,而且促销商品有限,低价仅仅是为了优惠和回报顾客。

广州某电器营销中心总监认为,商家降价主要是依靠销售数量的优势以及来自于厂家的支持。厂家以低价入市,是为了扩大品牌知名度;商家是为了凝聚人气,并不是想把对手打垮,因此这不属于倾销行为。

而暨南大学管理学院商学系主任杨建华指出,从目前看,广州超市的超低价大战仅仅是短期的表现,因此,简单用低价倾销来进行定性不很妥当。但是,这种超低价与市场正常价格水平背离太大,是不正常的,也是失去理智的。

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki

超低价大战,以多种手法低于成本销售,确有低价倾销的嫌疑。

超市大打价格战,眼下笑得最开心的莫过于消费者了。有的消费者甚至穿梭于邻近的超市间,对商品价格进行比较,谁的东西便宜,就买谁的。但是,消费者也有烦恼的时候,比如,为了买一只便宜的烤鸡,要等一个多小时。买便宜的电器,则要等上好几天,甚至多次到商场交涉才能收到货。

有关专家指出,从长远看,厂商在整个行业售价降低的情况下,只有通过降低生产标准、降低服务等方式来获得利润,最终受害的还是消费者。从更深层次看,由于商品的正常利润得不到保障,行业的平均利润率下降,将对整个社会的再生产不利。

政府

近日,广东省物价部门要求停止低于成本的三种销售方式。国家计委已派专人到广州调查此事

21寸海信彩电只卖399元,海尔手机只卖199元,爱多VCD只卖86元,超人剃须刀只卖2元……近日,位于广州中山二路的某家电商场内人声鼎沸,人们甚至在门口排起了长队等着购买超低价商品。

从去年年底开始,国内外许多大型超市纷纷抢滩广州,在短兵相接中掀起了一轮轮"超低价大战"。这一幕只是大战的一个缩影。

1月7日,广东省物价局和广州市物价局召集了40多家大型零售企业进行告诫,告诫的主要内容是不要以三种低于成本销售的方式来销售商品:一是不要直接以低于进货成本的价格销售商品,特别是彩电、空调、微波炉等家电产品;二是不要以名为特价、折扣、返利,实际是低于成本的方式来销售商品;三是不要通过赠送商品、多给数量等手段,变相以低于成本的价格销售商品。

广州市物价局负责人也表示,市物价局将积极介入对不正当价格竞争行为的调查和监督,纠正或处理各种不正当的价格竞争行为。

据悉,近日,国家计委已派人到广州调查此事。

### 猪肉大减价 香港咋处理

猪肉降价起风波

去年5月初,香港两家大型连锁超级市场"百佳"和"惠康"宣布大幅降低猪肉零售价,从每500克近30港元减至19港元左右,减幅超过30%。市民对此拍手称快。

不料,大幅减价,却触及了猪肉"买手"(本地的批发商)和街市肉贩的利益,"买手"于5月6日抵制屠房活猪拍卖,街市肉贩也于次日暂停新鲜猪肉供应。"买手"更高调指责两大超市采取"掠夺性定价"的手法,试图垄断猪肉零售市场。

指责超市减价的主要观点是,两大超市财大气粗,通过"割喉"减价赶绝小经营者,一旦垄断市场势必再提高售价,到时消费者只能任人宰割。两大超市则发表声明反驳说,19港元的售价仍然有利可图,不是赔本生意。它们还承诺,这次减价是长期性的,未来甚至会进一步降低售价。

详尽调查下结论

尽管舆情高涨,港府却一直没有出手干预市场定价,主管官员还反复强调由市场之手自己调节。但是,与此同时,香港"竞争政策委员会"委托港府卫生福利及食物局,对猪肉供应链的竞争情况作出调查,从产地、进口商一直到批发商、零售商,研究是否存在不当竞争的情况。

立法会的食物安全及环境卫生事务委员会也关注这一事件,专门召开听证会。半官方的消费者委员会向立法会提交了一份"新鲜猪肉供应意见书",分析这次事件所牵涉到的竞争政策。香港一些严肃的财经报纸没有人云亦云,而是派出记者深入了解猪肉供应链的运作,以实际数据支持了

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved. http://www.cnk

　　去年底出炉的"竞争政策委员会"调查报告最后认定,两家超级市场以只赚取薄利而不是以低于成本的方式出售猪肉,没有所谓的"掠夺性定价"。报告的结论是,港府目前不必采取任何行动来干预市场。七八个月过去了,不仅超市的猪肉一直保持着承诺的售价,街市肉摊的价格也有了明显的下降。一场风波过去,市民得到了实惠。

　　违反规则可干预

　　目前,香港尚未有"公平竞争法",也没有相应的"公平竞争委员会",但是香港已在几年前制定了《竞争政策纲领》,并成立由财政司司长出任主席的"竞争政策委员会"。这份纲领是香港首次就有违公认竞争规则的经营手法发出的指引,而"竞争政策委员会"则负责在接到有关投诉后展开调查。另外,《竞争政策纲领》公开阐明,港府可在有需要时采取行政或法律措施,以遏制违反公认竞争规则的经营手法。

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.　　http://www.cnk

# APPENDIX K



July 10, 2023

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, Johnson Wong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 山东省志 物价志(1997-2005)_制止不正当价格行为.pdf

*(Digital or printed signature here above the line)*

_____

Johnson Wong

**Project Number: BBLLP_2306_P0022**

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

**Shandong Province Information Network**
**Shandong Province Provincial Information Database**
www.infobase.gov.cn

| Please enter the search term | | Second round of provincial annals | Search |

The current single library is the second round of Shandong Provincial Annals Price Chronicles (1997-2005) Click here to open the full library catalog

Book IV: Price Law Enforcement
      Chapter I: Price Administrative Law Enforcement

      Section 3 Stop Unfair Price Behavior

From 1997 to 2005, the provincial Price Bureau continuously enhanced market supervision, accurately identified the "nodes" and patterns of the outbreak of unfair pricing violations, improved the timeliness of lawful investigation and handling, and improved the efficiency of case handling. The focus was on inspecting the prices of daily consumer goods and various service fees closely related to peoples lives. Especially during n ational holidays such as "May 1st," "October 1st," and New Years Day, they enhanced the supervision and inspection of prices and fee situations of "rice bags," "vegetable baskets," tourist attractions, parking lots, catering and entertainment venues, shopping places, etc. They also investigated and handled illegal pricing practices according to law such as unauthorized price hikes at tourist attractions, not executing clearly marked prices, price monopolies, and fraudulent overcharging, which played a positive role in establishing a fair and just market price order.

From 1997 to the first half of 1998, the provincial Price Bureau focused on inspecting products sold below the average industry cost, such as flat glass, steel, color cathode ray tubes, color TVs, and sugar, and maintained the market price competition order in related industries.

In 1998, the Agricultural Vehicle Branch of the China Agricultural Machinery Association launched an industry-wide "self-discipline price" movement nationwide under the pretext of "opposing low-price dumping" and "resisting vicious price competition." Shandong Shifeng Group was fined 953,000 yuan by the association for refusing to implement its so-called industry "self-discipline price," attracting the attention of provincial leaders. On September 14, the Deputy Governor Han Yuqun instructed on the Gaotang County Government's report on Shandong Shifeng Groups implementation of self-discipline prices: "The provincial Price Bureau should study this with the Legal Affairs Bureau. Are the objections raised by Shifeng Group reasonable, and how to handle self-discipline prices while protecting the enterprises right to set prices independently?" Deputy Governor Lin Shuxiang pointed out: "The industry association cannot be above the law in setting self-regulated prices. Any behavior that infringes on the rights and interests of enterprises should be resolutely resisted by the enterprises, and law-enforcement departments should strictly investigate and handle such behavior." Consequently, both the provincial Price Bureau and the State Planning Commission sent personnel to investigate. The results showed that the so-called industry "self-discipline price" promoted by the Agricultural Machinery Association violated the principles of encouraging competition stipulated by the "Price Law" and deprived enterprises of the right to make independent pricing decisions, and the industry association did not have the power to enforce price administration, which "suppressed the advanced and protected the backward." On October 26, Vice Premier of the State Council Wu Bangguo made important instructions on the investigation report submitted by the State Planning Commission, requiring to "punish the unfair competition behavior of low-price dumping according to law. Penalties should be enforced by law enforcement departments." The State Planning Commission ordered the Agricultural Vehicle Branch of the China Agricultural Machinery Association to refund the fines to the enterprise and issued a notice requiring the correction of the practices of the Agricultural Vehicle Branch of the National Agricultural Machinery Association.

In April-May 1999, the provincial Price Bureau organized a special inspection of more than 10 airlines, business departments, and over 110 civil aviation ticket sales agency businesses in the province, investigating and dealing with price violations, and maintaining the order of airfare and the legitimate rights and interests of consumers.

In response to some communication companies in Shandong adopting various illegal means such as lowering mobile phone access fees and implicitly lowering mobile phone monthly rental fees to compete unfairly for the market, the provincial Price Bureau conducted mobile communication charge inspections in the second half of 2000, investigating and dealing with unfair pricing behaviors in the mobile communication market.

In 2001, to implement the decisions of the State Council, the State Planning Commission, and the provincial government on rectifying and standardizing economic order, according to the requirements proposed at the National Tourism Development Conference to "improve tourism price management, implement clear pricing for tourism products and services, and strengthen supervision and inspection to crack down on price fraud and other illegal behaviors," the province conducted price inspections of the tourism market during the "May 1st" and "October 1st" holidays, combining centralized inspections with group inspections, carefully handling complaints and reports, and thoroughly investigating and dealing with all kinds of arbitrary price increases and illegal charging behaviors in tourist areas.

In January 2002, the State Planning Commission issued the "Regulations on Prohibiting Price Fraud." To effectively strengthen the work guidance for anti-unfair price behaviors across the provinces and adapt to the new situation of combating price fraud and other unfair price competition behaviors, the provincial price inspection office established a research center against unfair pricing behaviors during the same year to strengthen the work guidance for anti-unfair price behaviors across the provinces. A consumer in Jinan reported a communications company to the provincial Price Bureau due to a price dispute when purchasing a mobile phone. The inspectors checked the companys price execution situation. They found that the company was using the wor d "special offer" for publicity at the business premises and marked "buy a mobile phone and get a 100 yuan payment for phone bill" and "only 2 yuan per month, you can receive all calls for free" in the promotional posters, but the additional conditions for the "special offer" were not clearly stated in the advertisement and business premises. The inspection team believed that the companys behavior violated the "Regulations on Prohibiting Price Fraud" and constituted price fraud. After discussion and decision by the case hearing committee, the company was warned and fined 5000 yuan.



Figure 4-6: In 2002, the Price Bureau of Zaozhuang City set up billboards to stop unfair price behavior on the street

In April 2003, the provincial Price Bureau conducted key inspections on the prices of drugs, medical devices, sanitary materials, grains, and salt (non-staple foods) related to the prevention and treatment of Severe Acute Respiratory Syndrome (SARS). Six departments, including the Provincial Development and Reform Commission, Provincial Economic and Trade Commission, Provincial Health Department, Provincial Drug Administration, Provincial Administration for Industry and Commerce, and Provincial Price Bureau, jointly issued a document demanding strict, fast, and severe crackdown on illegal activities that harm public interest such as non-compliance with government-guided prices, government-set prices, or temporary intervention measures, non-implementation of clearly marked prices, hoarding, profiteering, price gouging, and production and sales of counterfeit goods. In the same month, the provincial Price Bureau specifically issued a "Reminder to strictly implement price laws, regulations, and policies" to all medical and pharmaceutical operating units in the province. In May, according to the provisions of the National Development and Reform Commissions "Reply on Defining the Illegal Act of Price Gouging" and as approved by the provincial government, the provincial Price Bureau issued a notice defining the illegal act of price gouging, stating that operators of goods and services that implement government-guided prices and government-set prices must strictly implement the prices set by the government; for those included in the price limit range, the price limit level set by the government may not be broken. Operators of other necessities for peoples livelihood that implement market-regulated prices and goods and services related to the prevention and treatment of SARS, whose prices exceed 50% of the transaction price on April 22, 2003, will be considered as committing the illegal act of price gouging. If an operator cannot provide the transaction price on April 22, 2003, the price department will determine it based on the local market price on April 22, 2003. The Provincial Price Inspection Office, in accordance with the unified arrangement of the Provincial SARS Prevention and Control Command, conducted joint law enforcement inspections in various places while inspecting 33 provincial medical and pharmaceutical units, ensuring the stability of market prices and social stability during the SARS prevention and control period. During the SARS prevention and control period, inspectors were dispatched for a total of 23,278 person-times, 55,472 units were inspected, 3,994 cases were investigated and handled, and economic sanctions of 4.0385 million yuan were imposed, of which 715,400 yuan was confiscated, 2.9924 million yuan was fined, and 330,700 yuan was returned to users. There were 300 cases of price violations exposed, 1 business license was revoked, and 2 people were transferred to the public security department.



Figure 4-7: In April 2003, the staff of the Price Bureau of Decheng District, Dezhou City, checked the prices of SARS drugs

    From October to December 2004, according to the unified deployment of the National Development and Reform Commission, the provincial Price Bureau organized inspections on the prices of refined oil products, investigated and dealt with behaviors of violating national regulations, leading price increases, and taking advantage of the situation to gouge prices of refined oil products, and ensured the basic price stability of the prices of refined oil products in the market.

    In April 2005, with the approval of the provincial government, the provincial Price Bureau issued the "Opinions on the Definition of the Degree of Price Increase Constituting Price Gouging." The "Opinions" clarified that with the approval of the provincial government, the provincial Price Bureau may differentiate different commodities and services different situations and determine the price increase constituting price gouging within the range of 30% to 100% over the normal average price. Five specific situations requiring timely and appropriate supervision are: 1. During major disasters and epidemics within a city- or county-level region, the price department needs to appropriately supervise the prices of goods and services related to controlling disasters and epidemics to maintain normal market price order and social stability; 2. During golden weeks of tourism and important holidays and festivals, some goods and services with prominent supply and demand contradictions and the prices of goods and services in important tourist areas need to be appropriately supervised; 3. In cases of national key project construction and poverty alleviation and disaster relief construction projects within a city or county, it is necessary to properly supervise the prices of related goods and services that have lost normal competitiveness; 4. When there are rumors of price increases within a city or county, leading to panic buying, hoarding, and other abnormal phenomena and causing market prices to rise sharply in a short period of time; 5. Other situations where price increases should be controlled. Price departments of governments at all levels in the province actively implemented the provisions of the "Opinions." The provincial Price Bureau investigated and dealt with the behavior of random price increases during holidays according to law. The cities of Taian and Heze controlled the price increase of some goods and services such as catering, accommodation, and rental in the Mount Tai scenic area during the National Day period, as well as the prices of materials used in building houses for immigrants in the Yellow River Beach area, effectively safeguarding the legitimate rights and interests of consumers and curbing the phenomenon of random price increases. This pioneering approach in the country has important significance for promptly and effectively stopping the illegal behavior of price gouging and regulating the market price order. It was affirmed by the national price department and promoted nationwide.

    From July 2005 to June 2006, according to the unified deployment of the National Development and Reform Commission, to stabilize the market price order, a year-long special action against price fraud was carried out throughout the province. In September, according to the "Notice on Carrying Out the 2005 Promoting Business with Integrity Publicity Month Activity" jointly issued by ten departments such as the National Rectification and Planning Office, the Central Propaganda Department, and the National Development and Reform Commission, a "Promote Price Integrity, Crack Down on Price Fraud" publicity and law enforcement month activity was organized throughout the province. In November, in accordance with the relevant deployment of the provincial governments teleconference on the prevention and control of highly pathogenic avian influenza, the provincial Price Bureau issued the "Notice on Strengthening Price Supervision and Inspection to Stabilize Market Prices in Response to Highly Pathogenic Avian Influenza," requiring all regions to strengthen price supervision and inspection, increase law enforcement efforts, and effectively prevent random price increases and illegal charges; strengthen market inspections, closely monitor market price dynamics, promptly stop price hike rumors, hoarding, price gouging, disruption to market order, and other behaviors, and effectively maintain a stable and orderly market order.

There are 3 entries at the same level

    Section 1: Special Price Inspection
    Section 2: Inspection of administrative charges
    Section 3: Stop Unfair Price Behavior *Current Record*

请输入检索词　　　　二轮省志　　检索

当前单库是 二轮山东省志 物价志(1997-2005) 点此打开全库目录

第四篇 价格执法
　第一章 价格行政执法

---

### 第三节 制止不正当价格行为

　　1997-2005年，省物价局不断加大市场监管力度，找准不正当价格违法行为暴发的"节点"、规律，提高依法查处的及时性，提高办案效率。重点检查与人民群众生活密切相关的日用消费品价格和各种服务收费，特别是在每年的"五一""十一"、元旦等节假日期间，加大对"米袋子""菜篮子"、旅游景点、停车场、餐饮娱乐场所、购物场所等价格和收费情况的监督检查力度，对擅自提高旅游景点门票价格、不执行明码标价以及价格差额、欺诈宰客等价格违法行为依法进行查处，为建立公平、公正的市场价格秩序起到了积极作用。

　　1997年至1998年上半年，省物价局重点对平板玻璃、钢材、彩色显像管、彩色电视机、食糖等低于行业平均成本销售的产品进行检查，维护了相关行业的市场价格竞争秩序。

　　1998年，中国农机协会农用车分会以"反对低价倾销""抵制价格恶性竞争"为由，在全国掀起行业"自律价"之风。山东时风集团因拒绝执行其所谓的行业"自律价"而被协会罚款95.3万元，引起省领导重视。9月14日，副省长韩寓群在高唐县政府关于山东时风集团执行自律价有关情况反映报告上批示："请省物价局会同法制局共同研究一下，时风集团提出的异议有否道理，怎样在保护企业定价自主权的基础上搞好自律价。"副省长林书香指出："行业协会不能凌驾于法律法规之上搞价格自律，任何侵犯企业权益的行为，企业要坚决抵制，执法部门要严肃查处。"为此，省物价局和国家计委均派员进行调查。调查结果显示，我省社会反映的所谓行业"自律价"，违背《价格法》鼓励竞争的原则，剥夺了企业价格决策自主权，行业协会不具有价格行政执法权，"打击了先进，保护了落后"。10月26日，国家院副总理吴邦国在国家计委报送的调查报告上作出重要批示，要求"依法处罚低价倾销的不正当竞争行为。处罚应由执法部门执行。"国家计委责令中国农机协会农用车分会退还企业罚款，并下发通知，要求对全国农机协会农用车分会做法予以纠正。1999年4-5月，省物价局组织对全省10多家航空公司、营业部和110多家民航客票销售代理企业开展专项检查，查处价格违法行为，维护了航空价格秩序和消费者合法权益。

　　针对山东部分通信公司为抢占市场，采取降低移动电话入网费、变相降低移动电话月租费等各种非法手段进行不正当竞争，2000年下半年，省物价局开展移动通信收费检查，对移动通信市场不正当价格行为进行查处。

　　2001年，为贯彻落实国务院、国家计委省和政府有关整顿和规范价格秩序的决定，根据全国旅游发展工作会议提出的"完善旅游价格管理，对旅游产品和服务价格实行明码标价，并加强监督检查，打击价格欺诈等违法行为"的要求，"五一""十一"期间，全省相继开展旅游市场价格检查，采取集中检查与分组检查相结合的方式，认真处理投诉举报，深入旅游景区查处各类乱涨价、乱收费行为。

　　2002年1月，国家计委印发《禁止价格欺诈行为的规定》。为切实强化对全省反不正当价格行为的工作指导，适应反价格欺诈不正当价格竞争行为新形势的需要，同年，省物价检查所成立反不正当价格行为调研中心，强化对全省反不正当价格的工作指导。济南市一消费者因购买手机发生价格纠纷，向省物价局举报某通讯公司，检查人员对该公司的价格执行情况进行检查。发现该公司在经营场所以"特价"字样进行宣传，并在宣传海报中标示"买手机送话费100元"和"每月只需2元，可免费拨打所有来电"，而"特价"的附加条件在广告及经营场所均无明示。检查组认为，该公司的行为违反了《禁止价格欺诈行为的规定》，属于价格欺诈行为。经案件审理委员会会计议决定，对该公司给予警告并处罚款5000元。



图4—6    2002年，枣庄市物价局在街头设置制止不正当价格行为宣传牌

　　2003年4月，省物价局针对与非典型性肺炎防治相关的药品、医疗器械、卫生材料、粮食、食盐(副食品)等价格进行重点检查。省发展改革委、省经贸委、省卫生厅、省药监局、省工商局、省物价局6部门联合发文，要求从快从重打击不执行政府指导价、政府定价、临时干预措施，不执行明码标价、囤积居奇、牟取暴利、哄抬物价、制售假冒伪劣商品等损害群众利益的违法行为。同月，省物价局专门向省医疗及药品经营单位发出《关于严格执行价格法律法规政策的提醒函》。5月，根据国家发展改革委《关于界定哄抬价格违法行为有关问题的复函》规定，经省政府批准，省物价局下发界定哄抬价格违法行为有关问题的通知，规定：实行政府指导价、政府定价的商品和服务，经营者必须严格执行政府规定的价格；列入限价范围的，一律不得突破政府规定的限价水平。经营者经营其他实行市场调节价的人民生活必需品、与防治非典相关的商品和服务，其价格超过2003年4月22日交易价格50%的，按哄抬价格违法行为认定。经营者不能提供2003年4月22日交易价格的，由物价部门按照2003年4月22日当地市场价格确定。省物价检查所按照省防治非典指挥部的统一安排，在对各地进行联合执法检查的同时，对33家省直医疗、医药单位进行检查，确保千防治非典时期市场价格的稳定和社会的安定。防治非典期间，全省出动物价检查人员23278人次，检查单位55472个，查处案件3994件，实施经济制裁403.85万元，其中，没收71.54万元，罚款299.24万元，退还用户33.07万元。曝光价格违法案件300件，吊销营业执照1件，移交公安部门12人。



图4-7　2003年4月，德州市德城区物价局工作人员检查非典药品价格

　　2004年10—12月，根据国家发展改革委统一部署，省物价局组织开展成品油价格检查，查处违反国家规定、带头涨价和趁机哄抬成品油价格的行为，确保了成品油市场价格的基本稳定。

　　2005年4月，经省政府同意，省物价局印发《关于构成哄抬价格行为涨价幅度界定问题的意见》。《意见》明确，经省政府同意，省物价局可区别不同商品和服务的不同情况，在超过正常平均价格30%～100%的区间内，确定构成哄抬价格行为的提价或涨价幅度。适时适度监管5种具体情形：1. 市、县地域范围内发生较大灾情、疫情期间，为维护正常市场价格秩序，保持社会稳定，物价部门需要对灾情、疫情相关的商品和服务价格进行适度监管的；2. 旅游黄金周和重要节假日、节庆日期间，需对部分供求矛盾突出的商品和服务以及重要旅游风景区的商品和服务价格进行适度监管的；3. 市、县范围内有国家重点项目建设、扶贫救灾建设项目，需对失去正常竞争性的相关商品和服务价格进行适当监管的；4. 市、县范围内出现涨价谣传，导致抢购、囤积等异常现象发生并使市场价格短期内急剧上涨的；5. 应当控制提价或涨价幅度的其他情形。全省各级政府物价部门，积极贯彻落实《意见》规定。省物价局对在节假日期间乱涨价行为进行依法查处，泰安、菏泽两市对国庆节期间泰山景区餐饮、住宿、租赁等部分商品和服务价格，以及黄河滩区移民建房用材价格实行涨价幅度控制，有效维护消费者合法权益，遏制了乱涨价现象。这一做法为全国首创，对及时有效制止哄抬价格违法行为，规范市场价格秩序具有重要意义，受到国家物价部门肯定，并在全国范围内予以推广。

　　2005年7月至2006年6月，根据国家发展改革委统一部署，为稳定市场价格秩序，全省开展为期一年的打击价格欺诈专项行动。9月，根据全国整顿规划办公室、中宣部、国家发展改革委等10部门联合下发《关于开展2005年"诚信兴商"宣传月活动的通知》，在全省组织开展"推进价格诚信、打击价格欺诈"宣传执法行动。11月，根据省政府防控高致病性禽流感电视电话会议的有关部署，省物价局下发《关于应对高致病性禽流感做好价格监督检查工作稳定市场价格的通知》，要求各地大力加强价格监督检查，加大执法力度，切实防止乱涨价、乱收费行为；加强市场巡查，密切监测市场价格动态，及时制止涨价谣道、囤积居奇、哄抬物价、扰乱市场秩序等行为，切实维护市场秩序平稳有序。

同层次的有3个条目

第一节 专项价格检查

第二节 行政性事业性收费检查

第三节 制止不正当价格行为 *当前记录*

# APPENDIX L



July 18, 2023

**Certification**

<div align="center">

**Welocalize Translations**

</div>

**TRANSLATOR'S DECLARATION:**

I, **Huo Gejun**, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 中国物价年鉴_程行云_ 依法制止工业品低价倾销.pdf

*(Digital or printed signature here above the line)*

Huo Gejun

_____

**Huo Gejun**
**Project Number: BBLLP_2306_P0022**

<div align="center">

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

</div>

## Lawfully Curbing Low-Price Dumping of Industrial Products

In recent years, many industrial products in China have experienced severe oversupply due to low-level redundant construction and insufficient market demand at home and abroad. In order to expand or maintain their market share, some enterprises compete to reduce prices at all costs and even dump products at prices lower than their costs, resulting in a significant drop in the prices of industrial products. This phenomenon exists in metallurgy, building materials, machinery, electronics, chemicals, light industry, and other industrial sectors to varying degrees. Ranging from mechanical equipment, steel, and automobiles to canned food and instant noodles, low-price dumping is very common and becoming increasingly severe.

Low-price dumping has brought serious consequences to the production and operation of enterprises and the development of an industry, resulting in increasing losses for enterprises and declining economic benefits of the industry, which has affected the normal operation of the national economy. In December 1997, eight domestic color cathode ray tube factories jointly submitted to the State Council the "Report on the Proposal to Strengthen Macro-Management of the Prices of Color Cathode Ray Tubes", requesting the government to strengthen macro-control over the prices of color cathode ray tubes, to prevent enterprises from competing to reduce prices, and to promote the sound development of the industry. Five leaders of the State Council gave instructions on this issue, requiring the State Planning Commission in conjunction with relevant departments to study measures for curbing vicious competition in the color cathode ray tube industry. In May 1998, the State Administration of Building Materials Industry asked the State Planning Commission to take measures for strengthening price management in response to the issue of low-price dumping in the flat glass industry causing industry-wide losses. How to regulate the price reduction behavior of enterprises has become a new challenge for the price control work. In accordance with the directive of the State Council and in conjunction with the promulgation and implementation of the "Price Law of the People's Republic of China" on May 1, 1998, the State Planning Commission set out to study the issue of curbing low-price dumping according to law.

There are two different approaches for how to curb low-price dumping: One is to re-integrate some products into the scope of direct government management and adopt government guidance prices or minimum prices, which is easy to operate and actually a model of direct government management of prices during the planned economy period; the other is for the government to implement indirect management of prices, formulate relevant regulations in accordance with the "Price Law", regulate the pricing behaviors of enterprises in the market, curb low-price dumping according to law, and explore a new way of indirect regulation of market prices by the government under market economy conditions. Through in-depth research, the State Planning Commission chose the second approach. In June 1998, the State Planning Commission and the State Administration of Building Materials Industry jointly issued the first special regulations on curbing low-price dumping in China - the Interim Provisions on Preventing Unfair Competition in Low-Price Dumping of Flat Glass Products in accordance with relevant provisions of the Price Law, which came into effect on July 1, 1998. This is a meaningful attempt of the competent governmental pricing departments to use the "invisible hand" of market economy to regulate market prices in accordance with the law. After the issuance of the Interim Provisions, the low-price dumping behavior in the flat glass industry was effectively curbed, and the market price of flat glass products rebounded significantly. According to statistics of the State Administration of Building Materials Industry, the flat glass industry had its profits increased by RMB400 million in 1998 due to the implementation of the "Interim Provisions" to suppress dumping at low prices, thus reversing the situation of continuous decline in industry

profitability at one stroke. At the request of the State Administration of Metallurgical Industry, the State Planning Commission, in conjunction with the State Administration of Metallurgical Industry, issued the second special regulations on curbing low-price dumping - the Interim Provisions on Preventing Unfair Competition in Low-Price Dumping of Steel Products, which came into effect on October 1, 1998. After the promulgation of the regulations, certain results were achieved, and steel prices once stopped falling and got stabilized.

While the State Planning Commission were actively studying and carrying out legal actions to curb low-price dumping, some industry organizations also studied and took measures to prevent the price decline of their products so as to protect the industry interests. In July 1998, the Agricultural Vehicle Transportation Branch of the China Association of Agricultural Machinery Manufacturers organized eight major three-wheeled agricultural vehicle manufacturers nationwide to set a self-regulated price for three-wheeled agricultural vehicles, requiring all three-wheeled agricultural vehicle manufacturers in China to implement the price. In August 1998, the State Economic and Trade Commission issued the "Opinions on the Implementation of Self-regulated Prices of Industry for Some Industrial Products", requiring relevant industry organizations to set their own self-regulated prices for some industrial products. The question on whether to formulate relevant regulations in accordance with the Price Law or to adopt self-regulated prices of the industry for curbing low-price dumping has caused extensive discussions among the economic theoretical circles and relevant departments. In August 1998, the Agricultural Vehicle Transportation Branch of the China Association of Agricultural Machinery Manufacturers imposed a penalty on Shandong Shifeng Group for not implementing the "self-regulated prices of the industry". Shifeng Group considered that the penalty had no legal basis and refused to accept that. Instead, it required the government to make clear-cut explanations. This attracted the attention of the leaders of Shandong Provincial Government, who asked the Provincial Price Bureau to report to the State Planning Commission and rectify this violation of the Price Law as soon as possible. The State Planning Commission investigated the case and found that the Agricultural Vehicle Transportation Branch's arbitrary setting of its self-regulated prices and imposing penalties at its own discretion had violated relevant provisions of the Price Law, interfered with the pricing autonomy of enterprises, and went beyond its due responsibilities and authority. In November 1998, the State Planning Commission issued An Official Letter Proposing to Rectify the Problem of the Agricultural Vehicle Transportation Branch of the China Association of Agricultural Machinery Manufacturers Organizing the Setting of "Self-regulated Prices of the Industry" for Selling Agricultural Vehicles on the Market, requiring the State Administration of Machinery Industry to rectify the problem of the Agricultural Vehicle Transportation Branch organizing the setting of "self-regulated prices of the industry" for selling agricultural vehicles on the market and, imposing penalties at its own discretion, and refund the fines and confiscated funds and the inspection fees apportioned to the enterprises.

Low-price dumping is a new issue emerging in the China's market economy system reform. How to treat the competition of enterprises by reducing prices and the policies for curbing low-price dumping has once become the focus of concern and debate from all sectors of society. Some comrades believe that the competition of enterprises by reducing prices is in the interests of consumers, so government intervention is unnecessary. Some comrades think that this situation indicates that the government has liberalized prices too quickly and excessively, and that some industry authorities have asked the government pricing department to re-implement government pricing for some products. Under this circumstance, the State Planning

(C) 1994-2023 China Academic Journal Electronic Publishing House. All rights reserved, http:// http://www.cnki.net

Commission carefully analyzed the situation and concluded that: (1) The price reduction competition now is an inevitable result of China's economic development to a certain level, an evil result of low-level repetitive construction of industrial products in previous years, as well as a result of the poor management level of Chinese enterprises and the lack of high-level competition approaches; (2) Fair price competition among enterprises is a good thing, which can urge enterprises to reduce costs, improve technologies, raise the level of products, promote industrial restructuring, and enhance the international competitiveness of enterprises, so fair price competition should be protected; (3) Enterprises recklessly selling their products at prices lower than their costs ought to be an inevitable result of the lagging reform of the state-owned enterprise system, the lack of self-discipline in their own behaviors, and no legal responsibility for their loss, bankruptcy, and shutdown. Such low-price dumping is irrational and harmful to market competition and development of industries and enterprises. Meanwhile, it will also do harm to the interests of consumers due to the declining product quality and decreasing after-sales services, which must be curbed according to law. To curb low-price dumping, we should firstly take actions according to law, secondly comply with economic laws and promote and protect market competition, and thirdly respect the pricing autonomy of enterprises. In order to unify the ideological understanding of all parties involved, the State Planning Commission proposed five basic principles to be followed for curbing low-price dumping:

1. Curbing low-price dumping requires self-discipline of enterprises and industries, but relying solely on their self-discipline is not enough. We must regulate the market behavior of enterprises by formulating relevant regulations. Under the conditions of market economy, we should give full play to the role of industry associations and allow industry associations to guide enterprises to conduct self-regulation of price, cost, quality, and after-sales services. The key to price self-regulation is the self-regulation of pricing behavior, thus enabling decision-makers of enterprises to regulate their own pricing behavior. Such self-discipline mainly focuses on the self-restraint of enterprises. Industry restraints are only intended to guide and regulate enterprises, which are soft restraints on the behavior of enterprises for the overall interests of the industry and for the benefit of the enterprises themselves. However, practice has proven that in the current situation where state-owned enterprises have not yet completed the transformation of their operating mechanism, it is difficult to curb low-price dumping behavior simply by relying on self-restraints of enterprises. To stop low-price dumping, we must formulate regulations in accordance with relevant laws, and impose hard restraints on the pricing behavior of enterprises by legal means.

2. Curbing low-price dumping should be conducive to encouraging advanced enterprises, spurring backward ones, and limiting low-level repetitive construction. Price competition is an important way and means of market competition among operators. The purpose of curbing low-price dumping is to regulate the market order, create a fair competition environment for enterprises, and protect their legitimate and legal rights and interests. Curbing dumping at low prices should be conducive to giving full play to the law of value and promoting the survival of the fittest, rather than restricting reasonable competition among enterprises, or protecting backward and low-level repetitive construction by simply setting a minimum price limit.

3. The identification and investigation of low-price dumping behavior should be carried out in strict accordance with policy boundaries and the law. The following three aspects should be observed in the identification and investigation of low-price dumping behavior: (1) The identification and investigation of low-price dumping by an enterprise must be mainly based on the advanced and reasonable individual cost of the enterprise, with reference

to the average social cost of the industry. As long as the enterprise does not sell products below their cost, even if it is lower than the average cost of the industry, the enterprise's behavior should not be considered as low-price dumping and should instead be protected. (2) Only when an enterprise has an obvious attempt to crowd out competitors, sell below its own cost, cause market disorder, and damage the national interests or the legitimate rights and interests of other operators, can it be considered as a low-price dumping behavior. If an enterprise sells at a price below its own cost but above the average cost of the industry due to its own high cost, without affecting the market order and other operators, it should not be considered as a low-price dumping behavior either. (3) The main body of the pricing law enforcement is the government department in charge of pricing. Industry associations may put forward price self-regulation requirements among enterprises based on market changes, accept the entrustment of government departments to determine and publish the average cost of the industry, and guide the pricing behavior of enterprises. However, they cannot set mandatory fixed prices, let alone impose sanctions such as fines on some enterprises that do not implement the mandatory regulations.

4. In the work of curbing low-price dumping, we should prevent industry price monopolies that seek illegitimate interests under the guise of self-regulation. Meanwhile, we also need to prevent the work of curbing cutthroat competition from going to another extreme situation, i.e., industry price fixing. We should prevent a few large enterprises that have a dominant position in market competition from colluding with each other, joining forces to agree on prices, oppressing other competitors, or artificially raising prices to seek excessive profits.

5. Curbing low-price dumping requires tackling both the phenomena and the root cause. The fundamental solution is to stop low-level repetitive construction, change the situation of oversupply, deepen enterprise reform, and establish a risk constraint mechanism.

Based the above principles and by summarizing the experience of the flat glass and steel industries in lawfully curbing low-price dumping, the State Planning Commission and the State Economic and Trade Commission have studied and formulated the general regulations on suppressing low-price dumping in industrial products -- "Regulations on Curbing Unfair Pricing Behaviors in Low-Price Dumping of Industrial Products", which were issued and implemented on November 25, 1998, with the main contents as follows:

1. Clarify the criteria and main forms of unfair pricing behaviors in dumping industrial products at low prices. (1) From the perspective of purpose, an enterprise sells products at low prices so as to crowd out other competitors; (2) From the perspective of behavior, the enterprise's sales price is lower than its own cost; (3) From the perspective of consequences, the enterprise's behavior causes market disorder and damages the interests of other operators. The Regulations list eight main forms of low-price dumping, mainly including: selling at a price lower than cost, selling below cost by giving discounts, subsidies, gifts, and other concessions, selling good-quality products at lower prices, selling at a lower grade, etc.

2. Authorize competent industrial authorities to publish average production costs of industries. For products with serious vicious price reduction competition and causing harm to industry development, the competent national industrial authorities may report to the State Planning Commission for approval and regularly publish the average industry cost of industrial product concerned, so as to guide enterprises in setting

(C) 1994-2023 China Academic Journal Electronic Publishing House. All rights reserved, http:// http://www.cnki.net

prices reasonably.

3. Conduct mutual supervision among enterprises. For enterprises selling below the average cost of an industry and causing market disorder, enterprises suffering damages can report to a government department in charge of pricing at or above the provincial level, while the government department shall promptly file a case for investigation.

4. Carry out investigation and deal with the problem. If, after investigation, it is confirmed that the reported enterprise does sell at a price not only below the published industry average cost, but also below its individual production cost, the enterprise shall be deemed to have engaged in unfair pricing behavior and should be punished in accordance with the law. If the price is lower than the average cost of the industry but no lower than its individual cost, such behavior shall not be considered as dumping.

In order to resolve the accounting discrepancies caused by different accounting methods and policies enjoyed by enterprises in the cost determination of curbing low-price dumping of industrial products, and to improve the work of curbing dumping according to law, the State Planning Commission, in conjunction with relevant departments, has studied and formulated the "Cost Determination Measures for Low-Price Dumping of Industrial Products (for Trial Implementation)," with the main contents as follows:

1. Define the scope of costing of industrial products. The cost of a manufacturing enterprise includes the manufacturing cost and a reasonable share of period expenses (management expenses, sales expenses, and financial expenses) and sales taxes and surcharges incurred for the sale of the industrial product, while the cost of a distribution enterprise includes the unit purchase price of the industrial product, unit transportation and miscellaneous charges to be shared, and in-price taxes payable.

2. Clarify the principles and calculation methods to be followed in determining the cost of dumped industrial products. (1) Cost determination shall be carried out in accordance with the provisions of the Accounting Law of the People's Republic of China, the Accounting Standards for Business Enterprises, the General Rules on Enterprise Finance, and financial and accounting systems of relevant industries; (2) Cost determination follows the basic and general principles of accounting and is based on actual costs. Once the cost calculation and apportionment method of an enterprise has been determined, it shall not be changed arbitrarily; (3) In cost determination, manufacturing enterprises shall take the costs of the previous month as the basis of determination, and if necessary, assess their previous costs according to the circumstances; distribution enterprises shall take actual costs incurred for the current batch of goods as the basis of determination. It is also stipulated that cost differences caused when an enterprise's depreciation rate is lower than the minimum national depreciation rate, when an enterprise enjoys special preferential policies, when an enterprise is not accounted for on an accrual basis, or when an enterprise reduces costs improper means shall be added to the cost determination.

3. Specify the cost determination bodies and procedures for dumped industrial products at low prices. The competent pricing departments under the State Council or provincial governments are the bodies responsible for determining the cost of dumped industrial products at low prices. The competent governmental pricing departments shall promptly file a case for any suspected dumping behavior of selling at a

price lower than the published average cost of the industry and causing market disorder as reported by relevant entities and individuals and may directly or entrust relevant industry authorities or industry associations, organizations, or intermediaries to conduct cost investigation. On the basis of reviewing a cost determination report, a decision will be made on whether the investigated enterprise is dumping at a low price.

4. Stipulate cost determination measures under special circumstances. If the information provided by an investigated enterprise is incomplete, making it difficult to determine the cost, or if an enterprise's price reduction behavior has obviously caused significant impact on the market order and the national economy and seriously damaged the interests of other operators, but it is difficult to determine its cost in the short term, the competent pricing department under the State Council may temporarily adopt the method of directly determining whether it is a low-price dumping behavior based on the average cost of the industry and a reasonable range of downward adjustment. The range of downward adjustment to the average cost of the industry shall be determined by the competent pricing department under the State Council in conjunction with the competent industry department according to the market conditions and the advanced production level of the industry.

On the basis of the above, the State Planning Commission issued the "Notice on Effectively Curbing Low-Price Dumping and Conducting Inspection on Low-Price Dumping", requesting local pricing departments to unify their thinking and effectively take legal measures to curb low-price dumping. Enterprises, which sell products below cost or below cost in a disguised manner and which reduce costs by improper means (using smuggled raw materials and spare parts, using poor-quality products to replace high-quality ones, reducing functionality, lowering quality, misrepresenting costs, etc.) to engage in low-price dumping, must be ordered for rectification and be punished in accordance with relevant laws and regulations.

Remarkable results have been achieved in lawfully curbing low-price dumping of industrial products, mainly reflected in: (1) The competent governmental pricing departments have timely changed the traditional concept of price management, transforming from the management of specific product prices to the management of market price order and market rules, and from the management of price increase to the management of all unfair pricing behaviors, including low-price dumping. They have actively exerted their governmental macro-control functions under market economy conditions and transformed from being indifferent to those products with liberalized prices to being able to regulate according to the law, which has enhanced the government's ability to regulate the overall level of prices. (2) A preliminary system of relevant laws and regulations has been established. The launch of the "Regulations on Curbing Unfair Pricing Behaviors in Low-Price Dumping of Industrial Products", the "Cost Determination Measures for Low-Price Dumping of Industrial Products (for Trial Implementation)" and relevant special regulations has laid a solid foundation for curbing dumping at low prices in accordance with the law. (3) The work of various industries to curb low-price dumping has achieved initial results, contributing to rebounding prices and increasing economic benefits of various industries. (CHENG Xingyun)

(C) 1994-2023 China Academic Journal Electronic Publishing House. All rights reserved, http:// http://www.cnki.net

# 依法制止工业品低价倾销

近几年来,受低水平重复建设和国内外市场需求不足的影响,我国许多工业品出现严重供大于求。一些企业为扩大或维持市场销售份额,竞相降价,甚至以低于产品自身成本的价格,不惜血本低价倾销,造成工业品价格大幅下降。这种情况在冶金、建材、机械、电子、化工、轻工等工业行业程度不同地存在,大到机械设备、钢材、汽车,小到罐头食品、方便面,低价倾销非常普遍,而且愈演愈烈。

低价倾销给企业生产经营和行业发展带来严重后果,致使企业亏损加剧,行业经济效益下滑,影响了国民经济的正常运行。1997 年 12 月,国内 8 家彩色显像管厂联合向国务院上报了《建议对彩管价格加强宏观管理的报告》,要求政府对彩色显像管价格加强宏观调控,制止企业竞相降价,促进行业健康发展。对此国务院五位领导同志做了批示,要求国家计委会同有关部门研究办法,制止彩色显像管行业恶性竞争。1998 年 5 月,国家建材工业局就平板玻璃行业低价倾销导致全行业亏损问题,要求国家计委采取措施,加强价格管理。如何规范企业的降价行为给物价工作提出了新课题。根据国务院指示精神,结合 1998 年 5 月 1 日《中华人民共和国价格法》的颁布实施,国家计委着手研究依法制止低价倾销问题。

对于如何制止低价倾销问题,存在着两种不同**思路:一种**是将部分产品重新纳入政府直接管理范畴,实行政府指导价或最低限价,这种做法易于操作,实际上是计划经济时期政府直接管理价格的模式;**另一种**是政府对价格实行间接管理,依据《价格法》制定有关法规,规范企业在市场中的价格行为,依法制止低价倾销,探索一条市场经济条件下政府对市场价格实行间接调控的新路。国家计委在深入进行研究后采取了第二种思路,与国家建材工业局根据《价格法》有关条款,于 1998 年 6 月联合发布了我国第一个制止低价倾销的专项法规——《关于制止低价倾销平板玻璃的不正当竞争行为的暂行规定》,自 1998 年 7 月 1 日起实行。这是政府价格主管部门运用市场经济"无形之手",依法调控市场价格的一次有益尝试。《暂行规定》发布后,平板玻璃行业低价倾销行为得到有效遏制,平板玻璃市场

价格明显回升。据国家建材工业局统计,1998 年平板玻璃行业因执行《暂行规定》,制止低价倾销,全行业增加效益 4 亿元,一举扭转了行业效益不断下滑的局面。根据国家冶金工业局的要求,国家计委会同国家冶金工业局颁布了第二个制止低价倾销专项法规——《关于制止低价倾销钢材的不正当竞争行为的暂行规定》,自 1998 年 10 月 1 日起实行。规定颁布后,也取得一定的效果,钢材价格一度止跌回稳。

在国家计委积极研究、开展依法制止低价倾销的同时,一些行业组织为维护行业利益,也研究采取措施制止本行业产品价格下滑。1998 年 7 月,中国农机工业协会农用车运输分会组织全国八大三轮农用车企业制定了三轮农用运输车自律价,要求全国所有三轮农用运输车企业执行。国家经贸委于 1998 年 8 月印发了《关于部分工业产品实行行业自律价的意见》,要求有关行业组织对部分工业品制定行业自律价格。是依据《价格法》制定有关法规制止低价倾销,还是采取行业自律的做法制止低价倾销,引发了经济理论界及有关部门的广泛讨论。1998 年 8 月,中国农机协会农用车分会对山东时风集团不执行"行业自律价"自行进行了处罚。时风集团认为处罚没有法律依据,不接受处罚,要求国家给予明确的说法。此事引起了山东省政府领导的关注,要求省物价局向国家计委反映,尽快纠正这一违反《价格法》的行为。国家计委经调查认定,农用车分会自行制定价格,自行处罚的做法违反了《价格法》的有关条款,干预了企业的定价自主权,超越了自身的职责权限。1998 年 11 月,国家计委发出《关于建议纠正中国农机协会农用车分会组织制定农用车市场销售"行业自律价"问题的函》,要求国家机械工业局纠正中国农机协会农用车分会组织制定农用车市场销售"行业自律价"并自行实施处罚的问题,清退罚没款和向企业分摊的检查费用。

低价倾销是我国市场经济体制改革中出现的新问题,如何看待企业降价竞争和制止低价倾销政策,一度成为社会各界关注和争论的焦点。一些同志认为,企业降价竞争对消费者有利,政府没有必要进行干预。一些同志认为,这种情况说明政府对

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.　http://www.cnki.net

价格放开过快、过多，一些行业主管部门要求政府价格部门对一些产品重新实行政府定价。在这种情况下，国家计委认真分析了形势，认为：(1)目前的降价竞争是我国经济发展到一定水平必然出现的结果，是前些年工业产品低水平重复建设的恶果，也是我国企业管理水平不高，缺乏高层次竞争手段的结果；(2)企业间正当的价格竞争是好事，可以促使企业降低成本、改进技术、提高产品水平，促进产业结构调整，增强企业国际竞争力，正当的价格竞争应予以保护；(3)企业不计后果，以低于其成本的价格销售产品，其原因是国有企业体制改革滞后，企业对自己的行为缺乏自我约束，对企业亏损、破产、倒闭不承担法律责任的必然结果。这种低价倾销是非理性的，对市场竞争、行业和企业发展有害。同时还会因产品质量下降、售后服务差等，损害消费者的利益，必须依法予以制止。制止低价倾销一是要依法进行；二是要符合经济规律，促进和保护市场竞争；三是要尊重企业的定价自主权。为统一各方思想认识，国家计委提出制止低价倾销应掌握的五项基本原则：

1、制止低价倾销需要企业、行业的自律，但仅靠自律是不够的，必须通过制定有关法规规范企业的市场行为。市场经济条件下，应充分发挥行业协会的作用，通过行业协会来引导企业进行价格自律、成本自律、质量自律、售后服务自律。价格自律的重点是价格行为的自律，使企业决策者规范自己的价格行为。自律主要是企业的自我约束。行业的约束只是对企业的指导和规范，是为了行业的整体利益和企业的自身利益对企业行为的软约束。但实践证明，在目前国有企业经营机制转换尚未完成的情况下，单纯依靠企业自身约束难以制止低价倾销行为。制止低价倾销必须依据有关法律制定法规，以法律的手段对企业的价格行为进行硬约束。

2、制止低价倾销要有利于鼓励先进、鞭策落后，限制低水平重复建设。价格竞争是经营者之间进行市场竞争重要的方式和手段。制止低价倾销行为，目的是规范市场秩序，为企业创造一个公平竞争的环境，保护企业正当的、合法的权益。制止低价倾销要有利于充分发挥价值规律的作用，促进优胜劣汰，不能限制企业间的合理竞争，不能通过简单制定最低限价办法，保护落后、保护低水平重复建设。

3、认定和查处低价倾销行为要严格掌握政策界限，依法进行。认定和查处低价倾销行为应把握

好以下三方面：(1)认定和查处企业低价倾销，必须以企业先进、合理的个别成本为主要判定依据，以行业的社会平均成本作为参照依据。只要企业不低于自身成本销售，即使低于行业平均成本，也不属于低价倾销行为，应该受到保护。(2)只有企业具有排挤竞争对手的明显企图，以低于企业自身成本销售，并造成市场秩序混乱、损害国家利益或者其它经营者的合法权益时，才能认定为低价倾销行为。如果由于个别企业自身成本较高，企业虽然以低于自身成本的价格销售，但不低于行业平均成本，未对市场秩序和其他经营者造成影响的，也不应认定为低价倾销行为。(3)价格执法主体是政府价格主管部门。行业协会可以根据市场变化，在企业之间提出价格自律要求，受政府部门委托测定公布行业平均成本，对企业定价行为进行引导，但不能制定强制性的固定价格，更不能对一些不执行规定的企业采用罚款等制裁措施。

4、制止低价倾销工作中要防止以自律为名，进行行业价格垄断，牟取不正当利益。同时，也要防止制止恶性竞争工作走向另一个极端，即行业价格垄断。要防止在市场竞争中占优势地位的少数大型企业相互串通，联手约定价格，压迫其竞争对手，或人为抬高价格牟取超额利润。

5、制止低价倾销要标本兼治，根本出路是制止低水平重复建设，改变供大于求的状况，深化企业改革，建立风险约束机制。

按照上述原则，并总结平板玻璃、钢材行业依法制止低价倾销的经验，国家计委、国家经贸委研究制定了一个在工业品中通行的制止低价倾销的规定《关于制止低价倾销工业品的不正当价格行为的规定》，于1998年11月25日发布执行。主要内容是：

1、明确低价倾销工业品不正当价格行为判定标准和主要表现形式。(1)从目的上看，企业低价倾销是为了排挤竞争对手；(2)从行为上看，企业的销售价格低于自身成本；(3)从后果上看，企业这种行为造成市场秩序混乱，损害了其他经营者利益。《规定》列举了低价倾销的八种主要表现形式，主要有：在价格上低于成本销售，采取折价、补贴、馈赠等让利方式低于成本销售，以好充次、降档销售等。

2、授权行业主管部门发布行业平均生产成本。恶性降价竞争严重，并对行业发展造成危害的产品，可以由国家工业主管部门报请国家计委同意，定期发布有关工业品行业平均成本，引导企业合理

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.　　http://www.cnki.net

制定价格。

3、企业间相互监督。对于企业以低于行业平均成本销售，造成市场秩序混乱的，受损害的企业可以向省级以上government价格主管部门举报。政府价格主管部门及时立案调查。

4、调查处理。经过调查，如确认被举报者不仅以低于公布的行业平均成本，并且也低于其个别生产成本的价格销售，即判定为不正当价格行为，应依法进行处罚。如低于行业平均成本、但不低于其个别成本，则不属于低价倾销。

为解决制止低价倾销工业品成本认定中因企业核算方法、享受政策不一造成的核算差异，完善依法制止低价倾销工作，国家计委会同有关部门研究制定了《低价倾销工业品的成本认定办法（试行）》，主要内容是：

1、规定工业品成本列支范围。生产企业的成本包括制造成本和应合理分摊的期间费用（管理费用、销售费用和财务费用）以及为销售该工业品而发生的销售税金和附加，经销企业的成本包括该工业品单位进价和应分摊的单位运杂费以及应纳的内税。

2、明确低价倾销工业品的成本认定应遵循的原则和计算方法。(1)成本认定按照《中华人民共和国会计法》、《企业会计准则》、《企业财务通则》和行业财务会计制度的规定进行；(2)成本认定遵循会计核算的基本原则和一般原则，按照实际成本认定。企业成本计算及分摊方法一经确定，不得随意变更；(3)成本认定中，生产企业按月成本为确认依据，必要时可根据情况考核企业以前的成本；经销企业按当批商品的实际发生成本为确认依据。同时规定，当企业折旧率低于国家规定的低折旧率、企业因享受特殊优惠政策、企业未按权责发生制进行核算、企业采取不正当手段降低成本造成的成本差异要在成本认定中追加。

3、明确规定低价倾销工业品的成本认定机构和认定程序。国务院和省级政府价格主管部门是低价倾销工业品的成本认定机构。政府价格主管部门对以低于发布行业平均成本的价格销售，造成市场秩序混乱，受到有关单位和个人举报的涉嫌低价倾销行为要及时立案，可直接或委托有关行业主管部门或行业协会组织、中介机构进行成本调查。在审核成本认定报告基础上，做出被调查企业是否低价倾销的判定。

4、规定特殊情况下的成本认定办法。如果被调查企业提供资料不全，使成本认定难以进行；或企业的降价行为已明显对市场秩序和国民经济造成重大影响，严重损害了其他经营者利益，但短期内难以核定其成本时，国务院价格主管部门可临时采取直接依据行业平均成本和合理下浮幅度的办法认定其是否为低价倾销行为。行业平均成本下浮幅度由国务院价格主管部门会同行业主管部门根据市场状况、行业先进生产水平等情况确定。

在上述基础上，国家计委发出《关于认真做好制止低价倾销工作及开展对低价倾销进行检查的通知》，要求各地物价部门统一思想，切实做好依法制止低价倾销工作。对以低于或变相低于成本销售，及采用不正当手段（使用走私原材料和零配件、以次充好、减少功能、降低质量和虚报成本等）降低成本，进行低价倾销的行为，要勒令其改正，并依据有关法规进行惩处。

依法制止工业品低价倾销工作取得了显著成绩。主要体现在：(1)政府价格主管部门及时转变传统价格管理观念，由管理具体产品价格，向管理市场价格秩序、市场规则转变，由管理产品价格上涨，向管理包括低价倾销在内的所有不正当价格行为转变；积极发挥市场经济条件下政府宏观调控的职能，从对放开价格的产品无所为，转变为能够依法进行调控，增强了政府对价格总水平的调控能力。(2)初步建立了相关法规体系。《关于制止低价倾销工业品的不正当价格行为的规定》、《低价倾销工业品成本认定办法（试行）》及有关专项法规的出台，为依法制止低价倾销工作打下良好的基础。(3)各行业制止低价倾销工作初见成效，价格止跌回升，行业经济效益有所提高。　　　　（程行云）

## 房地产价格

1998年，房地产价格工作的中心任务是，贯彻落实《国务院关于进一步深化城镇住房制度改革加

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.　　http://www.cnki.net

# APPENDIX M



July 11, 2023

**Certification**

<p align="center">**Welocalize Translations**</p>

**TRANSLATOR'S DECLARATION:**

I, Ann Chen, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of:【2000年价格监督检查成绩显著】-国家发展和改革委员会.pdf

*(Digital or printed signature here above the line)*

Ann Chen

_____

**Ann Chen**

**Project Number: BBLLP_2306_P0022**

<p align="center">15 W. 37th Street 4th Floor<br>New York, NY 10018<br>212.581.8870</p>

【2000年价格监督检查成绩显著】-国家发展和改革委员会

2023年6月22日 星期四



⏣ 无障碍模式 ▎ 工作邮箱 ▸

热门搜索： 油价  产业结构调整指导目录  可行性研究  能源  固定资产投

请输入关键字

⌂ 首页 | 🏛 机构设置 | 📰 新闻动态 | 🌐 政务公开 | 📋 政务服务 | 📊 发改数据 | ⚙ 互

🏠 Homepage > News updates > **News release**

## Great Achievements were Made in Price Supervision and Inspection in 2000

Release Date:
January 3, 2001

🖨 [Print]

 Weibo  WeChat

排行榜



01 关于第三监督周期省级电价及有关事项的通知(发改〔2023〕526号)
2023-05-15

02 关于印发《职业教育产教融合赋能提升行动实施方案(2023-年)》的通知
2023-06-13

03 关于做好2023年降成本重点工作的通知
2023-06-13

04 关于印发《职业教育产教融合赋能提升行动实施方案(2023-年)》的通知(发改社会〔号)
2023-06-13

05 关于做好2023年降成本重点工作的通知(发改运行〔2023〕号)
2023-06-13

In 2000, the price authorities at all levels continued to clean up fee problems and control chaos. They standardized price order, intensified law enforcement, and strictly enforced the law, yielding remarkable achievements. From January to November, a total of 284,600 cases of price violations were investigated and dealt with nationwide, with a total amount of illegal gains of RMB4.179 billion investigated. The total amount of economic sanctions reached RMB2.576 billion, of which RMB1.066 billion was returned to users and RMB1.510 billion was handed over to the government finance. Thanks to the effective work of price supervision and inspection, the burden on enterprises and farmers has been reduced, the interests of consumers have been protected, and positive contributions have been made to expanding domestic demand, promoting economic restructuring and sustained growth, and maintaining social stability.

Standardizing prices in the tourism market: During the May Day and National Day holidays, tens of thousands of price supervision and inspection cadres across the country went deep into tourist attractions to accept complaints and reports from the masses, investigated and punished random price increases and arbitrary charges, and were praised by all sides. Carrying out checks on electricity prices: A total of more than 10,000 cases of price violations have been investigated and punished nationwide, and economic sanctions have reached nearly RMB1 billion. Through the inspection, more than 560 problems of local governments exceeding their power to raise prices have been basically corrected, and the order of electricity prices has been further rectified, providing an important basis for promoting the reform of the power system. Curbing random price increases of refined oil products: The State Planning Commission promptly organized and guided local inspections of refined oil prices, which guaranteed reforming the pricing mechanism for crude oil and refined oil, bringing domestic crude oil and refined oil prices into line with the international market, and maintaining market price stability. Taking special measures to control public security fees: The State Planning Commission, the Ministry of Public Security, the Ministry of Supervision and the Office for Rectifying Malpractices of The State Council jointly deployed the national public security charging inspection. The publicity was strong, and the departments cooperated well. Investigating and punishing the arbitrary charges collected by rural primary and secondary schools: The inspection was focused on the charging behavior after the spring and autumn semester began this year, and illegal gains were returned to students, thus effectively curbing the momentum of arbitrary charging. Stopping unfair price competition: In response to the increasingly fierce "price war", some local authorities have enhanced the investigation and punishment of unfair price competition. Shanghai has made exploration in the field of anti-unfair price competition, and handled some cases of low-price dumping and price fraud according to law. Completing a national telecommunications tariff inspection: Through the inspection, we helped telecom enterprises establish and improve the internal management and supervision system, and standardized the charging behavior of telecom enterprises.

Promoting the development of legal systems for price supervision and inspection: In order to make some principles and provisions of the Price Law and the Provisions on Administrative Penalties for Price Violations concrete and more operable, a number of supporting regulations and normative documents have been formulated. Notable results have been achieved in the establishment of standardized price inspection institutes. First, the quality of cadres has been improved; Second, the work style of the organs has obviously changed; Third, the law enforcement behavior is constantly standardized; Fourth, the infrastructure has been strengthened. Publicizing and commending advanced collectives and individuals: The national price supervision and inspection advanced deeds report group went to Fujian, Shanghai, Shanxi, Tianjin, Zhejiang and other places to give speeches. So far, more than 5,000 people have listened to the reports, tens of thousands of people have watched the video of the reports, and 101 advanced price supervision and inspection groups and 208 advanced individuals have been selected nationwide. Seriously investigating and punishing reported price violations: From January to November, a total of 181,300 price complaints were accepted nationwide, according to which 61,700 cases were investigated and punished, and economic sanctions of RMB145 million were imposed, of which RMB86 million was returned to users. After the "Notice of the State Planning Commission on the Publicity and Implementation of the Provisions on the Implementation of Clearly Marked Prices for Goods and Services" was issued, various places carried out the "Clearly Marked Prices Publicity Month" activities with the theme of "ensuring honest pricing and stopping price fraud".

According to the data from the State Planning Commission, during the "Ninth Five-Year Plan" period, the price authorities at all levels across the country investigated and dealt with 2.61 million cases of price violations, and imposed economic sanctions of RMB13 billion, creating conditions for the smooth progress of price reform and even economic system reform, promoting economic structural adjustment, maintaining social stability, and maintaining the sustained, rapid and healthy development of the national economy.



网站地图 ▏ 联系我们

主办单位：中华人民共和国国家发展和改革委员会
技术支持：国家信息中心 中国经济信息网
网站标识码：bm04000007 京ICP备05052393号 京公网安备11010202000002号
国家发展和改革委员会 版权所有，如需转载，请注明来源

无障碍模式　工作邮箱



# 中华人民共和国国家发展和改革委员会
## National Development and Reform Commission

热门搜索：油价　产业结构调整指导目录　可行性研究　能源　固定资产投

请输入关键字

首页　机构设置　新闻动态　政务公开　政务服务　发改数据　互

首页 > 新闻动态 > 新闻发布

## 2000年价格监督检查成绩显著

发布时间：2001/01/03　　[打印]　　　　　　　　　　　　微博　　微信

　　2000年，各级价格主管部门继续清费治乱，规范价格秩序，加大执法力度，严格依法行政，取得了显著成绩。1-11月，全国共查处价格违法案件28.46万件，查处违法所得金额41.79亿元;实现经济制裁总金额25.76亿元,其中退还用户10.66亿元,上缴财政15.10亿元。价格监督检查卓有成效的工作，减轻了企业和农民负担，维护了消费者利益，为扩大国内需求，促进经济结构调整和持续增长，保持社会稳定做出了积极贡献。

　　规范旅游市场价格秩序。"五一"、国庆节日期间，全国数万名价格监督检查干部深入到旅游景区受理群众的投诉举报，查处乱涨价、乱收费，受到各方面的好评。开展电力价格检查。全国共查处价格违法案件1万余件，已实现经济制裁近10亿元。通过检查，560余项地方政府越权加价问题基本得到了纠正，进一步整顿了电价秩序，为促进电力体制改革提供了重要依据。遏制成品油乱涨价。国家计委及时组织和指导地方开展成品油价格检查，为改革原油、成品油价格形成机制，实现国内原油和成品油价格与国际市场接轨，保持市场价格稳定起了保障作用。对公安安排进行专项治理。国家计委、公安部、监察部、国务院纠风办联合部署了严肃查处乱收费案件，查传声势大，部门配合好。查处农村中小学乱收费。重点检查了今年春、秋季开学后的收费行为，将违法所得退还给学生，有效地遏制了乱收费的势头。制止不正当价格竞争。针对"价格大战"越演越烈的情况，一些地方注重了对不正当价格竞争的查处。上海市在反不正当价格竞争领域做出了探索，依法处理了一些低价倾销和价格欺诈的案件。完成全国电信资费检查。帮助电信企业建立健全内部管理监督制度，规范了电信企业的收费行为。

　　推进价格监督检查法制建设。为使《价格法》和《价格违法行为行政处罚规定》的一些原则规定具体化并更具有可操作性，制定了一些配套规章和规范性文件。创建规范化物价检查所活动取得明显成效。一是干部素质有所提高；二是机关工作风明显转变；三是执法行为不断规范；四是基础建设得到加强。宣传和表彰先进集体、先进个人。全国价格监督检查先进事迹报告团赴福建、上海、山西、天津、浙江等地巡回演讲。到目前为止，听取报告人数达5000余人次，观看报告会录像达数万人次，在全国评选出101个价格监督检查先进集体和208名先进个人。认真查处价格举报案件。1-11月份，全国共受理价格投诉举报18.13万件，据此立案查处6.17万件，实行经济制裁1.45亿元，其中退还用户0.86亿元。《国家计委关于宣传、贯彻商品和服务实行明码标价规定的通知》下发以后，各地以"诚实规范标价，制止价格欺诈"为主题，开展了"明码标价宣传月"活动。

　　据记者从国家计委了解，"九五"期间，全国各级价格主管部门共查处价格违法案件261万件，实现经济制裁金额130亿元，为价格改革乃至经济体制改革的顺利推进，促进经济结构调整，维护社会稳定，保持国民经济持续快速健康发展创造了条件。

---



### 网站地图 | 联系我们
主办单位：中华人民共和国国家发展和改革委员会
技术支持：国家信息中心 中国经济信息网
网站标识码：bm04000007 京ICP备05052393号　 京公网安备11010202000002号
国家发展和改革委员会 版权所有，如需转载，请注明来源

  

### 排行榜

01　关于第三监管周期省级电价及有关事项的通知(发改价格〔2023〕526号)
2023-05-15

02　关于印发《职业教育产教融合赋能提升行动实施方案(2023-2025年)》的通知
2023-06-13

03　关于做好2023年降成本重点工作的通知
2023-06-13

04　关于印发《职业教育产教融合赋能提升行动实施方案(2023-2025年)》的通知(发改社会〔2023〕号)
2023-06-13

05　关于做好2023年降成本重点工作的通知(发改运行〔2023〕(
2023-06-13

# APPENDIX N



July 19, 2023

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, Ann Chen, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of:

【关于 1998 年国民经济和社会发展计划执行情况与 1999 年国民经济和社会发展计划草案的报告】-国家发展和改革委员会.pdf

*(Digital or printed signature here above the line)*

*Ann Chen*

_____

**Ann Chen**

**Project Number: BBLLP_2306_P0022**

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

【关于1998年国民经济和社会发展计划执行情况与1999年国民经济和社会发展计划草案的报告】-国家发展和改革委员会

无障碍模式　工作部箱



# 中华人民共和国国家发展和改革委员会
## National Development and Reform Commission

热门搜索：油价 产业结构调整指导目录 可行性研究 能源 固定资产投

请输入关键字

⌂ 首页　🏛 机构设置　📰 新闻动态　🏛 政务公开　🏛 政务服务　🕐 发改数据　回 互

⌂ Homepage > News updates > News release

**Report on the Implementation of the 1998 National Economic and Social Development Plan and the Draft of 1999 National Economic and Social Development Plan
-- Presented at the Second Session of the Ninth National People's Congress on March 6, 1999**

Dear representatives:
Entrusted by The State Council, I present to you a report on the implementation of the 1998 Plan for National Economic and Social Development and the 1999 draft plan for National Economic and Social Development for your deliberation and approval. I also invite comments from the members of the National Committee of the Chinese People's Political Consultative Conference (CPPCC).

I. Implementation of the 1998 National Economic and Social Development Plan

1998 was an extraordinary year. Faced with the impact of the Asian financial crisis, the central government made a decisive decision to increase investment and expand domestic demand, strengthen infrastructure construction, and stimulate economic growth. The army and people of the whole country, united as one, worked hard and won a great victory in fighting the flood. On the whole, the implementation of the 1998 plan has been good, and all macro-control targets were basically achieved.

The national economy continued to grow rapidly, and the overall prices fell to a certain extent. With the implementation of various policies and measures to expand domestic demand, the economic growth gradually rallied. The economy grew 7.6% in the third quarter, 0.8 percentage points faster than the second quarter, and reached 9% in the fourth quarter. China's GDP reached RMB7.9553 trillion, representing an increase of 7.8% over the previous year and basically meeting the target set at the beginning of the year. The overall retail prices of commodities fell by 2.6% over the previous year, and the consumer prices fell by 0.8%. Despite the deepening impact of the Asian financial crisis and severe floods, the Chinese economy maintained a fast growth, which is hard won.

Agriculture obtained a good harvest and industrial production grew steadily. Total grain output exceeded 490 billion kilograms, cotton output reached 4.4 million tons and oilseed plant output reached 22.92 million tons. The animal husbandry and aquaculture industries continued to grow. The total output of pork, beef and mutton was 43.55 million tons, representing an increase of 6.5% over the previous year. Aquatic products reached 38.54 million tons, increased by 7.0%.

Driven by investment demand, industrial growth gradually accelerated. Growth rate of National Industrial Added value rose to 11.5% in December from 7.9% in June. The annual industrial added value (all state-owned industrial enterprises and non-state-owned industrial enterprises with annual product sales revenue of more than RMB5 million) was RMB2.0046 trillion, representing an increase of 8.8% over the previous year. The industrial structure was improved, and the development of high-tech industries such as electronic information accelerated. The output of microcomputers was 2.91 million units, increased by 41.1%; Program-controlled switch reached 42.2 million lines, with an increase of 51.4%; 2.7 billion integrated circuits were produced, representing an increase of 5.7%. The connection between production and marketing gradually improved. The sales rate of industrial products gradually rallied, averaging 96.5% for the whole year.

Investment in fixed assets increased, and infrastructure development accelerated significantly. The investment in fixed assets reached RMB2.8457 trillion, representing an increase of 14.1% over the previous year. Investment in state-owned enterprises increased by 19.5%.

The investment structure continued to improve, and infrastructure construction entered an unprecedented new situation. Investment in key areas identified by the state increased significantly. The investment in agriculture, forestry, animal husbandry, fisheries and water resources reached RMB68.4 billion, representing an increase of 47.8%; The investment in transportation, post and telecommunications industry reached RMB499 billion, representing an increase of 53.4%, of which the investment in the post and telecommunications industry reached RMB150.4 billion, with an increase of 48.3%. The central and western regions were given priority to in the investment in fixed assets. Investment in the western region grew by 31.2%, 14.9 percentage points faster than that in the eastern region. A number of large infrastructure projects were delivered and put into use. The communication optical cable installation from Lanzhou to Lhasa via Xining was completed ahead of schedule, enabling the national communications optical cable backbone network to take shape. Large and medium-scale projects such as Shanghai-Hangzhou Expressway, Beijing-Zhengzhou Railway electrification, Guangzhou Metro Phase 1, Shaanxi-Gansu-Ningxia Gas Field and Taolinkou Reservoir in Hebei Province were completed and put into operation. Last year, 1,487 kilometers of expressways, 900 kilometers of new railway, 596 kilometers of double lines and 995 kilometers of electrified railways were built and put into operation. Key projects such as the Three Gorges Project on the Yangtze River and Xiaolangdi Water Conservancy Project on the Yellow River, the Xi'an-Ankang Railway, the Shuozhou-Huanghua Railway and the expansion of the Capital Airport were progressing smoothly. Projects such as Ertan Hydropower Station and Yellow River Wanjiazhai Water Conservancy Project were partially completed and put into operation.

Post-disaster reconstruction was in full swing. A total of RMB20 billion was allocated from the central government budget and new government bonds for post-disaster reconstruction. Rapid progress was made in strengthening the main embankments of the Yangtze River and Yellow River and key embankments in Dongting Lake and Poyang Lake, as well as in building flood control systems in important cities. The work of leveling embankments to discharge flood, returning farmland to lakes, and building towns for resettlement was actively promoted.

A number of winter-proof houses were built, and most of the victims now moved into new houses.

Fiscal revenue grew rapidly, and the financial situation remained stable. National government revenue (excluding debt revenue) reached RMB985.3 billion, representing an increase of 13.9% over the previous year. Government expenditure (excluding debt expenditure) amounted to RMB1.0771 trillion, increased by 16.7%. National government expenditure exceeded revenue by RMB91.8 billion, of which the central government had a deficit of RMB96 billion. The implementation of a proactive fiscal policy played a key role in expanding domestic demand and stimulating the economy. Banks lowered their deposit and lending rates three times, easing the burden on enterprises and supporting economic growth. The balance of deposits in all the financial institutions was RMB9.5698 trillion, representing an increase of 16.1%; The outstanding balance of loans reached RMB8.6524 trillion, representing an increase of 15.5%. Money supply growth accelerated in the second half of the year. December

### 排行榜

01 关于第三监督周期省级电价及有关事项的通知(发改
〔2023〕526号)
2023-05-15



02 关于印发《职业教产教融合提升行动实施方案(2023-
年)》的通知
2023-06-13



03 关于做好2023年降成本
通知
2023-06-13

04 关于印发《职业教育产教融合提升行动实施方案(2023-
年)》的通知(发改社会〔2
号)
2023-06-13

05 关于做好2023年降成本
通知(发改运行〔2023〕)
2023-06-13

The general requirements for economic work in 1999 are: To hold high the great banner of Deng Xiaoping Theory, thoroughly implement the guiding principles of the 15th CPC National Congress and the Third Plenary Session of the 15th CPC Central Committee, continue to push forward reform and opening up, take expanding domestic demand as the main measure to promote economic growth, stabilize and strengthen agriculture, deepen reform of state-owned enterprises, adjust the economic structure, strive to open up urban and rural markets, make every effort to expand exports, prevent and address financial risks, rectify economic order, maintain sustained, rapid and healthy development of the national economy and comprehensive social progress, in order to welcome the fiftieth anniversary of the founding of the People's Republic of China. In line with the requirements, the main targets expected for economic and social development in 1999 are:
-- To achieve an economic growth rate of around 7%;
-- To increase the investment in fixed assets by around 12%;
-- To control the increase in the national retail prices of commodities within 2%, and the increase in the consumer prices within 4%;
-- To increase the total volume of import and export, and balance import and export;
-- To maintain the necessary balance between revenue and expenditure with a central government deficit of RMB150.3 billion;
-- To issue currency of around RMB150 billion;
-- To control the registered urban unemployment rate at around 3.5%;
-- To maintain the natural population growth rate of 10.1‰.

Under the conditions of a socialist market economy, the economic growth rate is an expected indicator that can be adjusted when economic conditions at home and abroad change. The growth rate of around 7% is determined by taking into account various factors. Maintaining a relatively fast growth rate will help resolve problems in all areas and boost the confidence of the people throughout the country. To achieve this growth target is both conditional and requires considerable efforts. We must accelerate the transformation of the economic system and the growth model, maintain the balance between speed, structure, quality and efficiency, and focus our work on expanding markets, optimizing the economic structure and improving the quality and efficiency of economic growth while maintaining appropriate and rapid growth.

The main tasks for national economic and social development in 1999 are:
(I) To strengthen agricultural infrastructure construction, adjust and optimize the agricultural structure
Continuing to strengthen agricultural infrastructure construction with emphasis on water conservancy. Speeding up the management of major rivers and lakes, promptly repairing facilities damaged by floods, and focusing on strengthening dry dikes to ensure a safe flood season this year. Focusing on dredging rivers and lakes, and carrying out planned flood discharge measures to level embankments, return farmland to lakes, and build towns for resettlement, so as to restore and improve the flood control capacity. Speeding up the reinforcement of dangerous reservoirs, strengthening the construction of control projects in major rivers, and improving the capacity of flood regulation and storage.
Effectively improving the ecological environment. In the upper and middle reaches of the Yangtze River and the Yellow River, as well as the sandstorms and grassland areas in the northeast, northwest and north China regions, making efforts to comprehensively improve the ecological environment, plant trees and grass on a large scale, and developing ecological agriculture. Enhancing efforts to return farmland to forests and transform slopes to terraced fields, restore and expand grassland vegetation, improving small river basins, reduce soil erosion, and continuing to protect natural forest resources and develop a system of ten shelter belts.
Adjusting and optimizing the agricultural structure. In 1999, the grain sown area shall be maintained at 1.65 billion mu, and the total grain output shall reach 495 billion kg. Adjusting the planting structure in accordance with market demand and improving the quality of agricultural products. Stabilizing cotton production in Xinjiang and reducing cotton production in Hebei, Shandong, Henan and Yangtze River basins, and produce sugar and flue-cured tobacco according to market demand. Continuing to improve the production of "vegetable basket" products to ensure market supply. Further promoting advanced and applicable agricultural technologies, especially water-saving and efficient-enhancing irrigation technologies such as channel seepage prevention, low-pressure pipeline water transmission, sprinkler irrigation and drip irrigation, as well as dry farming, and actively develop precision agriculture where conditions permit.
Doing everything possible to increase farmers' incomes. Improving the system of socialized agricultural services, developing industrialized agricultural operations, and improving the processing depth and conversion rate of agricultural products. Organizing rural labor forces to participate in infrastructure construction and increasing income from labor services. As for township enterprises, adjusting their structure, paying particular attention to quality, efficiency and environmental protection, and focusing on developing the processing, storage, preservation, and marketing of agricultural and sideline products. Effectively reducing the burden on farmers, implementing the policy of setting a reasonable limit on the amount of levies they can bear and not change it for three years once set, and resolutely banning all kinds of arbitrary charges, indiscriminate fund-raising, indiscriminate fines, and indiscriminate apportionment.
Speeding up the construction of small towns. Focusing on the pilot reform of the household registration system in small towns, giving play to the driving role of small towns in rural economy, and improving the quality of life of farmers.
(II) To create favorable external conditions for the reform of state-owned enterprises and increase support for small and medium-sized enterprises

This year is a key year for most large and medium-sized state-owned enterprises to get rid of their difficulties and for most state-owned large and medium-sized backbone enterprises to initially establish a modern enterprise system. Further adjusting and reducing excess production capacity in response to the problems caused by low level and repeated construction in state-owned enterprises over the years, such as insufficient production and low efficiency. In the textile industry, basically fulfilling the goal of reducing 10 million spindles, creating jobs for 1.2 million employees and reducing loss of RMB6 billion in the whole industry. In the coal industry, carrying out follow-up work to decentralize coal mine authorities, closing 25,800 small mines, and reducing production by 250 million tons. Rectifying and shutting down small glass factories, cement factories, thermal power plants, steel mills and oil refineries with backward technology, poor quality, serious pollution and serious waste of resources. Intensifying efforts to encourage mergers and regulate bankruptcies, improving the way banks write off provisions for bad debts and focusing on supporting the restructuring of key industries and enterprises.
Downsizing staff and improving efficiency for state-owned enterprises, and ensuring the re-employment of the laid-off employees. Improving the three security line systems: Insurance of unemployment, basic living safeguard of employees and lowest living safeguard of townsmen. For fiscal budgets at all levels, giving priority to fully allocating funds for ensuring the basic life of laid-off workers. Continuing to establish reemployment service centers, strengthening labor market development and reemployment training, and exploring new employment channels. Improving the overall pension system at the provincial level, expanding the coverage of pensions, raising the contribution collection rate, ensuring that pensions are paid in full and on time, and actively promoting the reform of the medical insurance system for urban workers. Enhancing the assessment and adjustment of enterprise leaders.

Taking various forms to further liberalize and invigorate small state-owned enterprises. Strengthening guidance and policy support for the development of small enterprises and creating conditions for the growth of small enterprises of all kinds of ownership, especially high-tech enterprises. Establishing an effective mechanism for the management, supervision and operation of state-owned assets to prevent the loss of state-owned assets and the evasion of bank debts.
Strengthening and improving guidance, supervision and management of the individual and private economies, and giving full play to their positive role in promoting economic growth and creating jobs.

(III) To promote economic restructuring and foster new growth areas
Proactively making use of advanced technologies to transform and improve traditional industries and speeding up the adjustment of processing industries. Being market-oriented, intensify technological upgrading, vigorously promoting and making comprehensive use of new processes and technologies that save energy, reducing consumption and improving environmental performance, accelerating the phase-out of backward processes, technologies and equipment, increasing application of technology in products, and improving their quality and grade. In the textile industry, speeding up the introduction of technology and equipment renewal, improving the level of printing and dyeing and other post-finishing, and actively developing decorative and industrial textiles. In the paper industry, adjusting the structure of raw materials, and developing pulp, high-grade paper and paper products. In the development of electric power, shifting from increasing power generation capacity to exploring the electricity market, adjusting the power structure, and strengthening the construction of power grids. In the petroleum and petrochemical industries, promoting advanced drilling and oil production technologies, strengthening the exploration, development and utilization of natural gas, upgrading existing refining enterprises, and increasing the yield of light oil. In the chemical industry, actively developing fine chemical products, adjusting the variety structure of fertilizers, and developing high-concentration fertilizers. In the iron and steel industry, speeding up the phase-out of backward processes and equipment such as open-hearth steelmaking, ferro-smelting steelmaking, mold casting and cross-train rolling mills. In the building materials industry, promoting the new dry process rotary kiln cement and other technologies, and developing new building materials featuring energy saving, water saving, land saving and low pollution.



Vigorously revitalizing the equipment industry and improving the technology and equipment. Relying on major national construction projects to enhance the introduction of foreign advanced technology, cooperative design, and cooperative manufacturing, improving independent development capabilities, and promoting the localization of key equipment. Implementing special plans for the localization of urban rail transit equipment and environmental protection equipment, and providing preferential buyer credit to encourage the use of domestic equipment. Developing emerging industries and high-tech industries, and actively fostering new areas of economic growth. Formulating plans for the development of high-tech industries, carrying out demonstration projects for the industrialization of high-tech industries, exploring an investment mechanism for high-tech entrepreneurship, and providing support in fiscal, taxation, finance, depreciation, and import and export operations. Strengthening the construction of information infrastructure. Boosting the development and production of mobile telecommunications, digital electronic information and other products, and actively cultivating and producing high-tech products with independent intellectual property rights and market competitiveness.

(IV) To further deepen price reform and vigorously rectify market order

Seizing the current favorable opportunity of falling prices, continuing to adjust the price structure and reforming the price-setting mechanism, so as to expand domestic demand and upgrade industries. Focusing on adjusting the prices of basic industries and public utilities such as postal services, telecommunications, and housing, and break industry monopolies. Reforming the system for managing electricity prices in rural areas, gradually realize the same price for electricity in urban and rural areas, and carrying out pilot projects of power plants separated from electric network and bidding for accessing to networks. Continuing to implement the policy of protecting grain purchase prices, rectifying the order of the grain purchase market, and liberating the purchase price of cotton and the retail price of chemical fertilizers. Actively promoting the reform of fees and charges and speeding up the rationalization of the relationship between taxes, fees and prices.

Rectifying market order, standardizing price-related behavior, and cracking down on the production and sale of fake and shoddy products. Formulating laws and regulations in line with the Price Law, and investigating and punishing unfair pricing behaviors such as low-price dumping, price monopoly, price fraud, price discrimination, and profiteering according to law. Improving the management of drug prices and medical service charges, and standardizing drug price discounts. Rectifying the construction market and standardizing construction fees. Carrying out inspections of prices and charges that have a close bearing on people's lives. In particular, strengthening inspections of telecommunications charges, grain purchase prices, rural electricity prices, and agriculture-related charges.

(V) To promote economic growth by relying on scientific and technological progress and improving the quality of workers, vigorously promote the reform of the scientific and technological systems, accelerate the development of the innovation system, and form a new mechanism for closely integrating science and technology with the economy according to the strategy of rejuvenating the country through science and education. Giving full play to the main role of enterprises in promoting industrial technological progress, and making enterprises the main player of scientific and technological investment and technological development as soon as possible. Encouraging scientific and technological forces of research institutes and institutions of higher education to enter enterprises, or cooperating with enterprises to enhance the technological innovation capacity of enterprises, promoting the transformation of application-oriented research institutes into scientific and technological enterprises, and changing the situation that most scientific and technological forces are outside of enterprises and the market. Deepening the internal reform of research institutes, establishing incentive mechanisms, and stimulating the enthusiasm and creativity of researchers. Accelerating the reform of the management system of scientific research institutions affiliated to departments, and transforming the operating mechanism as soon as possible. While targeting the technologies and products with high market potential, intensify development efforts, and accelerate the transformation of scientific and technological achievements.  

Putting education at a strategic priority position. Continuing to comprehensively promote education reform and development, and further mobilizing social forces for developing education. Actively developing higher education, accelerating the reform of higher education management system, accelerating the socialization of educational logistics, and improving the overall quality of faculty. Continuing to make nine-year compulsory education universal, developing illiteracy among young and middle-aged people, comprehensively promoting quality education, and actively developing vocational and adult education. Also speeding up the renovation of tube-shaped apartment buildings and dilapidated buildings in colleges and universities. In 1999, we plan to enroll 85,000 graduate students and 1.3 million regular college students.

(VI) To actively develop various social programs, and further improve people's lives according to the strategy of sustainable development

Continuing to strengthen the building of socialist spiritual civilization and promote the development of literature, art, radio, film and television, press, publication, sports and other undertakings by improving the relevant economic policies. Striving to increase the coverage of radio and television, and actively promote the project of "expanding radio and television coverage in rural areas". Enhancing regional healthcare planning and improving community-level healthcare service facilities. Accelerating the implementation of China's Agenda 21 and strengthen efforts for sustainable development. Effectively protecting and rationally using cultivated land, fresh water, forests, minerals and other resources, continueing to strengthen pollution control in key cities, regions, river basins and sea areas, and striving to achieve balanced environmental, economic and social development.

Enhancing family planning. Continuing to give priority to controlling the growth of the rural population, and integrating family planning work with developing the rural economy, helping farmers get rid of poverty and get rich, and building civilized and happy families. Vigorously advocating fewer births and better parenting to improve the quality of the population.

Making best efforts to improve the lives of urban and rural residents. In 1999, striving to increase the per capita disposable income of urban residents and the per capita net income of rural residents by 4% in real terms. Improving public facilities and social welfare facilities, enhancing patriotic healthcare campaigns and epidemic prevention and control, beautifying the living environment and improving the quality of life. Intensifying efforts to alleviate poverty and meeting the basic needs of over 10 million rural people living in poverty.

III. To continue to focus on expanding domestic demand and promote the sustained, rapid and healthy development of the national economy

Continuing to expand domestic demand is the right choice to cope with the Asian financial crisis and changes in the international market. It is also the basic standpoint and long-term strategic policy for China's economic development. With complex and ever-changing global finance and economy, and increasing volatile and uncertain factors, only by focusing on expanding domestic demand and actively promoting opening-up can we seize the initiative of economic development.

(I) To increase investment in fixed assets and ensure the quality of infrastructure construction

In 1999, total investment in fixed assets will be increased by about 12%. While continuing to increase investment in the state-owned economy, we should actively take measures to guide non-state-owned economy to increase investment. Investment in fixed assets should be mainly used for post-disaster reconstruction, rehabilitation of rivers and lakes, construction of water conservancy projects, infrastructure projects under construction, localization of major technical equipment and high-tech industrialization projects. This year, we will stop approving industrial construction projects, except for a few projects that are aimed at improving technology and upgrading products and have market potentials. Concentrating funds to ensure that a number of key construction projects can be completed and put into operation, including Shanghai large-scale integrated circuit chip base, Baodi to Shanhaiguan, Xi'an to Tongguan Expressway, Jiangyin Yangtze River Bridge, Xiamen Haicang Bridge, Capital Airport, Pudong Airport, Beijing Fuba Line subway, Xinjiang Ertis-Karamay Water Diversion Project, and Southern Xinjiang Railway.

Ensuring the quality of infrastructure projects is the key to the success of the policy of expanding domestic demand. Working strictly in accordance with construction procedures, ensuring proper execution of the preliminary work of the project, and implement all-round and whole-process quality management for all links such as survey and design, construction, equipment and raw material procurement. Improving the project legal person responsibility system, standardizing the bidding system, strengthening the project supervision system and contract management system, and implementing the leadership responsibility system of project quality. Strengthening quality supervision by means of economic, legal, administrative and public opinion supervision, and giving full play to the role of special inspectors for major projects. Projects found to have major engineering quality problems must be investigated thoroughly and dealt with seriously.

(II) To correctly guide people's consumption and vigorously explore the rural consumer market

Consumer demand is the end and new starting point of social reproduction. Only by increasing the consumption demand, can the increased investment achieve the expected effect and realize the virtuous circle of social reproduction. Vigorously developing urban and rural consumption markets is an important part of expanding domestic demand. We should take effective measures to expand household consumption, invigorate urban and rural markets, and give play to the role of investment.

6/22/23, 10:47 PM　　　　　　关于1998年国民经济和社会发展计划执行情况与1999年国民经济和社会发展计划草案的报告_国家发展和改革委员会

2023年6月22日 星期四　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　● 无障碍模式 | 工作邮箱

 **中华人民共和国国家发展和改革委员会**
National Development and Reform Commission

热门搜索：油价 产业结构调整指导目录 可行性研究 能源 固定资产投

请输入关键字

🏠 首页　　🏛 机构设置　　🗎 新闻动态　　🖥 政务公开　　🗎 政务服务　　🕘 发改数据　　🗎 互

🏠 首页 > 新闻动态 > **新闻发布**

## 关于1998年国民经济和社会发展计划执行情况与
## 1999年国民经济和社会发展计划草案的报告
## --1999年3月6日在第九届全国人民代表大会第二次会议上

各位代表：

我受国务院委托，向大会报告1998年国民经济和社会发展计划执行情况与1999年国民经济和社会发展计划草案，请予审议，并请全国政协委员提出意见。

一、1998年国民经济和社会发展计划执行情况

1998年是极不寻常的一年。面对亚洲金融危机的冲击，中央果断作出了增加投入、扩大内需的决策，加强基础设施建设，拉动经济增长；全国军民万众一心，顽强拼搏，夺取了抗洪抢险的伟大胜利。总的看，1998年计划执行情况是好的，基本实现了各项宏观调控目标。

国民经济继续较快增长，物价总水平有所下降。随着扩大内需各项政策措施的落实，经济增长速度逐步回升。三季度经济增长7.6%，比二季度快0.8个百分点，四季度达到9%。全年国内生产总值完成79553亿元，比上年增长7.8%，基本实现年初确定的目标。商品零售价格总水平比上年下降2.6%，居民消费价格下降0.8%。亚洲金融危机影响日益加深和遭受严重洪涝灾害的情况下，国民经济依然保持较快的增长速度，是来之不易的。

农业获得好收成，工业生产稳定增长。全年粮食总产量4900亿公斤以上，棉花440万吨，油料2292万吨。畜牧、水产业持续增长。猪牛羊肉总产量4355万吨，比上年增长6.5%；水产品3854万吨，增长7.0%。

受投资需求拉动，工业增长速度逐渐加快。12月份工业增加值增长速度由6月份的7.9%上升到11.5%。全年完成工业增加值(全部国有工业企业和年产品销售收入500万元以上的非国有工业企业)20046亿元，比上年增长8.8%。工业结构有所改善，电子信息等高技术产业发展加快。微机产量291万台，增长41.1%；程控交换机4220万线，增长51.4%；集成电路27亿块,增长5.7%。产销衔接状况逐步好转。工业产品销售率逐步回升，全年平均96.5%。

固定资产投资规模扩大，基础设施建设明显加快。全年全社会固定资产投资完成28457亿元，比上年增长14.1%。其中国有单位投资增长19.5%。

投资结构继续改善，基础设施建设出现了前所未有的新局面。国家确定的重点领域投资大幅度增加。全年农林牧渔水利业投资完成684亿元，增长47.8%；运输邮电通信业完成4990亿元，增长53.4%，其中，邮电通信业1504亿元，增长48.3%。固定资产投资注意对中西部地区适当倾斜。西部地区投资增长31.2%，比东部地区快14.9个百分点。一批大型基础设施项目交付使用。兰州经西宁到拉萨的通信光缆提前建成，使全国通信光缆骨干网基本形成。沪杭高速公路、京�murah铁路电气化、广州地铁一期、陕甘宁气田、河北桃林口水库等大中型项目竣工投产。全年建成投产高速公路1487公里，铁路新线900公里，复线596公里，电气化铁路995公里。长江三峡和黄河小浪底水利枢纽工程、西安-安康铁路、朔黄铁路、首都机场扩建工程等重点项目进展顺利。二滩水电站、黄河万家寨水利枢纽工程等项目分建成投产。

灾后重建全面展开。中央预算内投资和新增国债共安排200亿元用于灾后重建。长江、黄河干堤和洞庭湖、鄱阳湖重点垸堤加固，以及重要城市防洪体系建设进展较快，平垸行洪、退田还湖、移民建镇工作积极推进。

修建了一批过冬用房，目前大多数灾民已搬入新居。

财政收入增长较快，金融形势保持平稳。全国财政收入（不含债务收入）完成9853亿元，比上年增长13.9%；财政支出（不含债务支出）10771亿元，增长16.7%；全国财政支大于收918亿元，其中中央财政赤字960亿元。实施积极的财政政策，对扩大内需、启动经济发挥了关键作用。银行三次降低存贷款利率，减轻了企业负担，支持了经济增长。全部金融机构各项存款余额95698亿元，增长16.1%；各项贷款余额86524亿元，增长15.5%。下半年货币供应量增长加快。12月

1999年经济工作的总体要求是：高举邓小平理论伟大旗帜，深入贯彻落实党的十五大和十五届三中全会精神，继续推进改革开放，把扩大国内需求作为促进经济增长的主要措施，稳定和加强农业，深化国有企业改革，调整经济结构，努力开拓城乡市场，千方百计扩大出口，防范和化解金融风险，整顿经济秩序，保持国民经济持续快速健康发展和社会全面进步，迎接建国五十周年。根据这一要求，1999年经济和社会发展的主要预期目标是：

——经济增长率7%左右；
——全社会固定资产投资增长12%左右；
——全国商品零售价格涨幅2%以内，居民消费价格涨幅4%以内；
——进出口总额力争有所增长，进出口基本平衡；
——保持必要的财政收支差额，中央财政赤字1503亿元；
——货币发行量1500亿元左右；
——城镇登记失业率3.5%左右；
——人口自然增长率10.1‰。

在社会主义市场经济条件下，经济增长率是个预期性指标，在国内外经济情况发生变化时可以进行调整。经济增长率7%左右，是综合考虑各方面因素确定的。继续保持较快的增长速度，有利于各方面矛盾和问题的解决，有利于增强全国人民信心。实现这一增长目标，既是有条件的，也需要付出相当艰苦的努力。我们要加快推进经济体制和经济增长方式的转变，坚持速度、结构、质量、效益的统一，在保持经济适度快速增长的同时，把工作的着力点放在开拓市场、优化结构、提高经济增长的质量和效益上来。

1999年国民经济和社会发展的主要任务是：
（一）加强农业基本建设，调整和优化农业结构
继续加强以水利为重点的农业基本建设。加快大江大湖大河的治理，抓紧修复水毁设施，重点加固干堤，确保今年安全度汛。搞好江河湖清淤疏浚，有计划地实施平垸行洪、退田还湖、移民建镇，恢复和提高行蓄洪能力。加快病险水库除险加固，加强主要江河控制性工程建设，提高对洪水的调蓄能力。
切实搞好生态环境建设。在长江、黄河上中游地区，"三北"风沙区和草原区，大力开展生态环境综合治理，大规模植树种草，建设生态农业。加大退耕还林和"坡改梯"力度。恢复和扩大草地植被，搞好小流域治理，减少水土流失。继续搞好天然林资源保护和十大防护林体系建设。
调整和优化农业结构。1999年粮食播种面积稳定在16.5亿亩，粮食总产量4950亿公斤。要按照市场需求，调整种植结构，提高农产品质量。稳定新疆棉花生产，压缩冀鲁豫和长江流域棉花产量。糖料、烤烟也要按照市场需求生产。继续搞好"菜篮子"产品的生产，保证市场供给。进一步推广先进适用农业技术，特别是推广渠道防渗、低压管道输水和喷灌、滴灌等多种形式的节水增效灌溉技术，以及旱作农业技术。条件适宜的地方积极发展精准农业。
千方百计增加农民收入。完善农业社会化服务体系，发展农业产业化经营，提高农产品加工深度和转化率。组织农村劳动力参加基础设施建设，增加劳务收入。乡镇企业要抓好结构调整，尤其要注重质量、效益和环境保护，着重发展农副产品加工业和储藏、保鲜、运销业。切实减轻农民负担，落实合理负担定项限额、一定三年不变的政策，坚决取缔各种乱收费、乱集资、乱罚款、乱摊派。
加快小城镇建设。要搞好小城镇户籍管理制度改革的试点，发挥小城镇对农村经济的带动作用，提高农民生活质量。
（二）努力为国有企业改革创造良好的外部条件，加大对中小企业的扶持力度

今年是大多数国有大中型亏损企业摆脱困境、大多数国有大中型骨干企业初步建立现代企业制度的关键一年。针对多年来低水平重复建设造成国有企业开工不足、效益下降的问题，进一步调整和压缩过剩的生产能力。纺织行业要基本完成压锭1000万、分流人员120万和全行业减亏60亿元的目标；煤炭行业要做好煤矿下放的后续工作，关闭小矿井2.58万处，压产2.5亿吨；整顿和关闭技术落后、质量低劣、污染严重、浪费资源的小玻璃厂、小水泥厂、小火电厂、小炼钢厂和小炼油厂。加大鼓励兼并、规范破产的力度。改进银行呆坏帐准备金核销办法，集中支持重点行业和重点企业的改组。
做好国有企业减员增效和再就业工作。完善下岗职工基本生活保障、失业保险和城镇居民最低生活保障"三条保障线"制度。各级财政预算要优先用于下岗职工基本生活保障资金。加强劳动力市场建设和再就业培训，开拓新的就业渠道。完善养老金省级统筹制度，扩大覆盖面，提高收缴率，确保养老金按时足额发放。积极推进城镇职工医疗保险制度改革。切实抓好企业领导班子的考核和调整。

采取多种形式，进一步放开搞活国有小企业。加强对小企业发展的引导和政策扶持，为各种所有制企业特别是高新技术企业的成长创造条件。建立有效的国有资产管理、监督和营运机制，防止国有资产流失和逃废银行债务。
加强和改善对个体经济、私营经济的引导、监督和管理，充分发挥他们在促进经济增长和吸纳就业等方面的积极作用。

（三）推进经济结构调整，积极培育新的经济增长点
积极利用先进技术改造和提高传统产业，加快调整加工工业。以市场为导向，加大技术改造力度，大力推广节能降耗、综合利用和提高环保效益的新工艺和新技术，加快淘汰落后工艺、技术和设备，增加产品科技含量，提高产品质量和档次。纺织工业要加快技术升级和设备更新，提高印染后整理水平，积极开发装饰和服装用纺织品。造纸工业要调整原料结构，发展纸浆、中高档纸板及纸制品。电力发展要从以增加发电能力为主，转到开拓电力市场，调整电力结构，加强电网建设上来。石油、石化行业要推广先进钻井、采油技术，加强天然气的勘探、开发和利用，改造现有炼油企业，提高轻质油比重。化工行业要积极开发精细化工产品，调整化肥品种结构，发展高浓度化肥。钢铁工业要加快淘汰平炉炼钢、化铁炼钢、模铸和横列式轧机等落后工艺装备。建材工业要推广新型干法旋窑水泥等技术，发展节能、节水、节地和低污染




【关于1998年国民经济和社会发展计划执行情况与1999年国民经济和社会发展计划草案的报告】_国家发展和改革委员会

新型建筑材料。

大力振兴装备工业，提高技术装备水平。依托国家重大建设项目，抓好国外先进技术的引进、合作设计、合作制造，提高自主开发能力，推进关键设备的国产化。实施城市轨道交通设备和环保设备等国产化专项计划。提供优惠买方信贷，鼓励使用国产设备。发展新兴产业和高技术产业，积极培育新的经济增长点。制定高技术产业发展规划，实施高技术产业化示范工程。探索高技术创业投入机制，在财税、金融、折旧和进出口经营等方面给予支持。加强信息基础设施建设。抓好移动通信、数字化电子信息等产品的开发和生产，积极培育和生产具有自主知识产权和市场竞争力的高技术产品。

（四）进一步深化价格改革，大力整顿市场秩序

抓住当前物价总水平下降的有利时机，围绕扩大内需和产业升级，继续调整价格结构，改革价格形成机制。重点调整邮政、电信以及住房等基础产业和公用事业价格，打破行业垄断。改革农村电价管理体制，逐步实现城乡用电同网同价。进行厂网分开和发电竞价上网的试点。继续实行粮食收购保护政策，整顿粮食收购市场秩序。放开棉花收购价格和化肥零售价格。积极推进收费改革，加快理顺税、费、价三者关系。

整顿市场秩序，规范价格行为。严厉打击生产和销售假冒伪劣产品的行为。制定与《价格法》相配套的法规，依法查处低价倾销、价格垄断、价格欺诈、价格歧视、牟取暴利等不正当价格行为。完善药品价格及医疗服务收费管理，规范药品价格折扣。整顿建筑市场，规范建筑收费。开展与人民生活关系密切的价格和收费检查，特别要加强电信资费和粮食收购价格、农村电价、涉农收费的检查。

（五）坚持实施科教兴国战略，依靠科技进步和提高劳动者素质推动经济增长大力推进科技体制改革，加快创新体系建设，形成科技与经济紧密结合的新机制。充分发挥企业在推进产业技术进步中的主力军作用，尽快使企业成为科技投入和技术开发的主体。鼓励科研院所和高等院校的科技力量进入企业，或与企业联合、合作、共建，增强企业的技术创新能力，促进应用型科研院所转制为科技型企业，改变大部分科技力量游离于企业和市场之外的局面。深化科技体制改革，建立激励机制，激发科研人员的积极性和创造性。加快部门所属科研机构管理体制改革，尽快转变运行机制。瞄准市场潜力大的技术和产品，加大开发力度，加快科技成果转化。

切实把教育放在优先发展的战略地位。继续全面推进教育改革和发展，进一步调动社会力量发展教育的积极性。积极发展高等教育，加快高教管理体制改革，加速教育后勤社会化。努力提高教师队伍整体素质。继续大力普及九年义务教育和扫除青壮年文盲。全面推行素质教育。积极发展职业教育和成人教育。抓紧完成高校筒子楼和危房改造工作。1999年研究生计划招生8.5万人，普通高校招生130万人。

（六）坚持可持续发展战略，积极发展各项社会事业，进一步改善人民生活

继续加强社会主义精神文明建设，通过完善有关经济政策，促进文学、艺术、广播电影电视、新闻出版、体育等各项事业发展。努力提高广播电视覆盖率，积极推进"村村通广播电视"工程。认真做好区域卫生规划工作，完善基层卫生服务设施。加快实施《中国21世纪议程》，增强可持续发展能力。切实保护和合理利用耕地、淡水、森林、矿产等资源，继续加强重点城市、区域、流域和海域的污染治理，努力实现环境、经济和社会协调发展。

继续做好计划生育工作。坚持把控制农村人口增长作为重点，将计划生育工作与发展农村经济、帮助农民脱贫致富、建设文明幸福家庭结合起来。大力提倡少生优育，提高人口素质。

努力改善城乡居民生活。1999年，城镇居民人均可支配收入和农村居民人均纯收入力争实际增长4%。加强公共设施和社会福利设施建设。搞好爱国卫生运动，做好疫病防治工作。美化生活环境，提高生活质量。加大扶贫攻坚力度，解决1000万以上农村贫困人口的温饱问题。

三、继续立足于扩大国内需求，促进国民经济持续快速健康发展

继续扩大国内需求，是当前应对亚洲金融危机和国际市场变化的正确选择，也是我国经济发展的基本立足点和长期战略方针。在全球金融和经济复杂多变、不确定因素多的情况下，只有立足于扩大内需，同时积极推进对外开放，才能把握经济发展的主动权。

（一）增加固定资产投资，确保基础设施工程质量

1999年，全社会固定资产投资总规模增长12%左右。要在继续增加国有经济投资的同时，积极采取措施，引导非国有经济增加投资。固定资产投资，要重点用于灾后重建、整治江湖、兴修水利，在建的基础设施项目，重大技术装备国产化和高技术产业化项目。今年，除少数属于提高技术水平、产品升级又有市场的项目外，要停止审批工业建设项目。集中资金，确保一批重点建设项目竣工投产。在建的上海大规模集成电路芯片、宝坻至山海关、西安至潼关高速公路，江阴长江大桥、厦门海沧大桥，首都机场、浦东机场，北京复八线地铁，新疆引额济克工程，南疆铁路等。

确保基础设施工程质量，是扩大内需政策成败的关键。严格按建设程序办事，做好项目前期工作，对勘察设计、施工和设备、原材料采购等各个环节，实行全方位、全过程的质量管理。要健全和完善项目法人责任制，规范招标投标制，强化工程监理制和合同管理制，实行工程质量的领导责任制。运用经济、法律、行政和舆论监督等各种手段，强化质量监管。发挥重大项目稽察特派员的作用，对发现有重大工程质量问题的项目，要一查到底，严肃处理。

（二）正确引导居民消费，大力开拓农村消费市场

消费需求是社会再生产的终点和新的起点。只有增加消费需求，才能使增加的投资取得预期效益，实现社会再生产的良性循环。大力开拓城乡消费市场，是扩大内需的重要内容。要采取有效措施，扩大居民消费，活跃城乡市场，发挥投资




与消费对经济增长的双重拉动作用。

进一步完善收入分配结构和分配方式，提高城乡居民购买力。特别是注意增加广大中低收入居民的现金收入。合理引导居民心理预期，鼓励居民增加消费。理顺体制，完善政策，扩大住房等高价值商品消费。逐步建立以个人消费为主体的消费制度，减少福利型、供给型、实物型分配，实行分配货币化。加快推进城镇住房制度改革，整顿土地转让价格和拆迁补偿费，清理各种摊派和收费，规范住房成本构成，切实降低房价。增加住房信贷，完善二级市场，尽快把住房培育成新的消费热点。积极提倡和推广分期付款等大众信用消费。

花大力气开拓农村市场。改善农村消费环境，加强水、电、路、通信和广播电视等基础设施建设，为家用电器和电话进入农村居民家庭创造条件。积极生产和开发灌溉、田间作业、粮食烘干、农副产品加工、运输等质优价廉的农机产品。开发适合农村市场的净水设备和使用多种燃料的高效节能灶具。

拓宽消费领域，开发新的服务消费市场。鼓励和引导第三产业加快发展。推进文化、体育、非义务教育和非基本医疗保健的产业化。努力把旅游业培育成新的经济增长点。促进社区服务快速发展，方便居民生活。

(三)继续实行积极的财政政策和稳健的货币政策□

为了保证经济发展和稳定的大局，缓解经济社会生活中的各种困难和压力，实现宏观经济预期目标，今年还要继续实施积极的财政政策。增发一定数量的国债，继续用于灾后重建、兴修水利以及其他基础设施建设投资。实施积极的财政政策，增加财政支出，也要适时适度，充分考虑财政的承受能力。确保资金的合理投向，用好有限的资金，充分发挥财政资金对社会资金的引导作用。要切实抓好增收节支，反对铺张浪费。继续整顿财经秩序，推行对行政性收费和罚没收入"收支两线"管理，强化财政监督。

实行稳健的货币政策，适当增加货币供应量，促进经济增长。今年广义货币供应量(M2)预期增长14-15%；狭义货币供应量(M1)增长14%左右；国家银行新增贷款指导性计划1万亿元，增长14.6%。保持人民币汇率稳定。灵活运用利率、再贷款、再贴现、公开市场操作、存款准备金等手段，调节货币供应量。重点增加对基础设施建设、农业、消费和中小企业的信贷投入，加大支付结算增长的支持力度。稳步推进金融改革，大力整顿金融秩序，切实防范和化解金融风险。完善国有商业银行一级法人管理，强化内控制度建设，逐步建立金融管理责任制，负责处理银行系统内的不良信贷资产，对新增贷款质量实行严格的责任制。修订主办银行管理办法，实行双向选择，加强银企合作。逐步建立地方性中小金融机构存款保险制度。进一步加强金融监管。严格规范证券、保险市场运行。严厉查处各种违法违规行为，打击金融犯罪活动。

(四)努力扩大对外贸易，积极合理有效地利用外资

对外开放是我国的一项基本国策。在扩大内需的同时，要大力发展对外经济贸易。坚持实施市场多元化战略和以质取胜战略，千方百计扩大外贸出口。进一步扶持和鼓励机电产品出口。努力提高出口产品的质量、档次和配套化、系列化水平，增加附加值。积极支持和鼓励有条件的企业开展境外加工贸易，带动国内设备、原材料和劳务出口，这是当前扩大外贸出口的重要途径。继续优化出口产品结构，通过出口配额、信贷政策和调整出口退税率等措施，促进外贸出口，特别是扩大名优产品出口规模。培育大宗农产品出口生产基地，加强储备设施建设，建立风险防范机制。进一步改革外贸管理体制，加快出口经营权由审批制向登记备案制过渡。进一步优化进口商品结构，继续鼓励高技术产品和设备进口，组织好国内稀缺原材料和资源性产品进口。加强和完善对各类企业进出口经营的监督管理，继续严厉打击走私、骗汇和黑市交易等非法活动。

努力稳定利用外资规模，提高利用外资的质量和水平。要有选择地放宽某些领域对外商投资的限制，有步骤地推进服务贸易的对外开放。探索运用国际通行的吸收外资方式，努力开辟新的融资渠道。逐步落实外商投资国民待遇，积极吸引跨国公司投资。优化外商投资结构。鼓励外资投向中西部地区，优先安排一批农业、水利、交通、能源、原材料和环保等条件较好的项目吸引外资。对外商投资的管理，逐步由项目审批制为主转变为政策指导为主。继续改善外商投资环境，完善法律法规体系，依法制止对外商投资企业的乱收费行为。进一步加强口径外债管理，控制规模，优化结构，加强监测预警，完善责权利统一的借用还机制。

各位代表，1999年是中国人民迈向21世纪的重要一年，也是我国实现跨世纪宏伟目标进程中具有特殊意义的一年，改革、发展和稳定的任务十分繁重。我们要在以江泽民同志为核心的党中央领导下，高举邓小平理论伟大旗帜，统一思想、坚定信心，抓住机遇、知难而进，团结一致、艰苦奋斗，努力完成国民经济和社会发展计划!

**国家发展计划委员会主任 曾培炎**

发布时间: 1999/03/16    🖶 [打印]

 微博     微信

 

# APPENDIX O



July 10, 2023

**Certification**

<div align="center">Welocalize Translations</div>

**TRANSLATOR'S DECLARATION:**

I, Johnson Wong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 制止彩电低价倾销要标本兼治_李亢.pdf

*(Digital or printed signature here above the line)*

_____

Johnson Wong
**Project Number: BBLLP_2306_P0022**

<div align="center">15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870</div>

DOI: 10.19851/11-1010/.1999.09.006

☐ **Observation and Thinking**

# Curbing the Dumping of Low-Priced Color TVs Requires a Comprehensive Approach

## By Li Kang

Since 1996, due to the increasing competition in the color TV market, the prices of color TVs have drastically dropped several times. At present, the average prices of 21-inch and 25-inch color TVs have dropped by nearly half compared with 1995, and the cumulative price drop of 29-inch color TVs is around 30%. It should be said that the reduction in the price of color TVs is conducive to promoting sales, encouraging companies to strengthen internal management, reducing costs, and enhancing risk awareness. However, in the price reduction competition, some color TV companies dumped products at prices below the cost, disrupting the normal market order, and causing disorderly competition in the entire color TV industry, excessive price drops, and sharp reductions in industry profits and national income. The significant drop in the price of color TVs has also led to continuous reductions in the prices of ancillary products such as color tubes, and many ancillary factories have fallen into difficulties that they can only maintain simple re-manufacturing.

To rectify the price order of the color TV and color tube market, protect fair competition, and safeguard national interests, with the approval of the State Council, the State Planning Commission and the Ministry of Information Industry promulgated the "Interim Measures for Preventing Unfair Price Competition of Color Cathode Ray Tubes and Color TVs" on April 1 of this year, which clarified the judgment standards for unfair price competition behaviors of color TVs and color tubes. On April 12, the Ministry of Information Industry also released the average industry cost of 21-inch and 25-inch color TVs to guide and constrain corporate pricing. Recently, a special investigation team composed of the State Planning Commission and related departments conducted individual cost determination on several color TV production companies such as Changhong, Konka, and Xiamen Overseas that are suspected of dumping at low prices.

Based on preliminary findings related to the individual costs of certain companies and an analysis of the current cost and price situation for other color TV manufacturers, low-cost dumping in the color TV market has become widespread, and is no longer limited to a few manufacturers. This is particularly the case with 21-inch and 25-inch color TVs, where years of intense price competition have left businesses with virtually no room for profit. In an effort to maintain a foothold in the fiercely competitive market, color TV manufacturers of all sizes and strengths engage, to varying degrees, in pricing their products below individual production costs across all models they produce. In fact, low-cost dumping in the color TV industry has become a widespread issue. Since July of this year, this phenomenon has rapidly spread from 21 and 25-inch screens to larger screens of 29 inches and above. Some companies have even reduced the prices of their 29-inch color TVs to levels close to that of their 25-inch models.

At the same time as the low-price dumping of color TVs, product quality issues are also continuously being exposed. For example, replacing special parts with general components, and using game console tubes instead of standard picture tubes.

It is very necessary to establish regulations to define the criteria for identifying low-price dumping, publish the average industry costs, and impose economic sanctions on unfair competitive behaviors that constitute low-price dumping. However, in the case where low-price dumping is common in the entire industry, it is difficult to fundamentally reverse the situation of disorderly competition and blind price reduction. For most companies, although the purpose of price reduction is to exclude competitors, the motivation for price reduction is largely for survival. If they do not cut prices to fight back, they will lose market share and fall into a difficult situation where they cant pay salaries and have idle employees.

At present, all 29 provinces and cities in the country have color TV production lines, with repetitive and dispersed layouts, homogeneous products, and low technological content. According to incomplete statistics, the annual production capacity of 91 color TV companies exceeds 45 million units, the output in 1998 was about 30 million units, and the sales volume was 22 million units. The output from January to May this year was 15 million units, and it is estimated that the annual output will be 36 million units, while the annual demand is only about 25 million units. From the perspective of product structure, most of our countrys color TV products are imitations of similar products abroad, and they are mainly low-to-middle-grade products. There are not many high-end digital products that fit the international trend. The inventory of color TVs is increasing year by year. At the end of 1998, the inventory increased by 62% compared with the same period of the previous year, and it increased by 51.3% from January to May this year compared with the same period of last year. Currently, the total inventory, including industrial and commercial, has exceeded 10 million units, close to one-third of the annual output. Among the inventory, about 70% are 21- and 25-inch color TVs, and the contradiction of structural oversupply is quite prominent.

(C) 1994-2023 China Academic Journal Electronic Publishing House. All rights reserved. http://www.cnki.net

As of today, in the situation where the production capacity of color TVs is seriously overstocked and the inventory of enterprises is constantly increasing, many manufacturers are still stepping up production at full power. At the same time, some domestic home appliance enterprises such as refrigerators, air conditioners, and VCDs, as well as overseas multinational corporations are also rushing to enter the color TV industry in China. In addition, smuggling of main accessories such as color tubes and integrated circuits is unstoppable. According to surveys, most color TV enterprises are using smuggled parts to varying degrees to reduce costs. Under this circumstance, the prices of various color TVs including those above 29 inches further decrease, and the possibility of intensified vicious competition is high. Currently, the international color TV industry is at a critical stage of transitioning from analog to digital technology. However, Chinas color TV industry, due to multiple price wars, lacks the capacity for large-scale technological innovation and transformation. In particular, the situation where key technologies such as color tubes and integrated circuits are controlled by foreign multinational companies hasnt changed for a long time. The gap between Chinas color TV industry and the international advanced level is trending to widen further, putting the national color TV industry in a profound crisis. To fundamentally curb the unfair pricing behavior of low-price dumping in the color TV industry, establish a normal price formation mechanism for color TVs, and protect national interests and the overall and long-term interests of the color TV industry, the key is to be determined to take strong measures, strictly control the total production of color TVs, stop low-level repetitive construction, and accelerate product structure adjustment. Specific suggestions are:

1. Strictly control the production of color TVs. Among the 91 companies nationwide, only 7 have an economic scale of 1 million units, and more than half of the companies have an output below 50,000 units. Despite suffering losses for consecutive years, many enterprises are still forcibly supported under the protection by local governments. In response to this, a market exit mechanism should be established as soon as possible to facilitate survival of the fittest. To stop low-level repetitive construction, approval for new and expanded analog color TV projects (including joint venture projects) should be stopped. Small enterprises with a production volume of fewer than 50,000 units should be forcibly merged, suspended, or converted; loans should no longer be granted to state-owned color TV enterprises that have been operating at a loss for two consecutive years; those with a debt-to-asset ratio exceeding 100% (assets not enough to cover debts) should be declared bankrupt according to law.

2. Rectify the color TV market. Carry out a clean-up of national color TV production enterprises. Any color TV production enterprise that has not been approved or is approved by exceeding the approver's authority should be ordered to stop operations; "OEM processing" workshops without technology, production capacity, and production conditions shall be resolutely banned; departments of industry and commerce, technical supervision, customs, etc. should intensify law enforcement efforts, take joint actions, and seriously punish illegal behaviors such as inferior quality, reduced functionality, and use of smuggled color tubes, holding the primarily responsible personnel legally accountable.

3. Strictly control the import of color tubes and actively expand the export of color TVs. Given the fact that domestic color tubes below 29 inches can meet the needs of color TV accessories and there is still a certain gap in color tubes above 29 inches, approval for the import of color tubes below 25 inches should be explicitly stopped and the import of color tubes above 29 inches should be strictly limited. Quotas for the import of color tubes and other accessory components should only be granted to color TV enterprises that have a record of earning foreign exchange through exports; legally imported color tubes must be affixed with anti-counterfeit labels, otherwise, they will be treated as smuggling; large color TV enterprises that earn foreign exchange through exports should be given necessary support and preferences; relevant departments should strengthen coordination and guidance of color TV export prices.

4. Promote enterprise alliance and asset restructuring. We should actively take measures from fiscal, tax, and employment aspects to encourage and actively guide color TV manufacturing enterprises to break local blockades and protectionism through asset restructuring, reverse the current situation of "the best not outperforming the worst," and realize horizontal and vertical integration by forming several large enterprise groups involving components to complete machines. We should enhance the development and research of core technologies such as integrated circuits, speed up product updates and replacements, achieve breakthroughs in digital color TV technology, and improve competitiveness in both domestic and foreign markets.

5. Encourage and protect fair competition. The aim of curbing low-price dumping in the color TV industry is to regulate market order, create a fair and sufficient competitive environment for color TV enterprises, protect legitimate and legal rights and interests of enterprises, and promote survival of the fittest. In the process of curbing low-price dumping, industry organizations and enterprises should not agree on supply prices, jointly stop production to maintain prices, or hoard components; local governments should not rigidly stipulate the quantity of local color TVs sold by commercial enterprises in their regions, nor should they give preferential treatment in terms of taxes and funds to local color TV manufacturers. These practices distort price signals, hinder the rational flow and recombination of resources, restrict normal competition, and may cause greater overproduction and increase the difficulty of structural adjustment. Therefore, it is necessary to study and formulate regulations on the identification and punishment of price monopoly behaviors as soon as possible, maintain fair competition, and create a good market price environment.

(Author's Unit: Price Department of the State Planning Commission)

(C) 1994-2023 China Academic Journal Electronic Publishing House. All rights reserved. http://www.cnki.net

DOI：10.19851/j.cnki.cn11-4010/f.1999.09.006

Case 4:07-cv-05944-JST   Document 6385-4   Filed 05/21/24   Page 263 of 284

□ 观察与思考

# 制止彩电低价倾销要标本兼治

## 李 元

1996 年以来,由于彩电市场竞争日趋激烈,彩电价格几度大幅度下降。目前,21 英寸和 25 英寸彩电平均价格较之 1995 年跌去近一半,29 英寸彩电累计降价幅度在 30% 左右。应当说,彩电降价有利于促进销售,促进企业加强内部管理,降低成本,增强风险意识。但在降价竞争中,一些彩电企业以低于产品成本的价格倾销,扰乱正常的市场秩序,造成整个彩电行业无序竞争,产品价格过度下跌,行业利润和国家收益锐减。彩电大幅度降价,还导致彩管等配套产品价格一降再降,许多配套件厂陷入只能勉强维持简单再生产的困难境地。

为整顿彩电和彩管市场价格秩序,保护公平竞争,维护国家利益,经国务院批准,国家计委、信息产业部于今年 4 月 1 日颁布施行了《关于制止彩色显像管、彩色电视机不正当价格竞争的试行办法》,明确了彩电、彩管不正当价格竞争行为的判定标准;4 月 12 日,信息产业部又发布了 21 英寸、25 英寸两种规格彩电的行业平均成本,以指导和约束企业定价。近期,国家计委会同有关部门组成专项调查组,对长虹、康佳、厦华等若干涉嫌低价倾销的彩电生产企业进行个别生产成本认定。

据对有关企业个别成本的初步认定情况,及对其他彩电企业生产成本和价格现状分析,当前彩电市场低价倾销已不限于少数厂商所为,特别是 21 英寸、25 英寸彩电,几年的降价大战导致企业几无利润空间,为了在激烈的市场竞争中保有一席之地,各彩电生产企业不论规模大小,实力强弱,在所生产的各个型号彩电中或多或少地存在出厂价格低于个别生产成本的行为。可以说,彩电低价倾销,已是一个全行业普遍性的问题。今年 7 月份以来,彩电市场的低价倾销现象迅速由 21、25 英寸向 29 英寸以上大屏幕蔓延。有的企业的 29 英寸彩电价格已降到接近 25 英寸彩电价格。

在彩电低价倾销的同时,产品质量问题也不断暴露。如用通用元器件代替专用件;用游戏机显像管代替标准显像管等。

通过制定法规,界定低价倾销认定标准,发布行业平均成本,并对构成低价倾销的不正当竞争行为实施经济制裁,是十分必要的。但在全行业普遍存在低价倾销的情况下,很难从根本上起到扭转无序竞争、盲目降价局面的作用。对多数企业而言,虽然降价的目的是为了排斥竞争对手,但从降价动机上,很大程度上是为了求生存。如果不降价应战,就要丢掉市场份额,陷入发不出工资和员工待岗的困难境地。

目前,全国 29 个省市都有彩电生产线,布局重复、分散,产品趋同,技术含量低。据不完全统计,91 家彩电企业年生产能力超过 4500 万台,1998 年产量约 3000 万台,销量 2200 万台。今年 1-5 月产量 1500 万台,预计全年产量 3600 万台,而全年需求量只有 2500 万台左右。从品种结构上看,我国彩电产品多数是对国外同类产品的模仿,并以中低档产品为主,适合国际潮流的数字化高档品种不多。彩电库存逐年增大。1998 年底库存同比增加 62%,今年 1-5 月比去年同期增加 51.3%。目前,包括工业和商业在内的

22

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.   http://

总库存量已超过1000万台，接近全年产量的三分之一。库存品中，约70%是21、25英寸彩电，结构性过剩的矛盾相当突出。

时至今日，在彩电生产能力严重过剩，企业库存量不断增加的形势下，许多厂家仍在开足马力加紧生产。与此同时，国内一些冰箱、空调、VCD等家电企业及境外跨国公司还在纷纷进入我国彩电业，另外，彩管、集成电路等主要配套件走私禁而不绝。据调查，大部分彩电企业都在不同程度地使用走私件以降低成本。在此情况下，包括29英寸以上各种规格彩电的价格进一步走低，恶性竞争加剧的可能性很大。当前，国际上彩电工业正处在由模拟技术向数字技术发展的关键性阶段，而我国彩电行业由于多次降价大战，无力大规模技术创新和技术改造，尤其是彩管、集成电路等关键技术受制于国外跨国公司的状况长期得不到改变，我国彩电工业与国际先进水平的差距有进一步拉大的趋势，民族彩电工业面临深刻的危机。为从根本上制止彩电行业低价倾销不正当价格行为，建立正常的彩电价格形成机制，维护国家利益和彩电行业的整体、长远利益，关键是要下决心采取有力措施，严格控制彩电生产总量，制止低水平重复建设，加快产品结构调整。具体建议是：

1．严格控制彩电生产。全国91家企业中产量达到100万台经济规模的仅7家，半数以上产量在5万台以下。许多企业尽管连年亏损，仍在地方政府保护下强行支撑，对此应尽快建立市场退出机制以实现优胜劣汰。为制止低水平重复建设，要停止审批新建和扩建模拟彩电项目(包括合资项目)。对产量不足5万台的小企业，要强行予以合并、停产或转产；连续两年经营亏损的国有彩电企业，要停止发放贷款；资产负债率超过100%(资不抵债)的，要依法破产。

2．整顿彩电市场。对全国彩电生产企业进行清理，凡未经审批或越权审批，擅自上马的彩电生产企业，应责令停业；对无技术、无生产能力，不具备生产条件的"贴牌加工"作

坊，要坚决取缔。工商、技术监督、海关等部门要加大执法力度，采取联合行动，对以次充好、减少功能及使用走私彩管等手段的非法行为，要严惩不贷，追究主要责任人员的法律责任。

3．严格控制彩管进口，积极扩大彩电出口。鉴于29英寸以下国产彩管已能满足彩电配套需要，29英寸以上彩管尚有一定缺口的情况，应明令停止审批25英寸以下的彩管进口，严格限制29英寸以上彩管进口。彩管和其他配套元器件的进口配额，只对有出口创汇实绩的彩电企业发放；合法进口的彩管，必须加贴防伪标志，否则按走私论处；对出口创汇的大型彩电企业，要给予必要的扶持和优惠；有关部门应加强对彩电出口价格的协调和指导。

4．促进企业联合和资产重组。要积极从财政、税收、用工等方面采取措施，鼓励并积极引导彩电生产企业通过资产重组，打破地方封锁和地方保护，扭转目前"优胜劣不汰"的状况，实现横向和纵向联合，组建若干个从元器件到整机的大型企业集团；增强集成电路等核心技术的开发研究，加快产品更新换代，实现数字式彩电技术的突破，提高在国内外市场的竞争力。

5．鼓励和保护公平竞争。制止彩电行业的低价倾销行为，目的是规范市场秩序，为彩电企业创造一个公平、充分的竞争环境，保护企业正当、合法的权益，推动优胜劣汰。在制止低价倾销过程中，行业组织和企业之间不应采取协议商定供货价格、联合停产保价、囤积配套件等做法；地方政府不得硬性规定本地区商业企业销售地产彩电的数量，不得对本地彩电厂家给予税收、资金方面的优惠。这些做法扭曲了价格信号，妨碍了资源的合理流动和重新组合，限制了正常竞争，会造成更大的生产过剩，加大结构调整的难度。为此，有必要尽快研究制定有关价格垄断行为的认定和处罚法规，维护公平竞争，创造良好的市场价格环境。

(作者单位：国家计委价格司)

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.    http://

# APPENDIX P



July 5, 2023

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, **Samuel Chong**, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 【国家计委出台八项价格、收费检查措施】-国家发展和改革委员会

*(Digital or printed signature here above the line)*

_____

**Samuel Chong**
**Project Number: BBLLP_2306_P0022**

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

June 22, 2023 Thursday

Barrier-free mode 🔵   Working mailbox ⊙

🏛 **National Development and Reform Commission**

Hot search: Oil price; guiding catalogue of industrial restructuring; feasibility study; energy; fixed assets investment

Please enter a keyword

| 🏠 Home | 🏛 Organization | 📰 News | Government Transparency | Government Service | NDRC Data | 💬 互 |

🏠 Home > News > **News Release**

## The State Planning Commission issued eight measures to inspect prices and charges

Release time: January 06, 2000      🖨 [Print]

🔴 Microblog   🟢 WeChat

Vigorous activation of the consumer market is an important part of the implementation of the policy of expanding domestic demand. However, various price violations and arbitrary charges have added to burden on enterprises, suppressed residents consumption in electricity, housing, cars and communications and affected the increase of farmers income. Wang Yang, the Vice Minister of the National Development Planning Commission, revealed at the just-held national price supervision and inspection work conference that in order to promote consumption of urban and rural residents and play the driving role of consumer demand for economic growth, the State will introduce eight price and charge inspections this year to vigorously rectify the price order, clean up all kinds of arbitrary charges, and create a good environment for urban and rural consumption.

(1) Carry out the special inspection of prices in the electric power industry nationwide. The inspection focuses on the investigation of some local governments, departments and power enterprises, which violate regulations, levy various funds and surcharges beyond their authorities and raise or raise in disguised form the price of electricity, as well as the phenomena of "power-based electricity", "relationship-based electricity", "human interest-based electricity", and supporting for people with electricity.

(2) Carry out the special inspection of charges of public security organs nationwide. The inspection focuses on the investigation of the prominent problems of some local public security organs in the aspects of applications for registered permanent residence and licenses, and arbitrary charges by traffic police, which have been strongly complained by the masses in recent years.

(3) Carry out the price inspection of the tourism industry. The inspection focuses on the investigation of arbitrary price rise, arbitrary charges, and refusal to comply with the provisions of price marking in the tourism market, in order to protect the legitimate rights and interests of consumers and promote the healthy development of the tourism market.

(4) Carry out the inspection of housing prices and property management charges. The inspection focuses on the investigation of the excessive, arbitrary and too high charges of the construction departments, land departments, real estate development enterprises, real estate markets and property management companies in the aspects of land acquisition, demolition, construction, sale and property management.

(5)  Carry out the inspection of charges of sedans except price. The inspection focuses on the investigation of various attached charges during the purchase, registration and use of sedans, and charges introduced by local governments that are beyond their powers shall be cancelled resolutely.

(6)  Carry out the inspection of education charges. The inspection focuses on the investigation of the problems of arbitrary charges in the compulsory and non-compulsory education stages, such as high fees, disguised sponsorship fees and "dual-track system" for students enrolled through enrolment expansion in some areas and schools, and cross-regional fees and cross-industry fees collected from college graduates.

(7)  Carry out the inspection of agriculture-related charges, grain prices, and flue-cured tobacco prices. The inspection focuses on the investigation of arbitrary charges in rural medical care, marriage registration, family planning and housing land, which are strongly complained by farmers. Inspection of grain prices is continued during the purchase of summer grain and autumn grain. The purchase prices of flue-cured tobacco are inspected in major tobacco-producing provinces and regions.

(8)  Carry out the re-inspection of the charge items that are explicitly ordered to cancel. The re-inspection focuses on checking whether the cancellation, consolidation and standard reduction of the charge items announced by the CPC Central Committee, the State Council, the State Planning Commission, the Ministry of Finance and the provincial peoples governments have been strictly implemented. Those who do not comply with the orders and prohibitions shall be punished sternly to ensure that the policies for reduction of enterprise's burden are implemented.

In order to implement these measures to relieve chaos and lighten burdens in consumption, the State Planning Commission requires price authorities at all levels to set up price reporting agencies, improve the reporting network, timely accept the reporting of the masses on price dumping, price monopoly, price discrimination, price fraud and other improper price behaviors, and strictly comply with the Price Law and relevant regulations and rules. At the same time, the masses are expected to actively participate in price supervision so as to prompt enterprises to strengthen price self-discipline and establish and improve the price self-restraint mechanism of the industry.



Sitemap | Contact Us

Organizer: National Development and Reform Commission

Technical support: National Information Center and China Economic Information Network

Website ID: bm04000007 Jing ICP Bei 05052393    JGAB 11010202000002

National Development and Reform Commission, all rights reserved. In case of reprint, please indicate the source

2023年6月22日 星期四　　　　　　　　　　　　　　　　　　　　　　　　　　　🕹 无障碍模式　✉ 工作邮箱



# 中华人民共和国国家发展和改革委员会
## National Development and Reform Commission

热门搜索：油价　产业结构调整指导目录　可行性研究　能源　固定资产投

请输入关键字

| 🏠 首页 | 🏛 机构设置 | 📰 新闻动态 | 🏛 政务公开 | 📋 政务服务 | 🕐 发改数据 | 💬 互 |

🏠 首页 > 新闻动态 > **新闻发布**

## 国家计委出台八项价格、收费检查措施

发布时间：2000/01/06　　　🖨 [打印]　　　　　　　　　　　　　　　　　　👁 微博　　💬 微信

　　大力启动消费市场是实施扩大内需政策的重要内容，但是由于存在各种价格违法行为和乱收费，加重了企业负担，抑制了居民在用电、买房、购车和通信等方面的消费，影响了农民收入的增加。国家发展计划委员会副主任汪洋在刚刚召开的全国价格监督检查工作会议上透露，为了促进城乡居民消费，发挥消费需求对经济增长的拉动作用，今年国家将出台八项价格、收费检查，大力整顿价格秩序，清理各种乱收费，为启动城乡消费创造一个好的环境。

　　（一）开展全国电力行业价格专项检查。重点查处一些地方政府、部门和电力企业违反规定，越权征收各种基金、附加费，提高或变相提高电价的问题，以及农村"权力电"、"关系电"、"人情电"、以电养人的现象。

　　（二）开展全国公安部门收费专项检查。重点查处近年来群众反映强烈的一些地方公安部门在办理户口、证照和交警乱收费等方面的突出问题。

　　（三）开展旅游行业价格检查。重点查处旅游市场各种乱涨价、乱收费和不执行明码标价规定的行为，保护消费者合法权益，促进旅游市场健康发展。

　　（四）开展住房价格和物业管理收费检查。重点查处建设部门、土地部门、房地产开发企业、房屋交易市场、物业管理单位在征地、拆迁、建设、出售、物业管理等各个环节收费过多、过滥、过高问题。

　　（五）开展小轿车价外收费检查。重点查处小轿车购买、入户和使用过程中各种搭车收费，坚决取消地方政府越权出台的收费项目。

　　（六）开展教育收费检查。重点查处一些地方和学校对扩招学生采取高收费，变相收取各种"赞助费"、搞"双轨制"，对高校毕业生收取跨地区费、跨行业费，以及其他在义务教育和非义务教育阶段乱收费问题。

　　（七）开展涉农收费、粮食价格、烤烟价格检查。重点查处农民反映强烈的农村医疗、婚姻登记、计划生育、建房用地等乱收费。在夏粮和秋粮收购期间继续抓好粮食价格检查。在烟叶主产省区开展烤烟收购价格检查。

　　（八）开展明令取消的收费项目的复查。重点核查党中央、国务院以及国家计委、财政部和省级人民政府历次公布取消、合并和降低标准的各种收费项目、基金、附加（费），是否真正得到严格执行。对有令不行、有禁不止的，要依法严肃处理，确保减轻企业负担的政策落到实处。

　　为了贯彻这些消费治乱减负的措施，国家计委要求各级价格主管部门，设立价格举报机构，健全举报网络，及时受理群众对低价倾销、价格垄断、价格歧视、价格欺诈等不正当价格行为的举报，严格按《价格法》及有关法规、规章进行处理。同时希望广大群众积极参与价格监督，促使企业加强价格自律，建立和完善行业价格自我约束机制。

网站地图 | 联系我们
主办单位：中华人民共和国国家发展和改革委员会
技术支持：国家信息中心 中国经济信息网

 

 

### 排行榜

*01* 关于第三监管周期省级电价及有关事项的通知(发改
　　〔2023〕526号)
　　2023-05-15

*02* 关于印发《职业教育产提升行动实施方案(2023年)》的通知
　　2023-06-13

*03* 关于做好2023年降成本通知
　　2023-06-13

*04* 关于印发《职业教育产教提升行动实施方案(2023-年)》的通知(发改社会〔号)
　　2023-06-13

*05* 关于做好2023年降成本通知(发改运行〔2023〕
　　2023-06-13

国家计委批准/口收费 / 口收费（试运行）/ 国家发展和改革委员会

网站标识码： bm04000007 京ICP备05052393号   京公网安备11010202000002号

国家发展和改革委员会 版权所有，如需转载，请注明来源



# APPENDIX Q



July 11, 2023

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, Ann Chen, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of:【规范市场价格秩序又添新规】-国家发展和改革委员会.pdf

*(Digital or printed signature here above the line)*

_Ann Chen_

_____

**Ann Chen**

**Project Number: BBLLP_2306_P0022**

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870



# New Regulations Enacted for Regulating Market Price Order

Release Date:
November 21, 2001

🖶 [Print]

On November 7, the State Planning Commission issued Decree No. 15, the Regulations on Prohibiting Price Fraud. This is the third regulation on regulating market price behavior issued by the State Planning Commission following the promulgation and implementation of the Provisions on Preventing Low-price Dumping and the Provisions on the Implementation of Clearly Marked Prices for Goods and Services since the implementation of the Price Law. The introduction of these Regulations meets the needs for the rectification and standardization of the market economic order, and will play its due role in promoting the establishment of a market credit system and creating a fair and healthy competitive environment.

Since the beginning of this year, the State Planning Commission has taken the prevention of unfair price competition as a major task for the price department to rectify and standardize the market economic order during the "Tenth Five-Year Plan" period. In particular, the investigation and punishment of price fraud, price monopoly, price discrimination, low price dumping and other price violations has become an important work of the price department. The Regulations on Prohibiting Price Fraud promulgated this time divides price fraud into price fraud behavior and price fraud means, and lists the typical manifestations of price fraud existing in the market, such as false pricing, fuzzy pricing, false markdown, false discount, inflated pricing, low price marking and high price settlement, quality price and quantity price discrepancy and fake government pricing. The definition of price fraud effectively solves the specific implementation and operation problems in regulating the pricing behavior and price means, and implements the principle of open, fair, honest and trustworthy price competition, which will be of great significance for further opening up the market and developing a unified, fair and orderly market system across the country.



无障碍模式 工作邮箱



# 中华人民共和国国家发展和改革委员会
## National Development and Reform Commission

热门搜索：油价 产业结构调整指导目录 可行性研究 能源 固定资产投

请输入关键字

首页　机构设置　新闻动态　政务公开　政务服务　发改数据　互

首页 > 新闻动态 > 新闻发布

## 规范市场价格秩序又添新规

发布时间：2001/11/21　　　[打印]　　　微博　微信

　　11月7日，国家计委颁布第15号令，发布了《禁止价格欺诈行为的规定》，这是自《价格法》实施以来，国家计委继颁布实施《关于制止低价倾销行为的规定》、《关于商品和服务实行明码标价的规定》后发布的第三部有关规范市场价格行为的规章。这部规章的出台，适应了当前整顿和规范市场经济秩序的需要，对于建立市场信用体系，创造公平良好的竞争环境，将起到其应有的促进作用。

　　今年以来，国家计委将制止不正当价格竞争作为"十五"时期价格部门整顿和规范市场经济秩序的一项主要任务，特别是查处价格欺诈、价格垄断、价格歧视、低价倾销等价格违法行为，已成为价格部门的重要工作。此次颁布的《禁止价格欺诈行为的规定》将价格欺诈行为分为标价欺诈行为和价格欺诈手段，并列举了当前市场上存在的价格欺诈的典型表现形式，如：虚假标价行为、模糊标价行为、虚假降价行为、虚假折价行为、低价标示高价结算行为、质价量价不符行为、假冒政府价格行为等。对价格欺诈的行为界定，切实解决了规范标价行为和价格手段的具体实施操作问题，贯彻了公开、公平、诚实信用的价格竞争原则，对于进一步开放市场，发展全国统一、公平竞争、规范有序的市场体系，将具有重要意义。

### 排行榜

**01** 关于第三监管周期省级电价及有关事项的通知(发改〔2023〕526号)
2023-05-15

**02** 关于印发《职业提升行动实施方案年)》的通知
2023-06-13

**03** 关于做好2023年降成本通知
2023-06-13

**04** 关于印发《职业教育产教提升行动实施方案(2023-年)的通知(发改社会〔号)
2023-06-13

**05** 关于做好2023年降成本通知(发改运行〔2023〕
2023-06-13

网站地图 | 联系我们

主办单位：中华人民共和国国家发展和改革委员会
技术支持：国家信息中心 中国经济信息网
网站标识码：bm04000007 京ICP备05052393号　京公网安备11010202000002号
国家发展和改革委员会 版权所有，如需转载，请注明来源




# APPENDIX R



July 11, 2023

**Certification**

<p align="center">**Welocalize Translations**</p>

**TRANSLATOR'S DECLARATION:**

I, Ann Chen, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of:【国家计委部署 2002 年价格监督检查工作---加大执法力度，注重标本兼治 整治群众反映强烈的价格和收费问题】-国家发展和改革委员会.pdf

*(Digital or printed signature here above the line)*

Ann Chen

_____

**Ann Chen**

**Project Number: BBLLP_2306_P0022**

6/22/23, 11:17 PM 【国家计委部署2002年价格监督检查工作---加大执法力度，注重标本兼治 整治群众反映强烈的价格和收费问题】-国家发展和改革...

2023年6月22日 星期四

 无障碍模式 工作邮箱


中华人民共和国国家发展和改革委员会
National Development and Reform Commission

热门搜索：油价 产业结构调整指导目录 可行性研究 能源 固定资产投

请输入关键字

⌂ 首页　　🏛 机构设置　　🔔 新闻动态　　📢 政务公开　　📋 政务服务　　⊙ 发改数据　　◎ 互

⌂　Homepage > News updates > **News release**

## The State Planning Commission Deployed the Price Supervision and Inspection Work in 2002 - to Strengthen Law Enforcement, and Rectify the Problems of Prices and Fees That the People Seriously Complain about Focusing on Both Manifestations and Root Causes

Release Date: January 🖨 [Print]
10, 2002

 Weibo　WeChat

In 2001, guided by the important thought of "Three Represents" of Jiang Zemin and based on the Decision of The State Council on Rectifying and standardizing the Order of the Market Economy, the price authorities at all levels vigorously carried out special rectification actions on the price and fee issues related to the vital interests of the people. By enhancing both punishment and focusing on the treatment of both manifestations and root causes, we were committed to creating a good environment for maintaining the sustained, rapid and healthy development of the national economy. The work to rectify and standardize the order of market prices has achieved initial results, and won the support and praise of the broad masses of the people. From January to November, a total of 236,000 cases of price violations were investigated and dealt with nationwide, with a total amount of economic sanctions reaching RMB3.15 billion, of which RMB1.84 billion was returned to users and RMB1.31 billion was handed over to the government finance.

-- Launching a nationwide inspection of the prices of drugs and medical services: More than 20,000 inspectors were dispatched across the country to inspect more than 30,000 medical units, and more than 20,000 cases of various types of price violations were found, with illegal gains of more than RMB1.3 billion. This inspection has played an important role in regulating the price-related behavior of pharmaceutical production and distribution enterprises and medical institutions and safeguarding the vital interests of the people.

-- Launching a special inspection of rural electricity prices and charges for upgrading the rural power grid: Under the unified deployment of the State Planning Commission, the local authorities concentrated strength to resolutely investigate and punish the behavior of charging arbitrarily by the opportunity of rural power grid transformation in an intensive manner, treat such cases strictly in accordance with law, return the excess money to farmers, and effectively ensure the smooth progress of "transformation of rural power grid, reform of rural electricity consumption management and same price for urban and rural areas of same power grid". According to statistics from 28 provinces and cities, local governments have returned RMB330 million to farmers, confiscated RMB81 million of illegal gains and fined RMB8.4 million.

-- Launching special inspections of land and housing fees nationwide: According to the instructions of Vice Premier Wen Jiabao, the State Planning Commission and other departments have launched a special inspection of land and housing fees. According to incomplete statistics, illegal income of RMB1.67 billion has been investigated nationwide. We have found out the problems, analyzed the reasons, and put forward the countermeasures. At present, the inspection work is still in progress.

-- Launching special inspections of grain prices in major grain-producing areas nationwide: In order to rectify grain price order, safeguard the interests of farmers, and promote the smooth reform of the grain distribution system, we carried out special inspections of grain prices in major grain-producing areas, focusing on the act of withholding miscellaneous levies, lowering grade and price, and harming the interests of farmers in the process of grain purchase. At present, some places have achieved initial results. In addition, under the unified deployment of the State Planning Commission, the local governments have curbed the arbitrary charges on major construction projects, urged and inspected the implementation of cancellation of 238 traffic and vehicle charges, and rectified the order of agriculture-related prices and charges. Some local authorities have also carried out checks on primary and secondary school fees, road and bridge fees, and fuel price, Spring Festival passenger ticket price checks and holiday travel price checks.

-- Launching a national unified price violation reporting hotline, mobilizing the people to participate in price supervision: Local governments have launched the price violation reporting hotline 12358, broadening the channels for the masses to report price violations, and expanding the impact of price-related work. From January to November, a total of 213,000 price reports were accepted nationwide. We carried out the activities of "trustworthy price and measurement", and vigorously advocated fair, legal, honest and trustworthy business ethics among operators. We launched the "Five one demonstrations" activities in education, healthcare, tourism, commerce, telecommunications and other industries. During the Consumer Rights Protection Day (March 15), we vigorously publicized price laws and regulations to enhance consumers' awareness of self-protection.

-- Enhancing the deterrent power of price administrative law enforcement by holding press conferences and other forms to reveal typical cases: The State Planning Commission and local departments of Heilongjiang, Liaoning and Hubei held press conferences to announce the investigation and punishment of illegal charges and price increases in primary and secondary schools, medical institutions and rural power grid transformation, which evoked strong resonance in the society, deterred price violations, publicized price regulations, established law enforcement authority, and won the praise and support of the people. The central and local media also made a lot of publicity and reports on the special price rectification, creating a public opinion atmosphere to rectify and standardize the price order.

The general requirements for price supervision and inspection in 2002 are as follows: Guided by the important thought of Three Represents, we shall thoroughly implement the decisions of The State Council to rectify and standardize the order of the market economy, strengthen oversight and inspection of prices and fees administered by the government, intensify law enforcement, address both the manifestations and root causes, achieve phased results in addressing prominent problems with which the people are strongly concerned, and create a favorable environment for economic development and social stability.

(I) To vigorously carry out inspections of prices and charges related to agriculture, effectively reduce the burden on farmers, and promote social stability and economic development in rural areas: The price authorities at the county level shall focus on the inspection of agriculture-related prices and charges and pay great importance to it, ensuring enhanced leadership, careful organization and thorough arrangements. With an emphasis on the life and production of farmers, the inspection shall focus on the prices and charges related to primary and secondary school education, land used for housing construction, family planning, marriage registration, migrant work, grain, flue-cured tobacco, water and electricity, and the upgrading of rural power grids. We must not only seriously accept the complaints and reports of the masses, but also carry out dragnet inspections one by one; not only enhance the law enforcement to ensure that once any price violation is found, it will be addressed, and the　overcharged price will be returned to the farmer in full, but also study the measures to cure the root cause, so as to prevent the occurrence of price violations at the source.

排行榜

01 关于第三监督周期省级电价及有关事项的通知(发改〔2023〕526号)
2023-05-15

02 关于印发《职业教育产教融合赋能提升行动实施方案(2023-2025年)》的通知
2023-06-13

03 关于做好2023年降低成本重点工作的通知
2023-06-13

04 关于印发《职业教育产教融合赋能提升行动实施方案(2023-2025年)》的通知(发改社会〔号)
2023-06-13

05 关于做好2023年降低成本重点工作的通知(发改运行〔2023〕号)
2023-06-13

(II) To rectify the problems of prices and charges that affect the vital interests of the people, focusing on education, medicine and medical services: At present, indiscriminate price increases and arbitrary charges in primary and secondary schools, drugs and medical services are still hot spots for price complaints and reports, and some organizations have committed repeated violations despite repeated investigations and bans, causing strong response of all sides. In 2002, with this as the focus, we shall step up oversight and inspection of prices, make solid efforts to achieve results, curb arbitrary charges in education, and improve the order of prices of drugs and medical services. Local authorities may organize special inspection for the whole province, and adopt the method of down-checking or cross-checking; or dispatch special personnel to form a number of inspection teams to focus on inspecting some areas or organizations over a period of time. For serious problems and repeated violations, the problems identified and the results of handling should be publicized through the media to act as a deterrent, and the relevant personnel should also be held accountable according to law. Local governments should arrange regular checks on the prices of public utilities, such as water, electricity and gas, which are closely related to people's lives, and establish corresponding systems.

(III) To vigorously regulate the charges of administrative institutions, focusing on rectifying the problem of arbitrary charges strongly reflected in society: At present, the people and enterprises make serious complaints about some administrative departments and their subordinate institutions for arbitrarily charging fees by virtue of their power and status. In order to reduce the burden on enterprises and the masses and standardize the charging behavior of administrative organs, price authorities at all levels should strengthen the supervision and inspection of the charges of administrative organs leading to serious complaints from the masses, and promptly accept complaints and reports from the masses. We shall analyze the causes according to the problems found, fix the loopholes, help the inspected units to sum up experiences and lessons, establish and improve the system, and improve the relevant charging policies. In order to stop arbitrary tolling of vehicles and for use of roads, we shall carry out inspections of car tolling in some large and medium-sized cities, and organize special rectification of road and bridge tolling.

(IV) To stop unfair pricing practices and effectively safeguard the legitimate rights and interests of consumers and business operators: Price fraud, price discrimination, low-price dumping, profiteering and other unfair price acts that disrupt market order and undermine the legitimate rights and interests of consumers and business operators must be resolutely stopped. In 2002, we should focus on banning price fraud, and strictly investigate and punish the behavior of deceiving and inducing consumers or other business operators, such as false pricing, misleading prices, inconsistent quality and price, and giving less quantity to consumers. We shall vigorously publicize the Provisions of the State Planning Commission on Prohibiting Price Fraud through various forms. We shall continue to carry out the activities of "ensuring honest pricing and prohibiting price fraud" before and after "March 15". We shall continue to give full play to the role of the organization of employee price supervision.

(V) To improve the system and network and further enhance price violation reporting: All the local authorities should earnestly implement the Provisions of the State Planning Commission on Reporting Price Violations, attach great importance to the work of price reporting, and continue to give full play to the "12358" reporting hotline. Where conditions permit, the local authorities should be equipped with special vehicles to deal with complaints and reports, establish a director reception day system, seriously investigate and deal with complaints and reports in line with the principles of "Handling in accordance with the law, promptly and on the spot", and provide the result feedbacks to the whistleblower in a timely manner. The reporting procedures and document formats should be further standardized, and a sound reporting system should be established. The analysis and research of price reporting shall be strengthened, focusing on the discovery of problems with tendency of price violation, and solutions shall be proposed.

(VI) To give full play to the role of public opinion supervision, improve the social supervision network, and carry out the "trustworthy price and measurement" campaign: We shall attach great importance to and effectively strengthen public opinion supervision and publicity work, establish a press conference system; disclose the investigation and punishment of some typical cases, and report the progress and achievements of special rectification work. Where conditions permit, price supervision stations can be set up in towns and villages, and price supervisors can be hired in villages, forming a three-level supervision network of counties, townships and villages, and comprehensively covering the rural market. We shall continue to carry out the activities of "trustworthy price and measurement", participate in the activities of "One million stores without fake goods in one hundred cities", advocate fair, legal, honest and trustworthy business ethics, and guide operators to enhance self-restraint.

(VII) To strengthen the legal system, ensuring that laws are strictly followed, law enforcement is strict, and violations are investigated: We shall continue to formulate regulations and normative documents that are compatible with the "Price Law" and the "Provisions on Administrative Penalties for Price Violations". We shall take concrete measures to solve the problem of lax law enforcement and impunity for violations of the law: 1. To launch the responsibility system of administrative law enforcement and establish the wrong case judgment responsibility investigation system; 2. To explore the open trial of cases of price violations to achieve justice, openness and fairness, and increase the transparency of trial; 3. To strictly implement the working rules of case trial committees and adhere to the system of collective deliberation of major cases; 4. To limit the discretionary range of administrative punishment, and ensure that no one can reduce or cancel fines at will; 5. To strictly implement the prescribed procedures, ensuring "clear facts, solid evidence, accurate determination, appropriate handling, complete procedures, and legal procedures".

(VIII) To change the style of work, improve work, and vigorously strengthen the development of price supervision and inspection teams: 1. We shall continue to carry out activities to establish standardized price inspection stations. 2. We shall vigorously strengthen the training of cadres. Various types of training courses and seminars shall be held to improve the quality of law enforcement personnel. 3. We shall go deep into reality, investigate and study, and put forward specific opinions on strengthening and improving the price supervision and inspection work in accordance with the overall requirements of "setting rules and acting as judges". 4. We shall win support from the relevant parties, guarantee the funds for handling cases, improve law enforcement equipment and strengthen infrastructure construction. 5. We shall strengthen the guidance of grass-roots work and enhance the vertical and horizontal information exchange within the system. 6. We shall strictly implement the provisions on the development of clean government, establish and improve a series of relevant systems, and maintain the favorable image of the price supervision and inspection team.





网站地图 ｜ 联系我们

主办单位：中华人民共和国国家发展和改革委员会
技术支持：国家信息中心 中国经济信息网
网站标识码：bm04000007 京ICP备05052393号 京公网安备110102020000002号
国家发展和改革委员会 版权所有，如需转载，请注明来源





2023年6月22日 星期四

 

♿ 无障碍模式 | ✉ 工作邮箱 | 🌐



# 中华人民共和国国家发展和改革委员会
## National Development and Reform Commission

热门搜索： 油价 产业结构调整指导目录 可行性研究 能源 固定资产投

请输入关键字

🏠 首页 | 🏛 机构设置 | 📰 新闻动态 | 🏛 政务公开 | 📋 政务服务 | 🕐 发改数据 | ☐ 互

🏠 首页 > 新闻动态 > **新闻发布**

## 国家计委部署2002年价格监督检查工作---加大执法力度，注重标本兼治 整治群众反映强烈的价格和收费问题

发布时间：2002/01/10　🖨 [打印]

 微博　　💬 微信

　　2001年，各级价格主管部门以江泽民同志"三个代表"重要思想为指导，认真贯彻《国务院关于整顿和规范市场经济秩序的决定》，围绕关系群众切身利益的价格、收费问题，大张旗鼓地开展专项整治行动，加大处罚力度，坚持标本兼治，着力为保护国民经济持续快速健康发展创造良好环境。整顿和规范市场价格秩序工作初见成效，得到了广大人民群众的拥护、支持和好评。1-11月份，全国共查处价格违法案件23.6万件，实现经济制裁总金额31.5亿元，其中退还用户18.4亿元，上缴财政13.1亿元。

　　——开展全国药品及医疗服务价格专项检查。全国共抽调检查人员2万多人次，检查医药单位3万多家，查出各类价格违法案件7万余件，违法金额13亿多元。这次检查对规范医药品生产经营企业、医疗单位的价格行为，维护广大人民群众的切身利益，发挥了重要作用。

　　——开展全国农村电价和农网改造收费专项检查。各地按照国家计委的统一部署，集中时间，集中力量，坚决查处借农网改造之机乱收费的行为，依法严肃处理，将多收的钱退还给农民，切实保证了"两改一同价"的顺利进行。据对28个省市的统计，各地已退还农民3.3亿元，没收违法所得8100万元，罚款8000万元。□

　　——开展全国土地和住房收费专项检查。根据温家宝副总理的批示，国家计委会同有关部门开展了土地和住房收费专项检查。据不完全统计，全国已查出违法所得金额16.7亿元，初步查清了问题，分析了原因，提出了治理的对策。目前，检查工作仍在进行之中。□

　　——开展全国粮食主产区粮价专项检查。为整顿粮食价格秩序，维护广大农民利益，促进粮食流通体制改革顺利进行，在粮食主产区开展了粮价专项检查。重点检查粮食收购过程中违反规定扣杂扣水、压级压价，损害农民利益的行为。目前，部分地方已取得了初步成效。□此外，各地还在国家计委的统一部署下，治理向重大建设项目乱收费，督促检查已取消的238项交通和车辆收费的落实情况，整顿涉农价格和收费秩序。一些地方还开展了中小学收费、路桥收费、成品油价格检查、春运客票价格检查以及节假日旅游价格检查等。

　　——开通全国统一号码的价格举报电话，发动广大人民群众参与价格监督。各地相继开通12358价格举报电话，拓宽了群众举报价格违法行为的渠道，扩大了价格工作的影响。1-11月，全国共受理价格举报21.3万件。深入开展"价格、计量信得过"活动，在经营者中大力倡导公平、合法和诚实守信的商业道德。在教育、医疗、旅游、商业、电信等行业开展明码标价"五个一示范"活动。在"3.15"消费者权益保护日期间，大力宣传价格法律法规，增强消费者的自我保护意识。□

　　——通过召开新闻发布会等形式揭露典型案件，增强了价格行政执法的威慑力。国家计委以及黑龙江、辽宁、湖北等地通过召开新闻发布会的形式，公布对中小学收费、医疗单位以及农网改造乱收费、乱加价案件的查处情况，在社会上引起强烈反响，震慑了价格违法行为，宣传了价格法规，树立了执法权威，群众纷纷来信表示赞成和拥护。中央和地方的媒体还对价格专项整治作了大量宣传报道，营造了整顿和规范价格秩序的舆论氛围。□□

　　2002年价格监督检查工作总的要求是：以"三个代表"重要思想为指导，深入贯彻国务院整顿和规范市场经济秩序的决定，加强对政府管理的价格和收费的监督检查，加大执法力度，注重标本兼治，在解决群众反映强烈的突出问题上取得阶段性成果，为经济发展和社会稳定创造良好环境。

　　（一）大力开展涉农价格和收费检查，切实减轻农民负担，促进农村社会稳定和经济发展。县一级价格主管部门应把主要精力用于开展涉农价格和收费检查，做到高度重视、加强领导、精心组织、周密安排。围绕农民生活、生产，把中小学教育、建房占地、计划生育、婚姻登记、外出劳工、粮食、烤烟、用水、用电及农网改造等方面价格、收费作为检查的重点。既要认真受理群众的投诉举报，也要逐个乡镇进行拉网式检查；既要加大执法力度，对价格违法行为发现一起，查处一起，将多收价款如数退还给农民，又要研究治本的措施，注重从源头上遏制价格违法行为的发生。□

（二）以教育、药品和医疗服务为重点，整治涉及群众切身利益的价格、收费问题。当前，中小学校、药品和医疗服务乱加价、乱收费仍然是价格投诉举报的热点，一些单位屡查屡犯、屡禁不止，各方面反映十分强烈。2002年要以此为重点，继续加大价格监督检查力度，扎实工作，抓出成效，使教育乱收费有所遏制，药品和医疗服务价格秩序有所好转。各地可组织全省性的专项检查，采取下查一级或交叉检查的方法；也可抽调人员，组成若干检查组，在一段时间内，集中检查一些地区或单位。对问题严重、屡查屡犯的，要通过媒体公布查出的问题和处理结果，以起到震慑作用，还应依法追究有关人员的责任。对与群众生活密切相关的公用事业价格，如水、电、气等，地方要安排常规性检查，并建立相应的制度。

（三）以整顿社会反映强烈的乱收费问题为重点，大力规范行政事业单位的收费行为。当前，群众和企业对一些行政部门及其下属单位凭借权力、地位乱收费，反映强烈。为减轻企业和群众负担，规范行政机关收费行为，各级价格主管部门要加强对群众反映强烈的行政机关收费的监督检查，并及时受理群众投诉举报。要根据查出的问题分析原因，堵塞漏洞，帮助被查单位总结经验教训，建立健全制度，改进和完善有关政策。为制止围绕车辆和道路的乱收费，在部分大中城市开展小轿车收费检查，组织开展对路桥收费的专项整治。

（四）制止不正当价格行为，切实维护广大消费者和经营者的合法权益。价格欺诈、价格歧视、低价倾销、牟取暴利等不正当价格行为，扰乱市场秩序，损害消费者和经营者的合法权益，必须坚决予以制止。2002年要以禁止价格欺诈为重点，严厉查处虚假标价、价格误导、质价不符、短缺数量等欺骗、诱导消费者和经营者的行为。通过各种形式的大力宣传国家计委《禁止价格欺诈行为的规定》。在"3.15"前后，继续开展"诚实规范标价、禁止价格欺诈"活动。继续发挥职工价格监督组织的作用。

（五）健全制度，完善网络，进一步做好价格举报工作。各地要认真贯彻实施国家计委《价格违法行为举报规定》，高度重视价格举报工作，继续发挥"12358"举报电话的作用。有条件的地方要配备处理投诉举报的专用车辆，建立局长接待日制度，本着"依法、及时、就地处理"的原则，认真查处投诉举报案件，并及时将结果反馈给举报人。进一步规范举报工作程序和文书格式，建立健全举报制度。加强对价格举报的分析研究，注意发现带有苗头性、倾向性的问题，并提出解决的意见。

（六）发挥舆论监督作用，健全社会监督网络，深入开展"价格、计量信得过"活动。高度重视并切实加强舆论监督和宣传工作，建立新闻发布会制度；披露对一些典型案件的查处情况，报道专项整治工作的进展和取得的成果。有条件的地方可在乡镇设立价格监督站，在村庄里聘请价格监督员，形成县、乡、村三级监督网络，全方位覆盖农村市场。继续深入开展"价格、计量信得过"活动，参与"百城万店无假货"活动，倡导公平、合法和诚实守信的商业道德，引导经营者增强自我约束能力。

（七）加强法制建设，坚决做到有法必依、执法必严、违法必究。继续制定与《价格法》、《价格违法行为行政处罚规定》相配套的规章及规范性文件。采取切实措施解决执法不严、违法不究的问题：一是推行行政执法责任制，建立错案责任追究制度；二是探索价格违法案件公开审理，作到公正、公开、公平，增加审理案件的透明度；三是严格执行案件审理委员会工作规则，坚持重大案件集体审议制度；四是限制行政处罚中的自由裁量幅度，作到不能随意减免罚没款；五是严格履行规定的程序，作到"事实清楚，证据确凿，定性准确，处理恰当，手续完备，程序合法"。

（八）转变作风，改进工作，大力加强价格监督检查队伍建设。一是继续深入开展创建规范化物价检查所活动。二是大力加强干部培训工作。通过举办各种类型的培训班、研讨班，提高执法人员素质。三是深入实际，把握"定规则、当裁判"的总体要求，提出加强和改进价格监督检查工作的具体做法。四是争取有关方面支持，保证办案经费，改善执法装备，加强基础设施建设。五是加强对基层工作的指导，加强系统内部纵向和横向的信息交流。六是严格执行廉政建设的各项规定，建立和完善一系列相关制度，保持价格监督检查队伍的良好形象。

 

**网站地图 | 联系我们**

主办单位：中华人民共和国国家发展和改革委员会
技术支持：国家信息中心 中国经济信息网
网站标识码：bm04000007 京ICP备05052393号 京公网安备11010202000002号
国家发展和改革委员会 版权所有，如需转载，请注明来源

  




# APPENDIX S



July 11, 2023

**Certification**

<p align="center">**Welocalize Translations**</p>

**TRANSLATOR'S DECLARATION:**

I, Ann Chen, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of:【十三类价格违法行为 可以向价格主管部门举报】-国家发展和改革委员会.pdf

*(Digital or printed signature here above the line)*

*Ann Chen*

_____

**Ann Chen**

**Project Number: BBLLP_2306_P0022**

<p align="center">15 W. 37th Street 4th Floor<br/>
New York, NY 10018<br/>
212.581.8870</p>

【十三类价格违法行为 可以向价格主管部门举报】-国家发展和改革委员会

2023年6月22日 星期四                                                                          ◎ 无障碍模式  ⊠ 工作邮箱 ◎



热门搜索：油价 产业结构调整指导目录 可行性研究 能源 固定资产投

请输入关键字

| ⌂ 首页 | 🏛 机构设置 | 📖 新闻动态 | 📡 政务公开 | 🗐 政务服务 | 👁 发改数据 | ⊠ 互 |

🏠

Homepage  >  News updates  >  News release

# Thirteen Kinds of Price Violations can be Reported to the Price Authorities

Release Date: August 19, 2004   ⎙ [Print]                         Weibo    WeChat

排行榜

01  关于第三监管周期省级电
价及有关事项的通知(发改
〔2023〕526号)
2023-05-15                     

02  关于印发《职业教育产教
提升行动实施方案(2023-
年)》的通知
2023-06-13

03  关于做好2023年降成本
通知
2023-06-13

04  关于印发《职业教育产教
提升行动实施方案(2023-
年)》的通知(发改社会〔
号)
2023-06-13

05  关于做好2023年降成本
通知(发改运行〔2023〕
2023-06-13

In order to protect the rights of citizens, legal persons or other organizations to report price violations according to law, further facilitate the masses to report price violations, and improve the work efficiency of the price authorities, the National Development and Reform Commission recently issued the "Regulations on Reporting Price Violations" with the Director's Order No. 15, which will be implemented from October 1, 2004. According to these Regulations, citizen legal persons or other organizations can report to the local price authorities if they find any of the following 13 categories of price violations:

(I) acts of colluding with each other, manipulating market prices and harming the legitimate rights and interests of other business operators or consumers;

(II) acts of dumping goods at a price below cost in order to exclude competitors or monopolize the market, which disrupts the normal order of production and business, and harms the interests of the state or the legitimate rights and interests of other business operators, except for selling fresh goods, seasonal goods, or overstocked goods at reduced prices according to law;

(III) acts of price discrimination against other business operators with the same trading conditions when providing the same goods or services;

(IV) acts of fabricating or spreading information about price increases, bidding up prices, and promoting excessively high commodity prices;

(V) acts of using false or misleading price means to induce consumers or other business operators to transact;

(VI) acts of raising or lowering the price of goods or services in a disguised way by means of raising or lowering the grade when purchasing or selling goods or providing services;

(VII) acts of profiteering in violation of laws and regulations;

(VIII) acts of refusing to implement government-guided or government-fixed prices;

(IX) acts of refusing to implement statutory price intervention measures or emergency measures;

(X) acts in violation of the provisions on clearly marking price;

(XI) acts of providing false information when receiving price supervision and inspection;

(XII) arbitrary charges by administrative organs;

(XIII) Other price violations that should be addressed by the competent price department.

The whistleblower can report the above price violations without signing his name, as long as the name and address of the reported subject and the facts and relevant evidence of the violation of the price laws, regulations, rules or normative documents are provided. However, if a reply is required, effective contact information shall be provided.

The price authorities need to provide convenience for whistleblowers to report price violations under these Regulations. The competent price department shall publicize the price violation reporting hotline 12358, correspondence address and office address to the public, handle the reports received in accordance with law and keep them confidential for the whistleblowers. For typical cases of price violation reporting with great social impact, the competent price department may publicize them through news media, and provide incentives to the persons who report price violations and render meritorious service in accordance with the relevant provisions.

According to the relevant responsible person of the National Development and Reform Commission, the price authorities at all levels should take the promulgation and implementation of the Provisions on Reporting of Price Violations as an opportunity to enhance the work of price violation reporting, improve the working system in accordance with the requirements of the important thought of "Three Represents", ensure that the price violation reporting hotline 12358 is unimpeded and the price violation reporting is warmly accepted, so as to actively help the people solve their problems and protect their legitimate price-related rights and interests.

网站地图 | 联系我们

主办单位：中华人民共和国国家发展和改革委员会
技术支持：国家信息中心 中国经济信息网
网站标识码：bm04000007 京ICP备05052393号   京公网安备11010202000002号
国家发展和改革委员会 版权所有，如需转载，请注明来源

       

2023年6月22日 星期四

🌐 无障碍模式 | ✉ 工作邮箱



# 中华人民共和国国家发展和改革委员会
## National Development and Reform Commission

热门搜索：油价 产业结构调整指导目录 可行性研究 能源 固定资产投

请输入关键字

🏠 首页 | 🏛 机构设置 | 📰 新闻动态 | 🏢 政务公开 | 📋 政务服务 | 🕐 发改数据 | 💬 互

🏠 首页 > 新闻动态 > **新闻发布**

## 十三类价格违法行为 可以向价格主管部门举报

发布时间：2004/08/19   🖨 [打印]

👁 微博   💬 微信



为保障公民、法人或者其他组织依法行使举报价格违法行为的权利，进一步方便群众举报价格违法行为，提高价格主管部门的工作效率，国家发展改革委近日以15号主任令发布了《价格违法行为举报规定》，该《规定》将从2004年10月1日起施行。根据《规定》，公民法人或者其他组织发现以下十三类价格违法行为，可以向当地价格主管部门举报：

（一）相互串通，操纵市场价格，损害其他经营者或者消费者合法权益的行为；

（二）在依法降价处理鲜活商品、季节性商品、积压商品等商品外，为了排挤竞争对手或者独占市场，以低于成本的价格倾销，扰乱正常的生产经营秩序，损害国家利益或者其他经营者的合法权益的行为；

（三）提供相同商品或者服务，对具有同等交易条件的其他经营者实行价格歧视的行为；

（四）捏造、散布涨价信息，哄抬价格，推动商品价格过高上涨的行为；

（五）利用虚假的或者使人误解的价格手段，诱骗消费者或者其他经营者与其进行交易的行为；

（六）采取抬高等级或者压低等级等手段收购、销售商品或者提供服务，变相提高或者压低价格的行为；

（七）违反法律、法规的规定牟取暴利的行为；

（八）不执行政府指导价、政府定价的行为；

（九）不执行法定的价格干预措施、紧急措施的行为；

（十）违反明码标价规定的行为；

（十一）在接受价格监督检查时提供虚假资料的行为；

（十二）行政机关乱收费的行为；

（十三）应当由价格主管部门受理的其他价格违法行为。

举报人举报以上价格违法行为，只要提供被举报人的名称、地址及被举报人违反价格法律、法规、规章或者规范性文件的事实及有关证据即可，可以不署名举报。但要求答复的，应当提供有效的联系方式。

《规定》要求价格主管部门为举报人举报价格违法行为提供方便。要向社会公布12358价格违法行为举报电话、通讯地址和办公地址；要依法处理受理的举报，并为举报人保密；对社会影响大的价格举报典型案例，价格主管部门可以通过新闻媒体予以公布，并对举报价格违法行为的有功人员及按有关规定给予鼓励。

国家发展改革委有关负责人指出，各级政府价格主管部门要以《价格违法行为举报规定》发布施行为契机，继续高度重视价格举报工作，按照"三个代表"重要思想的要求，不断完善工作制度，确保12358举报电话畅通，热情受理价格举报，积极为民排忧解难，努力保护群众合法价格权益。

**网站地图 | 联系我们**

主办单位：中华人民共和国国家发展和改革委员会
技术支持：国家信息中心 中国经济信息网
网站标识码：bm04000007 京ICP备05052393号 京公网安备11010202000002号
国家发展和改革委员会 版权所有，如需转载，请注明来源

 

