# Exhibit 128



July 17, 2023

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, **Samuel Chong**, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 关于认真做好制止低价倾销工作及开展对低价倾销进行检查的通知.pdf

*(Digital or printed signature here above the line)*

_____

**Samuel Chong**
**Project Number: BBLLP_2306_P0022**

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

Case 4:07-cv-05944-JST Document 6285 Filed 05/21/24 Page 3 of 290

7/12/23, 8:58 AM

Guangdong Provincial Development and Reform Commission - Notice on Earnestly Stopping Price Dumping and Carrying out Inspection of Price Dumping

## Guangdong Provincial Development and Reform Commission

Guangdong Provincial Development and Reform Commission

Home    Government Transparency    Government Affairs    Interaction    Special Columns    Query & Download

Please enter search content…

Your location: Home > Government Transparency > Policy Documents > Normative Documents

## Notice on Earnestly Stopping Price Dumping and Carrying out Inspection of Price Dumping

Information source: This website    Time: March 12, 2003 00: 00: 00    Font: [Large] [Medium] [Small]

**Notice of State Planning Commission on Earnestly Stopping Price Dumping and Carrying out Inspection of Price Dumping**

**January 16, 1999    JJG [1999] No. 42**

Price bureaus (commissions) of all provinces, autonomous regions, municipalities directly under the Central Government, cities specifically designated in the state plan, and sub-provincial provincial capitals:

In order to implement the spirit of the instructions of the leading comrades of the State Council and earnestly stop price dumping, the relevant matters are hereby notified below:

1. In recent years, with the development of the economy, product oversupply and price-reduced competition among companies appear in some industries. Price competition among companies helps promote product sales and the balancing of total market supply and demand, prompts companies to strengthen internal management and reduce production costs, drives the progress and new-product development of companies and facilitates economic restructuring and rational allocation of resources. However, some companies sell at prices lower than product cost and some companies resort to price dumping by using smuggled raw materials or reducing product quality or by other illegal means, disrupting the normal price order and damaging the legitimate rights and interests of business operators and consumers. Therefore, price departments at all levels shall fully understand the necessity and urgency of stopping price dumping, and according to a series of regulatory documents for stopping price dumping promulgated by the State Planning Commission, shall resolutely stop price dumping and other price misconducts according to law to maintain the normal economic order while protecting and promoting competition.

2. In order to effectively stop price dumping, all areas shall investigate the companies, which sell products below the average cost of the industry and shall focus their inspection work on the prices of flat glass, steel, color cathode ray tubes, color TV sets and sugar in the first half of 1999. The inspection includes the following specific content:

(1)　Do the factory prices of production companies and the sales prices of distribution companies contain the behavior of price dumping set forth in Article 5 of the Regulation for Stopping Unfair Product Behavior of Price Dumping of Industrial Products promulgated by the State Planning Commission and the State Economic and Trade Commission and prescribed in the regulations for stopping price dumping of flat glass, steel and other products;

(2)　Do the factory prices of production companies and the sales prices of distribution companies contain the behavior of cost reduction and price dumping by using smuggled raw materials, parts and accessories, using shoddy goods for quality goods, reducing functions, lowering quality, or misstating or understating costs or by other illegal means;

(3)　Are the factory prices of production companies and the sales prices of distribution companies lower than the lower limits of the government-guided prices.

Each area can, according to the actual situation, determine by itself the key products for stopping price dumping and carry out inspection.

3. Before carrying out inspection, each area shall go deep into the grassroots, make a good investigation and research, figure out the situation and determine the organizations and product varieties to be inspected, and shall do a good job in pilot inspection, and properly organize centralized inspection on the basis of accumulating experience.

4. For the products included in the list for stopping price dumping, the companies can be required to first conduct self-inspection, and forces shall be organized to inspect some key companies. The companies, which are found using smuggled raw materials, parts and accessories, reducing functions, using shoddy goods for quality goods, or misstating cost, shall be ordered to make correction and be punished according to the relevant regulations until the relevant departments are requested to revoke their business licenses. All areas shall seriously accept the reports of price dumping behavior, and shall timely investigate and deal with the companies reported to have the problem of price dumping.  The State Planning Commission will set up working groups, which will organize relevant departments to conduct special investigations during supervision and guidance in some areas.

5. In the process of stopping price dumping and other improper price behaviors, all areas shall pay attention to the protection of fair, proper and lawful price competition and shall not limit competition and protect the backward. The identification, investigation and handling of price dumping behavior must use the advanced and reasonable individual costs of companies as the primary judgment basis, and the average cost of the industry published by the competent authorities as a reference basis. Companies selling their products below the average cost of the industry, but not below their own costs, shall not be punished as price dumping. The collusion between companies for price monopoly and oppression of other competitors, or artificial inflation of prices for seeking interests shall be stopped according to the relevant provisions of the Price Law.

6. Given the strong policy orientation and high difficulty of the work of stopping price dumping, the price departments at all levels shall, under the unified leadership of local governments, accurately grasp the policy boundaries, administer according to law, and enforce the laws strictly. Typical price dumping cases with serious circumstances and bad nature shall be publicly exposed to prompt the companies to restrain themselves and consciously comply with relevant state price laws, regulations and policies, thus effectively stopping blind price cuts and vicious competition among companies.

7. All areas shall report their experience, problems and major typical cases in the work of stopping price dumping to the State Planning Commission in a timely manner.



**Shared to** ⭐ 🔵 🔴 🟢

✕ Close the window    🖨 Print the paper.

| Related Websites ∨ | Bureaus/subordinates of the Commission ∨ | Agencies directly under provincial jurisdiction ∨ | Prefecture-level development and reform bureaus (commissions) ∨ | National and Provincial/municipal development and reform commissions ∨ | Other links |

**About Us | Site Map | Technical Support | Contact Us | Privacy | Copyright**

Organizer: Guangdong Provincial Development and Reform Commission    Undertaker: Guangdong Investment and Credit Center
Address: Building 5, No. 305 Dongfeng Middle Road, Guangzhou (Zip Code: 510031)    Business consulting telephone: 12345
Copyright: Guangdong Provincial Development and Reform Commission    Reproduction or mirroring without written authorization is prohibited
Yue ICP No. 2022065133    YGWAB 44010402001448    Website ID 4400000058

Government Websites
Find errors
Party Affairs Organ

  

2023年7月12日 星期三
网站支持IPv6

# 广东省发展和改革委员会
Guangdong Provincial Development and Reform Commission

**首页** 　政务公开　政务服务　互动交流　专题专栏　查询下载　　请输入搜索内容...

您所在的位置：首页 > 政务公开 > 政策文件 > 规范性文件

## 关于认真做好制止低价倾销工作及开展对低价倾销进行检查的通知

信息来源：本网　　　时间：2003-03-12 00:00:00　　　　字体：[大] [中] [小]

**国家计委关于认真做好制止低价**

**倾销工作及开展对低价倾销进行检查的通知**

**一九九九年一月十六日　　　计价格[1999]42号**

各省、自治区、直辖市及计划单列市、副省级省城市物价局（委员会）：

为了贯彻落实国务院领导同志的指示精神，认真做好制止低价倾销工作，现就有关事项通知如下：

一、近年来，随着经济的发展，一些行业出现了产品供过于求、企业间牌价竞争的现象。企业间的价格竞争有利于促进产品销售和市场供求总量的平衡，促使企业加强内部管理降低生产成本，推动企业的技术进步和新产品开发，促进经济结构调整和资源的合理配置。但有些企业以低于产品成本的价格倾销，有的企业采取使用私自私私材料、降低产品质量等非法手段降低成本降价倾销，扰乱了正常的价格秩序，损害了其他经营者和消费者的合法权益。因此，各级物价部门要充分认识制止低价倾销的必要性和紧迫性，根据国家计委颁布的一系列制止低价倾销的法规性文件，在保护竞争、促进竞争的同时，坚决依法制止低价倾销等不正当价格行为，维护正常的经济秩序。

二、为了切实做好制止低价倾销工作，各地要对低于行业平均成本销售产品的企业进行调查，把平板玻璃、钢材、彩色显像管、彩色电视机、食糖等产品价格作为1999年上半年检查工作的重点。检查的具体内容是：

（一）生产企业的出厂价格、经销企业的销售价格，是否符合国家计委、国家经贸委颁发的《关于制止低价倾销工业品的不正当价格行为的规定》第五条序列的及制止低价倾销平板玻璃、钢材等法规中规定的低价倾销行为；

（二）生产企业的出厂价格、经销企业的销售价格，是否采取使用违私私材料和零配件、以次充好、减少功能、降低质量和虚假少列成本等非法手段降低成本，进行低价倾销的行为；

（三）生产企业的出厂价格、经销企业的销售价格，是否低于政府指导价格的下浮界限。

各地可以根据实际情况，自行确定制止低价倾销的重点产品进行检查。

三、各地在开展检查前要深入基层，搞好调查研究，摸清情况，确定检查的单位和产品品种，并要认真搞好低价的试点工作，在取得经验的基础上，组织好集中的检查。

四、对列入制止低价倾销的产品，各地要求企业首先进行自查，并组织力量选择一些重点企业进行检查，对检查中使用私私材料和零配件的企业，以及采取减少功能、以次充好、虚报成本的企业，要勒令其改正，并根据有关法规进行处理。在重提调有关部门汇报情况时企业时，对被举报有低价倾销问题的企业，要及时进行检查。国家计委将组成工作组对部分地区进行检查，重点检查低价倾销的产品。各地要组织力量进行督促、指导，必要时将组织有关部门进行专项调查。

五、各地在开展检查中要认真做好对低价倾销工作的宣传，要注意保护公平、正当、合法的价格竞争，准确把握政策界限，保护落后，认定和查处低价倾销行为等。对企业相互串通，进行价格垄断，压迫其他竞争对手，或人为抬高价格与不当手段的，要依据《价格法》的有关规定予以制止。

六、减少制止低价倾销工作的政策性强，难度大，各级物价部门要在当地政府的统一领导下，准确把握政策界限，依法行政，严格执法。对情节严重、性质恶劣的低价倾销典型案件要公开曝光，以促使企业增强自我约束能力，自觉遵守国家有关价格法律、法规和政策，有效制止企业间盲目降价、恶性竞争。

七、各地在制止低价倾销工作中的经验、存在问题和重大典型案件请及时报告国家计委。

分享到 ⭐ ☁ ◉ 🅜　　　　　　　　　　　　　　　✕ 关闭窗口　　🖶 打印文档



相关网站 ▾　　委管局/直属单位 ▾　　省直单位 ▾　　地市发改局（委）▾　　国家及省市发改委 ▾　　其他链接 ▾

关于本站 ｜ 网站地图 ｜ 技术支持 ｜ 联系我们 ｜ 隐私保护 ｜ 版权声明

主办单位：广东省发展和改革委员会　　承办单位：广东省投资和信用中心
地址：广州市东风中路305号5号楼（邮编：510031）　　业务咨询电话：12345
版权所有：广东省发展和改革委员会　　未经书面授权禁止复制和建立镜像
粤ICP备2022065133号　　🛡粤公网安备 4401040200144号　　网站标识码4400000058

# Exhibit 129

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               OAKLAND DIVISION

4

5    IN RE: CATHODE RAY TUBE (CRT) )  Case No.

6    ANTITRUST LITIGATION,         )  07-cv-05944-JST

7    THIS DOCUMENT RELATES TO:     )

8    ALL DIRECT PURCHASER ACTIONS  )  MDL No.: 1917

9    -----------------------------X

10

11

12          REMOTE DEPOSITION OF HENRY GAO

13          Monday, July 10, 2023; 9:08 a.m. EDT

14

15

16

17

18   Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR,

     CLR, RSA, NYRCR, NYACR, CA CSR 14409, NJ CCR

19   30XI00244600, NJ CRT 30XR00019500, Washington State CSR

     23005926, Oregon CSR 230105, TN CSR 998, Remote Counsel

20   Reporter, LiveLitigation Authorized Reporter, Notary

     Public

21

     Job No. SF 5989366

22

                                        Page 1

| | | |
|---|---|---|
| 1 | MR. HEAPHY:  Matthew Heaphy of | 09:10:11 |
| 2 | Saveri & Saveri for Direct Purchaser | 09:10:15 |
| 3 | Plaintiffs. | 09:10:16 |
| 4 | MR. HWU:  David Hwu with Saveri & | 09:10:16 |
| 5 | Saveri for Direct Purchaser Plaintiffs. | 09:10:20 |
| 6 | THE VIDEOGRAPHER:  Thank you. | 09:10:28 |
| 7 | Will the court reporter please | 09:10:28 |
| 8 | swear in the witness? | 09:10:30 |
| 9 | --oOo-- | 09:10:30 |
| 10 | HENRY GAO, | 09:10:30 |
| 11 | after having been first duly sworn remotely | 09:10:30 |
| 12 | by the certified stenographer to tell the truth, the | 09:10:30 |
| 13 | whole truth, and nothing but the truth, testified | 09:10:30 |
| 14 | remotely as follows: | 09:10:30 |
| 15 | --oOo-- | 09:10:30 |
| 16 | CERTIFIED STENOGRAPHER:  Thank | 09:10:30 |
| 17 | you. | 09:10:30 |
| 18 | The witness is sworn, and I'll go | 09:10:30 |
| 19 | on mute now. | 09:10:30 |
| 20 | --oOo-- | 09:10:30 |
| 21 | EXAMINATION BY COUNSEL FOR IRICO GROUP CORP. AND | 09:10:30 |
| 22 | IRICO DISPLAY DEVICES CO., LTD. | 09:10:30 |

Page 11

```
 1              A.    This is the expert report of          09:56:43

 2       Professor Donald Clarke.                           09:56:45

 3              Q.    Have you reviewed this report          09:56:47

 4       before?                                            09:56:48

 5              A.    Yes.                                   09:56:49

 6              Q.    Is this the report that you mention    09:56:54

 7       in your report?                                    09:57:00

 8              A.    Yes.                                   09:57:03

 9              Q.    Did you review the entire report of    09:57:15

10       Donald Clarke?                                     09:57:18

11              A.    Yes.                                   09:57:19

12              Q.    Did you review the seven appendices,   09:57:21

13       or documents, attached to Donald Clarke's report?  09:57:23

14              A.    Yes.                                   09:57:28

15              Q.    Do you refer to those seven           09:57:39

16       appendices as the "pricing documents"?             09:57:41

17              A.    Yes.                                   09:57:43

18              Q.    And you reviewed all seven pricing     09:57:46

19       documents?                                         09:57:48

20              A.    Yes.                                   09:57:49

21              Q.    You state in your report that you      09:57:52

22       were able to obtain three of the seven pricing     09:58:10
```

Page 53

| | | |
|---|---|---|
| 1 | documents from the PKULaw China Law Info PKULaw | 09:58:13 |
| 2 | Database; is that correct? | 09:58:15 |
| 3 | A.    Yes. | 09:58:20 |
| 4 | Q.    And that's one of the leading | 09:58:20 |
| 5 | commercial databases for Chinese law; is that | 09:58:21 |
| 6 | right? | 09:58:23 |
| 7 | A.    Yes. | 09:58:24 |
| 8 | Q.    Those three pricing documents that | 09:58:26 |
| 9 | you were able to obtain are genuine and authentic | 09:58:28 |
| 10 | Chinese Government regulatory documents; is that | 09:58:31 |
| 11 | correct? | 09:58:33 |
| 12 | A.    Yes. | 09:58:34 |
| 13 | Q.    As to the other four pricing | 09:58:40 |
| 14 | documents that you were not able to obtain, you | 09:58:42 |
| 15 | state in your report that they appear to be | 09:58:44 |
| 16 | genuine and authentic based on their format and | 09:58:46 |
| 17 | appearance which are similar to other Chinese | 09:58:48 |
| 18 | Government regulatory documents, correct? | 09:58:50 |
| 19 | A.    Yes. | 09:58:55 |
| 20 | Q.    Is it still your opinion today that | 09:58:59 |
| 21 | all seven of the pricing documents attached to | 09:59:01 |
| 22 | Professor Clarke's March 2022 report and discussed | 09:59:03 |

Page 54

| | | |
|---|---|---|
| 1 | in your May 2023 report all appear to be genuine | 09:59:07 |
| 2 | and authentic Chinese Government regulatory | 09:59:10 |
| 3 | documents? | 09:59:12 |
| 4 | A.    Yes. | 09:59:14 |
| 5 | Q.    In Paragraph 10 of your report, you | 09:59:28 |
| 6 | state that the seven pricing documents would have | 09:59:31 |
| 7 | been binding and potentially enforceable on | 09:59:37 |
| 8 | producers in China. | 09:59:40 |
| 9 | Is that still your opinion? | 09:59:41 |
| 10 | MR. KLIPPER:  Counsel, one second. | 09:59:44 |
| 11 | You said "Paragraph 10"? | 09:59:45 |
| 12 | MR. CHANG:  That's correct. | 09:59:47 |
| 13 | THE WITNESS:  Yes. | 09:59:51 |
| 14 | BY MR. CHANG: | 09:59:52 |
| 15 | Q.    You haven't changed that opinion? | 09:59:53 |
| 16 | A.    Yes. | 09:59:54 |
| 17 | Q.    What did you mean by the phrase | 10:00:07 |
| 18 | "producers in China"? | 10:00:08 |
| 19 | A.    Well, Counsel, you know, these | 10:00:16 |
| 20 | pricing documents were basically looking at the | 10:00:18 |
| 21 | low-priced dumping activities of producers, so to | 10:00:23 |
| 22 | the extent that, let's say, a producer want to | 10:00:30 |

Page 55

C E R T I F I C A T E

1          I, Cindy L. Sebo, Nationally Certified Court

2     Reporter herein, do hereby certify that the foregoing

3     deposition of HENRY GAO was taken before me pursuant to

4     notice at the time and place indicated; that said

5     witness duly swore to tell the truth, the whole truth

6     and nothing but the truth under penalties of perjury;

7     that said testimony of the witness was correctly

8     recorded to the best of my abilities in machine

9     shorthand, thereafter transcribed under my supervision

10    with computer-aided transcription; that the deposition

11    is a true and accurate record of the testimony given by

12    the witness; that I am neither counsel, nor kin to any

13    party in said action, nor interested in the outcome;

14    and that a copy of this transcript obtained from a

15    source other than the court reporting firm, including

16    an adversary or co-counsel in the matter, is

17    uncertified and may not be used at trial.

18

19          Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR, CLR,

      RSA, NYRCR, NYACR, CA CSR 14409, NJ CCR

20    30XI00244600, NJ CRT 30XR00019500, Washington

      CSR 23005926, Oregon State 230105, Tennessee

21    CSR 998, Remote Counsel Reporter,

      LiveLitigation Authorized Reporter, Notary

22    Public

Page 217

# Exhibit 130



September 6, 2022

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, **Samuel Chong**, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of the document with bates number: BMCC-CRT000181673, BMCC-CRT000181675, BMCC-CRT000181677, BMCC-CRT000181679, BMCC-CRT000181681 & BMCC-CRT000181683.

*Digital or printed signature here above the line)*

_____

**Samuel Chong**

Project Number: *BBLLP_2209_P0013*

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

To: General Manager's Office

# Production Information Table of CPT (August 2000)

Prepared by: Department of Electronic Information Products Management, Ministry of Information Industry    Responsible person: Guoping Ji

| Category / Enterprise name | Product name | Current month Production | Current month Accumulative total | Current month Sales | Current month Accumulative total | Inventory | Remarks Unit: Pcs |
|---|---|---|---|---|---|---|---|
| | **Total** | **4,182,061** | **32,871,820** | **4,345,088** | **31,766,213** | **1,870,606** | **Color Tube manufacturers shall send the data of production, sale and inventory of color tube of last month to Guoping Ji, Director of Basic Products Office of Department of Electronic Information Products Management, Ministry of Information Industry around the 10th of each month!** |
| | **Subtotal** | **3,221,515** | **25,441,069** | **3,356,094** | **24,385,393** | **1,516,789** | |
| | 14" | 544,075 | 3,597,241 | 502,217 | 3,441,982 | 168,927 | |
| | 18" | 0 | 0 | 0 | 7,637 | 45026 | |
| | 20" | 91,500 | 538,000 | 91,500 | 541,000 | 0 | |
| | 21" | 1,117,703 | 9,855,599 | 1,245,023 | 9,649,533 | 337,010 | |
| | 25" | 637,325 | 5,513,071 | 679,567 | 5,287,982 | 329,145 | |
| | 29" | 776,667 | 5,338,970 | 734,321 | 4,962,330 | 455,717 | |
| | 32" | 200 | 5,500 | 0 | 0 | 5500 | **Fax: 010-68221839** |
| | 34" | 54,045 | 592,688 | 103,466 | 494,929 | 175,464 | |
| | **Subtotal** | **960,546** | **7,430,751** | **988,994** | **7,380,820** | **353,817** | As the data reported by Tianjin Samsung in July is wrong, it is now corrected as follows: Cumulative CDT should be **6470105** The total is **28633773** Please note this! |
| | 14" CDT | 313,900 | 3,221,608 | 310,300 | 3,253,796 | 24,580 | |
| | 15" CDT | 524,646 | 3,709,143 | 568,694 | 3,633,724 | 317,237 | |
| | 17" CDT | 122,000 | 500,000 | 110,000 | 493,300 | 12,000 | |
| Irico Group | 14" | 294,052 | 2,198,999 | 299,071 | 2,153,066 | 38,831 | |
| | 18" | 0 | 0 | 0 | 7,637 | 45,026 | |
| | 21" | 109,341 | 2,036,656 | 204,974 | 1,925,532 | 103,479 | |
| | 25" | 124,047 | 995,561 | 181,300 | 996,901 | 0 | |
| | **Subtotal** | **527,440** | **5,231,216** | **685,345** | **5,083,136** | **187,336** | |
| | 15" CDT | 55,546 | 634,543 | 106,094 | 534,624 | 282,337 | |
| | **Subtotal** | **55,546** | **634,543** | **106,094** | **534,624** | **282,337** | |
| | **Total** | **582,986** | **5,865,759** | **791,439** | **5,617,760** | **469,673** | |

Page 1 of 3

CONFIDENTIAL    BMCC-CRT000181673_E Translation

@02

DIVISION OF BP

25/09/00  10:05  FAX  68221839

| BMCC | 14" | 250,023 | 1,398,242 | 203,146 | 1,288,916 | 130,096 |
|---|---|---|---|---|---|---|
| | 21" PF | 20,269 | 123,305 | 2,013 | 96,490 | 26,815 |
| | 21" | 129,068 | 1,043,301 | 145,235 | 1,056,567 | 43,179 |
| | 25" PF | 0 | 0 | 0 | 0 | 115 |
| | 29" | 76,026 | 669,038 | 102,699 | 672,448 | 3,286 |
| | 29" PF | 38,836 | 117,164 | 20,034 | 78,255 | 42,124 |
| | **Subtotal** | **514,222** | **3,351,050** | **473,127** | **3,192,676** | **245,615** |
| | 14" CMT | 0 | 11,508 | 0 | 4,196 | 8,580 |
| | **Subtotal** | **0** | **11,508** | **0** | **4,196** | **8,580** |
| | **Total** | **514,222** | **3,362,558** | **473,127** | **3,196,872** | **254,195** |
| Shanghai Novel | 21" | 167,500 | 1,242,300 | 166,300 | 1,242,100 | 2,300 |
| | 25" | **0** | 414,600 | 0 | 387,100 | 27,600 |
| | 29" | 214,600 | 1,255,300 | 211,700 | 1,225,800 | 30,900 |
| | 32" | 200 | 5,500 | **0** | 0 | 5,500 |
| | 34" | 40,000 | 292,100 | 43,100 | 206,600 | 133,300 |
| | **Total** | **422,300** | **3,209,800** | **421,100** | **3,061,600** | **199,600** |
| Nanjing Huafei | 21" | 130,200 | 1,061,700 | 138,700 | 1,044,700 | 28,100 |
| | 25" | 134,700 | 1,107,700 | 136,600 | 1,089,700 | 22,100 |
| | 29" | 116,900 | 918,200 | 120,200 | 870,800 | 47,900 |
| | **Subtotal** | **381,800** | **3,087,600** | **395,500** | **3,005,200** | **98,100** |
| | 14" CMT | 83,900 | 673,700 | 82,500 | 673,000 | 1,500 |
| | 15" CMT | 96,000 | 677,500 | 90,400 | 676,900 | 5,900 |
| | **Subtotal** | **179,900** | **1,351,200** | **172,900** | **1,349,900** | **7,400** |
| | **Total** | **561,700** | **4,438,800** | **568,400** | **4,355,100** | **105,500** |
| Seg Hitachi | 21" | 259,010 | 1,975,675 | 263,012 | 1,983,538 | 23,274 |
| | 34" | 273 | 284,138 | 57,081 | 284,825 | 28,714 |
| | **Total** | **259,283** | **2,259,813** | **320,093** | **2,268,363** | **51,988** |

Page 2 of 3

CONFIDENTIAL

BMCC-CRT000181675_E Translation

@03

DIVISION OF BP

25/09/00   10:05   FAX   68221839

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Guangdong Fortune | 21" | 0 | 0 | 0 | -31 | 3,714 | |
| | 25" | 229,868 | 1,981,959 | 160,017 | 1,742,527 | 275,198 | |
| | 29" | 82,123 | 707,610 | 63,878 | 593,353 | 123,033 | |
| | **Total** | **311,991** | **2,689,569** | **223,895** | **2,335,849** | **401,945** | |
| LG Shuguang | 21" | 179,995 | 1,318,242 | 201,509 | 1,252,196 | 87,566 | |
| | 25" | 148,710 | 1,013,251 | 201,650 | 1,071,754 | 4,132 | |
| | **Total** | **328,705** | **2,331,493** | **403,159** | **2,323,950** | **91,698** | |
| Shenzhen Samsung | 20" | 91,500 | 538,000 | 91,500 | 541,000 | 0 | |
| | 21" | 122,320 | 1,054,420 | 123,280 | 1,048,441 | 18,583 | |
| | **Subtotal** | **213,820** | **1,592,420** | **214,780** | **1,589,441** | **18,583** | |
| | 14" CDT | 86,000 | 1,100,100 | 86,000 | 1,105,000 | 0 | |
| | 17" CDT | 122,000 | 500,000 | 110,000 | 493,300 | 12,000 | |
| | **Subtotal** | **208,000** | **1,600,100** | **196,000** | **1,598,300** | **12,000** | |
| | **Total** | **421,820** | **3,192,520** | **410,780** | **3,187,741** | **30,583** | |
| Tianjin Samsung | 29" | 95,840 | 897,040 | 85,000 | 875,100 | 31,842 | |
| | 29" DF | 25,000 | 89,000 | 25,000 | 80,000 | 0 | |
| | **Subtotal** | **120,840** | **977,040** | **110,000** | **955,100** | **31,842** | |
| | 15" CDT | 165,000 | 1,231,000 | 165,000 | 1,248,000 | 4,000 | |
| | **Subtotal** | **165,000** | **1,231,000** | **165,000** | **1,248,000** | **4,000** | |
| | **Total** | **285,840** | **2,208,040** | **275,000** | **2,203,100** | **35,842** | |
| Shanghai Suoguang | 29" | 19,099 | 124,808 | 24,025 | 109,291 | 63,961 | |
| | 34" | 13,772 | 16,450 | 3,285 | 3,504 | 13,450 | |
| | **Total** | **32,871** | **141,258** | **27,310** | **112,795** | **77,411** | |
| Chunghwa Picture Tubes | 14" CDT | 144,000 | 1,436,300 | 141,800 | 1,471,600 | 14,500 | |
| | 15" CDT | 208,100 | 1,166,100 | 207,200 | 1,174,200 | 25,000 | |
| | **Total** | **352,100** | **2,602,400** | **349,000** | **2,645,800** | **39,500** | |
| Foshan Thomson | 29" | 61,139 | 502,146 | 81,785 | 398,915 | 103,375 | Sales in the current month include two types of tubes |
| | **29" SF** | 47,104 | 67,664 | | 58,368 | 9,296 | |
| | **Total** | **108,243** | **569,810** | **81,785** | **457,283** | **112,671** | |

Page 3 of 3

CONFIDENTIAL

BMCC-CRT000181677_E Translation

# Production Information Table of CPT (July 2000)

Prepared by: Department of Electronic Information Products Management, Ministry of Information Industry          Responsible person: Guoping Ji

| Category / Enterprise name | Product name | Current month Production | Accumulative total | Current month Sales | Accumulative total | Inventory | Remarks Unit: Pes |
|---|---|---|---|---|---|---|---|
| | **Total** | **3,690,010** | **28,633,773** | **3,565,634** | **27,356,218** | **2,072,064** | **Color tube manufacturers shall send the data of production, sale and inventory of color tube of last month to Guoping Ji, Director of Basic Products Office of Department of Electronic Information Products Management, Ministry of Information Industry around the 10th of each month! Fax: 010-68221839** |
| | **Subtotal** | **2,862,536** | **22,163,668** | **2,711,699** | **20,964,692** | **1,689,722** | |
| | 14" | 455,423 | 3,053,166 | 406,121 | 2,939,765 | 128,638 | |
| | 18" | | | | 7,358 | 45305 | |
| | 20" | 58,500 | 446,500 | 58,500 | 449,500 | 0 | |
| | 21" | 1,081,346 | 8,730,543 | 1,010,090 | 8,412,908 | 468,333 | |
| | 25" | 634,809 | 4,862,354 | 643,836 | 4,590,352 | 379,350 | |
| | 29" | 624,379 | 4,527,162 | 564,073 | 4,173,364 | 438,397 | |
| | 32" | 5,400 | 5,400 | 0 | **0** | 5400 | |
| | 34" | 2,679 | 538,543 | 29,079 | 391,445 | 224,299 | |
| | **Subtotal** | **827,474** | **6,470,105** | **853,935** | **6,391,526** | **382,342** | |
| | 14" CDT | 330,500 | 2,907,608 | 336,604 | 2,943,296 | 18,380 | |
| | 15" CDT | 436,974 | 3,184,497 | 457,331 | 3,064,930 | 363,962 | |
| | 17" CDT | 60,000 | 378,000 | 60,000 | 383,300 | 0 | |
| Irico Group: | 14" | 284,022 | 1,904,947 | 259,250 | 1,853,995 | 45,419 | |
| | 18" | 0 | 0 | 0 | 7,358 | 45,305 | |
| | 21" | 238,255 | 1,927,315 | 159,895 | 1,720,558 | 199,916 | |
| | 25" | 121,186 | 871,514 | 158,950 | 815,601 | 59,811 | |
| | **Subtotal** | **643,463** | **4,703,776** | **578,095** | **4,397,512** | **350,451** | |
| | 14" CDT | | | | | | |
| | 15" CDT | 51,974 | 578,997 | 60,331 | 428,530 | 334,462 | |
| | **Subtotal** | **51,974** | **578,997** | **60,331** | **428,530** | **334,462** | |
| | **Total** | **695,437** | **5,282,773** | **638,426** | **4,826,042** | **684,913** | |

Page 1

CONFIDENTIAL

BMCC-CRT000181679_E Translation

@05

DIVISION OF BP

25/09-00  10:05  FAX  68221839

| | | | | | | |
|---|---|---|---|---|---|---|
| BMCC | 14" | 171,401 | 1,148,219 | 146,871 | 1,085,770 | 83,219 |
| | 21" PF | 13,723 | 103,036 | 15,243 | 94,477 | 8,559 |
| | 21" | 70,495 | 914,233 | 113,318 | 911,332 | 59,346 |
| | 21" Thick | | | | | |
| | 25" PF | 0 | 0 | 0 | 0 | 115 |
| | 29" | 42,206 | 593,012 | 83,504 | 569,749 | 29,959 |
| | 29" PF | 26,037 | 78,328 | 11,126 | 58,221 | 23,322 |
| | **Subtotal** | **324,862** | **2,836,828** | **370,062** | **2,719,549** | **204,520** |
| | 14" CMT | **0** | 11,508 | 504 | 4,196 | 8,580 |
| | **Subtotal** | **0** | **11,508** | **504** | **4,196** | **8,580** |
| | **Total** | **324,862** | **2,848,336** | **370,566** | **2,723,745** | **213,100** |
| Shanghai Novel | 21" | 121,300 | 1,074,800 | 127,100 | 1,075,800 | 1,200 |
| | 25" | 1,200 | 414,600 | 16,300 | 387,100 | 27,600 |
| | 29" | 158,600 | 1,040,700 | 129,000 | 1,014,100 | 30,000 |
| | 32" | 5,400 | 5,400 | **0** | 0 | 5,400 |
| | 34" | | 252,000 | 17,800 | 163,500 | 136,300 |
| | **Total** | **286,500** | **2,787,500** | **290,200** | **2,640,000** | **200,500** |
| Nanjing Huafei | 21" | 131,000 | 931,400 | 154,400 | 906,000 | 36,500 |
| | 25" | 131,600 | 973,100 | 161,400 | 953,100 | 24,000 |
| | 29" | 100,800 | 801,300 | 102,400 | 750,600 | 51,100 |
| | **Subtotal** | **363,400** | **2,705,800** | **418,200** | **2,609,700** | **111,600** |
| | 14" CMT | 71,200 | 589,800 | 71,500 | 590,400 | 200 |
| | 15" CMT | 70,500 | 581,500 | 70,500 | 586,400 | 300 |
| | 17" CMT | | | | | |
| | **Subtotal** | **141,700** | **1,171,300** | **142,000** | **1,176,800** | **500** |
| | **Total** | **505,100** | **3,877,100** | **560,200** | **3,786,500** | **112,100** |
| Seg Hitachi | 21" | 256,692 | 1,716,665 | 255,066 | 1,720,526 | 27,276 |
| | 34" | 1 | 283,865 | 11,078 | 227,744 | 85,522 |
| | **Total** | **256,693** | **2,000,530** | **266,144** | **1,948,270** | **112,798** |

Page 2

@06

DIVISION OF BP

25/09/00  10:05  FAX  68221839

| | | | | | | |
|---|---|---|---|---|---|---|
| Guangdong Fortune | 21" | 0 | 0 | 0 | -31 | 3,714 |
| | 25" | 271,629 | 1,752,091 | 189,757 | 1,582,510 | 205,347 |
| | 29" | 71,249 | 625,487 | 28,197 | 529,475 | 104,791 |
| | **Total** | **342,878** | **2,377,578** | **217,954** | **2,111,954** | **313,852** |
| LG Shuguang | 21" | 179,881 | 1,130,994 | 100,068 | 1,059,085 | 112,279 |
| | 25" | 109,194 | 851,049 | 117,429 | 852,041 | 62,477 |
| | 29" | 1,024 | 1,024 | 1,024 | 1,024 | |
| | **Total** | **290,099** | **1,983,067** | **218,521** | **1,912,150** | **174,756** |
| Shenzhen Samsung | 20" | 58,500 | 446,500 | 58,500 | 449,500 | 0 |
| | 21" | 70,000 | 932,100 | 85,000 | 925,161 | 19,543 |
| | **Subtotal** | **128,500** | **1,378,600** | **143,500** | **1,374,661** | **19,543** |
| | 14" CDT | 100,000 | 1,014,100 | 100,000 | 1,019,000 | 0 |
| | 17" CDT | 60,000 | 378,000 | 60,000 | 383,300 | 0 |
| | **Subtotal** | **160,000** | **1,392,100** | **160,000** | **1,402,300** | **0** |
| | **Total** | **288,500** | **2,770,700** | **303,500** | **2,776,961** | **19,543** |
| Tianjin Samsung | 29" | 123,500 | 801,200 | 112,100 | 790,100 | 21,002 |
| | **Subtotal** | **123,500** | **801,200** | **112,100** | **790,100** | **21,002** |
| | 15" CDT | 155,000 | 1,066,000 | 156,000 | 1,083,000 | 4,000 |
| | **Subtotal** | **155,000** | **1,066,000** | **156,000** | **1,083,000** | **4,000** |
| | **Total** | **278,500** | **1,867,200** | **268,100** | **1,873,100** | **25,002** |
| Shanghai Suoguang | 29" | 11,963 | 105,709 | 10,722 | 84,597 | 73,175 |
| | 34" | 2,678 | 2,678 | 201 | 201 | 2,477 |
| | **Total** | **14,641** | **108,387** | **10,923** | **84,798** | **75,652** |
| Chunghwa Picture Tubes | 14" CDT | 159,300 | 1,292,200 | 164,600 | 1,329,700 | 9,600 |
| | 15" CDT | 159,500 | 958,000 | 170,500 | 967,000 | 25,200 |
| | **Total** | **318,800** | **2,250,200** | **335,100** | **2,296,700** | **34,800** |
| Foshan Thomson | 29" | 64,000 | 480,402 | 86,000 | 375,498 | 105,048 |
| | 29" SF | 24,000 | | | | |
| | **Total** | **88,000** | **480,402** | **86,000** | **375,498** | **105,048** |

CONFIDENTIAL

BMCC-CRT000181683_E Translation

# Exhibit 131



September 6, 2022

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, **Samuel Chong**, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of the document with bates number: BMCC-CRT000142685.

*(Digital or printed signature here above the line)*

_____

**Samuel Chong**

Project Number: _BBLLP_2209_P0013_

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

Proposal on the Adjustment of Import Tariff (Provisional Tariff) of CPT and Glass Bulb

|  | Category | Original tariff rate | Adjusted tariff rate |
|---|---|---|---|
| CPT | 21", 25", 29" | 18% | 10% |
|  | PF tube, large-screen tube | 18% | Unchanged |
| Glass bulb | PF | 15% | 10% |
|  | 34" | 15% | To be determined |
|  | Others | 15% | Unchanged |

On November 7, 2001, in Shenzhen, the Ministry of Information Industry convened the "Working Conference on Price and Tariff of CPT and Color Bulb". After discussion among various CPT manufacturers and glass bulb manufacturers, the preliminary proposal is mentioned above. If there is no objection to the above two items, they will be reported and implemented within the year.

 Shuxin Zhou

Reported to                Fei Yong[Illegible]

                          Liu[Illegible]

[Illegible]                Fan[Illegible]

                          [Illegible]Lin
                          [Illegible]

CONFIDENTIAL

BMCC-CRT000142685_E Translation

# Exhibit 132



September 6, 2022

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, **Samuel Chong**, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of the document with bates number: BMCC-CRT000138732 to BMCC-CRT000138735.

*(Digital or printed signature here above the line)*

_____

**Samuel Chong**

Project Number: _BBLLP_2209_P0013_

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

# Production Information Table of CPT (October 2003)

Prepared by: Department of Electronic Information Products Management, Ministry of Information Industry

Responsible person: Guoping Ji

| Category / Enterprise name | Product name | Current month | | Current month | | Inventory | Remarks Unit: Pcs |
|---|---|---|---|---|---|---|---|
| | | Production | Accumulative total | Sales | Accumulative total | | |
| | Total | **7,802,497** | **67,176,421** | **7,701,282** | **67,873,570** | **918,172** | Color Tube manufacturers shall send the data of production, sale and inventory of color tube of last month by fax or e-mail to Guoping Ji, Director of Basic Products Office of Department of Electronic Information Products Management, Ministry of Information Industry around the 10th of each month! Fax: **010-68208272** |
| | Subtotal | **5,095,412** | **46,195,795** | **5,012,128** | **46,392,619** | **618,604** | |
| | 14" | 508,743 | 4,479,317 | 525,299 | 4,534,916 | 87,178 | |
| | 15" | 16 | 141,259 | 7,563 | 124,057 | 17,198 | |
| | 20" | 102,000 | 619,136 | 102,000 | 628,624 | 2,000 | |
| | 21" | 2,273,536 | 20,189,810 | 2,301,730 | 20,299,103 | 94,338 | |
| | 25" | 993,091 | 9,029,161 | 955,284 | 9,247,115 | 69,715 | |
| | 29" | 971,375 | 9,551,116 | 929,666 | 9,656,214 | 115,509 | |
| | 32" | 500 | -500 | 2,700 | 2,700 | 2,700 | |
| | 33" | 24,000 | 79,000 | 9,000 | 27,000 | 52,000 | |
| | 34" | 196,151 | 2,066,496 | 167,886 | 1,856,890 | 152,966 | |
| | | 26,000 | 41,000 | 11,000 | 16,000 | 25,000 | |
| | **Subtotal** | **2,707,085** | **20,980,626** | **2,689,154** | **21,480,951** | **299,568** | |
| | 14" CDT | 6,300 | 86,500 | 14,800 | 112,600 | 4,900 | |
| | 15" CDT | 686,031 | 6,505,115 | 641,033 | 6,586,219 | 139,842 | |
| | 17" CDT | 1,969,254 | 14,176,811 | 1,981,621 | 14,574,732 | 145,926 | |
| | 19" CDT | 45,500 | 212,200 | 51,700 | 207,400 | 8,900 | Production / Sales / 2004 |

| Category / Enterprise name | Product name | Production | Accumulative total | Sales | Accumulative total | Inventory | Production | Sales | | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|
| Irico Group: | 14" | 340,950 | 3,004,129 | 340,613 | 3,017,649 | 32,646 | 3603144 | 3,580,000 | Year-round | 3,600,000 |
| | 15" | 16 | 141,259 | 7,563 | 124,057 | 17,198 | 110,000 | 129,000 | | 400,000 |
| | 21" | 348,869 | 3,235,272 | 349,067 | 3,226,483 | 1,218 | 3,600,000 | 3,590,000 | | 5,000,000 |
| | 21" PF | 153,962 | 712,038 | 158,105 | 698,162 | 17,845 | 873450 | 870,000 | | 1,850,000 |
| | 25" PF | 114,720 | 639,051 | 98,560 | 697,054 | 27,737 | 763704 | 820,000 | | 850,000 |
| | 25" FS | 127,755 | 1,270,239 | 128,160 | 1,264,592 | 3,561 | 1404463 | 1,400,000 | | 1,670,000 |
| | 29" PF | 0 | 294,553 | 881 | 292,564 | 984 | 297562 | 300,000 | | 400,000 |
| | **Subtotal** | **1,086,272** | **9,296,541** | **1,082,949** | **9,320,561** | **101,189** | | 8,750,000 | 11,500,000 | 13,170,000 |

13,170,000

CONFIDENTIAL

BMCC-CRT000138732_E Translation

| | | | | | | | 2003 | | | 2004 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 15" CDT | 0 | 10,765 | 1,176 | 5,729 | 4,859 | | | | | |
| | Subtotal | **0** | **10,765** | **1,176** | **5,729** | **4,859** | | | | | |
| | Total | **1,086,272** | **9,307,306** | **1,084,125** | **9,326,290** | **106,048** | | | | | |
| BMCC | 14" | 167,793 | 1,475,188 | 184,686 | 1,517,267 | 54,532 | 1,630,000 | (January-November) | | | |
| | 21" PF | 118,356 | 588,431 | 110,403 | 593,872 | 15,383 | 70 | | | | |
| | 21" FS | 210,501 | 2,391,971 | 223,100 | 2,359,575 | 29,325 | 258 | | | | |
| | 29" SF | 128,368 | 1,324,230 | 113,872 | 1,299,356 | 21,515 | 144 | | | | |
| | 29" PF | 66,130 | 277,133 | 63,713 | 268,562 | 11,147 | 34 | | | | |
| | 34" PF | 842 | 88,781 | 16,132 | 84,777 | 8,029 | 11 | | | | |
| | 34" SF | 14,390 | 153,613 | 8,368 | 155,292 | 8,244 | 15 | | | | |
| | Total | **706,380** | **6,299,347** | **720,274** | **6,278,701** | **148,175** | | | | | |
| Shanghai Novel | 21" | 182,000 | 1,643,800 | 180,300 | 1,639,900 | 4,500 | 2,000,000 | (January-December) | Inventory | 2,200,000 | |
| | 25" | 137,200 | 1,275,400 | 135,000 | 1,268,000 | 8,000 | 155 | | | 172 | |
| | 29" [illegible] | 113,400 | 1,121,800 | 99,400 | 1,109,100 | 16,300 | 135 | | | 97 | |
| | 29" PF | 90,600 | 805,100 | 92,200 | 803,700 | 2,100 | 141 | | | 200 | |
| | 32" | 500 | -500 | 2,700 | 2,700 | 2,700 | | | | | |
| | 34" | 100 | 380,100 | 37,700 | 279,900 | 106,400 | 49 | | 80,000-90,000 | NTS: 90,000 PF 150,000 | |
| | Total | **523,800** | **5,225,700** | **547,300** | **5,103,300** | **140,000** | 6,800,000 | | | | 7,450,000 |
| Nanjing Huafei | 21" | 165,000 | 1,518,000 | 165,000 | 1,518,000 | 13,000 | 1,900,000 | (Including PE 700,000) | | 75 PF120 | |
| | 25" | 165,000 | 1,487,000 | 165,000 | 1,482,000 | 6,000 | 180 | | | 185 | |
| | 29" | 140,000 | 1,236,000 | 141,000 | 1,230,000 | 12,000 | 161 | (Including PF 780,000) | | 37 | PF105 |
| | 34" | 38,000 | 174,000 | 40,000 | 160,000 | 14,000 | 30 | | | 420,000 | |
| | Subtotal | **508,000** | **4,415,000** | **511,000** | **4,390,000** | **45,000** | 560 | | | | 5,650,000 |
| | 14" CDT | 1,000 | 58,000 | 5,000 | 60,000 | 2,000 | 150 | | | | |
| | 15" CDT | 208,000 | 1,695,000 | 198,000 | 1,683,000 | 33,000 | 210 | | | 150 | |
| | 17"CDT | 285,000 | 2,284,000 | 273,000 | 2,291,000 | 48,000 | 150 | | | 1,820,000 | |
| | Subtotal | **494,000** | **4,037,000** | **476,000** | **4,034,000** | **83,000** | 510 | | | | |
| | Total | **1,002,000** | **8,452,000** | **987,000** | **8,424,000** | **128,000** | CDT+CDT=10,700,000 | | | | 3,700,000 |

Note: Hua Fei will launch the 32"and 36" (16:9) new projects next year with a production capacity of 10 million

CONFIDENTIAL

BMCC-CRT000138733_E Translation

Note: 4 SEG production lines: 21"*2 lines, 34"*1 line（PS+SF）21"PF*1 line

Note: SEG exported 1.9 million of 21" CPT, and 60 ~ 70% will be exported next year

| | | | | | | January-October | January-December | | 2004 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Seg Hitachi | 21" | 369,000 | 2,892,000 | 366,000 | 2,889,000 | 2,890,000 | 3,800,000 | | 5,200,000 | |
| | 34" | 79,000 | 714,000 | 9,000 | 629,000 | 600,000 | FS 800,000 | (There are 260,000 SFs) | 800,000 | |
| | Total | 448,000 | 3,606,000 | 375,000 | 3,518,000 | 0 | 4,600,000 | | 6,000,000 | |
| Guangdong Fortune | 21" | 152,768 | 1,254,973 | 163,735 | 1,251,740 | 8,798 | 1,630,000 | (Nov.-Dec. [illegible] 800,000) | [illegible] | |
| | 25" | 216,552 | 2,440,653 | 186,414 | 2,442,739 | 17,329 | 315 | | | |
| | 29" | 27,037 | 427,075 | 26,044 | 431,532 | 14,507 | 43 | No inventory | 5,000,000 | |
| | Total | 396,357 | 4,122,701 | 376,193 | 4,126,011 | 40,634 | 5,100,000 | | | |
| LG Shuguang | 21" | 198,000 | 1,827,000 | 210,000 | 2,033,000 | 4,000 | 2,450,000 | | | |
| | 25" | 124,000 | 1,208,000 | 132,000 | 1,339,000 | 3,000 | 288 | | | |
| | 25" RF | 39,000 | 277,000 | 40,000 | 323,000 | 3,000 | | | | |
| | 29" SF | 11,000 | 201,000 | 11,000 | 202,000 | 1,000 | 210,000 | | | |
| | 29" FCD RF | 171,000 | 1,167,000 | 170,000 | 1,348,000 | 2,000 | 169 | | | |
| | Subtotal | 543,000 | 4,680,000 | 563,000 | 5,245,000 | 13,000 | | | 4,700,000 | |
| | 15" CDT | 54,000 | 534,000 | 52,000 | 622,000 | 4,000 | 66 | | | |
| | 17" CDT | :139,000 | 639,000 | 130,000 | 709,000 | 12,000 | 368 | | | |
| | 17" SMF | :193,000 | 1,101,000 | 188,000 | 1,297,000 | 9,000 | | | | |
| | Subtotal | :386,000 | 2,274,000 | 370,000 | 2,628,000 | 25,000 | | Sales | 6,260,000 | |
| | Total | 929,000 | 6,954,000 | 933,000 | 7,873,000 | 38,000 | 9,660,000 | 9,700,000 | 11,000,000 | |
| Shenzhen Samsung | 20" | 0 | 148,136 | | 150,624 | 0 | | | | |
| | 21" | 197,920 | 2,415,580 | 198,540 | 2,377,710 | 79 | | | | |
| | 21" DF | 177,160 | 1,710,745 | 177,480 | 1,711,661 | 190 | | | | |
| | Subtotal | 375,080 | 4,274,461 | 376,020 | 4,239,995 | 269 | | | | |
| | 17" CDT | 0 | 0 | 0 | 0 | 0 | | | | |
| | 17" DF | 0 | 0 | 0 | 0 | 0 | | | | |
| | Subtotal | 0 | 0 | 0 | 0 | 0 | | | | |
| | Total | 375,080 | 4,274,461 | 376,020 | 4,239,995 | 269 | | | | |

Page 3 of 4

CONFIDENTIAL                                    BMCC-CRT000138734_E Translation

| | | | | | | | 2003 | | 2004 |
|---|---|---|---|---|---|---|---|---|---|
| Tianjin Samsung<br>3 lines:<br>1L 25", 29"<br>2L 15", 17" CDT<br>3L 34"<br><br>In addition: Shenzhen Samsung still has 10,000,000 | 29 " | | | | | | (January-November) | | |
| | 29" DF | 94,938 | 1,188,025 | 89,847 | 1,182,078 | 13,691 | 1,470,000 | | 2,400,000 |
| | 29" SF | 41,696 | 152,280 | 43,981 | 143,082 | 9,198 | | | |
| | 25" DF | 68,864 | 431,818 | 70,150 | 430,730 | 1,088 | 49 | | |
| | 34" AF | 53,883 | 446,541 | 53,158 | 440,099 | 9,702 | 50 | | 800,000 |
| | **Subtotal** | **259,381** | **2,218,664** | **257,136** | **2,195,989** | **33,679** | | | |
| | 17" DF | 157,154 | 1,148,411 | 154,321 | 1,131,832 | 20,926 | 134 | | 1,800,000 |
| | 15" CDT | 108,431 | 1,143,850 | 82,857 | 1,104,390 | 42,283 | 120 | | 1,600,000 |
| | **Subtotal** | **265,585** | **2,292,261** | **237,178** | **2,236,222** | **63,209** | | | |
| | **Total** | **524,966** | **4,510,925** | **494,314** | **4,432,211** | **96,888** | 500 | | 6,600,000 |
| Shanghai Suoguang<br>29", 34"<br>RSN: 0.7,0.8<br>RFU: 0.35, 0.38<br>(Intercept) | 29" | 14,182 | 133,177 | 4,720 | 127,072 | 8,567 | 140,000 + PF6K | (January-November) | 60% |
| | 34" | 7,989 | 89,978 | 2,246 | 88,956 | 4,761 | 100,000 + PF16,000 | | 40% |
| | 29"RFEN | 24 | 7,743 | 8 | 7,168 | 500 | | | |
| | 34"RFEN | 1,947 | 19,483 | 1,282 | 18,866 | 1,830 | | | |
| | **Total** | **24,142** | **250,381** | **8,256** | **242,062** | **15,658** | 260,000 | (All sold in China) | 450,000 |
| Chunghwa Picture Tubes<br>Renamed in January next year | 14" CDT | 5,300 | 28,500 | 9,800 | 52,600 | 2,900 | | | The production of 14"CDT will be suspended next year, and transfer to 14" CPT |
| | 15" CDT | 315,600 | 3,121,500 | 307,000 | 3,171,100 | 55,700 | | | |
| | 17" CDT | 1,195,100 | 9,004,400 | 1,236,300 | 9,145,900 | 56,000 | | | |
| | 19" CDT | 45,500 | 212,200 | 51,700 | 207,400 | 8,900 | | | |
| | **Total** | **1,561,500** | **12,366,600** | **1,604,800** | **12,577,000** | **123,500** | 15,300,000 | | 16,000,000 |
| Foshan Thomson<br>Exports account for 20% | 29" | 73,000 | 1,216,000 | 73,000 | 1,212,000 | 2,000 | 1,390,000 + PF710,000 | | 1,000,000 FS+200,000 SF+PDF 1,540,000 |
| | 20" | 102,000 | 471,000 | 102,000 | 478,000 | 2,000 | | | |
| | 33" MP | 24,000 | 79,000 | 9,000 | 27,000 | 52,000 | | | |
| | 33" TF | 26,000 | 41,000 | 11,000 | 16,000 | 25,000 | 200,000+PF 150,000 | | 34" 440,000 (including 380,000 PF) |
| | **Total** | **225,000** | **1,807,000** | **195,000** | **1,733,000** | **81,000** | 2,360,000 | Sales 2,290,000 | 3,180,000 |

Note: The price of TFT in November 2003 17": 280$，15": 220$

Page 4 of 4

BMCC-CRT000138735_E Translation

# Exhibit 133



September 6, 2022

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, **Samuel Chong**, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of the document with bates number: BMCC-CRT000139461 to BMCC-CRT000139463.

*(Digital or printed signature here above the line)*

_____

**Samuel Chong**

Project Number: BBLLP_2209_P0013

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

# Meeting Minutes

Date: Nov. 3, 2003

Place: Ministry of Information Industry

Participants: Sales supervisors of some color TV sets and CPT manufacturers in China

**Content:**

1. Director Liu, Ministry of Information Industry

From January to September, 2003, the color TV industry continued to see develop, the domestic market was vigorous, the production and sales continued to increase at a rate of 26.8%, and the export was mainly contributed by small-screen color TVs, showing a good trend. Changhong still kept the first place in the industry with the advantage of the largest export volume.

Multinational enterprises from Japan and South Korea have increased their investment, and PTV, LCD and PDP have developed rapidly, and the competition has changed from price competition to technology competition.

In China, the consumption pattern has changed from one TV per household to multiple TV sets per household, and personalized products with low price and high quality are dominating the urban market.

2. Shanghai NOVEL CPT Factory

In 2002, it produced and sold 6 million CRTs, and 5.57 million from January to September 2003. It is estimated that 6.7 million CRTs will be produced and sold in the whole year, and the CRT sales will be increased to about 7 million in 2004.

3. XOCECO TV

In 2003, it saw an increase in the export of the complete units, and high-end TVs sold well. From January to September, XOCECO produced 1.6 million units, and a total of 2 million units will be produced in the whole years, of which exports account for about 37%, and the goal of balancing production and sales was achieved. In 2004, it is estimated that 2.5 million units will be produced, and the export destination is still mainly Australia, while the exports to the United States will reduce.

4. Changhong

In 2004, Changhong expects to produce 12-15 million color TV sets, and the production of PTV will increase from 350,000 in 2003 to more than 500,000, and the export destinations will be distributed more evenly.

5. Huafei CPT Factory

In 2003, Huafei produced 10 million CRTs, including 4.8 million CDTs and 5.2 million CPTs.

They hope the Ministry can have a clear guidance on the formulation and future development of digital TV sets in 2008.

6. Hisense

In 2003, Hisense produced and sold 4.6-4.8 million color TV sets, of which 1 million were exported. In 2004, the output was mainly driven by export, and the annual output was expected to be 6 million units, of which 2 million were exported.

It is expected that from the end of 2003 to the beginning of 2004, the demand for LCD, PDP and digital high-definition color TV sets will increase, and the decline in prices indicates that the products are mature, and the above products were mainly sold in domestic market.

7. KONKA

KONKA produced 9-9.5 million color TV sets in 2003, of which 7.5-8.5 million were sold in China, and the output will increase to about 12 million units in 2004.

8. Skyworth

Skyworth produced 6 million color TV sets from January to October 2003, and 8.4 million in the whole year, of which 2 million were exported, with emphasis on the production and research and development of high-definition color TV sets, and the output increased by 10%-15% in 2004

9. Seg Hitachi CPT Factory

The company is an export-oriented enterprise. In 2003, the export of color TV sets accounted for 70%, and the capacity of its production line will increase in 2004.

10. Ministry of Information Industry

Compared with the same period in 2002, the production and sales of color TV sets in the China market in 2003 increased at a rate of 10%-15%, and the export increased by 17%; The trend of technology development has changed from analog TV to digital HDTV, the purchasing power in urban areas has gradually developed from 29" CRT color TV to high-end color TV, the sales channel has changed from domestic market to the coexistence of domestic and export markets, and the competition among peers has also changed from price competition to technology competition.

The anti-dumping case in US, a new round of development trend of market structure and high-end products, the competition and cooperation among peers will become the uncertain factors of color TV industry in the future; The increase of urbanization products, the development of domestic real estate and the undeveloped rural market are also important factors directly related to the color TV market.

For digital color TV sets in China, the transformation from cable signals, satellite signals to ground station signals, from the separation of unit and card to their compatibility, from high definition to standard definition indicates that domestic color TV sets are maturing day by day.

**Suggestion to the company:**

1. With the introduction of export tax rebate policy, in order to reduce costs, attention should be paid to the purchase channels of raw materials.

2. Always pay attention to the development of digital high-definition color TV, and comprehensive digital information on the market status and trend of large-screen color TV should be obtained, so as to provide favorable basis for the Company's future production.

Sales Department: Jing Guo, Hai Huang
and Shuliang Li

November 4, 2003

CONFIDENTIAL                                            BMCC-CRT000139463_E Translation

# Exhibit 134



September 6, 2022

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, **Samuel Chong**, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of the document with bates number: BMCC-CRT000054691 to BMCC-CRT000054694.

*(Digital or printed signature here above the line)*

_____

**Samuel Chong**

Project Number: *BBLLP_2209_P0013*

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

# Business Travel Report

Reporter: Hong Qin

August 21, 2007

Duration: Aug. 15-17, 2007

Destination: Xi'an, Shaanxi province

Main task: Attend the appraisal meeting of the 32"CRT HDTV display circuit" of Shaanxi Tongshi Data Co., Ltd. to promote the sales of BMCC32" PF picture tubes.

Participants: Department of Electronic Information Products Management, Ministry of Information Industry: Director Weimin Bai, Department of Science and Technology: Director Xiaolong He, CETC No.3 Institute: Professor Quanen Liu and Professor Yongcheng An, No.4 Institute: Deputy Director Subing Zhang, No.5 Institute: Director Lihui Chen, Skyworth: Xiufeng Yang, KONKA: Mang Zhao, Hisense: Shihua Sun, Changhong: Chuanning Jiang, SVA: Xinyan Chu, Irico Group: Weichuan Zhang, Huanghe Electric: Jingwu Hou, Jun Duan and Ting Fang, Shaanxi Provincial Department of Information Industry: Deputy Director-General Pusheng Xu, Director Tieying Xue and Chun Lei, BMCC: Qi Liu, Hong Qin.

## I. Xi'an Tongshi Data Co., Ltd.

1. Xi'an Tongshi Data Co., Ltd. was established in March 1997, with a registered capital of RMB 50 million. It is a limited liability company and has more than 50 employees, including 38 technical service and R&D personnel. Tongshi is a high-tech enterprise mainly focusing on R&D and supplemented by production and sales. The projects it developed include large-screen HD solutions, data broadcasting products and digital TV front-end devices.

2. From 2005 to 2006, the Company has developed the high-definition TV display circuit based on the BMCC32" flat panel HD CRT (S76MAG185X91) picture tube. The prototype passed the high-definition test of the Digital TV Standard Test Center (No.4 Institute) of the Ministry of Information Industry in March 2007.

3. The research and development of 32" CRT HDTV display circuit was supported with RMB 1.5million from Shaanxi Provincial Department of Information Industry and RMB 1 million from Radio & Television Office of Department of Electronic Information Products Management, Ministry of Information Industry.

[Page]

## II. Description of the appraisal meeting

1.    Overall impression

With the HD circuit developed by Tongshi and the detail distance 32" HD CRT produced by BMCC, the TV images broadcast in HD signal sources have high picture definition and good color reducibility, and it can support various display modes. It is a high-quality high-definition TV (HDTV) with fine image quality rarely seen in recent years, which have much better visual effects than LCD TV. All representatives at the meeting a gave high recognition.

2.    Technical characteristics of the circuit

(1)  The self-developed "multi-horizontal frequency S correction circuit" (which has been patented) is adopted to realize the continuous adjustment of S-correction in multi-horizontal frequency mode. Mainly automatically adjust the S-correction capacitor corresponding to different horizontal frequencies. The circuit features simple structure, stable performance, high reliability, low cost and originality.

(2)  It can automatically adapt to the high-definition format under 28KHZ-48KHZ multi-horizontal frequencies, without format conversion, and directly add the image signal to the R, G and B guns of CRT without damaging the signal, thus realizing a high definition display effect.

(3)  By adding a brightness compensation circuit of horizontal frequency parabolic wave to G1, the central brightness is reduced to achieve overall brightness uniformity, which improves the non-uniformity of CRT full screen brightness.

(4)  Through the change of +B voltage in different horizontal frequencies, stable high voltage, horizontal width and field amplitude compensation are realized, and the image stability in multi-horizontal frequency mode is improved.

(5)  The self-developed embedded system software is added in a small signal box to simplify the problem of product debugging in multi-horizontal frequency mode.

3.    Experts' opinions (see the attachment)

## III.  Other information

[Page]

1. The 32" CRT HDTV display circuit developed by Tongshi has been recognized and supported by the leaders of Science and Technology Department and Product Management Department of the Ministry of Information Industry. Shaanxi Provincial Department of Information Industry also strongly supports its industrialization, and wants Xi'an Huanghe Electric Co., Ltd. to organize the production, and apply it to Xianyang Irico's 32" CRT and produce TV sets for sale. But Irico 32"CRT is now faced with two problems:

    a.  CRT is not a detail distance tube and cannot meet the standards for HDTV.

    b.  CRT DY does not support 48KHZ scanning and cannot support multi-horizontal frequency operation mode.

2. This technology is somewhat untimely. All the assembly plants indicated that if the technology was developed two or three years earlier, it would definitely be used in large quantities. At present, all the assembly plants hope to apply it to the 32"PF-SLIM tubes, and they estimated that DY cannot support 48KHZ, so it would not match it.

3. Director Weimin Bai has repeatedly said that we should consider how to publicize and support CRT industry in the near future. In the past two years, efforts have been made on positive publicity of PDP some effects have been achieved. Positive publicity of CRT should be considered later, but how to publicize it and guide the market is still under consideration. Several upcoming events:

    (1) The color TV industry summit will be held on Sept. 14, where the industrial structure will be discussed. At the meeting, the HD circuit of Tongshi and BMCC's 32" high-definition detail distance CRT will be demonstrated, and positive publicity will be made.

    (2) A report meeting of digital TV industry report meeting will be held on Sept. 20, in which CRT TV will be positively publicized and reported.

**IV. Ideas on product promotion**

1. From this appraisal meeting, we have seen the display effect of CRT TV, which can be called the best of all CRT TV products. Of course, only BMCC's 32" detail distance tube can provide this effect. Later, we should consider how to enable TV manufacturers to widely use the circuit scheme of Tongshi, and to produce products accepted by the market based on BMCC's 32" picture tubes. We should make follow-up efforts in promotion in the future.

CONFIDENTIAL                                        BMCC-CRT000054693_E Translation

2.　　The broadcast of national HD signal programs has a great influence on the sales of CRT 16:9 widescreen TV sets. In the future, we should pay attention to the trial broadcast time of high-definition TV programs and cooperate with TV manufacturers in publicity and promotion.

3.　　Recently, Changhong has been leading the sales of large-screen TV sets in China, and in the future, we should focus on promoting 32"detail distance HD TV sets in Changhong.

4.　　Hisense has been promoting its HDTV, so we can also cooperate with Hisense to promote 32" CRT HDTV.

5.　　The brightness compensation circuit of Tongshi can be used in the circuits of 28"PF (AK) and 29" PFI-ARC, which can effectively improve the white field uniformity of AK tubes.

——The End——

CONFIDENTIAL

# Exhibit 135



September 6, 2022

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, **Samuel Chong**, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of the document with bates number: CHU00047273 to CHU00047275.

*Digital or printed signature here above the line)*

_____

**Samuel Chong**

Project Number: _BBLLP_2209_P0013_

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

**From:** DENIS.HUANG [huangzy@cptf.com.cn]

**Sent:** Thursday, March 01, 2007 12:55 AM

**To:** humf@cptf.com.cn

**Subject：** Re: ??: Re: Medium? Large? 8 major color tube manufacturers?? Inventory? Word handover? Matters

Mei Fang,

Happy New Year!!

The question is, do the so-called eight major color tube manufacturers in China agree to exchange data in this way? Please make it clear, and then we will negotiate and deal with it!!

　　　Huang SIR March 1, 2007

---

**From:** Meifang Hu [mailto: humf@cptf. com.cn]

**Sent:** February 26, 2007 10:03

**To:** acptf-Director Zhenyi Huang

**Subject:** Fw: Fw: Reply: Medium? Large? 8 major color tube manufacturers?? Inventory? Word handover? Matters

**Importance:** High

Meifang Hu

February 26, 2007

---

**From:** Meifang Hu

**Sent:** February 26, 2007 10:01:51

**To:** huang-hai

**CC:**

**Subject:** Fw: Re: Medium? Large? 8 major color tube manufacturers?? Inventory? Word handover? Matters

Hai Huang,

The following is my application to the boss to join the data exchange of 8 major color tube manufacturers in China and my boss's reply.

The boss said that we can only exchange CPTF data, which I also think is reasonable. Although we only produce 14" CPTs at present, we have started to produce 21"/21" rf/21" short tubes one after another, and our sales target this year will probably be close to some of the 8 major color tube manufacturers (such as Novel), and it is estimated that will surpass them next year. If all the color tube manufacturers also exchanges their overseas data, I think that our boss will also agree to exchange CPTM data.

Everyone will report their data to the Ministry of Information Industry every month, so the data of each of them is quite transparent.

As the president of the industry, you can think about how to deal with this matter. I hope you can do your duty as the president.

Thank you very much!

I wish you a happy New Year.

Very depressed, I was asked by my boss to work overtime today.

Meifang Hu February 26, 2007

Meifang Hu

February 26, 2007

CONFIDENTIAL - GRAND JURY MATERIAL　　　　　　　　　　　　　　　　　　CHU00047273_E Translation

**From:** DENIS.HUANG

**Sent:** February 14, 2007 20:49:04

**To:** yangsj@cptm.com.my; Humf@cptf.com.cn; cpyong@cptm.com.my

**CC:** CPTM Lijie Huang (Manager); Manager Wenxiang Wu, CPTM

**Subject:** Re: Medium? Large? 8 major color tube manufacturers?? Inventory? Word handover? Matters

IRIS,

Please follow the latest instructions of the assistant manager to interact with the eight domestic color tube manufacturers. In the later process, the exchange will be made in principle after receiving the instructions of CPTF DATA. CPTM is irrelevant with this. Please understand and implement it. Let's negotiate and deal with the specific difficulties!!

?????????????????? DENIS. HUANG February 14, 2007

---

**From:** yangsj@cptm.com.my [mailto:yangsj@cptm.com.my]

**Sent:** February 14, 2007 11:04

**To:** Humf@cptf.com.cn; huangzy@cptf.com.cn; cpyong @cptm.com.my

**Subject:** RE: Medium? Large? 8 major color tube manufacturers?? Inventory? Word handover? Matters

CPTF will also produce 21" FS/RF/Slim in the future, and the scale will not be the smallest in mainland China. There is no reason to provide CPTM data, and LPD/SDI/MTPD will also provide all the data of the plants overseas?

S.J. Yang (Shengren Yang)

Assistant Vice President

Sales & Marketing Division

Chunghwa Picture Tubes (M) Sdn. Bhd.

E-mail: yangsj@cptm.com.my

---Original Message---

From: Meifang Hu

Sent: Thursday, February 08, 2007 1:32 PM

To： Zhenyi Huang; Yong Chaw Ping-SAL; Yang Sheng Jen-Sales Assistant Vice President

Subject: い？□？8□帅恨述？？□？□ユ？タ ｝

Assistant Manager Yang, Director Huang and Chao Ping:

The attachment is the standard format of monthly data delivery of 8 major Chinese color tube manufacturers.

The president of the association of 8 major Chinese color tube manufacturers said, The condition for CPTF to join the exchange is to exchange CPTM data according to the standard format.

Supervisors, please tell me how to deal with it, thank you!

CONFIDENTIAL - GRAND JURY MATERIAL

Meifang Hu February 8, 2007

Best regards

*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*

Meifang Hu (IRIS HU)

Sales & Marketing Dept.

Tel: 86-591-83971357 ext: 2727

Fax: 86-591-83970507

E-mail: humf@cptf.com.cn

P.c：   350015

Company CPTF Optronics Co., Ltd.

Address: No.1 XinYe road,
          Mawei Hi-tech Development Zone,
          Fuzhou, Fujian, China

*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*=*

CHU00047275_E Translation

# Exhibit 136



September 6, 2022

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, Samuel Chong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of the document with bates number:

IRI-CRT-00029680;

IRI-CRT-00029695 (section header) to IRI-CRT-00029700 (section header);

IRI-CRT-00029724 (section header) to IRI-CRT-00029729 (section header).

*(Digital or printed signature here above the line)*

_____

Samuel Chong

Project Number: *BBLLP_2209_P0013*

15 W. 37th Street 4th Floor

| | 2003 | 148 |
|---|---|---|
| Production, Technology | Long term | |

*29 Pages in Total*

CONFIDENTIAL                                                        IRI-CRT-00029680

**Data source: All companies, sorting of the Information Office   2003. 5**

**Among the above data, the capacities of the factories in China mainland, LPD and CPT are the data in 2003, and the capacities of other factories are the data in August 2002, for reference only.**

From the above table, we can see that the capacity distribution of 21″ (including 20″) CPTs in the world has the following features:

①　The global capacity of 21″ (including 20″) CPTs is surplus. The current capacity can already meet the demand for market growth in the next 5 years.

②　The capacity is oversupplied. However, after long-time price competition in the small and medium-sized screen CPT market, quite a few manufacturers in the developed countries have withdrawn, making the supply and demand basically strike a balance. And with the acceleration of asset restructuring in the industry and the transfer of small and medium-sized screen production lines to developing countries, locally there may be a shortage of CPTs in stages, but it will not last long.

③　Due to the mature technology of small and medium-sized screen CPT, the competition focuses on cost. In recent years, CPT production has been gradually transferred to developing countries, and China, India, Southeast Asia, Brazil and Mexico have become the main production bases.

(III) Chinese market

1. Market size

(1) Market status

China is the largest CPT production base in the world, and its annual output accounts for about 1/3 of the total output of the global market.

At present, ten companies in the Chinese CPT industry produce small and medium-sized screen CPTs. The output in recent years is shown in Table 4 below.

**Table 4 Output of small and medium-sized screen CPTs in China from 1999 to 2003**

Unit: Million pieces

| Size type | 1999 | 2000 | 2001 | 2002 | 2003 Q1 |
|---|---|---|---|---|---|
| Small and medium-sized screen CPT | 28.37 | 29.38 | 28.96 | 36.9 | 9.74 |
| Total CPT output | 34.95 | 38.77 | 37.31 | 49.67 | 13.41 |
| Proportion of small and medium-sized screen CPTs | 81.2% | 75.8% | 77.6% | 74.3% | 72.6% |

**Data source: Electronic Information Product Management Department of the Ministry of Information Industry, manufacturers, and sorting of the Information Office 03.05**

From Table 4, it can be seen that the Chinese small and medium-sized screen CPT market has the following features:

① Small and medium-sized screen CPTs are the mainstream of the market and accounted for 74.3% of the national CPT market in 2002, basically consistent with the global market (74.5% in the global market);

② The growth rate of the small and medium-sized screen CPT output is lower than the growth rate of the CPT market shipments; and the market share is shrinking;

**(2) Forecast in 2003**

Below is the forecast on the domestic small and medium-sized screen CPT output in 2003 based on the annual production plans formulated by the CPT manufacturers in early 2003, for reference only.

**Table 5      Forecast on domestic small and medium-sized screen CPT output in 2003**

**Unit: Million pieces**

| Company name | 14″ | 20″ | 21″FS | 21″PF | 25″FS | 25″PF | Total |
|---|---|---|---|---|---|---|---|
| Tianjin Samsung | | | | | | 0.1 | 0.1 |
| SEG Hitachi | | | 3.2 | 0.2 | | | 3.4 |
| Guangdong Fudi | | | 1.8 | | 2 | | 3.8 |
| Shenzhen Samsung | | 0.3 | 1.7 | 3 | | | 5 |
| LG Shuguang | | | 2.45 | | 1.1 | 0.3 | 3.85 |
| Shanghai Yongxin | | | 1.93 | | 1.25 | | 3.18 |
| Nanjing Huafei | | | 1.2 | 1.2 | 0.8 | 0.8 | 4 |
| Panasonic Beijing | 2 | | 2.8 | 0.8 | | | 5.6 |
| Caihong Group | 3.48 | | 3.55 | 0.3 | 1.46 | 0.51 | 9.3 |
| Total | 5.48 | 0.3 | 18.63 | 5.5 | 6.61 | 1.71 | 38.23 |
| Proportion of this size in the CPT market | 10.2% | 0..6% | 34.6% | 10.2% | 12.3% | 3.2% | 71.0% |

**Data source: CPT manufacturers, sorting of the Information Office 2003. 5**

2. Market mix

Table 6    Domestic output of major small and medium-sized screen CPTs in the recent years

Unit: Million pieces

| Size type | 1999 | 2000 | 2001 | 2002 | 2003 (forecast) |
|---|---|---|---|---|---|
| 14″ | 3.64 | 5.45 | 4.14 | 5.15 | 5.48 |
| Annual growth rate | | 49.7% | -24.0% | 24.4% | 6.4% |
| 21″ | 16.24 | 14.73 | 18.25 | 22.49 | 24.13 |
| Annual growth rate | | -9.3% | 23.9% | 23.2% | 7.3% |
| 25″ | 8.1 | 8.4 | 6.34 | 8.82 | 8.32 |
| Annual growth rate | | 3.7% | -24.5% | 39.1% | -5.7% |

**Data source: Electronic Information Product Management Department of the Ministry of Information Industry, sorting of the Information Office 2003, 02**

The mix of the domestic small and medium-sized screen CPT products in China (2002) is shown in Figure 4.

**Figure 7 CPT product mix in 2002 (based on size)**



**Data source: Electronic Information Product Management Department of the Ministry of Information Industry, sorting of the Information Office 2003, 02**

From the above chart, it can be seen that the mix of small and medium-sized screen CPT products in China has the following features:

① In the small and medium-sized screen CPT market, the three types 14″, 21″ and 25″ occupy the vast majority of the market. Their share in the entire CPT market is 73.5%;

② In the Chinese small and medium-sized screen CPT market, 21″ has the largest market share, and its average growth rate in recent years is also the largest. In 2002, the market share of 21″ was 45.3%, which was 8.5 percentage points higher than that in the global market in the same period. By contrast, the market shares of 14″ and 25″ were lower than those in the global market in the same period.

3. Import and export

(1) Export

The export mix of small and medium-sized screen CPTs in 2002 is shown in Table 7.

The data in the table is the data reported and provided by the manufacturers, for reference only:

**Table 7   CPT export mix in 2002**

| Size type | Export volume (million pcs) | Ratio |
|---|---|---|
| 14″ | 2.81 | 21.6% |
| 20″ | 0.33 | 2.5% |
| 21″ FS | 5.8 | 44.6% |
| 21″ PF | 1.98 | 15.2% |
| 25″ FS | 0.4 | 3.1% |
| 25″ PF | 0.06 | 0.5% |
| CPT above 25″ | 1.62 | 12.5% |
| Total | 13 | 100.0% |

**Data source: Exchange data of production, sales and storage of the CPT industry, sorting of the Information Office 2003. 05**

From the table, we can see obviously that the CPT export of China is dominated by small and medium-sized screen CPTs. In 2002, the export volume of small and medium-sized screen CPTs of 25″ or below was up to 11.38 million pieces, accounting for 87.5% of the total export of CPTs.

**(2) Import**

China is also a large CPT importer. It imported 9.82 million CPTs in 2002. From the fourth quarter of 2002, the import volume is larger than the export volume.

21″ accounts for a very large portion of the CPTs imported by China. Taking 2002 for example, China produced 22.49 million 21″ CPTs, sold 22.56 million 21″ CPTs and exported 7.78 million 21″ CPTs; in the same period, China produced 19.69 million 21″ color TV sets. Calculated based on the above data, the import volume of 21″ CPTs in 2002 was about 5 million pieces

**4. Main manufacturers**

At present, ten companies in the Chinese CPT industry produce small and medium-sized screen CPTs. The small and medium-sized screen CPT production of each manufacturer in 2002 is shown in Table 8.

**Table 8   Small and medium-sized screen CPT production of each CPT manufacturer in 2002**

**Unit: Million pieces**

| Company name | 14″ | 20″ | 21″ FS | 21″ PF | 25″ FS | 25″ PF | Total | Total CPT output | Proportion of small and medium-sized screen CPTs |
|---|---|---|---|---|---|---|---|---|---|
| Suoguang Visual | | | | | | | 0 | 0.31 | 0 |

IRI-CRT-00029698

| | C1 | C2 | C3 | C4 | C5 | C6 | Total | | % |
|---|---|---|---|---|---|---|---|---|---|
| Thomson | | 0.16 | | | | | 0.16 | 1.65 | 9.7% |
| Tianjin Samsung | | | | | | 0.34 | 0.34 | 2.18 | 15.6% |
| SEG Hitachi | | | 3.24 | | | | 3.24 | 3.92 | 82.7% |
| Guangdong Fudi | | | 2.09 | | 1.64 | 0.02 | 3.75 | 4.4 | 85.2% |
| Shenzhen Samsung | | 0.28 | 1.25 | 2.87 | | | 4.4 | 4.4 | 100.0% |
| LG Shuguang | | | 2.29 | | 1.47 | 0.23 | 3.99 | 5.58 | 71.5% |
| Shanghai Yongxin | | | 1.88 | | 1.34 | | 3.22 | 5.83 | 55.2% |
| Nanjing Huafei | | | 1.55 | 0.24 | 1.59 | | 3.38 | 4.63 | 73.0% |
| Panasonic Beijing | 1.94 | | 2.85 | 0.62 | | | 5.41 | 7.45 | 72.6% |
| Caihong Group | 3.21 | | 3.61 | | 1.48 | 0.71 | 9.01 | 9.32 | 96.7% |
| Total | 5.15 | 0.44 | 18.76 | 3.73 | 7.52 | 1.3 | 36.9 | 49.67 | 74.3% |

**Data source: Electronic Information Product Management Department of the Ministry of Information Industry, sorting of the Information Office   2003. 5**

From the above table, it can be seen that among domestic CPT companies, Suoguang Visual, Thomson and Tianjin Samsung mainly produce large-screen CPTs, while Caihong Group and Tianjin Samsung mainly produce small and medium-sized screen CPTs, and the proportion of small and medium-sized screen CPTs in Caihong is up to 96.7%.

To sum up, CRT TV will remain to be a mainstream type in the TV market in the next five years, while small and medium-sized screen color TV occupies a vast majority (above 70%) of the CRT market and its market size in the near future will be large.

Due to the large market size of small and medium-sized screen CPTs, although the market basically has no room for growth, the manufacturers are still profitable and the current competition focuses on cost and marketing.

**1. Global market**

☺ The shipments of small and medium-sized screen CPTs may reach a peak in 2005 and then will drop slowly.

☺ It is estimated that in next five years, in the global small and medium-sized screen CPT market, the shipments of 14″ will begin to drop slowly, while the shipments of 25″ will remain unchanged basically and only the shipments of 21″ will maintain slow and continuous growth.

☺ The global capacity of small and medium-sized screen CPTs is surplus, but the supply and demand basically strike a balance. With the suspension of production lines in developed countries and transfer to developing countries, locally there may be a shortage of some types, but it will not last long.

**2. Domestic market**

☺ In the domestic market, the capacity of small and medium-sized screen CPTs is much higher than the demand of the domestic color TV consumer market (in 2002, the size of the domestic small and medium-sized screen color TV market was about 17 million sets). In 2002, about 20 million small and medium-sized screen CPTs were exported directly or indirectly (installed in machines). Small and medium-sized screen CPT is increasingly dependent on exports to overseas markets,

making it more vulnerable to trade barriers, tariff policies and global economy.

⑦ Due to the shortage of some types in the domestic CPT market in 2002, and the good expectations for the market in the next few years, some manufacturers try to increase production lines or carry out expansion and upgrading. The expansion of small and medium-sized screen production is concentrated on 21″. SEG has introduced a 21″ PF production line from Hitachi (S-8 line, with an annual production capacity of 1.8 million pieces), which is expected to start production in the fourth quarter of 2003; through upgrading, Guangdong Fudi and Shenzhen Samsung increased the capacity of a single 21″ line from 6,000 pieces a day to 7,000 pieces a day. It is estimated that the capacity of 21″ in 2003 will increase by 2.4 million pieces, to 26.6 million pieces and the market competition in the future will be even fiercer.

⑦ In the domestic small and medium-sized screen CPT market, the share of 21″ is the largest and its average growth rate in the recent few years is the largest, too, but the room for growth of the market in the future will be limited, and the competition must rely on cost and marketing, while export (including indirect export) will become an important route.

CONFIDENTIAL                                                                                    IRI-CRT-00029700

**Data source: All companies, sorting of the Information Office   2003. 5**

**Among the above data, the capacities of the factories in China mainland, LPD and CPT are the data in 2003, and the capacities of other factories are the data in August 2002, for reference only.**

From the above table, we can see that the capacity distribution of 21″ (including 20″) CPTs in the world has the following features:

① The global capacity of 21″ (including 20″) CPTs is surplus. The current capacity can already meet the demand for market growth in the next 5 years.

② The capacity is oversupplied. However, after long-time price competition in the small and medium-sized screen CPT market, quite a few manufacturers in the developed countries have withdrawn, making the supply and demand basically strike a balance. And with the acceleration of asset restructuring in the industry and the transfer of small and medium-sized screen production lines to developing countries, locally there may be a shortage of CPTs in stages, but it will not last long.

③ Due to the mature technology of small and medium-sized screen CPT, the competition focuses on cost. In recent years, CPT production has been gradually transferred to developing countries, and China, India, Southeast Asia, Brazil and Mexico have become the main production bases.

(III)   Chinese market

1. Market size

CONFIDENTIAL                                                                                      IRI-CRT-00029724

(1) Market status

China is the largest CPT production base in the world, and its annual output accounts for about 1/3 of the total output of the global market.

At present, ten companies in the Chinese CPT industry produce small and medium-sized screen CPTs. The output in recent years is shown in Table 4 below.

**Table 4  Output of small and medium-sized screen CPTs in China from 1999 to 2003**

Unit: Million pieces

| Size type | 1999 | 2000 | 2001 | 2002 | 2003 Q1 |
|---|---|---|---|---|---|
| Small and medium-sized screen CPT | 28.37 | 29.38 | 28.96 | 36.9 | 9.74 |
| Total CPT output | 34.95 | 38.77 | 37.31 | 49.67 | 13.41 |
| Proportion of small and medium-sized screen CPTs | 81.2% | 75.8% | 77.6% | 74.3% | 72.6% |

**Data source: Electronic Information Product Management Department of the Ministry of Information Industry, manufacturers, and sorting of the Information Office 03.05**

From Table 4, it can be seen that the Chinese small and medium-sized screen CPT market has the following features:

① Small and medium-sized screen CPTs are the mainstream of the market and accounted for 74.3% of the national CPT market in 2002, basically consistent with the global market (74.5% in the global market);

② The growth rate of the small and medium-sized screen CPT output is lower than the growth rate of the CPT market shipments; and the market share is shrinking;

**(2) Forecast in 2003**

Below is the forecast on the domestic small and medium-sized screen CPT output in 2003 based on the annual production plans formulated by the CPT manufacturers in early 2003, for reference only.

**Table 5    Forecast on domestic small and medium-sized screen CPT output in 2003**

**Unit: Million pieces**

| Company name | 14″ | 20″ | 21″FS | 21″PF | 25″FS | 25″PF | Total |
|---|---|---|---|---|---|---|---|
| Tianjin Samsung | | | | | | 0.1 | 0.1 |
| SEG Hitachi | | | 3.2 | 0.2 | | | 3.4 |
| Guangdong Fudi | | | 1.8 | | 2 | | 3.8 |
| Shenzhen Samsung | | 0.3 | 1.7 | 3 | | | 5 |
| LG Shuguang | | | 2.45 | | 1.1 | 0.3 | 3.85 |
| Shanghai Yongxin | | | 1.93 | | 1.25 | | 3.18 |
| Nanjing Huafei | | | 1.2 | 1.2 | 0.8 | 0.8 | 4 |
| Panasonic Beijing | 2 | | 2.8 | 0.8 | | | 5.6 |
| Caihong Group | 3.48 | | 3.55 | 0.3 | 1.46 | 0.51 | 9.3 |
| Total | 5.48 | 0.3 | 18.63 | 5.5 | 6.61 | 1.71 | 38.23 |
| Proportion of this size in the CPT market | 10.2% | 0..6% | 34.6% | 10.2% | 12.3% | 3.2% | 71.0% |

**Data source: CPT manufacturers, sorting of the Information Office 2003. 5**

CONFIDENTIAL

2. Market mix

Table 6     Domestic output of major small and medium-sized screen CPTs in the recent years

Unit: Million pieces

| Size type | 1999 | 2000 | 2001 | 2002 | 2003 (forecast) |
|---|---|---|---|---|---|
| 14″ | 3.64 | 5.45 | 4.14 | 5.15 | 5.48 |
| Annual growth rate | | 49.7% | -24.0% | 24.4% | 6.4% |
| 21″ | 16.24 | 14.73 | 18.25 | 22.49 | 24.13 |
| Annual growth rate | | -9.3% | 23.9% | 23.2% | 7.3% |
| 25″ | 8.1 | 8.4 | 6.34 | 8.82 | 8.32 |
| Annual growth rate | | 3.7% | -24.5% | 39.1% | -5.7% |

**Data source: Electronic Information Product Management Department of the Ministry of Information Industry, sorting of the Information Office 2003, 02**

The mix of the domestic small and medium-sized screen CPT products in China (2002) is shown in Figure 4.

**Figure 7  CPT product mix in 2002 (based on size)**



**Data source: Electronic Information Product Management Department of the Ministry of Information Industry, sorting of the Information Office 2003, 02**

From the above chart, it can be seen that the mix of small and medium-sized screen CPT products in China has the following features:

☺   In the small and medium-sized screen CPT market, the three types 14″, 21″ and 25″ occupy the vast majority of the market. Their share in the entire CPT market is 73.5%;

☺   In the Chinese small and medium-sized screen CPT market, 21″ has the largest market share, and its average growth rate in recent years is also the largest. In 2002, the market share of 21″ was 45.3%, which was 8.5 percentage points higher than that in the global market in the same period. By contrast, the market shares of 14″ and 25″ were lower than those in the global market in the same period.

3. Import and export

(1) Export

The export mix of small and medium-sized screen CPTs in 2002 is shown in Table 7.

The data in the table is the data reported and provided by the manufacturers, for reference only:

**Table 7   CPT export mix in 2002**

| Size type | Export volume (million pcs) | Ratio |
|-----------|----------------------------|-------|
| 14″ | 2.81 | 21.6% |
| 20″ | 0.33 | 2.5% |
| 21″ FS | 5.8 | 44.6% |
| 21″ PF | 1.98 | 15.2% |
| 25″ FS | 0.4 | 3.1% |
| 25″ PF | 0.06 | 0.5% |
| CPT above 25″ | 1.62 | 12.5% |
| Total | 13 | 100.0% |

**Data source: Exchange data of production, sales and storage of the CPT industry, sorting of the Information Office 2003. 05**

From the table, we can see obviously that the CPT export of China is dominated by small and medium-sized screen CPTs. In 2002, the export volume of small and medium-sized screen CPTs of 25″ or below was up to 11.38 million pieces, accounting for 87.5% of the total export of CPTs.

**(2) Import**

China is also a large CPT importer. It imported 9.82 million CPTs in 2002. From the fourth quarter of 2002, the import volume is larger than the export volume.

21″ accounts for a very large portion of the CPTs imported by China. Taking 2002 for example, China produced 22.49 million 21″ CPTs, sold 22.56 million 21″ CPTs and exported 7.78 million 21″ CPTs; in the same period, China produced 19.69 million 21″ color TV sets. Calculated based on the above data, the import volume of 21″ CPTs in 2002 was about 5 million pieces

**4.   Main manufacturers**

At present, ten companies in the Chinese CPT industry produce small and medium-sized screen CPTs. The small and medium-sized screen CPT production of each manufacturer in 2002 is shown in Table 8.

**Table 8   Small and medium-sized screen CPT production of each CPT manufacturer in 2002**

Unit: Million pieces

| Company name | 14″ | 20″ | 21″ FS | 21″ PF | 25″ FS | 25″ PF | Total | Total CPT output | Proportion of small and medium-sized screen CPTs |
|--------------|-----|-----|--------|--------|--------|--------|-------|------------------|--------------------------------------------------|
| Suoguang Visual | | | | | | | 0 | 0.31 | 0 |

| | | | | | | Total | | |
|---|---|---|---|---|---|---|---|---|
| Thomson | 0.16 | | | | | 0.16 | 1.65 | 9.7% |
| Tianjin Samsung | | | | | 0.34 | 0.34 | 2.18 | 15.6% |
| SEG Hitachi | | 3.24 | | | | 3.24 | 3.92 | 82.7% |
| Guangdong Fudi | | 2.09 | | 1.64 | 0.02 | 3.75 | 4.4 | 85.2% |
| Shenzhen Samsung | 0.28 | 1.25 | 2.87 | | | 4.4 | 4.4 | 100.0% |
| LG Shuguang | | 2.29 | | 1.47 | 0.23 | 3.99 | 5.58 | 71.5% |
| Shanghai Yongxin | | 1.88 | | 1.34 | | 3.22 | 5.83 | 55.2% |
| Nanjing Huafei | | 1.55 | 0.24 | 1.59 | | 3.38 | 4.63 | 73.0% |
| Panasonic Beijing | 1.94 | | 2.85 | 0.62 | | | 5.41 | 7.45 | 72.6% |
| Caihong Group | 3.21 | | 3.61 | | 1.48 | 0.71 | 9.01 | 9.32 | 96.7% |
| Total | 5.15 | 0.44 | 18.76 | 3.73 | 7.52 | 1.3 | 36.9 | 49.67 | 74.3% |

**Data source: Electronic Information Product Management Department of the Ministry of Information Industry, sorting of the Information Office** 2003. 5

From the above table, it can be seen that among domestic CPT companies, Suoguang Visual, Thomson and Tianjin Samsung mainly produce large-screen CPTs, while Caihong Group and Tianjin Samsung mainly produce small and medium-sized screen CPTs, and the proportion of small and medium-sized screen CPTs in Caihong is up to 96.7%.

To sum up, CRT TV will remain to be a mainstream type in the TV market in the next five years, while small and medium-sized screen color TV occupies a vast majority (above 70%) of the CRT market and its market size in the near future will be large.

Due to the large market size of small and medium-sized screen CPTs, although the market basically has no room for growth, the manufacturers are still profitable and the current competition focuses on cost and marketing.

**1. Global market**

①  The shipments of small and medium-sized screen CPTs may reach a peak in 2005 and then will drop slowly.

①  It is estimated that in next five years, in the global small and medium-sized screen CPT market, the shipments of 14″ will begin to drop slowly, while the shipments of 25″ will remain unchanged basically and only the shipments of 21″ will maintain slow and continuous growth.

①  The global capacity of small and medium-sized screen CPTs is surplus, but the supply and demand basically strike a balance. With the suspension of production lines in developed countries and transfer to developing countries, locally there may be a shortage of some types, but it will not last long.

**2. Domestic market**

①  In the domestic market, the capacity of small and medium-sized screen CPTs is much higher than the demand of the domestic color TV consumer market (in 2002, the size of the domestic small and medium-sized screen color TV market was about 17 million sets). In 2002, about 20 million small and medium-sized screen CPTs were exported directly or indirectly (installed in machines).

IRI-CRT-00029728

Small and medium-sized screen CPT is increasingly dependent on exports to overseas markets, making it more vulnerable to trade barriers, tariff policies and global economy.

⏱ Due to the shortage of some types in the domestic CPT market in 2002, and the good expectations for the market in the next few years, some manufacturers try to increase production lines or carry out expansion and upgrading. The expansion of small and medium-sized screen production is concentrated on 21″. SEG has introduced a 21″ PF production line from Hitachi (S-8 line, with an annual production capacity of 1.8 million pieces), which is expected to start production in the fourth quarter of 2003; through upgrading, Guangdong Fudi and Shenzhen Samsung increased the capacity of a single 21″ line from 6,000 pieces a day to 7,000 pieces a day. It is estimated that the capacity of 21″ in 2003 will increase by 2.4 million pieces, to 26.6 million pieces and the market competition in the future will be even fiercer.

⏱ In the domestic small and medium-sized screen CPT market, the share of 21″ is the largest and its average growth rate in the recent few years is the largest, too, but the room for growth of the market in the future will be limited, and the competition must rely on cost and marketing, while export (including indirect export) will become an important route.

# Exhibit 137

# Exhibit 2



April 4, 2023

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, Johnson Wong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of bates number: IRI-CRT-00031938 and Section V.1. of IRI-CRT-00031944.

*(Digital or printed signature here above the line)*

Johnson Wong

Project Number: BBLLP_2303_P0009

IRICO DISPLAY DEVICES CO., LTD.

IRICO Display Devices Co., Ltd.

1999 Annual Report

[1]

V. Report of the Board of Directors

1. Company operating conditions

(I) The industry in which the company is situated is the color tube manufacturing industry. The industry in which the company is situated is the color tube manufacturing industry. In 1999, 39.3 million color tubes were produced nationwide, among which, 7.7 million were 64m color tubes. The company produced 1.3556 million pieces this year, accounting for 17.61% of the output of the same type of color tubes.

(II) The company's operating conditions in 1999

♦ The status of the company's main business

The company's main business is the production and sales of color tubes, and the leading product is 64 cm FS color tubes. In 1999, the company produced a total of 1,355,600 color tubes, sold 1,350,800 pieces, the production-to-sales rate was 99.65%, and achieved a main business income of 1,020,477,500 yuan. The main business profit was 241,465,400 yuan, an increase of 41.48% over the previous year, and the net profit was 163.4859 million yuan, an increase of 100.56% over the previous year.

♦ Problems and difficulties in operation and their solutions

In 1999, due to the increasingly fierce competition among domestic color TV manufacturers, the price of color tubes continued to slump, which caused certain difficulties for the company to complete its production and operation tasks throughout the year. Faced with the continuous decline in color tube prices and fierce market competition, the company's new board of directors and management have had a clear understanding of the situation, united and cooperated closely around the theme of "quality, cost, safety, and benefit," and continued to tap internal potentials, refine various managements, improve product quality, and strive to reduce production cost, which led to excellent results.

In the second half of 1999, in order to standardize the color TV market, the relevant state departments formulated the enterprise's self-discipline price based on the average cost of the industry and continued to increase the intensity of cracking down on smuggling, which ensured that the market price of color tubes basically returned to the normal level. The company made timely decisions according to changes in market conditions, and the output and quality reached the best level in history again. This ensured the completion of the company's annual tasks.

In order to change the status quo of the company's single product structure and improve the company's ability to resist market risks, the company fully investigated and demonstrated new product development projects, carefully organized stock allotment work, and realized the adjustment of product structure. It also signed a contract with Toshiba of Japan for the introduction of domestic leading technology and equipment of large-screen full-plane color tube production color tube, which accelerated the company's technological progress and opened a new chapter in the company's development.

IRICO DISPLAY DEVICES CO.,LTD.

# 彩虹显示器件股份有限公司

## 1999年年度报告

IRI-CRT-00031938

# 年度报告正文（境内）

彩虹显示器件股份有限公司一九九九年年度报告(正文)

重要提示

本公司董事会保证本报告所载资料不存在任何虚假记载、误导性陈述或者重大遗漏，并对其内容的真实性、准确性和完整性负个别及连带责任。

一、公司简介

1、公司名称
　　公司法定中文名称：彩虹显示器件股份有限公司
　　公司英文名称：IRICO DISPLAY DEVICES CO.,LTD (缩写：IDD)
2、公司法定代表人：薛宝明
3、董事会秘书：路西良
　　授权代表：　郑　涛
　　联系电话：（029）8214865
　　传　　真：（029）8214864
　　电子信箱：stock@iricoltd.con
4、公司注册地址：西安高新产业开发区西区
　　公司办公地址：西安高新技术开发区西区高新一路16号
　　邮政编码：710075
　　公司网址：http://www.iricoltd.com
5、公司选定的信息披露刊物：《中国证券报》、《上海证券报》
　　登载公司年报的中国证监会指定的国际互联网网址：http://www.sse.com.cn
　　公司年报备置地点：公司证券部
6、公司股票上市交易所：上海证券交易所
　　股票简称：彩虹股份
　　股票代码：600707

二、会计数据和业务数据摘要

1、公司本年度主要会计数据

|  | 1999年度 |
|---|---|
| 利润总额 | 191,696,465.21元 |
| 净利润 | 163,485,885.01元 |
| 扣除非经常性损益的净利润 | 163,485,885.01元 |
| 主营业务利润 | 241,465,408.99元 |
| 其他业务利润 | 349,915.68元 |

IRI-CRT-00031939

| | |
|---|---|
| 营业利润 | 188,094,571.76元 |
| 投资收益 | 3,625,930.54元 |
| 补贴收入 | 0.00元 |
| 营业外收支净额 | -24,037.09元 |
| 经营活动产生的现金流量净额 | 94,633,695.52元 |
| 现金及现金等价物净增加额 | 23,884,376.77元 |

**2、主要会计数据和财务指标**

| 指标项目 | 1999年度 | 1998年度 调整后 | 1998年度 调整前 | 1997年度 |
|---|---|---|---|---|
| 主营业务收入(元) | 1,020,477,484.20 | 1,149,549,098.97 | 1,149,549,098.97 | 1,136,044,451.62 |
| 净利润(元) | 163,485,885.01 | 81,516,090.38 | 81,125,712.05 | 139,393,834.45 |
| 总资产(元) | 1251,490,073.75 | 1,282,386,817.05 | 1,285,520,790.04 | 1,148,410,648.90 |
| 股东权益(元) | 941,157,783.45 | 777,671,898.44 | 780,805,871.43 | 700,251,761.84 |
| 每股收益（元） --摊薄 | 0.454 | 0.226 | 0.225 | 0.387 |
| --加权 | 0.454 | 0.226 | 0.225 | 0.387 |
| 每股净资产(元) | 2.614 | 2.160 | 2.169 | 1.945 |
| 调整后的每股净资产(元) | 2.613 | 2.153 | 2.161 | 1.928 |
| 每股经营活动产生的现金流量净额 | 0.263 | -0.352 | -0.352 | |
| 净资产收益率(%) | 17.37 | 10.48 | 10.39 | 19.91 |

注：公司于2000年2月15日开始实施配股，如以配股后的总股本计算，每股收益为0.388元。

财务指标计算公式如下：

● 每股收益=净利润/年度末普通股股份总数

● 每股净资产=年度末股东权益/年度末普通股股份总数

● 调整后的每股净资产=(年度末股东权益－三年以上的应收款项净额－待摊费用－待处理(流动、固定)资产净损失－开办费－长期待摊费用－住房周转金负数余额)/年度末普通股股份总数

● 每股经营活动产生的现金流量净额=经营活动产生的现金流量净额/年度末普通股股份总数

● 净资产收益率=净利润/年度末股东权益×100%

**3、报告期内股东权益变动情况**

(单位:万元)

| 项 目 | 股本 | 资本公积 | 盈余公积 | 法定公益金 | 未分配利润 | 股东权益合计 |
|---|---|---|---|---|---|---|
| 期 初 数 | 36000 | 15000 | 8163.65 | 2721.22 | 18603.57 | 77767.19 |
| 本期增加 | -- | -- | 2452.29 | 817.43 | 13896.27 | 16348.55 |
| 本期减少 | -- | -- | -- | -- | -- | -- |
| 期 末 数 | 36000 | 15000 | 10615.94 | 3538.65 | 32499.84 | 94115.78 |

变动原因：

IRI-CRT-00031940

(1)报告期内公司股本未发生变化；

(2)报告期内公司资本公积金未发生变化；

(3)公司本年度净利润按照10%的比例提取法定公积金，按照5%的比例提取法定公益金，致使本期盈余公积增加；

(4)本年度净利润按照法定比例提取后，剩余部分转入未分配利润，致使未分配利润增加。

三、股本变动及股东情况

1、股本变动情况

(1)股份变动情况表

(数量单位：股)

| | 本次变动前 | 本次变动增减(+、-) | | | | | 本次变动后 |
|---|---|---|---|---|---|---|---|
| | | 配股 | 送股 | 公积金转股 | 增发 | 其他 | |
| 一、未上市流通股份 | | | | | | | |
| 1、发起人股份 | | | | | | | |
| 国有法人股份 | 188,160,000 | -- | -- | -- | -- | +122,880,000 | 212,160,000 |
| 2、募集法人股份 | 61,344,000 | -- | -- | -- | -- | -24,000,000 | 37,344,000 |
| 未上市流通股份合计 | 249,504,000 | -- | -- | -- | -- | -- | 249,504,000 |
| 二、已上市流通股份 | | | | | | | |
| 人民币普通股 | 110,496,000 | -- | -- | -- | -- | -- | 110,496,000 |
| 已上市流通股份合计 | 110,496,000 | -- | -- | -- | -- | -- | 110,496,000 |
| 三、股份总数 | 360,000,000 | -- | -- | -- | -- | -- | 360,000,000 |

(2)股票发行与上市情况

◆1992年8月，经中国人民银行陕西省分行陕银复1992(54)号文件批复，公司按照每股1.5元的价格发行普通股
　股份3000万股，每股面值1元。

◆1996年5月，经中国证券监督管理委员会证监发审字(1996)25号文批准、上海证券交易所上证上字第(024)号
　文审核同意，公司社会公众股9208万股于1996年5月20日在上海证券交易所挂牌上市。

◆1996年6月，公司第四次股东大会审议通过1995年度利润分配方案：每10股送2股，股权登记日1997年7月2日，
　除权及红股上市日7月3日，公司股本总额变更为36000万股；

◆报告期内公司股本未发生变化。

2、股东情况介绍

(1)报告期末股东总数
　报告期末本公司股东总数为73227名。

(2)主要股东持股情况

(单位：股)

| 股东名称 | 持股数 | 持股比例 |
|---|---|---|

[4]

IRI-CRT-00031941

IRICO DISPLAY

| | | |
|---|---|---|
| 彩虹集团公司 | 208440000 | 57.90% |
| 浙江兰溪兰申新科电脑开发公司 | 7200000 | 2.00% |
| 西安雅轩有限责任公司 | 6000000 | 1.67% |
| 中国建设银行陕西分行第二直属直行 | 3720000 | 1.03% |
| 深圳蛇口社会保险公司 | 3600000 | 1.00% |
| 兴和基金（流通股） | 3168912 | 0.88% |
| 陕西省华通物资公司 | 2400000 | 0.67% |
| 乌鲁木齐幸福城市信用社 | 2400000 | 0.67% |
| 中化国际石油有限公司 | 2400000 | 0.67% |
| 泰和基金（流通股） | 1999960 | 0.56% |

注：1999年6月6日，本公司第一大股东彩虹集团公司分别与陕西信托投资有限公司、中国建设银行陕西省分行第二直属支行、中国银行陕西省分行签订了《股份转让协议书》，彩虹集团公司以每股2.169元的价格受让上述三家股东单位原分别持有的本公司6660万股、3228万股、2400万股法人股股份，股权登记日为1999年8月11日。本次转让后，彩虹集团公司所持本公司股份由8556万股增加到20844万股，成为本公司控股股东。其所持本公司股份在报告期内无质押、冻结。前10名股东之间不存在关联关系。

(3)持股10%(含10%)以上的法人股东情况
　　公司名称：彩虹集团公司
　　法定代表人：吴维仁
　　经营范围：彩色显像管、显示管、彩色电视机、显示器、计算机、通讯产品、工业控制系统及房地产、贸易、旅游服务等。

## 四、股东大会简介

### 1、股东大会情况

　　本公司第七次股东大会于1999年6月28日上午在西安高新技术开发区西区新纪元宾馆召开。有关情况如下：
(1)本公司第七次股东大会会议通知公告刊登于1999年5月25日《中国证券报》和《上海证券报》，召开股东大会的股权登记日为1999年6月11日。
(2)出席本次会议的股东及股东代表共7人，代表股份15276.15万股，占公司股本总数的42.43%，符合《公司法》及公司章程的有关规定。
(3)本次会议审议并通过了如下决议：
　　--批准《董事会工作报告》；
　　--批准《监事会工作报告》；
　　--批准公司《1998年度财务决算报告》；
　　--批准公司《1998年度利润分配方案》；
　　--批准《关于聘请公司会计师事务所的议案》。
(4)股东大会决议公告刊登于1999年6月29日《中国证券报》和《上海证券报》。

IRI-CRT-00031942

## 2、临时股东大会情况

**◆1999年度第一次临时股东大会**

(1)本公司1999年度第一次临时股东大会会议通知公告刊登于1999年1月29日《中国证券报》和《上海证券报》，召开股东大会的股权登记日为1999年2月5日。会议于1999年3月2日上午在本公司会议室召开。

(2)出席本次会议的股东及股东代表共5人，代表股份21816万股，占本公司股份总数的60.6%，符合《公司法》和公司章程的有关规定。

(3)会议选举产生了公司第三届董事会和监事会：

第三届董事会成员：薛宝明、雍浩平、陈德智、焦树堂、覃群慧、郝均科、邹钧浩；

第三届监事会成员：李作享、马永鸿、任海浪(职工监事)。

(4)股东大会决议公告刊登于1999年3月3日《中国证券报》和《上海证券报》。

**◆1999年度第二次临时股东大会**

(1)本公司1999年度第二次临时股东大会会议通知公告刊登于1999年8月14日《中国证券报》和《上海证券报》，召开股东大会的股权登记日为1999年9月10日。会议于1999年9月20日上午在西安骊苑宾馆召开。

(2)出席本次会议的股东及股东代理人共10人，代表股份23097万股，占公司股份总数的64.16%，符合《公司法》和公司章程的有关规定。

(3)会议审议并通过了公司《1999年度增资配股方案》。具体内容如下：

A、股本配股比例和本次配售股份的总额

以公司1998年末股份总数36000万股为基数，向全体股东按10：3的比例配售股份，本次配售股份总额为10800万股。其中国有法人股及法人股东可配售7485.12万股，社会公众股股东可配售3314.88万股。

B、配股价格及定价方法：配股价格拟定每股7-9元；配股价格的定价方法：配股价格不低于公司年度财务报告中公布的每股净资产值；根据本次募集资金投资项目的资金需求量；参考公司股票二级市场价格及市盈率情况；参考公司年度财务报告中公布的每股税后利润；与承销商协议一致的原则。

C、本次募集资金的用途

投资8820万元用于64cmPF纯平面中分辨率彩色显像管生产线技术改造项目；

投资9500万元用于64cmFS中分辨率彩色显像管生产线自动化改造项目；

投资7115万元用于64cmCPT用偏转线圈生产线技术改造项目；

投资7150万元用于74cmCPT用偏转线圈生产线技术改造项目。

D、控股股东彩虹集团公司认购配股方式

同意控股股东彩虹集团公司以非货币资产方式（两条54cm彩管生产线及其相关资产）认购2800万股，不足部分以现金补足。其余应配股份放弃配股权。该项议题彩虹集团公司在表决时进行了回避，且其持有股份未计入有效表决票总数。

E、本次配股决议的有效期限

自本次股东大会通过本次配股方案之日起一年内有效。

F、授权事项

授权董事会在本次配股决议有效期限内，全权办理与本次配股相关的具体事宜，并在配股结束后，根据配股结果修改公司章程相应条款。

(4)股东大会决议公告刊登于1999年9月21日《中国证券报》和《上海证券报》。

IRI-CRT-00031943

◆ 1999年度第三次临时股东大会

(1)本公司1999年度第三次临时股东大会会议通知公告刊登于1999年9月7日《中国证券报》和《上海证券报》。召开股东大会的股权登记日为1999年10月8日。会议于1999年10月14日上午在本公司会议室召开。

(2)出席本次会议的股东及股东代理人共6人，代表股份21280.13万股，占公司股份总数的59.11%，符合《公司法》和《公司章程》的有关规定。

(3)会议形成决议内容：同意公司出资约2740万美元受让日本国东芝公司彩色显像管及相关部品制造技术。本次受让的彩色显像管制造技术包括74cm全平面彩色显像管、64cm全平面彩色显像管、74cm及64cm全平面彩色显像管用偏转线圈制造技术。上述制造技术目前属于国际领先技术。

(4)股东大会决议公告刊登于1999年10月15日《中国证券报》和《上海证券报》。

3、选举、更换公司董事、监事情况

由于第二届董事会、监事会任期届满，本公司于1999年3月2日召开了1999年度第一次临时股东大会，对董事会、监事会进行了换届选举。会议选举薛宝明、穆浩平、陈德智、焦树堂、邵群慧、郝均科和邬钧浩为公司第三届董事会成员；选举李作华、马永鸿为股东监事和职工监事任海浪共同组成第三届监事会。

五、董事会报告

1、公司经营情况

(一) 本公司所处行业为彩管制造业。本公司所处行业为彩管制造业。1999年度全国生产彩管3930万只，其中64m彩管生产770万只，本公司本年度生产135.56万只，占同品种彩管产量的17.61%。

(二) 公司一九九九年度经营情况

◆ 公司主营业务情况

本公司主营业务为彩色显像管的生产、销售，主导产品为64cmFS彩色显像管。1999年公司共生产彩管135.56万只，销售135.08万只，产销率99.65%，实现主营业务收入102047.75万元，主营业务利润24146.54万元，比上年增长了41.48%，实现净利润16348.59万元，比上年增长了100.56%。

◆ 经营中出现的问题与困难及解决方案

一九九九年由于国内彩色电视机厂家竞争的日趋激烈，导致彩管价格持续低迷，给公司全年生产经营任务的完成造成了一定的困难。面对彩管价格的持续下滑和激烈的市场竞争，公司新一届董事会和经营层认清形势，团结协作，紧紧围绕"质量、成本、安全、效益"的主题，继续深挖内部潜力，细化各项管理，提高产品质量，努力降低生产成本，取得了优异的成绩。

99年下半年，国家有关部门为规范彩电市场，制定了以行业平均成本为基准的企业自律价和继续加大打击走私的力度，保证了彩管市场价格基本恢复到正常的水平，公司根据市场情况变化，适时做出决策，产量、质量再创历史最好水平，保证了公司全年任务的完成。

为改变公司产品结构单一的现状，提高公司抵御市场风险的能力，公司充分调查论证新品开发项目，精心组织配股工作，实现产品结构的调整，并与日本国东芝公司签订了引进国内领先的大屏幕全平面彩管生产技术及设备合同，加快了公司技术进步步伐，揭开公司发展的新篇章。

2、公司财务情况

| 项目 | 年初数 | 年末数 | 增减数 | 增减幅度% |
|------|--------|--------|--------|-----------|

IRI-CRT-00031944

| | | | | |
|---|---|---|---|---|
| 总资产 | 1,282,386,817.05 | 1,251,490,073.75 | 30,896,743.30 | -2.41% |
| 长期负债 | 0.00 | 0.00 | 0.00 | -- |
| 股东权益 | 777,671,898.44 | 941,157,783.45 | 163,485,885.01 | +21.02% |
| 主营业务利润 | 170,676,684.66 | 241,465,408.99 | 70,788,724.33 | +41.48% |
| 净利润 | 81,516,090.38 | 163,485,885.01 | 81,969,794.63 | +100.56% |

变动的主要原因：

A：总资产减少系负债减少所致；

B：股东权益比上年增加系本年度新增净利润；

C：主营业务利润及净利润增加系本年度公司营业成本大幅度下降所致。

### 3、公司投资情况

(1) 报告期内，公司无募集资金使用或募集资金延续到报告期内的情况。

(2) 长期投资情况：

单位：万元

| 被投资公司名称 | 年初投资额 | 本年增加 | 本年减少 | 主要经营活动 | 占被投资公司权益的比例 |
|---|---|---|---|---|---|
| 陕西信托投资有限公司 | 3000 | | | 信托投资 | 12.27% |
| 西安新纪元国际俱乐部 | 2000 | | 46.61 | 娱乐餐饮 | 47.62% |
| 金桥译港有限责任公司 | | 1500 | | 信息服务 | 70.00% |

注：长期投资本期增加1500万元，主要系权翔董事会决议投资金桥译港有限责任公司（注册资本4000万元，本公司投资2800万元），本公司按照协议规定首期投资1500万元，目前正在筹建中。长期投资减少46.61万元，主要系原投资于西安新纪元国际俱乐部九九年度亏损，按权益法核算导致长期投资减少。
本期投资收益362.59万元，其中：陕西信托投资有限公司1998年度分红409.20万元，西安新纪元国际俱乐部投资亏损46.61万元。

### 4、新年度业务发展计划

(1)继续做好主导产品64cmFS彩色显像管的生产经营工作。进一步深挖内部潜力，细化各项管理，扩大生产规模，提高产品产量、质量，确保全年生产54cm、64cm彩色显像管380万只；

(2)认真贯彻公司质量方针，不断提高产品质量，力争用户上机率和直通率再上台阶，保证产品质量最大限度的满足用户的要求。

(3)全方位降低成本，实施成本领先战略，增强公司的市场竞争能力，提高经济效益。

(4)尽快完成99年度的配股工作，确保募集资金的及时到位，尽快投入到承诺项目中去，争取今年内将纯平面影管推向市场。尽早占领市场，改变公司产品结构单一的局面。

(5)积极开拓新市场，适时扩大投资力度，在壮大公司主业的同时，寻求公司新的利润增长点。

### 5、董事会日常工作情况

(1)报告期内董事会召开的会议情况及决议内容

IRI-CRT-00031945

报告期内，公司董事会召开了七次会议。

● 公司第二届董事会第九次会议于1999年1月28日在公司会议室召开。由于第二届董事会任期届满，董事会决定于1999年3月2日召开1999年度第一次临时股东大会进行换届选举。

董事会决议公告刊登于1999年1月29日《中国证券报》和《上海证券报》。

● 公司第三届董事会第一次会议于1999年3月2日在公司会议室召开。会议选举产生了新一届董事长，并根据董事长提名聘任了总经理及高级管理人员。

董事会决议公告刊登于1999年3月3日《中国证券报》和《上海证券报》。

● 公司第三届董事会第二次会议于1999年3月8日在公司会议室召开。会议审议通过了《1998年年度报告》、《总经理业务报告》、《1998年董事会工作报告》、《1998年度财务决算报告》、《1998年度利润分配方案》等议案。

董事会决议公告刊登于1999年3月10日《中国证券报》和《上海证券报》。

● 公司第三届董事会第三次会议于1999年5月24日在公司会议室召开。会议审议通过了公司第七次股东大会有关文件，并决定于1999年6月28日召开第七次股东大会。

董事会决议公告刊登于1999年5月25日《中国证券报》和《上海证券报》。

● 公司第三届董事会第四次会议于1999年7月20日在公司会议室召开。会议审议通过了公司《1999年度中期报告》、99年度中期利润分配方案，同时决定投资金桥网络信息资讯项目。

董事会决议公告刊登于1999年7月22日《中国证券报》和《上海证券报》。

● 公司第三届董事会第五次会议于1999年8月13日在公司会议室召开。会议审议通过了本公司《1999年度增资配股预案》(配股方案详见1999年度第二次临时股东大会决议)。

董事会决议公告刊登于1999年8月14日《中国证券报》和《上海证券报》。

● 公司第三届董事会临时会议于1999年9月5日在公司会议室召开。会议决定出资约2740万美圆受让日本国东芝公司彩色显像管及相关部件生产技术。

董事会决议公告刊登于1999年9月7日《中国证券报》和《上海证券报》。

● 公司第三届董事会第六次会议于1999年12月25日在公司会议室召开。形成决议如下：(1)投资2800万元人民币与中科院下属的华建电子有限公司和吉通通讯有限公司共同组建"金桥译港有限责任公司"；(2)在西安高新技术开发区征地100亩，用于"彩虹工业园"的开发建设；(3)出资1950万美元购买日本国东芝公司彩色显像管及相关部件生产设备；(4)决定召开2000年度第一次临时股东大会的有关事宜。

董事会决议公告刊登于1999年12月28日《中国证券报》和《上海证券报》。

(2)报告期内本公司未进行利润分配或资本公积金转增股本。

(3)报告期内本公司1999年度配股申请获中国证券监督管理委员会证监公司字 [1999]146号文核准，于2000年2月开始实施。

## 6、公司管理层及员工情况

(1)董事、监事、高级管理人员

| 姓 名 | 职务 | 性别 | 年龄 | 任期起止日期 | 年末、年初持股数量 |
|---|---|---|---|---|---|
| 薛宝明 | 董事长 | 女 | 60 | 1999.03.02-2002.03.02 | 0 |
| 穆浩平 | 董事 | 男 | 37 | 1999.03.02-2002.03.02 | 0 |
| 陈德智 | 董事、总经理 | 男 | 40 | 1999.03.02-2002.03.02 | 0 |
| 焦树棠 | 董事 | 男 | 46 | 1999.03.02-2002.03.02 | 0 |

IRI-CRT-00031946

IRICO DISPLAY DEVICES CO.,LTD.

IRICO DISPLAY DEVICES CO.,LTD

| | | | | | |
|---|---|---|---|---|---|
| 邵群慧 | 董事 | 女 | 50 | 1999.03.02-2002.03.02 | 0 |
| 郝均科 | 董事 | 男 | 49 | 1999.03.02-2002.03.02 | 0 |
| 邬钧浩 | 董事 | 男 | 44 | 1999.03.02-2002.03.02 | 0 |
| 李作亭 | 监事会主席 | 男 | 58 | 1999.03.02-2002.03.02 | 0 |
| 马永鸿 | 监事 | 男 | 41 | 1999.03.02-2002.03.02 | 0 |
| 任海浪 | 监事 | 男 | 39 | 1999.03.02-2002.03.02 | 0 |
| 张君华 | 副总经理 | 男 | 40 | 1999.03.02-2002.03.02 | 0 |
| 刘珍珠 | 总会计师 | 女 | 38 | 1999.03.02-2002.03.02 | 0 |
| 路西良 | 董事会秘书 | 男 | 36 | 1999.03.02-2002.03.02 | 0 |

公司董、监事及高级管理人员年度报酬总额为282000元，其中30000元-50000元1人；50000元-80000元4人。不在本公司领取报酬的人员有薛宝明、肇浩平、焦树宝、邵群慧、郝均科、邬钧浩、李作亭、马永鸿。

◆报告期内离任的董事、监事及高级管理人员
　　因公司董事会换届选举，原第二届董事王俨广、毕军华、谢军、李卫生、黄自强、侯瑞金，原第二届监事张少文、郭峰不再担任第三届董事会董事和监事会监事。原副总经理、总会计师、董事会秘书张国强不再担任职务。

◆聘任公司经理、董事会秘书情况
　　公司第三届董事会聘任陈德智先生为公司总经理；聘任张君华先生为公司副总经理；聘任刘珍珠女士为公司总会计师；聘任路西良先生为董事会秘书。

(2)公司员工数量及专业构成情况
　　截止1999年末，公司员工总数为965人，其中生产人员681人，销售人员30人，技术开发人员171人，行政人员67人；其中博士1人，硕士2人，大专以上190人；具有高级职称11人，中级职称49人，初级职称58人，高级工17人，中级工50人；退休职工1人。

7、本次利润分配预案
　　经陕西岳华会计师事务所有限责任公司审计，1999年度本公司实现净利润163,485,885.01元，提取10%的法定公积金16,348,588.50元，和5%的法定公益金8,174,294.25元，加上年度末分配利润186,035,373.30元，可供股东分配利润为321,998,375.56元。基于公司2000年将进行多项技术引进、购买精平彩管制造设备等，以寻求公司新的利润增长点，资金缺口较大，因此董事会提议，本次不向股东分配股利，也不进行资本公积金转增股本。上述利润分配预案尚须提请公司第八次股东大会审议批准。

8、其他事项
●报告期内利润分配情况：本年度公司未进行利润分配和公积金转增股本。

IRI-CRT-00031947

## 六、监事会报告

一九九九年公司监事会按照《公司法》和公司章程赋予的职责，认真履行各项监督职责，维护公司利益和股东权益。监事会列席了报告期内历次股东大会和董事会会议，对董事会决议和股东大会召集程序及各项决议进行了监督。本年度监事会还另行召集了三次会议，分别对公司财务、执行股东大会决议、经营决策、依法规范运作，董事、经理经营行为、关联交易等情况进行了认真的监督与检查。

监事会认为：

(一)公司运作规范，董事会按照股东大会决议要求，切实履行各项决议，其决策程序符合《公司法》和《公司章程》的有关规定；公司董事、经理执行公司职务时，没有违反法律、法规、公司章程及损害公司利益的行为。

(二)公司本着审慎经营，有效防范和化解资产损失风险的原则，制定了内部控制制度，并已经董事会逐项审议通过后实施，其决议程序合法，依据充分。

(三)公司本年度财务报告经陕西岳华会计师事务所有限责任公司审计，并出具了无保留意见的审计报告，真实反映了公司的财务状况和经营成果。

(四)本年度，公司所进行的关联交易决策程序符合公司章程的规定，价格公允，没有损害本公司及非关联股东的利益，没有造成公司资产的损失。

(五)公司前次募集资金实际投入与承诺项目一致。

## 七、重要事项

1、报告期内公司无重大诉讼、仲裁事项。
2、报告期内公司、公司董事及高级管理人员未受到监管部门处罚的情况。
3、报告期内公司进行了董事会、监事会的换届选举，并重新聘任了公司总经理、总会计师及董事会秘书。
4、报告期内公司无收购及出售资产、吸收合并等事项。
5、重大关联交易事项
   重大关联交易事项详见会计报表附注。
6、本公司第一大股东彩虹集团公司以每股 2.169元的价格分别受让陕西信托投资有限公司、中国建设银行陕西省分行第二直属支行、中国银行陕西省分行分别持有的本公司6660万股、3228万股、2400万股法人股股份，其所持本公司股份由原8556万股增加到20844万股，成为本公司控股股东。
   此次股份转让的有关信息刊登于1999年7月17日《中国证券报》和《上海证券报》。
7、本公司与控股股东之间人员独立、资产完整、财务独立。
8、报告期内公司聘请的会计师事务所未发生变更。
9、报告期内公司未更改公司名称或股票简称。
10、经公司1999年度第一次临时股东大会批准，公司与日本东芝公司签订了彩色显像管及相关部品制造技术受让合同。
   股东大会决议公告刊登于1998年10月15日《中国证券报》和《上海证券报》。

## 八、财务会计报告

审计报告

陕岳会审字(2000)034号

彩虹显示器件股份有限公司全体股东：

IRI-CRT-00031948

我们接受委托，审计了贵公司1999年12月31日的资产负债表、1999年度的利润及利润分配表和现金流量表。这些会计报表由贵公司负责，我们的责任是对这些会计报表发表审计意见。我们的审计是依据《中国注册会计师独立审计准则》进行的。在审计过程中，我们结合贵公司实际情况，实施了包括抽查会计记录等我们认为必要的审计程序。

我们认为，上述会计报表符合《企业会计准则》和《股份有限公司会计制度》的有关规定，在所有重大方面公允地反映了贵公司1999年12月31日的财务状况及1999年度的经营成果和现金流动情况。会计处理方法的选用遵循了一贯性原则。

<table>
<tr><td>陕西岳华会计师事务所有限责任公司</td><td>中国注册会计师：邢留华</td></tr>
<tr><td></td><td>中国注册会计师：王伟雄</td></tr>
<tr><td>中国西安</td><td>报告日期：二〇〇〇年元月二十五日</td></tr>
</table>

**会计报表附注**

**一、公司简介**

彩虹显示器件股份有限公司(以下简称"本公司")是经陕西省经济体制改革委员会陕改发(1992)34号文批准，由彩虹电子集团公司(现为彩虹集团公司)、原中国工商银行陕西省信托投资公司、原中国人民建设银行陕西省信托投资公司三方共同发起，以募集方式设立的股份有限公司。

本公司股票于1996年5月20日在上海证券交易所挂牌交易。

本公司属于电子制造业，主要产品为64cmFS彩色显像管，主要从事彩色显示器的开发、生产、经营，兼营房地产开发、原材料加工及旅游业等。

**二、公司主要会计政策、会计估计及合并会计报表的编制方法**

**1.会计制度**

公司执行《股份有限公司会计制度》及有关补充规定。

**2.会计年度**

会计年度为公历1月1日至12月31日。

**3.记账本位币**

记账本位币为人民币。

**4.记账基础和计价原则**

以权责发生制为记账基础，以历史成本为计价原则。

**5.外币业务核算方法**

公司以人民币为记账本位币，会计年度内涉及外币的经济业务，按业务发生当日月初中国人民银行公布的市场汇价的中间价折合为人民币记账。月末按中国人民银行公布的市场汇价中间价折合本位币进行调整，调整后的记账本位币余额与原账面余额之间的差额，计入当期损益。

**6.合并会计报表的编制方法**

**(1)编制方法**

合并会计报表以母公司、纳入合并范围的子公司的会计报表和其他有关资料为依据，按照《合并会计报表暂行规定》编制而成。子公司的主要会计政策按照母公司的会计政策确定。公司间的重大交易、资金往来等，均已在合并时抵销。

**(2)合并范围**

本公司无依据财政部财会字(1995)11号《关于印发〈合并会计报表暂行规定〉的通知》规定的应纳入合并范围

[12]

IRI-CRT-00031949

的子公司。

7.现金等价物的确定标准

现金等价物是指企业持有的从购买日起三个月内到期的短期投资。

8.坏帐核算方法

(1)坏帐准备计提的确认标准：应收帐款和其他应收款年末余额

(2)计提方法：帐龄分析法

(3)坏帐准备计提比例：

| 6个月内 | 6个月-1年 | 1年-2年 | 2年-3年 | 3年-4年 | 4年-5年 | 5年以上 |
|---|---|---|---|---|---|---|
| (含6个月) | (含1年) | (含2年) | (含3年) | (含4年) | (含5年) | |
| 不计提 | 1% | 5% | 10% | 30% | 50% | 100% |

坏帐按下列原则进行确认：

(1)因债务人已经破产，依法清偿后确实无法收回的应收帐款；

(2)债务人死亡，既无遗产可供清偿，又无义务承担人，确实无法收回的应收帐款；

(3)债务人逾期3年未能履行义务，确实不能收回的应收帐款，报董事会批准，可以列作坏帐的应收帐款。

9.存货核算方法

公司存货分为原材料、修理用备品备件、在制品、产成品、低值易耗品。

各类存货以取得时的实际成本计价。

原材料发出采用"先进先出法"核算；产成品发出采用"加权平均法"核算；低值易耗品采用"一次摊销法"核算。

10.存货跌价准备

(1) 计提的范围：公司年终所有存货；

(2) 计提方法：成本与可变现净值孰低法。

11.短期投资核算方法

公司购入的各种股票、债券，按实际支付的价款核算，如实际支付的价款中包括已宣告发放，但未领取的现金股利或利息，则单独进行核算。决算日，将股票、债券等短期投资的市价与其成本进行比较，如市价低于成本的，按其差额计提短期投资跌价准备计入当年损益。

12.短期投资跌价准备

(1) 计提的范围：包括短期债券、股票投资；

(2) 计提的方法：按单项投资采用成本与市价孰低法计提。

13.长期投资核算方法

(1)长期债权投资

按购进成本计入长期投资，按期计提利息计入投资收益。

(2)长期股权投资

对其他单位的投资占该单位有表决权资本总额20%以下，或对其他单位的投资虽占该单位有表决权资本总额20%以上，但不具有重大影响，采用成本法核算；对其他单位的投资占该单位有表决权资本总额20%以上，或虽投资不足20%但有重大影响，采用权益法核算；对持有50%以上股权的长期股权投资采用权益法核算并编制合并会计报表。

14.长期投资减值准备

(1)计提的范围：包括长期债权投资、长期股权投资；

(2)计提的方法：有市价的长期投资，按个别投资项目采用成本与市价孰低法计提；无市价的长期投资，须根据政治、经济环境及产业政策的变化及被投资单位的生产经营状况、财务状况等确定计提损失的比例。

15.固定资产计价和折旧方法

IRI-CRT-00031950

本公司固定资产标准为使用年限在一年以上的经营性资产或不属于生产经营的主要设备、物品,单位价值在2000元以上,并且使用年限超过两年的资产。

固定资产按购建时的实际成本计价。固定资产折旧采用分类直线法,同时按预计净残值3%和规定的折旧年限确定的年折旧率如下:

| 资产类别 | 折旧年限 | 年折旧率(%) |
|---|---|---|
| 房屋及建筑物 | 30 | 3.23 |
| 动力设备 | 12 | 8.08 |
| 通用机械设备 | 10 | 9.70 |
| 专用电子设备 | 8 | 12.13 |
| 办公设备 | 5 | 19.40 |

16. 在建工程核算方法

在建工程按实际成本计价。

在建工程在工程完工交付使用以后,按工程竣工决算结转固定资产,对虽已交付使用但尚未办理竣工决算的工程,自交付使用之日起按工程预算、造价资料或工程成本等资料估价转入固定资产,并计提折旧。现工决算办理完毕以后,按照决算数调整原估价和已提折旧。

17. 无形资产核算方法

引进日本64cmFS彩色显像管生产技术转让费,按照双方协议10年期限进行摊销。土地使用权按照50年采用直线法摊销。

18. 开办费核算方法

开办费从1994年8月1日投产后按照5年进行摊销。

19. 收入确认原则

主营业务收入的实现是以商品所有权上的主要风险和报酬转移给买方,公司不再对该商品实施继续管理权和实际控制权,已经收到货款或取得了收款的证据,并且与销售该商品有关的成本能够可靠地计量时,确认营业收入的实现。

20. 所得税的会计处理方法

公司所得税采用应付税款法核算。

21. 会计政策的变更与调整

本公司按照《股份有限公司会计制度》的规定,从1999年1月1日起会计政策改变如下:

(1)坏帐准备原采用直接转销法,现改按帐龄分析法计提,根据债务单位的财务状况、现金流量等情况,规定约提取比例为:逾期六个月—1年(含1年)以内的,按其余额的1%计提;逾期1—2年(含2年)的按其余额的5%计提;逾期2-3年(含3年)的按其余额的10%计提;逾期3-4年(含4年)的按其余额的30%计提;4-5年(含5年)的按其余额的50%计提;5年以上的按其余额约100%计提。

(2)期末存货原按成本计价,现改为按成本与可变现净值孰低计价。

(3)期末长期投资原不计提减值准备,现改为计提减值准备。

上述会计政策变更已采用追溯调整法,调整了期初留存收益及会计报表相关项目的期初数;利润及利润分配表的上年数栏,已按调整后的数字填列。上述会计政策变更对以前年度影响如下:

| 影响项目 | 坏帐准备 | 存货跌价准备 | 净利润 | 盈余公积 | 未分配利润 |
|---|---|---|---|---|---|
| 97年以前 | 494,728.00 | 3,029,623.32 | -3,524,351.32 | -528,652.70 | -2,995,698.62 |
| 98年影响数 | -438,153.00 | 47,774.67 | 390,378.33 | 58,556.75 | 331,821.58 |
| 合计 | 56,575.00 | 3,077,397.99 | -3,133,972.99 | -470,095.95 | -2,663,877.04 |

三、预项

IRI-CRT-00031951

1. 公司主要适用的税种和税率

| 税种 | 计税依据 | 税率 |
|------|----------|------|
| 增值税 | 产品销售收入 | 17% |
| 城市维护建设税 | 增值税额 | 7% |
| 教育费附加 | 增值税额 | 3% |
| 企业所得税 | 应纳税所得额 | 15% |

2. 优惠税率及批文

所得税根据财税字(94)001号"关于企业所得税若干优惠政策的通知"和国发(1991)12号"国务院关于批准国家高新技术产业开发区和有关政策规定的通知",所得税按照15%税率缴纳。

四、控股子公司和合营企业

| 合营企业名称 | 注册资本 | 经营范围 | 投资额 | 所占权益比例 |
|--------------|----------|----------|--------|--------------|
| 新纪元国际俱乐部 | 4800万元 | 餐饮娱乐 | 2000万元 | 41.67% |
| 金桥详港有限责任公司 | 4000万元 | 网络服务 | 1500万元 | 正在筹建 |

五、会计报表主要项目注释

下列所披露的会计报表数据,除特别注明之外,资产负债表期初数指1998年12月31日的数字,期末数是指1999年12月31日的数字,利润及利润分配表、现金流量表的注释系1999年度的金额,货币单位为人民币元。

1. 货币资金

| 项目 | 期初数 | 期末数 | 备注 |
|------|--------|--------|------|
| 现金 | 13,242.18 | 18,386.17 | |
| 银行存款 | 122,310,856.20 | 141,190,088.98 | |
| 其他货币资金 | | 5,000,000.00 | 基金会存款 |
| 合计 | 122,324,098.38 | 146,208,475.15 | |

2. 应收票据

| | 期初数 | 期末数 | 备注 |
|---|--------|--------|------|
| | 604,878,705.00 | 387,896,720.00 | |

应收票据较上年减少216,981,985.00元,减幅35.87%,一是由于部分应收票据到期收现,二是购货单位使用票据结算减少所致。期末无抵押及贴现的应收票据。

截止报告日已承兑或背书转让的应收票据:

| 出票单位 | 出票日期 | 到期日 | 金额 | 备注 |
|----------|----------|--------|------|------|
| 景河万达家电公司 | 99.09.16 | 1999.12.31 | 1,000,000.00 | 已承兑 |
| 泰州春兰电子公司 | 99.07.07 | 1999.01.06 | 5,000,000.00 | 已承兑 |
| 泰州春兰电子公司 | 99.07.07 | 1999.01.06 | 5,000,000.00 | 已承兑 |

[15]

IRI-CRT-00031952

| 宁波华联商厦公司 | 99.10.19 | 2000.01.10 | 1,000,000.00 | 已承兑 |
|---|---|---|---|---|
| 新泰市小协镇小协村家电部 | 99.10.15 | 2000.01.15 | 500,000.00 | 已承兑 |
| 山东牟平农业机械公司 | 99.10.18 | 2000.01.18 | 100,000.00 | 已承兑 |
| 山东省宁阳县凌云物资公司 | 99.10.18 | 2000.01.18 | 100,000.00 | 已承兑 |
| 贵阳红华贸易公司 | 99.09.24 | 2000.03.24 | 200,000.00 | 已承兑 |
| 康佳集团股份公司 | 99.06.23 | 1999.12.22 | 5,000,000.00 | 已承兑 |
| 沈阳北泰电子有限公司 | 99.09.24 | 2000.03.24 | 3,000,000.00 | 背书转让 |
| 泰州春兰电子有限公司 | 99.09.27 | 2000.03.26 | 10,000,000.00 | 背书转让 |
| 湖南华峰电子公司 | 99.09.21 | 2000.03.21 | 600,000.00 | 背书转让 |
| 贵阳红华贸易公司 | 99.09.24 | 2000.03.24 | 200,000.00 | 背书转让 |
| 北京牡丹镇江电视厂 | 99.09.20 | 2000.03.20 | 2,000,000.00 | 背书转让 |
| 北京华联综合超市 | 99.10.19 | 2000.04.11 | 2,000,000.00 | 背书转让 |
| 湖南怀化和泰家电 | 99.09.24 | 2000.03.24 | 400,000.00 | 背书转让 |
| 合计 | | | 38,700,000.00 | |

无应收本公司5%以上股份股东单位票据。

3.应收帐款

(1)帐龄分析

| 帐龄 | 期初数 | | 期末数 | |
|---|---|---|---|---|
| | 金额 | 坏帐准备 | 金额 | 坏帐准备 |
| 六个月以内 | 92,668,121.76 | | 282,610,089.29 | |
| 六个月至一年 | 3,907,500.00 | 39,075.00 | 2,895,360.00 | 28,953.60 |
| 合计 | 96,575,621.76 | 39,075.00 | 285,505,449.29 | 28,953.60 |

应收帐款较上年增加188,929,827.53元,增幅为195.63%,主要原因是本年票据结算减少,应收帐款增加所致。

(2) 无持本公司5%以上股份股东单位欠款。

(3) 欠款金额前五名单位

| 单位名称 | 金额 | 欠款时间 | 欠款原因 |
|---|---|---|---|
| 康佳集团股份公司 | 136,226,738.36 | 1999年 | 欠显象管款 |
| 四川长虹电器 | 34,486,000.00 | 1999年 | 欠显象管款 |
| TCL-王牌公司 | 30,691,560.00 | 1999年 | 欠显象管款 |
| TCL-美乐公司 | 19,658,288.30 | 1999年 | 欠显象管款 |
| 厦华电子公司 | 13,140,207.55 | 1999年 | 欠显象管款 |

本公司应收帐款帐龄均在一年以内,且绝大多数在6个月内,属正常结算。

4.其他应收款

(1)帐龄分析

| 帐龄 | 期初数 | | 期末数 | |
|---|---|---|---|---|
| | 金额 | 坏帐准备 | 金额 | 坏帐准备 |

IRI-CRT-00031953

| | | | | |
|---|---|---|---|---|
| 六个月以内 | 13,076,789.63 | | 5,096,097.20 | |
| 六个月至一年 | 1,750,000.00 | 17,500.00 | | |
| 一至二年 | | | 1,750,000.00 | 87,500.00 |
| 合计 | 14,826,789.63 | 17,500.00 | 6,846,097.20 | 87,500.00 |

(2)无持本公司5%以上股份股票单位欠款。

(3)欠款单位:

| 单位 | 金额 | 欠款时间 | 欠款原因 |
|---|---|---|---|
| *西安高新技术产业开发区建设开发公司 | 4,767,300.00 | 1999年 | 退土地转让金 |
| 中华工商时报社 | 1,750,000.00 | 1998年 | 往来款 |
| 备用金 | 328,797.20 | 1999年 | 个人借款 |

*根据与西安高新技术产业开发区建设开发公司的协议。终止高建经地字(1996)第27号《国有土地使用权有偿转让合同书》中所受让的土地,本公司支付的土地转让金中的476.73万元尚未收回,建设开发公司承诺将于2000年六月份支付300万元,剩余176.73万元于2000年底一次支付清。

5.预付帐款

(1)帐龄分析

| 帐龄 | 期初数 | | 期末数 | |
|---|---|---|---|---|
| | 金额 | 比例(%) | 金额 | 比例(%) |
| 一年以内的 | 35,159,921.12 | 100.00 | 50,824,466.58 | 100.00 |
| 合计 | 35,159,921.12 | 100.00 | 50,824,466.58 | 100.00 |

(2)无预付本公司5%以上股份股东单位款项。

(3)欠款单位

| 单位名称 | 金额 | 欠款时间 | 欠款原因 |
|---|---|---|---|
| 中国电子进出口公司彩虹公司 | 5,824,466.58 | 1999年 | 保证金 |
| 中国电子进出口公司彩虹公司 | 45,000,000.00 | 1999年 | 技术转让费 |

6.存货

| 项目 | 期初数 | | 期末数 | |
|---|---|---|---|---|
| | 金额 | 存货跌价准备 | 金额 | 存货跌价准备 |
| 原材料 | 1,352,198.47 | | 916,333.76 | |
| 在产品 | 1,969,710.51 | | 1,797,569.19 | |
| 产成品 | 274,867.83 | | 256,826.52 | |
| 修理用备件 | 14,183,173.86 | 3,077,397.99 | 13,552,381.34 | 3,077,397.99 |
| 合计 | 17,779,950.67 | | 16,523,110.81 | |

存货跌价准备合计提方法为成本与市价孰低法;市价由公司计划员核定。

7.待摊费用

| 类别 | 期初数 | 本期增加 | 本期摊销 | 期末数 |
|---|---|---|---|---|
| 汽车、财产保险费 | 738,929.00 | 1,054,949.67 | 1,254,529.83 | 539,348.84 |
| 合计 | 738,929.00 | 1,054,949.67 | 1,254,529.83 | 539,348.84 |

IRI-CRT-00031954

8. 长期投资

(1) 投资项目

| 项目 | 期初数 | | 本期增加 | 本期减少 | 期末数 | |
|---|---|---|---|---|---|---|
| | 金额 | 减值准备 | | | 金额 | 减值准备 |
| 长期股权投资 | 49,108,064.65 | | 15,000,000.00 | 466,069.46 | 63,641,995.19 | |
| 合计 | 49,108,064.65 | | 15,000,000.00 | 466,069.46 | 63,641,995.19 | |

(2)长期股权投资

其他股权投资

| 被投资单位名称 | 投资期限 | 投资金额 | 占被投资单位注册资本比例 | 减值准备 | 权益法核算 | 备注 |
|---|---|---|---|---|---|---|
| 陕西省信托投资有限责任公司 | 长期 | 30,000,000.00 | 12.27% | | | |
| 西安新纪元国际俱乐部 | 长期 | 20,000,000.00 | 41.67% | | -466,069.46 | |
| 金桥译港有限责任公司 | 长期 | 15,000,000.00 | | | | 正在筹建 |

金桥译港有限责任公司注册资本为4000万元，本公司按协议规定首期已投资1500万元，在120天内再投资1000万元，在建设工程结束后五天内再投资500万元。

9. 固定资产及折旧

| 项目 | 期初数 | 本期增加 | 本期减少 | 期末数 | 备注 |
|---|---|---|---|---|---|
| 房屋及建筑物 | 102,878,111.26 | | | 102,878,111.26 | |
| 动力设备 | 36,411,312.38 | | | 36,411,312.38 | |
| 通用机械设备 | 11,214,110.66 | | | 11,214,110.66 | |
| 专用电子设备 | 340,015,932.12 | 3,090,764.68 | | 343,106,696.80 | |
| 办公设备 | 4,180,796.71 | 101,340.00 | 73,092.21 | 4,209,044.50 | |
| 固定资产原价合计 | 494,700,263.13 | 3,192,104.68 | 73,092.21 | 497,819,275.60 | |
| 累计折旧 | | | | | |
| 房屋及建筑物 | 14,449,051.30 | 3,326,392.32 | | 17,775,443.62 | |
| 动力设备 | 9,918,904.39 | 2,943,247.80 | | 12,862,152.19 | |
| 通用机械设备 | 3,698,140.66 | 1,087,768.68 | | 4,785,909.34 | |
| 专用电子设备 | 145,558,849.96 | 41,306,236.22 | | 186,865,086.18 | |
| 办公设备 | 1,892,712.48 | 806,892.79 | 46,995.12 | 2,652,610.15 | |
| 累计折旧合计 | 175,517,658.79 | 49,470,537.81 | 46,995.12 | 224,941,201.48 | |
| 固定资产净值 | 319,182,604.34 | | | 272,878,074.12 | |

固定资产以金额54,001.60万元进行最高额抵押贷款，其中：机器设备为42,582.60万元；房屋及建筑物为11,419.00万元。

IRI-CRT-00031955

**10.在建工程**

| 工程名称 | 期初数（其中利息资本化金额） | 本期增加（其中利息资本化金额） | 本期转入固定资产数（其中利息资本化金额） | 其他减少数（利息资本化金额） | 期末数（其中利息资本化金额） | 资金来源 | 项目进度 |
|---|---|---|---|---|---|---|---|
| 120万改造工程 | 1,494,645.35 | 597,980.65 | 901,141.44 | 536,391.36 | 655,093.20 | 自筹 | 95% |
| 高频炉加热装置 | | 1,842,074.28 | 1,842,074.28 | | | 自筹 | |
| 石墨机 | | 27,355.00 | | | 27,355.00 | 自筹 | |
| 办公楼 | 4,736,173.39 | | | | 4,736,173.39 | 自筹 | 96% |
| 合计 | 6,230,818.74 | 2,467,409.93 | 2,743,215.72 | 536,391.36 | 5,418,621.59 | | |

在建工程无利息资本化。

**11.无形资产**

| 种类 | 原始金额 | 期初数 | 本期增加 | 本期转出 | 本期摊销 | 期末数 | 剩余期限 |
|---|---|---|---|---|---|---|---|
| 日本64cm彩色显像管技术转让费 | 23,583,786.50 | 14,543,335.20 | | | 2,358,378.60 | 12,184,956.60 | 5年 |
| 土地使用权 | 2,330,468.20 | 2,171,219.69 | | | 46,609.32 | 2,124,610.37 | 46年 |
| 合计 | 25,914,254.70 | 16,714,554.89 | | | 2,404,987.92 | 14,309,566.97 | |

**12.开办费**

| 种类 | 期初数 | 本期增加 | 本期摊销 | 期末数 |
|---|---|---|---|---|
| 开办费、试车费 | 2,000,731.86 | | 2,000,731.86 | 0 |
| 合计 | 2,000,731.86 | | 2,000,731.86 | 0 |

**13.短期借款**

| 借款类别 | 期初数 | 期末数 | 备注 |
|---|---|---|---|
| 抵押借款 | 255,300,000.00 | 210,000,000.00 | |
| 合计 | 255,300,000.00 | 210,000,000.00 | |

**14.应付票据**

| | 期初数 | 期末数 | 备注 |
|---|---|---|---|
| | 116,327,667.28 | 6,293,754.24 | |

无应付持股5%以上股东单位款项；

应付票据较上年减少110,033,913.04元，减幅94.59%，主要是由于外购商品等直接付现量增加所致。

**15.应付帐款**

| | 期初数 | 期末数 | 备注 |
|---|---|---|---|

IRI-CRT-00031956

<table>
<tr><td></td><td>71,390,103.73</td><td>42,726,102.48</td></tr>
</table>

  (1) 无应付持股5%以上股东单位款项

  (2) 应付帐款较上年减少28,664,001.25元,减幅40.15%,主要是由于外购商品等直接付现量增加所致。

16.未交税金

| 税种 | 期初数 | 期末数 | 备注 |
|---|---|---|---|
| 增值税 | 10,639,994.33 | 7,264,727.80 | |
| 城市建设维护税 | 1,598,865.39 | 1,451,749.54 | |
| 企业所得税 | 10,925,968.13 | 10,266,751.80 | |
| 房产税 | | 538,044.48 | |
| 土地使用税 | | 52,473.28 | |
| 合计 | 23,164,827.85 | 19,573,746.90 | |

17.其他应付款

| | 期初数 | 期末数 | 备注 |
|---|---|---|---|
| | 2,683,020.47 | 2,953,990.05 | |

无应付持股5%以上股东单位款项

18.预提费用

| 费用类别 | 期初数 | 期末数 | 备注 |
|---|---|---|---|
| 预提日方提成费 | 11,970,457.54 | 9,373,351.50 | |
| 预提彩管运费 | 8,205,806.39 | 3,703,915.94 | |
| 商标使用费 | | 214,675.30 | |
| 代销费 | | 553,752.00 | |
| 合计 | 20,176,263.93 | 13,845,694.74 | |

预提费用比上年减少6,330,569.19元,减幅31.38%,主要是由于日方技术提成费已部分支付及运费降低所致。

19.股本

公司股份变动情况表

数量单位:股

| 项目 | 期初数 | 本次变动增减(+,—) | | | | 期末数 |
|---|---|---|---|---|---|---|
| | | 配股 送股 公积金转股 | 其他 | 小计 | | |
| 一、尚未流通股份 | | | | | | |
| 1.发起人股份 | 188,160,000 | | +24,000,000 | | | 212,160,000 |
| 其中:国家拥有股份 | | | | | | |
|  境内法人持有股份 | 188,160,000 | | +24,000,000 | | | 212,160,000 |

IRI-CRT-00031957

外资法人持有股份
　　其他

| | | | |
|---|---|---|---|
| 2.募集法人股 | 61,344,000 | -24,000,000 | 37,344,000 |
| 3.内部职工股 | | | |
| 4.优先股或其他 | | | |
| 尚未流通股份合计 | 249,504,000 | | 249,504,000 |
| 二、已流通股份 | | | |
| 1.境内上市的人民币普通股 | 110,496,000 | | 110,496,000 |
| 2.境内上市的外资股 | | | |
| 3.境外上市的外资股 | | | |
| 4.其他 | | | |
| 已流通股份合计 | 110,496,000 | | 110,496,000 |
| 三、股份总数 | 360,000,000 | | 360,000,000 |

20.资本公积

| 项目 | 期初数 | 本期增加 | 本期减少 | 期末数 |
|---|---|---|---|---|
| 股本溢价 | 150,000,000.00 | | | 150,000,000.00 |
| 合计 | 150,000,000.00 | | | 150,000,000.00 |

21.盈余公积

| 项目 | 期初数 | 本期增加 | 本期减少 | 期末数 |
|---|---|---|---|---|
| 法定盈余公积 | 54,424,350.10 | 16,348,588.50 | | 70,772,938.60 |
| 公益金 | 27,212,175.04 | 8,174,294.25 | | 35,386,469.29 |
| 任意盈余公积 | | | | |
| 合计 | 81,636,525.14 | 24,522,882.75 | | 106,159,407.89 |

22.未分配利润

| 项目 | 金额 | 备注 |
|---|---|---|
| 期初数 | 186,035,373.30 | |
| 本期增加 | 163,485,885.01 | |
| 其中:本年利润分配转入 | 163,485,885.01 | |
| 本期减少 | | |
| 其中:提取法定盈余公积 | 16,348,588.50 | |
| 提取公益金 | 8,174,294.25 | |
| 期末数 | 324,998,375.56 | |

23.主营业务成本

| 上年发生数 | 本年发生数 | 备注 |
|---|---|---|
| 973,822,288.24 | 773,778,431.20 | |

IRI-CRT-00031958

主营业务成本较上年降低幅度较大，主要原因是：原材料降价；产品良品率提高所致。产品销售收入有所降低是由于单位售价降低销售数量减少所致。

24.其他业务利润

| 项目 | 上年发生数 | 本年发生数 | 备注 |
|---|---|---|---|
| 备品备件销售 | 553.86 | | |
| 化工零部件销售 | 57,244.02 | 66,329.99 | |
| 包装物 | 176,197 | | |
| 其他 | | 283,586.69 | |
| 合计 | 233,994.88 | 349,916.68 | |

25.财务费用

| 类别 | 上年发生数 | 本年发生数 | 备注 |
|---|---|---|---|
| 利息支出 | 28,928,993.53 | 12,235,780.20 | |
| 减：利息收入 | 7,184,454.60 | 4,885,555.68 | |
| 汇兑损失 | | | |
| 减：汇兑收益 | | 150,796.89 | |
| 其他 | 102,110.43 | 1,290.20 | |
| 合计 | 21,846,649.36 | 7,200,717.83 | |

财务费用较上年减少14,645,931.53元，减幅67.04%，主要是由于银行借款利率下调及借款减少。(本年平均短期借款为1.6亿，上年平均短期借款为2.553亿元)

26.投资收益

| 项目 | 上年发生数 | 本年发生数 | 备注 |
|---|---|---|---|
| 非控股投资公司分配来利润 | | | |
| -陕西信托投资公司 | 3,598,500.00 | 4,092,000.00 | 分红 |
| 合营企业 | | | |
| -西安新纪元国际俱乐部 | -891,935.35 | -466,069.46 | 权益法调整 |
| 合计 | 2,706,564.65 | 3,625,930.54 | |

27.支付的其他与经营活动有关的现金,其中主要包括：

① 运输费用：  5,866,110.00
② 代销费用：  7,720,832.96
③ 日方提成费：  19,620,965.52
④ 商标使用费：  1,992,532.79

六、分行业资料

| 行业 | 营业收入 | | 营业成本 | | 营业毛利 | |
|---|---|---|---|---|---|---|
| | 上年数 | 本年数 | 上年数 | 本年数 | 上年数 | 本年数 |

IRI-CRT-00031959

彩色显像管 1,149,549,098.97 1,020,477,484.20 973,822,288.24 773,778,431.20 175,726,810.73 246,699,053.00

公司内行业间相互抵减

合计 1,149,549,098.97 1,020,477,484.20 973,822,288.24 773,778,431.20 175,726,810.73 246,699,053.00

七、关联方关系及其交易

1．存在控制关系的关联方

| 企业名称 | 注册地址 | 主营业务 | 与本企业关系 | 经济性质 | 法定代表人 |
|---|---|---|---|---|---|
| 彩虹集团公司 | 北京海淀区 上地四街9号 | 彩色显像管、 显示器生产开发 | 母公司 | 国有 | 吴维仁 |

2．存在控制关系的关联方的1998年12月31日至1999年6月30日注册资本变动情况

| 企业名称 | 期初数 | 本期增加数 | 本期减少数 | 期末数 |
|---|---|---|---|---|
| 彩虹集团公司 | 10亿元 | | | 10亿元 |

3.存在控制关系的关联方所持有股份或股权及其变化

| 企业名称 | 期初数 | | 本期增加数 | | 本期减少数 | | 期末数 | |
|---|---|---|---|---|---|---|---|---|
| | 金额(万元) | 比例(%) | 金额 | 比例(%) | 金额 | 比例(%) | 金额(万元) | 比例(%) |
| 彩虹集团公司 | 8,556 | 23.77 | 12,288 | 34.13 | | | 20,844 | 57.9 |

4.不存在控制关系的关联方关系的性质

| 企业名称 | 与本公司关系 |
|---|---|
| 彩虹彩色显像管总厂 | 同一母公司 |
| 陕西彩通电子有限公司 | 同一母公司 |
| 咸阳彩虹电子配件厂 | 同一母公司 |
| 彩虹集团公司昆山实业总公司 | 同一母公司 |
| 深圳市彩虹电子有限公司 | 同一母公司 |
| 彩珠实业总公司 | 同一母公司 |
| 彩虹包装箱厂 | 同一母公司 |
| 彩莲化工厂 | 同一母公司 |

5.关联方交易

(1)货物采购

本公司1999年度向关联方采购货物有关明细如下：

| 企业名称 | 金额 | 所占比例(%) |
|---|---|---|
| 彩虹彩色显像管总厂 | 216,288,105.80 | 32.38 |
| 陕西彩通电子有限公司 | 57,766,510.00 | 8.65 |
| 咸阳彩虹电子配件厂 | 18,405,129.60 | 2.76 |
| 彩虹集团公司昆山实业总公司 | 1,362,300.00 | 0.20 |
| 深圳市彩虹电子有限公司 | 2,190,618.00 | 0.33 |
| 彩珠实业总公司 | 3,091,487.40 | 0.46 |
| 彩虹包装箱厂 | 3,174,996.04 | 0.48 |
| 彩莲化工厂 | 4,894,753.31 | 0.73 |

(2)销售货物

IRI-CRT-00031960

本公司1999年度向关联方销售货物有关明细如下：

| 企业名称 | 金额 | 所占比例(%) |
|---|---|---|
| 彩珠实业总公司 | 24,211,085.49 | 2.37 |

(3)代理

本公司1999年度与关联方有关明细如下：

| 企业名称 | 金额 | 备注 |
|---|---|---|
| 彩虹彩色显像管总厂 | 7,720,832.96 | 代购、代销费 |

(4)许可协议

本公司1999年度与关联方有关明细如下：

| 企业名称 | 金额 | 备注 |
|---|---|---|
| 彩虹集团公司 | 1,992,532.79 | 商标使用费 |

(5)接收劳务

本公司1999年度月与关联方有关明细如下：

| 企业名称 | 金额 | 备注 |
|---|---|---|
| 彩虹彩色显像管总厂 | 28,928,746.49 | 提供风、水、电、气 |
| 彩虹彩色显像管总厂劳司 | 698,646.86 | 提供加工劳务 |

6.关联交易定价政策

关联交易的价格为协议价。

7.关联交易协议内容的变更

依照市场需求的变化及市场价格的波动，调整了部分关联交易价格。

8.关联方往来款项余额

| 项目 | 期初数 | | 期末数 | |
|---|---|---|---|---|
| | 金额 | 比例(%) | 金额 | 比例(%) |
| (1)应收单据 | | | | |
| 彩珠实业总公司 | 5,000,000.00 | 0.83 | 13,000,000.00 | |
| (2)应付帐款 | | | | |
| 陕西彩通电子有限公司 | 5,556,977.28 | 7.78 | | |
| (3)应付票据 | | | | |
| 陕西彩通电子有限公司 | 2,596,440.00 | 2.23 | | |
| 彩虹包装箱厂 | | | 884,189.76 | 14.05 |
| 彩莲化工厂 | | | 480,594.78 | 7.64 |
| 咸阳彩虹电子配件厂 | 1,778,763.17 | 1.52 | | |
| 彩虹集团昆山实业有限总公司 | 200,000.00 | 0.17 | | |

9.关键管理人员报酬(薪金)

| 关联方名称 | 金额 | 备注 |
|---|---|---|
| 薛宝明 | 不在本公司领薪金 | |
| 穆治平 | 同上 | |
| 邵群慧 | 同上 | |

IRI-CRT-00031961

| | | |
|---|---|---|
| 郝均科 | 同上 | |
| 焦树堂 | 同上 | |
| 李作亭 | 同上 | |
| 马永鸿 | 同上 | |
| 陈德智 | 77,594.90 | 1999年4月后在本公司领薪 |
| 张君华 | 72,884.10 | |
| 任海浪 | 62,968.20 | |
| 刘珍珠 | 71,344.70 | 1999年4月后在本公司领薪 |
| 路西良 | 49,043.20 | |
| 王 莉 | 56,445.40 | |

## 八、或有事项

本公司为了取得贷款，以固定资产金额54,001.60万元进行最高额抵押贷款，其中：机器设备为42,582.60万元；房屋及建筑物为11,419.00万元。

## 九、承诺事项

本公司无需说明的承诺事项。

## 十、资产负债表日后事项中的非调整事项

本公司无需说明的资产负债表日后事项。

## 十一、其他重要事项

本公司无需说明的其他重要事项。


## 九、公司的其他有关资料

1、公司首次登记日期和地点：1992年9月8日，咸阳
   变更登记注册日期和地点：1996年8月26日，西安
2、企业法人营业执照注册号：22053302-8
3、税务登记号码：陕国税直字610101220533028号
4、公司未流通股票的托管机构名称：上海证券中央登记结算公司
5、公司报告期内证券主承销机构名称：国信证券有限公司
6、会计师事务所：陕西岳华会计师事务所
   地址：西安高新技术开发区西区光华路A13号

## 十、备查文件目录

1、载有法定代表人、总会计师、会计经办人员签名并盖章的会计报表；
2、盖有会计师事务所盖章、注册会计师签名并盖章的审计报告原件；
3、报告期内在中国证监会指定报纸上公开披露过的所有公司文件的正本及公告的原稿。

IRI-CRT-00031962

上述备查文件在中国证监会、证券交易所要求提供时和股东依据法规或公司章程要求查阅时，公司将及时提供。

彩虹显示器件股份有限公司董事会
二零零零年二月二十五日

IRI-CRT-00031963

# 资产负债表

单位：（人民币）元

| 资　产 | 期末数 | | 期初数 | |
|---|---|---|---|---|
| | 合并 | 母公司 | 合并 | 母公司 |
| **流动资产：** | | | | |
| 货币资金 | | 146,208,475.15 | | 122,324,098.38 |
| 短期投资 | | | | |
| 减：短期投资跌价准备 | | | | |
| | | | | |
| 短期投资净额 | | | | |
| | | | | |
| 应收票据 | | 387,896,720.00 | | 604,878,705.00 |
| 应收股利 | | 4,092,000.00 | | |
| 应收利息 | | | | |
| 应收帐款 | | 285,505,449.29 | | 96,575,621.76 |
| 其他应收款 | | 6,846,097.20 | | 14,826,789.63 |
| 减：坏帐准备 | | 116,454.00 | | 56,575.00 |
| | | | | |
| 应收款项净额 | | 292,235,092.49 | | 111,345,836.39 |
| | | | | |
| 预付帐款 | | 50,824,466.58 | | 35,159,921.12 |
| 应收补贴款 | | | | |
| 存货 | | 16,523,110.81 | | 17,779,950.67 |
| 减：存货跌价准备 | | 3,077,397.99 | | 3,077,397.99 |
| 存货净额 | | 13,445,712.82 | | 14,702,552.68 |
| 待摊费用 | | 539,348.84 | | 738,929.00 |
| 待处理流动资产净损失 | | | | |
| 一年内到期的长期债券投资 | | | | |
| 其他流动资产 | | | | |
| 流动资产合计 | | 895,241,815.88 | | 889,150,042.57 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

IRI-CRT-00031964

# 资产负债表

单位：（人民币）元

| 资　产 | 期末数 | | 期初数 | |
|---|---|---|---|---|
| | 合并 | 母公司 | 合并 | 母公司 |
| **长期投资：** | | | | |
| 长期股权投资 | | 63,641,995.19 | | 49,108,064.65 |
| 长期债权投资 | | | | |
| | | | | |
| 长期投资合计 | | 63,641,995.19 | | 49,108,064.65 |
| 其中：合并价差 | | | | |
| 减：长期投资减值准备 | | | | |
| | | | | |
| 长期投资净额 | | 63,641,995.19 | | 49,108,064.65 |
| **固定资产：** | | | | |
| 固定资产原价 | | 497,819,275.60 | | 494,700,263.13 |
| 减：累计折旧 | | 224,941,201.48 | | 175,517,658.79 |
| | | | | |
| 固定资产净值 | | 272,878,074.12 | | 319,182,604.34 |
| 工程物资 | | | | |
| 在建工程 | | 5,418,621.59 | | 6,230,818.74 |

IRI-CRT-00031965

# 资产负债表

单位：（人民币）元

| 负债及股东权益 | 期末数 | | 期初数 | |
|---|---|---|---|---|
| | 合并 | 母公司 | 合并 | 母公司 |
| **流动负债：** | | | | |
| 短期借款 | | 210,000,000.00 | | 255,300,000.00 |
| 应付票据 | | 6,293,754.24 | | 116,327,667.28 |
| 应付帐款 | | 42,726,102.48 | | 71,390,103.73 |
| 预收帐款 | | | | |
| 代销商品款 | | | | |
| 应付工资 | | 7,171,729.02 | | 8,722,950.02 |
| 应付福利费 | | 6,971,200.03 | | 5,568,428.75 |
| 应付股利 | | | | 720,000.00 |
| 应交税金 | | 19,573,746.90 | | 23,164,827.85 |
| 其他应交款 | | 796,072.84 | | 661,656.58 |
| 其他应付款 | | 2,953,990.05 | | 2,683,020.47 |
| 预提费用 | | 13,845,694.74 | | 20,176,263.93 |
| 一年内到期的长期负债 | | | | |
| 其他流动负债 | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **流动负债合计** | | 310,332,290.30 | | 504,714,918.61 |
| | | | | |
| **长期负债：** | | | | |
| 长期借款 | | | | |
| 应付债券 | | | | |
| 长期应付款 | | | | |
| 住房周转金 | | | | |
| 其他长期负债 | | | | |
| | | | | |
| 长期负债合计 | | | | |
| | | | | |

IRI-CRT-00031966

# 资产负债表

单位：（人民币）元

| 负债及股东权益 | 期末数 | | 期初数 | |
|---|---|---|---|---|
| | 合并 | 母公司 | 合并 | 母公司 |
| **递延税项：** | | | | |
| 递延税款贷项 | | | | |
| | | | | |
| | | | | |
| 负债合计 | | 310,332,290.30 | | 504,714,918.61 |
| 少数股东权益 | | | | |
| | | | | |
| **股东权益：** | | | | |
| 股本 | | 360,000,000.00 | | 360,000,000.00 |
| | | | | |
| | | | | |
| 资本公积 | | 150,000,000.00 | | 150,000,000.00 |
| 盈余公积 | | 106,159,407.89 | | 81,636,525.14 |
| 其中：公益金 | | 35,386,469.29 | | 27,212,175.04 |
| | | | | |
| | | | | |
| 未分配利润 | | 324,998,375.56 | | 186,035,373.30 |
| 外币报表折算差额 | | | | |
| 股东权益合计 | | 941,157,783.45 | | 777,671,898.44 |
| 负债和股东权益总计 | | 1,251,490,073.75 | | 1,282,386,817.05 |

备　注：

IRI-CRT-00031967

# 利润及利润分配表

单位：（人民币）元

| 项 目 | 本期 | | 上期 | |
|---|---|---|---|---|
| | 合并 | 母公司 | 合并 | 母公司 |
| 一、主营业务收入 | | 1,020,477,484.20 | | 1,149,549,098.97 |
| 减：折扣与折让 | | | | |
| 主营业务收入净额 | | 1,020,477,484.20 | | 1,149,549,098.97 |
| 减：主营业务成本 | | 773,778,431.20 | | 973,822,288.24 |
| 主营业务税金及附加 | | 5,233,644.01 | | 5,050,126.07 |
| 二、主营业务利润 | | 241,465,408.99 | | 170,676,684.6600 |
| 加：其他业务利润 | | 349,916.68 | | 233,994.88 |
| 减：存货跌价损失 | | | | 47,774.67 |
| 营业费用 | | 11,269,478.00 | | 20,315,125.00 |
| 管理费用 | | 35,250,558.08 | | 38,191,565.48 |
| 财务费用 | | 7,200,717.83 | | 21,846,649.36 |
| 三、营业利润 | | 188,094,571.7600 | | 92,509,565.6300 |
| 加：投资收益 | | 3,625,930.54 | | 2,706,564.65 |
| 补贴收入 | | | | |
| 营业外收入 | | | | |
| 减：营业外支出 | | 24,037.09 | | 18,766.59 |
| 四、利润总额 | | 191,696,465.21 | | 95,197,363.0900 |
| 减：所得税 | | 28,239,580.20 | | 13,681,272.71 |
| 减：少数股东损益 | | | | |
| 五、净利润 | | 163,485,885.0100 | | 81,516,090.3800 |
| 加：年初未分配利润 | | 186,035,373.30 | | 136,218,043.78 |
| 盈余公积转入 | | | | |
| | | | | |
| | | | | |
| | | | | |

IRI-CRT-00031968

# 利润及利润分配表

单位：（人民币）元

| 项 目 | 期末数 | | 期初数 | |
|---|---|---|---|---|
| | 合并 | 母公司 | 合并 | 母公司 |
| 六、可供分配的利润 | | 349,521,258.3100 | | 197,734,134.1800 |
| 　减：提取法定盈余公积金 | | 16,348,588.50 | | 7,799,173.91 |
| 　减：提取法定公益金 | | 8,174,294.25 | | 3,899,586.95 |
| | | | | |
| 七、可供股东分配的利润 | | 324,998,375.5600 | | 186,035,373.3000 |
| 　减：应付优先股股利 | | | | |
| 　提取任意盈余公积 | | | | |
| 　应付普通股股利 | | | | |
| 　转作股本的普通股股利 | | | | |
| | | | | |
| 八、未分配利润 | | 324,998,375.5600 | | 186,035,373.3000 |

备 注：

IRI-CRT-00031969

# 现金流量表

单位：（人民币）元

| 项　目 | 合并 | 母公司 |
|---|---|---|
| **一、经营活动产生的现金流量** | | |
| 销售商品、提供劳务收到的现金 | | 972,667,609.86 |
| 收取的租金 | | |
| 收到的增值税销项税和退回的增值税款 | | |
| 收到的除增值税以外的其他税费返还 | | |
| 收到的其他与经营活动有关的现金 | | 18,640,936.88 |
| | | |
| | | |
| 经营活动现金流入小计 | | 991,308,546.74 |
| 购买商品、接收劳务所支付的现金 | | 752,899,932.93 |
| 经营租赁所支付的现金 | | |
| 支付给职工以及为职工支付的现金 | | 20,452,772.72 |
| 支付的增值税款 | | 45,425,981.37 |
| 支付的所得税款 | | 28,869,796.53 |
| 支付的除增值税、所得税以外的其他税费 | | 4,092,201.33 |
| 支付的其他与经营活动有关的现金 | | 44,934,166.34 |
| | | |
| | | |
| 经营活动现金流出小计 | | 896,674,851.22 |
| 经营活动产生的现金流量净额 | | 94,633,695.52 |
| | | |
| **二、投资活动产生的现金流量** | | |
| 收回投资所收到的现金 | | |
| 分得股利或利润所收到的现金 | | |
| 取得债券利息收入所收到的现金 | | |
| 处置固定资产、无形资产和其他长期资产而收回的现金净额 | | 2,060.00 |
| 收到的其他与投资活动有关的现金 | | |
| | | |
| | | |
| 投资活动现金流入小计 | | 2,060.00 |
| | | |
| | | |

IRI-CRT-00031970

# 现金流量表

单位：（人民币）元

| 项　目 | 合并 | 母公司 |
|---|---|---|
| 购建固定资产、无形资产和其他长期资产所支付的现金 | | 2,379,907.53 |
| 权益性投资所支付的现金 | | 15,000,000.00 |
| 债权性投资所支付的现金 | | |
| 支付的其他与投资活动有关的现金 | | |
| | | |
| | | |
| 投资活动现金流出小计 | | 17,379,907.53 |
| 投资活动产生的现金流量净额 | | -17,377,847.53 |
| | | |
| **三、筹资活动产生的现金流量** | | |
| 吸收权益性投资所收到的现金 | | |
| 其中：子公司吸收少数股东权益性投资收到的现金 | | |
| 发行债券所收到的现金 | | |
| 借款所收到的现金 | | 210,000,000.00 |
| 收到的其他与筹资活动有关的现金 | | 3,621,285.75 |
| | | |
| | | |
| 筹资活动现金流入小计 | | 213,621,285.75 |
| 偿还债务所支付的现金 | | 255,300,000.00 |
| 发生筹资费用所支付的现金 | | |
| 分配股利或利润所支付的现金 | | 720,000.00 |
| 其中：子公司支付少数股东的股利 | | |
| 偿付利息所支付的现金 | | 10,971,578.67 |
| 融资租赁所支付的现金 | | |
| 减少注册资本所支付的现金 | | |
| 其中：子公司依法减资支付给少数股东的现金 | | |
| 支付的其他与筹资活动有关的现金 | | 1,178.30 |
| | | |
| | | |
| 筹资活动现金流出小计 | | 266,992,756.97 |
| 筹资活动产生的现金流量净额 | | -53,371,471.22 |
| | | |

IRI-CRT-00031971

# 现金流量表

单位：（人民币）元

| 项　目 | 合并 | 母公司 |
|---|---|---|
| **四、汇率变动对现金流量的影响** | | |
| 汇率变动对现金的影响额 | | |
| | | |
| | | |
| **五、现金及现金等价物净增加额** | | |
| 现金及现金等价物净增加额 | | 23,884,376.77 |
| | | |
| **六、不涉及现金收支的投资和筹资活动** | | |
| 以固定资产偿还债务 | | |
| 以投资偿还债务 | | |
| 以固定资产进行长期投资 | | |
| 以存货偿还债务 | | |
| 融资租赁固定资产 | | |
| | | |
| **七、将净利润调节为经营活动的现金流量** | | |
| 净利润 | | 163,485,885.01 |
| 加：少数股东损益 | | |
| 计提的坏帐准备或转销的坏帐 | | 59,879.00 |
| 固定资产折旧 | | 49,469,962.60 |
| 无形资产摊销 | | 2,404,987.92 |
| 处置固定资产、无形资产和其他长期资产的损失（减：收益） | | |
| 固定资产报废损失 | | 24,037.09 |
| 财务费用 | | 7,300,717.83 |
| 投资损失（减：收益） | | -3,625,930.54 |
| 递延税款贷项（减：借项） | | |
| 存货的减少（减：增加） | | 1,256,839.86 |
| 经营性应收项目的减少（减：增加） | | 84,746,652.37 |
| 经营性应付项目的增加（减：减少） | | -206,359,078.45 |
| 增值税增加净额（减：减少） | | |
| 其他 | | -4,130,257.17 |
| 经营活动产生的现金流量净额 | | 94,633,695.52 |

IRI-CRT-00031972

# 现金流量表

单位：（人民币）元

| 项　目 | 合并 | 母公司 |
|---|---|---|
| 八、现金及现金等价物净增加情况： | | |
| 货币资金的期末余额 | | 146,208,475.15 |
| 减：货币资金的期初余额 | | 122,324,098.38 |
| 现金等价物的期末余额 | | |
| 减：现金等价物的期初余额 | | |
| 现金及现金等价物净增加额 | | 23,884,376.7700 |
| | | |
| | | |
| | | |
| | | |

备注：

IRI-CRT-00031973

# Exhibit 138

# Washington University Global Studies Law Review

Volume 1
Issue 1 *Symposium: APEC Competition Policy and Economic Development*

January 2002

# The Prospect of Antimonpoly Legislation in China

Wang Xiaoye
*Chinese Academy of Social Sciences*

Follow this and additional works at: https://openscholarship.wustl.edu/law_globalstudies

 Part of the Antitrust and Trade Regulation Commons, and the Comparative and Foreign Law Commons

## Recommended Citation

Wang Xiaoye, *The Prospect of Antimonpoly Legislation in China*, 1 WASH. U. GLOBAL STUD. L. REV. 201 (2002),
https://openscholarship.wustl.edu/law_globalstudies/vol1/iss1/10

This Article is brought to you for free and open access by Washington University Open Scholarship. It has been accepted for inclusion in Washington University Global Studies Law Review by an authorized administrator of Washington University Open Scholarship. For more information, please contact digital@wumail.wustl.edu.

# THE PROSPECT OF ANTIMONOPOLY
# LEGISLATION IN CHINA

## WANG XIAOYE[*]

Since the fall of the Berlin Wall, privatization, a reduction in administrative intervention, and antimonopoly measures have become the general trend of economic policies around the world. As a result, various countries have sped up the creation and implementation of their own antimonopoly legislation rapidly. Currently, antimonopoly laws exist not only in economically developed countries but also in many developing countries in Asia, Africa, and Latin America. The countries that have made the most progress in this area are those within the former Soviet Union and Eastern Europe. Most of these countries adopted antimonopoly laws in the early 1990s when they made the transition from a planned economy to a market economy. China adopted the Law of the People's Republic of China Against Unfair Competition in September 1993,[1] but has yet to promulgate a special antimonopoly law. However, with the increasing marketization of the Chinese economy, and with China's admission to the World Trade Organization (WTO) on December 11, 2001, the call for the speedy adoption and promulgation of an antimonopoly law is now much louder. The promulgation of an antimonopoly law undoubtedly will promote economic and political reform in China.

## I.   CHINA'S SOCIALIST MARKET ECONOMY NEEDS A SYSTEM TO PROTECT COMPETITION

The Chinese Constitution, revised in 1993, stipulates that "[t]he State implements a system of socialist market economy."[2] China ultimately will abandon its planned economy (whereby there is administrative management of the national economy) and replace it with a market economy (whereby a market mechanism regulates the allocation of resources and economic development). Laws adapted to the market

---

    *   Professor of law, Institute of Law, Chinese Academy of Social Sciences; J.D., Hamburg University.
    1.   Zhonghua Renmin Gongheguo Fan Buzhengdang Jingzhengfa [Law of the People's Republic of China Against Unfair Competition] (1993), *available at* http://www.apeccp.org.tw/doc/China/ Competition/cncom2.html [hereinafter Law Against Unfair Competition].
    2.   XIANFA [CONSTITUTION OF THE PEOPLE'S REPUBLIC OF CHINA] art. 15 (1999).

Washington University Open Scholarship

economy must regulate, restrain, and safeguard the socialist market economy. Among these laws, the most important are those that protect fair and free competition.

## A. Conditions for Competition in the Current Chinese Economy

Currently, China is still in a period of transition from a planned economy to a market economy. The market has yet to fully develop and still lacks an environment that encourages open and fair competition. However, a trend towards the marketization of the economy already is very clear. This trend has created certain conditions for competition among enterprises.

### 1. Disruption of the State Monopolized Price System

Since the reform and "opening-up" policies began in the late 1970s, the government has decentralized the pricing of most commodities and services. According to the Pricing Law of the People's Republic of China, the Chinese government should set the prices of only those commodities for which competition would be inappropriate, including those that are of importance to the national economy and the national livelihood, rare resources and resources in shortage, naturally monopolized commodities, and commodities relating to public welfare.[3] Since August 1, 2001, the government has liberalized the prices of ten commodities and services, subjecting them to the will of the market.[4] After this round of liberalization, the market regulates the "prices of more than 90% of retail, agricultural, and capital goods."[5] With the relaxation of its control over the prices of most products, the Chinese government drastically decreased the scope and number of mandatory production plans. As a result, enterprises gradually grew conscious of competition and risk taking, and subsequently abandoned the old idea of "everybody eating from the same big pot."

---

3.  Pricing Law of the People's Republic of China art. 18 (1997) [hereinafter Pricing Law].

4.  These products include sugar, agricultural film material, natural rubber, and coal for power generation. Now only thirteen products or services, including government-reserved grains, certain fertilizers, important medicines, natural gas, water, electricity, and postal and telecommunication services remain under governmental pricing control. *See* Fu Jing, *State Liberalizes Prices on 10 Items*, ZHONGGUO RIBAO [CHINA DAILY], July 12, 2001, *available at* 2001 WL 7483132.

5.  *Id.*

## 2. The Presence of a Plural Enterprise Ownership Structure

The modern ownership structure of Chinese enterprises evolved from the domination of the public ownership system (including ownership by the people and collectives) to the coexistence of state, collective, private, and various other forms of ownership. Consequently, the percentage of state-owned enterprises in the national economy has decreased gradually. According to statistics, the state-owned portion of the national economy decreased to 28.8% in 1998 whereas the collectively owned portion increased to 44.4%. The non-public portion increased from 13.4% in 1993 to 30.8% in 1998.[6] The percentage of the total sales volume of social consumer products for state-owned commercial enterprises and state-owned holding companies decreased from 67% in 1978 to 21% in 1998.[7] The proportion of non-public businesses will continue to increase with the deepening of economic reform and China's accession to the WTO. This is especially true considering the third revision of the Chinese Constitution in 1999, which stipulated that the individual economy, private economy, and other non-public sectors of the economy are important components of the social market economy,[8] as well as that "[t]he state protects the lawful rights and interests of the individual economy."[9]

In light of the goal of establishing a socialist market economy, the gradual decrease in the percentage of state-owned businesses benefits society. Experience shows that too large a percentage of state-owned businesses in the national economy hinders the development of the competitive economy as a whole and ultimately will result in economic rigidity and recession. On the other hand, the coexistence and parallel development of various sectors of the economy are conducive to the development of market competition and giving full play to the role of the market in optimizing the allocation of resources.

---

6. *See* JIN PEI, CHANYE ZUZHI JINGJIXUE [ECONOMICS OF INDUSTRIAL ORGANIZATION] 15 (1999).

7. *See* Zhu Qingfang, *Jianguo Wushinian Zhongguo Shehui Jingji Jiegou Fasheng Zhongda Bianhua* [*Major Changes in China's Socio-economic Structure After the Founding of the People's Republic*], ZHONGGUO SHEHUI KEXUEYUAN TONGXUN [NEWSLETTER OF THE CHINESE ACADEMY OF SOCIAL SCIENCES], Sept. 2, 1999.

8. XIANFA art. 11 (1999).

9. *Id.*

### 3. *State-Owned Enterprises Are Enjoying Increasingly Greater Managerial Autonomy*

Although there currently are more than three hundred thousand state-owned enterprises in China, only about ten thousand have undertaken some sort of a state production plan.[10] This means that the majority of state-owned enterprises have marketized their business operations. State-owned enterprises have made important contributions to economic construction in China and have played a dominant role in the national economy. However, due to the long-term influence of the traditional system and its resulting problems, the repetitive economic reconstruction over the years, and the rapid changes in the market environment, many state-owned enterprises no longer can meet the demands of the market economy. Therefore, since the beginning of the economic reformation, the Chinese government has explored ways to reform the management system of state-owned enterprises. As a result, the reform of state-owned enterprises has become the key to the success or failure of economic reform in China.

In 1995, China directed its state-owned enterprises to establish a modern enterprise management system.[11] The modern enterprise management system aims to clarify property rights, determine rights and responsibilities, separate the functions of the government from those of enterprises, develop a scientific management system, and perfect decision making, implementation, and supervision mechanisms. This will enable enterprises to truly become the legal persons and the principals of the market that can operate their businesses independently and assume responsibilities for their own profits or losses.[12] By 1999, through integration, mergers, leasing, contracting, the establishment of a shareholding cooperation system, sales, transfers, and bankruptcies, about 75% to 90% of small state-owned enterprises had reorganized their management systems.[13] Of the fourteen thousand medium and large state-owned enterprises, one-third reorganized as limited liability companies or

---

10.  *See* JIN PEI, *supra* note 6, at 15.

11.  According to the Decision on the Establishment of a Socialist Market System, which the Fourteenth Central Committee of the Chinese Communist Party adopted at the Plenary Meeting on Nov. 14, 1993, establishing a modern enterprise management system is an extremely important component of creating a socialist market system. To implement this Decision, the State Council selected one hundred state-owned enterprises in 1995 and began experimenting with enterprise management. *See* FASHI RIBAO [LEGAL DAILY], Feb. 8, 1995.

12.  *See* Jiang Zemin, Address at the Meeting of the 15th National Congress of the Communist Party of China (Sept. 12, 1997).

13.  *See* JIN PEI, *supra* note 6, at 15.

companies limited by shares.[14] By the first half of 1998, about 309,000 limited liability companies had reorganized themselves in accordance with the Company Law of the People's Republic of China.[15] Among them, more than 10,000 were reorganized state-owned enterprises or newly established companies with state-owned enterprises as their main subsidiaries, more than 4,000 were companies limited by shares,[16] and 745 were listed companies.[17] These statistics show that with both the implementation of a shareholding system for state assets and the circulation and transfer of state-owned stocks in the market, state-owned enterprises will cut off their subordinate relationship with the government and free themselves from the control of various government departments.[18] This serves as the ultimate goal of economic reform in China as well as a pre-condition for both the reinvigoration of state-owned enterprises and the introduction of competition mechanisms into China's economic life.

### 4. *China Already Possesses an Open Market Structure*

Since the promulgation of the Law of the People's Republic of China on Chinese-Foreign Equity Joint Ventures in 1979,[19] China has implemented the policy of absorbing direct investment by foreign enterprises. During this time, China established five special economic zones,[20] fourteen coastal "open cities,"[21] and several coastal economic

---

14. *Id.*

15. *Id.* at 17.

16. *Id.*

17. *Id.*

18. Since 1999, the state has paid tremendous attention to carrying out the strategic reorganization of state-owned enterprises in light of different conditions. Apart from a very small number of industries that the state must monopolize, all state-owned enterprises in competitive areas must rearrange assets and readjust structures using various methods. The large and medium-sized enterprises that meet the necessary conditions should develop gradually into shareholding enterprises with different sources of investment. *See Communist Party Discusses Industrial Reform With Non-Communist Parties*, RENMIN RIBAO [PEOPLE'S DAILY], Sept. 24, 1999, *available at* http://english. peopledaily.com.cn/199909/24/enc_19990924001008_TopNews.html [hereinafter *Communist Party Discusses*]. *Cf. Strengthening the Belief in Running Well State-Owned Enterprises (SOEs)*, ZHENLI DE ZHUIQIU [SEEKING TRUTH], Sept. 24, 1999 (hailing the decisions made on SOEs).

19. Zhonghua Renmin Gongheguo Zhongwai Hezi Jingying Qiye Fa [Law of the People's Republic of China on Chinese-Foreign Equity Joint Ventures] (1979), *translated in* THE LAWS OF THE PEOPLE'S REPUBLIC OF CHINA, 1979-1982 150 (1987). A current version is available online at http://www.qis.net/chinalaw/prclaw11.htm.

20. These special economic zones include Shenzhen, Zhuhai, Shantou, Xiamen, and Hainan.

21. These "open cities" include Dalian, Qinhuangdao, Tianjin, Yantai, Qingdao, Lianyungang, Nantong, Shanghai, Ningbo, Wenzhou, Fuzhou, Zhanjiang, Guangzhou, and Beihai. Since 1992, the central government has designated many of the cities along the Yangtze River, which were provincial capital cities in the border areas and interior areas, to adopt the coastal "open city" policy.

development regions in the Yangtse Delta, Zhujiang Delta, and Xiatang Delta areas, thereby establishing a structure for opening China to the outside world in various directions and through various channels.

By July 2000, China had absorbed more than US$327 billion in direct foreign investment and established more than 353,000 foreign-invested enterprises.[22] From 1993 to 2000, China absorbed the largest amount of foreign investment of any developing country in the world. Globally, China ranks second only to the United States in foreign investment. Of the five hundred most well known transnational corporations, nearly four hundred have made investments in China.[23] Foreign-invested enterprises have optimized their industrial structures gradually. These foreign enterprises have brought increased capital, technology, and employment opportunities to China, as well as new management methods, thereby injecting tremendous vitality into the Chinese markets and economy. Throughout the past twenty years, China's foreign trade has expanded more than sixteenfold. Its world ranking rose from number thirty-two in 1978 to number eleven in 1995, and ultimately to number seven in 2000.[24] This demonstrates that the Chinese market is compatible with, and able to compete within, the international marketplace, as well as the fact that the Chinese economy, to a large extent, has integrated into the international economy.

## B.  Restrictions on Competition in the Chinese Economy

Although China has introduced the competition mechanism into its economy, due to the lingering influence of the old economic system, many government organs still may treat enterprises differently or practice a high degree of departmental or market division. This results in the retention of many low-efficiency enterprises as well as the failure of many high-efficiency enterprises to compete effectively in the market. In addition, with the introduction of market competition, various acts of unfair

---

22.  See China: Developing Country Attracting Most Foreign Investment, RENMIN RIBAO [PEOPLE'S DAILY], Sept. 19, 2000, available at http://english.peopledaily.com.cn/200009/19/eng20000919_50854.html.

23.  See Background: China's Introduction to Foreign Investment, RENMIN RIBAO [PEOPLE'S DAILY], Sept. 7, 2000, available at http://english.peopledaily.com.cn/200009/07/eng20000907_49988.html.

24.  See Research Group for the Foreign Trade Situation of China, Chukou Zhiyue Yinsu Xianzeng - Zhongguo Duiwai Maoyi Xingshi 2001 Nian Chongji Baogao [Export Restraint Factors Increasing - The Spring 2001 Report on the Foreign Trade Situation of China], 6 GUOJI MAOYI [INTERTRADE] 18 (2001).

competition have emerged. Therefore, at the current stage of economic life in China, market competition is both insufficient and seriously distorted.

### 1. Economic Restrictions on Market Competition

Economic restrictions on competition specifically refer to acts of enterprises that restrict competition. Both Chinese and foreign experiences show that the market itself does not contain a mechanism that upholds fair and free competition. On the contrary, in order to reduce pressure from their competitors and avoid risks, enterprises constantly implement various means to acquire a monopoly within the relevant market. At the current stage of development, where the market is still immature and the market mechanism still imperfect, acts of enterprises that restrict competition occur frequently.

#### a. Coordinated Restrictions on Market Competition

Coordinated restrictions on competition refer to the acts of various legally independent enterprises of coordinating with each other to restrict competition through the conclusion of contracts or tacit agreements on prices, production, sales, and other matters relating to market competition. For example, during the air conditioner price war in Nanjing in 1993, eight large state-owned department stores coordinated to impose maximum prices on air conditioners to defeat their competitors.[25] In addition, in 1994, fifty-one pager service providers jointly imposed restrictions on service fees.[26]

The "8.9 Incident," or "15-day Price Alliance," represents a typical example of coordinated price restriction.[27] The seventeen enterprises in this alliance formed two price cartels. One was a production price cartel consisting of Little Swan, Cherry, Haier, and six other washing machine producers, whose alliance agreement required that all cartel members adopt unified prices and other related policies toward retailers.[28] The other cartel was a selling price cartel, consisting of the Beijing Department Store, Xidan Shopping Center, Longfu Shopping Center, and five other major shopping centers, whose alliance agreement stipulated that all cartel members implement the unified retail prices of washing machines set by

---

25. *See* NANJING RIBAO [NANJING DAILY], May 22, 1993.
26. *See* RENMIN RIBAO [PEOPLE'S DAILY], Jan. 12, 1995.
27. *See* Xi Weihang & Lu Wei, *15-day Price Alliance*, BEIJING RIBAO [BEIJING DAILY], Mar. 8, 1996.
28. *Id.*

Washington University Open Scholarship

the producers.[29] The purpose of this price coordination was to restrict the price competition between the washing machine producers and retailers.

In the last two years, the intensification of competition has increased the number of price alliances among competitors. For example: (1) in May 1999, eight major kinescope producers established an alliance in Beijing and imposed a one month moratorium on production to prevent further price drops;[30] (2) in March 2000, major air conditioner producers formed an alliance in Nanjing;[31] and (3) recently, nine major color television producers (including Konka, TCL, and Chuangwei) met in Shengzhen for the first meeting of their price alliance in the color television manufacturing industry.[32] These examples illustrate the harmful effects of price cartels on consumer interest. However, because the above-mentioned cartels possessed a limited number of members and existed in a limited number of industries, their effects on competition were far less harmful than the "industrial self-discipline prices" adopted by various industries in 1998 under the guidance of the relevant government departments.

One always should view "industrial self-discipline prices" as a synonym for government intervention in price competition among enterprises. In August 1998, the State Economic and Trade Commission issued its "Opinions On Self-Discipline Pricing For Certain Industrial Products,"[33] which, on the grounds that it was necessary to end price wars and disorderly competition, demanded that the producers of certain industrial products observe the minimum price limits set by their respective trade associations. The twenty categories of these regulated products included plate glass, cement, cars, agricultural vehicles, and electricity generators. The Transportation Vehicle Branch of the China Agricultural Machinery Association (TVB), which first advocated the imposition of industrial self-discipline prices, even imposed fines on the Shandong Shifeng Group and other enterprises for failing to observe the industrial self-discipline prices. The TVB forced the Shifeng Group to pay a fine of 800,000 yuan and an "inspection fee" of 153,000 yuan.[34]

---

29. *Id.*

30. *See* Wang Chenbo & Shen Yu, *Four Questions to Chinese Antimonopoly*, GONGREN RIBAO [WORKER'S DAILY], Apr. 20, 2001.

31. *Id.*

32. *Id.*

33. *See* RENMIN RIBAO [PEOPLE'S DAILY], Sept. 11, 1998, *available at* http://english.people daily.com.cn/199809/11/index.htm.

34. *See* RENMIN RIBAO [PEOPLE'S DAILY], Oct. 19, 1998, *available at* http://english.people daily.com.cn/199810/19/index.htm.

"Industrial self-discipline prices" operate as a type of compulsory price cartel because they force enterprises to sell their products according to "coordinated prices," which the government sets without their prior consent. Forcing enterprises to sell their products at industrial self-discipline prices is unreasonable because the government bases the prices on the average costs within a particular industry, which exceeds the individual costs of more efficient enterprises. Industrial self-discipline prices restrict the scope of price reduction for these enterprises and deprive them of the opportunity to expand their production and operation. The Shifeng Group was correct to criticize this practice as "punishing the advanced and protecting the backward."[35]

### b. Obstructive Restrictions on Market Competition

Obstructive restrictions on competition refer to the practice of enterprises of concluding compulsory agreements on tie-in sales, the restriction of resale prices, or other exclusive restrictions to either limit the managerial autonomy of competitors or place competitors in a disadvantaged position by limiting or refusing to provide goods. Since enterprises engage in this kind of restriction on competition at various stages of production, the restrictions are vertical in nature. Since these restrictions work to obstruct others from taking part in competition, they commonly are viewed as obstructive restrictions on competition.

In the current Chinese economy, obstructive restrictions on competition occur primarily in the areas of telecommunications, electricity, water, gas, and other public utilities. For example, postal and telecommunications offices forced telephone users to buy designated telephone sets,[36] power supply offices forced their customers to buy designated power distribution boxes,[37] and water companies forced consumers to buy the designated water supply equipment.[38] During the installation of gas pipelines in the housing districts in some cities, gas companies forced the residents to buy gas stoves and water heaters sold by the gas companies that were much more expensive than similar products in the market. The gas companies

---

35.  *Id.*
36.  *See* FAZHI RIBAO [LEGAL DAILY], Nov. 21, 1996.
37.  Li Bida, *Longduan Xinwei Zai Zhongguo de Zhuyao Biaoxian Jiqi Falv Jiandu* [*Main Manifestations of Monopoly in China and Their Legal Supervision*], *in* FANLONGDUANFA YU SHICHANG JINGJI [ANTIMONOPOLY LAW AND THE MARKET ECONOMY] 10-12 (Wang Xiaoye ed., 1998).
38.  *Id.*

either refused to issue certificates for the use of the gas or cut the gas supply to users that refused to buy their products.[39]

### 2. Administrative Restrictions on Market Competition

Administrative restrictions on competition refer to the acts of the Chinese government and its subordinate organs that abuse administrative power to restrict competition. These acts abuse administrative power because they do not qualify as either normal economic administrative actions that the government carries out for the maintenance of the socialist economic order or the industrial, financial, or other economic and social policies adopted by the government for the macro-regulation of the national economy. China currently is transitioning from a planned economy to a market economy and the transformation of the government's function of economic administration presently is incomplete. As a result, administrative restrictions on competition coming from the old economic system represent a very serious problem and a large obstacle to the establishment of effective competition in China. Administrative restrictions on competition primarily take the following forms:

### a. Departmental Monopoly and Regional Monopoly

Currently, Chinese academics summarize administrative restrictions on competition as departmental monopoly and regional monopoly or, more vividly, vertical monopoly and horizontal monopoly. Vertical monopoly refers to the administrative companies that various government departments approve and establish. They include: (1) companies that function both as administrative organs and producers or business operators; (2) large enterprise groups with the task of industrial administration; and (3) enterprises affiliated with certain bureaus or ministries that consequently enjoy favorable treatment. Since these companies possess governmental authorization, they have competitive advantages that other enterprises could not possibly have. In relation to certain products, the enterprises operate in government-created monopoly positions in terms of the production, sale, and purchase of raw materials, which thereby unfairly restrict competition. In China, critics refer to this phenomenon as "conducting business operations by abusing power."[40]

---

39. *See* FAZHI RIBAO [LEGAL DAILY], Sept. 29, 1995.

40. Respected economist Hu Angang recently stated that administrative monopolies simply are corrupt. *See* BEIJING QINGNIAN BAO [BEIJING YOUTH DAILY], Sept. 24, 2001, *available at*

Horizontal monopoly refers to local protectionism. It consists of acts of local governments that either prohibit certain foreign products from entering the local market or prevent local raw materials from flowing into other regions, thereby dividing the originally unified national market into many narrow local markets. Since the beginning of the economic reformation and the separation of the financial powers of central and local governments, local governments have developed independent interests.[41] As a result, the conflicts of interest between different regions have intensified and local protectionism has peaked.

Some local governments refuse to issue business licenses to enterprises that engage in wholesaling or retailing of commodities originating in other regions, and often arbitrarily confiscate their goods or impose fines. Some local governments even go as far as setting up checkpoints at regional border areas to pursue, obstruct, and intercept those who sell commodities originating in other regions.[42] For example, during the 1994 beer war in the Jixi Region of the Helongjiang Province, the counties and cities surrounding Jixi City confiscated, within a period of eight months and by means of setting up checkpoints and conducting unannounced inspections, thirteen thousand crates of bottled beer produced in Jixi City.[43] In 1997, the government of Gushi County in the Henan Province issued a special order to prevent chemical fertilizer originating in other regions from flowing into the county. The order stipulated:

> In order to protect the production of chemical fertilizer in the county, the county government prohibits any units or individual (including supply and marketing cooperatives) from purchasing carbonic ammonia produced in other areas. Those who violate this prohibition shall, apart from confiscation of the goods and illegal income, be imposed severe sanctions according to the relevant regulations. The leaders of the relevant county people's governments and of the relevant administrative departments also

---

http://www.bjyouth.com.cn.

41.  Article 8 of the Budget Law of the People's Republic of China mandates that the central government and the local governments shall separate taxation. The central government and the local governments divide tax items and categories at different levels according to their different responsibilities. *See* Rules for the Implementation of the Budget Law of the People's Republic of China (Nov. 2, 1995).

42.  *See* Li, *supra* note 37, at 11.

43.  *See* FAZHI RIBAO [LEGAL DAILY], Apr. 22, 2000.

Washington University Open Scholarship

shall be investigated for administrative or economic responsibilities.[44]

With the development of the automotive industry in China, the competition between certain automobile producers also has taken on a strong color of local protectionism. For example, ever since October 1, 1999, the Hubei Province, which produces Citröen cars, has imposed a seventy thousand-yuan "fee for helping enterprises with special difficulties" on the purchase of each Santana car, which the Shanghai Municipality produces. The Hubei Province imposed this fee in response to the Shanghai Municipality's policy of charging only a twenty thousand-yuan license fee for Santana cars, but an eighty thousand-yuan license fee for other cars.[45] This kind of local protectionism has harmed consumer interests by restricting their rights to select commodities, restricting the production scale of enterprises, and impeding the development of the automobile industry in China.

### b.  "Forced Marriages" in Mergers

The "forced marriage" in the merger of enterprises represents another typical form of administrative restriction on competition. It refers to situations where the government forces either an enterprise to join an enterprise group or an economically efficient enterprise to merge with an economically inefficient enterprise. Some government departments argue that the significance of mergers lies in the interests of the economy as a whole rather than that of the individual enterprises. Therefore, in establishing enterprise groups, the government often will ask enterprises to sacrifice their own interests for the interests of the economy. The government, according to the policy of the "equal distribution of wealth," has asked certain economically efficient enterprises to merge with enterprises that are either poorly managed or near the brink of bankruptcy.[46] Under these circumstances, many enterprises cannot benefit from the merger in any way, and in fact, they often have to pay

---

44.  Li, *supra* note 37, at 11.

45.  KONG XIANGJUN, ZHONGGUO XIANXING FANLONGDUANFA LIJIE YU SHIYONG [HOW TO UNDERSTAND AND APPLY THE CHINESE ANTIMONOPOLY LAW] 162-63 (2001).

46.  For example, the largest merger in China occurred when Qilu Petrochemical Company merged with both the Zibo Petrochemical Factory and the Zibo Chemical Fibres Factory in 1997. This merger was an administrative measure designed to rescue two merged enterprises from very difficult economic positions. Wu Baoguo, the Vice-Premier Minister of the State Council, stated that this merger was a helpful probe for the comprehensive utilization of market and administrative power. *See* JINGJI RIBAO [ECONOMIC DAILY], Nov. 11, 1997.

accumulated debt resulting from the merger and place the resulting surplus workers in alternate employment.[47] This has weakened the economic power of these enterprises and resulted in the deterioration of the conditions necessary for effective market competition. "Forced marriages" are harmful practices that seriously impede and restrict competition.

The primary theoretical basis for the Chinese government's preference for mergers is that the expansion of the production scale of enterprises may bring about economies of scale. Today, with the large scale rearrangement of assets of state-owned enterprises, an unprecedented movement toward merging state-owned enterprises is under way in China. Unfortunately, however, these acts of rearrangement are, to a large extent, the acts of the government rather than state enterprises.

The Guangdong Province recently adopted a plan to rearrange the assets of state-owned enterprises throughout the entire province. This plan will reorganize more than 1,546 state-owned enterprises in the province into twenty-three large corporations.[48] The provincial Party Committee must approve the appointments of all executives and directors of the newly reorganized corporations.[49] The rearranged corporations, including the provincial transportation group, provincial commercial group, provincial light industry group, and provincial machinery group, reveal that most of these corporations are industrial monopoly groups within the administrative area of the Guangdong Province. It is not difficult to imagine that, under the current conditions of the highly divided Chinese markets, regional industrial monopoly groups likely will have a negative effect on market competition.[50]

### 3. The Socialist Market Economy Needs a System That Protects Competition

The Fourteenth National Congress of the Chinese Communist Party, held in 1992, was a landmark in China's economic reform. The Congress' official report not only announced to the world that China planned to

---

47.  *See* discussion *supra* note 46. In the course of this merger, Qilu Petrochemical Company accepted more than three billion yuan in debt and took on about five thousand employees. This merger increased the proportion of Qilu Petrochemical Company's assets and liabilities from 41% to 60%. *See* JINGJI RIBAO [ECONOMIC DAILY], Nov. 24, 1997.

48.  *See Qian Duo Guoqi Zu 23 Jia Dagongsi* [*More Than 1,000 State-Owned Enterprises Have Been Reorganized into 23 Large Corporations*], SHENZHEN SHANGBAO [SHENZHEN BUSINESS NEWS], May 24, 2000.

49.  *Id.*

50.  *Id.*

implement a socialist market economy, but it also clearly pointed out the significance of the market mechanism to the development of the national economy:

> The purpose of the socialist market economic system, which China is going to establish, is, under the macro-control of the socialist state, to give full play to the basic role of the market in the allocation of resources; to ensure that economic activities are carried out in accordance with the law of value and adapted to the changes in relations between supply and demand; to use the lever of price and the competition mechanism to allocate resources to the places where they can produce the best economic results; to implement the system of selecting the superior and eliminating the inferior so as to give pressure and impetus to the enterprises; and to promote the timely adjustment of production and demand by taking advantage of the sensitivity of the market to various economic signals.[51]

This document confirmed that some of the basic mechanisms under the market economy, such as the market and competition mechanisms, also serve as the basic mechanisms in a socialist market economy. It also confirmed that both price regulations and market competition constitute the intrinsic economic order of a socialist market economy as well as the importance of protecting competition to the deepening of economic reform and the establishment of a socialist market economy in China.

Since a socialist market economy is a market economy, China must link it with competition. It must use: (1) the competition mechanism to eliminate low-efficiency enterprises, unreasonable production procedures, and low quality products so as to promote the rational distribution of social resources; (2) the price mechanism to let the enterprises decide their own production and operation plans to both improve the relationship between supply and demand and satisfy the needs of the market; and (3) competition as an incentive to encourage enterprises to update their technology and products, improve management, and reduce the costs and prices of products so as to achieve maximum output with minimum input.

The promotion of competition is also of special importance to the current economic reform in China, which possesses two main aspects. The first aspect concerns the establishment of both a unified national market

---

51.  *See* Jiang Zemin, Address at the Meeting of the 14th National Congress of the Communist Party of China (Oct. 18, 1992).

system and a market mechanism. Without competition, no market or market mechanism will exist because competition *is* the market mechanism. The second concerns the reform of enterprises, which means establishing a modern enterprise system, transforming the management mechanism of state-owned enterprises (especially that of the large and medium-sized state-owned enterprises), and pushing the enterprises into the market to inject greater vitality into them. Competition plays a decisive role in the invigoration of enterprises because the vitality of the enterprises lies in their ability to continuously update their organizational structure, technology, and products in accordance with the needs of the market. Without the pressure from market competition, enterprises do not have the incentive to continuously readjust and develop themselves, engage in creative activities, or improve their management control systems. Competition serves an indispensable role in invigorating all enterprises.

Based on primarily historical and structural reasons, China should concentrate its current antimonopoly efforts on state-owned enterprises. Breaking up the monopolies of state-owned enterprises is of great importance for the following reasons:

First, doing so will improve the economic efficiency of enterprises. High efficiency enterprises can achieve maximum output with minimum input, retain a spirit of creativity and innovation, and react most acutely to technological advancements and the needs of the market. Experiences show that without breaking the monopoly of state-owned enterprises, it is very difficult to solve their widespread problem of low efficiency. Therefore, apart from a very few key industries, the state should introduce competition into all areas the economy. The reform in China's telecommunications industry has proved that breaking the monopoly of state-owned enterprises will raise their economic efficiency and reduce their production costs.[52]

Second, doing so will improve state finance. Both Chinese and foreign experiences show that monopolistic enterprises receive government subsidies, with the unprofitable enterprises receiving more subsidies than the profitable enterprises. Regardless of whether the government grants the subsidies openly or covertly, they all come from state coffers. In China,

---

52. The emergence of China Unicom (China United Telecommunications Corporation) in 1994 ended the telecommunications monopoly in China. In addition, by the end of 2000, China Railway Communication Co. Ltd. (CRC) had become a new competitor in the telecommunications industry. Although the market shares of China Unicom and CRC remain small, the increase in competition produces tremendous benefits for consumers. For example, Beijing residents who wanted to install a home telephone ten years ago had to pay a five thousand-yuan installation charge. However, the competition in the telecommunications market forced the abandonment of this charge in July 2001.

the vast majority of state-owned enterprises receive various forms of government subsidies. The Chinese people often criticize state-owned enterprises for living on state subsidies and bank loans. Breaking the monopolies of state-owned enterprises likely will raise their economic efficiency and reduce their dependence on government subsidies. Moreover, allowing private investors to enter into the economic areas that state-owned enterprises monopolize will reduce the state's investment in these areas. This will reduce government subsidies and investment, increase the state's tax revenue, and improve the state's financial condition, thereby enabling the state to accomplish goals such as developing educational and public health projects and improving the social security system.[53]

Third, breaking up the monopolies of state-owned enterprises will improve the state's macro-control over the economy. The price of products, investment plans, and the employment rates of state-owned monopolistic enterprises are important to the state's macro-economic policy. Breaking up the monopoly of these enterprises will improve their productivity, reduce their costs, and increase their output, and therefore will improve the state's macro-control over the economy in the long run. Although breaking up the monopolies could create significant unemployment, the entrance of other business operators into the market will create new employment opportunities.

## II.   THE CURRENT SITUATION OF AND EXISTING PROBLEMS IN THE ANTIMONOPOLY LEGISLATION IN CHINA

### A.  The Current Situation of Antimonopoly Legislation in China

The Interim Provisions for the Promotion and Protection of Competition in the Socialist Economy, promulgated by the State Council in October 1980, represented the first legislative attempt to combat monopolies, including government monopolies. The Interim Provisions stipulated that "[i]n economic life, apart from the products which are to be exclusively traded in by the departments or units designated by the state, no other products may be monopolized or exclusively traded in."[54] "In

---

53. According to the Decision on Issues Relating to the Reform and Development of State-Owned Enterprises, the central government intends to take measures (including selling public assets and reasonably adjusting the structure of financial expenditures) to raise money for social security. *See Communist Party Discusses, supra* note 18.

54. Interim Provisions for the Promotion and Protection of Competition in the Socialist Economy art. 3 (1980), *reprinted in* ZHONGHUA RENMIN GONGHEGUO FALU QUANSHU 1949-1989

carrying out competition, efforts must be made to break regional blockades and departmental divisions. No region or department may blockade the market or prohibit the sale . . . of commodities originating in other regions or departments."[55] The Interim Provisions requested that departments in charge of industry, transportation, finance, and trade revise the existing rules and regulations and delete from them provisions that obstruct competition. The Interim Provisions also authorized the relevant regions and departments to adopt implementation measures in accordance with the spirit of the Interim Provisions that would ensure the smooth functioning of competition. Ever since, the government has promulgated a series of antimonopoly policies, laws, and regulations to effectuate this purpose.

### 1. Regulations That Prohibit Restrictive Agreements

Under this category, the most important regulations are those that prohibit price cartels. The Chinese government adopted the Pricing Law at the Twenty-Ninth Meeting of the Standing Committee of the National People's Congress in December 1997, which stipulates that a business operator may not "collude with others to manipulate the market price, thus harming the lawful rights and interests of other business operators or consumers."[56]

According to Article 40 of the Pricing Law, any business operator who colludes to manipulate market prices either may be required to pay restitution, or may have any illegal gains confiscated and be fined not more than five times the amount of the illegal gains.[57] If there are no illegal gains, the violator may be subject to a disciplinary warning and fine.[58] If the circumstances are serious, the business operator must suspend operation of the business or the relevant administrative department for industry and commerce will revoke the operator's business license permanently.[59] Article 40 also provides for the organs responsible for confirming business collusions. If the collusion is national in nature, the relevant department for pricing within the State Council will confirm it. If the collusion is regional in nature and is at or below the provincial level,

---

[COLLECTION OF LAWS OF THE PEOPLE'S REPUBLIC OF CHINA 1949-1989] 1137-38 (Wang Huaian et al. eds., 1989).

55.  *Id.*
56.  Pricing Law art. 14, para. 1 (1997).
57.  *Id.* art. 40.
58.  *Id.*
59.  *Id.*

the relevant departments for pricing under the people's governments of provinces, autonomous regions, and municipalities directly under the Central Government are responsible for confirmation. Supplementing Article 40 is Article 41, which states that any business operator who causes any overpayment by either consumers or other business operators due to illegal pricing shall return the overpaid money along with compensation for any consequential damages.[60]

Complementing the Pricing Law is the Law Against Unfair Competition, which stipulates that "[t]enderers shall not submit tenders in collusion with one another to force the tender price up or down. A tenderer shall not collaborate with the party inviting tenders to exclude competitors from fair competition."[61] Collusion between bidders constitutes a horizontal restriction on competition whereas collusion between bidders and tender-inviters constitutes a vertical restriction. However, on August 30, 1999, the Standing Committee of the Ninth National People's Congress adopted the Law on Bidding and Inviting Bids, more commonly known as the Bidding Law. Apart from its provisions regarding bidding and inviting bids, the Bidding Law contains a prohibition against collusion.

Some local regulations contain more detailed provisions than the Bidding Law on agreements that restrict competition. For example, Article 19 of the Regulations of the Hainan Special Economic Zone Against Unfair Competition clearly stipulate that acts such as dividing a sales market, boycotting specific enterprises in purchasing or selling, fixing prices, restricting the production quantity or sales volume, and colluding in the bidding process are all illegal. These regulations operate even more stringently than the national Law Against Unfair Competition.

### 2. Regulations That Oppose Alliances of Large-Scale Enterprises

In 1987, the State Commission for Economic Restructuring and the National Economy Commission jointly issued Opinions on the Establishment and Development of Enterprise Groups, which stipulated that "[t]he establishment of enterprise groups must be in accordance with the principle of encouraging competition and preventing monopoly."[62] The Opinions also stated that "as a general rule, no monopoly enterprise

---

60.  *Id.* art. 41.
61.  Law Against Unfair Competition art. 15 (1993).
62.  State Commission for Economic Restructuring & National Economy Commission, Opinions on the Establishment and Development of Enterprise Groups art. 5 (1987) [hereinafter Opinions].

groups shall be established within an industry, and competition between enterprise groups within the same industry shall be encouraged so as to promote technological advancement and increase economic efficiency."[63] In addition, the Interim Measures for the Merger of Enterprises, jointly promulgated by the State Commission for Economic Restructuring, the State Planning Commission, and other state organs in 1989, also pointed out that mergers must be conducive to economies of scale while not harming market competition.

### 3. Regulations That Prohibit the Abuse of a Market Dominant Position

Currently, China's legislation in this area primarily concerns public utility enterprises and other companies that enjoy legal monopoly positions. The Law Against Unfair Competition stipulates that "[p]ublic utility enterprises or other operators having monopolistic status according to law shall not force others to buy the goods of the operators designated by [the public utility enterprises or other operators] so as to exclude other operators from competing fairly."[64] In 1993, the State Administration for Industry and Commerce promulgated the Provisions on the Prohibition of Public Utility Enterprises from Committing Restrictive Acts Against Competition,[65] which listed various competition restrictions, including restricting users to purchasing designated products, tie-in sales, refusing to provide products to users who reject a business operator's unreasonable conditions, and arbitrarily charging fees.

According to the Law Against Unfair Competition, if a public utility enterprise or any other company with a legal monopoly abuses its advantage or restricts competition, the administrative organs for industry and commerce will order the enterprise to cease any illegal acts and may impose a fine of not less than fifty thousand yuan but not more than two hundred thousand yuan, depending on the severity of the circumstances.[66] In addition, according to the Provisions, users or consumers suffering losses as a result of any abuse may, in accordance with Article 20 of the Law Against Unfair Competition, file suit in the people's court to recover any losses.[67] The state organs that have the power to investigate and deal

---

63. *Id.*
64. Law Against Unfair Competition art. 6 (1993).
65. Provisions on the Prohibition of Public Utility Enterprises from Committing Restrictive Acts Against Competition (1993), *available at* http://www.apeccp.org.tw/doc/China/Decision/cndec05.html [hereinafter Provisions on the Prohibition].
66. Law Against Unfair Competition art. 23 (1993).
67. Provisions on the Prohibition art. 8 (1993).

with restrictive acts of public utility enterprises are the industrial and commercial administrative bureaus at either the provincial level or the level of cities divided into districts.

Other articles in the Law Against Unfair Competition prohibit the abuse of dominant positions. For example, a business operator may not, for the purpose of forcing out his competitors, sell his commodities at prices lower than cost.[68] The business operator also may not, against the will of the purchasers, conduct a tie-in sale of commodities or attach any other unreasonable conditions to such a sale.[69] In addition, the Pricing Law states:

> Apart from disposing of perishable, seasonal, and overstocked commodities at reduced prices according to law, a business operator may not dump commodities at prices lower than production costs in order to drive out rivals or monopolize the market, thus disrupting normal production and operational order and impairing the interests of the State or the lawful rights and interests of other business operators.[70]

Additionally, the Law on Electric Power stipulates that:

> The power-supply enterprise in any electricity service area shall be obligated to supply electricity to the consumers within its service area in accordance with the regulations of the state. It may not, in violation of state regulations, refuse to supply electricity to any unit or individual within their service area that applied for service.[71]

### 4. Regulations That Oppose Administrative Restrictions on Competition

Since the 1980s, the State Council has promulgated many regulations prohibiting administrative restrictions on competition. For example, the Council sought to resolve the problem of businesses misusing administrative powers by promulgating many regulations on screening and rectifying various kinds of companies. The regulations both emphasize the separation of enterprise management from government administration and prohibit party or government organs from creating enterprises.

---

68. Law Against Unfair Competition art. 11 (1993).
69. *Id.* art. 12.
70. Pricing Law art. 14, para. 2 (1997).
71. Law of the People's Republic of China on Electric Power art. 26 (1995).

Specifically, the Decision of the Party Central Committee and State Council on Strictly Prohibiting Party and Government Organs and Party and Government Cadres from Engaging in Commerce or Running Enterprises provided that:

> The leading organs of the Party and the government, especially the economic organs and their leaders, must appropriately perform their functions of leading and organizing economic construction, adhere to the principle of separation of the functions of government from that of enterprises . . . They are strictly prohibited from abusing their power to engage in business, set up enterprises, seek personal gains, and harm the interests of the people in violation of the regulations of the Party and of the State.[72]

The State Council also opposed local protectionism through the Circular on Breaking Regional Market Blockades and Further Promoting the Circulation of Commodities, which it issued in November 1990. The circular pointed out that production enterprises, after fulfilling the tasks of production for the allocation of products according to the state's mandatory plan and the purchase-and-sale contracts, possess the right to sell their products throughout the country. In addition, enterprises in the areas of industry, commerce, and materials and equipment may purchase the products they need independently. No region or department may set up blockades to interfere in any of these activities.

With respect to the prohibitions of restrictive abuses of administrative power, the most important such prohibition is the Law Against Unfair Competition, which stipulates that:

> A local government and its subordinate departments shall not abuse their administrative power to force others to buy the goods of the operators designated by them so as to restrict the lawful business activities of other operators. A local government and its subordinate departments shall not abuse their administrative power to restrict the entry of goods from other parts of the country into the local market or the flow of local goods to markets in other parts of the country.[73]

---

72. Guanyu Yanjin Dangzheng Jiguan he Dangzheng Ganbu Jingshang Banqiye de Jueding [Decision of the Central Committee of the Communist Party and the State Council on Strictly Prohibiting Party and Government Organs and Party and Government Cadres from Engaging in Commerce and Running Enterprises], *Foreword* (Dec. 3, 1984).
73. Law Against Unfair Competition art. 7 (1993).

In light of the difficulties in investigating and dealing with abuses of administrative power, the Law Against Unfair Competition provides that state organs that have abused their administrative power must take corrective action. However, if the circumstances are serious, the relevant department at the same or higher level of authority may issue administrative sanctions to the responsible parties.[74]

### B.  Existing Problems in Chinese Antimonopoly Legislation

An examination of the provisions above reveals the following major problems in current Chinese antimonopoly legislation:

1. The existing antimonopoly provisions are scattered throughout numerous "regulations," "circulars," "interim provisions," and the Law Against Unfair Competition, and therefore do not form a complete, specialized system of antimonopoly legislation. Some of the provisions only express certain intentions of the government. For example, the Opinions on the Establishment and Development of Enterprise Groups state that "[g]enerally, nationwide monopoly enterprise groups shall not be set up within an industry."[75] Does this statement imply that nationwide monopolistic enterprises may exist under special circumstances, or that the situation where two or three enterprises oligopolize the market within an industry is allowed?

2. The State Council, or the ministries or commission beneath it, issued most of the regulations, which therefore lack legal authority. Some regulations do not contain provisions on legal responsibility and, as a result, lack operability. For example, despite the numerous government regulations that prohibit Party and government organs and officials from engaging in business or setting up enterprises, many continue to do so. According to the statistics from the State Administration of Industry and Commerce, companies created by Party or government organs represented 10% of all newly established companies in 1992.[76] The establishment of these companies has enabled administrative and government influence to enter into markets and encourage unfair and unreasonable market activities.

---

74.  See id. art. 30.

75.  Opinions art. 5 (1987).

76.  See Guanyu Woguo Fanlongduan Lifa Ruogan Wenti de Yanjin [Several Issues Concerning the Antimonopoly Legislation in China], JINGJI GONGZUO TONGXUN [ECON. WORK NEWSLETTER] (State Econ. and Trade Comm'n, Beijing, People's Republic of China), Mar. 1, 1995, at 1-2, available at http://eastasian.lib.umn.edu/gztxun/gztx955.html.

3. The sanctions against government and administrative restrictions on competition are ineffective. According to the Law Against Unfair Competition, any person or entity that abuses government or administrative power to restrict competition will be ordered by administrative organs at higher levels to make corrections.[77] The Law Against Unfair Competition does not allow for the victims of such acts to file lawsuits in accordance with the Administrative Procedure Law.[78] The current provisions are insufficient. If the administrative organs at higher levels ignore abuses of power by their subordinate organs, or try to minimize the legal consequences of these abuses, the legitimate rights and interests of victims will not be protected and abuses will continue to occur.

4. The existing antimonopoly organs are ineffective. Antimonopoly law differs from other laws, including the Law Against Unfair Competition. Its task is to prevent large enterprise groups, monopolistic enterprises, and the government from restricting competition. This task demands that the antimonopoly organs possess sufficient independence and authority. However, in the current system, the antimonopoly organs are the departments for industrial and commercial administration. This system is problematic because cases involving governmental or administrative restrictions on competition are very complicated and difficult to investigate. If the antimonopoly organs lack sufficient independence or authority, administrative and government organs likely will interfere and influence the investigations. This ultimately will prevent the antimonopoly organs from making decisions in accordance with the law. For example, local protectionism in many areas of China prevents some departments for industrial and commercial administration from handling cases impartially and in accordance with the law. China urgently needs to not only adopt a systematic and complete antimonopoly law, but also establish independent and authoritative enforcement organs.

---

77. *See* Law Against Unfair Competition art. 30 (1993).

78. *See* Zhonghua Renmin Gongheguo Xingzheng Susong Fa [Administrative Procedure Law of the People's Republic of China], *reprinted in* Xinbian Zhonghua Renmin Gongheguo Changyong Falu Fagui Quanshu [The Newly Edited Compendium of the Laws and Regulations of the People's Republic of China] 1698 (Guowuyuan Fazhiju Yanjiushi exam. & approv., 1998). A translation of the Administrative Procedure Law also is available online at http://www.gchinalaw.com/cnlaw/reference/codes/adminlaw/procedure.htm.

*C. The Outline of the Antimonopoly Law*

*1. Background and Contents*

The Law Against Unfair Competition was promulgated in 1993. In May 1994, the government formed an Antimonopoly Law drafting group. Group members came primarily from two main sources: the Department of Law and Regulations of the State Economic and Trade Commission and the Department of Law and Regulations of the State Administration of Industry and Commerce. In the process of drafting and revising the outline of the Antimonopoly Law, the drafting committee not only solicited the opinions of Chinese antimonopoly experts, but also received support and assistance from both international organizations (including the Organisation for Economic Cooperation and Development (OECD), the World Bank, and the United Nations Conference on Trade and Development (UNCTAD)) and several countries (including the United States, Germany, Japan, Australia, and South Korea). From 1997 to 1999, the OECD organized international seminars with the Antimonopoly Law drafting committee and with Chinese antimonopoly experts, conducting article by article discussions on the outline of the Antimonopoly Law.

The outline of the Antimonopoly Law of the People's Republic of China, finalized on November 30, 1999, consists of eight chapters and fifty-six articles. Chapter One: General Principles explains the purpose of the legislation to end the acts of government organs that abuse their administrative powers to restrict competition. Chapter Two: Prohibition of the Abuse of Market Dominant Positions defines the concept and the different abuses of market dominant positions. Chapter Three: Prohibition of Monopoly Agreements defines the prohibited horizontal and vertical agreements that restrict competition as well as all applicable exempted agreements. Chapter Four: Control of Mergers defines the concept of mergers, the application process, prohibited conditions, and required special approvals. Chapter Five: Administrative Monopoly defines the various forms of administrative monopolies, including geographical and industrial monopolies. Chapter Six: Antimonopoly Authorities provides for the functions and powers of antimonopoly authorities, as well as the appointment and terms of office of members of the Antimonopoly Committee. Chapter Seven: Legal Responsibilities provides penalties for violations of the Antimonopoly Law (including administrative sanctions and civil damages), legal remedies for parties to the antimonopoly cases, and the responsibilities of the staff members of antimonopoly authorities. Chapter Eight: Supplementary Provisions provides that the Antimonopoly

Law shall not apply, within five years after its promulgation, to behavior ratified by the competent antimonopoly authorities under the State Council in natural monopolies or public utilities like the postal service, railroads, electricity, gas, and water.

The Antimonopoly Law is very specialized, involving both law and economics. It requires the government to establish a drafting body with high standards. Government officials drafted the current versions, and while they solicited the opinions of Chinese and foreign experts, they did not adopt all of the experts' suggestions. The net result of this failure is that many serious problems still exist in the outline. For example, Article 3 of the outline stipulates that "[b]usiness operators shall carry out production and business activities, and conduct fair competition in accordance with the principles of volunteerism, equality, fairness, honesty, and credibility." At first glance, there is nothing wrong with the principles of "volunteerism," "equality," "fairness," "honesty," and credibility." However, because the Antimonopoly Law opposes monopolies and protects competition by both prohibiting enterprises from restricting competition and controlling mergers between enterprises, principles such as the "freedom of contract" and "the autonomy of the will of parties" are not applicable. Another example is Article 8, Paragraph 4 of the outline, which provides that if one business operator occupies one half of the market, two business operators occupy more than two-thirds of the market, or three business operators occupy three-fourths of the market for a given commodity, such business operators occupy a market dominant position. However, Article 21 provides that if, in the course of a merger, an enterprise discovers that it will occupy one-third or more of the market after the merger, it must receive approval for the merger. This creates an apparent contradiction because an enterprise occupying one-third of the market is not in a market dominant position and therefore should not be required to report the merger to the appropriate antimonopoly authority for approval.

### 2. Obstacles to the Adoption of the Antimonopoly Law in China

The Antimonopoly Law drafting group, established in 1994, does not represent China's first attempt to draft antimonopoly legislation. As early as 1987, the Bureau of Legislative Affairs of the State Council set up a drafting group to accomplish this task. In 1988, the group submitted the Draft Interim Regulations Against Monopoly and Unfair Competition. However, while the Standing Committee of the Eighth National People's Congress adopted the Law Against Unfair Competition in September

1993, it did not adopt the Interim Regulations. The primary reason for the failure to adopt the Interim Regulations into law was the existence of differing opinions among the legislators and scholars as to whether China needed antimonopoly legislation at its current stage of economic development. One relatively popular opinion stated that China's economy was still in the early stages of development, and therefore any monopolization was not yet apparent. The average size of the enterprises was still too small and horizontal alliances were just beginning to develop. Therefore, adopting antimonopoly legislation at this stage would have a negative effect on Chinese industrial policy. The 1987 evaluation report on China's one hundred largest enterprises and nine largest industries, prepared by the China Enterprise Evaluation Center, represents this opinion. According to this report, the sales volumes of two-thirds of the one hundred largest industrial enterprises in China ranged between 500 million and 1.5 billion yuan. According to the exchange rate at that time, this amounted to between only 134 million and 400 million U.S. dollars.[79] The sales volume of the largest industrial enterprise, the Daqing Oil Management Bureau, was only 6.3 billion yuan (US$1.7 billion).[80] In comparison, the sales volume of General Motors, the largest industrial enterprise in the United States, was US$101.7 billion.[81] Based on this information, the report concluded that because enterprises in China were relatively too small and economies of scales had not developed yet, it was not advisable to adopt antimonopoly legislation at that time.[82]

This idea of the incompatibility between antimonopoly legislation and economies of scale already has lost its relevance. Most people realize that, although economies of scale are based on the scale of production, the scale of production is not necessarily directly proportional to the efficiency of the enterprises. When determining the actual scale of an enterprise in an industry, one should take into account not only the economies of scale but also internal conditions (including economic and technological conditions of the enterprise such as areas of specialized production and basic facilities) and external conditions (including the needs and maturity of the market). There is no absolute, universally applicable optimum enterprise scale in any industry. An enterprise must determine its scale of production

---

79. China Enterprise Evaluation Center, *Zhongguo 1987 Nian Zuida Yibaijia Qiye he Jiuda Hangye* [*China's 100 Biggest Enterprises and 9 Biggest Industries in 1987*], 2 GUANLI SHIJIE [MANAGEMENT WORLD] 103 (1989).

80. *Id.*

81. *Id.*

82. *Id.*

in light of its own production environment, technical conditions, management capabilities, market size, and consumer needs.

The practice of determining the production scale of Chinese enterprises by comparing them with enterprises in the United States is ill advised. Such comparisons inhibit the establishment of both a socialist market economy with Chinese characteristics and a competitive market structure. For producers and business operators, an enterprise scale based solely on mechanical production is not always optimal because it does not consider market conditions, transportation conditions, and consumer demand for diversity.[83] In 1997, Yaohan, the once powerful Japanese joint-stock company, went bankrupt. This incident proved that the survival and development of an enterprise depends on many factors, not merely on its scale of production. As a commentary in the *Economic Daily* pointed out, Yaohan should serve as a warning to those Chinese enterprises that scale expansion does not lead invariably to success.[84]

The genuine difficulty that the antimonopoly legislation faces comes from China's current economic system. Since China is still in a transitional period from a planned economy to a market economy, Chinese enterprises only recently have started to adopt market-oriented management systems. Many of these enterprises, especially large enterprises and enterprises in monopolized industries, are still government accessories. China still has a long way to go in separating government functions from business management. Therefore, the substantial Chinese antimonopoly legal norms may differ from those of countries with advanced market economics.

State-owned enterprises face the biggest problems in China's current economic reform. Specifically, they face inflexible management mechanisms, the inability to carry out technological innovation, debt, social burdens, a surplus of workers, difficulties in production and operation, declines in economic efficiency, and impoverished employees. Since antimonopoly legislation is the foundation that upholds the economic order of the markets, the reform and development of these state-owned enterprises will have a major impact on any proposed antimonopoly legislation. In the current Chinese economy, all kinds of monopolies possess a certain administrative color, and the government, to

---

83. *See* Wang Xiaoye, *Shehui Zhuyi Shichang Jingji Tiaojianxia de Fanlongduanfa* [*Antimonopoly Law in the Socialist Market Economy*], ZHONGGUO SHEHUI KEXUE [SOC. SCI. IN CHINA], Feb. 1996, at 82-84.

84. Ka Lin, *Cong Babaiban de Pochan Shuo Kai Qu* [*Reflections on the Bankruptcy of Yaohan*], JINGJI RIBAO [ECONOMIC DAILY], Oct. 22, 1997.

a certain extent, supports enterprises' acts that restrict competition. Therefore, regulating administrative monopolies is simultaneously the focal point and most difficult task in drafting antimonopoly legislation in China. As the experiences of countries with market economies demonstrate, the antimonopoly law enforcement authority must be a highly independent and authoritative organ. Under the current conditions in China, where enterprise management and government functions blend and the problems of departmental division and local protectionism are still very serious, it is questionable whether China can establish an independent and authoritative antimonopoly law enforcement organ. If the antimonopoly organ cannot handle cases or select and appoint its own staff members independently, the antimonopoly law will be worth less than the paper it is printed on.

Nevertheless, the adoption and promulgation of an antimonopoly law is not premature at the current stage because various monopolistic acts and restrictions on competition exist. Without eliminating such acts, it will be impossible for China to establish an open and competitive market, fair and free competition, and a socialist market economic system. However, the adoption and promulgation of antimonopoly legislation is also necessary to deepen economic and political reform.

Currently, the key to China's economic reform is the reform of state-owned enterprises, and promoting competition and breaking up monopolies are the keys to turning the state-owned enterprises into legal persons. Currently, China still lacks the mature market conditions necessary to implement antimonopoly legislation. However, China cannot wait for improved conditions because to do so would delay the establishment of the market economic system. China can promote the establishment of a market economic system by establishing a market-oriented legal system. An effective antimonopoly law will play a fundamental role in the transformation of the economic system and the reform of state-owned enterprises in China.

### III.   JOINING THE WTO: THE ADOPTION OF AN ANTIMONOPOLY LAW IN CHINA IS IMMINENT

The aim of the WTO is to create a fair and reasonable environment for competition and promote the development of international trade through the adoption of a series of effective legal principles. To gain admission to the WTO, China had to establish and improve its legal systems in accordance with the basic principles of the WTO. For example, China had to revise its foreign trade law in accordance with international practices so

https://openscholarship.wustl.edu/law_globalstudies/vol1/iss1/10

as to reduce import duties and gradually abolish import quotas and import license systems. China also revised its foreign investment law, which used to give foreign investors either super-national or sub-national treatment, thereby inhibiting fair market competition.

On the other hand, joining the WTO means opening national markets to the outside world, thereby requiring further introduction of a competition mechanism into every industry and economic sector. Under these circumstances, China must improve its competition laws and promulgate an antimonopoly law as soon as possible. This will create a legal environment for free and fair competition. The Antimonopoly Law will play at least two roles in meeting the challenge of admission to the WTO.

*A. A New Antimonopoly Law Will Enhance the Market Competitiveness of Chinese Enterprises*

Chinese economists have put forward various policy proposals to enhance the market competitiveness of Chinese enterprises, including mergers, reorganizations, a stock holding system, conversion of debt into stock, concentration on large enterprises, and allowing different forms of ownership. In the long run, however, the state must introduce a competition mechanism into every area of the national economy as soon as possible in order to enhance the competitiveness of Chinese enterprises. According to basic principles of economics, it is only under the pressure of market competition that enterprises will attempt to reduce costs, improve the quality of products and services, continuously develop new technology and products, and improve operations management. Therefore, market competition is actually a process in which enterprises continuously temper themselves and adapt to the needs of the market. This enhances the economic effectiveness and market competitiveness of enterprises and optimizes the distribution of resources in society. Presently, breaking departmental monopolies is of special importance to the establishment of an open, competitive, and unified market structure in China because doing so represents the only effective way to implement competition mechanisms. Only in this way can enterprises eradicate various administrative interventions, improve their economic effectiveness through competition, expand their scale of production and operation, and realize economies of scale.

### B. A New Antimonopoly Law Will Check the Monopoly Power of Transnational Corporations

With the implementation of economic reform and open policy in China, transnational corporations have made large-scale investments in China, especially in the electronics and telecommunications equipment manufacturing industries. In 1995, foreign-invested enterprises occupied leading positions (in terms of gross value of industrial output) in four of the five major electronics industries in China. Specifically, the gross value of industrial output of foreign-invested enterprises consisted of 52.5% of the total gross value of industrial output in the telecommunications equipment manufacturing industry, 72.7% in the computer industry, 52.7% in the electronic devices manufacturing industry, and 68.6% in the domestic electrical appliance manufacturing industry.[85]

Foreign-invested enterprises dominate the markets of the majority of the second class industries in China as well. For example, foreign-invested enterprises own 91.3% of the gross value of industrial output in the integrated circuit manufacturing industry, 85.7% in the computer peripheral equipment manufacturing industry, 75.7% in the communication terminal equipment manufacturing industry, and 77.5% in the radio and tape recorder manufacturing industry.[86] In brief, transnational corporations essentially have occupied the market dominant position in China's electronic industry for quite some time.[87]

China's admission to the WTO and the further opening up of Chinese markets to the outside world means more and more transnational corporations will enter into the Chinese markets. These transnational corporations not only possess abundant financial resources, world famous trademarks, and strong sales networks and advertising, but they also can rely on support from their parent corporations in terms of capital and production technology. They can acquire market dominant positions quickly, including monopolies. In order to prevent both transnational corporations from monopolizing Chinese markets and enterprises from abusing market dominant positions, China urgently needs to adopt antimonopoly policies and laws. Since these policies and laws target enterprises with the most market power, the adoption of an antimonopoly

---

85.  *See* Wang Yungui, *Kuaguo Gongsi de Longduan Youshi Jiqi Dui Dongdaoguo de Chanye Kongzhi* [*The Monopoly Position of Transnational Companies and Their Control of the Industries in Host Countries*], 2 GUANLI SHIJIE [MANAGEMENT WORLD] 216 (1998).

86.  *Id.*

87.  *Id.*

law will serve as an important tool for China to check the influence of the transnational corporations.

Of course, in any country, the adoption of an antimonopoly law is not solely for the purpose of checking the foreign monopoly power. It also uses competition mechanisms to both ensure the survival of the fittest enterprises and eliminate inferior enterprises so as to certify optimum resource distribution. Therefore, all competitors, domestic or foreign, state-owned or private, occupy equal positions under the rules of market competition. Otherwise, fair competition will not exist. However, compared with Chinese enterprises, transnational corporations possess an advantageous position in terms of capital and technology. They can occupy even market dominant positions. Under those circumstances, an antimonopoly law will, to a certain extent, protect weaker competitors.

As China continues to open its markets and integrate into the global economy, the Antimonopoly Law will play a double role. On one hand, it will protect China's domestic market competition and create a fair and free environment for competition so as to build China into a modern country with a socialist market economy. On the other hand, it will uphold the legitimate rights and interests of the enterprises in international competition and protect their opportunities to enter into the market, which undoubtedly will enhance China's status in international economic and trade activities.

# Exhibit 139




DATE DOWNLOADED: Tue Jul 18 18:21:54 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Yong Huang, Pursuing the Second Best: The History, Momentum, and Remaining Issues of
China's Anti-Monopoly Law, 75 Antitrust L.J. 117 (2008).

ALWD 7th ed.
Yong Huang, Pursuing the Second Best: The History, Momentum, and Remaining Issues of
China's Anti-Monopoly Law, 75 Antitrust L.J. 117 (2008).

APA 7th ed.
Huang, Y. (2008). Pursuing the second best: the history, momentum, and remaining
issues of china's anti-monopoly law. Antitrust Law Journal, 75(1), 117-132.

Chicago 17th ed.
Yong Huang, "Pursuing the Second Best: The History, Momentum, and Remaining Issues of
China's Anti-Monopoly Law," Antitrust Law Journal 75, no. 1 (2008): 117-132

McGill Guide 9th ed.
Yong Huang, "Pursuing the Second Best: The History, Momentum, and Remaining Issues of
China's Anti-Monopoly Law" (2008) 75:1 Antitrust LJ 117.

AGLC 4th ed.
Yong Huang, 'Pursuing the Second Best: The History, Momentum, and Remaining Issues of
China's Anti-Monopoly Law' (2008) 75(1) Antitrust Law Journal 117

MLA 9th ed.
Huang, Yong. "Pursuing the Second Best: The History, Momentum, and Remaining Issues
of China's Anti-Monopoly Law." Antitrust Law Journal, vol. 75, no. 1, 2008, pp.
117-132. HeinOnline.

OSCOLA 4th ed.
Yong Huang, 'Pursuing the Second Best: The History, Momentum, and Remaining Issues of
China's Anti-Monopoly Law' (2008) 75 Antitrust LJ 117            Please note:
citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your license, please use:
   *Copyright Information*

# PURSUING THE SECOND BEST: THE HISTORY, MOMENTUM, AND REMAINING ISSUES OF CHINA'S ANTI-MONOPOLY LAW

### YONG HUANG*

After thirteen years of debates, China at long last promulgated its Anti-Monopoly Law (AML) on August 30, 2007.[1] Few would doubt that anti-monopoly, or competition, law is fundamental to guarding the market economy in the western countries.[2] However, China which has a culture thousands of years old, with an ideology that is extremely conservative and even feudalistic, is a country undergoing a painful transition from command economy to market orientation. Under these circumstances, it is essential to examine the answers to these questions: What is the backstory to the creation of China's AML? What is the driving force behind developing China's AML? What were the controversies that held up the legislative process, and to what extent were they resolved?

These questions may well puzzle the antitrust practitioners and policy makers outside of China, and even more puzzling are the answers that their Chinese counterparts give. To comprehend the answers to these questions, Western scholars have to stand in the shoes of the Chinese

---

* Professor at the Beijing-based University of International Business and Economics School of Law. The author was influential in the drafting of the Anti-Monopoly Law. The author acknowledges his gratitude to Professor Eleanor Fox for her invaluable insights on the revision of this article.

[1] Anti-Monopoly Law of the People's Republic of China (promulgated by the Standing Committee of the National People's Congress on Aug. 30, 2007 and effective Aug. 1, 2008) [hereinafter AML]. The translations provided in this article are the author's. An unofficial English translation is available as an appendix to Nathan Bush, *The PRC Anti-monopoly Law: Unanswered Questions and Challenges Ahead*, ANTITRUST SOURCE, Oct. 2007, http://www.abanet.org/antitrust/at-source/07/10/Oct07-Bush10-18f.pdf.

[2] Whether or not to include unfair competition in the core anti-monopoly legislation differs among countries. China opted to leave unfair competition out of its AML. Therefore, the term "anti-monopoly law" in this article refers to antitrust law only, whereas "competition law" is used to refer to both antitrust and unfair competition laws. *See also* KONG XIANGJUN, PRINCIPLES OF ANTI-MONOPOLY LAW 3 (China Law Press 2001).

and possess a deep understanding about the political and economical reality of the country's past and present, as well as specific characteristics of the Chinese marketplace. Only against this backdrop can those antitrust scholars in the West comprehend the driving forces in the legislative process, the mission of the Chinese AML, and the major challenges facing this legislation. An in-depth discussion of this context is extremely vital to the accurate comprehension of the law and its future implementation. In this article I attempt to answer these questions and, in particular, try to present the story of how different groups strived for their own interests and then compromised, which ultimately produced a Chinese AML that reflects a second best solution.

## I. A BRIEF LEGISLATIVE HISTORY

### A. THE HOLDUP

The drafting of the Chinese AML bill commenced in 1994, but it was not enacted until August 2007. This is very rare in China's legislative activities, if not previously unseen.[3] The prolonged process is the result of a fierce debate around the crucial issue of whether an AML might be far from necessary at this moment. Despite a tendency toward concentration in certain Chinese industries, enterprises overall in China are still small and scattered, and could never match those in developed countries. Particularly, in a world of globalization, when Chinese companies are facing intense international competition, Chinese legislators and scholars seem to be more concerned about fighting the powerful multinationals instead. Consequently, one has to think twice about the question of whether China needs an AML and ask what the benefit would be of having this law.

Another major obstacle that prolonged the enactment of the AML is the painful transition associated with the path of reform that China has chosen. Unlike the simultaneous change of both political and economic systems in Eastern Europe, China is switching gradually to the market economy while keeping the political structure intact. This path is long and rocky because the government has to walk a fine line between the creation of a dynamic private sector and the maintenance of a socialist

---

[3] The former State Economic & Trade Commission (SETC) and the State Administration of Industry & Commerce (SAIC) were the original drafters of the bill, and it had been scheduled for enactment in both the Eighth and the Ninth terms of the National People's Congress (NPC). Since 1994 the two drafters had produced a single, joint draft, but for various reasons it had never been introduced in the NPC. *See* Shang Ming, *Current Status of The Drafting of China's Anti-monopoly Law, in* NEW DEVELOPMENTS OF COMPETITION LAWS IN THE ECONOMIC GLOBALIZATION 3 (Wang Xiaoye ed., Social Science Documentation Press 2005). Mr. Shang is Director of Anti-monopoly Investigation Office under the Ministry of Commerce.

country. The most challenging aspects include introducing competition without compromising the dominance of State-owned enterprises (SOEs) in strategic sectors, restraining the dramatic changes in the economy from extending to the political arena, and keeping a good balance between efficiency and equality. It is by no means easy to gain agreement among decision makers on how to achieve these ends, and passage of the AML was certainly delayed as the debates over how to tackle these challenges took place.

### B. The Revival

After the original, and then the subsequent joint (SETC and SAIC), bill had languished for a decade, the AML project was suddenly revived and expedited. In 2004, the Ministry of Commerce (MOFCOM) submitted another draft of the AML to the State Council, which was a sign to re-energize the drafting process. The State Council's Legislative Office continued to work on it and eventually finalized the draft one year later. In June 2006, the final draft was then introduced to the NPC, China's national lawmaking body, for legislative review.

In his submission to the NPC, Mr. Cao Kangtai, Director of the Legislative Office under the State Council, listed three reasons in urging the passage of the bill: (1) abuse of dominance and cartel practices are so prevalent that they jeopardize the interests of consumers and other competitors, and stand in the way of building a national common market; (2) mergers and reorganization transactions have been very active, and they need to be guided by a law to avoid restrictive effects; (3) as a market economy, China needs to establish a clear competition law framework so as to give business an open, transparent, and predictable expectation of the legal environment.[4] Another reason that has rarely been noticed by observers is that the Chinese legislature had promised to establish a fairly comprehensive legal system to regulate the socialist market economy by 2010,[5] and 2007 is the last year of the current administration. Therefore, it is no surprise that the government wants to have the AML as a political legacy.

---

[4] See Cao Kangtai, Notes to the Draft PRC Anti-monopoly Law. This note is an official instrument submitted to the NPC by the State Council, serving as the formal annotation of the draft AML.

[5] See The Ninth Five-Year Plan for National Socio-Economic Development and the Program for Perspective Goals in 2010 (adopted by the Eighth National People's Congress on Mar. 17, 1996).

## C. A DISTINCTIVE PRODUCT

Compared with other Chinese legislation, the AML is indeed a highly international work product in that it reflects many basic competition rules and principles acknowledged by most mature economies. However, it also differs in nature from those counterpart competition laws because it is seeded in an abnormal soil.

Competition laws in major developed powers were made in the late 19th or early 20th century, at which time the capitalist world economies were moving from atomistic competition among small firms to markets dominated by increasingly larger firms and trusts. What posed the most danger to the market mechanism was not public (i.e., government or state) power and publicly owned enterprises, but the various kinds of cartels, trusts, and syndicates organized by large companies. Thus, competition law in the Western economies has served the role of being "the economic constitution" or "the Magna Carta of free enterprise."

By contrast, the Chinese economic structure has never been built upon free competition but rather upon public power and public enterprises. The abandonment of the command economy has always been motivated by the government, and the process of establishing a market economy depends entirely on voluntary concessions made by the State. Even though the Chinese government has come a long way, excessive intervention still widely exists all over the country and is by far the top threat to competition. The primary mission of the AML is to correct governmental distortion rather than limit private restrictive practices. That also explains why it contains a special chapter addressing "administrative monopoly" or State restraint on trade.

Therefore, one has to bear in mind that the AML is not merely designed to restore competition but also to take affirmative actions to "create" competition. This unique feature distinguishes it from competition laws in most other jurisdictions.

## II. MULTIPLE DRIVING FORCES

The AML is driven by multiple forces and, as a result, its implementation will almost certainly be directed toward various different goals. Four of the major forces include the desire to establish a market economy, the desire to contain excessive state power, the desire to protect national security, and the desire to narrow income disparity.

## A. THE DESIRE TO ESTABLISH A MARKET ECONOMY

> *" The AML is an important legal device that protects orderly market competition, so as to have the market play a fundamental role in allocating resources."*
> — Cao Kangtai, Notes to the Draft PRC Anti-Monopoly Law

Since the 1990s, China's economic structure has been undergoing the transition from a command model to a free market. The amendment to the Chinese Constitution adopted in the First Session of the Eighth Term of the NPC on March 29, 1993, was a milestone along this path. Article 15 of the Constitution formerly stated that "the State implements a planned economy based on socialist public ownership . . ." and it now reads: "The State implements a socialist market economy. . . . It strengthens the making of economic laws and perfects macro regulation. . . ." Although "socialist market economy" is a politically sensitive phrase, it is still a "market economy."

A "market economy" requires that China abolish the old legal framework that was designed for a command economy and establish a new one that can foster competition because competition is the only mechanism that the market uses to correct itself. Consequently, establishing and maintaining competition becomes a real and urgent task, a necessity, and an indispensable pillar for the new legal framework. The massive transplantation of laws that regulate market activities from Western countries in the past decade has led Chinese legislators and scholars to reach a consensus which is, inter alia, that proven economic rules and principles in the West also work well in China despite the fact that China has a different political system. And it is this very kind of consensus driving the State Council's submission of the draft AML to the NPC in 2006.

## B. THE DESIRE TO CONTAIN ABUSIVE STATE POWER

> *"The abuse of executive power to distort or restrict competition is a phenomenon that exists among state agencies and organizations which are authorized by the law and regulations to control public affairs, albeit to a various degree. The AML needs to tackle this problem seriously."*
> — Cao Kangtai, Notes to the Draft PRC Anti-Monopoly Law

As provided by Article 8 of the AML, the so-called administrative monopoly generally refers to abusive conduct committed by state agencies and organizations, which are authorized by the law and regulations to control public affairs, to the extent that they distort or restrict competition. Two factors account for the widespread and intractable existence of administrative monopoly in the Chinese economic system. The first is the tradition, hundreds of years old, that "state power comes first"; in other words, a tradition that state power controls every single aspect of

the society's economic life. The second is the current political and economic structure, which has closely linked monopoly enterprises to the government since the 1949 revolution.

In today's China, people have agreed upon two conclusions with respect to the corrosive effects caused by intrusive State power upon economic development and even upon the political system. First, ever-expanding abusive State power is the biggest threat to a functioning competitive market system; second, the problem of administrative monopoly stems from the social structure, which is beyond any single statute to resolve. The ultimate solution relies on both economic and political reform.[6] However, for China, the process of reform can take a long time, longer than competition could afford. Therefore, a second best option would be to adopt some technical restraints against certain State powers within the AML framework, which might be an unsatisfactory but realistic approach. This is a reflection of the "doctrine of the golden mean" in the Confucian school, an equivalent to pragmatism.

### C. The Desire To Protect National Interest

*"Against the backdrop of economic globalization, countries around the world use anti-monopoly law to prevent and constrain restrictive activities, to protect lawful interests of operators and consumers, to encourage technological innovations, to achieve competitive advantages, and to ensure a healthy, sustainable and orderly development of national economy."*
  *– Cao Kangtai, Notes to the Draft PRC Anti-Monopoly Law*

China's policy of opening up to the outside world started in the late 1970s. Upon its accession to the World Trade Organization in 2006, integration into the global economy has been accelerated further. However, while the commitment to opening up is renewed, strong opposition is also developing. Many Chinese believe that, due to competitive disadvantages, their domestic industries could not possibly compete with multinationals in the near future.[7] If the globalization trend continues on its current course, the fear is that Chinese enterprises will lose any advantage they may currently hold. Those making this national interest/economic security argument urge that measures be taken to

---

[6] This is why some Chinese scholars prefer not to include this type of activity in the AML: they see no reason to include a subject in a statute which the statute could not tackle.

[7] For example, when the consumer product market opened up, several domestic household brands were eliminated because their SOE owners could not compete effectively with foreign giants like Procter & Gamble. Recognizing that the rule of "survival of the fittest" will not help these SOEs, some Chinese now argue that the Chinese brands are, in fact, assets owned by the State, where the national interest lies; so their failure for lack of competitiveness is not acceptable.

protect Chinese enterprises, and those advocating economic security policies regard the AML as a good opportunity to do so, under the guise of protecting national interest. Even more regrettably, certain government officials agree with that argument.

To complicate the matter, Chinese companies' overseas expansion experiences seem to reinforce the above argument. In 2004, the Chinese company Lenovo proposed to purchase IBM's personal computer division; this proposal met tough opposition from the U.S. Congress, which raised serious concerns about Lenovo's foreign identity. Fortunately, the Lenovo-IBM deal was cleared after all, but that hostility re-emerged in 2005 when CNOOC, another Chinese company, bid for the acquisition of Unocal. Despite CNOOC's lobbying efforts (much stronger than that of Lenovo's), this transaction was not completed in the end. Many Chinese criticized the United States for denying fair access to their domestic market for fear of competition. Although neither of these cases involved any antitrust issue, the average Chinese, including some ranking officials, mistook it that way. Obviously, the Chinese media should partly be blamed for the spread of such a misconception.

This sentiment was further provoked in 2005 when the U.S.-based Carlyle Group wanted to acquire the Xuzhou Construction Machinery Group, Inc. (XCMG). Mainstream Chinese observers were furious about this contemplated transaction, charging that it was a hostile acquisition committed by foreign capital and aimed at eliminating successful Chinese companies. A fierce debate was triggered surrounding this proposed transaction, raising it to a national security level problem and generating great uncertainty both within China and abroad. This case induced the MOFCOM to amend its Administrative Measures on Acquisition of Domestic Enterprises by Foreign Investors, a regulation that many believed was tailored to bar Carlyle from completing this transaction.

With such a philosophy gaining adherents, one will not be surprised that pressure built up to use the drafting of the AML as another weapon to fight against unwanted foreign buyers. Proponents argued that the AML should guard the country's national interest by setting up merger and acquisition barriers against certain overseas companies, and they argued that it is only a reciprocation of what the developed countries have done to Chinese companies. Although this type of argument is without sound legal basis, and although protective measures against foreign purchasers of domestic assets are not in the national interest, these misconceptions have been widely accepted throughout the country.

## D. The Desire to Narrow Income Disparity

As China's economy grows at a rapid pace, income disparity has become a real problem. According the World Bank's *World Development Report* 2005, China's Gini index increased to 0.447 in 2001, ranking 85th out of 120 countries/regions in the world; the percentage share of income or consumption of the poorest 20 percent of China's population was only 4.7 percent, while that of the most affluent 20 percent was 50 percent.[8] This meaningfully exceeds the internationally accepted 0.4 Gini index warning threshold.

Despite some economists' belief that China is at the highest point of the Kuznets curve[9] and that the growth of economy will gradually reduce the income disparity, the critical inequality of the individual wealth distribution is obvious. For the average Chinese, although the absolute living standard has increased dramatically compared with two decades ago, the comparative living standard is not even close. The mass of the population demands a fair share of benefits generated by the growth of the economy.

This prevailing demand has been met by the Chinese Communist Party's vow to build "a society in harmony." To build a society in harmony, the government has to narrow the wealth gap. There is a popular belief in China that in order to narrow the gap, monopoly has to be eliminated and replaced by an equal and free market, so that average Chinese consumer will have more choices for employment and investment. However, there is no sound evidence proving that reducing or eliminating the existing monopolies would result in a redistribution of social wealth that would substantially impact the overall income distribution. Nonetheless, the fact is that many Chinese support the bill purely based on this wishful thinking.

---

[8] World Bank, World Development Report 2005: A Better Investment Climate for Everyone 258 (2004).

[9] The Kuznets curve illustrates that income disparity was a common phenomenon in both the United States and United Kingdom during the expansion/development periods of those economies. Shaped like a bell curve, the Kuznets curve traces out the extent of income disparity (on the vertical axis) against time, or the stage of economic development (on the horizontal axis). The classic Kuznets curve shows income disparity increasing as the economy began to grow, reaching a maximum, and then gradually declining as the economy matures. Based on this theoretical relationship between income distribution and economic development, some Chinese scholars believe that although the income gap is substantial at the moment, it will naturally narrow down as the economy continues to grow without intervention. Therefore, they argue that the priority for the government is to improve efficiency, rather than putting equality first, allowing the expansion of the economy to correct the disparity problem by itself.

## III. ISSUES UNRESOLVED

### A. The Competition Authorities

Right after MOFCOM submitted its draft to the State Council, the issue of establishing an authority or agency to enforce the AML has surfaced as one of the most controversial topics, and that issue is still pending today. As a member of the advisory expert group to the AML drafting, my suggestion to the legislature was and is that the future authority ought to be a uniform, independent, professional, and authoritative agency. Uniform means the agency should be a centralized institution that carries out all necessary functions, thereby ensuring the efficiency and effectiveness of enforcement. Independence means the agency should be free from any interference made by other governmental departments. To that end, the agency must be a stand-alone institution which reports to the State Council only, with independent staff and a sufficient budget; otherwise, it cannot be expected to penalize violations of the administrative monopoly law. Professionalism means the enforcement officials should possess the necessary skills and knowledge to deal with complicated competition law issues. And authoritativeness means the agency must be positioned high enough in the political structure such that it is equipped with powers to investigate, hear cases, and impose sanctions; all of which means only the judicial branch may challenge the agency's decision.

However, after heated debate, the legislature eventually adopted a dual mode for AML enforcement and oversight: the State Council will create anti-monopoly enforcement agencies,[10] and then an anti-monopoly commission on top of them.[11] This is one of the most uncertain provisions in the AML: the important details of which agencies and how those agencies will relate to the anti-monopoly commission are yet to be determined. Currently, the National Development & Reform Commission (NDRC, formerly SETC) controls pricing issues pursuant to the Pricing Law;[12] the SAIC is responsible for policing unfair trade practices

---

[10] AML, *supra* note 1, art. 10 ("The Anti-monopoly Enforcement Authority designated by the State Council (Anti-Monopoly Enforcement Authority) is responsible for the enforcement of the anti-monopoly law.").

[11] *Id.* art. 9 ("The State Council shall set up the Anti-Monopoly Commission, being responsible to organize, lead, and coordinate the anti-monopoly activities: (i) studying and making competition policies; (ii) organizing the investigation, assessing the overall market competition status, and publishing an assessment reports; (iii) enacting and promulgating anti-monopoly guidelines; (iv) coordinating the anti-monopoly law enforcement; (v) other functions assigned by the State Council.").

[12] Price Law of the People's Republic of China (promulgated by the Standing Committee of the National People's Congress on Dec. 29, 1997 and effective May 1, 1998), *re-*

according to the Counter-Unfair Competition Law;[13] both SAIC and MOFCOM oversee merger and acquisition transactions that involve foreign capital. Does that suggest the enforcement power for the AML will be divided among the three agencies, with each regulating cartel agreements, abuse of dominance, and concentration, respectively? No one knows the answer, and no one knows what kind of anti-monopoly commission will come into existence. Only one thing seems to be sure: a centralized and independent agency is highly unlikely to occur. The reason is simple: the current administration has promised not to create any new agencies in the rest of its term, which means that the commission will merely be a liaison office, with no independent staffing or budget (and this seems to be confirmed by the AML wording). If this scenario does come true, turf battles between the enforcement agencies will be inevitable, and efficient enforcement of the AML will be sacrificed.

Of course, the outcome may not prove to be so dire. The AML is scheduled to take effect in August 2008, and by that time a new cabinet will be formed—perhaps the option of an independent, uniform, and professional agency will be reconsidered. On the other hand, even the liaison commission may get ambitious and go beyond coordination, perhaps even gathering the scattered powers from the enforcement agencies and becoming independent. Only time will tell.

## B. REGULATED INDUSTRIES AND STATUTORY MONOPOLY

The second important issue left unresolved concerns the relationship between the AML and the regulated and/or State-monopolized sectors. In China, strategic sectors are either heavily regulated by the State (such as banking and telecom) or simply monopolized by the State (such as oil and tobacco). How the AML would deal with these sectors naturally became problematic, and the lawmakers were under enormous pressure from those sector regulators and state monopolizers.

When the draft was under debate in the NPC, an immunity clause was once added, which completely insulated these sectors from the reach of the AML. However that provision was heavily criticized by the advisory

---

*printed and translated at* http://en.chinagate.com.cn/english/430.htm. (Translation available by subscription at http://www.chinalawinfo.com.).

[13] Anti-Unfair Competition Law of the People's Republic of China (promulgated by the Standing Commitee of the National People's Congress on Sept. 2, 1993 and effective Dec. 1, 1993), *reprinted and translated at* http://www.csptal.com/en/en_z.asp?id=47. (Translation available by subscription at http://www.chinalawinfo.com.).

committee and was ultimately deleted. But the pressure groups continued their efforts.[14]

In the end, there was an ambiguous compromise on this issue: on one hand, the law respects the status quo of state monopoly, but, on the other hand, it also expresses that these business activities need to be limited and abuse of dominance should be prevented.[15] Such a design is understandable because State dominance in strategic sectors is a constitutional privilege of the SOEs[16] and may not be challenged by the AML. However, its ambiguity is equally apparent: the provision does not say which law is going to be applied in these areas to limit or prevent anticompetitive practices. According to the pressure groups, all regulated industries and State-monopolized sectors have (or will have) their own tailored laws, with provisions related to competition, that empower the sector regulators to enforce. The assertion by the pressure groups supporting the continued protection of the regulated and State-monopolized industries is that these industry-specific laws and regulations leave no role for the AML in these sectors, according to the rule of conflicts of laws.[17] Simply put, the issue remains unresolved and the fight is likely to continue at the level of rules implementation.

It is important to recognize that sector regulation need not exclude those sectors from coverage by the AML and, furthermore, sector regulation may be insufficient. First, regulation does not necessarily rule out competition. The global trend today is to deregulate industries, which means even under regulation the role of competition law should be

---

[14] Huang Yong, *Understanding Chinese Anti-monopoly Law*, CAIJING MAG., Sept. 6, 2007, *available at* http://www.caijing.com.cn/newcn/ruleoflaw/other/2007-09-02/28866.shtml.

[15] AML, *supra* note 1, art. 7 ("Industries controlled by the State-owned economy and relied upon by the national economy and national security or industries implementing exclusive operation and sales in accordance with the law shall be protected by the State to conduct lawful operation by the business operators. The State shall supervise and control the price of commodities and services provided by these business operators and the operation of these business operators so as to protect the interests of the consumer and facilitate technical progress. The business operators mentioned in the paragraph above shall operate, in good faith, in accordance with the law and in a self-disciplined manner, accepting public supervision and shall not harm the interests of the consumer from a controlling or exclusive dealing position.").

[16] Constitution, Art. 7, [1982] (PRC) ("The state economy is the sector of socialist economy under ownership by the whole people; it is the leading force in the national economy. The state ensures the consolidation and growth of the state economy."), *reprinted and translated at* http://english.peopledaily.com.cn/constitution/constitution.html.

[17] This conclusion is not shared by academics and other government agencies because, under the current Chinese legal framework, it is not uncommon that general laws trump sector-specific laws. The only safe conclusion at this stage is that the hierarchy of relations between the AML and the sector laws is unclear.

maximized and the restrictive effects of regulation should be minimized. For example if both entry barriers and ex post surveillance could achieve regulatory goals, then the latter should be adopted because it creates less impact on competition. Second, for State monopolies, applying the AML does not mean a challenge to the constitutional privilege of those enterprises but, rather, it sets limits to which that privilege can be exercised, such as refraining from abusing a State-granted dominant position. Third, the so-called rules related to competition provided in the sector-specific laws are typically vague and impractical. They do not define important competition concepts, such as relevant market definition and dominance. How could they be expected to function as a constraint? Without the AML, competition issues in these sectors will not be resolved. Finally, the regulated businesses and State-monopolies are so closely connected to the sector regulators that no one can expect impartiality in the regulatory process; nor would anyone believe the regulators would have the resources and capability to handle competition issues. Even though the sector regulators need to be consulted on competition matters, the enforcement power should belong to the anti-monopoly enforcement agencies.

## C. MERGER CLEARANCE VIS-À-VIS NATIONAL SECURITY EVALUATION

As mentioned above, the desire to protect national interest has been one of the major drivers motivating the adoption of the AML, and this has resulted in two special provisions that are noteworthy. One is Article 5 of the AML, which allows competitors to merge and achieve economies of scale.[18] At first glance it seems to be redundant to include such a self-evident clause in the competition law, but the reason it was included indicates that this is not simple at all. It has been widely suspected among the local antitrust circles that the insertion was driven by the State-monopolies. Even though these enterprises have been huge conglomerates in the China market, due to State monopoly grants and favorable policy protection, they are still inefficient and their size is no match for the Fortune 500 companies. If the playing ground does become level due to the AML's implementation, these State monopolies will quickly lose to both domestic and foreign competitors. For this reason, they continue to press lawmakers, despite the rejection of the proposal of complete immunity for the State monopolies. At this time, they are raising an argument about concentration that the legislators cannot ignore: the AML should not prevent SOEs from growing stronger and

---

[18] AML, *supra* note 1, art. 5 ("Business operators may concentrate when such an action is in accordance with the law and adheres to fair competition and is a voluntary union that expands the scale of operation and improves market competition.").

competing more effectively with multinationals, and to that end concentration among domestic competitors should be encouraged. Hence Article 5. With this background in mind, it will be necessary to scrutinize more closely how Article 5 will affect the merger clearance system when the law takes effect.

The other special provision relating to the national security issue is Article 31 of the AML.[19] The term "national security" in China carries a meaning very different from its English origin. For the Chinese, this phrase has little to do with the fight against terrorism—it purely refers to China's economic interests, in a nationalist sense.[20] There has long been a concern in China about dependence on foreign capital. Thirty years after China opened up to the outside world, companies funded by overseas investors have already gained an advantageous position compared with domestic enterprises. In recent years, foreign companies have further consolidated their position by purchasing other foreign companies or competitive domestic companies. A growing sentiment among the average Chinese, and even lawmakers, is that excessive foreign investment will ultimately compromise the Chinese government's control over the domestic economy. And the failed CNOOC-Unocal deal has further inspired those concerned with this issue to consider how to block mergers using a national security justification. However, it is expected that detailed evaluation rules will be set forth in another set of laws and will not interfere much with the AML, simply because they are not related legal issues.

## D. The Role of Trade Associations

With respect to trade associations, Chinese legislators are hoping that these organizations can play an important role in enhancing the competitiveness of domestic industries. In particular, the lawmakers want the trade associations to eliminate "vicious competition," or cutthroat price wars.[21] In the legislators' eyes, there are two kinds of competition: the good and the bad. "Good competition" refers to competing on quality and variety of product/services; "bad competition" ("vicious competi-

---

[19] *Id.* art. 31 ("In the case that national security is concerned, besides the examination on concentration in accordance with this Law, the examination on national security according to the relevant regulations of the State shall be conducted as well on the acquisition of domestic business operaters by foreign capital or other circumstances involving the concentration of foreign capital.").

[20] *See* Xing Houyuan, *Foreign Buyers and National Security,* http://news.hexun.com/2007-08-20/100228699.html.

[21] AML, *supra* note 1, art. 11 ("The Trade associations shall strengthen the self-discipline of industries to lead business operators toward competing in accordance with the law and protecting the order of market competition.").

ANTITRUST LAW JOURNAL [Vol. 75

tion") refers to below-cost pricing. The legislators believe the latter type is a race to the bottom and harms Chinese enterprises, especially those in the business of exporting raw materials; and they further believe trade associations ought to promote "self-discipline" among competitors and avoid such price wars.[22]

This expectation might be misplaced. "Competition" is a neutral term and should not be labeled as either good or bad. Whether it focuses on price, quality, or any other aspect, competition is always allowable unless the competitors do not play by rules. A price war is not an act that breaks the functioning of the market; instead, it is the most common and effective means of competition. Assigning trade associations the function of self-discipline will more likely than not encourage the formation of cartels and restrain competition. This has been demonstrated recently: starting from year-end 2006, a Chinese instant noodle association convened three industry-wide conferences to facilitate a price cartel; the cartel members' market shares accounted for 95 percent in total, and that caused a 10 to 40 percent increase in the product price.[23]

The naked price cartel initiated by the instant noodle association was highly publicized and made the NPC reconsider this issue. Eventually a limitation clause[24] and a penalty clause[25] were added to the law: trade associations are forbidden to restrict price, and violations may result in up to half million RMB in fines, or even dissolution of the violating association.

### E. ADMINISTRATIVE MONOPOLY

The final important issue that deserves mention is the administrative monopoly law. In the review stage, substantial disagreements about this body of law emerged among the Chinese lawmakers. Proponents for in-

---

[22] According to the Xinhua News Agency, after the first reading of the AML bill, the NPC consulted with a variety of interest groups, including provincial governments and trade associations, which, in turn, vigorously advocated for "self-discipline" and "orderly competition." Then the NPC and the State Council agreed to add Article 11 to the bill. For more details, see the Xinhua coverage on June 24, 2007, http://www.sina.com.cn.

[23] Press Release, Nat'l Dev. & Reform Comm'n, On the Investigation of Price Conspiracy in Instant Noodle Products (Aug. 16, 2007), http://www.ndrc.gov.cn/xwfb/t20070816_154142.htm.

[24] AML, *supra* note 1, art. 16 ("The trade association shall not organize the business operators in the industry to be engaged in monopolistic conduct prohibited by this chapter.").

[25] *Id.* art. 46 ("In the case that the trade association violates the provisions of this Law to organize the business operators to reach monopolistic agreements, the Anti-monopoly Enforcement Authority may impose a fine of less than 500,000 RMB; and in the case of a serious situation, the registration authority of social organizations may revoke the registration in accordance with the law.").

cluding restrictions on administrative monopoly in the AML argued that
the distortion caused by the government was by far the most harmful
factor to the smooth transition of the economy and that failure to in-
clude this type of law would undermine the entire AML. On the other
hand, opponents argued that the so-called administrative monopoly was
so different from normal monopoly conduct in terms of subject matter,
investigation, remedies, and liabilities, that jurisdiction over administra-
tive monopolies should not be inserted in a competition statute. As
mentioned earlier, the concern is that administrative monopoly is a
problem stemming from an imperfect political system and beyond the
purview of the AML. During the process, those opposing inclusion of
administrative monopoly in the AML gained substantial support, and
the entire chapter addressing administrative monopoly was deleted
from the draft.[26] However, news of this change leaked to the public and
generated severe antagonism, causing the NPC to reinstate the chapter,
albeit a much more modest version.[27]

## IV. CONCLUSION

In summary, the drafting, debates, and ultimate solutions of the AML
carry distinctive Chinese characteristics. These distinctions remind read-
ers that the law is grounded in Chinese soil, reflecting the basic rules of
competition recognized in other market economies as well as special
rules tailored for the Chinese socialist economy. The AML is a product
of compromise based on existing political and economic realities, and a
product guided by pragmatism, or, as articulated by the late Premier
Deng Xiaoping, "crossing the river by feeling stones." Because the law as
drafted is short and abstract,[28] the future implementation will prove to
be a trial-and-error process.

If China stays on the current course and continues economic reform
(i.e., establishing a market economy and achieving economic democ-
racy), while also further marching into the waters of political reform
(i.e., achieving political democracy), another example of convergence
of global competition laws might be found in China.[29]

---

[26] This happened when the legislation was still being drafted within the State Council,
before the submission to the NPC.

[27] Although it is necessary to have this chapter in the AML, I am pessimistic regarding
its effectiveness because the final version only provides a set of mild restrictions upon
state power, so mild that no meaningful enforcement can be foreseen.

[28] The AML only has 57 articles, 6,487 Chinese characters in total.

[29] *See, e.g.,* Kevin J. O'Connor, *Federalist Lessons for International Antitrust Convergence,* 70
Antitrust L.J. 413 (2002); *see also* Randolph W. Tritell, *International Antitrust Convergence:
A Positive View,* Antitrust, Summer 2005, at 25.

# Exhibit 140



July 10, 2023

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, Johnson Wong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 山东省志 物价志(1997-2005)_ 制止不正当价格行为.pdf

*(Digital or printed signature here above the line)*

Johnson Wong
**Project Number: BBLLP_2306_P0022**

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

**Shandong Province Information Network**
**Shandong Province Provincial Information Database**
www.infobase.gov.cn

Please enter the search term _____  Second round of provincial annals ▾  Search

The current single library is the second round of Shandong Provincial Annals Price Chronicles (1997-2005) Click here to open the full library catalog

Book IV: Price Law Enforcement

Chapter I: Price Administrative Law Enforcement

Section 3 Stop Unfair Price Behavior

From 1997 to 2005, the provincial Price Bureau continuously enhanced market supervision, accurately identified the "nodes" and patterns of the outbreak of unfair pricing violations, improved the timeliness of lawful investigation and handling, and improved the efficiency of case handling. The focus was on inspecting the prices of daily consumer goods and various service fees closely related to peoples lives. Especially during n ational holidays such as "May 1st," "October 1st," and New Years Day, they enhanced the supervision and inspection of prices and fee situations of "rice bags," "vegetable baskets," tourist attractions, parking lots, catering and entertainment venues, shopping places, etc. They also investigated and handled illegal pricing practices according to law such as unauthorized price hikes at tourist attractions, not executing clearly marked prices, price monopolies, and fraudulent overcharging, which played a positive role in establishing a fair and just market price order.

From 1997 to the first half of 1998, the provincial Price Bureau focused on inspecting products sold below the average industry cost, such as flat glass, steel, color cathode ray tubes, color TVs, and sugar, and maintained the market price competition order in related industries.

In 1998, the Agricultural Vehicle Branch of the China Agricultural Machinery Association launched an industry-wide "self-discipline price" movement nationwide under the pretext of "opposing low-price dumping" and "resisting vicious price competition." Shandong Shifeng Group was fined 953,000 yuan by the association for refusing to implement its so-called industry "self-discipline price," attracting the attention of provincial leaders. On September 14, the Deputy Governor Han Yuqun instructed on the Gaotang County Government's report on Shandong Shifeng Groups implementation of self-discipline prices: "The provincial Price Bureau should study this with the Legal Affairs Bureau. Are the objections raised by Shifeng Group reasonable, and how to handle self-discipline prices while protecting the enterprises right to set prices independently?" Deputy Governor Lin Shuxiang pointed out: "The industry association cannot be above the law in setting self-regulated prices. Any behavior that infringes on the rights and interests of enterprises should be resolutely resisted by the enterprises, and law-enforcement departments should strictly investigate and handle such behavior." Consequently, both the provincial Price Bureau and the State Planning Commission sent personnel to investigate. The results showed that the so-called industry "self-discipline price" promoted by the Agricultural Machinery Association violated the principles of encouraging competition stipulated by the "Price Law" and deprived enterprises of the right to make independent pricing decisions, and the industry association did not have the power to enforce price administration, which "suppressed the advanced and protected the backward." On October 26, Vice Premier of the State Council Wu Bangguo made important instructions on the investigation report submitted by the State Planning Commission, requiring to "punish the unfair competition behavior of low-price dumping according to law. Penalties should be enforced by law enforcement departments." The State Planning Commission ordered the Agricultural Vehicle Branch of the China Agricultural Machinery Association to refund the fines to the enterprise and issued a notice requiring the correction of the practices of the Agricultural Vehicle Branch of the National Agricultural Machinery Association.

In April-May 1999, the provincial Price Bureau organized a special inspection of more than 10 airlines, business departments, and over 110 civil aviation ticket sales agency businesses in the province, investigating and dealing with price violations, and maintaining the order of airfare and the legitimate rights and interests of consumers.

In response to some communication companies in Shandong adopting various illegal means such as lowering mobile phone access fees and implicitly lowering mobile phone monthly rental fees to compete unfairly for the market, the provincial Price Bureau conducted mobile communication charge inspections in the second half of 2000, investigating and dealing with unfair pricing behaviors in the mobile communication market.

In 2001, to implement the decisions of the State Council, the State Planning Commission, and the provincial government on rectifying and standardizing economic order, according to the requirements proposed at the National Tourism Development Conference to "improve tourism price management, implement clear pricing for tourism products and services, and strengthen supervision and inspection to crack down on price fraud and other illegal behaviors," the province conducted price inspections of the tourism market during the "May 1st" and "October 1st" holidays, combining centralized inspections with group inspections, carefully handling complaints and reports, and thoroughly investigating and dealing with all kinds of arbitrary price increases and illegal charging behaviors in tourist areas.

In January 2002, the State Planning Commission issued the "Regulations on Prohibiting Price Fraud." To effectively strengthen the work guidance for anti-unfair price behaviors across the provinces and adapt to the new situation of combating price fraud and other unfair price competition behaviors, the provincial price inspection office established a research center against unfair pricing behaviors during the same year to strengthen the work guidance for anti-unfair price behaviors across the provinces. A consumer in Jinan reported a communications company to the provincial Price Bureau due to a price dispute when purchasing a mobile phone. The inspectors checked the companys price execution situation. They found that the company was using the wor d "special offer" for publicity at the business premises and marked "buy a mobile phone and get a 100 yuan payment for phone bill" and "only 2 yuan per month, you can receive all calls for free" in the promotional posters, but the additional conditions for the "special offer" were not clearly stated in the advertisement and business premises. The inspection team believed that the companys behavior violated the "Regulations on Prohibiting Price Fraud" and constituted price fraud. After discussion and decision by the case hearing committee, the company was warned and fined 5000 yuan.



Figure 4-6: In 2002, the Price Bureau of Zaozhuang City set up billboards to stop unfair price behavior on the street

In April 2003, the provincial Price Bureau conducted key inspections on the prices of drugs, medical devices, sanitary materials, grains, and salt (non-staple foods) related to the prevention and treatment of Severe Acute Respiratory Syndrome (SARS). Six departments, including the Provincial Development and Reform Commission, Provincial Economic and Trade Commission, Provincial Health Department, Provincial Drug Administration, Provincial Administration for Industry and Commerce, and Provincial Price Bureau, jointly issued a document demanding strict, fast, and severe crackdown on illegal activities that harm public interest such as non-compliance with government-guided prices, government-set prices, or temporary intervention measures, non-implementation of clearly marked prices, hoarding, profiteering, price gouging, and production and sales of counterfeit goods. In the same month, the provincial Price Bureau specifically issued a "Reminder to strictly implement price laws, regulations, and policies" to all medical and pharmaceutical operating units in the province. In May, according to the provisions of the National Development and Reform Commissions "Reply on Defining the Illegal Act of Price Gouging" and as approved by the provincial government, the provincial Price Bureau issued a notice defining the illegal act of price gouging, stating that operators of goods and services that implement government-guided prices and government-set prices must strictly implement the prices set by the government; for those included in the price limit range, the price limit level set by the government may not be broken. Operators of other necessities for peoples livelihood that implement market-regulated prices and goods and services related to the prevention and treatment of SARS, whose prices exceed 50% of the transaction price on April 22, 2003, will be considered as committing the illegal act of price gouging. If an operator cannot provide the transaction price on April 22, 2003, the price department will determine it based on the local market price on April 22, 2003. The Provincial Price Inspection Office, in accordance with the unified arrangement of the Provincial SARS Prevention and Control Command, conducted joint law enforcement inspections in various places while inspecting 33 provincial medical and pharmaceutical units, ensuring the stability of market prices and social stability during the SARS prevention and control period. During the SARS prevention and control period, inspectors were dispatched for a total of 23,278 person-times, 55,472 units were inspected, 3,994 cases were investigated and handled, and economic sanctions of 4.0385 million yuan were imposed, of which 715,400 yuan was confiscated, 2.9924 million yuan was fined, and 330,700 yuan was returned to users. There were 300 cases of price violations exposed, 1 business license was revoked, and 2 people were transferred to the public security department.



Figure 4-7: In April 2003, the staff of the Price Bureau of Decheng District, Dezhou City, checked the prices of SARS drugs

From October to December 2004, according to the unified deployment of the National Development and Reform Commission, the provincial Price Bureau organized inspections on the prices of refined oil products, investigated and dealt with behaviors of violating national regulations, leading price increases, and taking advantage of the situation to gouge prices of refined oil products, and ensured the basic stability of the prices of refined oil products in the market.

In April 2005, with the approval of the provincial government, the provincial Price Bureau issued the "Opinions on the Definition of the Degree of Price Increase Constituting Price Gouging." The "Opinions" clarified that with the approval of the provincial government, the provincial Price Bureau may differentiate different commodities and services different situations and determine the price increase constituting price gouging within the range of 30% to 100% over the normal average price. Five specific situations requiring timely and appropriate supervision are: 1. During major disasters and epidemics within a city- or county-level region, the price department needs to appropriately supervise the prices of goods  and services related to controlling disasters and epidemics to maintain normal market price order and social stability; 2. During golden weeks of tourism and important holidays and festivals, some goods and services with prominent supply and demand contradictions and the prices of goods and services in important tourist areas need to be appropriately supervised; 3. In cases of national key project construction and poverty alleviation and disaster relief construction projects within a city or county, it is necessary to properly supervise the prices of related goods and services that have lost normal competitiveness; 4. When there are rumors of price increases within a city or county, leading to panic buying, hoarding, and other abnormal phenomena and causing market prices to rise sharply in a short period of time; 5. Other situations where price increases should be controlled. Price departments of governments at all levels in the province actively implemented the provisions of the "Opinions." The provincial Price Bureau investigated and dealt with the behavior of random price increases during holidays according to law. The cities of Taian and Heze controlled the price increase of some goods and services such as catering, accommodation, and rental in the M ount Tai scenic area during the National Day period, as well as the prices of materials used in building houses for immigrants in the Yellow River Beach area, effectively safeguarding the legitimate rights and interests of consumers and curbing the phenomenon of random price increases. This pioneering approach in the country has important significance for promptly and effectively stopping the illegal behavior of price gouging and regulating the market price order. It was affirmed by the national price department and promoted nationwide.

From July 2005 to June 2006, according to the unified deployment of the National Development and Reform Commission, to stabilize the market price order, a year-long special action against price fraud was carried out throughout the province. In September, according to the "Notice on Carrying Out the 2005 Promoting Business with Integrity Publicity Month Activity" jointly issued by ten departments such as the National Rectification and Planning Office, the C entral Propaganda Department, and the National Development and Reform Commission, a "Promote Price Integrity, Crack Down on Price Fraud" publicity and law enforcement month activity was organized throughout the province. In November, in accordance with the relevant deployment of the provincial governments teleconference e on the prevention and control of highly pathogenic avian influenza, the provincial Price Bureau issued the "Notice on Strengthening Price Supervision and Inspection to Stabilize Market Prices in Response to Highly Pathogenic Avian Influenza," requiring all regions to strengthen price supervision and inspection, increase law enforcement efforts, and effectively prevent random price increases and illegal charges; strengthen market inspections, closely monitor market price dynamics, promptly stop price hike rumors, hoarding, price gouging, disruption to market order, and other behaviors, and effectively maintain a stable and orderly market order.

There are 3 entries at the same level

Section 1: Special Price Inspection
Section 2: Inspection of administrative charges
Section 3: Stop Unfair Price Behavior *Current Record*

当前单库是 二轮山东省志 物价志(1997-2005) 点此打开全库目录

第四篇 价格执法
　第一章 价格行政执法

### 第三节 制止不正当价格行为

　　1997~2005年，省物价局不断加大市场监管力度，找准不正当价格违法行为暴发的"节点"、规律，提高依法查处的及时性，提高办案效率。重点检查与人民群众生活密切相关的日用消费品价格和各种服务收费，特别是在每年的"五一""十一"、元旦等节假日期间，加大对"米袋子""菜篮子"、旅游景点、停车场、餐饮娱乐场所、购物场所等价格和收费情况的监督检查力度，对擅自提高旅游景点门票价格、不执行明码标价以及价格差额、欺诈宰客等价格违法行为依法进行查处，为建立公平、公正的市场价格秩序起到了积极作用。

　　1997年至1998年上半年，省物价局重点对平板玻璃、钢材、彩色显像管、彩色电视机、食糖等低于行业平均成本销售的产品进行检查，维护了相关行业的市场价格竞争秩序。

　　1998年，中国农机协会农用车分会以"反对低价倾销""抵制价格恶性竞争"为由，在全国掀起行业"自律价"之风。山东时风集团因拒绝执行其所谓的行业"自律价"而被协会罚款95.3万元，引起省领导重视。9月14日，副省长韩寓群在高唐县政府关于山东时风集团执行自律价有关情况反映报告上批示："请省物价局会同法制局共同研究一下，时风集团提出的异议非违法道理，怎样在保护企业定价自主权的基础上搞好自律价，"副省长林书香指出："行业协会不能凌驾于法律法规之上搞价格自律，任何侵犯企业权益的行为，企业要坚决抵制，执法部门要严肃查处。"为此，省物价局和国家计委均派员进行调查，调查结果显示，农机协会所谓行业"自律价"，违背《价格法》鼓励竞争的原则，剥夺了企业价格决策自主权，行业协会不具有价格行政执法权，"打击了先进，保护了落后"。10月26日，国务院副总理吴邦国在国家计委报送的调查报告上作出重要批示，要求"依法处罚低价倾销的不正当竞争行为。处罚应由执法部门执行。"国家计委责令中国农机协会农用车分会退还企业罚款，并下发通知，要求对全国农机协会农用车分会做法予以纠正。

　　1999年4~5月，省物价局组织对全省10多家航空公司、营业部和110多家民航客票销售代理企业开展专项检查，查处价格违法行为，维护了航空价格秩序和消费者合法权益。

　　针对山东部分通信公司为抢占市场，采取降低移动电话入网费、变相降低移动电话月租费等各种非法手段进行不正当竞争，2000年下半年，省物价局开展移动通信收费检查，对移动通信市场不正当价格行为进行查处。

　　2001年，为贯彻落实国务院、国家计委和省政府有关整顿和规范价格秩序的决定，根据全国旅游发展工作会议提出的"完善旅游价格管理，对旅游产品和服务价格实行明码标价，并加强监督检查，打击价格欺诈等违法行为"的要求，"五一""十一"期间，全省相继开展旅游市场价格检查，采取集中检查与分组检查相结合的方式，认真处理投诉举报，深入旅游景区查处各类乱涨价、乱收费行为。

　　2002年1月，国家计委印发《禁止价格欺诈行为的规定》。为切实强化对全省反不正当价格行为的工作指导，适应反价格欺诈不正当价格竞争行为新形势的需要，同年，省物价检查所成立反不正当价格行为调研中心，强化对全省反不正当价格的工作指导。济南市一消费者因购买手机发生价格纠纷，向省物价局举报某通讯公司，检查人员对该公司的价格执行情况进行检查。发现该公司在经营场所以"特价"字样进行宣传，并在宣传海报中标示"买手机送话费100元"和"每月只需2元，可免费提供所有来电"，而"特价"的附加条件在广告及经营场所均无明示。检查组认为，该公司的行为违反了《禁止价格欺诈行为的规定》，属于价格欺诈行为。经案件审理委员会合议决定，对该公司给予警告并处罚款5000元。



图4-6    2002年，枣庄市物价局在街头设置制止不正当价格行为宣传牌

　　2003年4月，省物价局针对与非典型性肺炎防治相关的药品、医疗器械、卫生材料、粮食、食盐(副食品)等价格进行重点检查。省发展改革委、省经贸委、省卫生厅、省药监局、省工商局、省物价局6部门联合发文，要求从快从重打击不执行政府指导价、政府定价、临时干预措施，不执行明码标价、囤积居奇、牟取暴利、哄抬物价、制售假冒伪劣商品等损害群众利益的违法行为。同月，省物价局专门向全省医疗及药品经营单位发出《关于严格执行价格法律法政策的提醒函》。5月，根据国家发展改革委《关于界定哄抬价格违法行为有关问题的复函》规定，经省政府批准，省物价局下发界定哄抬价格违法行为有关问题的通知，规定：实行政府指导价、政府定价的商品和服务，经营者必须严格执行政府规定的价格；列入限价范围的，一律不得突破政府规定的限价水平。经营者经营其他实行市场调节价的人民生活必需品、与防治非典相关的商品和服务，其价格超过2003年4月22日交易价格50%的，按哄抬价格违法行为认定。经营者不能提供2003年4月22日交易价格的，由物价部门按照2003年4月22日当地市场价格确定。省物价检查所按照省防治非典指挥部的统一安排，在对各地进行联合执法检查的同时，对33家省直医疗、医药单位进行检查，确保了防治非典期间市场价格的稳定和社会的安定。防治非典期间，全省出动检查人员23278人次，检查单位55472个，查处案件3994件，实施经济制裁403.85万元，其中，没收71.54万元，罚款299.24万元，退还用户33.07万元。曝光价格违法案件300件，吊销营业执照1件，移交公安部门12人。



图4-7　2003年4月，德州市德城区物价局工作人员检查非典药品价格

　　2004年10-12月，根据国家发展改革委统一部署，省物价局组织开展成品油价格检查，查处违反国家规定、带头涨价和趁机哄抬成品油价格的行为，确保了成品油市场价格的基本稳定。

　　2005年4月，经省政府同意，省物价局印发《关于构成哄抬价格行为涨幅度界定问题的意见》。《意见》明确，经省政府同意，省物价局可区别不同商品和服务的不同情况，在超过正常平均价格30%～100%的区间内，确定构成哄抬价格行为的提价或涨价幅度。适时适度监管5种具体情形：1.市、县地域范围内发生较大灾情、疫情期间，为维护正常市场价格秩序，保持社会稳定，物价部门需要对可控制灾情、疫情相关的商品和服务价格进行适度监管的；2.旅游黄金周和重要节假日、节庆日期间，需对部分供求矛盾突出的商品和服务以及重要旅游风景区的商品和服务价格进行适度监管的；3.市、县范围内有国家重点项目建设、扶贫救灾建设项目，需对失去正常竞争性的相关商品和服务价格进行适当监管的；4.市、县范围内出现涨价谣传，导致抢购、囤积等异常现象发生并使市场价格短期内急剧上涨的；5.应当控制提价或涨价幅度的其他情形。全省各级政府物价部门，积极贯彻落实《意见》规定。省物价局对在节假日期间乱涨价行为进行依法查处，泰安、菏泽两市对国庆节期间泰山景区餐饮、住宿、租赁等部分商品和服务价格，以及黄河滩区移民建房用材价格实行涨价幅度控制，有效维护消费者合法权益，遏制了乱涨价现象。这一做法为全国首创，对及时有效制止哄抬价格违法行为，规范市场价格秩序具有重要意义，受到国家物价部门肯定，并在全国范围内予以推广。

　　2005年7月至2006年6月，根据国家发展改革委统一部署，为稳定市场价格秩序，全省开展为期一年的打击价格欺诈专项行动。9月，根据全国整顿规划办公室、中宣部、国家发展改革委等10部门联合下发的《关于开展2005年"诚信兴商"宣传月活动的通知》，在全省组织开展"推进价格诚信、打击价格欺诈"宣传执法月活动。11月，根据省政府防控高致病性禽流感电视电话会议的有关部署，省物价局下发《关于应对高致病性禽流感做好价格监督检查工作稳定市场价格的通知》，要求各地大力加强价格监督检查，加大执法力度，切实防止乱涨价、乱收费行为；加强市场巡查，密切监测市场价格动态，及时制止涨价谣言、囤积居奇、哄抬物价、扰乱市场秩序等行为，切实维护市场秩序平稳有序。

---

同层次的有3个条目

第一节 专项价格检查
第二节 行政性事业性收费检查
第三节 制止不正当价格行为 *当前记录*

# Exhibit 141



September 12, 2022

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, **Samuel Chong**, hereby declare:

That I possess advanced knowledge of the Chinese and Englishlanguages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of the document with bates numbers range: IRI-CRT-00026139 to IRI-CRT-00026140 and IRI-CRT-00026227 to IRI-CRT-00026239

*(Digital or printed signature here above the line)*

_____

**Samuel Chong**

Project Number: BBLLP_2209_P0014

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

Note: Italics is handwritten

# Caihong Electronics Group Corp

## *COI Business Decision*

*Notice on Implementing the Spirit of the Working Conference of Caihong Group on "Big Company Strategy" and Restructuring*

| From *May 1995* to *December 1995* | Retention Period | *Permanent* |
|---|---|---|
| There are *one hundred and seventy-nine* sheets in this volume | Archiving No. | |

| General Archive No. | Catalog No. | File No. |
|---|---|---|
| | | |

CONFIDENTIAL                                      IRI-CRT-00026139

## Catalog in the Volume

| S/N | Doc author | Original font size | Doc receipt number | Confidential level | Doc date | Title | File sheet No. |
|-----|-----------|-------------------|-------------------|-------------------|----------|-------|----------------|
| 1 | Group Office | CT101 | | | May 21, 1995 | Notice on Implementing the Spirit of the Working Conference of Caihong Group on "Big Company Strategy" | 1 ˋ108 |
| | | | | | | | |
| 2 | Group Office | CTB277 | | | November 30, 1995 | Notice on Holding a Working Conference on Implementing "Big Company Strategy" and Restructuring | 109 ˋ113 |
| | | | | | | | |
| 3 | Group Office | CTB295 | | | December 13, 1995 | Notice on Delivering the Spirit of the Working Conference of Caihong Electronics Group Corp on Big Company Strategy and Restructuring | 114 ˋ179 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

CONFIDENTIAL

IRI-CRT-00026140

**Annex 1:**

## Speech at the Opening Ceremony of the Working Conference of Caihong Group on Implementing "Big Company Strategy"

### (May 16, 1995)

### Wenyi Zhang

Just now a few leaders have made important speeches. On the implementation of the big company development strategy, a consensus was reached at last year's Meixian Meeting and Chang'an Meeting. In the recent year, the company has achieved rapid development. Whether in the authorized operation of Inner Mongolia Television Factory or in the merger of No. 6 Institute of the Ministry of Electronics Industry, the situation is very good. This year, we plan to produce 5.3 million color picture tubes (CPT) and expect to exceed 5.5 million CPTs. From January to April, we produced 1.8 million CPTs, realized 1.2 billion yuan of sales revenue and 340 million yuan of profit and paid 100 million yuan of taxes. It is estimated that 2.7 million CPTs will be completed in the first half of the year, with profit and taxes exceeding 500 million yuan. In addition, the export situation is also quite good. Now the CPTs for export are in short supply, especially the 14" CPTs.

Judging from the above situation, each business department has played its role in mobilizing employees to devote themselves to the development of a big company. So, from the current figure, this year's profit may exceed 700 million yuan, and the profit and taxes will exceed one billion yuan. It will be a big step up, with profit and taxes increasing by 500 million yuan compared with last year, which is doubled. By June, the profit and tax figure of last year will be reached, which is quite remarkable. From the perspective of other projects, the progress is also rapid, including the implementation of the internal technical upgrading projects of the Group. Therefore, the factory holds this middle-level cadres meeting in such a favorable situation to further unify the thinking and unswervingly follow the big company strategy.

At this meeting, I'd like to talk about a few of my ideas. The implementation of the big company strategy indeed has encountered many problems. From the reports of the leaders just now, we can also see that the 650 million yuan of investment in the factory was done by each business department; the entrusted operation of Inner Mongolia Television Factory and the alliance of No. 6 Institute with us are for development of products; for the next five year, or for product development four years later, the pre-research, development and production of projection television were conducted in Sichuan. It has remarkable benefits.

CONFIDENTIAL                                                                    IRI-CRT-00026227

The sales amount estimated by Minister Jinqiang [illegible] is tens of billions of yuan. Besides, we also went abroad to talk with Toshiba about cooperation and Yellow River, Ruyi and Haiyan, the companies in Shaanxi, also want to join us. How should we handle these things? Our middle-level cadres are also worrying: Will such development never stop? Do we have the capacity? How much fund do we have? Is there a priority? Will we all accept as long as they come and request us? Will these affect our headquarters? Are our finance, cadre's strength, technical strength up to such a big scale? Some cadres and workers are very concerned about these. The purpose of this meeting is to inform you of some of the situation. This meeting is mainly a working meeting, where everyone can come up with ideas to see whether such development ideas, scale and speed are reasonable, and whether the several things to be done are feasible? In particular, some strategic matters or some important decision-making matters need to be considered repeatedly. Therefore, it is very useful for our decision-making to gather cadres together, fully listen to their opinions and draw on the wisdom of the masses. Therefore, at this meeting, I would like to make a few comments on these issues:

**I.** **How to handle the relationship between internal expansion and reproduction and external cooperation, alliance and merger in the development process of a big company**

How to handle the relationship between internal expansion and reproduction and external cooperation, alliance and merger? In general, it follows the main line of our planning meeting. That is, focus on CPT, and at the same time extend to terminal products, and also develop horizontally and engage in the information industry. This main line runs through our implementation of the big company strategy. For the headquarters, we must concentrate our strengths, give full play to our advantages and transform and expand our capabilities. Everyone is clear of this point. The whole plan for this year is to invest 650 million yuan. From the current point of view, everyone has done a good job. For example, the expansion of the production capacity of 600,000 in the First Factory was completed in only 15 days, which is quite ideal.  It is a very large project. When we looked around before the festival, the whole factory did not look like a production plant, and changes were being made everywhere. After more than half a month, I had a look again. It has become a new CPT factory and the production capacities of many key parts are more abundant than the original design capacities. Only the sealing process is still under a little stress now. If the equipment arrives at the factory in August and is installed in October as scheduled, it is estimated that the capacity will exceed 2.6 million. In addition to this, the upgrading of the glass screen line is moving on according to the schedule and is expected to be completed by the end of this year. The upgrading of parts and power has also been started. At the same time of production, these expansions are carried out according to plan by our own strength. This will lay a good foundation for us to form a production capacity of 9 million.  Now the First Factory hopes to increase the production capacity of small screens to five million. If it is done, nine million in Xianyang will have no problem.

CONFIDENTIAL                                                                                                          IRI-CRT-00026228

In July last year, when we proposed the nine-million plan, we felt a bit ahead of time. Now it seems that this figure is more realistic.  Now the second wave of CPT has formed in China, and the popularity is stronger than that of the original one. The first CPT wave was formed from 1988 to 1990. All regions involved in CPT, such as Beijing, Shanghai, Nanjing and Guangdong. It is the first wave. The recent CPT fever was caused by the entry of foreign companies into China. And coupled with the interest driving of various provinces and cities in China and the cooperation of large foreign companies, this force is even more violent. One is Sony, which invests 7 billion yuan in Shanghai, for 2 million CPTs, 2 million displays and [illegible] million complete machines in a package, as well as supporting facilities. Dalian, Tianjin, Chengdu, Changsha and other cities are also actively looking for foreign companies to cooperate in CPT and complete machine projects.

It is also difficult to stop this situation. So, if we had not proposed for 9 million at that time and only maintained a capacity of 3 or 4 million, after these big companies came in, it would be very difficult for us to stand on our feet. When they are discussing about the entry now, we have quickly formed a production capacity of 6 million to 7 million. They at least need a few years for construction. In the two to three years of their construction, we will form a capacity of 9 million. We will remain to be the number one in China. Therefore, each unit must push forward according to your plan, if we do not push forward, we will fall behind. Continuous upgrading is a very reliable way to increase our economic strength. Now the most profitable is CPT, so we can't give up CPT. Moreover, we are now focusing on expanding small and medium-sized screens, which is the right direction. Small screens are still in short supply internationally. We have produced more than 2 million 14" CPTs this year, more than 1.8 million of which have to be exported, far from meeting the needs. Now, the domestic price of 14" CPTs has increased from 460 yuan to 490 yuan, and the export price has also increased by one dollar, so the situation is very good. We must form this capacity as soon as possible. Not only do we have an eye on this market, but it is also the intention of Toshiba, which builds a 2.3-million CPT factory in Indonesia recently. It mainly produces 14" and 20" small screens. It was initiated in June and will start production in September next year. We are now one step ahead, giving us a lot of initiative. We spent very little money and created great benefits. The upgrading of the final assembly costs more than 50 million yuan and increases the production capacity by 600,000 pcs. If we build a new production line of 800,000 to 1,000,000, the investment will be at least hundreds of millions of yuan. We trade the smallest input for the largest output without any risk. Moreover, in case of depression of 14" CPTs after a few years, it will be very easy to switch to CDT. We can either advance or retreat.  We are also striving for the export of 21". This year, we plan to export 60,000 21" CPTs. Next year, the export volume may be increased, and the cost of 21" can be reduced to lay a good foundation for export.

CONFIDENTIAL                                                                        IRI-CRT-00026229

Once export is successful, it will drive domestic development of CPT. This is internal development. We are all very clear about this, and the thinking is also definite, and the opinions are unified.

In terms of implementing the big company strategy, we cannot stick to Xianyang all the time. It is all right to develop to about nine million in Xianyang. From an international perspective, Samsung, Toshiba and Hitachi all have built CPT factories in several places. In Japan, Hitachi has two factories to produce CPTs, and Toshiba also have two factories. Toshiba has a CPT production capacity of more than 10 million, including its overseas bases. The production capacity of our Xianyang factory is more than nine million, which is very large already. It will be difficult to expand it further. If the scale economy is even large, it will be a burden. So today, it is proposed whether to build another CPT base? Please discuss. In general, the internal things are developing quite well, and the external ones also need developing. What we are good at is CPT, but we can't just engage in one industry. According to our plan, we must develop to other industries. One is the information industry, which is a very important idea we put forward. The Ministry of Electronics Industry requires transformation from the traditional industry to the information industry during the 9th Five-Year Plan period. The industrial adjustment of the entire Ministry of Electronics Industry is towards this direction. Judging from the current situation, we are in line with this direction. The merger of No. 6 Institute into Caihong is a very good thing for Caihong, and of course it is also good for No. 6 Institute. The combination of the two parties is for developing the information industry in success, otherwise the information industry proposed by the Ministry of Electronics Industry will eventually be completed by other companies. Minister Hu said vividly, I raised my arms and cried for action on the mountain, but those who follow are not my own troops, but either foreign companies, private companies, or other companies, and none of them is our backbone troop. As a factory directly under the Ministry of Electronics Industry, we, Caihong, must build up this industry. Both the market and our group need it. Therefore, the ministry is very supportive of this thing. We have reported to several ministers, and to relevant departments and bureaus. Shortly after, a meeting was held to approve it. Just now, Institute Director Li and Factory Manager Ji introduced the situation of No. 6 Institute to everyone. It is indeed a very good industry. Especially, No. 6 Institute has great strength in computer workstations, industrial control and communication. If we start from scratch, it will be difficult. If we don't find a unit and we develop the information industry by ourselves, where can we find so many technical strengths, where can we choose this factory? and where can we build this factory? None of them is an easy task and all these will take us at least several years. The technical strength of more than 600 people engaged in the information industry in No. 6 Institute alone is an invisible and huge resource. Where can we find so many people?  The report made by Director Li just now is indeed exciting. The launch is very fast.   The entry into Group 06 is the result of the support of the ministry. After entering Group 06, we can access the network. It provides a reliable precondition for our plan of a 2-million line.  Of course,

CONFIDENTIAL                                                                                   IRI-CRT-00026230

we need to increase investment. However, we also take Caihong money very seriously, and the money we put in is to buy the stake of No. 6 Institute in the company.  Things must be made clear, and the brothers must settle accounts clearly. The accounts must be settled clearly. Then, since we make investment, we should have the right to get dividends according to the shares. Of course, after we become a family next year, we will be one body. We have lent some working capital, with interest. This account is also very clear. Anyway, for the sake of the country and the interests of the nation, we must develop the information industry and can't hand it over to large foreign companies, while none of Chinese companies involves. It is unacceptable. Now No. 6 Institute is merged into Caihong, which will revitalize the information industry. The start is quite well. Thanks to No. 6 Institute for this.

The other is terminal products. The terminal products were proposed by us. We can't engage in CPT only and should also develop terminal products. It is an aspect of our development. It was determined at the planning meeting. Many companies were selected. We talked with many companies, including Qingdao, Inner Mongolia and Xia Hua and in the end, we selected Inner Mongolia. Why did we select Inner Mongolia? Because this company is very simple and does not have any debt and have only some loans of working capital in a small amount. To be honest, we were very cautious and racked our brains at the time. At first, we also wanted to buy this factory as a controlling shareholder, but we were afraid of the risks. Therefore, we later adopted a method called asset entrustment management. That is, your assets are entrusted to me, I will not pay, but help you operate them, and the money from the operation is mine. It's been less than a year since the entrusted management contract was signed in July last year. It seems that the situation is good. More than 4 million yuan of profit was received in the four months of last year, with an average of one million yuan a month.  From January to April this year, the profit was even higher. It was more than two million yuan a month, and now we can get more than eight million yuan. This year, certainly the profit is more than 20 million yuan. That's how we get paid without investing. What does this rely on? It is our intangible assets to help the Inner Mongolia factory. It is also beneficial to the Inner Mongolia factory. Both sides calculate their own accounts and think it is favorable, so they come together. After the assets of the Inner Mongolia factory were entrusted to Caihong to operate, it has driven the electronics industry in Inner Mongolia. When we took over it in July last year, the Inner Mongolia factory almost stopped production due to lack of funds. We lent him working capital. Actually, we gave PCTs to them at first without collecting any money from them. They would pay us after they have sold TV. In this way, the Inner Mongolia Television Factory has come alive, and the parts factories supporting the Inner Mongolia Television Factory have also come alive. Now 90% of the profit of the electronics industry in Hohhot is from the Inner Mongolia Television Factory. We only lent 40 million yuan of working capital to the Inner Mongolia factory, with interest. Last year, we received more than 2 million yuan of interest. Authorized operation is beneficial but being at this stage all the time can be problematic. We are also thinking about what we should do if it stops the entrustment after it develops to the capacity of one million. Therefore, we now propose to it that if it wants to join Caihong, it shall integrate assets, that is, assets must come in.

CONFIDENTIAL                                                                 IRI-CRT-00026231

After we raised this issue, the Inner Mongolia Television Factory also attached great importance to it. In early May, the factory reported to the municipal government that the assets should enter Caihong. The leaders of the city stated that they agreed in principle that the assets would enter Caihong, but they hoped that the Inner Mongolia Television Factory would provide a specific solution.  Because our factory is a central factory, if the assets are assigned to the central government, and the local government worries about changes in taxes. We must also consider local interests, because taxes are not useful to us, but they are useful to the local government. Local taxes are paid locally. If after the assets enter Caihong, the taxes will be distributed to the central government and to the Ministry of Finance, which will cause great losses to the local area. We are also considering how to solve this problem, that is, not to affect the interests of the local area. The local area built the factory with great difficulties. In the end, after we take over it, the local area gets nothing. It is not acceptable. However, from the perspective of our corporate interests, assets must be integrated, and of course we need to prepare several solutions. In July, we plan to talk about the matter of Inner Mongolia and clarify the relationship.

In short, whether it is the whole machine or the information industry, it is difficult for us to do it ourselves. Therefore, the Group adopts ready-made methods of M&A. This is a way out. In this regard, our investment is quite prudent. No. 6 Institute is merged completely. Because we are both the companies of the Ministry of Electronics Industry, it was handed over quickly and our investment in No. 6 Institute will be large; for the Inner Mongolia factory, we have no investment, just loans. Therefore, there is a relational problem between the local and the central, and this problem is being coordinated and dealt with now.  In general, it is to ensure that Caihong Group develops to other industries in accordance with our original plan. Projection TV is also a new industry. Of course, this investment is earlier, starting from the research and development, and we will hold a large stake in the future when the factory is built. If you don't invest in the development of a good product from the beginning, it will be difficult for you to get it after it is successful.

In a word, we must properly handle the relationship between internal and external. For the headquarters, we must give full play to our strengths, continue to transform our original main business, expand reproduction, and generate maximum profits with the least investment. At the same time, we also need to develop and form new products. The favorable methods such as conglomeration and merger are good for the development of Caihong Group. We should handle the relationship between the two properly and must not take care of one and ignore the other.

## II.        Handle the relationship between government and enterprises properly

It was not a big problem in the past. For the main factory in Xianyang, the amount of government intervention in the enterprise is not large. We are directly affiliated to the ministry, and the province and city don't care about us. The ministry is far away, so the environment we are in is quite good. However, now you are going to expand the company and are looking for some new products and some new industries. The government comes out, and you can't leave the government wherever you go.

CONFIDENTIAL                                                                                    IRI-CRT-00026232

Therefore, the issue of government-enterprise relationship is a headache that we encounter in the development of a big company. On the one hand, we must listen to the government. Why? The boss of large and medium-sized state-owned enterprises is the state, the owner of the assets is the State Council, and the authorizer is the Ministry of Electronics Industry. Since the Ministry of Electronics Industry has not authorized us, the current shareholder and investor are still the Ministry of Electronics Industry. Since it is the shareholder, the shareholder has given its comments, the company is only the operator and the shareholder must be complied with, we must listen to the government. In addition, our country implements a socialist market economy, and it is a principle that enterprises should listen to the Party. However, if an enterprise listens to and follows all of the government's instructions, it will fail, because many interests of the enterprise are inconsistent with the interests of the government, and some of the government interests are also consistent with the enterprise interests, for example, the big company strategy proposed by the Ministry of Electronics Industry, which is consistent. But there are often conflicts and collisions, that is, the ministry has its own considerations, we have ours; or the provincial government has its own considerations, we have ours; these two are consistent in some aspects, and inconsistent in some aspects. It is a situation. Another situation is very simple, that is, it is completely inconsistent. It is easy to handle it. We will simply not implement it. The most troublesome thing is what we are encountering. Some are consistent and some are not consistent. It is quite difficult to deal with the problem. Everyone now knows about the Device Company. It is the case. We want to enter Beijing. As a large international group, we should also enter Beijing. In what way to enter Beijing, the ministry leader suggested that the Device Company should be handed over to us. Once the Device Company belongs to us, we will enter Beijing. It is very easy. It is indeed considered for us, and indeed beneficial for us to enter Beijing and increase our influence, and we can also enter its industry. However, several subordinate units of this company are not good. The biggest one is Mic. The Device Company has shares in Mic and Zhongkang, both of which are sluggish. If you take over it, you must take over both the creditor's rights and the debts. This is why we don't want to take over it. If you don't want Mic, how can you take over the Device Company? It's very contradictory. The factory leaders have held many meetings to study this issue, analyze the pros and cons and discuss whether or not to take over it and how to take over it. In the end, our idea is that in order to promote the development strategy of a big company, we agree to the decision of the ministry on handing the Device Company over to us, but we told our conditions to the Ministry. If the Device Company is handed over to us, it must be operated in the way of an enterprise. If it is not operated in the way of an enterprise but in the way of the government, we cannot take it over. In the end, the ministry agreed to our conditions. It has created a very good condition for how we operate the Device Company. In the past, this company was our superior, but now it has become our inferior. The son bought over the father. This event definitely will have a great effect on Caihong. We should run the Device Company according to corporate conduct. How to run it?

CONFIDENTIAL                                                                                 IRI-CRT-00026233

Especially, now the leaders and cadres of the Device Company are under the management of Caihong, and the original general manager and secretary are no longer the general manager and secretary. CEC will rearrange them. Our Group will arrange a person to act as the leader of this company, and the leadership should be in our hands. After this middle-level cadres meeting, several leaders will go to Beijing to review the finance and other aspects of the Device Company. At the first glance, the sales revenue of the Device Company is more than 300 million a year. Except for Mic, the operation in other parts is normal. In addition to feeding the company itself, there are several millions of yuan of profit. The industry of the company mainly consists of three parts: one part is real estate, including the real estate in Beijing, the real estate in Hainan and the real estate in Shenzhen. The second part is trade, which mainly gives play to the original advantages to support some industries of color TV and is profitable at present. The third part is industry. There are some good projects in the industry, including the program control at present, and communication in Shenzhen. There is also some post-encapsulation such as integrated circuits, which is also high-tech. The main burden is the 40% stake of Mic held by the Device Company. The total debt amount of Mic is 1.25 billion yuan now. 20% of the 40% is shares held by CEC, which means that the Device Company only takes 20% of the shares. This is the situation of Mic. Another is Zhongkang. The Device Company holds only 10% of the shares of Zhongkang indirectly. Zhongkang is now running normally. Although it owes a lot of debts, it can slowly repay the debts after the glass bulb business rises. So, the biggest difficulty is Mic. To take over the Device Company, first we need to liquidate the assets and then we need to formulate a development plan. If it is promising, we will support it to develop. If it is not promising, it will remain unchanged and fend for itself. That is to say, I have taken over you, but I will not care about you. You go on your own. If you create a promising future, I will support you. If you don't have a good future and go bankrupt in the end, then you will be wiped out. The general principle is: the stock does not change, and we consider the increment only. It is an approach. We have explained this idea to the Device Company.

The biggest difficulty for the Device Company is Mic. We think there are two ways out. One is to sell Mic. Now Mic is negotiating with Samsung about the transfer. It is difficult for Samsung to enter the Chinese market if it does not acquire Mic. So, after we take over it, we will continue to implement this approach. Now Samsung has offered $80 million to acquire Mic. They have negotiated about it for several rounds. The 80 million dollars can be used to settle the debts in Shenzhen. 80 million dollars are equivalent to about 700 million yuan. Just now I mentioned 1.25 billion yuan. If 700 million can be recovered, there will be only 400 to 500 million of debts. Of the 400 to 500 million yuan, Kangmao Company under the Ministry of Trade and Economic Cooperation accounts for 60% and we account for 40% only. Supposing that the debt amount is 500 million yuan, we will shoulder 200 million yuan. A half of the debts belong to CEC, while we only have 100 million yuan of the debts. We will ask the state for some more policies. We will pay off the debts after the account is suspended and the interest accruing is stopped for ten years. It is estimated that the debts will be depreciated to little amount after ten years.

CONFIDENTIAL                                                                       IRI-CRT-00026234

The ministry will report this matter to Vice Premier Jiahua Zou and Vice Premier Bangguo Wu. It will be decided by them. We think this solution is feasible. We sell it to Samsung, and we will bear the remaining debts of more than 100 million to 200 million yuan. Now we don't have the repayment ability, and we will pay off them after ten years. In addition, the Device Company still has a lot of assets, which are worth more than 100 million yuan. The land and houses alone are worth 100 million yuan. That said, it's not too much of a burden. This is a way of thinking. Another way out is, if the state does not agree to sell Mic, what should we do? We think we can talk with Kangmao. After all, we are a minority shareholder. A minority shareholder cannot decide on Mic. It is up to the major shareholder to make decision. In this case, it is likely that the matter of this factory will be postpone indefinitely. I hope that it is postponed until Kangmao feels a lot of pressure and then proposes it to the state. By then, we will buy over it. It is impossible to do anything to Mic now. We must mobilize Kangmao's enthusiasm and let Kangmao work hard on it.  We, a minority shareholder, must not bring responsibility to us.

The second is a matter of the province, which is also a matter proposed by the government. This year, the provincial government and the provincial party committee decided at a meeting to do several major events. One of them is the establishment of Shaanxi Color TV Group, led by Caihong. Three factories will be merged into Caihong. The consideration of the province is correct. What should they do if these factories fail? If they are handed over to Caihong and come alive under the support of Caihong, it will be a contribution to the country.  However, the debts of these factories are indeed too heavy. The total number of employees is more than that of our factory. We have 11,000 people, but they have 14,000 people in total. Furthermore, they don't have money, and suffer a loss of hundreds of millions of yuan, directly or indirectly.  Of course, the province has reiterated that these debts will not be handed over to Caihong and will not be borne by Caihong, but can it be honored? who will bear the debts? If it is included in Caihong, Caihong must bear the debts, so we need to talk with the province again. In general, the provincial leaders have made the remark, we must take it seriously and study it actively. There are several solutions already. Manager Ji will organize the leading group to discuss and confirm them and report them to the province. However, this matter is very complicated and involves the transfer of local assets to central assets. In China, no relatively sound method is available to handle asset transfer. There must be clear regulations on how to transfer assets between the State-owned Assets Administration and the Provincial Assets Administration. Besides, there is the need for dialogue between the ministry and the province, because we are a central enterprise, and if a provincial enterprise is handed over to us, we must obtain the approval of the ministry and receive a document issued by the ministry before we can take over the enterprise. So, this matter will take a long time to deal with. Although we have discussed this matter a lot and we all care about it, it is not easy to handle it. It is not easy to get it even if you want it.  Firstly, it involves asset allocation and other specific issues, on which no one has the final say. Moreover, Yellow River is also a listed company, and the transfer of a listed company must be approved by the State Securities Regulatory Commission. Coupled with the current affair handling efficiency of our country, it is quite difficult in real operation. In any case, we must be active and complete the formalities. The formalities must be completed.

CONFIDENTIAL                                                                                    IRI-CRT-00026235

It will take a long time to complete all formalities. When formalities are completed, all parties will listen to the opinions of the enterprises. After the enterprises expresses their views, there will be many difficulties. These difficulties are not solvable to many departments. Therefore, this thing will be a long process. Anyway, we are in the province, water, electricity and steam are all supplied by the province, and the province treats us well indeed. Now the province is a bit difficult. We must actively find ways to help it solve the difficulty. How to solve it? The general principle is that the interests of Caihong should not be affected. It is not likely that the interests of Caihong is affected. Therefore, when dealing with the relationship between government and enterprise, we must follow the decision of the government. It is also unacceptable for such a large enterprise not to follow the government's instructions, but we must consider issues according to corporate economic laws, rather than deal with corporate things with the behaviors of the government, otherwise the enterprise will collapse. We must strictly distinguish these two boundaries.

### III.      How to deal with the relationship between self-based development and cooperation with large foreign companies

In the process of group expansion, self-reliance, and adherence to our own path is the major route for our development in recent years, but some advanced technologies, foreign markets, and foreign intelligence are all that we lack. In the process of building a veritable big company, without close and reliable cooperation with one or two large foreign companies, the operation of this company will encounter some difficulties. Therefore, on the one hand, we must promote our own development, raise our strength and establish our confidence. On the other hand, we must also seek a cooperative foreign company for long-term technical cooperation to make up for our shortcomings. Based on this consideration, our visit to Toshiba this time is for comparing a few large companies in Japan and selecting and determining a cooperation object. After the first phase of the project was completed, Hitachi no longer contacted us in the second phase. Later, our CDT also sent a signal to Hitachi, but the Hitachi executives were very slow in making decision, also didn't show much interest in us. In this case, we can only rely on Toshiba. The same is true for some foreign companies, including Samsung and Daewoo. They also started with the help of long-term technical cooperation with Japanese companies, then made breakthroughs in some aspects and grew up. We only choose Toshiba from among foreign companies for cooperation with us because Toshiba has this desire and is willing to cooperate with us in an all-round way. For example, they will provide long-term technology in CPT.  In terms of color TV development, Toshiba is also willing to establish a joint venture, and willing to let Caihong share the high technology without reservation. Of course, we must spend money. In this way, we can take less detours in terms of technology. In addition, the same is true for determining product brand this time. At home, TV should use a composite trademark, rather than just the name of Toshiba. The name of Caihong is very beautiful, and they also admit that the meaning of Caihong (rainbow) is very good. Therefore, relying on cooperation with a foreign company, the brand becomes known to the people. It is very good for the future development of the company.

CONFIDENTIAL                                                                                        IRI-CRT-00026236

Now Toshiba shows great interest and enthusiasm and talks about the cooperation with us with great enthusiasm.  Therefore, we feel that the development of Caihong should depend on the support of the government, the cooperation with a foreign company, and our own efforts. If the three conditions are met, we will achieve a better environment in the development process. In the past, we also knew that we should cooperate with foreign companies, but we were asking for help. We bought things from them, but we had no strength and were not equal with them in status and were always inferior to them. It stands to reason that we were the user and bought things from them, they should beg us, but the opposite was true. However, after the development of Caihong in the recent years, the status of Caihong has been improved. When we went to Japan this time, we clearly felt that the two sides were on an equal footing. Toshiba proposed to cooperate in phosphor, but we think that in terms of phosphor, we do not need Toshiba, because we have both Hitachi technology and Toshiba technology and neither need your technology nor your capital. We made a counter suggestion to them, bring in the energy-saving lamp powder, and after the energy-saving lamp powder is brought in, your energy-saving lamps can be brought in. On this basis, we will discuss the joint venture. In the past, we couldn't say such words. It was difficult to make them establish a joint venture with us. How could we bull up and not establish the joint venture? The same is true for AGC. This time AGC offered to set up a joint venture with us, but we have not replied them yet, because we are not sure whether we will build it ourselves or whether it is a joint venture, so it is difficult to answer them. Only our strength increases, can we be in an equal position with them. Therefore, now the conditions are ripe, and we propose that we must rely on ourselves and seek partners from foreign companies.

## IV.        Issues of development speed and application of funds

Firstly, in the process of development, we should not only consider the need for expansion but also secure funds. Funds must be controlled within what we can afford and must not exceed our affordability. For example, this year, we have a profit of 700 million yuan, and after paying taxes, we have 500 million yuan left, plus depreciation of 200 million yuan, that is, our available funds this year are 700 million yuan. In the future, it may be higher than this figure, but based on 700 million yuan, we cannot invest all of the 700 million yuan, even more than 700 million yuan, every year.  Although it is expanded, it is unaffordable, so there must be a room for it.  At the office meeting, I proposed that 500 million yuan should be used for reinvestment every year, and 200 million yuan should be set aside as mobile money, or to supplement our working capital. We should not invest all the money, which is too risky. This point of view can be discussed again.

The second is investment diversification. We have a lot to do, and we invest so little, what if we can't do so many things? This requires investment diversification.

CONFIDENTIAL                                                                      IRI-CRT-00026237

The factories we are building now are all invested with our own funds. When we build factories in the future, we must pull in several partners to invest together. Some can be controlled, and some are not necessarily controlled. It is also in line with the requirements of the modern enterprise system. The modern enterprise system is to form a limited liability company. Therefore, we hope to do the same in the future. Taking the expansion of phosphor factory for example, we invite three or four investors, but we are the controlling shareholder.  In this way, we spend less money on each project, and the risk is lower. Taking color TV investment for example, Toshiba is the controlling shareholder, while we are not. The same is true for other projects, including the construction of a glass factory. Should it be a joint venture or a sole proprietorship? The so-called sole proprietorship also refers to the Chinese party alone, not Caihong alone. We hope to attract a few companies to make joint investment, but we are the controlling shareholder, so that more companies can be set up. As for foreign companies, such as Toshiba, it established a factory in Thailand, not with the sole investment. Instead, it invited a few local companies or Japanese companies. This time, the factory it built in Indonesia is also controlled by it, with several companies as shareholders, so as not to solely bear the risks. In this way, our problem of fund shortage can be solved.

This third is to establish our own financial company to improve the financing capability. In the current reform of the national financial system, the national investment companies are gradually disconnected from banks, and banks are not allowed to control the shares. This creates a new opportunity for us, and we take this opportunity to occupy a major part of shares in some good, invested companies, so as to control the invested companies. If the national policy is issued and the bank cannot be a controlling shareholder, we would like to control the stake, so that there will be a new source of financing for our funds. In addition, we also raised the issue of setting up a financial company together with a bank. Moreover, in the process of establishing a modern enterprise system, we also proposed to establish our own financial company. It is impossible for a large foreign company to not engage in finance. To support such a large company, the financial personnel and management personnel must be supplemented and improved.  We are unfamiliar in many fields, such as stock business. The current changes in foreign exchange are drastic. Our enterprises, deposits, foreign exchange, including the country's foreign exchange deposits are all in US dollars. Now the dollar keeps depreciating, and the loss is huge. If we saved yen in the beginning, we would have made a lot of money now. This all shows that we are immature in finance. After the formation of a big company, finance is a very important field. Whether we are engaged in the secondary industry or other sectors, finance is a very profitable field. Don't give up this field. During the seminar at No. 6 Institute this time, I invited the Dean of the School of Management of Tsinghua University. He suggested that we quickly develop finance and a financial company. He is optimistic at this field. When we set up a big company, we shouldn't look at the industry only and must prepare and enter the financial field, so that our industrial development has a reliable foundation.

The above are the four issues that I have talked about. I hope that it will arouse the train of thought of everybody for discussion.

CONFIDENTIAL                                                                 IRI-CRT-00026238

We can argue where it's not right. In the next step of implementation, what should we pay attention to? which aspects need to be improved? and what else should we do? I hope everyone can fully express your opinions. We must have full confidence in Caihong in the next few years. The overall development speed will be much faster than our plan made last year, because firstly, the goal is clearer; secondly, it is more operational and thirdly, the development scale is larger than expected.  At that time, we estimated 16 billion. After No. 6 Institute joined us, it became 20 billion. Then, these industries expanded again and the number was even larger. It is not drawing an outline but is being implemented. In the process of implementation, we must be active and prudent. I hope that everyone will fully express their opinions so that our decisions will not be wrong.

CONFIDENTIAL                                                                                 IRI-CRT-00026239

# Exhibit 142



July 5, 2023

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, **Samuel Chong**, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 【国家计委出台八项价格、收费检查措施】-国家发展和改革委员会

*(Digital or printed signature here above the line)*

_____

**Samuel Chong**
**Project Number: BBLLP_2306_P0022**

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

Case 4:07-cv-05944-JST Document 6282-2 Filed 08/24/23 Page 179 of 275

6/22/23, 10:52 PM [The State Planning Commission issued eight measures to inspect prices and charges]-National Development and Reform Commission

June 22, 2023 Thursday

Barrier-free mode  Working mailbox

**National Development and Reform Commission**

Hot search: Oil price; guiding catalogue of industrial restructuring; feasibility study; energy; fixed assets investment

Please enter a keyword

Home | Organization | News | Government Transparency | Government Service | NDRC Data | 互

Home > News > News Release

## The State Planning Commission issued eight measures to inspect prices and charges

Release time: January 06, 2000    [Print]    Microblog    WeChat

Vigorous activation of the consumer market is an important part of the implementation of the policy of expanding domestic demand. However, various price violations and arbitrary charges have added to burden on enterprises, suppressed residents consumption in electricity, housing, cars and communications and affected the increase of farmers income. Wang Yang, the Vice Minister of the National Development Planning Commission, revealed at the just-held national price supervision and inspection work conference that in order to promote consumption of urban and rural residents and play the driving role of consumer demand for economic growth, the State will introduce eight price and charge inspections this year to vigorously rectify the price order, clean up all kinds of arbitrary charges, and create a good environment for urban and rural consumption.

(1) Carry out the special inspection of prices in the electric power industry nationwide. The inspection focuses on the investigation of some local governments, departments and power enterprises, which violate regulations, levy various funds and surcharges beyond their authorities and raise or raise in disguised form the price of electricity, as well as the phenomena of "power-based electricity", "relationship-based electricity", "human interest-based electricity", and supporting for people with electricity.

(2) Carry out the special inspection of charges of public security organs nationwide. The inspection focuses on the investigation of the prominent problems of some local public security organs in the aspects of applications for registered permanent residence and licenses, and arbitrary charges by traffic police, which have been strongly complained by the masses in recent years.

(3) Carry out the price inspection of the tourism industry. The inspection focuses on the investigation of arbitrary price rise, arbitrary charges, and refusal to comply with the provisions of price marking in the tourism market, in order to protect the legitimate rights and interests of consumers and promote the healthy development of the tourism market.

(4) Carry out the inspection of housing prices and property management charges. The inspection focuses on the investigation of the excessive, arbitrary and too high charges of the construction departments, land departments, real estate development enterprises, real estate markets and property management companies in the aspects of land acquisition, demolition, construction, sale and property management.

(5)  Carry out the inspection of charges of sedans except price. The inspection focuses on the investigation of various attached charges during the purchase, registration and use of sedans, and charges introduced by local governments that are beyond their powers shall be cancelled resolutely.

(6)  Carry out the inspection of education charges. The inspection focuses on the investigation of the problems of arbitrary charges in the compulsory and non-compulsory education stages, such as high fees, disguised sponsorship fees and "dual-track system" for students enrolled through enrolment expansion in some areas and schools, and cross-regional fees and cross-industry fees collected from college graduates.

(7)  Carry out the inspection of agriculture-related charges, grain prices, and flue-cured tobacco prices. The inspection focuses on the investigation of arbitrary charges in rural medical care, marriage registration, family planning and housing land, which are strongly complained by farmers. Inspection of grain prices is continued during the purchase of summer grain and autumn grain. The purchase prices of flue-cured tobacco are inspected in major tobacco-producing provinces and regions.

(8)  Carry out the re-inspection of the charge items that are explicitly ordered to cancel. The re-inspection focuses on checking whether the cancellation, consolidation and standard reduction of the charge items announced by the CPC Central Committee, the State Council, the State Planning Commission, the Ministry of Finance and the provincial peoples governments have been strictly implemented. Those who do not comply with the orders and prohibitions shall be punished sternly to ensure that the policies for reduction of enterprise's burden are implemented.

In order to implement these measures to relieve chaos and lighten burdens in consumption, the State Planning Commission requires price authorities at all levels to set up price reporting agencies, improve the reporting network, timely accept the reporting of the masses on price dumping, price monopoly, price discrimination, price fraud and other improper price behaviors, and strictly comply with the Price Law and relevant regulations and rules. At the same time, the masses are expected to actively participate in price supervision so as to prompt enterprises to strengthen price self-discipline and establish and improve the price self-restraint mechanism of the industry.



Sitemap | Contact Us

Organizer: National Development and Reform Commission

Technical support: National Information Center and China Economic Information Network

Website ID: bm04000007 Jing ICP Bei 05052393    JGAB 11010202000002

National Development and Reform Commission, all rights reserved. In case of reprint, please indicate the source

2023年6月22日 星期四

⚲ 无障碍模式　✉ 工作邮箱



# 中华人民共和国国家发展和改革委员会
## National Development and Reform Commission

热门搜索：油价　产业结构调整指导目录　可行性研究　能源　固定资产投

请输入关键字

| ⌂ 首页 | 🏛 机构设置 | 📰 新闻动态 | ⚙ 政务公开 | 📄 政务服务 | ⏱ 发改数据 | 💬 互 |

🏠 首页 > 新闻动态 > **新闻发布**

## 国家计委出台八项价格、收费检查措施

发布时间：2000/01/06　🖨 [打印]

 微博　 微信

　　大力启动消费市场是实施扩大内需政策的重要内容，但是由于存在各种价格违法行为和乱收费，加重了企业负担，抑制了居民在用电、买房、购车和通信等方面的消费，影响了农民收入的增加。国家发展计划委员会副主任汪洋在刚刚召开的全国价格监督检查工作会议上透露，为了促进城乡居民消费，发挥消费需求对经济增长的拉动作用，今年国家将出台八项价格、收费检查，大力整顿价格秩序，清理各种乱收费，为启动城乡消费创造一个好的环境。

　　（一）开展全国电力行业价格专项检查。重点查处一些地方政府、部门和电力企业违反规定，越权征收各种基金、附加费，提高或变相提高电价的问题，以及农村"权力电"、"关系电"、"人情电"、以电养人的现象。

　　（二）开展全国公安部门收费专项检查。重点查处近年来群众反映强烈的一些地方公安部门在办理户口、证照和交警乱收费等方面的突出问题。

　　（三）开展旅游行业价格检查。重点查处旅游市场各种乱涨价、乱收费和不执行明码标价规定的行为，保护消费者合法权益，促进旅游市场健康发展。

　　（四）开展住房价格和物业管理收费检查。重点查处建设部门、土地部门、房地产开发企业、房屋交易市场、物业管理单位在征地、拆迁、建设、出售、物业管理等各个环节收费过多、过滥、过高问题。

　　（五）开展小轿车价外收费检查。重点查处小轿车购买、入户和使用过程中各种搭车收费，坚决取消地方政府越权出台的收费项目。

　　（六）开展教育收费检查。重点查处一些地方和学校对扩招学生采取高收费，变相收取各种"赞助费"，搞"双轨制"，对高校毕业生收取跨地区费、跨行业费，以及其他在义务教育和非义务教育阶段乱收费问题。

　　（七）开展涉农收费、粮食价格、烤烟价格检查。重点查处农民反映强烈的农村医疗、婚姻登记、计划生育、建房用地等乱收费。在夏粮和秋粮收购期间继续抓好粮食价格检查。在烟叶主产省区开展烤烟收购价格检查。

　　（八）开展明令取消的收费项目的复查。重点检查党中央、国务院以及国家计委、财政部和省级人民政府历次公布取消、合并和降低标准的各种收费项目、基金、附加（费），是否真正得到严格执行。对有令不行、有禁不止的，要依法严肃处理，确保减轻企业负担的政策落到实处。

　　为了贯彻这些消费治乱减负的措施，国家计委要求各级价格主管部门，设立价格举报机构，健全举报网络，及时受理群众对低价倾销、价格垄断、价格歧视、价格欺诈等不正当价格行为的举报，严格按《价格法》及有关法规、规章进行处理。同时希望广大群众积极参与价格监督，促使企业加强价格自律，建立和完善行业价格自我约束机制。

### 排行榜

*01* 关于第三监管周期省级电
价及有关事项的通知(发改
〔2023〕526号)
2023-05-15

02 关于印发《职业教育产教
提升行动实施方案（2023—
年）的通知
2023-06-13

03 关于做好2023年降成本重
通知
2023-06-13

04 关于印发《职业教育产教
提升行动实施方案(2023—
年)的通知(发改社会〔2
号)
2023-06-13

*05* 关于做好2023年降成本重
通知(发改运行〔2023〕
2023-06-13

---



**网站地图 | 联系我们**

主办单位：中华人民共和国国家发展和改革委员会
技术支持：国家信息中心 中国经济信息网

  

网站标识码：bm04000007 京ICP备05052393号  京公网安备11010202000002号

国家发展和改革委员会 版权所有，如需转载，请注明来源

# Exhibit 143



July 10, 2023

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, Johnson Wong, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 国务院总理朱镕基对坚决制止...当手段低价倾销行为作出批示.pdf

*(Digital or printed signature here above the line)*

Johnson Wong
**Project Number: BBLLP_2306_P0022**

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

# Premier of the State Council, Zhu Rongji, issued instructions to firmly prevent unfair low-price dumping behaviors

Recently, Premier Zhu Rongji made important instructions on the "Request for Prevention of Unfair Price Competition and Promotion of Healthy Development of Color Cathode Ray Tube Industry" submitted to the State Council by the National Development Planning Commission and the Ministry of Information Industry that "it should be clear that the pricing regulatory department (the Development Planning Commission) and the industry regulatory department (the Ministry of Information Industry) should jointly investigate enterprises that sell products below the industrys average cost. Enterprises that dump products at low prices by unfair means (such as using smuggled imported parts, reducing functions, passing off substandard products as good ones, and falsely reporting costs) must be ordered to correct their actions, up to the revocation of their business licenses."

In response to the recent problem of low-price dumping in market competition, the National Development Planning Commission, in conjunction with relevant departments, have successively formulated and promulgated two specific regulations, "Interim Provisions on Prevention of Unfair Competition Behaviors of Low-Price Dumping of Flat Glass" and "Interim Provisions on Prevention of Unfair Competition Behaviors of Low-Price Dumping of Steel." On November 16, 1998, the National Development Planning Commission and the State Economic and Trade Commission further issued the "Provisions on Prevention of Unfair Price Behavior of Low-Price Dumping of Industrial Products," which went into effect starting from November 25. This is an important comprehensive regulation guiding the prevention of low-price dumping and standardizing enterprise price behavior. It is a significant embodiment to implement the "Price Law."

Preventing low-price dumping according to the law is currently a key task for pricing regulatory departments at all levels. Pricing regulatory departments at all levels must follow Premier Zhu Rongjis requirements, unify their thoughts, effectively take on the responsibility of preventing low-price dumping, and perform their duties diligently to prevent low-price dumping. Recently, the National Development Planning Commission has organized and guided relevant regulatory departments to promptly determine and announce average industry costs of color cathode ray tubes and other main industrial products, as a pricing red line that enterprises should not undercut, guiding enterprises to reasonably set prices. All regions should strengthen the inspection and supervision of product prices such as flat glass, steel, color cathode ray tubes, and color TVs, seriously handle reports of low-price dumping behaviors, and promptly investigate enterprises reported to have suspicions of low-price dumping. For enterprises that use unfair means such as using smuggled parts, reducing functions, passing off substandard products as good ones, and falsely reporting costs for low-price dumping, they should be ordered to suspend operations for rectification or relevant departments should be asked for the revocation of business licenses, so as to maintain normal price and competition order, protect the legal rights and interests of operators and consumers, and promote the healthy development of the national economy.

# The State Economic and Trade Commission proposed this years goal for state -owned enterprises (SOEs) to get out of trouble - to eliminate losses in 1/3 of loss-making enterprises.

Zheng Silin, deputy director of the State Economic and Trade Commission, recently proposed at the first training class for operators of key enterprises in trouble held at Handan Steel: The alleviation of SOEs is of utmost importance to the economic work. This year, it is necessary to eliminate losses in 1/3 of the loss-making enterprises. At present, we must recognize the situation, have confidence, and make breakthrough progress in the alleviation of large and medium-sized loss-making state-owned enterprises.

Zheng Silin said that based on the new enterprise classification standards, the State Economic and Trade Commission has identified about 2,300 key enterprises for relief. The task this year is for 1/3 of loss-making enterprises to eliminate losses. By the end of 2000, the loss ratio of large and medium-sized industrial enterprises owned or controlled by the state should be reduced to 15% or less.

(C) 1994-2023 China Academic Journal Electronic Publishing House. All rights reserved. http://www.cnki.net

经贸政策与要闻

# 国务院总理朱镕基对坚决制止采取不正当手段低价倾销行为作出批示

最近，朱镕基总理在国家发展计划委员会、信息产业部上报国务院的《关于制止彩色显像管不正当价格竞争、促进彩色显像管工业健康发展的请示》上作出重要批示："应明确由价格主管部门（发展计划委员会）和行业主管部门（信息产业部）共同对以低于行业平均成本销售的企业进行调查，凡以不正当手段（如使用走私进口件、减少功能，以次充好、虚报成本等）进行低价倾销的企业，要勒令改正，直至吊销其营业执照"。

针对近一段时期市场竞争中出现的低价倾销问题，去年以来，国家发展计划委员会会同有关部门，先后制定颁布了《关于制止低价倾销平板玻璃的不正当竞争行为的暂行规定》和《关于制止低价倾销钢材的不正当竞争行为的暂行规定》两个专项法规。1998年11月16日，国家发展计划委员会、国家经贸委又印发了《关于制止低价倾销工业品的不正当价格行为的规定》，并从11月25日起施行，这是指导制止低价倾销工作，规范企业价格行为的一个重要的综合性法规，是贯彻《价格法》的重要体现。

依法做好制止低价倾销工作，是当前各级物价部门要重点抓好的一项重要工作。各级物价部门一定要按照朱镕基总理的要求，统一思想，切实承担起制止低价倾销工作的责任，认真做好制止低价倾销工作。近期，国家发展计划委员会组织指导有关主管部门抓紧测定并发布彩色显像管等主要工业品的行业平均成本，作为企业不应跌破的价格警戒线，引导企业合理制定价格。各地要加强对平板玻璃、钢材、彩色显像管、彩色电视机等产品价格的检查监督，认真受理对低价倾销行为的举报，对被举报有低价倾销嫌疑的企业，要及时立案调查，对违反规定的企业要从严查处。对使用走私零配件、减少功能、以次充好、虚报成本等不正当手段进行低价倾销的企业，要勒令停业整顿或提请有关部门吊销营业执照，维护正常的价格秩序和竞争秩序，保护经营者、消费者的合法权益，促进国民经济的健康发展。

## 国家经贸委提出今年国企脱困目标——
# 1/3 亏损企业消除亏损

国家经贸委副主任郑斯林最近在邯钢举办的重点脱困企业经营者首期培训班上讲话提出：国企脱困是经济工作的重中之重，今年要使1/3的亏损企业消除亏损。当前要认清形势，坚定信心，务求国有大中型亏损企业脱困取得突破性进展。

郑斯林说，根据新的企业划型标准，国家经贸委确定了重点脱困企业有2300户左右。今年的任务是1/3的亏损企业要消除亏损。到2000年底，要使国有及国有控股大中型工业企业的亏损面下降到15％以下。

(C)1994-2023 China Academic Journal Electronic Publishing House. All rights reserved.　http://www.cnki.net

# Exhibit 144



June 30, 2023

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, **Samuel Chong**, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: 中华人民共和国价格法释义_第二部分 释义 第六章 法律责任_中国人大网.pdf

*(Digital or printed signature here above the line)*

_____

**Samuel Chong**
**Project Number: BBLLP_2306_P0022**

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870



Current location: Legal interpretation and Q&A >> Economic laws >> Interpretation of the Price Law of the People's Republic of China

## Part 2 Interpretation Chapter 6 Legal Liability

www.npc.gov.cn               Date: November 25, 2000          Browsing size: Small  medium  large

Print this page          Close the window

Article 39     Business operators who refuse to implement the government-set or guided prices, legal price intervention measures or emergency measures shall be ordered to correct, have their illegal proceeds confiscated and be fined concurrently for an amount less than five times the illegal proceeds. In cases of no illegal proceeds involved, a fine may still be imposed. For serious cases, they shall be ordered to stop business operation and make correction.

[Interpretation]     This article specifies the legal liability that the business operators who refuse to implement the government-set or guided prices, legal price intervention measures or emergency measures shall bear.

Article 12 of this Law specifies that in their work related to prices, business operators shall strictly keep up with laws, regulations, government guided-prices, government-set prices, legal price intervention measures and emergency measures adopted by the government according to law. It is a provision on the obligation that business operators in price activities shall perform. If the business operators refuse to implement the government-set or guided prices, legal price intervention measures or emergency measures, in other words, violate the legal obligation and price-related laws, they shall bear the corresponding legal liability. The so-called legal liability refers to the legal consequences that the perpetrator shall bear due to the violation of the law. If the perpetrator makes the act prohibited by law or fails to perform the obligation prescribed by law, he shall bear the legal consequences caused by such illegal act. The investigation of legal liability is mandatory by the state and can only be implemented by the organs authorized by law, and the principle of legality of illegal acts must be adhered to. Because of different natures and harm degrees of the illegal acts, the perpetrators shall bear different legal liabilities, which can be classified into civil liability, criminal liability and administrative liability. The legal liability in the Price Law refers to the legal consequences that the price violator shall bear. It is a kind of mandatory sanction against the price violator and an important part of the Price Law.

Business operator's act of refusing to implement the government-set or guided prices, legal price intervention measures or emergency measures violates the legal provision on the obligation that business operators shall perform. It is a kind of price violation and shall bear the corresponding administrative liability and be given administrative punishment according to law. We know that the government-set or guided prices, legal price intervention measures or emergency measures formulated according to law are important means for the government to carry out effective macro-control and necessary moderate intervention on market prices according to law, and the needs to stabilize the overall level of market price, and they tally with the overall and long-term interests of the society, take into account fairness and efficiency, and are of great significance to ensuring the

sustainable, stable and healthy development of the national economy. If business operators in price activities refuse to implement the government-set or guided prices, legal price intervention measures or emergency measures, it will inevitably endanger the government's price management and disrupt the market price order. For such price violations, the price department responsible for supervision and inspection of price activities according to law must investigate their administrative liability, correct the illegal acts and give administrative punishment in order to maintain the normal market price order and stabilize the overall market price level.

In accordance with the provisions of this article, for such price violations, the business operators shall first be ordered to correct the illegal acts, and then according to the seriousness of the circumstances, have their illegal proceeds confiscated, be fined and even be ordered to stop business operation and make correction. According to the provisions of the Chinese administrative punishment law, the administrative organ implementing administrative punishment shall order the party to correct the illegal act or correct the illegal act within a time limit. It is a provision on the principle that before implementation of administrative punishment, the illegal act must be corrected. The fundamental purpose of implementing administrative punishment is to maintain public interests and social order and correct illegal acts. Therefore, when dealing with administrative punishment cases, no matter what kind of administrative punishment is to be imposed on the violator, the administrative organ shall first ask the violator to correct the illegal act in time, and shall not substitute punishment for correction. In accordance with this principle and the administrative punishment methods set forth in this article, business operators who refuse to implement the government-set or guided prices, legal price intervention measures or emergency measures shall first be ordered to correct, and then have their illegal proceeds confiscated, that is, have the illegal proceeds of the business operators confiscated by force according to law. Generally speaking, the total price difference between the actual transaction price of the business operator and the price stipulated by the government can be identified as illegal proceeds. It is a digital material for confirming the amount of illegal proceeds of the perpetrator from the price violations and the economic losses and other losses caused by the price violations to the state, other business operators and consumers, and is a basis of punishment seriousness and a quantitative limit of punishment. On theses grounds, the business operators can be fined concurrently for an amount less than five times the illegal proceeds. In cases of no illegal proceeds involved, a fine may still be imposed. A fine is an additional financial punishment in addition to the confiscation of illegal proceeds. In general, the fine in the law is in two expression forms: times of illegal proceeds and absolute number. This article adopts two forms depending on whether there are illegal proceeds or not. Such provision is more scientific and reasonable and helps prevent arbitrariness in law enforcement. Finally, for business operators in a serious case, the competent price department shall order them to stop business operation and make correction, which is also the most severe administrative punishment for the perpetrators of price violations. In short, by adopting this series of punishment means, the ultimate purpose is to correct illegal acts and ensure the enforcement of laws, thus maintaining the public interests and the normal order of market prices.

Article 40    Business operators who have violated one of the acts listed in Article 14 of this law shall be ordered to correct, have their illegal proceeds confiscated and be fined concurrently for an amount less than five times the illegal proceeds. In cases of no illegal proceeds involved, a warning shall be issued, together with a fine. For serious cases, they shall be ordered to stop operation for correction or have their business licenses revoked by the administrative authority for industry and commerce. If other laws have stipulations concerning the punishments for acts listed in Article 14 of this law, the related laws shall prevail.

Whether acts listed in 1, 2 of Article 14 and are of national in nature shall be upon the judgment of the State Council price department and whether the acts are regional in nature, they shall be confirmed by price departments of provincial, autonomous regional and municipal people's governments.

[Interpretation]    This article specifies the legal liability of business operators with illicit price acts.

Article 14 of the Price Law defines and prohibit illicit price acts. Therefore, the business operators who violate these provisions shall be investigated for legal liability. The relevant contents of this article will be interpreted below:

1.    Business operators are the subjects of the illegal acts specified in this article, so if it is determined in the very beginning that the business operators have illicit price acts, they shall be investigated for legal liability, so that they become the liability bearers of the illegal acts. The definition of business operators as illegal subjects with illicit price acts shall be based on the provisions on business operators in Article 3 of the Price Law.

2.    One of the acts listed in Article 14 of the Price Law as referred to in this article indicates that violation of any of the eight illicit price acts listed in the Price Law shall be investigated by law and bear the corresponding legal liability. The eight illicit price acts listed in Article 14 of the Price Law are all independent acts, and the wrongdoers can be held accountable independently, without any need to be linked together as a premise or consequence. If a business operator has more than two kinds of illegal acts at the same time, those acts can be investigated for legal liability at the same time, which is different from and not in conflict with the administrative punishment law, which stipulates that it is not allowed to give two or more punishments to the same illegal act of the party. The key is to distinguish between one illegal act and two illegal acts.

3.    Order to correct the illicit price acts. Ordering to correct is mandatory, and the illegal business operators must correct their illegal acts. The way of correction varies with the content and form of the violation. For example, if the business operator fabricates and spreads price rise information for pushing up the prices, it must immediately stop the act of fabricating and spreading price rise information and make correction initiatively to restore the original price.

4.    Have their illegal proceeds confiscated and be fined concurrently for an amount less than five times the illegal proceeds. This provision is made to address the characteristics of business operators' illicit price acts, that is, the purpose of business operator's violations is to seek illicit interests, and all kinds of illicit price acts are always linked with economic interests, so their illegal proceeds must be confiscated and returned to the state, followed by financial punishments, and fines shall be imposed for some business operators.

5.    In cases of no illegal proceeds involved, a warning shall be issued, together with a fine. This means that some business operators have illicit price acts, but they have not achieved the expected profit purpose, that is, they have not obtained illegal proceeds. In this case, the illegal acts of the business operators cannot be negated, and punishments shall still be imposed, one is warning as an administrative punishment, and the other is economic sanction, and a fine can be imposed at the same time of warning. Such fine serves both as a warning to the business operator and as compensation for the harm caused by the illegal act of the business operator to recognize that the illegal act of the business operator though without illegal proceeds will still cause harm and damage the interests of the state and the public.

6.    Order to stop operation for correction or have the business license revoked. These two administrative punishments are for serious cases of illicit price acts, so the business operators shall bear heavier liability. Ordering to stop operation for correction is to cease its right to operate by force and urge it to correct its illegal acts in order to return to the state of lawful operation. It is a punishment that still gives the opportunity to correct because the business operator still has the opportunity to resume business. Revocation of the business license is a more severe punishment, that is, to cancel the business qualification of those business operators who cause serious harm, to drive them out of the market. Since the business license is issued by the administrative authority for industry and commerce, the Price Law stipulates that this punishment is still implemented by the administrative authority for industry and commerce.

7.    Links of relevant laws. It means that in addition to the Price Law, if relevant laws

otherwise specify the punishment of illicit price acts, and the punishment authority, the provisions of the relevant laws can be followed to harmonize the implementation of the provisions of laws and avoid conflicts.

8. Identification of business operator's acts of control of market prices and price dumping. Firstly, it should be noted that control of market prices and price dumping are both relatively extensive price acts, and it is very complex to identify them, so it is determined that the price authority at a higher level is responsible for the identification. For example, to identify the control of market prices, it is necessary to compare normal prices with abnormal prices within a certain market scope and to investigate the acts related to price control; for another example, to identify price dumping, it is necessary to compare the price of the allegedly dumped commodity with its cost of production and operation, which shall also take into account the specific circumstances of average cost and individual cost. In addition, the market impact and harm are also an important part of the investigation. Whether the acts of control of market prices and price dumping are national or regional at or below provincial level shall be judged based on: firstly, the market situation and the scope of role; and secondly, coordination between the State Council and the provincial-level price departments. In the process of adhering to and improving the socialist market economy, the identification and sanction of these two illicit price acts will be increasingly important and require a higher level of law enforcement. It is necessary and timely to make relevant provisions in the Price Law.

Article 41    Whereas business operators have caused overpayment by consumers or other business operators in violation of price law, the part in excess of the due payment shall be returned. If damages are done, the business operators shall undertake to compensate for the losses.

[Interpretation]    This article specifies the civil legal liability that business operators with illegal price acts shall bear.

Civil legal liability is also referred to as civil liability, which is the civil legal consequences that the business operator as a civil subject who has price violations and infringes on the legitimate rights and interests of the legitimate right holders, namely: consumers or other business operator, in price activities, shall bear according to law. It is the concrete application of the prevailing principles of civil law in price relations. Although business operators in violation of price laws have been subjected to administrative punishments according to law, even been given severe punishments according to the law, their civil liability still cannot be exempted because these are two different legal relations. Administrative punishment is a sanction imposed on a business operator who has the act of violating the administrative order and bears the administrative legal liability. The civil liability in the price relation is a kind of economic liability. The price relation is actually a kind of economic relation. The General Principles of the Civil Law of the People's Republic of China specifies in Article 134 that the main methods of bearing civil liability shall be: (1) cessation of infringements; (2) removal of obstacles; (3) elimination of dangers; (4) return of property; (5) restoration of original condition; (6) repair, reworking or replacement; (7) compensation for losses; (8) payment of breach of contract damages; (9) elimination of ill effects and rehabilitation of reputation; and (10) extension of apology. The Price Law specifies the civil liability of business operators in violation of price law in Article 41 according to the nature and characteristics of price violations and the general provisions of the General Principles of the Civil Law.

The two methods specified in the Price Law including: return of the part in excess of the due payment and compensation for the losses are consistent and mutually linked with the provisions of the General Principles of the Civil Law. That business operators have caused overpayment by consumers or other business operators in violation of price law may have multiple forms of manifestation, and exists in various kinds of commodities and different transaction links. For example, in the verification of production and operating costs, the business operators commit falsification and inflate cost to raise the pricing; in the implementation of government-guided prices, the price exceeds the permitted range of fluctuation and is overcharged; the price marking violates relevant provisions, the price is above the marked price and fees not specified are collected; in the process of control of

market prices and price dumping, not only the interests of consumers will be damaged but also other business operators will suffer losses; pushing up prices and cheating consumers or other business operators by deceptive price means will inevitably result in losses of their interests; as an unfair transaction, price discrimination will damage the legitimate interests of some business operators; when raising or lowering the price in a disguised way, the business operators will benefit, but the interests of consumers or other business operators will be damaged correspondingly; the profiteering behavior of business operators is always based on making consumers pay too much, and under certain conditions, will also make some other business operators suffer losses; after the government-guided prices and government-set prices are determined, the refusal of the business operators to implement them in order to obtain illegitimate interests will cause damage to consumers or other business operators; when the market price rises significantly or the general price level fluctuates abnormally, the refusal of the business operators to implement legal price intervention measures or emergency measures in order to seek unlawful interests in the illegal acts may cause harm to consumers and other business operators. These illegal acts may directly or indirectly cause overpayment by consumers and cause other business operators to suffer losses. Of course, consumers may also suffer other losses in addition to overpayment. Here the Price Law has made clear and specific provisions: in case of overpayment, the part in excess of the due payment shall be returned, that is, the difference between the normal price and the abnormal price; of course, there is a premise here, that is, only when the transaction still exists, can the method of returning the part in excess of the due payment be adopted. If the original transaction relationship no longer exists due to the illegal price act of the business operator, the handling method will not be limited to returning the part in excess of the due payment. Where the price violation of the business operator has caused damage to consumers or other business operators, the Price Law determines firstly, undertaking to compensate for the losses, which is a legal principle that shall be followed; secondly, the ways of compensation, which shall comply with laws. Some of the ways of bearing civil liability stipulated in the General Principles of the Civil Law can be applied, and the relevant provisions in other laws shall also be taken as the basis.

Article 42    Whereas business operators violate the provisions about price marking, they shall be ordered to correct, have their proceeds confiscated and be fined concurrently for an amount of less than RMB5,000.

[Interpretation]    This article specifies the legal liability that the business operators in violation of price marking shall bear.

In order to regulate the price behavior of business operators, maintain the normal order of market prices, create a market environment of fair competition, and effectively protect the legitimate rights and interests of consumers, the law stipulates that business operators shall, when selling and purchasing goods and providing services, clearly mark the prices in accordance with the provisions of the government price departments. Practice has proved that price marking is not only conducive to business operators to sell goods, but also conducive to consumers to buy goods; not only conducive to the cooperation of manufacturers and merchants, but also conducive to accepting the supervision of the masses, and also conducive to preventing the use of price for unfair competition. Therefore, Article 13 of this Law expressly stipulates that in marketing and purchasing merchandises or providing services, business operators should clearly tap the related prices, specify names, places of origin, specifications, grades, price units, prices or items, fee collection standards and other related information according to the government's regulations. Business operators must not sell merchandises at prices above the marked prices or collect fees not specified. This provision on business operator's obligation to mark prices is an important legal system for price management in market economy, and also a clear requirement for business operators' price behavior. Business operators have the obligation to strictly implement it in accordance with legal provisions and consciously abide by the law. If business operators violate the legal provisions of price marking, they will go to the opposite of the normal market price order maintained by the law, constituting a price violation, which shall be investigated for legal liability according to law. Since this behavior is mainly caused by violation of

the law, it shall bear the corresponding administrative liability according to law.

In real life, the main problem of the price marking system is serious fiction of clearly marked prices. For the commodities and service items that shall adopt marked prices according to law, a small number of business operators in the process of independent pricing, afraid of the power of the law, do not dare to explicitly counter the law without marking the prices. However, they play with the tricks of clearly marked fictitious prices, other than follow the principles of fairness, legality and honesty or accord with production and operation costs and market supply and demand. They, by all means, ask sky-high prices, mark false prices, coax and cheat consumers who do not know the truth, and overcharge them as far as possible; a small number of business operators resort to deceptive pricing, deliberately make the prices ambiguous or the terms of payment unclear, and make a favorable explanation to the marked prices after consumers bite at a bait, forcing consumers to admit their bad luck. It should be pointed out that the meaning of clearly marked price and that of clearly marked fictitious prices are completely different. The clearly marked prices as required by law should be true other than fictitious prices marked arbitrarily. Therefore, this ill phenomenon is also an obvious price violation. According to the law, on the one hand, consumers should take up legal weapons to resolutely fight against this illegal behavior and safeguard their legitimate rights and interests in accordance with the law, and on the other hand, the government price departments should also strengthen the supervision of false price information in the market and punish this illegal behavior according to the law.

According to the provisions of this article, a business operator in violation of the provisions about price marking shall bear administrative liability. The price department of the government firstly orders it to correct according to law, and then imposes an administrative punishment of confiscating its illegal proceeds, and fining it concurrently for an amount of less than RMB5,000. It should be noted here that in the current Chinese laws and regulations, more than half of the means of administrative punishment have the provisions of ordering to correct, but any kind of illegal behavior should be corrected from the jurisprudence, so in fact, ordering to correct should not be a punishment, but a mandatory measure that must be taken first when implementing administrative punishment. Therefore, the implementation of administrative punishment for violation of price marking also must first order the business operators to correct their illegal acts before economic sanctions. As for what administrative punishments should be applied to what illegal acts, the basic principle is that the administrative punishment should be equivalent to the facts, nature, circumstances and social harm of the illegal acts. This article specifies that whereas business operators violate the provisions about price marking, they shall be ordered to correct, have their proceeds confiscated and be fined concurrently for an amount of less than RMB5,000. It is formulated in accordance with the above principle of equivalence of punishment to fault. The above administrative punishment for such price violations is more practical and feasible, so it is a powerful legal weapon to ensure that the price system can be fully implemented.

Article 43     For business operators who refuse to stop operation for correction as ordered or remove, hide or destroy things recorded for keeping according to law, a fine ranging from over one time to less than three times the value of the things removed, hidden or destroyed shall be imposed.

[Interpretation]     This article specifies the administrative liability that the business operators who refuse to comply with the provisions of the government price departments on stopping business operation and registering and keeping some evidences shall bear.

Article 34 of the Price Law specifies that in exercising monitoring and checking of prices, government price departments shall have the right to check property related to the price law violating acts and, if necessary, order the people concerned to stop related business operation. Such provision helps the government price departments stop price violations in a timely manner and find out illegal facts in time. If the business operators refuse to stop operation for correction as ordered, they have hindered the management behavior of the government price departments and shall be subjected to administrative punishment. Meanwhile, Article 34 of the Price Law also specifies that in exercising monitoring and checking of prices, government price departments may register and keep some evidences that are liable to be destroyed or kept out of hand or is hard to obtain for which people

concerned or related personnel must not in any cases remove, hide or destroy. The government price departments decide to register and keep some evidences for the purpose of preserving the evidences to facilitate the collection of evidence and the handling of price violations. The people concerned or related personnel shall cooperate. If the people concerned or related personnel remove, hide or destroy the registered and kept finance, it is an act of damaging and destroying evidence, which will disrupt the investigation and handling of price violations by government price departments, and is an act in violation of administrative order and should be subjected to administrative punishment. Therefore, this article specifies administrative liability for these two acts in violation of the administration of the government price departments.

Administrative liability is a kind of legal liability, which is a kind of administrative sanction given by a specific administrative organ against the violation of laws, regulations or rules, generally for minor illegal acts or disciplinary violations. Administrative liability includes two categories, namely: administrative punishment and disciplinary sanction. This article specifies administrative punishment. Administrative punishment refers to the punishment given by state administrative organs or organizations authorized by laws and regulations with the function of managing public affairs for the acts violating administrative order according to law, including warning, fine, confiscation of illegal proceeds, confiscation of illegal property, ordering to stop production or business operations, temporary suspension or revocation of permits, temporary suspension or revocation of licenses, administrative detention and other administrative punishments prescribed by laws and administrative regulations. The type of administrative punishment provided for in this article is fine, which is an economic sanction for illegal acts. Generally speaking, the amount of fine is expressed with an absolute number, such as 100,000 yuan, or with the times of the illegal proceeds. The latter method is adopted in this article. The specific provisions are as follows:

1.     For business operators who refuse to stop operation for correction as ordered, a fine ranging from over one time to less than three times the related business income. It should be emphasized that the fine provided for in this article is based on the related business income rather than its entire business income. Article 34 of the Price Law specifies that the government price departments may, if necessary, order the people concerned to stop related business operation, rather than stop all business operation. For example, when a party sells a product without implementing the government-set price, and the government price department orders it to stop related business operation, the government price department can only order the party to stop the business operation of this product. Therefore, the fine is also based on the illegal proceeds in the period when the sale of the product should be stopped, but is not stopped.

2.     For business operators who remove, hide or destroy things recorded for keeping according to law, a fine ranging from over one time to less than three times the value of the things removed, hidden or destroyed shall be imposed.

Article 44     Business operators who refuse to provide materials needed for price monitoring and checking or provide false materials shall be ordered to correct, with a warning. Whereas they refuse to correct within the prescribed time limit, a fine can be imposed.

[Interpretation]     This article specifies the administrative liability that the business operators who refuse to provide materials needed for price monitoring and checking as stipulated by government price departments or provide false materials shall bear.

Administrative liability is a kind of legal liability, which is a kind of administrative sanction given by a specific administrative organ against the violation of laws, regulations or rules, generally for minor illegal acts or disciplinary violations. Administrative liability includes two categories, namely: administrative punishment and disciplinary sanction. This article specifies administrative punishment. Administrative punishment refers to the punishment given by state administrative organs or organizations authorized by laws and regulations with the function of managing public affairs for the acts violating administrative order according to law, including warning, fine, confiscation of illegal proceeds, confiscation of illegal property, ordering to stop production or business operations, temporary suspension or revocation of permits, temporary suspension or revocation of licenses, administrative detention and other administrative punishments prescribed by laws and administrative regulations. The types of administrative punishment provided for in this article are warning and fine,

for the act of refusing to provide materials needed for price monitoring and checking as stipulated by government price departments.

It is a mandatory obligation of business operators to provide true information in accordance with the provisions of the government price departments, because Article 5 of the Price Law specifies that the State Council department in charge of prices shall be responsible for the administration of the work related to prices in the whole country, and the price departments of the people's governments at and above the county level shall be responsible for the work related to prices within the regions under their jurisdiction, and Article 33 of the Price Law specifies that the price departments of the people's governments at and above the county level exercise monitoring and checking over pricing activities according to law and mete out administrative punishments on acts that violate the law. As the subjects of price activities, business operators are of course the objects of monitoring and checking of the government price departments, and accepting the monitoring and checking by government price departments is the obligation that the business operators shall perform. Article 34 of the Price Law specifies that in exercising monitoring and checking of prices, government price departments shall have the right to inquire into people concerned or related personnel and demand for evidences or other materials relating to law-violating acts; and have the right to look into and duplicate account books, bills, vouchers, documents or other materials related to price law violating acts and verify banking materials associated with price law violating acts. Therefore, when accepting the monitoring and checking by government price departments, the business operators shall provide materials according to the provisions of the government price departments. Meanwhile, Article 35 of the Price Law specifies that in accepting the monitoring and checking by government price departments, business operators should provide their account books, bills and vouchers, documents or other materials needed for such monitoring and checking. That is to say, accepting the monitoring and checking by government price departments -- providing materials according to the provisions of the government price departments – truthfully providing these materials, are a few aspects of business operator's acceptance of the monitoring and checking by government price departments, and must be complied with by the business operators. At the same time, on the other hand, the information and relevant materials provided by the business operators are one of the bases for the government price departments to find problems and investigate and punish illegal price acts. If the business operators do not provide such information truthfully, it will not be conducive to the government price departments to carry out their work and also not conducive to the monitoring and checking of the business operators by the government price departments, and it is an act that impedes administrative management. Therefore, this article specifies administrative liability. This article specifies the following specific illegal acts: (1) refusing to provide materials needed for price monitoring and checking, for example, refusing to provide some of the materials specified by government price departments, or refusing to provide materials according to the time specified by government price departments. (2) providing false materials, i.e., providing materials according to the provisions, but the materials are untrue and have been falsified to evade the monitoring and punishment of the government price departments. The administrative punishment specified in this article is that business operators who refuse to provide materials needed for price monitoring and checking or provide false materials shall be ordered to correct, with a warning. In other words, business operators who refuse to provide materials are ordered to provide the materials within a certain period of time; business operators who provide false materials are ordered to provide true materials within a certain period of time. Whereas they refuse to provide materials or refuse to provide true materials within the prescribed time limit, a fine can be imposed by government price departments. Here it does not specify the specific extent of fine and specifies "a fine can be imposed". The Chinese administrative punishment law specifies that where the law has stipulated administrative punishments for offences against law, but specific stipulations are necessary in administrative regulations, stipulations on the behavior that should receive administrative punishments and the types and extent of punishments must be formulated within the limits provided by law. Rules and regulations formulated by ministries and commissions under the State Council may, within the limits provided by law and administrative regulations, make specific stipulations on the behavior that should receive administrative punishments and on types and extent of the punishments. Therefore, the administrative regulations or department rules can specify the time of fining the illegal act of refusing to provide materials needed for price monitoring and checking within the time limit or providing false materials, and the amount

of the fine according to the above provisions of the administrative punishment law. This article does not specify the subject of liability, while Article 34 of the Price Law specifies that in exercising monitoring and checking of prices, government price departments require the people concerned or related personnel, i.e., business operators or personnel related to them, to provide materials.

Article 45      Whereas local people's governments at all levels or related government departments at all levels fix or adjust prices beyond their terms of reference or refuse to implement price intervention measures or emergency measures, they shall be ordered to correct and may be criticized by issuing circulars. People in charge or related people directly responsible shall be given administrative punishments according to law.

[Interpretation] This article specifies the liability that local people's governments at all levels or related government departments at all levels in violation of law in price work shall bear.

1.      Whereas local people's governments at all levels or related government departments at all levels fix or adjust prices beyond their terms of reference, a punishment shall be given according to law. The government and its departments shall exercise their functions and powers in accordance with the law, and exercising powers beyond the scope of legal powers is an illegal act and shall be punished accordingly. Article 19 of this Law specifies that scope of specific items and uses for government-set or guided prices shall depend on the price catalogs issued by the central and local governments. At the same time, the relevant articles of this Law also stipulate the division of price setting authority from the following six aspects: firstly, catalogs of central government-set prices shall be fixed by the price department of the State Council, catalogs of local government-set prices shall be fixed by the price department of provincial people's government within its power according to scope of specific items and uses as set in the central price catalog; secondly, local people's governments below the provincial level shall not make their own price catalogs; thirdly, State Council price department and other related departments shall fix government-set and guided prices according to scope of items and uses as set in the central prices; fourthly, price departments and other related departments of the provincial people's governments shall fix indicative local government-set and guided prices within their respective power according to scope of items and uses as set in the local price catalogs; fifthly, people's governments of cities and counties may fix government-set and guided prices for their localities within their own power authorized by provincial people's governments according to scope of items and uses as prescribed in the local price catalogs; sixthly, the government-set and guided prices shall be adjusted according to scope of items. The act that local people's governments at all levels or related government departments at all levels violate the above provisions is an act of fixing or adjusting prices beyond the scope of specific items and uses as stipulated in this Law, and shall be punished.

2.      Whereas local people's governments at all levels or related government departments at all levels refuse to implement price intervention measures or emergency measures, a punishment shall be given according to law. In the course of administrative management, the government has the obligation to perform its duties according to law, and if it violates its statutory obligations, it shall bear the corresponding legal liability. According to the provisions in Article 30 and Article 31 of this Law, whereas prices of major merchandises or services rise sharply or are likely to rise sharply, the State Council and the people's governments of provinces, autonomous regions and municipalities may set limit at disparity of prices or rate of profitability for part of the merchandises, fix price ceilings or introduce other measures for intervention such as a system for announcing or recording price rises; When such abnormalities as violent fluctuation in the general price level occur nationwide, the State Council shall introduce power for the concentrated fixation of prices in the whole country or part of the regions for the time being or adopt such emergency measures as freezing part or all prices. Therefore, price intervention measures and emergency measures are mandatory price control measures taken under specific circumstances, and have effect on any organization and individual in the period and regional scope of the implementation of statutory price intervention measures and emergency measures. Related local people's governments and related government departments at all levels shall strictly implement the statutory price intervention measures and emergency measures. Failure to implement statutory intervention measures or emergency measures is a violation of statutory duties and shall be punished.

3.      Those with the illegal acts specified in this article shall be ordered to correct and may be criticized by issuing circulars. People in charge or related people directly responsible shall be given

administrative punishments according to law. Where a local government commits an illegal act as specified in this article, the administrative punishment against it shall be made by the government at a higher level. If related departments of the people's government at all levels commit illegal acts specified in this Law, punishments can be made by the government at the same level or the department at a higher level

Article 46    Whereas government personnel in charge of prices have leaked State secrets, commercial secrets or abused their power, resort to deception for personal gains, commit dereliction of duty or accept bribes and the cases are serious enough as to constitute crimes, criminal responsibilities shall be affixed. If a case is not serious enough to constitute a crime, an administrative punishment shall be meted out.

[Interpretation]    This article specifies the criminal liability and administrative liability that personnel in charge of prices who have leaked State secrets, commercial secrets or abused their power, resort to deception for personal gains, commit dereliction of duty or accept bribes shall bear.

1.    Criminal liability. Criminal liability refers to the legal consequences that the perpetrator must bear when he commits the act prohibited by the criminal law, that is, the criminal act. The illegal acts of personnel in charge of prices provided for in this article mainly involve the following contents specified in the criminal law:

(1)    Article 398 of the Criminal Law specifies that any functionary of a State organ who, in violation of the provisions of the Law on Guarding State Secrets, intentionally or negligently divulges State secrets, if the circumstances are serious, shall be sentenced to fixed-term imprisonment of not more than three years or criminal detention; if the circumstances are especially serious, he shall be sentenced to fixed-term imprisonment of not less than three years but not more than seven years. Any person who is not a functionary of a State organ commits the crime mentioned in the preceding paragraph shall, in the light of the circumstances, be punished in accordance with the provisions of the preceding paragraph. State secrets herein refer to matters that concern the security and interests of the state, are determined in accordance with legal procedures, and are known only to a certain number of persons within a certain period of time. According to the Law of the People's Republic of China on Guarding State Secrets, state secrets shall include secrets concerning major policy decisions on state affairs; secrets in the building of national defense and in the activities of the armed forces; secrets in diplomatic activities and in activities related to foreign countries as well as secrets to be maintained as commitments to foreign countries; secrets in national economic and social development; secrets concerning science and technology; secrets concerning activities for safeguarding state security and the investigation of criminal offences; and other matters that are classified as state secrets by the state secret-guarding department. Secrets of political parties that conform to the above provisions shall be state secrets. State secrets shall fall into three categories: most confidential, classified and confidential. The Criminal Law stipulates that the people liable for the crime of divulging state secrets are state functionaries, and also stipulates that non-state functionaries who commit this crime shall be punished as appropriate according to the criminal penalties imposed on state functionaries. "Punished as appropriate" means to be punished as appropriate according to specific circumstances within the range of punishment for state functionaries. The personnel in charge of prices in this article include both state functionaries engaged in price work and non-state functionaries engaged in price work. Therefore, the provisions in this article of the criminal law are applicable. The crime of divulging state secrets includes two circumstances: intentional and negligent. Negligent divulgence of state secrets means that a state functionary who should foresee that his act may cause divulgence of state secrets and result in a consequence that endangers state security and interests, but he fails to do so due to negligence, or although he has foreseen it, he readily believes that it can be avoided, causing loss or spread of the state secrets. Intentional divulgence of state secrets means that a state functionary is fully aware that his act will cause divulgence of state secrets, but he hopes or allows such a result to occur, resulting in a consequence that endangers state security and interests. The crime of divulging state secrets is objectively manifested as that the state functionaries violate the provisions of the Law on Guarding State Secrets by informing the secrets they are in charge of or know to those who should not know the secrets and the circumstance is serious. The divulgence is in various forms, and can be verbal or written. "The circumstance is serious" mainly means that the act of divulging state secrets causes or is enough to cause harmful consequences, and the method or means of divulgence is bad.

(2)    Article 219 of the Criminal Law specifies that  whoever commits any of the following acts of infringing on business secrets and thus causes heavy losses to the obligee shall be sentenced to fixed-term imprisonment of not more than three years or criminal detention and shall also, or shall

only, be fined; if the consequences are especially serious, he shall be sentenced to fixed-term imprisonment of not less than three years but not more than seven years and shall also be fined: 1. obtaining an obligee's business secrets by stealing, luring, coercion or any other illegitimate means; 2. disclosing, using or allowing another to use the business secrets obtained from the obligee by the means mentioned in the preceding paragraph; or 3. in violation of the agreement on or against the obligee's demand for keeping business secrets, disclosing, using or allowing another person to use the business secrets he has. Whoever obtains, uses or discloses another's business secrets, which he clearly knows or ought to know falls under the categories of the acts listed in the preceding paragraph, shall be deemed an offender who infringes on business secrets. The crime of infringing on business secrets is objectively manifested as that in addition to the above acts, heavy losses must be caused to the obligee. "Business secrets" refers to technology information or business information which is unknown to the public, can bring about economic benefits to the obligee, is of practical use and with regard to which the obligee has adopted secret-keeping measures. Specifically speaking, business secrets shall meet the following conditions: they must be technical information and business information not known to the public, and be confidential; the obligee has taken confidential measures for the technical information and business information to prevent outsiders from easily obtaining the information. If the obligee has not taken confidential measures, the information shall not be considered as business secrets; the information has economic values and can bring about economic benefits to the obligee, is of practical use.

(3)   Clause 1, Article 397 of the Criminal Law specifies that any functionary of a State organ who abuses his power or neglects his duty, thus causing heavy losses to public money or property or the interests of the State and the people, shall be sentenced to fixed-term imprisonment of not more than three years or criminal detention; if the circumstances are especially serious, he shall be sentenced to fixed-term imprisonment of not less than three years but not more than seven years, except as otherwise specifically provided in this Law. Clause 2, Article 397 of the Criminal Law specifies that   any functionary of a State organ who engages in malpractice for personal gain and commits the crime mentioned in the preceding paragraph shall be sentenced to fixed-term imprisonment of not more than five years or criminal detention; if the circumstances are especially serious, he shall be sentenced to fixed-term imprisonment of not less than five years but not more than 10 years, except as otherwise specifically provided in this Law. The crime of abuse of power is objectively manifested as the act of exercising power in violation or excess of the authority and procedure prescribed by law, resulting in heavy losses of public property and state and people's interests. The perpetrator must have power and the abuse of power has a direct causal relationship with the harmful result. If the perpetrator does not have this power, or even if he has the power, the exercise of the power does not have a direct causal relationship with the harmful result, it does not constitute this crime and shall be dealt with in accordance with other provisions. The crime of dereliction of duty is objectively manifested as the act of not performing the duties prescribed by law or not performing the duties seriously and correctly, resulting in heavy losses to public property and state and people's interests. Not performing duties means that any functionary of a State organ does not perform the obligation for the duties that he should and can perform, such as leaving his post without permission. Not performing the duties seriously and correctly means that any functionary of a State organ violates the requirements of his duties in the performance of his duties, works hastily and carelessly and is extremely irresponsible. Any functionary of a State organ engages in malpractice for personal gain and commits the crime mentioned in the preceding paragraph. It means that the functionary commits the crime mentioned in the preceding paragraph in order to seek personal gains or personal relationship with relatives and friends. The functionaries of State organs bear the responsibility of managing state affairs and must enforce the law impartially. Engagement in malpractice for personal gain is based on personal interests and disregards national interests, so the subjective culpability of the mind is more serious than that of the act provided for in the preceding paragraph. Therefore, the Criminal Law provides a heavier penalty for those who commit the crime of engaging in malpractice for personal gain than that for those committing the crime in the preceding paragraph. As stipulated in Article 397 of the Criminal Law, the subjects of liability for the crime of abusing his power or neglecting his duty are functionaries of State organs. Therefore, only the personnel in charge of prices who are in State organs meet the conditions for subjects of liability stipulated in Article 397 of the Criminal Law. If the personnel in charge of prices who are not in State organs have the above acts, constituting a crime, they shall bear liability in accordance with the relevant provisions of the Criminal Law.

(4)    Article 385 of the Criminal Law specifies that any State functionary who, by taking advantage of his position, extorts money or property from another person, or illegally accepts another person's money or property in return for securing benefits for the person shall be guilty of acceptance of bribes. Any State functionary who, in economic activities, violates State regulations by accepting rebates or service charges of various descriptions and taking them into his own possession shall be regarded as guilty of acceptance of bribes and punished for it. Article 388 of the Criminal Law specifies that any State functionary who, by taking advantage of his own functions and powers or position, secures illegitimate benefits for an entrusting person through another State functionary's performance of his duties and extorts from the entrusting person or accepts the entrusting person's money or property shall be regarded as guilty of acceptance of bribes and punished for it. Article 386 of the Criminal Law specifies that whoever has committed the crime of acceptance of bribes shall, on the basis of the amount of money or property accepted and the seriousness of the circumstances, be punished in accordance with the provisions of Article 383 of this Law. Whoever extorts bribes from another person shall be given a heavier punishment. The crime of acceptance of bribes is objectively manifested as by taking advantage of his position, extorting money or property from another person, or illegally accepting another person's money or property in return for securing benefits for the person. It mainly includes two aspects. One aspect is to by taking advantage of his position, illegally accept another person's money or property in return for securing benefits for the person. "Taking advantage of his position" means taking advantage of the power within his position, i.e., the convenience brought about by his power of being in charge of, responsible for or undertaking certain public affairs. "Illegally accept another person's money or property" refers to the act that the state functionaries illegally accept the money or property initiatively given by the perpetrator. "Secure benefits for the person" means that state functionaries take advantage of their power to work for the briber. Whether the interests sought for others are justified and whether the interests sought for others are realized shall not affect the establishment of the crime of acceptance of bribes. The other aspect is to by taking advantage of his position, extort money or property from another person. "Extort money or property from another person" means that state functionaries initiatively extort money or property from another person in their job activities. Extorting bribes is a serious act of accepting bribes, which has greater subjective culpability of the mind and social harm than ordinary acceptance of bribes does, so the Criminal Law does not define "secure benefits for the person" as a precondition for extorting money or property from another person, which can constitute a crime of acceptance of bribes no matter whether benefits have been secured for the person. The Criminal Law specifies that the subjects of liability for the crime of acceptance of bribes are state functionaries, and meanwhile the Criminal Law specifies that "State functionaries" as mentioned in this Law refers to persons who perform public service in State organs. Persons who perform public service in State-owned companies or, enterprises, institutions or people's organizations, persons who are assigned by State organs, State-owned companies, enterprises or institutions to companies, enterprises or institutions that are not owned by the State or people's organizations to perform public service and the other persons who perform public service according to law shall all be regarded as State functionaries. Therefore, as long as the personnel in charge of prices specified in this article conform to the provisions on state functionaries in the Criminal Law, they all may become the subjects of liability for the crime of acceptance of bribes as prescribed in the Criminal Law. If the personnel in charge of prices who are not in state-owned companies or enterprises, i.e., the personnel in charge of prices who are not state functionaries, extort or accept bribes, they shall be punished according to the provisions in Article 163 of the Criminal Law. Article 163 of the Criminal Law specifies: Where an employee of a company or enterprise who, taking advantage of his position, demands money or property from another person or illegally accepts another person's money or property in return for the benefits he seeks for such person, if the amount involved is relatively large, he shall be sentenced to fixed-term imprisonment of not more than five years or criminal detention; if the amount is huge, he shall be sentenced to fixed-term imprisonment of not less than five years and may also be sentenced to confiscation of property. Any employee of a company or enterprise who, violating State regulations in economic activities, accepts rebates or service charges of various descriptions and takes them into his own possession shall be punished in accordance with the provisions in the preceding paragraph.

If the personnel in charge of prices have the acts of divulging state secrets and business secrets, abusing their power, engaging in malpractice for personal gains, neglecting their duties or extorting or accepting bribes in the process of price management, and meet the above criminal conditions, they shall bear the criminal liability according to law.

2.    Administrative liability. If the acts of the personnel in charge of prices to divulge state

secrets and business secrets, abuse their powers, engage in malpractice for personal gains, neglect their duties or extort or accept bribes do not constitute a crime, or the circumstance is obviously minor and the harm is not heavy and no crime is recognized, a punishment shall be meted out. Punishments include the punishments imposed by state organs on their personnel in charge of prices, and the punishments imposed by companies, enterprises and public institutions on their personnel in charge of prices. The specific forms of punishment include warning, demerit, serious demerit, relegation, demotion, removal from his post, probation and dismissal.

Source:

Editor in Charge:

## Related papers

| Prince this page | Close the window | Back to top |

Copyright © 2007 www.npc.gov.cn All Rights Reserved      (To browse the homepage of this website, it is recommended to set the resolution of the computer screen to 1024*768)

All Rights Reserved: NPC Information Center      Sitemap | Contact Us | Submission Mailbox      Jing ICP Bei 06005931

首页 | 吴邦国委员长 | 代表大会会议 | 常委会会议 | 专题集锦 | 直播 | 访谈 | 图片 | 代表名单 | 文献资料 | 法律法规 | English



法律问答与释义

当前位置： 法律释义与问答 > 经济法类 > 中华人民共和国价格法释义

# 第二部分 释义 第六章 法律责任

中国人大网 www.npc.gov.cn    日期： 2000-11-25    浏览字号： 小 中 大

[打印本页] [关闭窗口]

　　第三十九条　　经营者不执行政府指导价、政府定价以及法定的价格干预措施、紧急措施的，责令改正，没收违法所得，可以并处违法所得五倍以下的罚款；没有违法所得的，可以处以罚款；情节严重的，责令停业整顿。

　　【释义】　　本条是对经营者不执行政府指导价、政府定价以及法定的价格干预措施、紧急措施应承担法律责任的规定。

　　根据本法第十二条的规定，经营者进行价格活动，应当遵守法律、法规，执行依法制定的政府指导价、政府定价和法定的价格干预措施、紧急措施，这是对经营者进行价格活动应当履行义务的规定。如果经营者不执行政府指导价、政府定价以及法定的价格干预措施、紧急措施，也就是违反了法律规定的义务，构成了价格违法行为，依法应承担相应的法律责任。所谓法律责任，是指行为人由于违反了法律规定而应承担的法律后果，行为人作出法律所禁止的行为或者不履行法律规定的义务，就要承担这种违法行为所引起的法律后果。追究法律责任，具有国家强制性，只能由法律授权的机关实施，同时必须贯彻违法行为法定原则。由于违法行为的性质和危害程度不同，所以行为人要承担的法律责任也是不同的，法律责任具体可分为民事责任、刑事责任和行政责任三种。价格法中的法律责任，是指价格违法行为人应当承担的法律后果，是针对价格违法行为人的一种强制性制裁，是价格法的重要组成部分。

　　经营者不执行政府指导价、政府定价以及法定的价格干预措施、紧急措施的行为，违反了法律对经营者应履行义务的规定，是一种价格违法行为，要承担相应的行政责任，依法给予行政处罚。我们知道，依法制定的政府指导价、政府定价和法定的价格干预措施、紧急措施是政府依法对市场价格进行有效的宏观调控和必要的适度干预的重要手段，是稳定市

场价格总水平的需要，它符合社会的整体利益、长远利益，兼顾了公平与效率，对保证国民经济持续、稳定、健康发展具有十分重要意义。如果经营者进行价格活动，不执行政府指导价、政府定价以及法定的价格干预措施、紧急措施，必然危害政府的价格管理，扰乱市场的价格秩序，对于这种价格违法行为，依法负有对价格活动进行监督检查职责的价格主管部门必须追究其行政责任，纠正违法行为，给予行政处罚，以维护正常的市场价格秩序，稳定市场价格总水平。

按照本条的规定，对这种价格违法行为首先应当责令经营者改正违法行为，然后可根据情节轻重实施没收违法所得、罚款直至责令停业整顿的行政处罚。根据我国行政处罚法的规定，行政机关实施行政处罚，应当责令当事人改正或者限期改正违法行为，这是关于实施行政处罚必须首先纠正违法行为原则的规定。实施行政处罚的根本目的是为了维护公共利益和社会秩序，纠正违法行为，因此行政机关在处理行政处罚案件时，无论准备对违法行为人处以何种行政处罚，都应首先要求违法行为人及时纠正违法行为，不能以罚代改。依据这一原则及本条所设定的行政处罚方式，对不执行政府指导价、政府定价以及法定的价格干预措施紧急措施的经营者，首先是责令其改正价格违法行为，然后是没收违法所得，也就是依法强制收缴经营者的非法收入，一般来讲经营者的实际成交价格与政府规定价格的全部价差金额可认定为是违法所得，确认价格违法行为的实施者从中获取多少非法收入，价格违法行为给国家、其他经营者、消费者造成的经济损失及其他损失的数字材料，是决定如何处罚的情节依据和处罚多少的数量界限，据此可以对经营者并处违法所得五倍以下的罚款，对没有违法所得的，也可以处以罚款，罚款是在没收全部违法所得之外追加的经济处罚，通常法律规定中的罚款采用违法所得的倍数、绝对数两种表述形式，本条就是考虑不同情况以有无违法所得作为标准分别采用两种形式的，这样规定更为科学合理也有利于防止执法中的随意性。最后对于情节严重的经营者，价格主管部门应当责令其停止营业进行整顿，这也是对这种价格违法行为人最重的一种行政处罚了。总之，通过采取这一系列的处罚手段，其最终目的是纠正违法行为、保证法律的执行，从而维护社会公共利益和市场价格正常秩序。

第四十条  经营者有本法第十四条所列行为之一的，责令改正，没收违法所得，可以并处违法所得五倍以下的罚款；没有违法所得的，予以警告，可以并处罚款；情节严重的，责令停业整顿，或者由工商行政管理机关吊销营业执照。有关法律对本法第十四条所列行为的处罚及处罚机关另有规定的，可以依照有关法律的规定执行。

有本法第十四条第（一）项、第（二）项所列行为，属于是全国性的，由国务院价格主管部门认定；属于是省及省以下区域性的，由省、自治区、直辖市人民政府价格主管部门认定。

【释义】  本条是对经营者不正当价格行为的法律责任作出规定。

价格法第十四条对不正当价格行为作出了界定，并同时作出了禁止性的规定，因此对违反这些规定的经营者追究法律责任，下面就本条有关内容进行解释：

一、经营者是本条所规定的违法行为的主体，所以在一开始就确定经营者有不正当价格行为的，就应当追究其法律责任，使该经营者成为违法行为的责任承担者。对于作出不正当价格行为的违法主体经营者的界定，应当依据价格法第三条中对经营者的规定。

二、这一条中所指的价格法第十四条所列行务之一的，就是表明在价格法所列八种不正当价格行为中，只要违反了其中任何一项规定的，都应当受到法律的追究，承担相应的法律责任。价格法第十四条所列八种不正当价格行为，都是各自独立的行为，可以独立地追究违法者的责任，不需要将某一项作为某一项前提或后果联系在一起。如果某一个经营者同时有两种以上的违法行为，那就可以同时追究其法律责任，这和行政处罚法中所规定的，对当事人的同一个违法行为不得给予两项以上处罚，属于是不同的概念，并不冲突，关键在于分清是一个违法行为还是两个违法行为。

三、责令改正不正当价格行为。责令改正是带有强制性的，违法的经营者必须改正自己的违法行为。违法的内容和形式不同，改正的方式也有区别，比如，捏造、散布涨价信息，哄抬价格的，必须立即停止捏造、散布涨价信息的行为，并主动纠正，恢复原有价格。

四、没收违法所得，可以并处违法所得五倍以下的罚款。这是针对经营者的不正当价格行为所具有的特点而作的规定，就是经营者违法的目的在于牟取不正当利益，种种不正当的价格行为总是与经济利益联系在一起，因此，必须没收其违法所得，将不正当的获利收归国家所有，同时给予经济上惩罚，对一些经营者并处罚款。

五、没有违法所得的，予以警告，可以并处罚款。这是指有一些经营者有不正当的价格行为，但是没有实现预期的谋利目的，也就是还没有获取违法所得。对于这种情况，并不能否定经营者的违法行为，而是仍然应当给予处罚，一是给予警告的行政处罚，二是从经济上进行制裁，可以在予以警告的同时，并处罚款，这种罚款既是对经营者的一种警戒，也是对经营者违法行为造成的危害的一种补偿，在作出这种处罚时，还应当承认，经营者有违法行为而无违法所得的情况下，仍然会产生危害，损害国家的和社会公众的利益。

六、关于责令停业整顿和吊销营业执照。这两种行政处罚都是针对情节严重的不正当价格行为的，经营者应当承担更重的责任。责令停业整顿，是强制地停止其经营权利，督促其改正违法行为，以恢复到合法经营的状态，这是一种仍然给予改正机会的处罚，因为它仍然有恢复营业的机会。吊销营业执照，这是一种更为严厉的处罚，就是对那些造成严重危害的经营者，取消其经营资格，逐出市场。由于营业执照是工商行政管理机关颁发的，因而价格法规定此项处罚仍由工商行政管理机关实施。

七、关于相关法律的衔接。这就是指对于不正当价格行为，除了价格法对其作出规

定外有关法律如果对这种行为的处罚及处罚机关另有规定的，可以依照有关法律的规定执行。这样使法律的规定在执行中协调起来，避免了冲突。

　　八、关于对经营者操纵市场价格和低价倾销行为的认定。这首先要考虑操纵市场价格和低价倾销都是涉及面比较广的价格行为，而且在认定中有相当的复杂性，因此确定由层次较高的价格主管部门负责认定。比如，对操纵市场价格的认定，就要在一定的市场范围内，进行正常价格与非正常价格的比较，同时要调查与控制价格的有关行为；又比如，对低价倾销行为的认定，就要进行被指控倾销的商品价格与其生产经营成本的比较，至于这个成本还要考虑平均成本与个别成本的具体情况，此外，对于造成的市场影响和危害也是调查的重要内容。对于什么是属于是全国性的，什么是省及省以下区域性的操纵市场价格和低价倾销的行为，一是根据市场上出现的情况，考虑其作用的范围；二是具体的由国务院和省一级价格主管部门之间的协调。在坚持与完善社会主义市场经济过程中，对这两项不正当价格行为的认定与制裁，将会显得日益重要并要求有更高的执法水平，在价格法中作出有关规定是必要的、及时的。

　　第四十一条　　经营者因价格违法行为致使消费者或者其他经营者多付价款的，应当退还多付部分；造成损害的，应当依法承担赔偿责任。

　　【释义】　　本条是对经营者因价格违法行为而承担民事法律责任的规定。

　　民事法律责任又简称为民事责任，这是由于作为民事主体的经营者，在价格活动中具有价格违法行为，侵害了合法权利人即消费者或者其他经营者的合法权益，而应当依照有关法律承担的民事法律后果。这是通行的民事法律的原则在价格关系中的具体运用，经营者有了价格违法行为，依法受到了行政处罚，甚至被依法给予了严厉的处罚，也不能免除他应承担的民事责任，因为这是两种不同的法律关系。行政处罚是由于经营者具有违反行政管理秩序的行为，承担行政法律责任而受到的制裁。而在价格关系中的民事责任，则是一种经济方面的责任，价格关系实际上是一种经济关系，调整这种关系，承担民事责任的方式，在民法通则第一百三十四条中规定主要有：（一）停止侵害；（二）排除妨碍；（三）消除危险；（四）返还财产；（五）恢复原状；（六）修理、重作、更换；（七）赔偿损失；（八）支付违约金；（九）消除影响、恢复名誉；（十）赔礼道歉。价格法根据价格违法行为性质和特点与民法通则中所作的一般规定，从而对经营者在价格违法行为中的民事责任作出了第四十一条的规定。

　　价格法中所作的退还多付价款和承担赔偿责任两种方式，与民法通则的规定是一致的、相互衔接的。经营者在价格违法行为中，使消费者或者其他经营者多付价款或受到损害的，可以有多种表现形式，存在于不同种类的商品和不同的交易环节之中，比如，在核定生产经营成本方面，经营者弄虚作假，虚列成本，抬高定价；在执行政府指导价时，超出允许

的浮动的幅度，多收价款；在明码标价时违反有关规定，在标价之外又实行加价，在标明的费用之外又加收费用；在操纵市场价格和低价倾销过程中，既会使消费者利益受损，也会使其他经营者蒙受损失；哄抬价格和以欺诈的价格手段诱骗消费者或者其他经营者，势将造成他们的利益损失；价格歧视作为不公平的交易，就会使一部分经营者的合法利益受损；变相提高或者压低价格的过程中，使经营者自身得益，就会相应地损害了消费者或其他经营者的利益；经营者的暴利行为，总是建立在使消费者过多地支付价款基础上的，在一定的条件下，也会使一些其他的经营者受损；政府指导价、政府定价制定后，经营者为了获取不正当利益而不执行，也就造成了对消费者或者其他经营者的损害；当市场价格显著上涨或者价格总水平出现异常波动时，经营者不执行法定的价格干预措施和紧急措施，以求在违法行为中谋求非法利益，这样对消费者和其他经营者也有可能造成损害等。这些违法行为，都可能直接或者间接地使消费者多支付价款，使其他经营者遭受损失，当然，消费者在除了多付价款之外，也会受到其他的损失。在这里价格法作出了明确具体的规定，属于是多付价款的，应当退还多付的部分，也就是正常价格与非正常价格之间的差额；当然这里有一个前提，就是该交易仍然存在的情况下，才能采取退还多付部分的做法，如果由于经营者的违法价格行为，原先的交易关系不复存在，则不限于是退还多付价款的处置方法。在经营者的违法价格行为中给消费者或者其他经营者造成损害的，价格法所确定的一是要承担赔偿责任，这是应当遵循的法律原则；二是如何赔偿，则依法进行，民法通则中所规定的一些承担民事责任的方式可以运用，其他法律中有关的规定也应当作为依据。

第四十二条　　经营者违反明码标价规定的，责令改正，没收违法所得，可以并处五千元以下的罚款。

【释义】　　本条是对经营者违反明码标价规定应承担法律责任的规定。

为了规范经营者的价格行为，维护市场价格的正常秩序，创造公平竞争的市场环境，切实保护消费者的合法权益，法律规定经营者在销售、收购商品和提供服务时，应当按照政府价格主管部门的规定实行明码标价。实践证明，明码标价既有利于经营者出售商品，也有利于消费者购买商品；既有利于厂家商家的协作，也有利于接受群众的监督，还有利于防止利用价格进行不正当竞争。因此，本法第十三条明确规定，经营者销售、收购商品和提供服务，应当按照政府价格主管部门的规定明码标价，注明商品的品名、产地、规格、等级、计价单位、价格或者服务的项目、收费标准等有关情况。经营者不得在标价之外加价出售商品，不得收取任何未予标明的费用。这项对经营者明码标价义务的规定是市场经济价格管理的一项重要法律制度，也是对经营者价格行为的一项明确要求，经营者有义务依照法律规定严格执行，自觉守法。如果经营者违反了明码标价的法律规定，就走向了法律所维护的市场价格正常秩序的反面，构成了一种价格违法行为，依法应追究其法律责任，由于这种行

为主要是因违反法律而引起，所以依法要承担相应的行政责任。

现实生活中，实行明码标价制度的主要问题是明码虚价现象比较严重，按照法律规定应当实行明码标价的商品和服务项目，少数经营者在自主定价过程中，慑于法律的威力，不敢不标价来明晃晃的对抗法律。但却大玩明码虚价的花招，不是遵循公平、合法和诚实信用的原则，也不是依据生产经营成本和市场供求状况，而是不择手段漫天要价、虚假标价，对不明真相的消费者连哄带骗、能宰则宰；还有少数经营者则采取欺骗性标价的手法，故意使标价含混或付款条件不明，等消费者上当后再对其所标价格作出有利于自己的解释，迫使消费者自认倒霉，有苦难言。应当指出，明码虚价与明码标价的含义是完全不同的，法律要求明码标价所标的价格应是真实的，绝不是随便标一个虚价就可以对付的，因此这种不良现象同时也是一种明显的价格违法行为，依据法律规定一方面消费者要勇于拿起法律武器与这种违法行为作坚决的斗争，依法维护自身的合法权益，另一方面政府的价格主管部门也要加强对市场虚假价格信息的监管，依法对这种违法行为给予惩处。

按照本条的规定，经营者违反明码标价规定要承担的行政责任，首先是由政府的价格主管部门依法责令改正，然后给予没收违法所得、可以并处五千元以下罚款的行政处罚。这里需要说明，在我国现行的法律、法规中，一半以上行政处罚的手段上都有责令改正的规定，然而对任何一种违法行为从法理上讲都应当予以纠正，因此实际上责令改正不应当是一种处罚，但却又是在实施行政处罚时必须首先要采取的强制措施，所以对违反明码标价违法行为实施行政处罚，同样首先要责令经营者改正违法行为，再做经济制裁。至于什么样的违法行为应当适用什么种类的行政处罚，其基本原则是给什么行政处罚，要与违法行为的事实、性质、情节以及社会危害程度相当，本条规定经营者违反明码标价规定的，没收违法所得，可以并处五千元以下罚款的处罚，正是遵循了上述过罚相当的原则制定出来的，应当讲对这种价格违法行为给予上述行政处罚是比较切实可行的，因此它是确保明码标价制度能够得到全面贯彻实施的有力法律武器。

第四十三条　经营者被责令暂停相关营业而不停止的，或者转移、隐匿、销毁依法登记保存的财物，处相关营业所得或者转移、隐匿、销毁的财物价值一倍以上三倍以下的罚款。

【释义】　本条是对经营者不遵守政府价格主管部门关于暂停相关营业和登记保存规定的行政责任的规定。

价格法第三十四条规定，政府价格主管部门在进行监督检查时，有权检查与价格违法行为有关的财物，必要时可以责令当事人暂停相关营业。这样规定，便于政府价格主管部门及时制止价格违法行为，及时查清违法事实。如果经营者被责令暂停相关营业而不停止，则妨碍了政府价格主管部门的管理行为，应当受到行政处罚。同时，价格法第三十四条还规

定，政府价格主管部门在进行监督检查时，在证据可能灭失或者以后难以取得的情况下，可以依法先行登记保存，当事人或者有关人员不得转移、隐匿或者销毁。政府价格主管部门作出先行登记保存的决定，是为了保全证据，以利于取证和对价格违法行为的处理，当事人或者有关人员应当予以配合。如果当事人或者有关人员将登记保存的财务转移、隐匿或者销毁，是一种破坏证据、毁坏证据的行为，会扰乱政府价格主管部门的调查及处理价格违法行为，是一种违反行政管理秩序的行为，应当受到行政处罚。因此，本条对这两种违反政府价格主管部门管理的行为规定了行政责任。

行政责任是法律责任的一种，是由特定的行政机关对违反法律、法规或者规章的行为所给予的一种行政制裁，一般是对轻微的违法行为或者违纪行为实施的。行政责任包括行政处罚和行政处分两大类，具体到本条，是对行政处罚的规定。行政处罚是国家行政机关或者法律、法规授权的具有管理公共事务职能的组织依法对违反行政管理秩序的行为给予的惩处，包括警告、罚款、没收违法所得、没收非法财物、责令停产停业、暂扣或者吊销许可证、暂扣或者吊销执照、行政拘留及法律、行政法规规定的其他行政处罚。本条规定的行政处罚种类是罚款，是对违法行为的一种经济制裁。一般来讲，罚款数额以绝对数比如十万元，或者以违法所得的倍数来表示，本条采用了后一种方法。具体规定是：

一、经营者被责令暂停相关营业而不停止的，处相关营业所得一倍以上三倍以下的罚款。需要强调的是，本条规定的罚款是针对相关的营业所得而言的，而不是其全部营业所得。因为价格法第三十四条规定，政府价格主管部门必要时可以责令当事人暂停相关营业，而不是暂停全部营业，比如当事人销售的某产品未执行政府定价，政府价格主管部门责令当事人暂停相关营业时，只能责令当事人暂停对该产品的营业，因此，罚款也是针对该产品应当停止销售而未停止这一期间的违法所得而言的。

二、经营者对政府价格主管部门登记保存的财务进行转移、隐匿或者销毁的，处转移、隐匿或者销毁的财务价值一倍以上三倍以下的罚款。

第四十四条　拒绝按照规定提供监督检查所需资料或者提供虚假资料的，责令改正，予以警告；逾期不改正的，可以处以罚款。

【释义】　本条是对拒绝按照政府价格主管部门的规定提供监督检查所需资料或者提供虚假资料的行政责任的规定。

行政责任是法律责任的一种，包括行政处罚和行政处分两种形式。具体到本条，是对行政处罚的规定。行政处罚是国家行政机关或者法律、法规授权的具有管理公共事务职能的组织依法对违反行政管理秩序的行为给予的惩处，包括警告、罚款、没收违法所得、没收非法财务、责令停产停业、暂扣或者吊销许可证、暂扣或者吊销执照、行政拘留及法律、行政法规规定的其他行政处罚。本条规定的行政处罚种类是警告和罚款，针对的具体行为是拒

绝按照政府价格主管部门的规定提供监督检查所需资料或者提供虚假资料。

按照政府价格主管部门的规定如实提供资料，是经营者必须履行的一项义务。因为价格法第五条规定，国务院价格主管部门统一负责全国的价格工作。县级以上地方各级人民政府价格主管部门负责本行政区域内的价格工作。价格法第三十三条规定，县级以上各级人民政府价格主管部门，依法对价格活动进行监督检查，并依照本法的规定对价格违法行为实施行政处罚。经营者作为价格活动的主体，当然是政府价格主管部门监督检查的对象，接受政府价格主管部门的监督检查是经营者应当履行的义务。价格法第三十四条规定，政府价格主管部门在进行监督检查时，有权询问当事人或者有关人员，并要求其提供证明材料和与价格违法行为有关的其他资料；有权查询、复制与价格违法行为有关的帐簿、单据、凭证、文件及其他资料，核对与价格违法行为有关的银行资料。因此，经营者在接受政府价格主管部门的监督检查时，应当按照政府价格主管部门的规定提供资料。同时，价格法第三十五条规定，经营者接受政府价格主管部门的监督检查时，应当如实提供价格监督检查所必需的帐簿、单据、凭证、文件以及其他资料。这就是说，接受政府价格主管部门的监督检查——按照政府价格主管部门的规定提供这些资料——如实提供这些资料，是经营者接受政府价格主管部门监督检查的几个方面，经营者必须遵守。同时，从另一方面讲，经营者提供的情况和有关资料，是政府价格主管部门发现问题，查处价格违法行为的依据之一，如果经营者不如实提供这些资料，不利于政府价格主管部门开展工作，也不利于政府价格主管部门对经营者的监督检查，是妨碍行政管理的行为，因此，本条对此规定了行政责任。本条规定的具体违法行为是：（一）拒绝按照规定提供监督检查所需资料，比如对政府价格主管部门规定的某些资料拒绝提供、拒绝按照政府价格主管部门规定的时间提供资料等。（二）提供虚假资料，即虽然按照规定提供资料，但这些资料不真实，已经被弄虚作假，以逃避政府价格主管部门的监管及处罚。本条规定的行政处罚是，对拒绝按照规定提供监督检查所需资料或者提供虚假资料的，责令其在一定期间内改正，予以警告。即对拒绝按照规定提供资料的，责令其在一定期间内提供；对提供虚假资料的，责令其在一定期间内重新提供真实的资料。对超过规定期限仍不提供资料或者不提供真实资料的，政府价格主管部门可以处以罚款。这里没有规定具体的罚款幅度，而且规定是"可以处以罚款"。我国行政处罚法规定，法律对违法行为已经作出行政处罚规定，行政法规需要作出具体规定的，必须在法律规定的给予行政处罚的行为、种类和幅度的范围内规定。国务院部、委员会制定的规章可以在法律、行政法规规定的给予行政处罚的行为、种类和幅度的范围内作出具体规定。因此，对逾期仍不提供监督检查所需资料或者提供虚假资料这一违法行为，在什么情况下处以罚款，以及具体罚款数额，可以由行政法规、部门规章依据行政处罚法的以上规定作出具体规定。本条未明确规定责任主体，从价格法第三十四条规定的政府价格主管部门行使监督检查权时要求提供资料的对象

看，应当包括当事人或者有关人员，即经营者或者与之有关的人员。

第四十五条　　地方各级人民政府或者各级人民政府有关部门违反本法规定，超越定价权限和范围擅自制定、调整价格或者不执行法定的价格干预措施、紧急措施的，责令改正，并可以通报批评；对直接负责的主管人员和其他直接责任人员，依法给予行政处分。

【释义】　　本条是对地方各级人民政府或者各级人民政府有关部门在价格工作中的违法责任所作的规定。

一、地方各级人民政府或各级人民政府有关部门超越定价权限和范围擅自制定、调整价格，应当依法受到处分。政府及政府部门应当依法行使职权，超越法定的权力范围行使权力，是违法行为，应当受到相应的处分。按照本法第十九条的规定，政府指导价、政府定价的定价权限和具体适用范围，以中央的和地方的定价目录为依据。同时，本法在有关条文中，又对定价权限的划分从以下六个方面作了规定：一是中央定价目录由国务院价格主管部门制定，地方定价目录由省级人民政府价格主管部门按照中央定价目录规定的定价权限和具体适用范围制定；二是省级以下各级地方人民政府不得制定定价目录；三是国务院价格主管部门和其他有关部门应当按照地方定价目录规定的定价权限和具体适用范围制定政府指导价、政府定价；四是省级人民政府价格主管部门和其他有关部门按照地方定价目录规定的定价权限和具体适用范围制定政府指导价、政府定价；五是市、县人民政府根据省级人民政府的授权，按照地方定价目录规定的定价权限和具体适用范围制定政府指导价、政府定价；六是政府指导价、政府定价应当按照规定的定价权限进行调整。地方各级人民政府或者各级人民政府有关部门违反上述规定的行为，就是本条所规定的违反本法规定超越定价权限和具体适用范围擅自制定、调整价格的行为，应当给予处分。

二、地方各级人民政府或者各级人民政府有关部门，不执行法定的价格干预措施、紧急措施的行为，应当依法给予处分。政府在进行行政管理的过程中，负有依法履行职责的义务，违反法定义务的，就应承担相应的法律责任。按照本法第三十条、第三十一条的规定，当重要商品和服务价格显著上涨或者有可能显著上涨，国务院和省、自治区、直辖市人民政府可以对部分价格采取限定差价率或者利润率、规定限价、实行提价申报制度和调价备案制度等干预措施；当市场价格总水平出现剧烈波动等异常状态时，国务院可以在全国范围内或者部分区域内采取临时集中定价权限、部分或者全面冻结价格的紧急措施。因此，价格干预措施和紧急措施是在特定情况下采取的强制性价格管制措施，在实行法定的价格干预措施、紧急措施的期间和区域范围内，对于任何单位和个人都具有效力。有关的地方人民政府和各级人民政府有关部门应当严格执行法定的价格干预措施、紧急措施。不执行法定的干预措施、紧急措施，就是违反了法定职责，应当受到处分。

三、有本条规定的违法行为的，责令改正，并可以通报批评；对直接负责的主管人

员其他直接责任人员，依法给予行政处分。地方政府有本条规定的违法行为的，对其的行政处分应当由其上级政府作出。各级人民政府有关部门有本法规定的违法行为的，可以由其本级政府或者上级部门对其进行处分。

第四十六条　　价格工作人员泄露国家秘密、商业秘密以及滥用职权、徇私舞弊、玩忽职守、索贿受贿，构成犯罪的，依法追究刑事责任；尚不构成犯罪的，依法给予处分。

【释义】　　本条是对价格工作人员泄露国家秘密、商业秘密以及滥用职权、徇私舞弊、玩忽职守、索贿受贿的刑事责任和行政责任的规定。

一、刑事责任。刑事责任是指行为人实施了刑法所禁止的行为即犯罪行为而必须承担的法律后果。本条规定的价格工作人员的违法行为，主要涉及刑法规定的以下内容；

（一）刑法第三百九十八条规定，国家机关工作人员违反保守国家秘密法的规定，故意或者过失泄露国家秘密，情节严重的，处三年以下有期徒刑或者拘役；情节特别严重的，处三年以上七年以下有期徒刑。非国家机关工作人员犯前款罪的，依照前款的规定酌情处罚。这里规定的国家秘密是指关系国家的安全和利益，依照法定程序确定，在一定时间内只限一定范围的人员知悉的事项。根据保守国家秘密法的规定，国家秘密包括国家事务的重大决策中的秘密事项；国防建设和武装力量活动中的秘密事项；外交和外事活动中的秘密事项以及对外承担保密义务的事项；国民经济和社会发展中的秘密事项；科学技术中的秘密事项；维护国家安全活动和追查刑事犯罪中的秘密事项；其他经国家保密部门确定应当保守的国家秘密事项。政党的秘密事项中符合上述规定的，也属于国家秘密。国家秘密的密级分为"绝密"、"机密"、"秘密"三级。刑法规定泄露国家秘密罪的责任主体是国家机关工作人员，同时规定，非国家机关工作人员犯此罪的，依照对国家机关工作人员的刑罚酌情处罚。"酌情处罚"是指在对国家机关工作人员的处罚幅度内，根据具体情节予以适当处罚。本条规定的价格工作人员，既包括国家机关从事价格工作的人员，也包括非国家机关中从事价格工作的人员。因此，均适用刑法这一条的规定。泄露国家秘密罪，包括故意和过失两种情况。过失泄露国家秘密，是指国家机关工作人员应当预见其行为可能发生国家秘密的泄露，造成危害国家安全和利益的后果，因为疏忽大意而没有预见，或者已经预见而轻信能够避免，以至使国家秘密遗失或者外传。故意泄露国家秘密，是指国家机关工作人员明知自己的行为会造成国家秘密的泄露，而希望或放任这种结果的发生，造成危害国家安全和利益的结果。泄露国家秘密罪的客观方面表现为国家机关工作人员违反保守国家秘密法的规定，将自己掌管或者知悉的秘密让不应知悉者知悉，且情节严重的行为。泄露的方式是多种多样的、可以是口头泄露，也可以是书面泄露，"情节严重"主要是指泄露国家秘密的行为造成了或者足以造成危害后果，泄露的方法、手段恶劣等。

（二）刑法第二百一十九条规定，有下列侵犯商业秘密行为之一，给商业秘密的权

利人造成重大损失的，处三年以下有期徒刑或者拘役，并处或者单处罚金；造成特别严重后果的，处三年以上七年以下有期徒刑，并处罚金。1．以盗窃、利诱、胁迫或者其他不正当手段获取权利人的商业秘密的；2．披露、使用或者允许他人使用以前项手段获取的权利人的商业秘密的；3．违反约定或者违反权利人有关保守商业秘密的要求，披露、使用或者允许他人使用其所掌握的商业秘密的。明知或者应知上述行为，获取、使用或者披露他人的商业秘密的，以侵犯商业秘密论。侵犯商业秘密罪的客观方面表现为除上述行为外，还必须具有给权利人造成重大损失的情节。商业秘密是指不为公众所知悉、能为权利人带来经济利益，具有实用性并经权利人采取保密措施的技术信息和经营信息。具体来讲，商业秘密应当具备下列条件：必须是不为公众所知悉的技术信息和经营信息，具有秘密性；权利人对这些技术信息和经营信息采取了保密措施，以防止外人轻而易举地获取这些信息。如果权利人未采取保密措施，就不能视为商业秘密；这些信息具有经济价值，能为权利人带来经济利益，具有实用性。

（三）刑法第三百九十七条第一款规定，国家机关工作人员滥用职权或者玩忽职守，致使公共财产、国家和人民利益遭受重大损失的，处三年以下有期徒刑或者拘役；情节特别严重的，处三年以上七年以下有期徒刑。本法另有规定的，依照规定。刑法第三百九十七条第二款规定，国家机关工作人员徇私舞弊，犯前款罪的，处五年以下有期徒刑或者拘役；情节特别严重的，处五年以上十年以下有期徒刑。本法另有规定的，依照规定。滥用职权罪的客观方面表现为违反或者超越法律规定的权限和程序行使职权，致使公共财产、国家和人民利益遭受重大损失的行为。必须是行为人手中有权，并且滥用权力，与危害结果有直接的因果关系。如果行为人手中没有此项权力，或者虽然有权，但行使权力与危害结果没有直接的因果关系，则不能构成此罪，而应当按照其他规定处理。玩忽职守罪的客观方面表现为不履行法律所规定的职责或者不认真、不正确履行职责，致使公共财产、国家和人民利益遭受重大损失的行为。不履行职责是指国家机关工作人员对于自己应当履行而且能够履行的职责，不尽履行的义务，如擅离职守。不认真、不正确履行职责是指国家机关工作人员在履行职责中违背职责要求，工作草率马虎，极端不负责任。国家机关工作人员因徇私舞弊行为犯第一款罪，是指国家机关工作人员为徇个人私利或者亲友私情而犯第一款罪。国家机关工作人员担负着管理国家事务的职责，必须秉公执法，徇私舞弊行为是从个人利益出发，置国家利益于不顾，所以主观恶性要比第一款规定的行为严重，因此，刑法对因徇私舞弊行为犯第一款罪的，规定了比第一款更重的刑罚。刑法第三百九十七条规定的滥用职权罪、玩忽职守罪的责任主体是国家机关工作人员，因此，本条规定的价格工作人员中，只有国家机关中从事价格工作的人员才符合刑法第三百九十七条规定的责任主体的条件。非国家机关中从事价格工作的人员因为上述行为构成犯罪的，应当依照刑法的有关规定承担责任。

（四）刑法第三百八十五条规定，国家工作人员利用职务上的便利，索取他人财物的，或者非法收受他人财物，为他人谋取利益的，是受贿罪。国家工作人员在经济往来中，违反国家规定，收受各种名义的回扣、手续费，归个人所有的，以受贿论处。刑法第三百八十八条规定，国家工作人员利用本人职权或者地位形成的便利条件，通过其他国家工作人员职务上的行为，为请托人谋取不正当利益，索取请托人财物或者收受请托人财物的，以受贿论处。刑法第三百八十六条规定，对犯受贿罪的，根据受贿所得数额及情节，依照刑法第三百八十三条关于贪污罪的规定处罚。索贿的从重处罚。受贿罪在客观方面表现为利用职务上的便利，索取他人财务，或者非法收受他人财务，为他人谋取利益。主要包括两个方面。一是利用职务上的便利，非法收受他人财务，为他人谋取利益。"利用职务上的便利"是指利用本人职务范围内的权力，即自己职务上主管、负责或者承办某种公共事务的职权所造成的便利条件。"非法收受他人财务"是指行为人向国家工作人员主动给予财务时，国家工作人员非法收受的行为。"为他人谋取利益"是指国家工作人员利用职权为行贿人办事，至于为他人谋取的利益是否正当，为他人谋取的利益是否实现，不影响受贿罪的成立，二是利用职务上的便利，索取他人财务。"索取他人财务"是指国家工作人员在职务活动中主动向他人索要财务。索贿是严重的受贿行为，比一般受贿具有更大的主观恶性和社会危害性，因此，对索要他人财务的，刑法没有规定要以"为他人谋取利益"为条件，不论是否为他人谋取利益，都可以构成受贿罪。刑法规定受贿罪的责任主体是国家工作人员，同时刑法规定，本法所称国家工作人员，是指国家机关中从事公务的人员。国有公司、企业、事业单位、人民团体中从事公务的人员和国家机关、国有公司、企业、事业单位委派到非国有公司、企业、事业单位、社会团体从事公务的人员，以及其他依照法律从事公务的人员，以国家工作人员论。因此，本条规定的价格工作人员，只要符合刑法关于国家工作人员的规定，均可以成为刑法规定的受贿罪的责任主体。同时，对非国有公司、企业单位中的价格工作人员，即价格工作人员中的非国家工作人员索贿受贿的，依照刑法第一百六十三条的规定处罚。刑法第一百六十三条的规定是：公司、企业的工作人员利用职务上的便利，索取他人财务或者非法收受他人财务，为他人谋取利益，数额较大的，处五年以下有期徒刑或者拘役；数额巨大的，处五年以上有期徒刑，可以并处没收财产。公司、企业的工作人员在经济往来中，违反国家规定，收受各种名义的回扣、手续费，归个人所有的，依照前款规定处罚。

价格工作人员在进行价格管理过程中，如果有泄露国家秘密、商业秘密以及滥用职权、徇私舞弊、玩忽职守、索贿受贿的行为，并符合上述犯罪要件的，就要依法承担刑事责任。

二、行政责任。价格工作人员泄露国家秘密、商业秘密以及滥用职权、徇私舞弊、玩忽职守、索贿受贿行为未构成犯罪的，或者情节显著轻微危害不大，不认为是犯罪的，应

当给予处分。处分包括国家机关对其价格工作人员的处分，以及公司、企业、事业单位等对其价格工作人员的处分。具体处分形式有警告、记过、记大过、降级、降职、撤职、留用察看和开除等。

来源：

责任编辑：

**相关文章**

打印本页　关闭窗口　返回顶部

Copyright © 2007 www.npc.gov.cn All Rights Reserved　（浏览本网主页，建议将电脑显示屏的分辨率调为1024*768）

版权所有：全国人大信息中心　　网站地图 ｜ 联系我们 ｜ 投稿信箱　　　　　　京ICP备06005931号

EXHIBIT 145

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |  |
|---|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION, | ) ) ) ) | Case No. 3:07-cv-05944-JST<br><br>MDL No.: 1917 |
| THIS DOCUMENT RELATES TO: | ) ) ) | |
| *ALL DIRECT PURCHASER ACTIONS* | ) ) ) ) ) ) ) ) | **DECLARATION OF DONALD CLARKE IN SUPPORT OF IRICO DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF JURISDICTION** |

I, Donald Clarke, declare as follows:

1.      I make this declaration in support of the motions to dismiss of Irico Group Corporation ("Irico Group") and Irico Display Devices Co., Ltd. ("Irico Display" and, together with Irico Group, the "Irico Defendants").

2.      I am a professor of law at the George Washington University Law School, where I have been employed since 2005. My academic specialization is the law of the People's Republic of China in general and the legal regime of Chinese economic reform in particular.  I speak and read Chinese fluently.

3.      From 1988 through 2004, I was on the faculty of the University of Washington School of Law ("UWLS"), and I have been a visiting professor at New York University Law School, University of California at Los Angeles School of Law, and Duke Law School. From 1995 to 1998, I was on a leave of absence from the UWLS and worked as an attorney at Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss"), a large United States law firm with a substantial China business practice. During that period, I visited China and Hong Kong approximately twice a year in the course of my work, a substantial amount of which was related to China. From 1998 through 2003, I regularly worked with Paul, Weiss as a consultant on Chinese law matters. Since that time I have maintained an independent consulting practice.

4.      I have published widely in the field of Chinese law; a full copy of my curriculum vitae and list of publications is set forth in my curriculum vitae, attached hereto as Exhibit 1.

5.      I graduated *cum laude* from Harvard Law School in 1987, where my studies focused on East Asian legal systems and I served as an editor of the *Harvard Law Review*. I earned a graduate degree (M.Sc. with Honors) in the Government and Politics of China from the School of Oriental and African Studies at the University of London in 1983. I also studied Chinese history for two years at Beijing University and Nanjing University in China from 1977 to 1979. I earned my undergraduate degree from Princeton University in 1977.

6.      I have served as adviser or consultant on Chinese law matters to a number of bodies, including the Asian Development Bank, the Agency for International Development, and

the World Bank's Financial Sector Reform and Strengthening Initiative. I have testified on aspects of the Chinese legal system before the Congressional-Executive Commission on China and the United States-China Economic and Security Review Commission. I have been appointed to the Academic Advisory Group to the US-China Working Group of the United States Congress. I am admitted to practice in the State of New York (1988) and am a member of the Council on Foreign Relations.

7.  I have been asked by counsel for the Irico Defendants to examine and comment on materials relating to Irico Group and Irico Display, their relationship to each other, and their relationship to the Chinese state in order to assist the court in determining whether Irico Group and Irico Display are agencies or instrumentalities of a foreign state for purposes of the Foreign Sovereign Immunities Act.

8.  In the course of preparing this declaration, I have examined the following documents, among others, in whole or in part:

a.  The set of documents provided by the Irico Defendants in this case numbered IRI-CRT-00000001 through IRI-CRT-00001029 (the "IRI-CRT Documents").

b.  Irico Defendants' Objections and Responses to Direct Purchaser Plaintiff Studio Spectrum, Inc.'s First Set of Interrogatories, dated May 4, 2018.

c.  Global Offering Prospectus of Irico Group Electronics Company Limited, dated Dec. 8, 2004 (the "Irico Electronics Prospectus")

d.  The business licenses of Irico (Hefei) Photovoltaic Co. Ltd., Hefei Irico Blu-ray Science & Technology Co. Ltd., and Irico (Hefei) LCD Glass Co. Ltd.

e.  The Declaration of Mengquan Guo in Support of Irico Defendants' Motions to Dismiss for Lack of Jurisdiction (the "Guo Declaration").

f.  The Declaration of Zhaojie Wang in Support of Irico Defendants' Motions to Dismiss for Lack of Jurisdiction.

g.  Other materials cited in this declaration.

9. All translations of Chinese into English in this declaration are my own or have been personally reviewed by me and are in my opinion accurate.

### A. State ownership in China

10. In 1978, at the beginning of the post-Mao era of economic reform, "China's industry was made up of thousands of similar, publicly owned organizations."[1] Production was carried out by government ministries; the Ministry of Chemical Industry, for example, was not so much the *regulator* of the chemical industry as it simply *was* the chemical industry. State-owned enterprises ("SOEs") in a given sector operated under the jurisdiction of the relevant ministry, and were essentially factories within the conglomerate that was the ministry.[2]

11. As described by a leading expert on the Chinese economy, Professor Barry Naughton of the University of California at San Diego,

> The traditional SOE—the "work unit" integrated into the government bureaucracy— dominated the scene, as it had since the 1950s. SOEs produced 77% of industrial output.[3]

12. In addition to production, SOEs performed substantial social and political functions, such as overseeing workers' health, welfare, personal lives, and political indoctrination.

13. Economic reform in the 1980s and 1990s allowed more non-SOEs to operate in the industrial economy, such that the SOE share of total output fell from 77% in 1978 to 33% in 1996.[4] Furthermore, SOEs underwent organizational reforms. Instead of being a factory within a ministry conglomerate, SOEs were re-organized into companies with shares. This reorganization did not change the substance of state ownership; the shareholders were state organs (for example, the central ministry in charge of the enterprise).

---

[1] BARRY NAUGHTON, THE CHINESE ECONOMY: TRANSITIONS AND GROWTH 299 (2007).

[2] In Naughton's words, "The enterprise was like a branch plant of the single vast undertaking that was Socialism, Incorporated." *Id.* at 308.

[3] *Id.*

[4] *See id.* at 300.

DECL. OF DONALD CLARKE IN SUPPORT OF IRICO'S MOTIONS TO DISMISS

3

14.     The 1990s saw a gradual change in the role of ministries, with an effort to transform them from *participants in* industry to *regulators of* industry. Many ministries were abolished, and large conglomerates (often known as group companies) were established to take over their productive functions. At the central level, formal ownership of these companies was often lodged in China's State Council (particularly in cases where the original ministry had disappeared).

15.     In 2003, concomitant with the establishment of the State-Owned Assets Supervision and Administration Commission ("SASAC"), nominal ownership of industrial enterprises owned by the Chinese state at the central level was transferred from the entity then holding it (in many cases, the State Council) into the hands of SASAC. This transfer was purely a matter of internal management by the central state of its enterprises and in no way affected the governmental character of the state owner. SASAC is a governmental body under the State Council much like a regular ministry.[5] In Naughton's words, "SASAC's core mission is to carry out the government's functions as investor and owner of state assets, and thus separate these tasks from the government's role as public manager of society as a whole."[6] The "government functions as investor and owner of state assets" referred to by Naughton are not, however, simply the pursuit of profit, as will be explained below.

16.     Despite decades of economic reform in the post-Mao era, the Chinese state still participates extensively in the Chinese economy. Part of this participation is via direct and indirect ownership of productive enterprises. The Chinese government has continuously repeated that this policy of extensive enterprise ownership will continue and that the state has no intention of changing it. As I wrote in 2010:

> The state remains firmly committed to retaining control over enterprises in several
> sectors: national security-related industries, natural monopolies, sectors providing

---

[5] *See id.* at 302-03; *see generally* Barry Naughton, *The Transformation of the State Sector: SASAC, the Market Economy, and the New National Champions*, in STATE CAPITALISM, INSTITUTIONAL ADAPTATION, AND THE CHINESE MIRACLE 46 (Barry Naughton & Kellee S. Tsai ed. 2015)

[6] BARRY NAUGHTON, *supra* note 1, at 316.

important goods and services to the public, and important enterprises in pillar industries and the high-technology sector.[7]

17.     The fact that this firm policy of enterprise ownership exists necessarily implies that the state's goals in owning enterprises are not purely commercial. As I wrote in 2003:

> The state wants the enterprises it owns to be run efficiently, but not solely for the purpose of wealth maximization. If the state owned simply for the purpose of maximizing the economic value of its holdings, there would be no need for a policy mandating state ownership of enterprises. If the enterprise would be worth more managed by another, the state should seek a share of that increased value by selling. A policy of wealth maximization for the state requires simply that the state acquire, maintain, or relinquish control according to whatever will realize the most wealth for the state.
>
> Because the Chinese government clearly does not have such a policy, it follows that a necessary element of state control of an enterprise must be the use of that control for purposes other than the maximization of its wealth as a shareholder—purposes such as the maintenance of urban employment levels, direct control over sensitive industries, or politically-motivated job placement.[8]

18.     Thus, while it is clear that enterprises with direct and indirect state investment are generally expected to make money (whether or not they actually do so), it is equally clear that if making money were the sole goal, there would be no need for a policy mandating state investment in specific sectors or indeed in any sector. Nor does the existing policy single out especially profitable sectors. Instead, it singles out sectors believed by the government to be of strategic importance to the state, such as national defense and high technology.

---

[7] Donald C. Clarke, *Law Without Order in Chinese Corporate Governance Institutions*, 30 Nw. J. Int'l L. & Bus. 131, 144 (2010).

[8] Donald C. Clarke, *Corporate Governance in China: An Overview*, 14 China Econ. Rev. 494, 494-95 (2003) (internal citations omitted).

**B.      Status of Irico Group**

19.      Relevant documents show that as of 2007, Irico Group was directly owned by the Chinese state, with no intermediate corporate layers.

20.      An Irico Group document from 2000 (a report to the Ministry of Finance) states that Irico Group is a "wholly state-owned enterprise."[9] It further identifies the investor as the State Council,[10] the highest executive body in the Chinese government.

21.      As part of the reform in the state's system for managing SOEs discussed in Paragraph 15 above, nominal ownership of Irico Group in 2003 passed from the State Council to SASAC, as shown by a SASAC document of that year.[11] As the relevant document makes clear, SASAC is to represent the State Council in carrying out the functions of the investor.[12]

22.      A number of documents show SASAC exercising close control and supervision over Irico Group.

a.    Various SASAC documents show SASAC auditing the accounts of Irico Group over the years.[13]

b.    A 2004 SASAC document shows SASAC approving Irico Group's reorganization plan.[14]

c.    Two 2005 SASAC documents show SASAC exercising supervision over salaries of senior Irico Group officers.[15]

---

[9] Declaration of Stuart Plunkett in Support of Irico Defendants' Motions to Dismiss for Lack of Subject Matter Jurisdiction ("Plunkett Decl."), Ex. 4, at -513.

[10] *Id.* at -515.

[11] *See* Plunkett Decl., Ex. 29, at -642.

[12] The list in which Irico Group's name appears is entitled "List to Be Issued of Enterprises in Which the State Council's State-Owned Assets Supervision and Administration Commission Is to Perform the Functions of Investor." *Id.* at -636. Because enterprises in Chinese corporate groups often have confusingly similar names, the purpose of this document was to ensure that the names of the listed enterprises were exactly correct before the list was formally announced.

[13] *See* Plunkett Decl., Ex. 21 (2003 results); Plunkett Decl., Ex. 22 (2004 results); Plunkett Decl., Ex. 23 (2005 results); Plunkett Decl., Ex. 24 (2006 results).

[14] *See* Plunkett Decl., Ex. 25.

[15] *See* Plunkett Decl., Ex. 27; Plunkett Decl., Ex. 17.

d. A 2005 SASAC document shows SASAC directly appointing senior officers of Irico Group. <u>Xing</u> Daoqin is appointed general manager (chief executive officer) and <u>Fu</u> Jiuquan is appointed chief accountant. <u>Ma</u> Jinquan is removed from his position as general manager.[16]

e. A 2005 SASAC document shows SASAC directly appointing <u>Tang</u> Rui as a member of Irico Group's board of supervisors.[17]

f. Two SASAC documents show SASAC evaluating and scoring the performance of Irico Group's management team over the previous year.[18]

g. A 2006 SASAC document shows SASAC exercising control over the total wage bill of Irico Group.[19]

h. A 2006 SASAC document shows SASAC instructing Irico Group to pay what are in effect dividends to the state.[20]

23. Irico Group remained directly under SASAC from that time until 2013, when its nominal ownership was transferred to China Electronics and Information Industry Group Corporation, another wholly state-owned enterprise directly under SASAC.[21]

---

[16] See Plunkett Decl., Ex. 45, at -867 Because the documentation in this case sometimes shows Chinese surnames before the given name and sometimes after, here and elsewhere I have underlined the surname in order to avoid confusion.

[17] *See* Plunkett Decl., Ex. 18.

[18] *See* Plunkett Decl., Ex. 26 (2005); Plunkett Decl., Ex. 28 (2006).

[19] *See* Plunkett Decl., Ex. 15.

[20] *See* Plunkett Decl., Ex. 16.

[21] *See Irico Group Corp. To Be Wholly Transferred Into China Electronics and Information Industry Group Co. Ltd.*, SASAC (Jan. 5, 2013), http://www.sasac.gov.cn/n2588035/n2641579/n2641660/c3753687/content.html [https://perma.cc/ZQ2Q-JDQW] (announcement on SASAC website).

### C.   Official status of Irico Display

24.     In my opinion, based on the evidence that I have reviewed and my knowledge of Chinese law, Irico Display was, before and during 2007, officially considered at the very least a state-controlled entity, and in some contexts a state-owned entity.

25.     In 1995, Irico Display was unquestionably considered "state-owned" by SASAC's predecessor, the State Bureau for the Management of State-Owned Assets.[22] Irico Display proposed to issue shares to the public, thus decreasing the state's ownership percentage. In order to prevent economic dilution, the state's policy in such cases was to insist on an asset appraisal and thereby to prevent shares being issued to management and favored buyers at too low a price. A document from SASAC at the central level instructs the Shaanxi Province SASAC to undertake the appraisal.[23]

26.     In 2006, when Irico Display proposed to reform its shareholding structure and eliminate non-circulating shares,[24] SASAC's approval was again needed.[25]

27.     Irico Display is described as "state-controlled" in Irico Group's 2007 audit report, covering the year 2006.[26]

---

[22] It would *a fortiori* have been considered "state-controlled." A document issued in 1994 by the same body defined "control" as including any ownership stake of over 30 but less than 50 percent where the state still exercises control because the other shareholding is dispersed. *See Temporary Management Measures for State-Owned Shareholding in Share-Issuing Limited Liability Companies*, STOCKSTAR.COM (Nov. 3, 1994), http://school.stockstar.com/GA2001070400004853.shtml [https://perma.cc/5T7F-3BQN], art. 11.

[23] *See* Plunkett Decl., Ex. 14. Although China is constitutionally a unitary state, state-owned enterprises are not always owned by the state at the central level. Sub-central SASACs have been established to act as nominal shareholders of enterprises owned by sub-central administrative units of the state—for example, provinces. The Shaanxi SASAC acts as the nominal owner of state-owned enterprises under the jurisdiction of Shaanxi province.

[24] For an explanation of the purpose of this reform in Irico Display and other companies, *see generally* Horace W.H. Yeung, *Non-Tradable Share Reform in China: Marching Towards the Berle and Means Corporation?* (Osgoode Hall Law School, Comparative Research in Law & Political Economy, Research Paper No. 48, 2009), available at http://bit.ly/splitshare.

[25] *See* Plunkett Decl., Ex. 20.

[26] *See* Plunkett Decl., Ex. 55, at 14 (Irico Group Audit Report 2007 (for 2006)).

28.     According to the Audit Law[27] and the Audit Law Implementing Regulations ("ALIR"),[28] Irico Display was and is subject to auditing in the same way a wholly state-owned enterprise is. Article 19 of the ALIR states in relevant part that "an enterprise . . . in which state-owned capital occupies a controlling position or a leading position" (a concept from Article 21 of the Audit Law) includes an enterprise "in which state capital constitutes 50% or less of the capital stock of the enterprise . . . , but the holder of the state capital possesses actual control."[29] It further states that such an enterprise must be audited in accordance with the provisions of Article 20 of the Audit Law—*i.e.*, it must be audited in the same way a wholly state-owned enterprise would be.

29.     Confirming the above analysis, in 2007, Irico Display was audited under the Audit Law. In the cover pages of its 2007 audited financial report, its "Economic Type" is stated to be "state-owned (*guoyou*)/state-controlled (*guoyou konggu*)."[30] This document also shows that the relationship between Irico Group and Irico Display was sufficiently close that Irico Group was required to consolidate Irico Display's financial results with its own for accounting purposes. At that time (as well as before and after), Chinese accounting standards required consolidated reporting when one company exercised actual control over another.[31]

30.     The document itself is labeled "Printed by the State-Owned Asset Supervision and Administration Commission," indicating SASAC's close connection with Irico Display, not just its grandparent, Irico Group.

---

[27] As amended Feb. 28, 2006; available at http://www.audit.gov.cn/n6/n36/c45865/content.html.

[28] *See* Plunkett Decl., Ex. 3, art. 19 (as amended, Feb. 2, 2010).

[29] I have omitted irrelevant language about financial institutions.

[30] *See* Plunkett Decl., Ex. 32, at -671, right-hand column, row 6. The "*guoyou konggu*," translated here as "state-controlled," means "controlled by state or state-owned entities."

[31] *See* Enterprise Accounting Standards No. 33—Consolidated Financial Reports (Feb. 15, 2006), available at https://perma.cc/Z75C-RDEN (in Chinese; partial English translation available at https://perma.cc/SYR8-SYSM). This document was superseded by a revised set of standards effective July 1, 2014. *See Notice on Revisions to the "Enterprise Accounting Standards No. 33—Consolidated Financial Reports"*, Ministry of Finance of the PRC (Feb. 17, 2014), http://kjs.mof.gov.cn/zhengwuxinxi/zhengcefabu/201402/t20140220_1045206.html [https://perma.cc/5V3Q-BA6T].

**D.    Control over Irico Display by Irico Group**

31.    The evidence shows that Irico Group exercised direct control over personnel appointments at Irico Display in the late 1990s and in 2007. I know of no reason to believe it did not also exercise such control in the intervening years.

        a.    In 1998, Irico Group formally nominated <u>Zhang</u> Shaowen to a position on the Board of Supervisors.[32]

        b.    In 1998, Irico Group issued a notice to the Board of Directors of Irico Display selecting its own legal representative, <u>Wu</u> Weiren, as the chairman of the board of directors of Irico Display, instructing it to confirm according to legal procedures.[33]

        c.    In 1999, Irico Group issued a document to the board of directors of Irico Display instructing it to put some persons on the board and to remove others, and naming a chairman of the board.[34]

        d.    On November 12, 2007, members of Irico Group's Leadership Office Meeting issued a resolution on personnel appointments and dismissals in Irico Display.[35] The resolution recommended Xing Daoqin, Guo

---

[32] *See* Plunkett Decl., Ex. 33, at -676.

[33] *Id.* at -677.

[34] Plunkett Decl., Ex. 45, at -871.

[35] *See* Plunkett Decl., Ex. 33, at -678. The members consisted of Irico Group's senior management: the general manager, three deputy general managers, and the Group's Communist Party secretary (concurrently a deputy general manager) and deputy secretary. Although this document refers only to "the stock company (A-shares)" and does not refer to Irico Display by name, I believe that the entity referred to is indeed Irico Display and not any other entity. Irico Display's Annual Report for 2007 shows the nominated individuals as all having been subsequently appointed to their respective positions on November 29, 2007. Furthermore, none of the individuals whose removal was recommended appear on the Annual Report's list of directors and officers, indicating that the removal recommendations were followed as diligently as the appointment recommendations. *See* Plunkett Decl., Ex. 2, at -241. Finally, I note that the 2004 Irico Electronics Prospectus at page 11 defines "A Share Company" (meaning "the company with A-shares") as Irico Display. Irico Electronics is a direct subsidiary of Irico Group, *see infra* ¶ 40. "A-shares" are freely circulating shares in Chinese companies sold on China's domestic stock exchanges. Irico Electronics itself is an "H-share" company, with its publicly circulating shares listed on the Hong Kong Stock Exchange; thus, the reference could

Mengquan, and Zhang Shaowen to the position of director; Xing Daoqin to the position of chairman of the board, and Guo Mengquan to the position of deputy chairman. It further recommended that three named persons no longer serve as directors. It recommended that Wang Ximin be named general manager, Li Miao be named deputy general manager, and Jiang Ahe be named chief financial officer, and recommended that four named individuals be removed from their management positions. (That "recommendations" were in fact instructions to be followed is evident from the fact that all the recommended appointments and dismissals had taken place by the end of the month.[36]) As can be seen, Irico Group was appointing not only directors, but also senior management, a task that as a formal matter is under the jurisdiction of the board of directors.

32. Irico Display's 2007 annual report, which contains disclosures mandated and enforced under China's regime for securities regulation, states unequivocally that while the controlling shareholder is Irico Group Electronics Co., Ltd., the actual controlling person (*shiji kongzhi ren*) is Irico Group.[37]

33. Documents show that in 2011 and 2012, the performance of Irico Display's management was directly evaluated by Irico Group.[38]

34. Irico Group's close connection with Irico Display is also shown by the fact the Irico Group directly guaranteed loans made to Irico Display.[39]

---

not have been to Irico Electronics.

[36] *See id.* at -241.

[37] *Id.* at -239. Note that the English translation is incorrect: the purpose of the disclosure is to reveal who actually controls the company, and the actual controller need not, of course, be a shareholder. The Chinese text calls for identification of the "actual controlling person" (*shiji kongzhi ren*). Elsewhere in the same document, Irico Group is identified as the "ultimate controlling company" (*zuizhong konggu gongsi*) of Irico Display. *Id.* at -312.

[38] *See* Plunkett Decl., Ex. 47 (2011); Plunkett Decl., Ex. 56 (2012).

[39] *See* Plunkett Decl., Ex. 55, at 14 (Irico Group Audit Report 2007 (for 2006)).

35.     I have reviewed the Guo Declaration and find that its statements regarding the control exercised by Irico Group over Irico Display are consistent with and supported by the documentary evidence I have examined.

### E.     Status of Irico Display's officers under China's Criminal Law

36.     In my opinion, Irico Display's senior management (directors and senior executives) would have been considered state personnel in 2007 for the purposes of China's Criminal Law. In a number of places, China's Criminal Law specifies that it is a crime for state personnel (*guojia gongzuo renyuan*) to commit various acts, or that an act will be punished more severely when committed by state personnel. Thus, it is critical to be able to distinguish those who are state personnel from those who are not.

37.     I have examined three criminal cases that shed light on this issue particularly as it pertains to Irico Display. In all three cases, defendants who were senior managers at companies associated with Irico Group were found guilty of receiving bribes as state personnel. They were found to be state personnel by virtue of their connection with the state via their immediate employer and Irico Group. Moreover, in all three cases the claim that they were state personnel was specifically contested by the defendant, and the defendant's position was rejected both at the trial level (with one exception) and at the appellate level (with no exceptions). Although these cases were decided after 2007, the critical year for this case, I have no reason to believe that official policy or treatment by courts of the relevant issues would have been different in 2007.

38.     At the time of the cases in question, China's Criminal Law defined "state personnel" as follows:

"State personnel" as used in this Law means persons performing official duties (*gongwu*)[40] in state organs.

---

[40] This term, translated here as "official duties," is not precisely defined in Chinese law. It is commonly understood that it would include the chief executive officer but not the maintenance worker. When applied to enterprise personnel, the general idea is that it designates someone who has significant decision-making authority over assets directly or indirectly owned by the state. *See generally Commentary on State Personnel in the Criminal Law*, PEOPLE'S

Persons who perform official duties in state-owned companies, enterprises, and institutions and people's organizations; persons who are dispatched by state-owned companies, enterprises, and institutions to perform official duties in non-state-owned companies, enterprises, institutions, and social groups; and other persons who perform official duties according to law shall be treated as state personnel.[41]

39.     The Criminal Law's definition of "state personnel" was further supplemented by a 2010 document issued jointly by the Supreme People's Court and the Supreme People's Procuratorate (in charge of prosecutions) (the "2010 Opinion").[42] The 2010 Opinion defines "state personnel" as follows:

Persons who perform official duties in state-controlled companies,[43] state-participating companies, or the branches of either, and who hold their positions as a result of nomination, recommendation, appointment, approval, etc. by state organs or state-owned companies, enterprises, or institutions, should be considered state personnel. They shall be so considered regardless of the specific appointing organ or method of appointment.

Those who, upon approval or decision after study of the organization in charge of management and oversight of state-owned assets in enterprises with state investment (*guojia chuzi qiye*),[44] represent [the organization] in organizational, leadership,

---

PROCURACY, No. 11, 2013, available at http://www.sohu.com/a/197386126_654603 [https://perma.cc/B3UQ-E85G].

[41] Criminal Law, as amended through Feb. 25, 2011, art. 93.

[42] *See* Plunkett Decl., Ex. 1.

[43] A state-controlled company is one in which the state, directly or indirectly, holds a majority of the shares or in which the state exercises a controlling influence, despite not holding a majority of shares. A state-participated company is a company in which the state holds shares but does not have control. *See* Letter from the State Bureau of Statistics Regarding the Opinion on the Finding of a State-Owned Company and Enterprise, 2003, at -571-572.

[44] Section 7 of the 2010 Opinion defines "enterprise with state investment" as follows:

In this Opinion, "enterprise with state investment" includes wholly state-owned companies and wholly state-owned enterprises with state investment as well as companies controlled by state-owned capital and companies with the participation of state-owned capital.

supervisory, operational, or management work in state-controlled or state-participated companies or the branches of either, should be considered state personnel.[45]

40.     In the case of Liu Junjie,[46] the defendant was the general manager, executive director, and legal representative (in other words, he was the chief executive officer) of Irico (Hefei) Photovoltaic Co. Ltd. ("Irico Photovoltaic"). Irico Photovoltaic had been established in 2010 as a wholly-owned subsidiary of Irico Group Electronics Co. Ltd. ("Irico Electronics"), which itself had been established as a wholly-owned subdidiary of Irico Group in 2004. The appointment of Liu Junjie to his various posts had been approved in 2010 by Irico Group, the parent once removed.

41.     In finding Liu Junjie to be state personnel, the court found Irico Electronics, Irico Photovoltaic's parent, to be a "state-controlled company" and stressed that Liu had been appointed after approval by Irico Group. It seems clear that this decision was correct under the Criminal Law and the 2010 Opinion. The decision was affirmed on appeal.[47]

42.     In the case of Liu Maihai,[48] the defendant was the general manager (chief executive officer) of Hefei Irico Blu-ray Science & Technology Co. Ltd. ("Irico Blu-ray"). The economic interest of Irico Group in Irico Blu-ray was much weaker than its interest in Irico Photovoltaic in the Liu Junjie case. Irico Blu-ray was 54.55% owned by a company called Shanghai Blu-ray, which in turn was 43.16% owned by Irico Group. Presumably this large albeit minority stake was enough for Irico Group to exercise control over Shanghai Blu-ray, and through it over Irico Blu-ray, but its economic interest in Irico Blu-ray was only 23.54%. The defendant asserted that Shanghai Blu-ray's investment in Irico Blu-ray came from the

---

Where it is unclear whether an enterprise is an enterprise with state investment, the delineation should be made according to the principle of "whoever made the investment has the property right."

[45] Plunkett Decl., Ex. 1, Section 6.

[46] First instance: Plunkett Decl., Ex. 7 (Feb. 28, 2014); Second instance: Plunkett Decl., Ex. 8 (May 6, 2014).

[47] See id. (May 6, 2014).

[48] First instance: Plunkett Decl., Ex. 9 (April 16, 2014); Second instance: Plunkett Decl., Ex. 10 (Nov. 11, 2014).

former's "own" assets, and not from Irico Group,[49] and that control by Shanghai Blu-ray could not be deemed control by Irico Group. Finally, he asserted that he had not been appointed in a way that made him state personnel; instead, he had received his post directly from Irico Blu-ray.

43.    The first-instance (trial)[50] court agreed with the defendant, but on appeal by the procuratorate, the second-instance court overturned the lower court and found that the defendant indeed met the definition of "state personnel" and so was guilty as charged.[51]

44.    In the case of Ge Di,[52] the defendant was the board chairman and general manager (chief executive officer) of Irico (Hefei) LCD Glass Co. Ltd. ("Irico LCD"). According to the first-instance court, Ge was appointed to his positions upon the approval of Irico Group. The court characterized Irico Group as a "participating shareholder" (*cangu*). In fact, Irico Group held a mere 0.27% interest, while the remaining 99.73% was held by a company called Shaanxi Irico Electronic Glass Co. Ltd. ("Shaanxi Irico").[53] In 2010, the year in which the defendant was alleged to have taken bribes, Shaanxi Irico was a 90.21%-owned subsidiary of Irico Display.[54] Its close connection with Irico Group is demonstrated by the fact that Irico Group directly guaranteed loans to Shaanxi Irico in 2008.[55]

---

[49] This claim is true by tautology; if Irico Group had been a direct investor, it would have been a shareholder. The investment came from Shanghai Blu-ray's assets, in which Irico Group had a 43.16% interest.

[50] Since appeals in the Chinese court system are heard *de novo* and therefore are not greatly different from the original hearing, it is customary to refer to the two levels of adjudication as "first instance" and "second instance" instead of "trial" and "appeal" respectively.

[51] *See id.* (Nov. 11, 2014).

[52] First instance: Plunkett Decl., Ex. 41 (June 30, 2014); Second instance: Plunkett Decl., Ex. 42 (May 16, 2016).

[53] Irico Group's microscopic equity interest was clearly not necessary for it to exercise control. It is more likely explained by a desire to avoid various disadvantages attendant on Irico LCD's being a single-shareholder company, an organizational form disfavored under China's Company Law.

[54] *See* Irico Display Annual Report 2010, at 25, available at http://bit.ly/idar2010. It is described as a "controlled subsidiary" on page 26.

[55] *See id.* at 35.

45.     Both the first-instance and the second-instance courts found these facts sufficient to hold that Ge Di should be deemed "state personnel." This is so even though Irico LCD was controlled by Irico Group only through a long chain of subsidiaries: Irico Group controlled Irico Electronics, which controlled Irico Display, which controlled Shaanxi Irico, which controlled Irico LCD, Ge's relevant employer.[56]

46.     Given the results in the above three cases, I believe that Irico Display's senior management would, in 2007, also have been considered to have the obligations and liabilities of "state personnel" under China's Criminal Law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of July, 2018, in Washington, DC.

Donald Clarke

_____

[56] It appears that Ge also held positions in other entities affiliated with Irico Group in 2010, *see id.* at 11, but this fact appears to have played no role in the court's decision.

DECL. OF DONALD CLARKE IN SUPPORT OF
IRICO'S MOTIONS TO DISMISS

16

CASE NO. 3:07-CV-05944-JST
MDL No. 1917

# EXHIBIT 1

# DONALD C. CLARKE

Professor of Law and David E. Weaver Research Professor of Law
George Washington University Law School
2000 H Street
Washington, DC 20052
Tel. (202) 994-2830
E-mail: dclarke@law.gwu.edu
World Wide Web: http://donaldclarke.net

## CURRENT POSITION

• Professor, George Washington University Law School, Washington, DC (from Jan. 2005)

        Courses taught:    • Chinese Law
                                  • Chinese Business Law
                                  • Business Organizations
                                  • Law and Development

## OTHER POSITIONS AND VISITORSHIPS

• Visiting Professor, Interdisciplinary Center, Herzliya, Israel (April-May 2013)
• Visiting Professor, Duke University Law School, Durham, NC (Spring 2012)
• Visiting Professor, University of California at Los Angeles School of Law, Los Angeles, CA (Fall 2008)
• Visiting Professor, New York University School of Law, New York, NY (2007-08)
• Professor, University of Washington School of Law, Seattle, Washington (1988-2004)
• Attorney, Paul Weiss Rifkind Wharton & Garrison, New York, New York (Sept. 1995-Aug. 1998) (on leave from University of Washington)
        Areas of practice: Corporate, East Asia (focusing on China)
• Lecturer in Commercial Law of the Far East, Department of Law, School of Oriental and African Studies, University of London, UK (Sept. 1985-July 1988)

## EDUCATION

• *Harvard Law School*, Cambridge, Mass., USA (1983-85, 1986-87)—JD cum laude 1987
        Activities:      Editorial Board, *Harvard Law Review*
                              *Harvard International Law Journal*
• *School of Oriental and African Studies*, University of London, UK (1981-83)—MSc 1983 in Government and Politics of China
        Honors: Award of Distinction for thesis
• *Beijing University and Nanjing University*, People's Republic of China (1977-79)— Non-degree academic exchange program
        Major area of study: Chinese history
• *Princeton University*, Princeton, New Jersey, USA (1973-77)—BA cum laude 1977
        Major areas of study: International affairs (Woodrow Wilson School of Public and International Affairs); Certificate of Proficiency in East Asian Studies

**SCHOLARSHIPS AND FELLOWSHIPS**

• Rowdget Young Visiting Fellow, Faculty of Law, University of Hong Kong, June 2005
• Fulbright Research Fellowship, 2003 (Tsinghua University Faculty of Law, Beijing)
• Visiting Fellow, China Law Center, Yale Law School, Fall 2001
• Research Fellowship, National Program, Committee on Scholarly Communication with the People's
    Republic of China, 1991-92
• Foreign Language and Area Studies Fellowship, 1986-87 (Harvard Law School)
• Foreign Language and Area Studies Fellowship, 1984-85 (Harvard Law School)
• Commonwealth Scholarship, 1981-83 (University of London)
• Canada-China Exchange Scholarship, 1977-79 (Peking University, Nanking University)

**PROFESSIONAL ASSOCIATIONS AND MEMBERSHIPS**

• Member, Council on Foreign Relations
• Member, New York Bar
• Member, Executive Committee, East Asian Law & Society Section, Association of American Law
Schools (2015-2017)
• Member, Executive Editorial Board, *American Journal of Comparative Law*
• Member, Editorial Board, *The China Quarterly*
• Member, Editorial Board, *Journal of Comparative Law*
• Member, Academic Advisory Group, US-China Working Group, United States Congress
• Affiliate Professor, University of Washington School of Law
• Director, U.S. China Law Society
• Director, Pacific Rim Law and Policy Association (publisher of *Pacific Rim Law and Policy Journal*)
• Member, Advisory Board, Center for Real Estate Law, Peking University Law School

**CONSULTANCIES (SELECTED)**

• Financial Sector Reform and Strengthening (FIRST) Initiative, *Amendments to the Securities Law of the
People's Republic of China*, 2004-2005
• Asian Development Bank, *Economic Law in the People's Republic of China: Retrospect and Prospect*, 2004-
2005
• Asian Development Bank, *Amendments to the Company Law of the People's Republic of China*, 2001-2005
• Agency for International Development, *Commercial Law Reform in the Former Soviet Republics*, 2002
• Asian Development Bank, *China's Legal and Administrative System*, 2001

**PUBLICATIONS**

## Books

*China's Legal System: New Developments, New Challenges* (Cambridge University Press, 2008) (edited
volume)

## Articles and Monographs

"China's Urban Land Regime: The Irrelevance of State Ownership," *Land Use Policy* (forthcoming 2018)

"The Bonding Effect in Chinese Cross-Listed Companies: Is It Real?", in Nicholas C. Howson & Robin Hui Huang (ed.), *Enforcement of Corporate and Securities Law: China and the World* (Cambridge University Press 2017): 88-100 [Working paper version: "The Bonding Effect in Cross-Listed Chinese Companies: Is It Real?", Dec. 31, 2015, GWU Legal Studies Research Paper No. 2015-55, available at http://ssrn.com/abstract=2710717]

"The Law of China's Local Government Debt: Local Government Financing Vehicles and Their Bonds" (with Fang Lu), *American Journal of Comparative Law*, vol. 65 (2017): 751-798

"Don't Ask, Don't Sell: The Criminalization of Business Intelligence in China and the Case of Peter Humphrey," *UCLA Pacific Basin Law Journal*, vol. 33, no. 2 (2016): 109-153

"Blowback: How China's Efforts to Bring Private-Sector Standards into the Public Sector Backfired," in Curtis Milhaupt & Benjamin Liebman (ed.), *Regulating the Visible Hand? The Institutional Implications of Chinese State Capitalism* (Oxford University Press 2015): 29-48

"Zai fanyizhong yishi? Jianping Zhongguo gongsi fa zhong de yizhiti" (Lost in Translation? Legal Transplants in Chinese Corporate Law), in Ge Pingliang & Liang Jiaolong (ed.), *Waiguo Xuezhe Lun Zhongguo Fa Congshu—Gongsi Fa Fenjuan* (Collection of Works of Foreign Scholars Discussing Chinese Law—Company Law Volume) (Zhongguo Dabaike Quanshu Chubanshe (Great Encyclopedia of China Publishers), forthcoming 2015)

"Judicial Innovation in Chinese Corporate Law," in John O. Haley & Toshiko Takenaka (ed.), *Legal Innovations in Asia: Judicial Law-Making and the Influence of Comparative Law* (Edward Elgar, 2014): 259-272

"China's Stealth Urban Land Revolution," *Am. J. Comp. L.*, vol. 62, no. 2 (Spring 2014): 323-366

"Derivative Actions in the People's Republic of China" (with Nicholas C. Howson), in Dan W. Puchniak, Harald Baum & Michael Ewing-Chow (ed.), *The Derivative Action in Asia: A Comparative and Functional Approach* (Cambridge University Press, 2012): 243-295; *translated as* "Tongwang xiao gudong baohu zhi lujing: Zhongguo paisheng susong," in Ge Pingliang & Liang Jiaolong (ed.), *Waiguo Xuezhe Lun Zhongguo Fa Congshu—Gongsi Fa Fenjuan* (Collection of Works of Foreign Scholars Discussing Chinese Law—Company Law Volume) (Zhongguo Dabaike Quanshu Chubanshe (Great Encyclopedia of China Publishers), forthcoming 2015)

"'Nothing But Wind'? The Past and Future of Comparative Corporate Governance," *Am. J. Comp. L.*, vol. 59, no. 1 (Winter 2011): 75-110

"Law Without Order in Chinese Corporate Governance Institutions," *Nw. J. Int'l L. & Bus.*, vol. 30 (2010): 131-199; *translated as* "Zhongguo gongsi zhili zhidu: you fa er wu zhixu," in Ge Pingliang & Liang Jiaolong (ed.), *Waiguo Xuezhe Lun Zhongguo Fa Congshu—Gongsi Fa Fenjuan* (Collection of Works of Foreign Scholars Discussing Chinese Law—Company Law Volume) (Zhongguo Dabaike Quanshu Chubanshe (Great Encyclopedia of China Publishers), forthcoming 2015)

"The Private Attorney-General in China: Potential and Pitfalls," *Wash. U. Global Studies L. Rev.*, vol. 8, no. 2 (2009): 241-255

"The Role of Non-Legal Institutions in Chinese Corporate Governance," in Curtis Milhaupt, Kon-Sik Kim and Hideki Kanda (ed.), *Transforming Corporate Governance in East Asia* (Routledge, 2008): 168-192

"The Role of Law in China's Economic Development" (with Peter Murrell and Susan Whiting), in Thomas Rawski and Loren Brandt (ed.), *China's Great Economic Transformation* (Cambridge University Press, 2008): 375-428

"China: Creating a Legal System for a Market Economy," Nov. 7, 2007 (report prepared for the Asian Development Bank) (available at http://ssrn.com/abstract=1097394)

"The Chinese Legal System Since 1995: Steady Development, Striking Continuities," *China Quarterly*, no. 191 (Sept. 2007): 555-566

"Legislating for a Market Economy in China," *China Quarterly*, no. 191 (Sept. 2007): 567-585

"Three Concepts of the Independent Director," *Delaware Journal of Corporate Law*, vol. 32, no. 1 (2007): 73-111 (available at http://ssrn.com/abstract=975111)

"How Do We Know When an Enterprise Exists? Unanswerable Questions and Legal Polycentricity in China," *Columbia Journal of Asian Law*, vol. 19, no. 1 (2005 [2006]): 50-71

"The Independent Director in Chinese Corporate Governance," *Delaware Journal of Corporate Law*, vol. 31, no. 1 (2006): 125-228 (available at http://ssrn.com/abstract=895588)

"Zhengfu chigu yu Zhongguo gongsi zhili" (Government Shareholding and Chinese Corporate Governance), *Hongfan Pinglun* (Hongfan Review [Journal of Legal and Economic Studies]), vol. 2, no. 2 (Sept. 2005): 230-248

"Yige bing buyuan de waiguo yueliang: Meiguo fan neimu jiaoyi falü zhidu" (A Foreign Moon That Is not Round: America's Anti-Insider Trading Legal Regime), *Hongfan Pinglun* (Hongfan Review [Journal of Legal and Economic Studies]), vol. 2, no. 1 (March 2005): 225-238

"Zhongguo xiuding 'Xing Fa' pingjia" (An Assessment of China's Revisions to the "Criminal Law"), in Xu Chuanxi (ed.), *Zhongguo Shehui Zhuanxing Shiqi de Falü Fazhan* (The Development of Law in China's Transitional Society) (Beijing: Falü Chubanshe [Law Press], 2004): 448-492

"Corporate Governance in China: An Overview," *China Economic Review*, vol. 14, no. 4 (2003): 494-507

"Empirical Research in Chinese Law," in Erik Jensen & Thomas Heller (eds.), *Beyond Common Knowledge: Empirical Approaches to the Rule of Law* (Stanford: Stanford University Press, 2003): 164-192

"Duli dongshi yu Zhongguo gongsi zhili" (The Independent Director and Chinese Corporate Governance), in Fang Liufang (ed.), *Fa Da Pinglun* (China University of Politics and Law Review), vol. 2 (Beijing: Zhongguo Zheng-Fa Daxue Chubanshe [China University of Politics and Law Press], 2003): 99-122 (also in Hamada Michiyo & Wu Zhipan (ed.), *Gongsi Zhili yu Ziben Shichang Jianguan—Bijiao yu Jiejian* (Corporate Governance and the Regulation of Capital Markets: Comparisons and Lessons) (Beijing: Beijing Daxue Chubanshe [Beijing University Press], Jan. 2003)

"The Independent Director in Chinese Corporate Governance and the 'Guidance Opinion on the Establishment of an Independent Director System in Listed Companies'," in Wang Baoshu (ed.), *Touzizhe Liyi Baohu* (The Protection of Investors' Interests) (Beijing: Shehui Kexue Wenxian Chubanshe [Social Sciences Documentation Press], 2003): 142-165

"Economic Development and the Rights Hypothesis: The China Problem," *American Journal of Comparative Law*, vol. 51 (2003): 89-111

"China's Legal System and the WTO: Prospects for Compliance," *Washington University Global Studies Law Review*, vol. 2, no. 1 (2003): 97-118

"Puzzling Observations in Chinese Law: When Is a Riddle Just a Mistake?" in C. Stephen Hsu (ed.), *Understanding China's Legal System* (New York: New York University Press, 2003): 93-121

"Zhongguo de jiufen jiejue" (Dispute Resolution in China), in Jiang Shigong (ed.), *Tiaojie, Fazhi yu Xiandaixing: Zhongguo Tiaojie Zhidu Yanjiu* (Mediation, Legality, and Modernity: Studies in the Chinese Mediation System) (Beijing: Zhongguo Fazhi Chubanshe [China Legal System Press], 2001)

"Zhongguo tudi shiyong guanli zi xia er shang de celüe" (A Bottom-Up Strategy for Land Use Regulation in China), in Chi Fulin (ed.), *Zouru 21 Shiji de Zhongguo Nongcun Tudi Zhidu Gaige*

(China's Rural Land System Reform Going Into the 21st Century) (Beijing: Zhongguo Jingji Chubanshe [China Economics Press], 2000): 299-303

"Chûgokuhô kenkyû no apurôchi: 'hô no shihai' paradaimu wo koete" (Approaches to Chinese Law: Beyond the 'Rule of Law' Paradigm), *Hikaku Hôgaku* (Studies in Comparative Law), vol. 34, no. 1 (2000): 73-91

"Alternative Approaches to Chinese Law: Beyond the 'Rule of Law' Paradigm," *Waseda Proceedings of Comparative Law*, vol. 2 (1998-1999): 49-62

"China and the World Trade Organization," in Freshfields (ed.), *Doing Business in China* (Yonkers, N.Y.: Juris Publishing, 1999): I-11.1 to I-11.30

"Private Enforcement of Intellectual Property Rights in China," *NBR Analysis*, vol. 10, no. 2 (April 1999): 29-41

*Wrongs and Rights: A Human Rights Analysis of China's Revised Criminal Code* (New York: Lawyers Committee for Human Rights, December 1998)

"Power and Politics in the Chinese Court System: The Execution of Civil Judgments," *Columbia Journal of Asian Law*, vol. 10, no. 1 (Spring 1996): 1-125

"The Creation of a Legal Structure for Market Institutions in China," in John McMillan & Barry Naughton (eds.), *Reforming Asian Socialism: The Growth of Market Institutions* (Ann Arbor: University of Michigan Press, 1996): 39-59

"The Execution of Civil Judgments in China," *China Quarterly*, no. 141 (March 1995): 65-81; translated into Japanese as "Chûgoku ni okeru minji hanketsu no kyôsei shikkô," in Hikota Koguchi (ed.), *Chûgoku no Keizai Hatten to Hô* (Tokyo: Waseda University Institute of Comparative Law, 1998): 343-367

"Antagonistic Contradictions: Criminal Law and Human Rights in China" (with James V. Feinerman), *China Quarterly*, no. 141 (March 1995): 135-154

"Justice and the Legal System," in Robert Benewick & Paul Wingrove (eds.), *China in the 1990s* (London: Macmillan, 1995): 83-93

"GATT Membership for China?," *University of Puget Sound Law Review*, vol. 17, no. 3 (Spring 1994): 517-531

"Regulation and Its Discontents: Understanding Economic Law in China," *Stanford Journal of International Law*, vol. 28, no. 2 (Spring 1992): 283-322

"Dispute Resolution in China," *Journal of Chinese Law*, vol. 5, no. 2 (Fall 1991): 245-296

"What's Law Got to Do with It? Legal Institutions and Economic Reform in China," *UCLA Pacific Basin Law Journal*, vol. 10, no. 1 (Fall 1991): 1-76

"Law, the State and Economic Reform in China," in Gordon White (ed.), *The Chinese State in the Era of Economic Reform: The Road to Crisis* (London: Macmillan, 1991): 190-211

"Political Power and Authority in Recent Chinese Literature," *China Quarterly*, no. 102 (June 1985): 234-252

"Concepts of Law in the Chinese Anti-Crime Campaign," *Harvard Law Review*, vol. 98, no. 8 (June 1985): 1890-1908

## Short Articles, Comments, and Book Reviews

"*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*: Respect but Verify: Foreign Government Statements of Foreign Law Do Not Get Conclusive Deference," *Geo. Wash. L. Rev. on the Docket* (June 21, 2018), https://www.gwlr.org/animal-science-products-inc.

"Do Western Media Focus Too Much on Human Rights Issues in China," *Hong Kong Free Press*, Jan. 13, 2018, *available at* https://perma.cc/ER6L-3LCF

"Has China Restored Private Land Ownership?", *Foreign Affairs*, May 16, 2017, *available at* https://perma.cc/FBH9-Z6L7

"The Paradox at the Heart of China's Property Regime," *Foreign Policy*, Jan. 19, 2017, http://foreignpolicy.com/2017/01/19/the-paradox-at-the-heart-of-chinas-property-regime-we nzhou-lease-renewal-problems/ [https://perma.cc/65UD-9TDA]

"China's Legal System and the Fourth Plenum," *Asia Policy*, no. 20 (July 2015), pp. 10-16, *available at* http://www.nbr.org/publications/issue.aspx?id=319

"Alibaba Shareholder Disenfranchisement: Worse than You Think," *FT Alphaville*, Oct. 20, 2014, http://on.ft.com/1vUEjQl

"The Significance of Recent Detentions for the Rule of Law in China," testimony before the Congressional-Executive Commission on China, in *Understanding China's Crackdown on Rights Advocates: Personal Accounts and Perspectives*, April 8, 2014, *available at* http://1.usa.gov/1j31ZK3

"Why Hefei?", *Caixin Online*, July 27, 2012, http://english.caixin.com/2012-07-27/100416240.html

"Waizi kongzhile Zhongguo hulianwang ma?" (Does Foreign Capital Control the Chinese Internet?), *Caixin Wang* (Caixin Online), July 22, 2011, http://www.caing.com/2011-07-22/100282578.html (Chinese-language version of "Who Owns the Chinese Internet" below)

"Who Owns the Chinese Internet?", *Caixin Online*, July 15, 2011, http://english.caing.com/2011-07-15/100279928.html, also in *Caixin Weekly*, no. 36 (July 25, 2011): 58-60

"China's Jasmine Crackdown and the Legal System," *East Asia Forum* (Australian National University), May 26, 2011, http://www.eastasiaforum.org/2011/05/26/china-s-jasmine-crackdown-and-the-legal-system/ (alternate URL: http://bit.ly/k8eI2U)

"New Approaches to the Study of Political Order in China," *Modern China*, vol. 36, no. 1 (2010): 87-99

"Lawyers and the State: Recent Developments," testimony before the Congressional-Executive Commission on China, Washington, D.C., October 7, 2009

"Lawsuits as Criticism," in "Room for Debate: China's New Rebels," *New York Times*, June 2, 2009, http://nyti.ms/kKt9sl

"Law, Institutions, and Property Rights in China" (with Peter Murrell and Susan Whiting), *Woodrow Wilson International Center for Scholars Asia Program Special Report*, no. 129, 2005: 42-47

"Xintuo zeren de zhenzheng yiyi -- yu Lang Xianping jiaoshou shangque" (The True Meaning of Fiduciary Liability: A Discussion with Professor Lang Xianping), *Zhongguo Zhengquan Bao* (China Securities News), Dec. 5, 2003

"Ruhe quezhi yijia gongsi de cunzai: Zhongguo fa shang de kunhuo he falü duoyuan zhuyi" (How Do We Know When an Enterprise Exists? Unanswerable Questions and Legal Polycentricity in Chinese Law), in Wang Baoshu (ed.), *Quanqiu Jingzheng Tizhi Xia de Gongsi Fa Gaige* (Company Law Reform in a System of Global Competition) (Beijing: Shehui Kexue Wenxian Chubanshe [Social Sciences Documentation Press], 2003): 74-76

"Corporatisation, Not Privatisation," *China Economic Quarterly*, vol. 7, no. 3 (2003): 27-30

Review of Peter Murrell (ed.), *Assessing the Value of Law in Transition Economies* (Ann Arbor: Univ. of Michigan Press, 2001), in *Journal of Economic Literature*, vol. 41 (June 2003): 624-625

"China" (with Nicholas Howson and Lester Ross), in *Insolvency & Restructuring 2003* (London: Law Business Research, 2003): Chapter 9

Statement Before the Congressional-Executive Commission on China (June 6, 2002), in "WTO: Will China Keep Its Promises? Can It?", *Hearing Before the Congressional-Executive Commission on China*, 107th Congress, Second Session (Washington, D.C.: U.S. Government Printing Office, 2002): 66-78

Statement Before the United States-China Security Review Commission (Jan. 18, 2002) [on China's accession to the World Trade Organization], in *Compilation of Hearings Held Before the U.S.-China Security Review Commission*, 107th Congress, First and Second Sessions (Washington, D.C.: U.S. Government Printing Office, 2002): 1171-1181

"China" (with Lester Ross), in *Insolvency & Restructuring 2002* (London: Law Business Research, 2002): 57-63 (Chapter 9)

"Dispute Resolution in China: The Arbitration Option" (with Angela H. Davis), in Asia Law and Practice (ed.), *China 2000: Emerging Investment, Funding and Advisory Opportunities for a New China* (Hong Kong: Euromoney Publications (Jersey) Limited, 1999): 151-162

"State Council Notice Nullifies Statutory Rights of Creditors," *East Asian Executive Reports*, vol. 19, no. 4 (April 15, 1997): 9-15

"China's New Partnership Law" (with Nicholas Howson and Gangliang Qiao), *The China Business Review*, July-August 1997: 30-33

"Shanghai Measures on Land Use by FIEs: An Indication of Coming Changes in the National System?" (with Nicholas C. Howson), *East Asian Executive Reports*, vol. 18, no. 11 (November 15, 1996): 9-13

"Bill Jones: An Appreciation," *Washington University Law Quarterly*, vol. 74 (Fall 1996): 545-546

"Methodologies for Research in Chinese Law," *University of British Columbia Law Review*, vol. 30, no. 1 (1996): 201-209

"One Step Back Permits Two Steps Forward," *China Rights Forum*, Fall 1996: 8-11

"Developing P.R.C. Property and Real Estate Law: Revised Land Registration Rules" (with Nicholas C. Howson), *East Asian Executive Reports*, vol. 18, no. 4 (April 15, 1996): 9, 13-17

"Implementation of Central Policy and the Law in China," *European Association for Chinese Law Information Bulletin* (1991)

"Foreign Economic Laws and Bureaucracy in China," *European Association for Chinese Law Information Bulletin*, vol. 5, no. 4 (December 1989): 3-7

Review of Frank K. Upham, *Law and Social Change in Postwar Japan* (1987), in *Bulletin of the School of Oriental and African Studies* (1989)

Contribution on the People's Republic of China for "Crime and Punishment" section of the *Encyclopaedia Britannica* (1989)

Review of Michael J. Moser (ed.), *Foreign Trade, Investment, and the Law in the People's Republic of China* (2nd ed. 1987), in *Lloyd's Maritime and Commercial Law Quarterly*, 1989, Part 1: 129-130 (February 1989)

"Relief on the Way for Foreign Investors," *South* (June 1987): 32

Review of J. Oldham (ed.), *China's Legal Development* (1986), in *China Quarterly*, no. 109 (March 1987): 122-123

Review of D.T.C. Wang, *Les sources du droit de la République populaire de Chine* (1982), in *China Quarterly*, no. 108 (December 1986): 727-728

Review of M.D. Pendleton, *Intellectual Property Law in the People's Republic of China* (1986), in *European Intellectual Property Review*, vol. 8, no. 10 (October 1986): 323-324

Review of D. Solinger, *Chinese Business Under Socialism. The Politics of Domestic Commerce, 1949-1980*
(1984), in *China Quarterly*, no. 106 (June 1986): 348-350

Review of P. Gladwin & A. Hameed, *Guide to the Patent Law of the People's Republic of China* (1985), in
*European Intellectual Property Review*, vol. 8, no. 5 (May 1986): 160

"China's New Rule of Law," *Britain-China*, no. 31 (Spring 1986): 11-14

"Proposed Consent Agreement Between General Motors Corporation and Toyota Motor
Corporation," *Harvard International Law Journal*, vol. 25, no. 2 (Spring 1984): 421-427

### Unpublished Working Papers

"The Bonding Effect in Cross-Listed Chinese Companies: Is It Real?" (Dec. 31, 2015), GWU Legal
Studies Research Paper No. 2015-55, available at http://ssrn.com/abstract=2710717

"The Peter Humphrey/Yu Yingzeng Case and Business Intelligence in China" (Aug. 5, 2015), GWU
Legal Studies Research Paper No. 2015-26, available at http://ssrn.com/abstract=2640737

"Lost in Translation? Corporate Legal Transplants in China" (July 3, 2006), GWU Law School Public
Law Research Paper No. 213, available at http://ssrn.com/abstract=913784

"The Enforcement of United States Court Judgments in China: A Research Note" (May 27, 2004),
available at http://ssrn.com/abstract=943922

### Blogs

*The China Collection*, http://thechinacollection.org/ (formerly *The Chinese Law Prof Blog*,
http://lawprofessors.typepad.com/china_law_prof_blog/)

Co-blogger, *ChinaFile*, http://www.chinafile.com (sponsored by the National Committee on US-China
Relations)

### Translations

"The Management Liability of Directors," *Law in Japan*, vol. 20 (1987): 150-172 (translation from
Japanese of M. Kondô, "Torishimariyaku no keiei sekinin")

### LECTURES, INTERVIEWS, PRESENTATIONS, AND CONFERENCE APPEARANCES

"The Supreme Court's Vitamin C Antitrust Case," presentation at George Washington University Law
School Faculty Workshop, Washington, DC, June 6, 2018

"The Law of Local Government Debt in China," presentation at *A Legal Revolution: Evolving Jurisprudence
in Present Day China*, symposium sponsored by George Washington University International Law
Review, Washington, DC, April 2018

"Corporate Governance in China," invited lecture at Columbia Law School, New York, NY, March
2018

"Local Government Debt in China," presentation at Center for Chinese Law, Columbia Law School,
New York, NY, March 2018

"Anti Anti-Orientalism," paper presented at *Comparative Law Works in Progress Workshop*, sponsored by
American Society of Comparative Law, Princeton, NJ, February 2018

"China's Law on Supervision," presentation at *US-China Rule of Law Dialog*, sponsored by National
Committee on US-China Relations, New York, NY, November 2017

Panelist, *Containing the Fallout from the North Korea Crisis: What Role for U.S. and International Law?*, George Washington University Law School, Washington, DC, Sept. 6, 2017

Panelist, *Anti-Corruption Forever? Xi Jinping's Signature Policy in a Fraught Political Year*, Woodrow Wilson International Center for Scholars, Washington, DC, March 24, 2017

"Short- and Long-Term Perspectives on Legal Developments in China," presentation at *Fourth Annual China Law Conference*, University of Toronto Faculty of Law, Toronto, Canada, Feb. 18, 2017

Panelist, *Reinvigorating Human Rights Policy Toward China*, conference sponsored by McCain Institute for International Leadership (Arizona State University) and Robert Strauss Center for International Security and Law, Washington, DC, Nov. 15-16, 2016

"Chinese Law and Chinese Language," paper presented at conference on *How and Why Language Learning Is Useful in China Careers*, sponsored by Princeton in Beijing, Princeton, NJ, Oct. 21-23, 2016

Participant, Roundtable discussion on China's Overseas NGO Law, Department of State, Washington, DC, May 13, 2016

Panel moderator and discussant, *Judicial Reform, Legal Reform and IP in China: A Roundtable Discussion*, United States Patent and Trademark Office, Alexandria, VA, April 14, 2016

Presentation at *World Development Report 2017 on Governance and the Law, Symposium on The Role of Law in Governance*, World Bank, Washington, DC, April 13, 2016

"Anti Anti-Orientalism, or Is Chinese Law Different?", invited lecture, University of British Columbia Law School, Vancouver, Canada, March 30, 2016

"Legal and Regulatory Reform – or Not: Implications for Business," presentation at *Third Annual China Law Conference*, University of Toronto Faculty of Law, Toronto, Canada, March 26, 2016

Participant in *Sixth Sino-American Dialogue on the Rule of Law and Human Rights*, sponsored by the National Council on US-China Relations and the China Foundation for Human Rights Development, Beijing, China, Dec. 6-10, 2015

"Legal Issues of the Fourth Plenum," presentation at *5th Annual NYU Conference on Chinese Capital Markets: Assessing the Progress of China's Economic and Legal Reforms*, New York University, New York, NY, Dec. 5, 2015

Invited participant, conference on *The Chinese State & Market: Toward the 13th Five-Year Plan*, Center for Strategic and International Studies, Washington, DC, Nov. 24, 2015

"Is the Xi Administration Interested in the Rule of Law?", invited lecture at USPTO's Global IP Academy, Alexandria, VA, July 14, 2015

"Recent Developments in American Insider Trading Law: Why China Should Not Learn from the US," invited lecture, China Securities Regulatory Commission, Beijing, China, May 25, 2015

"Anti Anti-Orientalism, or Is Chinese Law Different?", invited lecture, University of Michigan Center for Chinese Studies Occasional Lecture Series, Ann Arbor, MI, March 25, 2015

"Anti Anti-Orientalism, or Is Chinese Law Different?", keynote address, *Law and the Legal Profession in China Conference*, University of Pittsburgh School of Law, Pittsburgh, PA, Feb. 27, 2015

"The Bonding Effect in Cross-Listed Chinese Companies: Is It Real?", conference paper presented at *Public and Private Enforcement of Company Law and Securities Regulation—China and the World*, sponsored by Chinese University of Hong Kong, University of Michigan Law School, and University of Michigan Center for Chinese Studies, Hong Kong, Dec. 13, 2014

"China's Stealth Urban Land Revolution," invited lecture at Fall 2014 Speaker Series, Institute for the Study of International Development, McGill University, Montreal, Canada, Nov. 27, 2014

"Fourth Plenum Legal Reforms and Their Implications for US-China Relations," talk presented at conference on *Corruption, Constitutionalism & Control: Implications of the 4th Plenum for China and*

*U.S.-China Relations*, Woodrow Wilson International Center for Scholars, Washington, DC, Nov. 25, 2014

"Local Government Financing Vehicles in China and their Debt: The Legal Picture," talk presented at Sigur Center for Asian Studies, George Washington University, Nov. 25, 2014

"Legal Developments in China Since the Third Plenum," panel presentation at American Association for Chinese Studies Annual Meeting, Washington, DC, Oct. 11, 2014

"Blowback: How China's Efforts to Bring Private-Sector Standards into the Public Sector Backfired," paper presentation at conference on *Chinese State Capitalism and Institutional Change: Domestic and Global Implications*, Columbia Law School, New York, NY, June 13-14, 2014

"The Significance of Recent Detentions for the Rule of Law in China," testimony before the Congressional-Executive Commission on China, Washington, DC, April 8, 2014

Interviewed for the United States-China Policy Foundation's *China Forum*, available at http://youtu.be/7hfwjStUcDs, April 2, 2014

Moderator for panel on "Wider Implications of Asian Maritime Tensions," Mansfield Foundation conference on *Maritime and Territorial Disputes in East Asian Waters*, Washington, DC, Feb. 12, 2014

Speaker at Third Annual China Intellectual Property Conference, George Washington University Law School, Washington, DC, Dec. 11, 2013

"Legal Aspects of Entrepreneurship in China," presentation at US-China Legal Exchange (co-organized by U.S. Department of Commerce and P.R.C. Ministry of Commerce), George Washington University Law School, Washington, DC, Dec. 3, 2013

"China's Stealth Urban Land Revolution," seminar presentation, Yale Law School, April 4, 2013

"China's Stealth Urban Land Revolution," seminar presentation, Columbia Law School, March 1, 2013

Participant in *Fourth Sino-American Dialog on Rule of Law and Human Rights*, sponsored by the National Council on US-China Relations and the China Foundation for Human Rights Development, Haikou, China, Dec. 3-7, 2012

Discussant at *Festschrift Conference in Honor of Professor John Haley: Law in Japan and Its Role in Asia—Between East and West*, University of Washington School of Law, Seattle, Oct. 19, 2012

"China's Stealth Urban Land Revolution," invited lecture at University of Amsterdam, June 18, 2012

"China's Informal Constitutional Order," presentation at *Social Change and the Constitution: A Conference on the Occasion of the 30th Anniversary of the 1982 Constitution of the People's Republic of China*, Free University of Berlin, June 15-17, 2012

"Local Government Bonds in China: What's Behind Them?", presentation at *Shanghai Forum 2012*, sponsored by Fudan University and Korean Foundation for Advanced Studies, Shanghai, May 27, 2012 (in Chinese)

"China's Stealth Urban Land Revolution," presentation at *Perspectives on Chinese Law* conference, George Washington University Law School, Washington, DC, April 13, 2012

Panelist in "Who Makes Your iPhone? China Migration, Labor, and Human Rights," *Program in Public Law*, Duke Law School, Durham, NC, April 4, 2012

Panelist in "China's Environmental Policy," Duke Law School, Durham, NC, March 29, 2012

Interviewed by Radio Australia on recent developments in Chinese law, Mar. 21, 2012

Roundtable participant in conference on *Democracy in China and Southeast Asia: Local and National Perspectives*, Princeton University, Princeton, NJ, March 15, 2012

"China's Stealth Urban Land Revolution," Duke Law School, Durham, NC, Feb. 29, 2012

Participated in panel on "The Rule of Law and Economic Background" at conference on *Patents, Trade, and Innovation in China*, George Washington University Law School, Washington, DC, Dec. 13, 2011

Panelist at NYU Law School's *17th Annual Timothy A. Gelatt Dialogue on the Rule of Law in Asia, China's Quest for Justice: Law and Legal Institutions Since the Empire's Collapse*, Nov. 7, 2011

"Zhongguo de yinxing chengshi tudi geming" (China's Stealth Urban Land Revolution), presentation to Hongfan Institute of Law and Economics, Beijing, June 25, 2011 (in Chinese)

"Recent Developments in China's Legal System and Their Implications for Rule of Law," presentation sponsored by Economist Intelligence Unit, Shanghai, May 27, 2011

"Derivative Actions in China," invited lecture at Hong Kong University Faculty of Law, Hong Kong, May 12, 2011

Commentator, conference on *Criminal Justice in China: Comparative Perspectives*, sponsored by Chinese University of Hong Kong, Hong Kong, May 7-8, 2011

"Derivative Actions in China," presentation to faculty at Fordham University Law School, New York, March 7, 2011

"Derivative Actions in China," presentation to faculty at Duke University Law School, Durham, March 3, 2011

Discussant, *Second Sino-American Dialogue on the Rule of Law and Human Rights*, sponsored by the National Council on US-China Relations and the China Foundation for Human Rights Development, Xiamen, Dec. 7-8, 2011

"Transnational Litigation Involving China," presentation at conference on *Law and Business in China*, sponsored by the Faculty of Law and the Asian Studies Program of Pontificia Universidad Católica de Chile, Santiago, Nov. 25-26, 2010

"Understanding the Chinese Legal System: Searching for the Right Paradigm," invited lecture at University of Buenos Aires Faculty of Law, Buenos Aires, Nov. 22, 2010

"Is Chinese Law Different?", invited lecture at Universidad Torcuato Di Tella Faculty of Law, Buenos Aires, Nov. 22, 2010

"Governance and China's Evolving Relationship with Its Citizens," panel presentation at *Economist* conference *China Summit: China and the New World Disorder*, Beijing, Nov. 3, 2010

"Derivative Actions in the People's Republic of China," presentation at conference on *The Prospect of Structural Reform of the Corporate Legal System*, sponsored by Tsinghua University Faculty of Law, Beijing, Oct. 30-31, 2010

"The Interface Between the Regulation of China's Internal Market and the Global Trading System," seminar presentation, Yale Law School, Oct. 5, 2010

"The Interface Between the Regulation of China's Internal Market and the Global Trading System," seminar presentation, Columbia Law School, New York, Sept. 28, 2010

Commentator at conference on *The Global Financial Crisis and China's Development*, sponsored by the University of Chicago Center in Beijing and Renmin University School of Economics, Beijing, July 30-31, 2010

"Local Experimentation in the Chinese Legislative System," paper presented at *China-US Rule of Law Dialogue*, sponsored by the China-US Exchange Foundation, Beijing, July 29-30, 2010

"Shareholder Derivative Suits in China," invited lecture, Hong Kong University Faculty of Law, Hong Kong, June 1, 2010

Panelist on "Business Law" panel at George Washington University Law School- Georgetown University Law Center conference *Six Decades of Asian Law: A Celebration of Professor Jerome Cohen*, Washington, D.C., February 19, 2010

"Lawyers and the State in China: Recent Developments," testimony at hearing on *Human Rights and Rule of Law in China*, Congressional-Executive Commission on China, Washington, D.C., October 7, 2009

"Trends in Comparative Corporate Law Scholarship," panel presentation at Association of American Law Schools Mid-Year Conference, Long Beach, California, June 9, 2009

"Who and What Matters in Chinese Stock Markets: Implications for Regulation," presentation at symposium *A New Era Dawns for Asian Capital Markets*, Asia Law Society, University of Michigan Law School, Ann Arbor, 21 March 2009

"The Concept of the Extra-Legal in Chinese Law," presentation at Global Law Workshop, George Washington University Law School, Washington, D.C., 23 February 2009

"Is Chinese Law Different?", lecture presented at United States Naval Academy, Annapolis, Maryland, 13 February 2009

"Does Chinese Law Matter?", presentation to United States Treasury Department, Washington, D.C., 12 February 2009

"The Concept of the Extra-Legal in Chinese Law and Its Significance," lecture presented at seminar *Are Politics Really in Command? China and the Rule of Law*, Norwegian Centre for Human Rights, China Programme, Oslo, 16 January 2009

"Private Enforcement of the Public Interest in China: Potential and Pitfalls," lecture presented at UCLA Center for Chinese Studies, Los Angeles, 24 November 2008

"The Ecology of Corporate Governance in China," presentation at UCLA School of Law Faculty Colloquium, Los Angeles, 14 November 2008

"Selfishness in the Public Interest? The 'Private Attorney-General' in China," lecture presented at School of International Relations and Pacific Studies, University of California at San Diego, 30 October 2008

"New Developments in Chinese Property Law," presentation at 2008 US-China Business Law Conference at UCLA, Los Angeles, 24 October 2008

"The Ecology of Corporate Governance in China," presentation at University of Illinois Law School Faculty Workshop, Champaign, Ill., 20 October 2008

"Delaware's Dysfunctional Derivative Suit Doctrine," lecture presented at Faculty of Law, Renmin University, Beijing, 11 June 2008 (in Chinese)

"Three Concepts of the Independent Director," paper presented at Contemporary Corporate Law Scholarship Reading Group (seminar course conducted by Prof. Jeffrey Gordon, Columbia Law School), 23 April 2008

"Chinese Corporate Governance in Global Context," lecture presented at Yale University, sponsored by Yale Working Group on Corporate Governance and Millstein Center for Corporate Governance and Performance, 22 April 2008

"Corporate Governance Institutions in China," presentation at New York University School of Law Faculty Workshop, 14 April 2008

Commentator at *Conference on Law, Commerce and Development*, New York University School of Law, New York, 12 April 2008

Discussant at panel on *New Dimensions in China Watching: Internet Forums and the Study of Contemporary China*, Association for Asian Studies Annual Meeting, Atlanta, 3 April 2008

"Chinese Corporate Governance: All Sizzle, No Steak?", roundtable presentation at Council on Foreign Relations, New York, 19 November 2007

"The Institutional Environment of Chinese Corporate Governance," lecture presented at China House series on *The Legal Infrastructure of New China*, New York University, New York, 14 November 2007

"Forum Non Conveniens Issues in China-Related Litigation," presentation at *Global Justice Forum*, Columbia Law School, New York, 2 November 2007

"The Ecology of Chinese Corporate Governance," presentation at Chinese Law Workshop, Yale Law School, New Haven, 29 October 2007

"Private Attorney-General Litigation in China," paper presented at conference on *Chinese Justice*, Fairbank Center for East Asian Research, Harvard University, 12 October 2007

"The Ecology of Chinese Corporate Governance," lecture delivered at Max Planck Institute, Hamburg, Germany, 30 July 2007

Discussant at panel on *Comparative Corporate Governance: Law in Context*, Law and Society Association Annual Meeting, Berlin, 26 July 2007

"The Ecology of Chinese Corporate Governance," paper presented at panel on *Law and Development: The China Consensus?*, Law and Society Association Annual Meeting, Berlin, 26 July 2007

"China: Creating a Legal System for a Market Economy," report delivered at symposium on *Development and Reform of China's Legal and Judicial System: Review and Prospect*, sponsored by the Asian Development Bank, Beijing, 14-15 May 2007

Commentator, conference on *China's Financial System Reforms and Governance*, School of Advanced International Studies, Johns Hopkins University, Washington DC, 16 April 2007

"Is Chinese Law Different?", public lecture sponsored by East Asian Studies Program, Princeton University, Princeton, New Jersey, 10 April 2007

"The Role of Law in China's Economic Development," public lecture sponsored by Department of Economics, Middlebury College, Middlebury, Vermont, 5 April 2007

Panelist, "The Academic Perspective and Recent Research," *OECD-China Policy Dialogue on Corporate Governance*, sponsored by the OECD, Shanghai Stock Exchange, State Assets Supervision and Administration Commission, Chinese Securities Regulatory Commission, Development Research Center, Government of Japan, Global Corporate Governance Forum, and Millstein Center for Corporate Governance and Performance at Yale School of Management, 29-30 March 2007

Public lecture, "The Ecology of Chinese Corporate Governance," sponsored by Asian Institute of International Financial Law, Faculty of Law, University of Hong Kong, 2 March 2007

"The Rule of Law in China," roundtable discussion (with Jerome A. Cohen), MITRE Corporation, Washington, DC, 2 February 2007

Guest lecturer, National Taiwan University Faculty of Law, "The Institutional Environment of Corporate Governance in China" (in Chinese), 22 December 2006

Guest lecturer, New York University Law School, "Chinese Constitutional Law", 14 November 2006

"The Institutional Environment of Corporate Governance in China", lecture presented as part of Clarke Program Colloquium Series, Cornell Law School, 3 November 2006

"The Role of Non-Legal Institutions in Chinese Corporate Governance", paper presented at authors' workshop on *A Decade After Crisis: The Transformation of Corporate Governance in East Asia* sponsored by the Center of Excellence Program in Soft Law at the University of Tokyo, the Center on Financial Law at Seoul National University, and the Center for Japanese Legal Studies at Columbia Law School, Tokyo, 1 October 2006

"The Institutional Environment of Chinese Corporate Governance", paper presented at panel on *Legal Aspects of the Economic Transformation in China*, annual conference of the International Society for New Institutional Economics, Boulder, Colorado, 23 September 2006

"Law and the Economy in China: The Past Decade", paper presented at authors' workshop on *Developments in Chinese Law: The Last Ten Years*, sponsored by *The China Quarterly* and All Souls College, Oxford University, Oxford, UK, 15 September 2006

"The Institutional Environment of Corporate Governance in China and Its Policy Implications", paper presented at conference on *Corporate Governance in East Asia: Culture, Psychology, Economics and Law*, Berkeley Center for Law, Business and the Economy, Boalt Hall School of Law, 5 May 2006

Guest lecturer, Yale Law School, "Recent Revisions to China's Securities Law", 4 April 2006

Commentator, Roundtable on "China's Emerging Financial Markets: Opportunities and Obstacles," Transactional Studies Program, Columbia Law School, New York, 19 January 2006

Speaker at Timothy A. Gelatt Memorial Dialog on Law and Development in Asia, New York University Law School, New York, 18 January 2006

Speaker and participant in workshop on administrative rule-making under China's new Securities Law, sponsored by the FIRST Initiative, the Finance and Economics Committee of the National People's Congress, and the World Bank, Beijing, 14-15 January 2006

Panelist, "The Globalization of American Law? Comparative Law and the New Legal Transplants", Section on Comparative Law, American Association of Law Schools annual meeting, Washington, DC, 5 January 2006

Panelist, "Improving the Fairness and Transparency of Judicial Decisions", conference on *Rule of Law Developments in China*, sponsored by the Bureau of Democracy, Human Rights, and Labor, Department of State, Washington, DC, 7 November 2005

Interviewed on BBC World Service on recent developments in death penalty procedures in China, 26 October 2005

"Lost in Translation: Legal Transplants in Chinese Corporate Law", Rowdget Young Visiting Fellow Lecture, University of Hong Kong Faculty of Law, Hong Kong, 4 June 2005

"The Independent Director in Chinese Corporate Governance", invited paper presented at 4th Asian Corporate Governance Conference, co-hosted by Asian Institute of Corporate Governance, Korea University and Center for Financial Law, Seoul National University, sponsored by World Bank Global Corporate Governance Forum, Seoul, 19-20 May 2005

"The Legacy of History in China's Legal System", paper presented at conference on *The Rule of Law: Chinese Law and Business*, Centre for Socio-Legal Studies, Oxford University, May 11-13, 2005

"The Emerging Private Sector and China's Legal System", paper presented at conference on *China's Economic and Sociopolitical Transformation: Measuring China's Emerging Private Sector and Its Impact*, Washington, DC, 22 April 2005

"How Do We Know When an Enterprise Exists? Unanswerable Questions and Legal Polycentricity in China", paper presented at conference on *New Scholarship in Chinese Law: A Celebration in Honor of Stanley Lubman*, Center for Chinese Legal Studies, Columbia Law School, New York, 15 April 2005

"Lost in Translation? Corporate Law in China", paper presented at conference on *Asia in a Globalizing World*, Center for East Asian and Pacific Studies, University of Illinois at Urbana-Champaign, 9 April 2005

Guest lecturer in course on "China and Globalization", Prof. Reuven Avi-Yonah, University of Michigan Law School, Ann Arbor, 1 April 2005

"Law, Institutions, and Property Rights", paper presented at conference on *China's Economy: Retrospect and Prospect*, Woodrow Wilson International Center for Scholars, Washington, DC, 2 March 2005

"Insider Trading Law in the United States and China", lecture presented in Chinese at East China University of Politics and Law, Shanghai, 25 November 2004

"Law, Property Rights, and Institutions" (with Peter Murrell and Susan Whiting), paper presented at conference on *China's Economic Transition: Origins, Mechanisms, and Consequences* (Part II), University of Pittsburgh, 5-7 November 2004

"The Independent Director in Chinese Corporate Governance", opening paper presented at conference on *Amendment of the Company Law* organized by the Legislative Affairs Office of the State Council, the China Securities Regulatory Commission, and the Shanghai Stock Exchange, 10 October 2004

"Insider Trading Law in the United States and China", talk presented to Shanghai Institute of Law and Economics, Beijing, 28 September 2004

"China's Proposed Bankruptcy Law", commentator at conference on *Legal and Financial Infrastructure Requirements for Residential Mortgage Securitization in China* organized by Beijing University School of Law, Center for Real Estate Law and Financial Law Institute, Beijing, 17 July 2004

"Does Law Matter in China?", talk presented at Global Business Center, University of Washington School of Business, 15 January 2004

"Why China Should Not Adopt United States Insider Trading Law", paper presented at conference on *Corporate Fraud and Governance: American and Chinese Perspectives* organized by Shanghai Jiaotong University and New York University School of Law, Shanghai, 16 December 2003

"Human Rights and Culture", paper presented at conference on *Sino-U.S. Human Rights Conference* organized by Georgetown University Law Center, Beijing, 14 December 2003

"The History of Corporate Governance in China", commentator at conference organized by Shanghai Institute of Law and Economics, Beijing, 15 November 2003

"Professional Ethics of Defense Lawyers", commentator at conference on *The Defense Functions of Lawyers and Judicial Justice* organized by the All-China Lawyers Association, the American Bar Association, Renmin University of China, and New York University School of Law, Beijing, 21 September 2003

"The Independent Director in Chinese Corporate Governance", lecture presented at Tsinghua University Faculty of Law, Beijing, 10 April 2003

"The Independent Director in Chinese Corporate Governance", paper presented to the School of Business and Management, Hong Kong University of Science and Technology, 7 March 2003

"Assessing the Value of Law in China's Economy" (with Peter Murrell and Susan Whiting), paper presented at conference on *China's Economic Transition: Origins, Mechanisms, and Consequences* (Part I), University of Toronto, 15-17 November 2002

"China's Entry into the WTO: Prospects for Compliance", paper presented at conference on *China's Accession to the World Trade Organization*, Georgetown University Law Center, 10 Oct. 2002

"How Do We Know When an Enterprise Exists? Unanswerable Questions and Legal Polycentricity in China", paper presented at conference on *The Reform of Corporate Law Under Global Competition*, Commercial Law Research Center of the Faculty of Law, Tsinghua University, Beijing, China, 15 Sept. 2002

"Zhongguo youdai fazhan duoyuanhua de jiandu jizhi" (China Has Yet to Develop a Multidimensional Monitoring Mechanism), *21 Shiji Jingji Baodao* (21st Century Economic Report), 19 Aug. 2002, p. 39, col. 1 (interview)

Testified before the Congressional-Executive Commission on China, Washington, D.C., on issues relating to China's compliance with its WTO commitments, 6 June 2002

"Business Regulation in the Bureaucratic State: Enterprise Law in China", paper presented at panel on *The Rule of Law and Enterprise Reform in China*, Association for Asian Studies annual meeting, 5 April 2002

"What WTO Accession Does *Not* Mean for China", paper presented at panel on *WTO and the International Rule of Law*, American Society of International Law annual meeting, 15 March 2002

Testified before United States-China Security Review Commission, Washington, DC, on issues relating to China's WTO accession, 18 Jan. 2002

"The Independent Director in Chinese Corporate Governance", paper presented at conference on "Protection of Investors' Interests: International Experience and Chinese Practice", Commercial Law Research Center of the Faculty of Law, Tsinghua University, Beijing, China, 18-19 November 2001

"Economic Development and the Rights Hypothesis: The China Problem", paper presented at conference on *Law Reform in Developing and Transitional Economies*, Ulaanbaatar, Mongolia, 2-3 July 2001

Interviewed for feature entitled "Detained in China", broadcast on PBS, *The News Hour with Jim Lehrer*, 18 May 2001 <http://www.pbs.org/newshour/bb/asia/jan-june01/detained_05-18.html>

"Empirical Research in Chinese Law," paper presented to Rule of Law Workshop, Stanford Law School, 18 April 2001

"Transparency in China's Regulation of International Trade," presentation made to audiences from Chinese government, business, and academia in Beijing and Shanghai as part of 5-member United States government mission, 13-25 March 2000

"Courts and Markets in Post-Socialist Transition: China," paper presented at workshop on *Courts and Markets in Post-Socialist Transition*, University of Wisconsin School of Law, 3 March 2000

"Incentives and the Top-Down Model of Regulation in Chinese Land Law," paper presented (in Chinese) at *International Conference on the Legal Framework for Rural Land Use Rights in China*, China Institute for Reform and Development, Haikou, Hainan Province, China, 12-14 January 2000

"Corporate Governance in China," paper presented to members of Project on Corporate Governance in China, Stanford University, Stanford, California, 29 October 1999

"Alternative Approaches to Chinese Law," lecture delivered at UCLA School of Law, Los Angeles, 28 October 1999

Panelist on "Rule of Law in China – Recent Developments and Prospects," Inaugural Session of Global Business Briefing Series, Pacific Council on International Relations, Los Angeles, 28 October 1999

"Misunderstanding Chinese Law: The Lure of the 'Rule of Law' Paradigm," lecture delivered at Faculty of Law, City University of Hong Kong, 27 September1999

Guest lecturer, Chinese administrative law class of Prof. Wang Xixin, Beijing University Faculty of Law, Beijing, China, 23 September 1999

"Bankruptcy in Capitalist and Reforming Socialist Economies," brief course taught to delegation of North Korean legal officials and academics at Beijing University, Beijing, China, 20-23 September 1999

"Misunderstanding Chinese Law: The Lure of the 'Rule of Law' Paradigm," lecture delivered at Faculty of Law, Waseda University, Tokyo, Japan, 23 June 1999

"The Enforcement of Civil Judgments in China," lecture delivered at Faculty of Law, Waseda University, Tokyo, Japan, 19 June 1999

"China's Revised Criminal Law," paper presented at conference on *Contemporary Chinese Legal Development*, sponsored by Chinese Law Society of America, Harvard Law School, Cambridge, Mass., 26-27 March 1999

"Alternative Approaches to Chinese Law," lecture delivered at Yale Law School, 25 March 1999

Commentator, conference on *Administrative Law Reform in China*, sponsored by UCLA Center for Chinese Studies, International Studies & Overseas Programs, UCLA School of Law and Southern California China Colloquium, Los Angeles, 6 March 1999

Participant, *U.S.-China Symposium on the Legal Protection of Human Rights*, The Aspen Institute, 11-13 December 1998

"Private Enforcement of Intellectual Property Rights," paper presented at *Sino-U.S. Conference on Intellectual Property Rights and Economic Development: 1998 Chongqing*, sponsored by the National Bureau of Asian Research, Chongqing, China, 16-18 September 1998

Commentator, conference on *Law and Development in Asia*, co-sponsored by Asian Development Bank and Harvard University, Council on Foreign Relations, New York, 21 May 1998

"Introduction to U.S. Capital Markets for Chinese Enterprises," speech (in Chinese) presented at Investment Promotion Forum sponsored by United Nations Industrial Development Organization, Beijing, 31 March 1998

"Legal Order as a Prerequisite for Cooperation: The China Problem," paper presented at *Inaugural University of California at San Diego Social Sciences Research Conference on Cooperation Under Difficult Conditions*, Graduate School of International Relations and Pacific Studies, 18 October 1997

"Recent Developments in Criminal and Administrative Punishments in China," paper presented at University of Washington School of Law Conference on Asian Law, Seattle, Washington, 3 August 1996

"Enforcement of International Awards Involving China and Hong Kong," paper presented at EuroForum conference on *Dispute Resolution in China and Hong Kong*, London, 31 May 1996

"China and the WTO," paper presented at American Conference Institute conference on *Doing Business in China and Hong Kong*, New York, 10 May 1996

"Recent Developments in Chinese Foreign Investment Law," talk presented at conference on *Trade and Investment in Emerging Markets: China and India*, New York University School of Law, 17 November 1995

Commentator on China at *Timothy A. Gelatt Dialogue on Law and Development in Asia*, New York University School of Law, 14 September 1995

"Round Pegs and Square Holes: China and the GATT," paper presented at panel on *China in the World Economic Order* at the annual meeting of the Association for Asian Studies, Washington, DC, April 1995

"Civil Rights in China," talk delivered to Civil Rights Committee of the Seattle-King County Bar Association, Seattle, March 1995

"Foreign Business Law and China's Application to the GATT/WTO," paper presented at 1990 Institute Conference on Chinese Foreign Trade and Investment Law, San Francisco, March 1995

"China and the GATT/WTO," talk delivered to the World Affairs Club, Juneau, Alaska, March 1995

"The Chinese Court System," paper presented at *Winter Workshop on East Asian Law*, Center for Pacific Rim Studies, University of California at Los Angeles, January 1995

"Enforcement of Civil Judgments in a Changing Society: A Chinese Example," paper presented at annual meeting of the Law and Society Association, Phoenix, Arizona, 17 June 1994

"The Enforcement of Civil and Economic Judgments in China," paper presented at symposium on *The Chinese Legal System*, sponsored by the China Quarterly and the School of Oriental and African Studies, University of London, London, U.K., 10-12 May 1994

"GATT Membership for China?," paper presented at symposium on *Pacific Rim Trade*, University of Puget Sound School of Law, Washington, 5 November 1993

"The Creation of a Legal Structure for Market Institutions in China," paper presented at conference on *The Evolution of Market Institutions in Transition Economies*, Graduate School of International Relations and Pacific Studies, University of California, San Diego, 14-15 May 1993

Chair/discussant at panel on "Theoretical Perspectives in China's Legal Reform," conference on *Chinese Law -- A Re-Examination of the Field: Theoretical and Methodological Approaches to the Study of Chinese Law*, Faculty of Law, University of British Columbia, Vancouver, 22 March 1993

"Research Methodologies in Chinese Law," paper presented at conference on *Chinese Law -- A Re-Examination of the Field: Theoretical and Methodological Approaches to the Study of Chinese Law*, Faculty of Law, University of British Columbia, Vancouver, 22 March 1993

"Enforcement of Civil Judgments in China," talk delivered at *China Studies Seminar*, University of British Columbia, October 1992

Discussant at conference on *The Modernization of Chinese Law on Both Sides of the Taiwan Straits*, National Taiwan University College of Law, September 1992

"Enforcement of Civil Judgments in the People's Republic of China: Notes from the Field," talk delivered at Attorney-General's Chambers, Hong Kong, August 1992

"Dispute Resolution in China," talk delivered at Chinese University of Hong Kong, November 1991

Interviewed on modern Chinese law for program on East Asian legal systems broadcast by BBC World Service (London), September 1991

Discussant at panel on *New Perspectives on Chinese Economic Development*, Western Economic Association Annual Conference, Seattle, 30 June-3 July 1991

"The Trials of the June 4th Defendants," talk delivered at *East Asian Legal Studies Lunchtime Colloquium*, Harvard Law School, 22 March 1991

"What's Law Got to Do with It? Legal Institutions and Economic Reform in China," talk delivered at *East Asian Legal Studies Workshop*, Harvard Law School, 21 March 1991

Guest lecturer, Chinese law class of Prof. William C. Jones, Washington University School of Law, St. Louis, Missouri, 30 January 1991

"Legal Problems of Industrial Economic Reform in China," talk delivered to *Faculty Forum*, Washington University School of Law, St. Louis, Missouri, 30 January 1991

Speaker and panel chairman, "Chinese Business Law," at *China Trade Update: Doing Business with China in the 1990s*, conference sponsored by the Washington State China Relations Council, Seattle, Washington, 5 November 1990

"The Future of Democracy in China," panel discussion sponsored by the Council of International Organizations, Citizens International Center, Seattle, Washington, 21 April 1990

"Why Laws Fail: Central Legislation and the Structure of the Chinese Polity," paper delivered at *Winter Workshop on East Asian Law*, Center for Pacific Rim Studies, University of California at Los Angeles, 20 January 1990

"The Legal Background to the Behavior of State-Owned Enterprises," paper delivered at conference on *Ownership Reforms and Efficiency of State-Owned Enterprises* sponsored by the Institute of Economics of the Chinese Academy of Social Sciences and the Ford Foundation, Shenzhen, China, 6 January 1990

"Implications of Recent Events in China for Sino-U.S. Relations," panel discussion sponsored by U.S.-China People's Friendship Association and the East Asian Resource Centre, University of Washington, 11 July 1989

"Law and Economic Reform in China," *London China Seminar*, School of Oriental and African Studies, University of London, 19 May 1988

"Urban Enterprises and the Role of Law in China's Economic Reforms," Conference on *The Chinese Developmental State: Change and Continuum*, Institute of Development Studies, University of Sussex, 7-9 April 1988

Interviewed for feature entitled "How is China Run?", broadcast on BBC World Service, *The World Today*, 25 March 1988

"The 13th Congress of the Chinese Communist Party and China's Legal Reforms," Asian Studies Centre, St. Antony's College, Oxford University, 8 March 1988

"Chinese Economic and Legal Reforms," John F. Kennedy School of Government, Harvard University, 24 March 1987

Co-organizer and discussant, Conference on *China: Law and Trade 1986*, School of Oriental & African Studies, University of London, 30 June 1986

"The Role of Law in Modern China," Great Britain China Centre, London, 17 April 1986

"The Foreign Economic Contract Law," Law-China Society Seminar on China's Economic Laws, London, 17 April 1986

EXHIBIT 146

Mario N. Alioto, Esq. (56433)
Lauren C. Capurro, Esq. (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA 94123
Telephone:   (415) 563-7200
Facsimile:   (415) 346-0679
malioto@tatp.com
laurenrussell@tatp.com

*Lead Counsel for the Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 4:07-cv-05944-JST (N.D. Cal.)<br><br>MDL No. 1917 |
| This Document Relates to:<br><br>ALL INDIRECT PURCHASER ACTIONS | **INDIRECT PURCHASER PLAINTIFF DONNA ELLINGSON-MACK'S OBJECTIONS AND RESPONSES TO DEFENDANTS IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD.'S FIRST SET OF INTERROGATORIES** |

**PROPOUNDING PARTY:**     **IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD.**

**RESPONDING PARTY:**     **INDIRECT PURCHASER PLAINTIFF DONNA ELLINGSON-MACK**

**SET NUMBER:**     **ONE**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Indirect Purchaser Plaintiff Donna Ellingson-Mack ("Plaintiff Ellingson-Mack") hereby responds and objects to the First Set of Interrogatories propounded by Defendants Irico Group Corp. and Irico Display Devices Co., Ltd. ("Defendants"), as set forth below.

## **PRELIMINARY STATEMENT**

Each of the following responses is subject to all objections of and concerning relevance, materiality, and admissibility, as well as to all and any other objections on any ground requiring exclusion of any response if introduced in Court. All evidentiary objections and grounds accordingly are expressly reserved. Furthermore, Plaintiff Ellingson-Mack's decision, now or in the future, to provide information notwithstanding the objectionable nature of the Interrogatories shall not be construed as (a) an admission that she agrees with any of Defendants' definitions or characterizations contained therein, (b) an admission that the information sought likely will lead to the discovery of admissible evidence, or (c) an agreement that requests for similar information will be treated in a similar manner.

For purposes of these Interrogatories, Plaintiff Ellingson-Mack defines the term "CRT Products" as televisions and computer monitors containing CRTs.

Plaintiff Ellingson-Mack's responses to the First Set of Interrogatories are made without prejudice to her right to introduce any or all evidence of any kind in this case.

The specific responses and objections set forth below are based upon information now known. Plaintiff Ellingson-Mack has not yet completed discovery or preparation for trial in this case, and, therefore, reserves the right to amend, modify, or supplement any general or specific objection or response.

Nothing in her responses to these Interrogatories shall be construed as an admission by Plaintiff Ellingson-Mack going to the competence, admissibility, relevance, or materiality of any fact or document, or as an admission of the truth or accuracy of any characterization of any information of any kind sought by these Interrogatories.

Plaintiff Ellingson-Mack reserves her right to object to use of her responses herein, or the subject matter thereof, on any ground in this or in any subsequent proceeding, including, without limitation, the right to object on any ground at any time to the use of such responses in any discovery procedures in this or any proceeding, and/or at trial.

2

Plaintiff Ellingson-Mack's responses to the Interrogatories are subject to the provisions of the Stipulated Protective Order entered by the Court June 18, 2008 (Document 306) (the "Protective Order"). Plaintiff Ellingson-Mack's Interrogatory Responses hereby are designated "Confidential" in accordance with the provisions of the Protective Order.

Each of the General Objections herein is considered applicable to and is hereby incorporated into each and every response by Plaintiff Ellingson-Mack to the Interrogatories, and each response is given without waiving any of the General Objections. The assertion of any General Objection in response to any Interrogatory should not be considered a waiver of the remaining General Objections. By making the responses herein, Plaintiff Ellingson-Mack does not concede that the information provided is relevant to the claims or defenses of any party or reasonably calculated to lead to the discovery of admissible evidence.

## **GENERAL OBJECTIONS**

1.    Plaintiff Ellingson-Mack objects to, and will not answer, the Interrogatories to the extent they seek discovery of information, legal analysis, and/or strategies concerning any Class Certification motion Indirect Purchaser Plaintiffs may file under Rule 23 of the Federal Rules of Civil Procedure. Such information, legal analysis, and/or strategies are protected from disclosure by the attorney-client privilege and/or the work-product doctrine.

2.    Plaintiff Ellingson-Mack objects to, and will not answer, the Interrogatories to the extent Defendants intend or purport to impose obligations beyond those required or permitted by the Federal Rules of Civil Procedure and the Local Rules of the Northern District of California, or to the extent they are outside the scope of any order or opinion of this Court or of the Special Master, or contrary to any applicable rules of law.

3.    Plaintiff Ellingson-Mack objects to, and will not answer, the Interrogatories to the extent they comprise premature "contention interrogatories," the answers to which are dependent on merits and/or expert discovery. Pursuant to Rule 33(a)(2) of the Federal Rules of Civil Procedure, Plaintiff Ellingson-Mack, as necessary or appropriate, will respond to proper "contention interrogatories" after merits and expert discovery is complete, and/or after some

other time as directed by the Court or Special Master. *See, e.g., In re Convergent Technologies Securities Litigation*, 108 F.R.D. 328, 336 N.D. Cal. 1985) ("There is considerable recent authority for the view that the wisest general policy is to defer propounding and answering contention interrogatories until near the end of the discovery period."); *In re eBay Seller Antitrust Litigation*, No. C 07-1882 JF (RS), 2008 WL 5212170, at *1 (N.D. Cal. Dec. 11, 2008) ("Courts using their Rule 33(a)(2) discretion generally disfavor contention interrogatories asked before discovery is undertaken.").

4.     Plaintiff Ellingson-Mack objects to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent (a) they seek to elicit information relating or referring to matters not raised by the pleadings, (b) they seek to elicit information that is not relevant to the claims or defenses of the parties to this action, (c) they seek to elicit information that is not within Plaintiff Ellingson-Mack's possession, custody, or control, or (d) they seek to elicit information not reasonably calculated to lead to the discovery of admissible evidence.

5.     Plaintiff Ellingson-Mack objects to, and will not answer, the Interrogatories to the extent they seek information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege, protection, immunity, or rule (collectively, "Privileged Information"), including, without limitation, information concerning communications between Plaintiff Ellingson-Mack's attorneys, and/or between Plaintiff Ellingson-Mack and her attorneys, made during, or in anticipation of, litigation. Any inadvertent disclosure of such information is not intended to, and shall not, constitute a general or specific waiver, in whole or in part, of the foregoing privileges or immunities, or the subject matter thereof. Relatedly, any inadvertent disclosure of such information is not intended to, nor shall it, constitute a waiver of the right to object to any use of such information, and any such disclosure shall be treated as specified in Rule 26(b)(5)(B) of the Federal Rules of Civil Procedure.

6.     Plaintiff Ellingson-Mack objects to, and will not answer, the Interrogatories to the extent that (a) they seek the premature disclosure of expert material subject to Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure, and/or (b) they seek disclosure of information

4

INDIRECT PURCHASER PLAINTIFF DONNA ELLINGSON-MACK'S OBJECTIONS AND RESPONSES TO
DEFENDANTS IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD.'S FIRST SET OF
INTERROGATORIES CASE NO. 4:07-CV-05944-JST

concerning any person or entity whom Indirect Purchaser Plaintiff Donna Ellingson-Mack will not designate as an opinion or other witness at trial.

7.   Plaintiff Ellingson-Mack objects to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent they seek information that is equally accessible to Defendants as it is to Plaintiff Ellingson-Mack, or that has been provided by other parties or witnesses.

8.   Plaintiff Ellingson-Mack objects to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent they are cumulative to or duplicative of other Interrogatories.

9.   Plaintiff Ellingson-Mack objects to, and will not answer, the Interrogatories to the extent that they seek confidential or proprietary business information and research.

10.   Plaintiff Ellingson-Mack objects to the purported definition of the terms "You" and "Your" because they are vague, ambiguous, overly broad, and unduly burdensome, as they seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible information. Plaintiff Ellingson-Mack further objects to the inclusion of "attorneys, agents, and representatives of any of the above, and all persons acting or purporting to act on their behalf," within this Definition to the extent it purports to encompass information that is protected by attorney-client privilege and/or work-product doctrine, or any other applicable privilege, protection, immunity, or rule.

11.   Plaintiff Ellingson-Mack objects to the purported definition of the term "Document(s)" to the extent it attempts to impose burdens on her greater than or inconsistent with those imposed by the Federal Rules of Civil Procedure or the Local Rules for the United States District Court for the Northern District of California.

12.   Plaintiff Ellingson-Mack objects to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent they purport to require Plaintiff Ellingson-Mack to identify documents supportive of a response on the ground that any such information is subject to the attorney-client privilege and/or work product doctrine at this stage of this case.

1   13.   Plaintiff Ellingson-Mack objects to the Interrogatories, including the Definitions

2   and Instructions set forth therein, to the extent any one or more or all of them assume disputed

3   facts or legal conclusions. Any response or objection herein is without prejudice to this objection

4   and Plaintiff Ellingson-Mack's right to dispute such purported facts or legal conclusions.

5   **SPECIFIC OBJECTIONS AND RESPONSES**

6   **INTERROGATORY NO. 1:**

7   Identify all Persons who participated or assisted in the preparation of Your responses to

8   these interrogatories.

9   **RESPONSE NO. 1:**

10   In addition to her General Objections listed above, Plaintiff Ellingson-Mack objects to

11   Interrogatory No. 1 because it calls for the disclosure of privileged information, including

12   without limitation, information subject to the attorney-client privilege and/or the work product

13   doctrine. Plaintiff Ellingson-Mack also objects to Interrogatory No. 1 because it seeks

14   information that is neither relevant nor reasonably calculated to lead to the discovery of

15   admissible evidence.

16   Subject to and without waving the objections stated above, Plaintiff Ellingson-Mack

17   responds that her counsel participated or assisted in the preparation of these responses.

18   **INTERROGATORY NO. 2:**

19   Separately identify each acquisition of a CRT or CRT Product upon which You base any

20   claim in this action, including without limitation the date and place of acquisition, the type and

21   manufacturer of each CRT acquired, and the Identity of each Person involved in the acquisition

22   and the time period and nature of each Person's involvement.

23   As part of Your response, Identify each Document that supports Your response.

24   **RESPONSE NO. 2:**

25   In addition to the General Objections listed above, Plaintiff Ellingson-Mack objects to

26   Interrogatory No. 2 because the term "acquisition" is vague, ambiguous, and overly broad.

27

28

1        Subject to and without waiving the objections stated above, Plaintiff Ellingson-Mack

2   responds by stating that she purchased an emachines eView 17f2 Flat CRT Monitor from Best

3   Buy (Store #861) in Rapid City, South Dakota 57701 on March 6, 2004. A friend (Russ Penning)

4   assisted her in making the purchase. Plaintiff Ellingson-Mack also purchased a Sharp Color

5   Television Model 27L-S180 from Rex TV on October 18, 1999. Plaintiff Ellingson-Mack refers

6   Defendants to CRT000075-103 and CRT000525-561.

7        Plaintiff Ellingson-Mack's discovery and investigation is ongoing, and she reserves the

8   right to supplement this response as appropriate.

9   **INTERROGATORY NO. 3:**

10       For each acquisition of a CRT or CRT Product identified in Interrogatory No. 2, state all

11  terms and conditions that were a part of the acquisition, including without limitation all terms

12  and conditions Relating To pricing, taxes, tariffs, duties, freight charges, or any other fees paid

13  by any Person in connection with the acquisition.

14       As part of Your response, Identify each Document that supports Your response.

15  **RESPONSE NO. 3:**

16       In addition to the General Objections listed above, Plaintiff Ellingson-Mack objects to

17  Interrogatory No. 3 because the term "acquisition" is vague, ambiguous, and overly broad.

18       Subject to and without waiving the objections stated above, Plaintiff Ellingson-Mack

19  responds by stating that she paid South Dakota sales tax for both purchases. Plaintiff Ellingson-

20  Mack refers Defendants to CRT000075 and CRT000525.

21  **INTERROGATORY NO. 4:**

22       For each acquisition of a CRT or CRT Product identified in Interrogatory No. 2, state

23  whether the CRT or CRT Product was acquired as part of a system or other bundled product

24  (e.g., a CRT computer monitor acquired in conjunction with a computer, keyboard, speakers,

25  warranty, service plan, or other services) and, if so, the value of each component of such system

26  or bundled product.

27       As part of Your response, Identify each Document that supports Your response.

28

**RESPONSE NO. 4:**

In addition to the General Objections listed above, Plaintiff Ellingson-Mack objects to Interrogatory No. 4 because the term "acquisition" is vague, ambiguous, and overly broad. Plaintiff Ellingson-Mack further responds that the information sought by Interrogatory No. 4 is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the objections stated above, Plaintiff Ellingson-Mack responds by stating that the emachines eView 17f2 Flat CRT Monitor was purchased as part of a system, and she paid $209.99 for it. (*See* CRT000075.) The Sharp Color Television Model 27L-S180 was not acquired as part of a system or other bundled product.

**INTERROGATORY NO. 5:**

For each acquisition of a CRT or CRT Product identified in Interrogatory No. 2, identify any warranties, servicing plans or agreements, membership rewards, or other benefits received by You Relating To the acquisition.

As part of Your response, Identify each Document that supports Your response.

**RESPONSE NO. 5:**

In addition to the General Objections listed above, Plaintiff Ellingson-Mack objects to Interrogatory No. 5 because the term "acquisition" is vague, ambiguous, and overly broad. Plaintiff Ellingson-Mack further objects that the terms "membership rewards" and "other benefits received by You" are vague, ambiguous, overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the objections stated above, Plaintiff Ellingson-Mack responds by stating that she did not purchase an extended warranty or service plan in connection with her acquisition of the emachines eView 17f2 Flat CRT Monitor or the Sharp Color Television Model 27L-S180.

//

//

//

**INTERROGATORY NO. 6:**

Identify the purpose(s) for which You acquired each CRT or CRT Product during the Relevant Period, including without limitation whether the CRT was acquired for resale and, if so, whether and under what terms and conditions it was resold.

**RESPONSE NO. 6:**

In addition to the General Objections listed above, Plaintiff Ellingson-Mack objects to Interrogatory No. 6 because the term "acquired" is vague, ambiguous, and overly broad.

Subject to and without waiving the objections stated above, Plaintiff Ellingson-Mack responds by stating that she purchased both the emachines eView 17f2 Flat CRT Monitor and the Sharp Color Television Model 27L-S180 for personal use and not for resale.

**INTERROGATORY NO. 7:**

Identify in detail every Communication between You and any actual or potential member of the putative class relating to Your potential service as a class representative in this action, including without limitation the Identity of each Person with whom You have so Communicated, whether each such Person has consented, refused to consent, or otherwise responded to Your purported authority to institute this action or serve as a class representative, and the date, time, place, and content of the Communication.

As part of Your response, Identify each Document that supports Your response.

**RESPONSE NO. 7:**

In addition to the General Objections listed above, Plaintiff Ellingson-Mack objects to Interrogatory No. 7 because it calls for the disclosure of privileged information, including without limitation, information subject to the attorney-client privilege and/or the work product doctrine. Plaintiff Ellingson-Mack also objects to Interrogatory No. 7 because it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the objections stated above, Plaintiff Ellingson-Mack has had no such Communication.

**INTERROGATORY NO. 8:**

Identify each civil action, excluding this action, in which You have participated or are currently participating, including without limitation whether You provided deposition, trial, or other testimony in a civil or criminal action, including the date, location, and case number of the action in which the testimony was provided and whether any motion was filed to certify or decertify a class and, if so, the disposition of any such motion.

**RESPONSE NO. 8:**

In addition to the General Objections listed above, Plaintiff Ellingson-Mack objects to Interrogatory No. 8 because it is overly broad and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the objections stated above, Plaintiff Ellingson-Mack responds that she will identify (a) any putative or certified class actions in which she served as a Class Representative, and (b) any other litigation in which she has been involved relating to her purchases of CRT(s) and/or CRT Products.

Plaintiff Ellingson-Mack responds by stating that there are no such civil actions.

**INTERROGATORY NO. 9:**

Describe in detail how, when, the manner in which, and the extent to which You believe You have been damaged as a result of the conduct alleged in the Complaint, including the total dollar amount by which You allege You were overcharged. As part of Your answer, Identify each Person with whom You have consulted, and each Document that You contend supports Your response.

**RESPONSE NO. 9:**

In addition to the General Objections listed above, Plaintiff Ellingson-Mack objects to Interrogatory No. 9 because (a) it calls for the premature disclosure of expert material subject to Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure, and (b) it seeks disclosure of privileged information, including, without limitation, information subject to the attorney-client privilege and/or work product doctrine. Plaintiff Ellingson-Mack further objects that this Interrogatory is a

10

premature contention interrogatory, served before Defendants have provided fact discovery and/or expert analysis and disclosures. *See In re Convergent Technologies Securities Litig.*, 108 F.R.D. 328, 332-38 (N.D. Cal. 1985).

Subject to and without waiving the objections stated above, Plaintiff Ellingson-Mack responds that she suffered damages by paying higher CRT Product prices than she would have in the absence of Defendants' conduct. Plaintiff Ellingson-Mack refers Defendants to (1) the Expert Report of Janet S. Netz Ph.D. dated April 15, 2014, (2) the Errata to the Expert Report of Janet S. Netz Ph.D. dated July 3, 2014, (3) the Rebuttal Report of Janet S. Netz Ph.D. dated September 26, 2014, (4) the Indirect Purchaser Plaintiffs' Objections and Responses to Defendant Hitachi Ltd.'s First Request Set of Interrogatories to the Indirect Purchaser Plaintiffs, Attachment A, and (5) the productions of documents and written discovery responses by the other defendants in this action.

Plaintiff Ellingson-Mack's discovery and investigation is ongoing, and she reserves the right to supplement this response as appropriate.

**INTERROGATORY NO. 10:**

Describe in detail and in narrative form (including by Identifying each Document, Person or other evidentiary source that You rely upon) the factual basis for your allegation that Irico Group Corp. manufactured, marketed, sold and/or distributed CRT Products directly or indirectly throughout the United States, as alleged in paragraph 95 of the Complaint.

**RESPONSE NO. 10:**

In addition to the General Objections listed above, Plaintiff Ellingson-Mack objects to Interrogatory No. 10 because it is a premature contention interrogatory, served before Defendants have provided fact discovery and/or expert analysis and disclosures. *See In re Convergent Technologies Securities Litig.*, 108 F.R.D. 328, 332-38 (N.D. Cal. 1985).

Subject to and without waiving the foregoing objections, Plaintiff Ellingson-Mack responds by referring Defendants to (1) the Indirect Purchaser Plaintiffs' Opposition to the Irico Defendants' Amended Motions to Dismiss Claims of Indirect Purchaser Plaintiffs For Lack of

Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)), ECF No. 5440 at 4-10, (2) the Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Opposition to Irico Defendants' Amended Motion to Dismiss for Lack of Subject Matter Jurisdiction, ECF No. 5440-1, Exs. 1-39, and (3) the Declaration of R. Alexander Saveri in Support of Direct Purchaser Plaintiffs' Opposition to the Irico Defendants' Amended Motion to Dismiss for Lack of Subject Matter Jurisdiction, ECF No. 5419-1 & 5460-2, Exs. 12, 15, 16, 17 & 22.

Pursuant to Plaintiff Ellingson-Mack's obligations under Federal Rule of Civil Procedure 26(e), she will supplement her response to this Interrogatory at the appropriate time following completion of other fact discovery.

**INTERROGATORY NO. 11:**

Describe in detail and in narrative form (including by Identifying each Document, Person or other evidentiary source that You rely upon) the factual basis for your allegation that Irico Display Devices, Co., Ltd. manufactured, marketed, sold and/or distributed CRT Products directly or indirectly, including through its subsidiaries or affiliates, throughout the United States, as alleged in paragraph 96 of the Complaint.

**RESPONSE NO. 11:**

*See* Plaintiff Ellingson-Mack's Objections and Responses to Interrogatory No. 10.

**INTERROGATORY NO. 12:**

Describe in detail and in narrative form (including by Identifying each Document, Person or other evidentiary source that You rely upon) the factual basis for your allegation that Irico Group Corp. was an active participant in the alleged conspiracy, or participated through Display or Electronics, as alleged in paragraph 185 of the Complaint.

**RESPONSE NO. 12:**

In addition to the General Objections listed above, Plaintiff Ellingson-Mack objects to Interrogatory No. 12 because it is a premature contention interrogatory, served before Defendants have provided fact discovery and/or expert analysis and disclosures. *See In re Convergent Technologies Securities Litig.*, 108 F.R.D. 328, 332-38 (N.D. Cal. 1985). Plaintiff

Ellingson-Mack further objects that information responsive to this interrogatory is equally accessible to Defendants as it is to Plaintiff Ellingson-Mack because it has been provided by other parties or witnesses.

Subject to and without waiving the foregoing objections, Plaintiff Ellingson-Mack refers Defendants to (1) the Indirect Purchaser Plaintiffs' Objections and Responses to Defendant Hitachi Ltd.'s First Request Set of Interrogatories to the Indirect Purchaser Plaintiffs, Attachment A, (2) the productions of documents and written discovery responses by the other defendants in this action, (3) the Indirect Purchaser Plaintiffs' Opposition to the Irico Defendants' Amended Motions to Dismiss Claims of Indirect Purchaser Plaintiffs For Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)), ECF No. 5440 at 4-6, (4) the Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Opposition to Irico Defendants' Amended Motion to Dismiss for Lack of Subject Matter Jurisdiction, ECF No. 5440-1, Exs. 1-39, and (5) Declaration of R. Alexander Saveri In Support of Direct Purchaser Plaintiffs' Opposition to Irico Defendants' Motion to Set Aside Default, ECF No. 5226-1, Exs. 11-32 (identifying meetings attended by Irico personnel).

Pursuant to her obligations under Federal Rule of Civil Procedure 26(e), Plaintiff Ellingson-Mack will supplement her response to this Interrogatory at the appropriate time following completion of other fact discovery.

**INTERROGATORY NO. 13:**

Describe in detail and in narrative form (including by Identifying each Document, Person or other evidentiary source that You rely upon) the factual basis for your allegation that Irico Display Devices, Co., Ltd. was an active participant in the alleged conspiracy, or participated through Group, as alleged in paragraph 185 of the Complaint.

**RESPONSE NO. 13:**

*See* Plaintiff Ellingson-Mack's Objections and Responses to Interrogatory No. 12.

//

//

13

INDIRECT PURCHASER PLAINTIFF DONNA ELLINGSON-MACK'S OBJECTIONS AND RESPONSES TO DEFENDANTS IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD.'S FIRST SET OF INTERROGATORIES CASE NO. 4:07-CV-05944-JST

**INTERROGATORY NO. 14:**

Separately Identify each meeting or communication with a competitor or competitors not previously disclosed in Supplemented Attachment A to the Indirect Purchaser Plaintiffs' Objections and Responses to Defendant Koninklijke Philips N.V.'s First Set of Interrogatories to Indirect Purchaser Plaintiffs, dated September 5, 2014, including the Irico employee(s) associated with each meeting or communication, in which you contend Irico participated, as alleged in paragraph 185 of the Complaint.

**RESPONSE NO. 14:**

*See* Plaintiff Ellingson-Mack's Objections and Responses to Interrogatory No. 12.

Dated: April 19, 2021

By:   */s/ Mario N. Alioto*

Mario N. Alioto (56433)
Lauren C. Russell (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA 94123
Telephone:   (415) 563-7200
Facsimile:    (415) 346-0679
malioto@tatp.com
laurenrussell@tatp.com

*Lead Counsel for the*
*Indirect Purchaser Plaintiffs*

14

EXHIBIT 147

7/28/2023

Exhibit 9 to Declaration of Evan J. Werbel in Support of Irico Defendants' Motion for Summary Judgment

| MEETING DATE | LOCATION | CPT | LG | OEC/DW | SDI | HIT | MEC | MIT | TSB | PHS | LPD | MTPD | TCRT | BMCC | IRI | SMTL | TAT | SONY | THOM | INDIVIDUAL PARTICIPANTS | BEG BATES | DEPONENTS | DEPOSITION TESTIMONY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/12/1998 | Hitachi Greenville, S.C. Factory | | | | | X | | | | | | | | | | | | | X | HIT: Tom Heiser, Thom Schmitt<br>THOM: P. Kevin Trompak | HEDUS-CRT00126627 | Tom Heiser | 169:06 (Tom Heiser) |
| 7/8/1998 | White Columns Golf Club, Alpharetta, GA | | | | | X | | | | | | | | | | | | | X | HIT: Tom Heiser<br>THOM: Rick Love, Hans Braun | HEDUS-CRT00166576 | Tom Heiser | 92:03 (Tom Heiser) |
| 7/13/1998 | Third Serve Sports Grill, Norcross, GA | | | | | X | | | | X | | | | | | | | | | HIT Tom Heiser, Thom Schmitt, GL, JS<br>PHS: Jeff Johnson, Pat Canavan, | HEDUS-CRT00166576 | Tom Heiser | 92:03 (Tom Heiser) |
| 7/13/1998 | Hitachi Office, Norcross, GA | | | | | X | | | | X | | | | | | | | | | HIT:Tom Heiser Thom Schmitt<br>PHS: Geert Lievens, Pat Canavan, Jeff Johnson | PHLP-CRT-081748 | Tom Heiser | 100:18 (Tom Heiser) |
| 7/15/1998 | Hitachi, Norcross, GA | | | | | X | | | | X | | | | | | | | | | PH: Pat Canavan<br>PH: Jeff Johnson<br>HIT: Tom Heiser<br>HIT: Thom Schmitt<br>HIT: Geert Lievens | PHLP-CRT-081748 | Jim Smith | Jim Smith Dep. Vol. 1, 249-255 |
| 10/13/1998 | Ruth's Chris Scottsdale, AZ | | | | | X | | | | | | | | | | | | | X | HIT: Tom Heiser<br>THOM: Mr. Sterling Owens | HEDUS-CRT00160563 | Tom Heiser | 191:05 (Tom Heiser) |
| 1/6/1999 | Rosewood Grill, Las Vegas, NV | | | | | X | | | | X | | | | | | | | | | HIT: Tom Heiser, Thom Schmitt, BK<br>PHS: Joe Snyder, Emmanual Corney, | HEDUS-CRT00166472 | Tom Heiser | 107:23 (Tom Heiser) |
| 1/7/1999 | Terrace Point, Las Vegas, NV | | | | | X | | | | X | | | | | | | | | | HIT: Tom Heiser, Thom Schmitt<br>PHS: J. Johnson, P. Canavan | HEDUS-CRT00166472 | Tom Heiser | 107:23 (Tom Heiser) |
| 1/7/1999 | Terrace Point, Las Vegas, NV | | | | | X | | | | X | | | | | | | | | | HIT: Thom Schmitt, YN<br>PHS: Pat Canavan, Jeff Johnson, Hiyoshi Kashimura | HEDUS-CRT00098394 | Tom Heiser | 110:14 (Tom Heiser) |
| 1/12/1999 | U.S. | | X | X | | X | | X | | X | | | | | | | | | X | SDI: Chul Hong Im | SDCRT-0002526 | | |
| 1/22/1999 | Philips Monitor Facility, Raleigh, N.C. | | | | | X | | | | X | | | | | | | | | | HIT: Dan Mead,<br>PHS: Paul Toma | HEDUS-CRT00158744 | Tom Heiser | 426:05 (Tom Heiser) |
| 4/8/1999 | Huntsville, Alabama | | X | | | X | | | | | | | | | | | | | | HIT: CH SB Thom Schmitt<br>LG: Joseph Kim Joseph Woo, | HEDUS-CRT00098394 | Tom Heiser | 110:14 (Tom Heiser) |
| 4/22/1999 | Cafe Lousianne, Norcross, GA | | | | | X | | | | X | | | | | | | | | | HIT: Tom Heiser TN SI<br>PHS: Pat Canavan | HEDUS-CRT00160568 | Tom Heiser | 124:10 (Tom Heiser) |
| 12/16/1999 | Hitachi's Greenville plant | | | | | X | | | | X | | | | | | | | | | HIT: Fukuzawa, Saito, Toyama,<br>PHS: Schaffer, Gotje | JLI-00001286 | Noboru Toyama | 115 (Noboru Toyama) |
| 7/28/2000 | U.S. | | | | X | | | | | X | | | | | | | | | X | SDI: C.H. Im<br>SDI: Yoon Yang<br>PHS: Cor Saris<br>SDI: Jeff Johnson | SDCRT-0002506 | | |
| 9/29/2000 | U.S. | | | | X | | | | | X | | | | | | | | | X | SDI: Chul Hong Im<br>SDI: Woongrae Kim<br>PHS: Cor Saris | SDCRT-0002488 | | |
| 11/8/2000 | U.S. | | | | | X | | | | | | | | | | | | | X | HIT: Thom Schmitt<br>HIT: Tom Heiser<br>THOM: Alex Hepburn | HEDUS-CRT00164814; HEDUS-CRT00164816 | Lloyd Hepburn | 193 |
| 12/7/2000 | U.S. | | | | | X | | | | | | | | | | | | | X | HIT: Thom Schmitt<br>HIT: Tom Heiser<br>THOM: Alex Hepburn | HEDUS-CRT00168774 | Thomas Schmitt | 274:18 (Thom Schmitt) |
| 3/3/2001 | SDI San Diego | | | | X | | X | | | | | | | | | | | | | Jae In Lee (SDI); Moon Il Bae (SDI); CH Lim (SDI); K.C. Oh (SDI); Woong Rae K Kim (SDI); Alex Kinoshita (MEC) | SDCRT-0002585 | J.I. Lee | |
| 3/10/2001 | SDI San Diego | | | | X | | | | | | | X | | | | | | | | Jae In Lee (SDI); Moon Il Bae (SDI); CH Lim (SDI); K.C. Oh (SDI); Kyu In Choi (LPD) | SDCRT-0002588 | J.I. Lee | |
| 3/20/2001 | Detroit, Michigan | | | | | X | | | | X | | | | | | | | | | HIT: Tom Heiser TS<br>PHS: Pat Canavan Jeff Johnson Daren Ivy | HEDUS-CRT00004705 | Thom Schmitt | 257:05 (Thom Schmitt) |
| 5/6/2001 | Sushi Taro, Washington D.C. | | | | | X | X | | X | | | | | | | | | | | MEC: Nishiyama; HIT: Hirai; TSB: Kimura | MPDA_SEC-0896104 | Kazumasa Hirai; Nishiyama | 180:3 (Kazumasa Hirai); Nishiyama I at 162-66 |
| 5/7/2001 | Grand Hyatt - Washington D.C. | | | | | X | X | | X | X | | | | | | | | | X | HIT: Kazumasa Hirai, Tom Heiser<br>HIT: Jeff Johnson<br>TSB: John Webster<br>MEC: Harry Nishiyama<br>THOM: Alex Hepburn, Tom Carson, Tom Hallowell | PHLP-CRT-077930 | Kazumasa Hirai, Tom Heiser | 146:17 (Kazumasa Hirai) 147:13 (Tom Heiser) |
| 6/6/2001 | U.S. | | | | X | | | | | X | | | | | | | | | X | SDI: Cheol Hong Lim<br>PHS: Joe Killen | SDCRT-0002582 | Joseph Killen | 148 |
| 6/15/2001 | Greenville, S.C. | | | | | X | | | | X | | | | | | | | | | HIT: Kazumasa Hirai<br>PHS: Daniel den Engelsen, Hemant Betrabet | PHLP-CRT-090934 | Kazumasa Hirai | 271:12 (Kazumasa Hirai) |

7/28/2023

Exhibit 9 to Declaration of Evan J. Werbel in Support of Irico Defendants' Motion for Summary Judgment

| MEETING DATE | LOCATION | CPT | LG | OEC/DW | SDI | HIT | MEC | MIT | TSB | PHS | LPD | MTPD | TCRT | BMCC | IRI | SMTL | TAT | SONY | THOM | INDIVIDUAL PARTICIPANTS | BEG BATES | DEPONENTS | DEPOSITION TESTIMONY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/00/2001 | Philips Atlanta | | | | X | X | | | | X | X | | | | | | | | | HIT: Thom Schmitt, Biff Kinney<br>PHS: Christian Haring, Sukrit Mitra, | HEDUS-CRT00147432 | Tom Heiser | 359:04 (Tom Heiser) |
| 9/5/2001 | Hitachi's Greenville plant | | | | X | | | | | X | | | | | | | | | | HIT: Toyama. PHS: Gotje | PHLP-CRT-091563 | Noboru Toyama | 134 (Noboru Toyama) |
| 10/16/2001 | La Quinta Resort, La Quinta, California | | | | X | | | | | X | | | | | | | | | X | HIT: Thom Schmitt, Kazumasa Hirai, Thomas Heiser<br>THOM: Alex Hepburn<br>PHS: Jeff Johnson<br>LPD: Bob O'Brien<br>MEC: Haru Nishiyama | HEDUS-CRT00186930 | Thom Schmitt | 265:13 (Thom Schmitt) |
| 2002-2006 | U.S. (Ohio; Detroit; Washington, DC) | | | | | | X | | | | | | | | | | | | X | MEC: Shinichi Iwamoto<br>THOM: James Hanrahan | | Shinichi Iwamoto | 45-55, 81, 262-64, 35962 |
| 1/11/2002 | U.S. | | | | | | X | | | | X | | | | | | | | X | LPD: Ney Corsino<br>THOM: Tom Carson<br>MEC: Nakamoto | JJ-00004807 | Patrick Canavan | Patrick Canavan Dep. Vol. 1, 262:12-270:18 |
| 8/15/2002 | U.S. | | | | X | | | | | X | | X | | X | | | | | X | MTPD: Shigkazu Shibata MTPD: Shinichi Iwamoto MTPD: Ayumu Kinoshita MTPD: Mike Nakamoto MTPD: Takaki Kokado THOM: J.P. Hanrahan | MTPD-0223790 | | |
| 10/8/2002 | Parmesano Dayton Marriott Hotel | | | | | X | X | | | | | | | | | | | | | HIT: Kazumasa Hirai<br>MEC: Shinichi Iwamoto | MTPD-0036413 | Kazumasa Hirai | 152:4, 170, 435 (Kazumasa Hirai) |
| 10/22/2002 | U.S. | | | | X | | | X | | X | | X | | X | | | | | X | THOM: Tom Carson<br>THOM: Alex Carson<br>LPD: Jeff Johnson<br>LPD: Bob O'Brien<br>HIT: Thom Schmitt<br>HIT: Jake Spengler<br>BMCC: Elaine Sears | PHLP-CRT-087372 | | |
| 1/8/2003 | Garden Cafe, Harrah's Las Vegas | | | | X | | | | | X | | | | | | | | | | HIT: Tom Heiser, Thom Schmitt, JS, SB,<br>PHS: C. Haring, S. Little | HEDUS-CRT00166481 | Tom Heiser | 244:06 (Tom Heiser) |
| 1/8/2003 | La Playa Lounge, Harrah's Las Vegas | | | | X | | | | | | | | | | | | | | X | HIT: Tom Heiser, Thom Schmitt, AP SB<br>THOM: G. O'Donnel, J.P. Colin | HEDUS-CRT00166481 | Tom Heiser | 244:06 (Tom Heiser) |
| 1/9/2003 | U.S. | | | | X | | | | | | X | | | | | | | | | LPD - Chang Hoo Kim | SDCRT-0087934 | | |
| 2/3/2003 | Ann Arbor, MI | | | | X | | | | | | X | | | | | | | | | | PTC-00004295 | Bob O'Brien | Bob O'Brien Dep. Vol. 1,; 251:20-258:2 |
| 3/3/2003-3/11/2003 | San Diego; Mexico | | | | X | | | | | | X | X | | | | | | | X | KC Oh (SDI) | SDCRT-0076953; SDCRT-0076954 | KC Oh | 82:18-83:11 |
| 3/24/2003 | Atlanta, GA | | | | | X | X | | | | | | | | | | | | | HIT: Kazumasa Hirai, Nakanishi<br>MEC: Shinichi, (Steve) Iwamoto, President Mike Nakamoto | MTPD-0025523 | Kazumasa Hirai | 183:06 (Kazumasa Hirai) |
| 3/24/2003 | Atlanta, GA | | | | | X | X | | | | | | | | | | | | | HIT: Kazumasa Hirai Yosuke Nakanishi, Kumiko Wilson, MEC: Shinichi (Steve) Iwamoto, President Mike Nakamoto | MTPD-0042965 | Kazumasa Hirai | 194:13, 435 (Kazumasa Hirai) |
| 3/24/2003 | Atlanta, GA | | | | | X | X | | | | | | | | | | | | | HIT: Kazumasa Hirai<br>MEC: Shinichi (Steve) Iwamoto | MTPD-0041033 | Kazumasa Hirai | 202:3 (Kazumasa Hirai) |
| 5/2/2003 | U.S. | | | | X | | | | | | | | | | | | | | X | SDI: Woongrae Kim<br>SDI: Dong Suk Lee<br>THOM: J.P. Hanrahan<br>THOM: Jack Brunk | SDCRT-0007239 | KC Oh | 445 |
| July 2003-June 2006 | U.S. (California) | | | | X | | | | | | | X | | | | | | | | MTPD: Fujita, Norio<br>SDI: Kim, Ray | | Norio Fujita | |
| July 2003-June 2006 | U.S. (California) | | | | X | | | | | | | X | | | | | | | | MTPD: Fujita, Norio<br>SDI: Kim, Ray | | Norio Fujita | |
| July 2003-June 2006 | U.S. (California) | | | | X | | | | | | | X | | | | | | | | MTPD: Fujita, Norio<br>SDI: Kim, Ray | | Norio Fujita | |
| July 2003-June 2006 | U.S. (California) | | | | X | | | | | | | X | | | | | | | | MTPD: Fujita, Norio<br>SDI: Kim, Ray | | Norio Fujita | |
| July 2003-June 2006 | U.S. (California) | | | | X | | | | | | | X | | | | | | | | MTPD: Fujita, Norio<br>SDI: Kim, Ray | | Norio Fujita | |
| July 2003-June 2006 | U.S. (California) | | | | X | | | | | | | X | | | | | | | | MTPD: Fujita, Norio<br>SDI: Kim, Ray | | Norio Fujita | |
| July 2003-June 2006 | U.S. (California) | | | | X | | | | | | | X | | | | | | | | MTPD: Fujita, Norio<br>SDI: Kim, Ray | | Norio Fujita | |
| July 2003-June 2006 | U.S. (California) | | | | X | | | | | | | X | | | | | | | | MTPD: Fujita, Norio<br>SDI: Kim, Ray | | Norio Fujita | |
| July 2003-June 2006 | U.S. (California) | | | | X | | | | | | | X | | | | | | | | MTPD: Fujita, Norio<br>SDI: Kim, Ray | | Norio Fujita | |

| MEETING DATE | LOCATION | CPT | LG | OEC/DW | SDI | HIT | MEC | MIT | TSB | PHS | LPD | MTPD | TCRT | BMCC | IRI | SMTL | TAT | SONY | THOM | INDIVIDUAL PARTICIPANTS | BEG BATES | DEPONENTS | DEPOSITION TESTIMONY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/18/2003 | U.S. | | | | X | | | | | | X | | | | | | | | X | LPD: Quin Choi<br>SDI: KC Oh<br>THOM: Jack Brunk | SDCRT-0007173 | KC Oh | 210 |
| 7/26/2003 | Santee, CA | | | | X | | | | | | X | | | | | | | | X | | SDCRT-0007173 | KC Oh | |
| 8/19/2003 | U.S. | | | | | | | | | | | X | | | | | | | X | THOM: J.P. Hanrahan<br>THOM: J.R. Hirschler<br>MTPD: President Shibata<br>MTPD: Iwamoto<br>MTPD: Usuda | MTPD-0576483 | | |
| 10/30/2003 | Pittsburgh, PA | | | | | X | | | | X | | | | | | | | | X | MEC: S. Iwamoto, Tom Fote<br>THOM: Alex Hepburn<br>LPD: Bob O'Brien | HEDUS-CRT00164095 | Thom Schmitt | 272:21 (Thom Schmitt) |
| 10/31/2003 | U.S. | | | X | X | | | | | | X | X | | | | | | X | X | MTPD: Alex Kinoshita | MTPD-0426066 | Ayumu Kinoshita 30(6)(b) | 397 |
| 10/31/2003 | USA, San Diego: Matsushita Offices | | | | | | | | | | | X | | | | | | | | MTPD: Kinoshita | MTPD-0426066 | Kinoshita | Kinoshita II at 397-98 |
| 12/6/2003 | U.S. | | | | | | | | X | | | X | | | | | | | X | MTPD: Shigkazu Shibata<br>THOM: J. Hanrahan<br>THOM: Christian Lissorgues | MTPD-0026563 | | |
| 12/17/2003 | U.S. | | | | | | | | | | | X | | | | | | | X | MTPD: Shigkazu Shibata<br>THOM: J. Hanrahan<br>THOM: Christian Lissorgues<br>THOM: Didier Trutt | MTPD-0043577 | | |
| 2004 | U.S. | | | | | | | | | | | | | | | | | | X | THOM: Christian Lissorgues | MTPD-0014992; MTPD-0573840 | | |
| 4/1/2004 | San Diego | | | | X | | | | | | | X | | | | | | | | MTPD: Fujita, Norio; Yoshikawa; Usuta SDI: Oh, Patrick; Kim, Ray | MTPD-0027035 | Fujita | Fujita II at 298 |
| 4/20/2004 | Delafoil - Perrysburg, OH | | | | | X | | | | | X | | | | | | | | | HIT: Tom Heiser, Tom Schmitt<br>LPD: Pat Canavan, Bob O'Brien<br>MTPD: Steve Lammers, Tom Fote, Steve Iwamoto<br>THOM: Alex Hepburn | MTPD-0009514 | Tom Heiser | 222:21 (Tom Heiser) |
| 4/26/2004 | SDI's San Diego Office | | | | X | | | | | | | X | | | | | | | | MTPD: Kawano; Tobinaga | MTPD-0637815 | Tsuruta | Tsuruta II at 230-34 |
| 5/6/2004 | SDI's San Diego office | | | | X | | | | | | | X | | | | | | | | MTPD: Yoshikawa, Masakazu; Fujita, Norio SDI: Kim, C.W.; Choi, H.W.; Lee, J.I.; Kim, R. | MTPD-0260906 | Norio Fujita | Fujita II at 303 |
| 11/5/2004 | Telephone / MTPD's Ohio factory | | | | | X | | | | | | X | | | | | | | | HIT: Kawamura<br>MTPD: Totoku | HEDUS-CRT00028552 | Noboru Toyama | 178 (Noboru Toyama) |
| 1/7/2005 | Los Angeles | | | | X | | | | | | X | | | | | | | | | LPD: W. Vaartjes,<br>LPD: N. Corsino,<br>LPD: K. Nam,<br>LPD: C. Gyu. | SDCRT 0007539E | Wiebo Jan Vaartjes | Wiebo Jan Vaartjes Dep. Vol. 1, 263:12-283:18 |
| 2/2/2005 | San Diego | | | | X | | | | | | | X | | | | | | | | MTPD: Yoshikawa, Masakazu | SDI 2nd Supp Interrogatory Responses | | |
| 2/2/2005 | San Diego | | | | X | | | | | | | X | | | | | | | | MTPD: Fujita<br>SDI: Kim, Ray | MTPD-0235157 | Fujita | Fujita II at 326-27 |
| 5/31/2005 | U.S. (California) | | | | X | | | | | | | X | | | | | | | | MTPD: Fujita, Norio<br>SDI: Kim, Ray | MTPD-0479837 | Shinichiro Tsuruta; Norio Fujita | Tsuruta: 208:7-221:2; Fujita II at 336-38 |
| 8/18/2005 | U.S. (California) | | | | X | | | | | | | X | | | | | | | | MTPD: Fujita, Norio<br>SDI: Kim, Ray | MTPD-0303225 | Shinichiro Tsuruta; Norio Fujita | Tsuruta: 235:15244:9 |
| 9/20/2005 | U.S. | | | | X | | | | | | | | | | | | | | X | SDI: K.C. Oh<br>THOM: Alonso Pando<br>THOM: Li Yuguo<br>THOM: ES Shuy<br>THOM: Michael Bourgerie | SDCRT-0016638 | | |
| 11/30/2005 | U.S. (California) | | | | X | | | | | | | X | | | | | | | | MTPD: Fujita, Norio<br>SDI: Kim, Ray | MTPD-0291761 | Yasuki Yamamoto; Norio Fujita | Yamamoto: 478:6481:19 |
| 7/7/2007 | San Diego | | | | X | | | | | X | | | | | | | | | | Woong Rae Kim; KC Oh (SDI); Quinn Choi (LPD); | SDCRT-0007615 | KC Oh | |
| 9/3/2007 | San Diego | | | | X | | | | | X | | | | | | | | | | Woong Rae Kim; KC Oh (SDI); Quinn Choi (LPD); | SDCRT-0199834 | KC Oh | |
| Unknown | U.S. | | | | | | | | X | | | | | | | | | | X | PHS: Joe Killen | | Pat Canavan | 112-130, 194 |

EXHIBIT 148

1         IN THE UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5    IN RE: CATHODE RAY TUBE (CRT)

     ANTITRUST LITIGATION,        No. 07-cv-5944-JST

6    _____/

7

8

9

10

11

12   VIDEO-RECORDED DEPOSITION OF PHILLIP M. JOHNSON, PH.D.

13              Remote Zoom Proceedings

14               Danville, California

15             Tuesday, October 3, 2023

16

17

18

19

20

21

22

23   REPORTED BY:

24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25   Pages 1 - 117            Job No. 6132612

10/03/2023

Case 4:07-cv-05944-JST   Document 6385-5   Filed 05/21/24   Page 274 of 275
Johnson, Phillip Ph.D. [DPP CLASS CERT EXPERT] CRT Deposition

Page 8

1    Veritext Legal Solutions.

2         I am not related to any party in this action,

3    nor am I financially interested in the outcome.

4         Counsel and everyone attending remotely will now

5    state their appearances and affiliations for the record.

6         If there are any objections to proceeding,

7    please state them at the time of your appearance,

8    beginning with the noticing attorney.

9         MR. SAVERI:  Good morning.  Rick Saveri on

10   behalf of Class Plaintiffs and the witness.

11        MR. HEAPHY:  And Matthew Heaphy, Saveri &

12   Saveri, on behalf of Direct Purchaser Plaintiffs.

13        MR. CARTER:  Good morning.  Thomas Carter with

14   Baker Botts LLP, representing the Irico defendants.

15        MR. TALADAY:  John Taladay from Baker Botts,

16   also representing the Irico defendants.

17        THE VIDEOGRAPHER:  Would the court reporter

18   please swear in the witness.

19        THE REPORTER:  Yes, Counsel.

20        Dr. Johnson, please raise your right hand,

21   please.  Thank you, sir.

22        You do solemnly state that the evidence you

23   shall give in this matter shall be the truth, the whole

24   truth, and nothing but the truth, so help you God?

25        THE WITNESS:  I do.

10/03/2023    Case 4:07-cv-05944-JST    Document 6385-5    Filed 05/21/24    Page 275 of 275
Johnson, Phillip Ph.D. [DPP CLASS CERT EXPERT] CRT Deposition

Page 87

1          MR. SAVERI:  Object to form.

2          THE WITNESS:  I'm not recalling the details of

3    the transactions that I'm referencing as I sit here, but

4    I'm sure you're familiar with it, and we can go to it in

5    my report if you want to point me to the location.

6        Q.  BY MR. CARTER:  Okay.  So you're only aware of

7    this one Irico transaction in the United States; right?

8          MR. SAVERI:  Object to form.

9          THE WITNESS:  What I'm recalling as I sit here.

10   Maybe there was something more, but I'm not recollecting

11   it right now.

12       Q.  BY MR. CARTER:  Okay.

13       A.  By the way, it's not urgent, but when you do get

14   to a stopping point, I would like a bathroom break.

15       Q.  Sure.

16          And you said that one transaction that you're

17   recalling was a small transaction.

18          Fair?

19          MR. SAVERI:  Object to form.

20          THE WITNESS:  Relative to the -- relative to the

21   marketplace and the size of the transactions we see.  I

22   wouldn't -- I guess "small" is relative and was, you

23   know.  But it wasn't -- it wasn't a large percentage of

24   the US volume of commerce.

25          MR. CARTER:  Okay.  I think we can take ten