# DOCUMENT 8

# Exhibit A

1                IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
2
   - - - - - - - - - - - - - - - - - -
3  IN RE:                           )
                                    )
4  CATHODE RAY TUBE (CRT)           )
   ANTITRUST LITIGATION             )Master File No.:
5                                   )07-CV-5944-JST
                                    )
6                                   )MDL No. 1917
                                    )
7                                   )
                                    )
8  - - - - - - - - - - - - - - - - - -

9          VIDEOTAPED DEPOSITION OF ZHANG WENKAI

10                  HIGHLY CONFIDENTIAL

11                       VOLUME I

12                MONDAY, MARCH 4, 2019

13                  AT:  09.00 a.m.

14                     Taken at:

15                   Kobre & Kim
                    6/F ICBC Tower
16                  3 Garden Road
                       Central
17                   Hong Kong

18

19 Court Reporter:

20 Amanda Tolton
   Accredited Real-time Reporter
21

22

23

24

25

1   form of the document?

2        Q.  Do you understand what a retention policy

3   is?

4        A.  In China, the term "retention" referred to

5   the hard copy, which means a printed or paper

6   document.

7        Q.  During the time period between 1995 through

8   2008, did Irico have an established protocol for

9   retaining information or documents for operational or

10  regulatory compliance needs?

11       A.  I'm not quite sure I follow your question.

12  If you are referring to the hard copy or the paper

13  printed copy, based on our -- the regulatory

14  compliance for the accounting and the documents, we

15  do have a protocol.  With regard to the term

16  "information," I'm not quite sure whether those

17  information are printed on the paper or non-paper

18  information, I'm not quite sure.

19       Q.  I'm referring to anything in writing.

20       A.  Because when you say -- because when you say

21  "writing," so when regarding so the document or the

22  form, if it is writing or printed on the paper, then,

23  yes, we do have a protocol.  However, if the writing

24  is through computer which is a digital form, then

25  there's no rules about the government require us to

 1   maintain or retain those documents.

 2        Q.  So are you saying Irico, during the time

 3   period between 1995 to 2008, have a retention policy

 4   regarding hard copy documents?

 5        A.  Yes, for hard copy or paper printed, we do

 6   have a policy.

 7        Q.  What about electronically stored information

 8   or electronic records?

 9        A.  No, we don't have that system, because the

10   government don't ask us to do that.

11        Q.  And let's talk about the policy regarding

12   hard copy documents.

13            Is that a formal written policy?

14        A.  Yes, we do have a so-called document

15   retention system.

16        Q.  And is that in writing?

17        A.  You mean the system?  Yes, we do have that

18   system or policy.

19        Q.  Do you have a copy of that policy?

20        A.  I saw that document before, but I don't have

21   it with me right now.

22        Q.  But you have it somewhere in the company?

23        A.  Yes.

24        Q.  Can you -- strike that.

25            When was that policy put in place?

1        A.  I don't remember, because I only saw the

2   title is -- the title is called something called the

3   "document retention system."  With regard to the

4   effectiveness date, I have no recollection.

5        Q.  Has the policy changed during the time

6   period between 1995 and 2008?

7        A.  I don't know.

8        Q.  So this document retention policy you just

9   described, did you review this policy for your

10  deposition?

11       A.  I just took a glance.  I saw such a title on

12  the document.  I didn't read through the detailed

13  information.

14       Q.  Have you reviewed this policy before your

15  deposition, before your depo preparation?

16       A.  Yes, I also took a glance.  I did aware

17  there is such a document exist.  I only knew the

18  title, but I didn't look it through.

19       Q.  What do you recall about this policy?  Can

20  can you give me any detail about this written policy?

21       A.  Basically, it mentioned about the expiry

22  date for those retention document.  And there's a

23  procedure to access those or to read those documents.

24  And then the job description regarding the person who

25  has -- who is in charge of those document

1    manage or no control regarding their business during

2    the class period.  As to how they keep their

3    financial record or maintain their archive, I have no

4    idea.

5         Q.  Do you have any reason to believe that

6    CNEIECC did not follow its ordinary business protocol

7    in creating those original sales records?

8              MR. LUCARELLI:  Object to form.

9         A.  CNEIECC -- CNEIECC was transferred to the

10   Irico in 2014 without any transfer cost.  And the

11   class period is between 1995 to 2007.  During --

12   there is no way we can -- will understand how they

13   manage those sales record during the class period.

14             MS. FU:  Let's take a five-minute break.

15             VIDEOGRAPHER:  This marks the end of media

16   No. 8 in the deposition of Zhang Wenkai.  Going off

17   the record.  The time is 5:15.

18   (5.15 p.m.)

19                     (Break taken.)

20   (5.45 p.m.)

21             VIDEOGRAPHER:  We are back on the record.

22   Here begins Media No. 9 in the deposition of

23   Zhang Wenkai.  The time is 5:45 p.m.

24   BY MS. FU:

25        Q.  Mr. Zhang, you testified earlier today you

 1   have a working email address, correct?

 2           MR. LUCARELLI:  Object to form.

 3       A.  Yes, I do have an email address for working.

 4   BY MS. FU:

 5       Q.  Does everyone at Irico have a work address?

 6       A.  I'm only aware that all the employee from

 7   the Irico Group do have a working email address.  I'm

 8   not sure about the other subsidiaries.

 9       Q.  So you don't know if the employees at

10   Display have working addresses or not?

11       A.  I have no knowledge regarding how they

12   access the email accounts.

13       Q.  Do Irico Display employees have work email

14   addresses?

15       A.  Are you talking about the Irico Display?

16       Q.  Correct.

17       A.  I have no knowledge whether there is an

18   employee who have the working email address.  Only

19   the staff from IT center will aware of that.

20       Q.  When did Irico Group employees start to use

21   emails?

22       A.  Could you repeat the question one more time,

23   please?

24       Q.  When did Irico Group employees start to use

25   emails?

1        A.  Are you referring to the access to the free

2    Internet access or using our intranet or our own --

3    our own server?

4        Q.  Let's start with the email address that's

5    connected with your own server.

6        A.  I did check with the IT people regarding

7    when we started to use the email account with CH on

8    it.  So they told me it's around 2004 and 2005.

9    However, it is not distributed to each individual but

10   to a department, so everybody in the department know

11   the password, they share one computer back then.

12       Q.  When did every employee at Irico Group start

13   to use work email addresses?

14       A.  There is no fixed time frame.  In other

15   words -- in other words, it is a gradual process.

16   Whenever we upgrade our server, we will expand the

17   access of Internet to more employees.

18       Q.  As part of your search for documents and

19   information responsive to plaintiff's discovery

20   request, did you ask about what types of electronic

21   information the current or former employees would

22   have had that no longer exist?

23          MR. LUCARELLI:  Object to form.

24       A.  Are you referring to emails?

25

```
 1   BY MS. FU:

 2        Q.  Any kind of electronic information,

 3   including emails.

 4        A.  Well, I did check with former employees

 5   regarding the electronic information they have.  They

 6   all transfer those information to other colleagues.

 7   So, as I said earlier, there's no regulation in China

 8   with regarding to the retention of those digital or

 9   electronic informations.  So when the computer

10   expired or obsoleted, those data would be discarded.

11   And with regard to the email, like I said, in early

12   days, in the beginning, the department share one

13   email account, so the limitation of or several for

14   individual departments around four gigabyte.  Because

15   of the limitation of the server capacity, so the new

16   data were cover or were overload on their previous

17   data.  This is the reason sometimes we lost earlier

18   emails because of the limitation of the server, new

19   email will override the old emails.  I joined Irico

20   in January 2017.  The capacity for my email box when

21   I joined Irico is about 100 gigabyte.  By the end of

22   2017, we did have several upgrade.  And then my

23   personal email account has -- has been upgrade to 1G.

24   So this is why I say, when we lost those early

25   emails, this is because a limit size of the server
```

1   back then.

2       Q.  Do any back-up tapes exist that could

3   contain copies of those overridden files?

4       A.  Well, like I said, I also check with IT

5   people regarding the issue you just raised, because

6   there is no rule or requirement regarding the

7   detention of electronic files, so we never kept those

8   files, never backed up those files.

9       Q.  Why were electronic records deemed

10  unimportant such that they were not kept by Irico?

11          MR. LUCARELLI:  Object to form.

12          MR. HWU:  Can I ask the interpreter to try

13  rendering the question one more time.

14          INTERPRETER:  Okay.

15          MS. FU:  I think the court reporter made a

16  typo.  I'll ask the question again.

17  BY MS. FU:

18      Q.  Why were the electronic records deemed any

19  important such that they were not kept by Irico?

20          MS. FU:  I'll ask the question again.

21  BY MS. FU:

22      Q.  Why were the electronic records deemed not

23  important such that they were not kept by Irico?

24      A.  It is the Chinese culture.  Even at this

25  moment we do not consider electronic files are

1  important files.  Even back to the period of actual

2  period or at this moment, there is no government

3  policy or no government regulation to retain those

4  electronic documents.

5       Q.  What type of information was transmitted

6  electronically at Irico?

7          MR. LUCARELLI:  Object to form.

8  BY MS. FU:

9       Q.  Correct.

10      A.  You mean the action period?

11      Q.  Correct.

12      A.  Yes, correct.  With regard to this issue, I

13  did ask Mr. Long Tao and Mr. Wang Zhaojie, they both

14  told me they forgot what kind of or what type of

15  information was transmitted during the time that each

16  department shared one email account.  Plus the fact

17  that those early emails were -- or early transmission

18  were overwritten by the following datas.

19      Q.  Other than the shared computer, did Irico

20  use a centralized system to keep its electronic data

21  or records?

22      A.  Only electronic -- only information or das

23  would be kept in our server.  Like I said earlier,

24  during the actual period, the capacity of server is

25  very limited or very small.  So IT people told me

 1  those data created would be covered after three to

 2  five days by the more updated informations or data.

 3      Q.  Are you saying during the class period,

 4  emails records were only kept for three -- for five

 5  days?

 6      A.  Where I did obtain that information from the

 7  IT people, they told me it's all depends on the --

 8  how many people are using our access email.  For

 9  example, if Chinese New Year or May 1 or October 1

10  long weekend, then a lot of data would be accumulated

11  and then the earlier data would be covered by the

12  incoming datas.  However, this figure, three to five

13  days, is just a roughly estimation by the IT people.

14      Q.  And during the class period, Irico Group

15  never backed up its email in any way, correct?

16      A.  Yes.

17      Q.  So at Irico Group, employees never printed

18  out employee emails so they can find them later?

19          MR. LUCARELLI:  Object to form.

20      A.  From the Irico Group's perspective, we never

21  asked the employee to print out their email.  With

22  regard to whether any individual employee print out

23  their own email, I have no knowledge about that.

24  However, the person are interviewed, including

25  current employee as well as former employee, none of

```
 1   them have access of or have the print-out email
 2   available.
 3   BY MS. FU:
 4       Q.  Did Irico investigate if Irico has any
 5   print-out from this employee files?
 6           MR. LUCARELLI:  Object to form.
 7       A.  Employee files?
 8   BY MS. FU:
 9       Q.  Let me rephrase.
10           Did Irico investigate if Irico, within its
11   corporation, has any print-outs of those current or
12   former employees' emails?
13       A.  We never found any email being printed out
14   during the period of the action, the action period.
15       Q.  Did Group -- strike that.
16           Did Group's former or current employees back
17   up their emails with any storage media?
18       A.  We never identify any former employee who
19   back up their emails on the hard -- hard drive.
20   However, for the current employee, there is one
21   person who is a Director of the Legal Affair,
22   Mr. Yunglong, who owns a hard drive and he did back
23   up his emails on that particular hard drive.  But
24   with regard to the time frame, I have no knowledge.
25   We also have produced that evidence.
```

 1      Q.  Did Irico Sales Department share one email

 2   address during the class period?

 3      A.  I don't know about this issue.  I think

 4   discussion should be addressed to Mr. Wang Zhaojie,

 5   because he's from Sales Department.

 6      Q.  So you did not investigate whether Irico

 7   Sales Department shared one email address during the

 8   class period in connection with your searches?

 9      A.  No, that's not what I mean.  Actually, I did

10   consult with Mr. Wang Zhaojie and he told me that

11   there's a case like where people share one email

12   account from the department.  But for further

13   detailed information, you should check with Mr. Wang.

14      Q.  Did Irico produce any email files from this

15   shared email account at the Sales Department?

16      A.  There are no such data or evidence to

17   produce.  Like I said earlier, because of the

18   limitation of the server during the action period, so

19   those data were override by the incoming information.

20      Q.  Did Irico ever searched for -- did Irico

21   ever search for fax records?

22      A.  Yes.  We did conduct the search and those --

23   so because the fax machine in the Group is within the

24   Group's office, so we didn't find any fax during the

25   action period.  We also ask Long Tao and then he did

# Exhibit B

1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
2                    San Francisco Division

3   - - - - - - - - - - - - - - - - - -
    IN RE:                            )
4                                     )
    CATHODE RAY TUBE (CRT)            )Master File No.
5   ANTITRUST LITIGATION              )07-CV-5944-JST
                                      )
6                                     )MDL No. 1917
                                      )
7                                     )
                                      )
8   - - - - - - - - - - - - - - - - - -

9              DEPOSITION OF WANG ZHAOJIE

10               HIGHLY CONFIDENTIAL

11                  VOLUME III

12            Friday, March 8th, 2019

13              AT:  9.05 am

14              Taken at:

15              Kobre & Kim
                6/F ICBC Tower
16              3 Garden Road
                  Central
17              Hong Kong

18

19

20

21

22

23  Court Reporter:

24  Bron Williams
    Accredited Real-time Reporter

25

 1  with?

 2          A.  Have I said -- did I say anything regarding

 3  I have met people from Philips?

 4          Q.  Are you familiar with an entity called Philips

 5  Hefei?

 6          MS. FU:  Hefei Philip, doesn't really matter.

 7          A.  I have no knowledge of it.

 8   BY MS. CAPURRO:

 9          Q.  Did you ever meet with anyone during the

10  relevant period from LG Philips Displays?

11          A.  I'm not quite sure, but perhaps there is

12  a restructure between LG and Philips in the past.

13          MS. FU:  "Perhaps there is a reorganization or

14  merger between LG and Philips in the past."

15   BY MS. CAPURRO:

16          Q.  Yes, in 2001, LG and Philips combined their

17  CRT business to become LG Philips Displays.  Are you aware

18  of that?

19          A.  Yes, I heard of it.  But I don't know the

20  detailed information.

21          Q.  I'm not asking you for detailed information,

22  I'm asking you if you ever met with anyone who worked for LG

23  Philips Displays, or LPD?

24          MR. PLUNKETT:  Object to the form.

25          A.  Well it was too long ago, so I don't remember

 1    exactly, but we normally just call Changsha LG or Beijing

 2    Panasonic, or Shanghai Yonxin.  That's it.

 3     BY MS. CAPURRO:

 4         Q.  Did you have e-mail communications with

 5    employees of any of the CRT manufacturers that we have just

 6    discussed?

 7         MR. PLUNKETT:  Object to the form.

 8         A.  It was too long ago, I don't remember.

 9     BY MS. CAPURRO:

10         Q.  Did you use e-mail during the period to

11    communicate with -- strike that.

12         Did you use e-mail during the class period?

13         A.  E-mail, certainly, yes, but I don't remember

14    which time frame.

15         Q.  Did you communicate with employees of any of

16    the CRT manufacturers that we have discussed by fax?

17         A.  I don't remember whether I have used fax to

18    communicate with those employees, but back then, the primary

19    communication channels are either telephone or fax.

20         MS. FU:  I would like to make a correction.

21    I think he said "I don't remember whether I have

22    communicated with those competitors, but back then the

23    primary communication channels are either telephone or fax."

24         MR. PLUNKETT:  Do we need the interpreter to agree

25    or disagree with the check translator on the record?

1          INTERPRETER:  I agree.

2          MR. PLUNKETT:  Okay.

3          MS. CAPURRO:  Yes, I think we do.

4          MR. PLUNKETT:  So the record is clear, I would ask

5    the interpreter, when you -- when the check translator today

6    has corrected things and you have not said anything, did you

7    agree with the check translator?

8          INTERPRETER:  Yes.  If I don't agree, I will

9    voice.

10          MR. PLUNKETT:  Okay.

11    BY MS. CAPURRO:

12          Q.  You testified that you used e-mail during the

13    class period, correct?

14          A.  In that period, yes, I did use e-mail for

15    sure.  Because prior to 2007, yes, I did use e-mail for

16    sure.

17          Q.  Okay, and did you use e-mail to communicate

18    with any of the CRT manufacturers that we have been

19    discussing?

20          MR. PLUNKETT:  Object to the form.

21          A.  Because it was too long ago, I cannot remember

22    whether I have used e-mail to communicate with them.

23    BY MS. CAPURRO:

24          Q.  But you used e-mail during the class period,

25    and I'm asking you, was that the primary method of

1    communication that you used during the class period?

2             A.   No.

3             Q.   Did you have ever one on one meetings with

4    employees of other tube manufacturers?

5             A.   We have some interactions.

6             Q.   Which companies did you have interactions

7    with?

8             A.   It was too long ago.  I don't remember.

9             Q.   Do you remember if you had interactions with

10   employees of Chunghwa.

11            A.   I don't have any impression.

12            Q.   Do you remember generally what the purpose of

13   those meanings was?

14            A.   The interaction with whom?

15            Q.   You said you had some interactions with other

16   tube manufacturers.  Do you remember generally what the

17   purpose of those meetings was?

18            A.   Normally would just play cards, or have

19   drinks.  Because sometimes we were both traveling in

20   Shenzhen, we spend time together.

21            Q.   Would you exchange production or sales

22   information during these interactions?

23            MR. PLUNKETT:  Object to the form.

24            A.   In my impression, normally not, because we

25   just get together, have some fun, relax.  Because people in

Case 4:07-cv-05944-JST Document 6391-21 Filed 06/13/24 Page 22 of 780
Wang Zhen, highly confidential
March 08, 2019                                              39

 1  this tube industry, we all like to drink.

 2   BY MS. CAPURRO:

 3          Q.  Do you remember any of the names of these

 4  employees of the other CRT manufacturers that you played

 5  cards with?

 6          A.  (Chinese spoken).

 7          INTERPRETER:  Let me clarify one word.  (Chinese

 8  spoken).

 9          A.  When I say play cards, sometimes they play

10  Mahjong, sometimes they play cards.  Where I have no

11  interest of those games.  So what the procedure is the

12  people play cards or play Mahjong and later on we join for

13  meal and have drink, and that's it.  I will join the meal

14  and join the drinks.  And sometimes people change to

15  different people.

16   BY MS. CAPURRO:

17          Q.  So is it your testimony that you don't

18  remember any of these names of the people that you played

19  cards with and drank with?

20          MR. PLUNKETT:  Object to the form.

21          A.  Well, there are many, many people we get

22  together.  So I'm not quite sure they are the person within

23  that particular time frame.

24          So to name one person, this is Wong Lian.  Because

25  he drinks a lot and he also play cards and Mahjong.

# Exhibit C

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                   OAKLAND DIVISION

 4

 5   IN RE: CATHODE RAY TUBE (CRT)  ) MASTER FILE NO.
     ANTITRUST LITIGATION           ) CV-07-5944 JST
 6   _____)
                                     )
 7   THIS DOCUMENT RELATES TO:       )
                                     )
 8   ALL INDIRECT PURCHASER ACTIONS  )
     ALL DIRECT PURCHASER ACTIONS    )
 9                                   )
               DEFENDANTS.           )
10   _____)

11

12

13

14

15        VIDEOTAPED DEPOSITION OF YAN YUNLONG

16                    VOLUME I

17          TUESDAY, SEPTEMBER 27, 2022

18              MACAU S.A.R., CHINA

19

20

21

     FILE NO.  SF 5436473

22

     REPORTED BY  MARK McCLURE, CRR

23              CAL CSR 12203

24

25

                                       Page 1
```

| | | |
|---|---|---|
| 1 | different situation. | 08:26 |
| 2 | THE WITNESS:  Okay, then I did not hear the | 08:26 |
| 3 | question clearly. | 08:26 |
| 4 | Do you mind repeating it. | 08:26 |
| 5 | BY MR. BIRKHAEUSER: | |
| 6 | Q.   I do not mind repeating it. | 08:26 |
| 7 | So, in China, it is possible to become a | 08:26 |
| 8 | lawyer by taking a four-year undergraduate course of | 08:26 |
| 9 | study, is that correct? | 08:27 |
| 10 | A.   It should be put in this way.  In the past, it | 08:27 |
| 11 | can be done in that way, but right now, only students | 08:27 |
| 12 | who specialize or study the -- study laws and then in | 08:27 |
| 13 | the four-year program can enter the lawyer qualification | 08:27 |
| 14 | examination and become a lawyer after they pass. | 08:27 |
| 15 | Q.   So if I understand your testimony now, | 08:27 |
| 16 | presently, to become a lawyer, one must take a four-year | 08:28 |
| 17 | undergraduate course and then another four-year course | 08:28 |
| 18 | to specialize in law, is that correct? | 08:28 |
| 19 | A.   No. | 08:28 |
| 20 | Anyone who studied four years of law in their | 08:28 |
| 21 | undergraduate degree can then apply for -- can apply to | 08:28 |
| 22 | sit in the Bar exam. | 08:28 |
| 23 | Q.   Okay.  Did you sit for a Bar exam? | 08:28 |
| 24 | A.   I did. | 08:29 |
| 25 | Q.   And can we assume that you passed it | 08:29 |

Page 16

```
 1    successfully?                                      08:29

 2         A.   You don't need to assume; I did pass the exam.  08:29

 3         Q.   So are lawyers in China certified by a Bar or   08:29

 4    a governmental entity?                             08:29

 5         A.   They are certified by a government entity.  08:29

 6         Q.   Okay.  And you received that certification  08:29

 7    after you passed the qualification examination, is that  08:29

 8    right?                                             08:30

 9         A.   Correct.                                 08:30

10         Q.   In your four-year course of study, did you  08:30

11    learn about antitrust issues under Chinese law?    08:30

12              MR. CARTER:  Objection to form.          08:30

13              THE WITNESS:  Do I need to answer?       08:30

14              MR. CARTER:  Yes.                        08:30

15              THE WITNESS:  No, I did not.             08:30

16    BY MR. BIRKHAEUSER:                                08:30

17         Q.   Did you learn about antitrust issues under any  08:30

18    law foreign to China?                              08:31

19         A.   Are you talking about the four years I went to  08:31

20    undergraduate?                                     08:31

21         Q.   Yes.                                     08:31

22         A.   No, I did not.                           08:31

23         Q.   And at any time after your four-year      08:31

24    undergraduate degree, have you taken further courses of  08:31

25    study?                                             08:31
```

Page 17

| | | |
|---|---|---|
| 1 | A.   In what aspect? | 08:31 |
| 2 | Q.   Any further educational courses. | 08:32 |
| 3 | A.   Not for a degree. | 08:32 |
| 4 | Q.   Did you take any courses that were not for a | 08:32 |
| 5 | degree, for continuing education or for whatever other | 08:32 |
| 6 | purpose? | 08:32 |
| 7 | A.   No. | 08:32 |
| 8 | Q.   Okay.  So no further legal education after | 08:32 |
| 9 | your four-year degree, is that right? | 08:32 |
| 10 | A.   That's not correct. | 08:32 |
| 11 | Q.   So please tell me about any further legal | 08:33 |
| 12 | education that you've had after your four-year degree. | 08:33 |
| 13 | A.   I did not pursue any formal legal training or | 08:33 |
| 14 | legal classes for educational level purposes or for a | 08:33 |
| 15 | degree purpose, but China constantly publishes new laws | 08:33 |
| 16 | so I would study those new laws, and I would pay | 08:34 |
| 17 | attention to them. | 08:34 |
| 18 | Q.   When you engaged in that study did you do so | 08:34 |
| 19 | on your own or as part of some seminar or coursework? | 08:34 |
| 20 | A.   I self-taught. | 08:34 |
| 21 | Q.   In what year did you pass the qualification | 08:34 |
| 22 | exam? | 08:34 |
| 23 | A.   1994. | 08:34 |
| 24 | Q.   In China, do you receive a license to practice | 08:35 |
| 25 | law for -- let me just ask that. | 08:35 |

Page 18

```
 1              Do you receive a license to practice law?      08:35

 2      A.    Yes.                                             08:35

 3      Q.    Are you a member of the All China Lawyers        08:35

 4   Association?                                              08:35

 5      A.    I'm not.                                         08:35

 6      Q.    Are you a member of any other legal              08:36

 7   associations?                                             08:36

 8      A.    No.                                              08:36

 9      Q.    What was your very first job after you became    08:36

10   a lawyer?                                                 08:36

11      A.    That question was not in a very precise way.     08:36

12            I graduated from undergraduate and my first      08:36

13   job after graduation was with Irico.                     08:36

14      Q.    Let's try it this way.                           08:37

15            In what year did you receive your license to     08:37

16   practice law?                                             08:37

17      A.    I do not have the license to practice law.       08:37

18      Q.    Okay, I misunderstood.                           08:37

19            What must you do to obtain a license to          08:37

20   practice law?                                             08:37

21      A.    That's clearly set forth by the Department of    08:37

22   Justice in China, and since I am an employee of a         08:38

23   state-owned enterprise, I am not allowed to practice as   08:38

24   an attorney in the private sector.                        08:38

25      Q.    Let me just tell you that a few minutes ago,     08:38
```

Page 19

| | | |
|---|---|---|
| 1 | the record reflects my asking you if you received a | 08:38 |
| 2 | license to practice law and your answer being "yes," and | 08:38 |
| 3 | I just want to make sure that we have a clear record. | 08:38 |
| 4 | A.   What I received was a certificate to prove my | 08:39 |
| 5 | qualification as an attorney, but I did not receive a | 08:39 |
| 6 | license to practice law as an attorney. | 08:39 |
| 7 | Q.   Thank you. | 08:39 |
| 8 | If you graduated in 1991 and your first job at | 08:39 |
| 9 | Irico was in 1994, what did you do between 1991 and | 08:39 |
| 10 | 1994? | 08:40 |
| 11 | MR. CARTER:  Objection to form. | 08:40 |
| 12 | THE WITNESS:  Perhaps you do not understand | 08:40 |
| 13 | the historical background and situation in China back | 08:40 |
| 14 | then that much. | 08:40 |
| 15 | In the '90s, during the previous century, | 08:41 |
| 16 | college graduates would have to be allocated a job by | 08:41 |
| 17 | the country.  And I was planned and allocated to Irico, | 08:41 |
| 18 | and that was my first job.  And since then, I have been | 08:41 |
| 19 | working in the Irico Group; I have not left. | 08:41 |
| 20 | BY MR. BIRKHAEUSER: | |
| 21 | Q.   Is it fair to say that between 1991 and 1994, | 08:41 |
| 22 | you were waiting to become employed by some company and | 08:41 |
| 23 | it turned out to be Irico? | 08:41 |
| 24 | MR. CARTER:  Object to form. | 08:41 |
| 25 | THE WITNESS:  That's not what happened. | 08:42 |

Page 20

| | | |
|---|---|---|
| 1 | After I graduated in 1991 from my | 08:42 |
| 2 | undergraduate studies, the country had a plan to | 08:42 |
| 3 | allocate me a job in Irico, and at that time it was not | 08:42 |
| 4 | called the Irico Group, it was its predecessor, the | 08:42 |
| 5 | General Factory of Shaanxi Color Picture Tube. | 08:42 |
| 6 | And at that time the country also allowed us | 08:43 |
| 7 | to sit for the lawyer qualification exam, so that's why | 08:43 |
| 8 | I took the exam and obtained by lawyer qualification. | 08:43 |
| 9 | BY MR. BIRKHAEUSER: | |
| 10 | Q.   All right.  We're going to get into your | 08:43 |
| 11 | employment history with Irico in just a moment. | 08:43 |
| 12 | A.   Okay. | 08:43 |
| 13 | Q.   But first, I want to ask you, at any time | 08:43 |
| 14 | after your formal legal education, did you study the | 08:43 |
| 15 | antitrust law of China? | 08:43 |
| 16 | MR. CARTER:  Object to form. | 08:44 |
| 17 | THE WITNESS:  Do I need to answer this? | 08:44 |
| 18 | BY MR. BIRKHAEUSER: | |
| 19 | Q.   Yes.  You need to answer all of my questions | 08:44 |
| 20 | unless your attorney tells you not to. | 08:44 |
| 21 | A.   Okay. | 08:44 |
| 22 | I did not. | 08:44 |
| 23 | Q.   At any time after your formal education, did | 08:45 |
| 24 | you study the antitrust laws of any other -- any country | 08:45 |
| 25 | other than China? | 08:45 |

Page 21

```
 1        A.   No.                                          08:45

 2        Q.   Have you ever traveled to the United States? 08:45

 3        A.   I think I went there once, in 2017.          08:45

 4        Q.   And what was the purpose of your trip to the 08:45

 5   United States in 2017?                                 08:45

 6        A.   It was for this case.                        08:45

 7        Q.   And what did you do?                         08:46

 8        A.   I sat in for the trial to review and hear the 08:46

 9   motion filed by the plaintiffs for a default judgment 08:46

10   that was supposed to be entered against.              08:46

11   BY MR. BIRKHAEUSER:                                    08:46

12        Q.   So you attended the hearing on the motion for 08:46

13   a default judgment, is that correct?                   08:46

14        A.   Correct.                                     08:46

15        Q.   You were present in court when that hearing  08:47

16   took place, is that right?                             08:47

17        A.   My English is not very good, so I could not  08:47

18   fully understand it, but I just went there to sit in to 08:47

19   get the experience.                                    08:47

20        Q.   And how long did you stay in the United States 08:47

21   during that trip?                                      08:47

22        A.   I think I stayed for about five days.        08:47

23        Q.   And what did you do, other than attend the   08:47

24   hearing on the default proceedings?                    08:47

25        A.   I studied and looked at the case with the team 08:48
```

Page 22

```
1    of attorneys of Baker Botts.                        08:48

2         Q.   Did you do anything other than attend the  08:48

3    hearing and meet with the Baker Botts attorneys?     08:48

4         A.   Nothing else.                              08:48

5         Q.   Have you ever traveled to Canada?          08:48

6         A.   No.                                        08:48

7         Q.   Have you ever traveled to Europe?          08:48

8         A.   No.                                        08:48

9         Q.   Have you ever traveled to Mexico?          08:48

10        A.   No.                                        08:49

11        Q.   And the trip that you took in 2017 to attend  08:49

12   the court hearing, is that the only time that you have  08:49

13   ever traveled to the United States?                  08:49

14        A.   I think I made another trip in the beginning  08:49

15   of 2018.                                             08:49

16        Q.   And what was the purpose of the trip in 2018?  08:49

17        A.   The same purpose.                          08:49

18        Q.   When you say "the same purpose," did you    08:49

19   attend a court hearing in 2018?                      08:50

20        A.   Correct.                                   08:50

21        Q.   What was the subject matter of the hearing  08:50

22   that you attended in 2018?                           08:50

23        A.   It was still about the motion for a default  08:50

24   judgment.                                            08:50

25        Q.   And as far as you understand it, was that in  08:50
```

Page 23

| | | |
|---|---|---|
| 1 | Q.   Did you have a superior when you were working | 10:12 |
| 2 | on the Chang An project? | 10:12 |
| 3 | A.   Yes. | 10:12 |
| 4 | Q.   Who was that? | 10:12 |
| 5 | A.   Xing Daoqin. | 10:12 |
| 6 | Q.   And did Mr. Xing Daoqin also have a superior | 10:12 |
| 7 | who was working on this project? | 10:13 |
| 8 | A.   He did. | 10:13 |
| 9 | Q.   And who was that? | 10:13 |
| 10 | A.   Ma Jinquan. | 10:13 |
| 11 | Q.   Was Mr. Ma the most senior employee working on | 10:13 |
| 12 | this Chang An project? | 10:13 |
| 13 | A.   The most senior employee on the Chang An | 10:13 |
| 14 | project was Mr. Xing Daoqin. | 10:13 |
| 15 | Q.   Of the employees you've mentioned, who | 10:14 |
| 16 | actually retained outside counsel? | 10:14 |
| 17 | A.   I don't know the question. | 10:14 |
| 18 | Can you repeat it or re-ask it? | 10:14 |
| 19 | Q.   Sure. | 10:14 |
| 20 | Someone retained outside counsel on Irico's | 10:14 |
| 21 | behalf, right? | 10:14 |
| 22 | A.   Yes. | 10:14 |
| 23 | Q.   Who did that, of the employees that you have | 10:14 |
| 24 | mentioned? | 10:14 |
| 25 | A.   I think it should be Ma Jinquan. | 10:14 |

Page 46

```
 1          Q.    What was his title at the time?              10:15

 2          A.    The general manager of the Irico Group       10:15

 3     Company.                                                10:15

 4          Q.    And then Mr. Xing -- what was Mr. Xing's      10:15

 5     title?                                                  10:15

 6          A.    I think Mr. Xing was the deputy general      10:15

 7     manager at that time.                                   10:15

 8          Q.    Did you use email to communicate with your   10:15

 9     outside counsel and others when working on the Chang An 10:15

10     project?                                                10:15

11          A.    Yes.                                         10:15

12          Q.    So at that point in time, you had an Irico   10:16

13     email address?                                          10:16

14          A.    I cannot quite remember if I used an Irico   10:16

15     email address at that time or some free email addresses 10:16

16     provided by external third parties, because perhaps at  10:16

17     that time the domain name or the intranet of Irico was  10:17

18     not fully established, but I cannot remember clearly.    10:17

19          Q.    Physically, where were you officed when you  10:17

20     were working on the Chang An project?                   10:17

21          A.    I worked in the office of the Irico Group.   10:17

22          Q.    Is that the headquarters building?           10:17

23          A.    Yes.                                         10:17

24          Q.    And, obviously, you had a computer at the    10:17

25     time, right?                                            10:17
```

Page 47

```
 1        A.    Yes.                                        10:17

 2        Q.    Okay.  Would you correspond with Mr. Xing by  10:18

 3   email?                                                 10:18

 4        A.    No, we would not, or even if we had, it would  10:18

 5   be very minimal because at that time above me there was  10:18

 6   a leader of a working team and I reported to that      10:18

 7   leader.  Mr. Xing was not my direct supervisor at that  10:19

 8   time.                                                  10:19

 9        Q.    Okay.  And forgive me, I believe you've     10:19

10   already told me who the leader was, but I forget that  10:19

11   individual's name.                                     10:19

12        Can you tell me again.                            10:19

13        A.    I don't think you asked, but I can tell you.  10:19

14   It's Mr. Zhang Xinxi.                                  10:19

15        Q.    So you would email Mr. Zhang and then, if   10:19

16   necessary, Mr. Zhang could email Mr. Ma or Mr. Xing, is  10:20

17   that right?                                            10:20

18        MR. CARTER:  Object to form.                      10:20

19        THE WITNESS:  We all worked in the same office    10:20

20   space, so I'm not quite sure if we needed to still send  10:20

21   emails to each other when we were actually in the same  10:20

22   office space, so I cannot quite recall.                10:20

23   BY MR. BIRKHAEUSER:

24        Q.    Were there a lot of drafts generated with   10:20

25   respect to the IPO, draft documents?                   10:20
```

Page 48

| 1 | the complaint other than this report by the person that | 15:21 |
| 2 | Irico contracted with? | 15:21 |
| 3 | MR. CARTER:  Object to form. | 15:21 |
| 4 | THE WITNESS:  No. | 15:22 |
| 5 | BY MR. BIRKHAEUSER: | 15:22 |
| 6 | Q.   At the time you were investigating the facts | 15:22 |
| 7 | of the complaint, did any Irico employee tell you that | 15:22 |
| 8 | they had attended meetings with Irico's competitors? | 15:22 |
| 9 | A.   They did. | 15:22 |
| 10 | Q.   And what kind of investigation did you do as | 15:23 |
| 11 | to the meetings that Irico had with its competitors? | 15:23 |
| 12 | A.   We did not conduct any special investigation. | 15:23 |
| 13 | We simply confirmed whether or not there was such a | 15:23 |
| 14 | fact. | 15:23 |
| 15 | Q.   Who told you that Irico employees attended | 15:23 |
| 16 | meetings with Irico's competitors? | 15:23 |
| 17 | A.   At that time, it was Liu Maihai, Shen Xiaolin, | 15:23 |
| 18 | and there was another person who used to work for CEIEC, | 15:24 |
| 19 | and that person's name was Liang Yuan.  That's it. | 15:24 |
| 20 | Q.   Did Shen Xiaolin tell you that Mr. Shen had | 15:25 |
| 21 | attended a meeting of CEOs and presidents of CRT | 15:25 |
| 22 | competitors in Shanghai in November of 2006? | 15:25 |
| 23 | MR. CARTER:  Object to form. | 15:25 |
| 24 | THE WITNESS:  It was not as detailed as to | 15:25 |
| 25 | exactly which meeting. | 15:25 |

Page 117

1    BY MR. BIRKHAEUSER:

2         Q.   Did anyone tell you how many meetings that          15:25

3    Irico employees had had with Irico's competitors?            15:25

4         A.   No.                                                  15:26

5         Q.   Were you preliminary responsible for gathering      15:26

6    information to give to Pillsbury after you were served        15:26

7    with the complaint?                                           15:26

8              MR. CARTER:  Object to form.                        15:26

9              THE WITNESS:  No.  Actually, after we were          15:27

10   served the complaint, we did several things.                 15:27

11             The first one was -- we formed an internal         15:27

12   working group to lead the work of conducting the            15:28

13   investigation with respect to this litigation.  It was a    15:28

14   task force working group.                                   15:28

15             Secondly, we engaged Pillsbury as the counsel     15:28

16   to represent us, but at that time several law firms were    15:28

17   pitching us for the case, and we later talked with them     15:28

18   and engaged Pillsbury as our outside counsel.               15:28

19             The third one we did -- the third thing we did    15:28

20   was that we conducted an investigation to see if we         15:28

21   actually sold any products in the U.S. market, and the      15:28

22   information we got was no.  So we asked Pillsbury to try     15:28

23   to talk and reason with the plaintiffs that it was a        15:28

24   mistake to sue Irico, and we asked them to remove us        15:28

25   from the defendants.                                        15:28

Page 118

| | | |
|---|---|---|
| 1 | The fourth thing that we did was to notify all | 15:29 |
| 2 | the relevant people based on the request from Pillsbury, | 15:29 |
| 3 | and those people were asked to preserve all the | 15:29 |
| 4 | information and documents related to the case. | 15:29 |
| 5 | During that process, Pillsbury related a very | 15:30 |
| 6 | important piece of information to us.  It told us that | 15:30 |
| 7 | it was actually a class action and the plaintiffs in the | 15:30 |
| 8 | case were trying to form a group of plaintiffs to | 15:30 |
| 9 | conduct the litigation, and the defendants were also | 15:30 |
| 10 | trying to form a group, and Pillsbury's advice to us was | 15:30 |
| 11 | that we join the defendants group.  So, internally, in | 15:30 |
| 12 | the company, we also held some discussions on that | 15:30 |
| 13 | advice. | 15:30 |
| 14 | And the company held several rounds of | 15:31 |
| 15 | discussions on that issue in order to understand the | 15:31 |
| 16 | situation, but the situation with Irico is different | 15:31 |
| 17 | from that with other companies in the defendants' group. | 15:31 |
| 18 | Those other companies were big multinational companies | 15:31 |
| 19 | and the U.S. market was their main market.  They not | 15:31 |
| 20 | only had CRT products in the U.S. market, they also had | 15:31 |
| 21 | the TV whole sets in the U.S. market, and Irico, at that | 15:31 |
| 22 | time, had neither, so it was to the disadvantage of | 15:32 |
| 23 | Irico to join and form the defendants group. | 15:32 |
| 24 | And also, at that time, the U.S. government | 15:32 |
| 25 | was conducting, actually, criminal investigations in the | 15:32 |

Page 119

| | | |
|---|---|---|
| 1 | antitrust litigation proceeding against those companies. | 15:33 |
| 2 | Some of them already even pleaded guilty, and Irico | 15:33 |
| 3 | conducted some self-evaluation, and we believed that we | 15:33 |
| 4 | have not done anything to violate the antitrust law in | 15:33 |
| 5 | the U.S. | 15:33 |
| 6 | So for us to join and form the defendants | 15:33 |
| 7 | group would be what the Chinese would say "down the | 15:33 |
| 8 | drain with them," and we rejected the proposal or | 15:33 |
| 9 | suggestion from Pillsbury. | 15:33 |
| 10 | We also knew that it would be a long process | 15:33 |
| 11 | for the plaintiffs and the defendants to form the | 15:34 |
| 12 | litigation groups and to actually go through the | 15:34 |
| 13 | proceeding, so we were waiting for the plaintiffs to | 15:34 |
| 14 | file an independent, separate lawsuit against Irico, and | 15:34 |
| 15 | we wanted to wait until that time before we conducted | 15:34 |
| 16 | any relevant investigation. | 15:34 |
| 17 | It would be unnecessary or pointless for us to | 15:34 |
| 18 | conduct any investigation before a separate or | 15:34 |
| 19 | independent lawsuit was filed against us by the | 15:34 |
| 20 | plaintiffs. | 15:35 |
| 21 | That's it. | 15:35 |
| 22 | MR. BIRKHAEUSER:  Okay.  I'm going to move to | 15:35 |
| 23 | strike that answer. | 15:35 |
| 24 | BY MR. BIRKHAEUSER: | |
| 25 | Q.   Let me ask my question again, and if you could | 15:35 |

Page 120

| | | |
|---|---|---|
| 1 | listen very carefully to the question and just answer | 15:35 |
| 2 | the question. | 15:35 |
| 3 | A.   Okay. | 15:35 |
| 4 | Q.   Were you primarily responsible for gathering | 15:35 |
| 5 | information to give to Pillsbury after Irico was served | 15:35 |
| 6 | with a complaint? | 15:35 |
| 7 | MR. CARTER:  Object to form. | 15:36 |
| 8 | THE WITNESS:  No, I was working as a contact | 15:36 |
| 9 | person between Irico and Pillsbury.  That was it. | 15:36 |
| 10 | BY MR. BIRKHAEUSER: | |
| 11 | Q.   Were you personally the primary contact person | 15:36 |
| 12 | between Irico and Pillsbury? | 15:36 |
| 13 | A.   Yes. | 15:36 |
| 14 | Q.   You mentioned that Irico formed a litigation | 15:36 |
| 15 | group in 2008, after it was served with a complaint. | 15:36 |
| 16 | A.   Yes. | 15:37 |
| 17 | Q.   Do you know what interrogatories are? | 15:37 |
| 18 | A.   I don't know. | 15:37 |
| 19 | Q.   Are you aware that Irico has responded in | 15:37 |
| 20 | writing to written questions that plaintiffs have asked | 15:37 |
| 21 | in this litigation? | 15:37 |
| 22 | A.   I don't remember that clearly. | 15:37 |
| 23 | MR. BIRKHAEUSER:  Okay.  I'm introducing | 15:38 |
| 24 | Exhibit 8605. | 15:38 |
| 25 | (Exhibit 8605 marked for identification.) | 15:39 |

Page 121

# Exhibit D

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                     OAKLAND DIVISION

 4

 5    IN RE: CATHODE RAY TUBE (CRT)  ) MASTER FILE NO.

      ANTITRUST LITIGATION           ) CV-07-5944 JST

 6    _____)

                                      )

 7    THIS DOCUMENT RELATES TO:       )

                                      )

 8    ALL INDIRECT PURCHASER ACTIONS  )

      ALL DIRECT PURCHASER ACTIONS    )

 9                                    )

              DEFENDANTS.             )

10    _____)

11

12            VIDEOTAPED DEPOSITION OF LI MIAO

13                     VOLUME I

14              TUESDAY, MARCH 7, 2023

15               HONG KONG SAR, CHINA

16

17

18

19

20

21

22

23    JOB NO.  5759542

24    REPORTED BY  MARK McCLURE, CRR

25               CAL CSR 12203
```

Page 1

```
 1    other -- a diary, some other means of keeping track of      21:58:12

 2    your appointments?                                          21:58:17

 3            MR. CARTER:  Object to form.                        21:58:33

 4            THE WITNESS:  I'm a lazy person.  I don't           21:58:51

 5    quite take notes.                                           21:58:53

 6    BY MR. RUSHING:                                             21:58:54

 7       Q.   So the answer is "no"?                              21:58:54

 8            MR. CARTER:  Object to form.                        21:58:59

 9            THE WITNESS:  That's correct.                       21:59:02

10    BY MR. RUSHING:                                             21:59:02

11       Q.   So how did you keep track of your                   21:59:03

12    appointments?                                               21:59:05

13       A.   The office workers will follow up on those.        21:59:16

14       Q.   So the office workers, then, kept a calendar       21:59:21

15    for you.                                                    21:59:24

16            Is that your testimony?                             21:59:25

17            MR. CARTER:  Object to form.                        21:59:32

18            THE WITNESS:  I'm not sure.                         21:59:36

19    BY MR. RUSHING:                                             21:59:36

20       Q.   But if you had made an appointment to meet         21:59:56

21    someone on a certain day, you relied on your office        22:00:08

22    workers to tell you in advance of that so that you would   22:00:14

23    remember to go to that meeting, is that correct?          22:00:18

24       A.   Correct.                                            22:00:22

25       Q.   And how did they keep track of your               22:00:39
```

Page 94

| | | |
|---|---|---|
| 1 | appointments? | 22:00:44 |
| 2 | MR. CARTER:  Object to form. | 22:00:48 |
| 3 | THE WITNESS:  I never asked them. | 22:00:59 |
| 4 | BY MR. RUSHING: | 22:00:59 |
| 5 | Q.   But it was -- did they -- was it part of their | 22:01:08 |
| 6 | job to do that for you, though? | 22:01:26 |
| 7 | MR. CARTER:  Object to form. | 22:01:28 |
| 8 | THE WITNESS:  Yes. | 22:01:41 |
| 9 | BY MR. RUSHING: | 22:01:41 |
| 10 | Q.   And so, when you got a new assistant or, | 22:01:48 |
| 11 | excuse me, office worker, did you explain to that person | 22:01:52 |
| 12 | their responsibility to keep track of your appointments | 22:01:58 |
| 13 | for you? | 22:02:01 |
| 14 | MR. CARTER:  Object to form. | 22:02:02 |
| 15 | THE WITNESS:  I've never reminded them. | 22:02:21 |
| 16 | BY MR. RUSHING: | 22:02:21 |
| 17 | Q.   And how did they advise you, when you were | 22:02:34 |
| 18 | vice president of Electronics, of your upcoming | 22:02:38 |
| 19 | appointments? | 22:02:42 |
| 20 | A.   Face-to-face. | 22:02:42 |
| 21 | Q.   Did you have a computer -- did you have your | 22:02:59 |
| 22 | own office when you were vice president of Electronics? | 22:03:03 |
| 23 | A.   Yes. | 22:03:07 |
| 24 | Q.   Did you have a computer in your office that | 22:03:13 |
| 25 | you used for work? | 22:03:15 |

Page 95

| | | |
|---|---|---|
| 1 | A.   I had a computer. | 22:03:16 |
| 2 | Q.   In your office? | 22:03:26 |
| 3 | A.   Yes. | 22:03:31 |
| 4 | Q.   And could you receive emails on that computer? | 22:03:32 |
| 5 | A.   I've never reviewed emails on that computer. | 22:03:44 |
| 6 | Q.   Did you review your emails on some other | 22:03:51 |
| 7 | computer at that time? | 22:03:53 |
| 8 | A.   I rarely review emails. | 22:03:54 |
| 9 | Q.   When you say -- are you talking about that | 22:04:12 |
| 10 | time frame or are you talking about now? | 22:04:14 |
| 11 | A.   From the past until now, I rarely review | 22:04:16 |
| 12 | emails. | 22:04:41 |
| 13 | Q.   Can you get emails on your phone right now? | 22:04:48 |
| 14 | A.   I've never checked emails on my phone. | 22:04:51 |
| 15 | Q.   Do you use texts? | 22:05:25 |
| 16 | A.   I use texts. | 22:05:26 |
| 17 | Q.   Did you use texts when you were vice president | 22:05:33 |
| 18 | of Irico Electronics? | 22:05:36 |
| 19 | A.   I think I used texts at that time. | 22:05:38 |
| 20 | Q.   Did your office workers ever use texts to | 22:05:51 |
| 21 | communicate with you about your schedule? | 22:05:55 |
| 22 | A.   Yes. | 22:05:56 |
| 23 | Q.   And so, you testified that sometimes they told | 22:06:08 |
| 24 | you face-to-face about your appointments, but in | 22:06:16 |
| 25 | addition, you're now saying they also used texts, is | 22:06:20 |

Page 96

| | | |
|---|---|---|
| 1 | that correct? | 22:06:23 |
| 2 | MR. CARTER:  Object to form. | 22:06:42 |
| 3 | THE WITNESS:  Yes, but for the majority of the | 22:06:47 |
| 4 | time, they would tell me face-to-face. | 22:06:48 |
| 5 | BY MR. RUSHING: | 22:06:48 |
| 6 | Q.   Did they ever do both? | 22:06:52 |
| 7 | A.   It depends on their own judgment. | 22:07:05 |
| 8 | Q.   Do you have any of those texts from your | 22:07:08 |
| 9 | office workers about your schedule from the time you | 22:07:12 |
| 10 | were vice president of Irico Electronics? | 22:07:16 |
| 11 | MR. CARTER:  Object to form. | 22:07:33 |
| 12 | THE WITNESS:  Are you asking me if I still | 22:07:41 |
| 13 | have those texts from before? | 22:07:42 |
| 14 | BY MR. RUSHING: | 22:07:42 |
| 15 | Q.   Yes. | 22:07:45 |
| 16 | A.   No.  I don't even remember how many phones | 22:07:54 |
| 17 | I've had since then. | 22:07:56 |
| 18 | Q.   So what happened to the texts? | 22:08:03 |
| 19 | A.   What do you mean by "what happened to the | 22:08:11 |
| 20 | texts"? | 22:08:14 |
| 21 | Q.   I mean, where did they go? | 22:08:15 |
| 22 | MR. CARTER:  Object to form. | 22:08:27 |
| 23 | THE WITNESS:  Those texts were on my past | 22:08:28 |
| 24 | phones, so if I scrapped them, they are gone. | 22:08:31 |
| 25 | BY MR. RUSHING: | 22:08:35 |

Page 97

# Exhibit E

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202) 639-7700
(202) 639-7890 (fax)
Email: john.taladay@bakerbotts.com
        evan.werbel@bakerbotts.com
        tom.carter@bakerbotts.com
        drew.lucarelli@bakerbotts.com

*Attorneys for Defendants*
*Irico Group Corp. and*
*Irico Display Devices Co., Ltd.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION, | Master File No. 07-cv-05944-JST |
| | MDL No.: 1917 |
| THIS DOCUMENT RELATES TO: | |
| *ALL DIRECT PURCHASER ACTIONS* | **DECLARATION OF YAN YUNLONG RE DEPOSITION TESTIMONY AND IRICO DEFENDANTS' INTERROGATORY RESPONSES** |
| *ALL INDIRECT PURCHASER ACTIONS* | |

I, Yan Yunlong, declare as follows:

本人，闫云龙，声明如下：

1.       I am a citizen of the People's Republic of China and reside in Shaanxi Province, People's Republic of China.

本人是中华人民共和国公民，居住地为中华人民共和国陕西省。

2.       I am currently the General Counsel of Irico Group Corp. ("Irico Group") and the Director of Irico Group's Legal Affairs Department. I have been involved in the management of this litigation since 2008. I was a member of a Litigation Committee established by Irico Group Corp. in June 2008 to coordinate Irico Group Corp. and Irico Display Devices Co., Ltd.'s ("Irico Display," collectively "Irico") response to this litigation.  At the time the Litigation Committee was formed, I served as Legal Affairs Manager for Irico Group's Enterprise Management Department.

本人目前是彩虹集团公司（"彩虹集团"）的总法律顾问和彩虹集团法务部部长。本人自2008年以来一直参与此诉讼的管理工作。彩虹集团公司于2008年为了协调彩虹集团公司和彩虹显示器件股份有限公司（"彩虹显示"，统称"彩虹"）对此案的应诉而成立了诉讼委员会，本人是诉讼委员会的成员之一。诉讼委员会成立时，我担任彩虹集团企业管理部法务经理。

3.       I was deposed in this matter from September 27 through September 29, 2022.  I also provided input for Irico's responses to Indirect Purchaser Plaintiffs' 3rd and 4th Sets of Interrogatories served by Irico on August 13, 2021, January 21, 2022, and February 23, 2022.

本人于2022年9月27日至9月29日期间就此案作证。我还为彩虹于 2021 年 8 月 13 日、2022 年 1 月 21 日和 2022 年 2 月 23 日就间接购买者原告对彩虹的第三和第四组质询的回复提供了意见。

4.       In the process of reviewing the transcript of my deposition testimony and the interrogatory responses, I realized that I was confused regarding some questions and gave inaccurate testimony contained within pages 123 through 139 of the transcript, as well as inaccurate input for the interrogatory responses listed above.  This information related to certain events in 2008 following the formation of the Litigation Committee, specifically

relating to Irico's efforts to preserve documents for the litigation.

在审阅我的证词笔录和质询回答的过程中，我意识到我对一些问题没弄清楚，并在证词笔录的第 123 页至 139 页中提供了一些不准确的证词，同时上述质询回复中也存在错误。该信息与 2008 年诉讼委员会成立后的某些情况有关，特别是有关彩虹为诉讼保存文件所做的努力。

5.     I submit this Declaration to clarify and correct my testimony and recollections regarding these events.

我提交本声明以澄清和纠正我对这些情况的证词和回忆。

6.     In August 2008, I received an email from Irico's outside counsel at the time, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"), attaching a document containing Pillsbury's privileged legal advice to Irico regarding preservation of documents for the litigation.

2008 年 8 月，我收到了彩虹当时的外部律师 Pillsbury Winthrop Shaw Pittman LLP（"Pillsbury"）的一封电子邮件，其附件包含了 Pillsbury 就此诉讼的文件保存问题向彩虹提供的享有律师客户特权的法律建议。

7.     In a subsequent meeting of the Litigation Committee in August 2008, I printed and provided copies of the privileged document from Pillsbury to each of the Litigation Committee members. The Litigation Committee members reviewed the document and discussed the legal advice provided by Pillsbury.

在之后2008年8月的诉讼委员会会议上，我打印出向其他所有诉讼委员会的成员们出示了这份享有律师客户特权的文件的副本。诉讼委员会的成员们审阅了此文件并讨论了Pillsbury提供的法律意见。

8.     Following this discussion, the Litigation Committee members were tasked with the responsibility of identifying any relevant documents in their possession and preserving any such materials, as well as notifying subordinates who might have any relevant documents to preserve those materials, if any existed.  This instruction was given orally.

在讨论之后，交给诉讼委员会成员的任务是，如存在相关材料，则确认他们已掌握的相关材料并予以保存，同时通知可能拥有任何相关文件的下属去保存这些资料。该指示是口头给出的。

9.　While the Litigation Committee members did receive copies of and discuss the privileged document from Pillsbury, I do not recall whether the Litigation Committee members discussed the specific categories of documents that each Litigation Committee member would preserve and instruct other employees to preserve.　It is my understanding that each Litigation Committee member determined independently which subordinates should be contacted regarding the preservation efforts and what information regarding preservation should be relayed to each employee.　Any statement to the contrary in my testimony or Irico's interrogatory responses is inaccurate.

虽然诉讼委员会的成员们的确收到了Pillsbury具有律师客户特权的文件的副本，并进行了讨论，但我不记得诉讼委员会成员是否讨论过每位诉讼委员会成员将保存和指示其他员工保存的文件的特定类别。据我了解，每位诉讼委员会成员都独立确定应就保全工作联系哪些下属，以及应将哪些保全的相关信息传达给员工。在我证词中或彩虹的质询回复中的任何相反陈述都是不准确的。

10.　I do not recall further discussion with the Litigation Committee members in 2008 on the issue of document preservation after this meeting.

我不记得在2008年这次会议后诉讼委员会成员还就文件保存问题进行过进一步的讨论。

Executed this 18th day of November, 2022, in Xianyang, Shaanxi Province, People's Republic of China.

于 2022 年 11 月 18 日在中华人民共和国陕西省咸阳市签署。

_____
Mr. Yan Yunlong
闫云龙先生

DECL. OF YAN YUNLONG RE DEPOSITION
TESTIMONY & INTERROGATORY RESPS.

3

MASTER FILE NO. 07-cv-05944-JST
MDL No. 1917

Exhibit F

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
        evan.werbel@bakerbotts.com
        tom.carter@bakerbotts.com
        drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 4:07-cv-05944-JST (N.D. Cal.) |
| | MDL No. 1917 |
| This Document Relates to: | **IRICO DEFENDANTS' FIFTH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DIRECT PURCHASER PLAINTIFFS' FIRST SET OF INTERROGATORIES** |
| ALL DIRECT PURCHASER ACTIONS | |

PROPOUNDING PARTY:      Direct Purchaser Plaintiffs

RESPONDING PARTIES:      Irico Group Corporation
                        Irico Display Devices Co., Ltd.

SET NUMBER:      One

1    Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico

2  Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby provides this

3  supplemental response to the Direct Purchaser Plaintiffs' ("Plaintiff") First Set of Interrogatories,

4  dated March 12, 2010 ("Interrogatories"). Irico reserves the right to amend or supplement these

5  Objections and Responses (the "Responses") to the extent allowed by the Federal Rules of Civil

6  Procedure and the Local Rules of Practice in Civil Proceedings before the United States District

7  Court for the Northern District of California ("Local Rules"). Subject to and without waiving any

8  of Irico's General and Specific Objections as set forth below, Irico is willing to meet and confer

9  with Plaintiff regarding such General and Specific Objections.

10    The following Responses are made only for purposes of this case. The Responses are

11  subject to all objections as to relevance, materiality and admissibility, and to any and all

12  objections on any ground that would require exclusion of any response if it were introduced in

13  court. All evidentiary objections and grounds are expressly reserved.

14    These Responses are subject to the provisions of the Stipulated Protective Order issued by

15  the Court on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated

16  "Confidential" in accordance with the provisions of the Protective Order.

17                                **GENERAL OBJECTIONS**

18    Irico makes the following General Objections to Plaintiff's Interrogatories:

19    1.    Irico's Responses are based upon information available to and located by Irico as

20  of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states

21  that it has conducted, or will conduct, a diligent search, reasonable in scope, of those files and

22  records in its possession, custody, or control believed to likely contain information responsive to

23  Plaintiff's Interrogatories.

24    2.    No express, incidental, or implied admissions are intended by these Responses and

25  should not be read or construed as such.

26    3.    Irico does not intend, and its Responses should not be construed as, an agreement

27  or acquiescence with any characterization of fact, assumption, or conclusion of law contained in

28  or implied by the Interrogatories.

---

IRICO'S FOURTH SUPP. OBJECTIONS AND          1          Master File No. 4:07-cv-05944-JST
RESPONSES TO DPP'S FIRST SET                              MDL No. 1917
INTERROGATORIES

4.      To the extent that Irico responds to Plaintiff's Interrogatories by stating that Irico will produce or make available for examination responsive information or documents, Irico does not represent that any such information or documents exist. Irico will make a good faith and reasonable attempt to ascertain whether information responsive to Plaintiff's Interrogatories exists and is properly producible, and will produce or make available for examination non-privileged responsive materials to the extent any are located during the course of a reasonable search.

5.      Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiff.

6.      Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

7.      Irico objects to Plaintiff's Interrogatories to the extent they seek information that is not relevant or disproportionate to the needs of the case.

8.      Irico objects to Plaintiff's Interrogatories to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or amend its Responses.

9.      Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case.

10.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico will provide only information that it believes to be non-privileged and

otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any information or responsive documents subject to any such doctrine, privilege, protection or immunity from production shall not constitute a general, inadvertent, implicit, subject-matter, separate, independent or other waiver of such doctrine, privilege, protection or immunity from production.

11.     Irico objects to Plaintiff's Interrogatories to the extent that they call for information that is not in the possession, custody, or control of Irico. Irico also objects to the extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties, including but not limited to any of Irico's subsidiary or affiliated companies.

12.     Irico objects to Plaintiff's Interrogatories to the extent that responding would require Irico to violate the privacy and/or confidentiality of a third party or confidentiality agreement with a third party.

13.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily available from other sources.

14.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information or documents concerning transactions outside the United States. Such Interrogatories are unduly burdensome and irrelevant to this pending action as Plaintiffs' purported class definition is confined to "all persons . . . who directly purchased a Cathode Ray Tube Product . . . in the United States" (see Direct Purchaser Plaintiffs' Consolidated Amended Complaint dated March 16, 2009).

15.     Irico objects to Plaintiff's Interrogatories to the extent that compliance would require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body of foreign jurisdictions.

16.     Irico's responses, whether now or in the future, pursuant to Plaintiff's Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific

objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

17.     Irico objects to Plaintiff's Interrogatories to the extent that they are compound and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

18.     Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for legal conclusions.

19.     Irico objects to the Interrogatories to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

20.     Irico objects to the Interrogatories to the extent they seek information or documents that cannot be removed or transmitted outside China without violating the laws and regulations of that country, including but not limited to restrictions on the transmission of state secrets or trade secrets as those terms are defined under Chinese law.

21.     Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

## GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Irico objects to the definitions of "Defendant," "You," "Your," and "Yourself" (Definition Nos. 1 and 3) to the extent that Plaintiff defines those terms to include the Irico's "present or former employees, officers, directors, agents, predecessors, successors, parents, subsidiaries, affiliates, joint ventures or any other person acting on their behalf." This definition is overbroad, unduly burdensome, vague, and ambiguous. Irico also objects to the inclusion of all "present or former employees, officers, directors, agents . . . or any other person acting on [the] behalf [of]" Irico within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

2.     Irico objects to the definition of "Document" (Definition No. 4) to the extent it

1    seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil

2    Procedure, the Local Rules, or any other applicable laws.

3          3.      Irico objects to the definition of "Employee" (Definition No. 5) on the grounds

4    that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico

5    further objects to this definition to the extent that it attempts to impose burdens on Irico beyond

6    those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to

7    the extent that it seeks information protected by the attorney client or other applicable privilege,

8    attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or

9    foreign law.

10         4.      Irico objects to the definitions of "CRT" and "CRT Product" (Definition No. 6) on

11   the grounds that they are vague, ambiguous and overly broad. Irico further objects to the use of

12   the term "CRT Products" to the extent that it is inconsistent with the definition of "CRT

13   Products" as set forth in Plaintiff's pleadings.

14         5.      Irico objects to the definition of the "Relevant Time Period" (Definition No. 7) as

15   overbroad, unduly burdensome, and beyond the applicable statute of limitations.

16         6.      Irico objects to the definition of "Communication" (Definition No. 8) on the

17   grounds that it is vague, ambiguous, and overly broad. Irico further objects to this definition to the

18   extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of

19   Civil Procedure.

20         7.      Irico objects to the definition of "Meeting" (Definition No. 10) on the grounds that

21   the definition is overly broad, unduly burdensome, and seeks information that is neither relevant

22   nor proportionate to the needs of the case.

23         8.      Irico objects to Instruction No. 1 (related to identification of persons) to the extent

24   that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized

25   under the Federal Rules of Civil Procedure, including, without limiting the generality of the

26   foregoing, Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the

27   extent that it purports to impose burdens or obligations broader than, inconsistent with, or not

28   authorized under, the Local Rules and any orders of the Court, and on the grounds that it is vague,

ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the extent it seeks information that would disclose personal confidential information and/or violate any and all rights of privacy under the United States Constitution or Article I of the Constitution of the State of California, or any other applicable law or state constitution, or that is otherwise prohibited from disclosure because to do so would cause Irico to violate legal and/or contractual obligations to any other persons or entities.

9.      Irico objects to Instruction No. 2 (related to identification of an entity other than a natural person) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

10.     Irico objects to Instruction No. 3 (related to the production of business records in response to an interrogatory pursuant to Federal Rule of Civil Procedure 33(d)) on the grounds that it is unduly burdensome and purports to impose burdens and obligations upon Irico beyond those required by the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

## SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES
## INTERROGATORY NO. 16

State whether any documents or information responsive to this set of interrogatories were destroyed, discarded, erased, deleted, purged, or otherwise lost. If Your answer is in any way in the affirmative:

(a)     describe in detail the contents of each such document or information and the date it was destroyed, discarded, erased, deleted, purged or lost;

(b)     identify each person who had any role or responsibility in destroying, discarding, erasing, purging, deleting or losing of each such document or information; and

(c)     describe in detail the circumstances under which each such document or information was destroyed, discarded, erased, deleted, purged, or lost.

## RESPONSE TO INTERROGATORY NO. 16

Irico reasserts and incorporates each of the General Objections and Objections to the

1   Definitions and Instructions set forth above.

2        Subject to and without waiving the objections stated above, Irico responds that it will

3   conduct a reasonable search for information responsive to this Interrogatory, if any, and

4   supplement its response as necessary.

5   <u>**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16**</u>

6        Irico reasserts and incorporates each of the General Objections, Objections to the

7   Definitions and Instructions, and specific objections to Interrogatory No. 16 set forth above.

8        Subject to and without waiving the foregoing objections, Irico states as follows:

9                          <u>**Hard-Copy Documents**</u>

10       Pursuant to Chinese law, the Ministry of Finance and State Archives Administration

11  requires companies like Irico to maintain and preserve certain accounting archives, including but

12  not limited to original invoices for sales, accounting books, general ledgers, financial accounting

13  reports, and bank statements.  *See* IRI-CRT-00000900.  Irico followed and continues to follow

14  these requirements.  In addition, Irico's internal practices included the maintenance of additional

15  archives of material related to operational documents, administrative documents, technical

16  records and communications with agencies of the PRC government and Chinese Communist

17  Party.[1]  Irico is not aware of records from the 1995 to 2007 time period that were preserved in the

18  various archives being destroyed.  Irico understands that hard copy documents not preserved in

19  the archives were not required to be maintained in the ordinary course of business during the

20  period 1995 to 2007.  Irico does not have records regarding the specific hard copy documents that

21  would have existed at the time the complaint was served on Irico and were not preserved in the

22  archives during the time of 1995 to 2007.

23       In its search for potentially responsive, hard copy files outside of the archives, Irico has

24  learned of a few possible circumstances in which certain Irico hard copy files may have been

25  unintentionally lost or destroyed.  Irico is not aware whether any of the documents lost in the

26  events described below were: a) created in the time period 1995 through 2007, or b) relevant or

27  ───────────────

28  [1] Additional information regarding the documents maintained in Irico's archives can be found in
    Irico's December 18, 2020 letter to Plaintiffs regarding discovery issues.

1  responsive to any of the discovery requests issued to Irico during the course of this litigation.  The

2  specific instances at issue include:

3      • A warehouse fire at the headquarters of Irico Group in 2017, which is believed to

4        have resulted in the loss of some financial documents;

5      • The 2012 move of the offices of the Irico Sales Company[2] from the Irico CRT

6        Plant No. 1 to other offices at Irico Group's headquarters during which certain

7        hard copy files may not have been transferred; and,

8      • A subsequent renovation of the offices housing the disbanded Irico Sales Company

9        in 2014 in which historical records may have been lost.

10      Irico is continuing to review its hard copy files and will update its response to this

11  interrogatory if it identifies additional responsive information.

12  ### Electronic Documents

13      Based on its present knowledge, Irico understands that electronic documents were not

14  regularly maintained in an electronic format by the company in the ordinary course of business

15  during the period 1995 to 2007.  There was no obligation under Chinese law to preserve

16  electronic documents or data.  Because no such obligation existed and Irico had limited electronic

17  storage capacity, any documents required to be maintained under Chinese law, including original

18  invoices for CRT sales, accounting books, general ledgers, financial accounting reports, and bank

19  statements, or in the Corporate Archives of Irico, were printed and transferred to the archives.

20  Irico further understands that it regularly overwrote existing electronic data due to limited storage

21  capacity during that time period.   For example, Irico believes that its servers overwrote email

22  data every three to five days on average due to storage limits for the period including and prior to

23  2007.

24      Irico has reviewed and produced all responsive data from relevant and available

25  computers from the time period 1995 to 2007.  Irico is aware that computers of departed

26  employees and/or older versions of computers were recycled.   Irico is not aware of whether any

27  

28  [2] Although the translated name of this unit is Irico Sales Company, it was not a separately
incorporated entity.

IRICO'S FOURTH SUPP. OBJECTIONS AND    8    Master File No. 4:07-cv-05944-JST
RESPONSES TO DPP'S FIRST SET    MDL No. 1917
INTERROGATORIES

1  of the recycled computers contained: a) any data whatsoever; b) any documents created in the

2  time period 1995 through 2007, or c) any documents relevant or responsive to any of the

3  discovery requests issued to Irico during the course of this litigation.

4  **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16**

5      Irico reasserts and incorporates each of the General Objections, Objections to the

6  Definitions and Instructions, and specific objections to Interrogatory No. 16 set forth above.

7      Subject to and without waiving the foregoing objections, Irico states as follows:

8      Irico is no longer in the CRT business and most employees and management from that

9  line of business have since left the company.  Identifying specific documents that might have

10  existed between 1995 and 2007 is not always possible given the limited knowledge of available

11  resources.  Irico has provided information, and now provides additional information, some of

12  which is beyond the scope of the specific requests in Interrogatory 16 to provide additional

13  context regarding the available responsive information.

14                    **Hard-Copy Documents**

15      Irico has not identified any specific, responsive hard-copy documents from the 1995 to

16  2007 period that were lost or destroyed after the complaint was served on Irico.  Based on its

17  further investigation, Irico has determined that the following types of documents may have been

18  created between 1995 to 2007 and not preserved in Irico's archives, but Irico is unable to

19  determine whether any individual documents in these categories may have been responsive,

20  whether or how individual documents were lost or destroyed, or the date of such loss, if it

21  occurred:

22      • Sales reports containing general CRT market information (*see* Wang Zhaojie Mar.

23          6, 2019 Dep. Tr. 37:20-38:18);

24      • CRT sales contracts with customers;

25      • Correspondence with customers regarding CRT sales; and

26      • Handwritten working notes taken by individual employees during the course of

27          performing their job functions, including Wang Zhaojie and Wang Ximin.

28      Since the above categories of documents were not required to be preserved under the

1   Chinese regulations nor under Irico's own internal practices, Irico does not believe that these

2   records were maintained in any systematic format and employees have confirmed that they

3   regularly discarded these materials.

4        Based on its further investigation, Irico has also determined the following regarding

5   previously disclosed incidents of unintentional loss of hard copy documents:

6        • The warehouse fire at Irico headquarters occurred in August 2017 and resulted

7          only in the loss of accounting receipts from transactions occurring between 2016

8          and 2017; and

9        • The 2012 office move and subsequent 2014 renovation of the Irico Sales Company

10         offices did not result in the loss of any documents required to be preserved under

11         Chinese law or Irico's internal practices, including any original copies of sales

12         invoices or expense receipts.  The Irico Sales Company was closed in 2004.  At

13         that time, records required to be preserved under Chinese regulations or Irico's

14         internal practices were stored in the archives, pursuant to previously discussed

15         practices. Records of the Irico Sales Company that were not required to be

16         maintained under Chinese regulations or Irico's internal practices were likely not

17         preserved from the period preceding the closure of the Company in 2004, as Irico

18         began a reduction in sales and administrative staff at that time and transitioned

19         remaining staff to selling on behalf of Irico Electronics and Display.  If such

20         records existed and were not destroyed in or soon after 2004, they may not have

21         been maintained upon the office move in 2012.  At present, Irico has no way of

22         knowing exactly what records, if any, might have remained in the former offices of

23         Irico Sales Company, since several years had passed at the time of the office move

24         since any such records were reviewed or utilized.

25        Irico is continuing to review its hard copy files and will update its response to this

26   interrogatory if it identifies additional responsive information.

27                              **Email Systems**

28        Irico began using email in approximately the 2004-2005 time period. At first, Irico issued

1  email addresses only at the departmental level rather than to individual employees. Thus, for

2  example, the Sales Department personnel would share a single email address issued to that

3  department. Over time, Irico expanded the issuance of individual emails according to business

4  need and consistent with the available email storage capacity at that time.

5      At the time that Irico first introduced email through at least the end of 2007, electronic

6  documents generally, and email specifically, were not widely used. At that time, the company had

7  limited storage available to an individual user, whose accounts typically allowed for storage of

8  only 1-2 MB of email. As a result of this limited storage, email users, depending on the volume of

9  email received, would need to delete emails frequently in order to allow for the delivery of

10  additional email.

11      In addition to limited individual account capacity, Irico's email server likewise had

12  limited storage capacity. Due to this limited capacity, the server itself would need to overwrite the

13  oldest emails in order to keep the server from reaching its storage capacity. The frequency of this

14  process varied depending on the volume of email that the company received. During periods of

15  higher email activity, email would be overwritten every 3-5 days on average. During periods of

16  lower activity, such as during the Chinese New Year holiday, emails over a longer period may be

17  stored, for example closer to 14 days. In any event, Irico had a back-end server policy to delete all

18  emails older than 20 days from the time that Irico started using email through at least the end of

19  2007.

20  ## Other Electronic Systems

21      Irico did not use a networked computer system during the period 1995 – 2007. Likewise,

22  Irico did not have any centralized storage systems for electronic documents.

23  ## Handheld Devices

24      Irico did not issue electronic handheld devices to its employees, nor did Irico reimburse

25  employees for a personal cell phone or expenses related to it. If an employee chose to use a

26  personal cell phone for business, Irico had no control or oversight regarding that device, and Irico

27  did not deploy any enterprise software related to handheld devices. Irico has asked remaining

28  current employees who may be relevant to the issues raised by DPPs whether they have any cell

phone invoices from the 1995 to 2007 timeframe, but no such documents have been located.

Dated:  July 7, 2021                    BAKER BOTTS L.L.P.


                                        /s/ John M. Taladay

                                        John M. Taladay (*pro hac vice*)
                                        Evan J. Werbel (*pro hac vice*)
                                        Thomas E. Carter (*pro hac vice*)
                                        Andrew L. Lucarelli (*pro hac vice*)
                                        700 K Street, N.W.
                                        Washington, D.C. 20001
                                        (202)-639-7700
                                        (202)-639-7890 (fax)
                                        Email: john.taladay@bakerbotts.com
                                                evan.werbel@bakerbotts.com
                                                tom.carter@bakerbotts.com
                                                drew.lucarelli@bakerbotts.com

                                        Jonathan Shapiro (State Bar No. 257199)
                                        101 California Street, Suite 3600
                                        San Francisco, California 94111
                                        (415) 291-6200
                                        (415) 291-6300 (fax)
                                        Email: jonathan.shapiro@bakerbotts.com


                                        *Attorneys for Defendants*
                                        *IRICO GROUP CORP. and*
                                        *IRICO DISPLAY DEVICES CO., LTD.*

1

## **CERTIFICATE OF SERVICE**

2

**In re: Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917**

3

I declare that I am employed in Washington, District of Columbia.  I am over the age of

4

eighteen years and not a party to the within case; my business address is:  Baker Botts L.L.P., 700

5

K Street, N.W., Washington, D.C. 20001.

6

On July 7, 2021, I served the following document(s) described as:

7

8

### **IRICO DEFENDANTS' FIFTH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DIRECT PURCHASER PLAINTIFFS' FIRST SET OF INTERROGATORIES**

9

on the following interested parties in this action:

10

11

Guido Saveri (guido@saveri.com)
R. Alexander Saveri (rick@saveri.com)
Geoffrey C. Rushing (grushing@saveri.com)
Matthew D. Heaphy (mheaphy@saveri.com)
SAVERI & SAVERI, INC.
706 Sansome St # 200
San Francisco, CA 94111

12

13

Mario N. Alioto (malioto@tatp.com)
Lauren C. Capurro (laurenrussell@tatp.com)
TRUMP ALIOTO TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123

14

15

*Lead Counsel for the Direct Purchaser Plaintiffs*

*Lead Counsel for the Indirect Purchaser Plaintiffs*

16

17

Joseph Goldberg (jg@fbdlaw.com)
FREEDMAN BOYD HOLLANDER
GOLDBERG URIAS & WARD P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
D (505) 305-1263

18

19

Dan Birkhaeuser
(dbirkhaeuser@bramsonplutzik.com)
BRAMSON, PLUTZIK, MAHLER &
BIRKHAEUSER, LLP
2125 Oak Grove Rd, Suite 125
Walnut Creek, CA 94598

20

*Counsel for the Indirect Purchaser Plaintiffs*

*Counsel for the Indirect Purchaser Plaintiffs*

21

22

[X]    (BY ELECTRONIC MAIL) I caused such documents to be sent to the persons at the email addressed listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

23

24

25

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is true and correct.  Executed on July 7, 2021, in Washington, D.C.

26

27

*/s/ Thomas E. Carter*
Thomas E. Carter

28

| IRICO'S FOURTH SUPP. OBJECTIONS AND RESPONSES TO DPP'S FIRST SET INTERROGATORIES | 13 | Master File No. 4:07-cv-05944-JST MDL No. 1917 |

Exhibit G

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
        evan.werbel@bakerbotts.com
        tom.carter@bakerbotts.com
        drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-cv-05944-JST (N.D. Cal.) |
| | MDL No. 1917 |
| This Document Relates to: | **IRICO DEFENDANTS' OBJECTIONS AND RESPONSES TO DIRECT PURCHASER PLAINTIFF ARCH ELECTRONICS INC.'S FIRST SET OF INTERROGATORIES TO IRICO GROUP CORPORATION AND IRICO DISPLAY DEVICES CO, LTD.** |
| ALL DIRECT PURCHASER ACTIONS | |

PROPOUNDING PARTY:        ARCH ELECTRONICS, INC.

RESPONDING PARTIES:        Irico Group Corporation
                           Irico Display Devices Co., Ltd.

SET NUMBER:        One

1       Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico

2   Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby provides this

3   response to Direct Purchaser Plaintiff Arch Electronics, Inc.'s ("Plaintiff") First Set of

4   Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., dated December

5   13, 2021 ("Interrogatories"). Irico reserves the right to amend or supplement these Objections and

6   Responses (the "Responses") to the extent allowed by the Federal Rules of Civil Procedure and

7   the Local Rules of Practice in Civil Proceedings before the United States District Court for the

8   Northern District of California ("Local Rules"). Subject to and without waiving any of Irico's

9   General and Specific Objections as set forth below, Irico is willing to meet and confer with

10  Plaintiff regarding such General and Specific Objections.

11      The following Responses are made only for purposes of this case. The Responses are

12  subject to all objections as to relevance, materiality and admissibility, and to any and all

13  objections on any ground that would require exclusion of any response if it were introduced in

14  court. All evidentiary objections and grounds are expressly reserved.

15      These Responses are subject to the provisions of the Stipulated Protective Order that the

16  Court issued on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated

17  "Confidential" in accordance with the provisions of the Protective Order.

18                          **GENERAL OBJECTIONS**

19  Irico makes the following General Objections to Plaintiff's Interrogatories:

20      1.      Irico's Responses are based upon information available to and located by Irico as

21  of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states

22  that it has conducted a diligent search, reasonable in scope, of those files and records in its

23  possession, custody, or control believed to likely contain information responsive to Plaintiff's

24  Interrogatories.

25      2.      No express, incidental, or implied admissions are intended by these Responses and

26  should not be read or construed as such.

27      3.      Irico does not intend, and its Responses should not be construed as, an agreement

28  or acquiescence with any characterization of fact, assumption, or conclusion of law contained in

---

IRICO'S OBJECTIONS AND RESPONSES TO          1          Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET                    MDL No. 1917
INTERROGATORIES

1  or implied by the Interrogatories.

2      4.      Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad,

3  unduly burdensome, oppressive, and duplicative to the extent that they seek information or

4  documents that are already in the possession, custody, or control of Plaintiff.

5      5.      Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose

6  obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any

7  Order of this Court.

8      6.      Irico objects to Plaintiff's Interrogatories to the extent that they request duplicative

9  discovery in violation of the Order Re Discovery And Case Management Protocol, ECF No.

10  1128. *See* Order Re Plaintiffs' Motions To Compel Supplemental Discovery From Toshiba And

11  Panasonic, ECF No. 4128, at 4 ("The Discovery Protocol (ECF No 1128), requires parties to

12  coordinate discovery and not file duplicative discovery. . . . The benefit redounds to all parties on

13  both sides of the litigation, by conserving the efforts required by plaintiffs and protecting

14  defendants against unnecessary duplication of effort.") (Report and Recommendation adopted in

15  full at ECF No. 4256).

16      7.      Irico objects to Plaintiff's Interrogatories to the extent they seek information that is

17  not relevant or disproportionate to the needs of the case.

18      8.      Irico objects to Plaintiff's Interrogatories to the extent that they are vague,

19  ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such

20  vague or ambiguous Interrogatories so as to provide for the production of responsive information

21  that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of

22  any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or

23  amend its Responses.

24      9.      Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that

25  are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous

26  Interrogatories so as to provide for the production of responsive information that is proportionate

27  to the needs of the case.

28      10.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information

IRICO'S OBJECTIONS AND RESPONSES TO          2          Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET                   MDL No. 1917
INTERROGATORIES

1   that is protected from disclosure by the attorney-client privilege, work product doctrine, joint

2   defense or common interest privilege, self-evaluative privilege, or any other applicable privilege

3   or immunity. Irico has provided only information that it believes to be non-privileged and

4   otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed

5   as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any

6   information or responsive documents subject to any such doctrine, privilege, protection or

7   immunity from production shall not constitute a general, inadvertent, implicit, subject-matter,

8   separate, independent or other waiver of such doctrine, privilege, protection or immunity from

9   production.

10         11.    Irico objects to Plaintiff's Interrogatories to the extent that they call for

11   information that is not in the possession, custody, or control of Irico. Irico also objects to the

12   extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties,

13   including but not limited to any of Irico's subsidiary or affiliated companies.

14         12.    Irico objects to Plaintiff's Interrogatories to the extent that responding would

15   require Irico to violate the privacy and/or confidentiality of a third party or confidentiality

16   agreement with a third party.

17         13.    Irico objects to Plaintiff's Interrogatories to the extent that they seek information

18   that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily

19   available from other sources.

20         14.    Irico objects to Plaintiff's Interrogatories to the extent that they seek information

21   or documents concerning transactions outside the United States. Such Interrogatories are unduly

22   burdensome and irrelevant to this pending action as Plaintiffs' class definition is confined to "all

23   persons . . . who directly purchased a Cathode Ray Tube Product . . . in the United States" (see

24   Direct Purchaser Plaintiffs' Consolidated Amended Complaint dated March 16, 2009).

25         15.    Irico objects to Plaintiff's Interrogatories to the extent that compliance would

26   require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body

27   of foreign jurisdictions.

28

IRICO'S OBJECTIONS AND RESPONSES TO     3     Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET           MDL No. 1917
INTERROGATORIES

16.    Irico's responses, whether now or in the future, pursuant to Plaintiff's Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

17.    Irico objects to Plaintiff's Interrogatories to the extent that they are compound and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

18.    Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for legal conclusions.

19.    Irico objects to the Interrogatories to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

20.    Irico objects to the Interrogatories to the extent they seek information or documents that cannot be removed or transmitted outside China without violating the laws and regulations of that country, including but not limited to restrictions on the transmission of state secrets or trade secrets as those terms are defined under Chinese law.

21.    Irico objects to the Interrogatories to the extent that they are "contention interrogatories" regarding issues implicated by expert analysis and disclosures. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 Wl 9558055 (N.D. Cal. May 19, 2011). Irico objects to each Interrogatory to the extent that it is premature and/or to the extent that it: (a) conflicts with obligations that are imposed by the Federal Rules of Civil Procedure, the Civil Local Rules of this Court, and/or any other applicable rule; (b) seeks information that is the subject of expert testimony; and/or (c) seeks information that is dependent on depositions and documents of third-parties that have not been discovered.

22.    Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

## GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      Irico objects to the definitions of "Defendant," "You," and "Your" (Definition Nos. 1 and 2) to the extent that Plaintiff defines those terms to include Irico's "subsidiaries, affiliates, agents, employees, attorneys, consultants, representatives and any other person or entity acting on their behalf or at their direction." This definition is overbroad, unduly burdensome, vague, and ambiguous. Irico also objects to the inclusion of all "agents, employees, attorneys, consultants, representatives and any other person or entity acting on [Irico's] behalf or at [Irico's] direction" within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

2.      Irico objects to the definitions of "CRT" and "CRT Product" (Definition Nos. 4 and 5) on the grounds that they are vague, ambiguous and overly broad. Irico further objects to the use of the term "CRT Products" to the extent that it is inconsistent with the definition of "CRT Products" as set forth in Plaintiff's pleadings

3.      Irico objects to the definition of "Person" (Definition No. 12) on the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to the extent that it seeks information protected by the attorney client or other applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or foreign law.

4.      Irico objects to the definition of "Document" (Definition No. 13) to the extent it seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, or any other applicable laws.

5.      Irico objects to the definition of "Identify" (Definition No. 14) to the extent it seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, or any other applicable laws.

6.      Irico objects to the Instructions (related to the production of business records in

1  response to an interrogatory pursuant to Federal Rule of Civil Procedure 33(d)) on the grounds

2  that it is unduly burdensome and purports to impose burdens and obligations upon Irico beyond

3  those required by the Federal Rules of Civil Procedure or other applicable rule or Order of this

4  Court.

## SPECIFIC RESPONSES TO INTERROGATORIES

## INTERROGATORY NO. 1

7  To the extent that your answer to any of DPP Arch Electronics Inc.'s First Set of

8  Requests for Admission to Irico Group Corporation and Irico Display Devices, Co. Ltd, served

9  herewith, is anything other than an unqualified admission:

10  (a)  State the facts that You rely on to support Your denial or partial denial;

11  (b)  Identify each Person You contend has knowledge of facts that support Your

12  denial or partial denial; and

13  (c)  Identify each Document You contend supports Your denial or partial denial.

## RESPONSE TO INTERROGATORY NO. 1

15  Irico reasserts and incorporates each of the General Objections and Objections to the

16  Definitions and Instructions set forth above. Irico also reasserts and incorporates each of the

17  General Objections, Objections to the Definitions and Instructions, and objections in each of its

18  Specific Responses to Requests for Admission as set forth in Irico Defendants' Objections and

19  Responses to Direct Purchaser Plaintiff Arch Electronic, Inc.'s First Set of Requests for

20  Admission, served herewith. Irico further objects to this interrogatory as overbroad and unduly

21  burdensome, as Plaintiff has not demonstrated how the benefit of such information outweighs the

22  significant burden to Irico of responding to each denial of the 167 RFAs propounded by

23  Plaintiffs.

24  Subject to and without waiving the foregoing objections, Irico responds as follows:

## RESPONSE RE: REQUEST FOR ADMISSION NO. 1

26  In addition to Irico's General Objections, which Irico incorporates by reference, Irico

27  specifically objects to this Interrogatory on the grounds that it is overboard, unduly burdensome,

28  not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

1   that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

2   Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

3   conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

4   "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

5   burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

6   also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

7   that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

8   provide facts and evidence of events that did not take place.

9       Subject to and without waiving the objections stated above and pursuant to FRCP 33(d)

10   and not limited to the following, Irico states that despite the Interrogatory's demand for proof of

11   facts and evidence of events that did not take place, Irico relies on the following evidence:

12   Irico Defendants' Second Supplemental Objections and Responses to Direct Purchaser Plaintiffs'

13   First Set of Interrogatories, May 3, 2021; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico

14   Display Devices Co., Ltd., March 6-8, 2019; Expert Report of Robert D. Willig, December 17,

15   2012; Expert Report of Janusz A. Ordover, Ph.D., (IPP Report), August 5, 2014; Expert Report of

16   Janusz A. Ordover, Ph. D., (Various DAP Reports); Expert Report of Robert D. Willig, August 5,

17   2014; Expert Report of Margaret E. Guerin-Calvert, August 5, 2014; and Expert Report of Prof.

18   Dennis W. Carlton, August 5, 2014.

19       Irico identifies the following employees as having knowledge regarding this Interrogatory:

20   Wang Zhaojie and Su Xiaohua.

21   **RESPONSE RE: REQUEST FOR ADMISSION NO. 2**

22       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

23   specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

24   not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

25   that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

26   Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

27   conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

28   "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

1   burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

2   also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

3   that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

4   provide facts and evidence of events that did not take place.

5          Subject to and without waiving the objections stated above, and despite the Interrogatory's

6   demand for proof of facts and evidence of events that did not take place, Irico refers Plaintiffs to

7   its response to Request for Admission No. 2, which contains a complete basis for its response to

8   this Interrogatory.

9          **RESPONSE RE: REQUEST FOR ADMISSION NO. 3**

10          In addition to Irico's General Objections, which Irico incorporates by reference, Irico

11  specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

12  not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

13  that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

14  Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

15  conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

16  "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

17  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

18  also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

19  that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

20  provide facts and evidence of events that did not take place.

21          Subject to and without waiving the objections stated above, and despite the Interrogatory's

22  demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

23  has been brought in the above captioned matter that indicates that Irico manufactured, sold, or

24  distributed CRTs in the United States during the class period. In particular, Irico will be

25  producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the

26  United States. Irico also identifies the following evidence under FRCP 33(d): Direct Purchaser

27  Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico

28  Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs, July 14,

1    2021; Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser

2    Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental

3    Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January 7,

4    2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs'

5    Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd.,

6    January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co.,

7    Ltd., March 6-8, 2019.

8           Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

9    Zhaojie and Su Xiaohua.

10   **RESPONSE RE: REQUEST FOR ADMISSION NO. 4**

11          In addition to Irico's General Objections, which Irico incorporates by reference, Irico

12   specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

13   not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

14   that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

15   Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

16   conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

17   "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

18   burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

19   also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

20   that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

21   provide facts and evidence of events that did not take place.

22          Subject to and without waiving the objections stated above, and despite the Interrogatory's

23   demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

24   has been brought in the above captioned matter that indicates that Irico manufactured, sold, or

25   distributed CRTs in the United States during the class period. In particular, Irico will be

26   producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the

27   United States. Irico also identifies the following evidence under FRCP 33(d): Direct Purchaser

28   Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico

IRICO'S OBJECTIONS AND RESPONSES TO          9          Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET                   MDL No. 1917
INTERROGATORIES

1  Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs, July 14,

2  2021; Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser

3  Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental

4  Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January 7,

5  2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs'

6  Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd.,

7  January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co.,

8  Ltd., March 6-8, 2019.

9       Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

10  Zhaojie and Su Xiaohua.

11       **RESPONSE RE: REQUEST FOR ADMISSION NO. 5**

12       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

13  specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

14  not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

15  that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

16  Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

17  conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

18  "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

19  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

20  also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

21  that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

22  provide facts and evidence of events that did not take place.

23       Subject to and without waiving the objections stated above, and despite the Interrogatory's

24  demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

25  has been brought in the above captioned matter that indicates that Irico manufactured, sold, or

26  distributed CRTs in the United States during the class period. In particular, Irico will be

27  producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the

28  United States. Irico also identifies the following evidence under FRCP 33(d): Direct Purchaser

IRICO'S OBJECTIONS AND RESPONSES TO    10       Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET            MDL No. 1917
INTERROGATORIES

1   Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico

2   Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs, July 14,

3   2021; Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser

4   Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental

5   Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January 7,

6   2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs'

7   Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd.,

8   January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co.,

9   Ltd., March 6-8, 2019.

10       Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

11  Zhaojie and Su Xiaohua.

12   **RESPONSE RE: REQUEST FOR ADMISSION NO. 6**

13       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

14  specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

15  not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

16  that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

17  Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

18  conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

19  "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

20  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

21  also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

22  that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

23  provide facts and evidence of events that did not take place.

24       Subject to and without waiving the objections stated above, and despite the Interrogatory's

25  demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

26  has been brought in the above captioned matter that indicates that Irico manufactured, sold, or

27  distributed CRTs in the United States during the class period. In particular, Irico will be

28  producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the

1   United States. Irico also identifies the following evidence under FRCP 33(d): Direct Purchaser

2   Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico

3   Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs, July 14,

4   2021; Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser

5   Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental

6   Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January

7   2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs'

8   Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd.,

9   January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co.,

10  Ltd., March 6-8, 2019.

11       Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

12  Zhaojie and Su Xiaohua.

13       **RESPONSE RE: REQUEST FOR ADMISSION NO. 7**

14       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

15  specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

16  not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

17  that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

18  Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

19  conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

20  "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

21  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

22  also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

23  that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

24  provide facts and evidence of events that did not take place.

25       Subject to and without waiving the objections stated above, and despite the Interrogatory's

26  demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

27  has been brought in the above captioned matter that indicates that Irico manufactured, sold, or

28  distributed CRTs in the United States during the class period. In particular, Irico will be

1   producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the

2   United States. Irico also identifies the following evidence under FRCP 33(d): Direct Purchaser

3   Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico

4   Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs, July 14,

5   2021; Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser

6   Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental

7   Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January 7,

8   2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs'

9   Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd.,

10   January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co.,

11   Ltd., March 6-8, 2019.

12        Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

13   Zhaojie and Su Xiaohua.

14        **RESPONSE RE: REQUEST FOR ADMISSION NOS. 8-24**

15        In addition to Irico's General Objections, which Irico incorporates by reference, Irico

16   specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

17   not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

18   that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

19   Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

20   conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

21   "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

22   burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

23   also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

24   that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

25   provide facts and evidence of events that did not take place.

26        Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its

27   responses to Request for Admission Nos. 8-24, which contain a complete basis for its response to

28   this Interrogatory.

**<u>RESPONSE RE: REQUEST FOR ADMISSION NOS. 25-56 AND 61-160</u>**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

Subject to and without waiving the objections stated above, Irico responds that its decision to admit, admit-in part and deny-in-part, deny, or state that it lacked sufficient information to admit or deny was based a reasonable review of the discovery responses from other Defendants available to Irico. Irico possesses no knowledge of its own regarding the corporate structure of the entities listed in the aforementioned Requests. This information is equally available to Plaintiffs as it is to Irico.

**<u>RESPONSE RE: REQUEST FOR ADMISSION NO. 57</u>**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

1       Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its

2  responses to Request for Admission No. 57, which contains a complete basis for its response to

3  this Interrogatory.

4          **RESPONSE RE: REQUEST FOR ADMISSION NO. 58**

5       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

6  specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

7  not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

8  that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

9  Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

10  conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

11  "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

12  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

13  also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

14  that Plaintiffs alone carry to Irico.

15       Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its

16  responses to Request for Admission No. 58, which contains a complete basis for its response to

17  this Interrogatory.

18          **RESPONSE RE: REQUEST FOR ADMISSION NO. 59**

19       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

20  specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

21  not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

22  that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

23  Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

24  conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

25  "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

26  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

27  also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

28  that Plaintiffs alone carry to Irico.

IRICO'S OBJECTIONS AND RESPONSES TO    15         Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET              MDL No. 1917
INTERROGATORIES

1          Subject to and without waiving the objections stated above, Irico responds that from July

2    1992 to February 1996, Irico Group held an indirect but controlling share of Irico Display. In

3    February 1996, Irico Group acquired a controlling 23.77% of the non-publicly traded shares of

4    Irico Display. In June 1999, Irico Group increased its shareholding in Irico Display to 57.9%. In

5    September 2004, Irico Group transferred its 56.14% interest in Irico Display to Irico Group

6    Electronics Co., Ltd. ("Irico Electronics"), a majority-owned subsidiary of Irico Group. From

7    2004 onward, Irico Group indirectly controlled Irico Display through its ownership interest in

8    Irico Electronics. In July 2006, Irico Electronics shareholding interest in Irico Display decreased

9    to 42.90%, however Irico Electronics maintained a controlling interest in Irico Display.

10          **RESPONSE RE: REQUEST FOR ADMISSION NO. 60**

11          In addition to Irico's General Objections, which Irico incorporates by reference, Irico

12   specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

13   not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

14   that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

15   Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

16   conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

17   "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

18   burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

19   also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

20   that Plaintiffs alone carry to Irico.

21          Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its

22   Response re Request for Admission No. 59.

23          **RESPONSE RE: REQUEST FOR ADMISSION NOS. 161-167**

24          In addition to Irico's General Objections, which Irico incorporates by reference, Irico

25   specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

26   not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

27   that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

28   Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

1   conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

2   "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

3   burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

4   also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

5   that Plaintiffs alone carry to Irico.

6        Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its

7   responses to Request for Admission Nos. 161-167, which contain a complete basis for its

8   response to this Interrogatory.

9   **INTERROGATORY NO. 2**

10       Describe Irico's relationship with former employees including any obligations owed by

11  former employees to Irico, conditions imposed on severance or retirement benefit eligibility, or

12  similar policies and procedures.

13  **RESPONSE TO INTERROGATORY NO. 2**

14       Irico reasserts and incorporates each of the General Objections and Objections to the

15  Definitions and Instructions set forth above. Irico further objects to this interrogatory as

16  overbroad and unduly burdensome, as Plaintiff has not demonstrated how the benefit of such

17  information outweighs the significant burden to Irico of requiring the company to search through

18  historical records for such information. Irico also objects to this interrogatory to the extent it

19  purports to request information beyond the possession, custody, or control of Irico Group or Irico

20  Display, including but not limited to information in the possession of non-parties where Irico

21  lacks any duty to obtain or otherwise search for the information and for whom the Court lacks

22  personal jurisdiction. Irico further objects that this interrogatory is duplicative and cumulative of

23  other requests served on Irico, including but not limited to: Interrogatory No. 6 of Indirect

24  Purchaser Plaintiffs' Third Set of Interrogatories. Such duplicative and cumulative requests

25  violate the Order Re Discovery And Case Management Protocol, ECF No. 1128. *See* Order Re

26  Plaintiffs' Motions To Compel Supplemental Discovery From Toshiba And Panasonic, ECF No.

27  4128, at 4 ("The Discovery Protocol (ECF No 1128), requires parties to coordinate discovery and

28  not file duplicative discovery. . . . The benefit redounds to all parties on both sides of the

litigation, by conserving the efforts required by plaintiffs and protecting defendants against unnecessary duplication of effort.") (Report and Recommendation adopted in full at ECF No. 4256).

Subject to and without waiving the objections stated above, Irico responds that no relationship exists with former employees. When an employee ends his employment with Irico, his/her employment files are transferred to either the employees' new employer or, in the case of employees who retire from Irico, the archive management agency of the government of the People's Republic of China. When an employee retires from Irico, and his/her pension and other benefits are paid directly by the government of the People's Republic of China. Irico cannot impose conditions on severance or retirement benefit eligibility.

**INTERROGATORY NO. 3**

Do you contend that the market for CPTs was the same market, or a separate market, from the market for CDTs?

(a)     State the facts that You rely on to support Your contention;

(b)     Identify each Person You contend has knowledge of facts that support Your contention; and

(c)     Identify each Document You contend supports Your contention.

**RESPONSE TO INTERROGATORY NO. 3**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a contention interrogatory, served before fact depositions and/or expert analysis and disclosures. Irico asserts that such discovery is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures are not contemplated by the Court's schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). In particular, this Interrogatory concerning market definition for CRTs particularly implicates antitrust law and expert analysis, and is not ripe for a response at this stage of the litigation. Irico reserves all rights to further supplement its responses at an appropriate time following the substantial completion of other fact and expert discovery. Irico also objects to this

1  Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone

2  carry to Irico.

3         Subject to and without waiving the foregoing objections, Irico identifies the following

4  evidence under FRCP 33(d): Expert Report of Robert D. Willig, December 17, 2012; Expert

5  Report of Janusz A. Ordover, Ph.D., (IPP Report), August 5, 2014; Expert Report of Janusz A.

6  Ordover, Ph. D., (Various DAP Reports); Expert Report of Robert D. Willig, August 5, 2014;

7  Expert Report of Margaret E. Guerin-Calvert, August 5, 2014; and Expert Report of Prof. Dennis

8  W. Carlton, August 5, 2014.

9  **INTERROGATORY NO. 4**

10         Do You contend that You were a victim of the CRT conspiracy alleged in the

11  Complaint? If so:

12         1.      State the facts that You rely on to support Your contention;

13         2.      Identify each Person You contend has knowledge of facts that support

14                 Your contention; and

15         3.      Identify each Document You contend supports Your contention.

16  **RESPONSE TO INTERRGOATORY NO. 4**

17         Irico reasserts and incorporates each of the General Objections and Objections to the

18  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

19  contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

20  Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

21  relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

22  schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

23  Cal. May 19, 2011). Irico reserves all rights to further supplement its responses at an appropriate

24  time following the substantial completion of other fact and expert discovery.

25         Subject to and without waiving the foregoing objections, and based on its present

26  knowledge, Irico responds that it does not contend at this time that it was a victim of the alleged

27  conspiracy.

28

**INTERROGATORY NO. 5**

Do You contend that You did not fix prices with other Defendants, Mitsubishi, Thomson or Videocom? If so:

    (a)    State the facts that You rely on to support Your contention;

    (b)    Identify each Person You contend has knowledge of facts that support Your contention; and

    (c)    Identify each Document You contend supports Your contention.

**RESPONSE TO INTERROGATORY NO. 5**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a contention interrogatory, served before fact depositions and/or expert analysis and disclosures. Irico asserts that such discovery is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures are not contemplated by the Court's schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). In particular, this Interrogatory concerning allegations at the core of Plaintiffs' claims particularly implicates legal and economic expert conclusions, and is not ripe for a response at this stage of the litigation. Irico reserves all rights to further supplement its responses at an appropriate time following the substantial completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

Subject to and without waiving the foregoing objections, and based on its present knowledge, Irico directs Plaintiffs' to its Response to Interrogatory No. 1.

**INTERROGATORY NO. 6**

Do you contend that Your contacts with other CRT manufacturers had lawful, competitive purposes, for each contact? If so:

    (a)    State the facts that You rely on to support Your contention;

    (b)    Identify each Person You contend has knowledge of facts that support Your contention; and

IRICO'S OBJECTIONS AND RESPONSES TO    20    Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET    MDL No. 1917
INTERROGATORIES

1    (c)    Identify each Document You contend supports Your contention.

2    **RESPONSE TO INTERROGATORY NO. 6**

3        Irico reasserts and incorporates each of the General Objections and Objections to the

4    Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

5    contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

6    Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

7    relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

8    schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

9    Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

10   argument or legal conclusion. Irico further objects to this interrogatory to the extent that it

11   improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

12       Subject to and without waiving the foregoing objections, Irico identifies the following

13   evidence under FRCP 33(d): Expert Report of Robert D. Willig, December 17, 2012; Expert

14   Report of Janusz A. Ordover, Ph.D., (IPP Report), August 5, 2014; Expert Report of Janusz A.

15   Ordover, Ph. D., (Various DAP Reports); Expert Report of Robert D. Willig, August 5, 2014;

16   Expert Report of Margaret E. Guerin-Calvert, August 5,/* 2014; and Expert Report of Prof.

17   Dennis W. Carlton, August 5, 2014; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico

18   Display Devices Co., Ltd., March 6-8, 2019; Reply Brief of Irico In Support of Motion to Set

19   Aside Default at 10-11, ECF No. 5229; Exs. A – F to the Declaration of Stuart C. Plunkett in

20   Support of Motion to Set Aside Default, ECF Nos. 5229-02 through -07; IRI-CRT-00031457.

21   **INTERROGATORY NO. 7**

22       If you contend that any Samsung-branded color television or computer monitor sold in the

23   United States during the Relevant Time Period contained CRTs that were not manufactured by a

24   Defendant or alleged Co-Conspirator, please:

25   (a)    State the facts that You rely on to support Your contention;

26   (b)    Identify the brand, model number, size and time period sold in the United States

27          each such CRT color television or computer monitor;

28   (c)    Identify each Person You contend has knowledge of facts that support

1        Your contention; and

2        (d)      Identify each Document You contend supports Your contention.

3    **RESPONSE TO INTERROGATORY NO. 7**

4        Irico reasserts and incorporates each of the General Objections and Objections to the

5    Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

6    contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

7    Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

8    relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

9    schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

10   Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

11   the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

12   expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

13   rights to further supplement its responses at an appropriate time following the substantial

14   completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

15   it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

16       Subject to and without waiving the foregoing objections, and based on its present

17   knowledge, Irico responds that it lacks sufficient information to form a belief as to this

18   contention.

19   **REQUEST FOR ADMISSION NO. 8**

20       If you contend that any Hitachi-branded color television or computer monitor sold in the

21   United States during the Relevant Time Period contained CRTs that were not manufactured by a

22   Defendant or alleged Co-Conspirator, please:

23       (a)      State the facts that You rely on to support Your contention;

24       (b)      Identify the brand, model number, size and time period sold in the United States

25               each such CRT color television or computer monitor;

26       (c)      Identify each Person You contend has knowledge of facts that support Your

27               contention; and

28       (d)      Identify each Document You contend supports Your contention.

---

IRICO'S OBJECTIONS AND RESPONSES TO          22          Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET                    MDL No. 1917
INTERROGATORIES

**RESPONSE TO INTERROGATORY NO. 8**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a contention interrogatory, served before fact depositions and/or expert analysis and disclosures. Irico asserts that such discovery is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures are not contemplated by the Court's schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all rights to further supplement its responses at an appropriate time following the substantial completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

Subject to and without waiving the foregoing objections, and based on its present knowledge, Irico responds that it lacks sufficient information to form a belief as to this contention.

**INTERROGATORY NO. 9**

If you contend that any Mitsubishi-branded color television or computer monitor sold in the United States during the Relevant Time Period contained CRTs that were not manufactured by a Defendant or alleged Co-Conspirator, please:

    (a)    State the facts that You rely on to support Your contention;

    (b)    Identify the brand, model number, size and time period sold in the United States each such CRT color television or computer monitor;

    (c)    Identify each Person You contend has knowledge of facts that support Your contention; and

    (d)    Identify each Document You contend supports Your contention.

**RESPONSE TO INTERROGATORY NO. 9**

Irico reasserts and incorporates each of the General Objections and Objections to the

IRICO'S OBJECTIONS AND RESPONSES TO    23    Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET    MDL No. 1917
INTERROGATORIES

1   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

2   contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

3   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

4   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

5   schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

6   Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

7   the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

8   expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

9   rights to further supplement its responses at an appropriate time following the substantial

10  completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

11  it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

12        Subject to and without waiving the foregoing objections, and based on its present

13  knowledge, Irico responds that it lacks sufficient information to form a belief as to this

14  contention.

15  **INTERROGATORY NO. 10**

16        If you contend that any Toshiba-branded color television or computer monitor sold in

17  the United States during the Relevant Time Period contained CRTs that were not manufactured by

18  a Defendant or alleged Co-Conspirator, please:

19        (a)    State the facts that You rely on to support Your contention;

20        (b)    Identify the brand, model number, size and time period sold in the United States

21               each such CRT color television or computer monitor;

22        (c)    Identify each Person You contend has knowledge of facts that support Your

23               contention; and

24        (d)    Identify each Document You contend supports Your contention.

25  **RESPONSE TO INTERROGATORY NO. 10**

26        Irico reasserts and incorporates each of the General Objections and Objections to the

27  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

28  contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

1    Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

2    relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

3    schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

4    Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

5    the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

6    expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

7    rights to further supplement its responses at an appropriate time following the substantial

8    completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

9    it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

10        Subject to and without waiving the foregoing objections, and based on its present

11   knowledge, Irico responds that it lacks sufficient information to form a belief as to this

12   contention.

13   **INTERROGATORY NO. 11**

14        If you contend that any Thomson, RCA or GE-branded color television or computer

15   monitor sold in the United States during the Relevant Time Period contained CRTs that were not

16   manufactured by a Defendant or alleged Co-Conspirator, please:

17        (a)    State the facts that You rely on to support Your contention;

18        (b)     Identify the brand, model number, size and time period sold in the United States

19               each such CRT color television or computer monitor;

20        (c)    Identify each Person You contend has knowledge of facts that support Your

21               contention; and

22        (d)    Identify each Document You contend supports Your Contention.

23   **RESPONSE TO INTERROGATORY NO. 11**

24        Irico reasserts and incorporates each of the General Objections and Objections to the

25   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

26   contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

27   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

28   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

1   schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

2   Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

3   the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

4   expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

5   rights to further supplement its responses at an appropriate time following the substantial

6   completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

7   it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

8          Subject to and without waiving the foregoing objections, and based on its present

9   knowledge, Irico responds that it lacks sufficient information to form a belief as to this

10  contention.

11  **INTERROGATORY NO. 12**

12         If you contend that any Philips-branded color television or computer monitor sold in the

13  United States during the Relevant Time Period contained CRTs that were not manufactured by a

14  Defendant or alleged Co-Conspirator, please:

15         (a)    State the facts that You rely on to support Your contention;

16         (b)     Identify the brand, model number, size and time period sold in the United States

17                each such CRT color television or computer monitor;

18         (c)     Identify each Person You contend has knowledge of facts that support Your

19                contention; and

20         (d)    Identify each Document You contend supports Your contention

21  **RESPONSE TO INTERROGATORY NO. 12**

22         Irico reasserts and incorporates each of the General Objections and Objections to the

23  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

24  contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

25  Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

26  relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

27  schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

28  Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

1   the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

2   expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

3   rights to further supplement its responses at an appropriate time following the substantial

4   completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

5   it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

6         Subject to and without waiving the foregoing objections, and based on its present

7   knowledge, Irico responds that it lacks sufficient information to form a belief as to this

8   contention.

9   **INTERROGATORY NO. 13**

10         If you contend that any LG-branded color television or computer monitor sold in the

11   United States during the Relevant Time Period contained CRTs that were not manufactured by a

12   Defendant or alleged Co-Conspirator, please:

13         (a)     State the facts that You rely on to support Your contention;

14         (b)     Identify the brand, model number, size and time period sold in the United States

15                 each such CRT color television or computer monitor;

16         (c)     Identify each Person You contend has knowledge of facts that support Your

17                 contention; and

18         (e)     Identify each Document You contend supports Your contention.

19   **RESPONSE TO INTERROGATORY NO. 13**

20         Irico reasserts and incorporates each of the General Objections and Objections to the

21   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

22   contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

23   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

24   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

25   schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

26   Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

27   the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

28   expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

IRICO'S OBJECTIONS AND RESPONSES TO     27     Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET           MDL No. 1917
INTERROGATORIES

1   rights to further supplement its responses at an appropriate time following the substantial

2   completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

3   it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

4          Subject to and without waiving the foregoing objections, and based on its present

5   knowledge, Irico responds that it lacks sufficient information to form a belief as to this

6   contention.

7   **INTERROGATORY NO. 14**

8          If you contend that any Panasonic-branded color television or computer monitor sold in

9   the United States during the Relevant Time Period contained CRTs that were not manufactured

10  by a Defendant or alleged Co-Conspirator, please:

11         (a)     State the facts that You rely on to support Your contention;

12         (b)     Identify the brand, model number, size and time period sold in the United States

13                 each such CRT color television or computer monitor;

14         (c)     Identify each Person You contend has knowledge of facts that support

15                 Your contention; and

16         (d)      Identify each Document You contend supports Your contention.

17  **RESPONSE TO INTERROGATORY NO. 14**

18         Irico reasserts and incorporates each of the General Objections and Objections to the

19  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

20  contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

21  Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

22  relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

23  schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

24  Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

25  the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

26  expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

27  rights to further supplement its responses at an appropriate time following the substantial

28  completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

1    it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

2          Subject to and without waiving the foregoing objections, and based on its present

3    knowledge, Irico responds that it lacks sufficient information to form a belief as to this

4    contention.

5    **INTERROGATORY NO. 15**

6          If you contend that any NEC-branded color television or computer monitor sold in the

7    United States during the Relevant Time Period contained CRTs that were not manufactured by a

8    Defendant or alleged Co-Conspirator, please:

9          (a)    State the facts that You rely on to support Your contention;

10         (b)    Identify the brand, model number, size and time period sold in the United States

11                each such CRT color television or computer monitor;

12         (c)    Identify each Person You contend has knowledge of facts that support Your

13                contention; and

14         (d)    Identify each Document You contend supports Your contention.

15   **RESPONSE TO INTERROGATORY NO. 15**

16         Irico reasserts and incorporates each of the General Objections and Objections to the

17   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

18   contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

19   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

20   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

21   schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

22   Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

23   the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

24   expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

25   rights to further supplement its responses at an appropriate time following the substantial

26   completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

27   it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

28         Subject to and without waiving the foregoing objections, and based on its present

IRICO'S OBJECTIONS AND RESPONSES TO          29          Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET                   MDL No. 1917
INTERROGATORIES

1  knowledge, Irico responds that it lacks sufficient information to form a belief as to this

2  contention.

3  **INTERROGATORY NO. 16**

4      As to Your contention in the Second Defense set forth in Your Answer that Direct

5  Purchaser Plaintiffs' claims are barred because Plaintiffs have failed to allege facts sufficient to

6  support a claim under the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a:

7      (a)     State the facts that You rely on to support Your contention;

8      (b)     Identify each Person You contend has knowledge of facts that support Your

9              contention; and

10     (c)     Identify each Document You contend supports Your contention; and

11     (d)     Identify the damages, if any, Plaintiffs claim based on sales outside of the United

12             States

13  **RESPONSE TO INTERROGATORY NO. 16**

14      Irico reasserts and incorporates each of the General Objections and Objections to the

15  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

16  contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

17  Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

18  relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

19  schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

20  Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

21  argument or legal conclusion. Irico further objects to this interrogatory to the extent that it

22  improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

23  Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary

24  burden that Plaintiffs alone carry to Irico.

25      Subject to and without waiving the objections stated above, Irico contends that Plaintiffs

26  have failed to allege facts sufficient to support a claim under the Foreign Trade Antitrust

27  Improvements Act ("FTAIA"), 15 U.S.C. § 6a. At all relevant times, the North American CRT

28  market was unique and separate from other foreign markets, including China. In supporting its

1   claims, Plaintiffs rely on alleged meetings and communications that occurred outside the United

2   States that discuss and relate to CRTs sold outside the United States. Plaintiffs have not

3   established how it is entitled to any relief under FTAIA based on their purchases of either CRT

4   products outside of the United States or their purchase of CRT products containing CRTs

5   manufactured and/or purchased outside the United States. Irico also identifies the following

6   evidence under FRCP 33(d): Irico Group Corporation's Amended Motion to Dismiss Claims of

7   Direct Purchaser Plaintiffs for Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)),

8   March 19, 2019; Irico Display Devices Co., Ltd.'s Amended Motion to Dismiss Claims of Direct

9   Purchaser Plaintiffs for Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)), March 19,

10  2019; Irico Defendants' Reply in Support of Amended Motions to Dismiss Claims of Direct

11  Purchaser Plaintiffs for Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)), May 2,

12  2019.

13  **INTERROGATORY NO. 17**

14        As to Your contention in the Third Defense set forth in Your Answer that Direct

15  Purchaser Plaintiffs' claims are barred because the alleged conduct occurred outside the

16  jurisdiction of the Court or was neither directed to nor affected persons, entities, trade or

17  commerce in the United States, or both:

18        (a)    State the facts that You rely on to support Your contention;

19        (b)    Identify each Person You contend has knowledge of facts that support Your

20               contention; and

21        (c)    Identify each Document You contend supports Your contention.

22  **RESPONSE TO INTERROGATORY NO. 17**

23        Irico reasserts and incorporates each of the General Objections and Objections to the

24  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

25  contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

26  Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

27  relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

28  schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

IRICO'S OBJECTIONS AND RESPONSES TO          31          Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET                    MDL No. 1917
INTERROGATORIES

1  Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

2  argument or legal conclusion. Irico further objects to this interrogatory to the extent that it

3  improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

4  Subject to and without waiving the objections stated above, and despite the Interrogatory's

5  demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

6  has been brought in the above captioned matter that indicates that Irico manufactured, sold, or

7  distributed CRTs in the United States during the class period. In particular, Irico will be

8  producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the

9  United States. Irico also identifies the following evidence under FRCP 33(d): Direct Purchaser

10  Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico

11  Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs, July 14,

12  2021; Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser

13  Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental

14  Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January 7,

15  2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs'

16  Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd.,

17  January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co.,

18  Ltd., March 6-8, 2019.

19  Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

20  Zhaojie and Su Xiaohua.

21  **INTERROGATORY NO. 18**

22  As to Your contention in the Eighth Defense set forth in your Answer that Irico's actions

23  or practices were undertaken unilaterally for legitimate business reasons and in pursuit of Irico's

24  independent interests and those of its customers:

25  (a)  State the facts that you rely on to support your contention;

26  (b)  Identify each Person You contend has knowledge of facts

27  that support Your contention; and

28

1      (c)      Identify each Document You contend supports Your

2      contention.

3  **RESPONSE TO INTERROGATORY NO. 18**

4      Irico reasserts and incorporates each of the General Objections and Objections to the

5  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

6  contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

7  Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

8  relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

9  schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

10  Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

11  argument or legal conclusion.

12      Subject to and without waiving the objections stated above, Irico contends that its acts or

13  practices were undertaken unilaterally for legitimate business reasons and in pursuit of Irico's

14  independent interests. In addition, Irico asserts no evidence has been brought in the above

15  captioned matter that indicates that its actions were not undertaken unilaterally for legitimate

16  business reasons and in pursuit of Irico's independent interests. Pursuant to Rule 33(d) of the

17  Federal Rules of Civil Procedure, Irico relies on the following evidence to support its contention

18  that at all times its acts or practices were undertaken unilaterally for legitimate business reasons

19  and in pursuit of Irico's independent interests: Reply Brief of Irico In Support of Motion to Set

20  Aside Default at 10-11, ECF No. 5229; Exs. A – F to the Declaration of Stuart C. Plunkett in

21  Support of Motion to Set Aside Default, ECF Nos. 5229-02 through -07; IRI-CRT-00010133;

22  IRI-CRT-00010449; IRI-CRT-00010468; IRI-CRT-00026812; IRI-CRT-00030226; IRI-CRT-

23  00030865; IRI-CRT-00031457; BMCC-CRT000002761; BMCC-CRT000002762;

24  CHU00029175E; CHU00029179E; CHU00029259E; CHU00030067E; CHU00030777E;

25  CHU00030941E; CHU00030973E; CHU00031018E; CHU00031032; CHU00031044E; and,

26  CHU00031070E.

27      Irico identifies the following employees as having knowledge regarding this Interrogatory:

28  Wang Zhaojie and Su Xiaohua.

IRICO'S OBJECTIONS AND RESPONSES TO     33     Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET     MDL No. 1917
INTERROGATORIES

1  **INTERROGATORY NO. 19**

2    As to Your contention in the Eighth Defense set forth in your Answer that Irico's actions

3  and practices were not the product of any contract, combination or conspiracy with any other

4  person or entity:

5    (a)  State the facts that you rely on to support your contention;

6    (b)  Identify each Person You contend has knowledge of facts

7       that support Your contention; and

8    (c)  Identify each Document You contend supports Your

9       contention.

10  **RESPONSE TO INTERROGATORY NO. 19**

11    Irico reasserts and incorporates each of the General Objections and Objections to the

12  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

13  contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

14  Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

15  relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

16  schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

17  Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

18  argument or legal conclusion.

19    Subject to and without waiving the objections stated above, Irico contends that Irico's

20  pricing-related conduct was compelled by the Chinese government and based on duly enacted

21  laws and/or regulations of the People's Republic of China. Irico relies on the following evidence

22  to support this contention:

23    &bull; The State Planning Commission and the State Economic and Trade Commission

24     issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced

25     Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the

26     Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF

27     No. 5229-02.

28

---

IRICO'S OBJECTIONS AND RESPONSES TO  34  Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET    MDL No. 1917
INTERROGATORIES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- Notice of the State Planning Commission on Issuing the "Measures for the Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial Implementation)" – effective as of March 1, 1999. *See* https://law.lawtime.cn/d448076453170.html.

- Notice of the State Planning Commission and the Ministry of Information Industry on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex. B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-03.

- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.

- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-04.

- Notice on the issuance of the average production cost of certain types of color TV industries issued by the Ministry of Information Industry on August 25, 2000. *See* Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-06.

- Notice on the issuance of the average production cost of some industries of color picture tubes issued by the Ministry of Information Industry on September 14, 2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-07.

Irico identifies the following employees as having knowledge regarding this Interrogatory: Wang Zhaojie and Su Xiaohua.

**INTERROGATORY NO. 20**

IRICO'S OBJECTIONS AND RESPONSES TO      35      Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET                MDL No. 1917
INTERROGATORIES

1   As to Your contention in the Tenth Defense set forth in your Answer that Your acts or

2   practices that are the subject of the complaint were cost justified or otherwise economically

3   justified and resulted from a good faith effort to meet competition or market conditions:

4       (a)    State the facts that you rely on to support your contention;

5       (b)    Identify each Person you contend has knowledge of facts that

6                support Your contention; and

7       (c)    Identify each Document You contend supports Your

8                contention.

9   **<u>RESPONSE TO INTERROGATORY NO. 20</u>**

10   Irico reasserts and incorporates each of the General Objections and Objections to the

11   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

12   contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

13   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

14   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

15   schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

16   Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

17   argument or legal conclusion.

18   Subject to and without waiving the objections stated above, Irico contends that its acts or

19   practices were cost justified or otherwise economically justified, and resulted from a good faith

20   effort to meet competition or market conditions. In addition, Irico asserts no evidence has been

21   brought in the above captioned matter that indicates any action or practice of Irico was not cost

22   justified, otherwise economically justified, or did not result from a good faith effort to meet

23   competition or market conditions. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure,

24   Irico relies on the following evidence to support its contention that at all times its acts or practices

25   were cost justified or otherwise economically justified, and resulted from a good faith effort to

26   meet competition or market conditions: Reply Brief of Irico In Support of Motion to Set Aside

27   Default at 10-11, ECF No. 5229; Exs. A – F to the Declaration of Stuart C. Plunkett in Support of

28   Motion to Set Aside Default, ECF Nos. 5229-02 through -07; IRI-CRT-00010133; IRI-CRT-

1   00010449; IRI-CRT-00010468; IRI-CRT-00026812; IRI-CRT-00030226; IRI-CRT-00030865;

2   IRI-CRT-00031457; BMCC-CRT000002761; BMCC-CRT000002762; CHU00029175E;

3   CHU00029179E; CHU00029259E; CHU00030067E; CHU00030777E; CHU00030941E;

4   CHU00030973E; CHU00031018E; CHU00031032; CHU00031044E; and, CHU00031070E.

5     Irico identifies the following employees as having knowledge regarding this Interrogatory:

6   Wang Zhaojie and Su Xiaohua.

7   **INTERROGATORY NO. 21**

8     As to Your contention in the Eleventh Defense set forth in your Answer that Your conduct

9   that is the subject of the Complaint was caused by, due to, based upon, or in response to

10  directives, laws, regulations, policies, and/or acts of governments, governmental agencies and

11  entities, and/or regulatory agencies, and such is non-actionable or privileged:

12    (a) State the facts that you rely on to support your contention;

13    (b) Identify each Person you contend has knowledge of facts that support Your

14      contention; and

15    (c) Identify each Document You contend supports Your contention.

16  **RESPONSE TO INTERROGATORY NO. 21**

17    Irico reasserts and incorporates each of the General Objections and Objections to the

18  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

19  contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

20  Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

21  relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

22  schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

23  Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

24  argument or legal conclusion.

25    Subject to and without waiving the objections stated above, Irico contends that Irico's

26  pricing-related conduct was compelled by the Chinese government and based on duly enacted

27  laws and/or regulations of the People's Republic of China. Irico relies on the following evidence

28  to support this contention:

IRICO'S OBJECTIONS AND RESPONSES TO  37  Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET    MDL No. 1917
INTERROGATORIES

1
2
3
4
5

- The State Planning Commission and the State Economic and Trade Commission issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-02.

6
7
8
9

- Notice of the State Planning Commission on Issuing the "Measures for the Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial Implementation)" – effective as of March 1, 1999. *See* https://law.lawtime.cn/d448076453170.html.

10
11
12
13
14

- Notice of the State Planning Commission and the Ministry of Information Industry on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex. B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-03.

15
16
17

- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.

18
19
20
21
22

- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-04.

23
24
25
26

- Notice on the issuance of the average production cost of certain types of color TV industries issued by the Ministry of Information Industry on August 25, 2000. *See* Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-06.

27
28

- Notice on the issuance of the average production cost of some industries of color picture tubes issued by the Ministry of Information Industry on September 14,

1    2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to

2    Set Aside Default, ECF No. 5229-07.

3    Irico identifies the following employees as having knowledge regarding this Interrogatory:

4    Wang Zhaojie and Su Xiaohua.

5    **INTERROGATORY NO. 22**

6    As to your contention in the Twelfth Defense set forth in your Answer that Your conduct

7    that is the subject of the Complaint was caused by or in response to duly enacted laws and/or

8    regulations of the People's Republic of China and is therefore protected under the foreign

9    sovereign compulsion doctrine, the act of state doctrine, and international comity:

10   (a)   State the facts that you rely on to support your contention;

11   (b)   Identify each Person you contend has knowledge of facts that support Your

12         contention; and

13   (c)   Identify each Document You contend supports Your contention.

14   **RESPONSE TO INTERROGATORY NO. 22**

15   Irico reasserts and incorporates each of the General Objections and Objections to the

16   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

17   contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

18   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

19   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

20   schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

21   Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

22   argument or legal conclusion.

23   Subject to and without waiving the objections stated above, Irico contends that Irico's

24   pricing-related conduct was compelled by the Chinese government and based on duly enacted

25   laws and/or regulations of the People's Republic of China. Irico relies on the following evidence

26   to support this contention:

27   •   The State Planning Commission and the State Economic and Trade Commission

28       issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced

1   Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the

2   Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF

3   No. 5229-02.

4   • Notice of the State Planning Commission on Issuing the "Measures for the

5   Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial

6   Implementation)" – effective as of March 1, 1999. *See*

7   https://law.lawtime.cn/d448076453170.html.

8   • Notice of the State Planning Commission and the Ministry of Information Industry

9   on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and

10   Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex.

11   B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside

12   Default, ECF No. 5229-03.

13   • Notice on submitting cost information of color TV and color tube industry issued

14   by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of

15   Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.

16   • Notice on the issuance of the average production cost of some types of color

17   picture tubes and color TV industries issued by the Ministry of Information

18   Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to

19   the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default,

20   ECF No. 5229-04.

21   • Notice on the issuance of the average production cost of certain types of color TV

22   industries issued by the Ministry of Information Industry on August 25, 2000. *See*

23   Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside

24   Default, ECF No. 5229-06.

25   • Notice on the issuance of the average production cost of some industries of color

26   picture tubes issued by the Ministry of Information Industry on September 14,

27   2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to

28   Set Aside Default, ECF No. 5229-07.

1    Irico identifies the following employees as having knowledge regarding this Interrogatory:

2    Wang Zhaojie and Su Xiaohua.

3    **INTERROGATORY NO. 23**

4    As to your contention in the Thirty-Seventh Defense set forth in your Answer that

5    Plaintiffs' claims are barred because Plaintiffs may not recover damages based on sales outside of

6    the United States:

7    (a)    Identify the damages, if any, Plaintiffs claim based on sales outside of the United

8    States;

9    (b)    State the facts that you rely on to support your contention;

10   (c)    Identify each Person you contend has knowledge of facts that support Your

11   contention; and

12   (d)    Identify each Document You contend supports Your contention

13   **RESPONSE TO INTERROGATORY NO. 23**

14   Irico reasserts and incorporates each of the General Objections and Objections to the

15   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

16   contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

17   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

18   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

19   schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

20   Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

21   argument or legal conclusion.

22   Subject to and without waiving the objections stated above, Irico contends that Plaintiffs'

23   claims are barred in whole or in part to the extent that they are based on sales outside of the

24   United States. Irico contends that a certain unknown percentage of the CRTs contained within the

25   CRT products that Plaintiffs purchased were purchased from other countries. This contention is

26   based on the fact that Plaintiffs cannot identify which company manufactured the CRT within the

27   relevant CRT products. In the absence of knowing who manufactured the CRTs within its

28   products, Plaintiffs likewise cannot identify whether those CRTs were purchased from outside the

United States. Whether the CRTs themselves were purchased outside of the United States is relevant in determining if Plaintiffs' claims are barred because Plaintiffs alleged that they were injured on account of a price fixing conspiracy regarding CRTs as opposed to CRT products.

**INTERROGATORY NO. 24**

Do you contend that You purchased CRTs from other CRT manufacturers? If so:

(a)     State the facts that You rely on to support Your contention;

(b)     Identify each Person You contend has knowledge of facts that support Your contention; and

(c)     Identify each Document You contend supports Your contention.

**RESPONSE TO INTERROGATORY NO. 24**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a contention interrogatory, served before fact depositions and/or expert analysis and disclosures. Irico asserts that such discovery is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures are not contemplated by the Court's schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico reserves all rights to further supplement its responses at an appropriate time following the substantial completion of depositions and expert discovery.

Subject to and without waiving the objections stated above, and based on its present knowledge, Irico responds that it does not so contend.

**INTERROGATORY NO. 25**

Do You contend that You did not manufacture, market, sell and/or distribute CRT Products in the United States during the Class Period? If so:

(a)     State the facts that You rely on to support Your contention;

(b)     Identify each Person You contend has knowledge of facts that support Your ccontention; and

(d)     Identify each Document You contend supports Your contention.

**RESPONSE TO INTERROGATORY NO. 25**

1      Irico reasserts and incorporates each of the General Objections and Objections to the

2  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

3  contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

4  Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

5  relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

6  schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

7  Cal. May 19, 2011). Irico reserves all rights to further supplement its responses at an appropriate

8  time following the substantial completion of depositions and expert discovery. Irico also objects

9  to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs

10  alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts

11  and evidence of events that did not take place.

12      Subject to and without waiving the objections stated above, and despite the Interrogatory's

13  demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

14  has been brought in the above captioned matter that indicates that Irico manufactured, sold, or dis-

15  tributed "CRT Products" in the United States during the class period. In particular, Irico will be

16  producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the

17  United States.

18      Irico is not aware of Irico ever manufacturing, marketing, selling, or distributing any

19  CRTs or CRT Products in the United States. Irico's sole attempt at establishing a presence in the

20  United States, through a joint venture called Irico (USA) Inc. ("Irico USA"), was a complete

21  failure that resulted in no sales of CRTs in the United States and ended in 2001 when the

22  company was sold without authorization by its General Manager, Liu Feng, who absconded with

23  the profits of the sale. *See* Irico's Supp. Resp. to Interrogatory No. 8 of the Direct Purchaser

24  Plaintiffs' First Set of Interrogatories, as set forth in Irico's Sixth Supp. Resps. to Direct

25  Purchaser Plaintiffs' First Set of Interrogatories, dated January 7, 2022. Irico further directs

26  Plaintiffs to the following documents: IRI-CRT-00003490.

27      Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

28  Zhaojie and Su Xiaohua.

1   Dated:  February 23, 2022                      BAKER BOTTS L.L.P.

2

3                                                  */s/ John M. Taladay*

4                                                  John M. Taladay (*pro hac vice*)
                                                   Evan J. Werbel (*pro hac vice*)
5                                                  Thomas E. Carter (*pro hac vice*)
                                                   Andrew L. Lucarelli (*pro hac vice*)
6                                                  700 K Street, N.W.
                                                   Washington, D.C. 20001
7                                                  (202)-639-7700
                                                   (202)-639-7890 (fax)
8                                                  Email: john.taladay@bakerbotts.com
                                                           evan.werbel@bakerbotts.com
9                                                          tom.carter@bakerbotts.com
                                                           drew.lucarelli@bakerbotts.com
10
                                                   Jonathan Shapiro (State Bar No. 257199)
11                                                 101 California Street, Suite 3600
                                                   San Francisco, California 94111
12                                                 (415) 291-6200
                                                   (415) 291-6300 (fax)
13                                                 Email: jonathan.shapiro@bakerbotts.com

14                                                 *Attorneys for Defendants*
                                                   *IRICO GROUP CORP. and*
15                                                 *IRICO DISPLAY DEVICES CO., LTD.*

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit H

GUIDO SAVERI (22349)
   guido@saveri.com
R. ALEXANDER SAVERI (173102)
   rick@saveri.com
GEOFFREY C. RUSHING (126910)
   grushing@saveri.com
CADIO ZIRPOLI (179108)
   cadio@saveri.com
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA  94111-5619
Telephone:  (415) 217-6810
Facsimile:  (415) 217-6813

*Interim Lead Counsel for*
*Direct Purchaser Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-5944-SC |
| | MDL No. 1917 |
| This Document Relates To: | **DIRECT PURCHASER PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS** |
| ALL DIRECT PURCHASER ACTIONS | |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, plaintiffs hereby request that each Defendant respond to each of the following requests for production of Documents, and produce all responsive Documents for inspection and copying within 30 days.

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, these Document requests are continuing in nature so that if Defendants, their directors, officers, Employees, agents, representatives or any person acting, or purporting to act, on behalf of any Defendant, discover any Document(s) requested or required to be produced, Defendants shall make such Document(s) available.

## DEFINITIONS

As used herein, the following terms are defined as follows:

1.   "All" should be construed to include the collective as well as the singular and shall mean "each," "any," and "every."

2.   "Any" shall be construed to mean "any and all."

3.   "Communication" means without limitation, oral or written communications of any kind, such as electronic communications, e-mails, facsimiles, telephone communications, correspondence, exchange of written or recorded information, or face-to-face Meetings.  The phrase "communication between" is defined to include instances where one party addresses the other party but the other party does not necessarily respond.

4.   "Date" means the exact day, month and year, if ascertainable, or the best available approximation, including any relationship to other known events (designate whether exact or approximate).

5.   "Defendant" means any company, organization, entity or person presently or subsequently named as a Defendant in this litigation.

6.   "Document" means without limitation, the original and all non-identical copies of all items subject to discovery under Rule 34 of the Federal Rules of Civil Procedure.  This definition includes, without limitation, letters, correspondence, memoranda, legal pleadings, calendars, diaries, travel records, summaries, records of telephone conversations, telegrams, notes, reports,

DIRECT PURCHASER PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS; Master File No. 07-5944 SC

compilations, notebooks, work papers, graphs, charts, blueprints, books, pamphlets, brochures, circulars, manuals, instructions, ledgers, drawings, sketches, photographs, videotapes, audiotapes, film and sound reproductions, e-mails, internal or external web sites, compact discs, computer files and disks, sales, advertising and promotional literature, agreements, stored recordings, minutes or other records of Meetings, all written or graphic records or representations of any kind, and all mechanical or electronic data, records or representations of any kind.

7.      "Electronic Data" includes, without limitation, the following:

a.      activity listings of electronic mail receipts and/or transmittals;

b.      output resulting from the use of any software program, including, without limitation, word processing Documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, AOL Instant Messenger$^{TM}$ (or similar program) or bulletin board programs, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside and regardless of whether said electronic data exists in an active file, a deleted file, or file fragment;

c.      any and all items stored on computer memories, hard disks, floppy disks, CD-ROM, magnetic tape, microfiche, or in any other vehicle for digital data storage and/or transmittal, such as, but not limited to, a personal digital assistant, *e.g.*, Palm Pilot, R.I.M., Blackberry, or similar device, and file folder tabs, and/or containers and labels appended to, or relating to, any physical storage device associated with each original and/or copy of all Documents requested herein.

8.      "Employee" means, without limitation, any current or former officer, director, executive, manager, secretary, staff member, messenger, agent or other person who is or was employed by a Defendant.

9.      "Including" is used to emphasize certain types of Documents requested and should not be construed as limiting the request in any way.

10.      "Meeting" means, without limitation, any assembly, convocation, encounter, or contemporaneous presence of two or more persons for any purpose, whether planned or arranged, scheduled or not.

11.     "Or" and "and" should be construed so as to require the broadest possible response. If, for example, a request calls for information about "A or B" or "A and B," You should produce all information about A and all information about B, as well as all information about A and B collectively.  In other words, "or" and "and" should be read as "and/or."

12.     "Person" means, without limitation, any natural person, corporation, partnership, limited liability company, proprietorship, joint venture, association, government entity, group or other form of legal entity.

13.     "Relating to," "referring to," "regarding," or "with respect to" mean, without limitation, the following concepts:  discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

14.     "CRT" means cathode ray tube(s) and "CRT Products" means products containing cathode ray tubes.

15.     "You," "Your," or "Your Company" mean the responding Defendant, its predecessors, successors, subsidiaries, departments, divisions, and/or affiliates, including without limitation any organization or entity which the responding Defendant manages or controls, together with all present and former directors, officers, Employees, agents, representatives or any persons acting or purporting to act on behalf of the responding Defendant.

## INSTRUCTIONS

1.     Unless otherwise noted, the Relevant Time Period for these Document requests is January 1, 1995 through the present (the "Relevant Time Period").  These Document requests seek all responsive Documents created or generated during the Relevant Time Period, as well as responsive Documents created or generated outside the Relevant Time Period, but which contain information concerning the Relevant Time Period.

2.     To the extent Documents responsive to any of these Document requests have already been produced to plaintiffs, there is no need to produce those Documents a second time.  Instead, please provide the bates numbers of any responsive Documents already produced.

DIRECT PURCHASER PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS; Master File No. 07-5944 SC

3.      Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these Document requests are continuing in nature so that if You subsequently discover or obtain possession, custody, or control of any Document covered by these requests, You shall promptly make any such Document available to plaintiffs.

4.      In producing Documents and other materials, You are to furnish all Documents or things in Your possession, custody or control, regardless of whether such Documents or materials are possessed directly by You or Your Employees, agents, parent company(ies), subsidiaries, affiliates, investigators or by Your attorneys or their Employees, agents or investigators.

5.      Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, all Documents shall be produced in the same order as they are kept or maintained by You in the ordinary course of Your business.  All Documents shall be produced in the file folder, envelope or other container in which the Documents are kept or maintained.  If for any reason the container cannot be produced, You should produce copies of all labels or other identifying marks which may be present on the container.

6.      Documents shall be produced in such fashion as to identify the department, branch or office in whose possession they were located and, where applicable, the natural person in whose possession they were found and the business address of each Document(s) custodian(s).

7.      Documents attached to one another should not be separated.  If any portion of any Document is responsive to any portion of the Document requests below, then the entire Document must be produced.

8.      If a Document once existed and subsequently has been lost, destroyed or is otherwise missing, You should provide sufficient information to identify the Document and state, in writing, the details, including whether the Document:

        a.      is lost or missing;

        b.      has been destroyed and, if so, by whom at whose request;

        c.      has been transferred or delivered, voluntarily or involuntarily, to another person or entity and at whose request; and/or

DIRECT PURCHASER PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS; Master File No. 07-5944 SC

d.      has been otherwise disposed of.

9.      In each instance in which a Document once existed and subsequently is lost, missing, destroyed, or otherwise disposed of, explain the circumstances surrounding the disposition of the Document, including, but not limited to:

a.      the identity of the Person or entity who last possessed the Document;

b.      the date or approximate date of the Documents disposition; and

c.      the identity of all Persons who have or had knowledge of the Document's contents.

10.     If any Document responsive to any of these requests is privileged, and the Document or any portion of the Document requested is withheld based on a claim of privilege pursuant to Rule 26(b)(5) of the Federal Rules of Civil Procedure, provide a statement of the claim of privilege and all facts relied upon in support of that claim, including the following information:

a.      the reason for withholding the Document;

b.      the date of such communication;

c.      the medium of such communication;

d.      the general subject matter of such communication (such description shall not be considered a waiver of Your claimed privilege);

e.      the identity of any Document that was the subject of such communication and the present location of any such Document;

f.      the identity of the Persons involved in such communication;

g.      the identity of any Document which records, refers, or relates to such communication and present location of any such Document;

h.      the paragraph or paragraphs of these requests for production of Documents to which such information is responsive.

11.     Each Document requested herein should be produced in its entirety and without deletion, redaction or excisions, except as qualified by Instruction 10 above, regardless of whether You consider the entire Document or only part of it to be relevant or responsive to these Document

5

requests.  If You have redacted any portion of a Document, stamp the word "REDACTED" beside the redacted information on each page of the Document which You have redacted.  Any redactions to Documents produced should be identified in accordance with Instruction 10 above.

12.     All Documents produced in paper form should be Bates numbered sequentially, with a unique number on each page, and with a prefix identifying the party producing the Document.

13.     Pursuant to Federal Rule of Civil Procedure 34(b)(1)(C), the responding party must produce any electronically stored information ("ESI") in its native format. If ESI in its native format can only be accessed by proprietary or legacy software, or is password protected, or encrypted, the responding party must meet and confer with plaintiffs' lead counsel so the receiving party shall receive all information and software necessary to access the ESI.

## DOCUMENT REQUESTS

**Request No. 1**

Documents sufficient to show Your corporate structure or organization throughout the relevant period, including, but not limited to, departments, divisions, parents, subsidiaries, joint ventures, affiliates, or other sub-units that were engaged during any part of the relevant period in the manufacture, marketing, sale or distribution of CRT or CRT Products in the United States, including, where applicable, the percentage of any stock or other interests owned by each entity in the chain.

**Request No. 2**

As to each of Your divisions, subdivisions, departments, units, subsidiaries, parents, affiliates and joint ventures, Documents sufficient to identify each executive or Employee with managerial authority who had responsibilities or duties with respect to each of the following:

      (a)     the manufacturing or production of CRT or CRT Products;

      (b)     the marketing of CRT or CRT Products;

      (c)     the pricing of CRT or CRT Products;

      (d)     the sale or distribution of CRT or CRT Products;

      (e)     maintaining any electronic database(s), including archives, of e-mail or other electronic Documents relating to CRT or CRT Products.

**Request No. 3**

Documents sufficient to describe Your policies or practices with respect to the retention or destruction of Documents during the period January 1, 1991 through the present, and, if such policy or practice has been different with respect to any category of Documents or over different times, Documents sufficient to identify each such category or time period and to describe Your retention policy or practice with respect to each such category or time period.

**Request No. 4**

Documents sufficient to show the manner in which You have maintained records relating to CRT or CRT Products during the period January 1, 1991 through the present, including Documents sufficient to describe all electronic data processing systems, programs and outputs used to record, store, compute, analyze or retrieve electronically stored information relating to Your pricing, production, distribution, marketing or sale of CRT or CRT Products in the United States.

**Request No. 5**

All Documents and electronic data relating to Your sales of CRT or CRT Products during the period January 1, 1991 through the present, including, but not limited to:

     a)     customer names, customer billing addresses, and customer ship-to addresses;

     b)     sales terms;

     c)     sales dates and shipment dates;

     d)     product type, class, category, description, and respective use;

     e)     sales volumes;

     f)     unit price information, gross price, and actual net prices;

     g)     discounts, credits, and rebates;

     h)     shipping charges and terms;

     i)     any other related charges; and

     j)     amounts paid, dates paid, invoice numbers, and purchase order numbers.

If such data are not kept, or have not been kept, in electronic form in the ordinary course of Your business or are otherwise not available in electronic form, please produce such data in hard copy.

DIRECT PURCHASER PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS; Master File No. 07-5944 SC

**Request No. 6**

All software instructions, programs, manuals, or other Documents necessary to operate, run or understand any of the programs maintained on the computer-related equipment or system utilized by You to maintain, gain access to or read data produced in response to Request Nos. 4-5, including all record laYouts, field codes or other descriptions.

**Request No. 7**

All Documents relating to policies, methods, formulas or factors to be used in determining, computing or quoting prices, including any rebates or discounts, in connection with the sale of CRT or CRT Products.

**Request No. 8**

All Documents relating to any published prices for CRT or CRT Products during the period January 1, 1991 through the present, including price announcements, price lists, price schedules, or price changes communicated to customers in the United States.

**Request No. 9**

All Documents relating to contracts, offers or proposals for CRT or CRT Products sales during the period January 1, 1991 through the present.

**Request No. 10**

Documents sufficient to identify each of Your facilities that produced CRT or CRT Products from January 1, 1991 through the present, and for each such facility, all Documents relating to:

a)      capacity, rated capacity, production and capacity utilization during each year of the Relevant Time Period;

b)      any proposed or actual change in the capacity to produce CRT or CRT Products;

c)      any reason for changes in each facility's actual production of CRT or CRT Products;

d)      the identity of all persons who had decision-making or supervisory responsibility regarding CRT or CRT Products production;

e)      each type, class, category and respective use of CRT or CRT Products produced and the amounts of each produced during each month of the relevant period;

8

DIRECT PURCHASER PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS; Master File No. 07-5944 SC

f)      any production shutdowns or slowdowns of CRT or CRT Products production and reasons for such shutdowns or slowdowns; and

g)      any projected production forecasts;

h)      any future plans to construct, joint venture or purchase fabrication plants used to manufacture or produce CRT or CRT Products.

**Request No. 11**

Documents sufficient to describe the processes for producing CRT or CRT Products, including but not limited to, any industry standards.

**Request No. 12**

All Documents relating to the cost of manufacturing, marketing, selling, and distributing CRT or CRT Products during the period January 1, 1991 through the present.

**Request No. 13**

Documents sufficient to show Your inventory levels of CRT or CRT Products for each month, quarter, calendar year or fiscal year from January 1, 1991 through the present.

**Request No. 14**

Documents sufficient to identify and quantify all swaps, trades, sales, purchases or transfers of CRT or CRT Products between You and any of Your affiliates, or between You and any other producer of CRT or CRT Products, and the price or any other consideration involved in every such sale, swap, trade, purchase or transfer.

**Request No. 15**

All Documents relating to any relationship between prices for CRT or CRT Products and any costs of producing, marketing, selling, or distributing CRT or CRT Products during the period January 1, 1991 through the present.

**Request No. 16**

All of Your internal and public annual, quarterly and monthly financial statements, summaries or analyses, including profit-and-loss statements and comparisons to budget that relate to CRT or CRT Products.

9

DIRECT PURCHASER PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS; Master File No. 07-5944 SC

**Request No. 17**

All business plans, planning analyses, budgets, forecasts, or sales or profit projections relating to CRT or CRT Products.

**Request No. 18**

Documents sufficient to show the identity of all other producers and sellers of CRT or CRT Products during any portion of the relevant period.

**Request No. 19**

All Documents relating to Your percentage or share of industry production, capacity, sales or shipments of CRT or CRT Products, or the percentage or share of industry production, capacity, sales or shipments of any other producer or seller of CRT or CRT Products at any time during the period January 1, 1991 through the present.

**Request No. 20**

All Documents showing the dollar volume or quantity of sales or shipments of CRT or CRT Products (by type or category, if available) by You or by other producers or sellers of CRT or CRT Products by month, quarter, calendar year or fiscal year during the period January 1, 1991 through the present.

**Request No. 21**

All Documents that compare or contrast each type, class, or category of CRT or CRT Products produced or sold by You with that of any other producer or seller of CRT or CRT Products and all Documents that relate to any industry standards regarding types, classes, or categories of CRT or CRT Products.

**Request No. 22**

Documents sufficient to show the regions or territories in which each type, class, or category of CRT or CRT Products are sold in the United States.

DIRECT PURCHASER PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS; Master File No. 07-5944 SC

**Request No. 23**

All Documents relating to conditions of supply or demand for CRT or CRT Products, including, but not limited to, any market studies or industry reports during the period January 1, 1991 through the present.

**Request No. 24**

All Documents relating to any contemplated, proposed, planned, pending or executed purchases, sales, acquisitions, mergers, joint ventures, divestitures, transfers, spin-offs or any other change in ownership of any assets, liabilities, subsidiaries, departments, units or other subdivisions of Your or another company relating to production, distribution, marketing, pricing, sale or resale of CRT or CRT Products during the Relevant Time Period.

**Request No. 25**

All Documents relating to any communications between You and any parent, subsidiary, affiliated company, joint venturer, or partner regarding the production, pricing, marketing, sale or distribution of CRT or CRT Products.

**Request No. 26**

All Documents relating to communications regarding CRT or CRT Products between or among manufacturers of CRT or CRT Products, including Defendants.

**Request No. 27**

All Documents relating to any Meeting attended by You or any other Defendant or any manufacturer of CRT or CRT Products during which there was any communication concerning the production, marketing, pricing, distribution, inventory levels or sale of CRT or CRT Products, including, but not limited to the notes of any such Meetings.

**Request No. 28**

For each of Your Employees who has or had any non-clerical responsibility for recommending, reviewing, setting or approving prices, price increase announcements, bids or quotes for the sale of CRT or CRT Products, or any other involvement in the marketing or sale of CRT or CRT Products:

a.      all copies of electronic and manual diaries, calendars, appointment books, "to do" lists, day timers or appointment notes;

b.      all copies of trip and travel logs, records or other supporting Documents;

c.      all copies of expense reports or other supporting Documents;

d.      all copies of telephone number logs, directories, notebooks, Rolodex cards or related memoranda;

e.      all bills, statements, records and supporting Documents concerning long distance or cellular telephone calls;

f.      all Documents relating to membership in any trade association or industry group; and

g.      the complete personnel file for that Employee.

**Request No. 29**

Documents sufficient to show the name and address of each trade association (including committees and subcommittees) relating to CRT or CRT Products of which You or any of Your Employees are or have been a member, as well as Documents sufficient to show dates of membership and dates of participation in committees or subcommittees.

**Request No. 30**

All Documents relating to Meetings of each trade association and each of its committees or subcommittees relating to CRT or CRT Products, including all Documents relating to any such Meeting attended by You and any other CRT or CRT Products manufacturer and Documents sufficient to identify individuals from Your company who attended, the dates of attendance, and the subject matters discussed.

**Request No. 31**

All studies, analyses, communications, presentations or other Documents that You have submitted to or received from any trade association regarding CRT or CRT Products.

**Request No. 32**

All statements, announcements, disclosures or press releases issued by You or any of Your competitors relating to CRT or CRT Products.

12

DIRECT PURCHASER PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS; Master File No. 07-5944 SC

**Request No. 33**

All Documents relating to Your policies or practices directed toward compliance with the United States antitrust laws, including any statements signed by Your Employees with pricing, sales or marketing responsibility for CRT or CRT Products, acknowledging their receipt of and compliance with Your antitrust compliance policy.

**Request No. 34**

All Documents relating to, prepared for, submitted to, or received from any foreign governmental or legislative investigative body, including the Canadian Competition Bureau, the European Commission, any agency or representative body of any foreign country, state or other political subdivision, or any law enforcement agency, authority or commission in any foreign country, relating to the production, sale, marketing, pricing or distribution of CRT or CRT Products. This request includes all Documents relating to proffers, transcripts, notes, summaries, testimony, witness statements, or responses to requests for information that You produced to any foreign governmental agency or foreign grand jury, including any Documents produced as part of any plea bargain negotiations or in connection with any application for or grant of amnesty.

**Request No. 35**

All Documents relating to proffers, transcripts, notes, summaries, testimony, witness statements, or responses to requests for information that You produced or were seized by any foreign governmental agency in Italy, Canada, the European Union, India, Hong Kong, Hungary, Thailand, Malaysia, Korea, Japan, Singapore, China or Taiwan.

**Request No. 36**

Copies of all subpoenas or requests for production of Documents issued by any foreign governmental or legislative investigative body referring or relating to CRT or CRT Products during the relevant period.

DIRECT PURCHASER PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS; Master File No. 07-5944 SC

**Request No. 37**

All Documents relating to, prepared for, submitted to, or received by You as a result of any investigation or research conducted either internally or by an outside entity with respect to price fixing, price manipulation or manipulation of production or capacity of CRT or CRT Products.

**Request No. 38**

All Documents relating to the termination, retirement, discipline, discharge or suspension of any director, officer, or Employee who had any responsibility relating to the production, manufacture, distribution, marketing, pricing or sale of CRT or CRT Products.

**Request No. 39**

All Documents referring to or relating to plaintiffs in this litigation.

**Request No. 40**

All Documents that You claim would have been available to the plaintiffs or any purchaser of CRT or CRT Products prior to November 2007, which should have caused the plaintiffs or any such purchaser to investigate whether there was a conspiracy to fix, raise, maintain or stabilize the prices or to control or restrict sales of CRT or CRT Products in the United States.

DATED:  March 12, 2010

Respectfully submitted,
SAVERI & SAVERI, INC.

By _____
Guido Saveri
R. Alexander Saveri
Geoffrey C. Rushing
Cadio Zirpoli
706 Sansome Street
San Francisco, CA  94111-5619
Phone:  (415) 217-6810
Fax:  (415) 217-6813

**Direct Purchaser Plaintiffs' Interim Lead Counsel**

crt.250

DIRECT PURCHASER PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS; Master File No. 07-5944 SC

# Exhibit I

MARIO N. ALIOTO, ESQ. (56433)
LAUREN C. RUSSELL, ESQ. (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
E-mail: malioto@tatp.com
laurenrussell@tatp.com

*Interim Lead Counsel for the*
*Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** ) ) ) ) ) ) | Master File No. CV-07-5944 SC <br><br> MDL No. 1917 |
| This Document Relates To: ) ) | **INDIRECT PURCHASER PLAINTIFFS' SECOND REQUEST FOR PRODUCTION** |
| ALL INDIRECT PURCHASER ACTIONS ) ) ) | **OF DOCUMENTS FROM DEFENDANTS** |

**PROPOUNDING PARTY: INDIRECT PURCHASER PLAINTIFFS**

**RESPONDING PARTY:    ALL DEFENDANTS**

**SET NO.                TWO (2)**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, the Indirect

Purchaser Plaintiffs hereby request that each Defendant respond separately to the following

requests for production of documents ("Requests"), and produce the documents specified herein,

at a location agreed upon by counsel, within thirty (30) days from the date the Defendant

receives these Requests.

**1**
**INDIRECT PURCHASER PLAINTIFFS' SECOND REQUEST FOR PRODUCTION OF DOCUMENTS**

1

## DEFINITIONS

2      As used herein, the following terms have the meanings indicated below:

3      1.      "All" should be construed to include the collective as well as the singular and
4  shall mean "each," "any," and "every."

5      2.      "Any" shall be construed to mean "any and all."

6      3.      "Or" and "and" should be construed so as to require the broadest possible
7  response. If, for example, a request calls for information about "A or B" or "A and B," you
8  should produce all information about A and all information about B, as well as information
9  about A and B collectively.  In other words, "or" and "and" should be read as "and/or."

10      4.      "Including" is used to illustrate only, and should not be construed as limiting in
11  any way.

12      5.      "Defendant" means any company, organization, entity or person originally,
13  presently or subsequently named as a defendant in this litigation, as well as each such
14  Defendant's predecessors, successors, subsidiaries, departments, divisions and/or affiliates.
15  "Defendant" also includes Daewoo International Corporation, Daewoo Electronics Corporation,
16  Orion Electric Company, Daewoo-Orion Société Anonyme, Tatung Company, Panasonic
17  Consumer Electronics Company, MT Picture Display Corporation of America (New York), MT
18  Picture Display Corporation of America (Ohio), MT Picture Display (Malaysia) Sdn. Bhd., MT
19  Picture Display (Thailand) Co., Ltd., PT.MT Picture Display Indonesia, Matsushita Electronic
20  Corporation (Malaysia) Sdn. Bhd., Toshiba Display Devices (Thailand) Company, Ltd.,
21  LG.Philips Displays, Philips Consumer Electronics Co., Shenzhen SEG Hitachi Color Display
22  Devices Co., Ltd., Thomson S.A., TCL International Holdings, Ltd., TCL Corporation, TCL-
23  Thomson Electronics ("TTE") Corporation, Hua Fei Colour Display Systems Company Limited,
24  and each such Defendant's predecessors, successors, subsidiaries, departments, divisions or
25  affiliates.

26      6.      "Document(s), data, and tangible things" is used in the broadest possible sense
27  and has the meaning set forth in Federal Rule of Civil Procedure 34 including, but not limited
28  to: writings; records; files; correspondence; reports; memoranda; calendars; diaries; minutes;

**2**

1  electronic messages; voicemail; E-mail; telephone message records or logs; computer and
2  network activity logs; hard drives; backup data; removable computer storage media such as
3  tapes, disks, and cards; printouts; document image files; Web pages; databases; spreadsheets;
4  software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements;
5  worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations;
6  drawings; films; charts; digital or chemical process photographs; video, phonographic, tape, or
7  digital recordings or transcripts thereof; drafts; jottings; and notes. Information that serves to
8  identify, locate, or link such material, such as file inventories, file folders, indices, and metadata,
9  is also included in this definition.

10      7.      "All Documents" means every document and every non-identical copy known to
11  you and every such document or writing which you can locate or discover by reasonably diligent
12  efforts, including, but not limited to, all drafts of documents now in the possession, custody or
13  control of any defendant, its merged or acquired predecessors, former and present directors,
14  officers, counsel, agents, employees and/or persons acting on its behalf.

15      8.      "Electronically stored information" ("ESI") has the same full meaning as
16  construed by Fed. R. Civ. P. 26 and 34 and includes, without limitation, the following:

17              a.      activity listings of electronic mail receipts and/or transmittals;

18              b.      output resulting from the use of any software program, including without
19  limitation word processing documents, spreadsheets, database files, charts, graphs and outlines,
20  electronic mail, AOL Instant Messenger (or similar program) or bulletin board programs,
21  operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all
22  miscellaneous media on which they reside and regardless of whether such electronic data exist
23  in an active file, deleted file, or file fragment;

24              c.      any and all items stored on computer memories, hard disks, floppy disks,
25  CD-ROM, magnetic tape, microfiche, or on any other vehicle for digital data storage and/or
26  transmittal, including without limitation a personal digital assistant, e.g., Palm Pilot, Blackberry,
27  Treo or other device.

28

**3**
**INDIRECT PURCHASER PLAINTIFFS' SECOND REQUEST FOR PRODUCTION OF DOCUMENTS**

9. "You," "your" or "your company" means the Defendant responding to these Requests, its predecessors, successors, subsidiaries, departments, divisions and/or affiliates, including without limitation any organization or entity which the responding Defendant manages or controls, together with all present and former directors, officers, employees, agents, representatives, or any persons acting or purporting to act on behalf of the responding Defendant.

10. "Subsidiary," "affiliate" and "joint venture" refer to any entity or person in which you have any financial or ownership interest.

11. "Person" shall refer to natural persons, firms, joint owners, associations, companies, partnerships, joint ventures, corporations, trusts, estates, agencies, departments or bureaus (governmental or private), and any other form of business, governmental or juridical person or legal entity.

12. "Employee" means, without limitation, any current or former officer, director, executive, manager, secretary, messenger, agent, independent contractor or other person who is or was employed by a Defendant.

13. "Relating to," "referring to," "regarding," or "with respect to" mean without limitation discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, concerning, containing, mentioning, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting or otherwise involving, in whole or in part.

14. "Meeting" means, without limitation, any assembly, convocation, encounter, or contemporaneous presence of two or more persons for any purpose, whether planned or arranged, scheduled or not.

15. "Communication" and "communications" are used in a comprehensive sense and shall mean and include every conceivable manner or means of disclosure, transfer or exchange of oral or written information (in the form of facts, ideas, inquiries or otherwise) between one or more persons or entities including, but not limited to, writings, documents, inter- and intraoffice

**4**

memoranda, correspondence, meetings, conferences, conversations, and/or agreements, whether face-to-face, by telephone, by mail, by telecopier, by telex, by computer or otherwise.

16. "Antitrust regulatory authority" means any governmental antitrust regulatory or investigative entity, whether domestic or foreign, including but not limited to the United States Department of Justice, European Commission, Japanese Fair Trade Commission, or Korea Fair Trade Commission.

17. "Studies" and/or "analyses" includes all reports, memoranda, statistical compilations, reviews, audits and other types of written, printed, or electronic submissions of information.

18. "Competitor" means any Defendant and all persons other than you that manufacture or sell CRTs and/or CRT Products.

19. "Selling," "sold," or "sale" means selling, swapping, trading, or otherwise transferring.

20. "Price" means the price paid by a third party or the internal transfer price recorded or otherwise used in connection with a sale to a subsidiary, department, division, or affiliate.

21. "CRTs" means cathode ray tubes. "CRT Products" means products containing CRTs, such as televisions and computer monitors.

## INSTRUCTIONS

1. To the extent documents or ESI responsive to any of these Requests have already been produced to Plaintiffs, there is no need to produce those documents a second time. Instead, please provide the Bates numbers of any responsive documents already produced.

2. This document request calls for the production of all responsive documents and ESI in your possession, custody or control without regard to the physical location of such documents.

3. In producing documents, ESI and other materials, you must furnish all documents, ESI or things in your possession, custody or control, regardless of whether such documents, ESI or materials are possessed directly by you or your directors, officers, agents,

**5**

1  employees, representatives, subsidiaries, managing agents, affiliates, investigators, or by your
2  attorneys or their agents, employees, representatives or investigators.

3    4.    In producing documents and ESI, you must produce the original of each
4  document requested together with all non-identical copies and drafts of that document. If the
5  original of any document cannot be located, a copy shall be provided in lieu thereof, and shall be
6  legible and bound or stapled in the same manner as the original (to the extent this is known).

7    5.    Pursuant to Federal Rule of Civil Procedure 34(b), documents shall be produced
8  as they are kept in the usual course of business and shall be organized and labeled to identify
9  any file number, file name, or any other file identification system utilized by the responding
10  party, as well as the location and custodian of such records. These Requests include Plaintiffs'
11  request to physically inspect any file drawer, filing cabinet or any other storage device where
12  documents responsive to these requests are maintained at the time of the inspection of such
13  documents.

14    6.    Documents attached to each other should not be separated. If any portion of any
15  document is responsive to any portion of the document requests below, then the entire document
16  must be produced.

17    7.    All documents produced should be numbered sequentially, with a unique number
18  on each page, and with a prefix identifying the party producing the document.

19    8.    Documents shall be produced in such fashion as to identify the department,
20  branch or office in whose possession they were located and, where applicable, the natural person
21  in whose possession they were found (*i.e.*, the document custodian) and the business address of
22  each document custodian.

23    9.    Pursuant to Federal Rule of Civil Procedure 34(b)(1)(C), the responding party
24  must produce any ESI in its native format. If ESI in its native format can only be accessed by
25  proprietary or legacy software, the responding party shall receive all information and software
26  necessary to access the ESI.

27

28

**6**

1      10.    If any responsive document was, but no longer is, in the possession of or subject

2 to your control, state whether it (i) is missing or lost, (ii) has been destroyed, (iii) has been

3 transferred, voluntarily or involuntarily, to others, or (iv) has been otherwise disposed of.

4      11.    In each instance in which a document once existed and subsequently is lost,

5 missing, destroyed or otherwise disposed of, explain the circumstances surrounding the

6 disposition of the document, including but not limited to:

7           a.    the identity of the person or entity who last possessed the document;

8           b.    the date or approximate date of such disposition; and

9           c.    the identity of all persons who have or had knowledge of the document's

10                contents.

11      12.    In the event that you object to any document request on the ground of privilege or

12 work product, a statement shall be provided as to each document which includes:

13           a.    the name of the author of the document;

14           b.    the name of the recipient of the document;

15           c.    the names of the persons to whom copies were sent;

16           d.    the job title of every individual named in (a), (b), and (c) above;

17           e.    the date the document was created, sent, and received;

18           f.    the location of the document;

19           g.    the custodian of the document;

20           h.    a brief description of the nature and subject matter of the document; and

21           i.    a statement of the privilege asserted and each and every fact or basis upon

22 which a privilege is claimed or on which the document is otherwise withheld.

23      Notwithstanding the assertion of any objection to production, if a document contains

24 non-objectionable or non-privileged matter, please produce that document, redacting that

25 portion for which the objection is asserted, provided that the identification requested in

26 paragraphs (h) and (i) above are furnished. A log itemizing each of these documents and this

27 corresponding information that forms the basis for your objection on privilege or work product

28 grounds shall be served contemporaneously with your responses to these document requests.

1    13.    Each document should be produced in its entirety and without deletion, redaction

2    or excisions, except as provided by Instruction 12 above, regardless of whether you consider the

3    entire document or only part of it to be relevant or responsive to these document requests. If

4    you have redacted any portion of a document, stamp the word "REDACTED" beside the

5    redacted information on each page of the document which you have redacted. Any redactions to

6    such documents produced should be identified in accordance with Instruction 12 above.

7    14.    In responding to these requests you are to include documents: (a) obtained from

8    witnesses who gave information to any antitrust regulatory authority or investigatory body; (b)

9    that constitute, or refer or relate to, summaries of testimony or other statements in connection

10   with any antitrust regulatory authority or investigatory body proceedings or investigations; or

11   (c) obtained on your behalf by counsel in preparing for testimony or interviews before any

12   antitrust regulatory authority or investigatory body.

13   15.    The following requests are continuing in nature pursuant to Rule 26(e) of the

14   Federal Rules of Civil Procedure so as to require the prompt production of supplemental or

15   additional responsive documents when you become aware of such, up to and including the time

16   of trial.

17   **RELEVANT TIME PERIOD**

18   Unless otherwise stated, these Requests call for the production of all documents that

19   were generated and/or maintained during the period January 1, 1995 through the present (the

20   "Relevant Time Period"). These document requests seek all responsive documents created or

21   generated during the Relevant Time Period, as well as responsive documents created or

22   generated outside the Relevant Time Period, but which contain information concerning the

23   Relevant Time Period.

24   **DOCUMENTS TO BE PRODUCED**

25   **Request No. 1**

26   Documents sufficient to show your corporate structure or organization throughout the

27   relevant time period, including, but not limited to, departments, divisions, parents, subsidiaries,

28   joint ventures, affiliates, or other sub-units that were engaged during any part of the relevant

**8**

1    time period in the manufacture, marketing, pricing, sale or distribution of CRTs or CRT

2    Products including, where applicable, the percentage of any stock or other interests owned by

3    each entity in the chain.

4    **Request No. 2**

5       As to each of your divisions, subdivisions, departments, units, subsidiaries, parents,

6    affiliates and joint ventures, documents sufficient to identify each employee having any

7    responsibilities or duties with respect to each of the following:

8            a.      the manufacturing or production of CRTs or CRT Products;

9            b.      the marketing of CRTs or CRT Products;

10            c.      the pricing of CRTs or CRT Products;

11            d.      the sale or distribution of CRTs or CRT Products;

12            e.      maintaining any electronic database(s), including archives of e-mails or

13    other electronic documents relating to CRTs or CRT Products.

14    **Request No. 3:**

15       Documents sufficient to describe your policies or practices with respect to the retention

16    or destruction of documents during the period January 1, 1991 through the present, and, if such

17    policy or practice has been different with respect to any category of documents or over different

18
19    times, documents sufficient to identify each such category or time period and to describe your

20    retention policy or practice with respect to each such category or time period.

21    **Request No. 4:**

22       Documents sufficient to show the manner in which you have maintained records relating

23    to CRTs or CRT Products during the period January 1, 1991 through the present, including

24    documents sufficient to describe all electronic data processing systems, programs, and outputs

25    used to record, store, compute, analyze or retrieve electronically stored information relating to

26    your pricing, production, distribution, marketing or sale of CRTs or CRT Products in and into

27    the United States.

28    //

1  **Request No. 5**

2      All documents and electronic data relating to your sales of CRTs or CRT Products

3  during the period January 1, 1991 through the present, including, but not limited to:

4              a.    customer names, customer billing addresses, and customer ship-to

5                   addresses;

6              b.    sales terms;

7              c.    sales dates and shipment dates;

8              d.    product type, class, category, description and respective use;

9              e.    sales volumes;

10              f.    unit price information, gross price, and actual net prices;

11              g.    discounts, credits and rebates;

12              h.    shipping charges and terms;

13              i.    any other related charges; and

14              j.    amounts paid, dates paid, invoice numbers, and purchase order numbers.

15  If such data are not kept, or have not been kept, in electronic form in the ordinary course of your

16  business or are otherwise not available in electronic form, please produce such data in hard

17  copy.

18  **Request No. 6:**

19      All software instructions, programs, manuals, or other documents necessary to operate,

20  run or understand any of the programs maintained on the computer-related equipment or system

21  utilized by you to maintain, gain access to or read data produced in response to Request Nos. 4-

22  5, including all record layouts, field codes or other descriptions.

23  **Request No. 7:**

24      All documents relating to polices, methods, formulas or factors to be used in

25  determining, computing or quoting prices, including rebates or discounts, in connection with the

26  sale of CRTs or CRT Products.

27  //

28  //

**10**
INDIRECT PURCHASER PLAINTIFFS' SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

**Request No. 8:**

All documents relating to any published prices for CRTs or CRT Products during the period January 1, 1991 through the present, including price announcements, price lists, price schedules, price changes, or justifications or explanations of price changes communicated to customers in the United States.

**Request No. 9:**

All documents relating to contracts, offers or proposals for CRTs or CRT Products sales during the period January 1, 1991 through the present.

**Request No. 10:**

Documents sufficient to identify each of your facilities that produced CRTs or CRT Products from January 1, 1991 through the present and for each such facility, all documents relating to:

- a. capacity, rated capacity, production and capacity utilization during each year of the relevant time period;

- b. any proposed or actual change in the capacity to produce CRTs or CRT Products;

- c. any reason for changes in each facility's actual production of CRTs or CRT Products;

- d. the identity of all persons who had decision-making or supervisory responsibility regarding production of CRTs or CRT Products;

- e. each type, class, category and respective use of CRTs or CRT Products produced and the amounts of each produced during each month of the relevant time period;

- f. any production shutdowns or slowdowns of CRTs or CRT Products production and reasons for such shutdowns or slowdowns;

- g. any projected production forecasts; and

- h. any future plans to construct, joint venture or purchase fabrication plants used to manufacture or produce CRTs or CRT Products.

//

//

**11**

1  **Request No. 11:**

2       Documents sufficient to describe the processes for producing CRTs or CRT Products,

3  including but not limited to, any industry standards.

4  **Request No. 12:**

5       All documents relating to the cost of manufacturing, marketing, selling, and distributing

6  CRTs or CRT Products during the period January 1, 1991 through the present.

7  **Request No. 13:**

8       Documents sufficient to show your inventory levels of CRTs or CRT Products for each

9  month, quarter, calendar year or fiscal year from January 1, 1991 through the present.

10 **Request No. 14:**

11      All documents relating to sales, swaps, trades, product licensing or marketing

12 agreements, purchases or transfers of CRTs or CRT Products between you and any of your

13 affiliates, or between you and any other manufacturer of CRTs or CRT Products, and the price

14 or any other consideration involved in every such sale, swap, trade, agreement, purchase or

15 transfer.

16 **Request No. 15:**

17      All documents and electronic data relating to the relationship between prices for CRTs or

18 CRT Products and costs of producing, marketing, selling, or distributing CRTs or CRT Products

19 during the period January 1, 1991 through the present.

20 **Request No. 16:**

21      All of your internal and public annual, quarterly and monthly financial statements,

22 summaries or analyses, including profit and loss statements and comparisons to budget that

23 relate to CRTs or CRT Products.

24 **Request No. 17:**

25      All business plans, planning analyses, budgets, forecasts, or sales or profit projections

26 relating to CRTs or CRT Products.

27 //

28 //

**Request No. 18:**

Documents sufficient to show the identity of all other producers or sellers of CRTs or CRT Products during any portion of the relevant period.

**Request No. 19:**

All documents relating to your percentage or share of industry production, capacity, sales or shipments of CRTs or CRT Products, or the percentage or share of industry production, capacity, sales or shipments of any other producer or seller of CRTs or CRT Products at any time during the period January 1, 1991 through the present.

**Request No. 20:**

All documents showing the dollar volume or quantity of sales or shipments of CRTs or CRT Products (by type or category, if available), by you or by other producers or sellers of CRTs or CRT Products by month, quarter, calendar year or fiscal year during the period January 1, 1991 through the present.

**Request No. 21:**

All documents that compare or contrast each type, class or category of CRTs or CRT Products produced or sold by you with that of another producer or seller of CRTs or CRT Products and all documents that relate to any industry standards regarding types, classes or categories of CRTs or CRT Products.

**Request No. 22:**

Documents sufficient to show the regions or territories in which each type, class or category of CRTs or CRT Products are sold in the United States.

**Request No. 23:**

All documents relating to conditions of supply and demand for CRTs or CRT Products, including, but not limited to, any market studies or industry reports during the period January 1, 1991 through the present.

**Request No. 24:**

All documents relating to any contemplated, proposed, planned, pending or executed purchases, sales, acquisitions, mergers, joint ventures, divestitures, transfers, spin-offs or any

**13**

other change in ownership of any assets, liabilities, subsidiaries, departments, units or other subdivisions of your company relating to the production, distribution, marketing, pricing, sale or resale of CRTs or CRT Products during the relevant time period.

**Request No. 25:**

All documents relating to any communications between you and any parent, subsidiary, affiliated company, joint venturer, or partner regarding the production, pricing, marketing, sale or distribution of CRTs or CRT Products.

**Request No. 26:**

All documents relating to communications regarding CRTs or CRT Products between or among manufacturers of CRTs or CRT Products, including Defendants.

**Request No. 27:**

All documents relating to any meeting attended by you or any other Defendant or any manufacturer of CRTs or CRT Products during which there was any communication regarding the production, marketing, pricing, distribution, inventory levels or sale of CRTs or CRT Products, including, but not limited to the notes of any such meeting.

**Request No. 28:**

For each of your employees who has or had any non-clerical responsibility for recommending, reviewing, setting or approving prices, price increase announcements, bids or quotes for the sale of CRTs or CRT Products, or any other involvement in the production, marketing, sale or distribution of CRTs or CRT Products:

a.  all copies of electronic and manual diaries, calendars, appointment books, "to do" lists, day timers or appointment notes;

b.  all copies of trip and travel logs, records or other supporting documents;

c.  all copies of expense reports or other supporting documents;

d.  all copies of telephone number logs, directories, notebooks, Rolodex cards or related memoranda;

e.  all bills, statements, records and supporting documents concerning long distance or cellular telephone calls;

**14**

1      f.      all documents relating to membership in any trade association or industry group;

2            and,

3      g.      the complete personnel file for that employee.

4 **Request No. 29:**

5      Documents sufficient to show the name and address of each trade association (including

6 committees and subcommittees) relating to CRTs or CRT Products of which you or any of your

7 employees are or have been a member, as well as documents sufficient to show dates of

8 membership and dates of participation in committees or subcommittees.

9 **Request No. 30:**

10      All documents relating to meetings of each trade association and each of its committees

11 or subcommittees relating to CRTs or CRT Products, including all documents relating to any

12 such meeting attended by you and any other manufacturer CRTs or CRT Products, and all

13 documents identifying the employees from your company who attended, the dates of attendance,

14 and the subject matters discussed.

15 **Request No. 31:**

16      All studies, analyses, communications, presentations or other documents that you have

17 submitted to or received from any trade association regarding CRTs or CRT Products.

18 **Request No. 32:**

19      All statements, announcements, disclosures or press releases issued by you or any of

20 your competitors relating to CRTs or CRT Products.

21 **Request No. 33:**

22      All documents relating to your policies or practices directed toward compliance with the

23 United States antitrust laws, including any statements signed by your employees with pricing,

24 sales or marketing responsibility for CRTs or CRT Products, acknowledging their receipt of and

25 compliance with your antitrust compliance policy.

26 **Request No. 34:**

27      All documents relating to, prepared for, submitted to, or received from any foreign

28 governmental or legislative body, including the Canadian Competition Bureau, the European

<div align="center">15</div>

1  Commission, the Hungarian Competition Authority, the Japanese Fair Trade Commission, the
2  Korean Fair Trade Commission, or any agency or representative body of any foreign country,
3  state or other political subdivision, or any law enforcement agency, authority or commission in
4  any foreign country, relating to the production, sale, marketing, pricing or distribution of CRTs
5  or CRT Products. This request includes all documents relating to proffers, transcripts, notes,
6  summaries, testimony, witness statements, or responses to requests for information that you
7  produced to any foreign governmental agency or foreign grand jury, including any documents
8  produced as part of any plea bargain negotiations or in connection with any application for or
9  grant of amnesty or leniency.

10 **Request No. 35:**

11     All documents relating to proffers, transcripts, notes, summaries, testimony, witness
12 statements, or responses to requests for information that you produced or were seized by any
13 foreign governmental agency in Canada, the European Union, India, Hong Kong, Hungary,
14 Thailand, Malaysia, Indonesia, Korea, Japan, Singapore, China or Taiwan.

15 **Request No. 36:**

16     Copies of all subpoenas or requests for production of documents issued by any foreign
17 governmental or legislative investigative body referring or relating to CRTs or CRT Products
18 during the relevant period.

19 **Request No. 37:**

20     All documents relating to, prepared for, submitted to, or received by you as a result of
21 any investigation or research conducted either internally or by an outside entity with respect to
22 price fixing, price manipulation or manipulation of production or capacity of CRTs or CRT
23 Products.

24 **Request No. 38:**

25     All documents relating to the termination, retirement, discipline, discharge or suspension
26 of any director, officer, or employee who had any responsibility relating to the production,
27 manufacture, distribution, marketing, pricing or sale of CRTs or CRT Products.

28

**16**
**INDIRECT PURCHASER PLAINTIFFS' SECOND REQUEST FOR PRODUCTION OF DOCUMENTS**

**Request No. 39:**

All documents referring or relating to the named plaintiffs in this litigation.

**Request No. 40**

All documents that you claim would have been available to the plaintiffs or any purchaser of CRTs or CRT Products prior to November 2007, which should have caused the Plaintiffs or any such purchaser to investigate whether there was a conspiracy to fix, raise, maintain or stabilize the prices or to control or restrict sales of CRTs or CRT Products in the United States.

**Request No. 41:**

All documents relating to any refusal by you or any other manufacturer of CRTs or CRT Products to quote or bid for business or to supply CRTs or CRT Products to a customer, or to intentionally quote a price or bid you believed or the other manufacturer believed would be higher than a quote or bid by another manufacturer or seller of CRTs or CRT Products.

**Request No. 42:**

All documents and electronic data that relate to the relationship between the sale price of CRT Products and the cost of CRTs and/or any other component of CRT Products.

**Request No. 43:**

All documents and electronic data, including, but not limited to, any studies or analyses, that reflect, refer, or relate to how the price of CRTs or CRT Products sold by you or by any of your competitors affected the prices of CRT Products resold by third parties to others including, but not limited, end-user purchasers of CRT Products such as the classes identified in the Indirect Purchaser Plaintiffs' Consolidated Amended Complaint.

**Request No. 44:**

All documents and electronic data, including, but not limited to, any studies or analyses that reflect, refer or relate to the extent to which original equipment manufacturers, original design manufacturers, retailers, distributors or any other entities involved in the manufacture, distribution, or resale of CRT Products, pass through the cost of CRTs or CRT Products to their respective customers.

**17**

1  **Request No. 45:**

2     All documents and electronic data, including, but not limited to, any studies or analyses

3  that reflect, refer or relate to the distribution channels for CRTs or CRT Products from you to

4  end users such as the classes identified in the Indirect Purchasers' Consolidated Amended

5  Complaint, including, but not limited to, the specific entities in the distribution chain(s); the

6  CRTs or CRT Products sold by these entities; and the amount of CRTs or CRT Products sold by

7  these entities.

8  **Request No. 46:**

9     All documents and electronic data, including, but not limited to, any studies or analyses

10 that reflect, refer, or relate to retail prices, resale prices, or street prices of CRTs or CRT

11 Products.

12

13 Dated: March 25, 2010                By:     /s/ Mario N. Alioto
                                                 Mario N. Alioto (56433)
14                                               Lauren C. Russell (241151)
15                                               **TRUMP, ALIOTO, TRUMP & PRESCOTT,**
                                                 **LLP**
16                                               2280 Union Street
                                                 San Francisco, CA 94123
17                                               Telephone: (415) 563-7200
                                                 Facsimile: (415) 346-0679
18                                               malioto@tatp.com ; laurenrussell@tatp.com

19                                               *Interim Lead Counsel for the Indirect Purchaser*
20                                               *Plaintiffs*

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2      I, Lauren C. Russell, declare as follows:

3      I am a resident of the State of California, over the age of eighteen years, and not a party

4  to the within action. I am employed in the State of California, where the mailing occurs, and my

5  business address is TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP, 2280 Union Street, San

6  Francisco, California 94123.

7      On March 25, 2010, I served a true and correct copy of the following document(s):

8  **INDIRECT PURCHASER PLAINTIFFS' SECOND REQUEST FOR PRODUCTION OF
9                          DOCUMENTS**

10  on the following interested parties by electronic mail:

11                     **SEE ATTACHED SERVICE LIST**

12      I declare under penalty of perjury under the laws of the United States that the foregoing

13  is true and correct.

14      Executed on March 25, 2010, at San Francisco, California.

15

16                          /s/ Lauren C. Russell
17                            Lauren C. Russell

18

19

20

21

22

23

24

25

26

27

28

**1**
**PROOF OF SERVICE**

*In Re: Cathode Ray Tubes (CRT) Antitrust Litigation*, **MDL 1917**

## Service List—Defendants' Counsel

| | |
|---|---|
| Jeffrey L. Kessler (jkessler@dl.com)<br>A. Paul Victor (pvictor@dl.com)<br>Eva W. Cole (ecole@dl.com)<br>DEWEY LEBOEUF LLP<br>1301 Avenue of the Americas<br>New York, NY 10019<br>Tel: (212) 259-8000<br>Fax: (212) 259-7013<br><br>*Counsel for Defendants Panasonic*<br>*Corporation, Panasonic Corp. of North*<br>*America, and MT Picture Display Co., Ltd.* | Steven A. Reiss (steven.reiss@weil.com)<br>David L. Yohai (david.yohai@weil.com)<br>Alan R. Feigenbaum<br>(alan.feigenbaum@weil.com)<br>WEIL, GOTSHAL & MANGES, LLP<br>767 Fifth Avenue<br>New York, NY 10153-0119<br>Tel: (212) 310-8000<br>Fax: (212) 310-8007<br><br>*Counsel for Defendants Panasonic*<br>*Corporation, Panasonic Corp. of North*<br>*America, and MT Picture Display Co., Ltd.* |
| Gregory D. Hull (greg.hull@weil.com)<br>Joseph R. Wetzel (joseph.wetzel@weil.com)<br>WEIL, GOTSHAL & MANGES, LLP<br>201 Redwood Shores Parkway<br>Redwood Shores, CA 94065-1175<br>Tel: (650) 802-3000<br>Fax: (650) 802-3100<br><br>*Counsel for Defendants Panasonic*<br>*Corporation, Panasonic Corp. of North*<br>*America, and MT Picture Display Co., Ltd.* | Samuel L. Miller (srmiller@sidley.com)<br>Ryan Sandrock (rsandrock@sidley.com)<br>SIDLEY AUSTIN, LLP<br>555 California Street<br>San Francisco, CA 94104<br>Tel: (415) 772-1200<br>Fax: (415) 772-7400<br><br>*Counsel for Defendants LG Electronics, Inc.,*<br>*LG Electronics USA, Inc., and LG Electronics*<br>*Taiwan Taipei Co., Ltd.* |
| Terrence A. Callan<br>(terrence.callan@pillsburylaw.com)<br>PILLSBURY WINTHROP SHAW PITTMAN,<br>LLP<br>50 Fremont Street<br>P.O. Box 7880<br>San Francisco, CA 94120-7880<br>Tel: (415) 983-1000<br>Fax: (415) 983-1200<br><br>*Counsel for Defendants IRICO Display Devices*<br>*Co., Ltd., IRICO Group Corporation, and*<br>*IRICO Group Electronics Co., Ltd.* | Joseph R. Tiffany<br>(joseph.tiffany@pillsburylaw.com)<br>PILLSBURY WINTHROP SHAW<br>PITTMAN, LLP<br>2475 Hanover Street<br>Palo Alto, CA 94303-1114<br>Tel: (650) 233-4500<br>Fax: (650) 233-4545<br><br>*Counsel for Defendants IRICO Display*<br>*Devices Co., Ltd., IRICO Group Corporation,*<br>*and IRICO Group Electronics Co., Ltd.* |

| | |
|---|---|
| Kent M. Roger (kroger@morganlewis.com)<br>Diane L. Webb (dwebb@morganlewis.com)<br>Michelle Park-Chiu<br>(mchiu@morganlewis.com)<br>Robert S. Eaton (reaton@morganlewis.com)<br>MORGAN LEWIS & BOCKIUS, LLP<br>One Market, Spear Street Tower<br>San Francisco, CA 94105<br>Tel: (415) 442-1140<br>Fax: (415) 442-1001<br><br>*Counsel for Defendants Hitachi, Ltd., Hitachi Displays, Ltd., Hitachi Asia, Ltd., Hitachi America, Ltd., and Hitachi Electronic Devices (USA), Inc.* | Gary L. Halling<br>(ghalling@sheppardmullin.com)<br>James L. McGinnis<br>(jmcginnis@sheppardmullin.com)<br>Michael Scarborough<br>(mscarborough@sheppardmullin.com)<br>SHEPPARD MULLIN RICHTER &<br>HAMPTON, LLP<br>Four Embarcadero Center<br>17th Floor<br>San Francisco, CA 94111<br>Tel: (415) 434-9100<br>Fax: (415) 434-3947<br><br>*Counsel for Defendants Samsung SDI America, Inc., Samsung SDI Co., Ltd., Samsung SDI Mexico S.A. de C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung SDI Co., Ltd., Tianjin Samsung SDI Co., Ltd., and Samsung SDI (Malaysia) Sdn. Bhd.* |
| Ethan E. Litwin (litwine@howrey.com)<br>HOWREY, LLP<br>153 East 53rd Street, 54th Floor<br>New York, NY 10022<br>Tel: (212) 896-6500<br>Fax: (212) 896-6501<br><br>*Counsel for Defendants Koninklijke Philips Electronics N.V., Philips Electronics North America Corporation, Philips Electronics Industries (Taiwan), Ltd., Philips da Amazonia Industria Electronica Ltda.* | Joseph A. Ostoyich (ostoyich@howrey.com)<br>HOWREY, LLP<br>1299 Pennsylvania Avenue, N.W.<br>Washington, DC 20004-2402<br>Tel: (202) 783-0800<br>Fax: (202) 383-6610<br><br>*Counsel for Defendants Koninklijke Philips Electronics N.V., Philips Electronics North America Corporation, Philips Electronics Industries (Taiwan), Ltd., Philips da Amazonia Industria Electronica Ltda.* |
| David Lisi (lisid@howrey.com)<br>HOWREY, LLP<br>1950 University Avenue, 4th Floor<br>East Palo Alto, CA 94303<br>Tel: (650) 798-3500<br>Fax: (650) 798-3600<br><br>*Counsel for Defendants Koninklijke Philips Electronics N.V., Philips Electronics North America Corporation, Philips Electronics Industries (Taiwan), Ltd., Philips da Amazonia Industria Electronica Ltda.* | Bruce H. Jackson<br>(bruce.h.jackson@bakernet.com)<br>Robert W. Tarun<br>(robert.w.tarun@bakernet.com)<br>Nancy C. Allred<br>(nancy.c.allred@bakernet.com)<br>BAKER & MCKENZIE LLP<br>Two Embarcadero Center, 11th Floor<br>San Francisco, CA 94111-3802<br>Tel: (415) 576 3000<br>Fax: (415) 576 3099<br><br>*Counsel for Defendant Tatung Company of America* |

| | |
|---|---|
| Patrick J. Ahern<br>(patrick.j.ahern@bakernet.com)<br>Roxane C. Busey<br>(roxane.c.busey@bakernet.com)<br>Karen Sewell (karen.sewell@bakernet.com)<br>BAKER & McKENZIE LLP<br>130 East Randolph Drive<br>Chicago, IL 60601<br>Tel: (312) 861-8000<br>Fax: (312) 861-2899<br><br>*Counsel for Defendant Tatung Company of America* | Christopher M. Curran<br>(ccurran@whitecase.com)<br>George L. Paul (gpaul@whitecase.com)<br>Lucius B. Lau (alau@whitecase.com)<br>WHITE & CASE, LLP<br>701 13th Street, N.W.<br>Washington, DC 20005<br>Tel: (202) 626-3600<br>Fax: (202) 639-9355<br><br>*Counsel for Defendants Toshiba Corporation, Toshiba America, Inc., Toshiba America Consumer Products, LLC, Toshiba America Consumer Products, Inc., and Toshiba America Electronic Components, Inc.* |
| Jeremy J. Calsyn (jcalsyn@cgsh.com)<br>Michael R. Lazerwitz (mlazerwitz@cgsh.com)<br>CLEARY GOTTLIEB STEEN &<br>HAMILTON, LLP<br>2000 Pennsylvania Avenue, NW<br>Suite 9000<br>Washington, DC 20006<br>Tel: (202) 974-1500<br>Fax: (202) 974-1999<br><br>*Counsel for Defendant LP Displays International* | Bruce M. McCullough<br>(bruce.mcculloch@freshfields.com)<br>Kate S. McMillan<br>(kate.mcmillan@freshfields.com)<br>FRESHFIELDS BRUCKHAUS &<br>DERINGER US, LLP<br>701 Pennsylvania Avenue, NW, Suite 600<br>Washington, DC 20004<br>Tel: (202) 777-4566<br>Fax: (202) 777-4555<br><br>*Counsel for Defendant Beijing Matsushita Color CRT Co., Ltd.* |
| Michael Tubach (mtubach@omm.com)<br>O'MELVENY & MYERS LLP<br>Two Embarcadero Center, 28th Floor<br>San Francisco, California 94111<br>Telephone: (415) 984-8700<br>Facsimile: (415) 984-8701<br><br>*Attorneys for Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.* | Ian Simmons (isimmons@omm.com)<br>O'MELVENY & MYERS LLP<br>1625 Eye Street NW<br>Washington, D.C. 20006<br>Telephone: (202) 383-5300<br>Facsimile: (202) 383-5414<br><br>*Attorneys for Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.* |

3

| William Diaz (wdiaz@mwe.com) | Craig P. Seebald (cseebald@mwe.com) |
|---|---|
| McDERMOTT WILL & EMERY LLP | McDERMOTT WILL & EMERY LLP |
| 18191 Von Karman Avenue, Suite 500 | 600 Thirteenth Street |
| Irvine, CA 92612-7108 | Washington, D.C. 20005-3016 |
| Telephone: (949) 851-0633 | Telephone: (202) 756 8000 |
| Facsimile: (949) 851-9348 | Facsimile: (202) 756 8087 |
| | |
| *Attorneys for Defendant Samtel Color, Ltd.* | *Attorneys for Defendant Samtel Color, Ltd.* |

# Exhibit J



April 5, 2023

**Certification**

<div align="center">

**Welocalize Translations**

</div>

**TRANSLATOR'S DECLARATION:**

I, Ann Chen, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of the document with bates number: IRI-SU-000132.

*(Digital or printed signature here above the line)*

Ann Chen

_____

**Ann Chen**

Project Number: BBLLP_2303_P0007

<div align="center">

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

</div>

CONFIDENTIAL

Translation

IRI-SU-000132E



**CONFIDENTIAL**

**IRI-SU-000132**

Exhibit K



April 5, 2023

**Certification**

<div align="center">

**Welocalize Translations**

</div>

**TRANSLATOR'S DECLARATION:**

I, Ann Chen, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of the document with bates numbers range: IRI-SU-000103 - IRI-SU-000128.

*(Digital or printed signature here above the line)*

Ann Chen

_____

**Ann Chen**

Project Number: BBLLP_2303_P0007



CONFIDENTIAL          Translation                                    IRI-SU-000103E



CONFIDENTIAL          Translation                         IRI-SU-000104E



CONFIDENTIAL          Translation                    IRI-SU-000105E



CONFIDENTIAL        Translation                                    IRI-SU-000106E



CONFIDENTIAL          Translation                    IRI-SU-000107E

5



CONFIDENTIAL        Translation                                    IRI-SU-000108E



CONFIDENTIAL          Translation                              IRI-SU-000109E



CONFIDENTIAL          Translation                    IRI-SU-000110E



CONFIDENTIAL          Translation                              IRI-SU-000111E



CONFIDENTIAL                    Translation                        IRI-SU-000112E



CONFIDENTIAL                   Translation                   IRI-SU-000113E





CONFIDENTIAL          Translation          IRI-SU-000114E

13



CONFIDENTIAL      Translation      IRI-SU-000115E





CONFIDENTIAL Translation IRI-SU-000116E



CONFIDENTIAL Translation IRI-SU-000117E





CONFIDENTIAL          Translation                              IRI-SU-000118E





CONFIDENTIAL          Translation                    IRI-SU-000119E



CONFIDENTIAL Translation IRI-SU-000120E



CONFIDENTIAL                    Translation                                IRI-SU-000121E



CONFIDENTIAL
Translation
IRI-SU-000122E



CONFIDENTIAL                Translation                          IRI-SU-000123E



CONFIDENTIAL          Translation                              IRI-SU-000124E



CONFIDENTIAL          Translation                              IRI-SU-000125E





CONFIDENTIAL          Translation                    IRI-SU-000126E





CONFIDENTIAL                    Translation                              IRI-SU-000127E



CONFIDENTIAL          Translation                    IRI-SU-000128E



1

**CONFIDENTIAL**                                                                                    **IRI-SU-000103**



2

 **IRI-SU-000104**



3

**CONFIDENTIAL**

**IRI-SU-000105**



4

**CONFIDENTIAL**

**IRI-SU-000106**



5

**CONFIDENTIAL**                                                    **IRI-SU-000107**



6

CONFIDENTIAL IRI-SU-000108



CONFIDENTIAL

IRI-SU-000109



8

**CONFIDENTIAL**

**IRI-SU-000110**



9

CONFIDENTIAL IRI-SU-000111



**CONFIDENTIAL**                                                                      **IRI-SU-000112**



**CONFIDENTIAL**

**IRI-SU-000113**



**CONFIDENTIAL**                                                                 **IRI-SU-000114**



CONFIDENTIAL

IRI-SU-000115



14

**CONFIDENTIAL**

**IRI-SU-000116**



**CONFIDENTIAL**                                                                                              **IRI-SU-000117**



CONFIDENTIAL IRI-SU-000118



17

CONFIDENTIAL

IRI-SU-000119



CONFIDENTIAL

IRI-SU-000120



19

**IRI-SU-000121**



**CONFIDENTIAL**



**CONFIDENTIAL**

**IRI-SU-000123**



CONFIDENTIAL



**CONFIDENTIAL**



**CONFIDENTIAL**



**CONFIDENTIAL**



**CONFIDENTIAL**

Exhibit L



April 5, 2023

**Certification**

<div align="center">**Welocalize Translations**</div>

**TRANSLATOR'S DECLARATION:**

I, Ann Chen, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of the document with bates numbers range: IRI-SU-000052 - IRI-SU-000054.

*(Digital or printed signature here above the line)*

Ann Chen

_____

**Ann Chen**

Project Number: BBLLP_2303_P0007

<div align="center">15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870</div>



1

CONFIDENTIAL          Translation                                IRI-SU-000052E



CONFIDENTIAL          Translation                              IRI-SU-000053E



CONFIDENTIAL          Translation                                          IRI-SU-000054E



**CONFIDENTIAL**                                                                                    **IRI-SU-000052**



**CONFIDENTIAL**

**IRI-SU-000053**



**CONFIDENTIAL**

# Exhibit M

1  BAKER BOTTS L.L.P.
   John M. Taladay (*pro hac vice*)
2  Evan J. Werbel (*pro hac vice*)
   Thomas E. Carter (*pro hac vice*)
3  Andrew L. Lucarelli (*pro hac vice*)
   700 K Street, N.W.
4  Washington, D.C. 20001
   (202) 639-7700
5  (202) 639-7890 (fax)
   Email: john.taladay@bakerbotts.com
6          evan.werbel@bakerbotts.com
           tom.carter@bakerbotts.com
7          drew.lucarelli@bakerbotts.com

8  *Attorneys for Defendants*
   *Irico Group Corp. and*
9  *Irico Display Devices Co., Ltd.*

10

11               **UNITED STATES DISTRICT COURT**

12          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13                      **OAKLAND DIVISION**

14  IN RE: CATHODE RAY TUBE (CRT)      )   Master File No. 07-cv-05944-JST
    ANTITRUST LITIGATION,              )
15                                     )   MDL No.: 1917
                                       )
16  THIS DOCUMENT RELATES TO:          )
                                       )
17  *ALL DIRECT PURCHASER ACTIONS*     )   **DECLARATION OF ZHANG**
                                       )   **WENKAI IN SUPPORT OF**
18  *ALL INDIRECT PURCHASER ACTIONS*   )   **DEFENDANTS IRICO GROUP**
                                       )   **CORP. AND IRICO DISPLAY**
19                                     )   **DEVICES CO., LTD.'S**
                                       )   **EMERGENCY MOTION FOR**
20                                     )   **RELIEF FROM SCHEDULING**
                                           **ORDER (CIV. L.R. 16-2(d))**

21

22

23

24

25

26

27

28

---

DECL. OF ZHANG WENKAI IN SUPPORT OF                    MASTER FILE No. 07-CV-05944-JST
IRICO'S MOTION FOR RELIEF                                            MDL No. 1917

I, Zhang Wenkai, declare as follows:

1.     I am a citizen of the People's Republic of China and reside in Shaanxi Province, People's Republic of China.

2.     I make this declaration in support of the Motion for Relief from Scheduling Order filed by Irico Group Corp. ("Irico Group") and Irico Display Devices Co., Ltd.'s ("Irico Display," collectively, the "Irico Defendants").

3.     I am currently the Deputy General Counsel for Irico Group Corp. and have been involved in the day-to-day management of this litigation since I started with the company in September 2017. I have also been involved with the coordination of the depositions for Irico witnesses Wang Zhaojie and Su Xiaohua since August 2021, and the deposition of Yan Yunlong since December 2021.

4.     I understand that, until earlier this week, under the pandemic protection requirements of the health department of Shaanxi Province, People's Republic of China, where the Irico Defendants are headquartered, any witnesses returning from Macau would have been subject to quarantine obligations consisting of a minimum of twenty-one days in a government-run facility and an additional seven days of home confinement ("21+7 Day Policy"). I further understand that on June 27, 2022, based on a recent change in the national pandemic prevention policy, the Shaanxi provincial authorities updated their quarantine provisions to require a minimum of fourteen days in a government-run facility and an additional seven days of home confinement ("14+7 Day Policy"). It is also my understanding that these times can be increased at the sole discretion of the Shaanxi Province authorities.

5.     I worked with Wang Zhaojie, Su Xiaohua, and Yan Yunlong during the process of applying for the visas necessary to travel to Macau in May 2022. All three witnesses cooperated during this process, including providing all necessary information and documentation required to obtain the visas.

6.     Su Xiaohua formally resigned from Irico on May 25, 2022. I contacted Mr. Su and learned that Mr. Su resigned because he refused to travel to Macau for a deposition given the severe quarantine requirements that he would face upon his return to mainland China (21+7

Policy) and his ongoing care of his elderly mother.

7.     On June 8, 2022, Irico received visas authorizing Wang Zhaojie, Su Xiaohua, and Yan Yunlong to travel to Macau for the depositions.

8.     After Irico obtained the travel visas, Wang Zhaojie informed me that he would not agree to travel to Macau for his deposition. Mr. Wang cited concerns about the 21+7 Day Policy and the resulting impacts to his family and ongoing work obligations as reasons for his refusal. The recent change to the 14+7 Day Policy has not changed Mr. Wang's decision regarding the travel for the deposition at this time. Mr. Wang informed me that he was willing to travel to Macau once the quarantine restrictions had been lifted.

9.     Additionally, Yan Yunlong informed me that he would not agree to travel to Macau for his deposition after the visas were obtained. Mr. Yan cited similar concerns about the 21+7 Day Policy and how that would impact Mr. Yan's ability to care for his elderly father who is currently hospitalized. Mr. Yan has been regularly traveling to the hospital to assist in his father's care. Mr. Yan also cited concerns about the impact to the company given his role as General Counsel. The recent change to the 14+7 Day Policy has not changed Mr. Yan's decision regarding the travel for the deposition at this time. Mr. Yan informed me that he was willing to travel to Macau once the quarantine restrictions had been lifted.

10.     After Mr. Wang and Mr. Yan initially refused to travel to Macau, Irico made assurances to Mr. Wang and Mr. Yan that their work obligations will be covered by other employees, that Irico will cover all quarantine-related expenses for 21 days, that Irico will compensate the witnesses at double their normal pay rate, and that Irico will give the witnesses a bonus financial incentive as a result of the over one-month continuous period that the witness will be required to be separated from their families. Mr. Wang and Mr. Yan still refuse to travel to Macau at this time.

Executed this 30th day of June, 2022, in Xianyang, Shaanxi Province, People's Republic of China.

_____
Mr. Zhang Wenkai

DECL. OF ZHANG WENKAI IN SUPPORT OF          2          MASTER FILE NO. 07-CV-05944-JST
IRICO'S MOTION FOR RELIEF                                                        MDL NO. 1917

Exhibit N

1    BAKER BOTTS L.L.P.
     John M. Taladay (*pro hac vice*)
2    Evan J. Werbel (*pro hac vice*)
     Thomas E. Carter (*pro hac vice*)
3    Andrew L. Lucarelli (*pro hac vice*)
     700 K Street, N.W.
4    Washington, D.C. 20001
     (202)-639-7700
5    (202)-639-7890 (fax)
     Email: john.taladay@bakerbotts.com
6           evan.werbel@bakerbotts.com
            tom.carter@bakerbotts.com
7           drew.lucarelli@bakerbotts.com

8    Jonathan Shapiro (State Bar No. 257199)
     101 California Street, Suite 3600
9    San Francisco, California 94111
     (415) 291-6200
10   (415) 291-6300 (fax)
     Email: jonathan.shapiro@bakerbotts.com
11

12   *Attorneys for Defendants*
     *IRICO GROUP CORP. and*
13   *IRICO DISPLAY DEVICES CO., LTD.*

14

15                     **UNITED STATES DISTRICT COURT**

16                    **NORTHERN DISTRICT OF CALIFORNIA**

17                            **OAKLAND DIVISION**

18

19   IN RE: CATHODE RAY TUBE (CRT)          Master File No. 07-cv-05944-JST
     ANTITRUST LITIGATION                   (N.D. Cal.)
20
                                            MDL No. 1917
21   ────────────────────────────────
     This Document Relates to:             **IRICO DEFENDANTS' OBJECTIONS**
22                                         **AND RESPONSES TO DIRECT**
     ALL DIRECT PURCHASER ACTIONS          **PURCHASER PLAINTIFF ARCH**
23                                         **ELECTRONICS INC.'S FIRST SET OF**
                                           **INTERROGATORIES TO IRICO**
24                                         **GROUP CORPORATION AND IRICO**
                                           **DISPLAY DEVICES CO, LTD.**
25
26   PROPOUNDING PARTY:        ARCH ELECTRONICS, INC.

27   RESPONDING PARTIES:       Irico Group Corporation
                               Irico Display Devices Co., Ltd.
28
     SET NUMBER:               One
     ─────────────────────────────────────────────────────────────────────
     IRICO'S OBJECTIONS AND RESPONSES TO              Master File No. 07-cv-05944-JST
     DPP ARCH ELECTRONICS INC.'S FIRST SET                          MDL No. 1917
     INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby provides this response to Direct Purchaser Plaintiff Arch Electronics, Inc.'s ("Plaintiff") First Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., dated December 13, 2021 ("Interrogatories"). Irico reserves the right to amend or supplement these Objections and Responses (the "Responses") to the extent allowed by the Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California ("Local Rules"). Subject to and without waiving any of Irico's General and Specific Objections as set forth below, Irico is willing to meet and confer with Plaintiff regarding such General and Specific Objections.

The following Responses are made only for purposes of this case. The Responses are subject to all objections as to relevance, materiality and admissibility, and to any and all objections on any ground that would require exclusion of any response if it were introduced in court. All evidentiary objections and grounds are expressly reserved.

These Responses are subject to the provisions of the Stipulated Protective Order that the Court issued on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated "Confidential" in accordance with the provisions of the Protective Order.

## GENERAL OBJECTIONS

Irico makes the following General Objections to Plaintiff's Interrogatories:

1.      Irico's Responses are based upon information available to and located by Irico as of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states that it has conducted a diligent search, reasonable in scope, of those files and records in its possession, custody, or control believed to likely contain information responsive to Plaintiff's Interrogatories.

2.      No express, incidental, or implied admissions are intended by these Responses and should not be read or construed as such.

3.      Irico does not intend, and its Responses should not be construed as, an agreement or acquiescence with any characterization of fact, assumption, or conclusion of law contained in

1  or implied by the Interrogatories.

2       4.      Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad,

3  unduly burdensome, oppressive, and duplicative to the extent that they seek information or

4  documents that are already in the possession, custody, or control of Plaintiff.

5       5.      Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose

6  obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any

7  Order of this Court.

8       6.      Irico objects to Plaintiff's Interrogatories to the extent that they request duplicative

9  discovery in violation of the Order Re Discovery And Case Management Protocol, ECF No.

10 1128. *See* Order Re Plaintiffs' Motions To Compel Supplemental Discovery From Toshiba And

11 Panasonic, ECF No. 4128, at 4 ("The Discovery Protocol (ECF No 1128), requires parties to

12 coordinate discovery and not file duplicative discovery. . . . The benefit redounds to all parties on

13 both sides of the litigation, by conserving the efforts required by plaintiffs and protecting

14 defendants against unnecessary duplication of effort.") (Report and Recommendation adopted in

15 full at ECF No. 4256).

16      7.      Irico objects to Plaintiff's Interrogatories to the extent they seek information that is

17 not relevant or disproportionate to the needs of the case.

18      8.      Irico objects to Plaintiff's Interrogatories to the extent that they are vague,

19 ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such

20 vague or ambiguous Interrogatories so as to provide for the production of responsive information

21 that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of

22 any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or

23 amend its Responses.

24      9.      Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that

25 are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous

26 Interrogatories so as to provide for the production of responsive information that is proportionate

27 to the needs of the case.

28      10.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information

that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico has provided only information that it believes to be non-privileged and otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any information or responsive documents subject to any such doctrine, privilege, protection or immunity from production shall not constitute a general, inadvertent, implicit, subject-matter, separate, independent or other waiver of such doctrine, privilege, protection or immunity from production.

11.     Irico objects to Plaintiff's Interrogatories to the extent that they call for information that is not in the possession, custody, or control of Irico. Irico also objects to the extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties, including but not limited to any of Irico's subsidiary or affiliated companies.

12.     Irico objects to Plaintiff's Interrogatories to the extent that responding would require Irico to violate the privacy and/or confidentiality of a third party or confidentiality agreement with a third party.

13.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily available from other sources.

14.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information or documents concerning transactions outside the United States. Such Interrogatories are unduly burdensome and irrelevant to this pending action as Plaintiffs' class definition is confined to "all persons . . . who directly purchased a Cathode Ray Tube Product . . . in the United States" (see Direct Purchaser Plaintiffs' Consolidated Amended Complaint dated March 16, 2009).

15.     Irico objects to Plaintiff's Interrogatories to the extent that compliance would require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body of foreign jurisdictions.

16.     Irico's responses, whether now or in the future, pursuant to Plaintiff's Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

17.     Irico objects to Plaintiff's Interrogatories to the extent that they are compound and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

18.     Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for legal conclusions.

19.     Irico objects to the Interrogatories to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

20.     Irico objects to the Interrogatories to the extent they seek information or documents that cannot be removed or transmitted outside China without violating the laws and regulations of that country, including but not limited to restrictions on the transmission of state secrets or trade secrets as those terms are defined under Chinese law.

21.     Irico objects to the Interrogatories to the extent that they are "contention interrogatories" regarding issues implicated by expert analysis and disclosures. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 Wl 9558055 (N.D. Cal. May 19, 2011). Irico objects to each Interrogatory to the extent that it is premature and/or to the extent that it: (a) conflicts with obligations that are imposed by the Federal Rules of Civil Procedure, the Civil Local Rules of this Court, and/or any other applicable rule; (b) seeks information that is the subject of expert testimony; and/or (c) seeks information that is dependent on depositions and documents of third-parties that have not been discovered.

22.     Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

## GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      Irico objects to the definitions of "Defendant," "You," and "Your" (Definition Nos. 1 and 2) to the extent that Plaintiff defines those terms to include Irico's "subsidiaries, affiliates, agents, employees, attorneys, consultants, representatives and any other person or entity acting on their behalf or at their direction." This definition is overbroad, unduly burdensome, vague, and ambiguous. Irico also objects to the inclusion of all "agents, employees, attorneys, consultants, representatives and any other person or entity acting on [Irico's] behalf or at [Irico's] direction" within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

2.      Irico objects to the definitions of "CRT" and "CRT Product" (Definition Nos. 4 and 5) on the grounds that they are vague, ambiguous and overly broad. Irico further objects to the use of the term "CRT Products" to the extent that it is inconsistent with the definition of "CRT Products" as set forth in Plaintiff's pleadings

3.      Irico objects to the definition of "Person" (Definition No. 12) on the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to the extent that it seeks information protected by the attorney client or other applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or foreign law.

4.      Irico objects to the definition of "Document" (Definition No. 13) to the extent it seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, or any other applicable laws.

5.      Irico objects to the definition of "Identify" (Definition No. 14) to the extent it seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, or any other applicable laws.

6.      Irico objects to the Instructions (related to the production of business records in

1   response to an interrogatory pursuant to Federal Rule of Civil Procedure 33(d)) on the grounds

2   that it is unduly burdensome and purports to impose burdens and obligations upon Irico beyond

3   those required by the Federal Rules of Civil Procedure or other applicable rule or Order of this

4   Court.

## SPECIFIC RESPONSES TO INTERROGATORIES

## INTERROGATORY NO. 1

7   To the extent that your answer to any of DPP Arch Electronics Inc.'s First Set of

8   Requests for Admission to Irico Group Corporation and Irico Display Devices, Co. Ltd, served

9   herewith, is anything other than an unqualified admission:

(a)   State the facts that You rely on to support Your denial or partial denial;

(b)   Identify each Person You contend has knowledge of facts that support Your
     denial or partial denial; and

(c)   Identify each Document You contend supports Your denial or partial denial.

## RESPONSE TO INTERROGATORY NO. 1

15   Irico reasserts and incorporates each of the General Objections and Objections to the

16   Definitions and Instructions set forth above. Irico also reasserts and incorporates each of the

17   General Objections, Objections to the Definitions and Instructions, and objections in each of its

18   Specific Responses to Requests for Admission as set forth in Irico Defendants' Objections and

19   Responses to Direct Purchaser Plaintiff Arch Electronic, Inc.'s First Set of Requests for

20   Admission, served herewith. Irico further objects to this interrogatory as overbroad and unduly

21   burdensome, as Plaintiff has not demonstrated how the benefit of such information outweighs the

22   significant burden to Irico of responding to each denial of the 167 RFAs propounded by

23   Plaintiffs.

24   Subject to and without waiving the foregoing objections, Irico responds as follows:

## RESPONSE RE: REQUEST FOR ADMISSION NO. 1

26   In addition to Irico's General Objections, which Irico incorporates by reference, Irico

27   specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

28   not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

1   that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

2   Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

3   conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

4   "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

5   burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

6   also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

7   that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

8   provide facts and evidence of events that did not take place.

9        Subject to and without waiving the objections stated above and pursuant to FRCP 33(d)

10   and not limited to the following, Irico states that despite the Interrogatory's demand for proof of

11   facts and evidence of events that did not take place, Irico relies on the following evidence:

12   Irico Defendants' Second Supplemental Objections and Responses to Direct Purchaser Plaintiffs'

13   First Set of Interrogatories, May 3, 2021; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico

14   Display Devices Co., Ltd., March 6-8, 2019; Expert Report of Robert D. Willig, December 17,

15   2012; Expert Report of Janusz A. Ordover, Ph.D., (IPP Report), August 5, 2014; Expert Report of

16   Janusz A. Ordover, Ph. D., (Various DAP Reports); Expert Report of Robert D. Willig, August 5,

17   2014; Expert Report of Margaret E. Guerin-Calvert, August 5, 2014; and Expert Report of Prof.

18   Dennis W. Carlton, August 5, 2014.

19        Irico identifies the following employees as having knowledge regarding this Interrogatory:

20   Wang Zhaojie and Su Xiaohua.

21   **RESPONSE RE: REQUEST FOR ADMISSION NO. 2**

22        In addition to Irico's General Objections, which Irico incorporates by reference, Irico

23   specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

24   not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

25   that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

26   Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

27   conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

28   "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

1  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

2  also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

3  that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

4  provide facts and evidence of events that did not take place.

5       Subject to and without waiving the objections stated above, and despite the Interrogatory's

6  demand for proof of facts and evidence of events that did not take place, Irico refers Plaintiffs to

7  its response to Request for Admission No. 2, which contains a complete basis for its response to

8  this Interrogatory.

9      **RESPONSE RE: REQUEST FOR ADMISSION NO. 3**

10       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

11  specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

12  not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

13  that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

14  Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

15  conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

16  "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

17  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

18  also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

19  that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

20  provide facts and evidence of events that did not take place.

21       Subject to and without waiving the objections stated above, and despite the Interrogatory's

22  demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

23  has been brought in the above captioned matter that indicates that Irico manufactured, sold, or

24  distributed CRTs in the United States during the class period. In particular, Irico will be

25  producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the

26  United States. Irico also identifies the following evidence under FRCP 33(d): Direct Purchaser

27  Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico

28  Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs, July 14,

1    2021; Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser

2    Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental

3    Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January 7,

4    2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs'

5    Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd.,

6    January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co.,

7    Ltd., March 6-8, 2019.

8         Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

9    Zhaojie and Su Xiaohua.

10         **RESPONSE RE: REQUEST FOR ADMISSION NO. 4**

11         In addition to Irico's General Objections, which Irico incorporates by reference, Irico

12    specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

13    not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

14    that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

15    Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

16    conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

17    "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

18    burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

19    also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

20    that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

21    provide facts and evidence of events that did not take place.

22         Subject to and without waiving the objections stated above, and despite the Interrogatory's

23    demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

24    has been brought in the above captioned matter that indicates that Irico manufactured, sold, or

25    distributed CRTs in the United States during the class period. In particular, Irico will be

26    producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the

27    United States. Irico also identifies the following evidence under FRCP 33(d): Direct Purchaser

28    Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico

1   Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs, July 14,

2   2021; Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser

3   Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental

4   Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January 7,

5   2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs'

6   Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd.,

7   January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co.,

8   Ltd., March 6-8, 2019.

9       Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

10  Zhaojie and Su Xiaohua.

11      **RESPONSE RE: REQUEST FOR ADMISSION NO. 5**

12      In addition to Irico's General Objections, which Irico incorporates by reference, Irico

13  specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

14  not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

15  that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

16  Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

17  conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

18  "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

19  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

20  also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

21  that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

22  provide facts and evidence of events that did not take place.

23      Subject to and without waiving the objections stated above, and despite the Interrogatory's

24  demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

25  has been brought in the above captioned matter that indicates that Irico manufactured, sold, or

26  distributed CRTs in the United States during the class period. In particular, Irico will be

27  producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the

28  United States. Irico also identifies the following evidence under FRCP 33(d): Direct Purchaser

---

IRICO'S OBJECTIONS AND RESPONSES TO          10          Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET                          MDL No. 1917
INTERROGATORIES

1   Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico

2   Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs, July 14,

3   2021; Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser

4   Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental

5   Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January 7,

6   2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs'

7   Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd.,

8   January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co.,

9   Ltd., March 6-8, 2019.

10       Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

11   Zhaojie and Su Xiaohua.

12   **RESPONSE RE: REQUEST FOR ADMISSION NO. 6**

13       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

14   specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

15   not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

16   that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

17   Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

18   conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

19   "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

20   burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

21   also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

22   that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

23   provide facts and evidence of events that did not take place.

24       Subject to and without waiving the objections stated above, and despite the Interrogatory's

25   demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

26   has been brought in the above captioned matter that indicates that Irico manufactured, sold, or

27   distributed CRTs in the United States during the class period. In particular, Irico will be

28   producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the

1   United States. Irico also identifies the following evidence under FRCP 33(d): Direct Purchaser

2   Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico

3   Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs, July 14,

4   2021; Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser

5   Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental

6   Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January

7   2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs'

8   Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd.,

9   January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co.,

10  Ltd., March 6-8, 2019.

11       Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

12  Zhaojie and Su Xiaohua.

13       **RESPONSE RE: REQUEST FOR ADMISSION NO. 7**

14       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

15  specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

16  not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

17  that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

18  Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

19  conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

20  "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

21  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

22  also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

23  that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to

24  provide facts and evidence of events that did not take place.

25       Subject to and without waiving the objections stated above, and despite the Interrogatory's

26  demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

27  has been brought in the above captioned matter that indicates that Irico manufactured, sold, or

28  distributed CRTs in the United States during the class period. In particular, Irico will be

1   producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the

2   United States. Irico also identifies the following evidence under FRCP 33(d): Direct Purchaser

3   Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico

4   Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs, July 14,

5   2021; Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser

6   Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental

7   Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January 7,

8   2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs'

9   Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd.,

10   January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co.,

11   Ltd., March 6-8, 2019.

12       Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

13   Zhaojie and Su Xiaohua.

14       **RESPONSE RE: REQUEST FOR ADMISSION NOS. 8-24**

15       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

16   specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

17   not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

18   that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

19   Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

20   conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

21   "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

22   burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

23   also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

24   that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico

25   provide facts and evidence of events that did not take place.

26       Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its

27   responses to Request for Admission Nos. 8-24, which contain a complete basis for its response to

28   this Interrogatory.

---

IRICO'S OBJECTIONS AND RESPONSES TO       13       Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET                 MDL No. 1917
INTERROGATORIES

**RESPONSE RE: REQUEST FOR ADMISSION NOS. 25-56 AND 61-160**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

Subject to and without waiving the objections stated above, Irico responds that its decision to admit, admit-in part and deny-in-part, deny, or state that it lacked sufficient information to admit or deny was based a reasonable review of the discovery responses from other Defendants available to Irico. Irico possesses no knowledge of its own regarding the corporate structure of the entities listed in the aforementioned Requests. This information is equally available to Plaintiffs as it is to Irico.

**RESPONSE RE: REQUEST FOR ADMISSION NO. 57**

In addition to Irico's General Objections, which Irico incorporates by reference, Irico specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

1      Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its

2  responses to Request for Admission No. 57, which contains a complete basis for its response to

3  this Interrogatory.

4     **RESPONSE RE: REQUEST FOR ADMISSION NO. 58**

5      In addition to Irico's General Objections, which Irico incorporates by reference, Irico

6  specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

7  not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

8  that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

9  Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

10  conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

11  "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

12  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

13  also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

14  that Plaintiffs alone carry to Irico.

15      Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its

16  responses to Request for Admission No. 58, which contains a complete basis for its response to

17  this Interrogatory.

18     **RESPONSE RE: REQUEST FOR ADMISSION NO. 59**

19      In addition to Irico's General Objections, which Irico incorporates by reference, Irico

20  specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

21  not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

22  that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

23  Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

24  conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

25  "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

26  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

27  also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

28  that Plaintiffs alone carry to Irico.

IRICO'S OBJECTIONS AND RESPONSES TO   15   Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET   MDL No. 1917
INTERROGATORIES

1    Subject to and without waiving the objections stated above, Irico responds that from July

2  1992 to February 1996, Irico Group held an indirect but controlling share of Irico Display. In

3  February 1996, Irico Group acquired a controlling 23.77% of the non-publicly traded shares of

4  Irico Display. In June 1999, Irico Group increased its shareholding in Irico Display to 57.9%. In

5  September 2004, Irico Group transferred its 56.14% interest in Irico Display to Irico Group

6  Electronics Co., Ltd. ("Irico Electronics"), a majority-owned subsidiary of Irico Group. From

7  2004 onward, Irico Group indirectly controlled Irico Display through its ownership interest in

8  Irico Electronics. In July 2006, Irico Electronics shareholding interest in Irico Display decreased

9  to 42.90%, however Irico Electronics maintained a controlling interest in Irico Display.

10    **RESPONSE RE: REQUEST FOR ADMISSION NO. 60**

11    In addition to Irico's General Objections, which Irico incorporates by reference, Irico

12  specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

13  not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

14  that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

15  Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

16  conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

17  "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

18  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

19  also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

20  that Plaintiffs alone carry to Irico.

21    Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its

22  Response re Request for Admission No. 59.

23    **RESPONSE RE: REQUEST FOR ADMISSION NOS. 161-167**

24    In addition to Irico's General Objections, which Irico incorporates by reference, Irico

25  specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

26  not reasonably calculated to lead to the discovery of admissible evidence, and seeks information

27  that is maintained by and equally available to Plaintiffs or stated in publicly available documents.

28  Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal

1   conclusion. Irico further objects to the use of the terms "unqualified," "knowledge," and

2   "support" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

3   burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico

4   also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden

5   that Plaintiffs alone carry to Irico.

6        Subject to and without waiving the objections stated above, Irico refers Plaintiffs to its

7   responses to Request for Admission Nos. 161-167, which contain a complete basis for its

8   response to this Interrogatory.

9   **INTERROGATORY NO. 2**

10       Describe Irico's relationship with former employees including any obligations owed by

11  former employees to Irico, conditions imposed on severance or retirement benefit eligibility, or

12  similar policies and procedures.

13  **RESPONSE TO INTERROGATORY NO. 2**

14       Irico reasserts and incorporates each of the General Objections and Objections to the

15  Definitions and Instructions set forth above. Irico further objects to this interrogatory as

16  overbroad and unduly burdensome, as Plaintiff has not demonstrated how the benefit of such

17  information outweighs the significant burden to Irico of requiring the company to search through

18  historical records for such information. Irico also objects to this interrogatory to the extent it

19  purports to request information beyond the possession, custody, or control of Irico Group or Irico

20  Display, including but not limited to information in the possession of non-parties where Irico

21  lacks any duty to obtain or otherwise search for the information and for whom the Court lacks

22  personal jurisdiction. Irico further objects that this interrogatory is duplicative and cumulative of

23  other requests served on Irico, including but not limited to: Interrogatory No. 6 of Indirect

24  Purchaser Plaintiffs' Third Set of Interrogatories. Such duplicative and cumulative requests

25  violate the Order Re Discovery And Case Management Protocol, ECF No. 1128. *See* Order Re

26  Plaintiffs' Motions To Compel Supplemental Discovery From Toshiba And Panasonic, ECF No.

27  4128, at 4 ("The Discovery Protocol (ECF No 1128), requires parties to coordinate discovery and

28  not file duplicative discovery. . . . The benefit redounds to all parties on both sides of the

1   litigation, by conserving the efforts required by plaintiffs and protecting defendants against

2   unnecessary duplication of effort.") (Report and Recommendation adopted in full at ECF No.

3   4256).

4          Subject to and without waiving the objections stated above, Irico responds that no

5   relationship exists with former employees. When an employee ends his employment with Irico,

6   his/her employment files are transferred to either the employees' new employer or, in the case of

7   employees who retire from Irico, the archive management agency of the government of the

8   People's Republic of China. When an employee retires from Irico, and his/her pension and other

9   benefits are paid directly by the government of the People's Republic of China. Irico cannot

10  impose conditions on severance or retirement benefit eligibility.

11  **INTERROGATORY NO. 3**

12         Do you contend that the market for CPTs was the same market, or a separate market,

13   from the market for CDTs?

14         (a)    State the facts that You rely on to support Your contention;

15         (b)    Identify each Person You contend has knowledge of facts that support

16                Your contention; and

17         (c)    Identify each Document You contend supports Your contention.

18  **RESPONSE TO INTERROGATORY NO. 3**

19         Irico reasserts and incorporates each of the General Objections and Objections to the

20   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

21   contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

22   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

23   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

24   schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

25   Cal. May 19, 2011). In particular, this Interrogatory concerning market definition for CRTs

26   particularly implicates antitrust law and expert analysis, and is not ripe for a response at this stage

27   of the litigation. Irico reserves all rights to further supplement its responses at an appropriate time

28   following the substantial completion of other fact and expert discovery. Irico also objects to this

1  Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone

2  carry to Irico.

3      Subject to and without waiving the foregoing objections, Irico identifies the following

4  evidence under FRCP 33(d): Expert Report of Robert D. Willig, December 17, 2012; Expert

5  Report of Janusz A. Ordover, Ph.D., (IPP Report), August 5, 2014; Expert Report of Janusz A.

6  Ordover, Ph. D., (Various DAP Reports); Expert Report of Robert D. Willig, August 5, 2014;

7  Expert Report of Margaret E. Guerin-Calvert, August 5, 2014; and Expert Report of Prof. Dennis

8  W. Carlton, August 5, 2014.

9  **INTERROGATORY NO. 4**

10     Do You contend that You were a victim of the CRT conspiracy alleged in the

11  Complaint? If so:

12      1.      State the facts that You rely on to support Your contention;

13      2.      Identify each Person You contend has knowledge of facts that support

14              Your contention; and

15      3.      Identify each Document You contend supports Your contention.

16  **RESPONSE TO INTERRGOATORY NO. 4**

17     Irico reasserts and incorporates each of the General Objections and Objections to the

18  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

19  contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

20  Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

21  relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

22  schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

23  Cal. May 19, 2011). Irico reserves all rights to further supplement its responses at an appropriate

24  time following the substantial completion of other fact and expert discovery.

25     Subject to and without waiving the foregoing objections, and based on its present

26  knowledge, Irico responds that it does not contend at this time that it was a victim of the alleged

27  conspiracy.

28

1    **INTERROGATORY NO. 5**

2           Do You contend that You did not fix prices with other Defendants, Mitsubishi, Thomson

3    or Videocom? If so:

4           (a)     State the facts that You rely on to support Your contention;

5           (b)     Identify each Person You contend has knowledge of facts that support

6                   Your contention; and

7           (c)     Identify each Document You contend supports Your contention.

8    **RESPONSE TO INTERROGATORY NO. 5**

9           Irico reasserts and incorporates each of the General Objections and Objections to the

10   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

11   contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

12   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

13   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

14   schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

15   Cal. May 19, 2011). In particular, this Interrogatory concerning allegations at the core of

16   Plaintiffs' claims particularly implicates legal and economic expert conclusions, and is not ripe

17   for a response at this stage of the litigation. Irico reserves all rights to further supplement its

18   responses at an appropriate time following the substantial completion of other fact and expert

19   discovery. Irico also objects to this Interrogatory to the extent it improperly tries to shift the

20   evidentiary burden that Plaintiffs alone carry to Irico.

21          Subject to and without waiving the foregoing objections, and based on its present

22   knowledge, Irico directs Plaintiffs' to its Response to Interrogatory No. 1.

23   **INTERROGATORY NO. 6**

24          Do you contend that Your contacts with other CRT manufacturers had lawful,

25   competitive purposes, for each contact? If so:

26          (a)     State the facts that You rely on to support Your contention;

27          (b)     Identify each Person You contend has knowledge of facts that support Your

28                  contention; and

IRICO'S OBJECTIONS AND RESPONSES TO        20        Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET                MDL No. 1917
INTERROGATORIES

1    (c)  Identify each Document You contend supports Your contention.

2 **RESPONSE TO INTERROGATORY NO. 6**

3    Irico reasserts and incorporates each of the General Objections and Objections to the

4 Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

5 contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

6 Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

7 relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

8 schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

9 Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

10 argument or legal conclusion. Irico further objects to this interrogatory to the extent that it

11 improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

12    Subject to and without waiving the foregoing objections, Irico identifies the following

13 evidence under FRCP 33(d): Expert Report of Robert D. Willig, December 17, 2012; Expert

14 Report of Janusz A. Ordover, Ph.D., (IPP Report), August 5, 2014; Expert Report of Janusz A.

15 Ordover, Ph. D., (Various DAP Reports); Expert Report of Robert D. Willig, August 5, 2014;

16 Expert Report of Margaret E. Guerin-Calvert, August 5,/* 2014; and Expert Report of Prof.

17 Dennis W. Carlton, August 5, 2014; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico

18 Display Devices Co., Ltd., March 6-8, 2019; Reply Brief of Irico In Support of Motion to Set

19 Aside Default at 10-11, ECF No. 5229; Exs. A – F to the Declaration of Stuart C. Plunkett in

20 Support of Motion to Set Aside Default, ECF Nos. 5229-02 through -07; IRI-CRT-00031457.

21 **INTERROGATORY NO. 7**

22    If you contend that any Samsung-branded color television or computer monitor sold in the

23 United States during the Relevant Time Period contained CRTs that were not manufactured by a

24 Defendant or alleged Co-Conspirator, please:

25    (a)  State the facts that You rely on to support Your contention;

26    (b)  Identify the brand, model number, size and time period sold in the United States

27      each such CRT color television or computer monitor;

28    (c)  Identify each Person You contend has knowledge of facts that support

IRICO'S OBJECTIONS AND RESPONSES TO  21  Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET      MDL No. 1917
INTERROGATORIES

1    Your contention; and

2    (d)    Identify each Document You contend supports Your contention.

3    **RESPONSE TO INTERROGATORY NO. 7**

4    Irico reasserts and incorporates each of the General Objections and Objections to the

5    Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

6    contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

7    Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

8    relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

9    schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

10   Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

11   the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

12   expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

13   rights to further supplement its responses at an appropriate time following the substantial

14   completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

15   it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

16   Subject to and without waiving the foregoing objections, and based on its present

17   knowledge, Irico responds that it lacks sufficient information to form a belief as to this

18   contention.

19   **REQUEST FOR ADMISSION NO. 8**

20   If you contend that any Hitachi-branded color television or computer monitor sold in the

21   United States during the Relevant Time Period contained CRTs that were not manufactured by a

22   Defendant or alleged Co-Conspirator, please:

23   (a)    State the facts that You rely on to support Your contention;

24   (b)    Identify the brand, model number, size and time period sold in the United States

25           each such CRT color television or computer monitor;

26   (c)    Identify each Person You contend has knowledge of facts that support Your

27           contention; and

28   (d)    Identify each Document You contend supports Your contention.

1   **RESPONSE TO INTERROGATORY NO. 8**

2           Irico reasserts and incorporates each of the General Objections and Objections to the

3   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

4   contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

5   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

6   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

7   schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

8   Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

9   the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

10  expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

11  rights to further supplement its responses at an appropriate time following the substantial

12  completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

13  it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

14          Subject to and without waiving the foregoing objections, and based on its present

15  knowledge, Irico responds that it lacks sufficient information to form a belief as to this

16  contention.

17  **INTERROGATORY NO. 9**

18          If you contend that any Mitsubishi-branded color television or computer monitor sold in

19  the United States during the Relevant Time Period contained CRTs that were not manufactured

20  by a Defendant or alleged Co-Conspirator, please:

21          (a)      State the facts that You rely on to support Your contention;

22          (b)      Identify the brand, model number, size and time period sold in the United States

23                   each such CRT color television or computer monitor;

24          (c)      Identify each Person You contend has knowledge of facts that support Your

25                   contention; and

26          (d)      Identify each Document You contend supports Your contention.

27  **RESPONSE TO INTERROGATORY NO. 9**

28          Irico reasserts and incorporates each of the General Objections and Objections to the

IRICO'S OBJECTIONS AND RESPONSES TO          23          Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET                     MDL No. 1917
INTERROGATORIES

Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a contention interrogatory, served before fact depositions and/or expert analysis and disclosures. Irico asserts that such discovery is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures are not contemplated by the Court's schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all rights to further supplement its responses at an appropriate time following the substantial completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

Subject to and without waiving the foregoing objections, and based on its present knowledge, Irico responds that it lacks sufficient information to form a belief as to this contention.

**INTERROGATORY NO. 10**

If you contend that any Toshiba-branded color television or computer monitor sold in the United States during the Relevant Time Period contained CRTs that were not manufactured by a Defendant or alleged Co-Conspirator, please:

(a)    State the facts that You rely on to support Your contention;

(b)    Identify the brand, model number, size and time period sold in the United States each such CRT color television or computer monitor;

(c)    Identify each Person You contend has knowledge of facts that support Your contention; and

(d)    Identify each Document You contend supports Your contention.

**RESPONSE TO INTERROGATORY NO. 10**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

1   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

2   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

3   schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

4   Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

5   the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

6   expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

7   rights to further supplement its responses at an appropriate time following the substantial

8   completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

9   it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

10       Subject to and without waiving the foregoing objections, and based on its present

11   knowledge, Irico responds that it lacks sufficient information to form a belief as to this

12   contention.

13   **INTERROGATORY NO. 11**

14       If you contend that any Thomson, RCA or GE-branded color television or computer

15   monitor sold in the United States during the Relevant Time Period contained CRTs that were not

16   manufactured by a Defendant or alleged Co-Conspirator, please:

17       (a)   State the facts that You rely on to support Your contention;

18       (b)    Identify the brand, model number, size and time period sold in the United States

19             each such CRT color television or computer monitor;

20       (c)   Identify each Person You contend has knowledge of facts that support Your

21             contention; and

22       (d)   Identify each Document You contend supports Your Contention.

23   **RESPONSE TO INTERROGATORY NO. 11**

24       Irico reasserts and incorporates each of the General Objections and Objections to the

25   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

26   contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

27   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

28   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

1    schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

2    Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

3    the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

4    expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

5    rights to further supplement its responses at an appropriate time following the substantial

6    completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

7    it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

8         Subject to and without waiving the foregoing objections, and based on its present

9    knowledge, Irico responds that it lacks sufficient information to form a belief as to this

10   contention.

11   **INTERROGATORY NO. 12**

12        If you contend that any Philips-branded color television or computer monitor sold in the

13   United States during the Relevant Time Period contained CRTs that were not manufactured by a

14   Defendant or alleged Co-Conspirator, please:

15        (a)    State the facts that You rely on to support Your contention;

16        (b)    Identify the brand, model number, size and time period sold in the United States

17               each such CRT color television or computer monitor;

18        (c)    Identify each Person You contend has knowledge of facts that support Your

19               contention; and

20        (d)    Identify each Document You contend supports Your contention

21   **RESPONSE TO INTERROGATORY NO. 12**

22        Irico reasserts and incorporates each of the General Objections and Objections to the

23   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

24   contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

25   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

26   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

27   schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

28   Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

IRICO'S OBJECTIONS AND RESPONSES TO          26          Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET                    MDL No. 1917
INTERROGATORIES

1   the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

2   expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

3   rights to further supplement its responses at an appropriate time following the substantial

4   completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

5   it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

6        Subject to and without waiving the foregoing objections, and based on its present

7   knowledge, Irico responds that it lacks sufficient information to form a belief as to this

8   contention.

9   **INTERROGATORY NO. 13**

10       If you contend that any LG-branded color television or computer monitor sold in the

11  United States during the Relevant Time Period contained CRTs that were not manufactured by a

12  Defendant or alleged Co-Conspirator, please:

13       (a)    State the facts that You rely on to support Your contention;

14       (b)    Identify the brand, model number, size and time period sold in the United States

15              each such CRT color television or computer monitor;

16       (c)    Identify each Person You contend has knowledge of facts that support Your

17              contention; and

18       (e)    Identify each Document You contend supports Your contention.

19  **RESPONSE TO INTERROGATORY NO. 13**

20       Irico reasserts and incorporates each of the General Objections and Objections to the

21  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

22  contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

23  Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

24  relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

25  schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

26  Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

27  the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

28  expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

1  rights to further supplement its responses at an appropriate time following the substantial

2  completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

3  it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

4      Subject to and without waiving the foregoing objections, and based on its present

5  knowledge, Irico responds that it lacks sufficient information to form a belief as to this

6  contention.

7  **INTERROGATORY NO. 14**

8      If you contend that any Panasonic-branded color television or computer monitor sold in

9  the United States during the Relevant Time Period contained CRTs that were not manufactured

10 by a Defendant or alleged Co-Conspirator, please:

11     (a)   State the facts that You rely on to support Your contention;

12     (b)   Identify the brand, model number, size and time period sold in the United States

13           each such CRT color television or computer monitor;

14     (c)   Identify each Person You contend has knowledge of facts that support

15           Your contention; and

16     (d)    Identify each Document You contend supports Your contention.

17 **RESPONSE TO INTERROGATORY NO. 14**

18     Irico reasserts and incorporates each of the General Objections and Objections to the

19 Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

20 contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

21 Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

22 relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

23 schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

24 Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

25 the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

26 expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

27 rights to further supplement its responses at an appropriate time following the substantial

28 completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

1    it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

2        Subject to and without waiving the foregoing objections, and based on its present

3    knowledge, Irico responds that it lacks sufficient information to form a belief as to this

4    contention.

5    **INTERROGATORY NO. 15**

6        If you contend that any NEC-branded color television or computer monitor sold in the

7    United States during the Relevant Time Period contained CRTs that were not manufactured by a

8    Defendant or alleged Co-Conspirator, please:

9        (a)    State the facts that You rely on to support Your contention;

10       (b)    Identify the brand, model number, size and time period sold in the United States

11              each such CRT color television or computer monitor;

12       (c)    Identify each Person You contend has knowledge of facts that support Your

13              contention; and

14       (d)    Identify each Document You contend supports Your contention.

15   **RESPONSE TO INTERROGATORY NO. 15**

16       Irico reasserts and incorporates each of the General Objections and Objections to the

17   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

18   contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

19   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

20   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

21   schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

22   Cal. May 19, 2011). In particular, this Interrogatory concerning allegations that go to the core of

23   the viability of Plaintiffs' claims, but that are completely unrelated to Irico, particularly implicate

24   expert analysis, and thus are not ripe for a response at this stage of the litigation. Irico reserves all

25   rights to further supplement its responses at an appropriate time following the substantial

26   completion of other fact and expert discovery. Irico also objects to this Interrogatory to the extent

27   it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico.

28       Subject to and without waiving the foregoing objections, and based on its present

IRICO'S OBJECTIONS AND RESPONSES TO          29          Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET                    MDL No. 1917
INTERROGATORIES

1   knowledge, Irico responds that it lacks sufficient information to form a belief as to this

2   contention.

3   **INTERROGATORY NO. 16**

4        As to Your contention in the Second Defense set forth in Your Answer that Direct

5   Purchaser Plaintiffs' claims are barred because Plaintiffs have failed to allege facts sufficient to

6   support a claim under the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a:

7        (a)      State the facts that You rely on to support Your contention;

8        (b)      Identify each Person You contend has knowledge of facts that support Your

9                 contention; and

10       (c)      Identify each Document You contend supports Your contention; and

11       (d)      Identify the damages, if any, Plaintiffs claim based on sales outside of the United

12                States

13  **RESPONSE TO INTERROGATORY NO. 16**

14       Irico reasserts and incorporates each of the General Objections and Objections to the

15  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

16  contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

17  Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

18  relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

19  schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

20  Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

21  argument or legal conclusion. Irico further objects to this interrogatory to the extent that it

22  improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

23  Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary

24  burden that Plaintiffs alone carry to Irico.

25       Subject to and without waiving the objections stated above, Irico contends that Plaintiffs

26  have failed to allege facts sufficient to support a claim under the Foreign Trade Antitrust

27  Improvements Act ("FTAIA"), 15 U.S.C. § 6a. At all relevant times, the North American CRT

28  market was unique and separate from other foreign markets, including China. In supporting its

1  claims, Plaintiffs rely on alleged meetings and communications that occurred outside the United

2  States that discuss and relate to CRTs sold outside the United States. Plaintiffs have not

3  established how it is entitled to any relief under FTAIA based on their purchases of either CRT

4  products outside of the United States or their purchase of CRT products containing CRTs

5  manufactured and/or purchased outside the United States. Irico also identifies the following

6  evidence under FRCP 33(d): Irico Group Corporation's Amended Motion to Dismiss Claims of

7  Direct Purchaser Plaintiffs for Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)),

8  March 19, 2019; Irico Display Devices Co., Ltd.'s Amended Motion to Dismiss Claims of Direct

9  Purchaser Plaintiffs for Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)), March 19,

10 2019; Irico Defendants' Reply in Support of Amended Motions to Dismiss Claims of Direct

11 Purchaser Plaintiffs for Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)), May 2,

12 2019.

13 **INTERROGATORY NO. 17**

14      As to Your contention in the Third Defense set forth in Your Answer that Direct

15 Purchaser Plaintiffs' claims are barred because the alleged conduct occurred outside the

16 jurisdiction of the Court or was neither directed to nor affected persons, entities, trade or

17 commerce in the United States, or both:

18      (a)      State the facts that You rely on to support Your contention;

19      (b)      Identify each Person You contend has knowledge of facts that support Your

20               contention; and

21      (c)      Identify each Document You contend supports Your contention.

22 **RESPONSE TO INTERROGATORY NO. 17**

23      Irico reasserts and incorporates each of the General Objections and Objections to the

24 Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

25 contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

26 Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

27 relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

28 schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

---

IRICO'S OBJECTIONS AND RESPONSES TO          31          Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET                    MDL No. 1917
INTERROGATORIES

1 Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

2 argument or legal conclusion. Irico further objects to this interrogatory to the extent that it

3 improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

4       Subject to and without waiving the objections stated above, and despite the Interrogatory's

5 demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

6 has been brought in the above captioned matter that indicates that Irico manufactured, sold, or

7 distributed CRTs in the United States during the class period. In particular, Irico will be

8 producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the

9 United States. Irico also identifies the following evidence under FRCP 33(d): Direct Purchaser

10 Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico

11 Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs, July 14,

12 2021; Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser

13 Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental

14 Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January 7,

15 2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs'

16 Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd.,

17 January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co.,

18 Ltd., March 6-8, 2019.

19       Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

20 Zhaojie and Su Xiaohua.

21 **<u>INTERROGATORY NO. 18</u>**

22       As to Your contention in the Eighth Defense set forth in your Answer that Irico's actions

23 or practices were undertaken unilaterally for legitimate business reasons and in pursuit of Irico's

24 independent interests and those of its customers:

25       (a)     State the facts that you rely on to support your contention;

26       (b)     Identify each Person You contend has knowledge of facts

27                that support Your contention; and

28

IRICO'S OBJECTIONS AND RESPONSES TO    32    Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET          MDL No. 1917
INTERROGATORIES

1      (c)     Identify each Document You contend supports Your

2      contention.

3  **RESPONSE TO INTERROGATORY NO. 18**

4      Irico reasserts and incorporates each of the General Objections and Objections to the

5  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

6  contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

7  Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

8  relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

9  schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

10  Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

11  argument or legal conclusion.

12      Subject to and without waiving the objections stated above, Irico contends that its acts or

13  practices were undertaken unilaterally for legitimate business reasons and in pursuit of Irico's

14  independent interests. In addition, Irico asserts no evidence has been brought in the above

15  captioned matter that indicates that its actions were not undertaken unilaterally for legitimate

16  business reasons and in pursuit of Irico's independent interests. Pursuant to Rule 33(d) of the

17  Federal Rules of Civil Procedure, Irico relies on the following evidence to support its contention

18  that at all times its acts or practices were undertaken unilaterally for legitimate business reasons

19  and in pursuit of Irico's independent interests: Reply Brief of Irico In Support of Motion to Set

20  Aside Default at 10-11, ECF No. 5229; Exs. A – F to the Declaration of Stuart C. Plunkett in

21  Support of Motion to Set Aside Default, ECF Nos. 5229-02 through -07; IRI-CRT-00010133;

22  IRI-CRT-00010449; IRI-CRT-00010468; IRI-CRT-00026812; IRI-CRT-00030226; IRI-CRT-

23  00030865; IRI-CRT-00031457; BMCC-CRT000002761; BMCC-CRT000002762;

24  CHU00029175E; CHU00029179E; CHU00029259E; CHU00030067E; CHU00030777E;

25  CHU00030941E; CHU00030973E; CHU00031018E; CHU00031032; CHU00031044E; and,

26  CHU00031070E.

27      Irico identifies the following employees as having knowledge regarding this Interrogatory:

28  Wang Zhaojie and Su Xiaohua.

---

IRICO'S OBJECTIONS AND RESPONSES TO     33     Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET           MDL No. 1917
INTERROGATORIES

**INTERROGATORY NO. 19**

As to Your contention in the Eighth Defense set forth in your Answer that Irico's actions and practices were not the product of any contract, combination or conspiracy with any other person or entity:

      (a)      State the facts that you rely on to support your contention;

      (b)      Identify each Person You contend has knowledge of facts that support Your contention; and

      (c)      Identify each Document You contend supports Your contention.

**RESPONSE TO INTERROGATORY NO. 19**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a contention interrogatory, served before fact depositions and/or expert analysis and disclosures. Irico asserts that such discovery is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures are not contemplated by the Court's schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion.

Subject to and without waiving the objections stated above, Irico contends that Irico's pricing-related conduct was compelled by the Chinese government and based on duly enacted laws and/or regulations of the People's Republic of China. Irico relies on the following evidence to support this contention:

          •    The State Planning Commission and the State Economic and Trade Commission issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-02.

- Notice of the State Planning Commission on Issuing the "Measures for the Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial Implementation)" – effective as of March 1, 1999. *See* https://law.lawtime.cn/d448076453170.html.

- Notice of the State Planning Commission and the Ministry of Information Industry on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex. B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-03.

- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.

- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-04.

- Notice on the issuance of the average production cost of certain types of color TV industries issued by the Ministry of Information Industry on August 25, 2000. *See* Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-06.

- Notice on the issuance of the average production cost of some industries of color picture tubes issued by the Ministry of Information Industry on September 14, 2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-07.

Irico identifies the following employees as having knowledge regarding this Interrogatory: Wang Zhaojie and Su Xiaohua.

**INTERROGATORY NO. 20**

1    As to Your contention in the Tenth Defense set forth in your Answer that Your acts or

2    practices that are the subject of the complaint were cost justified or otherwise economically

3    justified and resulted from a good faith effort to meet competition or market conditions:

4         (a)    State the facts that you rely on to support your contention;

5         (b)    Identify each Person you contend has knowledge of facts that

6                support Your contention; and

7         (c)    Identify each Document You contend supports Your

8                contention.

9    **RESPONSE TO INTERROGATORY NO. 20**

10    Irico reasserts and incorporates each of the General Objections and Objections to the

11    Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

12    contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

13    Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

14    relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

15    schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

16    Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

17    argument or legal conclusion.

18    Subject to and without waiving the objections stated above, Irico contends that its acts or

19    practices were cost justified or otherwise economically justified, and resulted from a good faith

20    effort to meet competition or market conditions. In addition, Irico asserts no evidence has been

21    brought in the above captioned matter that indicates any action or practice of Irico was not cost

22    justified, otherwise economically justified, or did not result from a good faith effort to meet

23    competition or market conditions. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure,

24    Irico relies on the following evidence to support its contention that at all times its acts or practices

25    were cost justified or otherwise economically justified, and resulted from a good faith effort to

26    meet competition or market conditions: Reply Brief of Irico In Support of Motion to Set Aside

27    Default at 10-11, ECF No. 5229; Exs. A – F to the Declaration of Stuart C. Plunkett in Support of

28    Motion to Set Aside Default, ECF Nos. 5229-02 through -07; IRI-CRT-00010133; IRI-CRT-

1  00010449; IRI-CRT-00010468; IRI-CRT-00026812; IRI-CRT-00030226; IRI-CRT-00030865;

2  IRI-CRT-00031457; BMCC-CRT000002761; BMCC-CRT000002762; CHU00029175E;

3  CHU00029179E; CHU00029259E; CHU00030067E; CHU00030777E; CHU00030941E;

4  CHU00030973E; CHU00031018E; CHU00031032; CHU00031044E; and, CHU00031070E.

5       Irico identifies the following employees as having knowledge regarding this Interrogatory:

6  Wang Zhaojie and Su Xiaohua.

7  **INTERROGATORY NO. 21**

8       As to Your contention in the Eleventh Defense set forth in your Answer that Your conduct

9  that is the subject of the Complaint was caused by, due to, based upon, or in response to

10  directives, laws, regulations, policies, and/or acts of governments, governmental agencies and

11  entities, and/or regulatory agencies, and such is non-actionable or privileged:

12       (a)     State the facts that you rely on to support your contention;

13       (b)     Identify each Person you contend has knowledge of facts that support Your

14               contention; and

15       (c)     Identify each Document You contend supports Your contention.

16  **RESPONSE TO INTERROGATORY NO. 21**

17       Irico reasserts and incorporates each of the General Objections and Objections to the

18  Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

19  contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

20  Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

21  relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

22  schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

23  Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

24  argument or legal conclusion.

25       Subject to and without waiving the objections stated above, Irico contends that Irico's

26  pricing-related conduct was compelled by the Chinese government and based on duly enacted

27  laws and/or regulations of the People's Republic of China. Irico relies on the following evidence

28  to support this contention:

- The State Planning Commission and the State Economic and Trade Commission issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-02.

- Notice of the State Planning Commission on Issuing the "Measures for the Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial Implementation)" – effective as of March 1, 1999. *See* https://law.lawtime.cn/d448076453170.html.

- Notice of the State Planning Commission and the Ministry of Information Industry on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex. B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-03.

- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.

- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-04.

- Notice on the issuance of the average production cost of certain types of color TV industries issued by the Ministry of Information Industry on August 25, 2000. *See* Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-06.

- Notice on the issuance of the average production cost of some industries of color picture tubes issued by the Ministry of Information Industry on September 14,

2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-07.

Irico identifies the following employees as having knowledge regarding this Interrogatory: Wang Zhaojie and Su Xiaohua.

## INTERROGATORY NO. 22

As to your contention in the Twelfth Defense set forth in your Answer that Your conduct that is the subject of the Complaint was caused by or in response to duly enacted laws and/or regulations of the People's Republic of China and is therefore protected under the foreign sovereign compulsion doctrine, the act of state doctrine, and international comity:

    (a)    State the facts that you rely on to support your contention;

    (b)    Identify each Person you contend has knowledge of facts that support Your contention; and

    (c)    Identify each Document You contend supports Your contention.

## RESPONSE TO INTERROGATORY NO. 22

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a contention interrogatory, served before fact depositions and/or expert analysis and disclosures. Irico asserts that such discovery is premature given that no Irico witnesses have been deposed relating to merits issues and expert analysis and disclosures are not contemplated by the Court's schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion.

Subject to and without waiving the objections stated above, Irico contends that Irico's pricing-related conduct was compelled by the Chinese government and based on duly enacted laws and/or regulations of the People's Republic of China. Irico relies on the following evidence to support this contention:

    • The State Planning Commission and the State Economic and Trade Commission issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced

1    Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the

2    Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF

3    No. 5229-02.

4    • Notice of the State Planning Commission on Issuing the "Measures for the

5    Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial

6    Implementation)" – effective as of March 1, 1999. *See*

7    https://law.lawtime.cn/d448076453170.html.

8    • Notice of the State Planning Commission and the Ministry of Information Industry

9    on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and

10   Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex.

11   B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside

12   Default, ECF No. 5229-03.

13   • Notice on submitting cost information of color TV and color tube industry issued

14   by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of

15   Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.

16   • Notice on the issuance of the average production cost of some types of color

17   picture tubes and color TV industries issued by the Ministry of Information

18   Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to

19   the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default,

20   ECF No. 5229-04.

21   • Notice on the issuance of the average production cost of certain types of color TV

22   industries issued by the Ministry of Information Industry on August 25, 2000. *See*

23   Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside

24   Default, ECF No. 5229-06.

25   • Notice on the issuance of the average production cost of some industries of color

26   picture tubes issued by the Ministry of Information Industry on September 14,

27   2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to

28   Set Aside Default, ECF No. 5229-07.

1   Irico identifies the following employees as having knowledge regarding this Interrogatory:

2   Wang Zhaojie and Su Xiaohua.

3   **INTERROGATORY NO. 23**

4   As to your contention in the Thirty-Seventh Defense set forth in your Answer that

5   Plaintiffs' claims are barred because Plaintiffs may not recover damages based on sales outside of

6   the United States:

7     (a)  Identify the damages, if any, Plaintiffs claim based on sales outside of the United

8         States;

9     (b)  State the facts that you rely on to support your contention;

10     (c)   Identify each Person you contend has knowledge of facts that support Your

11         contention; and

12     (d)  Identify each Document You contend supports Your contention

13   **RESPONSE TO INTERROGATORY NO. 23**

14   Irico reasserts and incorporates each of the General Objections and Objections to the

15   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

16   contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

17   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

18   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

19   schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

20   Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal

21   argument or legal conclusion.

22   Subject to and without waiving the objections stated above, Irico contends that Plaintiffs'

23   claims are barred in whole or in part to the extent that they are based on sales outside of the

24   United States. Irico contends that a certain unknown percentage of the CRTs contained within the

25   CRT products that Plaintiffs purchased were purchased from other countries. This contention is

26   based on the fact that Plaintiffs cannot identify which company manufactured the CRT within the

27   relevant CRT products. In the absence of knowing who manufactured the CRTs within its

28   products, Plaintiffs likewise cannot identify whether those CRTs were purchased from outside the

IRICO'S OBJECTIONS AND RESPONSES TO    41    Master File No. 07-cv-05944-JST
DPP ARCH ELECTRONICS INC.'S FIRST SET          MDL No. 1917
INTERROGATORIES

1    United States. Whether the CRTs themselves were purchased outside of the United States is

2    relevant in determining if Plaintiffs' claims are barred because Plaintiffs alleged that they were

3    injured on account of a price fixing conspiracy regarding CRTs as opposed to CRT products.

4    **INTERROGATORY NO. 24**

5          Do you contend that You purchased CRTs from other CRT manufacturers? If so:

6          (a)      State the facts that You rely on to support Your contention;

7          (b)      Identify each Person You contend has knowledge of facts that support Your

8                   contention; and

9          (c)      Identify each Document You contend supports Your contention.

10   **RESPONSE TO INTERROGATORY NO. 24**

11         Irico reasserts and incorporates each of the General Objections and Objections to the

12   Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

13   contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

14   Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

15   relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

16   schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

17   Cal. May 19, 2011). Irico reserves all rights to further supplement its responses at an appropriate

18   time following the substantial completion of depositions and expert discovery.

19         Subject to and without waiving the objections stated above, and based on its present

20   knowledge, Irico responds that it does not so contend.

21   **INTERROGATORY NO. 25**

22         Do You contend that You did not manufacture, market, sell and/or distribute CRT

23   Products in the United States during the Class Period? If so:

24         (a)      State the facts that You rely on to support Your contention;

25         (b)      Identify each Person You contend has knowledge of facts that support Your

26                  ccontention; and

27         (d)      Identify each Document You contend supports Your contention.

28   **RESPONSE TO INTERROGATORY NO. 25**

1    Irico reasserts and incorporates each of the General Objections and Objections to the

2    Definitions and Instructions set forth above. Irico further objects that this Interrogatory is a

3    contention interrogatory, served before fact depositions and/or expert analysis and disclosures.

4    Irico asserts that such discovery is premature given that no Irico witnesses have been deposed

5    relating to merits issues and expert analysis and disclosures are not contemplated by the Court's

6    schedule at this time. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D.

7    Cal. May 19, 2011). Irico reserves all rights to further supplement its responses at an appropriate

8    time following the substantial completion of depositions and expert discovery. Irico also objects

9    to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs

10   alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts

11   and evidence of events that did not take place.

12   Subject to and without waiving the objections stated above, and despite the Interrogatory's

13   demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

14   has been brought in the above captioned matter that indicates that Irico manufactured, sold, or dis-

15   tributed "CRT Products" in the United States during the class period. In particular, Irico will be

16   producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the

17   United States.

18   Irico is not aware of Irico ever manufacturing, marketing, selling, or distributing any

19   CRTs or CRT Products in the United States. Irico's sole attempt at establishing a presence in the

20   United States, through a joint venture called Irico (USA) Inc. ("Irico USA"), was a complete

21   failure that resulted in no sales of CRTs in the United States and ended in 2001 when the

22   company was sold without authorization by its General Manager, Liu Feng, who absconded with

23   the profits of the sale. *See* Irico's Supp. Resp. to Interrogatory No. 8 of the Direct Purchaser

24   Plaintiffs' First Set of Interrogatories, as set forth in Irico's Sixth Supp. Resps. to Direct

25   Purchaser Plaintiffs' First Set of Interrogatories, dated January 7, 2022. Irico further directs

26   Plaintiffs to the following documents: IRI-CRT-00003490.

27   Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

28   Zhaojie and Su Xiaohua.

Dated:  February 23, 2022                    BAKER BOTTS L.L.P.


                                             */s/ John M. Taladay*

                                             John M. Taladay (*pro hac vice*)
                                             Evan J. Werbel (*pro hac vice*)
                                             Thomas E. Carter (*pro hac vice*)
                                             Andrew L. Lucarelli (*pro hac vice*)
                                             700 K Street, N.W.
                                             Washington, D.C. 20001
                                             (202)-639-7700
                                             (202)-639-7890 (fax)
                                             Email: john.taladay@bakerbotts.com
                                                     evan.werbel@bakerbotts.com
                                                     tom.carter@bakerbotts.com
                                                     drew.lucarelli@bakerbotts.com

                                             Jonathan Shapiro (State Bar No. 257199)
                                             101 California Street, Suite 3600
                                             San Francisco, California 94111
                                             (415) 291-6200
                                             (415) 291-6300 (fax)
                                             Email: jonathan.shapiro@bakerbotts.com


                                             *Attorneys for Defendants*
                                             *IRICO GROUP CORP. and*
                                             *IRICO DISPLAY DEVICES CO., LTD.*

Exhibit O

# BAKER BOTTS LLP

| | | |
|---|---|---|
| 700 K STREET, NW<br>WASHINGTON, D.C.<br>20001-5736 | AUSTIN<br>BRUSSELS<br>DALLAS<br>DUBAI | MOSCOW<br>NEW YORK<br>PALO ALTO<br>RIYADH |
| TEL  +1 202.639.7700<br>FAX  +1 202.639.7890<br>BakerBotts.com | HOUSTON<br>LONDON | SAN FRANCISCO<br>**WASHINGTON** |

March 10, 2022

Evan Werbel
TEL: 202.639.1323
FAX: 202.585.4077
evan.werbel@bakerbotts.com

VIA E-MAIL (RICK@SAVERI.COM,
LAURENRUSSELL@TATP.COM)

R. Alexander Saveri
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111

Lauren C. Capurro
Trump Alioto Trump & Prescott LLP
2280 Union Street
San Francisco, CA 94123

      Re:    In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Master File
            No. 07-CV-944-JST

Dear Rick and Lauren:

      Irico writes in response to your February 15, 2022 letter regarding the Irico Defendants'
Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' Third Set of
Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., served on
January 21, 2022 ("Supplemental Responses"), as required by Judge Walker's December 22,
2021 Order (ECF No. 5978) ("Order") (the "Feb. 15 Letter").  Irico disagrees that its
Supplemental Responses were inadequate or failed to respond to the Order given the information
available to Irico—as we have explained numerous times, including in the Supplemental
Responses.  Accordingly, and as discussed in greater detail below, Irico stands on its responses
regarding several issues that you raised in the Feb. 15 Letter.  However, in the interests of
avoiding further motions practice regarding Irico's discovery, Irico will provide some
supplementation of its responses.  Irico addresses each of your points as follows:

      1.   Identification of "All Documents" in Judge Walker's Issue No. 6

      Irico does not agree with Plaintiffs' tortured parsing of Judge Walker's language in Issue
No. 6. Order at 7-8.  It was Judge Walker who wrote the detailed questions to which Irico needed
to reply.  He specifically ordered Irico to provide the enumerated information on "sales" and
Irico provided that information as required.  If Plaintiffs object to the language of the Order, they
should have raised the issue with the Court.

**BAKER BOTTS** LLP

R. Alexander Saveri                                   - 2 -                                   March 10, 2022
Lauren C. Capurro

Regardless, Irico's answers provided all available information, and Plaintiffs' suggestion that Irico somehow circumvented any obligation to provide otherwise responsive information is wrong. For example, Plaintiffs statement that Irico's responses made "no mention of documents reflecting or memorializing meetings or other communications with competitors," (Feb. 15 Letter at 1), assumes that Irico read some improper limitation into the Order. Rather, Irico's response did not include such documents because, based on its present knowledge, it has no reason to believe that such documents existed in Irico's files in the summer of 2008. Moreover, Plaintiffs' assertions that Irico did not acknowledge any communications with other CRT manufacturers is false. As explained in its response to No. 3 below, Irico has acknowledged that it exchanged emails with other members of the China CPT Industry Association regarding meetings of the trade association. *See* Supplemental Responses at 16. However, as Irico has stated repeatedly, it does not believe that any such emails were likely to have existed even at the end of 2007 due to Irico's email storage issues, let alone in the summer of 2008. The focus of Issue No. 6 was to identify "all documents . . . that would have been preserved" in the summer of 2008 had Irico's preservation efforts not been limited to sales of CRTs in the United States, and Irico believes that it has done so to the best of its present knowledge.

2.  Sales Reports identified in Issue No. 8

Plaintiffs' arguments about Irico's response to Issue No. 8 concerning sales reports, (Feb. 15 Letter at 2), are pure sophistry. Issue No. 8 required Irico to "[i]dentify by type all documents . . . during the period 1997 to 2007." Order at 8. By listing "Sales reports containing general CRT market information," (Supplemental Responses at 14), Irico was necessarily identifying that these reports existed at some point during the period 1997 to 2007, but further clarified that it could not confirm whether such reports were created during the period 1997 to 2004. By simple logic, that means that Irico acknowledged that the reports were created during the period 2005 to 2007.

In the interests of avoiding any additional and unnecessary debate over this issue, Irico is willing to supplement its response to include language that such reports were created during the period 2005 to 2007. Irico states for the record, and will state in any supplemental response, that its original response was proper and needed no clarification.

3.  Emails

First, contrary to Plaintiffs statement, (Feb. 15 Letter at 2), nowhere in Irico's responses, let alone its Response to Issue No. 8, did Irico state that "most employees did have personal email." Irico has no idea why Plaintiffs are making that claim. To the extent that Irico employees used personal email addresses in the course of their duties, Irico was not responsible for creating or maintaining those email addresses and does not have information regarding who used personal email addresses and when they were used beyond the limited circumstances addressed in Irico's most recent discovery responses. *See* Responses to Interrogatory Nos. 1 and 8 in Irico Defendants' Objections and Responses to Indirect Purchaser Plaintiffs' Fourth Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., February 23, 2022.

Active 79246374.1.DOCX

**BAKER BOTTS** LLP

R. Alexander Saveri                                  - 3 -                                  March 10, 2022
Lauren C. Capurro

Second, Irico has been unable to determine the exact date that it started using email as repeated many times.  To the best of its present knowledge, Irico's corporate email system came online around 2004 or 2005.  In addition, Irico has recently discovered that the company conducted a limited pilot email test utilizing a Microsoft Exchange server in the early-2000s.  As with its subsequent launch of corporate email, this test utilized the domain @ch.com.cn.  Irico has been unable to determine the exact timeline of the test, or the number or identity of users who participated in the test.  Irico understands that the test ended prior to Irico's launch of corporate email in the 2004/2005 time period.  Irico understands that no information from the test was transferred to the new email system or was otherwise retained.  Irico will supplement its responses to reflect this information.

Third, Irico believes that Plaintiffs' reference to the "reality that employees could print emails" is yet another attempt to create an issue where one does not otherwise exist.  Irico reviewed its archives and produced responsive materials.  If employees had printed emails and sent them to the archives, Irico would have produced them.  The fact that emails could have been printed does not mean that there were any printed (or electronic) emails that could have been preserved at the end of 2007.  Similarly, Irico never stated that *all* communications regarding "Notices from the Chinese Communist Party" were *required* to be preserved.  As an entity, Irico received these notices in a variety of ways, including by mail and at meetings of the Chinese government and Chinese Communist Party, and it was these original notices that were subject to potential preservation under the policies described in Irico's Response to Issue No. 11.

Fourth, Plaintiffs also are wrong when they say, (Feb. 15 Letter at 2-3), that Irico made "no mention" of "emails related to meetings of the Chinese Color Tube Industry."  The final bullet under the subheading "Emails" is titled "Planning for Meetings of the China CPT Industry Association" and states that "emails were exchanged between Irico and other Chinese CRT manufacturers regarding the scheduling and planning of meetings of the China CPT Industry Association, a trade organization for manufacturers of CPTs."  Supplemental Responses at 15.  Irico is not aware that any of these emails or those referenced by Plaintiffs still existed in Irico's files or other sources accessed by Irico's employees at the end of 2007.  Irico has also explained "[w]hat happened to these emails" by describing in numerous responses, including the Supplemental Responses, Irico's near constant need to overwrite email due to limited storage capacity.  *See, e.g.*, Supplemental Responses at 16.  Plaintiffs even cite to these facts earlier in their letter.  *See* Feb. 15 Letter at 2 ("[T]his section of the Supplemental Responses goes on to assert that Irico's email storage capacity was limited and that each individual account had limited capacity as well. It continues that 'the users of the accounts had to constantly delete emails in order to continue receiving new emails.'").

4.  <u>Customer Correspondence and Handwritten Working Notes</u>

It is not even clear to Irico what Plaintiffs are arguing, in this section.  Feb. 15 Letter at 3.  Again, by listing the categories "Correspondence with customers regarding CRT sales" and "Handwritten working notes" under this section, Irico stated that it believes that such materials were "regularly prepared" and existed during the period 1997 to 2007 as required by Judge Walker in Issue No. 8.  Plaintiffs' suggestion to the contrary is false.  Irico's responses provided

**BAKER BOTTS** LLP

R. Alexander Saveri                                    - 4 -                                    March 10, 2022
Lauren C. Capurro

the known information about the documents in these categories and clarified its present
understanding about how those documents were handled in the ordinary course of business.

      5.  <u>Liang Yuan</u>

      As requested, Irico has investigated this issue and understands that Liang Yuan left Irico
in March 2014.  Irico will supplement its Supplemental Responses to reflect this information.

      Irico will provide supplemental responses as outlined above by Friday, March 18, 2022.


          Sincerely,


          */s/ Evan Werbel*
          Evan Werbel


cc:    Geoffrey C. Rushing
       Matthew D. Heaphy
       Mario N. Alioto
       Daniel E. Birkhauser

Exhibit P

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
        evan.werbel@bakerbotts.com
        tom.carter@bakerbotts.com
        drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 4:07-cv-05944-JST (N.D. Cal.) |
| | MDL No. 1917 |
| This Document Relates to: | **IRICO DEFENDANTS' OBJECTIONS AND RESPONSES TO INDIRECT PURCHASER PLAINTIFFS' THIRD** |
| ALL INDIRECT PURCHASER ACTIONS | **SET OF INTERROGATORIES TO IRICO GROUP CORPORATION AND IRICO DISPLAY DEVICES CO., LTD.** |

PROPOUNDING PARTY:      Indirect Purchaser Plaintiffs

RESPONDING PARTIES:      Irico Group Corporation
                                       Irico Display Devices Co., Ltd.

SET NUMBER:      Third (3)

---

1    Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico

2  Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby provides these

3  responses to the Indirect Purchaser Plaintiffs' ("Plaintiff") Third Set of Interrogatories to Irico

4  Group Corporation and Irico Display Devices Co., Ltd., dated July 7, 2021 ("Interrogatories").

5  Irico reserves the right to amend or supplement these Objections and Responses (the

6  "Responses") to the extent allowed by the Federal Rules of Civil Procedure and the Local Rules

7  of Practice in Civil Proceedings before the United States District Court for the Northern District

8  of California ("Local Rules"). Subject to and without waiving any of Irico's General and Specific

9  Objections as set forth below, Irico is willing to meet and confer with Plaintiff regarding such

10  General and Specific Objections.

11    The following Responses are made only for purposes of this case. The Responses are

12  subject to all objections as to relevance, materiality and admissibility, and to any and all

13  objections on any ground that would require exclusion of any response if it were introduced in

14  court. All evidentiary objections and grounds are expressly reserved.

15    These Responses are subject to the provisions of the Stipulated Protective Order issued by

16  the Court on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated

17  "Confidential" in accordance with the provisions of the Protective Order.

18    **GENERAL OBJECTIONS**

19  Irico makes the following General Objections to Plaintiff's Interrogatories:

20    1.    Irico's Responses are based upon information available to and located by Irico as

21  of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states

22  that it has conducted, or will conduct, a diligent search, reasonable in scope, of those files and

23  records in its possession, custody, or control believed to likely contain information responsive to

24  Plaintiff's Interrogatories.

25    2.    No express, incidental, or implied admissions are intended by these Responses and

26  should not be read or construed as such.

27    3.    Irico does not intend, and its Responses should not be construed as, an agreement

28  or acquiescence with any characterization of fact, assumption, or conclusion of law contained in

---

IRICO'S OBJECTIONS AND RESPONSES TO          1          Master File No. 4:07-cv-05944-JST
IPP'S THIRD SET INTERROGATORIES                                MDL No. 1917

1   or implied by the Requests.

2         4.      To the extent that Irico responds to Plaintiff's Interrogatories by stating that Irico

3   will produce or make available for examination responsive information or documents, Irico does

4   not represent that any such information or documents exist. Irico will make a good faith and

5   reasonable attempt to ascertain whether information responsive to Plaintiff's Interrogatories exists

6   and is properly producible, and will produce or make available for examination non-privileged

7   responsive materials to the extent any are located during the course of a reasonable search.

8         5.      Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad,

9   unduly burdensome, oppressive, and duplicative to the extent that they seek information or

10  documents that are already in the possession, custody, or control of Plaintiff.

11        6.      Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose

12  obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any

13  Order of this Court.

14        7.      Irico objects to Plaintiff's Interrogatories to the extent that they request duplicative

15  discovery in violation of the Order Re Discovery And Case Management Protocol, ECF No.

16  1128. *See* Order Re Plaintiffs' Motions To Compel Supplemental Discovery From Toshiba And

17  Panasonic, ECF No. 4128, at 4 ("The Discovery Protocol (ECF No 1128), requires parties to

18  coordinate discovery and not file duplicative discovery. . . . The benefit redounds to all parties on

19  both sides of the litigation, by conserving the efforts required by plaintiffs and protecting

20  defendants against unnecessary duplication of effort.") (Report and Recommendation adopted in

21  full at ECF No. 4256).

22        8.      Irico objects to Plaintiff's Interrogatories to the extent they seek information that is

23  not relevant or disproportionate to the needs of the case.

24        9.      Irico objects to Plaintiff's Interrogatories to the extent that they are vague,

25  ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such

26  vague or ambiguous Interrogatories so as to provide for the production of responsive information

27  that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of

28  any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or

---

1   amend its Responses.

2       10.    Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that

3   are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous

4   Interrogatories so as to provide for the production of responsive information that is proportionate

5   to the needs of the case.

6       11.    Irico objects to Plaintiff's Interrogatories to the extent that they seek information

7   that is protected from disclosure by the attorney-client privilege, work product doctrine, joint

8   defense or common interest privilege, self-evaluative privilege, or any other applicable privilege

9   or immunity. Irico will provide only information that it believes to be non-privileged and

10  otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed

11  as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any

12  information or responsive documents subject to any such doctrine, privilege, protection or

13  immunity from production shall not constitute a general, inadvertent, implicit, subject-matter,

14  separate, independent or other waiver of such doctrine, privilege, protection or immunity from

15  production.

16      12.    Irico objects to Plaintiff's Interrogatories to the extent that they call for

17  information that is not in the possession, custody, or control of Irico. Irico also objects to the

18  extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties,

19  including but not limited to any of Irico's subsidiary or affiliated companies.

20      13.    Irico objects to Plaintiff's Interrogatories to the extent that responding would

21  require Irico to violate the privacy and/or confidentiality of a third party or confidentiality

22  agreement with a third party.

23      14.    Irico objects to Plaintiff's Interrogatories to the extent that they seek information

24  that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily

25  available from other sources.

26      15.    Irico objects to Plaintiff's Interrogatories to the extent that they seek information

27  or documents concerning transactions outside the United States. Such Requests are unduly

28  burdensome and disproportionate to the needs of the case as Plaintiffs' class definition is confined

---

IRICO'S OBJECTIONS AND RESPONSES TO          3          Master File No. 4:07-cv-05944-JST
IPP'S THIRD SET INTERROGATORIES                                MDL No. 1917

1    to "individuals and entities that indirectly purchased Cathode Ray Tube Products . . . in the United

2    States" (see Indirect Purchaser Plaintiffs' Fifth Consolidated Amended Complaint ("Complaint")

3    dated September 19, 2019).

4          16.     Irico objects to Plaintiff's Interrogatories to the extent that compliance would

5    require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body

6    of foreign jurisdictions.

7          17.     Irico's responses, whether now or in the future, pursuant to Plaintiff's

8    Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific

9    objections or (ii) an admission that such information or documents are either relevant or

10    admissible as evidence.

11          18.     Irico objects to Plaintiff's Interrogatories to the extent that they are compound

12    and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

13          19.     Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for

14    legal conclusions.

15          20.     Irico objects to the Interrogatories to the extent that they contain express or implied

16    assumptions of fact or law with respect to the matters at issue in this case.

17          21.     Irico objects to the Interrogatories to the extent they seek information or

18    documents that cannot be removed or transmitted outside China without violating the laws and

19    regulations of that country, including but not limited to restrictions on the transmission of state

20    secrets or trade secrets as those terms are defined under Chinese law.

21          22.     Irico reserves the right to assert additional General and Specific Objections as

22    appropriate to supplement these Responses.

23          These General Objections apply to each Interrogatory as though restated in full in the

24    responses thereto. The failure to mention any of the foregoing General Objections in the specific

25    responses set forth below shall not be deemed as a waiver of such objections or limitations.

26                   **GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

27          1.     Irico objects to the definition of "DPPs' Written Discovery" (Definition No. 1) on

28    the grounds that it is vague, ambiguous and overly broad.

2.       Irico objects to the definition of "IPPs' Written Discovery" (Definition No. 2) on the grounds that it is vague, ambiguous and overly broad.

3.       Irico objects to the definition of "Document" (Definition No. 3) to the extent it seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, any Order of this Court, or any other applicable laws.

4.       Irico objects to the definitions of "Including" and "Relating" (Definition No. 4) on the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to the extent that it seeks information protected by the attorney client or other applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or foreign law.

5.       Irico objects to the definitions of "You" and "Your" (Definition No. 5) to the extent that Plaintiff defines those terms to include the Irico's "present and former members, officers, agents, employees, and all other persons acting or purporting to act on their behalf, including all present and former members, officers, agents, employees, and all other persons exercising or purporting to exercise discretion, making policy, and make decisions." This definition is overbroad, unduly burdensome, vague, and ambiguous. In particular, Irico objects to this definition to the extent it purports to request information beyond the possession, custody, or control of Irico Group or Irico Display, including but not limited to information in the possession of non-parties and third parties where Irico lacks any duty to obtain or otherwise search for the information and for whom the Court lacks personal jurisdiction. Irico also objects to the inclusion of all "present or former employees, officers, directors, agents . . . or any other person acting on [the] behalf [of]" Irico within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

6.       Irico objects to Instruction No. 1 (related to disclosure of additional information) to the extent it purports to impose burdens or obligations broader than, inconsistent with, or not

authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 26(e).

7.      Irico objects to Instruction No. 2 (related to production of business records) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 33(d), Rule 26(b). Irico further objects to this Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any Orders of the Court.

8.      Irico objects to Instruction No. 3 (related to privileged information) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 33(d), Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any Orders of the Court, and on the grounds that it is vague, ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the extent it seeks information that would disclose personal confidential information and/or violate any and all rights of privacy under the United States Constitution or Article I of the Constitution of the State of California, or any other applicable law or state constitution, or that is otherwise prohibited from disclosure because to do so would cause Irico to violate legal and/or contractual obligations to any other persons or entities.

## SPECIFIC RESPONSES TO INTERROGATORIES
## INTERROGATORY NO. 1

State whether any Documents or information responsive to DPPs' Written Discovery and/or IPPs' Written Discovery were destroyed, discarded, erased, deleted, purged, or otherwise lost. If your answer is in any way in the affirmative:

(a) describe in detail the contents of each such document or information and the date it was destroyed, discarded, erased, deleted, purged or lost;

(b) identify each person or document custodian whose documents or information was

1        destroyed, discarded, erased, deleted, purged or lost;

2        (c) state the date on which each responsive document or information was destroyed,

3        discarded, erased, deleted, purged or lost;

4        (d) identify each person or document custodian who had any role or responsibility in

5        destroying, discarding, erasing, purging, deleting, or losing of each such document or

6        information; and

7        (e) describe in detail the circumstances under which each such document or information

8        was destroyed, discarded, erased, deleted, purged, or lost.

9    **RESPONSE TO INTERROGATORY NO. 1**

10        Irico reasserts and incorporates each of the General Objections and Objections to the

11    Definitions and Instructions set forth above. Irico further objects that this interrogatory is

12    duplicative and cumulative of other requests served on Irico, including but not limited to:

13    Interrogatory No. 16 of Direct Purchaser Plaintiffs' First Set of Interrogatories; Instruction Nos. 8

14    and 9 of Direct Purchaser Plaintiffs' First, Second, and Third Sets of Requests for Production of

15    Documents; Instruction No. 8 of Indirect Purchaser Plaintiffs' First Request for Production of

16    Documents from Defendants; and, Instruction Nos. 10 and 11 of Indirect Purchaser Plaintiffs'

17    Second Request for Production of Documents from Defendants. Such duplicative and cumulative

18    requests violate the Order Re Discovery And Case Management Protocol, ECF No. 1128. *See*

19    Order Re Plaintiffs' Motions To Compel Supplemental Discovery From Toshiba And Panasonic,

20    ECF No. 4128, at 4 ("The Discovery Protocol (ECF No 1128), requires parties to coordinate

21    discovery and not file duplicative discovery. . . . The benefit redounds to all parties on both sides

22    of the litigation, by conserving the efforts required by plaintiffs and protecting defendants against

23    unnecessary duplication of effort.") (Report and Recommendation adopted in full at ECF No.

24    4256).

25        Subject to and without waiving the objections stated above, Irico refers Plaintiff to the

26    following discovery responses previously served on Plaintiff: Irico's Supplemental Objections

27    and Responses to Interrogatory No. 16 as stated in Irico Defendants' Fourth Supplemental

28    Objections and Responses to Direct Purchaser Plaintiffs' First Set of Interrogatories; and, Irico's

1   Second Supplemental Objections and Responses to Interrogatory No. 16 as stated in Irico

2   Defendants' Fifth Supplemental Objections and Responses to Direct Purchaser Plaintiffs' First

3   Set of Interrogatories.

4   **INTERROGATORY NO. 2**

5   State whether Irico implemented a litigation hold to preserve potentially discoverable

6   evidence relating to the alleged misconduct in this litigation. If your answer is in the affirmative:

7   (a) state the date (or dates) that the litigation hold notice was issued;

8   (b) state the date when the litigation hold was implemented;

9   (c) describe in detail the scope of the litigation hold, including the categories of

10   documents, electronically stored information (ESI), or other tangible evidence that are

11   subject to the litigation hold;

12   (d) identify the recipients of the litigation hold notice; and

13   (e) describe any steps taken to ensure compliance with the litigation hold.

14   **RESPONSE TO INTERROGATORY NO. 2**

15   Irico reasserts and incorporates each of the General Objections and Objections to the

16   Definitions and Instructions set forth above. Irico further objects that this interrogatory to the

17   extent that it requests the disclosure of information protected by the attorney-client privilege or

18   attorney work product doctrine.

19   Subject to and without waiving the objections stated above, Irico responds that, in summer

20   2008, the company orally instructed key employees to preserve documents related to sales of CRT

21   to the United States. It was determined that Irico possessed no such documents. As discussed in

22   more detail below, all documents required to be maintained under Chinese law were preserved at

23   that time. Around September 2017, when Irico reentered the litigation for the purposes of

24   contesting jurisdiction and asserting a foreign sovereign immunity defense, Irico confirmed the

25   need to preserve existing documents relevant to the litigation from the time period 1995 to 2007

26   with managers from each operational department, including finance and accounting, legal, HR,

27   and sales. The managers conveyed this message orally to relevant employees under their

28   supervision.

In addition to the preservation efforts described above, and as Irico has explained in other discovery responses, *see* Irico's Supplemental Objections and Responses to Interrogatory No. 16 as stated in Irico Defendants' Fourth Supplemental Objections and Responses to Direct Purchaser Plaintiffs' First Set of Interrogatories, pursuant to Chinese law, the Ministry of Finance and State Archives Administration requires companies like Irico to maintain and preserve certain documents and materials, including but not limited to original invoices for sales, accounting books, general ledgers, financial accounting reports, and bank statements. *See* IRI-CRT-00000900. Irico is not aware of such archived records from 1995-2007 being destroyed given the retention periods required by the Chinese government. In addition, Irico's internal practices included the maintenance of additional archives of material related to operational documents, administrative documents, technical records and communications with agencies of the PRC government and Chinese Communist Party.[1] Irico is not aware of any such records from the 1995 to 2007 time period that were preserved in the various archives being destroyed.

## INTERROGATORY NO. 3

State whether Irico had any document retention policies in place during the period between 1995 and 2008. If your answer is in the affirmative, for each such policy:

(a) state whether it is a formal written policy;

(b) state when the policy was put in place;

(c) describe how the policy has changed over time if applicable; and

(d) provide a summary of the policy, including the length of required retention, categories of documents and ESI covered by the policy, and departments and/or employees to which the policy applied.

## RESPONSE TO INTERROGATORY NO. 3

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above. Irico further objects that this interrogatory is duplicative and cumulative of other requests served on Irico, including but not limited to: Request No. 3 of Direct Purchaser Plaintiffs' Second Set of Requests for Production of Documents and

---

[1] Additional information regarding the documents maintained in Irico's archives can be found in Irico's December 18, 2020 letter to Plaintiffs regarding discovery issues.

1   Request No. 3 of Indirect Purchaser Plaintiffs' Second Request for Production of Documents

2   from Defendants. Such duplicative and cumulative requests violate the Order Re Discovery And

3   Case Management Protocol, ECF No. 1128. *See* Order Re Plaintiffs' Motions To Compel

4   Supplemental Discovery From Toshiba And Panasonic, ECF No. 4128, at 4 ("The Discovery

5   Protocol (ECF No 1128), requires parties to coordinate discovery and not file duplicative

6   discovery. . . . The benefit redounds to all parties on both sides of the litigation, by conserving the

7   efforts required by plaintiffs and protecting defendants against unnecessary duplication of

8   effort.") (Report and Recommendation adopted in full at ECF No. 4256).

9       Subject to and without waiving the objections stated above, Irico responds that it believes

10   it had a written document retention policy in place during the period 1995 through 2008, although

11   Irico has not been able to locate a copy of the policy in effect during that time. Neither has Irico

12   been able to determine at what points in time the policy changed. Irico further believes that the

13   document retention policy would apply company wide as to the relevant categories of documents

14   required to be maintained.

15       Irico believes that its document retention policy during the period of 1995 to 2008 called

16   for the maintenance and preservation of hard-copy documents within Irico's corporate archives.

17   Pursuant to Chinese law, the Ministry of Finance and State Archives Administration requires

18   companies like Irico to maintain and preserve certain accounting archives, including but not

19   limited to original invoices for sales, accounting books, general ledgers, financial accounting

20   reports, and bank statements. *See* IRI-CRT-00000900. These documents were generally required

21   to be kept for a period of not less than thirty (30) years. Irico followed and continues to follow

22   these requirements.

23       In addition, Irico's internal practices included the maintenance of additional archives of

24   material related to operational documents, administrative documents, technical records, and

25   communications with agencies of the PRC government and Chinese Communist Party, including

26   the following:

27   • Documents related to engineering, scientific and technological inventions and

28       research projects, project development, and implementation of new designs.

---

IRICO'S OBJECTIONS AND RESPONSES TO        10        Master File No. 4:07-cv-05944-JST
IPP'S THIRD SET INTERROGATORIES                        MDL No. 1917

1        • Documents related to health, safety, and environmental policies.

2        • Documents related to party committee work, political activities and implemental of

3           policy, and awards issued at the national, ministerial, provincial, and municipal

4           levels.

5        Irico is not aware of records from the 1995 to 2008 time period that were preserved in the

6   various archives being destroyed. During the period 1995 through 2008, Irico did not have a

7   retention policy regarding or applicable to electronic documents or data.

8   **INTERROGATORY NO. 4**

9        State when and how You first learned of potential anticompetitive conduct concerning the

10  pricing of Cathode Ray Tubes.

11  **RESPONSE TO INTERROGATORY NO. 4**

12       Irico reasserts and incorporates each of the General Objections and Objections to the

13  Definitions and Instructions set forth above. Irico further objects to the undefined terms

14  "potential," "concerning" and "pricing" as they render the interrogatory vague and ambiguous.

15  Irico also objects to the undefined term "anticompetitive conduct" on the grounds that it calls for

16  a legal conclusion and is otherwise vague, ambiguous, and overbroad.

17       Subject to and without waiving the objections stated above, Irico responds that it first

18  learned of the allegations in Plaintiff's Complaint on December 25, 2007, when it received a

19  summons from the United States District Court for the Northern District of California in the matter

20  *Figone v. L.G. Electronics, Inc.*, 07-cv-6381.

21  **INTERROGATORY NO. 5**

22       For each of the following individuals who You no longer employ, state (1) the date s/he

23  ceased to be employed by You; (2) the reason for separation, (3) the Date his or her Documents

24  (electronic and separately, hard copy) were destroyed, (4) a description of how the Documents

25  were destroyed; (5) Your efforts to determine if the Documents can be retrieved, including the

26  Dates of any such efforts and; (6) the individual's last known address as reflected in Your

27  records:

28                    a. 陈德智(Chen Di Zhi)

---

IRICO'S OBJECTIONS AND RESPONSES TO        11        Master File No. 4:07-cv-05944-JST
IPP'S THIRD SET INTERROGATORIES                                 MDL No. 1917

1       b. 段诚(Duan Cheng)

2       c. 方良军(Fang Liang-Jun)

3       d. 符九全(Fu Jiuquan)

4       e. 葛迪(Ge Di)

5       f. 郭盟权(Guo Mengquan)

6       g. 李卫生(Li Wei-Sheng)

7       h. 梁援(Liang Yuan)

8       i. 刘宏武(Liu Hongwu)

9       j. Liu Linghai

10       k. 刘晓东(Liu Xiaodong)

11       l. 龙涛(Long Tao)

12       m. 马金泉(Ma Jinquan)

13       n. 牛新安(Niu Xinan)

14       o. 沙涛(Shan or Sa Tao)

15       p. 申小琳(Shen Xiaolin)

16       q. 宋世振(Song Shi-Zhen)

17       r. 陶魁(Tao Kui)

18       s. 王大明(Wang Da-Ming)

19       t. 王李广(Wang Li Guang)

20       u. 王平权(Wang Ping-Quan)

21       v. 王西民(Wang Ximin)

22       w. 魏建社(Wei Jian-She)

23       x. 魏致远(Wei Zhiyuan)

24       y. 文海洋(Wen Haiyang)

25       z. 奚建生(Xi Jiansheng)

26       aa. 许高文(Xu Gao-Wen)

27       bb. 姚军(Yao Jun)

28       cc. 张少文(Zhang Shaowen)

1       dd. 张虎山(Zhang Hushan)

2       ee. 甄小红(Zhen Xiao-Hong)

3       ff. 竺简(Zhu Jian)

4       gg. 邢道钦(Xing Daoqin)

5   **RESPONSE TO INTERROGATORY NO. 5**

6       Irico reasserts and incorporates each of the General Objections and Objections to the

7   Definitions and Instructions set forth above. Irico further objects to this interrogatory to the extent

8   the undefined term "destroy" renders the interrogatory ambiguous and vague, and therefore

9   overbroad and unduly burdensome. Irico also objects to this interrogatory as Plaintiff has not

10  demonstrated how the benefit of such information outweighs the significant burden to Irico of

11  requiring the company to search through historical records. Irico also objects to this interrogatory

12  to the extent that it purports to request information protected by the attorney-client and/or attorney

13  work product privileges.

14      Subject to and without waiving the objections stated above, Irico responds as follows:

15      a. 陈德智  (Chen Di Zhi): Chen Dizhi resigned from Irico as of April 2002.  Irico has

16          no address available for Chen Dizhi in its records.

17      b. 段诚 (Duan Cheng): Duan Cheng retired from Irico as of June 2015.  Duan

18          Cheng's last known address is 咸阳市人民路彩虹新区 152#-2-6-11 邮编 710021.

19      c. 方良军 (Fang Liang-Jun): Fang Liangjun retired from Irico as of June 2012.  Fang

20          Liangjun's last known address is 咸阳市人民路彩虹新区 113#-2-4-7 邮编

21          710021.

22      d. 符九全  (Fu Jiuquan): Fu Jiuquan retired from Irico as of March 2011.  Irico has

23          no address available for Fu Jiuquan in its records.

24      e. 葛迪  (Ge Di): Ge Di resigned from Irico as of May 2016.  Ge Di's last known

25          address is 咸阳市秦都区渭滨街道阳光小区 10 号楼 邮编 710021.

26      f. 郭盟权 (Guo Mengquan): Guo Mengquan retired from Irico as of May 2017.  Irico

27          has no address available for Guo Mengquan in its records.

28      g. 李卫生 (Li Wei-Sheng): Li Weisheng resigned from Irico as of January 2002.

1    Irico has no address available for Li Weisheng in its records.

2    h.  梁援 (Liang Yuan): Liang Yuan resigned from Irico as of March 2014.  Liang

3        Yuan's last known address is 咸阳市人民路彩虹小区 5-1-3-5 邮编 710021.

4    i.  刘宏武 (Liu Hongwu): Liu Hongwu resigned from Irico as of January 2014.  Irico

5        has no address available for Liu Hongwu in its records.

6    j.  Liu Linghai: Irico has no information regarding this individual in its records.

7    k.  刘晓东 (Liu Xiaodong): Liu Xiaodong resigned from Irico as of May 2010.  Irico

8        has no address available for Liu Xiaodong in its records.

9    l.  龙涛 (Long Tao): Long Tao resigned from Irico in May 2021.  Long Tao's last

10       known address is 陕西省咸阳市秦都区彩虹一路一号彩虹小区.

11   m.  马金泉 (Ma Jinquan): Ma Jinquan retired from Irico as of February 2005.  Ma

12       Jinquan's last known address is 咸阳市人民路/彩虹新区 115#-1-5-10 邮编

13       710021.

14   n.  牛新安 (Niu Xinan): Niu Xinan resigned from Irico as of December 2015.  Niu

15       Xinan's last known address is 咸阳市人民路彩虹新区 115#-2-5-东户 邮编

16       710021.

17   o.  沙涛 (Shan or Sa Tao): Sha Tao resigned from Irico as of December 2002.  Irico

18       has no address available for Sha Tao in its records.

19   p.  申小琳 (Shen Xiaolin): Shen Xiaolin retired from Irico as of October 2015.  Shen

20       Xiaolin's last known address is 咸阳市人民路彩虹新区 115#-1-5-10 邮编

21       710021.

22   q.  宋世振 (Song Shi-Zhen): Song Shizhen retired from Irico as of November 2004.

23       Song Shizhen's last known address is 咸阳市彩虹一路彩虹老区 52#-4-3-6 邮编

24       710021.

25   r.  陶魁 (Tao Kui): Tao Kui retired from Irico as of March 2014.  Irico has no

26       address available for Tao Kui in its records.

27   s.  王大明 (Wang Da-Ming): Wang Daming resigned from Irico as of July 2004.

28       Irico has no address available for Wang Daming in its records.

1        t.  王李广 (Wang Li Guang): Wang Liguang resigned from Irico as of April 2002.

2             Irico has no address available for Wang Liguang in its records.

3        u.  王平权 (Wang Ping-Quan): Wang Pingquan retired from Irico as of March 2012.

4             Wang Pingquan's last known address is 咸阳市人民路彩虹新区 137#-6-2-3 邮编

5             710021.

6        v.  王西民 (Wang Ximin): Wang Ximin retired from Irico as of November 2013.

7             Wang Ximin's last known address is 陕西省咸阳市秦都区彩虹一路一号彩虹小

8             区. Wang Ximin was interviewed in 2021 and reported that, at the time of his

9             departure and after submitting any documents required to be maintained in Irico's

10           archives, *see generally* Irico's Response to Interrogatory No. 3, he discarded his

11           remaining working files. Wang Ximin did not believe that any such documents

12           were from the time period 1995 to 2007.

13        w.  魏建社 (Wei Jian-She): Wei Jianshe retired from Irico as of April 2018. Wei

14           Jianshe's last known address is 珠海番溪庄 27-1-405 邮编 519000.

15        x.  魏致远 (Wei Zhiyuan): Wei Zhiyuan resigned from Irico as of September 2006.

16           Irico has no address available for Wei Zhiyuan in its records.

17        y.  文海洋 (Wen Haiyang): Wen Haiyang resigned from Irico as of September 2017.

18           Wen Haiyang's last known address is 咸阳市彩虹一路彩虹新家园 B 座 1 单元

19           六层 12 号 邮编 710021.

20        z.  奚建生 (Xi Jiansheng): Xi Jiansheng resigned from Irico as of April 2006. Irico

21           has no address available for Xi Jiansheng in its records.

22        aa. 许高文 (Xu Gao-Wen): Xu Gaowen resigned from Irico as of October 2014. Xu

23           Gaowen's last known address is 咸阳市彩虹一路彩虹小区 85#-3-3-5 邮编

24           710021.

25        bb. 姚军 (Yao Jun): Yao Jun resigned from Irico as of April 2018. Yao Jun's last

26           known address is 咸阳市建设路彩虹北家属区 70 号楼 邮编 710021.

27        cc. 张少文 (Zhang Shaowen): Zhang Shaowen retired from Irico as of March 2016.

28           Irico has no address available for Zhang Shaowen in its records.

dd. 张虎山 (Zhang Hushan): Zhang Hushan retired from Irico as of May 2018. Zhang Hushan's last known address is 咸阳市人民西路彩虹劳司 E-1-8-16 邮编 710021.

ee. 甄小红 (Zhen Xiao-Hong): Zhen Xiaohong resigned from Irico as of February 2014. Irico has no address available for Zhen Xiaohong in its records.

ff. 竺简 (Zhu Jian): Zhu Jian resigned from Irico as of December 1998. Irico has no address available for Zhu Jian in its records.

gg. 邢道钦 (Xing Daoqin): Xing Daoqin passed away in December 2011 and was no longer employed by Irico as of that date.

Irico has been unable to locate the requested, detailed information regarding the disposition of each former employee's records. Irico notes that some of these employees departed Irico over 20 years ago and many before this litigation began. Based on Irico's records practices for departing employees, Irico believes that any documents required to be maintained in Irico's archives as detailed in Irico's Response to Interrogatory No. 3 were collected from departing employee prior to their departure from Irico and preserved in the archives. As plaintiffs are aware, Irico has conducted an extensive review of its archives to identify materials responsive to this request and plaintiffs' other requests as well as discussed these discovery requests with available personnel, including but limited to archivists and IT personnel, in an attempt to identify responsive information. *See also* Irico's Supplemental Objections and Responses to Interrogatory No. 16 as stated in Irico Defendants' Fourth Supplemental Objections and Responses to Direct Purchaser Plaintiffs' First Set of Interrogatories; Irico's Second Supplemental Objections and Responses to Interrogatory No. 16 as stated in Irico Defendants' Fifth Supplemental Objections and Responses to Direct Purchaser Plaintiffs' First Set of Interrogatories.

## INTERROGATORY NO. 6

State whether any relationship has existed (e.g., by Your providing any type of payments such as severance or retirement pay or by Your providing any other form of benefit, including medical benefits or reemployment with a company that is affiliated with You) between You and each of the individuals listed in Interrogatory No. 5, letters (a) – (gg). If so, please state the type

1  of benefit and its duration.

2  **RESPONSE TO INTERROGATORY NO. 6**

3       Irico reasserts and incorporates each of the General Objections and Objections to the

4  Definitions and Instructions set forth above. Irico further objects to this interrogatory as

5  overbroad and unduly burdensome, as Plaintiff has not demonstrated how the benefit of such

6  information outweighs the significant burden to Irico of requiring the company to search through

7  historical records for such information. Irico also objects to this interrogatory to the extent it

8  purports to request information beyond the possession, custody, or control of Irico Group or Irico

9  Display, including but not limited to information in the possession of non-parties where Irico

10  lacks any duty to obtain or otherwise search for the information and for whom the Court lacks

11  personal jurisdiction.

12       Subject to and without waiving the objections stated above, Irico responds that no such

13  relationship exists with the identified former employees. Irico further responds that when an

14  employee ends his employment with Irico, his/her employment files are transferred to the archive

15  management agency of the government of the People's Republic of China, and his/her pension

16  and other benefits are paid directly by the government of the People's Republic of China.

17

18

19  Dated:  August 13, 2021          BAKER BOTTS L.L.P.

20

21                         */s/ John M. Taladay*

22                         John M. Taladay (*pro hac vice*)
                       Evan J. Werbel (*pro hac vice*)

23                         Thomas E. Carter (*pro hac vice*)
                       Andrew L. Lucarelli (*pro hac vice*)

24                         700 K Street, N.W.
                       Washington, D.C. 20001

25                         (202)-639-7700
                       (202)-639-7890 (fax)

26                         Email: john.taladay@bakerbotts.com
                            tom.carter@bakerbotts.com

27                              drew.lucarelli@bakerbotts.com

28                         Jonathan Shapiro (State Bar No. 257199)
                       101 California Street, Suite 3600

San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

1

## CERTIFICATE OF SERVICE

2

**In re: Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917**

3

I declare that I am employed in Washington, District of Columbia.  I am over the age of

4

eighteen years and not a party to the within case; my business address is:  Baker Botts L.L.P., 700

5

K Street, N.W., Washington, D.C. 20001.

6

On August 13, 2021, I served the following document(s) described as:

7

8

**IRICO DEFENDANTS' OBJECTIONS AND RESPONSES
TO INDIRECT PURCHASER PLAINTIFFS' THIRD SET
OF INTERROGATORIES TO IRICO GROUP CORPORATION
AND IRICO DISPLAY DEVICES CO., LTD.**

9

10

on the following interested parties in this action:

11

12

13

14

Guido Saveri (guido@saveri.com)
R. Alexander Saveri (rick@saveri.com)
Geoffrey C. Rushing (grushing@saveri.com)
Matthew D. Heaphy (mheaphy@saveri.com)
SAVERI & SAVERI, INC.
706 Sansome St # 200
San Francisco, CA 94111

Mario N. Alioto (malioto@tatp.com)
Lauren C. Capurro (laurenrussell@tatp.com)
TRUMP ALIOTO TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123

15

16

*Lead Counsel for the Direct Purchaser
Plaintiffs*

*Lead Counsel for the Indirect Purchaser
Plaintiffs*

17

18

19

Joseph Goldberg (jg@fbdlaw.com)
FREEDMAN BOYD HOLLANDER
GOLDBERG URIAS & WARD P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
D (505) 305-1263

Dan Birkhaeuser
(dbirkhaeuser@bramsonplutzik.com)
BRAMSON, PLUTZIK, MAHLER &
BIRKHAEUSER, LLP
2125 Oak Grove Rd, Suite 125
Walnut Creek, CA 94598

20

21

*Counsel for the Indirect Purchaser
Plaintiffs*

*Counsel for the Indirect Purchaser
Plaintiffs*

22

23

[X]     (BY ELECTRONIC MAIL) I caused such documents to be sent to the persons at the email
addressed listed above.  I did not receive, within a reasonable time after the transmission,
any electronic message or other indication that the transmission was unsuccessful.

24

25

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

26

August 13, 2021, in Rockville, Maryland.

27

28

*/s/  Andrew L. Lucarelli*
Andrew L. Lucarelli

Exhibit Q

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
         evan.werbel@bakerbotts.com
         tom.carter@bakerbotts.com
         drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

 *Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 4:07-cv-05944-JST (N.D. Cal.) |
| | MDL No. 1917 |
| This Document Relates to: | **IRICO DEFENDANTS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO INDIRECT PURCHASER PLAINTIFFS' THIRD SET OF INTERROGATORIES TO IRICO GROUP CORPORATION AND IRICO DISPLAY DEVICES CO., LTD.** |
| ALL INDIRECT PURCHASER ACTIONS | |

PROPOUNDING PARTY:          Indirect Purchaser Plaintiffs

RESPONDING PARTIES:          Irico Group Corporation
                                           Irico Display Devices Co., Ltd.

SET NUMBER:          Third (3)

1        Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation ("Irico

2    Group") and Irico Display Devices Co, Ltd. ("Irico Display," collectively, "Irico" or "Irico

3    Defendants") hereby provide these supplemental responses to the Indirect Purchaser Plaintiffs'

4    ("Plaintiff") Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices

5    Co., Ltd., dated July 7, 2021 ("Interrogatories"), as modified by the Special Master's December

6    22, 2021 Order Re DPPs' Motion to Compel Interrogatory Further Answers (ECF No. 5978).

7    Irico reserves the right to amend or supplement these Supplemental Objections and Responses

8    (the "Responses") to the extent allowed by the Federal Rules of Civil Procedure and the Local

9    Rules of Practice in Civil Proceedings before the United States District Court for the Northern

10    District of California ("Local Rules"). Subject to and without waiving any of Irico's General and

11    Specific Objections as set forth below, Irico is willing to meet and confer with Plaintiff regarding

12    such General and Specific Objections.

13        The following Responses are made only for purposes of this case. The Responses are

14    subject to all objections as to relevance, materiality and admissibility, and to any and all

15    objections on any ground that would require exclusion of any response if it were introduced in

16    court. All evidentiary objections and grounds are expressly reserved.

## **GENERAL OBJECTIONS**

18    Irico makes the following General Objections to Plaintiff's Interrogatories:

19    1.    Irico's Responses are based upon information available to and located by Irico as

20    of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states

21    that it has conducted a diligent search, reasonable in scope, of those files and records in its

22    possession, custody, or control believed to likely contain information responsive to Plaintiff's

23    Interrogatories.

24    2.    No express, incidental, or implied admissions are intended by these Responses and

25    should not be read or construed as such.

26    3.    Irico does not intend, and its Responses should not be construed as, an agreement

27    or acquiescence with any characterization of fact, assumption, or conclusion of law contained in

28    or implied by the Requests.

1      4.      Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad,

2 unduly burdensome, oppressive, and duplicative to the extent that they seek information or

3 documents that are already in the possession, custody, or control of Plaintiff.

4      5.      Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose

5 obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any

6 Order of this Court.

7      6.      Irico objects to Plaintiff's Interrogatories to the extent that they request duplicative

8 discovery in violation of the Order Re Discovery And Case Management Protocol, ECF No.

9 1128. *See* Order Re Plaintiffs' Motions To Compel Supplemental Discovery From Toshiba And

10 Panasonic, ECF No. 4128, at 4 ("The Discovery Protocol (ECF No 1128), requires parties to

11 coordinate discovery and not file duplicative discovery. . . . The benefit redounds to all parties on

12 both sides of the litigation, by conserving the efforts required by plaintiffs and protecting

13 defendants against unnecessary duplication of effort.") (Report and Recommendation adopted in

14 full at ECF No. 4256).

15      7.      Irico objects to Plaintiff's Interrogatories to the extent they seek information that is

16 not relevant or disproportionate to the needs of the case.

17      8.      Irico objects to Plaintiff's Interrogatories to the extent that they are vague,

18 ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such

19 vague or ambiguous Interrogatories so as to provide for the production of responsive information

20 that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of

21 any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or

22 amend its Responses.

23      9.      Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that

24 are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous

25 Interrogatories so as to provide for the production of responsive information that is proportionate

26 to the needs of the case.

27      10.      Irico objects to Plaintiff's Interrogatories to the extent that they seek information

28 that is protected from disclosure by the attorney-client privilege, work product doctrine, joint

1    defense or common interest privilege, self-evaluative privilege, or any other applicable privilege

2    or immunity. Irico will provide only information that it believes to be non-privileged and

3    otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed

4    as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any

5    information or responsive documents subject to any such doctrine, privilege, protection or

6    immunity from production shall not constitute a general, inadvertent, implicit, subject-matter,

7    separate, independent or other waiver of such doctrine, privilege, protection or immunity from

8    production.

9           11.    Irico objects to Plaintiff's Interrogatories to the extent that they call for

10   information that is not in the possession, custody, or control of Irico. Irico also objects to the

11   extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties,

12   including but not limited to any of Irico's subsidiary or affiliated companies.

13          12.    Irico objects to Plaintiff's Interrogatories to the extent that responding would

14   require Irico to violate the privacy and/or confidentiality of a third party or confidentiality

15   agreement with a third party.

16          13.    Irico objects to Plaintiff's Interrogatories to the extent that they seek information

17   that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily

18   available from other sources.

19          14.    Irico objects to Plaintiff's Interrogatories to the extent that they seek information

20   or documents concerning transactions outside the United States. Such Requests are unduly

21   burdensome and disproportionate to the needs of the case as Plaintiffs' class definition is confined

22   to "individuals and entities that indirectly purchased Cathode Ray Tube Products . . . in the United

23   States" (see Indirect Purchaser Plaintiffs' Fifth Consolidated Amended Complaint ("Complaint")

24   dated September 19, 2019).

25          15.    Irico objects to Plaintiff's Interrogatories to the extent that compliance would

26   require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body

27   of foreign jurisdictions.

28

1    16.     Irico's responses, whether now or in the future, pursuant to Plaintiff's

2    Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific

3    objections or (ii) an admission that such information or documents are either relevant or

4    admissible as evidence.

5    17.     Irico objects to Plaintiff's Interrogatories to the extent that they are compound

6    and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

7    18.     Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for

8    legal conclusions.

9    19.     Irico objects to the Interrogatories to the extent that they contain express or implied

10   assumptions of fact or law with respect to the matters at issue in this case.

11   20.     Irico objects to the Interrogatories to the extent they seek information or

12   documents that cannot be removed or transmitted outside China without violating the laws and

13   regulations of that country, including but not limited to restrictions on the transmission of state

14   secrets or trade secrets as those terms are defined under Chinese law.

15   21.     Irico reserves the right to assert additional General and Specific Objections as

16   appropriate to supplement these Responses.

17   These General Objections apply to each Interrogatory as though restated in full in the

18   responses thereto. The failure to mention any of the foregoing General Objections in the specific

19   responses set forth below shall not be deemed as a waiver of such objections or limitations.

20   ## GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

21   1.     Irico objects to the definition of "DPPs' Written Discovery" (Definition No. 1) on

22   the grounds that it is vague, ambiguous and overly broad.

23   2.     Irico objects to the definition of "IPPs' Written Discovery" (Definition No. 2) on

24   the grounds that it is vague, ambiguous and overly broad.

25   3.     Irico objects to the definition of "Document" (Definition No. 3) to the extent it

26   seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil

27   Procedure, the Local Rules, any Order of this Court, or any other applicable laws.

28   4.     Irico objects to the definitions of "Including" and "Relating" (Definition No. 4) on

the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to the extent that it seeks information protected by the attorney client or other applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or foreign law.

5. Irico objects to the definitions of "You" and "Your" (Definition No. 5) to the extent that Plaintiff defines those terms to include the Irico's "present and former members, officers, agents, employees, and all other persons acting or purporting to act on their behalf, including all present and former members, officers, agents, employees, and all other persons exercising or purporting to exercise discretion, making policy, and make decisions." This definition is overbroad, unduly burdensome, vague, and ambiguous. In particular, Irico objects to this definition to the extent it purports to request information beyond the possession, custody, or control of Irico Group or Irico Display, including but not limited to information in the possession of non-parties and third parties where Irico lacks any duty to obtain or otherwise search for the information and for whom the Court lacks personal jurisdiction. Irico also objects to the inclusion of all "present or former employees, officers, directors, agents . . . or any other person acting on [the] behalf [of]" Irico within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

6. Irico objects to Instruction No. 1 (related to disclosure of additional information) to the extent it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 26(e).

7. Irico objects to Instruction No. 2 (related to production of business records) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 33(d), Rule 26(b). Irico further objects to this Instruction to the extent that

1    it purports to impose burdens or obligations broader than, inconsistent with, or not authorized

2    under, the Local Rules and any Orders of the Court.

3        8.      Irico objects to Instruction No. 3 (related to privileged information) to the extent

4    that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized

5    under the Federal Rules of Civil Procedure, including, without limiting the generality of the

6    foregoing, Rule 33(d), Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction

7    to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or

8    not authorized under, the Local Rules and any Orders of the Court, and on the grounds that it is

9    vague, ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to

10   the extent it seeks information that would disclose personal confidential information and/or

11   violate any and all rights of privacy under the United States Constitution or Article I of the

12   Constitution of the State of California, or any other applicable law or state constitution, or that is

13   otherwise prohibited from disclosure because to do so would cause Irico to violate legal and/or

14   contractual obligations to any other persons or entities.

15                        **SPECIFIC RESPONSES TO INTERROGATORIES**

16   **INTERROGATORY NO. 2**

17        State whether Irico implemented a litigation hold to preserve potentially discoverable

18   evidence relating to the alleged misconduct in this litigation. If your answer is in the affirmative:

19        (a) state the date (or dates) that the litigation hold notice was issued;

20        (b) state the date when the litigation hold was implemented;

21        (c) describe in detail the scope of the litigation hold, including the categories of

22            documents, electronically stored information (ESI), or other tangible evidence that are

23            subject to the litigation hold;

24        (d) identify the recipients of the litigation hold notice; and

25        (e) describe any steps taken to ensure compliance with the litigation hold.

26   **RESPONSE TO INTERROGATORY NO. 2**

27        Irico reasserts and incorporates each of the General Objections and Objections to the

28   Definitions and Instructions set forth above. Irico further objects that this interrogatory to the

---

extent that it requests the disclosure of information protected by the attorney-client privilege or attorney work product doctrine.

Subject to and without waiving the objections stated above, Irico responds that, in summer 2008, the company orally instructed key employees to preserve documents related to sales of CRT to the United States. It was determined that Irico possessed no such documents. As discussed in more detail below, all documents required to be maintained under Chinese law were preserved at that time. Around September 2017, when Irico reentered the litigation for the purposes of contesting jurisdiction and asserting a foreign sovereign immunity defense, Irico confirmed the need to preserve existing documents relevant to the litigation from the time period 1995 to 2007 with managers from each operational department, including finance and accounting, legal, HR, and sales. The managers conveyed this message orally to relevant employees under their supervision.

In addition to the preservation efforts described above, and as Irico has explained in other discovery responses, *see* Irico's Supplemental Objections and Responses to Interrogatory No. 16 as stated in Irico Defendants' Fourth Supplemental Objections and Responses to Direct Purchaser Plaintiffs' First Set of Interrogatories, pursuant to Chinese law, the Ministry of Finance and State Archives Administration requires companies like Irico to maintain and preserve certain documents and materials, including but not limited to original invoices for sales, accounting books, general ledgers, financial accounting reports, and bank statements. *See* IRI-CRT-00000900. Irico is not aware of such archived records from 1995-2007 being destroyed given the retention periods required by the Chinese government. In addition, Irico's internal practices included the maintenance of additional archives of material related to operational documents, administrative documents, technical records and communications with agencies of the PRC government and Chinese Communist Party.[1] Irico is not aware of any such records from the 1995 to 2007 time period that were preserved in the various archives being destroyed.

///

///

---

[1] Additional information regarding the documents maintained in Irico's archives can be found in Irico's December 18, 2020 letter to Plaintiffs regarding discovery issues.

1    **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2**

2         On December 22, 2021, the Special Master issued the Order Re DPPs' Motion to Compel

3    Interrogatory Further Answers, ECF No. 5978, directing Irico to "to furnish supplemental

4    responses to Interrogatory No 2 as set forth below" and listing eleven (11) enumerated

5    paragraphs. In this Supplemental Response, Irico repeats below each issue identified by the

6    Special Master, corresponding to the enumerated paragraphs, and responds as follows:

7         **ISSUE NO. 1**

8         With respect to the communications or work product that Irico objected to identifying in

9    its response to Interrogatory No 2, Irico is directed to identify the dates of any such

10   communications or work product, the parties thereto, the subjects thereof and sufficient

11   information to enable the PPs and the undersigned to determine whether a claim of privilege or

12   protection is warranted.

13        **RESPONSE TO ISSUE NO. 1**

14        With respect to Irico's objection to discovery of any privileged communications or work

15   product requested by Interrogatory No. 2, Irico responds that it is not objecting to or withholding

16   any information on such a basis and therefore is not identifying any information in response to

17   Issue No. 1.

18        **ISSUE NO. 2**

19        Identify by names and positions at Irico at all times from 2007 to the present the "key

20   employees" referred to in Irico's response to Interrogatory No 2.

21        **RESPONSE TO ISSUE NO. 2**

22        Irico provides the following information about known "key employees" referenced in

23   response to Interrogatory No. 2.

24   • Tao Kui
25        ○ 05/2001 – 09/2013
               ▪ Irico Group, Party Secretary and Deputy General Manager
26        ○ 03/2013
               ▪ Member of the Party Leading Group of China Electronics Information
27                  Industry Group Co., Ltd.
          ○ 05/2013 – approx. 2014
28             ▪ Irico Group, Party Secretary and Director (*retired*)

---

IRICO'S SUPP. OBJS. AND RESPS. TO IPP'S        8        Master File No. 4:07-cv-05944-JST
THIRD SET INTERROGATORIES                                MDL No. 1917

- Wang Ximin
  - 2007 – 09/2011
    - Irico Display, General Manager
  - 09/2011 – 09/2013
    - Irico Group, General Economist and General Manager of Shaanxi Branch (*retired*)

- Shen Xiaolin
  - 08/2004 – 11/2007
    - Irico Group, Sales Company, General Manager
  - 11/2007 – 01/2009
    - Irico Display, Assistant to General Manager and General Manager of Sales Department
  - 01/2009 – 09/2013
    - Irico Display, Deputy General Manager, and General Manager of Sales Department
  - 09/2013 – 10/2015
    - Zhuhai Caizhu Limited Company, Managing Director (*retired*)

- Liu Maihai
  - Title as of June 2008
    - Irico Group Electronics Co., Ltd., Sales Director
  - Irico has been unable to confirm employment information for Liu Maihai, other than his title in June 2008 when the 2008 Litigation Committee was formed (see Response to Issue No. 3). Irico believes that Liu Maihai left Irico within several years of the filing of the lawsuit.

- Liang Yuan
  - Title as of June 2008
    - Irico Group Electronics Co., Ltd., Head of Overseas Department and Assistant to the General Manager of the Marketing Department
  - Irico has been unable to confirm employment information for Liang Yuan, other than her title in June 2008 when the 2008 Litigation Committee was formed (see Response to Issue No. 3). Irico believes that Liang Yuan left Irico within several years of the filing of the lawsuit.

Irico has conducted a search for more detailed employment information for Liu Maihai and Liang Yuan, including a review of Irico's HR files, but has not been able to find information beyond that listed above. Likewise, Irico cannot confirm the exact date that Tao Kui retired from Irico but, based on the best recollection of its available employees, believes that it is around 2014.

As discussed below in Irico's Response to Issue No. 4, each of these employees also communicated with employees under their supervisions in an effort to identify and preserve documents related to potential Irico sales of CRTs to the United States, if any such records existed.

**ISSUE NO. 3**

State how Irico determined that the persons identified in Irico's response to No 2, above, were determined to be "key employees."

**RESPONSE TO ISSUE NO. 3**

The Irico employees identified in Irico's Response to Issue No. 2, above, were members of a group of Irico employees appointed to oversee Irico's response to the litigations in the above referenced action (the "2008 Litigation Committee") in June 2008. The other members of the committee were Gao Rongguo, Director, Corporate Management Department, Irico Group, and Yan Yunlong, Legal Affairs Manager, Corporate Management Department, Irico Group. The employees identified in Irico's Response to Issue No. 2 were those with managerial responsibility for the departments at Irico that Irico believed would have documents related to potential Irico sales of CRTs to the United States, if any such records existed. Each of these individuals then selected the employees under their supervision who might have information regarding Irico sales of CRTs to United States, if any.

**ISSUE NO. 4**

Explain how the 2008 "oral instruction" referred to in Irico's response to Interrogatory No 2 was conveyed; specifically, Irico is required to identify by name and position all persons who conveyed the "oral instruction," the dates each such person conveyed the "oral instruction," the persons by names and positions at the time to whom the "oral instruction" was conveyed, the offices, facilities or other locations at which the "oral instruction" was conveyed, the content of the "oral instruction" and all reasons upon which Irico contends the "oral instruction" was effective if Irico so contends.

**RESPONSE TO ISSUE NO. 4**

The 2008 Litigation Committee held a meeting in August 2008 at Irico Group's headquarters building in Xianyang City during which the instructions to preserve documents were discussed. The instructions were conveyed to the employees identified in Irico's Response to Interrogatory No. 2 at this and subsequent meetings. At that time Irico understood that, given the instant litigation arose under the antitrust laws of the United States, the focus of the litigation was

1   on sales of CRTs to the United States. The individuals identified in the Response to Issue No. 2

2   were tasked to search for documents and to identify other employees under their supervision and

3   instruct them to search for documents that might relate to the Irico sales in the United States and

4   to preserve such documents, if any existed. Irico believes that these efforts to search for and

5   preserve documents would have occurred immediately after the above-referenced meetings of the

6   2008 Litigation Committee in August or September 2008.

7         Irico has conducted a thorough search for additional information requested by the Court in

8   Issue No. 4 but has been unable to find additional information. Specifically, it cannot find

9   documents detailing the specific information and its answers are based on the recollections of Yan

10  Yunlong, the only remaining Irico employee with knowledge of the dissemination of the oral

11  instruction in 2008. All of the members of the 2008 Litigation Committee other than Yan

12  Yunlong have retired or otherwise departed the company.

13        Yan Yunlong recalls that the employees identified in the Response to Issue No. 2

14  contacted relevant employees and searched for documents, but that no documents relevant to the

15  sales of CRTs by Irico to the United States were identified at that time. Despite best efforts, Irico

16  has been unable to identify the specific individuals contacted by the employees identified in

17  Response to Issue No. 2.

18        Irico believes that the oral instructions provided at the time were sufficient to preserve

19  documents related to potential sales by Irico to the United States. Irico acknowledges that at the

20  time it misunderstood the scope of document preservation in connection with the litigation in the

21  United States and cannot be certain that all documents related to Irico's global sales of CRTs

22  were preserved.

23  **ISSUE NO. 5**

24        Identify the information that confirms, or the basis to believe, that the "oral instruction"

25  referred to in Irico's response to Interrogatory No 2 was adequate to prevent the destruction of

26  evidence that otherwise would have been preserved in compliance with an otherwise adequate

27  litigation hold.

28

1

**RESPONSE TO ISSUE NO. 5**

2      Irico does not contend that the oral instruction in 2008 was effective in preserving all

3  documents related to its global sales of CRTs, however, because Irico did not sell CRTs to the

4  United States, Irico's search at the time did not identify any documents concerning Irico's sales of

5  CRTs to the United States and thus no documents on this topic were lost or destroyed.

6      **ISSUE NO. 6**

7      If the summer 2008 "oral instruction" referred to in Irico's response to Interrogatory No 2

8  had not been limited to "sales of CRT to the United States," but rather to sales of CRT without

9  regard to location, identify all documents and information that otherwise would been preserved.

10     **RESPONSE TO ISSUE NO. 6**

11     Irico has made best efforts to identify specific documents and information that might have

12  been preserved if the "oral instruction" in 2008 had not been limited to the United States. Nearly

13  all of the employees knowledgeable about what types of documents related to Irico's sales of

14  CRTs were created and/or maintained during the relevant time period are no longer employed by,

15  and are not available to, Irico. Identifying such specific documents that existed in 2008 is nearly

16  impossible given the time that has elapsed and the lack of employees with knowledge of these

17  issues. As discussed, Irico regularly preserved documents and information in its archives pursuant

18  to Chinese law and its internal practices so extensive information regarding Irico's global sales of

19  CRTs was preserved regardless of the oral instruction provided in 2008. These categories of

20  preserved documents are detailed in Irico's Response to Issue Nos. 7 and 11 and include several

21  categories of documents related to sales of CRTs, including but not limited to accounting records,

22  invoices, planning documents, some production and sales reports, and travel and entertainment

23  reimbursements. In terms of documents that would not have been preserved in the archives, Irico

24  identifies the following types of documents regarding Irico's global sales of CRTs that are more

25  likely to have existed in the summer of 2008:

26          • Sales reports containing general CRT market information;

27          • CRT sales contracts with customers;

28          • Recent correspondence with customers regarding CRT sales; and,

1    • Handwritten working notes regarding recent internal and customer meetings

2    attended by members of Irico's sales team.

3    Irico has not been able to verify that specific documents in these categories existed in

4    summer of 2008. As noted above, there may have been other categories of documents that existed

5    at the time of the oral litigation hold in 2008, but Irico cannot identify those documents at this

6    time.

7    **ISSUE NO. 7**

8    Identify by type all documents and information related to sales of CRT without regard to

9    location during the period 1997 to 2007 that were required to be preserved in accordance with

10    applicable Chinese law.

11    **RESPONSE TO ISSUE NO. 7**

12    During the period 1997 to 2007 Chinese law required companies such as Irico to retain

13    hard-copy documents that contained financial information derived from Irico's sales of CRTs

14    such as accounting books, general ledgers, and financial accounting reports, however, the only

15    documents directly related to sales of CRTs that were required to be maintained under Chinese

16    law were original invoices for sales of CRTs.

17    **ISSUE NO. 8**

18    Identify by type all documents related to sales of CRT without regard to location during

19    the period 1997 to 2007 that Irico generated, but was not required by Chinese authorities to

20    preserve, and describe the information that such documents contained.

21    **RESPONSE TO ISSUE NO. 8**

22    Irico has attempted to locate information regarding the types of documents related to the

23    sales of CRTs that Irico would have generated during the period 1997 to 2007 that were not

24    required to be preserved by Chinese authorities. As discussed above, nearly all of the employees

25    knowledgeable about what types of documents related to Irico's sales of CRTs were created

26    and/or maintained during the period 1997 to 2007 are no longer employed by, and are not

27    available to, Irico. Consistent with its retention practices, Irico believes that most of those

28    documents would not have been retained in the ordinary course of business and were unlikely to

1    have existed at the end of 2007. Identifying such specific documents, let alone their contents, is

2    nearly impossible given the time that has elapsed and the lack of employees with knowledge of

3    these issues. The information found by Irico regarding regularly prepared materials is detailed

4    below. Irico believes that it is likely that other categories of documents were generated but not

5    retained due to changes in Irico's business over the course of the relevant time period. For

6    example, Irico exited CDT production around 2002, and believes that it may not have retained

7    materials related to the sales of CDTs through 2007. Additionally, Irico stopped production of

8    various types of CPTs during the relevant time period, and re-deployed that space for other uses.

9    Finally, there may have been periodic or "one off" materials prepared during this time period, but

10   Irico is not aware of such materials today.

11           Sales reports containing general CRT market information

12           The sales department prepared weekly- and monthly-summaries of information collected

13   by its employees. Irico has been unable to determine whether such reports were created during the

14   period 1997 to 2004. The reports focused on Irico's customers, who were primarily Chinese

15   television manufacturers. Both the weekly- and monthly-reports generally included information

16   regarding customers, competitors and general market information. It is not clear how long those

17   materials were kept after their creation, and Irico is unable to determine whether such materials

18   would have existed at the time of the instruction to preserve.

19           CRT sales contracts with customers

20           Irico entered into sales contracts with some customers regarding its sales of CRTs. Some

21   contracts pertained to general terms for sales to that customer, including post-sale issues such as

22   shipping terms and procedures. Others pertained to specific transactions and included information

23   such as product description, product quantity, unit price, and invoice total. Irico believes that it is

24   unlikely that many of these documents existed at the end of 2007 because Irico exited CDT

25   production around 2002, and stopped production of various types of CPTs during the relevant

26   time period.

27   ///

28   ///

1        Correspondence with customers regarding CRT sales

2        Although Irico primarily communicated with customers face-to-face or over the phone, it

3   believes that some communications with customers would have taken place via facsimile.  The

4   contents of these facsimiles varied but generally contained information related to a customer's

5   purchase of CRTs that would be captured in the original sales invoice such as type, quantity, and

6   price. Facsimiles were not required to be maintained under Chinese law and were routinely

7   discarded in the ordinary course of Irico's business. Irico believes that it is unlikely that many of

8   these documents existed at the end of 2007 because Irico exited CDT production around 2002 and

9   stopped production of various types of CPTs during the relevant time period.

10       Handwritten working notes

11       Irico understands that individual employees may have taken handwritten notes while

12  performing their job functions. Irico believes that these were regularly discarded by the

13  employees during the course of their employment.  For example, Wang Zhaojie and Wang Ximin

14  regularly discarded such notes during the course of their employment but cannot recall any

15  specifics regarding those instances. The notes most likely covered the employees' regular

16  activities as members of Irico's sales department including notes of internal meetings, customer

17  contacts, and customer meetings. Wang Zhaojie also recalls taking notes related to individual

18  sales transactions (such as customer, quantity, and price) but discarded those notes shortly after

19  the sales documents were prepared. Irico believes that it is unlikely that many of these notes

20  existed at the end of 2007 because Irico exited CDT production around 2002, and stopped

21  production of various types of CPTs during the relevant time period. Additionally, by 2008 many

22  employees connected to Irico's sales were no longer employed by Irico, some of whom left much

23  earlier in the relevant time period.

24       Emails

25       Although Irico did not begin to use email until toward the end of the relevant time period,

26  many employees did not have their own email account at any time during the relevant time

27  period, and the company did not rely on email as a primary form of communication during any

28  point in the relevant time period. Irico is aware of emails sent or received on the following topics:

1      • Notices from Irico regarding corporate policies.

2      • Notices from the Chinese Communist Party.

3      • CRT manufacturing—Irico understands that its manufacturing plants sent periodic

4         emails related to the production of CRTs that may have discussed the quantity of

5         CRTs produced for a given time period, quality issues, and problems or incidents

6         that affected the production output. Irico understands that these were not sent on a

7         routine basis (i.e., daily, weekly, or monthly), but rather more sporadically because

8         as an organization Irico made no effort to routinize its use of email in the regular

9         course of business.

10     • Planning for Meetings of the China CPT Industry Association—Irico understands

11        that emails were exchanged between Irico and other Chinese CRT manufacturers

12        regarding the scheduling and planning of meetings of the China CPT Industry

13        Association, a trade organization for manufacturers of CPTs.

14  As noted in its prior discovery responses, Irico's email storage capacity was very limited during

15  the relevant time period, and each individual account had limited capacity as well. This meant that

16  the users of the accounts had to constantly delete emails in order to continue receiving new

17  emails. In addition to the account-level limitations, Irico's central email server likewise had

18  limited email storage and Irico was forced to routinely delete emails from the server in order to

19  create sufficient storage capacity for the company to continue to receive emails. During regular

20  working periods emails were deleted from the server three to five days after they were sent or

21  received on average, depending on the volume of email traffic. During periods of lower email

22  activity, such as during Chinese holidays, emails would be deleted less frequently and it is

23  possible that email for up to a fourteen day period would be retained on the company's return

24  from the holiday before Irico needed to resume a more regular schedule as business activities

25  returned to normal. For these reasons, and Irico's exit from many segments of the CRT market

26  prior to 2008, Irico is not able to determine whether email created during the relevant time period

27  existed at the end of 2007, or the volume or type of such email.

28  ///

Sales Data

Irico did not utilize electronic databases to store information related to sales of CRTs in a systematic or routine manner, but between 1999 and 2002 Irico Group's finance department sporadically entered information utilizing a database software called Newgrand. Specifically, during those years Irico entered partial revenue information from its sales of CRTs. During the period April 2006 through end of the 2007, Irico Display's finance department utilized a database program called Kingdee to track revenue and other accounting data related to sales of CRTs. All of these Newgrand and Kingdee data were produced to Plaintiffs during FSIA discovery. Irico does not believe that either database was, or is, a complete dataset for the period of time that those data were entered, as electronic databases are not among the categories of information required to be maintained under Chinese accounting laws and therefore were not considered important sources of information to Irico. But Irico is not aware of any Newgrand or Kingdee data that existed from the time period 1997 to 2007 but has not been provided to Plaintiffs.

Corporate Archives

As described previously and in the below Response to Issue No. 11, Irico also preserved various documents in its archives pursuant to its internal practices, some of which also related to sales of CRTs, including but not limited to planning documents, financial reports and some production and sales reports, which have not been detailed here.

**ISSUE NO. 9**

With respect to the 2017 "oral instruction" referred to in Irico's response to Interrogatory No 2, Irico is required to identify by name and position all persons who conveyed the "oral instruction," the dates each such person conveyed the "oral instruction," the persons by names and positions at the time to whom the "oral instruction" was conveyed, the offices, facilities or other locations at which the "oral instruction" was conveyed, the content of the "oral instruction" and all reasons upon which Irico contends the "oral instruction" was effective if Irico so contends.

**RESPONSE TO ISSUE NO. 9**

The 2017 oral instruction was conveyed by Zhang Wenkai, Deputy Director, Legal Affairs Department for Irico Group. The oral instruction asked the employees to preserve all existing and

1   identified information related to Irico's CRTs from 1995 to 2007 (without a geographic

2   limitation, i.e., not solely related to sales of CRTs to the United States), and to preserve any newly

3   found materials. The instruction was conveyed in meetings or discussions that occurred in

4   September and October 2017; Irico has reviewed its available files but has been unable to

5   determine the exact dates of the meetings. Mr. Zhang separately communicated the oral

6   instruction to the following employees:

7       • Zhong Yuming: Business Manager, Human Resources Department, Irico Group.

8           ○ Mr. Zhang met with Mr. Zhong in person in the offices of the Human

9             Resources Department located at Irico Group's headquarters, 1 Caihong

10            Road, Qindu District, Xianyang City, Shaanxi Province, People's Republic

11            of China.

12      • Yang Hua: Director, Finance Department, Irico Group.

13          ○ Mr. Zhang met with Ms. Yang in person in the offices of the Finance

14            Department located at Irico Group's headquarters, 1 Caihong Road, Qindu

15            District, Xianyang City, Shaanxi Province, People's Republic of China.

16      • Wang Zhaojie: General Manager, Irico Group New Energy Co., Ltd.  Formerly

17      Mr. Wang was Director of Sales, Irico Sales Company and Irico Sales Department.

18          ○ Mr. Zhang called Mr. Wang, who was not in his office at the time of the

19            call. Mr. Zhang believes that Mr. Wang was traveling in Hefei, Anhui

20            Province, People's Republic of China.

21      • Su Xiaohua: Vice General Manager of Xianyang Irico Photovoltaic Technology

22      Company; Vice General Manager of Irico Photoelectric Materials Company.

23      Formerly Mr. Su was the Vice General Manager, Planning, Irico Sales Company

24      and Irico Sales Department.

25          ○ Mr. Zhang and Mr. Su both recall that the instruction occurred during a

26            phone call, but neither can recall where Mr. Su was at the time of the call.

27            Mr. Su recalls that he was away from his office because his office was in

28            Irico Group's headquarters building, as was Mr. Zhang's, and he would

1  have met directly with Mr. Zhang if he had been in the office.

2  • Li Mei: Head of Archives, Irico Group.

3  o Mr. Zhang met with Ms. Li in person in the offices of the Archives

4  Department, located in the Information Center building on Irico Group's

5  main campus, 1 Caihong Road, Qindu District, Xianyang City, Shaanxi

6  Province, People's Republic of China.

7  • Gao Xiangfeng: Director, Information Center, Irico Group.

8  o Mr. Zhang met with Mr. Gao in person in the offices of the Information

9  Center, located in the Information Center building on Irico Group's main

10  campus, 1 Caihong Road, Qindu District, Xianyang City, Shaanxi

11  Province, People's Republic of China.

12  The 2017 oral instruction was effective because the employees identified above were the

13  remaining employees that Irico determined were likely to have access to, or were designated

14  representatives of departments that maintained, documents from 1995 to 2007 that existed at the

15  time that the instruction was communicated in September or October 2017. Furthermore, Irico is

16  not aware of any potentially responsive documents from the time period 1995 to 2007 that were

17  lost or destroyed after September 2017.

18  **ISSUE NO. 10**

19  Inasmuch as Irico's response to Interrogatory No 2 states that Irico is not aware of the

20  destruction of "original invoices for sales, accounting books, general ledgers, financial accounting

21  reports, and bank statements" from 1995 to 2007, Irico shall state whether it is prepared to

22  produce all such materials to the PPs? If not, why not?

23  **RESPONSE TO ISSUE NO. 10**

24  By agreement between the parties, Irico has produced the identified, responsive materials

25  from accounting books, general ledgers, financial reports, and bank statements, and will be

26  producing Excel files summarizing the information contained in original invoices for sales

27  pursuant to a forthcoming stipulation between the parties.

28  As Irico has previously explained to the Court and to Plaintiffs, Irico's accounting

1    archives as described in its Response to Interrogatory No. 2 are voluminous and contain

2    significant amounts of information unrelated to its production or sales of CRTs, including

3    information related to the public functions entrusted to Irico by the Chinese government,

4    including the provision of primary and secondary public schools, the local police department, a

5    hospital, public transportation, and public recreational facilities (*see* Irico Group Corp.'s Mot. to

6    Dismiss for Lack of Subject Matter Jur. at 5, ECF No. 5312), and other non-CRT business

7    interests. Irico and Plaintiffs have been meeting and conferring throughout the discovery period

8    regarding these documents regarding the burden of production outweighing the benefits of

9    producing all of these materials, including for Plaintiffs as said production would require

10   Plaintiffs to review and analyze a large volume of non-responsive information. As discussed

11   above, the Parties have agreed on the scope of production of these materials.

12          **ISSUE NO. 11**

13          Irico is directed to describe its "internal practices" for the maintenance of "material related

14   to operational documents, administrative documents, technical records and communications with

15   agencies of the PRC government and Chinese Communist Party."

16          **RESPONSE TO ISSUE NO. 11**

17          As discussed in more detail below and previously described in its initial response to

18   Interrogatory No. 2, Irico preserves documents within its corporate archives related to four main

19   categories: operational documents, administrative documents, technical records and

20   communications with agencies of the PRC government and Chinese Communist Party.

21   Documents preserved in these categories apply not only to the portion of Irico's business

22   concerning production and sales of CRTs, but also those related to the public functions entrusted

23   to Irico by the Chinese government, including the provision of primary and secondary public

24   schools, the local police department, a hospital, public transportation, and public recreational

25   facilities (*see* Irico Group Corp.'s Mot. to Dismiss for Lack of Subject Matter Jur. at 5, ECF No.

26   5312), and also other non-CRT business interests. Once a document is passed to the archives

27   department of Irico, a member of the archives team enters the document into the archives. The

28   documents are physically placed into bound-books, or into folders within bound books, and the

1   books are stored in the archives department at Irico's headquarters. Once placed in the archives,

2   the documents may not be damaged or destroyed without specific authorization.

3        Within each of the four categories described above, Irico maintains the following types of

4   documents in its corporate archives:

5   • Operational documents:

6        o Documents related to business decisions, including:

7             ▪ Strategic planning and long-term forecasting.

8             ▪ Development plans.

9             ▪ Work plans.

10            ▪ Changes in management.

11            ▪ Communications to or from government agencies regarding the

12              above topics.

13       o Documents related to accounting and finance, including:

14            ▪ Financial reports.

15            ▪ Financial planning.

16            ▪ Audited financial statements.

17            ▪ Loan applications.

18            ▪ Accounting policies.

19            ▪ Transfers of financial interests in other companies.

20            ▪ Communications to or from government agencies regarding any of

21              the above topics.

22       o Annual production and sales reports from 1995 to 2004.

23       o Status reports for procurement of raw materials.

24       o Communications to or from governmental entities regarding enterprise

25         decisions.

26       o Adjustments to corporate form, including subsidiaries.

27   • Administrative documents:

28       o Documents related to administrative matters, including:

1                  ▪    Year-end summaries of work completed in the prior year.

2                  ▪    Work plans for the coming year.

3                  ▪    Award notices.

4                  ▪    The minutes of annual administrative meetings and board of

5                      directors' meetings.

6                  ▪    Requests for approval of corporate development initiatives, changes

7                      to corporate form, and capital expenditures.

8                  ▪    Decisions on requests for approval of corporate development

9                      initiatives, changes to corporate form, and capital expenditures by

10                     governmental entities, including the State-owned Assets

11                     Supervision and Administrative Commission of the State Council

12                     (SASAC), and the Shaanxi provincial government.

13           o   Documents related to HR matters, including:

14                  ▪    Notices of the appointment to, or removal from, positions issued by

15                     various departments within the Chinese government including the

16                     Department of Personnel and Education, the Ministry of

17                     Information and Industry, the Economy and Trade Commission.

18                  ▪    Notices of the appointment to, or removal from, positions issued by

19                     Shaanxi provincial authorities.

20                  ▪    Notices of the appointment to, or removal from, positions issued by

21                     the government of the city of Xianyang.

22                  ▪    Notices of the appointment to, or removal from, positions issued by

23                     Irico.

24                  ▪    Policies issued by Irico and its subdivisions regarding HR matters.

25           o   Documents related to Irico's provision of educational facilities.

26           o   Documents related to environmental issues.

27         •  Technical records:

28           o   Quality management.

1          o   Labor-related matters.

2          o   Energy-related matters.

3          o   Production security.

4          o   Technology.

5          o   Environmental protection.

6          o   Metering work.

7          o   Standardization.

8          o   File information.

9      •   Chinese Communist Party-related matters:

10          o   Meeting minutes and plans of the Party.

11          o   Administrative matters.

12          o   Public relations matters.

13          o   Discipline and inspection matters.

14          o   Labor union matters.

15          o   Communist Youth League matters.

16          o   Association matters.

17   **INTERROGATORY NO. 4**

18       State when and how You first learned of potential anticompetitive conduct concerning the

19   pricing of Cathode Ray Tubes.

20   **RESPONSE TO INTERROGATORY NO. 4**

21       Irico reasserts and incorporates each of the General Objections and Objections to the

22   Definitions and Instructions set forth above. Irico further objects to the undefined terms

23   "potential," "concerning" and "pricing" as they render the interrogatory vague and ambiguous.

24   Irico also objects to the undefined term "anticompetitive conduct" on the grounds that it calls for

25   a legal conclusion and is otherwise vague, ambiguous, and overbroad.

26       Subject to and without waiving the objections stated above, Irico responds that it first

27   learned of the allegations in Plaintiff's Complaint on December 25, 2007, when it received a

28   summons from the United States District Court for the Northern District of California in the matter

1    *Figone v. L.G. Electronics, Inc.*, 07-cv-6381.

2    **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4**

3        Pursuant to the Special Master's December 22, 2021 Order Re DPPs' Motion to Compel

4    Interrogatory Further Answers, ECF No. 5978, the Court has ordered Irico to respond to the

5    following request:

6            State when Irico had reason to believe that manufacturers or

7            distributors of CRT had at any time after 1997 communicated with

8            one another about prices or output of CRT and how Irico came to

9            this belief.

10        Subject to and without waiving any of the objections as stated in its original response,

11    Irico is not aware of any evidence or testimony that Irico learned of competitor communmications

12    discussing prices or output of CRTs prior to August 1998. Irico further responds that one of its

13    employees may have learned of competitor communications regarding pricing of CRTs in early-

14    August 1998.  The documents of an alleged co-conspirator, Chunghwa Picture Tubes, indicate

15    that Irico was invited to participate in a meeting with other manufacturers of CDTs on August 5,

16    1998 in Shenzhen, People's Republic of China. Irico has not been able to determine its

17    employees' actual knowledge or understanding of the communications at that meeting, or the

18    extent to which they may have involved communications about prices or output of CRTs, because

19    the Irico employee who was alleged to have attended the August 5 meeting (again, based on a

20    document produced by Chunghwa Picture Tubes), Wang Zhaojie does not remember attending

21    the meeting or any details of the meeting. All other known employees of the Sales Company from

22    that time period are no longer employed by, and no longer available to, Irico.

23

24

25    Dated:  January 21, 2022               BAKER BOTTS L.L.P.

26

27                              */s/ John M. Taladay*

28                              John M. Taladay (*pro hac vice*)
                                   Evan J. Werbel (*pro hac vice*)

Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
        tom.carter@bakerbotts.com
        drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF SERVICE</u>

**In re: Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917**

I declare that I am employed in Washington, District of Columbia.  I am over the age of eighteen years and not a party to the within case; my business address is:  Baker Botts L.L.P., 700 K Street, N.W., Washington, D.C. 20001.

On January 21, 2022, I served the following document(s) described as:

**IRICO DEFENDANTS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO INDIRECT PURCHASER PLAINTIFFS' THIRD SET OF INTERROGATORIES TO IRICO GROUP CORPORATION AND IRICO DISPLAY DEVICES CO., LTD.**

on the following interested parties in this action:

| | |
|---|---|
| R. Alexander Saveri (rick@saveri.com) | Mario N. Alioto (malioto@tatp.com) |
| Geoffrey C. Rushing (grushing@saveri.com) | Lauren C. Capurro (laurenrussell@tatp.com) |
| Matthew D. Heaphy (mheaphy@saveri.com) | TRUMP ALIOTO TRUMP & PRESCOTT LLP |
| SAVERI & SAVERI, INC. | 2280 Union Street |
| 706 Sansome St # 200 | San Francisco, CA 94123 |
| San Francisco, CA 94111 | |

*Lead Counsel for the Direct Purchaser Plaintiffs*

*Lead Counsel for the Indirect Purchaser Plaintiffs*

Dan Birkhaeuser
(dbirkhaeuser@bramsonplutzik.com)
BRAMSON, PLUTZIK, MAHLER &
BIRKHAEUSER, LLP
2125 Oak Grove Rd, Suite 125
Walnut Creek, CA 94598

*Counsel for the Indirect Purchaser Plaintiffs*

[X]    (BY ELECTRONIC MAIL) I caused such documents to be sent to the persons at the email addressed listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 21, 2022, in Rockville, Maryland.

*/s/ Andrew L. Lucarelli*
Andrew L. Lucarelli

Exhibit R

## SAVERI & SAVERI, INC.
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813


January 27, 2023


*VIA EMAIL*

Evan J. Werbel
Baker Botts LLP
700 K Street, N.W.
Washington, D.C. 20001
evan.werbel@bakerbotts.com

      Re:    *In re Cathode Ray Tube (CRT) Antitrust Litigation* – MDL No. 1917,
              Master File No. 07-CV-5944-JST

Dear Evan:

      This letter follows up on your clients' responses to Direct Purchaser Plaintiff Arch's RFAs Nos. 161 through 167, served on February 23, 2022, regarding the authenticity and maintenance of documents your clients produced.[1] Now that Irico recently completed its document productions, the purpose of this letter is to respond to Irico's offer to "meet and confer with DPPs to discuss a more reasonable list of documents that could potentially be used at trial," as discussed in my May 19 letter to you and during our June 14 meet and confer call. DPPs propose the following narrowed list of Irico documents to which Irico would respond to RFAs Nos. 161 through 167:

| Production | Bates ranges |
|---|---|
| 1 | IRI-CRT-00000517-30; IRI-CRT-00000676-79; IRI-CRT-00000736-46; IRI-CRT-00000773-85; IRI-CRT-00000805-54 |
| 2 | IRI-CRT-00000953-1010; IRI-CRT-00001026-96 |
| 3 | IRI-CRT-00001097-101 |
| 4 | IRI-CRT-00001102-03 |
| 5 | IRI-CRT-00001104-98 |
| 6 | IRI-CRT-00001410-80 |
| 7 | IRI-CRT-00003490-517 |
| 8 | IRI-CRT-00003518-25 |
| 9 | IRI-CRT-00003526-43 |
| 10 | IRI-CRT-00003544-645 |
| 11 | IRI-CRT-00003646-4168 |

---

[1] The Indirect Purchaser Plaintiffs will address the authenticity/business record status of Irico's documents and documents produced by other parties by stipulation, as envisioned by the Court's Jan. 5, 2023 Stipulation and Order Re: Case Schedule, ECF No. 6135.

Evan J. Werbel
1/27/2023
Page 2

| Production | Bates ranges |
|---|---|
| 12 | IRI-CRT-00004169-5996 |
| 13 | IRI-CRT-00005997-8050 |
| 12 (rescans) | IRI-CRT-00008051-806; IRI-CRT-00008191-247; IRI-CRT-00008316-19; IRI-CRT-00008624-63; IRI-CRT-00008843-59 |
| 14 | IRI-CRT-00009038-231 |
| 15 | IRI-CRT-00009232-10769 |
| 16 | IRI-CRT-000010770-1993 |
| 17 | Bates beginning plus attachments: IRI-CRT-00012062; IRI-CRT-00012210; IRI-CRT-00012228; IRI-CRT-00012340; IRI-CRT-00012910; IRI-CRT-00013104; IRI-CRT-00013143; IRI-CRT-00013151; IRI-CRT-00013270; IRI-CRT-00013297; IRI-CRT-00013325; IRI-CRT-00013432; IRI-CRT-00013489; IRI-CRT-00013520; IRI-CRT-00014153; IRI-CRT-00014200; IRI-CRT-00014246; IRI-CRT-00014280; IRI-CRT-00014508; IRI-CRT-00014545; IRI-CRT-00014598; IRI-CRT-00014661; IRI-CRT-00014733; IRI-CRT-00015847; IRI-CRT-00016075; IRI-CRT-00016077; IRI-CRT-00016233; IRI-CRT-00016645; IRI-CRT-00016781; IRI-CRT-00016912; IRI-CRT-00017059; IRI-CRT-00017691; IRI-CRT-00017778; IRI-CRT-00018017; IRI-CRT-00018049; IRI-CRT-00018052; IRI-CRT-00018199; IRI-CRT-00018395; IRI-CRT-00018432 |
| 18 | Bates beginning plus attachments: IRI-CRT-00019577; IRI-CRT-00019658; IRI-CRT-00020033; IRI-CRT-00020052; IRI-CRT-00020107; IRI-CRT-00020219; IRI-CRT-00020375; IRI-CRT-00020490; IRI-CRT-00020558; IRI-CRT-00020615; IRI-CRT-00020615; IRI-CRT-00020753; IRI-CRT-00021989; IRI-CRT-00022324; IRI-CRT-00022410; IRI-CRT-00022938; IRI-CRT-00023164 |
| 19 | IRI-CRT-00023458-4836 |
| 20 | IRI-CRT-00024837-30210 |
| 21 | IRI-CRT-00030211-1551 |
| 22 | IRI-CRT-00031552-89 |
| 23 | IRI-CRT-00031590-3000 |
| 24 | IRI-CRT-00033001-08 |
| 25 | IRI-CRT-00033009-398 |
| 27 | IRI-CRT-00033400-02 (Dep. Ex. 8598) |
| n/a | IRICO-00001-22 (part of Dep. Ex. 8610) |

DPPs reserve their right to identify additional documents produced by Irico.

Evan J. Werbel
1/27/2023
Page 3

DPPs are available to meet and confer further regarding the above issues. Thank
you.

Very truly yours,

*s/ Geoffrey C. Rushing*

Geoffrey C. Rushing

Cc:  John M. Taladay
     Thomas E. Carter
     Andrew L. Lucarelli
     Kaylee Yang
     R. Alexander Saveri
     Matthew D. Heaphy
     Mario N. Alioto
     Lauren C. Capurro
     Daniel E. Birkhaeuser
     Alan R. Plutzik

crt.797

# Exhibit S

1  John Taladay (*pro hac vice*)
   john.taladay@bakerbotts.com
2  Erik Koons (*pro hac vice*)
   erik.koons@bakerbotts.com
3  BAKER BOTTS LLP
   1299 Pennsylvania Ave., NW
4  Washington, D.C. 20004
   Telephone: (202)-639-7700
5  Facsimile: (202)-639-7890

6  Stuart C. Plunkett (State Bar No. 187971)
   stuart.plunkett@bakerbotts.com
7  BAKER BOTTS LLP
   101 California Street, Suite 3600
8  San Francisco, California 94111
   Telephone: (415) 291-6200
9  Facsimile: (415) 291-6300

10 *Attorneys for Defendants*
   *IRICO GROUP CORP. and*
11 *IRICO DISPLAY DEVICES CO., LTD.*

12                    **UNITED STATES DISTRICT COURT**

13                  **NORTHERN DISTRICT OF CALIFORNIA**

14                        **SAN FRANCISCO DIVISION**

15

16 IN RE: CATHODE RAY TUBE (CRT)          Case No. 3:07-cv-05944-JST
   ANTITRUST LITIGATION
17                                         MDL No. 1917

18 ─────────────────────────────          **IRICO DEFENDANTS' THIRD**
                                          **SUPPLEMENTAL OBJECTIONS AND**
19 This Document Relates to:              **RESPONSES TO DIRECT**
                                          **PURCHASER PLAINTIFF STUDIO**
      ALL DIRECT PURCHASER ACTIONS        **SPECTRUM, INC.'S FIRST SET OF**
20                                        **INTERROGATORIES**
21 ─────────────────────────────

22 PROPOUNDING PARTY:          Direct Purchaser Plaintiff Studio Spectrum, Inc.

23 RESPONDING PARTIES:         Irico Group Corporation
24                             Irico Display Devices Co., Ltd.

25 SET NO.:                    One

26

27

28 ─────────────────────────────

1    Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico

2    Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby respond to the

3    Direct Purchaser Plaintiff Studio Spectrum, Inc.'s ("Plaintiff") First Set of Interrogatories

4    ("Interrogatories"). Irico reserves the right to amend or supplement these Objections and

5    Responses (the "Responses") to the extent allowed by the Federal Rules of Civil Procedure and

6    the Local Rules of Practice in Civil Proceedings before the United States District Court for the

7    Northern District of California ("Local Rules"). Subject to and without waiving any of Irico's

8    General and Specific Objections as set forth below, Irico is willing to meet and confer with

9    Plaintiff regarding such General and Specific Objections.

10    The following Responses are made only for purposes of this case. The Responses are

11    subject to all objections as to relevance, materiality and admissibility, and to any and all

12    objections on any ground that would require exclusion of any response if it were introduced in

13    court. All evidentiary objections and grounds are expressly reserved.

14    These Responses are subject to the provisions of the Stipulated Protective Order that the

15    Court issued on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated

16    "Confidential" in accordance with the provisions of the Protective Order.

17    ## GENERAL OBJECTIONS

18    Irico makes the following General Objections to Plaintiff's Interrogatories:

19    1.    Irico's Responses are based upon information available to and located by Irico as

20    of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states

21    that it has conducted, or will conduct, a diligent search, reasonable in scope, of those files and

22    records in its possession, custody, or control believed to likely contain information responsive to

23    Plaintiff's Interrogatories.

24    2.    No express, incidental, or implied admissions are intended by these Responses and

25    should not be read or construed as such.

26    3.    Irico does not intend, and its Responses should not be construed as, an agreement

27    or acquiescence with any characterization of fact, assumption, or conclusion of law contained in

28

or implied by the Interrogatories.

4.      To the extent that Irico responds to Plaintiff's Interrogatories by stating that Irico will produce or make available for examination responsive information or documents, Irico does not represent that any such information or documents exist. Irico will make a good faith and reasonable attempt to ascertain whether information responsive to Plaintiff's Interrogatories exists and is properly producible, and will produce or make available for examination non-privileged responsive materials to the extent any are located during the course of a reasonable search.

5.      Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiff.

6.      Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

7.      Irico objects to Plaintiff's Interrogatories to the extent they seek information that is not relevant to jurisdictional issues or disproportionate to the needs of the case in resolving such jurisdictional issues.

8.      Irico objects to Plaintiff's Interrogatories to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or amend its Responses.

9.      Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case.

10.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico will provide only information that it believes to be non-privileged and otherwise properly discoverable. None of Irico's responses is intended nor should be construed as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any information or responsive documents subject to any such doctrine, privilege, protection or immunity from production shall not constitute a general, inadvertent, implicit, subject-matter, separate, independent or other waiver of such doctrine, privilege, protection or immunity from production.

11.     Irico objects to Plaintiff's Interrogatories to the extent that they call for information that is not in the possession, custody, or control of Irico. Irico also objects to the extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties, including but not limited to any of Irico's subsidiary or affiliated companies.

12.     Irico objects to Plaintiff's Interrogatories to the extent that responding would require Irico to violate the privacy and/or confidentiality of a third party or confidentiality agreement with a third party.

13.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily available from other sources.

14.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information or documents concerning transactions outside the United States. Such Interrogatories are unduly burdensome and irrelevant because they do not relate to actions by Irico in or causing a direct effect in the United States.  Such Interrogatories are also unduly burdensome and irrelevant to this pending action as Plaintiffs' class definition is confined to "all persons . . . who directly purchased a Cathode Ray Tube Product . . . in the United States" (see Direct Purchaser Plaintiffs' Consolidated Amended Complaint).

15.    Irico objects to Plaintiff's Interrogatories to the extent that compliance would require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body of foreign jurisdictions.

16.    Irico's responses, whether now or in the future, pursuant to Plaintiff's Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific objections or (ii) an admission that such information or documents are either relevant or admissible as evidence.

17.    Irico objects to Plaintiff's Interrogatories to the extent that compliance would require Irico to seek information stored on backup or archived databases or other systems that are not readily accessible or otherwise no longer active.

18.    Irico objects to Plaintiff's Interrogatories to the extent that they are compound and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

19.    Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for legal conclusions.

20.    Irico objects to the Interrogatories to the extent that they contain express or implied assumptions of fact or law with respect to the matters at issue in this case.

21.    Irico reserves the right to assert additional General and Specific Objections as appropriate to supplement these Responses.

These General Objections apply to each Interrogatory as though restated in full in the responses thereto. The failure to mention any of the foregoing General Objections in the specific responses set forth below shall not be deemed as a waiver of such objections or limitations.

## GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.    Irico objects to the definitions of "You" and "Your" (Definition No. 6) to the extent that Plaintiff defines those terms to include the Irico's "predecessors, successors, subsidiaries, departments, divisions, and/or affiliates." This definition is legally incorrect, overbroad, unduly burdensome, vague, and ambiguous. Irico also objects to the inclusion of "all present and former directors, officers, Employees, agents, representatives or any Persons acting or

purporting to act on behalf of" Irico within this definition to the extent it purports to encompass information that is protected by attorney-client privilege, work product protection or any other applicable doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

2.     Irico objects to the definition of "Document" (Definition No. 8) to the extent it seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, or any other applicable laws.

3.     Irico objects to the definition of "Employee" (Definition No. 9) on the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to the extent that it seeks information protected by the attorney client or other applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or foreign law.

4.     Irico objects to the definitions of "CRT" and "CRT Products" (Definitions No. 10 and 11) on the grounds that they are vague, ambiguous and overly broad. Irico further objects to the use of the term "CRT Products" to the extent that it is inconsistent with the definition of "CRT Products" as set forth in Plaintiff's pleadings.

5.     Irico objects to the definition of the "Relevant Time Period" (Definition No. 12) as overbroad, unduly burdensome, beyond the applicable statute of limitations, and beyond the relevant time period for determining jurisdictional issues.

6.     Irico objects to the definition of "Communication" (Definition No. 14) on the grounds that it is vague, ambiguous, and overly broad. Irico further objects to this definition to the extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of Civil Procedure.

7.     Irico objects to the definition of "Meeting" (Definition No. 16) on the grounds that the definition is overly broad, unduly burdensome, and seeks information that is neither relevant nor proportionate to the needs of the case.

8.      Irico objects to Instruction No. 1 (related to identification of persons) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any orders of the Court, and on the grounds that it is vague, ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the extent it seeks information that would disclose personal confidential information and/or violate any and all rights of privacy under the United States Constitution or Article I of the Constitution of the State of California, or any other applicable law or state constitution, or that is otherwise prohibited from disclosure because to do so would cause Irico to violate legal and/or contractual obligations to any other persons or entities.

9.      Irico objects to Instruction No. 2 (related to identification of an entity other than a natural person) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

10.      Irico objects to Instruction No. 3 (related to the production of business records in response to an interrogatory pursuant to Federal Rule of Civil Procedure 33(d)) on the grounds that it is unduly burdensome and purports to impose burdens and obligations upon Irico beyond those required by the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

## SPECIFIC RESPONSES TO INTERROGATORIES

## INTERROGATORY NO. 20

Please describe with particularity Irico's sales and marketing of CRT Products in the United States during the Class Period, and/or attempts to sell or market any CRT Products in the United States during the Class Period, including:

a.      The identity of all Persons with knowledge of such sales and marketing and/or

1          attempts to sell or market CRT Products in the United States; and

2          b.          The identity of all Documents referring or relating to such sales and marketing

3                       and/or attempts to sell or market CRT Products in the United States.

4  **RESPONSE TO INTERROGATORY NO. 20**

5          Irico reasserts and incorporates each of the General Objections and Objections to the

6  Definitions and Instructions set forth above.  Irico further objects that this request seeks

7  information and documents beyond the scope of what is relevant to resolving jurisdictional issues

8  and beyond that authorized under the Court's April 25, 2018 Order Denying Plaintiffs' Motion to

9  Compel.  Irico also objects that this request is overbroad, unduly burdensome, and

10  disproportionate to the needs of the case in resolving jurisdictional issues.  Irico also objects to

11  this interrogatory on the grounds that identification of "all Persons" and "all Documents" is

12  overbroad, unduly burdensome, and disproportionate to the needs of the case.

13          Subject to and without waiving these objections and pursuant to Federal Rule of Civil

14  Procedure 33(d), Irico will produce or make available for inspection business records from which

15  the answer to this Interrogatory may be determined.

16          Irico further states that Guo Menquan and Tao Long have knowledge of this subject.

17  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 20**

18          Subject to and without waiving the objections stated above and pursuant to the Special

19  Master's August 2, 2018 order (Dkt. No. 5320), Irico responds as follows:

20          The managerial persons with knowledge of any United States sales of Irico's CRT

21  Products throughout the class period and their work histories are as follows:

22          • Tao Long (current employee)

23                    o  May 1992-Oct. 1996: Accountant in the Finance Department, Irico Group

24                    o  Oct. 1996-Nov. 2000: Chief of Finance, Irico CRT No. 1 Plant

25                    o  Nov. 2000-June 2007: Chief of Finance, Irico Group Glass Factory

26                    o  July 2009-Nov. 2009: Deputy Director (Finance), Irico Display

27                    o  Nov. 2009-Oct. 2010: Director (Capital Operation), Irico Display

28

1          o   Apr. 2010-present: Secretary to the Board of Directors, Irico Display

2          o   Aug. 2013-Apr. 2014 (concurrent): Director (Finance), Irico Display

3      •   Guo Mengquan (former employee, retired May 2017)

4          o   Sept. 1983-Jan. 1987: Technical employee, Shaanxi Color CRT Central

5              Plant

6          o   Jan. 1987-Sept. 1988: Associate Director (CPT Department), Shaanxi

7              Color CRT Central Plant

8          o   Sept. 1988-Jan. 1990: Director (CPT Department), Shaanxi Color CRT

9              Central Plant

10         o   Jan. 1990-Sept. 1996: Associate General Manager (Glass Plant), Shaanxi

11             Color CRT Central Plant

12         o   Sept. 1996-Apr. 2001: General Manager (Glass Plant), Shaanxi Color CRT

13             Central Plant

14         o   Apr. 2001-Apr. 2013: Deputy General Manager, Irico Group

15         o   Aug. 2005-Nov. 2007 (concurrent): General Manager, Irico Electronics

16         o   Nov. 2007-Aug. 2011 (concurrent): Deputy Chairman of the Board, Irico

17             Display

18         o   Apr. 2013-Apr. 2016: General Manager, Irico Group

19         o   June 2013-2015 (concurrent): Chairman of the Board, Irico Electronics

20         o   June 2013-May 2016 (concurrent): Chairman of the Board, Irico Display

21         o   Apr. 2016-May 2017: Deputy Chairman of the Board, Irico Group

22     •   Zhaojie Wang (current employee of Irico Group subsidiary)

23         o   Work history detailed at Dkt. No. 5313-2, ¶¶ 1-7.

24         Pursuant to the Special Master's August 2, 2018 order (Dkt. No. 5320), Irico will further

25     supplement this response by (1) identifying the locations of all repositories of any electronic

26     documents or files relating to United States sales of Irico's CRT Products and the legal

27     relationships of Irico and any entities that sold Irico's CRT Products in the United States

28
IRICO'S 3RD SUPP. OBJECTIONS AND          8          Master File No. 3:07-cv-05944-SC
RESPONSES TO DPP'S FIRST SET                          MDL No. 1917
INTERROGATORIES

throughout the class period; and (2) providing summary explanations of sales records relevant to United States sales of Irico's CRT Products and of "Irico's efforts to sell products in the U.S. during the class period."

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 20**

Subject to and without waiving the objections stated above and pursuant to the Special Master's August 2, 2018 order (Dkt. No. 5320), Irico provides the following responsive descriptions:

**1.    "Irico's efforts to sell products in the U.S. during the class period."**

During the relevant time period, Irico Group and Irico Display ("Irico") neither exported nor planned to export CRT products to the U.S.  Irico focused its production of CRTs on sales within the domestic Chinese market.  Such CRTs were generally considered outmoded by U.S. standards.  Thus, Irico did not target the U.S. market because its CRTs were several years behind the U.S. demand.

Irico is aware from review of customs records that an independent company, CNEIECC, resold samples of Irico's CRTs into the U.S. in an apparent effort to enter the U.S. market.  Irico understands this effort was ultimately a failure.  CNEIECC did not report these efforts to Irico at the time.

**2.    "Summary explanations of sales records relevant to United States sales of Irico's CRT Products and of Irico's efforts to sell products in the U.S. during the class period."**

First, Irico Group's corporate archives are located on the first and third floors of Building 102 of Irico Group Headquarters, 1 Caihong Road, Qindu District, Xianyang, Shaanxi Province, People's Republic of China.  These archives contain a total of over 150 file cabinets and over 5,500 file boxes, of which the following are potentially responsive to plaintiffs' discovery requests:

a)    Approximately 700 bound volumes of financial records for Irico Group, dated from 1995 to 2007 and organized chronologically.  These financial records include contracts, receipts, invoices, approvals from the government, and approvals issued

by Irico Group relating to operations, suppliers, investment, and financing. Each volume ranges from approximately 100 to 300 pages depending on the volume of transactions in each period.

b)     Approximately 150 bound account books for Irico Group, dated from 1995 to 2007and organized chronologically. These account books contain information on Irico Group's sales, assets, operations, and cash flow based on the financial documents described above. Each account book contains approximately 200 to 500 pages.

Second, additional financial archive files of Irico Group are located at the Caihong Building at 11 Shangdi Xinxi Road, Haidian District, Beijing, People's Republic of China. These archives contain approximately 730 bound volumes of financial records and over 70 account books dated between 1995 and 2007. These documents are organized chronologically and similar in content and size to the financial documents and account books described above at the Irico Group Headquarters location.

Third, Irico Display's corporate archives are stored within the archives of Shaanxi Irico Electronic Glass Co., a subsidiary of Irico Display. Approximately 1,500 bound account books for Irico Display, dated from 1995 to 2007 and organized chronologically. These account books contain information on Irico Display's sales, assets, operations, and cash flow. Each account book contains approximately 200 to 500 pages.

**3.     "Managerial persons with knowledge of any United States sales of Irico's CRT Products throughout the class period and their work histories"**

- **Ximin Wang:**

    o  08/1978 - 02/1988
        ▪  Irico 4400 Plant, Technician
    o  03/1988 – 08/1994
        ▪  Irico 4400 Plant CRT No.2 Plant, Director of the Electron Gun Department
    o  08/1994 – 10/1995
        ▪  Irico 4400 Plant, Director of Technical Department
    o  10/1995 - 01/1999
        ▪  Irico Color CRT General Plant, General Manager of Sales Company

- o  01/1999 – 04/2001
  - ▪  Irico Group Corporation, Deputy Director of Technical Center
- o  04/2001 - 12/2004
  - ▪  Irico Group Corporation, Director of Manufacturing Department
- o  12/2004 – 07/2005
  - ▪  Irico Electronics, Assistant to the CEO and General Manager of the Operation Department
- o  08/2005 – 11/2007
  - ▪  Irico Electronics, Deputy CEO; Irico Display, Chairman of the Board of Directors
- o  12/2007 – 09/2011
  - ▪  Irico Display, General Manager
- o  09/2011 – 09/2013
  - ▪  Irico Group Corporation, General Economist and General  Manager of Shaanxi Branch (*retired*)

- **Jian-she Wei:**

  - o  08/1981 – 12/1989
    - ▪  Irico 4400 Plant, a Team Leader of part of an assembly line
  - o  12/1989 – 08/1990
    - ▪  Caizhu Electronic Industry Company, Deputy General Manager
  - o  08/1990 – 01/1999
    - ▪  Caizhu Electronic Industry Company (now named Zhuhai Caizhu Industry Company), General Manager
  - o  01/1999 – 11/2000
    - ▪  Irico Group, Sales Company, Deputy General Manager
  - o  11/2000 – 01/2004
    - ▪  Irico Group, Sales Company, General Manager
  - o  01/2004 – 05/2005
    - ▪  Shenzhen Caihong Huangqi Electronic Information Company, Director, Deputy Chairman of the Board of Directors, General Manager
  - o  05/2005 – 04/2018
    - ▪  Zhuhai Caizhu Industry Company, on leave (*retired*)

- **Xiaolin Shen**

  - o  03/1984 – 01/1992
    - ▪  Irico Group Corporation, CRT Plant No. 1, Secretary of the company's office and Director of the company's office
  - o  10/1992 – 08/2004
    - ▪  Irico Group Corporation, Sales Company, Assistant to the General Manager and Deputy General Manager
  - o  08/2004 – 11/2007
    - ▪  Irico Group Corporation, Sales Company, General Manager
  - o  11/2007 – 01/2009

1
- Irico Display, Assistant to General Manager and General Manager of Sales Department

2
- o 01/2009 – 09/2013

3
- Irico Display, Deputy General Manager, and General Manager of Sales Department

4
- o 09/2013 – 10/2015

5
- Zhuhai Caizhu Limited Company, Managing Director (*retired*)

6
## THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 20

7
Subject to and without waiving the objections stated above and pursuant to the Special

8
Master's August 2, 2018 order (Dkt. No. 5320), Irico provides the following additional

9
supplemental response:

10

11
1. **"identifying the locations of all repositories of any electronic documents or files relating to United States sales of Irico's CRT Products"**

12
Irico does not possess any repository of electronic documents or files relating to United

13
States sales of Irico's CRTs.  Irico is aware of one database of electronic sales records that

14
contains sales information during the relevant period.  This database consists solely of non-U.S.

15
sales, and Irico is reviewing it for responsiveness.

16

17
2. **"identifying the locations of all repositories of any electronic documents or files relating to . . . the legal relationships of Irico and any entities that sold Irico's CRT Products in the United States throughout the class period"**

18
Irico's only records concerning the export or sale of its CRTs into the United States are

19
the hard-copy Chinese customs records of CNEIECC's sale of Irico CRTs, which have been

20
produced.  Irico itself made no sales of its products to the United States and is not aware of any

21
other entity that sold Irico's CRTs to the United States, and thus Irico does not have any other

22
documents or reports concerning any sale or attempted sale into the United States.

23
CNEIECC and Irico's relationship is one of customer and supplier.  The two companies

24
are separate entities that have had separate shareholders and management at all relevant times.

25
The only documents Irico is aware of relating to their relationship of the companies are (1) Irico's

26
invoices and receipts from sales to CNEIECC and (2) Irico's sales contracts with CNEIECC.

27
Chinese accounting rules and Irico's internal policies designate invoices—not contracts—as the

28

1    official records of sale.  Thus, Irico generally retains all invoices but has few sales contracts.

2    Irico's invoices and receipts from Irico's sales to CNEIECC are stored in Irico's corporate

3    archive located in Xianyang City.  As stated in Irico's May 4, 2018 initial responses, August 3rd

4    meet and confer, August 7th letter, August 22nd letter, and August 31st meet and confer, these

5    archival documents are available for inspection.  Irico will produce the contracts with CNEIECC

6    that it has located.

7

8    Dated:  September 4, 2018

9

10                                         /s/ Stuart C. Plunkett
                                           Stuart C. Plunkett (State Bar No. 187971)
11                                         stuart.plunkett@bakerbotts.com
                                           BAKER BOTTS LLP
12                                         101 California Street, Suite 3600
                                           San Francisco, California 94111
13                                         Telephone: (415) 291-6200
                                           Facsimile: (415) 291-6300
14
                                           John Taladay (*pro hac vice*)
15                                         john.taladay@bakerbotts.com
                                           Erik Koons (*pro hac vice*)
16                                         erik.koons@bakerbotts.com
                                           BAKER BOTTS LLP
17                                         1299 Pennsylvania Ave., NW
                                           Washington, D.C. 20004
18                                         Telephone: (202)-639-7700
                                           Facsimile: (202)-639-7890
19
                                           *Attorneys for Defendants*
20                                         *IRICO GROUP CORP. and*
                                           *IRICO DISPLAY DEVICES CO., LTD.*
21

22

23

24

25

26

27

28

IRICO'S 3RD SUPP. OBJECTIONS AND              13              Master File No. 3:07-cv-05944-SC
RESPONSES TO DPP'S FIRST SET                                  MDL No. 1917
INTERROGATORIES

1

## CERTIFICATE OF SERVICE

2

3      I declare that I am employed in the County of San Francisco, California.  I am over the age of eighteen years and not a party to the within case; my business address is: Baker Botts LLP, 101 California Street, Suite 3600, San Francisco, CA 94111.

4

5      On September 4, 2018, I served the following document(s) described as:

6

**IRICO DEFENDANTS' THIRD SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DIRECT PURCHASER PLAINTIFF STUDIO SPECTRUM, INC.'S FIRST SET OF INTERROGATORIES**

7

on the following interested parties in this action:

8

9      Guido Saveri (guido@saveri.com)                    Mario N. Alioto (malioto@tatp.com)
       R. Alexander Saveri (rick@saveri.com)              Lauren C. Capurro (laurenrussell@tatp.com)
10     Geoffrey C. Rushing (grushing@saveri.com)          Joseph M. Patane (jpatane@tatp.com)
       Cadio Zirpoli (cadio@saveri.com)                   TRUMP, ALIOTO, TRUMP & PRESCOTT,
       Matthew D. Heaphy (mheaphy@saveri.com)             LLP
11     SAVERI & SAVERI, INC.                              2280 Union Street
       706 Sansome St # 200,                              San Francisco, CA 94123
12     San Francisco, CA 94111

13     *Lead Counsel for the Direct Purchaser*            *Lead Counsel for the Indirect Purchaser*
       *Plaintiffs*                                       *Plaintiffs*

14

15     Christopher Micheletti
       (cmicheletti@zelle.com)
       Qianwei Fu (qfu@zelle.com)
16     ZELLE LLP
       44 Montgomery Street, Suite 3400
17     San Francisco, CA 94104-4807
       D (415) 633-1912

18
       *Lead Counsel for the Indirect Purchaser*
19     *Plaintiffs*

20

21     [  ]    (BY OVERNIGHT DELIVERY) I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses listed above. I placed the envelope or package for collection and overnight delivery at an office or regularly utilized drop box of the overnight delivery carrier.

22

23     [  ]    (BY MAIL) by placing a true copy thereof in a sealed envelope with postage fully prepaid and addressed to the persons at the addresses as shown above.  I am readily familiar with the business practice of Baker Botts LLP for collection and processing of correspondence for mailing with the United States Postal Service, and the correspondence would be deposited with United States Postal Service that same day in the ordinary course of business.

24

25

26

27

28

IRICO'S 3RD SUPP. OBJECTIONS AND              14              Master File No. 3:07-cv-05944-SC
RESPONSES TO DPP'S FIRST SET                                  MDL No. 1917
INTERROGATORIES

1    [X]    (BY ELECTRONIC MAIL) I caused such documents to be sent to the persons at the
            email addressed listed above.  I did not receive, within a reasonable time after the
2           transmission, any electronic message or other indication that the transmission was
            unsuccessful.
3
            I declare under penalty of perjury under the laws of the State of California that the
4    foregoing is true and correct.  Executed on September 4, 2018, 2012 at San Francisco, California.

5
                                        */s/ Reilly T. Stoler*
6                                        Reilly T. Stoler

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
     IRICO'S 3RD SUPP. OBJECTIONS AND            15            Master File No. 3:07-cv-05944-SC
     RESPONSES TO DPP'S FIRST SET                             MDL No. 1917
     INTERROGATORIES

# Exhibit T



April 5, 2023

**Certification**

<div align="center">

**Welocalize Translations**

</div>

**TRANSLATOR'S DECLARATION:**

I, Ann Chen, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of the document with bates number: IRI-SU-000131.

*(Digital or printed signature here above the line)*

Ann Chen

_____

**Ann Chen**

Project Number: BBLLP_2303_P0007

<div align="center">

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870

</div>





CONFIDENTIAL

IRI-SU-000131

# Exhibit U



April 5, 2023

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, Ann Chen, hereby declare:

That I possess advanced knowledge of the Chinese and English languages. The attached Chinese into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of the document with bates numbers range: IRI-SU-000133 - IRI-SU-000134.

*(Digital or printed signature here above the line)*

Ann Chen

_____

**Ann Chen**

Project Number: BBLLP_2303_P0007

15 W. 37th Street 4th Floor
New York, NY 10018
212.581.8870



CONFIDENTIAL          Translation                    IRI-SU-000133E



CONFIDENTIAL            Translation                            IRI-SU-000134E



**CONFIDENTIAL**



**CONFIDENTIAL**

Exhibit V

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4

5  IN RE: CATHODE RAY TUBE (CRT)  ) MASTER FILE NO.
   ANTITRUST LITIGATION           ) CV-07-5944 JST
6  _____ )
                                  )
7  THIS DOCUMENT RELATES TO:      )
                                  )
8  ALL INDIRECT PURCHASER ACTIONS )
   ALL DIRECT PURCHASER ACTIONS   )
9                                 )
           DEFENDANTS.            )
10 _____ )

11

12

13         VIDEOTAPED DEPOSITION OF WANG ZHAOJIE

14                     VOLUME I

15            TUESDAY, SEPTEMBER 20, 2022

16               MACAU S.A.R., CHINA

17

18

19

20  JOB NO. 5436453

21

22  REPORTED BY  MARK McCLURE, CRR

23               CAL CSR 12203

24

25

                                        Page 1

| | | |
|---|---|---|
| 1 | those expenses, is that correct? | 10:03:26 |
| 2 | MR. LUCARELLI:  Object to form. | 10:03:28 |
| 3 | THE WITNESS:  At any rate, I'm not sure what | 10:04:15 |
| 4 | you're saying, but at any rate, I would go out of the | 10:04:17 |
| 5 | town for business.  When I come back, I would apply for | 10:04:21 |
| 6 | reimbursement.  When I do that, I would have to attach | 10:04:24 |
| 7 | evidences of the expenses, and then that would require | 10:04:32 |
| 8 | signature from relevant supervisors. | 10:04:38 |
| 9 | BY MS. CAPURRO: | 10:04:38 |
| 10 | Q.   Is it fair to say that you would always submit | 10:04:46 |
| 11 | accurate reimbursement requests and receipts to ensure | 10:04:49 |
| 12 | that you received full reimbursement for your travel | 10:04:52 |
| 13 | expenses? | 10:04:55 |
| 14 | A.   What was the question? | 10:04:57 |
| 15 | Q.   In submitting the travel reimbursement | 10:05:20 |
| 16 | requests, you would always be accurate in making those | 10:05:23 |
| 17 | requests, correct? | 10:05:25 |
| 18 | A.   Are you referring to the receipts? | 10:05:26 |
| 19 | Q.   The receipts and the requests for | 10:05:44 |
| 20 | reimbursement, assuming there was a form that you had to | 10:05:47 |
| 21 | fill out.  I think that's what you testified previously. | 10:05:50 |
| 22 | MR. LUCARELLI:  Object to form. | 10:05:53 |
| 23 | THE WITNESS:  Your question is convoluted, but | 10:06:23 |
| 24 | at any rate, I just applied for the reimbursement and | 10:06:26 |
| 25 | then get the signature and get the reimbursement based | 10:06:29 |

Page 42

| | | |
|---|---|---|
| 1 | on actual expenses. | 10:06:35 |
| 2 | BY MS. CAPURRO: | 10:06:43 |
| 3 | Q.   How soon after you return from your business | 10:06:43 |
| 4 | trips would you submit your requests for reimbursement? | 10:06:45 |
| 5 | A.   I'm not sure. | 10:07:01 |
| 6 | Q.   And since you were traveling so much as part | 10:07:08 |
| 7 | of your job for Sales Company, this financial | 10:07:10 |
| 8 | reimbursement procedure would have been something you | 10:07:13 |
| 9 | did on a regular basis, correct? | 10:07:15 |
| 10 | MR. LUCARELLI:  Object to form. | 10:07:31 |
| 11 | THE WITNESS:  Correct. | 10:07:32 |
| 12 | BY MS. CAPURRO: | 10:07:32 |
| 13 | Q.   Mr. Wang, during the relevant time period, did | 10:07:46 |
| 14 | you have your own personal work computer? | 10:07:49 |
| 15 | A.   You mean during this period? | 10:08:08 |
| 16 | Q.   Yes. | 10:08:12 |
| 17 | A.   No. | 10:08:14 |
| 18 | Q.   So you never had a laptop computer that you | 10:08:15 |
| 19 | would take with you on your business trips? | 10:08:18 |
| 20 | A.   No. | 10:08:21 |
| 21 | Q.   And you didn't have a desktop computer in your | 10:08:32 |
| 22 | office that you would use to work -- or for work? | 10:08:36 |
| 23 | A.   Since I went out of town for business often, | 10:08:39 |
| 24 | but the office had computers. | 10:09:02 |
| 25 | Q.   How did you conduct business when you were | 10:09:08 |

Page 43

| | | |
|---|---|---|
| 1 | traveling without a computer? | 10:09:10 |
| 2 | A.   Well, first of all, I went out of town for | 10:09:12 |
| 3 | business quite often, so without a computer.  I could do | 10:10:06 |
| 4 | business just the same because we had regular customers | 10:10:11 |
| 5 | and we would communicate over the phone.  So once we | 10:10:19 |
| 6 | met, the deal would be sealed.  So without a computer, | 10:10:24 |
| 7 | we would conduct the business just as well. | 10:10:30 |
| 8 | Q.   When did you start using email, Mr. Wang? | 10:10:38 |
| 9 | A.   I cannot remember clearly. | 10:10:41 |
| 10 | Q.   Did you not use email at all during the | 10:10:51 |
| 11 | relevant period? | 10:10:53 |
| 12 | A.   I cannot remember clearly.  I really cannot | 10:10:57 |
| 13 | because it has been such a long time.  I started to use | 10:11:11 |
| 14 | email much later. | 10:11:15 |
| 15 | Q.   So you would keep your business documents in | 10:11:37 |
| 16 | hard copy in your office, is that correct? | 10:11:40 |
| 17 | MR. LUCARELLI:  Object to form. | 10:11:42 |
| 18 | THE WITNESS:  Please repeat this question. | 10:11:56 |
| 19 | MS. CAPURRO:  Would the court reporter read | 10:12:14 |
| 20 | back the question. | 10:12:18 |
| 21 | (Record read by reporter: | 10:12:19 |
| 22 | "QUESTION:  So you would keep your | 10:11:38 |
| 23 | business documents in hard copy in your | 10:11:39 |
| 24 | office, is that correct?") | 10:11:41 |
| 25 | THE WITNESS:  I don't know specifically what | 10:12:28 |

Page 44

```
 1   you're referring to.  However, for the most part,        10:12:34

 2   documents would be printed out.                          10:12:38

 3   BY MS. CAPURRO:                                          10:12:38

 4        Q.   Printed out from a computer, then, correct?    10:12:41

 5        A.   Correct.                                       10:12:44

 6        Q.   But not your computer, is that right?          10:12:50

 7        A.   Correct, only the company's office had the     10:12:55

 8   printer.                                                 10:13:06

 9        Q.   I asked about the computer, not about the      10:13:11

10   printer.                                                 10:13:14

11             Was there one central computer that the entire 10:13:14

12   Sales Company used and printed documents from?           10:13:19

13        A.   Based on my knowledge, that is not the case.   10:13:23

14        Q.   Well, what was the case, then, Mr. Wang,       10:13:50

15   which -- how did you print documents if there was no     10:13:53

16   computer?                                                10:13:57

17             MR. LUCARELLI:  Object to form.                10:13:59

18             THE WITNESS:  In the big general office that I 10:14:49

19   worked in, there were many desks.  There was a computer  10:14:52

20   on one of the desks, so the documents were printed out   10:14:57

21   from that computer.                                      10:15:05

22   BY MS. CAPURRO:                                          10:15:05

23        Q.   Do you remember leaving an instruction in the  10:15:15

24   summer of 2008 to search for and preserve documents      10:15:16

25   relating to this case?                                   10:15:21
```

Page 45

Exhibit W



Teachers   Register

Home » Blogs » Business & Economics » Why Email Isn't Used in China

# Why Email Isn't Used in China



In the West, a workplace without constant emailing is pretty unheard of. It is the biggest way of communicating in an office. However, in China, things are a little different.

Emailing in China can be a very frustrating process, mostly because you probably just won't get a reply. In the West, there can be problems with having "too many emails". Whereas in China, emailing is avoided pretty much all together, and people will stick to their trusted instant messaging apps such as WeChat. But, why is this the case?



The reason is mixed between China's historical late coming into technology, and the fast rise of China's own tech giant, Tencent.

## Slow move to the internet

At the turn of the millennium, the internet was spreading quickly throughout the West, and email was becoming evermore commonplace in the office. In 2001, when email celebrated in 30th anniversary of existence, nearly every office had an email address. It was pretty much as common as having a phone number.

However, during the time of the West's internet boom, things in China were going a bit slower. In 2001, less than 3% of China's population were on the internet. Internet wasn't even hooked up to many people's homes. Instead, it was common for people to flock to internet cafes.

### Teacher ?

Save hours of planning time by using The Chairman's Bao. Discover more about classroom options.

Enquire Now





Even at the time that internet cafes were booming, it was young people who were going, most of whom weren't working in office environments. Their main reason for going to these cafes wasn't for the promise of productivity, but for the social possibilities.

As a result, the internet in China became particularly popular for its social benefits, rather than being used in a more formal context.

## The domination of Tencent

During the rise of internet cafes, a small tech company (at the time) known as Tencent developed a desktop messaging app called QQ. Although QQ and other desktop messaging apps are out of fashion now, Tencent is one of the biggest tech companies in the world and later created WeChat. WeChat has more than a billion daily users and is heavily present throughout China. WeChat is the main form of communication in the workplace.



Try The Chairman's Bao

Learn Mandarin through fun and engaging news-based lessons.

Get Started Now



## Difficulty of email in China

There have been a number of other issues with email in China. The use of English email addresses doesn't help. Additionally, the lack of financial incentives of investing into R&D with emails acted as another barrier, monetisation paths just weren't as obvious at the time.

As a result, most people have simply resorted to WeChat as the main form of office communication. It's fast and convenient and everyone is familiar with it. WeChat has the ability to send images, documents, as well as have group conferences.

## Working culture

Chinese working culture plays a role. Forum users noted that due to China's lack of procedure in doing business, it's easier to communicate through instant messaging apps. Emailing just adds to bureaucracy and slows down any process.

China has quite an informal working culture. So "the prevalence of emojis, voice messages and informal communication add to this more flexible and less black-and-white professional and personal relationships that often go with work in China," says Elliott Zaagman.

The divide between professional and personal life in China is less prominent. As a downside, using WeChat means it's more difficult to escape work, and employees are expected to reply straight away. This adds to the 996 culture that is so hotly debated. Using messaging apps means that employees are available at all times.



Email is still dominant in offices in the West, however this might change as social networking and instant messaging becomes more prevalent in every industry. The communication style could become more similar to China. Whether that is a good or bad thing remains unclear.

## Learn Chinese through news

- Authentic news-based lessons
- Reading and listening exercises
- One-tap dictionary
- Cross-platform study

Try free lesson

### Learn something new every week

| Your e-mail | Send |

## Our most recent blogs



The Best YouTube Channels to Learn Chinese

Learning Mandarin
11/04/2023

**Read More**

30 Useful Chengyu (Chin

Chinese Culture,Learning Ma
30/03/2023

**Read More**

More posts

## Latest articles in Chinese



Level 5

23   Science & Environment, Timeless News                                  20/04/2023

**Chinese Astronomers Made New Discoveries about Two Comets**

Read Now

Level 1

Education, Society

**Students and Teachers No**

See all lessons

## Start learning





   

Terms of Use    Privacy Policy    Contact Us

     

The Chairman's Bao® Ltd. is a company registered in England and Wales with company number 09222815.

Join our Facebook discussion group!

Exhibit X

Menu ☰

**EMAIL**

Why email loses out to popular apps in China



*(Image credit: Alamy)*



**By *Lu-Hai Liang*** 9th July 2020

**Email has never been huge in China, and it's down to a combination of cultural factors and timing.**

*Article continues below*

I n May 2008 I was teaching at a private English school in Yangshuo, a small town in southern China. It is an idyllic place to study, with limestone hills, known as karst, decorating the riverine landscape. When they finished their course my adult students told me to download QQ, a Chinese desktop application much like MSN Messenger, to keep in touch.

I asked them to register on Facebook (it was unblocked in China then), add me as a friend and also leave their email addresses. A few did but they were hard to remember, because

addresses even in the UK.

> *I never check email so I don't have expectations of people to respond – Hailan Jia*

Years later, I found myself in Beijing working as a freelance journalist and copywriter. I would hardly ever do business with my Chinese clients over email. Often, I would receive copywriting work on my smartphone, via the hugely popular Chinese messaging app WeChat. Once I'd completed it, I would then send it back and also get paid over WeChat. The whole process felt miraculous, such was the speed and mobile efficiency.

**More like this:**
• **How China went back to work after lockdown**
• **Young Chinese are sick of working overtime**
• **China's work from home experiment**

ADVERTISEMENT



In many Western countries, email still reigns supreme, especially at work. In both the US and the UK, email is the most popular online activity, drawing **90.9%** and **86%** of internet users respectively. In both the **US** and the **UK**, using email tops other online activities such as browsing for information about goods and services, internet banking, consuming digital videos or audio and using social media.



But in China, it's a different picture. Deloitte's 2018 China Mobile Consumer Survey **showed** that Chinese people checked their email 22% less than users globally. Instead WeChat is dominant; some **79.1% of smartphone owners are regular users of the app, while 84.5% of people who use messaging apps in China use WeChat**. And that preference extends into the office: the 2017 WeChat user behaviour **report** compiled by Penguin Intelligence, a research arm of Tencent (which created WeChat), found that almost 88% of 20,000 people surveyed used WeChat in their daily work communication. Phones, SMS and fax were used by 59.5%. Email was a distant third on 22.6%.

Eva Hsu, who runs a digital branding business, is Taiwanese and spent some of her youth living in the US. She's been working in Shanghai for six years. For her foreign clients, Hsu says she communicates via email and LinkedIn, but for her Chinese clients it's a different story. "Chinese clients tend to use WeChat and send files on WeChat as the main way of communication," she says.

**Late adopters**

With over a billion users in China, WeChat is a super app that is ubiquitous. But the reasons why Chinese people prefer communicating over a platform such as WeChat may have been formed years earlier. In 1999, newly-established Chinese technology company Tencent released a product called QQ, based on the popular desktop instant messaging programme ICQ, which was owned by AOL.

At the time, there were only 1.2 computers per 100 people in China, **according to the World Bank**. By contrast, there was one computer for every two people in the United States. But as the 2000s progressed internet cafes sprang up across China and were quickly embraced by young people. QQ became a key reason for the cafes' popularity, as it provided entertainment with features such as games, music and an early Chinese social network where people could post micro-blogs. Compared to email, QQ offered more interaction, with the ability to create avatars, for example, and instant messaging.



*Internet cafes were often the only way people could access computers in the 1990s and early 2000s in China (credit: Herve Bruhat/Gamma-Rapho via Getty Images)*

In their 2008 book **Supertrends of Future China**, co-authors James Yuann and Jason Inch noted that it was impractical for young Chinese to be without a QQ or MSN account. It "is almost like what Westerners would think of somebody without a driver's license", they wrote. Senior executives would list their QQ numbers on business cards and businesses would have their own QQ accounts.

*cultural and business environment in China" Zhong Ling*

By **2012** QQ had 798 million monthly active users, but WeChat, also created by Tencent and released in 2011, would go on to become the most popular communication tool in China, just as smartphones would go on to replace desktop computers as China's main computing device.

Matthew Brennan, a Briton who has worked in China since 2004 and is a consultant on Chinese digital innovation, says that having an email address in the UK is part of your identity as it's required to register for many online services. In China, however, mobile apps often take precedence and it is possible to do all your online transactions once you are logged into an app with multiple functionality such as WeChat or Alipay (created by online retail giant Alibaba) You can book an appointment, pay for shopping and message your friends all within a single app.

**Instant messaging**

Zhong Ling, assistant professor of economics at the Cheung Kong Graduate School of Business, believes WeChat fits into the Chinese working culture. "WeChat, as a messaging platform, demands less formal working time than email," she says. "This informality makes people more likely to respond instantaneously… the demand for [an] immediate response is motivated by the cultural and business environment in China."

Zhong observes that the boundaries between people's work and personal lives are weaker in China. "As a result, employers and managers often send out work inquiries or tasks outside of normal working hours and prefer not to wait until the next business day for a trivial reply." She adds that for conversations which require multiple rounds of interaction, WeChat is faster than email.



*There is pressure on workers in China to be available outside work hours (credit: Alamy)*

However, the flipside of this is that workers are under pressure to respond at all hours. While WeChat is ready for short, rapid responses, email has a clunkier interface, Brennan says. The way a platform is built influences how we communicate and there are subtle but noticeable effects when it comes to platforms such as Facebook, WhatsApp or indeed WeChat. "There can be an expectation for a more timely response for [instant] messaging," says Brennan. "So even if you receive a message on the weekend, you need to reply."

In Anglo-centric countries such as the UK, US, Canada, Australia and New Zealand, email retains the etiquette of an analogue age. The "Dear X" greetings and formal sign-offs –

> *Having an email address in countries such as the UK is part of your identity because you need it to register for so many online services*

Alan Casey, a partner at consultancy firm Prophet which has offices across Asia, says he and his multinational team believe chat apps are far more relevant than email in Asia than Western markets. "Many countries like China and SEA [South East Asia] have leapfrogged the computer age and gone straight to mobile connectivity," says Casey. "This has led to massive uptake of social platforms whether it be Facebook, WeChat, Line, KakaoTalk, Zalo, etc."

**Doing business**

In China, besides WeChat, **business apps serve the needs of larger corporations** or those requiring more work and productivity-focused features. Platforms such as Alibaba's DingTalk and ByteDance's Lark, as well as the business version of WeChat – WeChat Work – offer features such as document sharing and online editing, payroll, workplace compliance and a higher level of privacy. DingTalk allows users to see in real time if someone has read a message and, if not, users can send a push to prompt them to do so.



*Business and productivity apps replace email for work-related tasks (credit: Alamy)*

---

Thirty-year-old Hailan Jia is a public relations manager for a Chinese cryptocurrency trading company. She moved from her native Beijing to Plymouth in southwest England in 2018 to be with her partner. In the UK, she says, online services are more scattered. "You buy certain products on Amazon; groceries on apps; and book appointments on websites, which all require email or Facebook, unlike China where you use your WeChat account [for everything]," she says. Having to constantly check her email is something Hailan has had to get used to. "In China I never check email so I don't have expectations of people to respond to email and I don't stay on email for entertainment."

But this doesn't mean Chinese people aren't using email at all. Many do have an email address but check it far less regularly than their American or European counterparts. Brennan says that in the larger cities, like Beijing and Shanghai, there will be more alignment with international standards.

One of my old students in Yangshuo, Leely Wang, was one of the few who left me her email address when she finished her studies. We kept in touch via email for a time, before lapsing.

I ask her if she still uses the email address we used to keep in touch. "Which one is it?" She asks, laughing. "I had so many: 163, 126 and MSN," she says, referring to different email providers. She now checks her email rarely, and has difficulty remembering when she last checked in. "I use WeChat the most; I don't use QQ often, but sometimes I will," she says.

For Wang, and many other Chinese people, WeChat forms an integral part of daily life and email now seems a quaint leftover from the past.



SHARE

AROUND THE BBC



FUTURE
The men who tried to electrify plants



CULTURE
The TV thriller for wine connoisseurs



TRAVEL
A simple dish to celebrate Eid al-Fitr

## Explore the BBC

Home                                         News

**Future**

TV

**Sounds**

**Culture**

**Weather**

Terms of Use

Privacy Policy

Accessibility Help

Contact the BBC

Advertise with us

About the BBC

Cookies

Parental Guidance

BBC emails for you

Do not share or sell my info

Copyright © 2023 BBC. The BBC is not responsible for the content of external sites. Read about our approach to external linking.

Exhibit Y



info@certifiedtranslate.com | 2425 Olympic Blvd., Suite 4000W | usa 1-888-856-2228
www.certifiedtranslate.com | Santa Monica, CA 90404 | int +1-310-684-3153
| | fax +1-310-564-1944



**A member of the American
Translators Association
ATA Member Number: 248719**

# CERTIFIED TRANSLATION

*Description of Document(s):*

| |
|---|
| **EMPLOYEE INFORMATION REGISTRATION FORM** |
| **SU XIAOHUA** |
| **IRI-CRT-00031561 through IRI-CRT-00031562** |
| |

| Source Language: **CHINESE** | Target Language: **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**   Sean Kirschenstein, Director          **Date:**   January 24, 2022

A copy of the translated version(s) is attached to this statement of certification.

Personnel Number: 100751

# Employee Information Registration Form

| Name | Su Xiaohua | | Gender | Male | Ethnicity | [Personal Information Redacted] |  |
|---|---|---|---|---|---|---|---|
| Date of birth | [Personal Information Redacted] | | Native of | | [Personal Information Redacted] | | |
| Nationality | Chinese | Registered household location | Qindu District, Xianyang City, Shaanxi Province | | Political affiliation | [Personal Information Redacted] | |
| Joined Party on | [Personal Information Redacted] | | Began working on | | January 1, 1977 | | |
| ID # | [Personal Information Redacted] | | Health | | Healthy or good | Marital status | [Personal Information Redacted] |
| Contact address | ███████████████ | | | | | Postal code | ████████ |
| Phone | Landline: ████ | | | | Mobile: ████ | | |
| Email | sxh@ch.com.cn | | | | | | |

| Main family members | Name | Date of birth | Relationship | Workplace | Emergency phone |
|---|---|---|---|---|---|
| | Zhao Rong | [Personal Information Redacted] | Spouse | Retired | ████████ |

| 1st higher-education degree | | School and major | Northwest University of Political Science and Law. Major: law |
|---|---|---|---|
| Highest degree | Master's degree candidate | School and major | Central Party School of the Communist Party of China |
| Current department and position | Irico Foshan Flat Panel Display Co., Ltd. General manager of combined management department | | |
| Part-time work | | | |

| Professional certificates | Senior Political Worker | Date obtained | December 30, 2000 |
|---|---|---|---|
| Computer skill level | | Foreign language skill level | Languages: |

Personnel Number: 100751

| Technical level obtained | | Type of work (at this technical level) | |
|---|---|---|---|
| Education | September 1, 1993 to July 1, 1995: Shaanxi Province Party Committee School. Undergraduate studies in economic management.<br><br>September 1, 2001 to July 1, 2003: Shaanxi Normal University. Undergraduate studies in political thought education.<br><br>June 2, 2004 to September 2, 2007: Central Party School of the Communist Party of China. Master's degree candidate in economics.<br><br>June 2, 1991: Northwest University of Political Science and Law. Technical college studies in law. | | |
| Work experience | June 26, 1981 to August 1, 1984: Irico Main CRT Plant. Security section. Economic civil police.<br><br>August 1, 1984 to September 2, 1991:  Irico Main CRT Plant. Office and labor and capital section. Minutes secretary, administrative secretary, and clerk.<br><br>September 1, 1991 to April 1, 1993: Irico Group. Supervision department. Chief and special cases section chief.<br><br>April 1, 1993 to April 1, 2005: Irico Group. Human resources department. Personnel affairs office chief and assistant to department head.<br><br>April 1, 2005 to March 1, 2007: Irico Group. Sales company. Deputy general manager.<br><br>March 1, 2007 to August 1, 2013. Irico Group Electronics. Purchasing department. Deputy general manager and general manager.<br><br>August 30, 2013: Xianyang Rainbow Photovoltaic Technology Co., Ltd. Combined management department. Member of level-three unit management. Deputy general manager and legal representative.<br><br>June 1, 2017: Shaanxi Caihong Photoelectric Material General Merchandise Company. Member of level-three unit management. Legal representative.<br><br>June 1, 2017 to December 30, 2019: Xianyang Rainbow Photovoltaic Technology Co., Ltd. Combined management department. Member of level-three unit management. Deputy general manager and legal representative.<br><br>January 1, 2018 to December 30, 2019: Xianyang Rainbow Photovoltaic Technology Co., Ltd. Combined management department. Part-time position in level-three unit management. Deputy general manager.<br><br>December 31, 2019: Irico Foshan Flat Panel Display Co., Ltd. Combined management department. Full-time position in level-three unit management. General manager. | | |
| Recognitions and disciplinary actions | December 1, 1983: Main Plant. Security section. Advanced Worker of Section Office.<br><br>January 1, 1985: Irico Main Plant. Outstanding Communist Party Member. | | |

人员编码： 100751

# 员 工 信 息 登 记 表



人员编码： 100751

| 取得的工人<br>技术等级 | | 工种（与技术等级对应） | |
|---|---|---|---|
| 教育<br>经历 | 1993-09-01 1995-07-01 陕西省委党校 经济管理 大学本科<br><br>2001-09-01 2003-07-01 陕西师范大学 思想政治教育　大学本科<br><br>2004-06-02 2007-09-02 中央党校 经济学 硕士研究生<br><br>　1991-06-02 西北政法学院 法律 专科 | | |
| 工作<br>经历 | 1981-06-26 1984-08-01 彩虹彩色显像管总厂 保卫科　经济民警<br><br>1984-08-01 1991-09-02 彩虹彩色显像管总厂 办公室、劳资科 纪要秘书、行政秘书、劳资员<br><br>1991-09-01 1993-04-01 彩虹集团 监察处　主任、专案组长<br><br>1993-04-01 2005-04-01 彩虹集团 人力资源部　人事室主任、部长助理<br><br>2005-04-01 2007-03-01 彩虹集团 销售公司　副总经理<br><br>2007-03-01 2013-08-01 彩虹电子采购部　副总经理、总经理<br><br>2013-08-30　咸阳彩虹光伏科技有限公司 综合管理部 三级级单位班子成员 副总经理、法定代表人<br><br>2017-06-01　陕西彩虹光电材料总公司　三级单位班子成员 法定代表人<br><br>2017-06-01 2019-12-30 咸阳彩虹光伏科技有限公司 综合管理部 三级单位班子成员 副总经理、法定代表人<br><br>2018-01-01 2019-12-30 咸阳彩虹光伏科技有限公司 综合管理部 三级级单位班子副职 副总经理<br><br>2019-12-31　彩虹(佛山)平板显示有限公司 综合管理部 三级级单位班子正职 总经理 | | |
| 奖惩<br>情况 | 1983-12-01 总厂保卫科 科室先进生产者<br><br>1985-01-01 彩虹总厂 优秀共产党员 | | |

IRI-CRT-00031562

# DOCUMENT 9

# BAKER BOTTS LLP

700 K STREET, N.W.
WASHINGTON, D.C.
20001

TEL  +1 202.639.7700
FAX  +1 202.639.7890
BakerBotts.com

AUSTIN
BRUSSELS
DALLAS
DUBAI
HOUSTON
LONDON

NEW YORK
PALO ALTO
RIYADH
SAN FRANCISCO
SINGAPORE
**WASHINGTON**

May 2, 2023

VIA E-MAIL [VRW@JUDGEWALKER.COM]
The Honorable Vaughn R. Walker
Law Office of Vaughn R. Walker
Four Embarcadero Center, Suite 2200
San Francisco, CA 94111

John Taladay
TEL: 2026397909
FAX: 2026391165
john.taladay@bakerbotts.com

Re:   In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Master File
        No. 07-CV-944-JST

Dear Judge Walker:

We write to inform the Special Master of additional relevant authority in the Northern District of California further supporting the arguments raised by Irico in its Opposition to Plaintiffs' Motion for Sanctions submitted on April 21, 2023. Irico recently learned that, on April 21, 2023, Magistrate Judge Alex Tse denied a request by the U.S. Securities and Exchange Commission ("SEC") to impose sanctions against Volkswagen for failing to produce a current, foreign employee for a deposition in the *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*.  *See* No. 19-cv-01391-CRB (AGT), slip op. at 1-2 (N.D. Cal. Apr. 21, 2023) ("*Volkswagen*").[1]  The *Volkswagen* court had already found the employee to be a current "managing agent" of Volkswagen and in violation of a court order mandating his appearance for a deposition.  *Id*.  Yet, Judge Tse denied the severe sanctions sought by the SEC, finding that Volkswagen used its best efforts to produce the witness and concluding that "it's unclear what else VW can do."[2]  *Id.* at 1.  Also critical to Judge Tse's decision was the fact that Volkswagen had not acted in bad faith and that the SEC had other evidence available to prove its case:

---

[1] This recent decision has not yet been published, and a copy of the slip opinion is attached to this letter.

[2] The SEC sought the following sanctions: "at a minimum: (1) an instruction to the jury that VW was ordered to produce [the employee] as a witness, but VW failed to do so; (2) an instruction to the jury that they may infer from [the employee's] absence that his testimony, if it had been given, would be harmful to VW; and (3) a finding that all facts supporting the SEC's allegations that [the employee] could testify to . . . are deemed true and established for purposes of this case."  Pl. SEC's Mot. for Sanctions Against Def. Volkswagen AG for Violating Judge Tse's Feb. 10 Order at 6, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*, No. 19-cv-01391-CRB (AGT) (N.D. Cal. Mar. 17, 2023).  A copy of the SEC's motion is also attached to this letter.

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                    - 2 -

> [I]n the absence of bad faith, the Court isn't inclined to impose sanctions that could tilt the case sharply in the SEC's favor.  Also, while [the employee's] testimony could have helped the SEC, the SEC hasn't suggested that it needs [the employee's] testimony to satisfy its burden of proof.  The SEC presumably has other evidence at its disposal, and [the employee's] nonappearance shouldn't doom the SEC's case.

*Id.* at 2.  Finally, Judge Tse acknowledged that VW had already agreed not call the current employee at trial and left open the possibility of the parties preparing a statement to the jury explaining the witness's absence.  *Id.*

This recent decision further supports Irico's position that the sanctions that Plaintiffs seek against Irico, in particular those related to Mr. Su, are inappropriate and overreaching and should be denied.

Sincerely,

*/s/ John Taladay*

John Taladay

cc:    Jay Weil (jay.weil@fedarb.com)
       Tanveer Singh (tanveer.singh@fedarb.com)
       R. Alexander Saveri (rick@saveri.com)
       Geoffrey C. Rushing (geoff@saveri.com)
       Matthew D. Heaphy (mheaphy@saveri.com)
       Mario N. Alioto (malioto@tatp.com)
       Lauren C. Capurro (laurenrussell@tatp.com)
       Daniel E. Birkhaeuser (dbirkhaeuser@bramsonplutzik.com)
       Alan Plutzik (aplutzik@bramsonplutzik.com)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | Case No.  19-cv-01391-CRB (AGT) |
| Plaintiff, | |
| v. | **DISCOVERY ORDER** |
| | Re: Dkt. Nos. 113, 115, 123 |
| VOLKSWAGEN AKTIENGESELLSCHAFT, et al., | |
| Defendants. | |

The Court won't sanction VW for failing to produce Thorsten Duesterdiek for a deposition. Duesterdiek is one of VW's managing agents, and the Court ordered VW to make him available. *See* Dkt. 106. But despite VW's repeated appeals, Duesterdiek has refused to be deposed. He is on trial in Germany for criminal charges related to the "clean diesel" emissions fraud, and he has told VW that he won't sit for a deposition or submit a declaration in this case unless an order is issued "against him personally by a court of competent jurisdiction." Dkt. 113-3 at 2–3; *see also* Dkt. 113-6 at 2. The parties haven't suggested that this Court could issue such an order against Duesterdiek personally.

VW has used its best efforts to produce Duesterdiek, and at this point it's unclear what else VW can do. The SEC says VW should discipline Duesterdiek or threaten to fire him if he doesn't appear, but VW believes it would face legal consequences in Germany if it did so. VW's concerns aren't fantastical. Dr. Thuesing, a German labor law professor, has opined that Duesterdiek "act[ed] within his rights under German law not to comply with [VW's] request to testify" and would likely prevail in a civil suit against VW if VW disciplined him. Dkt. 104-19 at 23; *see also* Dkt. 113-7 (reaching the same conclusion as to the request that Duesterdiek

submit a declaration). Whether Dr. Thuesing's predictions would come true can't be definitively determined; but Dr. Thuesing's analysis of German law is cogent, and VW sensibly doesn't want to act against it.

Even so, it is true that the Court has the authority to enforce its discovery orders and to impose sanctions when its orders are not obeyed. *See* Fed. R. Civ. P. 37(b)(2)(A), (d)(1)(A)(i). But under the circumstances, the Court, in its discretion, concludes that sanctions are not warranted. VW, in the Court's judgment, hasn't acted in bad faith. And in the absence of bad faith, the Court isn't inclined to impose sanctions that could tilt the case sharply in the SEC's favor. Also, while Duesterdiek's testimony could have helped the SEC, the SEC hasn't suggested that it needs Duesterdiek's testimony to satisfy its burden of proof. The SEC presumably has other evidence at its disposal, and Duesterdiek's nonappearance shouldn't doom the SEC's case.

The SEC's motion for sanctions is denied. So too is VW's motion for reconsideration of the Court's February 10 order. *See* Dkts. 106, 113. There's no need for the Court to reconsider that order, in which the Court held that Duesterdiek was a managing agent of VW, given the Court's conclusion that sanctions aren't warranted for Duesterdiek's nonappearance. VW's motion for leave to file a sur-reply to the SEC's motion for sanctions is also denied. *See* Dkt. 123.

For the avoidance of doubt, the Court notes that VW has agreed not to call Duesterdiek as a witness. *See* Dkt. 120 at 15. VW must abide by that promise. Also, this order is without prejudice to the SEC and VW preparing a statement for the jury explaining why Duesterdiek didn't testify or appear for his deposition.

**IT IS SO ORDERED.**

Dated: April 21, 2023

Alex G. Tse
United States Magistrate Judge

2

DANIEL J. HAYES (IL Bar No. 6243089)
Email: hayesdj@sec.gov
ERIC M. PHILLIPS  (IL Bar No. 6237871)
Email: phillipse@sec.gov
JAKE A. SCHMIDT (IL Bar No. 6270569)
Email: schmidtj@sec.gov
KEVIN A. WISNIEWSKI (IL Bar No. 6294107)
Email: wisniewskik@sec.gov
RAVEN A. WINTERS (IL Bar No. 6291077)
Email:  wintersr@sec.gov

U.S. SECURITIES & EXCHANGE
COMMISSION
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone:  (312) 353-3368
Facsimile:  (312) 353-7398

*Attorneys for Plaintiff United States*
*Securities and Exchange Commission*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION <br><br> This Document Relates To: <br><br> *U.S. S.E.C. v. Volkswagen AG,* No. 3:19-cv-1391-CRB | MDL No. 2672 CRB (JSC) <br><br> **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR SANCTIONS AGAINST DEFENDANT VOLKSWAGEN AG FOR VIOLATING JUDGE TSE'S FEBRUARY 10 ORDER** <br><br> Courtroom:    A <br> Judge:          Magistrate Judge Alex G. Tse |

## NOTICE OF MOTION AND MOTION

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. Pro. 37 and Civ. LRs 7-8 and 37-4, Plaintiff Securities and Exchange Commission filed and noticed its Motion for Sanctions Against Defendant Volkswagen A.G. for Violating Judge Tse's February 10 Order, before Magistrate Judge Alexander Tse, Courtroom A of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102.

# TABLE OF CONTENTS

I.     QUESTION PRESENTED…………………………………………………1

II.    INTRODUCTION………………………………………………………1

III.   RELEVANT FACTS……………………………………………………2

     A.  Thorsten Duesterdiek Is A Critical Witness……………………………2

     B.  The Court Ruled That Duesterdiek Is VW's Managing Agent
          And Ordered VW To Produce Him For A Deposition……………………………4

     C.  Duesterdiek And VW Violate The Court's Order……………………………..4

IV.   ARGUMENT…..…………………………………………………..….5

     A.  The Court Should Sanction VW For Violating
          The Court's February 10 Order………………………………………5

     B.  German Law Does Not Trump This Court's Orders……………………………...8

V.    CONCLUSION…………………………………………………………...10

i

# TABLE OF AUTHORITIES

*Calderon v. Experian Information Solutions, Inc.*,
   209 F.R.D. 508 (D. Idaho 2013) ............................................... 9

*Card Tech. Corp. v. DataCard Inc.*,
   249 F.R.D. 567 (D. Minn. 2008) ............................................ 5, 6

*Elasticsearch, Inc. v. Floragunn, GMBH*,
   2021 WL 1753796 (N.D. Cal. May 4, 2021) .............................. 7

*Elasticsearch, Inc. v. Floragunn, GMBH*,
   2022 WL 214468 (N.D. Cal. Jan. 25, 2022) ............................. 6-7

*Graco, Inc. v. Kremlin, Inc.*,
   101 F.R.D. 503 (N.D. Ill. 1984) .............................................. 10

*Guinnane v. Dobbins*,
   479 F. Supp. 3d 989 (D. Mont. 2020) ...................................... 6

*Hickman v. Taylor*,
   329 U.S. 495 (1947) .......................................................... 8-9

*In re Honda American Motor Co., Inc. Dealership Relations Litig.* 168 F.R.D. 535 (D. Md.
1996) .................................................................................. 9, 10

*Motorola Credit Corp. v. Uzan*,
   509 F.3d 74 (2d. Cir. 2007) ..................................................... 6

*RP Golden State Mgmt., LLC v. Ohio Sec. Ins. Co.*,
   2021 WL 2536209 (E.D. Cal. June 19, 2021) ............................. 5

*SEC v. Helms*,
   2015 WL 5010298 (W.D. Tex. Aug. 21, 2015) ........................... 6

*Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*,
   357 U.S. 197 (1958) ............................................................... 6

*Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. De Equip. Medico*,
   2008 WL 81111 (S.D. Cal. Jan. 8, 2008) .................................... 8

*Work v. Bier*,
   106 F.R.D. 45 (D.D.C. 1985) ................................................. 8, 9

**Rules**
Fed. R. Civ. P. 37(b)(2)(A) ........................................................ 5

## MEMORANDUM OF POINTS AND AUTHORITIES

The Court should enter appropriate sanctions against Defendant Volkswagen A.G. ("VW") because it has violated this Court's February 10, 2023 Order ("February 10 Order"), by failing to produce its current employee and managing agent Dr. Thorsten Duesterdiek for deposition by March 3, 2023.

## I.    QUESTION PRESENTED

Should the Court enter sanctions against VW for violating the Court's February 10 Order requiring VW to produce its current employee and managing agent for a deposition in this case?

## II.    INTRODUCTION

Thorsten Duesterdiek is likely the most important witness in this case, and he is a big problem for VW. He had cradle-to-grave involvement in VW's long-running defeat device fraud. He can put senior VW executives in meetings where the defeat device was discussed and where orders were given to destroy documents. He can testify that VW personnel who worked on the Rule 144A Bond Offering documents at issue in this case knew about the defeat device, the emissions problems with VW's "Clean Diesel" cars, and the billions of dollars in fines and penalties VW faced as a result. And he's a current VW employee and managing agent, which means his testimony binds VW.

The fact that Duesterdiek refused to appear for his deposition does not change the fact that he is VW's managing agent. When this Court issued its February 10 Order, it considered the possibility that he might refuse to be deposed, as VW suggested. That is why the Court found "Factor 2 weighs modestly against a managing-agent finding." (Dkt. 106 at 3.) However, the Court also held: "[o]n balance, Factor 2 doesn't outweigh Factors 1, 3, and 4, all of which support a managing-agent finding." (*Id*.) Nothing has changed between February 10 and today; it's still three factors to one supporting the Court's managing-agent ruling.

The only relevant question now is what sanctions are appropriate for VW's failure, and Duesterdiek's refusal, to comply with this Court's February 10 Order. VW says none. (*See* VW's Motion for Relief from Court's February 10 Order, dkt. 113.) According to VW, it asked Duesterdiek to comply, he refused, and German law says there is nothing it can do about it. End

of story. VW argues its hands are tied even though it has a cooperation agreement with Duesterdiek that requires him to sit for "interviews" and to appear "in court" and "provide information … in civil court proceedings involving [VW] and/or other companies in the Volkswagen Group." But, according to VW, the cooperation agreement doesn't require Duesterdiek's cooperation in this case because VW "intended" to exclude from that agreement all U.S. "civil court proceedings." (*Id.* at 4.) It was not a drafting oversight; it was by design.

Yet while VW says Duesterdiek is off-limits to U.S. litigants and courts, it is making full use of his cooperation to defend itself against lawsuits in Germany. In a lengthy court brief VW filed in support of its defense to civil claims in Germany, VW has cited the testimony of "Dr. Thorsten Dusterdiek" over 100 times. According to VW's German court filing, Duesterdiek has already and/or will provide detailed testimony for VW about the defeat device fraud *in Germany*. He just refuses to do it *in the United States*. According to VW, that's not its problem; it's the SEC's problem and it's the Court's problem.

This Court should impose appropriate sanctions for VW's violation of this Court's order.

## III. <u>RELEVANT FACTS</u>

### A.  Thorsten Duesterdiek Is A Critical Witness.

Thorsten Duesterdiek is likely the most important witness in VW's entire defeat device fraud. He was a direct participant in all aspects of the fraud, from beginning to end. VW has admitted as much. According to VW's German court filing, Duesterdiek has testified or will testify about all of the following facts—among many, many others:

- Richard Dorenkamp's team of engineers "came up with the idea of using a switching function," which existed in "the engine control unit software … taken over from Audi AG," to adjust the vehicle's emission depending on the vehicle operating mode (German Filing, Ex. 1, ¶ 208);

- Duesterdiek and other "development engineers who were in the know continued to develop the [switching] function" (*id.* ¶ 228);

- "From 2010 onwards, increased damage to the diesel particulate filter occurred on US diesel vehicles with the EA 189 engine [which contained the defeat device]" (*id.* ¶ 464);

- "Dr. Thorsten Düsterdiek and other knowledgeable employees" suspected that the vehicles on the road were stuck in "roller mode" (*id.* ¶¶ 465-66);

2

- Duesterdiek had a meeting with senior VW personnel Bernd Gottweis[1], on July 25, 2012, during which he explained that "the damage to the diesel particulate filters [was possibly] due to the fact that the customers drove the vehicle in roller mode for too long," and he "drew a model explaining the roller mode" (*id.* ¶ 473);

- A few weeks later, Duesterdiek met with Dr. Heinz-Jakob Neusser[2], to explain the "true cause of the damage to the diesel particulate filters" and he used "the same model that he claims to have shown to Bernd Gottweis" (*id.* ¶ 475);

- After their respective meetings with Duesterdiek, Gottweis and Nuesser each "instructed" and "demanded" that "Duesterdiek destroy this model" (*id.* ¶¶ 473, 475);

- To fix the problem of the vehicles staying in "roller mode" for too long, Duesterdiek and others "had the idea of reversing" the switching function so the vehicles would "always start in road mode" and the switch to "roller mode should only take place once the parameters typical of emissions tests have been identified" (*id.* ¶¶ 485-87);

- After the International Council on Clean Transportation ("ICCT") announced that it had discovered excessive NOx emissions from VW vehicles tested during real world driving, VW assembled a "RDE NAR Task Force," with Duesterdiek selected as the "[h]ead of the task force" (*id.* ¶¶ 629-31);

- "The first meeting of the task force under Dr. Thorsten Duesterdiek took place on April 24, 2014" and included "Jurgen Peter," among others (*id.* ¶ 632);

- Duesterdiek's task force "include[d] precisely those who were entrusted with solving the problem [identified by the ICCT] who had taken the illegal measures in the first place" (*id.* ¶ 634);

- On April 28, 2014, Duesterdiek (and others) "informed Bernd Gottweis about a defeat device that is illegal under US law as the cause of the results of the ICCT study," (*id.* ¶ 612);

---

[1] In its criminal Plea Agreement, Volkswagen admits that Gottweis (called "Supervisor E"), who was the Head of VW's Product Safety Committee, knew about the defeat device and that, at a meeting "in or around July 2012," he instructed unnamed "engineers" to destroy a "document they had used to illustrate the operation of the defeat device." (Plea SOF, Ex. 2, ¶¶ 11, 48; VW Resps. to SEC Second RFAs, Ex. 3, ¶ 5 (admitting Gottweis is "Supervisor E").) Gottweis is no longer employed by VW, but Duesterdiek—one of the "engineers"—still is.

[2] In its criminal Plea Agreement, Volkswagen admits that Neusser (called "Supervisor A"), who was the Head of Engine Development for all of VW, knew about the defeat device and that, at a meeting "in or around July 2012," he instructed unnamed "engineers" to destroy a "document they has used to illustrate the operation of the defeat device." (Plea SOF, Ex. 2, ¶¶ 11, 48; VW Resps. to SEC Second RFAs, Ex. 3, ¶ 1 (admitting Neusser is "Supervisor A").) Neusser is no longer employed by VW.

3

- During that meeting, Duesterdiek warned Gottweis that the defeat device "could be discovered" by U.S. regulators, and that VW faced "significant financial consequences in the form of recalls and fines up to USD 30,000 per vehicle" (*id*.);

- At the conclusion of the meeting, "Bernd Gottweis announced that Prof. Dr. Martin Winterkorn will be informed about the content of the conversation." (*id*. ¶ 614).

Based on VW's German court filing, it's clear that VW has interviewed Duesterdieck, probably numerous times, and knows about his involvement in its defeat device scheme. Specifically as it relates to the SEC's case, he can testify that VW personnel who worked on the Rule 144A Bond Offering documents (*e.g.*, Juergen Peter) knew about the defeat device, the emissions problems with VW's "Clean Diesel" cars, and the billions of dollars in fines and penalties VW faced as a result. In fact, Juergen Peter, a member of Deusterdiek's ICCT task force, prepared VW's April 2014 task force memo, titled "Possible Consequences/Risks," that calculated the billions in fines and penalties and other legal consequences, such as buybacks, recalls and recertifications, VW could be hit with if U.S. regulators discovered the defeat device. (*Id*. ¶ 619; *see also* ICCT Task Force Memo, Ex. 4.)

### B. The Court Ruled that Duesterdiek is VW's Managing Agent and Ordered VW to Produce Him for a Deposition.

On February 10, 2023, this Court held that Duesterdiek is VW's managing agent, and ordered VW to produce him for deposition on or before March 3, 2023. (Dkt. 106 at 5.) The Court held three of the four managing agent factors supported a finding that Duesterdiek is VW's managing agent. (*Id*. at 2.) The only factor the Court found did not weigh in favor of managing agent status is the factor concerning whether Duesterdieck would appear at VW's request (*Id*. at 3.) The court still held Duesterdiek to be VW's managing agent: "Factor 2 doesn't outweigh Factors 1, 3, and 4, all of which support a managing-agent finding." (*Id*.)

### C. Duesterdiek and VW Violate the Court's Order.

During the weeks following the February 10 Order, the SEC tried to schedule Duesterdiek's deposition without success. On February 24, 2023, Duesterdiek's U.S. lawyer, Phillip Inglima, informed the parties that Duesterdiek would not appear for a deposition. (Ex. 5, 2/24/23 P. Inglima Ltr.) VW is paying for Mr. Inglima to represent Duesterdiek in this matter.

(Ex. 6, 3/13/23 S. Han Email.) According to Mr. Inglima, Duesterdiek would appear for testimony "only in response to a court order compelling his appearance." (Ex. 5, 2/24/23 P. Inglima Ltr.) The Court's February 10 Order did **not**, according to Mr. Inglima, order Duesterdiek "personally" to appear for testimony. (*Id.*) Further, "only a German court can compel his appearance for testimony in Germany" and, according to Mr. Inglima, this Court lacks "authority to compel his appearance outside of Germany." (*Id.*)

On February 27, 2023, the SEC sent correspondence to VW's and Duesterdiek's attorneys regarding Duesterdiek's refusal to appear for a deposition, and in turn, VW's noncompliance with the February 10 Order. (Ex. 7, 2/27/23 D. Hayes Ltr.) As a compromise, the SEC proposed that: (1) Duesterdiek sign a detailed, sworn declaration prepared by the SEC in which he formally exercises his rights under U.S. and German law not to incriminate himself in respect to the matters at issue in this case; and (2) the parties stipulate that the declaration can be used and would be admissible in this case to the same extent as a deposition. (*Id.*) The next day, Mr. Inglima rejected the SEC's proposal. (Ex. 8, 2/28/23 P. Inglima Ltr. to D. Hayes.)[3]

## IV.  ARGUMENT

### A.  The Court Should Sanction VW For Violating The Court's February 10 Order.

 "If a … managing agent of a party … fails to obey an order to provide or permit discovery, the court where the action is pending may issue further just orders." Fed. R. Civ. P. 37(b)(2)(A). Those orders can require a variety of sanctions, including, but not limited to adverse inferences against the party. *RP Golden State Mgmt., LLC v. Ohio Sec. Ins. Co.*, 2021 WL 2536209, at *3-4 (E.D. Cal. June 19, 2021) (granting motion for monetary and adverse inference sanctions against party whose managing agents failed to appear for their properly noticed depositions); *Card Tech. Corp. v. DataCard Inc.*, 249 F.R.D. 567, 571-72 (D. Minn. 2008) (admitting facts as established as sanction for managing agent's nonappearance, despite party's

---

[3] Mr. Inglima had previously informed the SEC that, if ordered to testify in this case, Duesterdiek would exercise "his rights [not to incriminate himself] under the Fifth Amendment to the U.S. Constitution and similar doctrines of German law." (Ex. 9, 11/28/22 P. Inglima Ltr. at 1-2.)

best efforts to get managing agent to appear). Moreover, the Court need not find a party willfully

violated its discovery order to issue sanctions. *Card Tech. Corp.,* 249 F.R.D. at 570; s*ee Societe*

*Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197,

207-208 (1958). "[T]he willfulness or good faith of [the party], can hardly affect the fact of

noncompliance and are relevant only to the path which the District Court might follow in dealing

with [the party's] failure to comply." *Societe Internationale*, 357 U.S. at 207-208. Thus, even if

the Court believes VW's actions in attempting to get Duesterdiek to appear constitute good faith,

the Court may still sanction VW for violating the Court's February 10 Order.

Here, the Court should enter appropriate sanctions against VW because Duesterdiek's

refusal to testify and provide evidence in this case substantially prejudices the SEC, particularly

given his extensive role in and knowledge about all aspects of the fraud. The Court's sanctions

should include, at a minimum: (1) an instruction to the jury that VW was ordered to produce

Duesterdiek as a witness, but VW failed to do so; (2) an instruction to the jury that they may

infer from Duesterdiek's absence that his testimony, if it had been given, would be harmful to

VW; and (3) a finding that all facts supporting the SEC's allegations that Duesterdiek could

testify to, including those facts set forth above in Section III.A., are deemed true and established

for purposes of this case. There is ample authority for the Court to impose these sanctions here.

*See Card Tech. Corp.,* 249 F.R.D. at 571-72 (admitting facts as established as sanction for

managing agent's nonappearance, despite party's best efforts to get managing agent to appear);

*see also Motorola Credit Corp. v. Uzan*, 509 F.3d 74, 85 (2d. Cir. 2007) (finding adverse

inference regarding net worth appropriate where defendants refused to sit for depositions);

*Guinnane v. Dobbins*, 479 F. Supp. 3d 989, 995-96 (D. Mont. 2020) (discussing the possibility of

an adverse inference instruction if a party fails to produce an adequate Rule 30(b)(6) deponent);

*SEC v. Helms*, No. A-13-CV-01036 ML, 2015 U.S. Dist. LEXIS 110758, 2015 WL 5010298, at

*11 (W.D. Tex. Aug. 21, 2015) (inferring from defendant's bad faith refusal to testify that her

answers to the SEC's deposition questions would have been unfavorable to her).

In its recently filed motion asking this Court to reconsider its February 10 Order, VW

relies heavily on this Court's ruling in *Elasticsearch, Inc. v. Floragunn, GMBH*, 2022 WL

214468, at *4 n.4 (N.D. Cal. Jan. 25, 2022) (M.J. Tse) ("*Elasticsearch II*"). In *Elasticsearch II*, the Court declined to enter sanctions against the defendant because the defendant terminated the contracts of two non-employee freelance programmers when they refused to appear for their depositions. *Id*. There is no comparison between the facts in the *Elasticsearch* case and the facts here.

In its initial *Elasticsearch* ruling, this Court found that two non-employee freelance programmers were defendant's managing agents and ordered defendant to produce them for depositions. *Elasticsearch, Inc. v. Floragunn, GMBH*, 2021 WL 1753796, at *3 (N.D. Cal. 2021) ("*Elasticsearch I*"). Later, after the freelance programmers refused to be deposed, the defendant threatened to terminate their contracts. When they refused still, the defendant carried through on its threat and terminated their contracts. Under those specific circumstances, the Court determined that sanctions were not appropriate for defendant's violation of the Court's order. *Elasticsearch II*, 2022 WL 214468, at 4 n.4.

The situation here is very different. *First*, Duesterdiek is nothing like the non-employee witnesses in *Elasticsearch*. He is currently employed by VW as a "manager in [VW's] Quality Assurance Department," he has worked for VW for over 25 years, and he has a cooperation agreement with VW requiring him to sit for interviews and answer questions about the diesel fraud. (*See* Dkt. 104 at 2, 3; Dkt. 104-14.) Although VW says that its cooperation agreement with Duesterdiek does not require his cooperation with U.S. civil proceedings, VW admits that is because it and Duesterdiek designed the agreement that way. They "intended" to exclude U.S. civil cases from its scope. (Dkt. 113 at 4.) *Second*, the defendant in *Elasticsearch* threatened to and did in fact terminate the contracts of the non-employee programmers when they refused to comply. Here, the opposite is true. VW has not threatened or taken any action against Duesterdiek to get him to cooperate. It has done nothing more than send two letters to Duesterdiek's attorney, whom VW is paying, asking Duesterdiek to sit for a deposition. *Third*, there was no indication in *Elasticsearch* that the freelance programmers and the defendant were cooperating in other proceedings. Duesterdiek, however, has made himself fully available to VW in German court proceedings, and VW is using his knowledge and testimony to defend itself in

those proceedings. In sum, Duesterdiek and VW believe they are free to pick which forums they will cooperate in. This Court just isn't one of them.[4] This was not the situation in *Elasticsearch*.

### B. German Law Does Not Trump This Court's Orders.

In its recent Motion for Relief (Dkt. 113), VW claims that it should not be required to make its managing agent and current employee Duesterdiek available for deposition by the SEC, despite the Court's February 10 Order, because German law purportedly gives VW's employees the right to ignore the orders of U.S. courts. According to VW, it cannot even require its employee to sign a declaration confirming that the employee has exercised his rights to remain silent. (Dkt. 113 at 5.) The Court doesn't need to wade into what German law permits or doesn't permit to reject VW's argument. German law cannot serve as a complete shield for VW's violations of the Court's February 10 Order.

German companies, like VW, choosing to do business in the U.S. must comply with U.S. discovery obligations when their actions lead to U.S. lawsuits. *Work v. Bier*, 106 F.R.D. 45 (D.D.C. 1985) (ordering German employees' depositions despite argument that German law barred depositions). As this Court noted in its February 10 Order, "[f]oreign laws 'do not deprive an American court of the power to order a party to produce evidence under the Federal Rules.'" *Id*. (*quoting Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. De Equip. Medico*, 2008 WL 81111, at * 6 (S.D. Cal. Jan. 8, 2008)). This is true "although the production of the evidence may violate [foreign statutes] and subject the defendant to penalties' in his home country." *Synthes*, 2008 WL 81111, at *6 (ordering depositions of Brazilian nationals even though Brazilian law did not permit depositions in Brazil). In the United States, "[m]utual knowledge of all the relevant

---

[4] VW's cooperation agreement with Duesterdiek is dated August 15, 2017. (Dkt. 104-14 at 6.) That is nearly two years after VW received notice that the SEC had begun investigating its defeat device fraud, and many months after other federal and state agencies and private plaintiffs filed lawsuits against VW in the U.S. If VW actually wanted to ensure Duesterdiek's cooperation in this and other U.S. civil cases, it easily could have, and would have, included an express provision requiring him to cooperate in U.S. proceedings. Instead, VW ***chose*** not to. Why? Obviously because it did not want Duesterdiek to cooperate in U.S. civil cases like this one. Thus, Duesterdiek is not now defying VW's wishes; he is doing what the parties "intended" when they designed his cooperation agreement. (*See* Dkt. 113 at 4.)

facts gathered by both parties is essential to proper litigation." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). It would be "patently unfair" for "the scope of plaintiff['s] discovery [to] be limited by [foreign] law," while defendants "have free reign to discover all relevant facts pursuant to the Federal Rules of Civil Procedure." *In re Honda American Motor Co., Inc. Dealership Relations Litig.*, 168 F.R.D. 535, 537-39 (D. Md. 1996) (compelling depositions of Japanese nationals in the United States to avoid limitations of Japanese law).[5]

This is not a case where the Court's discovery order threatens to infringe Germany's sovereignty, such that the Court needs to undertake a "comity analysis." *Id.* at 537 (a "balancing of competing interests between the sovereigns and the parties involved" is required if foreign nation's sovereignty would be infringed by the Court's order); *Calderon v. Experian Information Solutions, Inc.*, 209 F.R.D. 508, 520 (D. Idaho 2013). "[W]hen depositions of foreign nationals are taken on American or neutral soil, courts have determined that comity concerns are not implicated." *Honda*, 168 F.R.D. at 538 (citing cases); *Work*, 106 F.R.D. at 51 ("violation of [Germany's] judicial sovereignty is avoided by ordering that the depositions take place outside the country."). The Court did not order VW to produce Duesterdiek for a deposition in Germany. As with all other depositions of VW employees taken in this case, Duesterdiek's deposition can proceed in Brussels or America. VW and Duesterdiek can comply with the Court's order without violating German law; they just refuse to and now want to see if the Court will change its mind because of their defiance.

---

[5] VW claims it cannot even punish Duesterdiek for refusing to sign a declaration confirming his intent to exercise his rights to remain silent. (Dkt. 113 at 5.) That not only defies common sense, but it is simply not accurate. According to German employment attorney Dr. Dirk Freihube, German legal authority supports the fact that "the employee can [] be requested by the employer to submit a sworn statement" and that the "employee's obligation to provide information upon the employer's request is also enforceable." (Ex. 10, 3/15/23 Decl. of Dr. Dirk Freihube at 1-2 (cites omitted).) If VW really wanted Duesterdiek to sign a statement saying that he was exercising his right to remain silent, he would sign it. And if he didn't, VW *could* reprimand him. In any event, the Court need not get bogged down trying to resolve disputed principles of German labor law. United States law—not German law—governs the discovery obligations of VW and its managing agents.

Even if a balancing of competing interests were necessary, the sovereignty concerns of the United States would easily prevail over the non-existent German sovereignty interests implicated by the Court's order. The United States has a clear and strong interest "in maintaining the integrity of its judicial system and the power of its jurisdiction over persons doing business in the United States." *Honda*, 168 F.R.D. at 539. Moreover, this is an enforcement action brought by the federal government agency charged by Congress with civil enforcement of the federal securities laws, and it involves claims that defendants violated those laws by fraudulently selling billions of dollars in bonds to U.S. investors. *See id.* (case between private parties involving federal antitrust laws and questions of U.S. economic policy implicated U.S. sovereignty). The sovereignty concerns of the United States would be "severely infringed" if its laws, its court rules, and its courts' orders had to give way to Duesterdiek's objection to being deposed. *Id.*

VW cannot hide behind German law to side-step this Court's valid discovery orders to the great prejudice of the SEC. *See Graco, Inc. v. Kremlin, Inc.*, 101 F.R.D. 503, 527 (N.D. Ill. 1984). To paraphrase the *Graco* court's holding, "The [German] Statute is not [the SEC's] problem, and it is not the court's problem; it is [VW's] problem." *Id.*

VW's violation of the Court's February 10 Order should be sanctioned, not rewarded.

## V.   **CONCLUSION**

If the Court allows VW to escape sanctions here, VW will have written the perfect playbook for foreign corporate litigants looking to duck their discovery obligations— *i.e.*, their managing agents are free to disregard the orders of U.S. courts without consequence. The fact that VW is now trying to shoehorn its way into the very different situation present in this Court's recent ruling in *Elasticsearch* proves this point. VW—not the SEC and not the Court—must bear the consequences of the decisions made by its managing agents. VW certainly understood when it decided to tap into American financial markets to raise billions of dollars from U.S. investors that its decision came with strings—*i.e.*, an obligation to comply with U.S. law, including U.S. discovery rules. VW has enjoyed the immense upside to that decision; it cannot now simply cut the strings.

For the foregoing reasons, the SEC respectfully requests that grant this motion, that it enter all appropriate sanctions against VW, including the sanctions requested in this motion, and grant the SEC all additional relief that is appropriate in the circumstances.

Dated: March 17, 2023

Respectfully submitted,

*/s/* Daniel J. Hayes
U.S. Securities and Exchange Commission
175 W. Jackson Blvd., Suite 1450
Chicago, Illinois 60604
Telephone: 312-353-3368
Email: hayesdj@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2023, I electronically transmitted the foregoing document to the Court Clerk using the ECF System for filing. The Clerk of the Court will transmit a Notice of Electronic Filing to all ECF registrants.

/s/ Daniel J. Hayes

# DOCUMENT 10

**SAVERI & SAVERI, INC.**
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

*Trump Alioto Trump & Prescott*
ATTORNEYS LLP
2001 Union Street, Suite 482
San Francisco, California 94123
(415) 563-7200
FAX (415) 346-0679

May 26, 2023

*VIA EMAIL*

The Honorable Vaughn R. Walker
Law Office of Vaughn R. Walker
Four Embarcadero Center, Suite 2200
San Francisco, CA 94111
vrw@judgewalker.com

> Re: *In re Cathode Ray Tube (CRT) Antitrust Litigation* – MDL No. 1917,
> Master File No. 07-CV-5944-JST

Dear Judge Walker:

## I.    Introduction

Direct Purchaser Plaintiffs ("DPPs") and Indirect Purchaser Plaintiffs ("IPPs") (together, "Plaintiffs") respectfully submit this Reply Brief in Support of their Motion for Terminating or Alternative Sanctions ("Motion" or "Mot.").

Irico's Opposition (or "Opp.")[1] fails to refute the damning facts Plaintiffs set forth in the Motion. Those facts demonstrate that Irico:

- Ignored the advice of its counsel and failed to preserve entire categories of highly relevant documents;
- Failed to produce two key witnesses for deposition, and acted in bad faith in so doing;
- Improperly withdrew from the case for over seven years which effectively put most witnesses with knowledge of its participation in the alleged conspiracy beyond the reach of this litigation;
- Defied at least five Court orders; and
- Was repeatedly dishonest with Plaintiffs and the Court about the foregoing.

---

[1] Defendants Irico Group Corporation ("Group") and Irico Display Devices Co., Ltd. ("Display") (together, the "Irico Defendants" or "Irico").

The Honorable Vaughn R. Walker
5/26/2023
Page 2

In short, the record demonstrates that from the start of this litigation Irico has brazenly violated well-established law and this Court's orders, destroyed evidence, and repeatedly misled the Court. Irico's Opposition also reveals that it is unrepentant. It acknowledges none of its misdeeds. Instead, Irico portrays itself an exemplary litigant that has operated honestly and in compliance with discovery obligations since the outset of the case to the best of its abilities, and taken great pains to reduce the burdens of discovery to Plaintiffs. *See* Opp. at 22–23. It asserts that any shortcomings are the innocent results of its inexperience and unfamiliarity with American legal proceedings, and caused no meaningful prejudice to Plaintiffs. In other words, Irico's opposition manifests a decision to brazenly continue its dishonest defense of this case and to double down on its improper and unlawful conduct.

First, Irico's assertion that it has done nothing materially wrong and therefore lacked the requisite intent for the Court to impose terminating or any other severe sanction ignores the facts and the law. There is no question that Irico's wholesale destruction of virtually all evidence in its possession relating to its participation in the alleged conspiracy and its sale of CRTs was intentional. This is conclusively shown by Irico's admitted failure—after receiving explicit advice from its sophisticated counsel and an express order of the Court—to disseminate any written litigation hold notice beyond the Litigation Committee (who were themselves conspirators), or to search for and preserve evidence relating to its participation in the conspiracy. Irico's intentionality is also demonstrated by its long-running campaign to mislead Plaintiffs and the Court and prevent its wrongful conduct from seeing the light of day.

Second, Irico has no excuse for its failure to produce Su Xiaohua for deposition. Mr. Su was one of only two remaining Irico employees who attended competitor meetings. Irico fails to rebut Plaintiffs' showing that it violated two Court orders. Irico's claim that Mr. Su's failure to testify was outside its control is contrary to the record. Irico authorized his early retirement without requiring him to testify, knew he would not testify well before informing Plaintiffs, and did nothing to persuade him to testify.

Third, Irico fails to submit any evidence to support its contention that its unilateral withdrawal from the case for over seven years was based on a good faith belief that it was immune from suit under the Foreign Sovereign Immunities Act of 1976 ("FSIA"). Irico thereby concedes that its representation to that effect to the Court in connection with its motion to lift the default—and on which the Court appeared to rely in lifting the default—was false.

Fourth, Irico's dismissal of its various other failures to comply with Court Orders as too far in the past to form the basis for sanctions or to even be considered by the Court is incorrect. Much of this wrongdoing—which Irico does not meaningfully deny—only became clear after recent discovery revealed Irico's spoliation of evidence and dishonest coverup of that fact, among other things. Regardless, it is plainly proper for the Court to consider Irico's violations of orders of the Court and its discovery obligations. Indeed, the Court asked Plaintiffs to brief the issue.

The Honorable Vaughn R. Walker
5/26/2023
Page 3

As Plaintiffs explained in the Motion, Irico's conduct warrants the imposition of a terminating sanction to prevent Irico from profiting by its wrongful conduct, to vindicate the Court's authority, to deter such conduct by Irico and other litigants, and to remedy the severe prejudice to Plaintiffs and the Court caused by Irico's conduct. Short of that, the Court should impose severe alternative sanctions, including deeming key facts determined against Irico, striking Irico's affirmative defenses, instructing the jury that it must draw an adverse inference based on Irico's failure to preserve evidence and failure to produce a key witness (and drawing such an inference itself when the Court serves as trier of fact), and deeming notes of competitor meetings produced by other defendants herein to be admissible at trial against Irico.

## II.     Irico Fails To Rebut Plaintiffs' Evidence That Its Spoliation of Evidence Was Intentional.

Irico fails to rebut—or even meaningfully address—Plaintiffs' showing that it made no effort to identify or preserve potentially relevant evidence, and that in allowing that evidence to be lost or destroyed, it acted in bad faith and with the intent to deprive Plaintiffs of the use of that evidence in this case. Irico's claim that it failed to understand its basic obligations to preserve evidence despite the clear and repeated advice of a sophisticated law firm is preposterous. Its assertion that, in any event, there were few relevant documents left to preserve at the commencement of the litigation is equally unavailing. The law imposes on Irico the duty of establishing that the lost evidence was not material. *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (a spoliating party cannot assert a "presumption of irrelevance" as to destroyed documents). But Irico has made no attempt to meet that burden. Finally, Irico's arguments that Plaintiffs have misstated the law lack merit. The evidence of Irico's intent more than satisfies the requirements for terminating or other severe sanctions.

### A.     Irico's Claims That It Failed to Understand Its Obligations To Preserve Evidence Continue Its Campaign of Deception.

#### 1.     Pillsbury Clearly Informed Irico Of Its Obligations.

Irico claims that it did not understand its obligation to preserve "potentially relevant" documents despite the clear advice of its sophisticated counsel because it lacked experience with American litigation generally and antitrust litigation specifically. It therefore argues that its conduct was not sufficiently "intentional" to justify terminating or other severe sanctions. Opp. at 19–21. This argument is completely unsupported by facts and cannot withstand scrutiny. The facts compel the conclusion that Irico's claims of misunderstanding are false.

First and foremost, Irico disregards the fact that its obligations were repeatedly explained to it in detail by Pillsbury. Mot. at 4–7. Irico's attempts to minimize Pillsbury's express instructions to preserve "potentially relevant" documents ignore the plain language of those instructions. Pillsbury repeatedly advised Irico of the importance of preserving

The Honorable Vaughn R. Walker
5/26/2023
Page 4

documents and the dire consequences of a failure to do so. Pillsbury explained at least as early as February 2008 that Irico was required to disseminate a written notice to its employees to preserve documents; transmitted the Court's order requiring the preservation of evidence; explained in detail particular categories of documents that should be preserved; and drafted a proposed written litigation hold notice, in Chinese, with instructions that it should be disseminated to Irico employees. *Id.* It is uncontested that Pillsbury's advice was transmitted to and considered at the highest levels of Irico including the Litigation Committee.[2] Irico General Counsel Yan Yunlong admits that he read and understood Pillsbury's advice and discussed it with Pillsbury. He also forwarded and transmitted it to his superiors and to the members of the Litigation Committee. The Litigation Committee studied and discussed it.[3]

Irico also concedes that the Litigation Committee, in addition to General Counsel Yan, was made up of sophisticated senior Irico executives, *id.*, Ex. A at 8–10, many of whom had attended competitor meetings, some as recently as July 2007.[4] The Litigation Committee was thus well aware of the facts alleged in the complaints and the illegality of the meetings. Indeed, the meetings included discussions of the need to maintain secrecy.[5] It is not credible that the Litigation Committee members did not understand Pillsbury's clear and straightforward advice to locate and preserve evidence relating to those meetings. Despite all of this, Irico admits that no written litigation hold was ever disseminated to potential custodians, no investigation was ever performed into the existence of potentially relevant documents, and no documents were ever preserved as a result of Pillsbury's advice or the Court's Order. *See, e.g.*, Mot. at 11–14.

Indeed, even Irico's claim that it orally instructed its employees to preserve evidence is completely unsupported. There is no evidence in the record that a single person beyond the Litigation Committee was ever advised to preserve any evidence. The only witness with actual knowledge—General Counsel Yan—testified that he never told anyone beyond the Litigation Committee to preserve anything, and that while he asked other

---

[2] Capurro Decl., Ex. D (IRI-SUPP-000006–11E). "Capurro Decl." refers to the Declaration of Lauren C. Capurro submitted in support of the Motion. "Saveri Decl." refers to the accompanying Declaration of R. Alexander Saveri.

[3] *Id.*, Ex. E (Yan Yunlong Dep. Tr. Vol. I) at 127:19–130:23; *see also id.*, Ex. D (IRI-SUPP-000006–11E).

[4] *See* Saveri Decl., Ex. 1 (BMCC-CRT000105586–90E) at BMCC-CRT000105587 (listing Wang Ximin as attendee).

[5] *See, e.g., id.*, Ex. 2 (Dep. Ex. 8570, CHU00047657–74) (January 2007 meeting attended by Xing Daoquin (President of Group), Guo Mengquan (senior executive of Group), Wang Ximin and Shen Xiaolin (senior executives of Group and Litigation Committee members)) at CHU00047661–62 ("President of the Association Fan: The meeting needs to form a press release so that all speak with one voice. (Please pay attention to information security and information propaganda, and keep the meeting content from spreading outside.)").

The Honorable Vaughn R. Walker
5/26/2023
Page 5

members of the Litigation Committee to do so, he does not know if they did.[6] In short, the evidence overwhelmingly supports and compels the conclusion that Irico was fully aware that it was obliged to search for and preserve evidence, and it knew that evidence would be lost or destroyed in the absence of such preservation. Yet, Irico failed to take any steps to find or preserve any such evidence.

Irico fails to meaningfully address any of the foregoing evidence. Strikingly, Irico offers no positive evidence of its purported misunderstanding. While General Counsel Yan and other members of the Litigation Committee remain available to Irico, the record contains no positive averment by anyone with personal knowledge that Irico in fact misunderstood Pillsbury's advice. On the contrary, General Counsel Yan testified that he advised the Litigation Committee to preserve documents in addition to those relating to U.S. sales and competitor meetings.[7] Irico's reliance on Zhang Wenkai's testimony that Irico believed it was unnecessary to preserve evidence is misplaced. Mr. Zhang's testimony is not only not credible, it was also part of an attempted cover-up of Irico's failure to preserve evidence. Mot. at 8. Moreover, Mr. Zhang lacks credibility because he previously submitted a false declaration, *see* ECF No. 6115 ("Su Order") at 2–3, and he has no personal knowledge of Irico's preservation of evidence in 2008 because he did not begin serving as Irico's legal counsel until 2017.[8]

## 2. Pillsbury's Advice Was Clear.

Second, Irico's criticisms of Pillsbury's advice—i.e., that it was unclear and inadequate—lack merit. *See, e.g.*, Opp. at 17, 19 (characterizing February instructions as merely "general advice"). Pillsbury's instructions "not to destroy or dispose of any potentially relevant documents, whether in paper, electronic, or any other form" are clear and unambiguous. Irico also mischaracterizes Pillsbury's advice. The February email—in Chinese from a Pillsbury partner in its Shanghai office—clearly advised Irico to provide written instructions "as soon as possible" to its relevant employees to preserve evidence, and offered its help drafting the notice. Capurro Decl., Ex. C (IRI-SUPP-000001–05E) at IRI-SUPP-000001E. Irico's assertion—again unsupported by a declaration or other evidence—that this email was the only advice it received for "over four months" is incorrect. Opp. at 18. The June 2008 communication indicates at least one previous "discussion" with Irico personnel relating to evidence preservation, and again unambiguously emphasizes the importance of the issue. Capurro Decl., Ex. F (IRI-SUPP-000012–021E) at IRI-SUPP-000012E ("As we have discussed with Irico, this is an extremely important statutory requirement. If some potentially relevant information is lost or destroyed, this could have very serious consequences for Irico."). Moreover, Mr. Yan

---

[6] Capurro Decl., Ex. E (Yan Yunlong Dep. Tr. Vol. I) at 137:21–139:14.

[7] *Id.* at 136:25–138:21.

[8] ECF No. 5215-1 ¶ 2 (Zhang Declaration ISO Irico's Motion to Set Aside Default); ECF No. 5240 at 5–6 (Order Setting Aside Default finding Zhang lacked personal knowledge).

The Honorable Vaughn R. Walker
5/26/2023
Page 6

confirmed that he spoke with Pillsbury attorneys regarding document preservation issues. *See id.*, Ex. E (Yan Yunlong Dep. Tr. Vol. I) at 132:17–133:7.

The discussion(s) Irico personnel had with Pillsbury dispose of any possibility that Irico misunderstood its obligations to preserve evidence. Pillsbury lawyers were available (including Chinese-speaking attorneys in the Shanghai office) to discuss any questions Irico had, and Irico in fact discussed its obligations with them. In short, the record is clear that Pillsbury's instructions to Irico to preserve all "potentially relevant" documents were timely, repeated and clear, and that Irico had the opportunity to and did discuss them with its experienced counsel.

### 3. Irico Did Not Misunderstand the "Scope" of the Documents It Was Obligated to Preserve.

Irico's claim that it misunderstood the "scope" of the documents it was required to preserve is not credible in light of the foregoing. The Litigation Committee members were aware of the alleged wrongful behavior by virtue of their participation in it. *See* Mot. at 28. Irico's claim that "relevance" is a concept unique to American law that Irico had no experience with defies belief. It is, once again, unsupported by any evidence. In addition, it is implausible that the concept of relevance or the nature of evidence-based proceedings would be beyond the understanding of sophisticated Chinese businesspeople who have retained American lawyers to advise them. Irico's claim also rings false because it failed to preserve *any* evidence that might bear on the subject matter of this lawsuit. To lose or destroy *everything*, Irico cannot have had a mere misunderstanding about what was relevant. Rather, its failure to preserve anything must have been intentional. The notion that the Litigation Committee would fail to understand the concept of written notice to document custodians is similarly implausible.

### 4. Irico Was Not An "Inexperienced" Or "Unsophisticated" Litigant.

Irico's claims that it was an inexperienced and unsophisticated litigant unfamiliar with antitrust law are contradicted by the record. Consistent with its longstanding position as a major manufacturer and global exporter of CRTs,[9] Irico had substantial experience with high-level litigation by 2008, including matters in the United States and matters involving allegations of anti-competitive conduct. For example, in 2000, Irico was a participant in an antidumping proceeding before the European Commission alleging dumping of 14" CRTs. The case involved analysis of, among other things, Irico's eligibility for 'market economy status,' the CRT markets in India, Malaysia, China and the European Union and the cost basis for its 14" CRTs. Saveri Decl., Ex. 4 (Dep. Ex. 8396) at 1. Irico hired sophisticated European counsel and prevailed on the ground that its conduct had

---

[9] *See, e.g.*, Saveri Decl., Ex. 3 (excerpt of Dep. Ex. 8418, IRI-CRT-0000232–321E) (Irico Display 2007 Annual Report) at IRI-CRT-0000247E (18% of revenue from overseas)).

The Honorable Vaughn R. Walker
5/26/2023
Page 7

caused no harm to the complainant. *Id.* Moreover, its star witness in the proceeding—Liang Yuan—was a member of the Litigation Committee.[10]

Irico's statement that it was "wholly unfamiliar with U.S. litigation in 2008" is also demonstrably false. In 2001, Irico engaged prominent San Francisco lawyer Cedric Chao of Morrison & Foerster in connection with potential litigation regarding the fraudulent sale of assets of its United States sales company Irico (USA) Inc.[11] Irico ultimately decided not to pursue litigation because of its cost and because of anticipated problems with "evidence collection."[12] Based on this experience, Irico would have understood that the loss of communications relating to its attendance at competitor meetings and other evidence of its participation in the alleged conspiracy, and of its CRT production, pricing and sales, among other things, would be to its advantage in this litigation.

Irico argues that its good conduct since 2017 and its "candor" about its destruction of evidence rebuts a finding of intentionality. Opp. at 23. This argument is likewise contrary to the record. As the Court has noted, Irico's conduct in discovery has been clearly inadequate. *See, e.g.*, Su Order at 7 ("Throughout the entire CRT litigation, there have been many discovery disputes, but on a per defendant basis, the discovery motions involving the Irico defendants appear notably numerous. Most of the discovery disputes briefed by Irico and the PPs have resulted in orders compelling Irico to respond to discovery requests."); *id.* at 12 ("the chronology recited herein paints an unflattering picture of Irico"); *see also* Mot. at 15–21. In addition, as detailed in the Motion, Irico has been far from candid regarding its failure to search for and preserve relevant evidence in 2008 in a transparent attempt to avoid sanctions.

Further, Irico's claims of "good faith" and "candor" are absurd. Its conduct is comparable to that of the sanctioned parties in *Internmatch, Inc. v. Nxtbigthing*, LLC, No. 14-CV-05438-JST, 2016 U.S. Dist. LEXIS 15831, 2016 WL 491483, at *8–10 (N.D. Cal. Feb. 8, 2016), *vacated*, No. 14-CV-05438-JST, 2017 WL 8944065 (N.D. Cal. Nov. 17, 2017) ("*Internmatch*"); *Facebook, Inc. v. OnlineNIC Inc.*, No. 19-CV-07071-SI (SVK), 2022 WL 2289067, at *3–5 (N.D. Cal. Mar. 28, 2022), *report and recommendation adopted*, No. 19-CV-07071-SI, 2022 U.S. Dist. LEXIS 11306, 2022 WL 17371092 (N.D. Cal. Oct. 17, 2022); and *Dupuis v. Marriott Corp.*, No. 3:12-CV-00580-AC, 2014 U.S. Dist. LEXIS 5678, 2014 WL 199096, at *7 (D. Or. Jan. 15, 2014). *See* Opp. at 22–23. Indeed, as explained in the Motion and below, this conduct provides additional support for the imposition of severe sanctions. *See, e.g.*, Mot. at 3–21.

---

[10] Capurro Decl., Ex. A (Irico's Suppl. Objs. & Resps. To IPPs' Third Set Interrogs.) at 8–9.

[11] Saveri Decl., Ex. 5 (Dep. Ex. 8392, IRI-CRT-00003490–97E) at IRI-CRT-00003494E.

[12] *See id.* at IRI-CRT-00003496 ("evidence collection would involve US laws, which suggests too many big obstacles and hefty costs, making it hard to do"); *id.* at IRI-CRT-00003490 (records unavailable).

The Honorable Vaughn R. Walker
5/26/2023
Page 8

   **B.   Irico's Conduct Meets the Legal Standard of Intent, Willfulness and Bad Faith.**

   Irico's assertion that Plaintiffs set forth an improper standard for the degree of intentionality required for the imposition of terminating or other severe sanctions is incorrect. Plaintiffs' statement of the applicable standards is correct, *see* Mot. at 26–29, and none of the cases cited by Irico enunciate a materially different standard. "Intent," willfulness and bad faith can be proven inferentially through circumstantial evidence. *Torgersen v. Siemens Bldg. Tech., Inc.*, No. 19-CV-4975, 2021 U.S. Dist. LEXIS 98024, 2021 WL 2072151, at *4 (N.D. Ill. May 24, 2021). The facts and circumstances that distinguish Irico's conduct here have been repeatedly found to support a finding of intentional spoliation:[13]

   **Violation of a Court Order to Preserve Evidence.** In *John v. Cty. of Lake*, No. 18-cv-06935-WHA (SK), 2020 U.S. Dist. LEXIS 118241, *20–21, 2020 WL 3630391 (N.D. Cal. July 3, 2020), the district court found that the defendants had destroyed evidence with a guilty intent based on the fact that the court had "explicitly warned Defendants to put in place policies to preserve evidence and to stop any policy of destruction," but that they had failed to do so.[14] The same is true here—Irico ignored the Court's direction, in Pretrial Order No. 1, to search for and preserve potentially relevant evidence.

   **Massive Loss or Destruction of Evidence.** The sheer scope of the loss or destruction of evidence has also been held to support a finding of intent. *See WeRide Corp. v. Kun Huang*, No. 5:18-cv-07233-EJD, 2020 U.S. Dist. LEXIS 72738, 2020 WL 1967209

---

[13] Irico claims that Plaintiffs' arguments regarding its culpability "rest on bad authority" because it asserts that *Pension Committee of the University of Montreal Pension Plan v. Banc. of Am. Sec., LLC*, 685 F. Supp. 2d 456 (S.D.N.Y. 2010) ("*Pension Committee*"), was "abrogated" by the Second Circuit in *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012) ("*Chin*"). Opp. at 21–22. This argument is incorrect. *Pension Committee* has not been overruled. The *Chin* court, in *dicta*, merely took issue with *Pension Committee*'s statement that the failure to adopt a written litigation hold constitutes "gross negligence *per se*." *Chin,* 685 F.3d at 162. That quibble is profoundly irrelevant here because Plaintiffs argue that Irico's failure to adopt a written litigation hold, in defiance of its own counsel's repeated instructions, was willful. Moreover, none of the other propositions for which Plaintiffs cited *Pension Committee* have been questioned by the Second Circuit, much less abrogated. *See* Mot. at fns. 91, 96, 114 & 129. *Pension Committee* remains good law. And, in any event, it is not the only authority supporting the imposition of sanctions against Irico in this case.

[14] *See Bernstein v. Virgin America, Inc*., No. 15-cv-02277-JST, 2018 U.S. Dist. LEXIS 201712, 2018 WL 6199679, *5 (N.D. Cal Nov. 28, 2018) ("Disobedient conduct not shown to be outside the control of the litigant" was all that was required to demonstrate the defendant's willfulness, bad faith, or fault); *Internmatch*, 2016 U.S. Dist. LEXIS 15831, at *11 (same).

The Honorable Vaughn R. Walker
5/26/2023
Page 9

(N.D. Cal. Apr. 24, 2020) ("*WeRide*") (defendants' "massive" destruction of ESI held to support a finding of intent under Rule 37(e)). Here, virtually everything was destroyed.

**Failure to disable auto-delete functionality.** Failure to disable auto-delete functionality has also been held to satisfy the intent requirement of Rule 37(e)(2). *Glaukos, Inc., v. Ivantis, Inc.,* No. SACV 18-620 JVS (JDEx), 2020 U.S. Dist. LEXIS 257464 (June 17, 2020); *WeRide*, 2020 U.S. Dist. LEXIS 72738, at *35. *See Paisley Park Enters. v. Boxill*, 330 F.R.D. 226, 233 (D. Minn. 2019) (failure to de-activate auto-erase function found to be "sufficient to show that Defendants acted unreasonably"). In this case, Irico did nothing to terminate the automatic deletion of emails. Indeed, there is no evidence that anyone at Irico even talked to the IT department about preventing the automatic destruction of evidence or preserving records.

**Conscious Dereliction of a Known Duty to Preserve Evidence.** An intent to deprive can also be found from "a conscious dereliction of a known duty" to preserve evidence. *Mule v. 3-D Bldg. & Constr. Mgmt. Corp.*, 2021 U.S. Dist. LEXIS 124711, *37–38, 2021 WL 2788432 (E.D.N.Y. Jul. 2, 2021). Here, Pillsbury told Irico what it was obligated to do to comply with U.S. law regarding evidence preservation. That Irico deliberately defied Pillsbury's repeated instructions is evidence of intent. *See Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422, 436–37 (S.D.N.Y. 2004) (concluding that UBS acted willfully in destroying potentially relevant information and ordering an adverse inference instruction based, in large part, upon the finding that "UBS deleted the e-mails in defiance of explicit instructions [from counsel] not to.").

**Inconsistent Stories.** In *Internmatch*, 2016 WL 491483, at *11, Judge Tigar held that inconsistencies in the defendants' explanation of how evidence had been lost or destroyed supported an inference that they had been guilty of bad faith spoliation, and imposed sanctions that included a mandatory adverse inference instruction to the jury. *Accord Torgersen*, 2021 WL 2072151, at *4–5 (plaintiff's "shifting explanations" of why his Facebook page had been deleted supported a finding of intent). Irico's shifting explanations of what it did or failed to do to identify and preserve evidence also support a finding of intentionality. *See* Mot. at 8–10.

**Implausible Explanations.** In *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 337 (D. Ariz. Feb. 3, 2022), the Court found that the implausibility of Plaintiff's explanation for her loss or destruction of evidence supported the conclusion that she had failed to preserve this evidence with intent to deprive Ds of its use in the litigation. The same is true here.

**Notice of Relevance.** In *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006), the Ninth Circuit held that "[a] party's destruction of evidence qualifies as 'willful' spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'"). Here, Irico had been served with the complaint and was represented by experienced, knowledgeable counsel. It plainly had notice of the relevance of much, if not all, of the material that has now been lost.

The Honorable Vaughn R. Walker
5/26/2023
Page 10

C. **Irico Fails To Rebut Plaintiffs' Showing That Plaintiffs Have Been Prejudiced By Its Destruction Of Entire Categories Of Relevant Documents.**

Irico seeks to avoid sanctions for its failure to institute a litigation hold and suspend its email autodelete function by claiming that few relevant documents remained in late 2007 when its duty to preserve was triggered. Irico points to its "rudimentary" electronic systems, its limited use of email during the class period, and the fact that there was no requirement to preserve ESI under Chinese law. *See* Opp. at 13–17. Irico further asserts that it preserved and produced "many relevant hard copy documents" in Irico's government-mandated archives pursuant to Chinese law. *Id*. at 12–13.

This Court has already concluded that "[o]n balance, it appears highly likely that relevant evidence was destroyed or lost due to Irico's long-delayed and inadequately implemented litigation hold efforts." ECF No. 6146 at 9. The Court expressly rejected Irico's contention that all documents would have been destroyed before the duty to preserve arose. Mot. at 11, 13–14. Irico fails to even mention these findings, much less offer new evidence or arguments suggesting that they are inaccurate.

To show prejudice resulting from spoliation, a party need only come forward with plausible, concrete suggestions as to what the destroyed evidence might have been. *Micron Tech., Inc. v. Rambus Inc.,* 645 F.3d 1311, 1328 (Fed. Cir. 2011). Plaintiffs have satisfied this standard. In the Motion, Plaintiffs pointed to additional examples of entire categories of highly relevant electronic and hard copy documents that Irico generated during the relevant period, but which it failed to preserve and produce. *See* Mot. at 11–13. Plaintiffs also provided additional examples of emails dated 2006 and 2007, competitor meeting notes, weekly and monthly sales and marketing reports, and other Irico-authored documents—all of which were computer generated—that Plaintiffs have found in other defendants' files. *Id*. at 13–14. Irico has produced none of these documents.

Irico does not dispute that it generated the types of documents identified by Plaintiffs, that the documents Plaintiffs found in other defendants' files are authored by Irico, or that it failed to preserve and produce them. Nor does it challenge the Court's prior findings. Rather, Irico ignores Plaintiffs' evidence and the Court's findings and repeats arguments the Court has already rejected.

1. **Irico's Provides No Evidence In Support Of Its Claim That It Destroyed All Relevant ESI Before Its Duty To Preserve Was Triggered.**

Irico presents no admissible evidence in support of its implausible claim that it destroyed all relevant emails and other ESI in the ordinary course of business before its duty to preserve was triggered. Irico relies on its own self-serving interrogatory

The Honorable Vaughn R. Walker
5/26/2023
Page 11

responses,[15] which are not admissible evidence. *See Cardinal v. Lupo*, No. 18-cv-00272-JCS, 2019 U.S. Dist. LEXIS 159296, at \*72–73, 2019 WL 4450859 (N.D. Cal. Sep. 17, 2019), *citing AT & T Corp. v. Dataway Inc.*, 577 F. Supp. 2d 1099, 1109 (N.D. Cal. 2008) (a party cannot rely on its own interrogatory responses because "[a] party's own interrogatory responses . . . are hearsay"). Moreover, Irico's interrogatory responses elsewhere admit that it recycled the computers of departing employees long after its duty to preserve was triggered.[16]

Irico's only other evidence in support of this claim is Mr. Zhang's testimony that Irico had no retention policy for electronic documents because the Chinese government did not require it. *See* Opp. at 16. But Mr. Zhang did not work for Irico during the class period. Accordingly, he lacks personal knowledge of Irico's retention of electronic documents during that time. In addition, even if it is true that Irico did not have a retention policy for electronic documents in 2008, it does not follow that Irico had destroyed *all* relevant emails and other electronic documents before its duty to preserve was triggered. Irico has never provided any sworn evidence from an IT professional about the technical specifications of its servers or email systems (e.g., what equipment was installed and when, the storage capacity of the system, backup procedures, etc.), or any explanation for why it cannot do so. Likewise, even if the Court credits Irico's self-serving assertions that email servers were regularly overwritten at that time, "Irico [still] presents no information about investigating custodial files of 'key employees' who may have printed relevant emails, forwarded them to their personal email accounts or downloaded emails to their work or personal computers or to portable hard drives." ECF No. 6146 ("Lit. Hold Order") at 9. Irico's silence in response to the Court's invitation is telling.

Finally, as detailed in the Motion and above, Irico has admitted that it made no effort to investigate Plaintiffs' claims beyond attempting to prove it made no direct sales to the United States.[17] It has also admitted it has no evidence of anyone at Irico searching for relevant emails or other documents in 2008.[18] Thus, Irico has no way of knowing what existed when, and whether relevant evidence was destroyed before or after the duty to preserve was triggered. Since Irico's conduct has created this uncertainty, it should bear the consequence of it. *See Perez v. United States Postal Serv.*, No. C12-00315 RSM, 2014 U.S. Dist. LEXIS 184999, at \*9 (W.D. Wash. July 30, 2014) ("Where emails and documents are missing entirely due to a party's failure to preserve and their relevance cannot be directly ascertained, a party can hardly assert any presumption of irrelevance to

---

[15] S*ee* Opp. at 16 (citing Irico's interrogatory responses as support for the limited storage capacity of Irico's email server and its policy of retaining emails on its server for only twenty days).

[16] *See* Mot. at 12 nn. 43 & 44.

[17] *See* Mot. at 10 (citing Capurro Decl. Ex. S (Irico's Third Suppl. Resp. to Interrog. No. 2) at 25–26, & Ex. R (Unsworn Yan Decl.) ¶¶ 7–10.

[18] *Id.*

The Honorable Vaughn R. Walker
5/26/2023
Page 12

the destroyed documents. Rather, the party that fails to preserve evidence bears the consequence of the uncertainty as to the relevance of the documents and the resulting prejudice.") (internal quotation marks and citations omitted).

### 2. Irico's Claim That Its Employees' Use Of Email Was Limited Is Contrary To The Evidence And Cannot Justify Its Failure To Produce Any Emails.

As the Court has already recognized, Irico's claim that its employees' limited use of email justifies its failure to produce any emails lacks merit. Irico continues to rely upon self-serving and implausible testimony by individuals who lack knowledge of email use by others,[19] and its own interrogatory answers, which as demonstrated above, are not admissible evidence. *See Cardinal v. Lupo*, 2019 U.S. Dist. LEXIS 159296, at *72–73. Irico also ignores the substantial evidence demonstrating email use by its employees as far back as 2001. Emails produced by defendant BMCC show an "Irico.com.cn" domain as early as 2001, and in 2002 and 2003.[20] In addition, Liang Yuan regularly used email to communicate with Irico's competitors in 2006 and 2007. *See* Lit. Hold Order at 9 (finding that emails "in Ling Yuan's and others' files" likely still existed at the time the duty to preserve arose).[21] Irico also concedes that it used email to communicate regarding production and "the scheduling and planning of the China CPT Industry Association[,]"[22] a trade organization through which anticompetitive agreements were reached and enforced.

Further, Irico offers no meaningful new evidence to support its implausible assertion that no relevant pre-2007 email communications existed at the end of 2007. The recent (2020) newspaper article written about email use generally in China (Opp. at 16–

---

[19] Mr. Zhang's testimony regarding what he was told by "IT" is inadmissible hearsay. Opp. at 14. Yan's testimony lacks foundation as to how employees in other departments used email. Opp. at 15.

[20] *See* Saveri Decl., Ex. 6 (BMCC-CRT000127966–69) (2001 email sent to pqwang@irico.com.cn from LG), Ex. 7 (BMCC-CRT000314540) (2002 email sent to hywen@irico.com.cn from Konka), Ex. 8 (BMCC-CRT000296385) (2003 email sent to jingyuan@irico.com.cn from BMCC). Irico has asserted that the "Irico.com" domain was maintained by its sales company CNEIECC. *See* Capurro Decl., Ex. P (Irico's Objs. & Resps. to IPPs' Fourth Set of Interrogs.) at 8 (response to Interrogatory No. 1A). This is a distinction without a difference, even if true. However, business cards produced by Chunghwa show that Gao Rongguo used an Irico.com.cn email address in 2003, when he was a General Manager at Irico Group. *See* Saveri Decl., Ex. 9 (Dep. Ex. 8584, CHU00030303–04) at CHU00030303 (first column, second row), CHU00030304 (same, with handwritten date).

[21] *See also* Mot. at 13 (discussing emails); Capurro Decl. ¶¶ 29–31, Exs. Z–BB.

[22] *See* Capurro Decl. Ex. S (Irico Third Suppl. Resps. to IPPs' Third Set Interrogs., Resp. to Issue No. 8) at 13–17.

The Honorable Vaughn R. Walker
5/26/2023
Page 13

17) is (a) not evidence, (b) does not address *Irico's* email use, (c) does not account for Irico emails produced by its co-conspirators, and (d) in no way undermines the concrete evidence in the record or the Court's previous findings. Irico's assertion that, "[b]y the time email came into use at Irico, CRT sales in the U.S. had plummeted to near extinction," Opp. at 26, is demonstrably false. From 2004 through 2007, CRT sales were declining but they continued to constitute the majority of TV and monitor sales in the U.S.[23] And in any event, a decline in U.S. sales does not diminish the relevance of the emails Irico destroyed.

Finally, even if it is true that Irico generated limited emails and other ESI and did not preserve them in the ordinary course of business, that would not explain why Irico failed to preserve and produce hard copies of any of these broad categories of important documents. For example, Irico has no explanation for its failure to search for, preserve and produce *any* hard copy documents from the files of its "key employees"—particularly the Litigation Committee members who attended competitor meetings and who received Pillsbury's repeated and detailed instructions on preserving relevant evidence. There were likely also central files containing hard copies of the Irico sales and marketing reports that Plaintiffs have found in other defendant's files. Irico fails to respond to Plaintiffs' assertion that at least some of these reports must have existed at the time their duty to preserve was triggered, particularly given that they contained very valuable market data and were generated on a weekly or monthly basis. *See* Mot. at 14.

### 3. Irico's Preservation Of Some Relevant Documents Pursuant to Chinese Law Does Not Excuse Its Failure To Preserve Entire Categories Of Highly Relevant Documents.

In a desperate attempt to reduce the severity of the sanctions it faces, Irico points to its production of hard copy documents from its archive that it happened to preserve pursuant to Chinese law. Opp. at 22–23. But these documents do not help Irico's cause. Irico had a duty under U.S. common law and this Court's PTO No. 1 to find and preserve evidence potentially relevant to the subject matter of *this* case. The Chinese laws requiring the preservation of certain documents had nothing to do with the allegations of this case. That is why the documents in Irico's archive are largely worthless. In the recently filed Stipulation and Order Regarding Trial Evidence, ECF No. 6190, IPPs and Irico stipulated to authenticity and business records status of hundreds of documents for use at trial. *See id.,* Appendix. Only a very small number of those documents came from Irico's production. *See id.,* Appendix, at 7–8. Moreover, the fact that Irico happened to preserve some relevant documents in its archive does not excuse the fact that it failed to preserve any of the broad categories of highly relevant documents identified in Plaintiffs' Motion. *See* Mot. at 12–13.

---

[23] Saveri Decl., Ex. 10 (Jan. 6, 2006 Preliminary Television Market and Industry Research prepared for US EPA) at 7 ("CRTs, continued to account for the vast majority of televisions shipped to North America in 2004. This technology comprised approximately 75% of total shipments . . . . In 2005, it is estimated that approximately 64% of the total number of televisions shipped to North America will be CRTs . . . .").

The Honorable Vaughn R. Walker
5/26/2023
Page 14

In sum, Irico fails to rebut Plaintiffs' showing that it destroyed entire categories of relevant evidence after its duty to preserve was triggered. The Court should sanction Irico for this and other misconduct described below.

### III.    Sanctions Are Also Warranted For Irico's Failure To Produce Su Xioahua For Deposition.

Despite spending ten pages opposing Plaintiffs' motion for sanctions for failing to produce Su Xiaohua for deposition, Irico fails to fully address the questions critical to this sanctions motion: whether Irico knew that Mr. Su planned to resign to avoid being deposed, and what efforts Irico made to secure Mr. Su's attendance at his deposition. Instead, Irico attempts to distract the Court by knocking down straw men arguments and derisively dismissing Plaintiffs' interpretation of the evidence regarding Mr. Su's resignation as "tortured" and "pure speculation." But the record on Mr. Su's resignation is what Irico has chosen to reveal and, once again, Irico is choosing to hide the ball.

### A.    Irico Fails To Rebut Plaintiffs' Evidence That It Knew Su Xiaohua Would Resign In Order To Avoid Being Deposed.

The Court ordered Irico to produce several broad categories of documents relating to the circumstances surrounding Mr. Su's resignation, and specifically, Irico's awareness of Mr. Su's intent to resign. *See* Su Order at 11–12. Yet, Irico produced *only two* non-privileged documents that mention Mr. Su's resignation: (1) the April 7, 2022 meeting minutes in which Irico gave Mr. Su permission "to leave [his] position ahead of schedule,"[24] and (2) Mr. Su's "Resignation Report" dated either March or May 25, 2022,[25] in which Mr. Su "appl[ies] for early resignation from [his] position."[26] Significantly, Irico never disclosed to Plaintiffs or the Court that it had granted Mr. Su permission in April 2022 to leave his position ahead of schedule.[27] As Plaintiffs discussed at length in the

---

[24] *See* Capurro Decl. ¶ 50, Ex. TT.

[25] Irico argues that the date on the Resignation Report "plainly shows" a date of May 25, 2022. Opp. at 32, n. 11. Plaintiffs disagree, as set forth in their Motion. Irico fails to explain why Mr. Su would have been "apply[ing] for early resignation" on May 25, 2022 when Irico had already approved his request on April 7, 2022. It is much more logical that he applied for early resignation on March 25, 2022, the application was approved on April 7, 2022, and then he resigned on May 25, 2022. Irico claims it has no metadata for the Resignation Report because Mr. Su provided it to Irico in hard copy.

[26] Capurro Decl. ¶ 51, Ex. UU.

[27] In fact, in the parties' Joint Statement Re: Legal Consequences of Irico's Failure to Produce Su Xiaohua for a Deposition, ECF No. 6101, which came before the Court compelled Irico to produce documents relating to Mr. Su's resignation, Irico continued to insist that it did not know in April 2022 that Mr. Su intended to resign. *Id.* at 12 ("Even if

The Honorable Vaughn R. Walker
5/26/2023
Page 15

Motion, both of these documents are ambiguous in that they do not state exactly *when* Mr. Su intended to resign.[28] But the documents unambiguously show that Mr. Su applied for "early resignation" and that his request was granted on April 7, 2022.

Moreover, consistent with the April 7, 2022 meeting minutes, Irico's Legal Counsel testified unambiguously under oath that, "[a]t some point **in April**, he [Su Xiaohua] informed us that he was going to leave Irico, and he told us that he was not able to make time to be deposed in this case as a witness."[29] Notably, Irico's counsel questioned Mr. Yan on redirect about Mr. Su's resignation and his reasons for not wanting to testify, but Mr. Yan did not change his testimony that Mr. Su told Irico "in April" that he would leave Irico and would not agree to appear at his deposition.[30]

As noted in the Motion, Mr. Yan has submitted an erratum purporting to change this testimony to "***after April***," on the grounds that he mis-spoke. This is an improper attempt to rewrite Mr. Yan's sworn testimony on an important issue in this case. In the Ninth Circuit, Rule 30(e) errata changes are only permitted "for corrective, not contradictory changes and may not be used to rewrite sworn testimony." *In re Cathode Ray Tube (CRT) Antitrust Litig.,* MDL No. 1917, Master Case No 3:07-cv-05944SC, 2014 WL 12647874, at *2 (N.D. Cal. Dec. 12, 2014) (citing *Hambleton Bros. Lumber Co. v Balkin Enters., Inc.*, 397 F.3d 1217, 1226 (9th Cir 2005) (striking Sharp's deposition errata as "not merely corrections of transcription errors but rewriting of sworn testimony"). In any event, the change is not credible. Irico fails to acknowledge that Mr. Yan's testimony that Mr. Su informed Irico "in April" of his intent to resign is corroborated by the April 7, 2022 meeting minutes. Further, "after April" would render the testimony vague and unintelligible. Had Mr. Yan answered in this way during the deposition, Plaintiffs could have asked, "when exactly, after April?"

Irico also dismisses Mr. Yan's testimony as "misspoken hearsay," Opp. at 31, but Irico ignores that Mr. Yan did not only testify regarding the date that Irico learned Mr. Su intended to resign; he also testified that Mr. Su "told us that he was not able to make time to be deposed in this case as a witness." Capurro Decl., Ex. B (Yan Yunlong Dep. Tr. Vol. II) at 230:19–230:22. Even if Mr. Yan's testimony is changed to "after April," it still supports Plaintiffs' position that Irico knew before Mr. Su's formal resignation on May 25, 2022 that he intended to resign to avoid being deposed, and yet Irico did not inform Plaintiffs of this until June 7, 2022—after securing a further extension of the discovery cutoff and the pretrial schedule. The level of detail that Mr. Yan provided regarding the

---

Irico *had* known in April that Mr. Su intended to resign as Plaintiffs assert (it did not) . . .") (emphasis in original).

[28] Mot. at 17–18.

[29] Capurro Decl., Ex. B (Yan Yunlong Dep. Tr. Vol. II) at 230:16–230:22 (emphasis added).

[30] Saveri Decl., Ex. 11 (Yan Yunlong Dep. Tr. Vol. III) at 323:18–324:11.

The Honorable Vaughn R. Walker
5/26/2023
Page 16

reasons for Mr. Su's reluctance to testify[31] casts further doubt on Irico's implausible claim that Mr. Yan—who has always been closely involved in this litigation on Irico's behalf,[32] and is Mr. Zhang's superior[33]—lacks personal knowledge regarding Mr. Su's resignation.

In the face of this damning evidence, Irico could have provided additional documents or sworn testimony clarifying the record, or otherwise supporting its position that it believed Mr. Su would not leave Irico until December 2022 and would appear for his deposition. For example, the April 7, 2022 meeting minutes state that administrative paperwork was to be generated relating to Mr. Su's resignation.[34] But Irico has never produced any such paperwork or any other documents that definitively show when Mr. Su was supposed to leave Irico. Given that Irico granted Mr. Su's request to leave his position "ahead of schedule," it is difficult to believe that no document exists defining what "ahead of schedule" means.

Instead, Irico resorts to misleadingly quoting the April 7, 2022 meeting minutes by omitting the most important sentence in the minutes. *See* Opp. at 31 (quoting only the portion of the minutes stating that Mr. Su would "leave his position as manager at the end of December 2022 to retire and rest."). Immediately after the sentence quoted by Irico, the minutes state that, "**Because he himself [Mr. Su] submitted a request to leave the position ahead of schedule, after discussion, it has been agreed that Su Xiao Hua may leave the position ahead of schedule** after reaching the upper age for employment." Capurro Decl., Ex. TT at IRI-SU-000139E (emphasis added). Despite Plaintiffs arguing that this language meant Mr. Su was going to leave his position before December 2022 (Mot. at 17–18), Irico fails to even mention it. Irico likewise fails to explain why Mr. Su's "Resignation Report," which Irico asserts Mr. Su submitted on May 25, 2022 at the time

---

[31] Saveri Decl., Ex. 12 (Yan Yunlong Dep. Tr. Vol. II) at 230:23–231:2 ("Also, he repeatedly emphasized that he himself personally did not have anything to do with the CRT antitrust litigation, and he did not have any understanding about the circumstances surrounding the situation."). Mr. Yan further testified that the reason Mr. Su did not want to testify was "because of cultural background and the traditions in Chinese society. No one would agree to get themselves involved in such a matter. In the minds of most Chinese people, it's actually not an honorable thing to be involved in lawsuits." *Id.* at 229:17–23.

[32] *See* Mot. at 4–5 (describing Yan Yunlong's communications with Irico's former counsel regarding this litigation starting in February 2008); Saveri Decl., Ex. 12 (Yan Yunlong Dep. Tr. Vol. II) at 235:4–236:20 (testifying that he is currently a member of "the working task force, the working group that we formed in order to respond to the CRT antitrust litigation," along with Mr. Zhang and Mr. Wang).

[33] *Id.*, Ex. 13 (Yan Yunlong Dep. Tr. Vol. I) at 92:22–93:4.

[34] *See* Capurro Decl., Ex. TT (IRI-SU-000137–40E) at IRI-SU-000139E ("The relevant administrative work regarding Su Xiao Hua leaving the position shall be processed by Irico Industrial based on the relevant rules and stipulations in the 'Performance and Evaluation Measures for Managers or Supervisors of Irico Group Co., Ltd.'").

The Honorable Vaughn R. Walker
5/26/2023
Page 17

of his formal resignation, "*appl[ies]* early resignation." Capurro Decl., Ex. UU. This makes no sense given that Mr. Su's application for early resignation had been granted on April 7, 2022. Rather than address these critical questions, Irico engages in its usual bluff and bluster and asks the Court not to follow the "red herring," vaguely stating, "That approval did not anticipate Mr. Su's resignation prior to his deposition." Opp. at 32. But this is unsupported lawyer argument and should be disregarded as such.

Similarly, instead of producing any direct evidence of when Mr. Su and Irico had agreed he would leave, Irico asks the Court to *infer* that Irico did not know Mr. Su's intentions from the fact that Irico Group's Legal Department initiated procedures to approve Mr. Su's travel to Macau, and that Mr. Zhang communicated with him about his visa application during May 2022. *See* Opp. at 32. This falls far short of proving that Irico did not know that Mr. Su intended to resign early to avoid being deposed. At most, these messages show that *Mr. Zhang* may not have known about Mr. Su's intentions. Of course, that does not mean that others at Irico did not know.

Irico also inexplicably continues to rely on Mr. Zhang's declarations (ECF Nos. 6027-1, 6036-1) which it argues "completely obviates Mr. Yan's misspoken testimony (and corroborates his erratum)." Opp. at 31. But the Court has already found that Mr. Zhang's declarations "cannot be considered 'reliable evidence' that Irico only learned of Mr. Su's decision to depart on May 25, 2022." Su Order at 9. As the Court noted:

> The Zhang Wenkai Declaration speaks only to his personal knowledge, not Irico's. If Su Xioahua 'formally resigned' on May 25, 2022, he must have taken some actions and submitted written notice of his 'formal resignation' to others at Irico. Also, Zhang Wenkai's declaration fails to state when others at Irico first learned of Su Xiaohua's informal resignation, his intent to resign and his decision to resign rather than be deposed.

*Id.* Despite being on notice of the deficiencies the Court identified with Mr. Zhang's Declarations, Irico has never submitted a further declaration from Mr. Zhang (or anyone else at Irico) attempting to address them. Notably, Mr. Zhang has never attested affirmatively *when* he learned that Mr. Su *intended* to resign, as opposed to when he formally resigned. He has never attested affirmatively that he did not know before May 25, 2022 that Mr. Su intended to resign to avoid being deposed. Mr. Zhang's Second Declaration—which Irico filed *after* Plaintiffs raised questions about what Irico knew and when about Mr. Su's resignation—merely states: "Although Su Xiaohua formally resigned from Irico Foshan Flat Panel Display Co., Ltd. . . . on May 25, 2022, I did not learn of Mr. Su's resignation until May 31, 2022." ECF No. 6036-1 ¶ 4. Mr. Zhang has also never attested that he believed Mr. Su would appear for his deposition. Mr. Zhang has never attested—and no Irico document shows—when the visa application was actually submitted; before or after Mr. Su resigned. His first declaration states only that he worked with Mr. Su "during the process of applying for the visas necessary to travel to Macau" and that Mr. Su "cooperated during this process." ECF No. 6027-3. Mr. Zhang's and Irico's silence on these critical issues is deafening.

The Honorable Vaughn R. Walker
5/26/2023
Page 18

In sum, Irico's failure to produce *any* document or witness directly supporting their claim that Mr. Su "snookered" them when he resigned "ahead of schedule"—even though Irico granted him permission to resign ahead of schedule on April 7, 2022—speaks volumes. Irico has failed to rebut Plaintiffs' evidence that it acted in bad faith in failing to disclose that Mr. Su intended to resign to avoid being deposed while seeking extensions of the pretrial schedule to allow for his deposition.

### B. Irico Fails to Rebut Plaintiffs' Showing That It Violated Two Court Orders.

Irico contends that it never violated a Court order to produce Su Xiaohua because the May 25, 2022 Stipulated Order (ECF No. 6016) (the "May 25 Order"), which required Irico to produce Mr. Su for deposition by June 30, 2022, was superseded by the August 11, 2022 Order. ECF No. 6063 (the "August 11 Order").[35] *See* Opp. at 30. Irico further contends that the August 11 Order was somehow vacated by the August 22, 2022 Stipulation and Order (ECF No. 6056, the "August 22 Stipulation")—i.e., that Plaintiffs somehow agreed to excuse Mr. Su's failure to appear. *Id*. Irico's position is nonsensical.

The May 25 Order required Irico to produce three specifically named witnesses, one of which was Su Xiaohua. The Court denied Irico's Emergency Motion for Relief from that May 25 Order in its August 11 Order. Nothing in the Court's August 11 Order excused Irico's failure to produce Mr. Su by the June 30, 2022 deadline, or suggests that the Court was simply dropping Mr. Su because "Irico had explained that Mr. Su had resigned from Irico." Opp. at 30. On the contrary, the Court's August 11 Order required Irico to produce all witnesses by September 9, 2022, and if Irico failed to do so, the parties were instructed to file a document regarding the legal consequence of that failure. Indeed, the Court deliberately used language intended to encompass *all* of Irico's witnesses, even though it was fully aware of Irico's position that it no longer controlled Mr. Su because he was no longer an employee of Irico:

> **If fewer than all of the witnesses identified in these papers testify**, then by September 23, 2022, the parties shall either file a document indicating they are nonetheless dropping their dispute or setting forth their competing positions on what the legal consequence is of that witness' or those witnesses' failure to appear.

August 11 Order at 14:2–7 (emphasis added). Mr. Su was one of the witnesses identified in the papers, and he did not testify. Accordingly, Irico violated two Court Orders: the May 25 Order *and* the August 11 Order.

Contrary to Irico's claims, Plaintiffs do not assert that "the August 22 Stipulation bound Irico to produce Mr. Su." Opp. at 30. This is yet another example of Irico setting up

---

[35] Judge Tigar issued an order from the bench during the August 11, 2022 hearing on Irico's Emergency Motion for Relief from the Scheduling Order. *See* ECF No. 6063 (Aug. 11, 2022 Hr'g Tr.) at 12:10–14:7.

The Honorable Vaughn R. Walker
5/26/2023
Page 19

and knocking down straw men arguments. As Plaintiffs' Motion makes clear, the August 22 Stipulation did not vacate the August 11 Order requiring Irico to produce Mr. Su by September 9, 2022. There is no mention of Mr. Su in the August 22 Stipulation, or in any of the correspondence relating thereto. The August 22 Stipulation merely changed the dates by which Messrs. Wang and Yan were to appear for deposition. In fact, **the August 22 Stipulation specifically states that all other terms of the August 11 Order remain the same.** *See* August 22 Stipulation ¶ 7 ("This Stipulation and Order does not modify any other dates or terms of this Court's August 11, 2022 Order except as stated above.").

## C. Irico Fails To Demonstrate That It Made Any Effort To Convince Su Xiaohua To Attend His Deposition.

Irico argues that it should escape any consequences for its violation of this Court's Orders because it claims Mr. Su was no longer a managing agent under Irico's control at the time of the depositions. Opp. at 32–33. However, as Irico's own authorities recognize, where, as here, there is a court order compelling a witness' attendance at a deposition, it matters not whether the witness qualifies as a managing agent under the party's control at the time of the depositions. *Sali v. Corona Reg'l Med. Ctr.*, 884 F.3d 1218, 1223 (9th Cir. 2018) ("Rule 37(b)(2)(B) provides for sanctions '[i]f a party fails to comply with an order under Rule 35(a) requiring it to produce another person for [physical or mental] examination.'"). Such an order "compels the party to use its best efforts to secure the nonparty's attendance at the deposition." *Id*. at 1224.

Irico fails to demonstrate that it made any effort to convince Mr. Su to attend his deposition, much less its "best efforts." The only evidence Irico provides of its claimed "determined efforts" to secure Mr. Su's appearance at his deposition are documents showing that the Legal Department initiated internal procedures on May 6, 2022 to approve Mr. Su's travel for his deposition, that Mr. Zhang communicated with him about his visa application. *See* Opp. at 32. These documents do not show that Irico used "its best efforts" to secure Mr. Su's attendance at his deposition. They merely show that some preparations were made; they do not show that Irico did anything to attempt "to convince" Mr. Su to appear after his resignation, which Irico previously claimed was done.[36]

Indeed, far from demonstrating Irico's "determined efforts" to produce Mr. Su, Irico's documents show that Irico inexcusably delayed the visa applications for its witnesses, causing the parties to miss opportunities to take the depositions before Covid surges and leading to seriatim extensions of the deadline to depose these witnesses. For example, there is no record of Irico applying for visas for Hong Kong despite the parties agreeing in November 2021 to take the depositions in Hong Kong in December 2021, and

---

[36] *See* ECF No. 6101 at 9 ("When Irico's in-house counsel learned of Mr. Su's resignation on May 31, 2022, Irico tried to convince Mr. Su to reverse his decision . . ."). Clearly, despite the Court's order to do so, Irico was unable to produce any evidence of this.

The Honorable Vaughn R. Walker
5/26/2023
Page 20

then being ordered to take them by March 18, 2022.[37] Similarly, after the Court ordered Irico to produce Mr. Su and the other witnesses in Macau by May 31, 2022,[38] Irico's Legal Department did not seek approval from Irico's leadership to apply for visas to Macau until May 6, 2022, which approval was granted on May 9, 2022.[39] In other words, despite repeatedly telling Plaintiffs and the Court about "the complexity of obtaining visas," Opp. at 28, Irico did *nothing* to apply for the Macau visas for seven weeks after the Court's Order. These documents also show, moreover, that when Irico induced Plaintiffs to stipulate on May 20, 2022 to a *third* extension of time to take Mr. Su's deposition (ECF No. 6015), Irico had not even received Mr. Su's required passport photos, and thus had not yet applied for his Macau visa.[40]

---

[37] In November 2021, the parties agreed to take the depositions of Messrs. Wang and Su in Hong Kong in December 2021. Saveri Decl. ¶ 15, Ex. 15 (Nov. 18, 2021 letter). Due to there being a small number of Covid cases in Hong Kong in early December 2021, Messrs. Su and Wang refused to travel to Hong Kong, *id*., Ex. 16 (Dec. 3, 2021 letter), and the Court extended the deadline to take the depositions to March 18, 2022. ECF No. 5980. Irico's records show that its Legal Department waited until January 19, 2022 to request approval from Irico leadership to apply for visas for Hong Kong. *See* Saveri Decl., Ex. 17 (IRI-SU-000129E). Irico then delayed another 28 days until February 17, 2022 before approving the request to start the visa application process. *Id.*, Ex. 18 (IRI-SU-000130E). On February 24, 2022, after repeated inquiries from Plaintiffs, Irico's counsel informed Plaintiffs that the Customs Office had informed Irico that no visas could be issued due to rising Omicron cases. *Id*. ¶ 12, Ex. 19 (Feb. 24, 2022 letter). But there is no record that Irico ever applied for visas for Hong Kong. *Id*. ¶ 21.

[38] *See* ECF No. 5999. In a letter to Plaintiffs dated March 15, 2022, Irico's counsel wrote: "As we have been discussing, the depositions of Mr. Wang Zhaojie and Mr. Su Xiaohua in Hong Kong cannot occur as planned prior to March 18, 2022 due to the ongoing COVID-19 emergency situation in Hong Kong . . . Irico's goal . . . is to produce the three witnesses in Macau **by the end of May**. **Irico is currently working on submitting applications for travel to Macau** to governmental authorities, and we will provide you a further update in the next two weeks." Saveri Decl., Ex. 20 (emphasis added).

[39] *See* Carter Decl., Ex. J (IRI-SU-000132E).

[40] By email dated May 18, 2022, Irico's counsel informed Plaintiffs that, "The process continues to move forward. The last report that we received was that **the client expects to receive the Visa approvals next week**." Saveri Decl., Ex. 22 (May 18, 2022 email) (emphasis added). Irico's documents show that they did not even receive Su's required passport photos until May 24, 2022. *See* Carter Decl., Ex. K (IRI-SU-000103–28E) at IRI-SU-000125–28E. In addition, in a meet and confer call on April 26, 2022, Irico's counsel had informed Plaintiffs that as of that date, "[a] law firm in Macao ha[d] issued invitation letters to the witnesses which have been finalized and sent. They are in a mail quarantine facility from which they are expected to be released by April 30. It will take 10-14 days for the visa applications to the processed, thus the earliest Irico would produce the witnesses is Monday, May 16." Saveri Decl., Ex. 21 (April 26, 2022 letter). Irico's documents show

The Honorable Vaughn R. Walker
5/26/2023
Page 21

Thus, Irico's delays, coupled with false representations to Plaintiffs around that time, ensured that Mr. Su's visa would not be issued until well *after* his early resignation on May 25, 2022. Taken together with the documents showing that Mr. Su was granted permission to resign "ahead of schedule" on April 7, 2022, Irico's documents support Plaintiffs' position that Irico was not operating in good faith when it sought and received a further extension of the deadline to produce Mr. Su for deposition on May 20, 2022 (ECF No. 6016), and fall far short of demonstrating that Irico "used its best efforts" to secure Mr. Su's appearance at his deposition. Accordingly, Irico should be sanctioned for its failure to produce Mr. Su for deposition, in violation of two Court Orders.

Irico argues that neither terminating sanctions nor alternative sanctions are appropriate, and that the only consequence for misleading Plaintiffs and the Court, delaying this case for another year, and ultimately failing to produce Mr. Su in violation of two Court Orders, should be that Mr. Su should not be allowed to testify at trial. Opp. at 36. But this would amount to no consequence at all given that Irico has no intention of bringing Mr. Su (or any other witnesses) to trial.

As set forth in Section VI.A below, Plaintiffs seek terminating sanctions for Irico's conduct as a whole, not only for its failure to produce Mr. Su. But even standing alone, Irico's misconduct in failing to produce Mr. Su warrants severe sanctions. Courts have awarded severe sanctions such as adverse inference instructions and striking affirmative defenses under similar circumstances.[41]

## IV.     Irico Misrepresented the Circumstances of Its Withdrawal In Connection With Its Motion to Lift Default.

The evidence shows that Irico's representation to the Court that its withdrawal from the litigation was based on a good faith belief that it was "immune from suit" under the FSIA was false. ECF No. 5215-1 ¶ 5. *See also id.* (Irico's withdrawal was not done for any purpose of "manipulating the legal process.").

---

that Irico's Legal Department had not even requested permission to apply for the visas at this point. *See* Carter Decl., Ex. T (IRI-SU-000131E).

[41] *See, e.g., SEC v. Zhuobin Hong*, No. CV 20-04080-MCS (RAOx), 2021 U.S. Dist. LEXIS 202468, at *22–23 (C.D. Cal. Sep. 17, 2021) (granting an adverse inference instruction, denying summary judgment, prohibiting the witnesses from appearing at trial, and prohibiting defendants from using witnesses' testimony, documents, or interrogatory responses in support of their defenses, including at trial); *Estate of Boyles v. Gree USA, Inc.*, No. 1:20-CV-276, 2021 U.S. Dist. LEXIS 151632, at *4 (M.D.N.C. Aug. 12, 2021) (striking defendants' affirmative defenses and prohibiting them from offering any evidence at trial, beyond cross-examining the plaintiffs' witnesses); *Card Tech. Corp. v. DataCard Inc.*, 249 F.R.D. 567 (D. Minn. 2008) (awarding serious issue sanctions pursuant to Rule 37(b)(2) against a plaintiff that violated an order to produce a witness for a deposition).

The Honorable Vaughn R. Walker
5/26/2023
Page 22

First, as explained in the Motion (at 20–21), contrary to Zhang's declaration, General Counsel Yan's testimony establishes that Irico's withdrawal was tactical and not based on a good faith belief in FSIA immunity. Despite repeated opportunities, nowhere does he even mention sovereign immunity. *Id.* Irico's half-hearted attempt to argue that his testimony indicates a belief in a "jurisdictional" defense and is therefore "consistent" with a belief in immunity is simply not what he said. *See* Opp. at 39–40.

Second, Irico fails to offer any evidence in support of its assertions that Mr. Zhang's (and Irico's) representations to the Court were true, even though it should be well-within Irico's power to provide. *See* Opp. at 39. Mr. Yan, a member of the Litigation Committee, has percipient knowledge of the reasons for the withdrawal, and has not been shy—to say the least—about submitting declarations "clarifying" his testimony. This failure compels the conclusion that he cannot truthfully do so, and, therefore, that Mr. Zhang's declaration was false. This gap in the evidence is all the more acute because, as Irico is well-aware, Mr. Zhang has no personal knowledge of Irico's withdrawal because his employment did not begin until 2017. Indeed, Judge Tigar upheld DPPs' objection to his declaration on this ground. ECF No. 5240 at 5–6. Judge Tigar only considered Mr. Zhang's claim because of the unique standards applicable to a motion to lift a default, which are inapplicable here. *Id.* at 19 n.7.

Third, the fact that Irico's weak arguments in support of FSIA immunity were colorable is beside the point. The question is why Irico withdrew. *See* Opp. at 39. Irico's assertion that the issue was "resolved long ago without mention of sanctions" is also beside the point because—as the evidence now shows—the Court relied on the false testimony proffered by Irico. *See* Opp. at 38–39.

Finally, Irico's assertion that Plaintiffs have waited too long to raise this issue fails. *See* Opp. at 37. As explained below, it is proper for the Court to consider past conduct on a sanctions motion. In addition, Plaintiffs did not delay raising this issue. Plaintiffs were not able to obtain Mr. Yan's testimony until the end of September last year, approximately two months before the Court's request for sanctions motions "for any discovery misconduct throughout the history of this case." Su Order at 7. Indeed, Mr. Yan had not finished "correcting" and supplementing his testimony until November 11, 2022. *See* Capurro Decl., Ex. QQ (Yan deposition errata).

## V.    Irico's Other Refusals To Comply With Court Orders.

Irico attempts to dismiss its refusals to comply with the Court's discovery orders, and other wrongful conduct, as "old news" and irrelevant to this motion. This is incorrect. It is entirely proper for the Court to consider Irico's conduct. In addition, Irico's feeble attempts to explain away its conduct fail. For the most part, Irico does not take meaningful issue with Plaintiffs' descriptions of its conduct.

First, it is indisputable that Irico violated the Court's order when it refused to provide complete responses to Interrogatories Nos. 4 & 5 requiring it to identify meetings

The Honorable Vaughn R. Walker
5/26/2023
Page 23

and/or agreements with competitors. Irico's arguments that it acted properly mischaracterize the Order (*see* ECF No. 5919 at 5 requiring "full responses" by May 10, 2021) and ignore the Court's clear statement that Irico's responses were "plainly deficient." *See* Opp. at 45; Mot. at 21. Irico insists that it could not in good faith acknowledge the bulk of its myriad meetings or any of its agreements with its competitors (as documented in the notes of other defendants) because of a lack of institutional memory due to the passage of time. But we now know that Irico was concealing its widespread spoliation of documents in yet another conscious and deliberate flouting of the Court's order and its discovery obligations. Again, this conduct calls for the severest of sanctions.

Civil Local Rule 7-8(c)'s requirement that a sanctions motions be made "as soon as practicable after the filing party learns of the circumstance that it alleges make the motion appropriate" does not protect Irico from the consequences of its wrongful conduct. A key aspect to understanding Irico's wrongful conduct—its intentional spoliation of evidence—has only recently been revealed. Furthermore, nothing in Civil Local Rule 7-8(c) precludes a Court from considering a party's prior conduct in connection with a motion for sanctions. *See id.* Indeed, such a rule would be illogical. *See, e.g., WeRide*, 2020 WL 1967209, at *13 (relying on "prior inaccurate representations to the Court" it had relied on previously); *In Google LLC v. Starovikov*, No. 21cv10260-DLC, 2022 U.S. Dist. LEXIS 207437, 2022 WL 16948296, at *6 (S.D.N.Y. Nov. 15, 2022) (considering representations made in connection with lifting of default). Indeed, Irico concedes this point by asking the Court to consider its prior behavior herein. *See, e.g.*, Opp. at 22 ("Since 2017, Irico has participated in good faith in discovery . . .").[42]

Second, Irico essentially concedes—as it must—that during jurisdictional discovery it violated the Court's order compelling it to produce documents relating to certain competitor meetings, U.S. sales, and documents reviewed by Zhang Wenkai in connection with his (false) declaration submitted to the Court. Mot. at 21. Irico's attempt to characterize its conduct as a mere dispute over "*the level of detail*" of its responses (Opp. at 40) (emphasis in original) is laughable. Irico ignores (1) that Plaintiffs were required to bring a motion to compel compliance with a prior order of the Court; (2) that the Court granted it; and (3) the plain language of the enforcement order. *See, e.g.*, ECF No. 5352 at 7 ("Here, the 8/2/2018 Order expressly requires Irico to produce the documents—not to make the documents available for inspection.").

---

[42] The cases Irico relies on also do not support its broad assertions. *Siebert v. Gene Security Network, Inc.*, No. 11-cv-01987-JST, 2014 U.S. Dist. LEXIS 157284, 2014 WL 5808755 (N.D. Cal. Nov. 6, 2014) involved a minor dispute about attendance at a mediation. After holding that the factual predicate for the motion was not substantiated, the Court also noted that the motion was untimely under Civ. L.R. 7-8(c). 2014 WL 5808755, at *2. *Perdana Capital (Labuan) Inc. v. Chowdry*, No. CV 09-01479 RS, 2012 WL 13075527 (N.D. Cal. July 3, 2012), involved a motion filed after summary judgment had been granted based on a grab bag of minor transgressions, many of which were unsubstantiated. 2012 WL 13075527, at *2.

The Honorable Vaughn R. Walker
5/26/2023
Page 24

Third, Irico also concedes that it withheld records showing travel by the Irico personnel identified in the notes of seven of the "26 meetings" to the locations of the meetings on or around the time of the meetings despite being ordered by the Court in both its initial order as well as the enforcement order to produce documents relating to those meetings, and despite submitting a declaration from General Counsel Yan that Irico had not found "any responsive documents." ECF No. 5324 (first order); ECF No. 5352 (enforcement order); Capurro Decl., Ex. AAA (Yan Decl. ISO Irico's Third Suppl. Objs. & Resps. to DPP Studio Spectrum, Inc.'s RFPs) ¶ 3; Mot. at 21.

Irico's defense of this conduct fails. Opp. at 42–43. It amounts to a contention that it was entitled to decide that travel records for employees that matched the identities, locations and times of competitor meetings documented by other defendants were not "related" to those meetings based solely on a cynical, self-serving and patently incorrect claim that it could not "confirm" that the employee in question actually attended the meeting. Irico's withholding of these records is yet another instance of its conscious and purposeful disregard of the Court's orders and its discovery obligations and supports the imposition of severe sanctions.

## VI.    The Court Should Impose Terminating Or Other Severe Sanctions.

Plaintiffs have requested that the Court strike Irico's answers. *See* Mot. at 2, 29–33. Irico's position that the Court should impose no sanctions—except possibly a weak spoliation instruction and monetary sanctions—is without merit. *See* Opp. at 44. Irico's principal argument is that its conduct simply does not rise to a level justifying sanctions. As explained above, however, Irico's conduct has been flagrant and has run the gamut from intentional destruction of critical evidence, refusals to produce discovery and key witnesses in violation of Court orders, and repeated misrepresentations to the Court of material facts relating to the foregoing as well as other important issues. Plaintiffs respectfully submit that Irico's misconduct requires the imposition of terminating or other severe sanctions. There is no question that such sanctions are within the Court's discretion. *See* Mot. at 23–27. Absent such sanctions, Irico will profit from its wrongdoing because Irico's defenses depend on the gaps in the evidence its wrongful conduct has created and could diminish Plaintiffs' recoveries herein, regardless of other evidence. In addition, such an outcome would undermine the important policy of deterrence—indeed, it is likely that this case would become a roadmap for future litigants to destroy evidence and otherwise subvert the discovery process if Irico is able to avoid severe sanctions.

### A.    <u>Terminating Sanctions.</u>

Irico's arguments against the imposition of terminating sanctions lack merit.[43] Again, Irico's primary argument is simply to assert that it has done little or nothing wrong.

---

[43] In a throwaway footnote that does not cite a single case, Opp. at 3–4 n.2, Irico argues that the Special Master lacks the authority to grant or recommend terminating sanctions against Irico Group because 28 U.S.C. § 1608(e) prohibits the entry of default against an

The Honorable Vaughn R. Walker
5/26/2023
Page 25

Apart from that, however, Irico fails to meaningfully address the factors the Ninth Circuit has identified as determinative of the issue. *See* Mot. at 30–33.

First, Irico fails to even address the first two factors—the expeditious resolution of litigation and the Court's need to manage its docket. Mot. at 30. It therefore concedes that these factors favor terminating sanctions. Moreover, as Plaintiffs explained, these factors weigh heavily in this case in light of the extreme delays Irico's conduct has inarguably caused, not to mention the numerous orders it has ignored, and its myriad misrepresentations to the Court. *See* Mot. at 30.

As to the third factor—prejudice—Irico's argument that Plaintiffs have not suffered any prejudice is yet another refusal to acknowledge the obvious. Irico does not deign to even address the clear prejudice Plaintiffs explained in the Motion. *See* Mot. at 28–32. Its argument that the existence of other evidence supporting Plaintiffs' allegations excuses its conduct—or at least deprives the Court of the ability to sanction Irico for it—is patently incorrect. Nor does it address the injustice of allowing it to profit at Plaintiffs' expense from its wrongdoing by presenting defenses—and thereby limiting its liability—that depend on the loss of evidence it has engineered.

As detailed above, Irico's purposeful misconduct has destroyed or put beyond the reach of Plaintiffs virtually all of the evidence formerly in its possession relating to the core issue in the case—its participation in the alleged conspiracy. Irico ignores the evidence—and the Court's previous findings—that its failure to implement a proper litigation hold resulted in the destruction and/or loss of virtually all of the documentary evidence in its possession relating to (1) its attendance at over 100 conspiratorial meetings, including its internal communications; (2) the pricing and sales of its CRTs during the conspiracy; (3) the production of CRTs during the conspiracy; (4) and much more.

Irico also cannot dispute that its tactical withdrawal from the case for over seven years, and other Irico-engineered delays, resulted in the unavailability for deposition of virtually all Irico witnesses with knowledge of the core issues. For example, Irico produced only one witness—out of more than twenty—with knowledge of its attendance at conspiratorial meetings. Saveri Decl. ¶ 25. The three witnesses it has produced who were at Irico during the alleged conspiracy relied heavily on the passage of time to deny any specific recollection of relevant facts. Thus, for example, Mr. Wang—who apparently

---

instrumentality of a foreign government without an evidentiary determination on both liability and damages. At this time, Plaintiffs are seeking an order striking Irico Group's answer. The entry of a default judgment would await further proceedings. Furthermore, under § 1608(e), Plaintiffs need only "establish their claim or right to relief by evidence satisfactory to the court." The statute ***does not*** require the Court to conduct a formal evidentiary hearing or make explicit findings, as long as Plaintiffs have provided sufficient evidence in support of their claims to make that determination. *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994). Plaintiffs have already done so.

The Honorable Vaughn R. Walker
5/26/2023
Page 26

attended at least 18 competitor meetings—disclaimed any recollection of any of them.[44] The only other potential witnesses besides Mr. Wang with percipient knowledge of Irico's attendance at competitor meetings—Messrs. Su and Guo—refused to testify. The bottom line is that Irico has produced no witnesses able to testify to any significant percipient knowledge of Irico's attendance at conspiratorial meetings.

Additionally, Irico does not take issue with the fact that its defenses exploit and depend on the very gaps in the evidence—and the false and misleading testimony these gaps enable—that it has wrongfully created. For example:

- Irico denies attending over 90 conspiratorial meetings it is documented to have attended in the notes of other Defendants. Irico produced virtually no evidence relevant to these meetings, and explicitly relied on the lack of evidence or institutional memory in its responses to interrogatories requiring it to list all such meetings with competitors. Capurro Decl., Ex. Y at 8, 12–13.[45]

- Irico denies ever agreeing to fix prices or limit production. *See, e.g.*, ECF No. 5874 (Irico Group Answer to DPPs' Consolidated Am. Compl.) ¶ 138; ECF No. 5875 (Irico Group Answer to IPPs' 5th Consolidated Am. Compl.) ¶ 142. Again, Irico produced very little evidence relating to this issue, and relies on a lack of evidence or institutional memory in its responses to interrogatories requiring it to list all such agreements. Saveri Decl., Ex. 23 (Irico's Second Suppl. Objs. & Resps. to DPPs' First Set Interrogs.).

- Irico denies ever implementing conspiratorial price increases. *See, e.g.*, ECF No. 5874 ¶ 138; ECF No. 5875 ¶ 142. Irico has not produced pricing reports, internal communications relating to pricing or other relevant evidence. Nor has it produced a single witness identified as possessing pricing authority during the class period, except Mr. Wang, who disclaimed knowledge. *See* Saveri Decl., Ex. 24 (Wang Zhaojie 2019 Dep. Tr. Vol. III) at 67:18–69:7.

- Irico denies ever implementing conspiratorial production cuts. *See, e.g.*, ECF No. 5874 ¶ 138; ECF No. 5875 ¶ 201. The only witness it has produced with percipient knowledge (Li Miao) claims a lack of recall. Saveri Decl., Ex. 25 (Li Miao Dep. Tr. Vol. II) at 157:22–164:4. Irico has not produced production reports, internal communications or other relevant evidence.

---

[44] As Plaintiffs have noted, Mr. Wang invoked a lack of recollection or knowledge over 300 times in his testimony. ECF Nos. 6101 at 5 n.15, 6101 ¶ 7.

[45] Irico did eventually produce some records showing travel by Irico personnel consistent with attendance at meetings. *See* Capurro Dec., Ex. Y at 11–13. In most cases, however, Irico has continued to maintain that these records are insufficient to establish their attendance at a particular meeting, and, indeed, as noted above apparently withheld producing them on that ground. *See id.*

The Honorable Vaughn R. Walker
5/26/2023
Page 27

- Irico asserts that various passages from the meeting notes of other Defendants show that it was a "disruptor" not a conspirator. *See, e.g.*, ECF No. 5989 (Irico's opposition to DPPs' class certification motion) at 6–7. Again, Irico has not produced any internal documents or percipient testimony relevant to these issues.

- Irico asserts that the Chinese Government implemented price floors that would have prevented lower prices. It has produced no internal pricing documents or testimony that such issues were considered or were a material part of its pricing. Mot. at 31–32. Mr. Su—identified as having knowledge of the issue—refused to testify.[46]

Finally, regardless of how Plaintiffs have characterized their case in the past, Irico's defenses have the potential to reduce its liability. To the extent they do, it is inarguable that Plaintiffs will have suffered severe prejudice and that Irico will have profited by its misconduct.[47] Again, Irico does not even address this issue.

Irico's main argument—that because Plaintiffs have other evidence of Irico's participation in the conspiracy, there can be no "severe" prejudice—lacks merit. In addition to ignoring the clear prejudice described above, it is unsupported by authority, and contrary to common sense. Irico cites no case for the proposition that the intentional destruction of evidence is excused by the presence of other evidence. *See* Opp. at 24. Instead, Irico conflates the question of an appropriate remedy with the existence of prejudice—i.e., what the prejudice in a particular case justifies. *See id.*

---

[46] As noted in the Motion, at 15 n.61, Mr. Su was identified as a person with knowledge of three affirmative defenses as to IPPs. *See* ECF No. 6032-1 ¶ 2, Ex. A (describing Irico's interrogatory responses identifying Mr. Su as knowledgeable about Irico's Third, Eighth and Tenth Affirmative Defenses, and attaching responses), & ¶ 11, Ex. J (describing Irico's interrogatory responses identifying Mr. Su as knowledgeable about Irico's meetings and communications with competitors and attaching responses). Irico asserts similar affirmative defenses as to DPPs.

[47] This is also true to the extent it reduces the value of Plaintiffs' cases in settlement. As Judge Chhabria recently noted in a Facebook case:

> Or was Facebook, with the assistance of its lawyers, executing a different play from the playbook: resist discovery as long as possible, make things increasingly difficult and expensive and frustrating for the opposition, and hope that would drive down the case's settlement value? This is, by far, the most likely explanation for Facebook and Gibson Dunn's conduct.

*In re Facebook, Inc. Consumer Priv. User Profile Litig.*, No. 18-MD-02843-VC, 2023 WL 1871107, at *28 (N.D. Cal. Feb. 9, 2023).

The Honorable Vaughn R. Walker
5/26/2023
Page 28

Irico's simplistic argument would give it license to engage in no end of wrongful conduct. It also ignores other factors relevant to a choice of sanction such as deterrence and preventing a wrongdoer from profiting from its misdeeds.

Finally, Irico's assertion that any prejudice to Plaintiffs is speculative also lacks merit. Irico offers no reason to believe that the lost evidence would not assist Plaintiffs, except to wrongfully assert, as explained above, that only minimal amounts of evidence were lost. In fact, in light of the content of the meeting notes produced by other Defendants, it is likely that Irico's internal communications regarding the competitor meetings would be highly probative of its participation in the conspiracy. Further, the record is replete with examples of false and misleading testimony by Irico personnel in situations where Irico expected Plaintiffs to be unable to offer an effective rebuttal.

Thus, for example, one of Irico's principal assertions is that its products were not sold directly or indirectly in the United States. Among other things, Irico relied on this assertion to argue that it is not liable as a matter of law.

Plaintiffs know now that this assertion was false—despite Irico's continued insistence to the contrary—because, in this instance, Irico's belief that Plaintiffs lacked access to evidence to contradict its assertions was mistaken. Among other things, Irico inadvertently produced export records (which it attempted to claw back) showing sales to the United States, including to its U.S. sales company Irico (USA) Inc. *See, e.g.*, ECF No. 5640 at 12–14. Additionally, a handful of Irico sales department weekly reports were produced in discovery because Irico had provided them to its alleged co-conspirators. *See* Mot. at 13–14. These reports demonstrated that Irico sales personnel were well aware that Irico tubes were being used in televisions intended for sale in the United States, among other things. *Id.* at 14.

Similarly, as detailed in the Motion and above, Irico's lies about its document preservation efforts only came to light as a result of a Court order after years of efforts by Plaintiffs.

Finally, as to the fourth and fifth factors, Irico emphasizes the Court's obligation to implement the least drastic sanction possible and insists that the case can still be tried because there is other evidence of Irico's participation in the conspiracy. *See* Opp. at 5, 12–13, 22–24. However, the question is not whether Plaintiffs have other evidence of Irico's wrongdoing; it is whether alternative sanctions will effectively address the prejudice caused by Irico's wrongful conduct. *See, e.g., WeRide*, 2020 WL 1967209, at *11 (jury instruction insufficient to overcome large scale spoliation); Mot. at 32. Irico's opposition is devoid of any discussion of how lesser sanctions can address the fact that its defenses all depend on the gaps in the evidence it has wrongfully created. Irico also does not address the fact that it was clearly warned by its counsel of the consequences of spoliating evidence, its disregard of the Court's orders, or its many misrepresentations to the Court. *See* Mot. at 32–33. Indeed, if the Court finds that Irico's representations regarding its purported misunderstanding of its obligations to preserve evidence, the reasons for its extraordinary

The Honorable Vaughn R. Walker
5/26/2023
Page 29

withdrawal from the case, and the circumstances of Mr. Su's refusal to testify were knowingly false, the magnitude of Irico's wrongdoing is truly breathtaking.

Plaintiffs respectfully submit that the Court should strike the Irico Defendants' Answers.

## B. <u>Alternative Sanctions.</u>

If the Court declines to enter terminating sanctions, Plaintiffs respectfully submit it should impose the evidentiary sanctions outlined in the Motion—including (1) deeming Irico's agreements to fix prices and reduce production and its attendance at competitor meetings established as set forth in the meeting notes of other defendants; and (2) prohibiting Irico from offering evidence or argument to controvert the evidence of its participation in the conspiracy. The Court should also strike Irico's affirmative defenses.

As Plaintiffs have explained, while these alternatives will not completely remedy the pervasive prejudice Irico's conduct has caused, they will ameliorate it. *See* Mot. at 33–35. Irico fails to meaningfully address any of these proposed sanctions, much less offer reasons why they are improper or unfair, except to assert that they are disproportionately harsh, given its conduct. But this requires the Court to accept that its conduct is essentially innocent. *See* Opp. at 45–46. Irico's suggestion that these sanctions are little different from a terminating sanction is also incorrect. Substantial issues—including impact and damages—would still remain to be tried. As explained in the Motion, Judge Tigar imposed a similar sanction in the *InternMatch* case, where—as here—the sanctioned party had destroyed evidence relating to a dispositive issue in the case. Mot. at 32; *see InternMatch*, 2016 WL 491483, at *13–14.

In addition to the foregoing, the Court should also order that all documents produced by Irico, as well as all meeting notes produced by other defendants, should be deemed authentic and admissible. *See* Mot. at 33–36; 2–3. While this will not expand the universe of admissible documents substantially because—as demonstrated by the Court's determinations regarding the admissibility of the meeting notes showing Irico's involvement in the conspiracy—the bulk of these documents would likely be found to be admissible, it will save Plaintiffs (and the Court) substantial time and effort.

Finally, the jury should be instructed that Irico has destroyed evidence of its participation in the conspiracy and refused to make witnesses available for deposition, and that it must infer that the lost documentary evidence and testimony would have been unfavorable to it. Mot. at 34–35.

## VII.   Conclusion

For the foregoing reasons, Plaintiffs respectfully request that Your Honor grant this motion and impose either terminating or the alternative sanctions set forth above.

The Honorable Vaughn R. Walker
5/26/2023
Page 30

Very truly yours,

*/s/ R. Alexander Saveri*

R. Alexander Saveri
Lead Counsel for Direct Purchaser Plaintiffs

*/s/ Lauren C. Capurro*

Lauren C. Capurro
Lead Counsel for Indirect Purchaser Plaintiffs


Cc:    Tanveer Singh (tanveer.singh@fedarb.com)
       John M. Taladay (john.taladay@bakerbotts.com)
       Evan J. Werbel (evan.werbel@bakerbotts.com)
       Thomas E. Carter (tom.carter@bakerbotts.com)
       Andrew L. Lucarelli (drew.lucarelli@bakerbotts.com)
       Kaylee Yang (kaylee.yang@nortonrosefulbright.com)
       Geraldine W. Young (geraldine.young@nortonrosefulbright.com)

# DOCUMENT 11

R. Alexander Saveri (173102)
  *rick@saveri.com*
Geoffrey C. Rushing (126910)
  *grushing@saveri.com*
Matthew D. Heaphy (227224)
  *mheaphy@saveri.com*
David Y. Hwu (281780)
  *dhwu@saveri.com*
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Lead Counsel for Direct Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-CV-5944-JST |
| | MDL No. 1917 |
| This Document Relates to: | **DECLARATION OF R. ALEXANDER SAVERI IN SUPPORT OF PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR TERMINATING OR ALTERNATIVE SANCTIONS AGAINST DEFENDANTS IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD.** |
| *ALL DIRECT PURCHASER ACTIONS* | |
| *ALL INDIRECT PURCHASER ACTIONS* | |
| | Special Master: Hon. Vaughn R. Walker (Ret.) |

I, R. Alexander Saveri, declare:

1. I am the Managing Partner of Saveri & Saveri, Inc., Lead Counsel for Direct Purchaser Plaintiffs ("DPPs") in this action. I am a member of the Bar of the State of California and admitted to practice in the Northern District of California. I have been involved in virtually every aspect of this case from its outset in 2007. I make this Declaration in Support of Plaintiffs' Reply Brief in Support of Their Motion for Terminating or Alternative Sanctions Against Defendants Irico Group Corporation and Irico Display Devices Co., Ltd. Except as otherwise stated, I have personal knowledge of the facts stated below.

2. Attached hereto as Exhibit 1 is a true and correct copy of a document produced in this litigation by BMCC bearing the Bates numbers BMCC-CRT000105586 through BMCC-CRT000105590, and a certified translation thereof.

3. Attached hereto as Exhibit 2 is a true and correct copy of a document produced in this litigation by Chunghwa bearing the Bates numbers CHU00047657 through CHU00047674, and a certified translation thereof. It was marked as Deposition Exhibit 8570.

4. Attached hereto as Exhibit 3 is a true and correct copy of excerpts of a document produced in this litigation by Irico bearing the Bates numbers IRI-CRT-00000232 through IRI-CRT-00000321, and a certified translation thereof. It was Exhibit 2 to the Declaration of Stuart C. Plunkett in Support of Irico Defendants' Motions to Dismiss for Lack of Subject Matter Jurisdiction, dated July 18, 2018. The excerpted exhibit hereto was excerpted from ECF No. 5312-5 and marked as Deposition Exhibit 8418.

5. Attached hereto as Exhibit 4 is a true and correct copy of a document entitled "IRICO Won the Anti-Dumping Case" downloaded from the People's Daily website, dated November 20, 2000, and a certified translation thereof. It was marked as Deposition Exhibit 8396.

6. Attached hereto as Exhibit 5 is a true and correct copy of a document produced in this litigation by Irico bearing the Bates numbers IRI-CRT-00003490 through IRI-CRT-00003497, and a certified translation thereof. It was marked as Deposition Exhibit 8392.

7. Attached hereto as Exhibit 6 is a true and correct copy of a document produced in this litigation by BMCC bearing the Bates numbers BMCC-CRT000127966 through BMCC-

CRT000127969.

8.      Attached hereto as Exhibit 7 is a true and correct copy of a document produced in this litigation by BMCC bearing the Bates number BMCC-CRT000314540.

9.      Attached hereto as Exhibit 8 is a true and correct copy of a document produced in this litigation by BMCC bearing the Bates number BMCC-CRT000296385.

10.      Attached hereto as Exhibit 9 is a true and correct copy of a document produced in this litigation by Chunghwa bearing the Bates numbers CHU00030303 through CHU00030304. It was marked as Deposition Exhibit 8584.

11.      Attached hereto as Exhibit 10 is a true and correct copy of a document entitled "Preliminary Television Market and Industry Research," dated January 6, 2006. It was downloaded from the Internet at: https://www.energystar.gov/ia/partners/prod_development/revisions/downloads/tv_vcr/Preliminary _TV_Market_Research012006.pdf.

12.      Attached hereto as Exhibit 11 is a true and correct copy of excerpts of the transcript of the third day of the deposition of Yan Yunlong on September 29, 2022 ("Yan Yunlong Dep. Tr. Vol. III").

13.      Attached hereto as Exhibit 12 is a true and correct copy of excerpts of the transcript of the second day of the deposition of Yan Yunlong on September 28, 2022 ("Yan Yunlong Dep. Tr. Vol. II").

14.      Attached hereto as Exhibit 13 is a true and correct copy of excerpts of the transcript of the first day of the deposition of Yan Yunlong on September 27, 2022 ("Yan Yunlong Dep. Tr. Vol. I").

15.      In November 2021, the parties agreed to take the depositions of Messrs. Wang and Su via videoconference from Hong Kong in December 2021.

16.      Attached hereto as Exhibit 14 is a true and correct copy of a letter dated November 16, 2021, from me and Lauren Capurro of Trump, Alioto, Trump & Prescott, LLP, Lead Counsel for Indirect Purchaser Plaintiffs, to Evan J. Werbel of Baker Botts LLP, counsel for the Irico Defendants.

17.     Attached hereto as Exhibit 15 is a true and correct copy of a letter dated November 18, 2021, from Mr. Werbel to me and Ms. Capurro.

18.     Attached hereto as Exhibit 16 is a true and correct copy of a letter dated December 3, 2021, from Mr. Werbel to me and Ms. Capurro.

19.     Attached hereto as Exhibit 17 is a true and correct copy of a document produced in this litigation by Irico bearing the Bates number IRI-SU-000129, and a certified translation thereof.

20.     Attached hereto as Exhibit 18 is a true and correct copy of a document produced in this litigation by Irico bearing the Bates number IRI-SU-000130, and a certified translation thereof.

21.     Attached hereto as Exhibit 19 is a true and correct copy of a letter dated February 24, 2022, from Mr. Werbel to me and Ms. Capurro. In this letter, Mr. Werbel indicated that the Customs Office had informed Irico that no visas could be issued due to rising Omicron cases. However, I am not aware of any documents reflecting that Irico ever applied for visas for Hong Kong that were included in Irico's document production on December 20, 2022, made pursuant to the Court's December 6, 2022, Order Adopting Special Master's Report & Recommendation on Irico's Failure to Produce Su Xiaohua for Deposition (ECF No. 6115).

22.     Attached hereto as Exhibit 20 is a true and correct copy of a letter dated March 15, 2022, from Mr. Werbel to me and Ms. Capurro.

23.     Attached hereto as Exhibit 21 is a true and correct copy of a letter dated April 26, 2022, from me and Ms. Capurro to Mr. Werbel.

24.     Attached hereto as Exhibit 22 is a true and correct copy of an email I received from Mr. Werbel to Matthew Heaphy of my firm, dated May 18, 2022.

25.     I am informed by attorneys at my firm working under my supervision that, based on a review of the meeting notes produced by other defendants, more than twenty Irico employees attended conspiratorial meetings.

26.     Attached hereto as Exhibit 23 is a true and correct copy of the Irico Defendants' Second Supplemental Objections and Responses to DPPs' First Set of Interrogatories, dated May 3, 2021.

27.     Attached hereto as Exhibit 24 is a true and correct copy of excerpts of the transcript

3

of the third day of the deposition of Wang Zhaojie on March 8, 2019 ("Wang Zhaojie 2019 Dep. Tr. Vol. III").

28.     Attached hereto as Exhibit 25 is a true and correct copy of excerpts of the transcript of the second day of the deposition of Li Miao on September 28, 2022 ("Li Miao Dep. Tr. Vol. II").

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of May, 2023 in San Francisco, California.

                              */s/ R. Alexander Saveri*
                              R. Alexander Saveri

# EXHIBIT 1



STATE of NEW YORK          )
                           )          ss:
COUNTY of NEW YORK         )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *BMCC-CRT000105586E - BMCC-CRT000105590E*, originally written in *Chinese,* is to the best of our knowledge and belief, a true, accurate and complete translation into *English.*

Dated: December 6, 2017

*Allison Carey*
Allison Carey
Consortra Translations

Sworn to and signed before ME this
6ᵗʰ day of *December* ,
2017.

Notary Public

JAMES G. MAMERA
Notary Public- State of New York
No. 01MA6157195
Qualified In New York County
My Commission Expires December 4, 2018

Your
legal
translation
partner

New York, NY  |  Washington, DC  |  Houston, TX  |  San Francisco, CA
Hong Kong

Industry Meeting Minutes

Time: July 5, 2007

Place: Chinese Hotel Dongguan

Attendees:

Secretary General's remarks: In the first half of 2007 the market saw great changes, many problems in the industry were exposed, and the impact of flat panel products on CRT is increasingly evident. In this environment the attending companies are able to meet and discuss under these critical times; hopefully the meeting will be successful.

Analysis of current situation of CRT and CTV (See meeting report contents)

Secretary General Yang Guojun:

1. At beginning of this year, the color tube inventory was 9.2 million units; at the end of the year there were still 7.5 million units. Supply is still greater than demand; judging by the current situation inventory should be further reduced in stages by 5 million units. From the industry's estimation, the TV inventory of 4.5 million sets is not so large, but the CRT inventory is far greater than the CTV inventory. Therefore, solving the inventory problem is still key.

2. Each company is not cutting production enough; we will produce 36 million units in the second half of the year.

Remarks by each company's general manager:

1. BMCC general manager Chen Xi

    This year an obvious crisis has occurred in the glass supply chain; Solectron Shanghai's furnace was just repaired and immediately came under funding pressure. Other suppliers like Ancai and Baoshi are also not optimistic. The survival of glass enterprises is the foundation of CRT.

    BMCC has started recovering 14″ color tube prices this April; if prices drop lower, it will affect the entire industry.

TV factories rely on CRT for profits, propping up LCD. When the time comes that LCD is mature, abandoning CRT will be too easy. In the near term we can only save ourselves by maintaining prices.

BMCC will further increase export plans in the second half of this year.

2. Wang Ximin of Xianyang IRICO:

We suffered last November and December, and this year business from January to March was quite difficult. The 29″ just came out, and the loss from pricing was too great. Since the glass, steel plates and other materials we buy are designated to be sourced from our own group, our costs are higher than everyone else's.

Color TV and color tube refurbished products are a big threat to the industry, and also not ecological; we should ask the relevant government ministries to strictly control them.

We recommend raising prices by 10% for the main 21″ and 29″ product types beginning in July. We must unite everyone's understanding. Then comes limiting production.

For future main product types there has to be at least a limit price.

Export as much as possible; for example India has great demand for 14″. We and BMCC have good control of 14″ prices.

3. Cheng Shengguo of Samsung SDI

This year Samsung SDI's Mexico factory will continue production, and the chance of a shutdown does not exist. We will consider shutting down the Korean factory due to excessively high operating costs. The remaining production volumes will shift to China's Tianjin and Shenzhen factories, as well as the Malaysian, Mexican, and Brazilian factories.

Since Brazil's LPD factory shutdown, Samsung's factory there is doing somewhat better. In 2008 the Korean and Mexican factories will shut down, and Brazil will keep only one production line.

CONFIDENTIAL

BMCC-CRT000105587E

4. Wang Yufeng of SEG-Hitachi

   SEG-Hitachi's withdrawal will free up annual production capacity of 6 million 21″CRT units for the industry. We believes the recovery of the market in the second half of the year is not a problem. But SEG-Hitachi received the city government's request to cease CRT business due to high production costs in Shenzhen and other reasons.

5. Thomson's general manager

   China possesses a complete CRT production system; we estimate that CRT products will remain the world's most cost-competitive product until 2009.

   Although LCD manufacturers are showing some production overcapacity, prices continue to rise. Thomson continues to invest in China and new global CRT items (super slim, shadow mask conversion to AK). Striving for long-term development and becoming the last color tube manufacturer is our mission. Establish a complete glass and other supporting materials supply chain. We believe in the importance of cooperation and fair competition.

   Introduction to India market:

   India has two CRT manufacturers, VIDECON and Smtal. Annual production is 12 million units, mainly focused on producing 14″ CRT.

   The raw material supplier is also VIDECON.

   India's import tariff is 12%, so exporting is harder.

6. Fan Wenyi of Shanghai Novel

   Shanghai Novel only had one-plus production line for the first half of this year, and will expand production in the second half. We estimate two lines will produce four types, 21FS, 21PF, 25FS, and 29PF; production volume will be 1.8 million units. Concurrently, personnel will undergo about a 60% layoff adjustment.

BMCC-CRT000105588E

Solectron Shanghai halted half their furnaces beginning in July; if the third quarter is not good, it will shut all of them down. Solectron's business situation has a big effect on the Shanghai government. We estimate that the Shanghai Xingzhi Screen Factory will close at the end of year.

7. Li Dalin of BMCC

Looking at the global market, there is still opportunity; opportunity coexists with challenges. As for current production, each company faces different problems. BMCC will base itself on the export market; we estimate there will be 15% growth in the second half of this year. Exporting from China to India has higher tariffs; exporting from Thailand to India is relatively better.

Price must be decided based on the market and supply and demand.

Aggressively expand overseas markets; if we do well in overseas markets, we can also ease some of the pressure in the domestic market.

8. Sheng Jianzhong of Nanjing Huafei

Globally CRT is reducing, but it is still resilient, especially in China. As foreign factory closures speed up, some domestic companies are beginning to transform.

We must have confidence about raising prices; there are signs this is beginning for small screens. No one made money in the first half of the year; if we don't grab this chance in the second half, this year will be difficult.

Prices should be increased; everyone should be united as we face outward, or else next month prices will go down again. Currently, Philips' export business color tube prices have already begun to increase.

We should increase exports; judging from estimated figures for color tube imports, there will still be 5 million units of imports for the whole year—this quantity should be reduced.

It is worth noting that some companies (SEG Hitachi) pledged tubes as debt collateral, impacting the industry's color tube prices.

CONFIDENTIAL

BMCC-CRT000105589E

Conclusion by secretary general Yang Guojun:

1. We must decrease inventory, so that we can stabilize prices or raise them slightly. Raising prices domestically by 10% is absolutely doable.

2. Increasing exports is good for cash flow, and we must be determined to resolve the problem of payment conditions.

3. If we want to continue doing this, the industry must handle its own affairs well.

4. We plan in early August to gather the glass factory senior management for a meeting with CRT, to get to the point where no one in the entire CRT industry will have losses. This will be good for the CRT industry's healthy development.

5. The price of CRT is merely one-third that of LCD, so we must be confident about the CRT industry. Right now everyone must unite; if we don't get the second half of this year right, the year will be difficult.

CONFIDENTIAL

# 行业会议纪要

时间：2007 年 7 月 5 日

地点：东莞富盈酒店

出席人员：

**秘书长致辞：**2007 年上半年整个市场变化很大，行业本身暴露的问题很多，平板产品对 CRT 的冲击越来越显现出来，在此环境下与会厂家能够在此非常时期开会商讨，希望会议成功。

CRT、CTV 现状分析（请参见会议报告内容）

**杨国钧秘书长：**

1、今年彩管年初库存 920 万只，到了年底仍旧有 750 万只，还是供大于求，就目前的状况来看库存应该再逐步削减 500 万只。TV 的库存从行业推总来看 450 万台并不多，但 CRT 的库存远远大于 CTV 库存。因此，解决库存问题仍是关键。

2、各家减产的数量不够，下半年生产 3600 万只。

**各公司总经理发言：**

1、BMCC 陈曦总经理

今年供应链玻壳上已发生了明显的危机，上旭电的炉子刚刚修好，就受到资金的压力。其他供应商安彩、宝石也都不乐观。玻壳企业的生存是 CRT 的基础。

CONFIDENTIAL

BMCC-CRT000105586

BMCC 在今年 4 月份就开始对 14"彩管价格开始恢复，价格再降，将影响整个产业。

TV 厂依靠 CRT 赢利，扶持 LCD，到时候等 LCD 成熟了，抛弃 CRT 就太容易了。只有保价才能在短期内自救。

BMCC 下半年出口计划将进一步增加。


2、 咸阳彩虹王西民

去年 11、12 月备受磨难，今年的 1-3 月企业经营也是相当困难。29"刚出来，价格上亏损太大。购买的玻壳、网板等材料，由于是指定使用自己集团内的，因此要比大家的价格还要高。

彩电、彩管的再生品对行业威胁很大，也不环保，应要求国家相关部门对此严格控制。

建议主要品种 21"、29"从 7 月份开始上涨 10%，大家的认识要统一。再就是限产。

对于今后主要品种起码要有一个限价。

尽量出口，比如印度对 14"的需求很大。我们和 BMCC 对 14"价格的控制是好的。


3、三星 SDI 成圣国

今年三星 SDI 的墨西哥工厂将继续生产，不存在关闭的可能。韩国的工厂由于经营成本太高，将会考虑关闭。将余下的生产量转移到中国的天津、深圳两个工厂，以及马来西亚、墨西哥、巴西的工厂。

由于巴西 LPD 工厂的关闭，三星在那里的工厂状况要好一些。

CONFIDENTIAL

2008 年韩国、墨西哥的工厂将会关闭，巴西将只保留一条生产线。

4、赛格日立王宇峰

赛格日立的退出将给行业腾出了每年 600 万只 21"CRT 的产能。

认为下半年市场的回暖不是问题。但赛格日立是因在深圳生产成本高等原因，受市政府要求停止 CRT 业务的。

5、汤姆逊总经理

中国有完善的 CRT 配套生产的体系，预计到 2009 年 CRT 产品依旧是全球最具性价比的产品。

虽然 LCD 厂家出现了产能的少许生产过剩，但价格继续上升，汤姆逊在中国以及全球的 CRT 新品项目（超薄、荫罩 AK 化）上继续投资，致力于长期的发展，成为最后一家彩管制造商为我们的使命。建立完整的玻壳等配套材料的供应链体系，相信合作、公平竞争的重要。

印度市场介绍：

印度有两家 CRT 制造商，VIDECON 和 Smtal。年产 1200 万只，主要集中在 14"CRT 的生产。

原材料供应商也是 VIDECON。

印度的进口税是 12%，所以出口比较困难。

6、上海永新范文懿

上海永新上半年仅一条多线在生产，下半年要加大生产，预计两条线要生产

BMCC-CRT000105588

21FS、21PF、25FS、29PF 四个品种，产量将在 180 万只。同时，人员要做 60%左右的裁员调整。

上海旭电子 7 月开始停一半的炉子，如 3 季度不好，将全部关掉。上海旭电子经营的状况对上海市政府的影响很大。

预计上海新芝网板厂年底关闭。


7、BMCC 李大林

从全球市场来看还是有机会的，机会与挑战并存，对于目前的生产，各企业面临的问题各不相同。BMCC 将立足于出口市场，预计下半年将有 15%的增长。

从中国出口到印度的关税较高，泰国出口到印度要相对好一些。

价格要用市场和供需来决定。

积极拓展海外市场，海外市场做得好的话，国内市场也可以减轻部分压力。


8、南京华飞盛建忠

CRT 全球来看是减少的，但生命力还是很强，特别是在中国，加速国外工厂的关闭的同时，国内一些厂家也开始转型了。

对于价格的上涨要有信心，小屏幕已经开始有所迹象了。上半年大家不挣钱，下半年不抓住机会的话，今年就很困难了。

价格应该上涨，大家对外要统一，不然下月价格又要下降了。目前，飞利浦出口业务的彩管价格已经开始涨价了。

应该增加出口，从彩管进口的预计数据来看，全年仍将有 500 万只的进口，要减少这个量。

BMCC-CRT000105589

对于一些企业（赛格日立）的抵债管对行业彩管价格的冲击要值得关注。

杨国钧秘书长总结：

1、要把库存降下去，这样才能稳住价格或略有上升，在国内上涨 10%是完全可以的。

2、出口增加对于现金流是有好处的，解决付款条件的问题要下决心解决。

3、要继续做下去的话，行业要做好自己的事情。

4、计划 8 月初，把玻壳厂老总召集起来和 CRT 一起开会，做到整个 CRT 行业大家都不亏损，对 CRT 行业的健康发展是有好处的。

5、CRT 的价格相对 LCD 来说仅是三分之一，所以对 CRT 行业要有信心。现在大家要团结起来，如果下半年没做好，今年就都困难了。

CONFIDENTIAL

BMCC–CRT000105590

# EXHIBIT 2

**From:** DENIS.HUANG [huangzy@cptf.com.cn]
**Sent:** Tuesday, February 13, 2007 4:02 AM
**To:** SALES胡美芳
**Subject:** ??: file

**Attachments:** 西安??理????.doc; 西安??理???.ppt

自我了解即可！

  DENIS.HUANG 2007/2/13

  ──────

发件人: yliang6699 [mailto:yliang6699@163.com]
发送时间: 2007年2月8日 12:26
收件人: huangzy@cptf.com.cn
主题: file

Dear mr.Huang

(See attached file: 西安总经理会议记录.doc)(See attached file: 西安总经理会
汇报.ppt)
liang yuan

  ──────

HYPERLINK "http://www.126.com/" \n想加入吗？1.9亿用户正在使用网易邮箱 www.126.com



CONFIDENTIAL – GRAND JURY MATERIAL



STATE of NEW YORK        )
                         )           ss:
COUNTY of NEW YORK       )


### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"CHU00047658 - CHU00047662"* originally written in *Chinese* is to the best of our knowledge and belief, a true, accurate and complete translation into *English*.


Dated: December 17, 2014

Allison Carey
Consortra Translations

Sworn to and signed before ME this _____ day of _____ 2014.

Notary Public

JAMES G. MAMERA
Notary Public- State of New York
No. 01MA6157195
Qualified In New York County
My Commission Expires December 4, 2018

Your
legal
translation
partner

New York, NY  |  Washington, DC  |  Houston, TX  |  San Francisco, CA
Hong Kong

**January 23, 2007 CPT Industry General Manager (Xi'an) Meeting Minutes**

**Meeting Time**: January 23, 2007

**Meeting Location**: Fanglin Fragrant Garden Hotel, Xi'an

**Attending units and personnel**:

      **Beijing  Matsushita**: Wenqiang Fan, Xinwen Huang, Hai Huang
      **Xianyang IRICO**: Daoqin Xing, Mengquan Guo, Ximin Wang, Xiaolin Shen, Jun Yao, Gaowen Xu
      **SEG Hitachi**: Guojun Yang, Peng Guo
      **LPD**: Chang Gi Kim, Jiangnan Yu
      **Changsha Shuguang**: Yaping Yang, Jing Feng
      **Nanjing Huafei:** Jianzhong Sheng, Dezhu Zhang, Minghui Xu
      **Shanghai Novel:** Wei Sun, Zhiping Xu, Qing Ye
      **Samsung SDI**:  Yihuan Wu, Yun Xie
      **CPT:** Xiaoyan Liu

**Meeting Chair**: Secretary-General Guojun Yang

**Content**:
 Chairman Daoqin Xing delivered welcome speech:

2006 was a difficult year for the industry. In 2005, global market shrank, but Chinese market grew. However, in 2006, the Chinese market also shrank. Companies are facing transformation, and CRT will be concentrated in China, India and the surrounding areas in the future. As a community of interests, all should jointly explore how to develop the industry. (To effectively integrate resources).

Wenqiang Fan, President of the Association, read the letter that Thomson (Seligent) explained the reason of their absence from this meeting.

CONFIDENTIAL – GRAND JURY MATERIAL        

Information personnel representative reported the market conditions of 2006 and 2007 and elaborated the severe market trends (see attachment for details).

Moderator: 2006's inventory carried over to 2007; therefore, 2007 has 2-month extra production capacity (the Shanghai Meeting had suggested one month shutdown). Facing the significant increase of the current inventory and the decline of prices, all are very clear that we should discuss the next step. It is reported that, by the end of 2006, the inventory was 5 to 6 million in the industry, and it is estimated that the inventory will be over 10 million in January 2007. We hope to form a guideline document to make  the CPT industry well survive. All companies must operate under the industry's decision. Recently, I heard that several LCD companies want to cooperate and I think the industry's joint action is the right direction. I hope that all attending executives work together to consume the inventory of 10 million in the industry as soon as possible.

President of the Association: From a global point of view, the display industry is in a stalemate, and the development of FPD is in a transition stage. LCD's global investment peak period has passed, and now LCD is entering its second phase (integration phase). The total production capacity of LCD should be able to fix in 2010. Our original pessimistic projection is that in 2010, LCD will be 170 million and CRT will be 70 million. Now we do not think so (LCD capacity is expected to be 80-90 million); it will not be more than 100 million. Global TV demand is 220 million sets, of which 110 million are FPD, and 110 million are CRT (mostly Chinese companies'). The production lines in Southeast Asia will be gradually reduced (in 2007, China CPT supply will possibly rise to 60% while Southeast Asia shares 30% and other areas share10%). Chinese enterprises should work together and keep harmony to a great extent and to eliminate minor differences. Cooperation is the gist. Currently, five large color TV makers work together, so they have very big strength. Our CPT industry analyzes more on our industry rather than color TV, LCD and globe market. 2007 is a new year and we should specify the industry rules.

Moderator: All (including SDI) are facing difficulties, but we did not analyze the reason causing the current difficulties. Color TV makers cooperated, and CPT inventory soared up high since July. Prices of all materials increase. All of the current inventory is the materials purchased at high prices; cost pressure is very high, so we should work together.

**Executives of respective companies spoke on the meeting topics as follows:**

Novel: We support the Industry Association's decision. We hope the industry can work jointly to cope with and to face the difficulties in survival, and may consider less about the legal aspects. We suggest that the Association set a unified price and control outputs. FPD production is also limited. With respect to Shanghai TFT, the original plan was to expand capacity by 70% to 80%, but now its capacity is also shrinking.

SEG: We plan to shut down the whole plant for 20 days; after that, we will shut down for 10 days depending on the circumstances. (Secretary-General Guojun Yang will not be responsible for SEG's CPT sales any more from January 1. He will be primarily responsible for sales of Hitachi LCD screens as an agent.)

Huafei: Our company has higher requirement on inventory. We have stopped production for one week before the New Year's Day, and will stop production for two weeks or longer around Spring Festival period based on types. We think that coordination by the industry still has some effects. Huafei will control production, sales and inventory based on own interests and the industry's interests.

LPD: LPD Korea will stop production of 4 lines in Q1 this year (in January stopped 3 lines; among four production lines, 2.5 lines are CPT lines). Part of the purchase orders and production plan will be transferred to Huafei and Changsha. The Chinese plants' status becomes more important than it was before. The industry must control inventory.

LG: In December, 21 "/ 25" were shut down for 10 days. Shutting down by the industry's members individually is not strong enough. We suggest the industry should arrange shutdowns uniformly.

CPT: Fuzhou plant plans to produce 4.5 to 6 million pieces in 2007 and the types will be 14" and 21". Currently, Fuzhou has a total of eight production lines; it has converted  one line for producing 14 "CPT (capacity is 1.6 million/year) and two lines for producing 21"CPT (capacity is1.2 million/year) (it plans to use the technology of producing CDT short tubes to produce 21" short tubes after July 2007). We also plan to convert the 4th line, but it depends on the market condition after 2008. After Fuzhou plant starts to produce CPT, CPT Malaysia will reduce part of the outputs. It is anticipated that after a number of years, CPT can keep one plant only. However, when the plant was established in the early stage, its equipment, etc., was supervised by the customs. Now the supervision period has not yet expired, so it is expected to be a longer wait for the shutdown time. CPT's slogan is "fighting to the last single soldier." CPT originally had five CPT plants, but now it has plants in Fuzhou, China and Malaysia only (it closed its plants in Taoyuan, Taiwan, United Kingdom, and Yangmei, Taiwan one after another).

CPT currently has six plants in China, including a LCD module. It also acquired XOCECO to do the whole machine business. Its next step does not preclude the possibility of establishing a new whole machine plant (currently it is also negotiating with BOE).

SDI: Samsung produces strictly based on its purchase orders and arranges shutdown gradually; SDI considers LCD as its competitor. It has the least inventory in the CPT industry.

IRICO: We paid much attention to the essence of the Shanghai Meeting and limit production for 10 to 20 days. We will arrange our production, sales and inventory according to the essence of this meeting. The Industry Association has made great contributions to the nation and the industry. However, it should make some constraints on the current industry situation and should foresightedly understand how to make the industry out of the plight.  We also suggest the Industry Association to change its name to "Display Devices Industry Association," etc., to recruit new members and to expand its field of vision.

Beijing Matsushita: We called for meeting with the upstream and the downstream together, preferably led by the color TV makers. We must make the color TV makers know that maintaining the development of CRT industry is an important proposition of TV makers. In 2003, BMCC originally planned to further build a plant in Beijing, and it finally canceled the plan, which now appears to be wise. We hope that CPT will also consider that when it transferred to the Fuzhou plant, it adjusts the production capacity of the Malaysia plant to keep the overall balance. We also suggested that Malaysia plant export more to Europe. (Malaysia has tariff advantages, China - Europe 14 / Malaysia - Europe 7.9). In 2006, BMCC made its efforts to increase export, and export accounted for 55% of the sales. BMCC stopped production during the New Year's Day for three days. Currently, BMCC has over130 models; therefore, it is more difficult to control inventory. This year it needs to clean up its models to raise the overall capability to respond to the market. We hope that in 2007 the industry can control the balance between production and sales; the industry needs to increase exports and enhance global competitiveness. Regarding the matter on request for the government's restoration of export tax refund, what the industry previously did has not aimed at the right target. Currently, we have already contacted a consulting firm under the Ministry of Finance to promote this. If it is successful, they will charge certain fee. If not, they will not charge at all.

Secretary-General Yang: The policy of this meeting: limit production, reduce inventory, and keep price.
President of the Association Fan: The meeting needs to form a press release so that all

speak with one voice. (Please pay attention to information security and information propaganda, and keep the meeting content from spreading outside.)

2007 shutdown schedule and expected inventory during the Spring Festival

|  | February | Estimated inventory volumes at the end of February |
|---|---|---|
| SEG Hitachi | 10th to 28th | 400,000 |
| Shanghai Novel | 16th to 28th | 400,000 |
| Nanjing Huafei | 16th to 28th | 300,000 |
| Changsha LG | 10th to 25th | 250,000 |
| Chunghwa Picture Tubes | 15th to 28th | 0 |
| Samsung SDI | 15th to 28th | 200,000 |
| IRICO | 15th to 28th | 500,000 |
| Beijing Matsushita | 16th to 25th | 500,000 |

The meeting decided to convene the Industry's Department Chief Meeting after the Spring Festival.

## 2007 年 1 月 23 日彩管行业总经理（西安）会议记录

**会议时间**：2007 年 1 月 23 日

**会议地点**：西安   芳林苑宾馆

**与会单位及人员**：

北京松下   范文强   黄新文   黄海

咸阳彩虹   邢道钦   郭盟权   王西民   申小琳   姚军   徐高文

赛格日立   杨国钧   郭 鹏

LPD      金昌起   于江南

长沙曙光   杨亚平   冯靖

南京华飞   盛建忠   张德柱   许明晖

上海永新   孙 伟   徐志平   叶 青

三星 SDI   吴翊焕   谢 云

中华映管   刘晓燕

**会议主持**：杨国钧秘书长

**内容**：

邢道钦董事长致欢迎词：

2006 年是行业艰难的一年，2005 年全球市场萎缩，但中国市场有所增长，而 2006 年中国市场同时也有萎缩。企业面临着转型，未来 CRT 集中在中国、印度及周边地区，大家作为利益共同体，应该联手探讨行业如何发展。（资源有效整合）

范文强会长致辞并宣读汤姆逊（新骏）对于本次未出席此次会议原因说明的函件。

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00047658

信息员代表汇报 06 及 07 年市场情况，阐述严峻的市场趋势（详见附件）

主持人：06 年的库存带到了 07 年，07 年多了 2 个月的产能（上海会议时曾建议停产 1 个月）对于目前的库存大幅上升，价格下跌，大家都十分清楚，应该探讨下一步该如何走。根据报告，06 年底行业存在 500～600 万库存，07 年 1 月估计会超过 1000 万，希望能够形成一个纲领性的文件，让彩管行业好好生存。所有企业在行业的决定下工作，最近听说几家 LCD 企业要联手，我觉得行业联手行为是对的，希望在座各位老总群策群力，尽快消化行业 1000 万库存。

会长：从全球来看，显示行业正处于胶着状态，FPD 发展到了一个转型期，LCD 全球投入的高峰期已经过去，现在进入第二阶段（整合阶段）。2010 年 LCD 的总产能应该能定住了，原来我们悲观预计到 2010 年 LCD 有 1.7 亿，CRT7000 万，现在觉得未必如此（预计 LCD 产能在 8000～9000 万），不会达到 1 亿以上。全球 TV 需求为 2.2 亿台，其中 1.1 亿为 FPD，CRT 有 1.1 亿（以中国企业为主）。东南亚生产线会逐步减少（07 年中国 CPT 供应可能会上升到 60%，东南亚 30%，其它 10%）。中国企业应坐在一起，存大同，去小异，联手是主题。目前五大彩电厂联手，力度很大，我们彩管行业分析自己的行业比较多，对彩电、LCD 及全球分析比较少。07 年是新的一年，大家应该指定行业规矩。

主持人：大家都面临困难（包括 SDI），但是没对造成目前困难的原因分析，彩电厂联手，彩管库存从 7 月猛涨，材料价格全面涨价，现在的库存都是高价下采购的材料，成本压力很大，因此应当联手。

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00047659

**以下各个公司老总就会议议题发言**

永新：支持行业协会的决定，希望行业能够联合应对，面对生存的窘境，在法律方面可以考虑少一些，建议协会可以统一价格，控制产量；FPD 也限产，上海 TFT 原来计划扩产 70%～80%，现在产能也萎缩。

赛格：全厂计划停产 20 天，其后根据情况停产 10 天。( 杨国钧秘书长从 1 月 1 日开始不再负责赛格的彩管销售，主要销售代理日立液晶屏。)

华飞：公司对库存的要求比较高，元旦前已经停产 1 周，春节前后会根据品种停产 2 周或者更久。认为行业协调还是有一定作用力，华飞会从自身及行业利益出发控制产销存。

LPD： LPD 韩国今年 1 季度将停产 4 条线 ( 1 月停 3 条，4 条生产线其中 2.5 条是 CPT 线 )，部分订单及生产计划将向华飞及长沙转移，中国工厂地位较之之前更为重要，行业一定要控制库存。

LG：12 月 21"/25"停产 10 天。行业成员各自分头停产的力度不够，建议行业统一安排停产；

中华： 07 年福州工厂计划生产 450~600 万只，品种是 14" 及 21".目前福州共有 8 条生产线，已经改造 1 条生产 14"CPT ( 产能 160 万/年 )，2 条生产 21"CPT ( 产能 120 万/条/年 )( 07 年 7 月份以后计划用生产 CDT 短管的技术生产 21"短管 )，另还

CHU00047660

计划改造第 4 条线，不过要看 08 年后市场情况来定.福州工厂投产 CPT 后，马来西亚中华将减少部分产量，预计若干年以后，中华映管只能保存一个工厂，但因为早期建厂时设备等受到海关监管，监管期还没有达到，所以关闭的时间将是一个较长的预期。中华的口号是"战到最后的一兵一卒"。华映原有五家 CPT 工厂，现在只剩中国福州、马来西亚（先后关闭台湾桃园、英国、台湾杨梅）。华映目前在中国有 6 家工厂，其中包括有 LCD 模组，还收购厦华，做整机业务，下一步不排除建立新的整机厂（目前和京东方也在谈洽）。

SDI：三星是严格按照订单生产，逐步安排停产；SDI 认为竞争对手是 LCD，是彩管行业库存最少的。

彩虹：重视上海会议精神，限产维持 10～20 天，会根据此次会议精神安排产销存。行业协会为国家及行业做出了很大贡献，但就目前行业情况应做出一些约束，要前瞻性的了解如何使行业走出困境。并且建议行业协会更名，如"显示器件行业协会"等等，吸收新会员，扩大视野。

北京松下：呼吁上下游一起开会，最好有彩电厂牵头。要让彩电厂认识到维持 CRT 行业发展是 TV 厂的重要命题。03 年的时候，北松原计划在北京再盖工厂，最后取消了决议，现在看来是明智的。希望华映也能考虑，在向福州工厂转移的同事，马来西亚工厂调整产能，整体平衡。同时建议马来西亚工厂多往欧洲出口。（马来西亚有关税优势，中国——欧洲 14/马来西亚——欧洲 7.9）。06 年北松加大出口力度，出口占销售 55%。北松元旦停 3 天，目前北松有 130 多个型号，库存比较

CHU00047661

难控制，今年要专门清理品种，提高整体对应市场的能力。希望07年行业能控制产销平衡，行业要增加出口，增强全球竞争力。关于申请国家恢复出口退税的事宜，以前行业所做的工作没有对准目标，目前已经联系了一个财政部下属的咨询公司进行推广，如果成功，将要收取一定费用，不成功分文不取。

杨秘书长：此次会议方针： 限产、压库、保价

范会长： 会议形成新闻稿，以便大家统一口径。( 注意信息安全和信息宣传，会议内容不要外传。)

07年春节期间停产时间及预期库存

|  | 2月 | 预计2月底库存量 |
|---|---|---|
| 赛格日立 | 10日~28日 | 40万 |
| 上海永新 | 16日~28日 | 40万 |
| 南京华飞 | 16日~28日 | 30万 |
| 长沙LG | 10日~25日 | 25万 |
| 中华映管 | 15日~28日 | 0 |
| 三星SDI | 15日~28日 | 20万 |
| 彩虹 | 15日~28日 | 50万 |
| 北京松下 | 16日~25日 | 50万 |

会议决定：春节后召开行业部长会议。

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00047662



STATE of NEW YORK    )
                           )       ss:

COUNTY of NEW YORK   )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"CHU00047663 - CHU00047674"* originally written in *Chinese* is to the best of our knowledge and belief, a true, accurate and complete translation into *English*.

Dated: December 17, 2014

*Allison Carey*
Allison Carey
Consortra Translations

Sworn to and signed before ME this
_17TH_ day of _December_,
2014.

*[signature]*
Notary Public

JAMES G. MAMERA
Notary Public- State of New York
No. 01MA6157195
Qualified In New York County
My Commission Expires December 4, 2018

Your
legal
translation
partner

New York, NY | Washington, DC | Houston, TX | San Francisco, CA
Hong Kong



**2007 Q1 CRT Industry General Managers Conference**

Xi'an
January 23, 2007

CONFIDENTIAL – GRAND JURY MATERIAL

# Conference Agenda

9:00-9:30 President Xing's Welcome Speech and Conference Chairman's Welcome Speech

9:30-10:00 Report on Industry's Current Status

10:00-11:00 Statements by Industry Leaders

12:20- Luncheon Reception Hosted by Irico

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL                                                   CHU00047664E_Translation

# Conference Topics

- Review and analysis of market demand and supply for 2006

- Data for 2007 Q1 and market forecast for 2007

- Strengthening  communication and cooperation in CRT industry; together welcoming market challenges

- Collective planning of long-term development for CRT industry

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL                                        CHU00047665E_Translation

# 2006 Demand and Supply Analysis

- In 2006, our industry showed growth in a recovery mode.  Compared with 2005, there was an 11.5% increase in production; 6.7% increase in sales; 3.87% decrease in domestic sales; and a 128% increase in inventory.
- The restructuring and closing in overseas CRT makers caused a 27% increase in export (including same day import and export activities at the same port). However, due to the 2006 CRT import far exceeded the forecasted amount (net import 11.12M), which is a result of mostly  the CRT dumping effect from Malaysia and Thailand (factories in these two countries have been closed by the end of 2006; the effect will be limited for 2007.), the volume of imports has far exceeded expectation in 2006 .
- Because color TV makers made purchases in advance  in the second Quarter, and cleared the strategic inventory  in the fourth Quarter, this year has seen neither a weak off-season nor a strong  peak season.
- Because the changes in supply and demand have made the CRT inventory  to increase every month in the fourth season, reaching over 3,000,000 by the end of the year.

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL

# 2006 Market  Supply and Demand Analysis

2006 Supply and Demand Trend of Color TV and CRT

Color TV Makers' Production Forecast                                    Unit of measure:10,000 pieces/10,000 sets

| Month | 06.01 | 06.02 | 06.03 | 06.04 | 06.05 | 06.06 | 06.07 | 06.08 | 06.09 | 06.10 | 06.11 | 06.12 | Estimate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHONGHONG | 70 | 53 | 50 | 52 | 47 | 58 | 62 | 61 | 80 | 80 | 80 | 90 | 783 |
| SKYWORTH | 60 | 28 | 32 | 55 | 55 | 52 | 68 | 73 | 80 | 85 | 76 | 78 | 742 |
| KONKA | 75 | 40 | 35 | 60 | 50 | 67 | 70 | 74 | 90 | 100 | 105 | 105 | 871 |
| TTE | 95 | 60 | 107 | 111 | 90 | 95 | 92 | 113 | 119 | 120 | 110 | 95 | 1207 |
| HI SENSE | 55 | 13 | 20 | 50 | 45 | 59 | 50 | 65 | 75 | 75 | 72 | 80 | 659 |
| HAIER | 45 | 15 | 20 | 30 | 25 | 30 | 45 | 51 | 70 | 45 | 50 | 60 | 486 |
| Above Total | 400 | 209 | 264 | 358 | 312 | 361 | 387 | 437 | 514 | 505 | 493 | 508 | 4748 |
| Projected Total Color TV Production | 533 | 322 | 406 | 519 | 446 | 501 | 545 | 652 | 714 | 673 | 657 | 635 | 6604 |
| Net import of CRT | 80 | 70 | 76 | 87 | 75 | 77 | 405 | 125 | 132 | 110 | 90 | 85 | 1112 |
| Available domestic CRT quantity | 453 | 252 | 330 | 432 | 371 | 424 | 440 | 527 | 582 | 563 | 567 | 550 | 5492 |

CRT Production Forecast

| | 06.01 | 06.02 | 06.03 | 06.04 | 06.05 | 06.06 | 06.07 | 06.08 | 06.09 | 06.10 | 06.11 | 06.12 | Estimate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THOMSON | 75 | 59 | 69 | 80 | 69 | 78 | 83 | 99 | 100 | 93 | 86 | 80 | 971 |
| LPD-HE | 60 | 61 | 64 | 66 | 57 | 71 | 78 | 80 | 79 | 81 | 80 | 75 | 852 |
| LPD-OG | 57 | 54 | 60 | 58 | 60 | 64 | 59 | 64 | 63 | 62 | 63 | 50 | 714 |
| NOVEL | 51 | 36 | 30 | 31 | 33 | 43 | 44 | 43 | 48 | 41 | 50 | 42 | 492 |
| LRLOO | 99 | 79 | 109 | 117 | 111 | 130 | 130 | 135 | 135 | 135 | 132 | 112 | 1424 |
| BMOC | 71 | 63 | 75 | 74 | 72 | 77 | 82 | 83 | 77 | 88 | 80 | 70 | 912 |
| SDI | 78 | 62 | 68 | 79 | 92 | 96 | 105 | 105 | 105 | 102 | 96 | 79 | 1067 |
| SEG | 46 | 37 | 48 | 50 | 46 | 51 | 53 | 50 | 59 | 57 | 59 | 55 | 611 |
| Projected Total CRT Production | 537 | 451 | 523 | 555 | 540 | 640 | 634 | 659 | 666 | 659 | 646 | 563 | 7043 |
| Net export | 64 | 78 | 95 | 87 | 82 | 81 | 97 | 97 | 98 | 89 | 70 | 56 | 994 |
| Current Month Difference between CRT Import and CRT Export | 16 | -8 | -19 | 0 | -7 | -4 | 8 | 28 | 34 | 21 | 20 | 29 | |
| Domestic Supply of CRT | 473 | 373 | 428 | 468 | 458 | 529 | 537 | 562 | 568 | 570 | 576 | 507 | 6049 |
| Monthly Difference between Supply and Demand | 20 | 121 | 98 | 36 | 87 | 105 | 97 | 35 | -14 | 7 | 9 | -43 | |
| CRT Inventory | 159 | 280 | 378 | 414 | 501 | 606 | 703 | 738 | 724 | 730 | 739 | 696 | |
| Inventory per Industry Exchanged Data | 154 | 196 | 244 | 263 | 238 | 231 | 225 | 198 | 169 | 170 | 221 | 317 | |
| Grey Inventory | 5 | 84 | 134 | 151 | 263 | 375 | 478 | 540 | 555 | 560 | 518 | 379 | |

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL                                    CHU00047667E_Translation

# 2006 Market Supply and Demand Analysis Chart



# 2006 CRT Supply and Demand Balancing Chart



[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00047669E_Translation

# 2007 Q1 Market Forecast

- Currently, most makers have not made definite production plans for the rest of Q1. If the CRT industry continues to operate at full load, the supply and demand situation will further deteriorate. In addition, the impact of price surge in raw materials will cause crisis for CRT sales in Q1 in 2007.

- With the 2007 Chinese Lunar New Year being in late February, the peak season for color TV sales will be later than previous years. At the same time, color TV makers are even more cautious about the purchase of CRT and color TV productions, in order to reach their goal of limiting production and control inventory.

- In 2007, there will be more companies entering the Chinese CRT industry.  The production capacity will  increase 12.7% more than 2006 (10,800,000 pieces).

[auto date]

# 2007 Market Supply and Demand Analysis

2007 Supply and Demand Trend for Color TV and CRT

Color TV Makers' Production Forecast

Unit of Measure: 10,000 pieces/10,000 sets

| Month | 07.01 | 07.02 | 07.03 | 07.04 | 07.05 | 07.06 | 07.07 | 07.08 | 07.09 | 07.10 | 07.11 | 07.12 | Estimate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHONGHONG | 50 | 20 | 20 | 40 | 50 | 50 | 50 | 50 | 80 | 75 | 75 | 90 | 650 |
| SKYWORTH | 50 | 25 | 30 | 50 | 50 | 50 | 55 | 65 | 80 | 85 | 80 | 80 | 700 |
| KONKA | 70 | 50 | 50 | 60 | 50 | 70 | 70 | 80 | 100 | 120 | 120 | 110 | 950 |
| TTE | 95 | 60 | 100 | 110 | 90 | 95 | 90 | 100 | 110 | 120 | 120 | 110 | 1200 |
| H SENSE | 50 | 15 | 20 | 50 | 45 | 50 | 50 | 65 | 75 | 75 | 75 | 80 | 650 |
| HAI ER | 45 | 15 | 20 | 30 | 30 | 30 | 45 | 50 | 60 | 60 | 60 | 55 | 500 |
| Total Above | 360 | 185 | 240 | 340 | 315 | 345 | 360 | 410 | 505 | 535 | 530 | 525 | 4650 |
| Projected total Color TV Production | 486 | 285 | 369 | 493 | 450 | 486 | 514 | 621 | 711 | 733 | 716 | 665 | 6529 |
| CRT net import | 50 | 30 | 30 | 50 | 60 | 60 | 80 | 80 | 80 | 80 | 50 | 50 | 700 |
| Available domestic CRT | 436 | 255 | 339 | 443 | 390 | 426 | 434 | 541 | 631 | 653 | 666 | 615 | 5829 |

CRT Production Forecast

| | 07.01 | 07.02 | 07.03 | 07.04 | 07.05 | 07.06 | 07.07 | 07.08 | 07.09 | 07.10 | 07.11 | 07.12 | Estimate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THOMSON | 65 | 55 | 65 | 80 | 70 | 80 | 85 | 95 | 95 | 100 | 100 | 100 | 990 |
| LPD-HE | 65 | 50 | 60 | 65 | 55 | 70 | 75 | 80 | 80 | 80 | 80 | 78 | 838 |
| LPD-OG | 45 | 40 | 50 | 60 | 60 | 60 | 60 | 60 | 65 | 65 | 65 | 65 | 695 |
| NOVEL | 25 | 25 | 30 | 35 | 35 | 45 | 45 | 45 | 50 | 50 | 50 | 50 | 485 |
| LRLOO | 100 | 80 | 130 | 140 | 140 | 130 | 140 | 140 | 140 | 140 | 140 | 140 | 1560 |
| BMOC | 70 | 40 | 50 | 70 | 65 | 70 | 80 | 80 | 80 | 90 | 90 | 90 | 875 |
| SDI | 65 | 60 | 70 | 80 | 80 | 80 | 85 | 90 | 90 | 100 | 100 | 100 | 1000 |
| SEG | 50 | 35 | 50 | 50 | 50 | 50 | 50 | 50 | 60 | 60 | 60 | 55 | 620 |
| CPT | 10 | 20 | 20 | 30 | 40 | 45 | 45 | 50 | 50 | 50 | 50 | 50 | 460 |
| Projected Total CRT Production | 495 | 405 | 525 | 610 | 595 | 630 | 665 | 690 | 710 | 735 | 735 | 728 | 7523 |
| Net export | 60 | 70 | 90 | 90 | 85 | 90 | 100 | 100 | 100 | 100 | 70 | 60 | 1015 |
| Current Month Difference between CRT Import and CRT Export | -10 | -40 | -60 | -40 | -25 | -30 | -20 | -20 | -20 | -20 | -20 | -10 | |
| Domestic Supply of CRT | 435 | 335 | 435 | 520 | 510 | 540 | 565 | 590 | 610 | 635 | 665 | 668 | 6508 |
| Monthly Difference between Supply and Demand | -1 | 80 | 96 | 77 | 120 | 114 | 131 | 49 | -21 | -18 | -1 | 53 | |
| CRT Inventory | 695 | 775 | 871 | 948 | 1068 | 1182 | 1313 | 1362 | 1340 | 1322 | 1321 | 1375 | |
| Inventory per Industry Exchanged Data | 400 | 350 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | |
| Grey Inventory | 295 | 425 | 571 | 648 | 768 | 882 | 1013 | 1062 | 1040 | 1022 | 1021 | 1075 | |

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00047671E_Translation

# 2007 Industry Supply and Demand Analysis Chart



Available domestic CRT     Domestic CRT supply

CRT Inventory     Inventory per Industry Exchanged Data

[auto date]

# 2007 Summary of the Global Supply and Demand Relationship for CRT/Color TV

- With worldwide CRT industry reducing production and closing lines/plants , it is estimated that by 2006, the worldwide CRT supply will be approximately 160,000,000 pieces. Compared with the worldwide CRT demand of 150,000,000 sets of color TV, the CRT's supply and demand relationship maintains a state of equilibrium.
- The Chinese CRT industry's position in the worldwide market is becoming increasingly more prominent, accounted for nearly 50% of the worldwide supply.



| Color Picture Tube Supply | Color TV Production | Color TV Demand | Europe | America | Asia/Pacific Region | China |

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL

# Thank You, Everyone!

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL

CONFIDENTIAL – GRAND JURY MATERIAL



# 2007年Q1彩管行业总经理会议

西安
2007年1月23日

[auto date]

CHU0047663

CONFIDENTIAL – GRAND JURY MATERIAL

# 会议议程

9:00 ~ 9:30  邢总致欢迎辞、会长讲话

9:30 ~ 10:00  行业现状通报

10:00 ~ 11:00  与会领导发言

12:20 ~        彩虹设午宴

[auto date]

CHU00047664

CONFIDENTIAL – GRAND JURY MATERIAL

# 会议议题

✎ 2006年市场供求分析回顾

✎ 2007年Q1及2007年市场预测

✎ 彩管行业加强沟通与协作,共同迎接市场挑战

✎ 共谋彩管行业长远发展

[auto date]

CHU00047665

CONFIDENTIAL – GRAND JURY MATERIAL

# 2006年供求关系分析

- 2006年行业处于恢复性增长。产量比2005年同比增长11.5%，销量同比增长6.7%，内销同比减少３.８７%；库存同比增长128%。

- 国外彩管重组和关闭，使得国内彩管出口（包括一日游）增长27%。但是2006年彩管进口量大于预期值(净进口1112万)，主要受马来西亚和泰国向国内倾销彩管的影响(由于此两地工厂已于'06年末关闭,对'07年影响有限)

- 由于彩电厂在第二季度提前采购，在第四季度消化战略库存，使得本年度彩管销售呈现淡季不淡，旺季不旺的局面。

- 由于供求变化使得彩管库存在第四季度逐月上升，截止年底超过300万。

[auto date]

CHU00047666

# 2006年市场供求分析表

## 2006年彩电彩管供求趋势

彩电厂生产预测  万只/万台

| 月份 | 06.01 | 06.02 | 06.03 | 06.04 | 06.05 | 06.06 | 06.07 | 06.08 | 06.09 | 06.10 | 06.11 | 06.12 | 锤计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHONGHONG | 70 | 53 | 50 | 52 | 47 | 58 | 62 | 61 | 80 | 80 | 80 | 90 | 783 |
| SKYWORTH | 60 | 28 | 32 | 55 | 55 | 52 | 68 | 73 | 80 | 85 | 76 | 78 | 742 |
| KONKA | 75 | 40 | 35 | 60 | 50 | 67 | 70 | 74 | 90 | 100 | 105 | 105 | 871 |
| TTE | 95 | 60 | 107 | 111 | 90 | 95 | 92 | 113 | 119 | 120 | 110 | 95 | 1207 |
| H.SENSE | 55 | 13 | 20 | 50 | 45 | 59 | 50 | 65 | 75 | 75 | 72 | 80 | 659 |
| HAIER | 45 | 15 | 20 | 30 | 25 | 30 | 45 | 51 | 70 | 45 | 50 | 60 | 486 |
| 以上 TOTAL | 400 | 209 | 264 | 358 | 312 | 361 | 387 | 437 | 514 | 505 | 493 | 508 | 4748 |
| 彩电生产推总 | 533 | 322 | 406 | 519 | 446 | 501 | 545 | 652 | 714 | 673 | 657 | 635 | 6604 |
| 其中净进口彩管量 | 80 | 70 | 76 | 87 | 75 | 77 | 105 | 125 | 132 | 110 | 90 | 85 | 1112 |
| 可使用国产彩管量 | 453 | 252 | 330 | 432 | 371 | 424 | 440 | 527 | 582 | 563 | 567 | 550 | 5492 |

彩管生产预测

| | 06.01 | 06.02 | 06.03 | 06.04 | 06.05 | 06.06 | 06.07 | 06.08 | 06.09 | 06.10 | 06.11 | 06.12 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THOMSON | 75 | 59 | 69 | 80 | 69 | 78 | 83 | 99 | 100 | 93 | 86 | 80 | 971 |
| LPD-HF | 60 | 61 | 64 | 66 | 57 | 71 | 78 | 80 | 79 | 81 | 80 | 75 | 852 |
| LPD-CG | 57 | 54 | 60 | 58 | 60 | 64 | 59 | 64 | 63 | 62 | 63 | 50 | 714 |
| NOVEL | 51 | 36 | 30 | 31 | 33 | 43 | 44 | 43 | 48 | 41 | 50 | 42 | 492 |
| IRICO | 99 | 79 | 109 | 117 | 111 | 130 | 130 | 135 | 135 | 135 | 132 | 112 | 1424 |
| BMCC | 71 | 63 | 75 | 74 | 72 | 77 | 82 | 83 | 77 | 88 | 80 | 70 | 912 |
| SDI | 78 | 62 | 68 | 79 | 92 | 96 | 105 | 105 | 105 | 102 | 96 | 79 | 1067 |
| SEG | 46 | 37 | 48 | 50 | 46 | 51 | 53 | 50 | 59 | 57 | 59 | 55 | 611 |
| 彩管生产推总 | 537 | 451 | 523 | 555 | 540 | 640 | 634 | 659 | 666 | 659 | 646 | 563 | 7043 |
| 净出口 | 64 | 78 | 95 | 87 | 82 | 81 | 97 | 97 | 98 | 89 | 70 | 56 | 994 |
| 本月彩管进出口差 | 16 | -8 | -19 | 0 | -7 | -4 | 8 | 28 | 34 | 21 | 20 | 29 | |
| 彩管国内供应量 | 473 | 373 | 428 | 468 | 458 | 529 | 537 | 562 | 568 | 570 | 576 | 507 | 6049 |
| 每月供求差 | 20 | 121 | 98 | 36 | 87 | 105 | 97 | 35 | -14 | 7 | 9 | -43 | |
| CRT库存累 | 159 | 280 | 378 | 414 | 501 | 606 | 703 | 738 | 724 | 730 | 739 | 696 | |
| 行业变势剩馀库存 | 154 | 196 | 244 | 263 | 238 | 231 | 225 | 198 | 169 | 170 | 221 | 317 | |
| 所色库存 | 5 | 84 | 134 | 151 | 263 | 375 | 478 | 540 | 555 | 560 | 518 | 379 | |

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00047667

CONFIDENTIAL – GRAND JURY MATERIAL

CHU00047668



# 2006年市场供求分析图

CONFIDENTIAL – GRAND JURY MATERIAL

CHU0047669

# 2006年彩管供求关系平衡图



[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL

# 2007年Q1市场预测

• 目前各家尚未对后续1Q的生产作出明确的计划，如果CRT行业仍满负荷生产，供求关系将进一步恶化，并且受原材料涨价影响，2007年Q1彩管销售将出现危机。

• 2007年的春节在2月中下旬，彩电销售旺季比往年延迟，同时彩电厂的彩管采购和彩电生产将更加谨慎,以限产压库为宗旨。

• 2007年中国彩管行业会有新加入者，产能将比2006年增加12.7%（1080万只）。

[auto date]

CHU0047670

CONFIDENTIAL – GRAND JURY MATERIAL

CHU0047671

# 2007年市场供求分析表

## 2007年CRT彩电彩管供求趋势

彩电厂生产预测　　　　　　　　　　　　　　　　　　　　　万只/万台

| 月份 | 07.01 | 07.02 | 07.03 | 07.04 | 07.05 | 07.06 | 07.07 | 07.08 | 07.09 | 07.10 | 07.11 | 07.12 | 预计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHONGHONG | 50 | 20 | 20 | 40 | 50 | 50 | 50 | 50 | 80 | 75 | 75 | 90 | 650 |
| SKYWORTH | 50 | 25 | 30 | 50 | 50 | 50 | 55 | 65 | 80 | 85 | 80 | 80 | 700 |
| KONKA | 70 | 50 | 50 | 60 | 50 | 70 | 70 | 80 | 100 | 120 | 120 | 110 | 950 |
| TTE | 95 | 60 | 100 | 110 | 90 | 95 | 90 | 100 | 110 | 120 | 120 | 110 | 1200 |
| HISENSE | 50 | 15 | 20 | 50 | 45 | 50 | 50 | 65 | 75 | 75 | 75 | 80 | 650 |
| HAIER | 45 | 15 | 20 | 30 | 30 | 30 | 45 | 50 | 60 | 60 | 60 | 55 | 500 |
| 以上 TOTAL | 360 | 185 | 240 | 340 | 315 | 345 | 360 | 410 | 505 | 535 | 530 | 525 | 4650 |
| 彩电生产推总 | 486 | 285 | 369 | 493 | 450 | 486 | 514 | 621 | 711 | 733 | 716 | 665 | 6529 |
| 其中净进口彩管量 | 50 | 30 | 30 | 50 | 60 | 60 | 80 | 80 | 80 | 80 | 50 | 50 | 700 |
| 可使用国产彩管量 | 436 | 255 | 339 | 443 | 390 | 426 | 434 | 541 | 631 | 653 | 666 | 615 | 5829 |

彩管生产预测

| 月份 | 07.01 | 07.02 | 07.03 | 07.04 | 07.05 | 07.06 | 07.07 | 07.08 | 07.09 | 07.10 | 07.11 | 07.12 | 预计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THOMSON | 65 | 55 | 65 | 80 | 70 | 80 | 85 | 95 | 95 | 100 | 100 | 100 | 990 |
| LPD-HF | 65 | 50 | 60 | 65 | 55 | 70 | 75 | 80 | 80 | 80 | 80 | 78 | 838 |
| LPD-CG | 45 | 40 | 50 | 60 | 60 | 60 | 60 | 60 | 65 | 65 | 65 | 65 | 695 |
| NOVEL | 25 | 25 | 30 | 35 | 35 | 45 | 45 | 45 | 50 | 50 | 50 | 50 | 485 |
| LRICO | 100 | 80 | 130 | 140 | 140 | 130 | 140 | 140 | 140 | 140 | 140 | 140 | 1560 |
| BMCC | 70 | 40 | 50 | 70 | 65 | 70 | 80 | 80 | 80 | 90 | 90 | 90 | 875 |
| SDI | 65 | 60 | 70 | 80 | 80 | 80 | 85 | 90 | 90 | 100 | 100 | 100 | 1000 |
| SEG | 50 | 35 | 50 | 50 | 50 | 50 | 50 | 50 | 60 | 60 | 60 | 55 | 620 |
| OPT | 10 | 20 | 20 | 30 | 40 | 45 | 45 | 50 | 50 | 50 | 50 | 50 | 460 |
| 彩管生产推总 | 495 | 405 | 525 | 610 | 595 | 630 | 665 | 690 | 710 | 735 | 735 | 728 | 7523 |
| 净出口 | 60 | 70 | 90 | 90 | 85 | 90 | 100 | 100 | 100 | 100 | 70 | 60 | 1015 |
| 本月彩管进出口第 | -10 | -40 | -60 | -40 | -25 | -30 | -20 | -20 | -20 | -20 | -20 | -10 | |
| 彩管国内供应量 | 435 | 335 | 435 | 520 | 510 | 540 | 565 | 590 | 610 | 635 | 665 | 668 | 6508 |
| 每月供求第 | -1 | 80 | 96 | 77 | 120 | 114 | 131 | 49 | -21 | -18 | -1 | 53 | |
| CRT库存第 | 695 | 775 | 871 | 948 | 1068 | 1182 | 1313 | 1362 | 1340 | 1322 | 1321 | 1375 | |
| 行业交换资料库存 | 400 | 350 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | |
| 预急库存 | 295 | 425 | 571 | 648 | 768 | 882 | 1013 | 1062 | 1040 | 1022 | 1021 | 1075 | |

[auto date]

CONFIDENTIAL – GRAND JURY MATERIAL

CHU0004767



CONFIDENTIAL – GRAND JURY MATERIAL

# 2007年全球彩管/彩电供求关系总述

● 全球彩管线体的减产及关闭线体, 预计到2006年, 全球彩管可供应量约有1亿6千万只, 相比CRT彩电全球1亿5千万台的总需求量, 彩管供求关系保持基本平衡状态.

● 中国彩管在全球的市场地位越来越重要. 供应量接近50%.



CHU0004767673

CONFIDENTIAL – GRAND JURY MATERIAL



[auto date]

CHU00047674

# EXHIBIT 3

# Exhibit 2

D□P□ Exhibit 8418
Deponent  Wang
Date 3|7|19   Rptr TW



June 29, 2018

**Certification**

### Park IP Translations

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English of the document with bates number range: IRI-CRT-00000232 – IRI-CRT-00000321.

Hanna Kang

Project Manager

Project Number: BBLLP_1806_007

Irico Display Devices Co., Ltd.
600707
2007 Annual Report

CONFIDENTIAL

Irico Display Devices Co., Ltd. 2007 Annual Report

## Table of Contents

| | |
|---|---|
| I. Items of note............................................. | 2 |
| II. About the company......................................... | 2 |
| III. Main financial data and indices......................................... | 3 |
| IV. Share capital changes and shareholders' status......................................... | 4 |
| V. Directors, supervisors and senior executives......................................... | 9 |
| VI. Corporate governance structure......................................... | 12 |
| VII. Introduction to shareholder meetings......................................... | 14 |
| VIII. Board of directors report......................................... | 15 |
| IX. Board of supervisors report......................................... | 25 |
| X. Important items......................................... | 26 |
| XI. Financial accounting report......................................... | 32 |
| XII. Documents available for inspection | 89 |

1

Irico Display Devices Co., Ltd. 2007 Annual Report

VIII. Board of directors report
    I. Discussion and analysis of management
        (I) Review of the company's operation during the reporting period
        1. Overall operation during the reporting period
        This company's main business is the production, development, and management of color picture tubes. With breakthroughs in flat-screen TV technologies, the color picture tube television market share has exhibited a falling trend, and the color tube sector has been influenced accordingly. Facing this increasingly grim situation, the company is persisting in implementing a business development approach of "becoming stronger in color tubes and innovating the industry"; actively advancing the strategies of being driven by marketing, being led by overall costs, and being supported by new technologies; developing management innovations and technological innovations, accelerating the research and development of new products, optimizing production flows, and expanding product sales. Given the trend of the continued deterioration of the color tube sector's business environment, and while countering grave difficulties such as the drop in color tube prices and the sector's overall drop in sales, the company achieved a fairly good business performance compared to others in the domestic sector.
        In 2007, company produced a total of 7,807,300 color picture tubes, for an increase of 8.92% compared to the previous year; it sold 7,228,800 color tubes, for an increase of 5.22% compared to the previous year, including the export of 1,227,800 units, for an increase of 4.95% compared to the previous year. During the reporting period, despite the rise in color tube sales compared to the previous year, due to the considerable drop in prices of the company's main products, there was a drop in operating revenue and the gross profit margin, and there was a considerable drop in all main financial indices compared to the previous year. 2007 saw operating revenue of 1,705,696,100 yuan, for a decline of 17.48% compared to the previous year; operating profits of -28,948,700 yuan, for a decline of 287.74% compared to the previous year; and net profits attributable to parent company shareholders of -38,433,600 yuan.
        During the reporting period, to clarify industrial differentiation and highlight the company's main business, the company carried out work on the exchange and consolidation of major assets. Following the exchange of assets, the company will focus on the research and development, production, and sale of various display devices, including CRT, concentrating its energy on strengthening its main business. Following this exchange of assets, the company's color tube production lines were increased from 4 to 8, its variety of products was enriched (capable of producing a variety of color picture tubes, such as 37cm, 40cm, 54cm, 64cm, and 74cm), and its production capacity rose from its original 7,500,000 units to 16,000,000 units, to become China's largest manufacturer of color picture tubes and the third strongest in the global color tube sector. The large-scale increase in production capacity and improvement of the product structure has also solidified the company's domestic markets and has established a solid foundation for expansion into international markets.
        2. The company's main business and operation status
        (1) Table of main business by sector and product

Unit: yuan      Currency: RMB

| Sub-sector or product category | Operating revenue | Operating costs | Operating profit margin (%) | Change in operating revenue from previous year (%) | Change in operating costs from previous year (%) | Change in operating profit margin from previous year |
|---|---|---|---|---|---|---|
| Color picture tubes | 1,615,050,605.77 | 1,543,352,266.60 | 4.44% | -11.05% | -4.85% | Decrease of 623 percentage points |
| Deflection coils | 82,006,665.72 | 69,794,202.78 | 14.89% | -66.59% | -70.20% | Increase of 10.31 percentage points |

        (2) Main business by region

Unit: 10,000 yuan      Currency: RMB

| Region | Operating revenue | Change in operating revenue from previous year (%) |
|---|---|---|
| Southwest region | 28,167.05 | -12.66% |
| East China region | 23,801.70 | -18.82% |
| South China region | 81,988.86 | -9.75% |
| Northwest and other regions | 7,256.99 | -63.37% |
| Overseas | 29,355.01 | -13.41% |

15

CONFIDENTIAL                                           IRI-CRT-00000247

Irico Display Devices Co., Ltd. 2007 Annual Report

3. Main suppliers and customers

Unit: yuan   Currency: RMB

| | | | |
|---|---|---|---|
| Total purchase amount of top five suppliers | 1,063,503,928.97 | Proportion of total purchases | 69.62% |
| Total sales amount of top five customers | 1,170,692,917.98 | Proportion of total sales | 68.63% |

4. Changes in company's asset and profit structure

1) Explanation of major changes in the company's asset and liability structure at the end of the reporting period

Unit: yuan   Currency: RMB

| Item | 2007 | | 2006 | | Change from previous year |
|---|---|---|---|---|---|
| | Amount | Proportion of total assets (%) | Amount | Proportion of total assets (%) | |
| Accounts receivable | 665,112,104.96 | 32.56% | 868,277,329.30 | 40.44% | Down 7.88% |
| Inventory | 264,454,203.79 | 12.95% | 183,667,047.92 | 8.55% | Up 4.40% |
| Investment real estate | 4,696,564.26 | 0.23% | 4,914,972.33 | 0.23% | -- |
| Long-term equity investment | 24,060,000.00 | 1.18% | 133,088,165.45 | 6.20% | Down 5.02% |
| Fixed assets | 900,177,421.85 | 44.07% | 786,421,766.38 | 36.63% | Up 7.44% |
| Construction in progress | 3,516,591.17 | 0.17% | 2,005,222.00 | 0.09% | Up 0.08% |
| Intangible assets | 22,538,690.46 | 1.10% | 41,589,054.00 | 1.94% | Down 0.84% |
| Short-term loans | 314,000,000.00 | 15.37% | 300,000,000.00 | 13.97% | Up 1.40% |
| Total assets | 2,042,414,249.22 | 100.00% | 2,146,988,770.66 | 100.00% | -- |

(1) The main reason for the drop in accounts receivable was a drop in notes receivable.
(2) The main reason for the rise in inventory was a rise in stock commodities.
(3) The main reason for the drop in long-term equity investment was the company's implementation of assets reorganization during the reporting period, transferring all equity in Xianyang Irico Digital Display Co., Ltd. and Xi'an New Era Club Co., Ltd. to Irico Group Corporation.
(4) The main reason for the rise in fixed assets was the company's implementation of assets reorganization during the reporting period, purchasing equipment such as color tube production lines from Irico Group Electronics Co., Ltd.
(5) The main reason for the rise in construction in progress was the technical upgrades for this period were not rolled into fixed assets.
(6) The main reason for the drop in intangible assets was the company's transfer of all equity in Xi'an Irico Zixun Co., Ltd. to controlling shareholder Irico Electronics during the reporting period, which was not included in the consolidated financial statements for the second half of 2007, and the rolling out of its land use rights resulted in a drop in this company's intangible assets.

2) Explanation of changes in the company's expense structure during the reporting period

Unit: yuan   Currency: RMB

| Item | 2007 | 2006 | Change (%) |
|---|---|---|---|
| Sales expenses | 75,909,007.24 | 77,592,062.51 | -2.17% |
| Management expenses | 36,753,935.60 | 43,884,420.65 | -16.25% |
| Finance expenses | 19,948,968.22 | 18,749,015.89 | 6.40% |

16

CONFIDENTIAL

IRI-CRT-00000248

IRICO Display Component Co., Ltd. 2007 Annual Report

**XII. Directory of reference documents**

1. Financial statements that contain the signatures and seals of the legal representative, the person in charge of accounting work and the person in charge of the accounting institution.

2. Original copy of the audit report that contains the seal of the accounting firm and the signatures and seals of the certified accountants.

3. Original copies of all company documents and original drafts of public announcements disclosed in the newspapers designated by China Securities Regulatory Commission during the report period.

Chairman of the Board of Directors (signature): Xing Daoqin

IRICO Display Component Co., Ltd. Board of Directors
April 23, 2008

89

CONFIDENTIAL

IRI-CRT-00000321

# 彩虹显示器件股份有限公司

600707

# 2007 年年度报告

CONFIDENTIAL

IRI-CRT-00000232

彩虹显示器件股份有限公司 2007 年年度报告

# 目　录

一、重要提示 ............................................................................................................... 2

二、公司基本情况简介 ................................................................................................. 2

三、主要财务数据和指标 ............................................................................................. 3

四、股本变动及股东情况 ............................................................................................. 4

五、董事、监事和高级管理人员 ................................................................................. 9

六、公司治理结构 ..................................................................................................... 12

七、股东大会情况简介 ............................................................................................. 14

八、董事会报告 ......................................................................................................... 15

九、监事会报告 ......................................................................................................... 25

十、重要事项 ............................................................................................................. 26

十一、财务会计报告 ................................................................................................. 32

十二、备查文件目录 ................................................................................................. 89

1

彩虹显示器件股份有限公司 2007 年年度报告

## 八、董事会报告

### 一、管理层讨论与分析

#### （一）报告期内公司经营情况的回顾

#### 1、报告期总体经营状况

本公司主营业务为彩色显像管的生产、开发与经营。随着平板电视技术的突破，彩色显像管电视市场份额呈现出下降的趋势，彩管行业也随之受到影响。面对更加严峻的形势，公司坚持落实"做强彩管、创新产业"的经营发展思路；积极推进营销拉动战略、总成本领先战略、新技术支撑战略，开展管理创新、技术创新，加快新品研发，优化生产流程，扩大产品销售。在彩管行业经营环境持续恶化的形势下，克服彩管价格下降、行业总体销量下降等重重困难，取得国内同行业中较好的经营业绩。

2007 年，公司累计生产彩色显像管 780.73 万只，比上年同期增长 8.92%；销售彩管 722.88 万只，比上年同期增长 5.22%，其中出口 122.78 万只，比上年同期增长 4.95%。报告期内彩管销售数量虽比上年增加，但是由于主要品种价格降低幅度较大，导致营业收入减少，毛利率降低，主要财务指标较上年同期均出现较大幅度的下滑。2007 年实现营业收入 170,569.61 万元，较上年同期减少了 17.48%；实现营业利润-2894.87 万元，较上年同期减少了 287.74%；实现归属于母公司股东的净利润-2843.36 万元。

报告期内，为了明确产业分工、突出公司主营业务，公司实施了重大资产置换整合工作。资产置换后公司将专注于包括 CRT 在内的各种显示器件的研发、生产和销售，集中精力做强主业。本次资产置换后，公司的彩管生产线由原有的 4 条增加到 8 条，产品品种更加丰富（可生产 37cm、40cm、54cm、64cm、74cm 等多个品种的彩色显像管），产能由原来的 750 万只增加到 1600 万只，成为中国最大的彩色显像管制造商，位居全球彩管行业排名前三强。产能的大幅提升和产品结构的完善，也为公司巩固国内市场和开拓国际市场打下了坚实的基础。

#### 2、公司主营业务及其经营状况

##### （1）、主营业务分行业、产品情况表

单位:元　币种:人民币

| 分行业<br>或分产品 | 营业收入 | 营业成本 | 营业<br>利润率% | 营业收入比<br>上年增减(%) | 营业成本比<br>上年增减(%) | 营业利润率比<br>上年增减 |
|---|---|---|---|---|---|---|
| 彩色显像管 | 1,615,050,605.77 | 1,543,352,266.60 | 4.44% | -11.05% | -4.85% | 减少 623 个百分点 |
| 偏转线圈 | 82,006,665.72 | 69,794,202.78 | 14.89% | -66.59% | -70.20% | 增加 1031 个百分点 |

##### （2）、主营业务分地区情况

单位:万元　币种:人民币

| 地区 | 营业收入 | 营业收入比上年增减（%） |
|---|---|---|
| 西南地区 | 28,167.05 | -12.66% |
| 华东地区 | 23,801.70 | -18.82% |
| 华南地区 | 81,988.86 | -9.75% |
| 西北及其他地区 | 7,256.99 | -63.37% |
| 境外 | 29,355.01 | -13.41% |

15

CONFIDENTIAL　IRI-CRT-00000247

彩虹显示器件股份有限公司 2007 年年度报告

### 3、主要供应商、客户情况

单位：元 币种：人民币

| | | | |
|---|---|---|---|
| 前五名供应商采购金额合计 | 1,063,503,928.97 | 占采购总额比重 | 69.62% |
| 前五名销售客户销售金额合计 | 1,170,692,917.98 | 占销售总额比重 | 68.63% |

### 4、公司资产和利润构成变动情况

#### 1）报告期末公司资产及负债构成发生重大变化的说明

单位：元 币种：人民币

| 项目 | 2007 年末 | | 2006 年末 | | 同比增减 |
|---|---|---|---|---|---|
| | 金额 | 占总资产的比重（%） | 金额 | 占总资产的比重（%） | |
| 应收款项 | 665,112,104.96 | 32.56% | 868,277,329.30 | 40.44% | 减少7.88个百分点 |
| 存货 | 264,454,203.79 | 12.95% | 183,667,047.92 | 8.55% | 增加4.40个百分点 |
| 投资性房地产 | 4,696,564.26 | 0.23% | 4,914,972.33 | 0.23% | -- |
| 长期股权投资 | 24,060,000.00 | 1.18% | 133,088,165.45 | 6.20% | 减少5.02个百分点 |
| 固定资产 | 900,177,421.85 | 44.07% | 786,421,766.38 | 36.63% | 增加7.44个百分点 |
| 在建工程 | 3,516,591.17 | 0.17% | 2,005,222.00 | 0.09% | 增加0.08个百分点 |
| 无形资产 | 22,538,690.46 | 1.10% | 41,589,054.00 | 1.94% | 减少0.84个百分点 |
| 短期借款 | 314,000,000.00 | 15.37% | 300,000,000.00 | 13.97% | 增加1.40个百分点 |
| 资产总额 | 2,042,414,249.22 | 100.00% | 2,146,988,770.66 | 100.00% | -- |

(1)、应收款项减少的主要原因是应收票据减少所致。

(2)、存货增加的主要原因是库存商品增加所致。

(3)、长期股权投资减少的主要原因报告期内公司实施了资产重组，将所持有的咸阳彩虹数码显示有限公司、西安新纪元俱乐部有限公司股权转让彩虹集团公司所致。

(4)、固定资产增加主要是由于报告期内公司实施了资产重组，从彩虹集团电子股份有限公司购入彩管生产线等相关设备所致。

(5)、在建工程增加主要是由于本期技改项目未转入固定资产所致。

(6)、无形资产减少主要是报告期内公司将所持西安彩虹资讯有限公司的全部股权转让给控股股东彩虹电子，2007年下半年该公司未纳入合并报表，其土地使用权的转出使得本公司无形资产减少。

#### 2）报告期公司各项费用构成变动情况的说明

单位：元 币种：人民币

| 项目 | 2007 年度 | 2006 年度 | 增减比例（%） |
|---|---|---|---|
| 销售费用 | 75,909,007.24 | 77,592,062.51 | -2.17% |
| 管理费用 | 36,753,935.60 | 43,884,420.65 | -16.25% |
| 财务费用 | 19,948,968.22 | 18,749,015.89 | 6.40% |

16

CONFIDENTIAL

IRI-CRT-00000248

彩虹显示器件股份有限公司 2007 年年度报告

## 十二、备查文件目录

1、载有法定代表人、主管会计工作负责人、会计机构负责人签名并盖章的财务报表。

2、载有会计师事务所盖章、注册会计师签名并盖章的审计报告原件。

3、报告期内在中国证监会指定报纸上公开披露过的所有公司文件的正本及公告的原稿。


董事长(签名)：邢道钦


彩虹显示器件股份有限公司董事会
二〇〇八年四月二十三日

89

CONFIDENTIAL                                                                 IRI-CRT-00000321

# EXHIBIT 4



**consortra** translations

STATE of NEW YORK    )
                     )        ss:
COUNTY of NEW YORK   )

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"Gang, Ding (2000, November 20). IRICO Won the Anti-Dumping Case.* People's Daily. *Retrieved from http://www.people.com.cn/GB/channel3/23/20001120/318925.html (Last visited on 9/14/18)"*, originally written in *Chinese,* is to the best of our knowledge and belief, a true, accurate and complete translation into *English.*

Dated: September 17, 2018

Seth Wargo
Consortra Translations

Sworn to and signed before ME this
___ day of _____,
2018.

Notary Public

JAMES G. MAMERA
Notary Public - State of New York
No. 01MA6157195
Qualified in New York County
My Comm. Expires Dec. 4, 2018

Your
legal
translation
partner

New York, NY | Washington, DC | Houston, TX | San Francisco, CA
Hong Kong

D☐ P☐ Exhibit 8396
Deponent Zhang
Date 3/5/19 Rptr BW

7/3/2018                                                                          IRICO won the anti-dumping case

 **people**

www.people.com.cn

**GB    English    Japanese**


User
Registration    Subscription    Customization
Free mail

Retrieval

Home > Finance > Enterprises                                                      20 November 2000 02:18

## IRICO won the anti-dumping case

### Reporter   Ding Gang



Currently, anti-dumping is one of the means commonly employed by all countries in regulating trading process, but there are indeed acts involving foreign countries' adoption of discriminatory policies and abuse of anti-dumping against China. For example, unreasonable 'surrogate country' is used as the basis of decision when calculating the dumping margin. In the face of anti-dumping, it is necessary for the government to make representations more actively to seek for the opposite party's confirmation of China's 'market economy' status as soon as possible. On the other hand, enterprises should have greater awareness of self-protection and actively respond to litigation. IRICO's way of dealing with it may inspire Chinese enterprises in this connection.
--- The Editor

In early September, China National Electronics Import & Export Caihong Co. (belonging to IRICO Group), received a notice from the European Commission notifying that anti-dumping tax would not be imposed on China-made 14-inch color cathode ray tubes (CRT). One and a half months later, the decision was passed at the European Commission meeting, marking IRICO's victory in the anti-dumping litigation.
'We have to do it even if training is needed.'
The case was initiated by Philips last June. Philips determined that dumping margin of the China-made 14-inch color CRTs was 48.4% using India as the surrogate country. Other countries being prosecuted included India and Malaysia.
On hearing the news, the first thing which came to IRICO's mind was how to respond to the litigation. Three years ago when IRICO began to expand its export, Wu Weiren, the President of the Group said at the meeting that attention must be paid to anti-dumping if IRICO was to enter the international market. This time, it was less than 10 minutes after he started listening to the report that he slapped the table and decided: 'Answer the suit! This is the first time that the Group deals with anti-dumping in its history, we have to do it even if training is needed.' After that, they hired the experienced solicitors Lucas and Wang Lei of the Brussels-based Stanbrook & Hooper as representative attorney.
This was followed by the tight schedule of preparation work for the litigation. Solicitor Wang Lei, who has handled several anti-dumping cases for Chinese enterprises as a representative agent, said, 'I was deeply moved by the IRICO people's spirit. These people, whether from the finance or sales team, actively cooperate and would come over at every summon no matter if it is the weekend or late in the night and provide the information needed in no time.'
As a state-owned enterprise, IRICO is not eligible for 'market economy status' so a surrogate country needs to be selected by the EU for price comparison. IRICO's biggest concern is being compared with India as the surrogate country because of its relatively great differences with China. As the price of IRICO is considerably high, a comparison against India would certainly result in a very high dumping margin. Relatively speaking, Malaysia is the only one of all prosecuted countries which is relatively similar to China. The solicitor requested comparison against Malaysia in his legal pleating.
The solicitor then made further analysis based on the data provided by IRICO and confirmed that IRICO was the only enterprise in China which exported these kind of products to Europe with export share much less than the Eurostat data used by Philips. Pursuant to the EU regulations, dumping is determined based on dumping margin as well as whether it causes damage including higher unemployment in EU enterprises and lower profits. IRICO's export volume to Europe constituted no damage at all. Therefore, China confirmed that the case will be handled with 'no damage' as the target. Our solicitor pointed out that the color CRTs exported to Europe cost approximately US$30. The jointly-invested factory of the Philips produced with more advanced color CRT technology but it reported to customs that it cost US$26. If the price of Philips was a normal international market price, it would be unfair to deem China as dumping at the said price!
'The Chinese side made excellent comments.'
The hearing was held in Brussels on 7 March this year. After the hearing commenced, the solicitor quoted a lot of data and facts to explain that exports from IRICO constituted no damages to Philips and stated that IRICO was the only enterprise in China which exported this kind of products to Europe.
Then Liang Yuan, the representative of IRICO, analyzed the reasons for the price fall of color CRTs in the European market. She said during the investigation period of the case (1997), the sale of color CRTs from Philips surged. Its factory in Spain made minor modifications to the color CRTs manufactured in South America and exported them to the European market as locally made products. At the same time, Philips had two additional production lines in Europe. In the late investigation period, Philips' profits returned to the level of its prime years. As facts show, the price fall in the European market was associated with Philips, and export from China caused no damages.
Many European Commission officials were astonished at the Chinese side's deep knowledge of the market conditions. They continued to ask questions so the hearing was extended from the original 40 minutes to 2 hours. An official said on-site that the Chinese side made clear arguments and agreed that investigations into the related issues should continue. After the hearing, the Europe representative said, 'The Chinese side made excellent comments.'
In the several months that followed, IRICO cooperated closely with the solicitors to fight based on the merits. Eventually, the European Commission changed their mind and overruled the original decision of imposing an

IRICO won the anti-dumping case

11% anti-dumping tax. As a result, IRICO satisfactorily resolved the case they had dealt with for more than one year.

It was not by chance that IRICO won the case. It reflects that the pioneering color CRT manufacturer in China is extending its footprint to the international market aggressively.

Three years ago, IRICO decided on its development strategy: To catch up with the international standard and expand export volume for shortline products; Synchronous research and development of longline products at the international level and strive to surpass them. In recent years, IRICO invested several ten million dollars in joint research and develop of new products with Tsinghua University and remarkable results have been achieved. Wu Weiren said, 'We aimed at the international market when we started to research and develop these products. For market development of new products, IRICO must actively participate in the international competition through international cooperation and the launch of premium products. This is the only way to avoid the weird loop of anti-dumping.'

People's Daily (20 November 2000 Page 9)

Related news

- Trend of anti-dumping development and policies against China (20 November 2000   01:23)
- 6 major Chinese steel enterprises were prosecuted by the US for dumping (19 November 2000   13:49)
- Philips's 'anti-dumping' plot (22 September 2000   11:14)
- In the face of anti-dumping: Who shall prosecute and who will benefit (18 September 2000   14:56)
- Ministry of Commerce of the PRC Department of Foreign Trade: Chinese enterprises should also learn to fight against dumping (18 September 2000   13:49)
- Senior management of the Philips first states their stance: Anti-dumping hurts emotion of Chinese people (5 September 2000   14:53)
- More than 10% probability to win for counter-'anti-dumping (21 August 2000   15:53)'
- Advice should be given to EU anti-dumping solicitors (23 June 2000   16:57)

 Go exchange at BBS       Tell your views in a letter

Close window

Mirrors: USA   Japan   Education net   Technology net

About us   Site Map   Advertisement services   Contact us   Job Offer

Copyrights owned by People's Daily, reproduction or mirrors are forbidden without written authorization.

Email: info@peopledaily.com.cn
Tel: (010) 65092993
Advertisements: (010) 65091395   (010) 65092779   (010) 65092879

7/3/2018　　　　　　　　　　　　彩虹打赢了反倾销官司

人民网 people
www.people.com.cn

**GB**　**English**　**日本语**　　用户注册　新闻订阅　个人定制　免费邮件

　检索

主页 › 财 经 › 企 业　　　　　　　　　　　　　　　　　2000年11月20日 02:18

# 彩虹打赢了反倾销官司

## 本报记者　　丁刚



　　反倾销是当前世界各国规范贸易程序普遍采用的手段之一，但国外确实存在着对华采用歧视政策和滥用反倾销的行为，例如，在计算倾销幅度时采用不合理的"替代国"作为裁定依据等。面对反倾销，除了政府要加大交涉力度，让对方尽早确认中国"市场经济"地位之外，企业也要强化自保意识，积极应诉。彩虹的做法或许能给我国企业以启示。
　　——编者

　　9月初，中国电子进出口彩虹公司（属彩虹集团）接到欧盟委员会通知，对原产中国的14英寸彩色显像管不征收反倾销税。一个半月之后这一决定在欧盟理事会上获得通过，这标志着彩虹打赢了这场反倾销官司。
　　"就算是练兵，也要干"
　　此案是去年6月由飞利浦发起的，飞利浦以印度为替代国，认定中国14英寸彩管的倾销幅度高达48．4％。同时被诉的还有印度、马来西亚等国。
　　听到这个消息，彩虹首先想到的就是如何应诉。三年前，彩虹开始大出口时，集团总裁吴维仁就在会上讲过，彩虹要走向国际市场，就必须关注反倾销。这一次，他听取汇报不到10分钟，就拍桌子作出了决定："应诉！这是集团有史以来第一次应对反倾销，就算是练兵也要干。"随后，他们聘请了富有经验的布鲁塞尔史德华律师事务所的鲁夫夫和王磊为代理律师。
　　紧张的应诉准备工作开始了。曾多次为中国企业代理反倾销应诉的王磊律师说："彩虹人的精神令我们深为感动。无论是周末还是夜晚，不论是管财务的，还是管销售的，都是随叫随到，积极配合，非常迅速地拿出有关资料。"
　　因为是国企，彩虹不能获得"市场经济地位"，只能由欧盟选定一个替代国来做价格比较。彩虹最担心的就是印度来做替代，印度与中国差别较大，彩管价格相当高，与其相比，倾销差额必然很高。比较而言，在被诉国中只有马来西亚与中国比较接近。律师进而提出法律抗辩，要求用马来西亚做替代。
　　接着，律师又根据彩虹提供的数据作了进一步分析，确定彩虹是中国唯一对欧出口此类产品的企业，出口份额要比飞利浦借用的欧洲统计局数据少得多。依据欧盟法规，倾销的认定除要看倾销幅度，还要看是否对欧盟企业造成失业增加、利润下降等方面的损害。而彩虹的对欧出口量根本不构成损害。由此，中方确定了以"无损害"为目标的应诉方案。我方律师指出，彩虹销往欧洲的彩管价格为30美元左右，而飞利浦会资厂生产的彩管技术更为先进，在中国海关的报价却是26美元。如果飞利浦的价格是正常的国际市场价格，而中国的价格却被视为倾销，哪里还有公正可言！
　　"中方的发言太精彩了"
　　今年3月7日，听证会在布鲁塞尔举行。听证会开始后，律师列举了大量数据和事实，说明彩虹的出口对飞利浦无损害，并指出彩虹是中国唯一对欧出口此类产品的企业。
　　接着，律师又代表采援还分析了欧洲市场上彩管价格下跌的原因。她说，在本案调查期内（1997年），飞利浦彩管销量猛增，其在西班牙的一家工厂对南美生产的彩管做偷小改动就算作本地生产，投放欧洲市场。同时，飞利浦在欧洲还增加了两条生产线。调查期最后一段时间，飞利浦赢利回到了最好年份的水平。事实表明，欧洲市场价格下跌与飞利浦有关，而中国与并未造成损害。
　　中方对市场情况如此了解，使不少欧委会官员深感意外。他们不断提问，使预计40分钟的听证延长至两个小时。有官员当场称中方论点清楚，并同意就有关问题继续调查。欧方代表会后称赞说："中方的发言太精彩了。"
　　在以后的几个月里，彩虹又与律师紧密合作，据理力争，最终使欧委会改变了初裁征收

7/3/2018

彩虹打赢了反倾销官司

11%反倾销税的决定。至此，彩虹一年多的应诉有了圆满结果。

彩虹的胜诉并不是偶然的，它从侧面反映出，这个中国彩管生产的老大正在雄心勃勃地向国际市场推进。

三年前，彩虹集团确定了发展战略：短线产品赶上国际水平，扩大出口；长线产品的研发与国际水平同时起步，争取领先。彩虹近年来投入了数千万元，与清华大学合作开展新品研究与开发，成果显著。吴维仁总裁说："一开始研制这些产品，我们就盯着国际市场。在新品的市场开发方面，彩虹要拿出拳头产品，通过加强国际合作积极参与国际竞争，这样才能摆脱总被反倾销的怪圈。"

《人民日报》 （2000年11月20日第九版）


相关新闻

- 对华反倾销的发展趋势及对策(2000年11月20日 01:23)
- 6家中国主要钢铁企业被美起诉倾销(2000年11月19日 13:49)
- 飞利浦的"反倾销"阴谋(2000年09月22日 11:14)
- 面对反倾销：谁应诉谁受益(2000年09月18日 14:56)
- 外经贸部：中国企业亦应学会反倾销(2000年09月18日 13:49)
- 飞利浦高层首次表态：反倾销伤害中国人感情(2000年09月05日 14:53)
- 反"反倾销"不止一成胜算(2000年08月21日 15:53)
- 应对欧盟反倾销欧洲律师提建议(2000年06月23日 16:57)

到BBS交流          写信谈感想

关闭窗口

主页 ＞ 财 经 ＞ 企业

镜像： 美国 日本 教育网 科技网

关于我们    本站导航 广告服务 联系我们    招聘信息

人 民 日 报 社 版 权 所 有 ，未 经 书 面 授 权 禁 止 复 制 或 建 立 镜 像 。

Email: info@peopledaily.com.cn
电话: (010) 65092993
广告: (010)65091395 (010)65092779 (010)65092879

# EXHIBIT 5



STATE of NEW YORK ⟩

⟩ ss:

COUNTY of NEW YORK ⟩

### *CERTIFICATE OF ACCURACY*

This is to certify that the attached document, *"IRI-CRT-00003490 – IRI-CRT-0003497"*, originally written in *Chinese,* is to the best of our knowledge and belief, a true, accurate and complete translation into *English.*

Dated: December 17, 2018

Seth Wargo
Consortra Translations

Sworn to and signed before ME this
1 7ᵗʰ day of December,
2018.

Notary Public

JAMES G MAMERA
Notary Public - State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires Dec. 4, 2022

D☐P☐ Exhibit 8392
Deponent ZHANG
Date 3/4/15 Rptr AT

Your
legal
translation
partner

006

# IRICO Group Corporation
# Auditing Department Document

IRICO Auditing (2001) No.1

A Brief on Auditing Results for IRICO (USA) Inc.

To IRICO Group Corporation,

Under the instructions from IRICO Group Corporation leadership, our department assembled a three-person audit team led by department head ZHANG Xingxi and we served an audit notice to IRICO (USA) Inc. via fax on 27 April 2001. The audit team arrived in Fremont, California, USA on 27 May shortly before commencing field audit work. First of all, the audit team requested LIU Feng, General Manager of IRICO (USA) Inc., to supply documents and filings that are required to perform the audit, such as accounting documents, accounting books, and financial statements dating back to the year when the company was incorporated. However, the company's General Manager LIU Feng claimed that, before 1998, the company's finance function had been controlled by HUANG Xueli, the shareholder acting on behalf of the company's US investors and they didn't hand over accounting records when they pulled out of the company in 1998, and hence he could not supply such records. With regard to accounting records dated after 1998, General Manager LIU Feng alleged because the company was transferred to INB on 10 April 2001, which meant that all property of the original company including such records are in the possession of the acquirer and the acquirer's consent is required in order to access such records. After repeated negotiations initiated by the audit team, LIU Feng only provided records as follows:

1

007

1. Stubs of checks written by the company to external parties from 1 January 1998 to 30 April 2001;

2. Bank statements from 1 January 2000 to 30 April 2001;

3. IRICO (USA) Inc.'s Sale and Purchase Agreement;

4. A photocopy of the Resolutions of the 2nd-term Board of Directors, IRICO (USA) Inc.

Given that IRICO (USA) Inc. was already sold to US-based INB by LIU Feng without authorization on 10 April 2001, LIU Feng refused to provide accounting records required for the performance of the proposed audit, such as annual financial reports and accounting documents that are related to the company's business operations. As a result, the basic requirements for the performance of an audit could not be met. And given limitations on auditor's statutory duties and powers as well as means of inspection, the financial statements of IRICO (USA) Inc. under the audit, which would truly reflect its accounting information and lead to complete and accurate audit results, could not be revealed, making it impossible for the audit team to duly carry out its audit work. As a result, the audit team could only conduct some partial investigations over IRICO (USA) Inc. based on limited materials provided by LIU Feng, such as check stubs, some bank statements, and IRICO (USA) Inc.'s Sale and Purchase Agreement.

In carrying out the investigations, the audit team has mainly performed the following tasks in relation to the materials provided by LIU Feng:

1. Recorded each stub of checks written by the company since 1998;

2. Categorized the expenses by economic activity in line with the available stubs of checks;

3. Checked bank statements from 1 January 2000 to 30 April 2001 one by one;

4. Checked corporate credit card expenses with transaction value above 1,000 US dollars since 1998;

5. Reviewed IRICO (USA) Inc.'s Sale and Purchase Agreement signed by LIU and sought advice from a local law firm in relation to the content of the agreement;

6. Conducted inquiries and consultations with relevant US authorities in relation to company profile, shareholder identities, and corporate credit profile of the acquirer INB Co..

2

008

I. Company Profile

Based in Fremont, California, USA, IRICO (USA) Inc. was initially established as a joint venture between IRICO Group Corporation and its US partners. Incorporated in July 1995, the company had registered capital of 1.75 million US dollars. In particular, China National Electronics Imp & Exp Caihong Co. had a 34.3% stake in the company by contributing 600,000 US dollars in cash; Caihong (Hong Kong) Co. had a 45.7% stake in the company by contributing 800,000 US dollars in cash; HUANG Xueli had a 10% stake (including awarded performance shares worth 50,000 US dollars) by contributing 125,000 US dollars in cash, totalling 175,000 US dollars in cash; HUANG Maike had a 10% stake by contributing 175,000 US dollars in cash. In October 1995, IRICO Group Corporation dispatched LIU Feng and ZHU Jian to the US. ZHU Jian hasn't been to the US since March 1997 due to visa issues.

According to LIU Feng, an agreement was reached on 26 February 1998 for the US investors MS HUANG Xueli and MR HUANG Maike to unload their shareholdings in the company as collaboration with the siblings had been allegedly extremely difficult. And the brother and the sister refunded capital in the amount of 1 million US dollars to the company in 1998. Since then, the company has been entirely run by us, with LIU Feng solely in charge. During the audit, it was found that LIU Feng obtained permanent resident visa (green card) in the US on 20 July 2000. On 10 April 2001, the company was sold by its general manager LIU Feng to US-based INB Co. without authorization.

II. Company revenue and expenditures

1. Situation Prior to 1998

As LIU Feng failed to supply accounting documents for the company dated before 1998, the audit team could not verify the company's operational results prior to 1998.

2. Situation since 1998

①  Based on check stubs provided by LIU Feng, the company posted expenditures of 914,670.45 US dollars cumulatively from 1 January 1998 to 30 April 2001;

3

009

②  Based on check stubs from the company's opening bank as supplied by LIU Feng, the company procured fixed assets worth 40,417.48 US dollars cumulatively from 1 January 1998 to 30 April 2001;

③  As the company did not provide bank statements for 1998 and 1999, the audit team could not verify its operating revenue, fund investment gains or interest income during both years. Based on bank statements from the company's opening bank as supplied by LIU Feng, the company posted operating revenue of 122,943.00 US dollars and operating costs of 112,896.00 US dollars from 1 January 2000 to 30 April 2001, respectively.

④  Based on bank statements from the company's opening bank as supplied by LIU Feng, the company posted interest income of 12,105.59 US dollars from 1 January 2000 to 30 April 2001, including:

10,444.06 US dollars in 2000

1,661.53 US dollars in 2001.

⑤  Based on bank statements and fixed asset lists, the company had net assets of 119,581.42 US dollars as of 30 April 2001, including:

Net value of fixed assets of 30,364.17 US dollars

Bank deposits of 89,217.25 US dollars.

III. Investigations over Sale and Purchase Agreement

IRICO (USA) Inc. was sold to US-based INB Co. by LIU Feng on 10 April 2001. As far as the Sale and Purchase Agreement provided by LIU Feng is concerned, the audit team entrusted Mr. SHI Xiaodong, General Manager of San Francisco-based container service unit of China Ocean Shipping (Group) Company, to seek legal consultation with law firm Morrison and Foerster LLP.

4

010

According to Cedric C. Chao, a lawyer at Morrison and Foerster LLP, the signing process and basis of the agreement itself complied with US laws.

Taking into account the lawyer's opinions, the audit team believes that the Sale and Purchase Agreement signed by LIU Feng violated the parent company's intent and damaged the parent company's interests in the following ways:

1. It is against the spirit and intent of the resolutions reached by the IRICO (USA) Inc.'s Board of Directors on 9 March 2000. IRICO (USA) Inc.'s Board of Directors fully entrusted LIU Feng to sell the company on 9 March 2000 under the conditions that the transaction price shall be 1 million US dollars and total consideration for the deal shall be delivered by 31 December 2000 at the latest. The Board of Directors did not authorize the provision in the agreement signed by LIU Feng that IRICO Group Corporation shall support the company to realize annual net profit of 700,000 US dollars as a condition. That was tantamount to selling the company for free and resulted in asset losses on the part of IRICO (USA) Inc.

2. As the company name IRICO (USA) Inc. was also transferred to the acquirer as part of the deal, the acquirer would continue to use the corporate name IRICO (USA) Inc. to conduct business. In case the acquirer is engaged in any improper or illegal operating activity, it would damage the reputation of IRICO Group Corporation to some extent. And in case that IRICO Group Corporation plans to start a subsidiary again in the US, it would not be able to use the name IRICO (USA) Inc. any longer.

As far as the agreement signed by LIU Feng is concerned, Cedric C. Chao advised that we could sue LIU Feng and the acquirer INB Co. on the ground that "LIU Feng signed the Sale and Purchase Agreement against the spirit and intent of the resolutions reached by the IRICO (USA) Inc.'s Board of Directors on 9 March 2000", demanding to terminate the performance of the agreement.

Nonetheless, if the dispute concerning the selling of IRICO (USA) Inc. is to be resolved via a lawsuit in the US, IRICO Group Corporation would have to pay legal fees of a significant amount. According to Cedric C. Chao, a lawsuit that costs 100,000 US dollars in legal fees is commonplace in the US.

5

011

In order to appropriately handle this issue, the audit team sought consultations with Mr. SHI Xiaodong, General Manager of San Francisco-based container service unit of China Ocean Shipping (Group) Company and the latter's Financial Director, MS ZHOU Yuzhen. They think it is fairly easy to register a company in the US and pursuing a lawsuit in the US that involves hefty legal fees would be meaningless and unworthy since currently IRICO (USA) Inc. was only a shell company without property investments or any debt dispute in the country.

In order to get more information about the acquirer, the audit team visited a number of agencies of the California government to make inquiries about INB Co.. Incorporated on 24 October 1997, INB's registered address is 3695 STEVENSON BLVD BLD STE 236 FREMONT, CA 94538. According to a corporate filing with the California state government dated 12 January 1998, INB had only one shareholder, LIU Feng, with equity capital of 50,000 US dollars. In a corporate filing dated 18 March 1998, INB's CEO, secretary, and financial director positions were all assumed by LIU Feng. In a corporate filing dated 7 May 2001, the person assuming general manager, secretary, and financial director positions at INB changed into SUN Xiaolin.

According to LIU Feng, he initially established INB Co. and held a stake in the company on behalf of Hong Kong resident SUN Xiaolin, before having the company transferred to SUN Xiaolin on 30 March 2001. Later on, LIU Feng, on behalf of IRICO Group Corporation, signed the IRICO (USA) Inc.'s Sale and Purchase Agreement with SUN Xiaolin on 10 April.

IV. Outstanding issues

1. LIU Feng sold IRICO (USA) Inc. without authorization and refused to provide materials requested by the auditing department for the performance of the proposed audit, such as annual financial reports and accounting documents related to the company's business operations, making it impossible for the audit team to duly carry out its audit work. Such actions constituted serious violation of the company's rules and policies.

2. By reviewing the stubs of checks written by the company since 1998, the audit team found that the company paid 400,000 US dollars in three batches in April 1999, for the purposes of short-term fund investments and expenses related to the company's electronics, tooling, and other businesses in 1998 and 1999.

6

012

However, the audit team could not verify related revenue as LIU Feng refused to provide relevant financial statements.

3. As the general manager of IRICO (USA) Inc., LIU Feng sold the company to US-based INB Co. without approval from IRICO Group Corporation, resulting in losses of state-owned assets. Such an action constituted the violation of regulations related to supervision and management of state-owned enterprises' assets.

4. IRICO (USA) Inc.'s Sale and Purchase Agreement hurt the interests of IRICO Group Corporation. First of all, pursuant to the resolutions of the 2nd-term Board of Directors, IRICO (USA) Inc., LIU Feng was entrusted to sell the company for 1 million US dollars, but the terms of the agreement dictate that IRICO Group Corporation shall support the company to realize annual net profit of 700,000 US dollars as a condition, which not only runs contrary to the original intention of the resolutions but also results in asset losses on the part of IRICO Group Corporation. Second, in case the acquirer is engaged in any improper or illegal operating activity, it would damage the reputation of IRICO Group Corporation to some extent as the company name IRICO (USA) Inc. was also transferred to the acquirer as part of the deal and the acquirer continues to use the corporate name IRICO (USA) Inc. to conduct business.

5. In a corporate filing with California state government dated 18 March 1998, the acquirer INB's CEO, secretary, and financial director positions were all assumed by LIU Feng and the person assuming general manager, secretary, and financial director positions at INB was changed into SUN Xiaolin in a corporate filing dated 7 May 2001.

V. Suggestions

LIU Feng was apparently involved in suspected violations of laws and discipline, though there is insufficient evidence for now. To investigate LIU Feng's wrongdoings, there exist two major challenges: first, LIU Feng lives in the US, he holds a Green Card, it is impossible he would return to China; second, evidence collection would involve US laws, which suggests too many big obstacles and hefty costs, making it hard to do. To pursue a civil case, IRICO Group Corporation would have to pay a significant amount of US dollars for legal fees, which makes little sense as the potential gains could not make up for the losses.

7

013

If IRICO Group Corporation takes administrative actions against LIU Feng in accordance with relevant management processes, such as removing LIU Feng's employee status, it could be the best outcome for him as such a scenario is what he desires. Therefore, if there exist other potential solutions, any immediate administrative actions should be refrained.

Given the above reasoning, we have following recommendations in relation to IRICO (USA) Inc. and LIU Feng's situation:

1. As LIU Feng sold IRICO (USA) Inc. without an approval from IRICO Group Corporation, which was against the parent company's intent and damaged the parent company's interests, it is advisable to not acknowledge IRICO (USA) Inc.'s Sale and Purchase Agreement signed between LIU Feng and INB while awaiting an opportunity to pursue and reserve the rights to pursue legal action against LIU Feng;

2. Continue to negotiate with LIU Feng, urging him to immediately terminate the Sale and Purchase Agreement he signed with INB Co. and execute the resolutions reached by the IRICO (USA) Inc.'s Board of Directors on 9 March 2000 by selling the company at the price of 1 million US dollars.

3. IRICO Group Corporation should take administrative actions against LIU Feng in accordance with relevant management processes at an appropriate time.

4. As efforts aimed at dealing with IRICO (USA) Inc. and LIU Feng's situation would involve cross-border issues and any international legal actions would be confronted with deep policy implications and too many thorny obstacles, coupled with limitations on statutory duties and powers as well as means of inspection, it would be very hard for IRICO Group Corporation to pursue this case. It is recommendable to seek advices from relevant higher-level authorities on how to deal with it.

27 July 2001
Auditing Department
(Chop) IRICO Group Corporation

| CC: Supervisory Office | | Archive (2) |
| --- | --- | --- |
| Auditing Office | | Printed and Distributed on 27 July 2001 |
| Printed by: QING Bei | Reviewed by: ZHANG Xingxi | No. of Copies: 4 |

8

CONFIDENTIAL                         IRI-CRT-00003497 - Translation

# 彩虹集团公司

# 审计部文件

彩审 [2001] 1 号

### 关于彩虹（美国）公司审计情况汇报

彩虹集团公司:

　　根据集团公司领导的指示，我部组成了以部长仇兴喜为组长的三人审计小组，2001年4月27日我部以传真的方式向彩虹（美国）公司下达了审计通知。审计小组于5月27日到达美国加利福尼亚州福利蒙特市，随即展开审计工作。首先审计小组要求公司总经理刘丰提供自公司成立以来历年的会计凭证、帐簿和财务报告等实施审计所必需的资料。但刘丰总经理称，1998年以前，公司的财务是由美方股东黄雪莉控制，98年美方撤股时，未将会计资料移交我方，因而无法提供；98年以后的会计资料因公司已在2001年4月10日转让给INB公司，原公司的一切物品归受让方所有，若要求提供须经受让方同意。经过审计小组多次交涉，刘丰仅提供了以下资料:

1

由 扫描全能王 扫描创建

007

1. 1998年1月1日至2001年4月30日公司对外开具的支票存根;

2. 2000年1月1日至2001年4月30日的银行对帐单;

3. 彩虹（美国）公司转让合同;

4. 彩虹（美国）公司第二届董事会决议（复印件）;

由于刘丰将彩虹（美国）公司已在2001年4月10日擅自转让给美国INB公司,刘丰对审计所需的与经营活动有关的财务决算报表、会计凭证等会计资料不予提供,无法满足审计最基本的条件,受法定职责、权限和检查手段的局限,无法揭示被审计的彩虹（美国）公司会计报表反映会计信息的真实情况,作出完整、正确的审计结果,使正常的审计工作无法进行。审计小组只能根据刘丰所提供的支票存根和部分银行对帐单、彩虹（美国）公司转让合同等资料对彩虹（美国）公司的一些情况进行调查了解。

在调查了解实施过程中审计小组主要对其提供的资料进行了以下工作:

1. 对其所提供1998年以来支出的支票存根进行了逐一登记;

2. 对登记的支出按支票存根所列的经济内容进行了分类;

3. 对2000年1月1日至2001年4月30日银行对帐单进行了逐一核查;

4. 对98年以来1000美元以上的公司信用卡支出进行了核查。

5. 对其所签定的公司转让合同进行了审查,并就合同内容咨询了当地的律师行。

6. 对受让方INB公司的基本情况以及股东、公司资信等情况

2

 由 扫描全能王 扫描创建

CONFIDENTIAL

IRI-CRT-00003491

向美国政府有关部门进行了调查咨询。

一、 公司基本情况

彩虹（美国）公司是集团公司与美方合资成立的合资公司，地址位于美国加利福尼亚州福利蒙特市。公司成立于1995年7月，注册资本175万美元，其中：彩虹进出口公司投资60万美元现金，占34.3%股权；彩虹（香港）公司投资80万美元现金，占45.7%股权；黄雪莉投资12.5万美元现金，送其干股5万美元，合计17.5万美元，占10%股权；黄麦克投资17.5万美元现金，占10%股权。1995年10月彩虹集团公司派刘丰、竺简赴美。1997年3月以后竺简因签证问题在没有去美国。

据刘丰反映由于与合资外方黄氏兄妹的合作极为困难，1998年2月26日与外方达成协议，美方从公司撤股，并在1998年一年内归还我方100万美元资本金。自此，该公司转由我方独自经营，由刘丰一人负责，审计调查时得知刘丰于2000年7月20日取得美国永久居住身份（绿卡）。2001年4月10日公司被总经理刘丰擅自转让给美国INB公司。

二、公司财务收支情况

1. 1998年以前的情况

由于刘丰未能提供 1998 年以前的公司会计资料，因此，无法对1998年以前的经营情况进行核实。

2. 1998年以来的情况

① 据刘丰提供的支票存根资料，公司自 1998 年 1 月 1 日

3

 由 扫描全能王 扫描创建

至 2001 年 4 月 30 日累计发生费用 914,670.45 美元。

　　② 根据刘丰提供的公司开户银行支票存根，公司自 1998 年 1 月 1 日至 2001 年 4 月 30 日累计购置固定资产 40,417.48 美元。

　　③ 由于公司未提供 98、99 年度的银行对账单，其 98、99 年度的经营收入、基金投资收益和利息收入等无法核实。依据刘丰提供的公司开户银行 2000 年和 2001 年银行对账单，公司 2000 年 1 月 1 日至 2001 年 4 月 30 日累计主营业务收入 122,943.00 美元，累计主营业务成本　112,896.00 美元。

　　④ 依据刘丰提供的公司开户银行 2000 年和 2001 年银行对账单，公司 2000 年 1 月 1 日至 2001 年 4 月 30 日利息收入 12,105.59 美元。其中：

　　　　2000 年　10,444.06 美元

　　　　2001 年　　1,661.53 美元

　　⑤ 依据刘丰提供的公司开户银行对账单和固定资产清单，截止 2001 年 4 月 30 日，公司净资产 119,581.42 美元。其中：

　　　　固定资产净值　　　30,364.17 美元

　　　　银行存款　　　　　89,217.25 美元

　三、　合同调查情况

　　2001 年 4 月 10 日彩虹（美国）公司被刘丰转让给美国 INB 公司。根据刘丰所提供的转让合同书，审计小组委托中国远洋运输（集团）总公司在旧金山所设的集装箱服务有限公司总经理石小东先生，找到美国美富律师事务所对该合同进行了法律方面的

4

由 扫描全能王 扫描创建

CONFIDENTIAL

咨询。该律师事务所赵启民律师认为就合同本身来讲，合同签定的程序、依据均符合美国的法律。

综合律师的意见，审计小组认为刘丰所签订的转让合同有以下方面是违背了集团公司意愿并损害了集团公司利益的：

1、不符合彩虹（美国）公司 2000 年 3 月 9 日董事会决议精神和意愿。彩虹（美国）公司 2000 年 3 月 9 日董事会全权委托刘丰出让彩虹（美国）公司，是以 100 万美金的价格出让，且转让资金收回最迟应在 2000 年 12 月 31 日前，并没有象刘丰所签订的合同中所写的同时要彩虹集团公司每年支持其 70 万美金利润作为前提。这实际上是变相将公司无偿转让了，并造成彩虹（美国）公司资产的损失。

2、由于彩虹（美国）公司转让的同时"彩虹（美国）公司"的名称也被转让了，受让方继续使用彩虹（美国）公司来做生意，如有不正当或非法经营行为将会给彩虹集团的声誉造成一定的损害。例如彩虹集团再来美国投资注册公司将不能使用"彩虹（美国）公司"这个名称。

对于刘丰转让彩虹（美国）公司所签定的合同，美国律师事务所赵启民律师认为可按"刘丰没有按照彩虹（美国）公司 2000 年 3 月 9 日董事会决议精神和意愿签定了本转让合同"为理由起诉刘丰和买方 INB 公司，终止其合同的执行。

但如在美国通过法律诉讼打官司解决彩虹（美国）公司转让一事，彩虹集团将要支付一笔相当数额的美金，按美国律师赵启

5

由 扫描全能王 扫描创建

IRI-CRT-00003494

民所说，在美国打一场官司花 10 万美金是一件很平常的事。

就此问题审计小组又专门与中国远洋运输（集团）总公司在旧金山所设的集装箱服务有限公司总经理石小东先生、财务总监周玉珍女士进行了交谈咨询。他们认为在美国注册公司是一件很容易的事情，如目前彩虹（美国）公司在美国没有不动产投资，没有债权债务纠纷，仅仅是一个空壳公司，在美国起诉打官司花上一大笔律师费，意义不大，得不偿失。

为了解受让方公司的情况，审计小组先后到加州政府多个部门查询 INB 公司的情况。IBN 公司成立于 1997 年 10 月 24 日，注册地点是 3695 STEVENSON BLVD BLD STE 236   FREMONT, CA 94538 。1998 年 1 月 12 日上报州政府的公司资料显示只有一名股东为刘丰，股本 50,000 美元。1999 年 3 月 18 日上报资料中公司 CEO、秘书、财务总监均为刘丰，2001 年 5 月 7 日公司上报的资料将总经理、秘书、财务总监变更为孙晓林。

据刘丰讲：INB 公司是香港人孙晓林委托他注册成立并持股，直到 2001 年 3 月 30 日才被其转到孙晓林名下的。4 月 10 日他又代表彩虹与孙晓林签定了转让彩虹（美国）公司的。

#### 四、存在的问题

1、刘丰将彩虹（美国）公司擅自转让并拒绝向审计部门提供所需的与经营活动有关的财务决算报表、会计凭证等审计资料，使正常的审计工作无法进行，是严重的违规违纪行为。

2、从刘丰所提供的1998年以来支出的支票存根中审计小组发

6

 由 扫描全能王 扫描创建

IRI-CRT-00003495

012

现，公司99年4月分三次支付40万美元，用于短期基金投资和98、99年度经营电子产品、模具等业务的费用支出，因刘丰不提供有关财务帐目，所以无法对此收益情况进行核实。

3、公司总经理刘丰未经集团公司同意，于2001年4月10日擅自将彩虹（美国）公司转让给美国INB公司，造成国有资产流失，违反了国有企业财产监督管理的有关规定。

4、转让公司的合同中，损害了彩虹集团公司的利益。首先，第二届董事会决议委托其以100万美元转让，而合同中却以彩虹集团须每年支持其获得70万美元的利润为条件，不仅违背了董事会决议的原意，而且使公司资产造成损失；其次，在转让的同时"彩虹（美国）公司"的名称也被转让了，受让方继续以彩虹（美国）公司的名称经营，如有不正当或非法经营行为将会给彩虹集团的声誉造成一定的损害。

5、在1999年3月18日上报加州政府资料中受让方INB公司的CEO、秘书、财务总监均为刘丰，2001年5月7日公司上报的资料才将总经理、秘书、财务总监变更为孙晓林。

**五、建议**

刘丰涉嫌违法违纪问题明显，但目前证据不足。刘丰问题如要查证有两大难点：一是刘丰在美国，持有绿卡，不可能再回国；二是取证涉及到美国的法律问题，障碍太大太多，费用也不会少，很难做到。作为民事案子，可打民事官司，但彩虹集团将要支付一笔相当数额的美金，意义不大，得不偿失。

7

 由 扫描全能王 扫描创建

IRI-CRT-00003496

　　集团公司依据有关管理制度对刘丰其作出行政处理，如开除厂籍，这可能是刘丰最好的结局，也是刘丰所希望的。所以，在还有其他解决问题的可能情况下，不宜立即作出行政处理。

　　签于上述情况，对彩虹（美国）公司及刘丰问题的处理建议如下：

　　1、刘丰未经集团公司同意擅自转让彩虹（美国）公司，违背了集团公司意愿并严重损害了集团公司的利益，对其与美国 INB 公司所签定的彩虹（美国）公司的转让合同不予承认，等待机会，追究和保留追究对刘丰的法律责任。

　　2、继续和刘丰交涉，要求其立即终止与美国 INB 公司所签定的转让合同，执行彩虹（美国）公司 2000 年 3 月 9 日董事会决议，按 100 万美金的价格转让。

　　3、集团公司应依据有关管理制度在适当时候对其作出行政处理。

　　4、由于彩虹（美国）公司及刘丰问题的处理涉外跨国，而涉外案件政策性强，障碍太大太多，集团公司受法定职责、权限和检查手段的局限，很难查处此案，建议请示上级机关由有关部门处理。

　　　　　　　　　　　　　　二〇〇一年七月二十五日

| 抄送：监察处 | 档（2） |
| --- | --- |
| 审计办公室 | 2001 年 7 月 27 日印发 |

打印：庆蓓　　　　　校对：仉兴喜　　　份数：4

8

 由 扫描全能王 扫描创建

CONFIDENTIAL　　　　　　　　　　　　　　　　　　IRI-CRT-00003497

# EXHIBIT 6





"bmccsale"
<bmccsale@public3.bt
a.net.cn>

01-12-13 10:53

收件人： overseas@bmcc.panasonic.com.cn

抄送：
主题： Fw: CDT/CPT inquiry from LG-India

>
> Dear Sir,
> I would like to introduce myself as a representative of LG-India in Shanghai for China
Sourcing of CTV & Monitor parts. I am operating from LG Shanghai IPO. ILG-India  has a
turnover of around 500Million US$, with 6 products being manufactured in a 50,000 Sq.
Meter spread manufacturing facility. We produce CTV, Monitors, Airconditioners, Washing
Machines, Refrigerators & Microwave Ovens in India.
> The yearly Production plan for CTV + Monitor is 1.5 Million Pcs. which include 3
Monitor Models (0.5 Million) 15"/17" & 20 CTV Models (1.0 Million) .
> We invite you to explore the business possibility with LG Electronics, India. Lets
start with the most competitive Price list of your product range for above quantities for
export to India. Pls. include both FOB & C&F (New Delhi) prices in the quotation.
> Waiting for your response at the earliest.
> JP Singh (Mr.)
> Tel: 0086-21-62376317(Direct)
> H/P: 1304 669 7233
> Email : jsingh@lgindia.com
> Do You Yahoo!?
> Check out Yahoo! Shopping and Yahoo! Auctions
> for all of your holiday gifts!
------------------------------------------------
欢迎使用 BTA 电子邮件系统 http://www.bta.net.cn
Thank you for using BTA Email system

-----来自 J P Singh <jpsgh@yahoo.com> 的消息, 在 Tue, 11 Dec 2001 22:04:37 -0800 (PST)
-----

收件人：Beijing Matsushita <bmccsale@public3.bta.net.cn>, Shanghai Novel <jingyiwangl
<yiping.xu@philips.com>, IRICO CaiHong <pqwang@irico.com.cn>

抄送：Jarry Huang <jarryhuang@lge.com>, Anil K Tyagi <atyagi@lgindia.com>, Pan Zhan
Lee <dhlee12@lge.com>, S K Soni <ssoni@lgindia.com>, Rohit Ganjoo <rganjoo@lg
<vgupta@lgindia.com>

主题：CDT/CPT inquiry from LG-India

Dear Sir,

I would like to introduce myself as a representative of LG-India in Shanghai for
China Sourcing of CTV & Monitor parts. I am operating from LG Shanghai IPO.
ILG-India has a turnover of around 500Million US$, with 6 products being
manufactured in a 50,000 Sq. Meter spread manufacturing facility. We produce
CTV, Monitors, Airconditioners, Washing Machines, Refrigerators & Microwave
Ovens in India.

The yearly Production plan for CTV + Monitor is 1.5 Million Pcs. which include 3
Monitor Models (0.5 Million) 15"/17" & 20 CTV Models (1.0 Million) .

We invite you to explore the business possibility with LG Electronics, India. Lets start
with the most competitive Price list of your product range for above quantities for

CONFIDENTIAL

**Panasonic**

| 装　箱　单<br>Packing List | 北京·松下彩色显象管有限公司<br>Beijing·Matsushita Color CRT Co., Ltd. | Address: 9 Jiuxianqiao Northroad, Dashanzi<br>Chaoyang District, Beijing, China<br>Tel: 5006655<br>Fax: 5006154<br>Cable: 2795 |

收货人代号:　　　　　　目 的 地:　　　　　　箱 号:　　　　　　唛头:
Consignee Code:　　　　Destination:　　　　Case No.　　　　Shipping Mark:

合 同 号:　　　　　　合同附件号:　　　　　日期:
Contract No.　　　　Annexe No.　　　　Date:

| 箱号<br>Case No. | 品　名<br>Description | 单位<br>Unit | 数　量<br>Quantity | | 单价<br>Unit Price | 金额<br>Amount | 毛重<br>Gross Weight | 净重<br>Net Weight | 长×宽×高<br>(厘米)(厘米)(厘米)<br>Length×Width×Height<br>(cm)　(cm)　(cm) |
|---|---|---|---|---|---|---|---|---|---|
| | | | 每箱<br>Per P'kg | 共计<br>Total | | | | | |
| | | | ● | | | ● | | | |

BMCC-CRT000127967

export to India. Pls. include both FOB & C&F (New Delhi) prices in the quotation.

Waiting for your response at the earliest.

JP Singh (Mr.)

Tel: 0086-21-62376317(Direct)

H/P: 1304 669 7233

Email : jsingh@lgindia.com


Do You Yahoo!?
Check out Yahoo! Shopping and Yahoo! Auctions for all of your holiday
gifts!

CONFIDENTIAL

**Panasonic**

装 箱 单
Packing List

北京·松下彩色显象管有限公司
Beijing·Matsushita Color CRT Co., Ltd.

Address: 9 Jiuxianqiao Northroad, Dashanzi
Chaoyang District, Beijing, China
Tel: 5006655
Fax: 5006154
Cable: 2795

| 收货人代号:<br>Consignee Code: | 目 的 地:<br>Destination: | 箱 号:<br>Case No. | 唛头:<br>Shipping Mark: |
|---|---|---|---|
| 合 同 号:<br>Contract No. | 合同附件号:<br>Annexe No. | 日期:<br>Date: | |

| 箱号<br>Case No. | 品　名<br>Description | 单位<br>Unit | 数　量<br>Quantity | | 单价<br>Unit Price | 金额<br>Amount | 毛重<br>Gross Weight | 净重<br>Net Weight | 长×宽×高<br>(厘米)(厘米)(厘米)<br>Length×Width×Height<br>(cm) (cm) (cm) |
|---|---|---|---|---|---|---|---|---|---|
| | | | 每箱<br>Per P'kg | 共计<br>Total | | | | | |
| | | | ● | | | ● | | | |

CONFIDENTIAL

BMCC-CRT000127969

# EXHIBIT 7

| | |
|---|---|
| **From:** | sunbai@KONKA.COM |
| **Sent:** | Wednesday, November 13, 2002 2:47 AM |
| **To:** | overseas@bmcc.panasonic.com.cn; hongxingtao@samsung.com; zfjin@samsung.co.kr; wenhaiyang <hywen@irico.com.cn>; joy_lau@163.net; szshcom1@public.szptt.net.cn; 382 @lgphilips-displays.com; david_deng@teal.toshiba.co.jp; laurie_chow@teal.toshiba.co.jp; toyoisg@public.szptt.net.cn; hkg@gfico.com; szadgjcy@public.szptt.net.cn; qiang.ni@lgphilips-displays.com; hskim@leadingdigitalhk.com |
| **Cc:** | 0xLJD1EEz_0xLJCBAEC3AFz/0xLJB2C9B9BAB2BFz/0xLJD7DCB2BFz/konka <0xLJD1EEz_ 0xLJCBAEC3AFz/0xLJB2C9B9BAB2BFz/0xLJD7DCB2BFz/konka@konka.com>; 0xLJD3DAz_0xLJBAA3z/0xLJB2C9B9BAB2BFz/0xLJD7DCB2BFz/konka <0xLJD3DAz_ 0xLJBAA3z/0xLJB2C9B9BAB2BFz/0xLJD7DCB2BFz/konka@konka.com> |
| **Subject:** | 工作交接 |

各位尊敬的合作伙伴：

由于工作上的调整，本部于海先生将接手我的业务工作，我将调去通信事业部。请大
家一如既往地给予于海先生业务上的支持和协作，也欢迎大家和我保持联系。

于海先生的联系电话是：（86）755—26608866—238，（86）755—26603004；传真号
为：（86）755—26602002，E-MAIL地址是yuhai@konka.com。

祝大家：
工作愉快！
身体健康！
全家幸福！

孙柏
2002/11/13

1

CONFIDENTIAL

BMCC-CRT000314540

# EXHIBIT 8

**From:** overseas
**Sent:** Tuesday, September 30, 2003 4:04 AM
**To:** jingyuan@irico.com.cn
**Subject:** My e-mail address

Dear Mr.Jing

Thank you for your calling.

Please refer to the following e-mail add. and my TEL No.

Thanks and best regards!

Luzia Ben


==================================================
Overseas Section Marketing Dept.
Beijing Matsushita Color CRT Co., Ltd
No.9 Jiuxianqiao North Road Dashanzi,
Chaoyang District 100015  Beijing, China
Tel:86-10-64363168,86-10-64363355 ext.2304
Fax:86-10-64363162,86-10-64376154
e-mail:overseas@bmcc.panasonic.com.cn
==================================================

1

CONFIDENTIAL

BMCC-CRT000296385

# EXHIBIT 9



**HAO XIAOJING**

**CEIEC** CHINA NATIONAL ELECTRONICS IMP & EXP (XIANYANG CO.)
Sales & Marketing Department

No.1 Caihong Road, Xianyang, ShaanXi, China
Tel:(0910)3334330    3325177
PC:712021    Fax:(0910)3313101  3310708
E-mail: xjhao@irico.com.cn
web: http://www.irico.com.cn





**THAI CRT CO., LTD.**
www.thaicrt.com

 

มนตรี  มหาพฤกษ์พงศ์          586 5582
**MONTRI  MAHAPLERKPONG**
林 開 智          02-5864470
BUSINESS PLANNING MANAGER          5864898

87/9  Moo 2  Sukhapibarn 7 Rd.,        Tel  : 66 (38) 490220  Ext. 595
Laem Chabang Industrial Estate        Fax  : 66 (38) 493698
Tungsukhla Sriracha                   Mobile : 66 (1) 8637826
Chonburi 20230, THAILAND.             E-mail : montri.m@thaicrt.com

**GAO RONGGUO**

GENERAL MANAGER

**IRICO GROUP**
**IRICO IMPORT AND EXPORT COMPANY**
No.1  Caihong Road,Xianyang,Shaanxi China
TEL:(0910) 3334318  3310808
FAX:(0910) 3313101
CALL:  13809109698      POSTCODE:712021
E-mail:rggao@irico.com.cn



HONG-DA YANG
Vice Director

**CEIEC** CHINA NATIONAL ELECTRONICS IMP & EXP (XIANYANG CO.)
Sales & Marketing Department

No.1 Caihong Road, Xianyang, ShaanXi China
Tel:(0910)3334329    3334330
P C:712021    Fax:(0910)3313101   3310708
E-mail: hdyang@irico.com.cn
web : http://www.irico.com.cn

**LG Electronics Inc.**


Wan - Seok  Oh

Senior Engineer
DND Production Engineering Department

642, Jinpyoung-dong, Gumi-city, Gyung Buk
730-727 Korea.
Phone : +82-54-470-4716  Fax : +82-54-470-4639
E-mail : ows0625@lge.com

**LG.PHILIPS** Displays

梁 永 旭          150-721
                 Seoul市 永登浦區 汝矣島洞 20
營業擔當 / 常務        LG Twin Towers 西館 16層

                 Tel  : +82-2-3777-3070
                 Fax  : +82-2-3777-1333
                 E-mail : yeongug.yang
                 @lgphilips-displays.com

**Exhibit
Wang 8584**
9/20/2022
Wang Zhaojie - V2

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00030303

郝小菁


CEIEC 中国电子进出口彩虹公司
出口营销部

中國陝西咸陽彩虹路1號    郵編：712021
電話：(0910)3334330   3325177
傳真：(0910)3313101   3310708
電子信箱：xjhao@irico.com.cn
公司網址：http://www.irico.com.cn


IRICO

彩虹集团公司
彩虹進出口公司
總經理

高荣国

地址：中国陝西咸阳彩虹路1号
电话：(0910)3334348－3310808
传真：(0910)3313101
手机：13809109698  邮编：712021
电子信箱：rggao@irico.com.cn

杨宏达


CEIEC 中国电子进出口彩虹公司
出口营销部    副部长

中國陝西咸陽彩虹路155  郵編：712021
電話：(0910)3334329   3334330
傳真：(0910)3313101   3310706
電子信箱：hdyong@irico.com.cn
公司網址：http://www.irico.com.cn


LG전자

디지털 영상 사업부
DND 설계실
선임 연구원

오   완   석

730-727 경상북도 구미시 진평동 642번지
전화：054-470-4716  FAX：054-470-4639
E-mail：ows0625@lge.com


LG.PHILIPS Displays

Yeong-Ug(Albert)Yang
Vice President
Sales Director

LG.Philips Displays Korea Co., Ltd
LG Twin Towers(Western 16F)
20, Yeouido-dong, Yeongdeungpo-gu,
Seoul, 150-721 Korea

Tel   : 82-2-3777-3070
Fax   : 82-2-3777-1333
E-mail : yeongug.yang
        @lgphilips-displays.com

CONFIDENTIAL - GRAND JURY MATERIAL

CHU00030304

# EXHIBIT 10

1
2
3
4
5
6
7 # Preliminary Television Market and Industry Research
8
9
10
11
12
13
14
15
16
17
18                          Prepared for:
19
20
21
22                              US EPA
23                          in support of the
24                ENERGY STAR® TV Specification Revision
25
26
27
28
29
30
31
32
33
34
35                          January 6, 2006

## Preliminary Television Market and Industry Research
## Table of Contents

Background on Current ENERGY STAR TV Specification…………………………………………………...3

North American TV Market and Its Relevance for ENERGY STAR…………………………………………3

Key Technologies for the North American Market…………………………………………………………6

    CRT Televisions………………………………………………………………………………………7

    LCD Televisions………………………………………………………………………………………8

    Plasma Televisions……………………………………………………………………………………9

    DLP Televisions……………………………………………………………………………………...10

Next Steps…………………………………………………………………………………………………...10

Sources……………………………………………………………………………………………………- 12

## Preliminary Television Market & Industry Research

*This report provides an overview of the US television market, prepared on behalf of the US Environmental Protection Agency (EPA), as it begins a major revision of the current ENERGY STAR® specification for televisions and VCRs (henceforth known as the ENERGY STAR TV specification).*

### Background on Current ENERGY STAR TV Specification

The ENERGY STAR TV specification was originally launched at The Consumer Electronics Show® (CES) in January 1998.  Since then, it has undergone a significant revision to decrease the standby mode power levels to one watt or less for products covered by the specification.  This change was achieved through implementing a tiered approach to the revised specification, which was launched on July 1, 2002.  The final tier of this revised specification took effect on July 1, 2005.  Two minor amendments also were made, on September 15, 2003 and June 21, 2005 (Tier 3).  The first of these amendments regarded expanding the specification to allow Digital Cable Ready (DCR) televisions with Point of Deployment (POD) slots to qualify and the second clarified which products were eligible for the one-watt Illuminated Display Allowance under Tier 3 of the specification.

The purpose of the current specification is to recognize TVs with low energy consumption when turned off or in the standby mode. This approach was an important first step in reducing TV energy use due to the vast amount of time they spend in standby mode and the millions of televisions in use in US homes.  In 1998 when the specification was introduced, EPA estimated that ENERGY STAR qualified televisions would use about 20 percent less energy in a year than comparable televisions. See Table 1 below. (Please note that this analysis was based on CRT technology; other technologies, such as LCD and plasma, were not prevalent in the consumer market when the ENERGY STAR TV specification was released.)

**Table 1: Initial ENERGY STAR TV Savings Analysis**

|                          | Baseline TV | ENERGY STAR TV | Savings | % Savings |
|--------------------------|-------------|----------------|---------|-----------|
| Standby Energy (kWh)     | 40.4        | 12.3           | 28.1    | 69.5%     |
| Active Energy (kWh)      | 143.7       | 135.9          | 7.9     | 5.5%      |
| **Total Annual Energy (kWh)** | 184.2   | 148.2          | 36.0    | 19.5%     |

Source:  Developed by Lawrence Berkeley National Laboratory (LBNL) for EPA ENERGY STAR in 1998.

With the prevalence of new display technologies, which can consume significantly more energy in active mode than CRT models, and shifts in consumer viewing habits, EPA believes that standby power is no longer an effective measure of overall television efficiency. For example, it is currently possible for a television to earn the ENERGY STAR by meeting low standby levels while drawing significant power in on mode.  Significant opportunity now exists for EPA to address all relevant operational modes and technologies so consumers can easily identify the most energy-efficient models in the marketplace.

### North American TV Market and Its Relevance for ENERGY STAR

Not surprisingly, the number of televisions in the United States is growing.  According to iSuppli's Television Systems Market Tracker for the fourth quarter of 2005, the estimated market value of all televisions shipped to North America in 2004 was $19.19 billion.  This value is expected to grow by 19.6% in 2005 to $23.89 billion.  In terms of units, 2004 saw approximately 25.6 million televisions shipped to North America.  Shipments are expected to increase by 14% (29.3 million) in 2005 and reach a total of 37.69 million televisions by 2009 (see Figure 1).

103    **Figure 1: Estimated Number of TVs (in 000s) Shipped to North America per Year from 2004 – 2009**



104
105    Source: iSuppli's Television Systems Market Tracker – Q4 of 2005.
106
107    TV shipment growth can be attributed to several major factors, including:
108    ▪    Consumers showing higher preference for larger screen sizes, with a greater availability of televisions in
109         40-inch-plus sizes and declining price points;
110    ▪    Value brands entering the market, which are slowly gaining consumer acceptance;
111    ▪    Consumers investing in new units in preparation for the move from analog to digital over-the-air (OTA)
112         signal transmission;
113    ▪    The increased adoption of flat panels, allowing consumers to find new places in the household for
114         televisions – kitchens, bathrooms, home-offices, etc.; and
115    ▪    A decline in the average selling price of televisions.
116
117    Associated with the rise in TV shipments is an increase in the number of TVs per household. According to data
118    from the Consumer Electronics Association (CEA), there are currently 285 million televisions in use in US
119    households.  And per recent survey results that appeared in USA Today, there is currently an average of 2.8
120    working televisions in a US household.  As consumers buy new televisions, typically every seven to nine
121    years, this number is expected to grow because rather than dispose of their old ones, which often still work
122    due to the relatively long life-cycles of these products, they are placed in alternate locations, such as the
123    kitchen and children's bedrooms.
124
125    In addition, the North American TV market is quickly moving towards greater adoption of large screen, flat
126    panel televisions (see Figure 2).  By 2009, it is estimated that 71.5% of the market will be comprised of flat
127    panel televisions measuring 30 inches and above in screen size.
128

129    **Figure 2: Estimated North American TV Technology Penetration from 2004 – 2009**



130
131
132    Source: iSuppli's Television Systems Market Tracker – Q4 of 2005.
133
134    As depicted in Figure 2, it is expected that shipments of LCD televisions will overtake shipments of CRT
135    televisions at the beginning of 2007.  And approximately two years later, shipments of plasma televisions also
136    will overtake those of CRT televisions.
137
138    Overall, many of the large screen, flat panel televisions being purchased by consumers will consume double or
139    more the active mode power of the smaller CRT televisions that they are replacing.  Some of this differential in
140    power consumption is because large screen televisions, being bigger than their predecessors, will naturally
141    consume more power to operate.  Many of these newer televisions also are digital and capable of showing
142    high-definition picture, which also drives up overall power consumption.
143
144    Further, there can be a wide disparity in power consumption amongst similar televisions that incorporate the
145    same screen technology.  For example, according to a recent Digitimes article on the seven most energy-
146    efficient 37-inch flat panel televisions currently available in the Japanese market, there is a 55 kWh per year
147    difference in the measured annual power consumption of the most efficient flat panel available on the market
148    and the sixth most efficient flat panel available, both of which are LCD televisions.  However, a plasma
149    television was found to be the third most efficient flat panel model available, with an annual power
150    consumption that measured 71 kWh per year less than the next best performing plasma model on the
151    marketplace in terms of energy efficiency.  (Out of the seven models mentioned in the article, five were LCDs
152    and two were plasmas.)  Due to this variation in power consumption, EPA wants its new specification to
153    recognize those manufacturers that are investing in research and development to introduce more energy-
154    efficient TV models across all modes of operation.
155
156    The variety and number of features available on new televisions is expanding and, in many cases, will impact
157    overall energy consumption.  For example, consumers must now consider the following when purchasing a
158    new television: picture quality, price, size (overall and in terms of thickness), regular or high definition capable,
159    wide-screen or normal aspect ratio, TV sound, audio/video (A/V) input and outputs, and other features (e.g.,
160    digital cable ready, parental controls, etc.).
161
162    As televisions physically change in terms of their size, shape, and functionality, so do their usage patterns.
163    Americans are spending more hours a day watching television, both due to the increased availability of cable
164    and satellite programming content and the rapid adoption of DVDs.  And with the growth in sales of game
165    consoles, there is an additional increase in the number of hours a typical television operates each day.
166    According to Nielsen Media Research, for the September 2004 – September 2005 viewing season, the
167    average US household was tuned into television an average of 8 hours and 11 minutes per day.  Even though
168    televisions continue to spend the majority of time in standby mode, the energy consumed by them for the few

169 hours a day that they are active accounts for 80 – 95% of their annual energy consumption.  In fact, some of
170 the larger TVs on the market today use as much energy as a new refrigerator (e.g., 500 kWh/year).  (See
171 Table 2 for the estimated annual power consumption of US televisions in active mode and all modes.)
172
173 **Table 2: Annual Power Consumption Estimates for US TVs (kWh/Year)**

| Television Display Type | All Modes - Average Power Consumption per Unit | Active Mode Only - Average Power Consumption per Unit |
|---|---|---|
| CRT | 244 | 216 |
| LCD | 256 | 192 |
| Plasma | 679 | 532 |
| DLP | 444 | 311 |

174 Source: Prepared by LBNL. Data derived from various sources.
175
176 Further, EPA estimates that currently, all US televisions consume 69 TWh/year, costing consumers $5 billion
177 annually to power their sets.  In 2010, it is projected that this number will rise by approximately 75% and US
178 televisions will consume 121 TWh/year, costing consumers over $8 billion annually to power their sets.  (See
179 Table 3 for the estimated annual national power consumption of US televisions, projected through 2010.)
180
181 **Table 3: Annual National Power Consumption Estimates for US TVs (TWh/year)**

| Television Display Type | Year | | | | | |
|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| CRT | 57 | 55 | 53 | 50 | 46 | 42 |
| DLP | 1 | 2 | 3 | 3 | 4 | 5 |
| LCD | 5 | 6 | 7 | 9 | 11 | 13 |
| Plasma | 6 | 12 | 20 | 31 | 45 | 61 |
| Other | 0.00 | 0.05 | 0.10 | 0.16 | 0.24 | 0.32 |
| Total | 69 | 75 | 84 | 94 | 106 | 121 |

182 Source: Prepared by LBNL. Data derived from various sources.
183
184 As substantiated by the data and trends presented above, the United States is experiencing several significant
185 changes to the TV market: 1) shipments and the number of TVs per household are growing; 2) new consumer
186 viewing habits are increasing the amount of time a TV spends in active mode; 3) differences in manufacturer
187 design are leading to variations in power consumption amongst similar technologies and models; and 4) many
188 consumers are choosing larger, feature-rich models that on average consume more energy than their
189 predecessors.  In fact, residential electricity use by consumer electronics products alone has doubled since the
190 late 1990s; this category is now responsible for up to 15% of household electricity use and may reach 30% by
191 2015.  These increases in TV sales, usage patterns, and power consumption, suggest that it is time to reopen
192 the specification and develop new ENERGY STAR TV criteria that reflect today's marketplace.
193
194 **Key Technologies for the North American Market**
195
196 Several new display technologies have entered the marketplace since the launch of the first ENERGY STAR
197 TV specification in 1998.  Table 4 provides a brief overview of the four primary television technologies
198 currently available in North America. Immediately following the table is a market summary of each technology.
199
200
201
202
203
204
205
206
207
208

209    **Table 4: Overview of Four Primary TV Technologies Available in North America**

| Characteristics | CRT | LCD | Plasma | DLP |
|---|---|---|---|---|
| **Range of Screen Sizes Available (Inches)** | <15 - >40 | 10 - >50 | 31 - >60 | <50 - >60 |
| **Average Selling Price in 2005 & 2009** | $302; $184 | $1,352; $674 | $2,774; $877 | $2,483; $966 |
| **Est. Product Lifetimes** | 5-10 years | 50,000-60,000 hours of viewing | 30,000-60,000 hours of viewing | 75,000 hours of viewing |
| **Top Manufacturer in 3rd Qtr 2005 (% of Shipments)** | TTE Corporation | Sharp Electronics Corporation | Panasonic (Matsushita) | Samsung Corporation |

210    Source: Prepared by ICF Consulting. Data derived from various sources.
211
212    **CRT Televisions**
213    The most mature technology currently available for televisions, CRTs, continued to account for the vast
214    majority of televisions shipped to North America in 2004. This technology comprised approximately 75% of
215    total shipments, or 19.32 million units.  Of these 19.32 million units, over half were larger than 24 inches in
216    screen size.  In 2005, it is estimated that approximately 64% of the total number of televisions shipped to North
217    America will be CRTs, or 18.76 million units.  This overall decrease in both the number of CRTs shipped to
218    North America and the percentage of total shipments comprised of CRTs is estimated to escalate and in 2009,
219    only 5.27 million CRTs (13.8% of total shipments) are expected to ship to North America (see Figure 3).
220
221    **Figure 3: Estimated CRT TV Shipments to North America (in 000s), per Screen Size & per Year**



222
223    Source: iSuppli's Television Systems Market Tracker – Q4 of 2005.
224
225    The decline in CRT shipments can be attributed to a number of factors, including:
226    ▪    Relatively low margins on this technology, causing manufacturers to shift resources to other areas;
227    ▪    Increased adoption of flat panels due to their declining prices, leading to a smaller price-differential
228         between similar sized LCD and CRT televisions; and
229    ▪    The attractive form factor of flat panels and in many cases, the ability to receive digital OTA programming,
230         which complements consumer lifestyles and preferences.
231

232    In 2004, the average selling price of a CRT television was $319.  In 2009, the average CRT selling price is
233    expected to drop to $184.  This fairly aggressive decline in the average selling price for CRTs will likely
234    continue as CRT manufacturers attempt to stay more price-competitive against flat panels in this market.
235
236    In terms of CRT market share in North America, TTE Technology, Inc. held the largest share during the third
237    quarter of 2005 with 14.18%.  Toshiba (8.66%), Sanyo (8.11%), Panasonic/Matsushita (6.75%), and Sony
238    (5.57%) rounded out the top five.  All are ENERGY STAR partners for televisions.
239
240    **LCD Televisions**
241    LCD televisions are the most rapidly growing TV technology market in North America.  In 2004, approximately
242    10.75% of the total television shipments to North America were LCDs, or 2.75 million units.  Of these 2.75
243    million units, over half were larger than 21 inches in screen size.  In 2005, it is estimated that approximately
244    20.25% of the total number of televisions shipped to North America will be LCDs, or 5.93 million units.  This
245    growth trend is expected to continue with an estimated 21.8 million LCDs shipped to North America in 2009,
246    accounting for 57.8% of televisions shipped to this market (see Figure 4).
247
248    **Figure 4: Estimated LCD TV Shipments to North America (in 000s), per Screen Size & per Year**



249
250    Source: iSuppli's Television Systems Market Tracker – Q4 of 2005.
251
252    The increase in LCD unit shipments can be attributed to a number of factors, including:
253    ▪  The attractive form factor of LCDs, which fits well with consumer life-styles;
254    ▪  A decline in the average sales price of LCDs as an increased number of sixth and seventh generation LCD
255       fabs reach full production;
256    ▪  An increased number of large LCD panels becoming available for the manufacture of televisions, meaning
257       that this technology can now compete with other flat-panel technologies in terms of screen size *and*
258       decreasing price differentials; and
259    ▪  Improved product performance.
260
261    In 2004, the average selling price of an LCD television was $1,682.  The smallest screen sizes available, from
262    10 – 11 inches, sold at an average of $482 while screen sizes from 45-49 inches sold at an average of $7,537.
263    In 2005, the average selling price of an LCD television is estimated to decrease by approximately 20% to
264    $1,352.  As LCD manufacturers attempt to reduce the price differential between CRT televisions and become
265    more price-competitive against other flat-panel technologies, similar price declines are expected through 2009,
266    reaching an average price of $674 or 60% less than the 2004 figure.

267
268   In terms of LCD market share in North America, Sharp Electronics Corporation held the largest share during
269   the third quarter of 2005 with 15.08%.  Other market leaders included Philips, Sony, Samsung, and Advent
270   with 10.42%, 9.69%, 7.38%, and 5.30% market shares, respectively.
271
272   **Plasma Televisions**
273   In 2004, approximately 2.9% of the total television shipments to North America were plasmas, or 0.75 million
274   units.  Of these 0.75 million units, the vast majority were larger than 40 inches in screen size.  In 2005, it is
275   estimated that approximately 5.6% of the total number of televisions shipped to North America will be plasmas,
276   or 1.65 million units.  By 2009, 5.97 million plasmas are expected to ship to North America; this will represent
277   approximately 15.9% of televisions shipped to this market (see Figure 5).
278
279   **Figure 5: Estimated Plasma TV Shipments to North America (in 000s), per Screen Size & per Year**



280
281   Source: iSuppli's Television Systems Market Tracker – Q4 of 2005.
282
283   The increase in plasma television shipments can be attributed to a number of factors, including:
284   ▪  Declining price points as plasma television manufacturers strive to gain an increased share of the large
285      screen flat panel market prior to sixth and seventh generation LCD fabs reaching full production;
286   ▪  The attractive form factor of plasmas, which fits well with consumer life-styles;
287   ▪  Increased availability of plasma televisions through a variety of channels, such as consumer electronics
288      outlets, high-end audio and video stores, and mass merchandisers and price clubs; and
289   ▪  Increased capacity from plasma panel manufacturers, leading to a decline in the average sales price of
290      these products as they become more readily available.
291
292   In 2004, the average selling price of a plasma television was $3,823.  The smallest screen sizes available,
293   from 31 – 34 inches, sold at an average of $3,823 while screen sizes 60 inches and above sold at an average
294   of $11,451.  In 2005, the average selling price of a plasma television is estimated to decrease by
295   approximately 17.5% to $2,774.  As of 2006, it is estimated that there will be no shipments of plasma
296   televisions with screen sizes below 35 inches to North America.  By 2009, analysts predict an average plasma
297   selling price of $877.
298
299   In terms of plasma television market share in North America, Panasonic (Matsushita Electric Industrial Co.)
300   held the largest share during the third quarter of 2005 with 50.5%.  Samsung Corporation held the second
301   largest market share at 11.21%, followed by LG Electronics at 10.11%.
302

303 **DLP Televisions**
304 DLP televisions incorporate a relatively new technology available in the market, and currently account for the
305 lowest number of overall television shipments to North America.  In 2004, approximately 1.8% of the total
306 television shipments to North America were DLPs, or 0.45 million units.  In 2005, it is estimated that shipments
307 of DLPs will almost double, reaching a total of 0.8 million units.  However, they will still only comprise 2.7% of
308 the total number of televisions shipped to North America. DLP shipments are expected to slowly increase; in
309 2009, an estimated 2.1 million DLPs will ship to North America, accounting for approximately 5.53% of
310 televisions shipped to this market (see Figure 6).
311
312 **Figure 6: Estimated DLP TV Shipments to North America (in 000s), per Screen Size & per Year**



313
314 Source: iSuppli's Television Systems Market Tracker – Q4 of 2005.
315
316 DLP shipments are not increasing as rapidly as other technologies because they are generally more
317 expensive and still require some type of TV stand (unlike other flat panel technologies that can be hung on the
318 wall).  Samsung Corporation currently holds the largest market share for shipments of DLPs in North America.
319
320 In 2004, the average selling price of a DLP television was $3,102.  The smallest screen sizes available, below
321 50 inches, sold at an average of $2,515 while screen sizes above 60 inches sold at an average of $3,696.  In
322 2005, the average selling price of a DLP television is estimated to decrease by approximately 20% to $2,483.
323 By 2009, the average selling price is projected to be $966.
324
325 **Next Steps**
326
327 The drafting of this market research report is one of the initial steps in the ENERGY STAR specification
328 revision process.  As outlined in the ENERGY STAR Guiding Principles, EPA strives to develop energy-
329 efficiency specifications that are performance-based and technology neutral (i.e., specifications that evaluate
330 all models in a product category, such as televisions, in the same manner, regardless of technology).  This
331 approach offers several benefits, including specification longevity (i.e., specification does not have to be
332 automatically revised each time a new technology, such as SED or OLED, is introduced) and easy product
333 comparisons based on the ENERGY STAR mark (e.g., performance-based specifications allow consumers to
334 easily choose the most energy-efficient model to suit their needs and preferences).  For the ENERGY STAR
335 TV specification, EPA plans to follow this established approach and will accordingly develop one test method
336 and specification for all display technologies.  Key steps, consistent with ENERGY STAR's guiding principles
337 and established procedures, are briefly outlined below.
338
339     ▪  Establish new and varied industry contacts.  EPA is in the process of expanding its list of stakeholders
340        to include engineers and other technical staff involved in the design of TV technologies.

341     ■   <u>Complete market research</u>.  Stakeholders will be asked to provide their input on this market research
342         report.  Where appropriate, EPA will incorporate stakeholder feedback before finalizing the document
343         and posting it on the ENERGY STAR Web site at
344         http://www.energystar.gov/index.cfm?c=revisions.tv_vcr_spec.
345     ■   <u>Develop a new test procedure to measure the amount of energy consumed by a television in active or</u>
346         <u>on mode</u>. A number of key governments, including Canada, Australia and the European Union, have
347         already expressed an interest in working with EPA and the manufacturing community to develop a
348         single, harmonized global test procedure for televisions as an early step in the specification revision
349         process.  This test procedure will take into account variables such as what programming is displayed
350         and its format and measure all televisions in the same manner, regardless of technology.  Ultimately,
351         the test procedure will be used by each of these government entities, should they choose to implement
352         policies to encourage the sale of more efficient televisions.  A first draft of the test procedure is
353         expected to be available in late March 2006, and will be shared with manufacturers and other
354         stakeholders for their review and comment.
355     ■   <u>Gather and analyze data</u>.  Manufacturers will be requested to test their latest, most feature-rich
356         models using the new test procedure.  The data gathered from this testing will be used to determine
357         an appropriate performance metric and to inform initial levels for the new ENERGY STAR TV
358         specification.
359     ■   <u>Share drafts of the specification with stakeholders for their review and comment</u>.  EPA expects to
360         distribute an initial draft of this specification in August 2006, and develop and distribute additional
361         drafts as needed, prior to the development of the final version of this document.
362     ■   <u>Host stakeholder meetings and workshops</u>.  Stakeholder participation is critical to developing a
363         meaningful specification and to the overall success of ENERGY STAR. EPA will invite all interested
364         parties to attend periodic meetings and/or workshops designed to vet key elements of the
365         specification.
366     ■   <u>Finalize specification</u>.  EPA intends to finalize the TV specification by January 2007 and expects that it
367         will take effect in or around January 2008.  The current TV/VCR products specification will remain in
368         place until a new set of specifications can be finalized with a new effective date.
369
370 A timeline follows below with anticipated dates for key events milestones in the ENERGY STAR TV
371 specification revision.
372
373 **Table 5: Anticipated Timeline for ENERGY STAR TV Specification Revision**

| Date | Event |
| --- | --- |
| February 2006 | Finalize Television Market and Industry Research |
| Late March 2006 | Complete draft test procedure for televisions and share with stakeholders |
| April 2006 | Host stakeholder workshop to discuss Draft test procedure |
| April/May 2006 | Finalize test procedure for televisions |
| May – July 2006 | Test latest, most feature-rich models using newly developed test procedure.  Interested manufacturers share data with EPA |
| June 2006 | Attend meeting with international stakeholders in London to discuss progress to date regarding televisions; timed to coincide with Energy Efficiency in Domestic Appliances and Lighting (EEDAL 2006)<br>Attend Society for Information Display (SID) conference, SID 2006, in San Francisco |
| Late July 2006 | Conduct stakeholder meeting to discuss data gathered to date |
| August 2006 | Release Draft 1 specification for comment and feedback |
| September 2006 | Host stakeholder meeting to discuss Draft 1 specification |
| November 2006 | Release Draft 2 specification for comment and feedback |
| December 2006 | Host stakeholder meeting to discuss Draft 2 specification |
| January 2007 | Release final revised ENERGY STAR TV specification |
| January 2008 | Effective date of revised specification |

374
375 Additional information about EPA's ENERGY STAR Product Specification Development activities can be found
376 at www.energystar.gov/productdevelopment.
377

**Sources**

About TV, http://tv.about.com/od/glossary/ and http://tv.about.com/od/learningcenter/bb/buyingatv.htm

CNET, www.cnet.com

CNET Australia, www.cnet.com.au

Corning, www.corning.com/lcdtv

Consumer Electronics Association Press Release, dated June 8, 2005, "New Data Shows Analog Broadcasting Cut-off Will Impact Few US TV Sets and Homes"

Crutchfield Advisor, www.crutchfieldadvisor.com

Digitimes, www.digitimes.com

DLPs, www.dlp.com

Instant Free Info, www.instant-free-info.com

iSuppli, "LCD TV Shipments Soar – Will They Bring Early Demise of CRT TVs," – Television Systems Market Tracker, Q4 2005

The Natural Resource Defenses Council (NRDC), "Tuning in to Energy Efficiency: Prospects for Saving Energy in Televisions"

Niche Articles, www.niche-article-rss.com

Nielsen Media Research, http://www.nielsenmedia.com/newsreleases/2005/AvgHoursMinutes92905.pdf

Plasma TV Buying Guide, www.plasmatvbuyingguide.com

USA Today Survey of the Number of Televisions in a US Household (August 2005 phone survey of 1,005 adults ages 18 and over by Frank N. Magid Associates)

# EXHIBIT 11

```
 1                 UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                       OAKLAND DIVISION

 4

 5    IN RE: CATHODE RAY TUBE (CRT)  ) MASTER FILE NO.

      ANTITRUST LITIGATION           ) CV-07-5944 JST

 6    _____)

                                     )

 7    THIS DOCUMENT RELATES TO:      )

                                     )

 8    ALL INDIRECT PURCHASER ACTIONS )

      ALL DIRECT PURCHASER ACTIONS   )

 9                                   )

                     DEFENDANTS.     )

10    _____)

11

12

13

14

15          VIDEOTAPED DEPOSITION OF YAN YUNLONG

16                       VOLUME III

17             THURSDAY, SEPTEMBER 29, 2022

18                  MACAU S.A.R., CHINA

19

20

21

22    FILE NO.  SF 5436477

23

24    REPORTED BY  MARK McCLURE, CRR

25                 CAL CSR 12203
```

Page 308

1  BY MR. CARTER:                          08:19:13
2     Q.  Has Irico Group continued to act on behalf of   08:19:13
3  Irico Display in responding to the CRT lawsuit since   08:19:15
4  this time, in 2017?                      08:19:18
5        MR. RUSHING:  Objection.  Form.     08:19:22
6        THE WITNESS:  Yes.                  08:19:36
7  BY MR. CARTER:                          08:19:37
8     Q.  And to your knowledge, has anyone at Irico   08:19:38
9  Display ever contacted Baker Botts to inform them that   08:19:42
10 they wished for Baker Botts to withdraw as counsel for   08:19:46
11 Irico Display?                          08:19:49
12       MR. RUSHING:  Objection to form.  Lacks   08:19:51
13 foundation.                             08:19:52
14       THE WITNESS:  Nobody.               08:20:13
15 BY MR. CARTER:                          08:20:15
16    Q.  Mr. Yan, you also testified yesterday that the   08:20:17
17 litigation working group at Irico Group searched for   08:20:22
18 responsive documents in the possession of Irico Display   08:20:26
19 for this litigation.                     08:20:29
20       Do you recall that?                 08:20:53
21    A.  Yes.                             08:20:53
22    Q.  To the best of your knowledge, did the   08:20:53
23 litigation working group ensure that responsive   08:20:56
24 documents were searched for and collected from the files   08:20:59
25 of Irico Display for this litigation?    08:21:02

Page 321

1        MR. RUSHING:  Objection to form.     08:21:07
2        MR. BIRKHAEUSER:  Objection.  Very leading.   08:21:08
3        THE WITNESS:  Yes, we tried our very best.   08:21:36
4  BY MR. CARTER:                          08:21:40
5     Q.  Mr. Yan, do you also recall testifying   08:21:43
6  yesterday that Mr. Zhang Wenkai served as your primary   08:21:45
7  assistant with regard to the collection of documents for   08:21:48
8  this litigation since 2017?             08:21:51
9     A.  Yes.                             08:22:10
10    Q.  Was part of Mr. Zhang's role to gather   08:22:11
11 information on potential locations of relevant documents   08:22:14
12 for collection?                         08:22:17
13       MR. RUSHING:  Objection to form.     08:22:20
14       MR. BIRKHAEUSER:  Objection.  Leading.   08:22:22
15       THE WITNESS:  Yes.                  08:22:40
16 BY MR. CARTER:                          08:22:41
17    Q.  Was part of Mr. Zhang's role to assist with   08:22:42
18 searching those locations for relevant documents for   08:22:44
19 collection?                             08:22:47
20       MR. RUSHING:  Object to form.        08:22:49
21       MR. BIRKHAEUSER:  Objection.  Leading.   08:22:53
22       THE WITNESS:  Yes.                  08:23:05
23 BY MR. CARTER:                          08:23:05
24    Q.  Was part of Mr. Zhang's role to communicate   08:23:06
25 with Baker Botts regarding plaintiffs' information   08:23:10

Page 322

1  request in this litigation?             08:23:13
2        MR. RUSHING:  Object to form.        08:23:17
3        MR. BIRKHAEUSER:  Objection.  Leading.   08:23:19
4        THE WITNESS:  Yes, he was the only contact   08:23:43
5  person that we assigned to communicate with Baker Botts.   08:23:45
6  BY MR. CARTER:                          08:23:45
7     Q.  Was part of Mr. Zhang's role to gather   08:23:51
8  information to respond to plaintiffs' information   08:23:54
9  requests and provide that information to Baker Botts?   08:23:56
10       MR. BIRKHAEUSER:  Leading.           08:24:07
11       THE WITNESS:  Yes.                  08:24:30
12 BY MR. CARTER:                          08:24:31
13    Q.  And did you, Mr. Yan, authorize Mr. Zhang to   08:24:31
14 undertake all the roles that I just listed?   08:24:34
15       MR. RUSHING:  Object to form.        08:24:38
16       THE WITNESS:  Yes.                  08:24:47
17 BY MR. CARTER:                          08:24:51
18    Q.  Mr. Yan, do you recall being asked some   08:24:56
19 questions about Mr. Su Xiaohua what yesterday?   08:24:58
20    A.  Yes.                             08:25:09
21    Q.  You testified you thought he might be   08:25:09
22 reluctant to testify because of a Chinese cultural   08:25:11
23 notion that participation in lawsuits is not honorable.   08:25:15
24       Did I get that right?               08:25:20
25       MR. RUSHING:  Objection.  Asked and answered.   08:25:21

Page 323

1        THE WITNESS:  Yes.                  08:25:41
2  BY MR. CARTER:                          08:25:41
3     Q.  To your knowledge, was Mr. Su also concerned   08:25:44
4  about the COVID-19 pandemic and required COVID-19   08:25:47
5  quarantines for travel outside Mainland China?   08:25:51
6        MR. RUSHING:  Objection to form.  Lacks   08:25:54
7  foundation.                             08:25:56
8        MR. BIRKHAEUSER:  Objection.  Very, very   08:25:56
9  leading.                                08:25:57
10       THE WITNESS:  Yes, like me, I'm also very   08:26:24
11 concerned.                              08:26:27
12 BY MR. CARTER:                          08:26:27
13    Q.  Mr. Yan, going back to your work history, when   08:26:30
14 you were working in the Irico Group Enterprise   08:26:35
15 Management Department, did you have an understanding of   08:26:40
16 the corporate structure of Irico Group?  08:26:42
17       And by that, I mean the subsidiary and   08:26:45
18 affiliate companies that reported up to Irico Group.   08:26:48
19       MR. RUSHING:  Object to form.        08:26:51
20       THE WITNESS:  Yes.                  08:27:13
21 BY MR. CARTER:                          08:27:13
22    Q.  Was it important for your job in the Irico   08:27:15
23 Group Enterprise Management Department to have a good   08:27:21
24 understanding of Irico Group's corporate structure?   08:27:22
25       MR. RUSHING:  Object to form.  Lacks   08:27:27

Page 324

5 (Pages 321 - 324)

**Page 397**

1  very difficult circumstances and we appreciate that.   12:49:30
2      MS. CAPURRO:  I'll second that motion.   12:49:53
3      MS. YANG:  Yes, thank you very much.   12:49:53
4      THE VIDEOGRAPHER:  We are now going off the   12:49:58
5  record.  The time is 12:50.   12:49:59
6      (The deposition concluded at 12:50 p.m.,
7      China Standard Time.)
8          --oOo--
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 399**

1  STATE OF CALIFORNIA      )
2  COUNTY OF SANTA BARBARA  )  ss.
3
4      I, Mark McClure, C.S.R. No. 12203, in and for
5  the State of California, do hereby certify:
6      That prior to being examined, the witness
7  named in the foregoing deposition was by me duly sworn
8  to testify to the truth, the whole truth, and nothing
9  but the truth;
10      That said deposition was taken down by me in
11  shorthand at the time and place therein named and
12  thereafter reduced to typewriting under my direction,
13  and the same is a true, correct, and complete transcript
14  of said proceedings;
15      That if the foregoing pertains to the original
16  transcript of a deposition in a Federal Case, before
17  completion of the proceedings, review of the transcript
18  { } was { X } was not required.
19      I further certify that I am not interested in
20  the event of the action.
21      Witness my hand this 13th day of October, 2022.
22
23
24      Certified Shorthand Reporter
        State of California
25      CSR No. 12203

**Page 398**

1      DEPONENT'S DECLARATION
2
3      I, YAN YUNLONG, hereby declare:
4      I have read the foregoing deposition
5  transcript and identify it as my own and approve same.
6      I declare under penalty of perjury under the
7  laws of the State of California that the foregoing
8  testimony is true and correct.
9      Dated this _____ day of _____, 2022,
10  at _____, California.
11
12
13  _____
14  YAN YUNLONG
15
16
17
18
19
20
21
22
23
24
25

**Page 400**

1  THOMAS E. CARTER, ESQ.
2  TOM.CARTER@BAKERBOTTS.COM
3      OCTOBER 13, 2022
4  RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION
5  SEPTEMBER 28, 2022, YAN YUNLONG, VOL. III, JOB NO. 5436477
6  The above-referenced transcript has been
7  completed by Veritext Legal Solutions and
8  review of the transcript is being handled as follows:
9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10     to schedule a time to review the original transcript at
11     a Veritext office.
12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13     Transcript - The witness should review the transcript and
14     make any necessary corrections on the errata pages included
15     below, notating the page and line number of the corrections.
16     The witness should then sign and date the errata and penalty
17     of perjury pages and return the completed pages to all
18     appearing counsel within the period of time determined at
19     the deposition or provided by the Code of Civil Procedure.
20  __ Waiving the CA Code of Civil Procedure per Stipulation of
21     Counsel - Original transcript to be released for signature
22     as determined at the deposition.
23  __ Signature Waived – Reading & Signature was waived at the
24     time of the deposition.
25

24 (Pages 397 - 400)

## CERTIFICATE OF DEPONENT

I, YAN YUNLONG, hereby certify that I have read the foregoing pages, numbered 309 through 402, of my deposition of testimony taken in these proceedings on Thursday, September 29, 2022, and, with the exception of the changes listed on the next page and/or corrections, if any, find them to be a true and accurate transcription thereof.

Signed:

Name:  Yan Yunlong

Date:  2022/1/11

1

**ERRATA SHEET**

Case Name:        In Re Cathode Ray Tube Antitrust Litigation

Witness Name:     Yan Yunlong

Date:             09/29/2022

| PAGE | LINE | NOW READS | SHOULD READ | REASON |
|------|------|-----------|-------------|--------|
| 329 | 3 | some necessarily intervention | some necessary intervention | Transcription error |
| 381 | 1 | CNEIEC | CNEIECC | Transcription error |
| 381 | 11 | CNEIEC | CNEIECC | Transcription error |
| 381 | 14 | CNEIEC | CNEIECC | Transcription error |
| 382 | 3 | CNEIEC | CNEIECC | Transcription error |
| 382 | 6 | CNEIEC | CNEIECC | Transcription error |
| 384 | 9 | CNEIEC | CNEIECC | Transcription error |

Subscribed and sworn to before me this  11  th day of November, 2022.

YAN YUNLONG

# EXHIBIT 12

```
 1                 UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                      OAKLAND DIVISION

 4

 5   IN RE: CATHODE RAY TUBE (CRT) ) MASTER FILE NO.

     ANTITRUST LITIGATION         ) CV-07-5944 JST

 6   _____)

                                   )

 7   THIS DOCUMENT RELATES TO:     )

                                   )

 8   ALL INDIRECT PURCHASER ACTIONS )

     ALL DIRECT PURCHASER ACTIONS   )

 9                                   )

                DEFENDANTS.          )

10   _____)

11

12

13

14

15          VIDEOTAPED DEPOSITION OF YAN YUNLONG

16                      VOLUME II

17            WEDNESDAY, SEPTEMBER 28, 2022

18                 MACAU S.A.R., CHINA

19

20

21

22   FILE NO.  SF 5436476

23   REPORTED BY  MARK McCLURE, CRR

24            CAL CSR 12203

25
```

                                              Page 150

```
 1        MR. RUSHING:  Okay.  We can go off the record.    12:11
 2  We are going to reboot -- the thing is going to reboot   12:11
 3  again at 10:15 so let's come back at 10:20, okay?  Does   12:11
 4  that make sense, Mr. Carter?                             12:11
 5        MR. CARTER:  It may depend how much you have       12:12
 6  left because we are getting to the time of Mr. Yan's     12:12
 7  lunch break.                                             12:12
 8        MR. RUSHING:  Oh, we're going to lunch.            12:12
 9        MR. CARTER:  So you're talking about 10:20         12:12
10  Pacific would be 1:20 Eastern.  That works.              12:12
11        MR. RUSHING:  I'm just saying we will go for a     12:12
12  little more than an hour because I know the witness      12:12
13  would like a little more time to eat his lunch, and that 12:12
14  will hopefully avoid the usual evening kerfuffle about   12:12
15  the reboot of our machine so the virus software can run. 12:12
16        MR. CARTER:  It works for me.                      12:12
17        THE WITNESS:  Yes, that works for me.              12:12
18        MR. RUSHING:  Okay.  So we'll see you in an        12:12
19  hour and eight minutes.                                  12:12
20        THE WITNESS:  Okay.                                12:13
21        THE VIDEOGRAPHER:  We are off the record.          12:13
22  It's 12:12 p.m.                                          12:13
23        (The lunch recess was taken.)                      12:13
24        THE VIDEOGRAPHER:  We are back on the record.      13:25
25  It's 1:24 p.m.                                           13:25
                                                        Page 227
```

```
 1  BY MR. RUSHING:                                          13:25
 2     Q.  Mr. Yan, can you hear me?                         13:25
 3     A.  Yes.                                              13:25
 4     Q.  Okay.  Mr. Yan, do you know Mr. Su Xiaohua?       13:25
 5     A.  Yes.                                              13:26
 6     Q.  How do you know him?                              13:26
 7     A.  I think we met at work and it was quite early     13:26
 8  on.                                                      13:26
 9     Q.  When you say "early on," do you mean years        13:26
10  ago?                                                     13:26
11     A.  Yes.                                              13:26
12     Q.  Do you remember the first time you met him?       13:26
13     A.  I don't remember.                                 13:27
14     Q.  Did you ever work with Mr. Su?                    13:27
15        MR. CARTER:  Object to form.                       13:27
16        THE WITNESS:  No.                                  13:27
17  BY MR. RUSHING:                                          13:27
18     Q.  Were you ever in the same department where he     13:27
19  was?                                                     13:27
20     A.  No.                                               13:27
21     Q.  Now, you recall that Mr. Su was going to be --    13:27
22  had agreed to testify in this matter, is that correct?   13:27
23        MR. CARTER:  Object to form.                       13:27
24        THE WITNESS:  Yes.                                 13:27
25                                                           13:27
                                                        Page 228
```

```
 1  BY MR. RUSHING:                                          13:27
 2     Q.  Did you talk to him about his intentions to       13:27
 3  testify in the case?                                     13:27
 4     A.  I think the talk was done by our director,        13:27
 5  Zhang Wenkai.  I did not speak with Mr. Su directly.     13:28
 6     Q.  Was it your understanding in April of this        13:28
 7  year that Mr. Su had agreed to testify in this matter,   13:28
 8  to travel to Macau and testify in this matter?           13:28
 9        MR. CARTER:  Object to form.                       13:28
10        THE WITNESS:  At that time, it was agreed that     13:28
11  he would travel to Hong Kong.                            13:29
12  BY MR. RUSHING:                                          13:29
13     Q.  And it was your understanding that Mr. Su had     13:29
14  agreed to do that, or was he expressing reservations?    13:29
15     A.  He was reluctant to agree to do that, and with    13:29
16  a lot of reservations.                                   13:29
17     Q.  And why -- what was your understanding of why     13:29
18  he was reluctant to agree to testify?                    13:29
19     A.  I think it was because of cultural background     13:30
20  and the traditions in Chinese society.  No one would     13:30
21  agree to get themselves involved in such a matter.  In   13:30
22  the minds of most Chinese people, it's actually not an   13:30
23  honorable thing to be involved in lawsuits.              13:30
24     Q.  So is it your testimony that in April of this     13:30
25  year -- I guess the question is, had he actually agreed  13:31
                                                        Page 229
```

```
 1  to testify in April, or was he still expressing          13:31
 2  reservations?                                            13:31
 3        MR. CARTER:  Object to form.                       13:31
 4        THE WITNESS:  He did not give a very               13:31
 5  straightforward "yes" or a consent to agree to           13:31
 6  testifying, but according to our understanding, he was   13:32
 7  reluctant even though -- but he still agreed to testify. 13:32
 8  BY MR. RUSHING:                                          13:32
 9     Q.  And then at some point, he informed you that      13:32
10  he would not agree to testify, is that correct?          13:32
11        When I say "you," I mean someone at Irico who      13:32
12  was involved in the scheduling of his deposition.        13:32
13        MR. CARTER:  Object to form.                       13:32
14  BY MR. RUSHING:                                          13:32
15     Q.  Strike that.  Let me re-ask the question.         13:32
16        And then at some time after April of this          13:32
17  year, did he inform Irico that he was unwilling to give  13:32
18  a deposition in the case?                                13:33
19     A.  At some point in April, he informed us that he    13:33
20  was going to leave Irico, and he told us that he was not 13:33
21  able to make time to be deposed in this case as a        13:33
22  witness.                                                 13:33
23        Also, he repeatedly emphasized that he himself     13:34
24  personally did not have anything to do with the CRT      13:34
25  antitrust litigation, and he did not have any            13:34
                                                        Page 230
```

21 (Pages 227 - 230)

1 understanding about the circumstances surrounding the    13:34
2 situation.    13:34
3    Q.   And then, did he, in fact -- strike that.    13:34
4         He did, in fact, leave Irico, is that correct?    13:34
5    A.   Yes.    13:34
6    Q.   And do you know where he is now?    13:34
7    A.   I heard that he's now working in a private    13:35
8 company in a city or town called Nanxun.  I'm not sure    13:35
9 if you know that place.    13:35
10        And I'm not sure if that's in Zhejiang or    13:35
11 Jiangsu province.    13:35
12    Q.   So he resigned from all Irico-related    13:35
13 companies, is that correct?    13:35
14    A.   Correct.    13:36
15    Q.   Do you know what the job transfer and    13:36
16 settlement group at IGE-Irico New Energy -- the office    13:36
17 for managing retirees and former employees at CNEIEC --    13:36
18 strike that.    13:36
19        Do you know what the job transfer and    13:36
20 settlement group at IGE-Irico New Energy is?    13:36
21         MR. CARTER:  Object to form.    13:36
22         MAIN INTERPRETER:  Counsel, do you mind    13:36
23 repeating that question for the interpreter?    13:36
24 BY MR. RUSHING:    13:36
25    Q.   Is there a company affiliated with Irico known    13:36

Page 231

1 labor employment system for enterprises in China.    13:40
2    Q.   How does it manage the people?  Does it pay    13:40
3 them a pension or do anything like that?    13:40
4         MR. CARTER:  Object to form.    13:40
5         THE WITNESS:  I'm not clear about the    13:41
6 specifics of the management.    13:41
7 BY MR. RUSHING:    13:41
8    Q.   Do you know if Mr. Su is entitled to any sort    13:41
9 of pension or retirement payments from Irico?    13:41
10    A.   He cannot be entitled to that.    13:41
11    Q.   Why is that?    13:41
12    A.   Mr. Su opted to join the country's labor    13:41
13 society insurance system, so all his pensions and    13:41
14 retirement payment would have to come from that social    13:42
15 system.    13:42
16    Q.   And Irico has no -- there's no -- strike that.    13:42
17        So Group -- strike that.    13:42
18        So there were no Irico companies that have any    13:42
19 responsibility for making any payment to Mr. Su or to    13:42
20 the labor society insurance system on behalf of Mr. Su,    13:42
21 is that correct?    13:42
22         MR. CARTER:  Object to form.    13:42
23         THE WITNESS:  That's correct.    13:43
24 BY MR. RUSHING:    13:43
25    Q.   Does Irico have a pension system for some of    13:43

Page 233

1 as the job transfer and settlement group, or similar    13:36
2 name?    13:36
3         MR. CARTER:  Object to form.    13:36
4         THE WITNESS:  I do not know.    13:37
5 BY MR. RUSHING:    13:37
6    Q.   Do you know what the office for managing    13:37
7 retirees and former employees at CNEIEC is?    13:37
8    A.   I don't know.    13:37
9    Q.   Is there a department or group that manages    13:37
10 retirees and former employees?    13:37
11         MR. CARTER:  Object to form.    13:38
12         THE WITNESS:  Are you talking about an    13:38
13 internal department at Irico Group or just any    13:38
14 department or division having that responsibility    13:38
15 generally in society?    13:38
16 BY MR. RUSHING:    13:38
17    Q.   I'm talking about something affiliated with    13:38
18 Irico Group, and I don't know if it's a department or a    13:38
19 division or a subsidiary of some sort.    13:38
20    A.   There is an Office for Retiree and Departing    13:39
21 Employees.  That's the name of the office under Irico    13:39
22 Group.    13:39
23    Q.   And what is the purpose of that office?    13:39
24    A.   It is to manage the people who have retired    13:39
25 prior to the implementation of the labor contract and    13:40

Page 232

1 its workers?    13:43
2         MR. CARTER:  Form.    13:43
3         THE WITNESS:  Regarding this question, it's    13:44
4 not easy to explain.  China adopted this labor social    13:44
5 insurance system in the 1990s, so retirees who are    13:44
6 gradually retiring since the implementation of that    13:44
7 social system would draw their pension from the social    13:44
8 insurance system.    13:44
9         But prior to the implementation of that system    13:44
10 before the 1990s, anyone who did not opt into that, any    13:44
11 social system, and who have retired from their    13:44
12 employment in enterprises would be managed by the    13:44
13 Retiree and Departing Employees' office.    13:44
14 BY MR. RUSHING:    13:44
15    Q.   Thank you.    13:45
16        Last week, Mr. Wang Zhaojie was deposed, as I    13:45
17 think you know, and he indicated that his office -- that    13:45
18 he worked in the same group as you and Mr. Zhang.    13:45
19        Is that correct?    13:45
20         MR. CARTER:  Object to form.    13:45
21         THE WITNESS:  I never worked with Mr. Wang,    13:46
22 Wang Zhaojie.    13:46
23 BY MR. RUSHING:    13:46
24    Q.   Are your offices nearby, presently?    13:46
25         MR. CARTER:  Object to form.    13:46

Page 234

22 (Pages 231 - 234)

```
 1        THE WITNESS:  No.                      13:46
 2 BY MR. RUSHING:                               13:46
 3    Q.  Well, we were asking Mr. -- strike that.  13:46
 4        Mr. Wang was asked when he met with anybody in  13:46
 5 preparation for his deposition, and he was having  13:46
 6 trouble because he said that he sometimes met you and  13:46
 7 Mr. Zhang while he was just walking around.   13:47
 8        Do you understand what he means by that?  13:47
 9        MR. CARTER:  Form.                      13:47
10        THE WITNESS:  He often goes to the     13:48
11 headquarters of the Group to attend meetings, so we will  13:48
12 meet during the meeting breaks or during the meetings,  13:48
13 and also, regarding the CRT antitrust litigation,  13:48
14 sometimes I would chat about the details and the issue  13:48
15 with him or try to understand some information from him.  13:48
16 We would also meet for that purpose.          13:48
17 BY MR. RUSHING:                               13:48
18    Q.  And Mr. Wang also said that he was -- strike  13:49
19 that.                                         13:49
20        And Mr. Wang also testified that there was  13:49
21 what he called a working team established at Irico and  13:49
22 that he was a member of that working team, and I believe  13:49
23 he was referring to the time period of since 2017.  13:49
24        Do you understand what he means by that?  13:49
25        MR. CARTER:  Object to form.           13:49
                                         Page 235
```

```
 1        THE WITNESS:  Yes, I do.  He was referring to  13:50
 2 the working task force, the working group that we formed  13:50
 3 in order to respond to the CRT antitrust litigation.  13:50
 4 BY MR. RUSHING:                               13:50
 5    Q.  Has Mr. Wang been on that -- so was Mr. Wang  13:50
 6 on the team in 2007-2008?                     13:50
 7        MR. CARTER:  Object to form.           13:50
 8        THE WITNESS:  No.                      13:50
 9 BY MR. RUSHING:                               13:50
10    Q.  When did Mr. Wang join the team?       13:50
11    A.  It was 2017, after the second round of  13:51
12 litigation started.                           13:51
13    Q.  And are you on that team as well?      13:51
14    A.  Yes.                                   13:51
15    Q.  Who else is on the team?               13:51
16    A.  There were at least two changes in terms of  13:51
17 the members on the team.  Right now, according to what I  13:52
18 remember, there are Mr. Zhang Wenkai and Ms. Guo  13:52
19 Xiaoyan, and Ms. Shang Ting, and Mr. Guo Quan and  13:52
20 Ms. Yang Hua.                                 13:52
21    Q.  And one of the -- am I correct to understand  13:52
22 that one of the things that the team is responsible for  13:52
23 is to collect and -- to collect documents for production  13:53
24 in this case after review by your attorneys, is that  13:53
25 correct?                                      13:53
                                         Page 236
```

```
 1        MR. CARTER:  Object to form.           13:53
 2        THE WITNESS:  Yes.                     13:53
 3 BY MR. RUSHING:                               13:53
 4    Q.  And am I correct to understand that a great  13:53
 5 deal -- a great many of the documents that have been  13:54
 6 produced in this case have come from Group's or  13:54
 7 Display's archives, is that correct?          13:54
 8        MR. CARTER:  Object to form.           13:54
 9        THE WITNESS:  All the documents would come  13:54
10 from either the Group or Irico Display Devices.  Other  13:55
11 than these two places, I think only very few documents  13:55
12 would have come from other places.            13:55
13 BY MR. RUSHING:                               13:55
14    Q.  Right.                                 13:55
15        But my question was about the archives.  13:55
16        Many of the documents come from Display's or  13:55
17 Group's archives, is that correct?            13:55
18    A.  A part of the documents came from the Group's  13:55
19 archives.                                     13:56
20    Q.  Okay.  Well, I think I understand what the  13:56
21 archives are, but I just want to make sure that my  13:56
22 understanding is correct, so hopefully this won't take  13:56
23 too long.  Maybe it will, but I'm going to try and speed  13:56
24 it up for you, Mr. Yan.                       13:56
25        It's my understanding -- strike that.  13:56
                                         Page 237
```

```
 1        Am I correct to understand that Chinese law  13:56
 2 and the ministry of finance and state archives  13:56
 3 administration require companies like Irico to maintain  13:56
 4 and preserve certain accounting records and other  13:56
 5 documents in an archive.                      13:56
 6        MR. CARTER:  Object to form.           13:56
 7        THE WITNESS:  We would keep and maintain all  13:57
 8 the financial records and other documents in our archive  13:58
 9 or archive room according to the rules and regulations  13:58
10 of the management of such records and documents by the  13:58
11 country.  We will strictly follow the nation's rules and  13:58
12 regulations in that regard.                   13:58
13 BY MR. RUSHING:                               13:58
14    Q.  And are there employees whose job it is to  13:58
15 collect and preserve those records and documents in  13:58
16 accordance with the law and company practice?  13:58
17    A.  Yes.                                   13:58
18    Q.  And does the law require original documents to  13:59
19 be preserved?                                 13:59
20    A.  That I'm not sure.  Sometimes, what we receive  13:59
21 as the original document, in our mind, may even be a  13:59
22 copy of that document as well.  But even so, we are  13:59
23 still required to keep such copies according to the  13:59
24 country's requirements and rules and regulations.  14:00
25    Q.  And do the rules and regulations of the  14:00
                                         Page 238
```

23 (Pages 235 - 238)

1 this report was written, to the best of your knowledge,   17:50
2 in 2005?                                                   17:50
3        MR. RUSHING:  Objection to form.  Lacks            17:50
4 foundation.                                                17:50
5        MR. BIRKHAEUSER:  Objection.  Leading.             17:50
6        THE WITNESS:  It was accurate.                     17:50
7 BY MR. CARTER:                                             17:50
8    Q.  That paragraph concludes with:  "At present,       17:50
9 Caihong Limited has formally handled the procedures        17:50
10 related to import and export business in the first half   17:50
11 of 2005, from then on Caihong Limited's import and         17:50
12 export business is completed independently by itself."    17:50
13       Do you see that?                                   17:50
14    A.  I see it.                                          17:50
15    Q.  Is this related to the restructuring of           17:51
16 Irico's import and export business that happened that      17:51
17 you discussed regarding the IPO of Irico Electronics?      17:51
18       MR. RUSHING:  Objection to the form.  Lacks        17:51
19 foundation.                                                17:51
20       MR. BIRKHAEUSER:  Objection.  Leading.             17:51
21       THE WITNESS:  Yes.  Yes.                           17:51
22       MR. CARTER:  Could we get the time on the          17:51
23 record, please.                                           17:52
24       THE VIDEOGRAPHER:  We are at seven hours and       17:52
25 seven minutes.                                            17:52

Page 307

---

1        MR. CARTER:  Okay.  Shall we adjourn here for      17:52
2 the day, Geoff?                                            17:52
3        MR. RUSHING:  Yes.                                 17:52
4        MR. CARTER:  All right.                            17:52
5        THE VIDEOGRAPHER:  We are off the record.          17:52
6 It's 5:51 p.m.                                             17:52
7    (The deposition concluded at 5:51 p.m.,
8    China Standard Time.)
9           --oOo--
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 308

---

1                DEPONENT'S DECLARATION
2
3        I, YAN YUNLONG, hereby declare:
4        I have read the foregoing deposition
5 transcript and identify it as my own and approve same.
6        I declare under penalty of perjury under the
7 laws of the State of California that the foregoing
8 testimony is true and correct.
9        Dated this _____ day of _____, 2022,
10 at _____, California.
11
12
13        _____
14    YAN YUNLONG
15
16
17
18
19
20
21
22
23
24
25

Page 309

---

1 STATE OF CALIFORNIA        )
2 COUNTY OF SANTA BARBARA  )  ss.
3
4        I, Mark McClure, C.S.R. No. 12203, in and for
5 the State of California, do hereby certify:
6        That prior to being examined, the witness
7 named in the foregoing deposition was by me duly sworn
8 to testify to the truth, the whole truth, and nothing
9 but the truth;
10        That said deposition was taken down by me in
11 shorthand at the time and place therein named and
12 thereafter reduced to typewriting under my direction,
13 and the same is a true, correct, and complete transcript
14 of said proceedings;
15        That if the foregoing pertains to the original
16 transcript of a deposition in a Federal Case, before
17 completion of the proceedings, review of the transcript
18 { } was {X} was not required.
19        I further certify that I am not interested in
20 the event of the action.
21        Witness my hand this 12th day of October,
22 2022.
23
24        Certified Shorthand Reporter
         State of California
25        CSR No. 12203

Page 310

41 (Pages 307 - 310)

## CERTIFICATE OF DEPONENT

I, YAN YUNLONG, hereby certify that I have read the foregoing pages, numbered 150 through 308, of my deposition of testimony taken in these proceedings on Wednesday, September 28, 2022, and, with the exception of the changes listed on the next page and/or corrections, if any, find them to be a true and accurate transcription thereof.

Signed:

Name:   Yan Yunlong

Date:   2022 11 11

**ERRATA SHEET**

Case Name:       In Re Cathode Ray Tube Antitrust Litigation

Witness Name:    Yan Yunlong

Date:            09/28/2022

| PAGE | LINE | NOW READS | SHOULD READ | REASON |
|------|------|-----------|-------------|--------|
| 180 | 23 | IRC-CRT-00000232 | IRI-CRT-00000232 | Transcription error |
| 181 | 13 | IRC-CRT-00000232 | IRI-CRT-00000232 | Transcription error |
| 182 | 11 | IRC-CRT-00000234 | IRI-CRT-00000234 | Transcription error |
| 218 | 6 | substance, if any, advice | substance of any advice | Transcription error |
| 222 | 2 | presenting my advices | presenting my advice | Transcription error |
| 225 | 19 | from the CNEIEC | from CNEIECC | Transcription error |
| 226 | 1 | sales department of CNEIEC | sales department of CNEIECC | Transcription error |
| 230 | 19 | At some point in April | At some point after April | Misspoken |
| 232 | 7 | employees at CNEIEC | employees at CNEIECC | Transcription error |
| 263 | 12 | IRC-CRT-00024837 | IRI-CRT-00024837 | Transcription error |
| 283 | 21 | MR. CARTER | MR. RUSHING | Transcription error |
| 285 | 7 | CNEIEC | CNEIECC | Transcription error |
| 299 | 18 | state-owned Assets Supervision and Administration Commission | State-Owned Assets Supervision and Administration Commission | Transcription error |

Subscribed and sworn to before me this _11_ th day of November, 2022.

_____

YAN YUNLONG

# EXHIBIT 13

```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                      OAKLAND DIVISION
 4
 5   IN RE: CATHODE RAY TUBE (CRT) ) MASTER FILE NO.
     ANTITRUST LITIGATION          ) CV-07-5944 JST
 6   _____)
                                    )
 7   THIS DOCUMENT RELATES TO:      )
                                    )
 8   ALL INDIRECT PURCHASER ACTIONS )
     ALL DIRECT PURCHASER ACTIONS   )
 9                                  )
              DEFENDANTS.           )
10   _____)
11
12
13
14
15          VIDEOTAPED DEPOSITION OF YAN YUNLONG
16                       VOLUME I
17              TUESDAY, SEPTEMBER 27, 2022
18                 MACAU S.A.R., CHINA
19
20
21
     FILE NO.  SF 5436473
22
     REPORTED BY  MARK McCLURE, CRR
23               CAL CSR 12203
24
25
                                              Page 1
```

1 BY MR. BIRKHAEUSER:                        13:42

2  Q.  How frequently would the legal department make    13:42

3 appearances in court on the company's behalf before   13:42

4 2011?                                        13:43

5  A.  Two to three lawsuits a year, approximately.   13:43

6  Q.  And under what conditions would the legal    13:43

7 department represent the company in court?    13:43

8  A.  When the legal relationship involved in the    13:43

9 case is clearer and the merits or facts of the case are   13:43

10 clearer, we would represent the company on our own in   13:44

11 order to save some money.                    13:44

12  Q.  Okay.  I'm looking again at your résumé, 8601.   13:44

13  A.  Okay.                                 13:44

14  Q.  So we just looked at the time period from 2011   13:44

15 to 2020 in which you were the deputy general counsel of   13:44

16 Irico Group, right?                          13:44

17  A.  Yes.                                  13:44

18  Q.  Then, I wonder if you can explain to me why,   13:44

19 at the same time, you were deputy director, Irico Group   13:44

20 administration and legal affairs department for 2013 to   13:45

21 2016, and director of Irico Group legal affairs   13:45

22 department from 2016 to present.             13:45

23  A.  At that time, in 2013, I was the deputy   13:45

24 director of the administration and legal affairs   13:45

25 department.                                 13:45

Page 90

1  Q.  Is it fair to say that these other two   13:46

2 positions were positions you held in addition to being   13:46

3 deputy general counsel?                      13:46

4  A.  It's not like that.  It was that my managerial   13:46

5 role was transferred from the Enterprise Management   13:46

6 Department to the Irico Group office, so I was actually   13:46

7 working, serving a position in the administration and   13:46

8 legal affairs department under the Group.    13:47

9  Q.  Okay.                                 13:47

10  A.  Let me say one thing.                  13:47

11      In 2013, it was the time when CEIEC performed   13:47

12 the major reorg of the Irico Group, so the job functions   13:47

13 and organizations within Irico were -- went through a   13:47

14 major change.                              13:47

15  Q.  When you say "CEIEC," did you mean China   13:48

16 National Electronics?                        13:48

17  A.  CEC.                                  13:48

18  Q.  What does CEC stand for?               13:48

19  A.  China Electronics Information Industry   13:48

20 Company.                                    13:48

21  Q.  Okay.  Getting back to your duties as deputy   13:48

22 director of Irico Group administration and legal affairs   13:48

23 department, did you perform job functions in that role   13:49

24 that were different than your role as general counsel to   13:49

25 Irico Group?                                13:49

Page 91

1  A.  No.                                   13:49

2  Q.  As general counsel of Irico Group, did you   13:49

3 provide advice to Irico's board of directors?    13:49

4  A.  Yes.                                  13:49

5  Q.  And during what time period did you provide   13:50

6 advice to Irico's board of directors?         13:50

7  A.  That question is too broad.            13:50

8  Q.  Can you give me your best estimate?    13:50

9  A.  For example, when the Group company announces   13:50

10 major external investment projects, it will have to go   13:51

11 under the review by the board of directors, and the   13:51

12 legal department would be asked to provide consultation   13:51

13 on those reviews to see if there are any legal risks   13:51

14 associated with the project.               13:51

15      And me working as the general counsel, I would   13:51

16 provide the legal advices or legal opinions to the board   13:51

17 of directors.                              13:51

18  Q.  Currently, as general counsel of Irico Group,   13:51

19 who do you report to?                        13:51

20  A.  As the general counsel, currently, I report to   13:51

21 our general manager.                         13:51

22  Q.  And who is your most immediate subordinate?    13:52

23  A.  You're talking about my subordinate, right?   13:52

24  Q.  Yes, I am.                            13:52

25  A.  It would be the deputy director in my legal   13:52

Page 92

1 affairs department.                          13:52

2  Q.  And who's the deputy director of the legal   13:52

3 affairs department currently?                13:52

4  A.  Wenkai Zhang.                          13:52

5  Q.  I'm going to ask you some questions about the   13:53

6 production of documents to the plaintiffs in the   13:53

7 litigation that brings us here today, the CRT antitrust   13:53

8 case.                                       13:53

9  A.  Okay.                                 13:53

10  Q.  First of all, I want to ask you about   13:53

11 documents that you yourself produced to the plaintiffs   13:53

12 personally.                                 13:53

13      MR. CARTER:  Object to form.          13:54

14 BY MR. BIRKHAEUSER:                          13:54

15  Q.  So did you ever search your own files to   13:54

16 locate documents to be produced to the plaintiffs in   13:54

17 this case?                                  13:54

18  A.  Yes.                                  13:54

19  Q.  Do you remember when you first searched your   13:54

20 files for documents to produce in this case?    13:54

21      MAIN INTERPRETER:  Interpreter needs a moment.   13:55

22      THE WITNESS:  It was when we were working on   13:55

23 the motion for state sovereignty immunity that we were   13:55

24 looking for documents for production.        13:55

25 BY MR. BIRKHAEUSER:                          13:55

Page 93

24 (Pages 90 - 93)

1   STATE OF CALIFORNIA       )

2   COUNTY OF SANTA BARBARA   )   ss.

3

4        I, Mark McClure, C.S.R. No. 12203, in and for

5   the State of California, do hereby certify:

6            That prior to being examined, the witness

7   named in the foregoing deposition was by me duly sworn

8   to testify to the truth, the whole truth, and nothing

9   but the truth;

10            That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter reduced to typewriting under my direction,

13   and the same is a true, correct, and complete transcript

14   of said proceedings;

15            That if the foregoing pertains to the original

16   transcript of a deposition in a Federal Case, before

17   completion of the proceedings, review of the transcript

18   { } was { } was not required.

19            I further certify that I am not interested in

20   the event of the action.

21            Witness my hand this 12 day of October,

22   2022.

23

24            Certified Shorthand Reporter
             State of California

25            CSR No. 12203

                                          Page 146

## CERTIFICATE OF DEPONENT

I, YAN YUNLONG, hereby certify that I have read the foregoing pages, numbered 1 through 149, of my deposition of testimony taken in these proceedings on Tuesday, September 27, 2022, and, with the exception of the changes listed on the next page and/or corrections, if any, find them to be a true and accurate transcription thereof.

Signed: _____

Name:   Yan Yunlong

Date:   2022.11.11

1

## ERRATA SHEET

Case Name:          In Re Cathode Ray Tube Antitrust Litigation

Witness Name:       Yan Yunlong

Date:               09/27/2022

| PAGE | LINE | NOW READS | SHOULD READ | REASON |
|------|------|-----------|-------------|--------|
| 41 | 16 | "The Economist" | "Economist" | Transcription error |
| 45 | 24 | Morrison Foster | Morrison Foerster | Transcription error |
| 58 | 7 | color display tube | color picture tube | Translation error |
| 65 | 11 | computers were often seen | computers were not often seen | Translation error |
| 88 | 10 | deputy general manager | deputy general counsel | Transcription error |
| 101 | 14 | IRC-CRT-00005995 | IRI-CRT-00005995 | Transcription error |
| 109 | 25 | in this cas | in this case | Transcription error |
| 113 | 20 | CEIEC | CNEIECC | Transcription error |
| 127 | 8 | the Group's efforts | the group efforts | Transcription error |
| 134 | 23 | Wang Ximen | Wang Ximin | Transcription error |
| 137 | 16 | paying attention to | pay attention to | Transcription error |

Subscribed and sworn to before me this _11_ th day of November, 2022.

_____

YAN YUNLONG

# EXHIBIT 14

**SAVERI & SAVERI, INC.**

706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

*Trump Alioto Trump & Prescott*

ATTORNEYS LLP
2280 Union Street
San Francisco, California 94123
(415) 563-7200
FAX (415) 346-0679

November 16, 2021

**VIA EMAIL**

Evan J. Werbel
Baker Botts LLP
700 K Street, N.W.
Washington, D.C. 20001
evan.werbel@bakerbotts.com

      Re:    <u>*In re Cathode Ray Tube (CRT) Antitrust Litigation*</u> – MDL No. 1917,
              <u>Master File No. 07-CV-5944-JST</u>

Dear Evan:

      We write in response to your November 2, 2021, letter regarding Plaintiffs'
depositions of current and former Irico employees, and to request a meet and confer
conference to discuss a number of related issues.

      First, in light of the parties' disagreement over the location of the depositions,
Plaintiffs intend to contact Judge Walker to resolve the matter in accordance with section
VI of the Order re Discovery and Case Management Protocol (ECF No. 1128) ("Disputes
that cannot be resolved through the meet and confer process shall be decided on an
expedited basis by the Special Master through a telephonic hearing with no briefing
unless ordered.").

      Second, your November 2 letter indicates that you are willing to produce Messrs.
Wang and Su (via videoconference from Hong Kong). Irrespective of location, you did
not, however, state when you would be able to do so. Please provide additional
information about the availability of Messrs. Wang and Su for depositions at your earliest
convenience.

      Third, please provide an update on the expected completion of Irico's document
productions, including the timing and future volume. This information is relevant to the
timing of the depositions.

      Fourth, in our August 26, 2021, letter we asked you to "provide the names and
availability of . . . any individuals to be offered at trial." Inasmuch as you have not

Evan J. Werbel
11/16/2021
Page 2

responded, we understand that you do not intend call anyone else at trial. Please notify us immediately if this is not correct.

Fifth, you state that Messrs. Chen, Si and Li have "no knowledge of the facts relevant to the allegations in your complaint." However, Mr. Li, as a plant manager during the class period, will likely have information relating to production cuts and inventory levels, among other relevant facts. We also understand that Mr. Si may have been a director of Irico Display and Irico Group Electronics during the class period. Both Mr. Si and Mr. Chen may have information about the facts relevant to the alleged conspiracy both stemming from their roles at their previous companies and their roles in managing the defendant Irico companies after the class period. Moreover, all three will undoubtably have information that will *lead* to the discovery of admissible evidence.

Sixth, Plaintiffs would like to meet and confer regarding the current availability of former employees.

Please let us know your availability later this week or early next week to meet and confer.

Thank you.

Very truly yours,

*/s/ R. Alexander Saveri*
R. Alexander Saveri
Lead Counsel for the Direct Purchaser Plaintiffs

*/s/ Lauren C. Capurro*
Lauren C. Capurro
Lead Counsel for the Indirect Purchaser Plaintiffs

Cc:   John M. Taladay
      Thomas E. Carter
      Andrew L. Lucarelli
      Kaylee Yang
      Geoffrey C. Rushing
      Matthew D. Heaphy
      Mario N. Alioto
      Daniel E. Birkhaeuser

crt.762

# EXHIBIT 15

# BAKER BOTTS LLP

700 K STREET, NW
WASHINGTON, D.C.
20001-5736

TEL  +1 202.639.7700
FAX  +1 202.639.7890
BakerBotts.com

AUSTIN
BRUSSELS
DALLAS
DUBAI
HONG KONG
HOUSTON
LONDON

MOSCOW
NEW YORK
PALO ALTO
RIYADH
SAN FRANCISCO
**WASHINGTON**

November 18, 2021

Evan Werbel
TEL: 202.639.1323
FAX: 202.585.4077
evan.werbel@bakerbotts.com

VIA E-MAIL (RICK@SAVERI.COM,
LAURENRUSSELL@TATP.COM)

R. Alexander Saveri
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111

Lauren C. Capurro
Trump Alioto Trump & Prescott LLP
2280 Union Street
San Francisco, CA 94123

   Re: In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Master File
     No. 07-CV-944-JST

Dear Rick and Lauren:

   I write in response to your November 16, 2021 letter ("Nov. 16 Letter") regarding depositions. We agree that most of the issues raised in your letter are best addressed in a meet and confer. We are available anytime on Tuesday, November 23, 2021 from 1:00 to 5:00 eastern. Please let us know what times work for Plaintiffs. Below we address some of the issues raised in your letter to facilitate our discussions.

   First, Irico has no objection to involving Judge Walker in the ongoing disagreement regarding the location of the depositions.

   Second, Irico is working with Messrs. Wang Zhaojie and Su Xiaohua regarding their availability for depositions and will provide dates as soon as possible. The everchanging COVID-19 crisis is delaying the finalization of these issues.

   Third, in terms of Irico's responses to outstanding Requests for Production, Irico has completed its search and production of materials from its archives. Irico is now working on collecting and producing  responsive personnel records and is hoping to produce that information by the end of the month. Irico is also finalizing issues related to its production of sales summaries and/or records. We hope to have those issues resolved this month as well. Finally, Irico is still awaiting a response from Plaintiffs regarding the need to produce certain financial records discussed in our letters of October 11, 2021 and October 22, 2021.

Active 68979760.1

**BAKER BOTTS** LLP

R. Alexander Saveri                                    - 2 -                                    November 18, 2021
Lauren C. Capurro

Fourth, Irico has not made any final decisions regarding potential witnesses at trial. We are still in the discovery phase of this matter. Irico does not believe that it is under any obligation to provide a list of trial witnesses to Plaintiffs at this time.

Fifth, we continue to disagree with Plaintiffs' suggestion that the depositions of Messrs. Chen, Si and Li are warranted in this matter, especially given the severe burdens placed on anyone traveling for a deposition given the pandemic. Mr. Li is not alleged to have been involved in the allegations raised in the complaint. The burden of the mandated quarantine coupled with his health issues certainly outweigh any minimal information he may have from his role working in the CRT plant. Regarding Mr. Si, we are not aware of any information that he had any role at Irico prior to 2013, and Plaintiffs provide no support for their statement that he "may have been a director of Irico Display and Irico Group Electronics during the class period." Based on your statements in your Nov. 16 Letter, it is clear there is no legitimate basis for the depositions of Messrs. Si and Chen, and your position is at odds with the well settled law in this district prohibiting the "apex" depositions of senior management with no firsthand knowledge of events from the relevant time period. *See M.H. v. Cty. of Alameda*, Case No. 11-cv-02868-JST, 2013 WL 5297176, at *1-2 (N.D. Cal. Oct. 3, 2013) (Tigar, J.); *see also Affinity Labs of Tex. v. Apple, Inc.*, No. C 09-4436 CW (JL), 2011 WL 1753982, at *16-17 (N.D. Cal. May 9, 2011).

As mentioned, we are available to discuss all of these issues on Tuesday, November 23, 2021. Please let us know your availability.

Sincerely,


*/s/ Evan Werbel*
Evan Werbel


cc:     Geoffrey C. Rushing
        Matthew D. Heaphy
        Mario N. Alioto
        Daniel E. Birkhauser

Active 68979760.1

# EXHIBIT 16

# BAKER BOTTS LLP

700 K STREET, NW
WASHINGTON, D.C.
20001-5736

TEL  +1 202.639.7700
FAX  +1 202.639.7890
BakerBotts.com

AUSTIN
BRUSSELS
DALLAS
DUBAI
HONG KONG
HOUSTON
LONDON

MOSCOW
NEW YORK
PALO ALTO
RIYADH
SAN FRANCISCO
**WASHINGTON**

December 3, 2021

Evan Werbel
TEL: 202.639.1323
FAX: 202.585.4077
evan.werbel@bakerbotts.com

VIA E-MAIL (RICK@SAVERI.COM,
LAURENRUSSELL@TATP.COM)

R. Alexander Saveri
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111

Lauren C. Capurro
Trump Alioto Trump & Prescott LLP
2280 Union Street
San Francisco, CA 94123

Re:   In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Master File
No. 07-CV-944-JST

Dear Rick and Lauren:

I write to follow-up on our ongoing discussions regarding the scheduling of depositions for Mr. Wang Zhaojie and Mr. Su Xiaohua.  As we have told you previously, Irico is prepared to offer these witnesses for depositions and both have agreed to be deposed in this matter. However, there are a number of issues involving the COVID-19 pandemic and Chinese law that are significantly complicating our efforts to schedule these depositions.

As you know we had planned to offer these witnesses in Hong Kong for remote depositions in December.  Both Mr. Wong and Mr. Su remain willing to be deposed but are very concerned that travel may result in exposure to the coronavirus and about the severe quarantine requirements they would face.  With cases worldwide on the rise and the new threat from the Omicron variant, the risks of contracting the coronavirus are of increasing concern.[1]  Also, as discussed previously, Mr. Wang and Mr. Su will face quarantine periods of at least two- to four-weeks on their return to mainland China from Hong Kong.  Irico has been unable to convince

---

[1] Just this week, the Omicron variant was identified in Hong Kong. *See* https://www.scmp.com/news/hong-kong/health-environment/article/3157987/omicron-coronavirus-variant-could-greatly-reduce.

**BAKER BOTTS** LLP

R. Alexander Saveri                                    - 2 -                                    December 3, 2021
Lauren C. Capurro

either Mr. Wang or Mr. Su of their safety, so at this time we do not have a solution and do not anticipate being able to schedule these depositions in December or January.

As you know from our discussions, we have sought ways to produce the witnesses remotely from China, which would eliminate any travel risk. However, any depositions (including those conducted remotely) are prohibited in mainland China.[2] We therefore cannot lawfully propose that the depositions be conducted with the witnesses in China. As discussed on our last meet and confer call, if Plaintiffs have any authority that supports the lawful taking of depositions in mainland China, we welcome your input. Irico is also investigating whether it can obtain a waiver or exemption from the Chinese government to conduct the deposition, but it is not clear if or when such a waiver or exemption could be obtained. We understand that Plaintiffs' position is that Irico should force these employees to travel despite the legitimate health risks that they face, but we do not believe that is defensible given how courts have accommodated the health concerns of witnesses and lawyers during the pandemic.[3]

Given that Plaintiffs want to depose these witnesses and Irico wants to produce them but is unable to do so within the current discovery schedule, we recommend that all parties jointly approach the Court to ask for a discovery extension. We believe that a six-month discovery extension would give the parties the best chance to complete these depositions, which is what all parties want. In that time, we hope to be able to either produce the witnesses in Hong Kong or to identify a way of conducting the depositions remotely and lawfully from China. We are not proposing any changes to the current schedule for DPPs' class certification motion. Given the importance of the depositions to the factual record in the case, we propose that the agreement also should include pushing back the current IPP schedule by six months.

\*       \*       \*       \*

---

[2] *See, e.g.,* China Judicial Assistance Information ("China does **not** permit attorneys to take depositions in China for use in foreign courts" (emphasis in original)), available at https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/China.html; *see also* Order Regarding Consent Addendums to the Fact Witness Deposition Protocol at 3, *In re: Valstartan N-Nitrosodimethylamine (NDMA), Lostartan, and Irbesartan Products Liability Litigation*, Civil No. 19-2875 (D.N.J. Dec. 30, 2020), ECF No. 701; *Ji v. Jling, Inc.*, 2019 WL 1441130, at \*2, 4, and 6 (E.D.N.Y. Mar. 31, 2019).

[3] *See Brower v. McDonalds Corp.*, No. 2:19-cv-02099-GMN-BNW, 2021 WL 3573633, at \*2-3 (D. Nev. May 28, 2021) (holding that "even if certain persons are fully vaccinated, travel still presents a risk of infection because McDonald's has no control over the conduct or vaccination status of third parties"); *see also Mosiman v. C & E Excavating, Inc.*, No. 3:19-CV-00451-DRL-MGG, 2021 WL 1100597, at \*2-4 (N.D. Ind. Mar. 23, 2021) (noting that "courts all around the country have found that the health concerns created by the COVID-19 pandemic are a legitimate reason to take a deposition by remote means").

**BAKER BOTTS** LLP

R. Alexander Saveri                                  - 3 -                            December 3, 2021
Lauren C. Capurro


       Please let us know whether Plaintiffs are amendable to our proposal by Tuesday, December 7.  We are also available to meet and confer on these issues on Monday or Tuesday as well.

       Sincerely,


       */s/ Evan Werbel*
       Evan Werbel


cc:    Geoffrey C. Rushing
       Matthew D. Heaphy
       Mario N. Alioto
       Daniel E. Birkhauser

# EXHIBIT 17



City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document "**IRI-SU-000129**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

_____
Dan McCourt

Sworn to before me this
May 25, 2023

_____
Signature, Notary Public



_____
Stamp, Notary Public

**LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS**
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE



CONFIDENTIAL                                                      IRI-SU-000129



CONFIDENTIAL

IRI-SU-000129

# EXHIBIT 18



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document "**IRI-SU-000130**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.



_____
Dan McCourt

Sworn to before me this
May 25, 2023

_____
Signature, Notary Public

_____
Stamp, Notary Public

**LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS**
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE



CONFIDENTIAL

IRI-SU-000130



**CONFIDENTIAL**

# EXHIBIT 19

# BAKER BOTTS LLP

| 700 K STREET, NW | AUSTIN | MOSCOW |
| WASHINGTON, D.C. | BRUSSELS | NEW YORK |
| 20001-5736 | DALLAS | PALO ALTO |
| | DUBAI | RIYADH |
| TEL  +1 202.639.7700 | HOUSTON | SAN FRANCISCO |
| FAX  +1 202.639.7890 | LONDON | **WASHINGTON** |
| BakerBotts.com | | |

February 24, 2022

Evan Werbel
TEL: 202.639.1323
FAX: 202.585.4077
evan.werbel@bakerbotts.com

VIA E-MAIL (RICK@SAVERI.COM,
LAURENRUSSELL@TATP.COM)

R. Alexander Saveri
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111

Lauren C. Capurro
Trump Alioto Trump & Prescott LLP
2280 Union Street
San Francisco, CA 94123

      Re:    In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Master File
            No. 07-CV-944-JST

Dear Rick and Lauren:

      We received your letter today regarding outstanding issues, and we are working on our responses to the various items.  One pressing issue has arisen that we wanted to raise now.  Irico has informed us that Mr. Wang and Mr. Su have not been able to obtain the necessary visas to travel to Hong Kong for depositions in March.  The Covid numbers have been soaring in Hong Kong, as you have probably seen in recent press articles.  *See* Grace Tsoi, Hong Kong: What went wrong with its Covid plan?, BBC News (Feb. 23, 2022), https://www.bbc.com/news/world-asia-china-60474342.  Travel to Hong Kong has been curtailed, and the Customs Office has informed Irico that no visas can be issued to Irico employees for travel to Hong Kong at this time.  Unfortunately, these issues are beyond Irico's control, and there is nothing that Irico can do to change these circumstances.  Without the requisite visas, Mr. Wang and Mr. Su are not able to leave mainland China, and we do not believe the circumstances will change in the next few weeks based on the current Covid numbers in Hong Kong.

      Given the above, we propose that the parties agree to another extension of the relevant deadlines to allow for some reduction in the Covid numbers in Hong Kong.  We don't know exactly when travel will be allowed but believe that a three-month extension is appropriate at this time.  If Plaintiffs are agreeable to this extension, we propose filing a joint stipulation and proposed order with Judge Tigar extending all currently scheduled dates except for the remaining dates related to DPPs' Class Certification Motion.

Active 76314634.1

**BAKER BOTTS** LLP

R. Alexander Saveri                                    - 2 -                        February 24, 2022
Lauren C. Capurro


We are available to meet and confer if you would like to discuss these issues further.


Sincerely,


*/s/ Evan Werbel*
Evan Werbel


cc:     Geoffrey C. Rushing
        Matthew D. Heaphy
        Mario N. Alioto
        Daniel E. Birkhauser

# EXHIBIT 20

**BAKER BOTTS** LLP

700 K STREET, NW
WASHINGTON, D.C.
20001-5736

TEL  +1 202.639.7700
FAX  +1 202.639.7890
BakerBotts.com

AUSTIN
BRUSSELS
DALLAS
DUBAI
HOUSTON
LONDON

MOSCOW
NEW YORK
PALO ALTO
RIYADH
SAN FRANCISCO
**WASHINGTON**

March 15, 2022

Evan Werbel
TEL: 202.639.1323
FAX: 202.585.4077
evan.werbel@bakerbotts.com

VIA E-MAIL (RICK@SAVERI.COM,
LAURENRUSSELL@TATP.COM)

R. Alexander Saveri
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111

Lauren C. Capurro
Trump Alioto Trump & Prescott LLP
2280 Union Street
San Francisco, CA 94123

      Re:    In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Master File
              No. 07-CV-944-JST

Dear Rick and Lauren:

      As we have been discussing, the depositions of Mr. Wang Zhaojie and Mr. Su Xiaohua in
Hong Kong cannot occur as planned prior to March 18, 2022 due to the ongoing COVID-19
emergency situation in Hong Kong.  Irico has been working on alternate arrangements that will
allow Irico to produce Messrs. Wang and Su, as well as Mr. Yan Yunlong, for deposition.  Irico
believes that Macau is likely to be the best location for these depositions given the current
circumstances surrounding COVID in China.  Irico's goal, subject to obtaining the appropriate
visas from the Chinese government, is to produce the three witnesses in Macau by the end of
May.  Irico is currently working on submitting applications for travel to Macau to governmental
authorities, and we will provide you a further update in the next two weeks.

      In the meantime, Irico proposes that the parties stipulate to the removal of the current
March 18, 2022 deadline for the depositions in Hong Kong of Messrs. Wang and Su, given the
current circumstances in Hong Kong.  We are happy to provide a draft stipulation.

      We are available to meet and confer if you would like to discuss these issues further.

**BAKER BOTTS** LLP

R. Alexander Saveri                                    - 2 -                                    March 15, 2022
Lauren C. Capurro

<div style="margin-left:50%">

Sincerely,


*/s/ Evan Werbel*
Evan Werbel

</div>


cc:     Geoffrey C. Rushing
        Matthew D. Heaphy
        Mario N. Alioto
        Daniel E. Birkhauser

# EXHIBIT 21

**SAVERI & SAVERI, INC.**
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

*Trump Alioto Trump & Prescott*
ATTORNEYS LLP
2280 Union Street
San Francisco, California 94123
(415) 563-7200
FAX (415) 346-0679

April 26, 2022

***VIA EMAIL***

Evan J. Werbel
Baker Botts LLP
700 K Street, N.W.
Washington, D.C. 20001
evan.werbel@bakerbotts.com

      Re:    *In re Cathode Ray Tube (CRT) Antitrust Litigation* – MDL No. 1917,
                Master File No. 07-CV-5944-JST

Dear Evan:

    Following up on our call today, you provided the following updates regarding the scheduling, location and timing of the depositions of Su Xiaohua, Wang Zhaojie, and Yan Yunlong:

- Irico plans to produce the three witnesses in Macao for deposition by video.
- A law firm in Macao has issued invitation letters to the witnesses which have been finalized and sent. They are in a mail quarantine facility from which they are expected to be released by April 30.
- It will take 10-14 days for the visa applications to the processed, thus the earliest Irico would produce the witnesses is Monday, May 16. Your understanding is the visas provide permission for the witnesses to travel from China; the time frame for travel would begin upon entry in Macao.
- Irico's current plan is to produce one witness per week, beginning with Mr. Su, followed by Mr. Wang, and then Mr. Yan. Depending on when the visas are issued and other unknowns, it is likely that some of the deposition dates will occur in June. Please note that Plaintiffs will not proceed with the deposition of Mr. Yan until their motion to compel Irico to produce its litigation hold communications with its former counsel is resolved.
- It is possible that Irico's in-house counsel may accompany the witnesses to Macao.

Please supplement this information as soon as feasible if there any changes or updates.

Evan J. Werbel
4/26/2022
Page 2

   We also discussed the issue of entering into a stipulated remote deposition protocol. Plaintiffs will be prepared to discuss further on our next call.

   Lastly, the parties agreed to investigate issues such as the use of interpreters and videographers prior to our next call, likely early next week.

   Thank you.

        Very truly yours,


        */s/ Geoffrey C. Rushing*
        Geoffrey C. Rushing
        Lead Counsel for the Direct Purchaser Plaintiffs

        */s/ Lauren C. Capurro*
        Lauren C. Capurro
        Lead Counsel for the Indirect Purchaser Plaintiffs


Cc:  John M. Taladay
   Thomas E. Carter
   Andrew L. Lucarelli
   Kaylee Yang
   R. Alexander Saveri
   Matthew D. Heaphy
   Mario N. Alioto
   Daniel E. Birkhaeuser


crt.778

# EXHIBIT 22

**Matthew Heaphy**

| | |
|---|---|
| **From:** | Werbel, Evan <evan.werbel@bakerbotts.com> |
| **Sent:** | Wednesday, May 18, 2022 2:19 PM |
| **To:** | Matthew Heaphy |
| **Cc:** | Taladay, John; Carter, Tom; Lucarelli, Drew; Yang, Kaylee; Rick Saveri; Geoff Rushing; Mario Alioto; Lauren Russell; Dan Birkhaeuser |
| **Subject:** | RE: In re Cathode Ray Tube (CRT) Antitrust Litigation – MDL No. 1917, Master File No. 07-CV-5944-JST |

Matt, We wanted to give Plaintiffs the following update on the various issues related to the planned depositions raised in your below correspondence:

- Visas:  The process continues to move forward.  The last report that we received was that the client expects to receive the Visa approvals next week.  We will keep you posted on when they are received.  Once the visas and dates are finalized, the client will need to finalize travel and other related issues so will need a few days to get everything in order.  At this point, we think it is safe to plan for the first deposition to start the week of Memorial Day, but we hope to have more information on this in the coming days.
- Location:  At this time, we believe the witnesses will appear from their hotel rooms.
- Counsel:  In-house counsel will travel to Macau with most of the witnesses and will participate in the depositions.  We are reviewing the proposed deposition protocol that Dan circulated last night, and we can address how this will work logistically in that document.
- Translators:  All of the Irico witness will require translators.  Irico will pay for the translators per the Case Management Protocol.  We believe it will be most efficient to coordinate these services through the court reporter.
- Witness CVs:  To the extent not already provided, Irico will provide Plaintiffs with job histories for the witnesses.  For Mr. Su, please see a complete work history at IRI-CRT-00031561, which Plaintiffs have already translated as Ex. 26 of their MTC on Apex depositions.

We will provide additional updates as they become available.

Thanks,
Evan


**Evan J. Werbel**
Baker Botts L.L.P.
evan.werbel@bakerbotts.com
T - 202.639.1323
M - 202.744.0819

700 K Street, NW
Washington, DC  20001
USA

---

**From:** Werbel, Evan
**Sent:** Friday, May 13, 2022 2:29 PM
**To:** 'Matthew Heaphy' <mheaphy@saveri.com>
**Cc:** Taladay, John <john.taladay@bakerbotts.com>; Carter, Tom <Tom.Carter@BakerBotts.com>; Lucarelli, Drew <drew.lucarelli@bakerbotts.com>; Yang, Kaylee <kaylee.yang@bakerbotts.com>; 'Rick Saveri' <rick@saveri.com>; 'Geoff

Rushing' <geoff@saveri.com>; 'Mario Alioto' <MAlioto@TATP.com>; 'Lauren Russell' <LaurenRussell@TATP.com>; 'Dan Birkhaeuser' <dbirkhaeuser@bramsonplutzik.com>
**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litigation – MDL No. 1917, Master File No. 07-CV-5944-JST

Matt,  We are still working on confirming the issues raised in your recent letter.  In terms of the Visas, the process is moving forward, but, at this point, it does not appear that we will be ready to start depositions in Macau on May 23rd.  We hope to have some additional movement early next week and have a better idea of timing at that time.  We will keep you posted and also respond to the other issues in your letter as soon as we can.

Thanks and have a good weekend,
Evan

**Evan J. Werbel**
Baker Botts L.L.P.
evan.werbel@bakerbotts.com
T - 202.639.1323
M - 202.744.0819

700 K Street, NW
Washington, DC  20001
USA

---

**From:** Werbel, Evan
**Sent:** Thursday, May 12, 2022 3:57 PM
**To:** Matthew Heaphy <mheaphy@saveri.com>
**Cc:** Taladay, John <john.taladay@bakerbotts.com>; Carter, Tom <Tom.Carter@BakerBotts.com>; Lucarelli, Drew <drew.lucarelli@bakerbotts.com>; Yang, Kaylee <kaylee.yang@bakerbotts.com>; Rick Saveri <rick@saveri.com>; Geoff Rushing <geoff@saveri.com>; Mario Alioto <MAlioto@TATP.com>; Lauren Russell <LaurenRussell@TATP.com>; Dan Birkhaeuser <dbirkhaeuser@bramsonplutzik.com>
**Subject:** RE: In re Cathode Ray Tube (CRT) Antitrust Litigation – MDL No. 1917, Master File No. 07-CV-5944-JST

Matt, We will get updates from our client on what the current status is in China for the Visa applications and get back to you on the issues in your letter.

Evan

**Evan J. Werbel**
Baker Botts L.L.P.
evan.werbel@bakerbotts.com
T - 202.639.1323
M - 202.744.0819

700 K Street, NW
Washington, DC  20001
USA

---

**From:** Matthew Heaphy <mheaphy@saveri.com>
**Sent:** Wednesday, May 11, 2022 9:49 PM
**To:** Werbel, Evan <evan.werbel@bakerbotts.com>
**Cc:** Taladay, John <john.taladay@bakerbotts.com>; Carter, Tom <Tom.Carter@BakerBotts.com>; Lucarelli, Drew

<drew.lucarelli@bakerbotts.com>; Yang, Kaylee <kaylee.yang@bakerbotts.com>; Rick Saveri <rick@saveri.com>; Geoff Rushing <geoff@saveri.com>; Mario Alioto <MAlioto@TATP.com>; Lauren Russell <LaurenRussell@TATP.com>; Dan Birkhaeuser <dbirkhaeuser@bramsonplutzik.com>
**Subject:** In re Cathode Ray Tube (CRT) Antitrust Litigation – MDL No. 1917, Master File No. 07-CV-5944-JST

**[EXTERNAL EMAIL]**

Evan:

Please see the attached correspondence.

Best,
Matt

Matthew Heaphy
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111
mheaphy@saveri.com
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

**Confidentiality Notice:**

The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.

# EXHIBIT 23

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
        evan.werbel@bakerbotts.com
        tom.carter@bakerbotts.com
        drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 4:07-cv-05944-JST (N.D. Cal.) |
| | MDL No. 1917 |
| This Document Relates to: | **IRICO DEFENDANTS' SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DIRECT PURCHASER PLAINTIFFS' FIRST SET OF INTERROGATORIES** |
| ALL DIRECT PURCHASER ACTIONS | |

PROPOUNDING PARTY:      Direct Purchaser Plaintiffs

RESPONDING PARTIES:      Irico Group Corporation
                                        Irico Display Devices Co., Ltd.

SET NUMBER:      One

1       Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico

2 Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby provides these

3 supplemental responses to the Direct Purchaser Plaintiffs' ("Plaintiff") First Set of

4 Interrogatories, dated March 12, 2010 ("Interrogatories"). Irico reserves the right to amend or

5 supplement these Objections and Responses (the "Responses") to the extent allowed by the

6 Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the

7 United States District Court for the Northern District of California ("Local Rules"). Subject to

8 and without waiving any of Irico's General and Specific Objections as set forth below, Irico is

9 willing to meet and confer with Plaintiff regarding such General and Specific Objections.

10       The following Responses are made only for purposes of this case. The Responses are

11 subject to all objections as to relevance, materiality and admissibility, and to any and all

12 objections on any ground that would require exclusion of any response if it were introduced in

13 court. All evidentiary objections and grounds are expressly reserved.

14       These Responses are subject to the provisions of the Stipulated Protective Order issued by

15 the Court on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated

16 "Confidential" in accordance with the provisions of the Protective Order.

## GENERAL OBJECTIONS

18       Irico makes the following General Objections to Plaintiff's Interrogatories:

19       1.       Irico's Responses are based upon information available to and located by Irico as

20 of the date of service of these Responses. In responding to Plaintiff's Interrogatories, Irico states

21 that it has conducted, or will conduct, a diligent search, reasonable in scope, of those files and

22 records in its possession, custody, or control believed to likely contain information responsive to

23 Plaintiff's Interrogatories.

24       2.       No express, incidental, or implied admissions are intended by these Responses and

25 should not be read or construed as such.

26       3.       Irico does not intend, and its Responses should not be construed as, an agreement

27 or acquiescence with any characterization of fact, assumption, or conclusion of law contained in

28 or implied by the Interrogatories.

IRICO'S SECOND SUPP. OBJECTIONS AND     1     Master File No. 4:07-cv-05944-JST
RESPONSES TO DPP'S FIRST SET                         MDL No. 1917
INTERROGATORIES

4.       To the extent that Irico responds to Plaintiff's Interrogatories by stating that Irico will produce or make available for examination responsive information or documents, Irico does not represent that any such information or documents exist. Irico will make a good faith and reasonable attempt to ascertain whether information responsive to Plaintiff's Interrogatories exists and is properly producible, and will produce or make available for examination non-privileged responsive materials to the extent any are located during the course of a reasonable search.

5.       Irico objects to Plaintiff's Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and duplicative to the extent that they seek information or documents that are already in the possession, custody, or control of Plaintiff.

6.       Irico objects to Plaintiff's Interrogatories to the extent that they seek to impose obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

7.       Irico objects to Plaintiff's Interrogatories to the extent they seek information that is not relevant or disproportionate to the needs of the case.

8.       Irico objects to Plaintiff's Interrogatories to the extent that they are vague, ambiguous, or susceptible to more than one interpretation. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case. If Plaintiff subsequently asserts an interpretation of any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or amend its Responses.

9.       Irico objects to Plaintiff's Interrogatories to the extent that they contain terms that are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous Interrogatories so as to provide for the production of responsive information that is proportionate to the needs of the case.

10.      Irico objects to Plaintiff's Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work product doctrine, joint defense or common interest privilege, self-evaluative privilege, or any other applicable privilege or immunity. Irico will provide only information that it believes to be non-privileged and

1  otherwise properly discoverable. Nothing in Irico's responses is intended nor should be construed

2  as a waiver of any such privilege or immunity. The inadvertent or mistaken provision of any

3  information or responsive documents subject to any such doctrine, privilege, protection or

4  immunity from production shall not constitute a general, inadvertent, implicit, subject-matter,

5  separate, independent or other waiver of such doctrine, privilege, protection or immunity from

6  production.

7       11.     Irico objects to Plaintiff's Interrogatories to the extent that they call for

8  information that is not in the possession, custody, or control of Irico. Irico also objects to the

9  extent that any of Plaintiff's Interrogatories seek information from non-parties or third parties,

10  including but not limited to any of Irico's subsidiary or affiliated companies.

11       12.     Irico objects to Plaintiff's Interrogatories to the extent that responding would

12  require Irico to violate the privacy and/or confidentiality of a third party or confidentiality

13  agreement with a third party.

14       13.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information

15  that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily

16  available from other sources.

17       14.     Irico objects to Plaintiff's Interrogatories to the extent that they seek information

18  or documents concerning transactions outside the United States. Such Interrogatories are unduly

19  burdensome and irrelevant to this pending action as Plaintiffs' purported class definition is

20  confined to "all persons . . . who directly purchased a Cathode Ray Tube Product . . . in the

21  United States" (see Direct Purchaser Plaintiffs' Consolidated Amended Complaint dated March

22  16, 2009).

23       15.     Irico objects to Plaintiff's Interrogatories to the extent that compliance would

24  require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body

25  of foreign jurisdictions.

26       16.     Irico's responses, whether now or in the future, pursuant to Plaintiff's

27  Interrogatories should not be construed as either (i) a waiver of any of Irico's general or specific

28

IRICO'S SECOND SUPP. OBJECTIONS AND    3     Master File No. 4:07-cv-05944-JST
RESPONSES TO DPP'S FIRST SET                 MDL No. 1917
INTERROGATORIES

1   objections or (ii) an admission that such information or documents are either relevant or

2   admissible as evidence.

3       17.     Irico objects to Plaintiff's Interrogatories to the extent that they are compound

4   and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

5       18.     Irico objects to Plaintiff's Interrogatories to the extent that they state and/or call for

6   legal conclusions.

7       19.     Irico objects to the Interrogatories to the extent that they contain express or

8   implied assumptions of fact or law with respect to the matters at issue in this case.

9       20.     Irico objects to the Interrogatories to the extent they seek information or

10  documents that cannot be removed or transmitted outside China without violating the laws and

11  regulations of that country, including but not limited to restrictions on the transmission of state

12  secrets or trade secrets as those terms are defined under Chinese law.

13      21.     Irico reserves the right to assert additional General and Specific Objections as

14  appropriate to supplement these Responses.

15      These General Objections apply to each Interrogatory as though restated in full in the

16  responses thereto. The failure to mention any of the foregoing General Objections in the specific

17  responses set forth below shall not be deemed as a waiver of such objections or limitations.

18              **GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

19      1.      Irico objects to the definitions of "Defendant," "You," "Your," and "Yourself"

20  (Definition Nos. 1 and 3) to the extent that Plaintiff defines those terms to include the Irico's

21  "present or former employees, officers, directors, agents, predecessors, successors, parents,

22  subsidiaries, affiliates, joint ventures or any other person acting on their behalf." This definition is

23  overbroad, unduly burdensome, vague, and ambiguous. Irico also objects to the inclusion of all

24  "present or former employees, officers, directors, agents . . . or any other person acting on [the]

25  behalf [of]" Irico within this definition to the extent it purports to encompass information that is

26  protected by attorney-client privilege, work product protection or any other applicable doctrine,

27  privilege, protection or immunity or otherwise calls for a legal conclusion.

28      2.      Irico objects to the definition of "Document" (Definition No. 4) to the extent it

1    seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil

2    Procedure, the Local Rules, or any other applicable laws.

3            3.      Irico objects to the definition of "Employee" (Definition No. 5) on the grounds

4    that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly broad. Irico

5    further objects to this definition to the extent that it attempts to impose burdens on Irico beyond

6    those imposed by the Federal Rules of Civil Procedure. Irico further objects to this definition to

7    the extent that it seeks information protected by the attorney client or other applicable privilege,

8    attorney work product doctrine, or otherwise seeks to violate rights of privacy under U.S. or

9    foreign law.

10           4.      Irico objects to the definitions of "CRT" and "CRT Product" (Definition No. 6) on

11   the grounds that they are vague, ambiguous and overly broad. Irico further objects to the use of

12   the term "CRT Products" to the extent that it is inconsistent with the definition of "CRT

13   Products" as set forth in Plaintiff's pleadings.

14           5.      Irico objects to the definition of the "Relevant Time Period" (Definition No. 7) as

15   overbroad, unduly burdensome, and beyond the applicable statute of limitations.

16           6.      Irico objects to the definition of "Communication" (Definition No. 8) on the

17   grounds that it is vague, ambiguous, and overly broad. Irico further objects to this definition to the

18   extent that it attempts to impose burdens on Irico beyond those imposed by the Federal Rules of

19   Civil Procedure.

20           7.      Irico objects to the definition of "Meeting" (Definition No. 10) on the grounds that

21   the definition is overly broad, unduly burdensome, and seeks information that is neither relevant

22   nor proportionate to the needs of the case.

23           8.      Irico objects to Instruction No. 1 (related to identification of persons) to the extent

24   that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized

25   under the Federal Rules of Civil Procedure, including, without limiting the generality of the

26   foregoing, Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the

27   extent that it purports to impose burdens or obligations broader than, inconsistent with, or not

28   authorized under, the Local Rules and any orders of the Court, and on the grounds that it is vague,

ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the extent it seeks information that would disclose personal confidential information and/or violate any and all rights of privacy under the United States Constitution or Article I of the Constitution of the State of California, or any other applicable law or state constitution, or that is otherwise prohibited from disclosure because to do so would cause Irico to violate legal and/or contractual obligations to any other persons or entities.

9.      Irico objects to Instruction No. 2 (related to identification of an entity other than a natural person) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

10.     Irico objects to Instruction No. 3 (related to the production of business records in response to an interrogatory pursuant to Federal Rule of Civil Procedure 33(d)) on the grounds that it is unduly burdensome and purports to impose burdens and obligations upon Irico beyond those required by the Federal Rules of Civil Procedure or other applicable rule or Order of this Court.

## SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES
## INTERROGATORY NO. 4

Identify each actual or proposed agreement between You and any producer of CRT and/or CRT Products, including the named defendants in this coordinated proceeding, relating to prices, pricing, production or inventory levels of CRT and/or CRT Products during the relevant time period. Agreements shall include drafts. For every such actual or prosed agreement state:

(a)     the identity of the participants and all persons with knowledge thereof;

(b)     when such agreement was entered into;

(c)     where such agreement was entered into;

(d)     the terms of such agreement; and

(e)     when, how and which of your officers, directors or employees discovered the existence of such agreement.

**RESPONSE TO INTERROGATORY NO. 4**

Irico reasserts and incorporates each of the General Objections and Objections to the Definitions and Instructions set forth above.  Irico also objects that this interrogatory is duplicative and cumulative of other requests served on Irico, including during jurisdictional discovery.

Subject to and without waiving the objections stated above, Irico responds that it has already provided information responsive to this interrogatory to Plaintiff in its responses to jurisdictional discovery, including Irico's responses to Interrogatory No. 20 of Direct Purchaser Plaintiff Studio Spectrum, Inc.'s First Set of Interrogatories.  Irico will conduct a reasonable search for additional information responsive to this interrogatory, if any, and supplement its response as necessary.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4**

Irico reasserts and incorporates each of the General Objections, Objections to the Definitions and Instructions, and specific objections to Interrogatory No. 4 set forth above. Irico also objects to this interrogatory to the extent it purports to require Irico to respond beyond the scope of the modification to Interrogatory No. 4 removing CRT Products from the scope of this interrogatory, as stated in the February 5, 2021 letter from R. Alexander Saveri to John Taladay.

Subject to and without waiving the foregoing objections, Irico responds that, based on its present knowledge, neither Irico, nor any subsidiary or related entity thereof, reached any agreement with any producers of CRTs relating to prices, pricing, production or inventory levels of CRTs during the relevant time period.

Irico continues to conduct a reasonable search for information responsive to Interrogatory No. 4 as reflected in the March 31, 2021 Special Master's Order re DPPs' Motion to Compel Responses to Interrogatory Nos. 4 & 5, ECF No. 5919. To date that search has not identified agreements by Irico with producers of CRTs relating to prices, pricing, production or inventory levels of CRTs during the relevant time period. Irico's witness for jurisdictional discovery under Federal Rule of Civil Procedure 30(b)(6), Wang Zhaojie, categorically denied that Irico reached agreements with any producers of CRTs. *See* Wang Zhaojie Tr. at 60:18-21 (March 8, 2019) ("Q.

1   What is the basis for your testimony that Irico never reached an agreement with its competitors?

2   A. Well based on my understanding, we never reached any agreement with them."); *see also id*. at

3   60:3-10, 61:3-13, 68:16-69:14, 76:24-77:7; 90:10-25.

4        Irico's investigation into these issues continues and Irico will provide a supplemental

5   response by May 10, 2021 if it identifies additional responsive information.

6   **INTERROGATORY NO. 5**

7        Identify any meeting or communication between You and other producers of CRT and/or

8   CRT Products during the Relevant Time Period, including the named Defendants in this

9   coordinated proceeding, regarding CRT and/or CRT Product pricing, price increase

10   announcements, terms or conditions of sales, profit margins or market share, production levels,

11   inventory, customers, auctions, reverse auctions, dynamic bidding events, or sales, and for each

12   such meeting or communication:

13        (a)    provide the date and location of the meeting or communication;

14        (b)    identify the person(s) who initiated, called, organized, attended or participated in

15   the meeting or communication;

16        (c)    describe the subject matter discussed and any information you provided or

17   received;

18        (d)    describe every action taken by you as a result of the meeting or communication;

19   and

20        (e)    identify all persons with knowledge relating to the meeting or communication.

21   **RESPONSE TO INTERROGATORY NO. 5**

22        Irico reasserts and incorporates each of the General Objections and Objections to the

23   Definitions and Instructions set forth above.  Irico also objects that this interrogatory is

24   duplicative and cumulative of other requests served on Irico, including during jurisdictional

25   discovery.

26        Subject to and without waiving the objections stated above, Irico responds that it has

27   already provided information responsive to this interrogatory to Plaintiff in its responses to

28   jurisdictional discovery, including Irico's response to Request No. 10 of Direct Purchaser

IRICO'S SECOND SUPP. OBJECTIONS AND     8     Master File No. 4:07-cv-05944-JST
RESPONSES TO DPP'S FIRST SET     MDL No. 1917
INTERROGATORIES

1  Plaintiff Studio Spectrum, Inc's First Set of Requests for Production.  Irico will conduct a

2  reasonable search for additional information responsive to this interrogatory, if any, and

3  supplement its response as necessary.

4  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5**

5      Irico reasserts and incorporates each of the General Objections, Objections to the

6  Definitions and Instructions, and specific objections to Interrogatory No. 5 set forth above. Irico

7  also objects to this interrogatory to the extent it purports to require Irico to respond beyond the

8  scope of the modification to Interrogatory No. 5 removing CRT Products from the scope of this

9  interrogatory, as stated in the February 5, 2021 letter from R. Alexander Saveri to John Taladay.

10      Subject to and without waiving the foregoing objections, Irico states as follows: Wang

11  Zhaojie identifies the following meetings or communications with other producers of CRTs:

12      • November 6, 1998 meeting in Xi'an, People's Republic of China to discuss China

13          CDT market information attended by Wang Zhaojie.

14      • April 2, 1999 meeting in Nanjing, People's Republic of China to discuss China

15          CDT market information attended by Wang Zhaojie.

16      • April 6, 2000 meeting in Xiamen, People's Republic of China to discuss China

17          CDT market information attended by Wang Zhaojie.

18      • A meeting taking place on an unknown date at a SEG Hitachi factory in Shenzhen,

19          People's Republic of China, attended by Wang Zhaojie.

20      Wang Zhaojie believes that he may have attended additional meetings with other

21  producers of CRTs between 1998-2000, but he cannot recall the specifics of those meetings.

22  Such meetings may have occurred in Beijing and Changsha, People's Republic of China.  Wang

23  Zhaojie did not attend any meetings outside of China.  Wang Zhaojie believes he met with one or

24  more representatives of the following Chinese CRT producers: Shenzhen or Tianjin Samsung

25  SDI, Shanghai Yongxin, Changsha LG, Fuzhou Chunghwa, Beijing Matsushita, Shenzhen SEG

26  Hitachi, and/or Dongguan Fudi.  He could not recall the specific entities that participated in each

27  individual meeting.  Wang Zhaojie could not recall the names of the individual(s) from the

28  various entities who attended each meeting, but believes the various attendees included Wong

1  Lian (Changsha LG), Yang Guojun (Shenzhen SEG Hitachi), Li Mingzhi (either Shenzhen or

2  Tianjin Samsung SDI), and/or J.S. Lu (Fuzhou Chunghwa).  The subject matter of these

3  communications and meetings involved information on Chinese CRT issues and market

4  conditions.  Irico believes these meetings were largely connected to the China CPT Industry

5  Association.

6         In addition, Su Xiaohua, then the Deputy General Manager for Planning in the Irico Sales

7  Company, recalls attending an event, with an unknown Irico employee, hosted by Skyworth, a

8  Chinese television manufacturer and customer of Irico, at which he interacted with other CRT

9  manufacturers.  This event was organized by Skyworth and involved companies from throughout

10  Skyworth's supply chain, not just CRT manufacturers.  Irico is not aware of any discussions with

11  other CRT manufacturers at this meeting regarding pricing, price increase announcements, terms

12  or conditions of sales, profit margins or market share, production levels, inventory, other

13  customers, auctions, reverse auctions, dynamic bidding events, or sales.

14         Irico continues to conduct a reasonable search for information responsive to Interrogatory

15  No. 5 as reflected in the March 31, 2021 Special Master's Order re DPPs' Motion to Compel

16  Responses to Interrogatory Nos. 4 & 5, ECF No. 5919. Irico will provide an additional

17  supplemental response by May 10, 2021.

18

19

20  Dated:  May 3, 2021                          BAKER BOTTS L.L.P.

21

22                                              */s/ John M. Taladay*

23                                              John M. Taladay (*pro hac vice*)
                                                Evan J. Werbel (*pro hac vice*)
24                                              Thomas E. Carter (*pro hac vice*)
                                                Andrew L. Lucarelli (*pro hac vice*)
25                                              700 K Street, N.W.
                                                Washington, D.C. 20001
26                                              (202)-639-7700
                                                (202)-639-7890 (fax)
27                                              Email: john.taladay@bakerbotts.com
                                                       evan.werbel@bakerbotts.com
28                                                     tom.carter@bakerbotts.com

IRICO'S SECOND SUPP. OBJECTIONS AND          10          Master File No. 4:07-cv-05944-JST
RESPONSES TO DPP'S FIRST SET                             MDL No. 1917
INTERROGATORIES

drew.lucarelli@bakerbotts.com

Jonathan Shapiro (State Bar No. 257199)
101 California Street, Suite 3600
San Francisco, California 94111
(415) 291-6200
(415) 291-6300 (fax)
Email: jonathan.shapiro@bakerbotts.com


*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

1

<u>**CERTIFICATE OF SERVICE**</u>

2

**In re: Cathode Ray Tube (CRT) Antitrust Litigation - MDL No. 1917**

3

I declare that I am employed in Washington, District of Columbia.  I am over the age of

4

eighteen years and not a party to the within case; my business address is:  Baker Botts L.L.P., 700

5

K Street, N.W., Washington, D.C. 20001.

6

On May 3, 2021, I served the following document(s) described as:

7

**IRICO DEFENDANTS' SECOND SUPPLEMENTAL OBJECTIONS
AND RESPONSES TO DIRECT PURCHASER**

8

**PLAINTIFFS' FIRST SET OF INTERROGATORIES**

9

on the following interested parties in this action:

10

11

Guido Saveri (guido@saveri.com)                        Mario N. Alioto (malioto@tatp.com)
R. Alexander Saveri (rick@saveri.com)              Lauren C. Capurro (laurenrussell@tatp.com)

12

Geoffrey C. Rushing (grushing@saveri.com)     TRUMP ALIOTO TRUMP & PRESCOTT LLP
Matthew D. Heaphy (mheaphy@saveri.com)       2280 Union Street
SAVERI & SAVERI, INC.                                       San Francisco, CA 94123

13

706 Sansome St # 200
San Francisco, CA 94111

14

15

*Lead Counsel for the Direct Purchaser*            *Lead Counsel for the Indirect Purchaser*
*Plaintiffs*                                                               *Plaintiffs*

16

17

Joseph Goldberg (jg@fbdlaw.com)
FREEDMAN BOYD HOLLANDER

18

GOLDBERG URIAS & WARD P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102

19

D (505) 305-1263

20

*Counsel for the Indirect Purchaser*
*Plaintiffs*

21

22

[X]      (BY ELECTRONIC MAIL) I caused such documents to be sent to the persons at the
email addressed listed above.  I did not receive, within a reasonable time after the

23

transmission, any electronic message or other indication that the transmission was
unsuccessful.

24

I declare under penalty of perjury under the laws of the District of Columbia that the

25

foregoing is true and correct.  Executed on May 3, 2021, in Washington, D.C.

26

*/s/ Thomas E. Carter*

27

Thomas E. Carter

28

IRICO'S SECOND SUPP. OBJECTIONS AND           12            Master File No. 4:07-cv-05944-JST
RESPONSES TO DPP'S FIRST SET                                                             MDL No. 1917
INTERROGATORIES

# EXHIBIT 24

Page 1

1            IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
2                   San Francisco Division

3    - - - - - - - - - - - - - - - - - - -
     IN RE:                            )
4                                      )
     CATHODE RAY TUBE (CRT)            )Master File No.
5    ANTITRUST LITIGATION              )07-CV-5944-JST
                                       )
6                                      )MDL No. 1917
                                       )
7                                      )
                                       )
8    - - - - - - - - - - - - - - - - - - -

9                 DEPOSITION OF WANG ZHAOJIE

10                   HIGHLY CONFIDENTIAL

11                      VOLUME III

12              Friday, March 8th, 2019

13                  AT:  9.05 am

14                  Taken at:

15               Kobre & Kim
                 6/F ICBC Tower
16               3 Garden Road
                    Central
17               Hong Kong

18

19

20

21

22

23   Court Reporter:

24   Bron Williams
     Accredited Real-time Reporter

25

Page 66

1    A.  It was too long ago, I don't remember this
2  issue.
3   BY MS. CAPURRO:
4        Q.  In 1999, did Irico Group plan to manufacture
5  17-inch CDTs?
6        A.  It was too long ago, I don't remember.
7        Q.  Would this type of information, Irico's plan
8  to manufacture CDTs with Toshiba, would that information
9  have been public?
10       MR. PLUNKETT:  Object to the form.
11       A.  I don't know what you mean.  Public to who?
12  BY MR. PLUNKETT:
13       Q.  Would this type of information, Irico's plan
14  to manufacture CDTs with Toshiba, would that information
15  have been public?
16       MR. PLUNKETT:  Object to the form.
17       A.  When you say Irico, which Irico were you
18  referring to?
19  BY MS. CAPURRO:
20       Q.  Irico Group -- actually, strike that.
21  Irico Group or Irico Display.
22       A.  First of all, I'm not quite clear about this
23  issue.  Secondly, if such information were requested to be
24  public, then we would make it public.  Otherwise, if no
25  requirement, we probably would not make it public.

Page 67

1        Q.  Did you provide this information on behalf of
2  Irico Group at this meeting?
3        MR. PLUNKETT:  Object to the form, lacks
4  foundation.
5        A.  This kind of meeting is just a market
6  interaction meeting for the CDT industry in China.  If my
7  name is on this list, then yes, I did participate on this
8  meeting.  The objective is just exchange market information,
9  and I cannot remember the detail.
10       MS. FU:  I would like to make a minor correction.
11  "The objective is just to exchange market information.
12  I cannot remember what information was exchanged."
13  (Chinese spoken).
14       INTERPRETER:  Okay.  Yes.
15       A.  Yes, because it was too long ago, so I cannot
16  remember exactly what kind of information we have exchanged.
17  BY MS. CAPURRO:
18       Q.  Directing your attention to the bottom of the
19  page Bates stamped CHU00030736, the handwritten notes at the
20  end of that page.
21       A.  Which paragraph?  Yes, this paragraph at the
22  bottom?
23       Q.  At the very bottom of the page, the
24  handwritten notes.
25       A.  Yes, I saw it.

Page 68

1        Q.  Please read for me what that says, and
2  translator, I would ask you to translate how he reads it.
3        A.  It is very rough.
4        Q.  Strike that.  I'll read you the translation.
5        "At this meeting, because we spoke up strongly,
6  the unreasonable domestic sales price was seriously
7  reviewed.  15-inch is the main point in the future and
8  everyone agreed to go back to the export base price of US$65
9  and a price calculation coefficient for domestic sales of
10  10.4.  IRICO agreed to cooperate, which should be the key
11  point."
12       Do you see that?
13       A.  I saw this paragraph.  However the
14  handwritten, this is too rough.  So nevertheless, if the
15  translation is what you said, then it is what is there.
16       Q.  Did you agree to the price of 15-inch CDTs at
17  this meeting?
18       MR. PLUNKETT:  Object to the form, lacks
19  foundation.
20       A.  No.
21  BY MS. CAPURRO:
22       Q.  What is the basis for your testimony?
23       MR. PLUNKETT:  Object to the form.
24       A.  First of all, for this handwritten paragraph,
25  I don't know who wrote this.  Definitely this person is not

Page 69

1  from Irico.  Therefore, it only represents the person who
2  wrote this handwritten paragraph.  Secondly, the subject
3  said very clearly this is an exchange for the market in
4  China.  So we are not concerned about US price.  Thirdly,
5  back in 1999 my rank was very low, or relatively low.
6  Therefore I didn't have authority to sign any agreement with
7  them.
8        Q.  Mr. Wang, do you on behalf of Irico Group and
9  Irico Display have any evidence that Irico did not enter
10  into an agreement on 15-inch CDTs at this meeting?
11       MR. PLUNKETT:  Object to the form, lacks
12  foundation.  Calls for speculation.  Argumentative.
13       A.  It is impossible for Irico to sign any price
14  agreement with the competitors.
15       Q.  Does Irico have its own report regarding this
16  meeting?
17       MR. PLUNKETT:  Object to the form, lacks
18  foundation.
19       A.  It was too long ago, I don't remember.
20  BY MS. CAPURRO:
21       Q.  If Irico had its own report of this meeting,
22  it would have been produced to plaintiffs, correct?
23       MR. PLUNKETT:  Object to the form, lacks
24  foundation, beyond the scope.
25       A.  I feel like you cannot ask a question with an

Page 114

CERTIFICATE OF COURT REPORTER

I, Bron Williams, an Accredited Real-time Reporter, hereby
certify that the testimony of the witness Wang Zhaojie in
the foregoing transcript, numbered pages 1 through 115,
taken on this 8th day of March, 2018 was recorded by me in
machine shorthand and was thereafter transcribed by me; and
that the foregoing transcript is a true and accurate
verbatim record of the said testimony.


I further certify that I am not a relative, employee,
counsel or financially involved with any of the parties to
the within cause, nor am I an employee or relative of any
counsel for the parties, nor am I in any way interested in
the outcome of the within cause.


Signed:  *Bron Williams*

Name:    Bron Williams

Date:    .......................

---

Page 116

ERRATA SHEET

Case Name:      In Re Cathode Ray Tube Antitrust
Litigation

Witness Name:   WANG ZHAOJIE

Date:    03/08/2019

Page/Line           From                To

____/_____

____/_____

____/_____

____/_____

____/_____

____/_____

____/_____

____/_____

____/_____

____/_____

____/_____

____/_____

Subscribed and sworn to before

me this 8th day of March, 2019.


        _____

            Wang Zhaojie

---

Page 115

CERTIFICATE OF DEPONENT

I, Wang Zhaojie, hereby certify that I have read the
foregoing pages, numbered 1through 115, of my deposition of
testimony taken in these proceedings on Friday, March 8th,
2018 and, with the exception of the changes listed on the
next page and/or corrections, if any, find them to be a true
and accurate transcription thereof.


Signed:  .......................

Name:    Wang Zhaojie

Date:    .......................

## CERTIFICATE OF DEPONENT

I, WANG ZHAOJIE, hereby certify that I have read the foregoing pages, numbered 1 through 113, of my deposition of testimony taken in these proceedings on Friday, March 8, 2019 and, with the exception of the changes listed on the next page and/or corrections, if any, find them to be a true and accurate transcription thereof.

Signed:· _____

Name:· · Wang Zhaojie

Date:· · 2019. 4. 19

1

**ERRATA SHEET**

Case Name:      In Re Cathode Ray Tube Antitrust Litigation

Witness Name:    Wang Zhaojie

Date:             03/08/2019

| PAGE | LINE | NOW READS | SHOULD READ | REASON |
|------|------|-----------|-------------|--------|
|      |      |           |             |        |
|      |      |           |             |        |
|      |      |           |             |        |
|      |      |           |             |        |
|      |      |           |             |        |
|      |      |           |             |        |
|      |      |           |             |        |
|      |      |           |             |        |
|      |      |           |             |        |
|      |      |           |             |        |
|      |      |           |             |        |
|      |      |           |             |        |

Subscribed and sworn to before me this _19_th day of April, 2019.

WANG ZHAOJIE

Active 40061311.1

# EXHIBIT 25

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 OAKLAND DIVISION

4

5   IN RE: CATHODE RAY TUBE (CRT) ) MASTER FILE NO.
    ANTITRUST LITIGATION          ) CV-07-5944 JST
6   _____)
                                   )
7   THIS DOCUMENT RELATES TO:      )
                                   )
8   ALL INDIRECT PURCHASER ACTIONS )
    ALL DIRECT PURCHASER ACTIONS   )
9                                  )
             DEFENDANTS.           )
10  _____)

11

12

13

14

15         VIDEOTAPED DEPOSITION OF LI MIAO

16                  VOLUME II

17           WEDNESDAY, MARCH 8, 2023

18                  HONG KONG

19

20

21

22

23

       FILE NO.  SF 5759553
24

       REPORTED BY  MARK McCLURE, CRR
25               CAL CSR 12203

                              Page 124

THE WITNESS: I see the table and I can see the content in the table. 17:19:52 17:19:54
Regarding the understanding about this table, I heard from you, and that was your -- that was your understanding. I don't have further understanding other than what is indicated in the table. I personally feel that this table cannot address anything. 17:19:57 17:19:59 17:20:03 17:20:07 17:20:18
BY MR. RUSHING: 17:20:22
Q. And why do you feel that way? 17:20:22
A. I can give you a simple example. 17:20:24
For example, for my 20-inch production line, I can use it to manufacture FS and I can also use it to manufacture PF. If I reduce the production quantity for FS but I increase the production quantity for PF, regarding the FS, it is a reduction, but regarding the PF, it is actually an increased production. 17:21:36 17:21:39 17:21:44 17:21:49 17:21:54 17:21:59
Or another example is, my 21-inch line and my 15-inch line are compatible. If I reduce the quantity for the 21-inch line but I increase the quantity for the 15-inch line, that would be the same example as I addressed earlier. 17:22:06 17:22:10 17:22:14 17:22:17 17:22:21
So regarding the information reflected in this table, it's not sufficient to be relied upon to reach any conclusion. The author who wrote this table could write anything due to his personal preference and 17:22:23 17:22:25 17:22:32 17:22:38

judgment, and he could come to a conclusion based on his speculation of the industry. 17:22:41 17:22:47
But this table and information here does not have any meaning to be referenced to by any company in the industry or by the manufacturers in the industry. One would have to look at a lot of factors and do a comprehensive judgment and comprehension to come to a conclusion. 17:22:48 17:22:52 17:22:58 17:23:03 17:23:07 17:23:13
Q. You say you thought some of this was speculation, however, the document indicates that at least with regard to three of the manufacturers, the information that's contained in the chart was obtained from individuals who worked for the particular manufacturer, isn't that right? 17:23:30 17:23:33 17:23:35 17:23:45 17:23:48 17:23:55
MR. CARTER: Object to form. 17:23:56
THE WITNESS: I don't know what the source of the data was because I have never seen this document before. I cannot determine who wrote the document or what the data meant or what the intended purpose of writing this document was. 17:24:27 17:24:28 17:24:38 17:24:55 17:24:59
Q. Okay, thank you, Mr. Li. 17:25:20
Would you please open up Exhibit 8566 from the Marked Exhibits folder for today's session. And you should find a document entitled "Regular Marketing Meeting, Sales Company, June 13, 2005." And it is a 17:25:30 17:25:41 17:25:54 17:25:59

document Bates stamped No. CHU00123502 through 17. That's the Chinese language document, and there is an English translation attached thereto. 17:26:22 17:26:34 17:26:38
A. Is it Exhibit 8566, Document 26, a marketing meeting from June 2005, right. 17:27:17 17:27:23
Q. Yes. 17:27:29
For the record, I don't know how document No. 26 got into the name of the exhibit, but that's the number that I referred to it by with one of my colleagues. 17:27:34 17:27:36 17:27:41 17:27:45
So, Mr. Li, do you recognize this as a document prepared by the Irico Group Sales Company? 17:27:50 17:27:57
MR. CARTER: Objection. Lack of foundation. 17:28:26
THE WITNESS: I cannot tell. 17:28:32
BY MR. RUSHING: 17:28:32
Q. Have you ever seen any documents like this? 17:28:45
A. You're talking about a meeting minute for a marketing meeting, right? 17:28:48 17:29:03
Q. Yes. And I can -- 17:29:07
A. I don't have access -- I can't see the meeting minutes of marketing meetings. 17:29:14 17:29:18
Q. Well, I can represent to you that Irico has admitted in this litigation that it was the author -- or someone at Irico was the author of this document, and that it is, in fact, an Irico document. 17:29:24 17:29:36 17:29:40 17:29:47

Do you understand that? 17:29:50
MR. CARTER: Object to form. 17:29:51
THE WITNESS: I don't understand that, and nobody told me about that. 17:30:08 17:30:14
BY MR. RUSHING: 17:30:15
Q. Well, I'm telling you now. 17:30:15
A. Right, so I'm hearing it from you for the first time, but I still cannot make a judgment as to whether Irico created this document or not. I still cannot make that judgment. 17:30:37 17:30:39 17:30:43 17:30:47
Q. Okay, well, let's just see how this goes. 17:30:53
A. But there's a reason for me to determine that the possibility of this document to have come from Irico is small. That's not a very persuasive reason, but that's the reason that I have in mind. 17:31:25 17:31:29 17:31:33 17:31:39
I see that some of the Chinese characters in this article are in Traditional Chinese, and the possibility for the Irico people to write the Traditional Chinese characters in any articles of Irico is small. 17:32:08 17:32:11 17:32:16 17:32:22 17:32:25
Q. Did you say, Mr. Li, that the possibility for the Irico people to write the simplified Chinese characters in any articles of Irico is small? 17:32:38 17:32:41 17:32:44
MR. CARTER: Object to form. 17:32:50
THE WITNESS: The possibility of using 17:33:11

1 simplified Chinese characters is bigger. Usually, they   17:33:14
2 tend not to use Traditional Chinese characters in the   17:33:19
3 articles they write. That's seldom.   17:33:23
4 BY MR. RUSHING:   17:33:23
5   Q.  That's what I thought you meant.   17:33:28
6     So if you turn to the page 505, it's the   17:33:30
7 fourth page in my translation --   17:34:05
8   A.  Page 4, right?   17:34:22
9   Q.  Yes.   17:34:24
10   A.  What's the contents?   17:34:33
11   Q.  Well, I just want to point you to -- there's a   17:34:36
12 figure under subsection C towards the bottom of this   17:34:40
13 page, and then right above the figure there's a sentence   17:34:46
14 that says "However, the huge CPT inventory was shifted   17:34:51
15 to all CPT makers."   17:34:56
16     Do you see that sentence?   17:35:00
17     So the author of this document is again making   17:35:25
18 the point that there is an inventory problem in the CRT   17:35:29
19 business.   17:35:35
20     Is that the way you understand that?   17:35:36
21     MR. CARTER:  Object to form. Lack of   17:36:00
22 foundation.   17:36:04
23     THE WITNESS:  I don't see where you're   17:36:15
24 pointing me to. This is a long article.   17:36:17
25   17:36:17
                                          Page 160

1 BY MR. RUSHING:   17:36:17
2   Q.  It's on page 505, if you look at the bottom.   17:36:33
3     Ending in 505, right?   17:36:44
4   Q.  Yes.   17:36:46
5     And then there are two figures. It's the   17:36:50
6 second figure from the bottom and it's the line above   17:36:53
7 the second figure.   17:37:10
8     "However, the huge CPT inventory was shifted   17:37:23
9 to all CPT makers."   17:37:28
10   A.  When I tried to scroll the document downwards,   17:37:45
11 I couldn't do it. It's not scrolling. And it   17:37:48
12 disappeared when I tried to scroll it down. Now I'm on   17:37:58
13 the page ending in 505.   17:38:06
14   Q.  Okay.   17:38:10
15   A.  Can you point me to the sentence again,   17:38:18
16 please?   17:38:21
17   Q.  It's the line of text above -- strike that.   17:38:21
18     If you're counting from the bottom of the   17:38:26
19 page, there's two figures, and it's the line of text   17:38:30
20 directly above the second figure from the bottom.   17:38:39
21   A.  Can you repeat that line so we can make sure   17:39:01
22 that we are looking at the same part?   17:39:03
23   Q.  Yes. The first sentence in that line, I   17:39:10
24 believe, says "However, the huge CPT inventory was   17:39:12
25 shifted to all CPT makers."   17:39:16
                                          Page 161

1   A.  I see it.   17:39:33
2   Q.  Okay. Now, if you turn the page to the next   17:39:34
3 page, you will see another chart entitled "CPT Makers'   17:39:39
4 Production Suspension/Limitation Plans for June, 2005."   17:39:39
5     Do you see that?   17:40:02
6   A.  Yes.   17:40:04
7   Q.  And if you look at the first entry on that   17:40:23
8 chart, it's for Irico, and it shows -- well, do you see   17:40:26
9 the first entry?   17:40:31
10   A.  Yes.   17:40:32
11   Q.  It shows that Irico -- strike that   17:40:44
12     It shows, does it not -- or it says, does it   17:40:55
13 not, that Irico will be suspending or limiting its   17:40:58
14 production on the 21-inch FS line, which is no. 2, for a   17:41:04
15 full month, 30 days, and that the approximate volume   17:41:11
16 reduction as a result of that suspension is 350,000   17:41:18
17 pieces.   17:41:26
18     Do you see that?   17:41:26
19     MR. CARTER:  Object to form.   17:41:29
20     THE WITNESS:  I see that's what's written in   17:41:58
21 the table.   17:42:01
22 BY MR. RUSHING:   17:42:01
23   Q.  Do you see, under the column entitled   17:42:09
24 "Remarks," the reason apparently is market impact? Do   17:42:12
25 you see that?   17:42:17
                                          Page 162

1   A.  I see it.   17:42:18
2   Q.  So does it indicate to you that the purpose   17:42:31
3 for suspending production on that line is to reduce the   17:42:34
4 inventory of Irico in concert with the other   17:42:41
5 manufacturers' reductions in their own inventory in   17:42:44
6 order to increase the price of that CRT?   17:42:51
7     MR. CARTER:  Object to form. Lack of   17:42:55
8 foundation.   17:44:56
9     THE WITNESS:  You asked a few questions in   17:44:56
10 that question.   17:44:58
11     First of all, regarding the limited production   17:44:59
12 or the suspension of production, I am not sure if what's   17:45:04
13 reflected in the table and the document actually   17:45:12
14 happened. I don't recall it -- I don't recall that it   17:45:16
15 happened, although the information reflected in the   17:45:21
16 table says so.   17:45:24
17     Secondly, regarding the CRT prices, basically,   17:45:26
18 the prices are dropping all the way. There may be some   17:45:32
19 small bounce back within a short time. I remember it   17:45:36
20 happened. But I've never experienced the fact that the   17:45:41
21 prices of the CRT are going up continuously or are going   17:45:45
22 up steadily. I've never had that experience.   17:45:53
23     The third part was regarding the purpose of   17:45:56
24 doing this, and you said that doing this would have an   17:46:01
25 impact on the prices. Basically, I've not heard of that   17:46:05
                                          Page 163

                                          10 (Pages 160 - 163)

1 and I also have not experienced that.                17:46:09
2 BY MR. RUSHING:                                       17:46:09
3    Q.  So, Mr. Li, are you denying that this         17:46:29
4 production suspension occurred at Irico, as described in  17:46:34
5 this document?                                        17:46:41
6        MR. CARTER:  Object to form.                   17:46:42
7        THE WITNESS:  Your earlier question was asking 17:47:23
8 about the production suspension described in this     17:47:26
9 document, and that was for the 21-inch production.  I am  17:47:29
10 certain that it did not happen at Plant No. 1.  But as  17:47:34
11 to whether or not it happened in other manufacturers or  17:47:39
12 factories, I've not heard of that.                   17:47:42
13 BY MR. RUSHING:                                       17:47:51
14    Q.  Did Plant No. 1 manufacture 21-inch FS CRTs in  17:47:52
15 June of 2005?                                         17:48:02
16    A.  Plant No. 1 manufactured the 21-inch FS       17:48:03
17 product type.  It did manufacture that product type, but  17:48:34
18 as to what time frame it was doing so, I don't remember.  17:48:37
19    Q.  Was the 21-inch FS product manufactured at any  17:48:45
20 other Irico plant in June of 2005?                   17:48:54
21    A.  Yes.                                          17:48:59
22    Q.  And which plant was that also manufactured at?  17:49:14
23    A.  Plant No. 2 was the main factory that        17:49:18
24 manufactured the 21-inch FS product type.            17:49:34
25    Q.  Do you know whether this product -- production  17:49:52

Page 164

1 suspension occurred at the plant -- strike that.     17:49:56
2        Do you know whether the production suspension  17:49:59
3 described in Exhibit 8566 occurred at Plant No. 2?   17:50:01
4    A.  I don't know.                                  17:50:07
5    Q.  Is it your testimony that you never -- strike  17:50:22
6 that.                                                 17:50:22
7        Do you recall any discussion at or around     17:50:26
8 June 2005 of suspending production on any of Irico's CRT  17:50:30
9 lines?                                                17:50:38
10       MR. CARTER:  Object to form.                   17:50:49
11       THE WITNESS:  I didn't know and I don't have   17:51:02
12 any recollection in that regard.                     17:51:03
13 BY MR. RUSHING:                                       17:51:03
14    Q.  How often did you interact with people from   17:51:05
15 the sales department?                                 17:51:07
16    A.  Not much.  Not often.                         17:51:09
17    Q.  Because this document indicates that everyone,  17:51:20
18 or at least everyone who attended the regular market  17:51:27
19 meeting at Irico Sales Company, knew that Irico was  17:51:31
20 going to suspend production, along with all of the other  17:51:36
21 manufacturers in China, isn't that right?            17:51:41
22       MR. CARTER:  Object to form.                   17:51:45
23       THE WITNESS:  The people who attended the      17:52:35
24 regular marketing meetings would know about this, but I  17:52:37
25 myself did not know and I didn't hear about that.    17:52:42

Page 165

1        Also, it also talks about the fact that it    17:52:46
2 would do so -- Irico would do so with other CRT       17:52:49
3 manufacturers in the industry.  I haven't heard about  17:52:53
4 that either.                                          17:52:57
5        MR. RUSHING:  Okay, Mr. Carter, would you      17:53:05
6 confirm to Mr. Li that Irico agrees that this document  17:53:06
7 was authored by the Sales Company at Irico?          17:53:11
8        MR. CARTER:  Mr. Rushing, I'm familiar that   17:53:28
9 there's been some kind of representation made through  17:53:31
10 our discovery responses.  If you want me to make a   17:53:33
11 representation as to this specific document, I'd     17:53:37
12 probably need you to direct me to the discovery response  17:53:39
13 and give me some time to go look at that.            17:53:43
14       MR. RUSHING:  Well, let's see if we can do     17:53:45
15 that.  I need to go off the record now to move my car,  17:53:47
16 so should we reconvene in 20 minutes?                17:53:50
17       THE WITNESS:  Okay.                            17:54:18
18       THE VIDEOGRAPHER:  We are off the record at    17:54:19
19 9:54 a.m.                                            17:54:21
20       (A short recess was taken.)                    17:54:26
21       THE VIDEOGRAPHER:  We are back on the record   18:25:47
22 at 10:26 a.m.                                         18:26:03
23       MR. RUSHING:  Thank you.                       18:26:08
24       I would like to mark as next in line           18:26:15
25 Exhibit 8640.                                         18:26:22

Page 166

1        (Exhibit 8640 marked for identification.)     18:26:32
2 BY MR. RUSHING:                                       18:26:32
3    Q.  Mr. Li, you'll find that in the Marked        18:26:32
4 Exhibits section for today's deposition.             18:26:35
5        And Exhibit 8640 is a 29-page document         18:26:53
6 entitled "Irico Defendants' Objections and Responses to  18:27:02
7 Indirect Purchaser Plaintiffs' First Set of Requests for  18:27:09
8 Admission to Defendants Irico Group Corporation and  18:27:12
9 Irico Display Devices Co., Ltd."                      18:27:15
10       Mr. Li, do you have the document?             18:27:53
11    A.  I see the document, Exhibit 8640, but it's all  18:27:56
12 in English.                                           18:28:10
13    Q.  Yes, I'm sorry, there is no Chinese           18:28:11
14 translation.  But I think that we can manage without it.  18:28:13
15 I just wanted to point out, if you turn to page 13,  18:28:17
16 Request for Admission No. 4 asks:  "Admit that Irico  18:28:45
17 employees authored each of the following documents  18:28:49
18 (respond separately for each document)."             18:29:03
19       Then if you turn to page 14, you will see that  18:29:25
20 the Bates numbers following the letter L, which is in  18:29:33
21 line 7, match the Bates numbers of Exhibit 8566.     18:29:39
22       And then the response to the request, which is  18:30:12
23 found in line 12, on page 14, reads "Admit as to     18:30:15
24 requests 4A through 4O."                             18:30:22
25       So the effect of this admission is that Irico  18:30:48

Page 167

11 (Pages 164 - 167)

1 STATE OF CALIFORNIA      )
2 COUNTY OF SANTA BARBARA  )  ss.
3
4     I, Mark McClure, C.S.R. No. 12203, in and for the
5 State of California, do hereby certify:
6     That prior to being examined, the witness
7 named in the foregoing deposition was by me duly sworn
8 to testify to the truth, the whole truth, and nothing
9 but the truth;
10     That said deposition was taken down by me in
11 shorthand at the time and place therein named and
12 thereafter reduced to typewriting under my direction,
13 and the same is a true, correct, and complete transcript
14 of said proceedings;
15     That if the foregoing pertains to the original
16 transcript of a deposition in a Federal Case, before
17 completion of the proceedings, review of the transcript
18 { } was {x} was not required.
19     I further certify that I am not interested in
20 the event of the action.
21     Witness my hand this 21st day of March,
22 2023.
23
24     Certified Shorthand Reporter
       State of California
25     CSR No. 12203

Page 236

1 __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2   Transcript - The witness should review the transcript and
3   make any necessary corrections on the errata pages included
4   below, noting the page and line number of the corrections.
5   The witness should then sign and date the errata and penalty
6   of perjury pages and return the completed pages to all
7   appearing counsel within the period of time determined at
8   the deposition or provided by the Federal Rules.
9 _X_ Federal R&S Not Requested - Reading & Signature was not
10   requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 238

1 GEOFFREY RUSHING
2 GRUSHING@SAVERI.COM
3                March 21, 2023
4 RE: CRT Antitrust Litigation
5 3/7/23, LI MIAO, VOLUME II, JOB NO. 5759553
6 The above-referenced transcript has been
7 completed by Veritext Legal Solutions and
8 review of the transcript is being handled as follows:
9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10   to schedule a time to review the original transcript at
11   a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13   Transcript - The witness should review the transcript and
14   make any necessary corrections on the errata pages included
15   below, noting the page and line number of the corrections.
16   The witness should then sign and date the errata and penalty
17   of perjury pages and return the completed pages to all
18   appearing counsel within the period of time determined at
19   the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21   Counsel - Original transcript to be released for signature
22   as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24   time of the deposition.
25

Page 237

1 CRT Antitrust Litigation
2 LI MIAO, VOLUME II (#5759553)
3        E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 WITNESS                Date
25

Page 239

29 (Pages 236 - 239)

**CERTIFICATE OF DEPONENT**

I, LI MIAO, hereby certify that I have reviewed the foregoing pages, numbered 132 through 234, of my deposition of testimony taken in these proceedings on Wednesday, March 8, 2023, and, with the exception of the changes listed on the next page and/or corrections, if any, find them to be a true and accurate transcription thereof.

Signed:· _____

Name:· · Li Miao

Date:· · 2023. 5. 15

**宣誓书**

本人，李淼，特此证明，本人已审阅上述第 132 至 234 页记录的本人于 2023 年 3 月 8 日，星期三，在作证过程中所作的证词，并且除下一页列出的更改和/或更正（如果有）外，认为它们是真实及准确的记录。

签名:· _____

姓名:· 李淼

日期:· · 2023. 5. 15

1

**ERRATA SHEET**

Case Name:             In Re Cathode Ray Tube Antitrust Litigation

Witness Name:          Li Miao

Date:                  03/08/2023

| PAGE | LINE | NOW READS | SHOULD READ | REASON |
|------|------|-----------|-------------|--------|
| 137 | 7 | learning group | large group | Transcription error |
| 141 | 16 | Xianyan | Xianyang | Transcription error |
| 152 | 19 | are also sold | were also sold | Transcription error |
| 153 | 2 | I'm in charge of | I was in charge of | Transcription error |
| 173 | 4 | Thomson, Foshan | Thomson (Foshan) | Transcription error |
| 181 | 22 | Beijing Mitsubishi | Beijing Matsushita | Transcription error |
| 186 | 15 | Mr. Wong's | Mr. Wang's | Transcription error |
| 186 | 21 | Mr. Wong | Mr. Wang | Transcription error |
| 211 | 4 | Xiangyang.  Xiangyang is | Xianyang.  Xianyang is | Transcription error |

Signed this _15_ th day of May, 2023.

LI MIAO

勘误表

| 案件名称: | 阴极射线管反垄断诉讼 |
| --- | --- |
| 证人姓名: | 李淼 |
| 日期: | 03/08/2023 |

| 页数 | 行数 | 现记为 | 应记为 | 原因 |
| --- | --- | --- | --- | --- |
| 137 | 7 | learning group<br>学习组 | large group<br>大组 | 记录错误 |
| 141 | 16 | Xianyan<br>（拼写错误） | Xianyang<br>咸阳 | 记录错误 |
| 152 | 19 | are also sold<br>也被卖 | were also sold<br>也被卖了 | 记录错误 |
| 153 | 2 | I'm in charge of<br>我管 | I was in charge of<br>我过去管 | 记录错误 |
| 173 | 4 | Thomson, Foshan<br>汤姆逊，佛山 | Thomson (Foshan)<br>汤姆逊（佛山） | 记录错误 |
| 181 | 22 | Beijing Mitsubishi<br>北京三菱 | Beijing Matsushita<br>北京松下 | 记录错误 |
| 186 | 15 | Mr. Wong's<br>（拼写错误） | Mr. Wang's<br>王先生的 | 记录错误 |
| 186 | 21 | Mr. Wong<br>（拼写错误） | Mr. Wang<br>王先生 | 记录错误 |
| 211 | 4 | Xiangyang. Xiangyang is<br>（拼写错误） | Xianyang. Xianyang is<br>咸阳. 咸阳是 | 记录错误 |

签署于 2023 年 5 月 15 日.

_____

李淼

3

# DOCUMENT 12

**BAKER BOTTS** LLP

| | | |
|---|---|---|
| 700 K STREET, N.W.<br>WASHINGTON, D.C.<br>20001 | AUSTIN<br>BRUSSELS<br>DALLAS<br>DUBAI | MOSCOW<br>NEW YORK<br>PALO ALTO<br>RIYADH |
| TEL  +1 202.639.7700<br>FAX  +1 202.639.7890<br>BakerBotts.com | HOUSTON<br>LONDON | SAN FRANCISCO<br>**WASHINGTON** |

June 9, 2023

John Taladay
TEL: 2026397909
FAX: 2026391165
john.taladay@bakerbotts.com

VIA E-MAIL [VRW@JUDGEWALKER.COM]

The Honorable Vaughn R. Walker
Law Office of Vaughn R. Walker
Four Embarcadero Center, Suite 2200
San Francisco, CA 94111

      Re:    In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Master File
             No. 07-CV-944-JST

Dear Judge Walker:

    Defendants Irico Group Corp. and Irico Display Devices Co., Ltd. (collectively, "Irico") respectfully submit this sur-reply in opposition to Plaintiffs' motion for sanctions. Plaintiffs' May 26, 2023 reply letter brief ("Reply," for which Plaintiffs submitted corrections to some citations on June 9, 2023) once again attempts to justify their request for terminating or other extreme sanctions by misstating applicable caselaw and the strict standards laid out therein.[1] Irico addresses only the most egregious issues below, and otherwise rests on the factual and legal arguments made in its April 21, 2023 opposition brief ("Opp'n").

    ***Caselaw on terminating or other severe sanctions regarding spoliation.***  The caselaw – *including* that relied upon by Plaintiffs – uniformly demonstrates that terminating and other severe sanctions require a heightened showing of culpability that is not met here, even if one assumes Plaintiffs' version of the facts to be accurate. Critically, Plaintiffs still have not pointed to even one instance where Irico is alleged to have intentionally destroyed one piece of paper in a conscious effort intended to deprive Plaintiffs of evidence in this case.

    In its opposition, Irico thoroughly addressed the cases cited by Plaintiffs in their opening brief that *actually* granted terminating or other severe sanctions – many of the cases cited did not – showing that each of those cases relied upon a finding of specific intent to deprive the other party of access to crucial information or outright fraud on the court. *See* Opp'n 5-8. Plaintiffs, however, chose not to rebut any of this case-by-case analysis (because they cannot), again trying to hide the actual facts and ultimate decision of the court regarding sanctions in each of these cases. Instead, Plaintiffs highlight one carefully selected fact from each case that might be somehow connected to the fact pattern here, without revealing to the Court the true scope of the conduct that occurred in that case cited, or whether the Court even imposed terminating or other severe sanctions in that case. Reply 8-9; *see, e.g., WeRide Corp. v. Kun Huang*, No. 5:18-CV-07233-EJD, 2020 WL

---

[1] References to the Reply are to Plaintiffs' corrected letter brief submitted to the Special Master on June 9, 2023.

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                     - 2 -

1967209 (N.D. Cal. Apr. 24, 2020) (defendants made false representations to the court while in the process of actively wiping hard drives, deleting email accounts, and moving communications to ephemeral messaging tools to evade discovery); *Glaukos Corp. v. Ivantis, Inc.*, No. SACV18620JVSJDEX, 2020 WL 10501850 (C.D. Cal. June 17, 2020) (defendants affirmatively *implemented* an auto-deletion policy after they were on notice to preserve evidence); *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326 (D. Ariz. 2022), (plaintiff took affirmative steps to delete, rather than archive, relevant Facebook posts and attempted to "unsend" her Facebook messages to a witness regarding the case).  From reading the Plaintiffs' Reply, the Special Master might not realize that, in at least *four* cases relied upon by Plaintiffs, the court did not even impose a terminating or other severe sanction similar to what Plaintiffs seek here.  *See supra* at 2-4.  Plaintiffs also claim to have found additional support for imposing extreme sanctions, but these additional cases in fact confirm the same high burden of bad faith and intentional destruction of relevant materials, which Plaintiffs do not meet.

For example, Plaintiffs fail to address the relevant facts and sanctions in the following cases:

- Plaintiffs completely ignore the holding of *Micron Technology, Inc. v. Rambus Inc.*, 645 F.3d 1311 (Fed. Cir. 2011), failing to acknowledge that the Federal Circuit vacated the terminating sanction in that case.  The Federal Circuit in fact held that the district court's terminating sanction against Rambus was an abuse of discretion because it was *not* supported by sufficient findings of bad faith by the spoliating party.  The court held that, in order to support a terminating sanction, a party must have "intended to impair the ability of the [opposing party] to defend itself" through "advantage-seeking behavior" because the proper "exacting standard" requires "destruction *for the purpose of* hiding adverse information."  *Id.* at 1326-27 (emphasis added) (quoting *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998)).  This vacatur was in spite of evidence that Rambus instituted a "document retention plan" with the purpose to "disguise and hide its destruction of relevant documents" and that explicitly called for highly relevant documents to be "expunge[d]" by employees.  *Id.* at 1334 (Gajarsa, J., concurring in part and dissenting in part).

- Plaintiffs fail to discuss that in *Mule v. 3-D Building & Construction Management Corp.*, No. CV 18-1997 (JS) (AKT), 2021 WL 2788432 (E.D.N.Y. July 2, 2021), the court *rejected* terminating sanctions and a "broad preclusion order," instead ordering only "monetary sanctions" and a narrow preclusion on certain arguments that applied equally to both parties.  The court held that severe sanctions were "not appropriate" and "overly harsh" even following a prior discovery sanction and after finding that the defendant had "consciously" and "selectively" decided not to back up a crucial accounting file (among many others that he did back up) before discarding his computer.  *Id.*, 2021 WL 2788432 at *12, 17.

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                - 3 -

- Similarly, in *John v. County of Lake*, No. 18-cv-06935-WHA(SK), 2020 WL 3630391 (N.D. Cal. July 3, 2020), the court granted only "the mildest version of an adverse inference instruction" after finding that defendants intentionally deleted "key" text messages, lied about the existence of such messages in their depositions, and were given an "explicit, detailed" and "specific" warning at a court hearing regarding the necessity to preserve such messages and the likelihood of sanctions if they did not. *Id.*, 2020 WL 3630391, at *4, 6-7. Plaintiffs address none of these facts.

Plaintiffs also misstate the facts and holdings of multiple cases in their Reply:

- Plaintiffs misstate the holding in *Paisley Park Enterprises, Inc. v. Boxill*, 330 F.R.D. 226 (D. Minn. 2019), by claiming that the mere "failure to de-activate [an] auto-delete function" is "sufficient" to satisfy the intent requirement for severe sanctions, Reply 9. The court actually held that a showing of such intent requires "evidence of a serious and specific sort of culpability regarding the loss of the relevant ESI" that goes well beyond the "mere negligence" of a "failure to disengage the auto-delete function." *Id.* at 236-37. Based on a finding that defendants intentionally "wiped and discarded their phones" *after* receiving a discovery request for their text messages, the court imposed only monetary sanctions and deferred consideration of any adverse inference or evidentiary presumption until "closer to trial." *Id.* at 237.

- Plaintiffs claim that Irico's "conduct is comparable to that of the sanctioned part[y] in … *Dupuis v. Marriott Corp.*," Reply 7. But there was no sanctioned party in that case, as the court found that "[n]either a default judgment [n]or an adverse inference instruction would make sense" due to a lack of prejudice and dearth of "evidence of . . . willful destruction of evidence" and declined to impose any sanctions. *Dupuis v. Marriott Corp.*, No. 3:12-CV-00580-AC, 2014 WL 199096, at *7 (D. Or. Jan. 15, 2014). Rather, the court chastised the moving party for her "lack of candor in presenting her sanctions motion to the court." *Id.*[2]

---

[2] Plaintiff also cite *InternMatch, Inc. v. Nxtbigthing, LLC* and *Facebook, Inc. v. OnlineNIC Inc.* for the same proposition, but again fail to reveal the intentional efforts by the parties in those cases to destroy and deprive the opposing party of relevant evidence. *See InternMatch*, No. 14-cv-05438-JST, 2016 WL 491483 (N.D. Cal. Feb. 8, 2016) (party attempted a cover-up of spoliation by filing a fraudulent insurance claim using forged receipts, and then tried to block the production of evidence of the fraud from his insurance carrier); *Facebook*, No. 19-CV-07071-SI (SVK), 2022 WL 2289067 (N.D. Cal. Mar. 28, 2022) (defendants lied about the existence of data backups and actively deleted over half of the relevant data in its possession while working with a Special Master to have that data collected).

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                    - 4 -

Tellingly, Plaintiffs do not even attempt to rebut the recent authorities in this district discussed in detail by Irico, including *In re Google Play Store Antitrust Litigation*, No. 21-md-02981-JD, 2023 WL 2673109 (N.D. Cal. Mar. 28, 2023), and *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 993-94 (N.D. Cal. 2012) ("*Apple II*"), which illustrate the strict standard of intentional deprivation of evidence for the extreme sanctions Plaintiffs request.  *See* Opp'n 7, 20, 25.

In sum, the spoliation cases cited by both Irico and Plaintiffs consistently demonstrate the high bar for specific intent to deprive necessary to justify terminating or other severe sanctions. Plaintiffs do not come close to clearing that bar.

*Caselaw on a witness's failure to appear.*  Plaintiffs' citations to cases in support of sanctions for the nonappearance of Mr. Su Xiaohua are likewise revealed as distorted when the facts of the cases are examined.  The sanctioned parties in *Sali v. Corona Regional Medical Center*, 884 F.3d 1218 (9th Cir. 2018), failed (unlike Irico) to "ma[k]e *any effort* to secure" their expert witness' attendance at his deposition, and received only monetary sanctions, "the mildest of the possible Rule 37 sanctions."  *Id.* at 1225 (emphasis added).  *Card Technology Corp. v. DataCard Inc.*, 249 F.R.D. 567 (D. Minn. 2008) involved a party's managing agent and "key employee" with regard to a specific issue in the case who (unlike Mr. Su) refused to appear for deposition "at a time when he was under [that party's] control."  *Id.* at 571.[3]  Plaintiffs also conspicuously fail to address the very recent decision (discussed in Irico's May 2, 2023 letter regarding supplemental authority) in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, No. 19-cv-01391-CRB (AGT), slip op. at 1-2 (N.D. Cal. Apr. 21, 2023) ("*Volkswagen*"), declining to sanction Volkswagen for its current managing agent's refusal to appear for deposition and noting that the SEC had "other evidence at its disposal" mitigating any prejudice despite the recalcitrant witness's key role in the SEC's allegations of misconduct.  *Id.* at 2.

*Local Rule 7-8(c) and caselaw on timeliness of sanctions requests.*  Plaintiffs fail to meaningfully address the fact that many of their complaints about Irico's conduct are untimely under Civil Local Rule 7-8(c).  Plaintiffs first set up a strawman by arguing that they learned new information regarding alleged spoliation "only recently," Reply 23.  But Irico argues that Rule 7-8(c) applies not to Plaintiffs' spoliation claims but rather the assortment of unrelated complaints mixed in with Plaintiffs' motion.  In particular, Plaintiffs raise complaints about Irico's conduct during jurisdictional discovery over *four years* ago with no arguable connection to spoliation or Mr. Su's refusal to appear.  *See* Opp'n 36-44.  And Plaintiffs' attempt to dismiss *Siebert v. Gene*

---

[3] As already discussed in Irico's opposition, Plaintiffs' remaining cases are inapposite: *SEC v. Hong* because it involved parties who themselves refused to appear, rather than a former employee outside a party's control, *see* Opp'n 33-34; No. CV 20-04080-MCS (RAOx), 2021 WL 4803497, at *4-5 (C.D. Cal. Sept. 17, 2021), and *Estate of Boyles v. Gree USA, Inc.* because it involved a Rule 30(b)(6) notice for which the defendant could have chosen *any* witness to educate and sit for deposition, Opp'n 35; No. 1:20-CV-276, 2021 WL 3570413, *3 (M.D.N.C. Aug. 12, 2021).

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                 - 5 -

*Security Network, Inc.* and *Perdana Capital (Labuan) Inc. v. Chowdry* as involving "minor disputes" or a "grab bag of minor transgressions," Reply 23 n.42, misses the point entirely. The Local Rules are not suspended simply because Plaintiffs believe their motion to be more important than those in other cases. Nor has Irico "concede[d]" that such claims are timely by defending its past behavior on the merits, Reply 23. Rather, Irico has shown that the stale claims Plaintiffs use to improperly trump up their motion are both untimely *and* meritless.

   ***Caselaw on protections for foreign sovereigns.*** Plaintiffs state for the first time in their Reply that they are not seeking a default *judgment* sanction against Irico, but rather to strike Irico's answers, which was not at all clear from their opening motion. *See, e.g.*, Mot. 32 ("[A] default judgment is appropriate here . . .").  Regardless, the case cited by Plaintiffs regarding Irico Group's procedural protections as a foreign sovereign instrumentality, Reply 24-25 n.43, actually supports Irico's argument, respectfully made, that a default judgment sanction against Irico Group would exceed the Special Master's mandate. In *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994), the Second Circuit recognized that default judgment against a foreign sovereign "in some cases will require a hearing" on liability and damages and always requires a record that the "*district court* was satisfied with the evidence submitted," 15 F.3d at 242 (emphasis added). This is exactly the point Irico was making: that the district court, rather than the Special Master, would need to make that determination.

<div align="center">

*       *       *

</div>

   The Special Master should deny Plaintiffs' request for terminating sanctions and their alternate request for adverse inference, striking of defenses, and other extreme sanctions.

        Sincerely,
        */s/ John Taladay*
        John Taladay

cc: Tanveer Singh (tanveer.singh@fedarb.com)
   R. Alexander Saveri (rick@saveri.com)
   Geoffrey C. Rushing (geoff@saveri.com)
   Matthew D. Heaphy (mheaphy@saveri.com)
   Mario N. Alioto (malioto@tatp.com)
   Lauren C. Capurro (laurenrussell@tatp.com)
   Daniel E. Birkhaeuser (dbirkhaeuser@bramsonplutzik.com)

# DOCUMENT 13

# BAKER BOTTS LLP

700 K STREET, N.W.
WASHINGTON, D.C.
20001

TEL  +1 202.639.7700
FAX  +1 202.639.7890
BakerBotts.com

AUSTIN
BRUSSELS
DALLAS
DUBAI
HOUSTON
LONDON

NEW YORK
PALO ALTO
RIYADH
SAN FRANCISCO
SINGAPORE
**WASHINGTON**

July 20, 2023

VIA E-MAIL [VRW@JUDGEWALKER.COM]
The Honorable Vaughn R. Walker
Law Office of Vaughn R. Walker
Four Embarcadero Center, Suite 2200
San Francisco, CA 94111

John Taladay
TEL: 2026397909
FAX: 2026391165
john.taladay@bakerbotts.com

      Re:    In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Master File
           No. 07-CV-944-JST

Dear Judge Walker:

    At yesterday's hearing on Plaintiffs' motion for sanctions against the Irico Defendants, counsel for Irico referenced and displayed a copy of Direct Purchaser Plaintiffs' ("DPPs") Second Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico Display Devices Co., Ltd.'s First Set of Interrogatories, also marked as deposition exhibit number 8649 from the recent deposition of DPPs' economic expert, Dr. Phillip Johnson.  A copy of that exhibit is enclosed for Your Honor's reference.

                     Sincerely,

                     */s/ John Taladay*

                     John Taladay

cc:    Tanveer Singh (tanveer.singh@fedarb.com)
       R. Alexander Saveri (rick@saveri.com)
       Geoffrey C. Rushing (geoff@saveri.com)
       Matthew D. Heaphy (mheaphy@saveri.com)
       Mario N. Alioto (malioto@tatp.com)
       Lauren C. Capurro (laurenrussell@tatp.com)
       Daniel E. Birkhaeuser (dbirkhaeuser@bramsonplutzik.com)
       Alan Plutzik (aplutzik@bramsonplutzik.com)

R. Alexander Saveri (173102)
  *rick@saveri.com*
Geoffrey C. Rushing (126910)
  *grushing@saveri.com*
Matthew D. Heaphy (227224)
  *mheaphy@saveri.com*
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, California 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Lead Counsel for Direct Purchaser Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-CV-5944-JST |
| | MDL No. 1917 |
| This Document Relates To: | **DIRECT PURCHASER PLAINTIFFS' SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANTS IRICO GROUP CORP. AND IRICO DISPLAY DEVICES CO., LTD.'S FIRST SET OF INTERROGATORIES TO DIRECT PURCHASER PLAINTIFFS** |
| *ALL DIRECT PURCHASER ACTIONS* | |

**Exhibit
8649**

Phillip Johnson

DPPS' SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO IRICO DEFENDANTS' FIRST SET OF
INTERROGATORIES; Master File No. 07-CV-5944-JST

PROPOUNDING PARTIES:        IRICO GROUP CORP.; IRICO DISPLAY DEVICES CO., LTD.

RESPONDING PARTIES:         ARCH ELECTRONICS, INC.; CRAGO, D/B/A DASH COMPUTERS, INC.; MEIJER, INC.; MEIJER DISTRIBUTION, INC.; NATHAN MUCHNICK, INC.; PRINCETON DISPLAY TECHNOLOGIES, INC.; RADIO & TV EQUIPMENT, INC.; STUDIO SPECTRUM, INC.; WETTSTEIN AND SONS, INC. D/B/A WETTSTEIN'S

SET NO.:                    ONE

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Direct Purchaser Plaintiffs Arch Electronics, Inc.; Crago, d/b/a Dash Computers, Inc.; Meijer, Inc.; Meijer Distribution, Inc.; Nathan Muchnick, Inc.; Princeton Display Technologies, Inc.; Radio & TV Equipment, Inc.; Studio Spectrum, Inc.; and Wettstein and Sons, Inc. d/b/a Wettstein's (together, "Plaintiffs"), by their attorneys, hereby provide the following objections to Defendants Irico Group Corp. and Irico Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs (the "Interrogatories") as follows:

## **GENERAL OBJECTIONS**

Each of the following objections is incorporated by reference into each of the responses herein:

1.      Plaintiffs and their counsel have not completed their (1) investigation of the facts relating to this case, (2) discovery in this action, or (3) preparation for trial. The following responses are therefore based upon information known at this time and are provided without prejudice to Plaintiffs' right to supplement these responses prior to trial or to produce evidence based on subsequently discovered information. Likewise, Plaintiffs' responses are based upon, and therefore limited by, Plaintiffs' present knowledge and recollection, and consequently, Plaintiffs reserve the right to make any changes to these responses if it appears at any time that inadvertent errors or omissions have been made.

2.      Plaintiffs generally object to the Interrogatories, including the Instructions and Definitions, on the ground that they purport to enlarge, expand or alter in any way the plain

meaning and scope of any interrogatory or to impose any obligations on Plaintiffs' responses in excess of those required by the Federal Rules of Civil Procedure. Plaintiffs will respond to these Interrogatories in accordance with their understanding of the obligations imposed by the Federal Rules of Civil Procedure.

3.      Plaintiffs object to the Interrogatories, including the Instructions and Definitions, on the ground that the information sought is protected by the attorney-client privilege, the attorney work product doctrine, the settlement privilege, the mediation privilege or is otherwise privileged and/or immune from discovery. By responding to these Interrogatories, Plaintiffs do not waive, intentionally or otherwise, any attorney-client privilege, any settlement privilege, any mediation privilege, attorney work-product or any other privilege, immunity or other protection that may be asserted to protect any information from disclosure. Accordingly, any response or production of documents or disclosure of information inconsistent with the foregoing is wholly inadvertent and shall not constitute a waiver of any such privilege, immunity or other applicable protection.

4.      Plaintiffs object to these Interrogatories on the ground that they are compound, conjunctive or disjunctive.

5.      Plaintiffs object to the Interrogatories on the ground that they duplicate other requests, in whole or in part, made in MDL No. 1917 in violation of the Court's Order Re Discovery and Case Management Protocol (April 2, 2012) (Dkt. 1128). Plaintiffs will not reproduce any material that has been previously produced by another party to MDL No. 1917. *See* Case Management Order, 2 (Feb. 16, 2021) (Dkt. 5907).

6.      Plaintiffs object to the Interrogatories on the ground that they are overly broad and unduly burdensome.

7.      Plaintiffs object to the Interrogatories on the ground that they are vague, ambiguous, redundant, harassing or oppressive.

8.      Plaintiffs object to the Interrogatories on the ground that they require Plaintiffs to draw legal conclusions.

9.      Plaintiffs object to the Interrogatories on the ground that the information requested is neither relevant nor proportional to the needs of the case.

10.     Plaintiffs object to the Interrogatories on the ground that they, or any portion of them, seek production of any information within the possession, custody, or control of any Defendant, or of publicly available information such that the information is obtainable from some other source that is more convenient, less burdensome or less expensive, or the production of the information will impose undue burden, inconvenience, or expense upon Plaintiffs.

11.     Plaintiffs reserve the right to modify their allegations based on additional discovery, additional analysis of existing discovery, discovery not yet completed and/or expert discovery, and Plaintiffs reserve the right to supplement and/or delete the responses given in light of further evidence and further analysis of present and subsequently acquired evidence.

12.     In addition, in accordance with the Federal Rules of Civil Procedure, Plaintiffs reserve the right to introduce evidence not yet identified herein supporting Plaintiffs' allegations, including evidence that Plaintiffs expect to further develop through the course of discovery and expert analysis.

13.     In providing responses to the Interrogatories, Plaintiffs reserve all objections as to competency, relevance, materiality, privilege, or admissibility as evidence in any subsequent proceeding in, or trial of, this or any other action for any purpose whatsoever.

14.     No incidental or implied admissions are intended in these responses. Plaintiffs' response to all or any part of any interrogatory should not be taken as an admission that: (a) Plaintiffs accept or admit the existence of any fact(s) set forth or assumed by the interrogatory; or (b) Plaintiffs have in their possession, custody or control documents or information responsive to that interrogatory; or (c) documents or information responsive to that interrogatory exist. Plaintiffs' response to all or any part of an interrogatory also is not intended to be, and shall not be, a waiver by Plaintiffs of all or any part of its objection(s) to that interrogatory.

15.     Plaintiffs object to the Interrogatories on the ground that the cumulative requests by Defendants and Co-Conspirators in this litigation exceed the permissible number set forth in the Federal Rules.

**OBJECTIONS TO CERTAIN DEFINITIONS AND INSTRUCTIONS**

1.     Plaintiffs object to the definition of "Claim Form(s)" on the grounds that the term

"or similar forms approved by the Court and sent to or otherwise made available to potential Class Members" is vague and ambiguous and requires Plaintiffs to refer to multiple documents.

2.      Plaintiffs object to the definition of "Complaint" as vague and ambiguous. Plaintiffs understand this definition to refer to DPPs' Consolidated Amended Complaint at ECF No. 436 and as modified by the Stipulation and Order at ECF No. 996.

3.      Plaintiffs object to the definition of "Control" to the extent it requires Plaintiffs to draw legal conclusions.

4.      Plaintiffs object to the definition of "Co-Conspirators" on the grounds that it is vague, ambiguous, and unintelligible. Paragraphs 105-111 of DPP's Consolidated Amended Complaint (ECF No. 436) describe CRT technology and products and do not enumerate entities.

5.      Plaintiffs object to the definition of "Document(s)" on the ground that it is overbroad boilerplate that includes irrelevant examples, such as "package inserts or other information accompanying medications." Plaintiffs further object to the extent that the definition exceeds the scope of the Federal Rules of Civil Procedure.

6.      Plaintiffs object to the definition of "Irico CRTs" as vague, ambiguous, and unintelligible. Paragraphs 37-39 of the Complaint identify the Irico entities named as Defendants to this litigation and allege that those entities manufactured, sold, and distributed CRT Products either directly or through their subsidiaries or affiliates throughout the United States. The phrase "including without limitation any Claim Form(s) that reflects purchases from Irico in Sections A, B, or C of the form" is inconsistent with the preceding language in the definition and renders the definition unintelligible.

7.      Plaintiffs object to the definition of "Verified" as vague, ambiguous, and incomplete. The citation provided does not define the term "Verified."

8.      Plaintiffs object to the definition of "You" and "Your" as vague and ambiguous as it relies on the undefined, capitalized term "Plaintiffs." If "Plaintiffs" is intended to mean the parties identified as "Responding Parties" in the Interrogatories, Plaintiffs object to the definition as overbroad in seeking discovery of class members who are not current Named Plaintiffs and have not served as Class Representatives and further object on the grounds that this definition seeks the

production of documents outside Plaintiffs' possession, custody, and control. Plaintiffs further object on the ground that attorneys and agents are included in this definition, and any response or production of documents that may subsequently occur pursuant to these Interrogatories shall not include any documents protected by the attorney-client privilege, work product doctrine, the settlement privilege, or any other applicable privileges or doctrines. Plaintiffs further object to this definition to the extent that it refers to any entity other than Plaintiffs.

9.    Plaintiffs object to the Instructions to the extent they seek to expand the requirements of the Federal Rules of Civil Procedure. Plaintiffs will respond in accordance with the Federal Rules.

<div align="center">

**RESPONSES**

</div>

**INTERROGATORY NO. 1**

Identify any Document(s) that summarize, analyze, evaluate or otherwise compile any information contained in Claim Forms.

**RESPONSE TO INTERROGATORY NO. 1**

In addition to Plaintiffs' General Objections and Objections to Certain Definitions and Instructions, each of which is incorporated by this reference as though fully set forth herein, Plaintiffs object to this Interrogatory on the grounds that it calls for materials that are protected by the attorney-client privilege, the work product rule, and/or other evidentiary privilege. Plaintiffs further object to this Interrogatory on the grounds that it is vague and ambiguous including in its use of the terms "summarize," "analyze," "evaluate," and "otherwise compile." Plaintiffs further object to this Interrogatory on the grounds that it is overbroad and duplicative, and harassing in that it will interfere with the ongoing claims process as to which Defendants have no interest. Plaintiffs further object to this Interrogatory on the ground that the burden on Plaintiffs to describe such an overbroad group of documents outweighs any likely benefit and is not proportional to the needs of the case. Plaintiffs further object to this Interrogatory on the grounds that it seeks discovery of absent class members and serves as an inappropriate end-run around the prohibition on discovery of absent class members. Plaintiffs further object to this Interrogatory on the grounds that it seeks irrelevant information that is not necessary or proportional. Plaintiffs further object to this

Interrogatory on the grounds that it seeks confidential information of absent class members in violation of their privacy rights. Plaintiffs also object to this Interrogatory on the ground that it is compound.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1

Plaintiffs hereby incorporate their previous objections and response to this interrogatory, *supra*. Subject to, and without waiving the foregoing objections, Plaintiffs provide the following supplemental response pursuant to an agreement with the Irico Defendants whereby the Irico Defendants "will narrow the scope of the outstanding discovery requests to the information provided in Paragraphs 1(a), (b) and (c) in our proposed stipulation" provided that Plaintiffs provide this information and, subject to the Irico Defendants' reservation of rights, represent to Plaintiffs "that at this time Irico does not intend to serve further discovery regarding the claims process, the claims administrator or the absent class members." *See* Rushing July 7, 2021 Ltr.; Werbel July 9, 2021 Ltr. Subject to the foregoing agreement and without waiving the foregoing objections, Plaintiffs provide the following supplemental response:

   a.  To date, Direct Purchaser Plaintiffs have identified 1,816 valid claim forms submitted by settlement class members for the direct purchase of CRTs, Televisions or Monitors in the United States. Of the 1,816 valid claim forms, 334 identified purchases of CRTs, 1,549 identified purchases of Televisions, and 992 identified purchases of Monitors.

   b.  To date, Direct Purchaser Plaintiffs have identified no valid claims for purchases of a CRT, Television or Monitor by a settlement class member from any of the Irico Defendants.

   c.  Direct Purchaser Plaintiffs have no records from any third party documenting direct purchases of Irico CRTs or televisions or monitors containing Irico CRTs in the United States.

Plaintiffs will supplement this response in accordance with Rule 26(e) of the Federal Rules of Civil Procedure.

1    **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1**

2          Plaintiffs hereby incorporate their previous objections and responses to this interrogatory,

3    *supra*. Subject to, and without waiving the foregoing objections, Plaintiffs provide the following

4    supplemental response pursuant to the agreement set forth in Plaintiffs' supplemental response to

5    this interrogatory, *supra*. Subject to the foregoing agreement and without waiving the foregoing

6    objections, Plaintiffs provide the following supplemental response:

7          a.    To date, Direct Purchaser Plaintiffs have identified 1,834 valid claim forms

8                submitted by settlement class members for the direct purchase of CRTs, Televisions

9                or Monitors in the United States. Of the 1,834 valid claim forms, 349 identified

10               purchases of CRTs, 1,550 identified purchases of Televisions, and 1,008 identified

11               purchases of Monitors.

12         b.    To date, Direct Purchaser Plaintiffs have identified no valid claims for purchases of

13               a CRT, Television or Monitor by a settlement class member from any of the Irico

14               Defendants.

15         c.    Direct Purchaser Plaintiffs have no records from any third party documenting direct

16               purchases of Irico CRTs or televisions or monitors containing Irico CRTs in the

17               United States.

18   **INTERROGATORY NO. 2**

19         Separately, for each Defendant or Co-Conspirator listed on the Claim Form, Identify:

20         a.    The total number of submitted and Verified Claim Forms that include purchases

21               from that Defendant or Co-Conspirator in Section A of the Claim Forms;

22         b.    The total dollar amount of purchases from that Defendant or Co-Conspirator

23               detailed in Section A of the submitted and Verified Claim Forms;

24         c.    The total number of submitted and Verified Claim Forms from that Defendant or

25               Co-Conspirator that include purchases in Section B of the Claim Forms;

26         d.    The total dollar amount of purchases from that Defendant or Co-Conspirator

27               detailed in Section B of the submitted and Verified Claim Forms;

28         e.    The total number of submitted and Verified Claim Forms that include purchases

1    from that Defendant or Co-Conspirator in Section C of the Claim Forms; and,

2        f.    The total dollar amount of purchases from that Defendant or Co-Conspirator

3    detailed in Section C of the submitted and Verified Claim Forms.

4    **RESPONSE TO INTERROGATORY NO. 2**

5    In addition to Plaintiffs' General Objections and Objections to Certain Definitions and

6    Instructions, each of which is incorporated by this reference as though fully set forth herein,

7    Plaintiffs further object to this Interrogatory on the ground that it is vague and ambiguous as to the

8    meaning of "Identify," "Co-Conspirator," "Verified," and "submitted." Plaintiffs further object to

9    this Interrogatory on the ground that the burden on Plaintiffs to provide this analysis of the claims

10   process outweighs its likely benefit and is not proportional to the needs of the case. Plaintiffs object

11   to this Interrogatory on the ground that it is compound. Plaintiffs further object to this Interrogatory

12   on the grounds that it calls for (or could be construed to call for) materials that are protected by the

13   attorney-client privilege, the work product rule or other evidentiary privilege. Plaintiffs further

14   object to this Interrogatory on the grounds that Defendants' sales information is more easily

15   available to Defendants from their own records and from discovery already produced in this

16   litigation. Plaintiffs further object to this Interrogatory on the grounds that it seeks discovery of

17   absent class members and serves as an inappropriate end-run around the prohibition on discovery

18   of absent class members. Plaintiffs further object to this Interrogatory on the grounds that it seeks

19   irrelevant information that is not necessary or proportional. Plaintiffs further object to this

20   Interrogatory on the grounds that it seeks confidential information of absent class members in

21   violation of their privacy rights. Plaintiffs further object to this Interrogatory on the grounds that it

22   is overbroad and duplicative, and harassing in that it will interfere with the ongoing claims process

23   as to which Defendants have no interest.

24   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2**

25   Plaintiffs hereby incorporate their previous objections and response to this interrogatory,

26   *supra*. Subject to, and without waiving the foregoing objections, Plaintiffs supplement their

27   response as follows:

28   *See* supplemental response to Interrogatory No. 1, *supra*.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2**

Plaintiffs hereby incorporate their previous objections and responses to this interrogatory, *supra*. Subject to, and without waiving the foregoing objections, Plaintiffs supplement their responses as follows:

*See* second supplemental response to Interrogatory No. 1, *supra*.

**INTERROGATORY NO. 3**

Identify any claims submitted involving Irico CRTs not Identified in Your response to Interrogatory No. 2.

**RESPONSE TO INTERROGATORY NO. 3**

In addition to Plaintiffs' General Objections and Objections to Certain Definitions and Instructions, each of which is incorporated by this reference as though fully set forth herein, Plaintiffs further object to this Interrogatory on the ground that it is vague and ambiguous in its use of terms "claims submitted," "Irico CRTs," and "involving." Plaintiffs further object to this Interrogatory on the grounds that it calls for (or could be construed to call for) materials that are protected by the attorney-client privilege, the work product rule or other evidentiary privilege. Plaintiffs further object to this Interrogatory on the grounds that it seeks individualized discovery of absent class members and serves as an inappropriate end-run around the prohibition on discovery of absent class members. Plaintiffs further object to this Interrogatory on the grounds that it seeks information about individualized claims that are not necessary or proportional at this stage of the litigation. Plaintiffs further object to this Interrogatory on the grounds that it seeks confidential information of absent class members in violation of their privacy rights. Plaintiffs further object to this Interrogatory on the grounds that it is overbroad and duplicative, and harassing in that it will interfere with the ongoing claims process as to which Defendants have no interest.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3**

Plaintiffs hereby incorporate their previous objections and response to this interrogatory, *supra*. Subject to, and without waiving the foregoing objections, Plaintiffs supplement their response as follows:

1    *See* supplemental response to Interrogatory No. 1, *supra*.

2    <u>**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3**</u>

3    Plaintiffs hereby incorporate their previous objections and responses to this interrogatory,

4    *supra*. Subject to, and without waiving the foregoing objections, Plaintiffs supplement their

5    responses as follows:

6    *See* second supplemental response to Interrogatory No. 1, *supra*.

7

8    DATED: April 28, 2022          By: */s/ R. Alexander Saveri*

9                                                    R. Alexander Saveri
                                                     Geoffrey C. Rushing
10                                                   Matthew D. Heaphy
                                                     SAVERI & SAVERI, INC.
11                                                   706 Sansome Street
                                                     San Francisco, California 94111
12                                                   Telephone: (415) 217-6810
                                                     Facsimile: (415) 217-6813
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DOCUMENT 14

**SAVERI & SAVERI, INC.**
706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

*Trump Alioto Trump & Prescott*
ATTORNEYS LLP
2001 Union Street, Suite 482
San Francisco, California 94123
(415) 563-7200
FAX (415) 346-0679

August 22, 2023

**VIA EMAIL**

The Honorable Vaughn R. Walker
Law Office of Vaughn R. Walker
Four Embarcadero Center, Suite 2200
San Francisco, CA 94111
vrw@judgewalker.com

Re: ***In re Cathode Ray Tube (CRT) Antitrust Litigation* – MDL No. 1917, No. 07-CV-5944-JST/Plaintiffs' Motion for Sanctions**

Dear Judge Walker:

At oral argument on the Motion for Sanctions (the "Sanctions Motion") against Defendants Irico Group Corp. and Irico Display Devices Co., Ltd. (collectively, "Irico") that is currently under submission before Your Honor, Plaintiffs mentioned that Irico intended to file a motion for summary judgment against the Indirect Purchaser Plaintiffs ("IPPs"). We write to inform Your Honor that Irico has now filed that motion (the "SJ Motion"). A redacted version of the Motion was filed on July 28, 2023 (ECF No. 6225). An unredacted version is now available as ECF No. 6261 on the Court's online docket. The SJ Motion has implications for the Sanctions Motion that we respectfully request Your Honor consider.

Plaintiffs argued in their Sanctions Motion that Irico's defenses seek to exploit gaps in the evidence created by its willful and near-total spoliation of relevant evidence. The SJ Motion highlights that problem. It repeatedly asserts arguments as to which Plaintiffs' ability to respond has been impaired by Irico's spoliation of relevant evidence:

1.      Irico seeks summary judgment on IPPs' claims under the laws of 20 of the 22 States alleged by IPPs, arguing that IPPs have failed to provide evidence that applying the laws of those States to Irico would satisfy due process because Irico lacks sufficient contacts with those States. SJ Motion at 2-3, 6-9. Irico did not preserve documents or electronically stored information (ESI) showing communications with its customers. Such evidence likely would have confirmed that Irico communicated with or about customers in the United States, that it was involved in testing its CRTs for compatibility with televisions and monitors to be sold in the United States, and that it knew large quantities of televisions and monitors containing its CRTs were shipped to the relevant states.

Hon. Vaughn R. Walker
August 22, 2023
Page 2 of 3

2.      Irico also argues that IPPs lack sufficient evidence of Irico's participation in the conspiracy prior to August 5, 1998. *Id.* at 3-4, 12-15. Had Irico's files and records been preserved, they would provide internal evidence of Irico's conduct prior to that date. Irico's failure to preserve evidence unfairly prejudices Plaintiffs' effort to establish Irico's conduct during that time period.

3.      Irico argues that "international comity" requires the dismissal of IPPs' claims. It asserts that the Chinese government compelled it to charge the prices at which it sold its CRTs, and, thus, that Chinese law imposed legal duties on it that were incompatible with compliance with U.S. antitrust laws. *Id.* at 15-22.[1] But virtually no documents have survived that shed any light on how Irico actually determined the prices it would charge.

In sum, the SJ Motion underscores the prejudice Plaintiffs have suffered as a result of Irico's failure to preserve documents and ESI. The Court, too, is a potential victim:  It is at risk of being forced to decide the SJ Motion, and also the trial of this case, without the complete evidentiary record that is needed to ensure a just result.

Very truly yours,

*//s/ Mario N. Alioto*
Mario N. Alioto
Lead Counsel for the Indirect Purchaser Plaintiffs

*/s/ R. Alexander Saveri*
R. Alexander Saveri
Lead Counsel for the Direct Purchaser Plaintiffs

Cc:   John M. Taladay
       Evan J. Werbel
       Thomas E. Carter
       Andrew L. Lucarelli
       Kaylee Yang

---

[1] This argument is based on the 8th, 11th and 12th Affirmative Defenses of both Irico Group's and Irico Display's Answers to IPPs' Fifth Amended Complaint (ECF Nos. 5873 and 5875).  The Irico Defendants asserted those same affirmative defenses in its Answers to DPPs' Consolidated Amended Complaint (ECF Nos. 5872 and 5874). Irico identified the evidence relevant to each of its Affirmative Defenses in the Irico Defendants' Suppl. Objections and Responses to IPPs' Fourth Set of Interrogatories, dated Sept. 1, 2022. Plaintiffs intended to attach these responses as Exhibit X to the Declaration of Lauren C. Capurro filed in support of the Sanctions Motion, but inadvertently attached the wrong document. The correct Exhibit X is attached to this letter. Plaintiffs respectfully request that Your Honor substitute the attached correct Exhibit X for the incorrect version in the record.

Hon. Vaughn R. Walker
August 22, 2023
Page 3 of 3

     Mario N. Alioto
     Daniel E. Birkhaeuser
     Geoffrey C. Rushing
     Matthew D. Heaphy

# CORRECTED

# EXHIBIT X

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Evan J. Werbel (*pro hac vice*)
Thomas E. Carter (*pro hac vice*)
Andrew L. Lucarelli (*pro hac vice*)
700 K Street, N.W.
Washington, D.C. 20001
(202)-639-7700
(202)-639-7890 (fax)
Email: john.taladay@bakerbotts.com
      evan.werbel@bakerbotts.com
      tom.carter@bakerbotts.com
      drew.lucarelli@bakerbotts.com

*Attorneys for Defendants*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-cv-05944-JST (N.D. Cal.) |
| | MDL No. 1917 |
| This Document Relates to: | **IRICO DEFENDANTS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO INDIRECT PURCHASER PLAINTIFFS' FOURTH SET OF INTERROGATORIES TO IRICO GROUP CORPORATION AND IRICO DISPLAY DEVICES CO., LTD.** |
| *ALL INDIRECT PURCHASER ACTIONS* | |

PROPOUNDING PARTY:    Indirect Purchaser Plaintiffs

RESPONDING PARTIES:    Irico Group Corporation
                            Irico Display Devices Co., Ltd.

SET NUMBER:          Four

Pursuant to Federal Rules of Civil Procedure 26 and 33, Irico Group Corporation and Irico Display Devices Co, Ltd. (collectively, "Irico" or "Irico Defendants") hereby provides these supplemental responses to the Indirect Purchaser Plaintiffs' ("Plaintiffs") Fourth Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., dated December 14, 2021 ("Interrogatories"). Irico reserves the right to further amend or supplement these Objections and Responses (the "Responses") to the extent allowed by the Federal Rules of Civil Procedure and the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California ("Local Rules"). Subject to and without waiving any of Irico's General and Specific Objections as set forth below, Irico is willing to meet and confer with Plaintiffs regarding such General and Specific Objections.

The following Responses are made only for purposes of this case. The Responses are subject to all objections as to relevance, materiality and admissibility, and to any and all objections on any ground that would require exclusion of any response if it were introduced in court. All evidentiary objections and grounds are expressly reserved.

These Responses are subject to the provisions of the Stipulated Protective Order issued by the Court on June 18, 2008 ("Protective Order"). Irico's Responses are hereby designated "Confidential" in accordance with the provisions of the Protective Order.

## GENERAL OBJECTIONS

Irico makes the following General Objections to Plaintiffs' Interrogatories:

1.      Irico's Responses are based upon information available to and located by Irico as of the date of service of these Responses. In responding to Plaintiffs' Interrogatories, Irico states that it has conducted a diligent search, reasonable in scope, of those files and records in its possession, custody, or control believed to likely contain information responsive to Plaintiffs' Interrogatories.

2.      No express, incidental, or implied admissions are intended by these Responses and should not be read or construed as such.

3.      Irico does not intend, and its Responses should not be construed as, an agreement or acquiescence with any characterization of fact, assumption, or conclusion of law contained in

1    or implied by the Requests.

2        4.    Irico has made a good faith and reasonable attempt to ascertain whether

3    information responsive to Plaintiffs' Interrogatories exists and is properly producible, and has

4    produced or made available for examination non-privileged responsive materials located during

5    the course of that reasonable search.

6        5.    To the extent that Irico refers to any pleading, expert report, or other filing in its

7    Specific Responses, Irico incorporates by reference all exhibits and/or evidence cited therein.

8        6.    Irico objects to Plaintiffs' Interrogatories to the extent that they are overly broad,

9    unduly burdensome, oppressive, and duplicative to the extent that they seek information or

10   documents that are already in the possession, custody, or control of Plaintiffs.

11       7.    Irico objects to Plaintiffs' Interrogatories to the extent that they seek to impose

12   obligations on Irico beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any

13   Order of this Court.

14       8.    Irico objects to Plaintiffs' Interrogatories to the extent that they request duplicative

15   discovery in violation of the Order Re Discovery And Case Management Protocol, ECF No.

16   1128. *See* Order Re Plaintiffs' Motions To Compel Supplemental Discovery From Toshiba And

17   Panasonic, ECF No. 4128, at 4 ("The Discovery Protocol (ECF No 1128), requires parties to

18   coordinate discovery and not file duplicative discovery. . . . The benefit redounds to all parties on

19   both sides of the litigation, by conserving the efforts required by Plaintiffs and protecting

20   defendants against unnecessary duplication of effort.") (Report and Recommendation adopted in

21   full at ECF No. 4256).

22       9.    Irico objects to Plaintiffs' Interrogatories to the extent they seek information that is

23   not relevant or disproportionate to the needs of the case.

24       10.   Irico objects to Plaintiffs' Interrogatories to the extent that they are vague,

25   ambiguous, or susceptible to more than one interpretation. Irico has attempted to construe such

26   vague or ambiguous Interrogatories so as to provide for the production of responsive information

27   that is proportionate to the needs of the case. If Plaintiffs subsequently asserts an interpretation of

28   any Interrogatory that differs from Irico's understanding, Irico reserves the right to supplement or

---

IRICO'S SUPP. RESPONSES TO IPP'S          2          Master File No. 07-cv-05944-JST
FOURTH SET INTERROGATORIES                            MDL No. 1917

1    amend its Responses.

2         11.    Irico objects to Plaintiffs' Interrogatories to the extent that they contain terms that

3    are insufficiently or imprecisely defined. Irico shall attempt to construe such vague or ambiguous

4    Interrogatories so as to provide for the production of responsive information that is proportionate

5    to the needs of the case.

6         12.    Irico objects to Plaintiffs' Interrogatories to the extent that they seek information

7    that is protected from disclosure by the attorney-client privilege, work product doctrine, joint

8    defense or common interest privilege, self-evaluative privilege, or any other applicable privilege

9    or immunity. Irico provides only information that it believes to be non-privileged and otherwise

10   properly discoverable. Nothing in Irico's responses is intended nor should be construed as a

11   waiver of any such privilege or immunity. The inadvertent or mistaken provision of any

12   information or responsive documents subject to any such doctrine, privilege, protection or

13   immunity from production shall not constitute a general, inadvertent, implicit, subject-matter,

14   separate, independent or other waiver of such doctrine, privilege, protection or immunity from

15   production.

16        13.    Irico objects to Plaintiffs' Interrogatories to the extent that they call for

17   information that is not in the possession, custody, or control of Irico. Irico also objects to the

18   extent that any of Plaintiffs' Interrogatories seek information from non-parties or third parties,

19   including but not limited to any of Irico's subsidiary or affiliated companies.

20        14.    Irico objects to Plaintiffs' Interrogatories to the extent that responding would

21   require Irico to violate the privacy and/or confidentiality of a third party or confidentiality

22   agreement with a third party.

23        15.    Irico objects to Plaintiffs' Interrogatories to the extent that they seek information

24   that is publicly available, already in Plaintiffs' possession, custody, or control, or more readily

25   available from other sources.

26        16.    Irico objects to Plaintiffs' Interrogatories to the extent that they seek information

27   or documents concerning transactions outside the United States. Such Requests are unduly

28   burdensome and disproportionate to the needs of the case as Plaintiffs' class definition is confined

---

IRICO'S SUPP. RESPONSES TO IPP'S          3          Master File No. 07-cv-05944-JST
FOURTH SET INTERROGATORIES                            MDL No. 1917

1    to "individuals and entities that indirectly purchased Cathode Ray Tube Products . . . in the United

2    States" (see Indirect Purchaser Plaintiffs' Fifth Consolidated Amended Complaint ("Complaint")

3    dated September 19, 2019).

4          17.    Irico objects to Plaintiffs' Interrogatories to the extent that compliance would

5    require Irico to violate the laws, regulations, procedures, or orders of a judicial or regulatory body

6    of foreign jurisdictions.

7          18.    Irico's responses pursuant to Plaintiffs' Interrogatories should not be construed as

8    either (i) a waiver of any of Irico's general or specific objections or (ii) an admission that such

9    information or documents are either relevant or admissible as evidence.

10          19.    Irico objects to Plaintiffs' Interrogatories to the extent that they are compound

11    and/or contain discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1).

12          20.    Irico objects to Plaintiffs' Interrogatories to the extent that they state and/or call for

13    legal conclusions.

14          21.    Irico objects to the Interrogatories to the extent that they contain express or implied

15    assumptions of fact or law with respect to the matters at issue in this case.

16          22.    Irico objects to the Interrogatories to the extent they seek information or

17    documents that cannot be removed or transmitted outside China without violating the laws and

18    regulations of that country, including but not limited to restrictions on the transmission of state

19    secrets or trade secrets as those terms are defined under Chinese law.

20          23.    Irico objects to the Interrogatories to the extent that they are premature based on

21    the current status of discovery in the case. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011

22    WL 9558055 (N.D. Cal. May 19, 2011). Irico further objects to each Interrogatory to the extent

23    that it: (a) conflicts with obligations that are imposed by the Federal Rules of Civil Procedure, the

24    Civil Local Rules of this Court, and/or any other applicable rule; and/or (b) seeks information that

25    is dependent on depositions that have not occurred.

26          24.    Irico reserves the right to assert additional General and Specific Objections as

27    appropriate to supplement these Responses.

28          These General Objections apply to each Interrogatory as though restated in full in the

1    responses thereto. The failure to mention any of the foregoing General Objections in the specific

2    responses set forth below shall not be deemed as a waiver of such objections or limitations.

3                    **GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

4         1.      Irico objects to the definitions of "Including" and "Relating" (Definition No. 1) on

5    the grounds that it calls for a legal conclusion and is otherwise vague, ambiguous, and overly

6    broad. Irico further objects to this definition to the extent that it attempts to impose burdens on

7    Irico beyond those imposed by the Federal Rules of Civil Procedure. Irico further objects to this

8    definition to the extent that it seeks information protected by the attorney client or other

9    applicable privilege, attorney work product doctrine, or otherwise seeks to violate rights of

10   privacy under U.S. or foreign law.

11        2.      Irico objects to the definitions of "You," "Your," and "Irico" (Definition No. 2) to

12   the extent that Plaintiffs defines those terms to include the Irico's "present and former members,

13   officers, agents, employees, and all other persons acting or purporting to act on their behalf,

14   including all present and former members, officers, agents, employees, and all other persons

15   exercising or purporting to exercise discretion, making policy, and make decisions." This

16   definition is overbroad, unduly burdensome, vague, and ambiguous. In particular, Irico objects to

17   this definition to the extent it purports to request information beyond the possession, custody, or

18   control of Irico Group or Irico Display, including but not limited to information in the possession

19   of non-parties and third parties where Irico lacks any duty to obtain or otherwise search for the

20   information and for whom the Court lacks personal jurisdiction. Irico also objects to the inclusion

21   of all "present or former employees, officers, directors, agents . . . or any other person acting on

22   [the] behalf [of]" Irico within this definition to the extent it purports to encompass information

23   that is protected by attorney-client privilege, work product protection or any other applicable

24   doctrine, privilege, protection or immunity or otherwise calls for a legal conclusion.

25        3.      Irico objects to the definition of "Identify" (Definition No. 3) on the grounds that

26   the definition is overly broad, unduly burdensome, and seeks information that is neither relevant

27   nor proportionate to the needs of the case.

28        4.      Irico objects to the definition of "Document" (Definition No. 5) to the extent it

---

IRICO'S SUPP. RESPONSES TO IPP'S           5           Master File No. 07-cv-05944-JST
FOURTH SET INTERROGATORIES                              MDL No. 1917

seeks to impose requirements that are beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, any Order of this Court, or any other applicable laws.

5.     Irico objects to the definition of "CRT" (Definition No. 6) on the grounds that it is vague, ambiguous and overly broad.

6.     Irico objects to Instruction No. 1 (related to disclosure of additional information) to the extent it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 26(e).

7.     Irico objects to Instruction No. 2 (related to production of business records) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 33(d), Rule 26(b). Irico further objects to this Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any Orders of the Court.

8.     Irico objects to Instruction No. 3 (related to privileged information) to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, including, without limiting the generality of the foregoing, Rule 33(d), Rule 26(b)(5)(A) and Rule 26(e)(1). Irico further objects to this Instruction to the extent that it purports to impose burdens or obligations broader than, inconsistent with, or not authorized under, the Local Rules and any Orders of the Court, and on the grounds that it is vague, ambiguous, and inconsistent with common usage. Irico further objects to this Instruction to the extent it seeks information that would disclose personal confidential information and/or violate any and all rights of privacy under the United States Constitution or Article I of the Constitution of the State of California, or any other applicable law or state constitution, or that is otherwise prohibited from disclosure because to do so would cause Irico to violate legal and/or contractual obligations to any other persons or entities.

## SPECIFIC RESPONSES TO INTERROGATORIES

## INTERROGATORY NO. 7

1    As to each of the Defenses set forth in Your Answers to IPPs' Fifth Consolidated

2  Complaint (ECF Nos. 5873, 5875):

3       a.    State all facts that You rely on to support Your contention;

4       b.    Identify each Person You contend has knowledge of facts that support Your

5             contention; and

6       c.    Identify each Document You contend supports Your contention

7  **RESPONSE TO INTERROGATORY NO. 7**

8       In addition to Irico's General Objections, which Irico incorporates by reference, Irico

9  specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome,

10 not proportional to the needs of the case, and seeks information that is maintained by and equally

11 available to Plaintiffs or stated in publicly available documents. Irico objects to this Interrogatory

12 on the grounds that it calls for a legal conclusion. Irico objects that the term "support" is vague

13 and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not

14 proportionate to the needs of the case. Irico also objects to this Interrogatory on the grounds that it

15 contains impermissible subparts as Irico has identified forty-one defenses in its Answer to the

16 Plaintiffs' Complaint. Irico also objects to this Interrogatory to the extent it improperly tries to

17 shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to Plaintiffs'

18 Interrogatories to the extent that they request duplicative discovery in violation of the Order Re

19 Discovery And Case Management Protocol, ECF No. 1128. *See* Order Re Plaintiffs' Motions To

20 Compel Supplemental Discovery From Toshiba And Panasonic, ECF No. 4128, at 4 ("The

21 Discovery Protocol (ECF No 1128), requires parties to coordinate discovery and not file

22 duplicative discovery. . . . The benefit redounds to all parties on both sides of the litigation, by

23 conserving the efforts required by Plaintiffs and protecting defendants against unnecessary

24 duplication of effort.") (Report and Recommendation adopted in full at ECF No. 4256). Plaintiffs'

25 request is duplicative, in part or in whole, of the following discovery requests: Interrogatory No. 7

26 of Indirect Purchaser Plaintiffs' First Set of Interrogatories; Interrogatory Nos. 17-20 of Direct

27 Purchaser Plaintiffs' First Set of Interrogatories; and, Interrogatory Nos. 16-23 of Direct

28 Purchaser Plaintiffs Arch Electronics, Inc.'s First Set of Interrogatories to Irico Group

IRICO'S SUPP. RESPONSES TO IPP'S          7          Master File No. 07-cv-05944-JST
FOURTH SET INTERROGATORIES                             MDL No. 1917

1  Corporation and Irico Display Devices Co., Ltd.

2      Subject to and without waiving the foregoing objections, Irico responds as follows:

3      **INTERROGATORY RESPONSE AS TO IRICO'S SECOND DEFENSE**

4      Plaintiffs' claims for any foreign purchases, if any, should be dismissed to the extent that

5  they are barred, in whole or in part, because Plaintiffs have failed to allege facts sufficient to

6  support a claim under the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a.

7      **RESPONSE**

8      Irico further objects that this Interrogatory is premature given that no Irico witnesses have

9  been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See*

10 *Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico

11 also objects to this interrogatory on the ground that it calls for a legal argument or legal

12 conclusion. Irico further objects to this interrogatory to the extent that it improperly tries to shift

13 the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

14     Subject to and without waiving the objections stated above, Irico contends that Plaintiffs

15 have failed to allege facts sufficient to support a claim under the Foreign Trade Antitrust

16 Improvements Act ("FTAIA"), 15 U.S.C. § 6a. At all relevant times, the North American CRT

17 market was unique and separate from other foreign markets, including China. In supporting its

18 claims, Plaintiffs rely on alleged meetings and communications that occurred outside the United

19 States that discuss and relate to CRTs sold outside the United States. Plaintiffs have not

20 established how it is entitled to any relief under FTAIA based on their purchases of either CRT

21 products outside of the United States or their purchase of CRT products containing CRTs

22 manufactured and/or purchased outside the United States. Irico also identifies the following

23 evidence under FRCP 33(d): Irico Group Corporation's Amended Motion to Dismiss Claims of

24 Indirect Purchaser Plaintiffs for Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)),

25 March 19, 2019; Irico Display Devices Co., Ltd.'s Amended Motion to Dismiss Claims of

26 Indirect Purchaser Plaintiffs for Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)),

27 March 19, 2019; Irico Defendants' Reply in Support of Amended Motions to Dismiss Claims of

28 Indirect Purchaser Plaintiffs for Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)),

1  May 13, 2019.

2        **SUPPLEMENTAL RESPONSE**

3        Irico further objects that this Interrogatory is premature given that no Irico witnesses have

4  been deposed relating to merits issues. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL

5  9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it

6  calls for a legal argument or legal conclusion. Irico further objects to this interrogatory to the

7  extent that it improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone

8  carry to Irico. Irico does not intend, and its Response should not be construed as, an agreement or

9  acquiescence as to the admissibility of any document or fact contained in or implied by Irico's

10  Response.

11        Subject to and without waiving the objections stated above, Irico contends that Plaintiffs

12  have failed to allege facts sufficient to support a claim under the Foreign Trade Antitrust

13  Improvements Act ("FTAIA"), 15 U.S.C. § 6a. At all relevant times, the North American CRT

14  market was unique and separate from other foreign markets, including China. In supporting its

15  claims, Plaintiffs rely on alleged meetings and communications that occurred outside the United

16  States that discuss and relate to CRTs sold outside the United States. Plaintiffs have not

17  established how it is entitled to any relief under FTAIA based on their purchases of either CRT

18  products outside of the United States or their purchase of CRT products containing CRTs

19  manufactured and/or purchased outside the United States. Irico also identifies the following

20  evidence: Am. Wang. Decl. in Support of FSIA MTD (March 19, 2019); Clarke Decl. in Support

21  of FSIA MTD (March 19, 2019); Am. Plunkett Decl in Support of FSIA MTD (March 19, 2019);

22  Irico Group Corporation's Amended Motion to Dismiss Claims of Direct Purchaser Plaintiffs for

23  Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)), March 19, 2019; Irico Display

24  Devices Co., Ltd.'s Amended Motion to Dismiss Claims of Direct Purchaser Plaintiffs for Lack of

25  Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)), March 19, 2019; Irico Defendants' Reply in

26  Support of Amended Motions to Dismiss Claims of Direct Purchaser Plaintiffs for Lack of

27  Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)), May 2, 2019; Deposition of Woong Rae

28  Kim (SDI, July 1-2, 2014), 386:15-387:21; Deposition of Kyung Chul Oh (SDI, November 19-22,

1    2013), pp. 229:18-231:13; Deposition of Dae Eui Lee (SDI, January 16-18, 2013), p. 80:2-82:6;

2    Deposition of Sheng-Jen Yang (Chunghwa, February 22, 25-26, 2013), pp. 440:16-24; Deposition

3    of Kazutaka Nishimura (Toshiba/MTPD, June 10-12, 2014), pp. 136:21-137:15, 353:18-354:7,

4    385:21-386:22; HEDUS-CRT00126016; CHU00029131E; CHU00030665E; CHU00029171E;

5    CHU00029191E; CHU00036410E; CHU00029131E; CHU00029179E; SDCRT-0002520E;

6    CHU00030537E; SDCRT-0091491; SDCRT-0005852

7    **INTERROGATORY RESPONSE AS TO IRICO'S THIRD DEFENSE**

8         Plaintiffs' claims and the claims of any putative class members are barred, in whole or in

9    part, because the alleged conduct of [Group or Display] that is the subject of the Complaint either

10   occurred outside the jurisdiction of the Court or was neither directed to nor affected persons,

11   entities, trade or commerce in the United States, or both.

12   **RESPONSE**

13        Irico further objects that this Interrogatory is premature given that no Irico witnesses have

14   been deposed relating to merits issues and expert analysis and disclosures have not yet begun.

15   *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011).

16   Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal

17   conclusion. Irico further objects to this interrogatory to the extent that it improperly tries to shift

18   the pleading and evidentiary burden that Plaintiffs alone carry to Irico.

19        Subject to and without waiving the objections stated above, and despite the Interrogatory's

20   demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

21   has been brought in the above captioned matter that indicates that Irico manufactured, sold, or

22   distributed CRTs in the United States during the class period. In particular, Irico will be

23   producing compilations of its sales records that demonstrate that Irico did not sell CRTs to the

24   United States. Irico also identifies the following evidence under FRCP 33(d): Direct Purchaser

25   Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico

26   Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs, July 14,

27   2021; Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser

28   Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental

1  Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January 7,

2  2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs'

3  Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd.,

4  January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co.,

5  Ltd., March 6-8, 2019.

6        Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

7  Zhaojie and Su Xiaohua.

8        **SUPPLEMENTAL RESPONSE**

9        Irico further objects that this Interrogatory is premature given that no Irico witnesses have

10 been deposed relating to merits issues. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL

11 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it

12 calls for a legal argument or legal conclusion. Irico further objects to this interrogatory to the

13 extent that it improperly tries to shift the pleading and evidentiary burden that Plaintiffs alone

14 carry to Irico. Irico does not intend, and its Response should not be construed as, an agreement or

15 acquiescence as to the admissibility of any document or fact contained in or implied by Irico's

16 Response.

17       Subject to and without waiving the objections stated above, and despite the Interrogatory's

18 demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence

19 has been brought in the above captioned matter that indicates that Irico manufactured, sold, or

20 distributed CRTs in the United States during the class period. In particular, Irico has produced

21 summaries of its sales records that demonstrate that Irico did not sell CRTs to the United States.

22 See Summary of Invoice Records produced by Irico on June 2, 2022. Irico also identifies the

23 following evidence: Am. Wang. Decl. in Support of FSIA MTD, ¶¶ 12, 16-17 (March 19, 2019);

24 Direct Purchaser Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group

25 Corp. and Irico Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser

26 Plaintiffs, July 14, 2021; Irico Defendants' Sixth Supplemental Objections and Responses to

27 Direct Purchaser Plaintiffs' First Set of Interrogatories, at 17-18, 20-21, January 7, 2022; Irico

28 Defendants' Third Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' First

1    Set of Interrogatories, January 7, 2022; Irico Defendants' Supplemental Objections and

2    Responses to Indirect Purchaser Plaintiffs' Third Set of Interrogatories to Irico Group Corporation

3    and Irico Display Devices Co., Ltd., at 11-13, January 21, 2022; Wang Dep. Tr. (March 6, 2019)

4    94:3-97:1; 107:6-14; 109:2-12.

5        Irico identifies the following persons with knowledge regarding this Interrogatory: Wang

6    Zhaojie and Yan Yunlong.

7                    **INTERROGATORY RESPONSE AS TO IRICO'S EIGHTH DEFENSE**

8        Plaintiffs' claims and the claims of any putative class members are barred, in whole or in

9    part, because the actions or practices of [Group or Display] that are the subject of the Complaint

10   were undertaken unilaterally for legitimate business reasons and in pursuit of [Group or

11   Display]'s independent interests and those of its customers, and were not the product of any

12   contract, combination or conspiracy between Group and any other person or entity.

13                    **RESPONSE**

14       Irico further objects that this Interrogatory is premature given that no Irico witnesses have

15   been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See*

16   *Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico

17   also objects to this interrogatory on the ground that it calls for a legal argument or legal

18   conclusion.

19       Subject to and without waiving the objections stated above, Irico contends that its acts or

20   practices were undertaken unilaterally for legitimate business reasons and in pursuit of Irico's

21   independent interests. In addition, Irico asserts no evidence has been brought in the above

22   captioned matter that indicates that its actions were not undertaken unilaterally for legitimate

23   business reasons and in pursuit of Irico's independent interests. Pursuant to Rule 33(d) of the

24   Federal Rules of Civil Procedure, Irico relies on the following evidence to support its contention

25   that at all times its acts or practices were undertaken unilaterally for legitimate business reasons

26   and in pursuit of Irico's independent interests: Reply Brief of Irico In Support of Motion to Set

27   Aside Default at 10-11, ECF No. 5229; Exs. A – F to the Declaration of Stuart C. Plunkett in

28   Support of Motion to Set Aside Default, ECF Nos. 5229-02 through -07; IRI-CRT-00010133;

1   IRI-CRT-00010449; IRI-CRT-00010468; IRI-CRT-00026812; IRI-CRT-00030226; IRI-CRT-

2   00030865; IRI-CRT-00031457; BMCC-CRT000002761; BMCC-CRT000002762;

3   CHU00029175E; CHU00029179E; CHU00029259E; CHU00030067E; CHU00030777E;

4   CHU00030941E; CHU00030973E; CHU00031018E; CHU00031032; CHU00031044E; and,

5   CHU00031070E.

6          Irico further contends that Irico's pricing-related conduct was compelled by the Chinese

7   government and based on duly enacted laws and/or regulations of the People's Republic of China.

8   Irico relies on the following evidence to support this contention:

9          • The State Planning Commission and the State Economic and Trade Commission

10           issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced

11           Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the

12           Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF

13           No. 5229-02.

14         • Notice of the State Planning Commission on Issuing the "Measures for the

15           Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial

16           Implementation)" – effective as of March 1, 1999. *See*

17           https://law.lawtime.cn/d448076453170.html.

18         • Notice of the State Planning Commission and the Ministry of Information Industry

19           on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and

20           Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex.

21           B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside

22           Default, ECF No. 5229-03.

23         • Notice on submitting cost information of color TV and color tube industry issued

24           by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of

25           Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.

26         • Notice on the issuance of the average production cost of some types of color

27           picture tubes and color TV industries issued by the Ministry of Information

28           Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to

1      the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default,

2      ECF No. 5229-04.

3      • Notice on the issuance of the average production cost of certain types of color TV

4      industries issued by the Ministry of Information Industry on August 25, 2000. *See*

5      Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside

6      Default, ECF No. 5229-06.

7      • Notice on the issuance of the average production cost of some industries of color

8      picture tubes issued by the Ministry of Information Industry on September 14,

9      2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to

10     Set Aside Default, ECF No. 5229-07.

11     Irico identifies the following employees as having knowledge regarding this Interrogatory:

12     Wang Zhaojie and Su Xiaohua.

13     **SUPPLEMENTAL RESPONSE**

14     Irico further objects that this Interrogatory is premature given that no Irico witnesses have

15     been deposed relating to merits issues. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL

16     9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it

17     calls for a legal argument or legal conclusion. Irico also objects to this interrogatory to the extent

18     that it attempts to ascribe an unlawful or anticompetitive purpose to Irico contacts with CRT

19     manufacturers that were mere exchanges of information, which are lawful in the absence of

20     additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part

21     of, the information exchange. *See USA v. Penn et al* (Doc no. 1232, at ¶ 21, D. Colo. 1:20-cr-

22     00152-PAB).  Irico does not intend, and its Response should not be construed as, an agreement or

23     acquiescence as to the admissibility of any document or fact contained in or implied by Irico's

24     Response.

25     Subject to and without waiving the objections stated above, Irico contends that its acts or

26     practices were undertaken unilaterally for legitimate business reasons and in pursuit of Irico's

27     independent interests. In addition, Irico asserts no evidence has been brought in the above

28     captioned matter that indicates that its actions were not undertaken unilaterally for legitimate

---

business reasons and in pursuit of Irico's independent interests. Subject to and without waiving the foregoing objections, Irico identifies the following evidence: Expert Report of Robert D. Willig at ¶ 8, December 17, 2012; Expert Report of Robert D. Willig at ¶¶ 57-61, August 5, 2014; Expert Report of Margaret E. Guerin-Calvert at ¶¶ 90-98, August 5, 2014; Expert Report of Prof. Dennis W. Carlton at ¶¶ 64, 68, August 5, 2014; Wang Dep. Tr. (Mar. 8, 2019), at 43:5-15, 57:8-10, 64:14-21, 75:7-11; Reply Brief of Irico In Support of Motion to Set Aside Default at 10-11, ECF No. 5229; Exs. A – F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF Nos. 5229-02 through -07; Irico Response to Plaintiffs' Conspiracy Proffer to Special Master at 2-8, (April 11, 2022); BMCC-CRT000113367; BMCC-CRT000113368; BMCC-CRT000113372; BMCC-CRT000113374; BMCC-CRT000113378;  BMCC-CRT000113379; BMCC-CRT000113380; BMCC-CRT000113381; BMCC-CRT000113382;; BMCC-CRT000113389; BMCC-CRT000113392; BMCC-CRT000113393; BMCC-CRT000113394;  BMCC-CRT000113395 to 416. Irico further identifies the following evidence under FRCP 33(d): IRI-CRT-00010133; IRI-CRT-00010449; IRI-CRT-00010468; IRI-CRT-00026812; IRI-CRT-00030226; IRI-CRT-00030865; IRI-CRT-00031457; IRI-CRT-00004673; IRI-CRT-00008191; IRI-CRT-00008248; IRI-CRT-00008664; IRI-CRT-00018191; IRI-CRT-00024165; IRI-CRT-00024204; IRI-CRT-00024613.

Irico further contends that Irico's pricing-related conduct was compelled by the Chinese government and based on duly enacted laws and/or regulations of the People's Republic of China. Irico relies on the following evidence to support this contention:

- The State Planning Commission and the State Economic and Trade Commission issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-02; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice of the State Planning Commission on Issuing the "Measures for the Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial Implementation)" – effective as of March 1, 1999. *See*

https://law.lawtime.cn/d448076453170.html; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice of the State Planning Commission and the Ministry of Information Industry on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex. B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-03; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information Industry on April 2, 1999. See IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-04; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice on the issuance of the average production cost of certain types of color TV industries issued by the Ministry of Information Industry on August 25, 2000. *See* Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-06; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice on the issuance of the average production cost of some industries of color picture tubes issued by the Ministry of Information Industry on September 14, 2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-07; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

Irico identifies the following employees as having knowledge regarding this Interrogatory:

1  Wang Zhaojie and Yan Yunlong.

2  **INTERROGATORY RESPONSE AS TO IRICO'S TENTH DEFENSE**

3  Plaintiffs' claims and claims of any putative class members are barred, in whole or in part,

4  because any acts or practices of [Group or Display] that are the subject of the Complaint were

5  cost justified or otherwise economically justified and resulted from a good faith effort to meet

6  competition or market conditions.

7  **RESPONSE**

8  Irico further objects that this Interrogatory is premature given that no Irico witnesses have

9  been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See*

10  *Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico

11  also objects to this interrogatory on the ground that it calls for a legal argument or legal

12  conclusion.

13  Subject to and without waiving the objections stated above, Irico contends that its acts or

14  practices were cost justified or otherwise economically justified, and resulted from a good faith

15  effort to meet competition or market conditions. In addition, Irico asserts no evidence has been

16  brought in the above captioned matter that indicates any action or practice of Irico was not cost

17  justified, otherwise economically justified, or did not result from a good faith effort to meet

18  competition or market conditions. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure,

19  Irico relies on the following evidence to support its contention that at all times its acts or practices

20  were cost justified or otherwise economically justified, and resulted from a good faith effort to

21  meet competition or market conditions: Reply Brief of Irico In Support of Motion to Set Aside

22  Default at 10-11, ECF No. 5229; Exs. A – F to the Declaration of Stuart C. Plunkett in Support of

23  Motion to Set Aside Default, ECF Nos. 5229-02 through -07; IRI-CRT-00010133; IRI-CRT-

24  00010449; IRI-CRT-00010468; IRI-CRT-00026812; IRI-CRT-00030226; IRI-CRT-00030865;

25  IRI-CRT-00031457; BMCC-CRT000002761; BMCC-CRT000002762; CHU00029175E;

26  CHU00029179E; CHU00029259E; CHU00030067E; CHU00030777E; CHU00030941E;

27  CHU00030973E; CHU00031018E; CHU00031032; CHU00031044E; and, CHU00031070E.

28

Irico identifies the following employees as having knowledge regarding this Interrogatory: Wang Zhaojie and Su Xiaohua.

**SUPPLEMENTAL RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico does not intend, and its Response should not be construed as, an agreement or acquiescence as to the admissibility of any document or fact contained in or implied by Irico's Response.

Subject to and without waiving the objections stated above, Irico contends that its acts or practices were cost justified or otherwise economically justified, and resulted from a good faith effort to meet competition or market conditions. In addition, Irico asserts no evidence has been brought in the above captioned matter that indicates any action or practice of Irico was not cost justified, otherwise economically justified, or did not result from a good faith effort to meet competition or market conditions.  Subject to and without waiving the foregoing objections, Irico identifies the following evidence: Expert Report of Robert D. Willig at ¶ 8, December 17, 2012; Expert Report of Robert D. Willig at ¶¶ 57-61, August 5, 2014; Expert Report of Margaret E. Guerin-Calvert at ¶¶ 90-98, August 5, 2014; Expert Report of Prof. Dennis W. Carlton at ¶¶ 64, 68, August 5, 2014; Wang Dep. Tr. (Mar. 8, 2019), at 43:5-15, 57:8-10, 64:14-21, 75:7-11; Reply Brief of Irico In Support of Motion to Set Aside Default at 10-11, ECF No. 5229; Exs. A – F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF Nos. 5229-02 through -07; Irico Response to Plaintiffs' Conspiracy Proffer to Special Master at 2-8, (April 11, 2022); BMCC-CRT000113367; BMCC-CRT000113368; BMCC-CRT000113372; BMCC-CRT000113374; BMCC-CRT000113378;  BMCC-CRT000113379; BMCC-CRT000113380; BMCC-CRT000113381; BMCC-CRT000113382; BMCC-CRT000113389; BMCC-CRT000113392; BMCC-CRT000113393; BMCC-CRT000113394;  BMCC-CRT000113395 to 416. Irico further identifies the following evidence under FRCP 33(d): IRI-CRT-00010133; IRI-CRT-00010449; IRI-CRT-00010468; IRI-CRT-00026812; IRI-CRT-00030226; IRI-CRT-

00030865; IRI-CRT-00031457; IRI-CRT-00004673; IRI-CRT-00008191; IRI-CRT-00008248; IRI-CRT-00008664; IRI-CRT-00018191; IRI-CRT-00024165; IRI-CRT-00024204; IRI-CRT-00024613.

Irico further contends that Irico's pricing-related conduct was compelled by the Chinese government and based on duly enacted laws and/or regulations of the People's Republic of China. Irico relies on the following evidence to support this contention:

- The State Planning Commission and the State Economic and Trade Commission issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-02; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice of the State Planning Commission on Issuing the "Measures for the Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial Implementation)" – effective as of March 1, 1999. *See* https://law.lawtime.cn/d448076453170.html; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice of the State Planning Commission and the Ministry of Information Industry on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex. B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-03; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information

1   Industry on April 2, 1999. See IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to

2   the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default,

3   ECF No. 5229-04; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

4   • Notice on the issuance of the average production cost of certain types of color TV

5   industries issued by the Ministry of Information Industry on August 25, 2000. *See*

6   Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside

7   Default, ECF No. 5229-06; Expert Report of Donald Clarke at ¶¶ 6-7, March 16,

8   2022.

9   • Notice on the issuance of the average production cost of some industries of color

10   picture tubes issued by the Ministry of Information Industry on September 14,

11   2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to

12   Set Aside Default, ECF No. 5229-07; Expert Report of Donald Clarke at ¶¶ 6-7,

13   March 16, 2022.

14   Irico identifies the following employees as having knowledge regarding this Interrogatory:

15   Wang Zhaojie and Yan Yunlong.

16   **INTERROGATORY RESPONSE AS TO IRICO'S ELEVENTH DEFENSE**

17   Plaintiffs' claims are barred, in whole or in part, because the alleged conduct of [Group or

18   Display] that is the subject of the Complaint was caused by, due to, based upon, or in response to

19   directives, laws, regulations, policies, and/or acts of governments, governmental agencies and

20   entities, and/or regulatory agencies, and such is non-actionable or privileged.

21   **RESPONSE**

22   Irico further objects that this Interrogatory is premature given that no Irico witnesses have

23   been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See*

24   *Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico

25   also objects to this interrogatory on the ground that it calls for a legal argument or legal

26   conclusion.

27   Subject to and without waiving the objections stated above, Irico contends that Irico's

28   pricing-related conduct was compelled by the Chinese government and based on duly enacted

---

laws and/or regulations of the People's Republic of China. Irico relies on the following evidence to support this contention:

- The State Planning Commission and the State Economic and Trade Commission issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-02.

- Notice of the State Planning Commission on Issuing the "Measures for the Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial Implementation)" – effective as of March 1, 1999. *See* https://law.lawtime.cn/d448076453170.html..

- Notice of the State Planning Commission and the Ministry of Information Industry on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex. B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-03.

- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.

- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-04.

- Notice on the issuance of the average production cost of certain types of color TV industries issued by the Ministry of Information Industry on August 25, 2000. *See* Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-06.

1  • Notice on the issuance of the average production cost of some industries of color
2  picture tubes issued by the Ministry of Information Industry on September 14,
3  2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to
4  Set Aside Default, ECF No. 5229-07.

5  Irico identifies the following employees as having knowledge regarding this Interrogatory: Wang
6  Zhaojie and Su Xiaohua.

7  **SUPPLEMENTAL RESPONSE**

8  Irico further objects that this Interrogatory is premature given that no Irico witnesses have
9  been deposed relating to merits issues. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL
10  9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it
11  calls for a legal argument or legal conclusion. Irico does not intend, and its Response should not
12  be construed as, an agreement or acquiescence as to the admissibility of any document or fact
13  contained in or implied by Irico's Response.

14  Subject to and without waiving the objections stated above, Irico contends that Irico's
15  pricing-related conduct was compelled by the Chinese government and based on duly enacted
16  laws and/or regulations of the People's Republic of China. Irico relies on the following evidence
17  to support this contention:

18  • The State Planning Commission and the State Economic and Trade Commission
19  issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced
20  Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the
21  Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF
22  No. 5229-02; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.
23  • Notice of the State Planning Commission on Issuing the "Measures for the
24  Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial
25  Implementation)" – effective as of March 1, 1999. *See*
26  https://law.lawtime.cn/d448076453170.html; Expert Report of Donald Clarke at ¶¶
27  6-7, March 16, 2022.

28

1  • Notice of the State Planning Commission and the Ministry of Information Industry
2    on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and
3    Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex.
4    B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside
5    Default, ECF No. 5229-03; Expert Report of Donald Clarke at ¶¶ 6-7, March 16,
6    2022.

7  • Notice on submitting cost information of color TV and color tube industry issued
8    by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of
9    Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05;
10   Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

11 • Notice on the issuance of the average production cost of some types of color
12   picture tubes and color TV industries issued by the Ministry of Information
13   Industry on April 2, 1999. See IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to
14   the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default,
15   ECF No. 5229-04; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

16 • Notice on the issuance of the average production cost of certain types of color TV
17   industries issued by the Ministry of Information Industry on August 25, 2000. *See*
18   Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside
19   Default, ECF No. 5229-06; Expert Report of Donald Clarke at ¶¶ 6-7, March 16,
20   2022.

21 • Notice on the issuance of the average production cost of some industries of color
22   picture tubes issued by the Ministry of Information Industry on September 14,
23   2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to
24   Set Aside Default, ECF No. 5229-07; Expert Report of Donald Clarke at ¶¶ 6-7,
25   March 16, 2022.

26   Irico identifies the following employees as having knowledge regarding this Interrogatory:
27 Wang Zhaojie and Yan Yunlong.

28

---

IRICO'S SUPP. RESPONSES TO IPP'S          23          Master File No. 07-cv-05944-JST
FOURTH SET INTERROGATORIES                              MDL No. 1917

1

**INTERROGATORY RESPONSE AS TO IRICO'S TWELFTH DEFENSE**

2      Plaintiffs' claims are barred, in whole or in part, because the alleged conduct of [Group or

3  Display] that is the subject of the Complaint was caused by or in response to duly enacted laws

4  and/or regulations of the People's Republic of China and is therefore protected under the foreign

5  sovereign compulsion doctrine, the act of state doctrine, and international comity.

6  **RESPONSE**

7      Irico further objects that this Interrogatory is premature given that no Irico witnesses have

8  been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See*

9  *Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico

10  also objects to this interrogatory on the ground that it calls for a legal argument or legal

11  conclusion.

12      Subject to and without waiving the objections stated above, Irico contends that Irico's

13  pricing-related conduct was compelled by the Chinese government and based on duly enacted

14  laws and/or regulations of the People's Republic of China. Irico relies on the following evidence

15  to support this contention:

16  - The State Planning Commission and the State Economic and Trade Commission

17    issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced

18    Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the

19    Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF

20    No. 5229-02.

21  - Notice of the State Planning Commission on Issuing the "Measures for the

22    Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial

23    Implementation)" – effective as of March 1, 1999. *See*

24    https://law.lawtime.cn/d448076453170.html.

25  - Notice of the State Planning Commission and the Ministry of Information Industry

26    on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and

27    Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex.

28

---

IRICO'S SUPP. RESPONSES TO IPP'S              24              Master File No. 07-cv-05944-JST
FOURTH SET INTERROGATORIES                                    MDL No. 1917

B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-03.

- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.

- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-04.

- Notice on the issuance of the average production cost of certain types of color TV industries issued by the Ministry of Information Industry on August 25, 2000. *See* Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-06.

- Notice on the issuance of the average production cost of some industries of color picture tubes issued by the Ministry of Information Industry on September 14, 2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-07.

Irico identifies the following employees as having knowledge regarding this Interrogatory: Wang Zhaojie and Su Xiaohua.

**SUPPLEMENTAL RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico does not intend, and its Response should not be construed as, an agreement or acquiescence as to the admissibility of any document or fact contained in or implied by Irico's Response.

---

1        Subject to and without waiving the objections stated above, Irico contends that Irico's

2  pricing-related conduct was compelled by the Chinese government and based on duly enacted

3  laws and/or regulations of the People's Republic of China. Irico relies on the following evidence

4  to support this contention:

5               • The State Planning Commission and the State Economic and Trade Commission

6                  issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced

7                  Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the

8                  Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF

9                  No. 5229-02; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

10             • Notice of the State Planning Commission on Issuing the "Measures for the

11                Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial

12                Implementation)" – effective as of March 1, 1999. *See*

13                https://law.lawtime.cn/d448076453170.html; Expert Report of Donald Clarke at ¶¶

14                6-7, March 16, 2022.

15             • Notice of the State Planning Commission and the Ministry of Information Industry

16                on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and

17                Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex.

18                B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside

19                Default, ECF No. 5229-03; Expert Report of Donald Clarke at ¶¶ 6-7, March 16,

20                2022.

21             • Notice on submitting cost information of color TV and color tube industry issued

22                by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of

23                Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05;

24                Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

25             • Notice on the issuance of the average production cost of some types of color

26                picture tubes and color TV industries issued by the Ministry of Information

27                Industry on April 2, 1999. See IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to

28

1    the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default,

2    ECF No. 5229-04; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

3    • Notice on the issuance of the average production cost of certain types of color TV

4    industries issued by the Ministry of Information Industry on August 25, 2000. *See*

5    Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside

6    Default, ECF No. 5229-06; Expert Report of Donald Clarke at ¶¶ 6-7, March 16,

7    2022.

8    • Notice on the issuance of the average production cost of some industries of color

9    picture tubes issued by the Ministry of Information Industry on September 14,

10    2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to

11    Set Aside Default, ECF No. 5229-07; Expert Report of Donald Clarke at ¶¶ 6-7,

12    March 16, 2022.

13    Irico identifies the following employees as having knowledge regarding this Interrogatory:

14    Wang Zhaojie and Yan Yunlong.

15    **INTERROGATORY RESPONSE AS TO IRICO'S FOURTEENTH DEFENSE**

16    Plaintiffs' claims and claims of any putative class members are barred, in whole or in part,

17    because any alleged injuries and/or damages were not legally or proximately caused by any acts

18    or omissions of [Group or Display] and/or were caused, if at all, solely and proximately by the

19    conduct of third parties including, without limitations, the prior, intervening or superseding

20    conduct of such third parties.

21    **RESPONSE**

22    Irico further objects that this Interrogatory is premature given that no Irico witnesses have

23    been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See*

24    *Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico

25    also objects to this interrogatory on the ground that it calls for a legal argument or legal

26    conclusion.

27    Subject to and without waiving the objections stated above, Irico contends that Irico's

28    pricing-related conduct was compelled by the Chinese government and based on duly enacted

---

IRICO'S SUPP. RESPONSES TO IPP'S          27          Master File No. 07-cv-05944-JST
FOURTH SET INTERROGATORIES                            MDL No. 1917

1  laws and/or regulations of the People's Republic of China. Irico relies on the following evidence

2  to support this contention:

3  • The State Planning Commission and the State Economic and Trade Commission

4  issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced

5  Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the

6  Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF

7  No. 5229-02.

8  • Notice of the State Planning Commission on Issuing the "Measures for the

9  Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial

10  Implementation)" – effective as of March 1, 1999. *See*

11  https://law.lawtime.cn/d448076453170.html.

12  • Notice of the State Planning Commission and the Ministry of Information Industry

13  on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and

14  Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex.

15  B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside

16  Default, ECF No. 5229-03.

17  • Notice on submitting cost information of color TV and color tube industry issued

18  by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of

19  Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.

20  • Notice on the issuance of the average production cost of some types of color

21  picture tubes and color TV industries issued by the Ministry of Information

22  Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to

23  the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default,

24  ECF No. 5229-04.

25  • Notice on the issuance of the average production cost of certain types of color TV

26  industries issued by the Ministry of Information Industry on August 25, 2000. *See*

27  Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside

28  Default, ECF No. 5229-06.

1        •   Notice on the issuance of the average production cost of some industries of color
2            picture tubes issued by the Ministry of Information Industry on September 14,
3            2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to
4            Set Aside Default, ECF No. 5229-07.

5        Irico identifies the following employees as having knowledge regarding this Interrogatory: Wang
6  Zhaojie and Su Xiaohua.

7  **SUPPLEMENTAL RESPONSE**

8        Irico further objects that this Interrogatory is premature given that no Irico witnesses have
9  been deposed relating to merits issues. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL
10 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it
11 calls for a legal argument or legal conclusion. Irico does not intend, and its Response should not
12 be construed as, an agreement or acquiescence as to the admissibility of any document or fact
13 contained in or implied by Irico's Response.

14       Subject to and without waiving the objections stated above, Irico contends that Irico's
15 pricing-related conduct was compelled by the Chinese government and based on duly enacted
16 laws and/or regulations of the People's Republic of China. Irico relies on the following evidence
17 to support this contention:

18       •   The State Planning Commission and the State Economic and Trade Commission
19           issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced
20           Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the
21           Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF
22           No. 5229-02; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.
23       •   Notice of the State Planning Commission on Issuing the "Measures for the
24           Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial
25           Implementation)" – effective as of March 1, 1999. *See*
26           https://law.lawtime.cn/d448076453170.html; Expert Report of Donald Clarke at ¶¶
27           6-7, March 16, 2022.

28

- Notice of the State Planning Commission and the Ministry of Information Industry on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex. B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-03; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information Industry on April 2, 1999. See IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-04; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice on the issuance of the average production cost of certain types of color TV industries issued by the Ministry of Information Industry on August 25, 2000. *See* Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-06; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice on the issuance of the average production cost of some industries of color picture tubes issued by the Ministry of Information Industry on September 14, 2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-07; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

Irico identifies the following employees as having knowledge regarding this Interrogatory: Wang Zhaojie and Yan Yunlong.

1    **INTERROGATORY RESPONSE AS TO IRICO'S SEVENTEENTH DEFENSE**

2          Plaintiffs' claims are barred, in whole or in part, to the extent they are based on alleged

3    acts, conduct or statements that are specifically permitted by law.

4    **RESPONSE**

5          Irico further objects that this Interrogatory is premature given that no Irico witnesses have

6    been deposed relating to merits issues and expert analysis and disclosures have not yet begun. *See*

7    *Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico

8    also objects to this interrogatory on the ground that it calls for a legal argument or legal

9    conclusion.

10         Subject to and without waiving the objections stated above, Irico contends that Irico's

11   pricing-related conduct was compelled by the Chinese government and based on duly enacted

12   laws and/or regulations of the People's Republic of China. Irico relies on the following evidence

13   to support this contention:

14       •  The State Planning Commission and the State Economic and Trade Commission

15           issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced

16           Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the

17           Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF

18           No. 5229-02.

19       •  Notice of the State Planning Commission on Issuing the "Measures for the

20           Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial

21           Implementation)" – effective as of March 1, 1999. *See*

22           https://law.lawtime.cn/d448076453170.html.

23       •  Notice of the State Planning Commission and the Ministry of Information Industry

24           on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and

25           Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex.

26           B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside

27           Default, ECF No. 5229-03.

28

- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05.

- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information Industry on April 2, 1999. *See* IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-04.

- Notice on the issuance of the average production cost of certain types of color TV industries issued by the Ministry of Information Industry on August 25, 2000. *See* Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-06.

- Notice on the issuance of the average production cost of some industries of color picture tubes issued by the Ministry of Information Industry on September 14, 2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-07.

Irico identifies the following employees as having knowledge regarding this Interrogatory: Wang Zhaojie and Su Xiaohua.

**SUPPLEMENTAL RESPONSE**

Irico further objects that this Interrogatory is premature given that no Irico witnesses have been deposed relating to merits issues. *See Young v. Regis Corp.*, No. C 10-02634 SI, 2011 WL 9558055 (N.D. Cal. May 19, 2011). Irico also objects to this interrogatory on the ground that it calls for a legal argument or legal conclusion. Irico does not intend, and its Response should not be construed as, an agreement or acquiescence as to the admissibility of any document or fact contained in or implied by Irico's Response.

Subject to and without waiving the objections stated above, Irico contends that Irico's pricing-related conduct was compelled by the Chinese government and based on duly enacted

laws and/or regulations of the People's Republic of China. Irico relies on the following evidence to support this contention:

- The State Planning Commission and the State Economic and Trade Commission issued the "Regulations on Preventing Unfair Price Behavior of Low-Priced Dumping of Industrial Products" – effective as of Nov. 25, 1998. *See* Ex. A to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-02; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice of the State Planning Commission on Issuing the "Measures for the Determination of the Cost of Dumping Industrial Products at Low Prices (for Trial Implementation)" – effective as of March 1, 1999. *See* https://law.lawtime.cn/d448076453170.html; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice of the State Planning Commission and the Ministry of Information Industry on the Trial Measures to Stop Unfair Price Competition of Color Picture Tubes and Color TVs – effective as of April 1, 1999. *See* IRI-CRT-00031457 at 1460-64; Ex. B to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-03; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice on submitting cost information of color TV and color tube industry issued by the Ministry of Information Industry in 1999. *See* Ex. D to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-05; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

- Notice on the issuance of the average production cost of some types of color picture tubes and color TV industries issued by the Ministry of Information Industry on April 2, 1999. See IRI-CRT-00031457 at 1459-60, 1466-67; Ex. C to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside Default, ECF No. 5229-04; Expert Report of Donald Clarke at ¶¶ 6-7, March 16, 2022.

1        •  Notice on the issuance of the average production cost of certain types of color TV

2         industries issued by the Ministry of Information Industry on August 25, 2000. *See*

3         Ex. E to the Declaration of Stuart C. Plunkett in Support of Motion to Set Aside

4         Default, ECF No. 5229-06; Expert Report of Donald Clarke at ¶¶ 6-7, March 16,

5         2022.

6        •  Notice on the issuance of the average production cost of some industries of color

7         picture tubes issued by the Ministry of Information Industry on September 14,

8         2000. *See* Ex. F to the Declaration of Stuart C. Plunkett in Support of Motion to

9         Set Aside Default, ECF No. 5229-07; Expert Report of Donald Clarke at ¶¶ 6-7,

10         March 16, 2022.

11        Irico identifies the following employees as having knowledge regarding this Interrogatory:

12 Wang Zhaojie and Yan Yunlong.

13 **INTERROGATORY NO. 8**

14        If Your response to any of the IPPs' Requests for Admissions served concurrently

15 herewith is anything other than an unqualified admission:

16       a.     State all facts supporting Your denial;

17       b.     Identify each Person who provided facts relating to Your response;

18       c.     Identify each Document You consulted to formulate Your response

19 **RESPONSE TO INTERROGATORY NO. 8**

20        Irico reasserts and incorporates each of the General Objections and Objections to the

21 Definitions and Instructions set forth above. Irico also reasserts and incorporates each of the

22 General Objections, Objections to the Definitions and Instructions, and objections in each of its

23 Specific Responses to Requests for Admission as set forth in Irico Defendants' Objections and

24 Responses to Indirect Purchaser Plaintiffs' First Set of Requests for Admission, served herewith.

25 Irico further objects to this interrogatory as overbroad and unduly burdensome, as Plaintiffs has

26 not demonstrated how the benefit of such information outweighs the significant burden to Irico of

27 responding to each denial of the 119 RFAs (including subparts) propounded by Plaintiffs.

28        Subject to and without waiving the foregoing objections, Irico responds as follows:

**RESPONSE RE: REQUEST FOR ADMISSION NO. 16**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place.

Subject to and without waiving its foregoing objections, Irico refers Plaintiffs to the following evidence under FRCP 33(d): Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Third Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., January 21, 2022; Rule 30(b)(6) Deposition of Irico Group Corp. and Irico Display Devices Co., Ltd., March 6-8, 2019.

Irico identifies the following persons with knowledge regarding this Interrogatory: Wang Zhaojie and Su Xiaohua.

**SUPPLEMENTAL RESPONSE RE: REQUEST FOR ADMISSION NO. 16**

Irico further objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to Plaintiffs or stated in publicly available documents. Irico also objects to this Interrogatory on the grounds that it calls for a legal argument or legal conclusion. Irico further objects to the use of the terms "unqualified" and "supporting" because they are vague and ambiguous, rendering this Interrogatory overbroad, unduly

burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Irico also objects to this Interrogatory to the extent it improperly tries to shift the evidentiary burden that Plaintiffs alone carry to Irico. Irico further objects to this Interrogatory as it requests Irico to provide facts and evidence of events that did not take place. Irico does not intend, and its Response should not be construed as, an agreement or acquiescence as to the admissibility of any document or fact contained in or implied by Irico's Response.

Subject to and without waiving the objections stated above, and despite the Interrogatory's demand for proof of facts and evidence of events that did not take place, Irico asserts no evidence has been brought in the above captioned matter that indicates that Irico manufactured, sold, or distributed CRTs in the United States during the class period. In particular, Irico has produced summaries of its sales records that demonstrate that Irico did not sell CRTs to the United States. *See* Summary of Invoice Records produced by Irico on June 2, 2022. Irico also identifies the following evidence: Am. Wang. Decl. in Support of FSIA MTD, ¶¶ 12, 16-17 (March 19, 2019); Direct Purchaser Plaintiffs' Supplemental Objections and Responses to Defendants Irico Group Corp. and Irico Display Devices Co., Ltd.'s First Set of Interrogatories to Direct Purchaser Plaintiffs, July 14, 2021; Irico Defendants' Sixth Supplemental Objections and Responses to Direct Purchaser Plaintiffs' First Set of Interrogatories, at 17-18, 20-21, January 7, 2022; Irico Defendants' Third Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' First Set of Interrogatories, January 7, 2022; Irico Defendants' Supplemental Objections and Responses to Indirect Purchaser Plaintiffs' Third Set of Interrogatories to Irico Group Corporation and Irico Display Devices Co., Ltd., at 11-13, January 21, 2022; Wang Dep. Tr. (March 6, 2019) 94:3-97:1; 107:6-14; 109:2-12.

Irico identifies the following persons with knowledge regarding this Interrogatory: Wang Zhaojie and Yan Yunlong.

///

///

///

///

1    Dated:  September 1, 2022                BAKER BOTTS L.L.P.

2

3                                            */s/ John M. Taladay*

4                                            John M. Taladay (*pro hac vice*)
                                             Evan J. Werbel (*pro hac vice*)
5                                            Thomas E. Carter (*pro hac vice*)
                                             Andrew L. Lucarelli (*pro hac vice*)
6                                            700 K Street, N.W.
                                             Washington, D.C. 20001
7                                            (202)-639-7700
                                             (202)-639-7890 (fax)
8                                            Email: john.taladay@bakerbotts.com
                                                    evan.werbel@bakerbotts.com
9                                                   tom.carter@bakerbotts.com
                                                    drew.lucarelli@bakerbotts.com
10

11                                           *Attorneys for Defendants*
                                             *IRICO GROUP CORP. and*
12                                           *IRICO DISPLAY DEVICES CO., LTD.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

IRICO'S SUPP. RESPONSES TO IPP'S            37           Master File No. 07-cv-05944-JST
FOURTH SET INTERROGATORIES                               MDL No. 1917

# DOCUMENT 15

**BAKER BOTTS** LLP

| | | |
|---|---|---|
| 700 K STREET, N.W.<br>WASHINGTON, D.C.<br>20001<br><br>TEL  +1 202.639.7700<br>FAX +1 202.639.7890<br>BakerBotts.com | AUSTIN<br>BRUSSELS<br>DALLAS<br>DUBAI<br>HOUSTON<br>LONDON | MOSCOW<br>NEW YORK<br>PALO ALTO<br>RIYADH<br>SAN FRANCISCO<br>**WASHINGTON** |

August 30, 2023

VIA E-MAIL [VRW@JUDGEWALKER.COM]

John Taladay
TEL: 2026397909
FAX: 2026391165
john.taladay@bakerbotts.com

The Honorable Vaughn R. Walker
Law Office of Vaughn R. Walker
Four Embarcadero Center, Suite 2200
San Francisco, CA 94111

Re:   **In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Master File No. 07-CV-944-JST/Plaintiffs' Motion for Sanctions/*In Camera* Submission**

Dear Judge Walker:

Defendants Irico Group Corp. and Irico Display Devices Co., Ltd. (collectively, "Irico") write in response to Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs' ("Plaintiffs") letter submitted to Your Honor on August 22, 2023. Plaintiffs' letter purports to relate to the previously submitted motion for sanctions against Irico. Irico addresses the issues raised by Plaintiffs in their August 22 letter only, and otherwise rests on the factual and legal arguments made in its April 21, 2023 Opposition to Plaintiffs' Sanctions Motion ("Opp'n"), its accompanying briefing and oral arguments, and its Motion for Summary Judgment, ECF No. 6225.

Plaintiffs argue that the Irico Defendants are trying to "exploit gaps in the evidence created by its willful and near-total spoliation of relevant evidence," but this is misdirection. Rather, Plaintiffs opportunistically blame all faults in their claim against Irico, and their failure to develop sufficient evidentiary support, on alleged spoliation. Moreover, they seek to misuse this discovery sanctions process to persuade the Special Master to prevent a determination on the merits of the summary judgment motion, which Judge Tigar undoubtedly is able to undertake in light of all relevant facts and circumstances.

Most importantly, however, Plaintiffs' claims that Irico's summary judgment arguments would be undermined by spoliated evidence is not supported by the facts.  To believe in Plaintiffs' grievance, in light of the massive amount of affirmative evidence that *does* exist in support of Irico's arguments, would require an extraordinary flight of fantasy and speculation.  To assist Your Honor in understanding the unnecessary diversion presented by Plaintiffs' letter, Irico addresses each of Plaintiffs' claims in turn.

**Irico's Lack of CRT Sales to the 20 Non-Contact States**

Plaintiffs first suggest that they are prejudiced by Irico's failure to preserve documents regarding its communications with its customers because these documents "likely would have confirmed" Irico's communications with or about customers in the United States. Plaintiffs' Letter at 1. Plaintiffs claim this supposed evidence could help refute Irico's summary judgment argument

1

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                                    - 2 -

that due process precludes the application of the laws of 20 Non-Contact States[1] to Irico.  That assertion is not even plausible given the facts of the case.

First, Plaintiffs pretend that Irico preserved and produced no documents or ESI "showing communications with customers." Plaintiffs' Letter at 1.  That is not the case.  In fact, Irico preserved *all* of its invoices sent to customers from the relevant time period.  From these records, Irico prepared and produced to Plaintiffs detailed charts created from its actual invoices detailing sales of CRTs.  These spreadsheets included over 22,500 transactions by Irico entities with information on the date, customer, product, revenue, quantity, and, if applicable, *export destination for each transaction*.  Tellingly, *not one* of these records identified a sale by Irico to the United States. Additionally, Irico produced two accounting databases used during the relevant time period, which enabled Plaintiffs to tie revenue line items to specific invoices and transactions. These databases further confirm that no Irico CRT sales were made to the United States. Thus, Irico provided extensive and detailed records that respond to, and undermine, the very point about which Plaintiffs complain. This is hardly surprising: as Plaintiffs' own expert acknowledges, Irico's major customers were Chinese manufacturers, not U.S. customers. *See* Netz Decl. at 109 (IPPs' expert acknowledging that *all* of Irico's major customers were Chinese TV manufacturers), ECF No. 1527. Irico Electronics' 2010 Interim Report corroborates this finding as Irico's internal investigation brought on by this litigation at the time found that "Irico Display have [sic] not sold any CRT products in the market of the USA since 1995." Ex. A at 22. None of the other significant discovery produced by Irico warrants a contrary inference. This additional discovery includes large volumes of documents from Irico archives, interrogatory responses, and deposition of five Irico employees (three of whom who worked at Irico during the relevant period), including a 30(b)(6) designee. In all of this, there is not a suggestion that runs contrary to the extensive, detailed evidence produced by Irico that shows no contact with the Non-Contact states.

Second, Plaintiffs also ignore the mountain of evidence obtained from third-party customers of CRTs, which further demonstrates that Irico made no sales in any of the Non-Contact States.  Bear in mind that the Irico defendants produced and sold CRTs, not CRT products like TVs and monitors.  Thus, their sales would have been made to (few) manufacturers of CRT products, not (many) retailers or end consumers. These "direct purchaser" customers of CRTs, many of whom opted out to bring their own cases as Direct Action Plaintiffs (but almost none of whom manufactured CRT products in the Non-Contact states), were the object of extensive discovery in this case.  And, of course, one of the central questions in the discovery was "from whom did you buy CRTs?"[2]

---

[1] The 20 Non-Contact States are Arizona, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin (collectively, "Non-Contact States"). *See* ECF No. 6225 at 6.

[2] As noted by Plaintiffs' expert witness, "Cartel members accounted for at least 85% of CPT and CDT sales" and, as Plaintiffs frequently tout, the large majority of CRTs purchased by U.S. customers were made by integrated subsidiaries of the other defendant manufacturers of CRTs.

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                    - 3 -

In fact, Plaintiffs issued dozens of subpoenas seeking CRT purchase data directed to third party and direct action plaintiffs who manufactured and/or purchased CRTs, televisions and monitors as well as vertically integrated defendants who sold CRT finished products. *See, e.g.*, Exs. B[3]; C[4], D[5]. These subpoenas provided Plaintiffs a staggering amount of transaction-level data for the entire relevant period for all televisions, computer monitors, and CRTs purchased and sold that were either shipped to a U.S. location or billed to a customer in the U.S., including data on the manufacturer of those products purchased and sold. *See* Exs. C, D. Yet, Plaintiffs fail to mention these gigabytes of data in their possession. This omission was likely no accident as the purchase and sales data collected from these parties revealed ***no instance of an Irico CRT that was sold***, or incorporated into products sold, to consumers in the United States, let alone a Non-Contact state. Therefore, Plaintiffs' claim that any allegedly lost Irico documents will somehow miraculously provide support for their summary judgment rebuttal as to the Non-Contact States, when no such documents exist in any other parties' files, is a fallacy that should be ignored.

Plaintiffs also had unlimited opportunity to depose CRT and finished product manufacturers and purchasers and failed to develop evidence of Irico CRTs destined for the U.S. In the hundreds of hours of questioning by Plaintiffs, however, there was not a single witness who testified as to having purchased an Irico CRT for sale to the United States—because no such sale exists. *See, e.g.*, Ex. E (Max Wasinger Dep. at 147:1-17) (an employee at Mitsubishi Electronics America, a vertically integrated maker that CRT finished products to U.S. retailers, testified to having never heard of Irico before); Werbel Decl., Ex. 1 (Yan Dep.) at 111:9-25, ECF No. 6226; 118:5-119:21, *Id.*, Ex. 3 (Wang Dep.) at 81:12-82:9 (Confirming that neither Group nor Display ever sold to the US)), *Id.*, Ex. 2 (Li Dep.) at 254:18-24 (same); *Id.*, Ex. 3 (Wang Dep.) at 346:15-348:6 (stating that Irico CDTs were never sold to the US).

---

Werbel Decl. Ex. 1 (Expert Report of Dr. Janet Netz) at 33 ("Cartel members accounted for at least 85% of CPT and CDT sales for years in which I have found reliable data (from 2000 through 2006 for CPTs and 1998 through 2006 for CDTs)."), ECF No. 6150. Indeed, the Direct Purchaser Plaintiffs legal standing is predicated in large part upon the fact that the other defendants sold their CRTs to downstream affiliated manufacturers of TVs and computer monitors and to one another.

[3] IPPs' Notice of Subpoena to third parties includes a list of subpoenas served on Amazon.com, Inc., AOC, Arrow Electronics, BenQ USA Corp., Best Buy Co., Inc., Buy.com, CDW Corporation, Costco, Dell Inc., Envision Display, Fry's Electronics, Inc., Funai Corporation, Inc., Gateway, Inc., Iiyama North America, Inc., Ingram Micro Inc., NEC Display Solutions of America, Newegg.com, Nexgen, nowdirect.com, Office Depot, Office Max, PC Connection, PC Mall, Proview Technology, Inc., RadioShack Corporation, Sam's Club, Sanyo North America Corporation, Sharp Electronics Corporation, Sony Corporation of America, Staples, SYNAP, Tech Data Corporation, Tech Depot, Wal-Mart Stores, Inc., Zenith Corporation, and Zones.
[4] Subpoena directed to Thomson Consumer Electronics, inc.
[5] Subpoena directed to Mitsubishi Electric US, Inc.

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                    - 4 -

Admissions by the Plaintiffs ***themselves*** further confirm the lack of sales of Irico CRTs or sales of products containing Irico CRTs to consumers in the United States. IPPs have stipulated that none of the monitor or TV purchases upon which the class representatives base their claims contained a CRT manufactured by Irico.  ECF No. 6267 at ¶ 25.  Even more tellingly for Irico's summary judgment motion, DPPs have also stipulated that, of the 1,816 valid claim forms submitted by settlement class members in the DPP matter, ***not one claim*** involved the purchase of CRT manufactured by Irico.  *See* Werbel Decl., Ex. 7 (DPP Discovery Response) at 5, ECF No. 6226.

Plaintiffs have developed a bountiful discovery record that unearthed comprehensive information on sales and purchases of CRTs by U.S. customers. These efforts would have revealed any evidence tying the Irico defendants to the Non-Contact States. The evidence fails to do so, and Plaintiffs and now ask the Special Master to join in their delusion of believing that allegedly missing Irico documents would counter the massive weight of contrary evidence – and believe it so deeply as to interfere with Judge Tigar's evaluation of the issues on the merits.

### Irico's Lack of Participation in the Alleged Conspiracy Prior to August 5, 1998

Plaintiffs also boldly speculate that "[h]ad Irico's files and records been preserved, they would provide internal evidence of Irico's conduct" prior to August 5, 1998. Plaintiffs' Letter at 2. Unfortunately for Plaintiffs, that statement is directly contradicted by the affirmative evidence in this case.  Indeed, Plaintiffs themselves must not believe it, because it is Plaintiffs' affirmative assertion ***in their Complaint*** that "[t]he Chinese Glass Meetings began in 1998." *See* Indirect Purchaser Plaintiffs' Fifth Consolidated Amended Complaint at ¶ 150a, ECF No. 5589.  The lack of any conceivable participation by Irico prior to 1998 is also confirmed by the evidentiary record.

As the Special Master is aware, many of CRT manufacturers were quite methodical in documenting their alleged meetings with others in the industry.  This trove of information has allowed Plaintiffs to put forth submissions to the Court charting 1,100 examples of alleged incidents of competitor meetings and a separate chart of 81 documents compiled by Plaintiffs and ruled upon by Your Honor purporting to show Irico's participation in the alleged conspiracy. *See* Werbel Decl., Exs. 8, 11, ECF No. 6226. Yet none of these thousands of documents reliably demonstrate Irico's participation in the alleged conspiracy before August 5, 1998.  Indeed, the hundreds of examples of purported meeting notes before this date reflect that Irico was ***not present and had not yet been invited*** to meet.

Notes produced from a July 31, 1998 meeting among CRT manufactures confirm that Irico did not attend this meeting but suggests, for the first time, that ***Irico should be invited*** to join discussions with other defendants.  *See* Werbel Decl., Ex. 5 (CHU00030668) at -0668.01E, ECF No. 6226.  And then, on August 5, 1998 Irico's name appears ***for the first time*** in the notes of a competitor meeting that conceivably could be construed as part of the alleged conspiracy. Thus, the clear implication is that Irico was not engaged in the meetings that Plaintiffs assert comprised the conspiracy before that time.

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                - 5 -

Indeed, given the purported abundance of documents, so say Plaintiffs, detailing Irico's meetings with competitors after they were affirmatively invited to join the meeting on August 5, 1998, and the complete lack of documents that could be spun to tie Irico to the alleged conspiracy prior to August 5, 1998, Plaintiffs' argument that missing documents would somehow change history is plainly a far-fetched scenario.

Plaintiffs also ignore that Irico did produce files that further shine light on Irico's summary judgment arguments. Irico preserved and produced travel and expense records from the relevant time period, and Plaintiffs have utilized these records in an effort to corroborate Irico's attendance at competitor meetings. *See* Opp'n at 24. But again, none of these records reflect Irico's attendance at an improper meeting with a competitor prior to August 1998.

Plaintiffs have been unable to find reliable evidence of Irico's participation in the alleged conspiracy – including in the meticulous records created and maintained by the supposed coconspirators with whom Irico would have met – prior to August 5, 1998. Indeed, the record evidence affirmatively reflects the opposite. Yet, to make up for that shortcoming, Plaintiffs again pin their hopes on being able to convince the Special Master that, since they can't counter (or accept) the voluminous record of affirmative fact that already exists and the clear story it tells, contrary evidence must have been destroyed. There is no plausible basis on which to reach this conclusion.

### Irico's International Comity Defense

Finally, Plaintiffs' argument that Irico's alleged failure to preserve documents that would have "shed light on how Irico actually determined the prices it would charge" somehow should preclude Irico's comity argument is similarly unavailing. Indeed, Plaintiffs' grievance does not impact Irico's motion. As explained in more detail in the Irico Defendants' Motion for Summary Judgment, ECF No. 6225 at 15-25, the conflict consideration of a comity analysis rests on "whether foreign law, ***taken at face value***, 'requires [the defendants] to act in some fashion prohibited by the law of the United States." *In Re: Vitamin C Antitrust Litigation*, 8 F.4th 136, 144–45 (2d Cir. 2021), *cert. denied*, 143 S. Ct. 85 (2022) (emphasis added). As the Second Circuit held in *Vitamin C*, "***[e]xclusive attention to what foreign law facially requires*** makes sense in the context of international comity for several reasons" articulated in the Second Circuit's decision, including the purpose and aims of the doctrine. *Id.* at 146 (emphasis added); *see also id.* at 147 ("we look to the laws of each country in turn to determine whether, taking those laws at face value, a true conflict exists.")*; id.* at 158 ("as we explained above, our international comity analysis focuses on whether Chinese law, taken at face value, requires the defendants to act in a way that violates U.S. law.").

With its timely expert disclosures and summary judgment motion, Irico has produced public versions of each of the Chinese laws and regulations, with undisputed expert authentication, on which Irico relies for its comity arguments. Werbel Decl. Exs. 56, 59-67, ECF No. 6226; Clarke Decl.in Support of Irico's Motion for Summary Judgment, ECF No. 6225-1.

5

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                - 6 -

Contrary to Plaintiffs' argument, evidence of how Irico actually priced CRTs or implemented prices in response to the law does not change the comity analysis because, as the Second Circuit held in *Vitamin C*, comity "focus[es] on the foreign state rather than the defendants," and, even if a defendant's implementation of the price regulations was "imperfect," the comity doctrine is still implicated if the applicable Chinese law and regulations, "[t]aken at face value," create a "*prima facie* conflict between U.S. law and Chinese law." 8 F.4th at 146-47, 151 & n. 25, 152-53; *see also id.* at 158 n.36 ("we have reached the first conclusion on the basis of the regulations themselves … we reach this conclusion in light of what Chinese law facially required rather than the Chinese regulatory program's track record of enforcement. Thus, we find a true conflict even though the defendants did not always reach or adhere to a coordinated market price."); ECF No. 6225 at 17.

Consequently, the conflict consideration of a comity analysis rests on the facial requirements of publicly available Chinese and U.S. regulations that Irico has produced to Plaintiffs to assess the degree of conflict between Chinese and U.S. law. Any evidence regarding Irico's pricing decisions therefore does not impact that analysis. Thus, there is no prejudicial impact on Plaintiffs' ability to rebut Irico's comity argument as a result of any potentially lost evidence. Moreover, as Irico has briefed in its opposition to Plaintiffs' sanctions motion, the purported lost evidence Plaintiffs complain of was likely not in existence at the time Irico's duty to preserve arose, given Irico's Chinese legal obligations, preservation practices, and nascent IT system and e-mail practices at the time. *See* Opp'n at 12-17.

Separately, it is striking for Plaintiffs to decry their lack of evidence to rebut Irico's comity arguments when IPPs had the opportunity to depose Irico's Chinese law expert who authenticated all of the Chinese pricing regulations yet declined to do so. IPPs' lack of diligence in developing the record to rebut Irico's comity arguments should not now be rewarded through claims of non-existent prejudice and the extreme sanctions they seek. Lastly, Plaintiffs' implied request for the Special Master to intervene on this point, where the application of the doctrine of international comity is currently pending before and rests within the discretion of the trial court, is misplaced. In effect, the Plaintiffs are asking the Special Master to preempt the process by applying his discretion on a dispositive issue in place of Judge Tigar's.

*        *        *

<u>**Conclusion**</u>

Plaintiffs ask the court to assume Plaintiffs' suffered prejudice; however, subjecting Plaintiffs' claims to slight examination reveals that they are overreaching. Plaintiffs are not prejudiced in their ability to answer any of Irico's summary judgment arguments. Plaintiffs have an extensive discovery record in this matter that stems from "tens of thousands" of relevant documents already produced in this litigation, countless interrogatory and requests for admission responses, and testimony from over 250 witnesses. *See* Opp'n at 24. According to Plaintiffs this record provides "overwhelming" evidence against Irico. *See, e.g.,* ECF No. 5191 at 12. All told, however, none of the allegedly "overwhelming" evidence gathered by Plaintiffs provides a reliable basis to show that Irico had any contact with the Non-Contact States, to demonstrate that Irico

6

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                    - 7 -


participated in the alleged conspiracy prior to August 5, 1998, or to dispel Irico's international comity argument. Plaintiffs' real complaint is not that the evidentiary record is incomplete but, rather, that it is robust but unfavorable to their cause.   Plaintiffs' claims of prejudice regarding Irico's summary judgment arguments therefore strain credulity and should be ignored.


                                        Sincerely,

                                        */s/ John M. Taladay*
                                        John M. Taladay

# Exhibit A



彩 虹 集 團 電 子 股 份 有 限 公 司
**IRICO GROUP ELECTRONICS COMPANY LIMITED**\*

*( A joint stock company incorporated in the People's Republic of China with limited liability )*
( Stock Code: 0438 )

Interim Report **2010**

*\* For identification purposes only*

## CONTENTS

*Page*

| | | | |
|---|---|---|---|
| I. | | Results Highlights | 2 |
| II. | | Management Discussion and Analysis | 3 |
| | (i) | Conditions of the Industry | 3 |
| | (ii) | Business Review | 7 |
| | (iii) | Financial Review | 10 |
| III. | | Other Information | 16 |
| | (i) | Share Appreciation Rights Plan | 16 |
| | (ii) | Interests and Short Positions of Directors, Supervisors and Senior Management | 17 |
| | (iii) | Interests and Short Positions of Substantial Shareholders and Other Persons | 17 |
| | (iv) | Audit Committee | 18 |
| | (v) | Independent Non-executive Directors | 19 |
| | (vi) | Corporate Governance Practices | 19 |
| | (vii) | Model Code for Securities Transactions by the Directors of Listed Issuers | 19 |
| | (viii) | Purchase, Sale or Redemption of Shares | 19 |
| | (ix) | Employees | 20 |
| | (x) | Public Float | 20 |
| | (xi) | Significant Investments | 20 |
| | (xii) | Material Acquisition and Disposal | 21 |
| | (xiii) | Material Litigations | 21 |
| IV. | | Corporate Information | 23 |
| Independent Review Report | | | 25 |
| Condensed Consolidated Statement of Comprehensive Income | | | 27 |
| Condensed Consolidated Statement of Financial Position | | | 29 |
| Condensed Consolidated Statement of Changes in Equity | | | 32 |
| Condensed Consolidated Statement of Cash Flows | | | 34 |
| Notes to the Condensed Consolidated Interim Financial Information | | | 35 |

**IRICO GROUP ELECTRONICS COMPANY LIMITED**

## I.   RESULTS HIGHLIGHTS

| (RMB'000) | First half of 2010 | First half of 2009 (Restated) | Increase/ (decrease) | Percentage Change (%) |
|---|---|---|---|---|
| Turnover | 1,281,585 | 818,277 | 463,308 | 56.62 |
| Gross profit/(loss) | 191,150 | (22,715) | 213,865 | (941.51) |
| Operating profit/(loss) | 55,286 | (176,239) | 231,525 | (131.37) |
| Profit/(loss) before tax | 20,263 | (191,475) | 211,738 | (110.58) |
| Profit/(loss) | | | | |
| for the period | 16,528 | (191,445) | 207,973 | (108.63) |
| Attributable to: | | | | |
| Owners of the Company | 10,413 | (121,373) | 131,786 | (108.58) |
| Non-controlling interests | 6,115 | (70,072) | 76,187 | (108.73) |
| Total comprehensive | | | | |
| income (expenses) | | | | |
| for the period | 17,125 | (191,417) | 208,542 | (108.95) |
| Attributable to: | | | | |
| Owners of the Company | 11,010 | (121,345) | 132,355 | (109.07) |
| Non-controlling interests | 6,115 | (70,072) | 76,187 | (108.73) |
| Gearing ratio | 71% | 62% | 9% | N/A |

## II.   MANAGEMENT DISCUSSION AND ANALYSIS

### (I)   Conditions of the Industry

#### 1.   Display Devices

During the reporting period, the global display device industry continued its shift towards flat panels.

During the first half of 2010, the output volume of global liquid crystal display ("LCD") panels accounted for 71,000,000 square metres, representing a year-on-year growth of 53%, of which the output volume of LCD panels for LCD television sets exceed 100,000,000 units, representing a year-on-year increase of 68%. In China, LCD industry is in fast growing stage. The domestic output volume of LCD panels accounted for 1,810,000 square metres in the first half of 2010, representing a year-on-year increase of 53%. Meanwhile, investment in the domestic LCD panel industry remained competitive. In the beginning of the year, a 8.5-generation LCD panel line in Shenzhen owned by another company had commenced construction while investment plans for several LCD panel lines are under review. Three years in the future, as more LCD panel lines being built and put into production, the output volume of domestic LCD panels will hopefully sustain rapid annual growth of approximately 85% in the next three years.

The performance of the global cathode ray tube ("CRT") (with colour picture tube ("CPT"), being a type of CRT) television set industry was broadly in line with expectation in the first half of 2010, with significantly narrowed loss despite continuing recession. In China, the production volume and exports of CRT television sets accounted for 10,385,000 units and 7,412,000 units in the first half of the year respectively, representing a year-on-year increase of 12.5% and 37.9%, respectively. Exports had then provided a strong underpinning to the partial recovery of the domestic CRT industry. As for CPTs, the production volume of CPTs in China increased by 13.8% year-on-year to 13,063,000 units in the first half of the year, well above the general estimate in the beginning of the year. Such growth was mainly attributed to the resume in demand for CRT television sets and CPTs from developing countries in the first half of the year. However, under continuous price downturn of flat TV, future for the CRT industry will still be exposed to substantial risks but further reorganization and adjustment in the industry as well as the shortage of CPT raw materials will present industry leaders with opportunities to run a successful business.

In the organic light-emitting diode ("OLED'') industry, the global output volume of PM-OLED ("Passive Matrix'') accounted for 25,200,000 units in the first half of the year, representing a modest increase of 3.1% while that of AM-OLED ("Active Matrix'') which will be the mainstream OLED in the future accounted for 18,650,000 units, representing a year-on-year increase of 127%. The annual output volume of AM-OLED products is expected to increase to 47,630,000 units with the year-on-year growth rate of more than 100%, which will exceed the annual output volume of PM-OLED for the first time.

**2.   LCD Glass Substrate**

Strong momentum in the global LCD panel industry in the first half of 2010 had also driven the thin film transistor liquid crystal display ("TFT-LCD") glass substrate ("LCD glass substrate") market to solid growth in the same period. In the first half of the year, the global LCD glass substrate market reached a scale of 142,000,000 square metres, representing a year-on-year increase of 53%, which is the fastest growth rate in the last three years. Due to an accelerating demand for LCD glass substrate, the global supply of LCD glass substrate in the first half of the year remained tight. For instance, the shortage of the fifth and sixth generation glass substrates in Taiwan region accounted for 10 to 20% of the total demand during the first quarter. Looking over the year as a whole, the demand for LCD glass substrates is expected to hurdle over 300,000,000 square metres over the year-on-year increase of nearly 40%. As for the market in Mainland China, the increase in capacity utilization of panel enterprises and the expansion of production of certain manufacturers in the first half of the year had stimulated demand for LCD glass substrates to increase by more than 50% year-on-year. With new panel lines to come on stream in China in the second half of the year, demand for LCD glass substrates is expected to grow substantially going forward.

3.  **Solar Photovoltaic Glass**

    In recent years, low-carbon economy, energy saving and emission reduction as well as renewable energy development have become a consensus among governments around the world and solar photovoltaic has been one of the fastest-growing branches in the new energy industry up to date. The global solar photovoltaic market will have the better-than-expected growth in 2010, with installed global solar photovoltaic modules expected to increase by 93% year-on-year to 13.57GW. As the world's largest manufacturing and export base of photovoltaic modules, China had a year-on-year increase of 162% and 223%in its export volume and export value respectively in the first half of the year. In the same period, exports of domestic photovoltaic glass witnessed a strong growth. In the context of a booming photovoltaic module industry, the market of solar photovoltaic glass for encapsulation of photovoltaic modules is also expected to have the better-than-expected growth in 2010. Taking exports into account, the output volume of solar photovoltaic glass in Mainland China looks set to increase by nearly 50% year-on-year to over 100,000,000 square metres in 2010.

4.  **Luminous Materials**

    Luminous materials are yet another business focus of the Group. As Australia and European Union launched policies to prohibit use of incandescent lamp, global energy saving lamp market recorded admirable growth in 2010. Further, in October 2009, European Union revoked anti-dumping duty which has been imposed on energy saving lamps exported from China for 8 years. Therefore, China's energy saving lamp industry operated in a more favourable environment in 2010. In the first half of the year, exports of China's energy saving lamps amounted to 1,456,000,000 units, representing a year-on-year increase of 64%. As a result, market demand for domestic energy saving lamp phosphors grew rapidly. Apart from energy saving lamp phosphors, cold cathode fluorescent lamp ("CCFL") phosphor ("CCFL phosphor") for LCD backlight business, light emitting diode ("LED") phosphor business and plasma display panel ("PDP") phosphor ("PDP phosphor") business in Mainland China also experienced varying degree of growth in the first half of 2010, thanks to the stable momentum of China's panel display industry.

**(II)    Business Review**

**1.    Operation Highlights**

During the reporting period, in light of the rapid expansion of its new businesses and the stable and effective operation of traditional CPTs, the Group turned from loss-making to profit-making. In the first half of 2010, the turnover of the Group amounted to RMB1,281,585,000, representing a year-on-year increase of 57%. Profit attributable to shareholders amounted to RMB10,413,000, representing a year-on-year increase of RMB131,786,000.

The Group has been shifting its business focus from traditional CPTs and spare parts to flourishing industries such as panel display devices and its relevant products, solar photovoltaic glass and luminous materials. With the commissioning and expansion of its new TFT-LCD glass substrate and solar photovoltaic glass projects, as well as further expansion of the luminous materials business, the Group's strategic transformation has been gradually drawing closer to completion.

**2.    Progress of New Operations**

(1)    TFT-LCD Glass Substrate Business

With regard to the Group's TFT-LCD glass substrate business, the phase I TFT-LCD glass substrate project, which is the first domestic production line of the fifth generation TFT-LCD glass substrate, has completed construction and is operating in good condition. Through adjusting and optimizing glass materials, production equipment and craftwork conditions, the quality yield of products was maintained at a relatively high level. Several customers orderly conducted the work of market certification, of which some achieved mass sales.

The Group has commenced the construction of the phase II project of 12 new production lines of TFT-LCD glass substrate in Xianyang, Hefei and Zhangjiagang. The construction is in smooth progress and the preliminary preparations of the trial production were carried out in an orderly manner. It is expected to be completed in phase and put into production gradually by the end of September 2010. Looking ahead, the Group will see continuous enhancement in the scale effect and competitiveness of its TFT-LCD glass substrate business and the Group is set to become a key supplier of TFT-LCD glass substrate across the nation and even the world.

(2)     Solar Photovoltaic Glass Business

During the reporting period, the Company has constructed a glass furnace with a daily melting capacity of 250 tons together with the ancillary construction of two 125 tons/day glass rolling production lines and two glass tempering production lines with a production capacity of 6,788,000 square metres/year, which have an annual production capacity of 5,026,000 square metres of tempered solar photovoltaic glass. Currently, the production lines have been put into full operation with mass production and sales. The product is of high quality. Phase II of the project (which has the same scale as Phase I) commenced construction in March 2010 and is expected to commence operation in October 2010 and put into trial production in November 2010. With an aim to swiftly expand its scale and with a hope of becoming an industry leader, the Company will steadily expand the business of solar photovoltaic glass according to market condition in the future.

(3)    Luminous Materials Business

As the global economy gradually regained its strength and relevant industries developed swiftly during the reporting period, the luminous materials business of the Group increased as compared to the corresponding period last year. With ceaseless efforts in improving product quality and enhancing its technical services, the Group saw a 96.66% growth in the sales of energy saving lamp phosphors as compared to the corresponding period last year. Driven by the commencement of operation of the new production line and the promotional measures of sales and marketing, sales volume of CCFL phosphor increased by over 20 times as compared to the corresponding period last year. Furthermore, the Group's PDP phosphor and electronic silver paste business have realised sales revenue whilst the industrialization and market promotion of lithium battery powder, LED phosphor and other new products are in full swing.

(4)    FPD Devices Business

The Group's production lines of OLED, the third generation display device, which officially commenced construction in Shunde District, Foshan, Guangdong Province in May 2009, has completed construction of the main parts of the project. Currently, the equipment are under installation preparations. Equipment installation and testing process are expected to be completed and undergo trial operation in October 2010.

As for the PDP project jointly established by the Company and Sichuan Changhong Electrical Group Co., Ltd. (四川長虹電子集團有限公司), in January 2010, the monthly comprehensive quality yield of products has reached the designed and planned level and the project has been put into full production.

### 3.   Traditional CPT Business

During the reporting period, the domestic CRT television and CPT industry saw a rally. The Group achieved effective operation of CPT business by increasing marketing efforts, strengthening cost control and adjusting organisational structure. CPT sales volume of the Group amounted to 4,301,000 units in the first half of 2010, representing an increase of 848,000 units or approximately 24.56% as compared with the corresponding period last year; turnover was RMB702,548,000, representing an increase of RMB129,568,000 or approximately 22.61% as compared to the corresponding period last year.

### (III)   FINANCIAL REVIEW

### 1.   Overall performance

The overall gross profit margin of the Group increased from -2.78% for the first half of 2009 to 14.92% for the first half of 2010, which was mainly attributable to the increased profitability of CPT as a result of the increase in the price of CPT and the continuous reduction in costs due to strengthened cost control initiatives. Besides, the profitability of our new business segments was further enhanced, increasing the gross profit margin of the Group as a whole.

## 2. Business Results

*1)    Unaudited profit and loss (RMB'000)*

| (RMB'000) | For the six months ended 30 June | | | |
| | **2010** | 2009 (Restated) | Increase/ (decrease) | Percentage Change (%) |
|---|---|---|---|---|
| Turnover | **1,281,585** | 818,277 | 463,308 | 56.62 |
| Sales of CPTs | **702,548** | 572,979 | 129,569 | 22.61 |
| Sales of components and materials | **579,037** | 245,298 | 333,739 | 136.05 |
| Cost of sales | **(1,090,435)** | (840,992) | (249,443) | 29.66 |
| Gross profit/(Gross loss) | **191,150** | (22,715) | 213,865 | (941.51) |
| Operating expenses | | | | |
| Administrative expenses | **(104,502)** | (137,559) | 33,057 | (24.03) |
| a)  General administrative expenses | **(95,686)** | (127,924) | 32,238 | (25.20) |
| b)  Research and development expenses | **(8,816)** | (9,635) | 819 | 8.5 |
| Selling and distribution costs | **(53,259)** | (37,973) | (15,286) | 40.25 |
| Other operating expenses | **(2,246)** | (764) | (1,482) | 193.98 |
| Operating profit/(loss) | **55,286** | (176,239) | 231,525 | (131.37) |
| Finance costs | **(35,060)** | (18,423) | (16,637) | 90.31 |
| Profit/(loss) for the period | **16,528** | (191,445) | 207,973 | (108.63) |
| Attributable to: | | | | |
| Owners of the Company | **10,413** | (121,373) | 131,786 | (108.58) |
| Non-controlling interests | **6,115** | (70,072) | 76,187 | (108.73) |
| Total comprehensive income (expenses) for the period | **17,125** | (191,417) | 208,542 | (108.95) |

**IRICO GROUP ELECTRONICS COMPANY LIMITED**

2)   *Turnover*

Turnover by product *(RMB'000)*

| Name | 2010 | 2009 | Increase/ (decrease) | Change (%) |
|---|---|---|---|---|
| CPTs | 702,548 | 572,979 | 129,569 | 22.61 |
| Components and materials | 579,037 | 245,298 | 333,739 | 136.05 |
| Total | 1,281,585 | 818,277 | 463,308 | 56.62 |

## 3.   Change Over Corresponding Period Last Year and Reasons

### 1)   Turnover and gross profit margin

In the first half of 2010, the turnover of the Group increased by RMB463,308,000 or 56.62% to RMB1,281,585,000, as compared to the corresponding period in 2009. Of which, turnover from CPT increased by RMB129,569,000 or 22.61% to RMB702,548,000 when compared to that of the corresponding period in 2009. Turnover from components and materials increased by RMB333,739,000 or 136.05% to RMB579,037,000 as compared to the corresponding period in 2009. The overall gross profit margin of the Group increased from -2.78% in the first half of 2009 to 14.92% in the first half of 2010, mainly due to the increase in gross profit margin of the whole Group as a result of the increased profitability of our new business segments and the increased profitability of our products due to continuous reduction in costs through strengthened cost control initiatives and optimization of product mix.

**2)    Administrative expenses**

The Group's administrative expenses in the first half of 2010 decreased by RMB33,057,000 or approximately 24.03%, to RMB104,502,000 from RMB137,559,000 for the corresponding period in 2009. The decrease in administrative expenses was mainly attributable to the increase in production capacity of traditional business segments and significant decrease in losses arising from suspension of production as a result of the strengthening of marketing efforts and timely adjustment of product mix.

**3)    Finance cost**

The Group's finance costs in the first half of 2010 was RMB35,060,000 (excluding interest expense capitalized amounting to RMB9,500,000), representing an increase of RMB16,637,000 or approximately 90.31%, from RMB18,423,000 for the corresponding period in 2009. The increase in finance cost was mainly attributable to an increase in borrowings due to the development of new business segments.

**4.    Current assets and financial resources**

As at 30 June 2010, the Group's cash and bank balances aggregated to RMB1,394,251,000, representing an increase of RMB316,590,000 or 29.38%, from RMB1,077,661,000 as at 31 December 2009. For the half year ended 30 June 2010, the Group's capital expenditures totaled RMB1,408,797,000 (as at 30 June 2009: RMB64,494,000). Net cash flow from operating activities was RMB297,458,000 (as at 30 June 2009: RMB214,600,000), while net cash flow from financing activities and used for investing activities were RMB1,309,645,000 (as at 30 June 2009: RMB45,231,000) and RMB1,291,110,000 (as at 30 June 2009: RMB61,783,000), respectively.

As at 30 June 2010, the Group's total borrowings aggregated to RMB3,169,656,000, of which borrowings due within one year amounted to RMB2,189,548,000 and borrowings with maturity beyond one year amounted to RMB980,108,000. As at 31 December 2009, the Group's borrowings was RMB1,815,451,000, of which borrowings due within one year amounted to RMB1,221,949,000 and borrowings with maturity beyond one year amounted to RMB593,502,000. As at 30 June 2010, bank loans amounted to approximately RMB343,000,000 (as at 31 December 2009: RMB197,000,000) were secured by certain land and land use rights, buildings, equipment, trade receivables and inventories of the Group.

For the half year ended 30 June 2010, the turnover period for accounts receivable of the Group was 105 days, representing a decrease of 71 days from 176 days for the half year ended 30 June 2009. The decrease in the turnover days for accounts receivable was mainly attributable to the quickening of the turnover of trade receivable following a 56.62% year-on-year increase in turnover along with a 17.15% decrease in trade receivable as compared with the beginning of the year under doubled efforts in the collection of trade receivables during the Group's market expansion. For the half year ended 30 June 2010, the inventory turnover days of the Group decreased by 90 days from 164 days for the half year ended 30 June 2009 to 74 days, mainly attributable to the Group's strengthening of marketing efforts as well as its sales-oriented approach to production, which led to scientific and logical production and procurement as well as the reduction of inventories and fund appropriation.

**5. Capital structure**

As at 30 June 2010, the Group's borrowings were mainly denominated in Renminbi and US dollars, while its cash and bank balances were mainly denominated in Renminbi, Hong Kong dollars and US dollars. The Group intends to maintain an appropriate ratio of share capital to liabilities, so as to ensure that an effective capital structure is maintained from time to time. As at 30 June 2010, its total liabilities including bank borrowings aggregated to RMB4,662,730,000 (as at 31 December 2009: RMB3,150,959,000) with cash and bank balances aggregated to RMB1,394,251,000 (as at 31 December 2009: RMB1,077,661,000) and a gearing ratio (i.e. total liabilities divided by total assets) of 71% (as at 31 December 2009: 62%).

**6. Interim dividend**

As there was no accumulated surplus in the first half of 2010, the Board resolved not to distribute any interim dividends.

**7. Foreign exchange risk**

The Group's income and most of its expenses are denominated in Renminbi and US dollars. For the six months ended 30 June 2010, the operating cost of the Group increased by RMB976,000 as a result of exchange rate fluctuations (as at 30 June 2009: RMB426,000). There was no material impact on the operating capital or liquidity as a result of exchange rate fluctuations.

**8. Commitments**

As at 30 June 2010, capital commitments of the Group amounted to RMB2,146,751,000 (31 December 2009: RMB228,950,000).

**9. Contingent liabilities**

As at 30 June 2010, the Group had no material contingent liability.

**IRICO GROUP ELECTRONICS COMPANY LIMITED**

**10. Pledged assets**

As at 30 June 2010, bank loans of the Group amounted to approximately RMB343,000,000, which were secured by certain leasehold land and land use rights, buildings, equipment, trade receivables and inventories of the Group.

As at 31 December 2009, the bank loans of the Group amounted to approximately RMB197,000,000, which were secured by certain leasehold land and land use rights, buildings, equipment and trade receivables of the Group.

**III. OTHER INFORMATION**

**(1) Share Appreciation Rights Plan**

Pursuant to the Share Appreciation Rights Plan of the Company (details of which were set out in the Company's prospectus dated 8 December 2004), as at 30 June 2010, the following Directors, Supervisors and senior management members were granted share appreciation rights by the Company:

| Name | Number of Share Appreciation Rights (Shares) | Note |
|------|---------------------------------------------|------|
| Xing Daoqin | 3,600,000 | Director |
| Tao Kui | 2,920,000 | Director |
| Zhang Junhua | 1,950,000 | Director |
| Guo Mengquan | 2,460,000 | Director |
| Niu Xinan | 1,600,000 | Director |
| Fu Jiuquan | 1,050,000 | Director |
| Zhang Weichuan | 1,320,000 | Director |
| Fu Yusheng | 600,000 | Supervisor |
| Tang Haobo | 400,000 | Supervisor |
| Zhang Chunning | 1,570,000 | Senior Management |
| Zou Changfu | 1,320,000 | Senior Management |
| Ma Jianchao | 1,120,000 | Senior Management |
| Chu Xiaohang | 330,000 | Senior Management |

**(2)   Interests and Short Positions of Directors, Supervisors and Senior Management**

Save as disclosed in (1) above, as at 30 June 2010, none of the Directors, Supervisors, chief executive or senior management members of the Company or their respective associates had any interest or short position in the shares, underlying shares and/or debentures (as the case may be) of the Company and/or any of its associated corporations (within the meaning of Part XV of the Securities and Futures Ordinance (SFO)) which was required to be notified to the Company and the Stock Exchange pursuant to the provisions of Divisions 7 and 8 of Part XV of the SFO (including interest and short positions which any such Directors, Supervisors, chief executive or senior management members was deemed or taken to have under provisions of such chapters of the SFO), or which was otherwise required to be entered in the register to be kept by the Company pursuant to section 352 of the SFO, or which was otherwise required to be notified to the Company and the Stock Exchange pursuant to the Model Code for Securities Transactions by Directors of Listed Issuers (the "Model Code") as set out in Appendix 10 to the Rules Governing the Listing of Securities on the Stock Exchange (the "Listing Rules").

**(3)   Interests and Short Positions of Substantial Shareholders and Other Persons**

So far as the Directors are aware, each of the following persons, not being a Director, Supervisor, chief executive or member of senior management of the Company, had an interest or short position in the Company's shares or underlying shares (as the case may be) as at 30 June 2010 and as entered in the register of interests to be kept pursuant to section 336 of the SFO: IRICO Group Corporation had interests in 1,601,468,000 domestic shares of the Company (representing 100% of the Domestic Share capital), whereas HKSCC (Nominees) Limited had interests in 531,899,189 H shares of the Company (representing 99.63% of the H share capital). Xing Daoqin, Tao Kui, Guo Mengquan and Fu Jiuquan are the Company's Directors, and are IRICO Group Corporation's General Manager, Vice General Manager, Vice General Manager and Chief Accountant respectively.

**IRICO GROUP ELECTRONICS COMPANY LIMITED**

*Notes:*

*As at 30 June 2010, based on the information available to Directors and so far as the Directors are aware, HKSCC (Nominees) Limited held 531,899,189 H shares, among which:*

*Baystar Capital II, L.P. had beneficial interests in 54,509,400 H shares of the Company (representing approximately 10.21% of the issued H shares of the Company). Each of Baystar Capital Management LLC, Mr. Derby Steven P., Mr. Goldfarb Lawrence and Mr. Lamar Steven M. was deemed to be interested in the same tranche of H shares of the Company by virtue of their direct or indirect control of Baystar Capital II, L.P..*

*J.P. Morgan Fleming Asset Management Holdings Inc. held 37,116,200 H shares of the Company (representing 6.95% of the issued H shares of the Company) in the capacity of investment manager and through its controlled corporations, of which 36,517,800 H shares of the Company were held by JF Asset Management Limited and 598,400 H shares of the Company were held by JF International Management Inc..*

*Pictet Asset Management Limited held direct interests in 30,236,800 H shares (representing approximately 5.66% of the H Share capital) in the Company on behalf of Pictet Funds Asian Equities, which had interests in 31,354,400 shares.*

### (4) Audit Committee

In compliance with the provisions set out in the Code on Corporate Governance Practices (the "Code") in Appendix 14 to the Listing Rules, the Company has established the Audit Committee.

The Board adopted all contents set out in Code Provisions C.3.3 of the Code as the terms of reference of the Audit Committee. The Audit Committee has considered and reviewed the accounting standards and methods adopted by the Company and other matters relating to the auditing, internal control and financial reporting, which included the unaudited interim financial statements for the six months ended 30 June 2010.

**(5)   Independent Non-executive Directors**

The Group has complied with the requirement concerning the appointment of sufficient independent non-executive Directors and that at least one of them possesses appropriate professional qualification or appropriate accounting or relevant financial management expertise set out in Rule 3.10(1) and 3.10(2) of the Listing Rules. The Company has appointed five independent non-executive Directors, one of whom possesses financial management expertise.

**(6)   Corporate Governance Practices**

The Board has reviewed the documents regarding the Company's adoption of relevant corporate governance, and is of the opinion that they have met the principles and code provisions set out in the Code.

The Directors are not aware of any information that would reasonably reflect the non-compliance of the Company or any of the Directors with the Code during the period ended 30 June 2010. The Board considers that the Company has fully complied with the principles and code provisions set out in the Code during the reporting period.

**(7)   Model Code for Securities Transactions by the Directors of Listed Issuers**

For the six months period ended 30 June 2010, the Company has adopted a model code for securities transactions by Directors and Supervisors of the Company which is no less exacting than the standard stipulated by the Model Code. Having made specific enquiry in the reporting period, the Company has confirmed that all Directors and Supervisors have complied with the requirements set out in the Model Code.

**(8)   Purchase, Sale or Repurchase of Shares**

During the reporting period, the Group had not purchased, sold or repurchased any of the shares in the Company in issue.

**IRICO GROUP ELECTRONICS COMPANY LIMITED**

**(9)    Employees**

As at 30 June 2010, the Group has a total of 5,796* employees. Of which, approximately 9.3% are management and administrative staff, 7.9% are technicians, 1.4% are financial and auditing staff, 1.6% are sales and marketing staff, 77.5% are production workers and others are 2.3%.

The Company's employment and remuneration policies remain unchanged from those described in the prospectus of the Company dated 8 December 2004. The Group's employees are enthusiastic about their work and are committed to the provision of high quality products and reliable services.

*    *Excluding service dispatch worker*

**(10)   Public Float**

Based on the information that is publicly available to the Company and within the knowledge of the Directors of the Company, as at the date of this report, the Directors believe that the percentage of shares of the Company in public hands at all times during the reporting period was in compliance with the prescribed level of the minimum public float as set out in Rule 8.08 of the Listing Rules.

**(11)   Significant Investments**

During the reporting period, save as disclosed below, the Company had not made any other significant investment.

Leveraging on the successful establishment of the first phase of the self-developed photovoltaic glass production line project, the Company further established the second phase of the solar photovoltaic glass production line project with an investment of RMB187.26 million in March 2010. According to the project plan, a glass furnace with a daily melting capacity of 250 tons will be built together with the ancillary construction of two 125 tons/day glass rolling production lines and two glass tempering production lines with a production capacity of 6,788,000 square metres/year, which have an annual production capacity of 5,026,000 square metres of tempered solar photovoltaic glass. The project is expected to commence operation in October 2010 and will commence trial production in November 2010.

**(12)  Material Acquisition and Disposal**

During the reporting period, the Company did not have any material acquisition or disposal of subsidiaries and associated companies.

**(13)  Material Litigations**

As at 30 June 2010, save as disclosed below, the Directors were not aware of any other litigation or claim of material importance pending or threatened against any member of the Group.

• Claims by Curtis Saunders against the Company and IRICO Display

In January 2010, IRICO Group Corporation ("IRICO Group"), the Company and IRICO Display Device Co., Ltd. ("IRICO Display") received a statement of class action from the Registry of Supreme Court of British Columbia, Vancouver, Canada (加拿大不列顛哥倫比亞省高級法院溫哥華市書記官處). Curtis Saunders, the plaintiff, accused over 50 global CRT manufacturing enterprises, including IRICO Group, the Company and IRICO Display, of a conspiracy or a collusion to enter into agreements raising the price of CRT to an unreasonable level and lifting the profits from selling CRT products from 1 January 1995 to 1 January 2008. All these were alleged to cause damage to the interests of the plaintiff and other buyers of CRT products. Therefore, the plaintiff claimed for damages. As at the date of this report, Supreme Court of British Columbia Canada has accepted the case. Upon respective investigations and as confirmed by the Company, IRICO Group and IRICO Display, the Company, IRICO Group and IRICO Display have not sold any CRT products in the market of Canada directly or via agency since 1995. The Company's preliminary assessment is that the claim will not pose any negative impact on the business operation of the Group. Please refer to the announcement of the Company dated 25 January 2010 for the details of the class action.

- Claims by Fanshawe College against the Company and IRICO Display

  The Company and IRICO Display received statement of claim from Ontario Superior Court of Justice Canada in respect of a litigation brought by the Fanshawe College of Applied Arts and Technology ("Fanshawe College") in August 2009 and July 2009 respectively. The plaintiff, accused various global CRT manufacturing enterprises, including the Company and IRICO Display, of a conspiracy to sustain, control and stabilise the price of CRT since 1 January 1998, and a collusion to manipulate the market and to enter into agreements raising the price of CRT to an unreasonable level. All these were alleged to coerce the plaintiff and the public to pay an artificially high price for the CRT products which caused damage to their interests. Therefore, the plaintiff claimed for damages. As at the date of this report, Ontario Superior Court of Justice Canada has accepted the case. Upon respective investigations and as confirmed by the Company and IRICO Display, the Company and IRICO Display have not sold any CRT products in the market of Canada directly or via agency since 1998. The Company's preliminary assessment is that the claim will not pose any negative impact on the business operation of the Group.

- Claims by American Crago Company against IRICO Display

  In January 2008, IRICO Display, a subsidiary of the Company, received a statement of class action from the U.S. District Court, Northern District of California in respect of a class action being brought by American Crago Company on behalf of itself and other companies for the similar issue. The plaintiff accused various CRT manufacturing enterprises, including IRICO Display, of a conspiracy to control the market which was in violation of antitrust law. It was alleged that the plaintiff and other members in the class proceedings paid more than that would have been determined by competitive market and therefore claimed for triple damages. At present, U.S. District Court, Northern District of California has accepted the case. Upon investigations, IRICO Display have not sold any CRT products in the market of USA since 1995. The Company and IRICO Display's preliminary assessment is that the claim will not pose any negative impact on our ordinary business operation.

  In the opinion of the Directors, the above case did not have any material impact on the Group's interim financial statements for the six months ended 30 June 2010.

# **Exhibit B**

MARIO N. ALIOTO (56433)
LAUREN C. RUSSELL (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA  94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
malioto@tatp.com
laurenrussell@tatp.com

*Interim Lead Counsel for Indirect
Purchaser Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Case No. CV-07-5944-SC |
| | MDL No. 1917 |
| **This Document Relates to:** | **NOTICE OF SERVICE OF SUBPOENAS** |
| **ALL INDIRECT PURCHASER ACTIONS** | |

NOTICE IS HEREBY GIVEN that the Indirect Purchaser Plaintiffs in the above-captioned action shall serve subpoenas for production of documents on the entities listed below.  Subpoenas for the production of documents from these entities are attached hereto as the exhibit listed.

| **Exhibit** | **Entity Subpoenaed** |
|---|---|
| A. | Amazon.com, Inc. |
| B. | AOC |
| C. | Arrow Electronics |
| D. | BenQ USA Corp. |
| E. | Best Buy Co., Inc. |
| F. | Buy.com |
| G. | CDW Corporation |
| H. | Costco |
| I. | CTX Technology |
| J. | Dell Inc. |
| K. | Envision Display |
| L. | Fry's Electronics, Inc. |
| M. | Funai Corporation, Inc. |
| N. | Gateway, Inc. |
| O. | Iiyama North America, Inc. |
| P. | Ingram Micro Inc. |
| Q. | NEC Display Solutions of America |
| R. | Newegg.com |
| S. | Nexgen |
| T. | nowdirect.com |
| U. | Office Depot |
| V. | Office Max |
| W. | PC Connection |
| X. | PC Mall |
| Y. | Proview Technology, Inc. |
| Z. | RadioShack Corporation |
| AA. | Sam's Club |
| BB. | Sanyo North America Corporation |
| CC. | Sharp Electronics Corporation |
| DD. | Sony Corporation of America |
| EE. | Staples |
| FF. | SYNAP |
| GG. | Tech Data Corporation |
| HH. | Tech Depot |
| II. | Wal-Mart Stores, Inc. |
| JJ. | Zenith Corporation |
| KK. | Zones |

//

//

NOTICE OF SERVICE OF SUBPOENAS

1   Dated:  November 9, 2009              By:     /s/ Mario N. Alioto

2                                          Mario N. Alioto (56433)
                                           Lauren C. Russell (241151)
3                                          TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
                                           2280 Union Street
4                                          San Francisco, CA  94123
                                           Telephone: (415) 563-7200
5                                          Facsimile: (415) 346-0679
                                           malioto@tatp.com
6                                          laurenrussell@tatp.com

7                                          *Interim Lead Counsel for Indirect*
                                           *Purchaser Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF SERVICE OF SUBPOENAS

# Exhibit C

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Northern District of California

| | | |
|---|---|---|
| In Re: Cathode Ray Tube (CRT) Antitrust Litigation | ) | |
| *Plaintiff* | ) | Civil Action No.   3:07-cv-5944-SC MDL No. 1917 |
| v. | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.)
c/o Registered Agent Solutions, Inc., 1220 S St. STE 150, Sacramento, CA 95811

 ☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: See Exhibit A

| Place:  Perkins Coie LLP | Date and Time: |
|---|---|
| 1201 3rd Ave Suite 4900 Seattle, WA 98101 | 12/12/2013 5:00 pm |

 ☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  ____11/12/2013____

*CLERK OF COURT*

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                              *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*     Costco Wholesale
Corporation _____ , who issues or requests this subpoena, are:
Steven D. Merriman, Perkins Coie LLP, 1201 3rd Ave Suite 4900, Seattle, WA 98101.
Telephone: (206) 359-3495. Email: smerriman@perkinscoie.com

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 3:07-cv-5944-SC MDL No. 1917 .

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00 .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                     *Server's signature*

                                     _____
                                     *Printed name and title*

                                     _____
                                     *Server's address*

Additional information regarding attempted service, etc:

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

# EXHIBIT A

*In Re: Cathode Ray Tube (CRT) Antitrust Litigation*

**Master File No. 3:07-md-05944-SC / MDL No. 1917**

## EXHIBIT "A" TO SUBPOENA DIRECTED TO
## THOMSON CONSUMER ELECTRONICS, INC. (n/k/a TECHNICOLOR USA, INC.)

I. **DEFINITIONS**

The words and phrases used in these requests shall have the meanings ascribed to them under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Northern District of California. In addition, the following terms shall have the meanings set forth below whenever used in any Request for Production of Documents.

1. The words "all," "any," and "each" mean "each and every."

2. The words "and" and "or" are both conjunctive and disjunctive as necessary.

3. "Communications" means, without limitation, the transmittal of information (in the form of facts, ideas, inquiries or otherwise) between individuals or companies whether oral, written, electronic, or otherwise, and whether direct or through an intermediary.

4. "Concerning" or "concerns" means discussing, relating to, contradicting, referring to, reflecting, analyzing, describing, constituting, evidencing, containing or disclosing or supporting the referenced matter.

5. "Document" and "documents" shall have the meaning ascribed to them under the Federal Rules of Civil Procedure and shall also mean all electronically stored information ("ESI") including, without limitation, electronic data or data compilations, electronic files, email and other electronic communications saved to or located on hard disks, file servers, floppy disks, CDs, DVDs, backup tapes, thumb drives, or any other electronic media, whether or not in tangible or electronic form.

1

6.  The term "CRT" means cathode ray tube and includes cathode ray tubes used in color televisions and color computer monitors.

7.  The term "CRT Product" means a television or computer monitor containing a CRT.

8.  "Identify," when used with reference to an entity, means to state the full name, present or last known address, and present or last known telephone number of such entity.

9.  "Identify," when used with reference to documents, other than those under claim of privilege, means to identify the documents by each author, sender, addressee, date, subject, recipient, place of recording, and custodian.

10.  "Identify" or "identification," when used in reference to an individual person, means to state his or her full name, present or last known address, present or last known telephone number, and present or last known position and business affiliation.

11.  "Identify," "describe," "explain," or "state," when used in reference to any fact, act occurrence, transaction, statement, communication, document, or other matter, means to describe and identify the facts constituting such matter.

12.  "Including" or "includes" means without limitation.

13.  "Reflect(ing) or refer(ring) to" means a statement or communication about, relating to, concerning, describing, containing, identifying, or in any way pertaining to the subject matter in the request.

14.  The term "person" or "persons" includes any natural person, public entity, partnership, corporation, association, firm, trust, joint venture, agency, board, authority, commission or other such entity.

15.  "Supplier" means any supplier, manufacturer, or seller of CRT or CRT Products.

2

16.     "You" or "Your" means Thomson Consumer Electronics, Inc., as well as: its current and former parent(s), including but not limited to Thomson SA (n/k/a Technicolor SA); its current and former subsidiaries, including but not limited to Thomson Displays Americas, LLC (n/k/a Technologies Displays Americas, LLC); its affiliates and their subsidiaries; any employees, agents, representatives or any persons acting or purporting to act on Your behalf, including each of Your attorneys.

## II.     INSTRUCTIONS

1.     In responding to this subpoena, You are requested to produce all documents in Your possession, custody, or control, wherever located, including without limitation any document available to You upon request from Your parents, affiliates, subsidiaries, employees, officers, directors, attorneys, accountants, financial advisors, consultants, private investigators, or other agents or persons acting or purporting to act on Your behalf, as required by the Federal Rules of Civil Procedure and the applicable local rules.

2.     If any part of a document is responsive to any request herein, produce the entire document, including any attachments or exhibits.

3.     All documents should be produced as maintained in the ordinary course of business.

4.     Any noun used in the singular form shall be construed and applied so as to include the plural, form also, and vice versa.

5.     If You are not producing any documents in response to any of the Requests herein, Your response should make it clear that You are not producing any documents in response to that Request.

THOMSON SUBPOENA EXHIBIT A
LEGAL28335091.1

6.     If only a part of a Request is objectionable, the response shall identify with particularity any document or other tangible thing falling within any category of item in the request to which an objection is being made, and shall set forth clearly the extent of and the specific ground for the objection.

7.     Each Document Request shall be construed independently, and no Document Request shall be viewed as limiting the scope of any other Document Request.

8.     Unless a different time is specified, the term "Relevant Period" means the period beginning March 1, 1995 and continuing through the present.

## III. REQUESTS FOR PRODUCTION

### Finished Goods Sales Data

1.     Please produce transaction-level data maintained in the ordinary course of business, in a standard machine-readable format, for all sales of CRT Products sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S.  Please include fields that identify:

     a.     the date when You shipped the CRT Product;

     b.     the quantity of CRT Products associated with each transaction, along with the units of measure for each quantity field in the data;

     c.     the date when You billed each customer for the CRT Product;

     d.     the location from which You shipped the CRT Product in each transaction;

     e.     the name of each customer to whom You shipped the CRT product in each transaction;

     f.     the name of each customer whom You billed for each CRT Product in each transaction;

4

g.     the location to which You shipped the CRT Products in each transaction;

h.     the location of the customer whom You billed for the CRT Products in each transaction;

i.     the product code/model number for the CRT Product and the description of the CRT Product

j.     the gross and net Price of each CRT Product You sold in each transaction;

k.     any discounts, rebates, credits, freight allowances, free goods and/or any other price adjustments You made in connection with each transaction;

l.     the gross and net total amount paid by the customer for the CRT Products You sold in each transaction;

m.     any taxes, customs, tariffs, duties or other fees paid on the CRT Products in each transaction;

n.     the invoice number, purchase order number, and/or any other data sufficient to identify a unique transaction.

2.     Please produce documents or databases sufficient to identify all physical characteristics You use to identify each unique CRT Product contained in the data produced in response to Request No. 1.

3.     For each unique CRT Product identified in the data produced in response to Request No. 1, documents and or data sufficient to identify the supplier of the CRT for that unique CRT Product, the part number of the CRT contained in that CRT Product, and all information You maintain regarding the specifications and characteristics of the CRT contained in each unique CRT Product.

5

4.　　Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 1. Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 1.

**Finished Goods Cost Data**

5.　　Please produce transaction-level data maintained in the ordinary course of business, in a standard, machine-readable format, sufficient to show for all sales of CRT Products sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S. the costs You incurred in connection with the manufacture and sale of those CRT Products, including cost of goods sold (COGS). If this level of data is unavailable, then please provide COGS data at the most disaggregated level available.

　　　a.　　COGS data should be produced with information sufficient to identify the corresponding sales data (see Request No. 1) for each particular transaction.

6.　　Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 5. Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 5.

**CRT Purchase Data**

7.　　For each unique CRT Product identified in the data produced in response to Request No. 1, please produce transactional-level data maintained in the ordinary course of business, in a standard machine-readable format, reflecting Your purchases of CRTs in connection with the manufacture and sale of those CRT Products, from January 1995 through December 2009, including, but not limited to documents or data evidencing:

6

a.  the date when You received the CRT;

b.  the quantity of CRTs associated with each transaction, and the units of measure for each quantity field in the data;

c.  the location from where You took delivery of the CRTs;

d.  the manufacturer of the CRTs;

e.  the specific entity that shipped the CRTs to You;

f.  data or information used to identify the specifications of each CRT, including but not limited to part numbers, serial numbers or any other unique identifier, complete product descriptions, and size;

g.  the gross and net Price of each CRT You purchased in each transaction;

h.  any discounts, rebates, credits, freight allowances, free goods and/or any other Price adjustments You made in connection with each transaction involving an CRT;

i.  the gross and net total amount paid for the CRT You or Your Affiliates purchased in connection with each such transaction;

j.  any taxes, customs, tariffs, duties or other fees paid on each CRT You or Your Affiliates purchased;

k.  the invoice number, purchase order number, and/or any other data sufficient to identify a unique transaction.

8.  Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 7.  Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 7.

THOMSON SUBPOENA EXHIBIT A
LEGAL28335091.1

**CRT Sales Data**

9.    Please produce transaction-level data maintained in the ordinary course of business, in a standard machine-readable format, for all sales of CRTs sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S. Please include fields that identify:

    a.    the date when You shipped the CRT;

    b.    the quantity of CRTs associated with each transaction, along with the units of measure for each quantity field in the data;

    c.    the date when You billed each customer for the CRT;

    d.    the location from which You shipped the CRT in each transaction;

    e.    the name of each customer to whom You shipped the CRT in each transaction;

    f.    the name of each customer whom You billed for each CRTs in each transaction;

    g.    the location to which You shipped the CRTs in each transaction;

    h.    the location of the customer whom You billed for the CRTs in each transaction;

    i.    the product code/model number for the CRTs and the description of the CRTs

    j.    the gross and net Price of each CRT You sold in each transaction;

    k.    any discounts, rebates, credits, freight allowances, free goods and/or any other price adjustments You made in connection with each transaction;

8

l.     the gross and net total amount paid by the customer for the CRTs You sold in each transaction;

m.    any taxes, customs, tariffs, duties or other fees paid on the CRTs in each transaction;

n.    the invoice number, purchase order number, and/or any other data sufficient to identify a unique transaction.

10.    Please produce documents or databases sufficient to identify all physical characteristics You use to identify each unique CRT contained in the data produced in response to Request No. 9.

11.    Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 9.  Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 9.

**CRT Cost Data**

12.    Please produce transaction-level data maintained in the ordinary course of business, in a standard, machine-readable format, sufficient to show for all sales of CRTs sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S., Your costs incurred in connection with the manufacture and sale of those CRTs, including cost of goods sold (COGS).  If this level of data is unavailable, then please provide COGS data at the most disaggregated level available.

a.    COGS data should be produced with information sufficient to identify the corresponding sales data (see Request No. 9) for each particular transaction.

9

13.     Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 12.  Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 12.

10

# **Exhibit D**

 CT Corporation

**Service of Process Transmittal**
11/22/2013
CT Log Number 523942473

TO: Perry A. Pappous, Executive VP and General Counsel
Mitsubishi Electric & Electronics America, Inc.
5900-A Katella Avenue
Cypress, CA 90630-5019

RE: **Process Served in California**

FOR: Mitsubishi Electric US, Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Cathode Ray Tube (CRT) Antitrust Litigation, et al., Pltfs. vs. Hitachi, Ltd., et al., Dfts. // To: Mitsubishi Electric US, Inc. |
| **DOCUMENT(S) SERVED:** | Letter, Subpoena, Proof of Service, Attachment(s), Exhibit(s) |
| **COURT/AGENCY:** | Northern District - U.S. District Court, CA<br>Case # 307CV05944SC |
| **NATURE OF ACTION:** | Subpoena - Business records – Pertaining to database sufficient to identify all physical characteristics use to identify each unique CRT Product contained in the data produced (See documents for additional requested information) |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/22/2013 at 14:10 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | 12/12/2013 at 10:00 a.m. (Document(s) may contain additional answer dates) |
| **ATTORNEY(S) / SENDER(S):** | Jill S. Cassekman<br>Robins, Kaplan, Miller & Ciresi L.L.P.<br>2049 Century Park East<br>Suite 3400<br>Los Angeles, CA 90067<br>310-552-0130 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex 2 Day , 797235135260<br>Image SOP<br>Email Notification, Perry A. Pappous perry.pappous@meus.mea.com<br>Email Notification, Joan Albritton JOAN.ALBRITTON@MEUS.MEA.COM<br>Email Notification, Nancy Oleson nancy.oleson@meus.mea.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Nancy Flores |
| **ADDRESS:** | 818 West Seventh Street<br>Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |

Page 1 of 1 / MV

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

SUITE 3400
2049 CENTURY PARK EAST
LOS ANGELES, CA 90067-3208
TEL: 310-552-0130 FAX: 310-229-5800
www.rkmc.com

ATTORNEYS AT LAW

JILL S. CASSELMAN
310-229-5435

November 22, 2013

**VIA PERSONAL SERVICE**
Mitsubishi Electric US, Inc.
c/o Agent for Service of Process C T Corporation System
818 W. Seventh Street
Los Angeles CA 90017

> Re:   *In Re: Cathode Ray Tube (CRT) Antitrust Litigation;* **Master File No. 3:07-md-05944-SC / MDL No. 1917**
> **Our File No.: 011082.3574**

Dear Counsel:

I represent Best Buy in the above referenced litigation.  I write to request that Mitsubishi Electric US, Inc. produce certain cost and sales data for its CRT finished products.

Enclosed is a subpoena for the production of documents, issued pursuant to Federal Rule of Civil Procedure 45.  Please review Exhibit "A" to the subpoena which describes the requests for production.  Any responsive documents shall be due on December 12, 2013, and may be mailed to:

> Robins, Kaplan, Miller & Ciresi L.L.P.
> c/o Jill Casselman
> 2049 Century Park East, Suite 3400
> Los Angeles, CA  90067

Please call me at your earliest convenience so that we can discuss your response to the subpoena so that we may proceed in the most efficient and least disruptive manner.

Best regards,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

Jill S. Casselman

JSC/jc
Enclosures

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
Northern                    District of  California

In Re: Cathode Ray Tube (CRT) Antitrust Litigation
Best Buy Co., Inc., et al.

|  |  |
|---|---|
| _Plaintiff_ | ) |
| v. | ) |
| Hitachi, Ltd., et al. | ) |
|  | ) |
| _Defendant_ | ) |

MDL No. 1917
Civil Action No. 3:07-CV-05944-SC

(If the action is pending in another district, state where:
                                                    )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Mitsubishi Electric US, Inc.
c/o CT Corporation System
818 W. Seventh Street, Los Angeles, CA 90017

  ☒ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: See Exhibit A

| Place: Robins, Kaplan, Miller & Ciresi L.L.P. | Date and Time: |
|---|---|
| 2049 Century Park East, Suite 3400, Los Angeles, CA 90067 | December 12, 2013 at 10:00 a.m. |

  ☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
|  |  |

      The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: November 22, 2013

CLERK OF COURT

_____
_Signature of Clerk or Deputy Clerk_

OR

_____
_Attorney's signature_
Jill S. Casselman

      The name, address, e-mail, and telephone number of the attorney representing _(name of party)_  Best Buy Co., Inc.; Best Buy Purchasing LLC; Best Buy Enterprise Services, Inc.; Best Buy Stores, L.P.; BestBuy.com, L.L.C.; and Magnolia Hi-Fi, Inc. _____, who issues or requests this subpoena, are:

Jill S.Casselman, Robins, Kaplan, Miller & Ciresi L.L.P., 2049 Century Park East, Suite 3400, Los Angeles, CA 90067
Telephone: (310) 552-0130

AO-88B

AO 88B  (Rev.  06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____         _____
                                                    *Server's signature*

                                                _____
                                                    *Printed name and title*

                                                _____
                                                    *Server's address*

Additional information regarding attempted service, etc:

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

# EXHIBIT A

*In Re: Cathode Ray Tube (CRT) Antitrust Litigation*

**Case No. 11-cv-06275**

**Master File No. 3:07-md-05944-SC / MDL No. 1917**

**EXHIBIT "A" TO SUBPOENA DIRECTED TO
MITSUBISHI ELECTRIC US, INC.**

## I.   DEFINITIONS

The words and phrases used in these requests shall have the meanings ascribed to them under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Northern District of California. In addition, the following terms shall have the meanings set forth below whenever used in any Request for Production of Documents.

1.     The words "all," "any," and "each" mean "each and every."

2.     The words "and" and "or" are both conjunctive and disjunctive as necessary.

3.     "Communications" means, without limitation, the transmittal of information (in the form of facts, ideas, inquiries or otherwise) between individuals or companies whether oral, written, electronic, or otherwise, and whether direct or through an intermediary.

4.     "Concerning" or "concerns" means discussing, relating to, contradicting, referring to, reflecting, analyzing, describing, constituting, evidencing, containing or disclosing or supporting the referenced matter.

5.     "Document" and "documents" shall have the meaning ascribed to them under the Federal Rules of Civil Procedure and shall also mean all electronically stored information ("ESI") including, without limitation, electronic data or data compilations, electronic files, email and other electronic communications saved to or located on hard disks, file servers, floppy disks,

1

CDs, DVDs, backup tapes, thumb drives, or any other electronic media, whether or not in tangible or electronic form.

6.      The term "CRT" means cathode ray tube and includes cathode ray tubes used in color televisions and color computer monitors.

7.      The term "CRT Product" means a television or computer monitor containing a CRT.

8.      "Identify," when used with reference to an entity, means to state the full name, present or last known address, and present or last known telephone number of such entity.

9.      "Identify," when used with reference to documents, other than those under claim of privilege, means to identify the documents by each author, sender, addressee, date, subject, recipient, place of recording, and custodian.

10.     "Identify" or "identification," when used in reference to an individual person, means to state his or her full name, present or last known address, present or last known telephone number, and present or last known position and business affiliation.

11.     "Identify," "describe," "explain," or "state," when used in reference to any fact, act occurrence, transaction, statement, communication, document, or other matter, means to describe and identify the facts constituting such matter.

12.     "Including" or "includes" means without limitation.

13.     "Reflect(ing) or refer(ring) to" means a statement or communication about, relating to, concerning, describing, containing, identifying, or in any way pertaining to the subject matter in the request.

14.     The term "person" or "persons" includes any natural person, public entity, partnership, corporation, association, firm, trust, joint venture, agency, board, authority, commission or other such entity.

15.     "Supplier" means any supplier, manufacturer, or seller of CRT or CRT Products.

16.     "You" or "Your" means Mitsubishi Electric US, Inc., as well as: its current and former parents(s), including but not limited to Mitsubishi Electric Corporation; its current and former subsidiaries; its affiliates and their subsidiaries; and any employees, agents, representatives or any persons acting or purporting to act on Your behalf, including each of Your attorneys.

## II.     INSTRUCTIONS

1.     In responding to this subpoena, You are requested to produce all documents in Your possession, custody, or control, wherever located, including without limitation any document available to You upon request from Your parents, affiliates, subsidiaries, employees, officers, directors, attorneys, accountants, financial advisors, consultants, private investigators, or other agents or persons acting or purporting to act on Your behalf, as required by the Federal Rules of Civil Procedure and the applicable local rules.

2.     If any part of a document is responsive to any request herein, produce the entire document, including any attachments or exhibits.

3.     All documents should be produced as maintained in the ordinary course of business.

4.     Any noun used in the singular form shall be construed and applied so as to include the plural, form also, and vice versa.

5.     If You are not producing any documents in response to any of the Requests herein, Your response should make it clear that You are not producing any documents in response to that Request.

6.     If only a part of a Request is objectionable, the response shall identify with particularity any document or other tangible thing falling within any category of item in the request to which an objection is being made, and shall set forth clearly the extent of and the specific ground for the objection.

7.     Each Document Request shall be construed independently, and no Document Request shall be viewed as limiting the scope of any other Document Request.

9.     Unless a different time is specified, the relevant time period for each document request is January 1, 1995 through December 31, 2009.

## III. REQUESTS FOR PRODUCTION

### Finished Goods Sales Data

1.     Please produce transaction-level data maintained in the ordinary course of business, in a standard machine-readable format, for all sales of CRT Products sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S. Please include fields that identify:

      a.     the date when You shipped the CRT Product;

      b.     the quantity of CRT Products associated with each transaction, along with the units of measure for each quantity field in the data;

      c.     the date when You billed each customer for the CRT Product;

      d.     the location from which You shipped the CRT Product in each transaction;

4

e. the name of each customer to whom You shipped the CRT product in each transaction;

f. the name of each customer whom You billed for each CRT Product in each transaction;

g. the location to which You shipped the CRT Products in each transaction;

h. the location of the customer whom You billed for the CRT Products in each transaction;

i. the product code/model number for the CRT Product and the description of the CRT Product

j. the gross and net Price of each CRT Product You sold in each transaction;

k. any discounts, rebates, credits, freight allowances, free goods and/or any other price adjustments You made in connection with each transaction;

l. the gross and net total amount paid by the customer for the CRT Products You sold in each transaction;

m. any taxes, customs, tariffs, duties or other fees paid on the CRT Products in each transaction;

n. the invoice number, purchase order number, and/or any other data sufficient to identify a unique transaction.

2. Please produce documents or databases sufficient to identify all physical characteristics You use to identify each unique CRT Product contained in the data produced in response to Request No. 1.

3. For each unique CRT Product identified in the data produced in response to Request No. 1, documents and or data sufficient to identify the supplier of the CRT for that

unique CRT Product, the part number of the CRT contained in that CRT Product, and all information You maintain regarding the specifications and characteristics of the CRT contained in each unique CRT Product.

4.      Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 1. Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 1.

**Finished Goods Cost Data**

5.      Please produce transaction-level data maintained in the ordinary course of business, in a standard, machine-readable format, sufficient to show for all sales of CRT Products sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S., the costs You incurred in connection with the manufacture and sale of those CRT Products, including cost of goods sold ("COGS"). If this level of data is unavailable, then please provide COGS data at the most disaggregated level available.

a.      COGS data should be produced with information sufficient to identify the corresponding sales data (see Request No. 1) for each particular transaction.

6.      Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 5. Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 5.

**CRT Purchase Data**

6

7.     For each unique CRT Product identified in the data produced in response to Request No. 1, please produce transactional-level data maintained in the ordinary course of business, in a standard machine-readable format, reflecting Your purchases of CRTs in connection with the manufacture and sale of those CRT Products, from January 1995 through December 2009, including, but not limited to documents or data evidencing:

a.     the date when You received the CRT;

b.     the quantity of CRTs associated with each transaction, and the units of measure for each quantity field in the data;

c.     the location from where You took delivery of the CRTs;

d.     the manufacturer of the CRTs;

e.     the specific entity that shipped the CRTs to You;

f.     data or information used to identify the specifications of each CRT, including but not limited to part numbers, serial numbers or any other unique identifier, complete product descriptions, and size;

g.     the gross and net Price of each CRT You purchased in each transaction;

h.     any discounts, rebates, credits, freight allowances, free goods and/or any other Price adjustments You made in connection with each transaction involving an CRT;

i.     the gross and net total amount paid for the CRT You or Your Affiliates purchased in connection with each such transaction;

j.     any taxes, customs, tariffs, duties or other fees paid on each CRT You or Your Affiliates purchased;

k.     the invoice number, purchase order number, and/or any other data sufficient to identify a unique transaction.

7

8.     Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 7. Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 7.

**CRT Sales Data**

9.     Please produce transaction-level data maintained in the ordinary course of business, in a standard machine-readable format, for all sales of CRTs sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S. Please include fields that identify:

a.     the date when You shipped the CRT;

b.     the quantity of CRTs associated with each transaction, along with the units of measure for each quantity field in the data;

c.     the date when You billed each customer for the CRT;

d.     the location from which You shipped the CRT in each transaction;

e.     the name of each customer to whom You shipped the CRT in each transaction;

f.     the name of each customer whom You billed for each CRTs in each transaction;

g.     the location to which You shipped the CRTs in each transaction;

h.     the location of the customer whom You billed for the CRTs in each transaction;

i.     the product code/model number for the CRTs and the description of the CRTs

j.      the gross and net Price of each CRT You sold in each transaction;

k.      any discounts, rebates, credits, freight allowances, free goods and/or any other price adjustments You made in connection with each transaction;

l.      the gross and net total amount paid by the customer for the CRTs You sold in each transaction;

m.      any taxes, customs, tariffs, duties or other fees paid on the CRTs in each transaction;

n.      the invoice number, purchase order number, and/or any other data sufficient to identify a unique transaction.

10.     Please produce documents or databases sufficient to identify all physical characteristics You use to identify each unique CRT contained in the data produced in response to Request No. 9.

11.     Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 9. Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 9.

**CRT Cost Data**

12.     Please produce transaction-level data maintained in the ordinary course of business, in a standard, machine-readable format, sufficient to show for all sales of CRTs sold by You from January 1995 through December 2009 that were either shipped to a U.S. location or billed to a customer in the U.S., the costs You incurred in connection with the manufacture and sale of those CRTs, including COGS. If this level of data is unavailable, then please provide COGS data at the most disaggregated level available.

9

      a.     COGS data should be produced with information sufficient to identify the corresponding sales data (see Request No. 9) for each particular transaction.

13.    Please produce documents or data sufficient to explain all codes or abbreviations contained in the data produced in response to Request No. 12. Please also produce documents or data sufficient to identify the definition of each field contained in any data produced in response to Request No. 12.

# **Exhibit E**

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4

5    IN RE CATHODE RAY TUBE (CRT)

6    ANTITRUST LITIGATION

                                        No. 14-CV-2058 (SC)

7                                       MDL No. 1917

     This Document Relates to:

8

     ALL DIRECT PURCHASER ACTIONS

9

10

11

12        VIDEOTAPED DEPOSITION of MAX WASINGER

13             Los Angeles, California

14             Thursday, July 16, 2015

15

16

17

18

19

20

21

22

23   Reported by

     Daryl Baucum, RPR, CRR, RMR, CSR No. 10356

24

25

Page 2

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5    IN RE CATHODE RAY TUBE (CRT)

6    ANTITRUST LITIGATION
   _____        No. 14-CV-2058 (SC)

7                                           MDL No. 1917

     This Document Relates to:

8

     ALL DIRECT PURCHASER ACTIONS

9

     _____

10

11

12

13

14

15          VIDEOTAPED DEPOSITION of MAX WASINGER, at

16       633 West Fifth Street, Suite 3600, Los Angeles,

17       California, beginning at 9:03 a.m. and ending

18       at 2:02 p.m., on Thursday, July 16, 2015,

19       before Daryl Baucum, RPR, CRR, RMR,

20       CSR No. 10356.

21

22

23

24

25

```
                                               Page 3

 1   APPEARANCES OF COUNSEL:

 2

 3

 4        FOR THE DIRECT PURCHASER PLAINTIFFS:

 5

 6             SAVERI & SAVERI

 7             BY:  R. ALEXANDER SAVERI, ATTORNEY AT LAW

 8                  DAVID Y. HWU, ATTORNEY AT LAW

 9             706 Sansome Street

10             San Francisco, California  94111

11             415.217.6810

12             Rick@Saveri.com

13             DHwu@Saveri.com

14

15

16        FOR THE LG DEFENDANTS:

17

18             MUNGER, TOLLES & OLSON

19             BY:  JESSICA BARCLAY-STROBEL, ATTORNEY AT LAW

20             355 South Grand Avenue

21             Suite 3500

22             Los Angeles, California  90071

23             213.683.9100

24             Jessica.Barclay-Strobel@MTO.com

25
```

```
                                               Page 4
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2

 3

 4        FOR THE SEARS AND K-MART PLAINTIFFS:

 5

 6             KENNY, NACHWALTER

 7             BY:  KEVIN J. MURRAY, ATTORNEY AT LAW

 8             1100 Miami Center

 9             201 South Biscayne Boulevard

10             Miami, Florida  33131

11             305.373.1000

12             KMurray@KNPA.com

13

14

15        FOR ALFRED H. SIEGEL (CIRCUIT CITY TRUST):

16

17             KLEE, TUCHIN, BOGDANOFF & STERN

18             BY:  KATHRYN ZWICKER, ATTORNEY AT LAW

19             1999 Avenue of the Stars

20             Suite 3900

21             Los Angeles, California  90067

22             310.407.4076

23             KZwicker@KTBSLaw.com

24

25
```

```
                                              Page 5

 1    APPEARANCES OF COUNSEL (CONTINUED):

 2

 3        FOR MITSUBISHI ELECTRIC and THE DEPONENT:

 4

 5            JENNER & BLOCK

 6            BY:  GABRIEL A. FUENTES, ATTORNEY AT LAW

 7            353 North Clark Street

 8            Chicago, Illinois  60654

 9            312.222.9350

10            GFuentes@Jenner.com

11

12

13        FOR THE HITACHI ENTITIES:

14

15            KIRKLAND & ELLIS

16            BY:  ELIOT A. ADELSON, ATTORNEY AT LAW

17            555 California Street

18            San Francisco, California  94104

19            415.439.1413

20            EAdelson@Kirkland.com

21

22

23

24

25
```

Page 6

1    APPEARANCES OF COUNSEL (CONTINUED):

2

3        FOR THE SAMSUNG SDI DEFENDANTS:

4

5            SHEPPARD, MULLIN, RICHTER & HAMPTON

6            BY:  LEO CASERIA, ATTORNEY AT LAW

7            333 South Hope Street

8            Suite 4300

9            Los Angeles, California  90071

10           213.620.1780

11           LCaseria@SheppardMullin.com

12

13

14       FOR THE PHILLIPS DEFENDANTS:

15

16           BAKER, BOTTS

17           BY:  TIFFANY B. GELOTT, ATTORNEY AT LAW

18           1299 Pennsylvania Avenue, NW

19           Washington, D.C.  20004

20           202.639.7700

21

22

23

24

25

Page 7

1    APPEARANCES OF COUNSEL (CONTINUED):

2

3        FOR THE TOSHIBA DEFENDANTS:

4

5            WHITE & CASE

6            BY:  JONATHAN C. BLACK, ATTORNEY AT LAW

7            701 Thirteenth Street, NW

8            Washington, D.C.  20005

9            202.626.3618

10           Jonathanc.Black@WhiteCase.com

11

12

13       FOR THE PANASONIC DEFENDANTS:

14

15           WEIL, GOTSHAL & MANGES

16           BY:  MARJAN HAJIBANDEH, ATTORNEY AT LAW

17           767 Fifth Avenue

18           New York, New York  10153

19           212.310.8192

20           Marjan.Hajibandeh@Weil.com

21

22

23

24

25

Page 8

1   APPEARANCES OF COUNSEL (CONTINUED):

2

3

4        ALSO PRESENT:

5             Maksimilian V. Sklyarov

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 147

```
 1   or what their positions were.                      13:25:30

 2       Q    So it would be the same answer that you   13:25:31

 3   gave to Hitachi?  It was probably somebody that you 13:25:33

 4   may run into at the trade association or the group  13:25:36

 5   buying groups but you don't specifically recall it? 13:25:38

 6       A    It's very possible to say, yeah, same     13:25:40

 7   situation.                                          13:25:43

 8       Q    Now, I'm going to ask you when I refer to 13:25:45

 9   "Irico," have you heard of a company called "Irico"? 13:25:47

10       A    No.                                        13:25:52

11       Q    That if I -- when I refer to "Irico," I am 13:25:54

12   referring collectively to the Irico Group          13:25:58

13   Electronics, Irico displays.                        13:26:01

14            Do you ever recall during the '95 to 2000 13:26:04

15   period when you were at MELA having any             13:26:07

16   conversations with anybody from Irico?             13:26:09

17       A    No.                                        13:26:11

18       Q    Do you recall ever running into anybody at 13:26:12

19   Irico during that time period at any trade         13:26:14

20   associations?                                      13:26:17

21       A    No, I never heard of the company.         13:26:18

22       Q    Did you ever hear of anybody on your staff 13:26:21

23   running into anybody from Irico?                   13:26:23

24       A    No.                                        13:26:25

25       Q    Have you heard of LG?                      13:26:28
```

# DOCUMENT 16

# BAKER BOTTS LLP

700 K STREET, N.W.
WASHINGTON, D.C.
20001

TEL  +1 202.639.7700
FAX +1 202.639.7890
BakerBotts.com

AUSTIN
BRUSSELS
DALLAS
DUBAI
HOUSTON
LONDON

MOSCOW
NEW YORK
PALO ALTO
RIYADH
SAN FRANCISCO
**WASHINGTON**

September 13, 2023

John Taladay
TEL: 2026397909
FAX: 2026391165
john.taladay@bakerbotts.com

VIA E-MAIL [VRW@JUDGEWALKER.COM]

The Honorable Vaughn R. Walker
Law Office of Vaughn R. Walker
Four Embarcadero Center, Suite 2200
San Francisco, CA 94111

> Re:   In re Cathode Ray Tube (CRT) Antitrust Litigation, MDL No. 1917, Master File
> No. 07-CV-944-JST

Dear Judge Walker:

Defendants Irico Group Corp. and Irico Display Devices Co., Ltd. (collectively, "Irico") respectfully request an extension of time to produce responsive information and materials in response to Your Honor's Interim Reports and Recommendations on Plaintiffs' Motion for Discovery Sanctions dated August 4, 2023 (ECF No. 6233) ("First Interim Order") and September 1, 2023 (ECF No. 6275) ("Second Interim Order") (collectively, "Orders"). Baker Botts and Irico are continuing to work diligently to comply with Your Honor's Orders. As discussed in greater detail below, searching for and collecting all of the requested information (especially in China) under the required conditions is a complex process. While we are, and were already, working diligently on complying with Your Honor's First Interim Order when we received Your Honor's Second Interim Order, we were required to restart some of these processes given the process requirements of the Second Interim Order that explicitly require certain actions by certain parties. Given these various complexities, we request a three-week extension from September 22nd to October 13th to comply with the Orders.[1]

First, to clarify any misconceptions Your Honor may have had regarding my role and the role of Baker Botts in responding to Your Honor's First Interim Order, we were involved in organizing the process of responding to the Order. Baker Botts however does not have offices or any affiliated entities in China, nor do we have permanent attorneys involved in this matter who are fluent in Chinese. Our former colleague, Ms. Kaylee Yang, who is a native Chinese speaker and a key client conduit, left Baker Botts last year to join Norton Rose Fulbright. As Your Honor is aware, Ms. Yang has been involved in this matter since the inception of Baker Botts' work for Irico. Norton Rose Fulbright also has other lawyers who are fluent in Chinese, including Partner Geraldine Young, who has made a formal appearance in this case. Ms. Young is an experienced litigator and a former partner of Fulbright & Jaworski prior to that firm's merger with Norton Rose

---

[1] We contacted Plaintiffs to request this three-week extension, but Plaintiffs oppose the request.

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                     - 2 -

Fulbright.  Norton Rose Fulbright also has a relationship with a law firm in China experienced in working with Chinese companies subject to US discovery obligations who could assist in this matter. Thus, it was at my request – even prior to Your Honor's First Interim Order but after the last hearing on the expectation that further discovery would be required – that Norton Rose became directly involved on this issue because I believed compliance could best be achieved with their direct help. In any event, our focus now is (and always has been) on responding to Your Honor's Orders as accurately and completely as possible.

Despite best efforts to move this process forward as quickly and efficiently as possible, we have encountered several issues that necessitate additional time for compliance.  First and foremost is the fact that this collection is occurring in China and at a state-owned entity.  We understand that Your Honor wants US counsel of record and a US vendor experienced in discovery of ESI to supervise this entire process and we are complying with that obligation, but we still must work within the confines of Chinese laws and regulations, lest we or our client breach Chinese laws. For example, as detailed previously, the collection of devices and materials from Irico is subject to a state secret review which can be very time-consuming and burdensome both during and after the collection of materials (ultimately necessitating a separate review of all potentially responsive material). We then need time after the state secret review to ascertain responsiveness and process the documents for production.  Moreover, the current searches and interviews in China are being undertaken in two different locations over 1,000 miles apart – Xianyang (Irico's headquarters) and Foshan (the location where Mr. Su was working before his departure).

The more explicit requirements in Your Honor's Second Interim Order also require further time to complete, including some level of retreading work already undertaken.  For example, pursuant to Your Honor's Second Interim Order, Plaintiffs provided a list of search terms on September 7th that they expect Irico to apply broadly in its investigation.  That list contained approximately 80 terms without any qualifiers or limitations, including Mr. Su's name in different formats standing alone as well as extremely general terms (e.g., "delay," "allowance" and "cooperate").  Depending on the volume of documents that merely mention Mr. Su or were sent or received by him without any other connection to the relevant issues, the results of these searches could greatly increase the number of documents that must go through the state secret review and delay the accessibility of the materials for further review.  We understand that the Second Interim Order requires the immediate collection of all documents with hits on Plaintiffs' search terms with objections to be resolved at a later point and certainly intend to follow that process.  But in order to expedite the collection, review and production of responsive materials, we hope to meet and confer with the Plaintiffs in the coming days to discuss potential ways of effectively narrowing the searches and thus the resulting state secret review on search term hits.

Again, Baker Botts and Irico are doing everything we can to comply with the Court's Orders in a timely manner.  However, given the scope of the requirements, we do not believe it is possible to produce all responsive documents (without violating Chinese law) by next Friday.  We therefore ask Your Honor to allow three additional weeks for compliance with the Orders.

**BAKER BOTTS** LLP

The Honorable Vaughn R. Walker                    - 3 -


Thank you for your consideration of these issues.


Sincerely,

*/s/ John Taladay*

John Taladay


cc:      Tanveer Singh (tanveer.singh@fedarb.com)
         R. Alexander Saveri (rick@saveri.com)
         Geoffrey C. Rushing (geoff@saveri.com)
         Matthew D. Heaphy (mheaphy@saveri.com)
         Mario N. Alioto (malioto@tatp.com)
         Lauren C. Capurro (laurenrussell@tatp.com)
         Daniel E. Birkhaeuser (dbirkhaeuser@bramsonplutzik.com)

# DOCUMENT 17

**SAVERI & SAVERI, INC.**

706 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 217-6810
TELECOPIER: (415) 217-6813

*Trump Alioto Trump & Prescott*

ATTORNEYS LLP
2280 Union Street
San Francisco, California 94123
(415) 563-7200
FAX (415) 346-0679

September 14, 2023

***VIA EMAIL***

The Honorable Vaughn R. Walker
Law Office of Vaughn R. Walker
Four Embarcadero Center, Suite 2200
San Francisco, CA 94111
vrw@judgewalker.com

> Re:   *In re Cathode Ray Tube (CRT) Antitrust Litigation* – MDL No. 1917,
>         Master File No. 07-CV-5944-JST

Dear Judge Walker:

Direct Purchaser Plaintiffs ("DPPs") and Indirect Purchaser Plaintiffs ("IPPs") (together, "Plaintiffs") respond to the request for an extension of time to produce responsive information and materials required by Your Honor's Orders (ECF Nos. 6264, 6275), made in the letter from Irico's U.S. counsel, John Taladay, dated September 13, 2023.

Mr. Taladay's letter fails to establish good cause for the extension Baker Botts and Irico seek. First, it provides virtually no details of Baker Botts' and Irico's efforts to date, including whether 1) Baker Botts (or Norton Rose Fulbright) has dispatched any attorneys to China to assist in fulfillment of the Court's Orders as instructed by the Court, 2) whether they have collected or reviewed any of Mr. Su's documents and what the volume of documents is, or 3) whether they have run Plaintiffs' proposed search terms and, if so, the volume of documents they returned. The letter complains that Plaintiffs' search terms are overbroad, but it appears that they have not even tested them despite having had them for a week. *See* Taladay Letter at 2 (speculating that "the results of these searches *could* greatly increase the number of documents that must go through the state secret review") (emphasis added). The letter also fails to state whether ***any*** productions will be made by the September 22 deadline set by the Court's August 4 Order (ECF No. 6264), which provided Irico seven weeks to produce responsive documents.

Second, Mr. Taladay's letter likewise fails to provide any support for, or details regarding, the state secret review. Nor does it explain how records relating to Mr. Su's

The Honorable Vaughn R. Walker
9/14/2023
Page 2

deposition and early departure even implicate state secrets.[1] Irico gave no indication that a state secrets review was a substantial impediment to its previous production of records relating to these issues.[2]

Third, the assertion that an extension is required to accommodate a meet and confer with regard to Plaintiffs' search terms is inconsistent with the Court's Order of September 1 (ECF No. 6275), and appears to be calculated to delay compliance with the Court's Orders. While Plaintiffs provided their search terms a week ago in compliance with the Court's Order, Baker Botts and Irico have yet to inform Plaintiffs of any issues they have with them, or propose a date to meet and confer.[3] Their lack of clarity in this regard is telling. To the extent Irico communicates any legitimate concerns about any of these terms, Plaintiffs will address them immediately, but any such issue should not be an excuse to delay the document search required by the Court's September 1 Order.

Finally, the late disclosure that Irico's long-time attorneys do not have lawyers in China or speak Chinese suggests that Baker Botts does not intend to comply with the Court's Order which requires an attestation by a fully informed American lawyer that Irico has complied with its discovery obligations. As the Court's last order made clear, lawyers must travel to China to comply with the order if necessary. Similarly, if language is an issue, the obvious solution is for them to be accompanied by a translator, but Baker Botts cannot avoid its obligation to confirm that full discovery has been made, where, as here, the Court has raised concerns about the client's trustworthiness.

In sum, Plaintiffs respectfully submit that vague and self-serving assertions about supposed problems dealing with a client in China do not establish good cause to extend the schedule set by Your Honor. Your Honor's recommended rulings on Plaintiffs' Motion for Sanctions will almost certainly be appealed to the Court. Plaintiffs are anxious to get a resolution, particularly in light of the impact a ruling may have on Irico's pending summary judgment motion against IPPs, and the IPP trial, which is currently set to begin on February 26, 2024. ECF No. 6236.

---

[1] To the extent state secret review results in withholding responsive documents, will that be reflected in a privilege log? And has that been the case with previous privilege logs?

[2] Indeed, on December 20, 2022, Irico produced documents responsive to the Court's Order Adopting Special Master's Report & Recommendation on Irico's Failure to Produce Su Xiaohua for Deposition (ECF No. 6115)—and completed a privilege review—32 days after the issuance of Your Honor's Report & Recommendation, and 14 days after its adoption.

[3] In their transmission of search terms on September 7, 2023, Plaintiffs requested that Baker Botts provide a list of all additional search terms it intends to use. Plaintiffs have not received a response.

The Honorable Vaughn R. Walker
9/14/2023
Page 3

Very truly yours,

*s/ R. Alexander Saveri*

R. Alexander Saveri
Lead Counsel for Direct Purchaser Plaintiffs

*s/ Lauren C. Capurro*

Lauren C. Capurro
Lead Counsel for Indirect Purchaser Plaintiffs


Cc:     Tanveer Singh (tanveer.singh@fedarb.com)
        John M. Taladay (john.taladay@bakerbotts.com)
        Evan J. Werbel (evan.werbel@bakerbotts.com)
        Thomas E. Carter (tom.carter@bakerbotts.com)
        Andrew L. Lucarelli (drew.lucarelli@bakerbotts.com)
        Geraldine W. Young (geraldine.young@nortonrosefulbright.com)
        Kaylee Yang (kaylee.yang@nortonrosefulbright.com)